1

1

2  UNITED STATES BANKRUPTCY COURT

3  EASTERN DISTRICT OF NEW YORK

4  Case No. 12-12020-MG

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10           Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14           United States Bankruptcy Court

15           One Bowling Green

16           New York, New York

17

18           July 24, 2012

19           10:21 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   (Doc# 90, 47) STATUS CONFERENCE RE: Motion Authorizing the

3   Debtors to Continue to Perform Under the Ally Bank Servicing

4   Agreements in the Ordinary Course of Business.  Marked-Up

5   Documents: 47, 90, 118, 121, 218, 303, 366, 367, 385, 398, 424,

6   793

7

8   (CC: Doc# 507) DEBTORS' Application for an Order Under

9   Bankruptcy Code Sections 327(a) and 328(a) Authorizing

10  Employment and Retention of Centerview Partners LLC as

11  Investment Banker filed by Larren M. Nashelsky on behalf of

12  Residential Capital, LLC.  Marked-Up Documents: 507, 703, 747,

13  831

14

15  (CC: Doc# 704) DEBTORS' Application for an Order Authorizing

16  Employment and Retention of Fortace LLC as Consultant to the

17  Debtors Nunc Pro Tunc to May 21, 2012 filed by Larren M.

18  Nashelsky on behalf of Residential Capital, LLC.  Marked-Up

19  Documents: 704, 827

20

21  HEARING RE: Sale Order (CC: Doc# 538, 291, 292) Marked-Up

22  Documents: 291, 292, 538, 857, 858, 860, 862

23

24

25

1

2  (CC: Doc# 529)  APPLICATION Pursuant to Sections 328 and 1103

3  of the Bankruptcy Code and Federal Rules of Bankruptcy

4  Procedure 2014 for an Order to Retain and Employ Moelis &

5  Company LLC as Investment Banker to the Official Committee of

6  Unsecured Creditors, Nunc Pro Tunc, to May 16, 2012 filed by

7  Kenneth H. Eckstein on behalf of the Official Committee of

8  Unsecured Creditors.  Marked-Up Documents: 529, 703, 853

9

10  (CC: Doc# 526) DEBTORS' Application Under Sections 327(a) and

11  328(a) of the Bankruptcy Code for Authorization to Employ and

12  Retain FTI Consulting, Inc. as Financial Advisor Nunc Pro Tunc

13  to May 14, 2012 filed by Larren M. Nashelsky on behalf of

14  Residential Capital, LLC.  Marked-Up Documents: 526, 703, 747,

15  850, 855

16

17  (CC: Doc# 720) DEBTORS' Application Under Section 327(e) of the

18  Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1

19  for Authorization to Employ and Retain Severson & Werson PC as

20  Special California Litigation Counsel to the Debtors, Nunc Pro

21  Tunc to May 14, 2012 filed by Larren M. Nashelsky on behalf of

22  Residential Capital, LLC.  Marked-Up Documents: 720, 829

23

24

25

1

2   (CC: Doc# 719) DEBTORS' Application for an Order Authorizing

3   Employment and Retention of Towers Watson Delaware Inc. as

4   Human Resources Consultants to the Debtors Nunc Pro Tunc to

5   June 25, 2012 filed by Larren M. Nashelsky on behalf of

6   Residential Capital, LLC.  Marked-Up Document: 719

7

8   (CC: Doc# 182)  MOTION for Relief from Stay Motion of

9   Shellpoint Partners LLC f/k/a Shellpoint Mortgage LLC and New

10  Penn Financial, LLC for Entry of an Order Modifying the

11  Automatic Stay to Effectuate Termination Notice.  Marked-Up

12  Documents: 182, 184

13

14  (CC: Doc# 320)  STATUS CONFERENCE RE: Debtors' Motion Pursuant

15  to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement

16  Agreements.  Marked-Up Documents: 320, 321, 328, 392, 473, 481,

17  519, 705, 857, 858, 860, 862, 865, 866

18

19  (CC: Doc# 547)  Motion to Extend Time/Debtors' Second Motion

20  for Order Under Bankruptcy Code Section 521 and Bankruptcy Rule

21  1007(c) Further Extending Time for Filing Schedules and

22  Statements, Document#: 547.  Marked-Up Documents: 540, 541,

23  542, 547

24

25

1

2  (CC: Doc# 659)  MOTION for Relief from Stay, Document#: 659.

3  Marked-Up Document: 659

4

5  (CC: Doc# 274)  MOTION to Dismiss Case or for Relief from Stay

6  12-12020-mg Residential Capital, LLC.  Marked-Up Documents:

7  274, 275, 280, 314, 315, 661, 682

8

9  (CC: Doc# 540)  MOTION for Relief from Stay to Permit

10  Prosecution on Non-Bankruptcy Forum Action, Document#: 540.

11  Marked-Up Documents: 540, 541, 542, 802, 851, 852

12

13  (CC: Doc# 451)  MOTION for Relief from Stay to Allow

14  Continuation of Pre-Petition Litigation.  Marked-Up Documents:

15  451, 807

16

17

18

19

20  Transcribed by:  Sara Davis

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4        Attorneys for Debtors
 5        1290 Avenue of the Americas
 6        New York, NY 10104
 7
 8   BY:   ANTHONY PRINCI, ESQ.
 9         LORENZO MARINUZZI, ESQ.
10         GARY S. LEE, ESQ.
11         AARON M. KLEIN, ESQ.
12         NORMAN S. ROSENBAUM, ESQ.
13         STEFAN W. ENGELHARDT, ESQ.
14
15
16   KRAMER LEVIN NAFTALIS & FRANKEL LLP
17        Attorneys for Official Creditors' Committee
18        1177 Avenue of the Americas
19        New York, NY 10036
20
21   BY:   PHILIP BENTLEY, ESQ.
22         KENNETH H. ECKSTEIN, ESQ.
23         DOUGLAS MANNAL, ESQ.
24         STEPHEN D. ZIDE, ESQ.
25         ELISE S. FREJKA, ESQ.
```

1

2  DECHERT LLP

3        Attorneys for Bank of New York Mellon

4        1095 Avenue of the Americas

5        New York, NY 10036

6

7  BY:   GLENN E. SIEGEL, ESQ.

8

9

10  MORGAN LEWIS & BOCKIUS LLP

11        Attorneys for Deutsche Bank Trust

12         Company Americas

13        60 Wall Street

14        New York, NY 10005

15

16  BY:   JAMES L. GARRITY, JR., ESQ.

17        JOHN M. ROSENTHAL, ESQ.

18

19

20  ROPES & GRAY LLP

21        Attorneys for RMBS Certificate Holders

22        1211 Avenue of the Americas

23        New York, NY 10036

24

25  BY:   KEITH H. WOFFORD, ESQ.

1

2  ALSTON & BIRD LLP

3          Attorneys for Wells Fargo Bank NA

4          1201 West Peachtree Street

5          Suite 4200

6          Atlanta, GA 30309

7

8  BY:   JOHN C. (KIT) WEINTAUER, ESQ.

9          MARTIN G. BUNIN, ESQ.

10

11  WHITE & CASE LLP

12          Attorneys for Junior Secured Notes

13          1155 Avenue of the Americas

14          New York, NY 10036

15

16  BY:   J. CHRISTOPHER SHORE, ESQ.

17          GERARD UZZI, ESQ.

18          HARRISON DENMAN, ESQ.

19

20  MORRISON COHEN LLP

21          Attorneys for ResCap Independent Directors

22          909 Third Avenue

23          New York, NY 1022

24

25  BY:   JOSEPH T. MOLDOVAN, ESQ.

1

2 KIRKLAND & ELLIS LLP

3        Attorneys for Ally Financial, Inc.

4         and Ally Bank

5        601 Lexington Avenue

6        New York, NY 10022

7

8 BY:   RAY C. SCHROCK, ESQ.

9        STEPHEN E. HESSLER, ESQ.

10

11

12 CLEARY GOTTLIEB STEEN & HAMILTON LLP

13        Attorneys for Certain Unsecured Bondholders

14        One Liberty Plaza

15        New York, NY 10006

16

17 BY:   SEAN A. O'NEAL, ESQ.

18

19

20 KATHERINE S. PARKER-LOWE, ATTORNEY AT LAW

21        Attorney for Interested Party

22        Post Office Box 730

23        Ocracoke, NC 27960

24

25 BY:   KATHERINE S. PARKER-LOWE, ESQ.

1

2   HALPERIN BATTAGLIA RAICHT LLP

3         Attorneys for Interested Party

4         555 Madison Avenue

5         9th Floor

6         New York, NY 10022

7

8   BY:   CARRIE E. MITCHELL, ESQ.

9

10

11   WINSTON & STRAWN LLP

12         Attorneys for Interested Party

13         200 Park Avenue

14         New York, NY 10166

15

16   BY:   CRISTOPHER C. COSTELLO, ESQ.

17

18

19   CHASBOURNE & PARKE LLP

20         Proposed Counsel to the Examiner

21         30 Rockefeller Plaza

22         New York, NY 10112

23

24   BY:   DAVID M. LEMAY, ESQ.

25

 1

 2  SHERMAN & STERLING LLP

 3          Attorneys for Citibank NA

 4          599 Lexington Avenue

 5          New York, NY 10022

 6

 7  BY:   SUSAN A. FENNESSEY, ESQ.

 8

 9

10  STEWARD & KISSEL LLP

11          Attorneys for U.S. Bank National Association

12           as Securitization Trustee

13          One Battery Park Plaza

14          New York, NY 10004

15

16  BY:   ARLENE R. ALVES, ESQ.

17          MARK D. KOTWICK, ESQ.

18

19  KLESTADT & WINTERS LLP

20          Attorneys for Interested Party

21          570 Seventh Avenue

22          17th Floor

23          New York, NY 10018

24

25  BY:   BRENDAN M. SCOTT, ESQ.

1

CURTIS MALLET-PREVOST COLT & MOSLE LLP

2

     Attorneys for Debtors (ETS Services) and

3

      Conflicts Counsel to Debtors

4

     101 Park Avenue

5

     New York, NY 10178

6

7

BY:   TURNER P. SMITH, ESQ.

8

     MARYANN GALLAGHER, ESQ.

9

10

CADWALADER WICKERSHAM & TAFT LLP

11

     Attorneys for MBIA

12

     Dashwood House

13

     69 Old Broad Street

14

     London, EC2M 1QS

15

16

BY:   GREGORY M. PETRICK, ESQ.

17

18

LATHAM WATKINS LLP

19

     Attorneys for Moelis & Company

20

     885 Third Avenue

21

     New York, NY 10022

22

23

BY:   MICHAEL J. RIELA, ESQ.

24

25

1

2   CARTER LEDYARD & MILBURN LLP

3         Attorneys for Talcott Investors

4         8 Wall Street

5         New York, NY 10005

6

7   BY:   AARON R. CAHN, ESQ.

8

9

10   PROSKAUER ROSE LLP

11         Attorneys for Assured Guaranty

12         Eleven Times Square

13         New York, NY 10036

14

15   BY:   IRENA M. GOLDSTEIN, ESQ.

16

17

18   U.S. DEPARTMENT OF JUSTICE

19         Office of the U.S. Trustee

20         33 Whitehall Street

21         21st Floor

22         New York, NY 10004

23

24   BY:   BRIAN S. MASUMOTO, ESQ.

25

```
 1
 2   U.S. DEPARTMENT OF JUSTICE
 3        Office of the U.S. Attorney
 4        86 Chambers Street
 5        3rd Floor
 6        New York, NY 10007
 7
 8   BY:   JOSEPH N. CORDARO, ESQ.
 9
10   SIDLEY AUSTIN LLP
11        Attorneys for Nationstar Mortgage
12        One South Dearborn
13        Chicago, IL 60603
14
15   BY:   JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)
16        LARRY J. NYHAN, ESQ. (TELEPHONICALLY)
17
18   TOWERS WATSON
19        Proposed Human Resources Consultants to Debtors
20        Centre Square East
21        1500 Market Street
22        Philadelphia, PA 19102
23
24   BY:   PAT BROOKS, ESQ. (TELEPHONICALLY)
25
```

1

2   SEVERSON & WERSON PC

3        Attorneys for GMAC, Creditor, and Proposed Special

4         California Litigation Counsel to the Debtors

5        One Embarcadero Center

6        Suite 2600

7        San Francisco, CA 94111

8

9   BY:   DONALD H. CRAM, III, ESQ. (TELEPHONICALLY)

10        MARY KATE SULLIVAN, ESQ. (TELEPHONICALLY)

11

12   KILPATRICK TOWNSEND & STOCKTON LLP

13        Attorneys for HSH Nordbank, Creditor

14        Suite 900

15        607 14th Street, NW

16        Washington, DC 20005

17

18   BY:   MARK D. TAYLOR, ESQ. (TELEPHONICALLY)

19

20   JACKSON WALKER LLP

21        Attorneys for Frost Bank, Creditor

22        100 Congress Avenue, Suite 100

23        Austin, Texas 78701

24

25   BY:   PATRICIA B. TOMASCO, ESQ. (TELEPHONICALLY)

1

2  GREEN & HALL INC

3        Attorneys for Aurora Bank FSB,

4         Plaintiff(s) in Intervention,

5        1851 East First Street

6        10th Floor

7        Santa Ana, CA 92705

8

9  BY:   JAMES M. LLOYD, ESQ. (TELEPHONICALLY)

10

11  MCKOOL SMITH

12        Attorneys for Freddie Mac, Interested Party

13        600 Travis Street

14        Suite 7000

15        Houston, Texas 77002

16

17  BY:   PAUL D. MOAK, ESQ. (TELEPHONICALLY)

18

19  ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

20        Attorneys for Wells Fargo Bank NA, Movant

21        199 S. Los Robles Avenue

22        Suite 600

23        Pasadena, CA 91101

24

25  BY:   JEREMY E. SHULMAN, ESQ. (TELEPHONICALLY)

1

2  ALSO PRESENT:

3  FRANK SILLMAN, (TELEPHONICALLY), for FORTACE LLC

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE COURT: Please be seated.

Just briefly, before we begin, I just want to briefly report and I apologize for the late start; I had a meeting in chambers this morning with the examiner, the examiner's proposed counsel and various other constituencies, creditors' committee's counsel, debtors' counsel, AFI's counsel, secured lenders' counsel -- there were a lot of people in chambers. I didn't get the identity of everybody who was in there. The conference was arranged to talk about the scope of the examiner's proposed investigation. The opinion that I issued ordering the appointment of an examiner indicated that the examiner, once he or she is selected, counsel should meet and confer with the various constituencies to try and arrive at an understanding or agreement as to the appropriate scope of the investigation.

Mr. Gonzales (ph.) and his counsel from Chadbourne have reported that they've done that and as a result of their discussions with various constituencies there's largely agreement about the scope of the proposed examiner's investigation. And at least at this early stage, about the examiner's estimate of how long an investigation might take, at this point there isn't a specific work plan but the -- as I say, the scope has largely been agreed to. They're going to see if they can iron out the last few points. The Court

1    intends to enter an order hopefully this week that will set the

2    scope of the examiner's investigation.  It's subject to

3    possible modification as the examination goes forward.

4          With respect to the estimate of the length of time

5    required to conduct and to complete the examination and report,

6    the initial estimate is approximately six months.  There are

7    obviously some parties who think it should be shorter and there

8    are some who may think that more time than that would be taken.

9    I think at this stage, it's a good faith estimate by the

10   examiner and his counsel as to how much time would be required.

11   That may change as events unfold.  I think the examiner fully

12   understands the need to do this examination thoroughly,

13   appropriately and as expeditiously as possible.

14         So I anticipate being presented with an order that I

15   will sign and enter with respect to scope and the examiner is

16   clearly underway at this point.  With that, let's move forward.

17         MR. PRINCI:  Good morning, Your Honor; Anthony Princi

18   of Morrison & Foerster on behalf of the debtors.

19         THE COURT:  Good morning, Mr. Princi.

20         MR. PRINCI:  Judge, we're here to review with the

21   Court the proposed orders that have been submitted by various

22   parties, respecting the 9019 motion that the debtor filed on

23   June 11th.  And there's three things, Your Honor, in that

24   regard that I'd like to address today.

25         First, Judge, I'd like to explain why the proposed

RESIDENTIAL CAPITAL, LLC, et al.                        20

1  order submitted by the trustees and the committee is grossly

2  inappropriate.  There are fundamentally --

3          THE COURT:  But how do you feel about it?

4          MR. PRINCI:  Well -- and hopefully, I'll elucidate why

5  the adverb was appropriate.

6          There are four reasons for that, Judge, and I'm going

7  to explain these in more detail.  First, Judge, the provisions

8  of that order essentially usurp the debtors' rights to proceed

9  in the fashion that they're entitled to in connection with this

10 motion.

11          Second, the procedures and associated time frame are

12 not in the best interest of the estate.  Third, those

13 procedures as well, Your Honor, sort of turn on its head

14 conventional procedural law that govern these sort of matters.

15 And fourth, their proposed order as I'll get into in more

16 detail, Your Honor, is based on a number of factual

17 inaccuracies that Your Honor would have no reason to appreciate

18 but which I will elucidate for the Court.

19          That's one thing I'd like to do.  The second thing I'd

20 like to do, Judge, is walk you through quickly our proposed

21 order and why we believe that that is fair for all concerned

22 and in the best interest of the estate.  And the third thing,

23 Judge, and perhaps most importantly, I want to suggest to the

24 Court and the parties how I believe the two proposed orders can

25 perhaps still be reconciled.  So with that, Judge, let me begin

1   with the trustees' proposed order and I think I need to put

2   this in context because, as you'd imagine, the devil's in the

3   details here.  So I think one thing I unfortunately have to

4   inform the Court is I am operating from a bit of a

5   disadvantage.  The proposed order that Your Honor has from the

6   trustees and the committee, we, the debtor, only saw a draft of

7   that -- actually, we never saw a draft of it.  We only saw that

8   proposed order Friday at 5 o'clock.  So even though we were

9   here the last time, I think it was July 10, what happened

10  obviously is the committee and three of its members -- just let

11  me take a step back so you understand why the committee, I

12  think, why the committee is on board with this.

13          I think this is really driven by the trustees.  When

14  you look at the committee composition, you'll see that there

15  are three trustees on the committee; there's Deutsche Bank,

16  there's Bank of New York, and there's U.S. Bank.  So that's

17  three out of nine.  Then you have two monolines, MBIA and FGIC.

18  FGIC has joined in their order and field a brief in support of

19  it.  And MBIA has previously informed the debtor that it is not

20  in favor of the 8.7-billion claim that is at the heart of the

21  settlement agreement for which we made the 9019 motion.  So I

22  think it's understandable how the committee and three of its

23  members ended up doing this together.  It is unfortunate,

24  Judge, as I'm going to explain at the end of this that we

25  weren't given an opportunity to see a draft.  And ordinarily

RESIDENTIAL CAPITAL, LLC, et al.                          22

1    when parties prepare draft orders, they circulate them.  You

2    have the usual caveats; I haven't shown my client, I haven't

3    shown my mother, et cetera, et cetera.  But you circulate it

4    amongst all the parties.  To get this at 5 o'clock on Friday --

5              THE COURT:  Let's pass beyond when you got it.

6              MR. PRINCI:  Okay.  So with respect to the substance,

7    Judge, let me first go back to the motion itself and what is

8    the motion doing and who does the motion concern.  The motion,

9    Judge, concerns some of the largest institutional investors in

10   this country.  I think it might be helpful actually, Judge --

11   let me just -- there are probably three to four dozens

12   institutions, I'd say probably like four dozen institutions,

13   Judge, that are signators to the settlement agreement.  Amongst

14   them are the following companies, Judge; AEGON Investment

15   Management, Bank West, BlackRock Financial, Caterpillar

16   Insurance Company, Fairlawn Capital Management (ph.), Federal

17   Home Loan Bank of Atlanta, First Federal Bank of Florida,

18   Goldman Sachs Asset Management, HBK Master Fund, ING Investment

19   Management, Metropolitan Life Insurance Company, Neuberger

20   Berman, PIMCO, Pinnacle Bank of South Carolina, Reliance

21   Standard Life Insurance Company, Rocky Mountain Bank of Trust,

22   South Carolina Medical Malpractice Liability Insurance,

23   Teachers Insurance and Annuity.

24             That is just a sampling of who the parties are, Judge,

25   who want this to go forward on a time frame that gets to a

RESIDENTIAL CAPITAL, LLC, et al.                23

1   finish line consistent, Judge, with their interests.

2           Now, what the trustees have done with the committee

3   is -- and obviously, these people want to move as quickly as is

4   reasonably possible.  I think, as I admitted to the Court

5   before, we filed the motion on June 11th and quite candidly I

6   think the time frame was too aggressive.  And we heard people's

7   issues there.  And we have worked with people to try to give

8   them information.  But, Judge, you can't give people

9   information and help them if they don't want information.  So

10  let me create this perspective for you.

11          We filed -- first of all, on May 14, which is the

12  petition date, we announced publicly and in our first-day

13  papers this settlement agreement.  And we indicate we're going

14  to make a 9019 motion to have it approved.  We file that motion

15  on June 11.  Now that's a month-and-a-half ago.  It's more than

16  two months since the petition date.  And you heard the

17  trustees' counsel and you head the committee counsel here.

18  This is the most important issue in the case.  Okay.

19          You would think if it's the most important issue

20  they'd be on it.  But the trustees, to my understanding, have

21  yet to hire a financial advisor.  Now the committee hired a

22  lawyer in one day.  The committee hired three financial

23  advisors in a few days.  And the trustees who tell you this is

24  so important to them have yet to hire a financial advisor.  In

25  terms of information, I stopped asking them, Judge, after

1   numerous calls and meetings we had with them.  I stopped saying

2   to them listen, any time you want information we'll give you

3   information.  I stopped asking because I never got a response.

4   The first time they've asked for a single piece of paper was

5   6:30 on Friday the 20th, this past Friday.  It's tokenism.  It

6   asks for things like -- well, let me tell you what it asks for.

7   This is the first time -- and again, they're the ones, Judge,

8   suggesting that they need forever to do this but I guess I'd

9   need forever too if you don't get started.  So after the

10   motion's been filed since June 11, this is the first time

11   they've sought information with respect to the merits of the

12   8.7.

13         They asked for all information -- they ask for four

14   things: all information that we provided to the institutional

15   investors' counsel.  They ask fo6 any information our experts

16   relied on -- now, Judge, they had that expert affidavit the day

17   we filed the motion, June 11.  You wait until the eleventh hour

18   for this hearing to suddenly decide you want to ask for the

19   information that those experts relied upon.  Does that suggest

20   they're really diligently looking to see what the merits are of

21   that 8.7?  I think not.

22         Then they ask for a list of all the trusts where the

23   debtors serve in the capacity of depositor, seller, mass

24   servicer, enter servicer.  You want to just figure that out

25   now?  You want the list of the contracts now?  I mean -- and

RESIDENTIAL CAPITAL, LLC, et al.                                25

1    I'll get to how much information we've already provided them

2    which is entirely inconsistent with so many paragraphs in their

3    proposed order.  So let me jump ahead, Judge, because I think

4    you get the point I'm trying to make.

5           When you look at their proposed order, it is not about

6    the investors' interests; it's not about this estate's

7    interest.  It's about the trustees' interest and only the

8    trustees' interests.  Let me start, Judge, by first pointing

9    out the factual inaccuracies that underpin this.

10          If you take a look at their proposed order, you look

11   at page 6 --

12          THE COURT:  Mr. Princi, did you meet and confer face

13   to face to try and reach a consensual schedule?

14          MR. PRINCI:  Tried my best, Judge.  But I can't do it

15   myself.

16          THE COURT:  Did you -- no, but that -- let me ask one

17   more time.  Did you meet face to face to discuss reaching a

18   consensual schedule?

19          MR. PRINCI:  Yes.

20          THE COURT:  When?

21          MR. PRINCI:  July 9th in the offices of one of the

22   counsel to the trustees.

23          THE COURT:  And have there been any meetings since

24   then?

25          MR. PRINCI:  There's been a follow-up phone call.  It

1   was last --

2          THE COURT:  Have there been any face to face meetings

3   since then?

4          MR. PRINCI:  No.

5          THE COURT:  Have you tried?

6          MR. PRINCI:  We have been communicating by e-mail.  We

7   have been providing them with all the information they have

8   seeking from us.  But when we asked them for this, they told us

9   no, they hadn't finished working on it with the committee.  So

10  we didn't get it until you got it which was Friday at 5.

11         THE COURT:  Go ahead.

12         MR. PRINCI:  So, Judge, let's just get to the

13  particulars of the order.  If you take a look at page 6 and you

14  look at paragraph 2, the first thing they want us to do is to

15  file another motion and they call it the assumption and

16  assignment motion.  And they want us to file that motion.  They

17  say you'd file a motion by July 31st to assume and assign al

18  the contracts that you seek to transfer in connection with the

19  servicing sale -- it's a defined term -- that relate to any

20  RMBS trust.  Okay.  The problem with that is we filed that

21  motion on the petition date.  That is the sales motion.

22         Now what the sales motion does, Judge, is it requires

23  by July 25th, tomorrow, that Nationstar and the debtor provide

24  an exhibit that lists all the contracts that are being assumed.

25  We are timely going to do that.  We have told the trustees for

1  weeks that we'll be doing that, that we're in the process of

2  doing that.  So they will have the list with all the contracts

3  tomorrow, as per the terms of the motion.  So that motion is

4  already filed --

5          THE COURT:  So do I just check off paragraph 2 as

6  having been done?

7          MR. PRINCI:  I think they'll probably have things to

8  say about this, Judge, but I can't see what --

9          THE COURT:  In your view, is it --

10         MR. PRINCI:  It's done.  We have a motion filed.

11         THE COURT:  Okay.

12         MR. PRINCI:  It's scheduled to be heard on November

13  5th.  What they want, which they're going to get tomorrow is

14  the list of all the contracts.  But what they don't tell you,

15  Judge, what they don't tell you is with respect then to the

16  next part where they talk about the proposed cure amount and

17  they say what we want the Court to order you to do there is

18  identify any and all existing defaults.  Okay.  So what have we

19  done in that regard, Judge?  We met with them on July 9th and

20  we said look, our business people tell us that literally we

21  don't have any breaches of our servicing obligations and

22  therefore we think the cure amount is zero.  Now we understand

23  you folks are going to need to due diligence.  And as I -- I'll

24  say to you what I said to them.  I said look, the law of big

25  numbers tells me that there's some chance that well-intentioned

1  business people who believe that to be the case could make a

2  mistake.  So let's get into the weeds here.  Let's have you

3  folks start to do your due diligence.  And we said we will make

4  available to you these business people.  You get from your side

5  whoever the business people are or the securitization lawyers,

6  whoever it is, anybody you want, lawyers, financial advisors,

7  your business people, and we will produce these business people

8  to you so you can begin your due diligence.  And then let us

9  know what documents you want to try to sustain that.

10            THE COURT:  Stay with me.  With respect to paragraph

11  2 --

12            MR. PRINCI:  Yes.

13            THE COURT:  -- is there anything that they've included

14  in paragraph 2 that hasn't already been done or will be done by

15  July 31?

16            MR. PRINCI:  The offer is outstanding, Judge.  We are

17  providing them with the people who can explain to them --

18            THE COURT:  That's not my question.  I don't see where

19  there's anything in here about providing people to them to do

20  anything.  It seems to require that the debtors --

21            MR. PRINCI:  We did it already.  We told them it's

22  zero.

23            THE COURT:  Okay.  So --

24            MR. PRINCI:  Done already.

25            THE COURT:  -- I'll ask my question one more time.  Is

RESIDENTIAL CAPITAL, LLC, et al.                    29

1    there anything contained in paragraph 2 that in your view has

2    not already been done or will be done by July 31?

3              MR. PRINCI:  No.

4              THE COURT:  Okay.  So I can check that one off, in

5    your view?

6              MR. PRINCI:  Then they want an inventory with respect

7    to all the assigned contracts and the specific provisions that

8    the debtors contend they will assume pursuant to the severing

9    provisions.  Well, there's a host of problems with this, Judge.

10   Number one, as we informed the Court on July 10, the way we're

11   going to "sever" which is to say leave behind in this estate

12   the rep and warranty claims relating to the seller debtors, the

13   originator debtors, putback obligations and yet transfer to

14   Nationstar or whoever the highest bidder is, the servicing

15   rights the way we're going to do that.  And this motion will be

16   forthcoming -- I think we'll have this filed, Judge, sometime

17   in August.  We're going to have the depositor debtors, those

18   are the sellers, they are going to seek to reject those

19   contracts and then the servicer debtors are going to make a

20   motion to assume.

21             Now, what they've said to us is gee, well, what will

22   this look like when it's done?  They said give us a template.

23   Can you redline it and show us what a contract will look like

24   if you do this?  We said sure and we gave that to them.  So,

25   Judge, when I look at this and I say to myself --

1        THE COURT:  You're looking at paragraph 3?

2        MR. PRINCI:  Par -- beg your pardon?

3        THE COURT:  You're looking at paragraph 3?

4        MR. PRINCI:  I'm in paragraph 2, right.

5        THE COURT:  You're still in paragraph 2?

6        MR. PRINCI:  I'm still in paragraph 2 because that's

7   the sever provisions.  And with respect to these so-called

8   unenforceable provisions, we've tried to explain that under

9   365(f) we believe 365(f) covers all of those provisions that

10  either say you can't assign this contract or here's a condition

11  and unless you meet this condition you can't assign it -- you

12  know, I can't be any clearer than that.  I'm sorry if they

13  don't like the application of the law to the facts in this

14  case.  But when you look at paragraph 2 you say to yourself

15  wait a second, why are you asking the judge to order all this?

16  We've been trying to work with you on all this.

17       THE COURT:  Mr. Princi, that's not at all helpful.

18  What I want to know, is there anything -- and I thought I had

19  the answer to this but I guess I don't -- is there anything in

20  paragraph 2 which starts on page 6 and finished the top two

21  lines on page 7 --

22       MR. PRINCI:  Right.

23       THE COURT:  -- that either hasn't been, in your view

24  hasn't been done or won't be done by July 31 which is the

25  deadline they put in the paragraph?  I thought you told me that

1    everything's been done.

2          MR. PRINCI:  Well, just to be clear for the record,

3    Judge, we don't believe we should have to file another motion.

4    But other than caveat, Judge, which I know Your Honor

5    understood, no.  I think all of this has been taken care of

6    already.

7          What --

8          THE COURT:  Okay, so you say that the motion that you

9    filed on the petition date is the assumption and assignment

10   motion?

11         MR. PRINCI:  Correct.

12         THE COURT:  Okay.

13         MR. PRINCI:  Okay.  So, Judge, that's the first part.

14   And what --

15         THE COURT:  But let me just -- I want -- so I'm clear.

16   Maybe I'm behind you on this, but is there anything else in

17   paragraph 2 that you think is inappropriate or has -- you're

18   telling me it's all been done.  Well, they put a date of July

19   31.  If it's been done, then it's not a problem for you.

20         MR. PRINCI:  Judge, I know -- and I'm going to

21   recommend, Judge, the way I think these orders can be

22   reconciled.  And I know you don't want --

23         THE COURT:  Can we do it my way, please?

24         MR. PRINCI:  Sure.

25         THE COURT:  Tell me if there's anything in paragraph

1  2 -- this is your last chance -- tell me if there's anything in

2  paragraph 2 --

3           MR. PRINCI:  No, Your Honor.

4           THE COURT:  -- that you believe is inappropriate that

5  hasn't already been done or won't be done by July 31?

6           MR. PRINCI:  I think it's already been done.

7           THE COURT:  Okay.

8           MR. PRINCI:  Or --

9           THE COURT:  That's your last and final answer on this

10  paragraph.

11           MR. PRINCI:  Just give me one moment; I think it's

12  already been done, Judge.

13           Well, the July 25th is when we'll have -- tomorrow --

14  is when we'll have the list of the contracts.  So, yeah, by

15  July 31, all of this will be done.

16           Judge, where we have an issue with them is with

17  respect to paragraph 3 which then talks about objections that

18  they want to file based on any issues they see with the so-

19  called RMBS inventory.  So you go back and the RMBS inventory,

20  Judge, is the list that has all the contracts that are going to

21  be assumed.  We have no problem, Judge, working out a date by

22  which they can file an objection to that, but you don't need

23  all this time, Judge, laid out here to deal with that.  It's

24  just not -- particularly coming from a party, Judge, that

25  hasn't begun to do any real work here other than worry about

1    its own exposure -- which I don't hold against the trustees the

2    fact that they're concerned about their own exposure.  What we

3    have as the debtors, Judge --

4            THE COURT:  Tell me what's wrong with this -- I don't

5    want you to speculate about what their motivation is.  I'm

6    interested in a schedule.

7            MR. PRINCI:  Okay.

8            THE COURT:  Okay?  Tell me what's wrong with the

9    schedule they propose.

10            MR. PRINCI:  Judge, I think the schedule that we

11    proposed makes a lot more sense --

12            THE COURT:  Where -- you know, I've got a ton of

13    papers.  Do you have an extra copy of that?  I've got their

14    schedule in front of me; I'm not sure that I can easily lay my

15    hands on yours.

16            Thank you, sir.

17            MR. PRINCI:  Judge, in our proposal, we suggest very

18    specific dates and in connection with these dates, Judge, we

19    don't have any -- if you take a look at the last ordering

20    paragraph, we're suggesting that they file their objections by

21    July 30th.

22            THE COURT:  And they want until August 20th.

23            MR. PRINCI:  If they want more time, Judge, we'll give

24    them more time on that, okay?

25            THE COURT:  Well, July 30th, obviously isn't going to

1    work at this point.  So I take it that you're objecting to the

2    August 20th date?

3            MR. PRINCI:  We are, Judge.

4            THE COURT:  Okay.  And what do you believe is an

5    appropriate date?

6            MR. PRINCI:  If they need a couple more weeks, Judge,

7    we're happy to give them a couple more weeks post our July 30,

8    so August 14 would be fine.

9            The biggest issue -- I'm sorry, Your Honor.

10           THE COURT:  Go ahead.

11           MR. PRINCI:  Oh, you're ready, okay.

12           Judge, there is unfortunately -- and I apologize for

13   the sense of he said/she said on this stuff -- but the biggest

14   issue, Judge, with the order you've been presented is the

15   second part of this which says in essence look, we're going to

16   take some objections we had, cure claim objections, and we're

17   going to shelve them.  And we're not going to shelve a certain

18   objection we have -- which they've defined, Judge, as

19   limited -- I have to get to the definition, Judge -- so on page

20   4 they have a definition called "limitation of future

21   performance".  And they say at the bottom of that that because

22   the resolution of the scope of the obligations that must be

23   assumed may impact the bidding at the auction this issue must

24   be resolved prior to October 23.

25           The reality, Judge, is it doesn't impact the sale at

1  all.  What it impacts is them.  That's the indemnification

2  provision, Judge.  And what the asset purchase agreement says

3  is that the present purchaser, Nationstar, is not going to be

4  assuming any liabilities that arose from facts prior to the

5  closing date.  So the issue for the trustees is they're saying

6  look, we have an indemnification right under these PSAs.  Now

7  you, Nationstar, are saying that you're going to assume those

8  agreements and with that the indemnification obligation.  But

9  you, Nationstar, say you're only prepared to stand behind that

10  for any acts or events that arise after the closing date that

11  then give rise, let's say, to a suit against us.  And

12  admittedly, Judge, the trustees get sued a lot in nuisance

13  lawsuits.  And so they -- the indemnification, we understand

14  their issue.

15          That's not going to affect the auction process;

16  there's not going to be a sale because if somebody wants to

17  insist on that, you either have to cure it or not.  That's why

18  we should have a hearing to find out what their cure claims

19  are.  And that's why we don't' want to hold this in abeyance.

20  So we want their cure claims, Judge, and we're entitled not to

21  have either some combination of uncertainty under a sword of

22  Damocles hanging overhead.  If they believe they have cure

23  claims, we should set up a date to have those cure claims

24  decided.  And, Your Honor, we have done that.  In our proposed

25  order, that's what we say.  So there's no reason to hold this

1  in abeyance.

2         The biggest issue of all in this proposed order is

3  paragraph 5(e).  And that's on the last page, that's page 9.

4  And I didn't understand what this was about and last night

5  spoke to committee's counsel and what this is about, Judge, is

6  if you go back to paragraph 5(c) where they say --

7         THE COURT:  Let me just read (e) again.  Hold on.

8         MR. PRINCI:  Sure.

9         THE COURT:  Go ahead.

10        MR. PRINCI:  So this ties in with their earlier

11 paragraph and how they want to do this.

12        THE COURT:  Which paragraph are you talking about?

13        MR. PRINCI:  It's the earlier subparagraphs in 5.

14 They say look, we're going to complete our evaluation by

15 November 1 and that's where the good new lies, Judge, because

16 in our proposed order, Judge, we too have a date quite similar.

17 If you look at our proposed order and you look at paragraph --

18 ordering paragraph 5, it says, "The deadline for the trustees

19 to accept or reject the RBMS trust settlement will be the

20 earlier of ten days after entry of an order approving the RMBS

21 trust settlement or October 31, 2012."  So we're very close

22 with them, Judge, in terms of the time that they should have to

23 decide to opt in or opt out.

24        But what they want to do thereafter, Judge -- putting

25 aside the little debate we have on whether we're off a week or

1   so with them -- what they want to do is they want to say look,

2   at that point what we'll do is we'll see if we can come to an

3   agreement with you -- this is all in paragraph (c), 5(c) -- and

4   if we can come to an agreement with you, you've got to file

5   another 9019 motion.  And then it says, "And on or before

6   November 30, the RMBS trustees may file motions seeking court

7   approval of the settlement."  And then you look at paragraph

8   (e) and it says, "In the event by March 31st, any court order

9   that is conditioned to the effectiveness of the RMBS settlement

10  has not been entered", then this thing can blow up.

11          What that's about, Judge, we believe and we fear, is

12  the Article 77 proceeding that you heard about on June 25th.

13  Now look, if they want to come up today and say we will not

14  seek to make an Article 77 proceeding and they want to say you

15  have jurisdiction, Judge, this we can work out.  We are happy

16  to do a couple of things that are important to them.  Number

17  one, we're trying to work with them on the indemnification

18  issue I mentioned earlier.  And Nationstar and we are in

19  discussions to try to resolve that for them.

20          And number two, they have a concern which you heard

21  day one on June 25th when we began discussing this, they have a

22  concern about getting sued.  Well, their parochial interest,

23  Judge, we don't believe should hold up the show here.  But that

24  having been said, we want to work with them to try to help

25  them.  If they believe that this Court has jurisdiction to,

1    under CPLR, Article 77, issue a ruling that says they have

2    complied with their trust duties.  If this Court has

3    jurisdiction, we are happy, Judge, to actually work with them

4    to set that up as part of the schedule.  We're not looking to

5    stand in their way of getting comfort.  But what we can't do is

6    let their desire for comfort stand in the way of our rights to

7    move this case forward in a sensible way.  And that's what

8    their order does.

9            So there's a reason our order is simple and there's a

10   reason their order is incredibly complex.  And their order

11   obfuscates what they're really still about.  I know you don't

12   like the fact that today I have been extrapolating what I

13   believe their intentions are.  But I've been living with these

14   folks, Judge, since our last hearing and before that.  And I

15   haven't gotten cooperation.  I haven't gotten document

16   requests.  They don't have an expert yet.  And everything

17   points to the fact, Judge, that they're only worried about

18   their parochial interest.  We are trying to work with them but

19   the case has to proceed, Judge.  And all those investors that I

20   mentioned before, Judge, that's the reason why they entered

21   into this settlement agreement, because they don't have the

22   trust in these trustees to look out for their interests.  So

23   they took it into their own hands.  And they and we should be

24   allowed to get a ruling from you, Judge, as to whether you

25   believe -- and we'll present a host of evidence for you when

RESIDENTIAL CAPITAL, LLC, et al.                    39

1    you have this hearing -- whether you believe that that figure,

2    8.7 billion, was a fair settlement.  And if they can't, Judge,

3    get out of the way of their own parochial interest, it just

4    shouldn't stand in the way of this case coming forward.

5              Judge, do you have any other questions?

6              THE COURT:  I probably will but nothing there.

7              MR. PRINCI:  All right.  Thank you, Judge.

8              Let me hear from the committee first and then, Mr.

9    Siegel, why don't you come on up?

10             MR. BENTLEY:  Good morning, Your Honor; Philip Bentley

11   of Kramer, Levin on behalf of the Official Creditors'

12   Committee.

13             Your Honor, let me say at the outset that I'd like to

14   make clear what the committees' goals are here because Mr.

15   Princi raised certain questions about our goals and I think

16   it's important that we're clear on that subject.  We actually

17   share a lot of the debtors' goals, if not most of the debtors'

18   goals, with respect to the order that Your Honor is considering

19   entering.  We share with the debtor the goal of maximizing the

20   sale proceeds.  We want to do anything we can to avoid a

21   litigation process that might jeopardize that.  We also share

22   the debtors' goals in opposing any objections the trustees may

23   assert to the sale process.  We're actually joined at the hip

24   with the debtors on that issue.

25             We've heard that trustees have lots of substantial

1   objections to the sale process.  They've told us in detail what

2   those are; we summarized the very briefly in our papers.  As we

3   mentioned in our papers, we actually think those objections

4   don't have merit and we intend to work with the debtor to

5   oppose those objections if they have to be litigated.  But what

6   drove our thinking with respect to developing this procedural

7   order is that we're concerned that if the parties are forced to

8   litigate those issues over the next few months it could chill

9   the sale process.  It could be damaging.  And we're concerned

10  that the debtors' process would force the parties to do that.

11          The one other thing I would say, Your Honor, is a

12  question was raised about committee process and the process

13  we've followed with respect to the debtor.  To be very clear,

14  Your Honor, we recognize, as I just said, that we're adverse to

15  the trustees on some of the central issues here and whenever

16  those issues have come up and whenever the issue of this

17  schedule has come up in committee meetings, we've asked the

18  trustees to recuse themselves.  They have.  The order that

19  we've presented to Your Honor, we've negotiated at arm's length

20  with the trustees, seeing them as adversarial to us in key

21  respects.  And we got a deal that we think is in the best

22  interests of the estate.

23          One more comment at the outset, just about the process

24  that we've gone through with the debtor leading up to today.

25  We actually reached out to the debtor on Tuesday.  We struck an

RESIDENTIAL CAPITAL, LLC, et al.                    41

1  agreement in principle with the committees back on Tuesday and

2  I called the debtors --

3           UNIDENTIFIED SPEAKER:  The trustees.

4           MR. BENTLEY:  I'm sorry, Your Honor; I misspoke.

5           Yes, with the trustees on Tuesday, Tuesday late in the

6  day, and I called the debtors' counsel and left a voicemail

7  Tuesday evening saying I have news to report relating to this

8  schedule, call me back.  They weren't able to get back to me

9  until Thursday morning.  We spoke at length at that time and I

10 walked them through the approach that is now reflected in this

11 order in some detail.  We didn't actually share the actual form

12 of order with them until it was filed because, I can tell you,

13 Judge, we were still negotiating the language of the order

14 until 4:45 Friday afternoon.  So I do want to dispel any

15 suggestion that we haven't been trying to work with the debtor.

16 We have been.  We hope to continue working with them.

17          In terms of Mr. Princi's comments, I think some of his

18 comments reflect a not-complete understanding of what we're

19 trying to achieve here and it may be our fault because the

20 language of our proposed order doesn't reveal our intentions in

21 a crystal clear fashion.  And so I spoke with Mr. Princi

22 yesterday evening -- I'm happy to continue to speak with him --

23 to clarify what our intention is and I'd like to do that with

24 the Court.

25          Now Mr. Princi raised really three, I think, principle

1    objections to the order we're proposing.  The first relate to

2    the details of paragraphs 2 and 3 and as Your Honor, I think,

3    made clear, I'm not sure there's really a lot that's in dispute

4    as to those paragraphs.  In any event, the details of those

5    paragraphs, for example whether the trustees' deadline is

6    August 14 or August 20, we'd like to step aside and leave that

7    to be an issue to be discussed or argued between the trustees

8    and the debtor.

9            THE COURT:  Let me ask you this question first.  Mr.

10   Princi argued that the debtor should not be required to file

11   what you refer as another assumption and assignment motion.  He

12   said -- this is paragraph 2 of the trustees' and committee's

13   proposed scheduling order -- he said they did that on day one

14   of the case.  You agree or disagree that -- does the motion

15   that was already filed satisfy what's been drafted in paragraph

16   2?

17           MR. BENTLEY:  Your Honor, and I apologize if this is

18   not as helpful to the Court as it might be, but that's exactly

19   the sort of issue where I do think it's better responded to by

20   the trustees than by us.

21           THE COURT:  You've signed onto this --

22           MR. BENTLEY:  Understood, Your Honor.  And --

23           THE COURT:  What's your position?  I'm not letting you

24   off the hook.

25           MR. BENTLEY:  Our suggestion, Your Honor, is there are

1    details in paragraphs 2 and 3 as to which we think further due

2    discussion might be helpful, particular --

3             THE COURT:  Answer my question.  Does the motion that

4    the debtor has filed -- I asked Mr. Princi -- it took a lot of

5    time, a lot of questions to get what I thought finally was a

6    clear answer -- but I asked the question whether the debtor has

7    already done or will by July 31st all of those things that are

8    required by paragraph 2.  One of those things relates to this

9    filing of an assumption -- what is defined as assumption and

10   assignment motion.  Mr. Princi's position is that was done on

11   day one of the case.  What is the committee's position?

12            MR. BENTLEY:  Your Honor, we do not have a position on

13   that.

14            THE COURT:  Come on.

15            MR. BENTLEY:  Your Honor, we are not opposed to the

16   position Mr. Princi took.

17            THE COURT:  All right.  You know, you can't -- if

18   you're going to participate in this process, if you're going to

19   suggest a scheduling order, you have done that, you have

20   suggested this specific scheduling order I'm asking you about,

21   you need to have a position whether the debtor has already

22   satisfied what you propose to require.  I will not accept "we

23   don't have a position".  You have to have a position.

24            MR. BENTLEY:  If I may, Your Honor --

25            THE COURT:  If you don't have a position, then go sit

RESIDENTIAL CAPITAL, LLC, et al.                    44

1   down.

2          MR. BENTLEY:  If I may, Your Honor, our position is we

3   believe that this is an appropriate requirement to impose on

4   the debtor --

5          THE COURT:  That doesn't answer the question.

6          MR. BENTLEY:  I understand, Your Honor, but as to

7   what --

8          THE COURT:  Can you answer my question, Mr. Bentley,

9   yes or no?

10         Did the motion that the debtor filed at the outset of

11  this case fulfill the requirement of the order you're proposing

12  that I enter?  Yes or no?

13         MR. BENTLEY:  We think it did, Your Honor,

14         THE COURT:  Okay.  Let's move on to the next point.

15         MR. BENTLEY:  Okay.

16         As I heard it, Your Honor, Mr. Princi raised two other

17  issues, two other concerns about this order.  The first one is

18  he said we don't want the sword of Damocles hanging over the

19  parties' heads.  And what I believe he meant by that was that

20  he thinks that under our proposal, there's a threat that won't

21  be resolved until sometime after the sale hearing, the November

22  5 sale hearing, that the trustees could assert that they have

23  claims against the buyer, a threat that the buyer is not taking

24  the assets free and clear of all trustee claims.  That, Your

25  Honor, we think is mistaken and we tried to address that

1    clearly in the order and I think we did.

2            THE COURT:  Walk me through that.

3            MR. BENTLEY:  Yes.  Certainly, Your Honor.

4            That's addressed in paragraph 4 of the order.  And

5    what that paragraph says, Your Honor, is it says the trustees

6    will not object to the assumption and assignment of the PSAs

7    free and clear of any lien, claim or encumbrance.  We think

8    that's as clear as it could be and we think that will give any

9    buyer the comfort that there is no threat hanging over its

10   head.

11           The essence of the deal that we struck, Your Honor, as

12   reflected in this paragraph, is the trustees have said yes, we

13   have sale objections; yes, if we don't settle or if Your Honor

14   doesn't enter this order we, the trustees, would object to the

15   sale and say we do have claims against the buyer.  But they've

16   said in the context of this order they would withdraw those

17   objections and instead, agree to reserve all of those issues

18   until after the sale hearing.  And then if they haven't

19   settled -- and the hope is that they would have settled by the

20   November 15 deadline; if they did settle that would resolve the

21   sale issues as well as the RMBS issues -- but if they haven't

22   settled by November 15, litigation would then commence as to

23   those issues and their agreement is that any claims they've

24   provide up, at most the remedy they would have would be a cure

25   claim against a portion of the proceeds of the sale.

1        THE COURT:  Show me the language in here that does

2   what you've just described.

3        MR. BENTLEY:  Yes, Your Honor.  It's paragraph 4

4   and --

5        THE COURT:  I see the paragraph 4 language.  How does

6   that mesh with what's in paragraph 5?

7        MR. BENTLEY:  Okay, well two parts.  First, the

8   language I referred to earlier that they won't object to the

9   assumption free and clear -- assumption and assignment free and

10  clear.  And then it goes on to say provided that the sale order

11  provides that the cure claims -- and I'm paraphrasing, Your

12  Honor -- will have administrative expense priority in the case

13  and attached to the sales proceeds subject to liens.  And it

14  then goes on to say for the avoidance of doubt, the amount of

15  the cure claims shall not exceed the sale proceeds.  And "sale

16  proceeds" is defined in an earlier paragraph to mean a portion

17  of the overall sale proceeds.

18       THE COURT:  But what rights are being reserved in

19  paragraph 5?

20       MR. BENTLEY:  Their right to litigate the amount of

21  their cure claim.  Now that litigation will have a number of

22  different facets to it.  So, for example, Your Honor's aware

23  that they're objecting to the severance of some of these

24  agreements.  And the way that plays into the cure claim is to

25  the extent any obligations cannot be severed then any breaches

1   of those obligations would give rise to a cure claim.  So

2   severance and cure are joined at the hip.  And we would

3   contemplate if there were no settlement, all of those issues --

4   I'm sorry, Your Honor.  I keep hitting -- all of those issues,

5   severance, cure, would be litigated and would yield a result,

6   an amount of their allowed cure claim.

7            THE COURT:  That won't exceed the sale proceeds.

8            MR. BENTLEY:  Correct.

9       (Pause)

10            THE COURT:  In paragraph 5(c) --

11            MR. BENTLEY:  Yes, Your Honor, the RMBS settlement

12   that's referenced in 5(c) is, what, settlement of the cure

13   claims?

14            MR. BENTLEY:  It's settlement of what's defined as the

15   disputed matters which is defined earlier in paragraph 5 to

16   include both the cure claims and all other sale-related issues

17   plus the RMBS disputes that relate to the amount of the general

18   unsecured claim.

19            THE COURT:  So what --

20       (Pause)

21            THE COURT:  Just walk me through.  The RMBS claim

22   settlement is what?

23            MR. BENTLEY:  The RMBS -- the proposed RMBS claim

24   settlement is the settlement that the debtors are seeking

25   approval of.

RESIDENTIAL CAPITAL, LLC, et al.                    48

1    THE COURT:  Okay.  And this order would put off

2  consideration of that until when?

3    MR. BENTLEY:  The basic difference -- the fundamental

4  difference between this order and the debtors' proposed order

5  is both our order and the debtors' order give the trustees a

6  deadline that's pretty similar, either October 31, in the

7  debtors' case; November 15, in our case.  The difference is the

8  debtors would ask Your Honor to approve their settlement offer

9  earlier in October before it's been accepted by the trustees.

10 We would say that should be deferred and that if there is a

11 settlement announced by the November 15 deadline, the trustees

12 would then file -- I'm sorry -- the debtor would then file an

13 amended 9019 motion which would seek approval of the settlement

14 that at that point it actually would have reached.

15    THE COURT:  So this schedule would give no effect to

16 the proposed settlement that the debtors have reached with the

17 investors who have given directions to the trustees to approve

18 the settlement.

19    MR. BENTLEY:  Your Honor, if I --

20    THE COURT:  Do I understand that correctly?

21    MR. BENTLEY:  I think Your Honor has it partly right.

22    THE COURT:  Which part do I have right and which do I

23 have wrong?

24    MR. BENTLEY:  Okay.  The part you have right is we

25 would -- under our schedule, the Court would not be ruling on

RESIDENTIAL CAPITAL, LLC, et al.                    49

1  any settlement until such time, if any, as a settlement is

2  reached with the trustees.  So if that's what Your Honor meant,

3  that's correct.

4         The part where I think the answer may be no is we do

5  think that the settlement the debtors have reached with the

6  trustees is significant.  And we don't want to just brush it

7  aside and treat it as having no consequence.  We do think, as

8  we've pointed out --

9         THE COURT:  The settlement they reach is not with the

10 trustees.  It's with the holders of more than twenty-five

11 percent of various classes of RMBS securities, am I correct?

12         MR. BENTLEY:  That's absolutely right.  And so, as we

13 said in our papers --

14         THE COURT:  And the trustees don't want to be forced

15 to have to deal with that.

16         MR. BENTLEY:  If I may, Your Honor, our view as to the

17 significance of that is (1) Your Honor's absolutely correct, if

18 I understand your suggestion, that it doesn't have any binding

19 effect on the trustees.

20         THE COURT:  What doesn't have a binding effect on the

21 trustees?

22         MR. BENTLEY:  The settlement between the debtors and

23 the investors.

24         THE COURT:  Right.

25         MR. BENTLEY:  No binding effect on the trustees.

RESIDENTIAL CAPITAL, LLC, et al.                    50

1          THE COURT:  Well, we'll see.  But --

2          MR. BENTLEY:  We do think it may have some persuasive

3     effect on the trustees.

4          THE COURT:  So does the debtor.  And that's why they

5     want to go forward with that 9019.

6          MR. BENTLEY:  Well, and we agree with the debtors on

7     that point.  We just think that under our structure, it would

8     have the same persuasive effect.  We think that's important.

9     We don't want to throw that away.  But we don't think it's in

10    any way diminished under our structure because our structure

11    says November 15, just a few weeks after the debtors' deadline,

12    Trustees, you'll have to either say yea or nay.

13         THE COURT:  No.  You want -- the proposed schedule

14    that you have, you and the trustees, basically would have a new

15    round of settlement negotiations between the trustees and the

16    debtors and, I suppose, the committee.  And only upon the

17    successor failure of that -- well, what happens if the trustees

18    and the debtor are unable to reach agreement?  What happens?

19         MR. BENTLEY:  Then we flip into litigation.  And this

20    is addressed in paragraph (d) -- 5(d) of our order which says

21    if a settlement hasn't been finalized and filed by November 15

22    then the parties submit a litig --

23         THE COURT:  Then you want to start a new schedule all

24    over again.  That's not going to happen, okay?  We're coming

25    out of this.  I'm not saying this is the schedule or theirs is

 1  the schedule.  That's not going to happen.

 2          MR. BENTLEY:  We expect it could be very short, Your

 3  Honor, because we do expect --

 4          THE COURT:  Well, I don't plan to wait until November

 5  15th to set a schedule for some future litigation.  It's not

 6  going to happen, Mr. Bentley.

 7          MR. BENTLEY:  Well, Your Honor, I want to be clear.

 8  I'm not sure we're proposing something different than what Your

 9  Honor has in mind.  If you look --

10          THE COURT:  Am I reading these words wrong?  "If a

11  settlement of Disputed Matters is not finalized and filed with

12  the Court on or before November 15, 2012, then the parties

13  shall submit to the Court a litigation schedule on the Disputed

14  Matters."

15          MR. BENTLEY:  Litigation --

16          THE COURT:  I'm not waiting until November 15th for a

17  schedule.

18          MR. BENTLEY:  Okay.  Fair enough, Your Honor.  I just

19  wanted to point out that paragraph 5(a) does say discovery

20  starts now.  So discovery is not being held in abeyance until

21  November 15 -- it's starting now.  And if Your Honor wants to

22  set the litigation schedule now, we don't object to that, Your

23  Honor.  We don't object --

24          THE COURT:  Did you try and come up with a

25  comprehensive schedule?  I don't want to leave uncertainty in

1  anybody's mind about how this matter is going to proceed from a

2  scheduling standpoint.  Okay?  Whether the trustees have been

3  diligent or not diligent in pursuing discovery so far or

4  retaining experts, I, frankly, don't care.  What I care about

5  and what I want -- I want everybody on the same page that you

6  know this is what the schedule's going to be.  It can

7  accommodate further negotiation efforts to resolve issues and I

8  hope that occurs.  But if it doesn't, everybody's going to know

9  this is the deadline by which I have to do various things.

10 There will undoubtedly be further orders from the Court,

11 procedure orders, about how any contested hearings will go

12 forward.  That doesn't have to have that level of detail.  But

13 I don't want anybody under any misimpressions.  I don't want to

14 come back in November and have anybody saying, well, the

15 hearing should be next week and so the schedule should be --

16 you know, everything gets filed tomorrow.  That isn't going to

17 happen.  Nor am I going to hear from the trustees that we were

18 unable to resolve these disputed matters and so we have a

19 schedule that takes us out a few months.  That isn't going to

20 happen.

21         MR. BENTLEY:  We're happy to address these issues now,

22 Your Honor, if Your Honor thinks it's helpful to have us go out

23 into the hallway and try to --

24         THE COURT:  Well, you're not going to go out --

25         MR. BENTLEY:  -- fill in those holes.

RESIDENTIAL CAPITAL, LLC, et al.                    53

1     THE COURT:  -- into the hallway.  But I'm telling you,
2   what I am going to order direct is that after the hearing
3   today, I want the counsel to meet face-to-face day to day until
4   completed with a comprehensive schedule.  And if there are
5   competing provisions with dates, put them both in and indicate
6   who supports which one and who opposes which one.  And I'll
7   resolve it.  Okay?  But I'm not going to deal with two totally
8   different structures of orders that some of which leave dates
9   way too open and say come back in November and we'll talk about
10  a schedule.  That's not acceptable.  Okay.  I don't care -- I'm
11  not casting blame for where you all are today.  The fact that
12  there may have been one face-to-face meeting weeks and weeks
13  ago and exchange of e-mails, that lies in everybody's court.
14  That's unacceptable.  Okay.  What's going to happen is you're
15  going to meet day-to-day, all day if necessary, and you're
16  going to try to hammer out a comprehensive schedule that fills
17  in -- and to the extent parties disagree, you'll come in at a
18  separate hearing very soon and we'll iron it out.  But what I
19  have before me, these two proposals -- I have to read tea
20  leaves to understand what the committee and the trustees are
21  proposing.  Okay?  I don't like to read tea leaves.

22     MR. BENTLEY:  We're happy to follow Your Honor's
23  suggestion.

24     THE COURT:  Tell me why I shouldn't go forward and
25  hear the 9019 that the debtors filed and any objections to it

1    before the rest of these procedures that you've proposed.  I
2    mean, aren't the debtors entitled -- it may not get approved.
3    And there may be some very substantial problems with it.  And
4    it may get rejected.  Okay?  They filed the motion.  They want
5    a hearing.  There's a proposed schedule.  You agree or disagree
6    but the schedule you proposed is one that puts a whole bunch of
7    other things in the way of the Court hearing it.  That's the
8    way I perceive these differences.  Okay?  So why shouldn't I go
9    ahead, for better or worse, and decide the 9019 that's already
10   been filed and not wait to see whether there's some new 9019
11   that'll be filed or not?

12           MR. BENTLEY:  Your Honor, one concern -- I have a few
13   concerns about that.  One concern is what we're proposing to
14   you does rest on an agreement with the trustees.  And Your
15   Honor will have to ask the trustees if they would still be
16   prepared to make the concessions they're making as to the buyer
17   taking free and clear, if Your Honor were to impose that
18   structure, that schedule.  That's issue number one that I have,
19   Your Honor.

20           The second is --

21           THE COURT:  So if they don't get all their cards,
22   they're going to go home.

23           MR. BENTLEY:  If Your Honor can get their consent to
24   this, God bless.  Your Honor, we've done our best and this is
25   the deal we've been able to strike.

RESIDENTIAL CAPITAL, LLC, et al.                    55

1          THE COURT:  But you'd not sat down with the debtors'

2     counsel to see whether within these two proposed orders that I

3     have.  There's common ground that can be achieved that still

4     includes this consent to a free and clear sale but comes closer

5     to accommodating what the debtors' needs and interests are.

6     That hasn't happened.

7          MR. BENTLEY:  We've had a number of intensive

8     discussions with Your Honor (sic) that did take place over the

9     phone rather than face-to-face.  But we have had a number of

10    intensive discussions with the debtors.

11         THE COURT:  Anything else you want to note?

12         MR. BENTLEY:  I just want to respond to the one other

13    concern that Mr. Princi raised about the Article 77 process.

14    And I want to make sure that the committee's position on that

15    is clear.  And that is, we recognize that the trustees may ask

16    Your Honor to review the fairness of the settlement as to the

17    certificate holders, as to the beneficiaries.  We recognize

18    that there is a big issue as to whether Your Honor has

19    jurisdiction over that or not and we don't wish to prejudge

20    that issue.  What we've said to the trustee is if they want to

21    file that motion and ask Your Honor to consider we certainly

22    aren't going to try to stop them from filing the motion.  We

23    have said, though, that we don't want any motion of that sort

24    to delay the consummation of a settlement.  That is, if a

25    settlement is reached, we want it to be clear that that

RESIDENTIAL CAPITAL, LLC, et al.                    56

1  settlement will become final within a limited period of time

2  and will not be delayed indefinitely while they try to get this

3  approval that they would like to get.  The order that we've

4  submitted to the Court is consistent with that approach.

5          THE COURT:  How is it consistent with that approach?

6          MR. BENTLEY:  The order contemplates that they may

7  file a motion of this sort.  That's in paragraph 5(c).  It says

8  if they are going to file a motion of that sort, they have to

9  do it no later than November 30.  But it doesn't say anything

10 about the outcome of that motion or whether Your Honor

11 dismisses it for lack of --

12         THE COURT:  It's what I was talking about, tea leaves.

13 I mean --

14         MR. BENTLEY:  -- for lack of jurisdiction.

15         THE COURT:  The description in paragraph 5(c), one had

16 to read tea leaves to understand what type of motion this

17 potentially contemplated.

18         MR. BENTLEY:  It was deliberately vague, Your Honor,

19 because the trustees have not yet come to rest on exactly what

20 sort of motion they plan to file.  But that's why I did want to

21 make clear to Your Honor what's intended here and why it was

22 drafted the way it was.

23         The other provision that bears on this, Your Honor, is

24 paragraph 5(e).  And this provision is a bit of a mouthful.

25         THE COURT:  Yeah.  Could you walk me through it?

RESIDENTIAL CAPITAL, LLC, et al.                    57

1          MR. BENTLEY:  Yes.  I will, Your Honor.

2          THE COURT:  'Cause I see getting to March 31 and then

3   have everything blow up because the trustees decide, nah, we're

4   not going to waive the condition.  And so, we're just going to

5   walk away.  Let's go back to square one.

6          MR. BENTLEY:  The key point that I'd like to make,

7   Your Honor, is paragraph (e) is predicated on an assumption,

8   something that may or may not happen.  It says in the event

9   there's a -- that the settlement is conditioned on a court

10  order being entered.  We do not want to -- we certainly do not

11  want to give the trustees the right to insist that any

12  settlement they reach with the debtors have a condition

13  subsequent of that sort.  And this does impose any such

14  requirement on the debtors.  And if we need to make that more

15  clear, we're happy to because I understand the debtors read it

16  differently than we intended.  But the trustees certainly can

17  ask the debtors whatever they want.  They can ask the debtors

18  to include a condition subsequent.  Frankly, we would hope that

19  the debtors say no.  But the point of this paragraph is that if

20  the debtors were to say yes and if that order weren't obtained

21  by March 30 then we would say enough.  The point of this is to

22  say you can't hold up the process indefinitely.  At most, you

23  can hold it up till March 30th in the event, which we hope is

24  unlikely, that the debtors have agreed to give them a condition

25  subsequent of this sort.  That's the intended effect of this

1   provision.  And as I said, if Your Honor thinks it needs

2   clarification, we're happy to clarify.  All of these provisions

3   were drafted in some haste.

4          THE COURT:  You say they were drafted in haste.  Where

5   have you all been?  I mean, this issue, the need for a

6   schedule, has been clear for a very long time.  The status

7   conference has been adjourned before.  It got put on for today.

8   And now I hear that orders -- you know, Mr. Princi's

9   complaining he didn't see this order till it was filed on

10   Friday.  And each side -- you know, that's unacceptable.

11          MR. BENTLEY:  Your Honor, I do think that the language

12   here accomplishes its effect.

13          THE COURT:  Okay.  We'll see.

14          MR. BENTLEY:  But I admit that the intent behind it

15   needs to be unpacked a bit.

16          THE COURT:  Okay.  Let me hear from Mr. Siegel.

17          MR. BENTLEY:  And so, that's what I was trying to do

18   for Your Honor.

19          THE COURT:  Let me hear from Mr. Siegel.

20          MR. SIEGEL:  Good morning, Your Honor.  First of all,

21   I apologize --

22          THE COURT:  Just make your appearance for the record,

23   Mr. Siegel.

24          MR. SIEGEL:  Glenn Siegel on behalf of Bank of New

25   York now as one of the RMBS trustees.  As I said other times

1   when I've gotten up, we try to speak collectively.  I'm sure my

2   colleagues will pipe up if they need to, if I've left something

3   out or I've said something different than what their position

4   is.  But as a general matter, you should assume that we're

5   speaking collectively.

6          Your Honor, based upon the discourse between you and

7   the debtors' counsel and the committee's counsel, I'm kind of

8   throwing out my presentation and I want to hit upon some points

9   and I want to answer whatever questions you have.

10          I want to work backwards for a moment because there

11  was one thing that Mr. Princi said that I took some -- I felt

12  good about.

13          THE COURT:  You felt good about?

14          MR. SIEGEL:  I did.

15          THE COURT:  Did you hear that, Mr. Princi?

16          MR. PRINCI:  Only one?

17          MR. SIEGEL:  Yeah.  Only one.  Sorry.

18          THE COURT:  Take what you can get.

19          MR. SIEGEL:  The idea that somehow the trustees expect

20  that this Court is going to wait around while we get an order

21  under Article 77 in New York state court is not on the table

22  and we're not asking for that.  Let's just start with that.  We

23  recognize that in order to meet the needs of this case, there

24  has to be some sort of an expedited process.  And what we have

25  done was we have come up with what we think is an expedited

1  process that streamlines things so that we can reach at an

2  endpoint that we think is not disruptive to the administration

3  of the estate generally.  And to be clear, the March 31st day

4  is based on an assumption that the debtor can contest because

5  the reason we have a March 31st date -- and I appreciate

6  everybody wants to characterize this as the trustees' parochial

7  interests.  But what this is really designed --

8          THE COURT:  You know, I'm really not moved by any of

9  that.

10          MR. SIEGEL:  Well, but --

11          THE COURT:  If you and your client -- if you aren't

12  looking out for your client's specific interests, I'd be

13  shocked.  So that has no -- that argument doesn't resonate.

14  Okay?

15          MR. SIEGEL:  But I do want to mention that there are

16  other parties here involved.  As Your Honor has said, we have

17  received our letters, which we've now attached to our pleadings

18  so you can see the letters we've received, that represent -- or

19  represent twenty-five percent of some group of 390 of

20  approximately 500 trusts that are suggesting to us that we do

21  this deal.  From our standpoint, it is important in this

22  process we're describing to let the other certificate holders

23  have an opportunity as well to decide what they want to do.  We

24  have sent general notices out but we think there's a formal

25  process that's useful.  It does have the benefit of protecting

1   us as well.  But it also has the benefit of letting those

2   people have their say.  And I want to let that go.

3         THE COURT:  Well, the better you are -- it doesn't

4   mean you pers -- the better collectively the process allows as

5   many of the investors to sign on, the more likely they're going

6   to get the trustees to go along.  So I think building in time,

7   not too much time, but building in time that would encourage as

8   many as possible to sign on makes it more -- this, from my

9   standpoint, was an unusual provision because I've previously

10  dealt with indenture provisions that allow trustees to take

11  certain actions if a majority or two-thirds, depending on the

12  indenture, direct certain action.  I've never seen one that

13  said twenty-five percent.

14        MR. SIEGEL:  This is -- what's unusual about these

15  deals, generally, is they live in the structured world.  So

16  they don't look like the typical deals.  And moreover, one of

17  the additional difficulties we have is because of the structure

18  of these deals and because of the need for off-the-balance

19  sheet treatment which people gave opinions for, these

20  obligations cannot be ResCap obligations.  They have to be

21  trust obligations.  And that's why we're here in the first

22  place talking about what we're talking about.

23        I would note, Your Honor, this March 31st date

24  presumes, based upon our estimate, as to what a suitable period

25  of time to give the certificate holders is to file objections.

1      THE COURT:  Mr. Siegel, did you sit down with Mr.

2  Princi --

3      MR. SIEGEL:  We did not.

4      THE COURT:  Okay.  You're going to do that.

5      MR. SIEGEL:  Understood.

6      THE COURT:  Okay.

7      MR. SIEGEL:  And we will do that.

8      THE COURT:  We don't have to spend more time on the

9  date now.  It may or may not be appropriate.  After you explain

10  your concerns and interests and what's motivating it and he

11  explains his, you hopefully will resolve the issue.

12      MR. SIEGEL:  And the other point that we want to make

13  very clearly is -- and I appreciated what Mr. Princi said about

14  outstanding objections to the sale and not creating problems to

15  the sale.  And I think that Mr. Princi and his client will have

16  the opportunity to object to the limited number of sales

17  objections we've reserved.

18      THE COURT:  Respond to the objections that you're

19  going to file.

20      MR. SIEGEL:  That's exactly right.  And those limited

21  number of sales objections relate to two things.  They

22  relate -- which are basic and we could not take them out and

23  move them into the cure claim corner.

24      The first thing is simply whether or not the purchaser

25  can perform going forward.  By the way, we have no reason to

1   believe they can't.  But we can't turn that into a cure claim.

2   And the other is simply our understanding of what obligations

3   going forward the purchaser's going to undertake.  Mr. Princi

4   is correct that that principle obligation has to do with

5   indemnification.  But it's not just indemnification of the

6   trustees.  It's indemnification of the trust.  The question is

7   who will bear the cost of these particular charges.  You know,

8   the example -- I think I gave it at the last court hearing.

9   But the classic example is three months after the closing, a

10  lawsuit arrives and some county in some state is suing for

11  unpaid taxes for the last three years.

12          The question is what will the successor servicer do

13  with that.  There are two issues that attach to that.  One is,

14  will they pay the ongoing expenses and will they defend the

15  litigation.  We believe that under the current document as

16  written, the APA, that they will now.  Now Mr. Princi has said

17  that they're making efforts to change that and we appreciate

18  that.  But until that happens, we have to reserve on the

19  objection.

20          The second point is who pays the judgment.  And that's

21  a different issue.  And that may very well not be something --

22  we think that issue is something that's a little thornier and

23  that we'll have to work out.  But that's also a genuine

24  objection that we don't think we can shift into the other

25  corner.

RESIDENTIAL CAPITAL, LLC, et al.                    64

1          THE COURT:  Let's go back to schedule.  We're not

2     arguing the whole --

3          MR. SIEGEL:  No, no, no.  I appreciate it.  And I

4     apologize for how cryptic this document is to you, Your Honor.

5     But we have thought very hard about these things and I'm happy

6     to answer any questions, including scheduling questions, that

7     you have.

8          THE COURT:  This is almost in the nit category.  But

9     Mr. Princi started by saying they've already done that your

10    paragraph 2 requires.

11         MR. SIEGEL:  Well, I do have a suggestion although I'm

12    not sure it's the best resolution.  But we filed an objection

13    to their initial motion.  One of the objections we filed is

14    that they did not do what was necessary to bring before this

15    Court the issues associated with assumption and assignment of

16    these contracts.  That's our objection.  We say they have not

17    said what they're doing in any detail in a way that we can

18    respond to it.

19         THE COURT:  Well, they said they're going to file

20    schedules by the 31st.

21         MR. SIEGEL:  Okay.  So that tells us which contracts.

22    It doesn't really tell us what they're going to do with it.

23    You know, with due respect to Mr. Princi, and I do believe that

24    they've been acting in good faith trying to get us information,

25    but we didn't get an NDA signed until I think yesterday.  And

1  I'm not sure that all the signatures are signed.  You know, at

2  some point, when we have the stuff, we can look at it and we

3  can make a determination.  But we don't want to create delay

4  while this is going on.  We think it's useful to the process to

5  create some deadlines so that we can actually see the things.

6  I mean, I'm not suggesting the debtor's not proceeding in good

7  faith.  But the debtor's also been proceeding and talking to

8  us --

9          THE COURT:  I don't understand -- Mr. Princi says he

10  filed a motion; you filed objections to it.  You've got

11  objections to the motion.  But he says we've already filed the

12  motion long ago.

13          MR. SIEGEL:  Well, but that's actually what I'm going

14  to suggest.  If the debtor doesn't believe that our objection

15  is well taken, that they haven't properly brought this issue

16  before the Court, let's schedule a date on that objection.  I'm

17  a little worried that may create some delay because if we are

18  successful and you order him to file a motion, that's going to

19  create a delay.  But --

20          THE COURT:  I'm not ordering anybody to file a motion.

21          MR. SIEGEL:  No, no.

22          THE COURT:  He says he filed a motion.  If I have to

23  rule on it, I'll rule on it.

24          MR. SIEGEL:  Understood.

25          THE COURT:  But --

1        MR. SIEGEL:  But if Your Honor were to find that our

2    objection was well taken, you would find that they had not met

3    the requirements to assume and assign the contracts.  And

4    therefore --

5        THE COURT:  Okay.

6        MR. SIEGEL:  -- the debtor would have to do something.

7        THE COURT:  Any other points that you have on the

8    schedule?  Mr. Princi -- he says they did file a motion; you

9    say they didn't file a motion.

10       MR. SIEGEL:  No.  I understand.  And --

11       THE COURT:  He objects in paragraph 3 to the August

12   20th date.  He says it ought to be August 14th.

13       MR. SIEGEL:  I think that's not a big deal between the

14   14th and the 20th.  We can work that out.

15       THE COURT:  Let me see whether anybody else wants to

16   be heard.  Mr. Garrity?

17       MR. GARRITY:  Good morning, Your Honor.  Jim Garrity

18   from Morgan Lewis on behalf of Deutsche Bank.  I have one

19   question.  And I just -- I don't know if I heard it correctly.

20   I think when Mr. Princi was talking to you about paragraph 2,

21   he said, well, everybody knows what we're going to do because

22   in July we announced to the Court that we're going to assume --

23   some of the debtors are going to assume and some are going to

24   reject.  And we're going to file a motion in August to do that.

25   I thought that's what he said.  I don't know.  But if that's

1  the case, Your Honor, then we really don't have procedures and

2  your point is well taken that we need to sit down and work

3  through them.  But it just strikes me that there isn't a motion

4  on the calendar now to deal with that.  And I may have misheard

5  him.  I may have misunderstood.  And that was my only point.

6          THE COURT:  Thank you, Mr. Garrity.

7          MS. BOELTER (TELEPHONICALLY):  Your Honor?

8          THE COURT:  Let me get people in the courtroom first

9  and then I'll make sure than anybody on the phone has a chance

10 to speak.

11         MR. WEITNAUER:  Your Honor, may it please the Court.

12 I'm Kit Weitnauer from Alston & Bird.  I represent Wells Fargo

13 in two capacities, if you will.  One is as a trustee.  And

14 you've already heard from Mr. Siegel about our concerns there.

15         But Wells Fargo also has another role in this case,

16 Your Honor, as master servicer.  And as master servicer, we

17 filed a partial joinder to the submission of the RMBS trustees.

18 Now it's a partial joinder because Wells Fargo, as master

19 servicer, is dealing with a completely different set of trust.

20 They are not part of the set of trust.  They're part of the

21 9019 settlement.  They are not debtor-sponsored.  Their trust

22 with the debtor is one of the servicers or is the servicer.

23 And these trusts, as we understand it, these servicing

24 agreements with the debtor as servicer, are part of what was to

25 be assumed and assigned as part of the sale.

1          Now the total of this other set of trust is

2    approximately 385.  Okay.  So in that context for those trusts,

3    Wells Fargo, as master servicer, doesn't have any role on the

4    put-back claims that may exist in those trusts.  And I don't

5    know if there are or are not any valid put-back claims in those

6    trusts.  But if there are, they're not part of the 9019.

7          But what's our role?  As master servicer, Your Honor,

8    our role is sort of big picture.  Every month, when the

9    servicer hands us the money, they collect it from the

10   mortgagees and the amounts that are required to be advanced, we

11   then take that and hand it to the institutional investors in

12   accordance with the waterfall.  We're also obligated to

13   supervise the servicer's performance.  And if there's a default

14   to the extent provided in the documents, take action about

15   that.  So we care, in our role as master servicer, about

16   existing defaults and any assurance of adequate -- adequate

17   assurance of future performance.

18         Your Honor, we believe that the sales motion makes

19   clear that there will not be any future performance that could

20   possibly be adequate because Nationstar is not assuming an

21   obligation relating to the pre-closing period.  And we don't

22   think that works in the context of a long-term agreement that

23   has continuing obligations.  And it's not just indemnity.  It's

24   all sorts of obligations.

25         THE COURT:  Let me just -- that really doesn't bear on

RESIDENTIAL CAPITAL, LLC, et al.                    69

1    what I'm dealing with today.  I mean, you've got -- you may

2    have a valid objection.

3              MR. WEITNAUER:  Right.

4              THE COURT:  But it's not to the schedule.

5              MR. WEITNAUER:  Well, we submit that it might be

6    important to the sales process, Your Honor, because if this is

7    resolved that Wells Fargo is right then I think Nationstar

8    would say, well, the condition to our purchase is not satisfied

9    because all we were going to pick up was stuff on and after.

10   And so, we think it's appropriate that this issue be resolved

11   before the auction.

12             THE COURT:  Oh, it isn't going to get resolved today.

13             MR. WEITNAUER:  I know that.

14             THE COURT:  And what I'm dealing -- and with all due

15   respect, what I'm trying to deal with right now is what the

16   schedule -- you've acknowledged you're not part of the 9019.

17             MR. WEITNAUER:  Not for those purposes, that's

18   correct.

19             THE COURT:  And --

20             MR. WEITNAUER:  That's just a claim allowance issue,

21   Your Honor.

22             THE COURT:  Okay.  And you've got arguments you want

23   to make.  They'll be objections to the sale.

24             MR. WEITNAUER:  Yes.

25             THE COURT:  And when I get to the sale hearing, I'll

RESIDENTIAL CAPITAL, LLC, et al.                    70

1    take them up.

2              MR. WEITNAUER:  If that's how the Court wants to, that

3    will be fine, Your Honor.  We think it would be better to have

4    it clarified in advance but we'll do what the Court says.

5              THE COURT:  I'll decide the motions that are pending

6    before me on the calendar today and that's not one of them.

7              MR. WEITNAUER:  That's fine.

8              THE COURT:  Thank you.

9              MR. WOFFORD:  Your Honor, good morning, for the

10   record, Keith Wofford from the firm of Ropes & Gray on behalf

11   of the RMBS institutional investors.

12             Your Honor, the good news is that on behalf of our

13   fourteen billion dollars nearly in certificate holders and the

14   concurring four billion represented by Mr. Franklin, your

15   remarks today have presaged most of what I was going to say

16   today.  And the problem with respect to scheduling here is not

17   that the debtors have come with Schedule A and the committee of

18   trustees have come with Schedule B, but in fact the trustees as

19   you noted came with a schedule that is not a proposed schedule

20   at all.  What effectively the schedule being proposed by the

21   committee and the trustees would do, Your Honor, is to take

22   away the proposed 9019 in its entirety without the opportunity

23   of the debtor or our clients to get a day in court for the

24   proposed 9019 as filed already.

25             This framework we believe is not permitted.  The

1  debtors have the right to go forward with a motion.  And,

2  frankly, with respect to the notion of getting in the room

3  again to try this after several weeks, I'm a little concerned

4  Your Honor.  We spoke with the committee a number of times in

5  person and by the phone and, frankly, look, we've had the

6  opportunity to come with a schedule and they wouldn't come with

7  one.  I think with respect to the pre-sale items, perhaps,

8  there is some more for discussion but I think with respect to

9  the fundamental gravamen of the 9019 which is the size of the

10  claim and whether the trustees agree to accept that, we do need

11  to try to set a schedule today.

12       I'm not optimistic --

13       THE COURT:  The schedule isn't going to get set today

14  because what is happening today is I'm ordering that counsel

15  meet and confer beginning tomorrow morning and go day to day

16  until we have a schedule.  So I'm not going to pick and choose

17  or throw darts as to a schedule.  The constructs that each have

18  taken so far diverge.  We're not going to put off the 9019

19  until after some future negotiation between the trustees and

20  the debtor.  That isn't to say that they can't come -- the

21  parties can't come to an agreed schedule about it.  I'm

22  certainly mindful of the comments you make, Mr. Wofford, with

23  respect to -- be careful what you ask for because the 9019 may

24  get heard.  I'll hear evidence and the result may be it gets

25  rejected and some additional negotiation and a schedule that

RESIDENTIAL CAPITAL, LLC, et al.                    72

1  tries to accommodate the specific needs of the trustees could

2  avoid that happening.

3          MR. WOFFORD:  You are right that that could happen,

4  Your Honor, but one other thing that could happen as you are

5  certainly well aware is that the process of setting a calendar

6  date, of being able to ascertain and delineate the actual

7  objections that are on the record and having the parties have

8  the opportunity before hearing to resolve those objections, we

9  would suggest might have the same effect on a quicker timeline.

10         THE COURT:  Well, we're going -- whatever schedule is

11  agreed to or that I have to resolve because the parties can't

12  will -- needs to include specific dates for objections,

13  hearings, discovery, et cetera.  We're not going to come back

14  in mid-November and talk about a new scheduling order.  So this

15  needs to be a comprehensive schedule that includes whatever

16  matters -- either the motion, the 9019 that's been filed or

17  that the trustees intend to file.  I didn't press Mr. Siegel

18  about what the trustees want to do to see if this Court can

19  resolve issues that could take five years in the state court to

20  resolve.  That's not the issue for today.  But an important

21  issue from the trustee's standpoint, important issue for the

22  investors and for the debtor and the committee.  I mean it's

23  obviously important in being able to put a schedule together

24  that would have hearings, that would give parties a chance to

25  try and resolve these issues if they can, but at the end of the

1    process, we'll give everybody certainty and people can fell --

2    can do what they want but at least we'll provide all of these

3    moving parts some certainty about what the outcome is.

4           So I hear what you're saying but if you need to be a

5    part of the scheduling, the face-to-face meeting on scheduling,

6    that's fine, go ahead and do it but starting tomorrow morning.

7           MR. WOFFORD:  Your Honor, that we take that into

8    account but with one question because one thing that we need is

9    not just a start point but an end point.  Because even though

10   the last conference --

11          THE COURT:  The schedule is going to include start and

12   end.

13          MR. WOFFORD:  But I mean in terms of actually arriving

14   with a schedule.  Because one concern that we have, Your Honor,

15   is that one of the arguments that will be made if a schedule is

16   not agreed to is that as time continues to lapse, there isn't X

17   time remaining before a sale.

18          THE COURT:  I don't allow things to linger.  So the

19   schedule will be set -- I'm just not satisfied that the parties

20   are meeting face-to-face tried to resolve those issues

21   themselves.  And that's what needs to happen.

22          MR. WOFFORD:  Okay.  Your Honor, certainly with -- in

23   conjunction with the debtors and the committee, we'd love to

24   hear any thoughts on alternative dates to set that new schedule

25   because we are concerned.

1        THE COURT:  You're not going to do it here -- we're

2   not going to do it in court now.  Okay?

3        MR. WOFFORD:  Okay.

4        THE COURT:  Anybody else?

5        MS. BOELTER:  Jessica Boelter of Sidley Austin on

6   behalf of Nationstar Mortgage, Your Honor.

7        I raise -- I rise for a very limited purpose and that

8   is simply to point something out with respect to paragraph 4 of

9   the proposed order by the UCC and the RMBS trustees.  It's my

10  understanding of the papers that were filed by the UCC and the

11  trustees that they were intending to bifurcate issues that a

12  potential purchaser of the assets would care about to the pre-

13  auction period and let issues that perhaps only the debtor and

14  their estates would care about to the post-sale period.

15       And if you look at paragraph 4 of their proposed order

16  it says, "Except as to the pre-auction objections, all

17  objections and cure claims of the RMBS trustees in connection

18  with the sale motion are reserved notwithstanding the entry of

19  any order entered in connection with the sale motion."

20       Now, the pre-auction objections that define term as I

21  understand it is principally limited to issues like severing,

22  the RMBS inventory, the enforceability of various origination

23  provisions, but there are, of course, a lot of other objections

24  that the RMBS trustees could assert to the sale.  And the

25  assignment of contracts to Nationstar or any other purchaser

1   such as adequate assurance of future performance whether the

2   bid was the highest and best, good faith of the purchaser.  And

3   from our perspective and my guess is Your Honor doesn't want to

4   hear about those things --

5             THE COURT:  Look, highest and best is going to get

6   resolved in a sale hearing.

7             MS. BOELTER:  Right.

8             THE COURT:  I mean that -- but this would be the rare

9   case where the cure objections aren't deferred until after the

10  sale and you get your chance if you're -- if Nationstar is a

11  successful bidder for the servicing platform, it will no doubt

12  negotiate with those who have cure objections to see whether

13  they can resolve them.  And if they can't, it has to be a

14  hearing to resolve the cure objections, there will.  And at

15  some point Nationstar will just say nope, we're going to reject

16  that.  I'm not going to take that.  I don't want to assume that

17  contract.  That's what always happens.  Why is this different?

18            MS. BOELTER:  Again, in this case, Your Honor, the

19  only thing that concerns me is they're saying all objections to

20  the sale that are asserted by the RMBS trustees shall be

21  reserved notwithstanding the entry of an order approving a

22  sale.  And so, there are certain things that we think have to

23  be resolved at the sale hearing.

24            THE COURT:  I think you make a good point.  It's part

25  of the problem I have with this order in general that I don't

1    read the tea leaves well and I'm not sure what -- I don't want

2    to find out three months from now that somebody had some

3    different intention about it.  So when the parties meet and

4    confer and try to resolve it, clarity, I think is the most

5    important point.

6                MS. BOELTER:  Thank you, Your Honor.

7                THE COURT:  Thank you very much, Ms. Boelter.

8                Anybody else wish to be heard?

9                MR. SHORE:  Good morning, Your Honor.  Chris Shore

10   from White & Case on behalf of the junior secured notes.

11   They're holding a 900 million dollars in claims now with liens

12   on substantially all of the debtors' assets.  I'm also focusing

13   on paragraph 4, the language at the end which I don't think

14   works and I'm happy to talk to people about the language.  But

15   we can't have this order resolved in priority issues in

16   connection with the scheduling of sale objections.  So on the

17   record I'd add that if and to the extent anybody wants to put

18   in the scheduling order something that addresses priority

19   issues that they loop me in and we'll talk to them about it and

20   if we can resolve any objections we will and if not we'll come

21   back and address it when the scheduling orders up.

22               THE COURT:  Thank you very much, Mr. Shore.

23               Anybody else wish to be heard?  Anybody on the phone?

24   Mr. Princi?

25               MR. PRINCI:  First of all, Your Honor, I look forward

RESIDENTIAL CAPITAL, LLC, et al.                    77

1    to hopefully resolving this.  We should be able to resolve

2    this.  There's no reason why we shouldn't come to an agreement.

3             THE COURT:  Would you like everybody to meet in your

4    office starting tomorrow morning?

5             MR. PRINCI:  10 o'clock.

6             THE COURT:  Okay.  Beginning 10 o'clock at the

7    Morrison & Foerster officer, those who wish to be heard with

8    respect to the scheduling order.

9             MR. PRINCI:  Please.

10            THE COURT:  Talk to Mr. Princi after that's when --

11   when we start.  I'm serious about this.  We go day to day until

12   you finish it.

13            MR. PRINCI:  I'm --

14            THE COURT:  And you can't -- what I want to get is I

15   want to get one -- I can understand you may not be able to

16   resolve all the issues but you ought to be able to agree on at

17   least a format and what the format -- and maybe you think that

18   paragraph 4(c) should say this and the trustees think that 4(c)

19   should say that nd indicate what those positions are.  And

20   then, if it comes to that, I'll permit letter briefs that just

21   address indifferences.  And I'm not going to put a page limit

22   on long or short.  Okay.  Just simultaneously file -- and work

23   it out.  The faster this gets resolved the better it gets

24   resolved.

25            So try and iron out a common schedule.  If you intend

RESIDENTIAL CAPITAL, LLC, et al.                    78

1   to disagree, flag those issues.  Short letter briefs addressing
2   those.  Mr. Shore's point about a scheduling order is a
3   scheduling order.  You can't resolve issues about priority.
4   You can't -- it shouldn't have some very vague position that
5   all objections -- there are certain objections that really do a
6   sale process to be effective on.  The buyers need to know what
7   they're bidding on.  So if there are objections -- many
8   objections frequently don't get resolved until after a sale.
9        Adequate assurance, until you know who the successful
10  bidder is, how do you ever know whether there was adequate
11  assurance?
12       (Pause)
13       THE COURT:  I'm going to set the scheduling conference
14  for Tuesday, August 7th at 9 a.m.  So by 5 p.m. Wednesday,
15  August 1st I want to propose a scheduling order reflected to --
16  and hopefully you'll all agree.  To the extent you don't I show
17  the competing paragraphs and I want that same deadline for
18  letters that just address the issues that are in dispute.  I
19  don't need lengthy arguments about why.
20       MR. PRINCI:  Your Honor, may I ask the Court to
21  reconsider those dates for the following reasons?  I think you
22  had it right earlier when you said go in a room, go day to day,
23  get it done.  I mean, Judge, I just don't believe that there is
24  any reason why we should not be able to get a schedule
25  completed by going tomorrow in the same room, Thursday in the

RESIDENTIAL CAPITAL, LLC, et al.                    79

1   same room.  What I'm concerned about, Judge, if you give people

2   to August 1 it's going to be -- it's going, if you will, serve

3   to -- we have a greater incentive, Judge.  I think if you stay

4   with your earlier direction than providing August 1 and then,

5   providing a date where there's a scheduling conference.

6           THE COURT:  Well, I'm on an airplane then, July 31st.

7   And --

8           MR. PRINCI:  So why don't we get it done by the 30th,

9   Judge?

10          THE COURT:  Well, believe or not, I actually have

11  other things on my calendar.

12          MR. PRINCI:  Sorry about that.

13          Would it be possible, Judge, that we set an earlier --

14          THE COURT:  Stop.  Stop.

15          MR. PRINCI:  It's okay.

16          THE COURT:  Okay.  I will address the scheduling.

17          I want to schedule an order by this Friday at noon,

18  July 27th at noon.  I want letters addressing all the

19  differences by Sunday the 29th at noon.  And we'll have a

20  conference on Monday, July 30th, 3 o'clock.  I'm on an airplane

21  the next morning.

22          MR. PRINCI:  Your Honor, thank you very much for your

23  consideration and for moving your calendar like that.  We

24  appreciate it.

25          THE COURT:  Okay.  Mr. Lee, what are we going -- what

RESIDENTIAL CAPITAL, LLC, et al.                    80

1  do we have to cover today and then we'll decide how we're going

2  to deal with it?

3          MR. LEE:  Give me one second.

4          Your Honor, the next thing on the agenda would be the

5  long delayed promise that Mr. Eckstein and I have made to the

6  Court to actually explain what's at issue in relation to the

7  subservicing motion.  I would hope that we'll be able to

8  address that fairly quickly.

9          THE COURT:  Okay.

10          MR. LEE:  Thereafter, Your Honor, we have a reduced

11  number of contested stay relief motions and then a few

12  professional applications which I think we should be able to

13  address fairly quickly as well.

14          THE COURT:  All right.  Here's -- I need a short

15  break.  Let's take a ten minute recess and I'll come back in.

16  Okay?

17          MR. LEE:  Thank you, Your Honor.

18          THE COURT:  Everybody can remain seated when I come

19  back in.

20      (Recess from 11:56 a.m. to 12:15 p.m.)

21          THE COURT:  Okay.  We're back on the record in

22  Residential Capital No. 12-12020.  Mr. Lee?

23          MR. LEE:  Good afternoon, Your Honor.  Gary Lee from

24  Morrison & Foerster for the debtors.

25          The next item on the agenda is the status conference

1   on the debtors' motion for a final order approving the

2   servicing agreement between GMAC Mortgage and its nondebtor

3   affiliate Ally Bank.  That's the agreement under which the

4   debtors provide subservicing for, I think, about 690,000 of

5   Ally Bank's loans.

6           Your Honor, before I provide a report on the

7   outstanding issues and the debtors', the committee's and AFI's

8   efforts to resolve them, I'd like to put this motion into

9   context as Mr. Eckstein and I both suggested we would need to

10  do when we were last here.

11          As Your Honor is aware, the debtors are seeking to

12  complete the sale of a mortgage servicing business, an

13  origination business in bankruptcy.  And as I think we've said

14  from the outset, the success of that endeavor depends in large

15  measure on the continued support and cooperation of the various

16  governmental entities that are parties-in-interest in this

17  case.  And that support is contingent, really, on one thing

18  which is the continued performance by the debtors of their

19  obligations under the DOJ/AG settlement and the consent toward

20  it issued by the Fed.

21          And the servicing agreement, Your Honor, in our view

22  and I think the committee shares this view, it's a major

23  component of the means by which the debtors are complying with

24  the DOJ/AG settlement.  It is, in fact, Your Honor, the vehicle

25  by which the debtors are able to comply with the soft dollar

1    component of the settlement and creditor compliance and also is

2    part of parcel of the way in which the debtors are meeting the

3    hard servicing standards that they're required to comply with.

4            It is also, Your Honor, one of an integrated series of

5    agreements between the debtors on the one hand, AFI and Ally

6    Bank on the other which allow us to continue service loans and

7    to originate new loans during the bankruptcy.  And I think when

8    I -- we've made this point before, Your Honor, those agreements

9    and the support that Ally is providing are a significant driver

10   of value in relation to the asset sale and indeed they're

11   significant driver of the income ResCap generates during this

12   case.  Without the ability to originate that Ally Bank provides

13   to us, it would be a significant loss of income to ResCap

14   during this case in the order of tens of millions of dollars.

15           So as I mentioned earlier this morning, Your Honor,

16   AFI is doing what it committed to do at least under those

17   agreements and under the DIP and that was why, Your Honor, I

18   mentioned that we had committed to file a plan in the coming

19   weeks, in fact, in August so that we would at least comply with

20   some of the milestones in this case.

21           Now, turning to the servicing agreement specifically,

22   the committee has raised concerns regarding indemnification

23   payments paid by the debtors to Ally Bank pursuant to the

24   servicing agreement.

25           Our understanding of the committee's view is that AFI

1   should have made these payments to the bank as opposed to the

2   debtors.  And one point, and this needs to be very clear for

3   the record, absolutely everybody agrees the bank should be

4   paid.  The payments are due and owing.  What was paid should

5   have been paid.  And in our view, the payments that we've made

6   to date post-petition which are just under twenty million

7   dollars, were required by not just the servicing agreement but

8   they are part and parcel of the cost of complying with the

9   DOG/AG settlement.

10          Now, in addition to a difference of use with the

11  committee on payments made to date, there's also a difference

12  of opinion as between the debtors, the committee, AFI and the

13  bank as to the obligation to make future payments.

14          We have argued to AFI and the bank that the

15  requirement to make further payments under the servicing

16  agreement is capped once the debtors have obtained 200 million

17  dollars in soft dollar credits under the DOJ/AG settlement.

18  And because of the very efficient way in which the debtors went

19  about modifying Ally Bank's book, we believe that that

20  threshold has, in fact, been met and we have argued to AFI that

21  we believe that further payments are its obligation.  AFI

22  disagrees with us as does the bank.  And in that regard, last

23  Thursday we received a letter from the bank advising us that

24  the failure to make payments that are now due and owing of

25  about five million dollars are an event of default under the

1    agreement.  So the issue is very bright now.

2           Because of the significance of this agreement, we've

3    been working very hard to bridge the gap between the parties

4    and bring about a resolution of these issues.  And I think

5    that's demonstrated by the fact, Your Honor, that we have one

6    disagreement with the committee and another disagreement with

7    AFI and the bank.  We are trying to bridge the difference very

8    hard.  And everybody understands that these issues really need

9    to be resolved in order to conduct an orderly sale.

10          So as a result of those negotiations, we have

11   tentatively agreed to terms that were spelled out in the

12   supplemental declaration that was filed by the CEO of ResCap,

13   Mr. Marano, and I believe that was filed last Monday.

14          Now, we believe that the proposed compromise is

15   reasonable particularly in light of the importance of the

16   agreement.  And particularly in light of the potential

17   consequences that might arise if ResCap lost the ability to

18   service the Ally Bank loan portfolio.  Now, I want to caution

19   that nobody has made a threat that that will happen but clearly

20   the bank which is regulated by the FDIC has whatever rights it

21   has.

22          And Mr. Marano described, I think in some clear detail

23   what the potential consequences are if the servicing agreement

24   is not approved.  And I believe, and we've had this discussion

25   several times with the committee, they agree that approval of

1     the servicing agreement is critical.  Where the dispute lies,

2     Your Honor, is in relation to the compromise and the

3     indemnification payments.  So at the end of the day, everybody

4     understands that what we need to have is an approved servicing

5     agreement.  The dispute is over the indemnity.  So we will

6     continue to work with the committee, AFI and the bank to

7     address their concerns.

8          Your Honor, if our efforts are unsuccessful to bring

9     everybody to agreement and the hearing on the servicing motion

10    proceeds on a contested basis, we will argue, Your Honor, that

11    performance under the servicing agreement on the terms that Mr.

12    Marano spelled out in his declaration, and that's assuming that

13    AFI agrees to those terms because they are tentative, is a

14    reasonable exercise of the debtors' business judgment are

15    necessary to ensure the asset sale remains on track.

16         The committee served us with informal discovery on

17    July the 6th.  We provided them with documents both before July

18    the 6th.  We're providing them with documents after July the

19    6th and there really is no issue in terms of the speed with

20    which discovery is ongoing.  And depositions, we understand,

21    will need to be taken.

22         As for witnesses, the key witness if there's an

23    evidentiary hearing will be Mr. Marano, Mr. Detweiler who's the

24    head of the subservicing operation --

25         THE COURT:  This would come up as a 9019?  How -- in

RESIDENTIAL CAPITAL, LLC, et al.                    86

1   what warm or fashion would it be presented to the Court?

2          MR. LEE:  I believe, Your Honor, the way that it's

3   contemplated, and as I said, the resolution as between ResCap

4   and AFI is a tentative and be recent is that it would be

5   subject to an appropriate modification of the terms of the

6   servicing agreement.  So fundamentally, the servicing agreement

7   in a term X (ph.) requires ResCap to make certain

8   indemnification provisions.  And there is a dispute between us

9   and AFI as to how those indemnification provisions work and

10  between the committee.  So the simplest form, I think, rather

11  than in terms of a settlement to see --

12         THE COURT:  Is this a 363 motion?  Is it --

13         MR. LEE:  Well, it's a motion to assume the servicing

14  agreements.  That theoretically one could just simply modify

15  the terms of the agreement on terms that the parties agree.  Or

16  alternatively, Your Honor, might simply rule that the terms of

17  the agreement are X, Y and Z and the indemnification --

18         THE COURT:  I'm just trying to understand how this is

19  going to come before me if you don't resolve it.

20         MR. LEE:  It'll come before Your Honor in an

21  evidentiary hearing on the terms of the servicing agreement and

22  what the servicing agreement and the other related agreements

23  require in terms of indemnification.

24         THE COURT:  The reason I keep asking in the context is

25  because obviously a different standard may apply depending in

1   what form it comes before the Court.  There's a pending motion

2   to approve the subservicing agreement.  Now, you're talking

3   about amending or modifying the agreement.  Do I understand

4   that correctly?

5           MR. LEE:  Modifying --

6           THE COURT:  There's an existing agreement.

7           MR. LEE:  Yes, Your Honor.

8           THE COURT:  And assuming the debtor reaches an

9   agreement, at least, with AFI and the bank and contemplate an

10  amendment to the existing servicing agreement.

11          MR. LEE:  That is my view, Your Honor, but I haven't

12  had that discussion with AFI.  As I said, AFI's position is

13  that the agreement that was reached with the -- between ResCap

14  and AFI is tentative subject to documentation and my

15  contemplation is that the easiest way to do that is by an

16  amendment to the servicing agreement to spell out in the

17  servicing agreement which is the agreement between Ally Bank

18  and ResCap precisely where the indemnification obligations lie.

19          Ally Bank is not a party to the DOJ settlement

20  agreement.  So, therefore, what our position is it should be

21  irrelevant to the bank who pays it as long as somebody pays it

22  and there is a difference of view as to who has the obligation.

23  Our view is that the compromise that's been proposed is an

24  acceptable one from a business perspective.

25          THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    88

1        MR. LEE:  So I think, Your Honor, we will work with

2   the committee and with AFI to try to narrow the issues in the

3   event that evidentiary hearing is required.  I think, Your

4   Honor, we had spoken at the last hearing with some dates.  I

5   think Your Honor had suggested August the 14th.  I might be

6   misremembering.

7        THE COURT:  I have a very full ResCap calendar for

8   August 14th.  I don't know what -- there's a lot of stay relief

9   the motions which are all important.  It fills most of the page

10  on my computer screen just looking at the list of matters on

11  the calendar.  I'm not saying that this shouldn't be heard on

12  that day.

13       MR. LEE:  The reason why I think Your Honor will

14  recall why we wanted to have it heard in August was because if

15  the agreement's not approved then the existing agreement by its

16  terms effectively expires.  And the FDIC required Ally Bank to

17  effectively put the agreement out for bid.  And we, obviously,

18  ultimately ended up having the right to continue to subservice

19  the book.

20       What we don't want to do, Your Honor, is be in a

21  situation in which the agreement has expired by its terms which

22  is in effect what will happen.

23       THE COURT:  You need to remind me again because I

24  really am drawing a blank.  Was there an agreed schedule for

25  discovery, briefing, filings assuming hearing in AU --

1    contested hearing on August 14th or not?  I'm drawing a

2    complete blank.

3            MR. LEE:  Your Honor, it has been the subject of

4    discussion between ourselves and the committee but we haven't

5    submitted anything to the Court.  And again, I think what we --

6    what Your Honor asks us to do at the last hearing was to report

7    back.  We would then hear from Your Honor whether or not there

8    had been a couple -- there'd been a suggestion of an earlier

9    date in August but Your Honor had said that really isn't going

10   to work.  I think I want to do this on August the 14th.  Come

11   back and tell me whether or not you've reached a resolution.

12   If you haven't, I'll set it for August the 14th and then once

13   you've done that, we will submit an order -- a scheduling

14   order, Your Honor.

15           THE COURT:  Mr. Eckstein, you want to --

16           MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

17   Eckstein of Kramer Levin.

18           THE COURT:  We made it into the afternoon.

19           MR. ECKSTEIN:  I made it into the afternoon.  I did

20   notice.

21           Your Honor, before --

22           THE COURT:  All on scheduling it seems.

23           MR. ECKSTEIN:  All on scheduling, yes.

24           Before plunging into discovery schedules, I think it

25   would be useful to try to put this motion into context.  I know

RESIDENTIAL CAPITAL, LLC, et al.                    90

1  we've actually adjourned this motion on several occasions now

2  in an attempt to see whether or not this matter could be

3  resolved and I will assure Your Honor that last week was

4  occupied by almost an entire week of in-person meetings.

5  Tuesday, a full committee met with senior management from

6  ResCap about this subject among others.  On Wednesday,

7  representatives of the committee met with the senior executives

8  of Ally Bank.  And on Thursday, representatives of the

9  committee met with senior executives of AFI.  And so, there was

10 extensive in-person discussions and a time between the

11 adjourned hearing a week ago Thursday and today I thought was

12 put to extremely useful use in terms of the parties making

13 very, very serious in-person efforts to try to reach an

14 agreement.

15         I think it's -- I guess it's probably apparent to Your

16 Honor that we're not announcing an agreement today.  I'd like

17 to just put it into context briefly if I may and then we can

18 talk about maybe what the most sensible way is to proceed.

19         THE COURT:  As I understand it, since the petition

20 date the debtors have paid twenty million dollars in

21 indemnification payments?

22         MR. ECKSTEIN:  That's correct, Your Honor.

23         ResCap or GMAC Mortgage has been providing

24 subservicing to the Ally Bank mortgage portfolio going back to

25 2001.  And the terms of that arrangement, at least pre-petition

1   had been supplemented by a swap arrangement that provided some

2   compensation to ResCap in connection with the servicing and

3   that swap would be terminated prior to the commencement of the

4   case.  ResCap, AFI and Ally Bank all felt that it made sense to

5   continue the servicing during the bankruptcy case so that the

6   platform essentially could be maintained in the ordinary course

7   while the platform was being sold.  And toward that end, they

8   agreed to apparently proceed with an amended servicing

9   agreement.

10          Mr. Lee mentioned Ally Bank in an attempt to ensure

11  that there was an arm's length relationship between Ally Bank

12  and ResCap, insisted that before entering into an amended

13  agreement that the terms of an agreement be put out for bid to

14  third parties.  And apparently, the -- an RFP was put together.

15  It was given out to -- we're told twelve potential servicing

16  entities.  Six parties came back with proposals.  There were

17  three contracts and ultimately the ResCap proposal was -- was

18  accepted.  And we're told that ResCap was viewed as a good

19  servicer.  And there were 700,000 mortgages and sort of made

20  business sense that if ResCap was doing a good job servicing

21  and as long as we had market terms in order to deal with the

22  servicing for the next several months until a sale got

23  concluded that it makes sense for everybody; ResCap and AFI and

24  Ally Bank to maintain the status quo.

25          And we understand that a contract was entered into on

1  May 11th, three days before the bankruptcy for an amended

2  servicing arrangement and that was the subject of a motion that

3  was filed on the first day of the case and Judge Peck heard a

4  presentation with respect to the amended servicing motion and

5  the Court was told that it was business as usual and the terms

6  of the amended servicing arrangement were laid out in the

7  motion.  They were three pages single spaced laying out the

8  services and the compensation and the events of default and the

9  termination and it looked like a servicing motion.  And we were

10 told that it was on market terms.  And that was what we knew.

11 And it was approved.  And it was set down for a final hearing

12 on June 18th.

13       The motion did not make any reference, Your Honor, to

14 indemnity payments and that was troubling to us and it is

15 troubling to us right now.  And as Your Honor pointed out that,

16 in fact, as a result of the motion, following the entry of the

17 interim order, 19.9 million dollars was paid by ResCap in

18 respect of an indemnity obligation that ResCap and AFI jointly

19 had entered into with Ally Bank in January of 2012 with respect

20 to the DOJ attorney general settlement.  It's a complicated

21 settlement.  They're complicated obligation.  But when it's

22 boiled down to its essence, there was an agreement between AFI,

23 ResCap and Ally Bank that provided for reimbursement payments

24 and releases of debt and extensions of credit and a whole

25 series of undertakings that were not part of the servicing.  It

1   was a separate standalone agreement that was entered into pre-

2   petition where you had joint obligations by ResCap and AFI to

3   reimburse Ally Bank.  And there's discussions about whether it

4   was capped at 200 million dollars or not although what we now

5   understand is that everybody seems to agree that number one,

6   ResCap is in full compliance with the DOJ settlement, which is

7   important.  And number two, that, in fact, as of the petition

8   date, ResCap had satisfied between cash payments and soft

9   credits the 200 million dollar obligation that it was obligated

10  to pay under the DOJ settlement.

11          Now, if this motion was simply about whether or not

12  the terms of the servicing that were amended and built into the

13  motion were appropriate and whether it made business sense for

14  ResCap to continue to service Ally Bank's loan between now and

15  the closing of a sale, I don't think we would have had three

16  adjournments.  I don't think we would have a lot of discussion.

17  It makes business sense.  We understand that.  And while I

18  can't represent to Your Honor that we know for certain that

19  it's on market terms, we're told that if there was an RFP and

20  there was bidding and that ResCap's proposal is within the

21  range of market terms and that seems to make a lot of sense.

22  And the committee is supportive of the servicing continuing

23  between now and the closing.  We all agree on that.  We have a

24  problem.

25          THE COURT:  Did the RFP cover require

1    indemnification --

2         MR. ECKSTEIN:  We don't -- I don't believe so, Your

3    Honor, no.  I don't believe the indemnification has anything to

4    do with servicing.

5         What happened was that the servicing was used as a

6    vehicle to fold in the pre-petition indemnification

7    arrangements that existed between ResCap, AFI and Ally Bank and

8    that is the nub of the problem.

9         Pre-petition in March or April of 2012, ResCap paid

10   forty-eight million dollars in respect of this indemnity.

11   Post-petition, ResCap has paid 19.9 million dollars in respect

12   of this pre-petition indemnification.  As Your Honor heard,

13   there's a five million dollar bill that is outstanding for

14   June.  And, in fact, since it is still outstanding last week,

15   AFI -- Ally Bank delivered a notice of default under this

16   amended servicing agreement on the ground that they are

17   entitled to be reimbursed for the -- essentially the costs of

18   the modification.

19        THE COURT:  If the indemnification obligation didn't

20   exist pre-petition in the servicing agreement, where did it

21   arise from?

22        MR. ECKSTEIN:  It arose from a June -- January 30

23   letter agreement entered into between ResCap and AFI and Ally

24   Bank.  And they were pre-existing indemnity agreements that ran

25   between AFI and Ally Bank in connection with servicing but the

RESIDENTIAL CAPITAL, LLC, et al.                    95

1  indemnity with respect to the -- with respect to the DOJ

2  payments arose out of a January 30th, letter.

3          By rights, if it was appropriate and it made sense to

4  assume the January 30th, letter, a motion could be made to

5  assume the January 30th letter and there'd be a hearing on

6  whether or not we should assume the January 30 letter and on

7  what terms.  And that's -- part of the problem is that motion

8  is not pending.  Instead, it was folded into the servicing

9  agreement and essentially as a toll for the privilege of it

10 continuing to service on market terms, we essentially have

11 learned that what is necessary is that ResCap has to pay what

12 looks like it could be in excess of hundred million dollars of

13 cash to Ally Bank and it could be more if there are further

14 modifications essentially as a toll for having the privilege of

15 continuing to do what they've been doing in the ordinary course

16 of business now on market terms.

17         THE COURT:  Did the January 30 letter tie it into any

18 other agreements between the parties?

19         MR. ECKSTEIN:  Your Honor, I wouldn't even pretend to

20 try to answer that with certainty.  But it was a standalone

21 agreement.  It was related to the DOJ settlement.  I'm not

22 aware that it didn't tie into anything else that I'm aware of,

23 Your Honor.

24         But now in the amended servicing agreement, the

25 amended servicing agreement references -- references the DOJ

1   settlement and it essentially says that ResCap has to pay all

2   essentially costs of modification.

3         Now, as an aside, it's interesting from a business

4   standpoint, what are the modifications really mean?  Basically,

5   you have a pool of mortgages that Ally Bank originated.  The

6   mortgages have problems and they're not worth their face,

7   necessarily.  ResCap goes ahead and modifies the mortgages

8   usually by writing down the face or changing the terms.  And

9   so, essentially a mortgage with a one hundred dollar face is

10  modified down to seventy dollars, let's say.  And so, what does

11  it mean?  What does the indemnity mean?  It means that ResCap

12  goes out and modifies the mortgage.  It goes from a hundred to

13  seventy which is probably fair market value for the mortgage.

14  The mortgage is actually cleaned up and improved and then

15  ResCap has to turn around and write a check to Ally Bank for

16  thirty cash dollars on an administrative basis to reimburse

17  Ally Bank which is owned by AFI, of course, for the difference

18  between what the face amount of mortgage was and what the

19  real fair market value is.

20        Whether that makes business sense or not, Your Honor,

21  I don't know.  And that's not something that I want to deal

22  with today and I don't think anybody wants to deal with that

23  today but that was the agreement that was reached.

24        And the fact that AFI is jointly obligated to pay

25  those indemnities is interesting and important and is something

RESIDENTIAL CAPITAL, LLC, et al.                              97

1    that we, frankly, think should be dealt with in connection with

2    a plan.  That's a pre --

3             THE COURT:  I understand -- curiosity is the January

4    30th letter or the amended loan servicing agreement is subject

5    of the examiner's investigation?

6             MR. ECKSTEIN:  I have no doubt the examiner will look

7    closely at the January 30 letter and will look at all the

8    negotiations surrounding the January 30 letter and the payments

9    that were made prior to.  The January letter -- the January 30

10   letter was a fascinating letter because it contemplated the

11   bankruptcy file, it contemplates DIP financing, and it

12   contemplates an entire sequence of events that are now playing

13   out and it was contemplated very carefully at least as far back

14   as January and I'm sure before January.

15            But again, it's -- the problem we have, and I'm going

16   to be honest, the problem that we have is we've tried to

17   resolve this because we agree it is a good thing for ResCap and

18   we think for AFI to maintain the status quo and for ResCap to

19   continue to service 700,000 mortgages that are currently part

20   of their servicing platform between now and the closing.  And

21   it's a one year contract and there's no guarantee that AFI and

22   Ally Bank will continue to stay with the purchaser but it

23   essentially gives the purchaser and AFI post-closing the

24   ability to decide --

25            THE COURT:  What happens to the indemnification

1  obligation post-sale?

2          MR. ECKSTEIN:  Post-sale, ResCap no longer has a new

3  liability.  And AFI is obligated independently on the indemnity

4  and AFI and Ally Bank I'm sure we'll figure out a way to work

5  that out.

6          THE COURT:  So what discovery have you taken to date?

7          MR. ECKSTEIN:  Look, Your Honor, the problem is we

8  have --

9          THE COURT:  August 14th is going to be here before you

10  know it.

11          MR. ECKSTEIN:  Correct.  Everything is here before we

12  know it.

13          And we have -- as Mr. Lee indicated, we served the

14  debtor with document requests.  We had asked for e-mails and

15  the debtor has not yet provided e-mails.  We provided them

16  search terms and I take from Mr. Lee's comment that they will

17  find a way to provide us with the e-mails as to the facts

18  surrounding all these events.  There are a lot of facts.

19          THE COURT:  What's your discovery cutoff date?

20          MR. ECKSTEIN:  We have not yet taken depositions, Your

21  Honor, because we held off.  If we're going to have a--

22          THE COURT:  What should be the discovery cutoff?

23  Because I -- what's going to happen, August 14th is really just

24  around the corner and as you know from this and other matters

25  if I have to have a contested evidentiary hearing, I'm going to

RESIDENTIAL CAPITAL, LLC, et al.                    99

1   have everything well in advance of that hearing, direct
2   testimony, written narrative form, deposition designations,
3   counter designations, exhibits, objections, the full package, I
4   generally want it a week before, August 7th, okay.  That's
5   really close.  So I care most about that August 7th date and
6   everything else to that point is what's going to make all of
7   your lives miserable.  But you can't wait much longer to
8   have -- whether you call it a contingency plan in mind that,
9   okay, here's the schedule.  I don't -- what I don't want to
10  hear come August 7th well, we need to move that date another
11  four days because we're continuing to discuss and maybe we'll
12  have an agreement and then, I don't have the stuff, and I don't
13  feel I'm prepared for a contested hearing; and that's what I
14  insist on doing.
15          So what you all need to do is by Thursday, I want an
16  agreed order on a schedule.  Is your view that it needs to go
17  forward on August 14th?
18          MR. ECKSTEIN:  No, Your Honor.  I mean the problem --
19  there are two problems and I'm not belittling AFI's issues but
20  AFI has a deadline in the DIP and AFI feels as if they keep
21  pushing the deadline out and they don't like to push the
22  deadline out.
23          THE COURT:  Well, you've known about the deadline,
24  though.
25          MR. ECKSTEIN:  But we can't -- it's not in my control,

1  Your Honor.  So I'm dealing with --

2          THE COURT:  It is.  It's in your control to say we

3  don't agree; we're going forward with a contested hearing.

4  Yes?

5          MR. ECKSTEIN:  That's what we're prepared to do.

6          THE COURT:  Okay.

7          MR. ECKSTEIN:  So -- but I don't need to go forward.

8  I'm saying we're going forward because that's the deadline.

9          The other deadline is there's a five million dollar

10 bill out there which Ally Bank wants to be paid.  We agree Ally

11 Bank should be paid and there's an issue whether it should be

12 paid by ResCap or AFI and that -- that right now is not

13 resolved and that's putting some pressure right now on the

14 issue.

15         Your Honor, we'll be prepared to go forward on August

16 14th and we'll finish the -- we'll submit our papers --

17         THE COURT:  No, you're prepared to submit -- that both

18 sides will submit declarations for direct expected -- for the

19 direct testimony.  Declarants will be present in court for

20 cross-examination.  If you're going to submit any deposition

21 designations and counter-designations I want those by August

22 7th as well.  I want briefs of each side by August 7th.  And

23 I'm going to leave it in the first instance to you and Mr. Lee

24 to work out what dates you need to agree on to get to those

25 dates.

1        I hope you settle it.  If you can't, we'll have to go

2   forward.  I understand that.

3        MR. ECKSTEIN:  If I may suggest, Your Honor, rather

4   than burden Your Honor with the calendar right this moment, let

5   me and Mr. Lee or our colleagues try to work out a schedule

6   over the next two days and come back to Your Honor with the

7   schedule for how we would complete discovery and submit the

8   unnecessary materials contemplating an August 14th hearing.

9        THE COURT:  Okay.  Fair enough.

10        MR. ECKSTEIN:  Thank you, Your Honor.

11        THE COURT:  Let's be -- before you sit down, let's --

12   we have a call on Thursday at 2 o'clock, a telephone call, just

13   to see where you are on the schedule.

14        MR. ECKSTEIN:  On --

15        THE COURT:  This Thursday.

16        MR. ECKSTEIN:  -- on this issue?

17        THE COURT:  On this issue.

18        MR. ECKSTEIN:  Thursday at 2?

19        THE COURT:  Yes.

20        MR. ECKSTEIN:  That's fine.  That -- we can do that.

21   I think we can -- by then, we'll be -- we'll have worked out

22   the schedule.

23        THE COURT:  Just let my -- one of my law clerks know a

24   call-in number.

25        MR. ECKSTEIN:  That's fine.

1        THE COURT:  Hold on.  What do we have then?

2     (Off the record)

3        THE COURT:  1 o'clock.

4        MR. ECKSTEIN:  Thursday at 1?

5        THE COURT:  Thursday at 1.  I have a 2 o'clock.

6        MR. ECKSTEIN:  Okay.  Thank you, Your Honor.

7        THE COURT:  Okay?  Thank you.

8        Now, Mr. Lee, really briefly.  And then, I got to

9  figure out what we have left because I want to take a lunch

10 break.

11       MR. LEE:  Your Honor, just a couple of things by way

12 of clarification.

13       First of all, the -- I think Mr. -- counsel to the

14 committee suggested that we've actually satisfied the

15 requirement to obtain 200 million dollars in borrower relief

16 credits as of the petition date.  That is, in fact, incorrect.

17 We hadn't -- well, no, but that's --

18       THE COURT:  I don't want to get into the merits of it.

19 I just -- it is -- either you did or you didn't and --

20       MR. LEE:  But it -- just for -- there's a declaration

21 that sets out from Mr. Marano the time and I just don't want

22 the record or the transcript to --

23       THE COURT:  You don't agree to.

24       MR. LEE:  -- thank you, Your Honor.

25       THE COURT:  All right.  What is it that we need to

RESIDENTIAL CAPITAL, LLC, et al.                103

1   cover.  I'm trying to --

2          MR. CORDARO:  Your Honor, may I be heard on this just

3   briefly?

4          THE COURT:  Go ahead.

5          MR. CORDARO:  Thank you, Your Honor.  Joseph Cordaro,

6   Assistant United States Attorney appearing on behalf of the

7   United States of America.  And I just want to briefly point out

8   an issue of concern that the United States has with the Marano

9   declaration and we're still reviewing it.  It's rather complex

10  and there are a lot of complex exhibits to it.

11         But the solicitation and modification aspects of the

12  DOJ/AG settlement, of course, are a key component of the

13  borrower relief that's contemplated in that settlement.  And

14  there was a statement in the Marano affidavit to the effect

15  that solicitations on the Ally book have been suspended I

16  assume pending these negotiations.  It was in paragraph 18 of

17  that declaration.

18         THE COURT:  I haven't read the declaration.

19         MR. CORDARO:  Okay.  And again, there's a lot of

20  complex things going on here so we're reviewing it and, of

21  course, the government's position is regardless of whether that

22  200,000 dollar cap --

23         THE COURT:  I think it's 200 million --

24         MR. CORDARO:  -- 200 million dollars -- excuse me --

25  cap has been met, the solicitations under the DOJ/AG settlement

1  should continue as -- and the modifications.  They're bonded

2  together.  And to the extent there's any question about that, I

3  would encourage all parties to contact the government and

4  discuss that with us as soon as possible.  And, of course, to

5  the extent that there is disagreement over that, of course, we

6  reserve our rights to object or take any other appropriate

7  action.

8            THE COURT:  Okay.  Thank you very much, Mr. Cordaro.

9            MR. CORDARO:  Thank you, Your Honor.

10           MR. SCHROCK:  Your Honor?

11           THE COURT:  Yes, come on.

12           MR. SCHROCK:  Ray Schrock of Kirkland & Ellis on

13  behalf of Ally Financial and Ally Bank.  I think Your Honor, in

14  reading your body language we'll be very brief.

15           I think suffice to say we do have a disagreement with

16  the committee on behalf of the Ally Bank who is a counterparty

17  to this agreement as well as AFI.  We tried to work it out.

18  We'll be happy to speak to them.  I don't have a great deal of

19  faith that it's going to get worked out but I think

20  procedurally what you have in front of you is an

21  amended -- it's effectively an amendment to the subservicing

22  agreement and it can just be dealt with in the final order.

23           We disagree with the way the committee framed up the

24  issues for purposes of whether or not this agreement should be

25  approved.  I think fundamentally it's an agreement between Ally

1  Bank on the one hand and ResCap on the other.  And the question

2  is whether or not the debtors' business judgment should be

3  respected.

4        I don't think that a lot of these other issues come

5  into play but to the extent they do, we'll deal with them.  But

6  I think it makes the hearing unnecessarily complex.

7        THE COURT:  Thank you, Mr. Schrock.

8        MR. SCHROCK:  Um-hum.

9        THE COURT:  All right.  I'm looking at this long

10 agenda.  We still have quite a few matters to cover.  We're

11 going to take a lunch break.  Before we do, on the agenda on

12 page 4 was the ResCap, the Allstate Insurance Co adversary

13 proceeding which -- actually, this was on the motion to

14 dismiss.  I had the trial on the preliminary injunction and it

15 went forward only as to one of the defendants in the case and I

16 ruled from the bench.  I'm still waiting for proposed orders.

17 There was the stipulation that was entered into before the

18 hearing that resolved the motion stated until October 31 as to

19 the vast bulk of the defendants.

20       At the time of the hearing, there was an adjournment

21 after the plaintiff put on his case and there was announced on

22 the record a resolution with the FDIC.  I still haven't seen an

23 order about that.  I received an e-mail from Judge Swain today

24 who has the FDIC matter.  She was -- I had advised her of what

25 had occurred at the preliminary injunction hearing and I told

RESIDENTIAL CAPITAL, LLC, et al.                    106

1    her I would forward her the order after it was submitted and

2    entered.  I'm still waiting.

3           There also was to be an order as to the one -- I don't

4    remember whether -- but there were three parties that would be

5    covered by orders or one, but I haven't seen any of them yet.

6    Mr. Lee?

7           MR. LEE:  We'll go back to your office -- I'm sorry,

8    Gary Lee from Morrison & Forester -- we'll go back to the

9    office as soon as we're done, Your Honor, and make sure that's

10   done.

11          THE COURT:  Are they done?

12          MR. LEE:  I will check at the break.

13          THE COURT:  I really need to -- we need to get that

14   buttoned down.

15          MR. LEE:  I will force the issue internally.

16          THE COURT:  Okay.  All right.  So we're at the

17   portion, if I understand it, there's some uncontested matters.

18   I don't know whether anybody wants to be heard with respect to

19   those.  I gather the debtor has some proposed stipulations it

20   wants to present.  Do I understand that correctly?

21          MR. KLEIN:  Good afternoon, Your Honor.  Aaron Klein

22   from Morrison & Forester on behalf of the debtors.

23          Yes.  With respect to the Shellpoint motion to lift

24   the stay and also the Community South Bank motion to lift the

25   stay, we have prepared stipulations and orders.  We are

1  prepared to submit the Shellpoint stipulation to today.  And

2  I'm told that we will be sending you a stipulation regarding

3  Community South Bank, a consent order on that one later today

4  or tomorrow morning.  But those two have been resolved.  We're

5  pleased to report that.

6          THE COURT:  All right.  Thank you.

7          And there were also listed in the uncontested matters

8  the retention application for Towers Watson Delaware.  Mr.

9  Marinuzzi, there have been no objections filed to that as I

10 understand.

11         MR. MARINUZZI:  That's correct, Your Honor.  No

12 objection was filed to that application in lieu of us --

13         THE COURT:  Mr. Masumoto?

14         MR. MASUMOTO:  I believe I have a supplemental

15 declaration was filed and that's satisfied --

16         THE COURT:  And you're satisfied.  Anybody else wish

17 to be heard with respect to the Towers Watson application?

18         All right.  It's approved.

19         MR. MARINUZZI:  Thank you, Your Honor.  We also filed

20 an application to retain Fortace LLC as debtors' consultant in

21 connection with the RMBS litigation.

22         THE COURT:  All right.  Mr. Masumoto?

23         MR. MASUMOTO:  Similarly, we had discussions and I

24 believe a supplemental was filed which resolved those

25 objections.

1        THE COURT:  Anybody else wish to be heard on that?

2   It's approved.

3        MR. MARINUZZI:  Your Honor, and then, the final

4   retention application was to uncontested matters is the

5   debtors' application to retain Severson & Werson a special

6   California litigation counsel.  We filed supplemental

7   disclosures to address the issues.

8        THE COURT:  Mr. Masumoto?

9        MR. MASUMOTO:  No issues.

10       THE COURT:  Anybody else wish to be heard with respect

11  to the Severson & Werson PC retention application?  All right.

12  That's approved as well.

13       Are we going to take -- we'll get to the contested

14  matters --

15       MR. MARINUZZI:  Your Honor, I'm sorry to interrupt you

16  but we skipped over the debtors' application to extend the time

17  to file schedules and statements and it's not opposed and we

18  filed them.

19       THE COURT:  Anybody wish to be heard with respect to

20  the application to extend time on schedules?  All right.  It's

21  granted.

22       MR. MARINUZZI:  Thank you, Your Honor.

23       THE COURT:  Thank you.  All right.  Let me -- does the

24  agenda remain accurate as to those contested matters; Gilbert,

25  Wells Fargo, Centerview and there were a few others.  All

1  right.  We're going to be in recess until 2 o'clock.  We're

2  into the one hour recess and then we'll try to knock it off.

3  Okay?

4          MR. MARINUZZI:  Okay, Your Honor.

5          THE COURT:  Okay.  Thank you very much.

6          MR. MARINUZZI:  Thank you.

7       (Recess from 12:57 p.m. until 2:06 p.m.)

8          THE COURT:  Please be seated.

9          MR. MARINUZZI:  Good afternoon, Your Honor.

10         THE COURT:  Mr. Marinuzzi?

11         MR. MARINUZZI:  For the record, Lorenzo Marinuzzi,

12 Morrison & Foerster on behalf of the debtors.  Your Honor, if

13 it's okay with the Court, we'd like to proceed out of order a

14 little bit on the contested matters and deal with the retention

15 issues, because they're not really contested for the most part.

16         THE COURT:  That's fine.

17         MR. MARINUZZI:  And I'd like to begin with item 4,

18 which is the debtors' application to retain Centerview as

19 investment banker.  Your Honor, the U.S. Trustee filed an

20 objection to the motion which had originally been filed back in

21 June, and we continued the hearing to the 14th -- to today --

22 I'm sorry 24th.  And we believe that the issues raised by the

23 U.S. Trustee, which were really in the nature of disclosure,

24 have been addressed with the supplemental declaration of Marc

25 Puntus in support of the application.

1           And basically, Your Honor, to highlight the economic

2    terms of Centerview's retention:  Centerview's being retained

3    and has been retained to raise financing as well as oversee and

4    administer the sale process.  Their compensation post-petition

5    calls for a monthly fee of 300,000 dollars, a transaction fee

6    of 12.5 million dollars, half of which was paid upon the

7    execution of the asset purchase agreement.  The other half

8    would be due and earned at closing.  But as an accommodation to

9    the committee, Centerview's agreed that that second half will

10   not be paid until the effective date of a plan of

11   reorganization.

12          There's also a financing fee of up to five million

13   dollars which has been paid, and an interim transaction fee of

14   1.25 million dollars, which has already been paid as well.

15   There's crediting that's set forth in the engagement letter.

16   Crediting includes fifty percent of all monthlies against any

17   transaction fees -- fifty percent of monthlies earned post-

18   petition.  And there's also a crediting against the transaction

19   fee of fifty percent of all financing fees earned over 500,000

20   dollars.

21          Your Honor, we believe that the terms of their

22   retention are market.  And unless the Court has any questions

23   or anyone else wishes to be heard on it, we would ask that the

24   Court approve the debtors' retention of Centerview.

25          THE COURT:  Mr. Masumoto?

RESIDENTIAL CAPITAL, LLC, et al.                    111

1          MR. MASUMOTO:  Your Honor, subject to a review of the

2     final order, we believe the incorporated change in the final

3     order that addresses our concerns -- but I believe they have a

4     final change that needs to be circulated.

5          MR. MARINUZZI:  Correct, Your Honor.  The final change

6     is the change I just mentioned about not being paid the second

7     half of the transaction fee until the effective date of a plan.

8          THE COURT:  Does anybody else wish to be heard with

9     respect to the Centerview retention application?  Mr. Eckstein?

10         MR. ECKSTEIN:  Your Honor, Kenneth Eckstein from

11    Kramer Levin on behalf of the committee.

12         Your Honor, we did review the application carefully.

13    We reviewed comparable retention applications for investment

14    bankers in large, complex cases.  I think we concur with the

15    fact that this is market.  Or to the extent there's a market,

16    this is somewhere in the market.  We did ask all of the

17    financial professionals to make the modification that

18    Centerview has agreed to, which is that completion fees be paid

19    only upon the effective date of a plan.  And that was agreed

20    to.

21         And in an effort not to contest all matters that are

22    raised in the case, the committee, with that modification, did

23    not have an objection to the application.

24         THE COURT:  Thank you.  Anybody else wish to be heard?

25         All right.  The Centerview application is approved

1   subject to the U.S. Trustee and the Court having an opportunity

2   to review the final order.

3          MR. MARINUZZI:  Thank you, Your Honor.  That brings us

4   to the debtors' application to retain FTI Consulting as

5   financial advisor.

6          Your Honor, the United States Trustee had also

7   objected to this application.  And in response to that, FTI has

8   filed additional disclosures, which we believe address the U.S.

9   Trustee's concerns.  This application was originally filed

10  seeking approval of compensation that's a little bit different

11  from what is ultimately being proposed.  And that's a result of

12  modifications requested by the committee, after extensive

13  discussions.

14         And whereas originally FTI was to receive a monthly

15  fee of 1.75 million dollars through the end of March, and a 4.3

16  million dollar completion fee, payable upon the earlier of the

17  closing of a sale transaction, or confirmation of a plan, the

18  compensation's been modified as set forth in, I believe,

19  Exhibit 2 to the supplemental declaration of William Nolan.

20         And just to summarize the economics, Your Honor.

21  There is now -- it's an hourly engagement, subject to a cap.

22  And to the extent that FTI exceeds for that given month

23  whatever that cap is, it carries forward.  And it carries

24  forward through April, and thereafter there's no longer the

25  ability to roll forward any overage.

1          So in looking at the numbers and reconciling what made

2     sense -- and let me back up a second.  Part of the reason why

3     the company and FTI had agreed to an arrangement that held a

4     steady state was in part for cash flow purposes, to manage what

5     the professional expenses would be.  And so revisiting those

6     numbers with the committee, FTI and the company and the

7     committee have agreed that for the period from the inception of

8     the case through June 30th, the cap applicable to that period

9     would be 4 million dollars.  And then for the period July

10    through December of this year, the cap would be 1.75 million

11    dollars.  And then beginning in January and running through the

12    end of March, for those three months, the cap would be 1.25

13    million dollars.  And then thereafter, the cap would be 1

14    million dollars.  And the completion fee, which had originally

15    been 4.3 million dollars, is now 2.5 million dollars.

16          Your Honor, I believe that satisfies the committee's

17    concerns.  The U.S. Trustee's concerns, I believe, as I noted,

18    were addressed in the supplemental declaration.  We'll

19    certainly show a copy of the order to both the U.S. Trustee and

20    the committee before we present it to the Court.  But unless

21    Your Honor has any questions --

22          THE COURT:  I do.  My question really relates to FTI's

23    work for the Chapter 7 trustee of Alliance Bank Corp., and

24    how -- because they are -- the Chapter 7 trustee, as I

25    understand it, is involved with an adversary proceeding against

1    the debtors.  And how is the Alliance Bank Corp. potential

2    conflict matter being handled?

3         MR. MARINUZZI:  Your Honor, I know there was some

4    disclosure on this in Mr. Nolan's supplemental declaration, and

5    possibly in the original application, because we had wanted to

6    make sure that it was addressed by the court.  We were

7    satisfied that it didn't present a conflict, just based on the

8    nature of the proceedings and that there had been a wall

9    between those that had provided services for the Chapter 7

10   trustee and those providing services in this case.

11        I'm trying to find the portion of the declaration

12   that's relevant to this point.  And Mr. Nolan, by the way, Your

13   Honor, is here in court with us, and would be happy to address

14   the Court's concern, if I fail to do it adequately.

15        Your Honor, in paragraph 7 of Mr. Nolan's initial

16   declaration he describes the claims associated with that

17   Chapter 7 case.  And as he notes, the Chapter 7 trustee of

18   Alliance Bank Corp. is currently involved in an adversary

19   proceeding with Residential Funding Corporation for recovery of

20   pre-petition transfers.  FTI has agreed to work cooperatively

21   with the parties-in-interest to share files and work product.

22   But that engagement was essentially completed in 2010.  So it

23   predates, significantly, the commencement of this case.

24        From time to time they've been asked to provide and

25   interpret certain accounting information from Alliance Bank

1    Corp.'s books and records.  But the FTI professionals involved

2    in the Alliance Bank Corp. engagement have not been asked to

3    provide any services on this matter since March of 2012.

4            THE COURT:  Are those people going to be screened from

5    ResCap?

6            MR. MARINUZZI:  They will be, Your Honor.

7            THE COURT:  All right.  Mr. Masumoto?

8            MR. MASUMOTO:  Your Honor, we have no further

9    objections.  They did also include a modification to the order

10   which addressed further concerns that we had.

11           THE COURT:  All right.  Does anybody else wish to be

12   heard with respect to the FTI retention?  Mr. Eckstein?

13           MR. ECKSTEIN:  Your Honor, just very briefly.  Mr.

14   Marinuzzi has accurately captured the economic modifications to

15   the FTI arrangement.  And in contrast to the Centerview

16   retention, where it's a relatively small monthly and a large

17   back-end, this one had a large monthly.  And so the notion of

18   building in a cap we thought was actually quite meaningful.

19   Because it's very difficult to project out into the future what

20   would be an appropriate cap.  So the fact that there are now

21   going to be hourly rates with a cap, we thought was actually a

22   financial advantage to the estate.

23           FTI did agree to reduce the completion fee.  But we

24   thought that the cap provided meaningful consideration, so to

25   speak, for the completion fee.  I just wanted to point out that

1   the order now provides that the monthlies will be subject to

2   Section 330.  So if it turns out that the scope should change,

3   one way or the other, we'll all be able to go back and, I

4   think, talk to FTI.  And I think that that was understood, that

5   we'll be able to look at where the case is.  And the completion

6   fee, we understand, is a 328 order.

7           THE COURT:  Thank you.

8           MR. ECKSTEIN:  So with that, we're satisfied, Your

9   Honor.

10          THE COURT:  Anybody else wish to be heard?

11          All right.  The FTI retention application is approved.

12          MR. MARINUZZI:  Your Honor, that's it as far as the

13  debtors' applications respecting professionals.  I'll turn it

14  over to Mr. Eckstein to address the committee's application to

15  retain Moelis.

16          MR. ECKSTEIN:  If we can just have a second, Your

17  Honor?

18          THE COURT:  Sure.

19      (Pause)

20          MR. ECKSTEIN:  Your Honor, the creditors' committee

21  has engaged Moelis as an investment bank in the case.  We've

22  also retained AlixPartners as a financial advisor.  The

23  AlixPartners application is being adjourned to, I believe, the

24  August 8th hearing, because there are still open issues in

25  connection with disclosure that the U.S. Trustee is looking at.

1   And I think Alix agreed yesterday that it was going to file a

2   supplemental.  So we're going to go forward just with the

3   Moelis retention today.

4           The Moelis retention application, from an economic

5   standpoint, they have a monthly fee of 225,000 dollars per

6   month.  And they have a completion fee, Your Honor, of 7.75

7   million dollars, which will be payable in the same manner as

8   the Centerview and FTI completion fees, upon the effective date

9   of a plan.  They don't have any interim payments of a

10  completion fee, so it's all paid at the end of the case.

11          And again, we did look at comparable retentions for

12  financial advisors for committees in large, complex cases.  And

13  there was a fair amount of back-and-forth between the committee

14  and Moelis to ultimately arrive at the terms of this retention.

15  And we believe that the retention is reasonable and consistent

16  with what is approved in cases for similar complexity and size

17  in terms of transactions and amount of debt.

18          I think there are two issues that are still open with

19  the U.S. Trustee.  One, I believe, relates to the identity of

20  certain passive minority investors in Moelis itself.  And I

21  believe counsel for Moelis is in court and can speak to that

22  issue.  But my understanding is that the identity has been

23  disclosed to the U.S. Trustee.

24          THE COURT:  I saw it was going to be disclosed in

25  confidence to the U.S. Trustee, the committee, and the debtor.

1        MR. ECKSTEIN:  And we felt that that was satisfactory.

2   These are under one percent minority passive investors.  And we

3   don't think it has a relation to the case.  They were on the

4   debtors' list, which is why it was flagged.  But we thought

5   that those disclosures were appropriate.

6        The other issue, we understand, relates to

7   reimbursement of Moelis for outside legal fees in connection

8   with the retention application and the preparation of fee

9   applications.  I was in court when this was discussed most

10  recently.  And I am advocating some type of policy be adopted

11  by the investment banks.  But until that happens, the issue is

12  still open.  And so I'll let the U.S. Trustee address that

13  issue.

14       THE COURT:  Mr. Masumoto?

15       The investment bank policy is to ask for everything.

16       MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

17  Masumoto for the Office of the United States Trustee.  Your

18  Honor, as Mr. Eckstein indicated, we have pretty much narrowed

19  down the issues.  There is sort of a half issue that we had

20  discussed yesterday with Moelis, in which we had asked them to

21  expand the search for conflicts beyond the restructuring group

22  to include partners and the level down from partners, to

23  determine if there were any conflicts.

24       But with respect to the other two remaining issues, I

25  believe they were accurately represented by Mr. Eckstein.  With

1   respect to the confidential parties, it's the position of the

2   U.S. Trustee, while we certainly welcome the disclosure to our

3   office, to the committee, and to the debtors, we believe that,

4   in fact, the disclosure is most effective if it's done so that

5   other parties-in-interest who may, in fact, be affected by the

6   disclosure, can weigh in.

7        So it is our preference that any of the confidential

8   affiliates that are listed be identified.  I believe we had

9   tried to maintain that same policy with Alix, because they also

10  had certain confidential parties-in-interest.  And I believe,

11  based upon the supplement that I've seen, is that they appear

12  to be complying.  Once again --

13       THE COURT:  When you say "complying", what do you

14  mean?

15       MR. MASUMOTO:  Complying, they've identified the

16  confidential parties that the original declaration did not

17  formerly disclose.  But we will defer to the Court as to

18  whether or not the disclosure just to the committee, the U.S.

19  Trustee, and the debtors is sufficient with respect to Moelis'

20  circumstance.

21       With respect to the remaining issue, once again, it is

22  an issue that has been reviewed by the Court several times and

23  became an issue -- was raised as an issue and discussed during

24  the July 13th, I believe, hearing.  At that time -- just to try

25  to get to the heart of it -- I believe at that time Your Honor

RESIDENTIAL CAPITAL, LLC, et al.                                    120

1    did indicate that the decision in Borders was a decision

2    rendered at the time where the fee applications had been

3    considered, where the expenses that --

4             THE COURT:  The objection hadn't been asserted at the

5    time of the retention application.

6             MR. MASUMOTO:  That's correct, Your Honor.  And that

7    in this case, we are asserting it at the outset.  And in

8    addition, one other difference from the Borders decision

9    involving Mercer is that the Mercer professional in the Borders

10   case, as well as in this case, is an hourly -- is a

11   professional billing on an hourly basis.

12            Moelis, in this case, as indicated by counsel, is

13   billing on a fixed-fee basis.  As indicated, they're billing at

14   a monthly rate of 225,000 dollars, with a back-end of 7.75

15   million dollars.  I believe at a minimum, should a

16   restructuring transaction occur within the nine-month period,

17   their minimum compensation will be 9,775,000 dollars.

18            And basically -- and frankly, from the perspective of

19   the program, financial advisors are well-compensated.  Based

20   upon their compensation structure, frequently, at the end of

21   the day, taking into account their fixed-fee compensation as

22   well as their back-end fee, they're frequently the most highly

23   compensated professionals in these cases.

24            As a result, it is the position of the program that

25   the attorneys' fees should, in fact, be a cost of doing

1    business.  I believe Your Honor mentioned in the Borders

2    decision, perhaps in a slightly different context, that in many

3    cases the cost of doing business -- certain of the costs should

4    be borne by the applicant.  And in this case, where we have a

5    fixed-fee professional who is well-compensated, the cost of the

6    outside attorneys could well be borne by these professionals,

7    who routinely appear in bankruptcy and should have the

8    wherewithal and certainly the capability of:  1) being able to

9    prepare and submit a retention application; and 2) the fee

10   applications that are filed.

11        I do note, and I do understand, Your Honor mentioned

12   the Mesa case in the Borders case in regard to the level of the

13   fees that would be charged for a fee application process.  And

14   in those cases, a three to five percent fee might have been --

15   would be appropriate or might have been appropriate under the

16   circumstances.

17        THE COURT:  That was the -- what I mentioned -- I

18   think, because I haven't gone back to look at it -- but that

19   was trying to establish a range of compensable fees in

20   connection with preparation of a fee application.

21        MR. MASUMOTO:  That's exactly right, Your Honor.  And

22   in fact, I think it was made clear, both in the Mesa case as

23   well as in Borders, that that percentage may not necessarily

24   apply to every fee application.  Certainly, if one were to

25   apply that rate the present compensation, even at the minimum,

1    nine million dollars, the amount charged for a fee application

2    would be quite substantial.  I believe even at the three

3    percent rate, we're talking almost 300,000 --

4           THE COURT:  I can't imagine applying that structure in

5    a case such as this, with an engagement involving the dollars

6    that this does.

7           MR. MASUMOTO:  Agreed, Your Honor.  And so therefore,

8    from our perspective, the cost of preparing the fee

9    applications, in this case, which would probably represent the

10   larger part of the compensation, my understanding is that,

11   based upon the supplemental that was filed by Moelis, the

12   parties having reviewed the transcript of the prior hearing,

13   have really narrowed the amount they'll be charging for the

14   preparation of the retention application.

15          THE COURT:  What is that?

16          MR. MASUMOTO:   I believe we were advised that it's in

17   the range of 2,000 dollars.  That may be adjusted further.  And

18   that's really relatively de minimis.  So we're really talking

19   about the fee application in this case.  And given the amounts

20   involved, certainly at the outset, and again, the size of their

21   compensation, we do believe that, in fact, the fee application

22   preparation, as well as the retention should be borne by the

23   applicant.

24          THE COURT:  The difference, Mr. Masumoto, is -- I

25   mean, the rules about whether preparation of fee applications

RESIDENTIAL CAPITAL, LLC, et al.                    123

1   are compensable was a rule, at least as I saw it, that was

2   derived outside of this context of professional advisors.  The

3   cases support a law firm charging for preparation of its fee

4   application.  The time it spends preparing a fee application is

5   compensable.  That was, as I understood it, the law when I

6   wrote the Borders decision.

7        And I think the rationale is, if it's compensable for

8   a law firm to charge for the preparation of its own fee

9   application, shouldn't it be compensable for professional

10  advisors who are not lawyers to do the same.  That given the

11  rules that are applicable to fee applications, it, for better

12  or worse, has become a task that is largely overseen or

13  reviewed by lawyers.

14       So if a law firm can do it, why shouldn't Moelis be

15  able to do it?  I view that, actually, as different than the

16  fees in connection with retention, which I think is a stronger

17  argument that is overhead.

18       MR. MASUMOTO:  Your Honor, part of the concern that

19  our office has is that, once again, we do have the distinction

20  between any hourly compensated professional with a fixed-fee

21  professional.  And from our perspective, we regard that in the

22  aggregate.  The hourly compensated professional is entitled to

23  charge for fee application preparation --

24       THE COURT:  It's going to cost a lot less for the

25  periodic applications of a fixed-fee professional, because they

1    don't have to provide quite the same level of detail that the

2    hourly professional does.

3         MR. MASUMOTO:  And from our perspective, that's

4    perhaps another argument that, in fact, it should be an expense

5    absorbed by the estate (sic).  Once again, when looking at the

6    aggregate, the professionals, even if you include the time that

7    they would spend, or even the cost of preparing the fee

8    application, their compensation, in general, seems to far

9    exceed any of the hourly compensated professionals.

10        THE COURT:  But I want to be sure.  Your -- the third

11   piece of this that usually comes up is indemnification, if

12   they're deposed, and they have counsel.  You're not objecting

13   to that?

14        MR. MASUMOTO:  No, Your Honor.  We've always taken the

15   position that the costs associated with attorneys' fees for

16   indemnification purposes are permissible, pursuant to the

17   agreement that we've struck with the investment and financial

18   advisors.

19        THE COURT:  Okay.  Is it really only 2,000 dollars in

20   fees in connection with retention?

21        MR. RIELA:  Good afternoon, Your Honor.  Michael Riela

22   from Latham & Watkins on behalf of Mo --

23        THE COURT:  Speak quickly so we don't run the time up

24   anymore.

25        MR. RIELA:  I was just about to say, I'm going to be

 1  very brief given the topic at hand here.  With respect to the

 2  application itself, since Moelis gets retained in a lot of

 3  Chapter 11 cases, they have their forms done very well, and I

 4  don't have to spend too much time doing it.  More of the fees

 5  that I've incurred to date have been basically dealing with the

 6  objections.

 7          So if we're talking about all retention-related fees,

 8  like prosecuting the retention in connection with the

 9  objections, it's going to be a bit more than 2,000 dollars.  I

10  would say offhand, that perhaps in connection with doing the

11  retention application, reviewing the affidavit and all of that,

12  probably in the neighborhood of 3- to 4,000 dollars, more in

13  connection with dealing with this objection, with respect to

14  that question.  And I'm happy to address other issues.

15          THE COURT:  You know, the thing is, in -- I can't

16  remember the name -- Judge Bernstein's opinion -- was it CCT,

17  he doesn't make a blanket statement, but he basically comes out

18  that the general rule is you don't get paid for defending your

19  fee application.  If there's a challenge to the fee

20  application, for example, you don't get paid for defending

21  that.  If objections are raised to retention of a professional

22  because not sufficient information has been disclosed about

23  conflicts, that's really inherent in -- if you want to get

24  hired, you disclose the information that the U.S. Trustee

25  insists, or you put the issue to the Court and let the Court

1  decide in the end.

2          Anybody else wish to be heard with respect to these

3  remaining issues on reimbursement of outside counsel fees?

4          MR. RIELA:  If I could be just heard for one second,

5  Your Honor, again, staying very brief here.  Just to raise a

6  couple of concerns that were raised by Mr. Masumoto as well as

7  by this Court.  I did read the transcript from the last hearing

8  with respect to Mercer, and the supplemental declaration was

9  drafted to deal with the issues that Your Honor raised during

10 that time, in what's done outside of bankruptcy, what's done in

11 bankruptcy cases, what is Moelis' standard here.

12          And Moelis does retain outside counsel in Chapter 11

13 cases.  The engagement letters in bankruptcy and nonbankruptcy

14 cases always provide for payment of outside counsel fees.  To

15 the extent that those counsel fees are actually incurred,

16 they're typically paid -- they're typically paid in bankruptcy

17 as well.  We're not going to be seeking any fees in connection

18 with negotiating or drafting the engagement letter.  That was

19 only a couple thousand dollars on that end --

20          THE COURT:  Press the button on the computer, and it

21 spits it out.

22          MR. RIELA:  Exactly.  To a large extent, yes,

23 particularly, these days, with good form engagement letters.

24          The only point that I want to address is Mr.

25 Masumoto's point about investment bankers being very highly

1  paid in cases --

2          THE COURT:  Are you denying that?

3          MR. RIELA:  I'm not denying.  However, on the other

4  hand, though, I see a lot of Chapter 11 cases where lawyers get

5  quite a bit more than the investment bankers, and usually the

6  lawyers do get paid for their work in both retention and fee

7  application preparation matters.

8          THE COURT:  So am I supposed to have sympathy for the

9  investment bankers because sometimes lawyers earn more?

10         MR. RIELA:  Maybe a little.  I don't know.  I'm

11 kidding, Your Honor.  Unless Your Honor has any questions about

12 the supplemental declaration, Jared Dermont is here in the

13 courtroom.  Also, if you have any questions about the

14 confidentiality issue with respect to the few passive

15 investors, that is confidential information.  Moelis is a

16 private company.  And again, we did provide those names on a

17 confidential basis to both the debtors and --

18         THE COURT:  What's the largest percentage ownership of

19 any of the confidential investors?

20         MR. RIELA:  They're all less than one percent.

21         THE COURT:  Okay.  All right.  You know, this issue of

22 lawyers' fees as expense reimbursement has come before me now

23 in a number of different cases.  I wrote the Borders opinion.

24 In Borders the issue arose at the time of the fee application.

25 At the time of the retention the U.S. Trustee had a general

1   reservation of rights, but did not explicitly raise this issue

2   of reimbursement of professionals.  The opinion says what it

3   says, and I continue to adhere to it.

4          I did say in the opinion that the issues could well be

5   different if the objection were raised at the outset, and it

6   has been here.

7          I'm reluctant to adopt bright-line rules applicable in

8   all cases, and I don't intend to write another opinion at this

9   point on what's reimbursable and what is not.  I'm persuaded by

10  Mr. Masumoto's argument about the distinction between

11  professionals compensated on an hourly basis and the fixed-fee

12  professionals, such as Moelis, particularly with the upside

13  that it has with completion fees, et cetera.

14         Again, I'm not intending to establish a rule for all

15  cases in all circumstances.  But having reviewed this matter

16  and considered the objection of the U.S. Trustee, I'm going to

17  sustain the U.S. Trustee objection in part and overrule it in

18  part.  With respect to the retention issues, I'm going to

19  sustain the objection.  I do believe, particularly, since given

20  the size of this proposed engagement, that the very modest

21  amount of fees in connection with retention should be

22  considered part of overhead, whether Moelis seeks to include

23  such provisions in all of its engagement letters or not.  So as

24  to that portion of it, the objection is sustained.

25         With respect to reimbursement of outside counsel fees

1  in connection with preparation of fee applications, for the

2  reasons I articulated earlier, I think the law is reasonably

3  well-settled, certainly in this district, that the counsel

4  fees, when counsel prepares their own fee applications, the

5  time included and the cost for preparing fee applications is

6  compensable, subject to a very careful scrutiny by the Court.

7  And I think a similar rule should apply, whether it's Moelis or

8  AlixPartners or Mercer; whether it's an hourly fee professional

9  or a fixed-fee professional.

10        The obligation to do fee applications is one imposed

11 by the Bankruptcy Code.  For better or worse, the strictures in

12 the U.S. Trustee guidelines and in applicable case law is such

13 that lawyers' time is generally required in connection with

14 preparing fee applications.

15        I think Mr. Masumoto addressed what I said in Mesa,

16 which had discussed not, again, a rule applicable in all cases,

17 but I discussed -- I think Ms. Frejka, you were the one who, if

18 I'm not mistaken, didn't you argue that in --

19        MS. FREJKA:  No, Your Honor.

20        THE COURT:  No?

21        MS. FREJKA:  That is the one that they didn't have

22 counsel for.  They did it themselves.

23        THE COURT:  All right.  Okay.  That the three to five

24 percent was a general guideline range, barring other

25 circumstances, might be applicable, circumstances such as the

1    very large size of the expected engagement fee in this case.

2             So one shouldn't think that that applies.  But as I do

3    in all cases of fee applications, the applications are

4    scrutinized carefully.  With respect to expense reimbursement

5    for counsel fees, I expect detailed time records to be

6    provided, and they'll be scrutinized carefully. But subject to

7    that, I'm going to overrule, Mr. Masumoto, the U.S. Trustee's

8    objection with respect to whether fees in connection with

9    preparation of fee applications are compensable.

10            Mr. Masumoto, are there other issues with respect

11   Moelis that remain, or --

12            MR. MASUMOTO:  No, Your Honor.  I believe a

13   supplemental disclosure regarding -- outside their

14   restructuring group is all that we required.

15            THE COURT:  Okay.

16            MR. MASUMOTO:  And the disclosure of the

17   confidential --

18            THE COURT:  Yes.  With respect to the disclosure of

19   the confidential investors, again, I'm not intending -- because

20   I know that my colleagues and I from time to time see

21   transcripts of our hearings showing up in future cases.  I want

22   to make clear that in ruling on this issue now, I am not

23   intending to adopt a bright-line rule applicable in all

24   circumstances, or even for all professional advisors in this

25   case.

1          I will accept counsel's representation -- I have not

2   looked at this confidential list of investors -- but I accept

3   the representation as accurate -- the list has been provided to

4   the U.S. Trustee and to the debtor and committee counsel --

5   that none of the investors holds more than one percent.  On

6   that basis, I'm satisfied that submitting it in camera to those

7   parties who've received it, is sufficient here, and overrule

8   the objection in this case, under these circumstances, beyond

9   that.  But not intending to adopt a bright-line rule for all

10  cases.

11          Is that it, Mr. Masumoto?

12          MR. MASUMOTO:  Yes, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          MR. MASUMOTO:  Thank you, Your Honor.

15          THE COURT:  All right.

16          MR. RIELA:  Your Honor, is it acceptable for me to be

17  excused?

18          THE COURT:  Yes, it is.  Close the meter off.

19          MR. RIELA:  Excuse me?

20          THE COURT:  Close the meter off.

21          MR. RIELA:  Close the meter off.

22          MR. KLEIN:  Good afternoon, Your Honor; Aaron Klein

23  from Morrison & Foerster on behalf of the debtors.  We have two

24  contested motions to lift the automatic stay.  I know that the

25  agenda reflects the first one as the Gilbert motion.  With your

1   permission, we'd like to move forward first with the motion

2   filed by Aurora Bank.  But we need to confirm whether counsel

3   for Aurora Bank is on the phone today.

4         MR. LLOYD:  Yes, Your Honor; James Lloyd representing

5   Aurora Bank, from Green & Hall in California.

6         THE COURT:  All right, thank you.

7         MR. LLOYD:  Thank you, Your Honor.

8         THE COURT:  Go ahead, counsel.  It's your motion, so

9   let me hear the motion to lift the stay from Aurora.

10         MR. LLOYD:  Yes, Your Honor.  Aurora FSB is a bank

11   that was involved in servicing home mortgage loans.  There are

12   four separate mortgage loans.  They total about 1.4 million.

13   And as a result of transgressions by GMAC in wrongfully

14   reconveying, as part of --

15         THE COURT:  I think that's alleged transgressions, at

16   this point.

17         MR. LLOYD:  Alleged transgressions.  Well, you know,

18   you don't say -- you don't get it -- anyway.  So the

19   reconveyances made Aurora unable to foreclose on these

20   properties, and therefore we've been damaged.  In the process

21   of getting the motion -- making the motion to lift the

22   automatic stay, and also in responding to the opposition and

23   objections by GMAC, the bottom line here really is, you know,

24   why would the Court want to lift the stay when it appears that

25   we're just one of many.

RESIDENTIAL CAPITAL, LLC, et al.                    133

1        And in reality, there are vagaries of California real

2   estate law that -- for example, these are called trustees.

3   They're not mortgages.  There's a little bit of a difference.

4   There are other issues associated with some of the complexities

5   of California real estate law.  And so it's better if these

6   California real estate mortgage issues are litigated in

7   California.

8        The witnesses are there.  The --

9        THE COURT:  You know, let me just stop you there.  I

10  don't hold myself out as the resident expert, but I practiced

11  law in California for thirteen years, remain a member of the

12  California bar, and I'm generally quite familiar with

13  California real estate and mortgage law, so that part of your

14  argument doesn't get much traction with me.

15       MR. LLOYD:  Well, I was a member of the New York bar

16  for a long time, still am, so I understand where you're coming

17  from, Your Honor.

18       The other issue, then, would really -- what we're

19  trying to do is, as what was done in the case of In re Joyner,

20  is to allow us to proceed in state court so that we can obtain

21  basically the monetary damages, and find out -- so that we can

22  reduce these claims against the debtor to a judgment.  And it

23  allows us to determine exactly where Aurora Bank stands in this

24  mess of litigation.

25       We've tried to mediate.  We've tried to reduce the

RESIDENTIAL CAPITAL, LLC, et al.                    134

1    cost and the burden to GMAC.  I think we can still do that.

2    But in light of how we'd like to proceed, I think it's in the

3    best interests of the debtors, and it would certainly assist in

4    judicial economy to lift the stay to allow us to proceed so

5    that we can get a money judgment and then get back in line

6    where we need to be.

7                 THE COURT:  All right.  Anything else you want to add?

8                 All right, let me hear ResCap's counsel.

9                 MR. KLEIN:  Thank you, Your Honor.  Again, Aaron

10   Klein, Morrison & Foerster, on behalf of the debtors.

11                Your Honor, our response is pretty straightforward and

12   simple.  Aurora has not met its burden to show cause to lift

13   the fundamental protections afforded by the automatic stay to

14   the debtors.  This is a classic core matter dealing with the

15   liquidation of pre-petition money damages claims against the

16   debtors.

17                Let me take a step back.  The actions underlying in

18   California, Aurora is asserting claims against the debtors.

19   They're trying to liquidate those claims.  In one of those

20   actions, what they've termed the joint action, which is really

21   about three different properties, where they allege

22   transgressions against the debtors for wrongful reconveyance of

23   deeds of trust, in that action itself, we're the only

24   defendants.

25                And so the idea here that they're trying to reduce

1    their claims so that they understand where they are with

2    relation to other unnamed parties, doesn't really make much

3    sense to me.  This is not a complex matter, as Your Honor said,

4    that Aurora needs to litigate in a specialized forum.  This

5    Court is more than capable of adjudicating the claims that

6    Aurora has against the debtors, and should, through the uniform

7    centralized process for claimants provided under the Bankruptcy

8    Code.

9            THE COURT:  Is there a second case that does have

10   other defendants?

11           MR. KLEIN:  Right now, there is another case called

12   the Rogers action, in which GMAC mortgage has actually launched

13   an action to determine whether or not a reconveyance or a

14   release of a lien was void on its face because they released

15   the wrong lien -- allegedly released the wrong lien.  So there

16   are defendants in that case, but they're only as a counterclaim

17   asserted by Aurora against the debtors in that case.

18           THE COURT:  So what's the status of your affirmative

19   case?

20           MR. KLEIN:  The status of the affirmative case is

21   that --

22           THE COURT:  Because you're not going to get to use the

23   stay as a sword and shield.

24           MR. KLEIN:  Well, we're not trying to, Your Honor.

25   We're not -- we haven't moved forward with that.  What we're

1   trying to do in that case is to get a declaratory judgment that

2   says whether our reconveyance was right or wrong.  We're not

3   seeking money damages in that case, so --

4         THE COURT:  Yes, but why should you be -- are you

5   attempting to proceed with your declaratory judgment action,

6   and at the same time preventing Aurora from proceeding with its

7   counterclaim?

8         MR. KLEIN:  Right now, my understanding is, we're not

9   moving forward with that case.  We're not moving forward with

10  any of these cases, the Rogers case or any of the cases

11  involved in the joint action.  We did go to mediation in the

12  Rogers case.  That mediation was unsuccessful, Your Honor.

13        THE COURT:  I think --

14        MR. LLOYD:  Your Honor, James Lloyd again.  My

15  understanding --

16        THE COURT:  No, could you just hold on.  I'll give you

17  a chance after Mr. Klein is finished.  Sure.

18        MR. LLOYD:  Thank you.  Sorry, Your Honor.

19        MR. KLEIN:  Your Honor, I'm not going to take a long

20  time here.  I'll be brief.  I think the simple fact, Your

21  Honor, is that the claims that Aurora is bringing against us

22  are garden-variety pre-petition claims that can be liquidated

23  here in the bankruptcy court.  The key point -- and I can

24  address the Sonnax factors, and I'm very prepared to do so --

25  the key point is there's a simple resolution for Aurora.  If

1   it's seeking money damages against the debtors solely, the

2   remedy here is to file a proof of claim in this court and

3   liquidate its damages.

4          If they're seeking to bring claims against third

5   parties that they name in their reply:  the current homeowners,

6   the subsequent encumbrancers, the previous homeowners, all it

7   has to do is to sever GMAC Mortgage and ETS, which are the

8   debtor-defendants, from the California actions, and pursue

9   whatever claims they may have against third parties in

10  California state courts.

11         I'm very happy to walk this Court through --

12         THE COURT:  You don't need to go through each of the

13  Sonnax factors.

14         MR. KLEIN:  Okay.  Well, let me just say that we think

15  each of the factors does weigh in our favor of maintaining the

16  automatic stay, and we don't think that Aurora has met its

17  burden to even show good cause for why the stay should be

18  lifted.

19         THE COURT:  All right.  Mr. Lloyd?

20         MR. LLOYD:  Well, Judge, just in quick response to

21  that, Your Honor.  And one point is, my understanding is that

22  in the Rogers action there's been no stay filed.  So that

23  still -- that technically has not as yet been stayed.

24         With respect to the other points, I, with respect to

25  Mr. Klein, disagree with his assertions that we have not met

1  his burden -- we have not met our burden.  I believe that we

2  have.  And we're prepared to submit with -- after this

3  argument, we're also prepared to submit on the papers.

4          Also, as Your Honor may be aware, it's not just a core

5  matter of liquidation of claims.  These are pivotal issues of

6  California law with respect to --

7          THE COURT:  That's what claims resolution usually

8  involves.

9          MR. LLOYD:  Right.

10          THE COURT:  Virtually everything we get are state law

11  claims against a debtor.  And it's part of the claims

12  resolution process.

13          MR. LLOYD:  Well, I understand that, Your Honor.

14  Severance is not going to work, because GMAC is pivotal to the

15  whole issue.  There's likely to be other third parties

16  involved.  Other than that, Your Honor, I believe we've said

17  what we need to say.

18          THE COURT:  All right.  Mr. Klein, let's come back to

19  the status of the Rogers action.

20          MR. KLEIN:  Sure.

21          THE COURT:  Mr. Lloyd said it's not stayed.  And I

22  understand it's not.  And the automatic stay doesn't apply to

23  an action commenced by the debtor.  But what court is it in?

24  El Dorado County Superior Court?

25          MR. KLEIN:  Right.  And, Your Honor --

RESIDENTIAL CAPITAL, LLC, et al.                    139

1          MR. LLOYD:  Yes.

2          MR. KLEIN:  -- if I can give you a little bit of color

3    here.  In that case, we had moved for a rescission, a

4    declaratory judgment saying that a reconveyance or release of

5    the first deed of trust which Aurora was servicing, was void.

6    There was an intervening bankruptcy case, and the bankruptcy

7    trustees sold the property free and clear.  So the property is

8    sold.

9          The Rogers action is not stayed.  What's really -- the

10   only operative thing happening in the Rogers action, from what

11   I understanding, is that Aurora has filed a counterclaim in

12   intervention against us, because the trustees of the bankruptcy

13   borrowers sold the property free and clear.

14         Aurora has a secured claim in that bankruptcy, so they

15   have -- I don't know if they've received funds, but they are

16   entitled to a certain amount of funds.  And the issue in that

17   case and the issue in the other cases, the real factual issues

18   are, what are the damages.  Are the damages for the full face

19   amount of the loan?  In the Rogers action specifically, are the

20   damages mitigated by the fact that they have a secured claim

21   against the bankruptcy estate that sold the property.  And in

22   the other actions, what was the fair market value at the time

23   that Aurora could have foreclosed.

24         So there's many issues here.  But with respect to the

25   Rogers action, that's the status of it.  And really the only

RESIDENTIAL CAPITAL, LLC, et al.                    140

1   operative thing that's happening --

2           THE COURT:  Tell me what your intention is with

3   respect to the declaratory relief claim that the debtors have

4   asserted in the Rogers action.

5           MR. KLEIN:  At this point, Your Honor, I think what

6   we're -- this relates to another matter which is part of the

7   joint action, Tozier.  In Tozier there was a judgment that said

8   we, the debtors, did have authority to reconvey the first lien

9   deed of trust.  And so what I think is pending in the Rogers

10  claim now is waiting for a judgment to occur based upon kind of

11  what happened in the Tozier matter.  But from what I

12  understand, Your Honor, we are not moving forward.  There has

13  been no stay put in the Rogers matter, but we're not moving

14  forward, litigating the Rogers matter.

15          MR. LLOYD:  Your Honor?

16          THE COURT:  Go ahead, Mr. Lloyd.

17          MR. LLOYD:  Jim Lloyd, again, if I may?  My

18  understanding, and with all deference to Mr. Klein, is that

19  Aurora was determined not to be a secured claimant in the

20  underlying bankruptcy action because of the conveyance of the

21  property by GMAC.  So we're not standing in line in that action

22  as a secured creditor with a secured claim at all.

23          THE COURT:  My most immediate concern and questions

24  really relate to whether the debtor is intending to proceed --

25  here's where I'm confused now, Mr. Klein.  It sounded like

RESIDENTIAL CAPITAL, LLC, et al.                    141

1   you're waiting for the court to enter a judgment.  On what?  Is

2   there a summary judgment motion?  What is the precise

3   procedural status?

4           I generally, where --

5           MR. KLEIN:  I'm told that the Rogers matter --

6           THE COURT:  Let me finish.  I don't like when lawyers

7   turn their back on me when I'm speaking, which is what you did.

8           MR. KLEIN:  Pardon me, Your Honor.

9           THE COURT:  I don't like when lawyers seek to stay or

10  prevent a counterclaim from being asserted in a case in which

11  they're proceeding -- the debtor is proceeding with its own

12  claim.  That's why I'm  trying to get a very clear answer about

13  if I deny the motion to lift the stay, what is the debtors'

14  intention with respect to its claim against Aurora?

15          MR. KLEIN:  If you'd give me one moment, Your Honor, I

16  can confer with --

17          THE COURT:  Yes.  When you ask to do that, I'm more

18  than happy to allow you to go back and talk to your colleagues.

19          MR. KLEIN:  Thank you very much.  One minute.

20          Your Honor, after conferring with my colleagues, from

21  what I understand, since the property was sold and we went to

22  mediation and we agreed that there would be a standstill in

23  that Rogers action, nothing has happened since that point.  And

24  from our perspective, the debtors' claim is stayed in that

25  case.  We're not moving forward with --

1          THE COURT:  Well, the automatic stay doesn't apply --

2          MR. KLEIN:  -- getting a judgment.

3          THE COURT:  -- to a claim that -- did the state court

4  issue a stay?

5          MR. KLEIN:  I think there was a sta --

6          MR. LLOYD:  Not that I'm aware of, Your Honor.  Pardon

7  me for interrupting.

8          MR. KLEIN:  There was a standstill agreement while we

9  went to mediation.  The mediation failed.  And after the

10  mediation, nothing has occurred.  There has been no stay put in

11  place in the Rogers action.

12          THE COURT:  All right.  I'm going to take the matter

13  under submission, and an opinion or order will issue in due

14  course.  If I deny -- I'll tell you this; I want to be

15  absolutely crystal clear about this.  If I deny -- and I'm not

16  sure what I'm going to do yet -- but if I deny the motion to

17  lift the stay, I would expressly provide the debtor may not

18  proceed with its action without further leave of this court.

19          And if the state court in California -- you can

20  certainly appear if the state court schedules a conference.  I

21  don't want to interfere with the superior court's scheduling,

22  because there's no formal stay in place, you need to come back

23  and let me know, and I'll deal with it accordingly.  But I

24  don't want the automatic stay used as a sword and a shield.

25          MR. KLEIN:  Understood, Your Honor.  And I want to

1   make clear from the debtors that we do not intend to do that,

2   and we don't intend to move forward with the Rogers action

3   while at the same time defending against Aurora's claims

4   against us in the joint action.

5           THE COURT:  So tell me about the joint action.  What

6   is the -- you've got claims asserted in there as well or not?

7           MR. KLEIN:  No, Your Honor.  The claims --

8           THE COURT:  You're just --

9           MR. KLEIN:  -- the claims --

10          THE COURT:  -- the debtors are just defendants.

11          MR. KLEIN:  We're the defendants.

12          THE COURT:  Okay.

13          MR. KLEIN:  Yes.  And in the Rogers action, again,

14  we're not asserting claims for money damages at all.

15          THE COURT:  I understand what you're saying.  You're

16  not asserting claims for money damages, just declaratory

17  relief.

18          MR. KLEIN:  Right.

19          THE COURT:  Which can make -- I haven't seen the

20  pleadings in the case.  I don't really want to look at the

21  pleadings at this point.  I may ask to see them.  But for now,

22  I'm going to take the matter under submission.  Thank you very

23  much.

24          MR. KLEIN:  Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Lloyd.

1           MR. LLOYD:  Thank you very much, Your Honor.

2           MR. KLEIN:  Your Honor, the next matter is Gilbert's

3   motion to dismiss the Chapter 11 case, or in the alternative, a

4   motion for relief from the automatic stay.

5           THE COURT:  Right.

6           MR. KLEIN:  I would cede the podium to counsel for

7   Gilbert.

8           THE COURT:  Okay.  Thank you.

9           Why don't you just pull the microphone down a little

10  bit, make it easier for you.  Thank you.

11          MS. PARKER-LOWE:  Good afternoon.  My name is

12  Katherine Park-Lowe, and I represent Mr. and Mrs. Gilbert.  And

13  we're seeking relief from the stay.  Mr. and Mrs. Gilbert's

14  case was -- first of all let me back up just a minute.

15          The Gilberts' home and the Gilberts' mortgage is not

16  property of the debtors' estate.  That was established by the

17  North Carolina Court of Appeals more than a year ago.  The

18  Deutsche Bank and GMAC Mortgage, as servicer, failed to

19  establish that they had the right to proceed with the

20  foreclosure.

21          In the course of the foreclosure action, the Gilberts

22  filed an equitable action in North Carolina which was removed

23  by the defendants to the district court.  From there, that case

24  was dismissed.  We appealed to the Fourth Circuit Court of

25  Appeals.  The Fourth Circuit reinstated the entire case except

1   for one money damages claim.

2          It is an important case for consumers, but also for

3   bankers, because twelve days later, Bank of America tried to

4   get into the case just after the debtors filed a petition for

5   rehearing.  Bank of America tried to get into this case telling

6   the Fourth Circuit Court of Appeals that it did not know what

7   it was doing.

8          And we're seeking relief from the stay so that the

9   time period for the defendants to file a petition for cert can

10  run, and so that this matter can go forward.  Under the Sonnax

11  factors, this will allow a full and complete resolution,

12  because we have two parties who are outside of bankruptcy, and

13  we have two parties who are inside of bankruptcy.  This is --

14  and this is -- although there's not a special tribunal set up

15  to handle a matter like this, this is a Truth in Lending claim,

16  which is a highly technical area.  The nonbankruptcy federal

17  court is specifically set up to handle federal issues.  And in

18  the interests of justice and the efficiency of administration,

19  I think we are entitled to proceed in the forum that the

20  defendants, not debtors, chose.  We did not choose this forum.

21  But that's where we are and there's where we're headed.

22          THE COURT:  This was an action -- the Gilberts brought

23  an action against Deutsche Bank and Residential Funding LLC and

24  GMAC Mortgage LLC.  Is that correct?

25          MS. PARKER-LOWE:  Correct.

1           THE COURT:  The district court dismissed it.  The

2    Fourth Circuit reversed.  The Fourth Circuit -- I have the June

3    20th, 2012 order that denied the motion for rehearing --

4           MS. PARKER-LOWE:  Correct.

5           THE COURT:  -- and rehearing en banc.  Ordered that

6    the mandate issue as to Deutsche Bank America's, David Simpson

7    as substitute trustee, but stay the mandate as to appellees

8    Residential Funding LLC and GMAC Mortgage LLC, because of the

9    automatic stay.

10           MS. PARKER-LOWE:  Correct.

11           THE COURT:  And so what is it that prevents you from

12    proceeding with your action against Deutsche Bank in the

13    federal district court?  The Court reversed -- the Fourth

14    Circuit reversed, denied rehearing and rehearing en banc,

15    issued its mandate.  You could go back to the district court

16    and proceed with your case against Deutsche Bank.  Who's filing

17    cert?

18           MS. PARKER-LOWE:  The defendants have given all

19    indication, although we don't know for sure, but they have

20    hired Sidley Austin and another group of lawyers, which would

21    be an indication that they intend to seek cert.

22           THE COURT:  So let's say --

23           MS. PARKER-LOWE:  The matter that --

24           THE COURT:  -- they do.  Let's --

25           MS. PARKER-LOWE:  Excuse --

1           THE COURT:  -- let's say Deutsche Bank files a

2    petition for certiorari, and the Supreme Court either denies

3    cert or grants cert, and hears; and let's assume that it

4    ultimately hears it and affirms the Fourth Circuit.  Okay?  So

5    you're a little -- this case may well be over by then, because

6    of the schedule that it's on.  How does the stay impact what

7    you're going to do?

8           I mean, if -- the fact of the matter is, if the

9    Supreme Court -- if Deutsche Bank files a petition for

10   certiorari and the Supreme Court hears it, or more likely

11   denies cert, it'll go back to the trial court and the case --

12   no stay as to Deutsche Bank, and you can go ahead with your

13   case.  So how are you adversely impacted?

14          If you think you have a claim against any of the

15   debtors and you file a proof of claim against them and you go

16   through the claims allowance process, the debtor may not be

17   bound by what the Fourth Circuit did, but it sure may be pretty

18   persuasive about what the outcome of -- in the claims allowance

19   process.  So how are you hurt?

20          MS. PARKER-LOWE:  The folks in the clerk's office at

21   the United States Supreme Court tell me that the clock is

22   ticking as to the unstayed --

23          THE COURT:  Sure.

24          MS. PARKER-LOWE:  -- parties.

25          THE COURT:  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    148

1          MS. PARKER-LOWE:  They have an obligation to either

2    file or not file.  Assuming that they file, the folks in the

3    clerk's office tell me that then the case will be stopped, hung

4    up.

5          THE COURT:  Why is that?

6          MS. PARKER-LOWE:  Until there is some ruling from this

7    Court with respect to the two parties that are in bankruptcy.

8          THE COURT:  Well, if the ruling you're expecting is a

9    ruling on your motion to lift the stay, you'll have a ruling.

10   I'm not quite sure what it's going to be yet, but you'll have a

11   ruling.  I'm not familiar with -- is there something in the

12   Supreme Court rules that would hang it up, as you used the

13   term, where they have a petition for cert from nondebtors, as

14   to which the matter's not stayed, they'll either timely file a

15   petition or they won't?

16         MS. PARKER-LOWE:  They tell me they will not entertain

17   the motion as to the unstayed parties until there is a ruling

18   from this Court.

19         THE COURT:  Ruling on what?

20         MS. PARKER-LOWE:  On whether, at some point, these two

21   parties are going to be released.

22         THE COURT:  Oh, you'll have a ruling.  You'll have a

23   ruling pretty quickly.  That isn't going to hang anybody up.

24   The ruling may be to deny your motion to lift the stay.  I

25   don't know yet.  But that may be the ruling.  Let's assume

1  that's the ruling, what happens then?

2           MS. PARKER-LOWE:  Then --

3           THE COURT:  I deny your motion to lift the stay; what

4  happens then?  Deutsche Bank -- let's assume Deutsche Bank

5  files a petition for cert, I deny the motion to lift the stay;

6  what's your understanding of what happens then?

7           MS. PARKER-LOWE:  If we are at -- if we're at the

8  Supreme Court on the petition for cert then we go forward

9  without the two parties.

10           THE COURT:  Okay.  So all you need is a ruling from

11  me, one way or the other.

12           MS. PARKER-LOWE:  Correct.

13           THE COURT:  Okay.  Fair enough.  All right, anything

14  else you want to add?

15           MS. PARKER-LOWE:  No, sir.

16           THE COURT:  Thank you very much.

17           MR. ROSENBAUM:  Good afternoon, Your Honor.  Norm

18  Rosenbaum, Morrison & Foerster, for the debtors.

19           Your Honor, it think it's important to just understand

20  what's at stake here.  What movants are seeking then, is relief

21  from the automatic stay under which the debtors would then face

22  the decision whether to petition the Supreme Court and go

23  through that route --

24           THE COURT:  That's about the least compelling, from

25  your standpoint, frankly.  Just like the matter is going

1   forward in the Maine Supreme Court in one of the cases, I mean,

2   if the only issue were whether you were going to sign on to a

3   petition for cert, I'm not particularly moved by that argument.

4   Okay?

5           MR. ROSENBAUM:  That's fine.  I understand.  But

6   that's just step one.  I mean, if the cert's denied, then it's

7   remanded back to the district court, in which case the debtors

8   are defending really what are just monetary claims for damages

9   under TILA and various North Carolina statutes.

10          THE COURT:  So you -- whether it's binding on you or

11  not, I think you would have to concede that if the Fourth

12  Circuit decision stands, either because the Supreme Court

13  denies cert or if they granted cert and affirmed that decision,

14  whether it has a strict preclusive effect in the claims

15  allowance process, it's going to have an impact.  Would you

16  agree with that?

17          MR. ROSENBAUM:  I agree with that, Your Honor.

18          THE COURT:  So pretty much, you're going to have to

19  live with whatever happens in North Carolina.  If the district

20  court goes ahead and tries the case as to Deutsche Bank, and it

21  comes down a really bad decision for Deutsche Bank -- I don't

22  know whether all the issues are the same as to ResCap or not,

23  but let's assume they're pretty much the same -- it isn't going

24  to be helpful to you.  Agreed?

25          MR. ROSENBAUM:  We would probably be bound.  There

1   would be a very strong preclusive effect in any claims

2   resolution process, Your Honor.  However, what movant is

3   requesting is that we be drawn back into that litigation which

4   is --

5           THE COURT:  I know what they're asking.

6           MR. ROSENBAUM:  -- which is at step one.  It was just

7   on a motion to dismiss.  We'd have to fully litigate it.  Our

8   position is that we want to maintain the integrity of our

9   claims resolution process at this stage of the cases; and this

10  is going to be an invitation for every other creditor to do the

11  same.

12          THE COURT:  Okay.  I understand that.  Thank you very

13  much, Mr. Rosenbaum.

14          Ms. Parker-Lowe, anything you want to add?

15          MS. PARKER-LOWE:  I think the Court is duty-bound to

16  look at each case on its own merits and not whether or not this

17  is liable to open the floodgates, as the debtor --

18          THE COURT:  Whether this is one of the 1,900 actions

19  that are cited --

20          MS. PARKER-LOWE:  That are cited by the --

21          THE COURT:  -- in the affidavit in support of -- or in

22  opposition to the lift stay motion.

23          MS. PARKER-LOWE:  Correct, Your Honor.

24          THE COURT:  I will look at each case individually.

25          MS. PARKER-LOWE:  Thank you.

1          THE COURT:  Thank you very much.

2          All right.  I'm going to take this one under

3   submission as well.  Thank you.

4          MR. ROSENBAUM:  Your Honor, may I just be heard?

5          THE COURT:  Yes.

6          MR. ROSENBAUM:  Briefly.

7          THE COURT:  If it's about this, I've ruled already,

8   so --

9          MR. ROSENBAUM:  I just want to clarify, this motion

10  also requested the case be dismissed.  I assume --

11         THE COURT:  Oh, let me just say --

12         MR. ROSENBAUM:  -- counsel is only moving on --

13         THE COURT:  -- I want to -- time out.  Time out.

14         MR. ROSENBAUM:  Sorry.

15         THE COURT:  I've had I can't count the number of

16  motions to dismiss this Chapter 11 case that have been raised

17  so far, often by pro se parties, but sometimes by lawyers as

18  well.  The motion to dismiss the Chapter 11 case is denied.

19  The record in these Chapter 11 cases from petition date till

20  today establishes there was a good-faith basis to file the

21  cases.  I don't intend to address the motion to dismiss in any

22  decision I issue with respect to lift stay.

23         I should have said this before.  I'm treating this

24  exclusively as the Gilbert motion to lift the automatic stay.

25  So I'm saying this emphatically, because I keep getting these

1   motions to dismiss the Chapter 11 case, and never supported by

2   any evidence, just assertions that the cases were filed in bad

3   faith.

4           Everything that has occurred in this case since the

5   petition date would establish to the contrary.  There's

6   substantial evidence in the record in the form of the first-day

7   1007 affidavit, numerous declarations that have been submitted

8   in various contested matters in this case to date.  This is a

9   substantial case with serious issues.  The Court concludes and

10  finds that the case was filed in good faith, and whatever the

11  outcome may ultimately be.  So that portion of the motion is

12  denied.  The motion to lift the automatic stay is taken under

13  advisement.

14          MR. ROSENBAUM:  Thank you, Your Honor.

15          THE COURT:  Thank you.  Mr. Klein?

16          MR. KLEIN:  Thank you, Your Honor.  Aaron Klein,

17  Morrison & Foerster for the debtors.  I believe that concludes

18  our presentation for this afternoon unless --

19          THE COURT:  Wells Fargo --

20          MR. KLEIN:  There's one more?  Wells Fargo?  I'm

21  sorry.

22          THE COURT:  Wells Fargo.

23          MR. SMITH:  Good afternoon, Your Honor.  Turner Smith

24  with Curtis, Mallet-Prevost, Colt & Mosle.  As Your Honor may

25  know, we are conflicts counsel for the debtors.  And we've been

1  asked to take on this matter where we're facing --

2          THE COURT:  I apologize.  Just tell me your name one

3  more time.

4          MR. SMITH:  I'm sorry.  Turner Smith.

5          THE COURT:  Thank you.  It's an --

6          MR. SMITH:  You're welcome.

7          THE COURT:  -- easy one to remember, and I'm just

8  tired.

9          MR. SMITH:  And it's my first time in this case, so --

10          THE COURT:  Okay.

11          MR. SMITH:  Your Honor, we're close to having a

12  resolution or a potential resolution, but not completely there.

13  So let me just put it into context, and then I'll explain where

14  we are.  The case that -- the underlying case is a post-

15  foreclosure money damages case.  It's in the Central District

16  of California.

17          THE COURT:  What judge?

18          MR. BUNIN:  Christina Snyder.

19          MR. SMITH:  Snyder.  Thank you.

20          THE COURT:  Thank you, Mr. Bunin.

21          MR. SMITH:  Christina Snyder.  The plaintiff in that

22  case has accepted the automatic stay and is not pressing an

23  application to lift the stay.  Wells Fargo or Wachovia faces

24  ETS, which is the debtor entity, on cross claims as defendants.

25  There are basically two sets of cross claims for indemnity.  So

1    the issue before the Court is whether or not to lift the

2    automatic stay with respect to prosecution of the Wells

3    claim -- Wells Fargo claim against ETS.

4              Now, the benefit of having the motion practice is we

5    now understand better and have had a productive dialog with the

6    litigation counsel in the -- for Wells Fargo in the underlying

7    case.  And as we understand it, the key issue for them for

8    lifting the stay, relates primarily to some discovery set of

9    issues.

10             THE COURT:  That was the second prong of their motion.

11             MR. SMITH:  Right.  And so we have what we believe to

12   be a resolution at hand.  But it comes in two parts.  The first

13   part is a resolution that's within the control of the two

14   parties.

15             THE COURT:  All right, go ahead.

16             MR. SMITH:  The second part depends upon what the

17   court in the Central District does with respect to an

18   application to extend the trial date.  And we're not in a

19   position today to tell you either we've made the application or

20   that the judge has acted favorably on it.  But if we can solve

21   that second step, the first step will fall into place, and

22   we'll have a global resolution of the application --

23             THE COURT:  They're looking for a trial date --

24             MR. SMITH:  -- in support --

25             THE COURT:  -- in December?

RESIDENTIAL CAPITAL, LLC, et al.                    156

1          MR. SMITH:  The current trial date is December 4 of

2   this year.

3          THE COURT:  And what are they --

4          MR. SMITH:  The --

5          THE COURT:  -- what are they seeking?

6          MR. SMITH:  Well we are -- in our attempts to

7   cooperate with them on this two-pronged approach, one of the

8   issues is can we make available parties -- employees within our

9   control for trial on December 4th.  And as Your Honor knows

10  from looking at the papers, there is a burden associated with

11  getting witnesses ready for trial.  There's a very hands-on

12  litigation department.  If you haven't already seen that, you

13  will over the course of the case.  And December 4 comes at a

14  very bad time in terms of the litigation department's work in

15  this case and in the many other matters that they have to

16  service.

17         If we can move it out, if we can get the court to

18  agree to move it out to the middle of January of 2013, then all

19  the pieces fall into place and we can resolve this motion.

20         THE COURT:  All right.  Let me say this.  I don't want

21  to ask questions or make any comments that make it any more

22  difficult for the parties to reach an accommodation.  When --

23         MR. SHULMAN:  Your Honor, Jeremy Shulman for the

24  movant, Wells Fargo, on CourtCall.

25         THE COURT:  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    157

1          MR. SHULMAN:  If I could be heard briefly?

2          THE COURT:  Yes, go ahead.

3          MR. SHULMAN:  I think the idea here, in part, was to

4    sort of put the proposed issues before the Court, and if the

5    Court is willing to weigh in on it, we'd be happy for a

6    recommendation.  Unfortunately, there's a little bit of a

7    standstill which is out of our control, because the judge in

8    the Central District controls the trial date.

9          For Wells Fargo's part, the alternative relief in the

10   motion, at least we believe, is fairly clear on the law.  We

11   should be entitled to discovery of the ResCap affiliate, ETS,

12   as a third-party witness, with respect to claims that Wells

13   Fargo has to defend.  And also that any trial subpoena that

14   Wells Fargo would issue wouldn't be covered by the automatic

15   stay anyway.  But due to meet-and-confer efforts before filing

16   this motion, we didn't want to get to the point of trial and

17   have ETS take the position that their witnesses weren't going

18   to show up and seek to hide behind the automatic stay.  So we

19   wanted to resolve this up front.

20         THE COURT:  Well, let me stop you for a minute.  What

21   I need to know is, are you -- Mr. Smith seemed to be asking

22   that this matter be deferred to allow you to try and conclude a

23   resolution which would include asking Judge Snyder to adjourn

24   the trial date.  I'm listening to you, and it sounds like

25   you're saying something just the opposite, that you want to

1   press your motion today.  Which is it?

2            MR. SHULMAN:  Well, I'm in a difficult position in

3   that I sort of have to press my motion.  But if we can agree on

4   a short adjournment of this motion to go back to Judge Snyder,

5   I'm happy to support any application to move the trial date.

6   But as I've expressed to Mr. Smith in our meet-and-confer

7   efforts, Judge Snyder's already moved the trial date, is aware

8   of what we're trying to accomplish in the bankruptcy, and has

9   expressed to me that she believes she's already given us enough

10  time to do it.

11           So because of that, I'm a little leery of putting over

12  the date for -- even to the next omnibus date in August.

13  Because if it's not resolved, and the trial date is not moved,

14  and the existing discovery cutoff stands at September 17th, and

15  we're at August 14th without a resolution, even if the motion

16  is granted, attempting to get the discovery done in that time

17  window and prepare a summary judgment motion due for filing a

18  couple weeks later, becomes incredibly pressed, at best.

19           THE COURT:  Okay.  I need to know from the two of you

20  whether this matter is going forward for a decision today or

21  not.  I don't want to know what problems you have.  I've got

22  problems.  The next omnibus hearing date is August 14th.  If

23  the two of you agree, it'll be adjourned to then.  You can

24  contact Judge Snyder and see whether she'll move the trial

25  date.  If not, let's go forward and argue this motion.

1          MR. SHULMAN:  Well, for the moving party, then my

2     suggestion is to go forward and argue the motion.  The

3     resolution that we proposed before would be that there's an

4     agreement to do the discovery and there's an agreement that

5     they'll comply with any trial subpoena that's issued, and --

6          THE COURT:  Well, I don't want to know about

7     agreements.  Because if there's an -- do you have an agreement

8     that's been reflected in some writing, you're asking the Court

9     to approve or if the Court's approval isn't required?

10    Agreements -- you know, both sides have to agree.

11         MR. ROSENBAUM:  Your Honor, Norm Rosenbaum.  We're not

12    involved in this matter, but Ms. Goliar (ph.) would like to

13    confer with her counsel for a minute, if that's okay?

14         THE COURT:  Okay.  Let's -- all right, go ahead and

15    confer with the counsel.  We're going to hold off a minute

16    while counsel confers in the courtroom.

17         MR. SHULMAN:  Thank you.

18         THE COURT:  Okay.  While we're doing that, let me just

19    say, one of my law clerks pointed out to me that August 9th at

20    11 a.m. has a number of ResCap matters on.  And so if the

21    parties are in agreement to adjourn this to August 9th, that's

22    a possibility.  I'm not pressing anybody to do anything.  I'm

23    just -- I knew that the 14th, August 14th was an omnibus day.

24    We've got a very crowded calendar as of now.  But August 9th

25    has just a few matter on it in ResCap.

RESIDENTIAL CAPITAL, LLC, et al.                    160

1        All right It's 3:25 on the clock in the courtroom.

2   We're going to take a ten-minute recess while parties confer.

3        (Recess from 3:22 p.m. until 3:36 p.m.)

4        THE COURT:  All right.  We're back on the record in

5   Residential Capital, number 12-12020.  Mr. Smith?

6        MR. SMITH:  Yes, thank you, Your Honor.  Turner Smith,

7   Curtis Mallet-Prevost.  Time well spent over the break.  I

8   think we have a resolution of the motion.  The debtors will

9   provide declarations to Wells Fargo for the case.  And we

10  have -- that will take place over the coming weeks.  And we've

11  agreed to work with Mr. Shulman on getting those out the door.

12       The second prong that we discussed before is the

13  question of providing witnesses at trial.  To the extent that

14  we still employ witnesses who are -- we will accept a subpoena

15  and produce them for trial.  The parties have agreed that they

16  will make a joint application to the judge in the Central

17  District of California to move the trial date to some date

18  after January 14 of 2013.  But in order to resolve this motion,

19  the debtors have agreed to live by the existing schedule if we

20  cannot convince the judge to make that small adjustment to the

21  trial date.

22       THE COURT:  All right.  Let me ask the question.  Has

23  there been a discussion about document production?

24       MR. SMITH:  There have -- we have not discussed

25  document production, but document production is complete,

1    actually, in the case, on our part.  And the only discovery

2    that we have discussed for purposes of resolving the case, is

3    providing the declarations.

4              THE COURT:  Declarations for a summary judgment

5    motion?

6              MR. SMITH:  As I understand it, they are intended to

7    be used for summary judgment, yes.

8              THE COURT:  Okay.

9              MR. SHULMAN:  That's correct, Your Honor.

10             THE COURT:  All right.  Anything else you want to add

11   for Wells Fargo?

12             MR. SHULMAN:  The only caveat I would add is I presume

13   that this will be settled by formal stipulation and order.

14             THE COURT:  Yes.  That's what I would ask for.  You

15   ought to get a stipulation and order presented to the Court

16   within the next week, certainly.

17             MR. SMITH:  We will do that, Your Honor.  And in the

18   meanwhile, we're going to move ahead with the two component

19   parts, because time is running in the other case.

20             THE COURT:  All right.  I'm glad you were able to

21   resolve those issues.

22             MR. SMITH:  Thank you for the time to do that, Your

23   Honor.

24             THE COURT:  Thank you very much.

25             MR. SHULMAN:  Thank you, Your Honor.

1        THE COURT:  Thank you.  Okay.

2        MS. FREJKA:  Your Honor, Elise Frejka for the

3   committee.  Very quickly.  We'd like to review a copy of the

4   stipulation and order before it's submitted to Your Honor.  We

5   have been involved in the resolution of the two uncontested

6   lift stay motions, and we've also been involved in the status

7   and supporting the debtor in the three that went forward today.

8   So --

9        THE COURT:  Absolutely.

10       MS. FREJKA:  -- we are staying on top of things.  Thank

11  you.

12       THE COURT:  Thank you very much.

13       Mr. Marinuzzi, anything else?

14       MR. MARINUZZI:  Your Honor, I think that finally

15  concludes the calendar.  Thank you.

16       THE COURT:  Okay.  So let's just -- preview.  August

17  9th is -- what do we have for August 9th?  Retention

18  applications, KPMG retention application, hearing on the KEIP-

19  KERP --

20       MR. MARINUZZI:  Correct, to the extent that's not

21  concluded on the 8th.  Yes.  I'm hopeful that the retention

22  applications will be straightforward.  PWC may have some hairs

23  on it because it relates to some of the issues discussed

24  earlier today regarding obligations between the parent and

25  ResCap in connection with the consent order.

1          THE COURT:  Okay.  All right.  Anybody else have

2   anything they want to add?

3          We're adjourned.  Thank you.

4          IN UNISON:  Thank you, Your Honor.

5       (Whereupon these proceedings were concluded at 3:40 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                            **I N D E X**

3

4                            RULINGS

5                                              Page      Line

6    Motion to retain Towers Watson approved      107        18

7    Motion to retain Fortace, LLC approved       108         2

8    Debtors' motion to retain Severson &         108        12

9      Werson approved

10   Debtors' motion to extend time to file       108        21

11     schedules and statements granted

12   Centerview retention application approved     111        25

13     subject to review of final order

14   FTI retention application is approved         116        11

15   U.S. Trustee's objection re: Moelis'         128        17

16     retention application is sustained in part

17     and overruled in part, as delineated on the

18     record

19   Committee's application to retain Moelis is   131        15

20     granted as modified on the record

21   Motion to dismiss the Chapter 11 cases is     152        18

22     denied

23   Stipulation and order to be presented to the  161        14

24     Court on the Wells Fargo resolution

25

1

2                         C E R T I F I C A T I O N

3

4    I, Sara Davis, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10

11    _____

12    SARA DAVIS

13    AAERT Certified Electronic Transcriber CET**D 567

14

15    eScribers

16    700 West 192nd Street, Suite #607

17    New York, NY 10040

18

19    Date:  July 25, 2012

20

21

22

23

24

25