1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10                   Debtors.

11

12    - - - - - - - - - - - - - - - - - - - - -x

13

14                   United States Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   June 19, 2012

19                   11:30 AM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1

2  (Doc no. 61, 188) Notice of Continued Evidentiary Hearing RE:

3  Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363(b),

4  (f), and (m), 365 and 1123 and Fed. R. Bankr. P. 2002, 6004,

5  6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale

6  Procedures, Including Break-Up Fee and Expense Reimbursement;

7  (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving

8  Form and Manner of Notice Thereof; and (IV) Granting Related

9  Relief and (B)(I) Authorizing the Sale of Certain Assets Free

10  and Clear of Liens, Claims, Encumbrances, and Other Interests;

11  (II) Authorizing and Approving Asset Purchase Agreements

12  Thereto; (III) Approving the Assumption and Assignment of

13  Certain Executory Contracts and Unexpired Leases Related

14  Thereto; and (IV) Granting Related Relief filed by Lorenzo

15  Marinuzzi on behalf of Residential Capital, LLC.

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4          Attorneys for Debtors

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8  BY:   LARREN M. NASHELSKY, ESQ.

9

10

11  UNITED STATES DEPARTMENT OF JUSTICE

12          Office of the U.S. Trustee

13          33 Whitehall Street

14          21st Floor

15          New York, NY 10004

16

17  BY:   BRIAN S. MASUMOTO, ESQ.

18

19  KRAMER LEVIN NAFTALIS & FRANKEL LLP

20          Attorneys for Official Creditors' Committee

21          1177 Avenue of the Americas

22          New York, NY 10036

23

24  BY:   KENNETH H. ECKSTEIN, ESQ.

25          DOUGLAS MANNAL, ESQ.

4

1

2  SIDLEY AUSTIN LLP

3        Attorneys for Nationstar

4        787 Seventh Avenue

5        New York, NY 10019

6

7  BY:   LARRY J. NYHAN, ESQ.

8

9

10  MUNGER TOLLES & OLSON LLP

11        Attorneys for Berkshire Hathaway, Inc.

12        355 South Grand Avenue

13        35th Floor

14        Los Angeles, CA 90071

15

16  BY:   THOMAS B. WALPER, ESQ.

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    5
P R O C E E D I N G S

1

2        THE COURT:  Please be seated.  All right, we're here

3   on Residential Capital, LLC, number 12-12020.

4        MR. NASHELSKY:  Good morning, Your Honor.  Larren

5   Nashelsky from Morrison & Foerster, proposed counsel for

6   Residential Capital, the debtors before this Court.  We are

7   back this morning to inform the Court of the results of the

8   final and best bids we received last night before the 8:40

9   deadline set by the Court.

10        Your Honor, the debtors received two bids on the

11   debtors' platform prior to the 8:40 deadline.  We also received

12   one bid on the whole loan portfolio from Berkshire Hathaway,

13   which I will describe in a moment.

14        We received a bid from Berkshire Hathaway on the

15   debtors' platform.  The details of that bid are as follows.

16   Berkshire Hathaway increased the purchase price of its bid by

17   one hundred million dollars from the original purchase price

18   set forth in the Nationstar stalking horse and fifty million

19   more than the purchase price in Berkshire's APA, that was

20   Exhibit F yesterday.  To keep things apples to apples, I'll

21   refer to the increase from the original stalking horse.  That's

22   a hundred million dollars.

23        Berkshire Hathaway kept its breakup fee at twelve

24   million dollars, which was sixty million lower than the

25   original stalking-horse APA.  Berkshire Hathaway has no expense

1  reimbursement and continued to keep the bidding increments at

2  five million dollars.

3       Berkshire Hathaway -- sorry.  We received a bid from

4  Nationstar.  The details of that bid are as follows.

5  Nationstar increased the purchase price of its bid by 125

6  million dollars from the original purchase price set forth in

7  its stalking-horse bid, and 75 million more than the purchase

8  price it submitted during yesterday's proceedings.  That 125

9  million dollar bid is 25 million dollars higher on purchase

10  price than the Berkshire Hathaway final and best.

11       Nationstar kept its breakup fee at twenty-four million

12  dollars, which was forty-eight million lower than the stalking-

13  horse APA and twelve million higher than the Berkshire Hathaway

14  breakup fee.  Nationstar has no expense reimbursement.  The

15  bidding increments also remain at five million dollars.

16       The ResCap board of directors met early this morning

17  to consider the two final and best bids from Berkshire Hathaway

18  and Nationstar on the platform.  The entire board was present,

19  Your Honor, and the two bids were described to the board, as

20  well as copies of the e-mails which contained the bids, were

21  provided to the board.

22       After deliberations regarding the bids, the ResCap

23  board, in the sound exercise of their business judgment,

24  determined that the Nationstar bid for the platform was both

25  higher and better than the Berkshire Hathaway bid.  On a gross

RESIDENTIAL CAPITAL, LLC, ET AL.                    7

1  basis, the purchase price was twenty-five million dollars

2  higher on the Nationstar bid, and on a net basis, when you

3  include the difference in the breakup fee, the Nationstar bid

4  was thirteen million dollars higher.

5          As to the whole loan portfolio, we also received a bid

6  from Berkshire, the details of which are as follows.  Berkshire

7  Hathaway increased the purchase price of its bid for the whole

8  loan portfolio by fifty million dollars from the original

9  purchase price set forth in the AFI stalking-horse APA.  That's

10 the same price that Berkshire had in their APA that was entered

11 into evidence as Exhibit G.

12         Berkshire Hathaway kept its breakup fee at ten million

13 dollars, which would be ten million higher than the no breakup

14 fee in the AFI stalking horse.  Berkshire Hathaway has no

15 expense reimbursement.  And the bidding increments were five

16 million.

17         We compared the Berkshire Hathaway bid for the whole

18 loan portfolio to the original stalking-horse AFI bid.  The

19 ResCap board considered the two bids and had copies of the

20 bids.  After deliberating, the board, in the exercise of their

21 sound business judgment, determined that the Berkshire Hathaway

22 bid for the whole loan portfolio, was both higher and better

23 than the AFI stalking-horse bid.  On a gross basis, the

24 purchase price of the Berkshire Hathaway whole loan portfolio

25 bid was fifty million higher than the AFI bid, and on a net

1  basis the Berkshire Hathaway bid was forty million dollars

2  higher, if you reduce the fifty million by the ten million

3  breakup fee.

4         I just wanted to note, Your Honor, that although the

5  debtors selected Berkshire Hathaway as the stalking-horse for

6  the whole loan, the debtors do believe that AFI has complied

7  with its obligations under the settlement with ResCap to have

8  been the stalking-horse and that the debtors decided to go with

9  a different stalking horse.  And the debtors believe that it

10 was valuable to the estate to have AFI as the stalking-horse to

11 set the floor.

12        It is the debtors' sincere hope that both Berkshire

13 and Nationstar and many other bidders actively participate in

14 the auction for the platform assets.  The debtors believe there

15 is sufficient time and a well laid-out process to have a robust

16 auction for these assets.  Similarly, the debtors sincerely

17 hope that having clarified the bid and bid process for the

18 whole loan portfolio, with no connection to a plan or a

19 settlement in any way, that there will be a robust process for

20 bidding on the whole loan assets.

21        Your Honor, this is an incredibly complex financial

22 services company in a highly regulated industry, and we believe

23 that the bidding process is very important to enable bidders to

24 be at a place to make a successful bid and obtain the approvals

25 necessary to consummate these transactions.  And we felt it

1  important to note that the process leading up to today was not

2  a court-approved auction, it was a process to obtain the

3  approval of sale procedures and the stalking-horse protections.

4         An order, hopefully, will be entered today or tomorrow

5  that will officially start the bankruptcy court process, and we

6  want potential bidders to know that there will be an auction

7  and they need to attend, and that that process will follow the

8  sale procedures Your Honor approves.

9         With that said, Your Honor, the debtors believe the

10 evidence has shown that they exercised their sound business

11 judgment in selecting and continuing with Nationstar as the

12 stalking horse for the origination servicing platform, as I

13 described, and that they exercised their sound business

14 judgment in selecting Berkshire Hathaway as a stalking-horse

15 bidder for the whole loan portfolio.  Unless Your Honor has any

16 questions?

17        THE COURT:  I will.  But let me hear from others

18 first.  Mr. Eckstein?

19        MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

20 Eckstein of Kramer Levin, proposed counsel for the unsecured

21 creditors' committee.  Consistent with Your Honor's directions

22 at the conclusion of yesterday's hearing, we also received the

23 bids described by Mr. Nashelsky, both from Nationstar and

24 Berkshire.  Those bids were forwarded last night to the members

25 of the unsecured creditors' committee with a summary prepared

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    10

1   by our financial advisor, Moelis.

2          The committee met this morning.  Each member of the

3   committee participated in a comprehensive conference call

4   discussing the issues that arose at yesterday's hearing

5   describing the testimony, describing some of the nonfinancial

6   issues surrounding the transactions, including diligence, GSEs,

7   and other important items.  And after discussing all of the

8   issues and the bids, the committee arrived at the same

9   conclusion arrived at by the debtor.

10          The committee determined that the Nationstar bid, with

11  an increase of 125 million dollars, was in the best interests

12  of the estate.  And notwithstanding a higher break fee, the

13  committee felt that it was advantageous to, at this point in

14  the process, lock in the highest price for the assets.

15  Obviously, it's quite hopeful that Berkshire will participate

16  in the auction, and believes (sic) that both of these bidders

17  are extremely attractive bidders to consummate a transaction

18  for the estate.

19          With respect to the HFS assets, we determined, as I'd

20  indicated yesterday, preliminarily, that locking in an

21  additional fifty million dollars was in the best interests of

22  the estate, and that a ten million dollar break fee was

23  appropriate compensation for that additional floor.  And

24  therefore the committee endorses Berkshire as the stalking

25  horse for the HFS assets in lieu of AFI.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    11

1   So we share Mr. Nashelsky's view that at this point in

2   time, with the other modifications that have been negotiated

3   and have been described in the record, and that I believe are

4   the subject of agreement, that we have a set of procedures in

5   place that should be designed to maximize bidding on both of

6   these assets with adequate time and with a level playing field.

7   We understand that the asset purchase agreements for

8   both of the transactions are being revised to reflect both the

9   financial changes and the other procedural changes.  And we're

10  obviously going to be interested in making sure that the

11  revised APAs reflect all of the understandings.  But with that,

12  we are in agreement with the recommendation that the debtor has

13  articulated, and we would be supportive of the entry of an

14  order consistent with those recommendations.

15  THE COURT:  Thank you, Mr. Eckstein.  Anyone else want

16  to be heard?  Mr. Walper?

17  MR. WALPER:  Thank you, Your Honor.  Thomas Walper,

18  Munger, Tolles & Olson, representing Berkshire Hathaway.  I

19  just want to thank the Court yesterday for the opportunity to

20  present evidence and to display, I think, what the parties-in-

21  interest in this case will believe has been a valuable process

22  to the unsecured creditors in particular, but also to the

23  estates generally.  So thank you very much, Your Honor.

24  THE COURT:  Thank you, Mr. Walper.

25  Mr. Nashelsky -- anybody else want to be heard?  I

RESIDENTIAL CAPITAL, LLC, ET AL.                                    12

1    have a couple of questions --

2              MR. NASHELSKY:  Sure, Your Honor.

3              THE COURT:  -- really going to the APA.  When I spent

4    some time going over the actual document in more detail, I

5    don't find a fiduciary out.  And the testimony and the colloquy

6    yesterday -- testimony referred to a nonsolicitation provision,

7    and then Nationstar's counsel, at the very end, made a couple

8    of comments suggesting it was much more than just a

9    nonsolicitation provision.  He then said he had no objection to

10   the debtor communicating with Berkshire about an improved bid.

11             But when I went back over the APA itself, it raised a

12   question whether the absence -- unless, did I miss something?

13   Is there a fiduciary out?  I don't see it there.

14             MR. NASHELSKY:  Are you referring to going forward,

15   whether the debtors --

16             THE COURT:  Well, whether it's -- if I approve the

17   bidding procedures, this APA gets signed.  I understand what

18   the bidding procedures do and what it does with regard to the

19   auction.  But I don't know whether there could be other

20   circumstances that arise that would permit a debtor to trigger

21   the usual form of fiduciary out.  I became concerned, and I'm

22   sorry I didn't pick this up yesterday, because I would have --

23   you would have heard plenty from me; because of the form of

24   that nonsolicitation clause, I guess it's in paragraph 7.1,

25   "Competing transaction" -- the form of that paragraph is --

1         MR. NASHELSKY:  That --

2         THE COURT:  -- inconsistent with what I have always

3    viewed the fiduciary obligations of a debtor to be.  You could

4    argue that in light of how events have unfolded, specifically

5    the fact that there was additional dialog last night, there

6    were competing offers put on the table, Nationstar is

7    ultimately successful at achieving its stalking-horse status,

8    and I certainly do hope that there'll be continued bidding --

9    but I found the language in the APA really quite questionable.

10        And since the APA is going to be revised, I believe

11   that a -- unless I missed it; and my clerks looked and I looked

12   this morning -- I didn't see the usual fiduciary out provision

13   that would -- gee, I would have thought would be --

14   automatically would have been drafted into the agreement.  And

15   this wasn't just a no-shop clause.  This was a no negotiate;

16   don't provide information; this was a rather extraordinary

17   provision that you agreed to.

18        MR. NASHELSKY:  Your Honor, I think under the

19   circumstances, with the --

20        THE COURT:  You should have called it to my attention,

21   too.  Because this -- you refer to it as a nonsolicita -- this

22   is more than a nonsolicitation clause.

23        MR. NASHELSKY:  Well, my apologies, Your Honor, if I

24   didn't direct your attention to it.  Our view was that needing

25   to lock in a stalking horse, and the stalking horse being

1  concerned that if it has spent the time and money that it

2  spent, that at least up until the opportunity to have the

3  stalking horse approved, that we should stay with that stalking

4  horse.  I think our view is there's always a fiduciary out for

5  the estate, Your Honor.

6          THE COURT:  Where is that?  Show it to me.

7          MR. NASHELSKY:  No, I think it's inherent in the

8  bankruptcy --

9          THE COURT:  It's in the air?

10          MR. NASHELSKY:  -- well.  It's in the law that the

11  debtor has to do what's in the best interests of the estate.

12  But this was -- this provision now is -- goes away, because it

13  goes away when a sale procedure order is enter, presuming Your

14  Honor will enter an order.

15          We -- look, we tried to get it to be softened.  But

16  there are situations, Your Honor, where our choices are

17  limited.  And I would have liked to have had other

18  opportunities, but I also needed a stalking horse to get a DIP,

19  to have a soft landing, to preserve value.  And the debtors

20  believed that given those --

21          THE COURT:  Let me ask you this.  Do you agree this is

22  more than just a nonsolicitation clause?

23          MR. NASHELSKY:  Yes, I --

24          THE COURT:  Your witness, Mr. Greene, referred to it

25  as a nonsolicitation provision.  It's not.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    15

1          MR. NASHELSKY:  It's not.  Right, it's --

2          THE COURT:  It's that plus a whole lot more.

3          MR. NASHELSKY:  It's a non-negotiation provision, Your

4    Honor.  Nonsolicit and non-negotiation.

5          THE COURT:  I want it changed.  Okay?

6          MR. NASHELSKY:  Can I have one moment, Your Honor?

7          THE COURT:  Yes.

8          MR. NYHAN:  Your Honor, just to be clear --

9          THE COURT:  Just identify yourself for the record.

10         MR. NYHAN:  I beg your pardon, Your Honor.  Larry

11   Nyhan, Sidley & Austin on behalf of Nationstar.  Your

12   characterization is right, Your Honor.  It's a no-shop

13   provision.  But it only extends to the point --

14         THE COURT:  It's more than a no-shop provision.  I

15   understand a no-shop provision that the debtor couldn't go out,

16   take your bid, and go out and try and shop it elsewhere.  But

17   when Berkshire -- that's different than what happens when

18   Berkshire contacts the debtor and puts an offer on the table,

19   what they can or can't do in responding to it.  That's the part

20   that I'm bothered by.

21         When I heard the testimony yesterday, I kicked myself

22   that I didn't open up the APA to look specifically -- it was

23   referred to as a no solicitation.  It became a non-issue at the

24   and of the day when you indicated -- you said well, it's more

25   than nonsoliciation, but you said, but we have no objection.  I

1  didn't realize quite what was in this agreement.  Somebody

2  should have flagged this.  I wouldn't expect you to do it, but

3  I would have expected debtors' counsel or the committee's

4  counsel to have said the debtors' hands are tied in dealing

5  with Berkshire.

6          Could there have been a robust dialog with Berkshire

7  before last night about what its offer was -- I understand they

8  didn't come to the process until late in the day, but they did

9  come.  And maybe this is -- I'm venting a little bit, when it

10  doesn't make a whole lot of difference now as events have

11  unfolded.  I'm quite pleased that Nationstar has upped its

12  offer.  It is clear to me I'm going to approve it -- approve

13  them as the stalking horse.  I am going to require that a

14  specific fiduciary out provision be put in, because I don't

15  have -- I can't anticipate all the events that will unfold

16  going forward.

17          Certainly the bidding procedures will go forward.  The

18  bidding procedures order will govern.  But the board's

19  fiduciary duty is probably somewhat broader than that.  And I

20  don't think I've ever approved an APA that doesn't have the

21  typical fiduciary out provision in it.  So I'm surprised, Mr.

22  Nashelsky that you agreed and didn't flag for me, particularly

23  when your witness who testified yesterday referred to it as

24  nonsolicitation.  Maybe that's the simple euphemism you prefer

25  to call it.  But this is much more.

1      I understand what a nonsolicitation provision is.  I

2   understand what a no-shop provision is.  If someone said, well,

3   there's a no-negotiation provision.  We couldn't provide them

4   with information when Berkshire came forward, this is a lot

5   more than that.

6           MR. NYHAN:  Your Honor, to the extent it is helpful,

7   I'm prepared to confirm the representation of Mr. Nashelsky

8   that our interpretation of this agreement is that the

9   limitation on discussions, the no-shop, however one wishes to

10  characterize it, set forth in section 7.1, is extinguished once

11  the bidding procedures order is entered.  And the debtor is

12  free to do whatever it can to generate -- consistent with the

13  bid procedures -- to generate interest in the auction.

14          I will say, Your Honor, that we have had purchase

15  agreements with debtors that do not have fiduciary duty outs,

16  on the basis that the board has the facts in front of them; the

17  board has concluded its going to pursue a sale process --

18          THE COURT:  You've never had me approve one of those.

19          MR. NYHAN:  I appreciate that, Your Honor.  I

20  appreciate that.  And if Your Honor is telling me that Your

21  Honor is not going to approve this without a fiduciary duty

22  out, I would request an opportunity to speak to my client.

23          THE COURT:  Go speak to your client.

24          MR. NYHAN:  Thank you.

25          THE COURT:  Are they here?

1      MR. NYHAN:  Yes.

2      THE COURT:  Go ahead.

3      MR. NYHAN:  It was a short conversation, Your Honor.

4  The client is prepared to accept that.

5      THE COURT:  Okay.

6      MR. NASHELSKY:  So my apologies, Your Honor, for not

7  flagging that.  And we should have been more clear on it.  And

8  we apologize.  And we will add a fiduciary out, as Nationstar

9  just agreed.

10      THE COURT:  Okay.  All right.  Does anybody else want

11  to be heard at this point?

12      All right.  Pending before the Court is the debtors'

13  motion pursuant to Sections 105, 363(b), (f), (m), 365, 1123,

14  Federal Rule of Bankruptcy Procedure 2002, 6004, 6006, and 9014

15  for an order authorizing and approving sales procedures

16  including breakup fee and expense reimbursements, scheduling

17  bid deadline and sale hearing, approving form and manner of

18  notice thereof, and granting related relief.  I won't go on.

19  But it's the full title of the motion.

20      And through the motion, at this time, the debtors seek

21  approval of certain bid procedures and proposed stalking-horse

22  bidders for both what's been referred to as the servicing

23  platform and the legacy loan portfolio.

24      A number of parties objected to the bid procedures and

25  the debtors' proposed stalking-horse bidder for the loan

1   servicing platform.  Yesterday the Court held a hearing on the

2   motion, and in support of the motion heard testimony from

3   Samuel M. Greene, from Centerview Partners LLC, the debtors'

4   investment banker, and James Whitlinger, the debtors' chief

5   financial order.  In support of Berkshire Hathaway's objection

6   to the motion, the Court heard testimony from R. Ted Weschler,

7   an investment manager at Berkshire Hathaway.

8           Upon conclusion of the testimony, the Court directed

9   that Nationstar, Berkshire Hathaway, and the debtors' parent,

10  Ally Financial, submit their best and final offers to serve as

11  stalking-horse bidders to the debtors and the creditors'

12  committee, by 8:40 p.m. on June 18th.  Upon receipt of those

13  offers, the debtors' board of directors was directed to meet

14  and determine which party would act as stalking-horse bidder

15  for the proposed sale of the debtors' assets, which are more

16  fully set forth in the motion.  The creditors' committee,

17  likewise, was directed to meet and provide its recommendation

18  with respect to the stalking-horse bidders.

19          Both of those have occurred.  Counsel for both the

20  debtor and for the committee have reported on the directors'

21  committee meeting for the debtors and the creditors' committee

22  meeting.

23          The debtors' board of directors, in the exercise of

24  its business judgment, determined to go forward with the

25  Nationstar offer, as both quantitatively and qualitatively

RESIDENTIAL CAPITAL, LLC, ET AL.                                    20

1  better for the debtors' servicing business.  The terms have

2  been put forth on the record and will be set forth in the

3  written bidding procedures order and revised APA.

4       The debtors' board of directors concluded to go ahead

5  with Berkshire Hathaway as the stalking-horse bidder for the

6  loan portfolio, concluding that its bid was quantitatively

7  superior to the AFI proposal that had been made.

8       With respect to the servicing platform, the evidence

9  yesterday demonstrated that Nationstar as a stalking horse,

10 appears to have the ability quickly to consummate the sale,

11 obtain the necessary approvals, obviously, which consent from

12 the GSEs are required.  That's not done, but it appears that

13 they already had meetings with the GSEs.  That process is

14 underway.  Certainly the Court hopes that any competing

15 bidders, Berkshire Hathaway, for example, will likewise be in a

16 position to obtain the necessary approvals.  It certainly

17 appears to be a first-rate bidder for these assets.  The Court

18 certainly hopes they continue in the process going forward.

19      The debtors have shown this morning that the Berkshire

20 Hathaway bid for the loan portfolio is the superior bid.  It

21 was clear yesterday there were no consents that are required

22 for that sale to take place.  And the Court is hopeful that

23 continued bidding will occur during the auction process for the

24 loan portfolio.

25      With respect to both portions of the business, the

1  amounts of the breakup fees are reasonable in the context of

2  the amounts being offered and will not impede active bidding.

3          In the context of Section 363 auctions, bankruptcy

4  courts must have broad discretion and flexibility to enhance

5  the value of the estates before it.  See In re Financial News

6  Network Inc., 980 F.2d 165, 169 (2d Cir. 1992).  The Court must

7  not substitute its business judgment for that of the debtors.

8  See Committee of Equity Security Holders v. Lionel Corp., In re

9  Lionel Corp. 722 F.2d 1063, 1071 (2d Cir. 1983).

10         The Court is mindful that, "The fiduciary obligations

11  of debtors pervade bankruptcy administration."  In re Bidermann

12  Industries USA, Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997).

13  It is the overarching objective of sales in bankruptcy to

14  maximize value to the estate.  See Official Committee of

15  Subordinated Bondholders v. Integrated Resources, Inc., In re

16  Integrated Resource, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992),

17  ("It is a well-established principle of bankruptcy law that the

18  objective of bankruptcy rules and the debtor's duty with

19  respect to such sales, is to obtain the highest price or

20  greatest overall benefit possible for the estate.")

21         As this Court found in In re Metaldyne Corp., 409 B.R.

22  661, 669 (Bankr. S.D.N.Y. 2009), there is little doubt that

23  deciding to enter into a stalking-horse asset purchase

24  agreement, as is occurring here, is a reasonable exercise of

25  the debtors' business judgment, consistent with the debtors'

1  fiduciary obligations to their creditors, and consistent with

2  the overall objective of maximizing value to the estate.

3          With the changes that will be made to the two

4  respective asset purchase agreements and bidding procedures

5  order, to reflect the changes that were agreed upon yesterday,

6  and the additional one which I raised this morning, the Court

7  is satisfied that the board's decision to enter into these

8  asset purchase agreements reflects an appropriate business

9  judgment by a disinterested board of directors.

10         The evidence has shown that with respect to the loan

11 servicing platform, the Nationstar bid is the superior bid,

12 both quantitatively and qualitatively, and appropriate for the

13 board to agree to enter into that agreement.  With respect to

14 the loan portfolio, the evidence has established that the

15 Berkshire bid is a superior bid, quantitatively, and

16 appropriate exercise of business judgment by the debtors' board

17 to enter into that stalking-horse contract.

18         Bidder protections are granted when a bidder provides

19 a floor for bidding, by expanding resources to conduct due

20 diligence, and allowing its bid to be shopped around for a

21 higher offer; Integrated Resources, 147 B.R. 659.  The Court in

22 integrated Resources adopted a three-part test for evaluating

23 breakup fees:  1) is the relationship of the parties who

24 negotiated the breakup fee tainted by self-dealing or

25 manipulation; 2) does the fee hamper rather than encourage

1  bidding; and 3) is the amount of the fee unreasonable relative

2  to the proposed purchase price.  That's 147 B.R. 657.

3          An analysis of each of these factors, in this case,

4  supports the proposed bid protections and the breakup fee that

5  are being granted in this case.

6          In light of the considerations that I've discussed,

7  the Court finds that the bid procedures are fair and adequate

8  and will likely enhance the auction of the debtors' assets.

9  Further, the Court is confident that the debtors' board of

10  directors has exercised its valid business judgment in choosing

11  the stalking-horse bidders for the loan servicing platform and

12  for the loan portfolio.

13          And as I've said before, it's certainly the Court's

14  hope that the bidders who've been involved in the selection of

15  the stalking horse will remain active bidders in the auction.

16          As I've already indicated, the Court will require that

17  the asset purchase agreements be revised to include a fiduciary

18  out provision which was not included in the APA as presented to

19  the Court.

20          As events unfolded yester -- and while paragraph 7.1

21  of the Nationstar APA arguably would have prevented the debtors

22  from engaging with Berkshire with respect to its improved

23  offers, as events unfolded yesterday, the effect of paragraph

24  7.1 became of little consequence, because Nationstar's counsel

25  stated on the record that it consented to the debtors'

RESIDENTIAL CAPITAL, LLC, ET AL.                                    24

1  communications with Berkshire Hathaway regarding any further

2  revised offer.  Therefore, I consider this in the context of

3  this case to have been a no-harm no-foul situation.

4          For all of the foregoing reasons, the Court approves

5  the debtors' motion to enter into -- for approval of bidding

6  procedures as revised, subject to the Court seeing the final

7  orders, and entering into the asset purchase agreements, with

8  the changes that were discussed yesterday and this morning.

9          Mr. Nashelsky?

10         MR. NASHELSKY:  Thank you, Your Honor.  We'll be,

11 obviously, providing the parties with drafts of the order to

12 make sure all of the language we agreed --

13         THE COURT:  Tell me, where do things stand?  Because

14 there were a bunch of provisions that were agreed upon

15 yesterday, a number of reservation of rights, and things of

16 that nature.

17         MR. NASHELSKY:  Right.  So I believe that we have

18 agreement with the RMBS trustees and -- sorry -- Frost Bank,

19 thank you -- on reserving rights on the cure procedures.  We

20 have reservation rights with U.S. Bank on the waiver of credit

21 bidding.  And we have -- we will work in language with the U.S.

22 Trustee on the ombudsman issue, which will be for another day.

23 And we're reserving rights of Digital Lewisville, which was the

24 other objector.

25         I believe with those changes and all the other changes

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                          25

1   Your Honor described, we agree with the committee on timing and

2   otherwise, that everybody is on board, and we will obviously

3   confirm with each of them the language that we put in the order

4   that affects their rights.

5           THE COURT:  When is the -- with respect to the

6   consumer privacy ombudsman, the July 10th calendar is already

7   quite full.  What's the next date after that?

8           MR. NASHELSKY:  The 24th, Your Honor.

9           THE COURT:  My suggestion is, talk with Mr. Masumoto

10  and -- is all the briefing completed with respect to the

11  consumer privacy ombudsman?

12          MR. MASUMOTO:  Yes, it is, Your Honor.

13          MR. NASHELSKY:  I think, Your Honor, yes.  We would

14  like to spend some time on them and just see if we can

15  explain --

16          THE COURT:  See if you can work it out.

17          MR. NASHELSKY:  Yes -- what we were doing, and why we

18  think so.  If we still need to have it heard, we could, Your

19  Honor.

20          THE COURT:  So my suggestion is, if that date -- if

21  the July 24th date would work for you, I guess to put it on the

22  calendar for then.  If you believe you need an earlier

23  determination of the issue, which is fine if you do, we can

24  specially set a date just to deal with the consumer privacy

25  ombudsman.

RESIDENTIAL CAPITAL, LLC, ET AL.                                         26

1          MR. NASHELSKY:  No, I think that date should be fine,

2     Your Honor.

3          THE COURT:  Okay.  All right.  Anything else for

4     today?

5          MR. NASHELSKY:  No, I think we're done.  And thank you

6     very much for staying late last night and accommodating us.

7          THE COURT:  That's okay.  I want to commend everybody

8     for moving the process along to this point.  And obviously you

9     had fairly robust bidding that raised the stalking-horse price

10    considerably for both sets of assets.

11         MR. NASHELSKY:  Thank you, Your Honor.

12         THE COURT:  Thank you very much.  We're adjourned.

13       (Whereupon these proceedings were concluded at 12:04 PM)

27

1

2                              I N D E X

3

4                              RULINGS

5                                               Page        Line

6    Debtors' motion to approve bidding procedures   24          4

7    is granted as revised based on the record.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28

**C E R T I F I C A T I O N**

I, Penina Wolicki, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  June 20, 2012

12-12020-mg    Doc 942    Filed 07/30/12    Entered 07/31/12 10:37:32    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Pg 29 of 35

Case No. 12-12020(MG)
June 19, 2012

## A

**ability (1)**
20:10
**absence (1)**
12:12
**accept (1)**
18:4
**accommodating (1)**
26:6
**achieving (1)**
13:7
**act (1)**
19:14
**active (2)**
21:2;23:15
**actively (1)**
8:13
**actual (1)**
12:4
**add (1)**
18:8
**additional (4)**
10:21,23;13:5;22:6
**adequate (1)**
11:6;23:7
**adjourned (1)**
26:12
**administration (1)**
21:11
**adopted (1)**
22:22
**advantageous (1)**
10:13
**advisor (1)**
10:1
**affects (1)**
25:4
**AFI (9)**
7:9,14,18,23,25;
8:6,10;10:25;20:7
**agree (3)**
14:21;22:13;25:1
**agreed (6)**
13:17;16:22;18:9;
22:5;24:12,14
**agreement (8)**
11:4,12;13:14;
16:1;17:8;21:24;
22:13;24:18
**agreements (6)**
11:7;17:15;22:4,8;
23:17;24:7
**ahead (2)**
18:2;20:4
**air (1)**
14:9
**allowing (1)**
22:20
**Ally (1)**
19:10
**along (1)**

### 26:8
**although (1)**
8:4
**always (2)**
13:2;14:4
**amount (1)**
23:1
**amounts (2)**
21:1,2
**analysis (1)**
23:3
**Angeles (1)**
4:14
**anticipate (1)**
16:15
**APA (15)**
5:19,25;6:13;7:9,
10;12:3,11,17;13:9,
10;15:22;16:20;20:3;
23:18,21
**APAs (1)**
11:11
**apologies (2)**
13:23;18:6
**apologize (1)**
18:8
**appears (3)**
20:10,12,17
**apples (2)**
5:20,20
**appreciate (2)**
17:19,20
**appropriate (4)**
10:23;22:8,12,16
**approval (2)**
9:3;18:21;24:5
**approvals (3)**
8:24;20:11,16
**approve (5)**
12:16;16:12,12;
17:18,21
**approved (2)**
14:3;16:20
**approves (2)**
9:8;24:4
**approving (2)**
18:15,17
**arguably (1)**
23:21
**argue (1)**
13:4
**arise (1)**
12:20
**arose (1)**
10:4
**around (1)**
22:20
**arrived (2)**
10:8,9
**articulated (1)**
11:13
**asset (6)**
11:7;21:23;22:4,8;

### 23:17;24:7
**assets (11)**
8:14,16,20;10:14,
19,25;11:6;19:15;
20:17;23:8;26:10
**attend (1)**
9:7
**attention (2)**
13:20,24
**Attorneys (2)**
4:3,11
**attractive (1)**
10:17
**auction (10)**
8:14,16;9:2,6;
10:16;12:19;17:13;
20:23;23:8,15
**auctions (1)**
21:3
**AUSTIN (2)**
4:2;15:11
**authorizing (1)**
18:15
**automatically (1)**
13:14
**Avenue (2)**
4:4,12
**away (2)**
14:12,13

## B

**back (2)**
5:7;12:11
**Bank (2)**
24:18,20
**banker (1)**
19:4
**Bankr (2)**
21:12,22
**bankruptcy (8)**
9:5;14:8;18:14;
21:3,11,13,17,18
**basis (5)**
7:1,2,23;8:1;17:16
**became (3)**
12:21;15:23;23:24
**beg (1)**
15:10
**behalf (1)**
15:11
**believes (1)**
10:16
**benefit (1)**
21:20
**Berkshire (42)**
4:11;5:12,14,16,23,
25;6:3,10,13,17,25;
7:6,6,10,12,14,17,21,
24;8:1,5,12;9:14,24;
10:15,24;11:18;
12:10;15:17,18;16:5,
6;17:4;19:5,7,9;20:5,

### 15,19;22:15;23:22;24:1
**Berkshire's (1)**
5:19
**best (7)**
5:8;6:10,17;10:11,
21;14:11;19:10
**better (3)**
6:25;7:22;20:1
**bid (42)**
5:12,14,15,16;6:3,
4,5,7,9,24,25;7:2,3,5,
7,17,18,22,23,25;
8:1,17,17,24;10:10;
12:10;15:16;17:13;
18:17,21,24;20:6,20,
20;22:11,11,15,15,
20;23:4,7
**bidder (7)**
9:15;18:25;19:14;
20:5,17;22:18,18
**bidders (12)**
8:13,23;9:6;10:16,
17;18:22;19:11,18;
20:15;23:11,14,15
**bidding (21)**
6:1,15;7:15;8:20,
23;11:5;12:17,18;
13:8;16:17,18;17:11;
20:3,23;21:2;22:4,
19;23:1;24:5,21;26:9
**Bidermann (1)**
21:11
**bids (11)**
5:8,10;6:17,19,20,
22;7:19,20;9:23,24;
10:8
**bit (1)**
16:9
**board (17)**
6:16,18,19,21,23;
7:19,20;17:16,17;
19:13,23;20:4;22:9,
13,16;23:9;25:2
**board's (2)**
16:18;22:7
**Bondholders (1)**
21:15
**both (15)**
6:24;7:22;8:12;
9:23;10:16;11:5,8,8;
18:22;19:19,19,25;
20:25;22:12;26:10
**bothered (1)**
15:20
**BR (5)**
21:12,16,21;22:21;
23:2
**break (2)**
10:12,22
**breakup (12)**
5:23;6:11,14;7:3,
12,13;8:3;18:16;

### 21:1;22:23,24;23:4
**briefing (1)**
25:10
**broad (1)**
21:4
**broader (1)**
16:19
**bunch (1)**
24:14
**business (12)**
6:23;7:21;9:10,13;
19:24;20:1,25;21:7,
25;22:8,16;23:10

## C

**CA (1)**
4:14
**calendar (2)**
25:6,22
**call (2)**
10:3;16:25
**called (1)**
13:20
**came (1)**
17:4
**Can (6)**
15:6,19;17:12;
25:14,16,23
**Capital (2)**
5:3,6
**case (4)**
11:21;23:3,5;24:3
**Centerview (1)**
19:3
**certain (1)**
18:21
**certainly (6)**
13:8;16:17;20:14,
16,18;23:13
**changed (1)**
15:5
**changes (7)**
11:9,9;22:3,5;24:8,
25,25
**characterization (1)**
15:12
**characterize (1)**
17:10
**chief (1)**
19:4
**choices (1)**
14:16
**choosing (1)**
23:10
**Cir (2)**
21:6,9
**circumstances (2)**
12:20;13:19
**clarified (1)**
8:17
**clause (4)**
12:24;13:15,22;

12-12020-mg    Doc 942    Filed 07/30/12    Entered 07/31/12 10:37:32    Main Document
In the Matter of:                                      Pg 30 of 35                                  Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                                                              June 19, 2012

14:22

**clear (4)**
15:8;16:12;18:7;
20:21
**clerks (1)**
13:11
**client (3)**
17:22,23;18:4
**colloquy (1)**
12:5
**commend (1)**
26:7
**comments (1)**
12:8
**committee (16)**
9:21,25;10:2,3,8,
10,13,24;19:12,16,
20,21,21;21:8,14;
25:1
**committee's (1)**
16:3
**communicating (1)**
12:10
**communications (1)**
24:1
**company (1)**
8:22
**compared (1)**
7:17
**compensation (1)**
10:23
**Competing (3)**
12:25;13:6;20:14
**completed (1)**
25:10
**complex (1)**
8:21
**complied (1)**
8:6
**comprehensive (1)**
10:3
**concerned (2)**
12:21;14:1
**concluded (3)**
17:17;20:4;26:13
**concluding (1)**
20:6
**conclusion (3)**
9:22;10:9;19:8
**conduct (1)**
22:19
**conference (1)**
10:3
**confident (1)**
23:9
**confirm (2)**
17:7;25:3
**connection (1)**
8:18
**consent (1)**
20:11
**consented (1)**
23:25

**consents (1)**
20:21
**consequence (1)**
23:24
**consider (2)**
6:17;24:2
**considerably (1)**
26:10
**considerations (1)**
23:6
**considered (1)**
7:19
**Consistent (5)**
9:21;11:14;17:12;
21:25;22:1
**consumer (3)**
25:6,11,24
**consummate (3)**
8:25;10:17;20:10
**contacts (1)**
15:18
**contained (1)**
6:20
**context (3)**
21:1,3;24:2
**continue (1)**
20:18
**continued (3)**
6:1;13:8;20:23
**continuing (1)**
9:11
**contract (1)**
22:17
**conversation (1)**
18:3
**copies (2)**
6:20;7:19
**Corp (3)**
21:8,9,21
**counsel (7)**
5:5;9:20;12:7;16:3,
4;19:19;23:24
**couple (2)**
12:1,7
**COURT (54)**
5:2,6,7,9;9:5,17;
11:15,19,24;12:3,16;
13:2,20;14:6,9,21,24;
15:2,5,7,9,14;17:18,
23,25;18:2,5,10,12;
19:1,6,8;20:14,17,22;
21:6,10,21;22:6,21;
23:7,9,16,19;24:4,6,
13;25:5,9,16,20;26:3,
7,12
**court-approved (1)**
9:2
**courts (1)**
21:4
**Court's (1)**
23:13
**credit (1)**
24:20

**creditors (2)**
11:22;22:1
**creditors' (5)**
9:21,25;19:11,16,
21
**cure (1)**
24:19

**D**

**date (5)**
25:7,20,21,24;26:1
**day (3)**
15:24;16:8;24:22
**deadline (3)**
5:9,11;18:17
**deal (1)**
25:24
**dealing (1)**
16:4
**debtor (10)**
10:9;11:12;12:10,
20;13:3;14:11;15:15,
18;17:11;19:20
**debtors (19)**
5:6,10;8:5,6,8,9,14,
16;9:9;12:15;14:19;
17:15;18:20;19:11,
21;20:19;21:7,11;
23:21
**debtors' (22)**
5:11,15;8:12;16:3,
4;18:12,25;19:3,4,9,
13,15,23;20:1,4;
21:25,25;22:16;23:8,
9,25;24:5
**debtor's (1)**
21:18
**decided (1)**
8:8
**deciding (1)**
21:23
**decision (1)**
22:7
**deliberating (1)**
7:20
**deliberations (1)**
6:22
**demonstrated (1)**
20:9
**describe (1)**
5:13
**described (5)**
6:19;9:13,23;11:3;
25:1
**describing (2)**
10:5,5
**designed (1)**
11:5
**detail (1)**
12:4
**details (3)**
5:15;6:4;7:6

**determination (1)**
25:23
**determine (1)**
19:14
**determined (5)**
6:24;7:21;10:10,
19;19:24
**dialog (2)**
13:5;16:6
**difference (2)**
7:3;16:10
**different (2)**
8:9;15:17
**Digital (1)**
24:23
**diligence (2)**
10:6;22:20
**DIP (1)**
14:18
**direct (1)**
13:24
**directed (3)**
19:8,13,17
**directions (1)**
9:21
**directors (6)**
6:16;19:13,23;
20:4;22:9;23:10
**directors' (1)**
19:20
**discretion (1)**
21:4
**discussed (2)**
23:6;24:8
**discussing (2)**
10:4,7
**discussions (1)**
17:9
**disinterested (1)**
22:9
**display (1)**
11:20
**document (1)**
12:4
**dollar (2)**
6:9;10:22
**dollars (15)**
5:17,22,24;6:2,6,9,
12,15;7:1,4,8,13;8:1;
10:11,21
**done (2)**
20:12;26:5
**doubt (1)**
21:22
**drafted (1)**
13:14
**drafts (1)**
24:11
**due (1)**
22:19
**during (2)**
6:8;20:23
**duty (4)**

16:19;17:15,21;
21:18

**E**

**earlier (1)**
25:22
**early (1)**
6:16
**Eckstein (4)**
9:18,19,20;11:15
**effect (1)**
23:23
**else (4)**
11:15,25;18:10;
26:3
**elsewhere (1)**
15:16
**e-mails (1)**
6:20
**enable (1)**
8:23
**encourage (1)**
22:25
**end (1)**
12:7
**endorses (1)**
10:24
**engaging (1)**
23:22
**enhance (1)**
21:4;23:8
**enter (7)**
14:13,14;21:23;
22:7,13,17;24:5
**entered (3)**
7:10;9:4;17:11
**entering (1)**
24:7
**entire (1)**
6:18
**entry (1)**
11:13
**Equity (1)**
21:8
**ESQ (2)**
4:7,16
**established (1)**
22:2
**estate (9)**
8:10;10:12,18,22;
14:5,11;21:14,20;
22:2
**estates (2)**
11:23;21:5
**euphemism (1)**
16:24
**evaluating (1)**
22:22
**events (5)**
13:4;16:10,15;
23:20,23
**everybody (2)**

12-12020-mg Doc 942 Filed 07/30/12 Entered 07/31/12 10:37:32 Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 31 of 35
Case No. 12-12020(MG)
June 19, 2012

25:2;26:7
**evidence (6)**
7:11;9:10;11:20;
20:8;22:10,14
**example (1)**
20:15
**exercise (5)**
6:23;7:20;19:23;
21:24;22:16
**exercised (3)**
9:10,13;23:10
**Exhibit (2)**
5:20;7:11
**expanding (1)**
22:19
**expect (1)**
16:2
**expected (1)**
16:3
**expense (4)**
5:25;6:14;7:15;
18:16
**explain (1)**
25:15
**extends (1)**
15:13
**extent (1)**
17:6
**extinguished (1)**
17:10
**extraordinary (1)**
13:16
**extremely (1)**
10:17

**F**

**F2d (2)**
21:6,9
**fact (1)**
13:5
**factors (1)**
23:3
**facts (1)**
17:16
**fair (1)**
23:7
**fairly (1)**
26:9
**Federal (1)**
18:14
**fee (14)**
5:23;6:11,14;7:3,
12,14;8:3;10:12,22;
18:16;22:24,25;23:1,
4
**fees (2)**
21:1;22:23
**felt (2)**
8:25;10:13
**fiduciary (15)**
12:5,13,21;13:3,
12;14:4;16:14,19,21;

17:15,21;18:8;21:10;
22:1;23:17
**field (1)**
11:6
**fifty (5)**
5:18;7:8,25;8:2;
10:21
**final (5)**
5:8;6:10,17;19:10;
24:6
**financial (6)**
8:21;10:1;11:9;
19:5,10;21:5
**find (1)**
12:5
**finds (1)**
23:7
**fine (2)**
25:23;26:1
**first (1)**
9:18
**first-rate (1)**
20:17
**five (3)**
6:2,15;7:15
**flag (1)**
16:22
**flagged (1)**
16:2
**flagging (1)**
18:7
**flexibility (1)**
21:4
**Floor (4)**
4:13;8:11;10:23;
22:19
**Foerster (1)**
5:5
**follow (1)**
9:7
**follows (3)**
5:15;6:4;7:6
**foregoing (1)**
24:4
**form (4)**
12:21,23,25;18:17
**forth (7)**
5:18;6:6;7:9;
17:10;19:16;20:2,2
**forty (1)**
8:1
**forty-eight (1)**
6:12
**forward (6)**
12:14;16:16,17;
17:4;19:24;20:18
**forwarded (1)**
9:24
**found (2)**
13:9;21:21
**free (1)**
17:12
**front (1)**

17:16
**Frost (1)**
24:18
**full (2)**
18:19;25:7
**fully (1)**
19:16
**Further (2)**
23:9;24:1

**G**

**gee (1)**
13:13
**generally (1)**
11:23
**generate (2)**
17:12,13
**gets (1)**
12:17
**given (1)**
14:20
**goes (2)**
14:12,13
**Good (2)**
5:4;9:19
**govern (1)**
16:18
**Grand (1)**
4:12
**granted (2)**
22:18;23:5
**granting (1)**
18:18
**greatest (1)**
21:20
**Greene (2)**
14:24;19:3
**gross (2)**
6:25;7:23
**GSEs (3)**
10:6;20:12,13
**guess (2)**
12:24;25:21

**H**

**hamper (1)**
22:25
**hands (1)**
16:4
**happens (1)**
15:17
**Hathaway (27)**
4:11;5:12,14,16,23,
25;6:3,10,13,17,25;
7:7,12,14,17,21,24;
8:1,5;9:14;11:18;
19:7,9;20:5,15,20;
24:1
**Hathaway's (1)**
19:5
**hear (1)**

9:17
**heard (8)**
11:16,25;12:23;
15:21;18:11;19:2,6;
25:18
**hearing (4)**
9:22;10:4;18:17;
19:1
**held (1)**
19:1
**helpful (1)**
17:6
**HFS (2)**
10:19,25
**higher (11)**
6:9,13,25;7:2,4,13,
22,25;8:2;10:12;
22:21
**highest (2)**
10:14;21:19
**highly (1)**
8:22
**Holders (1)**
21:8
**Honor (37)**
5:4,10;6:19;8:4,21;
9:8,9,15,19;11:17,23;
12:2;13:18,23;14:5,
14,16;15:4,6,8,10,12;
17:6,14,19,20,21;
18:3,6;24:10;25:1,8,
12,13,19;26:2,11
**Honor's (1)**
9:21
**hope (4)**
8:12,17;13:8;23:14
**hopeful (2)**
10:15;20:22
**hopefully (1)**
9:4
**hopes (2)**
20:14,18
**horse (15)**
5:18,21;6:13;7:14;
8:9;9:12;10:25;
13:25,25;14:3,4,18;
16:13;20:9;23:15
**hundred (2)**
5:17,22

**I**

**identify (1)**
15:9
**impede (1)**
21:2
**important (3)**
8:23;9:1;10:7
**improved (2)**
12:10;23:22
**Inc (5)**
4:11;21:6,12,15,16
**include (2)**

7:3;23:17
**included (1)**
23:18
**including (2)**
10:6;18:16
**inconsistent (1)**
13:2
**increase (2)**
5:21;10:11
**increased (3)**
5:16;6:5;7:7
**incredibly (1)**
8:21
**increments (3)**
6:1,15;7:15
**indicated (3)**
10:20;15:24;23:16
**Industries (1)**
21:12
**industry (1)**
8:22
**inform (1)**
5:7
**information (2)**
13:16;17:4
**inherent (1)**
14:7
**Integrated (4)**
21:15,16;22:21,22
**interest (2)**
11:21;17:13
**interested (1)**
11:10
**interests (3)**
10:11,21;14:11
**interpretation (1)**
17:8
**into (8)**
7:11;13:14;21:23;
22:7,13,17;24:5,7
**investment (2)**
19:4,7
**involved (1)**
23:14
**issue (2)**
24:22;25:23
**issues (3)**
10:4,6,8
**items (1)**
10:7

**J**

**James (1)**
19:4
**judgment (10)**
6:23;7:21;9:11,14;
19:24;21:7,25;22:9,
16;23:10
**July (2)**
25:6,21
**June (1)**
19:12

12-12020-mg    Doc 942    Filed 07/30/12    Entered 07/31/12 10:37:32    Main Document
Pg 32 of 35

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 19, 2012

**K**

keep (2)
5:20;6:1
Kenneth (1)
9:19
kept (3)
5:23;6:11;7:12
kicked (1)
15:21
Kramer (1)
9:20

**L**

laid-out (1)
8:15
landing (1)
14:19
language (4)
13:9;24:12,21;25:3
Larren (1)
5:4
LARRY (2)
4:7;15:10
last (5)
5:8;9:24;13:5;
16:7;26:6
late (2)
16:8;26:6
law (2)
14:10;21:17
leading (1)
9:1
least (1)
14:2
legacy (1)
18:23
level (1)
11:6
Levin (1)
9:20
Lewisville (1)
24:23
lieu (1)
10:25
light (2)
13:4;23:6
liked (1)
14:17
likely (1)
23:8
likewise (2)
19:17;20:15
limitation (1)
17:9
limited (1)
14:17
Lionel (2)
21:8,9
little (3)
16:9;21:22;23:24

LLC (2)
5:3;19:3
LLP (1)
4:2,10
loan (19)
5:12;7:5,8,18,22,
24;8:6,18,20;9:15;
18:23,25;20:6,20,24;
22:10,14;23:11,12
lock (2)
10:14;13:25
locking (1)
10:20
look (2)
14:15;15:22
looked (2)
13:11,11
Los (1)
4:14
lot (3)
15:2;16:10;17:4
lower (2)
5:24;6:12

**M**

making (1)
11:10
manager (1)
19:7
manipulation (1)
22:25
manner (1)
18:17
many (1)
8:13
Masumoto (2)
25:9,12
maximize (2)
11:5;21:14
maximizing (1)
22:2
maybe (2)
16:9,24
meet (2)
19:13,17
meeting (2)
19:21,22
meetings (1)
20:13
member (1)
10:2
members (1)
9:24
met (2)
6:16;10:2
Metaldyne (1)
21:21
million (27)
5:17,18,22,24,24;
6:2,6,7,9,9,11,12,13,
15;7:1,4,8,12,13,16,
25;8:1,2,2;10:11,21,

22
mindful (1)
21:10
miss (1)
12:12
missed (1)
13:11
modifications (1)
11:2
Moelis (1)
10:1
moment (2)
5:13;15:6
money (1)
14:1
more (13)
5:19;6:7;12:4,8;
13:22;14:22;15:2,14,
24;16:25;17:5;18:7;
19:15
morning (9)
5:4,7;6:16;9:19;
10:2;13:12;20:19;
22:6;24:8
Morrison (1)
5:5
motion (8)
18:13,19,20;19:2,2,
6,16;24:5
moving (1)
26:8
much (5)
11:23;12:8;16:25;
26:6,12
MUNGER (2)
4:10;11:18
must (2)
21:4,6
myself (1)
15:21

**N**

NASHELSKY (27)
5:4,5;9:23;11:25;
12:2,14;13:1,18,23;
14:7,10,23;15:1,3,6;
16:22;17:7;18:6;
24:9,10,17;25:8,13,
17;26:1,5,11
Nashelsky's (1)
11:1
Nationstar (23)
4:3;5:18;6:4,5,11,
14,18,24;7:2,3;8:13;
9:11,23;10:10;13:6;
15:11;16:11;18:8;
19:9,25;20:9;22:11;
23:21
Nationstar's (2)
12:7;23:24
nature (1)
24:16

necessary (3)
8:25;20:11,16
need (3)
9:7;25:18,22
needed (1)
14:18
needing (1)
13:24
negotiate (1)
13:15
negotiated (2)
11:2;22:24
net (2)
7:2,25
Network (1)
21:6
New (1)
4:5
News (1)
21:5
next (1)
25:7
night (5)
5:8;9:24;13:5;
16:7;26:6
no-foul (1)
24:3
no-harm (1)
24:3
no-negotiation (1)
17:3
nonfinancial (1)
10:5
non-issue (1)
15:23
non-negotiation (2)
15:3,4
nonsoliciation (1)
15:25
Nonsolicit (1)
15:4
nonsolicita (1)
13:21
nonsolicitation (8)
12:6,9,24;13:22;
14:22,25;16:24;17:1
no-shop (6)
13:15;15:12,14,15;
17:2,9
note (2)
8:4;9:1
notice (1)
18:18
notwithstanding (1)
10:12
number (3)
5:3;18:24;24:15
NY (1)
4:5
NYHAN (9)
4:7;15:8,10,11;
17:6,19,24;18:1,3

**O**

objected (1)
18:24
objection (2)
12:9;15:25;19:5
objective (3)
21:13,18;22:2
objector (1)
24:24
obligations (4)
8:7;13:3;21:10;
22:1
obtain (5)
8:24;9:2;20:11,16;
21:19
Obviously (6)
10:15;11:10;20:11;
24:11;25:2;26:8
occur (1)
20:23
occurred (1)
19:19
occurring (1)
21:24
offer (6)
15:18;16:7,12;
19:25;22:21;24:2
offered (1)
21:2
offers (4)
13:6;19:10,13;
23:23
Official (1)
21:14
officially (1)
9:5
OLSON (2)
4:10;11:18
ombudsman (4)
24:22;25:6,11,25
once (1)
17:10
one (6)
5:12,17;15:6;17:9,
18;22:6
only (1)
15:13
open (1)
15:22
opportunities (1)
14:18
opportunity (3)
11:19;14:2;17:22
order (12)
9:4;11:14;14:13,
14;16:18;17:11;
18:15;19:5;20:3;
22:5;24:11;25:3
orders (1)
24:7
original (6)

12-12020-mg    Doc 942    Filed 07/30/12    Entered 07/31/12 10:37:32    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Pg 33 of 35

Case No. 12-12020(MG)
June 19, 2012

5:17,21,25;6:6;7:8,
18
**origination (1)**
9:12
**others (1)**
9:17
**otherwise (1)**
25:2
**out (13)**
12:5,13,21;13:12;
14:4;15:15,16;16:14,
21;17:22;18:8;23:18;
25:16
**outs (1)**
17:15
**over (2)**
12:4,11
**overall (2)**
21:20;22:2
**overarching (1)**
21:13

**P**

**paragraph (4)**
12:24,25;23:20,23
**pardon (1)**
15:10
**parent (1)**
19:9
**part (1)**
15:19
**participate (2)**
8:13;10:15
**participated (1)**
10:3
**particular (1)**
11:22
**particularly (1)**
16:22
**parties (3)**
18:24;22:23;24:11
**parties-in- (1)**
11:20
**Partners (1)**
19:3
**party (1)**
19:14
**Pending (1)**
18:12
**permit (1)**
12:20
**pervade (1)**
21:11
**pick (1)**
12:22
**place (3)**
8:24;11:5;20:22
**plan (1)**
8:18
**platform (11)**
5:11,15;6:18,24;
8:14;9:12;18:23;

19:1;20:8;22:11;
23:11
**playing (1)**
11:6
**Please (1)**
5:2
**pleased (1)**
16:11
**plenty (1)**
12:23
**plus (1)**
15:2
**pm (2)**
19:12;26:13
**point (5)**
10:13;11:1;15:13;
18:11;26:8
**portfolio (14)**
5:12;7:5,8,18,22,
24;8:18;9:15;18:23;
20:6,20,24;22:14;
23:12
**portions (1)**
20:25
**position (1)**
20:16
**possible (1)**
21:20
**potential (1)**
9:6
**prefer (1)**
16:24
**preliminarily (1)**
10:20
**prepared (3)**
9:25;17:7;18:4
**present (2)**
6:18;11:20
**presented (1)**
23:18
**preserve (1)**
14:19
**presuming (1)**
14:13
**prevented (1)**
23:21
**price (16)**
5:16,17,19;6:5,6,8,
10;7:1,7,9,10,24;
10:14;21:19;23:2;
26:9
**principle (1)**
21:17
**prior (1)**
5:11
**privacy (1)**
25:6,11,24
**probably (1)**
16:19
**procedural (1)**
11:9
**procedure (2)**
14:13;18:14

**procedures (17)**
9:3,8;11:4;12:17,
18;16:17,18;17:11,
13;18:15,21,24;20:3;
22:4;23:7;24:6,19
**proceedings (2)**
6:8;26:13
**process (16)**
8:15,17,19,23;9:1,
2,5,7;10:14;11:21;
16:8;17:17;20:13,18,
23;26:8
**proposal (1)**
20:7
**proposed (7)**
5:5;9:20;18:21,25;
19:15;23:2,4
**protections (3)**
9:3;22:18;23:4
**provide (3)**
13:16;17:3;19:17
**provided (1)**
6:21
**provides (1)**
22:18
**providing (1)**
24:11
**provision (16)**
12:6,9;13:12,17;
14:12,25;15:3,13,14,
15;16:14,21;17:1,2,3;
23:18
**provisions (1)**
24:14
**purchase (19)**
5:16,17,19;6:5,6,7,
9;7:1,7,9,24;11:7;
17:14;21:23;22:4,8;
23:2,17;24:7
**pursuant (1)**
18:13
**pursue (1)**
17:17
**put (5)**
13:6;16:14;20:2;
25:3,21
**puts (1)**
15:18

**Q**

**qualitatively (2)**
19:25;22:12
**quantitatively (4)**
19:25;20:6;22:12,
15
**questionable (1)**
13:9
**quickly (1)**
20:10
**quite (5)**
10:15;13:9;16:1,
11;25:7

**R**

**raised (3)**
12:11;22:6;26:9
**rather (2)**
13:16;22:25
**re (5)**
21:5,8,11,15,21
**realize (1)**
16:1
**really (2)**
12:3;13:9
**reasonable (2)**
21:1,24
**reasons (1)**
24:4
**receipt (1)**
19:12
**received (7)**
5:8,10,11,14;6:3;
7:5;9:22
**recommendation (2)**
11:12;19:17
**recommendations (1)**
11:14
**record (4)**
11:3;15:9;20:2;
23:25
**reduce (1)**
8:2
**refer (2)**
5:21;13:21
**referred (5)**
12:6;14:24;15:23;
16:23;18:22
**referring (1)**
12:14
**reflect (3)**
11:8,11;22:5
**reflects (1)**
22:8
**regard (1)**
12:18
**regarding (2)**
6:22;24:1
**regulated (1)**
8:22
**reimbursement (3)**
6:1,14;7:15
**reimbursements (1)**
18:16
**related (1)**
18:18
**relationship (1)**
22:23
**relative (1)**
23:1
**relief (1)**
18:18
**remain (2)**
6:15;23:15
**reported (1)**

19:20
**representation (1)**
17:7
**representing (1)**
11:18
**request (1)**
17:22
**require (2)**
16:13;23:16
**required (2)**
20:12,21
**ResCap (4)**
6:16,22;7:19;8:7
**reservation (2)**
24:15,20
**reserving (2)**
24:19,23
**Residential (2)**
5:3,6
**Resource (1)**
21:16
**Resources (4)**
21:15;22:19,21,22
**respect (10)**
10:19;19:18;20:8,
25;21:19;22:10,13;
23:22;25:5,10
**respective (1)**
22:4
**responding (1)**
15:19
**results (1)**
5:7
**revised (7)**
11:8,11;13:10;
20:3;23:17;24:2,6
**right (7)**
5:2;15:1,12;18:10,
12;24:17;26:3
**rights (5)**
24:15,19,20,23;
25:4
**RMBS (1)**
24:18
**robust (4)**
8:15,19;16:6;26:9
**Rule (1)**
18:14
**rules (1)**
21:18

**S**

**sale (8)**
9:3,8;14:13;17:17;
18:17;19:15;20:10,
22
**sales (3)**
18:15;21:13,19
**same (2)**
7:10;10:8
**Samuel (1)**
19:3

12-12020-mg    Doc 942    Filed 07/30/12    Entered 07/31/12 10:37:32    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 34 of 35

Case No. 12-12020(MG)
June 19, 2012

**satisfied (1)**
22:7
**scheduling (1)**
18:16
**SDNY (3)**
21:12,16,22
**seated (1)**
5:2
**section (2)**
17:10;21:3
**Sections (1)**
18:13
**Security (1)**
21:8
**seeing (1)**
24:6
**seek (1)**
18:20
**selected (1)**
8:5
**selecting (2)**
9:11,14
**selection (1)**
23:14
**self-dealing (1)**
22:24
**serve (1)**
19:10
**services (1)**
8:22
**servicing (7)**
9:12;18:22;19:1;
20:1,8;22:11;23:11
**set (10)**
5:9,18;6:6;7:9;
8:11;11:4;17:10;
19:16;20:2;25:24
**sets (1)**
26:10
**settlement (2)**
8:7,19
**Seventh (1)**
4:4
**share (1)**
11:1
**shop (1)**
15:16
**shopped (1)**
22:20
**short (1)**
18:3
**Show (1)**
14:6
**shown (3)**
9:10;20:19;22:10
**sic (1)**
10:16
**SIDLEY (2)**
4:2;15:11
**signed (1)**
12:17
**Similarly (1)**
8:16

**simple (1)**
16:24
**sincere (1)**
8:12
**sincerely (1)**
8:16
**situation (1)**
24:3
**situations (1)**
14:16
**sixty (1)**
5:24
**soft (1)**
14:19
**softened (1)**
14:15
**solicitation (1)**
15:23
**Somebody (1)**
16:1
**someone (1)**
17:2
**somewhat (1)**
16:19
**sorry (3)**
6:3;12:22;24:18
**sound (4)**
6:23;7:21;9:10,13
**South (1)**
4:12
**speak (2)**
17:22,23
**specially (1)**
25:24
**specific (1)**
16:14
**specifically (2)**
13:4;15:22
**spend (1)**
25:14
**spent (3)**
12:3;14:1,2
**stalking (14)**
5:18,21;7:14;8:9;
9:12;10:24;13:25,25;
14:3,3,18;16:13;
20:9;23:15
**stalking- (1)**
6:12
**stalking-horse (21)**
5:25;6:7;7:9,18,23;
8:5,8,10;9:3,14;13:7;
18:21,25;19:11,14,
18;20:5;21:23;22:17;
23:11;26:9
**stand (1)**
24:13
**start (1)**
9:5
**stated (1)**
23:25
**status (1)**
13:7

**stay (1)**
14:3
**staying (1)**
26:6
**still (1)**
25:18
**subject (2)**
11:4;24:6
**submit (1)**
19:10
**submitted (1)**
6:8
**Subordinated (1)**
21:15
**substitute (1)**
21:7
**successful (2)**
8:24;13:7
**sufficient (1)**
8:15
**suggesting (1)**
12:8
**suggestion (2)**
25:9,20
**summary (1)**
9:25
**superior (4)**
20:7,20;22:11,15
**support (2)**
19:2,5
**supportive (1)**
11:13
**supports (1)**
23:4
**sure (3)**
11:10;12:2;24:12
**surprised (1)**
16:21
**surrounding (1)**
10:6

**T**

**table (2)**
13:6;15:18
**tainted (1)**
22:24
**talk (1)**
25:9
**Ted (1)**
19:6
**telling (1)**
17:20
**ten (4)**
7:12,13;8:2;10:22
**terms (1)**
20:1
**test (1)**
22:22
**testified (1)**
16:23
**testimony (7)**
10:5;12:5,6;15:21;

19:2,6,8
**therefore (2)**
10:24;24:2
**there'll (1)**
13:8
**thereof (1)**
18:18
**thirteen (1)**
7:4
**THOMAS (2)**
4:16;11:17
**thought (1)**
13:13
**three-part (1)**
22:22
**tied (1)**
16:4
**timing (1)**
25:1
**title (1)**
18:19
**today (3)**
9:1,4;26:4
**TOLLES (3)**
4:10;11:18
**tomorrow (1)**
9:4
**transaction (2)**
10:17;12:25
**transactions (3)**
8:25;10:6;11:8
**tried (1)**
14:15
**trigger (1)**
12:20
**Trustee (1)**
24:22
**trustees (1)**
24:18
**try (1)**
15:16
**twelve (2)**
5:23;6:13
**twenty-five (1)**
7:1
**twenty-four (1)**
6:11
**two (5)**
5:10;6:17,19;7:19;
22:3
**typical (1)**
16:21

**U**

**ultimately (1)**
13:7
**under (2)**
8:7;13:18
**understandings (1)**
11:11
**underway (1)**
20:14

**unfold (1)**
16:15
**unfolded (4)**
13:4;16:11;23:20,
23
**Unless (3)**
9:15;12:12;13:11
**unreasonable (1)**
23:1
**unsecured (3)**
9:20,25;11:22
**up (4)**
9:1;12:22;14:2;
15:22
**Upon (4)**
19:8;12;22:5;24:14
**upped (1)**
16:11
**USA (1)**
21:12
**usual (2)**
12:21;13:12

**V**

**valid (1)**
23:10
**valuable (2)**
8:10;11:21
**value (4)**
14:19;21:5,14;22:2
**venting (1)**
16:9
**view (3)**
11:1;13:24;14:4
**viewed (1)**
13:3

**W**

**waiver (1)**
24:20
**WALPER (5)**
4:16;11:16,17,17,
24
**way (1)**
8:19
**well-established (1)**
21:17
**Weschler (1)**
19:6
**what's (3)**
14:11;18:22;25:7
**Whereupon (1)**
26:13
**Whitlinger (1)**
19:4
**whole (12)**
5:12;7:5,7,17,22,
24;8:6,18,20;9:15;
15:2;16:10
**who've (1)**
23:14

12-12020-mg   Doc 942   Filed 07/30/12   Entered 07/31/12 10:37:32   Main Document
In the Matter of:                          Pg 35 of 35                    Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                              June 19, 2012

**wishes (1)**
17:9
**without (1)**
17:21
**witness (2)**
14:24;16:23
**work (3)**
24:21;25:16,21
**written (1)**
20:3

## Y

**yester (1)**
23:20
**yesterday (14)**
5:20;10:20;11:19;
12:6,22;15:21;16:23;
19:1;20:9,21;22:5;
23:23;24:8,15
**yesterday's (3)**
6:8;9:22;10:4
**York (1)**
4:5

## 1

**1 (1)**
22:23
**10019 (1)**
4:5
**105 (1)**
18:13
**1063 (1)**
21:9
**1071 (1)**
21:9
**10th (1)**
25:6
**1123 (1)**
18:13
**12:04 (1)**
26:13
**12-12020 (1)**
5:3
**125 (3)**
6:5,8;10:11
**147 (3)**
21:16;22:21;23:2
**165 (1)**
21:6
**169 (1)**
21:6
**18th (1)**
19:12
**1983 (1)**
21:9
**1992 (2)**
21:6,16
**1997 (1)**
21:12

## 2

**2 (1)**
22:25
**2002 (1)**
18:14
**2009 (1)**
21:22
**203 (1)**
21:12
**24th (2)**
25:8,21
**25 (1)**
6:9
**2d (2)**
21:6,9

## 3

**3 (1)**
23:1
**355 (1)**
4:12
**35th (1)**
4:13
**363 (1)**
21:3
**363b (1)**
18:13
**365 (1)**
18:13

## 4

**409 (1)**
21:21

## 5

**547 (1)**
21:12
**551 (1)**
21:12

## 6

**6004 (1)**
18:14
**6006 (1)**
18:14
**650 (1)**
21:16
**657 (1)**
23:2
**659 (2)**
21:16;22:21
**661 (1)**
21:22
**669 (1)**
21:22

## 7

**7.1 (4)**
12:24;17:10;23:20,
24
**722 (1)**
21:9
**75 (1)**
6:7
**787 (1)**
4:4

## 8

**8:40 (3)**
5:8,11;19:12

## 9

**90071 (1)**
4:14
**9014 (1)**
18:14
**980 (1)**
21:6