UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date: August 8, 2012 at 2:00 p.m.
Objection Deadline: August 2, 2012 at 10:00 a.m.

-------------------------------------------------------- x
                                                                         :

In re                                      :            Chapter 11

                                           :

RESIDENTIAL CAPITAL, LLC,           :            Case No. 12-12020 (MG)

                                           :

                          Debtors.      :            Jointly Administered

                                                                   :

-------------------------------------------------------- x

**OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS'
MOTION FOR ORDER AUTHORIZING (I) IMPLEMENTATION
OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN
NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR
CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS
<u>ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES</u>**

TRACY HOPE DAVIS
UNITED STATES TRUSTEE

Brian S. Masumoto
Eric Small
Trial Attorneys
33 Whitehall Street, 21st Floor
New York, New York 10004
Tel. No. (212) 510-0500
Fax. No. (212) 668-2255

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

I.    PRELIMINARY STATEMENT ................................................................................1

II.   BACKGROUND ......................................................................................................3
      A.    General......................................................................................................3
      B.    The Bonus Motion .....................................................................................5
      C.    The KEIP ...................................................................................................6
      D.    The KERP ..................................................................................................8

III.  DISCUSSION ..........................................................................................................8
      A.    The Legal Framework: Section 503 of the Bankruptcy Code .................8
      B.    The KEIP Proposed by the Debtors Must Be Denied Because It Is Primarily
            Retentive and Fails to Meet the Requirements of Section 503(c)(1)....................10
            1.    The KEIP's Primary Purpose Is to Retain Key Employees.....................11
            2.    The KEIP Does Not Satisfy Section 503(c)(1) .........................................14
      C.    Even If the KEIP Were Governed by the Business Judgment Test of
            Section 503(c)(3) and Section 363, Neither the KEIP Nor the
            KERP Satisfy Them.................................................................................15
            1.    The KEIP .........................................................................................18
                  a.    The KEIP, with Its Easily Met Threshold for Vesting, Does
                        Not Establish a Relationship Between Effort and Outcome............18
                  b.    There is Insufficient Evidence to Conclude That the Costs
                        Are Reasonable ................................................................................19
                  c.    It Is Not Clear If the KEIP Discriminates Unfairly.........................20
                  d.    It Is Not Clear That the KEIP Meets Industry Standards................20
                  e.    The Debtors Do Not Establish Their Reasonable Due Diligence
                        in Assessing the Need for and Formulating the KEIP ...................21

            2.    The KERP ................................................................................................21

IV.   CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

Clarkson Co., Ltd. v. Shaheen, 660 F.2d 506 (2d Cir. 1981) .......................................................13

In re Borders Group, Inc., 453 B.R. 459 (Bankr. S.D.N.Y. 2011) .............................11, 15, 16, 17

In re Brooklyn Hospital Center, 341 B.R. 405 (Bankr. E.D.NY. 2006)........................................12

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
    722 F.2d 1063, 1070 (2d Cir. 1983)....................................................................16

In re Dana Corp., 351 B.R. 96 (Bankr. S.D.N.Y. 2006) ....................................................... *passim*

In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2007) ...................................................... *passim*

In re Dewey & LeBoeuf LLP, Case No. 12-12321 (MG)
    (Bankr. S.D.N.Y. July 30, 2012)......................................................................16

In re Georgetown Steel Co., 306 B.R. 549 (Bankr. D. S.C. 2004) ................................................12

In re Global Home Prods., LLC, 369 B.R. 778 (Bankr. D. Del. 2007) ...................................10, 15

In re Journal Register Co., 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009)........................................9

In re Mesa Air Group, Inc., Case No. 10-10018 (MG), 2010 WL 3810899
    (Bankr. S.D.N.Y. Sept. 24, 2010) ...........................................................10, 11, 13

In re Nobex Corp., No. 05-20050 (MFW), 2006 WL 4063024
    (Bankr. D. Del. Jan. 19, 2006) ..........................................................................16

In re Pilgrim's Pride Corp., 401 B.R. 229 (Bankr. N.D. Tex. 2009)............................................16

In re Velo Holdings Inc., Case No. 12-11384 (MG), 2012 WL 2015870
    (Bankr. S.D.N.Y. June 6, 2012)............................................................10, 11, 16

United States Trustee v. Fieldstone Mortgage Co., No. CCB-08-755,
    2008 WL 4826291 (D. Md. Nov. 5, 2008) ........................................................15

**Statutes, Rules, & Other Authorities**

11 U.S.C. § 363................................................................................................. *passim*
11 U.S.C. § 503................................................................................................. *passim*
28 U.S.C. § 586...........................................................................................................1
4 COLLIER ON BANKRUPTCY ¶ 503.17 (15th ed. 2007) ......................................................10

TO:    THE HONORABLE MARTIN GLENN,
       UNITED STATES BANKRUPTCY JUDGE:

Tracy Hope Davis, the United States Trustee for Region 2, in furtherance of the duties

and responsibilities set forth in 28 U.S.C. §§ 586(a)(3) and (5), hereby respectfully files her

objection (the "Objection") to the Debtors' Motion for an Order Pursuant to Sections 363(b)(1)

and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) Key Employee

Retention Plan for Certain Non-Insiders and (B) A Key Employee Incentive Plan for Certain

Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses

(the "Bonus Motion").  ECF Doc. No. 812.

## I.  PRELIMINARY STATEMENT

The Bonus Motion seeks relief not permitted by Section 503(c) of the Bankruptcy Code

and should not be approved.  The Bonus Motion consists of two parts: (i) a Key Employee

Incentive Program (the "KEIP"), which seeks authority to pay bonuses to seventeen senior

executive insiders of the Debtors, and (ii) a Key Employee Retention Program (the "KERP"),

which seeks authority to pay bonuses to 174 purported non-insider employees of the Debtors.

Congress imposed strict limits on the payment of retention bonuses to insiders when it

enacted Section 503(c)(1) of the Bankruptcy Code in 2005.  By its terms and the case law that

has developed since the statute was enacted, Section 503(c)(1) applies where (i) the employee to

receive the proposed bonus is an insider and (ii) the bonus is being offered primarily to persuade

the employee to remain employed by the debtor for some period of time.

Notwithstanding Debtors' contention otherwise, Section 503(c)(1) applies to the

Debtors' proposed KEIP: the 17 eligible employees are insiders, a fact conceded by the Debtors,

and, despite being labeled an incentive plan, is primarily retentive.  The KEIP is a disguised

retention plan, not an incentive plan, because it sets a low performance bar for employees to earn

1

the proposed bonuses. It does not provide real incentives for the employees to improve their performance, work harder, and achieve results greater than in the past.

Thus, as a true retention plan, the KEIP is subject to the stringent requirements of Section 503(c)(1). Debtors, therefore, must prove three elements before the KEIP may be approved: (1) each of the 17 insiders had bona fide job offers at the same or greater compensation; (2) each of the 17 insider's services are essential to the business's survival; and (3) the proposed payments fall within the strict pay limits of Section 503(c)(1)(C). If the Court approves the KEIP as proposed, the Debtors would pay bonuses to insiders in violation of the Code's rigorous requirements.

The KERP is similarly inappropriate. Debtors rightly state that the KERP is a retention plan – subject to the business judgment standards of Section 503(c)(3) and not the rigorous requirements of Section 503(c)(1) – if none of the 174 employees eligible for a KERP bonus are insiders. Although the bonus-eligible employees under the KERP include those with officer and director titles, such as vice-presidents, senior vice-presidents, and directors of operations, among others, the Debtors contend that these titles are only "officer-like." One inquiry for determining officer status is whether the position is one appointed or elected by the board. An officer appointed by the board is an officer regardless of the duties or functions of the position. The Debtors allege that none of the KERP participants were Board appointed and have provided additional information, and if the evidence sustains this allegation, then the KERP may be reviewed under the general administrative expense standards of Section 503(b) and the business judgment standard of Section 503(c)(3).

But even under the less rigorous standards for non-insiders, the Debtors here, too, fail to meet their burden. To be approved, the bonuses must be an actual and necessary cost of

2

preserving the estate, applicable to any administrative expense claim. Moreover, the Debtors

must satisfy the sound business judgment standard and show, among other criteria, a reasonable

relationship between the proposal and the results to be obtained, that the cost and scope of the

plan is reasonable, that the plan is consistent with industry standards, and that the Debtors

conducted reasonable due diligence in establishing the plan. The Debtors have not sustained

their burden to prove each of these elements and to prove that the bonuses are justified by the

facts and circumstances of the case.

For these reasons, the United States Trustee objects to the Bonus Motion – seeking

authority to pay bonuses under the proposed KEIP and the proposed KERP – in their entirety.

## II.  BACKGROUND

### A.  General

1.      Residential Capital, LLC and fifty of its affiliates (collectively "the Debtors")[1]

commenced voluntary cases under Chapter 11 of the Bankruptcy Code on May 14, 2012 (the

"Petition Date").

2.      By order entered on May 14, 2012, the Court authorized joint administration of

the cases.  ECF Docket No. 59.

---

[1] The Debtors in Case Nos. 12-12019 through12071 (MG) are: Residential Funding Company, LLC; Residential
Capital, LLC; Ditech, LLC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC;
Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC;
GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC
Residential Holding Company, LLC; GMACM Borrower LLC; GMACR Mortgage Products, LLC; GMAC-RFC
Holding Company, LLC; GMAC REO, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home
Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings,
LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI PATI B, LLC; PATI Real Estate Holdings,
LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit
Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential
Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer
Services of Texas, LLC; Residential Consumer Services, LLC;; Residential Funding Mortgage Exchange, LLC;
Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential
Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II,
LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO, LLC; RFC
SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

3

3.      The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank (f/k/a GMAC Bank), and other third parties. As of March 31, 2012, the Debtors were servicing over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately $374 billion.  Affidavit of James Whitlinger in Support of Chapter 11 Petitions and First Day Pleadings ("Whitlinger Affidavit."), ¶ 6.  ECF Docket No. 6.

4.  The Debtors are collectively the fifth largest servicer of residential mortgage loans in the United States.  Id. at ¶ 9.

5.      The Debtors are also a residential real estate finance company.  As of the Petition Date, the Debtors and their non-debtor affiliates, including Ally Bank, are collectively the tenth largest originator of residential mortgage loans in the United States.  Id. at ¶ 10.

6.      The Debtors' unaudited consolidated balance sheet reflects assets of $15,675,571,000 and liabilities of $15,276,228,000.  Id., Ex. 12, Schedule 4.

7.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On May 16, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors pursuant to Section 1102(a) of the Bankruptcy Code.  ECF Docket No. 102.

9.      On June 28, 2012, the Court entered an order approving bid procedures and scheduling a hearing on November 5, 2012, on the proposed sale of the Debtors' Loan Servicing Platform and Legacy Loan Portfolio and related relief (the "Asset Sales").  ECF Docket No. 538. Nationstar Mortgage, LLC and Berkshire Hathaway, Inc. were approved as the stalking horse bidders.  Id.

4

10.    On July 3, 2012, the Court entered an order approving the United States Trustee's appointment of Arthur J. Gonzalez, Esq. as the Examiner in these cases.  ECF Docket No. 674.

**B.    The Bonus Motion**

11.    On July 17, 2012, the Debtors filed the Bonus Motion,[2] requesting authorization of (A) a Key Employee Incentive Program ("KEIP") covering seventeen senior executive insiders of the Debtors ("KEIP Participants") and (B) a Key Employee Retention Program ("KERP"), covering 174 purported non-insiders ("KERP Participants").  Bonus Motion, ¶¶ 7–8.

12.    The employees covered by the KEIP and KERP are divided into "Tiers," with proposed target bonuses illustrated by the Debtors' compensation consultant, Mercer, Inc. ("Mercer"), as percentages of base salary as follows:

| Tier | Plan | No. of Executives | KEIP/KERP Target (avg. % of base salary) |
|------|------|-------------------|------------------------------------------|
| I | KEIP | 17 | 80 |
| II | KERP | 68 | 54 |
| III | KERP | 96 | 39 |
| IV | KERP | 10 | 13 |

Bonus Motion, Declaration of John Dempsey ("Dempsey Declaration"),¶ 8.

13.    The Debtors did not file in the record the list of KERP and KEIP participants, although they provided a list to the United States Trustee.[3]

---

[2] The proposed order attached to the Bonus Motion contains the following decretal paragraph, which was inserted at the request of the Office of the United States Trustee: ORDERED that notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, Residential Capital LLC, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012, by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with Ally Financial Inc. and Ally Bank and their respective subsidiaries and affiliates.

[3] The Debtors provided a list of Tier II employees to the United States Trustee and to the Creditors Committee, with a copy to the Court's chambers.  This list should be filed with the Court with appropriate redactions as necessary.

C.    **The KEIP**

14.    The Debtors anticipate that the payments under the KEIP will be between approximately $4.1 and $7.0 million and range from 52% to 117% of base salary, with an average target award of $241,353.  Bonus Motion, Attachment 2, Declaration of Ronald Greenspan ("Greenspan Declaration"),¶ 34.

15.    The Debtors state that the Debtors' CEO, President, and Chief Capital Markets Officer are not among the KEIP Participants because of restrictions under the Troubled Asset Relief Program ("TARP") regulations prohibiting their involvement in such a program.  Id. at ¶ 33.

16.    Awards under the KEIP are predicated upon meeting certain defined milestones, including the Debtors' (i)  closing on the Asset Sales, (ii) closing on the Asset Sales at prices in excess of the stalking horse bids, (iii) complying with the terms of the DIP financing order, and (iv) maintaining a top 3 Fannie Mae service ranking.  Bonus Motion, ¶ 24.  Moreover, each KEIP participant must achieve an "Effective" performance rating.[4]  Id.

---

[4] The milestones are defined as follows:

**Sales Milestone (70%)**
The Sales Milestone is deemed "achieved," and a KEIP Participant will earn up to a total of 70% of the KEIP award, with the KEIP Participant vesting in 42% of the award upon closing of the Platform Sale and 28% upon closing of the Legacy Sale at the negotiated stalking horse sale prices, or higher and better offers approved by the court.

90% of the Sales Milestone (the "Threshold Sales Award") will be earned upon closing of each sale; and 10% of the Sales Milestone (the "Target Sales Award") will be earned upon an auction of the Debtors' assets that results in the closing of a sale with a higher and better offer than the stalking horse purchase price.

KEIP Participants can achieve up to an additional 100% of the Target Award if the sale proceeds realized through the auction process exceeds the relevant stalking horse bid by 3%. The award level will be proportionate to the percentage of the potential 3% sale price increase actually achieved.

**Financial/Operational Performance Milestone (30%)**

17.    The Debtors' stated purpose for the KEIP is to provide incentives "to motivate the KEIP Participants and ensure that the Debtors can effectively work toward their collective goal of effectuating the Asset Sales."  Bonus Motion, Declaration of Anne Janiczek (the "Janiczek Declaration"), ¶ 13.

18.    In addition, the Debtors assert that the KEIP will help prevent resignations, stating that "without the proper incentives to motivate the KEIP Participants to perform their innumerable additional restructuring related tasks in addition to addressing their day-to-day obligations, the Debtors face a substantial risk that they could lose one or more of the KEIP Participants, to the detriment of the Debtors' businesses."  Id. at ¶ 13.

19.    The Debtors state that the KEIP is a replacement for the Business Continuity Incentive Plan ("Pre-Petition Bonus Plan") created by the Debtors in the months before the Petition Date.  Bonus Motion, ¶ 6.

20.    Debtors allegedly instituted the Pre-Petition Bonus Plan "to insure that their employees remained incentivized and focused throughout uncertain times and to manage the

---

Barclays DIP Covenant (10%)
The DIP Covenant Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided the Debtors maintain compliance without being in default of the 20% Cash Flow Variance covenant (as such term is defined in the Barclays DIP financing agreement) through the earlier of (i) closing of the Platform Sale or (ii) payoff of the Barclays DIP.

GSE Adherence (10%)
The GSE Adherence Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided the Debtors maintain a year-to date top 3 Fannie Mae service ranking, measured as of the earlier of (i) closing of the Platform Sale or (ii) December 31, 2012.

Performance Rating (10%)
The Performance Rating Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided such participant achieves an "Effective" rating based on his/her overall individual performance for all goals, as determined by the Debtors' compensation committee, measured as of the earlier of (i) closing of the Platform Sale or (ii) December 31, 2012.

Bonus Motion, ¶ 24.

7

degree of employee attrition, especially in light of the additional tasks being asked of them during a time of substantial uncertainty." Id.

**D.    The KERP**

21.    The KERP is a "pay-to-stay retention program structured to retain the Key Employees through the closing of the going concern Asset Sales." Bonus Motion, ¶ 50.

22.    The Debtors estimate the total cost of payments under the KERP will be $10.8 million and will vest upon closing of each of the Asset Sales. Greenspan Declaration, ¶ 42.

23.    The KERP Participants are designated as Tier II, III and IV employees, with different bonus structures.

24.    Tier II covers 68 employees who the Debtors describe as "critical manager and director level employees across all key functions of the Debtors' operations." Id. at ¶ 39. 32 of the Tier II employees are Directors or Senior Directors, seven are senior vice presidents, and four are vice presidents. Debtors contend that the Tier II employees are not insiders because, *inter alia*, they were not appointed by the Board, see Janiczek Declaration, ¶ 17, and they allegedly "do not possess the decision-making authority to implement company policies or strategies to render them insiders." Greenspan Declaration, ¶ 39.

25.    Tier III employees include 96 supervisory and professional support employees, and Tier IV employees are 10 mortgage origination operations support staff, all characterized by the Debtors as non-insiders. Id. at ¶ 40–41.

**III.  DISCUSSION**

**A.    The Legal Framework:  Section 503 of the Bankruptcy Code**

Section 503(c) of the Bankruptcy Code provides in relevant part:

8

Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1)     a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that

    (A)     the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

    (B)     the services provided by the person are essential to the survival of the business; and

    (C)     either –

        (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

        (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

(2)     a severance payment to an insider of the debtor, unless -

    (A) the payment is part of a program that is generally applicable to all full-time employees; and

    (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to non-management employees during the calendar year in which the payment is made; or

(3)     other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

9

Congress added Section 503(c) in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act to end abusive compensation practices in bankruptcy case.  In particular, Congress imposed significant limits on the payments of retention and incentive bonuses and severance to insiders and on the payments of retention bonuses granted to non-insiders without factual and circumstantial justification.  See In re Journal Register Co., 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009). "The intent of Section 503(c) is to 'limit the scope of "key employee retention plans" and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor.'" In re Velo Holdings Inc., Case No. 12-11384 (MG), 2012 WL 2015870, at *5 (Bankr. S.D.N.Y. June 6, 2012) (quoting 4 COLLIER ON BANKRUPTCY ¶ 503.17 (15th ed. 2007)).  Section 503(c) requires "'a set of challenging standards' and 'high hurdles'" before debtors can pay before retention bonuses.  In re Mesa Air Group, Inc., Case No. 10-10018 (MG), 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (citing In re Global Home Prods., LLC, 369 B.R. 778, 784–85 (Bankr. D. Del. 2007).

Not only must bonus plans comply with Section 503(c), as administrative expenses they must also be "actual, necessary costs and expenses of preserving the estate," as required by Section 503(b).

**B.    The KEIP Proposed by the Debtors Must Be Denied Because It Is Primarily Retentive and Fails to Meet the Requirements of Section 503(c)(1)**

Debtors effectively concede that the KEIP participants "may be" insiders and do not argue or prove otherwise.  Bonus Motion, ¶ 32.  Indeed, the Debtors acknowledge that the KEIP Participants are insiders within the meaning of 11 U.S.C. § 101(31).  Janisczek Declaration, ¶ 16.  Thus, given this concession, whether the KEIP is subject to the standards of Section 503(c)(1) or Section 503(c)(3) hinges upon whether the KEIP is primarily retentive.  Although the Debtors

10

allege that the KEIP is an incentive, not a retention, plan – which thereby evades rigorous review

under Section 503(c)(1) – the Debtors' own evidence belies their position.  As shown below, the

KEIP is primarily retentive and, therefore, can only be approved if the Debtors satisfy the

standards of Section 503(c)(1).

Attempts to characterize what are essentially prohibited retention programs as "incentive"

programs to bypass the requirements of Section 503(c)(1) of the Bankruptcy Code are looked

upon with disfavor, as the courts consider the circumstances under which particular proposals are

made, along with the structure of the compensation packages, when determining whether the

compensation programs are subject to Section 503(c)(1) of the Bankruptcy Code.  See In re Mesa

Air Group, 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. 2010) (citing In re Dana Corp., 351 B.R.

96, 102, n.3 (Bankr. S.D.N.Y. 2006) ("Dana I") (stating that if a bonus proposal "walks like a

duck (KERP), and quacks like a duck (KERP), it's a duck (KERP)."). The Debtors have failed to

satisfy their evidentiary burden that this is not simply a KERP with KEIP window dressing.

### 1.    The KEIP's Primary Purpose Is to Retain Key Employees

While stating that the purpose of the KEIP is to "motivate" and "incentivize" the KEIP

Participants, the Debtors acknowledge that it may have the "incidental" effect of encouraging the

KEIP Participants to remain with the Debtors.  The Debtors cite Velo Holdings, 2012 WL

2015870, and In re Borders Group, Inc., 453 B.R. 459 (Bankr. S.D.N.Y. 2011) in support of the

principle that the existence of some retentive effect does not make it primarily a retention plan.

Bonus Motion, ¶ 39.

The Debtors, however, have not met their burden to demonstrate that the retentive effect

of the KEIP is not its primary purpose.  The Janiczek Declaration is the only proffered evidence

11

from an employee of the Debtors[5] – their Chief Human Resources Officer – and one who herself stands to benefit from the KEIP. After noting that the KEIP is needed to motivate the KEIP Participants by tying incentive payments to the sale price achieved and to certain operational and financial goals, the description of the purpose of the KEIP in the Declaration concludes with the statement that:

> it is my belief that without the proper incentives to motivate the KEIP Participants to perform their innumerable additional restructuring related tasks in addition to addressing their day-to-day obligations, the Debtors face a substantial risk that they could lose one or more of the KEIP Participants to the detriment of the Debtors' businesses.

Janiczek Declaration, ¶ 13.

The Dempsey Declaration further substantiates that the KEIP is primarily retentive as well. See generally Dempsey Declaration, ¶ 7. Paragraph 7 of the Dempsey Declaration is an overview of both plans and states that "employees of all levels [have been] leaving the company for other opportunities." Id. It further states that a "loss of key talent would . . . jeopardize the ability of the Company to function effectively." Id. Finally, "retaining and motivating these employees has surfaced as a paramount concern of the Debtors." Id.

Retention plans usually are intended "to encourage certain crucial employees to remain with the company through a critical, transitional time period when the exact future of the company is unclear and when those employees would be most likely to search for other employment." In re Brooklyn Hospital Center, 341 B.R. 405, 413 (Bankr. E.D.NY. 2006) quoting In re Georgetown Steel Co., 306 B.R. 549, 556 (Bankr. D. S.C. 2004). Based on the information provided by the Debtors, the KEIP is being proposed to encourage its employees to remain with the Debtors through its tenure in Chapter 11.

---

[5] The Debtors have also proffered the Declarations of their financial advisor, FTI, and compensation consultant, Mercer. See Bonus Motion, Dempsey Declaration and Greenspan Declaration.

12

Specifically, the Debtors' desire to retain key management staff is not merely an incidental result of an intention to provide incentives for employees to work harder to effectuate the Asset Sales.  Even the structure of the KEIP, providing for the vesting of significant parts of the bonuses simply upon the closing of sales that have already been negotiated, manifests the Debtors' intention to reward management simply for remaining until the closing date.

Nor have Debtors established that the metrics required for the bonuses to be paid are challenging.  Mesa Air Group, Inc., 2010 WL 3810899, at *4 (incentive plans are designed to motivate employees to achieve performance goals).  The Debtors state that there is significantly more work and additional responsibilities for each employee, but are short on details regarding each person's additional duties and hours expended, as distinguished from those that are merely different.  Greenspan Declaration, ¶ 23–24 (containing a general listing of additional duties without time components).  The nexus between the proposed bonuses and increased hours and responsibilities should be specifically detailed for each employee.

In addition, the Debtors imply that the KEIP Participants would not perform the necessary work adequately without the proposed bonuses.  Insiders should not be paid bonuses to "incentivize" them to live up to their fiduciary duties to the estate.  See Dana I, 351 B.R. at 102 (citing Clarkson Co., Ltd. v. Shaheen, 660 F.2d 506, 512 (2d Cir. 1981)).  They have existing obligations to perform the services for which they are already being paid.  In any event, there is no evidence that the KEIP Participants would not perform the work necessary to close the Asset Sales irrespective of the proposed bonuses.

The Debtors also state that the KEIP was designed as a replacement for the Pre-Petition Bonus Plan, which was "adapted to comply with the Bankruptcy Code" into the KEIP and KERP now before the Court.  Bonus Motion,¶ 6.  The Pre-Petition Bonus Plan is not attached as an

13

exhibit, and the Debtors offer no further details regarding its contents or how it was "adapted" to meet the Code's requirements. The Debtors state that the payments contemplated in the Bonus Motion will deliver "substantially similar economic benefits" as the Pre-Petition Bonus Plan. Id. The Debtors' burden of proof should include showing that the Pre-Petition Bonus Plan was not a retention plan for insiders to which the Debtors – with the assistance of counsel and an outside consultant – made cosmetic changes to disguise it as a KEIP.

Finally, the Debtors state as further justification for the KEIP that the receipt of funds by Ally Financial, Inc. ("AFI") from the TARP[6] purportedly resulted in limitations on the pay of nine KEIP Participants over the last several years. In addition, the Debtors state that 50% of the KEIP Participants' potential income is at risk because of the possibility that AFI may not provide them with certain discretionary pay. Janiczek Declaration, ¶ 7–10. Thus, one of the purposes of the KEIP is to replace potentially lost discretionary income so that the insiders do not seek higher paying jobs elsewhere. That is a classic retention goal, making the KEIP a retention plan for insiders governed by Section 503(c)(1).

### 2.    The KEIP Does Not Satisfy Section 503(c)(1)

---

[6] While it does not appear to be the Debtors' intention, for the avoidance of doubt, the United States Trustee requests a decretal paragraph in any order approving any part of the requested relief to include a statement that "notwithstanding anything to the contrary, nothing in this order shall be construed as authorization for any payment that is prohibited by 12 U.S.C. § 5221 or any other TARP related statute, rule or regulation. On August 1, 2012, Ally Financial Inc. ("AFI"), the Debtors' non-debtor parent, filed a "Statement of Ally Financial Inc. Regarding Debtors' KEIP/KERP Motion and Debtors' Prepetition and Postpetition Employee Compensation" (the "AFI Statement"). See ECF Doc. No. 970. The AFI Statement discloses that the Debtors and AFI have agreed in principle to a number of revisions to be incorporated into the form of a proposed final order for the KEIP/KERP Motion that ensure AFI's and the Debtors' continued compliance with the limitations on employee compensation imposed by the Troubled Asset Relief Program. In addition the AFI Statement also provided a summary update regarding the status of negotiations between AFI and the Debtors regarding ResCap's prepetition and postpetition employee compensation practices. The United States Trustee is in the process of evaluating the effect of the proposed revisions to the final order for the KEIP/KERP Motion as well as the effect of the agreement between AFI and the Debtors regarding ResCap's prepetition and postpetition employee compensation practices.

14

Because the KEIP is primarily a retention plan for insiders, it is governed by Section 503(c)(1), not Section 503(c)(3) as Debtors contend.  But Section 503(c)(1) establishes specific and challenging standards a Debtor must satisfy before a bankruptcy court may authorize bonus payments to an insider to induce the insider to remain with a debtor's business.  Dana I, 351 B.R. at 100; 11 U.S.C. § 503(c)(1).  The Debtors have the burden to prove these facts and must show that the proposed KEIP payments comply with Section 503(c)(1).  See Dana I, 351 B.R. at 100; Mesa Air Group, 2010 WL 3810899, at *2 (citing Global Home Prods., 369 B.R. at 785).

Section 503(c)(1) requires that the insider have a bona fide job offer at the same or greater compensation, the services provided by the insider are essential to the survival of the business, and the proposed retention payments are either less than ten times the mean of similar payments made to non-management employees during the calendar year or less than 25 percent of the amount of any similar payments made in the prior year.  11 U.S.C. § 503(c)(1).  The Debtors have made not made this showing for any of the KEIP Participants, and the motion to approve the KEIP must be denied accordingly.

**C.      Even If the KEIP Were Governed by the Business Judgment Test of Section 503(c)(3) and Section 363, Neither the KEIP Nor the KERP Satisfy Them**

As discussed above, if proposed payments are governed by Section 503(c)(1), then the business judgment rule does not apply, irrespective of whether the Debtor may actually have a sound business purpose.  Dana I, 351 B.R. 96 at 100.  Thus, because the KEIP is effectively a retention plan for insiders, Section 503(c)(1) applies and the business judgment rule does not.  If the Court were to find otherwise, however, the KEIP still fails the sound business judgment tests

15

of Sections 503(c)(3) and 363.  The KERP, too, must meet the business judgment requirements

of Sections 503(c)(3) and 363.[7]

Section 503(c)(3) prohibits "transfers or obligations that are outside the ordinary course

of business and not justified by the facts and circumstances of the case, including transfers made

to, or obligations incurred for the benefit of, officers, managers or consultants hired after the date

of the filing of the petition." 11 U.S.C. § 503(c)(3).  Section 363 authorizes the Debtor, after

notice and a hearing, to use property outside of the ordinary course of business.  11 U.S.C. §

363(b).

Courts in this circuit have found that Section 503(c)(3) of the Bankruptcy Code simply

reiterates the standards of the business judgment rule for assessing transactions outside the

ordinary course of business under Section 363 of the Bankruptcy Code. See, e.g., Borders, 453

B.R. at 473 (Bankr. S.D.N.Y. 2011); Velo Holdings, 2012 WL 2015870, at *9; see also In re

Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2007) ("Dana II") (citing In re Nobex Corp.,

No. 05-20050 (MFW), 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006) for the proposition that

the Section 503(c)(3) transfers outside of the ordinary course of business are assessed by the

same business judgment test applied under Section 363(b) of the Bankruptcy Code); see also In

re Dewey & LeBoeuf LLP, Case No. 12-12321 (MG) (Bankr. S.D.N.Y. July 30, 2012) (ECF

Docket No. 301) (finding the debtor's process in coming to its ultimate decision was subject to

---

[7] This Court has held that an individual's title, by itself, is insufficient to establish whether a person is an officer or
director, and that it is the set of rights that are attendant to the title that are controlling.  Borders, 453 B.R. at 468–
69.  One of those criteria is appointment by the board of directors.  See e.g., id. at 468 (citing United States Trustee
v. Fieldstone Mortgage Co., No. CCB-08-755, 2008 WL 4826291, at *7 (D. Md. Nov. 5, 2008) (undisputed
evidence that the specified vice-presidents were appointed by the debtor's board of directors was sufficient to
establish their officer status)).  The Debtors represent that "[n]one of the Key Employees is appointed or elected by
the board of directors."  Janiczek Declaration ¶ 17.  Based upon that representation, the United States Trustee's
initial review of the recently provided list of the Key Employees describing their job functions and the supervisor to
whom they report (provided that no conflicting information is elicited at the hearing) the United States Trustee
accepts that the Key Employees bearing titles such as "Vice President" and "Director" are not "officers" or
"directors" as those terms are used in Section 101(31)(B).

challenge, but that the debtor was in the best position to determine how to maximize its collection of receivables); but see In re Pilgrim's Pride Corp., 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009) (Section 503(c)(3) sets a higher standard of review and should not be equated to the business judgment rule as applied under Section 363; to do so would render Section 503(c)(3) redundant).

In Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983), the Second Circuit set forth the following balancing test to be applied when determining whether assets may be disposed of in a chapter 11 case prior to confirmation of a plan of reorganization: "[t]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under Section 363(b)."  The Debtors implicitly acknowledge that the transaction is not within the ordinary course of the Debtors' business by arguing that it is supported by their sound business judgment.  See Borders, 453 B.R. at 473.  Thus, if Debtors fail to satisfy the Section 503(c)(3) test for whether extraordinary compensation is "justified by the facts and circumstances of the case," they would similarly fail to establish the plans satisfy the business judgment test of Section 363(b).

To evaluate whether a proposed bonus plan passes muster under Section 503(c)(3), courts generally consider the factors outlined in Dana II.  The Court in Dana II said that courts should consider the following factors in determining whether to approve a KEIP as an exercise of sound business judgment:

    a. Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

    b. Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

17

    c. Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

    d. Is the plan or proposal consistent with industry standards?

    e. What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

    f. Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

Dana II, 358 B.R. at 576-77.

The analysis differs somewhat between the KEIP and KERP, although there is some overlap.

**1.      The KEIP**

**a.      The KEIP, with Its Easily Met Threshold for Vesting, Does Not Establish a Relationship Between Effort and Outcome**

The Debtors have not established a nexus, much less a strong one, between the KEIP and the results sought to be achieved.  Even under the less rigorous standards of Sections 503(c)(3) and 363, the benchmarks for the payment of bonuses must be "difficult targets to reach."  Dana II, 358 B.R. at 583.  The KEIP contains various "milestones" to be reached before the bonuses vest.  Bonus Motion, ¶ 22.  Seventy percent (70%) of the bonus vests upon the closing of the Asset Sales, of which ninety percent (90%) vests simply upon closing of the Asset Sales at the already negotiated stalking horse prices, with the remaining ten percent (10%) vesting upon a sale at any price in excess of the stalking horse prices.  Id. at ¶ 24.   An additional bonus of up to one hundred percent (100%) of the projected target awards can be vested based upon the sales price exceeding the stalking horse bids by up to three percent (3%).  Id.

Thus, KEIP Participants will "earn" a bonus based on sales previously negotiated and may earn a larger bonus based on market forces largely beyond the Debtors' and the KEIP Participants' control.  Bonus Motion, ¶ 24.  These are not "difficult to reach" targets

18

contemplated by the statute.  See Dana II, 358 B.R. at 583.  Furthermore, the record is devoid of

any evidence that the Asset Sales would not close absent payment of the bonuses.

The remaining 30% of the bonuses are tied to the Debtors complying with the covenants

in their DIP financing agreement, maintaining an existing "top three" Fannie Mae service

ranking, and participants achieving an "Effective" rating, which is not defined (the other

available ratings are not specified).  Bonus Motion, ¶ 24.  Again, Debtors fail to prove that these

are difficult or challenging targets contemplated by Section 503(c)(3).

### b.      There is Insufficient Evidence to Conclude That the Costs Are Reasonable

The Debtors include an analysis prepared by Mercer of the cost of the KEIP ("the Mercer

Analysis") compared to bonus plans in other cases.  Mercer determined that the maximum cost

of the two plans was greater than 75 percent (75%) of the 21 companies surveyed (the 75th

percentile), but lower than 25 percent (25%) of those companies (the 25th percentile) as

expressed as a percentage of the sale proceeds.  Dempsey Declaration, ¶ 25.  Whether the cost of

the plan is reasonable, however, cannot be determined without a comparison to the Debtors' cash

flow and base salary information for the covered participants.   The Mercer Analysis is primarily

based on the cost of other bonus plans.  The information necessary to assess the overall cost of

the bonus plans should include financial information specific to the Debtors other than projected

proceeds from the Asset Sales, or an explanation why the Debtors' financial performance, base

salaries, cash flow, and net profit figures are not similarly relevant bases upon which to gauge

reasonableness.

Debtors have also failed to establish whether the plan is reasonable because the KEIP

participants' total compensation is unclear.  In addition to the absence of specific base salary

19

information, the vagueness of the KEIP Participants' total compensation package is further

compounded by the Debtors' statement that fifty percent (50%) or more of each KEIP

Participant's potential total annual compensation is at risk as a result of the possibility that AFI

will not continue to make certain discretionary variable pay awards ("AFI Variable Pay").

Bonus Motion,¶ 21.  The Debtors partly justify the necessity for KEIP awards upon this

possibility, but do not describe whether the KEIP bonus amounts will be altered if AFI makes the

payments.  In addition, the Debtors have characterized the KEIP bonuses in terms of possible

percentage increases in compensation.  See Dempsey Declaration, ¶ 8.  They should therefore

indicate whether they base the target bonus on compensation with or without the AFI Variable

Pay and describe the amount of the difference.  As of now, the reasonableness of the total cost of

the KEIP cannot be ascertained because the KEIP Participants may receive unknown additional

compensation – which could have effectively pay the KEIP Participants twice for the potential

Variable Pay the Debtors seek to replace with the KEIP.  The proposed payments by AFI and

reimbursements by the Debtors described in the AFI Statement add to this uncertainty.  At

present, the effects upon the total compensation of the KEIP Participants and the concomitant

costs to the Debtors are not easily determined.  The Debtors burden of proof should include an

analysis of the effects of the AFI modifications to the proposed order.

### c.    It Is Not Clear If the KEIP Discriminates Unfairly[8]

The KEIP applies to 17 insiders of the Debtors.  Bonus Motion, ¶ 7.  Other than the

Debtors' CEO, President, and Chief Capital Markets Officer who were purportedly excluded

from participation because of TARP restrictions, the record contains no evidence of why other

top employees were not chosen to receive the KEIP bonuses.  There is also no salary information

---

[8] See also the discussion in Section (e) relating to due diligence.

20

for the KEIP Participants or for those not covered by the KEIP. The KEIP thus lacks evidentiary support for the payment of bonuses to one group of employees over another since there is no record upon which the Court can compare the resulting bifurcated compensation packages. Under the circumstances, Debtors have not established the fairness of the KEIP.

### d.    It Is Not Clear That the KEIP Meets Industry Standards

The Mercer Analysis submitted by Debtors compared the KEIP with plans for 21 other companies that filed for bankruptcy after January 1, 2009, and concluded that the KEIP's design, structure, and proposed distributions are consistent with market standards and practice. In addition to her cocerns with respect to the assessment of the total cost as described above, it is not clear whether any of the 21 companies surveyed by Mercer are comparable to the Debtors in size, complexity, corporate structure, etc. Therefore, the Debtors have not demonstrated the probative weight to be accorded to the Mercer Analysis.

### e.    The Debtors Do Not Establish Their Reasonable Due Diligence in Assessing the Need for and Formulating the KEIP

The Debtors contend that they formulated the KEIP based upon their analysis and consideration of a number of factors. Before filing Chapter 11, Debtors designed a Pre-Petition Bonus Plan to reward employees for their efforts in effectuating the Debtor's pre-petition restructuring efforts and to stem employee departures. Janiscek Declaration,¶ 3. The Debtors assert that the KEIP and KERP have been proposed as a replacement for the Pre-Petition Bonus Plan. Id. As previously stated, the Pre-Petition Bonus Plan is not attached as an exhibit to the Bonus Motion. Without an understanding of the structure of the Pre-Petition Bonus Plan, it is difficult to assess the post-petition need for a replacement, to ascertain whether any employees previously covered by the Pre-Petition Bonus Plan are not covered by the KEIP, and the reasons for any change in the need to incentivize certain workers over others.

21

### 2.    The KERP

Most of the <u>Dana II</u> factors for which the Debtors have not met their evidentiary burden
with respect to the KEIP apply equally to the KERP, with somewhat different application of
factors (a) (relationship between effort and outcome) and (c) (unfair discrimination).  First,
unlike in the KEIP, the KERP Participants' bonuses vest simply upon being employed by the
Debtors through the closing of the Asset Sales.  There is a rational relationship between the
KERP and that desired result.

Second, the KERP applies to 174 out of a total of 3,575 full time employees, 50 part time
employees, 250 mostly commission-based workers, and 375 contract workers. Greenspan
Declaration, ¶ 10.  The Bonus Plan identifies three tiers of employees, with declining payment
amounts targeted for each successive tier.  Dempsey Declaration,¶ 8.  The Bonus Motion lacks
sufficient information to substantiate the reasonableness of the differing payments between the
three categories of KERP Participants.  While the Bonus Motion describes the importance of the
particular employees chosen to participate, and the reasons for excluding the 20 acknowledged
insiders are clear, the Bonus Motion contains little information regarding the Debtors' reasons
for not selecting any of the remaining 4,076 remaining workers to receive bonuses.

 As to the remainder of the factors to be considered under <u>Dana II</u>, as discussed above,
the absence of the Pre-Petition Bonus Plan as an exhibit similarly impedes the ability to assess
the Debtors' due diligence and need to provide bonuses to the KERP Participants.  Moreover,
despite the Mercer Analysis, for the reasons discussed above, it is not clear whether the KERP is
consistent with industry standards for mortgage servicers and whether the Debtors adequately
exercised due diligence prior to formulating the KERP.  <u>Dana II</u>, 358 B.R. at 576–77.

### IV.  CONCLUSION

22

**WHEREFORE,** the United States Trustee respectfully requests that the Court sustain

the foregoing Objection, deny the Bonus Motion, and grant such other and further relief as the

Court may deem just and proper.

Dated:  New York, New York
        August 2, 2012

                                    TRACY HOPE DAVIS
                                    UNITED STATES TRUSTEE

                         By:    */s/ Brian S. Masumoto*
                                Brian S. Masumoto
                                Eric Small
                                Trial Attorneys
                                33 Whitehall Street, 21st Floor
                                New York, New York 10004
                                Tel. No. (212) 510-0500