1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          July 30, 2012

          3:03 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2    Status Conference RE:  Hearing RE:  Sale Order (CC: Doc no.

3    538, 291, 292)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Penina Wolicki

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8  BY:   ANTHONY PRINCI, ESQ.

9         JAMIE LEVITT, ESQ. (TELEPHONICALLY)

10

11

12  KRAMER LEVIN NAFTALIS & FRANKEL LLP

13         Attorneys for Official Creditors' Committee

14         1177 Avenue of the Americas

15         New York, NY 10036

16

17  BY:   KENNETH H. ECKSTEIN, ESQ.

18         PHILIP BENTLEY, ESQ.

19         STEPHEN D. ZIDE, ESQ.

20

21

22

23

24

25

1

2  KIRKLAND & ELLIS LLP

3        Attorneys for Ally Financial Inc. & Ally Bank

4        601 Lexington Avenue

5        New York, NY 10022

6

7  BY:   RAY C. SCHROCK, ESQ.

8

9

10 SEWARD & KISSEL, LLP

11        Attorneys for U.S. Bank N.A. as Securitization Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15 BY:   ARLENE R. ALVES, ESQ.

16

17

18 ALSTON & BIRD LLP

19        Attorneys for Wells Fargo Bank, N.A.

20        90 Park Avenue

21        New York, NY 10016

22

23 BY:   MICHAEL E. JOHNSON, ESQ.

24        MARTIN G. BUNIN, ESQ.

25

1

2  ALSTON & BIRD LLP

3       Attorneys for Wells Fargo Bank, N.A.

4       One Atlantic Center

5       1201 West Peachtree Street

6       Atlanta, GA 30309

7

8  BY:   JOHN C. (KIT) WEITNAUER, ESQ. (TELEPHONICALLY)

9

10

11  ROPES & GRAY LLP

12       Attorneys for RMBS Certificate Holders

13       1211 Avenue of the Americas

14       New York, NY 10036

15

16  BY:   KEITH H. WOFFORD, ESQ.

17

18

19  MORGAN, LEWIS & BOCKIUS LLP

20       Attorneys for Deutsche Bank

21       101 Park Avenue

22       New York, NY 10178

23

24  BY:   JAMES L. GARRITY, JR., ESQ.

25

1  WHITE & CASE LLP

2       Attorneys for Junior Secured Noteholders

3       1155 Avenue of the Americas

4       New York, NY 10036

5

6  BY:   J. CHRISTOPHER SHORE, ESQ.

7       HARRISON DENMAN, ESQ.

8

9

10  TALCOTT FRANKLIN P.C.

11       Attorney for Talcott Investors

12       208 N. Market Street

13       Suite 200

14       Dallas, TX 75202

15

16  BY:   TALCOTT J. FRANKLIN, ESQ.

17

18

19  CARTER LEDYARD & MILBURN LLP

20       Attorneys for Talcott Investors

21       2 Wall Street

22       New York, NY 10005

23

24  BY:   AARON R. CAHN, ESQ.

25       BRYCE C. BERNARDS, ESQ.

```
 1
 2   DECHERT LLP
 3        Attorneys for Bank of New York Mellon
 4        1095 Avenue of the Americas
 5        New York, NY 10036
 6
 7   BY:   GLENN E. SIEGEL, ESQ.
 8
 9
10   SIDLEY AUSTIN
11        Attorneys for Nationstar Mortgage
12        One South Dearborn
13        Chicago, IL 60603
14
15
16   BY:   JESSICA BOELTER, ESQ. (TELEPHONICALLY)
17        LARRY NYHAN, ESQ. (TELEPHONICALLY)
18
19   MCKOOL SMITH
20        Attorneys for Freddie Mac
21        600 Travis Street
22        Suite 7000
23        Houston, TX 77002
24
25   BY:   PAUL D MOAK, ESQ. (TELEPHONICALLY)
```

1

2  JACKSON WALKER, L.L.P.

3        Attorneys for Frost Bank

4        100 Congress Avenue

5        Suite 1100

6        Austin, TX 78701

7

8  BY:    PATRICIA TOMASCO, ESQ. (TELEPHONICALLY)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.  Mr. Princi?

4          MR. PRINCI:  Good afternoon, Your Honor.  Your Honor,

5    I want to start with a housekeeping item.  My office had, I

6    believe, e-mailed to chambers a document that the parties have

7    a copy of that I wanted to hand to the Court to use today to

8    assist us in walking the Court through the proposed order that

9    we submitted on Friday.  I don't know if that --

10         THE COURT:  Is this the summary of deadlines?

11         MR. PRINCI:  It is, Your Honor.

12         THE COURT:  I was just handed it a few minutes ago.

13         MR. PRINCI:  Okay.  Would anybody like additional

14   copies, because I have additional copies.  Would any of your

15   clerks like?

16         Okay, well, Judge, before I jump in, let me frame this

17   for the Court.  Obviously, at the last hearing there was

18   consternation by the Court and by the parties about the state

19   of affairs that we were in with respect to the then

20   disagreement amongst the parties regarding a scheduling order.

21   Judge, I'm happy to report, as you saw on Friday, that the main

22   parties have agreed to a single order.  And that came about,

23   Your Honor, as a result of the very cooperative efforts by all

24   the parties, and in particular, Mr. Siegel and the rest of the

25   counsel for the trustees; Ms. Patrick and her team, on behalf

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1  of the institutional investors; and the Kramer Levin team, on

2  behalf of the committee.  So I want to thank them for their

3  cooperation.

4       I'm also happy to report, Your Honor, that we learned

5  a short while ago that Nationstar's lenders have consented to

6  the requested two-week adjournment to the sale hearing.  So

7  that now goes from November 5th to November 19th.  And I'll get

8  to that when I walk you through the order.  But with that, Your

9  Honor, if you will, the overhang to whether or not this was

10  truly firm is now gone.  And I want to extend my thanks to the

11  Sidley firm for their efforts in expediting that consent, Your

12  Honor.

13       Your Honor, I know that you haven't had a long time to

14  review the proposed order.  But what I thought I would do

15  today, subject to how Your Honor would like to handle this, is

16  maybe start by at least explaining to the Court what it is that

17  we have tried to accomplish, and then mechanically, how we

18  believe, hopefully, we've gotten there, and then, of course,

19  take the Court's questions, if that's okay with the Court?

20       THE COURT:  That's fine.  Go ahead.

21       MR. PRINCI:  Okay.  So, Judge, I think there are a few

22  things that we have tackled and that are covered by this order.

23  And let me get through the whereas clauses, the main purpose of

24  which, as Your Honor can see by reviewing the document, really

25  would provide the framework and the definitions that are

1  necessary later on.

2         But the first part, Your Honor, really is the sort of

3  guts of the schedule.  Those are -- and that additional sheet

4  we gave you, Your Honor, if you take a look, what we've done in

5  that summary of deadlines is really just to extract from this

6  order what, now, the dates are that are either going to be

7  subject to the Court's calendar, but more importantly, with

8  respect to the parties, they're deadlines for the parties to

9  commit to certain requirements under this order; mostly pre-

10  trial in nature.

11         And let me give you the highlights, Judge.  I think

12  you could see that we have a commencement for fact discovery.

13  The reality is, Judge, that we've actually already begun that.

14  But I think the first sort of main line of demarcation

15  thereafter is on page 5, paragraph 7.  And there you'll see,

16  Judge, that that's the date by which any party, with the

17  exception of the creditors' committee and the RMBS trustees,

18  has to file an objection to the 9019 motion, if they have one.

19  And that's October 5th.

20         And we all agree -- and obviously, Your Honor, the

21  creditors' committee in particular, is looking out for the

22  other creditors in the case, as the debtor.  We all believe,

23  Your Honor, that October 5th certainly gives all parties in

24  this case enough time to determine whether they want to object

25  to this order.

1     The reason, Your Honor, as you go forward, that you'll

2  see we have on page 6, paragraph 10, a separate deadline for

3  the committee and for the RMBS trustees, for October 15th, is

4  they're just going to be undertaking a greater review, and Your

5  Honor, appreciates that, I'm sure.  So what we've done in order

6  to make this schedule work for everybody -- and it is

7  relatively truncated with respect to the amount of work people

8  have to do -- we've provided to the committee and to the RMBS

9  trustees, October 15th, for those parties to file any objection

10  they have.

11     I think the next important date, Judge, that follows

12  is in paragraph 13 on page 6, and that's the hearing date.  So

13  we've settled on November 5th as the hearing date for the

14  present 9019 motion.

15     Thereafter, Judge, paragraph 14 on page 6; that

16  provides, Your Honor, that the RMBS trustees -- now bear in

17  mind, Your Honor, the Court will have heard the matter on

18  November 5th.  And after the Court has an opportunity to

19  consider the evidence and make its decision, obviously a

20  decision will be rendered by the Court.  And the thinking,

21  Judge, is that obviously that is a decision that the RMBS

22  trustees are going to consider with considerable weight in

23  terms of making their ultimate determination.  By that point

24  they will be well along their way, though, Judge, to having an

25  independent position with respect to this matter.

1          And in terms of their having to make the decision

2   whether or not to opt in, if the Court grants the motion, then

3   the trustees have to opt in on the later of either November

4   12th or five business days after the Court enters an order

5   approving the 9019 motion.

6          So what I'd like to do, Your Honor, is pause there,

7   because the next two sections get into somewhat different

8   matters, although this is all integrated.  But let me just

9   pause there and see with respect to that pre-trial schedule and

10  that hearing date, if the Court has any questions?

11         THE COURT:  Give me a second, Mr. Princi.

12         MR. PRINCI:  Sure.

13         THE COURT:  And I did go through the order before.

14     (Pause)

15         THE COURT:  I understand -- I certainly understand the

16  rationale for different objection dates for the committee and

17  the RMBS trustees versus other objectors.  Do you know, at this

18  point -- I mean, do you have indications at this point, who the

19  other potential objectors are?

20         MR. PRINCI:  Certainly, Your Honor, we've had

21  discovery requests from MBIA and from FGIC two of the

22  monolines.  We've had a meeting with Assured, a third monoline.

23  I can't say, Your Honor, what ultimately their intentions will

24  be.  But when one files discovery requests this early on,

25  that's a possibility.

1         THE COURT:  One question or concern I have is you have

2    their objection, the other potential objectors' deadline for

3    filing their objections, before the close of discovery.  And I

4    don't know whether I'm going to hear these last-minute requests

5    to move their objection deadline, because discovery hasn't been

6    closed.

7         MR. PRINCI:  Judge, that is a -- I really think this

8    schedule works relatively conventionally.  I think that's

9    probably the one area where it's somewhat unconventional.  We

10   worked a long time trying to figure out how to deal with this.

11   That was the best we could do.

12        I would say the following, Judge.  Number one, just by

13   way of further background for the Court, another reason why we

14   wanted to stagger those two deadlines, Judge, is one of the

15   things that will be presumably be helpful to the RMBS trustees

16   is to learn whether there are any other parties that file an

17   objection and what those parties have to say they believe are

18   the infirmities, if you will, with respect to the 9019 motion.

19        I think, Judge, that we tried to button this up as

20   tightly as we could.  I can't say to you that it is not

21   possible that somebody might come in and have an issue with

22   that.  But I will say this:  this proposed order is on notice

23   to the parties that have the interest.  For example, MBIA, Your

24   Honor, was part of the discussions that we had.  They were

25   present throughout all of these discussions that led to this

1   proposed order.  I don't know whether they're here today; I

2   haven't looked.  But it seems to me, Judge, that to the extent

3   that we don't hear an objection at this point to the way that's

4   staggered, I wouldn't think that somebody is likely to cause a

5   problem with this.

6           THE COURT:  Well, I see the close of fact discovery is

7   September 24th.  So that's before anybody's objection deadline,

8   under this proposed schedule.

9           MR. PRINCI:  Correct.  Keep in mind, Judge, if you

10  take a look at paragraph 6 on page 5; the debtors have an

11  obligation, Judge, to file any supplemental expert reports by

12  September 24.  So any party in this case, Judge, is not going

13  to be blindsided.

14          THE COURT:  Okay.

15          MR. PRINCI:  All we're really doing, Judge, is just

16  giving the committee and the RMBS an additional grace.  But we

17  don't believe, Judge, in any way, shape, or form, we're

18  inhibiting or taking away anything from any other party.

19          Judge, if Your Honor doesn't have any further

20  questions --

21          THE COURT:  Let me just -- go ahead.

22          MR. PRINCI:  Okay.  So, Judge, the other two sets of

23  ordering provisions have to do with the following.  And this

24  was --

25          THE COURT:  Those were the ones -- you're getting into

1    the area where I was less clear about what it is that the

2    parties are agreeing to.

3            MR. PRINCI:  And that's understandable.  And that's

4    sort of a cat's cradle of definitions.  And that's why we tried

5    to set aside a glossary, at least for easy reference, if not

6    that it makes it that much easier to understand.  But let me

7    first tell you what the parties are trying to achieve with

8    these two sets of ordering provisions.

9            What we have, Judge, is a situation where the trustees

10   are in the unfortunate position of potentially facing a sales

11   motion where, if they knew they were going to be ultimately

12   objecting to the 9019 motion, they might otherwise want to

13   assert certain objections to the sale motion.  But on the other

14   hand, knowing that the sale motion and the proceeds thereof,

15   will ultimately benefit the investors in the trusts, they

16   certainly, I don't believe Judge -- I don't think I'm speaking

17   out of turn -- I don't think they want to do anything, Judge,

18   that's going to lead to the estate not being able to

19   successfully transfer assets in accordance with law.

20           So that is a difficult conundrum.  What we've tried to

21   do, Judge, and what we've agreed to do, and the way we're going

22   to do it, subject to Your Honor ordering this, is, if you will,

23   bifurcate their objections.  So on the one hand, Judge, in the

24   next set of ordering paragraphs on page 6 and on page 7, so

25   paragraph 15 and paragraph 16, this sets out the objections

1  which the parties do not believe will in any way, shape, or

2  form chill a potential sale, and thus would be scheduled to be

3  heard, Your Honor, prior to the sale hearing.

4          And these are what we call the pre-auction objections.

5  And they're set forth in paragraph 16.  And they really fall

6  into three categories.  First, to the extent that the trustees

7  have any issues with any of the obligations that are not going

8  to be made part of the agreements that are being assigned to

9  Nationstar -- in other words a severing issue -- the trustees

10  can raise that, provided however, Your Honor, that these would

11  not be severing issues going to what is the biggest severing

12  issue; and that is, the debtor believes there's a couple of

13  legal ways in which the debtor can ultimately leave behind the

14  seller obligations, the so-called put-back obligations, that

15  are the heart of the claims that the investors through the

16  trusts have.

17          They're not going to contest that form of

18  severability.  But in case there's any other issues that come

19  up about what was technically severed, they'll raise that prior

20  to the sale.  So that's found in 16(a).

21          THE COURT:  Because it appeared to me that this

22  proposed stipulation had substantive effects and not just

23  scheduling, that's why I want to be clear about what, if any,

24  objections the trustees are agreeing will not be asserted or

25  when they'll be asserted.  This came up during the hearing last

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1    week, and you said it was an important part of what you thought

2    had been agreed with the trustees.  But it's not a typical

3    scheduling provision, because it does seem to have substantive

4    effects, unless I'm misreading or misunderstanding.

5           MR. PRINCI:  Your Honor, I'm not sure I'm clear on

6    what the Court is referring to when you refer to "substantive".

7           THE COURT:  Well, I want to be sure I understand

8    what's pure scheduling and what's more substantive.  The way I

9    was reading this, and perhaps misreading it, the RMBS trustees

10   were agreeing now that they wouldn't object to certain aspects

11   of the proposed transactions.  That, to me, is substantive.

12          MR. PRINCI:  Understood.  Okay.

13          THE COURT:  It's not just here's the schedule, but we

14   won't do that.  Okay?

15          MR. PRINCI:  Understood.

16          THE COURT:  And I just want to be clear and have a

17   clear record about what they're agreeing now will or won't be

18   asserted.  Not what will, because that they're waiting to see;

19   but what they're agreeing now --

20          MR. PRINCI:  Okay.

21          THE COURT:  -- won't be asserted as objections.

22          MR. PRINCI:  So that's a good way, then, to make this

23   clear, Judge.  Let me have you take a look at paragraph 17.

24   And let me give you a moment just to read that again to

25   yourself, Your Honor.

1          THE COURT:  I've read it.

2          MR. PRINCI:  Okay.  So, Judge, that is the focal point

3     to the answer to Your Honor's question.  It is that which is

4     referenced in paragraph 17 that the trustees are agreeing to

5     forego in connection with the sale motion.

6          THE COURT:  And when I read it, because it starts out,

7     "Subject only to the pre-auction objections," I then flipped

8     back to look at the pre-auction objections, and that's where I

9     just didn't have enough time to --

10         MR. PRINCI:  Okay.

11         THE COURT:  -- really work through it.  I want to be

12    clear what's saved by the "Subject to" introductory clause, and

13    what is it that the RMBS trustees will not object to.

14         MR. PRINCI:  Okay.  So, Judge, let's go back to 16

15    then.

16         THE COURT:  Okay.

17         MR. PRINCI:  16 gives you the three categories of

18    objections that the trustees, if they choose to, are going to

19    prosecute, which Your Honor will then hear on what will be the

20    new hearing for the sale motion, presumably November 19th,

21    subject to the Court's calendar.  Okay?

22         THE COURT:  I looked.  That date works.

23         MR. PRINCI:  Okay, good.  And as I mentioned, the

24    first category is very limited, if you will, to potential

25    severing issues.  And that's in contrast, Judge, for example,

1   to what 17 refers to, where 17 says that they won't seek to

2   attempt to hold the sale up in any way, shape, or form, with

3   respect to the transfer of these contracts, including they

4   won't contest that there are any liabilities relating to the

5   so-called origination-related provisions.  And you'll see a

6   reference, Judge, in the last sentence of paragraph 16, that's

7   a similar proviso, where it says, "The pre-auction objections

8   shall not include any objection by the trustees seeking to

9   impose any obligation or liability," and I'm paraphrasing, with

10  respect to the assigned RMBS contracts -- those are the ones

11  going to Nationstar or the highest bidder -- in respect of the

12  origination and sale of the mortgage loans, including, without

13  limitation, the origination-related issues.

14          THE COURT:  Those claims are the subject of numerous

15  lawsuits, though?

16          MR. PRINCI:  That's correct, Your Honor.  Those are

17  the ones, Your Honor, that constitute the debtors' and the

18  institutional investors' agreement on an 8.7 billion dollar

19  allowed claim.  And so what the trustees are saying is we will

20  not attempt to argue at the time of the sale, and

21  correspondingly try to hold the sale up or attach to the sale,

22  any of our rights respecting whether you can or can't sever

23  those provisions.  Okay?

24          What they are saying they want Your Honor to

25  potentially hear, are three categories of objections, the so-

1    called limited severing issues.  And we're not really sure what

2    that is, Judge.  They need a chance to be able to look at this

3    further.  And if they can't resolve with us some issue in that

4    regard, then they may potentially argue to the Court that

5    there's something that's not being assumed and assigned that

6    should be.  But won't be the Big Kahuna one, okay?

7            Then the second one, which is (b) in paragraph 16, is

8    really adequate assurance, Judge.  Okay?  And (c), which is the

9    third category, is sort of a subclass of adequate assurance,

10   Judge.  In the PSAs there are certain conditions having to do

11   with, amongst other things, for example, the creditworthiness

12   of a servicer.  So it has to be -- the rating agencies -- you

13   have to have a certain rating from the rating agencies.

14           Now, we believe 365(f) covers that and allows the

15   debtor to transfer these contracts, notwithstanding such

16   provisions.  But at the end of the day, the trustees may well

17   take the position that whether or not 365(f) covers it from a

18   legal vantage point or not, we still think those very

19   conditions go to whether we have adequate assurance of future

20   performance.

21           I suspect Your Honor can see that we all believe,

22   Judge, that we're going to work these out.  Now, that's no

23   guarantee from any of the parties.  But these are the sorts of

24   things, Judge --

25           THE COURT:  See who the successful bidder is, then

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

 1  maybe you'll know.

 2          MR. PRINCI:  That's a fair point.  But subject to your

 3  good point about who the successful bidder is, we do think

 4  we'll work it out.  We're certainly -- you won't get an

 5  objection, Your Honor, before the parties have certainly worked

 6  hard to work such issues out.  Okay.  So those are the pre-

 7  auction ones.  And if those objections are filed by August

 8  23rd, then Your Honor will hear those as part of the motion on

 9  November 5th, in connection -- excuse me, on November 19, in

10  connection with the sale hearing.

11          The rest of the ordering paragraphs, Your Honor -- and

12  I will say, this is the most complicated part -- relates to two

13  things.  Number one, the objections to severing that have been

14  preserved, well, if the trustees -- I shouldn't say trustees.

15  Let's be technically correct.  Any trust that opts in, what

16  does that mean?  That means it is agreeing to the settlement

17  agreement that's the subject of the 9019 motion.

18          Now, working on the assumption that the Court has

19  approved that motion, and then you have the November, let's

20  say, approximately 12th date, when the trusts have to decide if

21  they opt in.  Now, there are 392 trusts that are the subject of

22  the settlement agreement.  And I think there's around eighty-

23  five percent of them have been given a direction from the

24  institutional investors.  But there's another approximately,

25  Judge, 200 trusts that are not part of that settlement

1  agreement.

2          We, the debtor, and the institutional investors,

3  believe that those trusts are not likely to have the issues

4  with respect to the put-back claims that these other trusts

5  have.  And therefore, they weren't made part of the proposed

6  resolution in the settlement agreement.  And there's a lot of

7  technical reasons, Judge, that we don't need to get into today,

8  as to why those other 200 or so trusts, we the debtors believe,

9  are not likely to become a big issue in this case.

10          But that having been said, the Court needs to be

11  aware, because the rest of the provisions do have to deal with

12  this, that the trustees are the trustees not only in the 392

13  trusts that are the subject of the settlement agreement, but

14  they're trustees for about 200 additional trusts.  And so

15  they're going to have to make a decision through prudent man

16  standard, okay, with respect to all the trusts that they're

17  involved in.

18          So the next set of ordering paragraphs does two

19  things.  Number one is, it sets up a -- it makes clear that to

20  the extent any trust should not opt in and therefore should

21  still have this reserved severance claim -- and the reason that

22  the opt-in is important, because if you opt in to the

23  settlement agreement, by the very terms of the settlement

24  agreement, you're releasing those so-called cure claims.  Okay?

25  So you will no longer have those preserved, because you will

1    have released them.

2            But to the extent any trust goes forward, meaning they

3    haven't opted in, then to the extent that they succeed with

4    those claims, in terms of -- that would be a cure claim.  We,

5    the debtor, and the committee, and the other parties involved,

6    believe that as a matter of law, if you succeed in arguing that

7    the debtor was not entitled to sever those put-back provisions,

8    then we believe that in that situation, as a matter of law, you

9    have a cure claim.

10           So to provide adequate protection for the payment of

11   any cure claim, were it to be determined by the Court that

12   there is one --

13           THE COURT:  If you can't sever -- let me stop you

14   there.

15           MR. PRINCI:  Sure.

16           THE COURT:  Why isn't it deemed a rejection if you

17   can't sever?  You're saying -- I mean, the conclusion that it's

18   a cure claim assumes that that contract is being -- in total,

19   is being assumed.

20           MR. PRINCI:  That's right.  So let me make sure the

21   record is clear on this first.  The debtor believes there are

22   two ways it can legally, ultimately sever the so-called put-

23   back obligations, from the rest of the servicing obligations,

24   and transfer just the servicing obligations.  We have informed

25   the Court of the way we were going to go about this.  That has

1   now, also, Judge -- another piece of good news, that's actually

2   now been obviated.  There won't be a need to do that, because

3   the trustees are agreeing not to contest the transfer to the

4   ultimate buyer, free and clear of this issue.  Okay?  So that's

5   another great benefit of what we worked on and agreed to.

6             THE COURT:  That's one of the substantive effects of

7   this --

8             MR. PRINCI:  Yes, Your Honor.

9             THE COURT:  -- scheduling order.

10            MR. PRINCI:  Paragraph 17 -- that is a knockoff

11  substantive effect of paragraph 17 in this order.  But what

12  everybody's doing is reserving their legal rights.

13            So what might be before Your Honor someday?  Well, the

14  trust -- any trust that doesn't opt in to the settlement and

15  wants to test this issue, would file an objection saying I

16  don't think the debtors had a legal right to do what they did.

17  Now, I know I can't go and reel it back in, but per this order,

18  if I'm right, this is a cure claim.

19            And the reason, in fairness, we're prepared to say

20  it's a cure claim, is while one way we believe you can do this

21  is to have certain debtor entities reject and then have other

22  debtor entities assume; if that were to fail, the only other

23  way to do this -- and this was done in the American Home

24  Mortgage case -- is to treat the contracts as really being two

25  contracts.  Okay?  And then as was done in that case, you

1   assume and assign one, and leave behind the other.

2            If that does not pass muster under the law, then from

3   the trustee's vantage point, I think in fairness, what they're

4   saying is, look, under this contract, you had to pay the put-

5   back claim.  You had to make us whole on that before you were

6   able to assign it.  You had no legal -- the Court has found you

7   had no legal basis for severing this provision.  Therefore,

8   before you could assign it, you had to make us whole where your

9   breach is, where your breach lies with the put-back claim.  And

10  therefore, our put-back claim is a cure claim.

11           So that claim is being preserved in order to provide

12  adequate assurance that any cure claim, were the Court to find

13  that there is one, would be paid, we are agreeing to treat any

14  such allowed cure claim as an administrative expense.

15           THE COURT:  And perhaps it reflects my own lack of

16  understanding of this, but when I saw that, one question I had

17  is whether other potential administrative creditors will have

18  objections by virtue of the debtor agreeing that these cure

19  claims would be treated as administrative claims?  Is it

20  conceivable that the debtors would wind up as administratively

21  insolvent, that the amount you're agreeing to treat as

22  administrative claims, potentially a large group of claims that

23  might not otherwise be entitled to be treated as administrative

24  claims, and therefore potentially diluting the recovery of

25  other administrative creditors?

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1        MR. PRINCI:  Your Honor, as a practical matter, I

2  believe that's virtually impossible, for the following reasons.

3  We're only talking about a cure claim if the sale's gone

4  through.  Otherwise, by definition, there is no such thing as a

5  cure claim, if you haven't assumed and assigned.  So let's look

6  at the consequence of the sale going through.

7        We're presently looking at an approximately 2.4

8  billion dollar amount of proceeds.  So I think just stopping

9  there, I think we can -- I don't think anybody can feasibly

10 suggest that there really is any chance that this estate will

11 be administratively insolvent if the sale motion goes forward

12 and is granted.

13       THE COURT:  Will other unsecured creditors be able to

14 argue that this is unfair discrimination because these claims

15 should be treated -- their claims should be treated as the same

16 level as -- the cure claims shouldn't be treated as

17 administrative claims?

18       MR. PRINCI:  And there, I think not, again, Judge.

19 Because anybody who has a cure claim -- the trustees who are

20 really -- what they're doing, Your Honor, in connection with

21 this proposed order, is of tremendous value to this estate.

22 Because they have a right to prosecute these.  And this could

23 turn out the wrong way for everybody depending upon how all

24 that lands.

25       So but if you have a cure claim, legally, you're

1    entitled, we believe -- we the debtor believe, that you're

2    entitled to have your cure claim paid from those proceeds

3    before the rest of the estate gets them.  So I don't see how an

4    unsecured creditor can complain about the trustees being given

5    an administrative expense here, because either way, the

6    unsecured creditors were going to be behind that cure claim

7    before they got a distribution from the proceeds.

8            Your Honor, I'm sorry, have I --

9            THE COURT:  No, go ahead.

10           MR. PRINCI:  Okay.  So then if you take a look -- so

11   what we have here, Judge, the rest of what this attempts to do

12   is to deal with two things.  Number one is, there is a cap with

13   respect to the amount of the cure claim.  Because one could

14   well imagine, Judge, that given the kind of numbers you've

15   heard, 8.7 billion, as what we're proposing for the allowed

16   claim of these trusts, theoretically, you could be looking at

17   an astronomical potential cure claim.

18           So the amount of the cure claim has been limited by a

19   cap.  And that cap --

20           THE COURT:  That's the 600 million dollar cap?

21           MR. PRINCI:  The 600 would be the max.  But it's

22   reduced, Your Honor.  But it's further reduced as set forth

23   here.  But before I get into the weeds on that, I do want to

24   explain the other thing these paragraphs deal with.

25           They deal with the fact, Judge, that you've got to try

1    to pro rate all this as against the trusts that accept, i.e.,

2    opt in, and the trusts that don't accept.  Okay?  And so we've

3    done that both definitionally and mechanically.  By way of

4    definition, if you go to paragraph 14, you'll see that we use

5    pretty self-explanatory definitions:  accepting trusts and

6    nonaccepting trusts.  And you'll see that that, Your Honor,

7    works into these caps in subparagraph 18(b).  You'll see that

8    the way in which the cap works is, as you read through that,

9    you'll see it is pro rata based on whether you're accepting or

10   nonaccepting.

11           So let me just pause there before I get to the rest,

12   which actually is -- 19 through 22 are relatively

13   straightforward.  But let me just see if the Court understands

14   what those provisions are designed to do.

15           THE COURT:  I'm not sure I'm prepared for a quiz right

16   now, Mr. Princi, but why don't you go on.

17           MR. PRINCI:  Okay.  Well, I'm going to -- you know,

18   Your Honor, I just had a sidebar with Mr. Eckstein, and I'm

19   going to leave it to Mr. Eckstein to maybe flesh that out a

20   little further.  Your Honor, as I said, I think the rest of the

21   paragraphs are relatively straightforward, particularly as

22   against paragraph 18, which is not relatively straightforward.

23           But in addition, Your Honor, to the fact that this

24   proposed order has been painstakingly negotiated by the

25   creditors' committee, and is supported -- not just negotiated

1   but supported by the creditors' committee, the debtor, the RMBS

2   trustees, the instituitional investors; in addition, Your

3   Honor, I believe Ally is okay with this, the parent company.   I

4   believe -- I haven't heard from any other party, Your Honor, a

5   number of whom were involved in these discussions in one way or

6   the other, that there's any objection to it.

7           And so I think this is -- when it comes to the

8   complicated issues in this case, this order, Your Honor,

9   provides great value and kind of takes the chaos and organizes

10  it tremendously, here.  And as you point out, there are also

11  substantive benefits to this.  So --

12          THE COURT:  This is in the nit category -- I would

13  like the title of this document changed.  I don't -- it's now

14  called "Revised Joint Omnibus Scheduling Order".  Come up with

15  some more words.  I mean, because there are substantive --

16  there are very substantive aspects to this.  I don't want to

17  hear in November, somebody comes out of left field and says,

18  that was a scheduling order you entered.  I didn't know there

19  was substantive effects from it.

20          So it may be a revised joint omnibus scheduling order

21  and provisions for other relief.  I don't know.  I just don't

22  want to hear later that when objectors come in that -- and this

23  is really -- I mean, those provisions really are impacting the

24  RMBS trustees, potentially the investors, by virtue of that.

25  But this is much more than just a scheduling order.

1    MR. PRINCI:  Your Honor, we will do that.  And it is.

2  And in fact, I want to, Judge, point to two other things that I

3  failed to sort of up front.  And that's sort of in the specific

4  obligations of the various parties with respect to deadlines.

5    If you go to page 4 and look at paragraph 2, it talks

6  about the debtor filing a supplement.  One of the benefits,

7  Your Honor, of --

8    THE COURT:  I guess you're filing another motion too?

9    MR. PRINCI:  It'll be a supplement.  We're not going

10  to redo this motion, Judge.  And just so that Your Honor

11  understands, we have -- one of the benefits, and there were

12  many -- one of the benefits of us spending a lot of time

13  together, well into the night --

14    THE COURT:  Sometimes that helps.

15    MR. PRINCI:  It helped a lot, Judge.  It helped an

16  awful lot.  And one of the benefits, Judge, is that we realized

17  that there really are things that just needed to be clarified.

18  And so amongst and between the parties, we have a short list.

19  I'm actually going to be sending an e-mail to all of these

20  parties tomorrow, just confirming what we talked about.

21    Just by way of example, one of those things -- you've

22  heard me say this in open court before, I'll say it again --

23  the 9019 motion is detached from the plan support agreement

24  that we have with these same institutional investors.  So it

25  does not have any connection to the Ally issues that are being

1    examined by the examiner, et cetera, et cetera.  And we'll make

2    that -- we'll actually say that up front in the motion, if that

3    will be helpful for people, et cetera.

4            So we have a few items that we all discussed that we

5    think we need to clarify either in a motion, and in one

6    particular instance, also potentially in the settlement

7    agreement itself.  And we're going to do that.

8            The other thing I just want to inform the Court,

9    because I don't think this would be obvious what our intentions

10   were with respect to this for the Court.  There is a deadline

11   here, Judge.  I just need to find it.  So please just give me a

12   moment.

13           It is the fact that we are going to be working -- it

14   may be expressed, and I'm just missing it while I'm on my

15   feet -- but we're going to be working, Your Honor, on a

16   proposed order for the 9019 motion.  And Your Honor is well

17   aware, because it's come out at these hearings on this, that

18   there are difficult issues that the trustees need to balance in

19   doing their job.  And so the proposed order, Your Honor, which

20   we will present to the Court well in advance, Judge, of the

21   9019 hearing, will be designed to -- it'll have input from the

22   trustees and of course the committee and everyone else that's a

23   major party here, Judge.  And it'll be designed to try to deal

24   with some of those.

25           But what we'll make sure we do is to get to you and

1   present that to you early, allow the Court to schedule, if you

2   want, with us, either a court session or a chambers session to

3   discuss why we have these proposed findings.  Now, all of that,

4   Judge, in due course.  And of course, none of what we put in

5   the order, by way of any proposed findings, will be

6   inconsistent with what we present at the hearing.  So anything

7   that we have in that order, that means we intend to cover that

8   at the hearing.

9           I just do want to -- that wouldn't have been obvious,

10  our intention from this order.  And that is the intention of

11  the parties, Judge.

12          THE COURT:  Okay.

13          MR. PRINCI:  Judge --

14          THE COURT:  I will have some other comments.  I'm

15  going to save them, and questions.  Okay?

16          MR. PRINCI:  Let me cede the podium to Mr. Eckstein.

17          MR. ECKSTEIN:  Your Honor, good afternoon.  Kenneth

18  Eckstein of Kramer Levin on behalf of the official creditors'

19  committee.

20          Your Honor, first I'm going to echo Mr. Princi's

21  remarks complimenting the parties for working together and

22  constructively.  And I'll certainly include the Morrison &

23  Foerster team, on behalf of the debtor, in feeding us late into

24  Thursday night and working, I think, constructively, to

25  coalesce a lot of difficult issues where there were very

1    disparate viewpoints and interests.

2            Number two, I'd like to highlight, I think, a couple

3    of the areas where the committee feels the greatest heartburn

4    on this motion, because there are several issues that Your

5    Honor has started to identify that are not simply scheduling,

6    they're quite substantive, and they could affect the case as it

7    runs its entire course.

8            The first is timing.  As Your Honor sees from the

9    schedule, the parties have ultimately agreed to a tight time

10   schedule.  It essentially has the parties conducting near-term

11   discovery.  And to the extent there are going to be parties who

12   are going to be doing independent evaluations of the proposed

13   settlement, certainly, the committee and the RMBS trustees, and

14   there may be other parties as well, the parties have agreed

15   that expert reports are going to be submitted really in about

16   two months.  And that's fast.

17           And I don't want to give Your Honor the impression

18   that people were enthusiastic about the schedule.  I think

19   there was a practical recognition that one of the essential or

20   important elements of this was to complete this process before

21   the Court considered the sale hearing.  And while we did obtain

22   from Nationstar an agreement to extend the sale hearing out by

23   two weeks, it still did not leave a significant amount of time.

24   And in order to permit the discovery of the experts, the filing

25   of objections, and the filing of replies, consistent with Your

1   Honor's schedule to conduct a hearing of this complexity, this

2   was the schedule that parties ultimately were able to agree

3   upon.

4        We're very much relying upon the full and complete

5   cooperation of the debtor in terms of making the information

6   available.  And I'm hopeful that this will provide adequate

7   time.  Needless to say, if there are problems, parties will

8   have to come back and deal with it.  But that's not something

9   that we're doing today.  And Mr. Princi is right; all the

10  parties that Mr. Princi described are willing to work with this

11  schedule.

12       We had a committee call this morning.  And I tried to

13  impress upon the committee members the various elements of this

14  agreement as it was finalized.  And I think that people are all

15  going to try to work with this schedule.  And hopefully, we're

16  not going to have the need to come back.  And if we do, Your

17  Honor will deal with that.

18       Number two, Mr. Princi did indicate that a supplement

19  is going to be filed.  Obviously, we're going to -- everybody's

20  going to be very focused on the substance to that supplement.

21  The letter that Mr. Princi described that he's going to be

22  providing tomorrow, laying out the elements that we're going to

23  see in the supplement, I believe will be consistent with the

24  items that we've already discussed, and hopefully will give

25  parties clarity on what modifications to expect.  And we're

1    assuming that there are not going to be any material new

2    changes that are going to sort of move us in a different

3    direction.

4            But that's a very important submission.  And we feel

5    it's very important for all parties, not just the parties who

6    were participating in this negotiation, but all parties in this

7    case, to see the filing by August 15th, so that they have ample

8    time to know, with detail, what precisely everybody is

9    responding to.  And given the complexities of this, I trust

10   that the supplement will describe in the motion itself, all

11   substantive provisions that people should really be aware of

12   that could affect their evaluation of the settlement.  And I

13   think this will give us ample time to do that in a clear and

14   comprehensive fashion.

15           The next item I wanted to bring to Your Honor's

16   attention is the discussion that Mr. Princi had with you of the

17   pre-auction objections and what we consider the potential

18   claims that could give rise from that.  That is the first

19   category of administrative claims or potential administrative

20   claims or cure claims, that we are dealing with.

21           One of the difficult elements of this agreement is

22   that all parties are making a lot of assumptions that, at this

23   point in time, are not based on any level of certainty, or

24   really very little diligence.  We have as much information as

25   we've been able to collect, to date.  But people do not know

1   with any certainty what types of pre-auction objections will be

2   asserted by the trustees.

3           We have representations that these will not be

4   significant or material, relative to the size of this case.

5   And hopefully that will be the case.  Moreover, we're hopeful

6   that between now and when these claims are filed, that there'll

7   be an ample opportunity for the trustees and the debtor and the

8   committee to speak with Nationstar, which is the stalking-horse

9   bidder on the servicing platform.  And our goal is that many of

10  these concerns will be resolved in discussions with Nationstar,

11  so that there will not need to be claims filed, but that in

12  fact, the trustees can get comfort that many of their concerns

13  will be dealt with by the purchaser in the ordinary course, on

14  an ongoing basis, post-closing.

15          THE COURT:  Let me just stop you there.  Because I

16  deferred raising this with Mr. Princi, but this is an

17  aggressive schedule.  And the question I have is whether it

18  builds in any time or sufficient time for negotiations.

19  Because the last point you make, Mr. Eckstein, I just fully

20  anticipate before the evidentiary hearings starts in this, the

21  parties will sit down and knock heads and really try and see

22  whether you can resolve -- wishful thinking -- all of the

23  issues, some of the issues, whatever.

24          And with this aggressive schedule, the debtors' reply

25  brief -- discussions don't have to await for then -- but the

1    debtors' reply brief is October 29th, and with a hearing

2    commencing on November 5th.  So that's actually one of the big

3    concerns.  So one of the concerns I have is time for the

4    parties to be able to try and resolve -- negotiate, resolve as

5    many issues as possible.  And the second, and I guess I'll ask

6    Mr. Siegel about this when he comes up, is what process are the

7    trustees going to set up with the investors?  Because I mean I

8    think I fully expect the trustees don't want to get too far out

9    front of the investors.

10           We've talked before about what this provision is,

11   twenty-five percent being able to direct the action, will you

12   follow or won't follow.  But it seems to me that there are a

13   number of things that have to work parallel.  One, a process of

14   the RMBS trustees with the investors;  second, a dialog between

15   the debtors, the committee, and the RMBS trustees; all of this

16   going on while you've got discovery going on.

17           So I do have a concern that there's not enough built

18   into this.  And I don't want to complicate the schedule.

19   Assuming I'm likely to agree to the schedule, I think that you

20   all ought to work now on agreeing on an unofficial schedule by

21   which, without prejudice to anybody's rights, claims,

22   objections, that you will share preliminary objections.  And

23   you probably have already done this.  I mean, it's not a

24   mystery.  But until you've done -- as you're doing your

25   discovery.

1            I mean, I think you ought to be setting up a process

2    that has informal meetings that aren't to discuss the discovery

3    disputes or anything like that, but actual -- to see whether,

4    as issues are arising, whether you can talk through them.  I'm

5    not compelling you to do that.  But I'm just afraid you're

6    going to get to the end of this schedule, and it's going to be

7    a frantic path that you -- people are going to be getting ready

8    for an evidentiary hearing; exhibits, et cetera, and all that;

9    get their witnesses ready.  And at the same time they're going

10   to be trying to resolve whatever they can resolve.  So I do

11   have a concern about that.

12           MR. ECKSTEIN:  If I may, let me take it in a couple of

13   pieces.  With respect to how the trustees are going to deal

14   with the investor community, that is something that has been

15   contemplated here.  And I think it would be useful for Mr.

16   Siegel or one of the spokespeople for the trustees to address

17   that precisely.  Because that's been anticipated.  And I think

18   that that will help significantly in sort of smoothing the path

19   for the trustees to make a decision.

20           With respect to the particular issue I was starting

21   with, which was the pre-auction objections; that deadline is

22   August 23rd.  I think Your Honor can take some comfort in the

23   fact that discussions have already commenced between the

24   trustees and Nationstar, as the stalking-horse bidder, and the

25   other parties in the case, to see whether or not these precise

1   objections can get resolved.  And again, being somewhat

2   optimistic on this point, I think there is enough time between

3   now and August 23rd for those issues to be worked out.  And

4   based on what I've heard so far, I'm encouraged that many, if

5   not all, of those objections can be satisfactorily resolved on

6   a business level by that deadline.

7           If those objections can get resolved, what it would

8   mean is that there will not be pre-auction objections.  If it's

9   not resolved, I think the pre-auction objections will get

10  filed.  The one amendment that I was going to suggest to Mr.

11  Princi's schedule is, in the event the pre-auction objections,

12  which are, again -- those are the traditional servicing type of

13  claims, not put-back claims -- if those have not been worked

14  out satisfactorily --

15          THE COURT:  Give me an example of what those would be.

16          MR. ECKSTEIN:  Basically ongoing indemnities, what

17  about taxes that might still be due and owing.  They're not

18  small numbers.  But relative to the 2.4 billion dollar purchase

19  price, they're numbers that we believe are considered more

20  ordinary course.

21          But nonetheless, there are issues that are of concern

22  to the trustees and there are really of concern to the

23  purchaser.  And they have to figure out a way to balance that

24  out in a businesslike manner.  We think that can be done.  It's

25  been done in other situations and hopefully can be done here.

1    But the suggestion I was going to make is in the event the pre-

2    auction objections have not been worked out, I think it

3    probably would make sense to actually set those down for a

4    hearing prior to November 19th.  Although I don't think we need

5    to fix that date today, I think we wait and see whether or not

6    any objections are filed, and then we can come back and decide

7    what the schedule is.

8         But it might make sense to set those down for a

9    somewhat earlier hearing, if they, in fact get filed.  And so I

10   just wanted to flag that.  Because even if they're not resolved

11   by August 23rd, they could get resolved before a hearing date.

12   So that's one type of objection.

13        We're concerned about those.  We would obviously, from

14   the committee's standpoint, we would like to eliminate those

15   objections and would try to do what we can to ensure that's the

16   case.  And obviously, to the extent those are resolved with the

17   purchaser by August 23rd, it'll be known to any third party who

18   might submit a competing bid that those have been resolved, and

19   bidders can take account of how that's dealt with in connection

20   with any supplemental filing that's made.

21        The next category of concern was the last item that

22   Mr. Princi was talking about with respect to the cure claims.

23   It is quite complex.  And it took us a lot of time.  It's a

24   real balance.  The benefit -- one of the benefits of this

25   agreement is that the trustees and all parties have agreed to

1  allow the sale to go forward without objections.  We believe,

2  Your Honor, that that is going to maximize the value of the

3  transaction.  And we believe it will stimulate bidding at the

4  highest possible level, which should redound to the benefit of

5  the estate.  And so that's a plus.

6         If there was litigation with the trustees leading up

7  to the sale, it might not derail the sale, but it could

8  certainly distract the sale, and probably would be taken out of

9  the purchase price, just by people being skittish.  And so

10 hopefully this will redound to the benefit of the estate.

11        Now, on the other hand, we understood that until the

12 trustees have made a decision whether they're going to opt in,

13 we don't know whether or not they are or are not going to want

14 to assert the sort of large cure claims that would essentially

15 result from whether or not it was or was not appropriate to

16 sever the origination from the servicing, and therefore,

17 potentially give rise to a cure claim that's related to the

18 put-back litigation.

19        Obviously, if those claims get asserted, that will be

20 a major litigation.  And nobody is waiving any rights at this

21 point in time, with one exception.  If the trustees do not opt

22 in -- as Mr. Princi explained, it may not be all or nothing; it

23 may be that they opt out for some trusts, they opt in for other

24 trusts -- and so the paragraph that Mr. Princi explained,

25 paragraph 18 has a pro rata.  So whatever caps are provided

1  there are pro rata and will come down.

2          From the committee's standpoint, Your Honor put your

3  finger on it.  Looking at it this from the standpoint of the

4  unsecured creditors, we do not want to find ourselves in a

5  situation where we have swamped this estate with administrative

6  claims.  On the other hand, we felt it was advantageous for the

7  sale to go forward and to defer this fight until it became

8  necessary and not to front load this debate.

9          And so obviously, the first sort of level of defense

10  is, the trustees may ultimately decide to opt in to the

11  settlement.  If they opt in to the settlement, there will be no

12  claims that get triggered by paragraph 18.  It'll be a zero.

13  In the event the trustees do not fully opt in, the question

14  is --

15          THE COURT:  Assume the worst.  What happens if they

16  just don't opt in, period?

17          MR. ECKSTEIN:  If they don't opt in, then there'll be

18  a lot of questions that Your Honor will have if they don't opt

19  in.  But the question will really be, what is the significance

20  of the settlement?  How does it apply?  I'm told -- and again,

21  this remains to be seen -- the likelihood of there being no

22  participation in this settlement, I don't want to say is -- it

23  seems extreme at this point in time, but it's possible.

24          And so let's assume they don't opt in.  Okay.  So this

25  paragraph contemplates that.  In that event, the trustees will

1   assert a claim that essentially says that the put-back claims

2   are not severable from the transfer of the portfolio, and

3   therefore, in order to transfer the portfolio, the debtor -- or

4   the purchaser, essentially, had to assume the put-back claims,

5   and therefore cure.

6          Now, we know nobody is going to buy this portfolio if

7   they had to assume all the put-back litigation.  Just was not

8   going to happen.  So therefore, this is sort of a architecture

9   that is providing for the ability to sell and then deal with

10  how to sort of allocate the proceeds.  So there'll be a

11  litigation over whether or not, as a legal matter, there was or

12  was not an obligation for a purchaser to have assumed the cure

13  claims with respect to the put-back litigation.

14         Your Honor may determine that the debtor was within

15  its rights legally to have sold free and clear, in which case,

16  there'd be no cure claim.  And whatever claim ultimately the

17  trustees have will be a general unsecured claim.  And if the

18  trustees don't opt in to this settlement, there'll be a trial

19  in the future as to what the appropriate amount of the

20  unsecured claim would be.  That's not something we would have

21  to deal with today.  But it will clearly be something that'll

22  be pivotal to a plan, and we'll have to have a separate hearing

23  and a process on how to deal with the claims.

24         In the event Your Honor determines that there was no

25  right to sever, and that there was an obligation to assume

1  these claims, what paragraph 18 says is that there'll be a cap

2  on these claims.  And there's a dual cap.  The first cap Mr.

3  Princi identified was 600 million dollars.  But what paragraph

4  18(b) says, it's the lesser of the aggregate sale proceeds for

5  all settlement trusts or 600 million dollars.  So what you

6  really need to do is go into the definition and look at the

7  sale proceeds that are attributable to the trusts that don't

8  opt into the settlement.  And we, in fact, believe -- we don't

9  have to get into the details -- we believe that the relevant

10  sale proceeds that are going to be at issue, are in fact, less

11  than 600 million dollars.  We think it's materially less than

12  600 million.

13          Again, this is not something for today.  But our view

14  is, it is materially less, and Your Honor will have to

15  obviously consider that.  But we think that the amount of

16  potential exposure is a small fraction of 600 million.  But

17  just as belt and suspenders, we have an aggregate cap of 600

18  million.

19          In addition, if fifty percent of the trusts opt in and

20  fifty percent of the trusts opt out, the aggregate cap will be

21  300 million, and the sale proceeds will be fifty percent of the

22  maximum sale proceeds, because half the trusts will have opted

23  in.

24          So there's a lot of ways for the cap to come down to a

25  much lower number so that we ultimately satisfied ourselves

1   from a committee standpoint that the likely exposure is boxed

2   in enough different ways that the potential administrative

3   claim relative to the -- certainly to the 2.4 billion dollars,

4   but even to what is likely to be available to unsecured

5   creditors after you satisfy the DIP and other secured

6   obligations, we believe is a manageable, appropriate number,

7   and is a sensible, essentially, trade today, for the ability to

8   let the sale go forward on the best possible terms.

9           THE COURT:  Wait.  I don't want to come out of left

10  field on this.  But is this, itself, a substantive settlement

11  that has to be judged?  I mean, you've packed into a scheduling

12  order quite substantive provisions.  And I mean, why isn't this

13  a 9019?  Why -- first off, do the RMBS trustees have the

14  authority to agree to these substantive provisions?

15          MR. ECKSTEIN:  There's a lot -- Your Honor, there's a

16  lot of substance here.  And again, I'm trying --

17          THE COURT:  The last thing I want to do is -- I mean,

18  this seems to make good sense to me.  But I also want to make

19  sure I'm not missing the forest for the trees.  Is there --

20          MR. ECKSTEIN:  I don't think you're missing the forest

21  for the trees, Your Honor.  And I think these are questions

22  that we've all been asking ourselves.  And we do think that

23  we've set up a format that is best designed to lead to a

24  consensual resolution of a very, very thorny problem.

25          Now, again, I haven't begun to address whether the

1  committee is satisfied that 8.7 is an appropriate settlement.

2  We may decide that it's way too high.  And in that case, we'll

3  have to obviously weigh in on that issue.  But assuming this is

4  ultimately determined to be a reasonable settlement, we believe

5  that there is a mechanism in place right now that maximizes the

6  ability of all parties:  the trustees, the investors, and the

7  estate, to resolve a very difficult, thorny problem that would

8  likely consume years of litigation, and I hate to say, tens and

9  tens of millions of dollars of expense or more.  And we have a

10  mechanism right now that seems to be designed to lead to a

11  consensual resolution of a very difficult problem in a

12  relatively prompt period of time in a way that will give all

13  parties a great deal of comfort, without waiving rights.

14          And at this point in time, from the estate's

15  standpoint, Your Honor, we don't believe that anybody is

16  waiving any claims.  We think the estate's getting the benefit

17  of some agreed-upon -- some business agreements with respect to

18  caps on what claims will be asserted.  And we think the estate

19  can receive the benefit of that.

20          The trustees have given a great deal of thought -- and

21  I'll let them obviously speak to it -- but the trustees have

22  obviously given a great deal of thought and consideration to

23  what is and is not appropriate at this stage.  And I believe

24  the trustees will tell you that they are comfortable with

25  proceeding with the order as it's currently structured.  And it

1    defers to a later date the rights of all parties to make

2    whatever arguments and submissions have to be made, if those

3    litigations become necessary.

4              So we felt that on balance, the estate was getting

5    good benefits from this, and that the Court need only deal with

6    these claims in the event circumstances warrant and based upon

7    decisions that get made over the next couple of months.  And

8    that's what led us to recommend that this was a sensible way to

9    proceed; although I agree with Your Honor that this is not

10   simply a garden-variety scheduling order.  It is far from it.

11             THE COURT:  Thank you, Mr. Eckstein.

12             Mr. Siegel?

13             MR. SIEGEL:  Good afternoon, Your Honor.  I'm Glenn

14   Siegel from the Bank -- representing the Bank of New York.  I'm

15   with Dechert.  Just to make sure that no stone is left unturned

16   on the thanks being expressed to everyone, of course we thank

17   Morrison & Foerster and Kramer Levin for their hard work.  I

18   should mention our co-trustees, which are Deutsche Bank,

19   represented by Morgan Lewis; U.S. Bank represented by Seward &

20   Kissel; Wells Fargo, represented by Alston & Bird.  Also, the

21   institutional investors were integral to this, and Ropes & Gray

22   and Gibbs & Bruns were very heavily involved as well.

23             From our standpoint, there were a lot of things going

24   on here that the trustees needed to get comfort with in order

25   to be able to go forward.  It was a very important component of

1    this that we have the opportunity to have a supplemental motion

2    filed, which we think will give us a great deal more comfort in

3    the process.

4              THE COURT:  You haven't seen it yet.  I don't know.

5              MR. SIEGEL:  Well, we talked about it.  If it's what

6    we've talked about, I think we'll be okay.  And we've spent a

7    lot of time talking about it.

8              Your Honor, also Mr. Eckstein mentioned the issues

9    about as they relate to the sale.  Your Honor, I would suggest

10   to you that what's really going on here is a deferral of rights

11   by the RMBS trustees in connection with the sale that we have

12   agreed to, that for the moment, absent the 600 million dollar

13   issue, that there really isn't anything that is being finally

14   resolved with respect to any of our trusts.

15             And with respect to the 600 million dollar issue,

16   while I respect and appreciate Mr. Eckstein's view that that

17   number is substantially less, we of course believe it to be

18   substantially more.  And by the way, Your Honor, that's another

19   reason why we could agree on a number that was different.

20             With respect to authority, as we've talked about

21   previously; this is different than the typical trust indenture

22   that we encounter in bankruptcy cases.  For better or worse,

23   the trustees have authority to act under these documents.  We

24   can enter into this agreement.  The question is what our

25   tolerance is for holders who might disagree with us.  We think

1   in this context, under these circumstances, particularly

2   involving an issue where we were very concerned about two

3   issues:  one is maximizing the value of the sale itself; and

4   the other is providing for a smooth transition of our servicing

5   rights to a new servicer that's financially viable; we thought

6   this was a very reasonable outcome vis-a-vis our certificate

7   holders.  And that's why we are comfortable with the outcome.

8           As we said, there are very good and substantial issues

9   here that we are deferring to another day.  Just to be clear,

10  so that there's no surprise down the road, in the event that

11  this actually becomes a relevant issue, there are three

12  possible parties who would be liable for put-back claims.

13  There are the originators of these loans; there are the

14  depositors of these loans; and then finally, there is the

15  servicer entity itself, which had obligations to provide

16  notice, and in some instances, enforce these claims.

17          In some instances these are the same debtors.  In some

18  instances these are different debtors.  These are very complex

19  and thorny issues.  And I very much agree with Mr. Eckstein

20  that if we had to raise these issues prior to the sale, that it

21  would create a substantial cloud on the sale going forward.  So

22  what we've determined to do is to maximize the sales proceeds

23  instead of minimizing them and perhaps winning a Pyrrhic

24  victory, winning the claim, and then not getting the assets

25  sold.  So we thought that was a very reasonable approach going

1  forward.

2         Your Honor, I'm going to do the best I can -- I've

3  taken lots of notes here of the various things that came up --

4  and try to cover them.  If I've forgotten anything or if you

5  think the answer's already been provided to you, I would just

6  ask that you respond accordingly.  Let's just see here.

7         First of all, Your Honor should know, vis-a-vis our

8  reviewing the settlement and contacting the certificate

9  holders, we have retained a financial advisor; we've retained

10  Duff & Phelps as our financial advisor.  We think they are very

11  well qualified to do this.  My understanding is that we now

12  have access to the data room, and we are moving forward.  And

13  we are told that this time frame will be a time frame within

14  which we will be able to make our evaluation.

15         In terms of getting in touch with our certificate

16  holders, we are going to provide a very substantial and robust

17  notice to them that we will be sending out, I believe it's the

18  22nd.  We are also going to hire a facilitator --

19         THE COURT:  22nd of which month?

20         MR. SIEGEL:  Of August.  It's the 22nd, right?

21         UNIDENTIFIED SPEAKER:  I'm looking now.  Yes, it is.

22         MR. SIEGEL:  We are also going to hire a facilitator.

23  What I mean by that is there are companies that will make sure

24  the notices get to people to the extent they can; because,

25  again, we believe it to be very important that people know

1    what's going on.  This will also be posted.  It will be

2    advertised.  We will do what we can to make sure that people

3    get the notice that they need.

4           Part of the time frame established for the motion is

5    related to the amount of days we think is reasonable, based

6    upon traditional practice for corporate trustees between

7    sending the notice and the objection period.  And we have built

8    that into the schedule as well.  It is important to us, and we

9    think it's important to the certificate holders, that if they

10   have issues with respect to this settlement, that they have an

11   opportunity to express those before this Court and for us to

12   hear them, to see them --

13          THE COURT:  How active is the market for trading of

14   these certificates?

15          MR. SIEGEL:  It's not clear to me.  I can tell you

16   that most of this paper was held in institutional hands,

17   traditionally.  We have been receiving some calls from some

18   hedge funds.  So they are starting to get some of this paper.

19   I do not know if anyone is going to be in a position to provide

20   a critical mass or a direction to any of us with respect to

21   this.

22          From our standpoint, this is not going to be a squeaky

23   wheel issue.  It's not going to be whoever makes the most

24   noise, that's what we're going to do, particularly because

25   there are so many trusts involved.  From our standpoint, is we

1  are going to do a reasonable, studied review of this

2  settlement.  We're going to figure out whether or not these

3  numbers make sense.  And by the way, we've also reserved on the

4  allocation between the trusts, which is very important as well.

5          We are going to look at the objections that are filed.

6  We're going to determine in connection with those objections

7  whether or not they alter our means of looking at the

8  settlement as well.  And we're going to make a reasoned

9  decision.  And we're going to ask this Court to make a finding

10 with respect to that decision.  But be sure we take this very

11 seriously.  We want to hear from our certificate holders.  And

12 we worked very hard to give them the most reasonable amount of

13 notice, under the circumstances that we're presented with.

14         There is a very strong sense that this needs to be

15 done prior to the sale.  And we have now been able to

16 accommodate that timing, for among other reasons, the

17 willingness of the stalking-horse bidder to adjourn this for

18 two weeks.  That -- given the shortness of time, two weeks can

19 even be a lot of time here.

20         The other thing I just would mention for the sake of

21 clarification is that there are two universes of trusts here.

22 There are the trusts to whom the settlement is being offered

23 and the trusts to whom the settlement is not being offered.

24 With respect to those trusts who have the opportunity to

25 settle, they're going to be subject to the cap.

1         We have basically created a process where those other

2    trusts will ride through.  Their rights, other than this

3    deferral that we've agreed to, will be unaffected.  Now, having

4    said that, just so the Court has comfort, the debtor has

5    advised us that given the nature of those trusts, that they

6    expect that the amount of potential put-back claims dwarfs the

7    amount that we're talking about here; that it's not a

8    significant amount.

9         It's important to the trustees that we try to resolve

10   those claims as well. But we do not see the urgency nor do

11   other parties see the urgency of resolving that prior to the

12   sale.  However, that will be hopefully before Your Honor

13   relatively quickly, in the form of a settlement that will

14   happen post-sale, down the road; because we want to clean this

15   up.  We want to have as many allowed claims as possible down

16   the road.  And Your Honor should expect, if all goes well, that

17   that will be before you late this year or early next year.

18        Now, I'm not sure, but I think I've covered at least

19   what I put on my notes.  So if Your Honor has other questions,

20   I'm happy to answer them.

21        THE COURT:  I don't.

22        MR. SIEGEL:  Thank you, Your Honor.

23        THE COURT:  Thank you very much, Mr. Siegel.

24        Anyone else wish to be heard?

25        MS. TOMASCO:  Your Honor, on the phone.

1           THE COURT:  Why don't you hold off; let me get the

2   people in the courtroom and then I will absolutely hear you on

3   the phone, okay?

4           MS. TOMASCO:  Thank you.

5           MR. WOFFORD:  Your Honor, good afternoon.  Keith

6   Wofford from Ropes & Gray on behalf of the RMBS certificate

7   holders, often referred to as the institutional investors.

8           Just following up on some of the remarks of the

9   debtors and the committee and implications of the Court, some

10  of them refer to the schedule for this 9019, whether as

11  originally posited or as put forth in the schedule, as

12  aggressive.  But in fact, the proposed schedule, both initial

13  and current, is somewhat reflective of the foresight of the

14  debtors in this case.

15          The debtors knew, Your Honor, from their initial

16  diligence as well as from their discussions with us that the

17  complications of effectively transferring the servicing

18  platform without a resolution of the putback claims was almost

19  like a Rubik's cube to solve.  And the settlement was a means

20  to try to avoid that Rubik's cube.  As a result of the

21  complications, the debtors initially sought the schedule and a

22  scheduling track that would allow the putback claims to be

23  resolved before the sale hearings.  What has changed between

24  that initial motion and now is that we've gotten consensus from

25  other major constituents in the cases that in fact the

1   rationale behind that schedule, and in fact the way to solve

2   that Rubik's cube is, in fact, to get the settlement forward

3   and done -- hopefully done, at least with all the reservations

4   of the parties-in-interest.

5          Despite the complexity that Your Honor refers to in

6   this order -- and I won't use the term scheduling order for a

7   fear of prejudicing anyone -- the fact of the matter is it is

8   that complexity that allows this to be resolved in a way that

9   effectively preserves the rights of the parties, as the

10  committee noted, while allowing the sale to go forward at the

11  same time, bringing the value into the estates, which we as

12  investors have ultimate interest in, as well as everyone else

13  here.

14         With respect to the one particularized question, Your

15  Honor, that I would like to answer, the view of the investors

16  is that a 9019 is not required from this motion because in fact

17  this is not compromising or settling any claims on behalf of

18  the estates.  There certainly are some concessions that are

19  being made by the trustees, but what this is doing is

20  preserving an opportunity for a later day for those claims to

21  be litigated.  And as the committee rightly noted, it's

22  effectively a downward ratchet from a threshold that protects

23  the trustees, but then actually ratchets downwards so there

24  isn't undue prejudice to the unsecured creditor pool.

25         With that, Your Honor, I don't think I'd say anything

1  further, other than that the institutional investors support

2  the schedule and the trustees' entry into it.

3          THE COURT:  Thank you, Mr. Wofford.

4          Anyone else wish to be heard?

5          MR. SHORE:  Good afternoon, Your Honor.  Chris Shore

6  from White & Case on behalf of the ad hoc group of junior

7  secured notes.

8          Your Honor asked a couple of questions, and you got a

9  couple of answers on the administrative expense priority.  We

10  negotiated and got put in -- at least for the junior secured

11  notes -- paragraph 22 in the order, which sets forth that

12  whatever administrative expense priority is ultimately allowed

13  is not going to affect the nature, extent or priority of the

14  claims of the junior secured noteholders.

15          THE COURT:  Thank you.

16          Anyone else wish to be heard?

17          Anyone on the phone?

18          MS. TOMASCO:  Your Honor, this is Patty Tomasco on

19  behalf of Frost Bank.

20          THE COURT:  Okay.  Go ahead.

21          MS. TOMASCO:  I just -- and I apologize, but I'm

22  getting this order on Friday afternoon, and the original order

23  basically preserved the rights of counterparties to executory

24  contracts that were not RMBS trustees and people involved in

25  the settlement.  And so I would just like some clarification on

1  a couple of paragraphs that have nothing to do with the

2  settlement, but just whether or not they apply to

3  counterparties to assume servicing contracts that are not RMBS

4  contracts.

5          Beginning on page 4, it says that fact discovery

6  responses are due in ten days, but it doesn't specify whether

7  or not that applies to non-RMBS counterparties who are

8  otherwise objecting to the sale motion.

9          THE COURT:  Let me stop there.

10          Mr. Princi, can you address that?

11          MR. PRINCI:  It does, Your Honor.  It does.

12          THE COURT:  The same schedule --

13          MR. PRINCI:  The same schedule --

14          THE COURT:  The deadline applies.

15          MR. PRINCI:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MS. TOMASCO:  And so that does apply, and the non-RMBS

18  counterparties also have the benefit of the shortened discovery

19  response time?

20          THE COURT:  Yes.  The schedule has got to apply.  If

21  the deadline applies for objections, the same shortened time

22  for discovery has to apply.

23          MS. TOMASCO:  Thank you, Your Honor.

24          It says on page 6 in paragraph 15, it says that the

25  debtor shall provide the RMBS trustees and the creditors'

 1  committee all the performance-based information they have

 2  received by Nationstar.  Frost Bank also has a servicing

 3  contract that the debtors proposed to assume and assign to

 4  Nationstar, but they're not included in this disclosure.  I was

 5  wondering if any other counterparty to a servicing contract

 6  could be added to that paragraph?

 7          THE COURT:  Mr. Princi?

 8          Which paragraph -- just so I'm clear, what --

 9          MR. PRINCI:  Your Honor, this is paragraph 15.  Your

10  Honor --

11          MS. TOMASCO:  15.

12          MR. PRINCI:  Yes.  Your Honor, this arose specifically

13  in connection with the issues that these parties are raising

14  with us.  I would -- rather, Your Honor, than have other

15  parties start to use this to make and have us deal with any

16  information requests, I would recommend that counsel contact my

17  office.  We don't stand on principle when it comes to

18  information requests; we're happy to provide information

19  without the formality of formal discovery requests.  But I

20  don't think any of the parties here now, Your Honor, want to

21  start to alter these terms to start having other parties use

22  this to make information requests.

23          MS. TOMASCO:  Well, I would comment, Your Honor, that

24  Frost Bank did raise specifically the same objection to the

25  identity of the purchaser, in particular with respect to

1   whether or not the purchaser such as Nationstar would meet the

2   financial requirements so as to provide adequate assurance of

3   future performance, in particular, whether or not they meet the

4   financial criteria that's in the servicing agreement.

5           And so I'm not just a random other counterparty; my

6   client is not.  We raised the exact same objection as the RMBS

7   trustees did.  I'm happy to send the request.  I just want to

8   make it clear that we're not a lessor or some other person.  We

9   have a similar agreement to the RMBS trustees; they're just not

10  in the securitization itself.

11          MR. PRINCI:  Your Honor, the debtors will provide that

12  information; that's not the issue.  All I'm saying is we don't

13  want to start to alter this particular proposed order.  But I'm

14  happy to say on the record we have no problem providing the

15  information, in terms of memorializing this.  If counsel can

16  just contact my office, this will not be an issue.

17          THE COURT:  Why don't you contact Mr. Princi or his

18  colleagues.  If you can't resolve the issue satisfactorily to

19  Mr. Princi, you can arrange a conference call with the Court

20  and we'll try and address it.  There was a lot of work that

21  obviously went into this proposed order.  I don't undere -- I'm

22  not giving short shrift to the issues you're raising; I think

23  they're important.  Let's see whether you're able to resolve

24  them with Mr. Princi, and if you can't, you can come back and

25  ask for help from the Court, okay?

1          MS. TOMASCO:  Thank you, Your Honor.  I just wanted to

2     clarify that the other fact discovery provisions of the order

3     are equally applicable to non-RMBS --

4          THE COURT:  Yes.  It must be.

5          MS. TOMASCO:  Okay.  Thank you, Your Honor.

6          THE COURT:  The objection deadline -- if the other

7     deadlines apply, the discovery deadlines need to apply.

8          MS. TOMASCO:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          Anyone else on the telephone wish to be heard?

11          MR. MOAK:  Your Honor, Paul Moak on behalf of Freddie

12     Mac.

13          THE COURT:  Yes.  Go ahead.

14          MR. MOAK:  I had a question similar to those raised by

15     Frost Bank's counsel.  In particular, it is how the parties

16     reconcile this proposed scheduling order with the Court's

17     previously entered sales procedure order for parties that are

18     not RMBS trustees, like Freddie Mac.  And for example, the

19     sales procedure order established a cure objection deadline of

20     September 28th, and a deadline to object to the sale

21     transaction generally by October 29th.  And it's unclear to

22     me -- even after the discussion we've had -- about whether, for

23     example, the pre-auction objection deadline alters that

24     schedule in any way for parties other than RMBS trustees.

25          For example, in paragraph 16 it reads "except as

RESIDENTIAL CAPITAL, LLC, ET AL.                    62

1   limited by this paragraph, on or before August 23rd the

2   committee, the RMBS trustee or any other party-in-interest may

3   file any pre-auction objections".  And I guess the "may" makes

4   that permissive rather than compulsory, so maybe it's not an

5   issue.  But I just need some clarity on whether parties other

6   than RMBS trustees are expected to -- are required to file what

7   are labeled as "pre-auction objections" on or before August

8   23rd.  Because, for example, one of those potential objections

9   is an objection to the ability of the proposed assignee to

10  perform under the assumed servicing agreements, which I've

11  heard interpreted to mean you need to file objections to

12  adequate assurance as a pre-auction objection.  So it was

13  unclear to me how this impacts the previous sales procedure

14  order.

15          THE COURT:  Mr. Princi?

16          MR. PRINCI:  Your Honor, and that's a very fair and

17  understandable set of questions.  So to clarify, Your Honor,

18  none of the provisions in the previously issued what we call

19  sales procedure order are intended to be affected by this

20  order, except as expressly provided; and let me say what I mean

21  by that.  So for example, we're now going to have the hearing

22  on the sales motion move from November 5th to November 19th.

23          With respect to the specific deadlines that are set

24  forth -- and there are a number of them -- in the sales

25  procedure order for dealing with cure claims and the like,

1  those remain in effect.  Paragraph 16 is designed specifically

2  for the RMBS trustees, but we felt, Your Honor, all the parties

3  felt that we shouldn't preclude any other party who may want to

4  also file any similar sorts of claims from doing so by that

5  date so there would be an orderly timetable for those types of

6  questions, but --

7            THE COURT:  So the "may" means may.

8            MR. PRINCI:  May.

9            THE COURT:  It doesn't mean "shall".

10            MR. PRINCI:  "May" means totally "may".  We are not

11  looking, Your Honor, to otherwise revise the specific schedule

12  set forth in the sale procedure order.

13            THE COURT:  Mr. Moak, are you satisfied with that

14  answer?

15            MR. MOAK:  I am, Your Honor.  Thank you.

16            THE COURT:  Thank you.

17            Anybody else on the phone wish to be heard?

18            Anybody else in the courtroom?

19            All right.

20            MR. PRINCI:  Your Honor, if I may?

21            THE COURT:  Go ahead, Mr. Princi.

22            MR. PRINCI:  Thank you.  Very briefly, Your Honor.

23            Your Honor raised something that I think is important

24  earlier.  And you talked about the parties would be wise to

25  confer informally, if you will.  Your Honor, notwithstanding

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1  how it may have appeared from the last time we were here -- and

2  indeed, it may have appeared that we don't converse regularly

3  enough -- the truth is -- and I'll let anybody here who

4  disagrees with this, obviously, inform you -- the truth is the

5  trustees and we have been regularly communicating about things.

6  We regularly communicate with the committee about these sorts

7  of things, Judge.  And so, Your Honor, from the debtors'

8  vantage point we're going to continue to seek to communicate

9  with the parties.

10          What's going to happen, Judge, in terms of the

11  finality of their decisions, it's not going to -- it's going to

12  evolve.  This is not going to be a lightning strike at the

13  deadline.  So directionally, Your Honor, people are going to

14  start to get a sense through what they're hearing from their

15  financial advisors of whether they think that they're likely

16  moving towards an agreement with the debtor and the

17  institutional investors' assessment of what is a fair

18  settlement or not.  And no doubt, Your Honor, we are all

19  motivated to talk about that beforehand.  We all have our

20  independent but parallel motivations that will lead us to be

21  speaking to each other, Your Honor, prior to these deadlines.

22          So I did want to just note that.

23          THE COURT:  Mr. Princi, I know you talk to each other,

24  but -- although last week's hearing might suggest otherwise --

25  but with everything you have going on -- and I recognize

1  there's an enormous amount going on; there are a lot of moving

2  pieces to this -- sometimes the formality of knowing that there

3  is a regularly scheduled, periodic meeting -- which may wind up

4  getting cancelled if everybody agrees to cancel it -- assures

5  that issues won't get lost in the shuffle.  I'm not requiring

6  you to do it at this stage, okay.  But I just -- we spent two

7  and a half hours at a hearing last week talking about a

8  schedule.  That was nuts.

9           Okay, if it took two and a half hours of court time to

10  talk about a schedule, what about the real issues?  And the

11  stipulation that you've submitted has a got a lot of real

12  issues; there are real substantive things that are built into

13  it.  I think that you and the other counsel need to talk and

14  need to try and work out -- and maybe you've got to get to the

15  middle or end of August for it to really make sense to have.

16  But I really think you need -- and I may at some point order

17  that it happen that there be time scheduled -- if not every

18  week, every other week -- for face-to-face meetings where you

19  all sit in the room so you know there's no misunderstanding

20  about what issues.

21           It's without prejudice.  If Mr. Siegel doesn't raise

22  an issue at a particular meeting he's not foregoing raising it

23  at a later time, or vice versa, or the committee -- whatever.

24  But you all ought to agree that the meetings are off the record

25  and that it's not going to get quoted back to the Court that he

1  said, she said, et cetera.  But you need to have a regular

2  dialogue, because I'm really concerned, with an aggressive

3  schedule, you're going to get toward the end of this process

4  there's not going to be enough time built in to try and get

5  issues resolved.  That's end of speech on that.

6       MR. PRINCI:  Okay.  Your Honor, nobody can disagree

7  with that suggestion.  So what we'll do, Your Honor, we will

8  consult with the parties.  Without committing anybody, Your

9  Honor, we'll probably be suggesting that we give some people --

10  we give everybody an opportunity to get their arms around the

11  facts.  And then probably -- let's say mid --

12       THE COURT:  I'm going to leave it to you.  I'm not

13  dictating what you're going to do.

14       MR. PRINCI:  -- mid-September we'll start to arrange

15  that, Judge.

16       THE COURT:  I think you've all heard what I'm trying

17  to communicate.

18       MR. PRINCI:  Okay.  Real quickly, Judge, just -- I had

19  mentioned before and I wasn't able on my feet to locate it, but

20  just so that I point Your Honor to the correct provision, in

21  paragraph 2, page 4, in addition to filing the supplement by

22  August 15, we're also going to be filing a revised proposed

23  order.  And that's what I was referencing earlier, Judge.

24  We're going to be working with both the committee and in

25  particular the trustees to try to make sure that when we do get

1   to this hearing everybody's working together -- on the

2   assumption that there hasn't been some sort of a major

3   schism -- that everybody's working together to make sure that

4   we get all of the issues that need to be resolved, for which

5   then we'll ask the Court for appropriate findings of fact.  So

6   that's what I was referring to earlier.

7           One last thing, Judge.  And I think just to echo what

8   Mr. Eckstein was saying in terms of what's likely to happen,

9   and then what happens if the likely doesn't happen.  In terms

10  of what's likely to happen, you were asking what if no trusts

11  opt in.  Again, Judge, we are hopeful.  We are hopeful that

12  having the number of institutional investors with respect to

13  the amount of debt that they hold providing their views in

14  writing to the trustees will lead the trustees to not end up

15  with no trust opting in.  But to answer your question --

16          THE COURT:  It was just a hypothetical question.

17          MR. PRINCI:  But if no trusts opt in, Judge, then what

18  we'll have, fortunately by virtue of this we'll have had the

19  sale at least go forward, so we'll have a lot of proceeds in

20  this estate.  But we'll have a freefall when it comes to claims

21  resolution, and we'll deal with it accordingly.

22          THE COURT:  Okay.  Anybody else have anything else

23  they want to add?

24          All right.  We're adjourned.  Thank you very much,

25  everybody.

1          MR. PRINCI:  Thank you, Your Honor.

2          Your Honor, one housekeeping item.  I'm sorry.

3          THE COURT:  Yes.

4          MR. PRINCI:  We'll be submitting to you, Your Honor,

5    tomorrow, after we have a chance just to consult with

6    everybody, a revised form of order that will change the title.

7    And then we'll also send a disc down accordingly, Judge.

8          THE COURT:  Thank you very much.

9          MR. PRINCI:  Thank you, Your Honor.

10         THE COURT:  All right.

11      (Whereupon these proceedings were concluded at 4:36 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9              *Penina Wolicki*

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  July 31, 2012

19

20

21

22

23

24

25