1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


                Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                August 1, 2012

                4:02 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2     (Doc#90,47) Adj. Telephone Status Conference on the Record, Re:

3     Motion Authorizing the Debtors to Continue to Perform Under the

4     Ally Bank Servicing Agreements in the Ordinary Course of

5     Business.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:   Penina Wolicki

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

3

1

2  A P P E A R A N C E S :  (TELEPHONICALLY)

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   STEFAN W. ENGELHARDT, ESQ.

9        TODD GOREN, ESQ.

10       GARY S. LEE, ESQ.

11

12

13 MORRISON & FOERSTER LLP

14       Attorneys for Debtors

15       755 Page Mill Road

16       Palo Alto, CA 94304

17

18 BY:   DARRYL P. RAINS, ESQ.

19

20

21

22

23

24

25

4

KIRKLAND & ELLIS LLP

     Attorneys for Ally Financial Inc. & Ally Bank

     601 Lexington Avenue

     New York, NY 10022


BY:   RAY C. SCHROCK, ESQ.



KIRKLAND & ELLIS LLP

     Attorneys for Ally Financial Inc. & Ally Bank

     555 California Street

     San Francisco, CA 94104


BY:   MARK E. MCKANE, ESQ.



KRAMER LEVIN NAFTALIS & FRANKEL LLP

     Attorneys for Official Creditors' Committee

     1177 Avenue of the Americas

     New York, NY 10036


BY:   KENNETH H. ECKSTEIN, ESQ.

     BRADLEY O'NEILL, ESQ.

5

1

2    CHADBOURNE & PARKE, LLP

3          Attorneys for Examiner, Arthur J. Gonzalez

4          30 Rockefeller Plaza

5          New York, NY 10112

6

7    BY:    ROBERT GAYDA, ESQ.

8          DAVID LEMAY, ESQ.

9          HOWARD SEIFE, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                6

P R O C E E D I N G S

1

2          THE COURT:  On behalf of the debtor, Mr. Lee and Mr.

3    Rains.  Is that right?

4          MR. LEE:  That's correct, Your Honor.

5          THE COURT:  Mr. McKane and Mr. Schrock?

6          MR. MCKANE:  Yes.  That's correct, Your Honor.

7          THE COURT:  Seife, that's for the examiner, anybody

8    else?

9          All right.  Why don't we begin?

10         MR. LEE:  That's very good.  Your Honor?

11         THE COURT:  Yes?

12         MR. LEE:  I apologize.  So this is Gary Lee on behalf

13   of the debtors.  Your Honor, we wanted to give you a report on

14   discovery.  And I'm going to turn it over to my partner, Darryl

15   Rains, who's going to be trying the case if we get there, to

16   report.

17         At the end, Your Honor, we'd like to reserve some time

18   to raise an issue that's come up with respect to the motion

19   that's before Your Honor, as well as the fact that it covers in

20   sum and substance, the subject of Your Honor's examination

21   order.  We've had a discussion with the examiner, and he has

22   asked to address Your Honor at the end of the discussion on

23   discovery and timing and schedule.

24         THE COURT:  Okay.

25         MR. LEE:  Okay.  So if I may, Your Honor, may I turn

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    7

1  it over to Mr. Rains?

2          THE COURT:  You certainly may.

3          MR. LEE:  Thank you, sir.

4          MR. RAINS:  Good afternoon, Your Honor.  This is

5  Darryl Rains from Morrison & Foerster.  Let me give you a quick

6  report on discovery from the debtors' point of view.

7          First, I'm happy to report that we produced virtually

8  all of our documents on Monday.  There are a few stragglers

9  that we're getting out today.  There are also a few issues that

10 have arisen today, questions that we've gotten from the

11 creditors' committee.  But we still expect to have completed

12 our document production by today.

13         Let me also just update you on deposition scheduling.

14 We have four witnesses who we intend to submit direct testimony

15 for.  And they are scheduled for deposition beginning on

16 Friday.  We have the CFO, Mr. Whitlinger on Friday; then Senior

17 Vice President of Servicing Matt Detwiler, on Monday; the CEO,

18 Tom Marano, on Tuesday; and then we'll be offering up Joe

19 Pensabene, who's executive vice president.  He's available on

20 Wednesday.

21         So we think we have complied with the Court's prior

22 orders and that we've been quick and diligent in getting our

23 documents and our witnesses scheduled.

24         THE COURT:  Okay.

25         MR. MCKANE:  Your Honor, this is Mark McKane on behalf

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    8

1   of AFI and Ally Bank.  I'd like to give you an update as well.

2        THE COURT:  Thank you, Mr. McKane.  Go ahead.

3        MR. MCKANE:  Thank you, sir.  We also have satisfied

4   our obligations in response to the committee's request, which

5   we just received last Monday, eight and a half days ago.  We've

6   made a targeted production of all the materials on the issues

7   that they wanted us to focus on, the five core topics.  And we

8   completed that production today.  Importantly, the core

9   materials that we believe would be those most likely to be used

10  in a deposition or in a hearing were produced by yesterday.

11       We have two witnesses that we are going to be

12  presenting direct testimony for at trial.  The first is going

13  to be the bank's CEO, Barbara Yastine, and she is available for

14  a deposition on Friday.  And then on Monday, we are making

15  available Jim Mackey, who is the CFO of AFI.

16       THE COURT:  Okay.

17       MR. O'NEILL:  Your Honor, this is Brad O'Neill on

18  behalf of the committee.  We have a few issues on documents and

19  on depositions.  First, we did receive from the debtors on

20  Monday about 68,000 pages of documents.  We are working through

21  those.  We've received a number of installments from AFI, about

22  40,000 pages at the end of last week, plus, I think 1,000

23  yesterday and another 13,000 about an hour ago.  And we're

24  working through that.

25       There is one area of -- there's one gap, as we

RESIDENTIAL CAPITAL, LLC, ET AL.                                                    9

1  understand it, in the Ally-AFI production.  And that is that we

2  don't have e-mails from some critical people, including Ms.

3  Yastine, who they're proposing as a witness, and also, some

4  senior executives of Ally -- of AFI, rather.  And let me give

5  you an example.

6          We received from the debtors a copy of an e-mail from

7  Tom Marano, who's the CEO of ResCap, dated two days before the

8  petition date, to Michael Carpenter, the CEO of AFI, and Jeff

9  Brown, who is, I believe, his second-in-command, saying that --

10  describing essentially the modification in reimbursement

11  process under the subservicing agreement, indicating that the

12  pull-through rate is higher than expected, two times higher

13  than expected, and that as a result, indemnification payments

14  could be 70 to 120 million dollars higher than expected or

15  projected, and suggesting that AFI agree to reimburse ResCap

16  for that increased cost.

17          We do not have -- and my understanding is we will not

18  receive as part of this production, or at least AFI has not

19  undertaken to produce -- Mr. Carpenter's or Mr. Brown's

20  e-mails.  It seems to us, however, that there was a very high-

21  level discussion, at the upper reaches of both companies

22  concerning matters that are central to this motion and central

23  to Your Honor's consideration of the subservicing agreement.

24  And we think, frankly, we need the e-mails.

25          And the same thing would be true for Ms. Yastine, who

1  is being proposed as the person most knowledgeable of issues

2  relating to Ally Bank.  So that's point number one.

3          Point number two, on the scheduling of depositions,

4  Your Honor, what you've been told about the scheduling of

5  depositions, is the schedule proposed by the debtors and Ally

6  Bank and AFI.  We are working through the document productions.

7  I think given that we got 13,000 pages of documents today from

8  Ally Bank, it's going to be extremely difficult for us to be

9  prepared to take a deposition on Friday morning.

10         Interestingly, Your Honor, they're proposing to

11  produce the head of Ally Bank, whose office is in our building

12  on our elevator bank, out at Newark Airport.  So while I

13  understand she's flying in from the West Coast, it's just an

14  additional level of complication, and we would prefer to depose

15  both Ms. Yastine and Mr. Whitlinger next week.  And we have

16  made -- we have people available.  We're ready to do it Monday,

17  Tuesday, or Wednesday.  And we have sufficient attorneys

18  available to do it on a triple-track basis, if necessary.

19         MR. MCKANE:  Your Honor, this is Mark McKane.  May I

20  respond directly?

21         THE COURT:  Let me see whether anybody else wants to

22  be heard first.

23         Go ahead, Mr. McKane.

24         MR. MCKANE:  Thank you, sir.  Your Honor, we, unlike

25  the debtor, whose motion this is, we did not receive these

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    11

1  discovery requests six weeks ago.  We received this request

2  eight and a half days ago.  We immediately had a call the

3  following morning, Tuesday; identified targeted searches; and

4  proceeded and conducted those searches.

5          The materials that they want us to focus on were five

6  agreements:  the servicing agreement, the 2010 indemnity

7  agreement; the January 30th support agreement; the DOJ-AG

8  settlement agreement; and the resizing of the AFI DIP.  That's

9  not my identification of the topics.  That's the committee's

10 before our call on Thursday.

11         We proceeded forward focusing on those materials.  We

12 produced the following categories of materials:  board minutes,

13 presentations to the board, final versions of the agreements,

14 draft versions of the agreements, e-mails relating to those

15 negotiations, and calendar notices about the meetings and the

16 back-and-forths.  We had to do it on a targeted basis, focusing

17 on the key negotiators, including Ms. Yastine, who was the lead

18 negotiator in this case, who handled it personally against Tom

19 Marano, over series of months.  And so those are materials that

20 have been produced.  And they do include e-mails.

21         Moreover, as it relates to the targeted materials that

22 would be related to the matter, we have produced those.  If

23 there's anything that they're having difficulty identifying, we

24 have offered to identify it by Bates number.  For example, when

25 I spoke to Mr. O'Brien (sic) a few hours ago, he specifically

1  asked about bids that related to whether the pricing of the

2  servicing agreement vis-a-vis the marketplace, I specifically

3  identified and directed him to the April 25th presentation to

4  the Ally Bank and offered him the Bates number for that, if he

5  wanted it.

6          And as it relates to Ms. Yastine's availability, she

7  is currently en route to the West Coast for Ally business.  We

8  met with her this morning.  She is returning from the West

9  Coast on the redeye on Friday.  She asked to meet at the

10 airport.  We flagged this issue as soon as we were aware of it,

11 and made the accommodations available for it occur, because

12 immediately after the deposition, she is taking a week off, not

13 just for vacation, but to handle a very personal matter as it

14 relates to her mother.

15         So she is not in the office next week.  We recognize

16 that she's an important witness.  But we have made every offer

17 to identify the core materials, and importantly, the key

18 materials that will be relevant and necessary for any

19 examination of Ms. Yastine were produced by yesterday.  And we

20 made efforts -- specific efforts to do so.  And we by stand by

21 the offer.  If --

22         THE COURT:  Wait, wait.  Time out.  Stop.  You don't

23 get to unilaterally decide what the committee believes is

24 important for the deposition.  So that's number one.  That's

25 not a unilateral decision on your part.  If you produced 13,000

1  pages today and you're expecting them to take an important

2  deposition on Friday, it just isn't going to work that way.

3  Okay?

4         You all have to realize, I'm not driving this schedule

5  for this early hearing; you all are.  If you want this hearing,

6  then you're all going to have to jump through enormous hurdles

7  to produce everything.

8         Mr. O'Neill, what are the additional e-mails that you

9  have requested?

10        MR. O'NEILL:  Well, we requested documents defined to

11 include electronic communications, documents concerning, among

12 other things, the subservicing agreement, and the

13 indemnification obligations.  And I can't tell you what they

14 haven't given me.  I haven't looked at the 13,000 pages.  My

15 understanding, based on communications between my team and Mr.

16 McKane's team, is that we're not going to be getting a

17 substantial production of e-mails.  And my understanding was

18 we're not getting Ms. Yastine's e-mails.  And I don't expect to

19 get Mr. Carpenter's or Mr. Brown's e-mails.

20        My point in bringing this --

21        THE COURT:  This --

22        MR. O'NEILL:  -- one e-mail is --

23        THE COURT:  Mr. O'Neill, please stop there.

24        MR. O'NEILL:  Sorry.

25        THE COURT:  The difficulty with telephone hearings is

1    sometimes when somebody's speaking, it's hard to hear when the

2    judge is interrupting.  Mr. McKane, do they have Ms. Yastine's

3    e-mails?  If not, when are they going to get them?

4            MR. MCKANE:  Your Honor, we went through and did a

5    targeted search for e-mails relating to the negotiations and

6    the back-and-forth, as relates to the servicing agreement, the

7    core issue in the case.  We did that -- they -- as it relates

8    to electronic discovery, you have to understand that we only

9    received the request eight and half days ago, and we never even

10   got to where the committee proposed search terms as it relates

11   to her e-mail.

12           THE COURT:  Mr. McKane, Mr. McKane, just listen

13   carefully to me.  Okay?  I don't want to hear a long speech

14   about when they gave you the search terms and what you did.

15   They're saying that there -- has there been a -- I'm going to

16   ask this question, and I want a direct answer to it.  Has there

17   been a search for Ms. Yastine's e-mails; yes or no?

18           MR. MCKANE:  Your Honor, we did -- we have collected

19   her e-mail, and we specifically looked for e-mail regarding the

20   negotiations themselves.  That was the scope of the

21   negotiations.  And we produced those communications and the

22   meeting, calendar notices for the negotiations with Mr. Marano.

23           THE COURT:  Have you searched for Mr. Carpenter's

24   e-mails?

25           MR. MCKANE:  No, Your Honor, we have not been able to

1  conduct that search yet, because -- and this is an issue as it

2  relates to our ability to do collection on this timetable.  We

3  had already collected Ms. Yastine's e-mail in response to the

4  2004.  We do not have -- we did not have Mr. Carpenter's e-mail

5  harvested as of Tuesday to be able to conduct that parallel

6  search.

7          THE COURT:  When will you be able to do that?

8          MR. MCKANE:  Your Honor, I don't have the input from

9  our technical team to be able to give you that answer.

10         THE COURT:  Mr. O'Neill, Mr. McKane is saying that

11 there has been a search for Ms. Yastine's e-mails.  What is

12 that you say they haven't searched for?

13         MR. O'NEILL:  I am told by my team that we may have a

14 handful of e-mails from Ms. Yastine, and that's it.  I would

15 have expected more.

16         MR. MCKANE:  Your Honor --

17         MR. O'NEILL:  I can't tell you what's not there.

18         THE COURT:  Don't interrupt.

19         MR. MCKANE:  Mr. Carpenter --

20         THE COURT:  When he's finished, I'll give you a

21 chance.

22         Go ahead, Mr. O'Neill.

23         MR. O'NEILL:  I have concluded, Your Honor.

24         THE COURT:  Go ahead, Mr. McKane.

25         MR. MCKANE:  Your Honor, as it relates to Mr.

1  Carpenter, I don't want there to be a misconception.  The

2  counterparty to the servicing agreement is Ally Bank.  Ally

3  Bank were the people who were negotiating.  And it was

4  specifically Ms. Yastine who was the lead negotiator.

5  Obviously they're -- the committee wants to raise issues as it

6  relates to guarantee or other obligations as it relates to AFI,

7  and we're putting forward a witness on that, Mr. Mackey.

8           THE COURT:  Well --

9           MR. MCKANE:  But if the core issue in the case is the

10 integrated subservicing agreement and reimbursement obligations

11 of the debtor for the use of Ally Bank's assets, the proper

12 witness and the proper party is Ms. Yastine.

13          MR. O'NEILL:  For Ally Bank, that may be true, Your

14 Honor.  But AFI had an indemnification obligation itself and --

15 which was recognized by both parties.  And immediately pre-

16 petition, the CEOs of AFI and ResCap were discussing how and

17 whether AFI would reimburse ResCap for indemnification

18 obligations under the subservicing agreement.

19          THE COURT:  That's Mr. Carpenter and Mr. Brown?

20          MR. O'NEILL:  Yes.

21          THE COURT:  Okay.  You know, Mr. McKane, you may be

22 putting up -- you may be offering the Yastine and Mackey

23 declarations as your affirmative evidence, but that doesn't

24 say -- that doesn't mean that the committee can't take the

25 depositions or obtain the discovery of Carpenter and Brown

1  documents.

2          They've represented that they've seen e-mails that

3  show a discussion between them or communications between them

4  that would show that the indemnity obligation could rise as

5  high as 70 to 120 million dollars.  That, from what I know

6  about this dispute, is directly relevant to the dispute.  So

7  the fact --

8          MR. MCKANE:  Your Honor --

9          THE COURT:  -- you know, on this accelerated

10 timetable, you're saying that at this stage, at least, no

11 search for Carpenter -- what about Brown?  Has a search been

12 made of him?

13         MR. MCKANE:  Your Honor, I believe we're in the same

14 situation with Mr. Brown as we are with Mr. Carpenter.  We're

15 not trying to unilaterally limit the scope of the collection

16 efforts to narrow the committee's examination.  We have

17 produced material as it relates to the indemnification

18 obligations that pre-dated the subservicing agreement.  We

19 produced the requested indemnification as it related to it, and

20 the back-and-forth on it.

21         THE COURT:  Are you suggesting it's not relevant to

22 this dispute if Carpenter and Brown communicate with each other

23 and indicate that the amount of the indemnity obligation may

24 increase to seventy to a hundred million dollars?  Is it your

25 position that's not relevant to this dispute?

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1      MR. MCKANE:  No, Your Honor.  But what I'm saying is

2  that specific issue was negotiated between the debtor, Mr.

3  Marano -- Mr. Marano, specifically, and Ms. Yastine.  Based on

4  our interviewing and working with the witnesses and preparing

5  them for the deposition, we understand that that issue was

6  identified by Mr. Marano to both Ally and Ally Bank, as the

7  debtors were looking for additional financing support from AFI.

8  But that specific issue was addressed at the Ally Bank level by

9  Ms. Yastine, and Mr. Mackey was aware of it in providing what

10  became the AFI DIP.

11      And materials about the AFI DIP have been provided;

12  not just the actual agreements themselves, but the back-and-

13  forth between the parties.

14      THE COURT:  Mr. O'Neill, do you have a response to

15  that?

16      MR. O'NEILL:  Your Honor, the date of this e-mail is

17  after the signing of the amended and restated subservicing

18  agreement.  And it addresses issues -- it may well relate to

19  the modification of the -- the post-petition modification of

20  the AFI DIP.  I don't know that.  But that could easily be an

21  outcome.  It seems to me directly relevant to that topic,

22  however.  The issue is how are we going to pay for these

23  increased indemnification obligations.

24      I think the way they wound up doing it was increasing

25  the amount of the DIP.  But my guess is there's an extensive

1  discussion between the date of this e-mail and the date of that

2  modification.

3          MR. MCKANE:  Your Honor, there was back-and-forth on

4  this.  It was primarily not by e-mail.  But one of the outcomes

5  of the need of the debtors for additional liquidity as it

6  related to their missed forecast on these reimbursement

7  obligations, was the AFI DIP.  It was a requested issue in the

8  discovery, and we collected and produced material on it.

9          THE COURT:  Tell me again, Mr. McKane, what Ms.

10 Yastine's schedule is.

11         MR. MCKANE:  Your Honor, look, it is undeniably

12 regrettable.  She is returning on the redeye to Newark at 7

13 a.m. on Friday.  She is going -- she asked and we made an

14 accommodation so that the deposition would start at 10 o'clock

15 on Friday.  She'll go as long as it takes on Friday to answer

16 any questions on any of these issues.  She then is planning on

17 a pre-existing leave of absence for a week to deal with a

18 personal matter as relates to her mother and then spend the

19 remainder of the week with her family out-of-state.  But she

20 does not return -- and I recognize that -- she does not return

21 until after the briefs are due.

22         THE COURT:  Returning to California on Friday?

23         MR. MCKANE:  That's correct, Your Honor.  She's -- we

24 met with her this morning.  And all I -- I wasn't trying to

25 streamline or focus.  I just know what materials we used with

1    her.  Then she left for Ally business -- bank business to

2    California, and she returns Friday morning on the redeye.

3           THE COURT:  Mr. O'Neill, what depositions are you

4    seeking to take?

5           MR. O'NEILL:  At the moment, Your Honor, an AFI

6    witness, an Ally Bank witness, and each of the three

7    declarants.  We told the debtors today that we were not going

8    to take Mr. Pensabene.  That view might change if they're now

9    telling us that they're going to offer him as a separate

10   witness as well.  But at the time, I did not understand that

11   they were going to be doing that.

12          THE COURT:  Thinking of taking either Carpenter or

13   Brown depositions?

14          MR. O'NEILL:  Well, I guess it would depend on what

15   the e-mails say.

16          MR. MCKANE:  Your Honor, this is Mr. McKane.  Just so

17   you understand the state of play, we have not received a

18   deposition request or 30(b)(6) request for Ally Bank or AFI at

19   this point.

20          THE COURT:  Mr. McKane.

21          MR. MCKANE:  All we --

22          THE COURT:  Mr. McKane, in this expedited discovery

23   schedule, I don't necessarily expect that there are going to

24   be -- that they know exactly what they're going to do.  If we

25   want to put this -- look, if you all want to put this hearing

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                        21

1   off, that's fine with me.  I'm not the one pushing this

2   hearing.

3        AFI is the one who insists that this hearing go

4   forward and that a decision be reached promptly, okay?  If you

5   want to insist on that, then you're going to have to do

6   everything conceivable to provide the committee with all the

7   discovery it requests.  Otherwise, I'm just simply going to

8   adjourn the hearing.  It's as simple as that.  Okay.  I don't

9   want to hear about these problems.  Just throw another ten or

10  twenty people on and get the Carpenter and Brown documents and

11  any other e-mails that they want.

12       If the evidence comes out that there are additional

13  e-mails that weren't searched for and found, okay, there are

14  going to be consequences.  Okay?  I didn't set this schedule.

15  You're the one -- it's AFI that's the one that's driving this

16  train.  Okay?  If you want to insist on that, then you have to

17  do everything conceivably possible to get the committee

18  everything it needs so that it can be prepared to go forward

19  with a hearing on August 16 and 17.  It's as simple as that.

20       MR. MCKANE:  Your Honor --

21       THE COURT:  I don't want to hear what your problems

22  are.

23       MR. MCKANE:  We're not identifying problems.  We're

24  not, Your Honor.  We just -- we're trying to identify the

25  situation.

1    THE COURT:  Well, that's all I hear from you is about

2   how you've done this and how you've done that, and they have to

3   go forward on Friday when you produced 13,000 documents today.

4   Okay?  You know, I feel for Ms. Yastine about her vacation; and

5   if she has family issues, that'll take a priority.  But if

6   she's got a vacation, she may have to put the vacation off.

7   The deposition can start on Friday.  If it's not concluded

8   because the committee has not had an opportunity to review all

9   the documents or they have more questions, she can go make the

10  trip for family business, but she's going to have to interrupt

11  her vacation.  It's as simple as that.  Okay?

12    Regrettable, I understand.  But look, unless you want

13  to agree to adjourn the hearing now.  You're representing AFI.

14  Do you want to agree to adjourn the hearing?

15    MR. MCKANE:  Your Honor, I'm not in a position to make

16  that offer.

17    THE COURT:  Okay.

18    MR. MCKANE:  I'm not.

19    THE COURT:  And if you're not in the position to make

20  that offer, then I am ordering that Ms. Yastine be made

21  available for deposition starting Friday morning.  If the

22  deposition's not concluded, it will -- when does her vacation

23  start?

24    MR. MCKANE:  Your Honor, she was planning to address

25  the personal issue with her mother when the deposition ceased.

1   That's why she asked for it to be in New Jersey.

2           THE COURT:  No, I didn't ask about -- yeah, but then

3   you said she was going on vacation for a week.

4           MR. MCKANE:  That's correct.  I don't know -- I'm --

5           THE COURT:  We'll not interfere with her dealing

6   with --

7           MR. MCKANE:  I don't know exactly how many days it's

8   going to take.  I don't want to get into what the issue is with

9   her mother.

10           THE COURT:  You report back to Mr. O'Neill by tomorrow

11   morning at 10, on exactly what Ms. Yastine's situation is.  If

12   she needs to deal with health issues about her mother, she

13   definitely has to do that.  But vacation is going to have to be

14   interrupted.  If they're able to complete the deposition on

15   Friday, that's fine.

16           Mr. O'Neill, under the circumstances, take the

17   deposition at Newark Airport.  I fully understand.  If she's

18   coming in on the redeye for the deposition, and then she's

19   going immediately back on business and personal matters, do the

20   deposition at Newark Airport.  But if you need more time with

21   the deponent, I'm ordering that that take place next week.  If

22   there are more problems, contact the Court, and I'll deal with

23   it.

24           But I'll just tell you, Mr. McKane, if you want to get

25   your client to agree to adjourn the hearing to allow the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      24

1   committee to take the discovery that it needs and get ready for

2   the hearing, then we'll talk about a new hearing schedule.

3   Short of that, you're going to have to do -- I regret that

4   people will have to have their vacation interrupted, but that's

5   just the way it's going to have to be.

6           Personal business, health issues about her mother?

7   Fine.  Let her take care of that first.  You indicated she was

8   then planning to take a week's vacation.  That's going to have

9   to be interrupted.

10          MR. MCKANE:  I understand -- I understand the message.

11          THE COURT:  Mr. O'Neill, work that out with Mr. McKane

12  by tomorrow morning.

13          MR. O'NEILL:  I will, Your Honor.  I think the same

14  situation, to some degree, applies to Mr. Whitlinger, who I

15  understand is taking a vacation next week.  I don't think he

16  has the same health or family-related issues that Ms. Yastine

17  has.  I think we could agree to start that deposition on Friday

18  as well, and if we don't finish it, we would ask -- we'll, I

19  guess, deal with the debtors about how to get him back to

20  conclude it next week.

21          THE COURT:  Okay, the same applies -- I'm sorry that

22  this is in -- this is coming at a time where lots of people

23  have vacations planned.  Mr. Whitlinger was the first-day

24  declarant.  He's been present in court at other hearings.  I

25  regret if his vacation is interrupted by this.  But it's not

1   the committee that's driving the dates of this hearing.  So,

2   you know, start the deposition.  Hopefully you'll be able to

3   complete it and you won't have to take up the deposition.

4   Otherwise, do the best you can to accommodate these witnesses

5   so that they can take some of the time off that they were

6   intending to take.  But you're entitled to conclude your

7   deposition.  You're also entitled to be able to get documents

8   and prepare.

9          MR. O'NEILL:  And on that note, Your Honor, we would

10  like the Brown and Carpenter e-mails.  And depending on what

11  they say, we may need to take their depositions as well.

12         THE COURT:  After this call, discuss with Mr. McKane

13  and with Mr. Lee obtaining -- or Mr. Rains, obtaining the Brown

14  and Carpenter e-mails.  And Mr. McKane, you're just going to

15  have to commit whatever resources are needed to get those

16  documents produced as quickly as possible.  Okay?

17         MR. MCKANE:  We understand the message, Your Honor.

18  We'll get it done.

19         MR. LEE:  Your Honor, it's Gary Lee.  Perhaps this

20  would be the appropriate time to address the issue that we've

21  been discussing with the examiner and see whether there's --

22  how we address, now, this rather expanded motion practice and

23  trial and the way in which it's going to fit in with the

24  examination.  I don't know if Mr. Seife is still on or if we've

25  scared him away based on this call.

1    THE COURT:  Mr. Seife?

2       MR. SEIFE:  Good afternoon, Your Honor.  Howard Seife,

3  Chadbourne & Parke.  Yes, we've had discussions both with

4  committee counsel and with debtors' counsel about concerns we

5  have based on, as Gary suggested, this upcoming trial.  And

6  certainly listening in on today's call, our issues are only

7  heightened by what we're hearing.

8       And I guess they're really twofold, Your Honor.  One

9  is, which I think you noted at one of the prior conferences,

10  many of the issues being dealt with here, both factual and

11  legal, are what the examiner has been asked to look at.  And

12  clearly the parties have to be aware that to the extent these

13  issues are aired now and Your Honor is being asked to rule on

14  any of these legal issues or make factual findings, they may

15  well have implications for the investigation, may limit the

16  investigation, or put it in a different direction.  And I'm

17  just wondering if this is really the best procedure to get to

18  the underlying facts and deal with the much bigger and broader

19  issues which the examiner has been asked to look at.

20       And the second impact we're seeing on the

21  investigation is that understandably, many of the key parties

22  here are very much preoccupied.  And they are busy producing

23  documents and preparing witnesses and reviewing e-mails

24  relating to this particular narrow issue.  And frankly, it is

25  difficult, I think, for the parties and the law firms involved

RESIDENTIAL CAPITAL, LLC, ET AL.                                                    27

1   to focus on the needs of the examiner.

2          Now, understandably, this should be a fairly limited

3   period of time, if in fact, the hearing goes forward on the

4   16th.  But our concerns are, as often is the case, that -- and

5   Your Honor has even alluded to that -- there is always the

6   possibility for adjournments or new schedules, which would

7   heighten our concerns about getting our investigation off to a

8   robust start.

9          Those are the problems.  The solution, I would not

10  think is particularly the examiner's role.  But in discussing

11  these issues with the examiner, it seems, at least to an

12  outsider, that this should lend itself to some kind of

13  commercial resolution.  The dollars don't seem to be, in the

14  magnitude of this case, to be particularly overwhelming.  And

15  it seems to me that given the talent on this call and

16  representing the various parties, there should be some way for

17  parties to preserve their rights and find some kind of interim

18  solution, whether it's escrowing the monies to be paid, whether

19  it's finding some slicing of the baby or deferral of this issue

20  to a later date after the examiner has issued his report, just

21  would make so much commercial sense, rather than distracting

22  the parties, taking up this Court's time, and putting up

23  potential delays in the examiner's investigation.

24         So that said, Your Honor, I don't know to what extent

25  the parties have been talking.  But it seems to me, as an

1   outsider looking in, that some kind of commercial resolution

2   would certainly address our concerns as an examiner to be able

3   to look at these issues unimpeded by this potential sideshow

4   and without the inherent delays that we're hearing about.

5           THE COURT:  Mr. Eckstein, can you respond to that?

6           MR. ECKSTEIN:  Your Honor, I'm happy to.  I guess

7   first, I'm not sure I would necessarily share the view that

8   100-plus million dollars of post-petition payments are not

9   significant even in the context of this case.  These are very

10  significant payments.

11          That said, I think as I had indicated, Your Honor, at

12  the status conference the other day, we have been endeavoring

13  over the last several weeks to avoid the litigation and find a

14  resolution.  And I share Mr. Seife's view that finding a way to

15  really allow AFI and ResCap to sort of preserve their

16  respective rights is a sensible thing to do.  Unfortunately,

17  Ms. Yastine of Ally Bank expects to get paid.  And I think what

18  it ultimately comes down to is finding a way for ResCap and AFI

19  to come up with a, sort of, an interim solution that, to the

20  extent possible, maintains the status quo because I don't

21  believe that Ally Bank wants to participate in this process.

22  And we, therefore, haven't suggested to Ally Bank to defer.

23          We are amenable -- we've been amenable and remain

24  amenable to try to essentially find what Mr. Seife is referring

25  to as an interim status quo solution that allows this to be

1   folded into the examination.  And toward that end, I'm

2   anticipating and, frankly, hope that there's going to be more

3   discussions.  But candidly, Your Honor, short of literally

4   negotiating this on this call, which I don't know that Your

5   Honor necessarily is inviting, there needs to be a mutual

6   desire to try to reach that conclusion and that's what we,

7   frankly, need to have happen.

8           MR. LEE:  Your Honor, it's --

9           MR. SCHROCK:  May I be heard, Gary?

10          MR. LEE:  Sure.  I mean, Judge, it's up to you.  I

11  wanted to just remark on a couple things --

12          THE COURT:  Go ahead, Mr. Lee, and then I'll give

13  somebody else a chance.

14          Go ahead, Mr. Lee.

15          MR. LEE:  So, Your Honor, I am obviously concerned

16  about the impact this hearing is going to have not just on the

17  examination but on obviously the need to deliver on a

18  subservicing agreement.  And Your Honor heard from the DOJ at

19  the last hearing.  So we are facing this from lots of different

20  sides and none of them look good.  So I have had discussions

21  with Mr. Seife and I believe this really cries out for a more

22  elegant and Solomonic resolution that leaves all of the parties

23  with their rights reserved.

24          I think fundamentally, the bank needs to be paid.  It

25  seems to me, Your Honor, that there is a solution in which the

1   debtor continues to make the payments to the bank; the

2   committee reserves the right that I think it believes is

3   fundamental which is that if the agreement is approved, it will

4   impair its rights to argue later after the examination that the

5   indemnification obligation belonged to Ally and it impairs its

6   various rights.  It seems to me, Your Honor, that it's

7   perfectly possible to fashion an order in which the debtor

8   continues to make the payments but without prejudice to the

9   investigation, the examiner's ability to look at the fair

10  allocation of indemnification obligations pre- and post-

11  petition, and that preserves the parties' position and allows

12  the committee and everybody else, after they see the examiner's

13  report, to make an informed decision as to whether or not that

14  is or isn't a claim.

15          That will allow the debtor to go about what we think

16  is fundamentally important which is servicing pursuant to the

17  servicing agreement and delivering a robust bidding process and

18  sale.  It will leave everybody where they are today, and it

19  will leave the examiner to do what Your Honor's appointed the

20  examiner to do.  So I believe there is a solution.  I don't

21  believe it is as complicated as -- no more complicated than I

22  expressed it.

23          And just to sort of clarify one thing that Mr.

24  Eckstein has said, the sum total of post-petition payments to

25  date is nineteen million dollars.  This is definitely, Your

1   Honor, a hundred million dollar issue, but from a post-petition

2   perspective, it's a nineteen million dollar issue.  There are

3   future payments to be made.  We, and I think everybody,

4   believes that the bank needs to get paid then by somebody.  My

5   suggestion is that that is an appropriate outcome reserving all

6   of these issues for another day.

7           So I will stop there, Your Honor.

8           THE COURT:  Okay.

9           MR. SCHROCK:  Your Honor, it's Ray Schrock for Ally

10  Bank.

11          From the bank's perspective, and this is critically

12  important, I think, for the Court to understand and for all the

13  parties to understand, there is an agreement in front of the

14  Court for the subservicing which everybody acknowledges is

15  extremely important to the estate.  There is a provision in

16  that agreement that says if you use the bank's loans for DOJ

17  modifications, you have to reimburse the bank for using its

18  loans to fulfill those obligations.

19          I completely appreciate everybody -- I think the right

20  solution is to allow the debtor to make those payments.  If the

21  parties want to reserve rights on that, I think that's fine.

22  But it is critically important -- listen, this is a bank issue

23  to the bank.  The bank counterparty says ResCap, by law under

24  Reg. W, you must fulfill, ResCap, your obligations which you

25  agreed to with us.  And we get in at the sideshow of these

1  indemnities and the DOJ order, and there are lots of issues

2  associated with going into that, and it really is unnecessary.

3          But I sit here and I listen to this, Your Honor, about

4  that Ally -- there's an implication that Ally or Ally Bank is

5  being difficult.  Your Honor, this company's bent over

6  backwards to do the right thing here.  We're willing to do the

7  right thing and to continue to support the debtor, but it's not

8  just a foot in the sand or a foot on the line to say that

9  ResCap has to honor its obligations under the contract.  It is

10 critically important.

11         THE COURT:  You know, Mr. Schrock, the one thing that

12 I haven't heard people do is say that it's Ally Bank.  It

13 sounds like much more of an argument between AFI and the

14 debtors.

15         MR. SCHROCK:  But, Your Honor, this is a contract --

16         THE COURT:  Well, but I've also heard that the

17 indemnity was entered into in January or thereabouts.

18         MR. SCHROCK:  Now, Your Honor, there is one agreement

19 up for approval.  There is a subservicing agreement before the

20 Court.  It says -- and ResCap signed it; it was highly

21 negotiated -- it says ResCap, if you use our loans to modify,

22 you, ResCap, will pay back.  Now, if the examiner, if other

23 parties want to go back and look and say listen, under this

24 side agreement this or that, somebody owes somebody else,

25 people should reserve rights on that.  But this agreement, to

1   ask the bank to say listen, this agreement, we're not going

2   to -- ResCap's not going to honor its obligations to pay back

3   the bank for using its property to perform under a settlement

4   to which it's not even a party and it's -- it is not something

5   that we can settle.

6           MR. ECKSTEIN:  Your Honor, if I may just briefly

7   reply.

8           Mr. Schrock wears two hats here.  And Your Honor

9   correctly points out this is not a debate between ResCap and

10  Ally Bank.  Your Honor correctly points out the debate is about

11  whether or not the responsibility is going to be allocated to

12  ResCap, which has many obligations that it has not paid, or to

13  AFI, which is jointly and severally obligated to indemnify Ally

14  Bank.  And that's what this is about.  And I understand Mr.

15  Schrock would like to mask this as a debate with Ally Bank, but

16  it's not.

17          And this is about whether it's appropriate for one-

18  hundred percent of the indemnification to be imposed on ResCap

19  and zero on AFI.  And for Mr. Lee to suggest that the right

20  status quo is to have ResCap pay a hundred percent and we can

21  chase AFI, that's a solution.  Frankly, we had proposed a

22  fifty-fifty split, and let both sides pay fifty percent in

23  respect of the indemnification and let both sides reserve their

24  rights after the examiner.  The committee thought that was a

25  reasonable compromise and we took --

RESIDENTIAL CAPITAL, LLC, ET AL.                                34

1          THE COURT:  Mr. Eckstein, have you explored -- and I

2    don't want to get into negotiating, that's not my role.  But

3    let me just ask, you raised that you had a proposal about a

4    fifty-fifty split.  Have you discussed the possibility of a

5    dollar cap on the ongoing -- on the periodic monthly

6    obligations of the debtors?

7          If this issue -- on the one hand, Mr. O'Neill talks

8    about having seen e-mails that say it could rise to sixty to a

9    hundred million dollars, and Mr. Lee says post-petition it's

10   been nineteen million dollars, on an interim basis can you try

11   and agree with AFI -- because I -- it certainly was -- no one

12   seems to be disputing that Ally Bank is entitled to payments;

13   this dispute is between AFI and ResCap as to who ought to be

14   paying and how much and when.  If you can't get an agreement

15   with respect to the percentage, have you explored whether you

16   can reach an agreement as to a dollar cap per period?

17         MR. SCHROCK:  Your Honor, I just have to -- it's Ray

18   Schrock again.  Just to make one thing --

19         THE COURT:  The question was to Mr. Eckstein.  I'll

20   give you a chance, Mr. Schrock.

21         MR. SCHROCK:  Okay.

22         MR. ECKSTEIN:  Your Honor, we have proposed the fifty-

23   fifty allocation of the indemnification obligations and we'd be

24   happy to explore other variations.  But there hasn't been

25   anything beyond that.

1     THE COURT:  And I'll give you a chance, Mr. Schrock,

2  in just a minute, but from the Court's perspective, one of the

3  things that I find least satisfying about the current situation

4  is, here, an examiner's been appointed, this agreement, the

5  indemnity obligation is very much an important issue for the

6  examiner, and you're all charging ahead with an August trial

7  that doesn't allow the examiner to do his job.  Okay.  And

8  that's very disconcerting to me.  This case is certainly -- you

9  know, I haven't been at it as long as you all have been

10  practicing bankruptcy law, but from -- and in talking to some

11  of my colleagues, it's -- the things that are pushing this case

12  are not the normal ones that we see in the court, okay?  It

13  doesn't make me particularly happy.

14     If I have to go ahead -- look, if you're going to go

15  ahead and try it, fine.  Go ahead and try and I'll decide what

16  I have to.  But I think this, in part, goes to AFI.  If I go

17  ahead and try the case and I decide issues and then the

18  examiner completes his investigation and the facts turn out

19  different than you present them, you're going to have a high

20  cost to pay with me, I'll just tell you that right now.

21     I won't want to hear later on that, well, we didn't

22  have time to find those documents, those documents that we

23  discovered six months from now, they were -- everything was

24  produced under pressure, we produced -- you're going to pay the

25  price.  I'll just tell you that right now.  That's why I say

1  you insist on this schedule, you will insist -- I insist that

2  there be absolute full document production, discovery so that

3  this case goes to trial on August 16 and 17 with the committee

4  having a full, fair opportunity to prepare.  If there turn out

5  to be surprises later, there will be a price to pay.  I just

6  want to make that clear, okay?  If everything is done the way

7  it has to be and you can't resolve this issue, I'll go ahead

8  and decide what has to be decided.  But I just want to make

9  clear to you all there will be consequences.  Okay?  I don't

10  like -- I've made this comment in open court and I've made it

11  in our chambers conference before.  I don't like anybody trying

12  to drive the result here in a way that I don't think is

13  appropriate.  Okay?  I understand all of you feel time pressure

14  and we'll see how that all plays out.

15          Mr. Schrock, you wanted to be heard.

16          MR. SCHROCK:  I did.  Thank you, Your Honor.  I've

17  heard and understood on your message.

18          One point I think that I just have to emphasize again

19  for the Court and the parties:  there is a fully integrated

20  agreement before the Court and we -- as I said to Your Honor in

21  open court last week on this matter -- we don't think getting

22  into the DOJ, the indemnification issues, all of these things,

23  is necessary or appropriate on this particular issue because we

24  believe there is a fully integrated agreement and it's

25  important to the bank that the counterparty to that agreement

1   honors its obligations under the agreement.  And so that is the

2   fundamental issue that we're struggling with, Your Honor, and I

3   fully appreciate what you're saying.

4         We are not driving an unreasonable schedule.  We have

5   a package of support, we are cooperating fully.  This is the

6   subservicing agreement with the bank that I think everybody

7   wants to get approved.  And I don't want the Court to have any

8   misimpression that we're anything other than good faith actors

9   and very reasonable about all of these things, Your Honor.  I'm

10  just trying to make the point for you, Judge, that it's really

11  an integrated agreement.  We really see it as a bank issue.

12        We're happy to talk to anybody.  I'm talking to Mr.

13  Eckstein tonight at 6:30.  I reached out to him, I said Ken,

14  why don't we go have coffee, get together and talk.  We are

15  not -- we are in court a lot, Your Honor.  We're not the kind

16  of shop that runs an unreasonable case.  We're trying our best

17  to do the right thing, here.

18        We fundamentally do see it as the bank issue and I

19  take Your Honor's comments to heart.  But I don't want you to

20  think and I don't want to understate -- and I know Your Honor

21  doesn't like to hear the regulatory overlay; I appreciate that.

22  We are a bank holding company, we're a bank and I know we have

23  to answer sometimes to parties.  But we are doing everything

24  possible -- and I just wanted to share that for Your Honor --

25  to cooperate with the examiner, and we're meeting with him

1  tomorrow, and I don't want an unnecessary fight.  I think it's

2  the last thing AFI or Ally Bank wants.  We're trying to do the

3  right thing and support this company to a sale and we hope a

4  pre-arranged plan.  And that's what we signed up for.

5          MR. ECKSTEIN:  Your Honor, at the risk of belaboring

6  this call, two points.  First of all, I will admit that Mr.

7  Schrock and I are going to probably have drinks and not coffee.

8  But --

9          MR. SCHROCK:  That's true, Your Honor.

10         MR. ECKSTEIN:  -- more substantively, the problem, I

11 think as Mr. Schrock understands, is that this is an integrated

12 agreement that was crafted by AFI together with ResCap prior to

13 the filing and presented to us sort of as a package.  And

14 unfortunately, it's going to require the Court's determination

15 of whether or not this package was reasonable.  And we don't

16 believe it was reasonable in shifting a hundred percent of

17 these responsibilities to ResCap.  And that's simply -- and

18 there's a substantive disagreement on that.

19         But with all that said, and we understand that they

20 would like the Court to approve the agreement that they

21 crafted, and we're either going to be able to reach a

22 resolution or we'll have to present it to the Court and the

23 Court will have to make -- determine whether or not this

24 package is reasonable.  And we understand as much as everybody

25 else in this case the number of issues that are involved, and

1   so I would say at this point in time, Mr. Schrock and I are

2   going to sit down.  And I think we've all said that we'd like

3   to try to see if we can reach a resolution and we will continue

4   to try and I think we'd be happy to come back and report to the

5   Court again next week, if that would be useful.  But I think

6   that both sides have to understand that they need to come to

7   the table, and if there's really a desire to not litigate this

8   issue now and to come up with a real status quo solution, then

9   I would suggest that AFI has to understand that as much as

10  ResCap.

11          This is not Ally Bank; AFI and ResCap are going to

12  have to understand how to preserve the status quo if that's

13  what the parties want to do.

14          MR. LEE:  Your Honor, sorry; it's Gary Lee.  I just

15  want to be absolutely clear what ResCap's position is.  I think

16  that we are the ones that are alerting to the Court and the

17  examiner to the fact that we are concerned that, as Mr.

18  Eckstein lays out, this trial will get into far more than the

19  four corners of the indemnity and that goes to the heart of the

20  examiner's investigation.  And that causes us some pause,

21  number one.

22          And number two, what I think we were attempting to

23  suggest was between the position that AFI has and the committee

24  has -- because ResCap has one position and one position only:

25  we need the subservicing agreement approved so we can,

1  consistent with our fiduciary obligations, get the highest

2  purchase price and return to the creditors.

3          As to where the indemnity ultimately lies as opposed

4  to who needs to pay the bank back, the examiner will make that

5  determination if he is allowed to proceed with his examination.

6  He will make that determination and he will make those facts

7  known to the creditors when he issues his report.  And what I'm

8  simply suggesting and trying very hard to convince everybody of

9  is that there has to be a solution in which the bank gets

10 paid -- and I appreciate Mr. Eckstein doesn't like the notion

11 that it's ResCap who pays it -- that everybody reserves their

12 rights.  And if necessary, AFI -- and I'm happy to volunteer --

13 escrows the money somewhere else.  And the right solution, Your

14 Honor, is one that nobody likes.  And in this situation that

15 might be the right solution.

16         But the servicing agreement needs to be approved.  And

17 that is what will provide the best value to creditors and that

18 is, quite frankly, what we're concerned with, not what will

19 become not just a sideshow, but a very large side show.

20         THE COURT:  All right.  Let me deal with the issues

21 that I have to deal -- you know, I think you all ought to sit

22 down and have a good drink with -- Mr. Eckstein, have an extra

23 one for me.  Hopefully --

24         MR. ECKSTEIN:  Well, how about vino, Your Honor?

25         THE COURT:  Okay.  But in the meantime, Mr. O'Neill?

1          MR. O'NEILL:  Yes, sir?

2          THE COURT:  What documents do you require -- have you

3   requested that have not been produced, by category?  Whether

4   it's the Carpenter and Brown e-mails -- lay out for me what is

5   it that you believe have not been searched for or produced so

6   far.

7          MR. O'NEILL:  We believe that the Carpenter and Brown

8   e-mail accounts have not been searched at all with respect to

9   our document request to Ally Bank and --

10          THE COURT:  Have you given search terms?

11          MR. O'NEILL:  We have not; we have not been requested

12   to give search terms.  But we also think it's also two accounts

13   and so, therefore, it's not that onerous.  But we're happy to

14   give search terms if that will facilitate matters.

15          THE COURT:  What time period?

16          MR. O'NEILL:  My understanding is they only have them

17   going back for a period of ninety days.  Well, I guess to

18   January.  We've agreed to go back to January 1 of this year

19   with the debtor and I don't think we would require more of Ally

20   Bank or AFI.

21          THE COURT:  Okay.  What else?  The Carpenter and Brown

22   e-mails, what else?

23          MR. O'NEILL:  Yastine and Mackey, if those are their

24   two 30(b)(6) witnesses.  Same general conditions and we're

25   happy to get them search terms.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    42

1        THE COURT:  E-mails, January 1, 2012.

2        MR. O'NEILL:  Yes.

3        THE COURT:  I can acknowledge that the Carpenter and

4   Brown e-mails weren't searched.  I'm not sure what the answer

5   is as to Mackey and Yastine.

6        MR. O'NEILL:  Yastine is vague --

7        MR. MCKANE:  Your Honor --

8        MR. O'NEILL:  Excuse me; go ahead, Mr. McKane.

9        THE COURT:  McKane, go ahead.

10        MR. MCKANE:  Thank you, Your Honor.  We had done

11   targeted searches of Yastine.  We understand what you're

12   saying.  Right.  We will --

13        THE COURT:  Wait, you're going to understand what I

14   say because I'm going to give you a deadline.  But, go ahead.

15        MR. MCKANE:  We will conduct the e-mail searches and

16   produce any documents identified in the time period with the

17   search terms provided.

18        THE COURT:  Well, let me --

19        MR. MCKANE:  And we will double back and do Yastine

20   and Mackey as well as Brown and Carpenter.  And because we --

21   we had done targeted searches before but we want to do this in

22   a comprehensive process that satisfies the committee.

23        THE COURT:  And are you telling everyone that those

24   searches will be complete and the documents produced?

25        MR. MCKANE:  Your Honor, until I -- I don't have a

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    43

1  sense of the volume until the search is run.  That's just a

2  technical matter and so I think I will be able to do that, but

3  I will communicate it as soon as I get the information.  And I

4  understand what the Court said earlier about Ms. Yastine in

5  terms of coming back.

6           THE COURT:  Well, I'm going to put a finer point on

7  it.  E-mails of Yastine, Mackey, Carpenter and Brown shall be

8  produced, all responsive documents shall be produced no later

9  than 12 noon Wednesday, August 8th.  With respect to Yastine

10 and Mackey, it should be sooner than that because you've

11 indicated you've already done a targeted search of them.  So by

12 giving you this outside deadline, don't wait until then.  But

13 I'm telling you that is the deadline.  I don't care what

14 resources you need to commit to getting these documents.

15 That's already longer than, frankly, makes me comfortable given

16 when the hearing is.

17          That is, I'm so ordering the transcript that all

18 responsive documents in the Carpenter and Brown e-mails shall

19 be produced on or before 12 noon August 8th and as to Yastine

20 and Mackey -- they ought to be produced on a rolling basis, if

21 you can.  And Yastine and Mackey, please advise Mr. O'Neill

22 what additional steps need to be taken searching those two.

23 You've indicated as to Carpenter and Brown, that hasn't been

24 done yet.

25          Mr. O'Neill, anything else that you need?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    44

1    MR. O'NEILL:  Your Honor, just one follow-up point.

2  And that is to the extent that we need to -- we're obviously

3  going to need to take depositions after we get the e-mails and

4  so we'll need the flexibility to take them between the 9th and

5  the 16th.  And I know Your Honor's pre-trial procedures require

6  the submission of all deposition designations by the 9th.  So I

7  guess we just need an exception from that in order to pursue

8  these additional depositions.

9    THE COURT:  You'll advise what additional depositions

10  you're planning to take.

11    MR. O'NEILL:  Okay.

12    THE COURT:  Obviously, I will -- if you can't take the

13  deposition until you have these e-mails -- look, there's

14  nothing to stop you from -- you already have some documents

15  relating to Carpenter and Brown.  If you're going to go ahead

16  and -- while it would be nice to be able to get these done in

17  one sitting, you don't have to wait until everything is done.

18    MR. O'NEILL:  Very well, Your Honor.

19    THE COURT:  Any other issues about discovery, Mr.

20  O'Neill?

21    MR. O'NEILL:  No, I think that's it, Your Honor.

22    THE COURT:  All right.  I want to schedule another

23  telephone conference.  You'll have to bear with me because I'm

24  taking this call from home so I'm not in the court; this is

25  being recorded by an ECRO from -- takes me a minute to get my

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                        45

1   full calendar.

2          (Pause)

3          THE COURT:  The next thing I'd like to do, we have a

4   hearing scheduled for Wednesday the 8th, 2 o'clock.  We're

5   going to continue this, a status conference with respect to

6   this matter Wednesday the 8th at 2 o'clock.  Well, first, I

7   assume, we'll take up the KEIP-KERP?

8          MR. LEE:  Yes, Your Honor.

9          THE COURT:  At the conclusion of that, I know there a

10  couple of other things that are on, as well, but we'll take

11  this up.  I want a full status report of where things stand at

12  that time.

13         Nothing anybody wants to raise today?

14         Mr. Eckstein?

15         MR. ECKSTEIN:  Yes, sir?

16         THE COURT:  Find a solution.

17         MR. ECKSTEIN:  As Your Honor knows, I am singularly

18  focused on finding a solution.

19         THE COURT:  I don't mean to pick on you for that,

20  but --

21         MR. ECKSTEIN:  I understand, Your Honor.  That's fine.

22  I will try to do what we can and will surely try to report back

23  by the 8th.

24         THE COURT:  Okay.

25         MR. ECKSTEIN:  Okay.  Thank you, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    46

1          THE COURT:  We're adjourned.

2          (Whereupon these proceedings were concluded at 5:03 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

1

2                                      I N D E X

3

4                                      RULINGS

5                                                          Page        Line

6    E-mails of Yastine, Mackey, Carpenter and          43           7

7    Brown shall be produced; all responsive

8    documents shall be produced no later than 12

9    noon Wednesday, August 8th

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

48

# C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  August 2, 2012