MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Jamie A. Levitt
Lorenzo Marinuzzi
Jordan A. Wishnew

*Counsel for the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---

### DEBTORS' REPLY TO THE OBJECTION BY THE UNITED STATES TRUSTEE TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS <u>ADMINISTRATIVE EXPENSES</u>

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

REPLY ................................................................................................................................... 3

    A.    Section 503(c)(1) Does Not Apply to the KEIP ................................................... 3

    B.    The KEIP And The KERP Satisfy The Business Judgment Test and the
         *Dana II* Test ........................................................................................................ 7

         1.    The Relationship Between the KEIP, the KERP and the Results To
             Be Obtained ....................................................................................... 8

         2.    The KEIP And The KERP Are Reasonable............................................. 11

         3.    The KEIP and KERP Do Not Discriminate Unfairly ............................. 14

         4.    The KEIP and KERP Are Appropriate Within Industry Standards ......... 16

         5.    The Debtors Engaged in Substantial Due Diligence............................... 17

         6.    The Committee, Representing All Unsecured Creditors, Does Not
             Oppose The Plans ................................................................................. 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

In re Allen Family Foods, Inc., Case No. 11-11764 (KJC)
(Bankr. D. Del. July 13, 2011) .................................................................................5

In re Allied Holdings, Inc., 337 B.R. 716 (Bankr. N.D. Ga. 2005) ...............................................15

In re Borders Group, Inc., 453 B.R 459 (Bankr. S.D.N.Y. 2011). ...................................................5

In re Brooklyn Hosp. Ctr., 341 B.R. 405 (Bankr. E.D.N.Y. 2006)...............................................15

In re Dana Corp., 351 B.R. 96 (Bankr. S.D.N.Y. 2006) ...................................................................4

In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006) ...................................................... passim

In re Diamond Glass, Inc., Case No. 08-10601 (CSS)
(Bankr. D. Del. May 8, 2008) .................................................................................5

In re Global Home Prods., LLC, 369 B.R. 778 (Bankr. D. Del. 2007)......................................4, 8

In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC)
(Bank D. Del. May 29, 2007) .................................................................................5

In re Velo Holdings, Inc., Case No. 12-11384 (MG)
(Bankr. S.D.N.Y. June 6, 2012) .................................................................................5

FEDERAL STATUTES

11 U.S.C. § 503(c)(1)................................................................................................................3

11 U.S.C. § 503(c)(3)............................................................................................................7, 8

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

               The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**")[1] submit this reply (the "**Reply**"),[2] to the objection by the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") to the *Debtors' Motion for an Order Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) a Key Employee Incentive Plan for Certain Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses* [Docket No. 812] (the "**Objection**") [Docket No. 987].[3] In support of the Reply, the Debtors also concurrently submit the declaration of John E. Mack (the "**Mack Decl.**") and supplemental declarations by John Dempsey, Ronald Greenspan, and Anne Janiczek.  In further support of the Reply, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## PRELIMINARY STATEMENT

        1.     The Court should approve the KEIP and the KERP to ensure that the Debtors will have the vital human resources to maximize the Debtors' ability to continue operating as a going concern, while concurrently attempting to sell and transition the Debtors' businesses to the purchaser(s) that will result in creditors receiving maximum value for the assets.

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of the Chapter 11 Petitions and First Day Pleadings, filed with the Court on the Petition Date (the "**Whitlinger Affidavit**") [Docket No. 6].

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Reply may refer to http://www.kccllc.net/rescap for additional information.

[3]    Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

2.    The U.S. Trustee's assertion that because the KEIP bonuses vest "upon the closing of sales that have already been negotiated" and the targets are therefore not "difficult to reach" presupposes that closing the sale of the Debtors' businesses is a foregone conclusion. Objection at 18.  The Objection does not properly recognize the substantial risks that the Debtors are seeking to mitigate through the KEIP and KERP plans, the relative difficulty and benefits of earning an award under the plan, and the critical importance of retaining the Key Employees.

3.    Contrary to the U.S. Trustee's arguments, the KEIP and KERP are reasonable and justified based upon the unprecedented complexity of the Debtors' cases.  Significantly, the Debtors continue to operate their businesses thereby avoiding the fate of many others in the financial services industry that were forced to seek bankruptcy protection – piecemeal liquidation. The Debtors and their employees have painstakingly worked toward the singular goal of selling their businesses as a going concern to maximize the recoveries for their stakeholders.  This has required, out of necessity, the Debtors' employees to take on significant additional responsibilities, some anticipated and others not, the scope of which are unknown and impossible to forecast through the remainder of these cases.  The U.S. Trustee's suggestion that the thresholds established by the Debtors for vesting of KEIP payments are easily met ignores the history of bankruptcy filings of mortgage servicers.  In sum, the mere fact that the Debtors have negotiated stalking horse bids does not automatically guarantee a successful closing.

4.    The KEIP is primarily incentive-based, and the Debtors have and continue to provide relevant information to parties in interest – and have set forth additional information in this Reply and in the supplemental declarations of Anne Janiczek (the "**Janiczek Suppl. Decl.**"), Ronald Greenspan (the "**Greenspan Suppl. Decl.**") and John Dempsey (the "**Dempsey Suppl. Decl.**," and together with the Mack Decl., the Janiczek Suppl. Decl. and the Greenspan Suppl.

Decl., the "**Supplemental Declarations**"), filed contemporaneously herewith. The mere fact that

the KEIP requires the KEIP Participants to see the sales process through the closing does not

make the KEIP a retention plan.  Furthermore, the Debtors have sufficiently established a record

that the KEIP and KERP both satisfy the <u>Dana II</u> factors warranting approval of the Motion.

5.    Equally important, the committee representing the Debtors' unsecured creditors

(the "**Committee**") believes the relief sought in the Motion is designed to incentivize the KEIP

Participants to maximize the value of the Debtors' estates for the benefit of all stakeholders.

6.    For all of the reasons set forth herein, the Objection should be overruled and the

Motion should be granted.

## REPLY

### A.    Section 503(c)(1) Does Not Apply to the KEIP.

7.    As more fully set forth in the Motion, section 503(c)(1) of the Bankruptcy Code

does not apply to the KEIP because the KEIP payments are not being made "for the purpose of

inducing such person to remain with the debtor's business." 11 U.S.C. §§ 503(c)(1); Motion ¶¶

23-25.  Instead, the proposed payments incentivize senior management to maximize value for

stakeholders by continuing to perform their day-to-day job functions and taking on the

significant additional duties related to the restructuring and required to close the Asset Sales.  <u>Id</u>.

¶¶ 23-35, 36; Greenspan Decl. ¶¶ 23-24, 42; Greenspan Suppl. Decl. ¶¶ 7-12.  This is no small

task given the size and complexity of the Debtors' businesses and the lack of any blueprint for

successfully steering a mortgage servicing business through bankruptcy to the closing of a going

concern sale. Greenspan Decl. ¶ 12; Dempsey Suppl. Decl. ¶¶ 4, 6.  Indeed, <u>Dana II</u>, cited by the

U.S. Trustee, addresses exactly what the Debtors seek to accomplish through the KEIP, and

confirms that section 503(c) is "not intended to foreclose a chapter 11 debtor from reasonably

compensating employees, including 'insiders,' *for their contribution to the debtors'*

3

*reorganization.*" In re Dana Corp., 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006); see also In re

Global Home Prods., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (citing Dana II) (accord).

8.      Whether a payment is incentive- or retention-based depends upon the facts and

circumstances of each case. The Objection mischaracterizes the Motion and the Supporting

Declarations in an attempt to paint the KEIP as a disguised retention plan. See generally

Objection at 11-13.[4]  The U.S. Trustee mistakenly associates general references to the Debtors'

prepetition efforts to proactively manage employee attrition to support the U.S. Trustee's

argument that the KEIP is a retention plan.  From 2008 to 2012, the Debtors' workforce was

reduced from more than 9,000 employees to 3,625 as of the Petition Date.  See Janiczek Decl. ¶¶

4, 11.  As discussed in the Motion, it has always been the Debtors' primary goal for establishing

the BCIP and the KEIP to incentivize those senior executives that are critical to the sales process

and closing the Asset Sales.  Motion ¶¶ 6, 39.  Any retentive aspect of the KEIP is simply

incidental to the Debtors' tying the vesting of the KEIP awards to the closing of the Asset Sales.

9.      Moreover, the U.S. Trustee's citation to Dana I is off the mark.  Dana I had a

critical distinguishing factor that the U.S. Trustee ignores: the bonuses there were payable

"*regardless of the outcome of the[] cases,*" and were tied to nothing at all "other than *staying*

*with the company until the Effective Date.*" In re Dana Corp., 351 B.R. 96, 102 (Bankr. S.D.N.Y.

2006) (emphasis added).  Here, to the contrary, the KEIP clearly defines multiple milestones that

must be achieved before any awards vest.  As discussed in the greater detail in the Motion and

the Supporting Declarations, an overwhelming portion of the total target KEIP awards vests with

---

[4]      The Objection is also unclear as to whether the KEIP is primarily retentive because (a) it is designed to
encourage its employers to remain with the Debtors through the tenure of the Chapter 11, Objection at 12, or (b) the
Debtors' intention is to reward management simply for remaining until the closing date. Objection at 13.  In either
case, the U.S. Trustee is simply wrong.

the closing of each asset sale (i.e., the Platform Sale and the Legacy Sale) while the financial and

operational milestones vest on a different schedule.   Motion ¶ 24; Greenspan Decl. ¶ 34.  The

stated goal of the KEIP is to close a sale of the businesses as a going concern. Thus, the KEIP

award payments are most definitely tied to something "other than staying with the company until

the Effective Date."

10.     Incentive programs tied to the consummation of sale transactions coupled with

financial and operational goals have been approved by courts in this and other districts. See, e.g.,

In re Velo Holdings, Inc., Case No. 12-11384 (MG) (Bankr. S.D.N.Y. June 6, 2012) (Docket No.

232) (approving sale related incentive plan based upon DIP budget goals); In re Borders Group,

Inc., 453 B.R. 459, 471 (Bankr. S.D.N.Y. 2011).  This is true even in cases involving a stalking

horse bidder.  In re Diamond Glass, Inc., No. 08-10601 (CSS) (Bankr. D. Del. May 8, 2008)

(Docket No. 312)[5]; In re Allen Family Foods, Inc., No. 11-11764 (KJC) (Bankr. D. Del. July 13,

2011) (Docket No. 173); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bank D.

Del. May 29, 2007) (Docket No. 896)[6].  Significantly, the Diamond Glass court recognized that a

business that is "very volatile, competitive, people intensive is a poster child for a management

incentive plan."  See Transcript of hearing at 88-89, Diamond Glass.  As stated earlier, the

Debtors' businesses are in a highly competitive, relationship and service driven industry.  The

Debtors are not simply offering the KEIP Participants a bonus to "hang around" until closing

because to do so would be retentive.  Id. at 18.  The Debtors do not have that luxury.  Failure to

maintain a high performance level, which includes providing world class service, maintaining

business relationships and executing on business strategy, will impact the sales process.  See

---

[5]     Excerpts from the transcript of the Diamond Glass hearing dated May 8, 2008 are annexed hereto as Exhibit 1.

[6]     Excerpts from the transcript of the New Century hearing dated April 12, 2007 are annexed hereto as Exhibit 2.

generally Janiczek Suppl. Decl. ¶¶ 24-34. Thus, the performance level needed from the KEIP

Participants and required for the bonus awards to vest is directly related to the value of the

business and to the Debtors' ability to close the Asset Sales.  See Greenspan Suppl. Decl. ¶ 3; see

Dempsey Suppl. Decl. ¶ 6.

11.     The Debtors proposed the KEIP to incentivize the KEIP Participants to (a)

continue operating the Debtors' businesses in a manner that will promote efficiency and maintain

value, (b) work toward closing the Asset Sales and (c) deliver maximum value to stakeholders.

See Janiczek Suppl. Decl. ¶ 29; Mack. Decl. ¶¶ 6-7.  In particular, the value to be derived from

the Platform Sale is tied to the Debtors' ability to close the sale of the business on a going

concern basis. The mere fact that the KEIP requires KEIP Participants to remain through the

closing does not render the KEIP a retention plan – rather it aligns rewards with results.  The

Debtors would not otherwise be able to deliver maximum value to their stakeholders if the

Debtors did not have the personnel in place that are necessary to close the sale.  It is

counterintuitive for the U.S. Trustee to suggest that, in a case involving a proposed sale, the

KEIP would be primarily retentive because the KEIP Participants are required to be employed

through the closing for the awards to vest.

12.     In addition, the Trustee also seeks to establish new evidentiary requirements,

without citing to any applicable precedent, for the Debtors (a) detailing the nexus between the

proposed bonuses and the increased hours and responsibilities for each employee and (b)

showing the KEIP Participants would not perform the additional work in the absence of the

bonuses.  See Objection at 13.  This is not, and should not be, the law.  The U.S. Trustee's

argument in this regard necessarily implies that *no* insider should ever receive a bonus because

they are already being paid. Just because the KEIP Participants are working diligently to

ny-1052616

complete all the additional responsibilities with which they are tasked does not mean that they
are ineligible to receive an incentive bonus. Moreover, it would be impossible to forecast every
task and the hours required to complete such tasks during the pendency of these bankruptcy
cases.  That is why Dana II and other courts require that the plan have a reasonable relationship
with the desired result, which in these cases, requires the KEIP Participants to continue to
effectively operate the businesses and manage the sales process to maximize the value to be
realized from the Asset Sales.

13.    The final basis for the U.S. Trustee arguing that the KEIP is a retention plan is
premised upon the incorrect theory that that KEIP is designed to replace both the BCIP and
certain discretionary pay.  See Objection at 20.  Neither the KEIP nor the BCIP was intended to
replace discretionary pay. Janiczek Decl. ¶ 11.   Each was intended to compensate and
incentivize employees for the extensive additional responsibilities undertaken to restructure the
Debtors' businesses.  Id.; Mack Decl. ¶¶ 4, 6.  While the KEIP and KERP are intended to
provide employees with a substantially similar economic benefit as the BCIP, the KEIP is a
separate plan, with specific performance requirements, structured to comport with the
requirements of the Bankruptcy Code.  Mack Decl. ¶ 6.  Furthermore, the target KEIP payouts
are likely to have limited retentive effect on the KEIP Participants due to the size of the bonus
payments relative to their total direct compensation.  Accordingly, the structure of the KEIP is
not consistent with a plan that is primarily retentive.

**B.**     **The KEIP And The KERP Satisfy The Business Judgment Test and the *Dana II*
Test.**

14.    As set forth in the Motion, the KEIP and KERP both satisfy the factors set forth
by Dana II to determine whether a bonus plan satisfies section 503(c)(3) of the Bankruptcy Code.

See generally Motion ¶¶ 43-48. The U.S. Trustee's interpretation of these factors is inconsistent

with, and unsupported by, legal precedent.

15.     Courts in this district have looked to the following Dana II factors to determine

whether incentive plans satisfy section 503(c)(3) of the Bankruptcy Code:

- whether there is a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, whether the key employee will stay for as long as it takes for the debtor to reorganize or market its assets, or in the case of a performance incentive, *is the plan calculated to achieve the desired performance*;

- whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earning potential;

- whether the scope of the plan is fair and reasonable, *i.e.*, whether it applies to all employees or discriminates unfairly;

- whether the plan is consistent with industry standards;

- whether the debtor engaged in due diligence to investigate the need for the plan, which employees needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

- whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

See Dana II, 358 B.R. at 576-77 (citations omitted) (emphasis added); see also Global Home

Prods., 369 B.R. at 786 (applying Dana II factors). The U.S. Trustee has acknowledged that the

analysis conducted under section 503(c)(3) of the Bankruptcy Code is "less rigorous." See

Objection at 18.

    1.     The Relationship Between the KEIP, the KERP and the Results To Be Obtained.

16.     It is unclear what the U.S. Trustee means when it complains that "[t]he Debtors

have not established a nexus…between the KEIP and the results sought to be achieved." See

Objection at 18.  As set forth more fully in the Greenspan Supplemental Declaration, each metric

by which the KEIP Participants' performance will be evaluated has been specifically designed to

maximize value realized through the Asset Sales, thereby aligning the interests of the KEIP

Participants with the Debtors' stakeholders. Greenspan Suppl. Decl. ¶¶ 3, 24-34.

17.    The U.S. Trustee states that under <u>Dana II</u>, "the benchmarks for the payment of

bonuses must be 'difficult *targets* to reach,'" but then suggests a new test requiring "that the

Asset Sales would not close absent payment of the bonuses." <u>See</u> Objection at 18 (quoting <u>Dana</u>

<u>II</u>, 358 B.R. at 583) (emphasis added).  The U.S. Trustee's conclusion that the performance

metrics are "not difficult to reach" targets shows a complete disregard for the complexity of the

Debtors' businesses and the substantial risks related to closing the Assets Sales that remain.  <u>See</u>

Greenspan Suppl Decl. ¶¶ 7-12.  The Debtors' businesses face many challenges that require the

KEIP Participants to maintain the highest level of performance despite the significant demands

on their time and the distractions that are inherent in a bankruptcy case. <u>See</u> <u>generally</u> Janiczek

Suppl. Decl. ¶¶ 24-34.   The unrebutted evidence is that guiding the Debtors through the

bankruptcy process will be challenging given the size, scope and complexity of the Debtors'

businesses while consummating a going concern sale will be unprecedented for a debtor in the

mortgage servicing industry. Greenspan Decl. ¶ 12; Greenspan Suppl. Decl. ¶¶ 7-8; Janiczek

Suppl. Decl. ¶ 24.

18.    To further incentivize employees to work towards a value maximizing closing, the

KEIP provides KEIP Participants with the opportunity to receive an enhanced sale award should

the actual proceeds from the Platform Sale or Legacy Sale exceed the Court-approved stalking

horse bids.  Motion.¶¶ 24, 43; <u>see</u> Greenspan Decl. ¶¶ 34.  As a result of the Court approving

stalking horse bids greater than those originally proposed by the Debtors, stakeholders may

receive an additional $175 million more than the original stalking horse bids.  Greenspan Suppl.

Decl. ¶ 13.  Thus, the bar has been raised even higher for the KEIP Participants to qualify for an

enhanced Sales award.  The Objection misses the point by suggesting that the KEIP Participants

may earn a larger bonus based on market forces largely outside the control of the Debtors and the

KEIP Participants. <u>See</u> Objection at 18.  Although that may or may not be true (market forces

can also negatively impact the stalking horse and other bidders), the U.S. Trustee's position

ignores the impact of the covered employees on the sale of the operating business.  This is not an

ordinary sale of real estate or simple assets.

19.     In addition to the Sales Milestones, 30% of the KEIP awards are tied to financial

and operational performance.  Motion ¶ 24; Greenspan Decl. ¶ 34.  Each of these metrics is

designed to require KEIP Participants to continue to operate at high levels.  Greenspan Suppl.

Decl. ¶ 3.  The KEIP Participants will have to work under intense pressure to earn the KEIP

awards.  <u>See generally</u> Greenspan Decl. ¶¶ 5-6, 8-9, 13-14.  Indeed, the KEIP plan requires work

"beyond . . . ordinary job duties." <u>See</u> Janiczek Decl.¶ 13; <u>see</u> Greenspan Decl. ¶¶ 22-24

(containing list of additional duties to be performed by the KEIP Participants); <u>see also</u>

Greenspan Suppl. Decl. ¶¶ 8-10; <u>see generally</u> Janiczek Suppl. Decl. ¶¶ 24-34.  Moreover,

causing the company to survive Chapter 11 and transition the Debtors' businesses as a going

concern is certainly not part of the KEIP Participants' regular day-to-day duties. <u>See</u> Janiczek

Decl.¶ 13; <u>see</u> Greenspan Decl. ¶¶ 23-24; <u>see</u> Janiczek Suppl. Decl.¶ 27-29.

20.     The Motion and the Greenspan Declaration set forth an abundance of facts in

support of the analysis and decision to put in place the specific milestones. Motion ¶¶ 35-37, 43-

48; Greenspan Decl. ¶¶ 17-24.  The Greenspan Supplemental Declaration contains additional

facts and analyses showing this relationship. Greenspan Suppl. Decl. ¶¶ 5-6, 8-10, 13-14.

Accordingly, the U.S. Trustee's suggestion that the targets are "slam dunks" is unsupported by

the facts.

ny-1052616

     2.       <u>The KEIP And The KERP Are Reasonable.</u>

21.     The Objection argues that there is insufficient evidence to conclude that the cost of the plans is reasonable.  Objection at 19.  The U.S. Trustee fails to acknowledge the significant analysis undertaken by Mercer to ensure the costs of the KEIP and the KERP are reasonable and within industry standards.  The <u>Dana II</u> test requires a determination that the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earning potential.  <u>See Dana II</u>, 358 B.R. at 576-77 (citations omitted).  The Debtors retained Mercer to analyze the reasonableness of the KEIP and KERP.  Mack Decl. ¶ 7. Specifically, Mercer's mandate was to: (a) compare the KEIP and KERP, on an individual plan and a total cost basis, against twenty-one other plans involving substantial asset sales under section 363 of the Bankruptcy Code and (b) conduct a market analysis of total compensation for 37 job functions and (i) analyze the impact that target KEIP and KERP payouts would have on total compensation and (ii) determine where the KEIP Participants and Key Employees would fall within the competitive market compensation ranges vis-à-vis the Debtors' historical target compensation positioning in the market.  <u>See</u> <u>generally</u> Dempsey Decl. ¶¶ 19-28.

22.     The U.S Trustee either failed to notice or ignored Mercer's comparative analysis of KEIP Participant and Key Employee compensation levels to the market.  Dempsey Decl. ¶ 28. The Debtors' compensation policy is to offer market-competitive compensation, targeting overall compensation at the market 75th percentile.  <u>Id</u>. ¶ fn. 3.  As set forth in the Dempsey Decl., based on analyses performed by Mercer, assuming target KEIP and KERP payouts, total direct compensation for KEIP Participants and Key Employees would be above the market median, but below the target 75th percentile.  <u>Id</u>. ¶ 28.

11

23.    The Objection further questions the reasonableness of the KEIP by asserting the KEIP Participants' total compensation is unclear.  <u>See</u> Objection at 19.  As support for her position, the U.S. Trustee refers to a statement in the Motion which indicates that more than 50% of the KEIP Participants' historical annual compensation is at risk because of the bankruptcy proceedings.  <u>Id</u>.  The Debtors have subsequently provided additional information related to the KEIP Participants and Key Employee total direct compensation.  <u>See</u> Janiczek Suppl. Decl. ¶ Ex.1.

24.    As set forth in greater detail in the Janiczek Supplemental Declaration, the Debtors, as a wholly-owned subsidiary of a TARP recipient, must comply with TARP regulations regarding employee compensation for those employees that fall within the top-100 most highly compensated employees of AFI (defined below), including its subsidiaries, or should the employee's cash compensation exceed $500,000 in a calendar year.  <u>See</u> Janiczek Suppl. Decl. ¶¶ 9, 11 fn.6.   The modifications proposed by AFI to the proposed order do not impact the analysis of the reasonableness of the KEIP or KERP.  The only impact will be felt by certain KEIP Participants who will have a portion of their award bonuses deferred under the TARP rules. <u>Id</u>. ¶ 6.

25.    The U.S. Trustee also believes the statement filed by Ally Financial Inc. ("**AFI**") on August 1, 2012 (the "**AFI Statement**") [Docket No. 970], which refers to a tentative agreement reached between AFI and the Debtors regarding each parties' responsibilities for payment of prepetition and postpetition deferred compensation owed to certain of the Debtors' employees, adds to the perceived uncertainty over the reasonableness of the KEIP.  <u>See</u> Objection at fn.4, 20.  The Debtors' agreement with AFI, which at this point is not yet finalized, would require AFI to pay all obligations owed to the Debtors' employees on account of

compensation earned by those employees prior to the Petition Date, payment of which was

deferred due, in part, to TARP compensation rules, and is therefore not payable to the employees

until after the Petition Date.    The agreement with AFI would also require the Debtors to

reimburse AFI for all obligations owed to the Debtors' Top 25 employees related to

compensation earned post-petition, regardless of whether such obligations are paid in cash or in

the form of deferred stock units issued by AFI due to TARP compensation rules.

26.    Essentially, the U.S. Trustee is trying to create an issue where one does not exist.

To be clear – for services provided during calendar year 2012, the KEIP Participants and the Key

Employees are only guaranteed their base salary.  Motion ¶ 22.  The compensation obligations to

be paid by AFI, as referred to in the AFI Statement, were earned by the Debtors' employees prior

to the Petition Date.  The timing of the payment of these obligations should not factor into the

inquiry as to the reasonableness of the KEIP or KERP.    Moreover, potential discretionary

variable pay awards have not been factored into the cost analysis because (a) no discretionary

variable pay has been awarded for 2012[7] and (b) the Debtors are not seeking the Court's

approval to make payments under the Discretionary Variable Pay Plans.  The Wages Order

requires the Debtors to obtain Court approval prior to making any payments under the

Discretionary Variable Pay Plans.  Wages Order ¶ 4.  However, if discretionary variable pay

were factored into the analysis (based on actual 2011 awards), total direct compensation for

---

[7]    On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Under Bankruptcy Code Sections 105(a), 363(b), 507(a), 1107 and 1108 and Bankruptcy Rule 6003 (i) Authorizing, But Not Directing, the Debtors to (a) Pay and Honor Prepetition Wages, Compensation, Employee Expense and Employee Benefit Obligations; and (b) Maintain and Continue Employee Compensation and Benefit Programs, and (ii) Directing Banks to Honor Prepetition Checks and Transfer Requests for Payment of Prepetition Employee Obligations* [Docket No. 43] ("**Wages Motion**").  On May 16, 2012, the Court approved the Wages Motion on an interim basis [Docket No. 93]. After the hearing held on June 12, 2012, the Court entered an order on June 15, 2012 approving the Wages Motion on a final basis [Docket No. 386] (the "**Wages Order**").

KEIP Participants and Key Employees would be slightly above the target 75th percentile but the overall cost would still fall below the 50th percentile when compared to comparable cases. See Dempsey Suppl. Decl. ¶ 11. Accordingly, based on such evidence, Mercer has concluded that the KEIP and the KERP payments are still reasonable in light of the size, scope and complexity of the Asset Sales. Id.

27.    Finally, the U.S. Trustee takes issue with Mercer utilizing the projected Asset Sales' proceeds for its analysis of reasonableness and asserts that a determination cannot be made without a comparison of cash flow and base salary information for the covered participants. Objection at 19. Cash flow information may be relevant in a case where the plan will include the issuance of equity in a reorganized debtor to its creditors, where current or projected cash flows may be utilized to value a debtor's equity or enterprise value upon emergence from bankruptcy protection. Under the facts and circumstances of this case, the actual sales proceeds are the best proxy for the value of the Debtors' assets. Dempsey Suppl. Decl. ¶ 6. Thus, the Debtors have met their burden of establishing that the cost of the KEIP and KERP are reasonable under the Dana II test. Moreover, the U.S. Trustee fails to provide any factual basis for concluding otherwise.

3.    The KEIP and KERP Do Not Discriminate Unfairly.

28.    The Dana II factors require the Debtors to show that the scope of the plan is fair and reasonable, i.e., whether it applies to all employees or discriminates unfairly See Dana II, 358 B.R. at 576-77 (citations omitted). The U.S. Trustee asserts that the Debtors have not carried their burden in establishing the fairness of the plan because "there is no record upon which the Court can compare the resulting bifurcated compensation packages." Objection at 21. As set forth in the Motion and the Supporting Declarations, the KEIP includes 17 of the Debtors'

14

20 insiders.  Motion ¶ 23, 46, Janiczek Decl. ¶ 16.  TARP rules prohibit the Debtors from

accruing incentive pay for the Debtors' remaining three insiders: their Chief Executive Officer,

President and Chief Capital Markets Officer.  Janiczek Decl. ¶ 16, Greenspan Decl. ¶ 33.

Therefore, because the KEIP includes all insiders, other than those prohibited by TARP

regulations from being part of the KEIP, the Debtors have met their burden of proof under <u>Dana</u>

<u>II</u> that the KEIP is not discriminatory.

29.     Likewise, the U.S. Trustee suggests that the KERP may be discriminatory because

the Debtors do not provide sufficient information to substantiate the differing payments between

the tiers.  Objection at 22.  The KERP includes 172 Key Employees[8] segregated into three tiers.

Janiczek Suppl. Decl. ¶ 37.  The Greenspan Declaration provides detailed information related to

the categorization of employees by their level of responsibility and criticality to the organization

and the range of bonuses within each tier.  Greenspan Decl. ¶¶ 8, 15.  Moreover, the distinction

between the Key Employees and the Debtors' remaining employees is that the senior

management, after careful review of each employee's job function, seniority and performance,

identified this particular sub-set of employees for their unique and vital knowledge of the

Debtors' business operations that is critical to the businesses' long-term success.  Janiczek Decl.

¶ 14.  Moreover, the Debtors' senior management determined that the loss of a Key Employee

through resignation would (a) result in a diminution in value of the Debtors' businesses, (b)

result in the loss of institutional knowledge, thereby placing a hurdle in the Debtors' path to

closing the Asset Sales, and (c) burden the Debtors' with trying to replace the Key Employee in a

tough competitive market.  <u>Id</u>. ¶ 14.  The Debtors' decision-making process is similar to that of

---

[8]     Two Key Employees have resigned since the Motion was filed, reducing the current population covered by the
KERP from 174 to 172.

other debtors where the courts approved the proposed KERP.  See In re Brooklyn Hosp. Ctr., 341

B.R. 405, 412 (Bankr. E.D.N.Y. 2006) (KERP approved where "board considered which

employees to include based on (i) the importance of the employee's job functions to the debtors'

overall restructuring efforts, (ii) the importance of the employee's individual performance of

these functions, and (iii) the risk that the employee would seek alternate employment if he or she

were not included in the KERP, balanced against the debtors' ability to replace the employee if

he or she chose to leave.") (internal quotation and marks omitted); see also In re Allied Holdings,

Inc., 337 B.R. 716, 723 (Bankr. N.D. Ga. 2005) (factors to consider include the employee's

necessity to operations and reorganization, possession of unique skills and abilities, risk of

leaving, performance of heavy work loads since the bankruptcy filing and the difficulty of

replacing the employee).  Accordingly, the Debtors have exercised sound business judgment and

met their burden to justify the inclusion of only 172 of the Debtors' 3,625 employees in the

KERP.

       4.    The KEIP and KERP Are Appropriate Within Industry Standards.

      30.    Under Dana II, one of the factors courts consider in reviewing whether debtors

properly exercised their business judgment is to determine whether the plan is consistent with

industry standards.  See Dana II, 358 B.R. at 576-77 (citations omitted).  The U.S. Trustee has

raised a concern as to whether the 21 companies used by Mercer as comparables in its analysis of

the KEIP's design, structures and costs are, in fact, comparable to the Debtors in terms of size,

complexity and corporate structure. Objection at 21.  As set forth above, and in the Dempsey

Supplemental Declaration, the Debtors' bankruptcy cases are unprecedented because financial

services companies that file for bankruptcy protection typically cease operating and their assets

are often liquidated piecemeal.  Dempsey Suppl. Decl. ¶ 4.  Therefore, Mercer conducted

extensive multi-industry market research to determine whether, if the KEIP and KERP are approved, the cost of the KEIP and KERP would fall within the range of market competitive levels. Dempsey Suppl. Decl. ¶ 5. To the extent there is any continuing doubt about this, the Dempsey Supplemental Declaration contains additional information regarding certain of the comparable companies that were analyzed. Dempsey Suppl. Decl. ¶ 7. Accordingly, the Debtors have met their burden to establish that the KEIP and KERP meet industry standards.

5.    The Debtors Engaged in Substantial Due Diligence.

31.    The U.S. Trustee argues that Debtors' failure to attach a copy of the BCIP to the motion is sufficient reason to question whether the Debtors have established their due diligence under Dana II in assessing the need for and formulating the KEIP and KERP to meet. Objection at 21. The Objection fails to recognize the substantial information disclosing the due diligence steps the Debtors undertook prior to approving the KEIP and KERP. Motion ¶¶ 47, 59; Greenspan Decl. ¶ 12-14; Greenspan Suppl. Decl. ¶ 3.

32.    Since the beginning of calendar year 2012, the Debtors faced many questions from their employees regarding the future of the businesses and about a potential bankruptcy filing. Janiczek Decl. ¶ 11. The Debtors' senior executives and Compensation Committee of the Board of Director believed it was necessary to ensure the Debtors' management and employees remained motivated and focused on the extraordinary effort it would take accomplish a complex restructuring of the Debtors' business. Mack Decl. ¶ 3. The Debtors took a proactive approach and implemented the BCIP during the first quarter of 2012. Id. ¶ 4. The Debtors' management team identified what they believed to be proper incentive awards and sought the advice of its outside advisors. Id. FTI provided the Debtors' board of directors and management with guidance on the proper compensation levels it has seen in comparable situations. Id.

17

Management then identified employees critical to the Debtors' restructuring and sale efforts.  Id.

¶ 5.  Once identified and approved by the President, Steven Abreu, and the Chief Human

Resources Director, Anne Janiczek, the individuals were provided with a letter informing them

that they were eligible to receive an incentive bonus at the end of calendar year 2012.  Id.  The

BCIP payment was to be a supplemental monetary award in addition to base salary and any

Discretionary Variable Pay.  See Janiczek Decl. ¶ 11.

     33.     Despite the Debtors' best efforts to effectuate an out-of-court restructuring, the

Compensation Committee and the Board of Directors recognized the possibility that the

restructuring would have to be accomplished in connection with a bankruptcy.  Mack Decl. ¶ 8.

The Compensation Committee of the Debtors' Board of Directors engaged FTI to design the

KEIP and KERP, (ii) the Debtors and their professional advisors carefully reviewed and

considered incentive plans instituted by comparable companies, as well as incentive- and

retention-based programs implemented in other complex Chapter 11 cases, and (iii) the Debtors

and their professionals performed considerable diligence on limiting inclusion in the KEIP and

KERP to those individuals that are absolutely critical to the Debtors' operations and to executing

on the primary goal of closing the sale of the Debtors' businesses. Motion ¶¶ 47, 59; Greenspan

Decl. ¶ 13.  As stated above, the Debtors' cases are unprecedented because financial services

companies that file for bankruptcy protection typically liquidate.  Dempsey Suppl. Decl. ¶ 4.

The Debtors' management and outside advisors, including Mercer (US) Inc., presented the

proposed set of plan structures to the Compensation Committee that included a more detailed and

hybrid set of metrics than the prior BCIP with the intention of incentivizing employees to close

the sale of substantially all of the Debtors' assets after filing for bankruptcy protection.  Mack

Decl. ¶ 7.  The Compensation Committee evaluated whether the plans properly incentivized the

18

employees to preserve and enhance asset value.  Id.  Based on the advice of the Debtors'

advisors, the Compensation Committee satisfied itself that the KEIP and KERP accomplished

these goals.  Id.

34.    The Objection ignores the extensive efforts undertaken by the Debtors and their

advisors in assessing the need for and formulating the KEIP and KERP.  The U.S. Trustee fails

to provide any support in law or otherwise that requires a Debtor to do more than what the

Debtors did to properly conduct their due diligence.  As a result, the Debtors have met their due

diligence burden under Dana II.

6.    The Committee, Representing All Unsecured Creditors, Does Not Oppose The
Plans.

35.    Prior to seeking Court approval of the Motion, the Debtors shared a draft of the

KEIP and KERP plans with the Committee and engaged in numerous discussions to obtain the

Committee's feedback on the proposed structure and scope of the KEIP and KERP. Mack Decl.

¶ 8.  In addition, the Debtors provided supplemental documentation in response to Committee

requests and to inform the aforementioned discussions.  As a result of these discussions, and

upon recommendations from the Debtors' advisors, the Debtors' compensation committee

adopted modifications to the KEIP and the KERP to (a) defer payment of 40% of the vested

KEIP awards until the effective date of a plan of reorganization and (b) pay 100% of vested

KERP awards at closing, as opposed to part upon sale approval and part upon a closing. Id.  It is

quite remarkable that in a case of this magnitude, no true stakeholder opposes the relief sought in

the Motion.

19

## CONCLUSION

Accordingly, for the reasons set forth herein the Debtors respectfully request that the Court overrule the Objection, grant the Motion and grant such other and further relief as it deems just and proper.

Dated:  August 6, 2012
       New York, New York

*/s/* Gary S. Lee
Gary S. Lee
Jamie A. Levitt
Lorenzo Marinuzzi
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

20