**<u>Exhibit 2</u>**

ny-1052616

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                    .
IN RE:                              .        Chapter 11
                                    .
New Century TRS Holdings,           .
Inc., et al.,                       .
                                    .
         Debtor(s).                 .        Bankruptcy #07-10416 (KJC)
.............................................................

                           Wilmington, DE
                            May 7, 2007
                            10:00 a.m.

                    TRANSCRIPT OF MOTIONS HEARING
                 BEFORE THE HONORABLE KEVIN J. CAREY
                    UNITED STATES BANKRUPTCY JUDGE


   APPEARANCES:

   For The Debtor(s):              Suzzanne S. Uhland, Esq.
                                   O'Melveny & Myers, LLP
                                   275 Battery Street
                                   San Francisco, CA 94111

                                   Ben H. Logan, Esq.
                                   O'Melveny & Myers, LLP
                                   275 Battery Street
                                   San Francisco, CA 94111

                                   Robert J. Stern, Jr., Esq.
                                   Richards Layton & Finger, PA
                                   One Rodney Square
                                   Wilmington, DE 19801

                                   Michael J. Merchant, Esq.
                                   Richards Layton & Finger, PA
                                   One Rodney Square
                                   Wilmington, DE 19801

                                   Marcos A. Ramos, Esq.
                                   Richards Layton & Finger, PA
                                   One Rodney Square
                                   Wilmington, DE 19801
```

1  those loans has documentation associated with it, performance

2  criteria, past performance criteria that had to be extracted

3  from the Debtors' records and made available to parties, as

4  well as then the residual interests which, again, the Debtor

5  had to be capable of providing documentation that those

6  interests were actually owned and what they consisted of and

7  all of the various documentation that goes along with the

8  performance of the pools of assets to which those residuals

9  might be related.  So that the Debtors management team was

10 involved in a fairly comprehensive process to extract that

11 data, as well as to make it available to potential parties who

12 were interested in buying those assets.

13 Q.  Notwithstanding the fact that the Ellington sale was

14 approved today, is there work yet to be done by the Debtors'

15 employees to consummate the Ellington sale?

16 A.  Yes, very substantial work.  The Ellington sale documents

17 require, specifically, the delivery of all of that

18 documentation successfully to Ellington, and there's actually a

19 holdback that the Debtors would like to ultimately receive

20 that's pending the actual documentation, the receipt of the

21 documentation, and the transfer of all of that data

22 successfully to the buyer.

23 Q.  And how much is that holdback?

24 A.  So I believe it's approximately $3 million.

25 Q.  Now what happens if the Debtors' employees don't perform

Etlin - Direct                                                    150

1   all this hard work and provide the information to the
2   purchaser?
3   A.  So, well, in one case the deal could not close, potentially
4   not close at all in the most extreme view, and it's -- and in
5   the less extreme view, you could have an issue with actually
6   receiving the full amount of the proceeds under the holdback.
7   Q.  Let's chat for a moment, if we could, about the second
8   category, the Carrington sale, if I can use that to summarize
9   it.  What is the status of the Carrington servicing platform
10  asset sale?
11  A.  No, the Carrington stalking horse agreement was filed, if
12  not at the exact same time, we sought protection under Chapter
13  11, shortly thereafter.  However, because of the speed with
14  which that agreement was put together, Carrington has
15  continued, subsequent to that date through today's date, to do
16  additional due diligence on their own behalf with regard to
17  that transaction.  In addition, they're actively in the
18  servicing platform, have had professionals in the servicing
19  platform making substantial information requests.  My team in
20  the servicing platform, the Alex Partners team, is responsible
21  for helping manage and fulfill those requests so that they
22  don't significantly interfere with the day-to-day operations of
23  the servicing platform.  But the fact of the matter is is that
24  a lot of people and a lot of data have to be involved in making
25  sure that Carrington's requests are satisfied.  Carrington's

Etlin - Direct                                                  151

1  not the only interested party in this business so there have
2  been other parties doing due diligence, coming on site to have
3  meetings, and doing other kinds of activities with regard to
4  the sale process right through today's date.
5  Q.  I think you've probably answered, in large part, my next
6  question, but I'll ask it anyway to see if you want to add
7  anything to your answer.  What have the Debtors' employees done
8  so far in support of the Carrington sale?
9  A.  There's been very substantial data associated with that.
10 Carrington, as any bidder for this kind of asset, would want to
11 know that the company had adequate systems and people and
12 expertise in place to properly service a long portfolio the
13 size that the company currently services.  They would want to
14 know that the company was complying with the terms and
15 agreements of those servicing contracts, and so there's been a
16 very substantial amount of data gathering associated with that,
17 as well as understanding the company's policies and procedures
18 with regard to the non-performing portions of the loans in
19 those portfolios, given that this is a sub-prime loan
20 portfolio, which requires a lot more hands-on attention and
21 activity than a regular credit rated portfolio of mortgage
22 loans.
23 Q.  And what remains to be done by the Debtors' employees in
24 order to consummate the Carrington sale?
25 A.  Well, the first threshold issue is we're required to retain

Etlin - Direct                                                    152

1   a minimum number of them in order to close that transaction in
2   the first place.  So the first thing they have to do is at
3   least agree to stick around, which is no small issue.  There is
4   a competitive servicer of loans who opened up a brand new
5   facility and held extensive job fairs in the second week of
6   this case, and who has been actively trying to recruit the
7   company's personnel.  But in addition to that, it's not a fait
8   accompli that Carrington will be the purchaser of those assets,
9   it may be some other party, but if it were to be Carrington,
10  Carrington does not currently have the licenses necessary to
11  actually take over, close and operate a servicing operation.
12  And so we would be obligated, under the terms of a transition
13  services agreement, to continue to assist them in operating
14  those businesses until such time they obtain their own licenses
15  and were able to take over the operation of those servicing
16  businesses.
17       And there's a lot of transition that would occur.  If a
18  buyer were to actually be a current operator of a servicing
19  platform, it would still take approximately 3 to 4 weeks to set
20  up for the actual transfer of the service assets to that buyer,
21  and then there's about a 30 to a 60 day tail whereby you still
22  continue to receive checks from borrowers and other kinds of
23  reconciliation activity that you need to do to support the full
24  and complete transfer of that business over to the successful
25  buyer.

Etlin - Direct                                                    153

1  Q. You referenced, I think, a requirement under the Carrington
2  agreement that the Debtors essentially deliver a certain number
3  of employees identified by the purchaser under the agreement,
4  is that right?
5  A. That is correct. It's a certain percentage. If I recall
6  correctly, I think it's 75% of the employees that were in the
7  platform at the time the stalking horse agreement was signed.
8  Q. And what happens if we don't deliver the 75% of employees?
9  A. I believe at Carrington's option they have an option of not
10 closing.
11 Q. Okay. Now, while all of these things that you've just
12 described have been going on at the servicing business and the
13 related businesses, do the employees still need to run those
14 businesses?
15 A. Oh, absolutely. There's a lot of activity going on, not
16 just the running of the actual servicing business, but frankly,
17 we're, as of last week, only 30 days into this case. And so
18 there are huge amounts of activity that are ongoing in every
19 aspect of the business operation of the company, not only
20 pertaining to the issues with regard to the very rapid
21 downsizing of the business, the need to dispose of properly
22 facilities and leases and assets and those kinds of things, but
23 also all of the ongoing issues associated with the various --
24 the SEC investigation, the various regulatory departments in
25 every state in which the company has done business, there's

Etlin - Direct                                                              154

1   very active contact with each state, and those are licensing
2   issues.  And again, we have to maintain the licenses in order
3   to be able to transfer an operating business to Carrington or
4   another purchaser on the servicing side, so there are lots of
5   different kinds of activities ongoing at the company, in
6   addition to just supporting the sale process.
7   Q.  Let's talk about the status of the last bucket of assets,
8   which we'll just call "other assets."  What is the status of
9   the sale of the other assets?
10  A.  That process has only just barely commenced with regard to
11  the other assets.  We don't have any stalking horse bids for
12  any of those items other than the Access transaction, which
13  this Court has already heard, but which I think the Court will
14  remember, while there is a nominal value placed on that sale,
15  it is subject to an actual earn-out provision.  And so there
16  are things that need to happen in order to actually ultimately
17  receive those proceeds from Access.
18  Q.  And just so that the Court understands what's going on with
19  this business as well, or these businesses I think I should
20  say, what have the Debtors' employees done so far in support of
21  selling these other assets?
22  A.  So, well, first the Debtors employees had to and have been
23  continuing to identify all of the various kinds of smaller
24  miscellaneous assets that the company has that are not
25  particularly hard assets; you know, they're not tables and

Etlin - Direct                                                          155

1   chairs, or leases.  Those are the things that are kind of easy
2   to find.  It's the company's investment in Carrington and the
3   issues associated with the potential transferability of that,
4   it's Access, it's -- again, I mentioned the small title
5   insurance company and other kinds of things like this.  And of
6   course we were, until unfortunately last week, very actively
7   marketing the origination platform.  And there were huge
8   activities associated with preparing the materials associated
9   with that sale process, supporting Lazard in the sale process,
10  the demos of the IT component of that operating business, and
11  then, now, the continuing process associated with trying to
12  market and successfully sell just the IT components since the
13  employees have actually been terminated as of last week.
14  Q.  And just to round out the record, although I think you've
15  probably mentioned some of these things already, what remains
16  to be done by the employees to hopefully consummate sales of
17  these other assets?
18  A.  Well, probably the most important issue is that the
19  servicing platform and its IT requirements were not set up to
20  be separate and easily segregable from the normal IT operations
21  of the company.  And many systems are linked together.  We need
22  to figure out what goes with the servicing platform, what is
23  related to the technology sale, and what, frankly, systems and
24  data the ongoing estates need in order to properly perform
25  their function of filing a Plan of Reorganization and winding

Etlin - Direct                                                              156

1  down the process as it pertains to the remainder of the
2  business.  So that's one example of several activities that are
3  still ongoing and require some fairly substantial technical
4  input of the company's employees.
5  Q.  You mentioned previously that with respect to the other
6  assets, there's no stalking horse.  What's the outlook for the
7  sale of the other assets?
8  A.  Well, it's -- we would hope that it was good, but obviously
9  that component of this plan is much more highly speculative
10 than the other components.  The other components are
11 speculative as to timing and amount.  And certainly, for
12 example, in the case of Carrington, there could be a downward
13 adjustment just as easy as there could be an upward adjustment,
14 based upon the ongoing due diligence efforts.  But at least
15 there is, I think, a sense among the company's employees that
16 that business -- there will be a successful buyer.  The other
17 assets pieces, it's not necessarily known what the sale might
18 bring.  Commensurately, we've tried to structure the incentive
19 compensation to reflect some of the risks that the employees
20 perceive potentially with the successful sale of those assets.
21 Q.  Now, all the work that you've just described in great
22 detail that has been done by the Debtors' employees so far to
23 support and facilitate the asset sales and that remains to be
24 done to support and facilitate the asset sales, could that work
25 be done by the Debtors' investment bankers?

Etlin - Direct                                                           157

1  A.  No.  Lazard's job is to work with the various buyers in the
2  negotiations.  Lazard works at a much higher level.  And
3  certainly they do not have nearly the kind of detailed
4  knowledge with regard to these assets and businesses that the
5  company's employees do.  And so there is a logical break
6  between the role of the company's employees, frankly our role
7  as advisors to the business, and Lazard's role.
8  Q.  Now, in addition to participate -- and I think you
9  discussed a little bit of this a moment ago.  In addition to
10 participating in the sales processes and otherwise running the
11 various businesses, what other kinds of work have the Debtors'
12 employees been doing?
13 A.  Well, we have just completed -- unfortunately, going from
14 6,300 employees to less than 1,000, so the HR and benefits
15 portion of the company has been completely consumed with just
16 getting the appropriate documentation to people that you would
17 normally deliver to them as part of their termination; the
18 COBRA notification and everything associated with that process,
19 making sure that we get, you know, security passes and lap tops
20 back from people and that we secure the various office sites
21 that have been vacated by the Debtors as the various two rounds
22 of downsizing that have occurred.
23      Now, one round was on April 2nd, the second round was just
24 last week, about 30 days later.  There's a huge amount of
25 follow-on activity associated with all that process.

Etlin - Direct                                                         158

1  Substantially all of the company's desks and chairs and file
2  cabinets are subject to various forms of equipment financing,
3  equipment leasing arrangements, identifying which are on which
4  agreement, and what the rights or those various lenders or
5  lessors are and how we go about seeing that their rights are
6  protected with regard to these assets and making sure that we
7  maximize the value of these assets, which now constitute, you
8  know, used office furniture.  There's just a whole host of
9  different kinds of activities that are going on.  Of course,
10 the schedules and (indiscern.) preparation is the thing that's
11 now consuming the accounting department, for example.
12 Q.  Let's turn to the plans that are proposed for approval
13 today, the Key Employee Incentive Plan, and the Key Employee
14 Incentive Retention Plan.  Ma'am, are you familiar with those
15 plans?
16 A.  Yes, I am.
17 Q.  Okay, do you know how the plans were developed?
18 A.  Yes.
19 Q.  How were they developed?
20 A.  A joint effort between the compensation committee of the
21 Board of Directors, CDG, O'Melveny, input from me, and then
22 input from the senior management team as to the potential
23 participants in the plans and the basis for the plans.
24 Q.  Okay, and did you personally have a role with the plans?
25 A.  Yes, I'm the individual from Alex Partners who was involved

259

1     There are a number of issues I'd like to address in terms
2  of how I view this record and, unfortunately, they may come out
3  in no particular order, but I'll begin.
4     First, by addressing an overall concern.  The Trustee
5  complains that the Debtor, after having been rebuffed in early
6  request for relief, has come back and repackaged, in substance,
7  the same request, but in a different form.  Frankly, given a
8  couple of things, one the newness of 503(c) and some black
9  letter rules about how plans should be designed, there have
10 been a number of different plans proposed in this Court, and
11 other courts, that really go a lot of different ways and take a
12 lot of different forms.
13    Secondly, I think it's a good thing that the Debtor went
14 away, tried to rethink and restructure it's plans, consulted
15 and negotiated with the Committee, heard the U.S. Trustee's
16 objections and came up with a revised plan.  And I, frankly,
17 think the Debtor ought to be -- well let's put it this way, I
18 think have might have been necessary for the Debtor to do that,
19 under these circumstances, rather than simply to say there's no
20 way we can package an incentive plan in an acceptable form.
21    The Debtor argues, persuasively, and Ms. Etlin's
22 testimony, I think, was very strong on these points, some of
23 the services yet to be performed are sale related from due
24 diligence to transition and other sale related services, to the
25 requirement of at least one buyer that a certain number of

1  employees be available to continue in the business, other
2  downsizing functions that have to be performed, including the
3  extensive human relations and benefits issues that have to be
4  worked through with respect to the thousands of employees
5  who've been laid off, responding to the SEC investigation,
6  other regulatory interface, later on down the line claim
7  support, lease review.  Right now, with respect to the sales
8  particularly, they are the most important activity of the
9  company at the moment.  The activity, most likely, to produce
10 the most value for the Estate.  And to incentivize employees to
11 achieve those goals and perform those activities, which would
12 not otherwise be within their normal job descriptions, I think
13 is necessary under these circumstances.  These employees,
14 according to Ms. Etlin's testimony, have specific technical or
15 other knowledge about the business or the industry, which is
16 necessary for the conduct of the Debtor's business and for
17 achieving and taking sales to their conclusion.
18      With respect to the criteria that the Debtor has chosen,
19 in a non-liquidating plan you could argue there are lots of
20 other metrics that could be used, like EBIDTA just to name one,
21 increasing cash flows.  Those things can't be used
22 appropriately in this type of case.  It makes no sense and the
23 U.S. Trustee has suggested that there's no viable alternative
24 for the use of criteria.
25      I also note that these employees, as the Debtor has

1  alleged from the beginning even in its earlier iteration of
2  incentive, proposed incentive plans, that the employees
3  compensation, historically, has been based on things other
4  than, in addition to, base salary.  So it's entirely credible
5  for the Debtor to take the position that there is an
6  expectation by these employees that there's -- there would some
7  incentive compensation as a component of their overall
8  compensation, and the fact of the timing of the request for
9  approval and the development of the sales asserted by the
10 Trustee is being a reason alone to deny the relief, I think, is
11 wrong.  I think it's off the mark.  And I think it ignores the
12 situation that these Debtors are facing.
13     There's another element that strikes me, and I mean and it
14 strikes me as an important element, and although it's been
15 mentioned, it hasn't been mentioned in quite the way I look at
16 it, and that is the total amount to be paid is about 3.3
17 million or so, which has already been reduced by over half as a
18 result of negotiations with the Committee.  But this amount is
19 a fraction of the total value to be achieved and preserved by
20 this Estate, and it's a small fraction.  So it seems to me that
21 in the Debtor's business judgment, if it spends this amount of
22 money, it can preserve literally tens of millions of dollars,
23 or potentially more, worth the value for the Estate, it seems
24 to me to be a very small amount of money well spent.
25     So I conclude that these payments are justified under the