UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------- )
                                                                            )
In re:                                                                      )   Case No. 12-12020 (MG)
                                                                            )
RESIDENTIAL CAPITAL, LLC, et al.,                                           )   Chapter 11
                                                                            )
                                              Debtors.                      )   Jointly Administered
                                                                            )
--------------------------------------------------------------------------- )

**SUPPLEMENTAL DECLARATION OF JOHN DEMPSEY IN FURTHER SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, John Dempsey, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a Partner at Mercer (US) Inc. ("**Mercer**"). My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606. Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "**Debtor**s").

2. On July 17, 2012, I submitted my declaration (the "**Declaration**") in support of the *Debtors' Motion for an Order Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) a Key Employee Incentive Plan for Certain Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses* [Docket No. 812] (the "**Motion**").

ny-1052621

3.       I submit this supplemental declaration in further support of the Motion, and in support of the Debtors' reply to the objection to the Motion filed on behalf of the Office of the United States Trustee for the Southern District of New York [Docket No. 987] (the "**UST Objection**").

4.       The UST Objection questions whether Mercer's analysis of the KEIP and KERP takes into account whether these programs are consistent with industry standards. See UST Objection at 3. In performing the analysis of the KEIP and KERP,[1] Mercer compared the Debtors' KEIP and KERP with those plans implemented by companies that underwent a section 363 asset sale of all or substantially all of their assets and that implemented an incentive plan that was tied to this bankruptcy process, irrespective of industry. It has been my experience that this is the typical methodology in similar bankruptcy proceedings. Further, it has been my experience that financial services companies that file for bankruptcy typically liquidate and so would be unavailable to include as comparators. In addition, because of the limited number of bankruptcies relative to the overall economy, it is not appropriate to limit comparisons to organizations in the same industry. Therefore, it would be difficult, if not impossible, to compare the KEIP and KERP to companies in the same industry with the same circumstances and bankruptcy situations.

5.       In addition, when performing a compensation analysis in this bankruptcy context, based on my experience, comparing companies of similar size and complexity is equally, if not more relevant as comparing companies from the same industry. This is due to the fact that the incentive plan is directly tied to the executives' ability to successfully execute a sale transaction of the company's assets and operations, which is more dependent on size and complexity than

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

industry. The most important measure of success for this bankruptcy process is the successful and seamless sale of the business that generates the most proceeds for creditors, preserves jobs and ensures business continuity for customers and suppliers. Therefore, it is vital that this is the main driver of payments under the incentive plan and that these payments are calibrated to the successful sale of the Debtors' assets and the maximization of the proceeds generated. Given the clear objectives of the bankruptcy and the proposed incentive plan, it is most appropriate to compare the aggregate cost of the KEIP/KERP plans to those plans of companies of similar sizes that went through a similar bankruptcy process.

6.      As noted in my Declaration, to assess the reasonableness of the KEIP and KERP, the proposed plans were compared to the retention and incentive plans implemented by twenty-one (21) companies that underwent a section 363 sale of their asset base. To assess competitiveness, the Debtors' plans are compared to the market percentiles.[2] The total maximum cost of a plan is one of the most commonly used metrics to assess the reasonableness and impact of the plan, and is most appropriate in a sale situation such as this, where the cost of these plans must be justified in the context of the value generated in the sales. Expressing the plan costs as a percentage of expected sale proceeds takes into account the size and complexity of the transaction and the increased workload, manpower and diligence necessary to successfully execute the transaction for the benefit of creditors. See Declaration ¶ 19. The transactions at issue in this bankruptcy are more complicated, complex, and harder to successfully complete than a transaction of an asset base, for example, half of the size or even smaller than what the Debtors are proposing to execute. This complexity and difficulty, over the course of the past several months, has required significant additional time, work, and responsibility above and

---

[2]   The market percentiles are the 25th, 50th and 75th percentiles and represent, given a set of numbers, the positioning of a number within this set. For example, the 25th percentile is the number that is larger than 25% of the entire set and smaller than 75% of the entire set.

beyond the normal scope of the Debtors' employees' duties.  This additional work was proven critical to generating the proposed sale offers and will be critical going forward to getting the asset sales closed, and thus motivating employees is the goal of the proposed incentive plan.

7.  In addition to comparing the Debtors' proposed plans to the twenty-one (21) companies as outlined above, Mercer also compared the plans to a subset of four of the largest and most complex of the 21 comparator organizations.  See Declaration ¶ 26.  As outlined above, it has been my experience that size and complexity of the enterprise affect the scope of the incentive plan.  For this reason, I identify four Large Companies for specific comparisons that are particularly large, complex, and global organizations and thus the most appropriate comparables.  The companies in this subset are: Nortel Networks, Terrestar Networks, Borders Group and BearingPoint.  Clearly, these all were complex global organizations.  As described in my original declaration, the cost of the Debtors' proposed KEIP and KERP is smaller than all four of these companies when expressed as a percentage of asset sale proceeds; when expressed as a dollar amount, it is smaller than two.  This is demonstrated in the detail of each company, found below.

| Organization | Scope | Sale Proceeds / KEIP & KERP Costs[3] |
|---|---|---|
| *Nortel Networks (2009)*<br><br>Global telecommunications equipment and software provider | Prepetition Employees: 30,300 of which 16,000 were transferred in connection with sales<br><br>Prepetition Revenue: $7.6 Billion<br><br>Prepetition Assets: $9 Billion | Sale Proceeds: $8.2 Billion<br><br>KEIP Cost: $23 Million<br><br>KERP Cost: $22 Million<br><br>Total Cost as a percentage of Sale Proceeds: 0.55% |

---

[3]  Represents the outcome of Mercer's analysis of examining applicable court documents and public disclosures, and applying Mercer's valuation approaches to arrive at plan cost and asset sale proceeds estimates.

| | | |
|---|---|---|
| *Terrestar Networks (2010)*<br><br>Development stage company invested in development of satellite telecommunication network | Prepetition Employees: 107 employees<br><br>Prepetition Revenue: $2 Billion | Sale Proceeds: $1.4 Billion<br><br>KEIP Cost: $10.2 Million[4]<br><br>KERP Cost: n/a<br><br>Total Cost as a percentage of Sale Proceeds: 0.74% |
| *Borders Group (2011)*<br><br>National retailer of books and music | Prepetition Employees: 5,700 full time employees (plus 10,700 part time)<br><br>Prepetition Revenue: $2.2 Billion<br><br>Prepetition Assets: $1.4 Billion | Sale Proceeds: $0.73 Billion<br><br>KEIP Cost: $7.1 Million<br><br>KERP Cost: $1.2 Million<br><br>Total Cost as a percentage of Sale Proceeds: 1.14% |
| *BearingPoint (2009)*<br><br>Management and IT consulting firm | Prepetition Employees: 15,200 employees<br><br>Prepetition Revenue: $3.1 Billion<br><br>Prepetition Assets: $2 Billion | Sale Proceeds: $0.54 Billion<br><br>KEIP Cost: $6.8 Million<br><br>KERP Cost: $23.8 Million<br><br>Total Cost as a percentage of Sale Proceeds: 5.72% |
| *ResCap* | Prepetition Employees: 3,500<br><br>Prepetition Revenue: $633 Million<br><br>Prepetition Assets: $15 Billion | Sale Proceeds: $3.9 Billion[5]<br><br>KEIP Cost: $7 Million<br><br>KERP Cost: $10.8 Million<br><br>Total Cost as a percentage of Sale Proceeds: 0.46% |

While each of these situations is unique, they are each large, complex enterprises that untook to sell their assets to other organizations and implemented incentive plans to encourage a successful sale.

---

[4] Terrestar's KEIP was uncapped and paid a percentage of sale proceeds over a threshold. The cost displayed above is Mercer's estimation of the actual payout given the sale proceeds generated.

[5] Represents summation of the two current stalking horse bids.

ny-1052621                                                5

8.      The allegation contained in the UST Objection that the "bonus motion lacks sufficient information to substantiate the reasonableness of the different payments between the categories of KERP Participants" is baseless and is addressed by Table 4, set forth in the Declaration (which has been reproduced below), which presents total compensation statistics[6] for the respective Key Employee tiers.  In Mercer's view, the appropriate method of assessing reasonableness is based on analyzing the impact on the positioning of incumbent compensation in comparison to market competitive rates,[7] which is shown in Table 4.  Table 4 illustrates that on an aggregate basis and including proposed payments under the KEIP and KERP, total compensation is consistent with industry standards for mortgage servicers.  Furthermore, the Debtors relied on market pay information furnished by Mercer and other survey vendors and discussed this information with Mercer as a part of the process of developing the KEIP and KERP award amounts.

---

[6] Table 4 compares Debtors' employees' 2012 compensation composed of base salaries and KEIP or KERP payments to market total direct compensation levels.

[7] Market competitive rates were determined by analyses conducted by Mercer and the Debtors using Mercer and other compensation surveys.  Market data reflects the range of competitive compensation levels for a given position in the Debtors' industry and with the Debtors' size.  The competitive range of market compensation levels is represented by percentiles.

*Table 4: Benchmarking Results*

| Tier | Variance from Compensation Target[8] |
|---|---|
| I | -39.3% |
| II | -23.3% |
| III | 7.3% |
| IV | n/a [9] |
| **Aggregate** | **-21.4%** |

9. The fact that certain of the KEIP Participants and a Key Employee are subject to TARP restrictions does not change Mercer's analysis or conclusion that the KEIP and KERP are reasonable when compared to the market. Similarly, the applicability of TARP to the employees' compensation did not alter Mercer's analysis of the pricing or the structure of the KEIP and KERP. It is common practice for a large portion of compensation in the financial services industry to be determined immediately upon the conclusion of a given calendar year, and therefore a paid award is inherently based upon each employee's performance during the prior calendar year. The KEIP was developed to reward the employees for taking on additional responsibilities during the Debtors' restructuring, and thus should be considered compensation for the time period of the restructuring only. Therefore, the fact that certain KEIP Participants will be subject to TARP restrictions and have a portion of this year's compensation paid in the future did not affect my analysis on the KEIP or KERP because in Mercer's view, compensation earned in a given year is included in that year's total compensation amount regardless the fact

---

[8] The market 75th percentile is shown as the compensation target since this has been the Debtors' historical target pay positioning.

[9] Mercer did not perform nor was made available to benchmarking analyses for incumbents in Tier IV therefore cannot comment on market competitiveness. However only 10 Key Employees are in Tier 4 with an average award size of only 13% of base compensation, which Mercer did not think warranted further in depth analysis.

ny-1052621                                7

that it will not be paid until a later year. Similarly, any compensation amounts from previous years that have not yet been paid but will be paid in 2012 are irrelevant since these amounts are compensation for prior years and not appropriately considered 2012 compensation.

10. When assessing the reasonableness of the KEIP and the KERP, Mercer considered potential other payments that may be received by the participants including amounts deferred from prior years and AIP and LTECIP opportunities for 2012. As noted above, potential 2012 payments from Ally Financial Inc. ("**AFI**") are properly analyzed as a part of earlier year compensation. The AIP and LTECIP plans are uncertain given the sale process. There is no assurance that these programs will be assumed by the Debtors' buyers and as such, the compensation value of these programs to employees is uncertain and thus diminished. As a result, AIP and LTECIP should not be included in the total compensation analysis. Even if they were considered, however, I note from my research that 28% of organizations include KEIPs in addition to other incentive compensation. And, most importantly, even if these additional programs are included in total compensation, pay here will still be within the range of market practice when compared to market total compensation levels.

11. Although, as explained above in the preceeding paragraph, I believe the most appropriate means of comparison is comparing individual total compensation levels to market competitive compensation ranges (see paragraph 8), as well as comparing the KEIP and KERP in aggregate to those plans that were implemented by organizations undergoing the same bankruptcy process (see paragraph 6). In our in depth analysis, we also examined the plans in several other slightly different contexts. These analyses view ResCap compensation (existing and proposed) in the most conservative light and are included to demonstrate that when viewed in this conservative manner the plans still fall within the range of competitive practice. Table 5

ny-1052621                               8

illustrates that when we include all possible elements of compensation including base salary, AIP, LTECIP, and KEIP or KERP amounts and compare it to market competitive compensation levels, aggregate compensation is 17% above the compensation target. Although this is higher than the results of the analysis found in Table 4, it still falls within proximity to the market 75th percentile even though it includes the uncertain AIP and LTECIP amounts of 2012 compensation that might be deferred. On the same note, if we perform the analysis referenced in paragraph 6 but this time add all other ResCap incentive compensation programs (AIP and LTECIP) to the KEIP and KERP, the aggregate cost of these plans is only 0.94% of sale proceeds which still falls below the median value of our market analysis, which is 1.31% of sale proceeds. These additional analyses demonstrate that even when viewed in an extremely conservative sense, the proposed plans still fall within the range of competitive market practice.

*Table 5: Benchmarking Results Including Theoretical AIP and LTECIP*

| Tier | Variance from Compensation Target[10] |
|---|---|
| I | 9.9% |
| II | 15.7% |
| III | 29.3% |
| IV | *n/a* |
| **Aggregate** | **17%** |

    12.    Lastly, the UST Objection highlights one statement from the Declaration regarding the retentive aspect of the KEIP. See UST Objection at 12. For all the reasons stated in the Declaration, I believe that the KEIP is first and foremost an incentive plan, and like most plans it has an incidental retentive effect. The KEIP contains the appropriate metrics that will

---

[10] The market 75th percentile is shown as the compensation target since this has been the Debtors' historical target pay positioning.

properly motivate the KEIP Participants to perform at optimal service levels. It is a fundamental fact that to accomplish the tasks required during these Chapter 11 cases and to perform at this high level, participants must be employed by the Debtors, but the KEIP's primary purpose is to motivate and incentivize employees to undertake the additional work associated with the bankruptcy proceedings and closing of the asset sales.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 6th day of August, 2012.

                                                        /s/ John Dempsey
                                                           John Dempsey