**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------------
)
In re:                                                    )    Case No. 12-12020 (MG)
                                                          )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,    )    Chapter 11
                                                          )
                                    Debtors.       )    Jointly Administered
                                                          )
------------------------------------------------------------------------------

**DECLARATION OF JOHN E. MACK IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, John E. Mack, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.   I am a member of the Board of Directors (the "**Board**") of Residential Capital, LLC ("**ResCap**"), the parent debtor in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") commenced on May 14, 2012 (the "**Petition Date**"). I have been a director and served on the board of directors of Residential Capital and its committees in various capacities since November 2011. I received an AB in Economics from Davidson College in 1972 and a Masters in Business Administration in May 1974 from The Darden School of Business at the University of Virginia. Beginning in 1974 and continuing through September 2005, I worked in the financial services industry and held senior executive positions at major financial institutions, including Shinsei Bank and Bank of America, in which I managed billions of dollars of assets as well as overseeing teams of personnel charged with financial reporting, planning and budgeting

ny-1052853

responsibility. Since then, I have served as a director as well as in a variety of board roles for both financial and non-financial service companies.

2. Based on my service on the ResCap Board and in connection with my responsibilities as chairman of the Board's compensation committee (the "**Compensation Committee**"), which I became a member of in March 2012 when it was formed, I am familiar with the businesses of ResCap and the other above-captioned debtors (collectively, the "**Debtors**") as well as their overall compensation structure and the proposed key employee incentive plan ("**KEIP**") and key employee retention plan ("**KERP**"), as described in greater detail in the *Motion For An Order Pursuant To Sections 363(B)(1) And 503(C)(3) Of The Bankruptcy Code Authorizing (I) Implementation Of (A) A Key Employee Retention Plan For Certain Non-Insiders And (B) A Key Employee Incentive Plan For Certain Insiders And (Ii) Payment Of Any Obligations Arising Thereunder As Administrative Expenses* (the "**Motion**").

3. I submit this declaration to support the relief requested in the Motion. Unless otherwise indicated, all facts set forth in this declaration are based upon (i) my personal knowledge of the Debtors' current operations and financial performance, (ii) information learned from my review of relevant documents and (iii) information that I received from the Debtors' management or advisors. I am authorized to submit this declaration on behalf of the Debtors, and if I were called upon to testify, I could and would testify competently to the facts set forth herein. The uncertainty about the future of the Debtors' businesses, especially in light of the Debtors' efforts over the past year to implement a restructuring strategy, prompted the Board, upon the recommendation of the Debtors' management team, to implement a business continuity incentive program (the "**BCIP**"). The Board believed it was important to the Debtors' businesses to maximize value for its stakeholders, but to do so, the Debtors had to ensure that

their management team and key supporting employees would remain motivated to undertake the extraordinary efforts that would be demanded by a complex restructuring. The Board understood that the stress and time demands imposed on Debtors' management and key employees was sustained and extraordinary. In addition to their usual duties, they faced regulatory investigations, extensive litigation, and economic and industry-wide uncertainty. On top of all that, management and the key employees were asked to absorb the demands involved with the implementation of a complex restructuring strategy.

4. Accordingly, in the first quarter of 2012, the Compensation Committee implemented the BCIP, the goal of which was to ensure that the Debtors' employees were properly motivated to take on the additional tasks that would be asked of them, above and beyond their daily responsibilities, while the Debtors undertook a marketing process for their businesses. As the Debtors had done in the past under similar circumstances, the Debtors' management team identified what they believed to be proper incentive awards and subsequently sought assistance from outside advisors – FTI Consulting – to ensure that the proposed award amounts were consistent with industry practice. Specifically, FTI provided the Debtors' management and the Board with guidance as to the proper compensation levels for the different tiers of employees, which it had seen in other comparable situations. The company then took that guidance and set the award levels. The individual proposed compensation amounts were intended to be commensurate with the individual's level of responsibility, the work that would be required of them and their overall criticality to the Debtors' businesses.

5. It is my understanding that the Debtors' senior management team, together with the leaders of the different divisions, identified employees critical to the Debtors' restructuring and sale efforts, whose collective efforts would facilitate asset sales that would capitalize on the

value of the Debtors' servicing platform, preserve jobs and ultimately return value to the Debtors' stakeholders. Once identified and approved by the President, Steven Abreu, and Chief Human Resources Officer, Anne Janiczek, these individuals were provided with a letter, beginning in the first quarter of this year, identifying them as being eligible to receive an incentive bonus at the end of calendar year 2012. A sample copy of the BCIP letter is attached hereto as **Exhibit 1**.

6. The BCIP letter did not contain the same metrics identified in the KEIP; however, the BCIP letter did require the individual to meet pre-defined performance objectives and satisfactorily perform all transition-related tasks. The letter states, in pertinent part, that,

> to be eligible for the Award you will be required to satisfactorily meet your quantitative and qualitative job performance objectives and expectations for 2012, through and including December 31, 2012, as set forth in the performance management system. Your Award is further predicated upon your satisfactory performance in ensuring that ResCap meets all of its obligations and requirements relating to the transition, specifically those relating to the potential restructuring of ResCap, including but not limited to, the due diligence process and satisfaction of any requirements to facilitate, close and complete any transactions during this time. ResCap, in its sole discretion, will determine satisfactory achievement of performance objectives and satisfactory performance during this process. This determination is subject to the approval of the Mortgage Operations CEO.

Notwithstanding the Debtors' prepetition out-of-court restructuring efforts, the Compensation Committee and the Board recognized the possibility that the restructuring and asset sale would have to be accomplished by having the Debtors seek protection from their creditors under Chapter 11 of the Bankruptcy Code. Therefore, in the second quarter of 2012, the Debtors, with the assistance of their outside advisors, set out to create a KEIP/KERP program to be implemented in a bankruptcy case. The goals of the KEIP/KERP track those of the BCIP I describe above. The Compensation Committee recognized that the demands on management and

the key employees would only become greater with time. Therefore, the Compensation Committee believed it was critical to continue to incentivize them to achieve the Debtors' goals of maximizing the value of the estate.

7. The Debtors, with assistance from FTI, prepared a more detailed and hybrid set of metrics that were intended to incentivize the employees to close sales of substantially all of the Debtors' assets, including a substantial whole loan portfolio. The Debtors' management team and outside advisors, which also included Mercer (US) Inc. (who was retained to confirm the market reasonableness of the award levels and structure of the plans), presented proposed plan structures to the Compensation Committee. The Compensation Committee evaluated whether the plans were structured in a manner that would incentivize the employees to preserve and enhance asset value. Based on this evaluation and the advice of the Debtors' advisors, the Compensation Committee was satisfied that the KEIP and KERP accomplished such goals.

8. Since the Petition Date, the Debtors engaged in lengthy discussions with the Official Committee of Unsecured Creditors (the "**Committee**") about the details of the KEIP and KERP. As a result of such discussions, the Compensation Committee, upon the recommendation of the Debtors' advisors, approved certain modifications to the plans suggested by the Committee. Specifically, with regards to the KEIP – the Debtors agreed to defer payment of 40% of the vested award until the effective date of a plan. In addition, with regards to the KERP, the Debtors agreed that 100% of the vested award would be paid at closing, as opposed to part upon sale approval and part upon a closing.

9. Through these Chapter 11 cases, the Debtors are attempting to accomplish something that has not been done in recent memory in a Chapter 11 proceeding within the financial services industry – sell substantially all of a company's assets as a going concern for

nearly $4 billion dollars and in the process, potentially save thousands of jobs. Each day presents a new challenge to this company, and the individuals in the KEIP and KERP programs possess the leadership, skills and knowledge to address such challenges and close the contemplated asset sales.

        10.      In sum, I believe that the KEIP and KERP (each in its present form) promotes the Debtors' sale-driven restructuring objectives while also maximizing value for the stakeholders in these Chapter 11 cases by potentially generating nearly $4 billion in sale proceeds. I further believe that approval of the KEIP and KERP at this stage of the Chapter 11 cases is critically important to the morale of the Debtors' employees because it demonstrates that the Debtors value the extraordinary efforts of these individuals and are willing to reward these individuals in the event that they fulfill the requisite performance metrics and create the value for the estate that everyone hopes can be realized.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 6th day of August, 2012

/s/ John E. Mack
John E. Mack

## **Exhibit 1**



[Date]

[Name]
[Address]
[Address]

Re: Mortgage Operations Business Continuity Incentive Plan

Dear [Name]:

On behalf of Residential Capital, LLC and its subsidiaries ("ResCap"), I would like to thank you for your many contributions that have been an integral factor in our ability to succeed.  As you are aware, we continue to face changes and challenges as we move forward with the strategic alternatives for Mortgage Operations. I am counting on you to play an important role in our efforts during this transition period.

In recognition of your ongoing role in this transition, you have been selected to participate in a Business Continuity Incentive Plan.  This plan has been specifically designed to ensure the stability and continuity of ResCap by making you eligible for the Award in recognition of the additional efforts required to assist ResCap during this transition period.  Under this plan, you will be eligible to receive a monetary award in the amount of $XX (the "Award").  This Award will be payable as soon as administratively feasible following December 31, 2012.

To be eligible for the Award, you must be actively employed with ResCap as of December 31, 2012.  If ResCap terminates your employment without cause prior to December 31, 2012, you will remain eligible to receive your Award on the payment date.  If you either (i) voluntarily terminate your employment, (ii) become subject to any stage of ResCap's formal disciplinary procedures by reason of conduct and/or unsatisfactory job performance, or (iii) have your employment terminated for cause, as determined by ResCap in its sole discretion, prior to the payment date, then you will not be eligible for any portion of your Award.  Any rights to the Award will not accrue until the payment date.

In addition, to be eligible for the Award you will be required to satisfactorily meet your quantitative and qualitative job performance objectives and expectations for 2012, through and including December 31, 2012, as set forth in the performance management system.  Your Award is further predicated upon your satisfactory performance in ensuring ResCap meets all of its obligations and requirements relating to the transition, specifically those relating to a potential restructuring of ResCap, including but not limited to, the due diligence process and satisfaction of any requirements to facilitate, close and complete any transactions during this time.  ResCap, in its sole discretion, will determine satisfactory achievement of performance objectives and satisfactory performance during

this process. This determination is subject to the approval the Mortgage Operations CEO.

This Award is in addition to your base compensation and other benefits, and you will continue to be eligible for participation in a ResCap Annual Incentive Plan ("AIP"). All payments under AIP are subject to approval by the ResCap Compensation Committee based on company and individual performance and will take into consideration all compensation received including any payments under the Business Continuity Incentive Plan.

To the extent you are deemed to be in the top 100 most highly compensated employees in Ally Financial Inc., payment of your Award will need to comply with the rules and requirements as determined by the Office of the Special Master for TARP Executive Compensation (the "OSM").

If any Award payment is determined to have been based on statements of earnings, revenues, gains, or other performance criteria that are later found to be materially inaccurate, is based on erroneous data that resulted in an accounting restatement due to material noncompliance with any financial reporting requirement under the securities laws within the three years prior to payment, or is found to require repayment under the provisions of any other Federal law or regulation that may govern ResCap's executive compensation, such payment shall, upon notice to the employee, become immediately due and payable in full to ResCap. These payments shall, upon notice to the participant, become immediately due and payable in full to ResCap. Failure to promptly repay ResCap upon demand will constitute cause for termination of employment. The repayment obligation will survive the termination of employment.

Notwithstanding anything contained in this letter to the contrary, this letter and your compensation package may be unilaterally amended by ResCap – even if such amendment reduces the amount of any outstanding Award or otherwise adversely changes the terms and conditions thereof without your prior written consent – if such amendment is required to comply with any Federal Law or regulation that may govern compensation, including but not limited to Emergency Economic Stabilization Act of 2008, the American Recovery and Reinvestment Act of 2009, the rules and regulations of TARP, Federal Reserve Board guidance, the Dodd-Frank Wall Street Reform and Consumer Protection Act, and any other Federal law or regulation that may govern employee compensation.

If on or before the payment date of the Award, the Company becomes the subject of a court supervised restructuring, your right to receive the Award will be subject to court approval and the amount of the Award, the form of payment, the conditions to receipt of the Award (including, but not limited to, your required performance objectives), and the timing of receipt of such Award may be subject to further adjustment.

We are all dedicated to achieving the best outcome for the business.  With your help and personal commitment, we are confident that we can achieve that goal. Accordingly, we appreciate your continued efforts on a daily basis as your contribution is greatly valued.

Very Truly Yours,

Anne Janiczek                                              Thomas Marano
Chief Human Resources Officer                Mortgage Operations CEO

Acknowledged:

_____            _____
         Employee Signature                                      Date