**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | ) | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SUPPLEMENTAL DECLARATION OF RONALD GREENSPAN IN FURTHER SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, Ronald Greenspan, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a senior managing director in the Corporate Finance/Restructuring practice of FTI Consulting, Inc. ("**FTI**")[1]. My business address is 633 West 5th Street, Suite 1600, Los Angeles, CA 90071-2027.

2. I respectfully submit this supplemental declaration (the "**Supplemental Declaration**") in further support of the Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) a Key Employee Incentive Plan for Certain Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses (the "**Motion**") [Docket No. 812]. The Debtors have duly authorized me to do so.

---

[1] On July 25, 2012, the Court entered an order [Docket No. 902] approving the application of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") seeking authorization to engage FTI as their financial advisor [Docket No. 526].

ny-1052626

A.    **The KEIP Milestones are Challenging and Incentivizing**

3.    The United States Trustee's objection suggests that the KEIP Milestones[2] are not primarily incentivizing, are easily met, and do not encourage the KEIP Participants to achieve the Debtors' desired outcome. The Debtors, together with FTI, conducted an extensive analysis during the course of designing the KEIP to ensure that each of the KEIP Milestones would motivate and incentivize the KEIP Participants to perform at a high level. Based on their analysis, the Debtors concluded that the KEIP Milestones represented challenging metrics that would align the interest of the KEIP Participants and the Debtors' stakeholders in order to maximize the value of the Debtors' estates throughout the different stages of the these Chapter 11 cases.

i.    **The GSE Adherence Milestone**

4.    As described in the Motion, meeting the KEIP's GSE Adherence Milestone, by achieving a year-to-date "top three" Fannie Mae servicer ranking as of the closing of a sale or December 31, 2012, entitles the KEIP Participants to 10% of their overall target KEIP award. Fannie Mae servicers are scored each month based on ten servicing performance metrics, including specific metrics related to various loan delinquency ratios, defaulted loan liquidation efficiency, and foreclosure thresholds. Based upon performance on these ten metrics, each servicer is given a monthly and year-to-date score. The Debtors are then ranked among the twelve or more members in their servicing peer group. Fannie Mae uses the servicer performance scorecard and rankings to evaluate servicers, and consistently low performance scores and rankings could result in Fannie Mae reevaluating a servicer's eligibility to service Fannie Mae loans.

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

5.      For most of the pre-bankruptcy months of 2012, the Debtors were at or near the top of the Fannie Mae servicer rankings for their peer group. In fact, in January and March, 2012 the Debtors ranked second among their peer group, and in February they ranked first. However, in April and May, the Debtors' servicer ranking dropped to sixth and fifth, respectively. The drop in the Debtors' ranking was due in part to the addition of three new servicers to the Debtors' peer group, two of which are ranked in the top three and one of which holds the top rank. Also, the Debtors' lower servicer ranking was partially the result of worsening delinquency ratios as a result of decreases in origination activities intended to manage the Debtors' cash reserves.[3]

6.      Regardless of the reasons for the decrease in the Debtors' servicer ranking leading up to and during their Chapter 11 cases, it is clear that maintaining an acceptable servicer score and ranking is extremely important to the Debtors' estates due to the value of Fannie Mae servicing rights to their servicing platform (and the tag-along effect on all other servicing contracts if the Fannie Mae contract were to be compromised). It is also clear that achieving a top three ranking has become increasingly difficult as the Debtors have entered the bankruptcy process. The GSE Adherence Milestone is anything but a lay-up---the Debtors are not currently in compliance with this KEIP Milestone, and rebounding from the Debtors' April and May rankings and achieving the GSE Adherence Milestone by the determination date will be challenging for the Debtors.

---

[3] Decreased loan originations result in a lower number of new, performing loans being added to the Debtors' loan portfolio. Combined with the inevitable repayment of existing loans and some existing loans rolling to delinquent status, fewer new performing loans will result in increased delinquency ratios, especially when compared to other servicers whose portfolios are growing because they do not face the Debtors' liquidity issues.

ny-1052626

### ii.    The Sale Milestones

7.    The Debtors' management, including KEIP Participants and Key Employees, have been actively involved in the due diligence process associated with running two parallel multi-billion dollar asset and platform sales. This process will be conducted over many months and has attracted interest from numerous potential bidders. This is a very different situation than the more typical liquidating Chapter 11 which involves a rapid sale process, a single sale of all assets of substantial value, and a sale process which appeals to a much more limited universe of potential buyers. Further, even at the stalking horse prices of almost $4 billion, the size of these two sales efforts dwarf all but the very largest Chapter 11 asset sales.

8.    The on-going sales efforts require extraordinary efforts by the Debtors' management to handle, for instance, managing the immense number of due diligence requests from multiple parties in dual sales processes, which requires gathering and explaining information from all of the Debtors' departments. During this time, in order to close on the existing stalking horse bids, the Debtors' management must also work closely with Fannie Mae, Freddie Mac and Ginnie Mae (the "**Governmental Associations**") in order to ensure that the Debtors are able to maintain their servicing rights, which provide a substantial portion of the value of the Debtors' servicing platform, so that they can transfer those rights to a winning bidder, and obtain the Governmental Associations' approval of the transfer of the portfolio servicing to the winning bidder. Accordingly, management is aggressively pursuing Home Affordable Modification Program ("**HAMP**") and Home Affordable Refinance Program ("**HARP**") opportunities which the Governmental Associations view favorably, and such activities might assist in the servicing rights transfer. Finally, the Company is required to maintain compliance with its Department of Justice and states' Attorneys General settlements

and Consent Decree by performing modifications on its whole loan portfolio in order to remain in good standing through the close of the Asset Sales.

9. Additionally, the stalking horse bids require extensive monthly reporting requirements, which will continue through the closing of the Asset Sales. It is my understanding that these reporting requirements are far in excess of the reporting performed internally, or for third parties or the Debtors' prepetition lenders. Management's failure to ensure compliance with the stalking-horse reporting requirements or maintain relationships with the Governmental Associations could be detrimental to the Asset Sale processes and could result in significantly reduced sale prices.

10. Moreover, the Debtors' management is playing a critical role in the continued effort to amend the APAs and avoid any downward purchase price adjustments. Management's efforts in negotiating amendments to the APAs have the potential to increase the purchase price received in each of the Asset Sales. Additionally, under the Platform Sale, for example, the unpaid principal balance of loans serviced by the Debtors is a primary driver of the purchase price. The present low interest rate environment has fueled refinancings. To the extent the Debtors are unable to retain loans by refinancing existing loans – as opposed to losing the loans through third-party refinancings – the resulting reduction in unpaid principal balance of their servicing portfolio would lead directly to a decrease in the purchase price in the Platform Sale. As noted above, the Debtors' origination activities have decreased leading up to and during the bankruptcy in an attempt to preserve cash reserves. As a result, the Debtors' management is faced with the extraordinary task of trying to avoid decreases in the unpaid principal balance of the Debtors' servicing portfolio at the very time when they are limited in their ability to encourage refinancing of loans in order to avoid erosion of the portfolio. Here as

well, managements' efforts to develop methods for stemming erosion of the servicing portfolio during the bankruptcy will have a direct impact on the purchase price received in the Asset Sales.

11. Likewise, the KEIP is intended to incentivize the KEIP Participants to continue with their efforts to obtain a value maximizing Legacy Sale. In addition to incentivizing management to bring additional potential bidders into the process and satisfy their extensive due diligence requirements, the sales price is subject to reduction due to individual loan file document deficiencies. This is a very common term in loan sale agreements as such deficiencies can impede the enforcement and full collectability of a loan in the event of a default. Management has undertaken an extensive review and document correction process in conjunction with the Legacy Sale activities to maximize the sale price.

12. The Debtors designed the Sale Milestones to incentivize management to strive to overcome the difficulties presented by the bankruptcy, maintain the value of the Debtors' businesses and undertake the significantly increased duties and responsibilities necessary to close the Platform Sale. Likewise, the Legacy Sale Milestone was designed to incentivize the KEIP Participants to undertake the innumerable additional tasks associated with a second billion dollar sale of the Debtors' legacy loan portfolio. However, the Sale Milestones were also designed to ensure that the KEIP Participants would not be satisfied with just closing a sale. Instead, the Sale Milestones encourage KEIP Participants to take on additional due diligence duties and assist the Debtors' professionals with their marketing efforts, by awarding KEIP Participants in the event of an auction or an overbid. Additionally, to the extent that an overbid is obtained in the Platform Sale and the purchaser does not have the necessary servicing licenses, the KEIP Participants will likely bear the burden of the still further increased responsibilities and duties necessary to obtain the required licensing. The potential to share in

any increased sale price received at an auction will incentivize the KEIP Participants to pursue an increased sale price despite the increased workload that may result.

13. Obtaining additional bidders and achieving an overbid, like the other KEIP Milestones, will be no "lay-up." At the bid procedures hearing, the Court approved higher stalking horse bids than originally anticipated. While the increased stalking horse bids have the appropriate and desirable effect of potentially providing an additional $175 million to the Debtors' stakeholders, they also had the effect of rendering achievement of the target Sale Milestones more difficult for the KEIP Participants. In particular, increases in minimum opening bids can often result in fewer potential bidders for any given asset, making an auction less likely. Moreover, the KEIP Participants' efforts will need to render an even higher sale price than originally anticipated before they are able to share in any potential upside.

14. The challenges the Debtors' face in maintaining their position in the industry so they can deliver a turn-key operation to the purchaser of their businesses, in conjunction with the significant efforts required to avoid downward purchase price adjustments prior to the closing of the Asset Sales, render the sale milestones anything but a certainty, or "lay-ups." Instead, the Sale Milestones provide important, challenging incentives to encourage the KEIP Participants to work through the difficult sales process, including performing all of their increased responsibilities, and to strive to achieve value maximizing Asset Sales for the benefit of the Debtors' creditors.

### iii. The Barclays DIP Covenant Milestone

15. Continued availability of the Barclays DIP facility is also a necessity if the Debtors intend to operate as a going concern during the Sale Process, close the Asset Sales and maximize value for the Estate. Compliance with the Barclays DIP, like the other KEIP Milestones, is no "lay-up." The budget is adjusted every four weeks and each budget is subject

to approval by Barclays, which provides a third party check and push back. Further, the global capital and United States mortgage markets continue in a state of flux and unprecedented change, which require management to proactively plan and respond so that they maximize the probability that the Debtors comply with both the revenue and expense budgetary requirements. This is both not assured and is an objective certainly worth incentivizing management to achieve.

### iv.     The Performance Rating Milestone

16.     High performance of the KEIP Participants is also essential to continue operating the business during the pendency of these cases in addition to taking on enhanced daily responsibilities. See Greenspan Decl. ¶ 22 - 25. One aspect of the Debtors' prepetition human resources policy was to assign a performance rating to all employees during the annual performance review process as determined by an employee's supervisor. Four performance levels could be achieved: (i) Outstanding, (ii) Effective, (iii) Inconsistent, and (iv) Does Not Meet Expectations. The Performance Rating Milestone, consistent with the Debtors' prepetition practices, is designed to challenge and incentivize employees to elevate the performance of their roles and responsibilities. Also consistent with past practice, employees' supervisors will continue to set goals and evaluate employees' performances.

17.     As one should expect, the KEIP includes only those who have been top performers (i.e., Outstanding or Effective) and the Performance Rating Milestone is intended to motivate the KEIP Participants to continue to perform at a top level.

### B.     The Plan Participants

18.     As described in my prior declaration, the Debtors undertook a thorough analysis to identify the appropriate employees for inclusion in the KEIP and KERP. In particular, the Debtors' human resources staff undertook an analysis that involved discussions and analysis with each functional business unit leader. See Greenspan Decl. ¶ 31. From the population

8

identified, the Debtors' human resources team reviewed the role of each identified employee and concluded that the KEIP Participants and Key Employees provided distinct and necessary services to the Debtors' businesses. Based on my discussions of the analysis undertaken and my review of the roles and responsibilities of the KEIP Participants and Key Employees, I believe the populations of the KEIP and KERP were narrowly tailored to minimize the costs of the programs while including only those employees that will be the most critical to the Debtors' Asset Sale efforts and maintaining the value and operational capability of the Debtor's business and assets.

C. **Ally's Payment of Certain Obligations Does not Change the Analysis**

19. AFI's tentative commitment, as disclosed in the Statement of Ally Financial Inc. Regarding Debtors' KEIP/KERP Motion and Debtors' Prepetition and Postpetition Employee Compensation (the "AFI KEIP/KERP Statement") [Docket No. 970], to pay certain prepetition deferred compensation obligations to ResCap employees does not affect my analysis of the incentivizing nature of the KEIP or the retentive nature of the KERP. Each of the obligations discussed in the AFI KEIP/KERP Statement relates to compensation for prior years that was simply deferred to a future date. The subject deferred compensation payments are not compensation for work performed in 2012 and do not serve to achieve the goals or metrics set forth in the KEIP or to entice the KERP participants to remain with the Debtors through the closings of the sales.

D. **Conclusion**

20. Based on my review of the totality of the KEIP and the status of the Debtors' operations and extensive sales activities, it is my opinion that the KEIP Milestones are incentivizing, value-creating and instrumental in preserving and maximizing value for the estate. Moreover, it is my opinion that the KEIP Milestones are <u>not</u> principally retentive, nor do they

9

ny-1052626

simply reward management for doing the job originally contemplated by pre-petition ResCap or its employees.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

    Executed on the 6th day of August, 2012.

                                         /s/ Ronald F. Greenspan
                                             Ronald F. Greenspan