MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Joel C. Haims

*Counsel for the Debtors and
Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- )
                                                                 )
In re:                                                           )    Case No. 12-12020 (MG)
                                                                 )
RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,                         )    Chapter 11
                                                                 )
                                        Debtors.                 )    Jointly Administered
                                                                 )
---------------------------------------------------------------- )

## DEBTORS' OBJECTION TO MOTION OF THE FEDERAL HOUSING
## <u>FINANCE AGENCY FOR RELIEF FROM THE AUTOMATIC STAY</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................2

OBJECTION ...........................................................................................................................4

I.    THE DISCOVERY SOUGHT BY FHFA IS EXTREMELY COSTLY AND
      BURDENSOME TO THE DEBTORS .................................................................................4

      A.    Debtors' Loan Files and Loan Tapes....................................................................4

      B.    Producing the Discovery Sought by FHFA Will Pose a Substantial Burden
            on the Debtors and Interfere with Their Reorganization......................................6

            (i)    Burdens of Loan File Production ...............................................................6

            (ii)   The Employees Necessary for Producing Loan Files Have
                   Substantial and Important Duties Related to the Restructuring and
                   Preserving the Assets of the Estates .........................................................9

            (iii)  Burdens of Loan Tape Production..............................................................9

      C.    The Financial Costs of the Discovery Sought by FHFA Are Massive................10

II.   THE AUTOMATIC STAY APPLIES TO DISCOVERY AGAINST THE
      DEBTORS, AND FHFA HAS NOT SHOWN CAUSE TO LIFT IT ...........................12

      A.    The Automatic Stay Applies to the Discovery Sought by FHFA.........................13

      B.    FHFA Has Not, and Cannot, Show Cause to Lift the Automatic Stay ................18

      C.    The Sonnax Factors Weigh Heavily Against Lifting the Automatic Stay ..........22

CONCLUSION .......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow),*
   126 F.3d 43 (2d Cir. 1997) ..............................................................19

*Grigsby & Assocs. v. Rice Derivative Holdings, L.P.,*
   2001 U.S. Dist. LEXIS 16112 (S.D.N.Y. Sept. 21, 2001) ....................21

*Grocery Haulers, Inc. v. A&P (In re A&P),*
   467 B.R. 44 (S.D.N.Y. 2012) ...........................................................22

*Groner v. Miller (In re Miller),*
   262 B.R. 499 (B.A.P. 9th Cir. 2001) ............................................15, 16

*In re Carlson,*
   265 B.R. 346 (Bankr. D.R.I. 2001)....................................................16

*In re Hillsborough Holdings Corp.,*
   130 B.R. 603 (Bankr. M.D. Fla. 1991)...............................................17

*In re Johns-Manville Corp.,*
   40 B.R. 219 (S.D.N.Y. 1984) ...........................................................14

*In re Leibowitz,*
   147 B.R. 341 (Bankr. S.D.N.Y. 1992) ............................................19-20

*In re Lyondell Chem. Co.,*
   402 B.R. 596 (Bankr. S.D.N.Y. 2009) ...............................................24

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*
   140 B.R. 969 (N.D. Ill. 1992)........................................................16-17

*In re Penn-Dixie Indus., Inc.,*
   6 B.R. 832 (Bankr. S.D.N.Y. 1980) ...................................................14

*In re Phila. Newspapers, LLC,*
   423 B.R. 98 (E.D. Pa. 2010) ............................................................14

*In re Richard v. Vance & Co.,*
   289 B.R. 692 (Bankr. C.D. Ill. 2003) ................................................17

*Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.),*
   2010 U.S. Dist. LEXIS 125182 (S.D.N.Y. Nov. 8, 2010)................23, 24

*Mazzeo v. Lenhart (In re Mazzeo)*,
    167 F.3d 139 (2d Cir. 1999) ...................................................................................... 19

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
    474 U.S. 494 (1986) .................................................................................................. 13

*Morgan Guar. Trust Co. v. Hellenic Lines Ltd.*,
    38 B.R. 987 (S.D.N.Y. 1984) ................................................................................... 19

*Richards v. Badaracco*,
    No. 88-836, 1988 U.S. Dist. LEXIS 18294 (D.N.J. July 29, 1988) ....................... 14

*Signature Bank v. Ahava Food Corp.*,
    No. 3893, 2008 WL 4126248 (S.D.N.Y. Aug. 19, 2008)................................17-18

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
    907 F.2d 1280 (2d Cir. 1990) ........................................................................*passim*

*Teledyne Indus., Inc. v. Eon Corp.*,
    373 F. Supp. 191 (S.D.N.Y. 1974) .......................................................................... 14

## STATUTES

11 U.S.C. § 362(a)........................................................................................................ 13

11 U.S.C. § 362(d)(1)................................................................................................... 18

## OTHER AUTHORITIES

Collier on Bankruptcy ¶ 362.03[3] (16th ed, 2012) ................................................... 15

2 Howard J. Steinberg, Bankruptcy Litigation § 12:67 (2d ed. 2008) ......................... 15

Residential Capital, LLC and its affiliated debtors and debtors in possession in the above-caption Chapter 11 cases (collectively, the "Debtors") hereby submit this objection (the "Objection") to the *Motion of the Federal Housing Finance Agency Pursuant to the July 11, 2012 Order of the Honorable Denise L. Cote Seeking Limited Discovery from the Debtors and, If Necessary to That Purpose, Relief from the Automatic Stay*, dated July 17, 2012 (Docket No. 806) (the "Initial Motion") and the *Supplement to July 17, 2012 Motion of the Federal Housing Finance Agency Pursuant to the July 11, 2012 Order of the Honorable Denise L. Cote Seeking Limited Discovery from the Debtors and, If Necessary to That Purpose, Relief from the Automatic Stay* (Docket No. 859) (the "Supplemental Motion").[1]  In support of this opposition, the Debtors submit the Declaration of Jeffrey A. Lipps, dated August 7, 2012 (the "Lipps Declaration"), attached as Exhibit 1, the Declaration of John G. Mongelluzzo, dated August 7, 2012 (the "Mongelluzzo Declaration"), attached as Exhibit 2, and respectfully represent:

## PRELIMINARY STATEMENT

1.      The Federal Housing Finance Agency ("FHFA") seeks relief from the automatic stay in order to force the production of documents from the Debtors.  Because of the high cost and significant burden that such production would pose, FHFA cannot establish cause sufficient to truncate the statutorily imposed breathing spell to which the Debtors are entitled under section 362 of title 11 of the United States Code (the "Automatic Stay").

2.      Should FHFA's motion be granted, the Debtors will incur millions of dollars in expenses, and employees necessary for the restructuring and preservation of estate assets will be distracted during this critical period.  All of this expense and interference with the Debtors will not benefit them or any other creditor, and the sought discovery will most certainly

---

[1] The Initial Motion and the Supplemental Motion are referred to together as the "Motion."

be used against the Debtors and their interests by FHFA. In essence, FHFA is seeking to do

nothing more than put itself ahead of all other creditors by demanding the production of

documents at the expense of the estates so that it can pursue claims against Debtors' corporate

affiliates, and ultimately the Debtors. For these reasons, the Motion should be denied.

## BACKGROUND

3.        On the May 14, 2012 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code"). The Debtors are managing and operating their businesses as debtors

in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. These cases are being

jointly administered pursuant to Bankruptcy Rule 1015(b). No trustee has been appointed in the

Chapter 11 cases.

4.        On May 16, 2012, the United States Trustee for the Southern District of

New York (the "U.S. Trustee") appointed a nine-member official committee of unsecured

creditors (the "Creditors' Committee").

5.        On July 3, 2012, the U.S. Trustee appointed the Honorable Arthur T.

Gonzalez, former Chief Judge of this Court, as examiner (the "Examiner").

6.        On July 17, 2012, FHFA filed the Initial Motion, seeking the production

of "loan tapes" and "originator information" and arguing that the discovery it was seeking was

"extremely limited" and "consist[s] of just 21 data files . . . ." (Initial Motion at 13.)

7.        On July 20, 2012, FHFA filed the Supplemental Motion seeking access to

"Loan Files" on the "same [legal bases] as those set forth in the [Initial] Motion with respect to

the loan tapes and originator information." (Supplemental Motion at 3.) FHFA did not indicate

in its Supplemental Motion how many loan files it is seeking. The number could be as high as

105,000 loan files or potentially "only" 42,700 loan files if it seeks only the loan files in the

"supporting loan groups."[2]  FHFA makes no mention of the lack of burden *this* request would

have on the Debtors because it is well aware how massive that burden would be.  Instead, it

coyly relies on the "same" bases in the Supplemental Motion as it does in the Initial Motion,

though the scope and nature of the requests in each are completely different.

8.    The Loan Files and Loan Tapes that FHFA is seeking relate to its case

against, among others, Ally Securities, Ally Financial, Inc., and GMAC Mortgage Group, Inc.

(together, the "Non-Debtor Affiliates"), corporate affiliates of the Debtors, captioned *FHFA v.

Ally Financial Inc.,* 11-civ-07010 (S.D.N.Y.) (the "FHFA Litigation").  (Initial Motion at 3;

Supplemental Motion at 3.)  Debtors had initially been named as defendants in that case, but

were dismissed after the filing of these bankruptcy cases.  (Lipps Decl. ¶ 5.)  The allegations

against the Non-Debtor Affiliates are based on the same alleged conduct that was previously

alleged against the Debtors.  (*Id.*)  The Debtors, now inarguably third parties to the FHFA

Litigation, have received no formal request for the discovery FHFA is seeking other than the

Motion.  Although the Debtors are third parties to the FHFA Litigation, as fully discussed in

their motion to extend the automatic stay, the Debtors still face significant harm from the FHFA

Litigation including threats of res judicata, their indemnification obligations, depletion of their

shared insurance proceeds, and most relevant here—burdensome and costly discovery.  (Motion

to Extend the Automatic Stay Or, In the Alternative, for Injunctive Relief Enjoining Prosecution

of Certain Litigation Against Debtors' Directors and Officers and Non-Debtor Corporate

Affiliates, *Residential Capital LLC et al. v. Allstate Ins. Co. et al.*, Adv. No. 12-ap-01671 (MG),

ECF No. 4 (Bankr. S.D.N.Y. May 25, 2012).)

---

[2] FHFA has informally indicated it may seek a smaller number of loan files, but it has not formally
indicated whether it will do so, what that number of files will be, or which files it is seeking.

## **OBJECTION**

9.      The discovery sought by FHFA is onerous, expensive, and will interfere

with the Debtors' restructuring efforts.  Dismissing these incredible and very real burdens out of

hand, FHFA rests its argument on two premises: first, that the automatic stay does not apply to

third-party discovery against a debtor, and second, that even if it did, FHFA has shown sufficient

cause to lift the automatic stay.  Both premises are wrong and the Debtors should not be

subjected to the costly and burdensome discovery that FHFA demands.

## I.      THE DISCOVERY SOUGHT BY FHFA IS EXTREMELY COSTLY AND BURDENSOME TO THE DEBTORS

10.      The discovery that FHFA is seeking from the Debtors through the Motion

is significant.  Although FHFA glosses over the huge burden and costs, as described below and

in the Mongelluzzo and Lipps declarations, the burden and costs cannot be ignored and the

Motion must be denied.

11.      The discovery that FHFA seeks can be broken down into two parts.  First,

it seeks "loan tapes" and "originator information" (together, the "Loan Tapes").  (Initial Motion

at 3.)  Second, and most troublingly, it requests "Loan Files," and although it does not specify

how many, it may be seeking 42,700 or even 105,000 of them.  (Lipps Decl. ¶ 14b.) Producing

these documents would be extremely costly and burdensome to the Debtors.[3]

### A.      Debtors' Loan Files and Loan Tapes

12.      The Loan Files sought by FHFA are composed of two parts, an

"origination file" and a "servicing file."  (Supplemental Motion ¶ 5.)

---

[3] Debtors have only considered producing Loan Files in response to third-party subpoenas where (1) the number of sought documents is very small, (2) the requesting party agrees to pay all of the Debtors' expenses, and (3) none of the discovery will be used to the detriment of the Debtors.

ny-1050455

13.    Loan Files of the vintage sought by FHFA are stored in a combination of hard-copy form and electronic form.  (Mongelluzzo Decl. ¶ 13.)  And not even all portions of a single Loan File are stored together.  For all of the Loan Files sought by the FHFA, a portion of either or both the origination file and servicing file is likely stored in hard copy.  (*Id*. ¶ 40.)  Even as to a single Loan File, hard-copy portions could be stored in more than one place.  (*Id*. ¶ 28.)

14.    The Debtors' "Fulfillment Group," within Capital Markets Operations, is responsible for tracking down Loan Files and other such documents.  (*Id*. ¶ 5.)  Tracking down Loan Files is a regular part of the Debtors' business, and is necessary for a variety of other obligations the Debtors are facing in this bankruptcy case including requests from the Creditors' Committee seeking thousands of Loan Files.  (*Id*. ¶ 60b.)  The Fulfillment Group has only nine employees who handle requests such as the one FHFA makes here, and they are already at capacity, searching for, locating, and processing tens of thousands of Loan Files a month for the Debtors' business operations and other obligations further described below.  (*Id*. ¶ 5.)

15.    Loan Tapes are stored separately from Loan Files.  Loan Tapes, which are data files, are located on one or more of the Debtors' shared drives or in the historical email of the employees who worked on the securitizations when they were issued.  However, as described in further detail below, they are incredibly hard to find because of the sheer volume of such files that the Debtors maintain, and can only be effectively searched in historic email folders or by having a few select of the Debtors' employees who are knowledgeable about historic securitizations and the Debtors' systems scour old servers.

**B.**     **Producing the Discovery Sought by FHFA Will Pose a Substantial Burden on the Debtors and Interfere with Their Reorganization**

16.     The collection and production of the documents sought by FHFA will require huge amounts of time from the Debtors and distract Debtors' employees from key tasks related to the restructuring and preserving their business.

**(i)     Burdens of Loan File Production**

17.     The process of finding, collecting, and preparing Loan Files for production is exceptionally laborious and time consuming.  (*Id.* ¶ 12.)  And Fulfillment Group employees responsible for these tasks are trained on the Debtors' systems, are familiar with its storage systems, and cannot be replaced or supplemented by temporary workers.  (*Id.* ¶ 59)

18.     To simply identify the location of a Loan File—or the various locations in which its constituent parts might be located—a Fulfillment Group employee must search for the loan in each of ResCap's fourteen loan databases.  (*Id.* ¶ 20.)  Although the Fulfillment Team can search for Loan Files in "bulk," simply identifying the location of 105,000 would alone take approximately two weeks.  (*Id.* ¶¶ 22, 24.)  Even locating "just" 42,700 Loan Files would take at least a week.  (*Id.*)  And, importantly, while the databases are running such massive searches, they cannot be used for other functions, so the searches must be run overnight or the Debtors' regular business operations must be put on hold while the bulk searches are running.  (*Id.* ¶ 24.)

19.     Even after all 14 databases have been searched, the task of locating Loan Files is not complete.  The search results invariably include erroneous outputs, including missing Loan Files, parts of Loan Files shown as being in more than one location, among others.  (*Id.* ¶¶ 26-27.)  The Fulfillment Group must then work to rectify these "exceptions" manually.  (*Id.*)  Simply put, just finding the Loan Files that FHFA is seeking is a time-consuming and laborious task.

20.    Once a loan has been researched and the Fulfillment Group knows where each part of the Loan File is, a lot of work is still necessary to gather and process those Loan Files for production.  For Loan Files (or portions of Loan Files) that are stored in hard copy, the Debtors must contact one of their storage vendors to find the physical files.  (*Id*. ¶ 29.)

21.    The Debtors have two primary storage vendors among several other smaller vendors.  (*Id*.)  Those vendors store and track the Loan Files they maintain for the Debtors among innumerable additional documents stored for their other clients.  After receiving the request from the Fulfillment Group for a Loan File, the storage vendor must then locate the box in which each Loan File resides, and then pull that box.  (*Id*. ¶ 32.)

22.    The storage vendors have only so much capacity.  Contractually, Debtors can ask each of their primary vendors to pull 250 boxes per week at a specified price.  However, beyond that contractual limitation, the vendors charge several multiples of those fees (described below) and, in many cases, can simply not fulfill requests fast enough regardless of expense.  (*Id*.)  A request of 105,000 loan files or even 42,700 loan files required on a short time frame could overwhelm the vendors and impede their ability to get the documents to the Debtors that they need to operate their business and comply with restructuring obligations.

23.    After one of the storage vendors locates and pulls the correct Loan File, it sends it to the Debtors' imaging vendor.  (*Id*. ¶ 43.)  After the imaging vendor—Affiliated Computer Systems ("ACS")—receives the documents, it images them for a per-page cost.  (*Id*. ¶ 45.)  Once the imaging is complete, ACS uploads the Loan File directly to the Debtors' FileNet system.  (*Id*.)  ACS then returns the file to the storage vendor for reshelving.  (*Id*.)  This process can take several days.  (*Id*. ¶ 47.)  In addition, ACS is responsible for imaging a wide variety of documents necessary for the Debtors' business, including newly originated loans,

loans in foreclosure, and the like.  (*Id*. ¶ 44.)  In order not to interfere with these important

requests (which are typically very time sensitive), ACS has to spread out "bulk" requests,

meaning that they simply cannot be turned around quickly.  (*Id*.)  And these volume limitations

cannot be solved by simply adding more imaging vendors.  Because of the extremely sensitive

nature of the data contained within the Loan Files—including social security numbers and other

credit information—vendors must be pre-cleared for rigorous privacy requirements, requirements

that are time consuming to comply with and can simply not be met by many vendors.  (*Id.*)

24.     The process of searching, locating, and producing documents takes a huge

amount of time.  In one case, in which the Debtors produced 64,000 Loan Files to certain

plaintiffs, it took nine months from beginning to end to produce them.  (*Id*. ¶ 48.)

25.     If a Loan File, or a portion of a Loan File, is stored electronically by the

Debtors, it is easier and less expensive to track down than a hard-copy file.  (*Id*. ¶¶ 37-38.)  That

said, it still takes time and effort from the Fulfillment Group and impinges on its ability to

process other pressing requests.  (*Id*. ¶ 39.)  To produce a Loan File that is electronically stored,

the Fulfillment Team must still search for it among the fourteen loan databases.  (*Id*. ¶ 20.)  Once

the file is located, it can be brought up for review to confirm it is the correct and complete file.

Then, it can be prepared for production.  (*Id*. ¶ 38.)  In addition, certain portions of the servicing

file may be stored on a separate database—MortgageServ—maintained by the Debtors' servicing

group.  For that information, the Fulfillment Group must pull that data from MortgageServ and

combine it with the other portions of the Loan File that they collect.  (*Id.* at ¶ 14.)  Notably, the

time and cost benefits of producing Loan Files that are stored electronically will not likely have a

meaningful impact on the burdens and cost of discovery overall because the vast majority of the

Loan Files sought by FHFA are likely to be at least partially in hard-copy format.  (*Id*. ¶ 40.)

> **(ii)    The Employees Necessary for Producing Loan Files Have Substantial and Important Duties Related to the Restructuring and Preserving the Assets of the Estates**

26.    All of the costs and burdens that producing Loan Files will impose on the Debtors is not, of course, the only issue facing the Debtors.  Indeed, the very reason the automatic stay exists is because of the tremendous number of complicated obligations that the Debtors are dealing with while they restructure.

27.    The Debtors, among innumerable other issues, are currently dealing with the following:  (i)  due diligence and other issues with respect to the proposed sales of the Debtors' servicing operations and legacy loan portfolios, (ii) producing documents and responding to requests for information in connection with investigations by the Creditors' Committee and the Examiner (including potentially thousands of Loan Files), (iii) compliance with the April 13, 2011 Consent Order with the Board of Governors of the Federal Reserve System, and (iv) operating their business and preserving its value during the sale process, among many others.  (*Id*. ¶ 60.)  All of these tasks involve tracking down large numbers of Loan Files, and the Fulfillment Group—i.e., the same people who would be collecting FHFA's Loan Files— is responsible for searching for, collecting, and processing them.  (*Id*. ¶ 61.)

28.    Those tasks are already overburdening the Fulfillment Group (*id.* ¶ 62.), and adding tens of thousands of Loan File searches to its load will further strain, if not prevent altogether, the Debtors' ability to meet those critical obligations.

> **(iii)    Burdens of Loan Tape Production**

29.    Locating and producing the Loan Tapes is also a very labor intensive process.

30. The original Loan Tapes are stored either (1) on various shared drive servers maintained by the Debtors or (2) in the archived email boxes of individuals involved with the securitizations at issuance. (Lipps Decl. ¶ 15.)

31. To track down those original Loan Tapes on the shared drives, an employee with historical knowledge of the Debtors' securitizations—such as Heather Anderson—will have to search through the shared drives to find each of the twenty-one Loan Tapes. (*Id.* ¶ 17.) And despite the seeming simplicity of that exercise, it is no small task. There are tens of thousands of folders and subfolders that would have to be searched by a knowledgeable employee manually. (*Id.* ¶ 15.) There are no shortcuts, and no guides. Instead, a key Debtor employee such as Ms. Anderson would have to spend hours upon hours scouring shared drives and trying to find the documents, at the same time they are supposed to be undertaking critical tasks for the estate and restructuring. (*Id.* ¶ 16.)

32. And searching for the final Loan Tapes in archived email is not any easier. Restoring email from multiple custodians who may have emailed the Loan Tapes at issue is a very time-consuming process that requires the involvement of the Debtors' e-discovery team, which is incredibly strained during the restructuring, as well as employees with historical knowledge of who was involved in which aspects of each securitization at issue. Restoring archived email, even after the correct custodian and time frame have been identified, is time consuming and labor intensive. (*Id.* ¶ 14.) Then, the documents must be reviewed to find the relevant documents among potentially tens of thousands of restored emails. (*Id.*)

## C.    The Financial Costs of the Discovery Sought by FHFA Are Massive

33. Although the huge imposition that FHFA's discovery demands will have on the Debtors, their employees, and the restructuring process alone justifies denying the Motion,

the huge out-of-pocket costs such discovery will impose on the Debtors further demonstrate why the Motion should not be granted.

34.    Production by the Debtors of the Loan Files will be tremendously expensive.  In the aggregate, these costs will easily reach millions of dollars if the Debtors are required to produce 42,700 or 105,000 Loan Files.  (Mongelluzzo Decl. ¶ 54.)  Every penny spent on FHFA's discovery requests comes directly out of the money that the Debtors need to run their business and that they will ultimately have to distribute to their creditors.

35.    Because of the way Loan Files are stored, as described above, merely collecting them from the various vendors who hold them, converting them to electronic files where necessary, and preparing them for production is extremely expensive.  (*Id.* ¶ 49.)  On average, it costs $25 to collect and prepare a loan file that is stored in hard copy, and the vast majority of the Loan Files that FHFA is seeking will be in whole or in part stored in hard copy (*Id.* ¶ 52.)  Approximately half of these costs are attributable to the storage vendors for finding, shipping, and reshelving Loan Files, and half are attributable to the imaging vendors who charge per page to image Loan Files.  (*Id.* ¶ 50.)  And, as described above, those costs are likely to increase dramatically—to $75 to $100 per loan file—if the Debtors' contractual limits with their storage vendors are exceeded, a virtual certainty if the Debtors are required to produce 42,700 or 105,000 Loan Files in short order.  (*Id.* ¶ 54.) That means that the costs *just to collect and image the Loan Files*, which are far from the total costs of production, could range from more than $3 million (if "only" 42,700 loans are at issue and they must be produced very quickly) to more than $8 million (if all 105,000 loans are at issue and they must be produced quickly).[4]  And these are

---

[4] Even a calculation that assumes (1) "only" 42,700 Loan Files have to be produced and (2) those Loan Files could be produced on "regular" time frames results in costs to the Debtors in excess of $1 million.

out-of-pocket costs that the Debtors must pay their vendors—money that will come directly out of the estates with no benefit returning to the estate (or the other creditors).

36.    The costs payable to the storage and imaging vendors are not the end of it. There are costs to the Debtors attributable to preparing Loan Files to be turned over to counsel that, while only a few dollars for each file, can become meaningful when massive numbers of Loan Files, such as what are requested here, are at issue.  (*Id.* ¶ 51.)  Even then, prior to the actual production of documents, the costs to the Debtors are not over because significant hosting and processing is necessary to actually produce those documents to third parties such as FHFA. (*Id.* ¶ 56.)  The documents must be bates stamped, stamped for confidentiality, and in some cases reviewed for privilege or confidentiality.  (*Id.* ¶¶ 18, 19a, 20, 26.)  These costs, which could be significant, are in addition to the costs described above and in the Mongelluzzo Declaration. (Lipps Decl. ¶ 19.)  The costs of attorney time for reviewing documents, redacting confidential information (such as borrower information), as well as ancillary attorney costs (such as the cost of negotiating proper confidentiality agreements, etc.) will also be significant.

37.    These massive and unavoidable costs alone justify a continuation of the automatic stay and a denial of the Motion.  Stripping millions of dollars of assets from the estates to permit this third-party discovery will prejudice the rights of all other creditors.

## II.    THE AUTOMATIC STAY APPLIES TO DISCOVERY AGAINST THE DEBTORS, AND FHFA HAS NOT SHOWN CAUSE TO LIFT IT

38.    The discovery sought by FHFA is subject to the automatic stay, and because of the significant burden and cost that it will take to produce, FHFA cannot carry the heavy burden required to lift it.

A.    **The Automatic Stay Applies to the Discovery Sought by FHFA**

39.    Section 362(a)(1) of the Bankruptcy Code provides, in pertinent part, that

the filing of a bankruptcy petition:

> operates as a stay, applicable to all entities, of –

> > (1) the commencement or continuation, including the issuance or
> > employment of process, of a judicial, administrative, or other action or
> > proceeding against the debtor that was or could have been commenced
> > before the commencement of the case under this title, or to recover a
> > claim against the debtor that arose before the commencement of the
> > case under this title.

> > * * *

> > (3) any act to obtain possession of property of the estate or of property
> > from the estate or to exercise control over property of the estate

11 U.S.C. § 362(a).

40.    The automatic stay affords "one of the fundamental debtor protections

provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S.

494, 503 (1986) (citations omitted).

41.    As this Court stated in the context of the Debtors' earlier Motion to

Extend the Automatic Stay, discovery against the Debtors is subject to the automatic stay.  (Stay

Motion Transcript at 99 ("There is an automatic stay in place with respect to discovery from the

debtors" and "if you make the motion to vacate the stay, you're going to carry the burden."

"[Y]ou or anyone else who is seeking to lift the stay to launch discovery against the debtors is

going to carry a very heavy burden.").)  And with good reason:  allowing the massive discovery

that FHFA is seeking against the Debtors will interfere with the complex restructuring they are

undertaking and cause the estates to expend large amounts of money.

42.    This Court's statement on that point is well supported, as courts in this

district have found that the automatic stay extends to efforts to compel third-party discovery

13

from a debtor, especially where that discovery would be costly and interfere with the

reorganization process, as is the case here. *See In re Johns-Manville Corp.*, 40 B.R. 219, 223

(S.D.N.Y. 1984) (holding third-party discovery allowed "*only* when such discovery will not

interfere significantly with the Debtor's reorganization efforts); *Teledyne Indus., Inc. v. Eon

Corp.*, 373 F. Supp. 191, 203 (S.D.N.Y. 1974) (same); *In re Penn-Dixie Indus., Inc.*, 6 B.R. 832,

836 (Bankr. S.D.N.Y. 1980) (refusing to lift stay to allow third-party discovery from debtors

because "[i]nterference by creditors in the administration of the estate, no matter how small,

through the continuance of a preliminary skirmish in a suit outside the Bankruptcy Court is

prohibited").

        43.     Courts in other circuits have similarly held that the automatic stay applies

to third-party discovery where that discovery affects the property of the estate, and/or interferes

with the debtor's restructuring efforts. *See In re Phila. Newspapers, LLC*, 423 B.R. 98, 105

(E.D. Pa. 2010) (critiquing *In re Miller*, discussed below, because the third-party discovery

requests at issue there "would under no circumstances affect the property of the debtor, [and] so

much cannot be said here"); *Richards v. Badaracco*, No. 88-836, 1988 U.S. Dist. LEXIS 18294,

at *6–7 (D.N.J. July 29, 1988) ("It is [the bankruptcy] court which must, in the first instance,

determine the extent to which discovery may be had of [the debtor] without interfering with [the

debtor's] necessary involvement in the reorganization proceedings." (citing *In re Johns-

Manville*, 41 B.R. 926, 932 (S.D.N.Y. 1984))).

        44.     Despite this Court and others holding that discovery such as what FHFA is

seeking here is subject to the automatic stay, FHFA argues that the discovery it is seeking

"clearly falls outsid [sic] the scope of the automatic stay."  (Initial Motion at 10.)

45.      In support of this proposition, FHFA cites Collier's out of context along with a handful of cases that are completely inapposite and from outside of this Circuit.  FHFA fails to cite one controlling decision, or even one relevant non-controlling decision, that supports its argument.

46.      The provision of Collier's that FHFA cites is actually an example of a broader principle:  namely, "[l]itigation in which the debtor is not a party *and that only collaterally affects the debtor* is not stayed."  Collier on Bankruptcy ¶ 362.03[3] (emphasis added).[5]  FHFA conveniently ignores the second critical component of this principle—that is, the effect or burden on the debtor—for it knows that its extensive discovery requests would indeed have serious adverse effect on the Debtors' restructuring.  Not only would the discovery be costly and burdensome, as described at length above and in the Mongelluzzo and Lipps declarations, but it will be used to pursue a case against the Non-Debtor Affiliates that will have direct negative impacts on the Debtors, including indemnification obligations, depletion of insurance proceeds, and the risk of res judicata, law of the case, and/or collateral estoppel.

47.      Collier's then states, as an example of this principle, that third-party discovery against a debtor is not subject to the automatic stay; but the cases it cites—one of the same cases FHFA relies on—is clearly inapplicable to a situation where, as here, a party seeks document discovery that would cause great interference with reorganization.  In that case, *Groner v. Miller (In re Miller)*, the court found that a post-petition third-party subpoena to a

---

[5] *Steinberg's Bankruptcy Litigation* goes further, simply assuming that the automatic stay applies to third-party discovery, and notes that "[w]here creditors seek relief from the stay for the limited purpose of engaging the debtor in discovery, such requests may be granted unless the debtor can establish:  (1) The discovery will interfere with the job performance of high level corporate management or reorganization negotiations; (2) The debtor is involved in a critical process of plan formulation; (3) The expenditures related to discovery will imperil the reorganization or the interest of the debtors' creditors."  2 Howard J. Steinberg, Bankruptcy Litigation § 12:67 (2d ed. 2008) (citing *In re Johns-Manville Corp.*, 40 B.R. at 222–26; *In re Johns-Manville*, 39 B.R. 659, 661–62 (S.D.N.Y. 1984); *In re Towner Petroleum Co.*, 48 B.R. 182, 190–91 (Bankr. W.D. Okla. 1985) (relief denied); *In re Penn-Dixie Indus., Inc.*, 6 B.R. at 836).

Chapter 13 debtor—to depose her in a suit against her husband and to defend against a cross-

complaint she brought—did not violate the automatic stay. 262 B.R. 499, 501–03 (B.A.P. 9th

Cir. 2001). On its face, *In re Miller* had nothing to do with the kind of complex, multibillion-

dollar Chapter 11 reorganization or extensive document discovery at issue here. And even if it

did, *Miller* in fact counsels against the relief FHFA is seeking because it on its face only applies

where the "discovery requests . . . pertain[] only to the [creditors'] claims against the other, non-

debtor defendants." (*Id.* at 504.)

        48.      While it is true that the Debtors are no longer parties to the FHFA

Litigation, they were until just after their bankruptcy filing, and claims against their affiliated

entities in that case are tantamount to claims against the Debtors. That is because the claims in

the FHFA Litigation are based on the Debtors' conduct and because the Debtors have

indemnification obligations to and shared insurance policies with Ally. Moreover, the court's

conclusion in *Miller* was premised, at least in part, on the rationale that the automatic stay does

not bar actions based on a Chapter 13 debtor's post-petition conduct, and it does not bar post-

petition defensive action relating to a pre-petition suit brought by a debtor. *Id.* at 507–08.

Neither rationale has any application here.[6]

        49.      The other cases FHFA cites do no better. For example, in *In re Mahurkar*

*Double Lumen Hemodialysis Catheter Patent Litigation*, the court also allowed only the

deposition of a debtor's employees to prosecute a case against a codefendant—and this occurred

---

[6] The same is true of the second case cited in Collier's. In that case, *In re Carlson*, the court refused to
hold a party in contempt for filing a Rule 2004 examination of a bankrupt company's president, on
grounds that such a request did not violate the automatic stay in the president's own Chapter 7
bankruptcy. 265 B.R. 346, 346 (Bankr. D.R.I. 2001). The court based its decision, in part, on finding no
evidence that the Rule 2004 examination would harass or cause the officer-debtor any unnecessary
expense. *Id.* at 348. Again, a case involving a single, undemanding deposition or examination of an
individual debtor says nothing about the burdens of enormously expensive and extensive document
discovery on the complex reorganization at issue here.

only after the debtor had impermissibly instructed a non-party *former* employee not to attend a scheduled deposition because it erroneously believed that the automatic stay halted that deposition. 140 B.R. 969, 971 (N.D. Ill. 1992). The court said nothing about extensive document discovery, and it expressly stated that it would "issue orders as the need arises clarifying the permitted scope of discovery," clearly contemplating that discovery beyond the scheduled deposition could be curtailed by the automatic stay. *Id.* at 978.

50.    *In re Hillsborough Holdings Corp.* also dealt only with depositions, and there the court ruled that, "assuming without conceding" that the automatic stay did apply, the party seeking discovery carried its burden and showed that it was entitled to relief from the automatic stay. 130 B.R. 603, 606 (Bankr. M.D. Fla. 1991). Even then, the court noted that it might "be in a position to control the use of discovery and would certainly be able to prohibit the utilization against [the debtor] of any information obtained through the proposed discovery." *Id.* at 607. The same is not true here: as outlined below, FHFA cannot show that it is entitled to relief, and, unfortunately, this Court would not be in a position to cabin discovery because FHFA's case is pending in the district court.

51.    The only case FHFA cites that does not deal solely with depositions is *In re Richard v. Vance & Co.*, 289 B.R. 692 (Bankr. C.D. Ill. 2003). But there the subpoenas duces tecum at issue were directed to the debtor's non-debtor parent company and its bank, and not the debtor itself. *Id.* at 694. The court ruled that discovery from a non-debtor parent did not violate the automatic stay. *Id.* 697–98. This clearly has no bearing on whether discovery can be taken directly from the Debtors.[7]

---

[7] *Signature Bank v. Ahava Food Corp.*, cited by Judge Cote during the July 17 hearing (Doc. 859-1 at 26:10–16 (citing No. 3893, 2008 WL 4126248 (S.D.N.Y. Aug. 19, 2008)), also offers no help, for it too bears no resemblance to the present case. In *Signature Bank*, the court refused to hold that a company's recent bankruptcy petition precluded plaintiff from deposing two of debtor's employees to continue

52.    In short, FHFA can muster no controlling authority that supports its claim that the automatic stay does not apply here because no such controlling authority exists.  The automatic stay applies here, and as a result, FHFA must meet a very heavy burden to get the discovery it is seeking.

**B.    FHFA Has Not, and Cannot, Show Cause to Lift the Automatic Stay**

53.    Section 362(d) of the Bankruptcy Code provides that the Court shall grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not, however, define the phrase "for cause."  In the context of stayed pre-petition litigation, though, the Second Circuit has outlined a twelve-factor test (the "*Sonnax* Factors") to determine whether "cause" exists to lift the stay to allow the litigation to proceed:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding and (12) impact of the stay on the parties and the balance of harms.

---

claims against codefendants when those depositions had been noticed pre-petition.  2008 WL 4126248, at *1.  Much like *Carlson*, *Mahurkar*, and *Hillsborough* above—and in contrast to the present case—the *Signature Bank* court noted that the debtor had failed to make any case that the already-scheduled depositions would interfere with reorganization in any way.  *Id.*  Moreover, even though *Signature Bank* arises in this district, it does not state governing law:  the court in *Signature Bank* explicitly stated that it was applying Ninth Circuit law because the underlying bankruptcy was pending in California, and to that end it followed *In re Miller* without question.  *Id.*

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280,

1285-1287 (2d Cir. 1990) (citation omitted); *see also Mazzeo v. Lenhart (In re Mazzeo)*, 167

F.3d 139, 143 (2d Cir. 1999) (vacating a district court order granting stay relief where the

bankruptcy court had not applied the *Sonnax* Factors, made only sparse factual findings, and

ultimately did not provide the appellate court "with sufficient information to determine what

facts and circumstances specific to the present case the court believed made relief from the

automatic stay appropriate").

54.    Courts have recognized that not all of the *Sonnax* Factors will be

applicable to every case, and the Court may disregard irrelevant factors.  *See In re Mazzeo*, 167

F.3d at 143.  In a case such as this, which deals with onerous third-party discovery sought against

the Debtors, that is particularly true.  Nonetheless, an analysis of the relevant *Sonnax* Factors

makes clear that FHFA has not met its heavy burden.

55.    In a request for stay relief, the moving party bears the initial burden to

demonstrate that cause exists to lift the stay, using the *Sonnax* Factors, and the court may deny

the motion if the movant fails to make an initial showing of cause.  *See Sonnax*, 907 F.2d at

1285; *Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43, 48 (2d

Cir. 1997) ("We have emphasized that a bankruptcy court should deny relief from the stay if the

movant fails to make an initial showing of cause.") (quotation omitted).  Further, the cause

demonstrated must be "good cause."  *Morgan Guar. Trust Co. v. Hellenic Lines Ltd.*, 38 B.R.

987, 998 (S.D.N.Y. 1984).

56.    More than failing to meet this heavy burden, FHFA fails to make even an

initial showing of cause.[8]  FHFA argues that the *Sonnax* Factors "overwhelmingly weigh in favor

---

[8] FHFA also faces a heavy burden because it is an unsecured creditor.  *In re Leibowitz,* 147 B.R. 341, 345
(Bankr. S.D.N.Y. 1992) ("The general rule is that claims that are not viewed as secured in the context of §

ny-1050455

of relief." But FHFA's cursory and conclusory application of those factors falls far short of demonstrating initial cause for relief.

57.    The only harm that FHFA mentions in the initial Motion is that "it will be very difficult for [the FHFA Litigation] to proceed" without the documents. (Initial Motion at 14.) In the Supplemental Motion, FHFA relies on basically the same logic, asserting that it is of "paramount importance" to FHFA to receive the Loan Files "to avoid harm to the FHFA Coordinated Actions." (Supplemental Motion at 5.) These harms, they posit, far outweigh any harms to the Debtors, which FHFA simply dismiss out of hand. The only support FHFA has for this proposition is Judge Cote's statement from the bench during the hearing on Debtors' motion to extend the automatic stay in the FHFA Litigation. However, the specific and massive discovery burdens and expenses described by the Debtors above and in the Mongelluzzo and Lipps Declarations were not in the record during that proceeding.

58.    Perhaps most tellingly, in the Initial Motion, which relates only to Loan Tapes, FHFA makes much of the "limited number of loan tapes," "limited discovery," "extremely limited" discovery it is seeking, and the "non-existent harm to the Debtors." (Initial Motion at 3, 4, 13, 14.) Then, after having made that "limited" scope and burden argument the very centerpiece of the Initial Motion, FHFA seeks a massive amount of incredibly burdensome discovery in the Supplemental Motion, though rests on the "same bases" as the Initial Motion. (Supplemental Motion at 3.) FHFA's two briefs prove the point: it could only possibly hope to prevail on the Initial Motion because of the "limited nature of discovery" it was seeking, an admission that completely eviscerates a similar claim as to the expansive nature of discovery sought in the Supplemental Motion.

---

362(d)(1) should not be granted relief from the stay unless extraordinary circumstances are established to justify such relief.").

59.     Beyond the fact that FHFA has failed to offer any meaningful analysis or argument of the *Sonnax* Factors describing why cause to lift the stay exists, FHFA has also failed to even describe with any specificity the relief it is seeking.  FHFA simply states that it wants "loan files" without specifying which Loan Files it is seeking or even how many it wants.  And the difference is important.  There are 105,000 total loans in the securitizations at issue in the FHFA Litigation.  (Lipps Decl. ¶ 14b.)  However, only 42,700 of those loans are in the "supporting loan groups" that FHFA actually owns.  (*Id.*)  Further, FHFA has sought in the underlying case to sample loans instead of reviewing all of them, which may mean fewer are at issue than 42,700.  (*Id.*)  But the Debtors are left to guess as to what FHFA is actually seeking, undoubtedly because FHFA knows that what it is asking this Court to allow is massively burdensome, and is seeking to distract from that burden by speaking only broadly of "loan files."  It is hard to imagine how FHFA could possibly satisfy the requirement of showing "cause" if it did not even specify the documents it is seeking.  The lack of specificity in FHFA's request for third-party discovery is on its own enough to deny the Motion.  *Cf. Grigsby & Assocs. v. Rice Derivative Holdings, L.P.*, 2001 U.S. Dist. LEXIS 16112, at *11 (S.D.N.Y. Sept. 21, 2001) (quashing a third party subpoena because it contained only "non-specific, overbroad production requests that would surely amount to truckloads of documents").

60.     FHFA's failure to make even an initial showing of cause to overcome this heavy burden is alone grounds for denying the requested relief.  *See Sonnax*, 907 F.2d at 1285 ("[If] the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.").

21

C.    **The *Sonnax* Factors Weigh Heavily Against Lifting the Automatic Stay**

61.    Although FHFA fails to make even a minimal showing of cause, a review of the relevant *Sonnax* Factors and the facts demonstrates that it simply cannot do so.

62.    First, the early stage of the FHFA Litigation and the type of discovery sought by FHFA before this court demonstrates that first *Sonnax* Factor—whether relief would resolve the issues—and the eleventh *Sonnax* Factor—whether the parties are ready for trial in the other proceeding—weigh heavily against granting relief.

63.    A review of the Scheduling Order in the FHFA Litigation shows that the case is years away from going to trial, counseling against granting the Motion.  (*See* Pretrial Scheduling Order at 4, *FHFA v. Ally Fin. Inc.*, No. 11-cv-07010 (S.D.N.Y. June 14, 2012), ECF No. 71.)  *See Grocery Haulers, Inc. v. A&P (In re A&P)*, 467 B.R. 44, 56 (S.D.N.Y. 2012) (affirming the bankruptcy court's denial of relief, in part because "the parties were not ready for trial in the [other] action").

64.    Providing FHFA the relief it is seeking here will not resolve the issues. Lifting the stay here will not resolve even FHFA's discovery demands because it is likely to come back to this Court for more discovery that will further burden the Debtors and further cost the estate money.  Indeed, FHFA has already done so once and threatened to do so again.  FHFA supplemented the Initial Motion with the Supplemental Motion, which broadened its request to include tens of thousands of Loan Files.  Then, in a letter to Judge Cote dated July 30, 2012, FHFA stated that "[t]he Bankruptcy Court is scheduled to hear FHFA's application for loan tapes and loan files on August 14, and FHFA needs time to supplement its application to obtain additional documents from the Debtors based on the information provided at the 30(b)(6) deposition" of Ally Financial, Inc., currently scheduled for August 9, 2012.  (Lipps Decl., Ex. B.)

And even that will unlikely be the end of it.  That discovery will be burdensome and will all come from the Debtors.  (*Id*.)  Therefore, *Sonnax* Factors 1 and 11 weigh heavily in favor of denying relief.

65.     Second, lifting the stay will undoubtedly interfere with the bankruptcy case (*Sonnax* Factor 2) and prejudice the interests of other creditors (*Sonnax* Factor 7) because it will deplete estate resources.  *See Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 2010 U.S. Dist. LEXIS 125182, at *11, 16 (S.D.N.Y. Nov. 8, 2010) (affirming the bankruptcy court's refusal to lift a stay, in part, because "allowing [the party] to proceed . . . would force [the debtor] to expend estate resources," which shows that relief from the stay would interfere with the bankruptcy proceeding and prejudice other creditors).

66.     FHFA requests access to "loan files relevant to the FHFA Case that are in the Debtors' possession." (Supplemental Motion at 3.)  Finding, collecting, and producing Loan Files, as described in detail above, is a very labor-intensive, time-consuming, and expensive process.  (*Supra* pp. 4-12.)  Complying with FHFA's discovery demands would require a tremendous amount of work from ResCap employees and cost the Debtors a substantial amount of money.  (*Id.*)  Because lifting the stay would "force [the debtors] to expend estate resources"—in this case millions of dollars of estate money and immeasurable amounts of time from estate employees—*Sonnax* Factors 2 and 7 weigh in favor of denying relief.  *In re Motors Liquidation Co.*, 2010 U.S. Dist. LEXIS 125182, at *11 (affirming the bankruptcy court's denial of relief on similar grounds).

67.     Third, the tenth *Sonnax* Factor—"the interests of judicial economy and the expeditious and economical resolution of litigation"—weighs in favor of denying relief for similar reasons.  The court in *In re Motors Liquidation Co.* affirmed the bankruptcy court's

23

finding that judicial economy "weighed against relief because allowing Appellant to proceed

with his . . . action would open the 'floodgates' to thousands of other litigants with . . . claims

against the. . . estate." 2010 U.S. Dist. LEXIS 125182, at *15.  The *Motor Liquidators* court

correctly noted that, in such a case, lifting the stay would "usher in the very state of affairs the

automatic stay was enacted to prevent," namely "centraliz[ing] all disputes concerning property

of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently,

unimpeded by uncoordinated proceedings in other arenas."  *Id.* (citing *In re Ionosphere Clubs,

Inc.*, 922 F.2d 984, 989 (2d Cir. 1990)).

> 68.    While the court in *Motor Liquidation*  was considering lifting the stay of

an action against the estate—as opposed to an attempt to force third-party discovery from the

Debtors—the same rationale applies.  Various plaintiffs have brought dozens of MBS Actions

against the defendants.  Dozens more plaintiffs have brought suits related to foreclosures,

servicing, RESPA, among other claims.  All of those plaintiffs are likely to want discovery from

the Debtors, and lifting the stay and requiring the Debtors to produce documents to FHFA would

inevitably open the "floodgates" to similar requests from those plaintiffs, leading to an even

greater potential expenditure of estate resources.  Therefore, *Sonnax* Factor 10 weighs heavily in

favor of denying relief.

> 69.    Finally, *Sonnax* Factor 12—the impact of the stay on the parties and the

balance of the harms—also favors denying relief.  As described above, lifting the stay and

allowing FHFA to conduct essentially unfettered discovery against the Debtors would "distract

[the Debtors'] attention from its primary goal of reorganizing"—indeed a very serious harm.

*See, e.g.*, *In re Lyondell Chem. Co.*, 402 B.R. 596, 610 (Bankr. S.D.N.Y. 2009) (denying a

party's request to lift the automatic stay) (citation omitted).  The Debtors, including the

24

employees who would be involved in the discovery that FHFA is seeking, are involved in myriad time-sensitive, mission-critical tasks related to the restructuring and operation of the business. Interfering with those tasks could be devastating.  The potential harm to the Debtors if the stay is lifted clearly outweighs the potential harm to FHFA if the stay continues.  *See id.* (refusing to lift the automatic stay where "a delay of several months, or even more than that" would harm the moving party far less than distracting the debtor from its reorganization efforts would harm the debtor).  And the costs and burdens to the Debtors are of course not the only harm:  lifting the stay will allow FHFA to immediately pursue its case against the Non-Debtor Affiliates and lead to indemnification claims against the Debtors, depletion of their shared insurance proceeds, as well as risks of res judicata, law of the case, and/or collateral estoppel.  Put another way, the huge burden and massive costs that FHFA is trying to foist upon the Debtors will not benefit the Debtors or any creditor (other than FHFA) while allowing FHFA to prosecute its case against the Non-Debtor Affiliates, and ultimately the Debtors.

70.    It is clear that FHFA has not come close to meeting its burden, and as a result, its motion should be denied.

## CONCLUSION

71.    For the foregoing reasons, the Debtors request that the Court enter an Order denying the Motion and grant such other relief as the Court deems proper.

New York, New York
Dated: August 7, 2012

/s/ Joel C. Haims
Gary S. Lee
Joel C. Haims
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and Debtors in Possession*