**EXHIBIT 1**

**<u>Lipps Declaration</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

In re:                                          )    Case No. 12-12020 (MG)
                                                )
RESIDENTIAL CAPITAL, LLC, et al.,               )    Chapter 11
                                                )
                              Debtors.          )    Jointly Administered
                                                )
---------------------------------------------------------

## DECLARATION OF JEFFREY A. LIPPS

I, Jeffrey A. Lipps, declare:

1.      I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215 (the "Firm").

2.      The Firm is retained as special litigation counsel to the above-captioned debtors and debtors in possession (the "Debtors"). The Firm previously served as counsel of record in the *FHFA v. Ally* case (SDNY Case 11 Civ. 7010) for debtors GMAC-RFC Holding Company, LLC, Residential Funding Company, LLC, Residential Asset Mortgage Products, Inc., Residential Asset Securities Corporation, and Residential Accredit Loans, Inc. (the "Debtors"), and non-debtor affiliate Ally Securities, LLC ("Ally Securities"). Since the spring of 2010, the Firm has represented the Debtors in over a dozen separate lawsuits involving the Debtors' issuance of residential mortgage backed securities.

3.      I make this declaration to provide background concerning the *FHFA v. Ally* case and to describe in more detail the specific impact on the Debtors of the discovery requested by the Motion of the Federal Housing Finance Agency Pursuant to the July 11, 2012 Order of the Honorable Denise L. Cote Seeking Limited Discovery from the Debtors and, If Necessary to

That Purpose, Relief from the Automatic Stay and the related Supplement (together, the "FHFA Motion").

### Legal Claims Involved in *FHFA v. Ally*

4.    In September 2011, the Federal Housing Finance Agency ("FHFA"), in its capacity as conservator for Freddie Mac, filed a lawsuit against Debtors Residential Capital LLC, Residential Funding Corporation ("RFC"), Residential Asset Mortgage Products, Inc. Residential Asset Securities Corporation and Residential Accredit Loans, Inc. and nondebtors Ally Financial, Inc., GMAC Mortgage Group LLC and Ally Securities, LLC (the "Non-Debtor Affiliates") along with a number of third party underwriters for the transactions sponsored by the Debtors. FHFA simultaneously filed 16 other similar actions against other groups of issuers and underwriters. The lawsuit against the Debtors and the Non-Debtor Affiliates involved 21 securitizations, with more than 100,000 loans, in which Freddie Mac invested.

5.    After the Debtors filed for bankruptcy, FHFA filed an amended complaint (the "Amended Complaint") which dropped the Debtors, but continued to assert claims relating to alleged misstatements in the offering documents for 21 residential mortgage-backed securitizations issued by the Debtors. A copy of the Amended Complaint is attached hereto as Exhibit A. In the Amended Complaint, FHFA stated that it dropped the Debtors from the case solely because of the automatic stay put in place by the Debtors' bankruptcy filing. See Amended Complaint pg. 10 fn. 4.

6.    Thus, FHFA's claims all turn on the same nucleus of facts, namely, the facts and circumstances surrounding the *Debtors'* creation and issuance of these 21 mortgage-backed securities; and all turn on the same basic legal theory that the *Debtors* made misrepresentations in the offering materials for these securitizations.

2

### The Transactions Involved in *FHFA v. Ally*

7.      The 21 securitizations at issue in the case were issued by the Debtors between 2005 and 2007.  The Debtors' securitization business was structured around "shelves" that grouped securitizations by type.  Thus, securitizations issued by Debtor Residential Accredit Loans, Inc. all have the designation "RALI" in the name, and all involve first-lien mortgages of the "Alt-A" type of loan.  These loans were acquired by the Debtors pursuant to specific loan programs that focused on borrowers with "A" credit scores, but that had alternative features or allow alternative or non-standard documentation of income.  Similarly, securitizations issued by Debtor Residential Asset Securities Corporation all have the designation "RASC" in the name of the offering, and typically involve subprime first-lien mortgages.  And the securitizations issued by Debtor Residential Asset Mortgage Products, designated with a "RAMP" in their names, involved a variety of non-conforming or non-traditional loan products, including some securitizations in this case that were "single seller" transactions in which all the loans were contributed by a single loan originator, a format that was atypical for the Debtors' securitizations.

8.      Each securitization shelf was managed by a different group of the Debtors' employees. The personnel involved varied over time.

9.      Each loan product type involved different employees of the Debtors.    The personnel involved varied over time.

10.     Each of the 21 securitizations involved a unique set of mortgage loans.

11.     Each of the 21 securitizations had its own offering materials, which were specifically drafted and negotiated.

3

12.    Thus, each of the 21 securitizations involved different specific documents and communications.

13.    Here, FHFA has asserted claims relating to:

   a.  Ten RASC securitizations spanning a three year period;

   b.  Five RAMP securitizations spanning a two year period; and

   c.  Six RALI securitizations spanning a three year period.

### The Documents Currently Requested in *FHFA v. Ally*

14.    The Debtors have sole custody of the vast majority of the documents central to the allegations asserted by FHFA in that case, and the Non-Debtor Affiliates have very few in their custody. The FHFA Motion requests (a) loan tape and originator information and (b) loan files for the securitizations involved in that case.

   a.  Loan Tapes and Originator Information. FHFA already has access to a wealth of loan-level information via the publicly available GMAC ResCap Vision website, including the 21 spreadsheets containing 50 or 60 fields of loan level data described in their request. Their request goes beyond that, however, seeking additional information about originators that is not already available on Vision, and seeking the *actual* loan tapes created *at the time of issuance.* These pieces of information pose additional issues. The additional originator information typically must be mined from the Debtors' databases, under the direct supervision of the Debtors' personnel who have specific expertise with the data in question. In addition, while loan-level data of the type available on the Vision website is fairly readily available, the actual "final" loan tapes generated at issuance are not. Those must be mined either from shared drive

4

spaces that can only be reliably identified by the Debtors' personnel with substantive knowledge of the files, as described below, or from the collection of historical email correspondence, which, as described below, is also burdensome.

b. Loan Files. None of the Non-Debtor Affiliates have in their custody the "origination files" or loan files for the mortgage loans in the securitizations. Those files are in the possession of the Debtors. The files contain information relating to owner-occupancy representations made by borrowers, property values and appraisals, and borrower creditworthiness assessments. The same is true for the "servicing files," which contain post-closing information related to servicing the loan. There are over 105,000 loan files involved in the 21 securitizations at issue in the *FHFA v. Ally* case. Even if discovery is limited in the first instance to the "Supporting Loan Groups," as was suggested by Judge Cote at the July 17 hearing, over 42,700 individual loan files would be involved. Each of these loan files will likely be several hundred pages. While FHFA has discussed in its court filings in the *FHFA v. Ally* case using sampling to further limit the number of loan files it needs to review, it has not proposed a specific sampling protocol in the *FHFA v. Ally* case or identified any smaller group of loans as a limit to the Debtors' production.

15.     Producing the "final" loan tapes at the time of issuance will require research through user electronic files on shared drives and stored emails. Historical email files are accessible only through a burdensome process of manually restoring them from month-end backup tapes. There can be multiple backup tapes that must be restored to access a single

month's email for a single individual. The email files must then be processed, searched, and reviewed before they can be produced. This is time-consuming and burdensome, and due to the large volume of material, outside vendors typically must be engaged, at the Debtors' expense, to assist in the process. In this particular case, where there are 21 securitizations across three different shelves (each with its own constellation of relevant employees), and a three-year time period, even restoring the limited email necessary to locate "final" at issuance loan tapes would likely run in the hundreds of thousands of dollars. To my knowledge, FHFA has not offered to contribute to any of these costs, even though the Debtors are no longer parties to this action.

16.    Apart from loan files and email, many relevant documents, including various versions of the preliminary and final loan tapes generated at the time the securitizations were issued, are located on shared drive servers owned by the Debtors. However, these servers are massive, containing literally tens of thousands of folders and subfolders, many of which are not clearly labeled, and very few employees remain with substantive knowledge of *where* on these servers additional relevant materials can be located. Searching these folders will require one or more of the few remaining employees with substantive knowledge to spend hours manually searching these servers to locate responsive materials.

17.    By way of example, one such employee, Heather Anderson, is a key resource with respect to the securitization business generally and specifically is a witness with respect to the six RALI securitizations at issue in the *FHFA v. Ally* case. I understand, as set forth in the Declaration of Anne Janiczek submitted in support of the Debtors' motion to extend the automatic stay, that Ms. Anderson also has many significant responsibilities with respect to the restructuring of the Debtors. Assisting with litigation would be a burden and distraction.

6

18.    In order to locate the preliminary and final loan tapes and other securitization-related materials for the 21 offerings in question, we would likely need to ask Ms. Anderson – one of the only remaining employees of the company with substantive knowledge of the documents – to research the locations of those files on shared drive spaces and identify their likely email custodians so that they can be retrieved for review and production. Doing so is a distraction and imposition on her time during this critical juncture in the bankruptcy process.

19.    The loan files would also be burdensome to find and produce. The Mongelluzzo Declaration describes the burdens with locating, retrieving and imaging loan files by ACS. The Debtors' fulfillment group then provides that file to counsel handling the litigation. However, the files then need to be re-processed by litigation vendors so that they can be Bates-stamped, rendered searchable, and stamped for appropriate confidentiality protection, which is time-consuming and costly given the millions of pages involved. As an example of these costs, it is my understanding that the cost to retrieve, image, scan and produce the approximately 63,000 loan files in the MBIA v. RFC litigation totaled to more than $1.5 million.

### Demands on the Debtors' Limited E-discovery and Other Resources

20.    The costs associated with the anticipated discovery are substantial and the requests put a great strain on the Debtors' already-limited resources.

21.    Other than loan files, the Debtors' legal and e-discovery staff must participate in the collection and production of all materials sought.

22.    Currently, the Debtors' e-discovery team consists of five full time employees. One oversees the process and works with in-house and outside counsel to facilitate the collection and production of materials. One handles the preservation and capture of data, as well as works with collected data as it is processed and filtered. A third employee assists with the processing

7

and production of electronically stored information, as well as backup tape restoration. This employee is also responsible for managing the ediscovery system. The remaining two employees are involved in development and support for the information technology systems used by the team and do not work on the collection or processing of data.

23. At the current time, this small e-discovery group is already stretched to the limit with existing requests that are a priority for the Debtors as they work to proceed through the bankruptcy process in an orderly fashion. Specifically:

    a. The Debtors are currently responding to two very broad subpoenas served by the Securities and Exchange Commission. These subpoena responses have been consuming a substantial amount of the e-discovery team's time spent researching and collecting live data, as well as restoring, processing and searching month-end backup tape to locate additional responsive materials.

    b. The Debtors are responding to broad discovery requests which were served pursuant to the Bankruptcy Court's Rule 2004 Order and which are now being pursued by the examiner, which also require the collection of electronic documents and the restoration of month-end backup tape for a number of email custodians over a lengthy period of time.

    c. The e-discovery team is required to produce documents in response to certain contested matters in the bankruptcy, such as the Debtors' Motion to approve agreements with Ally Bank.

    d. Under the scheduling order recently entered by the Court, parties can now serve discovery on the Debtors in connection with the pending Rule 9019 Motion to Approve RMBS Trust Settlements. The Debtors are anticipating

receiving discovery requests in connection with that motion. The scheduling order imposes tight time periods to respond to discovery requests, which will impose additional burdens on the Fulfillment Group and the e-discovery group.

24.    These ongoing discovery requests pose a substantial burden for the company's small e-discovery group, and the Debtors have already had to contend with concerns expressed by the SEC and others regarding the pace of document production. Requiring the Debtors to produce documents relating to 21 securitizations during this same time period will unreasonably stretch the Debtors' limited staff.

25.    In addition, many aspects of the Debtors' business necessarily involved legal input and advice, and any documents to be produced by Debtors would have to be reviewed so that Debtors can preserve the attorney-client and other applicable privileges. Such review and production is costly and time-consuming.

26.    In light of the fact that FHFA sent a letter on July 30, 2012 to Judge Cote regarding the production of email from approximately 36 current or former employees of the Debtors (a copy of which without enclosures is attached as Exhibit B), it appears evident FHFA intends to come back and ask for additional categories of documents which are in the custody of the Debtors. Any such requests would, of course, pose additional burdens on the Debtors and their employees.

27.    For these reasons, the suggested discovery requests relating to the 21 securitizations at issue in the FHFA litigation poses a substantial burden on the Debtors and threatens to interfere significantly with the Debtors' efforts to complete a successful and timely restructuring.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true to the best of my knowledge, information, and belief.  Executed on August 6 2012, at Columbus, Ohio.

_____
Jeffrey A. Lipps

**<u>EXHIBIT A</u>**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
HOME LOAN MORTGAGE
CORPORATION,

          Plaintiff,

       -against-

ALLY FINANCIAL INC., GMAC
MORTGAGE GROUP, INC., ALLY
SECURITIES, LLC, J.P. MORGAN
SECURITIES LLC f/k/a J.P. MORGAN
SECURITIES, INC. and as successor-in-
interest to BEAR, STEARNS & CO. INC.,
CREDIT SUISSE SECURITIES (USA) LLC
f/k/a CREDIT SUISSE FIRST BOSTON
LLC, RBS SECURITIES, INC. f/k/a
GREENWICH CAPITAL MARKETS, INC.,
CITIGROUP GLOBAL MARKETS INC.,
BARCLAYS CAPITAL INC., UBS
SECURITIES LLC, and GOLDMAN, SACHS
& CO.,

          Defendants.

**11 Civ. 7010 (DLC)**

**AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................................................ 1

PARTIES .................................................................................................................... 5

    Plaintiff and Freddie Mac ..................................................................................... 5

    Defendants ............................................................................................................. 6

        Ally Defendants ................................................................................................ 6

        Non-Ally Defendants ........................................................................................ 7

        Non-Party Ally Debtors .................................................................................. 10

    Non-Party Originators .......................................................................................... 11

JURISDICTION AND VENUE ................................................................................ 11

FACTUAL ALLEGATIONS .................................................................................... 12

I.      FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ................................... 12

    A.      The Securitizations................................................................................ 13

        1.      Residential Mortgage-Backed Securitizations Generally ........................ 13

        2.      Securitizations at Issue in this Case ......................................................... 14

        3.      Securitization Process .............................................................................. 17

            a.      The Sponsors Grouped Mortgage Loans in
Special-Purpose Trusts................................................................ 17

            b.      The Trusts Issued Securities Backed by the Loans....................... 18

    B.      Defendants' and the Ally Debtors' Participation in the
Securitization Process ......................................................................... 21

        1.      The Ally Sponsor:  RFC ........................................................................... 22

        2.      The Ally Depositors:  RALI, RASC and RAMP....................................... 24

        3.      The Ally Underwriter:  Defendant Ally Securities ................................... 25

        4.      The Ally Control Persons:  Defendants Ally Financial and GMACM ..... 25

5.      Non-Ally Defendants .................................................................. 31

C.    Statements in the Registration Statements ............................................. 31

1.      Compliance with Underwriting Guidelines ............................... 32

2.      Occupancy Status of Borrower ................................................. 36

3.      Loan-to-Value Ratios ................................................................ 38

4.      Credit Ratings ........................................................................... 41

D.    Falsity of Statements in the Registration Statements........................... 43

1.      The Statistical Data Provided in the Prospectus Supplements
        Concerning Owner-Occupancy and Loan-to-Value Ratios
        Were Materially False or Misleading ....................................... 43

        a.      Owner-Occupancy Data Was Materially False or Misleading ..... 43

        b.      Loan-to-Value Data Was Materially False .................................. 46

2.      The Originators of the Underlying Mortgage Loans Systematically
        Disregarded Their Underwriting Guidelines ............................ 50

        a.      A Forensic Review of Loan Files Has Revealed Pervasive
                Failure to Adhere to Underwriting Guidelines ............................ 50

                i.      Stated Income Was Not Reasonable ................................. 53

                ii.     Evidence of Occupancy Misrepresentations..................... 57

                iii.    Debts Incorrectly Calculated; DTI Exceeded
                        Guidelines ........................................................................ 59

                iv.     Credit Inquiries That Indicated Misrepresentations
                        of Debts........................................................................... 61

        b.      Both Government and Private Investigations Confirm
                that the Originators of the Loans in the Securitizations
                Systematically Failed to Adhere to Their Underwriting
                Guidelines ..................................................................................... 64

                i.      New Century Violated Its Underwriting Guidelines ........ 65

                ii.     HFN Violated Its Underwriting Guidelines...................... 69

                iii.    MLN Violated Its Underwriting Guidelines..................... 71

iv.     Ownit Violated Its Underwriting Guidelines ................... 72

v.     EquiFirst Violated Its Underwriting Guidelines .............. 72

vi.     Inflated Appraisals ............................................................ 73

c.     The Collapse of the Certificates' Credit Ratings Further
Shows that the Mortgage Loans Were not Originated in
Adherence to the Stated Underwriting Guidelines ....................... 74

d.     The Surge in Mortgage Delinquency and Default Further
Demonstrates that the Mortgage Loans Were Not Originated
in Adherence to the Stated Underwriting Guidelines ................. 76

E.     Freddie Mac's Purchases of the Certificates ......................................... 78

F.     Freddie Mac Was Damaged by Defendants' Violations of Sections 11, 12
and 15 of the Securities Act ................................................................ 79

II.     ADDITIONAL FACTUAL ALLEGATIONS ................................................. 80

A.     The Fraud Defendants Were Incentivized to Fund Risky Residential Mortgage
Loans and to Securitize and Sell Them to Investors ............................................. 81

B.     The Fraud Defendants' Material Misrepresentations and Omissions in the
Offering Materials ................................................................................................ 83

C.     The Fraud Defendants, Ally Sponsor, and Ally Depositors Knew or
Were Reckless in not Knowing that Their Representations Were
False and Misleading ............................................................................................ 88

1.     The Fraud Defendants Ignored Due Diligence Results ........................... 89

2.     Warehouse Lending and Vertical Integration Gave The Fraud
Defendants Inside Knowledge of Underwriting Defects ......................... 97

3.     Other Evidence Demonstrating that The Fraud Defendants Knew
Or Were Reckless In Not  Knowing That Their Representations Were
False ...................................................................................................... 101

D.     Freddie Mac Justifiably Relied on the Misrepresentations and Omissions
in the Offering Materials and Was Damaged by the Fraud Defendants' Fraudulent
Conduct ................................................................................................................ 116

FIRST CAUSE OF ACTION ................................................................................. 120

SECOND CAUSE OF ACTION ............................................................................. 122

THIRD CAUSE OF ACTION ................................................................................. 124

FOURTH CAUSE OF ACTION ................................................................................................ 127

FIFTH CAUSE OF ACTION .................................................................................................. 130

SIXTH CAUSE OF ACTION ................................................................................................. 133

SEVENTH CAUSE OF ACTION ........................................................................................... 135

PRAYER FOR RELIEF ......................................................................................................... 137

Plaintiff Federal Housing Finance Agency ("Plaintiff" or "FHFA"), as Conservator of the

Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys Kasowitz, Benson,

Torres & Friedman LLP, for its Complaint against the defendants named herein ("Defendants"),

alleges as follows:

## NATURE OF ACTION

1.     This action arises from false and misleading statements and omissions in

registration statements, prospectuses, and other offering materials, pursuant to which certain

residential mortgage-backed securities ("RMBS") were purchased by Freddie Mac.  Among

other things, these documents falsely represented that the mortgage loans underlying the RMBS

complied with certain underwriting guidelines and standards, and presented a false picture of the

characteristics and riskiness of those loans.  These representations were material to Freddie Mac,

as they would have been to any reasonable investor, and their falsity violates Sections 11,

12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, as well as Sections 13.1-

522(A)(ii) and 13.1-522(C) of the Virginia Code (the "Virginia Securities Act").  Freddie Mac

justifiably relied on Defendants' misrepresentations and omissions of material fact to its

detriment.  In addition to its strict statutory liability under federal securities law and liability

under state law, Defendants' statements and omissions give rise to liability under state common

law.

2.     Between September 23, 2005 and May 30, 2007, Freddie Mac purchased over $6

billion in Certificates issued in connection with 21 securitizations that were virtually all

underwritten by Defendants.[1]

---

[1]     For purposes of this Amended Complaint, the securities issued under the Registration
Statements (defined in note 2 and paragraph 3, *infra*) are referred to as "Certificates."  Holders of
Certificates are referred to as "Certificateholders."

3.      The Certificates were offered for sale pursuant to one of six shelf registration

statements (the "Shelf Registration Statements") filed with the Securities and Exchange

Commission (the "SEC").  For each of the 21 securitizations sold to Freddie Mac (the

"Securitizations"), a prospectus ("Prospectus") and prospectus supplement ("Prospectus

Supplement," together with the Shelf Registration Statements and Prospectus Supplements, the

"Registration Statements") were filed with the SEC as part of the Registration Statement for that

Securitization.[2]  The Certificates were marketed and sold to Freddie Mac pursuant to the

Registration Statements and other offering materials ("Offering Materials").

4.      The Offering Materials contained representations concerning, among other things,

the characteristics and credit quality of the mortgage loans underlying the Securitizations, the

creditworthiness of the borrowers on those underlying mortgage loans, and the origination and

underwriting practices used to make and approve the loans.  Such representations were material

to a reasonable investor's decision to invest in the Certificates, and they were material to Freddie

Mac.  Unbeknownst to Freddie Mac, those representations were materially false because, among

other reasons, many of the underlying mortgage loans were not originated in accordance with the

represented underwriting standards and origination practices, and did not have the credit quality

and other characteristics set forth in the Offering Materials.

5.      Among other things, the Offering Materials presented the loan origination

guidelines of the mortgage loan originators who originated the loans that underlie the

Certificates.  The Offering Materials falsely represented that those guidelines were adhered to

---

[2]      The term "Registration Statement" as used herein, and in Appendix A attached hereto,
incorporates the Shelf Registration Statement, the Prospectus, and the Prospectus Supplement for
each referenced Securitization, except where otherwise indicated.

except in specified circumstances, when in fact the guidelines systematically were disregarded in that the loans were not originated in accordance with those guidelines.

6.      An initial forensic review of loan origination files has revealed that the vast majority of loans reviewed did not adhere to the originator's underwriting guidelines as represented in the Offering Materials.  A material discrepancy from underwriting guidelines is very serious, and means that the loan should never have been included in the Securitizations.  For example, the loan application may:  (i) lack key documentation necessary to properly underwrite the loan; (ii) include an invalid, incomplete, or unsupported appraisal; (iii) evidence the underwriter's failure to confirm the reasonableness of the borrower's stated income; or (iv) reflect that the borrower's income, FICO score, debt, debt-to-income ratio ("DTI"), or loan-to-value ratio ("LTV") are outside of the range permitted under the guidelines.  Adherence to underwriting guidelines, particularly on such key criteria bearing on loan eligibility, is a material consideration to reasonable investors.

7.      The Offering Materials also set forth for each Securitization statistical summaries of the characteristics of the underlying mortgage loans, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges.  This information was material to reasonable investors, and it was material to Freddie Mac.  However, a loan-level analysis of a sample of loans for each Securitization -- a review that encompassed in the aggregate thousands of mortgages across all of the Securitizations -- has revealed that for each Securitization these statistical summaries were false and misleading.  The statistics reflected or were based upon misrepresentations of other key characteristics of the mortgage loans and inflated property values.

8.      For example, the percentage of owner-occupied properties in the loan pool

underlying a RMBS is a material risk factor to the purchasers of certificates, such as Freddie

Mac, because a borrower who actually lives in a mortgaged property is generally less likely to

stop paying the mortgage and more likely to take care of the property.  The loan-level review

revealed that the true percentage of owner-occupied properties for the loans supporting the

Certificates was materially lower than that represented in the Offering Materials.  Likewise, the

Offering Materials misrepresented such material information as loan-to-value ratios -- that is, the

relationship between the principal amount of the loans and the true value of the mortgaged

properties securing those loans -- and the ability of the individual mortgage holders to satisfy

their debts.

9.      The Offering Materials also set forth ratings for each of the Securitizations.

Those AAA ratings were material to a reasonable investor's decision to purchase the Certificates,

and they were material to Freddie Mac.  The ratings for the Securitizations were based upon false

information supplied by Defendants and were materially misleading with respect to the credit

quality of the Certificates.  Upon information and belief, neither the Defendants nor the rating

agencies that issued the ratings believed or had any sound basis to believe in their truthfulness.

10.      Defendants, who are underwriters and/or controlled the issuers and sponsors of

the Certificates purchased by Freddie Mac are liable for the misstatements and omissions of

material fact contained in the Registration Statements and other Offering Materials because they

prepared, filed, and/or used these documents to market and sell the Certificates to Freddie Mac,

or because they directed and controlled the entities that did so.[3]

---

[3]      The Certificates purchased by Freddie Mac are identified below in paragraph 46 and are
listed *infra* in Table 10.

11.     Defendants' misstatements and omissions of material facts have caused loss and injury to Freddie Mac.  Freddie Mac purchased the highest rated tranches of Certificates offered for sale by Defendants.  Freddie Mac would not have purchased these Certificates but for Defendants' material misrepresentations and omissions concerning the mortgage loans underlying the RMBS.  As the truth concerning the misrepresented and omitted facts has come to light, and as the hidden risks have materialized, the market value of the Certificates purchased by Freddie Mac has declined.  Freddie Mac has suffered enormous financial losses as a result of Defendants' misrepresentations and omissions.  FHFA, as Conservator for Freddie Mac, now seeks rescission and damages for those losses.

## PARTIES

### Plaintiff and Freddie Mac

12.     Plaintiff, the Federal Housing Finance Agency, is a federal agency located at 400 7th Street, S.W. in Washington, D.C.  FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008, Pub L. No. 110-289, 122 Stat. 2654, codified at 12 U.S.C. § 4617 *et seq.* ("HERA"), to oversee the Federal National Mortgage Association ("Fannie Mae"), Freddie Mac and the Federal Home Loan Banks.  On September 6, 2008, the Director of FHFA, also pursuant to HERA, placed Freddie Mac into conservatorship and appointed FHFA as Conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of Freddie Mac, including, but not limited to, the authority to bring suits on behalf of and/or for the benefit of Freddie Mac.  12 U.S.C. § 4617(b)(2).

13.     Freddie Mac is a government-sponsored enterprise chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Freddie Mac invested in RMBS.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

**Defendants**

    **Ally Defendants**

14.    Defendant Ally Financial Inc. ("Ally Financial"), a leading, multi-national financial services firm with a corporate center in New York, has approximately $179 billion of assets and operations in approximately 25 countries.  Ally is the parent and sole owner of Defendants GMAC Mortgage Group, Inc. and Ally Securities, LLC (formerly known as Residential Funding Securities, LLC).  Prior to 2010, Ally Financial was known as GMAC, LLC.

15.    Defendant GMAC Mortgage Group, Inc. ("GMACM") is a wholly-owned subsidiary and the mortgage arm of Ally.  GMACM is a Delaware corporation with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.  GMACM transacted business in New York.

16.    Defendant Ally Securities, LLC is an SEC-registered broker-dealer and is registered to do business in New York.  Prior to August 1, 2011, Ally Securities, LLC was known as Residential Funding Securities, LLC, which was doing business as GMAC RFC Securities, and prior to 2007, Residential Funding Securities, LLC was known as Residential Funding Securities Corporation (collectively, "Ally Securities").  Ally Securities is a wholly-owned subsidiary of Ally Financial, and was registered to do business in New York.  Ally Securities was the co-lead underwriter for five of the Securitizations and was an underwriter for an additional six of the Securitizations.  Freddie Mac purchased Certificates from five of the Securitizations from Ally Securities in its capacity as co-lead underwriter of those Securitizations.

17.    Defendants Ally Financial, GMACM and Ally Securities are referred to together herein as "Ally."

**Non-Ally Defendants**

18.    Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with its principal place of business located at 200 Park Avenue, New York, New York 10166.  Barclays is an SEC-registered broker-dealer and served as underwriter or co-underwriter for one Securitization.

19.    Defendant Citigroup Global Markets Inc. ("Citi") is an SEC-registered broker-dealer.  Citi is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 388 Greenwich Street, New York, New York 10013.  Citi served as underwriter or co-underwriter for one Securitization.

20.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 11 Madison Avenue, New York, New York 10010.  Prior to January 16, 2006, Credit Suisse was known as Credit Suisse First Boston LLC.  Credit Suisse is an SEC-registered broker-dealer, and was the co-lead underwriter for four of the Securitizations.  Credit Suisse was co-underwriter for three of the Securitizations.

21.    Defendant Goldman, Sachs & Co. ("Goldman") is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 200 West Street, New York, New York 10282.  Goldman is an SEC-registered broker-dealer and served as underwriter or co-underwriter for one Securitization.

22.    Defendant J.P. Morgan Securities, LLC, formerly known as J.P. Morgan Securities, Inc. ("JPMSI"), is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 277 Park Avenue, New York, New York 10172.  JPMSI is an SEC-registered broker-dealer and was underwriter or co-lead underwriter for four of the Securitizations.

23.     JPMSI is also the successor-in-interest to Bear, Stearns & Co., Inc. ("Bear

Stearns") because on March 16, 2008, Bear Stearns' parent company, Bear Stearns Companies,

Inc. ("BSCI"), entered into an Agreement and Plan of Merger (the "Merger") with Bear Stearns

Merger Corporation, a wholly-owned subsidiary of JPMorgan Chase & Co. ("JPMorgan

Chase"), making Bear Stearns a wholly-owned, indirect subsidiary of JPMorgan Chase.

Following the Merger, on or about October 1, 2008, Bear Stearns merged with J.P. Morgan

Securities Inc., a subsidiary of JPMorgan Chase, which subsequently changed its name to J.P.

Morgan Securities LLC.  Thus, BSCI is now doing business as Defendant JPMSI.

24.     In a June 30, 2008 press release describing internal restructuring to be undertaken

pursuant to the Merger, JPMorgan Chase stated its intent to assume Bear Stearns and its debts,

liabilities, and obligations as follows:

> Following completion of this transaction, Bear Stearns plans to
> transfer its broker-dealer subsidiary Bear, Stearns & Co. Inc. to
> JPMorgan Chase, resulting in a transfer of substantially all of Bear
> Stearns' assets to JPMorgan Chase.  In connection with such
> transfer, JPMorgan Chase will assume (1) all of Bear Stearns'
> then-outstanding registered U.S. debt securities; (2) Bear Stearns'
> obligations relating to trust preferred securities; (3) Bear Stearns'
> then-outstanding foreign debt securities; and (4) Bear Stearns'
> guarantees of then-outstanding foreign debt securities issued by
> subsidiaries of Bear Stearns, in each case, in accordance with the
> agreements and indentures governing these securities.

(Press Release, JPMorgan Chase & Co., JPMorgan Chase Announces Internal Restructuring

Transactions and Guarantees Related to Bear Stearns Acquisition (June 30, 2008), *available at*

http://www.sec.gov/Archives/edgar/data/19617/000089882208000717/pressrelease.htm.)

Further, the former Bear Stearns website, www.bearstearns.com, redirects Bear Stearns visitors

to JPMSI's website.

25.     JPMSI was fully aware of the pending and potential claims against Bear Stearns

when it consummated the merger.  JPMSI has further evinced its intent to assume Bear Stearns'

liabilities by paying to defend and settle lawsuits against Bear Stearns.  JPMSI announced its

intention to "convert to a limited liability company, effective September 1, 2010," as part of

which it changed its name to J.P. Morgan Securities LLC.  As a result of the Merger, Defendant

JPMSI is the successor-in-interest to Bear Stearns and is jointly and severally liable for the

misstatements and omissions of material fact alleged herein of Bear Stearns.  This action is

brought against JPMSI as successor-in-interest to Bear Stearns.  Prior to acquisition, Bear

Stearns was an SEC-registered broker-dealer and served as an underwriter for one Securitization.

26.    Defendant RBS Securities, Inc., doing business as RBS Greenwich Capital

("RBS"), is an SEC-registered broker-dealer incorporated in the State of Delaware with offices

located at 101 Park Avenue, New York, New York 10178.  Prior to April 2009, RBS was known

as Greenwich Capital Markets, Inc.  RBS served as underwriter or co-underwriter for two of the

Securitizations.

27.    Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company

with its principal place of business located at 677 Washington Boulevard, Stamford, Connecticut

06901.  UBS transacts business in New York.  UBS is an SEC-registered broker-dealer and

served as underwriter or co-underwriter for one Securitization.

28.    Defendants Barclays, Citi, Credit Suisse, Goldman, JPMSI, RBS, and UBS are

referred to together herein as the "Non-Ally Defendants," and together with Ally Securities as

the "Underwriter Defendants."

**Non-Party Ally Debtors[4]**

29.    Residential Capital LLC ("ResCap") is a wholly-owned subsidiary of GMACM and originated, serviced, and securitized mortgage loans.  Prior to 2007, ResCap was known as Residential Capital Corporation.

30.    GMAC-RFC Holding Company, LLC, doing business as GMAC Residential Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of ResCap and acquired residential mortgage loans, which it then pooled and securitized as mortgage-backed securities sold to investors.

31.    Residential Funding Company, LLC ("RFC") is a wholly-owned subsidiary of GMAC-RFC.  Prior to October 2006, RFC was known as Residential Funding Corporation. RFC was the sponsor of all 21 of the Securitizations.  RFC is the parent and sole owner of Homecomings Financials, LLC ("HFN"), and the originator of loans underlying the Certificates for 13 of the 21 Securitizations.  Prior to 2006, HFN was known as Homecomings Financials Network, Inc.

32.    Residential Asset Mortgage Products, Inc. ("RAMP") is a wholly-owned subsidiary of GMAC-RFC.  RAMP was the depositor for five of the Securitizations.

33.    Residential Asset Securities Corporation ("RASC") is a wholly-owned subsidiary of GMAC-RFC.  RASC was the depositor for 10 of the Securitizations.

34.    Residential Accredit Loans, Inc. ("RALI") is a wholly-owned subsidiary of GMAC-RFC.  RALI was the depositor for six of the Securitizations and transacted business in New York.  RALI, as depositor, was also responsible for registering the Certificates with the

---

[4]    The non-party Ally Debtors have filed for Chapter 11 bankruptcy protection and are subject to an automatic stay.  But for the automatic stay, plaintiff would have reasserted its claims against each of the Ally Debtors.

SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

ResCap, GMAC-RFC, RFC, RAMP, RASC, RALI are referred to together herein as the "Ally

Debtors."

**Non-Party Originators**

35.    The loans underlying the Certificates were acquired by the sponsor RFC for each

Securitization from the following mortgage originators:  HFN; Aegis Mortgage Corporation

("Aegis"); Decision One Mortgage Company, LLC ("Decision One"); EFC Holdings

Corporation ("EFC Holdings") and its subsidiary EquiFirst Corporation ("EquiFirst"); Finance

America, LLC ("Finance America"); First National Bank of Nevada ("FNB Nevada"); Home123

Corporation ("Home123"); Homefield Financial Inc. ("Homefield Financial"); Mortgage

Lenders Network USA, Inc. ("MLN"); New Century Mortgage Corporation ("New Century");

Ownit Mortgage Solutions Inc. ("Ownit"); People's Choice Home Loan, Inc. ("People's

Choice"); Pinnacle Financial Corporation ("Pinnacle"); and SCME Mortgage Bankers, Inc

("SCME").  HFN -- a subsidiary of Defendant Ally and an affiliate of Defendant RFC --

originated loans underlying the Certificates for 13 of the 21 Securitizations.  Together, the

entities identified in this paragraph are referred to as the "Non-Party Originators."

**JURISDICTION AND VENUE**

36.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal

courts original jurisdiction over claims brought by FHFA in its capacity as conservator of

Freddie Mac.

37.    Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the

Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities

Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77(o).  This Court further has jurisdiction over the

Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

38.    This Court has jurisdiction over Plaintiff's common law claims and claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §1367(a).

39.    Venue is proper in this district pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. §1391(b).  Defendants are principally located in this district, and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements, occurred in substantial part within this district. Additionally, the Certificates were actively marketed and sold from this district.  Defendants also are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

## I.    FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

40.    The factual allegations set forth in paragraphs 41 through 176 below are made with respect to all causes of action against Defendants and are sufficient to establish Defendants' strict statutory liability under the federal Securities Act of 1933 and the Virginia Securities Act. With respect to such liability, no allegations are made or intended, and none are necessary, concerning Defendants' state of mind.  Defendants are strictly liable, without regard to intent on their part or reliance on Freddie Mac's part, for the misstatements in, and material omissions from, the Registration Statements under Sections 11 and 12 and, for control person defendants, under Section 15, of the Securities Act of 1933, and Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code.

A.      **The Securitizations**

1.      **Residential Mortgage-Backed Securitizations Generally**

41.      Asset-backed securitization involves pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

42.      In the most common form of securitization of mortgage loans, a sponsor -- the entity that acquires or originates the mortgage loans and initiates the securitization -- directly or indirectly transfers a portfolio of mortgage loans to a trust.  In many instances, the transfer of assets to the trust is a two-step process in which the sponsor first transfers the financial assets to an intermediate entity, typically referred to as a "depositor," and then the depositor transfers the assets to a trust.  The trust is established pursuant to a pooling and servicing agreement or trust indenture entered into by, among others, the depositor for that securitization.

43.      RMBS are the securities backed by the underlying mortgage loans in the trust. Some residential mortgage-backed securitizations are created from more than one cohort of loans, called collateral groups, in which case the trust issues different tranches of securities backed by different groups of loans.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities (in the form of certificates) acquire an ownership interest in the assets of the trust, which in turn owns the loans.  These purchasers are thus primarily dependent for repayment of principal and payment of interest upon the cash flows from the designated group of mortgage loans -- primarily mortgagors' payments of principal and interest on the mortgage loans held by the related trust.

44.      RMBS are generally issued and sold pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which describe the general

structure of the investment, and prospectus supplements, which set forth detailed descriptions of, among other things, the mortgage groups underlying the certificates.  Certificates are issued by the trust and sold pursuant to the registration statement, the prospectus and prospectus supplement.  Underwriters purchase the certificates from the trust and then offer, sell or distribute the certificates to investors.

45.    A mortgage servicer manages the collection of proceeds from the mortgage loans. The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust funds and delivers payments due each month on the certificates to the investors.

## 2.    Securitizations at Issue in this Case

46.    This case involves the following 21 Securitizations:

    i.    RASC Series 2005-EMX3 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EMX3 ("RASC 2005-EMX3");

    ii.    RASC Series 2005-KS10 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS10 ("RASC 2005-KS10");

    iii.    RASC Series 2005-KS11 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS11 ("RASC 2005-KS11");

    iv.    RASC Series 2006-EMX8 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EMX8 ("RASC 2006-EMX8");

    v.    RASC Series 2006-EMX9 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EMX9 ("RASC 2006-EMX9");

    vi.    RASC Series 2006-KS3 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS3 ("RASC 2006-KS3");

vii.    RASC Series 2006-KS9 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS9 ("RASC 2006-KS9");

viii.    RASC Series 2007-EMX1 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1 ("RASC 2007-EMX1");

ix.    RASC Series 2007-KS2 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS2 ("RASC 2007-KS2");

x.    RASC Series 2007-KS3 Trust, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS3 ("RASC 2007-KS3");

xi.    RAMP Series 2005-EFC6 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC6 ("RAMP 2005-EFC6");

xii.    RAMP Series 2005-EFC7 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC7 ("RAMP 2005-EFC7");

xiii.    RAMP Series 2005-NC1 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-NC1 ("RAMP 2005-NC1");

xiv.    RAMP Series 2005-RS9 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS9 ("RAMP 2005-RS9");

xv.    RAMP Series 2006-RS1 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS1 ("RAMP 2006-RS1");

xvi.    RALI Series 2005-QO4 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4 ("RALI 2005-QO4");

xvii.    RALI Series 2006-QO4 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO4 ("RALI 2006-QO4");

xviii.    RALI Series 2006-QO5 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO5 ("RALI 2006-QO5");

xix.    RALI Series 2006-QO8 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO8 ("RALI 2006-QO8");

xx.    RALI Series 2007-QO9 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO9 ("RALI 2007-QO9"); and

xxi.    RALI Series 2007-QH5 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH5 ("RALI 2007-QH5").

47.     For each of the 21 Securitizations, Table 1 identifies the:  (1) sponsor; (2)

depositor; (3) underwriter(s); (4) principal amount issued for the tranches[5] purchased by Freddie

Mac; (5) date of issuance; and (6) the loan group or groups backing the Certificate for that

Securitization (referred to as the "Supporting Loan Groups").

**Table 1**

| Transaction | Tranche | Sponsor | Depositor | Underwriters | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| RALI 2005-QO4 | IA1 | RFC | RALI | RBS | 143,428,800.00 | 11/29/05 | Group I |
| RALI 2006-QO4 | IA1 | RFC | RALI | RBS | 327,356,000.00 | 04/27/06 | Group I |
| RALI 2006-QO4 | IA2 | RFC | RALI | RBS | 81,838,000.00 | 04/27/06 | Group I |
| RALI 2006-QO5 | IA1 | RFC | RALI | UBS | 179,443,000.00 | 05/30/06 | Group I |
| RALI 2006-QO8 | IIA | RFC | RALI | Lehman Brothers | 409,198,000.00 | 10/30/06 | Group II |
| RALI 2006-QO9 | IIA | RFC | RALI | Lehman Brothers | 284,637,000.00 | 11/29/06 | Group II |
| RALI 2007-QH5 | AII | RFC | RALI | Goldman Ally Securities | 143,007,000.00 | 05/30/07 | Group II |
| RAMP 2005-EFC6 | AII | RFC | RAMP | JPMSI Ally Securities | 163,581,000.00 | 11/22/05 | Group II |
| RAMP 2005-EFC7 | AII | RFC | RAMP | Ally Securities Barclays | 199,376,000.00 | 12/28/05 | Group II |
| RAMP 2005-NC1 | AII | RFC | RAMP | Ally Securities Credit Suisse | 405,004,000.00 | 12/28/05 | Group II |
| RAMP 2005-RS9 | AII | RFC | RAMP | Bear Credit Suisse Ally Securities RBS | 494,922,000.00 | 11/29/05 | Group II |

---

[5]     A tranche is one of the classes of debt securities issued as part of a single bond or instrument.  Securities are often issued in tranches to meet different investor objectives for portfolio diversification.  Freddie Mac purchased two tranches of Certificates from the RALI 2006-Q04 Securitization, which is why the tables herein have 22 entries for 21 Securitizations.

| Transaction | Tranche | Sponsor | Depositor | Underwriters | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| RAMP 2006-RS1 | AII | RFC | RAMP | Ally Securities<br>Credit Suisse<br>RBS<br>BOA | 409,790,000.00 | 01/25/06 | Group II |
| RASC 2005-EMX3 | AII | RFC | RASC | Ally Securities<br>Credit Suisse | 267,481,000.00 | 09/23/05 | Group II |
| RASC 2005-KS10 | AII | RFC | RASC | JPMSI<br>Ally Securities<br>BOA | 495,741,000.00 | 10/28/05 | Group II |
| RASC 2005-KS11 | AII | RFC | RASC | Credit Suisse<br>Ally Securities<br>RBS | 547,641,000.00 | 11/29/05 | Group II |
| RASC 2006-EMX8 | AII | RFC | RASC | Ally Securities<br>Barclays | 236,806,000.00 | 09/28/06 | Group II |
| RASC 2006-EMX9 | AII | RFC | RASC | Barclays<br>Ally Securities | 197,896,000.00 | 10/27/06 | Group II |
| RASC 2006-KS3 | AII | RFC | RASC | Citi | 232,006,000.00 | 03/29/06 | Group II |
| RASC 2006-KS9 | AII | RFC | RASC | Barclays | 153,311,000.00 | 10/27/06 | Group II |
| RASC 2007-EMX1 | AII | RFC | RASC | Ally Securities<br>Credit Suisse | 326,812,000.00 | 03/12/07 | Group II |
| RASC 2007-KS2 | AII | RFC | RASC | JPMSI | 164,400,000.00 | 02/23/07 | Group II |
| RASC 2007-KS3 | AII | RFC | RASC | JPMSI<br>BOA<br>Ally Securities | 167,618,000.00 | 03/29/07 | Group II |

## 3.    Securitization Process

### a.    The Sponsors Grouped Mortgage Loans in Special-Purpose Trusts

48.    In each case, the sponsor purchased the mortgage loans underlying the Certificates either directly from the originators or through affiliates of the originators.  RFC sponsored all 21 Securitizations at issue here.

49.    RFC (the "Ally Sponsor"), as sponsor, then sold the acquired mortgage loans to one of three depositors, all of which are RFC-affiliated entities:  RALI, RAMP and RASC (the "Ally Depositors").

50.     The Ally Depositors were wholly-owned, limited-purpose financial subsidiaries of GMAC-RFC and affiliates of RFC.  The sole purpose of the Ally Depositors as depositors was to act as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

51.     As depositors for all 21 of the Securitizations, the Ally Depositors ostensibly transferred the relevant mortgage loans to the respective trusts for each of those Securitizations.

52.     As part of each Securitization, the trustee for that Securitization, on behalf of the Certificateholders, executed a Pooling and Servicing Agreement ("PSA") with the relevant depositor and the relevant servicer.  In each case, the trust, administered by the trustee, was required to hold the mortgage loans, pursuant to the related PSA, and issued certificates, including the Certificates.  The Certificates were purchased, directly or indirectly, by the Underwriter Defendants.  Freddie Mac purchased from the Underwriter Defendants the Certificates, through which it obtained an ownership interest in the assets of the trust, including the mortgage loans.

**b.      The Trusts Issued Securities Backed by the Loans**

53.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors, including Freddie Mac.  Each Certificate entitles its holder to a specified portion of the cash flows from the underlying mortgages in the supporting loan group for that Certificate.  Therefore, the value of the Certificates, derived in part from the likelihood of payment of principal and interest on the Securitizations, depends upon the credit quality of the underlying mortgages, *i.e.*, the risk of default by borrowers and the recovery value upon default of foreclosed-upon properties.

54.    The Certificates purchased by Freddie Mac were issued and sold pursuant to Shelf Registration Statements filed with the SEC on a Form S-3.[6]  The Shelf Registration Statements ("S-3") were amended by one or more Form S-3/A (the "Amendments" or "S-3/A") filed with the SEC.  Corporate officers and/or directors signed the six Shelf Registration Statements (and amendments thereto) that were filed, in each case, by RALI, RAMP or RASC.  The SEC filing number, registrants, signatories, and filing dates for all six Shelf Registration Statements with Amendments, as well as the Certificates purchased by Freddie Mac covered by each Shelf Registration Statement, are reflected in Table 2 below.

**Table 2**

| SEC File No. | Date S-3 Filed | Date(s) S-3/A(s) Filed | Registrants | Covered Certificates | Signatories of S-3 | Signatories of S-3/A(s)[7] |
|---|---|---|---|---|---|---|
| 333-125485 | 06/03/05 | 07/07/05 | RAMP | RAMP 2005-EFC6 RAMP 2005-EFC7 RAMP 2005-NC1 RAMP 2005-RS9 RAMP 2006-RS1 | Bruce Paradis Kenneth Duncan Ralph Flees David Walker | Bruce Paradis Kenneth Duncan Ralph Flees David Walker Diane Wold |
| 333-122688 | 02/10/05 | 04/19/05 | RASC | RASC 2005-EMX3 RASC 2005-KS10 RASC 2005-KS11 RASC 2006-KS3 | Bruce Paradis Davee Olson Ralph Flees David Walker | Bruce Paradis Davee Olson Jack Katzmark David Walker Lisa Lundsten |
| 333-126732 | 07/20/05 | 08/09/05 | RALI | RALI 2005-QO4 | Bruce Paradis Kenneth Duncan Ralph Flees David Walker | Bruce Paradis Kenneth Duncan Ralph Flees David Walker Lisa Lundsten |

---

[6]    Defendant RALI filed three Shelf Registration Statements that were used to market six of the Securitizations; Defendant RAMP filed one Shelf Registration Statement that was used to market five of the Securitizations; and Defendant RASC filed two Registration Statements that were used to market 10 of the Securitizations.

[7]    Some corporate officers and/or directors signed certain S-3/As through a power of attorney.

| SEC File No. | Date S-3 Filed | Date(s) S-3/A(s) Filed | Registrants | Covered Certificates | Signatories of S-3 | Signatories of S-3/A(s)[7] |
|---|---|---|---|---|---|---|
| 333-131209 | 01/20/06 | 02/23/06 03/21/06 03/30/06 | RASC | RASC 2006-EMX8 RASC 2006-EMX9 RASC 2006-KS9 RASC 2007-EMX1 RASC 2007-KS2 RASC 2007-KS3 | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson Lisa Lundsten |
| 333-131213 | 01/23/06 | 03/03/06 03/06/06 | RALI | RALI 2006-QO4 RALI 2006-QO5 RALI 2006-QO8 RALI 2006-QO9 | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson Lisa Lundsten |
| 333-140610 | 02/12/07 | 04/03/07 | RALI | RALI 2007-QH5 | David Applegate David M. Bricker Ralph Flees James Young | James Jones David Bricker Ralph Flees James Young Lisa Lundsten |

55.     The Prospectus Supplement for each Securitization describes the loan underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including:  the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ("LTV") ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios of the borrowers, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes, information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property, and information concerning whether the loans were delinquent.

56.     The Prospectus Supplement for each Securitization was filed with the SEC as part of the Registration Statements.  The Forms 8-K attaching the PSAs for each Securitization were also filed with the SEC.  The dates on which the Prospectus Supplement and Form 8-K were

filed for each Securitization, as well as the filing number of the Shelf Registration Statement

related to each, are set forth in Table 3 below.

### Table 3

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA | Filing No. of Related Shelf Registration Statement |
|---|---|---|---|
| RALI 2005-QO4 | 11/28/2005 | 12/15/2005 | 333-126732 |
| RALI 2006-QO4 | 4/28/2006 | 5/15/2006 | 333-131213 |
| RALI 2006-QO5 | 5/31/2006 | 6/14/2006 | 333-131213 |
| RALI 2006-QO8 | 11/1/2006 | 11/14/2006 | 333-131213 |
| RALI 2006-QO9 | 11/30/2006 | 12/14/2006 | 333-131213 |
| RALI 2007-QH5 | 5/30/2007 | 6/14/2007 | 333-140610 |
| RAMP 2005-EFC6 | 11/21/2005 | 12/7/2005 | 333-125485 |
| RAMP 2005-EFC7 | 12/22/2005 | 1/13/2006 | 333-125485 |
| RAMP 2005-NC1 | 12/27/2005 | 1/13/2006 | 333-125485 |
| RAMP 2005-RS9 | 11/29/2005 | 12/12/2005 | 333-125485 |
| RAMP 2006-RS1 | 1/25/2006 | 2/9/2006 | 333-125485 |
| RASC 2005-EMX3 | 9/23/2005 | 10/14/2005 | 333-122688 |
| RASC 2005-KS10 | 10/28/2005 | 11/14/2005 | 333-122688 |
| RASC 2005-KS11 | 11/28/2005 | 12/14/2005 | 333-122688 |
| RASC 2006-EMX8 | 9/27/2006 | 10/13/2006 | 333-131209 |
| RASC 2006-EMX9 | 10/27/2006 | 11/13/2006 | 333-131209 |
| RASC 2006-KS3 | 3/29/2006 | 4/13/2006 | 333-122688 |
| RASC 2006-KS9 | 10/30/2006 | 11/13/2006 | 333-131209 |
| RASC 2007-EMX1 | 3/9/2007 | 3/27/2007 | 333-131209 |
| RASC 2007-KS2 | 2/23/2007 | 3/9/2007 | 333-131209 |
| RASC 2007-KS3 | 3/28/2007 | 4/13/2007 | 333-131209 |

57.    The Certificates were issued pursuant to the PSAs, and the Underwriter

Defendants, along with the Ally Depositors, offered and sold the Certificates to Freddie Mac in

the primary market pursuant to the Registration Statements, which, as noted previously, included

the Prospectuses and Prospectus Supplements.

### B.    Defendants' and the Ally Debtors' Participation in the Securitization Process

58.    Each of the Defendants and Ally Debtors played a role in the securitization

process and the marketing for some or all of the Certificates purchased by Freddie Mac, which

included directly or indirectly purchasing the mortgage loans from the originators, arranging the

Securitizations, selling the mortgage loans to the depositor, ostensibly transferring the mortgage

loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the

Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to

Freddie Mac.

59.     The Defendants are liable, jointly and severally, as participants in the registration,

issuance and offering of the Certificates purchased by Freddie Mac, including issuing, causing,

or making materially misleading statements in the Registration Statements, and omitting material

facts required to be stated therein or necessary to make the statements contained therein not

misleading

60.     Defendant Ally Financial wholly owns GMACM and Ally Securities and is also

the ultimate parent of ResCap, GMAC-RFC, RFC, RALI, RASC and RAMP.  The chart below

indicates the corporate structure of the relevant Ally entities.



### 1.     The Ally Sponsor:  RFC

61.     RFC ("Ally Sponsor") was formed in 1985 as a wholly-owned subsidiary of

GMAC-RFC for the purpose of issuing mortgage-backed securities through its affiliates, the Ally

Depositors.  The Ally Sponsor was a leading sponsor of mortgage-backed securities and was the

sponsor of all 21 Securitizations.  In that capacity, the Ally Sponsor determined the structure of

the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized,

determined distribution of principal and interest, and provided data to the rating agencies to

secure investment grade ratings for the Certificates sold to Freddie Mac.  The Ally Sponsor also

selected the Ally Depositors as the special-purpose vehicles that would be used ostensibly to

transfer the mortgage loans from the Ally Sponsor to the trusts, and selected the Underwriter

Defendants for the Securitizations, including its affiliate, Defendant Ally Securities.  In its role

as sponsor, the Ally Sponsor knew and intended that the mortgage loans it purchased would be

sold in connection with the securitization process, and that certificates representing such loans

would be issued by the relevant trusts.

     62.     For all 21 Securitizations that it sponsored, the Ally Sponsor also ostensibly

conveyed the mortgage loans to the Ally Depositors, as depositor, pursuant to an Assignment and

Recognition Agreement or a Mortgage Loan Purchase Agreement.  In these agreements, the

Non-Party Originators and Ally Sponsor made certain representations and warranties to the Ally

Depositors regarding the mortgage loans collateralizing the Certificates purchased by Freddie

Mac.  These representations and warranties were assigned by the Ally Depositors to the trustees

for the benefit of the Certificateholders, and were described in the Prospectus Supplements.

     63.     The Ally Sponsor had the practical ability to and in fact exercised direction and

control of the Ally Depositors.  The Ally Sponsor shared overlapping management with the Ally

Depositors.  For example, in 2005, David C. Walker served as Director of RFC and Director of

RALI, RASC, and RAMP.  In 2005, Bruce J. Paradis served as CEO and Director of RFC;

Director, President and CEO of RALI and RASC; and President and CEO of RAMP.  In 2006,

Mr. Paradis served as President of RFC; Director, President and CEO of RALI and RASC; and

President and CEO of RAMP.  In 2007, David. M. Bricker served as Director of RFC; Director

and CFO of RALI; and CFO of RASC and RAMP.  In 2005, Davee L. Olson served as Director

of RFC; Director of RAMP; and Director and CFO of RASC.  In 2007, James N. Young served

as CFO of RFC and Director of RALI, RAMP and RASC.  In 2007, James G. Jones served as

President and Director of RFC and President, CEO and Director of RALI, RASC, and RAMP.

In 2005, Kenneth M. Duncan served as CFO of RFC and RAMP.  In 2005, Ralph T. Flees served

as Controller of RFC and Controller of RASC and RAMP.  In 2007, Mr. Flees served as

Controller of RFC and Controller of RALI, RASC and RAMP.

## 2.    The Ally Depositors:  RALI, RASC and RAMP

64.    RALI, RASC and RAMP have been engaged in the securitization of mortgage

loans as depositors since their incorporation in 1995, 1994, and 1999, respectively.  They are

special-purpose entities formed solely for the purpose of purchasing mortgage loans, filing

registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of

their rights and interests in such mortgage loans to the trustee for the benefit of certificateholders,

and depositing the underlying mortgage loans into the issuing trusts.

65.    RALI was the depositor for six of the 21 Securitizations, RASC was the depositor

for 10 Securitizations, and RAMP was the depositor for five Securitizations.  In their capacity as

depositors, the Ally Depositors purchased the mortgage loans from the Ally Sponsor pursuant to

an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  The Ally

Depositors then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to

the trusts.  Together with the Defendants, the Ally Depositors were also responsible for preparing

and filing the Registration Statements pursuant to which the Certificates purchased by Freddie

Mac were offered for sale.  The trusts, in turn, held the mortgage loans for the benefit of the

Certificateholders, and issued the Certificates in public offerings for sale to investors, including

Freddie Mac.

### 3.    The Ally Underwriter:  Defendant Ally Securities

66.    Defendant Ally Securities was formed in 1990 and is a wholly-owned subsidiary

of Ally Financial.  Defendant Ally Securities is an investment bank, solely operating as a

registered broker-dealer with respect to the issuance and underwriting of residential and

commercial mortgage-backed securities.  At all relevant times, Ally Securities was one of the

leading underwriters of mortgage and other asset-backed securities in the United States.

According *to Inside Mortgage Finance* in 2004, Ally Securities underwrote over $8.9 billion of

non-agency mortgage-backed securities.  In 2005, the data shows that Ally Securities underwrote

$14.5 billion, and in 2006 and 2007, Ally Securities underwrote $12.4 billion and $10.2 billion in

non-agency mortgage-backed securities, respectively.

67.    Defendant Ally Securities was the co-lead and selling underwriter for five of the

21 Securitizations and an underwriter for an additional six Securitizations.  In that role, it was

responsible for underwriting and managing the offer and sale of the Certificates to Freddie Mac

and other investors.  Ally Securities was also obligated to conduct meaningful due diligence to

ensure that the Registration Statements did not contain any material misstatements or omissions,

including as to the manner in which the underlying mortgage loans were originated, transferred

and underwritten.

### 4.    The Ally Control Persons:  Defendants Ally Financial and GMACM

68.    As the corporate parent of the underwriter Ally Securities and the ultimate parent

of the Ally Sponsor and Ally Depositors, Ally Financial had the practical ability to and in fact

exercised direction and control of these subsidiaries in coordinating the securitization process,

determining the structure of each offering, and issuing and selling the Certificates purchased by

Freddie Mac.  The Securitizations involved Ally at virtually every step in the process, and Ally

Financial and GMACM profited substantially from this vertically integrated approach to

mortgage-backed securitization.

69.    Ally Financial wholly owns and controls GMACM, which owns 100% of

ResCap's equity.  As discussed *infra*, paragraph 80, GMACM had overlapping management with

other Ally entities, and in fact, according to the Ally Debtors, GMACM "does not even have any

employees of its own."  (*In re Residential Capital, LLC*, Case No. 12-12020 (MG) (S.D.N.Y.

Bankr.), Debtors' Motion to Extend Automatic Stay or, in the Alternative, for Injunctive Relief

Enjoining Prosecution of Certain Pending Litigation Against Debtors' Directors and Officers and

Non-Debtor Corporate Affiliates, at 16.)

70.    As stated in ResCap's Form S-4 July 15, 2005 Registration Statement:

> [Ally Financial] control[s] all fundamental matters affecting
> [ResCap] . . . .  [Ally Financial] indirectly owns all of [ResCap's]
> outstanding common stock and has the power to elect and remove
> all of [ResCap's] directors, including the two independent directors
> . . . .  [Ally Financial] is also able to approve or reject any action
> requiring approval of stockholders, including the adoption of
> amendments to our certificate of incorporation an approval of
> mergers or sales of all or substantially all of [ResCap's]
> interests. . . .

(Residential Capital Corp., Registration Statement (Form S-4) ("ResCap Form S-

4"), at 23 (July 15, 2005).)

71.    Further, Ally Financial supports its subsidiaries financially.  In Ally Financial's

Form 8-K, filed on June 9, 2005, it disclosed that ResCap would enter into an operating

agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend

and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the

business and liabilities of [Ally Financial] and its subsidiaries."  (Ally Fin. Inc., Current Report

(Form 8-K) (June 9, 2005), Ex. 99.1, at 37.)  In 2008, Ally Financial announced to the market

that it renewed a funding facility with Citibank, which provided "funding of up to $13.8 billion,"

a portion of which was specifically earmarked for "mortgage assets across the [Ally Financial]

and [ResCap] businesses." (Ally Fin. Inc., Current Report (Form 8-K) (Sept. 19, 2008).)

72.    The Ally Debtors concede that they would have defaulted on their debt

obligations had they not received the financial support of Ally Financial. On March 14, 2012,

the Ally Debtors filed for Chapter 11 bankruptcy protection. In support of the Ally Debtors' first

day pleadings in Bankruptcy Court, ResCap's Chief Financial Officer, James Whitlinger stated:

"Without capital contributions from AFI [Ally Financial], the Debtors would have breached their

Consolidated Tangible Net Worth covenant on a number of occasions." (Whitlinger Aff. ¶ 82.)

"Capital contributions by AFI totaled approximately $2.7 billion in 2007, $3.3 billion in 2008,

and $4.0 billion in 2009." (*Id.* ¶ 82 n.32.)

73.    Moreover, Ally Financial publicly reports on its own business and that of its

subsidiaries on an integrated basis: "We engage in the origination, purchase, servicing, sale, and

securitization of consumer (i.e., residential) mortgage loans and mortgage-related products."

(Ally Fin. Inc., 2009 Annual Report (Form 10-K), at 3 (Feb. 26, 2010).) Ally Financial's Form

10-K Annual Report, for the period ending December 31, 2005, states:

- We operate directly and through our subsidiaries and affiliates in which we
  . . . have equity investments. . . . We originate, purchase, service, sell and
  securitize residential and commercial mortgage loans and mortgage related
  products. (*Id.*)

- [W]e utilize asset and mortgage securitizations and sales as a critical
  component of our diversified funding strategy. (*Id*. at 2.)

- We are a leading real estate finance company with two of our mortgage
  segments, GMAC Residential and GMAC-RFC, providing residential real
  estate products and services. Net income from the operations of GMAC
  Residential and GMAC-RFC together totaled $1,021 million, which
  accounted for approximately 43% of our net income in 2005. (*Id.* at 20.)

74.     More recently, discussing its various mortgage operations as a single enterprise,
Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading
originators of conforming and government-insured residential mortgage loans in the United
States.  We are one of the largest residential mortgage loan servicers in the United States and we
provide collateralized lines of credit to other mortgage originators."  (Ally Fin. Inc., 2011 Annual
Report (Form 10-K), at 4 (Feb. 28, 2012).)

75.     Ally Financial's Form 10-K, for the period ending December 2011, states that
"ResCap remains heavily dependent on Ally and its affiliates for funding and capital support
. . . ."  (*Id.* at 18.)  Ally Financial established a "Mortgage Repurchase Reserve" to pay for
potential liabilities stemming from repurchase demands made on its mortgage-related
subsidiaries, and as of the fourth quarter 2011, Ally Financial's Mortgage Repurchase Reserve
balance was $825 million.  (Ally Fin., Inc. 4Q Earnings Review, dated February 2, 2012, at 16.)

76.     In fact, Ally Financial continues to support and control the Ally Debtors in
bankruptcy.  The Ally Debtors have proposed an ambitious and expedited reorganization of more
than 50 entities with more than $15 billion of assets to be effectuated by the end of 2012.  The
proposed reorganization includes several significant transactions, including transactions between
the Ally Debtors and Ally Financial that purportedly are valued in excess of $2.75 billion.  The
transactions include (i) Ally Financial's stalking horse bid of up to $1.6 billion for a portfolio of
mortgage loans and securities owned by the Ally Debtors; (ii) Ally Financial's $150 million
debtor-in-possession loan to the Ally Debtors under an amendment to a pre-petition secured loan
agreement; and (iii) Ally Financial's agreement to support a plan of reorganization for the Ally
Debtors pursuant to which Ally Financial will contribute $750 million in cash and other
consideration (that the Ally Debtors allege should be valued in excess of $1 billion) in exchange

for extensive releases including broad non-consensual third-party releases in favor of Ally Financial.

77.    In addition, the Ally Debtors recently disclosed that Ally Financial provides various services to the Ally Debtors, which demonstrate the integrated nature of the Ally Debtors' and Ally Financial's businesses.  In the bankruptcy proceedings, the Ally Debtors filed a motion for entry of an order authorizing the Ally Debtors to enter into a shared services agreement with Ally Financial for the "*continued* receipt and provision of shared services necessary for the continued operation of the Debtors' businesses," which services include, among other things, financial services, accounting, tax advisory services, risk management, collateral management, facilities management, information technology support, and legal services.  (Debtors' Motion for Interim and Final Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Share Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Business, *In re Residential Capital, LLC, et al.*, 12-12020-mg (S.D.N.Y. Bankr.) (Docket #41) (emphasis added).)  With respect to shared legal services, Ally Financial "provides legal advice and counseling, including regarding changes in laws and regulations applicable to ResCap's business" to the Ally Debtors. The Ally Debtors, "[w]here requested by [Ally Financial], provide legal analysis and support as may be necessary or required by [Ally Financial] from time to time, including without limitation, support for the mortgage correspondent, warehouse, and wholesale lending lines." ( *Id.*, Ex. B.) Moreover, the Ally Debtors assert: "Given the integrated nature of the Debtor's and [Ally Financial's] businesses, the continuation of these services pursuant to the Agreement is both

warranted and absolutely necessary to avoid any disruption to the Debtors' day-to-day

operations." (*Id.* ¶ 7.)

78.      ResCap, as the sole corporate parent of GMAC-RFC, had the practical ability to,

and in fact, exercised direction and control over the activities of GMAC-RFC and GMAC-RFC's

subsidiaries, the Ally Sponsor and Ally Depositors, in connection with the issuance and sale of

the Certificates to Freddie Mac.  Indeed, ResCap has no operations separate from its investment

in its subsidiaries.  (ResCap Form S-4 at 29.)

79.      As discussed *supra*, GMAC-RFC employed its wholly-owned subsidiaries, the

Ally Sponsor and Ally Depositors, in the key steps of the securitization process.  Unlike typical

arm's length securitizations, the Securitizations involved various Ally subsidiaries and affiliates

at virtually each step in the chain.

80.      Furthermore, Ally Financial, GMACM, ResCap, and GMAC-RFC shared

overlapping management with each other and/or the Ally Depositors.  For example, in 2005 Eric

A. Feldstein served as Chairman of the Board of Ally Financial, GMACM and ResCap.  In 2005,

Linda K. Zukauckas served as Vice President and Corporate Comptroller of Ally Financial and

Director of ResCap.  In 2005, Sanjiv Khattri served as Executive Vice President and CFO of

Ally Financial and Director of GMACM and ResCap.  In 2005, Bruce Paradis served as Co-CEO

and Director for ResCap; CEO and Director for GMAC-RFC; Director, President, and CEO of

RALI and RASC; and President and CEO of RAMP.  In 2006, Mr. Paradis served as CEO and

Director for ResCap; President for GMAC-RFC; Director, President and CEO for RALI and

RASC; and President and CEO of RAMP.  In 2005, Davee L. Olson served as CFO and Director

for ResCap; Director of GMAC-RFC; CFO and Director for RASC; and Director for RAMP.  In

2006, Mr. Olson served as CFO and Director for ResCap and as Director for RALI, RAMP, and

RASC.  In 2005, Ralph T. Flees served as Controller of GMAC-RFC, RASC and RAMP.  In

2007, Mr. Flees served as Controller of GMAC-RFC, RALI, RASC and RAMP.  In 2007, James

N. Young served as Chief Accounting Officer and Controller for ResCap; and Director for

RALI, RASC, and RAMP.  In 2007, James G. Jones served as President, CEO and Director for

ResCap, Director of GMAC-RFC, and President, CEO and Director for RALI, RASC, and

RAMP.

81.     Furthermore, from the inception of this case on September 2, 2011 until March

12, 2012 -- a period of over six months -- Ally Financial, GMACM, Ally Securities, and the Ally

Debtors were represented by the same counsel, indicating an identity of interest.

### 5.     Non-Ally Defendants

82.     The Non-Ally Defendants were among the nation's largest non-agency mortgage-

backed securities underwriters between 2004 through 2007.  The Non-Ally Defendants were the

co-lead underwriters for 12 Securitizations and underwriters for an additional seven

Securitizations.  In those roles, the Non-Ally Defendants were responsible for underwriting and

managing the offer and sale of Certificates to Freddie Mac.  The Non-Ally Defendants also were

obligated to conduct meaningful due diligence to ensure that the Registration Statements did not

contain any material misstatements or omissions, including as to the manner in which the

underlying mortgage loans were originated, transferred and underwritten.

### C.     Statements in the Registration Statements

83.     Plaintiff relies for its claims, in part, upon the Registration Statements in their

entirety.  Specific representations and warranties in the Registration Statements that form the

basis for the claims herein are set forth for each Securitization in Appendix A hereto.

### 1.    Compliance with Underwriting Guidelines

84.    The Prospectus and Prospectus Supplement for each of the Securitizations contained detailed descriptions of the underwriting guidelines used to originate the mortgage loans included in the Securitizations.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.  Because payment on, and the value of, the Certificates is based on the cash flows from the underlying mortgage pool, representations concerning compliance with the stated underwriting guidelines were material to reasonable investors.  Investors, including Freddie Mac, did not have access to information concerning the collateral pool, and were required to rely on the representations in the Prospectus Supplements concerning that collateral.  As explained below, a reasonable investor would not have understood, in light of the representations regarding supposed adherence to underwriting guidelines, that there were pervasive and systemic breaches of those guidelines with respect to the securitized loans.

85.    Among other consequences, the failure to originate mortgage loans in accordance with stated guidelines diminished the value of the Certificates by increasing the significant risk that an investor will not be paid its principal and interest.  Misrepresentations concerning, or failing accurately to disclose, borrower, loan, and property characteristics bearing on the risk of default by the borrower, as well as the severity of losses given default, can artificially inflate the perceived value of the securities.  Without accurate information regarding the collateral pool, reasonable investors, including Freddie Mac, are unable accurately and independently to assess whether the price of an RMBS adequately accounts for the risks they are assuming when they purchase the security.

86.    The Prospectus Supplements for each of the Securitizations contained several key

statements with respect to the loan purchasing and underwriting standards of the Non-Party

Originators that originated the loans in the Securitizations.  For example, with respect to the

RAMP 2005-EFC7 Securitization, for which EquiFirst was originator, Ally Securities was a co-

underwriter, and RASC was the depositor, the Prospectus Supplement states:

> *All of the mortgage loans included in the trust were originated by
> EquiFirst, generally in accordance with [EquiFirst's]
> underwriting criteria* [and that] EquiFirst's underwriting standards
> are primarily intended to assess the ability and willingness of the
> borrower to repay the debt, and to evaluate the adequacy of the
> mortgaged property as collateral for the mortgage loan.

(RAMP 2005-EFC7, Prospectus Supplement (Form 424b5), at S-37 (Dec. 20,

2005) ("RAMP 2005-EFC7 Prospectus Supplement") (emphasis added).)

87.    Similarly, with respect to the RALI 2006-QO8 Securitization, for which the Ally

originator, HFN, was the primary originator and RALI was the depositor, the Prospectus

Supplement states:

> All of the mortgage loans in the mortgage pool were originated in
> accordance with the underwriting criteria of Residential Funding
> … Residential Funding will review each mortgage loan for
> compliance with its underwriting standards prior to purchase . . . .

(RALI 2006-QO8, Prospectus Supplement (Form 424b5), at S-60-61 (Nov. 11,

2006) ("RALI 2006-QO8 Prospectus Supplement").)

88.    With respect to the information evaluated by the originator (EquiFirst), the RAMP

2005-EFC7 Prospectus Supplement stated that:

> *EquiFirst considers, among other things, a mortgagor's credit
> history, repayment ability and debt service-to-income ratio ('Debt
> Ratio'), as well as the value, type and use of the mortgaged
> property*" (emphasis added) and that the borrower's "Credit
> Bureau Risk Score is used along with, but not limited to, mortgage
> payment history, seasoning on bankruptcy and/or foreclosure, and

>is not a substitute for the underwriter's judgment. EquiFirst's
>underwriting staff fully reviews each loan to determine whether
>EquiFirst's guidelines for income, assets, employment and
>collateral are met.

(RAMP 2005-EFC7 Prospectus Supplement at S-38.)

89.    Similarly, with respect to the information evaluated by the originators (including

HFN) the RALI 2006-QO8 Prospectus Supplement stated that:

>In accordance with the Seller Guide, the Expanded Criteria
>Program Seller is required to review an application designed to
>provide to the original lender pertinent credit information
>concerning the mortgagor.  As part of the description of the
>mortgagor's financial condition, each mortgagor is required to
>furnish information . . . regarding its assets, liabilities, income . . .
>credit history and employment history, and to furnish an
>authorization to apply for a credit report which summarizes the
>borrower's credit history with local merchants and lenders and any
>record of bankruptcy.  The mortgagor may also be required to
>authorize verifications of deposits at financial institutions where
>the mortgagor had demand or savings accounts.

(RALI 2006-QO8 Prospectus Supplement at S-59.)

90.    The Prospectus Supplement for the RAMP 2005-EFC7 securitization further

states:

>EquiFirst's guidelines comply with applicable federal and state
>laws and regulations and generally require an appraisal of the
>mortgaged property which conforms to Freddie Mac and/or Fannie
>Mae standards. All loans are subject to EquiFirst's appraisal
>review process.  Appraisals are provided by qualified independent
>appraisers licensed in their respective states.

(RAMP 2005-EFC7 Prospectus Supplement at S-39.)  The Prospectus

Supplement for RALI 2006-QO8 states:

>The appraisal procedure guidelines [described in the Seller Guide]
>generally require the appraiser or an agent on its behalf to
>personally inspect the property and to verify whether the property
>is in good condition and that construction, if new, has been
>substantially completed.  The appraiser is required to consider a
>market data analysis of recent sales of comparable properties and,

> when deemed applicable, an analysis based on income generated
> from the property, or replacement cost analysis based on the
> current cost of constructing or purchasing a similar property. In
> certain instances, the LTV ratio is based on the appraised value as
> indicated on a review appraisal conducted by the mortgage
> collateral seller or originator.

(RALI 2006-QO8 Prospectus Supplement at S-60.)

91.      The Prospectus Supplements for each of the Securitizations made similar

representations with respect to the underwriting guidelines employed by each of the Non-Party

Originators in the Securitizations, which included:  Aegis, Decision One, EFC Holdings and its

subsidiary EquiFirst, Finance America, FNB Nevada, Home123, Homefield Financial, MLN,

New Century, Ownit, People's Choice, Pinnacle, and SCME.  *See* Appendix A.

92.      Contrary to those representations, however, these originators routinely and

egregiously departed from, or abandoned completely, their stated underwriting guidelines, as

discussed in Section I.D.2, *infra*.  As a result, the representations concerning compliance with

underwriting guidelines and the inclusion and descriptions of those guidelines in the Prospectus

Supplements were false and misleading, and the actual mortgages underlying each Securitization

exposed the purchasers, including Freddie Mac, to a materially greater risk than that represented

in the Prospectus Supplements.

93.      As reflected more fully in Appendix A, for the vast majority of the

Securitizations, the Prospectus Supplements included representations that: (i) the mortgage loans

were underwritten in accordance with each originator's underwriting guidelines in effect at the

time of origination, subject only to limited exceptions; and (ii) the origination and collection

practices used by the originator with respect to each mortgage note and mortgage were in all

respects legal, proper and customary in the mortgage origination and servicing business.

94.    The inclusion of these representations in the Prospectus Supplements had the purpose and effect of providing assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations.  These representations were material to a reasonable investor's decision to purchase the Certificates, and they were material to Freddie Mac.  As alleged more fully below, Defendants' representations were materially false.

### 2.    Occupancy Status of Borrower

95.    The Prospectus Supplements for each Securitization set forth information about the occupancy status of the borrowers of the loans underlying the Securitization; that is, whether the property securing a mortgage is (i) the borrower's primary residence; (ii) a second home; or (iii) an investment property.  This information was presented in tables, typically titled "Occupancy Status of the Mortgage Loans," that assigned all the properties in the collateral group to one of the following categories:  (i) "Primary" or "Owner-Occupied"; (ii) "Second Home" or "Secondary"; and (iii) "Investor" or "Non-Owner."  For each category, the table stated the number of loans purportedly in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[8]

**Table 4**

| Transaction | Tranche | Supporting Loan Group | Primary or Owner-Occupied | Second Home / Secondary | Investor |
|---|---|---|---|---|---|
| RALI 2005-QO4 | IA1 | Group I | 81.68% | 1.71% | 16.61% |
| RALI 2006-QO4 | IA1 | Group I | 79.14% | 5.53% | 15.33% |
| RALI 2006-QO4 | IA2 | Group I | 79.14% | 5.53% | 15.33% |
| RALI 2006-QO5 | IA1 | Group I | 81.13% | 4.10% | 14.76% |
| RALI 2006-QO8 | IIA | Group II | 81.78% | 3.41% | 14.81% |
| RALI 2006-QO9 | IIA | Group II | 80.99% | 4.05% | 14.97% |
| RALI 2007-QH5 | AII | Group II | 77.36% | 5.74% | 16.90% |

---

[8]    Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner-occupied, investor, and second home.  These numbers have been converted to percentages for ease of comparison.

| Transaction | Tranche | Supporting Loan Group | Primary or Owner-Occupied | Second Home / Secondary | Investor |
|---|---|---|---|---|---|
| RAMP 2005-EFC6 | AII | Group II | 98.15% | 0.37% | 1.48% |
| RAMP 2005-EFC7 | AII | Group II | 100.00% | 0.00% | 0.00% |
| RAMP 2005-NC1 | AII | Group II | 83.96% | 5.56% | 10.48% |
| RAMP 2005-RS9 | AII | Group II | 65.80% | 1.35% | 32.85% |
| RAMP 2006-RS1 | AII | Group II | 78.45% | 2.11% | 19.44% |
| RASC 2005-EMX3 | AII | Group II | 93.92% | 2.29% | 3.79% |
| RASC 2005-KS10 | AII | Group II | 94.42% | 0.85% | 4.72% |
| RASC 2005-KS11 | AII | Group II | 89.88% | 2.53% | 7.59% |
| RASC 2006-EMX8 | AII | Group II | 100.00% | 0.00% | 0.00% |
| RASC 2006-EMX9 | AII | Group II | 100.00% | 0.00% | 0.00% |
| RASC 2006-KS3 | AII | Group II | 99.24% | 0.76% | 0.00% |
| RASC 2006-KS9 | AII | Group II | 95.82% | 2.81% | 1.36% |
| RASC 2007-EMX1 | AII | Group II | 93.65% | 1.98% | 4.37% |
| RASC 2007-KS2 | AII | Group II | 95.23% | 0.71% | 4.05% |
| RASC 2007-KS3 | AII | Group II | 95.56% | 1.27% | 3.17% |

96.    As Table 4 makes clear, the Prospectus Supplements reported that 17 of the 22 Supporting Loan Groups contained at least 80 percent owner-occupied loans, and 11 of the 22 Supporting Loan Groups contained at least 90 percent owner-occupied loans.

97.    Because information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan -- and, therefore, the Certificates that it backs -- the statements in the Prospectus Supplements concerning occupancy status were material to a reasonable investor's decision to invest in the Certificates, and they were material to Freddie Mac.  These statements were material because, among other reasons, borrowers who live in mortgaged properties are substantially less likely to default and more likely to care for their primary residence than borrowers who purchase properties as second homes or investments and live elsewhere.  For example, as stated in the Prospectus for the RALI 2005-QO4 Securitization: "[T]he rate of default on mortgage loans or manufactured housing contracts that are secured by investment properties . . . may be higher than on other mortgage loans or manufactured housing

contracts."   (RALI 2005-QO4 Prospectus Supplement (Form 424b5), at 62 (Nov. 28, 2005)

("RALI 2005-QO4 Prospectus Supplement").)  Accordingly, the percentage of loans in the

collateral group of a securitization that are secured by mortgage loans on owner-occupied

residences is an important measure of the risk of the certificates sold in that securitization.

98.    Other things being equal, the lower the percentage of loans secured by owner-

occupied residences, the greater the risk of loss to Certificateholders.  Even modest differences in

the percentages of primary/owner-occupied, second home/secondary, and investment properties

in the collateral group of a securitization can have a significant effect on the risk of each

certificate sold in that securitization, and thus, are important to the decision of a reasonable

investor whether, and at what price, to purchase any such certificate.  As discussed *infra* at

paragraphs 111 through 116, the Prospectus Supplement for each Securitization materially

overstated the percentage of loans in the Supporting Loan Groups that were owner-occupied,

thereby misrepresenting the degree of risk of the Certificates purchased by Freddie Mac.

### 3.    Loan-to-Value Ratios

99.    The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the

balance of the mortgage loan to the value of the mortgaged property when the loan is made.

100.    The denominator in the LTV ratio is the value of the mortgaged property, and is

generally the lower of the purchase price or the appraised value of the property.  In a refinancing

or home-equity loan, there is no purchase price to use as the denominator, so the denominator is

often equal to the appraised value at the time of the origination of the refinanced loan or home-

equity loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In

particular, an inflated appraisal will understate, sometimes greatly, the credit risks associated

with a given loan.

101.    The LTV ratio is among the most important measures of the risk of a mortgage loan for several reasons.  First, the LTV ratio is a strong indicator of the likelihood of default because a higher LTV ratio makes it more likely that a decline in the value of a property will completely eliminate a borrower's equity, and will incentivize the borrower to stop making mortgage payments and abandon the property.  Second, the LTV ratio is a strong predictor of the severity of loss in the event of a default because the higher the LTV ratio, the smaller the "equity cushion," and the greater the likelihood that the proceeds of foreclosure will not cover the unpaid balance of the mortgage loan.

102.    Thus, LTV ratios are material to a reasonable investor's decision to invest in the Certificates, and they were material to Freddie Mac.  Even small differences between the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that collateral groups will generate sufficient funds to pay certificateholders in that securitization.  Such differences are important to the decision of a reasonable investor on whether to purchase any such certificate, and they affect the intrinsic value of the certificate.

103.    The Prospectus Supplements for the Securitizations contain information about the LTV ratio for each Supporting Loan Group.  Table 5 below reflects two categories of important information reported in the Prospectus Supplements concerning the LTV ratios for each Supporting Loan Group: (i) the percentage of loans with an LTV ratio of less than or equal to 80 percent; and (ii) the percentage of loans with an LTV ratio greater than 100 percent.[9]

---

[9]    As used in this Amended Complaint, "LTV" refers to the loan-to-value ratio for first lien mortgages and for properties with second liens subordinate to the lien included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  Where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

**Table 5**

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| RALI 2005-QO4 | Group I | 94.77% | 0.00% |
| RALI 2006-QO4 (IA1 & IA2) | Group I | 94.37% | 0.00% |
| RALI 2006-QO5 | Group I | 95.44% | 0.00% |
| RALI 2006-QO8 | Group II | 95.56% | 0.00% |
| RALI 2006-QO9 | Group II | 93.89% | 0.00% |
| RALI 2007-QH5 | Group II | 93.70% | 0.00% |
| RAMP 2005-EFC6 | Group II | 57.86% | 0.00% |
| RAMP 2005-EFC7 | Group II | 71.74% | 0.00% |
| RAMP 2005-NC1 | Group II | 57.07% | 0.00% |
| RAMP 2005-RS9 | Group II | 53.93% | 0.00% |
| RAMP 2006-RS1 | Group II | 44.73% | 0.00% |
| RASC 2005-EMX3 | Group II | 47.33% | 0.00% |
| RASC 2005-KS10 | Group II | 45.62% | 0.00% |
| RASC 2005-KS11 | Group II | 61.19% | 0.00% |
| RASC 2006-EMX8 | Group II | 53.72% | 0.00% |
| RASC 2006-EMX9 | Group II | 41.34% | 0.00% |
| RASC 2006-KS3 | Group II | 61.60% | 0.00% |
| RASC 2006-KS9 | Group II | 45.21% | 0.00% |
| RASC 2007-EMX1 | Group II | 52.14% | 0.00% |
| RASC 2007-KS2 | Group II | 44.68% | 0.00% |
| RASC 2007-KS3 | Group II | 43.00% | 0.00% |

104.    Table 5 uses an LTV ratio of 80 percent as the benchmark because, as a condition for making a mortgage loan, lenders traditionally require borrowers to put down at least 20 percent of the value of the property.  Accordingly, a down payment of at least 20 percent corresponds to an LTV ratio of less than or equal to 80 percent.  As Table 5 makes clear, the Prospectus Supplements for most of the Securitizations reported that the majority of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less.  The Prospectus Supplements also reported that *none* of the Supporting Loan Groups contained a single loan with an LTV ratio over 100 percent.

105.    As discussed *infra* at paragraphs 117 through 123, the Prospectus Supplements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups

with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans

in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the

degree of risk to Certificateholders.

### 4.    Credit Ratings

106.    Credit ratings are assigned to the tranches of mortgage-backed securities by the

credit rating agencies, including Standard & Poor's, Moody's Investors Service, and Fitch

Ratings.  Each credit rating agency uses its own scale with letter designations to describe various

levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale

and are intended to designate the safest investments.  C and D ratings are at the bottom of the

scale and refer to investments that are currently in default and exhibit little or no prospect for

recovery.  At the time Freddie Mac purchased the Certificates, investments with AAA or its

equivalent ratings historically experienced a loss rate of less than .05 percent.  Investments with

a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a

result, securities with credit ratings between AAA or its equivalent through BBB- or its

equivalent were generally referred to as "investment grade."

107.    Rating agencies determine the credit rating for each tranche of a mortgage-backed

securitization by analyzing the expected loss, factoring in "credit enhancements" such as

subordination levels and excess spread, available to protect investors.  Rating agencies

determine, among other things, the likelihood of repayment of principal and interest based on the

quality of the underlying mortgage loans by using sponsor-provided loan-level data.  Credit

enhancements, such as subordination, represent the amount of "cushion" or protection from loss

incorporated into a given securitization.[10]  This cushion is intended to improve the likelihood that

---

[10]    "Subordination" refers to the fact that the certificates for a mortgage-backed
securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates

holders of highly-rated certificates receive the interest and principal to which they are

contractually entitled.  The level of credit enhancement offered is based on the composition of

the loans in the underlying collateral group and entire securitization.  Riskier loans underlying

the securitization necessitate higher levels of credit enhancement to ensure payment to senior

certificateholders.  If the collateral within the deal is of a higher quality, then rating agencies

require less credit enhancement for an AAA or its equivalent rating.

108.    For almost a hundred years, investors such as pension funds, municipalities,

insurance companies, and university endowments have relied heavily on credit ratings to assist

them in distinguishing between safe and risky investments.

109.    Each tranche of the Securitizations received a credit rating before issuance, which

purported to describe the riskiness of that tranche.  Defendants reported the credit ratings for

each tranche in the Prospectus Supplements.  For each of the Certificates purchased by Freddie

Mac the credit rating provided was always AAA or its equivalent.  The credit quality of the

Certificates endorsed by these ratings was material to a reasonable investor's decision to

purchase the Certificates, and it was material to Freddie Mac.  Among other things, the ratings

provided additional assurance that investors in the Certificates would receive the expected

interest and principal payments.  As set forth in Table 8, *infra* at paragraph 168, the ratings for

the majority of the Securitizations were severely downgraded after Freddie Mac's purchase of

the Certificates.  Upon information and belief, the initial ratings were based in substantial part

upon the materially inaccurate and incomplete information in the Registration Statements and

related information provided to the ratings agencies.

---

are "subordinate" to the senior certificates in that, should the underlying mortgage loans become
delinquent or default, the junior certificates suffer losses first.  These subordinate certificates
thus provide a degree of protection to the senior certificates from certain losses on the underlying
loans.

### D.    Falsity of Statements in the Registration Statements

**1.    The Statistical Data Provided in the Prospectus Supplements Concerning Owner-Occupancy and Loan-to-Value Ratios Were Materially False or Misleading**

110.    A review of loan-level data for a sample of mortgage loans in each Securitization was conducted to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the review included an analysis either of:  (i) a sample of 1,000 loans randomly selected from the Supporting Loan Group; or (ii) all the loans in the Supporting Loan Group if there were fewer than 1,000 such loans.  The review of sample data has confirmed, on a statistically-significant basis, that the data provided in the Prospectus Supplements concerning owner-occupancy and LTV ratios was materially false and misleading at the time the loans were originated and securitized, and that the Prospectus Supplements contained material misrepresentations with respect to the underwriting standards employed by the originators, and of certain key characteristics of the mortgage loans across the Securitizations at the time of their origination.

### a.    Owner-Occupancy Data Was Materially False or Misleading

111.    The data review reveals that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated at the time of loan origination. Indeed, the Prospectus Supplements over-reported the number of underlying properties that were occupied by their owners, and underreported the number of underlying properties held as second homes or investment properties.

112.    To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, *inter alia*, whether the borrower's tax bill was being mailed to the mortgaged property or to a different address six months after the loan closed, whether the borrower had claimed an owner-occupied tax exemption on the mortgaged

property, and whether the mailing address of the property was reflected in the borrower's credit

reports, tax records, or lien records.  Failing two or more of these tests constitutes strong

evidence that the borrower did not live at the mortgaged property and instead used it as a second

home or an investment property, rendering it much more likely that a borrower will not repay the

loan.

113.    For each Securitization, a significant number of the underlying loans failed two or

more of these tests, demonstrating that the owner-occupancy statistics provided to Freddie Mac

were materially false and misleading.  For example, the Prospectus Supplement for the RAMP

2005-EFC6 Securitization -- for which the Ally Sponsor was the sponsor and Ally Securities was

a co-lead underwriter -- stated that 1.85 percent of the underlying properties by loan count in the

Supporting Loan Group were not owner-occupied.  But the data review revealed that the true

percentage of non-owner-occupied properties was 13.67 percent,[11] approximately 700 percent

greater than the percentage reported in the Prospectus Supplement because for 12.04 percent of

the properties represented as owner-occupied, the owners lived elsewhere.

114.    The data review revealed that, for each Securitization, the Prospectus Supplement

misrepresented the percentage of non-owner-occupied properties.  The true percentage of non-

owner-occupied properties, as determined by the data review, versus the percentage stated in the

Prospectus Supplement for each Securitization, is reflected in Table 6 below.

---

[11]    The true percentage of non-owner-occupied properties (Table 6 Column C) is calculated
by adding the percentage reported in the Prospectus Supplement (Table 6 Column A) to the
product of owner-occupied properties reported in the Prospectus Supplement (100 minus
Column A) and the percentage of properties reported as owner-occupied but with strong
indication of non-owner-occupancy (Table 6 Column B).

**Table 6**

| Transaction | Supporting Loan Group | A<br>Reported Percentage of Non-Owner-Occupied Properties | B<br>Percentage of Properties Reported As Owner-Occupied Misrepresented in the Offering Materials | C<br>Actual Percentage of Non-Owner-Occupied Properties | D<br>Understatement of Non-Owner-Occupied Properties in the Offering Materials |
|---|---|---|---|---|---|
| RALI 2005-QO4 | Group I | 18.32% | 14.93% | 30.52% | 12.19% |
| RALI 2006-QO4 (IA1 & IA2) | Group I | 20.86% | 14.86% | 32.62% | 11.76% |
| RALI 2006-QO5 | Group I | 18.87% | 13.14% | 29.53% | 10.66% |
| RALI 2006-QO8 | Group II | 18.22% | 13.18% | 29.00% | 10.78% |
| RALI 2006-QO9 | Group II | 19.01% | 13.84% | 30.22% | 11.21% |
| RALI 2007-QH5 | Group II | 22.64% | 15.76% | 34.83% | 12.20% |
| RAMP 2005-EFC6 | Group II | 1.85% | 12.04% | 13.67% | 11.82% |
| RAMP 2005-EFC7 | Group II | 0.00% | 11.88% | 11.88% | 11.88% |
| RAMP 2005-NC1 | Group II | 16.04% | 10.72% | 25.04% | 9.00% |
| RAMP 2005-RS9 | Group II | 34.20% | 13.42% | 43.03% | 8.83% |
| RAMP 2006-RS1 | Group II | 21.55% | 11.66% | 30.69% | 9.15% |
| RASC 2005-EMX3 | Group II | 6.08% | 9.03% | 14.56% | 8.48% |
| RASC 2005-KS10 | Group II | 5.58% | 11.97% | 16.88% | 11.30% |
| RASC 2005-KS11 | Group II | 10.12% | 11.41% | 20.38% | 10.26% |
| RASC 2006-EMX8 | Group II | 0.00% | 12.38% | 12.38% | 12.38% |
| RASC 2006-EMX9 | Group II | 0.00% | 12.52% | 12.52% | 12.52% |
| RASC 2006-KS3 | Group II | 0.76% | 13.20% | 13.86% | 13.10% |
| RASC 2006-KS9 | Group II | 4.18% | 9.06% | 12.86% | 8.68% |
| RASC 2007-EMX1 | Group II | 6.35% | 9.44% | 15.19% | 8.84% |
| RASC 2007-KS2 | Group II | 4.77% | 10.28% | 14.56% | 9.79% |
| RASC 2007-KS3 | Group II | 4.44% | 11.10% | 15.05% | 10.60% |

115.    Table 6 demonstrates that the Prospectus Supplement for each Securitization was grossly inaccurate, understating the percentage of non-owner-occupied properties by at least eight percent, and for many Securitizations by 10 percent or more.  The inclusion of inaccurate statistics in its Prospectus Supplements was misleading because the Ally Depositors', Ally Sponsor's, and Underwriter Defendants' endorsed the accuracy of such statistics through the inclusion of their names on the document and their express statements in the Prospectus Supplements, similar to that in the Prospectus Supplement for RAMP 2005-EFC7, that investors "should rely on the information provided in the prospectus and accompanying prospectus supplement, including the information incorporated by reference."  (RAMP 2005-EFC7

Prospectus Supplement, at "Important Notice About Information Presented In This Prospectus

And The Accompanying Prospectus Supplement".)

116.    Specific examples of misrepresentations and omissions showing that the owner

occupancy statistics reported in the Prospectus Supplements were materially false and inflated at

the time of origination are discussed in detail below.  (*See infra*, at paragraphs 136-137.)  Initial

forensic loan reviews reaffirm what the above statistics demonstrate:  the owner occupancy data

in the Prospectus Supplements was materially false at the time of origination.

**b.        Loan-to-Value Data Was Materially False**

117.    The data review has further revealed that the LTV ratios disclosed in the

Prospectus Supplements were materially false and understated at the time the loans were

originated and securitized, as more specifically set out below.  For each of the sampled loans, an

industry standard automated valuation model ("AVM") was used to calculate the value of the

underlying property at the time the mortgage loan was originated.  AVMs are routinely used in

the industry as a way of valuing properties during prequalification, origination, portfolio review,

and servicing.  AVMs rely upon data similar to that upon which appraisers rely -- primarily

county assessor records, tax rolls, and data on comparable properties.  AVMs produce

independent, statistically-derived valuation estimates by applying modeling techniques to this

data.  The ValuePoint4 ("VP4") AVM was used to analyze the data via appraisal emulation,

repeat sales indices, and regression analysis, relying on the sales made within the last 24 months

prior to the origination of the mortgage loan at issue.

118.    Application of the VP4 AVM to the available data for the properties securing the

sampled loans shows that the original appraised value given to such properties was significantly

higher than the actual value of the properties as determined by the VP4 retroactive AVM.  The

result of this overstatement of property values is a material understatement of LTV.  That is, if a

property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value.  This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default.  As stated in the Prospectus for RALI 2005-QO4:  "The rate of default . . . on mortgage loans or manufactured housing contracts with higher LTV ratios may be higher than for other types of mortgage loans or manufactured housing contracts."  (RALI 2005-QO4 Prospectus Supplement at 62.)

119.    For example, for the RALI 2007-QH5 Securitization, for which RFC was the sponsor and Ally Securities was a co-underwriter, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent.  In fact, 18.26 percent of the sample of loans included in the data review had LTV ratios above 100 percent.  In addition, the Prospectus Supplement stated that 93.70 percent of the loans had LTV ratios at or below 80 percent.  The data review indicated that only 45.89 percent of the loans had LTV ratios at or below 80 percent.

120.    The data review revealed that, for each Securitization, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio above 100 percent, as well as the percentage of loans that had an LTV ratio at or below 80 percent at the time of their origination. Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group at the time of origination with LTV ratios above 100 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group at the time of origination with LTV ratios at or below 80 percent, versus the percentage reported in the Prospectus Supplement.  The percentages listed in Table 7 were calculated by aggregate principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS<br>Percentage of Loans Reported to have LTV Ratio at or Less than 80% | DATA REVIEW<br>True Percentage of Loans with LTV Ratio at or Less than 80% | PROSPECTUS<br>Percentage of Loans Reported to have LTV Ratio Over 100% | DATA REVIEW<br>True Percentage of Loans with LTV Ratio Over 100% |
|---|---|---|---|---|---|
| RALI 2005-QO4 | Group I | 94.77% | 61.17% | 0.00% | 8.18% |
| RALI 2006-QO4 (IA1 & IA2) | Group I | 94.37% | 57.25% | 0.00% | 8.43% |
| RALI 2006-QO5 | Group I | 95.44% | 53.64% | 0.00% | 11.09% |
| RALI 2006-QO8 | Group II | 95.56% | 46.48% | 0.00% | 11.62% |
| RALI 2006-QO9 | Group II | 93.89% | 48.39% | 0.00% | 13.12% |
| RALI 2007-QH5 | Group II | 93.70% | 45.89% | 0.00% | 18.26% |
| RAMP 2005-EFC6 | Group II | 57.86% | 35.31% | 0.00% | 16.70% |
| RAMP 2005-EFC7 | Group II | 71.74% | 38.91% | 0.00% | 13.32% |
| RAMP 2005-NC1 | Group II | 57.07% | 44.83% | 0.00% | 13.01% |
| RAMP 2005-RS9 | Group II | 53.93% | 36.91% | 0.00% | 17.27% |
| RAMP 2006-RS1 | Group II | 44.73% | 29.46% | 2.60% | 22.23% |
| RASC 2005-EMX3 | Group II | 47.33% | 29.10% | 0.00% | 19.47% |
| RASC 2005-KS10 | Group II | 45.62% | 31.29% | 0.00% | 17.94% |
| RASC 2005-KS11 | Group II | 61.19% | 44.25% | 0.00% | 14.41% |
| RASC 2006-EMX8 | Group II | 53.72% | 30.69% | 0.00% | 26.94% |
| RASC 2006-EMX9 | Group II | 41.34% | 21.70% | 0.03% | 33.84% |
| RASC 2006-KS3 | Group II | 61.60% | 44.12% | 0.00% | 11.68% |
| RASC 2006-KS9 | Group II | 45.21% | 27.87% | 0.00% | 26.92% |
| RASC 2007-EMX1 | Group II | 52.14% | 27.06% | 0.00% | 26.46% |
| RASC 2007-KS2 | Group II | 44.68% | 28.40% | 0.00% | 28.40% |
| RASC 2007-KS3 | Group II | 43.00% | 27.04% | 0.00% | 29.22% |

121.    As Table 7 demonstrates, the Prospectus Supplements for all the Securitizations falsely reported that only two of the Supporting Loan Groups had mortgage loans with an LTV ratio over 100 percent.  The data review revealed that at least eight percent of the mortgage loans for *every* Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.  Indeed, for 19 of the 21 Securitizations, the data review revealed that more than 10 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.  For 12 Securitizations, the data review revealed that more than 15 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent and for seven

Securitizations, the data review revealed that more than 20 percent of the mortgages in the

Supporting Loan Group had a true LTV ratio over 100 percent.

122.    These systemic misrepresentations with respect to reported LTV ratios also

demonstrate that the representations in the Registration Statements relating to appraisal practices

were false, and that the appraisers routinely furnished appraisals that the appraisers understood

were inaccurate and that they knew bore no reasonable relationship to the actual value of the

underlying properties.  One confidential witness, who was a national appraiser director at New

Century, stated that he did not support the practices employed by New Century, noting that his

group tried to follow the guidelines, but others at New Century overrode their decisions.

According to the witness, New Century was a "very volume driven company" where the

"originators did not care about the quality of the loan" because they were being paid by the

number of closings.  To form a long-lasting relationship with an originator, the witness stated

that third-party appraisers were pressured to inflate appraisal values.

123.    Indeed, independent appraisers following proper practices, and providing genuine

estimates as to valuation, would not systematically generate appraisals that, as demonstrated by

Table 7, deviate so significantly (and so consistently upward) from the true values of the

appraised properties.  These consistent errors demonstrate that, contrary to the representations in

the Prospectuses and Prospectus Supplements, the appraisers did not comply with the Uniform

Standards of Professional Appraisal Practice but instead generated appraisal values to justify the

issuance of a mortgage loan.  This conclusion is further confirmed by the findings of the

Financial Crisis Inquiry Commission ("FCIC"), which identified "inflated appraisals" as a

pervasive problem during the period of the Securitizations, and determined through its

investigation that appraisers were often pressured by mortgage originators, among others, to

produce inflated results.  (*See* Final Report of the National Commission on the Causes of the

Financial and Economic Crisis in the United States (2011) ("FCIC Report"), at 91.)

### 2.    The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines

124.    The Prospectus Supplements each contained material misstatements and

omissions concerning the underwriting guidelines used by the Non-Party Originators of the loans

included in the Securitizations.  Among other things, the Prospectus Supplements stated that the

Non-Party Originators underwrote all loans in compliance with their respective underwriting

guidelines.  *See* Appendix A, Sections I-XXI at Subsections B.  These statements were

materially false.

125.    The Non-Party Originators -- companies such as New Century, Decision One, and

others -- systematically disregarded their respective underwriting guidelines, as confirmed not

only by the pervasively false owner-occupancy and LTV figures alleged *supra*, but also by:  (1)

an forensic review of loan files; (2) government investigations and private actions relating to

their underwriting practices, which have revealed widespread abandonment of their reported

underwriting guidelines during the period of the Securitizations; (3) the collapse of the credit

ratings of Certificates purchased by Freddie Mac; and (4) the surge in delinquencies and defaults

in the mortgages in the Securitizations.

### a.    A Forensic Review of Loan Files Has Revealed Pervasive Failure to Adhere to Underwriting Guidelines

126.    An initial forensic review of 235 loans in the RALI 2006-QO8 and RALI 2007-

QH5 Securitizations, for which Ally Sponsor served as the sponsor and an Ally Depositor,

RALI, served as the depositor, has revealed that *none* of the reviewed loans had been

underwritten in accordance with the applicable underwriting guidelines.

127.    The forensic review consisted of an analysis of the loan origination file for each

loan, including the documents submitted by the individual borrowers in support of their loan

applications, as well as an analysis of information extrinsic to each loan file, such as borrowers'

filings in bankruptcy proceedings, motor vehicle registration, or other documentation available at

the time of the loan application with pertinent information indicating a borrower's assets or

residence.

128.    The mortgage loans in both the RALI 2006-QO8 Securitization and the RALI

2007-QH5 Securitization were originated by the Ally originator, HFN, among others.  Both the

RALI 2006-QO8 Prospectus Supplement and the RALI 2007-QH5 Prospectus Supplement stated

that "[p]rior to assigning the mortgage loans to the depositor, Residential Funding Company,

LLC will have reviewed the underwriting information provided by the mortgage collateral sellers

for the mortgage loans and, in those cases, determined that the mortgage loans were generally

originated in accordance with or in a manner generally consistent with the underwriting

standards described in the Seller Guide." (RALI 2006-QO8 Prospectus Supplement at S-60;

RALI 2007-QH5, Prospectus Supplement (Form 424b5), at S-54 (May 30, 2007) ("RALI 2007-

QH5 Prospectus Supplement").)   The Prospectus Supplements also stated that "[RFC] reviewed

the underwriting standards for the mortgage loans" and "[a]ll of the mortgage loans in the

mortgage pool were originated in accordance with the underwriting criteria of [RFC]."  (RALI

2006-QO8 Prospectus Supplement at S-59-61; RALI 2007-QH5 Prospectus Supplement at S-54-

55.)

129.    The results of the forensic review demonstrate, however, the material falsity of

the disclosures in the Registration Statements stating that the mortgage loans were underwritten

in accordance with the applicable underwriting guidelines described in the Prospectus

Supplements.

130.    The underwriting guidelines that were disregarded were designed to assess the

likelihood a borrower would be able to repay the loan.  The forensic review revealed

abandonment of underwriting guidelines, including as follows:

- failure to test the reasonableness of the borrower's stated income, contributing to material misrepresentations of income;

- failure to investigate properly the borrower's intention to occupy the subject properties when red flags surfaced in the origination process that should have alerted the underwriter that the property was intended for investment;

- failure to calculate properly the borrower's outstanding debt, causing the debt-to-income ratio ("DTI") to exceed the maximum allowed under the applicable underwriting guidelines; and

- failure to investigate properly information on the borrower's credit reports of potential misrepresentation of outstanding or potential debt.

131.    Although the Prospectus Supplements represented that exceptions would be

justified by sufficient compensating factors, none of the loan files reflecting a breach of

underwriting guidelines evidenced sufficient compensating factors, as set forth in the

underwriting guidelines, that would justify or support such an exception.  Similarly, the loan files

lack any documentation reflecting whether or how the originators considered, if at all, such

compensating factors.  A 100 percent breach rate, in any event, could not possibly be explained

by the proper application of any such exceptions.

132.    The following examples from the initial forensic review of the RALI 2006-QO8

and RALI 2007-QH5 Securitizations illustrate the types of breaches discussed above that

pervade the loan pools for these Securitizations.

### i.        Stated Income Was Not Reasonable

133.    Although no verification of income was required for stated income loans, the

applicable underwriting guidelines required the underwriter to verify the employment listed by

the borrower on the application and to assess whether the stated income was reasonable given the

applicant's line of work.

134.    The following examples reveal instances where there was no evidence that the

underwriter analyzed the reasonableness of the borrower's stated income for the employment

listed on the loan application as required by the applicable underwriting guidelines.  In fact, the

forensic review verified that the borrower misrepresented his or her income on the application.

This misrepresentation resulted in a miscalculation of the borrower's DTI.  Had the loan

underwriter performed an evaluation of the income stated on the application by the borrower, as

required by the applicable underwriting guidelines, the unreasonableness of the borrower's stated

income would have been evident.

- A loan that closed in April 2007 with a principal balance of $254,000 was originated under HFN's Stated Income Loan Program.  The loan application stated that the borrower was employed as an engineer earning $25,833 per month. The borrower's stated income exceeded the Bureau of Labor Statistics 90th percentile salary for an engineer in the same geographic region.  Moreover, in a Statement of Financial Affairs filed by the borrower as part of a 2009 Chapter 7 Bankruptcy, the borrower reported monthly income of $6,333 in 2007.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 261.98 percent, which exceeds the guideline maximum allowable DTI of 45 percent.  The loan defaulted, resulting in a loss of $243,148.

- A loan that closed in August 2006 with a principal balance of $328,500 was originated under First National Bank of Arizona's Stated Income Loan Program. The loan application stated that the borrower was self-employed as an owner of a beauty salon, earning $25,000 per month.  The borrower's stated income exceeded CBSalary.com's 90th percentile salary for a self-employed owner of a beauty salon in the same geographic region.  Moreover, according to the borrower's 2009 bankruptcy petition, the total household income for the borrower and non-borrower spouse for 2006 was $57,141, resulting in a monthly income of

$4,761.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of DTI based on the borrower's verified income yields a DTI of 187.05 percent, which exceeds the limits established by the applicable underwriting guidelines.  The loan defaulted, resulting in a loss of $211,774.

- A loan that closed in August 2006 with a principal balance of $371,250 was originated under Sea Breeze Financial Services' Stated Income Loan Program. The loan application stated that the borrower was employed as a customer service representative, earning $12,700 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a customer service representative in the same geographic region.  Moreover, according to a Statement of Financial Affairs, filed by the borrower as part of a 2010 bankruptcy proceeding, the borrower's income for 2008 was $47,604, resulting in a monthly income of $3,967.  From the time the subject loan closed in 2006 to 2008, the borrower was employed with the same employer in the same line of work.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of DTI based on the borrower's verified income yields a DTI of 115.31 percent, which exceeds the limits established by the applicable underwriting guidelines.  The loan defaulted, resulting in a loss of $221,953.

- A loan that closed in August 2006 with a principal balance of $364,000 was originated under BrooksAmerica Mortgage's Stated Income Loan Program.  The loan application stated that the borrower was employed as a driver earning $7,340 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a driver in the same geographic region. Moreover, according to a Statement of Financial Affairs, filed by the borrower as part of a 2010 bankruptcy proceeding, the borrower's income for 2008 was $1,711 per month.  Between the time the loan closed in 2006 and 2008, the borrower was employed with the same employer in the same line of work.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of DTI based on the borrower's verified income yields a DTI of 210.15 percent, which exceeds the limits established by the applicable underwriting guidelines.  The loan defaulted, resulting in a loss of $349,723.

- A loan that closed in September 2006 with a principal balance of $240,000 was originated under Golden Empire Mortgage Inc.'s Stated Income Loan Program. The loan application stated that the borrower was employed as a teaching assistant earning $5,379 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a teaching assistant in the same geographic region.  Moreover, the forensic underwriter confirmed with the borrower's employer that the borrower's 2006 income was actually $1,283 per month.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of DTI based on the borrower's verified income yields a DTI of 341.08 percent, which exceeds the

limits established by the applicable underwriting guidelines.  The loan defaulted,
resulting in a loss of $177,784.

- A loan that closed in August 2006 with a principal balance of $284,000 was
  originated under Flexpoint Funding Corp.'s Stated Income Loan Program.  The
  loan application stated that the borrower was employed in quality control for a
  food distribution company, earning $6,500 per month.  The borrower's stated
  income exceeded the Bureau of Labor Statistics' 90th percentile salary for
  employment in quality control in the same geographic region.  Moreover,
  according to a Statement of Financial Affairs, filed by the borrower as part of a
  2009 bankruptcy proceeding, the borrower's income for 2008 was $25,849,
  resulting in a monthly income of $2,154.  From the time the subject loan closed in
  2006 to 2008, the borrower was employed with the same employer in the same
  line of work.  There is no evidence in the file that the underwriter tested the
  reasonableness of the stated income.  A recalculation of DTI based on the
  borrower's verified income yields a DTI of 115.39 percent, which exceeds the
  limits established by the applicable underwriting guidelines.  The loan defaulted,
  resulting in a loss of $234,644.

- A loan that closed in August 2006 with a principal balance of $210,000 was
  originated under M&T Mortgage Corp.'s Stated Income Loan Program.  The loan
  application stated that the borrower was employed as a cardiac monitor nurse,
  earning $13,500 per month.  The borrower's stated income exceeded the Bureau
  of Labor Statistics' 90th percentile salary for a cardiac monitor nurse in the same
  geographic region.  Moreover, according to a Statement of Financial Affairs, filed
  by the borrower as part of a 2008 bankruptcy proceeding, the borrower's total
  household income, inclusive of income from a non borrowing spouse, for 2006
  was $2,083 per month.  There is no evidence in the file that the underwriter tested
  the reasonableness of the stated income.  A recalculation of DTI based on the
  borrower's verified income yields a DTI of 212.39 percent, which exceeds the
  limits established by the applicable underwriting guidelines.  The loan defaulted,
  resulting in a loss of $153,083.

- A loan that closed in August 2006 with a principal balance of $244,000 was
  originated under First National Bank of Arizona's Stated Income Loan Program.
  The loan application stated that the borrower was self-employed as a chemical
  engineer earning $17,000 per month. The borrower's stated income exceeded
  CBSalary.com's 90th percentile salary for a small business owner in the same
  geographic region.  Moreover, the borrower's 2008 bankruptcy filing confirms
  that the borrower's total income for 2006 was negative $45,777.  There is no
  evidence in the file that the underwriter tested the reasonableness of the stated
  income.  A recalculation of DTI based on the borrower's verified income yields a
  negative DTI due to the borrower's verified negative income and thus exceeds the
  limits established by the applicable underwriting guidelines.  The loan defaulted,
  resulting in a loss of $127,850.

- A loan that closed in March 2007 with a principal balance of $292,500 was originated under HFN's Stated Income Loan Program. The loan application stated that the borrower was employed as a support specialist earning $6,800 per month. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a support specialist in the same geographic region. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a 2008 Chapter 7 Bankruptcy, the borrower reported income of $1,090 per month in 2007. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of the DTI based on the borrower's verified income yields a DTI of 232.82 percent, which exceeds the guideline maximum of 45 percent. The loan defaulted, resulting in a loss of $222,977.

- A loan that closed in April 2007 with a principal balance of $194,803 was originated under First National Bank of Arizona's Stated Income Loan Program. The loan application stated that the borrower was employed as an electronic technician earning $6,200 per month. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for an electronic technician in the same geographic region. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a 2009 Chapter 7 Bankruptcy, the borrower reported income of $4,015 per month in 2009 from the same employer and in the same line of work as was stated on the subject loan application. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of the DTI based on the borrower's verified near year income and all other evidence uncovered in the forensic review yields a DTI of 87.13 percent, which exceeds the guideline maximum of 45 percent. The loan defaulted, resulting in a loss of $104,930

- A loan that closed in March 2007 with a principal balance of $296,000 was originated under HFN's Stated Income Loan Program. The loan application stated that the borrower was employed as a maintenance technician earning $6,500 per month. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a maintenance technician in the same geographic region. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a 2009 Chapter 7 Bankruptcy, the borrower reported monthly income of $2,935 for 2007. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of the DTI based on the borrower's verified income yields a DTI of 103.63 percent, which exceeds the guideline maximum of 45 percent. The loan defaulted, resulting in a loss of $277,110.

- A loan that closed in March 2007 with a principal balance of $236,000 was originated by Statewide Bancorp, Inc. as a stated income loan. The loan application stated that the borrower was employed as an electrician earning $7,500 per month. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for an electrician in the same geographic region. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a

2009 Chapter 13 Bankruptcy, the borrower reported monthly income of $3,697 in 2007.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 98.47 percent, which exceeds the guideline maximum of 38 percent.  The loan defaulted, resulting in a loss of $171,787.

- A loan that closed in April 2007 with a principal balance of $143,920 was originated under First National Bank of Arizona's Stated Income Loan Program. The loan application stated that the borrower was employed as a systems analyst earning $12,900 per month.  The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile salary for a systems analyst in the same geographic region.  Moreover, in a Statement of Financial Affairs filed by the borrower as part of a 2009 Chapter 7 Bankruptcy, the borrower reported that he had no income for the two years prior to filing, which includes 2007, the year the subject loan closed.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  The DTI could not be recalculated because the borrower had no income at the time the loan was originated.  The loan defaulted, resulting in a loss of $190,108.77.

135.    Accordingly, the results of the forensic review demonstrate that the statements in the Registration Statements concerning the originators' verification of the reasonableness of the stated income were materially false and misleading.  In particular, a significant number of mortgage loans were made on the basis of "stated incomes" that were facially unreasonable, and were not properly underwritten through efforts to verify the reasonableness of borrowers' income.

### ii.    Evidence of Occupancy Misrepresentations

136.    The following are examples from the forensic review where the loan underwriter did not adequately question the borrower's intended occupancy of the subject property.

- A loan that closed in September 2006 with a principal balance of $208,000 was originated under LoanCity's Stated Income Loan Program.  The loan was a refinance of a purported owner occupied property.  The applicable guidelines required that the borrower occupy the subject property.  The loan was represented as being for an owner occupied residence.  However, the subject property was located 134 miles away from the borrower's employer, while the borrower's declared rental property was located only 13 miles from the borrower's employer. Further, the forensic underwriter confirmed that the borrower never filed for a homestead exemption at the subject property and that the subject property's

utilities had never been in the borrower's name.  No evidence in the loan file indicates that the loan underwriter addressed or challenged the borrower's claim that he intended to reside at the new location. The loan defaulted, resulting in a loss of $193,151.

- A loan that closed in March 2007 with a principal balance of $360,000 was originated under First National Bank of Nevada's Stated Income Loan Program. The loan was a refinance of an owner occupied property.  The underwriting guidelines for this loan required that the borrower occupy the subject property. The loan was represented as being for an owner occupied residence.  However, the hazard policy for the subject property included in the loan file, reflected that the subject property was tenant occupied and that the borrower's address was at a property listed as a "rental" on the application.  No evidence in the file indicates that the loan underwriter addressed or challenged the borrower's claim that he intended to reside at the new location.  The loan defaulted, resulting in a loss of $175,988.

- A loan that closed in March 2007 with a principal balance of $374,000 was under SCME's Stated Income Loan Program.  The loan was a refinance of an owner-occupied property.  The underwriting guidelines for this loan required that the borrower occupy the subject property.  The loan was represented as being for an owner occupied residence.  However, the borrower's 2006 W-2, obtained at origination, reflected a different property as the borrower's address.  Moreover, the forensic re-underwriter searched Accurint and discovered that the borrower has not occupied the subject property at any point since origination.  No evidence in the file indicates that the loan underwriter addressed or challenged the borrower's claim that he intended to reside at the subject property.  The loan defaulted, resulting in a loss of $280,897.

- A loan that closed in April 2007 with a principal balance of $300,000 was originated under HFN's Stated Income Loan Program.  The loan was a refinance of an owner occupied property.  The underwriting guidelines for this loan required that the borrower occupy the subject property.  The loan was represented as being for an owner occupied residence.  However, according to a Statement of Financial Affairs, filed by the borrower as part of a 2008 Chapter 7 Bankruptcy, the borrower did not reside at the subject property at any point during the previous three years.  No evidence in the file indicates that the loan underwriter addressed or challenged the borrower's claim that he intended to reside at the subject property.  The loan defaulted, resulting in a loss of $173,221.

- A loan that closed in March 2007 with a principal balance of $263,800 was originated SCME's Stated Income Loan Program.  The loan was a refinance of an owner occupied property.  The underwriting guidelines for this loan required that the borrower occupy the subject property within 60 days after the mortgage loan closed and continue to occupy the property for at least one year.  The loan was represented as being for an owner occupied residence.  However, according to a Statement of Financial Affairs, filed by the borrower as part of a 2009 Chapter 7

Bankruptcy, the borrower vacated the subject property in May 2007. No evidence in the file indicates that the loan underwriter addressed or challenged the borrower's claim that he intended to reside at the subject property. The loan defaulted, resulting in a loss of $40,058.

137. The results of the forensic review demonstrate that the statements in the Offering Materials concerning the borrower's occupancy status were materially false or misleading and that the loans were not originated in accordance with the underwriting guidelines as represented in the Offering Materials. In particular, the Prospectus Supplements materially understated the proportion of loans secured by non-owner occupied properties. The lack of compliance with the underwriting process in this regard materially increased the credit risk of the loans and the portfolio because investment and second home properties generally have a higher rate of default and higher loss severities than owner occupied primary residences.

### iii.    Debts Incorrectly Calculated; DTI Exceeded Guidelines

138. Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan. The following are some examples where the underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly calculated. When properly calculated, the borrower's actual DTI exceeded the limits established by the applicable underwriting guidelines. The failure to properly calculate debt led to material misstatements regarding the credit risk of the securitized loans.

- A loan that closed in September 2006 with a principal balance of $260,000 was originated under HFN's Stated Income Loan Program. A forensic review of the loan file reveals that the borrower obtained two mortgages prior to the closing of the subject loan, which resulted in total additional monthly payments of $988. Although these loans were not listed on the application for the subject loan, there were three credit inquiries listed on the origination credit report for the previous 90 days. There is no evidence in the file that the underwriter investigated these credit inquiries or took these additional debt obligations into account in originating the loan. A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase in DTI from 34.27 percent to 126.01

percent, which exceeds the limits established by the applicable underwriting
guidelines. The loan defaulted, resulting in a loss of $213,284.

- A loan that closed in June 2006 with a principal balance of $280,000 was
  originated under HFN's Stated Income Loan Program. A forensic review of the
  loan file reveals that, while the underwriter calculated a monthly payment of $812
  for the subject loan based on the initial interest rate, the applicable guidelines
  required the monthly payment for the subject loan to be calculated using the
  amortized rate, which yields a monthly payment of $1,724. The underwriter also
  excluded a monthly installment debt of $248, and there was no documentation in
  the loan file to support this exclusion. Although the underwriter qualified the
  borrower based on monthly debts of $2974.78, the borrower's actual monthly
  debts were $4,510.84. A recalculation of the DTI that includes the borrower's
  undisclosed debt results in an increase in DTI from 39 percent to 74.29 percent,
  which exceeds the limits established by the applicable underwriting guidelines.
  The loan defaulted, resulting in a loss of $205,502.

- A loan that closed in September 2006 with a principal balance of $268,000 was
  originated under First National Bank of Arizona's Stated Income Loan Program.
  A forensic review of the loan file reveals that the borrower obtained a mortgage
  loan prior to the closing of the subject loan, which resulted in an additional
  monthly payment of $1,445. Although this loan was not listed on the application
  for the subject loan, there was a credit inquiry listed on the origination credit
  report for the previous 90 days. There is no evidence in the file that the
  underwriter investigated this credit inquiry or took this additional debt obligation
  into account in originating the loan. A recalculation of the DTI that includes the
  borrower's undisclosed debt results in an increase in DTI from 17.07 percent to
  152.46 percent, which exceeds the limits established by the applicable
  underwriting guidelines. The loan defaulted and is in foreclosure.

- A loan that closed in September 2006 with a principal balance of $240,000 was
  originated under Golden Empire Mortgage Inc.'s Stated Income Loan Program.
  A forensic review of the loan file reveals that the borrower obtained an auto loan
  prior to the closing of the subject loan, which resulted in an additional monthly
  payment. There is no evidence in the file that the underwriter took the additional
  debt obligation into account in originating the loan. A recalculation of the DTI
  that includes the borrower's undisclosed debt results in an increase in DTI from
  40.36 percent to 341.08 percent, which exceeds the limits established by the
  applicable underwriting guidelines. The loan defaulted, resulting in a loss of
  $177,784.

- A loan that closed in April 2007 with a principal balance of $154,000 was
  originated under HFN's Stated Income Loan Program. A forensic review of the
  loan file reveals that the borrower obtained a mortgage loan prior to the closing of
  the subject loan, which resulted in an additional monthly payment of $3,243. This
  loan was not listed on the application for the subject loan. There is no evidence in
  the file that the underwriter took this additional debt obligation into account in

originating the loan. Moreover, the underwriter failed to account for the $343 monthly payment for the subject property's second lien note, which was obtained simultaneously with the subject loan. There was no evidence in the file to support excluding the payment for the second lien note from the borrower's monthly debt obligations. A recalculation of the DTI based on all evidence uncovered in the forensic review results in an increase in DTI from 38.72 percent to 180.81 percent, which exceeds the guideline maximum of 38 percent. The loan defaulted, resulting in a loss of $142,425.

- A loan that closed in March 2007 with a principal balance of $236,000 was originated by Statewide Bancorp, Inc. as a stated income loan. A forensic review of the loan file reveals that the borrower obtained two mortgage loans prior to the closing of the subject loan, which resulted in total additional monthly payments of $1,238. These loans were not listed on the application for the subject loan. There is no evidence in the file that the underwriter took this additional debt obligation into account in originating the loan. A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase in DTI from 42.64 percent to 98.47 percent, which exceeds the guideline maximum of 38 percent. The loan defaulted, resulting in a loss of $171,787.

139.    Of the 94 loans reviewed in the RALI 2006-QO8 Securitization, 72.34 percent contained a DTI that exceeded the applicable underwriting guidelines for the product type. Of the 141 loans reviewed in the RALI 2007-QH5 Securitization, 70.92 percent contained a DTI that exceeded the applicable underwriting guidelines for the product type.

### iv.    Credit Inquiries That Indicated Misrepresentations of Debts

140.    The Prospectus Supplements for the RALI 2006-QO8 and RALI 2007-QH5 Securitizations represent that the loan originator "is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor" including the mortgagor's "credit history." (RALI 2006-QO8 Prospectus Supplement at S-59; RALI 2007-QH5 Prospectus Supplement at S-53.) The following examples are instances where the borrowers' credit reports contained numerous credit inquiries that should have put the loan underwriters on notice for potential misrepresentations of debt obligations to be included in the borrowers' DTI. In each of these instances, there was no evidence in the origination loan file

that the loan underwriter researched these credit inquiries or took any action to verify that such

inquiries were not indicative of undisclosed liabilities of the borrower.  Failure to investigate

these issues prevented the loan underwriting process from appropriately qualifying the loan and

evaluating the borrower's ability to make timely payments on the mortgage loan.

- A loan that closed in August 2006 with a principal balance of $187,200 was originated under Choice Capital Funding, Inc.'s Stated Income Loan Program.  A credit report included in the origination file dated prior to closing shows 18 credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, in July 2006 the borrower obtained an undisclosed mortgage loan with a $1,843 monthly payment.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 78.78 percent, which exceeds the limits established by the applicable underwriting guidelines.  The loan defaulted, resulting in a loss of $207,729.

- A loan that closed in August 2006 with a principal balance of $342,000 was originated under Trust One Mortgage Corp.'s Stated Income Loan Program.  A credit report included in the origination file dated prior to closing shows nine credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, in August 2006, prior to the subject loan closing, the borrower obtained an undisclosed mortgage loan with a $2,765 monthly payment.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 105.39 percent, which exceeds the limits established by the applicable underwriting guidelines.  The loan defaulted, resulting in a loss of $262,622.

- A loan that closed in September 2006 with a principal balance of $193,900 was originated under LoanCity's Stated Income Loan Program.  A credit report included in the origination file dated prior to closing shows five credit inquiries within the previous 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, in August 2006 the borrower obtained an undisclosed mortgage loan with a $2,783 monthly payment.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 99.03 percent, which exceeds the limits established by the applicable underwriting guidelines.  The loan defaulted and is in foreclosure.

- A loan that closed in April 2007 with a principal balance of $200,000 was originated under First Financial's Stated Income Loan Program. A credit report included in the origination file dated prior to closing shows five credit inquiries within the previous 90 days. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained two undisclosed installment loans prior to the subject loan closing with total monthly payments of $682. A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 77.30 percent, which exceeds the guideline maximum of 40 percent. The loan defaulted, resulting in a loss of $159,689.

- A loan that closed in March 2007 with a principal balance of $312,000 was originated under SCME's Stated Income Loan Program. A credit report included in the origination file dated prior to closing shows six credit inquiries within the previous 90 days. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained an undisclosed installment loan prior to the subject loan closing with a monthly payment of $447. A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 108.56 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted, resulting in a loss of $245,599.

- A loan that closed in April 2007 with a principal balance of $254,000 was originated under HFN's Stated Income Loan Program. A credit report included in the origination file dated prior to closing shows 13 credit inquiries within the previous 90 days, including several inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained two mortgage loans prior to the subject loan closing with total monthly payments of $3,048. A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 261.98 percent. The loan defaulted, resulting in a loss of $243,148.

- A loan that closed in April 2007 with a principal balance of $143,920 was originated under First National Bank of Arizona's Stated Income Loan Program. A credit report included in the origination file dated prior to closing shows 12 credit inquiries within the previous 90 days, including several inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained no less than 23 undisclosed mortgage loans prior to, or within thirty days of, the subject loan closing with total monthly payments of at least $23,746. A recalculation of the DTI based on all evidence uncovered in the forensic review was not possible because the borrower's income

for the year of subject loan closing was verified at $0.  The loan defaulted, resulting in a loss of $190,109.

- A loan that closed in April 2007 with a principal balance of $340,000 was originated under M&T Bank's Full Documentation Loan Program.  A credit report included in the origination file dated prior to closing shows five credit inquiries within the previous 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, the borrower obtained an undisclosed loan within 30 days of the subject loan closing with a $265 monthly payment.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 64.96 percent, which exceeds the guideline maximum of 45 percent. The loan defaulted, resulting in a loss of $282,241.

   **b.**  **Both Government and Private Investigations Confirm that the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines**

  141. An extraordinary volume of publicly-available information, including government reports and investigations, confirms that the originators whose loans were included by the Defendants in the Securitizations abandoned their loan origination guidelines throughout the period of the Securitizations.

  142. For example, in November 2008, the Office of the Comptroller of the Currency ("OCC"), an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations.  Aegis, Decision One, New Century, Ownit,[12] and People's Choice -- the companies that originated loans for the Securitizations at issue here -- were all on that list.  (*See* "Worst Ten in the Worst Ten," Office of the Comptroller of the

---

[12] Ownit, which originated loans for one of the Securitizations, was identified by the OCC as the fifteenth worst subprime lender in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas between 2005 and 2007 with the highest rates of delinquency.  (*See* "Worst Ten in the Worst Ten: Update," Office of the Comptroller of Currency Press Release, March 22, 2010.)

Currency Press Release, November 13, 2008.)  Several of the Non-Party Originators -- including

New Century, HFN, a wholly owned subsidiary of RFC, and MLN, which collectively originated

loans for 19 of the 21 Securitizations -- have been the target of government investigations or

private actions that allege a complete abandonment of their reported underwriting guidelines.

### i.    New Century Violated Its Underwriting Guidelines

143.    New Century and its subsidiary, Home123, originated loans for at least four of the

Securitizations.  As stated in the Prospectus Supplement for the RAMP 2005-NC1 Securitization,

"[f]or the quarter ending September 30, 2005, New Century Mortgage Corporation and

Home123 Corporation originated $40.4 billion in mortgage loans."  (RAMP 2005-NC1

Prospectus Supplement (Dec. 27, 2005), at S-37.)  By the end of 2006, Inside Mortgage Finance

reports that New Century was the second largest subprime mortgage loan originator in the United

States, with a loan production volume that year of $51.6 billion.  Before its collapse in the first

half of 2007, New Century was one of the largest subprime lenders in the country.  New Century

filed for protection from its creditors under Chapter 11 of the federal Bankruptcy Code on April

2, 2007.

144.    In 2010, the OCC identified New Century as *the* worst subprime lender in the

country based on the delinquency rates of the mortgages it originated in the 10 metropolitan

areas with the highest rates of delinquency between 2005 and 2007.  (*See* "Worst Ten in the

Worst Ten: Update," Office of the Comptroller of Currency Press Release, March 22, 2010,

*available at* http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf.)

Further, in January 2011, the FCIC Report detailed, among other things, the collapse of mortgage

underwriting standards and subsequent collapse of the mortgage market and wider economy.  *See*

FCIC Report.  The FCIC Report singled out New Century for its role:

> New Century—once the nation's second-largest subprime lender—
> ignored early warnings that its own loan quality was deteriorating
> and stripped power from two risk-control departments that had
> noted the evidence. In a June 2004 presentation, the Quality
> Assurance staff reported they had found severe underwriting
> errors, including evidence of predatory lending, legal [sic] and
> state violations, and credit issues, in 25% of the loans they audited
> in November and December 2003. In 2004, Chief Operating
> Officer and later CEO Brad Morrice recommended these results be
> removed from the statistical tools used to track loan performance,
> and in 2005, the department was dissolved and its personnel
> terminated. The same year, the Internal Audit department
> identified numerous deficiencies in loan files; out of nine reviews
> it conducted in 2005, it gave the company's loan production
> department "unsatisfactory" ratings seven times. Patrick Flanagan,
> president of New Century's mortgage-originating subsidiary, cut
> the department's budget, saying in a memo that the "group was out
> of control and tries to dictate business practices instead of audit."

(FCIC Report, at 157.)

145.    On February 29, 2008, after an extensive document review and conducting more

than 100 interviews, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued

a detailed report on the various deficiencies at New Century, including lax mortgage standards

and a failure to follow its own underwriting guidelines.  Among his findings, the Examiner

reported:

> New Century had a brazen obsession with increasing loan
> originations without due regard for the risks associated with that
> business strategy. . . . Although the primary goal of any mortgage
> banking company is to make more loans, New Century did so in an
> aggressive manner that elevated the risks to dangerous and
> ultimately to fatal levels.

> New Century also made frequent exceptions to its underwriting
> guidelines for borrowers who might not otherwise qualify for a
> particular loan.  A Senior Officer of New Century warned in 2004
> that the "number one issue is exceptions to the guidelines."
> Moreover, many of the appraisals used to value the homes that
> secured the mortgages had deficiencies.

> New Century . . . layered the risks of loan products upon the risks
> of loose underwriting standards in its loan originations to high risk
> borrowers.
>
> Senior Management [at New Century] turned a blind eye to the
> increasing risks of New Century's loan originations and did not
> take appropriate steps to manage those risks.

(Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings,
Inc.*, No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008).)

146.    On December 9, 2009, the SEC charged three of New Century's top officers with
violations of federal securities laws.  The SEC's complaint details the blatant falsity of New
Century's representations regarding its underwriting guidelines -- for example, its
representations that it was committed to "adher[ing] to high origination standards in order to sell
[its] loan products in the secondary market" and to "only approv[ing] subprime loan applications
that evidence a borrower's ability to repay the loan."  (Complaint at ¶¶ 19-20, *Securities and
Exchange Commission v. Morrice*, No. SACV09-01426 (C.D. Cal. Dec. 7, 2009).)

147.    New Century's failure to adhere to its underwriting guidelines is further reflected
in allegations made in the Assurance of Discontinuance signed by Morgan Stanley and the
Attorney General of Massachusetts (the "Assurance of Discontinuance"), in *In re: Morgan
Stanley & Co. Inc.*, Civil Action No. 10-2538 (Suffolk Cnty. Super. Ct. June 24, 2010).  The
Massachusetts Attorney General alleged:

- New Century "stretch[ed] underwriting guidelines to encompass or approve loans
  not written in accordance with the guidelines."  (*Id*. ¶¶ 17, 23.)

- "One recurring issue identified by Morgan Stanley was New Century's
  origination of loans that violated Massachusetts Division of Banks' borrower's
  best interest standard []." (*Id*. ¶ 18.)

- During the period 2006-2007, 91 percent of the loans approved for securitization
  that did not meet New Century's underwriting guidelines did not have "sufficient
  compensating factors to offset such exceptions."  (*Id*. ¶ 27.)

- "The loans originated by New Century were "unfair loans to Massachusetts borrowers" and "were in violation of Massachusetts law . . . ."  (*Id*. ¶¶ 43-44.)

148.    As a result, on or about June 24, 2010, Morgan Stanley agreed to pay $102 million to settle the claims asserted by the Attorney General and also agreed to drastic changes in its underwriting practices.  (*See id*. ¶¶ 45-52.)

149.    Confidential witnesses confirmed that New Century had abandoned its underwriting guidelines.  One confidential witness ("Confidential Witness 1"), an internal bureau quality assurance underwriter, reported that he doubted the quality of the loans he reviewed.  A second confidential witness ("Confidential Witness 2"), a national appraisal director at New Century, stated that he did not support New Century's practices, and asserted that the originators often found ways to "massage" the loan package and override his group's decision to decline the loan.  Confidential Witness 2 estimated that over 50 percent of the loans reviewed by his group lacked the proper collateral backing, but there were more senior people who approved the loans because they "liked the borrower" or claimed that the loan "came from their best broker." According to Confidential Witness 2, New Century was "a very volume driven company," and the "originators did not care about the quality of the loan" because they were paid by the number of closings.  This witness stated that, to form a long-lasting relationship with an originator, third-party appraisers were pressured to inflate appraisal values.

150.    Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century.  Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income.  (*See* Written Testimony of Patricia Lindsay for the

FCIC Hearing, April 7, 2010 ("Lindsay Testimony"), http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3.)

151.    Ms. Lindsay also testified that appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." (*Id*. at 5.)  Indeed, on May 7, 2007, *The Washington Post* reported that a former New Century appraiser, Maggie Hardiman, recounted how she "didn't want to turn away a loan because all hell would break loose" and that, when she did reject a loan, "her bosses often overruled her and found another appraiser to sign off on it."  (David Cho, *Pressure at Mortgage Firm Led to Mass Approval of Bad Loans*, WASHINGTON POST, May 7, 2007.)

### ii.    HFN Violated Its Underwriting Guidelines

152.    HFN, which originated loans for at least 14 of the Securitizations, was under enormous pressure to extend risky loans.  A former loan officer at HFN recounted that "[t]he main focus was doing Alt A because that's where the money was," and "[i]n order to keep your market share, you had to be more aggressive."  (*See* Steve Law, *Shaky loans may spur new foreclosure wave*, THE PORTLAND TRIBUNE, OCT. 30, 2009.)  A mortgage broker confirmed such pressure, stating: "'The V.P.s came down to the office beating the drums about Option ARMs' . . . 'I had Wachovia march through here; *I had GMAC*.'"  (*Id.* (emphasis added).)

153.    MBIA Insurance Corporation, which insured mortgage-backed securities issued by Ally, has filed two actions against GMACM and RFC, both parents of HFN, alleging, among other things, that GMACM and RFC made fraudulent representations regarding adherence to GMACM's loan origination underwriting guidelines.  MBIA alleged that it performed an extensive a review of loan files in advance of making its allegations.  Its complaint explains that it performed a review of "loan files associated with 4,104 delinquent or charged off loans" and

that its review revealed that "[a]t least 89% of the 4,104 delinquent or charged off loans . . . were not originated in material compliance with GMAC Mortgage's Underwriting Guidelines." (Complaint at ¶¶ 75, 6, *MBIA Insurance Corp. v. GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation*), No. 600837-2010 (N.Y. Sup. Ct. Apr. 1, 2010).)  MBIA's complaint further alleges that MBIA, or the experts that performed its review, found that "a significant number of mortgage loans were made on the basis of 'stated incomes' that were grossly unreasonable or were approved despite DTI or CLTV ratios in excess of the cut-offs stated in GMAC Mortgage's Underwriting Guidelines," and that, "contrary to its Underwriting Guidelines, GMAC Mortgage failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with ineligible credit scores, and approved loans without verifying that the borrower had sufficient funds or reserves."  (*Id.* at ¶ 76.)

154.    In its complaint against RFC, the direct parent of HFN, MBIA also asserted a claim for fraud, among other things, alleging that MBIA's review "[o]f the[] 1,847 defaulted mortgage loans [revealed that] . . . only 129 mortgage loans -- less than 7% of the mortgage loans reviewed -- were originated or acquired in material compliance with RFC's representations and warranties."  (Complaint at ¶ 46, *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No. 603552-2008 (N.Y. Sup. Ct. Dec. 4, 2008).)

155.    Further, on June 2011, the SEC and the U.S. Department of Justice ("DOJ") launched investigations of, among other things, "potential fraud related to the origination and/or underwriting of mortgage loans" by Ally Financial and its subsidiaries.  (Ally Fin. Inc., Amendment No. 3 to Form S-1 (Form S-1/A), at 23 (June 29, 2011).)  As an originator of residential mortgage loans for the Ally entities, the scope of the SEC and the DOJ's investigation

will likely include a review of HFN's compliance with its own loan origination underwriting guidelines.

### iii.    MLN Violated Its Underwriting Guidelines

156.    MLN, which originated the loans for four of the Securitizations, filed for bankruptcy on February 5, 2007, and on January 6, 2011, the Liquidating Trustee for MLN filed a motion seeking to destroy certain MLN records and releasing the Trustee from responding to any future requests concerning those records.  The United States Attorney objected to the Trustee's motion on the basis that "federal law enforcement records indicate that [MLN's] loans are the subject of many ongoing investigations.  As a result, [MLN's] records, including but not limited to the loan files and loan related information . . ., may be relevant to pending federal criminal investigations into mortgage fraud."  (Objection to Debtor's Motion for the Destruction for Certain Records, *In re Mortgage Lenders Network USA, Inc.*, No. 07-10146-PJW (Bankr. Del.) (Dkt. 3281).)  Accordingly, upon information and belief, government investigations into MLN's origination of loans and compliance with its own underwriting guidelines are ongoing.

157.    The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines.  The FCIC found that mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amounts needed for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization.  Upon information and belief, these inflated appraisals resulted in inaccurate LTV ratios.

### iv.    Ownit Violated Its Underwriting Guidelines

158.    Ownit, which originated loans for at least one of the Securitizations, was a mortgage lender based in Agoura Hills, California.  In September 2005, the investment bank Merrill Lynch & Co. ("Merrill Lynch") acquired a 20 percent stake in the company.  According to Ownit's founder and chief executive, William D. Dallas, after Merrill Lynch acquired that stake, it instructed Ownit to loosen underwriting standards and originate more stated income loans.  (*See* EDMOND L ANDREWS, BUSTED:  LIFE INSIDE THE GREAT MORTGAGE MELTDOWN 158-59 (2009).)  As a result, the number of stated income loans jumped from near zero to over 30 percent.  (*Id*. at 155, 162.)  Ownit also lowered the credit scores it required from borrowers.  (*Id*. at 162.)  Ownit thus abandoned its underwriting standards in order to originate more loans.

### v.    EquiFirst Violated Its Underwriting Guidelines

159.    EquiFirst originated loans for at least two of the Securitizations.  Confidential interviews with former EquiFirst employees during the relevant time period reveal that EquiFirst approved loans for borrowers for whom it believed lacked sufficient credit quality or would not otherwise be able to pay back the loan.

160.    One EquiFirst underwriter ("Confidential Witness 3") rejected many loans because she did not believe the borrowers had the ability to pay.  Often times, however, her supervisors "took the reins" and approved those loans anyway.  For example, according to Confidential Witness 3, sometimes documentation regarding a borrower's income would be included in the loan file even if the loan was a stated income loan.  In those instances, if the documentation reflected that the borrower's income was insufficient to approve the loan, Confidential Witness 3 would reject that borrower's loan application in accordance with EquiFirst's guidelines.  However, those "documents [reflecting that the borrower's income was insufficient] would go away" and the loan application would come back approved by her

supervisors.  Confidential Witness 3 also remembers declining loans in accordance with EquiFirst's underwriting guidelines because documents in the loan file were fraudulent or altered.  Confidential Witness 3 said that the file would come back with documents reflecting the "correct" income, but she did not feel comfortable approving those loans because of the prior misrepresentation and because the integrity of the entire file was compromised.  However, these loans were ultimately approved "behind the scenes."

161.    Another EquiFirst underwriter ("Confidential Witness 4") stated that there was "plenty of fraud" in loan file documentation, including false pay stubs and bank statements. When suspicious documents were included in the loan application, Confidential Witness 4 would write a report and submit the file to operations, but often times these loans were still approved.

162.    A third EquiFirst underwriter ("Confidential Witness 5") stated that management told the underwriters if they could not find a way to approve loans, it meant losing their jobs. Nine times out of ten she believed that a stated income borrower would not be able to repay his or her loan, yet Confidential Witness 5 received pressure from account managers, title companies, and brokers to push loans through, who would tell her, "there is always an exception to the rule."

### vi.    Inflated Appraisals

163.    As described above, the originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals.  Appraisal pressure was especially strong when the originators intended to put the mortgages into a package of mortgages that would be sold for securitization.  This resulted in

lower LTV ratios, discussed *supra*, which in turn made the loans appear to investors less risky than they were.

164.     As described by Ms. Lindsay in her FCIC testimony, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." (Lindsay Testimony at 5.) Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his FCIC testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again . . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'" (*See* Testimony of Jim Amorin to the FCIC, *available at* www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.) Faced with this choice, appraisers systematically abandoned applicable guidelines and overvalued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

> c.     **The Collapse of the Certificates' Credit Ratings Further Shows that the Mortgage Loans Were not Originated in Adherence to the Stated Underwriting Guidelines**

165.     The total collapse in the credit ratings of the Certificates invested in by Freddie Mac, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, underscoring that these Certificates were impaired from the start.

166.     The Certificates purchased by Freddie Mac originally were assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements. Those ratings

artificially were inflated, however, upon information and belief, in part as a result of the same misrepresentations that the Defendants made to investors in the Prospectus Supplements.

167.    Upon information and belief, Ally provided or caused to be provided loan-level information, including LTV ratios, owner-occupancy status, and other loan characteristics to the rating agencies.  The rating agencies in turn relied on this information to assign the Certificates credit ratings.  Upon information and belief, because the information that Ally provided or caused to be provided was materially false, the models used by the rating agencies under-predicted the likelihood of delinquency and loss, as well as the loss severity.  As a result of the false information provided, the Securitizations lacked the level of subordination required for the Certificates to be rated AAA (or its equivalent), and investors, including Freddie Mac, were deprived of the level of protection commensurate with an AAA (or equivalent) rating.  As a result, the Certificates were offered and purchased at prices suitable for AAA investment grade securities, when in fact the Certificates actually carried a severe risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).

168.    Freddie Mac could not have discovered facts indicating Defendants' false and misleading statements and omissions prior to, at the earliest March 2008.  This is the first month during which any of the Certificates at issue were downgraded below investment grade by a credit rating agency.  In subsequent months and years, most of these Certificates were downgraded by the credit rating agencies from AAA (or its equivalent) to below investment grade.  Prior to the initial downgrade in March 2008, Freddie Mac had insufficient reason to suspect Defendants' widespread misrepresentations and omissions of material fact in the Registration Statements relating to its Certificates.  After these downgrades, it required significant investigation and fact-finding for FHFA to formulate the claims stated herein.  The

downgrades beginning in March 2008 raised questions regarding the true underwriting practices used to originate the mortgage loans, and the mortgage loans' true value and credit quality. Table 8 details the extent of the downgrades.[13]

**Table 8**

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating as of April 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| RALI 2005-QO4 | IA1 | Aaa/AAA/AAA | Caa3/CCC/C |
| RALI 2006-QO4 | IA1 | Aaa/AAA/-- | Ca/CC/-- |
| RALI 2006-QO4 | IA2 | Aaa/AAA/-- | Ca/D/-- |
| RALI 2006-QO5 | IA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| RALI 2006-QO8 | IIA | Aaa/AAA/-- | Ca/D/-- |
| RALI 2006-QO9 | IIA | Aaa/AAA/-- | Ca/D/-- |
| RALI 2007-QH5 | AII | Aaa/AAA/-- | Ca/CC/-- |
| RAMP 2005-EFC6 | AII | Aaa/AAA/-- | A1/AAA/-- |
| RAMP 2005-EFC7 | AII | Aaa/AAA/-- | Ca/D/-- |
| RAMP 2005-NC1 | AII | Aaa/AAA/-- | Ca/D/-- |
| RAMP 2005-RS9 | AII | Aaa/AAA/-- | Ca/D/-- |
| RAMP 2006-RS1 | AII | Aaa/AAA/-- | Caa3/CCC/-- |
| RASC 2005-EMX3 | AII | Aaa/AAA/-- | Aa1/AAA/-- |
| RASC 2005-KS10 | AII | Aaa/AAA/-- | Baa3/AAA/-- |
| RASC 2005-KS11 | AII | Aaa/AAA/-- | Ba1/AAA/-- |
| RASC 2006-EMX8 | AII | Aaa/AAA/-- | Ca/CCC/-- |
| RASC 2006-EMX9 | AII | Aaa/AAA/-- | Caa3/CCC/-- |
| RASC 2006-KS3 | AII | Aaa/AAA/-- | Caa1/AA/-- |
| RASC 2006-KS9 | AII | Aaa/AAA/AAA | Ca/CCC/C |
| RASC 2007-EMX1 | AII | Aaa/AAA/-- | Ca/D/-- |
| RASC 2007-KS2 | AII | Aaa/AAA/AAA | Caa3/CCC/CC |
| RASC 2007-KS3 | AII | Aaa/AAA/-- | Caa3/CCC/-- |

**d.      The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines**

169.     Even though the Certificates were marketed as long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The

---

[13]      Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  A double-hyphen indicates that the relevant agency did not provide a rating at issuance.

overall poor performance of the mortgage loans is a direct consequence of the fact that their

underlying mortgage loans were not underwritten in accordance with applicable underwriting

guidelines as represented in the Prospectus Supplements.

170.    Loan groups that were underwritten properly and contained loans with the

characteristics represented in the Prospectus Supplements would have experienced substantially

fewer payment problems and substantially lower percentages of defaults, foreclosures, and

delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting

Loan Groups that are in default, have been foreclosed upon, or are delinquent as of April 2012.

**Table 9**

| Transaction | Supporting Loan Group | Percentage of Delinquent / Defaulted / Foreclosed Loans |
|---|---|---|
| RALI 2005-QO4 | Group I | 38.00% |
| RALI 2006-QO4 (IA1) | Group I | 38.00% |
| RALI 2006-QO4 (IA2) | Group I | 38.00% |
| RALI 2006-QO5 | Group I | 41.90% |
| RALI 2006-QO8 | Group II | 37.00% |
| RALI 2006-QO9 | Group II | 37.50% |
| RALI 2007-QH5 | Group II | 50.00% |
| RAMP 2005-EFC6 | Group II | 34.80% |
| RAMP 2005-EFC7 | Group II | 31.90% |
| RAMP 2005-NC1 | Group II | 28.70% |
| RAMP 2005-RS9 | Group II | 27.30% |
| RAMP 2006-RS1 | Group II | 25.30% |
| RASC 2005-EMX3 | Group II | 40.70% |
| RASC 2005-KS10 | Group II | 28.10% |
| RASC 2005-KS11 | Group II | 27.80% |
| RASC 2006-EMX8 | Group II | 53.70% |
| RASC 2006-EMX9 | Group II | 64.40% |
| RASC 2006-KS3 | Group II | 28.00% |
| RASC 2006-KS9 | Group II | 35.70% |
| RASC 2007-EMX1 | Group II | 41.60% |
| RASC 2007-KS2 | Group II | 36.60% |
| RASC 2007-KS3 | Group II | 39.20% |

171.    The confirmed misstatements concerning owner-occupancy and LTV ratios, the

confirmed systematic underwriting failures by the originators responsible for the mortgage loans

across the Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across those Securitizations all indicate that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

### E.    Freddie Mac's Purchases of the Certificates

172.    Between September 23, 2005 and May 30, 2007, Freddie Mac purchased from the Underwriter Defendants over $6 billion in Certificates issued in connection with the Securitizations.  Table 10 reflects each of Freddie Mac's purchases of the Certificates.[14]  To date, Freddie Mac has not sold any of the Certificates.

**Table 10**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| RALI 2005-QO4 | IA1 | 761118NL8 | 11/30/2005 | 143,428,800.00 | 100 | RBS |
| RALI 2006-QO4 | IA1 | 75114GAA7 | 4/27/2006 | 327,356,000.00 | 100 | RBS |
| RALI 2006-QO4 | IA2 | 75114GAB5 92911DAA4 | 4/27/2006 | 81,838,000.00 | 100 | RBS |
| RALI 2006-QO5 | IA1 | 75114HAA5 | 5/30/2006 | 179,443,000.00 | 100 | UBS |
| RALI 2006-QO8 | IIA | 75115FAT7 | 10/31/2006 | 409,198,000.00 | 100 | Lehman Brothers |
| RALI 2006-QO9 | IIA | 75115HAB2 | 11/30/2006 | 284,637,000.00 | 100 | Lehman Brothers |
| RALI 2007-QH5 | AII | 75116EAD4 | 5/30/2007 | 143,007,000.00 | 100 | Goldman |
| RAMP 2005-EFC6 | AII | 76112BL32 | 11/22/2005 | 163,581,000.00 | 100 | JPMSI |
| RAMP 2005-EFC7 | AII | 76112BR85 | 12/28/2005 | 199,376,000.00 | 100 | Ally Securities |
| RAMP 2005-NC1 | AII | 76112BR36 | 12/28/2005 | 405,004,000.00 | 100 | Credit Suisse |
| RAMP 2005-RS9 | AII | 76112BL99 | 11/29/2005 | 494,922,000.00 | 100 | Bear Stearns |
| RAMP 2006-RS1 | AII | 76112BU24 | 1/25/2006 | 409,790,000.00 | 100 | Credit Suisse |
| RASC 2005-EMX3 | AII | 75405MAE4 | 9/23/2005 | 267,481,000.00 | 100 | Ally Securities |
| RASC 2005-KS10 | AII | 75405WAD4 | 10/28/2005 | 495,741,000.00 | 100 | JPMSI |
| RASC 2005-KS11 | AII | 76110W7C4 | 11/29/2005 | 547,641,000.00 | 100 | Credit Suisse |

---

[14]    Purchases and holdings of securities in Table 10 are stated in terms of unpaid principal balance ("UPB") of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.  To date, Freddie Mac has not sold any of the Certificates it purchased as described in this section.

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| RASC 2006-EMX8 | AII | 74924UAE1 | 9/28/2006 | 236,806,000.00 | 100 | Ally Securities |
| RASC 2006-EMX9 | AII | 74924VAE9 | 10/27/2006 | 197,896,000.00 | 100 | Ally Securities |
| RASC 2006-KS3 | AII | 76113ABK6 | 3/29/2006 | 232,006,000.00 | 100 | Citi |
| RASC 2006-KS9 | AII | 75406YAE7 | 10/27/2006 | 153,311,000.00 | 100 | Barclays |
| RASC 2007-EMX1 | AII | 74924XAE5 | 3/12/2007 | 326,812,000.00 | 100 | Ally Securities |
| RASC 2007-KS2 | AII | 74924WAE7 | 2/23/2007 | 164,400,000.00 | 100 | JPMSI |
| RASC 2007-KS3 | AII | 74924YAE3 | 4/19/2007 | 167,618,000.00 | 99.96094 | JPMSI |

**F.    Freddie Mac Was Damaged by Defendants'**
**Violations of Sections 11, 12 and 15 of the Securities Act**

173.    The statements and information in the Registration Statements regarding the

credit quality and characteristics of the mortgage loans underlying the Certificates, and the

origination and underwriting practices pursuant to which the mortgage loans purportedly were

originated, were material to a reasonable investor.  Defendants were responsible for the contents

of those Registration Statements.  But for the misrepresentations and omissions in the

Registration Statements concerning those matters, Freddie Mac would not have purchased the

Certificates.

174.    Based upon sales of the Certificates or similar certificates in the secondary market

and other indications of value, Freddie Mac has incurred substantial losses on the Certificates

due to a decline in value that is directly attributable to Defendants' material misrepresentations

and omissions.  Among other things, the mortgage loans underlying the Certificates experienced

defaults and delinquencies at a higher rate than would have been the case had the loans

underlying the Certificates actually conformed to the origination guidelines, and had the

Certificates merited the credit ratings set forth in the Registration Statement.

175.    Defendants' misstatements and omissions in the Registration Statement were the

direct, proximate and actual cause of Freddie Mac's losses resulting from its purchase of the

Certificates.  Among other things, it was foreseeable to Defendants that non-compliant loans

would suffer higher incidences of delinquency and default than loans underwritten in accordance

with originators' underwriting standards.  The precise extent of Freddie Mac's injuries will be

proven at trial.

176.    At the time it purchased the Certificates, Freddie Mac was unaware of the

Defendants' misrepresentations, omissions, and/or untrue statements.  Plaintiff was appointed

Conservator of Freddie Mac less than one year after the discovery of the untrue statements and

omissions contained in the Registration Statements and within three years of the Certificates

being offered for sale to the public.  Despite the exercise of reasonable diligence, Freddie Mac

could not reasonably have discovered the untrue statements and omissions in the Registration

Statements more than one year prior to the appointment of the Plaintiff as Conservator.  This

action is timely pursuant to 12 U.S.C. §§ 4617(b)(12) & (13), which establishes all time periods

applicable to the claims brought herein.

## II.    ADDITIONAL FACTUAL ALLEGATIONS

177.    The allegations in paragraphs 178 through 262 below concerning Defendants'

knowledge or recklessness concerning the information set forth in or omitted from the Offering

Materials provided to Freddie Mac are made solely with respect to Plaintiff's common law

claims, as are the allegations set forth in paragraphs 263 through 276 concerning Freddie Mac's

reliance on the material misrepresentations and omissions alleged herein.

**A.      The Fraud Defendants Were Incentivized to Fund
Risky Residential Mortgage Loans and
to Securitize and Sell Them to Investors**

178.      Securitizing large volumes of loans was a highly lucrative and competitive

business for Defendants.  Ally Securities, JPMSI and Goldman (the "Fraud Defendants")[15] each

engaged in the securitization business on a massive scale, each doing multiple billions of dollars

worth of securitizations during the period when they sold the Certificates to Freddie Mac.  Fees,

which were a percentage of the balance of the loan pool being purchased, and other transaction

revenues associated with the Certificates and with the RMBS securitization business more

generally, accounted for a substantial portion of the Fraud Defendants' (and other Defendants')

earnings in the relevant time period.  The more and the larger the securitizations the Defendants

arranged and participated in, the greater their earnings.  This financial motive accounts for

Defendants' willingness, intentionally or recklessly, to make false statements in, or to omit

material facts from, the Offering Materials.  In furtherance of this motive, the Fraud Defendants

took measures and entered into arrangements designed to ensure that a continuous and high

volume of mortgage loans would be available for securitization.

179.      Thus, among other things, the Fraud Defendants (or their affiliates) provided

"warehouse" funding to mortgage originators to enable these originators to make, and to

continue to make, loans.  These subprime mortgage originators used those funds to make large

numbers of loans, which they then turned around and sold back to the banks whose funds

enabled them to make the loans in the first place.  The banks then securitized the loans they

effectively had funded, and transferred the risk to investors like Freddie Mac through the sale of

the RMBS resulting from the securitizations.

---

[15]      The actions of the Fraud Defendants include non-party Bear Stearns.

180.    These arrangements between the Fraud Defendants and loan originators

undermined the underwriting process for the Certificates because the Fraud Defendants had no

incentive to identify and exclude from the Securitizations loans that did not conform to the loan

originators' stated guidelines.  To the contrary, the Fraud Defendants had the motive to, and did,

include loans that they knew -- or were reckless in not knowing -- did not conform to those

guidelines, and that lacked the characteristics or did not merit the ratings set forth in the Offering

Materials.

181.    Bear Stearns and Goldman -- each of whom was an underwriter of the

Securitizations -- provided billions of dollars of warehouse lending to New Century.  JPMSI lent

their own mortgage origination subsidiaries at least $30 billion, between 2005 and 2007.  (*See*

The Center for Public Integrity, *The Subprime 25*, IWATCH NEWS.ORG (May 6, 2009, 12:00 AM),

http://www.iwatchnews.org/2009/05/06/5554/subprime-25.)

182.    Ally itself was a fully, vertically-integrated RMBS operation that was dependent

on volume.  An Ally affiliate, Ally Bank, provides warehouse lines of credit to mortgage

originators.  GMACM and HFN originated subprime and Alt A loans; the Ally Sponsor

sponsored securitizations of such loans and transferred them to the Ally Depositors; and Ally

Securities marketed and sold the RMBS to investors.  In 2003, 2005 and 2006, ResCap was the

largest warehouse lender in the country.  At the end of 2005, it had lent $17.8 billion and

purchased approximately 15 percent of the mortgage loans financed by warehouse lending.

(Residential Capital LLC, 2005 Annual Report (Form 10-k), at 10 (March 28, 2006).)  At the end

of 2006, ResCap had lent $13.2 billion and purchased approximately 23 percent of the mortgage

loans financed by its warehouse lending.  (Residential Capital LLC, 2006 Annual Report (Form-

10K), at 10 (March 13, 2007); Residential Capital Corp., Registration Statement (Form S-4), at

80 (July 15, 2005).)  Finally, in 2007 it had lent mortgage originators $3.3 billion and purchased

17.1 percent of the mortgage loan financed by warehouse lending.  (Residential Capital LLC,

2007 Annual Report (Form 10-k), at 12 (Feb. 27, 2008).)

183.    HFN, which originated loans for at least 14 of the Securitizations here, was under

enormous pressure to extend risky loans.  A former loan officer at HFN recounted that "[t]he

main focus was doing Alt A because that's where the money was," and "[i]n order to keep your

market share, you had to be more aggressive."  (*See* Steve Law, *Shaky Loans May Spur New

Foreclosure Wave*, PORTLAND TRIBUNE, OCT. 30, 2009.)  A mortgage broker confirmed such

pressure, stating:  "'The V.P.s came down to the office beating the drums about Option ARMs'

. . .  'I had Wachovia march through here; I had GMAC.'"  (*Id.*)

184.    Defendants were motivated to churn out and securitize as many mortgage loans as

possible because they earned so much in revenues on both ends of the securitization process,

while transferring the ultimate risk of default to investors, such as Freddie Mac.  Indeed, several

of the Defendants ranked in the top ten of the nation's largest underwriters of RMBS between

2004 and 2007, according to Inside Mortgage Finance.  JPMSI was especially prolific.  By 2007,

JPMSI ranked seventh with $43.5 billion.  (*2011 Mortgage Market Statistical Annual*, Vol. II

(Inside Mortgage Finance Publ'ns, Inc., 2011).)

### B.    The Fraud Defendants' Material Misrepresentations and Omissions in the Offering Materials

185.    In connection with the sale of the Certificates, the Fraud Defendants, the Ally

Depositors (RALI, RASC, and RAMP), and the Ally Sponsor (RFC) each made

misrepresentations and omissions of material fact to Freddie Mac in the Offering Materials.  The

Offering Materials included term sheets, Registration Statements, Prospectuses, Prospectus

Supplements, free writing prospectuses, other draft and final written offering documents, loan

data set forth in the applicable Pooling and Service Agreements, Mortgage Loan Purchase

Agreements, and electronic files, delivered or made available in connection with the offering.

These Offering Materials, which generally replicated the misstatements and omissions in the

Registration Statements, described the credit quality and other characteristics of the underlying

mortgage loans and were provided to investors, including Freddie Mac.

186.    Through the Offering Materials, the Fraud Defendants and Ally Sponsor also

furnished Freddie Mac with anticipated credit ratings on the proposed pool of mortgage loans

intended for securitization.  On information and belief, the Fraud Defendants and Ally Sponsor

solicited the anticipated ratings from credit rating agencies based on misrepresentations as to the

credit quality of the mortgage loans and the amount of the overcollateralization in the deal.  All

of the Securitizations had anticipated ratings of AAA or its equivalent.

187.    The Offering Materials, among other things:  (1) misrepresented the loans and

loan originators' adherence to the stated underwriting guidelines; (2) overstated the number of

loans for owner-occupied properties; (3) understated the loan pools' average LTV ratios; and (4)

failed to disclose that the credit ratings of the Certificates were based on false information and

that a higher level of subordination would be required for AAA (or its equivalent) rating.  Each

misrepresentation and omission created an additional, hidden layer of risk well beyond that

known to be associated with non-agency loans or subprime loans.

188.    First, the Fraud Defendants', Ally Sponsor's and Ally Depositors' statements

regarding the mortgage pools' compliance with stated underwriting guidelines were false.  The

falsity of such representations is evident from the initial forensic review of loans, disclosures

concerning the originators' systematic disregard of their stated underwriting guidelines, as well

as the Certificates' high default rates and plummeting credit ratings.  Indeed, of the 16 Non-Party

Originators, five were cited as among the "worst ten" in the "worst ten" metropolitan areas: Aegis, Decision One, New Century, Ownit, and People's Choice.  Both government and private investigations have confirmed that these originators failed to apply any standards at all when making high-risk loans.  Moreover, the high default rates and lowered credit ratings confirm that the loans were not properly underwritten in the first place.  As shown in Tables 8 and 9, the average rate of default across the Securitizations is 37.46 percent, and although every tranche of Certificates purchased by Freddie Mac had been rated AAA (or its equivalent) at the time of purchase, by April 2012, 19 of 22 tranches had been downgraded to junk-bond status, with ratings of BB (or its equivalent).  *See supra* Parts I.D.2.c and I.D.2.d.

189.    These misstatements were material because, as discussed above, the quality of loans in the pool determined the risk of the Certificates backed by those loans.  Because a reasonable underwriting process had not been followed, the entire loan pool was much riskier and more prone to default and market losses than represented.  The systemic underwriting failures decreased the reliability of *all* the information provided to Freddie Mac about the loans, and thus increased the actual risk to investors.  As a result of those failures, the value of the Certificates was substantially lower than the price paid by Freddie Mac for those Certificates.

190.    Second, as shown in Table 6, the Fraud Defendants, Ally Sponsor, and Ally Depositors materially understated the non-owner-occupied status for each Securitization by an average of 10.73 percent.  This understatement was material to Freddie Mac because it led Freddie Mac to believe that the Certificates it purchased were backed by the high owner-occupancy rates reported to Freddie Mac, which would have made the Certificates safer investments than certificates backed by second homes or investment properties.

191.    Third, the Fraud Defendants, Ally Sponsor, and Ally Depositors understated the loan pools' average LTV ratios, which overstated the borrowers' equity "cushion" in the property.  As Table 7 demonstrates, on average, only 38.5 percent of the loans actually had LTV ratios of less than 80 percent, as opposed to 64.2 percent as represented in the Offering Materials.  Moreover, while all but two of the Certificates were represented to have no loans with an LTV over 100 percent, in reality, every deal contained at least eight percent loans with greater than 100 percent LTV, with an average of 18.5 percent.  In other words, in almost all of the Securitizations, a significant percentage of the mortgage loans either were under-secured or "underwater" from the start.  The material understatement of LTV ratios was materially misleading because it misrepresented the risk that a borrower would abandon a property if the value dropped below the unpaid balance of the loan, as well as the risk that proceeds from any foreclosure sale would fail to cover the unpaid balance.

192.    Further, the Fraud Defendants, Ally Sponsor, and Ally Depositors failed to disclose that the Certificates' credit ratings were false and misleading because, in an attempt to manufacture predetermined ratings, Defendants provided to the ratings agencies the same misinformation contained in the Offering Materials.  In testimony before the Senate Permanent Subcommittee on Investigations, Susan Barnes, the North American Practice Leader for RMBS at S&P from 2005 to 2008, confirmed that the rating agencies relied upon investment banks to provide accurate information about the loan pools:

> The securitization process relies on the quality of the data generated about the loans going into the securitizations.  *S&P relies on the data produced by others and reported to both S&P and investors about those loans . . . .  S&P does not receive the original loan files for the loans in the pool*.  Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors.

(SPSI hearing testimony, April 23, 2010) (emphasis added).)  As a result, the ratings failed to

reflect accurately the actual risk underlying the Certificates purchased by Freddie Mac because

the ratings agencies were analyzing a mortgage pool that had no relation to the pool that actually

backed the Certificates purchased by Freddie Mac.

193.    Senior executives at Moody's also confirmed that they were supplied with and

relied on false information that affected their ratings:

- "We're on notice that a lot of the things that we relied on before just weren't
true."

- "There's a lot of fraud that's involved there, things we don't see. . . . We're sort of
retooling [our methodologies and approaches] to make sure that we capture a lot
of things that we relied on in the past that we can't rely on, on a going forward
basis."

- "It's actually quite interesting that we're being asked to figure out how much
everybody lied. . . . I mean, if all of the information was truthful and
comprehensive and complete, we wouldn't have an issue here."

("Moody's Investors Service: Managing Director's Town Hall Meeting" (Sept. 10, 2007),

"Hearing on Wall Street and the Financial Crisis:  The Role of Credit Rating Agencies"  (April

23, 2010) (Ed. 98).)

194.    The AAA (or equivalent) anticipated and final credit ratings were material to

Freddie Mac, because the ratings provided additional assurances that Freddie Mac would receive

the expected interest and principal payments.  Freddie Mac would not have purchased the

Certificates without the proper ratings and would not have paid as much for them without the

investment grade status.

195.    The Fraud Defendants', Ally Sponsor's and Ally Depositors' statements and

assurances in the Offering Materials were material to Freddie Mac, just as they were material to

any other investor.  Freddie Mac was similarly situated to other investors when it purchased the

Certificates at issue.  For instance, Freddie Mac lacked possession of and access to the

underlying loan files in order to evaluate the credit risk for the borrowers whose loans were included in the Securitizations.

196.    Each of the Fraud Defendants, Ally Sponsor, and Ally Depositors is responsible for the representations made in or omitted from the Offering Materials.  For its fraud claim, Plaintiff relies, in part, on the Offering Materials identified in Appendix A and Appendix B in their entirety.  Specific false and misleading statements in the Offering Materials for the Certificates purchased by Freddie Mac are detailed in Parts I.C. and I.D., Appendix A, and Appendix B, which are incorporated by reference.

197.    Because payment on the Certificates ultimately was funded by payments from the mortgagors, Freddie Mac faced a risk of non-payment if too many borrowers defaulted on their loans and the value of the mortgaged properties was insufficient to cover the unpaid principal balance.  Accordingly, any representation bearing on the riskiness of the underlying mortgage loans was material to Freddie Mac.  By misrepresenting the true risk profile of the underlying loan pools, the Fraud Defendants, Ally Sponsor, and Ally Depositors defrauded Freddie Mac.

198.    As the FCIC found:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.  *Potential investors were not fully informed or were misled* about the poor quality of the mortgages contained in some mortgage-related securities.  *These problems appear to have been significant.*

(FCIC Report at 187 (emphasis added).)

### C.    The Fraud Defendants, Ally Sponsor, and Ally Depositors Knew or Were Reckless in not Knowing that Their Representations Were False and Misleading

199.    The Fraud Defendants, Ally Sponsor, and Ally Depositors knew or were reckless in not knowing that their representations in the Offering Materials were false, and that the

information they omitted from those documents rendered them materially misleading. The same evidence discussed above not only shows that the representations were untrue, but also that the Fraud Defendants, Ally Sponsor, and Ally Depositors knew, or were reckless in not knowing, that they were falsely representing the underlying process and riskiness of the mortgage loans that collateralized the Certificates. Such evidence includes: (i) the consistency of the misrepresentations and omissions across the 21 Securitizations and the vast discrepancies between the information conveyed and the true characteristics of the mortgage loans; (ii) the purported due diligence performed by the Defendants and Ally Sponsor; and (iii) the undue influence exerted by the Fraud Defendants on the Non-Party Originators, appraisers, and credit rating agencies.

### 1.    The Fraud Defendants Ignored Due Diligence Results

200.    As discussed above, the credit quality and loan characteristics of the mortgage loans underlying the Certificates repeatedly and materially deviated from what was represented in the Prospectus Supplements and other Offering Materials. *See supra* Part I.D. The defects were so widespread across the Securitizations that they would have been apparent to a party that had performed due diligence on the individual mortgage loans included in the collateral pool. The pervasiveness of the defects is strong evidence that the Fraud Defendants, Ally Sponsor, and Ally Depositors did not innocently make materially false statements and omissions, but actually knew or were reckless in not knowing that (1) the loan originators systematically disregarded their own underwriting guidelines, (2) the LTV ratios presented in the Offering Materials were materially inaccurate, (3) the owner-occupancy rates presented in the Offering Materials were materially inaccurate, and (4) the credit ratings for the Certificates were based on incomplete and inaccurate information and were not believed by the ratings agencies when provided.

201.    The Ally Sponsor acquired mortgage loans from the Non-Party Originators for the

Securitizations that it sponsored and purportedly performed due diligence on the loans that it was

purchasing and on the Non-Party Originators from whom it was purchasing those loans.  The

Ally Depositors were vertically integrated with the Ally Sponsor, such that it had the same

knowledge or recklessly disregarded the same knowledge as the Ally Sponsor.  By presenting

Offering Materials to Freddie Mac, the Fraud Defendants also impliedly performed due diligence

on the loans in each Securitization to determine whether such loans complied with the applicable

underwriting guidelines and the other loan characteristics described in the Offering Materials.

202.    The Offering Materials represented that the loans were underwritten in

accordance with the Non-Party Originators' respective underwriting guidelines and contained

further assurances of quality control and due diligence.  For example, the Ally Sponsor

represented that it conducted due diligence on third-party lenders that originated loans for the

RALI 2005-QO4 Securitization:

> Residential Funding Corporation buys conventional mortgage
> loans under several loan purchase programs from mortgage loan
> originators or sellers nationwide, including affiliates, *that meet its
> seller/servicer eligibility requirements* and services mortgage loans
> for its own account and others.

(RALI 2005-QO4 Prospectus Supplement at 56 (emphasis added).)  Similar assurances and

representations were made in the Prospectus Supplements for the other Certificates.  Thus, by

virtue of its role as sponsor and its own purported due diligence, the Ally Sponsor had access to

information regarding the true credit quality of the loans collateralizing the Securitizations it

sponsored.

203.    The Fraud Defendants knew or recklessly disregarded the fact that certain

originators were not originating loans in accordance with their underwriting guidelines.

Documents released by a third-party due diligence firm, Clayton Holdings, Inc. ("Clayton")

confirm that these Defendants were aware -- on a daily basis -- of the deficiencies in the loan

pools and the underwriting standards of the originators they used in their RMBS.  Clayton was

"hired to identify, among other things, whether the loans met the originators' stated underwriting

guidelines and, in some measure, to enable clients to negotiate better prices on pools of loans."

(FCIC Report at 166 (footnote omitted).)

204.    In January 2008, Clayton disclosed that it had entered into an agreement with the

New York Attorney General ("NYAG") to provide documents and testimony regarding its due

diligence reports, including copies of the actual reports provided to its clients.  According to *The

New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005,

it saw a significant deterioration of lending standards and a parallel jump in lending

expectations."

205.    For the 18 month period ending on June 31, 2007, a significant percentage of the

loans sampled by Clayton at the direction of several Fraud Defendants failed to meet the various

loan originator's underwriting guidelines.  (*See* FCIC Report at 166.)  Of the loans Clayton

reviewed for certain Fraud Defendants, it rejected 13 percent for JPMorgan, 17 percent for Bear

Stearns and 16 percent for Goldman.  This information was provided to those Fraud Defendants,

but they and Bear Stearns overruled Clayton's findings and "waived in" substantial percentages

of these loans (approximately 51 percent for JPMSI, 29 percent for Bear Stearns and 29 percent

for and Goldman).  (*See* Clayton Trending Reports, *available at*

http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-

sacramento#documents; FCIC Report at 167.)

206.    Upon information and belief, these Defendants waived in these loans, found by

Clayton to be non-compliant with the relevant originator's origination guidelines, without taking

any adequate steps of their own to determine whether the loans met stated underwriting

guidelines or were otherwise consistent with the loan characteristics represented.  These loans

then found their way into the RMBS that were sold to investors like Freddie Mac.  (*See* Clayton

Trending Reports; FCIC Report at 167.)

207.    The FCIC concluded that the "waiver" or rejected loans that were not subject to

any compensating factors rendered the Fraud Defendants' representations regarding the

underwriting and due diligence processes misleading.  The report concluded:

> [M]any prospectuses indicated that the loans in the pool either met
> guidelines outright or had compensating factors, even though
> Clayton's records show that only a portion of the loans were
> sampled, and that of those that were sampled, a substantial
> percentage of [loans that failed to meet guidelines] were waived in.
> . . . .
> [O]ne could reasonably expect [the untested loans] to have many
> of the same deficiencies, at the same rate, as the sampled loans.
> Prospectuses for the ultimate investors in the mortgage-backed
> securities did not contain this information, or information on how
> few of the loans were reviewed, raising the question of whether the
> disclosures were materially misleading, in violation of the
> securities laws.

(FCIC Report at 167, 170.)

208.    Internal due diligence procedures were likewise inadequate.  For instance,

JPMorgan's internal policies condoned fraud by encouraging its employees to ignore and

manipulate JPMorgan's automated underwriting system, called "ZiPPY."  (Marc Friesen, *Chase

Mortgage Memo Pushes 'Cheats & Tricks'*, OREGONIAN, MARCH 27, 2008.)  Chase Home

Finance LLC ("CHF"), a wholly-owned subsidiary of JPMorgan Bank, went so far as to

explicitly instruct loan originators to falsify loan information in order to elicit approval from the

ZiPPY automated underwriting system for stated income loans of poor quality.  An internal

memorandum circulated by CHF in its Portland, Oregon office titled "Cheats and Tricks" gave

originators tips on how to circumvent the underwriting system, including exhortations that a

mortgage broker should '"Never Fear!!"' because ZiPPY '"can be adjusted"' to '"get the

findings you need."' (*Id.*)  The memorandum encouraged brokers to game the ZiPPY system

because "[i]ts super easy!  Give it a try!"  (*Id.*)  It provided the following "handy steps" in order

to gain approval for an otherwise rejected Stated Income / Stated Asset loan application:

> (1)  In the income section of your 1003, make sure you input all
> income in base income.  DO NOT break it down by overtime,
> commissions or bonus.
>
> (2)  NO GIFT FUNDS!  If your borrower is getting a gift, add it to
> a bank account along with the rest of the assets.  Be sure to remove
> any mention of gift funds on the rest of your 1003.
>
> (3)  If you do not get Stated/Stated, try resubmitting with slightly
> higher income.  Inch it up $500 to see if you can get the findings
> you want.  Do the same for assets.

(*Id.*)

209.    Management-level employees at JPMorgan Bank and CHF knew that mortgage

origination fraud was occurring, and indeed encouraged such fraudulent practices in an effort to

increase the volume of loans originated, and thus, their compensation.  CHF's former Regional

Vice President, James Theckston, explained to The New York Times that 60 percent of his 2006

performance review depended on him increasing the origination of high-risk loans.  Mr.

Theckston stated that CHF executives could earn a commission for the origination of subprime

loans that was seven times higher than for prime mortgages, and that they therefore looked for

less savvy borrowers—those with less education, without previous mortgage experience, or

without fluent English skills—and directed them toward subprime loans.  According to Mr.

Theckston, these borrowers ended up paying higher mortgage rates, and were more likely to

default and lose their homes.  (Nicholas D. Kristof, *A Banker Speaks, With Regret*, N.Y. Times

(Nov. 30, 2011).)

210.    Mr. Theckston further revealed: "'On the application, you don't put down a job; you don't show income; you don't show assets; but you still got a nod.'"  "'If you had some old bag lady walking down the street and she had a decent credit score, she got a loan . . .You've got somebody making $20,000 buying a $500,000 home, thinking that she'd flip it.  It was crazy, but the banks put programs together to make those kinds of loans.'"  (*Id.*)

211.    Mr. Theckston explained that knowledge of this fraud existed at the top levels of management:  "'The bigwigs of the corporations knew [about declining lending standards], but they figured we're going to make billions out of it, so who cares? . . . The government is going to bail us out.  And the problem loans will be out of here, maybe even overseas.'"  (*Id.*)

212.    Bear Stearns' management was also so eager to securitize as many mortgage loans as possible that it abandoned any adherence to underwriting or due diligence standards.  On February 11, 2005, Bear Stearns Senior Managing Director Mary Haggerty e-mailed Vice President of Due Diligence John Mongelluzo with instructions to reduce the amount of due diligence conducted "in order to make us more competitive on bids with larger sub-prime sellers."

213.    Bear Stearns Internal Audit Reports also described the various reductions in due diligence.  According to February 28, 2006 and June 22, 2006 reports, Bear Stearns would reduce the number of loans in the loan samples that were reviewed as part of the due diligence process, conduct due diligence only after the loans were repurchased ("post-closing" due diligence), eliminate internal reports on defective loans, and conduct no due diligence if such due diligence would interfere with mortgage loan pools being securitized.  *The Atlantic* confirmed this abandonment of reasonable due diligence procedures in a May 2010 article describing:

- how Bear Stearns pressured EMC analysts to perform their due diligence of the underlying mortgages in only one to three days;

- how Bear Stearns encouraged EMC analysts to falsify loan data (including FICO scores) if the loan was missing the requisite information; and

- how Bear Stearns pushed EMC analysts to avoid investigating a potentially bad loan and instead focus on making it "fit."

(Teri Buhl, *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, Atlantic, May 15, 2010; *See also* Teri Buhl, *E-mails Suggest Bear Stearns Cheated Clients Out of Billions*, Atlantic, Jan. 25, 2011.)

214.    Former EMC mortgage analyst Matthew Van Leeuwen, an employee from 2004 to 2006, confirmed in a March 30, 2009 e-mail that "the pressure was pretty great for everybody to just churn the mortgages on through the system," so that if there were "outstanding data issues" analysts should just "fill in the holes."  The pressure was directed from the top of Bear Stearns' corporate structure.  For example, EMC's Senior Vice President of Conduit Operations, Jo-Karen Whitlock, told her staff to do "whatever is necessary" to meet Bear Stearns' objectives for desired loan production.  Her April 14, 2006 e-mail further stated:

> I refuse to receive any more emails … questioning why we're not funding more loans each day.  I'm holding each of you responsible for making sure we fund at least 500 each and every day…. [I]f we have 500+ loans in this office we MUST find a way to … buy them…. I expect to see 500+ each day…. I'll do whatever is necessary to make sure you're successful in meeting this objective.

215.    Not only did the Fraud Defendants knowingly or recklessly permit low quality loans to pass into their securitizations in exchange for underwriting and securitization fees, they also took the fraud further, affirmatively seeking to profit from this knowledge.  Rather than rejecting these loans from the loan pool, as they should have, JPMSI, Bear Stearns and Goldman, used evidence of underwriting defects to negotiate lower prices for the loans and thus boost their own profits.  According to the September 2010 FCIC testimony of Clayton's former president,

D. Keith Johnson, the banks would use the exception reports to force a lower price for itself, and

not to benefit investors at all:

> I don't think that we added any value to the investor, the end
> investor, to get down to your point.  I think only our value was
> done in negotiating the purchase between the seller and securitizer.
> Perhaps the securitizer was able to negotiate a lower price, and
> could maximize the line.  We added no value to the investor, to the
> rating agencies.

(FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), *available at*

http://fcic.law.stanford.edu/resource/interviews.)  In other words, rather than exclude defective

loans from collateral pools, or cease doing business with consistently failing originators,

investment banks like the Fraud Defendants would instead use the Clayton data simply to insist

on a lower price from the loan originators, thereby increasing their own profits while the

defective loans were included in the pools for securitization.  For instance, Goldman discussed

proposals to charge higher warehouse fees to mortgage originators with higher early payment

default and "drop out" rates, including New Century.  (*See* Sen. Levin, Carl and Sen. Coburn,

Tom, U.S. Senate Permanent Subcommittee on Investigations, *Wall Street and the Financial*

*Crisis:  Anatomy of a Financial Collapse* (Committee on Homeland Security and Governmental

Affairs, April 13, 2011) ("SPSI Report"), 484 n.2038 (citing Goldman email, dated Feb. 2,

2007).)

216.    Moreover, the quality control work of Clayton performed was rendered

inadequate because, as Clayton informed the NYAG, "some investment banks directed Clayton

to halve the sample of loans it evaluated in each portfolio."  (Jenny Anderson, *Loan Reviewer*

*Aiding Inquiry Into Big Banks*, N.Y. Times, Jan. 27, 2008.)  Upon information and belief, the

Fraud Defendants were included in that group of investment banks.  Thus, these Defendants

made a conscious decision *not* to avail themselves of comprehensive due diligence regarding the

loans they were securitizing, which alone renders their misrepresentations concerning those loans knowing or reckless.

### 2.   Warehouse Lending and Vertical Integration Gave The Fraud Defendants Inside Knowledge of Underwriting Defects

217.    The Fraud Defendants' privileged positions as sources of warehouse lending also gave them unique knowledge of the conditions under which mortgage loans were originated. These arrangements allowed several of the Fraud Defendants to control the origination practices of the lenders, which depended on them for funding and gave these Fraud Defendants an insider look into the true quality of the loans they originated.  As one publication explained, "[w]arehouse lenders [like the Fraud Defendants] have detailed knowledge of the lender's operations."  (Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, at 11 (2007), *available at* http://northstarfund.org/blog/pdfs/wall-street-and-the-making-of-the-subprime-disaster.pdf.)

218.    The FCIC found that underwriter/originator warehouse lending relationships led to an environment in which "financial institutions ineffectively sampled loans they were purchasing to package and sell to investors.  The Commission's review of many prospectuses provided to investors found that this critical information was not disclosed."  (FCIC Report at xii.)

219.    Given the Fraud Defendants' close relationships with originators for the Certificates at issue, they had a unique window into the quality of the loans backing the Certificates and undue influence over the loan origination process.

220.    Goldman, as well as Bear Stearns, provided warehouse lines of credit to New Century, whose departure from its stated underwriting guidelines has now been extensively investigated and documented.  New Century's former president testified before the Bankruptcy

Examiner appointed by the Bankruptcy Court overseeing New Century's Chapter 11 proceeding

that New Century often reached deals with loan purchasers to limit the percentage of loans the

purchaser would "kick out" of the loan pool due to the poor quality of the loan.  (*See* Final

Report of Michael J. Missal Bankruptcy Court Examiner, Case No. 07-10416(KJC) (D.Del. Feb.

29, 2008) at 135.)  That admission, the warehouse lending relationship between New Century

and Goldman and the fact that Goldman did substantial business with this "worst of the worst"

originator, all strongly suggest that these Goldman and New Century had such a deal.

221.    In the case of the Ally, the Ally entities were so closely integrated and the abusive

lending practices so rampant from the top down that the Ally Depositors, Ally Sponsor, and Ally

Securities, knew -- or were reckless in not knowing -- that HFN -- a subsidiary of the sponsor --

systematically was disregarding prudent underwriting standards and that its loans lacked the

characteristics represented in the Offering Materials.  As detailed above, a sampling of GMACM

loans conducted by MBIA has revealed a non-compliance rate of at least 89 percent.

222.    Indeed, GMACM is currently being investigated by the U.S. Department of

Justice (the "DOJ") and the SEC for, among other things, fraud related to the origination and

underwriting of mortgage loans.  In June 2011, GMACM was served with a subpoena by the

DOJ and SEC.

> The subpoena received from the SEC includes a broad request for
> documentation related to certain "bulk settlements" relating to
> mortgage loans placed in securitization trusts, which are
> agreements we entered into with mortgage originators or mortgage
> sellers whereby we received value in lieu of such mortgage
> originator or mortgage seller repurchasing a loan from us, as well
> as a request for materials provided to investors and prospective
> investors in mortgage securitization transactions. The subpoena
> received from the U.S. Department of Justice includes a broad
> request for documentation and other information in connection
> with its investigation of potential fraud related to the origination
> and/or underwriting of mortgage loans. These subpoenas, or any

> other investigation or information-gathering request, may result in
> material adverse consequences including without limitation,
> adverse judgments, settlements, fines, penalties, injunctions, or
> other actions.

(Ally Financial, Inc. f/k/a GMAC, LLC, Amendment No. 3 to Form S-1 Registration Statement

under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).)

223.    Further, GMACM's abusive or reckless lending and servicing practices, including

commingling funds from custodial bank accounts and questionable and unlawful foreclosure

practices, have also been revealed.  (*See* "Moody's downgrades $1.4 billion in GMAC subprime

RMBS," *available at* http://www.housingwire.com/2011/03/25/allstates-mbs-exposure-hits-2-78-

billion.)

224.    The Ally Defendants also shared substantial overlapping management with HFN.

For instance, in 2005, David C. Walker served as Director of HFN, RALI, RASC, RAMP, RFC

and GMAC-RFC.  In 2007, David M. Bricker served as CFO and Director of HFN; Director and

CFO of RALI; CFO of RASC and RAMP; and Director of RFC.  In 2005, Davee L. Olson

served as Director of HFN; CFO and Director of ResCap and RASC; and Director of RAMP,

RFC and GMAC-RFC.  In 2007, James N. Young served as Controller of HFN; CAO and

Controller of ResCap; CFO of RFC; and Director of RALI, RASC and RAMP.  In 2007, James

G. Jones served as CEO, President and Director of HFN; CEO, President and Director of

ResCap, RALI, RASC and RAMP; President and Director of RFC, and Director of GMAC-RFC.

In 2005, Kenneth M. Duncan served as CFO of HFN, RAMP, RFC and GMAC-RFC.  In 2005,

Ralph T. Flees served as Controller of HFN, RASC, RAMP, RFC and GMAC-RFC.  Given the

overlapping management and the integrated structure, Ally knew or was reckless in not knowing

of the misrepresentations and omissions concerning HFN's underwriting guidelines.

225.    Bear Stearns' collapse and subsequent acquisition by JPMorgan has been the subject of intense public scrutiny and investigation, most notably by the FCIC.  In February 2011, the FCIC released interviews with Bear Stearns executives regarding its role in the origination, acquisition, and securitization of mortgage loans.  The documentary evidence revealed widespread fraudulent conduct on the part of Bear Stearns.  Such fraudulent conduct has been the basis for both investigation and litigation by public officials, including the Attorney General of Oregon, who filed an action on behalf of the Oregon Public Employees Retirement Fund against Bear Stearns for misrepresentations in its role as issuer and underwriter in the sale of certificates.  (*In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, 08 Civ. 8093 (SDNY).)

226.    Through its various affiliates and subsidiaries, Bear Stearns participated in every step of the securitization process, from the origination and servicing of the mortgage loans to the sponsoring and structuring of the securitization, to the underwriting and marketing of the Certificates.  According to the FCIC, it was Bear Stearns that actually "pioneered" the "'vertical integration' mortgage model" so that it could have "a stake in every step of the mortgage business—originating mortgages, bundling these loans into securities, bundling these securities into other securities, and selling all of them on Wall Street." (FCIC Report at 204.)  Between 2003 and 2006, Bear Stearns' revenue and profit increased by 123.8 percent and 77.6 percent, respectively.  This growth was largely driven by mortgage finance and Bear Stearns' securitization machine.  By 2006, Bear Stearns' securitizations accounted for 11 percent of the overall U.S. mortgage-securities market.  Bear Stearns announced in its 2006 Annual Report: "Our vertically integrated franchise allows us to access every step of the mortgage process, including origination, securitization, distribution and servicing."  (Bear Stearns 2006 Annual

Report, at 12, *available at* http://www.scribd.com/doc/7453453/Bear-Stearns-Annual-Report-2006.)

227.    This vertical integration allowed Bear Stearns to control and manipulate the loan level documentation, to knowingly choose poor quality mortgage loans for securitization as a method of off-loading the loans to investors as soon as possible, and to selectively make repurchase claims of originators while simultaneously denying those of investors.  By virtue of their control over each step in the securitization process, Bear Stearns had knowledge of the true characteristics and credit quality of the mortgage loans.

### 3.    Other Evidence Demonstrating that The Fraud Defendants Knew Or Were Reckless In Not Knowing That Their Representations Were False

228.    In addition to the unique insight gained from warehouse lending relationships, other evidence -- including Ally's and the Fraud Defendants' de-risking strategies -- supports the Fraud Defendants', Ally Sponsor's and Ally Depositors' knowledge or reckless disregard of the falsity of their representations in the Offering Materials.

229.    Thus, for example, the Ally Sponsor filed over a dozen federal lawsuits in Minnesota against mortgage companies, claiming that the originators had failed to conduct adequate due diligence on borrowers and demanding that the originators repurchase the subject mortgage loans.  The defendants in these lawsuits included at least one originator, Pinnacle, that had contributed loans to the Securitizations.  (*See, e.g., Residential Funding Co., LLC v. Pinnacle Direct Funding Corp.*, Civ. No. 08-cv-00591 (D. Minn., Feb. 29, 2008);  *see also* David Phelps, *ResCap Suing Brokers Who Originated Bad Mortgage Loans*, STAR TRIBUNE, Bus. at 1D, Aug. 10, 2008.)

230.    Defendant Goldman's malfeasance in the RMBS market has also been reviewed and reported in detail by the United States Senate.  A report issued by the Senate Permanent

Subcommittee on Investigations found that in exchange for lucrative fees, Goldman helped

lenders like New Century securitize high risk, poor quality loans, obtain favorable credit ratings

for the resulting RMBS, and sell the RMBS securities to investors, pushing billions of dollars of

risky mortgages into the financial system.  (SPSI Report at 377.)

231.    That Goldman knew of the originator's abandonment of applicable underwriting

guidelines and of the true nature of the mortgage loans it was securitizing is further evidenced by

how Goldman handled its own investments.  Goldman internally characterized its offerings as

"junk," "dogs," "big old lemons," and "monstrosities."  (FCIC Report at 235-36.)  Nevertheless,

it congratulated itself for successfully offloading such "junk" onto others.  As the public learned

in the FCIC's Report, by January 2007, "Daniel Sparks, the head of Goldman's mortgage

department, extolled Goldman's success in reducing its subprime inventory, writing that the team

had 'structured like mad and traveled the world, and worked their tails off to make some

lemonade from some big old lemons."  (*Id.* at 236.)  Also, as early as December 2006, David

Viniar, Goldman's Chief Financial Officer urged the head of Sales and Trading at Goldman to

"be aggressive" in marketing subprime risk "because there will be very good opportunities as the

markets go into what is likely to be even greater distress and we want to be in position to take

advantage of them."  (*Id.* at 235.)

232.    Even more damning than Goldman's decision to use securitization as a tool to

move declining loans off of Goldman's own books are the huge bets Goldman placed against the

very mortgage-backed investments it sold to Freddie Mac.  Goldman coupled those sales with an

aggressive campaign to force lenders (the very same ones who originated loans in the

Certificates) to repurchase defective loans which, due to the slowing securitization market, had

been stuck on Goldman's own books.

233.    Beginning in 2005 and into 2006, Goldman began to take an increasingly pessimistic view of the subprime mortgage market.  Goldman's sophisticated and powerful proprietary models analyzed trends in the performance of hundreds of thousands of mortgages that collateralized its RMBS, and those models and superior access to data regarding the underlying mortgage positions on its books gave Goldman unique knowledge that those securities were not as safe as their offering materials and ratings represented to investors.  In fact, Goldman's models and data showed that the RMBS had declined up to 70 percent from their face amounts.  In his book, *Money and Power:  How Goldman Sachs Came to Rule the World*, William D. Cohan explained:

> Goldman's RMBS model could analyze all the underlying mortgages and value the cash flows, as well as what would happen if interest rates changed, if prepayments were made, or if the mortgages were refinanced.  The model could also spit out a valuation if defaults suddenly spiked upward . . . . [Goldman's] proprietary model was telling [Goldman] that it would not take much to wipe out the value of tranches of a mortgage-backed security that had previously looked very safe, at least in the estimation of the credit-rating agencies that had been paid (by Wall Street) to rate them investment grade.  By tweaking the various assumptions based on events that seemed increasingly likely, [Goldman's] models were showing a marked decrease in the value of mortgage-related securities. Goldman's models said even if you don't believe housing prices are going to go down, even if we apply low-probability scenarios about it going negative ... there's no way this stuff can be worth anywhere near one hundred [cents on the dollar].... [Goldman's] models had them pegged anywhere between 30 cents and 70 cents . . . .

(WILLIAM D. COHAN, MONEY AND POWER: HOW GOLDMAN SACHS CAME TO RULE THE WORLD 494-95 (2011).)  According to a former Goldman employee, these models as well as other information in Goldman's exclusive possession showed it "the writing on the wall in this market as early as 2005," Gretchen Morgenson & Louise Story, *Banks Bundled Bad Debt, Bet Against It and Won*, N.Y. Times, Dec. 24, 2009, and into the "the early summer of 2006."  (SPSI Report at

398.)  Goldman exploited its asymmetric access to, and possession of, information about the weakness in the mortgage loans collateralizing the Certificates it marketed and sold.

234.    To reduce its massive financial exposure to the subprime mortgage market, Goldman began looking for ways to short the market (*i.e.*, to make investments which would rise in value and/or make payments to Goldman as the subprime mortgage market declined). Its shorting strategies included the purchase of credit default swap protection on the very RMBS positions it sold into the market.  Goldman bet that the RMBS would decline in value and/or default; if so, its swap counterparty would be required to pay Goldman.

235.    Goldman entered into swaps worth hundreds of millions of dollars during this time period, where it stood on the "short" side of the transaction, while its counterparty went "long."  For example, according to the SPSI Report, Goldman underwrote GSAMP 2007-FM2, a securitization it sold to Freddie Mac, and then turned around and bet *against* that same securitization through use of credit default swaps. As the SPSI Report explained:

> Goldman marketed and sold the Fremont securities to its customers, while at the same time purchasing $15 million in CDS contracts referencing some of the Fremont securities it underwrote. Seven months later, by October 2007, the ratings downgrades had begun; by August 2009, every tranche in the GSAMP securitization had been downgraded to junk status.

(SPSI Report at 516 (footnotes omitted).)  Goldman's shorting of GSAMP 2007-FM2 was emblematic of its approach to the Securitizations it marketed and sold to Freddie Mac.  As a recent magazine article explained, "Goldman was like a car dealership that realized it had a whole lot full of cars with faulty brakes. Instead of announcing a recall, it surged ahead with a two-fold plan to make a fortune: first, by dumping the dangerous products on other people, and second, by taking out life insurance against the fools who bought the deadly cars." (Matt Taibbi, *The People vs. Goldman Sachs*, ROLLING STONE, May 26, 2011.)

236.    Continuing from 2006 and 2007, Goldman used its shorting strategy as a way to reduce its own mortgage risk while continuing to create and sell mortgage-related products to its clients. In 2006, Goldman made a massive $9 billion bet that the same type of assets it was selling to investors like Freddie Mac would collapse.  (SPSI Report at 419.)  Goldman's net short position in 2007 rose as high as $13.9 billion.  (*Id.* at 430.)  As the SPSI Report explained, Goldman "sold RMBS and CDO securities to its clients without disclosing its own net short position against the subprime market or its purchase of CDS contracts to gain from the loss in value of some of the very securities it was selling to its client."  (*Id.* at 9.)

237.    On March 9, 2007, Goldman's Daniel Sparks wrote: "Our current largest needs are to execute and sell our new issues—CDO's and RMBS—and to sell our other cash trading positions . . . I can't overstate the importance to the business of selling these positions and new issues."  (SPSI Hearing, Ex. 4/27- 76.)  A leading structured finance expert, Sylvain R. Raynes, reportedly called Goldman's practice "the most cynical use of credit information that I have ever seen," and compared it to "buying fire insurance on someone else's house and then committing arson."  As the SPSI Report found, Goldman "sold RMBS securities to customers at the same time it was shorting the securities and essentially betting that they would lose value." (SPSI Report at 513.)

238.    This disregard for the clients' interests became a part of the culture at Goldman. Greg Smith, the former Executive Director of Goldman's equity derivative business, resigned from his position due to the "toxic and destructive" culture at Goldman.  Smith lamented that "[i]f you were an alien from Mars and sat in on one of [Goldman's daily sales] meetings, you would believe that a client's success or progress was not part of the thought process at all." (Greg Smith, *Why I am Leaving Goldman Sachs*, N.Y. TIMES, Mar. 14, 2012.)  In fact, Smith

recalled "five different managing directors refer[ring] to their own clients as 'muppets'. . . ."

(*Id.*)  Smith noted that one way to become a "leader" at Goldman was to "persuad[e] your clients

to invest in the . . . products that [Goldman was] trying to get rid of because they [were] not seen

as having a lot of potential profit" for Goldman.  (*Id.*)

239.    Another tactic that Goldman used to reduce its subprime exposure in 2006 was to

force originators from which it bought mortgages to buy them back. Goldman's repurchase rights

arose from mortgage purchase agreements that it entered into with originators. These agreements

typically required originators to warrant that their loans were underwritten according to standard

guidelines and conformed to certain characteristics, including the accuracy of the mortgage loan

schedule, the absence of fraud by the originator or borrower, and compliance with federal and

state laws. If a representation was breached, Goldman could demand that the originator

repurchase the defective loans as required by the mortgage purchase agreement. Goldman hired

third party re-underwriting firms to assist in this "put back" process and to find defects in the

loans which would then be used as a basis to require their repurchase.

240.    Goldman targeted its "put back" campaign at the originators whose loans

Goldman knew were most likely to yield underwriting breaches upon examination. Goldman had

unique insight into the quality of the loans purchased from originators, arising from diligence on

the originators themselves as well as their loans. Goldman knew based on its many years of

dealing with originators such as New Century that their loans were the worst on its books and

thus the most likely to yield put back claims.

241.    For example, the SPSI Report published a December 14, 2006 email from

Goldman's Daniel Sparks which told colleagues, "stay focused and aggressive on MLN. . . ."

(*See* SPSI Report at 405.)  On January 8, 2007, Daniel Sparks wrote to a colleague, "I just can't

see how any originator in the industry is worth a premium. I'm also a bit scared of [A]ccredited [Aames' parent company] and [N]ew [C]entury, and I'm not sure about taking a bunch of new exposures." (*Id.* at 484 n.2036.)

242.    On February 2, 2007, Sparks identified other prime targets of Goldman's repurchase campaign. He said that his "team is working on putting loans in the deals back to the [New Century, among others,] as there seem to be issues potentially including some fraud at origination, but resolution will take months and be contentious." (*Id.* at 484.)

243.    On March 7, 2007, Sparks continued emphasizing Goldman's priority in ridding itself of loans issued by certain originators. He described Goldman's exposure as follows:

> As for the big 3 originators – Accredited, New Century and Fremont, our real exposure is in the form of put-back claims. Basically, if we get nothing back we would lose around $60mm vs loans on our books (we have a reserve of $30mm) and the loans in the [CDO and RMBS] trusts could lose around $60mm (we probably suffer about 1/3 of this in ongoing exposures) . . . .

(*Id.* at 485.)

244.    In March 2007, following an analysis of a pool of loans, Goldman concluded that about 50 percent of the 200 files reviewed "look to be repurchase obligations." (*Id.* at 486.) Goldman made it a "priority" to re-underwrite and put back loans purchased from originators it considered weak. (*Id.* at 485.)

245.    In total, between 2006 and 2007, Goldman made approximately $475 million in repurchase claims to the originators and others for loans in its inventory. All told, Goldman recovered approximately $82 million from this process. (*Id.* at 483.)  After reviewing the loan files in one New Century deal, Goldman's analysts recommended to Goldman putting back 26 percent of the loan pool. (*See* SPSI Report at 485-86.)

246.    Goldman is the subject of numerous criminal and regulatory probes related to its

mortgage underwriting practices.  (*See Wall Street Probe Widens*, The Wall Street Journal, May

12, 2010 (reporting on federal criminal and regulatory investigations of whether Goldman and

others "misled investors about their roles in mortgage-bond deals").)  These investigations

further confirm that Goldman's misrepresentations were not mere isolated, innocent mistakes,

but the result of the company's reckless or intentional misconduct.

247.    For example, Goldman's misconduct prompted the Attorney General of

Massachusetts to examine whether Goldman:

- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;

- failed to take sufficient steps to avoid placing problem loans into securitization pools;

- failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and

- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan due diligence and the pre-securitization process, as well as information concerning Goldman Sachs' practices in making repurchase claims relating to loans in and out of securitizations.

248.    Goldman settled with the Commonwealth of Massachusetts, paying it $60 million.

(FCIC Report at 226.)  In announcing the settlement, the Massachusetts Attorney General stated

that Goldman did not take "sufficient steps to avoid placing problem loans in securitization

pools."  Goldman was also required to forgive all or portions of the balances on many loans it

had bought and securitized, which resulted in tens of millions of dollars in additional expenses to

Goldman.

249.    Similarly, the SPSI Report concluded that Goldman "knowingly sold high risk,

poor quality mortgage products to clients around the world, saturating financial markets with

complex, financially engineered instruments that magnified risk and losses when their underlying

assets began to fail."  (SPSI Report at 476; *see also id.* at 513 ("Goldman originated and sold

RMBS securities that it *knew* had poor quality loans that were likely to incur abnormally high

rates of default.") (emphasis added).)

250.    JPMSI also knowingly included defective loans in its securitizations, thereby

passing the risk of delinquency and default to investors.  This behavior was continued during the

worst period of the financial crisis.  As investors were demanding that JPMorgan's newly

acquired subsidiary, Bear Stearns, repurchase mortgage loans that were not underwritten to

represented standards of quality, JPMorgan was denying those repurchase requests while

simultaneously making repurchase demands for the very same loans from the originator, Capital

One Financial Corp.  In a June 26, 2008 letter to Capital One, Allison Malkin, an executive

director with J.P. Morgan Securities (the entity with which Bear Stearns was eventually merged),

stated "that it is [Bear Stearns'] position that these breaches materially and adversely affect the

value" of the mortgage loans.  (Jody Shenn, *JPMorgan Refused Mortgage Repurchases It Also

Sought, Ambac Says*, BLOOMBERG.COM (Jan. 24, 2011, 8:46 PM),

http://www.bloomberg.com/news/2011-01-25/jpmorgan-refused-mortgage-repurchases-it-also-

sought-ambac-filing-claims.html.)

251.    By 2006, however, JPMorgan had grown alarmed at the increasing rate of late

payments in its subprime portfolio.  As the pool quality of these mortgage loans became

apparent, JPMorgan decided to exit its subprime positions.  This decision came from JPMorgan's

CEO, Jamie Dimon, evidencing knowledge of the perilous state of JPMorgan's subprime assets

by JPMorgan senior management.  An article in *Bloomberg* on February 17, 2010 revealed that

JPMorgan CEO Jamie Dimon was fully aware that its residential mortgage backed securities

were of poor and deteriorating credit quality and that he attempted to shed the associated risk

from JPMorgan's own balance sheet.  The article reported that "[i]n October 2006, Mr. Dimon,

JPMorgan's CEO, told William A. King, its then head of securitized products, that [JPMorgan]

needed to start selling its subprime-mortgage positions."  In late 2008, *Fortune Magazine* quoted

the same October 2006 phone conversation, where Mr. Dimon instructed Mr. King to sell

JPMorgan's positions:  "I really want you to watch out for subprime! . . .  We need to sell a lot of

our positions.  I've seen it before.  This stuff could go up in smoke!"  (Shawn Tully, *Jamie

Dimon's swat team:  How J.P. Morgan's CEO and His Crew are Helping the Big Bank Beat the

Credit Crunch*, Fortune (September 2, 2008, 4:08 PM), *available at*

http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune/).  By the end of 2006,

JP Morgan had unloaded $12 billion in subprime assets that JPMorgan itself had originated.

(*Id.*)

251.    252.    Despite Mr. Dimon's view that JPMorgan's subprime holdings "could go up in

smoke!" and JPMorgan's decision to sell its holdings in subprime assets, JPMorgan continued to

originate and securitize poorly underwritten mortgage loans and vouch for their quality.  This

was the time period in which Freddie Mac acquired Certificates that JPMSI underwrote.

253.    With respect to Bear Stearns, loans acquired by Bear Stearns began to default at

an increasing rate.  These triggered concern in Bear Stearns as early as 2005.  Rather than

improving the quality of loans acquired for securitization, Bear Stearns reacted by changing the

time period in which Bear Stearns was required to hold loans it acquired.  Previously, Bear

Stearns was required to hold third-party loans in inventory for between 30 and 90 days before the

loans could be securitized.  This allowed Bear Stearns to determine whether any of the loans

would suffer from an early payment default.  In 2006, Bear Stearns stopped screening out these

defective loans and instead required that all mortgage loans be securitized before the early

payment default period expired.  Bear Stearns Senior Managing Director Jeffrey Verschleiser

confirmed the revised protocol in a June 13, 2006 e-mail to Haggerty stating that they need "to

be certain we can securitize the loans with 1 month epd [early payment default] before the epd

period expires."  This desire to unload bad mortgage loans by selling them to other investors

through the securitization process was further evidenced by a May 5, 2007 e-mail from Bear

Stearns Managing Director Keith Lind, who demanded "to know why we are taking losses on

2nd lien loans from 2005 when they could have been securitized?????"

254.    In addition to purposely acquiring and securitizing defective loans that did not

meet their represented underwriting guidelines and selling them to investors, Bear Stearns'

subprime subsidiary, EMC, further profited from these bad loans by making repurchase claims

against the originator of the loans.  Repurchase claims are derived from rights found in mortgage

loan purchase agreements, whereby the originator makes representations to the sponsor (EMC)

that the loans were underwritten in accordance with certain underwriting standards.  If the

sponsor (EMC) discovers this not to be the case, it can request that the originator repurchase any

affected loans.  Similarly, the PSA between EMC and the trust requires that EMC repurchase any

loans it knows are defective.  Instead of seeking the actual repurchase of these bad loans,

however -- which would remove the loans from the trust and compensate the certificateholders --

EMC settled its repurchase claims and kept the settlement proceeds itself.  EMC did not pass the

proceeds of the repurchase claims on to the trust.

255.    EMC came to several settlement agreements and other arrangements as part of its

repurchase scheme.  On January 30, 2007, an originator agreed to pay over $2.5 million to EMC

"in lieu of repurchasing the Defective Loans."  On December 18, 2007, an originator agreed to

pay almost $12 million "for full payment and satisfaction of the Monetary Claims, and the

balance of the Settlement Amount (if any) for settlement of the Defective Loans."  On October 1,

2007, an originator agreed to pay $1 million "in lieu of repurchasing the Defective Loans."

According to an internal presentation requested by Bear Stearns' Managing Director and Head of

Mortgage-Backed Securities, Thomas Marano, EMC received $1.9 billion from April 2006 to

April 2007 in claim resolutions, with most resolutions being settlements.  Bear Stearns would

also accept discounts on future loan purchases instead of immediate cash settlements, valuing

these arrangements at $367 million for the period beginning in 2007 through the first quarter of

2008.  (*See also* Teri Buhl, *E-mails Suggest Bear Stearns Cheated Clients Out of Billions*, THE

ATLANTIC, Jan. 25, 2011.)

256.    These funds should have passed to the trusts but Bear Stearns did not disclose its

repurchase settlements with certificateholders in the trust.  In a December 11, 2009 deposition,

Bear Stearns' Deal Manager Robert Durden could not identify a single "instance in which EMC

or Bear Stearns disclosed to Ambac or other investors that it was recovering on EPDs [early

payment defaults] from originators with respect to securitized mortgage loans, pocketing the

money and not putting it into the trust."  Bear Stearns knew this practice breached its

representations and warranties made to purchasers of certificates:  PriceWaterhouseCoopers

advised Bear Stearns that the program was contrary to "common industry practices, the

expectation of investors and . . . the provisions in the [deal documents]" in an August 31, 2006

audit, and, according to EMC President Stephen Golden, EMC concluded that it could not retain

funds in connection with the repurchase claims in mid-2007.  Despite this advice, EMC reached

two such agreements in the latter half of 2007 and continued to fail to remit the proceeds to the

trust.  (PriceWaterhouseCoopers LLP, Bear Stearns/EMC UPB Break Repurchase Project Audit

Report, August 31, 2006 (Haas Decl., Ex. 18, EMC-AMB 006803209).)

257.    As active participants in fraudulent origination practices, the Fraud Defendants,

Ally Sponsor, and Ally Depositors knew or were reckless in disregarding the falsity of their

statements in the Offering Materials concerning underwriting guidelines.

258.    The Fraud Defendants, Ally Sponsor, and Ally Depositors also knew or recklessly

disregarded that the owner-occupancy statistics and LTV ratios reported in the Offering

Materials were false and misleading.  Given their role as underwriters, sponsors and depositors

of the securities, the relationships they had with loan originators, and this expertise in

underwriting and securitizing RMBS, the Fraud Defendants, Ally Sponsor, and Ally Depositors

had the practical ability to gain access to loan files and the ability and resources to test the

reported data points, such as owner-occupancy rates and LTV ratios.  They intentionally elected

not to do so, rendering their representations concerning those data knowingly or recklessly false.

259.    Moreover, upon information and belief, underwriters, including certain of the

Fraud Defendants, influenced the appraisals used to determine LTV ratios.  Government

investigations have uncovered widespread evidence of appraisers being pressured to overvalue

properties so more loans could be originated.  For instance, several witnesses, ranging from the

President of the Appraisal Institute to appraisers and lenders on the ground, confirmed that

appraisers felt compelled to come in "at value" -- *i.e.*, at least the amount needed for the loan to

be approved -- or face losing future business or their livelihoods.  Given the systemic pressure

applied to appraisers, upon information and belief, the appraisers themselves, the originators, and

the underwriters did not believe that the appraised values of the properties -- and therefore LTV

ratios -- were true and accurate at the time they communicated the information to potential

investors, including Freddie Mac.

260.    Further, the Fraud Defendants and Ally Sponsor knew or were reckless in not

knowing that the credit ratings reported for the Certificates failed to reflect the actual risk of the

securities, and that the ratings agencies had no basis to believe in the accuracy of those ratings.

Not only did these Defendants provide the ratings agencies false, loan-level information, but they

also routinely engaged in "ratings shopping" -- *i.e.*, pressuring the ratings agencies for favorable

ratings and playing the rating agencies off one another with the threat of withholding future

business if the sponsoring bank was not given favorable treatment.  As detailed in the SPSI

Report:

> At the same time Moody's and S&P were pressuring their RMBS
> and CDO analysts to increase market share and revenues, the
> investment banks responsible for bringing RMBS and CDO
> business to the firms were pressuring those same analysts to ease
> rating standards.  Former Moody's and S&P analysts and managers
> interviewed by the Subcommittee described, for example, how
> investment bankers pressured them to get their deals done quickly,
> increase the size of the tranches that received AAA ratings, and
> reduce the credit enhancements protecting the AAA tranches from
> loss.  They also pressed the CRA analysts and managers to ignore
> a host of factors that could be seen as increasing credit risk.
> Sometimes described as "ratings shopping," the analysts described
> how some investment bankers threatened to take their business to
> another credit rating agency if they did not get the favorable
> treatment they wanted.  The evidence collected by the
> Subcommittee indicates that the pressure exerted by investment
> banks frequently impacted the ratings process, enabling the banks
> to obtain more favorable treatment than they otherwise would have
> received.

(SPSI Report, at 278.)

261.    As one S&P director put it in an August 8, 2006 e-mail:  "[Our RMBS friends

have] become so beholden to their top issuers for revenue [that] they have all developed a kind

of Stockholm syndrome which they mistakenly tag as Customer Value creation."  (SPSI Report

at 277.)  Ratings analysts who complained about the pressure, or did not do as they were told,

were quickly replaced on deals or terminated.

262.    Summarizing the intense pressure investment banks put on ratings analysts to

provide favorable ratings, a former Moody's VP and Senior Credit Officer testified before the

FCIC that:

> The willingness to decline to rate, or to just say no to proposed
> transactions, steadily diminished over time.  That unwillingness to
> say no grew in parallel with the company's share price and the
> proportion of total firm revenues represented by structured finance
> transactions . . . coincident with the steady drive toward
> *commoditization* of the instruments we were rating . . . .  The threat
> of losing business . . . even if not realized, absolutely tilted the
> balance away from independent arbiter of risk towards a captive
> facilitator of risk transfer . . . .  The message from management
> was . . . "Must say yes."

(*See* Written Testimony of Richard Michalek (FCIC Hearing, June 2, 2010), *available at*

http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2008-0602-Michalek-corrected-

oral.pdf; *see also* Written Statement of Eric Kolchinsky, Managing Director, Moody's

Derivatives Group ("Managers of rating groups were expected by their supervisors and

ultimately the Board of Directors . . . to build, or at least maintain, market shares.  It was an

unspoken understanding that loss of market share would cause a manager to lose his or her job;"

"[L]owering credit standards . . . was one easy way for a managing director to regain market

share."), *available at*

http://hsgac.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=bd65f802-961c-

4727-b176-72ece145baef.)

D.    **Freddie Mac Justifiably Relied on the Misrepresentations
and Omissions in the Offering Materials and Was
Damaged by the Fraud Defendants' Fraudulent Conduct**

263.    Freddie Mac is a government-sponsored enterprise chartered by Congress to

provide liquidity, stability, and affordability to the U.S. housing and mortgage markets.  In

furtherance of this mission, Freddie Mac purchases mortgages and invests in RMBS.

264.    Generally when purchasing RMBS, Freddie Mac requires compliance with its

investment requirements, as well as various representations and warranties concerning, among

other things, the credit quality of the underlying loans, evaluation of the borrower's ability to

pay, the accuracy of loan data provided, and adherence to applicable local, state and federal law.

Such representations and warranties were material to Freddie Mac's decision to purchase RMBS,

including the Certificates.

265.    The Fraud Defendants, Ally Sponsor, and Ally Depositors intended for investors,

including Freddie Mac, to rely on their representations of material facts about the assets backing

the Certificates.  The Fraud Defendants, Ally Sponsor, and Ally Depositors instructed investors

to rely on the information provided by them in the Registration Statements and no other

information.  Thus, the RAMP 2005-EFC7 Prospectus Supplement states:  "You should rely on

the information provided in this prospectus and the accompanying prospectus supplement,

including the information incorporated by reference. . . . We have not authorized anyone to

provide you with different information."  The Prospectus Supplements for the remaining

Securitizations contain similar language.

266.    Furthermore, these Defendants regularly provided prospective RMBS investors

with information concerning the volume of their annual securitization business to assure

investors that, by virtue of their expertise in and share of the RMBS market, Freddie Mac should

rely upon the representations and warranties in their Offering Materials.  (*See, e.g.*, RALI 2006-QO8 Prospectus Supplement.)

267.    The Fraud Defendants, Ally Sponsor, and Ally Depositors knew that Freddie Mac had specific requirements for investing in non-agency mortgage-backed securities and the Fraud Defendants, Ally Sponsor, and Ally Depositors intended for Freddie Mac to rely on their fraudulent misstatements as shown by their provision of representations, warranties and anticipated credit ratings in connection with the Certificates, and their repetition of false loan statistics in term sheets, free writing prospectuses, and Prospectus Supplements, among other Offering Materials.

268.    When the Fraud Defendants, Ally Sponsor, and Ally Depositors made misrepresentations and omissions in the Offering Materials, they were aware of Freddie Mac's investment requirements for purchasing RMBS.  For example, Freddie Mac's guidelines to sellers provided, among other things:

> The methodology used in underwriting the extension of credit for each mortgage loan in the trust employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely solely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such extension.  Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had the ability to make timely payments on the mortgage loan.

269.    Accordingly, Freddie Mac required the Defendants to provide representations and warranties regarding the origination and quality of the mortgage loans, including that the mortgage loans had been underwritten by the loan originators pursuant to extensive guidelines.

270.    Freddie Mac relied, to its detriment, on the Fraud Defendants', Ally Sponsor's, and Ally Depositors' misrepresentations and material omissions in the Offering Materials.

271.    Freddie Mac's reliance was justifiable because Freddie Mac necessarily was required to rely upon the Fraud Defendants, Ally Sponsor, and Ally Depositors to provide accurate information regarding the loans. Freddie Mac, as an investor, lacked access to the actual loan files, and the loan-level data essential to perform the necessary statistical tests with respect to, among other things, owner-occupancy and LTV ratios.

272.    Freddie Mac's reliance also was justifiable because industry practice was for an investor to rely upon the representations and warranties of the sponsors and underwriters regarding the quality of the mortgage loans and the standards under which they were originated. Information regarding the originators' compliance with underwriting guidelines, owner-occupancy rates, LTV ratios, and data provided to credit ratings agencies, was peculiarly within the knowledge of the Fraud Defendants, Ally Sponsor, and Ally Depositors and investors were therefore required to rely upon the representations made by the sponsors, depositors, and underwriters to address the asymmetry of information concerning the mortgage loans underlying the securitizations.

273.    The Offering Materials, including those filed with the SEC, did not provide sufficient information about the individual mortgage loans underlying the Certificates to render the Fraud Defendants', Ally Sponsor's, and Ally Depositors' false statements or omissions not misleading. While some aggregate data was provided about the mortgage loans in the collateral pool, such information did not disclose risk layering, or how many loans contained multiple risk factors. For example, the aggregate data may have disclosed how many borrowers had FICO scores below 650 and how many loans had LTV ratios greater than 80 percent, but it did not disclose how many loans had both characteristics. A loan originator applying underwriting guidelines would have evaluated such risk factors as a whole before extending a loan to the

borrower.  Had the Non-Party Originators actually complied with their stated underwriting guidelines, as represented in the Offering Materials, the aggregated data provided in the Offering Materials would not have been misleading as to the credit quality of the loans.

274.    Moreover, even if RMBS investors were expected to verify the information concerning each of the thousands of mortgage loans backing the Certificates -- and they are not -- Freddie Mac would not have been able to discover the Fraud Defendants', Ally Sponsor's, and Ally Depositors' misrepresentations and omissions concerning the mortgage loans prior to the closing.  The Offering Materials represented what the expected composition of the loan pool would be on the closing date.  The mortgage loan pools were not fully populated at the time of the misrepresentations and omissions, such that Freddie Mac necessarily had to rely on the accuracy of the information provided by the Fraud Defendants, Ally Sponsor, and Ally Depositors.  (*Compare* Table 3 (Prospectus Supplement Dates) *with* Table 10 (Settlement Dates).)  For example, the Prospectus Supplement for RASC 2007-KS3 was filed on March 28, 2007, but the settlement date -- *i.e.*, when the loans were assigned to the trust -- did not occur until several weeks later, on April 19, 2007.  (*See id.*)  Moreover, the Prospectus Supplements for all of the Securitizations described what the mortgage loan pool would be at the time of closing.

275.    Freddie Mac was induced into buying the Certificates based on the false and misleading Offering Materials.  Freddie Mac would not have purchased the Certificates had it known the truth concerning the matters alleged herein.  Alternatively, Freddie Mac suffered damages because the price it paid for the Certificates was higher than the Certificates' actual value.

276.    From the day Freddie Mac purchased the Certificates, Freddie Mac suffered

injury.  As a result of Defendants' misrepresentations, the true value of the Certificates on the

date of purchase was far lower than the price paid for them by Freddie Mac.

## FIRST CAUSE OF ACTION

**Violation of Section 11 of the Securities Act of 1933
(Against Defendants Ally Securities, JPMSI, Credit Suisse,
RBS, Citi, Barclays, UBS and Goldman Sachs)**

277.    Plaintiff realleges paragraphs 1 through 176 above as if fully set forth herein.  For

purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be

construed as sounding in fraud.

278.    This claim is brought by FHFA pursuant to Section 11 of the Securities Act of

1933 and is asserted on behalf of Freddie Mac, which purchased the Certificates issued pursuant

to the Registration Statements for the Securitizations listed in paragraph 46.

279.    This claim is for strict liability based on the material misstatements and omissions

in the Registration Statements, which registered securities that were *bona fide* offered to the

public on or after September 6, 2005, for the 21 Securitizations (as specified in Table 1, *supra* at

paragraph 47), and is asserted against the Underwriter Defendants.

280.    The Underwriter Defendants acted as underwriters in connection with the sale of

the Certificates for each of the 21 Securitizations (as specified in Table 1, *supra* at paragraph 47),

directly and indirectly participated in distributing the Certificates, and directly and indirectly

participated in drafting and disseminating the Registration Statements, which registered

securities that were *bona fide* offered to the public on or after September 6, 2005.  The

Underwriter Defendants were underwriters for the Certificates, and are strictly liable for the

misstatements and omissions in the Registration Statements under Section 11 of the Securities

Act of 1933.

281.    At the time that they became effective, each of the Registration Statements, as set forth above, contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated or omitted were material to a reasonable investor in the Certificates sold pursuant to the Registration Statements.

282.    The untrue statements of material facts and omissions of material fact in the Registration Statements are principally those set forth herein in Sections I.C. & I.D. and Appendix A, and pertain to purported compliance with underwriting guidelines, occupancy status, loan-to-value ratios and credit ratings.

283.    Freddie Mac purchased or otherwise acquired the Certificates pursuant to the false and misleading Registration Statements and in the primary market.  At the time it purchased the Certificates, Freddie Mac was unaware of the false and misleading statements and omissions alleged herein, and if Freddie Mac had known those facts, it would not have purchased the Certificates.

284.    The Underwriter Defendants were obligated to make a reasonable investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct, and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

285.    The Underwriter Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.

286.    By virtue of the foregoing, Freddie Mac sustained substantial damages, including depreciation in the value of the Certificates, as a result of the misstatements and omissions in the

Registration Statements.  Plaintiff is entitled to damages, jointly and severally, from each of the

Underwriter Defendants.

287.    Based on the foregoing, the Underwriter Defendants are jointly and severally

liable for their wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against Defendants Ally Securities, JPMSI, Credit Suisse,
### RBS, Citi, Barclays, UBS and Goldman Sachs)

288.    Plaintiff realleges paragraphs 1 through 176 as if fully set forth herein.  For

purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be

construed as sounding in fraud.

289.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities

Act of 1933 and is asserted on behalf of Freddie Mac, which purchased the Certificates issued

pursuant to the Registration Statements in the Securitizations listed in paragraph 47.

290.    The Underwriter Defendants are prominently identified as underwriters in each of

the Prospectuses (which include the Prospectus Supplements) used to sell the Certificates.  The

Underwriter Defendants offered, promoted, and/or sold the Certificates publicly, including

selling to Freddie Mac their Certificates, as set forth in the "Plan of Distribution" or

"Underwriting" sections of the Prospectuses.  The Underwriter Defendants offered, promoted,

and/or sold the Certificates to Freddie Mac as specified in Tables 1, *supra* at paragraph 47, and

Table 10, *supra* at paragraph 172, respectively.

291.    The Underwriter Defendants offered, promoted, and/or sold the Certificates to

Freddie Mac by means of the Prospectuses that contained untrue statements of material facts and

omitted to state material facts necessary to make the statements, in light of the circumstances

under which they were made, not misleading.  The Underwriter Defendants successfully solicited

Freddie Mac's purchases of the Certificates, and generated millions of dollars in commissions in connection with the sale of the Certificates.

292.    The Underwriter Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

293.    The Underwriter Defendants actively participated in the solicitation of Freddie Mac's purchase of the Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and/or assisting in marketing and selling the Certificates.

294.    Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

295.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Sections I.C. & I.D. and Appendix A and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

296.    The Underwriter Defendants offered and sold the Certificates directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

297.    The Underwriter Defendants owed to Freddie Mac a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  The Underwriter Defendants failed to exercise such reasonable care, and in the exercise of reasonable care should

have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

298.    Freddie Mac did not know of the misstatements and omissions contained in the Prospectuses at the time they purchased the Certificates.  If Freddie Mac had known of those misstatements and omissions, it would not have purchased the Certificates.

299.    Freddie Mac acquired the Certificates in the primary market pursuant to the Prospectuses.

300.    Freddie Mac sustained substantial damages in connection with its investments in the Certificates and has the right to rescind and recover the consideration paid for the Certificates, with interest thereon.  Plaintiff hereby seeks rescission and makes any necessary tender of its Certificates.  In the alternative, Plaintiff seeks damages according to proof.

### THIRD CAUSE OF ACTION

### Violation of Section 15 of the Securities Act of 1933
### (Against GMACM and Ally Financial)

301.    Plaintiff realleges paragraphs 1 through 176 above as if fully set forth herein.  For purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be construed as sounding in fraud.

302.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against GMACM and Ally Financial for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

303.    The Ally Sponsor was the sponsor for all 21 Securitizations carried out pursuant to the Registration Statements filed by the Ally Depositors (as specified in Table 1, *supra* at paragraph 47), and culpably participated in their violations of Sections 11 and 12(a)(2) by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the

structure of the Securitizations, selecting the Ally Depositors as special-purpose vehicles, and

selecting the Underwriter Defendants as underwriters.  In its role as sponsor, the Ally Sponsor

knew and intended that the mortgage loans it purchased would be sold in connection with the

securitization process, and that certificates representing the ownership interests of investors in

the mortgages would be issued by the relevant trusts.

304.    The Ally Sponsor sold the mortgage loans to the Ally Depositors (as specified in

Table 1, *supra* at paragraph 47), and conveyed the mortgage loans to the Ally Depositors

pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase

Agreement.  RFC controlled all aspects of the business of the Ally Depositors, who were special-

purpose entities created for the purpose of acting as a pass-through for the issuance of the

Certificates.  As set forth in paragraph 63, *supra*, the officers and directors of the Ally Sponsor

overlapped with the officers and directors of the Ally Depositors.  In addition, the Ally Sponsor

was able to, and did in fact, control the contents of the Registration Statements filed by the Ally

Depositors, including the Prospectuses and Prospectus Supplements that contained material

misstatements of fact and omitted facts necessary to make the contents therein not misleading.

305.    GMAC-RFC is the corporate parent of, and controlled the business operations of,

the Ally Sponsor and Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and

directors of GMAC-RFC overlapped with the officers and directors of the Ally Depositors.  As

the sole corporate parent of the Ally Sponsor and Ally Depositors, GMAC-RFC had the practical

ability to direct and control the actions of the Ally Sponsor and Ally Depositors in issuing and

selling the Certificates, and in fact exercised such direction and control over the activities of the

Ally Sponsor and Ally Depositors.

306.    GMAC-RFC oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Ally Depositors and the issuing trusts to serve as conduits for the mortgage loans.

307.    ResCap wholly owns GMAC-RFC and is thus, a parent of RFC and the Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and directors of ResCap overlapped with the officers and directors of GMAC-RFC and the Ally Depositors.  ResCap oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Ally Depositors and the issuing trusts to serve as conduits for the mortgage loans.

308.    Defendant GMACM wholly owns ResCap, and is thus, a parent of GMAC-RFC, RFC, and the Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and directors of GMACM overlapped with the officers and directors of ResCap.  GMACM oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Ally Depositors and the issuing trusts to serve as conduits for the mortgage loans.

309.    Defendant Ally Financial wholly owns GMACM and Ally Securities and is the ultimate parent of ResCap, GMAC-RFC, the Ally Sponsor, and the Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and directors of Ally Financial overlapped with the officers and directors of GMACM and ResCap.  As the sole corporate parent of Ally Securities, Ally Financial had the practical ability to direct and control the actions of Ally Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of Ally Securities in connection with the issuance and sale of the Certificates.  Ally culpably

participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of

its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the

Registration Statements and established special-purpose financial entities such as the Ally

Depositors and the issuing trusts to serve as conduits for the mortgage loans.

310.    Ally Financial and GMACM are controlling persons within the meaning of

Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of

the Ally Sponsor, Ally Securities, and Ally Depositors at the time of the wrongs alleged herein

and as set forth herein, including their control over the content of the Registration Statements.

311.    Freddie Mac purchased the Certificates in the primary market.  The Certificates

were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus

Supplements, which at the time they became effective, contained material misstatements of fact

and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated

and omitted were material to a reasonable investor reviewing the Registration Statements.

312.    Freddie Mac did not know of the misstatements and omissions in the Registration

Statements; had Freddie Mac known of those misstatements and omissions, it would not have

purchased the Certificates.

313.    Freddie Mac has sustained damages as a result of the misstatements and

omissions in the Registration Statements, for which it is entitled to compensation.

## FOURTH CAUSE OF ACTION

### Primary Violations of the Virginia Securities Act
### (Against Ally Securities, JPMSI, Credit Suisse,
### RBS, Citi, Barclays, UBS and Goldman Sachs)

314.    Plaintiff realleges paragraphs 1 through 176 above as if fully set forth herein.  For

purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be

construed as sounding in fraud.

315.    This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac with respect to those Certificates identified above that were purchased by Freddie Mac and issued pursuant to the Registration Statements.

316.    The Underwriter Defendants (as specified in Table 1, *supra* at paragraph 47) made false and materially misleading statements in the Prospectuses for the Securitizations effected under the Shelf Registration Statements.

317.    The Underwriter Defendants are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  The Underwriter Defendants offered the Certificates publicly, including selling to Freddie Mac the Certificates, as set forth in the "Method of Distribution" or equivalent underwriting section of each Prospectus.

318.    The Underwriter Defendants offered and sold the Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  The Underwriter Defendants reviewed and participated in drafting the Prospectuses.

319.    The Underwriter Defendants successfully solicited Freddie Mac's purchases of the Certificates.  The Underwriter Defendants were paid a substantial commission based on the amount it received from the sale of the Certificates to the public.

320.    The Underwriter Defendants offered the Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

321.    The Underwriter Defendants actively participated in the solicitation of the Freddie Mac's purchase of the Certificates, and did so in order to benefit itself.  Such solicitation

included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the Certificates.

322.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Freddie Mac.

323.    The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above, and include compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

324.    The Underwriter Defendants offered and sold the Certificates directly to Freddie Mac pursuant to the materially false, misleading, and incomplete Prospectuses.

325.    The Underwriter Defendants owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

326.    The Underwriter Defendants failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

327.    In contrast, Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time it

purchased the Certificates.  If Freddie Mac had known of those untruths and omissions, it would

not have purchased the Certificates.

328.    Freddie Mac sustained substantial damages in connection with its investments in

the Certificates and has the right to rescind and recover the consideration paid for the

Certificates, with interest thereon.  Plaintiff hereby seeks rescission and makes any necessary

tender of its Certificates.  In the alternative, Plaintiff seeks damages according to proof.

### FIFTH CAUSE OF ACTION

**Controlling Person Liability Under the Virginia Securities Act
(Against GMACM and Ally Financial)**

329.    Plaintiff realleges paragraphs 1 through 176 above as if fully set forth herein.  For

purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be

construed as sounding in fraud.

330.    This claim is brought under Section 13.1-522(C) of the Virginia Code and is

asserted on behalf of Freddie Mac, which purchased the Certificates (identified in Table 10,

*supra* at paragraph 172) that were issued pursuant to the Registration Statements.  This claim is

brought against GMACM and Ally Financial for controlling-person liability with regard to the

claim brought by Plaintiff pursuant to Section 13.1-522(A)(ii).

331.    The Ally Sponsor was the sponsor for all 21 Securitizations carried out pursuant

to the Registration Statements filed by the Ally Depositors (as specified in Table 1, *supra* at

paragraph 47), and culpably participated in their violations of Section 13.1-522(A)(ii) by

initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the

structure of the Securitizations, selecting the Ally Depositors as special-purpose vehicles, and

selecting the Underwriter Defendants as underwriters.  In its role as sponsor, the Ally Sponsor

knew and intended that the mortgage loans it purchased would be sold in connection with the

securitization process, and that certificates representing the ownership interests of investors in

the mortgages would be issued by the relevant trusts.

332.    The Ally Sponsor sold the mortgage loans to the Ally Depositors (as specified in

Table 1 *supra* paragraph 47), and conveyed the mortgage loans to the Ally Depositors pursuant

to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  The

Ally Sponsor controlled all aspects of the business of the Ally Depositors, who were special-

purpose entities created for the purpose of acting as a pass-through for the issuance of the

Certificates.  As set forth in paragraph 63, *supra*, the officers and directors of the Ally Sponsor

overlapped with the officers and directors of the Ally Depositors.  In addition, the Ally Sponsor

was able to, and did in fact, control the contents of the Registration Statements filed by the Ally

Depositors, including the Prospectuses and Prospectus Supplements that contained material

misstatements of fact and omitted facts necessary to make the contents therein not misleading.

333.    GMAC-RFC is the corporate parent of, and controlled the business operations of,

the Ally Sponsor and Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and

directors of GMAC-RFC overlapped with the officers and directors of the Ally Depositors.  As

the sole corporate parent of the Ally Sponsor and Ally Depositors, GMAC-RFC had the practical

ability to direct and control the actions of the Ally Sponsor and Ally Depositors in issuing and

selling the Certificates, and in fact exercised such direction and control over the activities of the

Ally Sponsor and Ally Depositors.

334.    GMAC-RFC oversaw the actions of its subsidiaries and allowed them to

misrepresent the mortgage loans' characteristics in the Registration Statements and established

special-purpose financial entities such as the Ally Depositors and the issuing trusts to serve as

conduits for the mortgage loans.

335.    ResCap wholly owns GMAC-RFC and is thus, a parent of the Ally Sponsor and Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and directors of ResCap overlapped with the officers and directors of GMAC-RFC and the Ally Depositors.  ResCap oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Ally Depositors and the issuing trusts to serve as conduits for the mortgage loans.

336.    Defendant GMACM wholly owns ResCap, and is thus, a parent of GMAC-RFC, the Ally Sponsor and Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and directors of GMACM overlapped with the officers and directors of ResCap.  GMACM culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Ally Depositors and the issuing trusts to serve as conduits for the mortgage loans.

337.    Defendant Ally Financial wholly owns and controls GMACM and Ally Securities and is the ultimate parent of GMACM, ResCap, GMAC-RFC, the Ally Sponsor, and Ally Depositors.  As set forth in paragraph 80, *supra*, the officers and directors of Ally Financial overlapped with the officers and directors of GMACM and ResCap.  As the sole corporate parent of Ally Securities, Ally Financial had the practical ability to direct and control the actions of Ally Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of Ally Securities in connection with the issuance and sale of the Certificates.  Ally Financial culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans'

characteristics in the Registration Statements and established special-purpose financial entities such as the Ally Depositors and the issuing trusts to serve as conduits for the mortgage loans.

338.    Ally Financial and GMACM are controlling persons within the meaning of Section 13.1-522(C) of the Virginia Code by virtue of their actual power over, control of, ownership of, and/or directorship of the Ally Sponsor, Ally Securities, and Ally Depositors at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

339.    Freddie Mac purchased the Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and specifically to Freddie Mac.

340.    Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the Certificates.

341.    Freddie Mac has sustained substantial damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation, and for which the Control Persons are jointly and severally liable.

### SIXTH CAUSE OF ACTION

**Common Law Fraud**
**(Against Ally Securities, JPMSI and Goldman Sachs)**

342.    Plaintiff realleges paragraphs 1 through 276 as if fully set forth herein.

343.    Freddie Mac was fraudulently induced to purchase the Certificates by the Fraud Defendants' misrepresentations and omissions of material facts.

344.    The material representations set forth above and in Appendix A and Appendix B were fraudulent, and the Fraud Defendants' representations falsely and misleadingly misrepresented and omitted material statements of fact.  The representations at issue are identified in Sections I.C. and I.D. and in Appendix A and Appendix B.

345.    The Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made, or made such representations and omissions recklessly without knowledge of their truth or falsity.

346.    Each of the Fraud Defendants made the misleading statements with the intent and for the purpose of inducing Freddie Mac to purchase the Certificates.

347.    Freddie Mac justifiably relied on the Fraud Defendants' false representations and misleading omissions.

348.    But for the Fraud Defendants' fraudulent misrepresentations and omissions regarding the Fraud Defendants' underwriting practice and quality of the loans making up the securitizations, Freddie Mac would not have purchased the Certificates.

349.    As a result of the foregoing, Freddie Mac has suffered damages in an amount to be proven at trial.  Plaintiff hereby demands rescission and makes any necessary tender of the Certificates.

350.    Because the Fraud Defendants defrauded Freddie Mac willfully and wantonly, and because, by their acts, the Fraud Defendants knowingly affected the general public, including but not limited to all persons with interest in the Certificates, Plaintiff is entitled to recover punitive damages.

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting Fraud
### (Against Ally Financial and GMACM)

351.    Plaintiff realleges paragraphs 1 through 276 as if fully set forth herein.

352.    This is a claim for aiding and abetting fraud against Ally and GMACM arising

from the intentional and substantial assistance each rendered to the Fraud Defendants to advance

the fraud on Freddie Mac.

353.    Through overlapping personnel, strategies, and intertwined business operations,

and the fluid transfer of information among the Defendants, Ally Financial and GMACM knew

of the Fraud Defendants', Ally Sponsor's, and Ally Depositors' fraudulent scheme to offload the

credit risks of non-agency loans to investors, including Freddie Mac.  Each of these Defendants

acted in concert to defraud Freddie Mac.

354.    Ally Financial and GMACM through their employees and representatives,

substantially assisted in, among other things: (a) the extension of warehouse loans to originators;

(b) acquiring the underlying mortgage loans from the originators; (c) packaging up those loans

into pools which were deposited into the Trust; (d) waiving into the collateral pools of the Trusts

loans previously rejected by Clayton or otherwise non-compliant loans, despite the lack of

compensating factors; (e) creating and structuring the Trusts whose Certificates would be sold to

investors including Freddie Mac; and (f) preparing the Registration Statements which would be

used to market the Certificates.

355.    The Fraud Defendants, Ally Sponsor, and Ally Depositors would not have been

able to implement their fraud against Freddie Mac without such substantial assistance.

356.    Through overlapping personnel, strategies, and intertwined business operations, and the fluid transfer of information among the Defendants, each of the Fraud Defendants knew of the fraud perpetrated on Freddie Mac.

357.    The Fraud Defendants, Ally Sponsor, and Ally Depositors could not have perpetrated their fraud without the substantial assistance of Ally Financial and GMACM, in the form of financial, strategic, and marketing assistance for their scheme.  Through the fraudulent sale of the Certificates to the Freddie Mac, the Fraud Defendants, Ally Sponsor, and Ally Depositors were able to materially improve their financial condition by reducing their exposure to declining subprime-related assets and garnering millions of dollars in fees from the structuring and sale of the Certificates.

358.    As a direct, proximate, and foreseeable result of the conduct of Ally Financial and GMACM Freddie Mac has suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiff hereby demands rescission and makes any necessary tender of the Certificates.

359.    Because the Fraud Defendants defrauded Freddie Mac willfully and wantonly, and because, by their acts, the Fraud Defendants knowingly affected the general public, including but not limited to all persons with interests in the Certificates, Plaintiff is entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that judgment be entered:

An award in favor of Plaintiff against all Defendants, jointly and severally, for:

a. Rescission and recovery of the consideration paid for the Certificates, with interest thereon (in connection with this request for rescission, the Certificates are hereby tendered to the Defendants);

b. Freddie Mac's monetary losses, including any diminution in value of the Certificates, lost principal and lost interest payments thereon, and consequential damages, including the cost of investigating the misrepresentations and performance of the underlying collateral to the Certificates, as well as any increased coupon payment on Freddie Mac's senior preferred stock held by the U.S. Treasury Department, arising from losses on the Certificates;

c. Punitive damages;

d. Attorneys' fees and costs;

e. Prejudgment interest at the maximum legal rate; and

f. Such other and further relief as the Court may deem just and proper.

DATED:        New York, New York
              June 13, 2012

KASOWITZ, BENSON TORRES
  & FRIEDMAN LLP

By: _____
    Marc E. Kasowitz (mkasowitz@kasowitz.com)
    Hector Torres (htorres@kasowitz.com)
    Christopher P. Johnson (cjohnson@kasowitz.com)
    Michael Hanin (mhanin@kasowitz.com)
    Kanchana Wangkeo Leung (kleung@kasowitz.com)

1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiff*
*Federal Housing Finance Agency, as Conservator for*
*the Federal Home Loan Mortgage Corporation*

## EXHIBIT B

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019-6799

212-506-1700

FACSIMILE: 212-506-1800

MARC E. KASOWITZ
212-506-1710
mkasowitz@kasowitz.com

ATLANTA
HOUSTON
MIAMI
NEWARK
SAN FRANCISCO

July 30, 2012

**By Hand Delivery and Email**

Hon. Denise L. Cote
United States District Court
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re: *Federal Housing Finance Agency v. Ally Financial, Inc., et al.*, 11 Civ. 7010 (DLC)

Dear Judge Cote:

We represent plaintiff Federal Housing Finance Agency ("FHFA") in the above-referenced action. Pursuant to the Court's Order, dated July 24, 2012, we write to seek the Court's assistance in resolving certain discovery disputes between FHFA and defendants Ally Financial Inc. ("AFI") and GMAC Mortgage Group, Inc. ("GMACM," together with AFI, "Ally").

On July 17, 2012, you inquired whether documents existed that FHFA needed from Ally's debtor affiliate, ResCap beyond loan tapes and loan files and gave FHFA permission to take a 30(b)(6) deposition of Ally to clarify the issue. (7/17/12 Tr. 20: 12-15, 26:24-27:3). On July 19, plaintiff served its 30(b)(6) deposition notice, which set forth topics aimed at determining, primarily (i) what categories of responsive documents are in the possession, custody, or control of the Debtors and/or Ally; (ii) any purported burden on the Debtors to produce such documents; and (iii) the extent to which Ally has the legal or practical ability to obtain those documents from the Debtors. (*See* Ex. A).

Although plaintiff informed Ally of its willingness to meet and confer regarding the 30(b)(6) deposition notice, Ally has not provided any information on which to have meaningful discussion nor has it served responses and objections to the notice. Ally advised us after the close of business on Friday that it would not be able to meet and confer until 2 p.m. today. Ally has not advised when it will produce a witness competent to testify regarding the Debtors' possession, custody, or control of documents, or any other parameters regarding the notice.

Ally's delay is extremely prejudicial to plaintiff because Ally has taken the position that the documents, including emails, of the Debtors' current or former employees are not within Ally's possession, custody, or control. Ally will only search the emails and electronically stored information of **four** custodians and refuses to search that of the Debtors' current or former employees—despite the fact that Ally identified at least **36** employees of Residential Funding

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Corp. ("RFC") as individuals who are likely to have discoverable information. (Exs. B, C). Ally's position is unsupportable. For example, if the emails of former RFC employees are retained on a server in a building owned by Ally, Ally should be ordered to search and produce responsive emails. The untenable nature of Ally's position is highlighted by one of its own proposed custodians, Jim Young, whom Ally identified as the former CFO of ResCap. (Ex. D; Ex. C at *2 (identifying Young's role)).

As Your Honor aptly observed, "we need to get all the critical documents produced so that they can be analyzed before the depositions begin in January." (7/17/12 Tr. 27:1-3). Ally's refusal to provide information or even make itself available to meet and confer until 2 p.m. today, renders plaintiff unable to articulate specific disputes concerning the 30(b)(6) deposition of Ally. However, to the extent these issues remain outstanding after the meet and confer today, at tomorrow's conference, we would ask you to resolve any remaining disagreements concerning the 30(b)(6) deposition, and direct Ally to produce competent witnesses by August 6, at the latest, for the topics set forth in plaintiff's notice. The Bankruptcy Court is scheduled to hear FHFA's application for loan tapes and loan files on August 14, and FHFA needs time to supplement its application to obtain additional documents from the Debtors based on the information provided at the 30(b)(6) deposition, if so directed by this Court.

Respectfully,

Marc E. ᴘ

Marc E. Kasowitz

cc:    Counsel of record (via email)

2