MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
)
In re:                                              )    Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )    Chapter 11
                                                    )
                            Debtors.                )    Jointly Administered
                                                    )
-------------------------------------------------------------------

**DEBTORS' OBJECTION TO MOTION OF CHRISTINA ULBRICH
FOR RELIEF FROM THE AUTOMATIC STAY AS TO GMAC MORTGAGE, LLC**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 3

    A.    General Chapter 11 Case Background ................................................. 3

    B.    Ulbrich Action ..................................................................................... 4

    C.    Other Pending Putative Class Actions Concerning Force-Placed Insurance Claims ............................................................................... 7

OBJECTION ........................................................................................................... 7

    D.    Relief From the Automatic Stay is Not Warranted at this Time........... 7

    E.    Movant Fails to Satisfy Her Burden Under Sonnax ............................. 9

    F.    Additional Sonnax Factors Support Continuation of the Stay........... 17

CONCLUSION....................................................................................................... 21

Exhibits:

Exhibit 1:      Delehey Declaration
Exhibit 2:      Appendix

# TABLE OF AUTHORITIES

Page(s)

CASES

Capital Comm. Fed. Credit Union v. Boodrow (In re Boodrow),
    126 F.3d 43 (2d Cir. 1997) ...................................................................................9

Carrera v. Bally Total Fitness (In re Bally Total Fitness of Greater N.Y., Inc.),
    411 B.R. 142 (S.D.N.Y. 2009).................................................................11, 13, 18

City Ins. Co. v. Mego Int'l Inc. (In re Mego Int'l Inc.),
    28 B.R. 324 (Bankr. S.D.N.Y. 1983).................................................................19

In re Bally Total Fitness of Greater N.Y., Inc.,
    402 B.R. 616 (Bankr. S.D.N.Y. 2009)........................................................ passim

In re Celotex Corp.,
    140 B.R. 912 (Bankr. M.D. Fla. 1992) .........................................................15, 20

In re Cuyahoga Equip. Corp.,
    980 F.2d 110 (2d Cir. 1992)...............................................................................20

In re Ephedra Prods. Liab. Litig.,
    329 B.R. 1 (S.D.N.Y. 2005)...........................................................................13, 17

In re Johns-Manville Corp.,
    26 B.R. 420 (Bankr. S.D.N.Y. 1983).................................................................11

In re Johns-Manville Corp.,
    41 B.R. 926 (S.D.N.Y. 1984).............................................................................11

In re Leibowitz,
    147 B.R. 341 (Bankr. S.D.N.Y. 1992)...............................................................9

In re Motors Liquidation Co.,
    Case. No. 10 Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 17, 2010)............9

In re Musicland Holding Corp.,
    362 B.R. 644 (Bankr. S.D.N.Y. 2007)...............................................................13

In re Northwest Airlines Corp.,
    2006 Bankr. LEXIS 477 (Bankr. S.D.N.Y. Mar. 13, 2006) .............................15, 20

In re Northwest Airlines Corp.,
    2006 WL 694727 (Bankr. S.D.N.Y. Mar. 3, 2006) .................................................16

In re Pioneer Commercial Funding Corp.,
    114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990) ................................................................12

In re Sacred Heart Hosp.,
    177 B.R. 16 (Bankr. E.D. Pa. 1995) ......................................................................18

In re Woodward & Lothrop Holdings, Inc.,
    205 B.R. 365 (Bankr. S.D.N.Y. 1997) .............................................................13, 17

In re Zenith Laboratories, Inc.,
    104 B.R. 659 (D.N.J. 1989) ....................................................................................15

Mazzeo v. Lenhart (In re Mazzeo),
    167 F.3d 139 (2d Cir. 1999) ..................................................................................8, 9

Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection,
    474 U.S. 494 (1986) ..................................................................................................8

Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),
    922 F.2d 984 (2d Cir. 1990) .....................................................................................8

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),
    907 F.2d 1280 (2d Cir. 1990) ........................................................................... passim

Teachers Ins. & Annuity Ass'n of Am. v. Butler,
    803 F.2d 61 (2d Cir. 1986) .......................................................................................8

**STATUTES**

11 U.S.C. § 362(a)(1) ......................................................................................................7

11 U.S.C. § 362(a)(1) ......................................................................................................8

ny-1052186

Residential Capital, LLC and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "***Debtors***") hereby submit this objection (the "***Objection***") to the *Motion of Christina Ulbrich for Relief from the Automatic Stay as to GMAC Mortgage, LLC*, dated July 3, 2012 [Docket No. 671] (the "***Motion***").  In support of hereof, the Debtors submit the Declaration of Lauren Delehey, dated August 7, 2012 (the "***Delehey Declaration***"), attached hereto as <u>Exhibit 1</u>, and respectfully represent:

<u>**PRELIMINARY STATEMENT**</u>

1.      Christina Ulbrich ("***Movant***") seeks relief from the automatic stay to pursue an action for damages against the Debtors entitled <u>Ulbrich v. GMAC Mortgage, LLC et al.</u> (the "***Ulbrich Action***") currently pending against GMAC Mortgage, LLC ("***GMAC***") and Balboa Insurance Services, Inc. ("***Balboa***") in the United States District Court for the Southern District of Florida (the "***Florida Court***").  Movant brings her claims on behalf of herself and potentially thousands of other claimants.   The Motion should be denied because Movant cannot satisfy her burden of establishing sufficient cause as to why her potentially massive and complex class action lawsuit should be permitted to proceed notwithstanding the statutorily imposed breathing spell to which the Debtors are entitled under section 362 of title 11 of the United States Code (the "***Bankruptcy Code***").

2.      First, the Motion ignores the vast burden that relief from the stay would place upon the Debtors and greatly overestimates the benefits that might flow from a grant of such relief.  As discussed below, there are three other putative class actions pending in different jurisdictions in which plaintiffs assert claims against the Debtors similar to those raised in the Ulbrich Action.  Granting Movant relief from the stay with respect to the Ulbrich Action would undoubtedly invite similar requests from others with class action claims pending against the Debtors.  Litigating the Ulbrich Action, which is nowhere near ready for trial and would require

1

significant discovery and preparation before it is litigated, would impose a substantial financial

burden on the Debtors (as they bear their own legal defense expenses and costs) and would

distract the Debtors' management and Legal Department (as defined below) and divert the

Debtors' resources at a critical juncture in the reorganization process.  Moreover, Movant

presents no evidence to suggest that she would be prejudiced by maintenance of the stay where

(i) the Debtors are in extensive negotiations to sell their mortgage servicing operations and

legacy loan portfolio and formulate a chapter 11 plan on an accelerated timeframe that would

enable the Debtors to emerge from bankruptcy expeditiously and (ii) time is not of the essence

with respect to the Ulbrich Action.

        3.      Moreover, the Ulbrich Action is just one of a substantial number of

lawsuits and proceedings for prepetition claims currently pending against the Debtors that are

being managed by the Legal Department across the country.  (Delehey Decl. ¶ 3.)[1]  As a policy

matter, the Debtors submit that it is simply too early in the Debtors' highly complex bankruptcy

cases (the "***Chapter 11 Cases***") for the Court to grant relief from the automatic stay for claimants

to proceed with actions and lawsuits against the Debtors, particularly one as inherently complex

as the Ulbrich Action.  Granting relief at this juncture would undoubtedly invite countless other

lift stay motions from the Debtors' myriad other prepetition claimants, opening the "floodgates"

---

[1] As of August 3, 2012, the Debtors by way of direct claims and counter-claims are defendants, respondents, or are contractually obligated to defend third parties in approximately 1,910 pending litigation and contested foreclosure and bankruptcy matters filed in jurisdictions all around the country involving a wide range of causes of action asserted against them, including in their capacities as loan servicers and originators of mortgage loans, as well as causes of action against third parties for which the Debtors are contractually obligated to defend.  This figure does not include the 62,618 accounts in foreclosure and 50,258 accounts in borrower bankruptcy-related proceedings primarily managed by the Debtors' mortgage default group (not by the Legal Department) to which the Debtors are a party to in connection with their mortgage loan servicing obligations.  Notwithstanding the application of the Supplemental Servicing Order (as defined below), there are still a substantial number of cases –approximately 450 cases – that are stayed by the automatic stay, including the Ulbrich Action and the Other Insurance Putative Class Actions.  (Delehey Decl. ¶ 3.)

to litigation which would impose a burden on the Debtors and their estates at a time when their remaining resources should be devoted to maximizing the value of their assets through the contemplated asset sales (discussed further below), consummating various settlements, proposing and confirming a Chapter 11 plan, and proceeding with the Chapter 11 claims resolution process.  Forcing the Debtors to address motions for relief from stay arising from, and potentially litigate, even a fraction of the suits in which they are named as defendants (including as a consequence of counterclaims) would deprive them of the "breathing spell" the automatic stay provides and distract them from addressing the critical tasks necessary to achieve a successful resolution of the Chapter 11 Cases.  (See Delehey Decl. ¶ 6-9.)  The Bankruptcy Code provides an orderly and centralized claims process meant to prevent a debtor from being forced to litigate claims in a piecemeal, ad hoc manner.  Granting relief from the stay at this early stage would in effect require the Debtors to conduct the claims resolution process in hundreds of forums across the country.

      4.     The burden imposed on the Debtors in terms of the time, financial resources, and attention necessary to defend themselves in the Ulbrich Action far outweighs any prejudice to the Movant in preserving the automatic stay as to the Debtors.   The Debtors therefore must oppose the Motion so that their estates – and their thousands of other creditors[2] – are not burdened and prejudiced by prepetition litigation proceeding against the Debtors.

      5.     For the above reasons, and as more fully set forth below, the Debtors respectfully request that this Court deny the Motion.

---

[2] See Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, ¶¶ 116; 118 [Docket No. 6] (the "*Whitlinger Affidavit*").

## BACKGROUND

### A.    General Chapter 11 Case Background

6.    On the Petition Date, each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"). No trustee has been appointed in these Chapter 11 cases.  On July 3, 2012, the Office of the United States Trustee for the Southern District of New York (the "***U.S. Trustee***") appointed the Honorable Arthur T. Gonzalez, former Chief Judge of the United States Bankruptcy Court for the Southern District of New York as examiner (the "***Examiner***").

7.    On May 16, 2012, the U.S. Trustee appointed a nine member official committee of unsecured creditors (the "***Creditors' Committee***").

### B.    Ulbrich Action

8.    On November 14, 2011, Movant filed her complaint (the "***Complaint***") against Defendants GMAC and Balboa in the Florida Court asserting money damages claims for GMAC's allegedly unlawful practice of purchasing insurance for Movant and other borrowers, and allegedly arranging for kickbacks or commissions from Balboa, the insurance company that issued the policies.  (Memorandum in support of the Motion, dated July 3, 2012 ((the "***MOL***), at ¶ 1.)  The Complaint also alleges one claim of unjust enrichment against Balboa, the insurance company that issued the policies in question.  (Compl. ¶ 7.)

9.    The Complaint seeks to litigate these claims on behalf of broadly defined proposed classes, specifically: (i) a "Nationwide" class, including all persons with residential mortgage loans or home equity lines of credit with GMAC who were charged for

4

lender-placed insurance by GMAC on or after November 14, 2006; (ii) a "Florida" class,

consisting of all persons with a residential mortgage loan or home equity line of credit with

GMAC secured by real property in the State of Florida who were charged for lender-placed

insurance by GMAC on or after November 14, 2007; (iii) an "Escrow" sub-class for those

persons whose lender-placed insurance premiums were escrowed by GMAC on or after

November 14, 2007; and (iv) a "Balboa" sub-class, consisting of those persons whose lender-

placed insurance policies were purchased by GMAC through Balboa.  (Compl., ¶ 61-64.)

According to Movant, the  Ulbrich Action could involve "thousands of GMAC's customers."

(Compl., ¶ 65.)

       10.     Movant and GMAC are currently parties to a standstill agreement,

pursuant to which, among other things, GMAC will not treat Movant's loan as being in default,

and will not take any action to foreclose on Movant's property while the action is pending.

(MOL, at p. 8.)

       11.     On January 13, 2012, GMAC filed a motion to compel arbitration and for

a stay of discovery while arbitration proceeded or, in the alternative, to dismiss the Complaint

(the "***GMAC MTD***").[3]  On the same day, Balboa also filed a motion to dismiss the Complaint

(together with the GMAC MTD, the "***Motions to Dismiss***").  (MOL, at p. 8.)  The Motions to

Dismiss have been briefed, but as of the date hereof, no decisions have been issued by the Court.

Limited discovery has occured.  (Delehey Decl. ¶ 10.)  On March 14, 2012, GMAC moved to

stay discovery pending the Florida Court's ruling on the Motions to Dismiss.  The Ulbrich

---

[3] At the same time that Movant obtained her home loan from GMAC (MOL, at p. 2), Movant received a home equity line of credit from GMAC in the amount of $100,00 (the "***HELOC***").  The agreement documenting the HELOC contained a broad arbitration provision, which required that any potential claim asserted by either Movant or GMAC against each other be resolved through arbitration.  See Motion of Defendant GMAC Mortgage, LLC to Compel Arbitration and For a Stay or, in the Alternative, to Dismiss the Complaint and Otherwise Strike the Jury Demand, dated January 13, 2012.  Court documents cited herein are included in the index annexed hereto as Exhibit 2.

Action is now stayed pursuant to the automatic stay as to GMAC only.  Movant and Balboa

jointly advised the Florida Court on May 23, 2012 that the case could proceed against Balboa

despite the stay as to GMAC.  (MOL, at p. 9.)

12.    On March 9, 2012, the Florida Court issued a scheduling order in the

Ulbrich Action (the "***Scheduling Order***") setting forth the following deadlines: (i) fact discovery

is to be completed by November 14, 2012; (ii) dispositive motions to be filed by November 29,

2012; (iii) expert discovery to be completed by January 14, 2013; and (iv) pretrial motions,

including evidentiary motions, to be filed by January 18, 2013.  (Scheduling Order, ¶ 1.)  The

case is set for a two-week trial beginning March 25, 2013.  (Scheduling Order, ¶ 1.)

13.    In addition, Movant has not yet moved for class certification and,

therefore, the parties have yet to undertake the vast amount of discovery relevant to a

determination on class certification should Movant do so.  (See Scheduling Order, ¶ 1; Delehey

Decl. ¶ 10.)  If the Court ultimately certifies a class, class members will need to be noticed  and

given an opportunity to "opt out" under Rule 23 of the Federal Rules of Civil Procedure.  A

trial on the merits for a certified class could be significantly more lengthy and complex than a

trial involving just Movant's claims.  (Delehey Decl. ¶ 10.)

**C.    Other Pending Putative Class Actions Concerning Lender-Placed Insurance
Claims**

14.    In addition to the Ulbrich Action, there are three other putative class

actions pending in different forums that raise substantially similar claims against GMAC

Mortgage regarding lender-placed insurance, including: (i) two in the United States District court

for the Eastern District of Pennsylvania, including (a) Cronk vs GMAC Mortgage, LLC, filed on

August 12, 2011[4]; and (b) Throm v. GMAC Mortgage, LLC, filed on October 31, 2011,[5] and

---

[4] See Cronk vs GMAC Mortgage, LLC, Case No.: 2:11-cv-06813 (E.D. Pa).

(ii) one in the United States District court for the Southern District of New York, <u>Rothstein v.</u>

<u>GMAC Mortgage, LLC et al.</u>, filed on April 30, 2012[6] (collectively, the "***Other Insurance***

***Putative Class Actions***").  While each is in various stages of litigation, each of the Other

Insurance Putative Class Actions seeks to litigate claims for lender-placed insurance on behalf of

broadly defined classes.  (Delehey Decl. ¶ 4.)  Each of the Other Insurance Putative Class

Actions are subject to the automatic stay.[7]

## OBJECTION

### D.    Relief From the Automatic Stay is Not Warranted at this Time

15.    The automatic stay imposed by section 362(a) of the Bankruptcy Code is a

core provision of bankruptcy law that promotes the reorganization process by providing the

debtor with "a breathing spell from [its] creditors."[8]  <u>Teachers Ins. & Annuity Ass'n of Am. v.</u>

<u>Butler</u>, 803 F.2d 61, 64 (2d Cir. 1986) (holding that the automatic stay applied to an appeal that

otherwise would "distract . . . debtor's attention from its primary goal of reorganizing") (citation

and internal quotation marks omitted).  It affords "one of the fundamental debtor protections

---

[5] <u>See</u> <u>Throm v. GMAC Mortgage, LLC</u>, Case No. 2:11-cv-06813  (E.D.N.Y.).

[6] <u>See</u> <u>Rothstein v. GMAC Mortgage, LLC et al.</u>, Case No.: 12-CV-3412 (S.D.N.Y.).

[7] The Ulbrich Action and the Other Insurance Putative Class Actions are identified in a motion pending before the United States Judicial Panel on Multidistrict Litigation seeking to include them and several other "related" matters raising claims for lender-placed insurance in a proposed consolidated multidistrict litigation proceedings (MDL Docket No. 2388) (the "***MDL Motion***").  The MDL Motion was filed by three plaintiffs in another action for lender-placed insurance claims, styled <u>Alberto Barreto, et. v. Chase Home Finance, et al.</u>, No. 12-cv-21988, which is currently pending before the United States District Court for the Southern District of Florida (an action to which GMAC is not a party).  (See Delehey Decl. ¶ 11.)]

[8] Section 362(a)(1) of the Bankruptcy Code provides, in pertinent part, that the filing of a bankruptcy petition: operates as a stay, applicable to all entities, of –

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

provided by the bankruptcy laws." <u>Midlantic Nat'l Bank v. New Jersey Dep't of Evntl.
Protection</u>, 474 U.S. 494, 503 (1986). Likewise, it allows the debtor to manage and, where
appropriate, centralize all creditor actions against property of the estate, "so that
reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other
arenas." <u>Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)</u>, 922 F.2d 984,
989 (2d Cir. 1990).

16.    Section 362(d)(1) of the Bankruptcy Code provides that a court may
grant relief from the automatic stay for "cause." <u>See</u> 11 U.S.C. § 362(d)(1). In the context of
stayed prepetition litigation, the Second Circuit has outlined a 12-factor test to determine
whether good cause exists to lift the stay to allow the litigation to proceed.[9] In a given case,
however, not all of the factors will be relevant, and the court may disregard irrelevant factors.
<u>See</u> <u>Mazzeo</u>, 167 F.3d at 143.

17.    The moving party bears the initial burden to demonstrate, using the
relevant <u>Sonnax</u> factors, that good cause exists for lifting the stay.[10] The movant's burden is
especially heavy if it is an unsecured creditor. "[T]he general rule is that claims that are not
viewed as secured in the context of § 362(d)(1) should not be granted relief from the stay unless
extraordinary circumstances are established to justify such relief."[11]

---

[9] <u>See</u> <u>Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)</u>, 907 F.2d 1280, 1286 (2d
Cir. 1990);[9] <u>see</u> <u>also</u> <u>Mazzeo v. Lenhart (In re Mazzeo)</u>, 167 F.3d 139, 143 (2d Cir. 1999) (vacating a district
court order granting stay relief where the bankruptcy court had not applied the <u>Sonnax</u> factors, made only sparse
factual findings and ultimately did not provide the appellate court "with sufficient information to determine what
facts and circumstances specific to the present case the court believed made relief from the automatic stay
appropriate.").

[10] <u>See</u> <u>Sonnax</u>, 907 F.2d at 1285. <u>See</u> <u>Capital Comm. Fed. Credit Union v. Boodrow (In re Boodrow)</u>, 126 F.3d
43, 48 (2d Cir. 1997) ("We have emphasized that a bankruptcy court should deny relief from the stay if the movant
fails to make an initial showing of cause.") (quotation omitted).

[11] <u>In re Leibowitz</u>, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992); <u>see</u> <u>also</u> <u>In re Motors Liquidation Co.</u>, Case. No. 10
Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 17, 2010).

ny-1052186

E.       **Movant Has Failed to Satisfy Her Burden Under <u>Sonnax</u>**

18.       Movant relies on three of the twelve Sonnax factors (factor numbers 2, 10,

and 12) as cause to lift the stay.  Movant misconstrues the facts, or the law, or both with respect

to each such factor.  Additionally, consideration of the remaining relevant <u>Sonnax</u> factors

demonstrates that the stay should not be lifted.[12]

**The Second <u>Sonnax</u> Factor: Lack of any connection**
**<u>with or interference with the bankruptcy case</u>**

19.       Movant could not be more mistaken when she asserts that lifting the stay

will not interfere with the Chapter 11 Cases.  (MOL, at p. 11.)  Significant attention must be

devoted to address the extraordinary operational difficulties that arise in the early stages of

complex Chapter 11 cases such as these.  In addition to addressing day-to-day challenges, the

Debtors must focus on the critical tasks necessary to achieve a successful resolution of these

cases, namely the preservation of the Debtors' going concern value through the sale of their

servicing platform and legacy assets through which the Debtors hope to maximize creditor

recoveries.[13]  The automatic stay is essential to the Debtors' ability to achieve this objective

because it permits the Debtors' management, employees, including the Debtors' in-house legal

department (the "***Legal Department***") and the Debtors' retained professionals to achieve the

objectives of these cases.[14]

---

[12] <u>Sonnax</u> factors numbers 3 and 9 are not applicable to the facts here.  The Debtors do not address <u>Sonnax</u> Factor 8 in their objection, but reserve all right with regard thereto.

[13] In tandem with this effort, the Debtors have entered into plan support agreements with key constituents including AFI, certain holders of their junior secured notes, and certain investors in mortgage-backed securitizations sponsored by the Debtors.

[14] These tasks include, but are not limited, to the following:  (i) a myriad of due diligence and other issues with respect to the proposed sales of the Debtors' servicing operations and legacy loan portfolios, (ii) the negotiation and preparation of a chapter 11 plan and accompanying disclosure statement, (iii) producing documents and responding to requests for information in connection with investigations by the Creditors' Committee and the Examiner, and (iv) obtaining approval for settlement agreements regarding potential claims to be asserted by or against the Debtors' estates (<u>e.g.</u>, the *Debtors' Motion Pursuant to Bankruptcy Rule Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements*, [Docket No. 320]) – all of which the Debtors' seek to accomplish on an

ny-1052186

20.     Lifting the automatic stay to permit the Ulbrich Action to proceed would distract the Debtors' management, the Legal Department and the retained professionals from handling important reorganization matters and unnecessarily increase their burden.[15]  The Legal Department is tasked with managing litigation in which the Debtors are defendants or respondents in state and federal court, including bankruptcy courts, as well as managing litigation for third parties for which the Debtors have a contractual obligation to defend.  The Legal Department plays a very active role in analyzing and strategizing on active litigation matters, working with various departments within the Debtors' various regional offices, collecting all documents and information necessary to analyze each case.[16]  In addition, the Legal Department has been the primary group tasked with assisting in the development and implementation of the Supplemental Servicing Order.[17]  (Delehey Decl. at ¶ 7.)  By virtue of the

---

accelerated time frame before the end of the year.  Performing just these tasks in isolation is in and of itself an enormous burden given that the objective of these Chapter 11 Cases are somewhat unprecedented (i.e., the sale of a mortgage loan servicing and origination platform as a going concern); in addition, the Debtors must address the concerns of multiple constituencies, including United States government entities and governmental associations in the context of a Chapter 11 case (e.g., FNMA; Federal Home Loan Mortgage Corporation; Governmental National Mortgage Association; Department of Housing and Urban Development; and the U.S. Department of Justice (the "**DOJ**") (in connection with a joint settlement among the Debtors, the DOJ, and State Attorneys General from 49 states); and the Board of Governors of the Federal Reserve System (in connection with that certain Consent Order, dated April 13, 2011)).

[15] *Carrera v. Bally Total Fitness (In re Bally Total Fitness of Greater N.Y., Inc.)*, 411 B.R. 142, 148 (S.D.N.Y. 2009) (finding that allowing an action to proceed distracts the debtor's management, thus hindering its performance of its fiduciary duty to maximize the value of the bankruptcy estate); *In re Johns-Manville Corp.*, 26 B.R. 420, 426 (Bankr. S.D.N.Y. 1983) (Aff'd in relevant part by *In re Johns-Manville Corp.*, 41 B.R. 926, 928 (S.D.N.Y. 1984)) (finding that the extensive discovery process associated with class actions would irreparably injure the bankruptcy estate by distracting management).

[16]  The Legal Department specific tasks include, but are not limited to, the following: (i) reviewing documents and information related to discovery, (ii) reviewing all draft pleadings and discovery responses, (iii) preparation of deposition and trial witnesses, (iv) directing settlement negotiations, (v) coordinating discussion with internal business personnel, (vi) maintaining the Legal Staff database, (vii) coordinating with local litigation counsel and ResCap bankruptcy counsel, (viii) attending mediations and settlement conferences and (ix) preparing for trial.

[17]  On July 13, 2012, the Court entered the Final Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay

---

10

Supplemental Servicing Order and their contractual obligations to defend certain non-debtor

third parties, the Legal Department is actively managing in excess of two-thirds of ResCap's

pending litigation (over 1,300 cases) that are not subject to the automatic stay and continue to

proceed in various jurisdictions across the country.  The overwhelming task of managing

hundreds of outside counsel in these cases and assisting them with automatic stay and application

of the Supplemental Servicing Order will continue to consume the time and resources of the

Legal Department.  (Delehey Decl. at ¶ 7.)

21.    As a result of the Debtors' bankruptcy filings and the entry of the

Supplemental Servicing Order, the Legal Department's responsibilities have increased to include

(i) the review and analysis of individual claims as they arise in conjunction with internal business

personnel, local litigation counsel and ResCap bankruptcy counsel to determine the applicability

of the Supplemental Servicing Order; (ii) fielding inquiries daily from both its outside litigation

counsel and its mortgage default counsel regarding the application of the Supplemental Servicing

Order (and will continue to do so as new legal actions arise); (iii) assisting Chapter 11 counsel

with the preparation of various motions, responses to motions for relief from stay and other

Court filings,[18] as well as various bankruptcy related tasks; (iv) assisting Chapter 11 counsel and

internal business personnel with Chapter 11 reporting requirements; and (v) assisting with

matters pertaining to the pending sale of the Debtors' servicing and origination platform and

legacy assets.  These responsibilities are ongoing and will continue and possibly increase as

---

Securitization Trustee Fees and Expenses [Docket No. 774] (the "Supplemental Servicing Order").

[18]    By way of example, the Legal Department had a significant role in the drafting of the motion to approve the Supplemental Servicing Order and the interim Supplemental Servicing Order [Docket No. 181] and participated in the negotiation of the final Supplemental Servicing Order.  The Legal Department also, *inter alia*, assisted in the preparation of the Debtors' schedules and statement of financial affairs, their motion to approve ordinary course professionals, their motion regarding servicing of non-governmental association mortgages, and all of the responses to the motions for relief from the automatic stay filed to date.

these Chapter 11 cases progress.  (Delehey Decl. at ¶ 7.)  Imposing such distractions by granting

the relief requested would run counter to the policies behind the automatic stay.[19]

22.    Moreover, contrary to Movant's assertions, waiting to resolve the Ulbrich

Action and liquidating her claims (and potentially the claims of the other putative class

members) pose no obstacle to the Debtors' ability to confirm a chapter 11 plan.  Even if the

Movant's claims are meritorious, she will only be accorded a general unsecured claim.[20]

23.    Due to its potential size and complexity, the Ulbrich Action threatens

to interfere with the administration of the Chapter 11 Cases on a much higher magnitude than

any single general liability claim.  (Delehey Decl. ¶ 9.)  Further, the relief sought in the MDL

Motion to consolidate the Ulbricht Action, the Other Insurance Putative Class Actions, and

allegedly "related" actions into multi-district litigation could significantly escalate the burden

and cost of defending the Ulbrich Action and the Other Insurance Putative Class Actions.  The

Debtors' participation in any multi-district litigation would require coordination of discovery

proceedings in multiple actions against multiple defendants.  Given the substantial variations

among claims and the marked differences between the insurance programs of GMAC and those

of other mortgage servicers, such coordination efforts could become extremely complex.

(Delehy Decl. ¶ 11, n. 4.)  The result, then, is clear: this Sonnax factor weighs heavily against

lifting the automatic stay.

---

[19] See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990) (noting that the automatic stay is intended to provide the Debtors with a "breathing spell" to address the immediate concerns related to the restructuring of the Debtors' businesses).

[20] See, e.g., In re Northwest Airlines Corp., 2006 WL 687163, at *2 (denying motion for relief from stay under the Sonnax factors where movant gave "no indication that the Movant's claims must be resolved before the Debtors can file a feasible plan.").

ny-1052186

**The Tenth *Sonnax* Factor: The interests of judicial economy
and the expeditious and economical resolution of litigation**

24.     Movant attempts to portray this <u>Sonnax</u> factor as weighing in favor of

lifting the automatic stay by arguing that the Florida Court is best equipped to adjudicate this

litigation because of its familiarity with a class action lawsuit that Movant contends is similar to

the Ulbrich Action.  (MOL, at p. 12.)  The salient question under this factor, however, is whether

(i) maintaining the automatic stay will lead to a waste of judicial resources or undermine the

economical resolution of the underlying litigation, and (ii) whether relief from the stay would

hinder or delay the Debtors' efforts for a speedy and effective reorganization process.  <u>See</u> <u>Bally</u>,

402 B.R. at 624.  Very few judicial resources have been expended by the Florida Court, as the

parties, to date, have conducted limited factual discovery, have not prepared for mandatory

mediation, have not briefed or filed summary judgment motions, have not yet engaged expert

witnesses, conducted discovery with respect thereto, or prepared any expert reports.  (Delehey

Decl. ¶ 10.)  Maintaining the automatic stay, therefore, will not lead to a waste of judicial

resources, nor will maintenance of the stay undermine an economical resolution of the litigation.

<u>See</u> <u>Bally</u>, 402 B.R. at 624.

25.     Moreover, the Debtors' priority at this time is in ensuring a speedy and

effective reorganization process,  which may be hindered if they are forced to litigate this or any

other class action suit during the pendency of the Chapter 11 Cases.[21]  The interests of judicial

economy and the economical resolution of litigation would best be served by resolving Movant's

---

[21] <u>In re Bally Total Fitness of Greater N.Y., Inc.</u>, 402 B.R. 616, 624 (Bankr. S.D.N.Y. 2009) (Aff'd <u>Carrera</u>, 411
B.R. at 147 (finding that lifting the stay to permit a class action would hinder debtor's efforts for a speedy and
effective reorganization process); <u>In re Woodward & Lothrop Holdings, Inc.</u>, 205 BR 365, 376 (Bankr. S.D.N.Y.
1997) ("[A] class action may 'gum up the works' because until complete, the bankruptcy court cannot determine the
entitlement of the other creditors"); <u>In re Ephedra Prods. Liab. Litig.</u>, 329 B.R. 1, 4 (S.D.N.Y. 2005) ("[G]ranting of
class action claims at this late juncture would wholly disrupt and undercut the expeditious execution of the Plan of
Reorganization"); <u>In re Musicland Holding Corp.</u>, 362 B.R. 644, 656 (Bankr. S.D.N.Y. 2007) (refusing to lift
automatic stay because allowing putative class members to lodge a "class claim would seriously delay the
administration of the case …").

claims against the Debtors through the uniform bankruptcy claims process, which will be utilized to address the thousands of claims filed against these estates, including claims asserted in the hundreds of legal actions pending against the Debtors.[22]

**The Twelfth *Sonnax* Factor: Impact**
 **of the stay on the parties and balance of harms**

26.     Movant asserts that the balance of the harms weighs in its favor. (MOL, at p. 12.) However, she has not demonstrated (or even articulated) how the continued suspension of the Ulbich Action results in any prejudice to Movant. Movant concedes that, by virtue of the Standstill Agreement, GMAC will not take any action to foreclose on the property during the pendency of the Ulbrich Action. (MOL, at p. 8.)[23]

27.     On the other hand, the cost to the Debtors of lifting the automatic stay at this early stage of the Chapter 11 Cases is substantial in terms of the time, financial resources, and attention necessary to defend itself in the Ulbrich Action. (See Delehey Decl. ¶ 6-10.) At this juncture in the Chapter 11 Cases, the estates' limited resources are better spent on the reorganization process, rather than litigating potentially massive class action lawsuits. Forcing a debtor to defend against suits and proceedings brought in other venues distracts and hinders a debtor from focusing on its own reorganization efforts.[24] As described above, the Debtors are working diligently towards achieving the proposed asset sales, formulating a chapter 11 plan,

---

[22] Judge Gerber noted in In re General Motors Corp., "[b]ankruptcy litigation is typically as efficient or more efficient than litigation in the district courts in connection with plenary litigation." In re Motors Liquidation Company f/k/a General Motors Corp., Chapter 11 Case No. 09-50026 (REG) , Hr'g Tr. 41:18 – 20 (Nov. 5, 2009).

[23]  Because of the Standstill Agreement, Movant is forced to argue that maintaining the stay would harm other potential claimants who may not have the benefit of similar standstill agreements. (MOL, at p. 8.) This argument is undercut by the fact that no class has as of yet been certified, and therefore any harm to other claimants is speculative and, in any event, irrelevant to the Court's consideration of this factor.

[24] See Bally, 402 B.R. at 624 (Bankr. S.D.N.Y. 2009) (finding that class actions distract the debtor from the central tasks of stabilizing operations and cash flows and hence harms all creditors); In re Zenith Laboratories, Inc., 104 B.R. 659, 666 (D.N.J. 1989) (finding that allowing debtors a sufficient window to reorganize their estates serves the public interest more than allowing class actions to be resolved sooner).

and obtaining approval of key settlement agreements.  In the meantime, the Debtors need the

protection of the automatic stay to afford themselves the "breathing space" necessary to allow

them to restructure and preserve the value of their assets for the benefit of their creditors.

28.    In addition to the Ulbrich Action and the Other Insurance Putative Class

Actions, the Debtors are defendants in approximately forty (40) other putative or certified class

actions pending in various forums across the United States.  (Delehey Decl. ¶ 5.)  The likelihood

that motions for relief from stay would be filed by other putative class action litigants

(particularly the claimants in the Other Insurance Putative Class Actions) in the event that the

Motion is granted, and the attendant costs associated with defending such motions and litigation

if relief were to be granted, would impose an untold burden on the Debtors' estates.[25]  Litigating

such lift stay motions and any single class action suit will result in a drain on the Debtors'

resources and an untimely distraction from the reorganization process.[26]  The Debtors should not

have to divert their resources to respond to a multitude of "lift stay" requests or defend against

the underlying class claims at the same time as they are attempting to sell their businesses as a

going concern, consummate settlements, and formulate, propose and confirm a plan.[27]  During

---

[25] See Bally, 402 B.R. at 623 (finding that allowing the stay to be lifted for one class can open the floodgates to many similar actions, which would further interfere with the resolution of the bankruptcy case); In re Northwest Airlines Corp., 2006 Bankr. LEXIS 477, 5-6 (Bankr. S.D.N.Y. Mar. 13, 2006) (when there are many potential claims being held back by a stay, the court should consider the interference with the bankruptcy proceeding if all of those matters were allowed to continue, not just the individual case at bar); In re Celotex Corp., 140 B.R. 912, 916 (Bankr. M.D. Fla. 1992) (declining to release a stay for fear of unleashing "an avalanche of litigation").

26 With the Debtors' named as defendants or respondents in over 1,900 prepetition actions and in addition, party to several thousand foreclosure, eviction and borrower bankruptcy proceedings nationwide, relief from stay motions filed by plaintiffs in even a relatively small percentage of the Debtors' outstanding litigation would unnecessarily distract the Debtors' management, professionals and, more importantly, the Legal Department from the primary task at hand of a successful rehabilitation of the Debtors' estates.

[27] See, e.g., In re Northwest Airlines Corp., No. 05-17930, 2006 WL 694727, at *2 (Bankr. S.D.N.Y. Mar. 3, 2006) (stating that "[t]o allow the automatic stay to be lifted with respect to this action at this time would prompt similar motions and . . . [t]he distraction and expense of defending such litigation would interfere with judicial economy and the Debtors' process of reorganization.") (citing In re Ionosphere Clubs, Inc., 922 F.2d 984, 989 (2d Cir. 1990)); Bally, 402 B.R. at 623 ("allowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding . . . thereby affecting the interests of other creditors.").

15

the pendency of the Chapter 11 Cases, the limited resources of the Debtors' estates are much

better spent on the Debtors' restructuring efforts, rather than litigating lawsuits spread

throughout the country.  Judge Gerber succinctly framed this concern in General Motors:

> [I]f I were ever to allow relief from the stay on a garden variety
> claim of this type there would indeed be the risk, if not the
> certainty, that every other party who thinks he or she has a good
> claim against the estate pending in another jurisdiction would be
> asking me to defend -- to provide relief from the stay and require
> the debtors to be litigating claims of this character all over the
> country. The floodgates concern that the estate articulated is indeed
> a very serious one.[28]

29.      This concern is also real in the Chapter 11 Cases; since the first motion

seeking relief from stay was filed, approximately 13 additional motions seeking relief from the

automatic stay have been filed and the Debtors and their counsel have received several additional

informal requests for such relief.  The balance of the harms clearly favors maintaining the

automatic stay with respect to the Ulbrich Action.

30.      Meanwhile, Movant suffers virtually no hardship on account of the

continued imposition of the automatic stay.  Even if the Movant's claims are meritorious, they

will be accorded general unsecured claims against the Debtors' estates.  She will experience no

great benefit if awarded such claims sooner rather than later, and is similarly situated to each

other potential creditor of the Debtors' estates.  Indeed, the Debtors objective remains to proceed

with the plan confirmation process in an expedited fashion.  This is similarly true as to any

potential class certification.  Though class treatment may be beneficial with respect to other civil

actions in consolidating the adjudication of common issues, this advantage disappears in the

---

[28] H'rg Tr. 45:2–45:10 (Nov. 5, 2009) (denying motion to lift stay because Sonnax Factors weigh against lifting the
stay).

ny-1052186

context of a bankruptcy.  The centralized bankruptcy claims resolution process provides the same

procedural advantages as a class action because it concentrates all disputes in one forum.[29]

### F.    Additional Sonnax Factors Support Continuation of the Stay

31.    Although the Debtors are under no affirmative obligation to demonstrate

that relief from stay is inappropriate where a plaintiff has failed in her burden to show "cause"

(as is the case here), the Debtors nevertheless submit that additional <u>Sonnax</u> factors not identified

by Movant as relevant to this matter in fact weigh in favor of preserving the stay.

**The First *Sonnax* Factor: Whether relief would result
<u>in a partial or complete resolution of the issues</u>**

32.    Lifting the stay will **<u>not</u>** allow for the complete resolution of the issues.

Permitting the Ulbrich Action to go forward at this time would push the Debtors into a morass of

issues that would need to be resolved with respect to Movant's claims and potentially thousands

of other claimants.  With respect to Movant's individual claims, the Motions to Dismiss must be

resolved.  If these Motions to Dismiss are decided in Movant's favor, the parties must engage in

the extensive factual discovery, prepare for and engage in mandatory mediation pursuant to the

Scheduling Order, and brief dispositive motions.  Barring dismissal or resolution through

mediation, the parties will need to prepare expert witnesses and conduct expert discovery and

proceed to trial.  (Delehey Decl. ¶ 10.)

33.    Moreover, the threat of the prosecution of a class action weighs against

lifting the stay with respect to the first <u>Sonnax</u> Factor.[30]  Should Ulbrich move to certify a class,

---

[29] <u>Woodward</u>, 205 BR at 376 (citing <u>In the Matter of American Reserve Corp.</u>, 840 F.2d 487, 490 (7th Cir. 1988))
("A bankruptcy proceeding offers the same procedural advantages as the class action because it concentrates all the
disputes in one forum"); <u>see</u> also <u>Ephedra Prods.</u>, 329 B.R. at 9 ("[S]uperiority of the class action vanishes when the
'other available method' is bankruptcy, which consolidates all claims in one forum and allows claimants to file
proofs of claim without counsel and at virtually no cost. In efficiency, bankruptcy is superior to a class action").

the parties will likely engage in extensive discovery necessary to make a determination on class

certification.  After the completion of class certification discovery and motion practice, the court

will conduct a pivotal hearing on class certification.  (Delehey Decl. ¶ 10.)  If the Court

ultimately certifies a class, class members will need to be noticed  and  given  an  opportunity  to

"opt  out"  under Rule  23 of the Federal Rules of Civil Procedure.[31]  A trial on the merits for a

certified class could be significantly more lengthy and complex than a trial involving just

Movant's claims.  (Delehey Decl. ¶ 10.)

**The Fourth *Sonnax* Factor: Whether a specialized tribunal with
<u>the necessary expertise has been established to hear the cause of action</u>**

34.    The fourth Sonnax factor does not support relief from the stay because no

specialized tribunal has been created to hear the claims brought in the Ulbricht Action.    The

Bankruptcy Code specifically contemplates resolving prepetition claims against the Debtors via a

centralized claims resolution process shepherded by the bankruptcy courts.  This Court has

recognized that it can interpret and apply state law in resolving claims through the bankruptcy

process.[32]  Movant's claims are no exception.  Accordingly, the fourth <u>Sonnax</u> Factor weighs in

favor of denying relief from the automatic stay.[33]

---

[30] <u>See Bally</u>, 402 B.R. at 623; <u>In re Sacred Heart Hosp.</u>, 177 B.R. 16, 23 (Bankr. E.D. Pa. 1995) (finding that an unresolved class certification question increases the uncertainty about the resolution of the matter were a stay to be lifted).

[31] <u>See</u> <u>Carerra</u>, 411 B.R. 147 (finding that the class member notice and opt out process and the potential for a lengthy class action trials weigh against a finding that lifting the stay would result in complete resolution).

[32] <u>See</u>, <u>e.g.</u>, <u>Bally</u>, 402 B.R. at 624 ("[t]his Court has significant experience in applying state law ….").

[33] If the automatic stay were lifted, the formation of an MDL could significantly escalate the burden and cost of defending the Ulbrich Action and the Other Insurance Putative Class Actions.  This would require coordination of discovery proceedings in multiple actions against multiple defendants.  Given the substantial variations among claims and the marked differences between the insurance programs of GMAC and those of other mortgage servicers, such coordination efforts could become extremely complex.

**The Fifth *Sonnax* Factor: whether the debtor's insurer
has assumed full responsibility for defending the action**

35.    Moreover, the Debtors pay their legal defense fees and costs out-of-pocket

for this action (and many others).  As a result, requiring the Debtors to defend the Ulbrich Action

(and any potential class action litigation) will result in increased out-of-pocket defense costs.[34]

(Delehey Decl. ¶ 14.)  This factor weighs heavily against granting relief from the automatic stay.

**The Sixth *Sonnax* Factor:
Whether the action primarily involves third parties**

36.    While the Ulbrich Action involves Balboa, four of the five counts are

alleged solely against GMAC Mortgage.  (See Compl. ¶ 108-115.)  As a result, the Debtors are

required to actively participate in the Ulbrich Action to avoid facing an adverse judgment and,

accordingly, this Sonnax factor weighs against granting relief from the automatic stay.[35]

**The Seventh *Sonnax* Factor: Whether litigation in another
forum would prejudice the interests of other creditors**

37.    The interests of the Debtors' other creditors will be severely prejudiced

if the automatic stay is lifted to allow the Ulbrich Actions to proceed against GMAC at this

juncture in the Chapter 11 Cases.  First, having to defend such actions would deplete estate

resources, thereby prejudicing other creditors.  Second, because the claims asserted in the Other

Insurance Putative Class Actions are substantially similar to the claims asserted in the Ulbrich

Action, if the Ulbrich Action was permitted to go forward, any decision or judgment in that case

could have preclusive effect on claimants in the Other Insurance Putative Class Actions.  Finally,

lifting the stay would also expose the Debtors to have to defend countless other lift stay motions,

---

[34]  For context, based upon the Debtors' records for the year prior to the Petition Date, their legal costs averaged approximately $5.7 million per month.

[35]  See City Ins. Co. v. Mego Int'l Inc. (In re Mego Int'l Inc.), 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the automatic stay where the debtor was more than a mere conduit for the flow of proceeds and the action impacted the "property and administration of [the debtor's] estate, suggesting that continuance of the stay was proper.").

ny-1052186

including likely lift stay motions from the Other Insurance Putative Class Actions.[36]  This would

impose a heavy burden on the valuable time and efforts of the Debtors' employees and retained

professionals, tax the Debtors' financial resources, and result in a wholly unnecessary distraction

to the Debtors' focus on achieving the objectives of the Chapter 11 Cases – the maximization of

value for creditors.

38.    Requiring the Debtors to defend the Ulbrich Action in the Florida Court

would upend the "strong bankruptcy code policy that favors centralized and efficient

administration of all claims in the bankruptcy court."[37]  A successful case is in the interests of all

of the Debtors' creditors and, as demonstrated above, permitting the Ulbrich Action to proceed

would impose a significant burden on the Debtors' estates both in terms of out-of-pocket legal

costs and the demands upon their personnel.  As a result, the seventh <u>Sonnax</u> Factor also weighs

in favor of denying relief from the automatic stay.

**The Eleventh *Sonnax* Factor: Whether the**
**<u>parties are ready for trial in the other proceeding</u>**

39.    The Ulbrich Action is not ready for trial.  As set forth in paragraph 24

above, this case is in its early stages, significant work needs to be done and resources expended

in order to prepare this case for trial.  (Delehey Decl. ¶ 10.)  Accordingly, the eleventh <u>Sonnax</u>

factor weighs in favor of denying stay relief.[38]

## CONCLUSION

40.    Based on the weight of settled authority and its application to the Motion

as described above, the Debtors respectfully submit that Movant has failed to meet her burden.

---

[36] <u>See</u> <u>infra</u> paragraph 28.

[37] <u>In re Cuyahoga Equip. Corp.</u>, 980 F.2d 110, 117 (2d Cir. 1992).  a

[38] <u>See</u> <u>Bally</u>, 402 B.R. at 624 (denying stay relief where the parties had not started conducting extensive discovery and were not ready for trial).

Substantially all of the applicable <u>Sonnax</u> Factors weigh in favor of maintaining the automatic

stay.  As such, the Court should deny the Motion.

WHEREFORE, for the foregoing reasons, the Debtors request that the Court enter an

Order denying the Motion and grant such other relief as the Court deems proper.


New York, New York                          /s/ Norman S. Rosenbaum
Dated: August 7, 2012                      Larren M. Nashelsky
                                           Gary S. Lee
                                           Norman S. Rosenbaum
                                           MORRISON & FOERSTER LLP
                                           1290 Avenue of the Americas
                                           New York, New York 10104
                                           Telephone: (212) 468-8000
                                           Facsimile: (212) 468-7900

                                           *Counsel to the Debtors and*
                                           *Debtors in Possession*

21