**EXHIBIT 2**

**<u>Appendix</u>**

ny-1052186

## **Appendix**

1.      Motion of Defendant GMAC Mortgage, LLC to Compel Arbitration and For a Stay or, in the Alternative, to Dismiss the Complaint and Otherwise Strike the Jury Demand, Christina Ulbrich v. GMAC Mortgage, LLC, et al., Case No. 11-62424 (S.D. Fla. Jan. 12, 2012).

2.      Scheduling Order, Christina Ulbrich v. GMAC Mortgage, LLC, et al., Case No. 11-62424 (S.D. Fla. Mar. 9, 2012).

3.      Complaint, Cronk vs GMAC Mortgage, LLC, Case No.: 2:11-05161 (E.D. Pa. Aug. 12, 2012).

4.      Complaint, Throm v. GMAC Mortgage, LLC, Case No. 2:11-06813 (E.D. Pa. Aug. 12, 2012).

5.      Complaint, Rothstein v. GMAC Mortgage, LLC et al., Case No.: 12-CV-3412 (S.D.N.Y. Apr. 30, 2012).

6.      Notice of Tag-Along Actions (MDL Motion), In re Mortgage Lender Forced-Place Insurance Litigation, MDL Docket No. 2388, (U.S. Judicial Panel on Multidistrict Litigation Jun. 26, 2012).

7.      Transcript of Hearing at 41:18–20; 45:2–45:10, In re Motors Liquidation Company f/k/a General Motors Corp., Chapter 11 Case No. 09-50026 (REG) (Nov. 5, 2009)

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 11-62424-Civ-SCOLA

Christina Ulbrich, as an individual and as      )
a representative of the classes,                )
                                                )
            Plaintiff,                          )
                                                )
    v.                                          )
                                                )
GMAC Mortgage, LLC, formerly known as           )
GMAC Mortgage Corporation, and Balboa           )
Insurance Services, Inc.,                       )
                                                )
            Defendants.                         )

MOTION OF DEFENDANT GMAC MORTGAGE, LLC
TO COMPEL ARBITRATION AND FOR A STAY OR, IN THE ALTERNATIVE,
TO DISMISS THE COMPLAINT AND OTHERWISE STRIKE THE JURY DEMAND

Defendant GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation

("GMAC"), moves the Court for an Order compelling arbitration between GMAC and Plaintiff

Christina Ulbrich ("Ulbrich") and staying the litigation pursuant to the Federal Arbitration Act

(the "FAA"), 9 U.S.C. §§ 1-16.  In the alternative, GMAC moves the Court for an Order

dismissing the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and

otherwise striking the jury demand pursuant to Rule 12(f) of the Federal Rules of Civil

Procedure.

## I.    INTRODUCTION

This putative class action filed by Ulbrich against GMAC involves a mortgage

borrower's duty to maintain continuous insurance coverage and a lender's right to purchase such

coverage should the borrower fail to do so.  Ulbrich attempts to assert the following claims

against GMAC: (1) Breach of Contract/Breach of Good Faith and Fair Dealing (Count I);

{22965286;1}

(2) Unjust Enrichment (Count II); (3) Breach of Fiduciary Duty (Count III); and (4) Violation of Florida Deceptive and Unfair Trade Practices Act (Count IV).

The Court should compel arbitration of Ulbrich's claims against GMAC because they arise out of lender-purchased wind insurance and because the parties made an agreement to arbitrate "any claim, dispute or controversy" between them, "including but not limited to" claims arising out of "insurance products and services." Further, the Court should stay this action while the arbitration is pending.

Alternatively, the Court should dismiss the Complaint for failure to state a claim. As a threshold matter, GMAC was acting within its express contractual rights when it required continuous insurance coverage on the mortgaged property and purchased such coverage on Ulbrich's behalf when she did not provide proof of coverage. Against this backdrop, there can be no claim that GMAC breached its contract with Ulbrich or any duty of good faith and fair dealing. Given that GMAC's acts were authorized by the parties' contract, it follows that Ulbrich's remaining claims – including her claim under the Florida Deceptive and Unfair Trade Act – fail. Further, there can be no unjust enrichment claim because there was an express contract governing the parties' relationship. And, there is no breach of fiduciary duty claim because GMAC, as her lender, did not owe Ulbrich a fiduciary duty and, in any event, such a claim is barred by the economic loss rule. Thus, the Complaint should be dismissed.

Finally, Ulbrich expressly waived any right to a jury trial in her mortgage documents and, given that federal courts in Florida have repeatedly upheld the identical waiver in other cases, the Court should at a minimum strike the jury demand in the Complaint.

## II.    FACTS

On August 4, 2003, Ulbrich entered into a thirty year "cash-out" mortgage refinance loan (the "Loan") with GMAC in the amount of $201,000. Compl., ¶ 19. In order to secure

repayment of the Loan, Ulbrich executed a uniform mortgage document created and approved by Fannie Mae/Freddie Mac for single family homes in Florida (Form 3010) (the "Mortgage") encumbering her home at 2825 NE 23rd Street, Fort Lauderdale, Florida (the "Property"). *Id.* at ¶ 19. The Mortgage is attached to the Complaint as Exhibit 2.

Among other things, the Mortgage requires that borrowers keep their homes insured "against loss by fire, hazards included within the term 'extended coverage,' and any other hazard including, but not limited to, earthquakes and floods, for which Lender requires insurance." *See* Compl., ¶ 20; Mortgage, p. 6, § 5. "This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires." Mortgage, p. 6, § 5. The Mortgage also provides that "[w]hat Lender requires pursuant to the preceding sentences can change during the term of the loan." *Id.* at p. 7, § 5.

The Mortgage specifically permits lenders to obtain coverage to protect their rights in mortgaged properties when borrowers fail to maintain such coverage, but the Mortgage does not obligate lenders "to purchase any particular type or amount of coverage." *See* Compl., ¶ 20; Mortgage, p. 7, § 5. Moreover, in executing the Mortgage, the "Borrower acknowledges that the cost of insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained." *Id.*, p. 6, § 5.

At the same time she entered into the Loan, Ulbrich also received a home equity line of credit from GMAC in the amount of $100,000 (the "HELOC"). The HELOC was evidenced by a Home Equity Line of Credit Agreement and Disclosure Statement (the "HELOC Agreement") along with a mortgage securing future advances under the HELOC (the "HELOC Mortgage").[1]

---

[1]    Copies of the HELOC Agreement and HELOC Mortgage are attached as Exhibits A and B, respectively, to the Declaration of Davida Harriott, **Exhibit 1** hereto ("Harriott Dec.").

The HELOC Agreement contained a broad arbitration provision, which provided that "any"
claim between Ulbrich and GMAC would be resolved by binding arbitration; such disputes were
not limited to those arising under the HELOC Agreement but, rather, encompassed the universe
of the Parties' potential claims against each other.[2] *See* HELOC Agreement, p. 6, ¶ 15. Indeed,
the arbitration agreement stressed that "[t]he term Claim shall be given the broadest possible
meaning." *Id.* The arbitration clause also gives a series of "including but not limited to"
examples of disputes subject to arbitration which specifically identified "insurance products or
services." *Id.* Finally, the HELOC Agreement also contained a class action waiver provision
whereby Ulbrich waived any right to participate as a class representative or class member
pertaining to "any" dispute between her and GMAC. *Id.*

According to the Complaint, in the beginning of 2011, GMAC sent notices to Ulbrich
informing her that its records showed a lapse of hazard, flood and/or wind insurance coverage for

---

[2]     The arbitration provision reads in part:

THIS AGREEMENT PROVIDES THAT EXCEPT AS DETAILED IN PARAGRAPH
15(b), ALL CLAIMS (AS DEFINED BELOW) WILL BE RESOLVED BY BINDING
ARBITRATION. BY SIGNING THIS AGREEMENT, THE PARTIES VOLUNTARILY AND
KNOWINGLY WAIVE ANY RIGHT TO LITIGATE THE CLAIM IN COURT,
PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OR
CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION OR HAVE A
JURY TRIAL FOR CLAIMS THAT ARE SUBJECT TO ARBITRATION.

(a)     **AGREEMENT TO ARBITRATE CLAIMS.** Any claim, dispute or
controversy (collectively "Claim") between GMAC and us (except those listed below in
Paragraph 15(b)) including but not limited to those arising out of the Credit Documents, any
application, advertisements, servicing and collection of the Account, any outstanding balances or
balance transfers posted to the Account, insurance products or services, as well as any other
disclosure or document related to the Credit Documents shall exclusively be resolved by
**BINDING ARBITRATION** by an arbitrator of the American Arbitration Association ("AAA")
in accordance with (i) the Federal Arbitration Act; (ii) the Expedited Procedures of the
Commercial Rules of the AAA and the AAA Supplementary Procedures for Consumer Related
Disputes and (iii) this Paragraph. The term Claim shall be given the broadest possible meaning.

*See* HELOC Agreement, p. 6, ¶ 15 (emphasis in original).

the Property.  *See* Compl., ¶¶ 22-23, 27-29, 31-32, 39-40, Exhs. 1-5, 7-11, 13-14.  The

Complaint alleges that GMAC thereafter purchased wind and flood insurance on Ulbrich's

behalf, but that it ultimately cancelled all but one of those polices and credited Ulbrich's escrow

account accordingly.  *See id. See also* Compl., ¶ 45.  Ultimately, Ulbrich alleges that GMAC

purchased a wind policy on April 27, 2011, providing coverage from October 1, 2010 to October

1, 2011, and that GMAC should have cancelled and refunded that policy as well.  *See* Compl., ¶

45.  Ulbrich concedes that she never paid for the policy, but nonetheless claims that the

Mortgage did not authorize the purchase of wind insurance or insurance covering a period of

time pre-dating the date of purchase and, further, that GMAC profited from the sale of lender-

placed insurance, which was not permitted by the Mortgage.  *Id.*, ¶¶ 37, n.7, 75 and 76.

Based on these allegations, Ulbrich attempts to assert the following claims against

GMAC on a class-wide basis: (1) Breach of Contract/Breach of Good Faith and Fair Dealing

(Count I); (2) Unjust Enrichment (Count II); (3) Breach of Fiduciary Duty (Count III); and

(4) Violation of Florida Deceptive and Unfair Trade Practices Act (Count IV).[3]

## III.    ARGUMENT

### A.    Ulbrich's Claims Against GMAC Are Subject To Her Agreement To Arbitrate "Any Claim, Dispute Or Controversy" Between Her And GMAC

Ulbrich has agreed to arbitrate "any claim, dispute or controversy" she has with GMAC.

*See* HELOC Agreement, ¶ 15.  Further, Ulbrich has agreed to do so on an individual – and not on

a class – basis.  *Id.*  That the Complaint involves a "claim, dispute or controversy" "between

GMAC and [Ulbrich]" in and of itself renders the claims therein subject to arbitration.  Indeed,

Ulbrich agreed that "[t]he term Claim shall be given the broadest possible meaning."  *Id.*  Lest

---

[3]      Ulbrich also asserts a claim for Unjust Enrichment (Count V) against Co-Defendant
Balboa Insurance Services, Inc. ("Balboa").

there be any doubt, however, the arbitration clause provides a series of "including but not limited
to" examples of disputes subject to arbitration and specifically identifies disputes arising out of
"insurance products or services." *Id.* Against this backdrop, the Court should compel arbitration
of the insurance dispute between GMAC and Ulbrich and stay the litigation as required by the
Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

The FAA represents "a congressional declaration of a liberal federal policy favoring
arbitration agreements, notwithstanding any state substantive or procedural policies to the
contrary," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, (1983), and
implements "the strong federal policy in favor of enforcing arbitration agreements." *Dean Witter
Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985). In short, the "principal purpose" of the FAA is
to "ensur[e] that private arbitration agreements are enforced according to their terms." *Volt Info.
Scis. v. Bd. of Trs., Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989).

This purpose is readily apparent from the FAA's text. Section 2 makes arbitration
agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in
equity for the revocation of any contract;" Section 3 requires courts to stay litigation of arbitral
claims pending arbitration of those claims "in accordance with the terms of the agreement;" and
Section 4 requires courts to compel arbitration "in accordance with the terms of the agreement"
upon the motion of either party to the agreement. Thus, in reviewing a motion to compel
arbitration, a court first considers whether an agreement to arbitrate exists and, if so, whether an
arbitrable issue exists. 9 U.S.C. §§ 2, 4. Applying this analysis to the case before this Court
results in the conclusion that GMAC and Ulbrich agreed to arbitrate the dispute that is the
subject of the Complaint.

{22965286;1}                                          6

Here, Ulbrich and GMAC entered into an agreement to arbitrate when Ulbrich signed the
HELOC Agreement on August 3, 2003, the same date she closed on the Loan.   Thus, the
traditional elements for the formation of a contract were present.   Further, that Ulbrich agreed to
arbitrate on an individual basis and waived participation in a class action as a named
representative or otherwise does not present grounds "as exist at law or in equity for the
revocation of any contract."   *See AT&T Mobility LLC v. Concepcion*, ___U.S. ___, 131 S. Ct.
1740, 1748 (2011) ("The overarching purpose of the FAA, evident in the text of §§ 2, 3, and 4, is
to ensure the enforcement of arbitration agreements according to their terms so as to facilitate
streamlined proceedings.   Requiring the availability of class wide arbitration interferes with
fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA.").
Accordingly, the making of a valid agreement to arbitrate is not an issue in this case.

Likewise, whether an arbitrable issue exists is not an issue in this case.   Courts "should
resolve all doubts in favor of arbitration, rather than against it."   *Moses H. Cone*, 460 U.S. at 1.
Further, the burden is on Ulbrich to show that the dispute between her and GMAC does not fall
within the scope of the arbitration provision.   *See Gilmer v. Interstate/Johnson Lane Corp.*, 500
U.S. 20, 26 (1991) (citations omitted).   To meet that heavy burden, Ulbrich would have to
establish "with positive assurance that the arbitration clause is not susceptible of an interpretation
that covers the asserted dispute."   *AT&T Techs. v. Commc'ns Workers*, 475 U.S. 643, 650 (1986)
(citation and internal quotation marks omitted).   This she cannot do.

Here, Ulbrich agreed in the HELOC Agreement to arbitrate "any claim, dispute or
controversy" "between GMAC and [Ulbrich]" "including but not limited to those arising out of"
"insurance products or services."   *See* HELOC Agreement, ¶ 15.   Ulbrich also agreed that "[t]he
term Claim shall be given the broadest possible meaning."   *Id.*   GMAC and Ulbrich are now

involved in a dispute over insurance purchased by GMAC. The broad arbitration provision in the HELOC Agreement applies to this dispute, even though GMAC purchased the insurance pursuant to the terms of the Mortgage.

Indeed, the Eleventh Circuit itself has recognized that parties to a contract can agree to arbitrate "the universe of the parties' potential claims against each other:"

> The language of the clause at issue is brief, unequivocal and all-encompassing. *It states that 'any dispute between them or claim by either against the other' is subject to arbitration. By using this inclusive language, the parties agreed to arbitrate any and all claims against each other, with no exceptions.* An arbitration agreement is not vague solely because it includes the universe of the parties' potential claims against each other.

*Brown v. ITT Cons. Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000) (emphasis added).

Thus, the courts will order arbitration where the parties have entered into a broad agreement to arbitrate in one contract and ended up in a dispute arising out of a separate contract or dealing between the parties. *See, e.g., 24 Go Wireless, Inc. v. AT&T Mobility II, LLC*, No. 11-20930, 2011 WL 2607099, at *2 (S.D. Fla. Jun. 30, 2011) ("24 Go argues that the offer it received from AT&T to market the Apple iPhone was a contract separate from the parties' Agreement and that 24 Go's claims concerning the iPhone offer are therefore not subject to the Agreement's arbitration provision. This argument ignores the fact that the arbitration provision expressly states that '*all claims and disputes* between [24 Go] and [AT&T] must be resolved by submission to binding arbitration.'") (emphasis in original) (Moreno, J.); *Branchville Mach. Co., Inc. v. Agco Corp.*, 252 F. Supp. 2d 307, 311 (E.D. Va. 2003) (agreement in one contract to arbitrate disputes arising out of or relating to "any relationship or business dealings between the parties" required arbitration of dispute under a contract that did not contain an arbitration clause: "The clause in the instant agreement, then, by its own terms, reaches beyond the Financing Agreement itself to cover disputes arising from all aspects of the parties' relationship.").

In short, there is a valid agreement to arbitrate that covers the insurance dispute between
GMAC and Ulbrich.  As required by the FAA, the Court should now compel arbitration on a
non-class basis between GMAC and Ulbrich and stay the litigation in the interim.

**B.**    **Ulbrich Fails To State A Claim Upon Which Relief Can Be Granted**

In the alternative, the Court should dismiss the Complaint pursuant to Rule 12(b)(6) of
the Federal Rule of Civil Procedure.  Dismissal is warranted under Rule 12(b)(6) where the
complaint lacks a cognizable legal theory, or where it presents a cognizable legal theory yet fails
to plead essential facts to support that theory.  *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).
The purpose of a Rule 12(b)(6) motion to dismiss is "to allow the court to eliminate actions that
are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the
burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. Scimed
Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993).

A complaint must plead enough facts to state a claim for relief that is "plausible" (as
opposed to just "conceivable").  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).
Thus, to survive a motion to dismiss, a complaint must contain more than "labels and
conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]
devoid of further factual enhancement;" rather, the factual allegations in the complaint "must be
enough to raise a right to relief above the speculative level." *Id.* at 555.  "Where a complaint
pleads facts that are 'merely consistent with' a defendant's liability, it "stops short of the line
between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129
S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557).

As set forth below, Ulbrich fails to state a claim against GMAC upon which relief can be
granted and, accordingly, the Court should dismiss the Complaint.

1.      **The Contract Expressly Authorized GMAC's Acts And The Duty Of**
        **Good Faith Cannot Be Used To Rewrite The Contract**

In Count 1 of her Complaint, Ulbrich alleges that GMAC breached its contract when it

required that she maintain continuous insurance coverage, purchased such coverage on her

behalf when she failed to do so, and allegedly profited from the sale of such coverage.  A

plaintiff, however, must plead and prove three elements to make out a breach of contract claim:

"(1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co.,*

*LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (Florida law).  Ulbrich, however, fails to allege a

breach of contract.

Because GMAC was acting within its express contractual rights as set forth in Section 5

of the Mortgage, GMAC did not breach the Mortgage and Ulbrich cannot assert a breach of

contract claim against GMAC.  *See Gibson v. Chase Home Fin., LLC,* No. 11-1302, 2011 WL

6319401, at *3 (M.D. Fla. Dec. 16, 2011) (dismissing breach of contract claim because "[t]he

mortgage require[d] [the plaintiff] to maintain flood insurance in the amount that [the defendant]

in its sole discretion require[d], the mortgage allow[ed] [the defendant] to purchase flood

insurance on [the plaintiff's behalf], and the mortgage warn[ed] [the plaintiff] that force-placed

flood insurance may cost more than the market rate"); *Kolbe v. BAC Home Loans Servicing,*

*L.P.,* No. 11-10312, 2011 WL 3665394, at *3 (D. Mass. Aug. 18, 2011) (dismissing breach of

contract claim because [t]he mortgage provision also gives the lender the right to change the

amount of required insurance as it deems necessary."); *Lass v. Bank of America, N.A.,* No. 11-

10570, 2011 WL 3567280, at *3 (D. Mass. Aug. 11, 2011) (dismissing breach of contract claim

because the Fannie Mae/Freddie Mac form language "unambiguously gave defendants the

discretion to determine the appropriate amount of flood insurance and to purchase that insurance

on plaintiff's behalf should she fail to do so."); *Hayes v. Wells Fargo Home Mortg.,* No. 06-

1791, 2006 WL 3193743, at *4 (E.D. La. Oct. 31, 2006) (reviewing the Fannie Mae/Freddie Mac form language and rejecting the mortgagor's breach of contract claim since the language clearly permitted the lender to place insurance in the amount it determined to be adequate).

Recognizing that the Fannie Mae/Freddie Mac form mortgage unequivocally provides lenders with the right to place insurance, Ulbrich alleges that GMAC violated the Mortgage by requiring continuous coverage and allegedly receiving a commission from the sale of such coverage. However, Ulbrich's claim is not supported by the language of the Mortgage or case law. As a threshold matter, Ulbrich cannot point to any contractual provision that GMAC allegedly breached. Ulbrich's inability to do so is a function of the simple fact that there is no provision that prohibits GMAC from requiring continuous insurance coverage or benefiting from the sale of such coverage as Ulbrich alleges. Indeed, Section 5 of the Mortgage expressly allowed GMAC to take the actions that it took, *i.e.*, purchase insurance on Ulbrich's behalf where it did not have proof of continuous coverage.

Further, courts that have faced the exact same claim that Ulbrich makes here have rejected the claim. *See Schilke v. Wachovia Mortg., FSB*, No. 09-cv-01363, 2011 WL 4501381, at *3, 8 (N.D. Ill. Sept. 28, 2011) (dismissing breach of contract claim that was based on "fees—which [the plaintiff] term[ed] 'kickbacks'" and policies that plaintiff coined as "backdated:" "In sum, Plaintiff's [breach of contract] claims fail[s] . . . because Plaintiff has not . . . demonstrated that Wachovia breached the terms of the contract. If anything, [the mortgagee] honored the agreement when it did exactly what it told Plaintiff it would do—purchase an insurance policy at Plaintiff's expense when Plaintiff failed to maintain its obligations under the agreement by maintaining insurance on the property."); *Webb v. Chase Manhattan Mortg. Corp.*, No. 05-0548, 2008 WL 2230696, at *20 (S.D. Ohio May 28, 2008) (rejecting plaintiff's claim based on so-

{22965286;1}                                                     11

called "backdated" policies and allegedly improper commissions to the lender based on such policies); *Richardson v. Ameriquest Mortg .Co.*, No. 08-22334, 2011 WL 5548066 (Fla. Cir. Ct. Nov. 8, 2011) (relying on the same mortgage language to reject breach of contract claim that alleged that the lender improperly received a share of the lender-placed insurance premium because "[e]ven if an overcharge existed, [the plaintiff] point[ed] to no provision within the mortgage preventing the lender from accepting a portion of the premium charged to [the plaintiff].").

Ulbrich cannot save her breach of contract claim by arguing that GMAC breached the implied covenant of good faith and fair dealing. While Florida recognizes an implied duty of good faith and fair dealing in contracts, "the doctrine of implied covenant of good faith cannot be used to vary the terms of an express contract." *Flagship Resort Dev. Corp. v. Interval Int'l, Inc.*, 28 So. 3d 915, 924 (Fla. 3d DCA 2010). *See also Senter v. JPMorgan Chase Bank, N.A.*, No. 11-60308, 2011 WL 4089585, at *18 (S.D. Fla. Aug. 9, 2011) ("a breach of the implied covenant of good faith and fair dealing is not an independent cause of action, and cannot be maintained under Florida law in the absence of a breach of an express term of a contract.").

The plain language of the Mortgage makes clear that GMAC acted in accordance with its express rights when it purchased insurance. *See Gibson*, 2011 WL 6319401, at *5 (granting motion to dismiss breach of good faith and fair dealing claim based on lender-placed insurance: "Because [the plaintiff] fails to identify a breached contract term, the good faith and fair dealing claim, which requires a breach, is untenable."); *Estate of Gleiberman v. The Hartford Life Ins. Co.*, 94 Fed. Appx. 944, 947 (3d Cir. 2004) ("the District Court properly dismissed the claim for breach of the covenant of good faith and fair dealing, as Hartford acted in accordance with the terms of the contract at all times.") (citation omitted). In fact, the contractual provisions that

{22965286;1}                    12

GMAC was enforcing were form provisions provided by Fannie Mae/Freddie Mac and have

been consistently upheld. *Kolbe*, 2011 WL 3665394 at *5 (dismissing breach of good faith and

fair dealing claim where the defendant exercised its rights under the Fannie Mae/Freddie Mac

form language); *Lass*, 2011 WL 3567280 at *5 (same); *Morgan v. Litton Loan Servicing LP*, No.

10-1865, 2010 WL 3464691, at *2 (D. Md. Sept. 8, 2010) (same); *Hayes*, 2006 WL 3193743 at

*4 (upholding the Fannie Mae/Freddie Mac form language).

Moreover, GMAC had every reason to exercise its right under the Mortgage to require

continuous coverage. For instance, GMAC, as the lender, cannot know with complete certainty

whether or not a loss might have been suffered during a lapse of insurance. *See Shilke*, 2011 WL

4501381 at *3, 8 ("Wachovia's contractual right was to have continuous coverage on the

property. Wachovia was not under any obligation to determine whether the property had

suffered any damage from the date that Plaintiff had allowed her coverage to lapse"); *Webb*,

2008 WL 2230696 at *2 ("Chase had to ensure that the property was continuously covered in the

event that a loss had occurred during the lapse in insurance coverage because no inspection of

the property was done. If Chase had obtained replacement insurance effective as of the date it

received confirmation that the property was no longer insured, and a loss had occurred in the

interim, then there would be no coverage to satisfy Chase's security interest or the borrower's

ownership interest in the property.").

Similarly, failing to ensure continuous coverage might actually expose GMAC to

potential lawsuits. *See, e.g., Trinity Evangelical Lutheran Church & Sch.-Friestadt v. Tower Ins.

Co.*, 661 N.W.2d 789 (Wisc. 2003) (involving multi-million dollar punitive damages award for

insured on bad faith claim where insurer initially refused to backdate coverage that had been

omitted from policy due to mutual mistake of insured and insurance agent); *Anderson v. Minn.*

*Mut. Fire & Cas. Co.*, 399 N.W.2d 233, 234 (Minn. Ct. App. 1987) (backdating of coverage by insurance agent was proper); *Folk v. Home Mut. Ins. Co.*, 368 N.W.2d 305, 308 (Minn. Ct. App. 1985) (finding duty to backdate insurance). Thus, not only does GMAC have the contractual right to act as it did, it had every reason to exercise that right.

Accordingly, Ulbrich's Breach of Contract/Breach of Good Faith and Fair Dealing claim should be dismissed.

> **2.   There Is No Unjust Enrichment Claim Because There Was An Express Contract And GMAC's Acts Were Authorized**

Ulbrich attempts to assert a claim for unjust enrichment in Count II of her Complaint.

As a preliminary matter, "[c]ourts have held that under Florida law, a claim for unjust enrichment, a form of equitable relief, cannot stand if an express contract exists." *Degirmenci v. Sapphire-Ft. Lauderdale, LLP*, 693 F. Supp. 2d 1325, 1347 (S.D. Fla. 2010). *See also Restrepo v. Wells Fargo Bank, N.A.*, No. 09-22436, 2010 WL 374771, at *3 (S.D. Fla. Feb. 3, 2010) ("Plaintiff has alleged an express contract and has attached the contract to the complaint. Consequently, the unjust enrichment claim must be dismissed with prejudice."); *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, No. 5:05-cv-260-Oc, 2006 WL 4990903, at *7 (M.D. Fla. Jun. 15, 2006) ("Plaintiff has not suggested nor alleged that the Agreement is invalid or unenforceable. Instead, Plaintiff, is seeking to recover the same monies through both its breach of contract and unjust enrichment claims. Therefore, because there is an available remedy at law, the equitable remedy of unjust enrichment-as presently pled-fails because the 'law will not imply a contract where a valid express contract exists.'") (quoted case omitted); *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291, 1309 (S.D. Fla. Oct. 15, 2009) ("where there is an express contract between the parties, claims arising out of that contractual relationship

will not support a claim for unjust enrichment"). For this reason alone, the unjust enrichment claim in Count II fails as a matter of law.

Further, an "enrichment" is "unjust" only if "it would be inequitable for [a defendant] to retain [a] benefit without paying for it." *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1006–07 (11th Cir. 2004). Here, there was no injustice as GMAC did not breach its contract and, indeed, acted as that contract authorized it to act. *See Gibson*, 2011 WL 6319401, at *5 (dismissing unjust enrichment claim based on lender-placed insurance because the lender demanded and received only that for which it contracted). The fact that GMAC allegedly profited from its insurance purchase is insufficient to support a claim that there was any injustice. *See Schilke*, 2011 WL 4501381, at *7 (dismissing unjust enrichment claim based on commissions allegedly paid in connection with lender-placed insurance); *Lass*, 2011 WL 3567280, at *7 (dismissing unjust enrichment claim based on commissions allegedly paid in connection with lender-placed insurance: "By failing to purchase the insurance on her own, plaintiff impliedly accepted the forced-placement of insurance, including any fee associated therewith."). For this additional reason, the Court should dismiss the unjust enrichment claim in Count II.

### 3. GMAC Did Not Owe Ulbrich A Fiduciary Duty, And Even If It Did, Florida's Economic Loss Rule Precludes Ulbrich's Claim

The Court should dismiss Ulbrich's fiduciary duty claim as asserted in Count III of the Complaint. The general rule is that the relationship between a bank and its borrower is that of a creditor-debtor and that a bank owes the borrower no fiduciary duty. *See McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1226 n. 13 (11th Cir. 2002) ("there is no presumed fiduciary relationship between a lender and a borrower") (applying Florida law); *Azar v. Nat'l City Bank*, No. 09-400, 2009 WL 3668460, at *2 (M.D. Fla. Oct. 26, 2009) (dismissing breach of fiduciary

duty claim despite longstanding relationship between lender and borrower). Nothing in the Complaint takes the instant case out of the general rule.

In fact, courts have routinely rejected the argument made by Ulbrich here – that a mortgage escrow account establishes a fiduciary duty on the part of a lender. *See, e.g., McLean v. GMAC Mortg. Corp.*, No. 06-22795, 2008 WL 1956285, at *17-18 (S.D. Fla. May 2, 2008) (rejecting plaintiff's breach of fiduciary duty claim stemming from alleged problems related to administration of escrow account: "The plaintiffs have not shown that GMAC owed a fiduciary duty to the plaintiffs in administering the escrow account or otherwise servicing the mortgage. Since there is no fiduciary relationship between the plaintiff and GMAC, GMAC is entitled to final summary judgment as to the plaintiffs' claim for breach of fiduciary duty . . . ."); *Sussman v. Weintraub*, No. 06-20408, 2007 WL 908280, at *4 (S.D. Fla. Mar. 22, 2007) (rejecting defendant's counterclaim for breach of fiduciary duty arising from administration of escrow account: "there [were] no allegations by [the mortgagors] that they either reposed confidence in the [mortgagee], nor that [the mortgagee] accepted any such duties").

Here, GMAC was simply Ulbrich's lender and owed her no fiduciary duty. Significantly, there is nothing in the Complaint that would elevate their relationship to a fiduciary level, including the allegation that GMAC administered Ulbrich's escrow account. The Court should dismiss Ulbrich's claim for this reason alone.

Further, a lender does not breach the duty when it allegedly charges a commission from a mortgagor's escrow account for force-placing insurance. As one court explained:

> [The mortgagor's] mortgage does not specifically address whether [the servicer] may charge a fee or commission for the purchase of force-placed insurance or whether such a fee can be paid out of [the mortgagor's] escrow account. That level of specificity was not necessary, however, because [the mortgagor's] escrow account was established for the express purpose of paying insurance

> premiums.   Thus, it can be inferred that any fees or charges
> associated with the payment of those premiums could also be
> withdrawn from the escrow account.   As such, the Court finds that
> plaintiff has failed to state a viable claim for breach of fiduciary
> duty . . . .

*Lass*, 2011 WL 3567280, at *8 (dismissing claim for breach of fiduciary duty stemming from use

of escrow funds to pay for force-placed insurance). *See also Telfair v. First Union Mortg. Corp.*,

216 F.3d 1333, (11th Cir. 2000) (rejecting breach of fiduciary claim arising from the defendant's

use of escrow funds to pay itself a commission for lender-placing insurance because no fiduciary

duty is established "[i]n the case of escrow funds held by a mortgagee for payment of tax and

insurance payments on behalf of a mortgagor pursuant to a security agreement").

    In short, GMAC did not owe or violate a fiduciary duty and Count III should be

dismissed.   However, even if GMAC somehow owed Ulbrich a fiduciary duty, her claim is

otherwise barred by Florida's economic loss rule.

    The economic loss rule is "designed to prevent parties to a contract from circumventing

the allocation of losses set forth in the contract by bringing an action for economic loss in tort."

*Indemn. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004).

    Accordingly, courts routinely dismiss fiduciary duty claims -- such as the one asserted

here -- where the claim seeks to recover economic damages that flow from a breach of contract

claim. *See, e.g., Royal Surplus Ins. Co. v. Coachman Indus., Inc.*, 184 Fed. Appx. 894, 901 (11th

Cir. 2006) (affirming dismissal of breach of fiduciary duty claim because they were based on the

same information that formed the basis for a breach of contract claim); *Gardner v. Construct

Corps. LLC*, No. 09-1743, 2010 WL 427742, at *2 (M.D. Fla. Feb. 1, 2010) (dismissing breach

of fiduciary duty claim because "the breach of duty in this action is premised upon an

employment agreement signed by each plaintiff"); *Cohen v. Nat'l City Mortg. Co.*, No. 08-578,

2009 WL 2436595, at *3 (M.D. Fla. Aug. 6, 2009) (dismissing breach of fiduciary duty claim);

*Action Nissan, Inc. v. Hyundai Motor Am.*, 617 F. Supp. 2d 1177, 1192-94 (M.D. Fla. 2008)
(dismissing breach of fiduciary duty claim because the fiduciary duty alleged was "established
entirely by the contract"); *Granat v. AXA Equitable Life Ins. Co.*, No. 06-21197, 2006 WL
3826785, at *5 (S.D. Fla. Dec. 27, 2006) (dismissing breach of fiduciary claim as "inextricably
intertwined and dependent upon the breach of contract claim" because the injuries alleged and
damages claimed under the two counts were the same).

Here, Ulbrich's Complaint makes clear that the duty she tries to style as a "fiduciary
duty" is established solely by Paragraph 3 of the Mortgage. *See* Compl., ¶ 93-96. Because the
duty which forms the basis of Ulbrich's breach of fiduciary duty claim is established by contract
between her and GMAC (or, at the *very* least, is "inextricably intertwined" with it), the economic
loss rule bars her claim. Accordingly, Count III should be dismissed for this additional reason.

    **4.**    **There Was No Plausible "Deceptive Act" Under The FDUPTA Given
That GMAC's Acts Were Expressly Permitted By The Mortgage**

The Court should also dismiss the Florida Deceptive and Unfair Trade Practices Act
("FDUTPA"), F.S.A. §§ 501.201-213, set forth in Count IV of the Complaint. The FDUTPA
makes it "unlawful" to engage in "[u]nfair methods of competition, unconscionable acts or
practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"
*Id.* § 201.204(1).

However, dismissal of a FDUTPA claim is appropriate where the contractual agreement
between the parties provides for the actions about which the plaintiff complains. *Ebeh v. St.
Paul Travelers*, No. 09-2628, 2010 WL 5553687, at *6 (M.D. Fla. Oct. 6, 2010), *adopted* 2011
WL 53028 (M.D. Fla. Jan. 7, 2011) (dismissing FDUTPA claim because lender-placed
replacement-value coverage was permitted "under the mortgage," even if replacement-value
coverage was not required by federal law); *Gibson*, 2011 WL 6319401 at *6 (dismissing

FDUTPA claim stemming from lender-placed insurance); *McLean*, 2008 WL 1956285 at *14

(Entering judgment in favor of GMAC as to plaintiff's FDUTPA claim stemming from alleged

problems related to administration of escrow account).

Here, GMAC's acts were not deceptive and, as noted above, were indeed expressly

permitted by the Mortgage. In particular, Section 5 of the Mortgage gave GMAC the right to

protect its security interest by requiring continuous insurance coverage and to purchase such

coverage on behalf on Ulbrich if she failed to do so. As reflected in the case law cited above,

this right has consistently been recognized and upheld. Accordingly, Ulbrich does not plead a

plausible claim under FDUTPA.

### C.    The Court Should At A Minimum Strike The Jury Demand

This Court should otherwise strike Ulbrich's demand for a jury trial because Ulbrich

expressly and specifically waived any right to a jury trial. *See* Mortgage, ¶ 25 ("**25. Jury Trial

Waiver.** The Borrower hereby waives any right to a jury trial in any action, proceeding, claim,

or counterclaim, whether in contract or in tort, at law or in equity, arising out of or in any way

related to this Security Instrument or the Note."). Paragraph 25 is the last paragraph of the

Mortgage. All that is between it and Ulbrich's notarized signature is her acknowledgement that

she "accepts and agrees to the terms and covenants contained in this Security Agreement[.]" *Id.*

This very waiver has been upheld by numerous Florida federal district courts. *See, e.g.,*

*Collins v. Countrywide Home Loans, Inc.*, 680 F. Supp. 2d 1287, 1295 (M.D. Fla. 2010) (Moody,

J.); *Sekesan v. Aegis Funding Corp.*, No. 09–62026, 2010 WL 1249443, at *1 (S.D. Fla. Mar. 25,

2010) (Huck, J.); *Oglesbee v. IndyMac Fin. Servs., Inc.*, 675 F. Supp. 2d 1155, 1158 (S.D. Fla.

2009) (King, J.); *Anderson v. Apex Fin. Group, Inc.*, Case No. 08-949, 2008 U.S. Dist. LEXIS

111449, at *5 (S.D. Fla. July 16, 2008) (Moody, J.); *Murphy v. Cimarron Mortg. Co.*, No. 06-

2142, 2007 WL 294229, at *2 (M.D. Fla. Jan. 29, 2007) (Bucklew, J.); *Belin v. Litton Loan*

*Servicing*, No. 06-760, 2006 WL 2061340, at *1 (M.D. Fla. July 17, 2006) (Bucklew, J.); *Gulati*

*v. Countrywide Home Loans, Inc.*, No. 6:05-CV-1097, 2006 WL 6300891, at *1-2 (M.D. Fla.

Feb. 17, 2006) (Baker, M.J.).  This Court should adopt the same approach and strike Ulbrich's

jury demand pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

### IV.    CONCLUSION

GMAC requests that this Court enter an Order directing GMAC and Ulbrich to proceed

to arbitrate the disputes between them on a non-class basis and staying this action in the interim.

In the alternative, the Court should enter an Order dismissing the Complaint and, to the extent

not otherwise moot, striking the jury demand.

Respectfully submitted,

/s/ Jennifer Cohen Glasser
Jennifer Cohen Glasser
**AKERMAN SENTERFITT**
One Southeast Third Avenue, 25th Floor
Miami, FL 33131
Telephone No. (305) 374-5600
Facsimile No.  (305) 374-5095
E-Mail Address: jennifer.glasser@akerman.com

Henry F. Reichner (admitted *Pro Hac Vice*)
Joe N. Nguyen (admitted *Pro Hac Vice*)
**REED SMITH LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
Telephone No. (215) 851-8100
Facsimile No.  (215) 851-1420
E-Mail Address: hreichner@reedsmith.com
E-Mail Address: jnguyen@reedsmith.com

*Attorneys for Defendant*
*GMAC Mortgage, LLC, formerly known as*
*GMAC Mortgage Corporation*

Dated: January 13, 2012

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion Of Defendant GMAC Mortgage, LLC To Compel Arbitration And For A Stay Or, In The Alternative, To Dismiss The Complaint And Otherwise Strike The Jury Demand has been filed electronically this 13th day of January, 2012, and the following counsel of record will be notified by the Court's ECF system.

E. Michelle Drake
drake@nka.com
Kai Richter
krichter@nka.com
Timothy C. Selander
selander@nka.com
Nichols Kaster, PLLP
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
*Attorneys for Christina Ulbrich*

Erika Deutsch Rotbart
edrotbart@dralawfirm.com
Deutsch Rotbart & Associates PA
4755 Technology Way
Suite 106
Boca Raton, FL 33431
Telephone: (561) 361-8010
Facsimile: (561) 361-8086
*Attorneys for Christina Ulbrich*

/s/ Jennifer Cohen Glasser
Jennifer Cohen Glasser

{22965286;1}

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 0 11-cv-62424

| | |
|---|---|
| Christina Ulbrich, as an individual and as a representative of the classes, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation, and Balboa Insurance Services, Inc. | ) ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF DAVIDA HARRIOTT

Pursuant to 28 U.S.C. § 1746, the undersigned, Davida Harriott, makes the following declaration in support of the motion to compel arbitration filed by Defendant GMAC Mortgage, LLC (formerly known as GMAC Mortgage Corporation) ("GMAC") and, under penalty of perjury, declares as follows:

1.    My name is Davida Harriott. I am a resident of Pennsylvania, am over eighteen years of age, and fully competent to make this declaration. I am authorized to make this declaration on behalf of GMAC. I make this declaration based on my personal knowledge and my investigation into this matter as described below.

2.    I am employed by GMAC as Document Execution Team Lead. In that capacity, I am directly involved in residential mortgage and home equity loan administration and routinely access and review GMAC's business records created and maintained in the regular course of GMAC's operations. These records are made either by persons with knowledge of the matters they record or from information supplied by persons with such knowledge, and were made at or

about the time of the events recorded. GMAC uses and relies on these records in conducting its day to day business operations.

3.      Included in these records are the origination files for mortgage and home equity loans. I have personally reviewed GMAC's records with respect to Christina Ulbrich, the plaintiff in this case.

4.      On August 4, 2003, Ms. Ulbrich entered into a thirty year "cash-out" mortgage refinance loan (the "Loan") with GMAC in the amount of $201,000. In order to secure repayment of the Loan, she executed a uniform mortgage document created and approved by Fannie Mae/Freddie Mac for single family homes in Florida (Form 3010) (the "Mortgage") encumbering her home at 2825 NE 23rd Street, Fort Lauderdale, Florida (the "Property").

5.      That same day (i.e., August 4, 2003), GMAC extended to Ms. Ulbrich a home equity line of credit in the amount of $100,000 (the "HELOC"). The HELOC is evidenced by a Home Equity Line of Credit Agreement and Disclosure Statement (the "HELOC Agreement") along with a mortgage securing future advances under the HELOC (the "HELOC Mortgage"), both of which were signed by Ms. Ulbrich. The HELOC Agreement is attached hereto as Exhibit A. The HELOC Mortgage is attached hereto as Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 13, 2012.

**Davida Harriott**

Account No.: 2632800

Credit Limit: $100,000.00

## GMAC MORTGAGE
## HOME EQUITY LINE OF CREDIT
## AGREEMENT AND DISCLOSURE STATEMENT

1.   **INTRODUCTION.** In this GMAC Mortgage Home Equity Line of Credit Agreement and Disclosure Statement, as amended and extended, Exhibit A hereto and the Addendum (this "Agreement"), "GMAC" refers to GMAC Mortgage Corporation and for Tennessee residents "GMAC" refers to GMAC Mortgage Corporation of TN. "We", "us", "you", "your" and "our" refer to the person or persons who sign this Agreement as borrower(s).

GMAC will open a Home Equity Line of Credit account (the "Account") for us when we sign this Agreement. A mortgage or deed of trust (collectively the "Mortgage") also must be signed so that advances under the Account will be secured by the mortgaged property (the "Property") identified in the Mortgage. This Agreement and the Mortgage, taken together, are called the "Credit Documents". By signing, we acknowledge that we have read the Credit Documents and we agree to use the Account on the terms set forth below.

We acknowledge that GMAC has provided us with the home equity brochure published by the Federal Reserve Board and a document entitled "Important Terms of your Home Equity Line of Credit Account" (the "Important Terms Disclosure"). Further, we acknowledge that GMAC has fulfilled all of its promises set forth in the Important Terms Disclosure with respect to providing additional information upon our request.

After giving notice of default, GMAC may end our right to advances under the Account, reduce the Credit Limit and/or demand repayment at once of all amounts outstanding under the Account in the circumstances described in paragraph 12(b). GMAC may also halt advances or reduce the Credit Limit, under the circumstances and for the period described in paragraph 12(c).

2.   **PROMISE TO PAY.** We promise to pay GMAC all monies advanced under the Credit Documents, including GMAC's out-of-pocket costs shown as Initial Charges on Exhibit A. This amount at any time is called the "Earning Balance Outstanding". We also promise to pay GMAC all FINANCE CHARGES under paragraph 6 and all fees and charges under paragraph 7 ("Special Charges"). This total of accrued Finance Charges and Special Charges at any time is called the "Non-Earning Balance Outstanding". The sum of the Earning Balance Outstanding and the Non-Earning Balance Outstanding is called the "Total Balance Outstanding".

3.   **OUR INDIVIDUAL LIABILITY.** GMAC may enforce its rights under this Agreement against any one of us or against all of us.

4.   **USING THE ACCOUNT.** The term of this Account will consist of a "Borrowing Period" and a "Repayment Period". During the "Borrowing Period", we may borrow any amounts, up to the Credit Limit shown on the first page of this Agreement. The "Borrowing Period" begins on the "Trigger Date" and ends on the 10th anniversary of the "Agreement Date". The "Repayment Period" begins on the day after the 10th anniversary of the "Agreement Date" and will continue until the 15th anniversary of the "Agreement Date". The "Agreement Date" is date below our signatures on this Agreement or the date the Mortgage was notarized, whichever is later. The "Trigger Date" is the first day after our right to cancel the Account expires.

During the Borrowing Period we may obtain cash advances and goods by presenting Home Equity checks ("Checks") issued to us by a bank or banks selected by GMAC (the "Check Bank(s)"). Each initial and subsequent Check must be written for at least $250 except for the residents of Alabama and Mississippi, where the initial Check must be at least $2000. For residents of Kentucky the initial Check must be at least $15,100. The Check Bank will not cash Checks for us.

Also, GMAC may with its prior approval allow us to obtain from the Check Bank and if the services and/or programs are available: (a) wire transfers; (b) cashier's checks and/or (c) a credit card for the Account which will allow you to obtain: (i) cash advances and (ii) goods and/or services ("Purchases") from participating merchants and ATMS to the extent permitted by law.

We may not borrow from the Account during the Repayment Period.

GMAC is not responsible if anyone refuses to accept a Check, wire transfer, cashier's check and/or credit card from your Account.

Std Draw/Repay

5.   NATURE OF THE ACCOUNT.

(a) AVAILABLE CREDIT DURING THE BORROWING PERIOD.  During the Borrowing Period the Account is a revolving credit line.  The maximum amount of credit available to us ("Available Credit") is the Credit Limit less the sum of the amount of all unpaid advances under the Credit Documents and other unpaid fees and charges.  Any payment which is applied against the Earning Balance Outstanding increases Available Credit 15 calendar days after the payment is received.  There is no Available Credit available to us during the Repayment Period.

(b) ADVANCES.  The Check Bank will notify GMAC daily of any Checks, wire transfers, cashier's checks, cash advances and/or Purchases it has paid and GMAC will promptly pay the Check Bank on our behalf for any of your Checks, wire transfers, cashier's checks, cash advances and/or Purchases that it has paid  However, GMAC may elect either to honor or to refuse to honor: (i) any Check, wire transfer or cashier's check which is less than $250, is postdated, improperly completed, presented to the Check Bank more than six months after the Check, wire transfer or cashier's check is dated, or (ii) any Check, wire transfer, cashier's check, cash advance and/or Purchase for an amount which exceeds our Available Credit at the time the Check, wire transfer, cashier's check, cash advance and/or Purchase is presented to the Check Bank (iii) any Check, wire transfer, cashier's check, cash advance and/or Purchase if an Event of Default as defined in Section 12 has occurred, (iv) any Check, wire transfer, cashier's check or cash advance intended to be used in payment of all or part of the amount we owe GMAC on the Account, or (v) any Check, wire transfer, cashier's check, cash advance and/or Purchase which is dated after the Borrowing Period ends.

6.   FINANCE CHARGES.

(a) DAILY RATE.  At the end of each day, GMAC will multiply the Earning Balance Outstanding (to get the Earning Balance Outstanding, GMAC takes the beginning balance of the account each day (which includes any Initial Charges 60 days after the Trigger Date, monies previously advanced for Checks, wire transfers, cashier's checks, cash advances and/or Purchases) and adds all monies advanced on that day for Checks, wire transfers, cashier's checks, cash advances and/or Purchases then GMAC subtracts any payments or credits posted as of that day; this gives GMAC the Earnings Balance Outstanding) by a Daily Rate equal to the ANNUAL PERCENTAGE RATE for that day divided by 365 (366 days in a leap year).  The result is the FINANCE CHARGE for that day.  The sum of these daily FINANCE CHARGES during a monthly billing cycle is the FINANCE CHARGE for the billing cycle.

The ANNUAL PERCENTAGE RATE is based on the value of an index plus a margin and is calculated daily according to the method set forth in the Addendum.  The ANNUAL PERCENTAGE RATE is a simple interest rate.  The index is the Prime Rate as defined in paragraph 6(c).

In addition, recent Daily Periodic Rates and corresponding ANNUAL PERCENTAGE RATES are shown on the Addendum.

(b) MAXIMUM ANNUAL PERCENTAGE RATE.  Notwithstanding any language in this Agreement to the contrary, the ANNUAL PERCENTAGE RATE will never exceed the Maximum Annual Rate shown on the Addendum.

(c) PRIME RATE.  The Prime Rate for any date (the "Rate Date") is the "prime rate" (or high point of any range of "prime rates") established for the Rate Date by the financial institutions surveyed by The Wall Street Journal in publishing its "Money Rates" (or any replacement) Table.  The Prime Rate for the Rate Date will appear in The Wall Street Journal on its first publication date after the Rate Date.  If for any reason no such information is published in The Wall Street Journal for the four consecutive days immediately after the Rate Date, and if the New York Times is then publishing a similar table that only includes the "prime rates" of financial institutions surveyed by The Wall Street Journal immediately prior to such time, GMAC will use the appropriate New York Times table until The Wall Street Journal resumes publishing the necessary information.  If neither newspaper publishes such information for the four consecutive days immediately after the Rate Date, GMAC will select a substitute index that produces a similar rate, that is publicly available and that is beyond GMAC's control.  We understand that a bank's "prime rate" is just a pricing index and is not necessarily the lowest rate charged by a bank.

(d) VARIABLE RATE.  Increases or decreases in the ANNUAL PERCENTAGE RATE and the Daily Rate take effect daily based on changes in the Prime Rate and if provided in the Addendum to the Earning Balance Outstanding.  We will not be given any advance notice of changes in these Rates.  An increase in these Rates will increase our minimum monthly payment.

(e) WHEN FINANCE CHARGES BEGIN.  FINANCE CHARGES on Initial Charges shown on Exhibit A begin 60 days after the Trigger Date.  FINANCE CHARGES on any payment except for checks begin on the date GMAC makes payment.  FINANCE CHARGES on a Check begin on the date it is presented to the Check Bank.  Except for the Initial Charges, there is no grace period when FINANCE CHARGES do not accrue.

(f) COMPLIANCE WITH RATE LIMITS.  Notwithstanding any other provision of this Agreement, we will not have to pay any FINANCE CHARGES, Initial Charges or Special Charges higher than permitted by law.  If it is finally determined that there would be an overcharge, but for this paragraph 6(f), the charge will be reduced to the maximum allowed by law.  The amount of any prior overcharge will be used to reduce the Total Balance Outstanding and the remainder will be refunded to us.  No credit or refund will cure or waive any default by us.

(g) NATURE OF FINANCE CHARGES. The ANNUAL PERCENTAGE RATE includes only interest and not other charges.

7. SPECIAL CHARGES.

(a) LATE CHARGE.

(i) If you are a resident of the *District of Columbia, Florida, Indiana, Iowa, Maine, Massachusetts, Michigan, North Carolina, Ohio, Oklahoma, Rhode Island, South Carolina* or *Wyoming* we will not be required to pay a late charge even if your payment is not made by the due date.

(ii) If you are a resident of *New York* and GMAC does not receive any month's minimum payment within 15 days after the payment due date we will be required to pay a late charge equal to the lesser of $20 or 2% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(iii) If you are a resident *of Idaho, Kansas, Kentucky, Mississippi, Oregon* or *Utah* and GMAC does not receive any month's minimum within 15 days of the payment due date we will be required to pay a late charge equal to the lesser of $20 or 4% of the excess (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(iv) If you are a resident of *Wisconsin* and GMAC does not receive any month's minimum payment within 15 days of the payment due date we must pay a late charge equal to $10.

(v) If you are a resident of *Alabama, Alaska, Connecticut, Delaware, Maryland, Minnesota, Montana, Nebraska, Nevada, New Mexico, New Hampshire,* or *Vermont* and GMAC does not receive any month's minimum payment by the due date shown on statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(vi) If you are a resident of *Arizona, California, Colorado* or *Georgia* and GMAC does not receive any month's minimum payment within 10 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(vii) If you are a resident of *Tennessee* and GMAC does not receive any month's minimum payment within 5 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(viii) If you are a resident of *Virginia* and GMAC does not receive any month's minimum payment within 7 days of the due date shown on the statement for the month we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(ix) If you are a resident of *Hawaii, Illinois, Missouri, New Jersey, Pennsylvania* or *Washington* and GMAC does not receive any month's minimum payment within 15 days of the payment due date as shown on our statement for that month, we will pay a late charge equal to the lesser of $20 or 5% of the excess of (i) the unpaid amount of such past due payment minus (ii) the sum of any overdue payments from prior months and any unpaid late charge.

(x) If you are a resident of *Louisiana* and GMAC does not receive any month's minimum payment within 10 days of the payment due date as shown on the statement for that month, you will be required to pay a late charge equal to the lesser of $15 or 5% of the amount of the delinquent minimum payment due.

(b) ANNUAL FEE. If you are a resident of *Hawaii, Kansas, Kentucky, Maine, Maryland, Michigan, Missouri, Montana, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, Wyoming* or the *District of Columbia* you will not have to pay an annual fee. If you are a resident of: a. *Illinois* you will pay an annual fee of $ $20.00; b. *Iowa* you will pay an annual fee of $15.00; c. *Louisiana* you will pay an annual fee of $12.00; d. *Florida* you will pay an annual fee of $25.00; e. *Ohio* you will pay an annual fee equal to the lesser of $35.00 or ½% of your available credit on the date the annual fee is charged to your account or f. if you are resident of any other state your annual fee will be $35.00. The annual fee will be billed on the first anniversary of this Agreement, is non-refundable and constitutes a FINANCE CHARGE.

The annual fee will be billed to us each year in the same month this Agreement is signed. GMAC will waive the annual fee if you accrue at least $100.00 of FINANCE CHARGES in the year immediately preceding the date in which the Annual Fee is charged.

(c) HANDLING COSTS. To the extent permitted by law, we will pay the following fees: (i) $25.00 for stopping the payment of any Check that you request to be not paid and (ii) $2.00 for each copy of a Check, sales draft or additional monthly billing statements that we request. However, GMAC will not charge handling costs for items requested due to a billing error inquiry.

8. PAYMENTS.

(a) MINIMUM PAYMENT EACH MONTH. During the Borrowing and Repayment Periods we agree to pay at least the amount of the minimum payment shown on each monthly billing statement by the payment due date on the statement. To figure the minimum payment during the Borrowing Period for a billing cycle, GMAC will add all FINANCE CHARGES and Special Charges accrued under paragraphs 6 and 7 respectively during the billing cycle and all overdue payments from prior billing cycle. The minimum payment is the lesser of the sum of this amount described immediately above or the Total Balance Outstanding at the end of the billing cycle period. The minimum payment for a billing cycle during the Repayment Period will be the sum of: (i) all FINANCE CHARGES and Special Charges accrued under paragraphs 6 and 7 accrued during the billing cycle; (ii) all overdue payments from prior billing cycles and (iii) the greater of $50.00 or 1.667% of the Earning Balance Outstanding at the end of the Borrowing Period. In addition, we will be required to repay GMAC any excess of the Earning Balance Outstanding over our Credit Limit.

(b) PREPAYMENT. We may prepay the Total Balance Outstanding in full or in part at any time without penalty.

(c) MATURITY DATE. We understand that making the minimum payment each month during the Borrowing Period will not result in any reduction of the Earning Balance Outstanding. Making the minimum payment each month during the Repayment Period will reduce the Earning Balance Outstanding. Unless we have paid off the Total Balance Outstanding and canceled the Account or GMAC terminates the Account before the end of the Repayment Period (the "Maturity Date") we will pay the remainder of the Total Balance Outstanding in a single payment which may be a balloon payment. See paragraphs 12(b) and 14. The Account will terminate after this final payment.

(d) APPLICATION OF PAYMENTS. GMAC will apply our payments first against FINANCE CHARGES and Special Charges from prior billing periods, next against advances in prior billing periods, then against FINANCE CHARGES and Special Charges from the current billing period and finally against advances obtained in the current billing period. Any Payments for Special Charges will be applied in the following order: late charges, if any; annual fees, if any; any handling costs and then to any insurance premiums. However, any time the Earning Balance Outstanding is greater than our Credit Limit, GMAC may elect to apply our payments first against advances outstanding, starting with the oldest advance.

(e) STATEMENTS CONCERNING PAYMENTS. GMAC may ignore statements such as "payment in full" on any check (or which accompany any check) which we send in payment of any amount owed by us. GMAC may deposit such check without notifying us and without its deposit being a settlement of the amount owed. Any such check will be applied as described in paragraph 8(d).

9. MONTHLY STATEMENT. GMAC will send us a statement for each monthly billing period in which we make a payment on the Account or in which the amount due is $1.00 or more.

10. SECURITY. The Mortgage gives GMAC a lien on the Property to the extent of the Total Balance Outstanding at any time and is made a part of this Agreement by reference. The Mortgage describes insurance we must maintain on the Property. Although we may choose the insurance company, GMAC has the right to refuse to accept our choice for reasonable cause.

11. TRANSFER OF RIGHTS AND DUTIES. The Account is our personal obligation, and GMAC is relying on us to repay the amounts it advances. We agree not to transfer our credit privileges or our payment duties to another person without GMAC's prior written consent. However, GMAC may transfer its rights and duties at any time with or without notice. Our heirs, successors and assigns shall be bound by all of our duties, and our approved assigns will have all of our rights. GMAC's successors and assigns shall be bound by all of GMAC's duties and will have all of GMAC's rights.

12. EVENTS OF DEFAULT.

(a) NOTICE. The events set forth in paragraphs 12(b) and 12(c) are Events of Default if and when GMAC gives any person (other than GMAC) who has signed a Credit Document ("Signer") notice of default. We agree to notify GMAC promptly upon the happening of any event that would be an Event of Default.

(b) TERMINATION EVENTS. In any of the events described in this paragraph 12(b), GMAC may give notice of default. Upon or after giving such notice, GMAC may permanently end our right to advances under the Account, may reduce our Credit Limit and/or, either immediately or at such later time as GMAC elects, may demand repayment at once of the Total Balance Outstanding.

(i)    There has been fraud or material misrepresentation by us in connection with the Account;

(ii)    We have failed to meet the repayment terms of this Agreement for any amount outstanding; or

(iii)    To the extent permitted by law, any action or inaction by you has adversely affected the Property or any right of GMAC in the Property; to the extent permitted by law, this will include, but not be limited to, (or any legal representative or successor of yours) you agreeing to sell, transfer, or assign or selling, transferring or assigning any interest in the Property without the prior written consent of GMAC.

(e)    SUSPENSION EVENTS.    In any of the events described in this paragraph 12(e), GMAC may give notice of default. GMAC may freeze advances (not permit us to access our Account for additional advances) or reduce the Credit Limit if any of the events described below occur. GMAC will notify us if our Account is frozen or if our Credit Limit is reduced. If the reason for such action no longer exists and we would like our credit privileges reinstated, then it is our responsibility to deliver to GMAC a written request for reinstatement of credit privileges, with evidence that the event(s) causing the suspension have been cured. We promise that we will include with any request for reinstatement any evidence reasonably necessary to show that the event(s) in question have ended. If, after reasonable investigation, GMAC agrees that the event(s) resulting in such action no longer exist and that no other conditions that would permit such action currently exist, then GMAC will reinstate our credit privileges.

The following events give rise to these consequences:

(i)    The value of the Property declines significantly below the appraised value of the Property used by GMAC in deciding to open the Account;

(ii)    GMAC reasonably believes that we will be unable to fulfill our repayment obligations under the Account because of a material change in our financial circumstances;

(iii)    Signers are in default of any of the following obligations under the Credit Documents, which we agree are material:

(A)    paragraph 12(c) of the Agreement, requiring evidence of the end of an Event of Default;

(B)    paragraph 16(c) of the Agreement, prohibiting conflicting instructions [or court orders];

(C)    paragraph 16(e) of the Agreement, requiring notice of lost or stolen Checks and/or credit cards;

(D)    paragraph 16(g)(ii) of the Agreement, requiring notice of adverse changes in our credit or financial condition or the value of the Property and requiring compliance with reasonable GMAC requests for information;

(E)    paragraph 16(i) of the Agreement, requiring notice of changes in our address, name or employment and notice of death, imprisonment or incompetency;

(F)    paragraph 3 of the Mortgage, prohibiting prior mortgages, deeds of trust, charges and liens on the Property;

(G)    paragraph 4 of the Mortgage, regarding hazard insurance and condemnation;

(H)    paragraph 5 of the Mortgage, regarding maintenance of the Property;

(I)    paragraph 6 of the Mortgage, regarding protecting GMAC's security;

(J)    if applicable, paragraph 1 of the Condominium Rider or Planned Unit Development Rider to the Mortgage, requiring payment of condominium or planned unit development obligations;

(K)    if applicable, paragraph 2 of the Condominium Rider, regarding notice of a lapse of insurance coverage; or

(L)    if applicable, paragraph 4 of the Condominium Rider or Planned Unit Development Rider, prohibiting certain actions without GMAC's consent;

(iv)    The Maximum Annual Percentage Rate provided for in paragraph 6(b) is reached; or

(v)    The priority of the Mortgage is adversely affected by government action to the extent that the value of the equity in the Property after liens prior to the Mortgage is less than 120% of the Credit Limit.

(vi)    GMAC is prevented by any government action from applying to my Account the Annual Percentage Rate that is provided for in this Agreement.

(vii)    GMAC is notified by its regulatory agency that continued advances would constitute an unsafe and unsound practice.

(d) **CURE, ETC.** Notwithstanding any language in this Agreement to the contrary, GMAC will not take any action upon an Event of Default unless permitted by applicable law and GMAC will give us any grace period, right to cure and/or reinstatement right required by applicable law. However, we understand and agree that this paragraph 12 is intended to give GMAC all rights permitted by applicable law.

(e) **RETURN OF CHECKS AND CREDIT CARDS.** Upon the occurrence of an Event of Default as set forth in Paragraph 12(b), we will promptly return all unused Checks and credit cards to GMAC.

(f) **FORECLOSURE.** If we do not repay the Total Balance Outstanding at once when due, GMAC may exercise any right available to it under applicable law, including foreclosure.

**13. AMENDMENT OF AGREEMENT.** We agree that GMAC may amend this Agreement, without any further consent from us, if (a) the amendment is "insignificant" (as defined under applicable federal law) or (b) if the amendment will unequivocally benefit us throughout the remainder of the term of this Agreement. All other amendments to this Agreement shall require a written agreement between GMAC and us.

**14. CANCELLATION BY US.** If we wish to close the Account, we must notify GMAC that we are closing our Account and return all unused Checks and credit cards. The notice must specify the Account number and an effective date of cancellation. The date of cancellation must be after GMAC receives the Notice. We will be responsible for all Checks signed by us whenever written as well as all credit card cash advances and/or Purchases made by us whenever made, and we will pay GMAC the Total Balance Outstanding on the cancellation date. We will not be released from our duties until this amount is paid. If GMAC receives a check which satisfies the Total Balance Outstanding GMAC may at its sole discretion consider the Account closed.

**15. ARBITRATION.**

THIS AGREEMENT PROVIDES THAT EXCEPT AS DETAILED IN PARAGRAPH 15(b), ALL CLAIMS (AS DEFINED BELOW) WILL BE RESOLVED BY BINDING ARBITRATION. BY SIGNING THIS AGREEMENT, THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT TO LITIGATE THE CLAIM IN COURT, PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OR CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION OR HAVE A JURY TRIAL FOR CLAIMS THAT ARE SUBJECT TO ARBITRATION.

(a) **AGREEMENT TO ARBITRATE CLAIMS.** Any claim, dispute, or controversy (collectively "Claim") between GMAC and us (except those listed below in Paragraph 15(b)) including but not limited to those arising out of the Credit Documents, my application, advertisements, servicing and collection of the Account, any outstanding balances or balance transfers posted to the Account, insurance products or services, as well as any other disclosure or document related to the Credit Documents shall exclusively be resolved by BINDING ARBITRATION by an arbitrator of the American Arbitration Association ("AAA") in accordance with (i) the Federal Arbitration Act; (ii) the Expedited Procedures of the Commercial Rules of the AAA and the AAA Supplementary Procedures for Consumer Related Disputes and (iii) this Paragraph. The term Claim shall be given the broadest possible meaning. The terms of this paragraph shall control any inconsistency between the arbitration rules and this Paragraph. We may obtain a copy of the arbitration rules by writing the AAA at American Arbitration Association 335 Madison Avenue 10th Floor New York, NY 10017-4605. An action to compel arbitration may be brought at any time even after a Claim has been commenced or raised in a court of law or equity or the Account has been paid in full. At your written request GMAC will pay all my fees up to $1,000 for the AAA's cost of the arbitration of the Claim. If the cost of the AAA arbitration exceeds $1,000 the parties will share the excess cost equally unless otherwise ordered by the AAA because my costs in pursuing the arbitration would be prohibitive. Unless inconsistent with applicable law each party shall pay his/her own attorney, expert and witness fees and expenses.

(b) **CLAIMS EXCLUDED FROM JURISDICTION.** The following actions shall not be subject to arbitration: any foreclosure action, any action to obtain possession of the property securing the Account; any action for prejudgment injunctive relief or appointment of receiver(s). In addition, GMAC agrees that it will not require us to arbitrate an individual Claim brought against GMAC in small claims court or our state's equivalent court, if any; however, if that Claim is transferred or appealed to a different court, GMAC reserves the right to require arbitration under Paragraph 15.

(c) **JUDGMENT AND ADDITIONAL TERMS.** An arbitration award shall be final and may be entered as a judgment in any court having jurisdiction, except that if the amount in controversy exceeds $10,000 either party may appeal the arbitrator's award to a three-arbitrator panel of the AAA which shall re-consider de novo any aspect of the initial award. The costs of such appeal will be borne by the appealing party. The costs of such appeal will be borne by the appealing party regardless of the outcome of the appeal. We agree that any arbitration proceeding will only consider our Claims. Claims by or on behalf of other borrowers, co-borrowers, co-signers, sureties or applicants will not be arbitrated in any proceeding that is considering our Claim.

This Paragraph 15 shall survive any termination of our Account including but not limited to repayments of amounts owed on our Account and an event of default. If any portion of this arbitration provision is deemed invalid or unenforceable, this shall not invalidate the remaining portions of the arbitration provision or the Credit Documents.

6

16. OTHER PROVISIONS.

(a) WAIVER. We agree that we will not be released from any of our obligations because GMAC releases or takes any additional security for the repayment of amounts owed. GMAC may waive or delay enforcing its rights without limiting its ability to exercise them in the future. Any waiver by GMAC shall be in writing and shall apply only to the extent stated in the writing. No waiver shall be regarded as a waiver of any other event.

(b) SATISFACTION, COLLECTION AND FORECLOSURE COSTS. To the extent permitted by law, all satisfaction fees charged by any recording office for canceling the Mortgage will be billed to you, and to the extent permitted by law reasonable out-of-pocket costs (including attorneys' fees) incurred and projected by GMAC in enforcing its rights shall be included as additional indebtedness in any judgment or decree against us.

(c) JOINT ACCOUNTS; CONFLICTING INSTRUCTIONS. If more than one person signs this Agreement, then this Account is a joint account and each signer will be individually responsible and liable for the entire account balance. If this is a joint Account, we agree not to give conflicting instructions regarding the Account. Nevertheless, in the absence of a court order, GMAC may comply with a request made by any of us (even if it conflicts with a request made by another one of us) or GMAC may refuse any request. GMAC may also give notice of an Event of Default under paragraph 12(c) if it receives conflicting instructions on the Account. If GMAC receives conflicting instructions, or a court order regarding the Account, it may refuse any request or dishonor any Check or credit card cash advance or Purchase, without notice to any of us.

(d) STOPPING PAYMENTS. In order to stop payment on a Check, we must call the telephone number for customer inquiries shown on our most recent monthly billing statement. WHILE GMAC WILL MAKE A GOOD FAITH EFFORT TO STOP PAYMENT, GMAC DOES NOT GUARANTEE THAT PAYMENT ON ANY CHECK WILL IN FACT BE STOPPED.

(e) LOST OR STOLEN CHECKS AND/OR CREDIT CARDS. We agree to contact GMAC immediately at the address or telephone number shown on our most recent monthly statement if we learn that any Check and/or credit card has been lost or stolen.

(f) GOVERNING LAW. This Agreement will be governed by federal and Florida law. If any provision is invalid, illegal, or unenforceable, this Agreement will be interpreted as if such provision had never been included. We agree to fully cooperate in the correction and adjustment of any errors in the loan documents if deemed necessary or desirable by GMAC to comply with any law or regulation or to meet the terms and conditions of the loan approval.

(g) CREDIT INFORMATION. (i) To the extent permitted by law, GMAC may disclose information about us, our performance under this Agreement, employment, credit, or other information: (1) to credit reporting agencies, (2) to affiliates of GMAC unless you (if there is more than one borrower each borrower must notify GMAC to prevent the sharing of that borrower's information with affiliates) notify GMAC at 100 Witmer Road, Horsham, PA 19044-0963 Attention: Home Equity Department that GMAC should not share this information with affiliates (upon receipt of this notice GMAC will stop sharing information with affiliates), (3) if GMAC reasonably believes disclosure necessary to ensure our compliance with the Credit Documents, or (4) if we give GMAC our written permission. We authorize GMAC to obtain reports from others (such as employers, creditors, lenders and credit reporting agencies) from time to time bearing on our credit status. This applies to each of us if this is a joint Account.

(ii) We agree to notify GMAC promptly if there is any material adverse change in our credit or financial condition or the value of the Property. We also agree to provide GMAC with any updated information GMAC reasonably requests from time to time concerning our credit or financial condition or the value of the Property.

(h) TIME OF THE ESSENCE. Time is of the essence in this Agreement.

(i) CHANGE OF ADDRESS, ETC. We will give GMAC prompt prior notice of any change in our address, name or employment and we will give GMAC prompt notice if any of us dies by sending GMAC a certified death certificate if it requests one, is imprisoned or becomes legally incompetent.

(j) NOTICES. Any GMAC notice shall be hand delivered or sent by first class, registered or certified mail to the address of the Property or such other address specified by the addressee in a written notice given to GMAC. Any GMAC notice shall be considered given on the day it is deposited in the U.S. mail or is hand-delivered.

Any notice from us must be mailed to GMAC by first class, registered or certified mail to the address shown on our most recent monthly statement or to such other address specified by GMAC in a written notice given to us. Any such notice shall be considered given on the day it is received by GMAC.

(k) FAILURE TO MAKE ADVANCE. We agree that GMAC will not be responsible if we cannot obtain an advance because of any cause beyond its reasonable control or if anyone refuses to accept a Check, wire transfer, cashier check and/or credit card.

(l) COPIES, ETC. If GMAC sues to enforce this Agreement, GMAC may use a copy, microfilm, or microfiche of any Check, monthly statement or other document to prove what we owe GMAC. The copy, microfilm or microfiche can be used just like the original document.

(m) CREDIT BALANCES. GMAC will not pay us interest on any credit balances

(n) ANNUAL STATEMENT. Within ten days after receipt of a written request from us, GMAC will deliver to us once per year and without charge a statement showing the date and amount of all payments on the account for the immediately preceding 12 month period, and the Total Balance Outstanding.

(o) USE OF FUNDS. We agree to use all funds advanced to us for personal, family or household purposes.

(p) TAXES. If taxes on mortgages or the debts they secure increase in any way after the date of the Mortgage, we shall pay the full amount of any such increase.

(q) TAX ADVICE. We should consult a tax advisor regarding the deductibility of interest and charges under the Account.


*(THIS SPACE INTENTIONALLY LEFT BLANK)*

8

## NOTICE TO BORROWER

You have the right to be represented by an attorney of your own choosing at the time this Agreement is signed.

Read the entire Agreement before you sign.

You are entitled to a copy of this Agreement.

You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with the law.

Do not sign this Agreement if it contains blank spaces. All spaces should be completed before you sign.

This Loan Agreement is secured by a secondary mortgage on your real property. Default in the payment of this loan may result in loss of the property securing this loan.

Christina Coolidge Ulbrich
_____
Borrower Name

2825 Ne 23Rd Street

Fort Lauderdale, Florida 33305
_____
Address

August 4, 2003
_____
Date

•   •   •   •

_____
Borrower Name

_____
Borrower Signature

_____
Address

August 4, 2003
_____
Date

_____
Borrower Name

_____
Borrower Signature

_____
Address

August 4, 2003
_____
Date

•   •   •   •

_____
Borrower Name

_____
Borrower Signature

_____
Address

August 4, 2003
_____
Date

As used in the following notice, the terms "we", "us" and "our" refer to GMAC and the terms "you" and "your" refer to the person(s) who signs the Agreement as borrower(s).

## FAIR CREDIT BILLING ACT DISCLOSURES

**Your Billing Rights**
**Keep this Notice for Future Use**
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About Your Bill**
If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill.  Write to us as soon as possible.  We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared.  You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected
- Describe the error and explain, if you can, why you believe there is an error.  If you need more information, describe the item you are not sure about.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then.  Within 90 days, we must either correct the error or explain why we believe the bill was correct

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent.  We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit.  You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount.  If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount.  In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent.  However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill.  And, we must tell you the name of anyone we reported you to.  We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

EXHIBIT A

| Initial Charge | Amount | |
|---|---|---|
| Appraisal Fee | $ | 0.00 |
| Title Insurance and Endorsement Fee(1) | $ | 0.00 |
| Title Search Fee(2) | $ | 0.00 |
| Recording Fee(1) | $ | 0.00 |
| Closing Agent Fee | $ | 0.00 |
| Flood Certificate | $ | 0.00 |
| Attorney Fee | $ | 0.00 |
| Survey | $ | 0.00 |
| State Tax/Stamps | $ | 0.00 |
| Intangible Tax | $ | 0.00 |
| City/County Tax/Stamps | $ | 0.00 |
| TOTAL | $ | 0.00 |

(1)  Estimated. Subject to adjustment when actual out-of-pocket costs determined.

(2)  Includes title examination.

Account No.: 2632800

## ADDENDUM TO AGREEMENT

THIS ADDENDUM TO AGREEMENT *(this "Addendum")* modifies and supplements the GMAC Mortgage Corporation Home Equity Line of Credit Agreement and Federal Truth-in-Lending Disclosure Statement (the "Agreement") that is being executed along with this Addendum. All terms defined in the Agreement have the same meanings in this Addendum. To the extent of any inconsistency with the Agreement, this Addendum shall control.

Since you are a Qualified GM Expanded Family member, the regular variable ANNUAL PERCENTAGE RATE on your Account, except for the discount rate period described in paragraph 1 below, will be calculated by adding to the Prime Rate a margin of 1/4 of 1% lower than the amount added for members of the general public. You will continue to receive this discount even if your GM Family member retires, leaves GM or becomes eligible for disability leave. A Qualified GM Expanded Family member is a person whose immediate family member is employed by General Motors Corporation and/or one of its wholly-owned subsidiaries *(collectively, "GM")*, as defined by the GM Personnel Department. A "Qualified GM Expanded Family Member" is also any person whose immediate family member was a GM Employee at the time of retirement and is receiving retirement benefits from GM at the time such person signs the Agreement.

1. **DISCOUNTED VARIABLE RATE.** You will receive a discount during the first 3 months of the Borrowing Period, the variable ANNUAL PERCENTAGE RATE for any day will be a simple variable interest rate which equals the Prime Rate for that day. No margin will be added to the Prime Rate. As of the day you sign the Agreement, the Daily Rate and corresponding variable ANNUAL PERCENTAGE RATE is estimated to be as follows:

| Daily Rate | Corresponding ANNUAL PERCENTAGE RATE |
|---|---|
| 0.01096% | 4.00% |

During the term of the discount this rate may vary. Unless otherwise agreed to by GMAC this discounted rate is available only for first time home equity credit line borrowers.

2. **REGULAR RATE.** When the discount rate is not in effect the ANNUAL PERCENTAGE RATE equals (i) the Prime Rate plus a margin of 1.75% for any day in which the Earning Balance Outstanding at the end of the day is $25,000 or less; (ii) the Prime Rate plus a margin of 1.50% for any day in which the Earning Balance Outstanding at the end of the day is greater than $25,000 but $50,000 or less; and (iii) the Prime Rate plus a margin of 1.25% for any day in which the Earning Balance Outstanding at the end of the day is more than $50,000. If the discounted rate was not in effect, the Daily Rate and corresponding variable ANNUAL PERCENTAGE RATE as of the day you sign this Agreement is estimated be as follows:

| Outstanding Principal Balance | Daily Rate | Corresponding ANNUAL PERCENTAGE RATE |
|---|---|---|
| $25,000 or less | 0.01575% | 5.75% |
| $25,001 to $50,000 | 0.01507% | 5.50% |
| More than $50,000 | 0.01438% | 5.25% |

During the term of your Agreement these rates may vary. Also, these rates apply to your entire Earnings Balance Outstanding. For example, based on the above rates if you have an Earnings Balance Outstanding of $110,000, the ANNUAL PERCENTAGE RATE for the entire $110,000 will be 5.25%.

The maximum ANNUAL PERCENTAGE RATE that can apply during the term of the loan is the lesser of: (a) ten percentage points (10.00%) over the index value the day before your Account is opened; or (b) the maximum percentage rate permitted by applicable law.

90% CLTV Piggyback

PCL XL error

Subsystem:  GE_VECTOR

Error:      GEEmptyClipPath        Warning:    IllegalMediaSize

ACCURATE TITLE CLOSINGS,INC
2421 UNIVERSITY DRIVE
CORAL SPRINGS, FL 33065
05-1152

**THIS INSTRUMENT PREPARED BY:**
Patrice Jividen
GMAC Mortgage Corporation
4 Walnut Grove Drive
Horsham, PA 19044-0963

**UPON RECORDATION, RETURN TO:**
GMAC Mortgage Corporation
Home Equity Funding
4 Walnut Grove Drive
Horsham, PA 19044-0963

INSTR # 103220171
OR BK 35840 Pages 873 - 879
RECORDED 08/1603 10:45:15
BROWARD COUNTY COMMISSION
DOC STMP-M $350.00
INT TAX: 11 $200.00
DEPUTY CLERK 1913
#2, 7 Pages

Branch No.: 194
Loan Product: 90% CLTV Piggyback

Account No. 2632800

MIN 1000697-0000263280-1

## MORTGAGE

### THIS MORTGAGE SECURES FUTURE ADVANCES

THIS MORTGAGE, as amended and extended *(this "Mortgage")* is signed to secure advances under a GMAC Home Equity Line of Credit agreement *(the "Agreement")*; it is dated as of August 4, 2003, and is made by Christina Coolidge Ulbrich, A Single Woman who reside(s) at 2825 Ne 23Rd Street , Fort Lauderdale, Florida 33305, as mortgagor(s), in favor of GMAC Mortgage Corporation, a Pennsylvania Corporation, 100 Witmer Road, Horsham, PA   19044-0963 (herein "GMAC") and the Mortgage Electronic Registration Systems, Inc., P.O. Box 2026, Flint, MI 48501-2026 ("MERS") acting solely as nominee for GMAC and GMAC's successors and assigns under this Mortgage, as mortgagee.

Throughout this Mortgage, "we", "us" and "our" refer to mortgagor(s).  "GMAC" refers to GMAC Mortgage Corporation or its assigns.  The "Account" refers to the Home Equity line of credit account established by GMAC under the Agreement.  "Borrower" refers to each person who signs the Agreement as borrower.  The Agreement and this Mortgage, taken together, are called the "Credit Documents."  "Signer" refers to any person (other than GMAC) who has signed a Credit Document.

### DESCRIPTION OF SECURITY

By signing this Mortgage, we mortgage, grant and convey to MERS acting solely as a nominee for GMAC, subject to the terms of this Mortgage, (a) the real estate located at 2825 Ne 23Rd Street , Fort Lauderdale, County of Broward, State of Florida 33305, more fully described in Schedule A; (b) all buildings and other structures on the property; (c) all rights we may have in any road, alley, easement or license regarding the property or in any mineral, oil, gas or water which is part of the property; (d) all rents and royalties from the property; (e) all proceeds of any insurance on the property and all refunds of premiums on such insurance; (f) all proceeds of any taking (or threatened taking) of the property by any governmental authority ("condemnation"); and (g) all fixtures on the property at any time *(collectively, the "Property")*.

The Property includes all rights and interests which we now have or which we may acquire in the future. For example, if the security mortgaged under this Mortgage is a leasehold estate and we subsequently acquire fee title to the Property, the rights and interests granted to MERS acting solely as a nominee for GMAC by this Mortgage will include the fee title that we acquire.  This Mortgage is also a Security Agreement under the Florida Uniform Commercial Code and we hereby grant MERS acting solely as a nominee for GMAC a security interest in the personal property described in (d) through (f) above.

### SECURED OBLIGATIONS

We have signed this Mortgage to secure payment to GMAC of up to $100,000.00, plus FINANCE CHARGES and any other amounts due GMAC under the Agreement *(the "Total Balance Outstanding")* and to secure performance by Borrower under the Agreement and our performance of the covenants of this Mortgage *(collectively, the "Secured Obligations")*.

### PRIORITY OF ADVANCES

The lien of this Mortgage will attach on the date this Mortgage is recorded.  The indebtedness evidenced by the Credit Documents is a revolving indebtedness.  The Credit Documents provide that amounts may be advanced, repaid and readvanced from time to time in accordance with the terms and provisions of the Agreement.  Accordingly, the aggregate advances during the term of the Credit Documents may exceed the Credit Limit as defined and set forth in the Agreement.  However, the Total Balance Outstanding less FINANCE CHARGES at any time *(the "Earning Balance Outstanding")* shall never exceed the Credit Limit, except for advances made to protect the lien of this Mortgage.  We agree that the lien and security title of this Mortgage shall not be deemed released or extinguished by operation of law or implied intent of the parties if the Total Balance Outstanding is zero as of the date of this Mortgage or is from time to time reduced to zero by payments made to GMAC.

GMAC-Fl.

**REPRESENTATIONS AND DUTIES**

We promise that, except for Permitted Liens: (a) we own the Property; (b) we have the right to mortgage the Property to GMAC; and (c) there are no outstanding claims or charges against the Property. The term "Permitted Lien" means (x) any mortgage, deed to secure debt or deed of trust *("security instrument")* disclosed to GMAC by any Signer in applying for the Account, to the extent that the amount secured by such security instrument does not exceed the amount disclosed on such application; and (y) any liens, claims and restrictions of record that do not individually or collectively have a material adverse impact upon GMAC's security, the value of the Property or the Property's current use.

Each of us gives a general warranty of title to GMAC. This means that each of us will be fully responsible for any losses which GMAC suffers because someone has rights in the Property other than Permitted Liens. We promise that we will defend our ownership of the Property against any claims of such right.

We will neither take nor permit any action to partition, subdivide or change the condition of title to all or any part of the Property. We will not amend any Permitted Lien without GMAC's prior written consent.

**CERTAIN PROVISIONS OF THE AGREEMENT**

We understand that GMAC may, under certain circumstances set forth in the Agreement, cancel its obligation to make future advances and/or require repayment at once of the Total Balance Outstanding.

Under the Agreement, FINANCE CHARGES are based on the "prime rate" published in The Wall Street Journal or in certain circumstances the "prime rate" published in The New York Times or a similar index selected by GMAC. The rate of FINANCE CHARGES changes on a daily basis as the index or the amount outstanding under the Agreement increases or decreases. We understand that we will not receive advance notice of such changes.

**PROMISES AND AGREEMENTS**

We agree with GMAC as follows:

1. TIMELY PAYMENT. Except as limited by paragraph 10 below, Borrower shall pay when due all sums owed GMAC under the Credit Documents.

2. APPLICATION OF PAYMENTS. All payments shall be applied by GMAC as set forth in the Agreement.

3. MORTGAGES AND DEEDS OF TRUST; CHARGES; LIENS. We shall make payments when due and perform all our obligations under any mortgage, deed of trust or other security agreement on the Property.

We shall pay or cause to be paid when due all loans, taxes, assessments, charges, fines, impositions and rents of any kind relating to the Property *("Assessments")*. Receipts evidencing such payments shall be delivered to GMAC upon its request. Except for Permitted Liens, we shall not allow any encumbrance, charge or lien on the Property to become prior to this Mortgage.

4. HAZARD INSURANCE; CONDEMNATION.

(a) We shall, at our cost, keep all improvements on the Property insured against loss caused by hazards included in the term "extended coverage" or by other hazards GMAC may reasonably specify. Hazard insurance shall be in an amount equal to the lesser of (i) the full replacement cost of the building that is part of the Property or (ii) the amount of this Mortgage plus the total amount of all Permitted Liens; but never less than the amount necessary to satisfy any coinsurance requirement contained in the insurance policy.

We may choose the insurance company, subject to approval by GMAC which may not be unreasonably withheld. All insurance policies and renewals must be in a form acceptable to GMAC and must include a standard mortgagee clause in favor of GMAC. GMAC shall have the right to hold the policies and renewals, subject to the terms of any Permitted Liens. If we pay the premiums directly, we shall provide GMAC with all renewal notices and, if requested by GMAC, all receipts for premiums. If policies and renewals are held by any other person, we shall supply copies of them to GMAC within ten calendar days after they are issued.

In the event of loss, we shall give prompt notice to the insurance company and GMAC. GMAC may file a proof of loss if we fail to do so promptly.

(b) The proceeds of any condemnation of the Property shall be paid to GMAC, subject to any Permitted Liens. We shall give GMAC notice of any threatened condemnation and sign all documents required to carry out this paragraph 4. No condemnation settlement may be made without GMAC's prior written approval which shall not be unreasonably withheld.

(c) Subject to the terms of any Permitted Lien, GMAC may elect that the proceeds of any insurance or condemnation (after payment of all reasonable costs, expenses and attorneys' fees paid or incurred by GMAC and us) shall be applied to pay the Secured Obligations, to repair or reconstruct the Property, and/or pay us for our loss. In the event that such proceeds are not used entirely for repair and reconstruction, we shall provide GMAC with a new appraisal or valuation of the Property, conducted by a person or entity and in a form reasonably acceptable to GMAC, unless GMAC waives this requirement in writing. The receipt of proceeds shall not cure or waive any default or notice of default under this Mortgage or invalidate any act done pursuant to such notice.

If the Property is abandoned by us, or if we fail to respond to GMAC in writing within 30 calendar days from the date notice of a proposed insurance or condemnation settlement is given to us, GMAC may settle the claim, collect the proceeds and apply them as set forth above.

If the Property is acquired by GMAC, all of our right, title and interest in and to any insurance or condemnation proceeds shall become the property of GMAC to the extent of the sums secured by this Mortgage.

**5. MAINTENANCE OF THE PROPERTY; LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** We shall: use, improve and maintain the Property in compliance with law; keep the Property in good repair and pay when due all repair costs; prevent waste, impairment and/or deterioration of the Property; and comply with the provisions of any lease of the Property.

If the Property is part of a condominium project or a planned unit development, we shall promptly perform all of our obligations under the governing documents of the project or development.

**6. PROTECTION OF GMAC SECURITY.** We shall appear in and defend any action or proceeding which may affect the security of GMAC under this Mortgage or result in a violation of paragraph 3 above. If such an action is filed, we violate this Mortgage or Borrowers violate the Agreement, then GMAC may disburse funds and do whatever it believes necessary to protect the security of this Mortgage. In doing so, GMAC shall give us notice but it need not make demand or release us from any obligation.

Any amounts paid by GMAC under this paragraph 6, with FINANCE CHARGES at the variable rate in effect under the Agreement, shall be paid by us upon demand. Until paid by us, such amounts are secured by this Mortgage. GMAC is not required to incur any expense or take any action under this Mortgage and no action taken shall release us from any duty.

**7. INSPECTION.** Representatives of GMAC may inspect the Property from time to time. Except in an emergency, GMAC must first give notice specifying reasonable cause for the inspection.

**8. FINANCE CHARGES AFTER END OF ACCOUNT AND/OR JUDGMENT.** To the extent permitted by law, we agree that FINANCE CHARGES after the end of the Account and/or after a judgment is entered shall continue to accrue at the rates and in the manner specified in the Agreement.

**9. OUR CONTINUING DUTIES AND GMAC'S RIGHTS; WAIVERS.** No waiver of any GMAC right under the Credit Documents shall release or limit our liability, Borrower's liability, that of our successors or Borrower's successors, nor shall any waiver affect the lien or priority of this Mortgage. GMAC shall not be required to start proceedings against any successor or modify payment terms by reason of any demand made by us or any successor.

No GMAC act or failure to act shall waive any right under this Mortgage. All waivers must be in writing and signed by GMAC; they shall apply only to the extent and with respect to the event specified in the writing. Obtaining insurance, or paying taxes, other liens or charges shall not be a waiver of GMAC's right to demand payment at once of the sums secured by this Mortgage in the event of a default under the Credit Documents.

**10. SUCCESSORS AND ASSIGNS; JOINT AND SEVERAL LIABILITY; CO-SIGNERS.** This Mortgage shall bind us and our respective successors and permitted assigns for the benefit of GMAC and its successors and assigns. All agreements made by us or any successor are joint and several and may be enforced against each of us or any successor.

Any Signer who does not execute the Agreement (a) is co-signing only to encumber that person's interest in the Property and to release all homestead, dower, curtesy, appraisement, evaluation, redemption, reinstatement, stay, extension, exemption and moratorium laws now existing or hereafter enacted, (b) is not personally liable under the Credit Documents, and (c) agrees that GMAC and any Signer may modify either Credit Document, without consent and without modifying the interests of the rest of us under this Mortgage.

**11. NOTICES.** All notices shall be in writing. Except where applicable law requires otherwise:

(a) GMAC notices shall be hand delivered or mailed by first class, registered or certified mail to the address of the Property or to such other address specified by the addressee in a written notice given to GMAC. Any GMAC notice shall be considered given on the day it is deposited in the U.S. mail or is hand-delivered.

(b) Our notices shall be mailed to GMAC by first class, registered or certified mail to the address for such notices specified on our most recent monthly statement under the Agreement or to such other address specified by GMAC in a written notice given to us. Any such notice shall be considered given on the day it is received by GMAC.

**12. GOVERNING LAW.** This Mortgage will be governed by federal and Florida law. If any provision is invalid, illegal, or unenforceable, this Mortgage shall be interpreted as if such provision had never been included.

**13. COPIES.** We shall receive copies of the Credit Documents at the time they are signed or after this Mortgage is recorded.

**14. EXERCISING REMEDIES.** GMAC may exercise all of the rights and remedies provided by the Credit Documents or law, and any of these rights and remedies may be exercised individually or jointly, once or a number of times. The parties to this document are subject to the provision for Arbitration as set forth in the Agreement which is incorporated by reference as if set forth at length herein.

**15. EVENTS OF DEFAULT.**

(a) The events set forth in paragraph 15(b) are Events of Default if and when GMAC gives any Signer notice of default. We agree to notify GMAC promptly upon the happening of any event that would be an Event of Default under either Credit Document upon the giving of notice by GMAC.

(b) After giving notice of default, GMAC may end the Account and/or demand repayment at once of the Total Balance Outstanding in any of the following events:

    (i)    There has been fraud or material misrepresentation by any Signer in connection with the Account;

    (ii)    Borrowers have failed to meet the repayment terms of the Agreement for any amount outstanding; or

    (iii)    Any action or inaction by any Signer has adversely affected the Property or any right of GMAC in the Property; to the extent permitted by law, this will include, but not be limited to, any Signer (or any legal representative or successor of any Signer) agreeing to sell, transfer or assign or selling, transferring or assigning any interest in the Property, without the prior written consent of GMAC.

(c) Notwithstanding any language in this Mortgage to the contrary, GMAC will not give notice of default unless permitted by applicable law and GMAC will give us any grace period, right to cure and/or reinstatement right required by applicable law. This paragraph 15 is intended to give GMAC all rights permitted by applicable law.

**16. REMEDIES. IF BORROWERS DO NOT REPAY AT ONCE THE TOTAL BALANCE OUTSTANDING WHEN DUE, GMAC MAY EXERCISE ANY REMEDY AVAILABLE TO IT UNDER APPLICABLE LAW, INCLUDING FORECLOSURE.**

**17. APPOINTMENT OF RECEIVER.** Upon an Event of a Default or our failure to pay taxes assessed against the Property and/or insurance premiums on the Property (which we agree shall constitute waste), GMAC shall be entitled to the appointment of a receiver if permitted by law.

**18. SATISFACTION OF MORTGAGE.** Upon payment and discharge of all sums secured by this Mortgage and termination of the Account, GMAC shall satisfy this Mortgage. We agree to pay the fee for recording the satisfaction. Payment of such amount shall be a condition precedent to GMAC's obligations under this paragraph 18.

**19. REQUEST FOR NOTICES.** GMAC requests that copies of notices of default, sale and foreclosure from the holder of any lien which has priority over this Mortgage be sent to GMAC at 100 Witmer Road, Horsham, PA 19044-0963.

**20. EXHIBITS, SCHEDULES AND RIDERS, ETC.** The terms of any Exhibit, Schedule or Rider attached to this Mortgage or executed and recorded with this Mortgage shall be treated as if fully set forth in this Mortgage. All of the terms of the Agreement are made part of this Mortgage.

**21. TIME OF ESSENCE.** Time is of the essence in this Mortgage.

**22. ACTUAL KNOWLEDGE.** For purposes of the Credit Documents, GMAC shall not be deemed to have actual knowledge of any fact until it actually receives notice as set forth in paragraph 11 or until it receives written notice thereof from a source GMAC reasonably believes to be reliable. The date of receipt shall be determined by reference to the "Received" date stamped on such written notice by GMAC or its agent.

**23. TAXES.** If taxes on mortgages or the debts they secure increase in any way after the date of this Mortgage, we shall pay the full amount of any such increase.

**24. WAIVER OF STATUTORY RIGHTS.** To the extent permitted by law, for ourselves and our successors and assigns, we hereby waive the benefit of all homestead, dower, curtesy, appraisement, valuation, redemption, reinstatement, stay, extension, exemption and moratorium laws now existing or hereafter enacted and any right to have the Property marshalled upon foreclosure. We further agree that any court having jurisdiction may order the Property sold as an entirety.

**25. ASSIGNMENT OF RENTS; RECEIVERS; GMAC POSSESSION OF THE PROPERTY.** As additional security, we hereby assign to GMAC any rents due on the Property after an Event of Default or abandonment of the Property. In any action to foreclose this Mortgage, GMAC shall be entitled to the appointment of a receiver.

If an Event of Default occurs or we abandon the Property, GMAC, without notice, may enter upon, take possession of, and manage the Property. GMAC may then collect or sue in its own name for any rents due on the Property. All rents so collected shall be applied first to payment of the reasonable costs of operation and management of the Property (such as collection costs, receiver's fees, bond premiums and attorneys' fees) and then to the Total Balance Outstanding. GMAC and the receiver must account only for rents actually received.

Acts taken by GMAC under this paragraph 25 shall not cure or waive any Event of Default or invalidate any act done pursuant to notice of default.

We will not, without the written consent of GMAC, receive or collect rent from any tenant on the Property more than one month in advance. Upon an Event of Default, we will pay monthly in advance to GMAC or any receiver the fair and reasonable rental value of the Property or that part of the Property in our possession. If we fail to pay such rent, we will vacate and surrender the Property to GMAC or to such receiver. We may be evicted by summary proceedings.

**26. COLLECTION COSTS.** In any proceeding to enforce any remedy of GMAC under the Credit Documents, we agree to pay all reasonable GMAC expenses, whether GMAC is obligated therefor or not, including attorneys' fees equal to 10% of the Total Balance Outstanding or such greater amount as a court may determine is reasonable, whether such expenses arise prior or subsequent to judgment, and whether in judicial proceedings (including appellate decisions) or otherwise.

**27. CAPTIONS; GENDER; ETC.** The headings in this Mortgage are not to be used to interpret or define its provisions. In this Mortgage, the masculine gender includes the feminine and/or neuter, singular numbers include the plurals, and plurals include the singular.

**28. WAIVER OF FUTURE ADVANCES UNDER PRIOR MORTGAGES.** We hereby agree that the principal amount secured by any mortgage or security agreement which is senior to the lien of this Mortgage shall not exceed the principal amount advanced and outstanding and secured by such prior mortgage or security agreement as of the date hereof. As the principal amount of such prior mortgage or security agreement is reduced, the maximum amount that may be secured thereby shall also be reduced to the then outstanding principal balance. We hereby waive the right to receive any additional or future advances under any such prior mortgage or security agreement. This paragraph shall constitute the notice required by Florida Statutes Section 697.04(1)(b)

**29. MERS.** Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Mortgage, but, if necessary to comply with local law or custom MERS (as nominee for GMAC and GMAC's successors and assigns) has the right: to exercise any or all of these interests, including, but not limited to, the right to foreclose and sell the property; and to take any action required of Lender including but not limited to, releasing and canceling this Mortgage.

*(THIS SPACE INTENTIONALLY LEFT BLANK)*

By signing this Mortgage, we agree to all of the above.

Witnesses:

_____
Christina Coolidge Ulbrich

_____

_____

_____
Name Printed: Renee M. Ruiz

_____

_____
Name Printed: TAMMY WAGNER

_____

_____

_____

STATE OF FLORIDA  )
COUNTY OF        )ss.
Broward

On the 4th day of August _____ 2008, before me personally came
Christina Coolidge Ulbrich, A Single Woman to me known to be the individual(s) described in and who
executed the foregoing instrument, and acknowledged that he/she/they executed the same.

_____
Notary Public

[SEAL]        My Comm. Expires: _____

Schedule A

Lot 4, Block E, CORAL RIDGE NORTH, according to the Plat thereof, as
recorded in Plat Book 28, Page 37, of the Public Records of Broward
County, Florida.

Tax ID Number: 494236030570

Known as: 2825 Ne 23Rd Street, Fort Lauderdale, Florida 33305

PCL XL error

    Subsystem:   GE_VECTOR

    Error:       GEEmptyClipPath        Warning:     IllegalMediaSize

**2**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 11-62424-Civ-SCOLA

CHRISTINA ULBRICH,

      Plaintiff,

vs.

GMAC MORTGAGE, LLC, *et al.*,

      Defendants.

_____/

## SCHEDULING ORDER

THIS MATTER is set for trial during the two-week trial period beginning on **March 25, 2013**. Calendar call will be held at 9:00 a.m. on **March 19, 2013** at the Wilkie D. Ferguson, Jr. United States Courthouse, 400 N. Miami Avenue, Courtroom 12-3, Miami, Florida. A pretrial conference will be held immediately following calendar call only if requested by the parties in advance.

    1.  The parties shall comply with the following schedule:

| | |
|---|---|
| April 13, 2012 | Deadline to join additional parties or to amend pleadings. |
| June 7, 2012 | Deadline to file Joint Interim Status Report. |
| September 5, 2012 | Deadline to file Proposed Order Scheduling Mediation, setting forth the name of the mediator, and the date, time, and location of the mediation. |
| November 14, 2012 | Deadline to complete all fact discovery |
| | Deadline to submit Joint Notice Indicating Whether The Parties Consent To Jurisdiction Before The Designated Magistrate Judge For Purposes Of Final Disposition. |
| | Deadline to disclose the identity of expert witnesses, and to exchange expert witness summaries/reports pursuant to Federal Rule of Civil Procedure 26(a)(2). Rebuttal disclosures are permitted, and shall conform to the deadline set forth in Federal Rule of Civil Procedure 26(a)(2)(C)(ii). |
| November 29, 2012 | Deadline for the filing of all dispositive motions. |
| December 4, 2012 | Deadline to complete mediation. |

Case 0:12-cv-60424-RNS   Document 42   Entered on FLSD Docket 08/09/2012   Page 2 of 3
12-c1-2020-mg   Doc 1025-2   Filed 08/07/12   Entered 08/07/12 16:10:45   Exhibit 2
Appendix    Pg 50 of 177

| January 14, 2013 | Deadline to complete all expert discovery. |
|---|---|
| January 18, 2013 | Deadline for the filing of pretrial motions, including motions *in limine* and *Daubert* motions |
| March 15, 2013 | Deadline to file Joint Pretrial Stipulation pursuant to Local Rule 16.1(e) and pretrial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(3).

Deadline to file proposed jury instructions (if the matter is set for a jury trial) or proposed findings of fact and conclusions of law (if the matter is set for a bench trial) pursuant to Local Rule 16.1(k). |

2.  <u>Interim Joint Status Report</u>.  The parties are required to submit an interim joint status report addressing the following issues:

a)  Have all defendants been served?  If not, state the reasons.

b)  Have all defendants responded to the complaint?  If not, state the reasons.

c)  If this is a class action, has a motion for class certification been filed?  If so, what is its status?

d)  Have the parties agreed on and selected a mediator?  Have the parties agreed upon a place, date, and time for mediation?

e)  Have the parties engaged in informal settlement negotiations?  If not, explain the reasons for the failure to do so.  If yes, state the status of such negotiations (*e.g.*, ongoing, impasse, etc.) and the relative prospects for resolution through informal means.

f)  Describe the status of discovery conducted to date, and identify whether the parties reasonably believe that they will be able to complete discovery by the Court's deadline. If not, explain the reasons.

g)  Identify any other issues that the Court should be aware of that may affect the resolution of this matter or the schedule as currently set.

h)  For Fort Lauderdale/West Palm division cases, the parties shall indicate whether they prefer to try the case in Miami or Fort Lauderdale/West Palm.

3.  <u>Jury Instructions</u>.  The parties shall submit their proposed jury instructions jointly, though they need not agree on each proposed instruction.  Where the parties do agree on a proposed instruction, that instruction shall be set out in regular typeface.  Instructions proposed only by a

plaintiff shall be underlined.  Instructions proposed only by a defendant shall be bold-faced.
Every instruction must be supported by a citation of authority.  The parties shall use as a guide
the Eleventh Circuit Pattern Jury Instructions for Civil Cases, including the directions to counsel,
or the applicable state pattern jury instructions.  The parties shall jointly file their proposed jury
instructions via CM/ECF, and shall also submit their proposed jury instructions to the Court via
e-mail at scola@flsd.uscourts.gov in MS Word format (.doc).

4.  Trial Exhibits.  All trial exhibits must be pre-marked.  Plaintiff's exhibits shall be marked
numerically with the letter "P" as a prefix.  Defendant's exhibits shall be marked alphabetically
with the letter "D" as a prefix.  A list setting out all exhibits must be submitted at the time of
trial.  This list must indicate the pre-marked identification label (*e.g.*, P-1, or D-A) and must also
include a brief description of the exhibit.

5.  Deposition Designations.  Any party intending to use deposition testimony as substantive
evidence must designate by line and page reference those portions in writing.  The designations
must be served on opposing counsel and filed with the Court fourteen days before the deadline to
file the joint pretrial stipulation.  The adverse party must serve and file any objections and any
cross-designations within seven days.  The initial party shall then have seven days to serve and
file objections to the cross-designations.

6.  Voir Dire Questions.  The Court will require each prospective juror to complete a brief
written questionnaire prior to the commencement of questioning in the courtroom.  Any party
may file, no more than five proposed, case-specific questions to be included in the questionnaire.
The proposed questions must be filed with the Court at the time of the filing of the joint pretrial
stipulation, and shall also be submitted to the Court via e-mail at scola@flsd.uscourts.gov in MS
Word format (.doc).

7.  Settlement Notification.  If this matter is settled, counsel are directed to inform the Court
promptly via telephone (305-523-5140) and/or e-mail (scola@flsd.uscourts.gov).

**DONE and ORDERED** in chambers, at Miami, Florida, on March 9, 2012.

_____
**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**

Copies to:
*Designated U.S. Magistrate Judge*
*Counsel of record*

**3**

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Elizabeth Cronk, individually and on behalf of all others similarly situated

**DEFENDANTS**

GMAC Mortgage, LLC

**(b)** County of Residence of First Listed Plaintiff   Hudson County, NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Montgomery County, PA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Berger & Montague, P.C., 1622 Locust St., Phila. PA 19103, 215-875-4656

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 | U.S. Government<br>Plaintiff | ☒ 3 | Federal Question<br>(U.S. Government Not a Party) |
| ☐ 2 | U.S. Government<br>Defendant | ☐ 4 | Diversity<br>(Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers'<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal<br>  Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury -<br>  Med. Malpractice<br>☐ 365 Personal Injury -<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br>  Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>  28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>  Exchange<br>☐ 875 Customer Challenge<br>  12 USC 3410<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities -<br>  Employment<br>☐ 446 Amer. w/Disabilities -<br>  Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br>  Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting<br>  & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br>  Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus -<br>  Alien Detainee<br>☐ 465 Other Immigration<br>  Actions | ☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS—Third Party<br>  26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br>  Act<br>☐ 900Appeal of Fee Determination<br>  Under Equal Access<br>  to Justice<br>☐ 950 Constitutionality of<br>  State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>another district<br>(specify) | ☐ 6 Multidistrict<br>Litigation | ☐ 7 Appeal to District<br>Judge from<br>Magistrate<br>Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. § 1601
Brief description of cause:
Violation of Truth-in-Lending Act/Breach of Contract

## VII. REQUESTED IN COMPLAINT:
☑ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   08/12/2011

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse  (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.**     **(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.**     **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**     **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.**     **Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**     **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**     Example:     U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.**     **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.**  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| Elizabeth Cronk, individually and on behalf of all others similarly situated<br>*Plaintiff*<br><br>v.<br><br>GMAC Mortgage, LLC<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  GMAC Mortgage LLC
1100 Virginia Drive
Fort Washington, PA 19034

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Shanon J. Carson
1622 Locust Street
Philadelphia, PA 19103
(215)-875-4656

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Michael E. Kunz*
*Clerk of Court*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*    GMAC Mortgage LLC
_____

was received by me on *(date)*    _____ .

❐  I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❐  I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐  I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❐  I returned the summons unexecuted because _____ ; or

❐  Other *(specify):*


.

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date:  _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA— DESIGNATION FORM to be used by counsel to indicate the category of the
case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff:  Elizabeth Cronk, 437 Dunlin Plaza, Secaucus, New Jersey 07094

Address of Defendant:  GMAC Mortgage LLC,  1100 Virginia Drive, Fort Washington, Pennsylvania 19034

Place of Accident, Incident or Transaction:  GMAC is a limited liability company whose corporate headquarters is in Fort Washington
Pennsylvania.  Plaintiff is a citizen and resident of Secaucus, New Jersey.  The incidents and transactions underlying this action took place in
Pennsylvania, New Jersey, and other and other locations.

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or
more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1                          Yes __  No **X** _____

Does this case involve multidistrict litigation possibilities?                                          Yes **X**_  No_____

*RELATED CASE, IF ANY*:
Case Number:        N/A          Judge:     N/A        Date Terminated:     N/A

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                     Yes __  No **X** _____

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously
terminated action in this court?                                                     Yes ____  No __**X**__

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year
previously terminated action in this court?                                           Yes____ No **X**

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                                     Yes____ No **X**

CIVIL: (Place X in ONE CATEGORY ONLY)

A. *Federal Question Cases*:
1. __Indemnity Contract, Marine Contract, and All Other Contracts
2. __FELA
3. __Jones Act-Personal Injury
4. __Antitrust
5. __Patent
6. __Labor-Management Relations
7. __Civil Rights
8. __Habeas Corpus
9. __Securities Act(s) Cases
10. __Social Security Review Cases (Please specify)
11. **X** All other Federal Question Cases

B. *Diversity Jurisdiction Cases*:
1. __ Insurance Contract and Other Contracts
2. __Airplane Personal Injury
3. __Assault, Defamation
4. __Marine Personal Injury
5. __Motor Vehicle Personal Injury
6. __Other Personal Injury
7. __Products Liability
8. __Products Liability— Asbestos
9. __All other Diversity Cases

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I,  Patrick F. Madden, counsel of record do hereby certify:
        **X** Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this
civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

        **X** Relief other than monetary damages is sought.

**DATE:** August 12, 2011            _[signature]_____            309991_____
`                                    Attorney-at-Law: Patrick F. Madden          Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in
this court except as noted above.**

**DATE:** August 12, 2011            _[signature]_____            309991_____
                                     Attorney-at-Law: Patrick F. Madden          Attorney I.D.#

CIV. 609 (6/08)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| **ELIZABETH CRONK, individually and** | : | |
| **on behalf of all others similarly situated,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO.** |
| | : | |
| **GMAC MORTGAGE, LLC,** | : | |
| | : | |
| **Defendant.** | : | |

        In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel
for  plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time
of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the
reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said
designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the
plaintiff and all other parties, a Case Management Track Designation Form specifying the track to
which that defendant believes the case should be assigned.

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:
(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                             ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                                     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)                                                                        **(X)**

(f) Standard Management – Cases that do not fall into any one of the other tracks.         ( )

Date  August 12, 2011          Attorney-at-law: Patrick F. Madden   Attorney for: Plaintiff

Telephone: 215.875.3035        FAX Number: 215.875.4064   E-Mail Address: pmadden@bm.net

(Civ. 660) 10/02

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)     The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)     In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)     The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)     Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)     Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases  involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELIZABETH CRONK, individually and on behalf of all others similarly situated, | Case No.: _____ |
| Plaintiff, | |
| v. | COMPLAINT - CLASS ACTION |
| GMAC MORTGAGE, LLC, | JURY TRIAL DEMANDED |
| Defendant. | |

### CLASS ACTION COMPLAINT

Plaintiff Elizabeth Cronk ("Plaintiff" or "Ms. Cronk"), individually and on behalf of a class including all others similarly situated, brings this class action against GMAC Mortgage LLC ("Defendant" or "GMAC"). The following allegations are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to the acts of others:

### INTRODUCTION

1.      Plaintiff owns a condominium in a complex in Secaucus, New Jersey. She financed her purchase of this property through a mortgage from First Acceptance Mortgage Corp., which closed on July 10, 2006. The mortgage was assigned to GMAC. GMAC was responsible for dictating the underwriting requirements for the loan to the originator, including confirmation that the property carried the requisite amount of flood insurance.

2.      Defendant GMAC originates, acquires and/or services loans secured by real property located in Special Flood Hazard Areas. These loans include original purchase-money mortgages secured by the property as well as home equity lines of credit ("HELOC").

1

3.     GMAC is engaged in a pattern and practice of forcing owners of individual

condominium units whose loans are secured by those units, and are originated or serviced by

GMAC, to purchase excessive high-premium flood insurance.  GMAC requires borrowers to

purchase flood insurance in excess of that required by federal law and, more importantly, in

excess of that required to protect its insurable interest in the collateral.

4.     A typical homeowner's ordeal with GMAC's force-placed flood insurance begins

with a notice from GMAC demanding proof of adequate flood insurance, continues with a series

of letters asking for more information and explaining GMAC's intention to force-place flood

insurance, and culminates with GMAC's purchase and forced placement of a high premium

flood insurance policy.  Throughout this process, GMAC misrepresents that its requirement that

homeowners obtain additional flood insurance at the homeowner's expense is in line with federal

laws for homeowners in "Special Flood Hazard Areas."

5.     GMAC requires borrowers to purchase flood insurance in excess of federal

requirements.  Most condominium complexes (including Plaintiff's) are insured through

collective Residential Condominium Building Association Policies ("RCBAP"), which insure

shared building elements as well as building elements within individual condominium units.

These policies provide complete coverage for losses to individual condominium units pledged as

collateral for GMAC's loans, but GMAC force places individual unit coverage ("Dwelling Unit"

coverage) on these condominium owners.

6.     Under federal law, the National Flood Insurance Program ("NFIP") will not pay

twice for an insurable loss in a condominium complex, even if a particular loss is insured by both

an RCBAP and a Dwelling Unit insurance policy.  The NFIP will only pay the replacement cost

2

of a property once.

7.      GMAC force-places homeowners into insurance policies brokered through
affiliated entities, including SouthWest Business Corporation.  These force-placed policies can
cost four times as much as insurance policies that borrowers obtain independently.

8.      Once GMAC forces a homeowner into one of its affiliate's excessively priced
insurance policies, it ensures payment of the premium by paying it and then withdrawing the bill
from the mortgagor's escrow account or tacking it onto the HELOC borrower's credit line
balance.  As a result, a condominium owner has no choice but to pay the premiums, because they
become part of his loan balance, which means GMAC can make negative reports about the
borrower with the consumer credit reporting agencies if the borrower fails to pay every penny
that GMAC says the borrower owes.

9.      GMAC victimized Plaintiff and members of the proposed Classes with these
practices.  At all times relevant to this action, the entire condominium complex where Plaintiff
lives has been covered by a RCBAP.  The policy provides flood insurance coverage for the entire
condominium complex that is equal to 100% of the replacement cost of the complex, including
Plaintiff's individual unit.  Plaintiff pays her portion of the RCBAP insurance premium through
her condominium owners' association maintenance payments.

10.      GMAC was aware that Ms. Cronk's condominium complex was covered by a
RCBAP.  Ms. Cronk had to provide proof of flood insurance as a prerequisite for closing her
original loan and provided additional proof of such insurance in 2011 when GMAC demanded it.
GMAC is also aware that the vast majority of condominium complexes are covered by RCBAP
policies that meet federal requirements.

3

11.     Nonetheless, GMAC sent Ms. Cronk numerous form letters explaining that she
had to provide proof of flood insurance and purchase additional flood insurance in order to meet
her obligations under federal law. After several months of back and forth correspondence,
GMAC placed Ms. Cronk in a flood insurance policy, withdrew that premium from her escrow
account, and increased her mortgage payment. This situation is a common phenomenon that has
happened to multiple similarly situated persons.

12.     There is no reasonable or good faith explanation for GMAC demanding that
Plaintiff secure additional flood insurance on her condominium when she already has flood
insurance through the RCBAP. GMAC forced Plaintiff to spend money needlessly to maintain
flood insurance on a piece of property that is already covered by the RCBAP.

13.     These actions constitute a breach of the mortgage contract between the
condominium unit owners and GMAC, in that GMAC is imposing a condition not required by
any reasonable construction of the contractual provisions relating to the obligation of Plaintiff
and class members to carry insurance on the properties in question. In addition to a breach of the
contract itself, GMAC's actions also constitute a breach of the implied covenant of good faith
and fair dealing applicable to contracts. GMAC's actions also constitute conversion, are
unconscionable, and violate the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*

14.     This complaint seeks disgorgement of all funds paid to GMAC after GMAC
force-placed flood insurance on properties that are already insured under the NFIP through
RCBAP plans, compensatory damages for all insurance premiums paid to third party insurance
plans to avoid GMAC's affiliates' high insurance premiums, treble damages under New Jersey's
Consumer Fraud Act, an injunction prohibiting GMAC from force-placing unnecessary flood

insurance policies on properties that already have adequate flood insurance as dictated by federal

law, and attorneys' fees and costs pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. §§

56:8-1, *et seq.*

## PARTIES

15.     Elizabeth Cronk is a resident of Secaucus, New Jersey and owns a condominium

there.  Plaintiff financed her condominium purchase through GMAC, and obtained flood

insurance for her property after GMAC force-placed her in a flood insurance plan with an

excessively high premium.

16.     Defendant GMAC is a limited liability company, with its principal place of

business in Fort Washington, PA.  GMAC originates, acquires and/or services mortgage loans

including mortgage loans to New Jersey homeowners.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims arise under the federal Truth in Lending Act, 12 U.S.C. § 1601, *et seq.*

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367.

19.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act,

28 U.S.C. § 1332(d)(2) ("CAFA") because the matter in controversy, on information and belief,

exceeds $5,000,000, exclusive of interest and costs, and this action is a class action in which

members of the Class are residents of a different state than that of Defendant.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial

part of the acts, events and/or omissions giving rise to this action took place in this District.

5

## FACTUAL BACKGROUND

**A.    The National Flood Insurance Program and Regulations**

21.    GMAC requires borrowers to purchase flood insurance in excess of what is
already provided by condominium unit owners' Residential Condominium Building Association
Policies ("RCBAP"). Such policies generally provide complete coverage for losses to the
individual condominium units pledged as collateral for loans.

22.    When this is the case (as it almost always is), insurance purchased through the
federal National Flood Insurance Program ("NFIP") will not pay for any amounts over what is
paid under an RCBAP that covers the replacement value for the condominium complex. So the
additional insurance on an individual condominium unit required by GMAC is excessive and
unnecessary.

23.    The purpose of NFIP was to reduce the federal government's burden to provide
disaster relief to flood prone areas by providing a federal flood insurance scheme. Payments for
flood losses under the NFIP are the exclusive source of insurance payments, and federal agencies
tasked with implementing the NFIP, most notably the Federal Emergency Management Agency
("FEMA"), proscribe minimum and maximum limits on how much insurance a homeowner can
have and how much the insurance policy will pay in the event of a loss.

24.    In the 1994 Amendments to the National Flood Insurance Act of 1968 ("NFIA"),
Congress required lenders to ensure that homeowners had flood insurance for property located in
areas designated as Special Flood Hazard Areas ("SFHA") by FEMA. Lenders are required to
ensure that properties in such areas pledged as security for loans have flood insurance equal to
the *lesser* of: (1) the maximum insurance coverage available through the NFIP, which is

6

$250,000 per unit; (2) the outstanding balance of the loan; or (3) the replacement cost of the unit.

25.     In the context of a condominium complex covered by RCBAP, the most that the

NFIP will pay in the event of a loss due to flooding is the lesser of: (1) the $250,000 NFIP limit,

(2) the outstanding balance of the loan or (3) the "insurable value" of the building. The

"insurable" value of an individual condominium unit is the replacement cost of the entire

condominium complex divided by the number of units. If, for example, the replacement cost of

the entire structure is $5,000,000, and there are 20 units, the NFIP limit for each unit is

$250,000. In this example, if the RCBAP provides $5,000,000 in coverage, the lender is

requiring useless "excess coverage" if it requires the owner of an individual unit to purchase

Dwelling Unit coverage. This is confirmed in the FEMA FLIP Mandatory Purchase of Flood

Insurance Guidelines (September 2007) ("FEMA Guidelines"), at 47:

> The NFIP prohibits duplication of NFIP policies on the same risk. As described
> below, both an association and a unit owner may obtain NFIP coverage, but the
> unit owner's coverage is proscribed in that it is in excess of the association policy.
> The combined coverage of the RCBAP and the unit owner Dwelling Form policy
> cannot exceed the statutory limits or insurable value, whichever is less.

26.     Requiring the borrower to carry flood insurance coverage in an amount that

exceeds the replacement value of the collateral creates an "excess insurance" situation where

more insurance is required by the lender than is necessary to protect the lender's interest in the

collateral.

27.     Worse yet, it creates a situation where the combined insurance coverage between

the RCBAP and the individual unit owner's Dwelling Coverage exceeds the amount that NFIP

will pay in the event of a loss due to flooding. There is no good faith basis for a lender to require

excess coverage that is of no benefit to the borrower or the lender in the event of a flood loss to

7

the collateral.

28.     The FEMA Guidelines make clear that "[w]here the outstanding principal balance
of the loan exceeds the insurable value of the building, the insurance amount should be the
insurable value of the building rather than the outstanding principal balance on the loan."
Otherwise, "the insured may be paying for coverage that exceeds the amount the NFIP will pay
in the event of a loss."   This section of the FEMA Guidelines concludes:  "Lenders should avoid
creating such a situation."  FEMA Guidelines, *supra* at 27.  *See also* 74 Fed. Reg. 35914, 35936
(July 21, 2009) ("lenders should avoid creating situations where a building is 'over-insured.'").

29.     Based on information from the Condominium Flood Workgroup, FEMA
determined several years ago that of 78,743 RCBAP policies in force, 93.1% were insured for at
least 80% of the insured value.[1]  If the RCBAP policy provides coverage for 80% of the
replacement value on an individual condominium unit, the NFIP will pay 100% of the
replacement cost in the event of a loss.  So, the lender requires useless and unnecessary coverage
if Dwelling Unit coverage is required in addition to the RCBAP if the RCBAP provides coverage
for at least 80% of the replacement cost of the condominium building – which almost all RCBAP
policies do.

30.     The FEMA Guidelines make it clear that the RCBAP alone is designed to protect the
interests of lenders that make loans secured by individual condominium units:

---

[1] This was at some point prior to early 2008.  At that time, compliance with the NFIP flood
insurance coverage requirements was adequate if the RCBAP policy provided coverage of at
least 80% of replacement cost.  Subsequent Question and Answer Combined Guidelines issued
by the Department of the Treasury, FDIC, Farm Credit Administration, National Credit Union
Administration, and Federal Reserve System indicate that RCBAP policies should cover 100%
of replacement cost.  So, today, more RCBAP policies cover a greater portion of replacement
cost than when this determination was made.

8

> Because the RCBAP provides flood insurance protection for both the building
> elements within the unit and the common building elements, the security interests
> of individual unit owner mortgagees should be protected, so long as coverage
> amounts reflect insurance to value, as with other forms of property insurance.

FEMA Guidelines, *supra* at 46. The Guidelines also state that the RCBAP "is the correct way to

insure a residential condominium building against flood loss" and that the RCBAP "protects the

financial interests of the association, unit owners, and lenders and also satisfies the statutory

requirements." *Id. See also* Guidelines at 47 ("The entire residential condominium building is

covered under the RCBAP, including both common building elements and individually owned

building elements within the units, improvements within the units, and personal property owned

in common if contents coverage is carried."). Thus, there simply is no rational basis for the

lender to require additional flood insurance coverage if the RCBAP already provides the amount

necessary to protect the collateral.

   31.  GMAC misrepresents to its customers that federal law requires them to obtain

flood insurance in amounts dictated by GMAC when, in reality, GMAC forces condominium

owners to purchase flood insurance that the federal government will not pay in the event of flood

loss claims, which is explicitly prohibited by federal regulations. GMAC force-places

consumers into flood insurance that duplicates their RCBAP policies and creates situations of

double insurance.

**B.**  **GMAC Force-Placed Plaintiff and Class Members Into Unnecessary and Inflated Flood Insurance**

   32.  Plaintiff Elizabeth Cronk obtained a mortgage from First Acceptance Mortgage

Corp. to purchase her condominium at 447 Dunlin Plaza in Secaucus, New Jersey on July 10,

2006. The underwriting requirements for the loan, including the requirement that the requisite

9

amount of flood insurance exist for the property at the time of the loan, were dictated by GMAC.

33.    Plaintiff's mortgage was assigned to GMAC at or around the same time as the
execution of the original mortgage on July 10, 2006.

34.    Plaintiff also obtained a HELOC on her property from GMAC for future
withdrawals against the line of credit.

35.    At the time of closing for these loans, GMAC required, and Ms. Cronk provided
to the closing lender, a certificate of insurance to ensure that the loans complied with GMAC's
requirements and the requirements of federal law, including the requirement of adequate flood
insurance coverage.

36.    A July 10, 2006 "Condominium Rider" was "incorporated into and "deemed to
amend and supplement the Mortgage, Deed of Trust, or Security Deed …of the same date" given
by Plaintiff to secure her note.  The "Condominium Rider" provides, *inter alia*:

> B.  Property insurance.  **So long as the Owners Association maintains, with a
> generally accepted insurance carrier, a "master" or "Blanket" policy on the
> Condominium Project** which is satisfactory to lender and which provides
> insurance coverage in the amounts (including deductable levels), for the periods,
> and against loss by fire, hazards included within the term "extended coverage,"
> and any other hazards, including but not limited to, earthquakes and floods, from
> which lender requires insurance, **then: (i) Lender waivers the provision in
> Section 3 for the Periodic Payment to Lender of the yearly premium
> installments for property insurance on the Property; and (ii) Borrower's
> obligation under Section 5 to maintain property insurance coverage on the
> Property is deemed satisfied to the extent that the required coverage is
> provided by the Owners Association policy.** What Lender requires as a
> condition of this waiver can change during the term of the loan. (emphasis added).

37.    The condominium owners' association for the condominium complex known as
Harmon Cove II (where Plaintiff's condominium is located) was insured through an RCBAP.

38.    Plaintiff was required to provide proof of such coverage prior to closing on her

mortgage and HELOC.  Defendant was satisfied by Plaintiff's coverage through the RCBAP and
closed on the loans.

39.    More than four years after closing on the loans, Plaintiff received notice from
GMAC starting in January 2011 that stated that her mortgaged property would require additional
flood insurance on her individual condominium unit.

40.    GMAC's notices indicated that if Plaintiff did not provide proof of flood
insurance within a specified time frame, GMAC would enroll her in a flood insurance policy
with one of GMAC's affiliates.

41.    In response to the initial inquiry, Plaintiff obtained a copy of the condominium
complex's RCBAP and had the condominium association's insurance broker provide a copy to
GMAC on January 12, 2011.  The declaration pages of the RCBAP demonstrated that the
complex was covered by $53,032,500 in flood insurance from Selective Insurance Company of
America, Ltd. – an amount that equals 100% of the replacement value of the complex.

42.    Notwithstanding Plaintiff's notice to and offer of proof to GMAC, GMAC sent
another letter on January 16, 2011, stating that "due to the fact that your property, on which we
hold a mortgage, is located in a SFHA, the terms of your mortgage and/or federal law require
you to purchase adequate flood insurance.  Our loan file does not contain evidence of enough
flood insurance in force on your property."  The letter further states that, absent such proof,
GMAC would force-place her into a high premium insurance policy.

43.    On information and belief, GMAC has made the same or similar misstatements to
thousands of members of the proposed Classes.

44.    Plaintiff's notice to GMAC and unsuccessful attempts to show GMAC that the

11

high-premium flood insurance policy GMAC was seeking to impose on Plaintiff was

unnecessary and outside the terms of the contract, provided GMAC with notice that GMAC's

conduct constituted a breach.

45.     Plaintiff has provided GMAC ample opportunity and a reasonable period to take

corrective action.

46.     Plaintiff's property was force-placed with flood insurance through one of

GMAC's affiliates, Southwest Business Corporation, on March 6, 2011.

47.     Plaintiff was charged for these unnecessary flood insurance premiums and paid an

inflated rate for the unnecessary premiums.

48.     GMAC withdrew these premium payments directly from Plaintiff's mortgage

escrow account on or around March 4, 2011.  Ms. Cronk's mortgage payment increased as a

result.  Ms. Cronk had no choice but to make GMAC's excessive payment after it added it to her

mortgage payment to avoid possible foreclosure and having her account reported delinquent to

the three consumer credit reporting agencies.

49.     GMAC's statement that "the terms of your mortgage and/or federal law require

you to purchase adequate flood insurance.  Our loan file does not contain evidence of enough

flood insurance in force on your property" is false and misleading.  GMAC had evidence of

adequate flood insurance coverage on the condominium complex because Plaintiff was required

to demonstrate such coverage, and in fact demonstrated such coverage, as a condition for closing

on her condominium.  Moreover, GMAC also had information of adequate coverage because

Plaintiff had the condominium association provide the RCBAP to GMAC on January 12, 2011.

Additionally, the statement is false and misleading because it is contrary to the terms of the

12

mortgage, including the "Condominium Rider."

50.     Defendant did not and cannot identify any changes in the mortgage documents or
circumstances surrounding the loan that justify Defendant's representations that Plaintiff's
coverage was suddenly not "adequate."

51.     On information and belief, GMAC made identical or similar misstatements to
thousands of members of the proposed Classes in order to justify force-placing them into
duplicative and excessive flood insurance policies for their individual condominium units.

**C.     GMAC's Practices**

52.     GMAC ties insurance products in with its home equity financing.

53.     GMAC enforces this tie in an arbitrary fashion without regard to whether a
particular borrower needs flood insurance in the amounts dictated by GMAC.

54.     On information and belief, GMAC makes its decision to force flood insurance
together with its affiliate Southwestern Business Corp. based on a federal register of homes
located in flood prone areas, primarily by reference to areas designated by FEMA as an SFHA.

55.     After determining that a particular home is in an SFHA, GMAC requires
borrowers to purchase flood insurance in excess of what is necessary to meet the requirements of
federal law or to protect its interest as a mortgagee.

56.     GMAC's affiliates charge insurance premiums that can be nearly four times the
cost of obtaining the same insurance from an independent insurance company, even though those
insurance policies are, as described in GMAC's own letters to Ms. Cronk, limited compared with
independently written insurance policies.

57.     GMAC is aware that condominium owners' property is insured through collective

13

RCBAP policies, but still force-places additional flood insurance on their properties even after condominium owners provide GMAC with proof of insurance.

58.     GMAC is aware that the vast majority of condominium complexes are covered by RCBAP policies and that its interest in individual units pledged as security for loans it makes and services is protected by the RCBAP policies.  GMAC was aware that there was adequate RCBAP coverage on Plaintiff's condominium building.  Plaintiff herself provided information to GMAC regarding the RCBAP coverage, both as a prerequisite for closing her mortgage and HELOC, and when GMAC began demanding proof of insurance in 2011.

59.     GMAC has the means and ability to easily determine the extent to which the individual units pledged as collateral for loans are protected by a RCBAP, so as not to require a borrower to purchase excess insurance coverage over that necessary to protect the collateral from loss or damage due to flood.

60.     Since October 1, 2007, it has been even easier for GMAC to determine the extent to which RCBAP policies protect its interest in the individual condominium units pledged as security.  This is because, since that date, the Declarations Page of each RCBAP issued or renewed must show the building's replacement cost value and the number of units within that building.  Before that date, GMAC still had an obligation to make this determination and not to require borrowers to carry unnecessary excess insurance coverage.

61.     GMAC sends out generic notices to borrowers, including Plaintiff, stating that the borrower must obtain insurance coverage in amounts dictated by GMAC.  The amount of coverage that GMAC dictates and requires of borrowers, whether their loan is secured by a condominium unit or some other SFHA property, exceeds that required by federal law, as

14

discussed in throughout this Complaint.  It exceeds what is necessary to protect GMAC's interest
in the collateral pledged as security.

62.     The relevant mortgage agreements, including Plaintiff's, provide that the
borrower will carry insurance on the collateral.  Plaintiff complied with the obligation to carry
flood insurance on her condominium unit through the RCBAP applicable to her condominium
complex.  To the extent that GMAC sought to impose coverage requirements beyond that
necessary to protect its insurable interest in the placement value of the unit, GMAC breached its
contract with Plaintiff and all similarly situated owners of condominium units whose loans
GMAC services.

63.     Plaintiff and members of the proposed Classes pay condominium association
maintenance payments that fund RCBAP coverage equal to the replacement value of the
property.  Nonetheless, GMAC "force-placed" a high premium flood insurance policy on
Plaintiff's condominium after she purchased it.

64.     GMAC ensures that its borrowers will pay GMAC's affiliates' exorbitant
insurance premiums by tacking the payments onto their borrowers' HELOC balances or
withdrawing the funds directly from the borrowers' escrow accounts.  These actions force
borrowers to make the payments or GMAC will report the GMAC-manufactured delinquencies
to the consumer credit reporting agencies and potentially even foreclose on their properties.

65.     Defendant engages in the above practices in order to reap improper financial gain
from their customers.

66.     By tacking its affiliates' flood insurance premiums onto homeowners' home
equity line of credit balances and withdrawing its affiliates' insurance premiums directly from

15

mortgage borrowers' escrow accounts, GMAC derives interest income on the increased loan
balance, and fee income, such as late payment fees, where applicable.

67.     On information and belief, GMAC has a mutually beneficial financial relationship
with affiliate insurance brokers.  Southwest Business Corp. ("SWBC") is an example of one of
GMAC's affiliates.

68.     SWBC provides lender-placed programs to more than 600 financial institutions
nationwide.  SWBC claims that "no matter your loan portfolio size, SWBC's expertise in risk
management products, processes, and technology design allows you to maintain the proper
balance between growth, customer value, service, and profitability."  As SWBC's statement
provides, its force-placed programs are specifically designed to provide GMAC (and others) with
"growth" and "profitability."

69.     In summary, GMAC forces homeowners to obtain unnecessary insurance policies,
then forces them into policies with high premiums where companies affiliated with GMAC
receive premiums and commissions, while GMAC directly receives interest payments from
borrowers on these debts that GMAC created for the customer.  Alternatively, class members
have the option of purchasing lower cost, but still unnecessary, flood insurance to avoid lining
GMAC's and GMAC's affiliates' pockets, that is providing GMAC with "growth" and
"profitability."

70.     On information and belief, discovery will reveal other direct and indirect financial
benefits and incentives that accrue to GMAC as a result of its unfair, unlawful, and
unconscionable conduct as set forth above.

16

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action on behalf of herself and all others similarly situated and

asks the Court to certify this case as a class action pursuant to Rule 23 of the Federal Rules of

Civil Procedure.

72.     This action satisfies the Rule 23 requirements of numerosity, commonality,

typicality, adequacy, predominance, and superiority.

73.     Plaintiff asserts COUNT I (breach of contract), COUNT II (Truth in Lending),

COUNT III (unconscionability), and COUNT IV (conversion) on behalf of a proposed

Nationwide Class (the "Nationwide Class") defined as:

> All persons with loans financed or serviced by GMAC and who were required to
> purchase flood insurance which, when combined with any RCBAP coverage or
> other primary coverage on the property, exceeded any of the following:  (1)
> $250,000; (2) the replacement cost value of the property pledged as security for
> the loan, or; (3) the total outstanding loan balance (if a traditional loan) or
> maximum line of credit (if a home equity line of credit).

74.     Plaintiff asserts COUNT V (New Jersey Consumer Fraud Act) and COUNT VI

(New Jersey Truth in Consumer Contracts Act) on behalf of a proposed New Jersey class (the

"New Jersey Class") defined as:

> All persons residing in New Jersey or who own property in New Jersey with loans
> financed or serviced by GMAC and who were required to purchase flood
> insurance which, when combined with any RCBAP coverage or other primary
> coverage on the property, exceeded any of the following:  (1)  $250,000; (2) the
> replacement cost value of the property pledged as security for the loan, or; (3) the
> total outstanding loan balance (if a traditional loan) or maximum line of credit (if
> a home equity line of credit).

75.     The Nationwide Class and the New Jersey Class (collectively, the "Classes") are

composed of thousands of mortgage or HELOC borrowers whose home financing was originated

17

and/or serviced through GMAC, the joinder of which in one action would be impracticable.  The

disposition of the claims of the proposed class members through this class action will benefit the

parties and the Court.  The identities of individual members of the proposed Classes are readily

ascertainable through the Defendant's account records.

76.     The members of the proposed Classes are so numerous that individual joinder is

impracticable.  The actual number of Class members is unknown at this time, but on information

and belief, will likely number in the thousands.  The identities of individual members of the

proposed Classes are within the knowledge of GMAC and can be ascertained using GMAC's

records.

77.     Plaintiff's claims are typical of the claims of the proposed Classes, in that

Plaintiff, like all Class members, was forced into a high-premium flood insurance policy and

ultimately was forced to purchase unnecessary and excessive flood insurance.  Plaintiff and all

members of the Classes suffered damages in the form of costs associated with the purchase and

maintainence of these high-premium policies.

78.     Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff

has retained experienced counsel with the necessary expertise and resources to prosecute a

nationwide consumer class action.  Plaintiff and her counsel do not forsee any circumstances

where the interests of Plaintiff would be adverse to those of the Classes.

79.     Common questions of law and fact exist as to all members of the Classes, which

predominate over any questions affecting solely individual members of the Classes.  Questions

of law and fact common to the Classes include, without limitation:

        (a)     whether Defendant has a policy and practice of misrepresenting to their

18

customers that federal law requires additional flood insurance on
mortgages or HELOCs for which such additional flood insurance is not
required by law;

(b)      whether Defendant's standard flood insurance notice letters are false,
misleading, and/or deceptive;

(c)      whether Defendant breached its mortgage agreements with customers by
demanding and force-placing unauthorized amounts of flood insurance or
amounts that were not provided for in the mortgage agreements;

(d)      whether Defendant's agreements comply with all mandated consumer
disclosures under TILA;

(e)      whether Defendant's agreements are void in their entirety under TILA;

(f)      whether Defendant's conduct constitutes an "unconscionable commercial
practice" under the New Jersey Consumer Fraud Act; and

(g)      the proper measure of damages.

80.     There are numerous questions of law and fact common to the proposed Classes
and those common questions predominate over any questions affecting only individual class
members.

81.     All class members have suffered damages as a result of a "common wrong" on the
part of GMAC. Damages are ascertainable by reference to GMAC's own records and records of
the class members, including Plaintiff.

82.     A class action is superior to other available methods for the fair and efficient
adjudication of this controversy. It would be economically impractical for Plaintiff and members

19

of the Classes to pursue individual actions against GMAC as the costs of prosecution would
likely surpass their individual damages.  Defendant continues to engage in the unlawful, unfair,
and unconscionable conduct that is the subject of this Complaint.  Class treatment of Plaintiff's
claims will permit Plaintiff and the Classes to vindicate their rights against GMAC, and conserve
the resources of the Court and the Parties.  Class treatment would also avoid the possibility of
inconsistent outcomes that could result from a multitude of individual actions in varying
jurisdictions nationwide.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract
### (on behalf of proposed Nationwide Class)

83.     Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

84.     Plaintiff entered into a mortgage contract with First Acceptance Mortgage Corp.
GMAC directed the terms of this contract and purchased it from First Acceptance Mortgage
Corp. thereby assuming all rights and responsibilities of First Acceptance Mortgage Corp. under
that contract.

85.     The contract provides, in pertinent part, that:

B.  Property insurance.  **So long as the Owners Association maintains, with a
generally accepted insurance carrier, a "master" or "Blanket" policy on the
Condominium Project** which is satisfactory to lender and which provides
insurance coverage in the amounts (including deductable levels), for the periods,
and against loss by fire, hazards included within the term "extended coverage,"
and any other hazards, including but not limited to, earthquakes and floods, from
which lender requires insurance, **then: (i) Lender waivers the provision in
Section 3 for the Periodic Payment to Lender of the yearly premium
installments for property insurance on the Property; and (ii) Borrower's
obligation under Section 5 to maintain property insurance coverage on the
Property is deemed satisfied to the extent that the required coverage is**

20

provided by the Owners Association policy.

86.    Prior to and as a condition to closing, Plaintiff provided her RCBAP that
demonstrated the property had adequate flood insurance coverage.  Plaintiff also provided
GMAC with notice and proof in January 2011 that RCBAP was equal to 100% of the
replacement value of the property.

87.    GMAC breached its contract with Plaintiff by requiring her to purchase and
additional and excessive flood insurance that was not required under the contract.

88.    Additionally, the law implies into every contract an obligation of good faith and
fair dealing, the purpose of which is to prevent one party's conduct under the contract from
impeding the other party's performance of that contract.

89.    GMAC's actions constitute a breach of its duty of good faith and fair dealing in
that, to the extent that GMAC had any discretion under the contract, they exercised that authority
in bad faith by imposing unnecessary insurance on Plaintiff's mortgage without regard for the
fact that GMAC's insurable interest was protected by RCBAP.  As a result, GMAC wrongfully
withdrew money from Plaintiff's mortgage escrow account, and forced her to make this
wrongfully increased payment with the implicit threat of negative credit reporting, thereby
impeding her ability to continue meeting her obligations according to the terms of the contract.

90.    On information and belief, GMAC has replicated these actions with respect to all
members of the Classes as part of a scheme to wrongfully increase income to it and its affiliates.

91.    Plaintiff and the Classes are entitled to compensatory damages resulting from
GMAC's wrongful actions in breach of their mortgage contracts and HELOC contracts and in
violation of GMAC's obligation of good faith and fair dealing in performing under the contracts.

21

**COUNT II**
**Violation of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.***
**(on behalf of proposed Nationwide Class)**

92.     Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

93.     Congress' objective in passing the Truth in Lending Act ("TILA"), 15 U.S.C. §

1601 *et seq.*, was to ensure that the true cost of goods and services be fully and completely

disclosed to the consumer in writing prior to the consumer's purchase and agreement to those

terms.

94.     Residential mortgage loan agreements and line of credit agreements are subject to

the disclosure requirements of TILA and all related regulations, commentary, and interpretive

guidance promulgated by the Federal Reserve Board.

95.     GMAC is a "creditor" as defined by the TILA

96.     As a creditor, TILA requires GMAC to timely disclose all finance charges, other

charges, and third-party charges that may be imposed in connection with a mortgage loan or line

of credit.

97.     TILA thus requires GMAC to make these disclosures clearly and conspicuously.

98.     TILA further requires GMAC to accurately and fully disclose the terms of the

legal obligation between the parties.

99.     GMAC violated the TILA by, *inter alia*, (i) adversely changing the terms of

mortgage loans or credit lines after origination without consent and demanding more insurance

than previously required in amounts greater than necessary to protect its interest in the propriety;

and (ii) failing to provide proper notice, after origination, that GMAC was amending the terms of

loans or credit lines as described in the relevant mortgage documents.

22

100.   The TILA violations set forth above occurred within one year of the
commencement of this action.  To the extent that the violations described above occurred earlier,
Plaintiff did not discover and did not have a reasonable opportunity to discover GMAC's
violations until less than one year before this action commenced.  Prior to this time, Plaintiff had
no reason or opportunity to complain about GMAC's TILA violations because it was not yet
apparent that GMAC's disclosures were incomplete, inaccurate, and misleading.

101.   Plaintiff's TILA claim is timely.  The statute of limitations on Plaintiff's TILA
claim did not begin to run and/or was equitably tolled until such time that she had a reasonable
opportunity to discover GMAC's TILA violations and complain about such violations.  It would
be manifestly unjust and inconsistent with the purposes of the TILA to apply and enforce an
earlier accrual date for Plaintiff's TILA claim.

102.   GMAC systematically and pervasively engaged in similar violations of the TILA
to the detriment of other members of the proposed Nationwide Class.

103.   Plaintiff and the proposed Nationwide Class have been injured and have suffered
monetary losses as a result of GMAC's violations of the TILA.

104.   As a result of GMAC's violations, Plaintiff and the proposed Nationwide Class
are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Defendant's net
worth, as provided by 15 U.S.C. § 1640(a)(l)-(2).

105.   Plaintiff and the proposed Nationwide Class are also entitled to recover attorneys'
fees and costs to be paid by GMAC, as provided by 15 U.S.C. § 1640(a)(3).

**COUNT III**
**Unconscionability**
**(on behalf of proposed Nationwide Class)**

106.    Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

107.    GMAC's conduct described herein is substantively and procedurally unconscionable in the following respects, among others:

        a)    GMAC did not disclose its insurance requirements at the time of closing and, in fact, represented that condominium owners' existing RCBAP flood insurance coverage was sufficient at the time of closing, in that such coverage was, by law, a prerequisite for obtaining GMAC financing in the first place;

        b)    GMAC force-placed condominium owners into its affiliates' flood insurance policies even after condominium owners provided proof of their RCBAP coverage;

        c)    GMAC's affiliates charged premiums as much as four times as costly as and substantially more limited than flood insurance that a condominium owner could purchase from an independent insurance company;

        d)    GMAC withdrew these premiums from customers' escrow accounts or added them to customers' HELOC credit line balances such that they became a part of the customers' loan obligation, which made them subject to negative credit reporting;

        e)    Nowhere in GMAC's mortgages or HELOCs is there any indication that GMAC will ever require a homeowner to obtain flood insurance greater than the minimum requirements of the NFIP, although GMAC force-places customers into such excessive coverage anyway; and

        f)    Nowhere in GMAC's mortgages or HELOCs is there any indication that a

24

homeowner will be forced to purchase flood insurance that duplicates protection already provided by the homeowner's condominium owners' association RCBAP policy.

108.    Considering the great business acumen and experience of GMAC in relation to Plaintiff and the Nationwide Class, the great disparity in the parties' relative bargaining power, the inconspicuous and incomprehensible nature of the contract language involved, the oppressiveness of the terms and GMAC's application of them, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of risk between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

109.    The imposition of flood insurance when a customer already has flood insurance through a RCBAP policy is itself unconscionable.

110.    If the mortgage or HELOC agreements at issue are understood to allow any of these practices, that contract is unconscionable.

111.    Plaintiff and members of the proposed Nationwide Class who paid excessive and unnecessary flood insurance premiums are entitled to rescission and restitution as a result of GMAC's unconscionable policies and practices as alleged herein.

## COUNT IV
### Conversion
### (on behalf of proposed Nationwide Class)

112.    Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

113.    GMAC had and continues to have a duty to maintain and preserve its customers' mortgage accounts, HELOC accounts, and mortgage escrow accounts, and to prevent their diminishment or alteration through its own wrongful acts.

25

114.    GMAC wrongfully collected insurance premiums from its customers' mortgage escrow accounts or added such payments to its customers' HELOC accounts.

115.    GMAC collected these premiums by wrongfully taking specific and readily identifiable funds from their mortgage customers' escrow accounts or misappropriating funds paid to their HELOC customers' account balances.

116.    GMAC has assumed and exercised the right of ownership over these funds without authorization to do so and in hostility to the rights of Plaintiff and members of the proposed Nationwide Class without legal justification.

117.    GMAC retains these funds unlawfully without consent of Plaintiff or members of the proposed Nationwide Class.

118.    GMAC intends to permanently deprive Plaintiff and members of the proposed Class of these funds.

119.    Plaintiff and members of the proposed Nationwide Class properly own these funds, not GMAC, which now claims that it is entitled to their ownership contrary to the rights of Plaintiff and members of the proposed Nationwide Class.

120.    Plaintiff and members of the proposed Nationwide Class are entitled to the immediate possession of these funds.

121.    GMAC has wrongfully converted these specific and readily identifiable funds.

122.    GMAC's wrongful conduct is of a continuing nature.

123.    As a direct and proximate result of GMAC's wrongful conversion, Plaintiff and members of the proposed Nationwide Class have suffered and continue to suffer damages.

124.    As a result of GMAC's actions constituting conversion, Plaintiff and members of

26

the proposed Nationwide Class have suffered actual damages for which Defendant is liable.

Defendant's liability should be measured by the extent of GMAC's conversion.

    125.    These wrongfully collected funds are specific and readily identifiable.

**COUNT V**
**Violation of New Jersey Consumer Fraud Act N.J.S.A. 56:8-1 et seq.**
**(On behalf of proposed New Jersey Class)**

    126.    Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

    127.    The New Jersey Consumer Fraud Act ("CFA") is a consumer protection statute

designed to protect consumers from a wide variety of marketplace tactics and practices.  The

CFA provides that that "[a]ny person who suffers any ascertainable loss . . . , as a result of the

use or employment by another person of any method, act, or practice declared unlawful under

this act, may bring an action . . . in any court of competent jurisdiction."  N.J.S.A. § 56:8-19.

    128.    "Unlawful acts" under the CFA include:

> The act, use or employment by any person of any unconscionable commercial
> practice, deception, fraud, false pretense, false promise, misrepresentation, or the
> knowing, concealment, suppression, or omission of any material fact with intent
> that others rely upon such concealment, suppression, or omission, in connection
> with the sale or advertisement of any merchandise . . . or with the subsequent
> performance of such person . . . , whether or not any person has in fact been
> misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8-2.

    129.    Plaintiff, New Jersey Class members and Defendant all qualify as "persons" under

the CFA.  N.J.S.A. § 56:8-1(d).

    130.    Defendant engaged in unlawful conduct through affirmative acts, including

affirmatively misrepresenting to Plaintiff and New Jersey Class members that they were required

to procure additional flood insurance and procuring flood insurance at inflated rates for plaintiff

27

when such insurance was unnecessary.

131.   Defendant's conduct constitutes unconscionable commercial practice pursuant to
N.J.S.A. § 56:8-2.

132.   Defendant's conduct described herein constitutes the employment of false
pretense, false promise, misrepresentation, misleading statement or deceptive practice upon
Plaintiff and the New Jersey Class members within the meaning of the CFA.

133.   Plaintiff and New Jersey Class members suffered an ascertainable loss as a result
of Defendant's unlawful conduct.

134.   Plaintiff and New Jersey Class members are entitled to three times their
ascertainable losses pursuant to N.J.S.A. §§ 56:8-19.  In addition, GMAC's conduct is subject to
an award of attorney fees and costs and any other appropriate legal or equitable relief as provided
under N.J.S.A. 56:8-19.

135.   Plaintiff and New Jersey Class members seek court-ordered relief of an equitable
nature against Defendant, including, but not limited to, orders declaring Defendant's practices as
alleged to be unlawful, unfair, unconscionable and/or deceptive, and enjoining Defendant from
undertaking any further unlawful, unfair, unconscionable and/or deceptive acts or omissions.

136.   Plaintiff and New Jersey Class members seek disgorgement and restitution of all
insurance premiums and brokerage fees paid to or withdrawn by GMAC for unnecessary flood
insurance through GMAC affiliates' insurance policies, plus interest on damages at the legal rate,
as well as three times the amount of their economic damages, and attorneys' fees and costs.

28

<u>**COUNT VI**</u>
**Violation of the New Jersey Truth-in-Consumer Contracts Act, N.J.S.A. § 56:12-14,** *et seq.*
**(On behalf of proposed New Jersey Class)**

137.    Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

138.    Under the New Jersey Truth-in-Consumer Contracts Act ("NJTCCA"):

> No seller, lessor, creditor, lender or bailee shall in the course of his business offer
> to any consumer or prospective consumer or enter into any written consumer
> contract . . . which includes any provision that violates any clearly established
> legal right of a consumer or responsibility of a seller, lessor, creditor, lender, or
> bailee as established by State or Federal law at the time the offer is made or the
> consumer contract is signed . . . .

N.J.S.A. 56:12-15.

139.    Plaintiff is a "consumer" under the NJTCCA because she bought a service which
is primarily for personal, family or household purposes.

140.    GMAC is a "seller, lessor, creditor, lender, or bailee" under the NJTCCA.

141.    GMAC's conduct described herein is substantively and procedurally
unconscionable.  The imposition of flood insurance when a customer already has flood insurance
through a RCBAP policy is itself unconscionable.  If the mortgage or HELOC agreements at
issue are understood to allow any of these practices, that contract is unconscionable.

142.    The mortgage and/or HELOC agreements thus violate the New Jersey Consumer
Fraud Act and federal TILA.

143.    Forcing consumers to purchase high premium flood insurance when they already
have sufficient flood insurance is an unconscionable commercial practice made unlawful by the
New Jersey Consumer Fraud Act.

144.    Similarly, to the extent that GMAC violated the federal TILA and the New Jersey

29

Consumer Fraud Act, as set forth above, violation of those rights is a violation of the NJTCCA.

145.    Plaintiff and members of the New Jersey Class, thus seek a civil penalty and actual damages together with attorneys' fees and court costs. Plaintiff and the New Jersey Class further seek to void their contracts with Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Classes, prays for relief as follows:

A.    That this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3), that Plaintiff be appointed as the class representative, and that Plaintiff's counsel be appointed as counsel for the proposed Classes;

B.    That Plaintiff and the proposed Classes recover the damages determined to have been sustained by them, trebled as provided by law, with any applicable civil penalties, and that judgment be entered against Defendant on behalf of Plaintiff and each and every member of the Classes;

C.    That Defendant, its subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining its unlawful conduct alleged in this Complaint;

D.    That Plaintiff and members of the proposed Classes be awarded prejudgment and postjudgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

E.    That Plaintiff and the Classes recover their costs of this suit, including attorneys'

30

fees and costs, as provided by law; and

      F.    That the Court direct all such further relief that it deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all claims so triable.

Dated: August 12, 2011                Respectfully submitted,

Eric L. Cramer, Atty ID # 69289
Shanon J. Carson, Atty ID # 85957
Patrick F. Madden, Atty ID # 309991
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604
ecramer@bm.net
scarson@bm.net
pmadden@bm.net

David M. Taus
DEVERO TAUS LLC
211 Somerville Road, Suite B
Bedminster, New Jersey 07921
Telephone:  (908) 375-8142
Facsimile:  (908) 375-8151
dtaus@deverotaus.com

Brett Cebulash, Esq.
Kevin Landau, Esq.
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
Facsimile: (212) 931-0703
bcebulash@tcllaw.com
klandau@tcllaw.com

Brent Walker
CARTER WALKER PLLC
2171 West Main Street, Suite 200
Cabot, AR 72023
Telephone: (501) 605-1346
Facsimile: (501) 605-1348
bwalker@carterwalkerlaw.com

Steven A. Owings
OWINGS LAW FIRM
1400 Brookwood
Little Rock, AR 72202
Telephone:  (501) 661-9999
Facsimile: (501) 661-8393
sowings@owingslawfirm.com

Kendall S. Zylstra
Richard Schwartz
FARUQI & FARUQI, LLP
101 Greenwood Avenue
Suite 600
Jenkintown, PA  19046
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
kzylstra@faruqilaw.com
rschwartz@faruqilaw.com

**4**

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Dennis A. Throm, individually and on behalf of all others similarly situated | GMAC Mortgage, LLC |

| (b) County of Residence of First Listed Plaintiff **Indian River, FL** (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant **Montgomery County, PA** (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
|---|---|

| (c) Attorney's (Firm Name, Address, and Telephone Number) Berger & Montague, P.C., 1622 Locust St., Phila. PA 19103, 215-875-4656 | Attorneys (If Known) |
|---|---|

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| | | **IMMIGRATION** | | | |
| | | ☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - Alien Detainee<br>☐ 465 Other Immigration Actions | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Section 1601

Brief description of cause:
Violation of Truth-in-Lending Act/Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE **Dalzell**  DOCKET NUMBER **2:11-cv-5161**

DATE 10/31/2011

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:      U.S. Civil Statute: 47 USC 553
                                            Brief Description: Unauthorized reception of cable service

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| Dennis A. Throm, individually and on behalf of all others similarly situated | ) ) ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No. |
| GMAC Mortgage, LLC | ) ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Shanon J. Carson
1622 Locust Street
Philadelphia, PA 19103
(215)-875-4656

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Michael E. Kunz*
*Clerk of Court*

Date: _____                    _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*    GMAC Mortgage, LLC _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                                    *Server's signature*

                                                    _____
                                                    *Printed name and title*

                                                    _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| **DENNIS A. THROM, individually and**<br>**on behalf of all others similarly situated,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO.** |
| | : | |
| **GMAC MORTGAGE, LLC,** | : | |
| | : | |
| **Defendant.** | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) **(X)**

(f) Standard Management – Cases that do not fall into any one of the other tracks. ( )

Date  October 31, 2011        Attorney-at-law: Patrick F. Madden   Attorney for: Plaintiff

Telephone: 215.875.3035        FAX Number: 215.875.4064   E-Mail Address: pmadden@bm.net

(Civ. 660) 10/02

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)    The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)    In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)    The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)    Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)    Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases  involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA— DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff:  Dennis A. Throm, 138 Kildare Drive, Sebastien, Florida 32958

Address of Defendant:  GMAC Mortgage, LLC,  1100 Virginia Drive, Fort Washington, Pennsylvania 19034

Place of Accident, Incident or Transaction:  GMAC is a limited liability company whose corporate headquarters is in Fort Washington Pennsylvania.  Plaintiff is a citizen and resident of Sebastian, Florida.  The incidents and transactions underlying this action took place in Pennsylvania, Florida, and other and other locations.

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1)                     Yes __ No **X**_____

Does this case involve multidistrict litigation possibilities?                                                  Yes **X** No_____

*RELATED CASE, IF ANY*:
Case Number:       2:11-cv-5161          Judge:      Dalzell      Date Terminated:      N/A

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                            Yes __ No **X**

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?                                               Yes **X** No____

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?                              Yes___ No **X**

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                                            Yes___ No **X**

CIVIL: (Place X in ONE CATEGORY ONLY)

A. *Federal Question Cases*:
1. __Indemnity Contract, Marine Contract, and All Other Contracts
2. __FELA
3. __Jones Act-Personal Injury
4. __Antitrust
5. __Patent
6. __Labor-Management Relations
7. __Civil Rights
8. __Habeas Corpus
9. __Securities Act(s) Cases
10. __Social Security Review Cases (Please specify)
11. _**X**_ All other Federal Question Cases

B. *Diversity Jurisdiction Cases*:
1. __ Insurance Contract and Other Contracts
2. __Airplane Personal Injury
3. __Assault, Defamation
4. __Marine Personal Injury
5. __Motor Vehicle Personal Injury
6. __Other Personal Injury
7. __Products Liability
8. __Products Liability— Asbestos
9. __All other Diversity Cases

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I,  Patrick F. Madden, counsel of record do hereby certify:

  **X**  Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

  **X** Relief other than monetary damages is sought.

**DATE:** October 31, 2011          _____          309991_____
                                   Attorney-at-Law: Patrick F. Madden          Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.**

**DATE:** October 31, 2011          _____          309991_____
                                   Attorney-at-Law: Patrick F. Madden          Attorney I.D.#

CIV. 609 (6/08)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DENNIS A. THROM, individually and on behalf of all others similarly situated, | : | Case No.: _____ |
| Plaintiff, | : | |
| v. | : | COMPLAINT - CLASS ACTION |
| GMAC MORTGAGE, LLC, | : | JURY TRIAL DEMANDED |
| Defendant. | : | |

## CLASS ACTION COMPLAINT

Plaintiff Dennis A. Throm ("Plaintiff" or "Mr. Throm"), individually and on behalf of all others similarly situated, brings this class action against GMAC Mortgage, LLC ("Defendant" or "GMAC"). The following allegations are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to the acts of others.

## INTRODUCTION

1. Plaintiff owns a home in Sebastian, Florida. Plaintiff's parents, who are now deceased, were the original purchasers of the home. On November 3, 1997, they refinanced their mortgage through Manning Financial Group, Inc. The resulting mortgage was subsequently assigned to GMAC.

2. GMAC originates, acquires and/or services loans secured by real property, some of which are located in Special Flood Hazard Areas ("SFHAs"). These loans include original purchase-money mortgages secured by the property, second mortgages, mortgage refinances, and home equity lines of credit ("HELOC").

1

3. ▤ GMAC is engaged in a pattern and practice of forcing owners of properties whose
loans are secured by their properties, and are originated or serviced by GMAC, to purchase
excessive high-premium flood insurance. GMAC requires borrowers to purchase flood
insurance in excess of that required by federal law or the parties' mortgage contract and, more
importantly, in excess of that required to protect GMAC's insurable interest in the collateral.
GMAC has the power and exerts that power to force borrowers to pay for the excessive and
worthless insurance since GMAC simply can withdraw the amounts from escrow, add the
amounts to the loan balance, and ultimately foreclose on the property should the borrower fail to
pay the forced premiums. Plaintiff was victimized by this illegal scheme when GMAC force-
placed a $176,000 flood insurance policy on his property that required Plaintiff to pay in excess
of $6,000 in annual premiums. GMAC's entire interest in the property amounted to $55,000 –
the amount remaining on Mr. Throm's mortgage. Unfortunately, these excessive fees forced
Plaintiff into foreclosure.

4. ▤ To add insult to injury, as GMAC knew, Plaintiff did not even live in an SFHA
and was therefore never required to carry flood insurance.

5. ▤ GMAC's scheme is highly automated. A typical homeowner's ordeal with
GMAC's force-placed flood insurance begins with a form notice from GMAC demanding proof
of adequate flood insurance, and continues with form letters asking for more information and
explaining GMAC's intention to force-place flood insurance. When sending these form letters to
homeowners, GMAC disregards whether the homeowners have adequate flood insurance
coverage. Even when a homeowner, such as Plaintiff here, sends GMAC information that
demonstrates that they have adequate coverage (or that coverage is unnecessary), Defendant does

2

not relent.  The process culminates with GMAC's purchase and forced placement of a high premium flood insurance policy.   These force-placed policies can cost up to ten times as much as insurance policies that borrowers can obtain independently.  Throughout this process, GMAC misrepresents that its requirement that homeowners obtain additional flood insurance at the homeowner's expense is in line with federal laws for homeowners in SFHAs.  In some cases, including that of Plaintiff, the property is not even in a SFHA.

6.    GMAC force-places homeowners into insurance policies brokered through affiliated entities, including SouthWest Business Corporation ("SWBC") and WNC First Insurance Services ("WNC").

7.    SWBC has a specialized business that focuses on lender-placed insurance services and helps GMAC identify which homeowners to target for force-placed insurance.  SWBC claims that its "risk management products, processes, and technology design allows you to maintain the proper balance between growth, customer value, service, and profitability."  SWBC's force-placed programs are specifically designed to provide GMAC (and others) with "growth" and "profitability" because GMAC is able to generate interest on unpaid insurance premiums and fees when homeowners are unable to pay the excessive premiums.

8.    WNC provides similar services to GMAC as SWBC.  WNC provides its services through a highly mechanized system, including what it refers to as its InsTrack system.  Moreover, WNC promises that it will force-place flood insurance without any need for elevation certificates.  As WNC states in describing its force-place flood insurance program that "[n]o elevation certificates are required, eliminating the most difficult requirement in obtaining flood insurance."

3

Case 2: Prev-06813-SD    Document 1    Filed 08/31/12    Page 45 of 33

9. The premiums GMAC and/or its brokers charged for this insurance were
unconscionably and outrageously excessive, far in excess of any amount that could be considered
"reasonable." Both the amount of force-place flood insurance coverage and the rate of that
coverage are excessive. GMAC inflates the premiums by its unreasonable and unwarranted
insistence on having properties insured for up to more than three times GMAC's insurable
interest in the property. Even if the amount of coverage were proper, the insurance premiums
were still excessively high, by the order of up to ten fold.

10. The above-described actions constitute GMAC's breach of the mortgage contract
between Plaintiff and GMAC, in that GMAC imposed conditions not required by any reasonable
construction of the contractual provisions relating to the obligation of Plaintiff to carry insurance
on the property in question. Plaintiff's form contract limits the amount of force-place insurance
that GMAC can place on the property. GMAC exceeded that limit by requiring flood insurance
coverage of $176,000 when its security interest is only $55,000. In addition to a breach of
contract, GMAC's actions also constitute a breach of the implied covenant of good faith and fair
dealing applicable to contracts. GMAC's actions also constitute conversion and are
unconscionable.

11. This Complaint seeks disgorgement of all funds paid to GMAC by Plaintiff and
those similarly situated after GMAC force-placed flood insurance on properties that are already
adequately insured under federal law and their mortgage contracts; disgorgement of any and all
funds paid to GMAC to modify loans after GMAC's practices forced foreclosure or potential
forceclosure; and an injunction prohibiting GMAC from force-placing unnecessary flood
insurance policies on properties that already have adequate flood insurance as dictated by federal

4

law.

## **PARTIES**

12.   Plaintiff Dennis A. Throm ("Plaintiff" or "Mr. Throm") is a resident of Sebastian,

Florida and owns a home there.  The previous owners of the home were Mr. Throm's parents,

Vernon H. Throm and Agnes K. Throm ("Predecessors in Interest").  Subsequent to his mother's

death in October 2008 (his father died in October 2004), Plaintiff took possession and ownership

of the property.

13.   Defendant GMAC Mortgage, LLC ("Defendant" or "GMAC") is a limited

liability company, with its principal place of business in Fort Washington, PA.  GMAC

originates, acquires and/or services mortgage loans including mortgage loans to Florida

homeowners.

## **JURISDICTION AND VENUE**

14.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims arise under the federal Truth in Lending Act, 12 U.S.C. § 1601, *et seq*.

15.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367.

16.   Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act,

28 U.S.C. § 1332(d)(2) ("CAFA") because the matter in controversy, on information and belief,

exceeds $5,000,000, exclusive of interest and costs, and this action is a class action in which

members of the Class are residents of a different state than Defendant.

17.   Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the

acts, events and/or omissions giving rise to this action took place in this District.

# FACTUAL BACKGROUND

## A.    The National Flood Insurance Program and Regulations

18.  In the 1994 Amendments to the National Flood Insurance Act of 1968 ("NFIA"), Congress required lenders to ensure that homeowners had flood insurance for property located in areas designated by the Federal Emergency Management Agency ("FEMA") as Special Flood Hazard Areas ("SFHA").  Lenders are required to ensure that properties in SFHAs pledged as security for loans have flood insurance equal to the *lesser* of:  (1) the maximum insurance coverage available through the federal National Flood Insurance Program ("NFIP"), which is $250,000 per unit; (2) the outstanding balance of the loan; or (3) the replacement cost of the unit.

19.  The purpose of the NFIP is to reduce the federal government's burden to provide disaster relief to flood-prone areas by providing a federal flood insurance scheme.  Payments for flood losses under the NFIP are the exclusive source of insurance payments, and federal agencies tasked with implementing the NFIP, most notably FEMA, proscribe minimum and maximum limits on how much flood insurance a homeowner can have and how much the insurance policy will pay in the event of a loss.

20.  GMAC requires borrowers to purchase flood insurance in excess of the outstanding balance on the mortgage when the full replacement value exceeds the mortgage balance.

21.  When this is the case, in the event of flood loss, GMAC has no interest in the insurance policy's excess coverage.  The additional insurance on the properties GMAC force-places is excessive and unnecessary.  There is no good faith basis for a lender to force-place coverage that exceeds the lender's interest in the property and harms the borrower's ability to

6

pay off the loan.  In some cases, however, the insurance premiums forced by GMAC force the

borrower into foreclosure.  In those cases, GMAC modifies the loan to wipe out equity the

borrower has in the home.

22.  GMAC misrepresents to its customers that federal law requires GMAC to obtain

flood insurance in amounts dictated by GMAC when, in reality, GMAC forces homeowners to

purchase flood insurance that the federal government does not require.  GMAC force-places

consumers into flood insurance that exceeds GMAC's security interest.  GMAC also force-

places consumers, including Plaintiff and Plaintiff's Predecessors in Interest, into flood insurance

policies that are not required by federal law because the properties are not even in an SFHA.  As

a result, GMAC charges these homeowners exorbitant and excessive insurance premiums that

significantly and unfairly add to the homeowners' mortgage payments.

**B.    GMAC Force-Placed Plaintiff, His Predecessors in Interest and the Class Into
Unnecessary and Excessive Flood Insurance**

23.  On November 3, 1997, Plaintiff's Predecessors in Interest obtained a mortgage

from Manning Financial Group, Inc.  The Predecessors in Interest borrowed $66,000 and

conferred a security interest in that amount on their home. The mortgage was subsequently

assigned to GMAC.

24.  At the time of closing, Plaintiff's Predecessors in Interest were not required to

purchase flood insurance as a condition of closing the loan.  The Predecessors in Interest were,

however, required to pay a $29 fee to a third-party company, Transamerica, as a "Flood

Certification Fee."  This fee was used to determine whether the property was in a floodplain to

ascertain whether the mortgage was subject to the federal flood insurance regulations.

25.     The "Flood Certification Fee," "Hazard Insurance Premium," and "Hazard Insurance Reserves" were all disclosed in the "Federal Truth-In-Lending Disclosure Statement" provided at closing.  Flood insurance was neither required nor disclosed as part of this document.

26.     The "Federal Truth-In-Lending Disclosure Statement" provided a payment schedule that required 359 monthly payments of $513.34 and one payment of $515.41 in November 2027.  Taxes and hazard insurance premiums were also added to the monthly payment, making the total $631.04/month.

27.     In 2002, approximately five years after closing on the loan, Plaintiff's Predecessors in Interest received a notice from GMAC requiring flood insurance.  Plaintiff and/or his Predecessors in Interest received similar notices in subsequent years.

28.     GMAC's notices indicated that if Plaintiff's Predecessors in Interest did not provide proof of flood insurance within a specified time frame, GMAC would automatically enroll them in a flood insurance policy with one of GMAC's affiliates.

29.     GMAC force-placed a policy effective from December 7, 2002 to December 7, 2003 with an earned premium of $864.51 (annually).  Over the next three years, GMAC force-placed flood insurance policies on Plaintiffs' Predecessors in Interest with annual premiums in similar amounts.

30.     However, beginning with the policy year July 1, 2006 to July 1, 2007, the premiums charged by GMAC on the force-placed flood insurance increased significantly, with premiums nearly three times what they had been in the preceeding years as the annual premium skyrocketed to $2,255.37.  The 2007-2008 annual premium rose again by over 30% to $2,976.11.  GMAC then doubled the 2008-2009 annual premium, forcing Plaintiff to pay $5,882.18 for his

8

flood insurance policy. GMAC increased the 2009-2010 annual premium yet again, this time by
5% to $6,159.14. By 2009, Plaintiff was being charged premiums that increased by over 700%
in the span of just four years.

31.  Not only were the premiums amounts outrageous but the annual premiums were
made even more excessive by GMAC's demand for coverage in excess of the loan balance. For
example, GMAC force-placed a flood insurance policy with $84,000 in coverage for the July
2007 to July 2008 policy year. The mortgage balance was substantially below $84,000 during
this time period. Similarly, GMAC then more than doubled the force-placed policy amount for
the July 2009 renewal to $176,000 in coverage notwithstanding the February 18, 2009 balance of
$55,490.56 on the mortgage.

32.  On information and belief, GMAC, or a wholly owned subsidiary of GMAC or its
holding company, receives a kickback or commission for acting as a putative "broker" for each
force-placed insurance policy. These kickbacks or commissions constitute at least part of the
reason for the exorbitant cost of the force-placed policies. This allegation is based on the high
proportion of premium amount per dollar of force-placed insurance coverage as well as similar
practices by other lenders.

33.  On July 5, 2005, GMAC sent a written notice to Plaintiff's Predecessors in
Interest informing them that GMAC would force-place fire insurance on the property. The
notice makes clear that "the amount of coverage will not be greater than the outstanding
principal balance in [Plaintiff's Predecessors in Interest's] account as of the effective date of the
coverage, *which may be less than the value of your property*." (emphasis added). While GMAC
indicated that the fire insurance policy would not exceed the outstanding principal balance,

9

GMAC showed no such restraint or policy in force-placing flood insurance policies on Plaintiff
or Plaintiff's Predecessors in Interest and force-placed flood insurance in an amount that was
over three times the outstanding principal balance.

34.  Due to GMAC's outrageous coverage demands and the outrageous premiums
associated with that coverage, the monthly mortgage payment skyrocketed to the point that,
during the 2009-2010 policy year, GMAC forced Plaintiff to pay a monthly amount for
unnecessary flood insurance alone that was almost *double* the monthly mortgage payment.

35.  On June 24, 2010, Plaintiff had a surveyor determine that his property was not
located in the floodplain.  The surveyor completed a Letter of Map Revision Based on Fill
Determination Document (Removal).  The surveyor's determination was not based on any recent
changes since the property had not been in the floodplain for some time.  On information and
belief, flood insurance was not required at closing of the loan because as far back as November
3, 1997, the property was not in a floodplain.

36.  Plaintiff requested a full refund of all premiums paid but GMAC denied his
request.  GMAC informed Plaintiff that only premiums that covered dates after the date of the
Letter of Map Revision Based on Fill Determination Document (Removal) could be refunded.

37.  In May 2010, GMAC foreclosed on the loan due to Plaintiff's inability to pay
both the loan payment and the excessive, force-placed flood insurance premiums.

38.  In August 2010, Plaintiff entered into a loan modification agreement with GMAC
to remove the loan from foreclosure.  Pursuant to the modification, Plaintiff owed as of August
2010, $77,395.53.  Thus, the modification not only wiped out $11,000 in equity that Plaintiff and
his Predecessors in Interest had in their property, it added more than $11,000 in new debt not

previously subject to the mortgage. Thus, GMAC used its unreasonable and excessive force-placed flood insurance to extract an additional $22,000 in debt from Plaintiff.

39. Plaintiff's situation is not unique since GMAC employs a highly mechanized program to force homeowners to pay whatever egregious amount GMAC (and its affiliates) determines for force-placed flood insurance. GMAC has enforced the same policies and taken similar actions against homeowners across the country. These policies and practices have even gone so far, as they did here, to result in GMAC's foreclosing on the loans. Overall, GMAC's practices have impaired Plaintiff's and Class members' ability to repay their loans and build equity in their homes, but have lined the pockets of GMAC and its affiliates.

40. Plaintiff has provided GMAC ample opportunity and a reasonable period to take corrective action.

41. Plaintiff's property was force-placed with flood insurance through two of GMAC's affiliates, SWBC and WNC, who on information and belief, compensates GMAC in connection therewith.

42. Plaintiff was charged for these unnecessary flood insurance premiums and paid an inflated and excessive rate for the unnecessary premiums.

43. GMAC, through its uniform and highly mechanized practices has made similar (and/or identical) misstatements to and took similar unwarranted positions and actions to force tens or hundreds of thousands of Class members to force-place excessive flood insurance policies on their properties.

C.    **GMAC's Practices**

44. GMAC ties insurance products in with its mortgage loan and home equity

11

financing activities.

45.  GMAC enforces this tie in a highly mechanized and arbitrary fashion without regard to whether a particular borrower needs flood insurance in the amounts dictated by GMAC and without regard to whether GMAC is forcing insurance over and above any interest GMAC has in the property.

46.  GMAC makes its decision to force-place flood insurance together with its affiliates, including, without limitation, SWBC and WNC.

47.  Flood Insurance Rate Maps ("FIRMs") show aerial views of the SFHAs but do not show whether a specific property is actually located in the floodplain and subject to the federal flood insurance regulations.

48.  After determining through its mechanized process, along with its affiliates, that GMAC will require flood insurance, GMAC then regularly requires borrowers to purchase flood insurance in excess of what is necessary to meet the requirements of federal law or to protect its mortgage interest, in violation of GMAC's mortgage contracts.

49.  GMAC and its affiliates charge insurance premiums that can be up to ten times the cost of obtaining the same insurance independently.  Additionally, by demanding excess coverage amounts that far exceed federal guidelines and GMAC's interests, GMAC inflates the premiums, thereby increasing GMAC's and its affiliates profits from this practice.  The premiums increase the monthly mortgage payments required of borrowers due to GMAC's practices and increases GMAC's profitability.

50.  On information and belief, GMAC or a subsidiary of itself or its parent company, receives a kickback or commission for the purchase of each force-placed flood insurance policy

12

as "broker" for the policy, contributing to the excessive costs of the insurance.

51.     GMAC sends out generic written notices to borrowers, including Plaintiff and/or Plaintiff's Predecessors in Interest, stating that the borrower must obtain insurance coverage in amounts dictated by GMAC.  The amount of coverage that GMAC dictates and requires of borrowers exceeds that required by federal law.  It also exceeds what is necessary to protect GMAC's interest in the collateral pledged as security.

52.     GMAC breached its contract with Plaintiff and all similarly situated borrowers whose loans GMAC services by imposing coverage requirements beyond that necessary to protect its insurable interest in the property.

53.     To the extent that GMAC sought to impose coverage requirements under the guise that federal law requires the insurance when, in fact, federal law does not requires such coverage at all or requires coverage in a lesser amount, GMAC breached its contracts with Class members, misrepresented federal law and violated the law.

54.     GMAC ensures that its borrowers will pay the exorbitant force-placed insurance premiums by tacking the payments onto their borrowers' principal balances and/or withdrawing the funds directly from the borrowers' escrow accounts.  These actions force borrowers to make the payments or GMAC will report the GMAC-manufactured delinquencies to the consumer credit reporting agencies and potentially even foreclose on their properties.

55.     GMAC engages in the above-described practices in order to reap improper financial gain from their customers.

56.     By tacking the force-placed flood insurance premiums onto homeowners' mortgage or home equity line of credit balances and withdrawing its affiliates' insurance

13

premiums directly from mortgage borrowers' escrow accounts, GMAC also derives interest

income on the increased loan balance, and fee income, where applicable.   GMAC can ultimately

even force the loan into foreclosure and wipe out any equity that the borrower had in their home

and sometimes generate additional revenue on the loan for GMAC in loan modifications.

57.     GMAC also has a mutually beneficial financial relationship with affiliate

insurance entities including SWBC and WNC.

58.     GMAC forces homeowners to obtain unnecessary insurance policies with

excessively high premiums that benefit only GMAC and its affiliates including, without

limitation, SWBC and WNC.  GMAC and/or its affiliates benefit from, *inter alia,* increased

premium and commission revenue, increased interest payments and other fees from borrowers on

these forced debts that GMAC creates for the customer.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action individually and on behalf of all others similarly

situated and asks the Court to certify this case as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

60.     This action satisfies Rule 23's requirements of numerosity, commonality,

typicality, adequacy, predominance, and superiority.

61.     Plaintiff's allegations are brough on behalf of a proposed nationwide class defined

as:

> All persons with loans financed or serviced by GMAC who GMAC provided
> force-placed flood insurance which exceeded any of the following:  (1)  $250,000;
> (2) the replacement cost value of the property pledged as security for the loan; or
> (3) the total outstanding loan balance (if a traditional loan) or maximum line of
> credit (if a home equity line of credit) (the "Class").

14

62. The Class is numerous, and is composed of hundreds or thousands of mortgage or HELOC borrowers whose home financing was originated and/or serviced through GMAC, the joinder of which in one action would be impracticable. The disposition of the claims of the Class through this class action will benefit the parties and the Court. The identities of individual Class members are readily ascertainable through GMAC's records.

63. Plaintiff's claims are typical of the claims of the Class, in that Plaintiff, like all Class members, was forced into paying for unnecessary and excessive flood insurance. Plaintiff and the Class suffered damages in the form of costs associated with the purchase and maintainence of these high-premium policies.

64. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained experienced counsel with the necessary expertise and resources to prosecute this action. Plaintiff and his counsel do not forsee any circumstances where the interests of Plaintiff would be adverse to those of the Class.

65. Common questions of law and fact exist as to all Class members which predominate over questions affecting solely individual Class members, including, without limitation:

      (a)      whether GMAC has a policy and practice of misrepresenting to its customers that federal law requires additional flood insurance on mortgages or HELOCs for which such additional flood insurance is not required by law;

      (b)      whether GMAC's standard flood insurance notice letters are false,

15

misleading and/or deceptive;

(c)      whether GMAC breached its mortgage agreements with customers by

demanding and force-placing unauthorized amounts of flood insurance or

amounts that were not provided for in the mortgage agreements;

(d)      whether GMAC's agreements comply with all mandated consumer

disclosures under TILA;

(e)      whether GMAC's agreements are void in their entirety under TILA; and

(f)      the proper measure of damages.

66.      All Class members have suffered damages as a result of a "common wrong" on

the part of GMAC.  Damages are easily ascertainable by reference to GMAC's own records.

67.      A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  It would be economically impractical for Plaintiff and Class

members to pursue individual actions against GMAC as the costs of prosecution would likely

surpass their individual damages.  GMAC continues to engage in the unlawful, unfair and

unconscionable conduct that is the subject of this Complaint.  Class treatment of Plaintiff's

claims will permit Plaintiff and the Class to vindicate their rights against GMAC, and conserve

the resources of the Court and the Parties.  Class treatment would also avoid the possibility of

inconsistent outcomes that could result from a multitude of individual actions in varying

jurisdictions nationwide.

**CAUSES OF ACTION**

**COUNT I**
**Breach of Contract**

68.     Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

69.     Plaintiff's Predecessors in Interest entered into a mortgage contract with Manning
Financial Group, Inc., which transferred its interest to GMAC causing GMAC to assume all
rights and responsibilities of Manning Financial Group, Inc. under that contract.

70.     The contract provides, in pertinent part, that:

5. **Hazard or Property insurance.**  Borrower shall keep the improvements now
existing or hereafter erected on the Property insured against loss by fire, hazards
included within the term "extended coverage" and any other hazards, ***including
floods or flooding***, for which Lender requires insurance.  This insurance shall be
maintained in the amounts and for the periods that Lender requires. . .  If
Borrower fails to maintain coverage described above, Lender may, at Lender's
option, ***obtain coverage to protect Lender's rights in the Property*** . . .

(emphasis added).

71.     The contract is a form contract obtained by the lender from the Fannie Mae and/or
Freddie Mac websites.

72.     GMAC breached its contract with Plaintiff and/or Predecessors in Interest by
requiring the purchase of excessive flood insurance that was not required under the contract or
federal law.

73.     The coverage amount in the force-placed policy exceeded the minimum amount
required under federal law and exceeded GMAC's security interest in the property.

74.     Additionally, the law implies into every contract an obligation of good faith and
fair dealing, the purpose of which is to prevent one party's conduct under the contract from

17

impeding the other party's performance of that contract.

75.     GMAC's actions constitute a breach of its duty of good faith and fair dealing in

that, to the extent that GMAC had any discretion under the contract, it exercised that authority in

bad faith by imposing unnecessary insurance on Plaintiff's mortgage without regard for the fact

that GMAC's insurable interest was protected by a lower amount of coverage.  As a result,

GMAC wrongfully withdrew money from Plaintiff's and/or his Predecessors in Interest's

mortgage escrow account, and forced these wrongfully increased payments with the implicit

threat of negative credit reporting, thereby impeding their ability to continue meeting their

obligations according to the terms of the contract.

76.     On information and belief, GMAC has replicated these actions with respect to all

members of the Class as part of a scheme to wrongfully increase income to it and its affiliates.

77.     Plaintiff and the Class are entitled to compensatory damages resulting from

GMAC's wrongful breach of contract and in violation of GMAC's obligation of good faith and

fair dealing in performing under the contracts at issue.

### COUNT II
### Violation of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*

78.     Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

79.     Congress' objective in enacting the Truth in Lending Act, 15 U.S.C. § 1601 *et

seq.* ("TILA"), was to ensure that the true cost of goods and services be fully and completely

disclosed to the consumer in writing prior to the consumer's purchase and agreement to those

terms.

80.     Residential mortgage loan agreements and line of credit agreements are subject to

18

the disclosure requirements of TILA and all related regulations, commentary, and interpretive

guidance promulgated by the Federal Reserve Board.

81.     GMAC is a "creditor" as defined by TILA

82.     As a creditor, TILA requires GMAC to timely disclose all finance charges, other

charges, and third-party charges that may be imposed in connection with a mortgage loan or line

of credit.

83.     TILA thus requires GMAC to make these disclosures clearly and conspicuously.

84.     TILA further requires GMAC to accurately and fully disclose the terms of the

legal obligation between the parties.

85.     GMAC violated TILA by, *inter alia*:  (a) adversely changing the terms of

mortgage loans or credit lines after origination without consent and demanding more insurance

than previously required in amounts greater than necessary to protect its interest in the property;

and (b) failing to provide proper notice, after origination, that GMAC was amending the terms of

loans or credit lines as described in the relevant mortgage documents.

86.     The TILA violations set forth above occurred within one year of the

commencement of this action.  To the extent that the violations described above occurred earlier,

Plaintiff did not discover and did not have a reasonable opportunity to discover GMAC's

violations until less than one year before this action commenced.  Prior to this time, Plaintiff had

no reason or opportunity to complain about GMAC's TILA violations because it was not yet

apparent that GMAC's disclosures were incomplete, inaccurate, and misleading.

87.     Plaintiff's TILA claim is timely.  The statute of limitations on Plaintiff's TILA

claim did not begin to run and/or was equitably tolled until such time that he had a reasonable

opportunity to discover GMAC's TILA violations and complain about such violations.  It would

be manifestly unjust and inconsistent with the purposes of the TILA to apply and enforce an

earlier accrual date for Plaintiff's TILA claim.

88.    GMAC systematically and pervasively engaged in similar violations of TILA to

the detriment of other Class members.

89.    Plaintiff and the Class have been injured and have suffered monetary losses as a

result of GMAC's violations of TILA.

90.    As a result of GMAC's violations, Plaintiff and the Class are entitled to recover

actual damages and a penalty of $500,000.00 or 1% of Defendant's net worth, as provided by 15

U.S.C. § 1640(a)(l)-(2).

91.    Plaintiff and the Class are also entitled to recover attorneys' fees and costs to be

paid by GMAC, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT III
### Unconscionability

92.    Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

93.    GMAC's conduct described herein is substantively and procedurally

unconscionable in the following respects, among others:

a)    GMAC did not disclose its insurance requirements at the time of closing

and, in fact, Plaintiff's Predecessors in Interest were not required to purchase flood insurance at

the time of closing, a supposed prerequisite for obtaining GMAC financing in the first place;

b)    GMAC force-placed Plaintiff and the Class into its affiliates' flood

insurance policies for amounts in excess of GMAC's security interest in the properties;

20

      c)     GMAC's affiliates charged premiums up to ten times as costly as that a homeowner could purchase from an independent insurance company;

      d)     GMAC withdrew these premiums from customers' escrow accounts or added them to customers' HELOC credit line balances such that they became a part of the customers' loan obligation, which made them subject to negative credit reporting;

      e)     Nowhere in GMAC's mortgages or HELOCs is there any indication that GMAC will ever require a homeowner to obtain flood insurance greater than the minimum requirements of the NFIP or greater than GMAC's security interest in the property, although GMAC force-places customers into such excessive coverage anyway; and

      f)     GMAC's force-placed policies' premiums were so high, Plaintiff's Predecessors in Interest were unable to pay their monthly payments sending the loan into foreclosure necessitating a modification agreement that wiped out the borrowers' equity in the property and generated substantial additional debt.

94.     Considering the great business acumen and experience of GMAC in relation to Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuous and incomprehensible nature of the contract language involved, the oppressiveness of the terms and GMAC's application of them, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of risk between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

95.     If the mortgage or HELOC agreements at issue are understood to allow any of these practices, that contract is unconscionable.

96.      Plaintiff and the Class who paid excessive and unnecessary flood insurance
premiums are entitled to rescission and restitution as a result of GMAC's unconscionable
policies and practices as alleged herein.

### COUNT IV
### Conversion

97.      Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

98.      GMAC had and continues to have a duty to maintain and preserve its customers'
mortgage accounts, HELOC accounts, and mortgage escrow accounts, and to prevent their
diminishment or alteration through its own wrongful acts.

99.      GMAC wrongfully collected insurance premiums from its customers' mortgage
escrow accounts or added such payments to its customers' HELOC accounts.

100.      GMAC collected these premiums by wrongfully taking specific and readily
identifiable funds from their mortgage customers' escrow accounts or misappropriating funds
paid to their HELOC customers' account balances.

101.      GMAC has assumed and exercised the right of ownership over these funds
without authorization to do so and in hostility to the rights of Plaintiff and the Class without legal
justification.

102.      GMAC retains these funds unlawfully without consent of Plaintiff or the Class.

103.      GMAC intends to permanently deprive Plaintiff and the Class of these funds.

104.      Plaintiff and the Class properly own these funds, not GMAC, which now claims
that it is entitled to their ownership contrary to the rights of Plaintiff and the Class.

105.      Plaintiff and the Class are entitled to the immediate possession of these funds.

22

106.    GMAC has wrongfully converted these specific and readily identifiable funds.

107.    GMAC's wrongful conduct is of a continuing nature.

108.    As a direct and proximate result of GMAC's wrongful conversion, Plaintiff and

the Class have suffered and continue to suffer damages.

109.    As a result of GMAC's actions constituting conversion, Plaintiff and the Class

have suffered actual damages for which GMAC is liable.  GMAC's liability should be measured

by the extent of its conversion.

### COUNT V
### Unjust Enrichment

110.    Plaintiff restates and incorporates the preceding paragraphs of the Complaint.

111.    GMAC received from Plaintiff and members of the Class a benefit in the form of

overcharges for force-placed insurance policies which are excessive and unreasonable, and are

the result of overcharging and overreaching.

112.    GMAC entered into agreements whereby its affiliates including, without

limitation, SWBC and WNC, would provide force-placed insurance policies to Plaintiff and the

Class which were paid for by Plaintiff and the Class at prices that were far higher than the market

rates for similar policies.  GMAC knew that the charges for these policies were excessive and not

the result of good faith practices.

113.    GMAC's affiliates, including SWBC and WNC, generated significant monies,

revenues and benefits for GMAC to be able to exclusively provide force-placed insurance

policies at unreasonable rates.

23

114.    As a result, Plaintiff and the proposed Class have conferred a benefit on
Defendant, and Defendant had knowledge of this benefit.  Defendant has voluntarily accepted
and retained the benefit conferred on it.

115.    Defendant will be unjustly enriched if allowed to retain the benefit, and each
Class member is entitled to an amount equal to the amount each Class member enriched
Defendant and for which Defendant has been unjustly enriched.

116.    Plaintiff and the Class demand an award against Defendant for the amounts equal
to the amount each Class member enriched Defendant and for which Defendant has been
unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, prays for
relief as follows:

A.    That this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3), that
Plaintiff be appointed as the Class representative, and that Plaintiff's counsel be appointed as
counsel for the Class;

B.    That Plaintiff and the Class recover the damages determined to have been
sustained by them, trebled as provided by law, with any applicable civil penalties, and that
judgment be entered against GMAC on behalf of Plaintiff and each Class member;

C.    That GMAC, its subsidiaries, affiliates, successors, transferees, assignees and the
respective officers, directors, partners, agents, and employees and all other persons acting or
claiming to act on GMAC's behalf, be permanently enjoined and restrained from continuing and
maintaining GMAC's unlawful conduct alleged in this Complaint;

24

D.      That Plaintiff and the Class be awarded prejudgment and postjudgment interest,

and that such interest be awarded at the highest legal rate from and after the date of service of the

Complaint in this action;

E.      That Plaintiff and the Class recover their costs of this suit, including attorneys'

fees and costs, as provided by law; and

F.      That the Court direct all such further relief that it deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all claims so triable.

Dated: October 31, 2011              Respectfully submitted,


                                     _____
                                     Eric L. Cramer, Atty ID # 69289
                                     Shanon J. Carson, Atty ID # 85957
                                     Patrick F. Madden, Atty ID # 309991
                                     BERGER & MONTAGUE, P.C.
                                     1622 Locust Street
                                     Philadelphia, PA  19103
                                     Telephone: (215) 875-4656
                                     Facsimile: (215) 875-4604
                                     ecramer@bm.net
                                     scarson@bm.net
                                     pmadden@bm.net

                                     Brett Cebulash
                                     Kevin S. Landau
                                     TAUS, CEBULASH & LANDAU, LLP
                                     80 Maiden Lane, Suite 1204
                                     New York, NY 10038
                                     Telephone: (212) 931-0704
                                     Facsimile: (212) 931-0703
                                     bcebulash@tcllaw.com
                                     klandau@tcllaw.com

25

Kendall S. Zylstra
FARUQI & FARUQI, LLP
101 Greenwood Avenue
Suite 600
Jenkintown, PA  19046
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
kzylstra@faruqilaw.com

David M. Taus
DEVERO TAUS LLC
211 Somerville Road, Suite B
Bedminster, New Jersey 07921
Telephone:  (908) 375-8142
Facsimile:  (908) 375-8151
dtaus@deverotaus.com

Brent Walker
CARTER WALKER PLLC
2171 West Main Street, Suite 200
Cabot, AR 72023
Telephone: (501) 605-1346
Facsimile: (501) 605-1348
bwalker@carterwalkerlaw.com

Steven A. Owings
OWINGS LAW FIRM
1400 Brookwood
Little Rock, AR 72202
Telephone:  (501) 661-9999
Facsimile: (501) 661-8393
sowings@owingslawfirm.com

**5**

JUDGE NATHAN

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

12 CV 3412

**LANDON ROTHSTEIN**, individually and
on behalf of all others similarly situated,

　　　　　Plaintiff,

　　v.

**GMAC MORTGAGE, LLC f/k/a GMAC
MORTGAGE CORPORATION, GMAC
INSURANCE MARKETING, INC. d/b/a
GMAC AGENCY MARKETING,
BALBOA INSURANCE COMPANY,
MERITPLAN INSURANCE COMPANY,**
and **JOHN DOES 1-20**.

　　　　　Defendants.

Civil Action No.: _____

RECEIVED
APR 3 0 2012
U.S.D.C. S.D. N.Y.
CASHIERS

**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

　　　　Plaintiff Landon Rothstein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF ACTION

　　　　1.　　Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO") and applicable state law on behalf of himself and a nationwide putative class (the "Class"), as more specifically defined below, consisting of all residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by defendant GMAC Mortgage, Inc. f/k/a GMAC

Mortgage Corporation (hereinafter "GM") at any time from March 6, 2003 to the present (the "Class

Period").

2.        To protect the lenders' interest in secured property, mortgage loan contracts require

the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the

lender is entitled to purchase coverage for the home, "force place" it, and be reimbursed by the

borrower for the cost. GM, a servicer of mortgage loans, procures force-placed insurance coverage

with respect to the loans in its servicing portfolio from defendant Balboa Insurance Company

("Balboa").

3.        This case is brought because, at all relevant times, GM has extracted kickbacks from

Balboa which have artificially inflated the force-placed insurance premiums that GM has paid. This

has enabled GM to demand inflated reimbursements from borrowers.

4.        Specifically, beginning in or about March 2003, GM, as a *quid pro quo* for awarding

Balboa its force-placed insurance business, has required Balboa to pay GM kickbacks. These

kickbacks have been in the form of bogus "commissions" paid to a GM affiliate, "GMAC Agency

Marketing," an unincorporated division and/or fictitious "doing business as" name of defendant

GMAC Insurance Marketing, Inc. ("GI"). Balboa agreed to label these payments as "commissions"

– and to funnel them through GMAC Agency Marketing – to disguise their true nature as bribes or

kickbacks.

5.        This kickback scheme has improperly inflated the reimbursements demanded from

borrowers with respect to force-placed insurance on GM-serviced loans because, at all relevant

times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. The

amounts of the kickbacks have then been repaid by Balboa to GM and/or GI in round-trip

2

transactions that have no legitimate business purpose.  The net charge – *i.e.*, the stated premium

minus the kickback – represents the true or actual price or cost of the insurance.

6.     This scheme has robbed not only borrowers, but also the owners of the loans being

serviced by GM.  All servicing agreements entitle servicers such as GM to recoup any advances they

incur from loan proceeds "off the top" before any money is passed through to the owners of the

loans.  Premiums on force-placed insurance constitute reimbursable servicing advances under all

such agreements.

7.     At all relevant times, GM in its capacity as loan servicer has reimbursed itself with

respect to force-placed insurance based not on its actual costs but instead on the artificially inflated,

fraudulently grossed-up premiums charged to borrowers.  In other words, GM, in recouping its

supposed servicing advances before passing money through to the owners of the loans, has not netted

out the amounts of the kickbacks that it has received from Balboa, but has instead included the full

amounts of the stated premiums, inflated by the kickbacks.  As a result, to the extent borrowers have

failed to pay, the owners of the loans have borne those fraudulently inflated costs in the form of

reduced proceeds and higher loss severities at liquidation.  In practice, this means that profits reaped

by GM as a result of the scheme alleged herein have come from the pockets of the pension funds that

invest in the mortgages in GM's servicing portfolio and – in the case of loans in the portfolio owned

by the Federal National Mortgage Association ("Fannie Mae") and other Government Sponsored

Enterprises ("GSEs") – from the pockets of United States taxpayers.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1367(a). This Court also has jurisdiction over the subject matter of this action pursuant

to 18 U.S.C. § 1964(c).

9.      Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to

institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or

transacts her affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is

subject to service in a particular district, additional parties residing in other districts may be brought

before the forum court, in the court's discretion, to the extent that "the ends of justice so require."

18 U.S.C. § 1965(b).

10.     Additionally, this Court also has personal jurisdiction over the defendants because

each systematically and continually conducts business throughout the State of New York.

11.     This Court also has original diversity jurisdiction pursuant to the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff is a citizen of the State of Texas.

Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, and there

are more than 100 members in the Class.

12.     This Court also has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this district under 28 U.S.C. § 1391(b), and 18 U.S.C. §§ 1965(b)

and (d). Defendants regularly conduct business in this District.

4

## PARTIES

14.     Plaintiff Landon Rothstein is a resident of Humble, Texas. Plaintiff has a mortgage loan serviced by GM on a property located at 97 County Road 3701, Splendora, Texas. Plaintiff was charged $105.00 by GM purportedly to reimburse it for the cost of force-placed hazard insurance with respect to the period October 6, 2010 to January 4, 2011. The force-placed coverage was obtained by GM from defendant Balboa through its wholly-owned subsidiary defendant Meritplan Insurance Company.

15.     Defendant GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation ("GM"), is a direct or indirect subsidiary of Residential Capital, LLC, which in turn is a direct or indirect subsidiary of bank holding company Ally Financial Inc. f/k/a GMAC, Inc. ("Ally Financial"). GM is a Delaware limited liability company headquartered in Fort Washington, Pennsylvania. GM is a financial services company that engages in the servicing of residential mortgage loans.

16.     Defendant GMAC Insurance Marketing, Inc. d/b/a GMAC Agency Marketing ("GI") is a Missouri corporation and a wholly owned indirect subsidiary of Ally Financial. GI is believed to have offices located at 59 Maiden Lane, 23rd Floor, New York, New York 10038.

17.     Defendants GM and GI are referred to collectively herein as the "GMAC Defendants."

18.     Defendants John Does 1-10 are direct or indirect subsidiaries and/or affiliates of Ally Financial which have at any time during the Class Period received payments from defendant Balboa in connection with residential force-placed insurance, regardless of how those payments have been characterized, whether as purported "commissions," reinsurance premiums or otherwise.

19.    Defendant Balboa Insurance Company ("Balboa") is a California corporation headquartered in Irvine, California. Balboa is a member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011, at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa maintains relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide directly and/or indirectly through its wholly-owned subsidiaries, including defendant Meritplan.

20.    Defendant Meritplan Insurance Company ("Meritplan") is a California corporation headquartered in Irvine, California. Meritplan is a wholly-owned subsidiary of Balboa. Meritplan is a provider of lender-placed insurance to financial institutions nationwide.

21.    Defendants John Does 11-20 are direct or indirect subsidiaries and/or affiliates of Balboa which have at any time during the Class Period provided force-placed insurance coverage in connection with residential mortgages serviced by GM.

22.    Defendants Balboa and Meritplan are referred to collectively herein as the "Balboa Defendants."

23.    GM, GI, Balboa, and Meritplan are referred to collectively herein as "Defendants."

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of himself and a nationwide Class consisting of:

> All residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by GM at any time from March 6, 2003 to the present.

25.    The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

6

26.    The Class is so numerous that joinder of all members is impracticable.

27.    A Class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.

28.    Plaintiff's claims are typical of the claims of the Class.

29.    There are questions of law and fact common to the Class, including but not limited

to:

    a.    Whether Defendants engaged in a kickback scheme relating to force-placed
        insurance;

    b.    Whether GM and/or GI extracted kickbacks from the Balboa Defendants;

    c.    Whether Defendants' kickback scheme constituted mail or wire fraud;

    d.    Whether GM violated the covenants of good faith and fair dealing implied in
        the mortgage agreements of Plaintiff and the Class;

    e.    Whether GM breached the terms of the mortgage loan agreements of Plaintiff
        and the Class;

    f.    Whether Defendants have been unjustly enriched;

    g.    Whether Defendants are liable to Plaintiff and the Class for damages and, if
        so, the measure of such damages.

30.    These and other questions of law and/or fact are common to the Class and

predominate over any questions affecting only individual Class members.

31.    Plaintiff will fairly and adequately represent and protect the interests of the members

of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel

competent and experienced in complex nationwide class actions, including all aspects of litigation.

Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

7

32.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of
separate actions by or against individual members of the Class would create a risk of inconsistent
or varying adjudications with respect to individual members of the Class, which would establish
incompatible standards of conduct for Defendants.

33.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution
of separate actions by or against individual members of the Class would create a risk of adjudications
with respect to individual members of the Class which would, as a practical matter, be dispositive
of the interests of the other members not parties to the adjudications or substantially impair or
impede their ability to protect their interests.

34.     Class action status is also warranted under Rule 23(b)(2) because Defendants have
acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final
injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

35.     Class action status is also warranted under Rule 23(b)(3) because questions of law
or fact common to the members of the Class predominate over any questions affecting only
individual members, and a class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**Background on Force-Placed Insurance,
Securitization and Servicing**

36.     To protect the lender's interest in secured property, mortgage loan contracts require
the borrower to maintain specified levels of hazard insurance.  If the borrower's coverage lapses or

8

is not obtained, the lender is entitled to purchase coverage for the home, "force place" it, and be

reimbursed by the borrower for the cost.

37.    Force-placed insurance policies generally are substantially more costly than borrower-

purchased policies, while providing less coverage. Additionally, force-placed insurance policies are

purchased by the lender and are for the lender. The lender is the sole insured and the only loss payee.

In the event of a casualty loss, the borrower has no right to collect any policy proceeds. The

borrower's only involvement with force-placed insurance coverage is that the borrower is obligated,

by virtue of the mortgage loan agreement, to reimburse the lender for the cost. This obligation is,

in fact, secured by the lender's lien on the property.

38.    Plaintiff's mortgage loan contract is typical. Section 5 thereof provides, in pertinent

part:

> Property Insurance. Borrower shall keep the improvements now
> existing or hereafter erected on the Property insured against loss by
> fire, hazards included within the term "extended coverage," and any
> other hazards including, but not limited to, earthquakes and floods,
> for which Lender requires insurance. This insurance shall be
> maintained in the amounts (including deductible levels) and for the
> periods that Lender requires. What Lender requires pursuant to the
> preceding sentences can change during the term of the Loan. The
> insurance carrier providing the insurance shall be chosen by Borrower
> subject to Lender's right to disapprove Borrower's choice, which
> right shall not be exercised unreasonably. . . .
>
> *If Borrower fails to maintain any of the coverages described above,
> Lender may obtain insurance coverage, at Lender's option and
> Borrower's expense.* Lender is under no obligation to purchase any
> particular type or amount of coverage. Therefore, such coverage shall
> cover Lender, but might or might not protect Borrower. Borrower's
> equity in the Property, or the contents of the Property, against any
> risk, hazard or liability and might provide greater or lesser coverage
> than was previously in effect. . . . *Any amounts disbursed by Lender
> under this Section 5 shall become additional debt of Borrower*

9

*secured by this Security Instrument*. These amounts shall bear
interest at the Note rate from the date of disbursement and shall be
payable, with such interest, upon notice from Lender to Borrower
requesting payment.

(emphasis added).

39.     Of course, the traditional lending relationship, where the lender makes a loan, retains

it in its portfolio, and services it itself, has become the exception rather than the rule.  Most

residential mortgages in the United States are financed through securitization.

40.     Securitization is a financing method involving the issuance of securities against a

dedicated cash flow stream such as mortgage payments.  A financial institution (the "sponsor" or

"seller") assembles a pool of mortgage loans made or "originated" by an affiliate or purchased from

unaffiliated third-parties.  The pool of loans is sold by the sponsor to a special-purpose subsidiary

(the "depositor") that has no other assets or liabilities.  The depositor sells the loans to a passive,

specially created, special-purpose vehicle ("SPV"), typically a trust in the case of residential

mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the loan.

The securities are sold directly to investors by the SPV or, as is more common, they are issued

directly to the depositor as payment for the loans.  The depositor then resells the securities, usually

through an underwriting affiliate that places them on the market.  Because the certificated securities

are collateralized by the residential mortgage loans owned by the trust, they are called residential

mortgage-backed securities ("RMBS").

41.     A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive;

it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the

financial institution.

10

42.     Loans, however, need to be managed. Bills must be sent out and payments collected. Thus, a third-party must be brought in to manage the loans. This third party is the mortgage loan servicer. Every loan, irrespective of whether it is securitized, has a servicer.

43.     Servicers are hired by owners of whole loans, typically trustees of securitization trusts. Billions of dollars of mortgage loans are owned by GSEs, *i.e.*, Fannie Mae, the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or the Government National Mortgage Association.

44.     The specific duties of servicers are set forth in PSAs, Servicing Agreements, or similar contracts between the servicer and the owners of the loans which are in all respects material to this lawsuit uniform.  Pursuant to these agreements, servicers are obligated to manage the mortgages on behalf, and in the best interests of, their owners.  In fact, servicers are held to a high standard – they are required, at minimum, to use the same skill, care and practices in servicing loans for others as they customarily employ servicing loans for their own account.

45.     For example, on June 1, 2004, GM executed a PSA to become the servicer of an SPV trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA").  Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

11

46.     Servicers are responsible for performing the day-to-day tasks relating to the mortgages. These tasks include account maintenance activities such as sending monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to the trust. These tasks also include handling defaulted loans, prosecuting foreclosures and taking appropriate steps to mitigate losses.

47.     One of the most important responsibilities of mortgage loan servicers is to protect the owners of the mortgages from damages caused by casualty losses. All PSAs and other servicing agreements, including those with the GSEs, require the servicer to make sure that adequate hazard insurance is at all times maintained on the secured properties, including through force-placement if appropriate.

48.     Section 3.05 of the JPMorgan PSA, for example, provides in pertinent part:

MAINTENANCE OF HAZARD INSURANCE

The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance with extended coverage on the Mortgaged Property in an amount which is at least equal to the lesser of (I) the Stated Principal Balance of such Mortgage Loan and (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. . . . The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.

49.     Additionally, Section 3.07 thereof provides:

MAINTENANCE OF INSURANCE POLICIES

12

The Servicer shall not take any action that would result in noncoverage under any applicable Insurance Policy of any loss which, but for the actions of the Servicer would have been covered thereunder. The Servicer shall use its best efforts to keep in force and effect (to the extent that the related Mortgage Loan requires the Mortgagor to maintain such insurance), any applicable Insurance Policy. The Servicer shall not cancel or refuse to renew any Insurance Policy that is in effect at the date of the initial issuance of the Mortgage Note and is required to be kept in force hereunder.

50.    The servicing requirements applicable to loans owned and/or guaranteed by the GSEs are set forth in the Fannie Mae Servicing Guide. Part II, Chapter 6 thereof provides, in pertinent part:

Part of a servicer's responsibility for protecting our interest in the security property is to ensure that hazard insurance (including flood insurance), under the terms specified in our Guides, is in place at all times. If the servicer is unable to obtain evidence of acceptable hazard insurance for a property, the servicer should obtain alternative insurance coverage (so-called "force-placed" insurance or "lender-placed" insurance) to protect our interests. In this instance, there are several guidelines that servicers should apply, subject to the provisions of and in compliance with applicable law and the mortgage documents.

**GM's Mortgage Servicing Portfolio**

51.    GM is the fifth largest servicer of residential mortgages in the United States, servicing a portfolio of 2.5 million mortgage loans with an aggregate unpaid principal balance of approximately $389 billion. At all relevant times, all the loans in GM's servicing portfolio have been subject to servicing agreements with their owners and/or holders.

52.    At all relevant times, GM's mortgage servicing portfolio has been comprised of loans owned and/or held by (i) Ally Bank, f/k/a GMAC Bank, a Utah state-chartered commercial bank

13

which is also an indirect subsidiary of Ally Financial; (ii) Fannie Mae and other GSEs; and (iii) various investors including securitization trusts pursuant to PSAs and similar agreements.

53.     The Ally Bank loans in GM's portfolio were originated by GM, then sold by GM to Ally Bank. Ally Bank either still owns such loans or has resold them to secondary market investors while retaining their servicing rights. Under the Servicing Agreements between Ally Bank and GM, GM is required to service the loans in accordance with the servicing guidelines of Fannie Mae. The servicing guidelines of Fannie Mae also govern GM's obligations with respect to the GSE loans serviced by GM.

**GM's Outsourcing Deal with Balboa**

54.     In the first quarter of 2003, GM contracted with defendant Balboa to buy force-placed insurance from Balboa in respect of GM-serviced loans.

55.     Several months later, in or about March 2003, GM expanded its relationship with Balboa by entering into a new agreement. The new agreement between GM and Balboa provided not only for GM to purchase force-placed insurance from Balboa, but for GM to outsource all of GM's functions relating to force-placed insurance – *e.g.*, tracking borrowers' insurance policies – to Balboa.

56.     According to a March 6, 2003 press release issued by GM relating to its deal with Balboa, Balboa provides GM with "insurance tracking services that include data maintenance, EDI processing, customer service and online claims service." The term "EDI" – electronic data interchange – referred to Balboa's ability to access and interface with GM's borrower databases in real-time without any active involvement on the part of GM.

14

57.     The GM agreement with Balboa tasks Balboa with, *inter alia*, monitoring the mortgages in GM's servicing portfolio to identify expired, cancelled or non-renewed borrower policies; issuing notices to borrowers regarding the opportunity to cure; and force-placing coverage when appropriate. Balboa is also required by the agreement to maintain and staff call centers should borrowers want to speak with someone.

58.     At all relevant times, pursuant to the agreement, Balboa has functioned in all relevant respects as GM's force-placed insurance back-office. Balboa has handled all aspects of GM's force-placed insurance activities. GM does not perform any such activities itself. Balboa even issues notices to borrowers on GM letterhead, signed "Insurance Department, GMAC Mortgage LLC." Balboa also has its call center personnel identify themselves as employees of GM. Additionally, Balboa's EDI system enables Balboa to manage billings in respect of force-placed insurance, *i.e.*, adding charges and issuing credits with respect to force-placed insurance on borrowers' monthly statements, without any active involvement by GM.

59.     The initial agreement between GM and Balboa had a term of three years. However, the arrangement between GM and Balboa has continued to the present. In fact, GM is today one of Balboa's largest accounts.

**The Kickback Scheme**

60.     There is nothing inherently wrong with GM's insurance and outsourcing arrangements with Balboa. PSAs and other servicing agreements authorize outsourcing. This case is brought, however, because since at least March 2003, the arrangement between GM and Balboa has involved a wrongful component.

15

61.     Specifically, GM and Balboa devised and at all relevant times have engaged in a kickback scheme designed to generate illicit profits for GM and its affiliates based on GM's dealings with Balboa. These profits have been made off the backs of mortgage borrowers and the owners of the loans being serviced.

62.     Pursuant to the scheme, GM has extracted kickbacks or bribes from Balboa based on a percentage of the gross force-placed insurance premiums that GM has paid. These bribes are in the form of bogus "commissions" paid by Balboa to GMAC Agency Marketing, the unincorporated division and/or fictitious "doing business as" name of defendant GI. GM and Balboa agreed to fraudulently label the payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as kickbacks. The pretense is that the "commissions" are being paid by Balboa in the ordinary course of business to the insurance agent or "producer" responsible for introducing the insurance customer – i.e., GM – to Balboa.

63.     At all relevant times, however, this pretense has been false. GI is not, and has never been, a bona fide insurance agent of Balboa; has not provided and does not provide any bona fide insurance agency services to Balboa; and has never solicited or sold any insurance or insurance products on behalf of Balboa, in connection with the force-placed insurance purchased by GM or otherwise.

64.     Instead, at all relevant times, GI's sole role with respect to the force-placed insurance purchased by GM has been to collect kickbacks from Balboa fraudulently labeled as "commissions." The "commissions" have been paid pursuant to a quid pro quo agreement or understanding that GM will continue to do force-placed insurance business with Balboa. Furthermore, at all relevant times,

16

the kickbacks have inured directly or indirectly to the benefit of GM, through inter-affiliate transactions or otherwise.

65.     Notably, the March 2003 GM press release about the deal between GM and Balboa did not say anything about GMAC Agency Marketing, GI, or "commissions." There was no mention of any broker or agent, that purportedly introduced GM to Balboa or otherwise. Rather, the deal described in the press release was bilateral, involving GM and Balboa only.

66.     Nevertheless, at all relevant times, for every dollar in gross premiums paid by GM to Balboa, Balboa has "kicked back" an agreed percentage to GI and/or GM as so-called "commissions." Meanwhile, the stated premiums have been "grossed up" to include these kickbacks.

**The Kickback Scheme Has Harmed
Borrowers and the Owners of the Loans**

67.     Defendants' kickback scheme has unnecessarily inflated the costs of force-placed insurance with respect to GM-serviced loans, thereby damaging borrowers who have been forced to reimburse GM for such costs. The amount of the unnecessary inflation is, at minimum, reflected by the amount of the kickbacks. This is because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. Balboa then returns the amounts of the kickbacks to GI and/or GM in round-trip transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium paid by GM minus the kickback returned directly or indirectly to GI and/or GM – represents the true or actual price or cost of the insurance.

68.     This scheme has not only robbed borrowers, but also improperly inflated force-placed insurance costs borne by the owners of the loans being serviced by GM.

69.     To be sure, the costs of force-placed insurance are initially incurred by the servicer, which is responsible for advancing the money to pay the premiums. Servicers such as GM, however, are functionally the senior-most creditors with respect to the loans they manage. This is because all servicing agreements entitle the servicer to recoup any costs, expenses or advances they incur "off the top" from the proceeds of collection or liquidation, before any money is passed through to the owners of the loans. This entitlement includes force-placed insurance premiums paid by the servicer, which are counted as reimbursable servicing advances under all servicing agreements. The right of the servicer to recover its servicing advances is senior even to the AAA RMBS securities issued by the securitization trusts. Furthermore, if loan-level proceeds are insufficient to enable the servicer to recoup its advances on a particular loan, the servicer is entitled to reimburse itself from the cash collected from all of the other loans covered by the servicing agreement.

70.     At all relevant times, GM in its capacity as servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs, but instead on the artificially inflated, grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances prior to passing money through the owners of the loans, has not netted out the amounts of the kickbacks that GM and/or GI have received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of GM-serviced loans have borne these fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM and/or GI from the kickback scheme alleged herein have come from the pockets of the pension funds that invest in the loans in GM's servicing portfolio and – in the case of the GSE loans in that portfolio – from the pockets of United States taxpayers.

18

71.     A number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts between servicers and mortgage investors. Servicers have no stake in the performance of mortgage loans and do not share mortgage investors' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing the fee and expense charges they can recoup "off the top."

72.     This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was simply never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, *see generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Geo. U. L. Center), or, as in this case, force-placing insurance that is fraudulently inflated in price.

73.     Servicers' compensation structure also incentivizes them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value. At that point, because there is no equity left to strip, the servicer just "want[s] to dump the property from portfolio as quickly as they can," Professor Levitin observes.

19

Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated fees and expenses, until there is no value left.

74.    Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated force-placed insurance have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and the investors in the mortgages and RMBS. It has also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

75.    Borrowers are not afforded any and have no choice with respect to the arrangements alleged herein. Borrowers have no legal ability or right to select their servicer or force-placed insurer. There is no mechanism for borrowers to select servicers that do not extract, or force-placed insurers that do not pay, kickbacks. When borrowers take their loans, they have no way to select their servicer, and no say whether the servicer is replaced with a new servicer, or what arrangements any servicer might have with its providers. Borrowers have no legal right or ability to opt-out with respect to the kickbacks or affiliate transactions described herein.

76.    Plaintiff does not challenge – and nothing in this complaint should be construed as challenging – the reasonableness or fairness of any force-placed insurance rates. Plaintiff challenges kickbacks and reimbursement charges fraudulently inflated by reason thereof.

77.    The kickback scheme in this case is similar to that conducted by the defendants in *Hofstetter v. Chase Home Finance, LLC*, NO. C 10-01313 WHA (N.D.Cal.), a class action that settled last year. In that case, Chase Home Finance, LLC ("Chase") allegedly extracted kickbacks

20

from force-placed flood insurer American Security Insurance Company ("ASIC"). ASIC did not,

however, pay the kickbacks to Chase directly. Instead, the parties allegedly agreed to fraudulently

label the kickbacks as "commissions" and route them through Chase's affiliate, Chase Insurance

Agency, Inc. ("CIA"), according to settlement papers filed in the case.

78.    Discovery in *Hofstetter* revealed a system in which CIA collected "commissions"

from ASIC yet rendered no *bona fide* insurance agency services in relation to the policies. "What

function does Chase Insurance Agency, Inc. perform with respect to flood insurance?" the Plaintiffs'

attorney asked in a deposition. "I would say no function," the Chase employee responded. *See*

"Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

79.    According to papers filed with the court in the case, the defendants' misconduct in

*Hofstetter* allegedly resulted in "commission damages" to the members of the class, with the amount

thereof measured by the force-placed insurance premiums charged multiplied by the "commission

percentage" paid thereon.

80.    The kickback scheme alleged in this case has operated in material respects like that

alleged in *Hofstetter*.

**Government Response**

81.    Force-placed insurance kickback schemes are increasingly becoming a focus of

attention for what they are – abusive and parasitic. Fannie Mae recently began fighting back. On

March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed

Insurance," regarding the "costs to taxpayers" of kickback arrangements that improperly inflate the

costs. The *Lender Letter* stated, in pertinent part:

Fannie Mae will soon implement changes to its Lender-Placed
Insurance (LPI) requirements to significantly reduce costs to
homeowners, taxpayers, and Fannie Mae. The changes will lower
barriers for borrowers who want to cure their delinquencies, while
improving transparency and boosting competition in the LPI market.

Fannie Mae requires hazard insurance on all properties for which it
owns the mortgage. If a homeowner cannot provide evidence of
coverage, the servicer must secure that coverage through the use of
LPI. *Lender-placed policies, however, are significantly more
expensive than voluntary coverage secured by the borrower and
often include commissions and other administrative costs, further
adding to the cost of LPI policies*. Two firms currently issue most
LPI policies.

An expensive LPI policy can often become an obstacle to a
delinquent borrower seeking to avoid foreclosure. To bring their loan
current, a borrower must reimburse the servicer for the cost of the LPI
policy. *If the borrower defaults in mortgage loan payments and
does not cure, Fannie Mae must reimburse the servicer for LPI
premiums. Costs to Fannie Mae ultimately become costs to
taxpayers*.

(emphasis added).

82. On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a

*Servicing Guide Announcement*. The *Servicing Guide Announcement* "clarif[ied]" Fannie Mae's

position that servicer requests for reimbursement of lender-placed insurance premiums must exclude

"any lender-placed insurance commission earned . . . by the servicer or any related entity." Fannie

Mae indicated that "any other costs beyond the actual cost of the lender-placed insurance policy

premium" were unacceptable.

83. The *Servicing Guide Announcement* stated, in pertinent part:

**Acceptable Lender-Placed Insurance Costs and Insurance
Tracking Fees**

22

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

- *any lender-placed insurance commission earned on that policy by the servicer or any related entity,*

- costs associated with insurance tracking or administration, or

- *any other costs beyond the actual cost of the lender-placed insurance policy premium.*

(emphasis added).

84.     In other words, Fannie Mae forbids servicers from engaging in precisely the type of misconduct alleged herein.

85.     Additionally, in or about January 10, 2012, Benjamin Lawsky, the Superintendent of the New York State Department of Financial Services ("NYDFS"), launched a probe into improper practices relating to force-placed insurance, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

86.     On January 27, 2012, the financial services publication *American Banker* disclosed a list of entities subpoenaed by the NYDFS as part of its investigation. The list identified Balboa as among the force-placed insurance companies targeted by the NYDFS. The list also identified GMAC Agency Marketing as among the targeted "insurance producers," *i.e.*, bogus "agents" through which purported "commissions" (a/k/a kickbacks) have been paid.

87.     On April 5, 2012, the NYDFS issued a press release announcing that it had expanded its probe into force-placed insurance and was scheduling public hearings on the matter to take place in May 2012. The NYDFS press release also disclosed that the NYDFS had issued formal document requests to a number of additional insurers, including Meritplan.

23

88.     Additionally, the NYDFS press release addressed the type of kickback arrangement
alleged herein.  It stated that the NYDFS investigation had already uncovered evidence that force-
placed insurance costs have been artificially inflated "due [to] relationships between and payments
by insurers to banks and their affiliates. . . .  Insurers pay high commissions to the banks or their
affiliates presumably to guarantee the insurers will receive business." The NYDFS press release also
discussed that, as alleged herein, kickback-inflated force-placed insurance costs harm not only
borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance
the insurance payments and then recoup those payments out of investment income before investors
are paid."

89.     The full text of the NYDFS release states:

**Department Of Financial Services Expands Probe Into
Force-Placed Insurance, Demanding Explanation For High
Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and
investors' expense**

**Hearings to be held on whether rates are excessive and to probe
payments between insurers, brokers, agents and mortgage
servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today
announced that he is intensifying the Department of Financial
Services investigation into force-placed insurance by requiring the
largest licensed force-placed insurers operating in New York to
provide a detailed accounting of their expenses, claims payments and
profits.

The Superintendent will hold public hearings in May to review
whether rates for force-placed insurance are excessive and to examine
the relationships between and payments to and from insurers, banks,
mortgage servicers and insurance agents and brokers. Testimony will
be taken from homeowners harmed by force-placed insurance and

24

from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to provide information: *Balboa Insurance Company*, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), *Meritplan Insurance Company*, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one

major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents.    This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage.  Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance.  The price is often extremely high—as much as ten times the normal rate for homeowners' insurance.  And sometimes consumers have this high priced policy

26

forced on them when their own insurance is still in place. *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors," Lawsky said.*

*The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure.   The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid.*

(emphasis added).

90.     It is thus apparent that the NYDFS probe has confirmed the allegations of this complaint and is targeting the illicit arrangements alleged herein.

## DEFENDANTS' KICKBACK SCHEME CONSTITUTES "HONEST SERVICES" MAIL AND WIRE FRAUD

91.     The scheme alleged herein violates the mail and/or wire fraud statutes, 18 U.S.C. §§ 1341, 1343.  Specifically, Defendants conducted a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their "intangible rights" to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346.

92.     The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

93.     The mail fraud statute reads in relevant part as follows:

Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

94.     The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

27

95.    In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this statutory language to apply only to deprivations of property and not to encompass "the right to have [one's] affairs conducted honestly." *Id.* at 352.

96.    In response to *McNally*, Congress broadened the scope of the mail and wire fraud statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

97.    Thus, through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

98.    In *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." 130 S.Ct. at 2928, 2931. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 2930–31.

99.    At all relevant times, GM owed legal duties to render services to the owners of the loans in GM's servicing portfolio under the PSAs, Servicing Agreements, GSE Servicing Guidelines and similar contracts governing their relationships. In all cases, those legal duties included the duty to protect the owners of the mortgages from damages caused by casualty loss by making sure that

28

adequate hazard insurance was at all times maintained on the secured properties, including through force-placement if necessary. The value of GM's services in fact depended on GM's rendering those services in an honest manner. Nevertheless, GM misused its position as the servicer of the loans to extract bribes and kickbacks from Balboa, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services" to those loan owners. Each Defendant, by virtue of the conduct as alleged herein, devised a scheme or artifice to defraud the owners of GM servicing portfolio loans by depriving those owners of their intangible rights to GM's honest services through kickbacks.

100.    Defendants' wire and mail fraud violations constitute predicate acts under RICO. Defendants' pattern of racketeering activity has proximately harmed Plaintiff and the Class.

## TOLLING OF THE STATUTES OF LIMITATIONS

101.    The claims of Plaintiff and the Class are subject to both equitable estoppel, stemming from Defendants' concealment of the facts alleged herein, and equitable tolling, stemming from Plaintiff's inability to obtain adequate information to plead the claims alleged herein. Defendants are estopped from relying on a statute of limitations defense because they purposefully concealed the misconduct alleged. At all relevant times Defendants maintained a shroud of secrecy around their illicit dealings. Separate and apart from Defendants' acts of concealment, any applicable statutes of limitations are properly tolled because Plaintiff and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this complaint.

102.    Furthermore, at all relevant times Plaintiff and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GM to fulfill its contractual duties under the mortgage loan contracts of Plaintiff and the Class in good faith, and to similarly execute

its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good faith and
in an honest manner. Even assuming there had been some indication of wrongdoing (which there
was not), and Plaintiff and the Class had attempted to investigate, such investigation would have
been futile because it would not, until recently, have been possible to uncover any specific
information as to GM's involvement in the unlawful kickback scheme alleged herein.

103.    Due to the complex, undisclosed and self-concealing nature of the scheme alleged
herein, neither Plaintiff, nor any other member of the putative Class whose claims would otherwise
be time-barred, possessed or could have possessed sufficient information or the requisite expertise
to discover the misconduct alleged. Plaintiff was able to discover the underlying basis for his claims
only through the assistance of counsel.

104.    Issues relating to mortgages and mortgage servicing have been in the news since the
2008 financial crisis. Nevertheless, the news coverage has generally related to "robo-signing" and
other improper foreclosure practices. It was not until January 2012 that any major national news
outlets began publishing reports about improper kickbacks relating to the referral of force-placed
insurance business.

105.    The first time the *The New York Times* published a news article about such kickbacks
was on January 10, 2012. *The New York Times* broke the story that Benjamin Lawsky, the
Superintendent of NYDFS, was investigating several large banks in connection with improper
practices relating to force-placed insurance, including "kickbacks." *See* "Big Banks Face Inquiry
Over Home Insurance," *The New York Times* (Jan. 10, 2012).

106.    Prior to such time, there was insufficient coverage of allegations of potential
kickbacks relating to force-placed insurance to have put Plaintiff or the Class on inquiry notice of

30

Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial

services trade journal" with a readership of only approximately 31,000 that is "read by senior

banking and financial services executives as well as consultants, lawyers, accountants and other

professionals who serve the financial industry" and which previously published articles on force-

placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought

national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face

Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

107.    Furthermore, even had Plaintiff or members of the Class been on inquiry notice of

misconduct relating to force-placed insurance in the mortgage servicing industry prior to January 10,

2012, despite diligent investigation they would have had no specific factual basis to allege – or even

suspect – that GM was involved in any misconduct until, at the earliest, January 27, 2012.

108.    As alleged above, it was on that day that *American Banker* published a list of the

entities subpoenaed as part of the NYDFS investigation. The list identified Balboa as among the

force-placed insurance companies targeted by that investigation. The list also identified GMAC

Agency Marketing (*i.e.*, GI) as among the targeted "insurance producers."

109.    Prior to January 27, 2012, there was simply no publicly available information that

even a highly skilled investigator could have uncovered linking GM to potential kickbacks relating

to force-placed insurance. Prior to such time, Plaintiff and the Class did not have an adequate factual

basis to plead the claims alleged herein.

110.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the

exercise of reasonable diligence, Plaintiff and the Class could not have known of Defendants'

violations until, at the earliest, January 27, 2012. Furthermore, any delay by Plaintiff and the Class

31

in asserting the claims herein was excusable because they could not reasonably have discovered

Defendants' misconduct absent specialized knowledge and/or assistance of counsel.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

111.  Plaintiff repeats and realleges each and every paragraph contained above as if set forth

herein.  This count is pled against all Defendants.

112.  Plaintiff, each Class member, and each Defendant are "persons," as that term is

defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

113.  For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term

is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of GM, GI, and the Balboa Defendants,

including their respective officers, directors, employees, agents and direct and indirect subsidiaries

(the "Enterprise").  The Enterprise was separate and distinct from the persons that constituted the

Enterprise.

114.  The Enterprise was primarily managed by GM which organized the fraudulent scheme

and procured the involvement of GI and the Balboa Defendants.  GI and the Balboa Defendants

carried out their part of the scheme under the direction of GM.

115.  The companies and individuals that constitute the Enterprise were associated for the

common purpose of fraudulently inflating the stated premiums on force-placed insurance with

respect to GM-serviced loans.  The purpose thereof was to induce borrowers to pay, and the owners

32

of the loans to incur, fraudulently inflated charges in respect of such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GI and directly and/or indirectly to GM.

116.    The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

## Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

117.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.    Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.    GM entered into servicing agreements with owners and/or holders of whole loans which provide, *inter alia*, that GM is obligated to make sure that the secured properties are adequately insured, including through force-placement of insurance if necessary;

b.    GM procures force-placed insurance with respect to the loans in its servicing portfolio from the Balboa Defendants;

c.    GM demanded and the Balboa Defendants agreed to and do pay kickbacks to GM and/or its affiliates based on a percentage of the force-placed insurance premiums paid by GM;

d.    GM and the Balboa Defendants agreed to and do gross-up the stated premiums on the force-placed insurance to include the amounts of the kickbacks;

e.    GM and the Balboa Defendants agreed to and do disguise the kickbacks as "commissions" paid by the Balboa Defendants to GI or other GM affiliate(s);

33

  f.  As a *quid pro quo* for the kickbacks, GM continues to procure force-placed insurance from and outsource its force-placed insurance functions to the Balboa Defendants;

  g.  The Balboa Defendants, on GM's behalf, track the loans in GM's servicing portfolio and issue notices to borrowers relating to purported lapses in their insurance coverage and their obligation to reimburse GM for the costs of any force-placed insurance;

  h.  GM bills borrowers in relation to force-placed insurance based on the stated, fraudulently inflated premiums, *i.e.*, incorporating the kickbacks;

  i.  To the extent borrowers pay the inflated costs billed to them, GM and/or GI profit from the kickbacks at the borrower's expense;

  j.  To the extent borrowers fail to pay the inflated costs billed to them, GM reimburses itself from the proceeds of loan collections and liquidations also based on the stated, fraudulently inflated premiums, thereby profiting from the kickbacks at the expense of the owners of the loans; and,

  k.  GM provides regular remittance and other reports to loan owners reflecting and/or incorporating the fraudulently inflated premiums as reimbursable servicing advances.

118.  The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers and the owners of GM-serviced loans and to obtain money or property from the borrowers and the owners of GM-serviced loans through false or fraudulent pretenses, representations and promises.

119.  At all relevant times, Defendants' conduct included a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their intangible right to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. At all relevant times, GM was contractually obligated to render services to the owners of the loans it serviced. GM owed a duty to render those services in an honest manner. The value of those services in fact depended on GM's rendering them

34

in an honest manner. Nevertheless, at all relevant times, GM misused its position to extract bribes and kickbacks from the Balboa Defendants, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services." GI and the Balboa Defendants intentionally and wilfully conspired and participated in said breach.

120.    Each such bribe or kickback extracted by GM constituted a predicate act of mail and/or wire fraud in that each furthered and executed the scheme to deprive the owners of the loans of their right to GM's "honest services."

121.    It was reasonably foreseeable to each defendant that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

122.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to Defendants' books and records. Nevertheless, Plaintiff can allege such transmissions generally.

123.    For the purpose of furthering and executing the scheme, Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

    a.    The Balboa Defendants, on GM's behalf, transmitted notices and correspondence to borrowers via mail;

    b.    GM issued monthly statements including force-placed insurance charges to borrowers via mail and/or wire;

35

c.   The Balboa Defendants, on GM's behalf, communicated with borrowers via telephone through call centers;

d.   GM received funds from borrowers via mail and/or wire;

e.   GM transmitted funds reflecting fraudulently inflated insurance premiums to the Balboa Defendants via mail and/or wire;

f.   The Balboa Defendants transmitted funds reflecting kickbacks to GI and/or GM via mail and/or wire; and,

g.   GM transmitted remittance and other reports to loan owners and/or holders via mail and/or wire that reflected and/or incorporated the fraudulently inflated force-placed insurance costs;

124.   As to Plaintiff, Defendants utilized the mails and/or wires in the following instances, among others, for the purpose of furthering and executing the scheme:

a.   The Balboa Defendants and/or GM transmitted notices to Plaintiff regarding force-placed insurance by mail dated October 27, 2010, December 12, 2010, September 6, 2011, and September 28, 2011;

b.   GM transmitted statements to Plaintiff reflecting charges in connection with force-placed insurance by mail dated February 14, 2011, March 16, 2011, April 11, 2011, May 9, 2011, June 6, 2011, July 4, 2011, August 8, 2011, September 17, 2011, and October 17, 2011; and

c.   The Balboa Defendants' call center representatives communicated with Plaintiff by wire regarding force-placed insurance on, among other dates, January 24, 2012;

125.   These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

126.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

127.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

128.    Defendants each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring fraudulently inflated charges in connection with force-placed insurance.

129.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and the owners of the loans to pay and incur inflated charges in respect of force-placed insurance and thereby enable Defendants to reap illicit profits.

130.    Defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and the owners of the loans.

### Injury to Plaintiff and the Class

131.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). At all relevant times, Plaintiff and the Class paid charges in connection with force-placed insurance that were fraudulently inflated by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

37

132.     Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

133.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against all Defendants.

134.     RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

135.     Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

136.     As set forth in Count I, above, at all relevant times, Plaintiff and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

137.     As set forth in Count I, above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

138.     Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently inflating the stated premiums on force-placed insurance with respect to GM-serviced loans. The purpose thereof was to induce borrowers and the owners of the loans to pay and incur fraudulently inflated charges in respect of such insurance.

139.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

140.    As set forth in Count I, above, Defendants associated with the Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

141.    Defendants each were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

142.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I, above.

143.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges in respect of force-placed insurance, as a direct, proximate and foreseeable result, of the scheme alleged herein.

144.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT III

### BREACH OF CONTRACT
### (Against GM)

145.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.  This count is pled against GM.

146.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property.  All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

147.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks.  Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

148.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

149.    GM breached and acted in excess of its authority under the mortgage loan contracts of Plaintiff and the Class by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges.  GM's charging Plaintiff and the Class for the cost of kickbacks constituted conduct not authorized and in breach of the terms of the mortgage loan contracts of Plaintiff and the Class.

150.    GM has thus breached its contracts with Plaintiff and the Class.

151.    As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiff and the Class have suffered damages.

**COUNT IV**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against GM)**

152.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against GM.

153.    Every contract contains an implied covenant of good faith and fair dealing.

154.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property. All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

155.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks. Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

156.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

157.    Pursuant to the implied covenant of good faith and fair dealing, GM was obligated to perform its duties under the mortgage loan contracts in good faith and to deal fairly with Plaintiff and the Class.

41

158.    GM breached its duty of good faith and fair dealing by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges.  By not netting out and instead incorporating the cost of the kickbacks in the force-placed insurance charges, GM engaged in bad faith conduct toward Plaintiff and the Class, dealt with Plaintiff and the Class unfairly, and contravened the reasonable expectations of Plaintiff and the Class.

159.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

<u>COUNT V</u>

**COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT**
**(Against all Defendants)**

160.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This count is pled against all Defendants.

161.    Plaintiff and the Class have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums.  These benefits came at the expense of Plaintiff and the Class.

162.    The circumstances are such that in equity and good conscious restitution should be made by Defendants to Plaintiff and the Class.

163.    As a result of Defendants' unjust enrichment, Plaintiff and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

164.     Plaintiff and the Class are entitled to restitution and/or disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

a.     For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as representative of the Class;

b.     For an order awarding compensatory damages on behalf of Plaintiff and the Class in an amount to be proven at trial;

c.     For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair and/or deceptive practices; along with exemplary damages to each Class member for each violation;

d.     For judgment for Plaintiff and the Class on their RICO claims, in an amount to be proven at trial, for three times the amount of the force-placed insurance charges paid to Defendants by Plaintiff and the Class;

e.     For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff and the Class;

f.     For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.     For an order awarding Plaintiff and the Class their attorneys' fees and costs; and

h.     Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the claims alleged herein.

43

Dated: April 30, 2012

                        **KIRBY McINERNEY LLP**

                        By: _____

                          Mark A. Strauss (mstrauss@kmllp.com)
                          Edward M. Varga, III (evarga@kmllp.com)
                          J. Brandon Walker (bwalker@kmllp.com)
                        825 Third Avenue, 16th Floor
                        New York, New York 10022
                        Tel:  (212) 371-6600
                        Fax: (212) 751-2540

                        *Attorneys for Plaintiff*

**6**

# BEFORE THE UNITED STATES
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: MORTGAGE LENDER FORCE-PLACED INSURANCE LITIGATION | MDL Docket No. 2388 |

## NOTICE OF TAG-ALONG ACTIONS

Pursuant to Rule 6.2(d) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation (the "Rules"), Plaintiffs, ALBERTO BARRETO, CAROL LYNN UPSHAW, and SALVATORE SACCOCCIO ("Plaintiffs"), hereby give notice to the Clerk of the Judicial Panel on Multidistrict Litigation ("the Panel") of the following "tag-along" actions, as defined in Panel Rule 1.1(h):

*Arnett et al v. Bank of America, N.A. et al*
3:11-cv-01372-SI (Or. Dist. Ct.)

*Lemmer et al v. Bank of America, N.A.*
3:12-cv-00242-MOC-DSC (W.D. N.C)

*Berger et al. v. Bank of America N.A. et al*
1:12-cv-10231-NMG (Mass. Dist. Ct.)

*Lugo v. Bank of America, N.A.*
7:11-cv-07955-ER (S.D. N.Y.)

*Bullerdick v. Balboa Insurance Co.*
8:10-cv-02739-EAK-TBM (M.D. Fla.)

*Mitchell v. Balboa Insurance Co.*
8:11-cv-02580-EAK-TGW (M.D. Fla.)

*Fawkes v. Balboa Insurance Co.*
8:10-cv-02844-JDW-TGW (M.D. Fla.)

*Ringold v. Bank of America et al*
2:12-cv-02344-JPM-dkv (W.D. Tenn.)

*Gustafson v. BAC Home Loans Servicing, LP et al*
8:11-cv-00915-JST-AN (C.D. Cal.)

*Rothstein v. GMAC Mortgage LLC et al*
1:12-cv-03412-AJN (S.D. N.Y.)

*Hill v. Bank of America, N.A.*
2:12-cv-00482-ALM-MRA (S.D. Ohio)

*Schneider v. Bank of America, N.A. et al*
2:11-cv-02953-LKK-EFB (E.D. Cal.)

*Kelly v. Balboa Insurance Co.*
8:11-cv-00450-MSS-MAP (M.D. Fla.)

*Ulbrich v. GMAC Mortgage, LLC et al*
0:11-cv-62424-RNS (S.D. Fla.)

*Kolbe v. BAC Home Loans Servicing, LP et al*
1:11-cv-10312-NMG (Mass. Dist. Ct.)

*Wallace v. Bank of America, N.A. et al*
3:12-cv-00935-SI (Or. Dist. Ct.)

*Lass v. Bank of America, N.A. et al*
1:11-cv-10570-NMG (Mass. Dist. Ct.)

A copy of the complaint and docket in each case is attached hereto.

The tag-along actions at issue share common questions of fact and law with the cases
noticed in Plaintiffs' motion to transfer pursuant to Section 1407 now pending before the Panel.

Based on the foregoing, Plaintiffs respectfully request that the Panel incorporate the tag-
along actions into Plaintiffs' motion to transfer and consolidate it with the other pending actions.


Dated: June 26, 2012


/s/ *Adam M. Moskowitz*
Adam M. Moskowitz, Esq.
amm@kttlaw.com
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce De Leon Blvd., 9th Floor
Miami, Florida  33134
Telephone: 305-372-1800/Facsimile: 305-372-3508

*Counsel for Plaintiffs*

2

**7**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, ET AL.,

        f/k/a General Motors Corp, et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            November 5, 2009

            9:50 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

41

1    is to permit his claim to be liquidated in another forum.  But

2    it has the consequences of requiring the estate to defend the

3    claim in an inefficient fashion.

4         In my experience, impact of the stay on the parties

5    and the balance of harms, factor number 12, is one of the most

6    important.  Here nobody is going to be depriving Mr. Lawrence

7    of his day in court.  The issue, rather, is which court will

8    decide the issues.

9         As we've now established I have subject matter

10   jurisdiction to decide a routine matter of claims allowance and

11   to address all of Mr. Lawrence's needs and concerns insofar as

12   he's looking for relief from this debtor.  Frankly, based upon

13   my understanding of the nonbankruptcy law, if and to the extent

14   he has claims, they're more likely to exist against the

15   separate defendant, the trust, rather than this debtor but I'll

16   give him a fair day in court to decide these issues if he

17   wishes to proceed with them in the claims context.

18        Bankruptcy litigation is typically as efficient or

19   more efficient than litigation in the district courts in

20   connection with plenary litigation.  And the very reason that

21   we have a claims allowance process is to deal with these

22   matters, subject to rights of appeal of course, in the most

23   economical way possible.

24        Conversely, if the estate has to go through the burden

25   of litigation elsewhere and the estate is paying full

45

1    connection, in connection with several of the factors, I do

2    have to note that if I were ever to allow relief from the stay

3    on a garden variety claim of this type there would indeed be

4    the risk, if not the certainty, that every other party who

5    thinks he or she has a good claim against the estate pending in

6    another jurisdiction would be asking me to defend -- to provide

7    relief from the stay and require the debtors to be litigating

8    claims of this character all over the country.  The floodgates

9    concern that the estate articulated is indeed a very serious

10    one.

11        So for the foregoing reasons the motion is denied.

12    The debtors are to settle an order in accordance with the

13    foregoing.  The order should not attempt to encapsulate

14    everything I said in this lengthy, dictated decision.  It

15    should merely provide that for the reasons set forth in this

16    decision the motion is denied.

17        Not by way of reargument, do we have anything that I

18    failed to address?  Mr. Lawrence?

19        MR. LAWRENCE:  Yes, Your Honor.

20        THE COURT:  I can't allow you to reargue the motion or

21    to debate my decision except by taking it up on appeal, but I

22    will allow you to tell me if you think I have any business that

23    I didn't address today.

24        MR. LAWRENCE:  Any what, sir?

25        THE COURT:  Business.