1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10                  Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  August 9, 2012

19                  11:10 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1

2   (Doc no. 530) Application Pursuant to Sections 328 and 1103 of

3   the Bankruptcy Code and Federal Rule of Bankruptcy Procedure

4   2014 for an Order to Retain and Employ AlixPartners LLP as

5   Financial Advisors to the Official Committee of Unsecured

6   Creditors of the Debtors, Nunc Pro Tunc, to May 21, 2012 filed

7   by Kenneth H. Eckstein on behalf of Official Committee Of

8   Unsecured Creditors.

9

10  (CC: Doc no. 910) Debtors' Application Pursuant to 11 U.S.C.S.

11  327(a) and Fed. R. Bankr. P. 2014 for Authorization to Employ

12  and Retain KPMG LLP as Tax Compliance Professionals and

13  Information Technology Advisors Nunc Pro Tunc to the Petition

14  Date filed by Larren M. Nashelsky on behalf of Residential

15  Capital, LLC.

16

17  (CC: Doc no. 911) Debtors' Application for Entry of an Order

18  Authorizing the Retention and Employment of Deloitte & Touche

19  LLP as Independent Auditor and Attest Service Provider to the

20  Debtors Nunc Pro Tunc to the Petition Date filed by Larren M.

21  Nashelsky on behalf of Residential Capital, LLC.

22

23

24

25

1

2    (CC: Doc no. 721) Debtors' Application Under Section 327(e) and

3    328 of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local

4    Rule 2014-1 for Authorization (I) to Employ and Retain Bradley

5    Arant Boult Cummings LLC as Special Litigation and Compliance

6    Counsel to the Debtors, Nunc Pro Tunc to May 14, 2012, and (II)

7    to Approve Alternative Billing Arrangement filed by Larren M.

8    Nashelsky on behalf of Residential Capital, LLC.

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Penina Wolicki

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4        Attorneys for Debtors
 5        1290 Avenue of the Americas
 6        New York, NY 10104
 7
 8   BY:   LORENZO MARINUZZI, ESQ.
 9        JORDAN A. WISHNEW, ESQ.
10
11
12   BRADLEY ARANT BOULT CUMMINGS LLP
13        Proposed Litigation Counsel to Debtors
14        1819 Fifth Avenue North
15        Birmingham, AL 35203
16
17   BY:   ROBERT MADDOX, ESQ.
18        JAY R. BENDER, EQ. (TELEPHONICALLY)
19
20
21
22
23
24
25
```

1

2  BRADLEY ARANT BOULT CUMMINGS LLP

3          Proposed Litigation Counsel to Debtors

4          100 North Tyron Street

5          Suite 2690

6          Charlotte, NC 28202

7

8  BY:   CHRISTY W. HANCOCK, ESQ. (TELEPHONICALLY)

9

10

11  U.S. DEPARTMENT OF JUSTICE

12          Office of the United States Trustee

13          33 Whitehall Street

14          21st Floor

15          New York, NY 10004

16

17  BY:   BRIAN S. MASUMOTO, ESQ.

18

19

20  KRAMER LEVIN NAFTALIS & FRANKEL LLP

21          Attorneys for Official Creditors' Committee

22          1177 Avenue of the Americas

23          New York, NY 10036

24

25  BY:   DOUGLAS MANNAL, ESQ.

1

2  KIRKLAND & ELLIS LLP

3         Attorneys for Ally Financial and Ally Bank

4         601 Lexington Avenue

5         New York, NY 10022

6

7  BY:   STEPHEN E. HESSLER, ESQ.

8

9

10  WHITE & CASE LLP

11         Attorneys for Junior Noteholders' Group

12         1155 Avenue of the Americas

13         New York, NY 10036

14

15  BY:   HARRISON DENMAN, ESQ.

16

17

18  WILLKIE FARR & GALLAGHER LLP

19         Attorneys for KPMG

20         787 Seventh Avenue

21         New York, NY 10019

22

23  BY:   JOHN C. LONGMIRE, ESQ.

24         SHAUNNA D. JONES, ESQ.

25

1

2   SIDLEY AUSTIN LLP

3         Attorneys for Nationstar

4         One South Dearborn

5         Chicago, IL 60603

6

7   BY:   JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)

8

9   ALSO PRESENT:

10        PATRICK JOSEPH HOPPER, appearing Pro Se

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.  We're here in
 3    Residential Capital, number 12-12020.  Mr. Marinuzzi?
 4              MR. MARINUZZI:  Good morning, Your Honor.  For the
 5    rec --
 6              THE COURT:  Actually, be -- go ahead, Mr. Marinuzzi,
 7    make your appearance.
 8              MR. MARINUZZI:  For the record, Lorenzo Marinuzzi,
 9    Morrison & Foerster, on behalf of the debtors.
10              THE COURT:  All right.  Before we begin, yesterday, as
11    certainly everyone here knows, the Court heard argument on the
12    KEIP and KERP motions.  During the course of the argument, Mr.
13    Masumoto arguing on behalf of the U.S. Trustee, withdrew the
14    objection with respect to the KERP.  And I indicated in the
15    argument that I did intend to approve the KERP.
16              What I would like -- I'm not ready to rule with
17    respect to the KEIP.  But what I would like is for the debtor,
18    the committee and the U.S. Trustee to agree on a form of an
19    order with respect to the approval of the KERP.  We don't have
20    to hold that up.  I fully expect to be writing an opinion with
21    respect to the KEIP.  I don't know what the decision is yet,
22    but it'll be in writing.  So I just wanted to indicate that
23    now.
24              Mr. Masumoto, is that a satisfactory way to proceed?
25              MR. MASUMOTO:  Yes, that's fine, Your Honor.

1        THE COURT:  Thank you.  All right.  Go ahead Mr. --

2        MR. MARINUZZI:  Thank you, Your Honor.

3        THE COURT:  -- Mr. Marinuzzi.

4        MR. MARINUZZI:  Your Honor, we're here on a limited

5  number of retention applications, the first of which is the

6  committee's application to retain and employ AlixPartners as

7  financial advisor.

8        THE COURT:  Yes.

9        MR. MARINUZZI:  I'll cede the podium to Mr. Mannal, so

10  he can present that to the Court.

11        THE COURT:  Thank you.

12        MR. MANNAL:  Good morning, Your Honor.  Doug Mannal on

13  behalf of the creditors' committee, from the firm of Kramer

14  Levin.

15        Your Honor, the committee seeks to retain AlixPartners

16  to provide certain services, including services relating to

17  investigation of pre-petition transactions and intercompany

18  transactions, potential fraudulent conveyances, preferences,

19  provide expert discovery, e-discovery services, assist in asset

20  sales, and monitor the debtors' performance during the pendency

21  of the case.  The application contemplates that Alix will bill

22  at an hourly rate, be subject to 330 review, and maintain their

23  time in tenths of an hour increments.

24        Your Honor, there was one objection to Alix's

25  retention, and that came from the United States Trustee's

1  Office.  And it was with respect to additional disclosures.

2  And Alix complied with the United States Trustee's request and

3  provided additional disclosure regarding certain other clients

4  that another part of Alix represents, that have claims or

5  potential claims against the estate.  They include MBIA, Mass

6  Mutual, AIG, FGIC and Ambac.  They've disclosed this.  They've

7  also created an ethical wall, such that the Alix team that is

8  addressing those claims is walled off from the Alix team that

9  is representing the creditors' committee.

10          The United States Trustee made an additional request

11  to have the members of the Alix team recuse themselves from the

12  committee's analysis of these claims or these potential claims

13  held by Alix clients on the other side of the wall; and Alix

14  has agreed to that, and we'll rely on our other financial

15  advisor, Moelis, to do an analysis of those claims.

16          With that, Your Honor, unless Mr. Masumoto has any

17  objection, I think that's the application.

18          MR. MASUMOTO:  Your Honor, no objection, but just one

19  slight clarification.  The supplemental declaration that was

20  filed indicated that with respect to RMBS claims, Alix would be

21  doing an analysis and potentially commenting or reviewing the

22  individual claims.  My concern at that point was, again,

23  whether Alix, on behalf of the committee, would be reviewing

24  claims for clients on which Alix was on the other side.

25          My understanding is that the understanding is that

1   that circumstance will not arise.  We did not want a situation

2   where Alix was literally on both sides of the issue.

3            THE COURT:  Mr. Mannal?

4            MR. MANNAL:  Confirmed, Your Honor.  Alix will be --

5   part of their engagement is to review the aggregate amount of

6   the claims.  And they'll be deferring to and relying on others

7   in connection with the analysis of those individual creditor

8   claims.

9            THE COURT:  All right.  Mr. Masumoto, are you

10  satisfied with that?

11           MR. MASUMOTO:  Yes, Your Honor.  That satisfies me.

12           THE COURT:  All right.  Do debtors want to be heard?

13           MR. MARINUZZI:  Yes, Your Honor.  Your Honor, we heard

14  the representations about the ethical wall and the separate

15  Alix teams, and we take comfort, understanding and believing

16  that the folks at Alix are going to understand and respect that

17  they have to be separate on these engagements.  And with that

18  representation, we have no objection.

19           THE COURT:  Thank you very much.  The only -- I'm

20  going to approve the application with only this additional

21  caution.  A number of the areas that you identified, Mr.

22  Mannal, as work that AlixPartners would do, are clearly

23  subjects of the examiner's investigation and likely to be of

24  the examiner's report.  I fully expect that the U.S. Trustee

25  will be scrutinizing fee applications carefully to make sure

1   there has not been any unnecessary duplication of effort.  And

2   I assure you that the Court will likewise be scrutinizing fee

3   applications from both lawyers and financial advisors to be

4   sure that there's no unnecessary duplication.

5          I use the word "unnecessary" because I certainly

6   recognize that for the committee to fulfill its

7   responsibilities, it will have to consider some of those same

8   issues that will be the subject of the examiner's report.  I

9   encourage dialog between the committee and the examiner's

10  professionals to try and assure that any overlap is minimized

11  and there is no unnecessary overlap.

12         Mr. Mannal?

13         MR. MANNAL:  Your Honor, Doug Mannal, for the record.

14  Completely understood, Your Honor.  And I think the key is the

15  unnecessary overlap.  There's -- certainly the committee has a

16  fiduciary obligation to the creditors to an investigation.  But

17  we will be very cognizant of any unnecessary overlap, Your

18  Honor.

19         THE COURT:  Okay.  All right.  With that said, the

20  application is approved.  Thank you very much, Mr. Mannal.  And

21  I appreciate your working with Mr. Masumoto, because I think

22  the U.S. Trustee's concerns were very real.  I think they've

23  been appropriately dealt with.  So I appreciate the way you've

24  both been able to resolve it.

25         Go ahead.

1        MR. MARINUZZI:  Your Honor, that bring us to item 2 on

2    the agenda, is the debtors' application to employ and retain

3    KPMG as tax compliance professionals and information technology

4    advisors.

5        The committee filed a reservation of rights with

6    respect to this application, and we've been providing

7    information and additional disclosure to the committee, as well

8    as to the U.S. Trustee.  Counsel for KPMG, Mr. Longmire, is in

9    the courtroom, should I stumble upon any question that the

10   Court might ask about the engagement.

11       But essentially, there are three statements of work at

12   issue here.  And historically, KPMG, not surprisingly, had done

13   work for the consolidated entity.  And this is an effort by

14   ResCap to separate itself.  And we heard a lot about that

15   testimony yesterday and the efforts the company's making to try

16   to separate, to the extent possible, as it becomes necessary in

17   this case.

18       And there are three statements of work at issue here.

19   Two relate to information technology services, and the third

20   relates to tax compliance and tax consulting services for

21   REMICs, which are real estate mortgage investment conduits.

22       The latter, as a master servicer, ResCap is required

23   to prepare reports, tax analyses for investors in these REMICs,

24   so they can go ahead and do whatever they do with them to

25   estimate their tax liabilities.  And ResCap just wants to be

1  able to continue to comply with that.

2          There are two aspects of compensation.  For REMIC part

3  of it it's an hourly or the lesser of some amount based on the

4  number of REMICs that are covered.  It's not the easiest

5  compensation structure to follow, but it's set forth in the

6  statements of work.  The second aspect of the retention relates

7  to IT services.  And those IT services are going to be billed

8  on an hourly basis, subject to a cap of 586,000 dollars.

9          And if Your Honor has any questions, I'm happy to

10  entertain them now.  But we did mark up the order, and I'd like

11  to walk the Court through the changes.

12          THE COURT:  Okay.  Go ahead.  Thank you.

13          MR. MARINUZZI:  Your Honor, the substantive change is

14  found in paragraph 5 on page 2.  And let me just give a little

15  bit of a background on this.

16          THE COURT:  Let me just read it, okay?

17          MR. MARINUZZI:  Sure.

18          THE COURT:  Go ahead.

19          MR. MARINUZZI:  So, and this is not a surprise.  When

20  the Court approves the retention of professionals, everybody

21  wants to make sure the professionals are doing those things

22  that the Court expects them to do and the parties expect them

23  to do.  And one of the issues that may arise here is that the

24  company may realize well, here are services that formerly were

25  done by our parent and they're not being done anymore and we

1   need to do them.  And so we're going to have to go back and

2   enter into another statement of work.

3          And the collective fear is that if we were to find out

4   in two or three weeks that there's some project that needs to

5   be undertaken by KPMG that we would have to file a motion or

6   run the risk that the work that they were doing was outside the

7   scope of the things that they'd been approved to do.  And what

8   we tried to do with the U.S. Trustee and the committee and with

9   KPMG was set up a streamlined process.  And we've streamlined

10  it further, or I guess tweaked it a little bit further, and

11  I'll describe how.

12         But originally, the concept was that we would file

13  with the Court a new statement of work and provide copies to

14  the committee to the U.S. Trustee, and that if neither objected

15  in ten days, that statement of work would be deemed approved

16  retroactively, under this order, and they could perform the

17  services thereunder.

18         And the concern raised by the U.S. Trustee is that

19  it's the position of their office -- and he could correct me

20  if -- Mr. Masumoto could correct me if I'm wrong -- that there

21  should be an order.  Anytime retention is expanded, there

22  should be a court order.  So the process we're contemplating so

23  that we don't have to file a formal application every time

24  something new comes up -- and I assure you, Your Honor, there

25  are lots of things that people haven't thought of yet that will

1  pop up in this case -- that we would not have to file an

2  application and come to court.

3       So the thought process is, in addition to the

4  statement of work, we would file a notice and a proposed order.

5  And the order, should the notice period expire without an

6  objection, would allow the Court to enter it, and it's deemed

7  approved.  And this way it avoids having to come to court to

8  expand an SOW on something that might be very trivial.

9       Second, Your Honor, modifications were made to

10  paragraph 8, or paragraph 8 was inserted.  And this goes to a

11  theme we'll hear a little bit more about, the Ally-AFI-debtor

12  relationship and trying to make sure, as we separate, that

13  we're paying our -- we're paying the debts for which we're

14  responsible; Ally's taking care of its own debts.

15       And the concern is, because many of these master

16  agreements are with the parent, and the process was the parent

17  had the agreement but the statement of work would be undertaken

18  for a particular entity; the entity for which the work was

19  being provided would either pay KPMG directly or reimburse the

20  parent for making the payment to KPMG.  But in our effort to

21  try to separate, we're trying to make sure that we pay for the

22  services that are provided to this debtor.

23       THE COURT:  Let me ask you this question.

24       MR. MARINUZZI:  Sure.

25       THE COURT:  To the extent that you're trying to

1    separate the two companies and IT is an area where work needs

2    to be done, is KPMG necess -- well, are they going to be doing

3    work on a specific project, whether it's a particular database

4    or system that's maintained, to modify it for both AFI and the

5    debtors?  And if so, how will the billing be done and the

6    separation be done?  Is it going to be an alloc -- are they

7    able to bill specifically to the debtors or AFI, or is there

8    going to be an allocation?  What is going to happen?

9          MR. MARINUZZI:  Well, right now, Your Honor, the only

10   work that is being requested to be performed by the debtors is

11   set forth in these statements of work.  So those payments will

12   be made by the debtors because it's their work.  To the

13   extent -- and there will be IT issues; and we're actually in

14   the process of examining those a little bit more closely, as it

15   relates to files and data that would be transferred as part of

16   the sale, and understanding what rights the debtors' estate has

17   to information that the buyer's going to want and what rights

18   the parent has to some of this information.

19          And it could be that in the future we decide that we

20   are going to work with KPMG or maybe some other service

21   provider to help us separate this commingled data.  And our

22   expectation would be that there would be a reasonable

23   allocation of those costs between the debtors, who need to

24   separate the data, and the parent.

25          THE COURT:  Is there anything I'm approving now that

1   deals with this issue?

2          MR. MARINUZZI:  Not at all.  Not at all.

3          THE COURT:  And at this stage, then, what -- the

4   retention that's being approved is not for projects that would

5   require work for both AFI and the debtors?

6          MR. MARINUZZI:  No, Your Honor.  But there's a caveat

7   here.  There's the shared services concept.  And that was an

8   order that Your Honor approved a while ago.  And I'll give you

9   an example.  There are, for example, franchise taxes, sales and

10  use taxes, that the parent prepares on behalf of the debtor,

11  because it's the debtor that generates the need to file those

12  returns.  And there is an allocation of costs.  And those are

13  typically overhead costs.  They calculate what it costs to have

14  an individual perform the services.

15          But it is possible that Ally would ask KPMG under some

16  statement of work to actually assist it in preparing this, and

17  they would pass that along to us as an out-of-pocket expense.

18  That's just the way the shared services agreement work.  It

19  could be KPMG, it could be some other entity under contract.

20          THE COURT:  I understand.  But what I'm really

21  focusing on now is whether there's anything in this retention

22  order that I'm being asked to approve that would deal with that

23  circumstance?

24          MR. MARINUZZI:  No, Your Honor.  There isn't.  And in

25  fact, if Your Honor looks at paragraph 8, it --

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1          THE COURT:  That's what I'm looking at.

2          MR. MARINUZZI:  -- right.  We're trying to

3     specifically identify to -- the committee raises a legitimate

4     concern, and we hear them -- that the work that KPMG is being

5     asked to do is the work that we asked them to do under this

6     statement of work, and their fee applications need to clearly

7     reflect that.  And to the extent that they're performing

8     services for AFI under a separate statement of work, that this

9     debtor's estate is not paying for it.

10         THE COURT:  Well, let's assume that one of the tasks

11    that's assigned to KPMG is to develop the system and then

12    extract the data from what is now a shared database or in the

13    possession, custody or control of AFI.  And AFI turns around

14    and says, well, of course I'm going to engage KPMG; they're

15    doing the work for the debtors.  Here's the statement of work,

16    but we fully plan to pass that cost along because it's the

17    debtors that are trying to extract the data.  It does require

18    work at our end as well, but we fully intend to send an invoice

19    to the debtor for KPMG's work in connection with this statement

20    of work which relates to exactly the same project, namely

21    separating out, extracting data that the debtors wish to

22    transition to their own system.  What happens then?

23         MR. MARINUZZI:  Well, Your Honor, I think Your Honor

24    is presupposing that the debtors are not going to be the ones

25    to say it's our data, it's our sale of assets and we want to

1  make sure we control the data.  But I think the answer to Your

2  Honor's question is understanding that concern, the parent will

3  be advised that for data extraction, if they were to retain

4  KPMG, that we would expect that it would be under a statement

5  of work that we see, agree to, and request court permission

6  for.

7          THE COURT:  Okay.  All right.  Go ahead, Mr.

8  Marinuzzi.

9          MR. MARINUZZI:  Your Honor, I think those are the --

10  oh, I'm sorry.  And then on page 5 of the marked draft,

11  paragraph 15, this just reflects, Your Honor, that to the

12  extent this court chooses not to exercise or doesn't have

13  jurisdiction over any disputes, that the matter would be

14  submitted to arbitration.

15          And paragraph 16 deals with contractors that might be

16  retained by KPMG to perform services, to make sure that the

17  cost is billed at actual cost.

18          THE COURT:  Mr. Mannal, do you want to be heard?

19          MR. MANNAL:  Doug Mannal from Kramer Levin on behalf

20  of the creditors' committee.

21          Your Honor, I think you're getting a clear picture of

22  the spaghetti that exists that binds AFI and ResCap.  And this

23  is sort of just another example of it.  We were conscious of

24  that, and that's why we insisted on the language in paragraph 8

25  to limit estate funds being used to pay KPMG.

1          In Your Honor's example, to the extent there's work

2     that needs to be done on behalf of the estate, it's our

3     impression and understanding that the estate will engage a

4     professional, be it KPMG if they're not conflicted, or another

5     professional, to do that work going forward.

6          But with respect to this application, I think, given

7     the language at paragraph 8, the committee is comfortable.

8          THE COURT:  Okay.  I mean, it may make absolutely the

9     most sense that KPMG is the one who does it; it does it from

10    both ends, because it's going to be the most cost effective for

11    everybody.  I just don't want any unpleasant surprises when a

12    dispute lands in my lap because the debtors have gotten a bill

13    from AFI for work that KPMG has done that wasn't expected to be

14    received, and the committee says wait a second; that wasn't --

15    KPMG, their statement of work for the debtors included this;

16    why are they now -- why is the debtor getting billed for it.

17         MR. MANNAL:  Right.  And it's my understanding, Your

18    Honor, under the shared services agreement, there are allocated

19    services.  I'm not sure if the example Your Honor used is

20    allocated in that shared services and governed by that order.

21    But AlixPartners is reviewing that information and

22    understanding exactly how the funds are flowing and making sure

23    that it is consistent with the terms of that order.

24         THE COURT:  All right.  Thank you.

25         Mr. Masumoto?

1          MR. MASUMOTO:  Your Honor, we had some discussions

2    with KPMG's counsel, and I think counsel can make the direct

3    representation; I believe all of our issues were resolved with

4    the exception of two issues.  The supplement that was filed

5    didn't address our concerns about the disclosure of the amount

6    of pre-petition services that were waived.  I believe that was

7    in paragraph 10 of their declaration.  We were advised that the

8    amount is 380,000 dollars.

9          And secondly, we had asked for disclosures of any

10   clients of KPMG over one percent of their revenues.  I believe

11   that the disclosure is that there is only one client with less

12   than two percent; but for confidentiality reasons, they did not

13   want to file to disclose that.  Our position is we will defer

14   to Your Honor.  Our preference, obviously, is for a fully

15   transparent process; and we had requested an additional

16   supplement disclosing the over one percent and less than two

17   percent client and the amount of the waiver.  But we will defer

18   to Your Honor --

19          THE COURT:  Okay.

20          MR. MASUMOTO:  -- to determine if that's necessary.

21          THE COURT:  Thank you very much.  Anybody else wish to

22   be heard?

23          MR. LONGMIRE:  Good morning, Your Honor.  John

24   Longmire from Willkie Farr & Gallagher on behalf of KPMG.  I

25   just wish to confirm the representations Mr. Masumoto just made

1  on behalf of KPMG with respect to the amount of the pre-

2  petition claim that KPMG is prepared to waive if its retention

3  is approved by the Court.  It is approximately 380,000 dollars

4  give or take a few dollars.

5          And as Mr. Masumoto said, he has asked us to identify

6  whether any of the KPMG clients who are listed on an attachment

7  to the KPMG declaration in support of this application

8  generated over one percent of KPMG's revenue for the last

9  reporting period.  And as I indicated to Mr. Masumoto, one of

10  those many clients and no others represented over one percent

11  but less than two percent of KPMG's revenue for its last fiscal

12  year.  I think I'm very confident that whatever the threshold

13  is, we're in a neighborhood where no reasonable assertion could

14  be made that any KPMG client of the magnitude we're discussing

15  could have such a large influence on KPMG's business that it

16  would somehow be inclined to skew its representation of the

17  debtors in any way to benefit that client, which I assume is

18  the concern behind the question.

19          But as Mr. Masumoto did indicate, for confidentiality

20  reasons, KPMG is not authorized to disclose publicly the --

21          THE COURT:  Could I ask you this, Mr. Longmire?

22          MR. LONGMIRE:  -- identity of that client.

23          THE COURT:  Have you disclosed the identity of the

24  client to the committee's counsel?

25          MR. LONGMIRE:  I have not, but I could, yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                          24

 1          THE COURT:  I'm going to -- on this issue, I

 2   definitely appreciate Mr. Masumoto's concern about whether --

 3   because I'm a strong believer that as much information as

 4   possible should be publicly disclosed so there's transparency.

 5   On this matter, given the representation that it's one client,

 6   more than one percent, less than two percent, I'm prepared to

 7   have that information not publicly disclosed, but it also does

 8   need to be disclosed to the committee's counsel as well.

 9          MR. LONGMIRE:  That's fine, Your Honor.

10          THE COURT:  All right.  Anybody else wish to be heard?

11          All right.  I'm going to go ahead and approve the KPMG

12   retention, subject to the disclosure to the committee's counsel

13   for their counsel only -- limited to counsel only.  Mr. Mannal,

14   if after it's disclosed, you have any issue about it, please

15   advise counsel for KPMG and the Court.  Okay?

16          MR. MANNAL:  Yes.  Thank you, Your Honor.

17          THE COURT:  All right.  Thank you.  All right, so

18   that's approved.

19          MR. MARINUZZI:  Your Honor, that brings us to agenda

20   item number 3, which is the debtors' application to retain,

21   under Section 327 and 328, as special counsel, the law firm of

22   Bradley Arant Boult & (sic) Cummings.  Mr. Robert Maddox is

23   here in court, and Christy Hancock and Jay Bender are on the

24   telephone, should Your Honor have any questions.

25          There are many, many matters that the Bradley Arant

1  firm is handling for the debtors.  There are over 600 open

2  litigation files that they have for claims under TILA, RESPA,

3  and other federal and state laws.  They represent the debtors

4  in litigation matters relating to servicing and foreclosures.

5  And from my selfish perspective, they represent the debtors in

6  connection with all matters relating to regulatory agencies,

7  the government, under the DOJ consent order, the DOJ-AG

8  settlement and consent order, compliance, and all of those

9  things for which they will be very important to the debtors to

10  assist us in the sale and transfer of rights and obligations

11  under those documents.

12          Their billing structure has a concept called

13  alternative billing arrangements.  And effectively, the company

14  will tell Bradley Arant that you're going to take this matter

15  on for us and you're going to agree to a flat 7,300 dollars and

16  you're not going to bill us for expenses except for witness

17  fees.  And there's a safety valve.  So if the matter turns out

18  to be one where the law firm finds itself spending a great deal

19  of time on it, because the matter is more complicated than the

20  company or the law firm originally thought, then they could

21  switch to pure hourly, but they have to waive the next 11,000

22  dollars in fees.

23          So if they find themselves in a position where if

24  they've billed 16,000 dollars for a case, then they can charge

25  7,300.  If they wind up billing more than 18,000, they could

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1  decide whehter they want to switch to an hourly at that point.

2  That we're asking the Court to approve under Section 328.  The

3  company finds it to be very advantageous and cost effective.

4  And we'd ask that to be approved under Section 328.

5        There were two objections filed to this application:

6  one by Mr. Patrick Hopper, who is sitting in the courtroom.

7  And he filed an objection and a declaration in support of his

8  limited objection.  And in response to his objections, Mr.

9  Maddox submitted supplemental declarations advising the court

10  on the status of that litigation of which Mr. Hopper complains.

11  We also talked to it in our response.  Mr. Hopper is free to

12  argue his objection.  Our view is it's not a basis to deny a

13  retention of this law firm under Section 327(e) as special

14  counsel.

15        The second objection was filed by the creditors'

16  committee.  And even prior to the filing of the objection we

17  and Robert Maddox worked with committee counsel to try to get

18  them comfortable on really what is the issue that causes the

19  greatest concern for the committee, and that's the

20  representation by the Bradley Arant firm of all of the parties

21  on the ResCap side to the consent order and AG-DOJ settlement.

22        And it's not surprising, at the time, that there was

23  one law firm dealing with the government and the regulatory

24  agencies.  And Mr. Maddox has been representing this company

25  for years and years and years and is familiar with its

1  operations.  The company really relies on him for regulatory

2  advice.  Ally also had retained Sullivan & Cromwell to assist

3  it in that process as well.

4          The committee's objection raises two points.  The

5  first is that the Court couldn't approve the retention of the

6  Bradley Arant firm unless they withdrew from representing Ally.

7  And over the course of the past several days, in various

8  stages, that representation has ceased.  It --

9          THE COURT:  Do I understand correctly that Ally has

10 consented to the Bradley Arant firm withdrawing from

11 representation of Ally, but continuing to represent the

12 debtors?

13         MR. MARINUZZI:  Correct.  That's correct.  And on the

14 governmental compliance issues, which have a lot more

15 publicity, it's clear what role they played.  On the class

16 action litigations, in many of the instances -- and they're

17 detailed in the second supplemental Maddox declaration --

18 people sued class actions against ResCap.  They decided to name

19 Ally, some after the bankruptcy, to allow them to continue to

20 try to litigate.  They've agreed, as of yesterday, to withdraw

21 from that representation.  Ally has consented to that.  The

22 debtors are comfortable with that.

23         THE COURT:  As to the class actions?

24         MR. MARINUZZI:  Yes.

25         THE COURT:  Okay.

1      MR. MARINUZZI:  And as to the other litigations, and

2  there were five or six litigations where Ally had been named as

3  the owner of the loan; ResCap was named as a servicer.  And

4  there were indemnity obligations and an obligation to defend.

5  And one could look at it, okay, it's arm's length; they have to

6  defend the party for whom they're providing services.  On the

7  other hand, there's an issue, obviously, we have to deal with

8  in the separation of the parent from ResCap.

9      And so they've agreed to withdraw from that

10  representation as well.  Ally has consented.  The debtors are

11  comfortable with their continuing representation of the

12  debtors' estates in those litigations.  So as far as I'm

13  concerned --

14      THE COURT:  What is -- are they continuing joint

15  representation in any matters?

16      MR. MARINUZZI:  No, none.

17      THE COURT:  None.

18      MR. MARINUZZI:  None.  They've completely severed the

19  joint representation in all of these engagements.  So they're

20  working for the debtors.

21      The second grounds for objection by the committee

22  is -- or request is that the Bradley Arant firm consult with

23  committee counsel on all matters relating to Ally and the

24  consent order.  And we tried to figure out how that could

25  possibly work.  And there are lots of reasons why it can't.

 1    It's invasive.  It violates attorney-client protected

 2    communications.  It's inefficient.

 3            The fact of the matter is, as professionals, we have

 4    to talk to one another.  And Mr. Mannal's not shy about picking

 5    up the phone if he has a concern and calling my office, or even

 6    Mr. Maddox directly, to discuss issues.  But what is being

 7    proposed here -- and I'll give you a real example.

 8            The committee's expectation would be, and assuming

 9    Your Honor were to approve this retention and we ask that the

10    Court does -- Mr. Maddox will leave this hearing and get on the

11    phone with the DOJ and talk to the DOJ about issues that are

12    integral to the tentative settlement that was described by Mr.

13    Lee, my partner, yesterday, that deals with subservicing,

14    because obviously there's regulations, there are obligations

15    and the DOJ needs to be comfortable.  And the committee would

16    expect that when Mr. Maddox hangs up that phone call that he's

17    supposed to pick up the phone and call Kramer Levin and say

18    this is what we discussed.

19            I just -- I don't see any precedent for that.  And how

20    is he supposed to respond?  Don't we have the ability to

21    authorize him or not authorize him to have a conversation.  I

22    mean, he's counsel for the debtors; he's not counsel for the

23    committee.  And so I just don't think this --

24            THE COURT:  Fundamentally your position is that with

25    respect to any work he did jointly for Ally and the debtors

1   until now, both Ally and the debtors were co-clients and Ally

2   retains its privilege as to any third persons, correct --

3           MR. MARINUZZI:  Correct.

4           THE COURT:  -- namely the committee being the third

5   persons.

6           MR. MARINUZZI:  Correct.

7           THE COURT:  And with respect to the ongoing

8   representation, the debtor has a privilege.

9           MR. MARINUZZI:  Correct.

10          THE COURT:  And it's up to the debtor to decide

11  whether to waive the privilege or not waive the privilege.

12          MR. MARINUZZI:  Yes.

13          THE COURT:  That's essentially your position?

14          MR. MARINUZZI:  Essentially, yes.  And there's an

15  exception for privileged communication.  But then we're putting

16  ourselves in a position where we have a fight later on about a

17  conversation, because Mr. Maddox didn't pick up the phone to

18  call Mr. Mannal, and we thought it was privileged, and now we

19  have to make a determination about whether a conversation with

20  the DOJ is privileged.  And you could make an argument it's

21  not.  But does that mean he now has to pick up the phone and

22  say well, this is what we just discussed.  It's just terribly

23  inefficient.

24          THE COURT:  And in the ongoing communication between

25  the committee and its professionals and the debtor and its

1   professionals, as on so many other subjects, it may be

2   appropriate at some time for there to be a meeting that focuses

3   on regulatory matters and the debtor will decide what

4   information either is privileged or not but wants to share with

5   the committee, and will do it or not.

6           MR. MARINUZZI:  Right.  That's what we would do.

7           THE COURT:  So you're not seeking a provision in an

8   order that say under no circumstances will we permit a

9   communication with Bradley Arant.

10          MR. MARINUZZI:  Not at all, Your Honor.  Not at all.

11  It's the reverse.  It's trying to --

12          THE COURT:  Let me hear from Mr. Mannal on it, because

13  I think --

14          MR. MARINUZZI:  Sure.

15          THE COURT:  -- I do understand your issue.

16          MR. MARINUZZI:  Okay.

17          MR. MANNAL:  Good morning, Your Honor.  Again, Doug

18  Mannal from Kramer Levin on behalf of the creditors' committee.

19          Your Honor, I think your questions show that you fully

20  understand the issue that the committee had.  The main issue

21  the committee had was that before the petition date, as of the

22  petition date, in fact, as of yesterday, the Bradley Arant firm

23  represented AFI, the nondebtor parent.

24          THE COURT:  Let me ask you this, Mr. Mannal.  In light

25  of the agreement that Bradley Arant will not represent

1  nondebtors Ally in any matter, governmental, compliance,

2  litigation, or whatever, are you withdrawing that aspect of

3  your objection?

4          MR. MANNAL:  Yes, Your Honor.

5          THE COURT:  Are you satisfied with that?

6          MR. MANNAL:  I think 327(e) is not retrospective, it's

7  prospective.

8          THE COURT:  Well, this is a little unusual.  Because

9  even 327(e) doesn't specifically deal with the co-client

10 circumstance.  But you're -- whatever you could argue, as I

11 understand it now, the committee is satisfied that so long as

12 Bradley Arant is no longer representing Ally, AFI, the

13 nondebtors, that you withdraw that portion of your objection.

14         MR. MANNAL:  Yes, with the following caveat, Your

15 Honor.

16         THE COURT:  Okay.

17         MR. MANNAL:  As you point out, 327(e) doesn't cover

18 this particular situation.  Each situation is unique.

19         THE COURT:  Right.

20         MR. MANNAL:  And it was our attempt by our request for

21 consultation directly with BABC to ensure that we were kept

22 apprised of what was going on, specifically with the DOJ-AG

23 discussions and other interactions between the debtors,

24 debtors' counsel and various governmental agencies.

25         So what we were suggesting is that there be an open

 1   dialog with the creditors' committee, understanding that BABC

 2   or Bradley Arant is being engaged by the debtors, that there is

 3   a privilege that would exist there, because of that engagement.

 4   And we're not seeking to waive that privilege.  But what we're

 5   seeking is a court order, or a provision in a court order that

 6   says, in light of the history here, you have to talk to the

 7   creditors' committee.  There has to be an open dialog to the

 8   creditors' committee as to what's going on.

 9        THE COURT:  You want more than that.  You want a

10   provision in an order that says that Bradley Arant has to

11   consult with the creditors' committee.

12        MR. MANNAL:  Correct.  As counsel to the -- as special

13   counsel to the debtors.  That's right.

14        THE COURT:  Do you have any authority for that?

15        MR. MANNAL:  Your Honor, given the --

16        THE COURT:  I know you'd like it, but I mean, do you

17   have any legal authority that supports my entering an order

18   that requires it?

19        MR. MANNAL:  I don't, Your Honor.

20        THE COURT:  Okay.

21        MR. MANNAL:  But I think the facts and circumstances

22   of this situation would support it.

23        THE COURT:  But the issue would be the same if they

24   went out and hired ABC firm that had never done any work for

25   anybody but they went out and hired them now to represent the

1   debtors in all governmental compliance matters and litigation.

2          MR. MANNAL:  That's right, Your Honor.  I think if the

3   representation is that BABC will make themselves available and

4   sit down with the creditors' committee and explain what it is

5   that's going on -- because I think our interests are completely

6   aligned in this situation --

7          THE COURT:  Yes, but well, this issue -- don't tell me

8   that your interests are completely aligned.  I've already wrote

9   an opinion in Velo a couple of months ago, dealing with common

10  interest privilege, for example.  And that's an area of the law

11  that has a lot of nuances.  And I'm not -- I don't want to go

12  there.  Okay?

13         I mean, I think, as I understand it Mr. Mannal, the

14  committee, to this date, from what you've said and what Mr.

15  Eckstein has said, have had an open and good relationship and

16  good dialog with the debtors.  And you're not bashful about

17  raising whatever issues are of importance to the committee with

18  the debtors.  And if you believe that the debtors aren't

19  sharing information with you on behalf of the committee, you

20  can certainly come and tell me about it.

21         But I would view it as an extraordinary provision

22  requiring retained counsel for the debtors to have an

23  affirmative obligation to consult with the committee.  I mean,

24  I've just -- I've never heard of that being ordered.  And I

25  think that the fact that they represented them pre-petition has

1  really got nothing to do with it.  I mean, I just have to

2  evaluate it as privileged information.  They're retained to

3  represent the debtors.

4           There's nothing wrong with you asking to meet with the

5  debtors and to meet with its lawyers.  And I would think, in at

6  least some circumstances they would agree and you'd arrange

7  meetings and you'd have discussions as to particular issues.

8  But I've never heard of a judge ordering what you're asking

9  for.

10          MR. MANNAL:  I understand, Your Honor.  It is unique

11  to these circumstances --

12          THE COURT:  Okay.

13          MR. MANNAL:  -- what we're asking for.  And I think we

14  have had a very good and open dialog with professionals for the

15  debtors, including Robert Maddox at --

16          THE COURT:  Okay.

17          MR. MANNAL:  -- the Bradley Arant firm.  And we hope

18  to continue that dialog going forward.

19          THE COURT:  Thank you.  Mr. Masumoto?

20          MR. MASUMOTO:  Your Honor, we have no specific

21  position with respect to the current complaint.  We would like

22  to see the final version of the order that's controlling.

23          THE COURT:  All right.  Mr. Hopper, do you want to be

24  heard?  Please come up.

25          MR. HOPPER:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. HOPPER:  My name is Patrick Hopper.  I'm

3    representing myself pro se.

4          THE COURT:  I know.  You're not a lawyer, right?

5          MR. HOPPER:  Right.

6          THE COURT:  Go ahead.

7          MR. HOPPER:  Thank you.  I'll try and keep it very

8    simple, Your Honor.

9          THE COURT:  It's okay.

10          MR. HOPPER:  The reason why I'm here today is

11   basically, it goes back to some of the things that we've just

12   discussed which is the ethical wall and also the potential and

13   actual conflict related to 327 and also Section 1014 that

14   you're talking about today.  And unlike the other law firms,

15   Bradley Arant is in a unique position.  And it's really

16   relevant in my particular case.

17          And what I'd like to show you is where the conflict --

18   the potential conflict is which I now believe is an actual

19   conflict.  The traditional -- sorry.  I am a little nervous.

20          THE COURT:  Go ahead.  Just relax.  Okay?

21          MR. HOPPER:  The initial relationship is you have a

22   borrower and a lender and it was a very simple process.  You

23   could track that.  We know the issues that have happened with

24   the consent judgment, the consent order that have led us to

25   this position where we are today.  What you have is you have a

1  lender, and you put MERS in the middle, so you can securitize a

2  Rubik's Cube to put on the back end, your borrower --

3          THE COURT:  I don't know about the Rubik's Cube, but

4  trust me, I'm very familiar --

5          MR. HOPPER:  Okay.

6          THE COURT:  -- with the role that MERS plays and --

7          MR. HOPPER:  Okay.  And it really has nothing to do

8  with that, Your Honor.  But what it has to do with is the

9  consent order, which in your order to go through and move

10 forward with the litigation, that consent order was to address

11 the bandaid that happened on documents that were filed in the

12 state court process and in the bankruptcy court.  I happened to

13 be in both bankruptcy and state court.  And unfortunately, I

14 have different parties in both of mine.

15         That bandaid has since been removed with the consent

16 order and consent judgment.  So what we have is we had a

17 position before where you had a hole on the top -- a blank

18 hole, you've now fixed that going forward by putting in the

19 consent judgment.

20         The problem is Bradley Arant, as they explained to the

21 Court, are very comfortable with the entire complexity of this

22 system.  They understand the SEC side, all the creditors

23 side -- they understand the SEC side, they understand the

24 securitization process, they understand the IRS REMIC

25 ramifications.  Their firm is very well entrenched in that

1   organization.  Because they negotiated the judgment order and

2   the consent order, they also know about the potential hole that

3   is sitting at the top end which prevents borrowers from getting

4   clear and marketable title at the very end.

5           The problem with that is this firm understands the

6   entire process.  And now what they're trying to do is in state

7   court, they're trying to box in and represent one particular

8   component, which happens to be the foreclosure side.  In trying

9   to represent the foreclosure side, they've now put

10  themselves -- potentially, they could have put themselves in a

11  position where it was continuing a fraud on the court.

12          The consent judgment was to go through and take care

13  of that.  Since this firm understands the complexity at the top

14  level, they should not be allowed to be engaged -- that's why

15  it's a limited objection -- to go in at state court level when

16  they know the problems here.

17          It gets a little more complex in mine.  Mine's a

18  simple case.  I just want it over.  I'm not here to better my

19  position.  I am -- if I have to go through and take it, I will

20  probably have to file a Chapter 20, a 13 on top of a 7 to go

21  through and get it resolved.  That's not what I'm looking to

22  do.  I'm looking to fix the system if I can, which is what I

23  think the purpose of the consent judgment is.

24          THE COURT:  Let me ask you this.  What is the status

25  of your foreclosure matter, at this point?

1              MR. HOPPER:  I already have a Chapter 7 discharge.

2     It's about the mortgage, and I've got four people that

3     represent -- let me get into the conflict; the potential

4     conflict and the actual conflict.

5              The actual conflict right now lies in those two

6     parties from Bradley Arent, the two main partners.  I'm going

7     to point them up:  Brian O'Dell and Christian Hancock.  Those

8     two individuals were integral in negotiating and settling the

9     consent judgment with the Attorney Generals.

10             THE COURT:  Let me -- I'll let you talk about that.

11             MR. HOPPER:  Okay.

12             THE COURT:  But what I'm just -- if you could, are you

13    in a bankruptcy proceeding now?

14             MR. HOPPER:  No.  I went through a bankruptcy, Your

15    Honor.  I had the house sold for 540,000, more than what the

16    first was owed.

17             THE COURT:  Okay.

18             MR. HOPPER:  I wouldn't be here today if that had gone

19    through.  And I asked GMAC to take it through a 363 bankruptcy

20    process.  They refused to do it, even though their bankruptcy

21    counsel said it made perfect sense.  And the reason why they

22    didn't do it is because they filed different documents with a

23    different assignment in the state court action.

24             THE COURT:  Let me just -- I'm trying to understand

25    and grasp exactly what litigation you're involved in now.  You

1   got a bankruptcy discharge.  Is your bankruptcy case closed?

2            MR. HOPPER:  Yes.  My bankruptcy case is closed.

3            THE COURT:  Okay.

4            MR. HOPPER:  I now -- I own a house.  I did not keep

5   my house.  I gave it back.  I had an indemnification with my

6   ex-wife, because I went through a divorce.  And basically my

7   goal was to get the house sold, which I did.

8            GMAC chose to go down the foreclosure method as

9   opposed to selling the house for more than they were owed.

10  That hurt other creditors in my Chapter 7 bankruptcy case.

11           THE COURT:  Okay.  But your bankruptcy case is closed

12  in this --

13           MR. HOPPER:  Yes, it is closed, Your Honor.

14           THE COURT:  You got a discharge?

15           MR. HOPPER:  Yes, I did.

16           THE COURT:  And --

17           MR. HOPPER:  So therefore the --

18           THE COURT:  -- are you out of possession of the house

19  now?

20           MR. HOPPER:  No.  I still have the house because the

21  debt has been forgiven.

22           THE COURT:  Right.

23           MR. HOPPER:  Now it comes down to enforcing that debt.

24  Enforcing that debt, the critical part -- and I'm in Florida --

25  the critical part to enforce that debt is to show the chain of

1  assignment.

2          THE COURT:  Okay.  Well, let me ask, has the house --
3  I understand you're still in possession.  Has the house been
4  sold?

5          MR. HOPPER:  I've had five offers.  I had it sold.  I
6  had money ready to close.  When I was in bankruptcy, I talked
7  to the trustee, I brought it back to them.  They were willing
8  to go through and get it sold for more than GMAC was owed on
9  the first through a 363 process.  Unfortunately, GMAC came back
10  and said they're not interested in doing that.

11          THE COURT:  Okay.  Did the trustee, your Chapter 7
12  trustee, abandon --

13          MR. HOPPER:  He has abandoned the property, yes.

14          THE COURT:  So it's revested in you?

15          MR. HOPPER:  So it is mine.  I apologize, yes, Your
16  Honor.

17          THE COURT:  No, that's okay.  I just want to be sure I
18  understand.  Okay.  And what's the state court litigation
19  you're engaged in?

20          MR. HOPPER:  The state court is when I had it sold I
21  couldn't understand why they didn't want to get it sold.  That
22  was three years ago.  And for those last three years, I've been
23  trying to figure out who owns the mortgage.  And basically what
24  I discovered is I discovered the Rubik's Cube.  It took me two
25  years to figure it out.  I understand the SEC filings.  I

1  understand the REMIC issues.  There is a page from my

2  declaration that was not included in the court filing.  I'm not

3  sure why.  It was page 6.  But it talks about certain of those

4  particular parts.

5          THE COURT:  And did Bradley Arant represent --

6          MR. HOPPER:  Yes, Your Honor --

7          THE COURT:  -- were they in the bankruptcy case?

8          MR. HOPPER:  No.  I was initially with David Stern,

9  okay?  My case was initially with David Stern -- the Law

10 Offices of David Stern.  And David Stern represented the

11 bankruptcy side and they represented the foreclosure side.  And

12 you had that ethical wall where you had the bankruptcy side and

13 you had the foreclosure side, and that was fine.

14         Bradley Arant came in when mine became complex, when I

15 raised questions about the ownership and the assignment.

16         THE COURT:  They came in representing?

17         MR. HOPPER:  Representing GMAC in 2010.

18         THE COURT:  In the bankruptcy case?

19         MR. HOPPER:  No.  In the state court action.

20         THE COURT:  Okay.  They never appeared in the

21 bankruptcy case?

22         MR. HOPPER:  They never appeared in the bankruptcy

23 court.

24         THE COURT:  Okay.  And where did the state -- what

25 county in Florida is it pending in?

1              MR. HOPPER:  I'm in Collier County, Your Honor.

2              THE COURT:  Okay.  Are you represented by counsel in

3    the state court action?

4              MR. HOPPER:  No, I'm not, Your Honor.

5              THE COURT:  Okay.  That's fine.  At any time in your

6    state court action, has the court imposed any sanctions against

7    Bradley Arant?

8              MR. HOPPER:  I have not filed to request sanctions.  I

9    did file a motion for dismissal for fraud on the court.  And

10   that was not heard, and that was never scheduled, because every

11   time I tried to schedule it I can't get it scheduled.

12             THE COURT:  Okay.  Anything else you want to tell me?

13   I'm happy to --

14             MR. HOPPER:  The last thing --

15             THE COURT:  Sure.

16             MR. HOPPER:  -- Your Honor.  Like I said, what it

17   comes down to is if it was any other firm, you could keep that

18   ethical wall in place.  The attorneys that negotiated this

19   entire transaction that know the problems here, when they come

20   in, and they have -- since your last order, Your Honor, they

21   have filed an amended complaint; they have failed to follow the

22   requirements that they're going to go through and represent the

23   debtor but trying to make sure that they're going to go through

24   and follow.

25             That's where my issues are, is that consent judgment

1 that just got issued and signed in May, the timing of that, two

2 attorneys who were critically involved in that filed an amended

3 complaint and they failed to leave out (sic) key critical

4 parts, and they've also asked me not to contact and work

5 directly or talk directly to GMAC, providing me an inability --

6 where they're controlling the process.  And what they're trying

7 to do is to control this process here so that it doesn't open

8 up all the other cans of worms, which I understand Your Honor,

9 you need to make sure that you're balancing the interests of

10 all the parties and that would make sense.

11   Mine is stuck that if mine goes in, it could

12 potentially cause the debtor expense, because I will have to

13 continue to go through the bankruptcy side, above the 18,000

14 probably.  I will then have a problem with I can go to the

15 independent review.

16   THE COURT:  Let me ask you this.  So I understand;

17 that you filed a state court action.

18   MR. HOPPER:  They did.

19   THE COURT:  They did.  And they're seeking to obtain

20 possession of the property?

21   MR. HOPPER:  Yes.

22   THE COURT:  And you're defending on the grounds that

23 they haven't established they hold title?

24   MR. HOPPER:  They have not established standing based

25 on title.  Correct, Your Honor.

1          THE COURT:  Okay.  And how far has that case

2    progressed at this point?

3          MR. HOPPER:  It's progressed.  Well, they filed a

4    summary judgment.  I filed a motion in limine to stop it.  I

5    filed a request for summary judgment which never got heard.

6    They filed an amended complaint based on the consent judgment.

7    That amended complaint did not conform with the requirements of

8    the consent judgment.  O'Dell and Hancock sent down to argue

9    that part -- they put up, finally, an ethical wall -- they sent

10   an attorney in a highly complex case that has no -- their

11   background is in construction -- to argue that.  And the reason

12   why they did that is there was no assignment attached in the

13   four walls of that complaint, which is a critical part of your

14   bankruptcy foreclosure complaint.

15         THE COURT:  Well, look.  The state court is going to

16   decide that a mortgagee either has title or doesn't have title.

17   And but that's not for me.  That's for a state court to decide.

18         MR. HOPPER:  Correct.  And it's not my case for you.

19   It's about Bradley Arant having the representation here.  My

20   case should either be transferred to another firm that has to

21   go through and at least verify that the data is accurate.  I

22   can't defend myself, because I don't have accurate facts.

23         THE COURT:  Well, let me ask you this.  One of the

24   forms of relief that you ask for is that an independent special

25   counsel be appointed to investigate both the debtors' conduct

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1   and Bradley Arant's conduct.  You make allegations about robo-

2   signing and things that actually I'm quite familiar with; not

3   in your -- as a general matter.

4           But have you alleged in your case that there were --

5   that so-called robo-signing occurred in your case?

6           MR. HOPPER:  Yes, I did have robo-signing in my case.

7   It is in there.  I have questioned and challenged the

8   assignment.  In the amended complaint, there was no assignment

9   attached.  I have an ALANG (ph.) that was produced three months

10  after the fact.  And that document differs from the document

11  that was supplied to the bankruptcy court six months prior to

12  that, which did not have an ALANG when they asked for relief of

13  stay.

14          I have GMAC -- I'll go back to -- Bradley Arant

15  represents a few other creditors in this deal where they say

16  their interests are aligned.  One creditor is MERS.  Their

17  interests aren't aligned because they haven't settled with the

18  government yet.  There's exposure there.  Bradley Arant needs

19  to manage the situation not to have the exposure.

20          I have no problem with Bradley Arant managing the

21  debtor.  But getting down at this level, I don't think they

22  belong at that level.

23          THE COURT:  So you're saying Bradley Arant is

24  representing MERS in your action?

25          MR. HOPPER:  No.  They represent -- they disclosed to

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1    the Court -- part of the disclosure, they disclosed that they

2    represent MERS, which is an integral part of --

3            THE COURT:  I know what MERS is.

4            MR. HOPPER:  -- this process.  Okay.  They also

5    represent, in my case.

6            THE COURT:  Is MERS a defendant in -- a party in your

7    case?

8            MR. HOPPER:  No.  And I have put in a motion to

9    dismiss for failure to attach all the defendants:  MERS,

10   Greenpoint Mortgage, which is no longer involved in my case,

11   which is no longer here.  They also have HSBS who Bradley Arant

12   represents in this findings (sic).  Bradley Arant represent

13   HSBC on this side, which can open up a can of worms.

14           THE COURT:  Okay.

15           MR. HOPPER:  And they also represent Wells Fargo.

16           THE COURT:  All right.  I think I understand your

17   position.

18           MR. HOPPER:  Okay.

19           THE COURT:  Anything else you want to say?

20           MR. HOPPER:  No, that's all, Your Honor.

21           THE COURT:  Thank you very much.

22           MR. HOPPER:  Thank you.

23           THE COURT:  Anyone else want to be heard?  Mr.

24   Marinuzzi?

25           MR. MARINUZZI:  Your Honor, I'm really not in a

1  position to respond as to the factual arguments that Mr. Hopper

2  just raised.  Obviously we're all sympathetic and understand

3  the frustration that he must be going through.  As I noted

4  earlier, there are representatives from BABC on the phone, to

5  the extent Your Honor has any specific questions about his

6  proceeding.  But I can't answer them.

7          THE COURT:  I do.  Who's going to speak on behalf of

8  Bradley Arant?

9          MS. HANCOCK:  Your Honor, this is Christy Hancock.

10  I'm one of the counsel on the Hopper case.

11          THE COURT:  Okay.  Ms. Hancock, one question I have

12  for you is whether your firm or any lawyers in your firm have

13  been sanctioned by any court in one of Mr. Hopper's cases,

14  either in the Chapter 7 case or in the state court action that

15  he's referred to?

16          MS. HANCOCK:  No, Your Honor.  We have not.  And it's

17  my understanding that the basis of Mr. Hopper's original motion

18  for sanctions goes back to pleadings that were filed by the

19  David Stern firm when they initiated the foreclosure.

20          THE COURT:  And what, the allegation is that -- what

21  was the allegation that was the basis for the sanctions

22  request?

23          MR. HOPPER:  Sure.  Mr. Hopper takes issue with the

24  person, Jeffrey Stephan, who signed the assignment of mortgage

25  that was filed with the original foreclosure complaint back in,

 1    I believe, 2010.  He also took issue with Jeff Stephan's

 2    signing of an affidavit of indebtedness, which has now been

 3    withdrawn and supplemented with a new affidavit.

 4              THE COURT:  Who is --

 5              MS. HANCOCK:  And we are not moving forward on the

 6    prior one.

 7              THE COURT:  By whom was Mr. Stephan allegedly

 8    employed?

 9              MS. HANCOCK:  GMAC mortgage.

10              THE COURT:  And was he, in fact, an employee of GMAC

11    mortgage?

12              MS. HANCOCK:  Yes, Your Honor.  And he still is today.

13              THE COURT:  And did he sign on behalf of GMAC Mortgage

14    or on behalf of MERS?

15              MS. HANCOCK:  I believe he signed the assignment on

16    behalf of MERS, because he was also authorized to sign for MERS

17    at that time.  And he signed the affidavit of indebtedness on

18    behalf of GMAC.

19              THE COURT:  All right.

20              MS. HANCOCK:  And the documents are not signed at the

21    same time.  There's several months to a year in between the two

22    of them.

23              THE COURT:  And have those documents been withdrawn?

24              MS. HANCOCK:  The affidavit of indebtedness has been

25    withdrawn.  It's been supplemented with a new one that is

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1  updated.  The assignment of mortgage, it's a recorded document.

2  It cannot really be withdrawn.  It's in the county records.

3  Florida is an original note state.  And we have located and

4  filed the original note with the court and are relying, at this

5  point in time, only on the original note to establish standing

6  to foreclose.

7           THE COURT:  Was the note endorsed --

8           MS. HANCOCK:  Which is proper under --

9           THE COURT:  -- was the note --

10          MS. HANCOCK:  Yes, Your Honor.

11          THE COURT:  -- endorsed in blank?

12          MS. HANCOCK:  The note is endorsed in blank, I

13  believe.

14          THE COURT:  And are you relying on delivery of the

15  original note endorsed in blank as the basis for standing?

16          MS. HANCOCK:  Yes, Your Honor.  I want to check on the

17  endorsement in blank, but we are relying on the endorsement and

18  the possession of the original note which carries foreclosure

19  in Florida.

20          THE COURT:  Who was the payee of the original note?

21          MS. HANCOCK:  Just a moment, Your Honor.  Mr. Hopper's

22  original note was with Greenpoint Mortgage Funding.

23          THE COURT:  Okay.

24          MS. HANCOCK:  And the note was endorsed in blank by

25  Mr. Thomas Mitchell, the vice president of Greenpoint Mortgage

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

 1  Funding.

 2          THE COURT:  All right.  And delivered -- to your

 3  knowledge, who was the original note endorsed in blank

 4  delivered to?  Did it go through -- was there a whole chain of

 5  recipients?

 6          MS. HANCOCK:  There's -- I think there's only one

 7  endorsement, Your Honor.  And the current investor is Wells

 8  Fargo, as a trustee for a securitized pool.

 9          THE COURT:  Okay.

10          MS. HANCOCK:  The note was with a custodian.  And

11  after my firm got involved in the foreclosure case, we

12  requested the original note and then filed it with the court.

13          THE COURT:  Okay.  Has your firm been sanctioned by

14  any court in any other matter in which you represent any of the

15  debtors?

16          MS. HANCOCK:  No, Your Honor.

17          THE COURT:  All right.  Thank you very much.

18          Mr. Marinuzzi?

19          MR. MARINUZZI:  Your Honor, unless the Court has

20  questions of me, we would just ask that the objections be

21  overruled and the application granted.  We'll circulate a

22  revised order to the United States Trustee reflecting the fact

23  that they've withdrawn from their representation of Ally.

24          THE COURT:  All right.  I'm going to take the matter

25  under submission.  I expect to rule in a matter of days.

1        MR. MARINUZZI:  Fine.

2        THE COURT:  Okay?

3        MR. MARINUZZI:  Thank you, Your Honor.

4        THE COURT:  Anything else for today, Mr. Marinuzzi?

5        MR. MARINUZZI:  Yes, Your Honor, there is one --

6        THE COURT:  Mr. Hopper, after I rule, I don't hear any

7    further argument.

8        MR. HOPPER:  I just want to clarify one thing.

9        THE COURT:  Go ahead, Mr. Hopper.  Come on up.  You

10   have to -- we have to have a clear record.  I haven't ruled.

11   But I'm taking it under submission.  But I -- I always try to

12   make sure I've given everybody an opportunity to say everything

13   they say.  But when I say I'm taking it under submission,

14   that's usually the last word.

15       MR. HOPPER:  I'm sorry --

16       THE COURT:  Go ahead, Mr. Hopper.

17       MR. HOPPER:  -- I'm sorry, Your Honor.

18       THE COURT:  Go ahead.

19       MR. HOPPER:  I just want to clarify something, with

20   who has the transferring rights.  In my bankruptcy court

21   hearing, relief of stay was granted to GMAC the servicer for a

22   trust SEQMT 2004A.  If you look at the MERS site, it shows that

23   the investor in this site is Redwood Trust.  Redwood Trust has

24   never been involved in that.  If you look at what they reported

25   to regulators, it's Wells Fargo.  Wells Fargo is the administer

1  (sic).  If you look at the plan and you look at Wells Fargo and

2  you look at their site, you'll see my notes sits in SEQMT,

3  sitting in there.  HSBC is the trustee of the particular action

4  that we're talking about, not Wells Fargo.  It's HSBC.

5          BABC represents HSBC, Wells Fargo, MERS and now

6  they're asking to represent the debtor in my action.  That's

7  all, Your Honor.

8          THE COURT:  Mr. Marinuzzi, let me just ask you this.

9  GMAC initiated a state court action in Florida seeking to

10  regain possession of the property, correct?

11          MR. MARINUZZI:  Based on what I've heard, yes, Your

12  Honor.

13          THE COURT:  Okay.  And the supplemental servicing

14  order that was entered earlier in the case permits Mr. Hopper

15  to assert defenses to foreclosure, correct?

16          MR. MARINUZZI:  My recollection is it does, Your

17  Honor.

18          THE COURT:  All right.  So Mr. Hopper, whatever you're

19  raising here today, if it establishes a defense to foreclosure,

20  that's for the Florida court to decide, not for me to decide.

21  The only -- and I appreciate your arguments and the situation

22  you're in.  But I'm taking the matter under submission.  That's

23  the last word on it.  Okay?

24          MR. HOPPER:  Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Hopper.

1              Mr. Marinuzzi?

2              MR. MARINUZZI:  Thank you, Your Honor.  That brings us

3    to the last item on the agenda, which is the debtors'

4    application to retain Deloitte as independent auditors and

5    attest service providers.

6              THE COURT:  Yes.

7              MR. MARINUZZI:  Your Honor, there were no objections

8    to this motion.  We have modified the order to address some

9    concerns from the U.S. Trustee.  If I may approach?

10             THE COURT:  Certainly.

11             MR. MARINUZZI:  Your Honor, just briefly.  Deloitte is

12   being retained to audit financial statements for ResCap, GMAC

13   Mortgage and Residential Funding for year-end -- for the year

14   ended 12/31/2012.  And they're also being retained to monitor

15   compliance with servicing standards as of December 31st, 2012

16   and for the year 2012; compliance with Regulation AB and

17   compliance with HUD programs.  They're being compensated for

18   their financial statement audits on an hourly basis.  And for

19   their servicing compliance, it's a fixed fee of 1.465 million

20   dollars.

21             The revisions to the order, Your Honor, are intended

22   to clarify the compensation structure, which I thought was set

23   forth in the actual application, but there might have been some

24   disagreement as to precisely where it was set forth, but it is

25   set forth in the supplemental declaration.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1          The order also includes the language requested by the

2    United States Trustee about the filing of fee applications so

3    that parties can review the fees that have been charged to the

4    estate.  And Your Honor, another theme here about

5    subcontractors that Deloitte, to the extent they're using

6    subcontractors, they can't use nonaffiliated entities as

7    subcontractors.

8          THE COURT:  Okay.  Mr. Masumoto?

9          MR. MASUMOTO:  Your Honor, based upon the revisions,

10   we have no further objection.

11         THE COURT:  Thank you.  Mr. Mannal?

12         MR. MANNAL:  We have no objections.

13         THE COURT:  All right.  The application is granted.

14         MR. MARINUZZI:  Thank you, Your Honor.  We'll submit

15   an order.

16         THE COURT:  Yes.  Is that it for today?

17         MR. MARINUZZI:  That is all for today, Your Honor.

18   Thank you very much.

19         THE COURT:  All right.  Thank you very much.  We're

20   adjourned.

21      (Whereupon these proceedings were concluded at 12:13 PM)

22

23

24

25

1

2                              I N D E X

3

4                                RULINGS

5                                                  Page       Line

6    KERP portion of KEIP/KERP motion is approved.  8          14

7    Form of order to be prepared.

8    Creditors' Committee's application to retain   12         19

9    AlixPartners is approved.

10   Debtors' application to retain KPMG is         24         11

11   approved, subject to disclosure of client to

12   committee counsel.

13   Debtors' application to retain Deloitte        55         13

14   is approved.

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

_____

11

PENINA WOLICKI

12

AAERT Certified Electronic Transcriber CET**D-569

13

14

eScribers

15

700 West 192nd Street, Suite #607

16

New York, NY 10040

17

18

Date:  August 10, 2012

19

20

21

22

23

24

25