**Hearing Date:  September 11, 2012, 10:00 a.m.**
**Objection Date:  August 24, 2012, 4:00 p.m.**

John G. Moon
Claire L. Huene
MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500

*Attorneys for Triaxx Prime CDO 2006-1, LLC,*
*Triaxx Prime CDO 2006-2, LLC and*
*Triaxx Prime CDO 2007-1, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Chapter 11 |
| Debtors. | |

### NOTICE OF MOTION OF THE TRIAXX ENTITIES FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE ISSUANCE OF SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS AND <u>THE PROVISION OF TESTIMONY BY SETTLING CERTIFICATEHOLDERS</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On August 14, 2012, Triaxx Prime CDO 2006-1, LLC, Triaxx

Prime CDO 2006-2, LLC and Triaxx Prime CDO 2007-1, LLC (collectively, "**<u>Triaxx</u>**")**,**

by and through its undersigned counsel, filed concurrently herewith the Motion of the

Triaxx Entities for Entry of An Order Pursuant To Bankruptcy Rule 2004 Authorizing

The Issuance of Subpoenas for The Production of Documents and The Provision of

Testimony By Settling Certificateholders. ("**<u>Rule 2004 Motion</u>**").

2.       A hearing (the "**<u>Hearing</u>**") to consider the Rule 2004 Motion shall

be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room

501 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One

Bowling Green, New York, New York 10004, or such other courtroom as may be announced on the date of the hearing, on September 11, 2012 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as counsel and the parties may be heard.

3.    Any objections to the Rule 2004 Motion must be made in writing, filed with the Court (with a copy to Chambers) in accordance with the Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 and Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management and Administrative Procedures entered by this Court on May 23, 2012 [Docket No. 141] (the "**Case Management Order**"), and served on the Special Service List, as the term is defined in the Case Management Order, so as to be received no later than August 24, 2012 at 4:00 p.m. (prevailing Eastern Time) (the "**Objection Deadline**").

4.    If no objections are timely filed and served with respect to the Rule 2004 Motion or any claim set forth therein, Triaxx may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Rule 2004 Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

5.    A copy of the Rule 2004 Motion can be obtained or viewed for a fee via PACER at www.pacer.gov or (without charge) on the Debtors' restructuring website at www.kccllc.net/rescap.

Dated:  August 14, 2012

MILLER & WRUBEL P.C.

By:  /s/ John G. Moon
      John G. Moon
      Claire L. Huene
      570 Lexington Avenue
      New York, New York 10022
      212-336-3500

      *Attorneys for Triaxx Prime CDO*
      *2006-1, LLC, Triaxx Prime CDO*
      *2006-2, LLC and Triaxx Prime*
      *CDO 2007-1, LLC*

**Hearing Date:  September 11, 2012, 10:00 a.m.
Objection Date:  August 24, 2012, 4:00 p.m.**

John G. Moon
Claire L. Huene
MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500

*Attorneys for Triaxx Prime CDO 2006-1, LLC,
Triaxx Prime CDO 2006-2, LLC and
Triaxx Prime CDO 2007-1, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Chapter 11 |
| Debtors. | |

**MOTION OF THE TRIAXX ENTITIES FOR ENTRY OF AN ORDER
PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE ISSUANCE
OF SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS AND THE
PROVISION OF TESTIMONY BY SETTLING CERTIFICATEHOLDERS**

1.      Debtors seek approval of two settlement agreements (collectively,

the "**Proposed RMBS Settlement**") concerning 392 trusts (the "**Trusts**") that issued

residential mortgage-backed securities ("**RMBS**" or "**Certificates**").  *See* Debtors'

Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement

Agreements (the "**9019 Motion**") [Docket No. 320].  The Proposed RMBS Settlement is

between the Debtors and certain institutional investors that hold Certificates (the

"**Settling Certificateholders**").

2.      Triaxx Prime CDO 2006-1, LLC, Triaxx Prime CDO 2006-2,

LLC, and Triaxx Prime CDO 2007-1, LLC (collectively "**Triaxx**") filed an objection to

the 9019 Motion (the "**Objection**") [Docket No. 481].  Triaxx hereby seeks an order

authorizing the issuance of a narrowly tailored subpoena (the "**Subpoena**") to each

Settling Certficateholder, seeking documents sufficient to show the date(s) and price(s) of

the Settling Certificateholders' purchases, to determine whether they are distressed debt

investors.

3.      As explained herein, the discovery Triaxx seeks from the Settling

Certificateholders pursuant to the Subpoena is relevant, *inter alia*, to whether the

Proposed Settlement is a "fair and equitable resolution of the R&W Claims" (9019

Motion, 6), whether it "prevent[s] a windfall" to the Settling Certificateholders (*id.* at 11),

and whether it was the product of "arm's-length and exhaustive" negotiations (*id.* at 10).

4.      The Subpoena is not duplicative of either the investigation

undertaken by the examiner (the "**Examiner**"), or the subpoenas previously served by the

Official Committee of Unsecured Creditors (the "**Official Committee**") pursuant to the

Court's order dated June 5, 2012 [Docket No. 217],[1] both of which are focused on the

Debtors.

5.      A copy of the proposed Subpoena and a proposed Order are

appended hereto.

**Preliminary Statement**

6.      The Trusts have potential claims against the Debtors for: (a)

breaches of the Debtors' representations and warranties regarding the residential

mortgage loans ("**Loans**") sold to the Trusts ("**R&W Claims**"), and (b) faulty servicing

of the Loans ("**Servicing Claims**") (collectively, the "**RMBS Claims**").  The Trusts

---

[1] In an effort to avoid bringing a duplicative Rule 2004 motion, Triaxx has attempted to contact counsel for the Debtors and the Official Committee to seek access to the documents made available pursuant to the Official Committee's subpoenas.  To date, such counsel have not responded.  Triaxx reserves the right to bring a Rule 2004 motion seeks documents and an examination of the Debtors and others concerning the Proposed RMBS Settlement.

could also assert RMBS Claims against the Debtors' non-debtor affiliates including Ally

Financial Inc. f/k/a GMAC Inc. (collectively, all non-Debtors affiliates, "**AFI**"),

including pursuant to alter-ego or veil-piercing theories of liability.  The Debtors

themselves could also assert claims against AFI with respect to RMBS Claims, including

contribution, indemnification or similar claims, including pursuant to alter-ego or veil-

piercing theories.

        7.     AFI seeks to shed potential liability with respect to the RMBS

Claims by means of the Debtors' bankruptcy.  To accomplish this, AFI, the Debtors, and

the Settling Certificateholders negotiated the Proposed Settlement and two related

agreements: (a) the Plan Support Agreement between the Debtors and the Settling

Certificateholders (the "**RMBS PSA**"); and (b) the Settlement and Plan Support

Agreement between the Debtors and AFI (the "**AFI Settlement and PSA**").  The

cumulative effect of these agreements, if their goals were accomplished, would be to

relieve AFI of all liability, whether to the Debtors or the Trusts, with respect to RMBS

Claims by means of broad third-party releases ("**Third-Party Releases**") to be included

in the plan.  In exchange, AFI would contribute $750 million to the Debtors, and the

Debtors would provide the Trusts with an allowed claim (the "**Allowed Claim**") of up to

$8.7 billion.

        8.     The Allowed Claim is supposed to be a settlement of potentially

valid RMBS Claims.  However, the Allowed Claim would be allocated (the "**Allocation**

**Formula**") among the Trusts based only on actual and estimated future losses ("**Losses**").

*See* Proposed Settlement [Docket No. 320-2, Exhibit B; 320-4, Exhibit B].  Trusts with

greater Losses would receive a greater share of the Allowed Claim.  Thus, the Allocation

Formula is based on the assumption that each Trust is the same, and each Trust has equally valid RMBS Claims for its Losses.

9.      To the contrary, the Trusts are not all the same.  They hold different types of Loans, with different risks, and the Debtors made different representations and warranties to the Trusts depending on the type of Loans were involved.  *See* Affidavit of Thomas Priore ("**Priore Aff.**"), sworn to August 14, 2012, at ¶¶ 8-14 (describing types of Loans and Trusts); 9019 Motion, 7 (the Debtors' "representations and warranties vary" depending on the type of Loans involved).

10.     The Debtors argue that the Settling Certificateholders' support demonstrates the fairness and reasonableness of the Proposed Settlement.  (9019 Motion, 27-28.)  The Proposed Settlement and the related agreements repeatedly recite that they were the product of "arm's-length" negotiations.  (*See, e.g., id*. at 10, 17, 20).

11.     However, the Certificates have long traded at distressed prices. The Settling Certificateholders have accumulated a large amount of Certificates, but have not disclosed when or at what prices they accumulated such holdings or whether they did so at distressed rates.  As demonstrated herein, their holdings are particularly concentrated in Certificates issued by Trusts with the greatest Losses, and which will receive a greater share of the Allowed Claim.

12.     The Debtors also seek to justify the Proposed Settlement on the grounds that it would be too difficult, costly and time-consuming to allocate the Allowed Claim differently.  (*Id*. at 20-24.)  Debtors assert that it would take a "Herculean" effort to litigate RMBS Claims or to conduct manual re-underwriting on a loan-by-loan basis to

determine the strength of each Trusts' RMBS Claims. (*Id.* at 21.) Thus, according to the Debtors, it is expedient to treat each of the Trusts as the same.

13.    However, in the seven weeks since Triaxx filed its Objection, Triaxx has completed a forensic analysis of the Trusts whose Certificates it holds, to the level of individual Loans backing up the Certificates. This analysis has identified Loans with likely breaches with a high degree of reliability. As demonstrated herein, Triaxx's analysis required neither a "Herculean" effort nor manual re-underwriting. Moreover, some of the differences between the Trusts, such as the strength of the different representations and warranties made by the Debtors, could have been taken into account in the Allocation Formula without any loan analysis at all.

14.    In short, both the Allocation Formula and the failure of the parties to the Proposed RMBS Settlement to analyze – on any level – the strength of different Trusts' RMBS Claims appear designed to favor the Settling Certificateholders.

15.    By means of the proposed Subpoena, Triaxx seeks discovery of the Settling Certificateholders concerning the date(s) on which they accumulated the Certificates they currently hold, and the price(s) they paid for such Certificates. Then, Triaxx can utilize its considerable experience analyzing RMBS to assess the extent to which the Settling Certificateholders would receive a windfall from the Proposed Settlement and whether the Proposed Settlement is equitable as to Certificateholders, including those such as Triaxx, that invested in the safer Trusts and are not distressed debt investors.

## Procedural Background

16.     Debtors filed voluntary petitions under Chapter 11 on May 14, 2012.  The Proposed Settlement, the RMBS PSA, and the AFI Settlement and PSA had been negotiated prior to filing.

17.     On June 5, 2012, the Court granted the Official Committee's Rule 2004 motion [Docket No. 217].  The Official Committee's subpoenas seek broad discovery relating to the Proposed RMBS Settlement, the RMBS PSA and the AFI Settlement and PSA, and were directed to certain Debtor and AFI entities and individuals.  (*Id.*)  The Official Committee's subpoenas were not directed to the Settling Certificateholders.

18.     On June 21, 2012, Triaxx filed its Objection [Docket No. 481].  Triaxx objects to the Proposed RMBS Settlement on the grounds, *inter alia*, that by basing the Allowed Claim on Losses, the Allocation Formula inequitably favors the Settling Certificateholders over more prudent investors such as Triaxx.[2]

19.     On July 27, 2012, the Court entered an Order setting forth the scope of the Examiner's authority [Docket No. 925].  The Examiner is to include in his report "the negotiation and entry into any plan sponsor, plan support, or settlement agreement."  However, the Order does not provide that the Examiner will report on the Settling Certificateholders' holdings or whether they are distressed debt investors.

20.     On August 6, 2012, the Examiner, through counsel, filed his work plan [Docket No. 1010].  The work plan states that the Examiner intends to take a staged approach, first seeking the cooperation of Debtors, AFI and entities and persons

---

[2] The deadline for objections to the 9019 Motion was adjourned.  Triaxx reserves the right to file an amended objection on or before the objection deadline.

associated with them.  (*Id.* at ¶ 18.)  The workplan does not state that the Examiner

intends to seek information from the Settling Certificateholders.

**Facts**

**A.    Triaxx**

21.    Before collapse of the real estate market, there was a proliferation

of RMBS backed by risky subprime, scratch and dent, second lien or adjustable-rate

mortgage loans, including negative-amortizing, pay-option adjustable-rate mortgage

loans ("**POAs**").  (*See* Priore Aff., ¶ 2.)

22.    The Triaxx entities invested in various RMBS, including

Certificates issued by the Trusts, and issued bonds to their investors ("**Triaxx Bonds**").

However, Triaxx carefully selected the RMBS it chose to purchase, and did not invest in

risky RMBS.  Instead, Triaxx invested only in super-senior classes of RMBS backed by

prime, first-lien, 30-year fixed-rate mortgages.  (*Id.* at ¶ 3.)

23.    As a result, Triaxx Bonds have performed throughout the financial

crisis.  (*Id.* at ¶ 4.)  To date, Triaxx has never missed a scheduled payment to its

bondholders.  (*Id.*)  Each month, Triaxx's investors are being retired at par.  (*Id.*)

Indeed, as a result of the financial crisis, the Federal Reserve ended up holding Triaxx

Bonds in one of the funds created as a vehicle for the bailout of AIG, Maiden Lane III.

In May 2012, the Federal Reserve sold the Triaxx Bonds to Merrill Lynch, Pierce, Fenner

& Smith for a substantial profit after receiving multiple competitive bids.  (*Id.*)

24.    Triaxx holds 24 classes of Certificates issued by 20 of the Trusts

(the "**Triaxx-Held Trusts**").  (*Id.* at ¶ 5.)   In 23 of the 24 classes, Triaxx's holdings

constitute greater than 25% of such class.  (*Id.*)  Triaxx's certificates had an aggregate

original issue balance ("**OIB**") of approximately $1.6 billion.  As of June 30, 2012,

Triaxx's Certificates had a total current notional balance of $629 million. Triaxx

purchased all of its Certificates prior to August 2008, and purchased most of its

Certificates at issuance.

   25. The Triaxx-Held Trusts originally held 44,292 Loans with a total

original outstanding balance of approximately $12.8 billion. (*Id.* at ¶ 6.) As of June 30,

2012, these Trusts hold approximately 20,000 Loans. The Triaxx-Held Trusts have

realized approximately $1 billion in Losses from liquidated Loans, hold in excess of

another $1.2 billion in delinquent Loans that have yet to be liquidated, and hold

approximately $5.3 billion in performing Loans. (*Id.*)

**B.** **Differences Among the Trusts**

   26. Although the Trusts share the same general structure, the Trusts

are not the same, and neither are their RMBS Claims. (*Id.* at ¶ 7.) The Debtors sold

different types of Loans to different Trusts. *See* 9019 Motion, at 25 (there are "many

loan types involved" in the Trusts).

   27. The different types of Loans present different inherent risks.

(Priore Aff., ¶ 9.) "Credit risk," the risk that a borrower will default on a Loan, is greater

with subprime borrowers than prime borrowers, irrespective of representation and

warranty breaches. (*Id.*) Credit risk is also greater with adjustable-rate mortgages,

particularly POAs, which create "payment shock" credit risk: the risk that the borrower

will be unable to make payments when the interest rate increases. (*Id.*)

   28. Different Loans also present different inherent "security risk," the

risk that the collateral for the Loan (the borrower's property) will be inadequate to repay

the Loan in full if the borrower defaults. (*Id.* at ¶ 10.) There is far greater security risk

with second liens and POAs (due to possible negative amortization) than with first lien,

fixed-rate loans.  (*Id.*)  There is also greater security risk with subprime Loans, which often have a greater loan-to-value ratio ("**LTV**") than prime Loans.  A greater LTV means that the borrower has less equity in the property.

29.    The Debtors' "representations and warranties vary" depending on the type of Loans involved.  9019 Motion, 7.  The Debtors made stronger representations and warranties to the Trusts, including the Triaxx-Held Trusts, that purchased the least risky Loans, namely the first-lien, 30-year, prime fixed-rate and prime Alt-A fixed-rate Loans.  (*Id.*)

30.    Moreover, even with respect to particular representations and warranties that may be similar across all Trusts, such as that the Loans were underwritten according to particular underwriting guidelines, different types of Loans involve "different evolving underwriting guidelines, different diligence standards, and different quality audit practices."  9019 Motion, 25.  Stricter underwriting guidelines were applied to higher quality Loans.  (Priore Aff., ¶ 14.)

31.    For all these reasons, the fact that the riskier subprime, scratch and dent, Alt-A POA,[3] and second lien Trusts have incurred greater Losses than the safer prime and prime Alt-A, fixed-rate Trusts, (*id.* at ¶¶ 9-14 & Exhibit 15), does not justify the assumption that Losses in these Trusts give rise to valid RMBS Claims.  The riskier Trusts would be expected to have greater Losses, given the heightened risk profile of the Loans they own.  (*Id.* at ¶¶ 32-35.)

---

[3] "Alt-A" refers to the use of "alternative" documentation (something other than W-2 forms) to document borrower income.

32.    Moreover, the Certificates issued by riskier Trusts generally receive a greater rate of return, to reflect the expected greater risk of Losses due to factors *other than* valid RMBS Claims.

### C.    Triaxx's Forensic Analysis of the Loans Held by the Triaxx-Held Trusts

33.    Triaxx has undertaken a detailed analysis of each of the approximately 20,000 Loans currently held by the Triaxx-Held Trusts.  (*Id.* at ¶ 15.) Triaxx's analysis did not require the Debtors to produce loan files, nor did it require manual re-underwriting of the Loans.  (*Id.* at ¶ 15.)  Rather, the analysis cross-referenced voluminous public and proprietary data pools to identify likely breaches.

34.    Triaxx's forensic analysis found that the Triaxx-Held Trusts have likely RMBS Claims with respect to appraised value / LTV, owner occupancy, early payment defaults and documentation.

### 1.    Appraisal / LTV Breaches

35.    Certain of the Debtors represented and warranted that the appraised value of each Loan, as of the date of origination, was accurate.  (*Id.* at ¶ 17.) The appraised value determines the LTV for the Loan, and it is an important measure of both credit risk and security risk.  (*Id.*)

36.    Triaxx's analysis indicates that the true market value at origination of many of the properties that secured the Loans in the Triaxx-Held Trusts was materially lower than the Debtors had represented.  (*Id.* at ¶ 18.)

37.    Triaxx has identified likely RMBS Claims for breaches of appraisal/LTV representations and warranties made by the Debtors to the Triaxx-Held Trusts amounting to $ 1.29 billion.  (*Id.* at ¶ 20.)

## 2. **Owner Occupancy Breaches**

38.     Another standard representation and warranty is that the borrower actually resides at the subject property.  (*Id.* at ¶ 21.)   This is important, because borrowers purchasing a second home or an investment property (in order to try to "flip" the property or use it as a rental property) are more likely to default than they would if the property secured by the mortgage was their primary residence.  (*Id.*)

39.     Owner occupancy testing can also be accomplished without re-underwriting or loan file production.  (*Id.* at ¶ 22.)

40.     Triaxx has identified likely RMBS Claims for breaches of owner occupancy representations and warranties made by the Debtors to the Triaxx-Held Trusts amounting to $ 352 million.  (*Id.* at ¶ 24.)

## 3. **Early Payment Defaults**

41.     In prime and Alt-A prime Trusts, some R&W Claims can be established beyond any reasonable dispute with little to no analysis.  If a Loan was delinquent when it was sold to a prime or Alt-A prime Trust, or if the borrower defaulted very quickly after being sold to such a Trust, it is highly likely that the Loan breaches representations and warranties, requiring repurchase.  (*Id.* at ¶ 25.)

42.     Notably, this is generally *not* true of the riskier subprime or scratch and dent Trusts, which could include Loans that had already been delinquent at some time prior to being sold to the Trust, or that were actually delinquent at the time they were sold to the Trust.  (*Id.* at ¶ 26.)

43.     Triaxx has identified likely RMBS Claims relating to early defaults in the aggregate amount of more than $ 97 million.  (*Id.* at ¶ 28.)

4.     **Documentation / Servicing Issues**

44.     Another indicator of representation and warranty breach with respect to a Loan is extended delinquencies and unsuccessful foreclosures.  (*Id.* at ¶ 29.) If a Loan has been delinquent or in foreclosure for a long time – in some cases, years – it is a sign that the Loan documentation was incomplete or faulty, such that the servicer cannot foreclose.  (*Id.*)

45.     Documentation failures that prevent the servicer from foreclosing on the property that was supposed to secure the Loan require automatic repurchase.   This situation violates multiple representations and warranties.  (*Id.* at ¶ 30.)

46.     Triaxx has identified likely RMBS Claims relating to documentation failures in the aggregate amount of more than $ 432 million.  (*Id.* at ¶ 32.)

D.     **Triaxx's Preliminary Analysis of the Settling Certificateholders' Positions**

47.     As of May 2012, the larger of the two Groups of Settling Certificateholders, the "Steering Committee Group" holds Certificates with a total notional value of approximately $30 billion.  9019 Motion, 2.[4]

48.     *Less than half* of the Steering Committee Group's holdings are in prime or Alt-A prime Trusts.  The majority of their holdings are in the more risky adjustable rate (including POA), subprime, second lien and scratch and dent trusts. (Priore Aff., ¶ 34 & Ex. 15.)

49.     These types of riskier Trusts have much greater Losses than the prime and Alt-A prime Trusts, such as the Triaxx-Held Trusts.  (*Id.* at ¶ 35.)  Pursuant to

---

[4] The Debtors prefer to describe the Settling Certificateholders' holdings in term of the total OIB of the Certificates issued by the Trusts in which they hold 25% of at least one class of Certificates.  9019 Motion at 5 (the Settling Certificateholders own 25% of at least one class of Certificate in *Trusts* that issued Certificates with an OIB of "$182.8 billion").

the Allocation Formula, they will receive the greatest share of the Allowed Claim, without regard to whether such Losses reflect valid RMBS Claims.  Thus, the Allocation Formula is at odds with the alleged purpose of the Allowed Claim: to settle valid RMBS Claims.  9019 Motion, 2-3, 6.

50.     Certificates issued by the Trusts, particularly the riskier Trusts, have long traded at distressed rates.  The Settling Certificateholders have not disclosed when they accumulated these holdings, nor at what prices.  It is therefore entirely possible that they negotiated the Allocation Formula to obtain a windfall.

## LEGAL ANALYSIS

51.     Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." A party in interest may seek documents concerning "acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."  Rule 2004(b).

52.     "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Almatis*, No. 10-12308, 2010 WL 4877868, at *3 (Bankr. S.D.N.Y. Nov. 24, 2010) (Glenn, J.). The scope of a Rule 2004 examination is broader than that of discovery under the Federal Rules of Civil Procedure. *In re Ecam Publications, Inc.,* 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991).

53.     Triaxx's proposed discovery under Rule 2004 is narrowly tailored, *see In re Texaco*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987) ("[T]he examination should not be so broad as to be more disruptive and costly to the [producing party] than

beneficial to the [requesting party].”).  Triaxx does not seek discovery as to the Settling

Certificateholders' trading history with respect to Certificates.  In addition, to the extent

the Settling Certificateholders claim to be authorized to represent, in connection with the

Proposed RMBS Settlement, certain clients or customers (“**Authorizing Customers**”) on

whose behalf they purchased or hold Certificates, Triaxx does not seek identification of

such Authorizing Customers.[5]  Instead, Triaxx seeks only the following information as to

the Certificates the Settling Certificateholders currently hold, whether in their own names

or on behalf of Authorizing Cutomers, as per CUSIP number, including tranche

references: (a) the date(s) on which such Certificates were purchased by the Settling

Certificateholders or their Authorizing Customers, and (b) the price(s) paid.

   54. The discovery sought by the Subpoena is not duplicative of the

examination to be undertaken by the Examiner, nor of the subpoenas previously served

by the Official Committee.  Neither the Examiner nor the Official Committee is seeking

information of the Settling Certificateholders about their interests, including, *inter alia*,

whether they are distressed debt investors and would receive a windfall from the

Proposed RMBS Settlement.

   55. As demonstrated herein, it is possible that the Proposed RMBS

Settlement is the product of, if not collusion, then a natural alignment of interests

between AFI and the Settling Certificateholders to the detriment of prudent RMBS

investors such as Triaxx.  AFI had an interest in minimizing the amount it would have to

contribute to a settlement in order to obtain releases of RMBS Claims.  The Settling

Certificateholders, who demonstrably invested in risky trusts and may also be distressed-

---

[5] Triaxx reserves the right to seek identification of Authorizing Customers, but does not seek such
identification at this time.

debt investors, may have been willing to accept a lower settlement, in exchange for the inequitable Allocation Formula.

56.     The risk of such an alignment of interests is apparent on the face of the Proposed Settlement and the Allocation Formula.  In addition, the Debtors' argument that it would be too difficult or time-consuming to take into account differences among the Trusts also suggests an alignment of interests between the Debtors and the Settling Certificateholders.  As Triaxx's analysis demonstrates, Loan-level analysis is not the "Herculean" task claimed by the Debtors.  9019 Motion, 21.  Triaxx was able to conduct a robust and granular analysis of each Loan in the Triaxx Held-Trusts, without manual loan file re-underwriting, and identify clear inconsistencies with Underwriting and Servicing Guidelines and the resultant damages with a high degree of specificity.  Thus, while settlement necessarily requires estimates of liability rather than "precise" determinations, there is no reason to treat the Trusts as fungible, except that doing so benefits holders of Certificates in the riskier Trusts, such as the Settling Certificateholders.

## **<u>CONCLUSION</u>**

57.     For these reasons, the Court should grant the attached Order.

Dated:  August 14, 2012

MILLER & WRUBEL P.C.

By:  /s/ John G. Moon
     John G. Moon
     Claire L. Huene
     570 Lexington Avenue
     New York, New York 10022
     212-336-3500

     *Attorneys for Triaxx Prime CDO
     2006-1, LLC, Triaxx Prime CDO
     2006-2, LLC and Triaxx Prime
     CDO 2007-1, LLC*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Chapter 11 |
| Debtors. | |

### ORDER AUTHORIZING THE TRIAXX ENTITIES TO ISSUE SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS AND THE PROVISION OF TESTIMONY BY <u>SETTLING CERTIFICATEHOLDERS</u>

Upon consideration of the motion (the **"Rule 2004 Motion"),** dated August 14, 2012, of Triaxx Prime CDO 2006-1, LLC, Triaxx Prime CDO 2006-2, LLC, and Triaxx Prime CDO 2007-1, LLC (collectively "<u>**Triaxx**</u>") of the institutional investors that entered into the Proposed RMBS Settlement with the Debtors (the "**Settling Certificateholders**"**),** for entry of an order, pursuant to 11 U.S.C. §§ 105(a) and 1103(c), Rules 2004, 9006(c)(1), and 9013 of the Federal Rules of Bankruptcy Procedure (the "**Rules**"**),** and Rule 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"**),** authorizing Triaxx to issue subpoenas compelling the production of documents and the provision of testimony by the Settling Certificateholders; that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; that the Rule 2004 Motion and the relief requested therein are a core proceeding pursuant to 28 U.S.C. § 57(b); that the relief requested in the Rule 2004 Motion is in the best interests of the Debtors and their respective estates, creditors, and other parties-in-interest; that proper notice has been given under the circumstances and no further notice is necessary; and after due deliberation thereon, and good and sufficient cause appearing therefor, it is hereby:

ORDERED that the Rule 2004 Motion is granted in its entirety and on the terms set forth herein;

ORDERED that pursuant to 11 U.S.C. §§ 105(a) and 1103(c); Rules 2004, 9006(c)(1), 9013; and Local Rule 9006-1(b), Triaxx is authorized to serve subpoenas (the "**Triaxx Subpoenas**") compelling the production of documents and the provision of Testimony on the Settling Certificateholders;

ORDERED that Triaxx shall file with the Court an affidavit or declaration of service for each Triaxx Subpoena it serves;

ORDERED that the subject of a Triaxx Subpoena (a "**Commanded Person**") compelling the production of documents shall produce responsive, non-privileged documents on a rolling basis and in the manner instructed in Exhibit B to the Rule 2004 Motion. Such document productions shall be substantially completed and received by Triaxx no later than twenty-one (21) days after receipt of a Triaxx Subpoena, and fully completed and received by Triaxx no later than thirty (30) days after receipt of a Triaxx Subpoena, unless otherwise agreed to by Triaxx or ordered by the Court;

ORDERED that if a Commanded Person claims that any privilege or protection excuses production of any document or part thereof, the Commanded Person must, consistent with Rule 7026 and Local Civil Rule 26.2 of the United States District Court for the Southern District of New York, expressly make such claim in a writing to Triaxx that provides a general description of the categories of documents being withheld and the basis for doing so, sufficient in detail for Triaxx to determine whether there is an adequate basis for invoking privilege or protection. Such writing shall be served on Triaxx no later than seven (7) days after the Commanded Person is required by this Order to complete their document production;

ORDERED that a Commanded Person compelled by a Triaxx Subpoena to provide testimony shall submit to an oral examination at a deposition no later than twenty-one (21) days

after receiving a Committee Subpoena, unless otherwise agreed to by the Committee or ordered

by the Court;

ORDERED that nothing herein shall limit the rights of a Commanded Person to seek

relief under Rule 9016 or Rule 45 of the Federal Rules of Civil Procedure, except that any

objections to a Triaxx Subpoena must be served on the Committee no later than ten (10) days

after receipt of such subpoena; and any motion to quash or modify a Committee Subpoena must

be filed with the Court and served on the Committee no later than fourteen (14) days after receipt

of such subpoena;

ORDERED that, in addition to the requirements of the immediately preceding paragraph,

in the event of a discovery dispute in this action counsel shall first meet and confer in

an effort to resolve the dispute before engaging in motion practice. If counsel are unable to

resolve the dispute, counsel for any party seeking assistance from the Court shall, before filing

any discovery motion, arrange a telephone call with the Court and all counsel directly involved

in the dispute. The Court will endeavor to resolve the dispute without the filing of motions;

ORDERED that Triaxx may file on an *ex parte* basis additional motions seeking

authority to obtain discovery under Rule 2004 from other entities or individuals; and

ORDERED that this Court shall retain jurisdiction to resolve any disputes arising from or

related to this Order, and to interpret, implement, and enforce the provisions of this Order.

Dated: New York, New York
August __, 2012

_____
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

B254 (Form 254 – Subpoena for Rule 2004 Examination) (12/07)

# UNITED STATES BANKRUPTCY COURT

Southern _____    District of    New York _____

**DRAFT**

In re    *Residential Capital LLC, et al.,*
Debtor

**SUBPOENA FOR RULE 2004 EXAMINATION**

Case No.*    12-12020 (MG)

To:    Counsel to Settling Certificateholders

Chapter    11

| | |
|---|---|
| Kathy D. Patrick | Talcott Franklin |
| Gibbs & Bruns LLP | Talcott Franklin, P.C. |
| 1100 Louisiana, Ste. 5300 | 208 N. Market Street, Ste. 200 |
| Houston, TX 77002 | Dallas, TX 75202 |
| Attorneys for the Steering | Attorneys for the Talcott Franklin |
| Committee Group | Group |

☐   YOU ARE COMMANDED to appear and testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure, at the place, date, and time specified below.  A copy of the court order authorizing the examination is attached.

| PLACE OF TESTIMONY | DATE AND TIME |
|---|---|
| | |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attached

| PLACE | DATE AND TIME |
|---|---|
| Miller & Wrubel P.C. | September [], 2012, 5:00 EST |
| 570 Lexington Avenue, New York, NY 110022 | |

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| /s/ John G. Moon, Esq. | August [], 2012 |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
John G. Moon, Esq., Miller & Wrubel P.C.
570 Lexington Avenue, New York, NY 110022    212-336-3507

* If the bankruptcy case is pending in a district other than the district in which the subpoena is issued, state the district under the case number.

B254 (Form 254 – Subpoena for Rule 2004 Examination) (12/07)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE                                              SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016, Federal Rules of Bankruptcy Procedure:

(c) Protecting a Person Subject to a Subpoena.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) Duties in Responding to a Subpoena.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## Definitions and Instructions

1.      Pursuant to Local Civil Rule 26.3(a) of the United States District Court for the

Southern District of New York (the "Local Civil Rules"), the full text of the definitions and rules

of construction set forth in Local Civil Rule 26.3(c) and (d) are incorporated herein by

reference. In addition, the definitions described herein apply.

1.      "You" and "your" means: (a) each of the Steering Committee Group, including,

but not limited to,  BlackRock Financial Management Inc. and its advisory affiliates; Kore

Advisors, L.P.; Maiden Lane, LLC; Maiden Lane, III LLC; Metropolitan Life Insurance

Company; The TCW Group, Inc. and its subsidiaries; Neuberger Berman Europe Limited;

Pacific Investment Management Company LLC; Goldman Sachs Asset Management, L.P.;

Teachers Insurance and Annuity Association of America; Thrivent Financial for Lutherans; ING

Investment Management LLC; ING Investment Management Co. LLC; AEGON USA

Investment Management LLC; Federal Home Loan Bank of Atlanta; Bayerische Landesbank;

Cascade Investments, LLC; and Western Asset Management Company; and (b) each of the

Talcott Franklin Group, including but not limited to, Vertical Capital, LLC; Union Investment

Luxemborg SA; Thomaston Savings Bank; Summit CU; Royal Park Investments SA/NV; Rocky

Mountain Bank & Trust; Reliance Standard Life Insurance Co.; First Reliance Standard Life

Insurance Co,; Safety National Casualty Corp.; Randolph Bank and Trust; Radian Asset

Assurance Inc.; Pinnacle Bank of South Carolina; Perkins State Bank; Mutual Savings

Association FSA; LL Funds LLC; Peoples Independent Bank; Northwestern Bank N.A.; Lea

County State Bank; Knights of Columbus; Kerndt Brothers Savings Bank; Heartland Bank; HBK

Master Fund L.P.; First National Bank & Trust Co. of Rochelle IL; First National Banking

Company; First National Bank of Wynne; First Federal Bank of FL; First Farmer's State Bank;

First Bank; Farmers and Merchants Trust Company of Chambersburg; Farallon Capital

Management; Ellington Management Group, L.L.C.;  Doubleline Capital LP; DNB National

Bank; CQS ABS Master Fund Limited; CQS Select ABS Master Fund Limited; CQS ABS

Alpha Master Fund Limited; Commonwealth Advisors, Inc.; Citizens Bank & Trust Co.; Cedar

Hill Mortgage Opportunity Master Fund, L.P.; Caterpillar Product Services Corporation;

Caterpillar Life Insurance Co.; Caterpillar Insurance Co. Ltd.; BankWest, Inc.; AnchorBank, fsb;

and Wells River Savings Bank.

2.      The "RMBS Trust Settlement Agreements" means agreements entered into as of

May 13, 2012 between Residential Capital, LLC and its direct and indirect subsidiaries on the

one hand and members of Steering Committee Group and the Talcott Franklin Group on the

other.

3.      "Trust" has the same meaning as in the RMBS Trust Settlement Agreement.

4.      Your written responses to these requests should respond separately to each

numbered demand for production below by: (1) providing a statement that you will comply with

the particular demand; or (2) providing a statement that you lack the ability to comply with the

particular demand; or (3) providing any objection to the particular demand.

5.      If your response to a particular demand is that you will comply with the demand,

you should state in your response whether the production will be allowed in whole or in part, and

you should state that all documents or things in the demanded category that are in your

possession, custody or control, and to which no objection is being made, will be included in the

production.

6.      If your response to a particular demand is a statement that you lack the ability to

comply with that demand, you should affirm in your response that a diligent search and a

2

reasonable inquiry have been made in an effort to comply with that demand.  This statement should also specify whether the inability to comply is because the particular item or category never existed, has been destroyed, has been lost, misplaced, or stolen, or has never been, or is no longer in your possession, custody, or control, in which case the name and address of any person or entity known or believed by you to have possession, custody or control of that document or category of documents should be identified.

7.     If you object to a request for production contained herein, state the basis for your objection with particularity.  If you object to part of a request for production contained herein, specify the part to which you object and the basis for your objection with particularity, and answer the unobjectionable part of the request.

8.     If you consider any Document falling within any of these requests to be privileged from discovery, you are directed to file and serve at the time you answer these requests for production a privilege log of all Documents withheld from production, identifying each Document as follows:  (a) the type of Document; (b) its date; (c) addressor's or author's name, title and address; (d) addressee's name, title and address; (e) the name and address of each other Person to whom a copy of the Document was sent or shown; (f) a description of the Document, including its general nature or character; (g) the number of pages, the number of attachments or appendices, if any; (h) the present custodian of the document; and (i) the basis on which the Document is considered to be privileged from discovery.  Where a requested Document contains allegedly privileged information, you are requested to produce those portions of the Document for which no privilege is claimed and to specifically identify on each such Document where material has been deleted or redacted.

9.     If any document responsive to any of these requests was, but is no longer, in your

3

possession or subject to your custody or control, state whether it is (a) missing or lost, (b) has been destroyed, (c) has been transferred, voluntarily or involuntarily to others, or (d) has been otherwise disposed of, and in each instance explain the circumstances surrounding such disposition thereof and state the date or approximate date thereof.

10.      These requests for production are deemed continuing.  If any information or documents sought by the requests are not learned about, or does not become available until after the requests are answered, or if the answers for any reason should later become incomplete or incorrect, there shall be a continuing duty on your part to supplement or change answers previously submitted.

## Request for Production of Documents and Things

1.      For all securities in any of the Trusts in which you, directly or indirectly, hold any ownership, right or interest, produce documents sufficient to identify: (a) the CUSIP of your securities, sufficient to identify their tranche within the Trust; (b) the name of the Trust; and (c) for all such securities, the date(s) on which you purchased or otherwise acquired an interest in the securities, the amount you currently hold and the price(s) or other consideration you paid.