**Hearing Date: November 5, 2012 at 10:00 a.m. (ET)**
**Objection Deadline:  October 5, 2012 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Jamie A. Levitt

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------
|                                    | ) |                          |
| In re:                             | ) | Case No. 12-12020 (MG)   |
|                                    | ) |                          |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11               |
|                                    | ) |                          |
|                         Debtors.   | ) | Jointly Administered     |
-------------------------------------------------------------

**NOTICE OF HEARING ON DEBTORS' SUPPLEMENTAL MOTION PURSUANT**
**TO FED. R. BANKR. P. 9019 FOR APPROVAL OF RMBS TRUST SETTLEMENT**
**<u>AGREEMENTS</u>**

**PLEASE TAKE NOTICE** that, on August 15, 2012, the above-captioned debtors and

debtors in possession (collectively, the "<u>Debtors</u>") filed *Debtors' Supplemental Motion Pursuant*

*to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* (the "<u>Motion</u>").

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held on the Motion before

the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States Bankruptcy

Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York,

New York 10004 (the "<u>Bankruptcy Court</u>") on **November 5, 2012 at 10:00 a.m. (prevailing**

**Eastern time**), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion and the relief requested therein must be filed with the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004 and served so as to be received by the following parties no later than **4:00 p.m. Eastern time on October 5, 2012**: (a) Residential Capital, LLC, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Tammy Hamzehpour); (b) counsel for the Debtors and Debtors in Possession, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Gary S. Lee, Anthony Princi, Jamie Levitt, and Larren M. Nashelsky); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (d) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attn: US Attorney General, Eric H. Holder, Jr.); (e)  Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attn: Nancy Lord, Esq. and Neal Mann, Esq.); (f) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attn: Joseph N. Cordaro, Esq.) (g) counsel for Official Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel LLP, 1117 Avenue of the Americas, New York, NY 10036 (Attn: Ken Eckstein and Douglas H. Mannal); (h) Citibank N.A., 390 Greenwich Street, 6th Floor, New York, NY 10013 (Attn: Bobbie Theivakurnaran); (i) Fannie Mae, 3900 Wisconsin Avenue NW, Mail Stop 8H-504, Washington, D.C. 20016 (Attn: Vice President, Credit Management, John S. Forlines); (j) counsel for Ally Financial Inc., Kirkland & Ellis, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M. Cieri and Ray C. Schrock) (k) Deutsche Bank Trust Company Americas, 25 DeForest Avenue, Summit, NJ 07901 (Attn: Kevin Vargas); (l) The Bank of New York Mellon, Asset Backed Securities

Group, 101 Barclays Street 4W, New York, NY 10286; (m) U.S. Bank National Association, 50

South 16th Street, Suite 2000, Philadelphia, PA 19102 (Attn: George Rayzis); (n) U.S. Bank

National Association, 60 Livingston Avenue, EP-MN-WS1D, St. Paul, MN 55107 (Attn: Irina

Palchuk); (o) counsel to U.S. Bank National Association, Kelley Drye & Warren LLP, 101 Park

Avenue, New York, NY 10178 (Attn: James S. Carr and Eric R. Wilson); (p) Wells Fargo Bank,

N.A., P.O. Box 98, Columbia, MD 21046 (Attn: Corporate Trust Services, GMACM Home

Equity Notes 2004 Variable Funding Trust); (q) counsel to the administrative agent for the

Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher &

Flom LLP, Four Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman and

Jonathan H. Hofer); (r) Nationstar Mortgage LLC, 350 Highland Drive, Lewisville, TX 75067

(Attn: General Counsel) (s) counsel to Nationstar Mortgage LLC, Sidley Austin LLP, One South

Dearborn, Chicago, IL 60603 (Attn: Larry Nyhan and Jessica CK Boelter); (t) Internal Revenue

Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market

Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); (u) Securities and Exchange

Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY

10281-1022 (Attn: George S. Canellos, Regional Director); (v) Talcott Franklin, P.C., 208 N.

Market Street Suite 200, Dallas, Texas 75202 (Attn: Talcott Franklin), Miller, Johnson, Snell &

Cummiskey, P.L.C., 250 Monroe Avenue NW, Suite 800, P.O. Box 306 Grand Rapids, MI

49501-0306, (Attn: Thomas P. Sarb), and Carter Ledyard & Milburn LLP, 2 Wall Street, New

York, New York 10005 (Attn: James Gadsden); and (x) Gibbs & Bruns LLP, 1100 Louisiana,

Suite 5300, Houston, TX 77002 (Attn: Kathy D. Patrick) and Ropes & Gray LLP, 1211 Avenue

of the Americas, New York, NY 10036-8704 (Attn: D. Ross Martin and Keith H. Wofford);

(y) counsel to the Bank of New York Mellon Trust Company, N.A., Dechert LLP, 1095 Avenue

of the Americas, New York, NY 10036 (Attn:  Glenn E. Siegel); (z) counsel to Deutsche Bank

National Trust Company and Deutsche Bank Trust Company Americas, Morgan, Lewis &

Brockius LLP, 101 Park Avenue, New York, NY 10178 (Attn:  James L. Garrity, Jr.); (aa)

counsel to Wells Fargo Bank, National Association, Alston & Bird LLP, 90 Park Avenue, New

York, NY 10016 (Attn:  Martin G. Bunin); and (bb) counsel to U.S. Bank National Association

or Wells Fargo Bank, N.A., Seward & Kissel LLP, One Battery Park Plaza, New York, NY

10004 (Attn:  Ronald L. Cohen).

**PLEASE TAKE FURTHER NOTICE** that the relief requested in the Motion may be granted without a hearing if no objection is timely filed and served as set forth above and in accordance with the order, dated May 23, 2012, implementing certain notice and case management procedures in these cases [Docket No. 141] (the "Case Management Order").

Dated: August 15, 2012
      New York, New York

               /s/ Gary S. Lee
               Gary S. Lee
               Anthony Princi
               Jamie A. Levitt
               MORRISON & FOERSTER LLP
               1290 Avenue of the Americas
               New York, New York 10104
               Telephone: (212) 468-8000
               Facsimile: (212) 468-7900

               *Counsel for the Debtors and*
               *Debtors in Possession*

ny-1053254

**Hearing Date: November 5, 2012 at 10:00 a.m. (ET)**
**Objection Deadline: October 5, 2012 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468 8000
Facsimile:    (212) 468 7900
Gary S. Lee
Anthony Princi
Jamie A. Levitt

*Counsel for the Debtors*
*and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---------------------------------------------------------------------------

## DEBTORS' SUPPLEMENTAL MOTION PURSUANT TO FED. R. BANKR. P. 9019
## <u>FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 2

JURISDICTION AND VENUE .......................................................................................... 6

BACKGROUND ................................................................................................................... 7

    A.    THE MECHANICS OF THE RMBS TRUST SETTLEMENT .......................... 10

    B.    THE AGREED-UPON ALLOWED CLAIM ...................................................... 14

    C.    PLAN SUPPORT AND THE RESOLUTION OF OBJECTIONS TO THE
            DEBTORS' PROPOSED SALE .......................................................................... 17

    D.    PAYMENT OF LEGAL FEES ........................................................................... 18

RELIEF REQUESTED ...................................................................................................... 19

ANALYSIS .......................................................................................................................... 19

    A.    THE RMBS TRUST SETTLEMENT SATISFIES THE SECOND
            CIRCUIT'S STANDARD UNDER FED. R. BANKR. P. 9019(a) ..................... 19

            i.    THE BALANCE BETWEEN THE LITIGATION'S
                    POSSIBILITY OF SUCCESS AND THE
                    SETTLEMENT'S FUTURE BENEFITS .................................... 21

            ii.    THE LIKELIHOOD OF COMPLEX AND
                    PROTRACTED LITIGATION ................................................... 25

            iii.    THE PARAMOUNT INTERESTS OF CREDITORS ............... 28

            iv.    SUPPORT FOR THE SETTLEMENT BY THE PARTIES
                    IN INTEREST ........................................................................... 29

            v.    THE PROPOSED RMBS TRUST SETTLEMENT
                    SATISFIES THE REMAINING *IRIDIUM* FACTORS ............. 30

    B.    THE RMBS TRUST SETTLEMENT IS FAIR AND REASONABLE TO
            THE INSTITUTIONAL INVESTORS AND OTHER
            CERTIFICATEHOLDERS IN THE TRUSTS .................................................. 31

            i.    THE TRUSTS' RECOVERY UNDER THE RMBS
                    TRUST SETTLEMENT IS WITHIN THE RANGE OF
                    THE DEBTORS' POTENTIAL REPURCHASE
                    LIABILITY ................................................................................ 31

            ii.    THE TRUSTS AND INVESTORS ALSO AVOID THE
                    COSTS AND DELAYS OF LITIGATION ................................. 33

CONCLUSION ................................................................................................................... 33

NOTICE ............................................................................................................................... 34

NO PRIOR REQUEST ...................................................................................................... 35

# TABLE OF AUTHORITES

**Page(s)**

CASES

*Federal Housing Finance Agency, as Conservator for The Federal Home Loan Mortgage
    Corporation v. Ally Financial Inc.*,
    No. 11 Civ. 7010 (S.D.N.Y. Sept. 2, 2011) ....................................................................15 n.42

*Finkelstein v. W. T. Grant Co. (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983).............................................................................................20, 34

*In re Bank of New York Mellon*,
    No. 651786/2011 (Sup. Ct. N.Y. Cnty. June 29, 2011) ........................................4 n.7, 23 n.64

*In re Hibbard Brown & Co.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998) ...............................................................................20, 22

*In re Ionosphere Clubs, Inc.*,
    156 B.R. 414 (S.D.N.Y. 1993).........................................................................................19, 20

*In re Lehman Bros. Holdings Inc.*,
    No. 08-13555 (Bankr. S.D.N.Y. Feb. 22, 2012) ......................................................22, 24 n.65

*In re Purofied Down Prods.*,
    150 B.R. 519 (S.D.N.Y. 1993)..............................................................................................20

*In re Residential Capital*,
    No. 12-12020 (Bankr. S.D.N.Y. May 14, 2012)............................................................7 n.12

*Kame v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)..........................................................................................20 n.54

*Mass. Mutual Life Ins. Co. v. Residential Funding Co.*,
    No. 11-cv-30035-MAP (D. Mass. May 17, 2012)........................................................15 n.43

*MBIA Ins. Corp. v. Residential Funding Co.*,
    No. 603552/2008 (Sup. Ct. N.Y. Cnty. Dec. 4, 2008)................................14 n. 38, 15 n.41, 27

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    No. 602825/08 (Sup. Ct. N.Y. Cnty) ............................................................................28 n.89

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007).................................................................................................21

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994)..............................................................................................10

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)...................................................................................20

*Ogle v. Fid. & Deposit Co. of Md.*,
   586 F.3d 143 (2d Cir. 2009)..........................................................................20 n.54

*Porges v. Gruntal & Co. (In re Porges)*,
   44 F.3d 159 (2d Cir. 1995)............................................................................20 n.54

STATUTES

28 U.S.C. § 157.............................................................................................................7

28 U.S.C. § 1334...........................................................................................................7

28 U.S.C. § 1408...........................................................................................................7

28 U.S.C. § 1409...........................................................................................................7

Fed. R. Bankr. P. 2002.................................................................................................34

Fed. R. Bankr. P. 9019....................................................................................6, 19, 33

EXHIBIT 1 –  Amended Proposed Order

EXHIBIT 2 –  Amended and Restated RMBS Trust Settlement Agreement with the Steering
              Committee Group

EXHIBIT 3 –  Amended and Restated RMBS Trust Settlement Agreement with the Talcott
              Franklin Group

ny-1053254

**TO THE HONORABLE JUDGE GLENN,
UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC ("ResCap") and each of its debtor affiliates (collectively, the "Debtors"), submit this *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* (the "Supplement"), amending and supplementing the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* (ECF Doc. # 320) (the "Initial Motion," and together with the Supplement, the "Motion"), under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  With the Motion, the Debtors seek entry of an order substantially in the form annexed hereto as Exhibit 1 (the "Amended Proposed Order") approving the compromise and settlement of an allowed claim of up to $8.7 billion against certain Debtors, as described below (the "Allowed Claim"), to be offered to and allocated amongst certain securitization trusts in accordance with the terms and conditions of the settlement agreements,[1] attached hereto as Exhibits 2 and 3 (collectively, the "RMBS Trust Settlement").  For the sake of clarity, the Debtors note that this Motion concerns only the RMBS Trust Settlement.  Neither this Motion nor the RMBS Trust Settlement is contingent upon any plan support agreement with any other

---

[1]  The Debtors entered into two identical settlement agreements with two sets of institutional investors that own securities held by the Trusts (as defined below).  The first is a group of institutions represented by Kathy Patrick of Gibbs & Bruns LLP (the "Steering Committee Group").  The other group of investors is represented by Talcott Franklin of Talcott Franklin, P.C. (the "Talcott Franklin Group" and, together with the Steering Committee Group, the "Institutional Investors").  As explained below, these settlements will jointly draw on the same allowed claim against certain Debtors, and, accordingly, this settlement process warrants a single motion for their approval by the Court under the Bankruptcy Code and the Bankruptcy Rules.  The RMBS Trust Settlement Agreements, attached to the Initial Motion as Exhibits 2-5, have been amended and restated through continued negotiation by the Parties.  The Amended and Restated RMBS Trust Settlement Agreements are attached hereto as Exhibit 2 and Exhibit 3 (such agreements, collectively, the "RMBS Trust Settlement Agreements").  To the extent of any inconsistencies between this Motion and the terms of the RMBS Trust Settlement, the RMBS Trust Settlement shall control in all respects.

party or upon the settlement between the Debtors and Ally Financial Inc. ("AFI").

In support of this Motion, the Debtors refer to the affidavit of James Whitlinger, the declaration of Jeffrey Lipps (the "Lipps Declaration"), the declaration of Frank Sillman (the "Sillman Declaration"), and the declaration of William J. Nolan (the "Nolan Declaration"), filed with the Initial Motion, as well as other supporting materials, and respectfully state as follows:[2]

### INTRODUCTION

1.     The RMBS Trust Settlement resolves, in exchange for the Allowed Claim, alleged and potential representation and warranty claims (the "R&W Claims") held by up to 392 securitization trusts (each a "Trust" and, collectively, the "Trusts")[3] in connection with approximately 1.6 million mortgage loans and approximately $221 billion in original issue balance ("OIB") of associated residential mortgage-backed securities ("RMBS"), comprising all of such securities issued by the Debtors' affiliates from 2004 to 2007.[4]  While the exact amount of such claims is the subject of debate, in aggregate the R&W Claims represent tens of billions of dollars in potential claims against the Debtors' estates.[5]  The R&W Claims allegedly arise under Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures,

---

[2]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the RMBS Trust Settlement Agreements.

[3]  In an agreement separate from and not affecting the RMBS Trust Settlement or the Allowed Claim (as defined below), the Debtors have agreed to negotiate in good faith with the Trustees concerning the resolution of claims, if any, held by trusts not covered by the RMBS Trust Settlement.

[4]  The Institutional Investors are a substantial subset of the certificateholders who own the securities held by the Trusts.  The entire group of the certificateholders is referred to herein as the "Investors" or the "Holders."

[5]  For instance, AFI, the Debtors' ultimate parent company and a secured creditor in the Debtors' bankruptcy cases, has also taken reserves in the billions of dollars and, for accounting purposes, made disclosures that these liabilities could be significant.  *See, e.g.*, AFI Form 10-Q, filed April 27, 2012.

Mortgage Loan Purchase Agreements, and other documents governing the Trusts (collectively, the "Governing Agreements").  These Governing Agreements require mortgage Sellers,[6] in certain circumstances, to repurchase securitized Mortgage Loans that materially breach applicable representations and warranties.  While the Debtors dispute the Trusts' claims, the Debtors have repurchased approximately $1.16 billion in loans out of $30.3 billion cumulative losses to date since 2005 to resolve similar contractual representation and warranty claims.  The Debtors dispute the R&W Claims and will vigorously defend future contractual representation and warranty claims brought against them.  However, absent the RMBS Trust Settlement, the Debtors' estates face substantial litigation costs and risks in connection with the R&W Claims and potentially disabling disruption to confirmation of a Chapter 11 plan.

2.      The R&W Claims are the single largest set of disputed claims against the Debtors' estates by a wide margin, and the RMBS Trust Settlement would resolve them without the need for protracted, costly, and all-consuming litigation.  The enormous expense to the Debtors' estates and delays in administering the Debtors' bankruptcy cases that pursuing such litigation would cause are clear.  Prepetition litigation of similar claims by debtor Residential Funding Company, LLC ("RFC"), for example, which involved just five securitizations and only 63,000 home equity lines of credit or closed-end second mortgages issued by RFC in just one year, required RFC to produce 1,000,000 pages of documents along with a terabyte of data and involved 80 days of fact depositions of current or former RFC and other personnel.  In contrast, and dwarfing the scope of this litigation, litigation of the R&W Claims would be based on almost 400 separate securitizations and would involve approximately 1.6 million mortgage loans of varying sizes and loan types securitized over many years.  Resolving the R&W Claims through

---

[6]  In descriptions of the terms of the Governing Agreements, capitalized terms have the meaning ascribed to them in the Governing Agreements.

litigation would drain exponentially more resources of the estate than Debtors' prepetition

litigation of similar claims.  As discussed below, the litigation of the R&W Claims would lead to

objections and additional litigation by the Trusts and Institutional Investors in the bankruptcy

cases, which could undermine the cornerstones of the Debtors' restructuring strategy and

substantially hinder the Debtors' reorganization.

3.       As described at the first-day hearings in these cases, the Debtors and two large

groups of investors, which include some of the world's largest and most sophisticated,[7]

extensively negotiated the terms of the proposed compromise in the period leading up to the

Debtors' May 14, 2012 bankruptcy filing (the "<u>Petition Date</u>").[8]  The Steering Committee Group

---

[7]  Many of the investors in the Steering Committee Group were previously involved in similar negotiations with other major financial institutions that were involved in mortgage origination, and were able to use their collective negotiating position to reach an $8.5 billion settlement with Bank of America, N.A., approval of which is pending in a New York state court.  *See In re Bank of New York Mellon,* No. 651786/2011 (Sup. Ct. N.Y. Cnty. June 29, 2011).

[8]  The investors in the Steering Committee Group consist of AEGON USA Investment Management, LLC, Angelo Gordon, Bayerische Landesbank, BlackRock Financial Management Inc., Cascade Investment, LLC, Federal Home Loan Bank of Atlanta, Goldman Sachs Asset Management, L.P., ING Investment Management Co. LLC, ING Investment Management LLC, Kore Advisors, L.P., Pacific Investment Management Company LLC, Maiden Lane LLC and Maiden Lane III LLC (by the Federal Reserve Bank of New York as managing member), Metropolitan Life Insurance Company, Neuberger Berman Europe Limited, SNB StabFund, The TCW Group, Inc., Teachers Insurance and Annuity Association of America, Thrivent Financial for Lutherans, Western Asset Management Company, and certain of their affiliates, either in their own capacities or as advisors or investment managers.

As of the filing of this motion, the investors in the Talcott Franklin Group consist of: Anchor Bank, fsb, Bankwest, Inc., Blue Heron Funding V, Caterpillar Life Insurance Company, Caterpillar Insurance Co. Ltd., Caterpillar Product Services Corporation, Cedar Hill Mortgage Opportunity Master Fund, L.P., Citizens Bank & Trust Co., Commonwealth Advisors, Inc., CQS ABS Master Fund Limited, CQS Select ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited Citizens Bank and Trust Company, DNB National Bank, Doubleline Capital LP, Ellington Management Group, LLC., Everest Reinsurance (Bermuda) Ltd., Everest International Re, Ltd., Farallon Capital Management, L.L.C., Farmers and Merchants Trust Company of Chambersburg, First National Bank and Trust Company of Rochelle, First National Banking Company, First National Bank of Wynne, First Farmers State Bank, First Bank, First Reliance Standard Life Ins. Co., Gemstone CDO I, Gemstone CDO II, Gemstone CDO V, Gemstone CDO VII, HBK Master Fund L.P., Heartland Bank, Kerndt Brothers Savings Bank, Kleros Preferred

alone represents 25% or more of the Holders of one or more classes of certificates in at least 304

of the 392 Trusts, which Trusts account for approximately 77.5% of the total OIB.  As of the

filing of this Motion, the Talcott Franklin Group represents 25% or more of the Holders of 295

classes of certificates in at least 189 Trusts, which accounts for an additional $17 billion in OIB

and adds 35 additional Trusts to the Institutional Investors' holdings.  The Institutional Investors

currently hold at least 25% of the voting rights (as required by the Governing Agreements) of a

class of the RMBS in not less than 336 of the Trusts, with OIB of approximately $193 billion,

which accounts for approximately 87% of the total OIB, and that they have directed the trustees

of these Trusts[9] to accept the settlement.[10]  The RMBS Trust Settlement is structured to provide

the same settlement opportunity to all Trusts, not just those in which the Institutional Investors

have significant holdings.

4.    Additionally, the RMBS Trust Settlement is an integral component of the

Debtors' efforts to restructure.  The RMBS Trust Settlement allowed the Debtors to defer

---

Funding V plc, Knights of Columbus, LL Funds LLC, Lea County State Bank, Manichaean
Capital, LLC, Mutual Savings Association FSA, Northwestern Bank N.A., Pinnacle Bank of
South Carolina, Peoples Independent Bank, Perkins State Bank, Phoenix Light SF Limited,
Radian Asset Assurance Inc., Randolph Bank and Trust, Reliance Standard Life Ins. Co., Rocky
Mountain Bank & Trust, Royal Park Investments SA/NV, Safety National Casualty Corp., SBLI
USA Mutual Life Insurance Company, Silver Elms CDO II Limited, Silver Elms CDO plc,
South Carolina Medical Malpractice Liability JUA, Summit Credit Union, Thomaston Savings
Bank, Union Investment Luxembourg S.A., United Educators Insurance - Reciprocal Risk
Retention Group, Wells River Savings Bank, Vertical Capital, LLC, and certain of their
affiliates, either in their own capacities or as advisors or investment managers.

Collectively, the Institutional Investors and their clients have aggregate holdings of securities of
greater than 25% of the voting rights in one or more classes of securities issued by not less than
336 of the Trusts covered by the RMBS Trust Settlement.

[9]  The trustees are The Bank of New York Mellon Trust Company, N.A., Deutsche Bank Trust
Company Americas, Deutsche Bank National Trust Company, U.S. Bank National Association
or Wells Fargo Bank, N.A., in each case solely in their respective capacity as trustee or indenture
trustee for a RMBS Trust and not in any other capacity) (collectively, the "Trustees").

[10]  In addition to the holdings of each group, the Institutional Investors add two Trusts with
approximately $1.02 billion OIB when their holdings are aggregated.

additional and allegedly substantial objections to the proposed sale of the Debtors' mortgage origination and servicing platform. For example, the Institutional Investors and the Trustees argue that the Trusts have (i) substantial cure claims in connection with any assumption and assignment of the Debtors' Pooling and Servicing Agreements, which assignment is the foundation of the Debtors' proposed sale and (ii) potential claims for setoff and/or recoupment that could attach to the proceeds of such sale under section 506(a) of the Bankruptcy Code. Because of the RMBS Trust Settlement, these cure claim objections were reserved with up to $600 million to cover any such successful claims as administrative expenses in the event the RMBS Trust Settlement is not approved or fully accepted.[11]   In consideration for accepting the RMBS Trust Settlement, the Trusts will also release their setoff and recoupment claims.  While the Debtors dispute the validity of such claims, if asserted they could be in the range of billions of dollars and could eclipse the proceeds of the sale themselves.

5.      In short, the Debtors believe that the RMBS Trust Settlement represents a fair and equitable resolution of the R&W Claims, is in the best interests of the Debtors' estates and the Trusts, and satisfies the Second Circuit's standard for approval of a compromise under Bankruptcy Rule 9019.  The Debtors respectfully request that the Court authorize the Debtors to enter into, and perform under, the RMBS Trust Settlement.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this Motion is a "core proceeding" arising in the Chapter 11 cases.

---

[11]   *See* the Court's *Revised Joint Omnibus Scheduling Order And Provisions For Other Relief Regarding (i) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of Rmbs Trust Settlement Agreements, and (ii) The RMBS Trustees' Limited Objection to the Sale Motion* (ECF Doc. # 945) (the "Scheduling Order") at 7-8.

7.      Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

8.      The Debtors are a leading residential real estate finance company indirectly

owned by AFI, which is not a Debtor.  The Debtors and their non-debtor affiliates operate the

fifth-largest mortgage servicing business and the tenth-largest mortgage origination business in

the United States.  A more detailed description of the Debtors, including their business

operations, their capital and debt structure, and the events leading to the filing of these

bankruptcy cases, is set forth in the affidavit of James Whitlinger, dated May 14, 2012

("Whitlinger Affidavit").[12]

9.      Prior to the Petition Date, a principal business of the Debtors was the origination,

acquisition, and securitization of residential mortgages.[13]  From 2004 to 2007, the Debtors were

involved in securitizations of residential mortgage-backed securities with OIB of approximately

$221 billion.[14]

10.     To securitize mortgage loans, Debtors RFC or GMAC Mortgage LLC ("GMAC

Mortgage") originated or acquired residential mortgage loans which were then sold to a Trust, in

some cases through one or more Debtors, acting as depositor.[15]  The interests in these Trusts —

as well as the accompanying rights to receive the income generated by the mortgage loans held

therein — are evidenced by the RMBS, which were created and sold to the Investors.[16]

---

[12]  Submitted in *In re Residential Capital,* No. 12-12020 (Bankr. S.D.N.Y. May 14, 2012) (ECF Doc. # 6).

[13]  *See* Whitlinger Aff. ¶¶ 9-37.

[14]  *See id.* ¶ 108; *see also* Exhibits 2 and 3 hereto ("Am. Settlement Agrmts."), Ex. A.

[15]  *See* Whitlinger Aff. ¶ 23.

[16]  *See id.*

11.    In connection with selling mortgage loans to the Trusts, one or more of the Debtors provided contractual representations and warranties in the Governing Agreements regarding the sold mortgage loans.[17]  These representations and warranties vary based on the Governing Agreements, but typically pertain to, among other things: (a) the standards and practices used in underwriting each mortgage loan; (b) the creditworthiness of the borrowers on the mortgage loans; (c) the percentage of a mortgage pool which has certain characteristics, such as owner-occupancy and documentation type; (d) the disclosure of information on the loan tape; (e) the completeness of each mortgage loan file; (f) the origination of the loans in accordance with applicable federal and state laws; and/or (g) various characteristics of each specific mortgage loan such as loan-to-value ratio, debt-to-income ratio, lien position, and whether the property mortgaged is owner-occupied.[18]

12.    Certain Governing Agreements contain provisions that impose a joint obligation on the mortgage Seller and Depositor to repurchase or substitute Mortgage Loans sold to a Trust that materially breach the stated representations and warranties when certain conditions are met.[19]  In the aftermath of the substantial downturn in the real estate and financial markets beginning in 2007, investors in securitization trusts and other interested parties — such as the government-sponsored entities ("GSEs") or "monoline" insurers, which are third-party or financial guarantors or credit enhancers — have brought claims regarding alleged breaches of

---

[17]  *See id.* ¶ 83.  The Debtors issued their RMBS securitizations in series, so they adopted a standardized set of terms that generally applied to a particular series.  Exhibit 6 to the Initial Motion is an exemplar of a typical pooling and servicing agreement.

[18]  *See* Exhibit 6 to the Initial Motion, Pooling and Servicing Agreement ("Pooling and Serv. Agrmnt") § 2.03.

[19]  *See* Pooling and Serv. Agrmnt § 2.04.

ny-1053254

representations and warranties contained in the agreements governing those trusts.[20]  The

Debtors have vigorously defended such claims, but the Debtors have nonetheless repurchased

approximately $1.16 billion in loans out of $30.3 billion cumulative losses to date since 2005 to

resolve similar contractual representation and warranty claims.[21]  Though the Debtors do not

admit liability for any repurchases associated with the R&W Claims, this previous liability

suggests the potential for successful claims against the Debtors if the RMBS Trust Settlement is

not approved.

13.    Under the Governing Agreements, the Mortgage Loans belong to the Trusts,

which hold them for the benefit of the Holders in the Trusts.[22]  The same is true of the

contractual mortgage repurchase claims: the Trusts own the claims for the benefit of the

Holders.[23]  The Trustee for each Trust is the party ultimately authorized to pursue representation

and warranty claims and to receive the proceeds from any repurchase of loans for which there is

a breach of a representation or warranty.[24]  Monoline insurers also have contractual rights in

certain cases to enforce breaches of representations and warranties regarding the mortgage

loans.[25]

14.    As the ongoing housing downturn unfolded, with an unsurprising impact on the

performance of the securitizations, the Institutional Investors organized themselves into voting

---

[20]  *See, e.g.*, Whitlinger Aff. ¶¶ 101-103.

[21]  *See* Declaration of William J. Nolan, attached to the Initial Motion as Exhibit 7 ("FTI Decl.")
¶¶ 9, 23; Whitlinger Aff. ¶¶ 83-84.

[22]  *See* Pooling and Serv. Agrmnt § 2.01(a) ("The Company, concurrently with the execution and
delivery hereof, does hereby assign to the Trustee for the benefit of the Certificateholders,
without recourse all the right, title and interest of the Company in and to the Mortgage
Loans…") and § 2.02 (acceptance by Trustee).

[23]  *Id.* § 2.04 (Trustee owns and holds right to enforce mortgage repurchase claims.).

[24]  *See id.*

[25]  *See* Whitlinger Aff. ¶ 108.

9

blocs with sufficient holdings to direct or otherwise persuade trustees to pursue claims for
alleged breaches of loan-level representations and warranties.[26] As of the date of the filing of
this Motion, the Institutional Investors hold RMBS that give them 25% of the voting rights for at
least 336 of the 392 outstanding securitization Trusts created by the Debtors, with approximately
$193 billion OIB.[27]

15.    After weeks of negotiations with the Institutional Investors, the Debtors
concluded that a reasonable resolution of the Trusts' repurchase claims could be achieved that
would benefit all of the Debtors' creditors, by removing the risks associated with expensive and
uncertain litigation over tens of billions of dollars in potential mortgage repurchase claims.  As
negotiated, and as discussed below, such resolution would also avoid an inevitable disruption
and potential delay to the Debtors' proposed sale of its mortgage origination and servicing
platform.  These arm's-length and exhaustive negotiations culminated in the up to $8.7 billion
Allowed Claim under the RMBS Trust Settlement.

## A.    THE MECHANICS OF THE RMBS TRUST SETTLEMENT

16.    As set forth in the Amended and Restated RMBS Trust Settlement Agreements,
the Debtors have agreed to offer each Trust that accepts the settlement (the "Accepting Trusts")
an allocated share of the Allowed Claim.  The Trustees, on behalf of the Trusts, will have until
the later of November 12, 2012 or five business days after the entry of an order by this Court
approving the RMBS Trust Settlement to accept or reject the RMBS Trust Settlement.[28]  The

---

[26]  Most of the Trusts permit holders of 25% or more of the certificates or notes in any tranche to
direct the Trustee with respect to such Trust.  *See* Pooling and Serv. Agrmnt § 11.03.

[27]  *See* Am. Settlement Agrmts., Exs. D.

[28]  *See* Amended and Restated Settlement Agreements ("Am. Settlement Agrmts.") § 5.01 (citing
the Scheduling Order).

final amount of the Allowed Claim will be reduced from $8.7 billion by the percentage, based on

OIB, of Trusts that do not accept the offer to participate in the Allowed Claim.[29]

17.    Each Trust's share of the Allowed Claim will be allocated under Article VI of the

Amended and Restated RMBS Trust Settlement Agreements and based on the agreed-upon

formulation attached to each as "Exhibit B – Allocated Allowed Claims."[30]  To ensure the

fairness of such allocation, an independent expert will be hired to allocate the Allowed Claim

based on net expected lifetime mortgage losses among the accepting Trusts, without regard to

expected lifetime claims to be paid by the monoline insurers on the securitizations they insured.[31]

Deposits into each Trust as a result of a distribution on an Allowed Claim will be treated as a

"subsequent recovery" (where applicable) and distributed by the terms of the waterfall in the

Governing Agreements.[32]  Accordingly, the RMBS Trust Settlement and its claims allocation

will prevent a windfall to any one Trust or Institutional Investor, treat the Holders equitably and

in accordance with their contractual rights under the Governing Agreements, and maximize

recoveries for all Investors.

18.    As described in greater detail below, the Institutional Investors and the Debtors

agreed, as a non-severable condition to the settlement, that the legal fees for counsel to the

Institutional Investors, as well as counsel for other Investors that have sufficient holdings to

direct the Trustees to accept the RMBS Trust Settlement, would be paid in the form of an

allowed claim, taken from the Trusts' Allocated Allowed Claim in the percentage set forth in

Exhibit C to the RMBS Trust Settlement Agreements.  Thus, the amount of the Allowed Claim

---

[29]  *See* Am. Settlement Agrmts. § 5.01.

[30]  *See id.* § 6.01; *id.*, Ex. B.

[31]  *See id.,* Ex. B.

[32]  *See id.*

allocated to counsel will reduce the amount of the Allowed Claim that is ultimately provided to the Trusts.

19.     The Allowed Claim will be against debtors RFC and GMAC Mortgage (collectively, the "Seller Entities") and also against debtors Residential Funding Mortgage Securities I, Residential Funding Mortgage Securities II, Residential Asset Securities Corp., Residential Accredit Loans, Inc., and Residential Asset Mortgage Products, Inc. (collectively, the "Depositor Entities").[33]  The Seller Entities and the Depositor Entities are jointly liable for each Accepting Trusts' allocable portion of the Allowed Claim (the "Allocated Claim").

20.     The RMBS Trust Settlement also resolves direct purported alter ego claims against ResCap that the Institutional Investors argue that they could have directed the Trustees to assert.  If successful, these claims could cause ResCap to be liable for the Seller Entities' and Depositor Entities' repurchase obligations.  Although the Institutional Investors and Debtors dispute the likelihood of success on and strength of such potential claims, the Debtors and Institutional Investors agreed to resolve them by permitting each Accepting Trust, by written notice at any time prior to confirmation of a Chapter 11 plan, to elect to reallocate up to 20% of its Allocated Claim against the Seller Entities and Depositor Entities as a general unsecured claim against ResCap (each a "HoldCo Election"). For each Accepting Trust as to which a HoldCo Election is made, the amount of the Allocated Claim of that Accepting Trust against the Seller Entities and Depositor Entities shall be reduced by the amount of the claim against ResCap. Regardless of whether an Accepting Trust makes a HoldCo Election, the RMBS Trust Settlement Agreement will provide releases of ResCap by all Accepting Trusts.

---

[33]  *See id.* § 6.02.

21.    In exchange for their allocable portion of the Allowed Claim, the Trustees for the Accepting Trusts agree to release all R&W Claims for such Trusts against the Debtors, effective on the date on which a Trustee accepts the settlement on behalf of any particular Trust.[34]  The Institutional Investors also agreed to direct and have directed the Trustees to accept the terms set forth in the RMBS Trust Settlement, which includes a release and waiver by the accepting Trusts and Trustees of all R&W Claims against the Debtors — again, effective on the date on which a Trustee accepts the settlement on behalf of any particular Trust.[35]  If, and when, a Trustee for a particular Trust accepts the RMBS Trust Settlement, by completing the Joinder as contemplated in the Amended Proposed Order, the Trust will be bound thereby and that particular Trust will benefit from the Allowed Claim.[36]  The RMBS Trustees shall endeavor to provide notice of the Motion and the RMBS Trust Settlements (the "RMBS Trustee Notice") to Investors by:

- Mailing a copy of the RMBS Trustee Notice to Investors whose names and addresses appear on the securities registration books of the RMBS Trustees;
- Providing the RMBS Trustee Notice to the Depository Trust Company ("DTC"), which will post the RMBS Trustee Notice in accordance with DTC's established procedures;
- Publishing the RMBS Trustee Notice in The Wall Street Journal (Global), Financial Times Worldwide, The New York Times, The Times (of London), USA Today, Investor's Business Daily, and The Economist Worldwide Edition for at least one (1) business day in each publication;
- Publishing the RMBS Trustee Notice to the following media distribution wire services:  PRNewswire, Business Wire, and GlobeNewswire;
- Establishing a website, www.rescaprmbssettlement.com, that will post a copy of the RMBS Trustee Notice, the RMBS Trust Settlements, and any other related material documents that are relevant to the RMBS Trust Settlements;
- Creating a hyperlink to www.rescaprmbssettlement.com, on the Debtors' claims agent website, http://www.kccllc.net/rescap, for information about the RMBS Trust Settlements; and
- Seeking to purchase banner advertisements announcing the RMBS Trust Settlements, with a hyperlink to www.rescaprmbssettlement.com, on the

---

[34]  *See id.* § 7.01.

[35]  *See id.* §§ 4.01, 4.02.

[36]  *See* Am. Settlement Agrmts. § 5.01.

following websites:  wsj.com, MarketWatch.com, Barrons.com, AllthingsD.com, IHT.com, SmartMoney.com, investors.com, ft.com, reuters.com, economist.com, Globalcustody.net, Assetman.net, FundServices.net, and yahoo.com.

22.     If a Trust does not accept the settlement — for any reason, including a decision by a Trustee or by a monoline insurer that has contractual rights with regard to a particular Trust — that Trust remains free to assert a claim in the bankruptcy cases that will then be subject to the ordinary — albeit lengthy — claims allowance process.

## B.    THE AGREED-UPON ALLOWED CLAIM

23.     The Debtors and the Institutional Investors extensively negotiated the RMBS Trust Settlement, and, in particular, the Allowed Claim, based on differing views of the Debtors' potential liability.

24.     The Debtors face considerable uncertainty and risk associated with the R&W Claims.  Although the calculation and estimation of repurchase exposure depends on a number of uncertain factors that parties to, and beneficiaries of, the Governing Agreements value and measure differently, the plaintiffs in similar RMBS litigation have asserted claims in the tens of billions of dollars.[37]  For instance, in its First Amended Complaint against RFC, MBIA alleged that more than 88% of 7,913 delinquent mortgage loans it had reviewed breached a representation or warranty.[38]  If this alleged breach rate were applied across all of the Debtors' securitizations, it would yield a repurchase claim in excess of $40 billion.[39]  While the Debtors vigorously dispute the accuracy and methodology of MBIA's allegations, it is notable that the loans MBIA claims to have examined were acquired on the same platforms as many of the loans

---

[37]  *See* Lipps Decl. ¶¶ 1, 8, 12, 20, 29, 33, 45, and 64.

[38]  *See MBIA Insurance Corp. v. Residential Funding Co., LLC*, No. 603552/2008 (Sup. Ct. N.Y. Cnty. Dec. 4, 2008), Docket No. 28 at ¶ 50; *see also* Lipps Decl. ¶¶ 26-30.

[39]  *See, e.g.*, Sillman Decl. ¶ 67.

held by the Trusts.[40]  The Institutional Investors, using more conservative estimates that are also

disputed by the Debtors, estimate the potential liability of the Debtors in excess of $20 billion.

25.    In prepetition securities cases brought against the Debtors, plaintiffs alleged that

37% to 88% of the loans at issue in those cases, and which are also included in the RMBS Trust

Settlement, contained breaches.[41]  For instance, the Federal Housing Finance Agency alleged

that the Debtors misstated loan-to-value ratios by approximately 18-25% and misstated owner

occupancy rates by more than 10%.[42]  Massachusetts Mutual, another securities plaintiff, alleged

that nearly 30% of loans in certain of the Trusts exceeded the required loan-to-value ratio

threshold.[43]  While the Debtors vigorously dispute these allegations, such allegations illustrate

the potential exposure of the Debtors to these types of claims.

26.    Additionally, other factors may significantly affect the size of the potential

repurchase claims the Debtors might face.  Any repurchase claim necessarily involves the

conveyance of an existing home mortgage out of the collateral pool and back to the seller.[44]  This

conveyance (and thus, the net cost of a repurchase to the Debtors) occurs at a given point in time,

in a given market for real estate.[45]  Thus, to value any individual repurchase claim — and to

estimate the exposure represented by all potential repurchase claims — the Debtors also

---

[40]  *See* FTI Decl. ¶ 13.

[41]  *See, e.g.*, First Amended Complaint filed by Allstate Insurance Co., et al. in Civil File No. 27-CV-11-3480 (Minn. Dist. Ct., Hennepin Cnty. Apr. 15, 2011) at ¶ 130;  *MBIA Insurance Corp. v. Residential Funding Company, LLC*, Case No. 603552/2008 (Sup. Ct., N.Y. Cnty.), Docket No. 28 at ¶ 50.

[42]  *See* Complaint at ¶¶ 98, 01, *Federal Housing Finance Agency, as Conservator for The Federal Home Loan Mortgage Corp. v. Ally Financial Inc.*, No. 11 Civ. 7010 (S.D.N.Y. Sept. 2, 2011) ECF No. 1; *see also* Lipps Decl. ¶¶ 63-68.

[43]  *See* First Am. Compl. at ¶¶ 74-181, *Mass. Mutual Life Ins. Co. v. Residential Funding Co.*, No. 11-cv-30035-MAP (D. Mass. May 17, 2012) ECF No. 86.

[44]  *See* Sillman Decl. ¶¶ 28-42.

[45]  *See id.*

ny-1053254

considered additional factors such as: estimated loss severity at the time of repurchase, conditions in the housing market, roll rates (a measure of the percentage of loans that are current and/or in various stages of delinquency that ultimately "roll" to default), the number of modified loans, the likelihood that modified loans would re-default, and the rate at which losses would be realized in the future.[46]  A new downturn in the housing market, or even a continuation of the present soft market, could thus magnify the Debtors' potential exposure.[47]

27.    Based on assertions that a certain percentage of the loans in the securitizations should be repurchased or made whole due to alleged breaches of representations and warranties (the "Alleged Breach Rate") and the percentage of loans that the Debtors would agree should be repurchased or made whole (the "Agree Rate"), the parties arrived at a Loss Share Rate of approximately 20%, which all parties agree represents a fair and reasonable means of assessing and resolving the Debtors' potential liability while avoiding costly and risky litigation.[48]  The Allowed Claim was calculated by multiplying the Loss Share Rate by the "Estimated Lifetime Losses" for the Trusts.[49]  Estimated Lifetime Losses were calculated by combining actual Trust losses to date with projected losses on the remaining loan portfolios based on an assumed frequency and severity of losses due to the foreclosure, short sale or write-off of liquidated loans.[50]  All parties agree that the RMBS Trust Settlement, which is based on a 20% Loss Share

---

[46]  *See id.* ¶¶ 31-34.

[47]  *See id*.

[48]  *See* Declaration of Frank Sillman, attached to the Initial Motion as Exhibit 8 ("Sillman Decl.") ¶¶ 64-70.

[49]  *See id.* ¶¶ 26, 68.  Terms defined in this section are explained in greater detail in the Sillman Declaration.

[50]  *See id.* ¶¶ 25, 67-68.

Rate, is an appropriate, prudent, objectively reasonable, and indeed preferable manner in which to settle R&W Claims.[51]

## C.    PLAN SUPPORT AND THE RESOLUTION OF OBJECTIONS TO THE DEBTORS' PROPOSED SALE

28.    The RMBS Trust Settlement benefits the Debtors in two additional ways.  First, subject to Bankruptcy Court approval, the Debtors, following extensive, good-faith, and arm's-length, multi-party negotiations, entered into substantially the same Chapter 11 Plan Support Agreement with the Steering Committee Group and the Talcott Franklin Group.  Absent the RMBS Trust Settlement, the Debtors could not have compelled the Institutional Investors to agree to support the Debtors' restructuring plan.  The ability of the Institutional Investors to object to the plan and otherwise interfere with the Debtors' attempt to complete transactions necessary for the Debtors' successful reorganization could thwart or delay the Debtors' restructuring efforts.[52]  Additionally, if the RMBS Trust Settlement is not approved, the Institutional Investors remain free to object to every step of the Debtors' Chapter 11 cases, a right that they surely would exercise.

29.    The RMBS Trust Settlement is also an integral component of the Debtors' efforts to restructure through a sale of its mortgage origination and servicing platform and provides the Debtors with significant and valuable benefits. The RMBS Trust Settlement allowed the Debtors to defer substantial objections to the proposed sale of the Debtors' mortgage origination and servicing platform. For example, the Institutional Investors and the Trustees argue that the Trusts have substantial cure claims in connection with any assumption and assignment of the Debtors' Pooling and Servicing Agreements – the foundation of the Debtors' proposed sale – and that they

---

[51]  *See id.* ¶¶ 67-70.

[52]  *See* FTI Decl. ¶¶ 21, 26.

have potential (though disputed) claims for setoff and/or recoupment that would attach to the

proceeds of such sale under section 506(a) of the Bankruptcy Code.  In consideration for

accepting the RMBS Trust Settlement, the Trusts deferred these claims and objections and will

also release their setoff and recoupment claims, which would be in the range of billions of

dollars and could eclipse the proceeds of the sale themselves. Although Debtors dispute the

validity and strength of these cure and recoupment claims, their settlement provides

extraordinary benefit to the Debtors, their estates, and creditors.

**D.    PAYMENT OF LEGAL FEES**

30.    Pursuant to the RMBS Trust Settlement Agreement, the Institutional Investors

and the Debtors agreed, as a non-severable condition to the settlement, that the legal fees for

counsel to the Institutional Investors would be paid out of the Allowed Claim.[53]  The firms

representing the Institutional Investors are to receive the percentages of the Allowed Claim set

forth on Exhibits C to the RMBS Trust Settlement Agreements.  Thus, the amount of the

Allowed Claim allocated to counsel for the Institutional Investors will reduce the amount of the

Allowed Claim that is ultimately provided to the Trustees, and, in turn, the RMBS Holders.  The

Accepting Trusts will receive benefits under the Settlement Agreement, and since all Holders in

the Accepting Trusts will receive benefits under the settlement in accordance with the Governing

Agreements, the Allowed Claim granted to the Trusts is reduced to reflect the fees incurred to

achieve the settlement.

31.    The RMBS Trust Settlement Agreement also contemplates that additional

investors may provide a direction to be given to the trustees of additional trusts to accept the

RMBS Trust Settlement Agreement. In such a case, the agreement provides that counsel to such

_____

[53] *See id.* § 6.02(b).

investors may be compensated in the same manner (but without an aggregate increase in the

claims allocated to legal fees, all as set forth more fully in section 6.04(b) of the RMBS Trust

Settlement Agreement).

## **RELIEF REQUESTED**

32.    The Debtors respectfully request that this Court enter an order substantially in the

form of the Amended Proposed Order, including the allowance of the Allowed Claim, pursuant

to Bankruptcy Rule 9019(a).

## **ANALYSIS**

33.    Debtors respectfully submit that the Court should grant the relief requested in this

Motion and enter the Amended Proposed Order, both because the RMBS Trust Settlement

satisfies the Second Circuit's standard for settlements under Fed. R. Bankr. P. 9019(a) because

the RMBS Trust Settlement is fair and in the best interests of the Investors.

**A.    THE RMBS TRUST SETTLEMENT SATISFIES THE SECOND CIRCUIT'S
STANDARD UNDER FED. R. BANKR. P. 9019(a)**

34.    Rule 9019(a) provides, in part, that "[o]n motion by the [debtor-in-possession]

and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.

Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve a settlement agreement

where "it is supported by adequate consideration, is 'fair and equitable,' and is in the best

interests of the estate."  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993).  The

Court's analysis is not a mechanical process, but rather contemplates a "range of reasonableness

. . . which recognizes the uncertainties of law and fact in any particular case and the concomitant

risks and costs necessarily inherent in taking any litigation to completion…."  *Newman v. Stein*,

464 F.2d 689, 693 (2d Cir. 1972).

35.     The decision to approve a particular settlement lies within the sound discretion of

the Bankruptcy Court.  *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994); *In re*

*Ionosphere Clubs, Inc.*, 156 B.R. at 426.  Discretion should be exercised by the Bankruptcy

Court "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co.,*

217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *Shugrue*, 165 B.R. at 123 ("[T]he general rule [is] that

settlements are favored and, in fact, encouraged.").

36.     To approve a proposed settlement, the Court need not definitively decide the

numerous issues of law and fact raised by the settlement.  Rather, the Court should "canvass the

issues and see whether the settlement 'fall[s] below the lowest point in the range of

reasonableness.'"  *Finkelstein v. W.T. Grant Co. (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d

Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *see also In re Purofied*

*Down Prods.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("the court need not conduct a 'mini-trial' to

determine the merits of the underlying [dispute]").[54]

37.     In deciding whether a particular settlement falls within the "range of

reasonableness," courts consider the following "*Iridium*" factors: (a) the balance between the

litigation's possibility of success and the settlement's future benefits; (b) the likelihood of

complex and protracted litigation, "with its attendant expense, inconvenience, and delay"; (c) the

---

[54]  While the Court need not resolve the numerous issues of law and fact raised by the proposed
settlement, the Court would have to address the validity of the Trusts' claims absent the
settlement.  Under Second Circuit law, a bankruptcy court is required "to determine the validity
of the claim[s] and the amount allowed."  *Porges v. Gruntal & Co.* (*In re Porges*), 44 F.3d 159,
164 (2d Cir. 1995) (citing *Kame v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2d Cir. 1988)).
Unless a specific provision of the Bankruptcy Code requires otherwise, the Court must make this
determination under applicable nonbankruptcy substantive law.  *See Ogle v. Fid. & Deposit Co.*
*of Md*, 586 F.3d 143, 147-48 (2d Cir. 2009).  Thus, in resolving any future objection to the
proofs of claim that the Trustees would surely file on behalf of the Trusts alleging breaches of
the Governing Agreements if the settlement is not approved, the Court would be required to
address the same kinds of complicated legal and factual issues faced by other courts when
dealing with prepetition lawsuits alleging the Debtors breached the Governing Agreements.

paramount interests of creditors; (d) whether other parties in interest support the settlement;

(e) "the nature and breadth of releases to be obtained by officers and directors"; (f) the

"competency and experience of counsel" supporting, and "[t]he experience and knowledge of the

bankruptcy court judge" reviewing the settlement; and (g) "the extent to which the settlement is

the product of arm's-length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured*

*Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations

and quotations omitted).

38.    The Debtors respectfully submit that each of the *Iridium* factors weighs in favor

of this Court's approval of the RMBS Trust Settlement.

### i.    THE BALANCE BETWEEN THE LITIGATION'S POSSIBILITY OF SUCCESS AND THE SETTLEMENT'S FUTURE BENEFITS

39.    The RMBS Trust Settlement is the result of tough, arm's-length negotiations

between sophisticated parties.  As part of these negotiations, the Institutional Investors and the

Debtors each concluded, based on their own assessments of the possibility of success of the

litigation and the benefits of the settlement, that a Loss Share Rate of approximately 20% was a

reasonable basis for the settlement.[55]  This percentage reflects the Debtors' reasonable

assessment of the risk, as well as the substantial expense of litigation, of the R&W Claims that

could be brought by the 392 Trusts, and the related impact on the Debtors' restructuring efforts,

balanced against the benefits to all parties of early resolution of such litigation.[56]  The RMBS

Trust Settlement also resolves substantial impediments to the Debtors' successful sale process

and restructuring and corresponding prompt emergence from Chapter 11.

---

[55]  *See* Sillman Decl. ¶¶ 64-70.

[56]  *See* FTI Decl. ¶¶ 14-17; Sillman Decl. ¶¶ 58, 64-70.

40.     Although the resolution of disputes through litigation always involves some measure of uncertainty, that is particularly true in the complex RMBS securitization context.[57] However, any uncertainty regarding the possibility for success in the litigation is not a bar to approval.  *See, e.g., In re Hibbard Brown & Co.,* 217 B.R. at 45 (approving settlement after finding that the multiple legal issues presented were "complex" and carried "no guarantee of success"); *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 22, 2012) (approving the establishment of $5 billion reserve, pursuant to the terms of the debtors' plan of reorganization, for claims asserted by indenture trustees arising out of RMBS sold by non-debtor affiliates).

41.     Determining the precise percentage of loans that the Debtors would be required to repurchase under the Governing Agreements if the matter were litigated would involve a Herculean and contentious loan-file-by-loan-file-review.[58]  Even if only a subset were ultimately reviewed — defaulted loans only, for example — the number of individual loans that would need to be examined across 392 securitizations containing over 1.6 million loans would still be massive.[59]  The Debtors and Institutional Investors agree that the cost, burden and time that would need to be dedicated to that litigation exercise are prohibitive.  Short of a loan-by-loan review, various analyses and review metrics can be used to estimate Alleged Breach Rates and Agree Rates in the mortgage loan industry, each ranging from approximately 30% to 50%, which equates to a Loss Share Rate ranging from 9% to 25%.[60]  Naturally, if claimants could prove a Loss Share Rate above 20%, it would give rise to liability greater than the $8.7 billion Allowed

---

[57]   *See* Lipps Decl. ¶¶ 17-18.

[58]   *See* Lipps Decl. ¶¶ 17-18.

[59]   *See, e.g.*, *id.* ¶ 28.

[60]   *See* Sillman Decl. ¶¶ 44-46, 64-69.

Claim, and, of course, a Loss Share Rate of less than 20% would give rise to less liability.[61]

However, after careful, practical and independent assessment, and taking into consideration the

cost, burden and risk of litigation, the Debtors and the Institutional Investors agreed that utilizing

a Loss Share Rate of approximately 20% is an objectively fair and reasonable way – for both the

Debtors and the Investors – of resolving the Debtors' potential liability, deferring objections and

claims that could interfere with the sale process, and obtaining the support of the Institutional

Investors for the Debtors' Plan.[62]

42.    Notably, comparable settlements with other sponsors have applied Breach Rates

and Agree Rates within the ranges provided above.[63]  Similar claims brought by certain trustees

against Bank of America, N.A., on account of securitized mortgage loans sold and/or serviced by

its Countrywide Financial Corporation subsidiaries, assumed a 36% Breach Rate and a 40%

Agree Rate.[64]  In the settlement reached between the debtors and potential claimants in the

Lehman Brothers Holdings Inc. Chapter 11 proceeding, the debtors calculated their estimate of

potential claims using a range of 30% to 35% for the Breach Rate and a range of 30 to 40% for

the Agree Rate.[65]

43.    Although the Parties may have differing views of the possibility of success in the

litigations (but agree that applying a Loss Share Rate of approximately 20% is a reasonable

compromise), there is universal agreement among the Parties that the proposed RMBS Trust

---

[61]  *See id.* ¶¶ 64-70.

[62]  *See id.*

[63]  *See id.* ¶¶ 59-63.

[64]  *See id.*; *see also In re Bank of New York Mellon,* No. 651786/2011 (Sup. Ct. N.Y. Cnty. June 29, 2011).

[65]  *See In re Lehman Bros. Holdings Inc.*, No. 08-13555 JMP (Bankr. S.D.N.Y); Sillman Decl. ¶¶ 59-63.

Settlement provides substantial benefits to the Debtors, all Trustees accepting the compromise on behalf of their Trusts, and other stakeholders relative to any alternative path.  Litigating these issues would distract the Debtors from focusing on critical aspects of their restructuring.[66] Moreover, lengthy claims litigation would not likely improve matters for the Debtors' other unsecured creditors.[67]  The claims of the other unsecured creditors are largely fixed in nature, and are dwarfed by the size of the R&W Claims.[68]  Increasing the size of the R&W Claims (or instituting an estimation procedure that risks increasing their potential size) could dramatically lower recoveries for the other creditors whose claims will be paid from the same, limited pool of funds.[69]

44.    The R&W Claims involve a multitude of issues, arguments, and discovery requirements from both sides.[70]  Particularly in the context of almost 400 complex mortgage securitizations and the varied loan products in each, the Debtors submit that the complexity of the litigation at issue, the difficulty inherent in predicting the success of either party with respect to any particular disputed issue, and the risks and unnecessary distractions associated with complex and protracted claims litigation render the RMBS Trust Settlement particularly reasonable and appropriate both for the Debtors and the Investors.[71]

45.    The RMBS Trust Settlement proposed in this Motion provides certainty to the Debtors with respect to the single largest set of disputed claims against the Debtors' estates and removes hurdles to resolving substantial impediments to a successful sale process and

---

[66]  *See* FTI Decl. ¶¶ 18-22.

[67]  *See id.* ¶ 22.

[68]  *See id.* ¶ 29.

[69]  *See id.*

[70]  *See* Lipps Decl. ¶¶ 17-18, 38-43, 58-62, 67.

[71]  *See id.*

restructuring of the Debtors in order to permit a prompt emergence from Chapter 11.[72]  In

particular, the Debtors' entry into the RMBS Trust Settlement was necessary to obtain the

Institutional Investors' commitment to perform under the Plan Support Agreements, which is

critical to the Debtors' obtaining the necessary relief throughout these bankruptcy cases and,

ultimately, a successful reorganization.[73]  Additionally, if the RMBS Trust Settlement is not

approved and the R&W Claims are increased, the recovery by the holders of the Debtors' Junior

Secured Bonds will be diluted and could compromise the Debtors' plan support agreement with

such bondholders and impede the Debtors' Chapter 11 proceedings.[74]

46.      In short, although the potential outcome of the R&W Claims after a lengthy

litigation process could be more or less than the Allowed Claim of up to $8.7 billion, the

administrative costs of an extended bankruptcy case and the costs and uncertainty of such

litigation make settlement a more efficient and reasonable way to resolve these claims in the best

interest of all parties, including the Debtors' estates and creditors and the Investors.  The

compromise of offering the $8.7 billion Allowed Claim will, if accepted by the Trusts, fully

resolve these matters, provide certainty in recoveries for the Investors, and greatly facilitate the

confirmation of the Debtors' Plan.

ii.      **THE LIKELIHOOD OF COMPLEX AND PROTRACTED
LITIGATION**

47.      The claims by the 392 Trusts involving OIB of approximately $221 billion of

RMBS securitizations and dozens of parties, if not resolved in settlement, will likely continue in

litigation for years and will inevitably delay the implementation of the Debtors' restructuring,

---

[72]  *See* FTI Decl. ¶¶ 18-22, 29.

[73]  *See id.* ¶ 29.

[74]  *See id.*

increase administrative costs, and tie up significant assets which would otherwise be available to creditors.[75]  Uncertain and protracted litigation would similarly delay and could negatively impact recovery for the Investors.

48.    As set out above, the litigation of alleged representation and warranty breaches alone is extremely complex, labor-intensive, costly and time-consuming.[76]  The discovery required to resolve claims based on the 1.6 million loans in the Trusts would be massive, as the relevant documents and information will differ from case to case.[77]  As an example, each claim will involve a different securitization, and RFC and GMAC Mortgage each ran their own securitization efforts with different personnel and procedures during this timeframe.[78]  Each Trust involves a unique set of mortgage loans, and each securitization shelf (an entity that registers with the SEC to publicly offer securities through the Trusts) involves unique documents, processes and personnel, all of which also varied over time for each shelf.[79]  Different loan products — second liens, first liens, prime, Alt-A, subprime — likewise involved different teams of employees, different automated processes, different evolving underwriting guidelines, different diligence standards, and different quality audit practices.[80]  As a result, the litigation of each claim poses a new discovery challenge and unique discovery burdens.  For instance, a claim involving 2005 RALI securitizations of Alt-A first liens will involve different documents and witnesses from a lawsuit involving 2006 RFMSII home equity securitizations,

---

[75]  *See id.* ¶¶ 14-22.

[76]  *See* Lipps Decl. ¶¶ 17-18, 38-43, 58-62, and 67.

[77]  *See id.* ¶¶ 17-18.

[78]  *See id.*

[79]  *See id.*

[80]  *See id.*

which would be different again from a lawsuit involving RASC subprime securitizations of any

vintage.

49.     Due to the complexity of the transactions at issue, as well as the number of parties

involved, in breach of representation and warranty litigation, the fact discovery requirements are

crippling.  ResCap's experience in *MBIA Insurance Corp. v. Residential Funding Company,*

*LLC*[81] illustrates the true enormity and difficulty of such litigation.[82]  MBIA's lawsuit against

RFC involved just five trusts securitizing approximately 63,000 Alt-A home equity lines of

credit or closed-end second mortgages — just two of the many loan types involved in the 392

trusts — brought to market over the course of less than one year.[83]  Yet, fact discovery has not

been completed over three and a half years after MBIA first sued RFC.[84]  RFC has produced

more than a million pages of documents, including loan files for more than 63,000 mortgage

loans.[85]  RFC has produced nearly one terabyte of data, including a variety of source code, other

application data, and back-end loan-level data relating to automated systems used in connection

with underwriting, pricing, acquiring, pooling, auditing, and servicing the mortgage loans.[86]

50.     Further, MBIA has taken over 80 days of depositions of current or former ResCap

entity personnel over the course of more than a year.  RFC has taken 50 days of depositions of

current or former MBIA personnel.[87]  A number of third-party depositions have been taken or

---

[81]  This case is now subject to the automatic stay.

[82]  *See* Lipps Decl. ¶¶ 26-30.

[83]  *See id.*

[84]  *See id.*

[85]  *See id.*

[86]  *See id.*

[87]  *See id.*

would be required, and the parties exchanged 10 expert reports without including rebuttal reports. [88]

51.     The extent of the discovery in the MBIA case against RFC is anything but aberrational — indeed, litigation of the separate MBIA lawsuit against Countrywide has been even more protracted[89] — and the litigation of the R&W Claims potentially held by the 392 Trusts invited to take part in the RMBS Trust Settlement would mire the Debtors' estates, the Trustees, and the Investors in litigation for years, and at great expense.[90]

### iii.     THE PARAMOUNT INTERESTS OF CREDITORS

52.     The RMBS Trust Settlement is beneficial to the Debtors' estates and their stakeholders because the proposed settlement is well within the range of potential litigation outcomes and will resolve the single largest group of unsecured claims against the Debtors, thereby providing much-needed predictability with respect to the Debtors' claims pool, a critical step towards obtaining consensus around a Chapter 11 plan.[91]  Moreover, the certainty of the proposed settlement avoids the necessity of setting aside substantial reserves for the potential payment of R&W Claims, which could delay (and reduce) recoveries to other stakeholders.[92]

53.     Additionally, the RMBS Trust Settlement removes a substantial number of potential objectors.  As noted above, absent the terms of the RMBS Trust Settlement, the Institutional Investors and Trustees would remain free to object to and complicate every step of

---

[88]  *See id.*

[89]  *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/08 (Sup. Ct. N.Y. Cnty), Decision dated May 25, 2012 (granting in part MBIA's motion to compel production of additional documents) (Docket No. 1726).

[90]  *See* FTI Decl. ¶¶ 18-22.

[91]  *See id.* ¶¶ 23-30.

[92]  *See id.* ¶ 14.

ny-1053254

the Debtors' Chapter 11 cases.  Furthermore, in the absence of the Settlement, the Trusts would

not have deferred their allegedly substantial cure claims in connection with the Debtors'

proposed sale, cure claims that, if successful, arguably could have administrative priority and/or

be secured under section 506(a) of the Bankruptcy Code.   The resolution of the alleged R&W

Claims and cure claims, as well as the releases given under the RMBS Trust Settlement, assures

a more efficient and expeditious reorganization process.

54.    Additionally, it is indisputable that the litigation of claims brought by the 392

Trusts would inevitably burden the Debtors' estates with significant legal expenses.  Even if the

Debtors were to defeat each claim, the administrative expenses incurred through defending the

litigation, as well as the distraction of the Debtors' limited personnel, would necessarily harm the

Debtors' estates and reduce and delay recoveries for the Debtors' creditors.[93]

### iv.    SUPPORT FOR THE SETTLEMENT BY THE PARTIES IN INTEREST

55.    The RMBS Trust Settlement is supported by a significant percentage of the

Holders, and this number continues to grow as more investors join the RMBS Trust Settlement.

As noted above, the Steering Committee Group alone represents 25% or more of the Holders of

one or more classes of certificates in at least 304 of the 392 Trusts, which Trusts account for

approximately 77.5% of the total OIB.[94]  As of the filing of this Motion, the Talcott Franklin

Group represents 25% or more of the Holders of 295 classes of certificates in at least 189 Trusts,

which accounts for an additional $17 billion in OIB and adds 35 additional Trusts to the

Institutional Investors' holdings.[95]  Accordingly, under the RMBS Trust Settlement, 336 Trusts,

---

[93]  *See id.* ¶¶ 14-22.

[94]  *See* Am. Settlement Agrmnt., Ex. D.

[95]  *See id.*

representing approximately 83% of the total OIB at issue, have been directed to accept the

settlement, and the Debtors believe that these and many, if not all, of the other Trusts will accept.

### v.    THE PROPOSED RMBS TRUST SETTLEMENT SATISFIES THE REMAINING *IRIDIUM* FACTORS

56.    For the reasons stated above, the Debtors believe that the paramount interests of

all parties are best served by approval of the RMBS Trust Settlement.  Moreover, the final three

*Iridium* factors are satisfied.  The RMBS Trust Settlement only released the Debtors' officers or

directors to the extent that the Debtors are released and do not extend beyond claims brought

under the Governing Agreements, with no exceptions or additional releases for the directors or

officers, so this *Iridium* factor weighs in favor of approval.  Second, the RMBS Trust Settlement

was negotiated separately between the Debtors and the Steering Committee Group and the

Debtors and the Talcott Franklin Group, without collusion, in good faith, and from arm's-length

bargaining positions, and all parties were represented by experienced and sophisticated counsel.

57.    Furthermore, the RMBS Trust Settlement is intentionally structured to reduce the

Allowed Claim proportionally if Trusts do not opt in, and to preserve the rights of those Trusts to

bring their claim in the normal course if they wish to do so.  The RMBS Trust Settlement is a

binding offer by the Debtors to all Trustees to accept on behalf of their Trusts, or to decline if

they prefer the uncertainties and costs of litigation.  Accordingly, only those Trustees that are

contractually directed to accept and/or independently decide that the RMBS Trust Settlement is

beneficial for their respective Institutional Investors will accept the settlement.[96]

---

[96]  As noted above, Debtors believe, and the Steering Committee Group and the Talcott Franklin
Group have each represented with regard to their holdings, that the Institutional Investors will
cumulatively direct approximately 83% of the 392 Trusts.

B.      **THE RMBS TRUST SETTLEMENT IS FAIR AND REASONABLE TO THE
        INSTITUTIONAL INVESTORS AND OTHER CERTIFICATEHOLDERS IN
        THE TRUSTS**

58.      While the RMBS Trust Settlement is soundly within the "range of

reasonableness" for the Debtors, it is equally so for the Investors.  The very documents and

analysis relied upon by the Debtors – the Sillman Declaration, the Nolan Declaration, and the

Lipps Affidavit – speak directly to the benefit of the RMBS Trust Settlement to the Investors,

and the resolution of the R&W Claims in a manner that is equitable and cost-effective for all

parties.  First, as described in the Sillman Declaration, the maximum Allowed Claim of $8.7

billion falls within a reasonable range of potential litigation outcomes that the Trusts, and thus

the Investors, could expect absent settlement.  Second, the Investors have an equally strong

interest in the expedient resolution of these claims and in preventing years of expensive and

uncertain litigation before they could potentially see any recovery.  These reasons are addressed

in turn.

i.      **THE TRUSTS' RECOVERY UNDER THE RMBS TRUST
        SETTLEMENT IS WITHIN THE RANGE OF THE DEBTORS'
        POTENTIAL REPURCHASE LIABILITY**

59.      Whether considered in the aggregate or for each Trust, the RMBS Trust

Settlement is in the best interests of the Trusts and the Investors.  The Potential Repurchase

Requirement range of $6.7 billion to $10.3 billion in the Sillman Declaration estimates the

potential range of liability for the Debtors and of recovery for the Trusts.[97]  The maximum

Allowed Claim under the RMBS Trust Settlement offers the Trusts on behalf of their Investors a

settlement of the R&W Claims for $8.7 billion, an amount well within, but above the midpoint

of, the potential range of recovery.  As noted in the Sillman Declaration, similar, but slightly

---

[97]  *See* Sillman Decl. ¶¶ 28-42.

lower Agree Rates and Breach Rates were used to estimate liability for settlement purposes for similar claims brought by certain trustees against Bank of America, N.A., and in the Lehman Brothers Holdings Inc. Chapter 11 proceeding. While these slightly-lower rates are still within the reasonable range for settlement by the Debtors, the Institutional Investors have alleged that the Breach Rates were significantly higher in the Trusts and asserted claims in excess of $20 billion based on conservative estimates, according to the Institutional Investors. Under this settlement, all Investors would benefit from this higher end of the range recovery, and would do so without the uncertainties, costs, and delays of litigating their claims.

60.    The RMBS Trust Settlement is also equitable when each Trust and that Trust's investors are considered individually. The $8.7 billion Allowed Claim is reduced proportionally according to the Trusts that do not accept the RMBS Trust Settlement, which means that the Debtors' estates will not be diminished by the share of the settlement allocated to any non-accepting Trust that instead chooses to pursue its own claims.[98] For those Trusts accepting the RMBS Trust Settlement on behalf of their investors, the method by which the Allowed Claim is allocated considers the types of loan in each – vintage, product, and shelf – and allocates the claims according to the forecasted losses for those loans.[99] The Parties believe this intra-trust allocation of the Allowed Claim leaves to the expert the determination of the allocation of loss in a way that is fair and in the best interest of the Holders, so that no Trust or Investors will get less (or more) than their equitable allocation of the Allowed Claim. In addition, the HoldCo Election provides that each Trust will receive the option of allocating a portion of its Allowed Claim to ResCap to account for direct claims that could have been asserted against ResCap by the Trusts, which claims are released by the settlement. Once allocated, the allocated portion of the Allowed

---

[98] *See* Am. Settlement Agrmts. § 5.01.

[99] *See id.*, Ex. B.

Claim will be distributed under each Trust's Governing Agreements, which "waterfall" the

Investors agreed to upon purchase of their certificates.

### ii.    THE TRUSTS AND INVESTORS ALSO AVOID
### THE COSTS AND DELAYS OF LITIGATION

61.    The Trusts and Investors benefit from the expedient and rational settlement of the

R&W Claims for precisely the same reasons as the Debtors: they avoid the uncertainty, cost, and

delay that necessarily accompany RMBS litigation.[100]  As set out above and in the accompanying

declarations, the legal uncertainties and extensive discovery involved in every RMBS claim

multiplied by 392 trusts with 1.6 million loans and varying representations and warranties, make

the costs and risks and time to litigate monumental with no certainty of recovery or recovery

amount.  Under the RMBS Trust Settlement, these claims are resolved with an Allowed Claim

based on a loss share rate and estimated range of recovery that all the parties and an independent

expert deemed fair and reasonable, and they are resolved without requiring the Trusts or

Investors to invest significant resources in fees to legal and financial professionals and without

the unavoidable delay and uncertainty of litigation.

### CONCLUSION

62.    In sum, the Debtors have determined, exercising their sound business judgment

that the RMBS Trust Settlement is fair, equitable, and eminently reasonable to the Debtors'

estates and creditors, thereby satisfying the standards of Bankruptcy Rule 9019, and similarly

fair and in the best interest of the Trusts and the Investors on whose behalf these claims would be

brought.  The timely resolution of these extensive claims is in the best interests of the Debtors

and their creditors and the Investors.  The Debtors therefore submit that the RMBS Trust

Settlement is fair and well within the range of reasonableness — and certainly not "below the

---

[100]  *See* Lipps Decl. ¶¶ 17-18, 38-43, 58-62, and 67; see also FTI Decl. ¶¶ 18-22, 29.

lowest point in the range of reasonableness." *Finkelstein*, 699 F.2d at 608.  Accordingly, the

Debtors respectfully request that the Court approve the RMBS Trust Settlement pursuant to

Bankruptcy Rule 9019.

## NOTICE

63.    Notice of this Motion will be given to the following parties, or in lieu thereof, to

their counsel:  (a) the Office of the United States Trustee for the Southern District of New York;

(b) the Office of the United States Attorney General; (c) the Office of the New York Attorney

General; (d) the Office of the United States Attorney for the Southern District of New York;

(e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the

Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for

the Debtors' outstanding notes issuances; (i) Ally Financial Inc.; (j)  the Steering Committee

Group; (k) the Talcott Franklin group (l) Barclays Bank PLC, as administrative agent for the

lenders under the debtor in possession financing facility; (m) Nationstar Mortgage LLC and its

counsel; (n) the Creditors' Committee; (o) the Trustees, and (p) all parties requesting notice

pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in view of the facts and

circumstances, such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUEST

64.    Except as otherwise noted herein, no prior application for the relief requested

herein has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request the entry of the Amended Proposed

Order granting the relief requested herein and such other and further relief as the Court may

deem just and proper.


Dated: New York, NY
       August 15, 2012

                         Respectfully submitted,

                         /s/ Gary S. Lee
                         Gary S. Lee
                         Anthony Princi
                         Jamie A. Levitt

                         MORRISON & FOERSTER LLP
                         1290 Avenue of the Americas
                         New York, New York 10104
                         Telephone: (212) 468-8000
                         Facsimile: (212) 468-7900

                         *Counsel for the Debtors*
                         *and Debtors in Possession*

ny-1053254