1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              August 14, 2012

19              10:04 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1

2  (Doc no. 264, 856) Motion for Relief from Stay filed by Corla

3  Jackson.

4

5  (CC: Doc no. 801) Motion for Relief from Stay to Proceed to

6  Trial before California Superior Court, and, Motion to Extend

7  Time to Object to Discharge filed by Michael E. Holt on behalf

8  of Hitoshi & Wakana Inoue.

9

10  (Doc no. 877, 888) Motion for Relief from Stay filed by Alan

11  Moss.

12

13  (CC: Doc no. 462, 871) Motion for Relief from Stay filed by

14  Arlene M. Richardson on behalf of Mary Gardner.

15

16  Doc# 1020 Hearing RE: Debtors' Objection to Motion for

17  Reconsideration of Final Supplemental Servicing Order. (related

18  document(s)916, 774)

19

20  (Doc# 652, 767) Motion Of Green Planet Servicing, LLC For Entry

21  Of Order: (A) Modifying The Automatic Stay To Effectuate Pre-

22  Petition Termination Of Servicing Agreement; Or (B)

23  Alternatively, Granting Relief From The Automatic Stay To Allow

24  Post-Petition Termination Of Servicing Agreement; And (C)

25  Granting Related Relief (related document(s)652)

1

2  (Doc# 263, 882) Motion for Relief from Stay.

3

4  Doc# 810, 859, 861 Hearing on (I) Motion of the Federal Housing

5  Finance Agency Pursuant to the July 11, 2012 Order of the

6  Honorable Denise L. Cote Seeking Limited Discovery from the

7  Debtors and, if Necessary to that Purpose, Relief from the

8  Automatic Stay and (II) Supplement to July 17, 2012 Motion of

9  the Federal Housing Finance Agency Pursuant to the July 11,

10  2012 Order of the Honorable Denise L. Cote Seeking Limited

11  Discovery from the Debtors and, if Necessary to that Purpose,

12  Relief from the Automatic Stay (related document(s) 810, 859)

13

14  Doc# 894 Motion for Relief from Stay

15

16  (CC: Doc# 667) Motion for Relief from Stay - Motion of

17  Christina Ulbrich for Relief from Automatic Stay as to GMAC

18  Mortgage, LLC

19

20  (CC: Doc# 763) Application for FRBP 2004 Examination / Notice

21  of Motion and Motion of OneWest Bank for Order Pursuant to

22  Bankruptcy Rule 2004 Authorizing Rule 2004 Examination of

23  Homecomings Financial, LLC and Requiring Production of

24  Documents

25

20    Transcribed by:  Penina Wolicki

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4         Attorneys for Debtors
 5         1290 Avenue of the Americas
 6         New York, NY 10104
 7
 8   BY:   NORMAN S. ROSENBAUM, ESQ.
 9         JOEL C. HAIMS, ESQ.
10         JONATHAN C. ROTHBERG, ESQ.
11         ERICA J. RICHARDS, ESQ.
12         GARY S. LEE, ESQ.
13         AARON M. KLEIN, ESQ.
14
15
16   U.S. DEPARTMENT OF JUSTICE
17         Office of the United States Trustee
18         33 Whitehall Street
19         21st Floor
20         New York, NY 10004
21
22   BY:   BRIAN S. MASUMOTO, ESQ.
23
24
25
```

1

2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

3           Attorneys for Official Creditors' Committee

4           1177 Avenue of the Americas

5           New York, NY 10036

6

7   BY:   ELISE S. FREJKA, ESQ.

8           RACHAEL L. RINGER, ESQ.

9

10

11  KIRKLAND & ELLIS LLP

12          Attorneys for Ally Financial & Ally Bank

13          655 Fifteenth Street, NW

14          Washington, DC 20005

15

16  BY:   JUDSON D. BROWN, ESQ.

17

18

19  KIRKLAND & ELLIS LLP

20          Attorneys for Ally Financial & Ally Bank

21          601 Lexington Avenue

22          New York, NY 10022

23

24  BY:   ANTHONY GROSSI, ESQ.

25

7

1

2  NICHOLS KASTER ATTORNEYS AT LAW

3       Attorneys for Christina Ulbrich

4       80 South 8th Street

5       Minneapolis, MN 55402

6

7  BY:   KAI H. RICHTER, ESQ.

8

9

10  DUANE MORRIS LLP

11       Attorneys for Green Planet Servicing LLC

12       111 South Calvert Street

13       Suite 2000

14       Baltimore, MD 21202

15

16  BY:   SCOTT H. MARDER, ESQ.

17

18

19  DUANE MORRIS LLP

20       Attorneys for Green Planet Servicing LLC

21       1540 Broadway

22       New York, NY 10036

23

24  BY:   JAMES J. VINCEQUERRA, ESQ.

25

1

2  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

3        Attorneys for FHFA

4        1633 Broadway

5        New York, NY 10019

6

7  BY:   ANDREW K. GLENN, ESQ.

8        DANIEL FLIMAN, ESQ.

9        KANCHANA LEUNG, ESQ.

10

11 MAYER BROWN LLP

12        Attorneys for Ally Financial Inc.

13        1675 Broadway

14        New York, NY 10019

15

16 BY:   MICHAEL D. WARE, ESQ.

17

18

19 WHITE & CASE LLP

20        Attorneys for Junior Secured Noteholders

21        1155 Avenue of the Americas

22        New York, NY 10036

23

24 BY:   HARRISON DENMAN, ESQ.

25

```
 1
 2  REED SMITH LLP
 3        Attorneys for Residential Capital LLC
 4        136 Main Street
 5        Suite 250
 6        Princeton, NJ 08543
 7
 8  BY:   DIANE A. BETTINO, ESQ.
 9
10
11  CRAVATH, SWAINE & MOORE LLP
12        825 Eighth Avenue
13        New York, NY 10019
14
15  BY:   LAUREN A. MOSKOWITZ, ESQ.
16
17
18  SIDLEY AUSTIN LLP
19        Attorneys for Nationstar
20        One South Dearborn
21        Chicago, IL 60603
22
23  BY:   LARRY J. NYHAN, ESQ. (TELEPHONICALLY)
24
25
```

10

```
 1
 2    MCKOOL SMITH
 3          Attorneys for Freddie Mac
 4          600 Travis Street
 5          Suite 7000
 6          Houston, TX 77002
 7
 8    BY:   PAUL MOAK, ESQ. (TELEPHONICALLY)
 9
10
11    QUARLES & BRADY LLP
12          Attorneys for OneWest Bank
13          300 North LaSalle Street
14          Suite 4000
15          Chicago, IL 60654
16
17    BY:   JOHN M. O'NEAL, ESQ. (TELEPHONICALLY)
18
19
20    CORLA JACKSON
21          Appearing Pro Se
22
23
24    KENNETH TAGGART
25          Appearing Pro Se
```

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  We're here in

3    Residential Capital, LLC, number 12-12020.  Mr. Rosenbaum?

4            MR. ROSENBAUM:  Good morning, Your Honor.  Norm

5    Rosenbaum, Morrison & Foerster, for the debtors, here with

6    several of my colleagues.  Your Honor, we have a fairly full

7    agenda this morning.  I'm pleased to report, however, that

8    we've resolved several of the motions for relief that were

9    originally scheduled to be heard today, and are attempting to

10   resolve a few others.  In total, I think I count seven matters

11   going forward today --

12           THE COURT:  Okay.

13           MR. ROSENBAUM:  -- for argument.  And I'll just work

14   off the agenda, starting with the resolved matters, unless Your

15   Honor wants me to address anything --

16           THE COURT:  No, go ahead.

17           MR. ROSENBAUM:  -- okay.  The first resolved matter is

18   number 1, it's on page 2 of the agenda, is the motion of

19   Vermont Housing Finance Agency for relief from the automatic

20   stay.  This was a motion to foreclose -- authority to foreclose

21   on a senior lien where the debtors hold the junior lien.  We

22   entered into a stipulation allowing this to go forward.  It was

23   consented to by the committee, and we'll submit that to the

24   Court.

25           THE COURT:  All right.  I saw that proposed -- I

 1   received a number of the proposed orders this morning, and I

 2   reviewed that, and the Court will approve it.

 3            MR. ROSENBAUM:  Thank you, Your Honor.  The next

 4   matter on the agenda was the application to retain Chadbourne &

 5   Parke as counsel to the examiner.  I believe that order has

 6   already been entered.

 7            THE COURT:  Yes.

 8            MR. ROSENBAUM:  The third matter on the agenda is the

 9   motion of Hitoshi and Wakana Inoue, again, for relief from the

10   automatic stay, to proceed with an action against the debtors.

11   We did enter into a stipulation allowing that action to go

12   forward, solely for determining any liability the debtors might

13   have to the Inoues for purposes of establishing their claim and

14   to assert any defenses they may have to a trustee's sale in

15   deed that closed.  And we'll be submitting a stipulated order

16   on that as well.

17            THE COURT:  And I've seen the stip; I have that order,

18   and that'll be approved likewise.

19            MR. ROSENBAUM:  Thank you, Your Honor.  The fourth

20   resolved matter is the motion of Hedeya Haroutounian.  Again,

21   this was relief from the automatic stay, and we've also

22   submitted a stipulation allowing that action to go forward

23   solely to determine an appeal.

24            THE COURT:  That'll be approved as well.  Thank you.

25            MR. ROSENBAUM:  Proceeding to the matters on which

1  we're going forward today, Your Honor --

2             THE COURT:  I thought there was one with State of New

3  York, as well.

4             MR. ROSENBAUM:  Yes, there is.  It was in the back of

5  the agenda.  That is, again, a motion of the State of New York

6  to continue an action, it's entitled Empire State.  Again,

7  we've consented to relief from the automatic stay to allow New

8  York State to proceed with that action.

9             THE COURT:  Yes.  I reviewed that.  That's approved as

10 well.

11            MR. ROSENBAUM:  Thank you, Your Honor.  That brings us

12 to the contested matters on for today, Your Honor.  The first

13 motion -- this is on page 5 of the agenda, Roman Numeral V,

14 number 1.

15            THE COURT:  Yes.

16            MR. ROSENBAUM:  This is Mr. Taggart's -- Kenneth

17 Taggart's motion for relief from the automatic stay.  This is a

18 continued matter from July 10th.  It's docket number 263.  Mr.

19 Taggart is present in the courtroom and I would cede the podium

20 to Mr. Taggart.

21            THE COURT:  All right, Mr. Taggart?

22            MR. TAGGART:  Mr. Taggart for motion for -- I'm pro

23 se, so --

24            THE COURT:  Yes, go ahead.

25            MR. TAGGART:  -- please excuse me if I --

1          THE COURT:  That's fine.  Go ahead.

2          MR. TAGGART:  -- make any mistakes or give me advice

3     if you may.

4          Yeah, this is a continuation from the adjourned

5     meeting from, I think, it was July 14th.  There was a

6     subsequent motion for two additional cases in federal court to

7     be heard today, which I withdrew the motions this morning for

8     those two cases.  But we are continuing with the motion for

9     relief from stay from the state court, which is GMAC Mortgage

10    LLC v. Taggart.

11         THE COURT:  Let me ask you, Mr. Taggart.  You say you

12    withdrew the motion to lift the stay this morning.  Is that

13    with respect to both federal -- because you had filed one pre-

14    petition federal court action in the Eastern District of

15    Pennsylvania.  And then after the bankruptcy was filed, you

16    filed another damages action in the federal court in the

17    Eastern District of Pennsylvania.  Is that what you have

18    referenced?

19         MR. TAGGART:  Yes.  Yes, that's been withdrawn.

20         THE COURT:  And are you withdrawing those cases?

21         MR. TAGGART:  I'm not withdrawing the cases, no, just

22    the motion for relief from stay.

23         THE COURT:  So if I understand it, you went ahead, in

24    the face of the automatic stay, and you filed a damage action

25    in the Federal District Court in the Eastern District of

1    Pennsylvania.  Thereafter you made a motion to lift the stay to

2    permit you to proceed with that action, but now you've

3    withdrawn the motion to lift the stay.  Do I understand that

4    correctly?

5              Let me try to explain it better.  You understand

6    there's an automatic stay in place, and it prohibits anyone

7    from filing an action against the debtor in any court, state or

8    federal, anywhere in the United States; and in the face of

9    that, you went ahead and filed another action in Federal

10   District Court in the Eastern District of Pennsylvania?  Do I

11   have that correct?

12             MR. TAGGART:  I did --

13             THE COURT:  Is that yes or a no?

14             MR. TAGGART:  -- I did file an action, yes.

15             THE COURT:  Okay.

16             MR. TAGGART:  If I may respond?  I was -- I filed that

17   and made a notation of the stay, that it was automatically

18   stayed.  I'm pro se and I did not do it intentionally in

19   violation of the court or the stay.

20             THE COURT:  I'm not sure I'm permitting you to

21   withdraw the motion to lift the stay to proceed with that,

22   because I may well go ahead and rule on that motion.  Because

23   you filed the action in violation -- it's such a clear

24   violation of the automatic stay when you went ahead and filed

25   that action.

RESIDENTIAL CAPITAL, LLC, ET AL.                    16

1      MR. TAGGART:  Yes, I misunderstood the -- I did

2  immediately file a relief from stay to not proceed any further,

3  just the filing.  And I did make a notation.

4      THE COURT:  But now you're leaving this action that

5  you filed in the federal court, having -- you say you've

6  withdrawn the motion.  I'll decide whether it's withdrawn or

7  not.  You may think you're withdrawing the motion to lift the

8  stay, but I'll hear from Mr. Rosenbaum about that.

9      But let's go on to talk about the state court

10  foreclosure action.  Go ahead.

11      MR. TAGGART:  The state foreclosure action, Your

12  Honor, GMAC did not file a notice with the court -- the

13  bankruptcy was filed May 14th, 2012.  They did not file with

14  the court any notice of stay until June 6th, 2012, nearly three

15  weeks later, and that's only after I filed a motion with the

16  state court on June 4th, letting them know that there was a

17  bankruptcy involving GMAC, at which time GMAC filed their

18  motion and asserted of the thirty-two counts alleged against

19  them, counterclaims, that only one count could proceed and the

20  other thirty-one counts should be stayed at that point, of

21  course, at which time the court did so, and stayed those

22  counts.  But GMAC proceeded with their case.

23      THE COURT:  If I understand it, you moved in the state

24  court for a stay of the foreclosure action that GMAC filed

25  against you, and the state court denied that motion.  Am I

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1    correct?

2          MR. TAGGART:  I asked the state to -- they filed a

3    stay against my claims.  I filed a stay with the court to stay

4    the entire case, both claims.

5          THE COURT:  And on June 15th, 2012, the state court

6    entered an order summarily denying your motion for a stay.  Am

7    I correct?

8          MR. TAGGART:  Yes, I believe that's correct.

9          THE COURT:  Okay, go ahead.

10         MR. TAGGART:  There were several entries in the docket

11   from the time GMAC filed for bankruptcy until June 6th, and

12   from June 6th until now, there's been nineteen entries in the

13   docket.  I haven't been able to proceed with any of my

14   counterclaims against GMAC.

15         THE COURT:  For damages?

16         MR. TAGGART:  Or even -- some of the -- I'm sorry.

17   Some of the claims for damages must be asserted with damages,

18   which actually are permitted in the order that was signed by

19   the Court that says that the damages must be -- if the claims

20   must be asserted with damages, they're permitted.  And that's

21   actually the case.  But GMAC asserted that thirty-one out of

22   the thirty-two claims should be stayed.

23         THE COURT:  Let me ask you this.  The debtors, in

24   their response to your -- in the supplemental filing that they

25   filed with this court -- because this came on for a hearing on

 1  July 10th --

 2          MR. TAGGART:  Yes.

 3          THE COURT:  -- and I directed that you and the

 4  debtors' counsel try and work this out.  You were unable to do

 5  that.

 6          MR. TAGGART:  Yes.

 7          THE COURT:  I understand that.  They filed an

 8  additional filing, actually several.  And the debtors have

 9  offered to consent to a limited stay as follows:  "The parties

10  may proceed through any dispositive motion practice in the

11  foreclosure proceeding, by which the trial court will determine

12  the viability of Mr. Taggart's alleged defenses to foreclosure,

13  in the foreclosure proceeding.  Thereafter, Mr. Taggart would

14  have the opportunity to renew his motion by filing a notice of

15  hearing fourteen days in advance of the next available omnibus

16  hearing, to the extent that any of Mr. Taggart's counterclaims

17  remain that would otherwise be stayed by the supplemental

18  servicing order."  That's in the debtors' supplement in further

19  opposition.

20          So what -- the difficulty I had the last time you were

21  here, not with your position, but really with the debtors'

22  position, they argued that none of the thirty-two

23  counterclaims -- I guess thirty-one of the thirty-two

24  counterclaims that you had asserted could not proceed as

25  defenses in the state court foreclosure action.  And I raised

1    with them, they hadn't briefed the issue.  They just simply

2    made that argument, that none of those could be asserted as

3    defenses.

4           And after you went back and were unable to work it

5    out, they filed a supplement, and they also filed a memorandum

6    of law from the debtors' Pennsylvania counsel, Reed Smith.  And

7    that addressed, in detail, applicable Pennsylvania state law as

8    to what could be asserted as a defense to foreclosure.  But the

9    debtor, in my view, correctly agrees that the judge in your

10   foreclosure action should be the one to decide what can

11   properly be asserted as a defense under state law.  Because

12   Pennsylvania law governs what are proper defenses to the state

13   court foreclosure.

14          So what's wrong with their position?  They're saying

15   go ahead, Mr. Taggart; go back to the state court judge.

16   You've asserted thirty-two counterclaims.  That judge will

17   decide which of those claims, if any can properly proceed as

18   defenses to foreclosure.  Why isn't that the right result?

19          MR. TAGGART:  That's -- I don't have a problem with

20   that, I just have -- the court had said that -- I'm citing a

21   decision just last week in Aurora by this court, that they're

22   using the sword and shield defense that, okay, they can proceed

23   in state court, but I have an issue with the monetary damages,,

24   if they're liable also for monetary damages, why that shouldn't

25   offset.

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1          THE COURT:  They're not seeking monetary damages from
2     you in the state court foreclosure action.  As I understand it,
3     and the state court judge will be one to determine this, it's
4     what's referred to as an in rem proceeding; that they can't get
5     a personal judgment against you.  If the prevail, they'll get a
6     judgment of foreclosure with respect just to the real property,
7     but no personal judgment against you.

8          So their position is, they're not seeking monetary
9     damages from you.  And they argue, they briefed, but I'll leave
10    it to a Pennsylvania judge to decide, that under Pennsylvania
11    law, in an in rem foreclosure proceeding, the court doesn't
12    decide any monetary damage issues.  The judge in Pennsylvania
13    will decide what's a valid -- what may be a valid defense to
14    foreclosure.  If any of your thirty-two counterclaims, under
15    Pennsylvania law, can be asserted as defenses, the judge in
16    Pennsylvania will decide that.

17         I mean, that's -- what's wrong with that -- that's the
18    position that the debtors have set forth in their supplement.
19    And they supported it with the memorandum of law from Reed
20    Smith that goes through and specifically talks about what
21    Pennsylvania law is.  I don't have -- with this proposal to
22    send it back to the judge there, I'm not going to decide what's
23    a valid defense, what's not a valid defense.  The Pennsylvania
24    judge will decide that.  What's wrong with that?

25         MR. TAGGART:  That part of it, I don't have a problem

1    with, Your Honor.  What they're attempt -- what GMAC is

2    attempting to do here is get an in rem judgment, I mean,

3    against the property.  But obviously state claims aren't on a

4    personal level.  I am the person who took out the loan on that

5    property.  It's my property.  It's my credit.  It's my -- you

6    know, once the property's gone, my claims against GMAC are just

7    stayed for --

8             THE COURT:  No, you'll file a proof of claim in this

9    court and -- actually, it's broader than that.  Because the one

10   thing I must say, what they set forth in their supplement

11   was that --

12            MR. TAGGART:  Your --

13            THE COURT:  Let me finish.

14            MR. TAGGART:  Okay.

15            THE COURT:  That you could come back to this court --

16   after the Pennsylvania judge rules, you can come back to this

17   court and seek to get broader stay relief.  So for example, if

18   the Pennsylvania judge decided that -- I'm picking a number out

19   of the air -- two, five, ten, of your counterclaims are -- may

20   be valid defenses to foreclosure, and he proceeds to decide the

21   issues on those; if those same counterclaims also give rise to

22   damage claims on your part, it's possible -- I'm not saying

23   I'll do this -- but it's possible that if you came back at some

24   point, I would say that judicial efficiency favors the

25   Pennsylvania judge fixing the amount of any liability, because

1   he or she necessarily had to decide issues of fact and law

2   relating to your defenses.  I'm not saying; I don't know.  But

3   it leaves open the possibility of you coming back.

4          If the court in Pennsylvania strikes all thirty-two or

5   thirty-one of the defenses and says they're not defenses to

6   foreclosure, your avenue for relief is clear.  You file a proof

7   of claim in this court and in due course you'll adjudicate --

8   the Court will, if there's objections to the claims, the Court

9   will adjudicate it.  But -- anything else you want to add, Mr.

10  Taggart?

11         MR. TAGGART:  Yeah.  I have a question for the Court.

12  It's obviously -- I file a claim with the court, which they'll

13  pay at back pennies on the dollar.  So if they get a judgment

14  for 800,000 dollars, even though, if I have claims --

15  counterclaims for 800,000 dollars in personam, they go ahead

16  proceed, I lose the property, and I have no recourse --

17         THE COURT:  They've represented in the supplement and

18  in the memorandum of law that Reed Smith filed, that in a

19  Pennsylvania foreclosure action such as the one pending, that

20  there is no in personam judgment entered.  It's purely a so-

21  called in rem proceeding.  If they prevail, they succeed in

22  foreclosing on your property.  But it doesn't result in an in

23  personam judgment.  I'll ask the debtors' counsel about that,

24  but --

25         MR. TAGGART:  I understand what you're saying.

1           THE COURT:  Do you agree with that?

2           MR. TAGGART:  I'm agreeing with what you're saying.

3    I'm saying they're using the in rem foreclosure, not only in

4    Pennsylvania and in other states, to circumvent and stay

5    everybody's --

6           THE COURT:  Well, you say that.  But --

7           MR. TAGGART:  -- you know, against -- that's what

8    they're doing.  So they're holding off --

9           THE COURT:  Well, they filed the foreclosure action

10   long before they filed for bankruptcy.

11          All right.  Any other points you want to make?

12          MR. TAGGART:  Yeah.  I mean, currently, in any

13   defenses that have come up that have to be alleged in federal

14   court:  racketeering, fraud, fraud on the court, it would have

15   to be alleged in federal court, because there are damages

16   regarding that claim, and can also be used as defenses, have to

17   be alleged in federal court.

18          And those claims can be used to offset a judgment.

19   This court in the one hearing, the National Association of

20   Bankruptcy Attorneys assert -- or is allowing this court,

21   people in bankruptcy to offset judgments that GMAC -- I believe

22   that's what's asserted by the Court, but not in foreclosure.

23          THE COURT:  Anything else?

24          MR. TAGGART:  That's it.

25          THE COURT:  All right.  Mr. Rosenbaum?

1          Just have a seat up front, because I'll give you a

2    chance if there's anything you want to -- you can sit back

3    against the rail or up there.  Either way.  Because I'll give

4    you another chance after Mr. Rosenbaum has spoken.

5          MR. ROSENBAUM:  Your Honor, just one thing.  Diane

6    Bettino of Reed Smith is here.  She's counsel in the

7    foreclosure actions --

8          THE COURT:  I do have -- I do understand it correctly

9    that you're not seeking an in personam judgment against Mr.

10   Taggart in the Pennsylvania action.  Is that correct?

11         MR. ROSENBAUM:  That's correct, Your Honor.

12         THE COURT:  Okay.

13         MR. ROSENBAUM:  Your Honor accurately stated the

14   position of the debtors on Mr. Taggart's motion.  We are

15   prepared to allow the stay to be lifted, to the extent it is

16   not subject to the supplemental servicing order, to allow the

17   state court to rule on dispositive motions, whatever Mr.

18   Taggart would like to bring, GMAC motions as well, and have the

19   state court determine the matters before it on the

20   counterclaims and any claims Mr. Taggart wishes to raise within

21   the confines of the procedures of that court.

22         And again, it's without prejudice.  If and when -- if

23   the court rules that there are actually monetary claims that

24   remain as part of his defenses that are otherwise stayed, Mr.

25   Taggart will have the right to come back to this court, renew

1    his motion for relief -- or to the court to --

2            THE COURT:  So the one thing -- and I raised this with

3    Mr. Taggart.  I mean, I'm not deciding any of it today of that

4    point.  But if the state court in Pennsylvania were to decide

5    that some number of these counterclaims are properly asserted

6    as defenses to foreclosure and were to go on and get ready for

7    a trial in them, and Mr. Taggart came back and said look, the

8    state court's going to go ahead and decide the issues of fact

9    and law, I'm not deciding it now, but judicial efficiency might

10   favor allowing the fixing of the claim.

11           You've entered into some stipulations today, in fact,

12   that do just that, allow another court to fix the amount of the

13   claim.  It's premature for me to even deal with it, other than

14   that I just want to make it clear to you that I'll look at the

15   situation as it exists at the time.

16           MR. ROSENBAUM:  Understood, Your Honor.

17           THE COURT:  Okay.  What about this new federal court

18   action he filed and the effort to withdraw the motion to lift

19   the stay.  I mean, the action was clearly filed in violation of

20   the stay.

21           MR. ROSENBAUM:  Your Honor, we have no objection to

22   withdrawal of the motions, provided Mr. Taggart withdraws the

23   actions --

24           THE COURT:  Well, he hasn't said he's going to

25   withdraw the action.  Well, the pre-petition action doesn't get

1   withdrawn.

2          MR. ROSENBAUM:  That's correct, Your Honor.

3          THE COURT:  It's just the question about that post-

4   petition action that he filed.

5          MR. ROSENBAUM:  Your Honor, these are clearly both

6   claims for monetary damages.  He does seek some injunctive

7   relief to stay the foreclosure proceeding.  But we're here

8   allowing that foreclosure proceeding to go forward.  These

9   cases were just filed.  No discovery's been taken.  We don't

10  see any basis for relief from the stay under the Sonnax

11  factors, and the motion should be denied.  And Mr. Taggart

12  should be directed to withdraw the motion for --

13         THE COURT:  Well, I don't have a motion in front of me

14  addressed to this issue of what should happen with the post-

15  petition action.  The pre-petition action, he wants to withdraw

16  the motion to lift the stay.  It's stayed.  Okay.  The post-

17  petition action is a different story.  It was filed in

18  violation of the automatic stay.  And if you're consenting to

19  his withdrawing of the motion to lift the stay, fine, then I'll

20  deem it withdrawn.  And you'll figure out -- I don't have

21  anything in front of me from you -- no motion that seeks relief

22  with respect to Mr. Taggart's filing of that action in

23  violation of the stay.

24         MR. ROSENBAUM:  That's correct, Your Honor.  We were

25  hoping to resolve everything today.  But I understand there's

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1  nothing before Your Honor, and we'll reserve all our rights

2  with respect to that action.  I think Mr. Taggart should

3  understand that, if he doesn't already, it's in violation of

4  the automatic stay, and we have certain rights under the

5  Bankruptcy Code, and procedures of this court to move for

6  appropriate sanctions and equitable relief.

7          THE COURT:  Well, I'm going to leave it to you to try

8  and work that out with Mr. Taggart.  Okay?

9          MR. ROSENBAUM:  Thank you, Your Honor.

10         THE COURT:  All right.  Mr. Taggart, is there anything

11 else you want to add?

12         MR. TAGGART:  If I may?

13         THE COURT:  Go ahead.  Come up.

14         MR. TAGGART:  Thank you, Your Honor, first, for your

15 time.  I apologize if -- again, I'm pro se, I'm not trying to

16 make excuses though.  And I didn't file that claim recently

17 with intentional malice or anything against the court or GMAC.

18 So --

19         THE COURT:  I'll tell you what, Mr. Taggart.  Talk to

20 Mr. Rosenbaum.  And he's consented to your withdrawing the

21 motion to lift the stay as to both that pre-petition federal

22 action and the post-petition federal action.  You ought to try

23 and resolve the issue about the post-petition action.  Because,

24 I understand you're pro se, but the rules -- I may be -- I try

25 to bend over backwards for pro ses, okay?  But there are some

1   things you can't do.  Okay?  Talk to Mr. Rosenbaum, see if you

2   can work it out, as to that.

3            MR. TAGGART:  Yeah, I will definitely do that.

4            THE COURT:  Okay.

5            MR. TAGGART:  The other question I had is, on the pre-

6   petition filing, which -- in federal court, which involved GMAC

7   actually as a third-party defendant.  It's actually against

8   Montgomery County.  Some state courts have recognized the

9   fraudulent, false robo-signed affidavits and assignments in

10  mortgage foreclosures, by GMAC, Jeffery Stephan affidavits.  I

11  don't want to waste the Court's time.  The State Attorney

12  General in Maine, Ohio -- they're basically considered fraud.

13           Some state court are still allowing those affidavits

14  to be used in foreclosure cases.  In my case it is true, and in

15  several other cases, they're still foreclosing on fraudulent

16  robo-signed affidavits currently.  I have evidence of that.

17  That is what, in a sense, that case is about.  The federal

18  complaint was filed January 26th against Montgomery County and

19  GMAC as a third party defendant.

20           That was one of the motions that was withdrawn.  They

21  just gave me a brief last week.  Not to waste the Court's time,

22  but I think it's essential that the Court recognize any pre-

23  petition cases or at this time, before proceeding, people

24  losing their houses, even in rem judgment, with false

25  affidavits.  There should be a remedy for homeowners like

RESIDENTIAL CAPITAL, LLC, ET AL.                    29

1  myself, and still thousands if not millions of people losing

2  their homes, because of in rem judgment, and they're holding

3  off litigation and using the bankruptcy court to evade

4  responsibility because of these false foreclosures.

5          And that's what that case is about.  And that was

6  filed prior to them filing for bankruptcy.  So I'm asking the

7  Court, at what point will these -- myself and other people get

8  relief from that, because after the house is gone, there's --

9          THE COURT:  Mr. Taggart, if you believe that false

10  documents, robo-signed documents have been used in their effort

11  to foreclose on your home, the place to raise that issue is in

12  the foreclosure proceeding in state court in Pennsylvania.

13          MR. TAGGART:  Yeah.

14          THE COURT:  You had -- let me just finish.

15          MR. TAGGART:  Okay, I'm sorry.

16          THE COURT:  The supplemental servicing order

17  specifically authorizes you to lift the stay with respect to

18  any defense to foreclosure.  If it's a -- I don't have your

19  case or any of the others in front of me, nor should they be in

20  front of me.  The matter is pending in a state court in

21  Pennsylvania.  You need to raise whatever defenses you believe

22  you can support that are proper defenses to foreclosure.

23          I have no tolerance for robo-signing or other efforts

24  by mortgagees or loan servicers, improperly to foreclose.  I've

25  written a number of opinions myself on those issues.  But the

1  place to raise the issue is in the foreclosure action in

2  Pennsylvania.  And there's nothing that prevents you from doing

3  that.

4          MR. TAGGART:  Your --

5          THE COURT:  Okay.  I need to move on on the calendar

6  now.

7          MR. TAGGART:  -- yeah.  In the evidentiary hearing on

8  Wednesday, can those documents be produced as well?

9          THE COURT:  What evidentiary hearing on Wednesday?

10          MR. TAGGART:  Robo-signed documents as far as --

11          THE COURT:  It has nothing to do with -- what does

12  that have to do with anything that's before me?

13          MR. TAGGART:  Okay.  I'm sorry.  Then I'll withdraw

14  that.  That's fine.

15          THE COURT:  Okay.  All right.  All right, thank you,

16  Mr. Taggart.

17          MR. TAGGART:  Okay.  Thank you.

18          THE COURT:  Mr. Rosenbaum -- and I'm taking the

19  Taggart matter under submission, and I'll issue an appropriate

20  opinion or order.

21          MR. ROSENBAUM:  Thank you, Your Honor.  The next

22  matter on the agenda is the amended motion for relief from the

23  stay filed by Corla Jackson.  It's docket number 856.  I'm

24  going to cede the podium to Aaron Klein.  And I believe Ms.

25  Jackson is in the courtroom as well.

1          THE COURT:  Okay.

2          MR. KLEIN:  Good morning, Your Honor.  Aaron Klein,

3   Morrison & Foerster, for the debtors.  I'll immediately cede

4   the podium to Ms. Jackson, since she's here.

5          THE COURT:  Okay.  Is someone here?  Is Ms. Jackson or

6   someone here?  Are you going to -- do you want to argue?  Come

7   on up.

8          MS. JACKSON:  Good morning, Your Honor.

9          THE COURT:  Good morning.  Just identify yourself

10  specifically for the record, okay?

11         MS. JACKSON:  Corla Jackson.

12         THE COURT:  Thank you, Ms. Jackson.

13         MS. JACKSON:  Um-hum.

14         THE COURT:  And just so it's clear what we have; on

15  June 8th, 2012, you filed a motion for relief from stay that's

16  at ECF docket number 264.  And on July 19th, 2012, you filed an

17  amended motion to lift the stay.  And that's at ECF docket

18  number 856.  All right. Go ahead.

19         MS. JACKSON:  Yes, sir.

20         THE COURT:  Go ahead.

21         MS. JACKSON:  I asked Mr. Aaron --

22         MR. KLEIN:  Klein.

23         MS. JACKSON:  -- Klein to produce the long form

24  original note and he refused.  I also asked him to produce the

25  original allonge; he also refused.  I also asked him --

1    THE COURT:  You need to speak into the microphone, Ms.

2  Jackson.

3    MS. JACKSON:  I also asked him to produce the

4  original -- these are long-form documents, that is given to

5  every homeowner.  I asked him to produce these, because --

6    THE COURT:  You need to speak into the microphone,

7  okay?  Talk to me, not to him.

8    MS. JACKSON:  Okay.  I asked him to produce everything

9  original, because I had a copy of all the originals that he

10  does not have.  I also asked him to produce the original copy

11  of the allonge that they whited out the loan number on, and

12  they also whited out the assignment number.  And, Your Honor, I

13  have a certified copy from the courts of Alabama with the loan

14  number that they had an assignment on that they somehow got a

15  hold to Wells Fargo's documents, Your Honor.

16    And I have it in their handwriting, right here, and I

17  have the loan number that they altered -- they handwritten it,

18  and put the loan number on here, and they filed it.  And

19  there's a certified copy from the courts.

20    THE COURT:  Let me ask you this, Ms. Jackson.  I

21  understand your home was foreclosed, correct?

22    MS. JACKSON:  Yes, my -- what happened was the United

23  States District Court of the Southern Division (sic) of Alabama

24  stayed the case.  After all of these original documents showed

25  up, they filed bankruptcy real quick.  And the judge stayed the

1   case.  And they're supposed to report back to the judge --

2            THE COURT:  Could I -- look.  Tell me this.

3            MS. JACKSON:  They're supposed to report back to the

4   judge, the status of the case.  They weren't supposed to

5   foreclose or anything.  Oh, it gets juicy, Your Honor.  I have

6   an affidavit here signed by GMAC Mortgage Corporation, that

7   they do not own my note.  Would you like to see it, Mr. Klein?

8            THE COURT:  Ms. Jackson, talk to me, not to Mr. Klein,

9   okay?

10            MS. JACKSON:  Okay.

11            THE COURT:  Ms. Jackson, as I understand it, you filed

12   a state court action in Alabama --

13            MS. JACKSON:  And --

14            THE COURT:  -- with claims for damages against GMAC

15   Mortgage, correct?

16            MS. JACKSON:  I filed -- I filed damages because they

17   committed fraud, Your Honor.

18            THE COURT:  Just let's take it one step at a time.

19   You filed a state court action seeking to recover damages,

20   filed it in Alabama State Court against GMAC Mortgage?

21            MS. JACKSON:  Correct.  And they ran and filed

22   bankruptcy.

23            THE COURT:  Okay.

24            MS. JACKSON:  Real quick.  And so the judge stayed the

25   case so they couldn't do anything --

RESIDENTIAL CAPITAL, LLC, ET AL.                    34

1          THE COURT:  And GMAC Mortgage --

2          MS. JACKSON:  Filed bankruptcy with you --

3          THE COURT:  Stop.  They removed the case from state

4   court to the United States District Court for the Southern

5   District of Alabama, correct?

6          MS. JACKSON:  Yes, sir.

7          THE COURT:  Okay.

8          MS. JACKSON:  And they didn't know I had all the

9   originals.  And, Your Honor, you know what they did after they

10  filed bankruptcy?  They were supposed to report to you.  Your

11  Honor, they sold my house for 400 and some thousand dollars,

12  and went around you and the United States government.  And I

13  have that as evidence too.

14         THE COURT:  Let me ask Mr. Klein -- I'll give you a

15  chance.  Why don't you just sit down in the front row up there

16  and I'll give you another chance.

17         Mr. Klein, what's the status of this matter?

18         MR. KLEIN:  One second, Your Honor.  Your Honor, Aaron

19  Klein, Morrison & Foerster, for the debtors.  The status of the

20  matter is that Ms. Jackson's house was foreclosed on and sold

21  in a foreclosure sale on June 1st.  That was finalized on June

22  1.  Under Alabama state law, Mr. Jackson has a right --

23         THE COURT:  Was that a judicial or nonjudicial

24  foreclosure --

25         MR. KLEIN:  It's a nonjudicial state, Your Honor.  One

1  second, Your Honor.

2          Under Alabama law, Your Honor, Ms. Jackson has a year

3  to redeem or cure the foreclosure, if within ten days of a

4  written demand for possession she vacates the premises.  If she

5  does not, then that redemption is waived.  The debtors

6  delivered a demand for possession on June 29th, and Ms. Jackson

7  did not vacate.  And under Alabama state law, she waived her

8  right for redemption, so the foreclosure action is --

9          THE COURT:  When did Ms. Jackson -- when did Ms.

10 Jackson file the state court action?

11         MR. KLEIN:  January of this year.  So about four

12 months before the foreclosure action.

13         THE COURT:  And when did you remove it to federal

14 court?

15         MR. KLEIN:  February -- February 14th.

16         THE COURT:  What was the basis for removal?

17         MR. KLEIN:  Diversity of jurisdiction, Your Honor.  I

18 think she met the requirements for amount of damages pled.

19         No eviction --

20         THE COURT:  And what was sought in her complaint?

21 Only monetary damages?

22         MR. KLEIN:  Your Honor, we've combed through the

23 complaint and GMAC's Alabama counsel has given us what they

24 think are the actions alleged.  And it looks like these are all

25 actions for damages.  In fact --

1            THE COURT:  The complaint was filed before --

2            MR. KLEIN:  The complaint was filed before --

3            THE COURT:  -- before you completed foreclosure.  All

4    right.

5            MR. KLEIN:  Yes.  Yes.  So the current status is that

6    she had the complaint filed prior to -- in which she alleged

7    various claims such as hate crimes, securities --

8            THE COURT:  I know what --

9            MR. KLEIN:  -- fraud --

10            THE COURT:  -- is being alleged.  I saw the complaint.

11            MR. KLEIN:  Okay.  And then the foreclosure happened

12    in June.  And we were in a gap period, because no eviction

13    proceedings had been filed.  So we think, respectfully, Your

14    Honor, that Ms. Jackson's remedies are to raise any valid state

15    law defenses to foreclosure that she has, when we file the

16    eviction proceeding.  Because her cure period for the

17    foreclosure is not available to her anymore, because she did

18    not vacate the premises after the demand for possession on, I

19    think it was June 29th.  She had ten days to vacate the

20    premises.

21            MS. JACKSON:  Your Honor, there's an affidavit they

22    say they didn't own my house.

23            THE COURT:  Just a second.

24            Who is the mortgagee?  Were you the loan -- was the

25    debtors the loan servicer or the original mortgagee?  What

```
 1   was --
 2           MR. KLEIN:  Both, Your Honor.
 3           MS. JACKSON:  No, you weren't.
 4           THE COURT:  Ms. Jackson --
 5           MR. KLEIN:  We were not the original --
 6           THE COURT:  -- Ms. Jackson, don't interrupt.  I'm
 7   going to give you another chance to speak, okay?  But you have
 8   to wait.  Okay?
 9           Go ahead, Mr. Klein.
10           MR. KLEIN:  Ms. Jackson is correct.  The original
11   mortgagee -- well, the original originator of the loan was
12   Option One.  We were always the servicer under that loan.  And
13   then in 2008, the loan was assigned to GMAC.  So we became the
14   servicer and the mortgagee.
15           THE COURT:  How was the note assigned?
16           MR. KLEIN:  It was assigned through a transfer --
17           THE COURT:  Written?
18           MR. KLEIN:  A written transfer, yes.  In fact, I think
19   Ms. Jackson cited that written transfer in her complaint,
20   attached it as a copy.
21           THE COURT:  And was the written transfer signed
22   contemporaneously with the transfer of the note to GMAC?
23           MR. KLEIN:  That I don't know, Your Honor.
24           If I may, Your Honor, I think that what we have here
25   is a situation where Ms. Jackson has asserted damages claims
```

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1   against the debtors that are not in connection with the

2   foreclosure.  The foreclosure proceeding happened.  She had an

3   opportunity to assert claims as valid state law defenses

4   against foreclosure.  She will have that opportunity again when

5   we move to -- if and when we move to evict, in the eviction

6   proceedings, under the supplemental servicing order.

7            THE COURT:  Okay, Mr. Klein.

8            Ms. Jackson, go ahead.

9            MS. JACKSON:  Your Honor, I have an order here from

10  the judge that stayed this case, so that they couldn't do

11  anything to my house.

12           THE COURT:  When was that entered?

13           MS. JACKSON:  November 30th, 2012.

14           THE COURT:  Can't be.

15           MS. JACKSON:  No, wait -- let's see.  Litigation on or

16  before -- let's see.  May 31st.

17           THE COURT:  Of what year?

18           MS. JACKSON:  It says "done and ordered this 31st day

19  of May 2012".  And we were supposed to report back to -- Mr.

20  Klein and I were supposed to report back to this judge and tell

21  them where we were by November 30th, 2012, right here.

22           And what they did was they filed bankruptcy.  They

23  went around you, they went around me, they went around the

24  judge, they went around the government, and they sold my house

25  for 401,000 dollars, and they cashed in a policy --

1          THE COURT:  Mr. Klein, why don't you bring me that --

2          Ms. Jackson, you can stay there.  Mr. Klein, bring me

3    that order, would you please?  Bring it up to me.

4          MS. JACKSON:  Oh, here's the affidavit too.

5          THE COURT:  No, let me just look at that first, okay?

6          MS. JACKSON:  Okay.

7          THE COURT:  I appreciate it, Mr. Klein.

8          MR. KLEIN:  May I approach, Your Honor?

9          THE COURT:  Yes, please.

10      (Pause)

11          THE COURT:  I'll give you this back at the end.  Okay?

12    Go ahead.  Anything else you want to add, Ms. Jackson?

13          MS. JACKSON:  Oh, Your Honor, it gets worse.  They

14    took the original loan documents and fabricated a page that did

15    not match and put my signature to it.  And I have the original

16    documents on how they did it.  And I asked Mr. Klein, I said,

17    Mr. Klein, would you please submit me your original allonge,

18    your original --

19          THE COURT:  Talk to me, not Mr. Klein.

20          MS. JACKSON:  -- original -- I'm sorry, Your Honor.

21    Your original allonge, your original assignment, your original

22    loan documents, the original appraisal on my property, because

23    two acres wasn't even attached to my loan.  And Your Honor, the

24    credit bureau did an investigation, and my loan was paid off in

25    full.  And, Your Honor, I think they was after that natural gas

1  on my property.

2          THE COURT:  Okay.  Would you like this back, Ms. --

3          MS. JACKSON:  You can have it.  I can get another

4  copy, Your Honor --

5          THE COURT:  Okay, thank you.

6          MS. JACKSON:  -- from the judge.

7          THE COURT:  Well, no, you can take it.  I can get one.

8          MS. JACKSON:  You can get one?

9          THE COURT:  I can get one.

10         MS. JACKSON:  Thank you.

11         THE COURT:  Thank you very much.  All right.  Mr.

12  Klein --

13         MS. JACKSON:  Your Honor, I'd like to add one thing.

14         THE COURT:  Go ahead.  Quickly.

15         MS. JACKSON:  Your Honor, you see that where -- they

16  said that they got this from Option One.  No, they did not.

17  They stole it from somebody named Jamie Company.  They

18  handwritten in the loan number.  They typed it up -- a fake

19  assignment.  They whited out the assignment to defraud the

20  courts in Alabama.  And I can prove it.  And that's why I am

21  here to get a motion to proceed to trial to get this stuff in

22  order, because, Your Honor, they fabricated each document.

23  Each loan document, Your Honor, has a special form number.

24         All these victims that's fighting, their loan

25  documents -- if their loan number changed, nine times out of

1   ten, they just might be a victim.  But on their original loan

2   document, Your Honor, the forms that they made up does -- it

3   has special forms, these forms do not match.  Example:  page 3,

4   they whited out the form down there, and they stuck my

5   signature to a form that's totally different from the original

6   loan docs.  And, Your Honor, when they did it, the page

7   numbers, like -- look, they handwritten it in, and then typed

8   it up and then filed it and thought I was crazy.

9           And they whited out the original loan number.  Your

10  Honor, it's on my credit report, on each loan document, all of

11  these victims need to know, by Option One Mortgage, on your

12  original loan documents, it has the victim's original loan

13  number and the servicer.  The servicer is at the top of each

14  original loan documents, with the date and the servicer, which

15  was not GMAC Mortgage Corporation at all.

16          THE COURT:  Okay.  I'm going to take this matter under

17  submission.  Thank you very much, Ms. Jackson.

18          MS. JACKSON:  Thank you, Your Honor.  Any time you

19  need to know what's going on, you just call me, and I tell you.

20          THE COURT:  Okay.

21          MR. KLEIN:  Thank you, Your Honor.  The next matter on

22  the agenda is the motion of Christina Ulbrich for relief from

23  the automatic stay.

24          THE COURT:  Yes.

25          MR. KLEIN:  I'd cede the podium to movant's counsel.

1        MR. RICHTER:  Thank you, Your Honor, and thank you,

2   counsel.  Kai Richter from Nichols Kaster, PLLP, for Christina

3   Ulbrich and the putative classes.  I have some familiarity with

4   the realm of force-placed insurance.  Our firm is handling a

5   number of different matters involving force-placed insurance

6   involving a number of different mortgage lenders and servicers.

7        I think in this case, the facts of this case are among

8   the most egregious that I have seen.  Very briefly, Your Honor,

9   Ms. Ulbrich took out a mortgage on August 4th, 2003 and as

10  alleged in the complaint, shortly before she took out the

11  mortgage, she was told that she would not be required to carry

12  wind insurance on the property.  Over seven years later, on

13  December 19th, 2010, she received a letter from GMAC

14  indicating, lo and behold, that she did need to carry,

15  according to GMAC, wind insurance on the property.  And then a

16  few months later, on March 23rd, 2011, GMAC force-placed,

17  purchased out of Ms. Ulbrich's escrow account, or using funds

18  from an escrow account that was set up for her, a windstorm

19  policy that was backdated over seventeen months to October 1st,

20  2009.  And the policy period expiring October 1st, 2010.

21        So at the time it was purchased, the policy was fully

22  expired.  And Ms. Ulbrich was charged almost 10,000 dollars for

23  that windstorm policy.  On the very same day, March 23rd, 2011,

24  Ms. Ulbrich was sent a --

25        THE COURT:  What you really need to tell me, Mr.

1  Richter, is why the stay should be lifted.

2           MR. RICHTER:  The stay should be lifted, Your Honor,

3  for several reasons.  First of all, we really feel like the

4  balance of harms weighs in favor of moving forward.  Now, as we

5  did note in our motion papers, there is a standstill agreement

6  in place with respect to Ms. Ulbrich.  And really, one of my

7  first duties as Ms. Ulbrich's counsel, was to try to put a

8  standstill agreement in place to avoid the risk of foreclosure

9  to her.  Because it was a very real possibility, when she

10 brought her suit.

11          The case, however, is styled as a putative class

12 action.  And unless her case is allowed to proceed, there is a

13 risk, and I would say a significant risk, that other borrowers

14 who have been backdated with policies --

15          THE COURT:  You refer to it as a putative class

16 action.  Has the court certified the class?

17          MR. RICHTER:  No.

18          THE COURT:  Has the class certification motion been

19 made?

20          MR. RICHTER:  No, because we haven't had the

21 opportunity to do it yet, because we haven't been able to take

22 any discovery from GMAC.

23          THE COURT:  There's another defendant as well.  Is

24 that correct?

25          MR. RICHTER:  That is correct.  And the fact -- the

1  stay is in place as to GMAC.  It is not in place, obviously, as

2  to Balboa Insurance Services, which is another complicating

3  factor for the action and is really hindering our ability to

4  pursue --

5           THE COURT:  What was the role of Balboa?

6           MR. RICHTER:  Balboa Insurance Services was a vendor

7  that worked with -- and let me just preface this.  We're

8  handicapped, to a certain extent, because we're still trying to

9  get to the bottom of it and take the discovery.

10          But based on what we've seen, it appears that Balboa

11  Insurance Services, Inc., was a vendor that GMAC used for the

12  force-placed policy, and helped GMAC procure the lender placed

13  policy.  And we allege Balboa Insurance Services, Inc. paid a

14  kickback or a commission to GMAC on the policy.

15          THE COURT:  That's alleged in the complaint?

16          MR. RICHTER:  Yes.

17          THE COURT:  Go ahead.

18          MR. RICHTER:  So with respect to the Sonnax factors,

19  Your Honor, we believe, first of all --

20          THE COURT:  Let me ask you this, before you go to the

21  Sonnax factors.  Because I understand that there's a fully

22  briefed motion to compel arbitration that's under submission

23  with the Court.

24          MR. RICHTER:  That's correct.

25          THE COURT:  When was it placed under submission?  Was

1  there argument, or just on the briefs?

2          MR. RICHTER:  There has not been oral argument.  And

3  the briefing was closed -- they filed their motion on January

4  13th, 2012.  I don't have the date that the briefing was

5  closed, but within, I would say, a month to two months after

6  that.  So it's fully teed up and ready to go before the Court.

7  Judge Scola down in the Southern District of Florida, who, as

8  we noted in our papers, has some experience dealing with force-

9  placed insurance issues down there.  He has another case

10 involving another defendant, Williams v. Wells Fargo, that also

11 deals with force-placed insurance matters.

12         THE COURT:  Has there been any discovery in the

13 action?

14         MR. RICHTER:  We've had the opportunity to take

15 discovery from Balboa Insurance Services, but have not had the

16 opportunity to take discovery from GMAC.  And the complication

17 of the bankruptcy is very real.  I can tell you we --

18         THE COURT:  What discovery did you take from Balboa?

19         MR. RICHTER:  We've taken -- we served a first set of

20 written discovery requests, both interrogatories and document

21 requests.  And one of the difficulties that we're facing, and

22 we actually have a pending motion to compel in the Southern

23 District of Florida against Balboa, is Balboa says, well, we

24 don't have all the documents.  You've got to go get them from

25 some -- you have to go get them from somebody else.

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1          THE COURT:  And has Balboa produced documents?

2          MR. RICHTER:  Balboa has produced documents.  Not as

3    much as we would like.

4          THE COURT:  When did it produce documents?

5          MR. RICHTER:  Within the last -- on the day -- they

6    had an initial production, which consisted of only twelve

7    documents, and then there was a supplemental production which

8    consisted roughly, I'll say of 1,000 pages of documents.  I

9    think we received the supplemental production within the last

10   month.  And the motion to compel was brought within the last

11   couple of weeks and is pending.

12         THE COURT:  Anything else?

13         MR. RICHTER:  Yes.  So with respect to the Sonnax

14   factors, we believe that a number of them favor relief from the

15   stay.  First of all, we believe that allowing the matter to go

16   forward will help resolve the issues, and if we get to the

17   point where we need to file a claim, will allow us to file a

18   meaningful claim.

19         THE COURT:  It's a putative class action to recover

20   monetary damages, correct?

21         MR. RICHTER:  Monetary damages, and very importantly,

22   injunctive relief.

23         THE COURT:  What injunctive relief are you seeking?

24         MR. RICHTER:  So with respect to injunctive relief,

25   the relevant paragraph of our complaint -- I'll just pull it up

1    here -- is paragraph K.  This is Exhibit A to my declaration in

2    support of our motion:  "K) awarding appropriate equitable

3    relief, including but not limited to an injunction requiring

4    GMAC to reverse all unlawful, unfair or, otherwise improper

5    charges for force-placed insurance and related charges;

6    allowing customers to close loans or credit lines without first

7    paying unlawful, unfair, or otherwise improper charges for

8    force-placed insurance; prohibiting GMAC and its affiliates

9    from accepting commissions and prohibiting Balboa from paying

10   commissions to GMAC in connection with force-placed insurance;

11   prohibiting GMAC from purchasing backdated force-placed

12   insurance policies; and prohibiting Balboa from issuing

13   backdated policies to GMAC; requiring defendants to cease and

14   desist from engaging in further unlawful conduct in the future;

15   requiring GMAC to immediately cancel any efforts to foreclose

16   on property owned by plaintiff or other putative class

17   members."

18          THE COURT:  Tell me about the standstill.  I'm sorry

19   to interrupt you.  But you said that you had -- with Ms.

20   Ulbrich, there was a standstill.  Tell me what that is.

21          MR. RICHTER:  There is a standstill in place.  And

22   what the standstill does is essentially fixes Ms. Ulbrich's

23   mortgage payments at an amount that takes out the backdated

24   charges.  Basically the backdated force-placed charges, it took

25   her from -- her monthly mortgage payment from roughly 1,200 a

RESIDENTIAL CAPITAL, LLC, ET AL.                                48

1  month to like 2,800 dollars a month.  It is an absolutely

2  crushing blow.

3          THE COURT:  Just tell me the facts, okay?

4          MR. RICHTER:  Sure.  So in the interim, the standstill

5  agreement provides some interim relief from her.  It's interim.

6  But it doesn't provide any relief to other borrowers in a

7  putative class.  And we feel like having Judge Scola rule on

8  these issues, would provide some needed clarification in this

9  area, particularly as to the backdating issue.  I mean, their

10  position is it's just fine.  Obviously we have a different

11  position.

12          THE COURT:  Just tell me -- just clarify for me, the

13  standstill reduced her current mortgage payments to reduce it

14  by the amount that was being charged for insurance?  Is that --

15  do I have that correct?

16          MR. RICHTER:  That's correct.  The standstill

17  agreement is at Exhibit B to my declaration.  The first term

18  was that she would pay the arrearages on her mortgage.  And

19  then in return for that, GMAC agreed that it would reduce her

20  monthly mortgage obligation to 1,141 dollars, that she could

21  make those payments.  Which obviously did not include the

22  amount that was built in for the backdated policies.

23          THE COURT:  Were there mortgage arrears at the time

24  you filed the case?

25          MR. RICHTER:  There were mortgage arrears, and she

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1   made them up.  Which was that first provision.  Because she

2   basically became so frustrated and overwhelmed that she just

3   figured she was going to lose her house anyway.

4          So coming back to the Sonnax factors.  I think

5   clarification from the court in the Southern District of

6   Florida, I think weighs in favor of relief from the stay.  I

7   think another important point here is we're dealing with an

8   escrow account.  And I know one of the Sonnax factors is

9   whether the debtor is involved as a fiduciary.  One of our

10  claims is a breach of fiduciary duty claim against GMAC for

11  basically imposing improper charges to the mortgage escrow

12  account.  So we believe that's another factor that weighs in

13  favor of relief from the stay.

14         Third, as I mentioned, the court in the Southern

15  District of Florida, Judge Scola, does have expertise in the

16  area of force-placed insurance.  This is not his first case

17  involving force-placed insurance issues.  Fourth, this action

18  does involve third parties, specifically Balboa.  And obviously

19  from our --

20         THE COURT:  The principal defendant was the debtor.

21  Am I correct?

22         MR. RICHTER:  I don't want to get into principal or

23  not principal.  I think it's fair to say --

24         THE COURT:  Well, you say they used Balboa to place

25  the insurance.

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1          MR. RICHTER:  Four of the claims are against GMAC, and

2     one of the claims is against Balboa.

3          THE COURT:  There's no other mortgagees or loan

4     servicers that are defendants in the action?

5          MR. RICHTER:  That is correct.

6          Fifth, given the stage of the proceedings, there's

7     been fully brief motions --

8          THE COURT:  It was a fully briefed motion to compel

9     arbitration.  What other motions are fully briefed?

10         MR. RICHTER:  A motion to dismiss by Balboa.  GMAC's

11    motion was --

12         THE COURT:  But that's not stayed.  I mean, Balboa's

13    motion to dismiss can go forward.

14         MR. RICHTER:  However, GMAC's motion to compel

15    arbitration was a motion to compel arbitration or a motion to

16    dismiss the case.  It was styled in the alternative.

17         And then finally, Your Honor, the sixth Sonnax factor,

18    the balance of harms, we believe that two aspects of this weigh

19    in favor of relief from the stay.  First of all, proceeding

20    against just one of the defendants instead of the other is --

21    raises some real problems from a litigation standpoint.  And

22    then second, as I've noted, the fact that there is not a

23    standstill agreement in place for the members of the putative

24    class, they don't have the relief.

25         THE COURT:  It's not certified as a class action.

RESIDENTIAL CAPITAL, LLC, ET AL.                51

1        MR. RICHTER:  Correct.  But the potential harm to them

2   is real.  And unless our hands are untied and we can move

3   forward, we can't get the case certified as a class action.

4   And that's really the crux of the matter.

5        THE COURT:  It's an additional reason why I wouldn't

6   lift the stay to allow a class action -- not certified class

7   action to proceed against the debtors.  If people have claims,

8   there's a claims allowance process in the bankruptcy court.

9        All right.  Let me hear from Mr. Klein.

10       Why don't you have a seat up front, and I'll give you

11   a chance to reply.

12       MR. KLEIN:  Thank you, Your Honor.  Aaron Klein,

13   Morrison & Foerster for the debtors.  Your Honor, we echo your

14   thoughts about the claims resolution process.  Our position is

15   that the movant has not met her burden to lift the automatic

16   stay.  The Sonnax factors weigh heavily against lifting the

17   automatic stay.

18       If the relief requested were granted, which is to

19   potentially form a huge class action, and counsel's papers --

20   movant's papers say it could number into the thousands -- and

21   move forward with a complex class action like that, it would

22   have a huge burden on the debtors.  That burden would distract

23   them from administration of the Chapter 11 cases, deplete the

24   resources of the debtors.  There's no insurance here, so it's

25   not going to cover the claims of the litigants, and it's not

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1  going to pay for the defense costs, which would be most likely

2  dramatic.  We think that --

3           THE COURT:  What's the basis for the arbitration

4  motion?

5           MR. KLEIN:  I'm sorry?

6           THE COURT:  What is the basis for the arbitration

7  motion that the debtor made?

8           MR. KLEIN:  Your Honor, at the beginning, at the

9  outset of the case, we wanted to proceed to arbitration to see

10 if there was a potential resolution.

11          THE COURT:  Is there an arbitration clause in

12 governing documents?

13          MR. KLEIN:  That's right, Your Honor.

14          THE COURT:  In what?

15          MR. KLEIN:  Ms. Ulbrich's, the movant's -- not only --

16 she took out a home loan, but she also took out a HELOC.  And

17 in a home equity line of credit, there's an arbitration -- a

18 mandatory arbitration clause.  That was the basis for the

19 motion to compel arbitration --

20          THE COURT:  What was the --

21          MR. KLEIN:  -- or in the alternative to dismiss.

22          THE COURT:  -- basis for the motion to dismiss?

23          MR. KLEIN:  I'm sorry?

24          THE COURT:  What was the basis of the motion to

25 dismiss?

1          MR. KLEIN:  The basis for the motion to dismiss, I

2    believe -- let me actually -- give me on second, if you would.

3    I have this in my notes.

4          Your Honor, if you'd just give me one second --

5          THE COURT:  Yes, go ahead.

6          MR. KLEIN:  -- while I can confirm with my client.

7          Apologies, Your Honor, for the delay.  Aaron Klein,

8    again, Morrison & Foerster, for the debtors.

9          The basis for the motion to dismiss, it was a 12(b)(6)

10   motion for failure to state a claim.  The position that the

11   debtors took in that was that in the mortgage documents, lender

12   placed insurance is spelled out as a potential occurrence or as

13   a right of the lender to make sure that there's continuous

14   insurance coverage.  So that was the basis for the motion to

15   dismiss.

16         THE COURT:  Am I correct that the Court in Florida set

17   a November 14th, 2012 discovery -- fact discovery cutoff?

18         MR. KLEIN:  That's right, Your Honor.  That scheduling

19   order was agreed to, I think, prior to filing for Chapter 11.

20         THE COURT:  And a deadline for dispositive motions of

21   November 29th?

22         MR. KLEIN:  That's right.

23         THE COURT:  And a two-week trial beginning March 25th?

24         MR. KLEIN:  That's correct, Your Honor.

25         Your Honor, if I may respond to some of Mr. Richter's

1  arguments.

2          THE COURT:  Before you do that -- and I'll give you a

3  chance.  But I'm concerned about the standstill that was

4  reached with Ms. Ulbrich.  What's the status of that now that

5  the debtors have filed for bankruptcy?

6          MR. KLEIN:  I believe the standstill is in place, Your

7  Honor.

8          THE COURT:  And what is it that the debtor is

9  committing to do with respect to the standstill with Ms.

10 Ulbrich.  If I deny the motion to lift the stay, is Ms. Ulbrich

11 suddenly going to face foreclosure because she's not paying the

12 insurance premium as part of her monthly mortgage payment?

13         MR. KLEIN:  No, Your Honor.  I --

14         THE COURT:  Where do I derive that from?

15         MR. KLEIN:  I believe that the status is that we

16 entered into the standstill agreement during the pendency of

17 her case.  So as long as her action is pending, stayed or

18 otherwise, the standstill agreement is in place.  So the

19 debtors will not move to foreclose on her property.

20         THE COURT:  Go ahead, if you want to address the

21 arguments Mr. Richter made.

22         MR. KLEIN:  Yes, Your Honor.  Thank you.  We believe

23 that the balance of the harms -- any harms that may come to the

24 movant by virtue of the fact that her litigation is stayed as

25 to GMAC Mortgage, is vastly outweighed by the harms that would

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1   come to the debtors of having to spend the time, energy, and
2   resources litigating this matter.
3        I would start out by saying that there really is no
4   immediate urgency by virtue of the standstill agreement and by
5   virtue of the fact that we intend to stand by the standstill
6   agreement to Ms. Ulbrich.  I would also be cautious in talking
7   about the harm that befalls movant by only going against --
8   being able to go against Balboa and also by virtue of the fact
9   that other claimants may be suffering harm.
10       Let me take the second one first in terms of other
11   claimants.  As you had said, there's no class certified here.
12   To the extent that any other -- we acknowledge these are very
13   serious allegations.  And other people may have these claims as
14   well, potentially a lot of other people.  Their remedy is,
15   under the supplemental servicing order, to assert a defense to
16   any foreclosure actions or any eviction proceedings -- we've
17   carved that out from the automatic stay -- or come to this
18   court and file a proof of claim.
19       Secondly, proceeding against just Balboa, we
20   understand that that presents a little bit of an inconvenience,
21   not just a little bit, but it does present an inconvenience.
22   We believe that they could move against Balboa as to the claims
23   against Balboa.  And they're certainly doing that with the
24   discovery that they've served on Balboa.
25       And to the extent that they -- they have a remedy here

1  to, which is to sever GMAC from the action and come to court

2  here, file a proof of claim.  And in fact, that's the remedy

3  for all of the other claimants in the putative class.  I would

4  say that that goes, itself, to the Sonnax factor of judicial

5  economy, which is to say that this forum provides benefits and

6  advantages over a class action in the fact that you don't have

7  to certify a class action.  This Court deals every day with

8  resolving the claims of thousands of claimants through the

9  centralized claims resolution process.  So --

10        THE COURT:  Did the court in Florida set a deadline

11  for filing of a class certification motion?

12        MR. KLEIN:  No, not to my knowledge.  In the

13  scheduling order, they asked for parties to advise them.  They

14  asked for Balboa and movant to advise them as to the status of

15  any class certification motions.

16        THE COURT:  Why --

17        MR. KLEIN:  I would also --

18        THE COURT:  -- why shouldn't the stay be lifted for

19  the purpose of permitting the court to decide the fully briefed

20  motion to dismiss or to compel arbitration?

21        MR. KLEIN:  Your Honor, I don't think that we would

22  have an issue with lifting the stay for the purpose of

23  determining whether or not the case should be dismissed.  My

24  concern -- and I could confer with my client on this -- but my

25  concern about arbitration at this point is that --

1           THE COURT:  Well, you made the motion.

2           MR. KLEIN:  Yes, understood.  My concern is that it's

3    still going to require a lot of discovery.  When Mr. Richter

4    talks about the motions are fully briefed and just they still

5    have to be argued; there's no writing or discovery that needs

6    to take place with those.

7           But my concern is that we would continue to expend

8    resources here on the arbitration when they could come into

9    this court --

10          THE COURT:  No, you have -- I didn't say the

11   arbitration would go forward.

12          MR. KLEIN:  Right.

13          THE COURT:  There's a fully briefed motion, as I

14   understand it, in the alternative, to dismiss the case or

15   compel arbitration.  Why shouldn't the trial judge be permitted

16   to decide that motion?

17          MR. KLEIN:  Your Honor, I --

18          THE COURT:  Because the law on arbitration here is --

19   I mean, it's not -- it's sort of an evolving area as to whether

20   a court should permit an arbitration to go forward to fix the

21   amount of a claim, for example.

22          MR. KLEIN:  Right.  Your Honor, after having you

23   clarify that you wouldn't say you would necessarily let the

24   arbitration proceed, I don't think we would have any issue with

25   lifting the stay solely for the purpose of permitting Judge

1    Scola in the Florida court to rule on the motions already posed

2    and presented in front of him.

3            THE COURT:  Anything else, Mr. Klein?

4            MR. KLEIN:  I just want to address briefly some of the

5    arguments made in terms of the balance of the harms.  That if

6    this were allowed to go forward beyond the dispositive motions

7    that are already pending stage, we're very concerned,

8    especially based upon the breadth and scope of discovery that

9    was served on Balboa, how quickly this could escalate into a

10   multi-hundreds of thousands of dollars litigation, and not

11   even -- that's discovery and class certification, expert

12   witness preparation, a trial on the merits.  It would be

13   heavily burdensome on the debtors.

14           And I think by virtue of the fact that Balboa and

15   movants told Judge Scola that they could move forward,

16   notwithstanding the fact that GMAC -- the case was stayed as to

17   GMAC -- undercuts any arguments to say that they're suffering

18   harm by doing so.  They both agreed to forward.  They didn't

19   have to.  Judge Scola asked them, please advise me as to how

20   you want to proceed.  And they --

21           THE COURT:  Let me ask you this; and I'll ask Mr.

22   Richter --

23           MR. KLEIN:  Sure.

24           THE COURT:  -- the same question.  Do you have any

25   objection to my talking to Judge Scola to ask him whether he

RESIDENTIAL CAPITAL, LLC, ET AL.                    59

1  wishes to proceed to decide the pending motion?

2          MR. KLEIN:  I don't think I have any objection, Your

3  Honor, to that.

4          THE COURT:  Thank you, Mr. Klein.

5          MR. KLEIN:  Thank you.

6          THE COURT:  Mr. Richter, do you have any objection to

7  my speaking to Judge Scola about whether he wishes to go

8  forward to decide the pending motion?

9          MR. RICHTER:  Not at all, Your Honor.

10         Just two points.  First of all, with respect to the

11 claims process.  I understand that individual borrowers may

12 have the opportunity to submit a claim.  I just think

13 fundamentally, the class action process is going to provide

14 more comprehensive relief to those borrowers.

15         THE COURT:  Well, you filed a case in November 2011,

16 and you never moved for class certification.  Here we are in

17 August 2012.  If you thought it was so important that this case

18 proceed as a class action, what were you waiting for?

19         MR. RICHTER:  Discovery.

20         THE COURT:  You know, ordina -- well, I'm not going to

21 get into the procedures of the district court in Florida.

22 Ordinarily class certification should proceed expeditiously.

23         MR. RICHTER:  I understand that, Your Honor.  And not

24 to go into like a long treatise on class action law, but the

25 United States Supreme Court has instructed litigants that you

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1  can't just rely on the pleadings anymore, and you need to come

2  forward with evidence to support your class certification

3  motion.

4         THE COURT:  That's why frequently there's discovery

5  related to class certification right at the outset of the case

6  before merits discovery goes forward.  But I'm not going to get

7  into a debate about that.  The fact is, your case was filed in

8  November 2011.  There's never been a motion for class

9  certification.

10        Anything else in response?

11        MR. RICHTER:  That's it, Your Honor.

12        THE COURT:  All right.  I'm going to take the matter

13 under submission.  I'm not certain whether I'm going to try to

14 speak to Judge Scola.  I may.  If I do, it will just be limited

15 to the issue of the pending motions.

16        MR. RICHTER:  If I may, one --

17        THE COURT:  Sure, go ahead, Mr. Richter.

18        MR. RICHTER:  If the concern is overburdensome class

19 certification discovery, I think Judge Scola if he were to rule

20 on the motion to dismiss, would decide some threshold issues

21 that would allow the case to move very expeditiously to move

22 toward class certification.  I think we could do it very

23 quickly and with limited discovery.

24        THE COURT:  Thank you.

25        MS. FREJKA:  Your Honor, may the committee be heard?

1          THE COURT:  Sure, go ahead.

2          MS. FREJKA:  Elise Frejka, Kramer Levin, appearing on

3    behalf of the committee.

4          THE COURT:  I'm sorry for not asking whether you

5    wished to be heard.

6          MS. FREJKA:  It's okay.  I moved out of your eyesight

7    to allow me to sit.

8          THE COURT:  That's okay.

9          MS. FREJKA:  The committee has reviewed the motion.

10   We've spoken with the debtors' counsel, and the committee

11   supports imposing the stay -- maintaining the stay with respect

12   to this.  We view this from -- this as a claims mitigation

13   process and appropriate for relief at the stage of claims

14   litigation.  We also view this as not affecting an individual

15   borrower's right in an individual foreclosure proceeding to

16   assert these issues to protect their homes.

17          And it doesn't need to have a class action to protect

18   those rights.  We believe that this will be very burdensome and

19   expensive if it proceeds, and it will invite further

20   litigation.  And we would ask that that motion be denied.

21          THE COURT:  Thank you very much.

22          MR. KLEIN:  Again, Aaron Klein, Your Honor, Morrison &

23   Foerster, for the debtors.  The next item on the agenda is the

24   motion to lift the automatic stay by Mary Gardner.  I'm pleased

25   to report that we have reached a consensual resolution that we

RESIDENTIAL CAPITAL, LLC, ET AL.                      62

1  are trying to paper at this point, and we will submit a

2  stipulation and consent order to Your Honor as soon as

3  possible.

4          THE COURT:  All right.  I'll adjourn the Gardner

5  matter, hopefully with a stipulation resolving it being

6  submitted.  Thank you, Mr. Klein.

7          MR. KLEIN:  Expeditiously, Your Honor.  I'm now going

8  to turn the podium over.  I think the next matter on the agenda

9  is the motion of the Federal Housing Finance Agency.  I'll turn

10 the podium over to Mr. Joel Haims, my colleague.

11         THE COURT:  Okay.

12         MR. HAIMS:  Good morning, Your Honor.  My name is Joel

13 Haims of Morrison & Foerster.  We're counsel to the debtors.

14 This is a preliminary hearing on the FHFA's motion to lift the

15 automatic stay to pursue discovery of the debtors.  Before I

16 turn the podium over to Mr. Glenn, I just want to update the

17 Court on resolution -- partial resolution.

18         We were able to reach agreement yesterday with respect

19 to two of the three parts of the motion.  The initial motion

20 sought loan tapes and originator information.  And yesterday we

21 were able to reach agreement on that portion of the motion.

22         We've also had discussions about the third portion,

23 which is the loan file production.

24         THE COURT:  That's in the supplement that --

25         MR. HAIMS:  It's in the supplement.

1          THE COURT:  -- FHFA filed?

2          MR. HAIMS:  Correct.  We've had some discussions about

3    that, but we haven't been able to reach resolution.  We've

4    talked about various ranges of production, but we haven't

5    gotten an actual specific number or list.  The two impediments

6    that we see to resolution on that front are:  one, is the FHFA

7    hasn't agreed to pay for the production, as others who sought

8    loan production from the debtors have agreed to; and secondly,

9    in our view, this opens up floodgates to others, particularly

10   in the FHFA case itself, because the debtors have an interest

11   in the defense of that case, because of indemnification

12   obligations to shared insurance coverage, and because of the

13   FHFA's stated position in the reply brief that they intend to

14   assert a claim against the debtors, so that if the debtors get

15   loan file production -- and if the FHFA gets loan file

16   production from the debtors, then the debtors are going to be

17   in a position in which we're going to have to give loan file

18   production to the defendants.  So it's going to have to be a

19   straight method.  And that's just the position we're in.

20          I will now turn it over to --

21          THE COURT:  All right, Mr. Glenn?

22          MR. GLENN:  Good morning, Your Honor.  Andrew Glenn,

23   Kasowitz Benson Torres & Friedman, on behalf of FHFA.  I'm

24   joined here today by my partner Kanchana Leung, who is the

25   litigation counsel in the FHFA litigation, along with Daniel

RESIDENTIAL CAPITAL, LLC, ET AL.                          64

1    Fliman.

2            As our papers made clear, this is a motion to obtain

3    documents filed at the direction of Judge Cote, who is

4    presiding over that litigation.  The litigation is against a

5    multitude of parties, including nondebtor affiliates, other

6    unrelated underwriters and issuers.

7            THE COURT:  I've read the complaint.

8            MR. GLENN:  Thank you.  We've put forward two

9    alternative theories --

10           THE COURT:  Let me ask you this.

11           MR. GLENN:  Yes, Your Honor.

12           THE COURT:  Have you resolved the issues with respect

13   to the loan tapes and the origination information?

14           MR. GLENN:  Yes, Your Honor, yes.  So just to put a

15   fine point on that, the first motion was filed at the direction

16   of Judge Cote to seek the loan tapes.  At a subsequent status

17   conference, she again directed us to file a motion before Your

18   Honor to pursue the loan files.  While it is true --

19           THE COURT:  Whoa.  Time out.  I didn't see where she

20   told you to pursue the loan files.  I definitely read the

21   transcript where she said to make the motion with respect to

22   loan tapes and origination information.

23           MR. GLENN:  I believe, Your Honor, that's the July

24   14th status conference transcript -- July 17th.  We cannot pull

25   the excerpt; that was in Ms. Leung's affidavit.  That was

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1   during the argument, I believe, where she announced the

2   decision on the Section 105 injunction.

3            THE COURT:  July 17th?

4            MR. GLENN:  I believe.  Mr. Fliman will provide the

5   Court with the cite to the record on that.

6            So it's true, as the debtors set forth in their

7   papers, that there are notionally 105,000 dollar -- 105,000

8   loan files at issue in the securitizations covered by that

9   litigation, but the real starting point is about 63,000, which

10  is what we call the supporting loan groups, which support the

11  loans that are actually at issue in those securitizations with

12  respect to Ally.

13           The litigation is a very complex one and the parties

14  have devoted a substantial amount of time, because if you look

15  at those 63,000 loan files, multiply that across all the

16  securitizations at issue in the litigation, it makes sense for

17  no one to get every single loan file at issue.

18           THE COURT:  That's a very persuasive argument you've

19  just made.

20           MR. GLENN:  Yes.  So what we're working on in the case

21  is narrowing it down to a statistically relevant sample that

22  experts can use to extrapolate across the securitizations.

23           So what we've done in this case, Your Honor, to

24  alleviate the burden that the debtors have identified is to

25  narrow that number down, for purposes today, to 5,000 loan

1    files that we will select in conjunction with our experts.  And

2    we would hope that that would be the absolute outer limit --

3              THE COURT:  I'll tell you what.  Let me ask, are you

4    still in discussions with the debtors in trying to resolve the

5    issue as to production of loan files?

6              MR. GLENN:  I don't believe so, Your Honor.  I think

7    we've reached an impasse.

8              THE COURT:  Okay, go ahead.

9              MR. GLENN:  I do think that the impasse is who's going

10   to pay for it.  To put a very fine point on the argument -- I'm

11   sure Your Honor's read the papers -- there are two issues here:

12   one, does the automatic stay apply; and two, if it does apply,

13   should it be lifted in this case?

14             The company has argued that this application is going

15   to open the floodgates, and I think that's actually not true.

16   We are in a very unique position.  We are acting as conservator

17   for Freddie Mac, which has hundreds of billions of loans, and

18   our job is to resuscitate Freddie Mac, along with other

19   government-sponsored enterprises.

20             THE COURT:  Is there something that says that you have

21   a greater right than any of the other plaintiffs in any of the

22   other cases pending in federal and state courts around the

23   country?

24             MR. GLENN:  Yes, Your Honor.  There are two points on

25   that.  Number one, we, unlike every other entity, other than

 1  other government-sponsored entities and conservators of those

 2  entities, are subject to a 105 injunction.  So the major

 3  argument the companies made in this case is that discovery will

 4  interfere with the reorganization efforts, will distract all

 5  those arguments that are relevant for Section 105.  Judge Cote

 6  has held, consistent with the Colonial Realty case enunciated

 7  by the Second Circuit, that HERA, much like FIRREA, does not

 8  allow a court to issue an injunction against FHFA.

 9          THE COURT:  But she has not ruled that discovery from

10  the debtors is not subject to the automatic stay.  She sent you

11  here.

12          MR. GLENN:  That's correct.  I believe she indicated

13  that she did not believe that that was the case.

14          THE COURT:  Well, she didn't rule.

15          MR. GLENN:  That's the case.

16          THE COURT:  And so the matter's before me.

17          MR. GLENN:  That's correct.

18          So if Your Honor looks at the authorities they've

19  cited --

20          THE COURT:  Let me ask you this:  what about the Johns

21  Manville case, Judge Bryant's (ph.) decision?

22          MR. GLENN:  That case, Your Honor, includes a very,

23  very fulsome explanation of the interference with the

24  reorganization process.  The --

25          THE COURT:  Do you have any -- you haven't provided

RESIDENTIAL CAPITAL, LLC, ET AL.                          68

1    the Court with any evidence rebutting the evidentiary showing

2    made by the debtors about the financial impact as well as

3    impact on the reorganization if the Court permitted your

4    discovery to go forward.  Now, I would acknowledge that, as

5    briefed at least as to the loan files, it was substantially

6    more than the 5,000 loan files that you've apparently narrowed

7    to.  But nevertheless, the debtors put in several declarations

8    that lay out in considerable detail the burden that would be

9    imposed on them to produce -- deal with loan files in

10   particular, and the cost of doing so wasn't refined down to

11   5,000 loan files.  So I don't know what they estimate the cost

12   to be; that wasn't set forth.  But do you agree that you have

13   not rebutted the debtors' evidentiary showing about the impact

14   on the reorganization proceeding and the expense to the debtor

15   if your discovery were to go forward?

16         MR. GLENN:  Your Honor, we have narrowed, as Your

17   Honor has indicated, to 5,000 loan files.  Our understanding --

18         THE COURT:  Let me --

19         MR. GLENN:  -- is the cost of that will be 25 dollars

20   each, for a total of 125,000 dollars.

21         THE COURT:  Just take it one step at a time.  You

22   agree that you have not offered any evidence at this stage of

23   what the cost -- and beside the cost, the impact on the debtor.

24   They set out in some detail the amount of time that would be

25   required to identify and retrieve loan files, arrange for

RESIDENTIAL CAPITAL, LLC, ET AL.                     69

1   copying, other -- admittedly their showing was based on

2   somewhere between 46,000 and 100-and-some-odd thousand loan

3   files, not 5,000 loan files, so I don't have evidence

4   specifically address that.  But you didn't put in any evidence

5   at all to rebut the evidentiary showing, which I consider

6   uncontroverted at this point.  You agree with that?

7           MR. GLENN:  That's correct, Your Honor.

8           THE COURT:  Okay, go ahead.

9           MR. GLENN:  But, again, that presumes that the

10  automatic stay applies --

11          THE COURT:  Yes --

12          MR. GLENN:  -- which we don't --

13          THE COURT:  -- which Judge Bryant in Manville did

14  find, correct?  You didn't seem to discuss that.  You discussed

15  the Ninth Circuit BAP decision in Miller, but you didn't really

16  delve into what Judge Bryant in the Southern District of New

17  York held in Manville on quite analogous facts and arguments.

18          MR. GLENN:  We did, Your Honor.  We indicated a

19  footnote that that case relates to an extension of the

20  automatic stay, not a proper and strict construction of Section

21  362 itself.  And if Your Honor goes to statute, it's -- there

22  is no argument rebutting the application or nonapplication of

23  Section 362.

24          THE COURT:  Well, let me ask you this.

25          MR. GLENN:  This is not an action against the debtor.

1          THE COURT:  Yes, but what that's -- 362(a), that's

2    what I -- I know what Collier says, I know what the Miller

3    decision says, but 362(a)(1) includes the issuance or

4    employment of process.  You've dismissed the debtors from your

5    action, and to get discovery from a third party, you have to

6    use process to do that, don't you?  I mean, it's -- ordinarily

7    process is usually in the form of a subpoena; that's judicial

8    process.  How is it that 362(a)(1) does not apply to the use of

9    judicial process to obtain discovery from a debtor?

10         MR. GLENN:  That provision -- in our position, Your

11   Honor, that process is service of the summons or summons

12   without notice.

13         THE COURT:  Is there -- do you have cases that say

14   that process doesn't include service of a subpoena?

15         MR. GLENN:  Well, I think it's the implication of

16   every case that we cited in our brief, the Collier's citation

17   and --

18         THE COURT:  So you would be entitled -- if it cost the

19   debtor ten million dollars to respond to your discovery, the

20   automatic stay would have no effect whatsoever.  You'd be

21   entitled to that discovery and all of the twenty-seven other

22   actions that have been filed involving RMBS claims.  Everybody

23   would be entitled to discovery from the debtor, whether it cost

24   ten million or a hundred million dollars, with no impact of the

25   automatic stay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1            MR. GLENN:  That's not correct, because every other --

2            THE COURT:  Isn't that the implication of your --

3            MR. GLENN:  No.  No, it's not, Your Honor.

4            THE COURT:  Why not?

5            MR. GLENN:  Because the implication is that in those

6     circumstances the Court could issue a 105 injunction against

7     everybody else.  If the SEC came in and said, we want to do --

8     we're giving the company a Wells notice for civil penalties, so

9     we're not even talking about police power, they would have to

10    produce those documents.

11           THE COURT:  That is a police power.

12           MR. GLENN:  I'm not sure about that, Your Honor.  And

13    that goes to my second argument.  We have the ability to issue

14    these subpoenas under our conservatorship statute, okay, and --

15           THE COURT:  Well, you're not proceeding with your

16    action as part of police power.  You're trying to recover

17    damages.

18           MR. GLENN:  At this point, that's correct.  But we do

19    have that power under the statute, just like any other entity

20    that is policing and governing interstate commerce like this.

21           In any event, there's no argument at all on subsection

22    3, that this is an act to obtain possession of property of the

23    estate.  We're asking for copies.  And I think that while Your

24    Honor's concerns are well-taken if it were ten million dollars,

25    we're not here to impose a ten million dollar expense on the

1  company.  We're here because we are subject to a court-ordered

2  schedule by Judge Cote to obtain these documents; she's noted

3  that it's important information, that it spans across a

4  multitude of parties in a complex litigation that she's trying

5  to orchestrate in tandem in the interest of judicial economy.

6          Unless Your Honor has any questions, I would reserve

7  for reply.

8          THE COURT:  Okay, Mr. Glenn, thank you.

9          MR. GLENN:  Thank you.

10          MR. HAIMS:  Joel Haims from Morrison & Foerster,

11  counsel for the debtors.  Your Honor, I'd just like to respond

12  to a few of the points that Mr. Glenn made.

13          THE COURT:  Why does the automatic stay apply,

14  Mr. Haims?

15          MR. HAIMS:  Why does the automatic --

16          THE COURT:  Yes.

17          MR. HAIMS:  Well, we think this is -- we cite John

18  Mansville (sic) for the proposition that it does apply,

19  particularly in this context.  We --

20          THE COURT:  Mr. Glenn says it's distinguishable

21  because 105 applied in that case.

22          MR. HAIMS:  Well, we disagree that this is not an

23  action against the debtor, for several reasons; one is that

24  he's civilly stated he intends to pursue a claim against the

25  debtor and will use these documents, and these are going to be

1    produced at some point anyway, so let's produce them now; we'll

2    use them against the debtors later.  And by pursuing the claims

3    against the nonaffiliated debtors in that case, there are

4    indemnification claims and there are shared insurance

5    coverages, so they're one and the same.

6              Just to respond to several of his points, one is

7    floodgates will open here; they have to open here.  And this is

8    not only about 5,000 loans, as I mentioned.  We've been told

9    that the defendants in that case -- and I believe some of the

10   defendants are here to address this -- disagree with the FHFA

11   sampling model and methodology.  And to the extent that they

12   get 5,000 loans, the defendants are going to need loans to

13   defend that case; it is in the debtors' interest to give them

14   the loans to defend that case.  And so this can't be a one-way

15   street.  This can't be just about 5,000 loans to the FHFA and a

16   100,000 dollar cost.  It has to be both ways.  And so that's

17   going to be some multiple of that, and I don't even know what

18   the defendants are going to want.  There has been some mention

19   of all of the loan files, but we haven't gotten formal numbers

20   from either of the parties.  We just got the FHFAs in their

21   reply brief and we haven't heard any definitive numbers from

22   the defendants.

23             Second, 100,000 dollars is still a significant sum.

24   The debtors should not bear the cost of that, shouldn't bear

25   the cost of it particularly since the documents are going to be

1   used against the debtors to file a claim against the debtors.

2   Somebody should bear it; shouldn't be the debtors.

3           And lastly, this is a motion to lift the stay.  Sonnax

4   factors apply, and we go through them in our briefs; I'm not

5   going to reply to them now.  But the only basis they gave to

6   lift the stay is that Judge Cote says they should come here.

7   They have a case before Judge Cote, and these documents will be

8   useful in their case before Judge Cote, and frankly that's just

9   enough under the Sonnax test to lift the stay here.

10          If Your Honor has any further questions, I'll --

11          THE COURT:  I do.

12          MR. HAIMS:  Oh, sure.

13          THE COURT:  I do.

14          First let me ask, Mr. Glenn, has somebody found that

15  transcript from Judge Cote?

16          MR. GLENN:  Your Honor, we can bring this to you.

17  It's in July 19th -- 20, just -- sure.

18          MR. FLIMAN:  Your Honor, Daniel Fliman of Kasowitz

19  Benson.  Judge Cote's direction regarding the loan files is

20  quoted at paragraph 4 of her supplemental motion, and that was

21  in her July 17th status conference.

22          MR. GLENN:  Would you like us to bring you a copy of

23  that?

24          THE COURT:  Do you have a copy?  I mean, I've got

25  three tons of paper --

1         MR. GLENN:  Okay.  Let's bring him --

2         THE COURT:  -- here.  If you could just bring me that.

3         MR. GLENN:  Sure.

4         THE COURT:  I would appreciate seeing it.

5         MR. FLIMAN:  Your Honor, I could just give you the

6    relevant pages of the supplemental, or --

7         THE COURT:  Sure.

8         MR. FLIMAN:  -- would you like the entire --

9         THE COURT:  No, I'd just like to see the relevant

10   pages.

11        MR. GLENN:  Here, hand him this as far as the

12   transcripts.

13        THE COURT:  Just identify for the record what it is

14   you're showing, so everybody knows what I'm looking at.

15        Unless somebody objects, I don't know that I need to

16   see the whole -- I'd like to see, obviously, the relevant

17   portion, but --

18        MR. FLIMAN:  Your Honor, I'm going to hand up a copy

19   of the transcript from the July 17th status conference in front

20   of Judge Cote.

21        THE COURT:  Okay.  Okay, and you had turned over at

22   page 24.  Is that --

23        MR. FLIMAN:  Yes, Your Honor.

24        THE COURT:  -- where you wanted me to look?

25        MR. FLIMAN:  The relevant excerpt is at page 24;

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

 1  starts at line 9.

 2          THE COURT:  Okay, let me just read it to myself.

 3      (Pause)

 4          THE COURT:  I'm starting to read at line 3 on page 24.

 5          Okay, I can give you back your transcript.  Thank you

 6  very much.

 7          MR. GLENN:  Your Honor, just so the record's clear --

 8          THE COURT:  Go ahead, Mr. Glenn.

 9          MR. GLENN:  -- Mr. Haims indicated other defendants'

10  positions and the like; that's not in the record and we object

11  to any argument by parties who did not file papers in this case

12  or in reference thereto.

13          THE COURT:  All right.

14          Mr. Haims, let me ask you some questions.  Before

15  Judge Cote, one of the issues that FHFA raised that she didn't

16  decide was the issue of whether Ally has, "control" of the

17  tapes; that would be true of the loan files as well.  And there

18  were two letters -- one from Kasowitz to Judge Cote and one

19  from, I think, Mayer Brown to Judge Cote -- that addressed the

20  issue.  Could you point to me -- are there provisions of the

21  shared services agreement that address whether ResCap has

22  contractually agreed to provide loan files to Ally if it

23  requests them?

24          MR. HAIMS:  We weren't parties to that briefing.  I

25  happened to have gotten copies of those letters.  But --

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1          THE COURT:  Okay, I mean, I got the shared services --

2          MR. HAIMS:  Right, so --

3          THE COURT:  -- agreement here, but --

4          MR. HAIMS:  Our --

5          THE COURT:  Is there somebody who can address this

6    issue?

7          MR. HAIMS:  Well, our posi --

8          THE COURT:  Look.  I mean, here -- before you go on,

9    Mr. Haims, I'll decide what I need to decide.  But you've

10   raised the issue about cost, and one of the issues that was

11   addressed in those two letters -- the Kasowitz letter, the

12   Mayer Brown letter -- dealt with cost.

13          I pulled the shared services agreement and also, I

14   guess it's Schedule C2, pricing for ResCap services, and I

15   confess I don't understand it.  So the Kasowitz letter pointed

16   to language which they specifically said obligated ResCap to

17   respond to Ally request for documents, like the loan files.

18   And then what I'm trying to -- it didn't specifically address,

19   when I look at the ResCap -- the pricing for ResCap services,

20   whether ResCap and Ally have contractually agreed that if

21   ResCap must pull and provide this information to Ally or at

22   Ally's request, whether ResCap can charge Ally for doing that.

23          MR. HAIMS:  My understanding of this, and I can only

24   speak on behalf of ResCap's --

25          THE COURT:  Is there somebody here who can talk about

1  this?  I apolog --

2          MR. HAIMS:  Yeah --

3          THE COURT:  Go ahead and tell me what you can, first.

4          MR. HAIMS:  -- is that the shared-service agreement

5  relates to shared services to run the businesses, that there is

6  no provision in the shared-service agreement that specifically

7  deals with third-party discovery and a pending securities

8  litigation such as this, and that --

9          THE COURT:  No, but let's get to the point.  The

10 defendants before Judge Cote are, I don't know, nondebtor Ally

11 entities; I don't know which one or whether it's AFI or what.

12         MR. HAIMS:  It's several of them.

13         THE COURT:  Okay, all right.  And she didn't resolve

14 this issue of "control".  And I'm prepared to decide what I

15 need to decide, but I'm just -- if FHFA is entitled to the

16 documents from Ally, and your position before Judge Cote was

17 these documents are in the possession of ResCap, not Ally.

18 Okay.  The issue may become whether Ally has the ability to

19 obtain the documents from ResCap.  And so my question is, what

20 does the shared services agreement provide with respect to

21 whether ResCap would have to respond if -- to Ally asking for

22 the loan files, 5,000 loan files, and who pays for it?  Because

23 you say --

24         MR. HAIMS:  My understa --

25         THE COURT:  Let me finish.  You say the cost would be

1   a lot, okay, and I've got the debtors before me.  Judge Cote

2   withdrew the reference with respect to extending the stay to

3   the nondebtors, and she said no.  Okay.

4              MR. HAIMS:  Right.

5              THE COURT:  Now I'm focusing on the discovery issue.

6   So tell me what in the shared services agreement specifically

7   addresses it, and tell me whether anything in the pricing of

8   services specifically says whether Ally has to pay for it.

9              MR. HAIMS:  I don't think it does, but the debtors'

10  position on this motion is that the debtors shouldn't be

11  required to pay for this discovery.  And whether it's the FHFA

12  or some other party, that the --

13             THE COURT:  I know; that's why I'm asking --

14             MR. HAIMS:  Right.

15             THE COURT:  -- the question whether --

16             MR. HAIMS:  So --

17             THE COURT:  -- Ally is required to pay for it.

18             MR. HAIMS:  That's an issue that's not here.  There is

19  a litigation provision in the shared services agreement that --

20             THE COURT:  Point it to me.

21             MR. HAIMS:  Huh?

22             THE COURT:  Point it out to me.  You know --

23             MR. HAIMS:  I don't have that.

24             THE COURT:  Can somebody help me on this?

25             MR. HAIMS:  Could I just consult for a second?

1        THE COURT:  Yes, go ahead.

2     (Pause)

3        MR. HAIMS:  Your Honor, my partner Gary Lee knows more

4  about the shared services agreement than I.

5        THE COURT:  Okay.  Let me just find something.

6        So what -- just so we're all on the same page, what I

7  was referring to was attached to Ms. Leung's -- maybe I'm

8  mispronouncing it; I apologize if I am -- declaration, which is

9  ECF docket number 808 -- it's her declaration dated July 17,

10  2012 -- Exhibit H was the July 2 letter to Judge Cote from

11  Kasowitz, and Exhibit I is the July 6 response from Mayer

12  Brown.  And the Kasowitz letter refers to the decision in In re

13  NTL, Inc. Securities Litigation, 244 F.R.D. 179 (S.D.N.Y.

14  2007).  I actually have the decision on this issue as well:  In

15  re Lozano, L-O-Z-A-N-O -- it's a published decision; but it's

16  August 13, 2008 -- and I fairly extensively review the issue of

17  possession, custody or control, what does control mean.  And

18  what I said there and what I understood the law to be:  that by

19  contract if somebody has the right to obtain the documents,

20  that satisfies the test for control.  So I come back to the

21  issue, Mr. Lee, of what does the shared services agreement

22  provide, specifically with respect to ResCap providing

23  documents to Ally, and does it provide who pays for it?

24        MR. LEE:  Sorry.  Good afternoon -- or good morning,

25  Your Honor.  Gary Lee from Morrison & Foerster --

1          THE COURT:  Five more minutes we're here --

2          MR. LEE:  -- for the debtors.

3          THE COURT:  Five more minutes of morning --

4          MR. LEE:  I'll speak slowly.

5          THE COURT:  Okay.

6          MR. LEE:  No filibust -- Your Honor, I was actually

7    involved in drafting and negotiating the shared services

8    agreement.

9          THE COURT:  Just tell me what it says, not what --

10          MR. LEE:  And the answer to your question --

11          THE COURT:  -- what the negotiations were.

12          MR. LEE:  -- Your Honor, in section 8.2 of the

13    agreement deals with ownership of the documents.

14          THE COURT:  Okay.

15          MR. LEE:  And this remains a very heavily discussed

16    issue with AFI.  The reason it's heavily discussed is because

17    these provisions were negotiated so that we could transfer to

18    Nationstar --

19          THE COURT:  Yes.

20          MR. LEE:  -- the relevant loan files and loan

21    information as part of what ResCap, the debtor, owns and what

22    ResCap, the debtor, can transfer to a third party.  So I think

23    that what is getting mixed up here -- this is definitely a case

24    of apples and oranges.  The materials relating to the private-

25    label securitizations, that information, the ongoing servicing

RESIDENTIAL CAPITAL, LLC, ET AL.                              82

1    rights are property of the debtor, Your Honor.  All of the

2    information belongs to the debtor; it's what we're transferring

3    to Nationstar, Your Honor.

4              Separate and apart from that, what the purpose of the

5    shared services agreement was for the ongoing provision of

6    services as opposed to production of documents as between the

7    parties, so that we could continue to run our business --

8              THE COURT:  I understand, but --

9              MR. LEE:  -- from a data perspective.

10             THE COURT:  -- it did specific --

11             MR. LEE:  Yeah.

12             THE COURT:  It did -- show me where the -- there is

13   language about litigation.

14             MR. LEE:  There is language about --

15             THE COURT:  Where is that?

16             MR. LEE:  -- litigation, Your Honor, yes.

17             THE COURT:  You know what, Ms. Leung's declaration, or

18   the letter, rather -- on the first page of the letter, the last

19   paragraph, it's got a quote:  "ResCap will provide", and then

20   there's an ellipsis, "when requested by AFI and consistent" --

21   and then the citation was not to the exhibit -- not to the

22   shared-service agreement, so I couldn't find where that

23   language is.  That's what I'm looking for.

24             MR. LEE:  And, Your Honor, I'm not sure, unless

25   there's a specific schedule to the shared services agreement

1   for provision of it, that there is anything.  I think the

2   difficulty here, Your Honor, is AFI's free to request whatever

3   it wants.  Unless there's a work order, we can or can't agree.

4   But our position, Your Honor, is the data belongs to us.

5           THE COURT:  I don't -- whether the data belongs to you

6   or not doesn't seem to me to be the controlling issue.  I mean,

7   if you've agreed -- if you've contractually agreed to provide

8   data or information to Ally, that's what I'd like to know,

9   where that is.  I couldn't find it when I looked at the

10  Kasowitz letter, okay.  I saw the quote, and then for whatever

11  reason, I then couldn't find where it came from.

12          MR. LEE:  I'm going to have to --

13          THE COURT:  Hold on.

14          MR. LEE:  -- look for a statement of work, Your Honor.

15  Yeah.

16          THE COURT:  Okay.  And so -- but I see this as very

17  pertinent to the issue before me.  Mr. Haims is raising the

18  issue about that ResCap shouldn't have to pay to produce loan

19  files.  Okay.  You've put that matter in issue.  I know you say

20  that FHFA should have to pay for it, but Judge Cote seems to

21  think that getting those documents is important to the

22  litigation.  It's one thing if the debtor has to pay to do it,

23  and it's another if the debtor doesn't have to pay to do it.

24  If there's a contractual agreement by which ResCap agreed it

25  would provide those services to Ally, and if the pricing

RESIDENTIAL CAPITAL, LLC, ET AL.                        84

1    schedule says who pays for it or how it's paid for, that's what

2    I want to know.

3            MR. LEE:  Your Honor, if you'll bear with us, I'm

4    going to take a look at the statements of work, because I'm not

5    sure whether there's anything beyond cooperation as opposed to

6    the specific provision of loan files, and I want to be quite

7    accurate in --

8            THE COURT:  Let me find out from Mr. Glenn.

9            Where'd the language in the letter come from?

10           MR. GLENN:  That's from the statement of work, Your

11   Honor.  It's not from the motion.  It's page 20 and 21 of the

12   statement of work.  And I apologize for that ambiguity.

13           THE COURT:  Where is the -- you know, what I did --

14           MR. GLENN:  But, Your Honor, maybe --

15           THE COURT:  There's so much stuff.

16           MR. GLENN:  May I --

17           THE COURT:  I printed out the shared services

18   agreement.  I didn't print out the statement of work.

19           MR. GLENN:  May I suggest that we pause, maybe put

20   this to the end of the calendar, which I understand is not

21   going to take all that long, so we can present this to Your

22   Honor in a more organized fashion and confer with each other?

23           THE COURT:  Well, here's what we're going to do.

24           MR. GLENN:  Okay.

25           THE COURT:  The Court concludes that FHFA's motion to

1    lift the automatic stay and the debtors' response thereto raise

2    a contested matter.  And under Local Rule 9014-1, the first

3    hearing on a contested matter is not an evidentiary hearing.

4    Consequently, the Court, considering this under, now, 362(e) --

5    this is a preliminary hearing on the motion to lift the stay --

6    I've concluded that this is a contested matter and an

7    evidentiary hearing will be required.  I'm going to set the

8    evidentiary hearing for Tuesday, September 11th, 2012 at 2 p.m.

9    September 11th is a ResCap omnibus hearing day.  The stay will

10   remain in place pending the conclusion of the final hearing.

11   The Court concludes that there is a reasonable likelihood that

12   the debtor, which is opposing relief from the stay, will

13   prevail at the conclusion of such final hearing.

14          September 11th is within thirty days of the date of

15   this preliminary hearing, and therefore satisfies 362(e).

16          On or before 5 p.m., Tuesday, August 28th, the parties

17   shall file supplemental memoranda of law and any supporting

18   declarations and exhibits addressing whether ResCap is required

19   under the shared services agreement and statement of work and

20   any other exhibits to it to provide loan files to Ally, and who

21   pays for it, and how is it determined at what price it'll be

22   paid for.

23          The debtor has specifically raised today the

24   issue -- and we're not going to revisit the issue as to the

25   loan tapes and the origination information; you say you've

1   resolved that.  So the only issue before the Court is the loan

2   file.  Some number.  As I understand it, in principal FHFA has

3   agreed to 5,000 loan files; the debtor has argued that that's

4   all well and good, but the defendants are going to want more.

5   I want supplemental evidence with respect to the burden and

6   cost that the debtor will incur if the stay is lifted and

7   discovery of the information requested by FHA (sic) is ordered

8   to be conducted.  I want to know how long it will take.

9           The only thing I have before me now, Mr. Lee, is their

10  request for 5,000 files.

11          And I assume that, Mr. Glenn, you will identify which

12  5,000 files you want.  Am I correct?

13          MR. GLENN:  Yes, Your Honor.  I'm not sure if it'll be

14  by that date, but -- we have to confer with our experts.

15          THE COURT:  Okay.  But the parties should confer so

16  that -- sooner than these supplemental filings.  I want to know

17  what is it that they want.  I want you to specifically address

18  what the burden -- how much time it would take, of what

19  personnel, what you project the cost of that to be.  The

20  supplemental declarations need to be filed by that October 20

21  (sic) -- it's not October -- August 28th date.  If FHFA wishes

22  to take the deposition of the declarants, you can do that, Mr.

23  Glenn, confer with the debtors' counsel with respect to that.

24  Okay.  But that's how we're going to proceed on the issue of

25  production of these documents to FHFA.

RESIDENTIAL CAPITAL, LLC, ET AL.                    87

1          Okay.  Anything else specifically with respect to the

2    directions I've given?

3          MS. MOSKOWITZ:  Yes, Your Honor.  If I may?

4          THE COURT:  Come on up.

5          MR. LEE:  Your Honor, may I -- we have a call from the

6    Department of Justice that I've just been told I need to --

7          THE COURT:  Okay.  You're excused.

8          MR. LEE:  Thank you, Your Honor.

9          THE COURT:  Blame them for your being late -- me.

10   Blame me for you being late.

11         MR. LEE:  Thank you, Your Honor.  I will.

12         THE COURT:  Okay.  Go ahead, Mr. Lee.  Go ahead.

13         MS. MOSKOWITZ:  Good afternoon, Your Honor.  My name

14   is Lauren Moskowitz, I'm at Cravath, Swaine & Moore.  I

15   represent Credit Suisse in the FHFA actions.  I'm also here to

16   speak for the other non-Ally related underwriters that are

17   defendants in that case, including Barclays, Citigroup, Goldman

18   Sachs, UBS, RBS and J.P. Morgan.

19         And Your Honor, just to -- it has been alluded to what

20   the other defendants may need in the FHFA v. Ally action.  And

21   it is correct that we are not prepared to live by the 5,000

22   sample that the FHFA has reduced their request for today and in

23   their reply papers.  And so I appreciate the opportunity to

24   just be heard briefly on that issue.

25         To put it in context, Judge Cote was presented with a

1   motion -- or a submission by FHFA a couple months ago to

2   restrict discovery in all of the FHFA actions to a sample of

3   loans.  Judge Cote rejected that in the face of due process and

4   Seventh Amendment concerns raised by the defendants.  We also

5   put in expert affidavits explaining why our burdens, not to

6   mention plaintiff's burdens, may not be able to be carried with

7   that sample that they propose.  So in light of all of that,

8   Judge Cote said that all the loan files are in play and that

9   the parties should go out and get them.

10          That is what we thought was happening, Your Honor,

11  here, when the FHFA brought its motion and would be seeking

12  the -- more than a sample of loan files.  We saw in the reply

13  that that's no longer the case.  And in effect, we feel that

14  FHFA is making an end run around Judge Cote's order that she

15  would not be restricting discovery in these cases.  So to the

16  extent that Your Honor is hearing further proceedings, we would

17  like to be heard on why 5,000 is not the proper amount of

18  loans.

19          THE COURT:  That's fine, Ms. Moskowitz.  But that same

20  August 28th deadline for additional submissions applies to you

21  or anyone else who's going to take a position.  I want to see

22  all of those briefs and any declarations in support of your

23  position at that time, okay?

24          MS. MOSKOWITZ:  Yes, Your Honor.  Thank you, Your

25  Honor.

1              THE COURT:  Thank you very much.

2              MR. WARE:  Your Honor, Michael Ware of Mayer Brown for

3     Ally Financial.  I don't represent them here, but I do

4     represent them in the FHFA case.

5              THE COURT:  Were you the author of the letter?

6              MR. WARE:  A partner of mine was the author of that

7     letter.  So that's Reg Goeke who submitted the letter.  And we

8     will also -- we didn't participate in this motion practice

9     until the reply introduced the concept of a sample.  And

10    there's enough data out there for them to pick a really good

11    sample.  They know enough already to pick the 5,000 losers;

12    you'd think every loan was a bummer.  But we would also like

13    to --

14             THE COURT:  The same deadline applies to anybody.

15             MR. WARE:  Thank you, Your Honor.

16             THE COURT:  Oh, and let me just make clear.  There's a

17    twenty-five-page limit on any memoranda of law.  It doesn't

18    apply -- even that --

19             MR. WARE:  We can make our point more quickly than

20    that.

21             THE COURT:  -- that seems awfully long to me, but

22    that's my normal limit.  Okay.

23             MR. WARE:  Thank you, Your Honor.

24             THE COURT:  It doesn't apply to declarations; it

25    applies to the memoranda of law.

1           Anybody else want to be heard?

2           MS. JACKSON:  Your Honor, may I say three things?

3           THE COURT:  No.  This only relates to this matter, Ms.

4    Jackson, okay?

5           MS. JACKSON:  Okay.

6           THE COURT:  And I don't think you've got any standing

7    to be heard on this specific matter.

8           MS. JACKSON:  Oh.  Okay.

9           THE COURT:  Okay.  Mr. Haim, is there anything else?

10          Mr. Rosenbaum, anything?

11          MR. HAIMS:  Nothing from me, Your Honor.

12          MR. ROSENBAUM:  Thank you, Your Honor.

13          THE COURT:  All right.  We're adjourned.

14          Oh.  Hang on just one second.

15          MR. ROSENBAUM:  Sorry, Your Honor.

16          THE COURT:  Mr. Rosenbaum, are there other matters on

17   the calendar?

18          MR. ROSENBAUM:  There's a status conference --

19          THE COURT:  Okay.  Well, let's --

20          MR. ROSENBAUM:  -- and two more motions.

21          THE COURT:  All right.  That's what I was trying to

22   understand.  Let's go.  Much as I'd like to be over, I want to

23   get everything done.

24          MR. ROSENBAUM:  Hopefully not too much longer, Your

25   Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    91

1          The next motion is -- it's number 7 on the agenda,
2    page 8.  It's the motion of OneWest Bank for order pursuant to
3    Bankruptcy Rule 2004 --
4          THE COURT:  Right.  The 2004.
5          MR. ROSENBAUM:  And I believe they're either
6    telephonic or in the courtroom.
7          THE COURT:  All right.  Is anyone present for OneWest?
8          MR. O'NEAL:  Good morning, Judge.  John Maston O'Neal
9    appearing telephonically for OneWest Bank.
10         THE COURT:  All right.  Go ahead.
11         MR. O'NEAL:  Thank you, Judge.
12         The facts on this are relatively straightforward.  In
13   of September 2005, a bank known as IndiMac Bank made a 640,000-
14   dollar loan to Myra Hernandez (ph.).  That money was used to
15   refinance and pay off a primary first position loan by
16   Citibank, and then a second position home equity line of credit
17   with Homecomings Financial.  And as you might expect, the loan
18   was made with the expectation that it would receive a first
19   position mortgage or an Arizona deed of trust to secure the
20   debt.
21         Unfortunately, the mortgage lien or the deed of trust
22   that was held by Homecomings Financial was not released, and we
23   don't know why.  But we what we do know that happened is that
24   in 2011, Homecomings, I think, sold the loan to another entity
25   called EZ Financial, which then proceeded with a foreclosure

RESIDENTIAL CAPITAL, LLC, ET AL.                    92

1    and then used Homecomings Financial's first position deed of

2    trust to wipe out OneWest's deed of trust, and then thereby

3    depriving OneWest of its rights in the collateral.  And Judge,

4    Arizona is an anti-deficiency state, which means that OneWest

5    can't collect on the debt, at least from the borrower.  It's

6    limited to its rights in collateral, and so therefore, it was

7    left without a remedy on the loan.

8            We were hired to try to track down and figure out

9    exactly how that happened, and the bottom line is it's usually

10   one of two things:  either A, Homecomings received full payoff,

11   but then failed, pursuant to a request and/or its policies, to

12   close the line of credit, allowed the borrower to run up

13   additional debt and then sought to collect it; or, there was

14   some mistake on the part of the escrow company, who tendered

15   the payoff in the sense that perhaps they didn't give the full

16   amount.

17           So to try to get to the bottom of this and to

18   determine whether, in fact, there is a claim in this case

19   against the debtor, we served very narrow 2004 requests asking

20   for precise and what we thought, Judge, were not overburdensome

21   documents.  The correspondence related to this particular loan,

22   what I have seen in the past are like servicing notes or call

23   log notes or computer entries showing what was done; a payment

24   history, which would show how much was owed at a particular

25   time, and most importantly, what was owed at the time that the

1  refinancing money was paid; e-mails for a very limited period

2  of time, Judge, related to the time period within which this

3  loan was paid off; and then last, Judge, documents related to

4  the sale of this particular loan to the entity that ultimately

5  foreclosed out OneWest.

6          And we're asking for this, Judge, because we're trying

7  to do a cost-effective assessment of whether OneWest is going

8  to be appearing in this case as a creditor making a proof of

9  claim or whether it's going to go elsewhere, because as I noted

10 before, if the records show that Homecomings didn't receive

11 payment in full, that's one issue and you probably won't be

12 hearing about OneWest Bank in this matter again.  On the other

13 hand, if there was something in the fall-through, then we would

14 be making a claim.

15         Prior to having this motion set for hearing before you

16 we had, I thought, productive conversations with the debtors'

17 counsel.  And, of course, he can correct me or she can correct

18 me if I'm wrong, but I believe that we settled on a couple

19 points, which is, it really wasn't that terribly burdensome to

20 print out a payment history or to obtain some sort of imaged

21 information related to correspondence -- the typical things

22 that you know would be maintained in a servicer related to a

23 loan and the job that they do.

24         Where we really boiled down to a disagreement was the

25 burden associated with searching for e-mails, a request by my

1   client for policies and procedures and places to what to do if

2   and when the payoff was received, Judge, and then a deposition.

3   With respect to the deposition, Judge, I don't need that; it

4   was only noticed for purposes of establishing custodian of

5   records, and I'll withdraw that without prejudice.  So what

6   we're really left with, at least as I understand it, are

7   e-mails and policies and procedures.

8           On the policies and procedures, it was my

9   assumption -- and I didn't see anything contrary in the

10  objection to the request -- that A, they exist, and number two,

11  they're probably in some sort of condensed form located

12  somewhere and that short of just trying to find out where they

13  are and copy, that would be the extent of the burden.  With

14  respect to e-mails, I did ask how difficult was it; I don't

15  think we ever got a full answer, and my review of the Scoliard

16  declaration doesn't tell me either.

17          But to be clear, I'm not asking the debtors to engage

18  in what I would call the classic search every corner for

19  e-mails, to lock down laptops and freeze hard drives and that

20  sort of thing.  I would highly doubt that information related

21  to this payoff would be found in any such a location.  All I'm

22  looking for are those that would be normally kept by the

23  company on its particular servers, if they even exist, for a

24  very limited time period -- that is, the time frame within

25  which the payoff was received, and Judge, the time frame within

1  which the loan was sold.

2      And it's important, Judge, that we get this

3  information now because, as I noted before and as we say in our

4  reply, otherwise we're going to be struggling along for years,

5  then be making the same potential claims later when it's time

6  to look at proof of claims.  And if I get it now, and in fact I

7  find out that hey, listen, there just simply isn't a claim

8  against the debtor, everybody wins.  The debtor doesn't have to

9  deal with OneWest or me in the future; we go away and that's

10  the end of it.

11      And to close, Judge, I candidly find it somewhat

12  difficult to believe that pulling these limited documents

13  related to one loan -- which is really the essence of the

14  business of the debtor -- is so unduly burdensome that that

15  task was outweighed -- or it outweighs the effort that's being

16  put in to resist the request.  And with that, Judge, I'll

17  answer any questions, of course, that you have.

18      THE COURT:  Mr. Rosenbaum?

19      MR. ROSENBAUM:  Thank you, Your Honor.

20      Your Honor, I frankly don't think what was discussed

21  among counsel is terribly relevant to this motion right now.

22  And it's an interesting pattern.  We started out with a two-

23  page motion, and then only after we went through the burden

24  that they criticized to respond to a two-page motion, and then

25  we learned more about it in our response, and now we're

RESIDENTIAL CAPITAL, LLC, ET AL.                    96

1   learning more about the scope of the request.  I think what we

2   should look at is what the request is.  I think it's very

3   clear.  I guess there's no dispute --

4           THE COURT:  Let me interrupt you.  Have you pulled the

5   loan history?

6           MR. ROSENBAUM:  We pulled the loan file, Your Honor.

7           THE COURT:  You have?

8           MR. ROSENBAUM:  Yes.

9           THE COURT:  Does it show the payoff?

10          MR. ROSENBAUM:  I don't know, Your -- I don't have

11  that information, Your Honor.

12          THE COURT:  So you have the loan file?

13          MR. ROSENBAUM:  We have the loan file.  And if we

14  offered to the movant to produce the loan file in resolution of

15  this motion, and they could take the loan file, look at it

16  without reservation of rights, if they want to come back to

17  this Court they could do so.  That's what we offer.

18          THE COURT:  Well, here's what -- is there -- you say

19  you have the loan file.  Have you searched whether there is an

20  electronic record of the loan payment history --

21          MR. ROSENBAUM:  No.

22          THE COURT:  -- which ordinarily -- just let me finish.

23          MR. ROSENBAUM:  Sorry.

24          THE COURT:  Because ordinarily that is not a difficult

25  thing to do.  Okay.  What it'll show, I don't know, but

RESIDENTIAL CAPITAL, LLC, ET AL.                    97

1    somebody -- if you've got a loan number you can put that in, in

2    your data systems, and you can pull the electronic record and

3    the payment history.  Has that been done?

4           MR. ROSENBAUM:  I'd have to confer with counsel.  I

5    don't know if we -- with our client represenative here.  I don't

6    know if that was done or not.

7           THE COURT:  Could you do that?

8           MR. ROSENBAUM:  Right now, Your Honor?

9           THE COURT:  Yeah.

10          MR. ROSENBAUM:  Sure.

11          Your Honor, we pulled and do have the payment history.

12          THE COURT:  Okay.  I'm going to deny the motion of

13   OneWest Bank for an order pursuant to Bankruptcy Rule 2004

14   authorizing the examination of Homecomings Financial, LLC,

15   except to the extent of directing that the debtors provide

16   OneWest Bank's counsel with a copy of the loan file and of the

17   elec -- what would you refer to this printout that you have?

18          Go ahead, confer.

19          MR. ROSENBAUM:  Payment history can get produced from

20   accessing other data.  It's one form.

21          THE COURT:  All right.  So I'm going to direct that

22   the debtor produce the loan file and the payment history.  And

23   the motion for the 2004 examination is denied in all other

24   respects.  With respect to -- they're obviously -- since you've

25   already pulled the loan file and the payment history, there's

RESIDENTIAL CAPITAL, LLC, ET AL.                    98

1  no burden associated with producing it.  With respect to the

2  e-mails, I definitely will not -- I'm not authorizing any

3  examination beyond what I'm ordering produced.  It is clear to

4  the Court that the burden of searching e-mail records, given

5  the dates of the issues -- the refinancing occurred in

6  September 2, 2005 -- would require searching archives, backup

7  tapes and many other records, so I'm definitely not going to

8  order or permit a 2004 examination.

9         2004 is principally designed to allowed parties-in-

10  interest to identify assets of a debtor to see whether there's

11  anything that should be recovered for the debtor.  It's not

12  intended for use for obtaining pre-complaint or pre-claim

13  discovery, as it appears to be used here.  Hopefully, by

14  providing the information that you have available it will

15  enlighten OneWest Bank as to what its situation is.  If it

16  believes it can -- that that's sufficient to file a proof of

17  claim, it'll do so.  If a proof of claim is filed and it

18  becomes a contested matter if the debtor subsequently objects,

19  the Federal Rules of Civil Procedure on discovery will apply to

20  it.

21         So that'll be the Court's determination.  So the

22  motion is denied, except as I've otherwise indicated.

23         MR. ROSENBAUM:  Thank you, Your Honor.

24         THE COURT:  All right.

25         MR. O'NEAL:  Thank you, Judge.

RESIDENTIAL CAPITAL, LLC, ET AL.                    99

1          THE COURT:  Thank you.

2          MR. ROSENBAUM:  Your Honor, the next matter on is Ms.

3   Wendy Nora's motion for reconsideration.  It's item number 8 on

4   the docket.

5          THE COURT:  All right.

6          MR. ROSENBAUM:  This was docket no. 916.  And I will

7   cede the podium to Erica Richards of my office.

8          THE COURT:  Local Rule 9023-1 of the Southern District

9   Bankruptcy Court provides in part "no oral arguments shall be

10  heard unless the Court grants the motion and specifically

11  orders that the matter be reargued orally".  I do not intend to

12  hear argument on Ms. Nora's current motion; the Court will

13  resolve it in a written order.

14         MR. ROSENBAUM:  Thank you, Your Honor.

15         The last matter -- I believe the last matter -- let me

16  check, Your Honor.

17         THE COURT:  Status conference on Green Planet?

18         MR. ROSENBAUM:  That should be the last matter on,

19  Your Honor.  I will confer with counsel.  Would you like me to

20  give the status?

21         THE COURT:  All the counsel should make an appearance

22  just so we have a complete record of it, okay?

23         MR. ROSENBAUM:  Sorry.

24         MR. MARDER:  Good afternoon, Your Honor.  Scott Marder

25  with Duane Morris on behalf of the movant, Green Planet.

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1          THE COURT:  Thank you.

2          Okay, Mr. Rosenbaum?

3          MR. ROSENBAUM:  Thank you, Your Honor.

4          Your Honor, we've been in -- GMAC has been in

5     discussions with Green Planet for several weeks.  In fact,

6     discussions actually preceded the filing of the motion for

7     relief and the related adversary proceeding.  We have made

8     significant progress in negotiating a stipulation under which

9     GMAC would consent to the relief under specific terms.

10          Part of the issue here is it's actually when the

11    servicing agreement is terminated these loans have to be

12    transferred.  There is in excess of 30,000 loans.  The parties

13    have been negotiating, in addition to the terms of the

14    stipulation, the process by which those loans would get

15    transferred.  We have been in negotiations to come to an

16    acceptable mechanism to transfer those loans.

17          We're working to get to that resolution; we have not

18    reached that resolution yet.  We continue to have those

19    discussions, and we'll continue to do so.  I'm cautiously

20    optimistic we will get there, but we don't know for certain.

21    My recommendation would be that we adjourn this to the next

22    omnibus hearing date.  If we can't come to a resolution, we

23    would advise the Court before we filed our response, which

24    would be seven days prior to August 29th.

25          MR. MARDER:  Your Honor, I wish I shared the optimism

1   of counsel, and I hope that, in fact, we have made progress.

2   But I think there is still a wide gap, and I am going to ask

3   the Court to schedule this for a hearing rather than adjourn

4   the matter.  And I'd like to give the Court a little bit of

5   background on the motion.

6            Green Planet is a --

7            THE COURT:  Well, it's not a motion.  I have an

8   adversary proceeding that's been filed.  This is a case

9   management conference in the adversary procee -- well, I

10  know -- I see you filed a motion, but the adversary proceeding

11  contends that the servicing agreement was terminated pre-

12  petition and, therefore, is not property of the estate.  Am I

13  right?

14           MR. MARDER:  Yes, Your Honor.  In the adversary

15  proceeding.

16           THE COURT:  And you think that by filing this motion

17  you're going to circumvent the requirements that apply to an

18  adversary proceeding?

19           MR. MARDER:  Your Honor, we believe the Court can

20  decide this and grant the limited relief that we're asking for

21  in the motion after an evidentiary hearing.  The reason for

22  that, Your Honor, is Green Planet owns the mortgage servicing

23  rights to approximately 5.2 billion dollars of loans -- the GPS

24  loan pool which you've seen referenced in the papers.

25           We believe that the servicing agreement was terminated

RESIDENTIAL CAPITAL, LLC, ET AL.                                   102

1   either pre-petition because of breaches, or post-petition

2   pursuant to the terms of the document itself.  If notice of

3   nonrenewal is given ninety days before the term ends, then the

4   contract ends on its own terms.  And so it's our position, Your

5   Honor, whether it was pre-petition termination as a result of

6   breaches, or post-petition because of the belt-and-suspenders

7   notice, so to speak, advising there's nonrenewal, the contract

8   has terminated by its terms.

9           THE COURT:  Look, let me -- here's the way you're

10  going to proceed, okay.  This is very similar to the

11  circumstance I was presented in Velo Holdings v. Paymentech.

12  There's a published decision from July 18th, 2012.  It was the

13  decision after trial.  The trial was of the adversary

14  proceeding and of the lift stay motion.  You and the debtors'

15  counsel should meet and confer and seek to agree upon a case

16  management order -- you can get a copy of the template that I

17  use for case management orders.

18          You're not going to use your lift stay motion as a way

19  to circumvent the requirements of the adversary proceeding

20  rules.  The adversary proceeding tees up the issue of whether

21  the servicing agreement was terminated pre-petition, in which

22  case it wouldn't be property of the estate, or whether it

23  remains property of the estate, okay.  You've tried to

24  jumpstart your argument by bringing the motion to lift the

25  stay, okay.  This is exactly what I had in Velo; I scheduled a

1  single trial for both, and I entered an opinion after the

2  trial.  Hopefully you'll be able to resolve this.

3          MR. MARDER:  Your Honor, I appreciate the Court's

4  position.  May I turn the podium over to co-counsel because he

5  wants to address an issue with respect to the history of the

6  discussions with GMAC and where we go from here.

7          THE COURT:  Go ahead.  I don't want to know about

8  settlement negotiations.

9          MR. VINCEQUERRA:  No.  No.  No, Your Honor.  Certainly

10  not.  I just want to address the Court's impression --

11          THE COURT:  Just identify yourself.

12          MR. VINCEQUERRA:  James Vincequerra from Duane Morris,

13  also for Green Planet.  I want to address the Court's

14  impression that we're trying to jumpstart the adversary

15  proceeding process.  That could not be further from the truth.

16          We filed the adversary proceeding and the motion for

17  relief from the stay substantially at the same time.  The

18  original time for the adversary proceeding to have been

19  answered has passed.  And in accordance with the request of

20  counsel for the debtor, we extended that time for thirty days

21  with the understanding that we'd be going forward on the motion

22  to lift the stay.  So there was no attempt by Green Planet to

23  jumpstart any process, Your Honor.  We've worked hand-in-hand

24  with the debtor to keep on the same page.

25          What has happened here, effectively, is the debtors'

1   time to answer the lift stay motion and the time to answer the

2   complaint were roughly the same.  Subsequent to the debtors'

3   request to adjourn the time to answer the adversary proceeding,

4   we granted that thirty-day extension with the understanding

5   that we would keep this date for the hearing on the motion.

6         Subsequent to that in the context of the settlement

7   discussions, counsel for the debtor requested an extension of

8   time to answer the motion.  We granted that five-day extension,

9   although in looking back we probably should not have because it

10  was in violation of your court's scheduling order.  The initial

11  motion was scheduled so that they would have an opportunity to

12  answer the motion within the appropriate time frame.

13        So the extension we granted them effectively gave them

14  until today -- until yesterday, I'm sorry -- to answer the

15  motion.  As a result of that we said, listen, we want to get in

16  front of the judge on the motion to set a schedule for the

17  motion going forward.  We share the hopes that we can get there

18  on a settlement, but right now we're in a position where we

19  followed the Court's directions with the scheduling order, we

20  tried to accommodate the debtors' requests for extra time in

21  the context of settlement, but we don't want to lose any more

22  time.  So we're in a funny position where would like to

23  accelerate the time now to answer our motion and move forward

24  with the hope and understanding that we can get there on

25  settlement.

RESIDENTIAL CAPITAL, LLC, ET AL.                    105

1          THE COURT:  Mr. Rosenbaum?

2          I'm telling you right now, I'm not going to hear the

3     lift stay motion separate from the adversary proceeding.  You

4     filed the adversary proceeding.  You filed it before you filed

5     a lift stay motion, okay.  You're trying -- the adversary

6     complaint is designed to test this issue of whether the

7     servicing agreement is property of the estate.

8          Mr. Rosenbaum.

9          MR. ROSENBAUM:  Your Honor, we're prepared to follow

10    the Court's direction on conferring and scheduling a trial and

11    a proper response.  And we would respond simultan --

12         THE COURT:  Don't think you're going to put off --

13    look, they filed a motion to lift the stay, and I'm not

14    relieving you of your obligation to respond to the motion.

15         MR. ROSENBAUM:  Your Honor, we're prepared to respond

16    to the motion.

17         THE COURT:  The only thing I have in front of me right

18    now is the complaint.  I've read it.  There's no answer that's

19    been filed.  I understand -- and your motion.  I've read them,

20    okay.  I understand the argument they're making; I haven't seen

21    what the debtors' response to it is.  Okay.  I'll resolve this

22    expeditiously, but don't expect -- I'll resolve this

23    expeditiously.  I want to know if there's discovery that needs

24    to be taken.

25         Are there disputed issues about whether the servicing

RESIDENTIAL CAPITAL, LLC, ET AL.                    106

1   agreement terminated because of material breach?  Is this an

2   issue that I had in Velo about whether the contract had a

3   conditional limitation such that the passage of time --

4          MR. ROSENBAUM:  Your Honor, I think these are all

5   relevant issues, and I think this is very similar to Velo.  And

6   we would require discovery.  And that's --

7          THE COURT:  Well, then there'll be expedited

8   discovery, okay.

9          MR. ROSENBAUM:  That's fine, Your Honor.

10          THE COURT:  You're not going to drag it out, okay?

11  You either settle it or I'm going to give you -- okay.

12          MR. MARDER:  Your Honor, may I address a point --

13          THE COURT:  Go ahead.

14          MR. MARDER:  -- with respect to scheduling --

15          THE COURT:  Yeah.

16          MR. MARDER: -- and some potential urgency here?  As

17  the Court may be aware, when transferring servicing of mortgage

18  loans, there are certain dates set by Ginnie Mae upon which

19  these transfers have to take place, and if you miss it, you've

20  got to wait for the next date, and then there's notice that has

21  to be given to the borrowers as well a certain period of time

22  ahead of time.  By the natural terms of the contract, it's

23  supposed to end October 1st, putting aside the allegations of

24  breach.

25          In order for us to effectuate this transfer, there is

1    a lot of work that needs to be done between the two parties; it

2    can't be done overnight with the flip of a switch.  And to the

3    extent we get closer and closer to that date, it puts borrowers

4    in jeopardy with respect to whether the transition can happen

5    in a way --

6              THE COURT:  What's the date after October 1?

7              MR. MARDER:  It would be the first week in November,

8    Your Honor.  I don't know which day it is, though.

9              THE COURT:  It's not extending it out for six months

10   or a year.

11             MR. MARDER:  Your Honor --

12             THE COURT:  So don't tell me that the one month --

13   what happens -- what's the prejudice you suffer if transfer of

14   the loans is delayed a month?

15             MR. MARDER:  It's several respects, Your Honor.

16   Number one, the contract is supposed to end October 1st, so we

17   shouldn't have to pay another month's servicing fees, which are

18   hundreds of thousands of dollars.  That's number one.  Number

19   two, there are very significant allegations of breaches by

20   GMAC, where they've been soliciting the loan pool.  They have

21   been foreclosing on homes when we have asked them to modify

22   loans --

23             THE COURT:  You know, what this sounds like is a lot

24   of contested issues.  Meet and confer, agree -- attempt to

25   agree on a schedule.  If you can't, okay.  The parties need to

1   meet and confer in an effort to agree on a schedule for the

2   adversary proceeding and the lift stay motion.  Both appear to

3   be contested, and discovery would appear to be required.  And a

4   schedule should include a deadline for the completion of all

5   fact discovery.

6           I want -- counsel for the debtors and for Green Planet

7   need to meet and confer face-to-face this week in an effort to

8   negotiate a full case management schedule.  It would be the

9   Court's intention, unless persuaded otherwise, that I will hear

10  both the adversary and the lift stay at the same time.  It's

11  the same basic issue:  was the servicing agreement terminated

12  pre-petition?  Hopefully you'll be able to agree on a schedule

13  and submit it to the Court by 5 p.m., Tuesday, August 28th.  If

14  you're not able to agree on a schedule, each side should submit

15  by that date and time their proposed schedule, and I'll decide

16  what I want to do with it.  In the meantime, your time is

17  better spent trying to resolve these issues.

18          Anything else anybody wants to raise?

19          MR. ROSENBAUM:  Thank you, Your Honor.

20          MR. MARDER:  Your Honor, thank you for the Court's

21  time.

22          THE COURT:  Okay.

23          MR. ROSENBAUM:  Your Honor, unless I'm missing

24  something, and hopefully someone would correct me --

25          THE COURT:  My law clerks always correct me when I

RESIDENTIAL CAPITAL, LLC, ET AL.                          109

1    miss something.

2              MR. ROSENBAUM:  -- I think that concludes the agenda

3    for this morning -- or this afternoon.

4              THE COURT:  All right.  We're adjourned.

5              MR. ROSENBAUM:  Thank you for your time, Your Honor.

6         (Whereupon these proceedings were concluded at 12:35 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                              I N D E X
 3
 4                              RULINGS
 5                                          Page      Line
 6   Motion of Vermont Housing Finance Agency for   12      2
 7   relief from the automatic stay granted
 8   Stipulation on motion of Hitoshi and Wakana    12      18
 9   Inoue is approved
10   Stipulation on motion of Hedeya Haroutounian   12      24
11   is approved.
12   Stipulation on motion for relief from stay of  13      9
13   State of New York is approved.
14   The issue of the lifting of the automatic      85      7
15   stay is a contested matter and an evidentiary
16   hearing on the matter will be held on
17   September 11, 2012 at 2 p.m.  The stay will
18   remain in place pending the conclusion of the
19   final hearing.
20   OneWest Bank's motion for order authorizing    97      12
21   2004 examination of Homecoming Financial,
22   LLC and production of documents, denied
23   except for production of loan file and
24   payment history
25
```

1

2                        C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11   _____

PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14

eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18

Date:  August 15, 2012

19

20

21

22

23

24

25