1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10                  Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  August 16, 2012

19                  11:04 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1

2   (CC: Doc# 1093) Application for FRBP 2004 Examination Motion of

3   the Examiner for Entry of an Order (I) Granting Authority to

4   Issue Subpoenas for the Production of Documents and Authorizing

5   the Examination of Persons and Entities, (II) Establishing

6   Procedures for Responding to Those Subpoenas, (III) Approving

7   Establishment of Document Depository and Procedures to Govern

8   Use, and (IV) Approving Protective Order.

9

10  (Doc# 90, 47) All Day Evidentiary Hearing RE: Motion

11  Authorizing The Debtors To Continue To Perform Under The Ally

12  Bank Servicing Agreements In The Ordinary Course Of Business.

13

14

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4        Attorneys for Debtors
 5        1290 Avenue of the Americas
 6        New York, NY 10104
 7
 8   BY:   GARY S. LEE, ESQ.
 9         TODD M. GOREN, ESQ.
10
11
12   KRAMER LEVIN NAFTALIS & FRANKEL LLP
13        Attorneys for Official Creditors' Committee
14        1177 Avenue of the Americas
15        New York, NY 10036
16
17   BY:   KENNETH H. ECKSTEIN, ESQ.
18         DOUGLAS MANNAL, ESQ.
19         RACHAEL L. RINGER, ESQ.
20
21
22
23
24
25
```

4

1

2   U.S. DEPARTMENT OF JUSTICE

3          U.S. Attorney's Office

4          86 Chambers Street

5          3rd Floor

6          New York, NY 10007

7

8   BY:   JOSEPH N. CORDARO, ESQ.

9

10

11   KIRKLAND & ELLIS LLP

12          Attorneys for Ally Financial and Ally Bank

13          601 Lexington Avenue

14          New York, NY 10022

15

16   BY:   RAY C. SCHROCK, ESQ.

17

18

19   KIRKLAND & ELLIS LLP

20          Attorneys for Ally Financial and Ally Bank

21          655 Fifteenth Street, N.W.

22          Washington, DC 20005

23

24   BY:   PATRICK M. BRYAN, ESQ.

25

1

2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

3          Attorneys for Unsecured Noteholders of ResCap

4          One Liberty Plaza

5          New York, NY 10006

6

7   BY:   THOMAS J. MOLONEY, ESQ.

8          MARK A. LIGHTNER, ESQ.

9

10

11  SCHULTE ROTH & ZABEL LLP

12          Attorneys for Cerberus Capital Management

13          919 Third Avenue

14          New York, NY 10022

15

16  BY:   MARGUERITE E. GARDINER, ESQ.

17          ADAM C. HARRIS, ESQ.

18          HOWARD O. GODNICK, ESQ.

19

20

21

22

23

24

25

```
 1  WHITE & CASE LLP
 2          Attorneys for Ad Hoc Group of Junior Secured Notes
 3          1155 Avenue of the Americas
 4          New York, NY 10036
 5
 6  BY:   J. CHRISTOPHER SHORE, ESQ.
 7
 8
 9  CHADBOURNE & PARKE LLP
10          Attorneys for the Examiner
11          30 Rockefeller Plaza
12          New York, NY 10112
13
14  BY:   HOWARD SEIFE, ESQ.
15          ROBERT A. SCHWINGER, ESQ.
16          ROBERT J. GAYDA, ESQ.
17
18
19  SIDLEY AUSTIN LLP
20          Attorneys for Nationstar
21          One South Dearborn
22          Chicago, IL 60603
23
24  BY:   LARRY J. NYHAN, ESQ. (TELEPHONICALLY)
25          JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)
```

1

2  MUNGER TOLLES & OLSON LLP

3         Attorneys for Berkshire Hathaway, Inc.

4         355 South Grand Avenue

5         35th Floor

6         Los Angeles, CA 90071

7

8  BY:    THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

1                    P R O C E E D I N G S
2              THE COURT:  Please be seated.  All right.  We're here
3    in Residential Capital, LLC, number 12-12020.  Mr. Lee?
4              MR. LEE:  Good morning, Your Honor.  The first item on
5    the agenda today is the status conference on the subservicing
6    motion.  It's Gary Lee from Morrison & Foerster for the
7    debtors.
8              The parties, Your Honor, are still engaged in what I
9    can now describe as very earnest discussion moving quite close.
10   What we'd like, Your Honor, if we may, is to set a telephonic
11   status conference with Your Honor.  Because of various meetings
12   that need to occur in advance, it might not be possible to do
13   it until Thursday of next week.  I'm not sure what Your Honor's
14   vacation schedule was.  So --
15             THE COURT:  Thursday the 23rd?
16             MR. LEE:  Yes, Your Honor.
17             THE COURT:  Dewey & LeBoeuf and Grubb & Ellis, so I'll
18   be here.  I have both a morning and afternoon calendar.  We
19   could have a call at 4 o'clock.
20             MR. LEE:  That would be ideal, Your Honor.  Thank you.
21             THE COURT:  Okay.  Thursday, August 23 at 4 o'clock,
22   telephonic conference.
23             MR. LEE:  Okay.  Your Honor, if it is resolved, what
24   we'll try and do is submit a stipulation setting out the terms
25   of the settlement in advance of the status conference.  And

1  then, Your Honor, the question will be whether or not Your

2  Honor will be satisfied with the explanation that we provide of

3  a stipulation or whether you will want a hearing on the motion.

4  We're happy to present just a stipulation, given the

5  complexity.

6          THE COURT:  Well what -- we can talk about it in the

7  call.  What I may have you do is do it on presentment, so that

8  if there are going to be objections, it gives any other parties

9  an opportunity to object.  Given the level of controversy and

10 parties with varying interests, I don't think I would enter --

11 approve a stipulation on this issue without giving others an

12 opportunity to object, if that's what they were going to do.

13         MR. LEE:  Thank you, Your Honor.

14         THE COURT:  Okay.

15         MR. LEE:  The --

16         THE COURT:  It would still be helpful if you have a

17 form of stipulation that you provided before that call.

18         MR. LEE:  It would be very helpful, Your Honor, yes.

19         THE COURT:  Right.

20         MR. LEE:  The second item on the agenda, which is a

21 contested matter, is the motion of the examiner.  So I will

22 turn the podium over to Mr. Seife.

23         THE COURT:  Okay.  Thank you, Mr. Lee.

24         MR. SEIFE:  Good morning, Your Honor.  Howard Seife

25 from Chadbourne & Parke, counsel for the examiner.  We're here

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1   this morning on the examiner's motion regarding really three

2   things we're seeking approval of, which will greatly facilitate

3   the examiner's ability to conduct his investigation in an

4   expeditious and efficient manner.

5           The relief we're seeking, as I said, is really

6   threefold.  First is under Rule 2004, seeking authorization for

7   the examiner to issue subpoenas for the production of documents

8   and for the examination of witnesses, without the necessity of

9   coming back to the Court each time.

10          THE COURT:  And I didn't see any objections to that

11  request for relief, right?

12          MR. SEIFE:  That is correct, Your Honor.

13          THE COURT:  Okay.

14          MR. SEIFE:  And in conjunction with that, it would

15  also establish procedures for parties to respond to those

16  subpoenas.  And again, no objection on that score.

17          And as we made clear in our papers and prior meetings

18  with Your Honor, we hope very much to have the discovery

19  conducted on a cooperative basis.  To date, all the parties

20  that we've approached have professed willingness to cooperate

21  without the necessity of subpoenas.  But it is an important

22  arrow in the quiver of the examiner to have that ability to

23  issue subpoenas.

24          The second element of the relief we're seeking is for

25  the establishment of a central document depository and

1   procedures governing its use.  Again, there is no objection to

2   the concept of establishing a depository.  The objections, and

3   there have been two limited objections filed -- one was by

4   Cerberus and the other was by Ally -- really involved the third

5   aspect of the relief, which is the protective order, which

6   would facilitate parties producing documents and governs the

7   accessibility of those documents for use by the examiner and

8   access by third parties.

9          Also, there was an objection to the initial list of

10  parties that would get access to the depository.

11          THE COURT:  The service parties.

12          MR. SEIFE:  The service parties, right.  I think it's

13  important to note at the outset, Your Honor, that the examiner

14  consulted with a whole variety of different parties before

15  bringing this motion, with the hope of bringing it on a fully

16  consensual basis.  That proved not to be possible, given the

17  competing interests of various parties.  We were pleased that

18  we had the support of both the debtor and the committee at the

19  end of the day, to the relief we're seeking.  Despite having

20  discussions with Cerberus, they, at the end of the day, did

21  have some misgivings about the relief we're seeking.  And

22  they're here, I assume, to make their objections.

23          I can go into some detail, if Your Honor would like,

24  as to how we've set up --

25          THE COURT:  No, I --

1          MR. SEIFE:  -- the depository?

2          THE COURT:  Tell me the mechanics of what you're

3    doing.  Because I assume a lot of the documents you'll receive

4    in electronic format initially.  But you may also be receiving

5    paper, if anybody still uses paper.  And that wasn't clear.  I

6    mean, what are the mechanics?  Are you going to scan everything

7    and --

8          MR. SEIFE:  It'll be a fully electronic depository.

9    In this day and age, virtually everything produced is in

10   electronic form.  If it's not, it'll be scanned and made

11   available.

12         THE COURT:  One question I have; in paragraph 16 on

13   page 12 of Exhibit B, your uniform protective order.

14         MR. SEIFE:  That was paragraph 16, Your Honor?

15         THE COURT:  Yes, on page 12.

16         MR. SEIFE:  Yes.

17         THE COURT:  This is the provision that provides that

18   after the date that is ninety days after the examiner's

19   finished, you use the terms "deactivate" and "terminate".  I

20   don't know what that really means.  And the debtors filed in

21   their statement they don't want to have to produce things more

22   than once.

23         I understand that the examiner will have no duty to

24   maintain or retain or make available anything in the

25   depository.  But what happens when the examiner is done?  Is

1    someone going -- is the debtor going to retain the database?

2    Is anybody else going to do it?  Subject to what limitations?

3            Because hope -- well, it would be nice if everything

4    were done in six months, but the likelihood of that is not

5    great.  So what happens when the examiner's finished and you

6    would have the right to deactivate it and terminate it?

7            MR. SEIFE:  Yes, Your Honor.  There is a cost to

8    maintaining the electronic --

9            THE COURT:  Yes.

10           MR. SEIFE:  -- database, and there are ongoing

11   efforts.  Presumably, once the examiner has issued his report,

12   and there are no further requests made of the examiner, then

13   the position would terminate.  So it would make no sense for

14   the examiner to continue --

15           THE COURT:  Correct.

16           MR. SEIFE:  -- this.  Certainly, if the debtor wants

17   to maintain the database, we would work with the debtor or the

18   committee, whoever is the most appropriate party.  So it would

19   not be our intention to not work cooperatively with the parties

20   if they wanted to continue to maintain it or use it for any

21   other purposes.

22           THE COURT:  Do you think there needs to be some -- the

23   way it's drafted now, ninety days after the issuance of the

24   examiner's report, the examiner may deactivate and terminate,

25   shall have no duty to maintain or retain or make available.  I

1    think whether it goes in this protective order or somewhere

2    else, there at least needs to be a mechanism for the debtor or

3    the committee to come back to the Court to seek to do something

4    with it.  I mean, I just -- it's clear that the examiner and

5    his professionals should not be the ones to bear the burden of

6    maintaining the database afterward.

7            But it does seem to me that there's going to be --

8    this is the debtors' money that's going to be invested in

9    creating and maintaining the database.  And so whether it's

10   something that says -- that makes it subject to further order

11   of the Court, I don't know.  But I just -- the way it was

12   drafted now, you could just go ahead and -- I don't know what

13   deactivate and terminate means, necessarily, but I got the gist

14   of it.

15           MR. SEIFE:  We're happy to modify that, Your Honor, to

16   reflect that it's subject to further order of this Court.

17           THE COURT:  Okay.

18           MR. SEIFE:  That would be fine.

19           THE COURT:  Let me hear from Cerberus' counsel, and

20   then -- because I do have some questions.  They had the most

21   specific objections about the scope of who would have access

22   and the designation of "professional's eyes only" versus

23   "highly confidential", et cetera.  So let me hear from

24   Cerberus' counsel.

25           MS. GARDINER:  Good morning, Your Honor.  Marguerite

RESIDENTIAL CAPITAL, LLC, ET AL.                    15

1   Gardiner, from Schulte Roth, on behalf of Cerberus Capital.

2   I'd just like to preface my argument by noting that Cerberus'

3   limited objection is in no way substantive.  It's a procedural

4   objection, and it really relates to who, as you stated, who has

5   access to the information produced.  And by that I mean this

6   objection does not relate to the scope of the examiner's

7   investigation.

8             THE COURT:  I understood that.

9             MS. GARDINER:  And so we don't intend to address that

10  here and don't have issues at this point.

11            Really, the proposed procedures raise three concerns

12  for us.  First, as noted, the broad access that will be allowed

13  by the use of the special services list or the special service

14  list; second, the designations; and then third, the issue that

15  arises really as a result of the first two, which is the lack

16  of use restrictions on the material that's collected.

17            To back up a little bit, Cerberus is one of several

18  entities that received a subpoena from the committee.  And the

19  subpoena was quite broad, seeking, essentially, all documents

20  relating to the debtors over an eight and a half year period.

21  As the examiners noted, this is going to -- a lot of materials

22  will be collected, and Cerberus has concerns about the

23  confidentiality of the materials collected, how that will be

24  treated.

25            So with respect to the access issue and using the

1  special service list, Rule 2004 is relatively clear that access

2  is granted to an examination or to materials only on motion of

3  the party.  And the courts have underscored that there's an

4  affirmative duty to show good cause why one's entitled to such

5  broad discovery.  Really, this type of discovery has been

6  described as a fishing expedition, and is broader than

7  discovery that would be --

8       THE COURT:  Tell me what happens when the plaintiffs

9  in -- when FHFA, which has been very aggressive, files a motion

10  for access to this database.  Is there law developed about

11  when -- because I know the protective order purports to limit

12  use to the Chapter 11 cases, and you have an objection about

13  that language as well.  But let's assume that by its terms,

14  it's limited to the Chapter 11 cases.  Is there any case law

15  that's developed about what happens when a party such as FHFA

16  files a motion for access to all of the documents in the

17  examiner's database?

18       MS. GARDINER:  Well, I think, essentially, what the

19  courts require are one, a showing of good cause for the

20  development of claims relating to the bankruptcy case and a

21  weighing of the competing interests of the parties.  And again,

22  there's an affirmative duty to show that the use of the

23  materials relate to the administration of the estate.

24       THE COURT:  Has this issue been litigated?

25       MS. GARDINER:  Well, I guess if the question is, have

1    individual creditors sought access --

2             THE COURT:  You give examples of similar types of

3    protective orders, I think, the Tribune case, and I don't know

4    whether there were some others that had been mentioned.  Have

5    there been challenges -- have there been motions of plaintiffs

6    in pending cases to gain access to an examiner's database?

7             MS. GARDINER:  In the Enron case, which we cite,

8    the --

9             THE COURT:  I didn't go back and read Judge Gonzalez's

10   opinions.

11            MS. GARDINER:  That's okay.

12            THE COURT:  I'm generally familiar.  But what did he

13   decide there?

14            MS. GARDINER:  So what happened there was the

15   plaintiffs in a pending securities action -- I think it was in

16   Texas -- sought access to the 2004 materials.  And they did so

17   in their capacity as plaintiffs in the securities action.  And

18   the Court said clearly that is not the appropriate use.  You

19   can't circumvent the limitations that are imposed under -- I

20   mean, there under the PSLRA, but more generally under the

21   Federal Rules and the discovery limitations imposed by the

22   Federal Rules -- you can't circumvent those rules by seeking

23   access to 2004 materials.  I think the --

24            THE COURT:  Even if the same materials would be

25   discoverable in the underlying cases?

1           MS. GARDINER:  Yes.  I mean, I think, again, the

2     courts weigh the interests.  And to the extent there is a good

3     basis for a party who is a party-in-interest to access the

4     materials, that that is something that needs to be weighed.

5     But --

6           THE COURT:  Which of Judge Gonzalez's opinions in

7     Enron cover -- was it his opinion or --

8           MS. GARDINER:  It was his opinion.

9           THE COURT:  On page 6 of your limited objection you

10    cite -- that's actually a district court opinion you cited here

11    in Enron.  You don't have to find it now.  If you or one of

12    your colleagues can point me to it, I'd like to --

13          MS. GARDINER:  To the Enron?

14          THE COURT:  Yes.

15          MS. GARDINER:  The citation for the Enron case?  Sure.

16          THE COURT:  Because what I'm looking at, the one I

17    found on page 6 is a district court citation, not a bankruptcy

18    court citation.

19          MS. GARDINER:  Oh.  Well, the citation I have is 281

20    B.R. --

21          THE COURT:  Hold on.

22          MS. GARDINER:  -- 836.

23          THE COURT:  Okay.

24          MS. GARDINER:  I do have one copy of it, but --

25          THE COURT:  No, no.  That's all right.

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1          MS. GARDINER:  Okay.

2          THE COURT:  So what's wrong with the special service

3   list defining who gets access?

4          MS. GARDINER:  Well, the special service list contains

5   parties just by default who haven't:  1) expressed any interest

6   in accessing the materials that will be at issue; and 2) and

7   haven't shown any good cause for access to it.  So those would

8   include the debtors' pre-petition lenders, representatives of

9   the DIP lenders, Nationstar Mortgage, which is a stalking-horse

10  bidder in certain of the debtors' assets, the IRS, the SEC, the

11  U.S. Attorney General's Office, the New York Attorney General's

12  Office.

13         THE COURT:  You're not anxious to have all of them get

14  access to your documents?

15         MS. GARDINER:  Well, and there's just no -- yes,

16  there's no -- without any cause, there's no reason for all

17  these parties to have access to sensitive information,

18  particularly in light of the scope of the discovery.

19         I'd also point out that list is likely to grow.  So

20  any time a party seeks to be added to the special service list,

21  that has implications with respect to the data collected, that

22  just the two -- there's no rational link between the two.

23         THE COURT:  Okay.  Tell me about -- you also objected

24  to the definitions of "highly confidential" and "professional

25  eyes only".

1          MS. GARDINER:  Okay.  Well, our first concern with

2     respect to "highly confidential" -- and I can offer, I know we

3     didn't attach a mark-up, and I can offer one up, if you're

4     interested.

5          THE COURT:  You submitted something, but it wasn't a

6     black-line, so I wasn't able to follow --

7          MS. GARDINER:  Okay.  I do have a black-line if that

8     would make this easier.

9          THE COURT:  It would.  It would.  Give one to one of

10    my law clerks as well.  Thank you.

11         MS. GARDINER:  So --

12         THE COURT:  This is a black-line against the one

13    that --

14         MS. GARDINER:  Against --

15         THE COURT:  -- Mr. Seife submitted?

16         MS. GARDINER:  Yes.  So it's our submission as against

17    their submission, reflecting our proposed additions to the

18    order.

19         With respect to "highly confidential", if you'll flip

20    to page 7 paragraph 7.

21         THE COURT:  Yes.

22         MS. GARDINER:  To back up a bit, highly confidential

23    materials under the -- will only be disclosed to the examiner

24    and won't be included in the database.  As defined by the

25    examiner's order, highly confidential material will only

RESIDENTIAL CAPITAL, LLC, ET AL.                    21

1  include privileged information or attorney work product.

2  Cerberus, as a third party, has no intention of producing

3  privileged materials or attorney work products.  So this, as it

4  stands, this wouldn't even apply to us, to any production by

5  Cerberus.

6          So we would propose expanding this definition to allow

7  for this heightened protection for particularly sensitive

8  materials.  In an earlier draft circulated by the examiner,

9  this Romanette ii was included.  And I gather during the course

10 of negotiations that came out.  So Cerberus, again, expects

11 that given the volume of information produced, it's possible

12 and likely that some of the information will run the risk of

13 resulting in direct and imminent competitive harm if disclosed

14 to the parties here.

15         Again, we don't dispute the examiner's right to access

16 the information, but there simply isn't any need for it to be

17 disclosed to such a broad range of parties.

18         THE COURT:  Where is the provision -- this deals with

19 "highly confidential" -- where is the "professional eyes only"?

20         MS. GARDINER:  "Professional's eyes only" is paragraph

21 5.  It's an earlier page.  And we do -- we have some comments

22 to the content of material that would be designated

23 "professional's eyes only", but also with respect to -- in the

24 next paragraph, in paragraph 6, the notion that that material

25 would be available to the financial advisors of individual

1    committee members.

2          THE COURT:  I had a lot of problem -- referring to

3    your objection on page 10, paragraph 16, discussing

4    professional eyes only.

5          MS. GARDINER:  Um-hum.

6          THE COURT:  You say, "But Cerberus proposes that the

7    examiner's definition be modified to restrict access to any

8    Rule 2004 material that may present a risk of harm to the

9    disclosing party, not merely competitive harm, as the examiner

10   proposes."

11         I mean, are you given the unilateral right -- given

12   the definition that you have, you can just say, oh, I think

13   this presents a harm to me.  I'm not going to produce it.  I'm

14   even troubled with competitive harm, whether that's too

15   restrictive.  But taking that out and just saying any risk of

16   harm, everybody will think oh, yeah, the risk of harm is

17   somebody will get a hold of it and sue me.

18         MS. GARDINER:  Well, you know, again, I think the

19   order is prefaced with the notion that these designations will

20   be used in good faith.

21         THE COURT:  I should tell everybody that -- and we

22   have to talk about how disputes come to me.  Because I have

23   some problem with the provisions that were put in.  But if

24   people start presenting issues to me about what's highly

25   confidential, what's professional's eyes only, I take a very

1    narrow -- I'm putting everybody on notice right now -- my view

2    is as much as possible should be disclosed as broadly as

3    possible.

4            Yes, competitive information can be maintained as

5    confidential, but I look at that very carefully.  So when I saw

6    this change that you were proposing on "professional eyes

7    only", I really kind of gulped and -- give me the justification

8    for it.

9            MS. GARDINER:  Well, I think, again, the --

10            THE COURT:  Where is that language actually reflected?

11    When I tried to go back to the order and see where you had made

12    that change, I --

13            MS. GARDINER:  That's in paragraph 5 of the proposed

14    order.

15            THE COURT:  Okay.  You took out the word

16    "competitive", and just have "risk" --

17            MS. GARDINER:  Yes.

18            THE COURT:  -- "of harm".  Okay.  And what's the

19    justification for that?

20            MS. GARDINER:  Well, the justification would be -- I

21    mean, competitive is unduly narrowing, we think.  Again, I

22    don't --

23            THE COURT:  And risk of harm is unduly broad.

24            MS. GARDINER:  So there may be a compromise to be

25    forged there.

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1            THE COURT:  Actually, I don't think there's going to

2    be a compromise.

3            MS. GARDINER:  Okay.  Fair enough.  I guess I would

4    just point out that to the extent -- again, we expect that

5    there will be a large number of documents produced.  And to the

6    extent there is an issue with a particular document that the

7    examiner feels should be more widely distributed, there are

8    mechanisms by which the examiner can raise that question with

9    us.

10           I think our concern is, going into this, as a default

11   for things to be widely disclosed is problematic when some of

12   that information, much of that information, may ultimately not

13   end up being of huge interest to the examiner or used in the

14   report.  And the examiner can do his job -- again, none of this

15   restricts access by the examiner to the information.  This is

16   simply restricting the disclosure to additional parties.

17           THE COURT:  Address for me what you have in paragraph

18   17 of your limited objection, your objection to disclosure to

19   committee members' -- of professional eyes only to committee

20   members' financial advisors.

21           MS. GARDINER:  Well, this ties in to, again, our broad

22   access, our view on the special service list, which is that the

23   committee has been charged with representing the collective

24   interests of the creditors of the estate.  To the extent

25   individual creditors want access to and are entitled to this

1    material, they should be entitled to make that showing.  They

2    should bear the burden, but also be entitled to make that

3    showing that they're entitled to such access.

4            The idea that their individual financial advisors can

5    access the information doesn't -- sort of runs along the

6    same -- presents the same problem.

7            THE COURT:  Why is that?  If they're subject to the

8    protective order, in other words, if any professional who

9    receives the information has to be bound, agrees to be bound by

10   the protective order, the members of the committee, many are

11   large institutional entities.  And frequently, they work

12   through professional -- in a case like this, they use

13   professional advisors.  So why shouldn't they be able to use --

14   if the committee member is entitled to access to professional

15   eyes only material, and you agree they are, right?

16           MS. GARDINER:  Yes.  Sorry, no.  The committee members

17   are not -- professional's eyes only, the point is to restrict

18   access to the business people.

19           THE COURT:  So --

20           MS. GARDINER:  So it's the professionals that are

21   entitled to view the information.

22           THE COURT:  All right.  So the outside counsel for a

23   committee member is entitled access to the professional eyes

24   only material, right?

25           MS. GARDINER:  I think, our view would be counsel to

1    the committee is entitled.

2          THE COURT:  Where do you -- your specific objection

3    here was to committee members' financial advisors.  It doesn't

4    say committee members' counsel.  It says specifically on page

5    11, the third line in paragraph 17, your objection was to

6    disclosing to committee members' professional advisors under

7    any circumstances.  I didn't see that you were objecting to

8    disclosure to a committee member's counsel.

9          MS. GARDINER:  Well, I think, one, in the interest of

10   trying to limit our objection.  But in addition, the financial

11   advisors are frequently, I think, in the same business world as

12   our client.  And so to the extent those -- that information --

13         THE COURT:  So the lawyers who rely on -- if they're

14   going to do that -- I mean, of course part of the problem is,

15   when you restrict it for use in the narrow use that is already

16   in the draft permitted, it leads to potentially a proliferation

17   of professional advisors; one to deal with it in a narrower

18   role, and one who may get access, and one in a different role

19   who can't get access.  So it becomes much more costly.

20         But I don't understand how you're saying okay for

21   lawyers, but for a committee member's lawyer, but not if that

22   lawyer is using a financial advisor to advise them.  This is a

23   heavily financial case.  I mean, anybody who's going to get it

24   has got to sign on.  And if it breached the -- if it turns out

25   that they breached the protective order, there'll be

1    consequences.

2            Why lawyers yes, financial advisor, no?

3            MS. GARDINER:  I guess advisors who represent for the

4    receiving -- I mean, the committee members that received the

5    documents are receiving those documents in their capacity as

6    committee members and not as individual.  So I'm not sure I

7    agree that paragraph (b) would allow disclosure to the -- I'm

8    looking at 6(b) -- would allow disclosure to the lawyers.  I

9    just -- I'm not sure I agree that individual lawyers --

10   individual committee members' lawyers get access either.

11       (Pause)

12           THE COURT:  Any other points you want to make?

13           MS. GARDINER:  Sorry?

14           THE COURT:  Any other points you wish to make?

15           MS. GARDINER:  I guess sort of the third problem we

16   have is well, one just procedural point.  In the examiner's

17   motion he indicates that parties will produce documents on a

18   rolling basis and accounts for that.  We just ask that the

19   order be revised to reflect that as well, that both the

20   documents can be produced on a rolling basis, starting ten days

21   after the receipt of a subpoena.  And also that privilege logs

22   be similarly produced on a rolling basis, as the documents are

23   produced.  That was a purely procedural point.

24           But I think the third issue we have is just the use

25   restriction.  And I think this ties into our concern about the

1    broad access.  I mean, the sort of big concern would be that a

2    third party who's shown no entitlement as required under Rule

3    2004 to the materials, gets access because of their membership

4    in the special service list, then is able to use -- so long as

5    they can say, in some form, that they're using the documents in

6    connection with the cases, they can use them.  We would ask

7    that the use be restricted to in connection with the

8    investigation.

9          THE COURT:  Yes.  I want other parties to address that

10   issue.   That -- I'm not ruling on it yet, but I'm sensitive to

11   this issue of who has access and that the designation of the

12   special service list was never intended to and doesn't link to

13   the examiner's materials that are being collected.  It's one

14   thing if someone -- an additional party not included originally

15   makes a motion for access and shows good cause.  So -- but I

16   want to hear others speak to that issue.  So I have that --

17   that point, I have clearly in mind.

18         MS. GARDINER:  Okay.  Well and again, as sort of tied

19   in with that, is this broader concern about use.  And the two

20   are related.  But also, we would ask that the materials be --

21   the use of the materials be limited to in connection with the

22   investigation.

23         THE COURT:  I don't know what that means either.  I

24   mean, that's not the purpose of the examiner.  Okay?  The

25   examiner's going to do a report, and it's going to provide

RESIDENTIAL CAPITAL, LLC, ET AL.                    29

1   information for the parties to use in connection with these

2   Chapter 11 cases.  Other parties are not conducting the

3   examination.  The examiner is conducting the information (sic).

4   Why is the examiner conducting the information (sic)?  Because

5   the requisite showing for appointment has been made.  There are

6   clearly matters that everyone agrees on the appropriate scope.

7   The examiner will report on it.

8          And I understand the need -- I understand the parties'

9   desire that the materials only be used in connection with this

10  Chapter 11 case.  When you want to add that additional

11  qualifier, I don't know what it means as a practical matter.

12         But let me hear from other parties.  Okay?

13         MS. GARDINER:  Okay.  Thank you.

14         THE COURT:  Thank you very much.

15         Let me see -- does the committee want to be heard, and

16  then -- Mr. Seife, I'll give you a chance.  And I do have some

17  more questions as we go along.

18         MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

19  Eckstein of Kramer Levin, on behalf of the creditors'

20  committee.  A couple of observations.  I'm not sure there are

21  that many points that need to be dwelled on.

22         But I do want to point out that we saw the limited

23  objection from Cerberus Tuesday night, and I believe we saw a

24  more limited objection from Ally, I think it was Wednesday

25  morning.  We actually had understood that this was actually

1    agreed to.  So I was a little bit surprised that there were

2    such significant disagreements, and I'm not sure I'd

3    characterize the Cerberus objection as limited.

4            So we didn't have an opportunity to put any response

5    in, but I do want Your Honor to appreciate that this protective

6    order was the result of extensive negotiation, not just with

7    the committee, but with the debtor and with other parties.  And

8    it took a lot of compromise to get to this.

9            Number two, I do feel a need to point out that the

10   committee already has in place a confidentiality agreement with

11   Cerberus.  On July 12th, Cerberus executed a confidentiality

12   with the committee.  And the protective order essentially

13   builds off of the confidentiality agreement.  And I'm a bit

14   perplexed, because the provisions that are being discussed now,

15   are already included in an executed confidentiality agreement.

16           For example, "professional eyes only" was lifted out

17   of the confidentiality agreement and goes into -- and again,

18   that was negotiated.  It was not just submitted to Cerberus;

19   Cerberus negotiated it.  It was agreed to with the debtor; it

20   was agreed to with Cerberus; and I believe it was agreed --

21           THE COURT:  I think they're trying to retrade it now.

22           MR. ECKSTEIN:  Well, I think that's probably one way

23   to look at it.  There was no "highly confidential" concept in

24   the confidentiality agreement.  The examiner wanted to include

25   a provision for highly confidential documents.  The intent was

1  so that the examiner would be able to get -- really, the

2  purpose was to get really legal analysis from the parties about

3  positions that parties did not want to share broadly.  And we

4  frankly understood that.  And to the extent that counsel for

5  one of the parties wanted to share legal analysis with the

6  examiner, we frankly felt it was appropriate for the examiner

7  to be able to see that without that going into the depository.

8          My concern is that that even now, the "highly

9  confidential" definition, as Your Honor pointed out, goes

10 beyond that.  And we are, in fact, quite concerned, that even

11 what's in there now, the competitive harm, for example, if --

12 it could go awry.  And we are relying on the good faith of the

13 parties not to take advantage of that provision.  It's been

14 represented by everybody that it's going to be used most

15 narrowly.  And I'm concerned.

16         Candidly, Your Honor, we have asked for a log.  We

17 have asked anybody who wants to submit highly confidential

18 information should provide a log of what that is, because we're

19 not going to know what's even in the category.  There is no log

20 right now in this agreement.  And frankly, I think there's good

21 reason for if a party wants to designate something as highly

22 confidential, they could submit a log to the examiner and

23 simply let everybody know these are the documents that we're

24 submitting as highly confidential.  Obviously, don't disclose

25 the info.

1            But that way, we'll have a better sense of knowing

2    whether or not, in fact, the narrow use of that provision is

3    being respected.  And we think that that would not be

4    burdensome, and would actually be a very reasonable way for

5    everybody to keep track of how that's being used.

6            But we would have strong problems with expanding

7    "highly confidential" even beyond where it is now.  We're

8    living with where it is now, in order to get this done.  But we

9    would object to expanding that provision.

10           In terms of the financial advisor issue, that was

11   negotiated and is in the confidentiality agreement.  I mean, it

12   specifically says that if a financial advisor for a committee

13   member is only working on the Chapter 11 case and is not

14   working with the committee member on anything unrelated to the

15   Chapter 11 case, then it was agreed that that financial advisor

16   could see the professional eyes only information.  And that's

17   simply what the protective order says.  So I'm not -- I don't

18   understand why that's even objectionable.

19           And as a practical matter --

20           THE COURT:  I don't either.

21           MR. ECKSTEIN:  So I don't believe that there's any

22   basis for that to be modified.  And in terms of the use issue,

23   Your Honor, I will tell you that I have had extreme difficulty

24   with my clients who are very concerned that this protective

25   order could potentially be used as a source for procedural

1   litigation against them to suggest that you're sitting in the

2   room, you're hearing a presentation from counsel on documents

3   that are confidential, and that's going to somehow be used to

4   hold up or distract ancillary litigation, on the grounds that

5   they have access to information.

6          We all know, if somebody hears the information, they

7   hear the information.  It doesn't mean that they can take a

8   document that's confidential and annex the document to a

9   pleading.  I think people understand that.  But I think it

10  should be made clear on the record that committee members who

11  have fiduciary duties and are basically involved in this

12  Chapter 11 case, should not be subjected to procedural

13  litigation arising out of this order because they have received

14  confidential information in the course of their duties as a

15  member of the committee.

16         And I think that that is an important clarification on

17  the record.  I don't think we need to modify the document.  But

18  we would have strong concerns about further modifying the use

19  beyond "in connection with the Chapter 11 case", which we think

20  is the appropriate definition.  And we share the view that this

21  protective order is being proposed very broadly, and it's going

22  to affect -- according to Ally, Ally would like this to cover

23  all discovery in the case.

24         So by definition, if it's going to cover all discovery

25  in the case, which is something that we haven't finally settled

1   on, but I know that that's their request and that may, at the

2   end of the day, be appropriate; all the more reason why it has

3   to be -- this has to be constructed in the broadest possible

4   framework, rather than the narrowest possible framework.

5           I'm not going to comment, Your Honor, on the first

6   point, which is the access of parties.  I understand the

7   examiner would like to maximize the possibility that this

8   report can be filed broadly.  We concur with that.  We think

9   that that is a very important goal.  We think it would be

10  disadvantageous if the examiner is compelled to file a report

11  that people can't read.  And so whatever needs to be done to

12  allow the examiner to file its report with as much publicity as

13  possible, once it's complete --

14          THE COURT:  Let me interrupt you for this purpose.

15  I'll make clear to everybody, in most matters where I've

16  approved confidentiality agreements, both when I was practicing

17  law and since I've been here approving them as a judge, where

18  it deals with discovery material -- and yes I see agreements,

19  and I approve agreements that have "professional eyes only",

20  "highly confidential", "confidential".  I've got a file with

21  agreements that people have seemed to want to draft.

22          And unless and until it gets into an issue about

23  what's going to get filed in court, I'm not overly -- I don't

24  give people a really hard time about what's in it; because I

25  figure, all right, let them -- let's move this along, get this

1  done.  But when it comes to the issue of what gets filed in the

2  public record, the examiner's report, don't think that because

3  something that I've approved a confidentiality agreement, that

4  that necessarily is going to carry forward to what gets made

5  public in the examiner's report.

6          Yes, people will have an opportunity to, before it's

7  public, if they think that something that was based on what was

8  designated as "highly confidential" or "professional's eyes

9  only", I'll give them a chance to be heard on it.  But don't

10 assume just because I'm going to approve the confidentiality

11 agreement, that the examiner's report -- the examiner is going

12 to be precluded from doing a report that relies on confidential

13 information.  That isn't going to happen.  I'll just put

14 everybody on notice of that right now.  It defeats the purpose

15 of having an examiner's report, in my view.

16          MR. ECKSTEIN:  And, Your Honor, that is the way we're

17 looking at this as well.  We are expecting that once the

18 examiner's report is filed that -- I don't want to say

19 necessarily most, but many, many of the documents that have

20 been designated confidential will become public.  And the use

21 issues will drop away, and that this is really governing how

22 the parties are operating over the next couple of months, until

23 the report is published.  But we're assuming that this report

24 is going to cleanse most of this information, so that we're not

25 going to have use problems and restriction problems on most of

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1  these documents, going forward, once the report is published.

2  And that's how we're approaching this as well, Your Honor.

3            In terms of the first point that Mr. Seife discussed

4  with Your Honor regarding the document depository.  I think the

5  modification that was suggestion, which is "subject to the

6  Court's order," is the appropriate way.  But as a practical

7  matter, I just want to assure Your Honor that the committee

8  certainly was expecting, and we carefully worked this out with

9  the examiner, that every document will be accessible.

10           We are expecting to take, essentially, those documents

11 into our own possession when they go into the depository, so

12 that we can work with the documents simultaneously with the

13 examiner.  And we expect to retain the documents.  Which is why

14 we were not as concerned about that.  Although, I think,

15 "subject to further order" is probably better.

16           THE COURT:  Look.  I'm going to leave it to you all to

17 work out.  I just wanted to be sure that this -- the debtors'

18 point is, they only want to do it once.  They only want to give

19 discovery once.  And I understand that.  And I'll talk with --

20 about that issue, I'll listen to the debtor further on that

21 point.

22           Is -- I'm looking and I'm searching.  I made notes on

23 these objections.  Was it Cerberus' objection who thought that

24 it should include any asset sales?  You broadened the

25 definition.  Was that in Cerberus?

1          MR. ECKSTEIN:  Yes, that was -- the Cerberus objection

2     wanted to include any asset sale, which we thought, frankly,

3     made no logic in this --

4          THE COURT:  Tell me why?

5          MR. ECKSTEIN:  The entire investigation is about the

6     asset sales.  It's -- everything is going to involve transfers

7     of the debtors' assets.  And that goes to the heart -- that

8     will swallow up every single component of the investigation.

9     That was, in our view, probably the most difficult edit to

10    justify, in our mind.  And we would oppose that, Your Honor,

11    because that would turn everything into, I guess, professional

12    eyes only, or highly confidential.  I don't recall which

13    provision it was in.  But it was not acceptable, from our

14    perspective.

15         THE COURT:  All right.  Thank you, Mr. Eckstein.

16         MR. ECKSTEIN:  Thank you, Your Honor.

17         THE COURT:  Who else wants to be heard?

18         MR. BRYAN:  Good morning, Your Honor.  Patrick Bryan,

19    Kirkland & Ellis, on behalf of Ally Financial.

20         Your Honor, following up on the issue of access, we do

21    share Cerberus' concerns with access to this confidential

22    material.  In particular, in our limited objection, we

23    requested that there be a provision expressly prohibiting use

24    outside of these Chapter 11 cases.  And for us, Your Honor,

25    this is a very real concern.

1          Members of the committee have initiated litigation,

2    and that litigation is ongoing against Ally as well as the

3    debtors, or there have been threatened litigation by committee

4    members.  So for us, the restriction that this information,

5    this confidential and professional eyes only information,

6    remain in this Chapter 11 proceeding only, is a very real

7    concern to avoid potential prejudice by parties obtaining

8    access to materials that they would not otherwise have access

9    to in the underlying litigation.

10         Your Honor mentioned FHFA.  That case is not stayed.

11   And that --

12         THE COURT:  I know that.

13         MR. BRYAN:  -- case is obviously continuing in

14   discovery.  They could very well be before Your Honor seeking

15   to use the document depository as the equivalent of the body of

16   water to conduct a fishing expedition for further claims.  And

17   we think that it is essential for Ally to have that be

18   expressly prohibited, and we'd ask that the order be modified

19   in that respect.

20         Now, Mr. Eckstein mentioned the possibility of

21   procedural litigation against committee members if they have

22   access to information in their role as committee members.  And

23   I'm not sure I understand that concern or whether it's

24   legitimate.  But as committee members, they only have the right

25   to access confidential information within this Chapter 11

1    proceeding.  So we respectfully submit, Your Honor, that that

2    concern should not be given much weight.

3          Now, Your Honor, we have also raised another issue

4    with respect to the scope of the protective order.  I'm happy

5    to address that now, if you like.

6          THE COURT:  If you're going to do it, now's the time

7    to do it.  Let me just -- hang on just for one second, because

8    I made some notes on your -- go ahead.

9          MR. BRYAN:  Your Honor, in our limited objection, we

10   made the simple request, let's make this protective order apply

11   to all discovery, whether it be conducted by the examiner or

12   the committee.  And we suggested at the very beginning, in

13   fact, in the discussions with the committee, that that was our

14   position from the very beginning, that this should be a uniform

15   protective order applying to all discovery.

16         And the examiner, in his papers, has acknowledged that

17   it's critical to have a uniform, single, protective order.  And

18   we agree.  We just think it should be extended to all

19   discovery.  And the reason is, because as Mr. Eckstein

20   mentioned, the committee has conducted discovery.  We have

21   produced documents.  And they've asked us to enter into a

22   bilateral confidentiality agreement.

23         Your Honor's 2004 order requires us to produce the

24   documents we give to the committee to anybody else, subject to

25   the committee's 2004 motion.   That means there are several

1  bilateral confidentiality agreements that would be necessitated

2  if this protective order is not expanded in scope to cover

3  committee discovery.  That's exactly the situation the examiner

4  is trying to avoid, and that's exactly the situation we're

5  trying to avoid.

6         And Mr. Eckstein mentioned the confidentiality

7  agreement that the committee has entered into with Cerberus.

8  They proposed a similar confidentiality agreement to us.  And

9  there are differences between that proposed confidentiality

10 agreement and the protective order that the examiner has

11 proposed.  For example, the definition of "professional eyes

12 only" is different between the two agreements.  There are

13 different designations.  There are different protections in the

14 examiner's proposed --

15        THE COURT:  It's become a cottage industry, preparing

16 protective orders.

17        MR. BRYAN:  Your Honor, and we are not -- the only

18 thing we are interested is let's do this efficiently.  Let's

19 make it so that the committee's work and the examiner's work is

20 not frustrated by these -- what should be very resolvable and

21 administrative matters.  We have proposed simple language.

22        THE COURT:  Have you entered into a protective order

23 with FHFA, with respect to Ally documents and the litigation

24 before Judge Cote?

25        MR. BRYAN:  We have, Your Honor.  Well, we have not --

RESIDENTIAL CAPITAL, LLC, ET AL.                              41

1  let me rephrase that.  Judge Cote has entered her protective

2  order in that case, yes.  Obviously --

3          THE COURT:  And how does it differ from the proposed

4  protective order here?

5          MR. BRYAN:  Your Honor, to be honest, I have not

6  reviewed that and I can't answer that question.  But what I can

7  address is the differences between what the committee has asked

8  Ally to do in this case and what the examiner has proposed.

9          THE COURT:  Well, I sort of share Mr. Seife's view in

10 the short reply.  This is -- I'm not going to hold this up

11 while people sort out what they're going to do.  I'm going to

12 approve a protective order.  It makes perfect sense for people

13 to sign onto it when they're asked to produce documents; but

14 I'm not going to hold this up.

15         If the issue comes before me when someone is objecting

16 to producing documents to another party without a protective

17 order, the first place I'm going to look is the protective

18 order that gets entered here.  But go ahead.

19         MR. BRYAN:  Your Honor, and we don't want to hold this

20 up either.  In fact, as I mentioned, we engaged both the

21 committee and the examiner, proposing language.  And the

22 committee indicated that they -- although they don't think our

23 request was necessary, they don't oppose the change that we

24 offered.  The examiner, in his papers, took the position that

25 we don't have a position on this.

1          I think this is something that we can resolve here

2     today, Your Honor.  It is something that will improve

3     efficiency; and that we shouldn't be here arguing about this

4     issue.  We should be moving forward in discovery.  And that's

5     what we intend to do.  In fact, Ally has produced documents to

6     both the examiner and the committee, without entry of a

7     protective order, to keep the process moving.  And we submit

8     that having a uniform protective order govern all discovery,

9     will avoid the next time Your Honor has to address protective

10    order issue, or the next time a party that's not on the service

11    list comes to you and says I want some different protections.

12    We can do this all at once, Your Honor.  And we think now is

13    the time to do it.

14              THE COURT:  Thank you.

15              MR. BRYAN:  Thank you.

16              THE COURT:  Anyone else want to be heard?

17              MR. MOLONEY:  Good morning, Your Honor.  For the

18    record, Tom Moloney of Cleary Gottlieb Steen & Hamilton.  We

19    represent a large number of the senior unsecured noteholders of

20    ResCap.  Actually, we've negotiated successfully a form of

21    instruction letter to Wilmington Trust, and a form of

22    indemnification letter with Wilmington Trust, and a form of

23    verification with Wilmington Trust.  And I suspect the next

24    time we appear before you, we'll be appearing as special

25    counsel to Wilmington Trust.  So I think that's what will be

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1    next.

2              And we obviously want to participate in this

3    discovery.  And there's a placeholder for us now under the

4    special designation list.  There's also a placeholder for us to

5    participate in the depositions as an ad hoc group which will be

6    changed to --

7              THE COURT:  What's the big deal if -- I'm concerned by

8    the category of special service parties, because it was never

9    intended to be linked to access to an examiner's depository.

10   As long as whatever I sign establishes a procedure that allows

11   you -- you may well be able to establish good cause for access

12   to it.

13             MR. MOLONEY:  Right.

14             THE COURT:  I start with a strong preference that

15   parties-in-interest be given access to as much information as

16   possible.  There may be reasons why some party should not be,

17   or certain kinds of information that they shouldn't be.  But

18   I'm not sure -- yes, it will be one more motion that has to get

19   added to an omnibus hearing day, when you want to obtain access

20   to the examiner's depository.  But okay.

21             MR. MOLONEY:  Well, Your Honor, we were part of the

22   group who negotiated this order, so we actually -- if language

23   doesn't change, we're okay with the order as is.  There have

24   been requests for changes, and I'm going to suggest that

25   changes are not merited, because there's already a mechanism in

1  place here.  You don't automatically get information just

2  because you're on the special service list.  You have to step

3  up and sign this protective order.  Presumably you're then

4  going to have to give notice.  And if you don't have to give

5  notice to all parties who are producing here, you should.  And

6  then if somebody has a problem and says, look, I'm involved in

7  another litigation with this party, and it's not appropriate

8  for them to be getting this information, or they're not really

9  a party-in-interest, they can -- they should be able to raise

10 it.

11        So I think the burden should really be on the party

12 who says look, presumptively the people on this list are

13 parties-in-interest in this case.  And to require all of them

14 to --

15        THE COURT:  Yes, but there's no -- I don't have any --

16        MR. MOLONEY:  -- file --

17        THE COURT:  At this stage, there's no -- I don't have

18 any control about who gets added to this special service list.

19        MR. MOLONEY:  Correct.  But until they actually sign

20 on to the protective order -- and you could build in a

21 mechanism where they give notice -- they're not getting the

22 information.  So it's not going to all of these -- and if they

23 sign on to the protective order, then I think it should be the

24 burden of the parties who think they're an inappropriate party

25 rather than having people constantly filing motions before Your

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1  Honor to get onto this list.  I think the presumption should

2  be, given where we started --

3          THE COURT:  That's what I don't see, Mr. Moloney.  I

4  don't understand -- I'm being very candid -- I don't -- the

5  category wasn't created with this in mind; why it should be

6  given a presumption now that it's to be given broader use,

7  other than making somebody's life easy, perhaps, it's not clear

8  to me.

9          If you want access to the documents, having to make a

10  motion, I don't think is a particularly onerous burden to put

11  on you.  And you may well be able to establish good cause to do

12  it.

13          MR. MOLONEY:  Well, Your Honor, can I make two points

14  about this?

15          THE COURT:  Yes, go ahead.

16          MR. MOLONEY:  One is that there have been two

17  suggestions to expand the whole scope of this, one by the

18  debtor that this is the exclusive avenue to get information.

19  And representing the noteholders, we'd asked them for

20  information, and they've told us, no, it's all going to be

21  given through the depository.  We don't want to have to produce

22  information collaterally.

23          THE COURT:  Well, look.  Let me stop you there, Mr.

24  Moloney, because actually, that was one of the things I wanted

25  to ask the debtor about.  I mean, the debtor shouldn't have to

1  be able to produce the material twice.  But what is not clear

2  to me, whether if this is an electronic database, it does seem

3  to me that the debtor could say -- I would assume that access

4  could be provided such that if the debtor says just get all the

5  documents that we've produced and that's on the examiner's

6  database, that you could obtain -- that rather than the debtor

7  have to produce it again, that you could get -- they could say,

8  just go to the examiner's database.  You've got the authority

9  to do that.  There ought to be a mechanism built in, just for

10  that purpose, so that their response could be, it's all there,

11  take it from there.  But that doesn't mean you get access to

12  every other party who has produced documents to the database.

13          So when I read it, that's what I envisioned happening;

14  that no -- the debtors shouldn't have to be able to go -- have

15  to go through this multiple times, but there ought to be a way

16  to be able to retrieve from the examiner's database, documents

17  produced by the debtors, even if you didn't have access to

18  Cerberus' documents, just as an example.  What's wrong with

19  that?

20          MR. MOLONEY:  We have no problem with it, provided

21  that you're not in a situation where you have an exclusive

22  source to go to to get information, which is the database, and

23  you'd be entitled to get that information vis-a-vis the debtor,

24  but because of some other procedure, that we've set up here,

25  you can't get to the database.  That --

1              THE COURT:  Well, one of the things --

2              MR. MOLONEY:  -- Your Honor may have fixed that in

3     your suggestion.

4              THE COURT:  I want hear from Mr. Seife.  I don't want

5     to create problems for Chadbourne on this, but -- or I don't

6     know where you get a vendor who's going to be the keeper of

7     this database.  But so I won't -- I mean, I don't think that

8     logistically it creates a big problem to say that the debtor

9     can provide the authority for someone, some party, to access

10    the documents produced by the debtor that reside on this

11    database.  It may raise an issue about cost.  And that ought to

12    be discussed as well.

13             But that seems to me to be -- because Cerberus

14    shouldn't have to produce documents twice.  Ally shouldn't have

15    to produce documents twice.  But it may be that there are some

16    parties who will gain access to Ally's documents.  And their

17    answer is, we produced it once; you can get it off the

18    examiner's database.  We will give written -- we'll sign a

19    written authorization for you to have access to the documents

20    we produced.

21             MR. MOLONEY:  Your Honor, I think there's -- I think

22    the only question I have of where I think this is coming out is

23    that I think there should be a very strong presumption that

24    parties-in-interest in this case get access to this database.

25             THE COURT:  I'm not so --

RESIDENTIAL CAPITAL, LLC, ET AL.                              48

1        MR. MOLONEY:  I mean, the Enron case, which I was

2   involved in, before Judge Gonzalez, it was a situation where

3   someone is trying to do an end-run around a PSLRA which doesn't

4   permit discovery, to get discovery in a 2004 proceeding.  And

5   also there's a rule that once you start a lawsuit you can't

6   get both --

7        THE COURT:  You can't use 2004 as a substitute.

8        MR. MOLONEY:  But the most -- for representing the

9   bondholders in this case, we don't have any lawsuits, we don't

10  have any securities cases.  There's no reason why we should not

11  have full access to this information.

12        THE COURT:  Okay.

13        MR. MOLONEY:  I can't imagine -- and I think that's

14  true of every party-in-interest and creditor.

15        THE COURT:  Because I don't want to have to go through

16  and I don't want everybody else to have to go through now and

17  say who's on this special service list now, how did they get on

18  there, how does that relate to --

19        MR. MOLONEY:  It may not be a good --

20        THE COURT:  -- this use --

21        MR. MOLONEY:  It may not be a good rubric.  It may be,

22  Your Honor, that a better rubric would be for them to come up

23  with a new definition that it includes --

24        THE COURT:  My approving something now, Mr. Moloney,

25  doesn't preclude an amendment to this if the parties -- I want

1  to come out today with perhaps some minor tweaking with what

2  these orders are going to be.  And it does not preclude further

3  discussions to try and tweak it so you can satisfy Mr. Lee that

4  the debtors don't have to produce more than once and how that

5  access -- that could be done with a separate order or something

6  of that nature.

7            MR. MOLONEY:  Right.  We agree with that, Your Honor,

8  not to hold up the examiner and that issue of whether it be a

9  single protective order for all purposes or whether -- how the

10  debtor avoids that --

11            THE COURT:  It would be better --

12            MR. MOLONEY:  -- for a later day.

13            THE COURT:  -- for everybody if it was a single

14  protective order for all purposes.

15            MR. MOLONEY:  We agree with that as well, Your Honor,

16  but we think that people have to -- maybe a broader group of

17  people need to be involved in looking at this, and it should be

18  teed up separately if that's the objective.  Then I think

19  the --

20            THE COURT:  Well --

21            MR. MOLONEY:  -- first objective is to get --

22            THE COURT:  -- putting in the protective order "unless

23  otherwise ordered by the Court this is what's applicable" --

24            MR. MOLONEY:  But --

25            THE COURT:  -- would also be --

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1          MR. MOLONEY:  -- can I make a very parochial request,

2     that if we just come out with an order today that it include,

3     basically, Wilmington Trust as the indenture trustee for the

4     bondholders, because we have been involved, we do expect we're

5     going to end up being counsel to them within a day or so and we

6     have been involved in negotiating this for three weeks, and I

7     think it would be unfair for us to be kicked out of this

8     process and have to come back again.  I don't have any doubts

9     Your Honor would allow us back in again, but I think as a

10    matter of economy, I think we should --

11          THE COURT:  All right.  I hear your arguments.

12          MR. MOLONEY:  Thank you.

13          THE COURT:  Thank you.

14          Anybody else want to be heard?

15          Mr. Shore, you want to be heard?

16          MR. SHORE:  Very quickly, Your Honor.  Chris Shore

17    from White & Case on behalf of the junior secured notes group.

18          I just echo the same concerns.  The status quo forty-

19    eight hours ago was we were getting the information, and now

20    we're not.  And I think that the concern Mr. Moloney was

21    raising was that the cut that was made in the Cerberus

22    objection ended at the creditors' committee and kind of

23    disenfranchised the other larger groups within the case,

24    obviously, who have either a collateral interest in the claims

25    that are being investigated or obviously a recovery interest

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

 1   that the people are willing to invest money in to analyze.

 2          So I would make the same request that we be included

 3   or we could, while the order is being negotiated, get put in,

 4   because I'd hate to just have to come back and address that

 5   motion.

 6          THE COURT:  Let me ask, Mr. Bryan, do you have any

 7   objection to -- and I'll ask Ms. Gardiner as well -- do you

 8   have any objection to the junior secured noteholders and -- Mr.

 9   Moloney, just tell me again how you designate who your parties

10   are.

11          MR. MOLONEY:  Wilmington Trust, the indenture trustee

12   for the senior unsecured notes.  That would be fine.

13          THE COURT:  All right.  Does anybody who has filed

14   limited objections object to those two groups being

15   specifically included?

16          MR. BRYAN:  Patrick Bryan on behalf of Ally Financial.

17   Your Honor, we don't object to those specific entities, with

18   the same caveat that we'd like a provision that it expressly is

19   for these cases only.

20          MR. HARRIS:  Your Honor?

21          THE COURT:  Mr. Harris?

22          MR. HARRIS:  Your Honor, Adam Harris from Schulte Roth

23   on behalf of Cerberus.

24          Your Honor, we don't have an objection either.  I just

25   want to note for the record, however, that we are going into

1  this under the impression that the investigation is being

2  conducted by the examiner for the purposes laid out in the

3  order appointing the examiner.  We have a lot of parties-in-

4  interest here.  We have a lot of people with a lot of parochial

5  interests here.  We expect the examiner to be the one --

6          THE COURT:  Are you surprised?

7          MR. HARRIS:  No, not at all, Your Honor, and I'm not

8  surprised that people would love the opportunity to go through

9  what could be millions of pages of documents, and I wish them

10  well and have a nice day at it.  But the purpose of the

11  investigation, as we understood it, was for the benefit of the

12  estate, review various causes of action and come up with an

13  objective and independent report on that.

14          THE COURT:  Would you like to fight discovery requests

15  from all of these other parties?

16          MR. HARRIS:  No, Your Honor, and that's why I started

17  off by saying we don't object to them participating, but the

18  participation and having access to the documents is, in my

19  view, very separate and distinct from the responsibility of the

20  examiner to the do the examiner's job, which we expect will be

21  done appropriately.

22          THE COURT:  Thank you, Mr. Harris.

23          All right, anyone else?

24          MR. CORDARO:  Good afternoon, Your Honor.  Joseph

25  Cordaro, Assistant United States Attorney on behalf of the

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1  United States.

2          I would note also that the United States, I believe,

3  is also on the special service list and --

4          THE COURT:  They don't want you to get access, Mr.

5  Cordaro.

6          MR. CORDARO:  Well, actually, we're not sure, Your

7  Honor.  We would like to try to find that out.  If that's an

8  issue then we'd like to be involved in any discussions that

9  ensue after this order.  But if there is no objection --

10         THE COURT:  Well, Mr. Cordaro, if -- I'm going to

11 listen to Mr. Seife on this, and I'm not sure he had, really, a

12 dog in this fight either, but I think the special service list

13 is too broad a designation, okay, because it wasn't created for

14 this purpose.  The other mechanism, and it's already there, is

15 that anybody else can move, make a motion, and for good cause

16 will get access.  So whether you're included initially or not,

17 yes, it may mean that you have to make an additional motion.  I

18 don't want to hold this up, because I suspect there'll be

19 another long -- there'll be a line behind you seeking to be

20 added on.

21         I understand your point and you may well -- I'm just

22 not addressing whether you should or shouldn't be given access

23 to the material.  That's not -- okay.  You're on the special

24 service list.  If that were the designation, yes you'd have

25 access to it.  But I think it wasn't created for that purpose

1    so it's not sufficiently linked.  Okay?

2              MR. CORDARO:  Okay.  Thank you, Your Honor.

3              THE COURT:  Thank you, Mr. Cordaro.

4              Mr. Seife?

5              Is there anybody else who wanted to be -- I think not.

6              MR. SEIFE:  Howard Seife, Chadbourne & Parke, for the

7    examiner.

8              On a variety of points.  Regarding ongoing access to

9    the depository, certainly the special service list is a very

10   arbitrary list and isn't linked in any way, necessarily, to

11   parties who should be getting access.  It was just an attempt

12   by the examiner to not be in the position of making that

13   determination, as Your Honor can well appreciate.  So we are

14   perfectly happy --

15             THE COURT:  I'm going to sustain the Cerberus

16   objection to the access to the special service parties.  I

17   think they had indicated -- specifically identified the parties

18   who should have access.  It's been agreed as to two additional

19   parties.  There has to be some -- that ought to be it for now.

20   I want to make clear that my preference is for broader rather

21   than narrower access, and so parties who make a motion, I'll

22   hear it and decide it quickly.

23             MR. SEIFE:  Your Honor, in fact we have built in a

24   mechanism.

25             THE COURT:  I know you did, and it's fine.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1          MR. SEIFE:  And the mechanism doesn't require each

2   party to come and make a motion, which I think would have

3   clogged your docket.  And it's --

4          THE COURT:  Where is that?

5          MR. SEIFE:  -- in the order on page 5; its

6   subparagraph (h).  And it's taken from a similar provision we

7   used in the Tribune case; we represent the committee there.

8   And I would note, in Tribune we started with a very small group

9   getting access, of five or six or seven --

10         THE COURT:  What page are you looking at?

11         MR. SEIFE:  Attached to our motion is the proposed --

12         THE COURT:  Yeah.

13         MR. SEIFE:  -- order, Exhibit A.

14         THE COURT:  Oh.

15         MR. SEIFE:  And page 5 --

16         THE COURT:  I was looking at the wrong --

17         MR. SEIFE:  -- it's single-spaced paragraph (h).

18  Everybody, am I describing it --

19         THE COURT:  Yeah, I did read it and --

20         MR. SEIFE:  Okay.  So there is a very detailed --

21         THE COURT:  -- it was hard because all this was single

22  spaced and there's --

23         MR. SEIFE:  Yeah, usually single-space you can flip

24  over, but it's a fairly detailed process which has worked in

25  other cases.

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1          THE COURT:  Okay.

2          MR. SEIFE:  As I said, in the Tribune, we ended up

3    with dozens of people that gained access.  And what it does is

4    a notice has to be given to the various parties that have

5    deposited documents.  And absent -- it's a negative notice, so

6    absent objection a party will get added to the list.  So I

7    think that's an efficient way to go.

8          THE COURT:  I agree.

9          MR. SEIFE:  And we're only before Your Honor if there

10   is a legitimate dispute.  That's number one.

11         Are we all clear on who the initial accessing parties

12   are?  It's the debtor, the committee, Ally.  I'm not sure I

13   heard Cerberus.

14         THE COURT:  Is it Cerberus?  No?  No, okay, not

15   Cerberus.

16         MR. SEIFE:  No, it's not Cerberus.

17         THE COURT:  Okay.

18         MR. SEIFE:  They weren't on their own list.

19         THE COURT:  Right.

20         MR. SEIFE:  And then the two additional parties that

21   appeared before Your Honor.

22         THE COURT:  Okay.  Some other questions, Mr. Seife.

23         MR. SEIFE:  Yes.

24         THE COURT:  I didn't raise this before.  I'm looking

25   now in the uniform protective order --

1    MR. SEIFE:  Yes.

2    THE COURT:  -- paragraph 10 on page 8, and paragraph

3  11 on page 9.  So there's language about "unless the disclosing

4  party shall have filed a motion with the Court within those

5  five business days after meet and confer to determine that its

6  use of highly confidential designation was appropriate."

7    The way I deal with discovery disputes is the parties

8  meet and confer, any party seeking the assistance of the Court

9  arranges for -- it's typically a call with the Court.  And I

10  don't like discovery motions, okay?

11    And I'll tell you that -- and usually -- and even

12  saying within five days, ordinarily parties meet and confer,

13  they can't resolve it, they know they can call the Court, they

14  will usually get a hearing that day or the next day.  And I

15  don't even want to see letters.  It's described what the

16  dispute is, and ordinarily I resolve it right then.  If, after

17  listening, I conclude that I need something in writing, it's

18  usually short letter briefs.

19    I mean, I can tell you in the last five years, there

20  have only been two or three -- first off, when people know

21  their judge is going to decide it immediately, usually it gets

22  resolved without ever having to go to the judge.  And I've only

23  asked for letter briefs in two or three matters, and even there

24  it's gotten resolved within a day.

25    So what you ought to -- if you don't have -- there

1   must be in this case management order in this case, there's

2   language about dealing with discovery disputes.  What I'm

3   focusing on is sort of in the middle of paragraph 10, "Unless

4   the disclosing party shall have filed a motion with the Court

5   shall meet and confer and shall have requested a conference

6   with the Court."  Take the five days out, and I'll tell you

7   right now, it's ordinarily going to be that day, the next day.

8   And in something like this, if it involves highly confidential

9   documents, somebody's going to have to deliver copies --

10  promptly deliver copies of the documents for the Court to look

11  at, and I'll decide.  So that was in paragraph 10.  And also --

12          MR. SEIFE:  Paragraph 11.

13          THE COURT:  -- paragraph 11.

14          MR. SEIFE:  Yep.

15          THE COURT:  Let me see whether there were any other

16  little notes.

17          All right.  So with respect to access, I've sustained

18  the Cerberus objection, and I think you'll craft -- it's not a

19  big language change as to what'll be done.  And I agree, the

20  mechanism you built into the order is certainly satisfactory

21  for adding additional parties.

22          Just, Mr. Seife, address this issue about whether it

23  should include asset sales in the "professional eyes only"

24  category.  This was the -- Mr. Eckstein, I think, spoke pretty

25  vocally, strongly about -- in opposition to it.  What's the

1  examiner's view about it?

2           MR. SEIFE:  I can only echo Mr. Eckstein's comments.

3  One of the primary focuses of the examination will be on these

4  many transactions which were between the debtors and Ally,

5  debtors and Cerberus.  And we need to be able to have full

6  access and use of those documen --

7           THE COURT:  Well, you would have full access, but --

8           MR. SEIFE:  Yes.

9           THE COURT:  The objection is overruled; that specific

10  objection is overruled.

11          MR. SEIFE:  There was another objection, Your Honor,

12  that it was not clear of the use of the information.  I think

13  it's quite clear.  Again, it's set forth in the protective

14  order on page 4, paragraph 3(b), that any confidential

15  information is to be used for any purpose other than in

16  connection with the Chapter 11 cases.  So I'm not sure I even

17  understood the --

18          THE COURT:  I've already made the point, I didn't

19  understand this -- I don't know what this change -- what havoc

20  this change would work.

21          MR. SEIFE:  Right.

22          THE COURT:  So that objection is overruled. I think

23  the language you had was appropriate.  Okay.

24          MR. SEIFE:  Then the concept of "highly confidential

25  information".  This category was specifically to enable parties

1    to share with us legal memoranda, legal thinking, that

2    otherwise they would be uncomfortable sharing.  So that

3    category will not be published and is solely to educate the

4    examiner and his professionals.  So we would strongly resist

5    any attempts to expand that category.  And similarly,

6    professional eyes only, I think competitive harm is a standard

7    in that type of category.

8            THE COURT:  Yeah, my comments before, I think taking

9    the word "competitive" out makes this completely open-ended, so

10   that objection is overruled as well.

11           And also the objection with respect to further

12   limiting who has access to the professional eyes only,

13   excluding the financial advisors, that objection's overruled as

14   well.  I mean, the professional -- the financial advisors have

15   got to sign the confidentiality agreement --

16           MR. SEIFE:  Yes.

17           THE COURT:  -- and agree to be bound.

18           MR. SEIFE:  In the course of that discussion, Your

19   Honor, it did seem to me there was a gap that would permit the

20   attorneys for committee members to have access to the

21   information.  For some reason they did not seem to be included,

22   so we would amend that, because I think that was the

23   understanding.

24           THE COURT:  Okay.  All right.

25           Were there any other -- let me see, were there any --

1    I tried to keep track of what --

2            MR. SEIFE:  The suggestion that parties that produce

3    highly confidential information need to produce logs, Your

4    Honor, we think that's unduly burdensome.  The examiner will

5    know what's highly confidential because it'll be stamped.  So I

6    don't -- and it would just be a log on what was being produced

7    to us.  I don't think that is necessary.  I don't think we need

8    other parties --

9            THE COURT:  But you know --

10           MR. SEIFE:  -- looking over our shoulder.

11           THE COURT:  -- anybody who's going to produce the

12   documents is going to create a log, and a field on that log

13   that lists whatever has been marked as highly confidential, is

14   there any burden in that?

15           MR. SEIFE:  Well, I think the suggestion was that it

16   would be made public and accessible to other parties to the

17   depository.  The examiner doesn't need it --

18           THE COURT:  Okay.

19           MR. SEIFE:  -- and we would resist --

20           THE COURT:  All right.

21           MR. SEIFE:  -- publicizing that.

22           THE COURT:  Okay.

23           MR. SEIFE:  I think that was --

24           THE COURT:  I'm going to overrule that objection,

25   then, as well.

1          MR. SEIFE:  Thank you.

2          I don't think I had any other issues that we needed to

3   treat at this moment.

4          THE COURT:  Ms. Gardiner?

5          MR. LEE:  Your Honor, may I --

6          THE COURT:  Yeah, come on, Mr. Lee.  I'll give you a

7   chance.  Go ahead, Mr. Lee.

8          MR. LEE:  Your Honor, I thought I was going to get

9   away without having to say anything, but unfortunately the

10  clarification that Mr. Seife just made in relation to the

11  provision of "professional eyes only" information to committee

12  members' attorneys was a very heavily negotiated point when we

13  had this discussion with the committee, and the protective

14  order is based on the same protective order that we had

15  proposed with the committee.

16         The difficulty we have is that those same attorneys

17  are representing those parties in respect of claims that they

18  have against the estate, and the purpose of our providing

19  professional eyes only information to committee counsel and to

20  the examiner was to educate them about things that ordinarily

21  we wouldn't produce because they're privileged or work product.

22  So I'm quite concerned about now expanding the category of

23  people who get professional eyes only information to committee

24  counsel.  So --

25         THE COURT:  Counsel for committee members.

1        MR. LEE:  -- committee members' counsel.  And we spent

2   a long time negotiating that point.  So that clarification

3   causes us quite a great deal of concern, Your Honor.

4        THE COURT:  Mr. Eckstein, can you address whether --

5   was that something that was agreed between -- because this

6   really doesn't affect the examiner because this is not -- you

7   don't have a --

8        MR. ECKSTEIN:  Your Honor, I think the concern Mr. Lee

9   was referring to was committee counsel for individual members

10  who were involved in ancillary litigation.  So it would seem to

11  me that to the extent they're involved in ancillary litigation

12  that it would be appropriate for them not to have access to the

13  PEO information.  Those who are not involved in ancillary

14  litigation, I would think that those are similar to the

15  financial advisors who are not involved in the ancillary

16  litigation.  And that might be the --

17       THE COURT:  Mr. Lee --

18       MR. ECKSTEIN:  -- the right way to --

19       THE COURT:  -- do you agree with that?

20       MR. LEE:  I agree --

21       THE COURT:  Okay.

22       MR. LEE:  I agree with --

23       MR. ECKSTEIN:  I think that type of demarcation makes

24  sense, Your Honor.

25       THE COURT:  Okay.  So I was going to say something,

1    but I can see people are jumping up --

2            MR. LEE:  I apologize, Your Honor.

3            THE COURT:  No, go ahead.  People are jumping up

4    behind you, but --

5            MR. LEE:  That was the only point I had, Your Honor.

6            THE COURT:  Let me ask you, Mr. Lee, with respect to

7    the point in the brief piece of paper you filed about not

8    producing things more than once, I mean, that seems to me to be

9    quite manageable, but maybe it's more Mr. Seife's point because

10   it's more of a complication if he and his professionals are

11   maintaining the database.  But I would assume that -- and I

12   don't know that it has to be in this document, but something

13   that allows a party who has submitted produced documents to the

14   depository to consent to their production to someone else.

15   Does that solve your problem?

16           MR. LEE:  It does, Your Honor.  And I think actually

17   the way it's described in the form of order that Mr. Seife

18   admitted is perfectly acceptable to the debtors.

19           THE COURT:  Okay.

20           MR. LEE:  Thank you, Your Honor.

21           THE COURT:  All right.  Mr. Bryan, you had something

22   you wanted to raise?

23           MR. BRYAN:  Your Honor, I think it may be resolved, if

24   I understand correctly, that Ally would be given an opportunity

25   before -- to object before the information is shared with the

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1   committee members' individual counsel.  Is that correct?

2           THE COURT:  Yes, that's the way you had it.  You're

3   going to clarify that language, right, Mr. Lee and Mr.

4   Eckstein?

5           MR. ECKSTEIN:  Just so we're not confused, I think

6   this is only with respect to the professional eyes only

7   category, and we're going to clarify that language as I just

8   put on the record.

9           THE COURT:  Mr. Bryan?

10          MR. BRYAN:  That's correct, Your Honor, with that

11  change.  The issue for us, obviously, Your Honor, is that there

12  may be ancillary litigation, as Mr. Eckstein referred to, or

13  there may be tolling agreements that it has not yet been

14  brought.  So it's an essential we have an opportunity to

15  object.  Thank you.

16          THE COURT:  Okay.  But we're only talking about the

17  "professional eyes only" material?

18          MR. BRYAN:  Yes, Your Honor.

19          THE COURT:  Okay.  Ms. Gardiner?

20          MS. GARDINER:  Thank you, Your Honor.  I just want to

21  quickly address our proposed modification on Romanette ii,

22  paragraph 5, regarding professional's-eyes-only.  When we

23  suggested this language or transferred the debtors' assets, we

24  didn't intend to swallow up every prior transaction, we just

25  meant debtors' current assets.

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

 1           THE COURT:  No, I --

 2           MR. SHORE:  I just wanted to --

 3           THE COURT:  -- overruled your objection.

 4           MS. GARDINER:  Okay.  Okay, thank you.

 5           THE COURT:  Anybody else wish to be heard?

 6           Mr. Seife, is it clear to you what's going to happen

 7  now?

 8           MR. SEIFE:  The only clarity that I perhaps don't have

 9  fully, Your Honor, is, taking the debtors as an example, the

10  debtors will be producing documents to us; they'll be putting

11  it into the depository.  The debtors, when they produce, will

12  have, in electronic form, everything they produce.  So if a

13  third party wants to see what they've produced, it doesn't seem

14  to me to be particularly burdensome for them to reissue what

15  they've delivered to us.  My concern is putting additional

16  burdens on running the depository in terms of segregating

17  information by the parties who produce it.

18           THE COURT:  I assume everybody's going to have unique

19  Bates numbers, though, on anything they produce.

20           MR. SEIFE:  It all sounds very easy, but I'm not the

21  one running it.  And then we'd also have to monitor who has

22  permission to get access to that limited database.  Right now

23  it's being set up --

24           THE COURT:  Well --

25           MR. SEIFE:  -- so that it's universal access.  So I'm

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1   not sure it's a real problem.  We're happy to discuss it

2   further with the debtors.  But once you produce something and

3   it's in electronic form, I think you have it.  So to send it

4   someone else, I don't think is a burden, but maybe other

5   parties can disagree.

6           THE COURT:  Mr. Lee, what's wrong with that?

7           MR. LEE:  I think, Your Honor -- is Your Honor's

8   question whether we should maintain our own document depository

9   for --

10          THE COURT:  No, but you will.  I mean, it's not

11  your -- it isn't a question, because this is only an issue

12  about the documents you produce.

13          MR. LEE:  Right.

14          THE COURT:  Right.  You're going to produce them in

15  electronic format.

16          MR. LEE:  Yes, Your Honor.

17          THE COURT:  You absolutely are going to keep an

18  electronic record of what you're producing.  Probably papers

19  too, but --

20          MR. LEE:  Yes, Your Honor.  That's correct.

21          THE COURT:  The other thing, Mr. Seife's point is

22  what's the big deal?  Somebody asked for it.  It's easy for you

23  to provide it.

24          MR. LEE:  I mean, I think, Your Honor, I thought the

25  purpose of the depository was to collect in one place all of

1  the documents relating to the analysis and the investigation.

2  So either they're easily segregatable or they're not, and it

3  would -- we will, effectively, be faced also with situations in

4  which we see Rule 2004 subpoenas being directed to other

5  parties where we're forced to intervene.  The thought was this

6  would be clean, streamlined, and effective.

7           THE COURT:  All right.  I think you can work this out

8  with Mr. Seife.  I don't think that it in any way needs to hold

9  up approval of the order for the 2004 examination, the

10 protective order, or the depository.  Would you agree with

11 that, Mr. Lee?

12          MR. LEE:  Absolutely, Your Honor.

13          THE COURT:  Okay.  And then to the extent -- I

14 understand your concern about having to produce things more

15 than once.  See if you can work this -- I think when the

16 depository actually gets set up, and you ought to be conferring

17 with -- I don't know who the vendor is you're using, Mr. Seife,

18 but talk to Mr. Lee.  Hopefully it can be set up in such a way

19 as that it's easily searchable, find by party producing, et

20 cetera.  Okay?

21          MR. LEE:  Thank you, Your Honor.

22          THE COURT:  Thank you.  Anybody else wish to be heard?

23 I really do appreciate the efforts, Mr. Seife.  Obviously there

24 were a lot of interests and concerns beyond just the examiner.

25          Last comment.  With respect to is this going to be the

1    only form of the protective order for the case, somebody's

2    going to have a very hard time convincing me that something

3    different than this ought to be approved, but because there may

4    be other parties not present in court because they didn't know

5    they were going to get served with a 2004 subpoena by someone,

6    you know, some other party, this clearly applies to what the

7    examiner is doing, I'm reluctant to hand down an edict today:

8    this is it for the entire case.  Everybody ought to assume

9    there's a strong presumption this is what it's going to be.

10   Let me leave it at that.  Okay?

11            Anything else you want to add, Mr. Seife?

12            MR. SEIFE:  No, Your Honor.

13            THE COURT:  Thank you very much.

14            MR. SEIFE:  And we'll make the changes --

15            THE COURT:  Okay.

16            MR. SEIFE:  -- and submit an order.

17            THE COURT:  All right.  Mr. Eckstein?

18            MR. ECKSTEIN:  Your Honor, if I may, before we leave?

19   I think we've finished the calendar.

20            THE COURT:  We have.

21            MR. ECKSTEIN:  But if it's acceptable I wanted to just

22   briefly made a couple of status report observations --

23            THE COURT:  Okay.

24            MR. ECKSTEIN:  -- on RMBS.  Given vacation schedules

25   and the like and the timing I thought it was appropriate to

1   just use this as a brief opportunity.  And I didn't stand up

2   when Mr. Lee spoke initially about the subservicing, but just

3   to make sure I appre -- I think we've left with a status

4   conference on Thursday, and I'm assuming that it'll be set

5   down -- assuming the matter is resolved we'll set it down for a

6   hearing to approve the motion at a subsequent date, which is

7   acceptable to us, Your Honor.

8          With respect to RMBS, what I wanted to just bring to

9   the Court's attention is that the committee has been laboring

10  quite actively over the last few weeks to put in place the

11  support it's going to need in order to do the investigation

12  that has to be done of the RMBS issues.  And it has been a more

13  arduous undertaking than one would have expected, given the

14  fact that many of the experts in this field are already spoken

15  for and there are conflicts that have made it close to -- I

16  don't want to say impossible -- very difficult to identify the

17  experts that will be needed to perform the roles that are

18  required.

19         I believe that as of this morning we actually have

20  overcome the hurdle and we have in place a series of parties

21  who are going to be able to work with the committee to provide

22  the analysis that we believe is going to be needed in order to

23  review the proposed settlement and the issues that are

24  implicated by that.

25         Apropos that, I do want to note that last night the

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1    debtor filed an amended 9019 motion with an amended settlement

2    agreement that is quite substantive and raises even more

3    complications, and, obviously, that's going to have to be

4    something that is looked at very carefully, but I do want to

5    underscore the fact that, from the committee's perspective, the

6    complexities of this issue are growing.  And, obviously, we're

7    going to do the best we can.

8         The reason I wanted to speak specifically today, Your

9    Honor, is that the committee is going to be -- the approach

10   that we're going to take is we intend to file a retention

11   application that will cover a consulting firm, a -- basically,

12   a testifying expert from a consulting firm, a group of

13   economists and statisticians who will be working with the

14   testifying expert, and a firm that will be able to assist

15   officially in reviewing samples of loan files that we believe

16   need to be done in order to do the evaluation.

17        The costs are substantial, just given the magnitude.

18   We hope to have an application on file, I would think, within

19   the next week, and I would expect it can be on the calendar for

20   September 11th, but I do expect that in order to even attempt

21   to grapple with the schedule that is out there right now, a

22   significant amount of work is going to need to be done between

23   now and September 11th.  And while I can't prejudge that the

24   Court's going to enter an order, I at least wanted to apprise

25   the Court and the parties that we are going to be engaging

1    these parties.  I have discussed this with the U.S. Trustee and

2    with the debtor.  I think they all understand it, but I wanted

3    to do what I can to lay the foundation for the fact that

4    there's going to be work done between now and the middle of

5    September that will be substantial, and our hope is that we can

6    give these parties a reasonable level of assurance that it will

7    be included in what is going to be compensated.

8          The alternative, Your Honor, would be to simply have

9    my firm engage them, essentially, as experts and to,

10   essentially, present them as expenses, but I thought, given the

11   size of the undertaking and the fact that they are consulting

12   firms that the better practice was to submit the application.

13   But I wanted to at least alert Your Honor to the issue.

14         THE COURT:  When will you be ready to -- has the U.S.

15   Trustee seen applications yet?

16         MR. ECKSTEIN:  Your Honor, the engagement --

17         THE COURT:  It was last night.

18         MR. ECKSTEIN:  The engagement is literally being

19   completed today.

20         THE COURT:  Okay.

21         MR. ECKSTEIN:  So there are no -- we've been vetting

22   conflicts quite extensively, and every time we vet conflicts,

23   new conflicts arise.  It's remarkable.  But that's neither here

24   nor there right now.

25         THE COURT:  When's the hearing?

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1          MR. ECKSTEIN:  Right now there is a hearing, I

2  believe --

3          THE COURT:  Is this the November 5th?

4          MR. ECKSTEIN:  I think expert reports are due

5  beginning of October.

6          THE COURT:  This the November 5th hearing?

7          MR. ECKSTEIN:  November 5.  November 15?  November 5.

8  I'm not commenting today, Your Honor, on what is achievable.  I

9  think Your Honor had suggested when we were last here on RMBS

10  that we should probably (A) that we should have regular meet-

11  and-confers, which we are having, and I would say that a very

12  good schedule has been set up and my office and Morrison &

13  Foerster are working hand-in-hand on this, but I think we

14  probably will need a status report early September with Your

15  Honor to honestly assess where we are.  And I don't want to

16  make any representations about an ability to meet that schedule

17  right now, because I think that would be too ambitious.

18          THE COURT:  Well, you're all here on September 11th.

19          MR. ECKSTEIN:  September 11th.  I think we should have

20  a status report on RMBS and, I think, assess where we are.  And

21  by that point in time, I think, at least from our perspective,

22  I think we'll have a better sense of what can be accomplished

23  when.  We obviously are -- we're making substantial requests of

24  the debtor for samples of loan files.  We know that's going to

25  take the debtor some time to produce.  We're trying to

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1   determine how quickly those loan files can be reviewed so that

2   we can have a reasonable sample, and --

3           THE COURT:  All I know is when FHFA was here on the

4   discovery issue and they said well, they'd narrowed their

5   request to 5,000 loan files, Cravath, on behalf of CSFB made

6   clear in their objection that their experts have said that

7   that's far too narrow a sample.  I don't know what --

8           MR. ECKSTEIN:  Sampling is a controversial issue.  We

9   will save for a later day what is an appropriate sample, but

10  there will be a sample that's going to be needed, and,

11  obviously, even fewer than 5,000 is going to be an undertaking

12  that's going to take some time.  So that is coming out, and I

13  think by the 11th of September we'll have a sense of what was

14  produced and what can be reviewed and how much time people are

15  going to need to complete that project.

16          There obviously are many other issues aside from

17  reviewing loan files that --

18          THE COURT:  Sure.

19          MR. ECKSTEIN:  -- need to be considered.

20          THE COURT:  And it looks like there's about fifteen

21  lift stay motions that are on that day.

22          MR. LEE:  I thought Your Honor's opinion would dispose

23  of some of them.

24          THE COURT:  I keep issuing opinions, but they keep

25  coming in.  Okay.

1          MR. ECKSTEIN:  Okay.

2          THE COURT:  Anybody else?  Do you have anything you

3    want to say to that, Mr. Lee?

4          MR. ECKSTEIN:  Thank you, Your Honor.

5          THE COURT:  With respect to what Mr. Eckstein has

6    reported?

7          MR. LEE:  Your Honor, the -- sorry.  Gary Lee from

8    Morrison & Foerster for the debtors.  Mr. Eckstein and his team

9    are actually working very hard with our group.  I mean, there

10   are not just weekly meetings.  There are, sort of, frequent

11   conversations several times a week, so we think that we are

12   hopefully on track for a hearing on the 5th of November.  I

13   don't want to understate the difficulties that Mr. Eckstein is

14   going through.  I understand the need for an expert, and we

15   believe that that will all culminate --

16         THE COURT:  Look, you have your experts in place,

17   right?

18         MR. LEE:  We do, Your Honor.

19         THE COURT:  And you, essentially, have your experts in

20   place as of last night.

21         MR. ECKSTEIN:  I hope so.

22         THE COURT:  So, one of the things I would strongly

23   urge is there is nothing -- there are few things more

24   frustrating to a Court to have the battle of the experts where

25   they can't even agree on what the appropriate data to be

1  considered is.  And so yes, they reach very different

2  conclusions, but they also have very different inputs to start

3  with.

4          To the extent your experts can meet face-to-face and

5  try and agree what the appropriate sampling is, that's fine.

6  They'll reach their own -- they'll have separate opinions and

7  everything, but it's just going to complicate your lives and

8  mine, in particular, when you can't even agree on those basics.

9  And maybe you won't, but I just -- and I appreciate the fact

10  that you're -- and maybe you're already doing this, maybe

11  you're trying to do this, but to the extent you can cut out as

12  many disagreements as possible, at least start with what's the

13  appropriate dataset to be reviewing, and then their experts

14  will, you know, they'll reach their own conclusions from it.  I

15  don't know whether that's possible or not.

16          MR. LEE:  I think it's not only possible but it -- as

17  a practical matter it's happening.

18          THE COURT:  Okay.

19          MR. LEE:  We're prepared to make our expert available,

20  the data he's reviewed.  I mean, this is genuinely a

21  cooperative process.  I think we all recognize just how much

22  work needs to get done before November the 5th, and there's,

23  you know, it is not adversarial in the slightest, Your Honor.

24      (Pause)

25          THE COURT:  How many days did I say I was blocking out

1  for this?  Did I say how many days I was blocking out for this?

2          MR. LEE:  Three, Your Honor.

3          THE COURT:  Three.

4          Oh, yeah.  November 6th is Election Day and the

5  Court's closed.  That's why.  So it's Monday, Wednesday.

6  Thursday it didn't get put on the calendar but we'll make sure

7  we get that day blocked.

8          THE CLERK:  It actually is.

9          THE COURT:  It is?  I'm sorry.

10         THE COURT:  We'll look.

11         MR. LEE:  Thank you, Your Honor.

12         THE COURT:  Okay.  We're adjourned.  Thank you very

13  much everybody.

14      (Whereupon these proceedings were concluded at 12:43 PM)

15

16

17

18

19

20

21

22

23

24

25

1                                 I N D E X

2

3                                  RULINGS

4                                                  Page      Line

5   Application for FRBP 2004 Examination Motion     68         8

6   of the Examiner is granted subject to

7   modifications on the record, and

8   objections that were sustained and overruled

9   on the record.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2                              C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  August 17, 2012

19

20

21

22

23

24

25