UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SUPPLEMENTAL DECLARATION OF ANNE JANICZEK IN FURTHER SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, Anne Janiczek, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am the Chief Human Resources Officer for the Mortgage Division at Debtor[1] Residential Capital LLC and its affiliates ("**ResCap**"). I submit this Declaration in further support of the *Debtors' Motion for an Order Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (i) Implementation of (a) a Key Employee Retention Plan for Certain Non-Insiders and (b) a Key Employee Incentive Plan for Certain Insiders and (ii) Payment of Obligations Arising Thereunder as Administrative Expenses* (the "**Motion**").[2]

2. I have been at ResCap for 13 years, the last 4 in my current position. In my current position, I am responsible for leading and managing a team that supports the business in

---

[1] Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Motion.

[2] I am a proposed recipient under the KEIP.

ny-1052857

all aspects of human resources, including: management and executive development; investing and preserving critical talent acquisition; learning and development; employee relations; performance management, planning and appraisal; oversight of incentive, long-term and executive compensation plans; diversity; organizational design and effectiveness; and succession planning.  Except as otherwise indicated, all statements in this Declaration are based upon: my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' operations, financial condition and history. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants to accurately record, prepare, collect, and/or verify any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

3.      Since ResCap began making plans for a possible restructuring, I have been involved with the full human capital strategy for the transition process.  In that role, I have worked with ResCap leadership to strategically design or enhance key functions to support an independent organizational structure. As part of my responsibilities, I manage critical tasks including organizational design, function responsibilities, staffing models, compensation design, such as the Business Continuity Incentive Plan (the "**BCIP**"), assigning individuals to their roles during the transition period, making sure that our human resources are properly allocated, and overseeing the design of the KEIP and KERP on behalf of the Debtors.  I have also become

ny-1052857                              2

aware of the roles that ResCap employees play in the transition process and in maintaining the value of the assets and business of the Debtors' estate.

4. It is my understanding that in connection with the filing of (i) *Objection of the United States Trustee To Debtors' Motion For Order Authorizing (I) Implementation of (A) Key Employee retention Plan For Certain Non-Insiders and (B) A Key Employee Incentive Plan For Certain Insiders and (II) Payment Of Any Obligations Arising Thereunder As Administrative Expenses* (the "**Objection**") [Docket No. 987] and (ii) *Statement of Ally Financial Inc. Regarding Debtors' KEIP/KERP Motion And Debtors' Prepetition And Postpetition Employee Compensation* (the "**AFI Statement**") [Docket No. 970], the Debtors have been asked by the Court and the parties to provide additional information concerning (x) the impact (if any) of the TARP Standards for Compensation and Corporate Governance on the KEIP and KERP plans being considered by the Court, (y) the scope of the employees' additional responsibilities and (z) the employees' total compensation package.

5. On July 17, 2012, I submitted my declaration (the "**Declaration**") in support of the Motion. [Docket No. 812]. I submit this supplemental declaration in further support of the Motion and in support of the Debtors' reply to the Objection.

## I. TROUBLED ASSET RELIEF PROGRAM ("TARP")

6. As described in greater detail herein, TARP does not restrict the amounts that can be paid to the employees who are participating in the KEIP or KERP programs. Instead, TARP only restricts (i) the <u>form</u> of consideration received by the KEIP Participant or Key Employee as well as (ii) the <u>timing</u> of the payment of the vested KEIP or KERP award.

7. Accordingly, as it relates to the Motion, TARP does not add a retentive element to the KEIP or KERP because it does not condition an individual's receipt of an award, such as the

ny-1052857                                   3

KEIP or KERP, on the individual remaining employed with the Debtors.  Rather, it simply limits an individual's ability to immediately realize portions of their compensation.

### A. **Background**

8. By way of background, in October 2008, the United States Department of the Treasury ("**Treasury**") established TARP under the Emergency Economic Stabilization Act of 2008 ("**EESA**").[3]  On February 13, 2009, Congress enacted the American Recovery and Reinvestment Act of 2009 ("**ARRA**").  Title VII of Division B of the ARRA amended in its entirety section 111 of the EESA.  Section 111 of the EESA, as amended by the ARRA, "imposes corporate governance and executive compensation requirements on TARP recipients and requires Treasury to establish certain corporate governance and executive compensation standards with which TARP recipients must comply." *See* TARP Standards for Compensation and Corporate Governance, 74 Fed. Reg. 28,396 (June 15, 2009).  TARP recipients' compensation recommendations are considered by Treasury's Office of the Special Master (the "**OSM**") in the issuance of the OSM determinations.

9. These restrictions apply to any entity of which a TARP recipient owns at least fifty percent.  Ally Financial Inc. ("**AFI**") received $17.2 billion of funds under TARP, and as of August 2012, it has repaid $5.7 billion of such funds to the Treasury.  ResCap is an indirectly, wholly-owned subsidiary of AFI.  Accordingly, ResCap, its subsidiaries and their employees have been subject to compensation restrictions since AFI first received funds under TARP.

---

[3]  *See* 12 U.S.C. § 5021 *et seq*.

These restrictions apply until AFI repays the exceptional financial assistance, or until the Debtors are no longer considered a TARP recipient.[4]

### B. Compensation Guidelines

10.     TARP regulations generally categorize individuals within a TARP recipient's employee population into two groups: (i) the top 25 most highly paid employees (i.e., 1-25) (the "**Top 25**") and (ii) the next 75 most highly paid employees (i.e., 26-100) (the "**Next 75**"). Whether someone is considered to be among the Top 100 most highly compensated employees depends on their total compensation for the prior calendar year.[5] The OSM's authority is narrowly limited to (y) setting maximum compensation levels and the compensation structure for Top 25 employees and (z) approving compensation structures, rather than individual pay, for the Next 75.

11.     The OSM does not set maximum compensation opportunities for the Next 75, and the Debtors have the ability to determine compensation amounts and the form of compensation. Accordingly, the pay structure that has been determined by the OSM for the Next 75 only affects the timing of the individual's receipt of its compensation. The OSM requires that (i) 50% of any discretionary variable pay to be paid in cash[6] and (ii) at least 50% of discretionary variable pay that would otherwise be paid in cash to be paid in restricted stock units ("**RSUs**").[7]

---

[4] As noted in the AFI Statement, the Debtors have agreed to add certain provisions into the proposed final form of order approving the KEIP and KERP that reaffirm the Debtors' obligation to abide by the relevant compensation guidelines set by TARP and enforced by the OSM.

[5] 74 Fed. Reg. at 28,398.

[6] This only applies if an individual's total cash compensation for the calendar year is greater than $500,000.

[7] Notwithstanding the OSM's requirement that 50% of the discretionary variable pay be paid in RSUs, AFI has a more rigorous set of requirements, which may require more than 50% of an individual's discretionary variable pay to be deferred if their total compensation exceeds AFI's predetermined thresholds.

12. TARP regulations, as enforced by the OSM, limit the amount of salary that the Top 25 highest-paid individuals may be paid entirely in cash in a single year. TARP permits a recipient to pay salary in the form of stock or other property, and the stock may be subject to holding periods or transferability restrictions. As a result, alternate forms of compensation, such as deferred stock units ("**DSUs**," which are also referred to as "**Salary Stock**"), are issued to the Top 25 individuals. However, the amount of the future payment on account of such Salary Stock must be denominated in dollars, rather than shares. Moreover, the stock unit cannot be subject to a substantial risk of forfeiture or other requirement of continued services and must be payable at a fixed date in the future.[8]

13. Section 111(b)(3)(D) of the EESA requires that standards be established "prohibiting TARP recipients from paying or accruing any bonus, retention award, or incentive compensation to certain highly compensated employees." (the Top 25). However, this rule has two exceptions – first, TARP recipients can pay or accrue such amounts if payable as long-term restricted stock, provided the vested units are not fully redeemable until the repayment of TARP assistance, has a value no greater than one-third of the total annual compensation of the applicable employee, and is subject to such other terms and conditions as the Secretary of the Treasury believes to be in the public interest, and second, TARP recipients can make bonus payments required to be paid under written employment contracts executed on or before February 11, 2009.[9]

14. In these Chapter 11 Cases, only three of the Debtors' employees currently fall within the Top 25 of AFI (i.e., the Chief Executive Officer, President and Chief Capital Markets

---

[8] 74 Fed. Reg. at 28,400.

[9] 74 Fed. Reg. at 28,396 – 97.

Officer), and <u>none of those individuals is a participant in the KEIP or KERP</u>. As previewed in the AFI Statement, the Debtors have a preliminary agreement with AFI on the payment of postpetition wages to these individuals. Once the agreement is finalized, the Debtors will be filing a motion seeking authority, consistent with the relief generally provided for in the first-day "wages" order,[10] to reimburse AFI for its future payments to these individuals on account of the DSUs currently being issued by AFI as a form of their salary. The motion will not seek authority to reimburse AFI for its payments to the Debtors' employees of previously-earned prepetition compensation (which covers both members of the KEIP/KERP population as well as individuals not included in the KEIP/KERP population).

    C.    **Compensation Practices**

        *i.*    *"Next 75"*

15. The Debtors currently have nine employees who fall within the "Next 75" – seven individuals are in the KEIP, and two individuals are in the KERP. TARP does not in any way affect or limit the amount of a KEIP/KERP award that an individual may earn because, as noted above, TARP does not set maximum compensation levels for these individuals. As explained above, TARP only restricts the employee's ability to immediately realize the full value of the KEIP/KERP award.

16. For those employees counted among the "Next 75" most highly-compensated employees (i.e., nos. 26-100), the OSM determines the structure, but not the amount, of their annual compensation. As long as the "Next 75" compensation satisfies the OSM structural requirements, the Debtors may determine compensation amounts and the form of compensation.

        *ii.*    *KEIP/KERP for "Next 75"*

---

[10] *See* Docket No. 386.

17. As described in paragraph 10, TARP restrictions require payment of discretionary variable pay for the Next 75 to be 50% in cash and 50% in equity. Twenty-five percent of discretionary variable pay, such as a KEIP or KERP award, may be paid immediately in cash. The remaining 25% is vested but payment must be deferred for twelve months from the grant date. The RSUs are linked to AFI's equity value, which is determined by AFI's Board of Directors. For the nine individuals within the "Next 75", who are eligible for awards under the KEIP or KERP, the award that they earn will be paid as follows: 25% of their KEIP/KERP award in cash immediately and 25% of their cash one year from the award date. The remaining 50% of their award will be in the form of a DSU[11] that will vest immediately, but payment thereon will be made three years from the date the award vested. The proposed form of order approving the Motion specifically provides for the Debtors to monetize the DSUs issued in connection with the individual's KEIP/KERP award.

      *iii.*    "Top 25"

18. As noted above, no member of the Top 25 is included in the KEIP/KERP programs. Nevertheless, in order to assist this Court, I will describe how TARP affects compensation for the Top 25. The Top 25 employees receive compensation in two principal elements: (a) base salary in the form of cash[12] and Salary Stock, and (b) incentive restricted stock units ("**IRSUs**").

19. For those individuals among the Top 25 in the AFI organization (inclusive of the Debtors), the amounts of their annual compensation, maximum compensation levels and the

---

[11] DSUs vest immediately upon receipt, and RSUs vest over time. Pursuant to the terms of the KEIP or KERP, the individual will have already vested in the KEIP/KERP award. Therefore, since only the payment of the award must be deferred, not the vesting of the award, the DSU is the proper equity-linked compensation mechanism to grant to members of the "Next 75".

[12] "Top 25" employees' cash base salaries may not exceed $500,000, absent a showing of good reason for an exception.

compensation structure are subject to the determination by the OSM. Pursuant to the TARP Standards, the OSM sets maximum compensation opportunities for the Top 25 on an annual basis, or more frequently if the OSM determines circumstances warrant revisions. The OSM also determines a compensation statement for each of the "Top 25" individuals, which identifies the components of their compensation for the calendar year.

20. Because of these restrictions, the Top 25 receive a significant amount of their compensation in the form of Salary Stock. Salary Stock is a form of equity-linked deferred cash compensation and its value is set by the AFI Board of Directors. Salary Stock is denominated in cash, the AFI equity units vest immediately upon issuance, and is non-forfeitable. Once issued, Salary Stock is subject to a one-year holding period before any cash payments are made, although the ultimate payments of cash are unconditional.

21. The payments that are made on account of Salary Stock depend on the year in which Salary Stock was issued. Salary Stock that was issued <u>before</u> January 1, 2011 is paid out in cash as part of the bi-weekly payroll over a five-year period, beginning after the one-year holding period. The Salary Stock that was issued <u>after</u> January 1, 2011 is paid out in cash as part of the bi-weekly payroll over a three-year period, also beginning after the one-year holding period.

22. Subject to OSM determinations, IRSUs are based on individual performance as recommended by managers to the Compensation Committee of the ResCap Board of Directors, whose recommendations are then subject to the approval of the Compensation, Nominating and Governance Committee of the AFI Board of Directors. The amount of IRSUs granted for any year cannot exceed one-third of total compensation (as determined by the OSM) for any person, or a specific maximum amount of IRSUs within this limit that the OSM determines is

appropriate, whichever is less. The IRSU awards generally cliff vest after a three-year period, and can be redeemed only after a portion of the funds received by the TARP recipient are repaid to Treasury. More specifically, payments may only be made in 25% increments as AFI's TARP obligation is repaid in equal increments. As of December 31, 2011, AFI repaid more than 25% of its TARP obligation, which means that 25% of any IRSU awards will be immediately payable upon vesting. As of the date hereof, no other portions of vested IRSUs become payable until AFI has repaid at least 50% of its TARP obligation.

23. Certain of the Debtors' employees have their compensation overseen by the FRB (defined below) because the nature of their position can create certain strategic, reputational, financial, market or other risks for AFI's business lines and global functions and as a result of AFI's status as a U.S. Bank Holding Company. These employees exist in both the KEIP and the KERP (i.e., 17). For these employees, the remittance of discretionary variable pay, such as the KEIP or KERP awards, is treated in the same manner as the awards given to the Next 75 (*see* paragraph 17 above) but is subject to ongoing review and revision by the FRB.

## II.     EMPLOYEES' ADDITIONAL RESPONSIBILITIES

24. The Debtors are working to effectuate something that has never been accomplished before in a bankruptcy proceeding within the financial services industry – maintaining one of the largest servicing and origination businesses in the country as a going concern, while at the same time undertaking a sales process that could yield billions of dollars in sale proceeds for the Debtors' estates. If the employees do not undertake the additional responsibilities described below, then it will be incredibly difficult to close the sales, which will result in the loss of an enormous amount of potential value to the Debtors' estate.

25. Getting to a closing of two asset sales with expected sale proceeds in the billions of dollars is not as simple as executing a negotiated asset purchase agreement. Rather, the

Debtors must not only continue running their businesses, but must also engage in daily diligence and marketing meetings with both the existing stalking horse bidders as well as third parties who are being solicited by or who have reached out to the Debtors' investment bankers to participate in a sale process. In addition, in order to deliver a stand-alone operation, the employees must ensure the complete segregation of the Debtors' operations and eliminate any lingering interdependent aspects of the Debtors' operations with those of AFI.

26. As part of running the businesses on a daily basis, the Debtors must address significant regulatory issues, including compliance with the consent order (the "FRB Consent Order") with the Board of Governors of the Federal Reserve System ("**FRB**") and Federal Deposit Insurance Corporation ("**FDIC**"), dated April 13, 2011 (the "**FRB Consent Order**"). As part of their agreement, the Debtors agreed to develop and implement certain risk management and corporate governance procedures under the guidance of the FRB in order to ensure prospective compliance with applicable foreclosure-related regulations and laws. Additionally, pursuant to the FRB Consent Order, GMAC Mortgage agreed to pay for an extensive, independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by the Debtors (the "**FRB Foreclosure Review**"). In addition, in order to transfer the platform to a buyer, the Debtors must ensure that their state licenses remain in good standing and thus, often are called upon to address queries from the multitude of regulators.

27. Beyond the additional daily regulatory issues that the Debtors must address, as part of the ongoing sales due diligence, the interested third parties will want to know that the Debtors are currently in compliance with their pre-existing servicing obligations. Accordingly, in

order to address the concerns of interested buyers, the Debtors' employees regularly gather and respond to data requests concerning the company's servicing and origination procedures.

28. In addition, the Debtors cannot say for certain that the stalking horse bidders will be the parties that provide the highest and best offer for the Debtors' assets. There is a chance that the winning platform bidder, unlike Nationstar Mortgage, does not have the necessary licenses to immediately take over the Debtors' servicing operations. Therefore, the Debtors must undertake and develop the necessary contingency planning to ensure that the Debtors can facilitate a post-sale transition to the buyer.

29. In order to close this sale, each division within the Debtors' businesses plays a unique role, and the result of their collective efforts is a cohesive business comprised of a highly valuable servicing platform and a legacy loan portfolio that will potentially create enormous value for the estate's stakeholders. As described in greater detail herein, each division's respective day-to-day responsibilities have been augmented as a result of the information and operational demands associated with the simultaneous sale and bankruptcy processes. To further explain this point and address the Trustee's questions regarding the extent of the additional responsibilities being undertaken by the Debtors' employees during the bankruptcy proceeding, below is a description of how the responsibilities of three of the senior officers (all of whom are KEIP participants) has changed and evolved since the Petition Date. Each is responsible for a distinct aspect of the Debtors' businesses, and they collectively oversee hundreds of other employees (many of whom are participants in the KERP).

30. First, the Head of Servicing (who oversees 30 employees in these plans). The Head of Servicing manages the fifth largest servicing operation in the country. The Servicing group was already stretched thin at the outset of these Chapter 11 cases because of the demands

imposed upon the Debtors related to FRB Consent Order requirements, implementation of the Servicing standards and consumer relief provisions outlined in the settlement with the states' attorneys general. The commencement of the bankruptcy proceeding and the simultaneous sale efforts has required the Head of Servicing to prepare and participate in monthly all day business reviews with the stalking horse bidder. In addition, in order to effectuate the asset sales, the Debtors have undertaken substantial efforts to separate their operations from those of AFI in order to ensure that the Debtors can deliver a stand-alone entity to the third-party asset purchaser. Similarly, while working to separate the Debtors' operations from AFI, the Debtors must also develop contingency plans to integrate with a third party upon a closing of the asset sales.

31.    Managing a servicing business is a challenging endeavor, when you layer on top of that (i) the current significant regulatory demands on the servicing industry, and (ii) the added operational responsibilities associated with effectuating a sale of substantially all of the Debtors' assets as a going concern, the collective effect is an immensely challenging work environment for all servicing personnel.

32.    *Second*, the Head of Consumer Lending (who oversees an additional 28 employees in these plans). It is incredibly rare for a debtor in possession to continue the origination of loans while operating under bankruptcy protection. The consumer lending group spends a significant amount of time with vendors who close, process and set-up the loans. As much as 30% of his time is now spent guiding vendors through the bankruptcy process. Moreover, as part of the asset marketing process, he and his team spend significantly more time in meetings with potential purchasers in an effort to educate them about the assets and potentially increase the value to be created for the estate. In addition, like the Head of Servicing, his team also spends time in meetings focused on integrating the Debtors' businesses into a third party's

business.  Finally, subsequent to the filing, his team became responsible for marketing and data analytics related to marketing efforts for originating consumer loans.

33.    <u>Third</u>, the Chief Information Officer (who oversees an additional 10 employees in these plans).  Since the Petition Date, the information technology group has grown significantly and is charged with maintaining the company's technological infrastructure.  As with the other two division heads, the CIO and his team are responsible for maintaining the backbone of the servicing platform, which is a significant component of the pending asset sales.  Like his colleagues, in order to deliver a stand-alone operation to a third party purchaser, the technology and information team must effectuate an operational separation from AFI, which from a technology perspective is especially challenging.  In addition, in connection with the potential asset sale, the preservation of existing vendor relationships has become significantly more acute.  For example, the information technology team must evaluate whether to assume executory vendor contracts and at the same time, work on a daily basis with critical vendors to ensure they continue to deliver the necessary services to the Debtors that support the businesses being sold through the Asset Sales.

34.    The business divisions are a representative sample of the types of employees who will be integral to the estate during the restructuring.  The Debtors narrowly tailored the KEIP and KERP and identified the most critical personnel.  These programs were tiered into four levels based on their role and level of authority within the organization, I can further represent that the composition of the KERP population includes individuals who possess unique institutional knowledge about the Debtors' businesses and provide distinct services to the enterprise that are not easily replaceable.  Were such individuals to depart, it would be more

costly and an inefficient use of the estate's assets to recruit and train replacements due to the legacy knowledge that these employees possess.

### III.    PARTICIPANTS' TOTAL COMPENSATION

35.    Contrary to the Trustee's assertion, it is not a primary purpose of the KEIP to replace potentially lost discretionary income so insiders do not go elsewhere. (Objection at p. 14) Rather, the KEIP is intended to reward individuals for the extraordinary value-creating efforts they are being asked to undertake during these Chapter 11 cases and keep them motivated to complete the monumental task at hand by meeting both sale-driven and financial/operational metrics.  In the Objection, the Trustee asserts that the Debtors have not established the reasonableness of the KEIP because the participants' compensation is unclear. (Objection at p. 19).  Attached hereto as **Exhibit 1** is a spreadsheet that contains the following information for all employees (as identified by column header):

- **2012 Base** – this is the cash salary that each individual will receive in calendar year 2012;

- **Estimated Incentive (AIP & Equity)** – in addition to cash salary, an employee's annual compensation also includes discretionary variable pay, which is remitted in cash and in certain instances, equity of AFI.  The amount in this column is the aggregate amount of discretionary variable pay that the individual was awarded in the first quarter of 2012 for their efforts in calendar year 2011.  This amount serves as an estimate of how much the individual might receive in first quarter 2013 for their efforts in calendar year 2012.  This amount is not determined and fixed until after the end of the calendar year.[13]

- **Deferred Payments** – In the years before the Petition Date, the individuals had portions of their discretionary variable pay deferred as a result of either TARP compensation restrictions or corporate compensation policies.  The amounts in this column were unpaid as of the

---

[13] In 2013, to the extent a sale has not closed, the Debtors' employees will be eligible to receive a ResCap AIP award for their performance in 2012 (subject to the Court's approval), and for those who are TARP-restricted RSUs.

ny-1052857    15

- Petition Date; however, as noted in the AFI Statement, these amounts are proposed to be paid by AFI as they come due, not the estate.

- **Deferred Payment Due Date** – this is the date range within which the deferred payments will be remitted by AFI.

- **Grant Year** - this is the year in which the discretionary variable pay was awarded to the individual.

- **KEIP / KERP Amount** – this is the target award for each individual.

- **Job Rationale** – this is a brief summary of the role each person plays within the organization and was used by the Debtors in identifying members for the KEIP and KERP populations.

36. In sum, a participant in the KEIP/KERP may receive the following payments during 2012, (i) base cash salary from the estate, (ii) a KEIP / KERP award from the estate and (iii) payment from AFI for any prepetition discretionary variable pay that comes due during 2012 but was awarded in prior years. Therefore, the only amounts payable to an individual for services provided to the estate are cash salary and a KEIP/KERP award.

37. It should be noted that between the time the Debtors filed the Motion and the hearing, two of the KERP participants chose to leave the Debtors' employ. As a result, the Debtors will now have to spend the extra time to recruit new employees and train them. In addition, current employees, whose efforts should be focused on the restructuring, will instead have to divert their time to training these new hires. Moreover, the new hires will not immediately add value to the Debtors' businesses and be productive.

38. Therefore, for the reasons stated in the Declaration as well as in this supplemental declaration, as a representative of the Debtors' management team, I believe that the KEIP and KERP are necessary to incentivize the Debtors' senior executives and, especially in light of recent employee defections, retain the Debtors' critical support personnel to achieve the Debtors'

simultaneous, multi-billion dollar asset sales in the contemplated timeframe and provide significant benefits to the Debtors' estate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 6th day of August, 2012.

                                                 /s/ Anne Janiczek_____
                                               Anne Janiczek