# CONSUMER BANKRUPTCY NEWS

CRITICAL ISSUES AND WINNING STRATEGIES FOR BANKRUPTCY PROFESSIONALS

MAY 8, 2012 | VOLUME 22 | ISSUE 12

## $3.1 MILLION PENALTY FOR STAY VIOLATION

Wells Fargo Home Mortgage Inc. has been ordered to pay $3,171,154 in punitive damages for violating the automatic stay. Judge Elizabeth W. Magner said the lender's actions "were not only highly reprehensible, but its subsequent reaction on their exposure has been less than satisfactory." (*Jones v. Wells Fargo Home Mortgage Inc. (In re Jones)*, 2012 WL 1155715 (Bankr. E.D. La. 4/5/12).)

The initial ruling in this case came in April 2007, when Judge Magner concluded that Wells Fargo willfully violated the automatic stay. The court found that Wells Fargo charged the Chapter 13 debtor unreasonable fees and costs, failed to notify the debtor that these post-petition charges were added to his account, failed to seek the court's approval of the charges, and applied payments received from the trustee to these charges. The court awarded the debtor $24,441.65 in damages.

A separate hearing was held in May 2007 to consider punitive damages. At that time, Wells Fargo offered to correct systemic problems with its accounting of home mortgage loans in bankruptcy. After negotiations with the court as to the nature and structure of those changes, the agreed upon new accounting procedures were embodied in a supplemental judgment and administrative order. The amended judgment also awarded the debtor $67,202.45 for attorney's fees and costs.

Wells Fargo then appealed the judgment, and withdrew its consent to the nonmonetary relief. The district court affirmed the bankruptcy court, increased the compensatory award to $170,824.96, and remanded for consideration of punitive damages.

In October 2009, the bankruptcy court imposed the changes to Wells Fargo's accounting procedures *in lieu* of punitive damages. In August 2010, the district court affirmed. This time the debtor appealed the denial of punitive relief to the 5th U.S. Circuit Court of Appeals.

Back in August 2007, another Chapter 13 debtor, Dorothy Stewart, objected to Wells Fargo's proof of claim alleging the same misconduct as Jones had asserted. Because Wells Fargo's conduct was in violation

41239413

**IN THIS ISSUE:**

**$3.1 Million Penalty For Stay Violation**
 Reprehensible Conduct .................. 2

**Stay Violation**
 Handwritten Notes Cause For Punitive Damages ............................ 3

**Filings**
 Filings Down 12% To Start 2012 ...... 4
 Bankruptcy Filings To Drop This Year ............................................ 4

**Leases**
 Leases Get Assumed, Not Reaffirmed ...................................... 4

**Agency Action**
 Court Bans Mortgage Relief Business ............................................ 5

**Fraud**
 Former Attorney Indicted In Fraud Schemes .................................. 5
 Illinois Debtor Pleads Guilty To Fraud ................................................ 5
 Leader Of $66 Million Fraud Scheme Pleads Guilty ...................... 6

**Case Notes** .......................................... 6

**WEST**

CONSUMER BANKRUPTCY NEWS

MAY 8, 2012 | VOLUME 22 | ISSUE 12

Judge Magner said Wells Fargo's conduct was clandestine. When questioned by the debtor about the charges on his account, Wells Fargo clammed up. Only by suing the lender was the debtor and the court able to discover what Wells Fargo was doing. And then, they learned that the lender was doing it in other cases.

Litigation with Wells Fargo can be a lengthy and expensive process, as was demonstrated in this case. With 80 percent of Chapter 13 debtors in the district earning less than $40,000 per year, Judge Magner said the cost of suing Wells Fargo is a burden many debtors can't bear.

"Wells Fargo has taken advantage of borrowers who rely on it to accurately apply payments and calculate the amounts owed. But perhaps more disturbing is Wells Fargo's refusal to voluntarily correct its errors. It prefers to rely on the ignorance of borrowers or their inability to fund a challenge to its demands, rather than voluntarily relinquish gains obtained through improper accounting methods. Wells Fargo's conduct was a breach of its contractual obligations to its borrowers. More importantly, when exposed, it revealed its true corporate character by denying any obligation to correct its past transgressions and mounting a legal assault to ensure it never had to. Society requires that those in business conduct themselves with honestly and fair dealing. Thus, there is a strong societal interest in deterring such future conduct through the imposition of punitive relief."

Given that it had already cost the debtor $292,673.84 to litigate his claim, the court found that punitive damages of $3,171,154 were warranted to deter Wells Fargo from engaging in similar conduct in the future. The court concluded that this award satisfied the final two *Gore* factors of bearing a reasonable relationship to the harm caused, and being within the range of penalties that a sophisticated lender would expect to face for its misconduct.

## STAY VIOLATION

### HANDWRITTEN NOTES CAUSE FOR PUNITIVE DAMAGES

Sending billing statements to the debtor was a willful violation of the automatic stay. Adding handwritten notes that were increasingly angry and malicious called for the imposition of punitive damages. (*In re Coopersmith*, 2012 WL 1143801 (Bankr. E.D.N.C. 4/4/12).)

The debtors owned and operated IPS Construction Inc., a company that provided general construction contracting services. IPS purchased some of its building supplies from M.G. Brown, a division of Foreman's Inc., on credit. The debtor-husband personally guaranteed payment on the M.G. Brown account.

After IPS defaulted on the account, M.G. Brown obtained a state court judgment for $4,951.16. The debtor-husband attended the hearing, and asked for an accounting of the amount owed. M.G. Brown did not provide that accounting, and the debtor appealed.

The matter was referred to arbitration. The debtor did not attend the arbitration hearing, so the arbitrator entered judgment in M.G. Brown's favor in the amount of $4,951.16 plus a $50 arbitration fee.

When the debtors filed for Chapter 13 relief on June 1, 2011, they listed M.G. Brown as a creditor. On June 30, M.G. Brown, through Clay B. Foreman Sr., president of Foreman's Inc., mailed an account statement to IPS. Foreman handwrote on the invoice: "Added the $50.00 Arbitration fee to your total as stated by judge @ court hearing you have paid attorneys to delay paying your M.G. Brown bill! Your choice as I'm certain attorneys appreciate it!"

The debtors contacted their lawyer, who sent a letter to M.G. Brown explaining that the debtors filed for bankruptcy so they were protected from attempts to collect prepetition claims. M.G. Brown said it did not receive the letter.

In August 2011, M.G. Brown sent a second invoice to IPS. This time it was for $5,053.37. Again, Foreman included a handwritten note. "'Promised to make monthly payments!' but Spent MONEY ON ATTORNEY Spent MONEY ON COURT SYSTEM Result = Expect you will pay attorney—up front—to help you file bankruptcy! Clay Foreman"

In September 2011, M.G. Brown mailed a third invoice to IPS. This time it was for $5,105.35. Foreman added: "You have paid attorneys—UP FRONT—instead of paying portion monthly! Your statement at Small Claim Court of son, ... accepting your offer of paying a little MORE when you could rings hollow as I suspected! Judgment recorded PRIOR to your filing bankruptcy."

The debtors said the invoices caused them to experience anxiety and sleepless nights. The debtors sued M.G. Brown alleging that the company willfully violated the automatic stay. M.G. Brown responded that any violation of the stay was inadvertent, and that the bills were not sent to the debtors but were sent to their company, which the debtors operated from their home.

At the hearing, Foreman testified that neither M.G. Brown nor Foreman's Inc. had a procedure for handling bankrupt accounts. Foreman said he was unaware of the debtors' bankruptcy when he wrote the notes on the invoices. His references to paying attorneys were based on his assumption that this was what the debtors were doing.

© 2012 Thomson Reuters