Hearing Date and Time: September 27, 2010 at 10 a.m. (ET)
Objection Deadline: : September 14, 2010 at 4 p.m. (ET)

**ROBERT E. BROWN, P.C.**
*Attorneys for Homeowner Claimants*
44 Wall Street, 12th Floor
New York, N.Y. 10005
Telephone:  (212) 766-9779
Facsimile:  (718) 979-9784

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

| | |
|---|---|
| In re: ) | Case No. : 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | Jointly Administered |
| ) | |
| Debtors. ) | |
| ) | |

-----------------------------------------------------------------

## MOTION FOR AN ORDER APPOINTING
## AN OFFICIAL COMMITTEE OF BORROWERS PURSUANT TO
## <u>SECTION 1102(a)(2) OF THE BANKRUPTCY CODE</u>

# TABLE OF CONTENTS

I.    BACKGROUND OF CASE ..................................................................................... 1

II.   ARGUMENT ..................................................................................................... 12

    A.   This Chapter 11 Matter is Very Large And Complex. ................................... 15

    B.   The Borrowers Interests are Fundamentally Different from Other Creditors ........ 15

    C.   Large Financial Institutions Dominate The Creditors Committee. ..................... 19

    D.   The Court Should Exercise Its Discretion To Appoint A Borrowers Committee. ..... 19

        1.   The Cost Associated With Appointment Is Relatively Small. ................... 20

        2.   A Borrowers Committee Will Not Add Complexity. ............................... 20

        3.   Borrowers Will Not Be Heard Absent a Borrowers Committee. ............... 21

III.  CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**CASE**                                                                    **PAGE**

*In re: Accredited Home Lenders Holding Co.,.*
  Case No. 09- 11516 (MF) (Bankr. D. Del. 2009)………………………………....  9

*In re: American Home Mortgage Holdings, Inc.*
  Case No. 07-11047 (CSS) (Bankr. D. Del. 2007)………………………………  9, 17

*In re: Arch Wireless, Inc.,*
  534 F.3d 76 (1st Cir. 2008)………………………………………  23

*In re: Beker Indus. Corp.,*
  55 B.R. 945 (Bankr. S.D.N.Y 1985)………………………...……………..……… 13, 14

*In re: Chemetron Corp v. Jones,*
  72 F.3d 341 (3d Cir. 1995)……………………………………………..  23

*In re: Chicago, Milwaukee, St. Paul & Pacific R.R.,*
  784 F.2d 831 (7th Cir. 1986)……………………………………………  23

*In re: Crystal Oil Co.,*
  158 F.3d 291 (5th Cir. 1998)……………………………………………..  23

*In re: Dana Corp.,*
  344 B.R. 35 (Bankr. S.D.N.Y. 2006)……………………………………  13

*In re: Dow Corning Corp.,*
  194 B.R. 121 (Bankr. E.D. Mich. 1996),
  *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997)………………  13, 14, 20

*In re: Feldman,*
  261 B.R. 568 (Bankr. E.D.N.Y. 2001)………………………………………..  23

*In re: Fidelity America Mortgage Co.,*
  7 B.C.D. 1186 (Bankr. E.D. Pa. 1981) ………………………………………  13

*In re: First Alliance Mortgage Company,*
  298 B.R. 652 (C.D. Cal. 2003)………………………………...……………  17

## TABLE OF AUTHORITIES
### (continued)

*In re: Henry v. Lehman Commer. Paper, Inc., (In re First Alliance Mortg)*
471 F.3d 977 (9th Cir. 2006)……………………………...…………… 9, 17

*In re: Jones v. Chemetron Corp.,*
212 F.3d 199 (3d Cir. 2000)…………………………........................ 23

*In re: Mansfield Ferrous Castings,*
96 B.R. 779 ……………………………………………………… 21

*In re: Oneida LTD.,*
Case No. 06- 10489 (ALG) (Bankr. S.D.N.Y. 2006)………………………... 9

*In re: Savage Indus.,*
43 F.3d 714……...…………………………………………………... 23

## STATUTES

11 U.S.C. § 1102(a)(2) ………………………………………………....……… 12

## OTHER AUTHORIES

*AMERICAN COLLEGE OF BANKRUPTCY, BEST PRACTICES REPORT
FORMATION FUNCTION & OBLIGATIONS OF EQUITY COMMITTEES IN
CHAPTER 11*                                                              14

## EXHIBITS

Exhibit A – Proposed Order

Exhibit B – *Pro se* letters

Exhibit C – Biographies/Statements of Individuals who have expressed interest in becoming members of the Borrowers Committee

Exhibit D – Transcript of the oral argument on the borrowers committee motion from *In re: American Home Mortgage Holdings, Inc.* Case No. 07- 11047 (CSS) (Bankr. D. Del. 2007), dated October 8, 2008

Certain homeowners (the "Movants")[1] who entered into mortgage contracts and/or whose loans were sold and securitized and currently held in one or more of the debtors in these cases (collectively, "Residential Capital" or the "Debtors")[2] respectfully submit this memorandum in support of their motion (the "Motion") for an order, a proposed form of which is attached hereto as Exhibit A, appointing an Official Committee of Borrowers (a "Borrowers Committee").

## I.    BACKGROUND OF CASE

### A.    The Debtor

According to filings in support of the Chapter 11 Petitions, as of March 31, 2012, the Debtors were servicing over 2.4 million domestic mortgages with an aggregate unpaid principal balance of approximately $374 billion.  The Debtors are collectively the fifth-largest servicer of residential mortgage loans in the United States.  Countless homeowners in every state are affected by this matter.  Thousands of claims and counterclaims have been brought against the Debtors in state and federal courts by homeowners who have an important stake in these

---

[1] The Movants are: Nathaniel Arnold; Luis Fitzgerald-Fernandez; Alan Israel & Jill C. Habib; Peter Webb; Ariel Barel; Jean-Marc Bensaid; Diane Boyter; Conrad Burnett; Stephen & Francesca Grello; Francine Modderno; Florence Mason; Jimmy Morris; Phillip Weissburg; Audrey & Griggs Wimbley; Patrick Farrell; Melissa Lallo; Caley Coleff; Terry Slovak; Amelia Colvin; Yvonne Hartshorn; Roxanne Harbert; William A. Marshall, Sr.; Joanna L. Belanger; David A. Belanger; Kristin Burak; Linda Clark; Shannon Mcintyre; John Lebron; Timothy Dixon; Jeffrey Ginn; and Val M. Steele.

[2] The Debtors in these cases are: Residential Funding Company, LLC; Residential Capital, LLC; ditech, LLC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC-RFC Holding Company, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACRH Settlement Services, LLC; GMACM Borrower LLC, GMAC REO LLC; GMACR Mortgage Products, LLC; HFN REO Sub II, LLC; Home Connects Lending Services, LLC; Homecomings Financial Real Estate Holdings, LLC; Homecomings Financial LLC; Ladue Associates, Inc.; Passive Asset Transaction, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc; Residential Asset Mortgage Products, Inc; Residential Asset Securities Corporation; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC-GSAP Servicer Advance, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; RFC SFJV-2002, LLC.

1

proceedings as they are simply trying to hold on to the largest and most precious asset they own -
- the very roof over their heads.

According to Debtors' own filing, "[i]n their capacity as a loan servicer and/or owner, the
Debtors are currently participating (either as the plaintiff/creditor or as servicer for the
plaintiff/creditor) in approximately 65,000 foreclosure proceedings and 51,000 borrower
bankruptcy proceedings. It is not uncommon for borrowers, mortgagors, and other lien holders
to raise defenses and related counter-claims against the Debtors in order to preserve their
purported interests in the property underlying the mortgage loans. In addition, the Debtors may
be required to bring eviction proceedings against borrowers or their tenants residing in properties
subject to mortgages upon which the Debtors have foreclosed. Many of these cases can be
resolved more quickly and inexpensively through settlements with the borrowers rather than
through continued time consuming litigation." *See* Debtors' Motion for Supplemental Order
Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a) and 1108 and Bankruptcy Rule
9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II)
Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and
Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction
Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing
and Directing the Debtors to Pay Securitization Trustee Fees and Expenses, Docket No. 181
(May 31, 2012).

### *The Bailout*

Ally Financial received $17.2 billion in loans from the Federal Government as part of the
bailouts. To date, Ally has only repaid $5.5 billion and still owes taxpayers about $12 billion.
The government still owns 74% of Ally. It has been widely reported that Ally put its home

mortgage subsidiary into bankruptcy to end the drag of its toxic mortgage assets on Ally's profitable businesses. Ally CEO Michael Carpenter said in a statement: "The action by ResCap will enable Ally to achieve a permanent solution to its legacy mortgage risks and put these issues behind us." *See* http://content.usatoday.com/communities/driveon/post/2012/05/auto-bailout-ex-gmac-puts-mortgage-unit-in-bankruptcy/1

Ally estimated that it could lose between $400 million and $1.25 billion because of its exposure to ResCap's troubles, according to in a Securities and Exchange Commission filing. ResCap was aggressive in the subprime market, making risky loans without serious reviews of borrowers' credit histories and ability to repay. Like others, it took huge losses when the housing bubble burst.

### The Multi-State Agreement

On March 2, 2012, Ally/GMAC and four other servicers entered into an agreement with 49 state attorneys general and the federal government (the "Multi-State Settlement"). *See* *http://portal.hud.gov/hudportal/HUD?src=/mortgageservicingsettlement* The Multi-State Settlement was supposed to grant homeowners some relief from the illegal servicing and foreclosure practices of, among others, the Debtor entities which serviced mortgage loans. It is clear that this bankruptcy may affect the enforceability of that agreement. It is extremely important that homeowners' rights are protected with respect to the treatment of the Multi-State Settlement.

### RoboSigning

The words "Robosigners" and "robosigning" are now forever etched in our modern lexicon. One example of this is found in the deposition of Jeffrey Stephan, who is now a well known robosigner and team leader of document execution for the GMAC foreclosure

3

department.    *See*   *http://www.scribd.com/doc/28762965/Full-Deposition-of-Jeffrey-Stephan-GMAC-s-Assignment-Affidavit-Slave-10-000-Documents-a-Month* .  Stephan's team of 13 people brought to him approximately 10,000 Documents per month to process.  During this deposition and as noted in the Multi-State Settlement Agreement entered into by the Debtors, numerous practices were identified such as signing while not in the presence of the notary, signing for companies that have long been out of business, and signing other people's names to keep up with the volume.  Courts throughout the country are inundated with a literal potpourri of litigation over fraudulent assignments executed by robosigners.  This scandal literally started a firestorm throughout the country.

### *Risky Mortgage Products*

Various GMAC entities including, Homecomings, Ditech, GMAC Mortgage and others originated hundreds of thousands of loans during the boom years between 2004 and early 2008. These entities profited wildly at the expense of homeowners and built market share by originating increasingly risky loans, including loans to many who did not understand their complex terms and could not meet their obligations.  These entities compensated loan officers based on sales volume and routinely paid brokers "yield spread premiums" that pegged their bonuses to originating adjustable rate loans with junk fees, higher interest rates and margins, teaser rates, prepayment penalties, inflated appraisals and other predatory terms.

In many instances, the purchasers of ResCap's mortgage-backed securities sued (and often settled) demanding that Ally buy back the toxic securities. *See, e.g.,*

*http://www.orrick.com/fileupload/3235.pdf,*

*http://www.mortgagedaily.com/MctLawsuitHancockVsAlly073112LP.asp?spcode=newsalert*

*http://www.gobankingrates.com/investments/jpmorgan-chase-ally-bank-sued-over-mortgage-*

*bond-losses* . At the same time, many of these pooled toxic mortgages are being foreclosed upon by members of the official committee of unsecured creditors ("Creditors Committee" or "Committee").

### Fraudulent Foreclosure Practices and the FDIC Consent Decree

ResCap's bankrupt entities signed a consent order with the Federal Reserve and the FDIC on April 13, 2011 ("FDIC Consent Decree") regarding these practices. *See* *http://www.fdic.gov/bank/individual/enforcement/2011-04-77.pdf*

ALLY FINANCIAL INC., ALLY BANK, RESIDENTIAL CAPITAL, LLC, and GMAC MORTGAGE, LLC entered into a consent agreement with the Federal Reserve -FRB Docket No. 11-020-B-HC 11-020-B-DEO and the Federal Deposit Insurance Commission -FDIC-11-123b, related to mortgage servicing practices of Ally Financial through various indirect subsidiaries, including GMAC Mortgage and its subsidiaries (collectively, the "Mortgage Servicing Companies"). The FDIC Consent Decree addressed allegations against the Mortgage Servicing Companies such as: (a) filing in state courts and in bankruptcy proceedings numerous affidavits asserting ownership of the mortgage note and mortgage which were not based on personal knowledge or review; (b) filing in state courts and in bankruptcy proceedings or in the local land record offices, numerous affidavits that were not properly notarized; (c) litigating foreclosure and bankruptcy proceedings without always confirming that documentation of ownership was in order; (d) failing to ensure that the Mortgage Servicing Companies adequately handled the foreclosure process; (e) failing to ensure that the Mortgage Servicing Companies adequately handled Loss Mitigation Activities and foreclosure activities; and (f) failing to have adequate internal controls and oversight of the foreclosure process.

Pursuant to the FDIC Consent Decree, Debtor entities were to put aside twenty billion dollars for those who have been defrauded by Ally Bank, GMAC Mortgage, RFC, Homecomings, and Ditech between December 2009 and December 2010. The closing date for claims related to foreclosure practices is in September 2012, and due to the bankruptcy filing it is even more important that a borrower constituency is appointed to ensure compliance and to keep a watchful eye over filings which may affect the administration of the FDIC Consent Decree.

**B.**    ***The Official Committee of Unsecured Creditors***

On May 16, 2012, the United States Trustee appointed the Creditors Committee in this case. The current members of the Creditors Committee are Allstate Life Insurance Company, Wilmington Trust, NA, The Bank of New York Mellon Trust Company, N.A., US Bank National Association, Deutsche Bank Trust Company Americas, AIG Asset management (U.S.), LLC, MBIA Insurance Corporation, Financial Guaranty Insurance Company and Rowena L. Drennan. Four of the Committee members – Wilmington Trust, NA, The Bank of New York Mellon Trust Company, N.A., U. S Bank National Association, Deutsche Bank Trust Company Americas (collectively, "Trustee Members") – are associated with the Debtor entities in the securitization of mortgage loans.

***The Trustee Members***

The Trustee Members were involved in lending money to various Debtor entities for loan originations, as well as acting as trustees and underwriters for securitizations. Many securitizing participants are creditors and have other associations with the trustee entities seated on the committee. This dynamic makes it impossible for the Trustee Members to adequately represent homeowners in this venue. Loyalty to other parties with whom the Trustee Members have many

interwoven relationships would supersede any loyalty to homeowners, to which they are *all* adverse.

Securitizers, underwriters, trustees, and insurers (including the Trustee Members) are vulnerable to claims that they conspired with, aided and abetted, or otherwise supported illegal lending practices of Debtor entities. These entities may bring petitions for protocols for breach-of-warranty, including inflated appraisals and defective closing documents, which are directly related to the same issues that borrower claimants can raise against them. The Trustee Members have already attempted a settlement agreement related to these claims without any scrutiny of any other parties. *See* Notice of Hearing and Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements; to be Held on July 10, 2012 at 10:00 a.m. (ET), Docket No. 320 (June 11, 2012).

In addition, borrowers may bring direct claims in this very forum for relief such as equitable subordination against Trustee Members, making it inherently impossible for the Trustee Members to adequately represent the interests of those borrowers. As judicial estoppels exists to protect entities from taking opposite positions in different courts, in these cases we need to coin a new phrase, "committee estoppel." The Creditors Committee in this sort of case can't possibly attempt to take up a position to represent homeowners in this venue and foreclose on them in other venues. The Trustee Members are not fit to represent the homeowners as an adverse group. Allowing them to do so would be the equivalent of allowing the proverbial wolf to represent the hens.

### *The Insurer Members*

Three Committee members – AIG Asset management (U.S.), LLC, MBIA Insurance Corporation and Financial Guaranty Insurance Company (collectively, "Insurer Members") are

7

insurers for various mortgage loans and securities. Insurer Members are also adverse to certain homeowners. For instance, Insurer Members frequently issued lender paid mortgage insurance which must be disclosed to the homeowner under the Homeowner Protection Act. If not disclosed to the homeowner at origination, the homeowner may bring an action for damages against the originator and the insurer. Insurer Members issued mortgage insurance policies and have paid out many claims. After a claim is paid the right to collect the deficiency is assigned to one of the Insurer Members. If the insurance was not disclosed to the homeowner at closing and the Insurer Member sits on the Committee, it clearly has an interest adverse to borrower claimants.

### One Committee Member is not Enough

One Committee member -- Rowena L. Drennan -- is a borrower claimant attorney but is outnumbered by the other adverse Committee members. Rowena L. Drennen was appointed as representative for plaintiffs in a class action styled *In re: Community Bank of Northern Virginia Second Mortgage Lending Practices Litigation*, MDL No. 1674, (*Brian Kessler, et al.*) Case No. 03-0425, Case No. 02-01201, Case No. 05-0688, case No. 05-1386, United States District Court for the Western District of Pennsylvania. This Pennsylvania class action is clearly not representative of *all* borrower claims.

One borrower claimant seated on the Committee will simply be overruled if any objection is made by the dominant Trustee Members and Insurer Members -- making it impossible to adequately represent all homeowners. Further, if it is found that the class action lawsuit brought by this attorney is not viable, then the one and only borrower representative will be found to have no standing to be on the Creditors Committee. In addition, if that one class action lawsuit is settled, then the only borrowers' representative on the Creditors Committee will

lose her capacity to remain on the Creditors Committee. All of the claims of the homeowners in the country can not be adequately represented by a person in such a precarious position. In re: *Accredited Home Lenders Holding Co.*, Case No. 09- 11516 (MF) (Bankr. D. Del. 2009), one borrower, Carrie Luft, was seated on the creditors committee. In the end it was determined that she never had standing to represent homeowners. *See* http://www.kccllc.net/documents/8911516/891151610033000000000009.pdf

Borrowers have claims as varied as fraud, violation of state and federal consumer protection laws, civil RICO claims, fraudulent foreclosure assignments, and servicing misconduct and must have more than just one representative whose issues and loyalty may not be the aligned with borrowers nationwide. Homeowner claimants must have representation of a cross section of types of state and Federal claims pending in numerous states.

### C. Borrowers Committee

The concept of a borrowers committee is not a new one. In *In re: American Home Mortgage Holdings, Inc.*, Case No. 07- 11047 (CSS) (Bankr. D. Del. 2007) and in *Henry v. Lehman Commer. Paper, Inc. (In re First Alliance Mortg)* 471 F.3d 977 (9th Cir. 2006) official borrowers committees were successfully appointed. In addition, official equity committees have also been appointed numerous times in the past. *See e.g., In re: Oneida LTD.*, Case No. 06-10489 (ALG) (Bankr. S.D.N.Y. 2006).

Here, a cursory review of the docket sheet reveals that there are many claims being filed by homeowners. There are also *pro se* letters illustrating the general state of confusion that homeowners across the country are experiencing. It is clear from the *pro se* letters received by the Court in this matter that homeowners do not understand the notices they received. Attached hereto as <u>Exhibit B</u> is a sampling of docketed letters evidencing homeowners' confusion.

Appointing a borrowers committee will centralize and streamline a method for the millions of homeowners affected by this filing to have representation in this matter. It will also relieve the Court and the United States Trustee of the burden of dealing directly with these borrowers.

### Borrowers' Claims

Thousands of individual homeowners across the United States have claims or potential claims against the Debtors. These homeowners allege that Debtors routinely engaged in deceptive lending practices, instituted fraudulent servicing policies, *i.e.* robosigning, systematically originated and serviced mortgages in violation of federal and state consumer protection laws, and intentionally collected millions of dollars in illegal fees and interest.

Borrowers' claims that should not be protected in bankruptcy include violations of:

- TRUTH IN LENDING ACT ( "TILA"), 15 U.S.C. § 1601
- HOME OWNERSHIP AND EQUITY PROTECTION ACT ( "HOEPA"), 15 U.S.C. § 1639
- REAL ESTATE SETTLEMENT PROCEDURES ACT ( "RESPA"), 12 U.S.C. § 2601
- FAIR DEBT COLLECTIONS PRACTICES ACT ("FDCPA") 15 U.S.C. §1692
- THE HOMEOWNER PROTECTION ACT of 1998 ("HOPA") 12 U.S.C. §4907
- EQUAL CREDIT OPPORTUNITY ACT ("ECOA") 15 U.S.C. §1691
- FAIR CREDIT REPORTING ACT ("FCRA") 15 U.S.C. §1681
- STATE SPECIFIC COMMON LAW FRAUD
- STATE SPECIFIC UNFAIR AND DECEPTIVE PRACTICES ACT ("UDAP")
- STATE SPECIFIC FORECLOSURE LAWS
- STATE SPECIFIC ELDER ABUSE LAWS
- STATE SPECIFIC FAIR LENDING LAWS
- STATE SPECIFIC CONSUMER PROTECTION LAWS

Thousands of homeowners are currently at risk of losing the home and may have claims that arose pre-bankruptcy or post-bankruptcy for actions that began prior to the bankruptcy filing. These homeowners are scattered throughout the United States and do not have the resources to attend hearings or the time to read dockets and keep track of events that may affect

their rights.   Without an official Borrowers Committee, homeowners will have no voice in these proceedings.

*Movants*

The following homeowners have engaged undersigned counsel for the limited purpose of seeking the appointment of a Borrowers Committee:   Nathaniel Arnold; Luis Fitzgerald-Fernandez; Alan Israel & Jill C. Habib; Peter Webb; Ariel Barel; Jean-Marc Bensaid; Diane Boyter; Conrad Burnett; Stephen & Francesca Grello; Francine Modderno; Florence Mason; Jimmy Morris; Phillip Weissburg; Audrey & Griggs Wimbley; Patrick Farrell; Melissa Lallo; Caley Coleff; Terry Slovak; Amelia Colvin; Yvonne Hartshorn; Roxanne Harbert; William A. Marshall, Sr.; Joanna L. Belanger; David A. Belanger; Kristin Burak; Linda Clark; Shannon Mcintyre; John Lebron; Timothy Dixon; Jeffrey Ginn; and Val M. Steele (collectively, the "Movants").   The Movants are a representative cross-section of homeowners throughout the country and reside in the following states: California, Florida, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Tennessee, Texas, Virginia.

Undersigned counsel has agreed to represent the Movants on a *pro bono* basis for the purpose of litigating this motion, but the Court should be advised that the scope of our engagement is expressly limited to this motion.   Undersigned counsel has *not* agreed to represent the Movants in connection with any other matters.

The Law Offices of Robert E. Brown, P.C. focuses on representing homeowners that are victims of predatory lending and has three offices within New York City.   The firm, which was established in 2006, has been featured on Sirius Talk Radio as well as CNN Money and CBS Nationwide Evening News.   We are experienced in lender liability litigation and bankruptcy practice.   Prior to my law career, I was a Captain in the New York City Police Department.

*Potential Borrowers Committee Members*

It is clearly within the authority of the Trustee to select the members of the Borrowers Committee. Several individuals have expressed a willingness to serve on the Borrowers Committee:

- Former Ohio Attorney General Marc Dann, Esq. - now in private practice in Ohio;
- Matthew D. Weidner, Esq. a nationally-recognized consumer-rights attorney with his primary office location in St. Petersburg, Florida;
- Heather Boone McKeever, Esq., counsel for plaintiffs in multiple class and consolidated actions against Debtor entities.

Detailed statements about the background of each of these individuals are attached hereto as Exhibit C. We respectfully request that the Trustee consider these individuals for appointment to the Borrowers Committee in the event the Court grants the instant motion.

*Bar Dates*

No bar date has been set yet in the case, and the borrower committee may take up issues such as proper notice to homeowners who feel they may have a claim in this case.

## II.    **ARGUMENT**

The Bankruptcy Code specifically authorizes the appointment of an additional committee of creditors "if necessary to assure adequate representation of creditors." *See* 11 U.S.C. § 1102(a)(2). Under section 1102(a)(2):

On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States Trustee shall appoint any such committee.

The Bankruptcy Code does not define "adequate representation." Instead, the decision whether to appoint an additional committee falls within the discretion of the Court based upon

the facts of the case. *See In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006). Bankruptcy courts have the discretion to examine the facts of each case to determine if additional committees are warranted. *See In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985).

In determining whether to appoint an additional committee, the Court engages in a two-step analysis: First, the Court must determine whether appointment of an additional committee is necessary to assure that the movants are adequately represented.    Second, if adequate representation is lacking, the Court must determine whether to exercise discretion by appointing an additional committee. *See In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997); *In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985). The Movants have the burden of showing that appointment of a committee is necessary to assure adequate representation.

As the *Beker* Court noted, "in a large case, in which there are significant groups of creditors or equity security holders with conflicting claims which are likely to be affected by the plan of reorganization, the court should authorize the appointment of additional committees. *See Beker* at 948-949 citing 5 L. King, *Collier on Bankruptcy* para. 1102.2 at 1102-18 (15th Ed. 1984); *In re Fidelity America Mortgage Co.,* 7 B.C.D. 1186 (Bankr. E.D. Pa. 1981).

Although the appointment of additional creditor and equity committees may be quite rare in the average bankruptcy matter, the appointment of an additional committee "in so called 'mega cases' has become relatively common." *See* AMERICAN COLLEGE OF BANKRUPTCY, BEST PRACTICES REPORT, FORMATION FUNCTION & OBLIGATIONS OF EQUITY COMMITTEES IN CHAPTER 11 (2011) at 3.

13

The Administrative Office of the U.S. Courts' working definition of a "mega case" is "an extremely large case with: (1) at least 1,000 creditors; (2) $100 million or more in assets; (3) a great amount of court activity as evidenced by a large number of docket entries; (4) a large number of attorneys who have made an appearance of record; and (5) regional and/or national media attention." Laura B. Bartell & S. Elizabeth Gibson; *A Guide to the Judicial Management of Bankruptcy Mega-Cases* 5 (Federal Judicial Center, 2d ed. 2009).  It could not be clearer that the instant bankruptcy matter is a "mega case."

Once the statutory tests are met, the burden shifts to the opponent of the motion to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways. *See Beker* at 949.

The Movants and other borrowers will not been adequately represented and their rights will only be protected unless the Court exercises its discretion by appointing a Borrowers Committee. The determination as to whether the Movants have "adequate representation" is case-specific and addresses whether the interests of the creditor constituency have a meaningful voice on the creditors' committee. *See Dow Corning*, 194 B.R. at 141.  The Court must consider all relevant factors, including (1) whether the case is large and complex, (2) how the interests of the creditor constituency balance against the interests of other groups on the committee and (3) whether the composition of the creditors' committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-making process. *See id.* at 141-42. Here, each of these factors favors the appointment of a Borrowers Committee.

### A.    This Chapter 11 Matter is Very Large And Complex.

As this Court is well aware, Chapter 11 cases in general are complex, but the analysis does not end there. The size of the Debtor in this case and its numerous subsidiaries who engaged in mortgage lending, servicing, and securitization is immense. Once again, this case fits the definition of "mega case" to a tee.'

### B.    The Borrowers Interests are Fundamentally Different from Other Creditors

The borrowers have fundamentally different interests from the other creditors. Other creditors such as warehouse lenders, securitizers, and third party servicers will seek to maximize the value of the loans on which borrowers are liable and to minimize the amount of liabilities attached. Creditors may do so by tactics such as leaving liabilities that rightfully would fall on them with the bankrupt Debtor entities. This can be accomplished many different ways in a Chapter 11 bankruptcy. Creditors may try and "hide" behind the bankrupt entities not revealing themselves to the homeowners in the role of investor or insurer. Creditors may quietly seek to settle claims based on repurchase obligations, defective documents, and indemnifications for faulty loans without proper disclosure.

Borrowers, on the other hand, seek full disclosure of the Debtor's business dealings with these creditors, including the Creditors Committee members. The type of investigation and inquiries that the borrowers would choose to take up are exactly the type of investigations the current Creditors Committee members would quash. Most notably, borrowers may lose their homes to the very Creditors Committee members who may use this venue to avoid liability and protect their own interest. The Creditors Committee members may engage in acts during this bankruptcy that amount to use of a position as an insider to further their own prosecution of

homeowners in other venues by blocking their access to information in this venue. As the Court can see this is a situation ripe for problems.

Borrowers' interests undoubtedly diverge from those of other creditors. As a result, other creditors and especially creditors with direct adverse interest cannot adequately represent the interests of borrowers. Unlike the other claims such as an unpaid vendor claim, the borrowers' injuries may be ongoing and not yet fully vetted as in the case of ongoing litigation or the defense of pending foreclosure matters. All claims involve injury suffered by consumers as a result of Debtor entities' violations of state and federal laws meant to protect consumers and in some cases fraudulent acts which should not be protected under the bankruptcy code. This clearly makes the borrowers' claims unique in nature and they deserve special treatment. These claim also put borrowers at odds with other creditors in important respects.

Borrowers may want to establish that their mortgage terms were illegal. Other creditors including Creditors Committee members may want to establish that they were legal and may even join in motions against borrower claims during the claims objection process. Borrowers may want to establish that that warehouse lenders, securitizers, and third party servicers are jointly liable with Debtor entities. Borrowers may want the claims of warehouse lenders, securitizers, and third party servicers to be equitably subordinated. Such creditors obviously would contest such treatment. Borrowers may be in the process of applying for loan modifications that must be approved by the Trustee Members or Insurer Members. Creditors Committee members may influence Debtor entities to use the bankruptcy as a shield to conceal that the party approving or denying the loan modifications may be seated on the Creditors Committee. Borrowers who assert loan rescission of mortgage contracts or other detrimental

claims may trigger investors and insurers, some seated on the committee, to make counter claims against the Debtor entities.

*In re First Alliance Mortgage Company*, 298 B.R. 652 (C.D. Cal. 2003), the U.S. Trustee appointed a Borrowers Committee pursuant to an order of the bankruptcy court, in accordance with Section 1102(a)(1) of the Bankruptcy Code. *First Alliance* demonstrates the importance of having an independent assessment of potential claims against creditors. In addition to protecting the interests of borrowers throughout the *First Alliance* bankruptcy case, the *First Alliance* borrowers committee filed suit against one of the debtor's mortgage securitizers, accusing it of aiding and abetting First Alliance's fraud. The securitizer's liability was predicated on its knowledge of First Alliance's fraudulent practices, which involved loan structures and sales incentives much like the Debtors here, and on the fact that First Alliance would not have been able to continue its illegal conduct without a line of credit from the securitizer. A jury agreed, and the Ninth Circuit affirmed. *See Henry v. Lehman Commer. Paper, Inc. (In re First Alliance Mortg)* 471 F.3d 977 (9th Cir. 2006).

The *American Home Mortgage Holdings* provides another excellent example of a successful borrowers committee. There, Judge Christopher Sontchi found that inherent conflicts of interest existed that could not be resolved between the borrowers and the members of the unsecured creditor committee. Judge Sontchi agreed that the creditors committee was "inherently conflicted" and wasn't "adequately representing the borrowers." *See In re: American Home Mortgage Holdings, Inc.* Case No. 07- 11047 (CSS) (Bankr. D. Del. 2007) Transcript of Proceedings (hereinafter "Tr. at __") of the oral argument on the borrowers committee motion, dated October 8, 2008, at 76, a copy of which is attached hereto as <u>Exhibit D</u>.

This transcript provides crucial insight into Judge Sontchi's reasoning in approving the borrowers committee.

Judge Sontchi approved the committee due to "the unique nature of a number of the borrower claims" that were "different from the general nature of the claims of most of the unsecured creditors, most of whom are financial institutions". Tr. at 76. Judge Sontchi considered the "numerosity of the claimants" and the fact that it would be "extremely difficult for any person to appear *pro se* in court." Tr. at 76. Judge Sontchi recognized that "the vast majority of these people are financially unable to hire counsel, and we're talking about people who are on the verge of losing their homes". Tr. at 77.

There, as here, it was "a sophisticated large complex case." Tr. at 77. There is a "uniqueness of the borrowers' claims" and the "individuals are not in a position to represent their own interests". Tr. at 77. Judge Sontchi noted that there was clearly "a potential for unique remedies on behalf of the borrowers" and "because it's a complex company and it's a complex plan, … it inherently makes it difficult for unsophisticated people familiar with the Bankruptcy Code to figure out what's going on." Tr. at 78.

It is extremely important to note that the Movants are not alleging any misconduct or breach of fiduciary duties by the Creditors Committee or its counsel. As in *American Home Mortgage Corp.*, the Creditors Committee has been diligently representing "the interests of general unsecured creditors as a general matter." Tr. at 61.

However, as Judge Sontchi determined in *American Home* that the creditors committee was "inherently conflicted" and wasn't "adequately representing the borrowers." Tr. at 76. The same is obviously true here.

### C.    Large Financial Institutions Dominate The Creditors Committee.

The large financial institutions and insurers dominate the Committee and prevent

borrowers from having any say in the decision making process. *See Dow Corning*, 194 B.R. at

142.

The Creditors Committee simply has no interest in protecting the interests of borrowers.

The one borrower seated on the Committee will simply be overruled if any objection is made by

the dominant trustee and insurer members.  Borrowers have a wide variety of claims against

Debtor.  Some of these same borrowers likely have claims against the Trustee Members also –

the very Committee members that are supposed to be protecting the interests of all creditors --

including the homeowner constituency.

The Creditors Committee is dominated by the Trustee Members who participated in

warehouse lending, mortgage securitizations as trustees, underwriters, and may even own

certificates issued by the trusts.   When combined with the Insurer Members, the Trustee

Members have a super majority.  This dynamic will undoubtedly make it impossible for one

borrowers' attorney to get anything accomplished.  If it is found that the class action lawsuit

brought by this attorney is not viable, then the one and only borrower representative will be

found to have no standing to be on the Creditors Committee.  In addition, if that one class action

lawsuit is settled, then the only borrowers' representative on the Creditors Committee will lose

her capacity to remain on the Creditors Committee.  All of the claims of the homeowners in the

entire country can not be adequately represented by a person in such a precarious position.

**D.**    **The Court Should Exercise Its Discretion To Appoint A Borrowers Committee.**

When determining whether to exercise its discretion to appoint a Borrowers Committee, The Court should consider the following discretionary factors:  (1) the cost associated with the appointment, (2) the time of the application, (3) the potential for added complexity, and (4) the presence of other avenues for creditor participation. *Dow Corning*, 194 B.R. at 143. These discretionary factors are only considerations and should not prevent appointment of an additional committee if such appointment is otherwise justified by the facts. *Id.*

**1.**    **The Cost Associated With Appointment Is Relatively Small.**

The extra cost associated with a Borrowers Committee will be small relative to the size of these entities.  As the Multi-State Settlement is in question, any cost to the estate for representation of homeowners who have been harmed by Debtor entities is undoubtedly justified. The Borrowers Committee will have little to no overlap with the duties of the Creditors Committee and will address issues specific to borrower claimants.

Few if any borrowers have the financial ability to appear individually in this Court.  Nor, do they have the financial wherewithal to finance an ad hoc borrowers committee.  Unlike an equity committee, where the members are often financial institutions, here, the claimants are individual homeowners.  Many of these homeowners are in foreclosure or have already lost their homes. Obviously, they are not in a position to finance a borrowers committee.

There can be no doubt that the relatively small amount of added costs to adequately represent borrowers will not appreciably diminish the value of the Debtors' estate.

## 2.    A Borrowers Committee Will Not Add Complexity.

The appointment of a Borrowers Committee will not add complexity to these cases that is not already present. Instead, a Borrowers Committee will simplify matters for the Court and the United States Trustee. A Borrowers Committee offers the Court a single voice to represent the interests of the borrowers as a whole. Rather than add complexity, counsel for the Borrowers Committee should be able to make these proceedings more efficient for the Court and the United States Trustee. The Borrowers Committee constituency will take up issues of concern to all homeowners to ensure fair and equal footing from which issues can be addressed and focused for the good of all.

It is important to note, that the intention is <u>not</u> to involve the Borrowers Committee in all issues in the case. Rather, the Borrowers Committee would be focused <u>solely</u> on issues that relate to the borrowers and their rights. An important example of such an issue is the retention of documents. It is not uncommon for a debtor in this type of bankruptcy to request to be allowed to destroy documents as a cost saving measure. In light of the thousands of litigations occurring throughout the country involving the authenticity of promissory notes, it is crucial from a homeowner's perspective that these key documents be preserved by the Debtor.

Without the Borrowers Committee, the Court may have to address identical issues brought by scores of *pro se* litigants and other individuals represented by various consumer advocates. The Borrowers Committee would be one unified voice to sit at the table with Debtors and the Creditors Committee. Without the Borrowers Committee, the question of whether the Creditors Committee is acting as a fiduciary in the best interest of borrower claimants may become an issue brought before the Court by one of these individual borrowers. Indeed, absence of the Borrower Committee may add complexity and uncertainty to the case.

### 3.    Borrowers Will Not Be Heard Absent a Borrowers Committee.

The borrowers are a diverse creditor group spread across the country.  Borrower claims are as diverse as the states they come from.  Open investigations exist in numerous states.  As a result, they are analogous to creditor or shareholder constituencies where the debt or securities are widely held.  *See Mansfield Ferrous Castings*, 96 B.R. 779, 781 (finding that the 141 employees lacked the resources to protect their interests individually in the bankruptcy proceedings).

More importantly, borrowers in trouble due to toxic loans, bad servicing practices, and complex securitization structures are caught in a web of things they rarely fully understand. Add another layer to that of Chapter 11 bankruptcy and you have another mountain they must climb to even figure out what to do to protect their rights.  The stakes couldn't be higher for these borrowers as homes, families and neighborhoods are being ripped apart.  Few if any borrowers have the financial means even to appear themselves in this Court, which would involve flying to New York and paying for lodging, even if it involves just one trip.  They have jobs and lives that leave little time to review thousands of dockets which will be filed in this case.  To the extent they are represented by counsel at all, most borrowers are represented by counsel from around the country.  Homeowners in foreclosure undoubtedly lack the resources needed to fly their attorneys to New York to litigate effectively in this Court.  Without a Borrowers Committee, most borrowers lack the resources individually to make their voice heard.

Finally, there is no other avenue for borrower participation.  The addition of one or two borrowers to the Creditors Committee will not result in adequate representation for borrowers because they will not be able to persuade the other members of the Committee to vote in favor of borrower interests that are contrary to the interests of the other members.  The Committee would

still be dominated by financial institutions whose interests are contrary to the interests of borrowers. Accordingly, adequate representation of borrowers will not be possible unless a separate Borrowers Committee is created.

Many homeowners will not even understand that events may be occurring which affect their rights. "The Supreme Court has held that 'an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Feldman*, 261 B.R. 568 (Bankr. E.D.N.Y. 2001) (quoting *Mullane v. Central Hanover Bank*, 339 U.S. 306, 317-18 (1950). In bankruptcy proceedings, courts distinguish between "known" and "unknown" claims when evaluating the sufficiency of notice under due process standards. On one hand, publication notice may be given to unknown creditors whose interests are either conjectural, future, or unlikely to come to the debtor's attention during the course of its business. *In re Arch Wireless, Inc.*, 534 F.3d 76, 80 (1st Cir. 2008); *Feldman*, 261 B.R. at 577 (citing *Mullane*, 339 U.S. 306 (1950)). On the other hand, actual notice is required if a debtor actually knows or can reasonably determine the creditor's identity and the nature of his or her potential claims. *Id.* In that situation, publication notice is inadequate. *See In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 784 F.2d 831, (7th Cir. 1986); *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998); *Chemetron Corp. v. Jones*, 72 F.3d 341, 345-47 (3d Cir. 1995); *In re Savage Indus.*, 43 F.3d 714, 721-22. A known creditor who has not been provided with appropriate notice of a bankruptcy proceeding cannot have his or her claim affected by a settlement occurring therein. *See Jones v. Chemetron Corp.*, 212 F.3d 199, 209-10 (3d Cir. 2000).

23

It is clear that the Debtor is not required to notify *all* borrowers who might have a claim. By definition, the Debtor only has to notify homeowners who have already initiated a lawsuit or otherwise are known to the Debtor to have a claim. However, a "claim" is not determined not by commencement of an action, but rather by accrual of rights to commence an action. As of now, the interests of homeowners with rights that have accrued, but have not yet been asserted are clearly unrepresented by the Creditors Committee. Ultimately, the Court must determine many issues, including the scope of the class of homeowners that must receive notice and the extent of the homeowners due process rights in this bankruptcy.

Under the circumstances, this Court should find that a Borrowers Committee should be appointed to represent borrowers' interests nationwide.

## III.    CONCLUSION

Borrowers must have a seat at the table and representative voice as settlements are proposed and reorganization plans are drafted. An additional Borrowers Committee is necessary to avoid inherent conflicts of interest of the seated Creditors Committee. Most individual borrowers simply cannot afford to pursue their rights. If the official Creditors Committee does not adequately protect them, these residential homeowners will likely become disenfranchised, effectively making these Bankruptcy Proceedings into a mechanism to protect the lenders at the expense of their victims. It is beyond dispute that the purpose of Chapter 11 is to both protect the debtor and to protect the interests of creditors. Absent appointment of an official Borrowers Committee, the homeowner-creditors will have no protection and no representation. Effectively, the Debtor will be able to steamroll their way through this proceeding, trampling the rights of the victims of their illegal practices, while remaining as a viable entity and preserving the value of

their assets.  At the same time, Debtors be eviscerating to rights of these victims established in the Multi-State Settlement and FDIC Settlement.

An official Borrowers Committee will ensure a voice in negotiations over a bankruptcy plan to ensure it will not improperly impair borrowers' rights in numerous respects.  The Multi-State Settlement leaves little doubt that homeowners have claims.

In view of the *First Alliance* and *American Home Mortgage Corp.* precedent, and the conflicts of interests inherent between borrowers and the existing members of the Committee, the Movants are hopeful that the Office of the United States Trustee and this Court would conclude that borrowers in this case are not adequately represented by the Creditors Committee.

As fully set forth in this motion, Movants respectfully request that this Court appoint an official Borrowers Committee direct the United States Trustee to appoint its members.


Dated: August 24, 2012                          Respectfully Submitted,


                                                  /s/   Robert E. Brown
                                                Robert E. Brown
                                                **ROBERT E. BROWN, P.C.**
                                                *Attorneys for Homeowner Claimants*
                                                44 Wall Street, 12th Floor
                                                New York, N.Y. 10005
                                                (212) 766-9779
                                                rbrown@robertbrownlaw.com