**Hearing Date and Time: September 11, 2012 at 10:00 a.m. (ET)**
**Objection Deadline: September 5, 2012 at 5:00 p.m. (ET)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
In re:                                  :  Chapter 11
                                        :
Residential Capital, LLC, et al.,       :  Case No. 12-12020 (MG)
                                        :
              Debtors.                  :  Jointly Administered
                                        :
------------------------------------------------------------ x

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**REGARDING THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING**
**THE DEBTORS TO CONTINUE TO PERFORM UNDER THE ALLY**
**BANK SERVICING AGREEMENT IN THE ORDINARY COURSE OF BUSINESS**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

    The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby files this statement (the "**Statement**") regarding the Debtors' motion for an order authorizing the Debtors to continue to perform under the Ally Bank Servicing Agreement in the ordinary course of business (the "**Motion**") [Docket No. 47], and respectfully submits as follows:[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

**STATEMENT**

1. The Committee is pleased that the parties have been able to reach a stipulation to avoid a contested evidentiary hearing on the Motion at this time and permit the Debtors to move forward with the Servicing Agreement without further delay and uncertainty. Subject to the Court's approval of the terms set forth in the parties' proposed stipulation and order (the "**Stipulation**"), the Committee supports granting the Motion. The Committee submits this Statement to highlight certain important features of the Stipulation, to make clear what it does and does not resolve, and to record the Committee's concerns with both the nature of the underlying related party transactions and the manner in which the Motion was presented. Both issues have significant implications for the future conduct of these cases – and, in particular, for the Examiner's ongoing investigation.

2. The Committee supports the resolution now before the Court because it permits the servicing relationship between Ally Bank and GMAC Mortgage to continue through the sale process – thereby preserving the going-concern value of the Debtors' business platform, minimizing any real or imagined risk to the Debtors' asset sale process or the performance of obligations under the DOJ/AG Settlement, avoiding any regulatory problems for Ally Bank resulting from uncertainty about indemnification, and permitting the Examiner to pursue a full and unimpeded investigation into the transactions underlying the Motion. In addition, through negotiation of the Stipulation, the Committee was able to secure important improvements in the terms of the Servicing Agreement itself – most significantly, Ally Bank's agreement not to deliver a 120 day notice to terminate the agreement before the earlier of 10 days after entry of a sale order or December 10, 2012.

3. As this Court is aware, the Committee did not object to a Servicing Agreement with Ally Bank on market terms, but strongly opposed AFI's attempt to leverage that

agreement to achieve de facto assumption of the Debtors' obligations under a prepetition indemnification agreement negotiated and approved by conflicted fiduciaries.  The Stipulation does not resolve the Committee's objection to the indemnification provisions, but preserves the rights of all parties and defers a challenge so that questions regarding the indemnification can be investigated, litigated, or settled in due course along with the larger set of prepetition transactions that appear to reflect AFI's dominance and control over the Debtors and the use of that influence to extract value for itself and Ally Bank to the detriment of the Debtors.  The Stipulation provides that the Debtors will make the disputed indemnification payments to Ally Bank, but that AFI will create and fund an escrow in the same amount as the Debtors' postpetition payments that will be subject to this Court's exclusive jurisdiction.  This structure removes Ally Bank from the dispute by assuring indemnification and properly crystallizing the dispute as one between the Debtors and AFI.  The escrow will be available either to reimburse the estates for any postpetition payments by the Debtors ultimately determined to have been illegal or inappropriate or otherwise to help fund a negotiated plan.  The Committee considers establishment of the escrow to be a significant benefit for unsecured creditors.

4. While a full explication of the underlying events must await the Examiner's more complete investigation, the Committee believes it is important for the Court and the Examiner to understand its concerns, including certain troubling facts learned by the Committee during its brief, initial discovery on the Motion.

5. *First*, the underlying indemnification agreement between the Debtors (ResCap and GMAC Mortgage) and AFI, embodied in a letter agreement entered into on January 30, 2012 (the "**Letter Agreement**"), appears to be an archetypal example of the Debtors' suspect transactions with related parties.  The Letter Agreement was entered into at a time when the

Debtors were certainly insolvent, clearly anticipated a ResCap bankruptcy, and accordingly is an obvious attempt to protect AFI and Ally Bank from the consequences of that filing.  The Letter Agreement was negotiated by officers and ratified by directors with hopelessly conflicted loyalties to the Debtors and AFI, with no apparent attempt to subject its terms to independent scrutiny by a special committee of either Debtor's board or to employ any other mechanism to protect the interests of such Debtors' creditors from overreaching by AFI.  The Letter Agreement's terms – imposing on the Debtors massive obligations incurred in connection with the DOJ/AG Settlement for the benefit of the shareholder and its subsidiary – will need to satisfy the heightened scrutiny of the "entire fairness" test.  While the Letter Agreement contained certain limits on the Debtors' indemnification obligations, it also purported to dictate the terms of indemnification provisions that would be included in a new subservicing agreement with Ally Bank – but these terms did not include the limits specified elsewhere in the Letter Agreement, which permitted AFI eventually to argue that the Debtors were responsible for *unlimited* indemnity obligations and then, when challenged, to reach a new "settlement" with AFI's subsidiary extracting yet more value for Ally Bank (and thus AFI).  This purported settlement was negotiated with no notice to or involvement by the Committee. The Committee believes that the Examiner should fully investigate both the process by which the Letter Agreement was negotiated (and subsequently renegotiated postpetition) and the substance of its terms to determine whether it could possibly satisfy heightened scrutiny.

6.      *Second*, just five days before filing the Debtors' bankruptcy cases in May 2012, AFI caused the Debtors to pay nearly $49 million in indemnification to Ally Bank.  This transaction certainly is not an ordinary course payment and appears to have served no legitimate purpose other than to prefer AFI over other of the Debtors' unsecured creditors.  AFI could have

and should have made this payment itself based on its own indemnification obligation and asserted a claim for contribution in the chapter 11 case. The Committee's preliminary discovery revealed that Ally Bank was advised by counsel that payment of these indemnification amounts on the eve of the bankruptcy filing would likely be challenged as a preference, but that Ally Bank would be better off having the money and defending against the preference claim rather than being left with an unsecured claim for the same amount. The Committee expects that this payment made to an insider and for the benefit of an insider-guarantor five days prior to the Petition Date should be recoverable by the estates. This course of conduct, as well as the fairness and legality of the $49 million payment itself, should be examined.

7.  *Third*, whatever the original merits of the Letter Agreement, there was no legitimate reason for the Debtors to continue performing under it postpetition – particularly since AFI itself had independently indemnified Ally Bank for the same losses and the Debtors had defaulted on *all* of their other outstanding prepetition unsecured debt, thereby confirming even AFI's view that its indemnity obligation had matured. Rather than honoring its indemnity obligation to Ally Bank, AFI used the new servicing agreement to compel GMAC Mortgage to absorb the indemnity postpetition. And the Debtors were fully aware that these were not *de minimis* obligations. The Committee's discovery has revealed that, on the eve of filing for bankruptcy, the Debtors' executives expected that, even after paying $49 million, it would have to make between *$70 and $120 million more* in indemnification payments to Ally Bank and acknowledged that the modification program would significantly improve Ally Bank's portfolio and AFI's earnings. AFI imposed this substantial cash burden on the Debtors as they entered bankruptcy by funding a postpetition AFI DIP (which has administrative priority in this case) to insure that the Debtors would have the financial capacity to make these payments to AFI's

subsidiary, Ally Bank. The escrow fund will be available, among other possible dispositions, to reverse these payments if the Examiner or the Court determines that AFI rather than the Debtors should have been responsible postpetition for the indemnity payments to Ally Bank.

8.  *Fourth,* the Committee's concerns were heightened by the less-than-candid manner in which the indemnification issue was presented. Neither the Letter Agreement nor the subject of indemnification generally was even mentioned in the Motion or its original supporting papers. Nor was indemnification mentioned at the first day hearing, when Judge Peck was assured that it would be "business as usual" under the revised Servicing Agreement, 5/15/12 Hearing Tr. at 59:2-3. Although the Motion represented that "[t]he Debtors are not seeking to pay any prepetition claims through or pursuant to" the revised Servicing Agreement (Motion ¶¶ 26-27), Judge Peck's interim approval order was relied on as purported authority to make a $19.9 million postpetition indemnification payment to Ally Bank (including $13 million relating to *prepetition* loan modifications) – none of which was disclosed in the Debtors' reply papers or elsewhere in the record until, in response to the Committee's investigation, Mr. Marano's declaration was filed on July 16, 2012, two months after the Motion was first filed.[2] Only then did the Debtors acknowledge – contrary to earlier assertions that the Servicing Agreement would be profitable – that indemnification payments to Ally Bank could well exceed any income under the new agreement. Marano Decl. ¶ 22. The Committee believes that the Examiner should investigate the circumstances surrounding the Motion and disclosure of the indemnity and payments to Ally Bank.

---

[2] Mr. Marano suggests that the orders authorizing the Debtors to continue servicing activities for governmental associations [D.I. 87] and non-governmental associations [D.I. 91] also may have somehow authorized such payments. Marano Decl. ¶ 15. But none of the motions, the approving orders, or the DOJ/AG Settlement itself concern (or even implicitly authorize or refer to) the indemnification obligations or the Letter Agreement.

9. The resolution now before the Court obviates the need to assess these issues at this time, clearing the way for the Examiner's comprehensive investigation. But the Committee believes that the Debtors would have faced an uphill battle in attempting to justify continued performance of the Letter Agreement obligations as part of the new Servicing Agreement. The Committee has confirmed through discovery that the servicing terms of the new agreement – excluding any provisions for indemnification – were tested by Ally Bank in a market-driven process, confirming that the servicing terms were fair to both Ally Bank and the Debtors. Enforcing the indemnification obligations therefore represents merely a bonus for Ally Bank, for the ultimate benefit of AFI. While the Debtors belatedly argue that access to Ally Bank's portfolio helps the estates satisfy their obligations under the DOJ/AG Settlement (Marano Decl. ¶ 11), the more significant benefits of the indemnification obligations accrue to Ally Bank and its parent, AFI. Unlike modifications to the Debtors' own loans, which simply recognize a loss in value that has already occurred, indemnification payments to Ally Bank are hard costs that turn the Debtors into guarantors of the full amount of Ally Bank's loss of original loan value. Far from "compensating" Ally Bank for some benefit provided to the Debtors, these payments extract value from the Debtors to remedy flaws in Ally Bank's own loan portfolio *that may have been caused by Ally Bank's own originating activities.* At the same time, they reduce, dollar for dollar, the parallel obligations of the Debtors' solvent parent, which is jointly liable with certain Debtors under the DOJ/AG Settlement and which has separately agreed to indemnify Ally Bank for the very same "losses". It is doubtful that this huge transfer of up to $100 million in value could be justified by any supposed ancillary benefit to the Debtors. Nor can it be justified based on AFI's willingness to provide DIP financing (for which it will be repaid at market rates) or to forgive a portion of GMAC Mortgage's "debt" (as it purported to do

in the Letter Agreement while shifting to the Debtors the entire cost of complying with the DOJ/AG Settlement), since AFI's debt claims are likely to be challenged on the theory that they should be recharacterized as equity in any event.

10. The Stipulation expressly preserves for further investigation and resolution of these and all other issues implicated by the Servicing Agreement, the Letter Agreement, and the parties' overall course of dealing. The Committee hopes and expects that these issues, and others implicating the complex financial relationships between and among the Debtors and their related parties, can be addressed with greater candor and transparency as the Examiner's investigation moves forward.

WHEREFORE, the Committee respectfully requests that the Court grant the Motion subject to the terms included in the Stipulation and grant such other and further relief as may be just and proper.

Dated: New York, New York
August 27, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Douglas H. Mannal
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for the Official Committee
of Unsecured Creditors*