**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FOR PUBLICATION**

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*,

Debtors.

Case No. 12-12020 (MG)

Jointly Administered

## MEMORANDUM OPINION AND ORDER DENYING DEBTORS' MOTION FOR APPROVAL OF A KEY EMPLOYEE INCENTIVE PLAN

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Counsel for the Debtors*
1290 Avenue of the Americas
New York, New York 10104
By:    Gary S. Lee, Esq.
       Jamie A. Levitt, Esq.
       Larren M. Nashelsky, Esq.
       Jordan A. Wishnew, Esq.

TRACY HOPE DAVIS
*United States Trustee for Region 2*
33 Whitehall Street, 21st Floor
New York, New York 10004
By:    Brian S. Masumoto, Esq.
       Eric Small, Esq.
       Michael Driscoll, Esq.

KIRKLAND & ELLIS LLP
*Counsel for Ally Financial Inc. and Ally Bank*
601 Lexington Avenue
New York, New York 10022
By:    Richard M. Cieri, Esq.
       Ray C. Schrock, Esq.
       Stephen E. Hessler, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion (the "Motion") of Residential Capital, LLC and its affiliated debtors (the "Debtors" or "ResCap") for authorization to implement a key employee incentive plan (the "KEIP" or the "Plan") for certain key insiders of the Debtors (the "KEIP Participants").[1] (ECF Doc. # 812.) The Debtors' chapter 11 cases were filed on May 14, 2012 (the "Petition Date"). The instant Motion was filed on July 17, 2012, and a hearing on the Motion occurred on August 14, 2012. The Debtors' Plan provides for the award of between $4.1 million and $7 million in the aggregate (the "KEIP Awards") to seventeen insiders of the Debtors provided that the Debtors businesses meet or exceed certain enumerated bankruptcy-related targets. The KEIP Awards vest upon the occurrence of various milestones. Most significantly, the Debtors' Plan provides that 63% of the KEIP Awards may vest upon the closing of the two sales of the Debtors' principal assets.[2] Greenspan Decl. ¶ 34.

The United States Trustee (the "UST") opposes the Motion. ("UST Objection," ECF Doc. # 987.) The UST argues that section 503(c)(1) of the Bankruptcy Code applies to the KEIP because it is primarily retentive, and should not be approved because it does not meet the requirements of that section. The Debtors argue in their reply that section 503(c)(1) does not apply because the primary

---

[1]    In support of the Motion, the Debtors submit the Declarations of John Dempsey (the "Dempsey Declaration"), Ronald Greenspan (the "Greenspan Declaration"), and Anne Janiczek (a proposed recipient under the KEIP) (the "Janiczek Declaration"). (ECF Doc. # 812, Exs. A-C.) The Debtors also submit the Supplemental Declarations of Ronald Greenspan (the "Supplemental Greenspan Declaration"), (ECF Doc. # 1006), John Dempsey (the "Supplemental Dempsey Declaration"), and Anne Janiczek (the "Supplemental Janiczek Declaration"), and the Declaration of John E. Mack (the "Mack Declaration). (ECF Doc. # 1005.)

[2]    There are a number of conditions precedent to the vesting of the KEIP Awards. *See infra*, Section I.D. But 63% of the KEIP Awards would vest upon the occurrence of the closing of the Debtors' asset sales without the occurrence of an auction. *See* Greenspan Decl. ¶ 34.

purpose of the KEIP is incentivizing; therefore, section 503(c)(3) applies and the KEIP is permissible under the facts and circumstances of this case.[3]  (ECF Doc. # 1005.)

The question raised by the Motion is whether the KEIP is primarily incentivizing—and therefore subject to review under section 503(c)(3)—when it allows for nearly two thirds of the KEIP Awards to vest upon the closing of two section 363 asset sales that were negotiated before the commencement of these cases, and where that KEIP does not impose any additional financial metrics or hurdles in order for those KEIP Awards to vest.  For the reasons discussed below, the Court concludes that, as designed, the KEIP is primarily retentive in nature and accordingly subject to the more rigid requirements of section 503(c)(1).  While other aspects of the KEIP may be permissible, the Plan as a whole does not pass muster under section 503(c)(1).  Consequently, the Motion is **DENIED WITHOUT PREJUDICE**.  If the Debtors decide to modify the Plan, they should confer with the UST and other constituencies in an effort to avoid further objections.

## I.    BACKGROUND

The Debtors assert that their plan is designed to "incentiviz[e] the KEIP Participants to close the value-maximizing" sales of the Debtors assets.  Mot. ¶ 35.  Accordingly, a review of the events leading up to the filing of these cases, including the decision to sell substantial portions of the Debtors' businesses, and the Debtors' compensation practices before and after these cases were filed, is useful in evaluating whether the KEIP, as designed, is in fact primarily incentivizing.

### A.    Events Leading Up to the Bankruptcy Filing

The Debtors are the country's fifth largest servicer of residential mortgages, servicing over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately $374 billion as of

---

[3]    The Debtors also sought approval of a Key Employee Retention Plan ("KERP").  Initially, the UST objected to the KERP.  But after the Debtors supplied additional information to the UST about the KERP, the UST withdrew its objection.  An agreed order was then submitted and entered by the Court approving the KERP.  (ECF Doc. # 1169.)

March 2012.[4]  The Debtors and their non-debtor affiliates are also the tenth largest originator of

residential mortgage loans in the United States.  Whitlinger Decl. ¶ 10.  The collapse of the housing

market in the United States has taken a heavy toll on the Debtors' business and finances.  The Debtors

suffered net losses of $5.6 billion and $4.5 billion in the years ended December 31, 2008 and 2009,

respectively.  *Id.* ¶ 82.  In 2010, the Debtors had net income of $575.1 million.  *Id.* at ¶ 84.  But in 2011,

the Debtors had a consolidated net loss of $845.1 million.  *Id.* ¶ 86.

The Debtors are also parties to numerous lawsuits and investigations throughout the nation,

including lawsuits brought either by (i) investors in or insurers of residential mortgage-backed securities

("RMBS") created or serviced by the Debtors or their non-debtor affiliates,[5] (ii) borrowers of loans

originated or serviced by the Debtors, and (iii) federal and state law enforcement authorities or agencies.

The Debtors face the potential for enormous liability in these cases and investigations.[6]  The Debtors

have entered into several significant settlement agreements with government authorities.[7]

---

[4]      *See* Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, dated May 14, 2012, ¶¶ 6, 9 ("Whitlinger Decl.") (ECF Doc. # 6).

[5]      "[S]ince 2007, the Debtors have faced substantial and continuing increases in repurchase requests due to alleged breaches of representations and warranties or early payment defaults. From January 1, 2008 through March 31, 2012, the Debtors have repurchased mortgage loans or otherwise made payments with respect to representation and warranty claims of approximately $2.8 billion. At March 31, 2012, the Debtors' aggregate reserve in respect of representation and warranty liabilities was $810.8 million." *Id.* ¶ 100.

[6]      The Debtors have estimated that "their reasonably possible losses over time related to litigation matters and potential repurchase obligations and related claims . . . could be between $0 and $4 billion in excess of existing accruals." *Id.* ¶ 104.

[7]      On February 9, 2012, Ally Financial Inc. ("AFI"), certain of the Debtors, and the country's four largest mortgage loan servicers reached an agreement in principal with the federal government, forty-nine state attorneys general, and forty-eight state banking departments with respect to a Department of Justice/Attorneys General Investigation (the "DOJ/AG Settlement"). The DOJ/AG Settlement "generally resolves potential claims of the government parties arising out of origination and servicing activities and foreclosure matters . . . ." *Id.* ¶ 89. Also on February 9, 2012, AFI and the Debtors agreed with the Federal Reserve Board ("FRB") on a $207 million civil money penalty ("CMP") "related to the same activities that were the subject of the DOJ/AG Settlement." *Id.* ¶ 90. This penalty, however, will be reduced dollar-for-dollar in connection with the AFI and the Debtors' "satisfaction of the federal portion of the required monetary payment and the borrower relief obligations included within the DOJ/AG Settlement, as well as participation in other similar programs approved by the FRB." Nevertheless, the Debtors face possible future penalties related to the CMP if they cannot satisfy the borrower relief requirements of the DOJ/AG Settlement within two years. *Id.*

Operating losses and civil and regulatory liability have substantially curtailed the Debtors ability

to fund their operations:

> Since January 1, 2008, the Debtors have lost $12.8 billion of committed
> financing capacity and $8.8 billion of uncommitted capacity has not been
> replaced.   Moreover, because the ability to sell or obtain long-term
> financing for assets is a function of the perceived market value of those
> assets, the continuing adverse conditions in the residential mortgage loan
> market have restricted the Debtors' alternatives, including their ability to
> finance assets in the secondary markets.   Furthermore, since 2008, because
> of these adverse conditions and lenders' concerns about the Debtors'
> financial condition, most of the Debtors' debt facilities have maturities of
> no more than one year, which requires the Debtors to negotiate extensions
> on more onerous pricing terms and on a nearly continuous basis, adversely
> affecting Debtors' ability to manage their operations and financial
> condition.

*Id.* ¶ 94.

Faced with these daunting prospects described above, AFI—which also owns substantial non-

residential mortgage-related businesses—developed a strategy to file these chapter 11 cases, seek an

early sale of its significant mortgage-related businesses, and  seek to limit its own present and future

liabilities through third-party non-debtor releases.[8]  AFI's goal was obviously to separate and shed its

money-losing residential mortgage-related businesses and as much of the present and future liabilities

associated with those businesses as possible.

The Debtors announced in their first day filings that they had entered into two separate asset

purchase agreements.   One, with Nationstar Mortgage LLC ("Nationstar") as the proposed stalking

horse bidder, was for the sale of their "mortgage loan origination and servicing businesses" (the

"Platform Sale").  *Id.* ¶ 7.  The other, with AFI as the proposed stalking horse bidder, was for the sale of

Debtors' "legacy" portfolio "consisting mainly of mortgage loans and other residual financial assets"

(the "Legacy Sale" and together with the Platform Sale, the "Asset Sales").  *Id.*

---

[8]  "The purpose of these Chapter 11 cases is to facilitate an orderly sale of the Debtors' most valuable assets, settle the Debtors' claims with their parent AFI, resolve the Debtors' legacy liabilities and complete an orderly wind-down of their remaining assets." *Id.* ¶ 105.

**B.      Marketing and Sale of the Loan Servicing Platform and Legacy Loan Portfolio**

AFI and the Debtors made the decision to sell substantial portions of the Debtors' businesses before the bankruptcy filing.  The marketing process for the proposed sales was designed and implemented before the bankruptcy filing; and agreements were reached with potential purchasers before the bankruptcy filing.  No one at this stage (including the UST) has questioned the appropriateness of the business judgment to sell these two businesses early in these chapter 11 cases; no one (including the UST) has questioned the need to maintain "one of the largest servicing and origination businesses in the country as a going concern, while at the same time undertaking a sales process that could yield billions of dollars in sale proceeds for the Debtors' estates."  Suppl. Janiczek Decl ¶ 24.

The Whitlinger Declaration recounts the genesis and development of the sales process.

> By August 2011, ResCap was focused on (i) concerns regarding its liquidity and inability to satisfy its (or its subsidiaries') tangible net worth and liquidity covenants under credit facilities and agreements with Fannie Mae, Freddie Mac, and Ginnie Mae; (ii) looming expirations of credit facilities, unsecured note maturities and interest payments; (iii) the magnitude of the Debtors' potential liability for representations and warranties the Debtors made related to mortgage loans sold by them, and the significant time and defense costs in respect of litigation claims alleged with respect to such mortgage loans and sales; (iv) the continuing volatility in the interest rate markets, which affects the Debtors' ability to hedge the value of their MSRs and to comply with the financial covenants in their credit facilities and other agreements; and (v) continued uncertainty over the future of ResCap and how such uncertainty could negatively impact business performance.  During this period, ResCap continued reviewing its strategic alternatives and began to contemplate a sale of its business operations and a potential filing under Chapter 11.

Whitlinger Decl. ¶ 218.

As early as August 2011, the Debtors began contemplating a potential chapter 11 filing as one of its options.  *Id.* ¶ 219.  In October 2011, the Debtors retained Centerview Partners LLC ("Centerview") as a financial advisor, and began preparing for a potential auction of the Debtors' businesses.  Over the

next several months, Centerview evaluated strategic alternatives, conducted due diligence, including meetings with the Debtors' senior management team and personnel in servicing, origination, risk, accounting, and other functional groups.  *Id.* ¶ 220.

According to Whitlinger, "[o]n or about January 23, 2012, Centerview launched a targeted marketing process for the Debtors' assets.  On or about February 13, 2012, Centerview received three preliminary indications of interest, including one from Nationstar." *Id.* ¶ 221.  On February 17, 2012, the Debtors and their advisors determined to proceed with two of the three bidders.  *Id.*  After comparing the bids the Debtors and their professionals decided to negotiate exclusively with Nationstar.  *Id.* ¶ 222. "The Debtors and Centerview concluded that working exclusively with one bidder would increase the likelihood that the Debtors would be able to consummate a transaction in a limited amount of time due to looming maturities and debt service obligations." *Id.* ¶ 223.   Nationstar then undertook extensive due diligence over a twelve-week time period with access to over 1.2 million pages of electronic diligence materials and additional presentation materials describing the Debtors' operations and assets.  *Id.* ¶ 224.

Between March 2, 2012 and May 14, 2012, the Debtors negotiated the terms of the Nationstar Asset Purchase Agreement.  *Id.* ¶ 226.  Also, starting in February 2012, the Debtors and their advisors negotiated terms of a proposed settlement with AFI, including a sale to AFI of Debtors' legacy loan portfolio.  *Id.* ¶ 227.  The Debtors and AFI reached an agreement for AFI to serve as a stalking horse bidder for these assets for a purchase price in the range of $1.4 billion to $1.6 billion.  *Id.*  Again, all of this occurred pre-petition.

A sale of the Debtors' businesses to any third parties would necessitate separating the Debtors' operations from the operations of the Debtors' non-debtor affiliates.  Many of the affiliates share numerous corporate functions, personnel and equipment.  The Debtors were also dependent on AFI and its affiliates to allow the Debtors to originate mortgage loans in the months before the bankruptcy filing.

Therefore, the Debtors had to reorganize how they and AFI originate and sell mortgage loans.  *Id.* ¶ 225.

This no doubt required major efforts by the Debtors' employees at all levels of the organization.  The

point here is that this work was largely done *before* the Debtors commenced these cases and while the

Debtors engaged in the pre-petition marketing process.

The distinction between pre-petition and post-petition activities of key employees is important

because an employee "incentive" plan should incentivize employees for their post-petition efforts, not

compensate them for the work they did before the bankruptcy filing.

### C.    The Debtors' Pre-Petition Compensation Structure

A useful place to start in evaluating the proposed KEIP is the compensation policies and

practices it is intended to replace or supplement.  The Debtors' First Day Wages Motion (ECF Doc.

# 43) explained that the pre-petition compensation structure the Debtors sought to continue reflected the

"ordinary course of business," and included both fixed wages and variable pay.  The variable pay

components are the ones most relevant to the present Motion.  The Debtors explained:

> Variable pay is one component of total Employee compensation.
> Employees generally receive variable pay in the form of cash or AFI
> restricted stock depending upon which of the numerous variable pay plans
> (collectively, the 'Variable Pay Plans') the individual Employee
> participates.  Specifically, the Debtors have established two commission-
> based Variable Pay Plans, five production-based Variable Pay Plans and
> two discretionary Variable Pay Plans.

*Id* ¶ 16.[9]

---

[9]    The First Day Wages Motion was supported initially by the Whitlinger Declaration and then by the Declaration of George Crowley, Sr. Human Resources Director in Further Support of Debtors' Motion for a Final Order Under Bankruptcy Code Sections 105(a), 363(b), 507(a), 1107 and 1108 and bankruptcy Rule 6003 (I) Authorizing But Not Directing Debtors to (A) Pay and Honor Prepetition Wages, Compensation, Employee Expense and Employee Benefit Obligations; and (B) Maintain and Continue Employee Compensation and Benefit Programs; and (II) Directing Banks to Honor Prepetition Checks and Transfer Requests for Payment of Prepetition Employee Obligations, dated June 8, 2012 (ECF Doc. # 258).

The KEIP Motion relates only to seventeen of the top twenty employees of the Debtors.  There are two discretionary variable pay plans that are relevant to examine for these employees:[10]  AFI's Long-Term Equity Compensation Plan (the "AFI LTECIP") and, effective January 1, 2012, the ResCap Annual Incentive Plan (the "ResCap AIP").[11]

The First Day Wages Motion explains that the ResCap AIP is designed to tie a portion of an eligible Employees' [*sic*] to annual [*sic*] established by management and approved by the compensation committee."  Payments are made during the first quarter of each year "based on performance for the prior year and considered on a corporate, business unit, function and individual bases, with the earliest payments being in 2013."  *Id.*  ¶ 29.  No further explanation has been provided about the criteria used for awards of discretionary variable pay.  But the First Day Wages Motion discloses the following in a footnote:

> In connection with any sale of the Debtors' business during the Chapter 11 proceeding, Employee awards under the AFI LTECIP may vest as a result of their termination by the Debtors as a result of such sale.  As of the Petition Date, the value of all AFI LTECIP awards to Employees that would vest upon a sale, and be paid on a deferred basis, is approximately $17.6 million.

*Id.* ¶ 26 n.14.

---

[10]    Because of severe employee attrition, reducing the Debtors' workforce by almost two-thirds over four years, the Debtors developed and implemented a Business Continuity Incentive Plan ("BCIP") in early 2012.  "The BCIP provides a supplemental monetary award to the employee for their efforts in effectuating the Debtors' out-of-court restructuring efforts in 2012.  The Debtors are not seeking to assume the BCIP within these cases; rather, the KEIP and KERP replace and supersede the BCIP and provide an alternate structure through which to deliver substantially similar economic benefits to the employee. The KEIP Participants and Key Employees are substantially similar to the actual or intended participants under the BCIP."  Janiczek Decl. ¶¶ 11-12.  Therefore, the BCIP is not relevant to the analysis of the Motion.

[11]    The ResCap AIP replaced the AFI Annual Incentive Plan (the "AFI AIP").  "The ResCap AIP adopts substantially all of the terms of the AFI AIP and is consistent with the AFI AIP.   Under the AFI AIP, the Debtors reimbursed AFI though direct cash transfers for all awards paid by AFI to Employees thereunder.  The practical effect of the adoption of the ResCap AIP is for the most part administrative.  ResCap is now offering the ResCap AIP directly to Employees rather than having AFI sponsor the AFI AIP with the Debtors having the corresponding obligation to reimburse AFI for all payments made thereunder.  ResCap will be responsible for the administration of and obligations relating to the ResCap AIP."  *Id.* ¶ 28.

How many employees would share in this largess, or the basis and time periods covered by the awards, is not explained. As previously mentioned, the Debtors estimated payments under the KEIP of $4.1 million to $7 million.[12] Greenspan Decl. ¶ 34.

While the KEIP Motion only seeks approval of the KEIP, it is important to recognize that Debtors still seek approval of *both* the AFI LTECIP *and* the KEIP.[13] As a result, the following questions arise: first, what are the criteria for awards under the existing discretionary variable pay plans and how do the criteria compare to the criteria under the proposed KEIP; second, what are the total amounts that the seventeen proposed KEIP participants could receive under these two plans; and, third, how would the total compensation for the seventeen proposed KEIP participants compare to their compensation in prior years? Debtors' counsel were unable to answer these questions at the hearing on the Motion. Therefore, the Court asked Debtors to supply the Court with additional information addressing the second and third questions. The Debtors supplied the Court with a letter and a confidential spreadsheet with additional information.[14] These questions and the information provided in response to the Court's questions are discussed in Section E, *infra*, in connection with the cost of the KEIP.

### D.    The Structure of the Proposed KEIP

The Debtors argue that the purpose of the KEIP is to help "motivat[e] . . . key talent" during a sales process that has required the Debtors' employees to assume "responsibilities above their normal

---

[12]    The KERP, previously approved by the Court, permits the Debtors to make up to $10.8 million in payments to 174 non-insider key employees. Together, the KEIP and the KERP would cost approximately $17.8 million.

[13]    The approval of the First Day Wages Motion on an interim basis did *not* include approval of the discretionary variable pay. When the First Day Wages Motion came on for final approval, the Debtors agreed with the Creditors Committee to defer consideration of the discretionary variable pay. The final order that was entered specifically provides that "[t]he Debtors shall not make any payments under the AFI LTECIP and ResCap AIP without further order of this Court." (ECF Doc. # 386 ¶ 4, entered on June 15, 2012.)

[14]    The Debtor also provided the spreadsheet to counsel for the Committee and the UST. Debtors' counsel represents and the Court agrees that the information in the spreadsheet is confidential and appropriately protected under section 107(b) of the Bankruptcy Code.

duties," and subject them to "extraordinary stress, pressure, and uncertainty as to the security of their jobs." Dempsey Decl. ¶ 7. The Debtors assert that the KEIP Participants are the "primary decision-makers whose decisions affect the direction of the Debtors' businesses and are critical to achieving the objective of selling the Debtors' businesses as a going concern." Janiczek Decl. ¶ 13. The Debtors want to motivate the KEIP Participants to ensure that "the Debtors can effectively work toward their collective goal of effectuating the Asset Sales." *Id.*

According to the Debtors and their advisors, the KEIP is designed to compensate the KEIP Participants for the extra efforts that are being asked—and that are required—of them during the pendency of these cases.[15] The KEIP provides that portions of the KEIP Awards will vest upon the accomplishment of five Milestones—two Sales Milestones and three Financial and Operational Performance Milestones.

The Sales Milestones are divided between the Platform Sale (with Nationstar as the stalking horse) and the Legacy Sale (with Berkshire Hathaway as the stalking horse); the potential awards are split according to the relative sizes of the proposed sales. The Sales Milestones collectively account for 70% of each KEIP Participant's target Award, with 42% of the total KEIP Award (or 60% of the Sales Milestone) tied to the closing of the Platform Sale and 28% of the total KEIP Award (or 40% of the Sales Milestone) tied to the closing of the Legacy Sale. Dempsey Decl. ¶ 10. For the two Sales Milestones, each KEIP Participant will receive (i) 90% of their Sales Milestone award upon the closing of an Asset Sale (the "Closing"); (ii) 100% of the target award upon a Closing after an auction; and (iii) 200% of the target award upon a Closing through which the sale proceeds realized exceed the stalking

---

[15]     The Debtors top three executives—Chief Executive Officer, President and Chief Capital Markets Officer—are excluded from the KEIP. Dempsey Decl. ¶ 7.

horse bid by at least 3%.[16]  *Id.*  The auction for these two key components of the Debtors' businesses is currently scheduled for October 23, 2012.  The Debtors emphasize the amount and intensity of the additional work required by the seventeen KEIP Participants to encourage a successful auction.

Twenty-seven additional parties (other than Nationstar and Berkshire Hathaway) have signed nondisclosure agreements, and hopefully many will bid in the auction.  The evidence establishes that the Debtors' employees will indeed be required to perform additional work leading up to the auction.  Potential bidders particularly for the Platform Sale need cooperation and assistance in due diligence; in meeting and working with Fannie Mae, Freddie Mac, and Ginnie Mae, among others, to assure that the purchaser can continue servicing loans on their behalf; to develop information necessary to obtain licenses required to operate in the many jurisdictions in which the Debtors currently service loans; and generally in obtaining more information about the Debtors' businesses.

The Financial and Operational Performance Milestones for KEIP Awards provide three milestones:  The KEIP Participants will receive (i) 10% of their KEIP Award if the Debtors maintain compliance with the 20% cash flow variance covenant described in section 5.02(b) of the DIP Agreement;  (ii) 10% of their KEIP Award if the Debtors achieve a year-to-date "Top 3" Fannie Mae servicer ranking, measured as of the earlier of (a) a Closing or (b) December 31, 2012, and (iii) 10% of their KEIP Award if the Debtors achieve an "Effective" performance rating for all applicable organizational goals in the period leading up to a Closing, with such goals and performance approved and assessed by the Compensation Committee.

---

[16]     The prices negotiated pre-petition for the Platform Sale and the Legacy Sale, respectively, were $2.3 billion for the Platform Sale to Nationstar, and $1.4 billion for the Legacy Sale to AFI.  During the hearings seeking court approval of the stalking horse bidders, lively bidding encouraged by the Court ensued.  Nationstar was successful in becoming the stalking horse bidder for the Platform Sale, but at a price $125 million higher than the price it negotiated pre-petition, and with considerably lower break-up fees and expense reimbursement.  Berkshire Hathaway rather than AFI was successful in becoming the stalking horse bidder for the Legacy Sale at a price $50 million higher than the price negotiated by AFI pre-petition. If the KEIP as proposed had been approved before the stalking horse bidders were approved by the Court, the KEIP Awards would have *doubled* with no additional efforts required by the seventeen KEIP Participants.  These facts highlight the importance of selecting appropriate metrics for large KEIP Awards based on increases in asset sales prices.

To the extent the KEIP Awards are based on these Financial and Operational Performance Milestones, the issue is whether each of these hurdles is sufficiently challenging and incentivizing; if so, each milestone would be judged under section 503(c)(3). But where, as here, the Plan design provides that only 30% of the proposed awards are based on financial and operational performance metrics, the Court will not parse the Plan and consider whether these components of the Plan should be approved separate from the Plan as a whole. The burden rests on the Debtors to propose a Plan that passes muster under applicable legal principles. As explained below, the Debtors have so far failed to do so.

The avowed goal of the auction is to obtain higher sales prices than the current stalking horse bids. While metrics enabling senior executives to receive KEIP Awards if higher sales prices are obtained may be supportable", the current Plan design rewards the KEIP Participants for work that was mostly done pre-petition. Accordingly, the KEIP is not supportable based on the applicable legal principles discussed below unless combined with challenging financial metrics relating to the performance of the businesses.

### E.    The Cost of the Proposed KEIP

If the Debtors meet their stated goals, the cost of the KEIP will range from approximately $4.1 million to $7 million. Of the KEIP Participants, the 2012 annual base salaries range from $186,000 to $450,000, with an average 2012 annual base salary of $303,484;[17] the KEIP Awards range from

---

[17]    As already explained, pre-petition many of the Debtors' employees received a portion of their annual pay in the form of "variable pay awarded based on company, unit and individual performance targets established by management and approved by the compensation committee (the 'Compensation Committee') of the Debtors' board of directors (the 'Discretionary Variable Pay')". Janiczek Decl. ¶ 5. Among the KEIP Participants, Discretionary Variable Pay comprised more than 50% of their total annual compensation. *Id.*

After AFI received support under the federal government's Troubled Asset Relief Program ("TARP"), the Debtors (as subsidiaries of AFI) have been required to comply with compensation rules administered by the U.S. Treasury's special paymaster ("Special Pay Master"). These rules require that 50% of Discretionary Variable Pay be in the form of equity that must be deferred for three years, and that, of the 50% of Discretionary Variable Pay payable in cash, 50% of that amount is typically be deferred for one year. *Id.* ¶ 6. As a result of the commencement of these cases, the Debtors cannot pay any Discretionary Variable Pay to the Employees without this Court's permission; and even with this Court's permission, Discretionary Variable Pay must separately comply with TARP rules administered by the Special Pay Master. The KEIP Participants only source of assured pay is their base salaries that historically are roughly half of their annual compensation.

13

$111,000 to $495,000, with an average of $241,353; and, as a percentage of 2012 base salary, the KEIP

Awards range from 52% to 117%, with an average of 79% of base salary.[18]

The amount of the awards will be determined upon the date that each milestone is achieved and

each award vests.  Sixty percent of the KEIP Awards would be paid on the earlier of (i) a Closing and

(ii) a KEIP Participant's termination to the extent such Participant is not terminated for cause and, if

terminated for cause, to the extent such Participants Awards have vested.  Further, 40% of the vested

KEIP Awards will be deferred until the effective date of a plan of reorganization or its equivalent.

    1.  Mercer's Analysis of the KEIP

In the process of constructing the Plan, the Debtors engaged Mercer to analyze the KEIP and to

provide the Debtors with specific advice comparing it to the "market."  Dempsey Decl. ¶ 17 & Ex, 1.

Dempsey states that Mercer compared the KEIP to other plans implemented by twenty-one companies

that "filed for bankruptcy after January 1, 2009, underwent a section 363 sale of their asset base and

implemented an incentive plan which incentivized key employees based on this asset transactions."  *Id*.

¶ 19.  The primary comparison used by Mercer compares the cost of the KEIP to the expected asset sale

proceeds.  The KEIP, with a maximum cost of $7 million, would be approximately 0.18% of the

expected sale proceeds.  As a percentage of the expected sale proceeds, then, the KEIP falls well below

the 25th percentile of KEIPs to which Mercer compared the Debtors' proposed KEIP.  *See id.*

Mercer also compared the KEIP to what it considers market practices for "plan design, payout

metrics, and payout timing."  *Id.* ¶ 21.  According to Mercer, other KEIPs typically base plan payouts on

either deal completion or on sale proceeds; KEIP payouts are in a fixed pool or based on sale proceeds

---

[18]    The Debtors also seek authority to add new participants to the Plan and adjust payments to Key Employees to reflect changes in job responsibility and employment terms.  In the event the Debtors seek to add new participants, they will provide the UST and the Committee the name and title of the proposed Key Employee.  The Debtors anticipate that the addition of new participants will not cause the Plans to exceed the current estimated cost.

in approximately even amounts; and 95% of KEIPs analyzed paid awards immediately after deal

completion. The Debtors' argue that the proposed KEIP is consistent with the practices that Mercer

identified as being typical in the market.

The fundamental flaw in Mercer's analysis is the assumption that a KEIP can be approved

simply because the amount of KEIP Awards falls within a range of reasonableness based on a

percentage of asset sales proceeds. While limiting the amount of the aggregate KEIP Awards to a

percentage of sales proceeds may be a *necessary* requirement for reasonableness of the amount of the

awards, it is not a *sufficient* requirement for approval of the KEIP.[19]

2. The Cost of the KEIP in Connection with the Debtors' Other Compensation Plans

The Debtors provided a detailed analysis of the cost of the KEIP on a standalone basis, but the

cost of the KEIP needs to be considered in relation to the cost of the Debtors' compensation plans

covering the KEIP Participants. As indicated in Section D, *supra,* the Court requested more information

from the Debtors about the total potential compensation that could be received by the seventeen

proposed KEIP Participants during 2012, based on the Debtors' pre-petition compensation plans and

potential KEIP Awards if the proposed Plan is approved by the Court. Additionally the Court requested

information comparing such total potential compensation for 2012 to the amounts these individuals

received in 2010 and 2011. The Debtors supplied the information to the Court in a letter dated August

10, 2012, along with a spreadsheet showing compensation information for each of the seventeen KEIP

---

[19] Quite simply, Mercer should know better than advocating for a KEIP that pays awards based *solely* on closing asset sales. Mercer was also the benefits consultant and Dempsey was the expert witness supporting approval of a KEIP in *In re Borders Group, Inc.*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011). In *Borders*, the Court only approved the KEIP after it was twice amended, specifically adding significant financial milestones to a going concern or asset sales trigger. *Id.* at 471-72 ("Unlike the Initial KEIP and the First Revised KEIP that permitted the Executives to receive an incentive bonus that was merely predicated on exiting bankruptcy in a timely manner without regard to the financial state of the business, the KEIP approved by the Court requires the Debtors to achieve annualized cost reductions . . . ."). The approved KEIP metrics included requirements for a successful reorganization or going concern asset sale *and* financial performance metrics. *Borders* was not unique in requiring financial performance requirements before a approving a KEIP. Mercer was the compensation consultant that testified in one of the leading cases in this district setting forth the standards for approving KEIPs. *See In re Dana Corp.*, 358 B.R. 567, 579 (Bankr. S.D.N.Y. 2006).

Participants.  Explanations were also provided for each individual, including any changed corporate

positions or additional responsibilities.  As the Debtors point out, the amount of any discretionary

variable pay under the pre-petition compensation plans is entirely uncertain at this point, and in any

event it is subject further order of the Court.  Additionally, the Debtors posit that for certain individuals,

the increase in their 2012 total compensation opportunity is not based solely on the addition of the KEIP,

because such individuals' base salaries increased pre-petition due to job advancement resulting from the

Debtors' separation of operations from AFI.

The Debtors point to paragraph 10 of the Supplemental Dempsey Declaration, (ECF Doc.

# 1005), which states, "I note from my research that 28% of organizations include KEIPS in addition to

other incentive compensation," thus arguing that there is nothing wrong with KEIP Participants earning

more in 2012 than they earned in prior years.  While KEIP Awards may be incremental to all

compensation payable under existing compensation plans, analysis of the propriety of a KEIP should not

be made in the abstract.  Section 503(c)(3)—the standard that the Debtors argue should be applied in

evaluating the KEIP—requires the Court to determine whether a proposed KEIP is justified by the facts

and circumstances of the case.  11 U.S.C. § 503(c)(3).  In determining whether the Debtors have made

an appropriate exercise of their business judgment, the Court cannot rely on the statement that "28% of

organizations include KEIPs in addition to other incentive compensation," and conclude that a KEIP is

reasonable notwithstanding the possibility that KEIP Participants could wind up earning significantly

more money were the KEIP to be approved.  Suppl. Dempsey Decl. ¶ 10.  Additionally, Dempsey's

statement says nothing about the circumstances under which those 28% of incentive plans (*e.g.,* minority

of plans) were put in place.  Were the KEIPs contested in those matters?  What were the cost and

triggers for those KEIPs?

Moreover, an examination of the spreadsheet supplied by the Debtors shows that for each of the seventeen KEIP Participants, his or her total compensation projected for 2012 based solely on base salary and projected KEIP Awards would be less (in some cases substantially less) than the total compensation received by the individuals in 2010 and 2011. But if the discretionary variable pay under pre-petition plans is added to the 2012 base salary plus projected KEIP Award, the potential compensation for each of the seventeen KEIP Participants is substantially more (approximately 30% more) than the total compensation each person received in 2010 and 2011.

This is a hypothetical comparison, of course, in that discretionary variable compensation has not yet been awarded or, more importantly, approved by the Court, and the KEIP has not been approved and awards under the KEIP have not been determined. It is nevertheless a revealing analysis. Even if the Court determines that the Plan is primarily incentivizing, the Debtors must establish that the Plan was proposed as an appropriate exercise of business judgment. A KEIP cannot be analyzed separately from the existing compensation structure. The Debtors have not provided a basis for the Court to conclude that paying the KEIP Participants 30% more than they earned in each of the prior two years' operating outside of bankruptcy would be justified under the facts and circumstances of this case.

### F.  The Debtors' Arguments in Support of the KEIP

The Debtors principle argument in support of the KEIP is that in light of the "monumental task" the Debtors face to complete the Asset Sales, it is sufficiently incentivizing to link the vesting of the KEIP Awards to the Closing of the Asset Sales. It is undoubtedly true that the Asset Sales—anticipated to bring nearly $4 billion into the Debtors' estates—constitute the central element of AFI's and the Debtors' objectives in these bankruptcy cases. Successful sales require the Debtors, through the efforts of their senior executives (who are the KEIP Participants), to "deliver a stand-alone operation" to the

purchasers of the Debtors' assets.  Suppl. Janiczek Decl. ¶ 25.[20]  In addition to running their business,

the KEIP Participants must:

> [E]ngage in daily diligence and marketing meetings with both the existing
> stalking horse bidders as well as third parties who are being solicited by or
> who have reached out to the Debtors' investment bankers to participate in
> a sale process.  In addition, in order to deliver a stand-alone operation, the
> employees must ensure the complete segregation of the Debtors'
> operations and eliminate any lingering interdependent aspects of the
> Debtors' operations with those of AFI.

Suppl. Janiczek Decl. ¶ 25.

According to the Debtors, each of these responsibilities requires a significant amount of time and

effort from the KEIP Participants.  They must also address a myriad of significant regulatory issues, *see*

*id.* ¶ 26; and they have increased day-to-day responsibilities meeting the "information and operational

demands associated with the simultaneous sale and bankruptcy processes." *Id.* ¶ 29.  The Debtors

submitted evidence of how the KEIP Participants' responsibilities and demands have increased as a

result of the proposed Asset Sales.[21]  While it is no doubt true that the requirements of these chapter 11

cases and the proposed asset sales have altered or increased the work required of insiders, such would

also be true in virtually all chapter 11 cases; section 503(c) requires more than increased responsibilities

to justify increased pay for insiders.

---

[20]     The Debtors argue that the value of the assets that are being sold through the Asset Sales is derived in large part
from the infrastructure that is already in place, which includes the Employees.  *See* June 18, 2012 Hr'g Tr. at 145:17-19,
241:18-242:6, ECF Doc. # 472.  In essence, bidders "are bidding on . . . a turnkey operation," and the assets are being sold
"lock, stock and barrel and [along with] all of [the Debtors'] employees." *Id.* at 145:17-19.  Berkshire Hathaway, one of the
bidders for the loan servicing platform and the successful bidder in obtaining stalking horse status for the legacy loan
portfolio, stated its intention, if it acquires the Debtors' businesses, to "keep the existing business as similar as possible to
what it is right now, and that would be the same people [and] the same procedures . . . ." *Id.* at 241:25-242:2.  Perhaps the
strongest incentive for Debtors' employees in assist in the sales process is the prospect for continued employment by the
purchasers of Debtors' assets.

[21]     Underlying these facts, however, is the Debtors' acknowledgment of the apparently significant retentive purpose of
the Plan.  The Debtors argue that if the KEIP Participants were to depart, "it would be [a] more costly and an inefficient use
of the estate's assets to recruit and train replacements due to the legacy knowledge that these employees possess." *Id.* ¶ 34.

### G.  The UST Objection

The UST argues in the Objection that the KEIP is in fact primarily retentive and, accordingly,

that section 503(c)(1) of the Bankruptcy Code—rather than the more permissive section 503(c)(3)—

should guide the Court's analysis.  Even assuming that the KEIP is primarily incentivizing, the UST

urges that the Debtors have failed to show that (i) a reasonable relationship exists between the proposal

and the results to be obtained, (ii) the cost and scope of the plan is reasonable, (iii) the plan is consistent

with industry standards, and (iv) the Debtors conducted reasonable due diligence in establishing the

KEIP.  UST Obj. at 3.

The UST also argues that the KEIP does not meet the requirements set forth in *In re Dana Corp.*,

351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) (Lifland, J.) ("*Dana I*") and *In re Dana Corp.*, 358 B.R. 567,

576-77 (Bankr. S.D.N.Y. 2006) (Lifland, J.) ("*Dana II*").  The UST argues that the KEIP is not

primarily incentivizing because the main target for the awards is the closing of the sale transactions that

"have already been negotiated."  UST Obj. at 13.  Because 63% of the KEIP Awards may vest upon the

closing of a transaction that has already been negotiated, the UST argues that there is no nexus between

the plan proposed and the results contemplated.[22]  Additionally, assuming that the KEIP is primarily

---

[22]        The UST also argues that the KEIP is essentially filling in for Discretionary Variable Pay that the KEIP Participants
are no longer receiving: "one of the purposes of the KEIP is to replace potentially lost discretionary income so that the
insiders do not seek higher paying jobs elsewhere." *Id.* at 14.  There is nothing inherently wrong with a KEIP that has the
effect of permitting insiders to maintain their pre-petition income; a properly constructed incentive plan may also enable
Debtors to retain key senior executives who may otherwise leave.  Approximately 50% of the KEIP Participants' pre-petition
income was derived from discretionary variable pay; the loss of that much income may drive good people out the door.
Section 503(c) does not compel such a result.  The Court is concerned, however, that the combination of the KEIP *and*
discretionary variable pay under the Debtors' pre-petition compensation plan may result in KEIP Participants receiving more
in total compensation post-petition than they received before bankruptcy.  The KEIP Participants are employed by the
company they were responsible for managing en route to a bankruptcy that primarily results from potential liabilities to
government agencies, RMBS investors, monoline insurers, mortgage borrowers and others; such liabilities were not the
inevitable result of the burst of the housing bubble, although that may have contributed to it.  During the last four years, the
Debtors shed almost two-thirds of their workforce, *see* Janiczek Decl. ¶ 11, hardly a reason for paying bonuses to senior
executives.  To the extent the Debtors' value is increased through the current efforts of senior executives, all creditors will
benefit.  Designing appropriate incentives and rewards that maximize value is an appropriate exercise of business judgment.
However, any proposal that rewards insiders must be carefully scrutinized.

incentivizing, the UST argues that the Debtors have failed to show that the KEIP is a sound exercise of the Debtors' business judgment.

## II.    DISCUSSION

The ability of a debtor to implement a key employee incentive plan is governed by section 503(c) of the Bankruptcy Code.  First, if a debtor proposes to (i) make a transfer or incur an obligation; (ii) to or for the benefit of an insider of a debtor; (iii) for the purpose of retaining that insider, it must meet the strict requirements of section 503(c)(1).  To avoid the strict requirements of section 503(c)(1), a debtor must show that the proposed transfers are not to insiders of a debtor or, if the recipients of the proposed transfers are insiders, that the transfers are not being made for the purpose of retaining those insiders.  If the Court determines that an employee is an insider and that the program proposed is primarily retentive, then a plan must meet the requirements of section 503(c)(1).  *See generally In re Velo Holdings Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012); *In re Borders Grp. Inc.*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011).

Congress enacted section 503(c) as part of the 2005 BAPCPA amendments to the Bankruptcy Code to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process," *In re Global Home Prods., LLC,* 369 B.R. 778, 784 (Bankr. D. Del. 2007) (internal quotation marks omitted); *accord In re Hawker Beechcraft, Inc.*, __ B.R. __, No. 12-11873 (SMB), 2012 WL 3637251, at *4 (Bankr. S.D.N.Y. Aug. 24, 2012); *Velo Holdings,* 472 B.R. at 209, and to "limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." 4 COLLIER ON BANKRUPTCY ¶ 503.17, at 503–105 (Alan N. Resnick & Henry J. Sommer, eds., 16th rev. ed. 2012).

To satisfy section 503(c)(1), a debtor must show:

> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
> (B) the services provided by the person are essential to the survival of the business; and
> (C) either—
>> (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>> (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred . . . .

11 U.S.C. § 503(c)(1). Here, the Debtors acknowledge that the KEIP Participants are all insiders of the Debtors. In order to show that the more permissive section 503(c)(3) applies, the Debtors must establish by a preponderance of the evidence that the KEIP is primarily incentivizing and not primarily retentive. If the Debtors fail to meet their burden of proof, the KEIP cannot be approved.[23] *Hawker Beechcraft*, 2012 WL 3637251, at *4 ("The proponent of the KEIP bears the burden of proving that the plan is not retention plan governed by § 503(c)(1).").

The Debtors must show that the KEIP is a "pay for value" plan that offers incentives based on performance rather than a "pay to stay" plan. *Global Home Prods*, 369 B.R. at 783. A "pay for value" plan must be *primarily* incentivizing. *In re Nellson Nutraceuticals*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) ("Any payment to an employee, including regular wages, has at least a partial purpose of retaining the employee. Therefore, if the Court did not apply a materiality standard, all payments to insiders would be subject to 503(c)(1), which would be an absurd result. At the same time, applying a 'sole

---

[23] The Debtors have made no effort to show that the KEIP complies with section 503(c)(1).

purpose' standard goes too far.  Thus, the Court reads section 503(c)(1) to mean 'a transfer to . . . an insider of the debtor for the [*primary*] purpose of inducing such person to remain with the debtor's business.'") (citation omitted; emphasis in original).  A debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism; the circumstances under which the proposal is made and the structure of the compensation package control.  *Velo Holdings*, 472 B.R. at 209-10 ("Attempts to characterize what are essentially prohibited retention programs as incentive programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1).  Although a purported KEIP may contain some retentive effect, that does not mean that the plan, overall, is retentive rather than incentivizing in nature.") (internal quotation marks and citations omitted); *see also Hawker Beechcraft*, 2012 WL 3637251, at *4 ("The concern in the type of motion presented . . . is that the debtor has dressed up a KERP to look like a KEIP in the hope that it will pass muster under the less demanding 'facts and circumstances' standard in . . . § 503(c)(3)."); *Dana I*, 351 B.R. at 102 n.3 ("If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").

When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1).  *See, e.g. In re Mesa Air Grp.*, No. 10-10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving incentive plan that tied payments to performance goals like maintenance of flight schedules, efficient return of aircraft, securing aircraft equipment at reduced rates, and negotiating reduced rates for aircraft no longer in service).

In *Dana I*, the debtors proposed a plan that provided for payment of awards upon "the effective date of a plan of reorganization" if the executive were still employed by the debtor, and for payment of additional awards based on the enterprise value of the debtors six months after the effective date of a plan. 351 B.R. at 99. The court in *Dana I* rejected the plan because it included "an amount payable to the [plan recipients] upon the [d]ebtors' emergence from chapter 11, regardless of the outcome of these cases. Without tying this portion of the bonus to anything other than staying with the company until the [effective date of a plan]," the court refused to find that the plan was primarily incentivizing. *Id.* at 102. Here, the KEIP proposed by the Debtors suffers the same problem that led to the rejection of the plan in *Dana I*: in this case 63% of the KEIP Awards are linked solely to the Closing of the Asset Sales. Without more, this is insufficient to render the KEIP primarily incentivizing.

The Debtors insist that the magnitude of the tasks ahead render the Closing of the Asset Sales an appropriate goal for a KEIP. The Debtors argue that they are "working to effectuate something that has never been accomplished before in a bankruptcy proceeding within the financial services industry," as most similar cases have resulted in liquidations rather than reorganizations or going concern sales. Suppl. Janiczek Decl. ¶ 24. The Debtors also argue that providing that the KEIP Awards vest upon the Closings is sufficiently incentivizing due to the uncertainty whether the Debtors' businesses will be able to survive long enough to allow the Closings to occur. The lively bidding during the Court hearings seeking approval of the stalking horse bidders (with a $125 million price increase by Nationstar for the loan servicing platform (after it had already done twelve weeks of due diligence) and a $50 million price increase by Berkshire Hathaway for the legacy loan portfolio, raises substantial doubts whether the Closing of the Asset Sales is a target that is sufficiently aspirational such that the KEIP is in fact primarily incentivizing. Yes, the KEIP Participants may well have increased responsibilities to make the

auction a success, but the KEIP Awards are not primarily measured by those efforts or the auction results.

Ultimately, the Debtors have failed to carry their burden to show that vesting 63% of the KEIP Awards based solely upon the Closings is not primarily retentive in nature. The evidence Debtors have submitted supporting their assertion that the KEIP is primarily incentivizing is generally conclusory. *See, e.g.* Greenspan Decl ¶ 44 ("[T]he Sale Metric motivates the KEIP Participants to . . . complete a sale of their businesses . . . .").[24] Under the Plan as proposed, the only thing that KEIP Participants have to do for their Awards to vest is remain with the Debtors' businesses until the Closing of two Asset Sales that were substantially negotiated pre-petition. Under the facts and circumstances of this case, the Court concludes absent requiring additional challenging performance metrics, the largest component of the KEIP is primarily retentive.[25] Other cases in this district make clear that triggering bonus awards solely on the basis of a sale transaction, confirming a reorganization plan or exiting bankruptcy are not sufficient to shift consideration of a plan providing for payments to insiders from section 503(c)(1) to section 503(c)(3). *Hawker Beechcraft*, 2012 WL 36372151, at *5 ("In essence, the KEIP pays a bonus

---

[24]    The evidence supporting whether the KEIP is retentive or incentivizing is conflicting: while the Debtors insist that the KEIP is primarily incentivizing and that any retentive effect is merely incidental, the Debtors continually emphasize how difficult it would be to replace any of the KEIP Participants if they were to leave:

> The KEIP Participants are critical to the Sale Process and the success of the Debtors' businesses after a Closing as a result of their relationships with governmental regulators and familiarity with the relevant regulatory schemes. Should any member of this team choose to leave, it would be extremely difficult, if not impossible, to replace him/her during the bankruptcy cases, leaving significant functional leadership and talent gaps.

Greenspan Decl. ¶ 45. *See also, e.g.* Suppl. Janiczek Decl. ¶ 34 ("Were [the KEIP Participants] to depart, it would be more costly and an inefficient use of the estate's assets to recruit and train replacements due to the legacy knowledge that these employees possess.").

[25]    The Debtors rely on statements by the court approving a KEIP in *In re Diamond Glass, Inc.*, No. 08-10601 (CSS) (May 8, 2008). The court stated that a proposed KEIP was not primarily retentive "even if the only thing management has to do . . . is hold [the] company together for the stalking horse bidder to close." May 8, 2008 Hr'g Tr. at 89:6-8, ECF Doc. # 255. The court further stated that "stalking horse bidders walk away. There are material adverse changes that occur." *Id.* at 89:15-16. While bad things may happen that keep sales from closing, I respectfully disagree with the *Diamond Glass* court that the risks surrounding the closing of asset sales are enough to render a KEIP primarily incentivizing where the awards vest upon the closing of a pre-negotiated asset sale without imposing additional financial or operational milestones.

for consummating a plan that is likely to occur, and closely resembles the KERP rejected in *Dana I*.");
*Velo Holdings*, 472 B.R. 472 B.R. at 205-06 (approving KEIP measured by section 363 sales proceeds
*and* financial hurdles);[26] *Borders Grp.*, 453 B.R. 465-66 (approving KEIP that required successful
reorganization or going concern sale *and* meeting substantial cost reduction targets); *Dana II*, 358 B.R.
at 583 (after rejecting original plan in *Dana I*, approving plan that required achieving difficult financial
target that was not a "lay up").

The KEIP proposed by the Debtors here bears a striking similarity to the plan proposed and
rejected in *Dana I*, when the vesting of an award only required the eligible recipients to remain with the
debtors' business until the effective date of a plan of reorganization.  Such an award cannot be fairly
characterized as primarily incentivizing.

It may be the case that the KEIP Participants must do a significant amount of work simply to
move the Debtors toward closing of the Asset Sales, even without a successful auction resulting in an
increase in the sales prices.  But this KEIP appears to attempt an end-run around section 503(c)(1) of the
Bankruptcy Code.  To avoid the stringent requirements of section 503(c)(1), the Debtors must more
closely link vesting of the KEIP Awards to metrics that are directly tied to challenging financial and
operational goals for the businesses, tailored to the facts and circumstances of the case.[27]

---

[26]    While the financial hurdles in *Velo Holdings* only required debtors to meet performance requirements in the DIP
budget, such performance was a stretch because one of the debtors' main contract counterparties—their credit card processor
that was responsible for processing transactions that yielded 55% of debtors' total revenue—claimed that the contract had
terminated pre-petition; and the debtors were unable to find a substitute processor.  *In re Velo Holdings Inc.*, 2012 WL
2913779, at *3 (Bankr. S.D.N.Y. July 18, 2012).  Termination of the processing agreement threatened the debtors' ability to
reorganize.  *Id.* at *13 ("Accordingly, termination would significantly impede the Debtors' ability to restructure, if not
eliminate the possibility of a successful restructuring entirely, and impair creditor recoveries.").  Ultimately, the debtors
prevailed in obtaining a permanent injunction and declaratory judgment that the contract remained in force and could not be
terminated.  *Id.* at *17.

[27]    Linking KEIP awards to increases in the auction sale prices of Debtors' assets, and to overall creditor recoveries
may also provide permissible metrics for an incentivizing KEIP.  "While an expeditious emergence from bankruptcy via a
confirmed reorganization plan is the ultimate objective of most chapter 11 debtors, a sale of a debtor's business as a going
concern under section 363 also achieves the chapter 11 goal of preserving businesses and maximizing recoveries for
creditors."  *Velo Holdings*, 472 B.R. at 206, 211 (approving KEIP targets based on net sales proceeds from section 363 sales
combined with financial and operational targets).

### III.    CONCLUSION

For the aforementioned reasons, the KEIP proposed by the Debtors is primarily retentive in

nature and therefore subject to review under Bankruptcy Code section 503(c)(1).  Because the KEIP, as

proposed, cannot be approved under section 503(c)(1), the Motion to approve the KEIP is **DENIED**

**WITHOUT PREJUDICE**.

**IT IS SO ORDERED**

Dated:    August 28, 2012
          New York, New York

_____*Martin Glenn*_____
            MARTIN GLENN
      United States Bankruptcy Judge