# Exhibit 1

## Kevin Matthews Prepetition Counter Complaint

## filed in

## *O'Sullivan v. Matthews*, Balt. City. Cir. Ct., Md., Case No. 24-O-12000286

## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | |
|---|---|
| **LAURA H.G. O'SULLIVAN,** *et al.* | |
| Plaintiffs | Case No. **24O12000286** |
| **v.** | |
| **KEVIN J. MATTHEWS** | |
| Defendant | |

**KEVIN J. MATTHEWS**

Counter Plaintiff

**v.**

**GMAC MORTGAGE LLC**
SERVE ON:
CSC-Lawyers Incorporating Service
     Company, Resident Agent
7 St. Paul Street, Suite 1660
Baltimore, MD 21202

And

**CARRIE WARD**
4520 East West Highway, Suite 200
Bethesda, MD 20814

And

**JEFFREY STEPHAN**
42 Lenape Drive
Sellersville, PA 18960-1568

Counter Defendants

## COUNTER COMPLAINT

&

## JURY DEMAND

1

## I.    **Introduction**

1.    The claims outlined herein exemplify the abusive fast-track foreclosure and abusive debt collection practices that have rocked our headlines and economy for the past year and half by certain so-called professionals who have thumbed their nose to the rule of law and in which the Plaintiff, Kevin Matthews ("Matthews" or "Plaintiff") has and continues to suffer damages and losses.  Further, Counter Defendants GMAC Mortgage LLC ("GMAC"), Carrie Ward ("Ward"), and Jeffery Stephan ("Stephan")(collectively "Counter Defendants") have levied similar unfair, deceptive, and knowingly bogus or fraudulent practices against hundreds of other similar Maryland homeowners for the sake of expediency and profit by disregarding and ignoring the rule of law.   Matthews and every other Maryland homeowner relied upon the representations of GMAC, Ward, and Stephan to be truthful and honest because that is what a reasonable person expects of witnesses and parties in our courts.

2.    After returning from military service in Iraq in 2006 with a medical discharge from the Maryland Army National Guard, Matthews had a number of service-related health problems including post-traumatic stress and a herniated disk.   While serving in our armed forces Matthews was recognized with the Army commendation for his meritorious service and mission miles.

3. Upon his return from Iraq, Matthews used his GI benefits and qualified for a VA mortgage in which he purchased his home and property on February 14, 2008 which is subject to this action.

4. Sometime about December 2008 Matthews was injured in a car accident which exasperated certain injuries he had sustained in Iraq and he had a significant reduction of income as a result. He later exhausted his savings keeping his mortgage current and then fell into default when those savings were used up.

5. However, acting as a responsible homeowner, Matthews anticipated his default before it occurred and attempted to seek appropriate loss mitigation options while he was even in the hospital recovering from his accident. In taking this action he relied upon the terms of his VA loan that GMAC would work with him. GMAC, however, omitted offering Matthews the meaningful loss mitigation alternatives he was entitled to receive pursuant to his VA loan. GMAC also ignored requests made on his behalf by his housing counselor. Matthews also sought and has improved his earning capacity through increased job skills by obtaining a Bachelor of Science degree in biology from Coppin State University.

6. In its debt collection efforts against Matthews, GMAC, Ward, and Stephan worked together to collect upon his mortgage, by filing a bogus foreclosure action and improperly acquiring the jurisdiction of this Court with those bogus documents (i) before GMAC had properly considered Matthews for

3

all the applicable loss mitigation programs available him and (ii) before it had the right to do so under Maryland law since had not complied with the mandatory requirements established by the Maryland General Assembly before the commencement of the foreclosure action.

7. To add insult to injury, the true owner of the mortgage loan, GMAC, neglected to honor protections afforded to Mr. Matthews by the Veterans Administration HAMP program to which Mr. Matthews relied, and proceeded instead to an illegal foreclosure action. It also subsequently evicted Matthews without the legal right to do so while Matthews was away on a school research and training trip without even advising his counsel of record who by then had properly and timely objected to the illegal foreclosure sale. When Matthews returned to his home after the bogus foreclosure action was dismissed, Matthews found that his house was damaged by GMAC's failure to properly winterize it.

8. While fighting to undue the original foreclosure sale (which had occurred without the right to do so), GMAC's illegal robo-signing practices, including those knowingly carried out by Stephan and Ward against Matthews, became nationally known. After first attempting to defend these practices, GMAC later received leave to dismiss its bogus foreclosure action before this Court could rule upon their bogus practices.

9. Now, Mr. Matthews stands before the Court with a host of losses and damages as a result of the actions of the Counter Defendants and their

4

authorized agents and affiliates.  Not only has he lost and regained his legal rights to his property, but he has also lost his belongings in the eviction, he incurred legal expenses to defend the illegal debt collection action, had to pay for temporary rental housing, and has suffered physical property damage to his home by the improper seizure and weatherization of his home at the time of the illegal eviction.  Alongside these financial injuries, his health and emotional well-being has been further damaged due to the stress of the illegal foreclosure action against him.

## II. THE PARTIES

10. Counter Plaintiff Kevin Matthews is a resident of Baltimore City Maryland whose address is 3216 East Northern Parkway, Baltimore, Maryland 21214 ("Matthews Property").

11. Counter Defendant GMAC Mortgage, LLC ("GMAC") engages in originating and servicing residential mortgages and is a wholly-owned subsidiary and the mortgage arm of Ally. GMAC is a Delaware corporation with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034. GMAC transacts business in Maryland during all operative periods of this action.  GMAC is also a Maryland licensed mortgage lender/servicer (Lic. Number 15813).  GMAC is also the employer of Defendant Jeffrey Stephan who is a resident of the Commonwealth of Pennsylvania.  At all times described herein Stephan acted with direct and apparent authority of GMAC. GMAC is further liable for the acts of its authorized employee.

5

12. Counter Defendant Carrie Ward (Ward) was a member of the law firm
Bierman, Geesing, Ward & Wood LLC (hereinafter "the Firm") located at 4250
East West Highway, Suite 200, Bethesda, MD  20814 during the operative
period of this action. Defendant Carrie Ward was an authorized Substitute
Trustee acting on of GMAC Mortgage, LLC and improperly instituted
foreclosure proceedings against Mr. Matthews on April 2, 2010 by the filing an
Order to Docket in the Circuit Court of Maryland for Baltimore City with legally
deficient and improper papers. GMAC is presumed to have knowledge of all
of its substitute trustees'/attorneys' actions taken on its behalf in the state
foreclosure proceeding against Mr. Matthews even if GMAC never reviewed
what its substitute trustees did on its behalf. *Putnam v. Day*, 89 U.S. 60, 22
L. Ed. 764 (1874); *Salisbury Beauty Sch. v. State Bd. of Cosmetologists*, 268
Md. 32, 300 A.2d 367 (1973); *Bob Holding Corp. v. Normal Realty Corp.*, 223
Md. 260, 266, 164 A.2d 457, 460 (Md. 1960).

13. Not named as a party to this action, the USAA Federal Savings Bank (USAA
Bank) is an affiliated lender of the United State Automobile Association, a
Fortune 500 financial services company offering banking, investing, and
insurance to people and families that serve, or served, in the United States
Military. USAA Bank is located 9800 Fredericksburg Road in San Antonio,
Texas 78288.

14. Not named as a party to this action, Ally Financial Inc. ("Ally") is a registered
bank holding company business affiliate of GMAC and is a leading, multi-

6

national financial services firm with a corporate center in New York. Ally has approximately $179 billion of assets and operations in approximately 25 countries. Ally engages in the business of servicing residential mortgage loans through GMAC.

## JURISDICTION & VENUE

15. This Court has jurisdiction asserted herein for the following reasons:

   a. The Maryland Rules expressly provide that a party in a civil action in this Court may bring a Counter Complaint (Rule 2-331);

   b. The Maryland Rules expressly provide that a Counter Plaintiff may add additional parties as Counter Defendants if they are not already parties to the action (Rule 2-331(c));

   c. The Maryland Rules specifically state that "Title 2 [of the Maryland Rules] applies to civil matters in the circuit courts" (Rule 1-101(b));

   d. The Maryland Court of Appeals has expressly held that a party is permitted to file a counter complaint in a foreclosure action such as this action (see *Fairfax Sav., F.S.B. v. Kris Jen Ltd. Partnership*, 338 Md. 1, 21 (1995));

   e. This Court has jurisdiction asserted because Defendants transact business and perform work and services in Maryland and each has availed themselves to the jurisdiction of this Court through their appointed agents, the Plaintiffs and the firm of Shapiro & Burson LLP, in this Court.

7

      f.   Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§ 3-401-3-415.

16. Venue is appropriate in this Court because the Counter Defendants conduct business within the Baltimore City, Maryland, have an interest in real property in Baltimore City, Maryland, and because the conduct complained of occurred in Baltimore City, Maryland.

## FACTS

### A.   The Foreclosure Crisis

17. Over the last four years, Maryland and, indeed, the United States have been in a foreclosure crisis.  Recent news reports have established that one in ten American homes is at risk of foreclosure.

18. The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

19. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

20. The foreclosure crisis is far from over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith for another five years or more.

21. Since the commencement of the crisis, revelations of bogus, false, and deceptive "robo signing" have come to light involving national lenders and

8

mortgage servicers.   In Maryland the illegal "robo-signing" issue has even come to the forefront because attorneys and substitute trustees, including those acting on behalf of GMAC, have admitted that they filed bogus documents in hundreds of foreclosure cases filed in state courts.

## B.  Maryland's Response to the Foreclosure Crisis

22. In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway.  The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

> Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

> Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

> Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a

9

community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12

(November 29, 2007) *available at*

http://www.gov.state.md.us/documents/HomePreservationReport.pdf

(footnotes omitted).

23. To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court. *See Id.* at 40-43.

24. In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate processes. These bills were passed with nearly complete bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an

"assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

***Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2)***, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

***Senate Bill 217/House Bill 360*** define "mortgage fraud" as any action by a person made with the intent to defraud that involves:
• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;
• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;
• conspiring to violate either of the preceding provisions; or
• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.
Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008

Legislative    Session,    F16-18    (April    11,    2008)    *available    at*

http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

25. The Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure. Writing for the Committee the Honorable Alan M. Wilner explained:

> The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.

> In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.

> Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

26. In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the…servicing…of any mortgage loan, including, but not limited to…(3) The duty when servicing mortgage loans to: (a)

12

Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible."   Md. Code Regs. 09.03.06.20.   As a Maryland licensed mortgage servicer and lender GMAC has contractually agreed to this duty and as discussed below has utterly failed in fulfilling its responsibilities.

**C. Scrutiny of GMAC's, Ward's, and Stephan's Foreclosure Practices**

27. In depositions given under oath on December 10, 2009 and June 7, 2010, Stephan testified that he signed affidavits were prepared by attorneys, that he was given anywhere from 5,000 to 10,000 of these documents to sign each month, that he did not read much of the information on the documents before signing them, and that he did not have any personal knowledge of many of the facts attested to in the affidavits. Stephan Dep. 7:9-20, 10:1-13:4, Dec. 10, 2009; Stephan Dep. 29:11-30:17, 38:7-40:21, 43:12-45:21, 46:9-48:17, 54:12-25, 57:20-63:23, June 7, 2010.

28. On April 13, 2011, in response to revelations of irregular, improper, and bogus foreclosure and servicing practices of GMAC, the Board of Governors of the Federal Reserve System ("Board of Governors"), the Federal Deposit Insurance Corporation ("FDIC"), GMAC, and Alley entered into a Consent

13

Order concerning GMAC's loss mitigation and foreclosure servicing practices

(hereinafter "Consent Order"). The Consent Order came about as a result of

a horizontal review of various major residential mortgage servicers conducted

by the Board of Governors, the Office of the Comptroller of the Currency, and

the Office of Thrift Supervision, examiners from the Federal Reserve Bank of

Chicago and the FDIC.

29. The Consent Order recognized the following improper practices, relevant to

the facts alleged herein, allegedly performed by GMAC when:

    a. It "[f]iled or caused to be filed in state courts…numerous affidavits
executed by employees of [GMAC] or employees of third-party
providers making various assertions, such as the ownership of the
mortgage note and mortgage, the amount of principal and interest
due, and the fees and expenses chargeable to the borrower, in
which the affiant represented that the assertions in the affidavit
were made based on personal knowledge or based on a review by
the affiant of the relevant books and records, when, in many cases,
they were not based on such knowledge or review;"

    b. It ["f]iled or caused to be filed in courts in various states…or in the
local land record offices, numerous affidavits and other mortgage-
related documents that were not properly notarized, including those
not signed or affirmed in the presence of a notary;"

    c. It "[l]itigated foreclosure…proceedings…without always confirming
that documentation of ownership was in order at the appropriate
time, including confirming that the promissory note and mortgage
document were properly endorsed or assigned and, if necessary, in
the possession of the appropriate party;"

    d. It "[f]ailed to respond in a sufficient and timely manner to the
increased level of foreclosures by increasing financial, staffing, and
managerial resources to ensure that the [GMAC] adequately
handled the foreclosure process;"

    e. It "[f]ailed to respond in a sufficient and timely manner to the
increased level of Loss Mitigation Activities to ensure timely,

effective and efficient communication with borrowers with respect to Loss Mitigation Activities and foreclosure activities;" and

f.  It "[f]ailed to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to the Servicing Portfolio."

Consent Order at Pages 3-4.

30. GMAC and Ally did not admit to any facts in the Consent Order but did agree that the practices described in the preceding paragraph were "unsafe and unsound banking practices." *Id.* at Page 4.

31. In a judicial statement by its authorized counsel to Superior Court of New Jersey Chancery Division, GMAC represented *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Doc. No. F-059553-10 (Sept. 2, 2011), GMAC stated as follows:

GMAC entered into a "mortgage and Purchasing Agreement with USAA…[which] provides that [GMAC] 'shall Service all Mortgage Loans in accordance with the Servicing Agreements, the Mortgage Loan Requirements, the Service Level Objectives as set forth in Section 12.3, and the terms and conditions of the this Agreement.' 'Service' or to engage in 'Servicing' is defined in the Agreement and specifically encompasses 'foreclosure services.' …Moreover, [GMAC] would like to make it clear that if a default occurs pursuant to Mortgage Purchasing and Servicing Agreement between [GMAC] and USAA…that any foreclosure action would be institute with USAA…as the named party, not [GMAC]."

32. In the Fall of 2010 Ward and her firm became subject to numerous foreclosure investigations after an investigative story appeared in the Baltimore Sun about her and her firm's robo-signing practices. The Maryland

Secretary of State began investigating the improper certification and attestation of documents Ward's firm and as result of that investigation, the Secretary of State decommissioned no less than four notaries employed by Ward and her firm.

33. Subsequent to public discovery of Ward's and her firm's signature practices, and the initiation of State agency investigations, the Ward and her partners asserted to numerous state courts, including this Court, that they have changed their procedures to comply with Maryland law and court rules. Ward also filed multiple, "so-called" corrective affidavits in the state courts where they admitted that the purported signatures on the original testimony used to improperly acquire the jurisdiction of the state courts, were not actually her signatures.

34. Ward's irregular signature and affidavit practices were also rebuked by the courts. For example, the Honorable Diane O. Leasure found Ward's practices to be improper for a Maryland foreclosure case. Specifically, Judge Leasure found and ruled, in a final order, that it was improper of Ward to initiate a Maryland foreclosure action based upon an affidavit or declaration (i.e. testimony) which lists each of the attorneys/substitute trustees at Ward's firm as the affiant but contains only a single indecipherable signature. *See Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

35. Upon information and belief, on or about March 9, 2012, GMAC and Ally

16

entered into a final settlement agreement related to the Multistate/ Federal

Settlement Of Foreclosure Misconduct Claims with a coalition of state

attorneys general ("National Mortgage Settlement").

36. The National Mortgage Settlement

"follow[ed] ten months of intensive negotiations between the five banks and a coalition of state attorneys general and federal agencies, including the Departments of Justice, Treasury, and Housing and Urban Development. The investigation began in October 2010 following revelations of widespread use of "robo-signed" affidavits in foreclosure proceedings across the country. State attorneys general formed a working group to investigate the problem and to confront the banks about the allegations. The major mortgage servicing banks soon acknowledged that individuals had been signing thousands of foreclosure affidavits without reviewing the validity or accuracy of the sworn statements. Several national banks then agreed to stop their foreclosure filings and sales until corrective action could be taken.

While the robo-signing issue received the most attention, other servicer-related problems were identified, including deceptive practices in the offering of loan modifications (for example, telling consumers that a loan modification was imminent while simultaneously foreclosing). The performance failures resulted in more than just poor customer service. Unnecessary foreclosures occurred due to failure to process homeowners' requests for modified payment plans. And where foreclosures should have been concluded, shoddy documentation led to protracted delays. This misconduct threatened the integrity of the legal system and had a negative impact on communities and the overall housing market."

Executive Summary of the National Mortgage Settlement at Page 1 (http://www.atg.wa.gov/uploadedFiles/Home/About_the_Office/Cases/Nationa l_Mortgage_Settlement/National_Settlement_Executive_Summary.pdf)

## D.  Background Leading to Mr. Matthews' Foreclosure Crisis

37. Plaintiff Kevin Jerron Matthews enlisted in the U.S. Air Force on July 31,

1998 after graduating Baltimore Polytechnic Institute.    After multiple

deployments, Mr. Matthews was discharged in 2001 due to a family hardship.

38. In 2002, Mr. Matthews enlisted in the Maryland Army National Guard as a

reserve, stationed out of Towson, Maryland.

39. In May 2005, Mr. Matthews was selected to be deployed to Iraq with the 243rd
Engineering Company. Mr. Matthews was officially deployed in August 2005
Kuwait and Iraq where his duties involved transportation missions.

40. Mr. Matthews returned home from Iraq in 2006 when his tour was completed.
At the time when he returned, Mr. Matthews began to experience adverse
effects from his deployment. Specifically, Mr. Matthews suffered from chronic
back pain, post-traumatic stress disorder, and migraine headaches.

41. Despite Mr. Matthews' ailments, he continued to work for Baltimore City,
Maryland.

42. In 2006 Mr. Matthews was married and in 2007 his son Kevin was born.

43. On or about February 14, 2008, Mr. Matthews purchased his home on 3216
East Northern Parkway with the assistance of the VA Guaranty Loan
Program. Mr. Matthews obtained his mortgage from USAA Bank.

44. When Mr. Matthews purchased his home, he was employed as a contractor
at Fort Meade in the field of waste water management.

45. In December 2008, Mr. Matthews was involved in a serious car accident
caused by a third party that further aggravated his pre-existing injuries. Due
to these new, aggravated injuries, Mr. Matthews was continually absent from
work and had difficulty performing the physical work required of him. As a
result, he was laid off from his job in February 2009.

46. Until October 30, 2010 Matthews believed at all times when he was applying

for a loan modification and seeking loss mitigation alternatives discussed in the proceeding paragraphs that he was communicating with USAA. However, on October 30, 2010 he was learned for the first time that he actually was communicating with GMAC and not USAA representatives.  This knowledge came from an admission by USAA in the Washington Post reported as follows, "Roger Wildermuth, a USAA spokesman, said his firm was no longer responsible for Matthews's loan because it had been sold to GMAC, though GMAC employees in his case would have identified themselves as USAA workers 'to create a seamless customer experience.'"

    a. Is further evidence of GMAC's concealment of the true facts concerning its interest in Mr. Matthews' loan throughout the operative time period of this complaint, on March 7, 2012 GMAC sent Matthews a letter acknowledging to him for the first time that GMAC actually retained the servicing rights of his loan at the time he closed on his loan.

47. The events surrounding Mr. Matthew's foreclosure and illegal eviction took place while the VA HAMP program was in effect.  GMAC failed to take actions required by the Veterans Administration prior to commencing and then actually foreclosing on Mr. Matthew's VA-guaranteed loan.  As such, the foreclosure and eviction were conducted in violation of the VA HAMP program.

48. The VA HAMP program was established on January 8, 2010 when the

Veterans Benefits Administration issued Circular 26-10-02 (hereinafter "VA Circular"). This circular provided lenders with authority and instructions for modifying VA-guaranteed home loans in accordance with the President's Making Home Affordable (MHA) program. The circular stated that the new procedures would become effective on February 1, 2010.

49. The Home Affordable Modification Program ("HAMP") is one of the main features of the MHA program. The purpose of HAMP is to help borrowers avoid foreclosure by modifying loans to increase affordability relative to borrower income. The VA Circular laid out the framework for outline the procedures that servicers of VA-guaranteed loans are required to follow before proceeding with a foreclosure.

50. Specifically, the VA Circular required all servicers to first evaluate defaulted mortgages for traditional loss mitigation actions, including repayment plans, special forbearances, and traditional loan modifications. If none of these traditional mitigation options provided the borrower with an affordable payment, the servicer would then be required to evaluate the loan for a VA HAMP modification *before* deciding that the borrower's default is insoluble and exploring alternatives to foreclosure.

51. If, after completing the HAMP evaluation, the servicer determines that the loan meets HAMP eligibility requirements, the servicer *must* execute the modification pursuant to the HAMP guidelines.

52. GMAC never offered Mr. Matthews a traditional home retention loss

20

mitigation option, to which we was owed and relied upon in taking out his loan, during the period in which he was in default of his mortgage. Upon information and belief, Mr. Matthews' loan was never properly evaluated by GMAC for a VA HAMP modification as required by the VA Circular.

53. Prior to missing any payments on his mortgage, Mr. Matthews contacted GMAC, d/b/a USAA, to inform them of his circumstances, including his hospitalization, disability, and his anticipated financial hardships and he requested GMAC's assistance in exploring loss mitigation options relying upon the terms of his VA loan.

54. From December 2008 through August 2009, Mr. Matthews contacted GMAC d/b/a USAA by telephone after being released from the hospital and throughout his rehabilitation in an effort to keep them apprised of his current situation sometimes multiple times in a week. The continued communications demonstrates Matthews' reliance that GMAC would help him explore loss mitigation options.

55. Mr. Matthews made every reasonable effort to stay current on his mortgage, including draining his savings (approximately $6,000) and 401k (approximately $5,500) as well as applying his tax return refunds (approximately $4,000) and short-term disability benefits (approximately $1,500) towards his monthly mortgage payments and reasonably relied upon GMAC's duty to meaningfully consider him for loss mitigation options. Mr. Matthews chose not to pay some of his other bills so that he could use all his

available funds to pay off his mortgage first.  However while he was current on the mortgage, GMAC never offered him any meaningful loss mitigation options given his unfortunate situation.

56. Mr. Matthews finally ran out of funds in July 2009, and became thirty days delinquent on his mortgage in August 2009.

57. Mr. Matthews continued to contact GMAC after defaulting on the mortgage, calling approximately twice a week and faxing over hardship letters.  Mr. Matthews explained to GMAC that he had applied for disability benefits in March 2009 which he hoped would permit him to make a modified payment.

58. At no time during this period of communications with GMAC was Mr. Matthews ever offered a repayment plan, special forbearance, loan modification, compromise claim, deed-in-lieu, refinance, assumption, or refunding.  In fact GMAC intentionally concealed these loss mitigation options from him since it had no risk in the loan.

59. In August 2009, Mr. Matthews contacted GMAC again and specifically requesting information about a deed-in-lieu as an alternative to foreclosure.  A representative of GMAC told him to draft a letter stating his financial situation and asking that a deed-in-lieu be accepted.  In reliance of that representation, Mr. Matthews faxed the letter as instructed to GMAC but never received any response.

60. The stress of the mortgage situation took a toll on Mr. Matthew's family, and he and his wife divorced which was approved by this Court in July 2010.

61. Finally after months of applications and waiting, in February 2010 Mr. Matthews was approved for Social Security disability ($1,620 per month). He also had at the time his VA disability payment ($1,298 per month).

**E.  Maryland Changed its Foreclosure Law in 2008**

62. The foreclosure laws in the State of Maryland were substantially changed by the Maryland Legislature in 2008 in emergency legislation changing 200 years of Maryland foreclosure procedure. The legislature imposed specific prerequisites before any owner of a security instrument had the right to initiate a foreclosure proceeding before a Maryland Court. Among these other prerequisites, a homeowner is entitled to a Notice of Intent to Foreclose ("NOITF"). MD. ANN. CODE, REAL PROP. § 7-105.1. The NOITF must include specific information including the name of the secured party. MD. ANN. CODE, REAL PROP. § 7-105.1(c)(4)(ii)(1)(A).

63. The simple reason for this requirement was that the legislature intended for the homeowners to know the name of the secured party who owned their mortgage because the servicers were not responding to calls from homeowners for assistance or in many instances even answering the phones in a reasonable time period. In addition, many servicers falsely claimed, all too frequently, that the owner of the loan would not permit a sustainable modification. To verify these representations and ensure homeowners had knowledge of who owned their loan, the legislature required that a standard, uniform NOITF be sent to each homeowner which identified the secured party

so that the homeowner could have some other party to contact when the servicer failed to help.

64. The GMAC retains various agents, substitute trustees, and attorneys including the Plaintiffs in this action and Ward previously, to perform foreclosure services on its behalf in the State of Maryland.   The agents, substitute trustees, and attorneys act with GMAC's express authority in the foreclosure actions filed on its behalf and at its request.

65. A foreclosure proceeding based upon a bogus NOITF is improper because it does not provide the information required by the legislature.

66. Instead of providing the name and address of the true secured party, the GMAC routinely and regularly relies on a NOITF that sets forth a bogus party as the secured party because it does not want its borrowers to complain to the true owners of their loans that GMAC is not providing the services it is required to provide.

67. Under Maryland law a servicer is "a person responsible for collection and payment of principal, interest, escrow, and other moneys under an original mortgage." MD. ANN. CODE, COMM. LAW ART. § 13-316(a)(3).   Maryland law also defines a servicer as "a person who: (1) Engages in whole or in part in the business of servicing mortgage loans for others; or (2) Collects or otherwise receives payments on mortgage loans directly from borrowers for distribution to any other person." MD. ANN. CODE, FIN. INST. § 11-501(n).

68. The servicer in these instances is not the secured party since it does not own

any interest in the property of the mortgagors.

69. GMAC knows that it does not hold an interest in the mortgagor's property and that its client holds an interest in the property.

70. GMAC and Ward have engaged in a deceptive artifice to avoid the requirements of the Maryland foreclosure laws to the detriment of Matthews.

71. GMAC has authorized and actually proceeded to file foreclosure proceedings in Maryland courts knowing that the NOITF it provided to Matthews and other Maryland residents does not set forth the true secured party.

72. Because GMAC and Ward send bogus NOITFs to Matthews and other Maryland homeowners these homeowners have no way of knowing whether the party identified as the secured party on the NOITF is accurate or not.

73. GMAC intends to proceed to foreclosure with the intent and goal that the inaccurate NOITF will not be discovered by Matthews and other Maryland homeowners.  This pattern and practice is also consistent with the many inconsistent practices identified recently by the Inspector General of the Federal Housing Finance Agency's recent audit and report entitled "FHFA's Oversight of Fannie Mae's Default-Related Legal Services" (available at http://www.fhfaoig.gov/Content/Files/AUD-2011-004.pdf).

74. The filing a foreclosure proceedings when GMAC and Ward knows that the Matthews has not been provided the information that the legislature mandated is unfair or deceptive.

75. The filing of a foreclosure proceeding under the above circumstances is an

assertion of a legal right when the right does not exist.

### F.   The First Illegal and Improper Matthews Foreclosure Action

76. Around the time of his divorce, Mr. Matthews received a Notice of Intent to Foreclosure dated February 3, 2010.  The Notice of Intent falsely stated that the Secured Party was Government National Mortgage Association ("Ginny Mae") and that the servicer of his loan was GMAC.  However, up to this time Mr. Matthews never had any knowledge of either GMAC or Ginny Mae's involvement with his loan since the statements he was sent and the representatives he had spoken to identified themselves on behalf of USAA. GMAC.

77. Without actual knowledge to Mr. Matthews on February 4, 2010, USAA assigned Mr. Matthew's Note and Deed of Trust to GMAC effective January 23, 2010 for all purposes related to the foreclosure.

78. On February 4, 2010, GMAC, appointed Carrie Ward, Howard Bierman, and Jacob Geesing as its authorized Substitute Trustees in the Matthews matter. At all times thereafter Ward was an authorized agent of GMAC and acted within the scope of apparent and actual authority by GMAC.

79. On or about April 2, 2010, Mr. Matthews was served with an Order to Docket via posting on his front door. The Order to Docket was filed in this Court on March 29, 2010 by the law firm of Bierman, Geesing, Ward & Wood, LLC and Ward in their capacity as Substitute Trustees GMAC (Case No. 24O10001394)("First Foreclosure Action").   In support of the First

26

Foreclosure Action, Ward and Stephan on behalf of GMAC provided the following bogus affidavits and papers in order to acquire this Court's jurisdiction:

a. The Order to Docket contained an single indecipherable signature of one of three substitute trustees.

b. The Affidavit, Pursuant to Md. Rule 14-207(b)(4) Regarding Copy of Deed of Appointment of Substitute Trustee contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

c. The Deed of Appointment signed by Stephan was done so without the authorization of Ginny Mae but represented something different. Further Stephan signed the document without any knowledge of the truth of any of the statements contained therein. . It also contained a false notarization to make it appear to be a legitimate document.

d. The Affidavit, Pursuant to Md. Rule 14-207(b)(1) Regarding Copy of Lien Instrument contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

e. The Affidavit Certifying Ownership of Debt Instrument and Truth

and Accuracy of Copy Filed Herein was signed by Stephan even though he lacked an personal knowledge of the facts contained within it and certain of those facts were clearly false.  It also contained a false notarization to make it appear to be a legitimate document.

f.  The Affidavit of Deed of Trust Debt and Right to Foreclose contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

g.  The Affidavit Pursuant to Service Members Civil Relief Act contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

h.  The Affidavit of Default and Mailing of Notice of Intent to Foreclose signed by Stephan was done so without any knowledge of the truth of any of the statements contained therein.  It also contained a false notarization to make it appear to be a legitimate document.

i.  The Affidavit of Mailing of Notice to Occupant(s) contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of

28

*Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-
C-10-082594).

j.  The Statement Designating Secured Property "Residential Real
Property" contained single indecipherable signature but listed one
of three possible affiants including Ward—a practice held to be
improper in the matter of *Geesing v. Willson* (Circuit Court for
Howard County, Case No. 13-C-10-082594).

80. In April 2010, in reliance to Ward's and GMAC's efforts to foreclose on his
home and property, Mr. Matthews engaged the housing counseling services
of Belair-Edison Neighborhoods, Inc. to assist him with his efforts to mitigate
his loan situation and seek alternatives to foreclosure that were required and
allowed under his VA loan.  His case was assigned to Roy Miller, who was
authorized by Mr. Matthews to contact GMAC and negotiate on Mr. Matthews'
behalf.

81. Prior to his engagement of Mr. Miller, Mr. Matthews had contacted GMAC on
many occasions but had not received any modification or forbearance or any
other loss mitigation services or consideration from GMAC.

82. A foreclosure sale of Mr. Matthews' home was scheduled on May 21, 2010 by
Ward and her firm even though the papers and documents she presented to
this Court were not legally correct.  Since Ward is an attorney and officer of
the Court, Matthews relied upon her representations to this Court and himself
as being truthful and correct.

83. On or about May 6, 2010, Mr. Matthews contacted GMAC regarding the status of his modification he had previously sought by application. GMAC falsely stated he was denied a modification because he to reduce did not have sufficient income.

84. On behalf of Mr. Matthews, Miller contacted USAA by telephone on May 10, 2010 and confirmed that Mr. Matthews was denied a modification due to an incorrect determination that Mr. Matthews did not have sufficient income. The GMAC loss mitigation specialist that Miller spoke with said that Matthews could apply again on Mr. Matthews' behalf.

85. Like Mr. Matthews, when Miller contacted what he thought was USAA on behalf of Mr. Matthews it was in fact was GMAC using the name USAA.

86. In response and reliance to GMAC's representation to Miller, he proceeded to prepare a new loan modification/hardship application with updated documents and materials on behalf of Mr. Matthews following the directions from USAA's website.

87. On May 13, 2010, Mr. Matthews and Miller met to complete his new modification request package. The package all the required documents as described on USAA's website.

88. On May 14, 2010, Miller faxed the completed hardship package to GMAC d/b/a USAA. Mr. Miller called GMAC d/b/a USAA on May 21, 2010 to confirm receipt of the package. The representative confirmed receipt of the package, but informed Miller the foreclosure sale had not been postponed. Miller

30

specifically asked for the foreclosure sale to be put on hold so the package may be reviewed per VA HAMP guidelines. The representative from USAA said he would request a hold.

89. Following the May 21, 2010 conversation with GMAC d/b/a USAA, Matthews contacted GMAC d/b/a USAA throughout the day to see if the sale had been postponed.

90. On May 24, 2010, Miller contacted the office of Bierman, Geesing, & Ward to and confirmed that that GMAC had purchased the property at the May 21, 2010 foreclosure sale.

91. Following the foreclosure sale, and in reliance of Ward's firm's representation that it had the legal right to conduct a foreclosure sale of his home and property, Mr. Matthews retained legal counsel to determine his legal rights related to the improper foreclosure action and sale given that (i) he had not received any meaningful and correct loss mitigation related to his mortgage loan despite numerous, good faith attempts prior to the sale; and (ii) GMAC and Ward had not complied with a mandatory, condition precedent by sending a correct and accurate Notice of Intent to Foreclose prior to the commencement of the action. Mr. Matthews incurred legal expenses to respond to the illegal First Foreclosure Action.

92. Prior to Mr. Matthews engaging counsel in First Foreclosure Action, neither Mr. Matthews nor Miller actually knew GMAC was involved in Mr. Matthews loan since in all communications it pretended and represented it was USAA.

Had GMAC's role been properly disclosed to Mr. Matthews or even Miller, they could have forwarded Mr. Matthews's mitigation requests to escalation representatives at GMAC. However, since the true relationship and ownership interests in Mr. Matthews' loan were concealed from him by GMAC, he did not have the option of mitigating his options and was limited to dealing with GMAC d/b/a USAA.

93. When Matthews contacted Ginny Mae through counsel, Ginny Mae would not respond because it was never the secured party or owner of his loan as represented by GMAC and Ward on the NOITF used to commence the First Matthews Foreclosure Action.

94. Mr. Matthews' counsel appeared on his behalf in the First Foreclosure Action and timely filed exceptions to the foreclosure sale on July 19, 2010 with this Court. In those exceptions, Mr. Matthews objected to the right of GMAC and Ward to have conducted the foreclosure sale and to have even brought this action.

95. However, without the right to do so and while it knew Mr. Matthews was represented by counsel in the First Foreclosure Action, GMAC through its authorized representative RM Property Services illegally seized control of the Matthews Property. At the time Mr. Matthews was out-of-town on a school required internship. When Mr. Matthews returned he discovered that his home had been taken over by GMAC and a lockbox was now on his front door, and all personal property, including his son's possessions, had been

illegally removed from the premises and disposed of.

96. In addition, upon return Mr. Matthews found an eviction notice was taped to his door, unfairly and deceptively stating that Mr. Matthews had 24 hours to contact RM Property Services, or the locks would be changed and the property secured.  Since Mr. Matthews was out of town at the time, he had no knowledge of this notice and no opportunity to remove his property—even though GMAC and RM Property Services had no legal right to seize the Matthews Property since his timely exceptions were still pending in this Court in the First Foreclosure Action.  Neither GMAC nor RM Property Services ever contacted Mr. Matthews counsel concerning the locks or Mr. Matthews possession at the Matthews Property.

97. Due to this illegal eviction, Mr. Matthews immediately had to find an apartment to live in, and attempt to replace the belongings confiscated by the lender's agents.  These belongings included but were not limited to: family clothes, tools, furniture, expensive furniture, lawn mower, a safe, tv, etc.

98. To date, Mr. Matthews has not received any of his belongings back from the lender's agents.   The approximate value of what was stolen by the eviction was about $4,250.

99. As a result of the illegal eviction, Mr. Matthews incurred expenses for the apartment in the sum of about $7,000 since he was illegally evicted from his home and needed a place to live.

100.   In the fall of 2010, when the national and state robo-signing scandals

came to light, Mr. Matthews learned for the first time that Stephan had admitted in several depositions, under oath, that he had signed tens of thousands of bogus affidavits that were used to initiate foreclosure proceedings, including the First Foreclosure Action, on behalf of GMAC.

101.    On October 28, 2010 in the First Foreclosure Action, Mr. Matthews' sought to certify a class of defendants similar to him in then pending GMAC foreclosure cases based upon the bogus Stephan affidavits and other papers.

102.    Rather than defend the use of its bogus affidavits and papers in the First Foreclosure Action, GMAC and Ward sought to dismiss the action without prejudice.    Mr. Matthews objected since GMAC did not state (at that time) that it would dismiss all the foreclosure actions using bogus Stephan affidavits and it had not offered to rescind the report of sale which creates a cloud on the Matthews Property.

103.    This Court scheduled a hearing on the pending motions to take place on January 14, 2011.    At that hearing, GMAC's new counsel, William Murphy, made the following representations to this Court on behalf of GMAC:

 a.  For the first time, GMAC explained that it was willing to rescind the foreclosure sale of the Matthews Property.

 b.  GMAC was in the process of dismissing cases, which had not been ratified, similarly situated to First Foreclosure Action which were based upon Stephan affidavits and papers

 c.  This promise to voluntary dismiss all then pending cases applied to

all cases carried out by Ward and her firm as well as two other firms then representing GMAC in Maryland foreclosure actions.

d. That the costs of the dismissed foreclosures would not be passed on to the borrowers.

104.    Based upon the representations of GMAC's counsel William Murphy described in the above paragraph, this Court dismissed the First Foreclosure Action.

### E. Following the First Matthews Foreclosure Action

105.    Following the dismissal of the foreclosure, Mr. Matthews attempted to secure the keys to the home from Ward's firm.  However, no one at Ward's firm ever responded and the keys were never provided.

106.    Left with no other option, Mr. Matthews had to break into the Matthews Property on or about March 25 2011 to regain possession since GMAC and its agents and attorneys refused to provide him the keys.  Matthews had to break the lock with a hammer.  When he did a neighbor he did not know called the police.  The police arrived and would not allow Matthews enter enter the house that he owned and required him to return to his apartment to obtain and this Court's Order rescinding the foreclosure sale.

107.    Matthews was angry and embarrassed that the police did not accept his representations that he was the owner of the Matthews Property.  He was worried about this was just another roadblock toward his attempts to get a fresh start and utilize his GI benefits.

35

108.    Upon entering the Matthews Property after having to get, he realized that the home had not been properly winterized by GMAC's agents prior to the discontinuation of the utilities.  As a result, Mr. Matthews' sewage pipe and hot water heater cracked from the water expanding in the cold weather.  These known damages equaled a sum of out $2,000.  Additional damages and mold have also occurred as a result.

109.    On July 27, 2011, GMAC d/b/a USAA sent Matthews a false and bogus Notice of Intent to Foreclose identifying USAA as both the secured party and the servicer of the Matthews loan.

110.    Even though GMAC had dismissed the First Foreclosure Action, Mr. Matthews continued to receive notices from GMAC d/b/a USAA demanding action on his behalf and threatening to take his property.   These notices are completely unsubstantiated, have required significant time to respond to by Mr. Matthews counsel which constitute additional damages incurred by Matthews, and placed undue stress on Mr. Matthews.

111.    On July 23, 2011, GMAC d/b/a USAA mailed Mr. Matthews a letter indicating that it believed the Matthews Property was vacant and that it would be taking steps to secure the property if not otherwise informed.    Mr. Matthews' attorneys responded on August 22, 2011, and informed GMAC d/b/a USAA that the property was not vacant and is currently occupied.  Mr. Matthews incurred the expense of this communication by his attorneys.

112.    Despite the proof of his occupancy, Mr. Matthews then received another

notice by the mails on August 31, 2011 stating that GMAC d/b/a USAA
believed the property to be vacant and would be taking steps to change the
locks on the property.    Mr. Matthews' attorneys again responded on
September 7, 2011 to again clarify this discrepancy.    GMAC d/b/a USAA then
acknowledged that the property is owner occupied in a notice sent on October
4, 2011. Mr. Matthews incurred the expense of this communication by his
attorneys.

113.    In spite of GMAC's (d/b/a USAA) acknowledgment, notices stating that the
property is vacant and that USAA seeks to change the locks have persisted.

114.    On November 8, 2011, Mr. Matthews received another notice on his door
from GMAC d/b/a USAA indicating that the Property was still considered
vacant and the locks would be changed despite the fact his car was in the
driveway, the lights were on in the house, and there was substantial furniture
inside and outside the house.    Mr. Matthews' attorneys again responded on
November 9, 2011 and again notified GMAC that the property was not vacant
and is owner-occupied.    Mr. Matthews incurred the expense of this
communication by his attorneys.

**E.  Second Matthews Foreclosure Action**

115.    On behalf of GMAC, Plaintiffs commenced this action on February 10,
2011 by filing an Order to Docket. The Order to Docket falsely states that the
Matthews Property is not owner occupied when GMAC knows this allegation
to be untrue.    In reliance of this false statement and other described in the

next paragraph, Matthews has engaged counsel to object to the sale of his home and property in the Court.

116.    GMAC provided the Plaintiffs with certain affidavits to support the Order to Docket filed by the Plaintiffs in this action to acquire the Court's jurisdiction. Included among these was an Affidavit Certifying Ownership of Debt Instrument and that the Copy of the Note is a True and Accurate Copy. In this affidavit, GMAC's Authorized Officer Kimberly Fritz falsely testified "that Ginnie Mae is the owner of the [Matthews] loan." This statement is false based upon the following facts:

  a. On Ginnie Mae's website it explains, "Borrowers are sometimes mistakenly advised that Ginnie Mae is the owner or investor in a loan because government-insured or guaranteed loans (FHA, VA, RD) serve as collateral for Ginnie Mae-guaranteed securities. Ginnie Mae guarantees the security, and it carries Ginnie Mae's name; therefore, borrowers are often mistakenly advised that Ginnie    Mae    owns    their    loan."    See http://www.ginniemae.gov/media/consumer_web.pdf.

  b. The Notice of Intent to Foreclose sent to Mr. Matthews on October 7, 2011 which is required as a mandatory prerequisite for every foreclosure filed in Maryland and was presented to the Court by the Plaintiffs did not identify Ginnie Mae as the secured party.

  c. Despite Ms. Fritz's testimony to the contrary, nothing on the copy of

the Note presented to the Court by the Plaintiffs on behalf of GMAC
indicates any ownership interest by Ginnie Mae.    Rather, an
examination of the Note identifies an assignment by USAA to
GMAC.

d. USAA by Deed of Assignment recorded in the land records of
Baltimore City, Maryland, through its purported nominee Mortgage
Electronic Registration Systems Inc., granted, assigned, and
transferred to GMAC "all beneficial interest" under the Matthews
Deed of Trust to GMAC on January 18, 2012 (recorded at Book
14058, Page 19).

e. On February 10, 2012 the Plaintiffs in this action wrote to Mr.
Matthews and explained that his mortgage loan was with GMAC.
This correspondence never identified any interest in the loan by
USAA or Ginnie Mae.

## F.  Mr. Matthews' Damages

117.        Having nowhere else to turn for help, Mr. Matthews is left to seek
this Court's help in preventing injustice by GMAC, Stephan, and Ward of
the unconscionable, illegal, unfair and deceptive acts of each described
herein and ongoing.  These acts have damaged Mr. Matthews by:

a. Statutory damages available under the FDCPA,

    b.  Incurring legal fees defending the bogus First Foreclosure Action when GMAC did not have the right to so in the manner it attempted to pursue,

    c.  fees and costs assessed to his mortgage account based upon the bogus and otherwise improper foreclosure actions,

    d.  damage to his credit through the public reporting of foreclosure collection actions filed in a manner to which Ward and GMAC had no right to pursue,

    e.  lost opportunity time trying to deal with the illegal debt collection practices of the Defendants which dramatically reduced his academic GPA while he was in fear of losing his home during the First Foreclosure Action and at risk of being put on academic probation which would have jeopardized his academic assistance package, and

    f.  emotional damages manifested by irritability, anger, sleeping problems, stress, worry, and decreased socialization.

118.    Matthews is prepared to offset whatever damages he receives as a result of these Counter Claims from the sums claimed to be owed by the true, bona fide owner of his loan.  He also has established an escrow account during the pendency of these Counter Claims representing the accruing interest (i.e. profit on the loan) and taxes and insurance on the Matthews Property.

## COUNT I:  FRAUD & FRAUDULENT CONCEALMENT

## (Against GMAC & WARD)

119.      Counter Plaintiff re-alleges the previous paragraphs as if fully restated herein.

120.      As a Maryland licensed mortgage lender/servicer, GMAC owed a duty of good faith and fair dealing to Matthews even though he did not know he was communicating with GMAC (and thought he was communicating with USAA) to disclose material facts to Matthews.  Md. Code Regs. 09.03.06.20.   Further, GMAC's duty is also exemplified and based upon the following:

  a. GMAC has a duty to disclose its servicing interests in Mr. Matthews' loan to him and to respond to his qualified written requests pursuant to RESPA, 12 USC 2605.

  b.  Md. Code Ann., Crim. Law § 9-101 provides that is a crime to "willfully and falsely make an oath or affirmation as to a material fact: (1) if the false swearing is perjury at common law; (2) in an affidavit required by any state, federal, or local law; (3) in an affidavit made to induce a court or officer to pass an account or claim; (4) in an affidavit required by any state, federal, or local government or governmental official with legal authority to require the issuance of an affidavit; or (5) in an affidavit or affirmation made

41

under the Maryland Rules." *See also* Md. Code Ann., Crim. Law §
9-306.

    c.  "[I]t is generally prudent for a 'purchasing lender to review the'
applicable land records or other registry to determine whether all
assignments of the loan and the related security interest are in
proper form and ensure that the document assigning the security
interest in the underlying collateral is properly filed or recorded such
that the lender has record title to the loan and related security. In a
securitization transaction, the trustee is often charged with ensuring
that the' securitization trust, holds record title to the loan."
Katherine A. Burroughs & Robert E. Grady, Mortgage and Asset
Backed Securities Litigation Handbook 8:43 (April 2008).

121.    As a witness and party to litigation in this Court, including the First
Foreclosure Action, Ward had duty to Matthews to present truthful and
accurate testimony (i.e. material facts) to the Court and Matthews (a party
to that litigation)—to say otherwise is simply an assault upon our judicial
system and Matthews right to a fair and just administration of justice
concerning his home and property. *See* Md. Code Ann., Crim. Law § 9-
101; Md. Code Ann., Crim. Law § 9-306; Md. Rules 1-304 & 5-603.

122.    Despite the duties it owes to Matthews, GMAC concealed and
failed to disclose material facts to Matthews as described above and

including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116.

123.    Despite the duties she owed to Matthews, Ward concealed and failed to disclose material facts to Matthews as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79.

124.    GMAC either knew the representations as described above and including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116 were false or were made with reckless indifference as to their truth.

125.    Ward either knew the representations as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79 were false or were made with reckless indifference as to their truth.

126.    GMAC's concealment was intentional and effective since its actions as described above and including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116. created or continued a false impression as to its rights to collect a debt in false and fraudulent the manner in sought to do so.

127.    Ward's concealment was intentional and effective since its actions as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79 created or continued a false impression as to its rights to collect a debt in false and fraudulent the manner she sought to collect against Matthews.

128.    GMAC's concealment was knowing, intentional, and effective since its actions  described above and including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116 created or continued a false impression as to its rights to collect a debt in false and fraudulent manner in attempted in this Court against Matthews.

129.    Ward's concealment was knowing, intentional, and effective since its actions as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79 created or continued a false impression as to her right to collect a debt in false and fraudulent the manner she sought to collect against Matthews.

130.    Matthews took action in justifiable reliance of GMAC's concealment as described above and including ¶¶ 1, 5, 7, 52-55, 57, 59, 66, 80, 86, 115.

131.    Matthews took action in justifiable reliance of Ward's concealment as above and including ¶¶ 1, 80, 82, 84, 85.

132.    Matthews has suffered damages as a result of GMAC's and Ward's fraudulent concealment as described above including ¶¶ 1, 7, 9, 97-99, 107-108, 117-118 .

WHEREFORE, Counter Plaintiff respectfully requests that judgment be entered against Counter Defendants GMAC and Ward for:

a. Compensatory economic and non-economic damages in the amount of no less than $500,000.

b.  Punitive Damages in the amount of $1,000,000.

c.  Counter Plaintiff's costs and attorneys fees.

d.  Such further relief as the Court deems just and proper.

### COUNT II: VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT (Against All Counter Defendants)

133.     Counter Plaintiff re-alleges the previous paragraphs as if fully restated herein.

134.     The Maryland Consumer Protection Act ("MCPA"), MD CODE ANN., COMM. LAW §§ 13-101 *et seq.*, prohibits a person from engaging in unfair or deceptive trade practices in the collection of a consumer debt.  MD CODE ANN., COMM. LAW § 13-303(4).

135.     The MCPA includes in its definition of "unfair or deceptive trade practices" the following:

i.  Any false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers.  MD CODE ANN., COMM. LAW § 13-301(1).

ii.  Any failure to state a material fact if the failure deceives or tends to deceive.  MD CODE ANN., COMM. LAW § 13-301(3).

iii. Any violation of a provision of Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act.  MD

45

CODE ANN., COMM. LAW § 13-301(14)(iii).

136.     Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.

137.     The consideration of a loan modification and threat of a foreclosure action involves both the extension of credit and the collection of debts. Section 13-316 requires servicers GMAC to respond to inquiries from consumers within 15 days.

138.     The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

139.     By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, the Counter Defendants has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and (3), Sec. 13-303(4), Sec. 13-316, and Sec. 13-301(14)(iii) of the MCPA.

140.     The Counter Defendants' conduct, as set forth above, had the capacity, tendency or effect of deceiving Mr. Matthews who in fact was deceived or misled, causing injury and loss through the unfair or deceptive

46

prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a bogus foreclosure action by Defendants directly and indirectly.

141.  Under the MCPA, a "person" can be "an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity." MD CODE ANN., COMM. LAW § 13-101(d).

142.  Defendants GMAC, Ward, and Stephan are persons as defined by the MCPA.

143.  Matthews reasonable relied upon the representations and actions of the Counter Defendants as stated in ¶¶ 1, 5, 7, 52-55, 57, 59, 66, 80, 82, 84-86, 115.

144.  The MCPA defines a "consumer" as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." MD CODE ANN., COMM. LAW § 13-101(c)(1).  Matthews is a consumer.

145.  The MCPA defines "consumer credit" and "consumer debts" as credit and debts that are "primarily for personal, family, household, or agricultural purposes." MD CODE ANN., COMM. LAW § 13-101(d).

146.  Matthews' mortgage serviced and collected by GMAC, Ward, and Stephan, is a consumer debt.

147.  Mr. Matthews' financial obligations to GMAC are also consumer debts

47

under the MCPA because Mr. Matthews' mortgage debt was primarily for personal, family, and household purposes.

148.    Counter Defendant GMAC, acting through its authorized substitute trustee/attorney, Ward, and employee, Stephan, initiated the foreclosure action against Mr. Matthews using robo-signed or otherwise bogus affidavits. These affidavits contained false written statements that the affiant had personal knowledge of the information sworn to in the affidavit. The affidavits filed in Mr. Matthews' foreclosure case were fraudulent because they contained either false signatures of Ward and Stephan or because the affiant lacked the personal knowledge necessary to swear to the accuracy of their contents.

149.    But for the bogus paperwork presented by GMAC, Stephan, and Ward, this Court would not have had jurisdiction for the foreclosure action that was filed against Mr. Matthews.  Matthews would not have incurred attorney's fees, losses and damages, charges, and other costs related to the foreclosure process.

150.    The use of the bogus affidavits in Mr. Matthews' foreclosure violated the MCPA's prohibition against the use of false or misleading written statements or other representations that have the capacity, tendency, or effect of misleading consumers like Mr. Matthews.  As such, GMAC, Ward, and Stephan are directly liable to Mr. Matthews under the MCPA. MD CODE ANN., COMM. LAW § 13-303(4).

151.   In addition to its direct liability pursuant to this claim, GMAC is alternatively responsible as the substitute trustees' principal in the foreclosure action brought on its behalf.   Under Maryland law, "'[a] principal is *prima facie* liable for the acts of his agent done in the general course of business authorized by him.' *Carroll*, 3 A. at 29." *Winemiller v. Worldwide Asset Purchasing, LLC*, 1:09-CV-02487, 2011 WL 1465571, *3 (D. Md. Apr. 15, 2011).

152.   Additionally, during its communications with Mr. Matthews, GMAC failed to tell Mr. Matthews that he was not speaking with USAA but was speaking with GMAC.   This fact was material.   Had Mr. Matthews known that GMAC was the true owner, he would have escalated his situation to the appropriate contacts at GMAC or even the true owner of his loan, whoever that was at the time.

153.   GMAC's failure to inform Mr. Matthews that GMAC, and not USAA, was the true servicer of his loan tended to and did in fact deceive Mr. Matthews.

154.   Because GMAC failed to inform Mr. Matthews of this material fact, and because this failure had the tendency of and in fact did deceive Mr. Matthews, GMAC committed an unfair or deceptive trade practice in violation of the MCPA.   MD CODE ANN., COMM. LAW § 13-301(3).

155.   Finally, GMAC's violation of the Maryland Consumer Debt Collection Act, detailed in Count III, also constituted a violation of the MCPA.   MD CODE ANN., COMM. LAW § 13-301(14)(iii).

156.   Mr. Matthews damages and losses as alleged herein were proximately

caused by GMAC, Stephan's and Ward's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described above.

WHEREFORE, Counter Plaintiff respectfully requests that judgment be entered against Counter Defendants GMAC, Stephan, and Ward for:

    a. Compensatory economic and non-economic damages in the amount of no less than $500,000.

    b. Additional compensatory damages pursuant to Sec. 13-316.

    c. Plaintiff's costs and attorneys fees pursuant to MD CODE ANN., COMM. LAW § 13-408(b).

    d. Such further relief as the Court deems just and proper.

### COUNT III: VIOLATIONS OF MARYLAND MORTGAGE FRAUD PROTECTION ACT
### (Against All Counter Defendants)

157.    Counter Plaintiff re-alleges the previous paragraphs as if fully restated herein.

158.    The Maryland Mortgage Fraud Protection Act, MD CODE ANN., REAL PROP. LAW § 7-401, *et seq.* ("MMFPA") governs the relationship between the Counter Defendants and Mr. Matthews.

159.    The MMFPA defines a "homeowner" as a record owner of residential property. MD CODE ANN., REAL PROP. LAW § 7-401(c). Mr. Matthews is the record owner of the Matthews Property and is therefore a homeowner under the Act.

160.   The MMFPA defines "mortgage lending process" to include the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan.  MD CODE ANN., REAL PROP. LAW § 7-401(e).

161.   Under the MMFPA, a "mortgage loan" means any loan or other extension of credit that is (1) secured, in whole or in part, by any interest in residential real property in Maryland, and (2) is primarily for personal, household, or family purposes.  MD CODE ANN., FINANCIAL INSTITUTIONS LAW § 11-501(I).  The loan extended to Mr. Matthews was primarily for his personal, household, and family use and was secured by an interest in the residential real property located at 3216 East Northern Parkway, and is therefore a "mortgage loan" as defined by the MMFPA.

162.   The MMFPA defines "Mortgage fraud" (MD CODE ANN., REAL PROP. LAW § 7-401(d)) as any action by a person made with the intent to defraud that involves:

  a. Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

  b. Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement,

misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; and

   c. Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

163.    Counter Defendants GMAC, Stephan, and Ward has committed Mortgage Fraud by engaging in acts described above.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Counter Defendants GMAC, Stephan, and Ward for:

   a. Compensatory economic and non-economic damages in the amount of no less than $500,000

   b. Treble damages in the amount of no less than $1,500,000 as authorized by MD CODE ANN., REAL PROP. § 7-406(c).

   c. Plaintiff's costs and attorneys fees pursuant to MD CODE ANN., REAL PROP. § 7-406(b).

   d. Such further relief as the Court deems just and proper.

### COUNT IV: VIOLATION OF MARYLAND CONSUMER DEBT COLLECTION ACT (Against GMAC and Ward)

164.   Counter Plaintiff re-alleges the previous paragraphs as if fully restated herein.

165.   GMAC and Ward's institution of foreclosure proceedings based upon bogus documents was an attempt to collect a consumer debt, and was therefore governed by the Maryland Consumer Debt Collection Act, MD CODE ANN., COMM. LAW §§ 1-201 *et seq.* ("MCDCA").

166.   The MCDCA defines a "consumer transaction" as "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes."  MD CODE ANN., COMM. LAW § 14-201(c).

167.   The servicing of the Matthews mortgage loan was a consumer transaction under the MCDCA.  Counter Plaintiff used the mortgage loan for personal, family, and household purposes.

168.   The MCDCA defines a "collector" as "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction."  MD CODE ANN., COMM. LAW § 14-201(b).

169.   Counter Defendant Carrie Ward is a "person" as defined by MD CODE ANN., COMM. LAW § 14-201(d).

170.   Under the MCDCA, a "person" may be a corporation or any other legal or commercial entity.  MD CODE ANN., COMM. LAW § 14-201(d).  GMAC is a person under the MCDCA.

171.   GMAC's and Ward's institution of foreclosure proceedings against the

53

Plaintiff and their subsequent actions taken pursuant to that foreclosure were attempts to collect the debt that Plaintiff owed on his mortgage. GMAC and Ward are therefore "collectors" as defined by the MCDCA.

172.    The MCDCA states that, in collecting or attempting to collect an alleged debt, a collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." MD CODE ANN., COMM. LAW § 14-202(8).

173.    By authorizing the filing of debt collection foreclosure proceedings and/or conducting foreclosure actions based upon bogus or insufficient papers and affidavits through its authorized substitute trustees/attorneys, Counter Defendant GMAC has asserted a claim with knowledge that the right does not exist, a violation of MD CODE ANN., COMM. LAW § 14-202(8). Specifically, GMAC and Ward were aware that such affidavits needed to be valid in order to initiate a foreclosure action against Mr. Matthews. By initiating the foreclosure proceeding without satisfying this condition precedent, GMAC and Ward attempted to enforce a right with the knowledge that the right did not yet exist.

174.    By the filing of an Order to Docket and instituting foreclosure proceedings based upon bogus or insufficient papers and affidavits through its authorized substitute trustees/attorneys, Counter Defendant Ward asserted a claim with knowledge that the right does not exist, a violation of MD CODE ANN., COMM. LAW § 14-202(8). Specifically, Ward was aware that such affidavits needed to

54

be valid in order to initiate a foreclosure action against Mr. Matthews. By initiating the foreclosure proceeding without satisfying this condition precedent, Ward attempted to enforce a right with the knowledge that the right did not yet exist.

175.    Counter Defendant GMAC also violated the MCDCA by authorizing its agents to enter Mr. Matthews' property and remove his belongings with the knowledge that it did have the right to do so.

176.    At the time that GMAC's agents entered Mr. Matthews' property, they were aware that the foreclosure sale of the property had never been ratified by the Circuit Court. Accordingly, GMAC, Ward and its agents were aware that they had neither equitable nor legal title to the property, and were therefore not entitled to possession of the property.

177.    GMAC and Ward must be held to be aware that, in Maryland, the sole method available allowing a foreclosure sale purchaser to be awarded actual possession following the sale but prior to the audit and conveyance of the property is prescribed in Maryland Rule 14-102(a). *Empire Properties, LLC v. Hardy*, 386 Md. 628, 632, 873 A.2d 1187, 1190 (Md. 2005).

178.    Specifically, Maryland Rule 14-102(a) requires a party *entitled to possession* of a property purchased at foreclosure to file a motion for judgment awarding possession of that property.

179.    At no time was Defendant GMAC or Ward legally entitled to possession of Mr. Matthews' property, nor did GMAC or Ward ever file a motion for

judgment awarding possession pursuant to Maryland Rule 14-102(a).

180.   Despite knowing that they did not have a legitimate claim to possession of the property, Defendants GMAC and Ward authorized its agents to forcibly enter Mr. Matthews home without his permission, change the locks on the doors, and remove Mr. Matthews' property.  This act constituted an attempt by GMAC to collect on the debt Mr. Matthews owed on his mortgage.

181.   GMAC and Ward's attempt to enforce a right with knowledge that it did not exist constitutes a violation of the MDCA and has damaged Mr. Matthews. Due to GMAC violation, Mr. Matthews was forced to find an apartment on extremely short notice.  Additionally, he has lost the use and enjoyment of the personal property that was confiscated by GMAC and Ward's agents.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant GMAC and Ward for:

a.  Compensatory economic and non-economic damages in the amount of no less than $500,000.

b.  Such further relief as the Court deems just and proper.

### COUNT V: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICE ACT, 15 U.S.C. § 1692, et seq. (Against GMAC)

182.   Counter Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

183.   Counter Defendant GMAC acquired the ownership rights and servicing rights to Mr. Matthews; mortgage during a period in which GMAC alleges the

loan was in default and is therefore a "Debt Collector" within the meaning of 15 U.S.C. § 1692a(6).

184.    By sending false, deceptive, and misleading communications described above, initiating the pending foreclosure action in a manner to which it had no right to do so based upon bogus documents and papers, and claiming Mr. Matthews does not reside in his property, GMAC is in violation of 15 U.S.C. § 1692e.

185.    GMAC's actions described above in the last twelve months with Mr. Matthews constitute unfair or deceptive practices in violation of 15 U.S.C. § 1692f.

186.    Counter Plaintiff has suffered actual economic and non-economic damages, as more fully described in above, and have incurred attorney's fees and court costs as a result of GMAC's conduct.

187.    The FDCPA provides for statutory damages in addition to actual damages.

WHEREFORE, Plaintiff respectfully request the Court enter judgment in favor of Counter Plaintiff and against Counter Defendant GMAC for:

a.    Actual damages in an amount not less than $100,000;

b.    Statutory damages in the amount of $1,000;

c.    Costs and attorney's fees incurred by Plaintiff; and

d.    Grant Plaintiff such other and further relief as this court finds necessary and proper.

57

Respectfully Submitted,

Phillip R. Robinson
Scott Borison
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
*Attorney for Counter Plaintiff/Defendant*

## REQUEST FOR A JURY TRIAL

Counter Plaintiff requests a jury trial on all claims asserted herein.

_____
Phillip Robinson

## Certificate of Service

I hereby certify that a copy of the foregoing was served by first-class, prepaid

mail to the Plaintiffs in this matter by mailing to:

Erin Brady
312 Marshall Avenue, Suite 800
Laurel, MD  20707
*Counsel for the Plaintiffs*

Phillip Robinson