MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Joel C. Haims

*Counsel for the Debtors and
Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

—————————————————————
|   |   |
|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|   | ) |   |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|   | ) |   |
| Debtors. | ) | Jointly Administered |

--------------------------------------------------------------

## DEBTORS' SUPPLEMENTAL BRIEF IN SUPPORT OF ITS
## OBJECTION TO MOTION OF THE FEDERAL HOUSING
## <u>FINANCE AGENCY FOR RELIEF FROM THE AUTOMATIC STAY</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

SUPPLEMENTAL OBJECTION ...............................................................................3

I.    THE BURDENS OF PRODUCING LOAN FILES ...........................................3

    A.    Burdens and Costs of Producing 5,000 Loan Files to FHFA ..................4

    B.    Burdens and Costs of Producing 43,000 Loan Files to the Defendants in
        the FHFA Litigation ...............................................................................6

II.   SHARED SERVICES AGREEMENT ..............................................................8

    A.    History, Purpose, and Scope of Shared Services Agreement ..................9

    B.    The Shared Services Agreement Does Not Require the Debtors to Produce
        Any Documents to FHFA or the Underwriter Defendants ....................12

    C.    The Shared Services Agreement Does Not Require the Debtors to Provide
        AFI With the Loan Files at Issue Here .................................................15

        (i)    The Legal Services SOW Does Not Cover The Production of Loan
               Files ...........................................................................................15

        (ii)   The Type and Scope of Discovery Sought by FHFA and the
               Underwriter Defendants Is Outside the Scope of the Record
               Services SOW ..............................................................................18

    D.    If Debtors Are Required to Produce the Loan Files Pursuant to the Shared
        Services Agreement, AFI Must Bear the Cost of Production ................22

    E.    If the Production of Thousands of Loan Files is a "Change Requested" By
        AFI, AFI Must Pay All Out-of-Pocket Costs and All Increased
        Operational Costs of the Debtors .........................................................22

CONCLUSION .......................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Eaton Vance Mgmt. v. Forstmannleff Assocs., LLC*,
No. 06 Civ. 1510, 2006 U.S. Dist. LEXIS 55741 (S.D.N.Y. Aug. 11, 2006) ........................ 13

*Highlands Ins. Co. v. PRG Brokerage, Inc.*,
No. 01 Civ. 2272, 2004 U.S. Dist. LEXIS 83 (S.D.N.Y. Jan 6, 2004) ................................... 12

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
74 N.Y.2d 487 (N.Y. 1989) .................................................................................................... 20

*In re Law Firms of McCourts & McGrigor Donald*,
No. M19-96, 2000 U.S. Dist. LEXIS 20287 (S.D.N.Y. Nov. 3, 2000) ................................... 14

*Israel v. Carpenter*,
No. 95 civ 2703, 2002 U.S. Dist. LEXIS 11792 (S.D.N.Y. June 28, 2002) .......................... 14

*Wong v. N.Y. Times Co.*,
297 A.D.2d 544 (N.Y. App. Div. 2002) ................................................................................. 20

*Zubalake v. UBS Warburg LLC*,
217 F.R.D. 309 (S.D.N.Y. 2003) ........................................................................................... 14

OTHER AUTHORITIES

Fed. R. Civ. P. 45(c)(1) ......................................................................................................... 13

Fed. R. Civ. P. 45(c)(2)(B)(ii) ........................................................................................... 13-14

ny-1055729

Residential Capital, LLC and its affiliated debtors and debtors in possession in the above-caption Chapter 11 cases (collectively, the "Debtors") hereby submit this supplemental brief (the "Supplemental Brief") in support of their objection (the "Objection")[1] to the *Motion of the Federal Housing Finance Agency Pursuant to the July 11, 2012 Order of the Honorable Denise L. Cote Seeking Limited Discovery from the Debtors and, If Necessary to That Purpose, Relief from the Automatic Stay*, dated July 17, 2012 (ECF No. 810) (the "Initial Motion") and the *Supplement to July 17, 2012 Motion of the Federal Housing Finance Agency Pursuant to the July 11, 2012 Order of the Honorable Denise L. Cote Seeking Limited Discovery from the Debtors and, If Necessary to That Purpose, Relief from the Automatic Stay* (ECF No. 859) (the "Supplemental Motion").[2]  In support of this Supplemental Brief, the Debtors submit the Declaration of Mary Fahy Woehr, dated August 28, 2012 (the "Woehr Declaration"), attached as Exhibit 1, the Supplemental Declaration of John G. Mongelluzzo, dated August 28, 2012 (the "Supplemental Mongelluzzo Declaration"), attached as Exhibit 2, and the Declaration of Joel C. Haims, dated August 28, 2012 (the "Haims Declaration"), attached as Exhibit 3, and respectfully represent:

## PRELIMINARY STATEMENT

1.     Debtors submit this Supplemental Brief and the accompanying declarations, at the direction of the Court, for the following purposes:

(i) to provide "supplemental evidence with respect to the burden and cost that the debtor will incur if the stay is lifted and discovery of the information

---

[1] *Debtors' Objection to Motion of the Federal Housing Finance Agency for Relief from the Automatic Stay* filed on August 7, 2012 (ECF No. 1023), and arguments therein, are incorporated herein by reference.  Defined terms in this Supplemental Brief not otherwise defined have the meanings provided in the Objection.

[2] The Initial Motion and the Supplemental Motion are referred to together as the "Motion."

1

requested by the [FHFA] is ordered to be conducted" (Hr'g Tr. at 86:5-8)

(Aug. 14, 2012) ("Hr'g Tr.") and

(ii) to address "whether ResCap is required under the shared services agreement[3]

and statement of work and any other exhibits to it to provide loan files to Ally,

and who pays for it, and how is it determined at what price it'll be paid for"

(Hr'g Tr. at 85:18-22.)

2.      As described in more detail below, the burdens of producing the sought

loan files are substantial and the Shared Services Agreement does not provide for, and was not

intended to provide for, the Debtors to produce loan files with respect to litigation brought

against Ally to which the Debtors are not parties.

## **BACKGROUND**

3.      On July 17, 2012, FHFA filed the Initial Motion, seeking the production

of "loan tapes" and "originator information" and arguing that the discovery it was seeking was

"extremely limited" and "consist[s] of just 21 data files . . . ." (Initial Motion at 13.) The

Debtors and FHFA have agreed to resolve the Initial Motion.

4.      On July 20, 2012, FHFA filed the Supplemental Motion seeking access to

"Loan Files" on the "same [legal bases] as those set forth in the [Initial] Motion with respect to

the loan tapes and originator information." (Supplemental Motion at 3.) FHFA did not indicate

in its Supplemental Motion how many Loan Files it is seeking. The number could have been as

high as 105,000 loan files based on the number of loans in the 21 securitizations at issue in the

FHFA Litigation.

---

[3] The Court authorized the Debtors and Ally Financial Inc. ("AFI") to enter into a shared services
agreement (the "Shared Services Agreement") on June 15, 2012. A copy of the executed Shared Services
Agreement is attached as Exhibit A to the Woehr Declaration.

2

5.      In the *Federal Housing Finance Agency's Reply in Further Support of Its Motion Pursuant to Orders of the Honorable Denise L. Cote Seeking Limited Discovery from the Debtors and, If Necessary to that Purpose, Relief from the Automatic Stay* filed on August 10, 2012 ("Reply") (ECF No. 1086), FHFA for the first time asserted that it was seeking "only" 5,000 Loan Files from the Debtors (Reply at 6).[4]  FHFA has not provided a list of the specific Loan Files it seeks.

6.      At the preliminary hearing on the Motion, counsel for other defendants in the FHFA Litigation ("Underwriter Defendants") stated that if FHFA received any Loan Files from the Debtors, the Underwriter Defendants would require Loan Files as well because they oppose FHFA's sampling methodology.  At the Court's direction, the Debtors conferred with Underwriter Defendants to determine how many Loan Files they would ultimately be seeking from the Debtors.  The Underwriter Defendants informed the Debtors that they would be seeking all of the Loan Files contained in the supporting loan groups of the securitizations at issue in the FHFA Litigation, which they estimate total 43,000 Loan Files.[5]

## SUPPLEMENTAL OBJECTION

## I.      The Burdens of Producing Loan Files

7.      In this section, and in the Supplemental Mongelluzzo Declaration, the Debtors address the costs and burdens of producing the 5,000 Loan Files that FHFA now asserts that it seeks.  The Debtors also address the costs and burdens of producing the 43,000 Loan Files

---

[4] One week after submitting its Reply in which it claimed to be seeking only 5,000 Loan Files, FHFA issue a very broad subpoena to Homecomings Financial, LLC, a Debtor, seeking the production of innumerable documents for not only the FHFA Litigation, but also many of the other cases the FHFA is pursuing before Judge Cote.  (*See* Haims Decl., Ex. A)  That subpoena demands *all* Loan Files originated by Debtors (among myriad other documents including emails) for dozens of securitizations.

[5] The Debtors have not received a Loan File request from AFI.

that the Underwriter Defendants have asserted they will need from the Debtors to defend the

FHFA Litigation.

### A.    Burdens and Costs of Producing 5,000 Loan Files to FHFA

8.    Producing the 5,000 Loan Files requested by FHFA is no small task.

Identifying the location of those files requires searching for all of them through all of the

Debtors' 14 databases, which would take approximately three days and occupy the time of two

Fulfillment Group employees.  (Mongelluzzo Suppl. Decl. ¶ 6.)

9.    After running those searches, the Fulfillment Group employees would

have to resolve "exceptions" that turn up in the searches.  (*Id*. ¶ 7.)  It would likely take the

Fulfillment Group approximately two days to resolve all of the exceptions.  (*Id*.)

10.    After identifying the location of all of the Loan Files through the databases

and resolving exceptions, the Fulfillment Group would then send requests to the Debtors' third-

party storage vendors to pull the physical files.  (*Id*.)  In the Debtors' contracts with those

vendors, there is a limit of 1,250 boxes per week[6] that the vendors are required to pull at the pre-

determined contractual rate.  (*Id*. ¶ 8.)  Although each box typically contains up to ten Loan

Files, most boxes will only have one or two Loan Files that are actually being sought, and many

Loan Files have components in more than one box.  (*Id*.)  Assuming the Debtors request no

additional Loan Files from the vendors while working on FHFA's Loan File request (which

would certainly not be the case), it could take approximately five weeks or more for all 5,000

Loan Files to be pulled by the vendors.  (*Id*. ¶ 9.)

---

[6] In the Objection, Debtors had asserted that the contractual limit was 250 boxes per week.  That was an error, and should have been 1,250 boxes per week.  (Mongelluzzo Suppl. Decl. ¶ 8 n.1.)  All of the calculations herein are based on the revised and correct number.

4

11.     The storage vendors can sometimes pull documents more quickly than 1,250 per week, but that comes at increased cost and is subject to their physical capacity. (*Id*. ¶ 10.) Most importantly, the Debtors already use all or most of their contractual capacity with the requests they make during the course of running their businesses. (*Id*. ¶ 9.) For example, in July 2012, the Debtors requested 5,082 Loan Files and in August 2012, the Debtors' requests exceeded 8,000 Loan Files. (*Id*.) There are constantly additional requests coming in, such as the request by the Creditors Committee for 1,500 Loan Files that they have requested be expedited. If these trends continue, it is likely that *all* 5,000 Loan Files will have to be requested outside the scope of the contractual limitations. (*Id*.)

12.     After the storage vendor pulls the Loan Files, they are sent for imaging to an imaging vendor. (*Id*. ¶ 11.) Although imaging an individual Loan File is not particularly time consuming, bulk requests such as would be required to produce 5,000 Loan Files over the course of several weeks represent a significant increase in volume, and usually the imaging vendors spread out those bulk requests so as not to interfere with the other time-sensitive requests from the Debtors that are critical to operating their businesses. (*Id*.)

13.     To summarize, in the best case scenario, it could take approximately five to seven weeks to produce 5,000 Loan Files while occupying the time of two of the Debtors Fulfillment Group employees. (*Id*. ¶ 12.) That timing and burden is exclusive of the additional time it would take to finalize, process, and bates stamp, the Loan Files. (*Id*. ¶ 13.)

14.     The costs associated with producing 5,000 Loan Files are also substantial. If the Loan Files were produced within the standard contractual limitations of 1,250 boxes being pulled per week, each Loan File would cost approximately $25-28 to produce, meaning the total out-of-pocket costs would be $125,000 to $140,000. (*Id*. ¶ 13.) However, as noted above,

because of the regular requests for documents that the Debtors make, nearly all—if not all—of

any Loan File requests made for FHFA would be in excess of those contractual prices.  (*Id.* ¶ 9.)

Therefore, the costs to pull each Loan File are likely to be $75-$100 per Loan File, meaning the

total out-of-pocket costs for producing 5,000 Loan Files could be as much as $375,000-

$500,000.  (*Id.* ¶ 14.)  Those costs are exclusive of the costs of litigation processing (including

bates stamping, hosting, and related costs) and the costs of outside counsel involved in such

production.  (*Id.* ¶ 13.)

> **B.    Burdens and Costs of Producing 43,000 Loan Files to the Defendants
> in the FHFA Litigation**

15.    It is self-evident that producing 43,000 Loan Files is significantly more

burdensome and costly than producing 5,000 Loan Files.  Attempting to do so on any type of

expedited time frame makes the task much more expensive and burdensome, and will impinge

on the Fulfillment Group's ability to meet obligations necessary for the restructuring and the

operation of the Debtors' business.

16.    Just searching Debtors' databases for 43,000 Loan Files is likely to take

more than a week.  (*Id.* ¶ 17.)  Then, the Fulfillment Group will spend one to two weeks clearing

exceptions and fixing other errors that the search process brings up.  (*Id.* ¶ 18.)  And, because of

the size of these searches, they will have to be conducted at night because otherwise, they would

prevent any other searches of the Debtors' databases from taking place, including searches

critical to running the Debtors' business and meeting its restructuring and other obligations.  (*Id.*

¶ 17.)[7]

---

[7] As described in the Objection, these obligations include, but are not limited to, producing Loan Files to
the Creditor's Committee and Examiner, processing Loan Files necessary to comply with the April 13,
2011 Consent Order with the Board of Governors of the Federal Reserve, and processing Loan Files in
preparation for the sale process.

ny-1055729

17.     Once the Fulfillment Group identifies the location of all 43,000 Loan Files, it can tell the Debtors' storage vendors to locate and pull the files. (*Id.* ¶ 19.)  If the storage vendors pull the documents at the rate of 1,250 boxes per week—which is all they are required to do by contract—it would take approximately 34 weeks to pull all 43,000 Loan Files. However, as noted above, the Debtors are already requesting on a monthly basis thousands of Loan Files to run their business and meet their other pressing obligations, meaning all, or nearly all, of the 43,000 Loan Files at issue would have to be requested on an extra-contractual basis. (*Id.*)

18.     As with a request for 5,000 Loan Files, having 43,000 Loan Files processed by Debtors' imaging vendors over the course of eight or so months for scanning will take significant time.  Although it is hard to estimate the specific times and burdens, there is little doubt that sending hundreds of thousands of pages of Loan Files to be scanned will impede the imaging vendor's ability to meet the Debtors' other requests.

19.     In sum, it would take approximately ten months to produce 43,000 Loan Files and, during that time, the Fulfillment Group and the Debtors' various vendors would be significantly strained. (*Id.* at ¶ 21.)

20.     The out-of-pocket cost of producing the 43,000 Loan Files, if done on that non-expedited basis, and assuming the Debtors had no other Loan File requests—which is not the case—would be approximately $1,075,000 to $1,204,000 based on a cost of $25-$28 per loan file.  (*Id.* ¶ 22.)  However, in reality, since the Debtors are already requesting at or near their full contractual limit of boxes per week, the costs to produce the 43,000 Loan Files at issue would more likely be approximately $3,225,000 to $4,300,000.  (*Id.*)  These costs are exclusive of

7

internal operating costs to the Debtors, costs of litigation vendors to host, process, and produce the documents. (*Id.* ¶ 13.)

21.    Even setting aside these tremendous costs, producing 43,000 Loan Files would be very burdensome to the Debtors—in particular to the Fulfillment Group—and interfere with their restructuring obligations and operating their business.  Although the impact would primarily be felt by the Fulfillment Group, it would nonetheless have a meaningful negative impact on the Debtors' business if they were required to process and produce tens of thousands of documents in addition to those documents required for running the business and meeting various restructuring related obligations.

## II.    Shared Services Agreement

22.    The Court also requested briefing to address "whether ResCap is required under the shared services agreement and statement of work and any other exhibits to it to provide loan files to Ally, and who pays for it, and how is it determined at what price it'll be paid for." (Hr'g Tr. at 85:18-22.)

23.    As an initial matter, AFI has not requested any Loan Files from the Debtors for the FHFA Litigation, and has sought dismissal from that case based on FHFA's failure to adequately allege control-person liability as to AFI.  In any event, as detailed below, the Shared Services Agreement and the statements of work were not intended to require the Debtors to provide the production of the Loan Files at issue here.

24.    However, if AFI were to request from the Debtors the production of the Loan Files under the Shared Services Agreement, and if this Court were to require the Debtors to make the production under the terms of the Shared Services Agreement, someone other than the Debtors, presumably AFI as the only other party to the Shared Services Agreement, would be

8

required to pay all costs of the production, including out-of-pocket production costs and costs associated with the use of the Debtors' employees and systems.

### A.    History, Purpose, and Scope of Shared Services Agreement

25.    Prior to the Petition Date, Debtors, AFI, and certain of their affiliates provided various financial, operational and administrative services.  (Woehr Decl. ¶ 4.)

26.    The Debtors and AFI historically provided these services on a documented basis, but that prior agreement did not provide detailed descriptions of the services being provided.  (*Id.* ¶ 5.)  Accordingly, on May 14, 2012, the Debtors moved for entry of interim and final orders, under sections 105(a) and 363(b) of title 11 of the United States Code authorizing Debtors to enter the Shared Services Agreement with AFI *nunc pro tunc* to the Petition Date for the continued receipt and provision of shared services between Debtors and AFI necessary for the continued operation of the Debtors' businesses (the "Shared Services Agreement Motion") (ECF No. 41.).[8]  This Court issued an interim order on May 15, 2012 (ECF No. 92) and a final order on June 15, 2012 (ECF No. 387) authorizing Debtors to enter into the Shared Services Agreement with AFI.

27.    The Debtors entered into the Shared Services Agreement because they determined it was in their best interest to compile a comprehensive and integrated agreement, to become effective post-petition, and to ensure that (i) the Debtors obtain and pay for only those services that are necessary during their Chapter 11 cases; (ii) the services that are being provided between Debtors and AFI are specifically identified; and (iii) the Debtors may reduce or terminate the receipt of services at any time, including, without limitation, following the closing of a sale of substantially all of the Debtors' assets.  (Woehr Decl. ¶ 5.)

---

[8] The Shared Services Agreement was entered into by Residential Capital LLC, which is referred to herein as "Debtors" for internal consistency.

28.     The Shared Services Agreement—at its name implies—deals solely with *services* and does not alter the ownership of any data or documents belonging to the Debtors or AFI.  (Shared Services Agreement, § 8.2.)

29.     The Debtors' reasons for entering into a Shared Services Agreement are clear on the face of the Shared Services Agreement Motion; they aimed "to allow for a smooth transition to operating as a debtor in possession, facilitate [its sales of assets], and complete a wind-down of the Debtors' businesses following a sale."  (Shared Services Agreement Mot. ¶ 12.)  Pursuant to the Shared Services Agreement, among other things, Debtors and AFI entered into various statements of work pursuant to which Debtors agreed to provide certain services to AFI and AFI's subsidiary, Ally Bank.  (Woehr Decl. ¶ 7.)

30.     The purpose of the Shared Services Agreement was to allow Debtors and AFI to continue sharing the services post-bankruptcy that they had shared pre-bankruptcy.  (*Id.* ¶ 4.)  Therefore, the statements of work were intended to capture, and not expand upon, the scope of services that had been provided between Debtors and AFI prior to the bankruptcy filing.  (*Id.* ¶ 6.) The Shared Services Agreement makes clear that parties did not intend the services to increase beyond the scope of what they had provided pre-bankruptcy, and explicitly makes provision for "reasonable" increases in service.  (Shared Services Agreement, § 3.3(b).)  The Shared Services Agreement also permits a party to request—but does not obligate the other party to provide—"Additional Services" that are completely outside the scope of its terms.  (*Id.* § 3.2.)

31.     Two statements of work have been raised as a possible basis for requiring the Debtors to provide Loan Files to AFI.  The first relates to "legal services" (the "Legal

10

Services SOW") and the other relates to "record services" (the "Record Services SOW"). Summaries of all the statements of work were attached to the Shared Services Motion.[9]

32.    Under the Legal Services SOW, Debtors agreed to provide AFI, "consistent with current and historical practice: Legal advice and counseling, including litigation management and support, including service of process, e-discovery, discovery responses, and litigation holds as may be necessary or required by AFI from time to time, including without limitation, making available relevant systems and software that may be developed by or for the e-discovery team . . . ."  (Legal Services SOW at 1 (attached as Ex. B to Woehr Decl.).)

33.    Under the Record Services SOW, Debtors agreed to provide to AFI, upon AFI's request, certain enumerated record services, including, among other things:  "process requests for files/documents that are received from internal and external clients for loans sales, litigation requests, audits and reconciliation projects." (Record Services SOW at 2 (attached as Ex. A to Mongelluzzo Decl.).)

34.    Schedule C to the Shared Services Agreement ("Schedule C") sets forth a pricing methodology for services provided under the agreement.  (Woehr Decl. ¶ 10.)  Pursuant to Schedule C, AFI is responsible for paying "monthly fixed charges" and "monthly variable charges" for services provided by ResCap under each statement of work, as described in Schedule C-2b.  (Schedule C, § 1.4(c)-(d)) (Woehr Decl. ¶ 10.)  Schedule C also provides that

---

[9] The only statements of work that could possibly have any bearing here are those that involve the provision of services from the Debtors to AFI.  Therefore, none of the services AFI has to provide to the Debtors under the Shared Services Agreement could conceivably be read to require the Debtors to provide Loan Files to AFI.  Despite this obvious conclusion, FHFA has apparently raised in the proceeding before Judge Cote the "Legal Services" and "Loan Review" services that *AFI provides to the Debtors* under the Shared Services Agreement as possible grounds for establishing the Debtors' obligation to provide Loan Files to AFI.  That Legal Services statement of work calls for AFI to provide legal advice and counseling on matters applicable to ResCap's business, and the Loan Review statement of work relates to a bi-annual review of a small sample of loan files for compliance purposes—and nothing in either of those SOWs was intended or contemplated to call for ResCap to provide Ally with tens of thousands of loan files in ResCap's possession.  (Shared Services Agreement Mot., Ex. B at 7.)

out-of-pocket expenses actually incurred by ResCap in connection with providing a service to

AFI will be borne directly by AFI, as a "pass-through expense." (Schedule C, § 1.4(e)) (Woehr

Decl. ¶ 10.) For the Legal Services SOW, the monthly fixed charges are $21,481 and costs of

external counsel are "Monthly Variable As incurred." For the Record Services SOW, the

monthly fixed charges are $49,829 and all "3rd Party Costs" are "Monthly Variable As

incurred." (Schedule C-2b) (Woehr Decl. ¶ 10.)

35.    The intention of these provisions is to ensure that each party is

compensated for the value of services provided to the other party. (Woehr Decl. ¶ 10.) The

"monthly fixed charges" are intended to represent the actual costs of providing the services to

each other. (*Id.*)

> **B.    The Shared Services Agreement Does Not Require the Debtors to
> Produce Any Documents to FHFA or the Underwriter Defendants**

36.    Regardless of how one reads the Shared Services Agreement, one thing is

abundantly clear: nothing anywhere in that agreement provides a basis for FHFA or the

Underwriter Defendants to directly seek documents from the Debtors.

37.    Not only that, but the Shared Services Agreement expressly excludes

third-party beneficiaries—which is exactly what FHFA or the Underwriter Defendants would be

if they attempt to assert the Shared Service Agreement allows them to get documents directly

from the Debtors. (Shared Services Agreement, § 16.14.) Indeed, they lack standing to enforce

the terms of the Shared Services Agreement. *See, e.g.*, *Highlands Ins. Co. v. PRG Brokerage,

Inc.*, No. 01 Civ. 2272, 2004 U.S. Dist. LEXIS 83, at *42-44 (S.D.N.Y. Jan 6, 2004).

38.    And, just as importantly, FHFA and the Underwriter Defendants have no

standing to seek a declaration from this Court as to what the rights of the parties under the

Shared Services Agreement are because "[p]arties who lack standing to enforce an agreement

also lack standing to seek a declaration of rights under the contract." *Eaton Vance Mgmt. v. Forstmannleff Assocs., LLC*, No. 06 Civ. 1510, 2006 U.S. Dist. LEXIS 55741, at *17 (S.D.N.Y. Aug. 11, 2006).

39.     Because the Shared Services Agreement has no bearing whatsoever on FHFA's or the Underwriter Defendants' request to the Debtors for Loan Files, these requests should be treated as third-party requests for the production of documents.  Such a request can only be properly made through a third-party subpoena, and would be governed by Rule 45 of the Federal Rules of Civil Procedure.  As fully briefed by the Debtors in their Objection, the automatic stay prohibits the type of third-party discovery from Debtors that is sought here. (Objection at 12-25.)  This Court has already stated that a subpoena constitutes judicial process subject to the stay under section 362(a)(1).  (Hr'g Tr. at 70:6-8) ("[O]rdinarily process is usually in the form of a subpoena; that's judicial process.")

40.     However, even presuming that the automatic stay does not apply, which the Debtors do not concede, the production of the documents sought by FHFA and the Underwriter Defendants should not be permitted because Federal Rule of Civil Procedure 45 makes clear that a discovery request pursuant to a third-party subpoena cannot be unduly burdensome on the respondent.  Rule 45 specifically states that "a party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(c)(1).  Clearly, requesting thousands of loan files from a debtor in bankruptcy does not accomplish this.

41.     Even if production were compelled, Rule 45 directs that any order requiring compliance with the subpoena "*must* protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  Fed. R. Civ. P.

13

45(c)(2)(B)(ii) (emphasis added).  Demanding that the Debtors incur at least hundreds of thousands of dollars of production expenses violates this basic principle.

42.    It is clear, therefore, that the requesting party—in this case FHFA or the Underwriter Defendants—should bear the discovery costs for any production they are able to compel from the Debtors.  *In re Law Firms of McCourts & McGrigor Donald*, No. M19-96, 2000 U.S. Dist. LEXIS 20287, at *3 (S.D.N.Y. Nov. 3, 2000) (noting that after the 1991 amendments to Rule 45, it became mandatory for district courts to alleviate excessive costs to third parties).

43.    Whether the costs associated with responding to a third-party subpoena will be shifted to the requesting party is determined by a three-factor balancing test that requires the court to weigh:  "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the cost than the requesting party, and whether the litigation is of public importance."  *In re Law Firms of McCourts & McGrigor Donald*, 2000 U.S. Dist. LEXIS 20287, at *4, 7-8 (applying the three-factor test to determine that subpoena respondent must produce the requested documents "only after receiving in advance the reasonably estimated costs of production, including the attorney's fees"); *see also*, *Israel v. Carpenter*, No. 95 civ. 2703, 2002 U.S. Dist. LEXIS 11792, at *3-4 (S.D.N.Y. June 28, 2002) (conditioning enforcement of a subpoena to a non-party on the requesting party's payment of the reasonable cost of production and copying incurred by the non-party).  *Cf Zubalake v. UBS Warburg LLC*, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) (factors including "the total cost associated with production" and "the resources available to each party" must be considered when determining whether to shift discovery costs between parties to a litigation).

14

44.     Therefore, if the Court is inclined to require the Debtors to produce

documents to FHFA or the Underwriter Defendants, it should require those parties to bear the

costs of the productions they demand, just as other third parties have agreed to bear such costs in

these cases.  (*See* Stipulation and Order Modifying the Automatic Stay to Permit Limited Third

Party Discovery filed on Aug. 27, 2012 (ECF No. 1271).)

**C.     The Shared Services Agreement Does Not Require the Debtors to
Provide AFI With the Loan Files at Issue Here**

45.     Clearly, neither FHFA nor the Underwriter Defendants can compel the

Debtors to produce documents through any provision of the Shared Services Agreement.

However, should this Court (or any other Court) direct AFI to attempt to seek the production of

Loan Files through the Shared Services Agreement, such an attempt would fail because the

Shared Services Agreement does not require that the Debtors provide such discovery to AFI.

But, even if the Shared Services Agreement were construed to require the Debtors to provide the

Loan Files at issue to AFI, AFI, not the Debtors, would be responsible for the costs of any such

production.

**(i)     The Legal Services SOW Does Not Cover The Production of
Loan Files**

46.     The Legal Services SOW, which has been touted by FHFA as a basis for

AFI producing the Loan Files at issue, simply does not cover the production of the Debtors'

Loan Files.

47.     FHFA has seized upon language of the Legal Services SOW, which

provides for the Debtors to provide AFI with "Legal advice and counseling, including litigation

management and support, including service of process, e-discovery, discovery responses, and

litigation holds as may be necessary or required by AFI from time to time, including without

15

limitation, making available relevant systems and software that may be developed by or for the

e-discovery team . . . ."  (Legal Services SOW at 1.)

48.    A plain reading of that provision makes clear that the Legal Services SOW

relates primarily to *legal advice and counseling* related to, among other things "e-discovery" and

"discovery responses."  The Legal Services SOW on its face does not cover the actual collection

and production of Loan Files.  And this was the precise intent of the parties when they entered

into the Shared Services Agreement and Legal Services SOW.  (Woehr Decl. ¶¶ 17-21.)

49.    The "e-discovery" and "discovery responses" clauses in fact have nothing

to do with Loan File (or similar file) production at all, and cannot be used as a basis here to

compel the production of Loan Files from the Debtors to AFI.  And that makes sense in the

context of the functions captured by the Legal Services SOW because the Debtors' legal

department (the "Legal Department") is not and has not been responsible for collecting and

producing Loan Files.  (*Id*. ¶ 17.)

50.    Rather, the "e-discovery" clause was intended to provide AFI with

continued access to the Debtors' e-discovery tools to collect *its own* emails and to process *its*

*own* electronic documents for production.  (*Id*. ¶ 18.)  Those tools and the e-discovery team that

runs them operate as part of the Legal Department and are not involved in the collection,

processing, or production of Loan Files.  (*Id*. ¶ 19.)  Pre-petition, AFI and the Debtors shared an

"e-discovery team" that was responsible for collecting archived e-mails, implementing document

preservation protocols, and other related tasks; this clause was simply intended to ensure that

those same e-discovery services continued to be provided by the Debtors to AFI post-petition.

(*Id*. ¶ 20.)

16

51.    In other words, the "e-discovery" clause was intended to ensure that AFI
was able to access *its own* electronic documents after the e-discovery team was relocated to the
Debtors.  (*Id.* ¶ 18.)  Nothing about that clause was intended to cover the discovery sought by
FHFA and others here, which is of the *Debtors'* documents, outside the scope of the e-discovery
team's responsibilities and capabilities.  (*Id.*)

52.    The "discovery responses" clause in the Legal Services SOW is similarly
irrelevant to the issues here.  That provision covers—at most—(1) *legal advice and counseling*
related to "discovery responses" (i.e., legal advice from the Legal Department in responding to
written discovery responses and interrogatories, where necessary) and (2) assistance from the e-
discovery team in processing *AFI's documents* in response to discovery requests.  (*Id.* ¶ 21.)
Both are a far cry from an obligation to produce tens of thousands of the Debtors' Loan Files to
AFI.

53.    Although the text of the Legal Services SOW is plain that the production
of Loan Files is not within its ambit, the other portions of the Shared Services Agreement also
support that conclusion.  In Schedule C-2b to the Shared Services Agreement, which sets forth
the pricing of all of the services the Debtors are to provide to AFI, the only "services" provided
for under the Legal Services SOW are for (1) Internal Counsel and (2) External Counsel.
(*Id.* ¶ 22.)  This supports the clear language of the Legal Services SOW that indicates it relates
primarily to *legal advice and counsel*.  Clearly, if the parties had intended to include the
production of tens of thousands of Loan Files within the scope of the Legal Services SOW, they
would have addressed in the Agreement the potential for millions of dollars in out-of-pocket
expenses that such a production would require.

17

54.     In short, the Legal Services SOW simply has nothing whatsoever to do with the production of Loan Files to AFI, and it cannot therefore be used to compel the Debtors to produce the Loan Files sought here by FHFA and the Underwriter Defendants.

> (ii)     **The Type and Scope of Discovery Sought by FHFA and the Underwriter Defendants Is Outside the Scope of the Record Services SOW**

55.     Similar to the Legal Services SOW, the Record Services SOW simply does not cover the large-scale production of Loan Files at issue here.

> a.     **The Scope of the Record Services SOW is Clear From Its Text, the Intent of the Shared Services Agreement, and Historical Practice**

56.     As described above, the Record Services SOW, along with all the other statements of work in the Shared Services Agreement generally, is intended to capture only those services that Debtors provided to AFI prior to the bankruptcy.  (Mongelluzzo Suppl. Decl. ¶ 27.) That includes the provision of the Record Services SOW that states the Debtors will process "request[s] for files/documents that are received from internal and external clients for loan sales, litigation requests, audits and reconciliation projects."[10]  (*Id.*)

57.     Those pre-petition services were always very limited, and never included a request such as the one at issue here.  (*Id.* ¶ 28.)  Typical requests that the Fulfillment Group received from AFI pre-bankruptcy were for small numbers of files (including Loan Files) that were necessary for ordinary business purposes, such as individual foreclosure cases, repurchase requests, among others. (*Id.*)  Most commonly, the Fulfillment Group pulled one or two Loan Files at a time for AFI.  (*Id.* at ¶ 28.)  On rare occasions, AFI requested a few hundred Loan Files

---

[10] By its terms, the "files/documents" referenced in the Record Services SOW are limited to "mortgage loan file records associated with origination/purchase and servicing of mortgage assets."  (Record Services SOW at 1.)

from the Fulfillment Group, and no such request prior to the bankruptcy involved more than a few hundred Loan Files.  (*Id.*)[11]

58.    Further evidencing this intent is the "Service Level Agreement Timeline" attached to the Record Services SOW.  (Record Services SOW, Ex. D, ¶ 1.)  That timeline provides that "Folder and Document Request[s]" are to be "[o]rdered on the same business day [the] request is made."  (*Id.*)  As is clear from both of the Mongelluzzo declarations, it is a literal impossibility to place an order for 5,000 (and certainly for 43,000) Loan Files on the same day such a request is received.  Such a fast turnaround is only practical where a very small number of Loan Files—such as those typically requested and contemplated by the Record Services SOW— are at issue.

59.    The fee structure set forth in the Shared Services Agreement also comports with the parties' intention for the Records Services SOW to capture typical document processing the Fulfillment Group performed for AFI prior to the bankruptcy.  That fee structure, which allocates just under $50,000 to Debtors per month for Record Services, was arrived at based on the customary costs of the services typically provided prior to the bankruptcy—which included, among other things—only modest and limited Loan File pulls.  (Mongelluzzo Suppl. Decl. ¶ 30.)  If AFI and Debtors intended for the Record Services SOW to include projects requiring the production of thousands of Loan Files, the flat monthly fee for the services provided by Debtors under the Record Services SOW would have undoubtedly exceeded the $50,000 that was allocated, because the production of thousands of Loan Files would cause a

---

[11] The only occasions in which the Fulfillment Group pulled tens of thousands of Loan Files for *any party* in litigation was for *Debtors* when *Debtors* were defendants in those cases, not when they were third parties.  One such example is the MBIA case discussed in the Objection and the Supplemental Mongelluzzo Declaration.  Debtors and AFI did not intend for the Record Services SOW to include the production of thousands of Loan Files for AFI in litigation in which the Debtors were not involved: such a large scale document pull was unprecedented prior to the bankruptcy.  (Mongelluzzo Suppl. Decl. ¶ 28.)

huge burden, tie up many members of the Fulfillment Group for extended periods of time, and tie up the Debtors systems and operations. (*Id.*)

60.    The context of the Shared Services Agreement, and section (b) of the Record Services SOW in particular, are critical in understanding the intended purpose of the provision relating to "process[ing] requests for files/documents that are received from internal and external clients for loans sales, litigation requests, audits and reconciliation projects" in the Record Services SOW. *Wong v. N.Y. Times Co.*, 297 A.D.2d 544, 547 (N.Y. App. Div. 2002) ("A fair and reasonable interpretation, consistent with that purpose, must guide the courts in enforcing the agreement." (citation omitted).)

61.    Indeed, while the clause "litigation requests" might be pointed to as evidence that the Shared Services Agreement covers the massive requests at issue here, taken in the proper context, it is clear that it does not. Even when "words [in a contract] might 'seem to admit of a larger sense'" the court's interpretation "'should be restrained to the particular occasion and the particular object which the parties had in view.'" *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491 (N.Y. 1989) (quoting *Robertson v. Ongley Elec. Co.*, 146 N.Y. 20, 23 (N.Y. 1895).

62.    So, despite other parties' attempts to broaden the purpose and meaning of the Records Services SOW, what the FHFA now seeks to do here—compel the production of thousands (and tens of thousands) of Loan Files in a case in which the Debtors are not parties—is simply not what the Shared Services Agreement permits.

　　　　　　b.    **The Shared Services Agreement Explicitly Addresses Services That Are Beyond the Scope of the Statements of Work**

63.    Removing all doubt as to whether the production of thousands of Loan Files is within the Record Services SOW is the fact that the Shared Services Agreement

specifically provides a mechanism to address the provision of services not contemplated thereunder.  Such requests are considered "Additional Services" under the Shared Services Agreement and require explicit agreement from the Debtors to provide them and requires the parties to negotiate the rate and other terms for such services.  (Shared Services Agreement, § 3.2.)  Perhaps most importantly, pursuant to Section 3.2 of the Shared Services Agreement, the Debtors *are not* required to agree to provide Additional Services.  (*Id.*)

64.    If AFI wants Additional Services from the Debtors, pursuant to Section 3.2 of the Shared Services Agreement, it may, from time to time during the term, upon at least ninety (90) days prior written notice to Debtors, request that Debtors provide those services.  Because of the massive scope and burden (costs aside) of the theoretical Additional Services at issue here, the Debtors very likely will not be able to agree to provide the Additional Services.  However, even if they were to do so, before Debtors have any obligation to provide Additional Services relating to the production of thousands of loan files, Debtors and AFI need to agree on the scope of such Additional Services and the charges therefor.  (*Id.*)

65.    If Debtors agreed to provide Additional Services to AFI, AFI would bear the costs of such additional services (Schedule C, § 3.5), and the Shared Services Agreement requires the parties to negotiate the terms of such Additional Services. (Shared Services Agreement, § 3.2.)

66.    Further supporting the conclusion that the requests at issue here are at most to be considered "Additional Services," is that the only other conceivable avenue to compel the production of Loan Files through the Shared Services Agreement would be through a "Change in Services" which accounts for increases in the amount of services provided by Debtors to AFI (the Change in Services provision of the Shared Services Agreement is described

fully below).  (Shared Services Agreement,  § 3.3(b).)  However, only "reasonable" increases in
services are within the scope of that provision.  (*Id.*)

67.     The request for 5,000 or 43,000 Loan Files is so significant, and so far
exceeds the very small numbers of Loan Files ever provided to AFI pre-petition, that clearly it
amounts to an *unreasonable* increase in services that the Debtors agreed to provide in the Record
Services SOW, and therefore cannot be compelled from the Debtors through the Shared Services
Agreement other than as a separately negotiated Additional Service.

**D.      If Debtors Are Required to Produce the Loan Files Pursuant to the
Shared Services Agreement, AFI Must Bear the Cost of Production**

68.     As described above, the Shared Services Agreement does not cover the
production of Loan Files here.  But, even if the Court finds that the request for 5,000 or 43,000
Loan Files is within the scope of the Record Services SOW and can be required to be produced
to AFI, the Shared Services Agreement requires AFI to bear not only the third-party costs of
producing those documents, but also the increased internal costs to the Debtors.

**E.      If the Production of Thousands of Loan Files is a "Change
Requested" By AFI, AFI Must Pay All Out-of-Pocket Costs and All
Increased Operational Costs of the Debtors**

69.      As noted above, under Section 3.3 of the Shared Services Agreement,
AFI may require Debtors from time to time, upon at least thirty (30) days' notice, to *reasonably*
increase the amount of services to be provided by Debtors to AFI under any statement of work
and the corresponding increase in charges shall be determined in accordance with the procedures
set forth in [Schedule] C.  (Shared Services Agreement, § 3.3(b).)  Given that FHFA has
requested 5,000 Loan Files and the Underwriter Defendants have requested 43,000 Loan Files,
and given that the average project under the Record Services SOW was intended to require
Debtors to produce in the range of a few loan files up to a few hundred loan files at most,

complying with the current requests would not be a "reasonable" increase in the amount of services required to be provided by Debtors under the Record Services SOW, and, as noted above, would have to be considered—at best—an Additional Service.

70.    However, if the Court were to conclude that a request of 5,000 or 43,000 Loan Files was a "reasonable" increase over the handful of documents typically requested (which the Debtors strenuously disagree with), the Shared Services Agreement is clear that AFI must bear not only all out-of-pocket costs related to such production, but also any increased costs of overhead.

71.    Specifically, the Shared Services Agreement directs that where a party seeks an increase in services, "Charges shall be modified in accordance with the procedures set forth in [Schedule] C." (Shared Services Agreement, § 3.3(b).) Section 3.5 of Schedule C, in essence, directs that the parties will use "the cost allocation methodology that was used to determine the Initial Cost Allocation for such Service." (Schedule C, § 3.5.) In this context, that means AFI would still be responsible for the third-party out-of-pocket costs, but also the increased costs associated with the additional labor, time, and use of the Debtors' systems. Without knowing the precise scope of the increase at this time—which must be negotiated by AFI and the Debtors pursuant to the Shared Services Agreement—it is impossible to determine what the increase in the base price would be. Regardless, all the increased internal costs and burdens would also have to be borne by AFI.

23

## CONCLUSION

72.    For the foregoing reasons, the Debtors request that the Court enter an

Order denying the Motion and grant such other relief as the Court deems proper.

New York, New York                    /s/ Joel C. Haims
Dated: August 28, 2012                Gary S. Lee
                                      Joel C. Haims
                                      MORRISON & FOERSTER LLP
                                      1290 Avenue of the Americas
                                      New York, New York 10104
                                      Telephone: (212) 468-8000
                                      Facsimile: (212) 468-7900

                                      *Counsel to the Debtors and Debtors in Possession*

ny-1055729