**<u>EXHIBIT A</u>**

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              August 14, 2012

19              10:04 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1   are trying to paper at this point, and we will submit a

2   stipulation and consent order to Your Honor as soon as

3   possible.

4           THE COURT:  All right.  I'll adjourn the Gardner

5   matter, hopefully with a stipulation resolving it being

6   submitted.  Thank you, Mr. Klein.

7           MR. KLEIN:  Expeditiously, Your Honor.  I'm now going

8   to turn the podium over.  I think the next matter on the agenda

9   is the motion of the Federal Housing Finance Agency.  I'll turn

10  the podium over to Mr. Joel Haims, my colleague.

11          THE COURT:  Okay.

12          MR. HAIMS:  Good morning, Your Honor.  My name is Joel

13  Haims of Morrison & Foerster.  We're counsel to the debtors.

14  This is a preliminary hearing on the FHFA's motion to lift the

15  automatic stay to pursue discovery of the debtors.  Before I

16  turn the podium over to Mr. Glenn, I just want to update the

17  Court on resolution -- partial resolution.

18          We were able to reach agreement yesterday with respect

19  to two of the three parts of the motion.  The initial motion

20  sought loan tapes and originator information.  And yesterday we

21  were able to reach agreement on that portion of the motion.

22          We've also had discussions about the third portion,

23  which is the loan file production.

24          THE COURT:  That's in the supplement that --

25          MR. HAIMS:  It's in the supplement.

1           THE COURT:  -- FHFA filed?

2           MR. HAIMS:  Correct.  We've had some discussions about

3    that, but we haven't been able to reach resolution.  We've

4    talked about various ranges of production, but we haven't

5    gotten an actual specific number or list.  The two impediments

6    that we see to resolution on that front are:  one, is the FHFA

7    hasn't agreed to pay for the production, as others who sought

8    loan production from the debtors have agreed to; and secondly,

9    in our view, this opens up floodgates to others, particularly

10   in the FHFA case itself, because the debtors have an interest

11   in the defense of that case, because of indemnification

12   obligations to shared insurance coverage, and because of the

13   FHFA's stated position in the reply brief that they intend to

14   assert a claim against the debtors, so that if the debtors get

15   loan file production -- and if the FHFA gets loan file

16   production from the debtors, then the debtors are going to be

17   in a position in which we're going to have to give loan file

18   production to the defendants.  So it's going to have to be a

19   straight method.  And that's just the position we're in.

20           I will now turn it over to --

21           THE COURT:  All right, Mr. Glenn?

22           MR. GLENN:  Good morning, Your Honor.  Andrew Glenn,

23   Kasowitz Benson Torres & Friedman, on behalf of FHFA.  I'm

24   joined here today by my partner Kanchana Leung, who is the

25   litigation counsel in the FHFA litigation, along with Daniel

 1  Fliman.

 2          As our papers made clear, this is a motion to obtain

 3  documents filed at the direction of Judge Cote, who is

 4  presiding over that litigation.  The litigation is against a

 5  multitude of parties, including nondebtor affiliates, other

 6  unrelated underwriters and issuers.

 7          THE COURT:  I've read the complaint.

 8          MR. GLENN:  Thank you.  We've put forward two

 9  alternative theories --

10          THE COURT:  Let me ask you this.

11          MR. GLENN:  Yes, Your Honor.

12          THE COURT:  Have you resolved the issues with respect

13  to the loan tapes and the origination information?

14          MR. GLENN:  Yes, Your Honor, yes.  So just to put a

15  fine point on that, the first motion was filed at the direction

16  of Judge Cote to seek the loan tapes.  At a subsequent status

17  conference, she again directed us to file a motion before Your

18  Honor to pursue the loan files.  While it is true --

19          THE COURT:  Whoa.  Time out.  I didn't see where she

20  told you to pursue the loan files.  I definitely read the

21  transcript where she said to make the motion with respect to

22  loan tapes and origination information.

23          MR. GLENN:  I believe, Your Honor, that's the July

24  14th status conference transcript -- July 17th.  We cannot pull

25  the excerpt; that was in Ms. Leung's affidavit.  That was

1    during the argument, I believe, where she announced the

2    decision on the Section 105 injunction.

3              THE COURT:  July 17th?

4              MR. GLENN:  I believe.  Mr. Fliman will provide the

5    Court with the cite to the record on that.

6              So it's true, as the debtors set forth in their

7    papers, that there are notionally 105,000 dollar -- 105,000

8    loan files at issue in the securitizations covered by that

9    litigation, but the real starting point is about 63,000, which

10   is what we call the supporting loan groups, which support the

11   loans that are actually at issue in those securitizations with

12   respect to Ally.

13             The litigation is a very complex one and the parties

14   have devoted a substantial amount of time, because if you look

15   at those 63,000 loan files, multiply that across all the

16   securitizations at issue in the litigation, it makes sense for

17   no one to get every single loan file at issue.

18             THE COURT:  That's a very persuasive argument you've

19   just made.

20             MR. GLENN:  Yes.  So what we're working on in the case

21   is narrowing it down to a statistically relevant sample that

22   experts can use to extrapolate across the securitizations.

23             So what we've done in this case, Your Honor, to

24   alleviate the burden that the debtors have identified is to

25   narrow that number down, for purposes today, to 5,000 loan

1   files that we will select in conjunction with our experts.  And

2   we would hope that that would be the absolute outer limit --

3               THE COURT:  I'll tell you what.  Let me ask, are you

4   still in discussions with the debtors in trying to resolve the

5   issue as to production of loan files?

6               MR. GLENN:  I don't believe so, Your Honor.  I think

7   we've reached an impasse.

8               THE COURT:  Okay, go ahead.

9               MR. GLENN:  I do think that the impasse is who's going

10  to pay for it.  To put a very fine point on the argument -- I'm

11  sure Your Honor's read the papers -- there are two issues here:

12  one, does the automatic stay apply; and two, if it does apply,

13  should it be lifted in this case?

14              The company has argued that this application is going

15  to open the floodgates, and I think that's actually not true.

16  We are in a very unique position.  We are acting as conservator

17  for Freddie Mac, which has hundreds of billions of loans, and

18  our job is to resuscitate Freddie Mac, along with other

19  government-sponsored enterprises.

20              THE COURT:  Is there something that says that you have

21  a greater right than any of the other plaintiffs in any of the

22  other cases pending in federal and state courts around the

23  country?

24              MR. GLENN:  Yes, Your Honor.  There are two points on

25  that.  Number one, we, unlike every other entity, other than

RESIDENTIAL CAPITAL, LLC, ET AL.                        67

1    other government-sponsored entities and conservators of those

2    entities, are subject to a 105 injunction.  So the major

3    argument the companies made in this case is that discovery will

4    interfere with the reorganization efforts, will distract all

5    those arguments that are relevant for Section 105.  Judge Cote

6    has held, consistent with the Colonial Realty case enunciated

7    by the Second Circuit, that HERA, much like FIRREA, does not

8    allow a court to issue an injunction against FHFA.

9         THE COURT:  But she has not ruled that discovery from

10   the debtors is not subject to the automatic stay.  She sent you

11   here.

12        MR. GLENN:  That's correct.  I believe she indicated

13   that she did not believe that that was the case.

14        THE COURT:  Well, she didn't rule.

15        MR. GLENN:  That's the case.

16        THE COURT:  And so the matter's before me.

17        MR. GLENN:  That's correct.

18        So if Your Honor looks at the authorities they've

19   cited --

20        THE COURT:  Let me ask you this:  what about the Johns

21   Manville case, Judge Bryant's (ph.) decision?

22        MR. GLENN:  That case, Your Honor, includes a very,

23   very fulsome explanation of the interference with the

24   reorganization process.  The --

25        THE COURT:  Do you have any -- you haven't provided

1   the Court with any evidence rebutting the evidentiary showing

2   made by the debtors about the financial impact as well as

3   impact on the reorganization if the Court permitted your

4   discovery to go forward.  Now, I would acknowledge that, as

5   briefed at least as to the loan files, it was substantially

6   more than the 5,000 loan files that you've apparently narrowed

7   to.  But nevertheless, the debtors put in several declarations

8   that lay out in considerable detail the burden that would be

9   imposed on them to produce -- deal with loan files in

10  particular, and the cost of doing so wasn't refined down to

11  5,000 loan files.  So I don't know what they estimate the cost

12  to be; that wasn't set forth.  But do you agree that you have

13  not rebutted the debtors' evidentiary showing about the impact

14  on the reorganization proceeding and the expense to the debtor

15  if your discovery were to go forward?

16          MR. GLENN:  Your Honor, we have narrowed, as Your

17  Honor has indicated, to 5,000 loan files.  Our understanding --

18          THE COURT:  Let me --

19          MR. GLENN:  -- is the cost of that will be 25 dollars

20  each, for a total of 125,000 dollars.

21          THE COURT:  Just take it one step at a time.  You

22  agree that you have not offered any evidence at this stage of

23  what the cost -- and beside the cost, the impact on the debtor.

24  They set out in some detail the amount of time that would be

25  required to identify and retrieve loan files, arrange for

RESIDENTIAL CAPITAL, LLC, ET AL.                    69

1   copying, other -- admittedly their showing was based on

2   somewhere between 46,000 and 100-and-some-odd thousand loan

3   files, not 5,000 loan files, so I don't have evidence

4   specifically address that.  But you didn't put in any evidence

5   at all to rebut the evidentiary showing, which I consider

6   uncontroverted at this point.  You agree with that?

7          MR. GLENN:  That's correct, Your Honor.

8          THE COURT:  Okay, go ahead.

9          MR. GLENN:  But, again, that presumes that the

10  automatic stay applies --

11         THE COURT:  Yes --

12         MR. GLENN:  -- which we don't --

13         THE COURT:  -- which Judge Bryant in Manville did

14  find, correct?  You didn't seem to discuss that.  You discussed

15  the Ninth Circuit BAP decision in Miller, but you didn't really

16  delve into what Judge Bryant in the Southern District of New

17  York held in Manville on quite analogous facts and arguments.

18         MR. GLENN:  We did, Your Honor.  We indicated a

19  footnote that that case relates to an extension of the

20  automatic stay, not a proper and strict construction of Section

21  362 itself.  And if Your Honor goes to statute, it's -- there

22  is no argument rebutting the application or nonapplication of

23  Section 362.

24         THE COURT:  Well, let me ask you this.

25         MR. GLENN:  This is not an action against the debtor.

1          THE COURT:  Yes, but what that's -- 362(a), that's

2     what I -- I know what Collier says, I know what the Miller

3     decision says, but 362(a)(1) includes the issuance or

4     employment of process.  You've dismissed the debtors from your

5     action, and to get discovery from a third party, you have to

6     use process to do that, don't you?  I mean, it's -- ordinarily

7     process is usually in the form of a subpoena; that's judicial

8     process.  How is it that 362(a)(1) does not apply to the use of

9     judicial process to obtain discovery from a debtor?

10          MR. GLENN:  That provision -- in our position, Your

11    Honor, that process is service of the summons or summons

12    without notice.

13          THE COURT:  Is there -- do you have cases that say

14    that process doesn't include service of a subpoena?

15          MR. GLENN:  Well, I think it's the implication of

16    every case that we cited in our brief, the Collier's citation

17    and --

18          THE COURT:  So you would be entitled -- if it cost the

19    debtor ten million dollars to respond to your discovery, the

20    automatic stay would have no effect whatsoever.  You'd be

21    entitled to that discovery and all of the twenty-seven other

22    actions that have been filed involving RMBS claims.  Everybody

23    would be entitled to discovery from the debtor, whether it cost

24    ten million or a hundred million dollars, with no impact of the

25    automatic stay.

RESIDENTIAL CAPITAL, LLC, ET AL.                              71

1          MR. GLENN:  That's not correct, because every other --

2          THE COURT:  Isn't that the implication of your --

3          MR. GLENN:  No.  No, it's not, Your Honor.

4          THE COURT:  Why not?

5          MR. GLENN:  Because the implication is that in those

6    circumstances the Court could issue a 105 injunction against

7    everybody else.  If the SEC came in and said, we want to do --

8    we're giving the company a Wells notice for civil penalties, so

9    we're not even talking about police power, they would have to

10   produce those documents.

11         THE COURT:  That is a police power.

12         MR. GLENN:  I'm not sure about that, Your Honor.  And

13   that goes to my second argument.  We have the ability to issue

14   these subpoenas under our conservatorship statute, okay, and --

15         THE COURT:  Well, you're not proceeding with your

16   action as part of police power.  You're trying to recover

17   damages.

18         MR. GLENN:  At this point, that's correct.  But we do

19   have that power under the statute, just like any other entity

20   that is policing and governing interstate commerce like this.

21         In any event, there's no argument at all on subsection

22   3, that this is an act to obtain possession of property of the

23   estate.  We're asking for copies.  And I think that while Your

24   Honor's concerns are well-taken if it were ten million dollars,

25   we're not here to impose a ten million dollar expense on the

1  company.  We're here because we are subject to a court-ordered

2  schedule by Judge Cote to obtain these documents; she's noted

3  that it's important information, that it spans across a

4  multitude of parties in a complex litigation that she's trying

5  to orchestrate in tandem in the interest of judicial economy.

6         Unless Your Honor has any questions, I would reserve

7  for reply.

8         THE COURT:  Okay, Mr. Glenn, thank you.

9         MR. GLENN:  Thank you.

10        MR. HAIMS:  Joel Haims from Morrison & Foerster,

11  counsel for the debtors.  Your Honor, I'd just like to respond

12  to a few of the points that Mr. Glenn made.

13        THE COURT:  Why does the automatic stay apply,

14  Mr. Haims?

15        MR. HAIMS:  Why does the automatic --

16        THE COURT:  Yes.

17        MR. HAIMS:  Well, we think this is -- we cite John

18  Mansville (sic) for the proposition that it does apply,

19  particularly in this context.  We --

20        THE COURT:  Mr. Glenn says it's distinguishable

21  because 105 applied in that case.

22        MR. HAIMS:  Well, we disagree that this is not an

23  action against the debtor, for several reasons; one is that

24  he's civilly stated he intends to pursue a claim against the

25  debtor and will use these documents, and these are going to be

1  produced at some point anyway, so let's produce them now; we'll

2  use them against the debtors later.  And by pursuing the claims

3  against the nonaffiliated debtors in that case, there are

4  indemnification claims and there are shared insurance

5  coverages, so they're one and the same.

6          Just to respond to several of his points, one is

7  floodgates will open here; they have to open here.  And this is

8  not only about 5,000 loans, as I mentioned.  We've been told

9  that the defendants in that case -- and I believe some of the

10  defendants are here to address this -- disagree with the FHFA

11  sampling model and methodology.  And to the extent that they

12  get 5,000 loans, the defendants are going to need loans to

13  defend that case; it is in the debtors' interest to give them

14  the loans to defend that case.  And so this can't be a one-way

15  street.  This can't be just about 5,000 loans to the FHFA and a

16  100,000 dollar cost.  It has to be both ways.  And so that's

17  going to be some multiple of that, and I don't even know what

18  the defendants are going to want.  There has been some mention

19  of all of the loan files, but we haven't gotten formal numbers

20  from either of the parties.  We just got the FHFAs in their

21  reply brief and we haven't heard any definitive numbers from

22  the defendants.

23          Second, 100,000 dollars is still a significant sum.

24  The debtors should not bear the cost of that, shouldn't bear

25  the cost of it particularly since the documents are going to be

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1  used against the debtors to file a claim against the debtors.

2  Somebody should bear it; shouldn't be the debtors.

3          And lastly, this is a motion to lift the stay.  Sonnax

4  factors apply, and we go through them in our briefs; I'm not

5  going to reply to them now.  But the only basis they gave to

6  lift the stay is that Judge Cote says they should come here.

7  They have a case before Judge Cote, and these documents will be

8  useful in their case before Judge Cote, and frankly that's just

9  enough under the Sonnax test to lift the stay here.

10          If Your Honor has any further questions, I'll --

11          THE COURT:  I do.

12          MR. HAIMS:  Oh, sure.

13          THE COURT:  I do.

14          First let me ask, Mr. Glenn, has somebody found that

15  transcript from Judge Cote?

16          MR. GLENN:  Your Honor, we can bring this to you.

17  It's in July 19th -- 20, just -- sure.

18          MR. FLIMAN:  Your Honor, Daniel Fliman of Kasowitz

19  Benson.  Judge Cote's direction regarding the loan files is

20  quoted at paragraph 4 of her supplemental motion, and that was

21  in her July 17th status conference.

22          MR. GLENN:  Would you like us to bring you a copy of

23  that?

24          THE COURT:  Do you have a copy?  I mean, I've got

25  three tons of paper --

1           MR. GLENN:  Okay.  Let's bring him --

2           THE COURT:  -- here.  If you could just bring me that.

3           MR. GLENN:  Sure.

4           THE COURT:  I would appreciate seeing it.

5           MR. FLIMAN:  Your Honor, I could just give you the

6    relevant pages of the supplemental, or --

7           THE COURT:  Sure.

8           MR. FLIMAN:  -- would you like the entire --

9           THE COURT:  No, I'd just like to see the relevant

10   pages.

11          MR. GLENN:  Here, hand him this as far as the

12   transcripts.

13          THE COURT:  Just identify for the record what it is

14   you're showing, so everybody knows what I'm looking at.

15          Unless somebody objects, I don't know that I need to

16   see the whole -- I'd like to see, obviously, the relevant

17   portion, but --

18          MR. FLIMAN:  Your Honor, I'm going to hand up a copy

19   of the transcript from the July 17th status conference in front

20   of Judge Cote.

21          THE COURT:  Okay.  Okay, and you had turned over at

22   page 24.  Is that --

23          MR. FLIMAN:  Yes, Your Honor.

24          THE COURT:  -- where you wanted me to look?

25          MR. FLIMAN:  The relevant excerpt is at page 24;

1  starts at line 9.

2          THE COURT:  Okay, let me just read it to myself.

3      (Pause)

4          THE COURT:  I'm starting to read at line 3 on page 24.

5          Okay, I can give you back your transcript.  Thank you

6  very much.

7          MR. GLENN:  Your Honor, just so the record's clear --

8          THE COURT:  Go ahead, Mr. Glenn.

9          MR. GLENN:  -- Mr. Haims indicated other defendants'

10 positions and the like; that's not in the record and we object

11 to any argument by parties who did not file papers in this case

12 or in reference thereto.

13         THE COURT:  All right.

14         Mr. Haims, let me ask you some questions.  Before

15 Judge Cote, one of the issues that FHFA raised that she didn't

16 decide was the issue of whether Ally has, "control" of the

17 tapes; that would be true of the loan files as well.  And there

18 were two letters -- one from Kasowitz to Judge Cote and one

19 from, I think, Mayer Brown to Judge Cote -- that addressed the

20 issue.  Could you point to me -- are there provisions of the

21 shared services agreement that address whether ResCap has

22 contractually agreed to provide loan files to Ally if it

23 requests them?

24         MR. HAIMS:  We weren't parties to that briefing.  I

25 happened to have gotten copies of those letters.  But --

1          THE COURT:  Okay, I mean, I got the shared services --

2          MR. HAIMS:  Right, so --

3          THE COURT:  -- agreement here, but --

4          MR. HAIMS:  Our --

5          THE COURT:  Is there somebody who can address this

6     issue?

7          MR. HAIMS:  Well, our posi --

8          THE COURT:  Look.  I mean, here -- before you go on,

9     Mr. Haims, I'll decide what I need to decide.  But you've

10    raised the issue about cost, and one of the issues that was

11    addressed in those two letters -- the Kasowitz letter, the

12    Mayer Brown letter -- dealt with cost.

13         I pulled the shared services agreement and also, I

14    guess it's Schedule C2, pricing for ResCap services, and I

15    confess I don't understand it.  So the Kasowitz letter pointed

16    to language which they specifically said obligated ResCap to

17    respond to Ally request for documents, like the loan files.

18    And then what I'm trying to -- it didn't specifically address,

19    when I look at the ResCap -- the pricing for ResCap services,

20    whether ResCap and Ally have contractually agreed that if

21    ResCap must pull and provide this information to Ally or at

22    Ally's request, whether ResCap can charge Ally for doing that.

23         MR. HAIMS:  My understanding of this, and I can only

24    speak on behalf of ResCap's --

25         THE COURT:  Is there somebody here who can talk about

1  this?  I apolog --

2           MR. HAIMS:  Yeah --

3           THE COURT:  Go ahead and tell me what you can, first.

4           MR. HAIMS:  -- is that the shared-service agreement

5  relates to shared services to run the businesses, that there is

6  no provision in the shared-service agreement that specifically

7  deals with third-party discovery and a pending securities

8  litigation such as this, and that --

9           THE COURT:  No, but let's get to the point.  The

10  defendants before Judge Cote are, I don't know, nondebtor Ally

11  entities; I don't know which one or whether it's AFI or what.

12           MR. HAIMS:  It's several of them.

13           THE COURT:  Okay, all right.  And she didn't resolve

14  this issue of "control".  And I'm prepared to decide what I

15  need to decide, but I'm just -- if FHFA is entitled to the

16  documents from Ally, and your position before Judge Cote was

17  these documents are in the possession of ResCap, not Ally.

18  Okay.  The issue may become whether Ally has the ability to

19  obtain the documents from ResCap.  And so my question is, what

20  does the shared services agreement provide with respect to

21  whether ResCap would have to respond if -- to Ally asking for

22  the loan files, 5,000 loan files, and who pays for it?  Because

23  you say --

24           MR. HAIMS:  My understa --

25           THE COURT:  Let me finish.  You say the cost would be

 1   a lot, okay, and I've got the debtors before me.  Judge Cote

 2   withdrew the reference with respect to extending the stay to

 3   the nondebtors, and she said no.  Okay.

 4          MR. HAIMS:  Right.

 5          THE COURT:  Now I'm focusing on the discovery issue.

 6   So tell me what in the shared services agreement specifically

 7   addresses it, and tell me whether anything in the pricing of

 8   services specifically says whether Ally has to pay for it.

 9          MR. HAIMS:  I don't think it does, but the debtors'

10   position on this motion is that the debtors shouldn't be

11   required to pay for this discovery.  And whether it's the FHFA

12   or some other party, that the --

13          THE COURT:  I know; that's why I'm asking --

14          MR. HAIMS:  Right.

15          THE COURT:  -- the question whether --

16          MR. HAIMS:  So --

17          THE COURT:  -- Ally is required to pay for it.

18          MR. HAIMS:  That's an issue that's not here.  There is

19   a litigation provision in the shared services agreement that --

20          THE COURT:  Point it to me.

21          MR. HAIMS:  Huh?

22          THE COURT:  Point it out to me.  You know --

23          MR. HAIMS:  I don't have that.

24          THE COURT:  Can somebody help me on this?

25          MR. HAIMS:  Could I just consult for a second?

1            THE COURT:  Yes, go ahead.

2        (Pause)

3            MR. HAIMS:  Your Honor, my partner Gary Lee knows more

4    about the shared services agreement than I.

5            THE COURT:  Okay.  Let me just find something.

6            So what -- just so we're all on the same page, what I

7    was referring to was attached to Ms. Leung's -- maybe I'm

8    mispronouncing it; I apologize if I am -- declaration, which is

9    ECF docket number 808 -- it's her declaration dated July 17,

10   2012 -- Exhibit H was the July 2 letter to Judge Cote from

11   Kasowitz, and Exhibit I is the July 6 response from Mayer

12   Brown.  And the Kasowitz letter refers to the decision in In re

13   NTL, Inc. Securities Litigation, 244 F.R.D. 179 (S.D.N.Y.

14   2007).  I actually have the decision on this issue as well:  In

15   re Lozano, L-O-Z-A-N-O -- it's a published decision; but it's

16   August 13, 2008 -- and I fairly extensively review the issue of

17   possession, custody or control, what does control mean.  And

18   what I said there and what I understood the law to be:  that by

19   contract if somebody has the right to obtain the documents,

20   that satisfies the test for control.  So I come back to the

21   issue, Mr. Lee, of what does the shared services agreement

22   provide, specifically with respect to ResCap providing

23   documents to Ally, and does it provide who pays for it?

24           MR. LEE:  Sorry.  Good afternoon -- or good morning,

25   Your Honor.  Gary Lee from Morrison & Foerster --

1          THE COURT:  Five more minutes we're here --

2          MR. LEE:  -- for the debtors.

3          THE COURT:  Five more minutes of morning --

4          MR. LEE:  I'll speak slowly.

5          THE COURT:  Okay.

6          MR. LEE:  No filibust -- Your Honor, I was actually

7   involved in drafting and negotiating the shared services

8   agreement.

9          THE COURT:  Just tell me what it says, not what --

10         MR. LEE:  And the answer to your question --

11         THE COURT:  -- what the negotiations were.

12         MR. LEE:  -- Your Honor, in section 8.2 of the

13  agreement deals with ownership of the documents.

14         THE COURT:  Okay.

15         MR. LEE:  And this remains a very heavily discussed

16  issue with AFI.  The reason it's heavily discussed is because

17  these provisions were negotiated so that we could transfer to

18  Nationstar --

19         THE COURT:  Yes.

20         MR. LEE:  -- the relevant loan files and loan

21  information as part of what ResCap, the debtor, owns and what

22  ResCap, the debtor, can transfer to a third party.  So I think

23  that what is getting mixed up here -- this is definitely a case

24  of apples and oranges.  The materials relating to the private-

25  label securitizations, that information, the ongoing servicing

RESIDENTIAL CAPITAL, LLC, ET AL.                    82

1  rights are property of the debtor, Your Honor.  All of the

2  information belongs to the debtor; it's what we're transferring

3  to Nationstar, Your Honor.

4          Separate and apart from that, what the purpose of the

5  shared services agreement was for the ongoing provision of

6  services as opposed to production of documents as between the

7  parties, so that we could continue to run our business --

8          THE COURT:  I understand, but --

9          MR. LEE:  -- from a data perspective.

10         THE COURT:  -- it did specific --

11         MR. LEE:  Yeah.

12         THE COURT:  It did -- show me where the -- there is

13 language about litigation.

14         MR. LEE:  There is language about --

15         THE COURT:  Where is that?

16         MR. LEE:  -- litigation, Your Honor, yes.

17         THE COURT:  You know what, Ms. Leung's declaration, or

18 the letter, rather -- on the first page of the letter, the last

19 paragraph, it's got a quote:  "ResCap will provide", and then

20 there's an ellipsis, "when requested by AFI and consistent" --

21 and then the citation was not to the exhibit -- not to the

22 shared-service agreement, so I couldn't find where that

23 language is.  That's what I'm looking for.

24         MR. LEE:  And, Your Honor, I'm not sure, unless

25 there's a specific schedule to the shared services agreement

1    for provision of it, that there is anything.  I think the

2    difficulty here, Your Honor, is AFI's free to request whatever

3    it wants.  Unless there's a work order, we can or can't agree.

4    But our position, Your Honor, is the data belongs to us.

5            THE COURT:  I don't -- whether the data belongs to you

6    or not doesn't seem to me to be the controlling issue.  I mean,

7    if you've agreed -- if you've contractually agreed to provide

8    data or information to Ally, that's what I'd like to know,

9    where that is.  I couldn't find it when I looked at the

10   Kasowitz letter, okay.  I saw the quote, and then for whatever

11   reason, I then couldn't find where it came from.

12           MR. LEE:  I'm going to have to --

13           THE COURT:  Hold on.

14           MR. LEE:  -- look for a statement of work, Your Honor.

15   Yeah.

16           THE COURT:  Okay.  And so -- but I see this as very

17   pertinent to the issue before me.  Mr. Haims is raising the

18   issue about that ResCap shouldn't have to pay to produce loan

19   files.  Okay.  You've put that matter in issue.  I know you say

20   that FHFA should have to pay for it, but Judge Cote seems to

21   think that getting those documents is important to the

22   litigation.  It's one thing if the debtor has to pay to do it,

23   and it's another if the debtor doesn't have to pay to do it.

24   If there's a contractual agreement by which ResCap agreed it

25   would provide those services to Ally, and if the pricing

RESIDENTIAL CAPITAL, LLC, ET AL.                         84

1  schedule says who pays for it or how it's paid for, that's what

2  I want to know.

3          MR. LEE:  Your Honor, if you'll bear with us, I'm

4  going to take a look at the statements of work, because I'm not

5  sure whether there's anything beyond cooperation as opposed to

6  the specific provision of loan files, and I want to be quite

7  accurate in --

8          THE COURT:  Let me find out from Mr. Glenn.

9          Where'd the language in the letter come from?

10         MR. GLENN:  That's from the statement of work, Your

11 Honor.  It's not from the motion.  It's page 20 and 21 of the

12 statement of work.  And I apologize for that ambiguity.

13         THE COURT:  Where is the -- you know, what I did --

14         MR. GLENN:  But, Your Honor, maybe --

15         THE COURT:  There's so much stuff.

16         MR. GLENN:  May I --

17         THE COURT:  I printed out the shared services

18 agreement.  I didn't print out the statement of work.

19         MR. GLENN:  May I suggest that we pause, maybe put

20 this to the end of the calendar, which I understand is not

21 going to take all that long, so we can present this to Your

22 Honor in a more organized fashion and confer with each other?

23         THE COURT:  Well, here's what we're going to do.

24         MR. GLENN:  Okay.

25         THE COURT:  The Court concludes that FHFA's motion to

1    lift the automatic stay and the debtors' response thereto raise

2    a contested matter.  And under Local Rule 9014-1, the first

3    hearing on a contested matter is not an evidentiary hearing.

4    Consequently, the Court, considering this under, now, 362(e) --

5    this is a preliminary hearing on the motion to lift the stay --

6    I've concluded that this is a contested matter and an

7    evidentiary hearing will be required.  I'm going to set the

8    evidentiary hearing for Tuesday, September 11th, 2012 at 2 p.m.

9    September 11th is a ResCap omnibus hearing day.  The stay will

10   remain in place pending the conclusion of the final hearing.

11   The Court concludes that there is a reasonable likelihood that

12   the debtor, which is opposing relief from the stay, will

13   prevail at the conclusion of such final hearing.

14           September 11th is within thirty days of the date of

15   this preliminary hearing, and therefore satisfies 362(e).

16           On or before 5 p.m., Tuesday, August 28th, the parties

17   shall file supplemental memoranda of law and any supporting

18   declarations and exhibits addressing whether ResCap is required

19   under the shared services agreement and statement of work and

20   any other exhibits to it to provide loan files to Ally, and who

21   pays for it, and how is it determined at what price it'll be

22   paid for.

23           The debtor has specifically raised today the

24   issue -- and we're not going to revisit the issue as to the

25   loan tapes and the origination information; you say you've

1     resolved that.  So the only issue before the Court is the loan

2     file.  Some number.  As I understand it, in principal FHFA has

3     agreed to 5,000 loan files; the debtor has argued that that's

4     all well and good, but the defendants are going to want more.

5     I want supplemental evidence with respect to the burden and

6     cost that the debtor will incur if the stay is lifted and

7     discovery of the information requested by FHA (sic) is ordered

8     to be conducted.  I want to know how long it will take.

9              The only thing I have before me now, Mr. Lee, is their

10    request for 5,000 files.

11             And I assume that, Mr. Glenn, you will identify which

12    5,000 files you want.  Am I correct?

13             MR. GLENN:  Yes, Your Honor.  I'm not sure if it'll be

14    by that date, but -- we have to confer with our experts.

15             THE COURT:  Okay.  But the parties should confer so

16    that -- sooner than these supplemental filings.  I want to know

17    what is it that they want.  I want you to specifically address

18    what the burden -- how much time it would take, of what

19    personnel, what you project the cost of that to be.  The

20    supplemental declarations need to be filed by that October 20

21    (sic) -- it's not October -- August 28th date.  If FHFA wishes

22    to take the deposition of the declarants, you can do that, Mr.

23    Glenn, confer with the debtors' counsel with respect to that.

24    Okay.  But that's how we're going to proceed on the issue of

25    production of these documents to FHFA.

1        Okay.  Anything else specifically with respect to the

2   directions I've given?

3            MS. MOSKOWITZ:  Yes, Your Honor.  If I may?

4            THE COURT:  Come on up.

5            MR. LEE:  Your Honor, may I -- we have a call from the

6   Department of Justice that I've just been told I need to --

7            THE COURT:  Okay.  You're excused.

8            MR. LEE:  Thank you, Your Honor.

9            THE COURT:  Blame them for your being late -- me.

10  Blame me for you being late.

11           MR. LEE:  Thank you, Your Honor.  I will.

12           THE COURT:  Okay.  Go ahead, Mr. Lee.  Go ahead.

13           MS. MOSKOWITZ:  Good afternoon, Your Honor.  My name

14  is Lauren Moskowitz, I'm at Cravath, Swaine & Moore.  I

15  represent Credit Suisse in the FHFA actions.  I'm also here to

16  speak for the other non-Ally related underwriters that are

17  defendants in that case, including Barclays, Citigroup, Goldman

18  Sachs, UBS, RBS and J.P. Morgan.

19       And Your Honor, just to -- it has been alluded to what

20  the other defendants may need in the FHFA v. Ally action.  And

21  it is correct that we are not prepared to live by the 5,000

22  sample that the FHFA has reduced their request for today and in

23  their reply papers.  And so I appreciate the opportunity to

24  just be heard briefly on that issue.

25       To put it in context, Judge Cote was presented with a

1  motion -- or a submission by FHFA a couple months ago to

2  restrict discovery in all of the FHFA actions to a sample of

3  loans.  Judge Cote rejected that in the face of due process and

4  Seventh Amendment concerns raised by the defendants.  We also

5  put in expert affidavits explaining why our burdens, not to

6  mention plaintiff's burdens, may not be able to be carried with

7  that sample that they propose.  So in light of all of that,

8  Judge Cote said that all the loan files are in play and that

9  the parties should go out and get them.

10        That is what we thought was happening, Your Honor,

11 here, when the FHFA brought its motion and would be seeking

12 the -- more than a sample of loan files.  We saw in the reply

13 that that's no longer the case.  And in effect, we feel that

14 FHFA is making an end run around Judge Cote's order that she

15 would not be restricting discovery in these cases.  So to the

16 extent that Your Honor is hearing further proceedings, we would

17 like to be heard on why 5,000 is not the proper amount of

18 loans.

19        THE COURT:  That's fine, Ms. Moskowitz.  But that same

20 August 28th deadline for additional submissions applies to you

21 or anyone else who's going to take a position.  I want to see

22 all of those briefs and any declarations in support of your

23 position at that time, okay?

24        MS. MOSKOWITZ:  Yes, Your Honor.  Thank you, Your

25 Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    89

 1            THE COURT:  Thank you very much.

 2            MR. WARE:  Your Honor, Michael Ware of Mayer Brown for

 3   Ally Financial.  I don't represent them here, but I do

 4   represent them in the FHFA case.

 5            THE COURT:  Were you the author of the letter?

 6            MR. WARE:  A partner of mine was the author of that

 7   letter.  So that's Reg Goeke who submitted the letter.  And we

 8   will also -- we didn't participate in this motion practice

 9   until the reply introduced the concept of a sample.  And

10   there's enough data out there for them to pick a really good

11   sample.  They know enough already to pick the 5,000 losers;

12   you'd think every loan was a bummer.  But we would also like

13   to --

14            THE COURT:  The same deadline applies to anybody.

15            MR. WARE:  Thank you, Your Honor.

16            THE COURT:  Oh, and let me just make clear.  There's a

17   twenty-five-page limit on any memoranda of law.  It doesn't

18   apply -- even that --

19            MR. WARE:  We can make our point more quickly than

20   that.

21            THE COURT:  -- that seems awfully long to me, but

22   that's my normal limit.  Okay.

23            MR. WARE:  Thank you, Your Honor.

24            THE COURT:  It doesn't apply to declarations; it

25   applies to the memoranda of law.

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

1           Anybody else want to be heard?

2           MS. JACKSON:  Your Honor, may I say three things?

3           THE COURT:  No.  This only relates to this matter, Ms.

4    Jackson, okay?

5           MS. JACKSON:  Okay.

6           THE COURT:  And I don't think you've got any standing

7    to be heard on this specific matter.

8           MS. JACKSON:  Oh.  Okay.

9           THE COURT:  Okay.  Mr. Haim, is there anything else?

10          Mr. Rosenbaum, anything?

11          MR. HAIMS:  Nothing from me, Your Honor.

12          MR. ROSENBAUM:  Thank you, Your Honor.

13          THE COURT:  All right.  We're adjourned.

14          Oh.  Hang on just one second.

15          MR. ROSENBAUM:  Sorry, Your Honor.

16          THE COURT:  Mr. Rosenbaum, are there other matters on

17   the calendar?

18          MR. ROSENBAUM:  There's a status conference --

19          THE COURT:  Okay.  Well, let's --

20          MR. ROSENBAUM:  -- and two more motions.

21          THE COURT:  All right.  That's what I was trying to

22   understand.  Let's go.  Much as I'd like to be over, I want to

23   get everything done.

24          MR. ROSENBAUM:  Hopefully not too much longer, Your

25   Honor.