**EXHIBIT E**

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

———

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1227

STUART W. GOLD
JOHN W. WHITE
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER

DAVID MERCADO
ROWAN D. WILSON
CHRISTINE A. VARNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KEITH R. HUMMEL
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
SARKIS JEBEJIAN

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK

LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA

———

SPECIAL COUNSEL

SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III

———

OF COUNSEL

PAUL C. SAUNDERS

August 24, 2012

<u>FHFA v. Ally Financial Inc., et al., 11-CV-7010 (DLC) (S.D.N.Y.)</u>

Dear Judge Cote:

We represent Credit Suisse Securities (USA) LLC ("Credit Suisse") in the above-referenced action (the "7010 Action"), and we write on behalf of Credit Suisse, Barclays Capital, Inc., Citigroup Global Markets, Inc., Goldman, Sachs & Co., UBS Securities LLC, RBS Securities, Inc. and J.P. Morgan Securities LLC (together, the "Non-Ally Underwriter Defendants") to address FHFA's August 16, 2012 letter to the Court. In direct contravention of the instructions of the Bankruptcy Court and the relevant proceedings in this Court, FHFA seeks to preclude the Non-Ally Underwriter Defendants from presenting to the Bankruptcy Court their legal position that there should be full discovery of all supporting loan group files in this action—not just the sample to which FHFA now has limited its request. This Court's prior orders make clear that all supporting group loan files should be produced and that FHFA should seek all such files for the 7010 Action from the Bankruptcy Court. This Court should reject FHFA's attempt to undo those prior orders.

In their June 6, 2012 submission to the Court, defendants in the coordinated FHFA actions argued, *inter alia*, that limiting discovery to a sample of loans is tantamount to a deprivation of their Fifth and Seventh Amendment rights because such an approach could hinder their ability to present their defense and improperly would preclude any testing or questioning of the validity of the sample as discovery and expert analyses unfold. As a result, defendants argued that they must have access to all of the loan files at issue in the actions. (*See* 6/6/12 Defs.' Sampling Submission.) As the Court observed, in its submission to the Court seeking to limit the scope of loan file production, even FHFA reserved its rights to sample additional loans beyond the initial sample: "FHFA reserves its right to sample separately in the damages phase, including drawing a smaller sample of loans from non-Supporting Loan Groups." (*See* 6/6/12 FHFA's Sampling Submission 6 n.5; *see also* 6/13/12 Tr. 11, Ex. A.) On June 13, 2012, the Court rejected FHFA's request to limit discovery and held that "I am not going to restrict discovery of loan files based on a determination at this phase of the case that some kind of sampling is appropriate". (6/13/12 Tr. 14-15.) The Court stated that in order to limit discovery

to a sample, the parties would have to agree that the rest of the files were unavailable "for all purposes for all time"; because no party agreed to that point, the Court stated "I'm not going to do it unilaterally". (*Id.* at 15-16.) Since then, defendants have produced millions of pages of loan files and have subpoenaed hundreds of third parties to produce all of the loan files for the supporting loan groups at issue in these actions, and are working diligently to facilitate this production.

On July 17, 2012, the Court held a hearing in *Residential Capital, LLC v. FHFA*, 12 Civ. 5116 (DLC), to discuss production of the loan files for the supporting loan groups in the 7010 Action in the possession of Residential Capital, LLC and affiliated debtors. The Court stated that "[t]he loan files . . . are going to be essential to the prosecution of the litigation in 11 CV 7010. It is my judgment that they are also essential to the prosecution of the 16 cases before me . . . because there are seven non-affiliate defendants who are in 11 CV 7010 and one or more of the remaining 15 actions and the 16 actions are moving forward in a coordinated fashion . . . ." (7/17/12 Tr. 16, Ex. B.) Notwithstanding this Court's determination that discovery of all supporting loan group files should proceed, Plaintiff again offered to "talk to Ally and all the other defendants about limiting the burden of producing loan files" through sampling. (*Id.* at 21-22.) At no point during the conference did the Court permit FHFA to seek only a subset of the loans. To the contrary, the Court made clear that "[i]t is important that there be access to [the Non-Ally Underwriter Defendants], to *all the loan files that they're being sued upon* so that their witnesses can be prepared with respect to the entire universe of issues that they are going to face and that depositions occur just once". (*Id.* at 25-26 (emphasis added).) The Court instructed FHFA to seek the loan files for the supporting loan groups at issue from the Bankruptcy Court. (*Id.* at 26.)

On July 20, 2012, FHFA filed a motion supplement in the Bankruptcy Court to lift the bankruptcy stay for the purpose of seeking production of *all* the loan files at issue in the 7010 Action. It was not until FHFA's August 10, 2012 reply brief on that motion that FHFA suddenly changed course and sought "to limit its request at this time to a sample of only 5,000 loan files to be chosen by FHFA without prejudice to request more if necessary".[1] (8/10/12 FHFA Reply 3, Ex. B to Plaintiff's 8/16/12 letter.) FHFA's new position in the Bankruptcy Court is a clear attempt at an end run around this Court's prior orders governing discovery in these actions. Upon learning of FHFA's new position in its August 10 reply, the Non-Ally Underwriter Defendants requested to be heard at the August 14, 2012 hearing in the Bankruptcy Court on the FHFA's motion. The Bankruptcy Court granted that application. Counsel for the Non-Ally Underwriter Defendants argued that FHFA's revised position was at odds with this Court's prior orders and that all the loan files at issue in the 7010 Action must be produced.

The Bankruptcy Court granted the Non-Ally Underwriter Defendants' request for leave to file a submission on August 28 in advance of the evidentiary hearing the Bankruptcy Court set for September 11. (8/14/12 *In re ResCap* Tr. 88, Ex. C to Plaintiff's 8/16/12 letter.) Plaintiff's assertion in its August 16 letter that the Non-Ally Underwriter Defendants somehow are "interfere[ing]" with FHFA's application to the Bankruptcy Court is false. The Non-Ally Underwriter Defendants are entitled to protect their rights to seek the loan files for all loans in the supporting loan groups at issue in the 7010 Action. The Non-Ally Underwriter Defendants should not be prevented from complying with the procedure set by the Bankruptcy Court.

---

[1] Once again, Plaintiff seeks to limit discovery to its sample while attempting to reserve its rights to seek more loans in the future.

Respectfully,

Richard Clary /LAM

Richard W. Clary

The Honorable Denise L. Cote
   United States District Judge
     United States Courthouse
       500 Pearl Street, Room 1610
         New York, NY 10007-1312

BY EMAIL

Copy to:

All counsel of record

BY EMAIL

# EXHIBIT A

```
                                                           1
     C6DFFED1
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    -----------------------------x
2                         11 CV 05201 (DLC)
3    FEDERAL HOUSING
3    FINANCING AGENCY        11 CV 06188 (DLC)
4                           11 CV 06189 (DLC)
4                           11 CV 06190 (DLC)
5         v.                11 CV 06192 (DLC)
5                           11 CV 06193 (DLC)
6    UBS AMERICAS INC.       11 CV 06195 (DLC)
6    and others and its      11 CV 06196 (DLC)
7    related cases           11 CV 06198 (DLC)
7                           11 CV 06200 (DLC)
8                           11 CV 06201 (DLC)
8                           11 CV 06202 (DLC)
9                           11 CV 06203 (DLC)
9                           11 CV 06739 (DLC)
10                          11 CV 06805 (DLC)
10                          11 CV 07010 (DLC)
11                          11 CV 07048 (DLC)
11   -----------------------------x
12                               June 13, 2012
12                               3:00 p.m.
13   Before:
13                  HON. DENISE COTE,
14
14                                District Judge
15
15                  APPEARANCES
16
16   QUINN EMANUEL URQUHART & SULLIVAN, LLP
17        Attorneys for Plaintiff Federal Housing Finance Agency
17   PHILIPPE SELENDY, ESQ.
18   ADAM ABENSOHN, ESQ.
18   MANISHA SHETH, ESQ.
19   CHRISTINE CHUNG, ESQ.
19   LEAH RAY, ESQ.
20   JORDAN GOLDSTEIN, ESQ.
20
21   KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
21        Attorneys for Plaintifff Federal Housing Finance Agency
22   HECTOR TORRES, ESQ.
22   KANCHANA LEUNG, ESQ.
23   ANDREW GLENN, ESQ.
23
24   STEPHEN HART, ESQ.
24        Attorney for Federal Housing Finance Agency
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

10

C6DFFED1

1  between 9,000 to as many as 25,533 and that's, rounding it off,
2  26,000 loans out of 44,000 loans, so way north of 50 percent.
3          I think it's apparent to me and it's certainly been
4  apparent to the parties from the beginning that these issues
5  can't be discussed in the abstract.  You need a concrete case
6  and for our purposes it's the UBS case.  You need to understand
7  the characteristics of the securitizations and the certificates
8  that are at issue.  So that a sampling protocol that the
9  plaintiff may use in one case may not be the one it would use
10  in another, and of course each defendant may have their own
11  preferences and indeed the protocols may change from
12  securitization to securitization.  And these different
13  approaches may each pass a Daubert analysis and may each be
14  appropriate to present to a jury, at least that's my initial
15  conclusion.  As I say, I'm not making any judgment about that
16  now, it would be inappropriate for me to do so.
17          I note that Dr. Barnett seems to think that the
18  plaintiff's working theory of using a sampling protocol with a
19  95 percent confidence level is just fine, but takes issue with
20  the margin of error that the plaintiff's statistician wishes to
21  employ of plus or minus 5 percent, but seems to accept a plus
22  or minus 3 percent.  Well, no doubt I'll get better informed by
23  counsel about all these matters at a later point in time.
24          But as important in this analysis I think it's useful
25  for me to note that everyone here who has made a presentation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

C6DFFED1

1   to me reserves the right to change their sampling protocol once
2   they get more deeply involved in the specifics of the
3   individual case.  Everyone, including the plaintiffs, reserve
4   the right to not only change those protocols but to look at
5   information from non-supporting loan groups, as well as other
6   loans in the supporting loan groups, and the plaintiffs want to
7   reserve the right to reach outside the boundaries of their
8   initial sampling group to draw on other data to address
9   arguments defendants might make with respect to affirmative
10  defenses or the damages phase of this litigation.
11            In thinking about these issues and in looking with
12  care at the two expert reports that defense counsel have given
13  to me, and I found them very informative and helpful, it seems
14  that much of the complexity in this litigation in terms of
15  discovery will arise from one of the three allegations the
16  plaintiff is making.  And that is the allegation with respect
17  to the underwriter guidelines, underwriting guidelines.  And
18  Dr. James in particular stresses that there may be a need to
19  resort to the loan files for the individual loans when a
20  borrower has not met the hard criteria and I think the
21  assumption, if not explicitly stated, is the failure to meet
22  the hard criteria for the underwriting process will probably be
23  apparent from the loan tapes and the analysis that can be done
24  from the loan tapes.
25            It's not clear to me that that's true, but that was I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

C6DFFED1

1    thought implied, but definitely if an exemption is being, or an
2    exception is being taken, I think Dr. James was clear that
3    you'd have to look into the loan file to look at the soft
4    criteria that may have been used to support the exception.
5            The submissions of the parties to date make it less
6    clear to me that there will be a need or much of a need for the
7    loan file for the other two theories upon which the plaintiff
8    is proceeding; the rate of owner occupancy and the LTV
9    representations.  Nonetheless -- well, before I get to the
10   nonetheless -- among the issues that were discussed in the
11   presentations to me were issues about loss causation and
12   determination of damages.  And in connection with those issues
13   as well, it's not clear to me that the loan files will need to
14   be examined.  Some of the characteristics that Dr. James is
15   talking about in terms of analyzing loss causation I expect,
16   you will know better than I, will be apparent from the loan
17   tapes.  He talked about four things in particular:  The purpose
18   of the loan, whether it's for purchase of property or not.  The
19   type of property, whether it's a single family dwelling or not,
20   the state in which the underwriting occurred -- Arizona,
21   California, Florida, Nevada, and the vintage, the year, the
22   date.
23           Now, I make that observation fully aware that the
24   parties may strongly contest some of the legal analysis here,
25   fully apart from the factual analysis and what conclusions you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

C6DFFED1
1    draw.  They may dispute whether or not some of these variables
2    are properly considered in connection with any affirmative
3    defense or damages, but, again, for my purposes right now I was
4    trying to think through, well, how much of this analysis that
5    the parties have laid out at this preliminary stage of the case
6    is really going to implicate an examination of the individual
7    loan files which is the extraordinarily burdensome thing that
8    we're trying to address right now or I'm trying to address.
9    And I want to note again as a footnote here in terms of loss
10   causation and damages another legal issue which the plaintiffs
11   have stressed from time to time, that on the blue sky claims
12   there does not appear to be a loss causation affirmative
13   defense available to the defendants, and therefore much of the
14   discussion in the two expert reports that the defendants have
15   given me, as useful as it was to give me an understanding and
16   their perspective in the case, may be irrelevant to the
17   ultimate evaluation of damages by a jury or to an evaluation of
18   settlement value of a case.  I leave that for another day.  I
19   think I invited early motion practice and was advised at our
20   last conference that counsel thought that should wait.
21           Next point regarding sampling.  I thought that
22   Dr. Barnett made a very, very good point at page 37 of his
23   report that a sampling protocol should be arrived at early,
24   should be evaluated quickly and that a confirmation of an
25   appropriate sampling protocol is something that can be done at
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

14

C6DFFED1
1   an early stage of the case.  This all suggested to me that, and
2   I think the parties have even defendants in their proposal for
3   a schedule here, have suggested that at least some part of
4   expert discovery should be conducted concurrently with fact
5   discovery and I think to the extent that it involves loan
6   performance that we should really move that part of expert
7   discovery up, identifying the incidence of reach for any
8   particular certificate, if necessary correlating the
9   comparative risk of default.  Therefore, the parties are going
10  to perhaps need to or want to discuss making expert disclosures
11  to each other on a rolling basis, the plaintiff perhaps with
12  its sampling protocol, the results of breach and its damages
13  calculation and the defendants with any counter protocol and
14  what they want to show about their affirmative defenses from
15  these loans.
16          I think that early exchange of these protocols and
17  what you think your sampling techniques have shown will help
18  sharpen fact discovery.  I think it will promote a settlement
19  analysis and help you put your resources in the rest of fact
20  discovery where it belongs.  Some of the plaintiff's claims on
21  some certificates may fall by the wayside.  Some originators
22  may end up being far more important and significant than they
23  would now appear once the numbers are run.
24          So the bottom line, and I think you probably have
25  gathered this from what I have said, is I am not going to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

15

C6DFFED1
1    restrict discovery of loan files based on a determination at
2    this phase of the case that some kind of sampling is
3    appropriate.
4         Now, everyone is well aware of, I expect, the Court's
5    obligation under Rule 26(b)(2)(c) to control discovery.  I have
6    an independent duty to limit discovery, the frequency and
7    extent of it, where I find it would be unreasonably cumulative
8    or duplicative, overly burdensome, too expensive, where
9    principles of proportionality suggest that I do so, and the
10   manual for complex litigation suggests that Courts consider,
11   particularly, as I say, in complex cases, using sampling
12   techniques in discovery to limit the burden on the parties.
13   But at this point I have no desire to opine on Daubert issues,
14   and I think I shouldn't for many good reasons.  Ordinarily it
15   is a defendant who is resisting production of voluminous files,
16   but these defendants are not, and the plaintiff in this case
17   wants the flexibility to draw on all the files potentially and
18   to revise its sampling protocols and that's entirely sensible,
19   and I think the only way that sampling could work to reduce the
20   burden and expense of litigation here would be if we took a
21   percentage of the loan files and basically agreed that they
22   were entirely unavailable to both sides for all purposes;
23   whether it's 50 percent or 75 percent or even 25 percent,
24   they'd have to be considered unavailable for argument at trial,
25   unavailable for proof at trial for all parties for all purposes

16

C6DFFED1

1    for all time, and nobody is asking me to do that.  So I'm not
2    going to do it unilaterally.  But I hope this discussion has
3    suggested that if you work together to come up with a system
4    for early disclosure of expert reports and the results of the
5    analyses principally of the tapes and the information on the
6    tapes that the burden of going into the individual files might
7    be substantially reduced.
8         Let's talk a little bit about some of the other
9    discovery issues that you've agreed upon or are disputing in
10   your submissions to me.  With respect to our September 30th
11   date for substantial completion of discovery, yes, that should
12   include third party discovery and so that discovery should be
13   ongoing now in terms of document discovery.  Serve your
14   demands, give them a chance to produce their documents.  That
15   would include rating agencies and due diligence firms and
16   originators.
17        In terms of interrogatories, the defendants want the
18   right to serve 50 interrogatories, each corporate family of
19   companies wants the right to serve its own 50 interrogatories
20   on the plaintiff.  The plaintiff argues for 50 interrogatories
21   in total to be served upon it, with it having the corresponding
22   right to serve 50 interrogatories on each corporate family.
23   Well, let me just say a little bit about interrogatories.  It
24   is rare in my experience that they produce anything that is
25   useful for trial.  They are extraordinarily burdensome to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12-12020-mg    Doc 1296-5    Filed 08/28/12    Entered 08/28/12 16:53:10    Exhibit E
Pg 14 of 27


17

C6DFFED1
1   produce, respond to and manage, and that management includes
2   arguing about the adequacy of the response.  I think that
3   interrogatories should be used to help support and refine other
4   discovery requests.  They should be targeted and they should be
5   few in number.  So I am going to restrict the number of
6   interrogatories to be served on the plaintiff by all defendants
7   in all 16 actions in total to 50, which is the number that the
8   parties seem to be using as their working number.
9            You seem to have agreement about requests to admit.
10  It wasn't clear to me that the request to admit included
11  addressing issues of authenticity.  I am assuming if there's
12  any disagreement about this you'll bring it to my attention at
13  the appropriate time, but I'm assuming authenticity is a
14  separate issue and not going to be a contested one here and
15  everybody's going to work that out.  So in terms of more
16  substantive requests to admit, we'll work on the same
17  assumption that all defendants are restricted in total to 50 to
18  the plaintiff and the plaintiff may serve 50 on each corporate
19  family.
20           Depositions.  There seems to be a lot of agreement on
21  three points.  The 30(b)(6) depositions can begin at any time.
22  They don't need to wait for the completion of document
23  discovery.  That's fine with me.  That individual defendants
24  should be restricted to a one day deposition, that's fine with
25  me.  And that any limitation on third party depositions be
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

# EXHIBIT B

```
                                                                   1
        C7h6resc
 1      UNITED STATES DISTRICT COURT
 1      SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x
 2
 3      RESIDENTIAL CAPITAL, LLC, et
 3      al.,,
 4
 4                      Plaintiffs,
 5
 5              v.                          12 CV 5116(DLC)
 6
 6      FEDERAL HOUSING FINANCE
 7      AGENCY,
 7
 8                      Defendant.
 8
 9      ------------------------------x
 9                                          New York, N.Y.
10                                          July 17, 2012
10                                          3:30 p.m.
11
11      Before:
12
12                      HON. DENISE L. COTE,
13
13                                          District Judge
14
14                      APPEARANCES
15
15      MORRISON & FOERSTER, LLP
16              Attorneys for Plaintiff ResCap
16      BY:  JAMIE LEVITT
17           JONATHAN C. ROTHBERG
18
18      KASOWITZ BENSON TORRES & FRIEDMAN, LLP
19              Attorneys for Defendant FHFA
19      BY:  ANDREW GLENN
20           KANCHANA W. LEUNG
21
21      MAYER BROWN, LLP
22              Attorneys for Ally Financial, Inc. and GMAC
22      BY:  REGINALD GOEKE
23           MICHAEL WARE
24
25
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

15

C7h6resc
```
 1   throughout the Minneapolis/St. Paul area.
 2            THE COURT:  There is argument by counsel in their
 3   papers about a stocking horse agreement and I am not sure that
 4   I understand the impact of the Ally Financial stocking horse
 5   agreement on any of this litigation.  It is my understanding
 6   that pursuant to that agreement, Ally Financial may be buying
 7   the legacy portfolio, which would contain the loans at issue in
 8   11 CV 7010, but whether it does or doesn't make that purchase,
 9   I am not sure how that is supposed to impact our analysis.
10            Is there anyone who wishes to speak to that?
11            MS. LEVITT:  Your Honor, only to say that our position
12   is there is no relevance to that stocking horse bid.  First of
13   all, it is unclear who will end up being the successful
14   purchaser of the legacy files.  Also, my understanding is Judge
15   Glenn found that had no relevance to this analysis.
16            THE COURT:  That is Ms. Levitt again.
17            MS. LEVITT:  Yes.  I apologize, your Honor.
18            MR. BROWN:  Your Honor, if I may, Judson Brown of
19   Kirkland & Ellis.  So the record is straight, your Honor, Ally
20   Financial, had been the stocking horse bidder for that legacy
21   portfolio; but as I understand it, the bankruptcy proceedings
22   at Ally Financial isn't currently the stocking horse bidder.
23            MS. LEVITT:  That's correct, your Honor.  There is
24   another potential purchaser is the stocking horse, but we don't
25   know how that will turn out.
```

16

C7h6resc

```
 1              THE COURT:  There is another question that I had.  The
 2    loan files -- and we don't know the number, but it is a
 3    knowable number, something less than 105,000 apparently -- are
 4    you going to be essential to the prosecution of the litigation
 5    in 11 CV 7010.  It is my judgment that they are also essential
 6    to the prosecution of the 16 cases before me for reasons I
 7    discussed in last week's telephone call because there are seven
 8    non-affiliate defendants who are in 11 CV 7010 and one or more
 9    of the remaining 15 actions and the 16 actions are moving
10    forward in a coordinated fashion with an understanding -- well,
11    it is hope that through coordinated discovery, there will be
12    efficiencies for the party and ultimately savings for all
13    concerned.
14              The first parties to be deposed beginning in January
15    are FHFA, which would need access to all the documentation that
16    was important, certainly at a minimum the loan files, and UBS
17    who is a defendant in 11 7010 and three other cases before me
18    and a case in California that is related.  So those depositions
19    will begin in January.
20              It is my understanding, and nobody has argued to me
21    the contrary, that when a debtor is in bankruptcy proceedings,
22    it is not immune from discovery and whether it is in bankruptcy
23    or emerges some day from bankruptcy with its assets, in this
24    instance the loan files retained by it or some other entity,
25    whoever has those loan files is going to have to produce them.
```

17

C7h6resc

1   Therefore, in the restructuring process or the reorganization
2   process that is ongoing before the bankruptcy court, I would
3   understand that all the parties, including any potential
4   bidders for assets, would be evaluating the burdens of
5   participating in the inevitable discovery.
6          Now, Mr. Lipps in his affidavits has describe some of
7   the costs associated with the production of material.  He has a
8   figure that on average it takes $25 per file to produce a loan
9   file.  I assume that number is influenced by how many of the
10  documents or loan files are entirely electronic and how many
11  are composite and how many arn't electronic at all.  Again, we
12  don't know the number of loan files in our supporting loan
13  books here.
14         So it seems to me that when it comes down to the
15  arguments with respect to indemnification for defense costs or
16  wasting insurance policies that those arguments have to be
17  weighed in the context of understanding that this discovery is
18  going to occur and there will be a cost to participation in
19  this discovery and that the cost is affecting the economics of
20  the restructuring, whether or not the documents are produced
21  today or in the future.
22         Ms. Levitt.
23         MS. LEVITT:  Your Honor, there are two things that I
24  need to address with respect to your Honor's question or
25  position.  One, it is our understanding that the debtors will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

C7h6resc
1    extraordinarily burdensome discovery in another case, as well
2    as the time to prepare for depositions or whatever might occur,
3    that I believe the bankruptcy court would find that to be not a
4    good use of resources both monetary and time.  It will have an
5    effect on the ultimate recovery to creditors.  But, your Honor,
6    I apologize that I cannot tell you how that factors in at this
7    point other than to repeat what I think was probably not
8    responsive but which is that this short delay while on the flip
9    side allowing debtors to consummate this reorganization, we
10   submit is reasonable in terms of the overall management of this
11   case.
12             THE COURT:  Mr. Glenn, I am focusing now on the loan
13   tapes and the loan files.  Is there anything immediately
14   critical in terms of discovery from ResCap beyond those two
15   items?
16             MR. GLENN:  I am going to defer to Ms. Leung on that
17   point who is handling the.
18             MS. LEUNG:  First of all, I think that it is difficult
19   for us to answer that question because we don't have any
20   transparency into what Ally has versus what the debtors have.
21   Your Honor has seen the objections that have been interposed by
22   Ally Financial and Ally Securities for document requests.  I
23   think it was one of the exhibits to the motion where they
24   object to the document requests on the grounds that it is in
25   the possession of debtors or its property estate subject to the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

21

C7h6resc

1   automatic stat.  We don't really have transparency into that
2   and so it is difficult for us to when we're talking to them to
3   know in terms of should they be searching the custodial files
4   for ResCap or should they be searching the files or e-mails of
5   employees of ResCap.  We're not really sure because we don't
6   have any, like I said, transparency or window into Ally and
7   ResCap.
8           So one solution might be to have a 30(b)(6) deposition
9   so that we can get that clarity in terms of what does Ally have
10  versus what does the debtors have, how much access does Ally
11  have over ResCap's files.  As you know it is our position that
12  Ally does have access to all of ResCap's and the debtor's files
13  and personnel by virtue of, among other things, the shared
14  services agreement.  We think that is a relevant legal
15  question, not whether the debtors have title to certain
16  documents but whether they have access to it.  We do need other
17  types of documents, but it is difficult for us to say that it
18  is in the possession of the debtors and we need it right now
19  because we don't know what one entity possesses versus what
20  another entity possesses.  That is the first point.
21          I know your Honor didn't ask this, but I do want to
22  address the issue of the loan files, because that has come up
23  in terms of how burdensome the discovery is going to be.  At
24  the outset plaintiff has always been willing to talk to Ally
25  and all the other defendants about limiting the burden of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

C7h6resc
1    producing loan files.  That was the purpose of trying to get
2    out our sample protocols early and try to limit the universe of
3    loan files that would have to be produced.  That is still a
4    conversation that we're willing to have with Ally and the
5    debtors in terms of minimizing the number of loan files that we
6    need to reproduce and the burden to them, whether there are
7    other ways we can reduce burden by, for example, getting copies
8    of what is already being produced in the bankruptcy litigation
9    that might overlap with the discovery that we're looking for.
10   So we're certainly open to having that conversation with the
11   debtors and with Ally and Ally Securities.
12           So I can't point to anything immediately besides the
13   loan tapes and the loan files that we need that would be in the
14   possession of debtors, but I would like to reserve on that
15   because like I said we just don't know enough.
16           THE COURT:  I am not going to give you a ruling on the
17   shared services agreement argument until there has been an
18   application to Judge Glenn for production of documents, and it
19   has not been fruitful to make that application.
20           So I don't have an answer on the question that I
21   posed, which stems from this fact:  Whether or not ResCap is a
22   defendant in any litigation, it is holding in its physical
23   possession documents which are critical to litigation and they
24   include at least the loan files.  There will be a cost in
25   production of those loan files.  There will be a cost of being
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

23

C7h6resc

1  a witness in the various lawsuits that have arisen out of
2  ResCap's business, whether it is a defendant or not in those
3  litigations.  That is known.  That is not unknown.  Everyone
4  knows that ResCap or any restructured entity is going to have
5  some litigation to deal with in the future, whether it is a
6  defendant or not, because it possesses critical documents.
7        So it seems to me the arguments about the wasting
8  insurance policies and even the indemnification arguments,
9  indemnification for defense costs are impacted, both of those
10  arguments, by that financial reality.
11        So I have already ruled that the stay cannot be
12  extended because of the anti-injunction bar to the
13  defendants.  I personally don't find the Section 105 analysis
14  very strong either.  I don't need to reach it because I
15  wouldn't have jurisdiction to extend the stay, but I don't find
16  that ResCap has made a strong enough showing even if it were
17  within my jurisdiction to consider the Section 105 argument.
18        The critical thing that has to happen right now, and
19  it is important that it happen right now, is production of the
20  loan tapes and the loan files.  I don't see that there is any
21  risk of prejudice to a debtor on collateral estoppel or res
22  judicata grounds.  The cost is hard to quantify now because we
23  don't know how many loans are part of the supporting loan
24  groups.  We don't know how many of those loans are
25  electronically available, but that is an expense that is going

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                        24
        C7h6resc
   1    to have to be borne at some point no matter what.  It is not an
   2    expense that is going away.
   3              I don't think production of either the loan files or
   4    the loan tapes is something that is going to involve management
   5    of ResCap.  These are ministerial duties, clerical duties to
   6    gather these documents.  I don't see how they would be
   7    interfering in any way with the involvement of management in
   8    making judgments or negotiating a restructuring.
   9              I want FHFA to go in the first instance to Judge
  10    Glenn.  I have already told you to do that with respect to the
  11    loan tapes.  I want you to do that with respect to the loan
  12    files as well.  I have read his decision of July 10th with
  13    respect to Western and Southern Life Insurance and I think that
  14    decision is quite distinguishable and not terribly predictive
  15    of what is going to happen with your application here.
  16              In the Ohio case, the Western and Southern Life
  17    Insurance case, as I understand it there were five
  18    securitizations that were at issue out of about 61 or so.  Here
  19    every securitization in this lawsuit is at issue and cannot
  20    proceed without production of the loan files and the loan
  21    tapes.  Here there are seven non-affiliated defendants against
  22    whom this litigation will continue no matter what happens with
  23    ResCap, and it is not a defendant, or the Ally defendants.
  24              It is important that document discovery proceed
  25    quickly so that counsel and their experts have an opportunity
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

25

C7h6resc

1  to review the documents and prepare for the January
2  depositions.  As I mentioned, the FHFA and UBS depositions
3  begin in January and both are parties to 11 CV 7010.
4              I notice with some interest the discussion the page
5  133 of the transcript of Judge Glenn's decision in which he
6  pointed out that when the parties hold an indirect direct claim
7  against a non-debtor for violating the federal securities laws,
8  there is no compelling basis by which a court must extend the
9  automatic stay.  There are claims here, direct claims, against
10  Ally and the Ally entities.  I also emphasize the point I have
11  already made that these documents are going to have to be
12  produced and knowledge of that expense will affect the
13  organization whether or not that expense is incurred today or
14  later.
15              I have no showing that there is any significant
16  participation of any individual critical to the reorganization
17  in the production of the loan files or the loan tapes.  Again,
18  we're talking about a period by which the only thing that has
19  happened is production of documents.  I want to underscore that
20  this issue isn't confined to the impact production of these
21  critical documents will have just on 11 CV 7010.  That is one
22  of 16 cases before me.  The seven non-Ally underwriter
23  defendants are involved in a number of lawsuits.  It is
24  important that there be access to these entities, to all the
25  loan files that there being sued upon so that their witnesses

26

C7h6resc
1  can be prepared with respect to the entire universe of issues
2  that they are going to face and that depositions occur just
3  once.  The depositions will begin in January.  It is too late
4  to wait to produce those documents until later this fall.
5       With respect to the law about discovery of a debtor,
6  during the bankruptcy process, of course this is something that
7  the Ninth Circuit has spoken of in the Miller case, 262 BR
8  4909, as the Ninth Circuit noted at page 505, information is
9  information, and when it is in the possession of a debtor, it
10 is discoverable.  More recently Judge Dolinger permitted
11 depositions to occur of a debtor's employees in the Signature
12 Bank case, 2008 WL 4126248, noting that the automatic
13 litigation stay in Section 362 does not prevent discovery in a
14 current lawsuit even if the depositions in question unearth
15 information that may be relevant to the bank's state claims
16 against a debtor.
17      I know the parties are familiar with the Johns
18 Manville case from 1984, which can be found in 40 BR 219.  But
19 even there the test is, as articulated in that court, one of
20 significant interference with a debtor's reorganization
21 efforts.  For all the reasons I have already described, I don't
22 think that the limited production of loan tapes and loan files
23 can meet that test, but I want FHFA to go to Judge Glenn in the
24 first instance and if need be you can come back to me.  If you
25 need a 30(b)(6) deposition of Ally, go ahead and schedule it.

C7h6resc                                                         27

1    Take it next week if you need.  Time's a wastin.  We need to
2    get all the critical documents produced so that they can be
3    analyzed before depositions begin in January.
4              Ms. Levitt, is there anything you wish to add?
5              MS. LEVITT:  No, your Honor.  Thank you.
6              THE COURT:  Mr. Glenn?
7              MR. GLENN:  Just by way of update, your Honor.  We're
8    filing the motion for Judge Glenn today.  That motion will
9    include only the loan tapes consistent with the last court
10   conference.  We'll supplement that motion to include the loan
11   files hopefully with and next 24 to 48 hours.
12             THE COURT:  Thank you.
13             MR. GLENN:  Thank you.
14             THE COURT:  Is it Mr. Goeke?
15             MR. GOEKE:  Yes, your Honor.  Nothing further.
16             THE COURT:  Mr. Lipps.
17             MR. LIPPS:  Nothing further, your Honor.
18             THE COURT:  Does anyone else wish to add anything or
19   be heard?
20             Not hearing anyone, thank you so much.
21                            o0o
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300