HEARING DATE: SEPTEMBER 11, 2012 AT 10:00 A.M. EST
OBJECTION DEADLINE: SEPTEMBER 4, 2012 AT 4:00 P.M. EST

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National
Association, as Indenture Trustee for the Senior
Unsecured Notes Issued by Residential Capital, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
:
In re                                               :
:          Chapter 11 Case No.
RESIDENTIAL CAPITAL, LLC, et al.,                   :
:          12-12020 (MG)
Debtors.                          :
:          (Jointly Administered)
:
------------------------------------------------------X

## DECLARATION OF MARK A. LIGHTNER IN SUPPORT OF THE MOTION TO MODIFY THE REVISED JOINT OMNIBUS SCHEDULING ORDER AND PROVISION FOR OTHER RELIEF REGARDING (I) DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF RMBS TRUST SETTLEMENT AGREEMENT, AND (II) THE RMBS TRUSTEES' LIMITED OBJECTION TO THE SALE MOTION

MARK A. LIGHTNER declares as follows under penalty of perjury under the laws of the

United States of America that the forgoing is true and correct:

    1.      I am an associate at the law firm of Cleary Gottlieb Steen & Hamilton LLP, special

counsel for Wilmington Trust, National Association (the "Trustee"), solely in its capacity as

indenture trustee for various series of senior unsecured notes (the Notes," and the holders thereof,

the "Noteholders") issued by Residential Capital, LLC.[1] I am admitted to practice before the

courts of the State of New York and the United States District Court for the Southern District of

New York. I make this declaration in support of the Trustee's motion to Modify the Revised Joint

Omnibus Scheduling Order and Provision for Other Relief Regarding (I) Debtors' Motion Pursuant

to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreement, and (II) The RMBS

Trustees' Limited Objection to the Sale Motion.

2.      I am familiar with the facts and circumstances based on my knowledge, information

and belief, and would so testify if called as a witness that they are true and correct.

3.      During a discussion on July 26, 2012 between attorneys from Cleary Gottlieb and

Morrison & Foerster LLP, along with advisors from FTI Consulting and Alvarez and Marsal,

representatives of the Debtors stated that the RMBS settlement did not concern the Noteholders,

and questioned the need for the Noteholders or their advisors to receive information related to the

RMBS settlement.

4.      True and correct copies of the following documents are attached as exhibits:

EXHIBIT A:   Excerpts from the transcript of proceedings before the Hon. Martin Glenn, June 25, 2012.

EXHIBIT B:   Excerpts from the transcript of proceedings before the Hon. Martin Glenn, July 10, 2012.

EXHIBIT C:   Excerpts from the transcript of proceedings before the Hon. Martin Glenn, July 24, 2012.

EXHIBIT D:   Excerpts from transcript of proceedings before the Hon. Martin Glenn, July 30, 2012.

EXHIBIT E:   Blackline comparison between the RMBS Trust Settlement Agreement with the Steering Committee Group, found at exhibit 2 to the Original Motion, and the Amended and Restated RMBS Trust Settlement

---

[1] Unless otherwise indicated, capitalized terms shall have the same meanings given in the Motion.

Agreement with the Steering Committee Group, found at exhibit 2 to the Supplemental Motion.

EXHIBIT F:   Blackline comparison between the RMBS Trust Settlement Agreement with the Talcott Franklin Group, found at exhibit 4 to the Original Motion, and the Amended and Restated RMBS Trust Settlement Agreement with the Talcott Franklin Group, found at exhibit 3 to the Supplemental Motion.

EXHIBIT G:   Letter, dated July 25, 2012 from Sean A. O'Neal to Larren M. Nashelsky.

EXHIBIT H:   Letter, dated August 3, 2012 from Sean A. O'Neal to Larren M. Nashelsky.

EXHIBIT I:   E-mail chain, with last e-mail dated July 30, 2012 from Mark Lightner to Mark Renzi and Todd M. Goren, with carbon copy to Alexandra Steinberg Barrage, David S. Brown, Gary S. Lee, Joel C. Haims, Jamie A. Levitt, Jeremy Opolsky, Moira C. Heiges, Stefan W. Engelhardt, Sean A. O'Neal, Todd M. Goren and Thomas J. Moloney.

EXHIBIT J:   Letter, dated August 10, 2012 from Jamie A. Levitt to Sean O'Neal.

EXHIBIT K:   Letter, dated August 21, 2012 from Sean A. O'Neal to Larren M. Nashelsky

EXHIBIT L:   Letter, dated August 23, 2012 from Anthony Princi to Sean O'Neal

EXHIBIT M:   Excerpts from the transcript of proceedings before the Hon. Martin Glenn, August 16, 2012.

Executed this 28th day of August 2012 in Istanbul, Turkey.

/s/Mark A. Lightner\
Mark A. Lightner

# EXHIBIT A

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            June 25, 2012

19            11:17 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2 SEWARD & KISSEL LLP

3        Attorneys for U.S. Bank

4        One Battery Park Plaza

5        New York, NY 10004

6

7 BY:    RONALD L. COHEN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    7

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  We're here on

3    Residential Capital, LLC.  It's case number 12-12020.

4          MR. PRINCI:  Good morning, Your Honor.  Anthony Princi

5    of Morrison & Foerster on behalf of the debtors.

6          THE COURT:  Good morning.

7          MR. PRINCI:  Your Honor, I believe this is a status

8    conference on two motions that we've calendared with the Court.

9    One is a 9019 motion respecting certain settlement agreements

10   we have with certain institutional investors, and the second is

11   motions to assume certain plan support agreements that we have

12   with those same institutional investors.

13          There have been a number of discussions that we've had

14   with a number of the main parties in this case respecting the

15   time table for those motions.  And having heard the concerns by

16   those parties, we are going to propose to the Court that at the

17   end of the day -- I'll give you sort of the punch line and then

18   work backwards -- we're going to propose to the Court that we

19   continue to have discussions with those parties to try to come

20   up with a specific new proposed hearing date, of course subject

21   to the Court's calendar.

22          But we do have, I think, Your Honor, progress with

23   respect to when those motions perhaps should be heard.  And

24   what I'd like to do, Judge, before I get into the weeds on

25   that, is first take a step back and just give Your Honor a

1  little bit of a summary about what is involved in each of those

2  motions, what those agreements pertain to and what their impact

3  on the estate is, if I may.

4          THE COURT:  You can.  I read the three motions but not

5  all of the exhibits to them.  I've read what I think is the

6  only objection to be filed so far, the Triaxx objection.  I

7  didn't -- looking quickly at the docket, I didn't see other

8  objections having been filed yet, but I know that the deadline

9  for objections was already extended once, and I suppose,

10 depending on what the schedule is -- we'll see what the new

11 schedule is, but those are the papers I've read so far.

12         MR. PRINCI:  I think you've got the main ones, then,

13 Judge.

14         So Judge, let me start by first addressing what the

15 9019 motions pertain to and why they're so important to the

16 progress and ultimately the outcome of this case.

17         As the Court is aware, the debtors have both been

18 originators and servicers of a large number of residential

19 mortgage-backed trusts.  The settlement agreement, Judge, that

20 has been reached -- and I should say, Judge -- let me take a

21 step back.  From 2004 to 2007, which are the period of time for

22 which those trusts are the subject of tremendous amount of

23 litigation or potential litigation claims respecting alleged

24 breach of representation and warranty claims, and there are

25 approximately 392 trusts all together in that period of time.

RESIDENTIAL CAPITAL, LLC, ET AL.                    32

1          UNIDENTIFIED SPEAKER:  Use the mic.

2          MR. PRINCI:  I've just been informed that the loss

3    share rate is the product of the breach rate and -- just -- and

4    the agreed rate.

5          THE COURT:  I'm not sure what that means, but I don't

6    need to know today.  But I just -- you know, when I read it --

7          MR. PRINCI:  Yes.  I'm only slightly ahead of you --

8          THE COURT:  -- you gave this comparison:  we reached a

9    twenty percent on the loss share rate, but then I'm reading

10   about a different range in the Bank of America/Countrywide

11   litigation, but for two different metrics.

12         MR. PRINCI:  I think, Judge, so that you know, all of

13   this will be brought out in appropriate, clear detail, through

14   our expert at the time of the 9019 motion.

15         THE COURT:  Okay.

16         MR. PRINCI:  It's complicated.  And we understand that

17   people can argue for different methodologies, and some people

18   will.

19         So Judge, we hear you on the need to take into account

20   discovery, which we will, in connection with any proposed

21   hearing date that we bring you.  We'll do that, Judge, in

22   coordination with the committee, taking into account what we

23   hear from the objecting parties.

24         THE COURT:  Here's what I would -- I'm going to hear

25   others who are here.  But I'd like an update on the status of

1  this at the July 10th hearing, to see what progress you've made

2  about a schedule.  And I don't -- you may have informally heard

3  about more objections than the one that's been filed.  And

4  we've got enough on the plate on July 10th already.  We won't

5  take an enormous amount of time with this, but I do want an

6  update at that point.

7            MR. PRINCI:  Okay.

8            THE COURT:  Okay?

9            MR. PRINCI:  Thank you, Judge.  And that's also

10 consistent with the date that we chose with the trustees from

11 the sales procedure motion to try to resolve their open issues.

12           THE COURT:  Okay.

13           MR. PRINCI:  So that makes perfect sense.

14           THE COURT:  Thank you, Mr. Princi.

15           MR. PRINCI:  Thank you, Judge.

16           THE COURT:  All right.  Who else wants to be heard?

17 Mr. Eckstein?

18           MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

19 Eckstein of Kramer Levin, proposed counsel for the unsecured

20 creditors' committee.  I'd like to make a couple of

21 observations on a preliminary basis on these motions.

22           As Your Honor observed, the committee has not yet

23 filed a response to the motions.  And my understanding, our

24 response date was not set for several days, so hence we didn't

25 feel it was necessary or appropriate to prematurely file one.

1  And I know that the trustees' counsels are going to speak about

2  their issues.  I don't intend to speak about their issues

3  specifically, but I will make a couple of observations.

4          I think, Your Honor, just as the punch-line, probably

5  has come out at the place we would have recommended, so I feel

6  that Your Honor has come out to the right conclusion in terms

7  of how to approach this.  But there are details.

8          THE COURT:  We're either both wrong, Mr. Eckstein,

9  or --

10          MR. ECKSTEIN:  That's true.  But I think Your Honor

11  made the comment, that particularly with these motions, the

12  devil is very much in the details.  These are complicated

13  motions that go to the heart of this case.

14          As Your Honor knows, we spent a fair amount of time

15  the last several weeks, as I view it, sort of setting the table

16  for this case with DIP financing and with sale procedures

17  motions and with an investigation, and now an examiner.

18  There's been a lot of activity, all of which was, in many

19  respects, designed to put the case on a path moving forward.

20  And I think the case is moving forward at a brisk, and I think,

21  pretty well-organized manner.

22          These motions really go to the punch-line of the case.

23  I mean, in many respects, the motion with respect to the 9019

24  is seeking to resolve and fix the overwhelming claims in the

25  case.  And as Your Honor correctly pointed out, the three

1    motions:  the motions to approve the plan support agreements

2    and the motion for the 9019, collectively fix the claims and

3    were intended to cause the claimants and ultimately the

4    trustees, who are in fact the parties who hold the put-back

5    claims, to support a plan which embodied an agreement between

6    ResCap and Ally for Ally to make a contribution to the plan in

7    exchange for a release.

8            So in many respects, what we were looking at when we

9    read these motions, it seemed to me, on first glance, to

10   essentially be the plan.  And I asked myself, and I'm still

11   asking myself whether or not it's reasonable and appropriate to

12   go forward with these motions outside of a plan.  And we

13   haven't made a decision on that.  And --

14           THE COURT:  That was one of the -- I didn't say this

15   before, but when I thought about it, if the PSAs provide that

16   the trustees -- I'll use "should", but maybe that's the wrong

17   term -- but if the trustee gets a direction from twenty-five

18   percent of the holders -- investors -- whether it should,

19   could, would follow the direction and vote in favor of the

20   plan.  I started thinking, that's interesting, because that's

21   not the vote that's required for confirmation of a plan for

22   classes of creditors.  This is the biggest group of claims.  I

23   have recognized that in my own thinking.

24           I may be wrong.  We'll see how this unfolds; but

25   that's a very substantial bulk of the claims.  And has suddenly

1  the requirement of a vote been altered by the fact that twenty-

2  five percent can direct trustees how to vote -- anyway, that's

3  just -- I may be looking at it the wrong way.

4          MR. ECKSTEIN:  That's one of the questions we would

5  like to think more about and we'd like to discuss that with the

6  debtor and with other parties in the case, which is whether or

7  not these should or should not be done separate from a plan or

8  released until a plan has had an opportunity to potentially

9  take some more shape.

10          The second threshold question that we are still

11  grappling with is whether or not it is even ripe for the Court

12  to hear a 9019 motion with respect to the claims, even if the

13  PSAs are put aside and even if the obligation to support the

14  plan is delinked from the 9019, which is what I understand Mr.

15  Princi is suggesting, so that we simply look at the claim

16  amount.

17          We're in the process of trying to understand exactly

18  what the direction really means and what the holdings really

19  mean.  As we understand it, and as we've now looked at the

20  documents that have been made available to us, the direction is

21  not what we would typically understand a direction to mean in a

22  traditional indenture, for example, where a requisite majority

23  can actually direct the trustee.

24          In this case, it appears that the direction really is

25  a submission to the trustees of a request that they support or

1  endorse a certain outcome.  Typically those directions or

2  instructions or requests need to be accompanied by an

3  indemnification.  And in this case, it's pretty clear from the

4  documents that no indemnifications are being provided; which I

5  understand, at least for the trustees, is a fundamental

6  omission.

7          We also understand that there's a lot of complexity

8  surrounding what do the holdings mean.  As we understand it, in

9  order to direct the trustees, a group of claimants needs to

10  hold twenty-five percent of a tranche within a trust.  Now, my

11  understanding is that that's the representation with respect to

12  approximately three-quarters of the trusts.  But when one looks

13  at the overall claims, our understanding is that the group of

14  investors that are the parties to the 9019, in fact, hold

15  substantially less than twenty-five percent of the overall

16  claims.

17          We don't know right now what percentage they hold.

18  But it may be that they hold ten percent of the overall claims.

19  And it leads to the question:  what about the other ninety

20  percent?  And what's going to happen if there are two

21  directions or three directions or four directions?

22          It leads us to believe, at least preliminarily, that

23  it would be ideal -- and by the way, sitting here today, we

24  don't have a quarrel with the idea of the settlement, and we

25  don't have a quarrel with the amount of the settlement.  We

# EXHIBIT B

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Lead Case No. 12-12020-mg   Adv. Proc. No. 12-01671-mg

4   - - - - - - - - - - - - - - - - - - - -x

5   In the Matters of:

6   RESIDENTIAL CAPITAL, LLC, et al.,

7              Debtors.

8   - - - - - - - - - - - - - - - - - - - -x

9   RESIDENTIAL CAPITAL, LLC, et al.,

10                   Plaintiffs,

11             - against -

12  ALLSTATE INSURANCE COMPANY, et al.,

13                   Defendants.

14  - - - - - - - - - - - - - - - - - - - -x

15

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             July 10, 2012

21             10:07 AM

22

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                              18

1            MR. PRINCI:  It does vary, Your Honor.

2            THE COURT:  Okay.

3            MR. PRINCI:  I will say this.  And while this doesn't

4   end the inquiry that Your Honor or all of us might have, it is

5   important.  We are not aware of anyone, Judge, and I don't

6   believe anybody in this courtroom is aware of anyone, who holds

7   twenty-five percent in the other tranches, and otherwise has

8   directed the trustees.  In fact, I'm not aware of anybody --

9            THE COURT:  Say that again.  I didn't understand --

10           MR. PRINCI:  -- I'm not -- okay.

11           THE COURT:  -- where you were.

12           MR. PRINCI:  The debtors are not aware, Your Honor --

13  and I don't believe anybody else is in the courtroom, including

14  the trustees -- of any single holder of twenty-five percent or

15  more of any other tranche.  And I believe I can inform Your

16  Honor that no other party other than the parties that have

17  signed the settlement agreement has provided any direction to

18  the trustees.  Does that preclude that from happening tomorrow?

19           THE COURT:  So, in other words --

20           MR. PRINCI:  No.

21           THE COURT:  -- in any given trust, twenty-five percent

22  or more of the holders have not instructed the trustee not to

23  approve the settlement.

24           MR. PRINCI:  Correct.  Correct.  All right.  So that's

25  one piece of the progress.

1    The other, Your Honor, is that we, the debtors, have

2    been working with both the creditors' committee and the

3    trustees on the both need for some sort of a process with

4    respect to information exchange, formal and informal, and also

5    the calendaring of the various matters for the 9019 motion.

6    We've made progress on both fronts.  For example, with the

7    committee, we are talking about those very points:  what would

8    a discovery schedule deadline look like, both for fact and for

9    experts; the objection deadline; the hearing date; the opt-in

10   date for the trustees.

11        Having similar discussions with the trustees.  Also,

12   with the trustees, we're talking to them about matters that are

13   particular to them.  So there's issues relating to information

14   exchanges with respect to whether there are any cure notices

15   that are going to need to be filed, and the like.

16        So we are making progress.  We don't have a definitive

17   agreement with either the creditors' committee, on that front,

18   or the trustees.

19        THE COURT:  How many trustees are there?

20        MR. PRINCI:  Four, Your Honor.  But what we have

21   decided to do, Judge, because we are making progress -- and I

22   should mention two other things, I mean, in terms of progress.

23   One of the things that we've expressed to people, Judge, and

24   it's not a matter for debate today, just I'd point out to the

25   Court though, that the one thing the debtors are very mindful

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    20

1    of is the November 5th hearing for the sale.  That to us, is

2    sacrosanct.  We do not want to allow -- we do not want to take

3    the risk that we could potentially lose the two billion dollar

4    proceeds from the Nationstar sale or from anybody else who

5    outbids Nationstar.  So we, the debtor, at least, are trying to

6    work backwards from that.  We recognize that people -- the

7    committee and the trustees have their individual issues.  And

8    we're trying to work as against that timeline to see if we can

9    make this happen and get back to you with a schedule.

10            On that front, Judge, what we're going to do is see if

11   we can back to you, with the Court's permission, on the hearing

12   on the 24th.  What we, the debtors, will do, Your Honor, is

13   hopefully with the consent of the committee and perhaps also

14   the consent of the trustees, we would like to bring to you a

15   complete schedule for the 9019 motion that will include very

16   specific dates for discovery, very specific dates for the

17   objection deadlines and the like, and the hearing date as well,

18   subject to the Court's calendar, of course.

19            But, Your Honor, in the absence of an agreement with

20   these parties, on the 24th the debtor is going to present to

21   the Court a schedule.  And if we, so-called, go it alone, at

22   that point, Judge, it will simply be, Judge, driven by our

23   desire to balance both their specific needs, the time they

24   would like to do everything they would like to do, and what we

25   believe to be the needs of this case, to make sure that we

1  don't risk either a meltdown, or in the shorter term, which

2  would really be a meltdown, not getting that sale done on the

3  5th.

4            So one way or the other, Judge, on the 24th, we're

5  going to present to you --

6            THE COURT:  Let me ask you.  Are the trustees' counsel

7  present in the courtroom?

8            MR. PRINCI:  I would ima -- I know I've seen one.

9            THE COURT:  Are all four --

10           MR. PRINCI:  I don't know if they are all present.

11           THE COURT:  Oh, I know, Mr. Siegel, you -- how many

12  trustees do you represent, Mr. Siegel?

13           MR. SIEGEL:  I represent one of the trustees --

14           THE COURT:  One.  Well, you spoke for most of them

15  last time.

16           MR. SIEGEL:  We have been working together, the four

17  trustees --

18           THE COURT:  You have to identify yourself.

19           MR. SIEGEL:  I'm sorry.  Glenn Siegel on behalf of

20  Bank of New York Mellon, one of the RMBS trustees.  There are

21  four RMBS trustees.  They are Bank of New York Mellon, Wells

22  Fargo, U.S. Bank, and Deutsche Bank.  We've been working

23  together.  You should assume I'm speaking for all of the

24  trustees, unless they contradict me.  But we've been working

25  together.  Well, I can't read their minds, right?  But we have

**RESIDENTIAL CAPITAL, LLC, ET AL.**                          22

1   been working together.

2           Your Honor, do you have a specific question?

3           THE COURT:  Well, here's what I think.  Mr. Princi

4   said that hopefully he will present an agreed schedule with the

5   trustees on July 24th.  And so that we don't have any surprises

6   on the 24th, I'm going to set a deadline of 5 o'clock Friday,

7   July 20th for either to file a proposed agreed schedule, and if

8   there is no agreement, for the respective parties to file their

9   proposed schedules.  So that when we have the hearing on the

10  24th, I will impose a schedule.  And if there's an agreed one,

11  I'll certainly be heavily influenced by it, subject to the

12  Court's calendar.

13          But so that we don't spin our wheels on the 24th and I

14  start hearing, no, we haven't agreed to this; we haven't agreed

15  to that, let's get all of the proposed schedules filed by

16  Friday the 20th at 5 o'clock.  And hopefully it will be a

17  single proposed schedule.  And when I take the bench on the

18  24th, I'll either agree to it as proposed or make adjustments

19  as necessary to the Court's calendar and deal with it that way.

20          MR. SIEGEL:  Your Honor, just one clarification.

21          THE COURT:  Okay.

22          MR. SIEGEL:  There are two different issues here, at

23  least in my view.  There is the schedule related to the sale

24  and there is the schedule related to the 9019.  I heard Mr.

25  Princi, that he believes they ought to be linked.  I'm not sure

**RESIDENTIAL CAPITAL, LLC, ET AL.** 23

1  that the trustees are there on that point.  When you say --

2         THE COURT:  Just put that issue -- just give me your

3  proposed schedule.  Whether it's expressly linked or otherwise,

4  I'm going to set a schedule.  And --

5         MR. SIEGEL:  Understood.  Just --

6         THE COURT:  -- the debtor obviously wants to schedule

7  it with the November deadline hearing in mind.  And you may or

8  may not agree.  But let's see where we are when I see you on

9  the 20th, whether there is an agreed proposed schedule or not.

10  Okay?

11         MR. SIEGEL:  Okay.  Your Honor, as long as I'm up

12  here, I have one point of clarification that I need to make.

13  The debtor and others like to use the word "direct", when they

14  refer to the support that's been expressed by certificate

15  holders.  We do not dispute that there is a large group of

16  cert -- large group -- there is a significant group of

17  certificate holders who have expressed their support for the

18  agreement.

19         To date, we have not received a direction or an

20  instruction within the meaning of the applicable documents.

21  And as Mr. Princi did say, that means we have to act on our

22  own, and all of the issues that we discussed at the last

23  hearing remain present.  If that changes, we will advise you.

24  But of course, it's encouraging that there is a larger group of

25  certificate holders who've expressed their support.  But the

1          So what we're going to do, Judge, is there will be a

2     motion at some point forthcoming, pursuant to which those

3     depositor entities will seek to reject those contracts.  And

4     then, at the time of the sale hearing, the servicing debtor

5     entities will be seeking to assume and assign those very same

6     contracts.

7          So we've explained to both the committee and to the

8     trustees that from a procedural vantage point, that's how we're

9     going to actually execute, if you will.  And that's also part

10    of our ongoing discussions with them, Judge.

11          THE COURT:  It's the same contract?

12          MR. PRINCI:  It is the same contract.  And --

13          THE COURT:  And you're telling me that it's legally

14    possible for one party --

15          MR. PRINCI:  It is, Judge.

16          THE COURT:  -- to reject and another to assume and

17    assign?

18          MR. PRINCI:  It is.  And that's why we're going to do

19    that, Judge.  Because the controlling law in this area allows

20    for two separate debtor entities --

21          THE COURT:  Am I going to be surprised when there are

22    objections to that?

23          MR. PRINCI:  Judge, I would be disappointed in my

24    colleagues if somebody can't find a way to object to everything

25    in this case.  Okay?  But that notwithstanding doesn't mean

1  that the law that I've referred to is not the controlling law.

2  we believe it is.

3            So I believe that's it, Your Honor.  And I'll just

4  pass the podium to Mr. Eckstein.

5            THE COURT:  Okay.

6            MR. ECKSTEIN:  Your Honor, Kenneth Eckstein on behalf

7  of the unsecured creditors' committee.  I'd like to ask my

8  partner, Philip Bentley, to make a few remarks on this.  Before

9  doing so, I may have misstated a particular date with respect

10 to the Ally subservicing motion.  I just want to correct that

11 for the record.  I believe the agreement has been to extend the

12 deadline for approval of the Ally subservicing motion to July

13 27th.  That was moved from July 13th.  I think I had said --

14           THE COURT:  You said the 31st.

15           MR. ECKSTEIN:  -- July 31st.  So --

16           THE COURT:  The 27th?

17           MR. ECKSTEIN:  -- I want to correct, and say the 27th.

18           THE COURT:  Okay.

19           MR. ECKSTEIN:  And with that, Your Honor, I'm going to

20 let my partner, Philip Bentley --

21           THE COURT:  Thank you.

22           MR. BENTLEY:  Good morning, Your Honor.  For the

23 record, Philip Bentley of Kramer Levin.

24           Your Honor, just to respond briefly to Mr. Princi's

25 comments.  We agree and we're appreciative of the efforts the

1  debtors have been making.  We've had a series of productive

2  discussions with them.  We haven't yet received, but we

3  understand we're going to receive later today, a lot of data

4  backing up the estimation of the aggregate put-back claims,

5  which are addressed in the declarations in support of their

6  9019 motion.  We're looking forward to getting that data.  We

7  think that will be very helpful in enabling us to move the ball

8  forward with respect to understanding the issues that underlie

9  this discussion, these discussions that we're having with them

10 about the schedule that Mr. Princi described.

11          As he said, we have had been having a series of

12 discussions with them about what's the right schedule.  And

13 frankly in our mind, the threshold issue, the biggest issue, is

14 not so much the details of the -- they're proposing a schedule

15 that would get the 9019 motion to Your Honor to be heard at

16 some point prior to the November 5 sale hearing.  There are

17 issues about the details of how you get there, but the

18 threshold issue, and frankly the bigger issue in our mind is,

19 is it appropriate to work through the process on quite a quick

20 basis, to have the 9019 motion heard at that relatively early

21 date?  Will it benefit the sale process?

22          And it may benefit the sale process.  It might help,

23 for example, with respect to the issue that Mr. Princi just

24 described, which we call the severability issue.  Can the

25 debtors sever the rights from the obligations?  It might help

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    29

1  to get that resolved in advance of the November 5 hearing, if

2  you could get the trustees --

3          THE COURT:  Go ahead.  Mr. Garrity is playing with the

4  lights.

5          MR. GARRITY:  Sorry, Your Honor.

6          MR. BENTLEY:  The hope is that if you can get the

7  trustees to sign on to this settlement -- and as Mr. Princi

8  said, they're certainly the real parties-in-interest here, or

9  the real parties who have the rights here -- if you can get

10 them to sign on before November 5, and perhaps if you can also

11 get the Court to approve of that settlement before November 5,

12 would that help moot the severability issues.  That's one big

13 issue.  We're hopeful that a few weeks from now, we will be

14 back -- or a week and a half from now, we will be back before

15 Your Honor with an agreement.

16         If Your Honor likes, I can walk you through briefly

17 one or two of the other principal issues that we're looking at

18 with respect to this issue, or we can defer that to the 24th.

19         THE COURT:  Let's defer it.  We have a pretty full

20 agenda for today.

21         MR. BENTLEY:  Okay.

22         THE COURT:  Let me just caution everybody.  In setting

23 the schedule, if there's going to be a contested evidentiary

24 hearing, and the debtors are desirous of a decision before

25 November 5th, don't think you're going to have an evidentiary

# EXHIBIT C

1

1

2  UNITED STATES BANKRUPTCY COURT

3  EASTERN DISTRICT OF NEW YORK

4  Case No. 12-12020-MG

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              July 24, 2012

19              10:21 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1   anybody's mind about how this matter is going to proceed from a

2   scheduling standpoint.  Okay?  Whether the trustees have been

3   diligent or not diligent in pursuing discovery so far or

4   retaining experts, I, frankly, don't care.  What I care about

5   and what I want -- I want everybody on the same page that you

6   know this is what the schedule's going to be.  It can

7   accommodate further negotiation efforts to resolve issues and I

8   hope that occurs.  But if it doesn't, everybody's going to know

9   this is the deadline by which I have to do various things.

10  There will undoubtedly be further orders from the Court,

11  procedure orders, about how any contested hearings will go

12  forward.  That doesn't have to have that level of detail.  But

13  I don't want anybody under any misimpressions.  I don't want to

14  come back in November and have anybody saying, well, the

15  hearing should be next week and so the schedule should be --

16  you know, everything gets filed tomorrow.  That isn't going to

17  happen.  Nor am I going to hear from the trustees that we were

18  unable to resolve these disputed matters and so we have a

19  schedule that takes us out a few months.  That isn't going to

20  happen.

21          MR. BENTLEY:  We're happy to address these issues now,

22  Your Honor, if Your Honor thinks it's helpful to have us go out

23  into the hallway and try to --

24          THE COURT:  Well, you're not going to go out --

25          MR. BENTLEY:  -- fill in those holes.

1          THE COURT:  -- into the hallway.  But I'm telling you,

2    what I am going to order direct is that after the hearing

3    today, I want the counsel to meet face-to-face day to day until

4    completed with a comprehensive schedule.  And if there are

5    competing provisions with dates, put them both in and indicate

6    who supports which one and who opposes which one.  And I'll

7    resolve it.  Okay?  But I'm not going to deal with two totally

8    different structures of orders that some of which leave dates

9    way too open and say come back in November and we'll talk about

10   a schedule.  That's not acceptable.  Okay.  I don't care -- I'm

11   not casting blame for where you all are today.  The fact that

12   there may have been one face-to-face meeting weeks and weeks

13   ago and exchange of e-mails, that lies in everybody's court.

14   That's unacceptable.  Okay.  What's going to happen is you're

15   going to meet day-to-day, all day if necessary, and you're

16   going to try to hammer out a comprehensive schedule that fills

17   in -- and to the extent parties disagree, you'll come in at a

18   separate hearing very soon and we'll iron it out.  But what I

19   have before me, these two proposals -- I have to read tea

20   leaves to understand what the committee and the trustees are

21   proposing.  Okay?  I don't like to read tea leaves.

22         MR. BENTLEY:  We're happy to follow Your Honor's

23   suggestion.

24         THE COURT:  Tell me why I shouldn't go forward and

25   hear the 9019 that the debtors filed and any objections to it

1   before the rest of these procedures that you've proposed.  I

2   mean, aren't the debtors entitled -- it may not get approved.

3   And there may be some very substantial problems with it.  And

4   it may get rejected.  Okay?  They filed the motion.  They want

5   a hearing.  There's a proposed schedule.  You agree or disagree

6   but the schedule you proposed is one that puts a whole bunch of

7   other things in the way of the Court hearing it.  That's the

8   way I perceive these differences.  Okay?  So why shouldn't I go

9   ahead, for better or worse, and decide the 9019 that's already

10  been filed and not wait to see whether there's some new 9019

11  that'll be filed or not?

12          MR. BENTLEY:  Your Honor, one concern -- I have a few

13  concerns about that.  One concern is what we're proposing to

14  you does rest on an agreement with the trustees.  And Your

15  Honor will have to ask the trustees if they would still be

16  prepared to make the concessions they're making as to the buyer

17  taking free and clear, if Your Honor were to impose that

18  structure, that schedule.  That's issue number one that I have,

19  Your Honor.

20          The second is --

21          THE COURT:  So if they don't get all their cards,

22  they're going to go home.

23          MR. BENTLEY:  If Your Honor can get their consent to

24  this, God bless.  Your Honor, we've done our best and this is

25  the deal we've been able to strike.

1    take them up.

2         MR. WEITNAUER:  If that's how the Court wants to, that

3    will be fine, Your Honor.  We think it would be better to have

4    it clarified in advance but we'll do what the Court says.

5         THE COURT:  I'll decide the motions that are pending

6    before me on the calendar today and that's not one of them.

7         MR. WEITNAUER:  That's fine.

8         THE COURT:  Thank you.

9         MR. WOFFORD:  Your Honor, good morning, for the

10   record, Keith Wofford from the firm of Ropes & Gray on behalf

11   of the RMBS institutional investors.

12        Your Honor, the good news is that on behalf of our

13   fourteen billion dollars nearly in certificate holders and the

14   concurring four billion represented by Mr. Franklin, your

15   remarks today have presaged most of what I was going to say

16   today.  And the problem with respect to scheduling here is not

17   that the debtors have come with Schedule A and the committee of

18   trustees have come with Schedule B, but in fact the trustees as

19   you noted came with a schedule that is not a proposed schedule

20   at all.  What effectively the schedule being proposed by the

21   committee and the trustees would do, Your Honor, is to take

22   away the proposed 9019 in its entirety without the opportunity

23   of the debtor or our clients to get a day in court for the

24   proposed 9019 as filed already.

25        This framework we believe is not permitted.  The

1  debtors have the right to go forward with a motion.  And,

2  frankly, with respect to the notion of getting in the room

3  again to try this after several weeks, I'm a little concerned

4  Your Honor.  We spoke with the committee a number of times in

5  person and by the phone and, frankly, look, we've had the

6  opportunity to come with a schedule and they wouldn't come with

7  one.  I think with respect to the pre-sale items, perhaps,

8  there is some more for discussion but I think with respect to

9  the fundamental gravamen of the 9019 which is the size of the

10  claim and whether the trustees agree to accept that, we do need

11  to try to set a schedule today.

12          I'm not optimistic --

13          THE COURT:  The schedule isn't going to get set today

14  because what is happening today is I'm ordering that counsel

15  meet and confer beginning tomorrow morning and go day to day

16  until we have a schedule.  So I'm not going to pick and choose

17  or throw darts as to a schedule.  The constructs that each have

18  taken so far diverge.  We're not going to put off the 9019

19  until after some future negotiation between the trustees and

20  the debtor.  That isn't to say that they can't come -- the

21  parties can't come to an agreed schedule about it.  I'm

22  certainly mindful of the comments you make, Mr. Wofford, with

23  respect to -- be careful what you ask for because the 9019 may

24  get heard.  I'll hear evidence and the result may be it gets

25  rejected and some additional negotiation and a schedule that

1  tries to accommodate the specific needs of the trustees could

2  avoid that happening.

3        MR. WOFFORD:  You are right that that could happen,

4  Your Honor, but one other thing that could happen as you are

5  certainly well aware is that the process of setting a calendar

6  date, of being able to ascertain and delineate the actual

7  objections that are on the record and having the parties have

8  the opportunity before hearing to resolve those objections, we

9  would suggest might have the same effect on a quicker timeline.

10        THE COURT:  Well, we're going -- whatever schedule is

11  agreed to or that I have to resolve because the parties can't

12  will -- needs to include specific dates for objections,

13  hearings, discovery, et cetera.  We're not going to come back

14  in mid-November and talk about a new scheduling order.  So this

15  needs to be a comprehensive schedule that includes whatever

16  matters -- either the motion, the 9019 that's been filed or

17  that the trustees intend to file.  I didn't press Mr. Siegel

18  about what the trustees want to do to see if this Court can

19  resolve issues that could take five years in the state court to

20  resolve.  That's not the issue for today.  But an important

21  issue from the trustee's standpoint, important issue for the

22  investors and for the debtor and the committee.  I mean it's

23  obviously important in being able to put a schedule together

24  that would have hearings, that would give parties a chance to

25  try and resolve these issues if they can, but at the end of the

1    process, we'll give everybody certainty and people can fell --

2    can do what they want but at least we'll provide all of these

3    moving parts some certainty about what the outcome is.

4            So I hear what you're saying but if you need to be a

5    part of the scheduling, the face-to-face meeting on scheduling,

6    that's fine, go ahead and do it but starting tomorrow morning.

7            MR. WOFFORD:  Your Honor, that we take that into

8    account but with one question because one thing that we need is

9    not just a start point but an end point.  Because even though

10   the last conference --

11           THE COURT:  The schedule is going to include start and

12   end.

13           MR. WOFFORD:  But I mean in terms of actually arriving

14   with a schedule.  Because one concern that we have, Your Honor,

15   is that one of the arguments that will be made if a schedule is

16   not agreed to is that as time continues to lapse, there isn't X

17   time remaining before a sale.

18           THE COURT:  I don't allow things to linger.  So the

19   schedule will be set -- I'm just not satisfied that the parties

20   are meeting face-to-face tried to resolve those issues

21   themselves.  And that's what needs to happen.

22           MR. WOFFORD:  Okay.  Your Honor, certainly with -- in

23   conjunction with the debtors and the committee, we'd love to

24   hear any thoughts on alternative dates to set that new schedule

25   because we are concerned.

RESIDENTIAL CAPITAL, LLC, et al.                    76

1    read the tea leaves well and I'm not sure what -- I don't want

2    to find out three months from now that somebody had some

3    different intention about it.  So when the parties meet and

4    confer and try to resolve it, clarity, I think is the most

5    important point.

6              MS. BOELTER:  Thank you, Your Honor.

7              THE COURT:  Thank you very much, Ms. Boelter.

8              Anybody else wish to be heard?

9              MR. SHORE:  Good morning, Your Honor.  Chris Shore

10   from White & Case on behalf of the junior secured notes.

11   They're holding a 900 million dollars in claims now with liens

12   on substantially all of the debtors' assets.  I'm also focusing

13   on paragraph 4, the language at the end which I don't think

14   works and I'm happy to talk to people about the language.  But

15   we can't have this order resolved in priority issues in

16   connection with the scheduling of sale objections.  So on the

17   record I'd add that if and to the extent anybody wants to put

18   in the scheduling order something that addresses priority

19   issues that they loop me in and we'll talk to them about it and

20   if we can resolve any objections we will and if not we'll come

21   back and address it when the scheduling orders up.

22             THE COURT:  Thank you very much, Mr. Shore.

23             Anybody else wish to be heard?  Anybody on the phone?

24   Mr. Princi?

25             MR. PRINCI:  First of all, Your Honor, I look forward

RESIDENTIAL CAPITAL, LLC, et al.                    77

1  to hopefully resolving this.  We should be able to resolve

2  this.  There's no reason why we shouldn't come to an agreement.

3          THE COURT:  Would you like everybody to meet in your

4  office starting tomorrow morning?

5          MR. PRINCI:  10 o'clock.

6          THE COURT:  Okay.  Beginning 10 o'clock at the

7  Morrison & Foerster officer, those who wish to be heard with

8  respect to the scheduling order.

9          MR. PRINCI:  Please.

10          THE COURT:  Talk to Mr. Princi after that's when --

11  when we start.  I'm serious about this.  We go day to day until

12  you finish it.

13          MR. PRINCI:  I'm --

14          THE COURT:  And you can't -- what I want to get is I

15  want to get one -- I can understand you may not be able to

16  resolve all the issues but you ought to be able to agree on at

17  least a format and what the format -- and maybe you think that

18  paragraph 4(c) should say this and the trustees think that 4(c)

19  should say that nd indicate what those positions are.  And

20  then, if it comes to that, I'll permit letter briefs that just

21  address indifferences.  And I'm not going to put a page limit

22  on long or short.  Okay.  Just simultaneously file -- and work

23  it out.  The faster this gets resolved the better it gets

24  resolved.

25          So try and iron out a common schedule.  If you intend

1   to disagree, flag those issues.  Short letter briefs addressing

2   those.  Mr. Shore's point about a scheduling order is a

3   scheduling order.  You can't resolve issues about priority.

4   You can't -- it shouldn't have some very vague position that

5   all objections -- there are certain objections that really do a

6   sale process to be effective on.  The buyers need to know what

7   they're bidding on.  So if there are objections -- many

8   objections frequently don't get resolved until after a sale.

9          Adequate assurance, until you know who the successful

10  bidder is, how do you ever know whether there was adequate

11  assurance?

12       (Pause)

13       THE COURT:  I'm going to set the scheduling conference

14  for Tuesday, August 7th at 9 a.m.  So by 5 p.m. Wednesday,

15  August 1st I want to propose a scheduling order reflected to --

16  and hopefully you'll all agree.  To the extent you don't I show

17  the competing paragraphs and I want that same deadline for

18  letters that just address the issues that are in dispute.  I

19  don't need lengthy arguments about why.

20       MR. PRINCI:  Your Honor, may I ask the Court to

21  reconsider those dates for the following reasons?  I think you

22  had it right earlier when you said go in a room, go day to day,

23  get it done.  I mean, Judge, I just don't believe that there is

24  any reason why we should not be able to get a schedule

25  completed by going tomorrow in the same room, Thursday in the

RESIDENTIAL CAPITAL, LLC, et al.                    79

1  same room.  What I'm concerned about, Judge, if you give people

2  to August 1 it's going to be -- it's going, if you will, serve

3  to -- we have a greater incentive, Judge.  I think if you stay

4  with your earlier direction than providing August 1 and then,

5  providing a date where there's a scheduling conference.

6          THE COURT:  Well, I'm on an airplane then, July 31st.

7  And --

8          MR. PRINCI:  So why don't we get it done by the 30th,

9  Judge?

10         THE COURT:  Well, believe or not, I actually have

11  other things on my calendar.

12         MR. PRINCI:  Sorry about that.

13         Would it be possible, Judge, that we set an earlier --

14         THE COURT:  Stop.  Stop.

15         MR. PRINCI:  It's okay.

16         THE COURT:  Okay.  I will address the scheduling.

17         I want to schedule an order by this Friday at noon,

18  July 27th at noon.  I want letters addressing all the

19  differences by Sunday the 29th at noon.  And we'll have a

20  conference on Monday, July 30th, 3 o'clock.  I'm on an airplane

21  the next morning.

22         MR. PRINCI:  Your Honor, thank you very much for your

23  consideration and for moving your calendar like that.  We

24  appreciate it.

25         THE COURT:  Okay.  Mr. Lee, what are we going -- what

1  do we have to cover today and then we'll decide how we're going

2  to deal with it?

3         MR. LEE:  Give me one second.

4         Your Honor, the next thing on the agenda would be the

5  long delayed promise that Mr. Eckstein and I have made to the

6  Court to actually explain what's at issue in relation to the

7  subservicing motion.  I would hope that we'll be able to

8  address that fairly quickly.

9         THE COURT:  Okay.

10        MR. LEE:  Thereafter, Your Honor, we have a reduced

11 number of contested stay relief motions and then a few

12 professional applications which I think we should be able to

13 address fairly quickly as well.

14        THE COURT:  All right.  Here's -- I need a short

15 break.  Let's take a ten minute recess and I'll come back in.

16 Okay?

17        MR. LEE:  Thank you, Your Honor.

18        THE COURT:  Everybody can remain seated when I come

19 back in.

20     (Recess from 11:56 a.m. to 12:15 p.m.)

21        THE COURT:  Okay.  We're back on the record in

22 Residential Capital No. 12-12020.  Mr. Lee?

23        MR. LEE:  Good afternoon, Your Honor.  Gary Lee from

24 Morrison & Foerster for the debtors.

25        The next item on the agenda is the status conference

# EXHIBIT D

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              July 30, 2012

19              3:03 PM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1    to pro rate all this as against the trusts that accept, i.e.,

2    opt in, and the trusts that don't accept.  Okay?  And so we've

3    done that both definitionally and mechanically.  By way of

4    definition, if you go to paragraph 14, you'll see that we use

5    pretty self-explanatory definitions:  accepting trusts and

6    nonaccepting trusts.  And you'll see that that, Your Honor,

7    works into these caps in subparagraph 18(b).  You'll see that

8    the way in which the cap works is, as you read through that,

9    you'll see it is pro rata based on whether you're accepting or

10   nonaccepting.

11           So let me just pause there before I get to the rest,

12   which actually is -- 19 through 22 are relatively

13   straightforward.  But let me just see if the Court understands

14   what those provisions are designed to do.

15           THE COURT:  I'm not sure I'm prepared for a quiz right

16   now, Mr. Princi, but why don't you go on.

17           MR. PRINCI:  Okay.  Well, I'm going to -- you know,

18   Your Honor, I just had a sidebar with Mr. Eckstein, and I'm

19   going to leave it to Mr. Eckstein to maybe flesh that out a

20   little further.  Your Honor, as I said, I think the rest of the

21   paragraphs are relatively straightforward, particularly as

22   against paragraph 18, which is not relatively straightforward.

23           But in addition, Your Honor, to the fact that this

24   proposed order has been painstakingly negotiated by the

25   creditors' committee, and is supported -- not just negotiated

1  but supported by the creditors' committee, the debtor, the RMBS

2  trustees, the instituitional investors; in addition, Your

3  Honor, I believe Ally is okay with this, the parent company.  I

4  believe -- I haven't heard from any other party, Your Honor, a

5  number of whom were involved in these discussions in one way or

6  the other, that there's any objection to it.

7          And so I think this is -- when it comes to the

8  complicated issues in this case, this order, Your Honor,

9  provides great value and kind of takes the chaos and organizes

10 it tremendously, here.  And as you point out, there are also

11 substantive benefits to this.  So --

12         THE COURT:  This is in the nit category -- I would

13 like the title of this document changed.  I don't -- it's now

14 called "Revised Joint Omnibus Scheduling Order".  Come up with

15 some more words.  I mean, because there are substantive --

16 there are very substantive aspects to this.  I don't want to

17 hear in November, somebody comes out of left field and says,

18 that was a scheduling order you entered.  I didn't know there

19 was substantive effects from it.

20         So it may be a revised joint omnibus scheduling order

21 and provisions for other relief.  I don't know.  I just don't

22 want to hear later that when objectors come in that -- and this

23 is really -- I mean, those provisions really are impacting the

24 RMBS trustees, potentially the investors, by virtue of that.

25 But this is much more than just a scheduling order.

1    MR. PRINCI:  Your Honor, we will do that.  And it is.

2    And in fact, I want to, Judge, point to two other things that I

3    failed to sort of up front.  And that's sort of in the specific

4    obligations of the various parties with respect to deadlines.

5        If you go to page 4 and look at paragraph 2, it talks

6    about the debtor filing a supplement.  One of the benefits,

7    Your Honor, of --

8        THE COURT:  I guess you're filing another motion too?

9        MR. PRINCI:  It'll be a supplement.  We're not going

10   to redo this motion, Judge.  And just so that Your Honor

11   understands, we have -- one of the benefits, and there were

12   many -- one of the benefits of us spending a lot of time

13   together, well into the night --

14       THE COURT:  Sometimes that helps.

15       MR. PRINCI:  It helped a lot, Judge.  It helped an

16   awful lot.  And one of the benefits, Judge, is that we realized

17   that there really are things that just needed to be clarified.

18   And so amongst and between the parties, we have a short list.

19   I'm actually going to be sending an e-mail to all of these

20   parties tomorrow, just confirming what we talked about.

21       Just by way of example, one of those things -- you've

22   heard me say this in open court before, I'll say it again --

23   the 9019 motion is detached from the plan support agreement

24   that we have with these same institutional investors.  So it

25   does not have any connection to the Ally issues that are being

1  examined by the examiner, et cetera, et cetera.  And we'll make

2  that -- we'll actually say that up front in the motion, if that

3  will be helpful for people, et cetera.

4          So we have a few items that we all discussed that we

5  think we need to clarify either in a motion, and in one

6  particular instance, also potentially in the settlement

7  agreement itself.  And we're going to do that.

8          The other thing I just want to inform the Court,

9  because I don't think this would be obvious what our intentions

10 were with respect to this for the Court.  There is a deadline

11 here, Judge.  I just need to find it.  So please just give me a

12 moment.

13         It is the fact that we are going to be working -- it

14 may be expressed, and I'm just missing it while I'm on my

15 feet -- but we're going to be working, Your Honor, on a

16 proposed order for the 9019 motion.  And Your Honor is well

17 aware, because it's come out at these hearings on this, that

18 there are difficult issues that the trustees need to balance in

19 doing their job.  And so the proposed order, Your Honor, which

20 we will present to the Court well in advance, Judge, of the

21 9019 hearing, will be designed to -- it'll have input from the

22 trustees and of course the committee and everyone else that's a

23 major party here, Judge.  And it'll be designed to try to deal

24 with some of those.

25         But what we'll make sure we do is to get to you and

1  present that to you early, allow the Court to schedule, if you
2  want, with us, either a court session or a chambers session to
3  discuss why we have these proposed findings.  Now, all of that,
4  Judge, in due course.  And of course, none of what we put in
5  the order, by way of any proposed findings, will be
6  inconsistent with what we present at the hearing.  So anything
7  that we have in that order, that means we intend to cover that
8  at the hearing.
9          I just do want to -- that wouldn't have been obvious,
10  our intention from this order.  And that is the intention of
11  the parties, Judge.
12          THE COURT:  Okay.
13          MR. PRINCI:  Judge --
14          THE COURT:  I will have some other comments.  I'm
15  going to save them, and questions.  Okay?
16          MR. PRINCI:  Let me cede the podium to Mr. Eckstein.
17          MR. ECKSTEIN:  Your Honor, good afternoon.  Kenneth
18  Eckstein of Kramer Levin on behalf of the official creditors'
19  committee.
20          Your Honor, first I'm going to echo Mr. Princi's
21  remarks complimenting the parties for working together and
22  constructively.  And I'll certainly include the Morrison &
23  Foerster team, on behalf of the debtor, in feeding us late into
24  Thursday night and working, I think, constructively, to
25  coalesce a lot of difficult issues where there were very

RESIDENTIAL CAPITAL, LLC, ET AL.                        34

1    disparate viewpoints and interests.

2              Number two, I'd like to highlight, I think, a couple

3    of the areas where the committee feels the greatest heartburn

4    on this motion, because there are several issues that Your

5    Honor has started to identify that are not simply scheduling,

6    they're quite substantive, and they could affect the case as it

7    runs its entire course.

8              The first is timing.  As Your Honor sees from the

9    schedule, the parties have ultimately agreed to a tight time

10   schedule.  It essentially has the parties conducting near-term

11   discovery.  And to the extent there are going to be parties who

12   are going to be doing independent evaluations of the proposed

13   settlement, certainly, the committee and the RMBS trustees, and

14   there may be other parties as well, the parties have agreed

15   that expert reports are going to be submitted really in about

16   two months.  And that's fast.

17             And I don't want to give Your Honor the impression

18   that people were enthusiastic about the schedule.  I think

19   there was a practical recognition that one of the essential or

20   important elements of this was to complete this process before

21   the Court considered the sale hearing.  And while we did obtain

22   from Nationstar an agreement to extend the sale hearing out by

23   two weeks, it still did not leave a significant amount of time.

24   And in order to permit the discovery of the experts, the filing

25   of objections, and the filing of replies, consistent with Your

1 | Honor's schedule to conduct a hearing of this complexity, this
2 | was the schedule that parties ultimately were able to agree
3 | upon.
4 | We're very much relying upon the full and complete
5 | cooperation of the debtor in terms of making the information
6 | available.  And I'm hopeful that this will provide adequate
7 | time.  Needless to say, if there are problems, parties will
8 | have to come back and deal with it.  But that's not something
9 | that we're doing today.  And Mr. Princi is right; all the
10 | parties that Mr. Princi described are willing to work with this
11 | schedule.
12 | We had a committee call this morning.  And I tried to
13 | impress upon the committee members the various elements of this
14 | agreement as it was finalized.  And I think that people are all
15 | going to try to work with this schedule.  And hopefully, we're
16 | not going to have the need to come back.  And if we do, Your
17 | Honor will deal with that.
18 | Number two, Mr. Princi did indicate that a supplement
19 | is going to be filed.  Obviously, we're going to -- everybody's
20 | going to be very focused on the substance to that supplement.
21 | The letter that Mr. Princi described that he's going to be
22 | providing tomorrow, laying out the elements that we're going to
23 | see in the supplement, I believe will be consistent with the
24 | items that we've already discussed, and hopefully will give
25 | parties clarity on what modifications to expect.  And we're

1  assuming that there are not going to be any material new
2  changes that are going to sort of move us in a different
3  direction.

4         But that's a very important submission.  And we feel
5  it's very important for all parties, not just the parties who
6  were participating in this negotiation, but all parties in this
7  case, to see the filing by August 15th, so that they have ample
8  time to know, with detail, what precisely everybody is
9  responding to.  And given the complexities of this, I trust
10 that the supplement will describe in the motion itself, all
11 substantive provisions that people should really be aware of
12 that could affect their evaluation of the settlement.  And I
13 think this will give us ample time to do that in a clear and
14 comprehensive fashion.

15        The next item I wanted to bring to Your Honor's
16 attention is the discussion that Mr. Princi had with you of the
17 pre-auction objections and what we consider the potential
18 claims that could give rise from that.  That is the first
19 category of administrative claims or potential administrative
20 claims or cure claims, that we are dealing with.

21        One of the difficult elements of this agreement is
22 that all parties are making a lot of assumptions that, at this
23 point in time, are not based on any level of certainty, or
24 really very little diligence.  We have as much information as
25 we've been able to collect, to date.  But people do not know

1    with any certainty what types of pre-auction objections will be

2    asserted by the trustees.

3            We have representations that these will not be

4    significant or material, relative to the size of this case.

5    And hopefully that will be the case.  Moreover, we're hopeful

6    that between now and when these claims are filed, that there'll

7    be an ample opportunity for the trustees and the debtor and the

8    committee to speak with Nationstar, which is the stalking-horse

9    bidder on the servicing platform.  And our goal is that many of

10   these concerns will be resolved in discussions with Nationstar,

11   so that there will not need to be claims filed, but that in

12   fact, the trustees can get comfort that many of their concerns

13   will be dealt with by the purchaser in the ordinary course, on

14   an ongoing basis, post-closing.

15           THE COURT:  Let me just stop you there.  Because I

16   deferred raising this with Mr. Princi, but this is an

17   aggressive schedule.  And the question I have is whether it

18   builds in any time or sufficient time for negotiations.

19   Because the last point you make, Mr. Eckstein, I just fully

20   anticipate before the evidentiary hearings starts in this, the

21   parties will sit down and knock heads and really try and see

22   whether you can resolve -- wishful thinking -- all of the

23   issues, some of the issues, whatever.

24           And with this aggressive schedule, the debtors' reply

25   brief -- discussions don't have to await for then -- but the

1  debtors' reply brief is October 29th, and with a hearing

2  commencing on November 5th.  So that's actually one of the big

3  concerns.  So one of the concerns I have is time for the

4  parties to be able to try and resolve -- negotiate, resolve as

5  many issues as possible.  And the second, and I guess I'll ask

6  Mr. Siegel about this when he comes up, is what process are the

7  trustees going to set up with the investors?  Because I mean I

8  think I fully expect the trustees don't want to get too far out

9  front of the investors.

10      We've talked before about what this provision is,

11  twenty-five percent being able to direct the action, will you

12  follow or won't follow.  But it seems to me that there are a

13  number of things that have to work parallel.  One, a process of

14  the RMBS trustees with the investors;  second, a dialog between

15  the debtors, the committee, and the RMBS trustees; all of this

16  going on while you've got discovery going on.

17      So I do have a concern that there's not enough built

18  into this.  And I don't want to complicate the schedule.

19  Assuming I'm likely to agree to the schedule, I think that you

20  all ought to work now on agreeing on an unofficial schedule by

21  which, without prejudice to anybody's rights, claims,

22  objections, that you will share preliminary objections.  And

23  you probably have already done this.  I mean, it's not a

24  mystery.  But until you've done -- as you're doing your

25  discovery.

RESIDENTIAL CAPITAL, LLC, ET AL.                39

1          I mean, I think you ought to be setting up a process

2     that has informal meetings that aren't to discuss the discovery

3     disputes or anything like that, but actual -- to see whether,

4     as issues are arising, whether you can talk through them.  I'm

5     not compelling you to do that.  But I'm just afraid you're

6     going to get to the end of this schedule, and it's going to be

7     a frantic path that you -- people are going to be getting ready

8     for an evidentiary hearing; exhibits, et cetera, and all that;

9     get their witnesses ready.  And at the same time they're going

10    to be trying to resolve whatever they can resolve.  So I do

11    have a concern about that.

12          MR. ECKSTEIN:  If I may, let me take it in a couple of

13    pieces.  With respect to how the trustees are going to deal

14    with the investor community, that is something that has been  .

15    contemplated here.  And I think it would be useful for Mr.

16    Siegel or one of the spokespeople for the trustees to address

17    that precisely.  Because that's been anticipated.  And I think

18    that that will help significantly in sort of smoothing the path

19    for the trustees to make a decision.

20          With respect to the particular issue I was starting

21    with, which was the pre-auction objections; that deadline is

22    August 23rd.  I think Your Honor can take some comfort in the

23    fact that discussions have already commenced between the

24    trustees and Nationstar, as the stalking-horse bidder, and the

25    other parties in the case, to see whether or not these precise

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1    objections can get resolved.  And again, being somewhat
2    optimistic on this point, I think there is enough time between
3    now and August 23rd for those issues to be worked out.  And
4    based on what I've heard so far, I'm encouraged that many, if
5    not all, of those objections can be satisfactorily resolved on
6    a business level by that deadline.

7             If those objections can get resolved, what it would
8    mean is that there will not be pre-auction objections.  If it's
9    not resolved, I think the pre-auction objections will get
10   filed.  The one amendment that I was going to suggest to Mr.
11   Princi's schedule is, in the event the pre-auction objections,
12   which are, again -- those are the traditional servicing type of
13   claims, not put-back claims -- if those have not been worked
14   out satisfactorily --

15            THE COURT:  Give me an example of what those would be.
16            MR. ECKSTEIN:  Basically ongoing indemnities, what
17   about taxes that might still be due and owing.   They're not
18   small numbers.  But relative to the 2.4 billion dollar purchase
19   price, they're numbers that we believe are considered more
20   ordinary course.

21            But nonetheless, there are issues that are of concern
22   to the trustees and there are really of concern to the
23   purchaser.  And they have to figure out a way to balance that
24   out in a businesslike manner.  We think that can be done.  It's
25   been done in other situations and hopefully can be done here.

1    committee is satisfied that 8.7 is an appropriate settlement.

2    We may decide that it's way too high.  And in that case, we'll

3    have to obviously weigh in on that issue.  But assuming this is

4    ultimately determined to be a reasonable settlement, we believe

5    that there is a mechanism in place right now that maximizes the

6    ability of all parties:  the trustees, the investors, and the

7    estate, to resolve a very difficult, thorny problem that would

8    likely consume years of litigation, and I hate to say, tens and

9    tens of millions of dollars of expense or more.  And we have a

10   mechanism right now that seems to be designed to lead to a

11   consensual resolution of a very difficult problem in a

12   relatively prompt period of time in a way that will give all

13   parties a great deal of comfort, without waiving rights.

14          And at this point in time, from the estate's

15   standpoint, Your Honor, we don't believe that anybody is

16   waiving any claims.  We think the estate's getting the benefit

17   of some agreed-upon -- some business agreements with respect to

18   caps on what claims will be asserted.  And we think the estate

19   can receive the benefit of that.

20          The trustees have given a great deal of thought -- and

21   I'll let them obviously speak to it -- but the trustees have

22   obviously given a great deal of thought and consideration to

23   what is and is not appropriate at this stage.  And I believe

24   the trustees will tell you that they are comfortable with

25   proceeding with the order as it's currently structured.  And it

1  defers to a later date the rights of all parties to make

2  whatever arguments and submissions have to be made, if those

3  litigations become necessary.

4         So we felt that on balance, the estate was getting

5  good benefits from this, and that the Court need only deal with

6  these claims in the event circumstances warrant and based upon

7  decisions that get made over the next couple of months.  And

8  that's what led us to recommend that this was a sensible way to

9  proceed; although I agree with Your Honor that this is not

10 simply a garden-variety scheduling order.  It is far from it.

11        THE COURT:  Thank you, Mr. Eckstein.

12        Mr. Siegel?

13        MR. SIEGEL:  Good afternoon, Your Honor.  I'm Glenn

14 Siegel from the Bank -- representing the Bank of New York.  I'm

15 with Dechert.  Just to make sure that no stone is left unturned

16 on the thanks being expressed to everyone, of course we thank

17 Morrison & Foerster and Kramer Levin for their hard work.  I

18 should mention our co-trustees, which are Deutsche Bank,

19 represented by Morgan Lewis; U.S. Bank represented by Seward &

20 Kissel; Wells Fargo, represented by Alston & Bird.  Also, the

21 institutional investors were integral to this, and Ropes & Gray

22 and Gibbs & Bruns were very heavily involved as well.

23        From our standpoint, there were a lot of things going

24 on here that the trustees needed to get comfort with in order

25 to be able to go forward.  It was a very important component of

1  this that we have the opportunity to have a supplemental motion

2  filed, which we think will give us a great deal more comfort in

3  the process.

4          THE COURT:  You haven't seen it yet.  I don't know.

5          MR. SIEGEL:  Well, we talked about it.  If it's what

6  we've talked about, I think we'll be okay.  And we've spent a

7  lot of time talking about it.

8          Your Honor, also Mr. Eckstein mentioned the issues

9  about as they relate to the sale.  Your Honor, I would suggest

10  to you that what's really going on here is a deferral of rights

11  by the RMBS trustees in connection with the sale that we have

12  agreed to, that for the moment, absent the 600 million dollar

13  issue, that there really isn't anything that is being finally

14  resolved with respect to any of our trusts.

15          And with respect to the 600 million dollar issue,

16  while I respect and appreciate Mr. Eckstein's view that that

17  number is substantially less, we of course believe it to be

18  substantially more.  And by the way, Your Honor, that's another

19  reason why we could agree on a number that was different.

20          With respect to authority, as we've talked about

21  previously; this is different than the typical trust indenture

22  that we encounter in bankruptcy cases.  For better or worse,

23  the trustees have authority to act under these documents.  We

24  can enter into this agreement.  The question is what our

25  tolerance is for holders who might disagree with us.  We think

1     in this context, under these circumstances, particularly

2     involving an issue where we were very concerned about two

3     issues:   one is maximizing the value of the sale itself; and

4     the other is providing for a smooth transition of our servicing

5     rights to a new servicer that's financially viable; we thought

6     this was a very reasonable outcome vis-a-vis our certificate

7     holders.  And that's why we are comfortable with the outcome.

8          As we said, there are very good and substantial issues

9     here that we are deferring to another day.  Just to be clear,

10    so that there's no surprise down the road, in the event that

11    this actually becomes a relevant issue, there are three

12    possible parties who would be liable for put-back claims.

13    There are the originators of these loans; there are the

14    depositors of these loans; and then finally, there is the

15    servicer entity itself, which had obligations to provide

16    notice, and in some instances, enforce these claims.

17         In some instances these are the same debtors.  In some

18    instances these are different debtors.  These are very complex

19    and thorny issues.  And I very much agree with Mr. Eckstein

20    that if we had to raise these issues prior to the sale, that it

21    would create a substantial cloud on the sale going forward.  So

22    what we've determined to do is to maximize the sales proceeds

23    instead of minimizing them and perhaps winning a Pyrrhic

24    victory, winning the claim, and then not getting the assets

25    sold.  So we thought that was a very reasonable approach going

# EXHIBIT E

**EXHIBIT 2**

~~RMBS Trust Settlement Agreement with the
Steering Committee Group~~
**AMENDED AND RESTATED RMBS TRUST SETTLEMENT AGREEMENT WITH
THE STEERING COMMITTEE GROUP**

EXECUTION COPY

## AMENDED AND RESTATED RMBS TRUST SETTLEMENT AGREEMENT

This Amended and Restated RMBS Trust Settlement Agreement is entered into as of May 13, August 15, 2012, by and between Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap" or the "Debtors"), on the one hand, and the Institutional Investors (as defined below), on the other hand (the "Settlement Agreement"), and amends and restates in its entirety the RMBS Trust Settlement Agreement entered into as of May 13, 2012, by and between ResCap, on the one hand, and the Institutional Investors, on the other hand. Each of ResCap and the Institutional Investors may be referred to herein as a "Party" and collectively as the "Parties."

RECITALS

WHEREAS, certain ResCap entities were the Seller, Depositor, Servicer and/or Master Servicer for the securitizations identified on the attached Exhibit A (the "Settlement Trusts");

WHEREAS, certain ResCap entities are parties to certain applicable Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the Settlement Trusts (the "Governing Agreements"), and certain ResCap entities have, at times, acted as Master Servicer and/or Servicer for the Settlement Trusts pursuant to certain of the Governing Agreements;

WHEREAS, pursuant to the Governing Agreements, certain ResCap entities have contributed or sold loans into the Settlement Trusts (the "Mortgage Loans");

WHEREAS, the Institutional Investors have alleged that certain loans held by the Settlement Trusts were originally contributed in breach of representations and warranties contained in the Governing Agreements, allowing the Investors in such Settlement Trusts to seek to compel the trustee or indenture trustee (each, a "Trustee") to take certain actions with respect to those loans, and further have asserted past and continuing covenant breaches and defaults by various ResCap entities under the Governing Agreements;

WHEREAS, the Institutional Investors have indicated their intent under the Governing Agreements for each Settlement Trust in which the Institutional Investors collectively hold or are authorized investment managers for holders of at least 25% of a particular tranche of the Securities (as defined below) held by such Settlement Trust either to seek action by the Trustee for such Settlement Trust or to pursue claims, including but not limited to claims to compel ResCap to cure the alleged breaches of representations and warranties, and ResCap disputes such claims and allegations of breach and waives no rights, and preserves all of its defenses, with respect to such allegations and putative cure requirements;

WHEREAS, the Institutional Investors are jointly represented by Gibbs & Bruns, LLP ("Gibbs & Bruns") and Ropes & Gray LLP ("Ropes & Gray") and have, through counsel, engaged in arm's length settlement negotiations with ResCap that included the exchange of confidential materials;

WHEREAS, ResCap ~~contemplates filing~~filed petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

~~WHEREAS, ResCap and the Institutional Investors have reached agreement on a plan support agreement (the "Plan Support Agreement") pursuant to which the Institutional Investors will support the confirmation of a chapter 11 plan for ResCap;~~

~~WHEREAS, Ally Financial Inc. and its subsidiaries and affiliates, other than ResCap (collectively, "Ally") have agreed to a settlement with ResCap in return for releases of any alleged claims held by ResCap and certain third parties against Ally;~~

WHEREAS, ResCap and the Institutional Investors have reached agreement concerning all claims of the Settlement Trusts under the Governing Agreements; and

WHEREAS, the Parties therefore enter into this Settlement Agreement to set forth their mutual understandings and agreements for terms for resolving the disputes regarding the Governing Agreements.;

## AGREEMENT

NOW, THEREFORE, after good faith, arm's length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

### ARTICLE I.   DEFINITIONS.

As used in this Settlement Agreement, in addition to the terms otherwise defined herein, the following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Settlement Agreement). Any capitalized terms not defined in this Settlement Agreement shall have the definition given to them in the Governing Agreements.

Section 1.01    "Bankruptcy Code" shall mean title 11 of the United States Code;.

Section 1.02    "Covered Trusts" means the Settlement Trusts listed in Exhibit D hereto and any other Settlement Trusts for which the Institutional Investors in the aggregate hold, and/or are authorized investment managers for holders of, 25% or more of the voting rights in one or more classes of notes, bonds and/or certificates backed by mortgage loans held by the Trusts.

Section 1.03    "Depositor Entity" means, for each individual Settlement Trust, the entity from the following list that the Governing Agreements define as the "Company" for that Settlement Trust, including but not limited to: Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Asset Securities Corp., Residential Accredit Loans, Inc., and Residential Asset Mortgage Products, Inc.

Section 1.04    "Direction" shall mean the direction by the Institutional Investors, to the

**EXECUTION COPY**

extent permitted by the Governing Agreements, directing any Trustee to take or refrain from taking any action; *provided, however*, that in no event shall the Institutional Investors be required to provide a Trustee with any security or indemnity for action or inaction taken at the direction of the Institutional Investors and the Institutional Investors shall not be required to directly or indirectly incur any costs, fees, or expenses to compel any action or inaction by a Trustee, except that the Institutional Investors shall continue to retain contingency counsel;.

Section ~~1.03~~1.05    "Effective Date" shall have the meaning ascribed in Section ~~2.01;~~2.01.

**EXECUTION COPY**

Section ~~1.04~~ 1.06    "Governmental Authority" shall mean any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to the foregoing, or any other authority, agency, department, board, commission, or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal, or arbitrator(s) of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency, or authority (including the New York Stock Exchange, Nasdaq, and the Financial Industry Regulatory Authority)~~;~~.

Section ~~1.05~~ 1.07    "Institutional Investors" shall mean the authorized investment managers and Investors identified in the attached signature pages~~;~~.

Section ~~1.06~~ 1.08    "Investors" shall mean all certificateholders, bondholders and noteholders in the Settlement Trusts, and their successors in interest, assigns, pledgees, and/or transferees~~;~~.

Section ~~1.07~~ 1.09    "Net Losses" means, with respect to any Settlement Trust, the amount of net losses for such Settlement Trust that have been or are estimated to be borne by that trust from its inception date to its expected date of termination, as determined by the Expert (as defined in Exhibit B) in accordance with the methodology described in Exhibit B. For the avoidance of doubt, a loss on a mortgage loan that has been reimbursed or indemnified by reason of applicable policies of mortgage or bond insurance shall be considered a loss on a mortgage loan and included within the calculation of "Net Losses."

Section 1.10    "Person" shall mean any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a Governmental Authority~~;~~.

Section ~~1.08~~ 1.11    "Petition Date" means the date on which ResCap files petitions under chapter 11 of the Bankruptcy Code;

~~Section 1.09    "Plan" has the meaning ascribed to it in the Plan Support Agreement; and Section 1.10    "Restructuring" shall have the meaning ascribed to it in the Plan Support Agreement.~~

Section 1.12    "Plan" shall mean a chapter 11 plan of reorganization for the Debtors.

Section 1.13    "Purchaser" means Nationstar Mortgage LLC or any other successful bidder for any or all of the Debtors' mortgage loan origination and servicing platform.

Section 1.14    "Scheduling Order" shall mean the Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (II) the Trustees' Limited Objection to the Sale Motion, entered by the Bankruptcy Court on July 31, 2012.

Section 1.15    "Securities" shall mean securities, notes, bonds, certificates, and/or other instruments backed by mortgage loans held by Settlement Trusts.

Section 1.16    "Seller Entity" means, for each Settlement Trust, the entity from the

-3-

**EXECUTION COPY**

following list that the Governing Agreements define as the "Seller" for that Trust, including but

-3-

EXECUTION COPY

not limited to: Residential Funding Company LLC (f/k/a Residential Funding Corporation) and GMAC Mortgage LLC (f/k/a GMAC Mortgage Corporation).

## ARTICLE II. SETTLEMENT PROCESS.

Section 2.01    Effective Date. This Settlement Agreement shall be effective immediately except as to the granting of allowed claims to the ~~Trusts and the releases set forth herein. The claims allowance and releases shall only be effective, with respect to Trusts that timely accept~~Accepting Trusts (as defined below in Section 5.1) ~~the compromise,~~and the releases set forth herein. The claims allowance and releases shall only be effective, with respect to a specific Accepting Trust on the date on which ~~the Bankruptcy Court enters an order approving~~a Trustee accepts the settlement ~~contemplated hereby~~with respect to such Settlement Trust (the "Effective Date"). However, for the sake of clarity, the Debtors' obligations hereunder are subject to the approval of this Settlement Agreement by the Court.

Section 2.02    Bankruptcy Court Approval. The Debtors ~~shall~~ (a) orally ~~present~~presented this Settlement Agreement in court on the Petition ~~date~~Date, including the agreed amount of the Total Allowed Claim (as defined below)~~, (b) file a motion in the Bankruptcy Court as soon as practicable, but in no event later than fourteen (14) days after the Petition Date, seeking authority to perform under this Settlement Agreement and for~~ in Section 5.01), and (b) shall comply with the schedule for the approval of this Settlement Agreement ~~and the compromise contained herein, and (c) obtain an order from the Bankruptcy Court approving such motion by the earlier of (i) 60 days after the Petition Date and (ii) the date on which the Disclosure Statement is approved by the Bankruptcy Court. The Trustee for each~~set forth in the Scheduling Order. The Trustee for each Settlement Trust may accept the offer of a compromise contemplated by this Settlement Agreement ~~in writing pursuant to a~~on behalf of such Settlement Trust, within the time set forth in the Scheduling Order, by a writing substantially in the form of acceptance ~~to be~~ included in the proposed order for approval of this Settlement Agreement to be submitted to the Bankruptcy Court.

Section 2.03    Standing. The Debtors agree that the Institutional Investors are parties in interest in the chapter 11 cases of ResCap for the purposes of enforcing rights and complying with obligations under this Settlement Agreement~~and the Plan Support Agreement~~. The Parties further agree that they will not oppose any effort of the Institutional Investors or any other Investor(s) in seeking status as a party in interest in the Chapter 11 Cases.

## ARTICLE III. REPRESENTATIONS AND WARRANTIES.

Section 3.01    Holdings and Authority. ~~Lead~~As of May 13, 2012, lead counsel to the Institutional Investors, Gibbs & Bruns, has represented to ResCap that the Institutional Investors have or advise clients who have aggregate holdings ~~of securities~~ of greater than 25% of the voting rights in one or more classes of the ~~securities, certificates or other instruments backed by the mortgages held~~Securities issued by each of the ~~Covered Trusts (as defined in the Plan Support Agreement)~~Settlement Trusts identified on the attached Exhibit D. Each Institutional Investor represents that (i) it has the authority to take the actions contemplated by this Settlement Agreement, to the extent that it has the authority with respect to any other entities, account holders, or accounts for which or on behalf of which it is signing this Settlement Agreement, and (ii) it holds, or is the authorized investment manager for the holders of, the ~~securities~~Securities

-4-

listed in the schedule attached to the Plan Support Agreement as Exhibit F theretoD hereto, in the respective amounts set forth therein by CUSIP number, that such schedule was accurate as of the date set forth for the respective institution, and that since the date set forth for the Institutional Investor, the Institutional Investor has not, in the aggregate, materially decreased the Institutional Investor's holdings in the Securities. The Parties agree that the aggregate amounts of Securities collectively held by the Institutional Investors for each Settlement Trust may be disclosed publicly, but that the individual holdings of the Institutional Investors shall remain confidential, subject to review only by ResCap, Ally, the Bankruptcy Court, the Office of the United States Trustee,

-4-

the Trustees, and ~~any~~the official committee of unsecured creditors ~~that may be~~ appointed in the Chapter 11 Cases.

Section 3.02   Holdings Retention. ~~The~~As of May 13, 2012, the Institutional Investors ~~currently and~~ collectively ~~hold~~held Securities representing in aggregate 25% of the voting rights in one or more classes of Securities of not less than 290 of the ~~Covered~~Settlement Trusts. The Institutional Investors, collectively, shall maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 235 of the Covered Trusts ("Requisite Holdings") until the earliest of: (i) confirmation of a plan of reorganization, (ii) December 31, 2012, (iii) a Consenting Claimant Termination Event, or (iv) a Debtor Termination Event (as the terms in subsections
~~(i) confirmation of the Plan, (ii) December 31, 2012, (iii) a Consenting Claimant Termination Event, (iv) a Debtor Termination Event, or (v) an Ally Termination Event (as terms (iii), (iv) and (v) are~~and (iv) were defined in the ~~Plan Support Agreement~~plan support agreement agreed to by the Parties); *provided, however,* that any reduction in Requisite Holdings caused by: (a) sales by Maiden Lane I and Maiden Lane III; or (b) exclusion of one or more trusts due to the exercise of ~~Voting Rights~~voting rights by a third party guarantor or financial guaranty provider, shall not be considered in determining whether the Requisite Holdings threshold has been met. If the Requisite Holdings are not maintained, ~~each of Ally and~~ResCap shall have the right to terminate the Settlement Agreement, but ~~neither Ally nor~~ResCap shall not terminate the Settlement Agreement before it has conferred in good faith with the Institutional Investors concerning whether termination is warranted. For the avoidance of doubt, other than as set forth above, this Settlement Agreement shall not restrict the right of any Institutional Investor to sell or exchange any Securities issued by a Settlement Trust free and clear of any encumbrance. The Institutional Investors will not sell any of the Securities for the purpose of avoiding their obligations under this Settlement Agreement, and each Institutional Investor (except Maiden Lane I and Maiden Lane III) commits to maintain at least one position in one of the Securities in one of the Settlement Trusts until the earliest of the dates set forth above. If the Debtor ~~or Ally reach~~reaches a similar agreement to this with another bondholder group, the Debtor ~~and Ally~~ will include a substantially similar proportionate holdings requirement in that agreement as contained herein.

## ARTICLE IV.   DIRECTION TO TRUSTEES AND INDENTURE TRUSTEES.

Section 4.01   Direction to Trustees and Indenture Trustees. The relevant Institutional Investors for each Settlement Trust shall, by the time of the filing of a motion to approve this Settlement Agreement, provide the relevant Trustee with Direction to accept the settlement and compromises set forth herein. The Institutional Investors hereby agree to confer in good faith with ResCap as to any further or other Direction that may be reasonably necessary to effectuate the settlement contemplated herein, including ~~those actions listed in Section 3.1 of the Plan Support Agreement,~~ filing motions and pleadings with the Bankruptcy Court and making statements in open court in support of the ~~Restructuring~~Debtors' restructuring.

Section 4.02   No Inconsistent Directions. Except for providing ~~instructions~~Directions in accordance with Section 4.01, the Institutional Investors agree that (i) between the date hereof and the Effective Date, with respect to the Securities ~~on~~issued by the ~~Holdings Schedule~~Settlement Trusts, they will not, individually or collectively, direct, vote for, or take any other action that they may have the right or the option to take under the Governing Agreements or to join with any other ~~holders~~Investors or the ~~trustee~~Trustee of any note, bond or other security issued by the Settlement Trusts, to cause the Trustees to enforce (or seek derivatively to enforce) any representations and warranties regarding the Mortgage Loans or the servicing of the Mortgage Loans, and (ii) to the extent that any of the Institutional Investors have already taken any such action, the applicable Institutional Investor

**EXECUTION COPY**

will promptly rescind or terminate such action. Nothing in the foregoing shall restrict the ability of the Institutional Investors to demand that any ~~other~~ Investor who seeks to direct the Trustee for a Settlement Trust post any indemnity or bond required by the Governing Agreements for the applicable Settlement Trust.

      Section 4.03   Amendments to Governing Agreements Regarding Financing of Advances. The Institutional Investors agree to use commercially reasonable efforts (which shall not require the giving of any indemnity or other payment obligation or expenditure of out-of-pocket funds) to negotiate any request by the Debtors or the Trustees for any Settlement Trusts ~~that~~ with respect to which the servicing rights are being assumed and assigned to the Purchaser, and if any Trustee shall require a vote of the certificate or note holders with respect thereto, shall vote in favor of (to the extent agreement is reached) any amendment to the relevant Governing Agreements and related documents requested by the Debtors in order to permit "Advances" (as it or any similar term may be defined in the Governing Agreements) to be financeable and to make such other amendments thereto as may be reasonably requested by the Debtors in accordance with any agreement to acquire all or substantially all of the Debtors' servicing assets ~~pursuant to the Restructuring and the Plan~~, so long as such changes would not cause material financial detriment to the Settlement Trusts, their respective trustees, certificate or note holders, or the Institutional Investors.

ARTICLE V. ALLOWANCE OF CLAIM.

      Section 5.01   The Allowed Claim. ResCap hereby makes an irrevocable offer to settle, expiring at 5:00 p.m. prevailing New York time on the date that is ~~forty-five (45) days after the Petition Date~~ set forth in the Scheduling Order, with each of the Settlement Trusts (the Settlement Trusts that timely ~~agrees~~ agree to the terms of this Settlement Agreement (being the "Accepting Trusts"). In consideration for such agreement, ResCap will provide a general unsecured claim of $8,700,000,000 in the aggregate against the Seller Entities and the Depositor Entities (as the Depositor Entities are jointly liable for such claim), and which claim is subject to the HoldCo Election (as defined below) right (the "Total Allowed Claim"), all of which shall be allocated and implemented as provided in Section 6.01. For the avoidance of doubt, the Total Allowed Claim shall be ~~shared~~ allocated among ~~any~~ the Accepting Trusts ~~accepting the offer contained in this Section 5.01~~, subject to the provisions of this Settlement Agreement. ~~Any Trusts accepting the offer contained in this Section 5.01, subject~~ Subject to the provisions of this Settlement Agreement, the Accepting Trusts shall be allowed ~~claims~~ an aggregate claim in an amount calculated as set forth below (such claim, including any claim provided pursuant to the HoldCo Election, the "Allowed Claim"), ~~but in no case shall the amount of the Allowed Claim exceed $8,700,000,000.~~ which aggregate claim shall be allocated to each Accepting Trust pursuant to Article VI herein. The amount of the Allowed Claim shall equal (i) $8,700,000,000, less (ii) $8,700,000,000 multiplied by the percentage represented by (a) the total dollar amount of original principal balance for the Settlement Trusts not accepting the offer outlined above, divided by (b) the total dollar amount of original principal balance for all Settlement Trusts.

      Section 5.02   Waiver of Setoff and Recoupment. By accepting the offer to settle contained in Section 5.01, each ~~accepting~~ Accepting Trust irrevocably waives any right to setoff and/or recoupment such Accepting Trust may have against ~~Ally and~~ ResCap, subject to the exclusions set forth in Section 8.06 of this agreement.

-6-

**EXECUTION COPY**

## ARTICLE VI. <u>ALLOCATION OF ALLOWED CLAIM.</u>

Section 6.01    The Allocation ~~Schedule. The allocation of the amounts~~ of the Allowed Claim ~~as to each Trust (each, an "Allocated Allowed Claim"), is,~~ Each Accepting Trust shall, subject to the HoldCo Election, be allocated a share of the Allowed Claim against its Seller Entity (each, an "Allocated Seller Claim") and its Depositor Entity (each, an "Allocated Depositor Claim" and each Allocated Depositor Claim together with the Allocated Seller Claim as to a particular Accepting Trust, subject to the HoldCo Election, an "Allocated Claim"), calculated as set forth on Exhibit B hereto.

Section 6.02    HoldCo Election. At any time prior to confirmation of a chapter 11 plan in the Chapter 11 Cases, each Accepting Trust shall have the option to, by written notice to the Debtors, make one or more elections (each, a "HoldCo Election"), with respect to all or any portion of the amount of each Accepting Trust's Allocated Claim (subject to an aggregate cap equal to 20% of such Accepting Trust's Allocated Claim), to receive in lieu of such elected portion a general unsecured claim against Residential Capital, LLC ("HoldCo"). For each Accepting Trust as to which a HoldCo Election is made, such Accepting Trust shall have an allowed claim against HoldCo in the amount of the HoldCo Election(s) so made (subject to the aggregate cap described above) (the "Allowed Holdco Claim") and the amount of the Allocated Seller Claim and Allocated Depositor Claim of that Accepting Trust shall be reduced by the amount of such Trust's Allowed HoldCo Claim.

Section 6.03    In the event the Bankruptcy Court does not approve the Allowed Claim as to a particular Seller Entity, Depositor Entity, or the HoldCo, after giving effect to the HoldCo Election, the settlement shall remain in full force with respect to any other Seller Entity, Depositor Entity, or HoldCo (pursuant to the HoldCo Election), as applicable; *provided, however*, that if the Allowed Claim in the amounts proposed herein is not approved as to any of the Seller Entities, Depositor Entities, or HoldCo (pursuant to the HoldCo Election), the Institutional Investors shall have the right to terminate this Settlement Agreement upon written notice to the Debtors; *provided, further*, that in the event that the Bankruptcy Court does not approve the Allowed Claim as to a particular Seller Entity, Depositor Entity, or HoldCo (pursuant to the HoldCo Election), that particular Seller Entity, Depositor Entity, or, in the case of disapproval of the HoldCo Election, HoldCo shall not receive any release, waiver, or discharge of any Released Claims pursuant to Article VII.

Section 6.04    Legal Fees.

(a) ResCap and the Institutional Investors agree that Gibbs & Bruns and Ropes & Gray shall, on the Effective Date ~~of the Plan~~, be ~~paid~~allocated legal fees as follows, as an integrated and nonseverable part of this Settlement Agreement. First, Gibbs & Bruns and Ropes & Gray, as counsel to the Institutional Investors, shall be allocated by ResCap without conveyance to the Trustees the percentages of the Allowed Claim set forth on the fee schedule attached hereto as Exhibit C, without requirement of submitting any form of estate retention or fee application, for their work relating to these cases and the settlement. Second, the Debtors and Institutional Investors may further agree at any time, that the Debtors may pay Gibbs & Bruns and Ropes & Gray in cash, in an amount that Gibbs & Bruns and Ropes & Gray respectively agree is equal to the cash value of their respective portions of the Allowed

-7-

**EXECUTION COPY**

Claim, and in any such event, no estate retention application, ~~fee application or further~~ ~~order of the Bankruptcy Court shall be required as a condition of the Debtors making such~~ ~~agreed payment. Third, the Debtors agree and the settlement approval order shall provide~~ ~~that the amount of the Allowed Claim payable to Gibbs & Bruns and Ropes & Gray may be~~ ~~reduced to a separate claim stipulation for convenience of the parties.~~

**EXECUTION COPY**

application, fee application or further order of the Bankruptcy Court shall be required as a condition of the Debtors making such agreed allocation. Third, the Debtors agree and the settlement approval order shall provide that the amount of the Allowed Claim payable to Gibbs & Bruns and Ropes & Gray may be reduced to a separate claim stipulation for convenience of the parties.

In the event that, prior to acceptance of this compromise by a Trustee for a Settlement Trust other than an original a Covered Trust (as defined in the Plan Support Agreement), counsel to Investors in such Settlement Trust cause a direction to be given by more than 25% of the holders of a tranche of such Settlement Trust to accept this compromise, then the same provisions as contained in Section 6.02(a) shall apply to such counsel, solely as to the amounts allocated to such Settlement Trust. Such counsel shall be entitled to a share of the fee for such trust equal to the ratio of (a) 25% minus the percentage of such tranche held by Institutional Investors divided by (b) 25%. Counsel would be required to identify itself and satisfy the Debtors and Institutional Investors as to the holdings of client-investors and that counsel caused such directions.

ARTICLE VII.    RELEASES.

Section 7.01    Releases. Except as set forth in Article VIII, as of the Effective Date, with respect to each and every Accepting Trust, and in exchange for whom the Trustee accepts the compromise contemplated by this Settlement Agreement, the Investors, Trustee, Trust the Allowed Claim, the Institutional Investors, Accepting Trusts, Trustees in respect of such trusts, and any Persons claiming by, through or on behalf of such Trustee Accepting Trust or the Trustees of such trusts (including Institutional Investors claiming derivatively) or such Trust (collectively, the "Releasors"), irrevocably and unconditionally grant a full, final, and complete release, waiver, and discharge of all alleged or actual claims, demands to repurchase, demands to cure, demands to substitute, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, losses, debts, costs, expenses, obligations, demands, claims for accountings or audits, alleged events of default, damages, rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct or derivative, arising under law or equity, against ResCap and its officers, directors, and employees (but in no case does this section apply to Ally Financial Inc. ("AFI") or any person who is an officer or director of AFI) that arise under the Governing Agreements. Such released claims include, but are not limited to, claims arising out of and/or relating to (i) the origination; and sale, or delivery of Mortgage Loans of mortgage loans to the Accepting Trusts, (including the, without limitation, the liability of any Debtors that are party to a Pooling and Servicing Agreement with respect to representations and warranties made in connection with the origination, sale, or delivery of Mortgage Loans to the Trusts or any alleged obligation of ResCap to repurchase or otherwise compensate the Trusts for any Mortgage Loan on the basis of any representations or warranties or otherwise or failure to cure any alleged breaches of such sale or with respect to the noticing and enforcement of any remedies in respect of alleged breaches of such representations and warranties) (collectively, the "Origination-Related Provisions"), (ii) the documentation of the Mortgage Loans held by the Accepting Trusts including with respect to allegedly defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, or any alleged failure to provide notice of such defective, incomplete or non-existent documentation, (iii) the servicing of the Mortgage Loans held by the Accepting Trusts (including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers, advances,

-8-

servicing advances, or claims that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by or servicing advances) (the "Servicing Claims"), but only to the extent assumed

12-12020-mg   Doc 1176-2   Filed 08/15/12   Entered 08/15/12 22:04:28   Exhibit 2
Pg 15 of 59

pursuant to Section 365 of the Bankruptcy Code by an assignee to the applicable Debtor in its capacity as Master Servicer, ~~Seller, or any other Person),~~ (iv or Servicer under any Governing Agreement (the "Assumed Servicing Claims"), (iv) any duty of a debtor as master servicer, servicer or sub-servicer to notice and enforce remedies in respect of alleged breaches of representations and warranties (together with the Assumed Servicing Claims, the "Released Servicing Claims"), (v) setoff or recoupment under the Governing Agreements against ResCap, ~~and (v~~ with respect to the Origination-Related Provisions or the Released Servicing Claims, and (vi) any loan seller that either sold loans to ResCap or AFI that were sold and transferred to such Accepting Trust or sold loans directly to such Accepting Trust, in all cases prior to the Petition Date (collectively, all such claims being defined as the "Released Claims"). For the avoidance of doubt, this release does not include individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities.

    Section 7.02   Release of Claims Against Investors, Accepting Trusts, and Trustees. Except as set forth in Article VIII, as of the Effective Date, ResCap irrevocably and unconditionally grants to the ~~Investors a full,~~Accepting Trusts, Trustees in respect of such trusts, and Investors in such trusts, as well as such Accepting Trusts', Trustees' and Investors' respective officers, directors, and employees, a full final, and complete release, waiver, and discharge of all alleged or actual claims from any claim it may have under or arising out of the Governing Agreements. ~~For the avoidance of doubt, nothing in this provision shall affect Ally's rights in any way.~~

Section 7.03   Agreement Not to Pursue Relief from the Stay. The Institutional Investors agree that neither they nor their successors in interest, assigns, pledges, delegates, affiliates, subsidiaries, and/or transferees, will seek relief from the automatic stay imposed by section 362 of the Bankruptcy Code in order to institute, continue or otherwise prosecute any action relating to the Released Claims; provided, however, nothing contained herein shall preclude the Institutional Investors or their advised clients from seeking any such relief with respect to direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities. ResCap reserves its rights and defenses therewith.

    Section 7.04   Inclusion of Accepting Trusts and Trustees in Plan Release and Exculpation Provisions. The Accepting Trusts and the Trustees in respect of any such Accepting Trust ~~accepting the offer to settle described in Section 5.01~~ and their respective counsel shall be entitled to the benefit of any releases and plan exculpation ~~provision~~provisions, if any, included in the Plan, which ~~exculpation~~provisions shall be no less favorable than the releases and plan exculpation provisions extended to similarly situated creditors or parties in interest who are parties to any plan support agreement with ResCap. ~~Section 7.05   Servicing of the Mortgage Loans. Except as provided in Section 8.01, the release and waiver in Article VII includes all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts prior to the Petition Date.~~

ARTICLE VIII.   CLAIMS NOT RELEASED

    Section 8.01   Administration of the Mortgage Loans. The releases and waivers in Article VII herein do not include: (i) claims that first arise after the Effective Date ~~which~~and are based in

-9-

whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the ~~Trusts in their aggregation and remittance of Mortgage Loan Payments, accounting for principal and interest, and preparation of tax-related information, in connection with the Mortgage Loans and the ministerial operation and administration of the Trusts and the Mortgage Loans held by the Trusts, for which the Master Servicer, Servicer, or Subservicer received servicing fees, unless, as of the date hereof, the Institutional Investors, have or should have knowledge of the actions, inactions, or practices of ResCap in connection with such matters~~ Accepting Trusts, and (ii) any Servicing Claim that is not an Assumed Servicing Claim and for which the Court finds a cure or rejection claim exists pursuant to Section 365 of the Bankruptcy Code (it being understood that such cure or rejection claims, if any, are not intended to be affected by such releases and waivers).

-9-

**EXECUTION COPY**

Section 8.02    Financial-Guaranty Provider Rights and Obligations. To the extent that any third party guarantor or financial-guaranty provider with respect to any Settlement Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Settlement Trusts, the releases and waivers in Article VII are not intended to and shall not release such rights.

Section 8.03    Settlement Agreement Rights. The Parties do not release or waive any rights or claims against each other to enforce the terms of this Settlement Agreement or the Allowed Claim.

Section 8.04    Disclosure Claims. The releases and waivers in Article VII do not include any claims based on improper disclosures under federal or state securities law.

Section 8.05    Reservation of Rights. Notwithstanding anything in this Settlement Agreement to the contrary, the Institutional Investors have not waived their right to file an objection to a motion of the holders of the ResCap 9 5/8% bonds requesting payment of any interest on account of their ResCap 9 5/8% bond claims that may be due and owing after the Petition Date.

Section 8.06    HoldCo Election. Notwithstanding anything in this Agreement, the right to make a HoldCo Election set forth in Section 6.02 is not released by this Agreement.

ARTICLE IX. RELEASE OF UNKNOWN CLAIMS.

Each of the Parties acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM
> OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR."

The Parties acknowledge that inclusion of the provisions of this Article IX to this Settlement Agreement was a material and separately bargained for element of this Settlement Agreement.

ARTICLE X. OTHER PROVISIONS

Section 10.01 Voluntary Agreement. Each Party acknowledges that it has read all of the terms of this Settlement Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Settlement Agreement voluntarily and without duress.

-10-

Section 10.02 <u>No Admission of Breach or Wrongdoing</u>. ResCap has denied and continues to deny any breach, fault, liability, or wrongdoing. This denial includes, but is not limited to, breaches of representations and warranties, violations of state or federal securities laws, and other claims sounding in contract or tort in connection with any securitizations, including those for which ResCap was the Seller, Servicer and/or Master Servicer. Neither this Settlement Agreement, whether or not consummated, any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, whether or not consummated, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap with respect to any claim or of any breach, liability, fault, wrongdoing, or damage whatsoever, or with respect to any infirmity in any defense that ResCap has or could have asserted.

Section 10.03 <u>No Admission Regarding Claim Status</u>. ResCap expressly states that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, then neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap that any claims asserted by the Institutional Investors are not contingent, unliquidated or disputed. The Institutional Investors expressly state that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the Institutional Investors that any claims asserted by the Institutional Investors and Trustees are not limited to the amounts set forth in this Settlement Agreement or are of any particular priority.

Section 10.04 <u>Counterparts</u>. This Settlement Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Settlement Agreement. Delivery of a signature page to this Settlement Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Settlement Agreement.

Section 10.05 <u>Joint Drafting</u>. This Settlement Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Settlement Agreement, no provision shall be construed and interpreted for or against any of the Parties because such provision or any other provision of the Settlement Agreement as a whole is purportedly prepared or requested by such Party.

Section 10.06 <u>Entire Agreement</u>. This document contains the entire agreement between the Parties, and may only be modified, altered, amended, or supplemented in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Settlement Agreement and the Plan Support Agreement.

Section 10.07 <u>Specific Performance</u>. It is understood that money damages are not a sufficient remedy for any breach of this Settlement Agreement, and the Parties shall have the right, in addition to any other rights and remedies contained herein, to seek specific performance, injunctive, or other equitable relief from the Bankruptcy Court as a remedy for any such breach.

-11-

**EXECUTION COPY**

The Parties hereby agree that specific performance shall be their only remedy for any violation of this Agreement.

Section 10.08 <u>Authority</u>. Each Party represents and warrants that each Person who executes this Settlement Agreement on its behalf is duly authorized to execute this Settlement Agreement on behalf of the respective Party, and that such Party has full knowledge of and has consented to this Settlement Agreement.

Section 10.09 <u>No Third Party Beneficiaries</u>. There are no third party beneficiaries of this Settlement Agreement.

Section 10.10 <u>Headings.</u> The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

Section 10.11 <u>Notices</u>. All notices or demands given or made by one Party to the other relating to this Settlement Agreement shall be in writing and either personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, or by electronic mail transmission, and shall be deemed to be given for purposes of this Settlement Agreement on the earlier of the date of actual receipt or three days after the deposit thereof in the mail or the electronic transmission of the message. Unless a different or additional address for subsequent notices is specified in a notice sent or delivered in accordance with this Section, such notices or demands shall be sent as follows:

> To:  Institutional Investors
> c/o Kathy Patrick
> Gibbs & Bruns LLP
> 1100 Louisiana Suite
> 5300 Houston, TX
> 77002 Tel:
> 713-650-8805 ~~Email: kpatrick@gibbsbruns. com~~Email: kpatrick@gibbsbruns. com
> -and- Keith H. Wofford D. Ross Martin Ropes & Gray LLP 1211 Avenue of the Americas New York, NY 10036 Tel: 212-841-5700 Email: ~~keith.wofford@ropesgray.com ross.martin@ropesgray.com~~keith.wofford@ropesgray.com ross.martin@ropesgray.com

> To:  ResCap c/o Gary S. Lee Jamie A. Levitt Morrison & Foerster LLP

**EXECUTION COPY**

1290 Avenue of the Americas New York, NY 10104 Tel: 212-468-8000
Email: glee@mofo.com Email: glee@mofo.com jlevitt@mofo.com

Section 10.12 Disputes. This Settlement Agreement, and any disputes arising under or in connection with this Settlement Agreement, are to be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of laws principles thereof. Further, by its execution and delivery of this Settlement Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Settlement Agreement, *provided*, *however*, that, upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Settlement Agreement.

Section 10.13 The Parties have agreed to include the following statement in the proposed order attached to the Debtors' motion to approve this Settlement Agreement: "Nothing contained in the RMBS Trust Settlement Agreement, the order approving the RMBS Trust Settlement Agreement, and any associated expert reports, including exhibits, schedules, declarations, and other documents attached thereto or referenced therein, or in any declarations, pleadings, or other documents or evidence submitted to, or filed in, the Bankruptcy Court in connection therewith, shall be construed as an admission of, or to prejudice in any way, Ally Financial Inc. and its non-Debtor direct and indirect subsidiaries and affiliates (collectively, "Ally") and may not be used as evidence against Ally in any court proceeding."

Section 10.14 Notwithstanding anything to the contrary in this Settlement Agreement, nothing herein is intended to or shall be deemed to amend any of the Governing Agreements for any Settlement Trust.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

12-12020-mg    Doc 320-2    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 2 Pg 14 of 39

12-12020-mg    Doc 320-2    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 2 Pg 15 of 39

12-12020-mg    Doc 320-2    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 2 Pg 16 of 39

12-12020-mg    Doc 320-2    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 2 Pg 17 of 39

12-12020-mg    Doc 320-2    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 2 Pg 18 of 39

12-12020-mg Doc 1176-2 Filed 08/15/12 Entered 08/15/12 22:04:28 Exhibit 2
Pg 21 of 59

**EXECUTION COPY**

*Pacific Investment Management Company LLC*

Name: Douglas M. Hodge

Title: Chief Operating Officer

Dated: May 13, 2012

12-12020-mg Doc 320-2 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 2 Pg 19 of 39

12-12020-mg Doc 320-2 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 2 Pg 20 of 39

12-12020-mg Doc 320-2 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 2 Pg 21 of 39

12-12020-mg Doc 320-2 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 2 Pg 22 of 39

12-12020-mg Doc 320-2 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 2 Pg 23 of 39

12-12020-mg Doc 320-2 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 2 Pg 24 of 39 12-12020-mg Doc 320-2 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 2 Pg 25 of 39

*Federal Home Loan Bank of Atlanta*

Name: Reginald T. O'Shields

Title: General Counsel and Senior Vice President

Dated: May ___, 2012

-13-

ny-1054163

12-12020-mg    Doc 1301-2    Filed 08/28/12    Entered 08/28/12 17:15:17    Main Document
Pg 15 of 59
12-12020-mg    Doc 1176-2    Filed 06/15/12    Entered 06/15/12 22:04:28    Exhibit 2
Pg 15 of 59
12-12020-mg    Doc 320-2    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 2 Pg
29 of 30

12-12020-mg    Doc 176-2    Filed 08/15/12    Entered 08/15/12 22:04:28    Exhibit 2

12-12020-mg    Doc 320-2    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 2  Pg 30 of 39

## Exhibit A- Trusts

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2004-AR1 | 635.0 | 2004-QS12 | 424.3 |
| 2004-AR2 | 510.1 | 2004-QS13 | 129.2 |
| 2004-GH1 | 224.1 | 2004-QS14 | 212.9 |
| 2004-HE1 | 1,292.3 | 2004-QS15 | 213.7 |
| 2004-HE2 | 711.5 | 2004-QS16 | 534.7 |
| 2004-HE3 | 977.3 | 2004-QS2 | 292.3 |
| 2004-HE4 | 1,018.0 | 2004-QS3 | 207.8 |
| 2004-HE5 | 700.0 | 2004-QS4 | 320.6 |
| 2004-HI1 | 235.0 | 2004-QS5 | 293.7 |
| 2004-HI2 | 275.0 | 2004-QS6 | 156.5 |
| 2004-HI3 | 220.0 | 2004-QS7 | 449.2 |
| 2004-HLTV1 | 175.0 | 2004-QS8 | 271.0 |
| 2004-HS1 | 477.1 | 2004-QS9 | 105.1 |
| 2004-HS2 | 604.1 | 2004-RP1 | 199.5 |
| 2004-HS3 | 284.0 | 2004-RS1 | 1,400.0 |
| 2004-J1 | 401.0 | 2004-RS10 | 1,250.0 |
| 2004-J2 | 400.6 | 2004-RS11 | 925.0 |
| 2004-J3 | 350.0 | 2004-RS12 | 975.0 |
| 2004-J4 | 600.1 | 2004-RS2 | 875.0 |
| 2004-J5 | 551.9 | 2004-RS3 | 600.0 |
| 2004-J6 | 408.0 | 2004-RS4 | 1,100.0 |
| 2004-KR1 | 2,000.0 | 2004-RS5 | 1,050.0 |
| 2004-KR2 | 1,250.0 | 2004-RS6 | 1,000.0 |
| 2004-KS1 | 950.0 | 2004-RS7 | 1,183.7 |
| 2004-KS10 | 986.0 | 2004-RS8 | 900.0 |
| 2004-KS11 | 692.7 | 2004-RS9 | 950.0 |
| 2004-KS12 | 541.8 | 2004-RZ1 | 485.0 |
| 2004-KS2 | 990.0 | 2004-RZ2 | 475.0 |
| 2004-KS3 | 675.0 | 2004-RZ3 | 360.0 |
| 2004-KS4 | 1,000.0 | 2004-RZ4 | 276.6 |
| 2004-KS5 | 1,175.0 | 2004-S1 | 307.7 |
| 2004-KS6 | 1,000.0 | 2004-S2 | 362.0 |
| 2004-KS7 | 850.0 | 2004-S3 | 228.3 |
| 2004-KS8 | 600.0 | 2004-S4 | 460.3 |
| 2004-KS9 | 600.0 | 2004-S5 | 423.5 |
| 2004-PS1 | 100.1 | 2004-S6 | 527.2 |
| 2004-QA1 | 201.3 | 2004-S7 | 105.3 |
| 2004-QA2 | 365.1 | 2004-S8 | 311.0 |
| 2004-QA3 | 320.1 | 2004-S9 | 645.9 |
| 2004-QA4 | 290.2 | 2004-SA1 | 250.1 |
| 2004-QA5 | 325.1 | 2004-SL1 | 632.9 |
| 2004-QA6 | 720.3 | 2004-SL2 | 499.0 |
| 2004-QS1 | 319.9 | 2004-SL3 | 222.5 |
| 2004-QS10 | 216.6 | 2004-SL4 | 206.5 |
| 2004-QS11 | 217.5 | 2004-SP1 | 233.7 |

Exhibit 2

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2004-SP2 | 145.1 | 2005-KS8 | 1,165.8 |
| 2004-SP3 | 306.9 | 2005-KS9 | 487.0 |
| 2004-VFT | 820.7 | 2005-NC1 | 870.8 |
| 2005-AA1 | 265.6 | 2005-QA1 | 296.7 |
| 2005-AF1 | 235.5 | 2005-QA10 | 621.8 |
| 2005-AF2 | 296.9 | 2005-QA11 | 525.1 |
| 2005-AHL1 | 463.7 | 2005-QA12 | 285.2 |
| 2005-AHL2 | 434.2 | 2005-QA13 | 560.2 |
| 2005-AHL3 | 488.8 | 2005-QA2 | 501.0 |
| 2005-AR1 | 399.8 | 2005-QA3 | 500.0 |
| 2005-AR2 | 458.4 | 2005-QA4 | 525.2 |
| 2005-AR3 | 523.7 | 2005-QA5 | 241.8 |
| 2005-AR4 | 386.1 | 2005-QA6 | 575.5 |
| 2005-AR5 | 597.2 | 2005-QA7 | 575.0 |
| 2005-AR6 | 592.0 | 2005-QA8 | 519.5 |
| 2005-EFC1 | 1,101.5 | 2005-QA9 | 650.5 |
| 2005-EFC2 | 679.3 | 2005-QO1 | 711.1 |
| 2005-EFC3 | 731.9 | 2005-QO2 | 425.1 |
| 2005-EFC4 | 707.8 | 2005-QO3 | 500.6 |
| 2005-EFC5 | 693.3 | 2005-QO4 | 797.0 |
| 2005-EFC6 | 672.7 | 2005-QO5 | 1,275.1 |
| 2005-EFC7 | 698.2 | 2005-QS1 | 214.6 |
| 2005-EMX1 | 792.8 | 2005-QS10 | 265.7 |
| 2005-EMX2 | 620.4 | 2005-QS11 | 213.6 |
| 2005-EMX3 | 674.5 | 2005-QS12 | 528.9 |
| 2005-EMX4 | 492.6 | 2005-QS13 | 639.2 |
| 2005-EMX5 | 380.0 | 2005-QS14 | 615.8 |
| 2005-HE1 | 991.1 | 2005-QS15 | 431.5 |
| 2005-HE2 | 1,113.5 | 2005-QS16 | 428.0 |
| 2005-HE3 | 988.0 | 2005-QS17 | 540.1 |
| 2005-HI1 | 240.0 | 2005-QS2 | 213.0 |
| 2005-HI2 | 240.0 | 2005-QS3 | 475.6 |
| 2005-HI3 | 224.9 | 2005-QS4 | 211.7 |
| 2005-HS1 | 853.8 | 2005-QS5 | 214.0 |
| 2005-HS2 | 577.5 | 2005-QS6 | 265.1 |
| 2005-HSA1 | 278.8 | 2005-QS7 | 370.0 |
| 2005-J1 | 525.5 | 2005-QS8 | 104.1 |
| 2005-KS1 | 708.8 | 2005-QS9 | 371.0 |
| 2005-KS10 | 1,299.2 | 2005-RP1 | 343.1 |
| 2005-KS11 | 1,339.3 | 2005-RP2 | 301.1 |
| 2005-KS12 | 1,117.2 | 2005-RP3 | 282.5 |
| 2005-KS2 | 543.4 | 2005-RS1 | 975.0 |
| 2005-KS3 | 413.5 | 2005-RS2 | 725.0 |
| 2005-KS4 | 411.1 | 2005-RS3 | 741.3 |
| 2005-KS5 | 401.8 | 2005-RS4 | 522.4 |
| 2005-KS6 | 596.2 | 2005-RS5 | 497.5 |
| 2005-KS7 | 387.6 | 2005-RS6 | 1,183.2 |

| Deal Name | Original Issue Balance (In Thousands) | Deal Name | Original Issue Balance (In Thousands) |
|---|---|---|---|
| 2005-RS7 | 493.0 | 2006-HI4 | 272.7 |
| 2005-RS8 | 660.0 | 2006-HI5 | 247.5 |
| 2005-RS9 | 1,179.0 | 2006-HLTV1 | 229.9 |
| 2005-RZ1 | 203.8 | 2006-HSA1 | 461.4 |
| 2005-RZ2 | 333.7 | 2006-HSA2 | 447.9 |
| 2005-RZ3 | 340.0 | 2006-HSA3 | 201.0 |
| 2005-RZ4 | 411.2 | 2006-HSA4 | 402.1 |
| 2005-S1 | 463.1 | 2006-HSA5 | 295.6 |
| 2005-S2 | 260.9 | 2006-J1 | 550.0 |
| 2005-S3 | 183.1 | 2006-KS1 | 840.1 |
| 2005-S4 | 259.4 | 2006-KS2 | 977.5 |
| 2005-S5 | 258.2 | 2006-KS3 | 1,125.9 |
| 2005-S6 | 412.9 | 2006-KS4 | 687.8 |
| 2005-S7 | 311.7 | 2006-KS5 | 687.1 |
| 2005-S8 | 312.3 | 2006-KS6 | 529.1 |
| 2005-S9 | 366.6 | 2006-KS7 | 532.7 |
| 2005-SA1 | 295.2 | 2006-KS8 | 535.9 |
| 2005-SA2 | 500.8 | 2006-KS9 | 1,197.1 |
| 2005-SA3 | 675.2 | 2006-NC1 | 536.8 |
| 2005-SA4 | 850.5 | 2006-NC2 | 745.2 |
| 2005-SA5 | 355.3 | 2006-NC3 | 504.9 |
| 2005-SL1 | 370.5 | 2006-QA1 | 603.9 |
| 2005-SL2 | 168.9 | 2006-QA10 | 375.5 |
| 2005-SP1 | 831.0 | 2006-QA11 | 372.4 |
| 2005-SP2 | 490.2 | 2006-QA2 | 394.0 |
| 2005-SP3 | 285.7 | 2006-QA3 | 398.5 |
| 2006-AR1 | 508.7 | 2006-QA4 | 304.4 |
| 2006-AR2 | 373.0 | 2006-QA5 | 695.6 |
| 2006-EFC1 | 593.2 | 2006-QA6 | 625.8 |
| 2006-EFC2 | 387.6 | 2006-QA7 | 588.2 |
| 2006-EMX1 | 424.6 | 2006-QA8 | 795.1 |
| 2006-EMX2 | 550.1 | 2006-QA9 | 369.2 |
| 2006-EMX3 | 773.6 | 2006-QH1 | 337.9 |
| 2006-EMX4 | 661.7 | 2006-QO1 | 901.2 |
| 2006-EMX5 | 580.2 | 2006-QO10 | 895.7 |
| 2006-EMX6 | 620.5 | 2006-QO2 | 665.5 |
| 2006-EMX7 | 495.3 | 2006-QO3 | 644.8 |
| 2006-EMX8 | 698.6 | 2006-QO4 | 843.2 |
| 2006-EMX9 | 728.8 | 2006-QO5 | 1,071.6 |
| 2006-HE1 | 1,274.2 | 2006-QO6 | 1,290.3 |
| 2006-HE2 | 626.2 | 2006-QO7 | 1,542.4 |
| 2006-HE3 | 1,142.3 | 2006-QO8 | 1,288.1 |
| 2006-HE4 | 1,159.1 | 2006-QO9 | 895.6 |
| 2006-HE5 | 1,244.5 | 2006-QS1 | 323.8 |
| 2006-HI1 | 214.2 | 2006-QS10 | 533.6 |
| 2006-HI2 | 237.4 | 2006-QS11 | 751.5 |
| 2006-HI3 | 223.2 | 2006-QS12 | 541.3 |

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2006-QS13 | 641.0 | 2006-SP3 | 291.9 |
| 2006-QS14 | 753.7 | 2006-SP4 | 303.9 |
| 2006-QS15 | 538.6 | 2007-EMX1 | 692.9 |
| 2006-QS16 | 752.1 | 2007-HE1 | 1,185.9 |
| 2006-QS17 | 537.0 | 2007-HE2 | 1,240.9 |
| 2006-QS18 | 1,181.9 | 2007-HE3 | 350.6 |
| 2006-QS2 | 881.7 | 2007-HI1 | 255.0 |
| 2006-QS3 | 969.8 | 2007-HSA1 | 546.8 |
| 2006-QS4 | 752.3 | 2007-HSA2 | 1,231.4 |
| 2006-QS5 | 698.0 | 2007-HSA3 | 796.4 |
| 2006-QS6 | 858.8 | 2007-KS1 | 415.6 |
| 2006-QS7 | 537.5 | 2007-KS2 | 961.5 |
| 2006-QS8 | 966.3 | 2007-KS3 | 1,270.3 |
| 2006-QS9 | 540.1 | 2007-KS4 | 235.9 |
| 2006-RP1 | 293.0 | 2007-QA1 | 410.1 |
| 2006-RP2 | 317.0 | 2007-QA2 | 367.0 |
| 2006-RP3 | 290.4 | 2007-QA3 | 882.4 |
| 2006-RP4 | 357.4 | 2007-QA4 | 243.5 |
| 2006-RS1 | 1,173.6 | 2007-QA5 | 504.1 |
| 2006-RS2 | 785.6 | 2007-QH1 | 522.3 |
| 2006-RS3 | 741.6 | 2007-QH2 | 348.4 |
| 2006-RS4 | 887.5 | 2007-QH3 | 349.5 |
| 2006-RS5 | 382.6 | 2007-QH4 | 401.0 |
| 2006-RS6 | 372.2 | 2007-QH5 | 497.5 |
| 2006-RZ1 | 483.8 | 2007-QH6 | 597.0 |
| 2006-RZ2 | 368.6 | 2007-QH7 | 347.0 |
| 2006-RZ3 | 688.3 | 2007-QH8 | 560.1 |
| 2006-RZ4 | 851.8 | 2007-QH9 | 594.4 |
| 2006-RZ5 | 505.1 | 2007-QO1 | 625.1 |
| 2006-S1 | 367.1 | 2007-QO2 | 529.3 |
| 2006-S10 | 1,087.7 | 2007-QO3 | 296.3 |
| 2006-S11 | 623.2 | 2007-QO4 | 502.8 |
| 2006-S12 | 1,204.3 | 2007-QO5 | 231.2 |
| 2006-S2 | 260.6 | 2007-QS1 | 1,297.4 |
| 2006-S3 | 337.8 | 2007-QS10 | 435.8 |
| 2006-S4 | 313.9 | 2007-QS11 | 305.8 |
| 2006-S5 | 678.1 | 2007-QS2 | 536.7 |
| 2006-S6 | 599.6 | 2007-QS3 | 971.6 |
| 2006-S7 | 469.7 | 2007-QS4 | 746.9 |
| 2006-S8 | 416.3 | 2007-QS5 | 432.7 |
| 2006-S9 | 442.3 | 2007-QS6 | 808.3 |
| 2006-SA1 | 275.1 | 2007-QS7 | 803.3 |
| 2006-SA2 | 791.3 | 2007-QS8 | 651.8 |
| 2006-SA3 | 350.9 | 2007-QS9 | 707.0 |
| 2006-SA4 | 282.3 | 2007-RP1 | 334.4 |
| 2006-SP1 | 275.9 | 2007-RP2 | 263.3 |
| 2006-SP2 | 348.1 | 2007-RP3 | 346.6 |

Exhibit 2

| Deal Name | Original Issue Balance (in Thousands) |
|-----------|--------------------------------------|
| 2007-RP4 | 239.2 |
| 2007-RS1 | 478.3 |
| 2007-RS2 | 376.8 |
| 2007-RZ1 | 329.3 |
| 2007-S1 | 522.5 |
| 2007-S2 | 472.2 |
| 2007-S3 | 575.3 |
| 2007-S4 | 314.5 |
| 2007-S5 | 524.8 |
| 2007-S6 | 707.7 |
| 2007-S7 | 419.1 |
| 2007-S8 | 488.8 |
| 2007-S9 | 172.4 |
| 2007-SA1 | 310.8 |
| 2007-SA2 | 385.1 |
| 2007-SA3 | 363.8 |
| 2007-SA4 | 414.9 |
| 2007-SP1 | 346.6 |
| 2007-SP2 | 279.3 |
| 2007-SP3 | 298.1 |
| **Grand Total** | **220,987.7** |

~~Exhibit B – Allocated Allowed Claims~~

## EXHIBIT B

## ALLOCATION OF ALLOWED CLAIM

1.      The Allowed Claim shall be allocated amongst the Accepting Trusts by the Trustees pursuant to the determination of a qualified financial advisor (the "Expert") who will make any determinations and perform any calculations required in connection with the allocation of the Allowed Claim among the Accepting Trusts. To the extent that the collateral in any Accepting Trust is divided by the Governing Agreements into groups of loans ("Loan Groups") so that ordinarily only certain classes of investors benefit from the proceeds of particular Loan Groups, those Loan Groups shall be deemed to be separate Accepting Trusts for purposes of the allocation and distribution methodologies set forth below. The Expert ~~is~~ to apply the following allocation ~~formula~~formulas:

    (i) *First*, the Expert shall calculate the amount of ~~net losses~~Net Losses for each Accepting Trust ~~that have been or are estimated to be borne by that trust from its inception date to its expected date of termination~~ as a percentage of the sum of the ~~net losses that are estimated to be borne by~~Net Losses for all Accepting Trusts ~~from their inception dates to their expected dates of termination~~ (such amount, the "Net Loss Percentage");

    (ii) *Second,* the Expert shall calculate the "Allocated ~~Allowed~~Depositor Claim" ~~of the Allowed Claim~~ for each Accepting Trust by multiplying (A) the amount of the Allowed Claim by (B) the Net Loss Percentage for such Accepting Trust, expressed as a decimal; provided that the Expert shall be entitled to make adjustments to the Allocated ~~Allowed~~Depositor Claim of each Accepting Trust to ensure that the effects of rounding do not cause the sum of the Allocated ~~Allowed~~Depositor Claims for all Accepting Trusts to exceed the ~~applicable~~amount of the Allowed Claim; and

    (iii)      the Expert shall calculate the "Allocated Seller Claim" for each Accepting Trust by multiplying (A) the amount of the Allowed Claim by (B) the Net Loss Percentage for such Accepting Trust, expressed as a decimal; provided that the Expert shall be entitled to make adjustments to the Allocated Seller Claim of each Accepting Trust to ensure that the effects of rounding do not cause the sum of the Allocated Seller Claims for all Accepting Trusts to exceed the amount of the Allowed Claim.

    (iv)      Any HoldCo Claim provided to an Accepting Trust making one or more HoldCo Elections, and any reduction to the Allocated Depositor Claim and Allocated Seller Claim of that Accepting Trust, shall be calculated pursuant to Section 6.02.

    (v)      For the avoidance of doubt, and subject to the HoldCo Election, each Accepting Trust shall receive an Allocated Claim only against its Seller Entity, which Allocated Claim its Depositor Entity is jointly liable for.

    (vi)      ~~(iii) *Third*, if~~ If applicable, the Expert shall calculate the portion of the Allocated ~~Allowed~~ Claim that relates to principal-only certificates or notes and the portion of the Allocated ~~Allowed~~ Claim that relates to all other certificates or notes.

2.      All distributions from the Estate to ~~a~~an Accepting Trust on account of any Allocated ~~Allowed~~ Claim shall be treated as Subsequent Recoveries, as that term is defined in the Governing Agreement for that trust; provided that if the Governing Agreement for a particular ~~Covered Trust does not include the term "Subsequent Recovery," the distribution resulting from the Allocated Allowed Claim Trust shall be distributed as though it was unscheduled principal available for distribution on that distribution date.~~Accepting

> 3.      ~~Notwithstanding any other provision of any Governing Agreement, the Debtors and all Servicers agree that neither the Master Servicer nor any Subservicer shall be entitled to receive any portion of any distribution resulting from any Allocated Allowed Claim for any purpose, including without limitation the satisfaction of any Servicing Advances, it being understood that the Master Servicer's other entitlements to payments, and to reimbursement or recovery, including of Advances and Servicing Advances, under the terms of the Governing Agreements shall not be affected by this~~

Trust does not include the term "Subsequent Recovery," the distribution resulting from the Allocated Claim shall be distributed as though it was unscheduled principal available for distribution on that distribution date; *provided, however,* that should the Bankruptcy Court determine that a different treatment is required to conform the distributions to the requirements of the Governing Agreements, that determination shall govern and shall not constitute a material change to this Settlement Agreement.

3.    Notwithstanding any other provision of any Governing Agreement, the Debtors and all Servicers agree that neither the Master Servicer nor any Subservicer shall be entitled to receive any portion of any distribution resulting from any Allocated Claim for any purpose, including without limitation the satisfaction of any Servicing Advances, it being understood that the Master Servicer's other entitlements to payments, and to reimbursement or recovery, including of Advances and Servicing Advances, under the terms of the Governing Agreements shall not be affected by this Settlement Agreement except as expressly provided here. To the extent that as a result of the distribution resulting from an Allocated ~~Allowed~~ Claim in a particular Accepting Trust a principal payment would become payable to a class of REMIC residual interests, whether on the distribution of the amount resulting from the Allocated ~~Allowed~~ Claim or on any subsequent distribution date that is not the final distribution date under the Governing Agreement for such Accepting Trust, such payment shall be maintained in the distribution account and the relevant Trustee shall distribute it on the next distribution date according to the provisions of this section.

4.    In addition, after any distribution resulting from an Allocated ~~Allowed~~ Claim pursuant to section 3 above, the relevant Trustee will allocate the amount of the distribution for that Accepting Trust in the reverse order of previously allocated Realized Losses, to increase the Class Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance, as applicable, of each class of Certificates or Notes (or Components thereof) (other than any class of REMIC residual interests) to which Realized Losses have been previously allocated, but in each case by not more than the amount of Realized Losses previously allocated to that class of Certificates or Notes (or Components thereof) pursuant to the Governing Agreements. For the avoidance of doubt, for Accepting Trusts for which the Credit Support Depletion Date shall have occurred prior to the allocation of the amount of the Allocable Share in accordance with the immediately preceding sentence, in no event shall the foregoing allocation be deemed to reverse the occurrence of the Credit Support Depletion Date in such Accepting Trusts. Holders of such Certificates or Notes (or Components thereof) will not be entitled to any payment in respect of interest on the amount of such increases for any interest accrual period relating to the distribution date on which such increase occurs or any prior distribution date. Any such increase shall be applied pro rata to the Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance of each Certificate or Note of each class. For the avoidance of doubt, this section 4 is intended only to increase Class Certificate Balances, Component Balances, Component Principal Balances, and Note Principal Balances, as provided for herein, and shall not affect any distributions resulting from Allocated ~~Allowed~~ Claims provided for in section 3 above.

~~Except as set forth above, nothing~~Nothing in this Settlement Agreement amends or modifies in any way any provisions of any Governing Agreement. To the extent any credit enhancer or financial guarantee insurer receives a distribution on account of the Allowed Claim, such distribution shall be credited at least dollar for dollar against the amount of any claim it files against the Debtor that does not arise under the Governing Agreements.

-18-

6. ~~In no event shall the distribution to a Trust as a result of any Allocated Allowed~~

5. In no event shall the distribution to an Accepting Trust as a result of any Allocated Claim be deemed to reduce the collateral losses experienced by such ~~Covered~~Accepting Trust.

### Exhibit C — Fee Schedule

Percentage of the Allowed Claim (being the sum of the Allocated Allow Claims) allocable to trusts which accept the settlement, subject to adjustment pursuant to section 6.02(b) for trusts other than original "Covered Trusts."

Gibbs & Bruns, L.L.P.: 4.75%

Ropes & Gray LLP:

If Effective Date of Plan occurs on or before Sept. 2, 2012, 0.475%

If Effective Date of Plan occurs after Sept. 2, 2012 and on or before Dec. 2, 2012, 0.7125% If

Effective Date of Plan occurs after Dec. 3, 2012 and on or before May 2, 2013, 0.855%

If Effective Date of Plan occurs after May 2, 2013, 0.95%

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| GMACM 2004-AR1 | 36185NX54 | $112,473,000.00 | $18,850,721.55 |
| GMACM 2004-AR1 | 36185NX70 | $66,361,100.00 | $11,581,008.18 |
| GMACM 2004-AR1 | 36185NX39 | $59,525,000.00 | $8,175,172.37 |
| GMACM 2004-AR1 | 36185NX88 | $11,279,800.00 | $1,494,687.97 |
| GMACM 2004-AR1 | 36185NX62 | $14,902,800.00 | $779,440.52 |
| GMACM 2004-AR1 | 36185NX96 | $0.00 | $0.00 |
| GMACM 2004-AR2 | 36185N3U2 | $32,000,000.00 | $5,702,662.00 |
| GMACM 2004-AR2 | 36185N3V0 | $25,000,000.00 | $5,517,771.53 |
| GMACM 2004-AR2 | 36185N4A5 | $2,000,000.00 | $441,421.73 |
| GMACM 2004-AR2 | 36185N3T5 | $600,000.00 | $118,037.31 |
| GMACM 2004-HE2 | 361856DD6 | $20,085,000.00 | $5,653,540.45 |
| GMACM 2004-HE3 | 361856DG9 | $113,600,000.00 | $42,412,025.20 |
| GMACM 2004-HE4 | 361856DR5 | $152,334,918.00 | $152,334,917.38 |
| GMACM 2004-HE5 | 361856DX2 | $20,000,000.00 | $9,798,206.17 |
| GMACM 2004-HE5 | 361856DY0 | $7,000,000.00 | $3,139,785.06 |
| GMACM 2004-J1 | 36185NW48 | $6,014,000.00 | $3,426,858.69 |
| GMACM 2004-J1 | 36185NW55 | $2,406,000.00 | $1,370,971.40 |
| GMACM 2004-J1 | 36185NV64 | $2,005,000.00 | $1,286,938.57 |
| GMACM 2004-J3 | 36185N3F5 | $14,008,000.00 | $21,022,980.38 |
| GMACM 2004-J3 | 36185N2Z2 | $17,680,250.00 | $12,943,219.33 |
| GMACM 2004-J3 | 36185N3B4 | $10,420,086.00 | $10,420,086.00 |
| GMACM 2004-J3 | 36185N3G3 | $2,000,000.00 | $884,010.74 |
| GMACM 2004-J4 | 36185N4K3 | $33,900,000.00 | $51,395,233.90 |
| GMACM 2004-J4 | 36185N4J6 | $26,000,000.00 | $34,448,182.05 |
| GMACM 2004-J5 | 36185N5C0 | $14,500,000.00 | $14,500,000.00 |
| GMACM 2004-J5 | 36185N5B2 | $11,250,000.00 | $7,263,675.06 |
| GMACM 2004-JR1 | 36185NS43 | $28,311,915.00 | $43,238,535.34 |
| GMACM 2004-JR1 | 36185NS35 | $10,000,000.00 | $8,686,073.08 |
| GMACM 2004-VF1 | 36186FAA4 | $330,778,998.00 | $52,795,821.54 |
| GMACM 2005-AA1 | 76112BNN6 | $50,000,000.00 | $10,022,410.39 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| GMACM 2005-AF1 | 36185MAJ1 | $30,935,205.00 | $17,992,750.89 |
| GMACM 2005-AF1 | 36185MAK8 | $58,719,000.00 | $7,860,050.53 |
| GMACM 2005-AF1 | 36185MAN2 | $1,000,000.00 | $1,479,905.60 |
| GMACM 2005-AF2 | 36185MDE9 | $202,283,350.00 | $69,096,264.77 |
| GMACM 2005-AR1 | 76112BKN9 | $53,559,000.00 | $14,272,877.71 |
| GMACM 2005-AR1 | 76112BKS8 | $7,796,000.00 | $5,462,481.28 |
| GMACM 2005-AR1 | 76112BKP4 | $16,390,000.00 | $4,684,637.43 |
| GMACM 2005-AR1 | 76112BKK5 | $10,000,000.00 | $687,431.34 |
| GMACM 2005-AR1 | 76112BKQ2 | $277,340.00 | $90,952.47 |
| GMACM 2005-AR2 | 36185N6Q8 | $37,293,000.00 | $14,492,493.16 |
| GMACM 2005-AR2 | 36185N6N5 | $1,500,000.00 | $475,829.57 |
| GMACM 2005-AR2 | 36185N6M7 | $2,100,000.00 | $373,455.48 |
| GMACM 2005-AR3 | 36185N7L8 | $100,617,387.26 | $33,343,345.49 |
| GMACM 2005-AR3 | 36185N7H7 | $50,000,000.00 | $3,690,962.79 |
| GMACM 2005-AR3 | 36185N6Y1 | $23,756,000.00 | $3,078,751.10 |
| GMACM 2005-AR3 | 36185N7M6 | $5,000,000.00 | $1,656,937.55 |
| GMACM 2005-AR3 | 36185N7E4 | $1,000,000.00 | $1,000,000.00 |
| GMACM 2005-AR3 | 36185N7D6 | $9,516,000.00 | $925,595.37 |
| GMACM 2005-AR4 | 76112BUG3 | $56,000,000.00 | $20,747,040.06 |
| GMACM 2005-AR4 | 76112BUD0 | $14,512,000.00 | $1,717,517.74 |
| GMACM 2005-AR4 | 76112BUM0 | $3,933,000.00 | $1,298,661.68 |
| GMACM 2005-AR4 | 76112BUK4 | $2,592,000.00 | $836,696.62 |
| GMACM 2005-AR5 | 76112BYD6 | $35,000,000.00 | $13,182,471.99 |
| GMACM 2005-AR5 | 76112BYF1 | $5,905,000.00 | $2,475,640.32 |
| GMACM 2005-AR5 | 76112BYB0 | $600,000.00 | $231,853.88 |
| GMACM 2005-AR6 | 36185MBJ0 | $81,693,026.00 | $30,858,233.47 |
| GMACM 2005-AR6 | 36185MBN1 | $44,030,945.00 | $22,277,176.61 |
| GMACM 2005-AR6 | 36185MBG6 | $48,131,000.00 | $15,396,021.72 |
| GMACM 2005-AR6 | 36185MBL5 | $27,986,000.00 | $12,501,009.30 |
| GMACM 2005-HE1 | 361856EC7 | $45,000,000.00 | $20,883,629.47 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| GMACM 2005-HE1 | 361856EB9 | $35,100,000.00 | $16,289,231.06 |
| GMACM 2005-HE2 | 36185MAF9 | $44,000,000.00 | $26,323,988.66 |
| GMACM 2005-HE2 | 36185MAD4 | $5,000,000.00 | $2,666,379.03 |
| GMACM 2005-HE3 | 361856EH6 | $2,500,000.00 | $1,351,643.25 |
| GMACM 2005-J1 | 36185MCP5 | $24,000,000.00 | $24,000,000.00 |
| GMACM 2005-J1 | 36185MCL4 | $20,000,000.00 | $18,348,106.59 |
| GMACM 2005-J1 | 36185MCJ9 | $20,000,000.00 | $17,253,639.71 |
| GMACM 2005-J1 | 36185MBY7 | $13,650,000.00 | $2,595,782.18 |
| GMACM 2006-AR1 | 36185MDQ2 | $112,902,000.00 | $47,427,857.23 |
| GMACM 2006-AR1 | 36185MDN9 | $8,840,000.00 | $3,784,623.44 |
| GMACM 2006-AR2 | 36185MFB3 | $30,697,840.00 | $9,100,819.00 |
| GMACM 2006-HE1 | 361856ER4 | $49,485,000.00 | $21,833,699.68 |
| GMACM 2006-HE2 | 38011AAC8 | $25,150,000.00 | $16,046,139.33 |
| GMACM 2006-HE3 | 38012TAD4 | $16,316,000.00 | $9,448,665.27 |
| GMACM 2006-HE3 | 38012TAB8 | $8,620,000.00 | $3,248,873.04 |
| GMACM 2006-HE3 | 38012TAC6 | $1,360,000.00 | $787,581.94 |
| GMACM 2006-HE4 | 38012UAA7 | $104,119,000.00 | $49,113,268.16 |
| GMACM 2006-HE4 | 38012UAB5 | $91,100,000.00 | $42,972,163.13 |
| GMACM 2006-HE4 | 38012UAC3 | $45,000,000.00 | $21,226,644.80 |
| GMACM 2006-HLTV | 36185HEJ8 | $20,500,000.00 | $20,250,000.00 |
| GMACM 2006-HLTV | 36185HEH2 | $9,700,000.00 | $138,887.96 |
| GMACM 2006-J1 | 36185MEG3 | $15,000,000.00 | $14,127,453.31 |
| GMACM 2006-J1 | 36185MEB4 | $58,877,000.00 | $10,286,054.12 |
| GMACM 2007-HE1 | 36186KAD7 | $14,000,000.00 | $14,000,000.00 |
| GMACM 2007-HE1 | 36186KAB1 | $4,731,000.00 | $770,700.89 |
| GMACM 2007-HE2 | 36186LAG8 | $51,541,000.00 | $31,164,661.06 |
| GMACM 2007-HE2 | 36186LAD5 | $5,000,000.00 | $3,023,288.36 |
| GMACM 2007-HE2 | 36186LAC7 | $2,550,000.00 | $1,541,877.06 |
| GMACM 2007-HE2 | 36186LAB9 | $90,000.00 | $54,419.27 |
| GMACM 2007-HE3 | 36186MAC5 | $36,960,000.00 | $18,812,695.41 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| GMACM 2007-HE3 | 36186MAA9 | $35,735,000.00 | $13,454,365.26 |
| RAAC 2004-SP1 | 7609855V9 | $49,812,000.00 | $5,700,976.26 |
| RAAC 2004-SP1 | 7609855Y3 | $2,337,000.00 | $704,462.52 |
| RAAC 2004-SP2 | 7609857N5 | $1,000,000.00 | $55,326.52 |
| RAAC 2004-SP3 | 76112BEN6 | $12,769,000.00 | $12,769,000.00 |
| RAAC 2004-SP3 | 76112BES5 | $30,000,000.00 | $5,442,471.66 |
| RAAC 2005-RP1 | 76112BJR2 | $7,000,000.00 | $7,000,000.00 |
| RAAC 2005-RP2 | 76112BXN5 | $66,360,000.00 | $640,466.76 |
| RAAC 2005-RP3 | 76112BP95 | $4,000,000.00 | $4,000,000.00 |
| RAAC 2005-SP1 | 76112BQL7 | $31,117,000.00 | $27,013,250.19 |
| RAAC 2005-SP1 | 76112BQS2 | $2,180,500.00 | $3,285,426.60 |
| RAAC 2005-SP1 | 76112BQN3 | $57,000,000.00 | $757,348.91 |
| RAAC 2005-SP1 | 76112BSA9 | $1,500,000.00 | $343,937.96 |
| RAAC 2005-SP1 | 76112BRE2 | $323,000.00 | $233,120.85 |
| RAAC 2005-SP2 | 76112BF54 | $113,800,000.00 | $23,201,012.00 |
| RAAC 2005-SP2 | 76112BE48 | $13,000,000.00 | $3,365,502.68 |
| RAAC 2005-SP2 | 76112BF70 | $4,291,000.00 | $1,579,709.70 |
| RAAC 2005-SP2 | 76112BE71 | $1,551,000.00 | $1,551,000.00 |
| RAAC 2005-SP3 | 76112BS43 | $2,600,000.00 | $2,455,539.56 |
| RAAC 2006-RP1 | 76112B2W9 | $8,000,000.00 | $8,000,000.00 |
| RAAC 2006-RP1 | 76112B3R9 | $42,483,000.00 | $5,659,607.67 |
| RAAC 2006-RP1 | 76112B2V1 | $2,880,055.00 | $2,880,055.00 |
| RAAC 2006-RP2 | 74919MAA4 | $132,274,000.00 | $24,870,249.66 |
| RAAC 2006-RP3 | 74919RAA3 | $151,820,000.00 | $37,512,966.12 |
| RAAC 2006-RP3 | 74919RAE5 | $15,000,000.00 | $15,000,000.00 |
| RAAC 2006-RP4 | 74919TAA9 | $105,576,520.00 | $28,972,532.49 |
| RAAC 2006-RP4 | 74919TAB7 | $20,700,000.00 | $20,700,000.00 |
| RAAC 2006-SP1 | 76112B3D0 | $3,200,000.00 | $752,301.25 |
| RAAC 2006-SP2 | 74919PAB5 | $35,409,000.00 | $9,478,791.84 |
| RAAC 2006-SP3 | 74919QAD9 | $4,364,000.00 | $4,364,000.00 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAAC 2006-SP4 | 74919VAH9 | $5,000,000.00 | $5,000,000.00 |
| RAAC 2007-RP1 | 74977YAA7 | $184,091,000.00 | $67,091,939.37 |
| RAAC 2007-RP1 | 74977YAB5 | $11,800,000.00 | $11,800,000.00 |
| RAAC 2007-RP2 | 74919WAA2 | $74,860,000.00 | $25,790,180.45 |
| RAAC 2007-RP2 | 74919WAB0 | $9,800,000.00 | $9,800,000.00 |
| RAAC 2007-RP3 | 74978BAA6 | $60,200,000.00 | $22,780,459.57 |
| RAAC 2007-RP3 | 74978BAB4 | $6,900,000.00 | $6,900,000.00 |
| RAAC 2007-RP3 | 74978FAA7 | $14,400,000.00 | $5,672,315.02 |
| RAAC 2007-RP4 | 74919LAD0 | $35,700,000.00 | $17,303,135.56 |
| RAAC 2007-RP4 | 74919LAE8 | $16,513,000.00 | $16,513,000.00 |
| RAAC 2007-SP1 | 74978AAC4 | $51,211,000.00 | $51,211,000.00 |
| RAAC 2007-SP2 | 74919XAE2 | $13,000,000.00 | $13,000,000.00 |
| RAAC 2007-SP2 | 74919XAF9 | $3,653,660.00 | $3,653,660.00 |
| RAAC 2007-SP3 | 74978FAA7 | $117,076,000.00 | $46,117,492.22 |
| RALI 2004-QA1 | 76110HRM3 | $19,000,000.00 | $789,690.45 |
| RALI 2004-QA2 | 76110HVU0 | $25,000,000.00 | $3,499,008.16 |
| RALI 2004-QA3 | 76110HXR5 | $10,657,000.00 | $1,861,483.53 |
| RALI 2004-QA4 | 76110HZP7 | $6,095,900.00 | $3,326,557.02 |
| RALI 2004-QA4 | 76110HZH5 | $10,564,000.00 | $1,362,671.05 |
| RALI 2004-QA4 | 76110HZQ5 | $3,143,400.00 | $1,229,988.93 |
| RALI 2004-QA5 | 76110HC72 | $37,338,000.00 | $2,260,669.39 |
| RALI 2004-QA5 | 76110HC98 | $100,000.00 | $5,188.91 |
| RALI 2004-QA6 | 76110HH85 | $18,350,000.00 | $4,765,681.90 |
| RALI 2004-QA6 | 76110HH28 | $70,320,000.00 | $4,456,586.56 |
| RALI 2004-QR1 | 76110HB57 | $108,346,390.00 | $13,542,294.00 |
| RALI 2004-QS1 | 76110HQF9 | $36,482,573.00 | $3,351,246.65 |
| RALI 2004-QS1 | 76110HQA0 | $1,700,000.00 | $1,290,523.04 |
| RALI 2004-QS10 | 76110HWK1 | $216,614,427.00 | $54,544,002.09 |
| RALI 2004-QS10 | 76110HWG0 | $21,200,000.00 | $33,543,864.51 |
| RALI 2004-QS10 | 76110HWC9 | $50,000,000.00 | $3,696,417.31 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2004-QS11 | 76110HXC8 | $217,512,005.00 | $56,892,689.34 |
| RALI 2004-QS11 | 76110HWX3 | $19,000,000.00 | $16,747,700.57 |
| RALI 2004-QS11 | 76110HWV7 | $13,000,000.00 | $13,000,000.00 |
| RALI 2004-QS11 | 76110HWU9 | $40,633,600.00 | $3,411,076.00 |
| RALI 2004-QS11 | 76110HWW5 | $3,380,000.00 | $283,741.48 |
| RALI 2004-QS13 | 76110HYH6 | $129,166,655.00 | $28,131,284.43 |
| RALI 2004-QS13 | 76110HYF0 | $3,600,000.00 | $827,786.04 |
| RALI 2004-QS16 | 76110HJ59 | $121,835,000.00 | $19,351,250.94 |
| RALI 2004-QS16 | 76110HJ91 | $17,500,000.00 | $15,779,390.45 |
| RALI 2004-QS16 | 76110HK24 | $3,200,000.00 | $728,620.56 |
| RALI 2004-QS2 | 76110HQM4 | $95,777,000.00 | $21,124,010.62 |
| RALI 2004-QS2 | 76110HQS1 | $6,870,000.00 | $5,137,689.94 |
| RALI 2004-QS2 | 76110HQG7 | $38,831,040.00 | $4,380,787.00 |
| RALI 2004-QS2 | 76110HQT9 | $3,215,800.00 | $2,510,081.95 |
| RALI 2004-QS3 | 76110HRA9 | $11,800,000.00 | $2,322,241.08 |
| RALI 2004-QS4 | 76110HSG5 | $7,694,900.00 | $5,699,173.40 |
| RALI 2004-QS4 | 76110HSA8 | $29,543,500.00 | $5,170,290.87 |
| RALI 2004-QS4 | 76110HSH3 | $3,686,800.00 | $2,744,461.69 |
| RALI 2004-QS4 | 76110HRV3 | $690,000.00 | $81,890.07 |
| RALI 2004-QS5 | 76110HSU4 | $12,438,900.00 | $12,438,900.00 |
| RALI 2004-QS5 | 76110HSR1 | $16,725,000.00 | $2,370,928.64 |
| RALI 2004-QS5 | 76110HSW0 | $2,805,000.00 | $389,577.36 |
| RALI 2004-QS6 | 76110HTG4 | $2,000,000.00 | $448,522.46 |
| RALI 2004-QS7 | 76110HTW9 | $15,000,000.00 | $15,000,000.00 |
| RALI 2004-QS7 | 76110HTV1 | $40,457,000.00 | $2,607,829.90 |
| RALI 2004-QS7 | 76110HTX7 | $2,000,000.00 | $890,694.16 |
| RALI 2004-QS8 | 76110HUT4 | $25,174,900.00 | $7,265,375.54 |
| RALI 2004-QS8 | 76110HUR8 | $3,500,000.00 | $5,379,589.02 |
| RALI 2004-QS8 | 76110HUN7 | $9,630,166.00 | $726,675.12 |
| RALI 2004-QS8 | 76110HUL1 | $150,000.00 | $12,805.31 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2004-QS9 | 76110HVH9 | $51,542,000.00 | $11,523,385.30 |
| RALI 2005-QA1 | 76110HM63 | $70,000,000.00 | $11,644,941.30 |
| RALI 2005-QA10 | 761118GE2 | $74,247,000.00 | $35,330,729.37 |
| RALI 2005-QA10 | 761118GD4 | $63,450,000.00 | $28,434,595.73 |
| RALI 2005-QA10 | 761118GL6 | $12,077,000.00 | $332,539.02 |
| RALI 2005-QA12 | 761118MY1 | $32,839,000.00 | $10,055,832.86 |
| RALI 2005-QA12 | 761118NB0 | $24,031,000.00 | $9,296,623.99 |
| RALI 2005-QA12 | 761118MZ8 | $24,000,000.00 | $6,139,991.23 |
| RALI 2005-QA12 | 761118NC8 | $4,050,000.00 | $1,592,391.26 |
| RALI 2005-QA13 | 761118PE2 | $197,550,000.00 | $80,522,480.40 |
| RALI 2005-QA13 | 761118PF9 | $375,000.00 | $127,465.58 |
| RALI 2005-QA2 | 76110HT90 | $38,817,000.00 | $12,132,243.89 |
| RALI 2005-QA3 | 76110H2H1 | $84,790,900.00 | $19,011,586.77 |
| RALI 2005-QA3 | 76110H2K4 | $31,402,800.00 | $7,949,443.21 |
| RALI 2005-QA3 | 76110H2P3 | $17,924,800.00 | $2,937,306.19 |
| RALI 2005-QA3 | 76110H2L2 | $8,765,600.00 | $2,774,968.65 |
| RALI 2005-QA4 | 76110H4L0 | $87,930,000.00 | $33,362,341.52 |
| RALI 2005-QA4 | 76110H4F3 | $13,225,000.00 | $3,556,000.19 |
| RALI 2005-QA4 | 76110H4K2 | $9,868,000.00 | $3,317,258.50 |
| RALI 2005-QA4 | 76110H4G1 | $96,000.00 | $23,602.35 |
| RALI 2005-QA5 | 76110H5A3 | $44,000,000.00 | $2,530,640.80 |
| RALI 2005-QA5 | 76110H5C9 | $3,859,900.00 | $1,427,833.31 |
| RALI 2005-QA6 | 76110H6E4 | $20,612,560.00 | $4,993,573.00 |
| RALI 2005-QA6 | 76110H5Z8 | $3,882,000.00 | $798,192.82 |
| RALI 2005-QA6 | 76110H6F1 | $230,000.00 | $230,000.00 |
| RALI 2005-QA7 | 76110H7B9 | $84,350,000.00 | $30,476,596.74 |
| RALI 2005-QA7 | 76110H7D5 | $5,000,000.00 | $1,806,555.90 |
| RALI 2005-QA7 | 76110H7J2 | $3,500,000.00 | $373,818.85 |
| RALI 2005-QA8 | 761118BP2 | $101,397,000.00 | $26,691,765.84 |
| RALI 2005-QA8 | 761118BS6 | $54,000,000.00 | $19,664,315.85 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|-----------|-------|----------------------|---------------------|
| RALI 2005-QA8 | 761118BW7 | $10,025,000.00 | $3,443,924.79 |
| RALI 2005-QA9 | 761118FM5 | $42,390,000.00 | $18,981,051.78 |
| RALI 2005-QA9 | 761118FJ2 | $41,501,000.00 | $11,412,169.14 |
| RALI 2005-QA9 | 761118FG8 | $27,700,000.00 | $7,774,410.12 |
| RALI 2005-QO1 | 761118EN4 | $99,400,000.00 | $29,924,469.79 |
| RALI 2005-QO1 | 761118EP9 | $6,330,000.00 | $1,905,653.50 |
| RALI 2005-QO2 | 761118HU5 | $111,860,000.00 | $35,809,815.74 |
| RALI 2005-QO3 | 761118KU1 | $129,849,000.00 | $44,254,225.46 |
| RALI 2005-QO3 | 761118KV9 | $36,156,400.00 | $11,762,228.18 |
| RALI 2005-QO4 | 761118NN4 | $131,410,000.00 | $47,913,396.79 |
| RALI 2005-QO4 | 761118NP9 | $35,953,000.00 | $11,792,949.44 |
| RALI 2005-QO5 | 761118QM3 | $257,979,000.00 | $98,220,567.34 |
| RALI 2005-QS1 | 76110HP78 | $214,597,361.00 | $76,877,951.15 |
| RALI 2005-QS1 | 76110HN88 | $80,000,000.00 | $22,370,403.00 |
| RALI 2005-QS1 | 76110HP45 | $40,410,000.00 | $11,299,850.02 |
| RALI 2005-QS10 | 761118CZ9 | $13,283,000.00 | $10,134,410.76 |
| RALI 2005-QS10 | 761118CW6 | $25,000,000.00 | $9,824,052.31 |
| RALI 2005-QS10 | 761118CX4 | $25,000,000.00 | $7,277,629.12 |
| RALI 2005-QS11 | 761118CL0 | $213,644,237.00 | $87,832,932.66 |
| RALI 2005-QS11 | 761118CE6 | $36,149,700.00 | $32,452,216.90 |
| RALI 2005-QS11 | 761118CK2 | $369,202.00 | $196,701.21 |
| RALI 2005-QS12 | 761118ED6 | $528,901,122.00 | $212,688,469.65 |
| RALI 2005-QS12 | 761118DN5 | $37,460,154.00 | $21,107,151.66 |
| RALI 2005-QS12 | 761118DR6 | $10,410,000.00 | $9,774,428.07 |
| RALI 2005-QS12 | 761118DU9 | $10,560,000.00 | $594,177.68 |
| RALI 2005-QS12 | 761118EC8 | $1,137,106.00 | $583,655.71 |
| RALI 2005-QS13 | 761118HJ0 | $639,169,632.00 | $277,360,657.31 |
| RALI 2005-QS13 | 761118HA9 | $42,460,154.00 | $23,880,480.72 |
| RALI 2005-QS13 | 761118HC5 | $68,400,000.00 | $17,944,983.83 |
| RALI 2005-QS13 | 761118GW2 | $41,885,000.00 | $8,871,234.82 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2005-QS13 | 761118HH4 | $3,199,626.00 | $1,615,561.81 |
| RALI 2005-QS13 | 761118GX0 | $1,300,000.00 | $535,461.24 |
| RALI 2005-QS14 | 761118JQ2 | $484,882,069.00 | $178,984,271.76 |
| RALI 2005-QS14 | 761118JJ8 | $99,999,999.68 | $36,579,683.96 |
| RALI 2005-QS14 | 761118JG4 | $125,510,000.00 | $34,169,004.34 |
| RALI 2005-QS14 | 761118JH2 | $46,530,000.00 | $21,227,525.11 |
| RALI 2005-QS15 | 761118KL1 | $431,500,310.00 | $174,527,325.85 |
| RALI 2005-QS15 | 761118KG2 | $66,099,000.00 | $32,667,405.47 |
| RALI 2005-QS15 | 761118KJ6 | $18,861,000.00 | $7,825,497.29 |
| RALI 2005-QS15 | 761118KK3 | $8,301,530.00 | $4,268,196.42 |
| RALI 2005-QS16 | 761118MP0 | $427,980,012.00 | $176,537,054.01 |
| RALI 2005-QS16 | 761118MC9 | $25,450,000.00 | $23,333,695.90 |
| RALI 2005-QS16 | 761118MN5 | $2,596,273.00 | $1,372,835.35 |
| RALI 2005-QS17 | 761118QC5 | $540,112,378.00 | $216,187,505.47 |
| RALI 2005-QS17 | 761118PY8 | $103,032,000.00 | $35,783,851.00 |
| RALI 2005-QS17 | 761118PZ5 | $53,366,200.00 | $15,208,445.59 |
| RALI 2005-QS17 | 761118PQ5 | $13,165,000.00 | $11,751,935.12 |
| RALI 2005-QS17 | 761118PS1 | $10,000,000.00 | $8,543,063.86 |
| RALI 2005-QS17 | 761118QB7 | $5,958,254.00 | $3,045,665.67 |
| RALI 2005-QS17 | 761118PU6 | $1,500,000.00 | $293,127.89 |
| RALI 2005-QS2 | 76110HQ69 | $53,001,600.00 | $14,062,105.00 |
| RALI 2005-QS3 | 76110HY86 | $103,981,675.00 | $27,427,074.84 |
| RALI 2005-QS3 | 76110HX79 | $173,143,700.00 | $23,192,814.82 |
| RALI 2005-QS3 | 76110HX87 | $24,048,000.00 | $22,501,858.82 |
| RALI 2005-QS3 | 76110HX53 | $10,990,200.00 | $9,840,588.13 |
| RALI 2005-QS3 | 76110HX61 | $15,000,000.00 | $2,009,268.73 |
| RALI 2005-QS5 | 76110H2X6 | $81,000,000.00 | $20,210,307.25 |
| RALI 2005-QS5 | 76110H2Z1 | $58,392,577.00 | $14,745,643.72 |
| RALI 2005-QS6 | 76110H5F2 | $118,400,000.00 | $24,716,937.00 |
| RALI 2005-QS6 | 76110H5L9 | $8,844,000.00 | $8,287,892.76 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2005-QS6 | 76110H5J4 | $13,083,333.00 | $5,929,652.65 |
| RALI 2005-QS6 | 76110H5M7 | $250,000.00 | $234,280.10 |
| RALI 2005-QS7 | 761118AH1 | $99,840,000.00 | $38,586,890.82 |
| RALI 2005-QS7 | 761118AE8 | $22,827,000.00 | $21,309,278.84 |
| RALI 2005-QS7 | 761118AA6 | $20,100,000.00 | $4,967,334.76 |
| RALI 2005-QS9 | 761118AZ1 | $12,098,000.00 | $11,225,892.70 |
| RALI 2005-QS9 | 761118AV0 | $42,000,000.00 | $9,277,846.07 |
| RALI 2006-Q10 | 751153AA5 | $19,410,000.00 | $11,084,423.82 |
| RALI 2006-QA1 | 761118TB4 | $147,482,000.00 | $65,247,325.86 |
| RALI 2006-QA1 | 761118SZ2 | $50,000,000.00 | $12,606,050.84 |
| RALI 2006-QA1 | 761118TD0 | $9,800,000.00 | $3,304,827.88 |
| RALI 2006-QA10 | 74922NAB5 | $91,295,092.00 | $38,214,542.99 |
| RALI 2006-QA10 | 74922NAA7 | $35,728,269.00 | $13,459,710.78 |
| RALI 2006-QA2 | 761118TU2 | $27,106,000.00 | $13,682,175.07 |
| RALI 2006-QA2 | 761118TR9 | $25,000,000.00 | $10,435,351.77 |
| RALI 2006-QA2 | 761118TN8 | $25,849,397.00 | $10,099,810.44 |
| RALI 2006-QA3 | 75114RAD7 | $65,500,000.00 | $19,946,268.36 |
| RALI 2006-QA4 | 748939AA3 | $55,340,405.00 | $19,362,187.54 |
| RALI 2006-QA5 | 75115BAB5 | $100,000,000.00 | $34,840,508.38 |
| RALI 2006-QA5 | 75115BAA7 | $48,463,281.00 | $17,088,242.50 |
| RALI 2006-QA6 | 74922MAA9 | $69,181,483.00 | $22,240,617.04 |
| RALI 2006-QA6 | 74922MAB7 | $15,000,000.00 | $5,362,548.77 |
| RALI 2006-QA6 | 74922MAC5 | $6,370,000.00 | $2,277,295.71 |
| RALI 2006-QA7 | 751152AA7 | $122,384,675.00 | $40,803,254.28 |
| RALI 2006-QA8 | 74922QAA0 | $73,678,889.00 | $25,312,045.04 |
| RALI 2006-QA8 | 74922QAB8 | $25,000,000.00 | $9,542,936.62 |
| RALI 2006-QA9 | 75115VAA3 | $27,007,000.00 | $9,931,577.59 |
| RALI 2006-QH1 | 75115GAA6 | $15,000,000.00 | $8,515,112.78 |
| RALI 2006-QO1 | 761118RM2 | $105,602,000.00 | $51,300,225.35 |
| RALI 2006-QO1 | 761118RN0 | $89,680,800.00 | $29,684,643.50 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2006-QO1 | 761118RJ9 | $78,443,000.00 | $24,013,603.76 |
| RALI 2006-QO1 | 761118RG5 | $5,400,000.00 | $838,109.67 |
| RALI 2006-QO1 | 761118RK6 | $10,496,000.00 | $0.03 |
| RALI 2006-QO10 | 751153AA5 | $99,395,000.00 | $56,761,261.83 |
| RALI 2006-QO10 | 751153AB3 | $81,000,000.00 | $41,396,225.42 |
| RALI 2006-QO2 | 761118VY1 | $265,842,000.00 | $94,138,538.93 |
| RALI 2006-QO2 | 761118VZ8 | $99,413,600.00 | $38,595,980.48 |
| RALI 2006-QO3 | 761118WP9 | $164,541,000.00 | $70,431,593.54 |
| RALI 2006-QO3 | 761118WQ7 | $34,747,000.00 | $16,745,355.27 |
| RALI 2006-QO4 | 75114GAC3 | $5,470,000.00 | $2,647,461.19 |
| RALI 2006-QO5 | 75114HAD9 | $66,000,000.00 | $35,286,331.22 |
| RALI 2006-QO5 | 75114HAK3 | $11,000,000.00 | $9,974,691.10 |
| RALI 2006-QO5 | 75114HAH0 | $29,397,000.00 | $7,731,231.07 |
| RALI 2006-QO5 | 75114HAE7 | $10,800,000.00 | $4,274,581.07 |
| RALI 2006-QO6 | 75114NAA2 | $532,153,000.00 | $268,255,921.95 |
| RALI 2006-QO6 | 75114NAB0 | $249,055,000.00 | $127,674,640.47 |
| RALI 2006-QO7 | 751150AD5 | $80,751,000.00 | $48,796,184.34 |
| RALI 2006-QO7 | 751150AH6 | $64,378,000.00 | $46,855,661.04 |
| RALI 2006-QO7 | 751150AJ2 | $37,954,000.00 | $32,438,418.87 |
| RALI 2006-QO7 | 751150AA1 | $12,000,000.00 | $7,142,533.74 |
| RALI 2006-QO8 | 75115FAS9 | $15,000,000.00 | $13,791,616.34 |
| RALI 2006-QO9 | 75115HAN6 | $548,514,000.00 | $257,600,151.69 |
| RALI 2006-QO9 | 75114PAC3 | $85,000,000.00 | $79,706,842.10 |
| RALI 2006-QO9 | 75114PAA7 | $1,700,000.00 | $0.00 |
| RALI 2006-QS1 | 761118SB5 | $22,000,000.00 | $5,271,753.67 |
| RALI 2006-QS10 | 751155AP7 | $66,810,666.00 | $29,334,407.16 |
| RALI 2006-QS10 | 751155AN2 | $15,810,666.00 | $6,941,953.19 |
| RALI 2006-QS10 | 751155BE1 | $5,293,385.00 | $2,509,526.92 |
| RALI 2006-QS11 | 75115EAA1 | $75,000,000.00 | $27,080,806.88 |
| RALI 2006-QS11 | 75115EAU7 | $17,284,000.00 | $13,187,758.02 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2006-QS11 | 75115EAJ2 | $5,521,342.00 | $2,490,944.03 |
| RALI 2006-QS12 | 751151AA9 | $85,000,000.00 | $25,462,526.17 |
| RALI 2006-QS12 | 751151AD3 | $25,177,000.00 | $18,110,058.92 |
| RALI 2006-QS12 | 751151AV3 | $40,744,973.00 | $17,225,512.65 |
| RALI 2006-QS12 | 751151AU5 | $20,000,000.00 | $8,455,282.29 |
| RALI 2006-QS12 | 751151AH4 | $10,300,000.00 | $7,059,103.39 |
| RALI 2006-QS12 | 751151AG6 | $7,000,000.00 | $2,647,360.10 |
| RALI 2006-QS12 | 751151AZ4 | $2,005,760.00 | $907,193.10 |
| RALI 2006-QS13 | 75115DAA3 | $126,039,000.00 | $54,810,097.54 |
| RALI 2006-QS13 | 75115DAK1 | $3,338,000.00 | $2,543,031.36 |
| RALI 2006-QS14 | 74922GAP9 | $75,000,000.00 | $37,600,223.93 |
| RALI 2006-QS14 | 74922GAE4 | $15,384,616.00 | $6,240,381.48 |
| RALI 2006-QS14 | 74922GAK0 | $5,547,285.00 | $3,920,867.58 |
| RALI 2006-QS15 | 74922YAH8 | $538,578,792.00 | $208,420,463.44 |
| RALI 2006-QS15 | 74922YAA3 | $32,000,000.00 | $14,218,626.83 |
| RALI 2006-QS15 | 74922YAE5 | $14,697,000.00 | $10,796,952.80 |
| RALI 2006-QS15 | 74922YAG0 | $1,839,075.00 | $868,551.15 |
| RALI 2006-QS15 | 74922YAD7 | $251,000.00 | $212,376.61 |
| RALI 2006-QS16 | 74922LAA1 | $155,025,250.00 | $71,509,273.88 |
| RALI 2006-QS16 | 74922LAG8 | $500,000.00 | $210,221.71 |
| RALI 2006-QS17 | 74922SAA6 | $27,500,000.00 | $13,065,317.92 |
| RALI 2006-QS18 | 74922RAH3 | $256,013,950.00 | $119,929,539.25 |
| RALI 2006-QS18 | 74922RAC4 | $116,032,000.00 | $42,573,048.93 |
| RALI 2006-QS18 | 74922RAF7 | $50,000,000.00 | $29,161,054.63 |
| RALI 2006-QS18 | 74922RAM2 | $23,171,000.00 | $10,120,686.65 |
| RALI 2006-QS18 | 74922RAU4 | $4,914,900.00 | $2,225,640.34 |
| RALI 2006-QS18 | 74922RAR1 | $4,660,000.00 | $1,663,671.74 |
| RALI 2006-QS18 | 74922RAP5 | $2,690,000.00 | $960,359.87 |
| RALI 2006-QS18 | 74922RAW0 | $355,377.00 | $131,256.12 |
| RALI 2006-QS18 | 74922RAS9 | $190,116.00 | $70,230.52 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2006-QS2 | 761118UY2 | $100,000,000.00 | $60,908,920.86 |
| RALI 2006-QS2 | 761118VA3 | $106,430,000.00 | $26,481,615.06 |
| RALI 2006-QS2 | 761118UQ9 | $29,500,000.00 | $8,330,539.80 |
| RALI 2006-QS2 | 761118UL0 | $8,550,000.00 | $5,156,304.28 |
| RALI 2006-QS3 | 761118XL7 | $88,458,000.00 | $22,276,987.61 |
| RALI 2006-QS4 | 749228AA0 | $25,553,000.00 | $20,021,007.78 |
| RALI 2006-QS4 | 749228AJ1 | $22,950,000.00 | $8,116,379.87 |
| RALI 2006-QS4 | 749228AF9 | $10,000,000.00 | $3,081,460.09 |
| RALI 2006-QS5 | 75114TAE1 | $33,909,000.00 | $25,685,427.28 |
| RALI 2006-QS5 | 75114TAC5 | $40,000,000.00 | $23,719,955.70 |
| RALI 2006-QS5 | 75114TAD3 | $20,000,000.00 | $15,149,622.39 |
| RALI 2006-QS5 | 75114TAG6 | $40,000,000.00 | $11,937,084.15 |
| RALI 2006-QS6 | 74922EAA7 | $80,000,000.00 | $28,624,734.00 |
| RALI 2006-QS6 | 74922EAN9 | $16,669,000.00 | $5,609,641.33 |
| RALI 2006-QS6 | 74922EAQ2 | $3,550,000.00 | $1,779,842.27 |
| RALI 2006-QS6 | 74922EAB5 | $450,000.00 | $147,346.81 |
| RALI 2006-QS7 | 748940AA1 | $139,600,000.00 | $66,316,587.90 |
| RALI 2006-QS7 | 748940AD5 | $19,000,000.00 | $2,229,816.56 |
| RALI 2006-QS8 | 75115AAA9 | $116,485,000.00 | $56,007,745.08 |
| RALI 2006-QS8 | 75115AAC5 | $26,500,000.00 | $19,632,216.64 |
| RALI 2006-QS8 | 75115AAB7 | $11,095,000.00 | $8,219,601.67 |
| RALI 2006-QS8 | 75115AAD3 | $51,255,000.00 | $7,551,577.51 |
| RALI 2006-QS9 | 75115CAG2 | $10,755,650.00 | $8,440,367.10 |
| RALI 2006-QS9 | 75115CAA5 | $43,000,000.00 | $7,531,962.67 |
| RALI 2006-QS9 | 75115CAL1 | $12,000,000.00 | $4,250,967.47 |
| RALI 2007-QA1 | 74923GAA1 | $72,495,000.00 | $25,552,691.63 |
| RALI 2007-QA2 | 74922PAA2 | $40,000,000.00 | $12,631,088.43 |
| RALI 2007-QA2 | 74922PAC8 | $990,054.00 | $396,607.77 |
| RALI 2007-QA4 | 74923YAA2 | $128,000,000.00 | $46,308,406.45 |
| RALI 2007-QA5 | 749236AE5 | $36,360,960.00 | $24,506,067.00 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2007-QH1 | 74922HAA0 | $71,968,000.00 | $44,264,673.62 |
| RALI 2007-QH1 | 74922HAB8 | $17,551,200.00 | $10,795,050.00 |
| RALI 2007-QH2 | 74922JAA6 | $30,079,200.00 | $18,122,445.00 |
| RALI 2007-QH2 | 74922JAB4 | $29,862,600.00 | $17,991,945.01 |
| RALI 2007-QH3 | 74922WAA7 | $112,327,000.00 | $70,667,905.38 |
| RALI 2007-QH4 | 74922TAB2 | $55,482,400.00 | $36,363,577.04 |
| RALI 2007-QH4 | 74922TAA4 | $48,200,000.00 | $31,590,638.47 |
| RALI 2007-QH5 | 75116EAB8 | $49,048,800.00 | $31,653,442.00 |
| RALI 2007-QH5 | 75116EAA0 | $30,000,000.00 | $19,360,377.15 |
| RALI 2007-QH6 | 74922AAA5 | $146,600,000.00 | $96,850,905.58 |
| RALI 2007-QH6 | 74922AAB3 | $56,000,000.00 | $36,996,253.00 |
| RALI 2007-QH7 | 75115LAA5 | $45,957,480.00 | $30,899,122.00 |
| RALI 2007-QH9 | 749241AA3 | $102,885,000.00 | $78,363,668.81 |
| RALI 2007-QO1 | 75115YAA7 | $102,083,000.00 | $59,735,302.14 |
| RALI 2007-QO2 | 75116AAA8 | $88,030,000.00 | $51,729,339.74 |
| RALI 2007-QO2 | 75116AAB6 | $15,110,400.00 | $1,961,764.00 |
| RALI 2007-QO3 | 74923TAA3 | $63,615,000.00 | $38,905,015.60 |
| RALI 2007-QO3 | 74923TAC9 | $8,675,000.00 | $616,980.44 |
| RALI 2007-QO4 | 74923LAB8 | $53,700,000.00 | $32,730,845.05 |
| RALI 2007-QO4 | 74923LAC6 | $11,325,000.00 | $6,902,734.06 |
| RALI 2007-QO4 | 74923LAA0 | $3,250,000.00 | $1,980,917.06 |
| RALI 2007-QO4 | 74923LAD4 | $7,625,000.00 | $1,405,484.34 |
| RALI 2007-QS1 | 74922KAW5 | $430,044,970.00 | $230,346,205.11 |
| RALI 2007-QS1 | 74922KAH8 | $186,220,000.00 | $102,623,571.92 |
| RALI 2007-QS1 | 74922KAB1 | $34,499,000.00 | $25,666,406.90 |
| RALI 2007-QS1 | 74922KAQ8 | $28,309,600.00 | $13,441,990.34 |
| RALI 2007-QS1 | 74922KAX3 | $12,521,309.00 | $5,952,887.73 |
| RALI 2007-QS1 | 74922KAA3 | $15,000,000.00 | $4,871,042.36 |
| RALI 2007-QS1 | 74922KAD7 | $5,000,000.00 | $3,949,705.88 |
| RALI 2007-QS1 | 74922KAV7 | $1,462,542.00 | $746,434.93 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RALI 2007-QS10 | 74924DAA7 | $1,385,000.00 | $831,511.26 |
| RALI 2007-QS11 | 74925GAA9 | $1,925,000.00 | $1,060,502.07 |
| RALI 2007-QS2 | 74923CAD4 | $10,000,000.00 | $5,087,390.51 |
| RALI 2007-QS2 | 74923CAC6 | $3,200,000.00 | $2,452,121.99 |
| RALI 2007-QS3 | 75116BAB4 | $240,000,000.00 | $119,345,672.00 |
| RALI 2007-QS3 | 75116BAE8 | $39,000,000.00 | $30,661,109.71 |
| RALI 2007-QS4 | 74923HAX9 | $49,758,800.00 | $23,545,932.49 |
| RALI 2007-QS4 | 74923HAE1 | $39,661,000.00 | $20,632,988.04 |
| RALI 2007-QS4 | 74923HAM3 | $39,390,000.00 | $19,192,252.08 |
| RALI 2007-QS4 | 74923HAT8 | $23,203,000.00 | $18,859,618.00 |
| RALI 2007-QS4 | 74923HBA8 | $9,976,000.00 | $3,319,478.46 |
| RALI 2007-QS5 | 74923JAB3 | $100,000,000.00 | $67,741,718.36 |
| RALI 2007-QS5 | 74923JAH0 | $60,132,000.00 | $35,121,337.54 |
| RALI 2007-QS6 | 75116CAA4 | $143,200,000.00 | $76,856,023.56 |
| RALI 2007-QS6 | 75116CAM8 | $52,229,464.00 | $34,031,437.58 |
| RALI 2007-QS6 | 74923WAK4 | $55,127,000.00 | $29,693,716.77 |
| RALI 2007-QS6 | 75116CAF3 | $25,213,000.00 | $18,947,451.15 |
| RALI 2007-QS6 | 75116CBW5 | $20,000,000.00 | $9,250,604.24 |
| RALI 2007-QS6 | 75116CCP9 | $12,000,000.00 | $2,343,699.33 |
| RALI 2007-QS7 | 74923WAD0 | $43,289,000.00 | $35,231,826.19 |
| RALI 2007-QS7 | 74923WAE8 | $47,398,500.00 | $22,308,609.97 |
| RALI 2007-QS8 | 74922UAG8 | $149,706,000.00 | $84,999,326.00 |
| RALI 2007-QS8 | 74922UAD5 | $67,500,000.00 | $54,127,001.26 |
| RALI 2007-QS8 | 74922UAB9 | $80,869,000.00 | $48,267,531.82 |
| RALI 2007-QS8 | 74922UAA1 | $75,345,750.00 | $44,970,920.70 |
| RALI 2007-QS8 | 74922UAC7 | $48,500,000.00 | $38,891,252.76 |
| RALI 2007-QS8 | 74922UAK9 | $10,585,000.00 | $5,107,615.58 |
| RALI 2007-QS8 | 74922UAH6 | $9,000,000.00 | $4,879,220.92 |
| RALI 2007-QS8 | 74922UAN3 | $3,876,000.00 | $3,266,816.52 |
| RALI 2007-QS9 | 75116FBH1 | $125,543,462.00 | $73,847,619.44 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAMP 2004-RS1 | 760985M81 | $18,787,000.00 | $10,504,735.65 |
| RAMP 2004-RS1 | 760985M73 | $15,620,000.00 | $8,714,738.52 |
| RAMP 2004-RS1 | 760985N49 | $16,250,000.00 | $8,099,314.24 |
| RAMP 2004-RS10 | 76112BDT4 | $7,100,000.00 | $7,100,000.00 |
| RAMP 2004-RS10 | 76112BED8 | $5,000,000.00 | $4,466,167.04 |
| RAMP 2004-RS10 | 76112BDV9 | $250,000.00 | $201,745.48 |
| RAMP 2004-RS10 | 76112BDS6 | $10,285,000.00 | $193,886.84 |
| RAMP 2004-RS11 | 76112BFJ4 | $3,000,000.00 | $1,602,696.08 |
| RAMP 2004-RS11 | 76112BFK1 | $2,000,000.00 | $949,025.56 |
| RAMP 2004-RS12 | 76112BFV7 | $6,000,000.00 | $6,000,000.00 |
| RAMP 2004-RS12 | 76112BGG9 | $4,500,000.00 | $4,500,000.00 |
| RAMP 2004-RS12 | 76112BGF1 | $2,500,000.00 | $2,500,000.00 |
| RAMP 2004-RS12 | 76112BGD6 | $5,000,000.00 | $1,970,412.37 |
| RAMP 2004-RS2 | 760985Q38 | $37,636,000.00 | $27,858,421.88 |
| RAMP 2004-RS2 | 760985Q46 | $8,000,000.00 | $3,405,596.23 |
| RAMP 2004-RS2 | 760985Q61 | $4,000,000.00 | $2,052,757.42 |
| RAMP 2004-RS2 | 760985Q79 | $1,813,000.00 | $811,954.38 |
| RAMP 2004-RS3 | 760985V32 | $31,030,000.00 | $23,136,930.34 |
| RAMP 2004-RS4 | 7609852X8 | $39,042,000.00 | $27,967,608.06 |
| RAMP 2004-RS4 | 7609853J8 | $16,100,000.00 | $8,295,682.31 |
| RAMP 2004-RS4 | 7609852Y6 | $17,000,000.00 | $6,525,918.21 |
| RAMP 2004-RS5 | 7609854A6 | $35,000,000.00 | $32,700,643.15 |
| RAMP 2004-RS5 | 7609854H1 | $12,000,000.00 | $3,336,677.45 |
| RAMP 2004-RS5 | 7609854G3 | $5,000,000.00 | $2,493,091.93 |
| RAMP 2004-RS5 | 7609854K4 | $5,000,000.00 | $1,323,313.48 |
| RAMP 2004-RS5 | 7609854L2 | $2,500,000.00 | $38,743.75 |
| RAMP 2004-RS6 | 7609855B3 | $9,600,000.00 | $9,600,000.00 |
| RAMP 2004-RS6 | 7609855L1 | $15,000,000.00 | $7,309,699.69 |
| RAMP 2004-RS6 | 7609855M9 | $10,000,000.00 | $2,601,383.85 |
| RAMP 2004-RS6 | 7609855A5 | $498,000.00 | $78,442.97 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAMP 2004-RS7 | 7609857E5 | $7,000,000.00 | $6,974,642.27 |
| RAMP 2004-RS7 | 7609857K1 | $23,500,000.00 | $5,391,788.00 |
| RAMP 2004-RS7 | 7609857F2 | $2,000,000.00 | $969,387.95 |
| RAMP 2004-RS7 | 7609857D7 | $2,500,000.00 | $823,092.17 |
| RAMP 2004-RS8 | 76112BAE0 | $12,558,000.00 | $12,558,000.00 |
| RAMP 2004-RS8 | 76112BAM2 | $15,000,000.00 | $11,845,975.74 |
| RAMP 2004-RS9 | 76112BCM0 | $10,000,000.00 | $7,502,690.65 |
| RAMP 2004-RS9 | 76112BCG3 | $5,000,000.00 | $4,983,526.53 |
| RAMP 2004-RS9 | 76112BCQ1 | $4,200,000.00 | $953,082.87 |
| RAMP 2004-RZ1 | 760985U25 | $71,100,000.00 | $7,012,288.47 |
| RAMP 2004-RZ1 | 760985T92 | $19,533,000.00 | $6,722,418.53 |
| RAMP 2004-RZ1 | 760985T84 | $8,304,000.00 | $5,611,962.62 |
| RAMP 2004-RZ1 | 760985U58 | $6,487,000.00 | $2,272,796.22 |
| RAMP 2004-RZ1 | 760985U33 | $2,000,000.00 | $671,187.13 |
| RAMP 2004-RZ1 | 760985U66 | $2,000,000.00 | $584,166.15 |
| RAMP 2004-RZ2 | 7609854S7 | $7,500,000.00 | $2,706,475.59 |
| RAMP 2004-RZ3 | 76112BBK5 | $7,125,000.00 | $7,125,000.00 |
| RAMP 2004-RZ3 | 76112BAZ3 | $6,500,000.00 | $6,500,000.00 |
| RAMP 2004-RZ3 | 76112BAY6 | $6,000,000.00 | $1,437,110.87 |
| RAMP 2004-RZ4 | 76112BHF0 | $5,000,000.00 | $286,682.17 |
| RAMP 2004-SL1 | 760985W98 | $59,393,000.00 | $4,451,324.10 |
| RAMP 2004-SL1 | 760985W72 | $19,207,000.00 | $4,203,462.56 |
| RAMP 2004-SL1 | 760985X30 | $7,537,000.00 | $4,086,504.89 |
| RAMP 2004-SL1 | 760985W80 | $26,100,000.00 | $2,352,360.99 |
| RAMP 2004-SL1 | 760985Z53 | $3,913,200.00 | $1,434,146.17 |
| RAMP 2004-SL1 | 760985Z61 | $1,750,000.00 | $641,356.48 |
| RAMP 2004-SL1 | 760985Z79 | $1,206,600.00 | $442,206.18 |
| RAMP 2004-SL1 | 760985W31 | $4,456,000.00 | $324,387.89 |
| RAMP 2004-SL1 | 760985W56 | $3,800,000.00 | $117,989.18 |
| RAMP 2004-SL1 | 760985W49 | $12,430,000.00 | $72,000.97 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAMP 2004-SL2 | 7609856D8 | $76,187,665.00 | $12,461,237.03 |
| RAMP 2004-SL2 | 7609856L0 | $10,585,236.00 | $5,865,707.85 |
| RAMP 2004-SL2 | 7609856A4 | $37,152,866.00 | $596,695.63 |
| RAMP 2004-SL3 | 76112BBQ2 | $76,115,000.00 | $10,383,340.35 |
| RAMP 2004-SL3 | 76112BBS8 | $31,380,000.00 | $5,993,322.42 |
| RAMP 2004-SL3 | 76112BBR0 | $18,005,000.00 | $2,180,343.75 |
| RAMP 2004-SL3 | 76112BBZ2 | $2,449,000.00 | $1,694,219.49 |
| RAMP 2004-SL3 | 76112BBP4 | $12,967,000.00 | $442,622.92 |
| RAMP 2004-SL4 | 76112BGP9 | $23,390,000.00 | $5,758,786.10 |
| RAMP 2004-SL4 | 76112BGM6 | $16,560,000.00 | $2,199,077.62 |
| RAMP 2004-SL4 | 76112BGU8 | $2,065,900.00 | $1,333,007.01 |
| RAMP 2004-SL4 | 76112BGK0 | $9,000,000.00 | $270,565.02 |
| RAMP 2005-EFC1 | 76112BRN2 | $7,000,000.00 | $7,000,000.00 |
| RAMP 2005-EFC1 | 76112BRM4 | $6,000,000.00 | $6,000,000.00 |
| RAMP 2005-EFC1 | 76112BRQ5 | $4,000,000.00 | $4,000,000.00 |
| RAMP 2005-EFC2 | 76112BVW7 | $2,686,000.00 | $1,446,627.80 |
| RAMP 2005-EFC2 | 76112BVP2 | $8,423,000.00 | $1,411,499.91 |
| RAMP 2005-EFC2 | 76112BVQ0 | $1,331,000.00 | $1,331,000.00 |
| RAMP 2005-EFC3 | 76112BYU8 | $10,347,000.00 | $10,347,000.00 |
| RAMP 2005-EFC3 | 76112BYY0 | $6,000,000.00 | $6,000,000.00 |
| RAMP 2005-EFC3 | 76112BYV6 | $4,069,272.00 | $4,069,272.00 |
| RAMP 2005-EFC3 | 76112BYT1 | $9,626,000.00 | $3,911,256.23 |
| RAMP 2005-EFC3 | 76112BZA1 | $2,708,000.00 | $2,708,000.00 |
| RAMP 2005-EFC3 | 76112BZB9 | $4,625,000.00 | $164,013.99 |
| RAMP 2005-EFC4 | 76112BC40 | $7,000,000.00 | $7,000,000.00 |
| RAMP 2005-EFC4 | 76112BC99 | $4,000,000.00 | $4,000,000.00 |
| RAMP 2005-EFC4 | 76112BC32 | $53,237,500.00 | $290,553.86 |
| RAMP 2005-EFC5 | 76112BH94 | $10,000,000.00 | $10,000,000.00 |
| RAMP 2005-EFC5 | 76112BH60 | $6,000,000.00 | $6,000,000.00 |
| RAMP 2005-EFC5 | 76112BH86 | $5,000,000.00 | $5,000,000.00 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAMP 2005-EFC5 | 76112BH52 | $4,315,000.00 | $4,315,000.00 |
| RAMP 2005-EFC5 | 76112BH29 | $43,812,500.00 | $2,678,499.47 |
| RAMP 2005-EFC5 | 76112BH45 | $1,150,000.00 | $1,150,000.00 |
| RAMP 2005-EFC6 | 76112BK25 | $8,000,000.00 | $8,000,000.00 |
| RAMP 2005-EFC6 | 76112BJ84 | $2,000,000.00 | $110,644.68 |
| RAMP 2005-EFC7 | 76112BR69 | $35,000,000.00 | $12,084,337.06 |
| RAMP 2005-NC1 | 76112BQ94 | $62,423,000.00 | $25,177,881.59 |
| RAMP 2005-RS1 | 76112BHX1 | $10,000,000.00 | $10,000,000.00 |
| RAMP 2005-RS1 | 76112BJH4 | $10,000,000.00 | $7,377,835.23 |
| RAMP 2005-RS1 | 76112BJG6 | $9,690,000.00 | $5,983,691.73 |
| RAMP 2005-RS1 | 76112BHY9 | $4,165,000.00 | $2,546,583.13 |
| RAMP 2005-RS1 | 76112BHW3 | $8,139,000.00 | $2,335,511.15 |
| RAMP 2005-RS1 | 76112BHZ6 | $2,300,000.00 | $2,167,784.09 |
| RAMP 2005-RS1 | 76112BJB7 | $1,500,000.00 | $594,015.49 |
| RAMP 2005-RS2 | 76112BKE9 | $3,938,000.00 | $3,938,000.00 |
| RAMP 2005-RS2 | 76112BKF6 | $3,688,000.00 | $3,603,074.99 |
| RAMP 2005-RS2 | 76112BKC3 | $390,000.00 | $390,000.00 |
| RAMP 2005-RS3 | 76112BLH1 | $10,487,000.00 | $10,487,000.00 |
| RAMP 2005-RS3 | 76112BLP3 | $5,587,000.00 | $5,587,000.00 |
| RAMP 2005-RS3 | 76112BLK4 | $4,906,000.00 | $4,906,000.00 |
| RAMP 2005-RS3 | 76112BLJ7 | $4,625,000.00 | $4,625,000.00 |
| RAMP 2005-RS3 | 76112BLN8 | $2,000,000.00 | $2,000,000.00 |
| RAMP 2005-RS4 | 76112BPA2 | $14,660,000.00 | $6,228,978.94 |
| RAMP 2005-RS4 | 76112BPC8 | $5,000,000.00 | $5,000,000.00 |
| RAMP 2005-RS4 | 76112BPF1 | $3,000,000.00 | $3,000,000.00 |
| RAMP 2005-RS4 | 76112BPE4 | $2,500,000.00 | $2,500,000.00 |
| RAMP 2005-RS5 | 76112BPU8 | $20,289,000.00 | $12,169,437.02 |
| RAMP 2005-RS5 | 76112BPX2 | $11,500,000.00 | $11,500,000.00 |
| RAMP 2005-RS5 | 76112BPY0 | $8,750,000.00 | $8,750,000.00 |
| RAMP 2005-RS5 | 76112BPW4 | $3,000,000.00 | $3,000,000.00 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAMP 2005-RS5 | 76112BPZ7 | $2,500,000.00 | $2,500,000.00 |
| RAMP 2005-RS5 | 76112BQA1 | $2,500,000.00 | $2,500,000.00 |
| RAMP 2005-RS6 | 76112BTS9 | $4,300,000.00 | $4,300,000.00 |
| RAMP 2005-RS6 | 76112BTU4 | $944,044.00 | $944,044.00 |
| RAMP 2005-RS7 | 76112BWV8 | $40,000,000.00 | $40,000,000.00 |
| RAMP 2005-RS7 | 76112BWU0 | $2,000,000.00 | $15,006.49 |
| RAMP 2005-RS8 | 76112BZF0 | $178,300,000.00 | $18,079,197.61 |
| RAMP 2005-RS8 | 76112BZK9 | $10,000,000.00 | $10,000,000.00 |
| RAMP 2005-RS8 | 76112BZL7 | $3,983,000.00 | $3,983,000.00 |
| RAMP 2005-RS8 | 76112BZM5 | $3,650,000.00 | $3,333,200.24 |
| RAMP 2005-RS9 | 76112BL81 | $10,000,000.00 | $8,144,162.23 |
| RAMP 2005-RZ1 | 76112BMC1 | $3,075,000.00 | $2,098,810.64 |
| RAMP 2005-RZ3 | 76112BA42 | $7,350,000.00 | $7,350,000.00 |
| RAMP 2005-RZ3 | 76112BZZ6 | $5,613,000.00 | $5,613,000.00 |
| RAMP 2005-RZ3 | 76112BZY9 | $7,026,430.00 | $950,568.84 |
| RAMP 2005-RZ4 | 76112BN48 | $10,000,000.00 | $9,281,295.50 |
| RAMP 2005-RZ4 | 76112BM72 | $26,754,000.00 | $5,856,793.31 |
| RAMP 2005-SL1 | 76112BMS6 | $76,216,000.00 | $20,669,574.90 |
| RAMP 2005-SL1 | 76112BMQ0 | $34,244,200.00 | $5,363,872.76 |
| RAMP 2005-SL1 | 76112BMR8 | $19,354,700.00 | $3,673,290.70 |
| RAMP 2005-SL1 | 76112BMX5 | $4,076,800.00 | $2,888,121.24 |
| RAMP 2005-SL1 | 76112BMY3 | $3,520,100.00 | $1,920,074.18 |
| RAMP 2005-SL1 | 76112BMM9 | $2,475,000.00 | $166,513.03 |
| RAMP 2005-SL2 | 76112BUZ1 | $22,145,000.00 | $6,373,354.89 |
| RAMP 2005-SL2 | 76112BUW8 | $24,780,000.00 | $4,107,671.07 |
| RAMP 2005-SL2 | 76112BVE7 | $3,802,100.00 | $2,445,045.16 |
| RAMP 2005-SL2 | 76112BVF4 | $3,039,400.00 | $1,963,527.92 |
| RAMP 2005-SL2 | 76112BUX6 | $7,350,000.00 | $1,926,493.93 |
| RAMP 2005-SL2 | 76112BUY4 | $2,519,000.00 | $657,614.11 |
| RAMP 2005-SL2 | 76112BUV0 | $7,000,000.00 | $303,221.92 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAMP 2005-SL2 | 76112BVB3 | $1,390,306.00 | $184,320.85 |
| RAMP 2006-EFC1 | 76112BW22 | $5,490,000.00 | $5,490,000.00 |
| RAMP 2006-EFC1 | 76112BW30 | $4,941,000.00 | $2,258,349.62 |
| RAMP 2006-EFC2 | 749238AB7 | $28,640,000.00 | $1,517,991.00 |
| RAMP 2006-NC1 | 76112BW97 | $132,750,000.00 | $26,358,652.87 |
| RAMP 2006-NC1 | 76112BX21 | $16,044,500.00 | $16,044,500.00 |
| RAMP 2006-NC1 | 76112BX39 | $5,640,000.00 | $5,640,000.00 |
| RAMP 2006-NC2 | 75156TAB6 | $177,000,000.00 | $54,784,911.58 |
| RAMP 2006-NC2 | 75156TAC4 | $8,650,000.00 | $8,650,000.00 |
| RAMP 2006-NC2 | 75156TAD2 | $4,720,000.00 | $4,720,000.00 |
| RAMP 2006-NC2 | 75156TAE0 | $4,180,000.00 | $4,180,000.00 |
| RAMP 2006-NC2 | 75156TAF7 | $3,000,000.00 | $1,661,418.67 |
| RAMP 2006-NC3 | 76112B4M9 | $67,650,000.00 | $24,337,082.03 |
| RAMP 2006-RS1 | 76112BT83 | $142,400,000.00 | $40,984,787.83 |
| RAMP 2006-RS1 | 76112BU32 | $10,000,000.00 | $9,480,809.20 |
| RAMP 2006-RS2 | 76112B2C3 | $214,820,000.00 | $58,010,800.41 |
| RAMP 2006-RS2 | 76112B2E9 | $4,400,000.00 | $4,400,000.00 |
| RAMP 2006-RS2 | 76112B2F6 | $3,800,000.00 | $2,623,297.82 |
| RAMP 2006-RS3 | 75156VAC9 | $75,000,000.00 | $46,815,957.76 |
| RAMP 2006-RS4 | 75156WAC7 | $114,300,000.00 | $78,293,576.05 |
| RAMP 2006-RS4 | 75156WAD5 | $34,312,810.00 | $34,312,810.00 |
| RAMP 2006-RS4 | 75156WAF0 | $10,000,000.00 | $8,272,962.37 |
| RAMP 2006-RS5 | 75156YAC3 | $60,000,000.00 | $33,902,496.85 |
| RAMP 2006-RS6 | 75156QAD8 | $30,000,000.00 | $24,735,661.96 |
| RAMP 2006-RS6 | 75156QAC0 | $29,896,749.00 | $23,103,490.41 |
| RAMP 2006-RZ1 | 76112BY87 | $66,402,000.00 | $9,462,919.04 |
| RAMP 2006-RZ1 | 76112BZ29 | $8,000,000.00 | $8,000,000.00 |
| RAMP 2006-RZ1 | 76112BZ78 | $4,000,000.00 | $1,457,622.54 |
| RAMP 2006-RZ2 | 75156UAB3 | $30,044,000.00 | $11,208,239.22 |
| RAMP 2006-RZ3 | 75156MAB1 | $73,066,000.00 | $37,281,085.61 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RAMP 2006-RZ3 | 75156MAD7 | $28,200,000.00 | $28,200,000.00 |
| RAMP 2006-RZ3 | 75156MAE5 | $2,000,000.00 | $2,000,000.00 |
| RAMP 2006-RZ3 | 75156MAF2 | $7,000,000.00 | $1,654,046.15 |
| RAMP 2006-RZ4 | 75156XAB7 | $190,256,318.55 | $107,160,858.53 |
| RAMP 2006-RZ4 | 75156XAD3 | $46,910,000.00 | $46,910,000.00 |
| RAMP 2006-RZ4 | 75156XAE1 | $30,080,000.00 | $30,080,000.00 |
| RAMP 2006-RZ4 | 75156XAF8 | $18,480,000.00 | $6,906,503.91 |
| RAMP 2006-RZ4 | 75156XAC5 | $4,340,620.00 | $4,340,620.00 |
| RAMP 2006-RZ5 | 749239AD1 | $6,400,000.00 | $4,341,988.16 |
| RAMP 2007-RS1 | 74923RAC3 | $124,951,000.00 | $122,382,552.82 |
| RAMP 2007-RS1 | 74923RAD1 | $52,287,000.00 | $52,287,000.00 |
| RAMP 2007-RS2 | 75157DAB0 | $11,000,000.00 | $11,000,000.00 |
| RAMP 2007-RS2 | 75157DAA2 | $92,422,000.00 | $1,357,531.55 |
| RAMP 2007-RZ1 | 74923PAB9 | $645,000.00 | $568,928.73 |
| RASC 2004-KS1 | 74924PAM4 | $15,000,000.00 | $5,688,468.09 |
| RASC 2004-KS1 | 74924PAE2 | $5,600,000.00 | $5,600,000.00 |
| RASC 2004-KS1 | 74924PAJ1 | $5,600,000.00 | $2,170,170.60 |
| RASC 2004-KS1 | 74924PAH5 | $1,200,000.00 | $432,225.48 |
| RASC 2004-KS1 | 74924PAN2 | $250,000.00 | $27,172.46 |
| RASC 2004-KS10 | 76110WF84 | $13,614,000.00 | $10,272,334.60 |
| RASC 2004-KS10 | 76110WG34 | $7,000,000.00 | $4,282,973.02 |
| RASC 2004-KS10 | 76110WG26 | $9,000,000.00 | $248,459.26 |
| RASC 2004-KS12 | 76110WK88 | $5,180,000.00 | $3,701,602.32 |
| RASC 2004-KS2 | 76110WWF9 | $7,500,000.00 | $7,500,000.00 |
| RASC 2004-KS2 | 76110WWG7 | $4,650,000.00 | $2,488,695.18 |
| RASC 2004-KS2 | 76110WWJ1 | $5,375,000.00 | $2,221,100.75 |
| RASC 2004-KS2 | 76110WWK8 | $4,925,000.00 | $2,035,147.86 |
| RASC 2004-KS2 | 76110WWN2 | $5,000,000.00 | $1,910,537.87 |
| RASC 2004-KS2 | 76110WWH5 | $4,000,000.00 | $1,646,616.79 |
| RASC 2004-KS2 | 76110WWP7 | $5,000,000.00 | $640,050.65 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RASC 2004-KS2 | 76110WWE2 | $2,500,000.00 | $497,509.89 |
| RASC 2004-KS2 | 76110WWQ5 | $4,000,000.00 | $485,550.23 |
| RASC 2004-KS3 | 76110WWY8 | $8,750,000.00 | $8,750,000.00 |
| RASC 2004-KS3 | 76110WXF8 | $8,375,000.00 | $4,453,747.86 |
| RASC 2004-KS3 | 76110WXG6 | $10,000,000.00 | $1,261,444.30 |
| RASC 2004-KS3 | 76110WXH4 | $4,000,000.00 | $684,922.67 |
| RASC 2004-KS3 | 76110WWX0 | $1,150,000.00 | $263,332.71 |
| RASC 2004-KS4 | 76110WXR2 | $9,700,000.00 | $9,700,000.00 |
| RASC 2004-KS5 | 76110WYM2 | $22,000,000.00 | $13,257,445.50 |
| RASC 2004-KS5 | 76110WYD2 | $6,500,000.00 | $6,500,000.00 |
| RASC 2004-KS5 | 76110WYF7 | $8,500,000.00 | $4,163,788.62 |
| RASC 2004-KS5 | 76110WYG5 | $6,000,000.00 | $2,950,022.79 |
| RASC 2004-KS5 | 76110WYN0 | $10,000,000.00 | $1,839,241.73 |
| RASC 2004-KS5 | 76110WYC4 | $3,000,000.00 | $1,206,793.58 |
| RASC 2004-KS5 | 76110WYP5 | $14,500,000.00 | $865,310.17 |
| RASC 2004-KS6 | 76110WZX7 | $30,000,000.00 | $17,747,971.60 |
| RASC 2004-KS6 | 76110WZN9 | $6,617,000.00 | $6,617,000.00 |
| RASC 2004-KS6 | 76110WZY5 | $10,000,000.00 | $2,074,463.58 |
| RASC 2004-KS6 | 76110WZU3 | $3,750,000.00 | $1,977,420.69 |
| RASC 2004-KS6 | 76110WZV1 | $2,750,000.00 | $1,855,137.45 |
| RASC 2004-KS6 | 76110WZP4 | $3,000,000.00 | $1,638,231.02 |
| RASC 2004-KS8 | 76110WD52 | $3,700,000.00 | $2,100,986.84 |
| RASC 2004-KS8 | 76110WC79 | $3,000,000.00 | $1,522,638.57 |
| RASC 2004-KS8 | 76110WC95 | $2,300,000.00 | $1,461,157.45 |
| RASC 2004-KS9 | 76110WE69 | $11,000,000.00 | $11,000,000.00 |
| RASC 2004-KS9 | 76110WF35 | $55,700,000.00 | $3,580,968.41 |
| RASC 2004-KS9 | 76110WE51 | $9,000,000.00 | $2,798,705.96 |
| RASC 2005-AHL1 | 76110W4G8 | $3,564,000.00 | $3,564,000.00 |
| RASC 2005-AHL1 | 76110W4E3 | $3,000,000.00 | $3,000,000.00 |
| RASC 2005-AHL1 | 76110W4K9 | $2,112,000.00 | $1,073,321.57 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RASC 2005-AHL1 | 76110W4J2 | $500,000.00 | $500,000.00 |
| RASC 2005-AHL1 | 76110W4D5 | $16,500,000.00 | $225,410.86 |
| RASC 2005-AHL2 | 76110W5G7 | $12,150,000.00 | $12,150,000.00 |
| RASC 2005-AHL2 | 76110W5J1 | $2,200,000.00 | $2,200,000.00 |
| RASC 2005-AHL2 | 76110W5K8 | $1,500,000.00 | $1,500,000.00 |
| RASC 2005-AHL3 | 76110W6L5 | $49,000,000.00 | $8,762,120.45 |
| RASC 2005-EMX1 | 76110WQ66 | $7,500,000.00 | $2,441,957.10 |
| RASC 2005-EMX2 | 76110W2G0 | $8,274,837.00 | $8,274,837.00 |
| RASC 2005-EMX2 | 76110W2J4 | $6,839,000.00 | $6,839,000.00 |
| RASC 2005-EMX3 | 75405MAK0 | $5,000,000.00 | $5,000,000.00 |
| RASC 2005-EMX3 | 75405MAF1 | $1,000,000.00 | $978,212.49 |
| RASC 2005-EMX4 | 76110W6E1 | $10,000,000.00 | $8,958,505.52 |
| RASC 2005-EMX4 | 76110W5X0 | $24,140,000.00 | $608,980.59 |
| RASC 2005-KS1 | 76110WM37 | $12,350,000.00 | $10,255,314.10 |
| RASC 2005-KS10 | 75405WAC6 | $12,372,000.00 | $12,372,000.00 |
| RASC 2005-KS10 | 75405WAF9 | $6,500,000.00 | $6,500,000.00 |
| RASC 2005-KS10 | 75405WAH5 | $6,500,000.00 | $6,500,000.00 |
| RASC 2005-KS10 | 75405WAE2 | $5,160,000.00 | $5,160,000.00 |
| RASC 2005-KS10 | 75405WAJ1 | $5,000,000.00 | $4,260,613.89 |
| RASC 2005-KS10 | 75405WAG7 | $4,000,000.00 | $4,000,000.00 |
| RASC 2005-KS10 | 75405WAB8 | $5,000,000.00 | $335,253.03 |
| RASC 2005-KS11 | 76110W7D2 | $7,000,000.00 | $7,000,000.00 |
| RASC 2005-KS11 | 76110W7E0 | $5,750,000.00 | $5,750,000.00 |
| RASC 2005-KS11 | 76110W7A8 | $23,969,000.00 | $518,815.34 |
| RASC 2005-KS12 | 753910AB4 | $167,090,000.00 | $21,262,557.03 |
| RASC 2005-KS12 | 753910AD0 | $5,535,000.00 | $5,535,000.00 |
| RASC 2005-KS12 | 753910AC2 | $5,087,000.00 | $5,087,000.00 |
| RASC 2005-KS2 | 76110WN69 | $10,000,000.00 | $8,517,521.32 |
| RASC 2005-KS3 | 76110WS31 | $3,000,000.00 | $2,774,174.72 |
| RASC 2005-KS3 | 76110WS72 | $1,600,000.00 | $1,107,505.79 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RASC 2005-KS3 | 76110WS98 | $1,000,000.00 | $215,051.64 |
| RASC 2005-KS4 | 76110WU61 | $11,427,000.00 | $8,646,818.79 |
| RASC 2005-KS4 | 76110WU87 | $500,000.00 | $500,000.00 |
| RASC 2005-KS4 | 76110WV37 | $1,000,000.00 | $81,229.91 |
| RASC 2005-KS5 | 76110WW77 | $2,762,000.00 | $2,762,000.00 |
| RASC 2005-KS5 | 76110WW69 | $5,406,000.00 | $2,619,680.96 |
| RASC 2005-KS5 | 76110WX43 | $2,198,000.00 | $2,198,000.00 |
| RASC 2005-KS5 | 76110WX35 | $1,811,000.00 | $1,811,000.00 |
| RASC 2005-KS5 | 76110WX50 | $1,702,000.00 | $778,032.96 |
| RASC 2005-KS6 | 76110WY75 | $4,000,000.00 | $4,000,000.00 |
| RASC 2005-KS6 | 76110WZ25 | $3,500,000.00 | $3,500,000.00 |
| RASC 2005-KS6 | 76110WY91 | $2,500,000.00 | $2,500,000.00 |
| RASC 2005-KS6 | 76110WY83 | $1,750,000.00 | $1,750,000.00 |
| RASC 2005-KS6 | 76110WY67 | $3,292,000.00 | $1,349,242.59 |
| RASC 2005-KS7 | 76110W2Z8 | $4,001,000.00 | $4,001,000.00 |
| RASC 2005-KS7 | 76110W3C8 | $4,000,000.00 | $4,000,000.00 |
| RASC 2005-KS7 | 76110W2X3 | $3,402,000.00 | $3,168,683.66 |
| RASC 2005-KS7 | 76110W3B0 | $2,000,000.00 | $2,000,000.00 |
| RASC 2005-KS7 | 76110W2Y1 | $1,202,000.00 | $1,202,000.00 |
| RASC 2005-KS7 | 76110W2V7 | $10,000,000.00 | $0.00 |
| RASC 2005-KS8 | 76110W3T1 | $7,000,000.00 | $7,000,000.00 |
| RASC 2005-KS8 | 76110W3X2 | $5,900,000.00 | $5,900,000.00 |
| RASC 2005-KS8 | 76110W3S3 | $5,500,000.00 | $5,500,000.00 |
| RASC 2005-KS8 | 76110W3U8 | $3,500,000.00 | $3,500,000.00 |
| RASC 2005-KS9 | 754058AL9 | $3,250,000.00 | $3,250,000.00 |
| RASC 2005-KS9 | 754058AG0 | $3,000,000.00 | $3,000,000.00 |
| RASC 2005-KS9 | 754058AF2 | $1,779,941.00 | $1,779,941.00 |
| RASC 2005-KS9 | 754058AB1 | $28,000,000.00 | $0.00 |
| RASC 2006-EMX1 | 75405KAG3 | $3,140,000.00 | $3,140,000.00 |
| RASC 2006-EMX1 | 75405KAF5 | $3,020,000.00 | $3,020,000.00 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RASC 2006-EMX1 | 75405KAB4 | $8,400,000.00 | $1,118,039.34 |
| RASC 2006-EMX2 | 75406AAC3 | $16,596,000.00 | $16,596,000.00 |
| RASC 2006-EMX2 | 75406AAB5 | $60,139,000.00 | $13,559,341.24 |
| RASC 2006-EMX2 | 75406AAD1 | $6,000,000.00 | $6,000,000.00 |
| RASC 2006-EMX3 | 76113ABZ3 | $240,966,000.00 | $81,498,726.85 |
| RASC 2006-EMX4 | 75406DAC7 | $50,000,000.00 | $35,660,535.05 |
| RASC 2006-EMX5 | 74924QAC4 | $50,000,000.00 | $40,627,360.38 |
| RASC 2006-EMX6 | 754065AC4 | $22,070,000.00 | $21,903,194.98 |
| RASC 2006-EMX6 | 754065AE0 | $11,800,000.00 | $11,800,000.00 |
| RASC 2006-EMX6 | 754065AF7 | $5,250,000.00 | $1,977,875.46 |
| RASC 2006-EMX7 | 74924TAC8 | $49,437,000.00 | $49,437,000.00 |
| RASC 2006-EMX8 | 74924UAC5 | $41,325,000.00 | $41,325,000.00 |
| RASC 2006-EMX8 | 74924UAB7 | $62,403,000.00 | $15,957,746.09 |
| RASC 2006-EMX9 | 74924VAC3 | $19,350,000.00 | $19,350,000.00 |
| RASC 2006-EMX9 | 74924VAD1 | $10,000,000.00 | $10,000,000.00 |
| RASC 2006-KS1 | 76113AAF8 | $26,783,000.00 | $26,783,000.00 |
| RASC 2006-KS1 | 76113AAE1 | $66,000,000.00 | $15,482,646.26 |
| RASC 2006-KS1 | 76113AAG6 | $12,581,240.00 | $12,581,240.00 |
| RASC 2006-KS1 | 76113AAH4 | $5,000,000.00 | $5,000,000.00 |
| RASC 2006-KS1 | 76113AAK7 | $4,500,000.00 | $4,500,000.00 |
| RASC 2006-KS2 | 75406BAF4 | $23,500,000.00 | $23,500,000.00 |
| RASC 2006-KS2 | 75406BAE7 | $14,230,000.00 | $14,230,000.00 |
| RASC 2006-KS2 | 75406BAC1 | $35,996,000.00 | $8,724,635.75 |
| RASC 2006-KS2 | 75406BAG2 | $7,000,000.00 | $7,000,000.00 |
| RASC 2006-KS2 | 75406BAJ6 | $2,500,000.00 | $743,081.43 |
| RASC 2006-KS3 | 76113ABJ9 | $13,000,000.00 | $13,000,000.00 |
| RASC 2006-KS3 | 76113ABL4 | $12,700,000.00 | $12,700,000.00 |
| RASC 2006-KS3 | 76113ABH3 | $25,860,000.00 | $7,629,300.26 |
| RASC 2006-KS3 | 76113ABM2 | $7,500,000.00 | $7,500,000.00 |
| RASC 2006-KS4 | 75406EAC5 | $32,000,000.00 | $17,265,755.42 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RASC 2006-KS4 | 75406EAD3 | $17,038,000.00 | $17,038,000.00 |
| RASC 2006-KS5 | 75406VAC7 | $84,000,000.00 | $68,431,902.21 |
| RASC 2006-KS5 | 75406VAD5 | $26,928,000.00 | $26,928,000.00 |
| RASC 2006-KS5 | 75406VAE3 | $12,300,000.00 | $12,300,000.00 |
| RASC 2006-KS6 | 75406WAC5 | $36,634,000.00 | $30,637,551.16 |
| RASC 2006-KS6 | 75406WAE1 | $9,000,000.00 | $9,000,000.00 |
| RASC 2006-KS6 | 75406WAG6 | $8,887,000.00 | $5,977,851.33 |
| RASC 2006-KS6 | 75406WAF8 | $2,000,000.00 | $2,000,000.00 |
| RASC 2006-KS7 | 75406XAC3 | $44,647,000.00 | $38,240,894.29 |
| RASC 2006-KS8 | 74924RAC2 | $83,565,000.00 | $83,565,000.00 |
| RASC 2006-KS8 | 74924RAD0 | $58,063,000.00 | $58,063,000.00 |
| RASC 2006-KS8 | 74924RAE8 | $20,112,000.00 | $20,112,000.00 |
| RASC 2006-KS8 | 74924RAF5 | $18,183,000.00 | $9,175,572.46 |
| RASC 2006-KS9 | 75406YAC1 | $65,000,000.00 | $65,000,000.00 |
| RASC 2006-KS9 | 75406YAB3 | $15,000,000.00 | $5,748,734.94 |
| RASC 2007-KS1 | 74924SAC0 | $13,600,000.00 | $13,600,000.00 |
| RASC 2007-KS1 | 74924SAF3 | $2,200,000.00 | $1,165,088.05 |
| RASC 2007-KS2 | 74924WAC1 | $20,515,000.00 | $20,515,000.00 |
| RASC 2007-KS2 | 74924WAB3 | $2,500,000.00 | $2,053,337.73 |
| RASC 2007-KS3 | 74924YAC7 | $59,000,000.00 | $59,000,000.00 |
| RASC 2007-KS3 | 74924YAB9 | $50,082,000.00 | $46,323,949.39 |
| RASC 2007-KS4 | 74924NAB3 | $17,500,000.00 | $17,500,000.00 |
| RASC 2007-KS4 | 74924NAA5 | $50,210,000.00 | $1,632,885.32 |
| RASC 2007-KS4 | 74924NAF4 | $800,000.00 | $595,300.37 |
| RFMS2 2004-HI1 | 76110VPR3 | $12,774,000.00 | $5,375,864.86 |
| RFMS2 2004-HI1 | 76110VPT9 | $6,615,000.00 | $1,456,111.01 |
| RFMS2 2004-HI1 | 76110VPU6 | $3,400,000.00 | $751,602.81 |
| RFMS2 2004-HI1 | 76110VPV4 | $2,350,000.00 | $519,490.16 |
| RFMS2 2004-HI1 | 76110VPS1 | $2,000,000.00 | $431,477.93 |
| RFMS2 2004-HI1 | 76110VPW2 | $1,125,000.00 | $248,692.11 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RFMS2 2004-HI2 | 76110VQS0 | $20,161,000.00 | $9,843,248.50 |
| RFMS2 2004-HS1 | 76110VQC5 | $15,000,000.00 | $3,704,850.20 |
| RFMS2 2004-HS2 | 76110VQM3 | $89,000,000.00 | $4,891,352.74 |
| RFMS2 2004-HS2 | 76110VQJ0 | $10,000,000.00 | $1,279,156.28 |
| RFMS2 2005-HI1 | 76110VRD2 | $8,000,000.00 | $5,222,408.91 |
| RFMS2 2005-HI2 | 76110VRJ9 | $10,154,000.00 | $9,898,144.21 |
| RFMS2 2005-HI2 | 76110VRK6 | $1,000,000.00 | $462,390.21 |
| RFMS2 2005-HI3 | 76110VSG4 | $12,425,000.00 | $12,425,000.00 |
| RFMS2 2005-HI3 | 76110VSF6 | $2,325,000.00 | $2,325,000.00 |
| RFMS2 2005-HS1 | 76110VRX8 | $75,000.00 | $75,000.00 |
| RFMS2 2005-HSA1 | 76110VSY5 | $20,544,000.00 | $17,135,868.39 |
| RFMS2 2006-HI1 | 76110VTV0 | $17,614,000.00 | $2,344,608.40 |
| RFMS2 2006-HI1 | 76110VUE6 | $2,850,000.00 | $1,546,289.62 |
| RFMS2 2006-HI2 | 437185AC5 | $1,200,000.00 | $839,102.88 |
| RFMS2 2006-HI3 | 43718NAC6 | $28,586,000.00 | $20,121,732.33 |
| RFMS2 2006-HI4 | 43718MAD6 | $15,000,000.00 | $15,000,000.00 |
| RFMS2 2006-HSA1 | 76110VTF5 | $167,000.00 | $136,765.03 |
| RFMS2 2006-HSA1 | 76110VTE8 | $155,000.00 | $118,648.19 |
| RFMS2 2006-HSA2 | 76110VTR9 | $14,715,000.00 | $11,361,763.69 |
| RFMS2 2006-HSA2 | 76110VTQ1 | $7,095,000.00 | $7,095,000.00 |
| RFMS2 2006-HSA2 | 76110VTS7 | $982,000.00 | $188,532.63 |
| RFMS2 2006-HSA2 | 76110VTP3 | $125,000.00 | $104,019.92 |
| RFMS2 2006-HSA3 | 76113JAA0 | $28,340,000.00 | $3,990,692.56 |
| RFMS2 2007-HI1 | 43718WAC6 | $7,550,000.00 | $7,550,000.00 |
| RFMS2 2007-HSA2 | 43710RAG6 | $44,000,000.00 | $41,351,102.76 |
| RFMS2 2007-HSA2 | 43710RAF8 | $35,478,000.00 | $35,478,000.00 |
| RFMS2 2007-HSA3 | 43710WAF7 | $31,124,000.00 | $29,517,173.99 |
| RFMS2 2007-HSA3 | 43710WAE0 | $15,000,000.00 | $15,000,000.00 |
| RFMSI 2004-S1 | 76111XFD0 | $18,000,000.00 | $27,489,967.95 |
| RFMSI 2004-S1 | 76111XFP3 | $923,100.00 | $518,269.40 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RFMSI 2004-S4 | 76111XHA4 | $21,141,000.00 | $19,887,000.00 |
| RFMSI 2004-S4 | 76111XHD8 | $19,898,000.00 | $10,033,772.06 |
| RFMSI 2004-S4 | 76111XHZ9 | $4,314,300.00 | $2,392,797.85 |
| RFMSI 2004-S4 | 76111XJB0 | $616,400.00 | $341,867.88 |
| RFMSI 2004-S5 | 76111XJW4 | $16,913,000.00 | $25,493,807.08 |
| RFMSI 2004-S6 | 76111XNB5 | $155,008,185.00 | $24,602,302.03 |
| RFMSI 2004-S6 | 76111XLX9 | $17,415,332.00 | $12,180,540.23 |
| RFMSI 2004-S6 | 76111XLZ4 | $10,553,000.00 | $10,553,000.00 |
| RFMSI 2004-S7 | 76111XNQ2 | $105,288.00 | $41,243.93 |
| RFMSI 2004-S8 | 76111XNZ2 | $15,300,000.00 | $23,090,241.73 |
| RFMSI 2004-S8 | 76111XNU3 | $15,000,000.00 | $10,793,439.93 |
| RFMSI 2004-S9 | 76111XRD7 | $32,000,000.00 | $24,057,029.27 |
| RFMSI 2004-S9 | 76111XRB1 | $19,800,000.00 | $19,800,000.00 |
| RFMSI 2004-S9 | 76111XRL9 | $127,000,000.00 | $19,672,338.67 |
| RFMSI 2004-S9 | 76111XRG0 | $3,660,000.00 | $562,571.06 |
| RFMSI 2005-S1 | 76111XSK0 | $203,320,667.00 | $30,158,419.03 |
| RFMSI 2005-S1 | 76111XRX3 | $100,000,000.00 | $14,886,339.31 |
| RFMSI 2005-S2 | 76111XTR4 | $23,903,000.00 | $20,013,781.66 |
| RFMSI 2005-S3 | 76111XUG6 | $89,368,000.00 | $14,799,184.98 |
| RFMSI 2005-S5 | 76111XWT6 | $12,310,000.00 | $10,396,236.97 |
| RFMSI 2005-S6 | 76111XXN8 | $28,000,000.00 | $23,795,750.59 |
| RFMSI 2005-S6 | 76111XXR9 | $24,475,000.00 | $8,742,085.13 |
| RFMSI 2005-S6 | 76111XXQ1 | $58,900,000.00 | $7,977,883.09 |
| RFMSI 2005-S7 | 76111XZR7 | $30,690,000.00 | $5,421,925.58 |
| RFMSI 2005-S7 | 76111XA29 | $1,547,234.00 | $710,499.12 |
| RFMSI 2005-S7 | 76111XZV8 | $2,015,000.00 | $355,985.03 |
| RFMSI 2005-S8 | 76111XC76 | $29,879,000.00 | $27,926,722.41 |
| RFMSI 2005-S8 | 76111XC50 | $100,000,000.00 | $25,497,258.50 |
| RFMSI 2005-S8 | 76111XC68 | $12,673,000.00 | $12,673,000.00 |
| RFMSI 2005-S9 | 76111XF65 | $366,598,962.00 | $132,761,150.93 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RFMSI 2005-S9 | 76111XF24 | $15,000,000.00 | $15,000,000.00 |
| RFMSI 2005-S9 | 76111XE90 | $10,000,000.00 | $14,091,189.32 |
| RFMSI 2005-S9 | 76111XE33 | $49,879,000.00 | $13,928,476.46 |
| RFMSI 2005-S9 | 76111XF57 | $3,504,096.00 | $1,510,686.83 |
| RFMSI 2005-S9 | 76111XF99 | $5,300,000.00 | $733,021.98 |
| RFMSI 2005-SA1 | 76111XTF0 | $75,000,000.00 | $15,048,069.15 |
| RFMSI 2005-SA1 | 76111XTB9 | $50,000,000.00 | $5,413,251.20 |
| RFMSI 2005-SA1 | 76111XTC7 | $21,040,000.00 | $2,277,896.16 |
| RFMSI 2005-SA2 | 76111XVL4 | $33,760,000.00 | $11,277,484.98 |
| RFMSI 2005-SA2 | 76111XVJ9 | $10,075,000.00 | $6,473,238.80 |
| RFMSI 2005-SA2 | 76111XVE0 | $7,455,000.00 | $1,761,469.27 |
| RFMSI 2005-SA2 | 76111XVG5 | $1,000,000.00 | $1,000,000.00 |
| RFMSI 2005-SA3 | 76111XVZ3 | $69,930,000.00 | $20,570,507.34 |
| RFMSI 2005-SA3 | 76111XWE9 | $35,000,000.00 | $11,344,114.94 |
| RFMSI 2005-SA3 | 76111XWF6 | $10,804,000.00 | $6,833,798.54 |
| RFMSI 2005-SA4 | 76111XYD9 | $82,781,000.00 | $41,979,229.93 |
| RFMSI 2005-SA4 | 76111XYJ6 | $69,500,000.00 | $27,032,890.62 |
| RFMSI 2005-SA4 | 76111XYH0 | $65,000,000.00 | $25,776,283.51 |
| RFMSI 2005-SA4 | 76111XYF4 | $17,530,000.00 | $7,659,100.73 |
| RFMSI 2005-SA4 | 76111XYC1 | $16,000,000.00 | $4,054,256.97 |
| RFMSI 2005-SA4 | 76111XYE7 | $1,833,000.00 | $929,536.11 |
| RFMSI 2005-SA5 | 76111XZB2 | $97,687,000.00 | $43,172,570.45 |
| RFMSI 2005-SA5 | 76111XZA4 | $70,173,900.00 | $22,568,835.50 |
| RFMSI 2005-SA5 | 76111XZC0 | $11,000,000.00 | $4,324,195.78 |
| RFMSI 2006-KS6 | 75406WAD3 | $31,498,000.00 | $31,498,000.00 |
| RFMSI 2006-S1 | 76111XJ61 | $8,500,000.00 | $1,024,211.35 |
| RFMSI 2006-S1 | 76111XK44 | $2,294,732.00 | $947,656.99 |
| RFMSI 2006-S10 | 74958DAA6 | $220,000,000.00 | $82,616,854.29 |
| RFMSI 2006-S10 | 74958DAH1 | $127,923,000.00 | $20,766,069.93 |
| RFMSI 2006-S10 | 74958DAG3 | $15,000,000.00 | $13,174,729.68 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RFMSI 2006-S10 | 74958DAL2 | $1,773,523.00 | $367,640.85 |
| RFMSI 2006-S10 | 74958DAJ7 | $599,347.00 | $258,177.41 |
| RFMSI 2006-S11 | 74958FAA1 | $200,000,000.00 | $75,832,800.10 |
| RFMSI 2006-S11 | 74958FAD5 | $7,393,000.00 | $6,474,198.55 |
| RFMSI 2006-S11 | 74958FAB9 | $24,931,000.00 | $3,476,388.82 |
| RFMSI 2006-S11 | 74958FAE3 | $1,448,359.00 | $457,764.98 |
| RFMSI 2006-S12 | 74958EAX4 | $727,804,417.00 | $274,928,982.46 |
| RFMSI 2006-S12 | 74958EAD8 | $50,000,000.00 | $50,000,000.00 |
| RFMSI 2006-S12 | 74958EAC0 | $183,485,000.00 | $27,882,303.15 |
| RFMSI 2006-S12 | 74958EAV8 | $112,277,350.00 | $15,528,660.52 |
| RFMSI 2006-S12 | 74958EAF3 | $15,000,000.00 | $15,000,000.00 |
| RFMSI 2006-S12 | 74958EAJ5 | $46,926,805.00 | $12,084,524.62 |
| RFMSI 2006-S12 | 74958EAY2 | $524,821.00 | $250,679.73 |
| RFMSI 2006-S12 | 74958EAW6 | $492,311.00 | $218,341.13 |
| RFMSI 2006-S12 | 74958EAU0 | $209,746.00 | $41,544.01 |
| RFMSI 2006-S2 | 76111XM75 | $260,567,948.00 | $104,032,333.11 |
| RFMSI 2006-S2 | 76111XM42 | $45,141,000.00 | $37,393,781.29 |
| RFMSI 2006-S2 | 76111XM26 | $14,000,000.00 | $19,290,394.90 |
| RFMSI 2006-S2 | 76111XL76 | $8,500,000.00 | $1,735,032.06 |
| RFMSI 2006-S2 | 76111XM34 | $1,000,000.00 | $1,264,657.95 |
| RFMSI 2006-S2 | 76111XM67 | $658,812.00 | $267,989.95 |
| RFMSI 2006-S3 | 76111XQ22 | $337,775,843.00 | $138,668,781.55 |
| RFMSI 2006-S3 | 76111XP56 | $50,000,000.00 | $13,594,001.60 |
| RFMSI 2006-S3 | 76111XN90 | $7,500,000.00 | $8,781,254.61 |
| RFMSI 2006-S3 | 76111XP98 | $163,797.00 | $103,372.29 |
| RFMSI 2006-S4 | 762010AE6 | $10,032,000.00 | $10,032,000.00 |
| RFMSI 2006-S4 | 762010AB2 | $28,000,000.00 | $5,667,759.06 |
| RFMSI 2006-S4 | 762010AL0 | $2,574,100.00 | $1,149,800.80 |
| RFMSI 2006-S4 | 762010AK2 | $1,092,000.00 | $1,016,832.20 |
| RFMSI 2006-S5 | 74957EAX5 | $678,078,630.00 | $254,742,719.66 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RFMSI 2006-S5 | 74957EAF4 | $39,131,000.00 | $35,650,071.62 |
| RFMSI 2006-S5 | 74957EAR8 | $57,000,000.00 | $29,996,388.60 |
| RFMSI 2006-S5 | 74957EAE7 | $19,184,000.00 | $17,798,440.17 |
| RFMSI 2006-S5 | 74957EAN7 | $5,930,000.00 | $5,343,306.42 |
| RFMSI 2006-S5 | 74957EAQ0 | $5,373,000.00 | $973,873.79 |
| RFMSI 2006-S5 | 74957EAM9 | $1,000,000.00 | $901,063.48 |
| RFMSI 2006-S5 | 74957EAW7 | $1,669,734.00 | $517,425.44 |
| RFMSI 2006-S6 | 74957VAT6 | $599,553,773.00 | $207,283,871.15 |
| RFMSI 2006-S6 | 74957VAQ2 | $32,849,000.00 | $27,437,794.59 |
| RFMSI 2006-S6 | 74957VAM1 | $69,999,999.93 | $22,616,534.52 |
| RFMSI 2006-S6 | 74957VAJ8 | $22,000,000.00 | $6,868,488.98 |
| RFMSI 2006-S6 | 74957VAS8 | $2,070,240.00 | $595,397.14 |
| RFMSI 2006-S7 | 74958AAD6 | $32,786,000.00 | $29,373,428.34 |
| RFMSI 2006-S7 | 74958AAH7 | $30,000,000.00 | $26,877,356.81 |
| RFMSI 2006-S7 | 74958AAC8 | $104,247,000.00 | $17,062,077.17 |
| RFMSI 2006-S7 | 74958AAJ3 | $6,000,000.00 | $5,328,507.22 |
| RFMSI 2006-S7 | 74958AAL8 | $1,570,946.00 | $615,948.38 |
| RFMSI 2006-S8 | 74957XAF2 | $37,400,000.00 | $35,769,546.93 |
| RFMSI 2006-S8 | 74957XAN5 | $50,080,000.00 | $9,585,917.80 |
| RFMSI 2006-S8 | 74957XAQ8 | $8,546,000.00 | $1,838,300.20 |
| RFMSI 2006-S8 | 74957XAV7 | $773,947.00 | $234,817.81 |
| RFMSI 2006-S9 | 749577AL6 | $19,147,000.00 | $18,794,123.35 |
| RFMSI 2006-S9 | 749577AC6 | $15,000,000.00 | $2,468,178.10 |
| RFMSI 2006-S9 | 749577AN2 | $205,694.00 | $98,123.79 |
| RFMSI 2006-SA1 | 76111XG72 | $80,815,000.00 | $37,619,977.46 |
| RFMSI 2006-SA1 | 76111XG98 | $14,500,000.00 | $6,102,313.33 |
| RFMSI 2006-SA2 | 749574AC3 | $40,778,220.00 | $17,460,725.05 |
| RFMSI 2006-SA2 | 749574AG4 | $21,795,000.00 | $10,394,314.81 |
| RFMSI 2006-SA3 | 749575AA4 | $15,363,000.00 | $6,375,525.75 |
| RFMSI 2006-SA3 | 749575AD8 | $7,000,000.00 | $5,895,166.88 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| REMSI 2006-SA3 | 749575AG1 | $17,420,000.00 | $5,769,644.21 |
| REMSI 2006-SA3 | 749575AJ5 | $5,000,000.00 | $2,007,792.86 |
| REMSI 2006-SA4 | 74958CAB6 | $16,995,000.00 | $6,156,025.83 |
| REMSI 2007-S1 | 749581AL8 | $15,000,000.00 | $13,367,809.87 |
| REMSI 2007-S1 | 749581AJ3 | $8,000,000.00 | $3,497,457.02 |
| REMSI 2007-S2 | 749583AJ9 | $30,000,000.00 | $28,039,031.17 |
| REMSI 2007-S2 | 749583AY6 | $27,978,000.00 | $21,010,285.72 |
| REMSI 2007-S2 | 749583AH3 | $10,973,000.00 | $10,366,382.22 |
| REMSI 2007-S3 | 74958BAH5 | $28,115,000.00 | $22,934,450.48 |
| REMSI 2007-S3 | 74958BAM4 | $20,000,000.00 | $16,065,109.52 |
| REMSI 2007-S3 | 74958BAQ5 | $26,200,000.00 | $3,933,879.89 |
| REMSI 2007-S4 | 74958YAB8 | $72,244,357.00 | $27,978,918.04 |
| REMSI 2007-S4 | 74958YAN2 | $10,000,000.00 | $8,517,878.90 |
| REMSI 2007-S4 | 74958YAE2 | $2,150,000.00 | $771,919.61 |
| REMSI 2007-S5 | 749580AB2 | $100,000,000.00 | $39,944,339.80 |
| REMSI 2007-S5 | 749580AC0 | $51,497,000.00 | $26,996,308.06 |
| REMSI 2007-S6 | 762009AL2 | $53,000,000.00 | $22,201,811.18 |
| REMSI 2007-S6 | 762009AK4 | $4,000,000.00 | $1,475,398.94 |
| REMSI 2007-S6 | 762009AR9 | $18,899.43 | $8,479.71 |
| REMSI 2007-S7 | 76200RAV0 | $170,622,000.00 | $97,354,764.97 |
| REMSI 2007-S7 | 76200RAC2 | $75,000,000.00 | $41,919,876.53 |
| REMSI 2007-S8 | 76200QAA8 | $2,500,000.00 | $1,304,277.38 |
| REMSI 2007-S9 | 74958VAA6 | $78,440,000.00 | $38,019,490.47 |
| REMSI 2007-SA1 | 74958WAC0 | $66,660,000.00 | $25,350,819.97 |
| REMSI 2007-SA1 | 74958WAF3 | $46,363,200.00 | $22,996,709.00 |
| REMSI 2007-SA1 | 74958WAA4 | $2,800,000.00 | $1,059,401.63 |
| REMSI 2007-SA2 | 74958XAF1 | $27,804,800.00 | $13,901,970.00 |
| REMSI 2007-SA2 | 74958XAC8 | $19,478,400.00 | $8,132,804.42 |
| REMSI 2007-SA2 | 74958XAB0 | $14,000,000.00 | $5,526,124.30 |
| REMSI 2007-SA3 | 74958TAJ2 | $38,625,000.00 | $17,386,053.08 |

| Deal Name | Cusip | Sum Of Original Face | Sum Of Current Face |
|---|---|---|---|
| RFMSI 2007-SA3 | 74958TAB9 | $20,895,000.00 | $10,585,687.94 |
| RFMSI 2007-SA4 | 74959AAF0 | $73,536,400.00 | $39,676,725.48 |
| RFMSI 2007-SA4 | 74959AAB9 | $35,000,000.00 | $17,040,241.21 |
| RFSC 2004-RP1A | 760985S44 | $7,000,000.00 | $1,265,075.64 |
| RFSC 2004-RP1A | 760985S36 | $14,577,000.00 | $0.00 |

# EXHIBIT F

12-12020-mg   Doc   Filed   Entered 06/08/12 15/12   Exhibit
0608/11 Pg 12 of

# EXHIBIT

## ~~4~~3

# ~~RMBS Trust Settlement Agreement with the Talcott Franklin Group~~

## AMENDED AND RESTATED RMBS TRUST SETTLEMENT AGREEMENT WITH THE TALCOTT FRANKLIN GROUP

**EXECUTION COPY**

## AMENDED AND RESTATED RMBS TRUST SETTLEMENT AGREEMENT

This Amended and Restated RMBS Trust Settlement Agreement is entered into as of ~~May 13,~~August 15, 2012, by and between Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap" or the "Debtors"), on the one hand, and the Institutional Investors (as defined below), on the other hand (the "Settlement Agreement"), and amends and restates in its entirety the RMBS Trust Settlement Agreement entered into as of May 13, 2012, by and between ResCap, on the one hand, and the Institutional Investors, on the other hand. Each of ResCap and the Institutional Investors may be referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, certain ResCap entities were the Seller, Depositor, Servicer and/or Master Servicer for the securitizations identified on the attached Exhibit A (the "Settlement Trusts");

WHEREAS, certain ResCap entities are parties to certain applicable Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the Settlement Trusts (the "Governing Agreements"), and certain ResCap entities have, at times, acted as Master Servicer and/or Servicer for the Settlement Trusts pursuant to certain of the Governing Agreements;

WHEREAS, pursuant to the Governing Agreements, certain ResCap entities have contributed or sold loans into the Settlement Trusts (the "Mortgage Loans");

WHEREAS, the Institutional Investors have alleged that certain loans held by the Settlement Trusts were originally contributed in breach of representations and warranties contained in the Governing Agreements, allowing the Investors in such Settlement Trusts to seek to compel the trustee or indenture trustee (each, a "Trustee") to take certain actions with respect to those loans, and further have asserted past and continuing covenant breaches and defaults by various ResCap entities under the Governing Agreements;

WHEREAS, the Institutional Investors have indicated their intent under the Governing Agreements for each Settlement Trust in which the Institutional Investors collectively hold or are authorized investment managers for holders of at least 25% of a particular tranche of the Securities (as defined below) held by such Settlement Trust either to seek action by the Trustee for such Settlement Trust or to pursue claims, including but not limited to claims to compel ResCap to cure the alleged breaches of representations and warranties, and ResCap disputes such claims and allegations of breach and waives no rights, and preserves all of its defenses, with respect to such allegations and putative cure requirements;

WHEREAS, the Institutional Investors are jointly represented by Talcott Franklin P.C. ("Talcott Franklin"); Miller, Johnson, Snell & Cummiskey, P.L.C. ("Miller Johnson"); and Carter Ledyard & Milburn LLP; ("Carter Ledyard") and have, through counsel, engaged in arm's length settlement negotiations with ResCap that included the exchange of confidential materials;

WHEREAS, ResCap ~~contemplates filing~~filed petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

~~WHEREAS, ResCap and the Institutional Investors have reached agreement on a plan support agreement (the "Plan Support Agreement") pursuant to which the Institutional Investors will support the confirmation of a chapter 11 plan for ResCap;~~

~~WHEREAS, Ally Financial Inc. and its subsidiaries and affiliates, other than ResCap (collectively, "Ally") have agreed to a settlement with ResCap in return for releases of any alleged claims held by ResCap and certain third parties against Ally;~~

WHEREAS, ResCap and the Institutional Investors have reached agreement concerning all claims of the Settlement Trusts under the Governing Agreements; and

WHEREAS, the Parties therefore enter into this Settlement Agreement to set forth their mutual understandings and agreements for terms for resolving the disputes regarding the Governing Agreements.;

## AGREEMENT

NOW, THEREFORE, after good faith, arm's length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

### ARTICLE I.   DEFINITIONS.

As used in this Settlement Agreement, in addition to the terms otherwise defined herein, the following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Settlement Agreement). Any capitalized terms not defined in this Settlement Agreement shall have the definition given to them in the Governing Agreements.

Section 1.01   "Bankruptcy Code" shall mean title 11 of the United States Code;.

Section 1.02   "Covered Trusts" means the Settlement Trusts listed in Exhibit D hereto and any other Settlement Trusts for which the Institutional Investors in the aggregate hold, and/or are authorized investment managers for holders of, 25% or more of the voting rights in one or more classes of notes, bonds and/or certificates backed by mortgage loans held by the Trusts.

Section 1.03   "Depositor Entity" means, for each individual Settlement Trust, the entity from the following list that the Governing Agreements define as the "Company" for that Settlement Trust, including but not limited to: Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Asset Securities Corp., Residential Accredit Loans, Inc., and Residential Asset Mortgage Products, Inc.

Section 1.04   "Direction" shall mean the direction by the Institutional Investors, to the extent permitted by the Governing Agreements, directing any Trustee to take or refrain from taking any action; *provided, however,* that in no event shall the Institutional Investors be required to provide a Trustee with any security or indemnity for action or inaction taken at the direction of the Institutional Investors and the Institutional Investors shall not be required to directly or indirectly incur any costs, fees, or expenses to compel any action or inaction by a Trustee, except that the Institutional Investors shall continue to retain contingency counsel;.

EXECUTION COPY

Section ~~1.03~~1.05    "Effective Date" shall have the meaning ascribed in Section
~~2.01;~~2.01.
~~-2-~~

Section ~~1.04~~1.06    "Governmental Authority" shall mean any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to the foregoing, or any other authority, agency, department, board, commission, or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal, or arbitrator(s) of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency, or authority (including the New York Stock Exchange, Nasdaq, and the Financial Industry Regulatory Authority);.

Section ~~1.05~~1.07    "Institutional Investors" shall mean the authorized investment managers and Investors identified in the attached signature pages;.

Section ~~1.06~~1.08    "Investors" shall mean all certificateholders, bondholders and noteholders in the Settlement Trusts, and their successors in interest, assigns, pledgees, and/or transferees;.

Section ~~1.07~~1.09    "Net Losses" means, with respect to any Settlement Trust, the amount of net losses for such Settlement Trust that have been or are estimated to be borne by that trust from its inception date to its expected date of termination, as determined by the Expert (as defined in Exhibit B) in accordance with the methodology described in Exhibit B. For the avoidance of doubt, a loss on a mortgage loan that has been reimbursed or indemnified by reason of applicable policies of mortgage or bond insurance shall be considered a loss on a mortgage loan and included within the calculation of "Net Losses."

Section 1.10    "Person" shall mean any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a Governmental Authority;.

Section ~~1.08~~1.11    "Petition Date" means the date on which ResCap files petitions under chapter 11 of the Bankruptcy Code;

~~Section 1.09    "Plan" has the meaning ascribed to it in the Plan Support Agreement; andSection 1.10    "Restructuring" shall have the meaning ascribed to it in the Plan Support Agreement.~~

Section 1.12    "Plan" shall mean a chapter 11 plan of reorganization for the Debtors.

Section 1.13    "Purchaser" means Nationstar Mortgage LLC or any other successful bidder for any or all of the Debtors' mortgage loan origination and servicing platform.

Section 1.14    "Scheduling Order" shall mean the Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (II) the Trustees' Limited Objection to the Sale Motion, entered by the Bankruptcy Court on July 31, 2012.

Section 1.15    "Securities" shall mean securities, notes, bonds, certificates, and/or other instruments backed by mortgage loans held by Settlement Trusts.

Section 1.16 "Seller Entity" means, for each Settlement Trust, the entity from the following list that the Governing Agreements define as the "Seller" for that Trust, including but

-3-

not limited to: Residential Funding Company LLC (f/k/a Residential Funding Corporation) and GMAC Mortgage LLC (f/k/a GMAC Mortgage Corporation).

## ARTICLE II. SETTLEMENT PROCESS.

Section 2.01 Effective Date. This Settlement Agreement shall be effective immediately except as to the granting of allowed claims to the ~~Trusts and the releases set forth herein. The claims allowance and releases shall only be effective, with respect to Trusts that timely accept~~Accepting Trusts (as defined below in Section 5.1) ~~the compromise,~~and the releases set forth herein. The claims allowance and releases shall only be effective, with respect to a specific Accepting Trust on the date on which ~~the Bankruptcy Court enters an order approving~~a Trustee accepts the settlement ~~contemplated hereby~~with respect to such Settlement Trust (the "Effective Date"). However, for the sake of clarity, the Debtors' obligations hereunder are subject to the approval of this Settlement Agreement by the Court.

Section 2.02 Bankruptcy Court Approval. The Debtors ~~shall~~ (a) orally ~~present~~presented this Settlement Agreement in court on the Petition ~~date~~Date, including the agreed amount of the Total Allowed Claim (as defined below~~), (b) file a motion in the Bankruptcy Court as soon as practicable, but in no event later than fourteen (14) days after the Petition Date, seeking authority to perform under this Settlement Agreement and for~~ in Section 5.01), and (b) shall comply with the schedule for the approval of this Settlement Agreement ~~and the compromise contained herein, and (c) obtain an order from the Bankruptcy Court approving such motion by the earlier of (i) 60 days after the Petition Date and (ii) the date on which the Disclosure Statement is approved by the Bankruptcy Court. The Trustee for each~~set forth in the Scheduling Order. The Trustee for each Settlement Trust may accept the offer of a compromise contemplated by this Settlement Agreement ~~in writing pursuant to a~~on behalf of such Settlement Trust, within the time set forth in the Scheduling Order, by a writing substantially in the form of acceptance ~~to be~~ included in the proposed order for approval of this Settlement Agreement to be submitted to the Bankruptcy Court.

Section 2.03 Standing. The Debtors agree that the Institutional Investors are parties in interest in the chapter 11 cases of ResCap for the purposes of enforcing rights and complying with obligations under this Settlement Agreement ~~and the Plan Support Agreement.~~. The Parties further agree that they will not oppose any effort of the Institutional Investors or any other Investor(s) in seeking status as a party in interest in the Chapter 11 Cases.

## ARTICLE III. REPRESENTATIONS AND WARRANTIES.

Section 3.01 Holdings and Authority. ~~Lead~~As of August 15, 2012, lead counsel to the Institutional Investors, Talcott Franklin ~~P.C.~~, has represented to ResCap that ~~its clients have, or will assemble as of 45 days from the Petition Date,~~the Institutional Investors hold Securities representing in aggregate ~~holdings of securities of greater than~~ 25% of the voting rights in one or more classes of the ~~securities, certificates or other instruments backed by the mortgages held~~Securities issued by each of the ~~Covered Trusts (as defined in the Plan Support Agreement)~~Settlement Trusts identified on the attached Exhibit D. Each Institutional Investor represents that (i) it has the authority to take the actions contemplated by this Settlement Agreement, to the extent that it has the authority with respect to any other entities, account

**EXECUTION COPY**

holders, or accounts for which or on behalf of which it is signing this Settlement Agreement, and (ii) it holds, or is the authorized investment manager for the holders of, the ~~securities~~Securities listed in ~~a schedule (the "Schedule"), which Schedule will be provided to ResCap no later than 45 days after the Petition Date and will list the securities~~Exhibit D hereto, in the respective amounts set forth therein by CUSIP number, ~~and which Schedule is~~that such schedule was accurate as of the date ~~it is provided by the Institutional Investors or Talcott Franklin P.C.~~set forth for the respective institution, and that since the date set forth for the Institutional Investor, the Institutional Investor has not, in the aggregate, materially decreased the Institutional Investor's holdings in the Securities. The Parties agree that the aggregate amounts of Securities collectively held by the Institutional Investors for each ~~Settlement~~ Trust may be disclosed publicly, but that the individual holdings of the Institutional Investors shall remain confidential, subject to review only by ResCap, ~~Ally,~~ the Bankruptcy Court, the Office of the United States Trustee, the Trustees, and ~~any~~the official committee of unsecured creditors ~~that may be~~ appointed in the Chapter 11 Cases.

-4-

Section 3.02  ~~Purchasers and Assigns. The~~Holdings Retention. As of August 15, 2012, the Institutional Investors ~~collectively hold, or will assemble as of 45 days after the Petition date,~~ hold Securities representing in aggregate 25% of the voting rights in one or more classes of the Securities issued by each of the ~~Covered~~Settlement Trusts identified on the attached Exhibit D. The Institutional Investors, collectively, shall maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 80% of the Covered Trusts (~~the~~ "Requisite Holdings") until the earliest of: (i) confirmation of ~~the Plan~~a plan of reorganization, (ii) December 31, 2012, (iii) a Consenting Claimant Termination Event, ~~or~~ (iv) a Debtor Termination Event~~, or (v) an Ally Termination Event~~ (as the terms in subsections (iii), ~~(i),~~ (iv) and (~~v~~) ~~are~~were defined in the ~~Plan Support Agreement~~plan support agreement agreed to by the Parties); provided, however, that any reduction in Requisite Holdings caused by exclusion of one or more trusts due to the exercise of ~~Voting Rights~~voting rights by a third party guarantor or financial guaranty provider, shall not be considered in determining whether the Requisite Holdings threshold has been met. If the Requisite Holdings are not maintained, ~~each of Ally and~~ResCap shall have the right to terminate the Settlement Agreement, but ~~neither Ally nor~~ ResCap shall not terminate the Settlement Agreement before it has conferred in good faith with the Institutional Investors concerning whether termination is warranted. For the avoidance of doubt, other than as set forth above, this Settlement Agreement shall not restrict the right of any Institutional Investor to sell or exchange any Securities issued by a Settlement Trust free and clear of any encumbrance. The Institutional Investors will not sell any of the Securities for the purpose of avoiding their obligations under this Settlement Agreement, and each Institutional Investor commits to maintain at least one position in one of the Securities in one of the Settlement Trusts until the earliest of the dates set forth above. If the Debtor ~~or Ally reach~~reaches a similar agreement to this with another bondholder group, the Debtor ~~and Ally~~ will include a substantially similar proportionate holdings requirement in that agreement as contained herein.

## ARTICLE IV. DIRECTION TO TRUSTEES AND INDENTURE TRUSTEES.

Section 4.01   Direction to Trustees and Indenture Trustees. The relevant Institutional Investors for each Settlement Trust shall, by the time of the filing of a motion to approve this Settlement Agreement, provide the relevant Trustee with Direction to accept the settlement and compromises set forth herein. The Institutional Investors hereby agree to confer in good faith with ResCap as to any further or other Direction that may be reasonably necessary to effectuate the settlement contemplated herein, including ~~those actions listed in Section 3.1 of the Plan Support Agreement,~~ filing motions and pleadings with the Bankruptcy Court and making statements in open court in support of the ~~Restructuring~~Debtors' restructuring.

Section 4.02   No Inconsistent Directions. Except for providing ~~instructions~~Directions in accordance with Section 4.01, the Institutional Investors agree that (i) between the date hereof and the Effective Date, with respect to the Securities ~~on~~issued by the ~~Holdings Schedule~~Settlement Trusts, they will not, individually or collectively, direct, vote for, or take any other action that they

may have the right or the option to take under the Governing Agreements or to join with any other holders~~Investors~~ or the ~~trustee~~Trustee of any note, bond or other security issued by the Settlement Trusts, to cause the Trustees to enforce (or seek derivatively to enforce) any representations and warranties regarding the Mortgage Loans or the servicing of the Mortgage Loans, and (ii) to the extent that any of the Institutional Investors have already taken any such action, the applicable Institutional Investor will promptly rescind or terminate such action. Nothing in the foregoing shall restrict the ability of the Institutional Investors to demand that any ~~other~~ Investor who seeks to direct the Trustee for a Settlement Trust post any indemnity or bond required by the Governing Agreements for the applicable Settlement Trust.

-5-

Section 4.03   Amendments to Governing Agreements Regarding Financing of Advances. The Institutional Investors agree to use commercially reasonable efforts (which shall not require the giving of any indemnity or other payment obligation or expenditure of out-of- pocket funds) to negotiate any request by the Debtors or the Trustees for any Settlement Trusts ~~that~~with respect to which the servicing rights are being assumed and assigned to the Purchaser, and if any Trustee shall require a vote of the certificate or note holders with respect thereto, shall vote in favor of (to the extent agreement is reached) any amendment to the relevant Governing Agreements and related documents requested by the Debtors in order to permit "Advances" (as it or any similar term may be defined in the Governing Agreements) to be financeable and to make such other amendments thereto as may be reasonably requested by the Debtors in accordance with any agreement to acquire all or substantially all of the Debtors' servicing assets ~~pursuant to the Restructuring and the Plan~~, so long as such changes would not cause material financial detriment to the Settlement Trusts, their respective trustees, certificate or note holders, or the Institutional Investors.

## ARTICLE V. ALLOWANCE OF CLAIM.

Section 5.01   The Allowed Claim. ResCap hereby makes an irrevocable offer to settle, expiring at 5:00 p.m. prevailing New York time on the date that is ~~forty-five (45) days after the Petition Date~~set forth in the Scheduling Order, with each of the Settlement Trusts (the Settlement Trusts that timely ~~agrees~~agree to the terms of this Settlement Agreement ~~(being~~ the "Accepting Trusts"). In consideration for such agreement, ResCap will provide a general unsecured claim of $8,700,000,000 in the aggregate against the Seller Entities and the Depositor Entities (as the Depositor Entities are jointly liable for such claim), and which claim is subject to the HoldCo Election (as defined below) right (the "Total Allowed Claim")~~,~~, all of which shall be allocated and implemented as provided in Section 6.01. For the avoidance of doubt, the Total Allowed Claim shall be ~~shared~~allocated among ~~any~~the Accepting Trusts ~~accepting the offer contained~~in this Section 5.01~~,~~, subject to the provisions of this Settlement Agreement. ~~Any Trusts accepting the offer contained in this Section 5.01, subject~~Subject to the provisions of this Settlement Agreement, the Accepting Trusts shall be allowed ~~claims~~an aggregate claim in an amount calculated as set forth below (such claim, including any claim provided pursuant to the HoldCo Election, the "Allowed Claim"), ~~but in no case shall the amount of the Allowed Claim exceed $8,700,000,000.~~which aggregate claim shall be allocated to each Accepting Trust pursuant to Article VI herein. The amount of the Allowed Claim shall equal (i) $8,700,000,000, less (ii) $8,700,000,000 multiplied by the percentage represented by (a) the total dollar amount of original principal balance for the Settlement Trusts not accepting the offer outlined above, divided by (b) the total dollar amount of original principal balance for all Settlement Trusts.

Section 5.02   Waiver of Setoff and Recoupment. By accepting the offer to settle contained in Section 5.01, each ~~accepting~~Accepting Trust irrevocably waives any right to setoff and/or recoupment such Accepting Trust may have against ~~Ally and~~ ResCap, subject to the exclusions set forth in Section 8.06 of this agreement.

## ARTICLE VI. ALLOCATION OF ALLOWED CLAIM.

Section 6.01   The Allocation ~~Schedule. The allocation of the amounts of the Allowed~~

EXECUTION COPY

~~Claim as to each Trust (each, an "Allocated Allowed Claim"), is set forth on Exhibit B hereto.~~of the Allowed Claim. Each Accepting Trust shall, subject to the HoldCo Election, be allocated a share of the Allowed Claim against its Seller Entity (each, an "Allocated Seller Claim") and its Depositor Entity (each, an "Allocated Depositor Claim" and each Allocated Depositor Claim together with the Allocated Seller Claim as to a particular

-6-

Accepting Trust, subject to the HoldCo Election, an "Allocated Claim"), calculated as set forth on Exhibit B hereto.

Section 6.02   HoldCo Election. At any time prior to confirmation of a chapter 11 plan in the Chapter 11 Cases, each Accepting Trust shall have the option to, by written notice to the Debtors, make one or more elections (each, a "HoldCo Election"), with respect to all or any portion of the amount of each Accepting Trust's Allocated Claim (subject to an aggregate cap equal to 20% of such Accepting Trust's Allocated Claim), to receive in lieu of such elected portion a general unsecured claim against Residential Capital, LLC ("HoldCo"). For each Accepting Trust as to which a HoldCo Election is made, such Accepting Trust shall have an allowed claim against HoldCo in the amount of the HoldCo Election(s) so made (subject to the aggregate cap described above) (the "Allowed Holdco Claim") and the amount of the Allocated Seller Claim and Allocated Depositor Claim of that Accepting Trust shall be reduced by the amount of such Trust's Allowed HoldCo Claim.

Section 6.03   In the event the Bankruptcy Court does not approve the Allowed Claim as to a particular Seller Entity, Depositor Entity, or the HoldCo, after giving effect to the HoldCo Election, the settlement shall remain in full force with respect to any other Seller Entity, Depositor Entity, or HoldCo (pursuant to the HoldCo Election), as applicable; *provided, however,* that if the Allowed Claim in the amounts proposed herein is not approved as to any of the Seller Entities, Depositor Entities, or HoldCo (pursuant to the HoldCo Election), the Institutional Investors shall have the right to terminate this Settlement Agreement upon written notice to the Debtors; *provided, further,* that in the event that the Bankruptcy Court does not approve the Allowed Claim as to a particular Seller Entity, Depositor Entity, or HoldCo (pursuant to the HoldCo Election), that particular Seller Entity, Depositor Entity, or, in the case of disapproval of the HoldCo Election, HoldCo shall not receive any release, waiver, or discharge of any Released Claims pursuant to Article VII.

Section 6.04   Legal Fees.

(a) ResCap and the Institutional Investors agree that Talcott Franklin ~~P.C.;~~, Miller~~,~~ Johnson, ~~Snell & Cummiskey, P.L.C.;~~ and Carter ~~Ledyard & Milburn LLP~~Leydard shall, on the Effective Date ~~of the Plan,~~ be ~~paid~~allocated legal fees as follows, as an integrated and nonseverable part of this Settlement Agreement. First, Talcott Franklin ~~P.C.;~~, Miller~~,~~ Johnson, ~~Snell & Cummiskey, P.L.C.;~~ and Carter ~~Ledyard & Milburn LLP~~Leydard, as counsel to the Institutional Investors, shall be allocated by ResCap without conveyance to the Trustees the percentages of the Allowed Claim set forth on the fee schedule attached hereto as Exhibit C, without requirement of submitting any form of estate retention or fee application, for their work relating to these cases and the settlement. Second, the Debtors and Institutional Investors may further agree at any time, that the Debtors may pay Talcott Franklin ~~P.C.;~~, Miller~~,~~ Johnson, ~~Snell & Cummiskey, P.L.C.;~~ and Carter ~~Ledyard & Milburn LLP~~Leydard in cash, in an amount that Talcott Franklin ~~P.C.;~~, Miller~~,~~ Johnson,

EXECUTION COPY

~~Snell & Cummiskey, P.L.C.;~~ and Carter ~~Ledyard & Milburn LLP~~Leydard respectively
agree is equal to the cash value of their respective portions of the Allowed Claim, and in
any such event, no estate retention application, fee application or further order of the
Bankruptcy Court shall be required as a condition of the Debtors making such agreed
~~payment~~allocation. Third, the Debtors agree and the settlement approval order shall
provide that the amount of the Allowed Claim payable to Talcott Franklin ~~P.C.~~, Miller,
Johnson, ~~Snell & Cummiskey, P.L.C.;~~ and Carter ~~Ledyard & Milburn LLP~~Leydard may
be reduced to a separate claim stipulation for convenience of the parties.

-7-

(b)  In the event that, prior to acceptance of this compromise by a Trustee for a Settlement Trust
other than ~~an original~~a Covered Trust ~~(as defined in the Plan Support Agreement)~~, counsel
to Investors in such Settlement Trust cause a direction to be given by more than 25% of the
holders of a tranche of such Settlement Trust to accept this compromise, then the same
provisions as contained in Section 6.02(a) shall apply to such counsel, solely as to the
amounts allocated to such Settlement Trust. Such counsel shall be entitled to a share of the
fee for such trust equal to the ratio of (a) 25% minus the percentage of such tranche held by
Institutional Investors divided by (b) 25%. Counsel would be required to identify itself and
satisfy the Debtors and Institutional Investors as to the holdings of client-investors and that
counsel caused such directions.

~~of (a) 25% minus the percentage of such tranche held by Institutional Investors divided by~~
~~(b) 25%. Counsel would be required to identify itself and satisfy the Debtors and~~
~~Institutional Investors as to the holdings of client-investors and that counsel caused such~~
~~directions.~~

ARTICLE VII.        RELEASES.

Section 7.01   Releases. Except as set forth in Article VIII, as of the Effective Date, with
respect to each and every Accepting Trust, and in exchange for ~~whom the Trustee accepts the~~
~~compromise contemplated by this Settlement Agreement, the Investors, Trustee, Trust~~the Allowed
Claim, the Institutional Investors, Accepting Trusts, Trustees in respect of such trusts, and any
Persons claiming by, through or on behalf of such ~~Trustee~~Accepting Trust or the Trustees of such
trusts (including ~~Institutional~~ Investors claiming derivatively) ~~or such Trust~~ (collectively, the
"Releasors"), irrevocably and unconditionally grant a full, final, and complete release, waiver, and
discharge of all alleged or actual claims, demands to repurchase, demands to cure, demands to
substitute, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities,
losses, debts, costs, expenses, obligations, demands, claims for accountings or audits, alleged
events of default, damages, rights, and causes of action of any kind or nature whatsoever, whether
asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in
contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct or
derivative, arising under law or equity, against ResCap and its officers, directors, and employees
(but in no case does this section apply to Ally Financial Inc. ("AFI") or any person who is an officer
or director of AFI) that arise under the Governing Agreements. Such released claims include, but
are not limited to, claims arising out of and/or relating to (i) the origination, and sale, ~~or delivery of~~
~~Mortgage Loans~~ of mortgage loans to the Accepting Trusts, (including ~~the~~, without limitation, the
liability of any Debtors that are party to a Pooling and Servicing Agreement with respect to
representations and warranties made in connection with ~~the origination, sale, or delivery of~~
~~Mortgage Loans to the Trusts or any alleged obligation of ResCap to repurchase or otherwise~~

~~compensate the Trusts for any Mortgage Loan on the basis of any representations or warranties or
otherwise or failure to cure any alleged breaches of~~such sale or with respect to the noticing and
enforcement of any remedies in respect of alleged breaches of such representations and warranties)
(collectively, the "Origination-Related Provisions"), (ii) the documentation of the Mortgage Loans
held by the Accepting Trusts including with respect to allegedly defective, incomplete, or
non-existent documentation, as well as issues arising out of or relating to recordation, title,
assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, or
any alleged failure to provide notice of such defective, incomplete or non-existent documentation,
(iii) the servicing of the Mortgage Loans held by the Accepting Trusts (including any claim relating
to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers,
advances~~, servicing advances, or claims that servicing includes an obligation to take any action or
provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by~~ or
servicing advances) (the "Servicing Claims"), but only to the extent assumed pursuant to Section
365 of the Bankruptcy Code by an assignee to the applicable Debtor in its capacity as Master
Servicer~~, Seller, or any other Person), (iv) setoff or recoupment~~ or Servicer under any Governing
Agreement (the "Assumed Servicing Claims"), (iv) any duty of a debtor as master servicer,
servicer or sub-servicer to notice and enforce remedies in respect of alleged breaches of
representations and warranties (together with the Assumed Servicing Claims, the "Released
Servicing Claims"), (v) setoff or recoupment

-8-

under the Governing Agreements against ResCap~~, and (v~~ with respect to the
Origination-Related Provisions or the Released Servicing Claims, and (vi) any loan seller that
either sold loans to ResCap or AFI that were sold and transferred to such Accepting Trust or sold
loans directly to such Accepting Trust, in all cases prior to the Petition Date (collectively, all
such claims being defined as the "Released Claims"). For the avoidance of doubt, this release
does not include individual direct claims for securities fraud or other disclosure-related claims
arising from the purchase or sale of Securities.

Section 7.02   Release of Claims Against Investors, Accepting Trusts, and Trustees. Except as set
forth in Article VIII, as of the Effective Date, ResCap irrevocably and unconditionally grants to the
~~Investors a full,~~Accepting Trusts, Trustees in respect of such trusts, and Investors in such trusts, as
well as such Accepting Trusts', Trustees' and Investors' respective officers, directors, and
employees, a full final, and complete release, waiver, and discharge of all alleged or actual claims
from any claim it may have under or arising out of the Governing Agreements. ~~For the avoidance of
doubt, nothing in this provision shall affect Ally's rights in any way.~~

Section 7.03   Agreement Not to Pursue Relief from the Stay. The Institutional Investors
agree that neither they nor their successors in interest, assigns, pledges, delegates, affiliates,
subsidiaries, and/or transferees, will seek relief from the automatic stay imposed by section 362 of
the Bankruptcy Code in order to institute, continue or otherwise prosecute any action relating to the
Released Claims; provided, however, nothing contained herein shall preclude the Institutional
Investors or their advised clients from seeking any such relief with respect to direct claims for
securities fraud or other disclosure-related claims arising from the purchase or sale of Securities.
ResCap reserves its rights and defenses therewith.

Section 7.04   Inclusion of Accepting Trusts and Trustees in Plan Release and Exculpation
Provisions. The Accepting Trusts and the Trustees in respect of any such Accepting Trust
~~accepting the offer to settle described in Section 5.01~~ and their respective counsel shall be entitled
to the benefit of any releases and plan exculpation ~~provision~~provisions, if any, included in the Plan,
which ~~exculpation~~provisions shall be no less favorable than the releases and plan exculpation

EXECUTION COPY

provisions extended to similarly situated creditors or parties in interest who are parties to any plan support agreement with ResCap.~~Section 7.05~~ ~~Servicing of the Mortgage Loans. Except as provided in Section 8.01, the release and waiver in Article VII includes all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts prior to the Petition Date. Provided, the foregoing language is not intended to release any claims against any person other than ResCap and Ally; provided, further, that the applicable Institutional Investor shall indemnify (i) any direct or indirect subsidiary of ResCap that is not a Debtor and/or (ii) Ally, against any and all harm in connection with any Institutional Investor pursuing such claim.~~

## ARTICLE VIII.     CLAIMS NOT RELEASED

Section 8.01     Administration of the Mortgage Loans. The releases and waivers in Article VII herein do not include: (i) claims that first arise after the Effective Date ~~which~~and are based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the ~~Trusts in their aggregation and remittance of Mortgage Loan Payments, accounting for principal and interest, and preparation of tax-related information, in connection with the Mortgage Loans and the ministerial operation and administration of the Trusts and the Mortgage Loans held by the Trusts, for which the Master Servicer, Servicer, or Subservicer received servicing fees, unless, as of the date hereof, the Institutional Investors, have or should have knowledge of the actions, inactions, or practices of ResCap in connection with such matters~~Accepting Trusts, and (ii) any Servicing Claim that is not an Assumed Servicing Claim and for which the Court finds a cure or rejection claim exists pursuant to Section 365 of the Bankruptcy Code (it being understood that such cure or rejection claims, if any, are not intended to be affected by such releases and waivers).

Section 8.02     Financial-Guaranty Provider Rights and Obligations. To the extent that any third party guarantor or financial-guaranty provider with respect to any Settlement Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Settlement Trusts, the releases and waivers in Article VII are not intended to and shall not release such rights.

-9-

Section 8.03     Settlement Agreement Rights. The Parties do not release or waive any rights or claims against each other to enforce the terms of this Settlement Agreement or the Allowed Claim.

Section 8.04     Disclosure Claims. The releases and waivers in Article VII do not include any claims based on improper disclosures under federal or state securities law.

Section 8.05     Reservation of Rights. Notwithstanding anything in this Settlement Agreement to the contrary, the Institutional Investors have not waived their right to file an objection to a motion of the holders of the ResCap 9 5/8% bonds requesting payment of any interest on account of their ResCap 9 5/8% bond claims that may be due and owing after the Petition Date.

Section 8.06     HoldCo Election. Notwithstanding anything in this Agreement, the right to make a HoldCo Election set forth in Section 6.02 is not released by this Agreement.

## ARTICLE IX. RELEASE OF UNKNOWN CLAIMS.

Each of the Parties acknowledges that it has been advised by its attorneys concerning, and is

12-12020-mg  Doc  Filed
0608/11/12 of
Entered 0608/12 15/12  Exhibit

familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The Parties acknowledge that inclusion of the provisions of this Article IX to this Settlement Agreement was a material and separately bargained for element of this Settlement Agreement.

## ARTICLE X. OTHER PROVISIONS

Section 10.01 Voluntary Agreement. Each Party acknowledges that it has read all of the terms of this Settlement Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Settlement Agreement voluntarily and without duress.

Section 10.02 No Admission of Breach or Wrongdoing. ResCap has denied and continues to deny any breach, fault, liability, or wrongdoing. This denial includes, but is not limited to, breaches of representations and warranties, violations of state or federal securities laws, and other claims sounding in contract or tort in connection with any securitizations, including those for which ResCap was the Seller, Servicer and/or Master Servicer. Neither this Settlement Agreement, whether or not consummated, any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, whether or not consummated,

-10-

shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap with respect to any claim or of any breach, liability, fault, wrongdoing, or damage whatsoever, or with respect to any infirmity in any defense that ResCap has or could have asserted.

Section 10.03 No Admission Regarding Claim Status. ResCap expressly states that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, then neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap that any claims asserted by the Institutional Investors are not contingent, unliquidated or disputed. The Institutional Investors expressly state that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the Institutional Investors that any claims asserted by the Institutional Investors and Trustees are not limited to the amounts set forth in this Settlement Agreement or are of any particular priority.

Section 10.04 Counterparts. This Settlement Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Settlement Agreement. Delivery of a signature page to this Settlement Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Settlement Agreement.

12-12020-mg  Doc 1301  Filed 08/28/12  Entered 08/28/12 17:15:17  Exhibit
0608/1 Pg 9 of

**EXECUTION COPY**

Section 10.05 <u>Joint Drafting</u>. This Settlement Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Settlement Agreement, no provision shall be construed and interpreted for or against any of the Parties because such provision or any other provision of the Settlement Agreement as a whole is purportedly prepared or requested by such Party.

Section 10.06 <u>Entire Agreement</u>. This document contains the entire agreement between the Parties, and may only be modified, altered, amended, or supplemented in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Settlement Agreement and the Plan Support Agreement.

Section 10.07 <u>Specific Performance</u>. It is understood that money damages are not a sufficient remedy for any breach of this Settlement Agreement, and the Parties shall have the right, in addition to any other rights and remedies contained herein, to seek specific performance, injunctive, or other equitable relief from the Bankruptcy Court as a remedy for any such breach. The Parties hereby agree that specific performance shall be their only remedy for any violation of this Agreement.

Section 10.08 <u>Authority</u>. Each Party represents and warrants that each Person who executes this Settlement Agreement on its behalf is duly authorized to execute this Settlement Agreement on behalf of the respective Party, and that such Party has full knowledge of and has consented to this Settlement Agreement.

-11-

Section 10.09 <u>No Third Party Beneficiaries</u>. There are no third party beneficiaries of this Settlement Agreement.

Section 10.10 <u>Headings.</u> The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

Section 10.11 <u>Notices</u>. All notices or demands given or made by one Party to the other relating to this Settlement Agreement shall be in writing and either personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, or by electronic mail transmission, and shall be deemed to be given for purposes of this Settlement Agreement on the earlier of the date of actual receipt or three days after the deposit thereof in the mail or the electronic transmission of the message. Unless a different or additional address for subsequent notices is specified in a notice sent or delivered in accordance with this Section, such notices or demands shall be sent as follows:

> To:   Institutional Investors
>        c/o Talcott Franklin
>        <u>P.C.</u>
>        208 N. Market Street Suite 200 Dallas, ~~Texas~~ TX 75202 Tel:
>        214-736-8730 ~~Email:~~ Email: tal@talcottfranklin.com ~~-~~ -and~~-~~ Miller,
>        Johnson, Snell & Cummiskey, P.L.C.
>        250 Monroe Avenue NW
>        Suite 800 P.O. Box 306
>        Grand Rapids, MI

EXECUTION COPY

49501-0306 Tel:
~~616.831.1748Email:~~618-
831-1748 Email:
sarbt@millerjohnson.com
- -and— Carter Ledyard &
Milburn LLP 2 Wall
Street New York, New
York 10005 Tel-.:
212-238-8607~~Email:~~
Email:
gadsden@clm.com

To:    ResCap c/o Gary S. Lee Jamie A. Levitt Morrison & Foerster LLP 1290
       Avenue of the Americas New York, NY 10104 Tel: 212-468-8000

-12-

~~Email:~~Email:
       glee@mofo.com-
       jlevitt@mofo.com

Section 10.12 Disputes. This Settlement Agreement, and any disputes arising under or in connection with this Settlement Agreement, are to be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of laws principles thereof. Further, by its execution and delivery of this Settlement Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce to, or filed in, the Bankruptcy Court in connection therewith, *provided, however,* that, upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Settlement Agreement.

Section 10.13 The Parties have agreed to include the following statement in the proposed order attached to the Debtors' motion to approve this Settlement Agreement: "Nothing contained in the RMBS Trust Settlement Agreement, the order approving the RMBS Trust Settlement Agreement, and any associated expert reports, including exhibits, schedules, declarations, and other documents attached thereto or referenced therein, or in any declarations, pleadings, or other documents or evidence submitted to, or filed in, the Bankruptcy Court in connection therewith, shall be construed as an admission of, or to prejudice in any way, Ally Financial Inc. and its non-Debtor direct and indirect subsidiaries and affiliates (collectively, "Ally") and may not be used as evidence against Ally in any court proceeding."

Section 10.14 Notwithstanding anything to the contrary in this Settlement Agreement, nothing herein is intended to or shall be deemed to amend any of the Governing Agreements for any Settlement Trust.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

12-12020-mg    Doc 301    Filed 06/11/12    Entered 06/12/12 15:12    Exhibit
0608/11 Pg 13 of

**EXECUTION COPY**

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 15 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 16 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 17 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 18 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 19 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 20 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 21 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 22 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 23 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 24 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 25 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 26 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 27 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 28 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 29 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 30 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 31 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 32 of 67

ny-1040920

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 33 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 34 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 35 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 36 of 67

12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg 37 of 67

-13-

Dated the 15th day of August, 2012.

Talcott Franklin P.C. on behalf of the Institutional Investors

Signature: _(signature)_

First National Banking Company

[Institution] Name¹: Talcott J. Franklin

By: _Signed/Martin Carpenter

Name: Martin Carpenter

Title: Chairman/CEO Dated: May 14 Principal, Talcott Franklin P.C.

EXECUTION COPY

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
41 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
42 of 67 12-12020-mg   Doc 320-4   Filed 06/11/12   Entered
06/12/12 00:00:34   Exhibit 4 Pg 43 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
44 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
45 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
46 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
47 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
48 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
49 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
50 of 67

Commonwealth Advisors, Inc.
*[Institution Name]*

By: _____

Name: Ashley R. Schexnaildre

Title: Portfolio Manager

Dated: May 15, 2012

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
51 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg
52 of 67

12-12020-mg   Doc 320-4   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit 4 Pg

ny-1040920

12-12020-mg    Doc    Filed    Entered 0608/1215/12    Exhibit
0608/11/12 of

EXECUTION COPY

~~53 of 67 12-12020-mg       Doc 320-4       Filed 06/11/12                     Entered~~
~~06/12/12 00:00:34       Exhibit 4 Pg 54 of 67 12-12020-mg                    Doc 320-4~~
~~           Filed 06/11/12                     Entered 06/12/12 00:00:34    Exhibit 4 Pg~~
~~55 of 67~~

~~12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg~~
~~56 of 67~~

~~12-12020-mg    Doc 320-4    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 4 Pg~~
~~57 of 67~~

-14-

12-12020-mg    Doc    Filed    Entered 08/28/12 15/12    Exhibit
0608/11Pg/12 of

*Wells River Savings Bank*


By:

Name: Frank Tilghman

Title: Executive Vice President

Dated: May 14, 2012

Exhibit A- Trusts

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2004-AR1 | 635.0 | 2004-QS12 | 424.3 |
| 2004-AR2 | 510.1 | 2004-QS13 | 129.2 |
| 2004-GH1 | 224.1 | 2004-QS14 | 212.9 |
| 2004-HE1 | 1,292.3 | 2004-QS15 | 213.7 |
| 2004-HE2 | 711.5 | 2004-QS16 | 534.7 |
| 2004-HE3 | 977.3 | 2004-QS2 | 292.3 |
| 2004-HE4 | 1,018.0 | 2004-QS3 | 207.8 |
| 2004-HE5 | 700.0 | 2004-QS4 | 320.6 |
| 2004-HI1 | 235.0 | 2004-QS5 | 293.7 |
| 2004-HI2 | 275.0 | 2004-QS6 | 156.5 |
| 2004-HI3 | 220.0 | 2004-QS7 | 449.2 |
| 2004-HLTV1 | 175.0 | 2004-QS8 | 271.0 |
| 2004-HS1 | 477.1 | 2004-QS9 | 105.1 |
| 2004-HS2 | 604.1 | 2004-RP1 | 199.5 |
| 2004-HS3 | 284.0 | 2004-RS1 | 1,400.0 |
| 2004-J1 | 401.0 | 2004-RS10 | 1,250.0 |
| 2004-J2 | 400.6 | 2004-RS11 | 925.0 |
| 2004-J3 | 350.0 | 2004-RS12 | 975.0 |
| 2004-J4 | 600.1 | 2004-RS2 | 875.0 |
| 2004-J5 | 551.9 | 2004-RS3 | 600.0 |
| 2004-J6 | 408.0 | 2004-RS4 | 1,100.0 |
| 2004-KR1 | 2,000.0 | 2004-RS5 | 1,050.0 |
| 2004-KR2 | 1,250.0 | 2004-RS6 | 1,000.0 |
| 2004-KS1 | 950.0 | 2004-RS7 | 1,183.7 |
| 2004-KS10 | 986.0 | 2004-RS8 | 900.0 |
| 2004-KS11 | 692.7 | 2004-RS9 | 950.0 |
| 2004-KS12 | 541.8 | 2004-RZ1 | 485.0 |
| 2004-KS2 | 990.0 | 2004-RZ2 | 475.0 |
| 2004-KS3 | 675.0 | 2004-RZ3 | 360.0 |
| 2004-KS4 | 1,000.0 | 2004-RZ4 | 276.6 |
| 2004-KS5 | 1,175.0 | 2004-S1 | 307.7 |
| 2004-KS6 | 1,000.0 | 2004-S2 | 362.0 |
| 2004-KS7 | 850.0 | 2004-S3 | 228.3 |
| 2004-KS8 | 600.0 | 2004-S4 | 460.3 |
| 2004-KS9 | 600.0 | 2004-S5 | 423.5 |
| 2004-PS1 | 100.1 | 2004-S6 | 527.2 |
| 2004-QA1 | 201.3 | 2004-S7 | 105.3 |
| 2004-QA2 | 365.1 | 2004-S8 | 311.0 |
| 2004-QA3 | 320.1 | 2004-S9 | 645.9 |
| 2004-QA4 | 290.2 | 2004-SA1 | 250.1 |
| 2004-QA5 | 325.1 | 2004-SL1 | 632.9 |
| 2004-QA6 | 720.3 | 2004-SL2 | 499.0 |
| 2004-QS1 | 319.9 | 2004-SL3 | 222.5 |
| 2004-QS10 | 216.6 | 2004-SL4 | 206.5 |
| 2004-QS11 | 217.5 | 2004-SP1 | 233.7 |

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2004-SP2 | 145.1 | 2005-KS8 | 1,165.8 |
| 2004-SP3 | 306.9 | 2005-KS9 | 487.0 |
| 2004-VFT | 820.7 | 2005-NC1 | 870.8 |
| 2005-AA1 | 265.6 | 2005-QA1 | 296.7 |
| 2005-AF1 | 235.5 | 2005-QA10 | 621.8 |
| 2005-AF2 | 296.9 | 2005-QA11 | 525.1 |
| 2005-AHL1 | 463.7 | 2005-QA12 | 285.2 |
| 2005-AHL2 | 434.2 | 2005-QA13 | 560.2 |
| 2005-AHL3 | 488.8 | 2005-QA2 | 501.0 |
| 2005-AR1 | 399.8 | 2005-QA3 | 500.0 |
| 2005-AR2 | 458.4 | 2005-QA4 | 525.2 |
| 2005-AR3 | 523.7 | 2005-QA5 | 241.8 |
| 2005-AR4 | 386.1 | 2005-QA6 | 575.5 |
| 2005-AR5 | 597.2 | 2005-QA7 | 575.0 |
| 2005-AR6 | 592.0 | 2005-QA8 | 519.5 |
| 2005-EFC1 | 1,101.5 | 2005-QA9 | 650.5 |
| 2005-EFC2 | 679.3 | 2005-QO1 | 711.1 |
| 2005-EFC3 | 731.9 | 2005-QO2 | 425.1 |
| 2005-EFC4 | 707.8 | 2005-QO3 | 500.6 |
| 2005-EFC5 | 693.3 | 2005-QO4 | 797.0 |
| 2005-EFC6 | 672.7 | 2005-QO5 | 1,275.1 |
| 2005-EFC7 | 698.2 | 2005-QS1 | 214.6 |
| 2005-EMX1 | 792.8 | 2005-QS10 | 265.7 |
| 2005-EMX2 | 620.4 | 2005-QS11 | 213.6 |
| 2005-EMX3 | 674.5 | 2005-QS12 | 528.9 |
| 2005-EMX4 | 492.6 | 2005-QS13 | 639.2 |
| 2005-EMX5 | 380.0 | 2005-QS14 | 615.8 |
| 2005-HE1 | 991.1 | 2005-QS15 | 431.5 |
| 2005-HE2 | 1,113.5 | 2005-QS16 | 428.0 |
| 2005-HE3 | 988.0 | 2005-QS17 | 540.1 |
| 2005-HI1 | 240.0 | 2005-QS2 | 213.0 |
| 2005-HI2 | 240.0 | 2005-QS3 | 475.6 |
| 2005-HI3 | 224.9 | 2005-QS4 | 211.7 |
| 2005-HS1 | 853.8 | 2005-QS5 | 214.0 |
| 2005-HS2 | 577.5 | 2005-QS6 | 265.1 |
| 2005-HSA1 | 278.8 | 2005-QS7 | 370.0 |
| 2005-J1 | 525.5 | 2005-QS8 | 104.1 |
| 2005-KS1 | 708.8 | 2005-QS9 | 371.0 |
| 2005-KS10 | 1,299.2 | 2005-RP1 | 343.1 |
| 2005-KS11 | 1,339.3 | 2005-RP2 | 301.1 |
| 2005-KS12 | 1,117.2 | 2005-RP3 | 282.5 |
| 2005-KS2 | 543.4 | 2005-RS1 | 975.0 |
| 2005-KS3 | 413.5 | 2005-RS2 | 725.0 |
| 2005-KS4 | 411.1 | 2005-RS3 | 741.3 |
| 2005-KS5 | 401.8 | 2005-RS4 | 522.4 |
| 2005-KS6 | 596.2 | 2005-RS5 | 497.5 |
| 2005-KS7 | 387.6 | 2005-RS6 | 1,183.2 |

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2005-RS7 | 493.0 | 2006-HI4 | 272.7 |
| 2005-RS8 | 660.0 | 2006-HI5 | 247.5 |
| 2005-RS9 | 1,179.0 | 2006-HLTV1 | 229.9 |
| 2005-RZ1 | 203.8 | 2006-HSA1 | 461.4 |
| 2005-RZ2 | 333.7 | 2006-HSA2 | 447.9 |
| 2005-RZ3 | 340.0 | 2006-HSA3 | 201.0 |
| 2005-RZ4 | 411.2 | 2006-HSA4 | 402.1 |
| 2005-S1 | 463.1 | 2006-HSA5 | 295.6 |
| 2005-S2 | 260.9 | 2006-J1 | 550.0 |
| 2005-S3 | 183.1 | 2006-KS1 | 840.1 |
| 2005-S4 | 259.4 | 2006-KS2 | 977.5 |
| 2005-S5 | 258.2 | 2006-KS3 | 1,125.9 |
| 2005-S6 | 412.9 | 2006-KS4 | 687.8 |
| 2005-S7 | 311.7 | 2006-KS5 | 687.1 |
| 2005-S8 | 312.3 | 2006-KS6 | 529.1 |
| 2005-S9 | 366.6 | 2006-KS7 | 532.7 |
| 2005-SA1 | 295.2 | 2006-KS8 | 535.9 |
| 2005-SA2 | 500.8 | 2006-KS9 | 1,197.1 |
| 2005-SA3 | 675.2 | 2006-NC1 | 536.8 |
| 2005-SA4 | 850.5 | 2006-NC2 | 745.2 |
| 2005-SA5 | 355.3 | 2006-NC3 | 504.9 |
| 2005-SL1 | 370.5 | 2006-QA1 | 603.9 |
| 2005-SL2 | 168.9 | 2006-QA10 | 375.5 |
| 2005-SP1 | 831.0 | 2006-QA11 | 372.4 |
| 2005-SP2 | 490.2 | 2006-QA2 | 394.0 |
| 2005-SP3 | 285.7 | 2006-QA3 | 398.5 |
| 2006-AR1 | 508.7 | 2006-QA4 | 304.4 |
| 2006-AR2 | 373.0 | 2006-QA5 | 695.6 |
| 2006-EFC1 | 593.2 | 2006-QA6 | 625.8 |
| 2006-EFC2 | 387.6 | 2006-QA7 | 588.2 |
| 2006-EMX1 | 424.6 | 2006-QA8 | 795.1 |
| 2006-EMX2 | 550.1 | 2006-QA9 | 369.2 |
| 2006-EMX3 | 773.6 | 2006-QH1 | 337.9 |
| 2006-EMX4 | 661.7 | 2006-QO1 | 901.2 |
| 2006-EMX5 | 580.2 | 2006-QO10 | 895.7 |
| 2006-EMX6 | 620.5 | 2006-QO2 | 665.5 |
| 2006-EMX7 | 495.3 | 2006-QO3 | 644.8 |
| 2006-EMX8 | 698.6 | 2006-QO4 | 843.2 |
| 2006-EMX9 | 728.8 | 2006-QO5 | 1,071.6 |
| 2006-HE1 | 1,274.2 | 2006-QO6 | 1,290.3 |
| 2006-HE2 | 626.2 | 2006-QO7 | 1,542.4 |
| 2006-HE3 | 1,142.3 | 2006-QO8 | 1,288.1 |
| 2006-HE4 | 1,159.1 | 2006-QO9 | 895.6 |
| 2006-HE5 | 1,244.5 | 2006-QS1 | 323.8 |
| 2006-HI1 | 214.2 | 2006-QS10 | 533.6 |
| 2006-HI2 | 237.4 | 2006-QS11 | 751.5 |
| 2006-HI3 | 223.2 | 2006-QS12 | 541.3 |

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2006-QS13 | 641.0 | 2006-SP3 | 291.9 |
| 2006-QS14 | 753.7 | 2006-SP4 | 303.9 |
| 2006-QS15 | 538.6 | 2007-EMX1 | 692.9 |
| 2006-QS16 | 752.1 | 2007-HE1 | 1,185.9 |
| 2006-QS17 | 537.0 | 2007-HE2 | 1,240.9 |
| 2006-QS18 | 1,181.9 | 2007-HE3 | 350.6 |
| 2006-QS2 | 881.7 | 2007-HI1 | 255.0 |
| 2006-QS3 | 969.8 | 2007-HSA1 | 546.8 |
| 2006-QS4 | 752.3 | 2007-HSA2 | 1,231.4 |
| 2006-QS5 | 698.0 | 2007-HSA3 | 796.4 |
| 2006-QS6 | 858.8 | 2007-KS1 | 415.6 |
| 2006-QS7 | 537.5 | 2007-KS2 | 961.5 |
| 2006-QS8 | 966.3 | 2007-KS3 | 1,270.3 |
| 2006-QS9 | 540.1 | 2007-KS4 | 235.9 |
| 2006-RP1 | 293.0 | 2007-QA1 | 410.1 |
| 2006-RP2 | 317.0 | 2007-QA2 | 367.0 |
| 2006-RP3 | 290.4 | 2007-QA3 | 882.4 |
| 2006-RP4 | 357.4 | 2007-QA4 | 243.5 |
| 2006-RS1 | 1,173.6 | 2007-QA5 | 504.1 |
| 2006-RS2 | 785.6 | 2007-QH1 | 522.3 |
| 2006-RS3 | 741.6 | 2007-QH2 | 348.4 |
| 2006-RS4 | 887.5 | 2007-QH3 | 349.5 |
| 2006-RS5 | 382.6 | 2007-QH4 | 401.0 |
| 2006-RS6 | 372.2 | 2007-QH5 | 497.5 |
| 2006-RZ1 | 483.8 | 2007-QH6 | 597.0 |
| 2006-RZ2 | 368.6 | 2007-QH7 | 347.0 |
| 2006-RZ3 | 688.3 | 2007-QH8 | 560.1 |
| 2006-RZ4 | 851.8 | 2007-QH9 | 594.4 |
| 2006-RZ5 | 505.1 | 2007-QO1 | 625.1 |
| 2006-S1 | 367.1 | 2007-QO2 | 529.3 |
| 2006-S10 | 1,087.7 | 2007-QO3 | 296.3 |
| 2006-S11 | 623.2 | 2007-QO4 | 502.8 |
| 2006-S12 | 1,204.3 | 2007-QO5 | 231.2 |
| 2006-S2 | 260.6 | 2007-QS1 | 1,297.4 |
| 2006-S3 | 337.8 | 2007-QS10 | 435.8 |
| 2006-S4 | 313.9 | 2007-QS11 | 305.8 |
| 2006-S5 | 678.1 | 2007-QS2 | 536.7 |
| 2006-S6 | 599.6 | 2007-QS3 | 971.6 |
| 2006-S7 | 469.7 | 2007-QS4 | 746.9 |
| 2006-S8 | 416.3 | 2007-QS5 | 432.7 |
| 2006-S9 | 442.3 | 2007-QS6 | 808.3 |
| 2006-SA1 | 275.1 | 2007-QS7 | 803.3 |
| 2006-SA2 | 791.3 | 2007-QS8 | 651.8 |
| 2006-SA3 | 350.9 | 2007-QS9 | 707.0 |
| 2006-SA4 | 282.3 | 2007-RP1 | 334.4 |
| 2006-SP1 | 275.9 | 2007-RP2 | 263.3 |
| 2006-SP2 | 348.1 | 2007-RP3 | 346.6 |

| Deal Name | Original Issue Balance (in Thousands) |
|---|---|
| 2007-RP4 | 239.2 |
| 2007-RS1 | 478.3 |
| 2007-RS2 | 376.8 |
| 2007-RZ1 | 329.3 |
| 2007-S1 | 522.5 |
| 2007-S2 | 472.2 |
| 2007-S3 | 575.3 |
| 2007-S4 | 314.5 |
| 2007-S5 | 524.8 |
| 2007-S6 | 707.7 |
| 2007-S7 | 419.1 |
| 2007-S8 | 488.8 |
| 2007-S9 | 172.4 |
| 2007-SA1 | 310.8 |
| 2007-SA2 | 385.1 |
| 2007-SA3 | 363.8 |
| 2007-SA4 | 414.9 |
| 2007-SP1 | 346.6 |
| 2007-SP2 | 279.3 |
| 2007-SP3 | 298.1 |
| Grand Total | 220,987.7 |

12-12020-mg  Doc 1301  Filed 08/28/12  Entered 08/28/12 17:15:17  Exhibit
0608/ 1 Pg 72 of 209

**EXECUTION COPY**

## EXHIBIT B

### ~~Exhibit B - Allocated Allowed Claims~~
### ALLOCATION OF ALLOWED CLAIM

1.      The Allowed Claim shall be allocated amongst the Accepting Trusts by the Trustees pursuant to the determination of a qualified financial advisor (the "Expert") who will make any determinations and perform any calculations required in connection with the allocation of the Allowed Claim among the Accepting Trusts. To the extent that the collateral in any Accepting Trust is divided by the Governing Agreements into groups of loans ("Loan Groups") so that ordinarily only certain classes of investors benefit from the proceeds of particular Loan Groups, those Loan Groups shall be deemed to be separate Accepting Trusts for purposes of the allocation and distribution methodologies set forth below. The Expert is to apply the following allocation ~~formula~~formulas:

(i) *First*, the Expert shall calculate the amount of ~~net losses~~Net Losses for each Accepting Trust ~~that have been or are estimated to be borne by that trust from its inception date to its expected date of termination~~ as a percentage of the sum of the ~~net losses that are estimated to be borne by~~Net Losses for all Accepting Trusts ~~from their inception dates to their expected dates of termination~~ (such amount, the "Net Loss Percentage");

(ii)      *Second,* the Expert shall calculate the "Allocated ~~Allowed~~Depositor Claim" ~~of the Allowed Claim~~ for each Accepting Trust by multiplying (A) the amount of the Allowed Claim by (B) the Net Loss Percentage for such Accepting Trust, expressed as a decimal; provided that the Expert shall be entitled to make adjustments to the Allocated ~~Allowed~~Depositor Claim of each Accepting Trust to ensure that the effects of rounding do not cause the sum of the Allocated ~~Allowed~~Depositor Claims for all Accepting Trusts to exceed the ~~applicable~~amount of the Allowed Claim; and

(iii)      the Expert shall calculate the "Allocated Seller Claim" for each Accepting Trust by multiplying (A) the amount of the Allowed Claim by (B) the Net Loss Percentage for such Accepting Trust, expressed as a decimal; provided that the Expert shall be entitled to make adjustments to the Allocated Seller Claim of each Accepting Trust to ensure that the effects of rounding do not cause the sum of the Allocated Seller Claims for all Accepting Trusts to exceed the amount of the Allowed Claim.

(iv)      Any HoldCo Claim provided to an Accepting Trust making one or more HoldCo Elections, and any reduction to the Allocated Depositor Claim and Allocated Seller Claim of that Accepting Trust, shall be calculated pursuant to Section 6.02.

(v)      For the avoidance of doubt, and subject to the HoldCo Election, each Accepting Trust shall receive an Allocated Claim only against its Seller Entity, which Allocated Claim its Depositor Entity is jointly liable for.

(vi)      ~~(iii) *Third,* if~~ If applicable, the Expert shall calculate the portion of the Allocated ~~Allowed~~ Claim that relates to principal-only certificates or notes and the portion of the Allocated ~~Allowed~~ Claim that relates to all other certificates or notes.

-17-

12-12020-mg    Doc    Filed    Entered 0608/12-15/12    Exhibit
0608/11 Pg 72 of

EXECUTION COPY

2.    All distributions from the Estate to ~~a~~an Accepting Trust on account of any Allocated ~~Allowed~~ Claim shall be treated as Subsequent Recoveries, as that term is defined in the Governing Agreement for that trust; provided that if the Governing Agreement for a particular ~~Covered Trust~~ ~~does not include the term "Subsequent Recovery," the distribution resulting from the Allocated~~ ~~Allowed Claim Trust shall be distributed as though it was unscheduled principal available for~~ ~~distribution on that distribution date.~~Accepting

~~3.    Notwithstanding any other provision of any Governing Agreement, the Debtors and all~~ ~~Servicers agree that neither the Master Servicer nor any Subservicer shall be entitled to~~ ~~receive any portion of any distribution resulting from any Allocated Allowed Claim for~~ ~~any purpose, including without limitation the satisfaction of any Servicing Advances, it~~ ~~being understood that the Master Servicer's other entitlements to payments, and to~~ ~~reimbursement or recovery, including of Advances and Servicing Advances, under the~~ ~~terms of the Governing Agreements shall not be affected by this~~

ny-1054596

Trust does not include the term "Subsequent Recovery," the distribution resulting from the Allocated Claim shall be distributed as though it was unscheduled principal available for distribution on that distribution date; *provided, however,* that should the Bankruptcy Court determine that a different treatment is required to conform the distributions to the requirements of the Governing Agreements, that determination shall govern and shall not constitute a material change to this Settlement Agreement.

3.       Notwithstanding any other provision of any Governing Agreement, the Debtors and all Servicers agree that neither the Master Servicer nor any Subservicer shall be entitled to receive any portion of any distribution resulting from any Allocated Claim for any purpose, including without limitation the satisfaction of any Servicing Advances, it being understood that the Master Servicer's other entitlements to payments, and to reimbursement or recovery, including of Advances and Servicing Advances, under the terms of the Governing Agreements shall not be affected by this Settlement Agreement except as expressly provided here. To the extent that as a result of the distribution resulting from an Allocated Allowed Claim in a particular Accepting Trust a principal payment would become payable to a class of REMIC residual interests, whether on the distribution of the amount resulting from the Allocated Allowed Claim or on any subsequent distribution date that is not the final distribution date under the Governing Agreement for such Accepting Trust, such payment shall be maintained in the distribution account and the relevant Trustee shall distribute it on the next distribution date according to the provisions of this section.

4.       In addition, after any distribution resulting from an Allocated Allowed Claim pursuant to section 3 above, the relevant Trustee will allocate the amount of the distribution for that Accepting Trust in the reverse order of previously allocated Realized Losses, to increase the Class Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance, as applicable, of each class of Certificates or Notes (or Components thereof) (other than any class of REMIC residual interests) to which Realized Losses have been previously allocated, but in each case by not more than the amount of Realized Losses previously allocated to that class of Certificates or Notes (or Components thereof) pursuant to the Governing Agreements. For the avoidance of doubt, for Accepting Trusts for which the Credit Support Depletion Date shall have occurred prior to the allocation of the amount of the Allocable Share in accordance with the immediately preceding sentence, in no event shall the foregoing allocation be deemed to reverse the occurrence of the Credit Support Depletion Date in such Accepting Trusts. Holders of such Certificates or Notes (or Components thereof) will not be entitled to any payment in respect of interest on the amount of such increases for any interest accrual period relating to the distribution date on which such increase occurs or any prior distribution date. Any such increase shall be applied pro rata to the Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance of each Certificate or Note of each class. For the avoidance of doubt, this section 4 is intended only to increase Class Certificate Balances, Component Balances, Component Principal Balances, and Note Principal Balances, as provided for herein, and shall not affect any distributions resulting from Allocated Allowed Claims provided for in section 3 above.

Except as set forth above, nothingNothing in this Settlement Agreement amends or modifies in any way any provisions of any Governing Agreement. To the extent any credit enhancer or financial guarantee insurer receives a distribution on account of the Allowed Claim, such distribution shall be credited at least dollar for dollar against the amount of any claim it files against the Debtor that does not arise under the Governing Agreements.

-18-

**EXECUTION COPY**

~~6.        In no event shall the distribution to a Trust as a result of any Allocated Allowed~~ 5.        In no event shall the distribution to an Accepting Trust as a result of any Allocated Claim be deemed to reduce the collateral losses experienced by such ~~Covered~~Accepting Trust.

<u>Exhibit C -- Fee Schedule</u>

Percentage of the Allowed Claim (being the sum of the Allocated Allowed Claims) allocable to trusts that accept the settlement, subject to adjustment pursuant to section 6.02(b) for trusts other than original "Covered Trusts."

If Effective Date of Plan occurs on or before Sept. 2, 2012, 5.225%

If Effective Date of Plan occurs after Sept. 2, 2012 and on or before Dec. 2, 2012, 5.4625%

If Effective Date of Plan occurs after Dec. 3, 2012 and on or before May 2, 2013, 5.605%

If Effective Date of Plan occurs after May 2, 2013, 5.7%

All fees shall be allocated between: (i) Talcott Franklin P.C.; (ii) Miller, Johnson, Snell & Cummiskey, P.L.C.; and (iii) Carter Ledyard & Milburn LLP, based on lodestar as calculated per agreement between co-counsel.

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| GMACM 2004-J2 | 36185N2C3 | A6 | $14,062,500.00 | $14,062,500.00 |
| GMACM 2005-AF1 | 36185MAS1 | M1 | $4,946,000.00 | $6,946,000.00 |
| GMACM 2005-AR3 | 36185N7J3 | 4A4 | $4,000,000.00 | $4,000,000.00 |
| GMACM 2005-HE1 | 361856ED5 | A1VN | $16,970,000.00 | $28,762,000.00 |
| RAAC 2004-SP3 | 76112BET3 | MIII1 | $3,485,000.00 | $3,485,000.00 |
| RAAC 2005-RP1 | 76112BJQ4 | M1 | $7,000,000.00 | $28,000,000.00 |
| RAAC 2005-RP3 | 76112BP87 | M1 | $15,289,000.00 | $22,839,000.00 |
| RAAC 2005-SP2 | 76112BF62 | 2M1 | $2,000,000.00 | $7,356,000.00 |
| RAAC 2005-SP3 | 76112BS50 | M1 | $12,590,000.00 | $12,590,000.00 |
| RAAC 2006-RP1 | 76112B2W9 | M2 | $6,914,000.00 | $14,914,000.00 |
| RAAC 2006-RP2 | 74919MAB2 | M1 | $2,660,000.00 | $8,000,000 ** Pending Verification |
| RAAC 2006-SP1 | 76112B3F5 | M1 | $9,069,000.00 | $21,069,000.00 |
| RAAC 2006-SP1 | 76112B3G3 | M2 | $11,449,000.00 | $17,173,000.00 |
| RAAC 2006-SP4 | 74919VAC0 | A3 | $15,000,000.00 | $47,545,000.00 |
| RAAC 2007-RP4 | 74919LAE8 | M1 | $9,000,000.00 | $25,513,000.00 |
| RAAC 2007-SP2 | 74919XAH5 | M2 | $5,000,000.00 | $17,961,000.00 |
| RAAC 2007-SP2 | 74919XAG7 | M1 | $17,049,000.00 | $23,049,000.00 |
| RAAC 2007-SP3 | 74978FAB5 | M1 | $8,000,000.00 | $24,496,000.00 |
| RALI 2004-QA3 | 76110HXU8 | M1 | $6,401,000.00 | $6,401,000.00 |
| RALI 2004-QA6 | 76110HJ26 | M1 | $14,408,900.00 | $14,408,900.00 |
| RALI 2004-QR1 | 76110HB99 | A5 | $20,054,123.00 | $20,054,123.00 |
| RALI 2004-QS1 | 76110HQA0 | M2 | $1,568,600.00 | $3,518,600.00 |
| RALI 2004-QS10 | 76110HWF2 | A4 | $58,278,444.00 | $69,278,444.00 |
| RALI 2004-QS12 | 76110HYY9 | M1 | $2,500,000.00 | $9,546,300.00 |
| RALI 2004-QS14 | 76110HA41 | AV | $212,904,630.00 | $212,904,630.00 |
| RALI 2004-QS15 | 76110HE47 | A1 | $122,235,023.00 | $122,235,023.00 |
| RALI 2004-QS15 | 76110HF46 | AV | $213,702,042.00 | $213,702,042.00 |
| RALI 2004-QS16 | 76110HJ67 | 1A2 | $7,500,000.00 | $15,000,000.00 |
| RALI 2004-QS2 | 76110HQP7 | AV | $292,339,189.00 | $292,339,189.00 |
| RALI 2004-QS3 | 76110HRC5 | AV | $207,818,903.00 | $207,818,903.00 |
| RALI 2004-QS5 | 76110HSY6 | A8 | $21,109,053.00 | $21,109,053.00 |
| RALI 2004-QS5 | 76110HTA7 | AV | $293,661,892.00 | $293,661,892.00 |
| RALI 2004-QS8 | 76110HUY3 | AV | $271,022,934.00 | $271,022,934.00 |
| RALI 2005-QA12 | 761118NC8 | NB5 | $15,959,000.00 | $41,969,000.00 |
| RALI 2005-QA7 | 76110H7J2 | M1 | $5,300,000.00 | $14,664,000.00 |
| RALI 2005-QA9 | 761118FG8 | CB1 | $46,241,000.00 | $82,941,000.00 |

12-12020-mg    Doc 1176-3    Filed 08/15/12    Entered 08/15/12 22:04:28    Exhibit 3
Exgr2/Pg9

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| RALI 2005-QS1 | 76110HP45 | A5 | $25,378,000.00 | $76,378,000.00 |
| RALI 2005-QS10 | 761118DB1 | AP | $1,864,997.00 | $1,864,997.00 |
| RALI 2005-QS13 | 761118HC5 | 2A3 | $40,050,000.00 | $130,000,000.00 |
| RALI 2005-QS13 | 761118GX0 | 1A6 | $29,500,000.00 | $73,261,000.00 |
| RALI 2005-QS13 | 761118HB7 | 2A2 | $82,000,000.00 | $139,000,000.00 |
| RALI 2005-QS14 | 761118JH2 | 2A1 | $43,918,000.00 | $115,613,000.00 |
| RALI 2005-QS14 | 761118JM1 | 1AP | $1,302,649.00 | $1,302,649.00 |
| RALI 2005-QS14 | 761118JP4 | 2AP | $7,998,674.00 | $7,998,674.00 |
| RALI 2005-QS15 | 761118KH0 | 2A | $25,000,000.00 | $43,296,000.00 |
| RALI 2005-QS16 | 761118MA3 | A1 | $50,000,000.00 | $132,500,000.00 |
| RALI 2005-QS16 | 761118MF2 | A6 | $14,504,565.00 | $14,504,565.00 |
| RALI 2005-QS16 | 761118MJ4 | A9 | $94,233,000.00 | $94,233,000.00 |
| RALI 2005-QS17 | 761118PS1 | A3 | $10,000,000.00 | $25,000,000.00 |
| RALI 2005-QS17 | 761118PU6 | A5 | $20,057,500.00 | $38,457,500.00 |
| RALI 2005-QS17 | 761118PR3 | A2 | $25,000,000.00 | $25,000,000.00 |
| RALI 2005-QS17 | 761118PT9 | A4 | $25,000,000.00 | $25,000,000.00 |
| RALI 2005-QS17 | 761118PV4 | A6 | $21,443,500.00 | $21,443,500.00 |
| RALI 2005-QS2 | 76110HR35 | AV | $212,988,702.00 | $212,988,702.00 |
| RALI 2005-QS3 | 76110HX61 | 1A21 | $98,000,000.00 | $167,418,000.00 |
| RALI 2005-QS3 | 76110HY60 | 1AV | $371,599,754.00 | $371,599,754.00 |
| RALI 2005-QS4 | 76110H3V9 | AV | $211,687,240.00 | $211,687,240.00 |
| RALI 2005-QS5 | 76110H2Z1 | A3 | $83,591,000.00 | $83,591,000.00 |
| RALI 2005-QS6 | 76110H5P0 | AP | $902,809.00 | $902,809.00 |
| RALI 2005-QS6 | 76110H5K1 | A5 | $12,787,000.00 | $12,787,000.00 |
| RALI 2005-QS6 | 76110H5Q8 | AV | $265,144,243.00 | $265,144,243.00 |
| RALI 2005-QS9 | 761118AU2 | A1 | $35,000,000.00 | $133,249,500.00 |
| RALI 2006-QH1 | 75115GAA6 | A1 | $74,315,000.00 | $192,035,000.00 |
| RALI 2006-QO1 | 761118RM2 | 3A1 | $82,758,000.00 | $309,242,000.00 |
| RALI 2006-QO5 | 75114HAJ6 | 3A3 | $16,094,000.00 | $32,687,000.00 |
| RALI 2006-QS1 | 761118SE9 | A6 | $11,343,992.00 | $11,343,992.00 |
| RALI 2006-QS1 | 761118SJ8 | AP | $2,784,565.00 | $2,784,565.00 |
| RALI 2006-QS10 | 751155AG7 | A7 | $24,638,000.00 | $24,638,000.00 |
| RALI 2006-QS12 | 751151AX9 | 2A18 | $40,072,903.00 | $49,972,903.00 |
| RALI 2006-QS13 | 75115DAK1 | 1A10 | $16,000,000.00 | $19,338,000.00 |
| RALI 2006-QS14 | 74922GAT1 | A18 | $30,113,677.00 | $30,113,677.00 |
| RALI 2006-QS16 | 74922LAL7 | A11 | $15,040,000.00 | $15,540,000.00 |

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| RALI 2006-QS16 | 74922LAD5 | A4 | $43,131,000.00 | $43,131,000.00 |
| RALI 2006-QS16 | 74922LAH6 | A8 | $6,092,000.00 | $6,092,000.00 |
| RALI 2006-QS17 | 74922SAD0 | A4 | $21,500,000.00 | $45,000,000.00 |
| RALI 2006-QS17 | 74922SAE8 | A5 | $177,061,000.00 | $187,061,000.00 |
| RALI 2006-QS17 | 74922SAH1 | A8 | $28,792,000.00 | $28,792,000.00 |
| RALI 2006-QS18 | 74922RAX8 | 3AV | $104,211,499.00 | $104,211,499.00 |
| RALI 2006-QS18 | 761118VF2 | 2AP | $1,618,278.00 | $1,623,637.00 |
| RALI 2006-QS2 | 761118YD7 | 1AP | $3,239,836.00 | $3,240,432.00 |
| RALI 2006-QS2 | 761118UK2 | 1A4 | $14,457,800.00 | $14,457,800.00 |
| RALI 2006-QS2 | 761118YG0 | 2AV | $131,448,942.00 | $131,448,942.00 |
| RALI 2006-QS2 | 761118UR7 | 1A10 | $60,000,000.00 | $105,672,000.00 |
| RALI 2006-QS2 | 761118XP8 | 1A11 | $497,722,000.00 | $497,722,000.00 |
| RALI 2006-QS3 | 74922BAH5 | A8 | $32,000,000.00 | $41,010,000.00 |
| RALI 2006-QS4 | 74894DAE3 | AP | $1,376,144.00 | $1,376,144.00 |
| RALI 2006-QS4 | 75114TAC5 | A3 | $39,129,000.00 | $96,590,000.00 |
| RALI 2006-QS5 | 75114TAF8 | A5 | $67,018,000.00 | $77,009,000.00 |
| RALI 2006-QS5 | 75115CAD9 | A6 | $348,750,000.00 | $348,750,000.00 |
| RALI 2006-QS5 | 75115CAF4 | 1A4 | $9,000,000.00 | $15,354,000.00 |
| RALI 2006-QS6 | 74922WAA7 | 1A4 | $25,000,000.00 | $25,000,000.00 |
| RALI 2006-QS6 | 74922WAC3 | A2 | $13,670,000.00 | $13,670,000.00 |
| RALI 2007-QH4 | 74924TAC0 | A3 | $56,537,000.00 | $56,537,000.00 |
| RALI 2007-QH4 | 74924IAA3 | A1 | $20,000,000.00 | $49,682,000.00 |
| RALI 2007-QH2 | 75116AAA8 | A1 | $50,000,000.00 | $198,727,000.00 |
| RALI 2007-QO2 | 74923TAA3 | A1 | $77,329,000.00 | $388,219,000.00 |
| RALI 2007-QO3 | 74923TAA3 | A1A | $44,479,000.00 | $146,700,000.00 |
| RALI 2007-QO4 | 74923JAB8 | A1 | $74,176,000.00 | $125,568,000.00 |
| RALI 2007-QS1 | 74922KAB1 | 1A2 | $104,191,250.00 | $166,706,000.00 |
| RALI 2007-QS1 | 74922KAR6 | 2A10 | $60,194,000.00 | $88,250,000.00 |

12-12020-mg   Doc 1176-5   Filed 08/15/12   Entered 08/15/12 22:04:28   Exhibit 3
Exhibit 3
Pg 160 of 209

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| RALI 2007-QS1 | 74922KAN5 | 2A7 | $2,000,000.00 | $2,558,600.00 |
| RALI 2007-QS2 | 74923CAA0 | A1 | $17,775,000.00 | $20,000,000.00 |
| RALI 2007-QS2 | 74923CAB8 | A2 | $8,770,000.00 | $8,800,000.00 |
| RALI 2007-QS3 | 75116BAA6 | A1 | $254,000,000.00 | $300,000,000.00 |
| RALI 2007-QS3 | 75116BAD0 | A4 | $19,620,000.00 | $19,620,000.00 |
| RALI 2007-QS5 | 74923JAH0 | A8 | $40,000,000.00 | $100,132,000.00 |
| RALI 2007-QS5 | 74923JAA5 | A1 | $32,782,000.00 | $73,592,000.00 |
| RALI 2007-QS6 | 75116CBW5 | A45 | $32,105,874.00 | $56,475,000.00 |
| RALI 2007-QS6 | 74922UAE3 | A5 | $30,000,000.00 | $35,643,000.00 |
| RALI 2007-QS6 | 75116CAN6 | A13 | $6,267,536.00 | $6,267,536.00 |
| RALI 2007-QS8 | 74922UAH6 | A8 | $19,375,000.00 | $48,375,000.00 |
| RALI 2008-QR1 | 74925FAD5 | 1A4 | $9,300,000.00 | $14,920,000.00 |
| RAMP 2004-RS1 | 760985P54 | MII6 | $3,500,000.00 | $13,500,000.00 |
| RAMP 2004-RS10 | 76112BEF3 | MII4 | $7,000,000.00 | $21,400,000.00 |
| RAMP 2004-RS10 | 76112BEC0 | MII1 | $30,000,000.00 | $68,900,000.00 |
| RAMP 2004-RS11 | 76112BFL9 | M4 | $5,500,000.00 | $18,500,000.00 |
| RAMP 2004-RS11 | 76112BFJ4 | M2 | $21,000,000.00 | $48,563,000.00 |
| RAMP 2004-RS11 | 76112BFM7 | M5 | $10,875,000.00 | $13,875,000.00 |
| RAMP 2004-RS2 | 760985R37 | MII1 | $14,000,000.00 | $46,500,000.00 |
| RAMP 2004-RS2 | 760985Q79 | MI3 | $1,500,000.00 | $4,813,000.00 |
| RAMP 2004-RS2 | 760985R45 | MII2 | $20,000,000.00 | $36,000,000.00 |
| RAMP 2004-RS3 | 760985V81 | M3 | $5,000,000.00 | $10,500,000.00 |
| RAMP 2004-RS4 | 7609853J8 | MII2 | $21,000,000.00 | $37,100,000.00 |
| RAMP 2004-RS4 | 7609853H2 | MII1 | $45,200,000.00 | $64,400,000.00 |
| RAMP 2004-RS5 | 7609854B4 | AI6 | $11,000,000.00 | $40,000,000.00 |
| RAMP 2004-RS5 | 7609854H1 | MII2 | $10,500,000.00 | $30,875,000.00 |
| RAMP 2004-RS5 | 7609854J7 | MII3 | $4,000,000.00 | $8,125,000.00 |
| RAMP 2004-RS6 | 7609855M9 | MII2 | $11,250,000.00 | $33,250,000.00 |
| RAMP 2004-RS6 | 7609855N7 | MII3 | $4,375,000.00 | $8,750,000.00 |
| RAMP 2004-RS7 | 7609857F2 | AI6 | $22,500,000.00 | $40,000,000.00 |
| RAMP 2004-RS8 | 76112BAD2 | AI4 | $15,000,000.00 | $47,894,000.00 |
| RAMP 2004-RS8 | 76112BAP5 | MII3 | $8,375,000.00 | $12,375,000.00 |
| RAMP 2004-RS9 | 76112BCQ1 | MII4 | $4,000,000.00 | $15,200,000.00 |
| RAMP 2004-RS9 | 76112BCF5 | AI4 | $16,300,000.00 | $56,800,000.00 |
| RAMP 2004-RS9 | 76112BCG3 | AI5 | $15,000,000.00 | $37,700,000.00 |
| RAMP 2004-RS9 | 76112BCH1 | AI6 | $15,357,000.00 | $27,500,000.00 |

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| RAMP 2004-RS9 | 76112BCP3 | MIII3 | $15,200,000.00 | $15,200,000.00 |
| RAMP 2004-RZ2 | 7609854S7 | AI4 | $11,530,000.00 | $43,700,000.00 |
| RAMP 2004-RZ4 | 76112BHM5 | M6 | $700,000.00 | $2,100,000.00 |
| RAMP 2004-RZ4 | 76112BHQ6 | B | $2,800,000.00 | $2,800,000.00 |
| RAMP 2005-EFC1 | 76112BRR3 | M6 | $5,262,000.00 | $17,262,000.00 |
| RAMP 2005-EFC2 | 76112BVW7 | M8 | $3,000,000.00 | $10,186,000.00 |
| RAMP 2005-EFC2 | 76112BVU1 | M6 | $7,889,000.00 | $10,889,000.00 |
| RAMP 2005-EFC4 | 76112BC73 | M4 | $6,196,000.00 | $13,196,000.00 |
| RAMP 2005-EFC6 | 76112BK41 | M3 | $12,500,000.00 | $17,000,000.00 |
| RAMP 2005-RS1 | 76112BHX1 | AI5 | $8,100,000.00 | $27,843,000.00 |
| RAMP 2005-RS4 | 76112BPF1 | M5 | $4,875,000.00 | $7,875,000.00 |
| RAMP 2005-RS6 | 76112BTX8 | M6 | $9,500,000.00 | $16,800,000.00 |
| RAMP 2005-RS6 | 76112BTV2 | M4 | $16,000,000.00 | $21,000,000.00 |
| RAMP 2005-RS7 | 76112BWX4 | M2 | $3,750,000.00 | $12,250,000.00 |
| RAMP 2005-RS7 | 76112BXA3 | M5 | $2,500,000.00 | $5,000,000.00 |
| RAMP 2005-RS7 | 76112BWY2 | M3 | $5,000,000.00 | $6,500,000.00 |
| RAMP 2005-RS7 | 76112BXB1 | M6 | $4,750,000.00 | $4,750,000.00 |
| RAMP 2005-RS8 | 76112BZJ2 | M1 | $20,000,000.00 | $20,283,000.00 |
| RAMP 2005-RZ1 | 76112BMB3 | M4 | $4,100,000.00 | $4,100,000.00 |
| RAMP 2005-RZ2 | 76112BWJ5 | M3 | $3,800,000.00 | $7,547,000.00 |
| RAMP 2005-RZ2 | 76112BWG1 | M1 | $10,000,000.00 | $18,615,000.00 |
| RAMP 2005-RZ2 | 76112BWL0 | M5 | $8,050,000.00 | $8,050,000.00 |
| RAMP 2005-RZ3 | 76112BZY9 | A2 | $36,100,000.00 | $116,001,000.00 |
| RAMP 2006-EFC1 | 76112BV80 | M2 | $10,980,000.00 | $21,960,000.00 |
| RAMP 2006-EFC2 | 749238AF8 | M2 | $6,600,000.00 | $13,200,000.00 |
| RAMP 2006-EFC2 | 749238AE1 | M1 | $15,000,000.00 | $15,000,000.00 |
| RAMP 2006-NC1 | 76112BX47 | M2 | $6,800,000.00 | $16,500,000.00 |
| RAMP 2006-NC3 | 76112B4R8 | M3 | $3,500,000.00 | $10,140,000.00 |
| RAMP 2006-NC3 | 76112B4Q0 | M2 | $10,000,000.00 | $17,680,000.00 |
| RAMP 2006-RS2 | 76112B2E9 | M1 | $5,000,000.00 | $18,400,000.00 |
| RAMP 2006-RS4 | 75156WAE3 | M1 | $14,875,000.00 | $35,613,000.00 |
| RAMP 2006-RS5 | 75156YAC3 | A3 | $44,776,000.00 | $104,776,000.00 |
| RAMP 2006-RS5 | 75156YAE9 | M1 | $5,725,000.00 | $10,725,000.00 |
| RAMP 2006-RZ1 | 76112BZ45 | M3 | $5,000,000.00 | $9,750,000.00 |
| RAMP 2006-RZ1 | 76112BZ52 | M4 | $9,000,000.00 | $9,000,000.00 |
| RAMP 2006-RZ2 | 75156UAE7 | M2 | $4,000,000.00 | $11,812,000.00 |

12-12020-mg    Doc 176-5    Filed 08/15/12    Entered 08/15/12 22:04:28    Exhibit 5
Exhibit 5

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|-----------|-------|-------|-----------------|---------------------|
| RAMP 2006-RZ2 | 75156UAD9 | M1 | $6,000,000.00 | $13,688,000.00 |
| RAMP 2006-RZ3 | 75156MAF2 | M3 | $6,620,000.00 | $15,620,000.00 |
| RAMP 2006-RZ5 | 749239AE9 | A3 | $12,760,000.00 | $32,720,000.00 |
| RAMP 2006-RZ5 | 749239AH2 | M3 | $10,960,000.00 | $10,960,000.00 |
| RASC 2004-KS1 | 74924PAN2 | MII2 | $17,250,000.00 | $35,750,000.00 |
| RASC 2004-KS10 | 76110WG67 | M4 | $4,500,000.00 | $10,000,000.00 |
| RASC 2004-KS10 | 76110WG59 | M3 | $8,000,000.00 | $15,000,000.00 |
| RASC 2004-KS12 | 76110WL20 | M3 | $3,500,000.00 | $8,200,000.00 |
| RASC 2004-KS12 | 76110WL79 | SB | $8,250,228.00 | $8,250,228.00 |
| RASC 2004-KS2 | 76110WWP7 | M22 | $4,500,000.00 | $38,500,000.00 |
| RASC 2004-KS3 | 76110WXF8 | MII1 | $16,500,000.00 | $30,875,000.00 |
| RASC 2004-KS6 | 76110WZW9 | MI3 | $1,000,000.00 | $4,000,000.00 |
| RASC 2004-KS6 | 76110WZN9 | AI5 | $6,000,000.00 | $20,617,000.00 |
| RASC 2004-KS6 | 76110WZY5 | MII2 | $13,500,000.00 | $42,000,000.00 |
| RASC 2004-KS6 | 76110WZV1 | MI2 | $2,750,000.00 | $5,500,000.00 |
| RASC 2004-KS8 | 76110WD52 | MII1 | $7,800,000.00 | $25,600,000.00 |
| RASC 2004-KS9 | 76110WE77 | AI6 | $4,000,000.00 | $15,000,000.00 |
| RASC 2004-KS9 | 76110WE51 | AI4 | $11,750,000.00 | $21,100,000.00 |
| RASC 2005-AHL2 | 76110W5J1 | M2 | $3,526,000.00 | $13,626,000.00 |
| RASC 2005-AHL2 | 76110W5K8 | M3 | $2,605,000.00 | $9,605,000.00 |
| RASC 2005-AHL3 | 76110W6L5 | A2 | $58,490,000.00 | $187,495,000.00 |
| RASC 2005-AHL3 | 76110W6P6 | M2 | $13,025,786.00 | $15,500,000.00 |
| RASC 2005-EMX1 | 76110WQ90 | M5 | $3,000,000.00 | $10,800,000.00 |
| RASC 2005-EMX1 | 76110WQ82 | M4 | $5,800,000.00 | $10,800,000.00 |
| RASC 2005-EMX1 | 76110WR24 | M6 | $10,800,000.00 | $10,800,000.00 |
| RASC 2005-EMX1 | 76110WR40 | SB | $7,210,111.00 | $7,210,111.00 |
| RASC 2005-EMX2 | 76110W2L9 | M5 | $4,175,000.00 | $10,592,000.00 |
| RASC 2005-EMX2 | 76110W2N5 | M7 | $3,800,000.00 | $9,308,000.00 |
| RASC 2005-EMX2 | 76110W2P0 | M8 | $3,500,000.00 | $8,345,000.00 |
| RASC 2005-EMX2 | 76110W2M7 | M6 | $8,950,000.00 | $9,950,000.00 |
| RASC 2005-EMX2 | 76110W2S4 | SB | $21,510,156.00 | $21,510,156.00 |
| RASC 2005-EMX3 | 75405MAJ3 | M4 | $4,000,000.00 | $12,250,000.00 |
| RASC 2005-EMX4 | 76110W6A9 | M2 | $5,000,000.00 | $18,540,000.00 |
| RASC 2005-KS10 | 75405WAG7 | M3 | $7,614,931.00 | $25,799,000.00 |
| RASC 2005-KS11 | 76110W7G5 | M4 | $6,161,000.00 | $22,080,000.00 |
| RASC 2005-KS11 | 76110W7D2 | M1 | $16,680,000.00 | $49,680,000.00 |

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| RASC 2005-KS12 | 753910AG3 | M4 | $9,208,000.00 | $20,125,000.00 |
| RASC 2005-KS2 | 76110WN77 | M2 | $10,000,000.00 | $28,875,000.00 |
| RASC 2005-KS3 | 76110WS64 | M6 | $3,481,000.00 | $7,481,000.00 |
| RASC 2005-KS4 | 76110WU61 | M1 | $9,740,000.00 | $20,927,000.00 |
| RASC 2005-KS4 | 76110WU87 | M3 | $6,363,000.00 | $7,873,000.00 |
| RASC 2005-KS8 | 76110W3U8 | M4 | $7,500,000.00 | $21,000,000.00 |
| RASC 2005-KS9 | 754058AJ4 | M6 | $3,750,000.00 | $7,750,000.00 |
| RASC 2006-EMX2 | 75406AAB5 | A2 | $51,000,000.00 | $203,139,000.00 |
| RASC 2006-EMX2 | 75406AAE9 | M2 | $6,375,000.00 | $21,375,000.00 |
| RASC 2006-EMX2 | 75406AAD1 | M1 | $9,085,000.00 | $23,085,000.00 |
| RASC 2006-EMX2 | 75406AAG4 | M4 | $8,115,000.00 | $11,115,000.00 |
| RASC 2006-EMX3 | 76113ACG4 | M6 | $5,000,000.00 | $13,600,000.00 |
| RASC 2006-EMX3 | 76113ACA7 | A3 | $16,260,000.00 | $29,750,000.00 |
| RASC 2006-EMX4 | 75406DAF0 | M2 | $7,500,000.00 | $25,002,000.00 |
| RASC 2006-EMX6 | 754065AC4 | A3 | $37,752,000.00 | $106,095,000.00 |
| RASC 2006-EMX6 | 754065AD2 | A4 | $24,011,000.00 | $39,011,000.00 |
| RASC 2006-EMX8 | 74924UAL5 | M6 | $3,500,000.00 | $12,045,000.00 |
| RASC 2006-EMX8 | 74924UAH4 | M3 | $8,000,000.00 | $16,060,000.00 |
| RASC 2006-EMX9 | 74924VAL3 | M6 | $3,000,000.00 | $11,020,000.00 |
| RASC 2006-KS2 | 75406BAG2 | M3 | $5,000,000.00 | $20,000,000.00 |
| RASC 2006-KS2 | 75406BAK3 | M6 | $5,000,000.00 | $15,500,000.00 |
| RASC 2006-KS2 | 75406BAH0 | M4 | $11,000,000.00 | $18,000,000.00 |
| RASC 2006-KS3 | 76113ABL4 | M1 | $15,000,000.00 | $43,700,000.00 |
| RASC 2006-KS3 | 76113ABP5 | M4 | $8,000,000.00 | $20,700,000.00 |
| RASC 2006-KS4 | 75406EAE1 | M1 | $15,000,000.00 | $26,614,000.00 |
| RASC 2006-KS4 | 75406EAF8 | M2 | $16,000,000.00 | $24,863,000.00 |
| RASC 2006-KS5 | 75406VAG8 | M3 | $4,000,000.00 | $14,350,000.00 |
| RASC 2006-KS5 | 75406VAH6 | M4 | $4,000,000.00 | $12,950,000.00 |
| RASC 2006-KS6 | 75406WAF8 | M2 | $6,508,000.00 | $18,508,000.00 |
| RASC 2006-KS7 | 75406XAM1 | M8 | $2,000,000.00 | $7,700,000.00 |
| RASC 2006-KS7 | 75406XAE9 | M1 | $17,175,000.00 | $21,175,000.00 |
| RASC 2007-KS1 | 74924SAK2 | M6 | $2,250,000.00 | $6,768,000.00 |
| RASC 2007-KS1 | 74924SAH9 | M4 | $3,900,000.00 | $7,826,000.00 |
| RASC 2007-KS1 | 74924SAC0 | A3 | $35,455,000.00 | $79,455,000.00 |
| RASC 2007-KS2 | 74924WAF4 | M1 | $14,374,990.00 | $42,000,000.00 |
| RASC 2007-KS2 | 74924WAD9 | AI4 | $25,000,000.00 | $65,200,000.00 |

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| RASC 2007-KS3 | 74924YAF0 | M1S | $37,181,000.00 | $56,069,000.00 |
| RASC 2007-KS4 | 74924NAB3 | A2 | $11,775,000.00 | $29,400,000.00 |
| RFMS2 2004-HS1 | 76110VQE1 | All | $63,000,000.00 | $172,125,000.00 |
| RFMS2 2006-HI1 | 76110VUE6 | M8 | $2,877,000.00 | $5,727,000.00 |
| RFMSI 2004-S2 | 76111XFY4 | IA6 | $17,500,000.00 | $17,500,000.00 |
| RFMSI 2004-S3 | 76111XGT4 | M2 | $456,600.00 | $456,600.00 |
| RFMSI 2004-S5 | 76111XKC6 | 1AV | $322,312,635.00 | $322,312,635.00 |
| RFMSI 2004-S6 | 76111XLY7 | 2A4 | $1,111,000.00 | $1,111,000.00 |
| RFMSI 2004-S6 | 76111XMX8 | 1AV | $175,743,890.00 | $175,743,890.00 |
| RFMSI 2004-S6 | 76111XMZ3 | 2AV | $196,429,039.00 | $196,429,039.00 |
| RFMSI 2004-S8 | 76111XPB3 | AV | $311,005,474.00 | $311,005,474.00 |
| RFMSI 2004-S9 | 76111XQE6 | 1A2 | $35,700,000.00 | $35,700,000.00 |
| RFMSI 2004-S9 | 76111XRJ4 | 1AV | $518,853,762.00 | $518,853,762.00 |
| RFMSI 2005-S1 | 76111XSH7 | 1AV | $259,777,920.00 | $259,777,920.00 |
| RFMSI 2005-S2 | 76111XTV5 | A6 | $11,600,000.00 | $23,484,000.00 |
| RFMSI 2005-S4 | 76111XUW1 | AV | $259,355,464.00 | $259,355,464.00 |
| RFMSI 2005-S5 | 76111XWW9 | AP | $472,373.00 | $472,374.00 |
| RFMSI 2005-S5 | 76111XWX7 | AV | $258,235,737.00 | $258,235,737.00 |
| RFMSI 2005-S6 | 76111XXT5 | AV | $412,859,719.00 | $412,859,719.00 |
| RFMSI 2005-S8 | 76111XC84 | AP | $1,370,905.00 | $1,370,905.00 |
| RFMSI 2005-S9 | 76111XE82 | A8 | $4,486,000.00 | $15,986,000.00 |
| RFMSI 2005-S9 | 76111XE66 | A6 | $32,000,000.00 | $32,000,000.00 |
| RFMSI 2006-S11 | 74958FAC7 | A3 | $2,360,000.00 | $4,643,000.00 |
| RFMSI 2006-S12 | 74958EAT3 | 3A10 | $11,625,000.00 | $11,625,000.00 |
| RFMSI 2006-S12 | 74958EAZ9 | 3AV | $364,207,747.00 | $364,207,747.00 |
| RFMSI 2006-S3 | 76111XN74 | A1 | $66,950,000.00 | $76,950,000.00 |
| RFMSI 2006-S4 | 762010AE6 | A5 | $12,000,000.00 | $40,487,000.00 |
| RFMSI 2006-S4 | 762010AM8 | AV | $153,917,718.00 | $313,917,718.00 |
| RFMSI 2006-S4 | 762010AG1 | A7 | $20,200,000.00 | $30,300,000.00 |
| RFMSI 2006-S7 | 74958AAM6 | AV | $180,000,000.00 | $469,651,185.00 |
| RFMSI 2006-S8 | 74957XAC9 | A3 | $25,000,000.00 | $25,000,000.00 |
| RFMSI 2006-S8 | 74957XAG0 | A7 | $6,250,000.00 | $6,250,000.00 |
| RFMSI 2006-S8 | 74957XAD7 | A4 | $2,866,667.00 | $2,866,667.00 |
| RFMSI 2006-SA3 | 749575AD8 | 2A3 | $26,150,000.00 | $33,150,000.00 |
| RFMSI 2007-S1 | 749581AL8 | A7 | $22,000,000.00 | $82,000,000.00 |
| RFMSI 2007-S2 | 749583AD2 | A4 | $39,000,000.00 | $65,000,000.00 |

| Deal Name | Cusip | Class | Group Class Sum | Original Class Face |
|---|---|---|---|---|
| REMSI 2007-S2 | 74958AA8 | A1 | $35,058,000.00 | $35,058,000.00 |
| REMSI 2007-S3 | 74958BAK8 | 1A4 | $20,000,000.00 | $20,000,000.00 |
| REMSI 2007-S5 | 74958OAA4 | A1 | $250,000,000.00 | $250,000,000.00 |
| REMSI 2007-S6 | 762009AK4 | 1A10 | $13,500,000.00 | $43,184,000.00 |
| REMSI 2007-S6 | 762009BB3 | 2A4 | $25,000,000.00 | $50,233,000.00 |
| REMSI 2007-S9 | 74958VAR4 | 1A2 | $1,425,000.00 | $5,400,000.00 |
| REMSI 2007-SA1 | 74958WAG1 | 4A | $38,604,000.00 | $38,604,000.00 |
| RFSC 2001-RM2 | 76098SFR7 | A1 | $35,249,800.00 | $75,249,800.00 |

# EXHIBIT G

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON
MOSCOW · FRANKFURT · COLOGNE · ROME · MILAN
HONG KONG · BEIJING · BUENOS AIRES · SÃO PAULO

Writer's Direct Dial: +1 212 225 2416
E-Mail: soneal@cgsh.com

July 25, 2012

## VIA EMAIL

Larren M. Nashelsky
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Re:    Diligence Questions

Dear Mr. Nashelsky:

As you know, we represent certain holders of the senior unsecured notes issued by Residential Capital, LLC ("ResCap"), and we have signed a confidentiality agreement with ResCap to receive and review Evaluation Material related to a Possible Transaction (as defined in the confidentiality agreement). In order to facilitate the flow of information, and to avoid costly litigation related to their production, we have attached an informal list of documents that we wish to review. We note that many of our requests are directly related to the requests made by the official committee of unsecured creditors. Accordingly, providing us with a copy of, or access to, that production, would streamline this process.

We seek to obtain these documents at the earliest possible time, and I am available at your convenience to arrange for their delivery or other access (including access to a virtual data room). I thank you in advance for your attention to this matter.

Sincerely,

Sean O'Neal

Sean O'Neal

cc:    Messrs. Todd M. Goren and Gary Lee, Morrison & Foerster (via email)
       Messrs. Daniel Ehrmann and David Coles, Alvarez & Marsal (via email)

CLEARY GOTTLIEB STEEN & HAMILTON LLP OR AN AFFILIATED ENTITY HAS AN OFFICE IN EACH OF THE CITIES LISTED ABOVE

*Diligence List of*
*Cleary Gottlieb / Alvarez & Marsal*
*July 25, 2012*

| Request No. | Diligence Question / Related Document | Approx. UCC Doc. Req. ¶ No. (ECF 192) |
|---|---|---|
| | **Corporate/Group Companies** | |
| 1 | Corporate formation documents (certificates/articles of incorporation, etc.), as amended, for each debtor. | 5 |
| 2 | Documents pertaining to resources and corporate functions shared between Ally and the Debtors since 2008 including, but not limited to, legal, procurement, risk, treasury, finance and audit services, and the cost sharing for such services. | |
| 3 | Bylaws, operating agreements, partnership agreements, or equivalent corporate governance documents, as amended, for each debtor. | |
| 4 | Copies of each debtor's register of shareholders and directors, and listing of each debtor's officers. | |
| 5 | Correspondence from and to Berkshire Hathaway or its affiliates, beginning in Jan. 2008. | |
| 6 | List of all officers, directors and senior employees of the Debtors who were also officers, directors or employees of AFI, GMAC LLC and/or Ally Bank since 2008. | |
| | **Financial Information** | |
| 7 | Documents related to ResCap's issuance of secured notes in exchange for unsecured notes to AFI and other participating holders. | |
| 8 | All documents related to the exchange offer of May 2008, including, but not limited to, the confidential offering memorandum and consent solicitation statement dated May 5, 2008 and its amendments of May 14, 2008 and May 29, 2008. | |
| 9 | Documents relating to the exchange offer in November 2008 for ResCap notes. | |
| 10 | Detailed legal entity-level balance sheets for all debtor and non-debtor entities as of (i) filing, and (ii) the latest month-end available. | |
| 11 | A schedule that details the book value of assets (as of filing and the latest month-end available) by (i) balance sheet line item, (ii) legal entity, and (iii) secured credit facility to the extent the asset is collateral. | |
| 12 | An updated Estimated Purchase Price Allocation by Facility schedule (similar to Docket #66) as of (i) filing and (ii) the latest month-end available and explanation / support of allocation methodology. | |
| 13 | Latest financial forecast or business plan, including a cash flow forecast. | |
| 14 | Explanation of how the total assets per the Debtor's Schedules of Assets and Liabilities ($5.9 billion, excluding interco receivables) reconciles to the subtotal of the Debtors total assets per the schedule "Trial Balance - Asset by Facility as of 2/29/2012 ($7.2 billion)." | |
| 15 | With respect to the $168,844,378 in cash equivalents held by Residential Capital, LLC on the Petition Date, a description of whether the cash encumbered is security and, if so, by which instruments. | |

1

| | | | |
|---|---|---|---|
| **Material Contracts** | | | |
| 16 | Copies of all agreements relating to a material acquisition or disposition, however structured (asset purchase, stock purchase, merger, etc.), since Jan. 2008. | | |
| 17 | Copies of all loan agreements, indentures, security agreements, or other financial instruments involving one or more of the debtors. | | |
| 18 | Copies of all existing swap, future, derivatives contracts, and confirmations, including contracts between AFI and ResCap or one of its direct or indirect subsidiaries. | | |
| 19 | Copy of deposit control or similar agreements relating to cash held by ResCap. | | |
| **InterCo Claims** | | | |
| 20 | Documents supporting allegations that Ally has contributed more than $10 billion to ResCap since 2007. | | |
| 21 | Description of the intercompany claims described in the schedules. | | |
| 22 | Documentation of the intercompany claims described in the schedules. | | |
| 23 | Intercompany balances among Rescap and its subsidiaries, since Jan. 2008 (priority is intercompany balances as of the most recent month-end available, including priority status to the extent not deemed unsecured). | | |
| **Transactions Related to Ally Bank** | | | |
| 24 | Copies of all agreements relating to the transfer of interests in the Ally Bank (f/k/a GMAC Bank) transaction. | | |
| 25 | Copies of any fairness opinions, appraisals, or similar documents relating to the Ally Bank transaction, and all communications with AFI, Cerberus, Ally Bank, or their respective financial advisors, investment bankers, valuation experts or consultants, and/or government regulators related to the Ally Bank transaction. | 9 | |
| 26 | Documents analyzing the Ally Bank transaction provided to the board, UCC, or other parties in interest. | | |
| 27 | Copies of investigation or internal reports relating to the Ally Bank transaction prepared by the board or a subset thereof. | | |
| 28 | Documentation evidencing the market value of the Common M Units of IB Finance in November 2006. | | |
| 29 | Copy of the LLC Agreement of IB Finance dated November 20, 2006. | | |
| 30 | Explanation as to why the option to convert the preferred units in ResCap to preferred units in IB Finance was only exercisable after January 1, 2009. | | |
| 31 | Documents, other than the LLC operating agreement, that describe how profits / losses were allocated between and among the A and M units of IB Finance. | | |
| 32 | What were the respective values of the IB Finance units during the relevant time periods (2008, 2009, 2010, 2011)? | | |
| 33 | What securities of the Debtors did GMAC own at the time of the May 2008 exchange offer? | | |
| 34 | How did GMAC acquire the $830.5 million face of the 8.5% Senior Secured Notes used to obtain the Common M Units of IB Finance? | | |
| **Other Transactions** | | | |
| 35 | Copies of all management and services agreements. | | |
| 36 | Copies of servicing agreements and related documents between ResCap and its subsidiaries and AFI or Ally Bank since 2006. | | |

2

| | | |
|---|---|---|
| 37 | Description of collateral for AFI facilities and Third Lien Notes and supporting documentation, including all security agreements, control agreements, UCC financing statements and similar documentation. | |
| 38 | Description of derivative contracts with Ally and any and all agreements between ResCap and Ally regarding the derivative book including (a) the extent to which the derivatives between ResCap and Ally are back-to-back with the street, and (b) the extent to which such back-to-back positions have differing terms. | |
| 39 | Documents and presentations relating to (i) the Master Mortgage Loan Purchase and Sale Agreement and (ii) any other agreement that governs the sale and transfer of mortgages and mortgage services rights between or among a debtor and/or an affiliate. | |
| 40 | Description and documents and presentations relating to ResCap's 2008 agreement with Ally Bank purportedly altering its relationship from "correspondent" to "broker." | |
| 41 | Description, documents and all presentations of the purported 2007 alteration of the servicing relationship between the Ally Bank, GMACM and the GSEs. | |
| 42 | Copies of any document, fairness opinions, appraisals, or similar documents relating to the Amended and Restated Servicing Agreement, dated as of May 11, 2012, and all communications with AFI, Ally Bank, or their respective financial advisors, investment bankers, valuation experts or consultants, and/or government regulators related to the Debtors' entry into said agreement. | |
| 43 | Copies of any swap or ISDA agreement by and among ResCap, GMACM, and Ally Bank since 2007 that are identified in slides A-40 through A-52 of the ResCap Presentation to Unsecured Creditors' Committee Regarding Ally Claims Investigation and Settlement dated June 8, 2012 (and any documents, fairness opinions, appraisals, or similar documents related thereto) and all related communications with and presentations to ResCap, GMACM, AFI, Ally Bank, or their respective financial advisors, investment bankers, valuation experts or consultants, and/or government regulators. | |
| **RMBS Settlement** | | |
| 44 | All documents and communications concerning the RMBS settlement agreement (or any mortgage-related legal proceeding), including valuations, appraisals, and fairness opinions, and tolling agreements in connection therewith. | 17 |
| 45 | Composition of UPB by product type and vintage as of the filing date in order to assess comparability with recent other settlements | |
| 46 | Is there a split between the PLS investors and the monoline insurers? If so, what is it and provide the rationale. If not, what is the Debtors gross exposure and likely settlement with the monoline insurers? | |
| 47 | Provide split by monoline of UPB at (i) filing date and (ii) origination date from 2002 onward including scheduled principal payments and prepayments. | |
| **Plan Support Agreements** | | |
| 48 | All documents related to each plan support agreement, including, but not limited to, communications, valuations, appraisals, and fairness opinions in connection therewith. | 12, 13, 14, 15 |
| 49 | Documents relating to allocation of $750 million Ally contribution. | |
| 50 | Basis for allocation of Ally's $750 million contribution between the Debtors. | |

3

| | | |
|---|---|---|
| 51 | Copies of the "Executive Summaries" dated May 9, 2012 and May 12, 2012, as described in certain plan support agreements and/or settlement agreements with parties in interest, which purportedly describe the methodology of allocation of sale proceeds, settlement proceeds, and all other matters that determine distribution to creditors. | |
| 52 | Presentations to board concerning Plan Support Agreements, including any allocation of Ally's $750 million contribution. | |
| 53 | Any modeling of the allocation under the plan term sheets. | |
| 54 | Documents and communications related to the decision to file for bankruptcy. | 22 |
| 55 | Documents related to ResCap's board's approval of the AFI settlement and the plan support agreements. | 34 |
| **Schedules & Statements** | | |
| 56 | Provide explanation of payments listed in SOFA 3b and 3c, including business purpose and nature of the obligation. | |

4

# EXHIBIT H

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON DC · PARIS · BRUSSELS · LONDON

MOSCOW · FRANKFURT · COLOGNE · ROME · MILAN

HONG KONG · BEIJING · BUENOS AIRES · SÃO PAULO

Writer's Direct Dial: +1 212 225 2416
E-Mail: soneal@cgsh.com

August 3, 2012

## VIA EMAIL

Larren M. Nashelsky
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Re:    Diligence Questions

Dear Mr. Nashelsky:

Reference is made to our letter dated July 24, 2012 seeking Evaluation Material related to a Possible Transaction (the "July 24 Letter").[1] The purpose of the July 24 Letter was to facilitate the flow of information between ResCap and Cleary. Accordingly, we provided you with a list of diligence items that we wished to review in an effort to avoid discovery litigation. Given our prior conversations, and the representations that the debtors have made publicly, we anticipated receiving Evaluation Material in a timely manner.

Further to our July 24 Letter, we had a conference call on July 26, 2012 with FTI Consulting and Morrison & Foerster LLP regarding significant intercompany transactions. We also discussed document production issues on that call, and we understood that you would provide us with (1) specifically requested items related to the approximate $10 billion of debt forgiveness at ResCap, (2) access to a virtual dataroom housing over 50,000 documents deemed to be Evaluation Material, and (3) access to the debtors' FRBP 2004 materials that were produced to the creditors' committee. We also tentatively scheduled a subsequent call with Ms. Cathy Dondzila for Tuesday, July 31, 2012, on the assumption that we would receive some of this material by that time.

---

[1]    All capitalized terms not defined herein shall have the same meaning as in that certain confidentiality agreement between Residential Capital, LLC and Cleary Gottlieb Steen & Hamilton LLP dated July 11, 2012.

CLEARY GOTTLIEB STEEN & HAMILTON LLP OR AN AFFILIATED ENTITY HAS AN OFFICE IN EACH OF THE CITIES LISTED ABOVE

Mr. Larren M. Nashelsky
Morrison & Foerster LLP, p. 2

        To date, we have not received the requested information related to the approximate $10 billion of debt forgiveness or access to the FRBP 2004 production. We have only received access to a virtual dataroom that contains a mere fraction of the material we requested (and what appears to be far less than 50,000 documents). Accordingly, we had to postpone our discussion with Ms. Dondzila. Mr. Todd Goren agreed to that postponement, but he nonetheless indicated that, going forward, the only way to share information with the various constituents was to utilize a central repository that the examiner plans to establish at some unspecified point in the future. This suggested approach unjustifiably delays access to information that is readily available.

        While we understand the debtors' desire to streamline the process of gathering and producing information (a process that could take at least several weeks), it is imperative that we receive meaningful information in these chapter 11 cases. For us, that includes receiving the diligence items we have requested, including information relating to the Ally subservicing agreement and the material produced to the creditors' committee pursuant to FRBP 2004. Providing us with information you have already provided to the creditors' committee should take, at most, only a few minutes. Your failure to provide us with this information can only be viewed as an attempt to delay or avoid legitimate information sharing.

        To facilitate this production, we have updated the list of documents that we attached to the July 24 Letter to reflect the documents that are not in the dataroom you gave us access to. In an effort to avoid discovery litigation on these matters, we remain available at your convenience to arrange for their delivery or other access. Thank you in advance for your attention to this matter.

        Sincerely,

        Sean O'Neal

cc:    Messrs. Todd M. Goren and Gary Lee, Morrison & Foerster (via email)
       Messrs. Daniel Ehrmann and David Coles, Alvarez & Marsal (via email)
       Mr. Mark Renzi, FTI Consulting (via email)
       Mr. Thomas Moloney, Cleary Gottlieb (via email)

*Diligence List of*
*Cleary Gottlieb / Alvarez & Marsal*
*August 3, 2012*

| | Diligence Question / Related Document | Approx. UCC Doc. Req. ¶ No. (ECF 192) | Information Received | Information Not Received |
|---|---|---|---|---|
| | **Corporate/Group Companies** | | | |
| 1 | Corporate formation documents (certificates/articles of incorporation, etc.), as amended, for each debtor | 5 | Corporate formation documents for ResCap and most subsidiary Debtors (3.2) | Missing formation documents for GMACM Borrower LLC; GMACM REO LLC; RFC Borrower LLC; and RFC REO LLC. |
| 2 | Documents pertaining to resources and corporate functions shared between Ally and the Debtors since 2008 including, but not limited to, legal, procurement, risk, treasury, finance and audit services, and the cost sharing for such services. | | Unexecuted agreement between AFI and ResCap for shared services, dated March 2012 (12.9); Spending Detail for JLL services contract (paybale to AFI) (6.4.2) | Missing executed shared service agreement. Other shared service or corporate function agreements between Ally and Debtors. |
| 3 | Bylaws, operating agreements, partnership agreements, or equivalent corporate governance documents, as amended, for each debtor. | | LLC Agmt. and Operating Agmt. for ResCap (3.2.1); Operating Agmts. for most other Debtors (3.2.2-.4) | Missing operating agreements for GMACM Borrower LLC; GMACM REO LLC, RFC Borrower LLC; and RFC REO LLC. |
| 4 | Copies of each debtor's register of shareholders and directors, and listing of each debtor's officers. | | Corporate Profiles contain a list of past and current officers and board members. Some profiles include a list of shareholders (3.1). | Based on review, some Corporate Profiles do not contain a list of registered shareholders. Also missing profiles for GMACM Borrower LLC; GMACM REO LLC; RFC Borrower LLC; and RFC REO LLC (3.1). |
| 5 | Correspondence from and to Berkshire Hathaway or its affiliates, beginning in Jan. 2008 | | | Based on review to date, there has been no response to request. |
| 6 | List of all officers, directors and senior employees of the Debtors who were also officers, directors or employees of AFI, GMAC LLC and/or Ally Bank since 2008 | | Corporate Profiles contain a list of past and current officers and board members (3.1) | Corporate Profiles contain a list of past and current officers and board members, but do not indicate which were officers or directors for AFI, GMAC LLC and/or Ally Bank (3.1) |

| Financial Information | | | |
|---|---|---|---|
| 7 | Documents related to ResCap's issuance of secured notes in exchange for unsecured notes to AFI and other participating holders. | | 6/6/2008 Indenture between ResCap and Guarantors for Junior Secured Guaranteed Notes and related transaction documents (12.1.8). (Currently reviewing for responsiveness) | Under review |
| 8 | All documents related to the exchange offer of May 2008, including, but not limited to, the confidential offering memorandum and consent solicitation statement dated May 5, 2008 and its amendments of May 14, 2008 and May 29, 2008. | | | Based on review to date, there has been no response to request. |
| 9 | Documents relating to the exchange offer in November 2008 for ResCap notes. | | | Based on review to date, there has been no response to request. |
| 10 | Detailed legal entity-level balance sheets for all debtor and non-debtor entities as of (i) filing, and (ii) the latest month-end available | | Consolidated balance sheets for ResCap dated Jan., Feb., and Apr. 2012. (6.6.1) | Missing ResCap and subsidiary Debtor balance sheets as of May 14, 2012 filing, and latest month-end available. |
| 11 | A schedule which details the book value of assets (as of filing and the latest month-end available) by (i) balance sheet line item, (ii) legal entity, and (iii) secured credit facility to the extent the asset is collateral. | | Consolidated balance sheets for ResCap dated Jan., Feb., and Apr. 2012. (6.6.1)  DIP Projections provide asset balance rollforwards for DIP Collateral, Ally LOC, Ally Revolver, Citi MSR, FNMA EAF, and Unencumbered Assets (6.3);  2012 ResCap financial statements include asset class assessment detail for Apr.-June 2012 (6.6.1) (Currently reviewing for responsiveness) | Based on review to date, information details assets by balance sheet line item and secured credit facility. It does not provide a breakdown by legal entity. |
| 12 | An updated Estimated Purchase Price Allocation by Facility schedule (similar to Docket #66) as of (i) filing and (ii) the latest month-end available and explanation / support of allocation methodology. | | | Based on review to date, there has been no response to request. |

| | | | |
|---|---|---|---|
| 13 | Latest financial forecast or business plan, including a cash flow forecast | | Confidential Information Memo provides business overview for "NewCo" related to the two stalking-horse asset purchase agreements (2.1).<br><br>Supp. Data Book to Confidential Memo provides characteristics and forecasted P&L for various MSRs purchased by NewCo from ResCap (2.2).<br><br>DIP Projections provide cash flow projections through May 2013 (6.3) | Under review |
| 14 | Explanation of how the total assets per the Debtor's Schedules of Assets and Liabilities ($5.9 billion, excluding interco receivables) reconciles to the subtotal of the Debtors total assets per the schedule "Trial Balance - Asset by Facility as of 2/29/2012 ($7.2 billion)." | | | Based on review to date, there has been no response to request<br><br>Also, please provide clarification as to whether this discrepancy exists because assets that secured the pre-petition GSAP facility were held by a non-debtor. |
| 15 | With respect to the $168,844,378 in cash equivalents held by Residential Capital, LLC. on the Petition Date, a description of whether the cash encumbered is security and, if so, by which instruments | | | Based on review to date, there has been no response to request. |
| 15.1 | Provide documentation related to the validity and perfection of all liens (as related to material secured claims). | | n/a -- new request | |
| **Material Contracts** | | | | |
| 16 | Copies of all agreements relating to a material acquisition or disposition, however structured (asset purchase, stock purchase, merger, etc.), since Jan. 2008. | | | Based on review to date, there has been no response to request |

| 17 | Copies of all loan agreements, indentures, security agreements, or other financial instruments involving one or more of the debtors. | | Documents provided for: FNMA EAF; Senior Loan, LOC, GSAP, Citi MSR; Junior Secured Notes; Unsecured Notes; Covenant Waivers, Intercompany; and DIP transactions (12.1) | Under review. |
| 18 | Copies of all existing swap, future, and derivatives contracts, including contracts between AFI and ResCap or one of its direct or indirect subsidiaries. | | | Based on review to date, there has been no response to request |
| 19 | Copy of deposit control or similar agreements relating to cash held by ResCap. | | | Based on review to date, there has been no response to request. |
| **InterCo Transactions** | | | | |
| 20 | Documents supporting allegations that Ally has contributed more than $10 billion to ResCap since 2007. | | | Based on review to date, there has been no response to request. |
| 21 | Description of the intercompany claims described in the schedules. | | Documents provided for various intercompany transactions, including "Top 10 Intercompany Relationships" (12.1.11); (FTI00009) | Missing a comprehensive description of intercompany claims. |
| 22 | Documentation of the intercompany claims described in the schedules. | | Documents provided for various intercompany transactions, including "Top 10 Intercompany Relationships" (12.1.11); (FTI00009) | Please confirm that all responsive materials have been provided. |
| 23 | Intercompany balances among Rescap and its subsidiaries, since Jan. 2008. (priority is intercompany balances as of the most recent month-end available, including priority status to the extent not deemed unsecured). | | Documents showing Intercompany balances (12.1.11.1-.4) | Documents provided are dated 12/31/2011. Please provide the most recent month-end information. |
| **Transactions Related to Ally Bank** | | | | |
| 24 | Copies of all agreements relating to the transfer of interests in the Ally Bank (f/k/a GMAC Bank) transaction. | | | Based on review to date, there has been no response to request. |

| 25 | Copies of any fairness opinions, appraisals, or similar documents relating to the Ally Bank transaction, and all communications with AFI, Cerberus, Ally Bank, or their respective financial advisors, investment bankers, valuation experts or consultants, and or government regulators related to the Ally Bank transaction. | 9 | | Based on review to date, there has been no response to request |
|---|---|---|---|---|
| 26 | Documents analyzing the Ally Bank transaction provided to the board, UCC, or other parties in interest | | | Based on review to date, there has been no response to request. |
| 27 | Copies of investigation or internal reports relating to the Ally Bank transaction prepared by the board or a subset thereof. | | | Based on review to date, there has been no response to request. |
| 28 | Documentation evidencing the market value of the Common M Units of IB Finance in November 2006 | | 2006 Financial Statements provided for various Debtor entities. (6.6.7) (Currently reviewing for responsiveness) | Based on review to date, it appears that no 2006 Financial Statements were provided for ResCap. |
| 29 | Copy of the LLC Agreement of IB Finance dated November 20, 2006. | | | Based on review to date, there has been no response to request. |
| 30 | Explanation as to why the option to convert the preferred units in ResCap to preferred units in IB Finance was only exercisable after January 1, 2009? | | | Based on review to date, there has been no response to request. |
| 31 | Documents, other than the LLC operating agreement, that describe how profits / losses were allocated between and among the A and M units of IB Finance. | | | Based on review to date, there has been no response to request |
| 32 | What were the respective values of the IB Finance units during the relevant time periods (2008, 2009, 2010, 2011)? | | | Based on review to date, there has been no response to request. |
| 33 | What securities of the Debtors did GMAC own at the time of the May 2008 exchange offer? | | | Based on review to date, there has been no response to request |

| 34 | How did GMAC acquire the $830.5 million face of the 8.5% Senior Secured Notes used to obtain the Common M Units of IB Finance? | | | Based on review to date, there has been no response to request |
|---|---|---|---|---|
| **Other Transactions** | | | | |
| 35 | Copies of all management and/or services agreements. | | Unexecuted agreement between AFI and ResCap for shared services, dated March 2012 (12.9) | Missing executed shared service agreement. |
| 36 | Copies of servicing agreements and related documents between ResCap and its subsidiaries and AFI or Ally Bank since 2006. | | Unexecuted agreement between AFI and ResCap for shared services, dated March 2012 (12 9) | Missing executed shared service agreement. |
| 37 | Description of collateral for AFI facilities and Third Lien Notes and supporting documentation, including all security agreements, control agreements, UCC financing statements and similar documentation. | | Documents provided for: FNMA EAF, Senior Loan; LOC; GSAP, Citi MSR; Junior Secured Notes; Unsecured Notes; Covenant Waivers; Intercompany; and DIP transactions (12.1) | Under review |
| 38 | Description of derivative contracts with Ally and any and all agreements between ResCap and Ally regarding the derivative book including (a) the extent to which the derivatives between ResCap and Ally are back-to-back with the derivatives Ally has with the street; and (b) the extent to which such back-to-back positions have differing terms. | | | Based on review to date, there has been no response to request. |
| 39 | Description, documents and presentations relating to (i) the Master Mortgage Loan Purchase and Sale Agreement and (ii) any other agreement that governs the sale and transfer of mortgages and mortgage services rights between or among a debtor and/or an affiliate | | Master Mortgage Loan Purchase and Sale Agreement and related transaction documents (12 26) | Under review. |

| 40 | Description and documents and presentations relating to ResCap's 2008 agreement with Ally Bank purportedly altering its relationship from "correspondent" to "broker." | | Addendum to client contract and brokerage client materials (12.26.6) | Based on review to date, the provided materials are dated as of 2011. Please provide materials relating to 2008 agreement |
|----|----|----|----|----|
| 41 | Description, documents and all presentations of the purported 2007 alteration of the servicing relationship between the Ally Bank, GMACM and the GSEs | | | Based on review to date, there has been no response to request. |
| 42 | Copies of any document, fairness opinions, appraisals, or similar documents relating to the Amended and Restated Servicing Agreement, dated as of May 11, 2012, and all communications with AFI, Ally Bank, or their respective financial advisors, investment bankers, valuation experts or consultants, and/or government regulators related to the the Debtors' entry into said agreement. | | | Based on review to date, there has been no response to request. |
| 43 | Copies of any swap or ISDA agreement by and among ResCap, GMACM, and Ally Bank since 2007 that are identified in slides A-40 through A-52 of the ResCap Presentation to Unsecured Creditors' Committee Regarding Ally Claims Investigation and Settlement dated June 8, 2012 (and any documents, fairness opinions, appraisals, or similar documents related thereto) and all related communications with and presentations to ResCap, GMACM, AFI, Ally Bank, or their respective financial advisors, investment bankers, valuation experts or consultants, and/or government regulators | | | Based on review to date, there has been no response to request |

| 43.1 | Provide detailed description of MSR swap transaction with Ally, including any information regarding any marketing process for the origination / servicing platform. | | n/a -- new request | |
| 43.2 | Provide any documentation related to the MSR swap transaction and servicing / sub-servicing economics, including (i) executed agreements, (ii) any fairness opinions or other information utilized to evaluate whether the transactions were "market" and (iii) any relevant correspondence and board minutes discussing the merits of the transaction. | | n/a -- new request | |
| 43.3 | Provide any documentation, agreements and related correspondence related to the DOJ / AG settlement, including an understanding of the $200M cap. | | n/a -- new request | |
| **RMBS Settlement** | | | | |
| 44 | All documents and communications concerning the RMBS settlement agreement (or any mortgage-related legal proceeding), including valuations, appraisals, and fairness opinions, and tolling agreements in connection therewith. | 17 | | Based on review to date, there has been no response to request. |
| 45 | Composition of UPB by product type and vintage as of the filing date in order to assess comparability with recent other settlements | | | Based on review to date, there has been no response to request. |
| 46 | Is there a split between the PLS investors and the monoline insurers? If so, what is it and provide the rationale  If not, what is the Debtors gross exposure and likely settlement with the monoline insurers? | | | Based on review to date, there has been no response to request |

| 47 | Provide split by monoline of UPB at (i) filing date and (ii) origination date from 2002 onward including scheduled principal payments and prepayments. | | | Based on review to date, there has been no response to request |
|---|---|---|---|---|
| | **Plan Support Agreements** | | | |
| 48 | All documents related to each plan support agreement, including, but not limited to, communications, valuations, appraisals, and fairness opinions in connection therewith. | 12, 13, 14, 15 | | Based on review to date, there has been no response to request. |
| 49 | Documents relating to allocation of $750 million Ally contribution. | | | Based on review to date, there has been no response to request. |
| 50 | Basis for allocation of Ally's $750 million contribution between the Debtors. | | | Based on review to date, there has been no response to request |
| 51 | Copies of the "Executive Summaries" dated May 9, 2012 and May 12, 2012, as described in certain plan support agreements and/or settlement agreements with parties in interest, which purportedly describe the methodology of allocation of sale proceeds, settlement proceeds, and all other matters that determine distribution to creditors | | | Based on review to date, there has been no response to request. |
| 52 | Presentations to board concerning Plan Support Agreements, including any allocation of Ally's $750 million contribution | | | Based on review to date, there has been no response to request |
| 53 | Any modeling of the allocation under the plan term sheets | | | Based on review to date, there has been no response to request |
| 54 | Documents and communications related to the decision to file for bankruptcy. | 22 | | Based on review to date, there has been no response to request |
| 55 | Documents related to ResCap's board's approval of the AFI settlement and the plan support agreements | 34 | | Based on review to date, there has been no response to request |

## Schedules & Statements

| | | |
|---|---|---|
| 56 | Provide explanation of payments listed in SOFA 3b and 3c, including payment type and business purpose. | Based on review to date, there has been no response to request. |

10

# EXHIBIT I

Date: 7/30/2012 4:54:50 PM

To: "Renzi, Mark" <mark.renzi@FTIConsulting.com>, "Goren, Todd M."
<TGoren@mofo.com>

Copy: "Barrage, Alexandra Steinberg" <ABarrage@mofo.com>, "Brown, David S."
<dbrown@mofo.com>, "Lee, Gary S." <GLee@mofo.com>, "Haims, Joel C."
<JHaims@mofo.com>, "Levitt, Jamie A." <JLevitt@mofo.com>, "Jeremy Opolsky"
<jopolsky@cgsh.com>, "Moira C Heiges" <mheiges@cgsh.com>, "Engelhardt, Stefan W."
<sengelhardt@mofo.com>, "Sean A ONEAL" <soneal@cgsh.com>, "Goren, Todd M."
<TGoren@mofo.com>, "Thomas J MOLONEY" <tmoloney@cgsh.com>

From: Mark Lightner

Subject: RE: ResCap -- Requested Materials

**0 attachments appear as related documents in the Virtual Fileroom.**


Mark & Todd --

Thank you for pointing our attention to this.  It was our understanding based
on last week's call, though, that the executive committee had specific
procedures for authorizing debt forgiveness (and perhaps minutes relating
thereto), and that you were going to send those over.  We also want to
know the mechanics of how this worked, why they did this, what the
business purpose was, and what the consideration was.  Is this information
that you have?

In addition, we very much appreciate the debtors' desire to streamline the
process of gathering and producing documents as contemplated by the
examiner's forthcoming procedures and information-sharing motion.  We
plan to participate fully in that process.  In the interim, however, and given
that it will likely take some time for those procedures to be approved, can
we receive copies of the debtors' 2004 production (as we understand the
examiner has already received from some parties)?  Although we don't
believe this request is particularly burdensome, we are available at your
convenience to assist in making this happen.

Best regards,

-- Mark

---

Mark Lightner
Cleary Gottlieb Steen & Hamilton LLP
Assistant: zorduz@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2436 | f: +1 212 225 3999

1

www.clearygottlieb.com | mlightner@cgsh.com

| | |
|---|---|
| From: | "Renzi, Mark" <mark.renzi@FTIConsulting.com> |
| To: | "Goren, Todd M." <TGoren@mofo.com>, "Mark Lightner" <mlightner@cgsh.com> |
| Cc: | "Thomas J MOLONEY" <tmoloney@cgsh.com>, "Sean A ONEAL" |
| | <soneal@cgsh.com>, "Jeremy Opolsky" <jopolsky@cgsh.com>, "Moira C Heiges" |
| | <mheiges@cgsh.com>, "Barrage, Alexandra Steinberg" <ABarrage@mofo.com>, "Lee, Gary |
| | S." <GLee@mofo.com>, "Levitt, Jamie A." <JLevitt@mofo.com>, "Brown, David S." |
| | <dbrown@mofo.com>, "Haims, Joel C." <JHaims@mofo.com>, "Engelhardt, Stefan W." |
| | <sengelhardt@mofo.com> |
| Date: | 07/30/2012 02:11 PM |
| Subject: | RE: ResCap -- Requested Materials |

Sean and Mark,

Attached is the information that you requested regarding debt forgiveness/capital contributions and the timeline.  It starts on page 117 of the PDF.

Regards,
**Mark A. RENZI**
617.897.1528 direct
617.785.0177 mobile

Confidentiality Notice
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

**From:** Goren, Todd M. [mailto:TGoren@mofo.com]
**Sent:** Monday, July 30, 2012 12:12 PM
**To:** Mark Lightner
**Cc:** Thomas J MOLONEY; Sean A ONEAL; Jeremy Opolsky; Moira C Heiges; Renzi, Mark; Barrage, Alexandra Steinberg; Lee, Gary S.; Levitt, Jamie A.; Brown, David S.; Haims, Joel C.; Engelhardt, Stefan W.
**Subject:** RE: ResCap -- Requested Materials

Agree that it probably makes sense to push off tomorrow's call - though those two weeks will be quite busy with KEIP/KERP and subservicing.  We can try to pick a time and see if it works, or the following week would probably be much better.

With respect to Sean's email from this weekend, we have been in discussions with the Examiner about establishing a central repository for investigation related material, and a protocol to allow interested parties access to such information.  We

2

expect that Chadbourne is going to file a motion tomorrow (or Wednesday at the latest) to approve that protocol. In light of the number of requests we are getting for this type of information, we believe this is the only practical way to share this information with the various constituents.

Regards,

Todd

**From:** Mark Lightner [mailto:mlightner@cgsh.com]
**Sent:** Monday, July 30, 2012 11:02 AM
**To:** Goren, Todd M.
**Cc:** Thomas J MOLONEY; Sean A ONEAL; Jeremy Opolsky; Moira C Heiges
**Subject:** Re: ResCap -- Requested Materials
Todd --

We think it makes sense to push tomorrow's call with the controller out a couple weeks (assuming we get additional information, etc.). Is there a time during the week of 8/6 or 8/13 that works?

-- Mark

---

Mark Lightner
Cleary Gottlieb Steen & Hamilton LLP
Assistant: zorduz@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2436 | f: +1 212 225 3999
www.clearygottlieb.com | mlightner@cgsh.com

From:        Sean A ONEAL/NY/Cgsh
To           "Todd M. Goren" <TGoren@mofo.com>
Cc:          "Thomas J. Moloney" <tmoloney@cgsh.com>, "Moira C. Heiges" <mheiges@cgsh.com>,
"Jeremy R. Opolsky" <jopolsky@cgsh.com>, "Mark A. Lightner" <mlightner@cgsh.com>
Date:        07/28/2012 03:05 PM
Subject:     Re: ResCap -- Requested Materials

Todd,

Despite a few requests, we have yet to receive access to the documents produced in response to the UCC's Rule 2004 requests. Unfortunately, the data room site your team provided contains only some of the requested information sought in our diligence request and the Rule 2004 request.

3

During our last call, your team agreed to send us a schedule of the $10 billion in debt that Ally reportedly contributed to ResCap before the bankruptcy filing. I haven't seen that yet. Please send it.

In a similar vein, we have requested access to the materials being provided to the UCC relating to the Ally subservicing motion. These documents were included in the scope of the UCC's Rule 2004 request as well as our diligence request. As I understand it, documents relating to this motion have been and are being provided to the UCC. Given the timeline, we request that those documents be produced to us at the same time as the committee. In addition, we will want to participate in the depositions related to that motion.

Sean

---

Sean A. O'Neal
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1.212.225.2416 | f: +1.212.225.3999 | c: +1.917.324.8364
www.clearygottlieb.com | soneal@cgsh.com

| | |
|---|---|
| From: | Mark Lightner |
| To: | "Goren, Todd M." |
| | <TGoren@mofo.com> |
| Cc: | Sean ONEAL |
| Date: | 07/26/2012 05:58 PM EDT |
| Subject: | ResCap -- CGSH Next Steps |

Todd --

Thanks for the call this afternoon. As for next steps, we'll keep an eye out for the additional I/C docs, particularly those related to the ~$10bn in contribution(s) discussed on the phone. As for access to the central repository and the UCC 2004 doc production(s), I'm available at your convenience to make that happen. Finally, we look forward to our call with the controller in the near future, subject to the ability to review the information, etc.

Please let me know what, if anything, I can do to facilitate these action items.

Cheers,

4

-- Mark

---

Mark Lightner
Cleary Gottlieb Steen & Hamilton LLP
Assistant: zorduz@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2436 | f: +1 212 225 3999
www.clearygottlieb.com | mlightner@cgsh.com
This message is being sent from a law firm and may contain
confidential or privileged information. If you are not the
intended recipient, please advise the sender immediately by
reply e-mail and delete this message and any attachments
without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the
"firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its
affiliated entities in certain jurisdictions, and the term
"offices" includes offices of those affiliated entities.

-------------------------------------------------------------------

To ensure compliance with requirements imposed by the IRS, Morrison &
Foerster LLP informs you that, if any advice concerning one or more U.S.
Federal tax issues is contained in this communication (including any
attachments), such advice is not intended or written to be used, and cannot
be used, for the purpose of (i) avoiding penalties under the Internal Revenue
Code or (ii) promoting, marketing or recommending to another party any
transaction or matter addressed herein.

For information about this legend, go to

http://www.mofo.com/Circular230/

=====================================================================
=======================

This message contains information which may be confidential and
privileged. Unless you are the addressee (or authorized to receive for the

5

addressee), you may not use, copy or disclose to anyone the message or any
information contained in the message. If you have received the message in
error, please advise the sender by reply e-mail @mofo.com, and delete the
message.


------------------------------------------------------------------[attachment "Whit
Affidavit.pdf" deleted by Mark Lightner/NY/Cgsh]

# EXHIBIT J

**MORRISON | FOERSTER**

1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104-0050

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

August 10, 2012

Writer's Direct Contact
212.468.8203
JLevitt@mofo.com

**VIA EMAIL**

Sean O'Neal, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

Re:    Letter, dated August 3, 2012

Dear Sean:

Reference is made to your letter dated August 3, 2012 seeking production of documents from the Debtors regarding certain of their prepetition transactions, including documents the Debtors produced to the Official Committee of Unsecured Creditors (the "Committee") appointed in the above-reference Chapter 11 cases (the "Cases") in connection with the Committee's investigation pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Requested Diligence").

As you are aware, the Court appointed Arthur J. Gonzalez as examiner in the Cases (the "Examiner") and, by Orders dated June 28, 2012 and July 27, 2012, directed the Examiner to conduct an investigation that encompasses the scope of the Committee's investigation (the "Examiner Investigation"). Today, the Examiner filed a motion (ECF No. 1093) for authority to establish a global protocol in the Cases to streamline discovery in connection with the Examiner Investigation and the sharing of relevant discovered information with parties in interest in the Cases ("Parties"). The proposed protocol contemplates the creation of a centralized document depository (the "Depository") into which the Examiner will place a majority of the documents produced to it in connection with the Examiner Investigation (including the Requested Diligence) and, subject to execution of a protective order to safeguard any confidential information, provide access to the Depository to Parties to share such discovery with them.

In accordance with the proposed protocol, going forward, the Debtors will produce documents in connection with the Examiner Investigation solely to the Examiner. To the extent Parties wish to review such information, they may do so by accessing the Depository in accordance with the procedures established by the Court. The Examiner's proposed protocol provides an efficient mechanism by which to consolidate and appropriately share

**MORRISON | FOERSTER**

Sean O'Neal, Esq.
August 10, 2012
Page Two

relevant discovery with Parties without unnecessary duplication of efforts and/or needless
depletion of the Debtors' estates' resources.

Sincerely,

/s/ Jamie A. Levitt

Jamie A. Levitt

cc: Larren L. Nashelsky, Gary S. Lee, Todd M. Goren
 and Aaron M. Klein, Morrison & Foerster LLP
 Daniel Ehrmann and David Coles, Alvarez & Marsal
 Mark Renzi, FTI Consulting
 Thomas Moloney, Cleary Gottlieb Steen & Hamilton LLP

# EXHIBIT K

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON
MOSCOW · FRANKFURT · COLOGNE · ROME · MILAN
HONG KONG · BEIJING · BUENOS AIRES · SÃO PAULO

LESLIE B SAMUELS
LAURENT ALPERT
VICTOR I LEWKOW
LESLIE N SILVERMAN
ROBERT I TORTORIELLO
A RICHARD SUSKO
LEE C BUCHHEIT
JAMES M PEASLEE
ALAN L BELLER
THOMAS J MCLONEY
JONATHAN I BLACKMAN
WILLIAM F GORIN
MI HAEL L RYAN
ROBERT P DAVIS
YARON Z REICH
RICHARD S LINCER
JAIME A EL KOURY
STEVEN G HOROWITZ
JAMES A DUNCAN
STEVEN M LOEB
DONALD A STERN
L RAIG B BRUD
SHELDON H ALSTER
WANDA J OLSON
MITCHELL A LOWENTHAL
EDWARD J ROSEN
JOHN PALENBERG
LAWRENCE B FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E AUSTIN
SETH GROSSMANDLER
WILLIAM A GROLL
JANET L FISHER
DAVID L SUGERMAN
HOWARD S ZELBO
DAVID E BRODSKY
ARTHUR H KOHN
RICHARD J COOPER

JEFFREY S LEWIS
FILIP MOERMAN
PAUL J SHIM
STEVEN L WILNER
ERIKA W NIJENHUIS
LINDSEE P GRANFIELD
ANDRES DE LA CRUZ
DAVID C LOPEZ
CARMEN A CORRALES
JAMES L BROMLEY
MICHAEL A GERSTENZANG
LEWIS J LIMAN
LEV L DASSIN
NEIL Q WHORISKEY
JORGE U JUANTORENA
MICHAEL D WEINBERGER
DAVID LEINWAND
JEFFREY A ROSENTHAL
ETHAN A KLINGSBERG
MICHAEL J VOLKOVITSCH
MICHAEL D DAYAN
CARMINE D BOCCUZZI JR
JEFFREY D KARAN
KIMBERLY BROWN BLACKLOW
ROBERT J RAYMOND
LEONARD C JACOBY
SANDRA L FLOW
FRANCISCO L CESTERO
FRANCESCA L ODELL
WILLIAM L MCRAE
JASON FACTOR
MARGARET S PEPONIS
LISA M SCHWEITZER
KRISTOFER W HESS
JUAN G GIRALDEZ
DUANE MCLAUGHLIN
BREON S PEACE
MEREDITH E KOTLER
CHANTAL E KORDULA

BENET J O'REILLY
DAVID AMAN
ADAM J KLOSNER
SEAN A O'NEAL
GLENN P MCGRURY
CHRISTOPHER P MOLINE
JOON H KIM
MATTHEW P SALERNO
MICHAEL J ALBANO
VICTOR L HOU
ROGER A COOPER
AMY R SHAPIRO
JENNIFER KENNEDY PARK

RESIDENT PARTNERS

SANDRA M ROCKS
S DOUGLAS BORISKY
JUDITH KASSEL
DAVID E WEBB
PENELOPE L CHRISTOPHOROU
BOAZ S MORAG
MARY E ALCOCK
DAVID H HERRINGTON
HEIDE H IL\BENFRITZ
JONATHAN B KOLODNER
HUGH C CONROY JR
KATHLEEN M EMBERGER
WALLACE L LARSON JR
JAMES D SMALL
AVRAM E LUFT
ELIZABETH LENAS
DANIEL LAN
ANDREW WEAVER
HELENA K GRANNIS
GRANT M BINDER

RESIDENT COUNSEL

Writer's Direct Dial  +1 212 225 2416
E-Mail  soneal@cgsh.com

August 21, 2012

## VIA E-MAIL

Larren M. Nashelsky
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Re:  Residential Capital, LLC (12-12020 et al.)

Dear Larren:

As you know, we represent certain holders (the "Noteholders") of the senior unsecured notes (the "Notes") issued by Residential Capital, LLC ("Residential Capital," and with its affiliated debtors, the "Debtors"). As discussed at the last hearing, we are in the process of becoming engaged as special counsel to Wilmington Trust, National Association, as Indenture Trustee for the Notes. We were extraordinarily surprised to see in the recent *Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the RMBS Trust Settlement Agreements* (Doc. No. 1176) filed on August 15, 2012 a new "HoldCo Election," which would permit settling trustees to allocate up to 20% of their proposed allowed claim against Residential Capital, which, as you know, is the obligor on the Notes.

The Supplemental Motion raises very serious concerns about the conduct of Residential Capital and its advisors. Based on our conversations with you and the Debtors' other advisors, we justifiably expected to be informed before Residential Capital purported to make any commitments that could materially affect the Noteholders' recovery. Our concern grew when we learned that the Official Committee of Unsecured Creditors was not at the table and

Larren M. Nashelsky
Morrison & Foerster LLP, p. 2

was completely blindsided by the proposed HoldCo Election. We doubt that the proposed HoldCo Election was approved by independent fiduciaries of Residential Capital truly focused on the interests and perspectives of Residential Capital and its creditors. If there was, in fact, an independent and informed review, we request a prompt and complete explanation by the end of this week.

Our need for an explanation is amplified because the Debtors have stymied each of our requests for information on the status of the RMBS settlement and its potential impact on our debtor, and have even told us that it does not impact us at all. As you recall, on July 25, 2012, we requested from you inter alia (1) information concerning the RMBS settlement agreement, including valuations, appraisals, and fairness opinions, and any tolling agreements in connection therewith; and (2) copies of the "Exccutive Summaries" dated May 9, 2012 and May 12, 2012, as described in certain plan support agreements and/or settlement agreements with parties in interest, which purportedly describe the methodology of allocation of sale proceeds, settlement proceeds, and all other matters that determine distribution to creditors. On a July 26, 2012 conference call with attorneys from your firm and FTI Consulting, we were promised access to meaningful information that would answer our diligence questions. Notably during that call, Mr. Mark Renzi of FTI Consulting stated that the RMBS settlements did not concern the Noteholders (and he specifically questioned the need for us to receive such information in the first instance). On August 3, 2012, after receiving no meaningful information, we again asked for information, including the information identified under (1) and (2), above. On August 10, 2012, Ms. Jamie Levitt at your firm denied our request ostensibly because producing information would be administratively burdensome as those documents would be available through the examiner's document depository at some unspecified point in the future.

There is no substantive or rational basis for purporting to compromise an alter ego or single enterprise claim at the Residential Capital level (assuming it has any merit as to which we do not yet express a view) as opposed to further up the corporate chain to Ally Financial Inc. Nor is there any basis for the Debtors to purport to settle substantive consolidation issues without providing information to, and receiving input from, the Noteholders, especially where the Debtors are making settlement proposals in advance of a Chapter 11 plan process and prior to the publication of the report of the Examiner who has been charged to look at those issues. Moreover, we do not understand how the Debtors and you, as counsel, could even take sides on these inter-debtor issues that involve inherent conflicts of interest without actively involving the creditors of Residential Capital. See In re Adelphia Commc'ns Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006).

The Debtors' conduct in these cases demonstrates repeated attempts to stonewall our legitimate requests for information and to abdicate their fiduciary responsibilities to Residential Capital and its creditors. You are hereby on notice (as surely you are already) that the Debtors and their counsel should preserve all documents and communications related to this

Larren M. Nashelsky
Morrison & Foerster LLP, p. 3

settlement, including, without limitation, documents relating to who negotiated or approved the settlement and what information they were given prior to or as part of such negotiation or approval.

Sincerely,

*Sean O'Neal*

Sean O'Neal

cc:    Mr. Todd Gorren, Morrison & Foerster LLP (via email)
Mr. Howard Seife, Chadbourne & Parke LLP (via email)
Mr. Kenneth Eckstein, Kramer Levin Naftalis & Frankel LLP (via email)

# EXHIBIT L

**MORRISON | FOERSTER**

1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104-0050

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

August 23, 2012

Writer's Direct Contact
212.468.8030
APrinci@mofo.com

<u>VIA EMAIL</u>

Sean O'Neal
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

Re:    <u>In re Residential Capital, LLC, et al., Chapter 11 Case No. 12-12020 (MG):  Cleary
       Letter, dated August 21, 2012</u>

Dear Sean:

   We are writing in response to your letter, dated August 21, 2012 (the "August 2012
Letter"), regarding the relief requested in the *Supplemental Motion Pursuant to Fed. R.
Bankr. P. 9019 For Approval of the RMBS Trust Settlement Agreements* [ECF #1176] (the
"Supplemental 9019 Motion") and your discovery requests.

   At the outset we note that there are a number of misstatements and incorrect
allegations in your letter which we do not believe would be constructive to address.
Although, contrary to your suggestion, the Debtors are under no obligation to seek your
clients' consent with respect to the matters of which you incorrectly complain, we seek to
consider all good faith issues raised by stakeholders, and will similarly consider those of
your clients regarding the Supplemental 9019 Motion.

   With respect to discovery, as we stated in our prior letter to you, dated August 10,
2012, we have begun and will continue to produce all documents responsive to the court-
appointed Examiner's investigation in accordance with the order establishing discovery
procedures and approving a standard protective order (the "Protective Order"), entered on
August 20, 2012 [ECF #1223]. This production will encompass all documents produced by
the Debtors to the Official Committee of Unsecured Creditors appointed in these Chapter 11
cases in connection with its investigation pursuant to Rule 2004 of the Federal Rules of
Bankruptcy Procedure. We understand from the description in your Aug. 3, 2012 letter that
much of the discovery you seek has already been or will be produced by the Debtors to the
Examiner in connection with his investigation. You may review such information by
executing the Protective Order and accessing the Examiner's centralized document
depository in accordance with the procedures established by the Court.

ny-1055343

**MORRISON | FOERSTER**

Sean O'Neal
August 23, 2012
Page Two

In addition, your firm has already been given access to a data room maintained by the Debtors, which contains documents related to the Supplemental 9019 Motion. Please be assured that the Debtors are preserving all documents related to the Supplemental 9019 Motion.

The Debtors remain committed to fostering a productive working relationship with your firm and your clients, and are available to discuss any additional, legitimate concerns you may have.

Sincerely,

Anthony Princi

cc: Larren L. Nashelsky, Morrison & Foerster LLP
    Howard Seife, Chadbourne & Park LLP
    Kenneth Eckstein, Kramer Levin Naftalis & Frankel LLP

# EXHIBIT M

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10          Debtors.

11

12  - - - - - - - - - - - - - - - - - - -x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, New York

17

18          August 16, 2012

19          11:04 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1    just use this as a brief opportunity.  And I didn't stand up

2    when Mr. Lee spoke initially about the subservicing, but just

3    to make sure I appre -- I think we've left with a status

4    conference on Thursday, and I'm assuming that it'll be set

5    down -- assuming the matter is resolved we'll set it down for a

6    hearing to approve the motion at a subsequent date, which is

7    acceptable to us, Your Honor.

8            With respect to RMBS, what I wanted to just bring to

9    the Court's attention is that the committee has been laboring

10   quite actively over the last few weeks to put in place the

11   support it's going to need in order to do the investigation

12   that has to be done of the RMBS issues.  And it has been a more

13   arduous undertaking than one would have expected, given the

14   fact that many of the experts in this field are already spoken

15   for and there are conflicts that have made it close to -- I

16   don't want to say impossible -- very difficult to identify the

17   experts that will be needed to perform the roles that are

18   required.

19           I believe that as of this morning we actually have

20   overcome the hurdle and we have in place a series of parties

21   who are going to be able to work with the committee to provide

22   the analysis that we believe is going to be needed in order to

23   review the proposed settlement and the issues that are

24   implicated by that.

25           Apropos that, I do want to note that last night the

1   debtor filed an amended 9019 motion with an amended settlement

2   agreement that is quite substantive and raises even more

3   complications, and, obviously, that's going to have to be

4   something that is looked at very carefully, but I do want to

5   underscore the fact that, from the committee's perspective, the

6   complexities of this issue are growing.  And, obviously, we're

7   going to do the best we can.

8        The reason I wanted to speak specifically today, Your

9   Honor, is that the committee is going to be -- the approach

10  that we're going to take is we intend to file a retention

11  application that will cover a consulting firm, a -- basically,

12  a testifying expert from a consulting firm, a group of

13  economists and statisticians who will be working with the

14  testifying expert, and a firm that will be able to assist

15  officially in reviewing samples of loan files that we believe

16  need to be done in order to do the evaluation.

17       The costs are substantial, just given the magnitude.

18  We hope to have an application on file, I would think, within

19  the next week, and I would expect it can be on the calendar for

20  September 11th, but I do expect that in order to even attempt

21  to grapple with the schedule that is out there right now, a

22  significant amount of work is going to need to be done between

23  now and September 11th.  And while I can't prejudge that the

24  Court's going to enter an order, I at least wanted to apprise

25  the Court and the parties that we are going to be engaging

RESIDENTIAL CAPITAL, LLC, ET AL.                72

1    these parties.  I have discussed this with the U.S. Trustee and

2    with the debtor.  I think they all understand it, but I wanted

3    to do what I can to lay the foundation for the fact that

4    there's going to be work done between now and the middle of

5    September that will be substantial, and our hope is that we can

6    give these parties a reasonable level of assurance that it will

7    be included in what is going to be compensated.

8            The alternative, Your Honor, would be to simply have

9    my firm engage them, essentially, as experts and to,

10   essentially, present them as expenses, but I thought, given the

11   size of the undertaking and the fact that they are consulting

12   firms that the better practice was to submit the application.

13   But I wanted to at least alert Your Honor to the issue.

14           THE COURT:  When will you be ready to -- has the U.S.

15   Trustee seen applications yet?

16           MR. ECKSTEIN:  Your Honor, the engagement --

17           THE COURT:  It was last night.

18           MR. ECKSTEIN:  The engagement is literally being

19   completed today.

20           THE COURT:  Okay.

21           MR. ECKSTEIN:  So there are no -- we've been vetting

22   conflicts quite extensively, and every time we vet conflicts,

23   new conflicts arise.  It's remarkable.  But that's neither here

24   nor there right now.

25           THE COURT:  When's the hearing?

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1          MR. ECKSTEIN:  Right now there is a hearing, I

2    believe --

3          THE COURT:  Is this the November 5th?

4          MR. ECKSTEIN:  I think expert reports are due

5    beginning of October.

6          THE COURT:  This the November 5th hearing?

7          MR. ECKSTEIN:  November 5.  November 15?  November 5.

8    I'm not commenting today, Your Honor, on what is achievable.  I

9    think Your Honor had suggested when we were last here on RMBS

10   that we should probably (A) that we should have regular meet-

11   and-confers, which we are having, and I would say that a very

12   good schedule has been set up and my office and Morrison &

13   Foerster are working hand-in-hand on this, but I think we

14   probably will need a status report early September with Your

15   Honor to honestly assess where we are.  And I don't want to

16   make any representations about an ability to meet that schedule

17   right now, because I think that would be too ambitious.

18         THE COURT:  Well, you're all here on September 11th.

19         MR. ECKSTEIN:  September 11th.  I think we should have

20   a status report on RMBS and, I think, assess where we are.  And

21   by that point in time, I think, at least from our perspective,

22   I think we'll have a better sense of what can be accomplished

23   when.  We obviously are -- we're making substantial requests of

24   the debtor for samples of loan files.  We know that's going to

25   take the debtor some time to produce.  We're trying to

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1  determine how quickly those loan files can be reviewed so that

2  we can have a reasonable sample, and --

3          THE COURT:  All I know is when FHFA was here on the

4  discovery issue and they said well, they'd narrowed their

5  request to 5,000 loan files, Cravath, on behalf of CSFB made

6  clear in their objection that their experts have said that

7  that's far too narrow a sample.  I don't know what --

8          MR. ECKSTEIN:  Sampling is a controversial issue.  We

9  will save for a later day what is an appropriate sample, but

10  there will be a sample that's going to be needed, and,

11  obviously, even fewer than 5,000 is going to be an undertaking

12  that's going to take some time.  So that is coming out, and I

13  think by the 11th of September we'll have a sense of what was

14  produced and what can be reviewed and how much time people are

15  going to need to complete that project.

16          There obviously are many other issues aside from

17  reviewing loan files that --

18          THE COURT:  Sure.

19          MR. ECKSTEIN:  -- need to be considered.

20          THE COURT:  And it looks like there's about fifteen

21  lift stay motions that are on that day.

22          MR. LEE:  I thought Your Honor's opinion would dispose

23  of some of them.

24          THE COURT:  I keep issuing opinions, but they keep

25  coming in.  Okay.

1        MR. ECKSTEIN:  Okay.

2        THE COURT:  Anybody else?  Do you have anything you

3   want to say to that, Mr. Lee?

4        MR. ECKSTEIN:  Thank you, Your Honor.

5        THE COURT:  With respect to what Mr. Eckstein has

6   reported?

7        MR. LEE:  Your Honor, the -- sorry.  Gary Lee from

8   Morrison & Foerster for the debtors.  Mr. Eckstein and his team

9   are actually working very hard with our group.  I mean, there

10  are not just weekly meetings.  There are, sort of, frequent

11  conversations several times a week, so we think that we are

12  hopefully on track for a hearing on the 5th of November.  I

13  don't want to understate the difficulties that Mr. Eckstein is

14  going through.  I understand the need for an expert, and we

15  believe that that will all culminate --

16        THE COURT:  Look, you have your experts in place,

17  right?

18        MR. LEE:  We do, Your Honor.

19        THE COURT:  And you, essentially, have your experts in

20  place as of last night.

21        MR. ECKSTEIN:  I hope so.

22        THE COURT:  So, one of the things I would strongly

23  urge is there is nothing -- there are few things more

24  frustrating to a Court to have the battle of the experts where

25  they can't even agree on what the appropriate data to be