CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National
Association, as Indenture Trustee for the Senior
Unsecured Notes Issued by Residential Capital, LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X
|  |  |
|---|---|
| **In re** | : |
| | : |
| **RESIDENTIAL CAPITAL, LLC, et al.,** | : |
| | : |
| **Debtors.** | : |
| | : |
| | : |

**Chapter 11 Case No.**

**12-12020 (MG)**

**(Jointly Administered)**

-----------------------------------------------------------------X

**OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION
TO THE DEBTORS' MOTION FOR THE ENTRY OF AN ORDER EXTENDING
THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT
ACCEPTANCES THEREOF**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 3

    A.    The Chapter 11 Filing.................................................................................. 3

    B.    The Examiner ............................................................................................. 4

BASIS FOR RELIEF ................................................................................................ 4

    A.    The Debtors' Should Not Be Permitted An Unprecedented Nine-Month
            Extension of Exclusivity ............................................................................ 4

         i.    The Section 1121 Standard ................................................................. 4

        ii.    Cause Does Not Exist To Extend Exclusivity .................................... 6

                i.    This Is A Liquidation, Not A Complex Reorganization
                     Case.................................................................................. 6

               ii.    Unresolved Contingencies Will Be Satisfied Before Nine
                     Months .............................................................................. 7

              iii.    Debtors' Have Not Demonstrated Good Faith In Dealing
                     With Creditors................................................................... 8

             iv.    Debtors Have Not Demonstrated Any Reasonable
                     Prospects For Filing A Viable Plan ............................... 11

              v.    An Extension Very Likely Will Be Used To Pressure
                     Creditors.......................................................................... 12

    B.    A Limited Extension Should Be Granted...................................................... 13

CONCLUSION............................................................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

Statutes

11 U.S.C. § 1121(b) ................................................................................... 4

11 U.S.C. § 1121(c) ................................................................................... 4

11 U.S.C. § 1121(d)(1) .............................................................................. . 4

Cases

*Century Glove, Inc. v. First Am. Bank of New York,*
860 F.2d 94 (3d Cir. 1988).......................................................................... 5

*In re Adelphia Commc'ns Corp.,*
352 B.R. 578 (S.D.N.Y. 2006)..................................................................... 5, 6

*In re Adelphia Commc'ns Corp.,*
336 B.R. 610 (Bankr. S.D.N.Y. 2006).......................................................... 12

*In re Borders Group, Inc.,*
460 B.R. 818 (Bankr. S.D.N.Y. 2011).......................................................... 5, 7

*In re Curry Corp.,*
148 B.R. 754 (Bankr. S.D.N.Y. 1992).......................................................... 5, 12-13

*In re Mid- State Raceway, Inc.,*
323 B.R. 63 (Bankr. N.D.N.Y. 2005) ........................................................... 5-6

*In re Pine Run Trust, Inc.*
67 B.R. 432 (Bankr. E.D. Pa. 1986) ............................................................. 6-7

*In re Texaco, Inc.,*
76 B.R. 322 (Bankr. S.D.N.Y. 1987) ............................................................ 11

*In re Timbers of Inwood Forest Assocs., Ltd.,*
808 F.2d 363 (5th Cir.1987), *aff'd*, 484 U.S. 365 (1988)............................... 12

*In the Matter of Lake in the Woods,*
10 B.R. 338 (E.D. Mich.1981)...................................................................... 11

*Matter of Newark Airport/Hotel Ltd. P'ship,*
156 B.R. 444 (Bankr. D.N.J. 1993)
*aff'd sub nom. FGH Realty Credit Corp. v Newark Airport/Hotel Ltd. P'ship*
155 B.R. 93 (D.N.J. 1993) ........................................................................... 6

ii

Other Authorities

H.R. Rep. No. 95-595 (1978),
*reprinted in* 1978 U.S.C.C.A.N. 5963, 1977 WL 9628 ................................................... 5

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA),
Pub. L. No. 109–8, 119 Stat. 23 (2005) (*codified at* 11 U.S.C. § 1121(d)(2)) ................ 5

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Wilmington Trust, National Association (the "Trustee"), solely in its capacity as indenture trustee for various series of senior unsecured notes in the outstanding aggregate principal amount of approximately $1 billion (the "Notes," and the holders thereof, the "Noteholders") issued by Residential Capital, LLC ("Residential Capital," and with its debtor-affiliates, the "Debtors"), under that certain indenture dated as of June 24, 2005 (as supplemented, the "Indenture"),[1] respectfully submits this objection to the Debtors' Motion for Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (Doc. 1248) (the "Motion"). In support of the objection, the Trustee represents as follows:

**PRELIMINARY STATEMENT**

1.     The Debtors' request for an unprecedented nine-month extension of the exclusive period for filing a plan, plus an additional 60 days for soliciting acceptances of the plan, should not be granted. The Debtors' conduct in these chapter 11 cases raises serious doubts about whether they deserve any extension of the exclusive right to file a plan, let alone a nine-month extension. And the facts giving rise to the appointment of an Examiner, including a multitude of questionable transactions between the Debtors and their non-debtor affiliates Ally Financial Inc. ("AFI") and Ally Bank, raise even more questions about the Debtors' conduct.

2.     During these cases, the Debtors have repeatedly stonewalled legitimate requests by creditors for information, pushed for aggressive schedules at the behest of their non-debtor parent,

---

[1]     The Notes include $1,250,000,000 6.5% notes due 2012, $1,750,000,000 6.5% notes due 2013, $750,000,000 6.875% notes due 2015, €750,000,000 5.125% notes due 2012, £400,000,000 6.375% notes due 2013, and £400,000,000 7.875% notes due 2014, with a total aggregate outstanding principal amount of approximately $1 billion (based on the foreign exchange rate as of the petition date, May 14, 2012).

failed to disclose to this Court and creditors material information about their post-petition

relationship with their non-debtor affiliates,[2] and proposed a bait-and-switch HoldCo Election in

the RMBS settlements several weeks after the Court approved a schedule to consider approval of

the settlements.[3] Debtors have also failed to engage in any negotiations with key creditor

constituencies, including the Noteholders and the Trustee, regarding the proposed plan that they

filed with this Motion. Such conduct is little more than an attempt to pressure creditors into

accepting the Debtors' favored positions, which were designed and packaged for the benefit of the

Debtors' non-debtor affiliates and other preferred parties in interest.

3.    A nine-month extension makes even less sense in these cases because the Debtors

are merely liquidating their assets rather than reorganizing their businesses. In this liquidation—

where there are no reorganizing businesses or complex cross-border issues—the creditors are the

only parties in interests. The purpose of the liquidation plan will be to distribute the Debtors'

assets, particularly proceeds from asset sales and recoveries from estate claims, causes of action

and related settlements. The plan will necessarily involve the determination of whether such

claims and causes of action should be settled, and if so on what terms. The creditors should be the

key drivers in this process, which involves mostly interdebtor and intercreditor issues. The

Debtors and their professionals should not be the sole drivers—in fact, it is unclear how they can

practically take positions on these issues because they are inherently conflicted by their divided

duties of loyalty to various Debtor entities. Given the Debtors' conflicted situation, and the

---

[2]    *See Statement of the Off. Comm. of Unsecured Creditors Regarding the Debtors' Motion for an Order Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business* (Doc. 1280) (the "Creditors Committee Subservicing Statement").

[3]    *See Motion to Modify the Revised Joint Omnibus Scheduling Order and Provision for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreement, and (II) the RMBS Trustees' Limited Objection to the Sale Motion* (Doc. 1300) (the "Motion to Modify").

2

liquidating nature of this case, the most efficient way to resolve these cases may be to allow creditors to present their own plans as soon as possible.

4.      The Trustee, however, is willing to support a limited extension of the exclusive periods that would extend the Debtors' exclusive period for filing a plan until the earlier of (i) 30 days following the issuance of the Examiner's report, or (ii) February 27, 2013, without prejudice to the Debtors' seeking further extensions of the exclusive periods or the rights of parties in interest to object to such requests or to seek a termination of the Debtors' exclusive periods.[4] The Trustee further requests that the Court not consider approval of any disclosure statement prior to making a determination on the appropriateness of any further extension of the exclusive periods. Such a limited extension will enable the Court to evaluate, with creditor input based on the facts then known, whether a further extension of the exclusive periods is warranted. This will impose no prejudice on the Debtors or any other party in interest, because the rights of all parties in interest would be preserved.

## BACKGROUND

### A.      The Chapter 11 Filing

5.      On May 14, 2012, the Debtors commenced voluntary cases under chapter 11, title 11, of the United States Bankruptcy Code (the "Bankruptcy Code").

6.      On May 14, 2012, the Court authorized joint administration, and the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[4]      During this time period, the Debtors' exclusive periods for filing a plan and soliciting support for a plan would be coterminous.

**B.    The Examiner**

7.    On June 28, 2012, the Court directed the United States Trustee to appoint an

examiner. *See Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of*

*the Bankruptcy Code* (Doc. 536). The appointment of Arthur J. Gonzalez, Esq. as examiner (the

"Examiner") was approved by the Court on July 3, 2012. *See Order Approving Appointment of*

*Arthur J. Gonzalez, Esq. as Examiner* (Doc. 674).

8.    On July 27, 2012, the Court approved the Examiner's preliminary statement

regarding the scope and timing of his investigation. *See Order Approving Scope of Investigation of*

*Arthur J. Gonzalez, Examiner* (Doc. 925). The scope of the Examiner's investigation is quite

broad, covering all material pre-petition transactions and relationships between or among the

Debtors and their non-debtor affiliates, negotiation and entry into the various plan support

agreements, activities of the Debtors' directors and officers, corporate relationships between the

Debtors and their current and former affiliates, all state and federal law claims or causes of action

against the Debtors' affiliates, directors and officers, and the value of the releases contemplated by

the Debtors. *Id.* The Examiner has estimated that his investigative report will take approximately

six months to prepare. *Id.*

**BASIS FOR RELIEF**

**A.    The Debtors Should Not be Permitted An Unprecedented Nine-Month**
      **Extension of Exclusivity**

          **i.    The Section 1121 Standard**

9.    The Debtors have an exclusive right to propose a chapter 11 plan for the first 120

days of this proceeding, and the exclusive right to solicit votes for such a plan during an additional

60-day period. *See* 11 U.S.C. § 1121(b) and (c). This period may be extended "for cause" on

request of any party in interest. *See* 11 U.S.C. § 1121(d)(1). In 2005, Congress expressed concern

4

about unfettered extensions of the exclusive periods by imposing a hard cap of eighteen months on

plan exclusivity. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

(BAPCPA) Pub. L. No. 109–8, Apr. 20, 2005, 119 Stat. 23; *codified at* 11 U.S.C. § 1121(d)(2).

10.    The burden rests with the party requesting an extension of the exclusivity period.

*See In re Mid-State Raceway, Inc.*, 323 B.R. 63, 67-68 (Bankr. N.D.N.Y. 2005) ("[i]t is the

Debtors that have the burden of establishing the requisite cause for any extension"). "The debtor

must make a clear showing of 'cause' to support an extension of the exclusivity period." *In re

Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992). Courts will "not routinely extend the

exclusivity period absent a showing of 'cause' when creditors object to such requests for

extensions." *Id.*; *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (S.D.N.Y. 2006).

11.    As this Court has recognized, "[the] court's decision to extend a debtor's exclusive

periods is a serious matter; extensions are not granted routinely or cavalierly." *In re Borders

Group, Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011). The Bankruptcy Code does not define

"cause" in this context, however legislative history indicates that courts should apply a flexible

standard that balances the competing interests of a debtor and its creditors. *See* H.R. Rep. No. 95-

595 (1978) at 231, 232, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6191; *see also Century Glove, Inc.

v. First Am. Bank of New York*, 860 F.2d 94, 102 (3d Cir. 1988) ("Congress believed that debtors

often delay confirmation of a plan, while creditors want quick confirmation. Therefore, unlimited

exclusivity gave a debtor 'undue bargaining leverage,' because it could use the threat of delay to

force unfair concessions.") (citing H.R., 1978 U.S.C.C.A.A.N. at 6191). The decision to permit an

extension is a matter of discretion based on all facts and circumstances. *See In re Adelphia, 352

B.R. at 586; see also In re Mid-State Raceway*, 323 B.R. at 68 (noting an extension of exclusivity

"represents a compromise between the dual goals of giving the debtor time to reorganize and

protecting the creditors' legitimate interests.") (citation omitted).

12.    To assist in this "cause" analysis, courts routinely consider the following factors:

> (a) the size and complexity of the case; (b) the necessity for
> sufficient time to permit the debtor to negotiate a plan of
> reorganization and prepare adequate information; (c) the existence
> of good faith progress toward reorganization; (d) the fact that the
> debtor is paying its bills as they become due; (e) whether the
> debtor has demonstrated reasonable prospects for filing a viable
> plan; (f) whether the debtor has made progress in negotiations with
> creditors; (g) the amount of time which has elapsed in the case; (h)
> whether the debtor is seeking an extension of exclusivity in order
> to pressure creditors to submit to the debtor's reorganization
> demands; and (i) whether an unresolved contingency exists.

*In re Adelphia*, 352 B.R. at 587.    These factors are not exclusive, and the primary consideration is

whether a change in exclusivity will materially move the case forward. *Id.* at 587, 590.

### ii.    Cause Does Not Exist to Extend Exclusivity

13.    Analysis of the relevant *Adelphia* factors reveals that no cause exists for the

extension requested by the Debtors.

### (i)    This Is a Liquidation, Not a Complex Reorganization Case

14.    While at first glance these cases appear to be large and complex, the ultimate goal

of these cases is liquidation.  Exclusivity periods are primarily designed to provide protection for

entities attempting to emerge from bankruptcy through a *reorganization* of their businesses.  *See*

*Matter of Newark Airport/Hotel Ltd. P'ship*, 156 B.R. 444, 451 (Bankr. D.N.J. 1993) *aff'd sub nom.*

*FGH Realty Credit Corp. v Newark Airport/Hotel Ltd. P'ship*, 155 B.R. 93 (D.N.J. 1993) ("The

purpose of the debtor's exclusivity period is to make a chapter 11 filing attractive enough to

encourage ailing businesses to seek reorganization without unduly delaying creditors."); *In re Pine*

*Run Trust, Inc.*, 67 B.R. 432, 434-35 (Bankr. E.D. Pa. 1986) (noting that Congress created

6

exclusivity periods to prevent debtors from avoiding, or failing in their attempts at, reorganization, while simultaneously recognizing the interests of creditors to have a say in the future of the business) (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 231–232 (1978), *reprinted in* U.S.C.C.A.N. 1978, pp. 5787, 6191). After the auctions for the sales of the Debtors' mortgage origination and servicing businesses and other legacy assets, the key remaining task will be to distribute proceeds among the creditors according to a liquidation plan. The creditors—not the Debtors—are the key parties in interest when determining the allocation of proceeds from these sales and the recoveries from estate claims and causes of action, including any settlements. The Debtors are not reorganizing and should have only minimal interest in how assets will be distributed to creditors.

15.     This case stands in stark contrast to *In re Borders*, where this Court recently granted a debtor's motion to extend exclusivity. 460 B.R. at 828. In *Borders*, unlike here, it was not certain at the time the Court decided the motion whether the case would involve a liquidation or a standalone reorganization. *Id.* at 823-24. The Borders case was substantially complicated by the ongoing effort to develop a "sustainable business plan," which required continuing decisions to be made regarding whether to assume, reject or modify thousands of contracts and leases, and what to do with hundreds of operating stores and thousands of employees. *Id.* By contrast, in this case, no such decisions are left to be made. Substantially all of the Debtors' assets are going to be sold. As the Court recognized in *Borders*, liquidation plans, such as the plan in this case, are simply different because they are "usually not a time-consuming process to develop." *Id.* at 824.

### (ii)    Unresolved Contingencies Will Be Satisfied Before Nine Months

16.     The Debtors argue for a nine-month extension in light of unresolved contingencies. They point to the Court's statement that it will not permit the solicitation of votes until the issuance

7

of the Examiner's report as a circumstance necessitating extension of their exclusivity periods, *see* Motion ¶¶ 29-30, and they characterize the Examiner's investigation as an "unresolved contingency" justifying their requested extensions. *See* Motion ¶ 36.

17.     Both of these "contingencies" will be resolved by the publication of the Examiner's report. There is no reason to give the Debtors more than four months of additional exclusivity after publication of the report. An extension of a few weeks after publication of the report would give the Debtors ample opportunity to file a plan based on creditor input and participation. More importantly, the Court and parties in interest should have the opportunity to review the Examiner's report, take stock of the situation, and evaluate whether an extension is warranted. Even if the report is not published in six months, this evaluation can be done on the basis of facts known at that time.

### (iii)    Debtors Have Not Demonstrated Good Faith in Dealing With Creditors

18.     The Debtors' conduct in these cases has not reflected good faith. Debtors have hampered discovery, negotiations and collective progress towards a fair resolution of these cases for all interested parties. The Debtors' pre- and post-petition efforts have focused on the interests of AFI, Ally Bank and themselves, as well as a few favored creditor constituencies. For example, prior to filing these cases, Debtors negotiated the a settlement with AFI under which AFI has agreed to pay $750 million in exchange for a release of estate claims and a non-consensual release of all third-party claims (the "AFI Settlement"). The Debtors are now trying to impose the AFI Settlement on creditors by incorporating it into their proposed plan. Though the Debtors purport to have negotiated with creditors in good faith regarding that plan, *see* Motion ¶ 32, they have not engaged in negotiations with the Trustee or the Noteholders regarding the plan. Two additional

examples of the Debtors' questionable conduct can be found in the way the Debtors have handled the subservicing motion and the RMBS settlements.

19.    As this Court is aware, on May 14, 2012, the Debtors filed a motion seeking an order authorizing GMACM to continue to perform under the AFI servicing agreement.[5] The Debtors were less than candid by not immediately disclosing that five days prior to the filing of these cases, AFI caused the Debtors to pay approximately $49 million in indemnification payments to Ally Bank pursuant to a servicing agreement with AFI. *See* Creditors Committee Subservicing Statement at ¶ 6. Clearly, this raises preference issues that should have been raised when the Debtors filed the Subservicing Motion. Moreover, indemnification was not referenced in the Subservicing Motion or in any of the Debtors' supporting papers, and the Debtors represented to the Court that, under the servicing agreement, business as usual would continue. *See id.* at ¶ 8. However, it was later disclosed, two months after the Subservicing Motion was first filed, that Judge Peck's interim order had been used as purported authority for the Debtors to transfer approximately $19.9 million in post-petition payments to Ally Bank in connection with these purported indemnification obligations. *See id.* Aside from the obvious disclosure issues, the transfer may be an avoidable, unauthorized transfer.

20.    As noted by the Official Committee of Unsecured Creditors (the "Creditors Committee"), discovery related to the Subservicing Motion demonstrated that the Debtors appear to have engaged in a series of "suspect transactions" that "reflect AFI's dominance and control over the Debtors and the use of their influence to extract value for itself and Ally Bank to the detriment of Debtors." *See id.* at ¶¶ 3, 5.

---

[5]    *See Debtors' Motion For Interim And Final Orders Under Bankruptcy Code Sections 105(a) And 363 Authorizing The Debtors To Continue To Perform Under The Ally Bank Servicing Agreements In The Ordinary Course Of Business* (the "Subservicing Motion") (Doc. 47).

21.     Similar problems of non-disclosure and questionable tactics have arisen with respect to the RMBS settlements, and, particularly, the recently proposed "HoldCo Election." In their Motion, Debtors contend they have "successfully negotiated" RMBS settlements with "relevant constituencies." *See* Motion at ¶ 32. This statement is simply not accurate.[6]  The proposed RMBS settlements cannot truly be described as having been "successfully negotiated" by the "relevant constituencies" because they now include the Holdco Election, a perverse form of substantive consolidation, outside the context of a plan, that would permit settling RMBS trustees to allocate up to 20% of their $8.7 billion allowed claim to Residential Capital on the basis of unasserted, hypothetical alter ego claims.  In addition to potentially diluting the claims of the Noteholders to a significant degree, the HoldCo Election would preserve an uncapped claim for RMBS-related liabilities against Residential Capital in the event the HoldCo Election is not approved by the Court, while still giving the RMBS trustees the benefit of the $8.7 billion allowed claim against other Debtor entities, and would make it impossible for Noteholders to understand their expected recoveries at the time of plan voting because the RMBS trustees could exercise the HoldCo Election up until plan confirmation. *See* Motion to Modify at ¶ 38.  Despite the fact that HoldCo Election directly affects the interests of the Noteholders, the Debtors did not involve the Trustee or the Noteholders whatsoever in their "successful negotiation."

22.     The Debtors' lack of good faith in the RMBS settlements is underscored by their repeated failure to provide relevant discovery at key junctures in these proceedings.  For weeks

---

[6]     On August 15, 2012, the Debtors filed a supplement to the RMBS settlements, which included—for the first time—a novel provision called the "Holdco Election." *See Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* (Doc. 1176) (the "Supplemental Motion"). Because the HoldCo Election had not been disclosed before entry of the order setting the schedule for discovery and approval of the RMBS settlements, the Trustee filed a motion to modify the schedule to allow sufficient time for the Trustee to engage in discovery. *See* Declaration of Matthew J. Dolan, dated September 4, 2012 (the "Dolan Decl.") Ex. A (attaching the Motion to Modify).  The hearing on the Motion to Modify has been adjourned until September 27 in light of ongoing discussions and the Debtors' agreement to immediately provide discovery on certain issues.

10

prior to the amendment of the RMBS settlements to include the HoldCo Election, the Debtors shut

out certain Noteholders from any discovery related to the RMBS settlements. *See id.* at ¶¶ 25-28.

Just days before publicly revealing the HoldCo Election, the Debtors formally denied all

information requests made by certain Noteholders related to the RMBS settlements. *See id.* at ¶ 28.

23.      Courts consider a debtor's failure to negotiate in good faith with key creditor

constituencies when determining whether to extend exclusivity. *See, e.g.*, *In the Matter of Lake in

the Woods,* 10 B.R. 338, 345 (E.D. Mich.1981) (denying exclusivity extension due to debtor's

demonstrated unwillingness to negotiate in good faith with creditors). Courts have likewise

acknowledged the importance of adequate disclosure to the fair and efficient resolution of

bankruptcy proceedings. *See, e.g.*, *In re Texaco, Inc.*, 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987)

(noting the importance of allowing creditors "an opportunity to review and negotiate an acceptable

plan"). The Debtors' dissatisfaction at being "inundated" with discovery requests, *see* Motion at

¶ 1, only belies their misguided view of discovery as an inconvenience rather than an essential

aspect of these proceedings. They have chosen the path of selling their assets through a chapter 11

process, and, therefore, must accept the consequences of that decision, including their obligation to

provide necessary disclosure and information and to involve all creditors in the plan process.

### (iv)    Debtors Have Not Demonstrated Any Reasonable Prospects for Filing a Viable Plan

24.      The Debtors' conduct to this point raises serious doubts about whether there is a

reasonable prospect of Debtors filing a viable plan. As discussed above, any plan will need to

address the core issues of how to divide the proceeds of the liquidation of the Debtors' assets

amongst creditors, and the determination of whether certain claims and causes of action should be

settled, and if so, on what terms. These are fundamentally interdebtor and intercreditor issues. The

Debtors' overreaching attempt to propose the HoldCo Election in advance of a plan, without

11

involving key creditor constituencies, further suggests that the Debtors are not prepared to put forth a viable plan. Making matters worse, the Debtors have already created a conflict of interest by taking sides in the interdebtor dispute represented by the RMBS settlements and the HoldCo Election. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610 (Bankr. S.D.N.Y. 2006) (disqualifying debtors' counsel from taking public positions on issues related to intercreditor disputes).

### (v)    An Extension Very Likely Will be Used to Pressure Creditors

25.    The Debtors deny they will use the requested extension as a means to pressure creditors, and claim instead to have "maintained consistent and regular communication with their key constituencies" during these proceedings. *See* Motion ¶ 35. As already discussed, this assertion is not credible. Preserving exclusivity for several months after release of the Examiner's report goes well beyond this Court's guidance and could only serve to further pressure creditors. *See Memorandum Opinion and Order Granting Berkshire Hathaway's Motion to Appoint an Examiner Under 11 US.C. § 1104(c)* at 16-17 (Doc. 454). Further, given that this is a liquidation, the Debtors should have little interest in the intercreditor issues surrounding how to divide their liquidated assets and recoveries, including the proceeds of any settlements. The Trustee is concerned that a nine-month extension would be used to continue the Debtors' attempts to pressure creditors into a plan that benefits the Debtors' non-debtor affiliates and favored parties in interest. *See, e.g., In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir.1987), *aff'd*, 484 U.S. 365 (1988) (noting that "[s]ection 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors."); *see also In re Curry*, 148 B.R. at 756 (holding that an extension of exclusivity "should not be employed as a tactical device to put pressure on creditors to yield to a plan that they might consider

12

unsatisfactory") (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 406 (1977)). Certainly, the

Debtors' conduct to this point should not afford them any benefit of the doubt.

**B.    A Limited Extension Should be Granted**

26.    A nine-month extension of the Debtors' exclusivity period is simply not warranted

in these cases. The Debtors have already filed a proposed plan and will no doubt continue to refine

their proposal as the Examiner works to complete his report. Extending the plan exclusivity period

for several weeks following publication of the report – assuming that the exclusive periods were

not terminated – would allow the Debtors to review the Examiner's report and revise their

proposed plan in accordance with the report.

27.    The Trustee therefore requests that the Court grant only a limited extension,

extending the exclusive period for filing a plan until the earlier of (i) 30 days following the

issuance of the Examiner's report, or (ii) February 27, 2013, without prejudice to the Debtors'

ability to seek further extensions of the exclusive periods or the rights of parties in interest to object

to such requests or to seek termination of the Debtors' exclusive periods.[7] The Trustee further

requests that the Court not consider approval of any disclosure statement prior to making a

determination on the appropriateness of a further extension of such exclusive periods.

28.    While the Debtors' suggest that an early end to exclusivity will open the

"floodgates" to competing plans which will derail these cases, *see* Motion at ¶ 38, such concerns

are misplaced. The public submission of multiple plans from various groups of creditors could be

beneficial and actually hasten a consensual resolution of these cases. In the Lehman Brothers

chapter 11 cases, three competing plans were proposed—including two plans by competing groups

of creditors. Ultimately, the existence of the competing plans helped foster an historic global

---

[7]    During this time period, the Debtors' exclusive periods for filing a plan and soliciting support for a plan
would be coterminous.

settlement supported by representatives from virtually all creditor classes holding claims in excess of $100 billion.[8]

## CONCLUSION

For the foregoing reasons, the Debtors' Motion should be denied, and the Court should permit an extension to the Debtors' exclusivity period for a more limited period as described herein.

Dated: New York, New York
      September 4, 2012

              Respectfully submitted,

              CLEARY GOTTLIEB STEEN & HAMILTON LLP


              By: /s/Sean A. O'Neal
              Thomas J. Moloney (TJM-9775)
              Sean A. O'Neal (SAO-4067)
              Members of the Firm
              One Liberty Plaza
              New York, NY 10006
              *(212) 225-2000*

              *Special Counsel for Wilmington Trust, National Association, as Indenture Trustee for the Senior Unsecured Notes Issued by Residential Capital, LLC*

---

[8]     At the confirmation hearing to approve the consensual plan in *In re Lehman Brothers Holdings, Inc.*, the Court characterized the final result as the "most overwhelming outpouring of creditor consensus in the history of insolvency law." *See* Dolan Decl. Ex. B at 69:4-6.