**Hearing Date: September 11, 2012 at 10:00 a.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' OMNIBUS REPLY TO LIMITED OBJECTIONS TO DEBTORS'
MOTION FOR THE ENTRY OF AN ORDER EXTENDING THEIR EXCLUSIVE
PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

ny-1056737

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................................ 1

DEBTORS' AMENDED REQUEST FOR AN EXTENSION OF EXCLUSIVITY PERIODS .................................................................................................................................... 6

THE LIMITED OBJECTIONS ............................................................................................................. 6

    A.    THE COMMITTEE OBJECTION ...................................................................................... 6

        a.    Responses To The Creditors' Committee Misstatements ....................................... 7

        b.    The Court Should Not Require That The Exclusive Periods Be Coterminous ................................................................................................................. 10

    B.    THE AURELIUS OBJECTION ......................................................................................... 11

    C.    THE WILMINGTON TRUST OBJECTION .................................................................... 12

    D.    JUNIOR SECURED NOTES OBJECTION ...................................................................... 14

CONCLUSION .................................................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

In re Adelphia Commc'ns Corp.,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006) ................................................................... 7,9,11

In re Borders Group, Inc.,
    460 B.R. 818 (Bankr. S.D.N.Y. 2011) ............................................................... 7,9,10,11

In re Texaco Inc.,
    81 B.R. 806 (Bankr. S.D.N.Y. 1988) ........................................................................... 10

ny-1056737

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") submit this reply (the "Reply") to limited objections[1] to the *Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1248] (the "Exclusivity Motion"). In further support, the Debtors respectively allege as follows:

## INTRODUCTION

1. The Debtors' request for an extension of their exclusive periods to file a Chapter 11 plan and solicit acceptances thereof has drawn a total of four limited objections. None of the objections concludes that the Debtors should not be afforded some extension of their Exclusive Periods.[2] Rather, for these objecting parties the question is merely the length of the Debtors' proposed extension periods. Three of the objecting parties concede that the Debtors should have some period of time after the filing of the Examiner's Report to negotiate a plan. The fourth, Aurelius, suggests a modest extension that will not even extend far enough for the closing of the Asset Sales.

2. The Exclusivity Motion sought to extend the Debtors' plan exclusivity for a period of time after the anticipated filing of the Examiner's Report in order to have a meaningful discussion with the major stakeholders. These stakeholders will themselves require an

---

[1] *Limited Objection of Aurelius Capital Management, LP ("Aurelius") to Debtors' Motion to Extend Exclusivity* [Docket No. 1334] (the "Aurelius Objection"), *Objection of Wilmington Trust, National Association* ("Wilmington Trust") *to the Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 plan and Solicit Acceptances Thereof* [Docket No. 1336] (the "Wilmington Trust Objection"), *Limited Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1338] (the "Junior Secured Notes Objection") and *Limited Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1352] (the "Committee Objection," and collectively with the Aurelius Objection, Wilmington Trust Objection and Junior Secured Objection, the "Limited Objections").

[2] Capitalized terms not otherwise defined herein, shall have the meanings ascribed to them in the Exclusivity Motion or the respective Limited Objection.

1

ny-1056737

opportunity to review the report and discuss it with their respective professionals. Because major aspects of the plan negotiation process cannot begin in earnest until the Examiner's Report is filed, the Debtors' request for an extension should not have been viewed as an extension for "nine months." Rather, it should have been viewed as an extension of three to four months following the issuance of the report. In any event, and as noted below, the Debtors have agreed to modify their request to try to accommodate the concerns raised by the Creditors' Committee, Wilmington Trust and the Junior Secured Notes.

3.   The Debtors are hopeful that the Examiner's Report will be filed by February 6, 2013,[3] the target date that is currently contemplated under the Examiner's work plan. But the Debtors are also conscious of the breadth and scope of the Examiner's work plan, his need to obtain discovery from many parties not under the Debtors' control, and the need to give all parties in interest in this case an opportunity to consider the Examiner's Report. The Debtors and all of the objectors recognize the importance of the Examiner's Report to the overall plan process; indeed it cannot be overstated. Accordingly, measuring the extension of the Debtors' Exclusive Periods from the date on which the Examiner files his report is sensible. And while the Debtors will continue to solicit views from all stakeholders on how to achieve consensus before the Examiner issues his report, a great deal of effort will be required even after that date.

4.   Despite the appointment of the Examiner and the time and resources required to support his investigation, the Debtors have made significant progress in these cases in less than 120 days – almost unprecedented in cases of this size and complexity. Since the Petition Date,

---

[3] The Committee Objection incorrectly states that the Examiner's report is expected to be issued by January 2013. The Examiner's work plan, which was filed on the docket on August 6, 2012 (Docket No. 1010) states the following: "At this juncture, based upon his discussions with his counsel and the parties, the Examiner believes that a realistic time frame for the preparation of his report is *six months from the date of this submission*, subject to adjustment if after meaningful due diligence a different time period appears to be more reasonable." (emphasis added). Therefore, the expected date of the Examiner's Report is not "by January 2013," but in fact February 6, 2013. Therefore, the calculation of any proposed extension to exclusivity should be measured from February 6, 2013.

2

ny-1056737

the Debtors have secured and obtained court approval of over $1.5 billion of DIP financing which stabilized the Debtors' operations and gave the Debtors the opportunity to successfully sell its mortgage loan origination and servicing business and whole loan portfolio.  In addition, the Debtors obtained the first-of-their-kind relief to allow them to continue servicing over 2.4 million loans during these Chapter 11 cases.  Moreover, the Debtors have obtained Court approval of bidding procedures that will allow them to conduct an auction for the above-referenced assets for an aggregate sales price of approximately $4 billion – all for the benefit of the Debtors' creditors.

5. While awaiting the filing of the Examiner's Report, there are many matters on which the Debtors must focus their efforts at this time.  Not the least of which are the Debtors' efforts to sell their servicing platform.  What the Debtors have done to date and are hopefully well on their way to achieving in these cases - selling a live loan servicing and origination platform - has never been accomplished before in bankruptcy.  Such a sale will generate significantly more value for creditors than if the Debtors had been forced to cease operations and liquidate like all of the previous mortgage servicing debtors that sought bankruptcy protection.  In achieving these goals, the Debtors have been faced with extraordinary challenges and have been required to strike a precarious balance between the varying interests of key creditor constituencies, all while (i) complying with settlements with the DOJ/AG and the Federal Reserve Board, (ii) producing millions of pages of documents to creditors, regulatory agencies and the Examiner, (iii) operating their businesses as a going concern, and (iv) marketing their assets for an unprecedented sale.

6. Certain of the objecting parties fail to recognize these achievements and instead criticize the Debtors for entering into the very agreements (i.e. the various plan support

agreements)[4] that have allowed the Debtors to make a smooth transition into Chapter 11 and be poised to return billions of dollars to creditors.

7. It is certainly not a secret that one of the central issues in these cases is the Examiner's review of possible claims against the Debtors' parent, Ally Financial Inc. ("AFI"). Whatever the findings of the Examiner (with whom the Debtors are cooperating extensively), and whether or not the objecting parties chose publicly to recognize it, the Debtors wisely chose to avoid the fate of other mortgage originators and servicers whose bankruptcies resulted in scrap-value liquidations. And in order to avoid that fate, the Debtors procured AFI's agreement to (a) provide debtor in possession financing, (b) permit the Debtors to continue subservicing its mortgages, (c) support the Debtors' continued origination of mortgage loans, (d) allow the Debtors to utilize the combined back office, payment processing, and servicing functions that are integral to conducting the business during the sale process, (e) cooperate with the Debtors to permit the separation of resources to allow for the Asset Sales to occur as smoothly as possible, and, last but certainly not least, (f) serve as the stalking horse bidder for the Debtors' whole loan portfolio.

8. Similarly, it is the RMBS Settlement that has allowed the Debtors to minimize potential objections to the Asset Sales and help ensure their ability to successfully transfer the assets to the successful bidder, while also limiting the extent of cure claims to be asserted against the Debtors' estates by the RMBS trustees in connection with the sale. See *Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (i) Debtors' Motion Pursuant to Fed. R. Bank. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (ii)*

---

[4] The various plan support agreements (referred to herein as either the "AFI PSA," "JSB PSA," and "RMBS PSAs") are attached as Exhibits 8, 9 and 10, respectively to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Motions [Docket No. 6] and filed on the docket on June 11, 2012 [Docket No. 319].

*the RMBS Trustees' Limited Objection to the Sale Motion* [Docket No. 945].[5] While the amount of cure claims that will <u>not</u> be asserted cannot be known, there is no question that the Debtors' estates have benefited greatly from this major concession negotiated by the Debtors for the benefit of its creditors.

9. Likewise, the JSB PSA entered into with the Junior Secured Bonds and the RMBS PSAs entered into with holders of RMBS Trust certificates helped smooth the way into Chapter 11 by, among other things, ensuring that the Debtors had consensual use of cash collateral and access to debtor in possession financing to continue operating in the ordinary course. Without such support, the opening weeks of these cases would have been spent litigating over such matters. Even assuming that the Debtors were ultimately successful in obtaining the financial and operational relief they sought, such uncertainty could have significantly impaired the Debtors' ability to operate their businesses, without major disruption and deterioration in value.

10. All of these activities have been intended to further the most important and most immediate goal of this bankruptcy -- to sell a significant portion of the Debtors' assets for the highest and best value. While the Limited Objections conveniently ignore these facts,[6] the Debtors believe that it is important for this Court and the public to understand the importance of what is at hand, the steps that have been taken to get the Debtors' estates this far, and, in particular, the role that the agreements with AFI, the RMBS investors and Junior Secured Bonds have played in positioning the Debtors to be able to provide billions of dollars of value to

---

[5] Three of the RMBS Trustees, Deutsche Bank Trust Company Americas, The Bank of New York Mellon Trust Company, N.A. and U.S. Bank National Association, are members of the Creditors' Committee. As such, they have a firsthand understanding of the importance of the RMBS Settlement to the sale process. Wilmington Trust sits on the Creditors' Committee in its capacity as indenture trustee for the senior unsecured notes.

[6] Buried innocuously (in paragraph 10) of the Committee Objection is the begrudging recognition by the Creditors' Committee of the tremendous progress that has been made by the Debtors in operating their businesses and in pushing this unprecedented sale process forward.

5
ny-1056737

creditors. This is in sharp contrast to the results of the mortgage originators and servicers that have entered bankruptcy before these Debtors. That the objecting parties choose to belittle those achievements does not invalidate them.

11. The Debtors believe that their Exclusivity Motion demonstrates that they have satisfied the legal requirements for an extension of their Exclusive Periods. Apart from using the request as an opportunity to sling mud in a manner that is not very useful to the Court, none of the Limited Objections presents any factual basis to demonstrate that these Debtors are not deserving of an extension. Understandably, the objecting parties want a seat at the negotiating table. And, as appropriate, they will have a seat, as will many other equally important constituents, both private and governmental, affiliated and independent, large and small.

## DEBTORS' AMENDED REQUEST FOR AN EXTENSION OF EXCLUSIVITY PERIODS

12. In response to the Limited Objections, the Debtors have determined to amend their request for an extension to file a Chapter 11 plan to the earlier of (i) forty-five (45) days following the issuance of the Examiner's Report or (ii) March 29, 2013, and sixty (60) days thereafter to solicit votes (together, the "<u>Amended Exclusivity Periods</u>"). A revised proposed order granting the relief requested in the Exclusivity Motion, revised to reflect the Amended Exclusivity Periods request, is attached hereto as <u>Exhibit 1</u>. Such extension would be without prejudice to the Debtors' right to seek further extensions of the Amended Exclusivity Periods, or the rights of any party to seek to terminate exclusivity.

## THE LIMITED OBJECTIONS

### A. The Committee Objection

13. The Committee Objection should be overruled. In determining whether to extend exclusivity in <u>In re Borders Group, Inc.</u> ("<u>Borders</u>"), this Court analyzed those factors (the

6

ny-1056737

"Adelphia Factors")[7] considered by Judge Gerber in Adelphia. In re Borders Group, Inc., 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011). The Creditors' Committee fails to provide any evidence that the Debtors have not satisfied the Adelphia Factors. Instead the Committee Objection focuses on issues that are inapposite to the Court's consideration of exclusivity. Although the Debtors do not think they are relevant at this juncture, the Debtors would like to address in this Reply some of the more glaring of the many misstatements contained in the Committee Objection.

### a. Responses To The Creditors' Committee Misstatements

14. In paragraph two of the Committee's Objection, the Creditors' Committee alleges that the Debtors' hands are tied and that the Debtors have "locked themselves in to plan support agreements." Committee Objection ¶ 2. This statement is misleading and, in fact, incorrect. The Debtors' plan support agreements each contains a "fiduciary out." See AFI PSA § 3.2(c), JSB PSA § 2.4, and RMBS PSAs §2.4. It is also important to note that absent amendment, the AFI plan support agreement will terminate automatically on October 31, 2012, as no plan confirmation order will be entered by that date. The Debtors' hands are thus hardly tied – though they continue to believe that subject to the Examiner's investigation, a plan incorporating the AFI Settlement is in the best interests of the estates. Moreover, as noted above, the purpose of the Debtors' entry into these agreements was to extract necessary support for the maximization of value from the Asset Sales. All parties seek to embrace the benefits that accrue from these

---

[7] The Adelphia Factors include: (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. In re Adelphia Commc'ns Corp., 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006).

pre-petition agreements and simultaneously criticize the Debtors for negotiating them. So be it. But the Asset Sales will not magically happen on their own.

15.  The Committee Objection also insinuates that the Debtors have failed to engage the Creditors' Committee on key matters in these cases. See Committee Objection ¶ 4. This also is without merit. The Debtors have engaged in repeated, meaningful dialogue with the Creditors' Committee almost daily. As a result of this consistent dialogue, significant contested matters in these cases have ultimately been resolved consensually with the Creditors' Committee. The parties have also engaged in several discussions regarding matters that will form the basis of a plan, including their relationship with AFI, the RMBS Settlement, the Examiner's investigation and other matters. That there have been limited postpetition discussions on the specifics of a plan should not be a surprise at this point in these cases.

16.  The Creditors' Committee also takes issue with the plan attached as an exhibit to the Exclusivity Motion (the "Draft Plan"). But the issue here is not whether the Creditors' Committee agrees with the Draft Plan, but whether the Debtors have met the criteria for a further extension of their Exclusive Periods. The Debtors had advised the Creditors' Committee on multiple occasions both in open court and privately that the Debtors' determination to "file" the Draft Plan (ultimately as an exhibit to the Exclusivity Motion) was intended to meet one of the Debtors' requirements under the AFI Settlement – albeit not on a timely basis. In filing the Draft Plan as an exhibit, the Debtors did not intend to prosecute the Draft Plan at this time. For the Creditors' Committee to argue that attaching the Draft Plan to the Exclusivity Motion, which was meant to foster discussion amongst all interested parties as to how a consensual Chapter 11 plan might be achieved, is instead evidence of the Debtors' intent to prosecute a plan dictated by AFI, is quite unfortunate and not at all consistent with reality. The fact that the Draft Plan does

8

ny-1056737

not yet reflect input of the Creditors' Committee should not be surprising and should have nothing to do with whether the Exclusive Periods should be extended, as the Debtors are still months away from being able to prosecute any plan. The Debtors committed in the Exclusivity Motion and reaffirm now in this Reply, that they intend to use an extension of the Exclusive Periods to negotiate and work with all key parties in interest, including the Creditors' Committee to seek confirmation of a substantially consensual Chapter 11 plan if possible

17.     Regardless, even if a consensual plan cannot ultimately be reached, as noted by Judge Gerber in Adelphia, "displeasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file." Adelphia, 352 B.R. at 587. That is particularly true here where creditors (both secured and unsecured) holding or controlling billions in claims have expressed support for the plan suggested by the Debtors. Furthermore, this Court stated in Borders that it "expects cooperation, but that does not mean that the Debtors, or the Committee for that matter, is expected to 'share' incomplete plans with other constituencies." Borders, 460 B.R. at 825. If nothing else, the Committee Objection seems to read into the Bankruptcy Code a requirement that a debtor may not propose a plan of reorganization that is not supported by its creditors' committee. This is simply not the law.

18.     The Creditors' Committee has not produced any evidence showing that the Debtors' have or intend to use exclusivity to coerce anyone to accede to their demands. If the Creditors' Committee or any other party in interest disapproves of the AFI Settlement, the Bankruptcy Code provides them with a right to vote against, or object to, the plan. The Examiner will clearly also be weighing in on the subject.

9

ny-1056737

### b. The Court Should Not Require That The Exclusive Periods Be Coterminous

19.     The Debtors oppose the Creditors' Committee's suggestion that the Exclusive Periods be coterminous.  See Committee Limited Objection ¶ 7.[8]  The Creditors' Committee has not cited any case law for its argument that the Exclusive Periods be conterminous.  These are large and complicated cases and there are many creditor constituencies. The Bankruptcy Code, in providing both exclusive filing and solicitation periods, recognizes the importance of allowing the Debtors to manage this process for an extended period of time.  Because these cases are unique in that the Court has already stated that solicitation cannot occur until after the Examiner's Report is issued, that exclusive period necessarily should be extended as well.  The Creditors' Committee's request effectively renders the extension of plan filing exclusivity meaningless and will almost certainly create a disorderly and unwieldy competing plan process, even if the Examiner's Report finds that the AFI Settlement is in the best interests of the Debtors' estates.  See, e.g., Borders, 460 B.R. at 827-28 ("Terminating exclusivity at this time would also create a situation where the estates could be saddled with multiple and competing plans."); In re Texaco Inc., 81 B.R. 806, 811 (Bankr. S.D.N.Y. 1988) (refusing to terminate exclusivity because "if Texaco's plan exclusivity periods were terminated, this could result [in] an avalanche of plans from parties in interest which would undermine the prospects for a prompt resolution of Texaco's chapter 11 cases.").[9]

20.     For the foregoing reasons, this Court should overrule the Committee Objection.

---

[8]  The Wilmington Trust Objection also requests that the Exclusive Periods be coterminous.
[9]  While Wilmington Trust cites Lehman as a case where multiple plans resulted in positive results (Wilmington Trust Objection ¶ 28), those competing plans were filed more than two years after Lehman filed for bankruptcy, and after the Lehman debtors' plan exclusivity expired.

B. **The Aurelius Objection**

21.     The Aurelius Objection is, in reality, a poorly disguised objection to the Draft Plan, that is improperly couched as an objection to the Exclusivity Motion. It should be overruled.

22.     As noted above, even though the Debtors have not sought to prosecute a Chapter 11 plan to date, even if they had, "displeasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a plan on file." Adelphia, 352 B.R. at 587.

23.     The Aurelius Objection seeks to reduce the extension of exclusivity to 90 days and condition such extension on certain revisions to the plan support agreements. Such a short proposed extension does not extend through the conclusion of the sale process and would be detrimental to the sale process, as it injects uncertainty at a time when the Debtors' estates can least afford it. See e.g. Borders, 460 B.R. 824 (stating that the "sale process is likely to proceed most efficiently if the Debtors retain exclusivity and can manage the sale process.").

24.     Moreover, the allegation that the PSA counterparties are prohibited from negotiation with other creditors is false. As noted in the Noteholders Limited Objection, the Junior Secured Noteholders can terminate the PSA at any time. Junior Secured Notes Objection ¶ 15. The same is true under the RMBS PSAs. Additionally, as noted above absent amendment, the AFI plan support agreement will terminate automatically on October 31, 2012. Even if Aurelius were correct in stating that creditors are not free to negotiate, the fact that certain creditors are committed to supporting a specific plan does not form a basis to terminate or modify exclusivity.

11

25.     For the foregoing reasons, the Debtors respectfully request that the Court overrule the Aurelius Objection.

### C. The Wilmington Trust Objection

26.     Despite all the rhetoric in the Wilmington Trust Objection, like the other objectors to the Exclusivity Motion, Wilmington Trust does not in fact object to an extension of the Exclusive Periods.[10] The Debtors' revised exclusivity request as set forth herein, seeks only a slightly longer extension than the extension suggested by Wilmington Trust.

27.     The Wilmington Trust Objection casually states that after the Asset Sales the "key remaining task will be to distribute proceeds among the creditors according to a liquidation plan" and thus, the Debtors are not entitled to an exclusivity extension. Wilmington Trust Objection ¶ 14. To be clear, under applicable law, whether this is a liquidation is not determinative because courts regularly grant exclusivity extensions in liquidating cases.[11] More to the point, Wilmington Trust ignores the significance of the remaining assets following the closing of the Asset Sales, which assets will need to be administered and/or monetized for the benefit of the Debtors' estates. As reflected in the asset chart, attached hereto as <u>Exhibit 2</u>, there will still be in excess of approximately $1.7 billion in book value of assets to be administered after the closing of the Asset Sales. Those assets consist of real estate owned (REO) properties, certain held for sale loans, securities, master servicing rights and federally insured accounts receivable and loans. Thus, even putting aside the tremendous amount of work that needs to be done to

---

[10] Wilmington Trust proposes an extension of the earlier of (i) 30 days after the issuance of the Examiner's Report or (ii) February 27, 2012. Wilmington Trust Objection ¶ 4.

[11] In all of the following liquidating cases, the Debtors were granted extensions of exclusivity, <u>In re Lehman Brothers Holdings Inc.</u>, Case No 08-13555 (JMP) (Bankr. S.D.N.Y. Jan. 15, 2009) [Docket No. 2549]; <u>In re Enron Corp.</u>, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Apr. 24, 2002) [Docket No. 3302]; <u>In re Adelphia Commc'ns Corp.</u>, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Oct. 25, 2002) [Docket No. 949]; <u>In re Ames Dep't Stores, Inc.</u>, Case No. 01-42217 (REG) (Bankr. S.D.N.Y. Dec. 18, 2001) [Docket No. 600]; <u>In re TL Admin. Corp.</u>, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. Jan. 7, 2004) [Docket No. 370].

reconcile claims and ultimately make distributions after the Asset Sales conclude, this case does not end upon the closing of the Asset Sales.[12]

28. The Wilmington Trust Objection further asserts that the Debtors have "stonewalled legitimate requests" for information, have "denied all information requests," and have "repeatedly failed to provide relevant discovery" regarding the RMBS settlement agreement and, in particular, the so-called "HoldCo" amendment entered into on August 15, 2012. Wilmington Trust Objection, ¶¶ 2, 22. There are many detailed facts that can be asserted to demonstrate that such allegations are in fact incorrect, but it is enough to point out that Wilmington Trust, prior to the filing of its objection, had been granted access to the same data rooms, and the same information, as the Examiner, the Creditors Committee, and other interested parties in addition to a database containing documents relevant to the RMBS Settlement.

29. While not at all relevant to the Exclusivity Motion, the Wilmington Objection is critical of the HoldCo amendment, which was negotiated in connection with the RMBS Settlement. The HoldCo amendment was a good faith attempt to address a dispute between the parties to the settlement regarding the allocation of the proposed allowed claim.[13] That being said, like all other issues in these cases where the Debtors have sought to build consensus, the Debtors have heard the complaints of Wilmington Trust and other holders of Senior Unsecured

---

[12] The attached chart was filed on the docket in these Chapter 11 cases as Exhibit G to the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), 365 and 1123, and Fed. R. Bank. P. 2002, 6004, 6006, and 9014 for Order: (A)(I) Authorizing and Approving Sale Procedures, including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances and Other Interest; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 66].

[13] As will be more fully addressed in response to Wilmington Trust's pending motion to adjourn the scheduling order relating to the RMBS Settlement Agreements, as the Debtors have come to learn, it was a phone call from one of the holders of Senior Unsecured Notes to plaintiff's counsel alleging that the Senior Unsecured Noteholders will be the ultimate recipients of the proceeds of any settlement with AFI that triggered the discussions leading to the HoldCo amendment.

Notes, and have discussed with counsel to certain of the RMBS Trustees as well as the Creditors' Committee and Wilmington Trust potentially modifying or rescinding the HoldCo amendment. As a result, the Debtors are hopeful that Wilmington Trust's arguments regarding the supposed inadequacies of the HoldCo amendment will be mooted by further changes to the settlement agreement. The Debtors continue to cooperate with Wilmington Trust by providing it with requested information and access to the Debtors' consultants.

30. Finally, Wilmington Trust also requests that the Debtors include them in future plan negotiations. As discussed in the Exclusivity Motion and as set forth above, the Debtors will continue to cooperate with their creditor constituencies and other key parties in interest to craft a largely consensual plan if possible and ultimately propose a Chapter 11 plan that they believe is in the best interests of the Debtors' estates

### D. Junior Secured Notes Objection

31. The Junior Secured Noteholders agree that the Debtors should be allowed to retain exclusivity during the pendency of the Examiner's investigation and for a period thereafter. Junior Secured Objection ¶ 3. The Junior Secured Noteholders propose a six month extension of the Exclusive Periods, which would result in the termination of exclusivity on March 11, 2013. The Debtors' Amended Proposed Exclusivity Period does not seek to extend exclusivity materially more than the extension proposed by the Junior Secured Noteholders. In the event the Examiner files his report on February 6, 2013, as stated in his work plan, the Amended Plan Exclusivity Period would only run until March 22, 2013, only eleven days longer than the proposal contained in the Junior Secured Objection.

32. The Debtors have advised counsel for the Junior Secured Noteholders of their decision to reduce the exclusivity extension request and, although the Debtors believe that this

14

reflects a more than reasonable compromise and response to the Junior Secured Objection, it has not been withdrawn to date.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court overrule the Limited Objections and grant the relief requested in the Exclusivity Motion, as modified herein, and such other and further relief as is just and proper.

New York, New York  /s/ Gary S. Lee
Dated: September 7, 2012  Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
 Debtors in Possession*

15

ny-1056737