# Exhibit A

SERVICING AGREEMENT
by and between


GREEN PLANET SERVICING, LLC
Owner


and


GMAC MORTGAGE, LLC
Servicer


Dated as of October 1, 2011

# TABLE OF CONTENTS

ARTICLE I. ................................................................................................. 1

DEFINITIONS ............................................................................................ 1

  SECTION 1.01.   DEFINITIONS ......................................................................... 1

ARTICLE II. ............................................................................................... 13

SERVICING ............................................................................................... 13

  SECTION 2.01.   SERVICER TO ACT AS SERVICER ...................................... 13
  SECTION 2.02.   LIQUIDATION OF MORTGAGE LOANS ................................ 17
  SECTION 2.03.   COLLECTION OF MORTGAGE LOAN PAYMENTS ............... 19
  SECTION 2.04.   ESTABLISHMENT OF AND DEPOSITS TO CUSTODIAL ACCOUNTS ..... 19
  SECTION 2.05.   PERMITTED WITHDRAWALS FROM CUSTODIAL ACCOUNTS ..... 21
  SECTION 2.06.   ESTABLISHMENT OF AND DEPOSITS TO ESCROW ACCOUNTS ..... 22
  SECTION 2.07.   PERMITTED WITHDRAWALS FROM ESCROW ACCOUNTS ..... 23
  SECTION 2.08.   PAYMENT OF ESCROW ITEMS AND OTHER CHARGES ..... 23
  SECTION 2.09.   PROTECTION OF ACCOUNTS .......................................... 24
  SECTION 2.10.   MAINTENANCE OF HAZARD AND FLOOD INSURANCE ..... 25
  SECTION 2.11.   MAINTENANCE OF BLANKET HAZARD INSURANCE COVERAGE ..... 26
  SECTION 2.12.   MAINTENANCE OF PMI POLICIES .................................. 26
  SECTION 2.13.   MAINTENANCE OF FIDELITY BOND AND ERRORS AND OMISSIONS INSURANCE ..... 27
  SECTION 2.14.   INSPECTIONS ................................................................ 28
  SECTION 2.15.   RESTORATION OF MORTGAGED PROPERTY ..................... 28
  SECTION 2.16.   TITLE, MANAGEMENT AND DISPOSITION OF REO PROPERTY ..... 28
  SECTION 2.17.   NOTIFICATION OF ADJUSTMENTS ................................. 28
  SECTION 2.18.   NON-RECOVERABLE ADVANCES ................................... 29
  SECTION 2.19.   SERVICING CHANGES .................................................. 29
  SECTION 2.20.   PREPAYMENT CHARGES .............................................. 30
  SECTION 2.21.   CREDIT REPORTING ...................................................... 30
  SECTION 2.22.   SAFEGUARDING CUSTOMER INFORMATION ................... 30

ARTICLE III. ............................................................................................. 31

REMITTANCES AND STATEMENTS ...................................................... 31

  SECTION 3.01.   REMITTANCES FOR PORTFOLIO LOANS THAT ARE NOT HELOC LOANS ..... 31
  SECTION 3.02.   REMITTANCES FOR HELOC LOANS .............................. 31
  SECTION 3.03.   REMITTANCE FOR AGENCY LOANS .............................. 32
  SECTION 3.04.   RECONCILIATION OF SERVICING ADVANCES ................ 32
  SECTION 3.05.   STATEMENTS TO OWNER ............................................. 32
  SECTION 3.06.   INTERNAL REVENUE SERVICE REPORTS ...................... 33
  SECTION 3.07.   NO PRINCIPAL & INTEREST ADVANCES ....................... 34
  SECTION 3.08.   ODD DUE DATES .......................................................... 34

ARTICLE IV. .............................................................................................. 35

ADDITIONAL SERVICING PROCEDURES ............................................. 35

  SECTION 4.01.   TRANSFERS OF MORTGAGED PROPERTY ..................... 35
  SECTION 4.02.   SATISFACTION OF MORTGAGES UPON PAYMENT IN FULL ..... 35
  SECTION 4.03.   SERVICING COMPENSATION AND OWNER EXPENSES ..... 36
  SECTION 4.04.   POSSESSION OF MORTGAGE FILES ............................. 36
  SECTION 4.05.   RIGHT TO EXAMINE SERVICER RECORDS ................... 37

SECTION 4.06.   LOSSES AND EXPENSES ................................................... 37
SECTION 4.07.   REPURCHASE REQUESTS .............................................. 38

ARTICLE V. ................................................................................................ 40

COMPLIANCE AND CONFIDENTIALITY ............................................. 40

SECTION 5.01.   ANNUAL STATEMENT AS TO COMPLIANCE ..................... 40
SECTION 5.02.   ANNUAL INDEPENDENT PUBLIC ACCOUNTANTS' SERVICING REPORT ... 40
SECTION 5.03.   COMPLIANCE WITH GRAMM-LEACH-BLILEY ACT OF 1999 ............. 40
SECTION 5.04.   CONFIDENTIALITY OF INFORMATION .................................. 41

ARTICLE VI. ............................................................................................... 43

REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER........... 43

SECTION 6.01.   ORGANIZATION AND GOOD STANDING ......................... 43
SECTION 6.02.   ORDINARY COURSE OF BUSINESS ................................. 43
SECTION 6.03.   NO VIOLATIONS ........................................................... 43
SECTION 6.04.   ABILITY TO PERFORM ................................................... 43
SECTION 6.05.   LITIGATION .................................................................. 43
SECTION 6.06.   NO CONSENT REQUIRED ............................................... 44
SECTION 6.07.   OWNERSHIP .................................................................. 44
SECTION 6.08.   ACCURACY ................................................................... 44
SECTION 6.09.   ELIGIBILITY CRITERIA .................................................. 44

ARTICLE VII. .............................................................................................. 45

REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICER ...... 45

SECTION 7.01.   ORGANIZATION AND GOOD STANDING ......................... 45
SECTION 7.02.   ORDINARY COURSE OF BUSINESS ................................. 45
SECTION 7.03.   NO VIOLATION .............................................................. 45
SECTION 7.04.   ABILITY TO PERFORM ................................................... 45
SECTION 7.05.   ABILITY TO SERVICE ..................................................... 45
SECTION 7.06.   LITIGATION .................................................................. 46
SECTION 7.07.   NO CONSENT REQUIRED ............................................... 46

ARTICLE VIII. ............................................................................................ 47

OWNER DEFAULT ..................................................................................... 47

SECTION 8.01.   OWNER EVENTS OF DEFAULT ....................................... 47

ARTICLE IX. ............................................................................................... 49

SERVICER DEFAULT ................................................................................ 49

SECTION 9.01.   SERVICER EVENTS OF DEFAULT .................................... 49

ARTICLE X. ................................................................................................. 51

INDEMNIFICATION AND ASSIGNMENT ............................................... 51

SECTION 10.01.   INDEMNIFICATION ...................................................... 51
SECTION 10.02.   LIMITATION ON LIABILITY OF SERVICER AND OTHERS ...... 54
SECTION 10.03.   OPERATION OF INDEMNITIES ..................................... 55
SECTION 10.04.   ASSIGNMENT ............................................................. 55
SECTION 10.05.   MERGER OR CONSOLIDATION OF THE SERVICER ............ 56
SECTION 10.06.   COOPERATION OF SERVICER WITH AN AGENCY TRANSFER ...... 56

ARTICLE XI. ................................................................................................ 58

SERVICING AGREEMENT BY AND BETWEEN
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC    OCTOBER 1ST, 2011

**TERMINATION** ............................................................................................................ **58**
    SECTION 11.01.    TERMINATION ...................................................................................... 58
    SECTION 11.02.    TRANSFER PROCEDURES ...................................................................... 58

**ARTICLE XII.** ............................................................................................................. **61**

**MISCELLANEOUS PROVISIONS** ............................................................................ **61**
    SECTION 12.01.    NOTICES ............................................................................................. 61
    SECTION 12.02.    WAIVERS ............................................................................................ 62
    SECTION 12.03.    ENTIRE AGREEMENT; AMENDMENT ..................................................... 62
    SECTION 12.04.    COUNTERPARTS; BINDING EFFECT ...................................................... 62
    SECTION 12.05.    NO-HIRE ............................................................................................ 62
    SECTION 12.06.    HEADINGS .......................................................................................... 62
    SECTION 12.07.    GOVERNING LAW ............................................................................... 63
    SECTION 12.08.    RELATIONSHIP OF PARTIES .................................................................. 63
    SECTION 12.09.    SEVERABILITY OF PROVISIONS ............................................................ 63
    SECTION 12.10.    RECORDATION OF ASSIGNMENTS OF MORTGAGE .................................. 63
    SECTION 12.11.    EXHIBITS ............................................................................................ 63
    SECTION 12.12.    OWNER'S FINANCIALS ........................................................................ 63
    SECTION 12.13.    NO SOLICITATION ............................................................................... 64
    SECTION 12.14.    FORCE MAJEURE ................................................................................. 64
    SECTION 12.15.    WAIVER OF TRIAL BY JURY ................................................................ 64
    SECTION 12.16.    LIMITATION OF DAMAGES .................................................................. 64
    SECTION 12.17.    SURVIVAL .......................................................................................... 65

## EXHIBITS

EXHIBIT I      PRICING EXHIBIT
EXHIBIT II    MORTGAGE LOAN DOCUMENTS
EXHIBIT III   ELIGIBILITY CRITERIA
EXHIBIT IV   APPROVAL MATRIX
EXHIBIT V    FORM OF LIMITED POWER OF ATTORNEY
EXHIBIT VI   FORM OF TRANSFER INSTRUCTIONS
EXHIBIT VII  FORM OF AGENCY TRANSFER ACKNOWLEDGMENT AGREEMENT
EXHIBIT VIII FORM OF ADDITIONAL CUSTODIAL ACCOUNT REQUEST
EXHIBIT IX   FORM OF SALES, DELIVERY, TRANSFER FILE

# SERVICING AGREEMENT

This Servicing Agreement ("Agreement") is entered into as of September 1, 2011, by and among GMAC MORTGAGE, LLC, a Delaware limited liability company (the "Servicer") and GREEN PLANET SERVICING, LLC, a Delaware limited liability company (the "Owner"). The Servicer and the Owner may be referred to herein as a "Party" or collectively as the "Parties".

WHEREAS, the Owner has purchased or originated and expects in the future to purchase or originate residential, first lien mortgage loans, closed-end subordinate lien mortgage loans and home equity lines of credit and/or the related servicing rights; and

WHEREAS, the Servicer regularly services such mortgage loans and lines and has agreed to service the mortgage loans that become subject to this Agreement and the Parties desire to provide the terms and conditions of such servicing by the Servicer.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I.
### DEFINITIONS

Section 1.01.  Definitions

The following terms are defined as follows:

Accepted Servicing Practices:  With respect to any Portfolio Loan or REO Property, (i) the Fannie Mae Guides, (ii) any applicable mortgage insurer guides, (iii) the VA Regulations applicable for any VA Mortgage Loan and FHA regulations applicable for any FHA Mortgage Loans, and (iv) to the extent not inconsistent therewith, those mortgage servicing practices of mortgage lending institutions which service mortgage loans of the same type as such Portfolio Loan or REO Property in the jurisdiction where the related Mortgaged Property is located, exercising a reasonable standard of care in performing those practices.  With respect to any Agency Loan, (i) the applicable Agency Guide including the VA Regulations applicable for any VA Mortgage Loan and FHA regulations applicable for any FHA Mortgage Loans, (ii) any applicable mortgage insurer guides and (iii) to the extent not inconsistent therewith , those mortgage servicing practices of mortgage lending institutions which service mortgage loans of the same type as such Agency Loan in the jurisdiction where the related Mortgaged Property is located, exercising a reasonable standard of care in performing those practices.

**Adjustable Rate Mortgage Loan**: Any Mortgage Loan with respect to which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is subject to change from time to time in accordance with the terms of such Mortgage Note.

**Advances**: In connection with any Agency Loan, the Monthly Payment (or portion thereof) required to be remitted to an Agency according to the Agency Guide.

**Affiliate**: With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

**Agency**: Any of Fannie Mae, Freddie Mac or Ginnie Mae.

**Agency Guide**: The respective Fannie Mae Guide, Freddie Mac Guide or Ginnie Mae Guide, as they may be modified from time to time.

**Agency Loan**: Any Mortgage Loan sold to an Agency.

**Agency Loan Remittance Date**: The remittance date specified in the applicable Agency Guide.

**Agency Transfer**: The sale or transfer by Owner of some or all of the Portfolio Loans to Fannie Mae under its Cash Purchase Program (Special Servicing Option) or its MBS Swap Program (Special Servicing Option) or to Freddie Mac under its Freddie Mac Cash Program or Gold PC Program, or to Ginnie Mae, in each case retaining the Servicer as "servicer" thereunder.

**Agency Transfer Acknowledgment Agreement**: An acknowledgment agreement substantially in the form of Exhibit 7 hereto to be executed by the Parties prior to each Agency Transfer with respect to the servicing of a pool of Agency Loans identified as part of such acknowledgment agreement.

**Ancillary Income**: All income derived from the Mortgage Loans and REO Properties that the Servicer may collect in connection with servicing the Mortgage Loans and REO properties, including, but not limited to (a) interest or other benefits earned in connection with funds on deposit in the Custodial Accounts and Escrow Account less the interest on escrowed funds required by Applicable Law to be paid to the Mortgagor, (b) fees payable in connection with the Home Affordable Modification Program, (c) Agency incentive and loss mitigation fees, (d) late charges, (e) customer prepayment fees and line termination fees, and (f) non-sufficient funds fees, ACH fees, assumption fees, amounts associated with marketing special products to the Mortgagors, and all other incidental fees and charges with respect to a Mortgage Loan or REO Property.

Applicable Law:  All federal, state or local laws or regulations applicable to any Mortgage Loan, Mortgaged Property, or any REO Property, or the Servicer's activities under this Agreement as if Servicer were servicing the Mortgage Loans for its own account.

Approval Matrix:  The approval matrix attached as Exhibit 4 and applicable only to the Portfolio Loans and REO Properties to the extent not inconsistent with the requirements of any applicable mortgage insurer or guarantor.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer or sale of the Mortgage.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions are authorized to be closed for business in the States of California, Iowa or Texas, or the Commonwealth of Pennsylvania.

Condemnation Proceeds:  All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Confidential Information:  Shall have the meaning set forth in Section 5.04 hereof.

CPI:  The Consumer Price Index for All Urban Consumers (CPI U), United States City Average, All Items (1982 84=100) (the CPI Index), published monthly by the Bureau of Labor Statistics of the US Department of Labor.

Credit Line Increase:  An increase in the maximum available principal balance with respect to a HELOC Loan.

Custodial Account:  The separate account or accounts created and maintained pursuant to Section 2.04(a) or Section 2.04(b).

Custodian:  The custodian of the Mortgage Loan Documents as specified under any related custodial agreement between the Owner and their custodian.

Daily HELOC Report:  The daily report to be provided by Servicer to Owner in connection with the HELOC Loans, as described in Section 3.05.

Deboarding Fee:  With respect to each Mortgage Loan and REO Property, the deboarding fees set forth in the Pricing Exhibit.

Default: The status of a Mortgage Loan when one Monthly Payment is due and unpaid as of the last day of the calendar month in which the monthly payment was due.

Determination Date: With respect to Portfolio Loans, the last Business Day of the month prior to the related Portfolio Loan Remittance Date. With respect to Agency Loans, the date specified in the applicable Agency Guide.

Due Date: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Eligibility Criteria: The eligibility criteria for residential mortgage loans and home equity lines of credit to be delivered by Owner and serviced by Servicer under this Agreement attached as Exhibit 3.

Eligible Investments: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than one day prior to the Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable, in each month (or such other date as permitted under this Agreement):

> (i)    direct obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America ("Direct Obligations");

> (ii)   federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company (including U.S. subsidiaries of foreign depositories) incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal or state banking authorities, so long as at the time of such investment or the contractual commitment providing for such investment the commercial paper or other short term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the commercial paper or other short term debt or deposit obligations of such holding company or deposit institution, as the case may be) have been rated by each Rating Agency in its highest short-term rating category or one of its two highest long-term rating categories;

> (iii)  repurchase agreements collateralized by Direct Obligations or securities guaranteed by Fannie Mae or Freddie Mac with any registered broker/dealer subject to Securities Investors' Protection Corporation jurisdiction or any commercial bank insured by the Federal Deposit

4

Insurance Corporation, if such broker/dealer or bank has an uninsured, unsecured and un-guaranteed obligation rated by each Rating Agency in its highest short-term rating category;

(iv)     securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have a credit rating from each Rating Agency, at the time of investment or the contractual commitment providing for such investment, at least equal to one of the two highest long term credit rating categories of each Rating Agency; provided, however, that securities issued by any particular corporation will not be Eligible Investments to the extent that investment therein will cause the then outstanding principal amount of securities issued by such corporation to exceed 20% of the aggregate principal amount of all Eligible Investments in the Custodial Accounts and the Escrow Accounts; provided, further, that such securities will not be Eligible Investments if they are published as being under review with negative implications from either Rating Agency;

(v)     commercial paper (including both non-interest-bearing discount obligations and interest bearing obligations payable on demand or on a specified date not more than 180 days after the date of issuance thereof) rated by each Rating Agency in its highest short-term rating category;

(vi)     certificates or receipts representing direct ownership interests in future interest or principal payments on obligations of the United States of America or its agencies or instrumentalities (which obligations are backed by the full faith and credit of the United States of America) held by a custodian in safekeeping on behalf of the holders of such receipts; and

(vii)     any other demand, money market, common trust fund or time deposit or obligation, or interest bearing or other security or investment rated in the highest rating category by each Rating Agency; provided, however, that (a) any such instrument shall be acceptable to the Rating Agencies, and (b) no such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations.

Environmental Liability:  Shall have the meaning set forth in Section 10.01 hereof.

**Escrow Account:** The separate account or accounts created and maintained pursuant to Section 2.06(a) or Section 2.06(b).

**Escrow Payment:** With respect to any Mortgage Loan, the amounts constituting real estate taxes, mortgage insurance premiums, fire and hazard insurance premiums, and any other payments required to be escrowed by the Mortgagor with the mortgagee or Servicer pursuant to the Mortgage Loan Documents.

**Extension Term:** Shall have the meaning set forth in Section 11.01 hereof.

**Fannie Mae:** Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

**Fannie Mae Guides:** The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto.

**FHA:** The Federal Housing Administration of HUD, or any successor thereto.

**Fitch:** Fitch, Inc., or any successor thereto.

**Flood Act:** The Flood Disaster Protection Act of 1973, as amended.

**Forbearance:** Shall have the meaning set forth in Section 2.01(i) hereof.

**Freddie Mac:** The Federal Home Loan Mortgage Corporation, or any successor thereto.

**Freddie Mac Guide:** The Single-Family Seller/Servicer Guide.

**Ginnie Mae:** The Government National Mortgage Association or any successor thereto.

**Ginnie Mae Guide:** The Ginnie Mae MBS Guide.

**Home Affordable Modification Program (HAMP):** A federal program established to assist eligible Mortgagors modify their Mortgage Loans to be more affordable for such Mortgagor

**HELOC Draw:** With respect to any HELOC Loan, a borrowing by the Mortgagor under the related Mortgage Note.

**HELOC Loan:** Any revolving line of credit, secured by a lien on a one to four family residential real property, whether or not said line of credit has a loan balance.

HOEPA Loan: A Mortgage Loan subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

HUD: shall mean the United States Department of Housing and Urban Development or any successor thereto.

Insurance Proceeds: With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interest Rate Adjustment Date: With respect to each Adjustable Rate Mortgage Loan, the date specified in the related Mortgage Note and the New Loan Data File, on which the Mortgage Interest Rate is adjusted.

Liability: Shall have the meaning set forth in Section 10.01 hereof.

LIBOR Rate: The three month London Inter-Bank Offered Rate as published in the Wall Street Journal (northeast edition).

Liquidation Proceeds: Cash received by the Servicer in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

LPMI Policy: A policy of primary mortgage guaranty insurance issued by an insurer pursuant to which the related premium is either (a) to be paid by the servicer of the related Mortgage Loan from payments of interest made by the Mortgagor in an amount as is set forth in the related New Loan Data File, or (b) to be paid by the Owner.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the state of Delaware, or any successor thereto.

Monthly Advice: The monthly report to be provided by Servicer to Owner in connection with each remittance.

Monthly Payment: The monthly payment of principal and interest due on a Mortgage Loan under the applicable Mortgage Loan Documents.

Moody's: Moody's Investors Service, Inc., and any successor thereto.

Mortgage: The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first or subordinate lien, as applicable, on an unsubordinated estate in fee simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust

or other instrument securing the Mortgage Note may secure and create a first or subordinate lien, as applicable, upon a leasehold estate of the Mortgagor.

Mortgage File:  The documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File, listed in Exhibit 2 annexed hereto to the extent received by the Servicer from the Owner, prior servicer, sub-servicer or originator, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate:  The annual rate of interest borne on a Mortgage Note with respect to each Mortgage Loan including any changes resulting from any amendment, modification, forbearance, application of the Servicemembers Civil Relief Act of 2003 or any court order.

Mortgage Loan:  An individual mortgage loan conforming to the Eligibility Criteria and which is subject to this Agreement, consisting of any Agency Loans and the Portfolio Loans.

Mortgage Loan Documents:  The documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File in Exhibit 2 attached hereto.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property:  The real property (or leasehold estate, if applicable) located in one of the fifty states or the District of Columbia, securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor:  The obligor on a Mortgage Note.

Mortgagor Check:  A check intended to be used by a Mortgagor as a means for drawing down funds on a HELOC Loan.

New Loan Data File:  With respect to each Mortgage Loan delivered, or caused to be delivered, hereunder, the data file produced by Owner or the prior servicer pursuant to the Transfer Instructions, which is used to enable Servicer to set up each Mortgage Loan on its loan servicing system.

Non-recoverable Advance:  Any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property which, in the good faith judgment of the Servicer, will not or, in the case of a proposed advance, may not, be ultimately recoverable from related Insurance Proceeds, Liquidation Proceeds or otherwise from such Mortgage Loan or REO Property.  The determination by the Servicer that it has made a Non-recoverable Advance shall be evidenced by an officer's certificate delivered to the Owner.

**Original Term:** Shall have the meaning set forth in Section 11.01 hereof.

**Owner Event of Default:** Any one of the conditions or circumstances enumerated in Section 8.01.

**Owner Expense:** "Out-of-pocket" costs to third parties incurred by the Servicer in servicing the Mortgage Loans and REO Properties that are generally not reimbursable by the Mortgagor or from Liquidation Proceeds and that are customarily paid by the Owner. Owner Expenses may include, but are not limited to the cost of (a) Mortgagor counseling fees payable to a third party, (b) any Mortgage Loan assignment, recording, trustee, endorsement or release fee including recordation of powers of attorney and any MERS charges, which fees are not reimbursable to Servicer by any other party, (c) tax penalties as a result of a prior servicer or originator not paying taxes, (d) flood tracking contracts, (e) tax service contracts (f) tax certifications performed to research past due tax amounts, (g) LPMI premiums, (h) attorneys' fees and costs not chargeable to the Mortgagor, (i) funds to repurchase Agency Loans from the applicable Agency, (j) funds to buyout a superior lien, (k) environmental clean up costs, (l) costs from the sale of charged-off assets, or (m) any other fees or amounts contained in this Agreement, required to be processed by Servicer and not otherwise reimbursed. All such expenses are subject to change from time-to-time.

**Owner Income:** That portion of Ancillary Income which is payable to the Owner pursuant to the Pricing Exhibit.

**Owner Indemnified Parties:** Shall have the meaning set forth in Section 10.01(b) hereof.

**Person:** Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

**PMI Policy:** A policy of primary mortgage guaranty insurance issued by an insurer in connection with any Mortgage Loan.

**Portfolio Loan:** Any Mortgage Loan that is not an Agency Loan. The Portfolio Loans shall include the HELOC Loans.

**Portfolio Loan Remittance Date:** The 7th Business Day of the month following the Determination Date.

**Pricing Exhibit:** The pricing exhibit attached hereto as Exhibit 1.

**Principal Prepayment:** Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date (including any charge or premium thereon) and which is not accompanied by an amount of interest

representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Program Form: Any form of worksheet, checklist, summary, log, transmittal, request, order, report or other written form and any written document, instrument, statement, notice, request, authorization or communication, including, without limitation, customer billing forms and customer correspondence, utilized in connection with the servicing of the Mortgage Loans.

Qualified Depository: For Portfolio Loans and REO Properties, a depository the accounts of which are insured by the Federal Deposit Insurance Corporation, or any successor thereto. For Agency Loans, a depository which meets the requirements of the applicable Agency Guide.

Rating Agency: Any of Fitch, Moody's or Standard & Poor's.

Recourse Obligation: means, with respect to any Mortgage Loan, any obligation or liability (actual or contingent), as applicable, for loss of principal incurred in connection with the foreclosure or other disposition of, or other realization or attempt to realize upon the collateral securing such Mortgage Loan, or any repurchase obligation in connection with a Mortgage Loan.

REO Property: A Mortgaged Property that secured a Portfolio Loan acquired by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure.

Repurchase Request: A request to repurchase a Mortgage Loan.

Servicer Employees: Shall have the meaning set forth in Section 2.13 hereof.

Servicer Event of Default: Any one of the conditions or circumstances enumerated in Section 9.01 hereof.

Servicer Indemnified Parties: Shall have the meaning set forth in Section 10.01(a) hereof.

Servicer Recovery Costs: The costs of any necessary (a) Mortgagor credit reports, (b) asset searches or bankruptcy searches, (c) asset valuations, or (d) Mortgagor skip tracing, which costs shall be borne by the Servicer.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred (a) in the performance by the Servicer of its servicing obligations pursuant to this Agreement including, but not limited to, the cost relating to (i) the preservation, restoration and protection of the Mortgaged Property, (ii) any enforcement or judicial

proceedings, including, but not limited to proof of claim charges, (iii) foreclosure actions, (iv) property inspections, (v) property valuations including broker price opinions, appraisals, or automated values, (vi) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage (vii) taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property, (viii) insurance premiums including PMI insurance premiums, or (b) by a prior servicer prior to the applicable Transfer Date.

Servicing Change:  Shall have the meaning set forth in Section 2.19 hereof.

Servicing Change Proposal:  Shall have the meaning set forth in Section 2.19 hereof.

Servicing Compensation:  With respect to each Mortgage Loan and REO Property, the amounts Owner shall pay to the Servicer, (a) as set forth on the Pricing Exhibit, or (b) for any specially requested services by Owner.

Servicing Rights:  Any and all of the following: (a) any and all rights to service and administer, or direct the servicing or administration, of the Mortgage Loans; (b) any payments to or monies received by the Servicer for servicing the Mortgage Loans; (c) any Ancillary Income associated with the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such servicing rights and all rights of the Servicer thereunder; (e) any and all rights to and in the Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected by the Servicer with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; and (g) any and all servicing files, servicing documents, servicing records, or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

Standard & Poor's:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies Inc., and any successor thereto.

Termination Date:  Shall have the meaning set forth in Section 11.02 hereof.

Termination Fee:  With respect to each Mortgage Loan and REO Property, the termination fees set forth in the Pricing Exhibit, which is calculated as of the date of notice.

Third Party Claim:  Shall have the meaning set forth in Section 10.01(c) hereof.

Transfer Date:  With respect to each Mortgage Loan and REO Property, the date Servicer physically assumes its obligations of servicing pursuant to this Agreement.

Transfer Instructions:  The form of transfer instructions used by the Servicer and provided to Owner or any prior servicer in connection with any given transfer of Mortgage Loans or REO Properties for servicing under this Agreement, as modified by Servicer from time to time. The current form of the Mortgage Loan (excluding HELOC Loan) Transfer Instructions is attached hereto as Exhibit 6A, the current form of the HELOC Loan Transfer Instructions is attached hereto as Exhibit 6B, the current form of recovery Transfer Instructions is attached hereto as Exhibit 6C, and the current form of REO Property Transfer Instructions is attached hereto as Exhibit 6D

VA:  The United States Department of Veterans Affairs, or any successor thereto.

VA No-Bid Instruction:  An instruction given by the VA that the VA will not accept conveyance of the REO Property resulting from the foreclosure of a VA guaranteed Mortgage Loan or when the VA pays all or part of the difference between the net sale proceeds and the total indebtedness on a VA guaranteed loan following the private sale of the property where the proceeds are insufficient to fully payoff the existing Mortgage.

VA Regulations:  Any and all regulations promulgated by the VA under the Servicemen's Readjustment Act of 1944, as amended.

SERVICING AGREEMENT BY AND BETWEEN                                                    OCTOBER 1ST, 2011
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC

# ARTICLE II.
## SERVICING

### Section 2.01.  Servicer to Act as Servicer

(a)     From and after the date of this Agreement and the applicable Transfer Date (provided that all information required hereunder from Owner or any prior servicer has been provided to Servicer by such Transfer Date), the Servicer, as an independent contractor, shall service and administer each Mortgage Loan and REO Property and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement, Accepted Servicing Practices, Agency Guidelines, and the Approval Matrix.  The Owner shall not interfere with or itself attempt to perform the duties and activities of the Servicer hereunder, and Owner shall refer to Servicer any Mortgagor inquiries or correspondence, payments or payoff funds, or similar matters within the Servicer's responsibilities hereunder that Owner may receive. All Mortgage Loans and REO Properties transferred to Servicer hereunder shall conform to the Eligibility Criteria and shall be documented on those Mortgage Loan Documents that have been approved by Servicer.  If Owner wishes the Servicer to assume the servicing of Mortgage Loans or REO Properties that do not meet the Eligibility Criteria or that are not documented on approved Mortgage Loan Documents, such request shall be subject to the Servicer's consent and the Parties' agreement on a new Pricing Exhibit covering such loans and properties.

(b)     If the Owner has performed a due diligence review of the Mortgage Loans and REO Properties, (i) Owner shall inform the Servicer of such review and (ii) upon Servicer's reasonable request, Owner shall provide to the Servicer information obtained in such review.

(c)     Owner shall provide or cause to be provided by the prior servicer(s), in accordance with the Transfer Instructions, the New Loan Data File and any related Mortgage Loan documentation for each Mortgage Loan and REO Property to be serviced by the Servicer under this Agreement.  For newly originated Mortgage Loans being transferred prior to the first payment due date of the Mortgage Loan, the Servicer must receive this information no later than five (5) Business Days before Servicer is to begin servicing such Mortgage Loan. For Mortgage Loans being transferred after the first payment due date, Owner agrees (i) to provide Servicer this information no later than two (2) Business Days following the Transfer Date, (ii) to provide Servicer notice of any incoming transfers no less than thirty (30) days prior to the Transfer Date, and (iii) to notify Servicer, in writing, within two (2) Business Days of Servicer's receipt of the New Loan Data File of any changes in the information contained therein.  For all Mortgage Loans, Owner agrees to provide Servicer, within two (2) Business Days after Servicer's request, copies of the Mortgage Note, the Mortgage or any other documents with respect to a Mortgage Loan or REO Property that Servicer (i) deems reasonably necessary in connection with its performance of the servicing of such loan, or (ii) that Servicer requires in order to respond to or comply with any audit, examination or other review

conducted by any state or federal agency, department or regulator with jurisdiction over Servicer or any affiliate of Servicer. Owner agrees to, and shall use commercially reasonable efforts to cause any prior servicer to, comply with the Transfer Instructions. Owner is responsible for ensuring that all advances made by any prior servicer are communicated to Servicer within three (3) Business Days following the Transfer Date so as to enable Servicer to meet Mortgagor notification requirements of Applicable Law; if the foregoing timeframe is not met Servicer shall have no obligation to board or collect any such prior servicer advances. Owner is responsible for reconciling and funding all prior servicer advances directly with the prior servicer; Servicer will reasonably cooperate and assist in the reconciliation process but Servicer will not advance any of its own funds to reimburse the prior servicer or Owner for such amounts.

Owner hereby agrees that the Servicer shall net the costs or expenses incurred to transfer tax service contracts and flood service contracts or to obtain contracts that are not existing or transferable to the Servicer, in the amounts indicated on the Pricing Exhibit, which amounts can change from time to time, from amounts payable to the Owner.

Owner acknowledges that Servicer's obligations to pay taxes and insurance pursuant to Section 2.08 and this Section 2.01 are contingent upon the existence of life of loan tax and flood service contracts on a per Mortgage Loan or REO Property basis. To the extent Servicer has not received evidence of the existence of contracts that are acceptable to Servicer, as specified below, the Servicer shall obtain such contracts. Owner acknowledges that Servicer will accept life of loan service contracts from the following vendors: (i) for tax service contracts, (x) First American Real Estate Tax Services and (y) for Mortgage Loans more than one (1) year aged (based on the first payment due date of such Mortgage Loan) and provided the tax identification numbers for each Mortgaged Property are guaranteed, LSI, ZC Sterling and LandAmerica Tax & Flood Services, and (ii) for flood service contracts, First American Flood Data Services and LPS National Flood.

For newly originated Mortgage Loans being transferred prior to the first due date of the Mortgage Loan, Owner is responsible to ensure that any items included in Escrow Payments that are due within sixty (60) days following the closing date of the Mortgage Loan, are paid. For all other Mortgage Loans, Owner is responsible to ensure that any items included in Escrow Payments that are due within thirty (30) days following the Transfer Date are paid prior to transfer to Servicer. Owner is responsible for any loss of discount, tax penalties or lapses in hazard or flood coverage due to non-payment of such amounts prior to the Transfer Date.

(d)    In servicing and administering the Mortgage Loans and REO Properties, the Servicer shall comply in all material respects with Applicable Law and employ Accepted Servicing Practices except and to the extent that such practices conflict with the requirements of this Agreement. The Servicer shall retain adequate personnel to service and administer the Mortgage Loans and REO Properties.

(e)     In connection with any subordinate lien Portfolio Loan that succeeds to a superior lien position as a result of payment in full of the related superior lien mortgage loan, the Servicer may subordinate such subordinate lien Portfolio Loan in accordance with the Approval Matrix and Accepted Servicing Practices.

(f)     In connection with the HELOC Loans, the Servicer will, upon Owner's request, provide Mortgagor Checks to the Mortgagors and shall be reimbursed by Owner for all out of pocket expenses associated with providing such checks. The Servicer will verify the availability of funds prior to authorizing payment of Mortgagor Checks. The Mortgagor will also be able to access available funds by calling Servicer, via a toll free number. For each request made by a Mortgagor via the toll free number, such Mortgagor will be sent a wire request form and given instructions on where the form is to be sent once completed. Servicer will review the form and verify funds availability and funds will be wire transferred to the account designated by such Mortgagor requesting funds. Servicer will not issue payment of a Mortgagor Check and will not wire funds in response to a wire request form if Servicer has knowledge that the Mortgagor is not eligible to make a HELOC Draw from his or her HELOC Loan because HELOC Draw privileges have been suspended or terminated. If Servicer pays a Mortgagor Check or wires funds to a Mortgagor when Servicer had knowledge that the Mortgagor was not eligible to make a HELOC Draw from his or her HELOC Loan, Servicer shall be responsible for such payment or wire of funds.

(g)     The Servicer will process all Credit Line Increase requests received on a HELOC Loan in compliance with the Mortgage Loan Documents and Accepted Servicing Practices. The Servicer will obtain approvals in accordance with the Approval Matrix.

(h)     The Servicer's computer system shall clearly reflect (i) the Owner's ownership of (a) each Portfolio Loan and REO Property and (b) the Servicing Rights associated with the Mortgage Loans and REO Properties and (ii) the applicable Agency's ownership of each Agency Loan. The Servicer shall release from its custody the contents of any Mortgage File retained by it only in accordance with this Agreement.

(i)     In the event that any Mortgage Loan is in Default or, in the judgment of the Servicer, such a Default is reasonably foreseeable, the Servicer, consistent with Accepted Servicing Practices and Applicable Law, may waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Interest Rate, forgive the payment of principal or interest, or waive, in whole or in part, a prepayment charge), accept payment from the related Mortgagor of an amount less than the principal balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor (any and all such waivers, modifications, payment plans, variances, forgiveness of principal or interest, postponements, or indulgences collectively referred to herein as "Forbearance"). Any approvals required in connection with such Forbearance shall be obtained in accordance with the Approval Matrix and Agency Guidelines. The Servicer's analysis supporting any Forbearance and the conclusion that any Forbearance

meets the standards of this section, shall be appropriately reflected in the Servicer's records.

(j)     The Servicer shall, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments and documents necessary to carry out its servicing and administrative duties under this Agreement including but not limited to instruments in connection with foreclosures; satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Owner shall furnish the Servicer with a power of attorney in the form of Exhibit 5 appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement. If reasonably required by the Servicer, the Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

With respect to the performance of any service to be performed by the Servicer hereunder, including, without limitation, the obtaining of credit report data, the provision of field or other inspections, the provision of title-related services, and the sale or management of REO Properties, the Servicer may obtain such services from an Affiliate in accordance with Accepted Servicing Practices.

(k)     With respect to any Portfolio Loan in Default, if the Servicer determines that (i) no significant net recovery is possible through foreclosure proceedings or other liquidation of the related Mortgaged Property or (ii) the potential net recoveries are anticipated to be an amount, determined by the Servicer in its reasonable discretion, that is insufficient to warrant proceeding through foreclosure or other liquidation of the related Mortgaged Property, the Servicer may, at its discretion, forego foreclosing and treat such Portfolio Loan as a charge off. The Servicer will provide Owner with written notice of such charge offs and will seek the approval of the Owner where required under the Approval Matrix.  Servicer has no obligation to foreclose upon a charged off Portfolio Loan; however, Servicer shall continue to attempt to collect the Portfolio Loan as set forth below.

Servicer shall use all reasonable methods to collect the amounts due under each charged off Portfolio Loan. The Owner recognizes that not all amounts due under each charged off Portfolio Loan may be collectable, due to inadequate collateral value, Mortgagor inability or unwillingness to pay, or otherwise. Servicer shall use such methods, consistent with this Agreement, which in Servicer's reasonable judgment will maximize the recovery under the charged off Portfolio Loan. The Servicer shall pay all items constituting Servicer Recovery Costs, without reimbursement therefore from Owner. The Servicer shall be under no obligation to make any Servicing Advance in connection with a charged off Portfolio Loan, including advances to protect the lien status of such Portfolio Loan, but to the extent Servicer does so it shall be reimbursed as provided herein. The Servicer shall have no obligation to attempt to collect on any charged off Portfolio Loan via institution of litigation against the Mortgagor, whether via suit on the Mortgage Note or otherwise.

In the event the Servicer is unable to collect in full or in part from the Mortgagor on a charged off Portfolio Loan within a reasonable period of time following the date of charge off (determined by Servicer in its reasonable discretion), Servicer may, on behalf of Owner, sell such charged off Portfolio Loan or the Mortgage Note servicing released to a third party, either individually or as part of a bulk package of charged off mortgage loans. In furtherance of any such sale, Owner agrees and hereby authorizes Servicer to disclose information related to the charged off Portfolio Loans and make available for inspection the Mortgage Loan Documents (to the extent those documents are in Servicer's possession) to prospective purchasers of the charged off Portfolio Loans conducting a due diligence examination. Servicer shall obtain a non-disclosure agreement from any such prospective purchaser prior to releasing any information. Any such sale shall be evidenced by a purchase and sale agreement which shall be entered into between Servicer (on behalf of Owner) and the purchaser of such assets. Servicer shall negotiate such agreement on behalf of Owner and Owner agrees to cooperate in such negotiation and, if necessary, execute such agreement in a timely manner to accomplish such sale. Proceeds from any such sale shall be treated as a recovery on the Portfolio Loan(s), subject to Servicer's right to receive the fee specified in the Pricing Exhibit and recover any Servicing Advances as contemplated in this Agreement.

At the expiration of six months from the date of charge off, unless (i) the charged off Portfolio Loan is in a paying status or negotiations with the Mortgagor are pending to resolve the delinquency, or (ii) the charged off Portfolio Loan is in the process of being sold servicing released to a third party, Servicer shall cease active collections efforts and either (i) at Owner's request, transfer such Portfolio Loan servicing released to Owner or its designee pursuant to Section 11.02, or (ii) if Owner does not request such transfer or timely respond to Servicer's transfer request, satisfy the lien securing such Portfolio Loan and remove such Portfolio Loan from Servicer's servicing system. The Servicer shall have no further obligation to service such Portfolio Loan.

The Servicer, as permitted by Applicable Law, will continue to service a Portfolio Loan in recovery regarding which the Mortgagor files bankruptcy. Upon notice of a bankruptcy filing, the Owner agrees to pay the Servicer for any out of pocket costs incurred by Servicer. In addition, the Owner agrees to pay the Servicer a monthly fee as shown on the Pricing Exhibit while the Portfolio Loan remains in bankruptcy.

(l)    For all Agency Loans, the Servicer shall service, report and remit in compliance with the applicable Agency Guide as allowed or required by its role as "subservicer" on behalf of Owner; Owner retains the role and responsibility as "Issuer" and "Servicer" as defined by the Ginnie Mae Guide and as "Seller" and "Servicer" as defined by the Fannie Mae Guide or Freddie Mac Guide, as applicable.

Section 2.02.    Liquidation of Mortgage Loans

In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 2.01 is not paid when the same becomes due and payable,

or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as is consistent with Applicable Law and Accepted Servicing Practices. In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 2.01 and remains delinquent for a period of 90 days or any other default continues for a period of 90 days and provided that foreclosure is allowed by Applicable Law in the jurisdiction where the related Mortgaged Property is located and as allowed by Accepted Servicing Practices, and further provided that such Mortgage Loan has not been charged off pursuant to Section 2.01(k), the Servicer shall refer the Mortgage Loan for foreclosure unless otherwise defined within the Approval Matrix. In connection with any such foreclosure, the Servicer shall make all necessary and proper Servicing Advances, provided, however, that the Servicer shall not be required to expend any funds in connection with any foreclosure or towards the restoration or preservation of any Mortgaged Property, unless it shall determine that such expense is beneficial to the Owner or will be recoverable by Servicer on behalf of Owner either through Liquidation Proceeds (respecting which Servicer shall have priority for purposes of withdrawals from the Custodial Account pursuant to Section 2.05) or through Condemnation Proceeds or Insurance Proceeds (respecting which Servicer shall have similar priority).

In connection with a foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, the Servicer shall cause the Mortgaged Property to be inspected by a qualified environmental inspector at the Owner's expense. Upon completion of the inspection, the Servicer shall promptly provide the Owner with a written report of the environmental inspection.

Notwithstanding anything to the contrary contained herein, after reviewing the environmental inspection report, the Owner shall determine how the Servicer shall proceed with respect to the Mortgaged Property; provided, that Servicer may determine in its sole discretion that it will not proceed with a foreclosure or acceptance of a deed in lieu of foreclosure with respect to a Mortgaged Property that has been determined to be contaminated by hazardous or toxic substances or wastes and with respect to which Servicer would be expected to take title in its own name. In the event (a) the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes and (b) the Owner directs the Servicer to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Owner shall be responsible for all reasonable costs associated with any related environmental clean up. The Servicer shall calculate such costs and Owner shall wire transfer the amount to the Servicer within one (1) Business Days of the Servicer's request.

In the event the Owner directs the Servicer not to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, or the Servicer is otherwise not proceeding to liquidation as a result of environmental contamination, the Servicer shall transfer the servicing of such Mortgage Loan or REO Property within fifteen (15) days of such determination following the procedures in Section 11.02 and Servicer will have no further obligation with regard to such Mortgage Loan or REO Property.

### Section 2.03.   Collection of Mortgage Loan Payments

The Servicer shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take reasonable care in ascertaining and estimating Escrow Payments, to the extent applicable, and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the extent that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable. In connection with any Mortgage Loan that is in Default or regarding which the Servicer believes Default is reasonably foreseeable, the Servicer may, in accordance with Accepted Servicing Practices, recommend or counsel the Mortgagor to refinance their Mortgage Loan with the Servicer, an Affiliate of Servicer or with any third party lender. Notwithstanding the confidentiality provisions of this Agreement, the Servicer may (with any required Mortgagor consent) share Confidential Information relative to the Mortgagor's Mortgage Loan in connection with any such refinance.

### Section 2.04.   Establishment of and Deposits to Custodial Accounts

(a)   The Servicer shall segregate and hold all funds collected and received pursuant to the Portfolio Loans and REO Properties separate and apart from any of its own funds and general assets and shall establish one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "GMAC Mortgage, LLC, in trust for Green Planet Servicing, LLC re: Fixed and Adjustable Rate Residential Mortgage Loans" (the "non-HELOC Custodial Account") and "GMAC Mortgage, LLC, in trust for Green Planet Servicing, LLC re: Home Equity Lines of Credit" (the "HELOC Custodial Account"), or such other title as is mutually agreed upon and directed in writing by Owner in accordance with Exhibit 8. The Custodial Accounts shall be established with a Qualified Depository which Qualified Depository may be an Affiliate of Servicer. Any funds deposited in the Custodial Accounts shall at all times be fully insured to the full extent permitted under Applicable Law.

The Servicer shall deposit in the corresponding Custodial Account no more than two (2) Business Days following receipt thereof (unless otherwise noted), the following collections received by the Servicer or payments to be made by the Servicer, in connection with the Portfolio Loans and REO Properties, after the applicable Transfer Date:

(i)   all collections of principal, including all Principal Prepayments;

(ii)   all collections of interest;

(iii)   all Liquidation Proceeds (which shall be deposited as soon as practical after the expenses of such sale are paid and the Servicer has reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and unpaid Owner Expenses);

(iv)     net cash flow, if any, from the REO Property, which shall equal the revenues from such REO Property net of expenses and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses;

(v)     all Insurance Proceeds, required to be deposited pursuant to Section 2.10, other than proceeds to be held in a suspense account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vi)     all Condemnation Proceeds which are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vii)     any amount required to be deposited in the Custodial Account pursuant to Section 2.09 (losses on Eligible Investments), or Section 3.01(interest on late remittances);

(viii)     any amounts required to be deposited by the Servicer pursuant to Section 2.11 in connection with the deductible clause in any blanket hazard insurance policy;

(ix)     any amounts received by the Servicer under a PMI Policy or an LPMI Policy (which shall be deposited as soon as practical after Servicer has reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and unpaid Owner Expenses); and

(x)     any other amount specifically required to be deposited in the Custodial Account pursuant to this Agreement.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, unless otherwise provided herein, payments consisting of Servicing Compensation, Owner Expenses, or Ancillary Income due the Servicer pursuant to the Pricing Exhibit need not be deposited by the Servicer into the Custodial Account.

(b)     The Servicer shall segregate and hold all funds collected and received in connection with the Agency Loans separate and apart from any of its own funds and general assets and shall establish Custodial Accounts in accordance with the applicable Agency Guide. The Servicer shall deposit in the corresponding Agency Custodial Accounts no more than two (2) Business Days following receipt thereof, the applicable collections received by the Servicer in accordance with the Agency Guide. The Owner shall ensure the Agency Custodial Account shall be sufficiently funded to pay any Advances due by Owner to the applicable Agency.

(c)    Any interest paid on funds deposited in the Custodial Accounts by the depository institution or any other non-interest benefits shall accrue to the benefit of the Parties set forth in the Pricing Exhibit.

Section 2.05.    Permitted Withdrawals from Custodial Accounts

(a)    The Servicer shall be entitled to withdraw funds from the Custodial Accounts for the following purposes; provided, however, no such withdrawal from the Custodial Accounts relating to the Agency Loans shall be made if prohibited by the applicable Agency Guide:

(i)    to make payments to the Owner in the amounts and in the manner provided in Section 3.01 and Section 3.02;

(ii)    to pay to itself Servicing Compensation and Owner Expenses (to the extent the Servicer has not retained the Servicing Compensation and Owner Expenses);

(iii)    to reimburse itself for un-reimbursed Servicing Advances (except to the extent already reimbursed pursuant to any other provision of this Agreement), any accrued but unpaid Servicing Compensation, and unpaid Owner Expenses. The Servicer's right to reimbursement pursuant to this section shall be prior to the rights of the Owner;

(iv)    to reimburse itself for any un-reimbursed Non-recoverable Advances made by the Servicer in accordance with this Agreement;

(v)    to invest funds in Eligible Investments in accordance with Section 2.09;

(vi)    to withdraw funds deposited in error;

(vii)    to withdraw funds necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance and the fees of any managing agent acting on behalf of the Servicer.;

(viii)    to pay itself any interest earned on funds deposited in the Custodial Account as set forth in the Pricing Exhibit (all such interest to be withdrawn no later than each Portfolio Loan Remittance Date);

(ix)    to pay itself any amounts that are owed by Owner under this Agreement and that remain unpaid;

(x)    to pay for any LPMI Policy premiums;

(xi)    to transfer funds to another Qualified Depository in accordance with Section 2.09 hereof;  and

(xii)    to clear and terminate the Custodial Account upon the termination of this Agreement.

Section 2.06.    Establishment of and Deposits to Escrow Accounts

(a)    The Servicer shall segregate and hold all funds collected and received pursuant to a Portfolio Loan constituting Escrow Payments separate and apart from any of its own funds and general assets in one or more Escrow Accounts, in the form of time deposit or demand accounts, titled, "GMAC Mortgage, LLC, in trust for Owners of Residential Fixed and Adjustable Rate Mortgage Loans, and various Mortgagors" , or such other title as is mutually agreed upon and directed in writing by Owner in accordance with Exhibit 8. The Escrow Account shall be established with a Qualified Depository, in a manner which shall provide the maximum available insurance thereunder.

The Servicer shall deposit in the Escrow Account or Accounts no more than two (2) Business Days following receipt thereof the following amounts received in connection with the Portfolio Loans:

(i)    all Escrow Payments collected for the purpose of effecting timely payment of any such items as required under the terms of this Agreement along with any refunds received in connection with Escrow Payment items;

(ii)    all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property; and

(iii)    buydown funds and other amounts held is suspense prior to application to the Mortgage Loan or REO Property.

(b)    The Servicer shall segregate and hold all funds collected and received pursuant to the Agency Loans separate and apart from any of its own funds and general assets and shall establish Escrow Accounts in accordance with the applicable Agency Guides. The Servicer shall deposit in the corresponding Agency Escrow Accounts no more than two (2) Business Days following receipt thereof, the applicable collections received by the Servicer in accordance with the applicable Agency Guide

(c)    Any benefit related to the funds held in the Escrow Accounts and any obligation to pay interest on such funds to the related Mortgagor shall be allocated between the Servicer and Owner as set forth in the Pricing Exhibit.

Section 2.07.  Permitted Withdrawals from Escrow Accounts

(a)      The Servicer shall be entitled to withdrawal funds from the Escrow Accounts for the following purposes; provided, however, no such withdrawal from the Escrow Accounts relating to the Agency Loans shall be made if prohibited by the applicable Agency Guide:

> (i)    to effect timely payments of real estate taxes, assessments, mortgage insurance premiums, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Portfolio Loan;

> (ii)    to reimburse itself for any Servicing Advance constituting Escrow Payments made by the Servicer pursuant to this Agreement with respect to a related Portfolio Loan (except to the extent already reimbursed pursuant to any other provision of this Agreement), but only from amounts received on the related Portfolio Loan which represent late collections of Escrow Payments thereunder;

> (iii)    to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Portfolio Loan or Applicable Law;

> (iv)    to transfer funds to the Custodial Account for application to reduce the principal balance of the Portfolio Loan in accordance with the terms of the related Mortgage and Mortgage Note;

> (v)    to pay to itself, or any Mortgagor to the extent required by Applicable Law, any interest paid on the funds deposited in the Escrow Account;

> (vi)    to restore or repair the Mortgaged Property in accordance with Section 2.15 ;

> (vii)    to withdraw funds deposited in error; and

> (viii)    to clear and terminate the Escrow Account on the termination of this Agreement.

Section 2.08.  Payment of Escrow Items and Other Charges

With respect to each first lien Mortgage Loan that provides for Escrow Payments, the Servicer shall maintain accurate records reflecting the status of real estate taxes and other charges which are or may become a lien upon the Mortgaged Property, and the status of hazard and flood insurance coverage, and shall obtain, from time to time, all bills for the payment of such charges that are part of Escrow Payments

(including renewal premiums) and shall effect payment thereof prior to the applicable loss of discount, penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage. The Servicer assumes full responsibility for the timely payment of all such bills and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments.

With respect to each first lien Mortgage Loan that does not provide for Escrow Payments, the Servicer shall monitor to ensure that any such payments are made by the Mortgagor. The Servicer shall make Servicing Advances to effect such payments, as commercially reasonable, within the time period required to avoid additional penalties and interest, and no later than the time required to avoid the loss of the related Mortgaged Property by foreclosure from a tax or other lien. Servicer will charge the Mortgagor for such penalties and interest associated with such past due amounts paid by Servicer in connection with the Mortgaged Property. Servicer may, at Servicer's discretion and in accordance with Applicable Law and Accepted Servicing Practices, establish an Escrow Account for any Mortgagor that fails to pay real estate taxes, flood or hazard insurance on the Mortgaged property in a timely manner.

With respect to each second lien Mortgage Loan, the Servicer shall not be required to collect any Escrow Payments and shall not be responsible for monitoring or paying any taxes, flood or hazard insurance, or other amounts constituting Escrow Payments.

Section 2.09.   Protection of Accounts

The Custodial Accounts and Escrow Accounts for the Mortgage Loans and REO Properties will be held by the Servicer at a Qualified Depository. The Servicer may transfer the Custodial Accounts or the Escrow Accounts to a different Qualified Depository from time to time. Such transfer shall be made only upon reasonable advance notice to the Owner.

Amounts on deposit in the Custodial Accounts may at the option of the Servicer be invested in Eligible Investments. Any such Eligible Investment shall mature no later than one day prior to the Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable, in each month; provided, however, that if such Eligible Investment is an obligation of a Qualified Depository (other than the Servicer) that maintains the Custodial Account, then such Eligible Investment may mature on the related Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account, by the Servicer out of its own funds prior to the next Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable.

All suspense and clearing accounts in which funds relating to the Mortgage Loans and REO Properties are deposited shall be established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder.

Section 2.10.  Maintenance of Hazard and Flood Insurance

The Servicer shall cause to be maintained (a) for each first lien Portfolio Loan,  hazard insurance such that all buildings upon the Mortgaged Property are insured by a generally acceptable insurer acceptable under the Fannie Mae Guides against loss by fire, hazards of extended coverage and such other hazards as are required to be insured pursuant to the Fannie Mae Guides, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such first lien Mortgage Loan or (ii) the outstanding principal balance of the first lien Mortgage Loan provided that such amount represents at least 80% of the insurable value of the Mortgaged Property and (b) for each Agency Loan, hazard insurance coverage as required under the terms of the applicable Agency Guide.  If a Mortgaged Property is not covered by hazard insurance or is covered in an amount less than the amount required, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such insurance coverage, and if said Mortgagor fails to obtain the required insurance coverage after such notification, the Servicer shall force place insurance on the Mortgagor's behalf within the time permitted by Applicable Law and Accepted Servicing Practices.

The Servicer shall cause to be maintained  (a) for each first lien Portfolio Loan secured by a Mortgaged Property located in a special flood hazard area (where flood insurance is available, and where the originator or prior servicer maintained, such flood insurance), a flood insurance policy with an insurance carrier acceptable under the Fannie Mae Guides in an amount representing coverage not less than the lesser of (i) the aggregate unpaid principal balance of the Mortgage Loan, (ii) maximum amount of insurance which is available under the Flood Act , and (iii) the full replacement value of the improvements which are part of such Mortgaged Property and (b) for each Agency Loan secured by a Mortgaged Property located in a special flood hazard area (where flood insurance is available, and where the originator or prior servicer maintained, such flood insurance), flood insurance coverage as required under the terms of the applicable Agency Guide.  If a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Act, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage after such notification, the Servicer shall force place flood insurance on the Mortgagor's behalf within the time permitted by Applicable Law and Accepted Servicing Practices.

All policies required hereunder shall name the Servicer and its successors and assigns as a mortgagee and loss payee and shall be endorsed with non contributory standard or New York mortgagee clauses which shall provide for at least 30 days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting a insurance carrier or agent, provided, however, that the Servicer shall not accept any insurance policies from insurance companies unless such companies are acceptable (a) for Portfolio Loans, in accordance with the Fannie Mae Guides or (b) for Agency Loans, in accordance with the applicable Agency Guide. The Servicer shall determine that such policies provide sufficient coverage in amounts as required pursuant to the applicable guide.

Any amounts collected by the Servicer under any such policies (other than amounts to be deposited in a suspense account and applied to the restoration or repair of the related Mortgaged Property, or to be released to the Mortgagor, in accordance with the Servicer's normal servicing procedures as specified in Section 2.15) shall be deposited in the Custodial Account pursuant to Section 2.04, subject to withdrawal pursuant to Section 2.05.

With respect to each subordinate lien Mortgage Loan, including HELOC Loans, the Servicer shall obtain and maintain the blanket hazard insurance and flood policy described in Section 2.11.

Section 2.11.  Maintenance of Blanket Hazard Insurance Coverage

In the event that the Servicer shall obtain and maintain a blanket policy insuring against losses arising from fire, hazards and flood covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy complies with all of the requirements of Section 2.10 relating to hazard insurance, the Servicer shall conclusively be deemed to have satisfied its obligations as set forth in Section 2.10 to maintain such hazard and flood insurance. Any amounts collected by the Servicer under any such blanket policy relating to a Mortgage Loan shall be deposited in the applicable Custodial Account as provided in Section 2.04, subject to withdrawal as provided in Section 2.05. Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property an individual policy complying with Section 2.10, and there shall have been a loss which would have been covered by such individual policy, the Servicer shall deposit in the applicable Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to be deposited from the Servicer's funds, without reimbursement therefore.

Section 2.12.  Maintenance of PMI Policies

With respect to each Mortgage Loan subject to a PMI Policy or LPMI Policy on the related Transfer Date, the Servicer shall maintain or cause the Mortgagor to maintain (to the extent that the Mortgage Loan Documents require the Mortgagor to maintain such insurance) in full force and effect such PMI Policy or LMPI Policy, and shall pay or shall cause the Mortgagor to pay their Escrow Payments relating thereto, on a timely basis. In connection with any assumption or substitution agreements entered into

or to be entered into with respect to a Mortgage Loan, the Servicer shall promptly notify the insurer under the related PMI Policy or LPMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such PMI Policy or LPMI Policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under such PMI Policy or LPMI Policy.

The Servicer shall comply with all provisions of Applicable Law relating to the cancellation of, or collection of premiums with respect to, PMI Policies, including, but not limited to, the provisions of the Homeowners Protection Act of 1998, and all regulations promulgated thereunder, as amended from time to time. The Servicer shall be obligated to make premium payments with respect to PMI Policies required to be maintained by the Mortgagor, if the Mortgagor is required but fails to pay any Escrow Payments, which shall be paid from the Escrow Account.

With respect to each Mortgage Loan covered by a PMI Policy or LPMI Policy, the Servicer shall take all such actions on behalf of the Owner as are necessary to service, maintain and administer the related Mortgage Loan in accordance with such policy and to enforce the rights under such policy. Except as expressly set forth herein, the Servicer shall have full authority on behalf of the Owner to do anything it deems appropriate or desirable in connection with the servicing, maintenance and administration of such policy; provided that the Servicer shall not take any action with respect to such Mortgage Loan which would result in non-coverage under such LPMI Policy or PMI Policy of any loss which, but for actions of the Servicer, would have been covered thereunder. The Servicer shall cooperate with the PMI Policy or LPMI Policy insurers and shall furnish all reasonable evidence and information in the possession of the Servicer to which the Servicer has access with respect to the related Mortgage Loan.

The Servicer agrees to prepare and present, on behalf of itself and the Owner, claims to the insurer under any PMI Policy or LPMI Policy in a timely fashion in accordance with the terms of such PMI Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any PMI Policy or LPMI Policy respecting a defaulted Mortgage Loan.

Section 2.13.  Maintenance of Fidelity Bond and Errors and Omissions Insurance

The Servicer shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans and REO Properties ("Servicer Employees"). Any such fidelity bond and errors and omissions insurance policy shall be in the form of the mortgage banker's blanket bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Servicer Employees. No provision of this Section 2.13 requiring such fidelity bond and errors and omissions insurance policy shall relieve the Servicer from its duties and obligations as set forth in this Agreement. The Servicer shall maintain minimum coverage amounts under any such fidelity bond and

SERVICING AGREEMENT BY AND BETWEEN                                          OCTOBER 1ST, 2011
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC

errors and omissions insurance policy as acceptable to the Agency. The Servicer shall provide proof of such coverage upon written request by Owner.

Section 2.14.   Inspections

Regarding Mortgage Loans in a first lien position, the Servicer shall perform inspections of the Mortgaged Property as required by Accepted Servicing Practices. Regarding subordinate lien Mortgage Loans, the Servicer shall have no obligation to perform inspections.

Section 2.15.   Restoration of Mortgaged Property

The Servicer shall release to the Mortgagor any Insurance Proceeds to be applied to the restoration or repair of the Mortgaged Property or any Condemnation Proceeds in accordance with (a) for Portfolio Loans and REO properties, the Fannie Mae Guide and (b) for Agency Loans, the applicable Agency Guide.

Section 2.16.   Title, Management and Disposition of REO Property

(a)      In the event that title to any Mortgaged Property securing a Portfolio Loan is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Owner.

The Servicer, either itself or through an agent selected by the Servicer, shall manage, protect and market for sale each REO Property for the Owner for the purpose of securing its prompt disposition and sale. The disposition of REO Property shall be carried out by the Servicer in accordance with the terms of the Approval Matrix.

The Servicer shall use commercially reasonable efforts to dispose of each REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Servicer determines that a longer period is necessary for the orderly liquidation of such REO Property.

The Servicer shall maintain on each REO Property fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Act, flood insurance.

(b)      In the event that title to any Mortgaged Property securing an Agency Loan is acquired in foreclosure or by deed in lieu of foreclosure, the Servicer shall take title and manage such property in accordance with the applicable Agency Guide.

Section 2.17.   Notification of Adjustments

With respect to each Adjustable Rate Mortgage Loan, the Servicer shall adjust the Mortgage Interest Rate on the related Interest Rate Adjustment Date in

compliance with the requirements of the related Mortgage Note and Applicable Law.
The Servicer shall deliver any and all notices required under Applicable Law and the
terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate
and the Monthly Payment adjustments. The Servicer shall promptly upon written request
thereof, deliver to the Owner any applicable data regarding such adjustments and the
methods used to calculate and implement such adjustments. In connection with any
Forbearance entered into pursuant to Section 2.01(i), the Servicer may waive any
Mortgage Interest Rate or Monthly Payment adjustments provided such waiver
corresponds with the attached Approval Matrix.

Section 2.18.   Non-Recoverable Advances

Notwithstanding anything to the contrary in this Agreement, if the
Servicer determines a Servicing Advance may be a Non-recoverable Advance, the
Servicer shall have no obligation to make such Servicing Advance.

Section 2.19.   Servicing Changes

If, following the date of this Agreement, Owner shall propose to (a)
amend, supplement, discontinue or introduce any Program Form; and/or (b) alter, amend
or supplement the servicing activities (any such amendment, supplement, discontinuation,
introduction or other alteration being herein referred to as a "Servicing Change"), the
Owner shall provide written notice of each such proposed Servicing Change to the
Servicer by providing (i) a specimen of each Program Form proposed to be amended,
supplemented or introduced, in the form in which it is proposed to be amended,
supplemented or introduced; and/or (ii) a written description of each proposed
amendment, supplement or other alteration to the servicing activities, which description
shall in each case be sufficiently clear, comprehensive and detailed to provide a
reasonable basis for the training of individuals who would be required to follow the
procedures described thereby (such written notice, as accompanied by the items described
in clauses (i) and (ii), is referred to herein as a "Servicing Change Proposal").

Upon receipt of a Servicing Change Proposal, the Servicer shall deliver a
written response either (a) accepting such Servicing Change Proposal, in which case the
Servicing Change shall become effective on the date that Servicer, in its reasonable
discretion, is able to implement the Servicing Change, or (b) reject such Servicing
Change Proposal, which rejection shall include the reasons for such rejection set forth in
reasonable detail.   No Servicing Change shall become effective unless and until all
terms, including the cost thereof, are agreed upon in writing by both Parties.

If, following the date of this Agreement, a change in Applicable Law or
investor requirements, including Fannie Mae, Freddie Mac or Ginnie Mae requirements,
increases the Servicer's cost to service or otherwise negatively affects the Servicer's
economics from that contained on the Pricing Exhibit, in each case determined by
Servicer in its reasonable discretion, the Servicer may increase the pricing payable by
Owner hereunder in an amount reasonably necessary to address such change in

Applicable Law or investor requirements, upon thirty (30) days advance written notice to Owner.

### Section 2.20.  Prepayment Charges

The Servicer shall not waive any applicable prepayment charge with respect to any Mortgage Loan that prepays during the term of the prepayment charge. If the Servicer fails to collect the applicable prepayment charge upon any prepayment of any Mortgage Loan, the Servicer shall pay the Owner an amount equal to the prepayment charge not collected. Notwithstanding the foregoing, the Servicer may waive a prepayment charge without paying the Owner the amount of the prepayment charge if (a) the Mortgage Loan is in Default or Default is reasonably foreseeable and such waiver would maximize recovery of total proceeds taking into account the value of such prepayment charge and the other amounts due on the related Mortgage Loan or (b) the collection of the prepayment charge would be in violation of Applicable Law or Accepted Servicing Practices.

### Section 2.21.  Credit Reporting

For each Mortgage Loan, the Servicer shall, on a monthly basis, accurately and fully furnish, in accordance with Applicable Law, accurate and complete information (e.g., favorable and unfavorable) on the Mortgagors to each of the following credit repositories: Equifax Credit Information Services, Inc., Trans Union, LLC and Experian Information Solution, Inc.

### Section 2.22.  Safeguarding Customer Information

The Servicer has implemented and will maintain security measures designed to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder, as amended from time to time.

# ARTICLE III.
## REMITTANCES AND STATEMENTS

### Section 3.01.  Remittances for Portfolio Loans that are not HELOC Loans

On each Portfolio Loan Remittance Date the Servicer shall remit for each Portfolio Loan that is not a HELOC Loan and for each REO Property by wire transfer of immediately available funds to the Owner all amounts deposited in the applicable Custodial Account as of the close of business on the Determination Date (net of charges against or withdrawals from the Custodial Account permitted by this Agreement).

With respect to any remittance not made to Owner on the Portfolio Loan Remittance Date on which such remittance was required to be made, the Servicer shall, if such remittance has not already been made when written notice of such nonpayment is provided from Owner to Servicer, pay to the Owner interest on any such late payment at an annual rate equal to the LIBOR Rate, adjusted as of the date of each change, but in no event greater than the maximum amount permitted by law.  Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the Business Day on which notice of such non-payment was given by Owner and ending with the Business Day on which such payment is made, both inclusive.  Such interest shall be remitted along with the distribution payable on the next succeeding Portfolio Loan Remittance Date.  The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Servicer Event of Default.

### Section 3.02.  Remittances for HELOC Loans

(a)    The Servicer shall on each Business Day determine the amount of all HELOC Draws made on account of the HELOC Loans on the preceding Business Day and notify the Owner of such amount in the Daily HELOC Report.

(b)    Each Business Day, the Servicer shall remit for each HELOC Loan by wire transfer of immediately available funds to the Owner all amounts deposited in the Custodial Account on the previous Business Day, net of (i) charges against or withdrawals from the Custodial Account as permitted by this Agreement, and (ii) HELOC Draws not previously reimbursed.  To the extent HELOC Draws exceed the available funds in the Custodial Account, the Owner will be required to reimburse Servicer for the amount of HELOC Draws not previously reimbursed within one (1) Business Day.

(c)    If such payment is not made by Owner when due, in addition to any other rights or remedies available to Servicer under this Agreement, including but not limited to the right of the Servicer to collect interest on such late payment pursuant to Section 4.03, the amount payable to Servicer may be deducted from the Custodial Account or from any subsequent remittance due Owner.

### Section 3.03.  Remittance for Agency Loans

The Owner shall remit to Servicer, or ensure the Agency Custodial Account has sufficient funds for, all Monthly Payments due to the applicable Agency, on the date such funds are due to the applicable Agency.   The Servicer requires any funds due to the Agency be in the Custodial Account on the day prior to the date such funds are due to be remitted to the Agency or deducted from the Agency Custodial Account.  This includes but is not limited to Monthly Payments, guaranty fees, buyout amounts and Repurchase Requests.

On each Portfolio Loan Remittance Date the Servicer shall also remit for each Agency Loan by wire transfer of immediately available funds, all amounts required to be remitted to the Owner pursuant to this Agreement, as of the close of business on the Determination Date. This amount shall include any Agency servicing fees collected by the Servicer and due Owner net of amounts due Servicer pursuant to Section 4.03.

### Section 3.04.  Reconciliation of Servicing Advances

With respect to all Mortgage Loans and REO Properties, Servicer shall maintain a corporate account to monthly reconcile the amount of unreimbursed Servicing Advances and Servicing Advances recovered.  The Servicer shall, on each Determination Date determine all amounts representing Servicing Advances recovered and unreimbursed Servicing Advances on account of the Mortgage Loans and REO Properties. To the extent that the aggregate Servicing Advances recovered exceed the unreimbursed Servicing Advances, Servicer shall remit such difference to Owner by wire transfer of immediately available funds on the Portfolio Loan Remittance Date.  To the extent that the aggregate amount of unreimbursed Servicing Advances exceed the Servicing Advances recovered, (a) Servicer shall notify Owner of such difference in the Servicing Advance report which shall be provided on the Portfolio Loan Remittance Date following the Determination Date and (b) the Servicer shall net such amount from the remittance due to the Owner or withdrawal such amount from the Custodial Account; provided, however, if the remittance is not sufficient to allow the Servicer to net the full amount of the Servicing Advances and the Servicer cannot deduct the amount from the Custodial Account, the Owner shall, by wire transfer, remit to Servicer such amount within one (1) Business Day.

If such payment is not made by Owner when due, in addition to any other rights or remedies available to Servicer under this Agreement, including but not limited to the right of the Servicer to collect interest on such late payment pursuant to Section 4.03, the amount payable to Servicer may be deducted from the Custodial Account or from any subsequent remittance due Owner.

### Section 3.05.  Statements to Owner

Not later than each Portfolio Loan Remittance Date, the Servicer shall furnish to the Owner a Monthly Advice for the Mortgage Loans and REO Properties, with a trial balance report attached thereto, in electronic medium mutually acceptable to the Parties, as of the preceding remittance and the period ending on the preceding Determination Date.

No later than the Portfolio Loan Remittance Date of each month, the Servicer shall provide the Owner with a billing statement for amounts owed to Servicer under the terms of this Agreement and which have either been withdrawn from the Custodial Account, deducted from a remittance or billed to Owner pursuant to Section 4.03.

Servicer shall furnish to the Owner a Servicing Advance report for all Mortgage Loans and REO Properties in accordance with Section 3.04.

Servicer shall furnish to the Owner a Daily HELOC Report in accordance with Section 3.02(a).

The Servicer shall provide the Owner with a report showing the amounts due the Agency no less than one (1) Business Day prior to the date such funds are due.

During the term of this Agreement, in addition to the reports specifically required under this Agreement, the Servicer shall also furnish to the Owner such other periodic, special, or other reports or information as shall be reasonably requested by the Owner to the extent such reports or information are readily accessible to the Servicer without any more than nominal expense or effort. To the extent any such report not otherwise provided for herein and requiring more than nominal expense or effort is reasonably requested by Owner, Servicer shall have no obligation to provide such report until Servicer and Owner agree on the additional compensation to be paid Servicer for such report using the Servicing Change process outlined in Section 2.19.

Section 3.06.    Internal Revenue Service Reports

The Servicer shall mail, on or before the dates required by Applicable Law, U.S. Internal Revenue Service ("IRS") Form No. 1099 to all parties entitled to receive interest on Escrow Accounts, where applicable, as well as IRS Form No. 1098 to each Mortgagor. The Servicer shall timely file all required reporting relating to the Mortgage Loans with the IRS, including, for all periods after the applicable Transfer Date. In addition, the Servicer shall provide the Owner with such information concerning the Mortgage Loans which is reasonably available to the Servicer and which is necessary for the Owner to prepare its federal income tax return as the Owner may reasonably request from time to time.

Following the foreclosure sale or abandonment of any Mortgaged Property, the Servicer shall report such foreclosure or abandonment to the U.S. Internal Revenue Service as required by Applicable Law.

Section 3.07.   No Principal & Interest Advances

The Servicer will service the Portfolio Loans on an "actual/actual" basis and the Servicer shall have no obligation to advance principal or interest payments not collected from Mortgagors.  The Owner is responsible for providing sufficient funds to the Servicer for any Agency Loans that require Advances.

Section 3.08.   Odd Due Dates

Any Mortgage Loan which has a scheduled Due Date on a day other than the first day of each month shall, for the purposes of this Agreement, be considered due on the first day of the month following the month in which that payment is due.  For example, a Mortgage Loan with a scheduled payment due on August 15 shall be considered to have a Due Date of September 1 for the purposes of this Agreement, including investor reports and remittance, and for calculating the length of payment Default on such Mortgage Loan.

SERVICING AGREEMENT BY AND BETWEEN
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC                                    OCTOBER 1st, 2011

# ARTICLE IV.
## ADDITIONAL SERVICING PROCEDURES

Section 4.01.   Transfers of Mortgaged Property

The Servicer shall be required to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note.  When the Mortgaged Property has been conveyed by the Mortgagor without repayment in full of the related Mortgage Loan, the Servicer shall, to the extent it has knowledge of such conveyance, exercise its right to accelerate the maturity of such Mortgage Loan under the applicable "due-on-sale" clause, provided, however, that the Servicer shall not exercise such right if prohibited by Applicable Law from doing so.

If the Servicer reasonably believes it is unable under Applicable Law to enforce a "due-on-sale" clause, the Servicer, shall, to the extent permitted by Applicable Law, attempt to enter into (a) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (b) in the event the Servicer is unable under Applicable Law to require that the original Mortgagor remain liable under the Mortgage Note and the Servicer has the prior consent of the PMI Policy or LPMI Policy provider, a substitution of liability agreement with the purchaser of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the purchaser of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note.  In connection with any such assumption, the Mortgage Interest Rate, the term of the Mortgage Loan and the outstanding principal amount of the Mortgage Loan shall not be changed.

To the extent that any Mortgage Loan is assumable, the Servicer shall inquire diligently into the creditworthiness of the proposed transferee, and shall follow Accepted Servicing Practices, subject to the Approval Matrix, including but not limited to conducting a review of the credit and financial capacity of the transferee, and may, subject to the Approval Matrix, approve the assumption if it believes the transferee is capable of performing the mortgage obligations.  If the credit of the proposed transferee does not satisfy the relevant underwriting criteria and the transfer of ownership actually occurs, the Servicer shall, to the extent permitted by the Mortgage, Mortgage Note and Applicable Law, accelerate the maturity of the Mortgage Loan.

Section 4.02.   Satisfaction of Mortgages Upon Payment in Full

Upon the payment in full of any Mortgage Loan, or if a HELOC Loan, the receipt of written notification from the Mortgagor to satisfy their HELOC Loan (provided that no amounts are due on such HELOC Loan),  the Servicer shall notify the Owner in the Monthly Advice, and may request the release of any Mortgage Loan Documents from the Owner or Custodian. The Servicer shall satisfy the lien of record securing any such paid in full Mortgage Loan within the applicable time limit required by Applicable Law;

provided that the Owner or its Custodian has provided, or caused to be provided, all necessary documents requested by the Servicer.

Section 4.03.   Servicing Compensation and Owner Expenses

As consideration for servicing the Mortgage Loans pursuant to this Agreement, the Servicer shall be entitled to retain the applicable Servicing Compensation from payments on the Mortgage Loans or to withdraw the applicable Servicing Compensation with respect to each Mortgage Loan from the Custodial Account pursuant to Section 2.05 hereof.   In addition to the Servicing Compensation, the Owner also agrees to pay Owner Expenses and (when applicable) any other fees as mutually agreed, if not otherwise withdrawn from the Custodial Account pursuant to this Agreement.

To the extent any amounts due the Servicer per the Pricing Exhibit or this Agreement, including but not limited to Servicing Compensation, Owner Expenses, Servicing Advances, and Advances, cannot be deducted from any Custodial Accounts or deducted from any remittance due Owner, the Servicer shall bill the Owner. The Owner agrees to pay all such bills within 10 days from receipt, unless a shorter period of time is provided elsewhere in this Agreement for Owner to make a particular payment.

If such amounts are not paid when required, the Owner shall, if such amounts have not already been paid when written notice of such non-payment is provided from Servicer to Owner, pay to the Servicer interest on any such late payment at an annual rate equal to the LIBOR Rate, adjusted as of the date of each change, but in no event greater than the maximum amount permitted by law.   Such interest shall be paid by Owner with the payment to which such interest relates, or withdrawn by Servicer from the Custodial Account with the withdrawal to which such interest relates, and shall cover the period commencing with the Business Day on which notice of such non-payment was given by Servicer and ending with the Business Day on which such payment is made by Owner or withdrawn by Servicer, both inclusive.   The payment by the Owner of any such interest shall not be deemed an extension of time for payment or a waiver of any Owner Event of Default.

The Servicer shall have the right to adjust the monthly base servicing fees (as set forth on the Pricing Exhibit) on each anniversary date of this Agreement.   Such increased base servicing fees shall be calculated by multiplying (a) the CPI plus one percentage point (1.0%) times (b) the applicable then current monthly base servicing fees, and adding the result to the applicable then current monthly base servicing fees.

The Servicer shall have the right to offset any amounts due and unpaid under this Agreement with funds due Owner from Servicer or any of Servicer's Affiliates.

Section 4.04.   Possession of Mortgage Files

The contents of each Mortgage File are and shall be held in trust by the Servicer for the benefit of the Owner as the owner thereof. The possession of the Mortgage File by the Servicer is at the will of the Owner for the sole purpose of servicing the related Mortgage Loan, pursuant to this Agreement, and such retention and possession by the Servicer is in its capacity as Servicer only and at the election of the Owner; provided that Servicer may keep copies of any records it deems necessary for compliance with any state or federal record retention requirements or as it deems advisable for use in defending any litigation, action or claim. The Servicer shall release the contents of any Mortgage File only in accordance with written instructions from the Owner, unless such release is required as incidental to the Servicer's servicing of the Mortgage Loans pursuant to this Agreement.

To the extent that original documents (other than the Mortgage Loan Documents) are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Servicer may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imaging techniques so long as the Servicer complies with Accepted Servicing Practices.

The Owner agrees to make arrangements with its Custodian (if any) to provide Servicer with access to any Mortgage Loan Documents held by such Custodian as necessary in order for Servicer to service the Mortgage Loans as required by this Agreement.

Section 4.05.    Right to Examine Servicer Records

During the Original Term and any Extension Term of this Agreement, the Owner shall have the right to examine and audit, up to two times annually and upon reasonable advance written notice, any and all of the books, records, or other information of the Servicer, whether held by the Servicer or by another on its behalf, with respect to or concerning this Agreement, the Mortgage Loans or the REO Properties, during normal business hours or as otherwise agreed to by the Servicer. If Servicer incurs any out of pocket costs associated with such review, Owner shall reimburse Servicer for such costs.

Section 4.06.    Losses and Expenses

(a)    Notwithstanding any other provisions of this agreement, including Section 10.01(b), Owner shall remain responsible, as between Owner and Servicer, for losses related to Owner's investment in the Servicing Rights or, as applicable, the Mortgage Loans or REO. Losses of the type referred to above for which Owner shall remain responsible include, but are not limited to: VA No-Bid Instruction, VA partial guaranties, FHA partial claims payments, shortages in the reimbursement amounts for fees paid by Servicer on FHA and VA Mortgage Loans, prepayment interest shortfall for Agency deliveries, Agency penalties, investor repurchase demands, earthquake losses or other such special hazard losses not covered by the insurance required to be maintained under this Agreement, fraud, foreclosure losses, tax penalties related to taxing authorities

supplying bills only to Mortgagors, REO Property losses, Recourse Obligations, and losses resulting from application of the Servicemembers Civil Relief Act of 2003 unless any such losses are incurred as a result of Servicer gross negligence or willful misconduct.

(b)      In addition to Servicing Advances and Owner Expenses regarding which the Servicer is entitled to reimbursement hereunder, Owner shall reimburse Servicer for expenses incurred in connection with the performance by Servicer at the request of Owner of any activity that is not specifically required to be performed by Servicer under this Agreement and is not reasonably ancillary to any specific obligation of Servicer under this Agreement. Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incurred in connection with the preparation of and performance under this Agreement, including, without limitation, its own legal fees and expenses of preparing and delivering the notices, documents, reports, accountings and any other information required of it hereunder. Owner shall be solely responsible for all custodial fees (including related shipping costs) of Owner's document Custodian, if any.

(c)      In the event that Servicer determines it is in the Owner's best interest to cure a Default under or pay off a superior lien mortgage loan related to a subordinate lien Mortgage Loan, Servicer shall notify Owner of the amount needed to effectuate such a cure or pay off. Owner agrees to remit such funds to Servicer within the time period specified by Servicer if Owner wishes to preserve the subordinate lien Mortgage Loan being serviced by Servicer. If Servicer does not receive the required funds within the time periods specified, Servicer will not cure or pay off such superior lien mortgage loan.

Section 4.07.   Repurchase Requests

In the event Servicer receives a Repurchase Request directly from an Agency, investor or any other Person, or a repurchase is otherwise required pursuant to the terms of the applicable Agency Guide, Servicer shall act in accordance with Accepted Servicing Practices and shall provide notice to the Owner within five (5) Business Days and provide Owner with reasonably requested information relating to such Repurchase Request as is in the Servicer's possession or control. If such repurchase request results from a violation of this Agreement by Servicer, Servicer shall respond in a timely manner directly to the Person making such Repurchase Request. For all other Repurchase Requests, Owner shall respond in a timely manner directly to the Person making such Repurchase Request.

In the event the Owner requests the seller or the originator of the Mortgage Loan to repurchase such Mortgage Loan and/or the Servicing Rights to such Mortgage Loan, Servicer agrees to cooperate with Owner to provide Owner with reasonably requested information relating to such request.

If the Mortgage Loan is to be repurchased, Servicer shall calculate, on behalf of Owner, amounts required to repurchase the Mortgage Loan and Owner shall wire such amount to Servicer within one (1) Business Day. In the event of a repurchase

by the seller or originator at Owner's request with transfer of servicing to another
servicer, Owner shall immediately reimburse Servicer (a) for any funds owed to or
advanced by Servicer; and (b) for any outstanding funds due Servicer according to
Section 11.02 of this Agreement.

# ARTICLE V.
## COMPLIANCE AND CONFIDENTIALITY

Section 5.01.   Annual Statement as to Compliance

The Servicer shall deliver to the Owner, on or before March 31st each year beginning March 31, 2012, an officer's certificate, stating that (a) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement has been made under such officer's supervision, and (b) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof and the action being taken by the Servicer to cure such default.

Section 5.02.   Annual Independent Public Accountants' Servicing Report

The Servicer, at its expense, shall provide an SAS 70 report, or its equivalent, on control effectiveness for the prior fiscal year period which assessment shall be attested to by a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants and either (a) cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owner to the effect that such firm has examined certain documents and records for the preceding fiscal year (or during the period from the date of commencement of such Servicer's duties hereunder until the end of such preceding fiscal year in the case of the first such certificate) and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Servicer's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement, or (b) furnish to Owner the Servicer's assessment of Servicer's compliance with the servicing criteria set forth in Section 1122(d) of Securities and Exchange Commission Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be attested to by a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants. The SAS 70 report, or its equivalent, must be provided as soon as it is available.  If pursuant to generally accepted accounting principles or accepted mortgage industry practice, material changes to the requirements of this Section 5.02 become necessary or desirable in the reasonable good faith judgment of either Party, the Parties agree to negotiate in good faith to modify the requirements of this Section 5.02.

Section 5.03.   Compliance with Gramm-Leach-Bliley Act of 1999

With respect to each Mortgage Loan and the related Mortgagor, each party shall as required comply with Title V of the Gramm-Leach-Bliley Act of 1999 and all

applicable regulations promulgated thereunder, and shall provide all notices required of
such party thereunder.

### Section 5.04.   Confidentiality of Information

      The Servicer and the Owner each agree that any information and
documents that are furnished by either Party for the purposes of performing under this
Agreement or that are produced or are otherwise furnished by either Party to or come to
the attention of either Party in connection herewith are confidential and proprietary and
shall be used only for the purposes of carrying out such Party's obligations under this
Agreement.  This information includes the terms of this Agreement, technical
specifications and operating manuals, information concerning current, future, or proposed
products and services and combinations of products and services; product and services
descriptions; financial information; information related to mergers or acquisitions;
passwords and security procedures; computer programs, loan servicing systems, software,
and software documentation; customer and/or prospective client lists, mortgage loan files,
and all other information relating in any way to the Mortgagor and/or prospective
mortgagor; printouts; records; policies, practices and procedures; and any or all other
information, data or materials relating to the business, trade secrets and technology of
either Party, its customers, clients, employees, business affairs and Affiliates (all of the
foregoing collectively referred to as "Confidential Information").

      The obligations imposed under this Agreement shall not apply to
Confidential Information that is (a) made public by the Party disclosing Confidential
Information to the other Party (b) generally available to the public other than by a breach
of this Agreement by the receiving Party, its employees or agents, (c) rightfully received
from a third person having the legal right to disclose the Confidential Information free of
any obligation of confidence or (d) necessary or appropriate to disclose in such Party's
work with legal counsel, accountants, auditors or as required by law.  In the event that the
receiving Party, or any of such Party's agents or employees, becomes legally compelled
(by deposition, interrogatory, request for documents, subpoena, civil or criminal
investigative demand or similar process) to disclose any Confidential Information of the
disclosing Party, such receiving Party shall, provided it is not legally prohibited from
doing so, provide prompt prior notice to the disclosing Party so that it may seek a
protective order or other appropriate remedy.  In the event that such protective order or
other remedy is not obtained, the receiving Party will furnish only that portion of the
Confidential Information which in the judgment of its counsel is legally required and will
exercise reasonable efforts to obtain assurances that confidential treatment will be
accorded the Confidential Information.

      Each Party shall maintain the Confidential Information of the other in
confidence using the same care and discretion to avoid disclosure of Confidential
Information as it uses to protect its own confidential information that it does not want
disclosed, but in no event less than a reasonable standard of care.  Each Party further
agrees to restrict disclosure of Confidential Information of the disclosing Party solely to
persons who need to know the Confidential Information to perform under this Agreement

and inform those third parties and other persons who receive Confidential Information of its confidential nature and obtain their agreement to abide by the obligations set forth herein.

Each Party acknowledges and agrees that any breach or threatened breach of any of the provisions of this section by the other Party may result in immediate and irreparable harm and that any remedies at law in such event will be inadequate. The Parties agree that such breaches, whether threatened or actual, will give the disclosing Party the right to obtain injunctive relief to restrain such disclosure or use. This right shall, however, be in addition to and not in lieu of any other remedies at law or in equity.

Upon termination of this Agreement, all copies of the Confidential Information will either be destroyed or returned to the disclosing Party immediately upon such Party's request. Each Party agrees that it will not retain any copy, summary or extract of the Confidential Information or any related work papers on any storage medium whatsoever, except as may be legally required for records retention compliance purposes. Notwithstanding anything to the contrary contained herein, neither Party shall be required to purge information from computer system back-up tapes or comparable back-up medium, and Servicer shall in no event have any obligation hereunder to destroy Mortgage Loan files or any documents related thereto.

# ARTICLE VI.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER

As of the date of this Agreement (or such other date if set forth below), the Owner warrants and represents to, and covenants and agrees with, the Servicer as follows:

### Section 6.01.  Organization and Good Standing

The Owner is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is licensed, qualified and in good standing in each state where a Mortgaged Property is located to the extent necessary to perform its obligations under this Agreement.  The Owner has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Owner enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

### Section 6.02.  Ordinary Course of Business

The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Owner.

### Section 6.03.  No Violations

The execution, delivery and performance of this Agreement by the Owner will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Owner, except for violations that will not adversely affect the Owner's ability to perform its obligations under this Agreement, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Owner is a party or by which the Owner may be bound.

### Section 6.04.  Ability to Perform

The Owner does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

### Section 6.05.  Litigation

No litigation or administrative proceeding before any court, tribunal or governmental body is currently pending or to the knowledge of the Owner threatened, against the Owner or with respect to this Agreement, which if adversely determined would have a material adverse effect on the transactions contemplated by this Agreement.

43

Section 6.06.   No Consent Required

       The Owner is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Owner to perform all obligations hereunder.

Section 6.07.   Ownership

       With respect to each Portfolio Loan and REO Property, Owner is the owner of all right, title, and interest in and to such loan or property and the Servicing Rights.  With respect to each Agency Loan, Owner is the owner of all right, title, and interest in and to the Servicing Rights. Each Mortgage Loan is a valid and collectible obligation of the respective Mortgagor.

Section 6.08.   Accuracy

       All information provided to the Servicer, including but not limited to information in the New Loan Data File, is true, complete and correct in all material respects.

Section 6.09.   Eligibility Criteria

       All Mortgage Loans and REO Properties conform to the Eligibility Criteria.

# ARTICLE VII.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICER

As of the date of this Agreement (or such other date if set forth below), the Servicer warrants and represents to, and covenants and agrees with, the Owner as follows:

### Section 7.01.  Organization and Good Standing

The Servicer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Servicer, and in any event the Servicer is in compliance with the laws of any such state to the extent necessary to perform its obligations in accordance with the terms of this Agreement. The Servicer has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Servicer enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

### Section 7.02.  Ordinary Course of Business

The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Servicer.

### Section 7.03.  No Violation

The execution, delivery and performance of this Agreement by the Servicer will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Servicer, except for violations that will not adversely affect the Servicer's ability to perform its obligations under this Agreement or the certificate of formation of the Servicer, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Servicer is a party or by which the Servicer may be bound.

### Section 7.04.  Ability to Perform

The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

### Section 7.05.  Ability to Service

45

The Servicer has the facilities, procedures, and experienced personnel necessary for the servicing of mortgage loans of the same type as the Mortgage Loans. The Servicer is in good standing to enforce and service mortgage loans in the jurisdiction wherein the Mortgaged Properties are located.

Section 7.06.   Litigation

No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending or to the knowledge of the Servicer threatened, against the Servicer or with respect to this Agreement, which if adversely determined would have a material adverse effect on the transactions contemplated by this Agreement.

Section 7.07.   No Consent Required

The Servicer is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Servicer to perform all obligations hereunder.

# ARTICLE VIII.
## OWNER DEFAULT

Section 8.01.  Owner Events of Default.

The following shall constitute an Owner Event of Default under this Agreement:

(a)    any failure by the Owner to remit to the Servicer any payment required to be made under the terms of this Agreement which continues un-remedied for a period of three (3) Business Days after the date upon which notice of such failure, requiring the same to be remedied, shall have been given to the Owner by the Servicer; or

(b)    the failure by the Owner duly to observe or perform in any material respect any other of the obligations of the Owner set forth in this Agreement which continues un-remedied for a period of sixty (60) days after the date on which notice of such failure, requiring the same to be remedied, shall have been given to the Owner by the Servicer; provided, however, that in the case of a failure that cannot be cured within sixty (60) days, the cure period shall be extended up to, but no more than, sixty (60) additional days if the Owner can demonstrate to the reasonable satisfaction of the Servicer that the failure can be cured and the Owner is diligently pursuing remedial action; or

(c)    a decree or order of a court, agency or supervisory authority having jurisdiction for the appointment of a conservator, receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Owner and such decree or order shall have remained in force un-discharged or un-stayed for a period of sixty (60) days; or

(d)    the Owner shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Owner or relating to all or substantially all of its property; or

(e)    the Owner shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

In each and every such case, in addition to whatever rights the Servicer may have at law or equity to damages, including injunctive relief and specific performance, the Servicer, by notice in writing to the Owner, may terminate this Agreement.

Upon receipt by the Owner of such written notice, Owner shall cooperate with Servicer to transfer the servicing to the successor appointed pursuant to Section 11.02. The Servicer agrees to reasonably cooperate with the Owner and such successor in transferring the servicing hereunder, as described in Section 11.02, and shall place in such successor's possession all Mortgage Files, and do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination

# ARTICLE IX.
## SERVICER DEFAULT

Section 9.01.  Servicer Events of Default.

The following shall constitute a Servicer Event of Default under this Agreement on the part of the Servicer:

(a)  any failure by the Servicer to remit to the Owner any payment required to be made under the terms of this Agreement which continues un-remedied for a period of three (3) Business Days after the date upon which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; or

(b)  the failure by the Servicer duly to observe or perform in any material respect any other of the obligations of the Servicer set forth in this Agreement which continues un-remedied for a period of sixty (60) days after the date on which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; provided, however, that in the case of a failure that cannot be cured within sixty (60) days, the cure period shall be extended up to, but no more than, sixty (60) additional days if the Servicer can demonstrate to the reasonable satisfaction of the Owner that the failure can be cured and the Servicer is diligently pursuing remedial action; or

(c)  a decree or order of a court, agency or supervisory authority having jurisdiction for the appointment of a conservator, receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force un-discharged or un-stayed for a period of sixty (60) days; or

(d)  the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or

(e)  the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(f)  the Servicer fails to maintain its license to do business or service residential mortgage loans in any jurisdiction where the Mortgaged Properties are located which failure continues un-remedied for a period of sixty (60) days after receiving actual notice of such failure and such failure has a material and adverse effect on the Servicer's ability to perform its obligations under the Agreement.

In each and every such case, in addition to whatever rights the Owner may have at law or equity to damages, including injunctive relief and specific performance, the Owner, by notice in writing to the Servicer, may terminate all the rights and obligations of the Servicer under this Agreement.

Upon receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 11.02. The Servicer agrees to reasonably cooperate with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder, as described in Section 11.02, and shall place in such successor's possession all Mortgage Files, and do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination.

# ARTICLE X.
## INDEMNIFICATION AND ASSIGNMENT

Section 10.01. Indemnification.

(a)    The Owner shall defend and indemnify the Servicer, its employees, officers, Affiliates, agents and representatives (the "Servicer Indemnified Parties"), against any and all assessments, judgments, claims, liabilities, losses, costs, damages or expenses whatsoever (including, reasonable attorneys' fees, expenses and disbursements in connection with any action, suit or proceeding and any such reasonable attorneys' fees, expenses and disbursements incurred in enforcing any right of indemnification) (collectively, the "Liability"), provided such Liability is not a result of gross negligence or willful misconduct on behalf of the Servicer.  Servicer Indemnified Parties may sustain arising from:

(i)    the Servicer taking any action, or refraining from taking any action, in conformity with the express written direction of the Owner or this Agreement;

(ii)    the failure of the Owner to perform its duties under this Agreement or the Owner's breach of any of the terms of this Agreement;

(iii)    the failure of the Owner or any trustee or Custodian in possession of original Mortgage Loan Documents to provide to the Servicer the originals of any Mortgage Loan Documents within a reasonable amount of time after a request for such documents has been received in order to allow the Servicer sufficient time to process satisfactions, payoffs and releases;

(iv)    any act or omission to act of any Person, including but not limited to the originator of the Mortgage Loan or any prior servicer, prior to the Transfer Date, including, without limitation, any data integrity issue (and any costs of correcting such issue);

(v)    perpetuating the acts or omissions of prior servicers, unless (x) the Servicer has actual knowledge that perpetuating such act or omission will result in Liability to the Servicer, (y) the Servicer knowingly acts or fails to act and such act or failure to act, as a singular event, not in combination with any other act or omission of any prior servicer(s), results in Liability to the Servicer, or (z) the acts or omissions are based on a mistaken or false conception of the law that is obvious and significant and the Servicer, over a period of time, in more than a single instance, continues in its course of servicing to perpetuate such acts or omissions;

(vi)    the Owner's or a prior servicer's failure to comply with the Transfer Instructions;

51

(vii)    Advances and Servicing Advances, if any, incurred by a prior servicer and reimbursed by the Servicer that ultimately are not recoverable from the Mortgagor or other proceeds;

(viii)    a Mortgage Loan being classified as "high cost" under the Home Ownership and Equity Protection Act of 1994; or "high cost," "predatory," or similar classification under any law or regulation applicable to such Mortgage Loan;

(ix)    any VA No-Bid Instruction and for any interest curtailment associated with standard servicing of the FHA or the VA Mortgage Loans and timeline variances relating to referral to the attorney, foreclosure initiation or conveyance to HUD;

(x)    any claim by a purchaser or prospective purchaser of a Mortgage Loan or group of Mortgage Loans, including relating to any note sale agreement and;

(xi)    any Environmental Liability.

The term "Environmental Liability" shall mean any Liability arising out of the existence of environmentally hazardous materials on any Mortgaged Property, including, without limitation, (x) any liability under or on account of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as the same may be amended from time to time, and/or any other federal or state environmental laws, and specifically including, without limitation, any liability relating to asbestos and asbestos containing materials, polychlorinated biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory," "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition, including the assertion of any lien thereunder, (y) claims brought by third parties for loss or damage incurred or sustained subsequent to the date hereof, and (z) liability with respect to any other matter affecting the Mortgaged Property within the jurisdiction of the federal Environmental Protection Agency or state environmental regulatory agencies pursuant to any state laws, and in the regulations adopted pursuant to any of said laws; provided, however, that the indemnity for Environmental Liability shall not be effective with respect to any liability caused by the Servicer that would otherwise be imposed by reason of the Servicer's willful misfeasance or bad faith in the performance of or failure to perform its duties hereunder.

(b)    Except as provided in Section 4.06, the Servicer shall defend and indemnify the Owner, its employees, officers, Affiliates, agents and representatives (the "Owner Indemnified Parties") against any and all Liability sustained by the Owner Indemnified Parties arising from the failure of the Servicer to perform its duties under this Agreement or the Servicer's breach of the terms of this Agreement.

(c)      As soon as is reasonably practicable after becoming aware of a claim for
indemnification under this Agreement involving a claim (or the commencement of any
proceeding or investigation) of a type described herein, the Party seeking indemnification
(for purposes of this Section 10.01 (c), the "Indemnified Party") shall give written notice
to the other Party (for purposes of this Section 10.01 (c), the "Indemnifying Party") of
such claim; provided, that the failure of the Indemnified Party to give such written notice
shall not relieve the Indemnifying Party of its obligations to indemnify except to the
extent (if any) that the Indemnifying Party shall have been prejudiced thereby.  The
Indemnifying party shall pay any undisputed claims within thirty (30) days.  If within
such 30-day period the Indemnifying Party agrees that it has an indemnification
obligation but objects that it is obligated to pay only a lesser amount, the Indemnified
Party shall be entitled to recover from the Indemnifying Party and the Indemnifying Party
shall promptly pay to the Indemnified Party the lesser amount, without prejudice to the
Indemnified Party's claim for the difference.

The obligations of the Indemnifying Party to indemnify any Indemnified
Party with respect to any Liability resulting from the assertion of any claim or the
commencement of any proceeding or investigation by any Person not a party hereto (a
"Third Party Claim"), shall be subject to the following additional terms and conditions:

(i)      The written notice required pursuant to Section 10.01(c) above by
the Indemnified Party to the Indemnifying Party regarding the Third Party
Claim shall contain reasonable details concerning such Third Party Claim.
The Indemnifying Party may, at its own expense, (x) participate in the
Indemnified Party's defense of any such Third Party Claim and (y) upon
written notice to the Indemnified Party and the Indemnifying Party
delivering to the Indemnified Party a written agreement that the
Indemnified Party is entitled to indemnification pursuant to this
Agreement for all Liability arising out of such Third Party Claim and that
the Indemnifying Party shall be liable for the entire amount of any
Liability resulting therefrom, at any time during the course of any such
Third Party Claim assume the defense thereof; provided, that (a) the
Indemnifying Party shall provide written evidence reasonably satisfactory
to the Indemnified Party demonstrating that the Indemnifying Party has
sufficient financial resources for purposes of such assumption of defense,
(b) the Indemnifying Party's counsel is reasonably satisfactory to the
Indemnified Party and (c) the Indemnifying Party shall thereafter consult
with the Indemnified Party upon the Indemnified Party's reasonable
request for such consultation from time to time with respect to such Third
Party Claim.  If the Indemnifying Party assumes such defense, the
Indemnified Party shall have the right (but not the duty) to participate in
the defense thereof and to employ counsel, at its own cost and expense,
separate from the counsel employed by the Indemnifying Party.  If,
however, the Indemnified Party reasonably determines in its judgment that
representation by the Indemnifying Party's counsel of both the

Indemnifying Party and the Indemnified Party would present such counsel with a conflict of interest, then such Indemnified Party may employ separate counsel to represent or defend it in any such Third Party Claim and the Indemnifying Party shall pay the reasonable fees and disbursements of such separate counsel. Whether or not the Indemnifying Party chooses to defend or contest any such Third Party Claim, upon the request of the Indemnified Party, the Indemnifying Party shall provide reasonable cooperation to the Indemnified Party with respect thereto.

(ii)    Any settlement or compromise made or caused to be made by the Indemnified Party or the Indemnifying Party, as the case may be, of any Third Party Claim shall also be binding upon the Indemnifying Party or the Indemnified Party, as the case may be, in the same manner as if a final judgment or decree had been entered by a court of competent jurisdiction in the amount of such settlement or compromise; provided, that (a) no obligation, restriction or Liability shall be imposed on the Indemnified Party as a result of such settlement without its prior written consent (i.e., the Indemnifying Party may not settle any Third Party Claim for other than the payment of money damages only, to be paid by the Indemnifying Party, without the Indemnified Party's prior written consent), and (b) the Indemnified Party shall not compromise or settle any Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(iii)    If the Indemnifying Party does not elect to assume the defense of any Third Party Claim, then any failure of the Indemnified Party to defend or to participate in the defense of any such Third Party Claim, or to cause the same to be done, shall not relieve the Indemnifying Party of its obligations hereunder.

(d)    As provided in Section 12.17 hereof, the foregoing indemnification obligations of Owner and Servicer shall survive termination of this Agreement or removal of some or all of the Mortgage Loans from the coverage of this Agreement, including removal due to an Agency Transfer.

Section 10.02. Limitation on Liability of Servicer and Others

Notwithstanding Section 10.01(b), the Servicer shall not incur any Liability to the Owner for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Servicer against any breach of warranties or representations made herein, or failure to perform its obligations in compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. The Servicer does not guarantee or warrant the collectability, in whole or in part, of any Mortgage Loan or REO Property or the results of the resolution or ultimate disposition of

any Mortgage Loan or REO Property. The Servicer Indemnified Parties may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Servicer may undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the Parties hereto. In such event, the Servicer shall be entitled to reimbursement from the Owner of the reasonable legal expenses and costs of such action.

Notwithstanding any other provision of this Agreement to the contrary, the Servicer's maximum cumulative Liability under this Agreement to Owner, whether in contract, tort or otherwise, shall in no event exceed the amount of the Servicing Compensation payable by Owner to Servicer during the twelve month period immediately preceding the month in which demand for indemnification and/or notice of breach of this Agreement is first provided by Owner to Servicer as provided herein.

Section 10.03. Operation of Indemnities

If any Person has made any indemnity payments to any other Person pursuant to this Article X and such other Person thereafter collects any of such amounts from others, such other Person will repay such amounts collected, together with any interest collected thereon. The provisions of this Article X shall survive any termination of this Agreement, the liquidation of any Mortgage Loan, or the transfer or assignment by the Owner to another Person of any Mortgage Loan or REO Property or any interest in any Mortgage Loan or REO Property.

Section 10.04. Assignment

The Servicer shall not assign this Agreement or delegate its duties hereunder or any portion thereof without the prior written consent of the Owner, which consent shall not be unreasonably withheld; provided that the Servicer may, without the consent of the Owner, assign this Agreement or delegate any duty to an Affiliate capable of performing the Servicer's obligations hereunder. It is acknowledged and agreed that Servicer's Affiliate, Executive Trustee Services, LLC, shall perform certain collection and recovery services hereunder on behalf of Servicer in connection with charged off Mortgage Loans.

Notwithstanding the foregoing, the Servicer or, as applicable, its Affiliates may also, without the consent of the Owner, retain third party contractors to perform certain servicing and loan administration functions, including without limitation, hazard insurance administration, tax payment and administration, flood certification and administration, collection services, REO services and similar functions; provided, that the retention of such contractors by Servicer or its Affiliate shall not limit the obligation of

the Servicer to service the Mortgage Loans and REO Properties pursuant to the terms and conditions of this Agreement.

The Owner shall not assign this Agreement or delegate its duties hereunder or any portion thereof without the prior written consent of the Servicer, which consent shall not be unreasonably withheld. For the avoidance of doubt, withholding consent shall not be considered unreasonable if Servicer requires a revision to the Pricing Exhibit as a condition of such consent.

### Section 10.05. Merger or Consolidation of the Servicer

Any Person into which the Servicer may be merged or consolidated, or any entity resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the Parties hereto, anything herein to the contrary notwithstanding.

### Section 10.06. Cooperation of Servicer with an Agency Transfer

(a)    The Servicer and the Owner agree that with respect to some or all of the Portfolio Loans, the Owner may effect Agency Transfers.

The Servicer shall reasonably cooperate with the Owner in connection with any Agency Transfer contemplated by the Owner pursuant to this Section 10.06, provided, however, that under no circumstances and in no event shall such Agency Transfer materially increase the Servicer's liabilities or obligations beyond those liabilities and obligations contained in this Agreement, or decrease the Servicer's profitability from that provided for herein, except as otherwise specifically set forth in this Section 10.06. Additionally, the Servicer does not service or participate in all of the Fannie Mae, Freddie Mac or Ginnie Mae programs or products including but not limited to bond programs and negotiated waivers.

(b)    In connection with any Agency Transfer the Owner shall provide the Servicer with an Agency Transfer Acknowledgment Agreement and a preliminary loan list in the form of Exhibit 9 at least thirty (30) Business Days prior to the closing date of such Agency Transfer. Owner shall provide Servicer with a complete and final list of loans related to any Agency Transfer at least five (5) Business Days prior to the scheduled closing date of the Agency Transfer. In addition, any Portfolio Loans regarding which Owner wishes to affect an Agency Transfer must be transferred to Servicer and live on Servicer's servicing system at least five (5) Business Days prior to the month-end prior to the first reporting period. If any Agency Transfer involves the establishment of a new Custodial Account or new Escrow Account, the Owner shall provide information on the naming of the accounts no less than thirty (30) Business Days in advance of the Agency Transfer's closing date.

(c)     Owner agrees to timely coordinate with the Servicer to effectuate each Agency Transfer. Owner agrees to deliver any agreement or other documents related to the Agency Transfer to the Servicer at least five (5) Business Days prior to the closing date for an Agency Transfer. The Servicer shall promptly review any Agency Transfer agreement and/or related documents, and provided that such agreement or documents contain servicing provisions substantially similar to those herein or is otherwise acceptable to the Servicer in its sole discretion, Servicer shall execute such agreement and/or related documents. The Servicer shall have no Liability to Owner and no obligation to cooperate with Owner if Owner fails to provide such notice or deliver such documents in a timely manner.

The Servicer may require an amendment to this Agreement and/or a new Pricing Exhibit for Agency Transfers. In addition, on each anniversary date of the Agency Transfer, if the Servicer determines that the monthly base servicing fee provided for in the Agency Transfer should be increased in a manner similar to the permitted increases in the Servicing Compensation permitted under this Agreement, Owner agrees to pay the difference between such increased fee and the servicing fee provided for in the Agency Transfer directly to Servicer.

# ARTICLE XI.
## TERMINATION

Section 11.01. Termination

(a)    This Agreement shall continue in full force and effect for an original term (the "Original Term") of one (1) year from the date hereof, unless terminated sooner by mutual agreement or otherwise in accordance with this Agreement. The term of this Agreement automatically shall be extended for successive one (1) year terms (each an "Extension Term") unless either Party delivers written notice of intent not to extend to the other Party not less than ninety (90) days before the end of, as applicable, (i) the Original Term or (ii) any Extension Term.

(b)    The Owner may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon ninety (90) days advance written notice to Servicer. If the count of active Mortgage Loans serviced under this agreement falls to less than fifty (50) for a period of sixty (60) consecutive days, this Agreement shall be deemed to have been terminated without cause by the Owner, subject to Servicer's consent, at Servicer's sole discretion, in writing to Owner. The Servicer shall be entitled to receive the Deboarding Fees and Termination Fees for any termination under this Section 11.01(b).

(c)    Servicer may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon one hundred twenty (120) days advance written notice to the Owner.

(d)    The Owner may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, with cause, upon the occurrence of a Servicer Event of Default as provided in Section 9.01.

(e)    The Servicer may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, with cause, upon the occurrence of an Owner Event of Default as provided in Section 8.01. The Servicer shall be entitled to receive the Deboarding Fees and Termination Fees for any termination under this Section 11.01(e).

(f)    The Servicer may terminate this Agreement upon the determination that its duties hereunder are no longer permissible under Applicable Law and such incapacity cannot be cured by the Servicer. Any such determination permitting the resignation of the Servicer shall be evidenced by an opinion of counsel to such effect delivered to the Owner.

Section 11.02. Transfer Procedures

(a)    In the event this Agreement is terminated in whole or in part, the Servicer agrees to reasonably cooperate with the Owner and with any party designated as the

successor servicer in transferring the servicing to such successor servicer in accordance with Accepted Servicing Practices, including sending the transferor's notice of transfer of servicing or "goodbye letter" in accordance with the requirements of Applicable Law. Owner agrees to cooperate with Servicer to provide any required information necessary to complete an orderly servicing transfer which shall include a loan schedule in the form of Exhibit 9 no less than twenty (20) days prior to the Termination Date.

Within five (5) Business days following the date (the "Termination Date") on which this Agreement is terminated pursuant to Section 11.01, the Servicer shall deliver to the successor servicer any and all Mortgage Files in the possession of the Servicer. The Servicer shall provide the successor servicer with the net funds held in the Escrow Account and suspense funds related to the Mortgage Loans within five (5) Business Days following the Termination Date.

If Servicer is named as the mortgagee of record, Servicer may prepare certain documents which are necessary to effect the transfer of servicing from Servicer, including but not limited to the transfer and endorsement or assignment of the related Mortgage Loans and related documents at Owner's request and expense. The Servicer, at the Owner's expense, shall cause MERS to designate on the MERS system the Owner or its designee as the beneficial holder with respect to such Mortgage Loan. All other reasonable out-of-pocket expenses incurred in connection with any such transfer shall be borne by Owner, except in the case of termination of this Agreement without cause by Servicer pursuant to Section 11.01(c) or termination with cause by Owner pursuant to Section 11.01(d), in which cases such other reasonable out-of-pocket costs shall be borne by Servicer. In addition, in the event of termination of this Agreement without cause by Servicer pursuant to Section 11.01(c) or termination with cause by Owner pursuant to Section 11.01(d), no Deboarding Fees or Termination Fees will be payable by Owner.

On the Termination Date, the Servicer shall be entitled to be reimbursed from funds in the Custodial Account for all actual and estimated un-reimbursed Servicing Advances, unpaid Servicing Compensation, Owner Expenses, and any other amounts owed to Servicer under this Agreement, including, if applicable, the Deboarding Fees and Termination Fees. However, if the funds on deposit in the Custodial Account five (5) Business Days prior to the Termination Date are insufficient to pay Servicer such amounts due, Owner shall pay to Servicer an amount that, when combined with the amount on deposit in the Custodial Account, is sufficient to cover the amount due to Servicer. Such amount will be paid to the Servicer in advance of the Termination Date. If such funds are not received by the Termination Date, Servicer shall be entitled to interest pursuant to Section 4.03. Any funds related to the transferred Mortgage Loans held by Servicer in the Custodial Account after reimbursement to Servicer of the foregoing amounts will be remitted to Owner on the next Portfolio Loan Remittance Date following the Termination Date. In addition, the Owner shall cause the Servicer to be reimbursed within five (5) Business Days of request for any for any trailing expenses representing Servicing Advances and Owner Expenses for which invoices are received by the Servicer after the Termination Date.

Servicer agrees to cooperate with Owner on the transfer out of REO Properties. Owner agrees to pay the Servicer's cost to cancel the title preparation and the cost to dismiss the closing agent as indicated on the Pricing Exhibit. Such costs are subject to change. In addition, Owner agrees to reimburse Servicer for any costs associated with the preparation of any deeds.

Except as otherwise provided in this Agreement, on the related Termination Date for each related Mortgage Loan, this Agreement, except for the provisions described in Section 12.17 hereof which shall survive the related Termination Date, shall terminate with respect to such Mortgage Loan. For the avoidance of doubt, as provided in Section 12.17 hereof, the obligation of the Owner to pay any applicable Deboarding Fees, Termination Fees and out-of-pocket transfer expenses shall survive removal of some or all of the Mortgage Loans from the coverage of this Agreement, including removal due to an Agency Transfer.

(b)    If the Owner does not designate a successor servicer and transfer out the servicing of the Mortgage Loans and REO Properties by the Termination Date, Servicer shall be entitled to the following additional remedies (in addition in all other rights and remedies to which Servicer is entitled under this Agreement or in law or equity):

(i)    The Servicer shall not be required to make any remittances normally required on the Portfolio Loan Remittance Date after the Termination Date until such time Owner has transferred out the servicing of the Mortgage Loans and REO Properties Such amounts shall remain in the Custodial Account pursuant to Section 2.04. For the avoidance of doubt, the Servicer shall have no obligation to pay Owner interest on such amounts.

(ii)    The Owner shall pay the Servicer the following additional fees calculated as of the applicable Determination Date, in addition to the fees on the Pricing Exhibit, for each Mortgage Loan and REO Property for each additional month beyond the Termination Date the Servicer must service the Mortgage Loans and REO Properties: (x) First month beyond the Termination Date: $5 per Mortgage Loan and REO Property, (y) Second month beyond the Termination Date: $10 per Mortgage Loan and REO Property, and (z) Third and each additional month thereafter beyond the Termination Date: $20 per Mortgage Loan and REO Property, with a minimum of $50,000 in the aggregate due and payable in each such third month and each month thereafter.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

Section 12.01. Notices

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the mailing thereof, sent by registered or certified mail, return receipt requested, or nationally recognized overnight delivery service:

(a)    If to Owner:

Green Planet Servicing, LLC
10 Research Parkway , Suite 2
Wallingford, CT  06492
Attention:  Sandra Jarish

With a Copy to:

Planet Financial Group, LLC
2100 Huntington Drive, N.  Suite A
Algonquin, IL  60102
Attention:  Senior Counsel


(b)    If to Servicer:

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention: Chief Servicing Officer


With a Copy to:

GMAC Mortgage, LLC
3451 Hammond Ave.
Waterloo, IA  50702-5345
Attention: General Manager


With a Copy to:

GMAC Mortgage, LLC
1100 Virginia Drive

61

Fort Washington, PA 19034
Attention: General Counsel

### Section 12.02. Waivers

The Servicer or the Owner may, by written notice to the other, waive compliance with any of the terms, conditions or covenants required to be complied with by the other hereunder; and waive or modify performance of any of the obligations of the other hereunder. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

### Section 12.03. Entire Agreement: Amendment

This Agreement, including all documents and exhibits incorporated by reference herein, constitutes the entire agreement between the Parties with respect to servicing of the Mortgage Loans. This Agreement may be amended and any provision hereof waived, but, only in writing signed by the Party against whom enforcement of such amendment or waiver is sought.

### Section 12.04. Counterparts: Binding Effect

This Agreement may be executed in one or more counterparts and by the different Parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. This Agreement shall inure to the benefit of and be binding upon the Servicer and the Owner and their respective permitted successors and assigns.

### Section 12.05. No-Hire

During the term of this Agreement and for a period of 24 months following any termination of this Agreement, Owner shall not solicit for hire, or provide any information that would permit Owner's affiliates to solicit for hire, any employees of Servicer. It is acknowledged that advertising positions generally available to the public, such as positions posted online, advertised in newspapers, or similarly made available to the general public, shall not constitute solicitation for purposes of the foregoing.

Additionally, during the term of this Agreement and for a period of 24 months following any termination of this Agreement, regardless of any lack of solicitation by Owner, Owner shall not hire all or substantially all of any team or functional group of employees of Servicer, including but not limited to any collections or loss mitigation team assigned to service the Mortgage Loans under this Agreement.

### Section 12.06. Headings

Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

Section 12.07. Governing Law

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE
WITH THE LAWS OF THE STATE OF ILLINOIS AND THE OBLIGATIONS,
RIGHTS AND REMEDIES HEREUNDER SHALL BE DETERMINED IN
ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF ILLINOIS,
WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

Section 12.08. Relationship of Parties

Nothing contained herein shall be deemed or construed to create a
partnership or joint venture, association, franchise or other form of business or
relationship between the Parties. The duties and responsibilities of the Servicer shall be
rendered by it as an independent contractor and not as an agent of the Owner. The
Servicer shall have full control of all of its acts, doings, and proceedings relating to or
required in connection with the discharge of its duties and responsibilities under this
Agreement. Nothing contained in this Agreement shall be construed as making a party
hereto liable for the debts or obligations of the other party, except only as expressly
provided herein.

Section 12.09. Severability of Provisions

If any one or more of the covenants, agreements, provisions or terms of
this Agreement shall be held invalid for any reason whatsoever, then such covenants,
agreements, provisions or terms shall be deemed severable from the remainder of this
Agreement and shall in no way affect the validity or enforceability of the other provisions
of this Agreement.

Section 12.10. Recordation of Assignments of Mortgage

If Assignments of Mortgage are required to be recorded, such recordation
shall be effected by the Owner or the Owner's designee at its expense.

Section 12.11. Exhibits

The exhibits to this Agreement are hereby incorporated and made a part
hereof and are integral parts of this Agreement. If there are any discrepancies between
the Agreement and any of the Exhibits, the Agreement shall prevail.

Section 12.12. Owner's Financials

The Owner shall deliver to the Servicer, on or before March 31st each year
beginning March 31, 20[XX] (or within 60 days of the end of Owner's fiscal year, if
Owner's fiscal year does not correspond to the calendar year), audited financial

statements of Owner covering the year ended the previous December 31 (or such other period constituting Owner's fiscal year).

Section 12.13. No Solicitation

Unless in accordance with Section 2.03 for the purposes of loss mitigation, from and after the date hereof, the Servicer shall not, nor shall it take any action that would permit any Affiliate of Servicer, to solicit the Mortgagors for purposes of prepayment or refinance of the Mortgage Loans, without the written consent of the Owner, except as otherwise provided herein. Nothing in this Section 12.13 shall prohibit the Servicer from generalized advertising not targeted exclusively to the Mortgagors, including on its website, monthly account statements, or VRU (voice response unit), mortgage leads purchased from third parties, recorded communications, or otherwise engaging in a program directed to the general public at large to encourage or recommend mortgage loan products and other products and services provided by the Servicer or such Affiliate, or from taking applications for refinance from Mortgagors as a result thereof.

Section 12.14. Force Majeure

A Party will not be responsible for delays or failures in performance of its obligations under this Agreement resulting from acts beyond its reasonable control such as acts of God, strikes, riots, acts of war, terrorism, earthquakes or other similar events. A Party excused from performance pursuant to this section shall exercise reasonable efforts to continue to perform its obligations hereunder and shall thereafter continue with reasonable due diligence and good faith to remedy its inability to so perform, except that nothing herein shall obligate either Party to settle a strike or labor dispute when it does not wish to do so.

Section 12.15. Waiver of Trial by Jury

THE SERVICER AND THE OWNER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.16. Limitation of Damages

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PARTIES AGREE THAT NEITHER OWNER OR SERVICER SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, WHETHER IN CONTRACT, TORT OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE; PROVIDED, HOWEVER, THAT SUCH LIMITATION SHALL NOT BE APPLICABLE WITH RESPECT TO INDEMNIFICATION OBLIGATIONS FOR THIRD PARTY CLAIMS MADE AGAINST A PARTY.

Section 12.17. <u>Survival</u>

In addition to any provisions in this Agreement, which by their express terms shall survive termination, the following provisions shall survive termination of this Agreement or removal of some or all of the loans from the coverage of this Agreement due transfer to a successor servicer, or otherwise: Sections 3.04 (Reimbursement of Servicing Advances), 4.06 (Losses and Expenses), 5.04 (Confidentiality of Information), Article VI (Representations, Warranties and Covenants of Owner), Article VII (Representations, Warranties and Covenants of Servicer), 10.01 (Indemnification), 10.02 (Limitation on Liability of Servicer and Others), 10.03 (Operation of Indemnities), 10.06 (Agency Transfers),11.01 (Termination), 11.02 (Transfer Procedures), Sections 12.01 (Notices), 12.02 (Waivers), 12.03 (Entire Agreement; Amendment), 12.04 (Counterparts; Binding Effect), 12.05 (No-Hire), 12.06 (Headings), 12.07 (Governing Law), 12.08 (Relationship of Parties), 12.09 (Severability of Provisions), 12.13 (No Solicitation), 12.14 (Force Majeure), 12.15 (Waiver of Trial by Jury), 12.16 (Limitation of Damages) and this Section 12.17 (Survival).

[SIGNATURES APPEAR ON NEXT PAGE]

IN WITNESS WHEREOF, the Parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

GREEN PLANET SERVICING, LLC
(Owner)

By: _____

Name:    Sandra Jarish

Title:    President


GMAC MORTGAGE, LLC
(Servicer)

By: _____

Name:    CURTIS J. SCHARES

Title:    VICE PRESIDENT


66

SERVICING AGREEMENT EXHIBITS
by and between


GREEN PLANET SERVICING, LLC
Owner


and


GMAC MORTGAGE, LLC
Servicer


Dated as of October 1, 2011


i

## EXHIBITS TABLE OF CONTENTS

EXHIBIT I.

PRICING EXHIBIT

EXHIBIT II.

MORTGAGE LOAN DOCUMENTS

EXHIBIT III.

ELIGIBILITY CRITERIA

EXHIBIT IV.

APPROVAL MATRIX

EXHIBIT V.

FORM OF LIMITED POWER OF ATTORNEY

EXHIBIT VI.

TRANSFER INSTRUCTIONS

EXHIBIT VII.

FORM OF AGENCY TRANSFER ACKNOWLEDGMENT AGREEMENT

EXHIBIT VIII.

FORM OF ADDITIONAL CUSTODIAL ACCOUNT REQUEST

EXHIBIT IX.

FORM OF SALES, DELIVERY, TRANSFER FILE

# EXHIBIT I.
## PRICING EXHIBIT

(a)    Portfolio Loans and Agency Loans

| # | Family | Name | Description | Price | Comments |
|---|--------|------|-------------|-------|----------|
| A | Boarding | | | | |
| A1 | A. Boarding | Boarding - Current | < 90 Days Delinquent | $10.00 | |
| A2 | A. Boarding | Boarding - Delinquent | ≥ 90 Days Delinquent and/or Foreclosure | $60.00 | |
| A3 | A. Boarding | Boarding - Transfer Remediation | Per hour fee | $50.00 | |
| B, C | Monthly | | | | |
| B1.1 | B. Monthly Base | Monthly - Base: Portfolio Loans | Applies to all Portfolio Loans that are not HELOC loans | $5.50 | Moderate Collections |
| B1.2 | B. Monthly Base | Monthly - Base: Agency Loans | Applies to all Agency Loans | $5.50 | Moderate Collections |
| B2 | B. Monthly Base | Monthly - Traditional ARM | Assessed in addition to the Monthly - Base | $0.50 | |
| B3 | B. Monthly Base | Monthly - Non-Traditional ARM | Assessed in addition to the Monthly - Base | $1.00 | |
| C1 | C. Monthly Default | Monthly - 30 Days Delinquent | ≥ 30 Days Delinquent | $25.00 | |
| C2 | C. Monthly Default | Monthly - 60 Days Delinquent | ≥ 60 Days Delinquent | $40.00 | |
| C3 | C. Monthly Default | Monthly - 90 Days Delinquent | ≥ 90 Days Delinquent | $55.00 | |
| C4 | C. Monthly Default | Monthly - Bankruptcy | Assessed for Bankruptcy status | $70.00 | |
| C5 | C. Monthly Default | Monthly - Foreclosure | Assessed beginning with the month of referral to attorney | $70.00 | |
| D | Loss Mitigation Incentives | | | | |
| D1 | D. Loss Mitigation Incentives | Incentive - Repayment | Percent of UPB Minimum of $1,000 Maximum of $2,500 | $500.00 | |
| D2 | D. Loss Mitigation Incentives | Incentive - Reinstatement | Percent of UPB Minimum of $1,000 Maximum of $2,500 | $500.00 | |
| D3 | D. Loss Mitigation Incentives | Incentive - Loan Modification | Percent of UPB Minimum of $1,000 Maximum of $2,500 | $500.00 | |
| D4 | D. Loss Mitigation Incentives | Incentive - Redemption | Percent of UPB Minimum of $1,000 Maximum of $2,500 | $500.00 | |
| D5 | D. Loss Mitigation Incentives | Incentive - Short Sale | Percent of Liquidation Proceeds Minimum of $1,000 Maximum of $2,500 | $500.00 | |
| D6 | D. Loss Mitigation Incentives | Incentive - Deed-in-Lieu | Percent of UPB Minimum of $1,000 Maximum of $2,500 | $500.00 | |
| E | REO | | | | |

Exhibit I

1

SERVICING AGREEMENT BY AND BETWEEN                                              OCTOBER 1ST, 2011
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC

| # | Family | Name | Description | Price | Comments |
|---|--------|------|-------------|-------|----------|
| E1 | E. REO Fees | REO – Disposition Incentive | Percent of Sales Price Minimum of $1,000 Maximum of $2,500 | 0.50% | |
| E2 | E. REO Fees | REO – Carrying | Per month fee assessed after month 10 of REO status | 300.00 | |
| F | Other Default | | | | |
| F1 | F. Other Default | Other Default – Title Remediation | Per occurrence | $500.00 | |
| F2 | F. Other Default | Other Default – FHA/VA Conveyance | Per claim | $250.00 | |
| F3 | F. Other Default | Other Default – Recovery Collection | Percentage of recovered amount | 35.00% | |
| G, H | Deboarding and Termination | | | | |
| G1 | G. Deboarding | Deboarding – Transfer | A flat fee is assessed per transfer in addition to a per loan fee | $50.00 | |
| G2 | G. Deboarding | Deboarding – Tier 1: ≤100 Loans | Per loan, tier based on transfer loan count | $8.00 | |
| G3 | G. Deboarding | Deboarding – Tier 2: 101 to 200 Loans | Per loan, tier based on transfer loan count | $7.00 | |
| G4 | G. Deboarding | Deboarding – Tier 3: >200 Loans | Per loan, tier based on transfer loan count | $5.00 | |
| G5 | G. Deboarding | Deboarding – Tier 4: Automated Transfer | Per loan, tier applied to automated transfers. Fee based on requirements of the transfer. If not otherwise addressed, this amount will apply. | $5.00 | |
| H2.1 | H. Termination | Contract Termination – Tiered: Year 1 | Per loan | $20.00 | |
| H2.2 | H. Termination | Contract Termination – Tiered: Year 2 | Per loan | $15.00 | |
| H2.3 | H. Termination | Contract Termination – Tiered: Year 3 | Per loan | $10.00 | |
| H2.4 | H. Termination | Contract Termination – Tiered: Year 4+ | Per loan | $5.00 | |
| I - K | Other Program | | | | |
| I1 | I. Minimum | Monthly – Base Minimum | Applies to the Monthly Fee - Base | $5,000.00 | |
| K1 | K. Other | Repurchase Processing | Per occurrence | $0.00 | |

| Component | Party |
|-----------|-------|
| Custodial Account Benefit (Principal and Interest Float) | Servicer |
| Escrow Account Benefit (Escrow Float) and Interest on Escrow Expense | Servicer |
| Late Charges | Split - Servicer 50% |
| Servicing Activity Fees | Servicer |
| Customer Prepayment Fees and Line Termination Fees | Owner |
| Home Affordable Modification Program Fees | Servicer |
| Agency Traditional Loss Mitigation Incentives | Owner |

Exhibit I                                                    2

# EXHIBIT II.
## MORTGAGE LOAN DOCUMENTS

(a)      The following documents shall constitute the Mortgage Loan Documents with respect to each Mortgage Loan:

(i)      the original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____, without recourse" and signed in the name of the last endorsee (the "Last Endorsee") by an authorized officer.  To the extent that there is no room on the face of the Mortgage Notes for endorsements, the endorsement may be contained on an allonge, if state law so allows and the Custodian is so advised by the loan seller that state law so allows.  If the Mortgage Loan was acquired by the loan seller in a merger, the endorsement must be by "[Last Endorsee], successor by merger to [name of predecessor]".  If the Mortgage Loan was acquired or originated by the Last Endorsee while doing business under another name, the endorsement must be by "[Last Endorsee], formerly known as [previous name]";

(ii)      the original of any guarantee executed in connection with the Mortgage Note;

(iii)      the original Mortgage with evidence of recording thereon.  If in connection with any Mortgage Loan, the loan seller cannot deliver or cause to be delivered the original Mortgage with evidence of recording thereon on or prior to the Transfer Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the loan seller shall deliver or cause to be delivered to the Custodian, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an officer's certificate of the loan seller (or certified by the title company, escrow agent, or closing attorney) stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the loan seller; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(iv)      the originals of all assumption, modification, consolidation or extension agreements, if any, with evidence of recording thereon;

Exhibit II                                    1

(v)      the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Assignment of Mortgage must be duly recorded only if recordation is either necessary under applicable law or commonly required by private institutional mortgage investors in the area where the Mortgaged Property is located or on direction of the Owner as provided in this Agreement. If the Assignment of Mortgage is to be recorded, the Mortgage shall be assigned to the Owner or MERS or per the Owner's instructions. If the Assignment of Mortgage is not to be recorded, the Assignment of Mortgage shall be delivered in blank. If the Mortgage Loan was acquired by the loan seller in a merger, the Assignment of Mortgage must be made by "[Seller], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the loan seller while doing business under another name, the Assignment of Mortgage must be by "[Seller], formerly known as [previous name]";

(vi)      the originals of all intervening assignments of mortgage (if any) evidencing a complete chain of assignment from the originator to the Last Endorsee with evidence of recording thereon, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of mortgage, the loan seller shall deliver or cause to be delivered to the Custodian, a photocopy of such intervening assignment, together with (i) in the case of a delay caused by the public recording office, an Officers Certificate of the loan seller (or certified by the title company, escrow agent, or closing attorney) stating that such intervening assignment of mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded intervening assignment of mortgage or a copy of such intervening assignment of mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage will be promptly delivered to the Custodian upon receipt thereof by the loan seller; or (ii) in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(vii)      The original mortgagee policy of title insurance or, in the event such original title policy is unavailable, a certified true copy of the related policy binder or commitment for title certified to be true and complete by the title insurance company;

Exhibit II                                    2

(viii)    original powers of attorney, if applicable, or, if in connection with any Mortgage Loan, the loan seller cannot deliver or cause to be delivered the original power of attorney with evidence of recording thereon, if applicable, on or prior to the Transfer Date because of a delay caused by the public recording office, the loan seller shall deliver or cause to be delivered to the Custodian, a photocopy of such power of attorney, together with an officer's certificate of the loan seller (or certified by the title company, escrow agent, or closing attorney) stating that such power of attorney has been dispatched to the appropriate public recording office for recordation and that the original recorded power of attorney or a copy of such power of attorney certified by such public recording office to be a true and complete copy of the original recorded power of attorney will be promptly delivered to the Custodian upon receipt thereof by the loan seller; and

(ix)    security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage.

(b)    The following documents, together with the Mortgage Loan Documents, shall constitute the Mortgage File with respect to each Mortgage Loan:

(i)    The original hazard insurance policy and, if required by law, flood insurance policy.

(ii)    Residential loan application.

(iii)    Mortgage Loan closing statement.

(iv)    Verification of employment and income except for Mortgage Loans originated under a Limited Documentation Program.

(v)    verification of acceptable evidence of source and amount of downpayment.

(vi)    Credit report on the Mortgagor.

(vii)    Residential appraisal report, if available.

(viii)    Photograph of the Mortgaged Property.

(ix)    Survey of the Mortgaged Property, if any.

(x)    Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

Exhibit II                                3

(xi)    All required disclosure statements.

(xii)    If available, termite report, structural engineer's report, water potability and septic certification.

(xiii)    Sales contract, if applicable.

(xiv)    Tax receipts, insurance premium receipts, ledger sheets, payment history from date of origination, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers and records which are customarily contained in a mortgage loan file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

(xv)    Amortization schedule, if applicable.

Exhibit II                              4

# EXHIBIT III.
## ELIGIBILITY CRITERIA

Servicer agrees to subservice Mortgage Loans possessing the following characteristics:

All Mortgage Loans shall be prime, alt-a and subprime, fixed or adjustable rate, first lien and closed-end subordinate lien residential mortgage loans and home equity lines of credit including, without limitation, condominium developments, planned unit developments and cooperatives. Provided that, in no case will a loan delivered to Servicer be:

(i)     A loan regarding which four (4) or more years have passed since its charge off date, unless funds have been received since the charge off date;

(ii)    a loan with single-premium credit life;

(iii)   a loan subject to a buy down agreement subject to future value calculations unless Owner fully funds the buydown amount prior to transfer;

(iv)    a bond or housing authority loan;

(v)     a loan secured by a manufactured home not affixed to real property;

(vi)    a construction loan or a loan which allows for construction to permanent financing in which the construction funds have not been fully disbursed;

(vii)   a loan that has an increased interest rate upon default unless the Owner agrees the Servicer is not required to increase the interest rate upon default;

(viii)  a payment option Adjustable Rate Mortgage Loan;

(ix)    an Adjustable Rate Mortgage Loan with a Mortgage Note that GMACM is not currently servicing or has explicitly advised that it will not service;

(x)     a HELOC Loan permitting borrowers to access draws or additional borrowing using a credit card or debit card, with a Mortgage Note that GMACM is not currently servicing, or that GMACM has explicitly advised that it will not service;

(xi)    a HOEPA Loan, a higher-priced mortgage loan (HPML) or any loan subject to any similar law or regulation addressing high cost or predatory lending;

(xii)   a loan with an unsecured promissory note or an invalid security instrument;

(xiii)  for recovery purposes only, an unsecured 2nd lien located in CA, AZ, TX or OK (or such other states as may be added from time to time (please check with GMACM for a current listing)) that has been released as a result of a foreclosure of the senior lien;

(xiv)   for recovery purposes only, a loan in an active bankruptcy;

Exhibit III                                    1

(xv)    any loan regarding which any Mortgagor is a party to litigation, including class action litigation (but excluding litigation constituting routine foreclosure actions and bankruptcy filings, which may be delivered by the Owner), against the Owner, any prior servicer, any Person connected with the origination of such Mortgage Loan, or other litigation related to or arising from such Mortgage Loan;

(xvi)    a commercial loan; and

(xvii)    a loan requiring the servicer to be an approved Federal Home Loan Bank servicer.

Exhibit III                    2

SERVICING AGREEMENT BY AND BETWEEN                                    OCTOBER 1ST, 2011
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC

# EXHIBIT IV.
## APPROVAL MATRIX

[To be inserted]

Exhibit IV                              1

## EXHIBIT V.
### FORM OF LIMITED POWER OF ATTORNEY

### LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that [Client Name] ("Company"), having its principal place of business at [Address], hereby constitutes and appoints GMAC Mortgage, LLC ("GMACM"), a Delaware limited liability company, having offices at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034, by and through its officers, its true and lawful Attorney-in-Fact, in its name, place and stead and for its benefit, in connection with mortgage loans serviced by GMACM on behalf of Company pursuant to that certain Servicing Agreement, dated as of [Date] between GMACM and Company (the "Servicing Agreement") for the purpose of performing all acts and executing all documents in the name of Company necessary and incidental to the servicing of said loans, including but not limited to:

1. Foreclosing delinquent loans or discontinuing such foreclosure proceedings, including, but not limited to, the execution of notices of default, notices of sale, assignments of bids, and assignments of deficiency judgments, and appearing in the prosecuting bankruptcy proceedings;

2. Selling, transferring or otherwise disposing of real property acquired through foreclosure or otherwise, including, but not limited to, executing all contracts, agreements, deeds, assignments or other instruments necessary to effect such sale, transfer or disposition, and receiving proceeds and endorsing checks made payable to the order of Company from such proceedings;

3. Preparing, executing, and delivering satisfactions, cancellations, discharges, list note instruments, or full or partial releases of lien, subordination agreements, modification agreements, assumption agreements, substitutions of trustees under deeds of trust, and UCC-3 Continuation Statements;

4. Endorsing promissory notes and executing assignments of mortgages, deeds of trust, deeds to secure debt, and other security instruments securing said promissory notes in connection with loans for which GMACM has received full payment of all outstanding amounts due on behalf of Company;

5. Endorsing insurance proceeds checks and mortgage payment checks to the order of Company;

6. Any and all such other acts of any kind and nature whatsoever that are necessary and prudent to service the loans.

Exhibit V                                                    2

Company further grants to GMACM full power and authority to do and perform all acts necessary for GMACM to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as Company might or could do with the same validity as if all and every such act had been herein particularly stated, expressed and especially provided for, and hereby ratifies and confirms all that GMACM shall lawfully do by virtue of the powers and authority granted and contemplated hereby. This Limited Power or Attorney shall remain in full force and effect until revoked or terminated by Company.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney, and may be satisfied that this Limited Power of Attorney has not been revoked by Company.

[CLIENT NAME]
(Company)

By:     _____

Name:   _____

Title:  _____

STATE OF [State]
COUNTY OF [County]

On this [DD] day of [Month], before me, the undersigned, a Notary Public in and for said county and state, personally appeared [Company Officer], personally known to me to be the person who executed the within instrument as [Officer's Title], on the behalf of the corporation therein named, and he or she acknowledged that said instrument is the act and deed of said corporation, and that he or she, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

WITNESS by hand and official seal.

_____
Notary Public

                                    [Seal]

Exhibit V                          3

# EXHIBIT VI.
## TRANSFER INSTRUCTIONS

[To be inserted]

Exhibit VI                    1

# EXHIBIT VII.

## FORM OF AGENCY TRANSFER ACKNOWLEDGMENT AGREEMENT

Reference is made to that certain Servicing Agreement, dated as of [MONTH, DD], 2010 (the "Agreement"), between [CLIENT] ("Owner"), and GMAC Mortgage, LLC ("Servicer"). On this [DD] day of [MONTH], 2010, the Owner and the Servicer hereby agree that the Owner will effectuate an Agency Transfer. This document serves as notice to the Servicer pursuant to Section 10.06 to perform the servicing responsibilities related to the Mortgage loans identified on Exhibit A hereto (the "Mortgage Loan Schedule") as Agency Loans in accordance with the Agreement.

Effective Date: _____   Agency: _____

Seller/Servicer or Lender Number:   _____

The Owner and Servicer agree to cooperate to complete any necessary forms or notices to the applicable Agency. The Owner agrees to provide information related to the loans in Exhibit A to the servicer in the electronic "Sales, Delivery, Transfer File", a form of which is provided in Exhibit 9, as may be updated from time to time.

The Owner and Servicer agree to the Pricing Exhibit included as Schedule 1 for Agency Loans.

IN WITNESS WHEREOF, Owner and Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

[CLIENT NAME]
(Owner)

By:      _____

Name:   _____

Title:   _____

GMAC MORTGAGE, LLC
(Servicer)

By:      _____

Name:   _____

Title:   _____

Exhibit VII                                    I

# EXHIBIT VIII.
## FORM OF ADDITIONAL CUSTODIAL ACCOUNT REQUEST

Reference is made to that certain Servicing Agreement, dated as of [MONTH DD], 2010 (the "Agreement"), between [CLIENT] ("Owner"), and GMAC Mortgage, LLC ("Servicer"). On this [DD] day of [MONTH], 2010, the Owner and the Servicer hereby agree that the Owner requests an additional Custodial Account to be opened.

Mortgage Loans in the following investor code shall be subject to the new Custodial Account.

Investor Code: _____
Custodial Account Title: _____
Effective Date: _____

IN WITNESS WHEREOF, Owner and Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

[CLIENT NAME]
(Owner)

By:    _____

Name:  _____

Title: _____

GMAC MORTGAGE, LLC
(Servicer)

By:    _____

Name:  _____

Title: _____

Exhibit VIII                                    1

SERVICING AGREEMENT BY AND BETWEEN                                OCTOBER 1ST, 2011
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC

# EXHIBIT IX.
## FORM OF SALES, DELIVERY, TRANSFER FILE

| Column | Field Name | Formatting | Description |
|---|---|---|---|
| A | GMACM Loan Number | 0000000000 | from GMAC Daily File |
| B | Client Loan # | 0000000000 | your loan number |
| C | UPB Balance Sold | 0.00 | See Table below |
| D | Interest Pd To Date | mm/dd/yy | |
| E | Service Fee Rate | 0.0000 | if applicable 0.00 unless sold to FNMA or FHLMC |
| F | Net Pass Thru Rate | 0.0000 | if applicable Note Rate minus Service Fee (H - E) |
| G | Investor Ln# | 0000000000 | New Servicer's loan number |
| H | Note Rate | 0.000 | Current Interest Rate |
| I | Client Name | | your company name |
| J | Pool ID/Commitment # | | if available, not required |
| K | Sale Type | Actual or Scheduled | See Table below |
| L | Date Loan Sold | mm/dd/yy | |
| M | Service Release Date | mm/dd/yy | If Actual = last day GMAC will service loan, If Scheduled = Column Q |
| N | Purchaser | | Company Sold To |
| O | New Servicer Name | | "Servicer" may not be the same as Column N |
| P | New Servicer Loan # | 0000000000 | if available, not required |
| Q | 1st payment due new servicer | mm/dd/yy | |
| R | Borrower Last Name | | |
| S | Borrower First Name | | |
| T | Escrow Balance Net Funded | 0.00 | If Actual = n/a, If Scheduled = amount removed from Net Funding |
| U | Remit Escrow funds | "To Client" "To New Servicer" "No Escrow" | See Table below |
| V | Lien Position | 1 = 1st 2 = 2nd | |
| W | Buydown Funds Net Funded | 0.00 | If Actual = n/a, If Scheduled = amount removed from Net Funding |

Exhibit IX                                          1

| Column | Field Name | Formatting | Description |
|--------|-----------|-----------|-------------|
| X | Remit Buydown funds | "To Client" "To New Servicer" "No Buydown" | See Table below |

Legend

| Industry Terms | GMACM Terminology | Principal Balance @ Transfer | Escrow Funds @ Transfer | Buydown Funds @ Transfer |
|---|---|---|---|---|
| | Column K | Column C | Column U | Column X |
| Instant Scheduled Flow Daily | Scheduled | New servicer services based on scheduled UPB and due date | Sent to client (netted at funding) | Sent to client (netted at funding) |
| Bulk Actual Interim | Actual | New servicer services as of cut-off data provided by GMACM | Sent to new servicer | Sent to new servicer |

Exhibit IX                    2

# Exhibit B

# Transfer Instructions

# Transfer Instructions
## _Table of Contents_

### Contents

Critical Dates ................................................................................................................... 4

Notification of Transfer ................................................................................................... 6

Items Required Within 3 Days of Transfer Date ............................................................ 7

    1.   Tax Information ......................................................................................... 7

    2.   Hazard and Flood Insurance Information .................................................. 7

    3.   Credit, Life and Disability (Optional) Insurance Information ......................... 8

    4.   Special Mortgage Loans (ARMs, GPMs, Buy Downs, Balloons, State housing Agencies, etc.) 8

    5.   Escrow Analysis Information ..................................................................... 8

    6.   Collections ................................................................................................ 8

    7.   Foreclosures ............................................................................................. 8

    8.   Bankruptcies ............................................................................................ 8

    9.   Eviction .................................................................................................... 9

    10.   REO ......................................................................................................... 9

Items Required Within  1 Business Day after the Transfer Date ..................................... 9

    1.   Final  File for Data Conversion (as of Transfer Date) .................................. 9

    2.   Final Trial Balance Report ......................................................................... 9

    3.   Escrow and Suspense Funds ..................................................................... 9

    4.   Principal and Interest Funds and Reports: ............................................... 10

    5.   Loan Servicing Files (Imaged Files) and Other Working Files (not yet imaged) ............ 10

    6.   Histories ................................................................................................. 11

    7.   Credit Processing (Modification, Assumptions, Subordinations, etc.) ............. 11

    8.   Hazard and Flood Insurance .................................................................... 11

    9.   Payments/Payoffs ................................................................................... 11

    10.   Returned Items ....................................................................................... 12

Documents, Correspondence, etc. after the Transfer Date ............................................ 13

    Wire Instructions: .................................................................................................. 13

    Contacts ................................................................................................................ 13

Exhibits ........................................................................................................................ 15
   Exhibit B- Payment/Payoff Transmittal.................................................................. 16
   Exhibit C- Sample Goodbye Letter......................................................................... 17

# Transfer Instructions

**Green Planet Servicing, LLC**
MERS ID: 1006543
HUD ID: 27128-0000-9
VA ID: 519998 01
GNMA ISSUER #: 4135

In order to coordinate a smooth and efficient servicing transfer, the following items are to be received by Green Planet Servicing, LLC (GPS) within the stated time frames. Please refer to the applicable pages of the attached procedures for complete description and instructions and additional items. The items listed below should be forwarded to:

> Green Planet Servicing, LLC
> Attn:  Transfer Coordinator
> 321 Research Parkway
> Suite 303 Meriden, CT 06450

***Obtain all approvals from Agencies, Investors and MI companies to complete the transfer of servicing.***

## Critical Dates

8/3/12:         Conference call between GMACM & GPS to discuss conversion process and review critical dates based on GMACM processes

8/15/12 :               GPS to receive preliminary service release reports and corresponding trial balance -Preliminary  service release files from GMACM to Green Planet, data will be as of 8/14/12.

TBD:          Mapping sessions held with knowledgeable GMACM representatives conference call sessions are acceptable

9/10/12:       Goodbye letters sent by GMACM

10/3/12:            Final service release reports and corresponding trial balance from GMACM to Green Planet, data will be as of 10/2/12

10/2/12:              Initiate TOS process in MERS system

10/7/2012       Submit transfer notification in the VALERI system for all VA loans.

**DATA AND FILE INFORMATION REQUIRED FOR EACH TEST, TRIAL and FINAL CONVERSION:**

A)   Service Release Reports (reports generate only as applicable), to be received electronically via the GMAC EFT Site  no later than 10/3/2012, unless otherwise noted:

   1. System Trial Balance (to be received on 10/2/12 as of 10/1/12 cutoff)
   2. Master Record Report
   3. 30, 60, and 90+ Day Delinquent Reports
   4. ACH Report
   5. ARM Report
   6. Bankruptcy Status and Bankruptcy Trial Reports
   7. Default Attorney Information Report
   8. Disaster Area Loans
   9. Escrow Frequency Report
   10. Fees Report (includes Corporate Advances)
   11. Hazard Insurance Report (includes Hazard, Flood & Force Placed)
   12. Foreclosure Report
   13. Loss Mitigation Info (comments)
   14. Non-Tax Payee Listing
   15. Optional Insurance Report
   16. Payoff Report
   17. Pending Escrow Report (Open Items)
   18. SCRA Report
   19. Tax Listing Report
   20. Tax Payee Report
   21. Special Mortgage Loans (ARM, Buydown, Balloon)
   22. Credit Processing (loss mitigation)
   23. Credit Processing (assumptions, subordinations)
   24. Open Insurance Claims with Loss Draft Funds

B)   The following will be sent electronically (EFT site), on CD, or hard copy sent  via overnight delivery under separate cover.  Tracking information will be provided when available.

   o   GNMA Pool and Security Holder data (database 008 and codebreakers including Cobol layout ), to be received no later than 10/3/2012
   o   Foreclosure Files
   o   Bankruptcy Files
   o   Loss Mitigation Info (Imaged Docs; Password is lossmit1)
   o   Loss Draft Files
   o   Collection Notes/Breach Letters
   o   Mortgagee Clause Letters
   o   Corporate Advance Invoices reflected on report #10  (sent within 30  days after transfer)

***To be received no later than 3 Business Days after the Transfer Date unless otherwise specified:***
- Escrow and Suspense Funds 5 Business Days after Transfer Date
- Principal and Interest Funds (GMAC to complete final remittance to GNMA. All prepaid funds not used for remittance – 3 Business Days after the GNMA Remittance Date)
- Loan Servicing Files (on Imaging) – 30 days after Transfer Date
- Work in Process ( Modification, Subordinations, Assumptions, etc)

***To be completed no later than the Transfer Date:***
- Complete a TOS in MERS to:
  - Servicer Org ID: █████

Assignments must be prepared on all loans that are assigned to GMAC Mortgage, LLC. To the extent loans have been assigned to GMAC Mortgage, assignments will be completed in a reasonable timeframe; cost for preparation and recordation will be paid by Green Planet.

Contact List

A contact name, contact phone number and contact email address for post-transfer issues.

## Notification of Transfer

AT LEAST FIFTEEN (15) DAYS PRIOR TO THE TRANSFER OF SERVICING, THE TRANSFERRING SERVICER SHALL PROVIDE BORROWERS WITH THE SERVICING INFORMATION SET FORTH BELOW:

**Notification of Transfer – 15 Days Prior**

In accordance with RESPA requirements, a notice of the transfer of loans must be sent to the borrower at least fifteen (15) days prior to the effective date of the transfer. The Transferring Servicer shall provide GPS with a copy of the transfer notification letter for review and approval prior to mailing to the borrowers (see Exhibit C for Sample Letter). The notification letter must contain the following information:

A. The effective date of the transfer.
B. New Servicer name: **Green Planet Servicing, LLC.**
C. New Servicer mailing address for written inquires:

> Green Planet Servicing, LLC
> 321 Research Parkway
> Suite 303
> Meriden, CT 06450
> Attn: Customer Service

D. Customer Service number: **1-866-882-8187**.
E. Customer Service hours: **Monday-Friday, 8:30am to 9:00pm EST**.
F. New Servicer Payment Address:

> Green Planet Servicing, LLC
> P.O. Box 660596
> Dallas, TX 75266-0596

G. Inform borrowers when applicable, that automatic drafts will be canceled.
H. Inform borrowers when applicable of the cancellation of any Optional Insurance
I. Inform borrowers when applicable to notify third party payment agencies or government allotment services of change of loan servicer.

## Items Required Within 3 Days of Transfer Date

THE TRANSFERRING SERVICER SHALL DELIVER TO GPS AT THE ADDRESS STATED BELOW:

> Green Planet Servicing, LLC
> Attn: Transfer Coordinator
> 321 Research Parkway
> Suite 303
> Meriden, CT 06450

1. Tax Information
   - See reports listed as #19 and #20
   - The Transferring Servicer or their vendor shall prepare and forward the appropriate notice of loan transfer, electronic or hard copy effective with the transfer date, to the applicable tax service provider.
   - For loans covered by a tax service provider, Transferring Servicer shall provide verification of whether life of loan fee has been paid.
   - A listing by state of all accounts with no tax contract service.

   **NOTE: All tax installments due within 30 calendar days (based on GMAC Mortgage's tax due dates) following the transfer date where bills are available for payment are to be paid by the Transferring Servicer prior to the transfer date.**

2. Hazard and Flood Insurance Information

   Mortgagee Clause should read as follows:

   > Green Planet Servicing, LLC
   > PO Box 5023
   > Troy, MI 48007-5023

---

- See reports listed as #11and #24
- Transferring Servicer shall prepare and forward, effective with the transfer date, to the applicable insurers the required Loss Payee Endorsement letters. **Copies of the Loss Payee Endorsement letters are to be forwarded to GPS.**
Any unearned premium refunds received prior to the transfer date are to be credited to the affected borrower's escrow account **before** the transfer date and prior to providing loan cut-off balances.
- Any separate working files for loss draft claims in process. File documentation must include any loan disbursement history and information on any undisbursed premiums.
- Original condominium master policies, if available.

**NOTE: All renewable premiums due within 30 days following the effective transfer date (based on GMACM's due dates) where bills are available for payment are to be paid by the Transferring Servicer prior to the transfer date.**

3. Credit, Life and Disability (Optional) Insurance Information
- Transferring Servicer shall advise borrowers that any optional insurance paid on a monthly or annual basis will not be transferred.

4. Special Mortgage Loans (ARMs, GPMs, Buy Downs, Balloons, )
See reports listed as #5 and #21
- Copies of each interest rate change letter will be provided on a case-by-case basis.
- Conversion addendum (if an adjustable loan has an option to convert to a fixed rate loan).
- Conversion agreement (if an adjustable rate loan has converted to a fixed rate loan).

5. Escrow Analysis Information
- Pending payments changes will be reflected on the master record.
- Copies of the last escrow analysis on a case-by-case basis.

6. Collections
- See report #3
- Copies of breach letters on loans 90+ days delinquent
- Listing of all loans presently on a repayment plan.

7. Foreclosures
- See reports #12 and #7.

8. Bankruptcies
- See reports #6 and #7..
- Payments should be mailed to:

Green Planet Servicing, LLC
321 Research Parkway

Suite 303
Meriden, CT 06450
Attn: Cash Management

9. Eviction (if applicable)
- Copies of notices prepared and sent to attorneys advising them of the transfer.
- Name and address listing of eviction attorneys.
- Name and address listing of real estate agents.
- Copies of listing agreements with assigned real estate agents.
- Copies of all cash-for-key agreements.

10. REO (if applicable)

- Copies of foreclosure deed, if available.
- Name and address listing of real estate agents.
- Copies of listing agreements with assigned real estate agents.
- Copies of most recent broker price opinion and/or REO appraisal.
- Copies of marketing plans and monthly activity reports.

## Items Required after the Transfer Date – (Delivery Timeframe Specified Below)

THE TRANSFERRING SERVICER SHALL DELIVER THE FOLLOWING TO GPS:

Green Planet Servicing, LLC
Attn: Transfer Coordinator
321 Research Parkway
Suite 303
Meriden, CT 06450

1. Final File for Data Conversion (as of Transfer Date) (see report #2)

As of the cut off date a final data file in the same format as the preliminary file.

2.      Final Trial Balance Report (see report #1)

3. Escrow and Suspense Funds (within 5 Business Days of Transfer Date)

Net of positive and negative escrow and/or suspense funds (taking into account funds held by GMACM previously reimbursed to GMACM by GPS and any unreimbursed advances

---

outstanding as of the Transfer Date) must be remitted to GPS with loan level detail (trial
balance).

4.  Principal and Interest Funds and Reports:

- If the current remittance method is other than actual/actual, the Transferor will
  calculate and provide an electronic (excel) loan level Test of Expected P&I, including
  over and under collateralized position, reduced by investor remittance due to be
  paid/paid by the Transferor.  GPS will review the calculation and wire the P&I
  advance funds to the account designated by Transferor no later than one day prior to
  the Ginnie Mae remittance date.

- A copy of the depository's reconciliation, as of the close of the bank's last Business
  Day immediately preceding the effective date of the transfer, for each Custodial
  Account maintained.

- Copies of all Servicing and accounting reports filed with the Agency for the three
  months immediately preceding the effective date of the transfer, if not previously
  provided.

5.  Claim funds and reports
- GMACM shall deliver the weekly claims reporting until all loans serviced by
  GMACM have been transferred to GPS or all applicable claims proceeds and/or REO
  sales proceeds have been received.
- Claims proceeds shall be wired to GPS on a weekly basis as received.

  - <u>Loan Servicing Files and Other Working Files Loan Servicing Files:  Imaged
    files to be provided within 60 calendar days of the Transfer Date</u>
  - Loan Boarding Files:  Imaged files to be provided within a reasonable
    timeframe on a case by case basis.
  - Working Files (Work in Progress):
    - Screenshots and imaged Loss Mitigation files to be provided within
      5 business days of the Transfer Date
    - Other work in progress imaged files:  to be provided within two
      business days on a case by case basis.

GMACM shall deliver loan servicing files in its possession.

Imaged files will be sent on DVD or hard drive.

A master listing is to be provided that includes:

Transferring Servicer's Loan Number

FedEx tracking number

**NOTE:  GPS shall inventory the shipment upon receipt and note any discrepancies on the inventory sheet, sign and return to the Transferring Servicer.**

6. Histories (within 5 business days of the Transfer Date)

   Please provide the following in electronic format:
   - Loan history - from the time period GMACM last began servicing the loans
   - List of transaction codes and explanations
   - Copy of prior year 1098 or year-end statement sent to borrower on a case-by-case basis.

   **NOTE:  Transferring Servicer is responsible for preparing and mailing current year 1098's (year end interest statements) by January 31, of the following year to all borrowers for interest paid prior to the loan transfer.**

7. Credit Processing (Modification, Assumptions, Subordinations, etc.) (within 3 business days of the Transfer Date)

   o   See report #22 & #23.

8. Hazard and Flood Insurance

   Any unearned premium refunds:
   - Received prior to the transfer date are to be credited to the affected borrower's escrow account before the transfer date and prior to providing loan cut-off balances.
   - Received after the transfer date must be forwarded to GPS within 2 business days of receipt.

9. Payments/Payoffs

   - See report #4 for a listing of loans on ACH prior to transfer.
   - Transferring Servicer shall stop all financial processing including disbursement on loans to be transferred as of the Transfer Date.
   - Any Payoffs received after the Transfer Date are to be forwarded to GPS within 2 business days of receipt via wire or overnight delivery.. The day proceeds are wired, an email must be sent to: cs@myloansupport.com.

   The email must include the following information:

   Loan Number
   Borrower's Last Name
   Property Address
   Total Payoff Proceeds
   Wire Confirmation Number

---

<u>Wire proceeds to the following:</u>
Bank Name: Wells Fargo Bank N.A.
Account Name: Green Planet Servicing LLC, Payment Clearing
Account Number: ███████
ABA Number: ███████
Address: Boston, MA
Reference: Customer Full Name and Servicer Account Number

- All Payments and/or Payoffs received after the Transfer Date are to be:

  1. Date stamped and properly endorsed as follows:

     Pay to the order of
     Green Planet Servicing, LLC.
         Without Recourse
     By:_____
         (name of signer)
         (title of signer & name of company)

  2. Listed on the appropriate transmittal form (similar to Exhibit B) detailing the Transferring Servicer's loan number, borrower's full name, amount received and the effective date of the payment.
  3. The purpose of the check should be clearly identified and grouped accordingly. (i.e., payment, pay-down, payoff, escrow, etc.)
  4. Delivered, via overnight delivery to:

     Green Planet Servicing, LLC
     321 Research Parkway
     Suite 303
     Meriden, CT 06450
     Attn: Cash Management

## 10. <u>Returned Items</u>

Original returned items (i.e., non-sufficient funds, stop payments, etc.) received after the cut-off date are to be forwarded to the Acquiring Servicer for processing with a copy of the loan history showing the applicable transactions(s). The Acquiring Servicer will perform the reversal of P&I and T&I from the borrower's account and notify the borrower. The Acquiring Servicer will remit the reimbursement to the Transferring Servicer within five (5) business days of receipt of the returned item.

## Documents, Correspondence, etc. after the Transfer Date

Any document, communication, payment or notice received after the transfer date pertaining to any Mortgage Loan shall be forwarded within (2) two business days of receipt to GPS by overnight express carrier for a period of 30 days after transfer and then by regular mail.

The items listed should be placed in separate envelopes and labeled according to the contents of the envelope indicating the appropriate department as set forth below. The individual envelopes should be placed in an overnight shipping envelope and delivered to:

> Green Planet Servicing, LLC
> 321 Research Parkway
> Suite 303
> Meriden, CT 06450
> Attn: Transfer Coordinator

Wire Instructions:

All back-up for wires remitted and wire amounts need to be provided to cs@myloansupport.com at the time the funds are remitted. Any unidentified wires will be returned and a $35 returned wire fee will be incurred. When remitting funds for interim servicing, P&I and T&I funds must be sent separately.

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, N.A |
| Address: | Boston, Massachusetts |
| ABA#: | █████████ |
| Acct#: | █████████ |

Reference: Sale Identification, Transfer Date, Wire Contents (i.e. P&I, or T&I)

Contacts
FAX NUMBER: 203-265-3950

### *Escrow Department*

**Insurance:** Carolyn Grillo          **Taxes:** Ann Lea
Phone: 203-303-5521                    Phone: 203-265-303-5522

### *Cash Management*

---

Contact: Dawn Pawelczyk
Phone: 203-303-5281

### *Investor Accounting*

Contact: Alyse Frechette
Phone: 203-303-5287

### *Customer Service*

Contact: Rob Pescetelli
Phone: 203-303-5273

### *Operations Department* (including ARMS and system adjustments)

Contact: Shantell Cristaldi
Phone: 203-303-5398

### *Collections and Mitigation*

All collection and mitigation related items:

Contact: Tom O'Connell
Phone: 203-303-5283

### *Default Servicing*
All Property Preservation, Foreclosure, Bankruptcy and REO related items:

Contact: Eric Hammar, Default Servicing Manager
Phone: 203-303-5284

### *New Loan Department*

Contact: Dawn Pawelczyk
Phone: 203-303-5281

# Exhibits

<u>Exhibit A – Form of Servicing File Manifest</u>

<u>Exhibit B-  Form of Payment/Payoff Transmittal</u>

Servicer Name: _____

Prepared By: _____    Date: _____

| Servicer Loan Number | Borrower Full Name | Property Address | Payment Amount | Effective Date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Total Amount    | $ |

**THIS PORTION TO BE COMPLETED BY GREEN PLANET SERVICING**

Reviewed By: _____    Date: _____

<u>Exhibit C- Sample Goodbye Letter</u>

<u>Date</u>

<u>CUST NAME</u>
<u>ADDRESS</u>
<u>CITY, STATE, ZIP CODE</u>

Re: Mortgage Loan Number_____

Dear Mortgagor(s):

Effective _____, the servicing of your mortgage loan, that is the right to collect payments from you, will be transferred from _____to Green Planet Servicing, LLC (GPS).

The transfer of loan servicing is a common practice in the mortgage industry today. The transfer of servicing of your mortgage loan does not affect any terms or conditions of your mortgage instrument, other than the terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you notice at least fifteen (15) days before the effective date of the transfer or at closing. Your new servicer must also send you this notice no later than fifteen (15) days after the effective date or at closing.

We have taken extra care and worked closely with Green Planet Servicing to ensure that the transfer of your account will be a smooth transition.   Green Planet Servicing will be sending you a letter regarding their continued servicing of your loan.

The date that we will stop accepting payments from you is _____. The date that GPS will begin to accept payments from you is _____. Send all payments due on or after that date to GPS at the following address:

> Green Planet Servicing, LLC
> P.O. Box 660596
> Dallas, TX 75266-0596

If you are currently being escrowed for taxes or insurance, your new servicer will continue to escrow and pay bills from your escrow account.

Additionally, if you are set up to make payments through our automatic drafting service, this service will be terminated with the transfer of your mortgage loan.  Please contact GPS to enroll in their automatic payment service.  If you are currently making your mortgage payment through government allotment or have established a third party relationship to automatically make payments on your behalf, please ensure you take the necessary steps to advise them of your new loan number and to change the payee to Green Planet Servicing, LLC.

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12USC 2605).

During the sixty day period following the effective date of the transfer of loan servicing, a loan payment received by your previous servicer by its due date, may not be treated by your new servicer as being late and a late fee may not be imposed on you.

> RESPA gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning your mortgage loan, your servicer must provide you with a written acknowledgement within twenty (20) business days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer which includes your name and account number, and your reasons for the request. Not later than sixty (60) business days after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During this 60-day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or to the qualified written request. A business day is any day excluding legal public holidays (state or federal), Saturday and Sunday.

Section 6 of RESPA also provides for damages and costs for individuals in circumstances where servicers are shown to have violated the requirements of the section. You should seek legal advice if you believe your rights have been violated.

Should you have any questions, please call our Customer Service Department at _____
From _____ to _____ Monday through Friday or write to us at:

>     Transferring Servicer Company Name
>     Address
>     City, State, Zip Code

The business address for your new servicer is:

>     Green Planet Servicing, LLC
>     321 Research Parkway
>     Suite 303
>     Meriden, CT 06450

You may reach their Customer Service Department at 1-866-882-8187 between the hours of 8:30 am and9:00 pm Monday – Friday ET.

We have appreciated the opportunity to be of service with your financial needs.

Sincerely,


ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE INBANKRUPTCY: Please be advised that this letter constitutes neither a

demand for payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of section 362 of the United States Bankruptcy Code.