1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                September 11, 2012

                10:06 AM

                 2:04 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1  AM SESSION

2  Status Conference RE:  Debtors Motion Pursuant to Fed. R.

3  Bankr. P. 9019 for Approval of the RMBS Trust Settlement

4  Agreement [Docket No. 320]

5

6  (CC: Doc no. 1303) Notice of Supplemental Application Pursuant

7  to Sections 328 and 1103 of the Bankruptcy Code and Federal

8  Rule of Bankruptcy Procedure 2014 for an Order to Expand the

9  Scope of Retention of Moelis & Company LLC as Investment Banker

10  to the Official Committee of Unsecured Creditors of the Debtors

11  Nunc Pro Tunc to August 1, 2012

12

13  (CC: Doc no. 1281) Application Of The Official Committee Of

14  Unsecured Creditors For Entry Of An Order Authorizing The

15  Employment And Retention Of San Marino Business Partners LLC As

16  Consultant To The Committee, Nunc Pro Tunc To August 11, 2012

17  filed by Philip Bentley on behalf of Official Committee Of

18  Unsecured Creditors

19

20  (CC: Doc # 1248) Motion to Extend Exclusivity Period for Filing

21  a Chapter 11 Plan and Disclosure Statement/Debtors' Motion for

22  the Entry of an Order Extending Their Exclusive Periods to File

23  a Chapter 11 Plan and Solicit Acceptances Thereof

24

25  (CC: Doc # 1245) Debtors' Motion for an Order Pursuant to

3

1    Section 365(d)(4) of the Bankruptcy Code Extending the Time

2    Within Which Unexpired Leases of Nonresidential Property May Be

3    Assumed or Rejected

4

5    (CC: Doc #90, 47, 1275) Hearing RE: Stipulation RE: Motion

6    Authorizing the Debtors to Continue to Perform Under The Ally

7    Bank Servicing Agreements In The Ordinary Course of Business.

8    This matter was filed under notice of presentment.

9

10   (CC: Doc # 1173)Motion for Relief from Stay in regards to

11   property located at 33 North Church Street, Ortonville,

12   Michigan

13

14   (CC: Doc. 1171) Motion for Relief from Stay in regards to

15   property located at 184 Dahlia Drive, Mastic Beach, New York

16

17   (CC: Doc #1182) Motion for Relief from Stay in regards to

18   property located at 631 20th Street SW, Vero Beach, Florida

19

20   (CC: Doc #1162) Motion for Relief from Stay in regards to

21   property located at 1917 East Concord Street, Orlando Florida

22

23   (CC: Doc #1057) Motion for Relief from Stay in regards to

24   property located at 2 Hill Dale Avenue, Miller Place, NY

25

4

(CC: Doc #1059) Motion for Relief from Stay in regards to
property located at 3597 West 127th Street, Cleveland, Ohio

PM SESSION

Doc.#810, 859, 861 Evidentiary Hearing Regarding (I) Motion of
the Federal Housing Finance Agency Pursuant to the July 11,
2012 Order of the Honorable Denise L. Cote Seeking Limited
Discovery from the Debtors and, if Necessary to that Purpose,
Relief from the Automatic Stay and (II) Supplement to July 17,
2012 Motion of the Federal Housing Finance Agency Pursuant to
the July 11, 2012 Order of the Honorable Denise L. Cote Seeking
Limited Discovery from the Debtors and, if Necessary to that
Purpose, Relief from the Automatic Stay.  (CC: document(s)
1295, 1296, 1297)

Transcribed by:  Ellen S. Kolman

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

(973)406-2250

operations@escribers.net

5

```
 1   A P P E A R A N C E S :

 2   MORRISON & FOERSTER LLP

 3        Attorneys for Debtors

 4        1290 Avenue of the Americas

 5        New York, NY 10104

 6

 7   BY:   GARY S. LEE, ESQ.

 8        JAMIE A. LEVITT, ESQ.

 9        LORENZO MARINUZZI, ESQ.

10        ANTHONY PRINCI, ESQ.

11        NORMAN S. ROSENBAUM, ESQ.

12        JOEL C. HAIMS, ESQ.

13        JONATHAN C. ROTHBERG, ESQ

14

15   KRAMER LEVIN NAFTALIS & FRANKEL LLP

16        Attorneys for Official Creditors' Committee

17        1177 Avenue of the Americas

18        New York, NY 10036

19

20   BY:   DOUGLAS MANNAL, ESQ.

21        RACHAEL L. RINGER, ESQ.

22        KENNETH ECKSTEIN, ESQ.

23        PHILIP BENTLEY, ESQ.

24        JOSEPH SHIFER, ESQ. (TELEPHONICALLY)

25        ELISE S. FREJKA, ESQ.
```

6

1  CADWALADER, WICKERSHAM & TAFT LLP

2         Attorneys for MBIA

3         One World Financial Center

4         New York, NY 10281

5

6  BY:   GREGORY M. PETRICK, ESQ. (TELEPHONICALLY)

7

8

9  CARTER LEDYARD & MILBURN LLP

10        Attorneys for Talcott Franklin Group Investors

11        2 Wall Street

12        New York, NY 10006

13

14 BY:   AARON R. CAHN, ESQ.

15

16

17 CLEARY GOTTLIEB STEEN & HAMILTON LLP

18        Attorneys for Wilmington Trust as Indenture Trustee

19        One Liberty Plaza

20        New York, NY 10006

21

22 BY:   SEAN A. O'NEAL, ESQ.

23

24

25

7

```
 1  CRAVATH, SWAINE & MOORE LLP

 2        Attorneys for Credit Suisse First Boston

 3        825 Eighth Avenue

 4        New York, NY 10019

 5

 6  BY:  LAUREN A. MOSKOWITZ, ESQ.

 7

 8

 9  DECHERT LLP

10        Attorneys for Bank of New York Mellon

11        1095 Avenue of the Americas

12        New York, NY 10036

13

14  BY:   GLENN E. SIEGEL, ESQ.

15

16

17  GIBBS & BRUNS LLP

18        Attorneys for RMBS Steering Committee

19        1100 Louisiana

20        Suite 5300

21        Houston, TX 77002

22

23  BY:   KATHY D. PATRICK, ESQ.

24

25
```

8

1   JONES DAY

2        Attorneys for Financial Guaranty Insurance Company

3        555 South Flower Street

4        Fiftieth Floor

5        Los Angeles, CA 90071

6

7   BY:   RICHARD L. WYNNE, ESQ. (TELEPHONICALLY)

8

9

10  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

11       Attorneys for FHFA

12       1633 Broadway

13       New York, NY 10019

14

15  BY:   KANGHANA WANGKEO LEUNG, ESQ.

16       ANDREW K. GLENN, ESQ.

17       DANIEL A. FLIMAN, ESQ.

18

19  KIRKLAND & ELLIS LLP

20       Attorneys for Ally Financial Inc. and Ally Bank

21       655 Fifteenth Street, N.W.

22       Washington, D.C. 20005

23

24  BY:   PATRICK M. BRYAN, ESQ.

25       JUDSON D. BROWN, ESQ.

9

KIRKLAND & ELLIS LLP

     Attorneys for Ally Financial Inc. and Ally Bank

     601 Lexington Avenue

     New York, NY 10022

BY:   RAY C. SCHROCK, ESQ.

LOEB & LOEB, LLP

     Attorneys for Trustee, Wilmington Trust National

      Association

     345 Park Avenue

     New York, NY 10154

BY:   WALTER H. CURCHACK, ESQ. (TELEPHONICALLY)

MAYER BROWN LLP

     Attorneys for Ally Financial, Inc.

     1999 K Street, N.W.

     Washington, DC 20006

BY:   REGINALD R. GOEKE, ESQ.

10

1

2 MAYER BROWN LLP

3     Attorneys for Ally Financial, Inc.

4     1675 Broadway

5     New York, NY 10019

6

7 BY:   MICHAEL O. WARE, ESQ.

8

9

10 MCKOOL SMITH

11     Attorneys for Freddie Mac

12     600 Travis Street

13     Suite 7000

14     Houston, TX 77002

15

16 BY:   PAUL D. MOAK, ESQ. (TELEPHONICALLY)

17

18

19 MORGAN, LEWIS & BROCKIUS LLP

20     Attorneys for Deutsche Bank

21     101 Park Avenue

22     New York, NY 10178

23

24 BY:   JAMES L. GARRITY, JR., ESQ.

25

11

```
 1  MUNGER, TOLLES & OLSON LLP

 2         Attorneys for Berkshire Hathaway

 3         355 South Grand Avenue

 4         35th Floor

 5         Los Angeles, CA 90071

 6

 7  BY:   THOMAS WALPER, ESQ. (TELEPHONICALLY)

 8

 9

10  ROPES & GRAY LLP

11         Attorneys for RMBS Steering Committee

12         1211 Avenue of the Americas

13         New York, NY 10036

14

15  BY:   KEITH H. WOFFORD, ESQ.

16

17

18  SEWARD & KISSEL LLP

19         Attorneys for U.S. Bank NA as Securitization Trustee

20         One Battery Park Plaza

21         New York, NY 10004

22

23  BY:   MARK D. KOTWICK, ESQ.

24         ARLENE R. ALVES, ESQ.

25
```

12

```
 1   SIDLEY AUSTIN LLP

 2          Attorneys for Nationstar Mortgage

 3          One South Dearborn

 4          Chicago, IL 60603

 5

 6   BY:    JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)

 7          LARRY J. NYHAN, ESQ. (TELEPHONICALLY)

 8

 9   U.S. DEPARTMENT OF JUSTICE

10          Office of the United States Trustee

11          33 Whitehall Street

12          21st Floor

13          New York, NY 10004

14

15   BY:    MICHAEL DRISCOLL, ESQ.

16

17   WHITE & CASE LLP

18          Attorneys for Ad Hoc Group of Junior Secured Noteholders

19          1155 Avenue of the Americas

20          New York, NY 10036

21

22   BY:    J. CHRISTOPHER SHORE, ESQ.

23          HARRISON DENMAN, ESQ.

24          IAN J. SILVERBRAND, ESQ.

25
```

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

P R O C E E D I N G S

1

2          THE COURT:  All right.  Please be seated.  We're here

3    in Residential Capital LLC, number 12-12020.

4          Mr. Princi?

5          MR. PRINCI:  Good morning, Your Honor.  There are a

6    number of matters on the agenda for today.  The first one,

7    Judge, which I'm going to address on behalf of debtors and just

8    direct --

9          THE COURT:  Can you pull the microphone a little bit

10   closer, please?

11         MR. PRINCI:  Yes.  Excuse me.  For the record, Anthony

12   Princi from Morrison & Foerster on behalf of the debtors.

13         And the first matter on the agenda, Your Honor, is the

14   status conference respecting the debtors' 9019 motion for

15   approval of its RMBS trust settlement.

16         THE COURT:  Before you get to that --

17         MR. PRINCI:  Yes, Your Honor.

18         THE COURT:  -- let me just ask you a question.

19         The amended agenda starts with listing adjourned

20   matters, a very large number of lift stay motions, and it

21   indicates, I think, in all cases they're being adjourned to

22   September 27th.  I'd just like a little explanation.

23         First, the question is has the moving party consented

24   to the adjournment.  And second, are we just kicking the can

25   down the road in one hearing.  What is happening?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    14

1        MR. LEE:  The answer to your first question, Your

2   Honor, is yes, and the answer to your second question is no.

3   There have been a number of stipulations that have been

4   executed between the parties resolving the lift stay motions

5   and the expectation is between now and that date we will do

6   what we've done in relation to most of them which is resolve

7   them, Your Honor.

8        THE COURT:  Thank you very much, Mr. Lee.

9        MR. LEE:  Thank you.

10       THE COURT:  Mr. Princi, go ahead.

11       MR. PRINCI:  Thank you, Judge.

12       Judge, I'll start by noting what I believe the Court

13   has received with respect to this matter.  So the debtors, Your

14   Honor, filed a short status report on Friday regarding this

15   matter.  And I believe yesterday both the committee and MBIA

16   filed also short responses to that.  I just want to make sure

17   the Court has --

18       THE COURT:  I've got them.

19       MR. PRINCI:  Okay.  So, Judge, let me see if I can,

20   perhaps, shed some light instead of heat on what has happened

21   and where we are.

22       The jumping off point, of course, Your Honor, is that

23   we filed this motion on June 14th, so it's approximately three

24   months ago.  The Court's aware of the history.  We had -- we

25   had a hearing on July 24th at which there were competing

1  scheduling orders:  one submitted by the trustees jointly with

2  the committee and one submitted by the debtor.  Based on the

3  Court's instructions, the parties spent a number of consecutive

4  dates at Morrison & Foerster's offices and we were able to work

5  out a schedule that was agreeable to all parties which we

6  jointly submitted to the Court.

7           The "we" here, Your Honor, when I say "we," that's the

8  debtors, the institutional investors who are the counterparty

9  under the settlement agreement, the creditors' committee, the

10 trustees for the RMBS trusts, and Ally Financial, the parent

11 company of the debtors.  MBIA participated in all those

12 negotiations but did not jointly submit that order to Your

13 Honor.

14          Consistent with that order, Your Honor, and I should

15 say that there were -- thank you -- I should say, Your Honor,

16 that at the earlier hearing, the Court had obvious and

17 understandable consternation about how the parties were

18 approaching this and I think it's fair to say on the one side,

19 the debtors and the institutional investors were pushing for

20 the most expedited schedule and the committee, in particular,

21 with MBIA I would guess, were pushing for the most lax, if you

22 will.  In fact, I think the committees' position, then, on July

23 24th, Your Honor, as I recall was that there really should be

24 sort of an open date.  And let's do what we can, let's work

25 hard and then let's come back to you, see where we are and then

1  you can give us a date at that time.

2          I think Your Honor made clear on the 24th what we have

3  been working off of which is that we, the debtors, and more

4  importantly, I think, the institutional investors who have the

5  skin in the game are entitled to get a ruling from this Court

6  as to the merits of that settlement and that, I think, as Your

7  Honor pointed out in the 24th, this wasn't going to be just

8  left hanging out there.

9          Post the submission of that order and the entry of the

10  order by the Court and consistent with the understanding of all

11  the parties, we began to incorporate certain amendments into

12  the settlement agreement with the exception of one that's

13  caused issues for certain parties.  Those amendments were

14  understood by the parties.  The parties understood there were

15  going to be amendments and the parties tried the best as they

16  could to --

17          THE COURT:  I didn't understand there were going to be

18  amendments.

19          MR. PRINCI:  I believe -- Your Honor, I could be

20  wrong.  I --

21          THE COURT:  Well, let's put it --

22          MR. PRINCI:  -- I believe the scheduling orders --

23          THE COURT:  Wait.  Stop.

24          MR. PRINCI:  -- indicates that.

25          THE COURT:  Mr. Princi, until I read the status

RESIDENTIAL CAPITAL, LLC, ET AL.                                    17

1   reports, maybe I had been told; if so, it had gone right over

2   my head and I didn't understand that this is a moving target

3   that the objectors have to deal with.  So it is what it is.

4             MR. PRINCI:  Understood.

5             THE COURT:  Go ahead.

6             MR. PRINCI:  Understood.  And, I think, Judge, you've

7   hit the nail on the head with respect to the complaint.  I

8   think the substantive complaint and the one that we have

9   attempted to resolve is that this is a moving target.  It's not

10  a moving target.  It became, I think a fair argument in that

11  regard can be made with respect to the so-called Holdco

12  election which I'm going to address in a moment.  But the rest,

13  Your Honor, of the changes quite candidly just were not

14  substantive and they were -- they were understood by the

15  parties who negotiated this.  So we, I think, we actually, Your

16  Honor --

17            THE COURT:  Let me stop you here, Mr. Princi.

18            MR. PRINCI:  Yes.  Sure.

19            THE COURT:  Until there is something that can be

20  considered final, this remains a moving target.  My immediate

21  concern is more than amendments because it's quite common, as

22  you know, that when agreements are presented to the Court and

23  parties seek approval in light of objections and things like

24  that there often are changes and that doesn't particularly

25  disturb me nor that there will be changes to this agreement.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    18

 1  That, in itself, is not at issue.  I'm, frankly, more concerned

 2  that -- over the status of the discovery.  There was a

 3  scheduling order that was agreed to.  You filed a status report

 4  on Friday.  It indicated that discovery is substantially on

 5  track.  Then I read the committee's report yesterday, and it

 6  certainly appears that discovery is not on track.  The setting

 7  of a November 1st -- November 5th hearing was premised on

 8  substantially complete discovery in accordance with the

 9  schedule that everyone agreed upon and that I approved, okay?

10  I left it to the parties to negotiate the schedule.  They did

11  so and I told them, look, if you can't agree, I will do so, but

12  it's better when the parties do that.

13          The parties did that.  They presented the Court with

14  an agreed schedule.  The Court entered it.  It's the operative

15  document.  I don't underestimate the task that's involved on

16  all parties -- for all parties in complying with a schedule.

17  You wanted a hearing as soon as possible.  Okay.  There were

18  others who wanted the schedule moved out.  I believe I made it

19  clear from the start that going forward with an aggressive

20  schedule was contingent upon complying with all discovery

21  obligations.  The committee or any other objectors are entitled

22  to full discovery and an opportunity to prepare for all of the

23  issues that are going to be raised at the hearing.

24          This is, to put it euphemistically, a huge deal.

25  You're seeking approval of a settlement that would provide an

1   allowed claim of 1 -- 8.7 billion dollars.  It has enormous

2   consequences for this case as a whole.  That's fine.  I'll go

3   ahead.  But you've already failed to comply with the agreed

4   schedule.

5          The changes that you may be negotiating to try and

6   deal with objections that have been raised informally or

7   formally, that's pretty standard.  It may be that when we get

8   to a date for a hearing, the changes will be so substantial

9   that parties will be objecting:  they've changed the deal, we

10  haven't had an opportunity to prepare, this raises new issues.

11  I don't know.  I'm not going to prejudge any of that.  But the

12  process of amending agreements, that's pretty common; I see

13  that all the time.

14         But the one thing that I won't abide, I want to make

15  it crystal clear, your November 5th hearing date is

16  substantially in jeopardy right now because you've not complied

17  with the schedule that was agreed to by the parties and so

18  ordered by the Court.

19         MR. PRINCI:  Okay.  Your Honor, a couple of things.

20  There's a -- there's some basic propositions that you've

21  stated, they've been stated by other parties; I just want to

22  make sure that we're on the record as being absolutely clear

23  that we're in full agreement.

24         This is a settlement of significant proportions.  I

25  think the term that the committee used in its response to our

1  status report was "historic".  The magnitude is immense of this

2  settlement.  And, of course, Your Honor's absolutely right and

3  I don't say that to be solicitous because it's obvious that in

4  a situation like that, all parties have to have the opportunity

5  for full discovery, and we're working towards that goal.

6           The other goal, though, Your Honor, that we are also

7  working towards, and, so this does create the reason why, Your

8  Honor, we have been, if you will, "pushing" is the desire to

9  make sure of two things which we think is also historic and

10 monumental and even more important than settling, if you will,

11 this claim.  One is, Judge, the sale of the servicing rights of

12 this debtor.  Those servicing rights, Your Honor, are an

13 intangible asset.  They are only as good as the body of people

14 who perform the services.  It's fragile, Judge.  It is like

15 when an investment banker of a servicing company files for

16 Chapter 11 protection; you have that rush at the beginning of

17 the case to try to sell the platform before it dissolves.

18           Now, we have maintained good order and we have kept it

19 together and we have a contract with a real purchaser who's

20 got -- who's creditworthy and can get this deal done, and we

21 may get a higher bidder, perhaps.  But a big focus of ours,

22 Judge, is in balancing the issues here to make sure we don't

23 lose that sale.

24           Now, how do the two intersect?  Well, one of the big

25 things that we were able to do in connection with the last

1  scheduling order, was to get substantive concessions from the

2  investor group and the trustees with respect to the sale

3  process that is going to allow the sale process to go forward

4  unencumbered by very serious legal issues that this Court would

5  otherwise have to resolve and for which, therefore, the debtors

6  and their estate have risk in the event that the Court does not

7  resolve it in debtors' favor.

8          For example, Your Honor's heard me to say at prior

9  hearings before we got those concessions from the trustees and

10 the institutional investors that the way in which we were going

11 to deal with the legacy claims, the putback claims and how we

12 were going to not -- how we were going to assume and assign the

13 benefits, if you will, of those contracts but not have the

14 purchasing party get burdened with the legacy claims --

15         THE COURT:  I'm still waiting to see how you're going

16 to accomplish that, frankly.  We'll see.

17         MR. PRINCI:  Well, Judge -- Judge, how we are

18 accomplishing it is that the trustees have waived their claim

19 in that regard with respect to the sale.  In other words,

20 they're preserving that claim --

21         THE COURT:  Well, look --

22         MR. PRINCI:  -- for afterwards.

23         THE COURT:  -- I've read it and it's one of the

24 questions I have because I read the pre-auction objections;

25 August 23rd was the deadline for it.  What I didn't see in the

1  schedule is when you're going to respond to the pre-auction

2  objections.  And I gather, what, the hearing on the pre-auction

3  objections is October 17th, is that -- am I right on that?  Am

4  I correct in that, Mr. Princi?  Is it October 17th?

5          MR. PRINCI:  I unfortunately would have to check, Your

6  Honor.  I've been told yes, Judge.

7          THE COURT:  Okay.  When are you responding to the

8  pre-auction objections?

9          MR. PRINCI:  Excuse me one second, Judge.  Excuse me

10 one moment.

11         THE COURT:  Go ahead.

12         MR. PRINCI:  Thank you, Judge.

13         So Judge, the objection date is October 10 but I think

14 what's critically important --

15         THE COURT:  When you say the objection deadline --

16         MR. PRINCI:  Excuse me, the re --

17         THE COURT:  -- when are you responding --

18         MR. PRINCI:  -- pardon me.  I believe October 10,

19 Judge.  Pardon me, I misspoke.  But, Judge, what I have to

20 clear up, what's critically important is to understand what

21 those objections relate to and what they no longer relate to

22 because of what was agreed to in the scheduling order.

23         THE COURT:  Look, they were just filed; it was filed

24 August 23rd.  I just read them, okay?

25         MR. PRINCI:  Okay.

1    THE COURT:  They're serious objections that go to the

2    basic issue of whether you can separate the burdens and the

3    benefits.  Here it is.  It's -- I brought it out on the bench

4    with me.  Are you saying that's no longer operative?

5    MR. PRINCI:  Judge, first of all, we're working those

6    out, so I think we're relatively confident, Judge, that those

7    issues will be resolved without the need for judicial

8    determination.  But the real -- the objections that I'm

9    referring to, Judge, which is effectively a deal breaker, okay,

10   is the argument that you cannot sever the putback claims, all

11   of the putback claims.  And were that to have to be decided

12   prior to the sale and were there to be an adverse ruling, we

13   wouldn't have a sale.  We would be losing billions of dollars

14   because --

15   THE COURT:  Tell me something.

16   MR. PRINCI:  Yes.

17   THE COURT:  I just read -- I thought I brought them

18   out and maybe I didn't -- here it is, it was dated August 23rd,

19   it's denominated pre-auction objections of the RMBS trustees to

20   the debtors' sale motion.

21   MR. PRINCI:  Okay.

22   THE COURT:  You're saying those are being worked out?

23   MR. PRINCI:  Yes.  But, Judge, let me just clarify

24   this because --

25   THE COURT:  Because they went to the issue of whether

RESIDENTIAL CAPITAL, LLC, ET AL.                                                       24

1    you could separate the burdens and the benefits.

2          MR. PRINCI:  Understood but let me explain the

3    magnitude of those, Judge, okay.  We're talking if we lose,

4    Judge, if we don't resolve them and if we have to come to the

5    Court, we're talking order of magnitude we estimate twenty-five

6    million dollars max.  Meaning it's not a deal breaker, Judge.

7          What those go to is that there is an indemnification

8    provision in all of these pooling and servicing agreements for

9    the trustee's, understandably.  And what Nationstar has agreed

10   to assume in connection with the assumption and the assignment,

11   in connection with the asset purchase agreement is they are

12   agreeing to assume that indemnification obligation but only as

13   to events that occur and give rise to claims post-closing.

14         THE COURT:  I've read it.

15         MR. PRINCI:  Okay.

16         THE COURT:  I understand.

17         MR. PRINCI:  And, so that, Your Honor, that pre-

18   closing -- that pre-closing gap, if you will, relates to claims

19   that if we were to have to pick those up, because at the end of

20   the day, Judge, our view as to the law is that if we don't

21   resolve this, and we believe we will, there's a good argument

22   on the trustee's part that that will be a cure claim.

23         Now, what is the amount of a cure claim, it's going to

24   be, obviously, left to the Court if we litigate it, but we have

25   a history, Judge, of data when it comes to these sort of

RESIDENTIAL CAPITAL, LLC, ET AL.                                    25

1  indemnification costs.  And so our estimate is what I gave you

2  earlier.  So that is not a deal breaker.

3       What is a deal breaker is the same concept applied to

4  the putback claims, and that is a critical, absolutely critical

5  substantive right that we negotiated for in the context of a

6  scheduling order.  And what the trustees have done is the

7  trustees have agreed they will not assert that claim, have that

8  claim attach to the sale.  They are preserving that claim

9  subject to very, very limited caps for post-sale.  In the event

10 we don't work those claims out, then those will be litigated,

11 but the order of magnitude is dramatically different because of

12 the caps.  Dramatically, dramatically different.

13      Now, we do not want to lose those substantive

14 provisions that we negotiated for.

15      THE COURT:  Okay.  So let me stop you there.  I

16 understand you don't want to lose it, I will accept that it is

17 of monumental importance to this case.  You're going to hear me

18 express my frustration when we get to the exclusivity motion,

19 as well.  I'm not very happy about the pace at which this case

20 is proceeding and the level of cooperation with the committee

21 and others regarding -- I understand these are all -- all these

22 things you're dealing with you say that there's cooperation

23 about issues; the committee says and Wilmington Trust says and

24 Aurelius says they won't negotiate a plan.  They won't

25 negotiate a plan.

1   You have an agenda.  You started with your agenda on

2   day one.  That's fine.  I'm prepared -- I was prepared to move

3   this case at the pace you wanted conditioned on your complying

4   with all of your discovery obligations.  I don't want to hear,

5   right now, Mr. Princi, how important holding this RMBS deal

6   together is.  I accept it's very important.  But the other side

7   of that, if you want to hold it together, you have to fully

8   comply.

9        I don't particularly care the magnitude of the effort

10  it's going to require on the part of the debtors and its

11  professionals to do that.  If you want to stick to the

12  schedule, if you want a November 5 hearing, you have to comply

13  with the order.  I don't think I can make it any clearer.

14        MR. PRINCI:  Understood.

15        THE COURT:  And I'm going to add to your woes because

16  I will tell you right now, from November 30th to December 16th

17  I will be out of the country.  If you don't hold to your

18  November 5 date, it will be next year when you get a hearing.

19        MR. PRINCI:  Okay.

20        THE COURT:  I don't think I can be any clearer about

21  it.  Given the schedule that this Court has with this and other

22  matters, if you can't hold to the schedule, it's going to be

23  your doing, okay?  This hearing will not be pushed to late

24  November, okay.

25        MR. PRINCI:  Your Honor --

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1    THE COURT:  It will be next year.  So you got a lot --

2  if it's as important as you say to hang onto these dates, you

3  got a lot of work to do and you'd better get it done.  I'm not

4  saying it was bad faith or anything.  I don't doubt the

5  magnitude of the task you have in complying with everything

6  that's on the table right now:  the examiner's investigation,

7  the committees' expedited discovery or other party stuff.

8  There's a lot going on.  I understand that.

9    MR. PRINCI:  Your Honor, I hear you loud and clear; we

10  hear you loud and clear with respect to the discovery issue.

11  Let me address that head on.

12    First, Your Honor, I must say with all due respect I

13  disagree with the Court's view that we have not complied with

14  discovery in a material sense.  Of course, Judge, there's times

15  when there --

16    THE COURT:  Look, there are always odds and ends in

17  every big case with discovery.

18    MR. PRINCI:  Okay.

19    THE COURT:  That's not what I'm worried about.

20    MR. PRINCI:  Okay.  And, Judge, just one thing as a --

21    THE COURT:  You're saying the committee has been

22  inaccurate in what they say the state of discovery is and the

23  open issues.

24    MR. PRINCI:  And I want to address that.

25    THE COURT:  Is that true?

1    MR. PRINCI:  That is incorrect at a fundamental level.

2  And I want to addr --

3         THE COURT:  The committee is incorrect at a

4  fundamental level?

5         MR. PRINCI:  The committee is incorrect at a

6  fundamental level with respect to its allegation in that

7  regard.

8         I want to, Judge, say that we are concerned about the

9  procedural posture in which we find ourselves with the

10  discovery allegation given the obvious significance to how it

11  will affect our substantive rights.  Our understanding, Judge,

12  and we've heard you loud and clear a number of times with

13  respect to how you handle discovery disputes, is that if

14  there's a discovery dispute we don't have to end up in two

15  weeks of motion practice; we put it before the Court and you do

16  a good job of resolving those things by looking parties in the

17  eyes and telling them how you think this should be resolved.

18         We'd like that opportunity, Judge, to be heard.

19  We're -- I am very concerned, Judge, about getting a pleading

20  last night that -- and let me just give you background so you

21  understand where we're coming from, Judge.

22         Last Wednesday, we sent -- I have the letter with

23  me -- we sent the creditors' committee a multi-page detailed

24  recitation of all of the discovery that we've provided, all the

25  discovery requests that they made in a categorical fashion and

1  the responses we've provided them.

2          The first paragraph says to Mr. Eckstein, "We are

3  providing you with this letter because we have a status

4  conference coming up this coming Monday, so we thought it would

5  be helpful if we show you, if we walk you through what we think

6  the progress on discovery has been to date."  And then, at the

7  end, and it's one, two, three, four, five, six full pages, and

8  at the end, we say, "We hope you'll agree with this summary of

9  our discovery and we're available to discuss the matter at your

10 convenience."

11         The guts of this, in shorter form, is in the status

12 report.  We did not hear from the creditors' committee with

13 respect to this letter.  And then, I see in the creditors'

14 committee's status report two things that are disturbing.  The

15 one is the allegation that we failed in our discovery request.

16 Well, you know what, I think in the case of this matter, or any

17 case, but particularly given Your Honor's rules of court, if

18 you will, it would have made more sense and it still makes more

19 sense for us to confer and really see, Your Honor -- because

20 I'm going to get more specific about this in a moment -- where

21 are the real issues here?  And if we have real issues as

22 opposed to issues, Judge, that are self-made, perhaps for the

23 purpose of trying to as the -- which is the overarching driver

24 of the committee, the committee makes no bones about the fact,

25 Judge, that regardless of discovery, they want the RMB -- the

1    hearing on the 9019 motion for the RMBS settlement moved back

2    to after the examiner issues his report.

3            THE COURT:  Well, let me -- I want to stop you there

4    for this reason, and this carries over on the issues about

5    extension of exclusivity, this case is not on hold.  This is

6    more directed to the committee and others but also to the

7    debtors, this case is not on hold awaiting an examiner's

8    report.  The examiner's report is important.  There are serious

9    issues that the examiner is looking at.  The examiner will

10   issue a report, if the examiner identifies issues or potential

11   causes of action or whatever it is or not.  It will not resolve

12   how this case -- how this case should be resolved.  There is no

13   reason in my view to say we have to wait until the examiner's

14   report to negotiate a plan.  There may be important issues that

15   can't be finally -- fully and finally settled, but you know

16   what the issues are.  You know what -- I mean you all

17   cooperated; there was no substantial disagreement, I'm not

18   aware of any disagreement about what the scope of the

19   examiner's investigation was to be.  You all know what

20   transactions are going to be the focus of the examiner's

21   report.  You all have sort of staked out some positions already

22   about whether you think they were improper transfers or what

23   have you.  Uncertainty is usually what leads to negotiation and

24   resolution.  And maybe you can't dot the i's and cross the t's

25   until the examiner's report.  This case is not sitting on hold

1  until there's an examiner's report, okay.

2          So I'm -- look, you've made a lot of progress in the

3  case so far, in my view.  There have been a lot of issues

4  you've dealt with.  You've dealt with the debtors, dealt with

5  effectively, you're conducting business in a difficult

6  environment, you've got litigation pending everywhere.  Some --

7  a lot of it where one of the debtors is a plaintiff and some

8  where they're defendants and where -- even nondebtor affiliates

9  are defendants and all.  It's -- I don't underestimate the task

10  that everybody on your side of the table is facing, okay.  But

11  we're not putting this case on hold for an examiner's report

12  that at the end of the day isn't really going to resolve that

13  much because he'll issue a report, and if he finds some

14  questionable transactions, then you're still going to be

15  arguing about it.  You'll disagree with it, the committee will

16  think he didn't find enough bad things happen, and you're still

17  going to be left to negotiate.  So you ought to be negotiating

18  effectively now.

19          I don't -- I understand the importance of the RMBS

20  settlement and I think -- I commented, when I approved the

21  schedule, it wasn't just a schedule.  There was a lot of

22  substance in it.  It was important to the debtor.  The RMBS

23  trustees, I think, agreed to important points from the debtors'

24  standpoint and their own standpoint.  Whether the settlement's

25  going to work in the end, I don't know.  But we'll find that

RESIDENTIAL CAPITAL, LLC, ET AL.                                    32

1   out.  But you're not going to get to that point.

2          Here's what we're going to do, I don't want to

3   spend -- I want to give -- if you have some last points on the

4   RMBS status you want to talk about it, I'll let you do that.

5   We're going to have a separate conference to deal with the

6   discovery issues.

7          MR. PRINCI:  Okay.

8          THE COURT:  And I don't want to -- I've reacted

9   strongly to what on the one hand you file a status report and

10  say everything's hunky-dory with respect to discovery and they

11  file a sta -- if I see a bunch of status reports saying, no,

12  no, no, no, no.  So I want to move forward with the agenda.  If

13  there's some last points you want to make, we'll do that.  But

14  the message, I think, I got across pretty clearly is if it

15  doesn't happen on November 5th, it probably isn't happening

16  until sometime in January.  So you better go through backflips

17  if you want to keep to the schedule.

18         MR. PRINCI:  Your Honor, we will move Mother Earth to

19  keep that schedule, and I appreciate Your Honor allowing us the

20  time to first try to address this with the committee, and,

21  then, we can bring to the Court, as Your Honor sees fit,

22  whatever real discovery disputes there are.  And I emphasize

23  the word "real", Judge, because, again, the committee is taking

24  a position that goes beyond that and I want to address that

25  which is --

RESIDENTIAL CAPITAL, LLC, ET AL.                      33

1      THE COURT:  Well, some of what the committee -- let me

2   just -- I mean, some of what the committee says is -- they say

3   there's no disagreement about producing 1,500 loan files.

4   Their gripe is you haven't done it.

5      MR. PRINCI:  Judge, let -- again, I hesitate because

6   once you start talking about the discovery --

7      THE COURT:  Okay.  We'll do it in a separate --

8      MR. PRINCI:  -- you get into their --

9      THE COURT:  -- we're going to have a separate -- when

10  a -- yes, you are going to meet and confer and see what's real

11  and what's not but if I can get my computer to work, which I'm

12  having trouble with here, I'm going to have you come in for a

13  conference next week --

14     MR. PRINCI:  Okay.

15     THE COURT:  -- where the only thing we're going to

16  talk about is the status of discovery.

17     MR. PRINCI:  That'd be terrific, Judge.

18     THE COURT:  Okay.

19     MR. PRINCI:  By the way, just a footnote since you

20  raised it, I'm not trying to get the last word on you but out

21  of the --

22     THE COURT:  Don't worry; Mr. Eckstein hasn't even got

23  a chance to speak yet so you're not getting the last word.

24     MR. PRINCI:  -- out of the 1,500 loan files we --

25     THE COURT:  Or Mr. Mannal; I don't know which one of

RESIDENTIAL CAPITAL, LLC, ET AL.                                                    34

1   you is going to get the honors here.

2          Go ahead, Mr. Princi.

3          MR. PRINCI:  -- out of the 1,500 loan files requested,

4   they have 1,462 as of today, I'm informed.

5          In any event, Judge, let me get to the other points of

6   the status report.  Let me address the Holdco election.

7          First let me explain to the Court how that evolved and

8   let me explain to you why we are now, in light of the

9   objections that we got from certain parties, in the process of

10  removing it.

11         THE COURT:  Can I -- I don't want to interrupt for

12  this.

13         MR. PRINCI:  Please.

14         THE COURT:  The history is undoubtedly fascinating how

15  it got in there --

16         MR. PRINCI:  It's really not.

17         THE COURT:  -- and whether it comes out of there.  I'm

18  more interested in what it's going to be at the end of the day.

19         MR. PRINCI:  Okay.

20         THE COURT:  Okay?

21         MR. PRINCI:  So the Holdco election, Judge, simply

22  put, addressed the institutional investors' claim vis-a-vis the

23  parent debtor company, ResCap LLC.  ResCap LLC is a holding

24  company.  And ResCap LLC is not involved in the sale because

25  ResCap LLC isn't an operating company.  It doesn't have any of

1  the servicing rights, et cetera.  So there was a dispute after

2  we left court here on July 30th, which was, I think, the last

3  time -- there was a dispute as to the settlement agreement and

4  how it related to ResCap LLC --

5          THE COURT:  I think you're telling me more than I

6  really want to know.

7          MR. PRINCI:  -- and where we are today is that we are

8  intending, Judge, I think, right now to remove it which will

9  mean that -- remove it and remove -- so it will be removed, the

10 release related to LLC will be removed and where does that

11 leave the parties?  Well, that leaves the parties free to --

12 free to address the alter ego claim, which is what it's based

13 on, at another date.  That is what I believe Wilmington, which

14 is the noteholders, the ad hoc group of noteholders --

15         THE COURT:  Mr. Moloney's client.

16         MR. PRINCI:  Right.  Right.  And so I think that was

17 their big claim.

18         What we have done -- or what we haven't done yet --

19 what we're intending to do, what we're working on is still work

20 in progress, but we're hoping, Judge --

21         THE COURT:  When is this work in progress going to be

22 completed?  I'm more interested in that than what you're doing.

23         MR. PRINCI:  I thought it was going to be today so I'm

24 off on my -- I'm off on my estimates.  I am certainly hopeful

25 it will be the end of this week, Judge.

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1    So -- and I think that the problem with addressing it

2    now, as you can see, Judge, is it is certainly a moving target

3    and that I'm uncomfortable because -- it's --

4        THE COURT:  That's why I don't want to get down in the

5    weeds.

6        MR. PRINCI:  All right.

7        THE COURT:  If it's a moving target, I don't want to

8    spend a lot of time --

9        MR. PRINCI:  Fair enough.  Fair enough.  So we'll

10   address that, Judge.  I think with respect to discovery issues,

11   we'll welcome MBIA to the party because they love discovery.

12   And so we'll have them in our offices to discuss that and we'll

13   bring anybody who wants to talk about discovery into our

14   offices.  We'll listen to the Court with respect to when you

15   can give us a date to resolve anything we can't resolve with

16   these folks.

17       THE COURT:  Well, whether -- I'm going to give you a

18   date whether you've got it resolved or not.  We're having --

19   we're going to have another -- we're going to have a session;

20   just going to talk about discovery, disputes or not disputes.

21       MR. PRINCI:  Judge, I'll see --

22       THE COURT:  Can I ask you another question?

23       MR. PRINCI:  Please.

24       THE COURT:  I should know the answer to it and I

25   don't.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    37

1    This afternoon we have the FHFA.  That's a securities

2    case, right?  Are there representation and warranty claims in

3    that case, too?  I see one of your colleagues saying no.

4    Shaking her head no.

5           MS. PATRICK:  Your Honor --

6           THE COURT:  Can you come up.

7           MS. PATRICK:  -- I'll come up and help you.

8           THE COURT:  Identify yourself for the record.

9           MS. PATRICK:  Your Honor, Kathy Patrick.  I represent

10   the steering committee group of investors and out of everybody

11   in this room other than, perhaps, Mr. Lipps for the debtor, I'm

12   closest to these repurchase claims.

13          FHFA, as the conservator for Fannie and Freddie, has

14   two kinds of repurchase claims.  They have repurchase claims

15   that adhere to their -- what's called their guarantee portfolio

16   where they buy loans from the originators and guarantee them as

17   to principal in the event of a default.  That's one channel of

18   repurchase claims.

19          They have a separate channel of repurchase claims that

20   is part of the RMBS trust settlement.  They are holders of RMBS

21   that are embodied in the settlement.  But the litigation that

22   is before you today, the conference this afternoon, does not

23   include any repurchase claims at all.  It is a pure securities

24   case.

25          THE COURT:  Okay.  And so if the RMBS settlement is

1    approved --

2              MS. PATRICK:  Yes, sir.

3              THE COURT:  -- and all of the trustees act in

4    accordance with the instruction they've received from --

5              MS. PATRICK:  Ninety percent of the holders already.

6              THE COURT:  Well, I won't get into what classes and

7    all that, but let's just assume for purposes of discussion that

8    the RMBS trustees act -- sign onto the settlement.

9              MS. PATRICK:  Yes, sir.

10             THE COURT:  Adhere to it.  Will it resolve any of the

11   claims of FHFA?

12             MS. PATRICK:  It will resolve claims related to -- so

13   that -- the repurchase claims belong to the trusts not to FHFA.

14             THE COURT:  Yes.

15             MS. PATRICK:  Right?  So it will take all of those

16   trust claims off the table.  FHFA's guarantee portfolio is not

17   resolved by the RMBS settlement, but to the extent Fannie and

18   Freddie have a controlling interest in any trust and that trust

19   accepts the settlement, those claims go away.

20             THE COURT:  And is that true of FDIC because there's

21   the motion to withdraw the reference; FDIC is a receiver for --

22   I don't know which institution -- that's before Judge Swain.

23   What is their --

24             MS. PATRICK:  Any holder in any RM -- sir, what I'm

25   talking about are what are called private label

RESIDENTIAL CAPITAL, LLC, ET AL.                        39

1   securitizations.

2           THE COURT:  Yes.  Um-hum.

3           MS. PATRICK:  Any PLS repurchase claim for the 392

4   trusts resolved in the settlement is resolved.  It doesn't

5   matter who the certificate holders are.  If the trustees for

6   that trust accept the settlement and the order is entered by

7   the Court, a gigantic swath of repurchase claims will be put to

8   bed; potentially, twenty-two or more billion dollars.

9           THE COURT:  And the -- just focusing on the FHFA

10  case --

11          MS. PATRICK:  Um-hum.

12          THE COURT:  -- the non-Ally underwriters, okay --

13          MS. PATRICK:  Yes, sir.

14          THE COURT:  -- who've -- they've all filed regarding

15  discovery.

16          MS. PATRICK:  Um-hum.

17          THE COURT:  All right.  They say they have indemnity

18  claims against ResCap and AFI.

19          MS. PATRICK:  Um-hum.

20          THE COURT:  Will any of the indemnity claims likewise

21  be resolved or not?

22          MS. PATRICK:  No.  Their indemnity claims arise under

23  underwriting agreements in connection with the offering --

24          THE COURT:  Securities.

25          MS. PATRICK:  -- of the securities.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    40

1              THE COURT:  Okay.

2              MS. PATRICK:  So I'm not a bankruptcy lawyer but I

3    think your safe haven, there, Judge, is 503(b).

4              THE COURT:  I'm --

5              MS. PATRICK:  They tell --

6              THE COURT:  We'll deal with that.

7              MS. PATRICK:  Yes.

8              THE COURT:  I just -- when I started putting these

9    pieces together, it wasn't clear to me, what, if anything, will

10   be resolved with respect to the federal regulators in their

11   capacities as conservators or receivers or what have you.

12             MS. PATRICK:  Right.

13             THE COURT:  And of the other parties to that

14   litigation that asserted indemnity claims --

15             MS. PATRICK:  Right.

16             THE COURT:  -- or they haven't yet but will.

17             MS. PATRICK:  Correct.  And as conservators and

18   receivers on the PLS side, the FHFA, Fannie and Freddie, don't

19   own those claims.  They still belong to the trust.  They're not

20   assets of the GSEs.

21             THE COURT:  Okay.

22             MS. PATRICK:  The securities they hold are assets of

23   the GSEs.

24             THE COURT:  Okay.  All right.  Thank you very much.

25             MS. PATRICK:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                                      41

1          THE COURT:  I appreciate it.

2          Mr. Princi, go ahead.

3          MR. PRINCI:  Thank you, Judge.

4          Judge, let me just -- I realize other parties want to

5    speak but there's two -- there's two points in the committee's

6    response that can't go unanswered.

7          One, Judge, is the --

8          THE COURT:  They probably could, but go ahead.

9          MR. PRINCI:  Well, since you're indulging me I'm going

10   to get it in before you cut me off.

11         So footnote 4, Judge, basically, what footnote 4 says

12   is look, there's no reason why the Court can't put off

13   discovery -- not discovery -- the hearing date and we'll still

14   be okay because we got these other provisions that give us the

15   substantive rights.  And, Judge, I don't want to get into what

16   was negotiated and what the understanding was when we were,

17   and, obviously, the committee's counsel was there when we were

18   negotiating with the other parties but I certainly did not view

19   that as what the understanding was.  And I've contacted the

20   institutional investors and I understand that that is -- that's

21   certainly not their position.  And, again, we don't want to

22   lose what we negotiated hard for.

23         The other point, Judge --

24         THE COURT:  I guess maybe you -- I sound like a broken

25   record at this point.  You still have your November 5th date.

1    I'm more concerned -- I said it before, I'm more concerned

2    about them having a full and fair opportunity to prepare and be

3    able to put on whatever case they wish to put on.  The November

4    5th date may be precarious but it still is holding.  So I think

5    your --

6              MR. PRINCI:  Understood.  Judge, trust me when I say

7    this:  we hear you loud and clear on this.

8              One last point, Judge, and I do, unfortunately, have

9    to make a response to.

10             In paragraph 12 of the committee's response, there's

11   an unfortunate statement, it's untrue and we have to respond,

12   Judge.  It says flatly, "The settlement," this being the RMBS

13   settlement, "The settlement was negotiated by debtors with

14   little motivation to protect creditors by limiting the

15   settlement number and with every motivation to lock in the RMBS

16   investors' support for the debtors' pre-negotiated plan

17   providing Ally with a global release of the state and third-

18   party claims."  That's just terribly unfortunate, Judge.  It is

19   vehemently denied by the debtor and that sort of thing's

20   unnecessary.  And that's it for now, Judge.  Thank you.

21             THE COURT:  Well, when we get to the motion to --

22   well, let me -- I'll get to that later.

23             Go ahead, Mr. Eckstein.  Or I don't know which of your

24   colleagues is --

25             MR. PRINCI:  Judge, I guess I'll wait for the

RESIDENTIAL CAPITAL, LLC, ET AL.                                43

1  conclusion when you give us a date for the discovery

2  conference?

3             THE COURT:  Yes.

4             MR. PRINCI:  Okay.

5             THE COURT:  If I can ever get my computer working.

6             MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

7  Eckstein of Kramer Levin on behalf of the official creditors'

8  committee.

9             I did come prepared today with a fairly lengthy status

10 report.  It seems as if Your Honor, at the moment, is focused

11 primarily on discovery so let me start with the discovery.

12            I heard Mr. Princi say at one point that what the

13 committee said was fundamentally incorrect.  I didn't hear him

14 then go on and explain how it was fundamentally incorrect.  The

15 facts of the matter are is this.  In connection with the dates

16 that were put in place in July where we all recognized and the

17 Court recognized that these dates were ambitious at best and

18 these dates probably did not provide the parties with any real

19 opportunity to both deliberate and then confer and negotiate

20 over potential resolutions of issues to narrow --

21            THE COURT:  I don't think I ever said that.

22            MR. ECKSTEIN:  Well, I'm certainly willing to say

23 that, Your Honor.  Because I don't believe --

24            THE COURT:  You may feel that's your position --

25            MR. ECKSTEIN:  I don't believe --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    44

1      THE COURT:  -- but that's not a position that I took.

2      MR. ECKSTEIN:  -- I don't believe that the schedule

3   does provide that.  But be that as it may, the schedule

4   included, at the debtors' urging, that all discovery would be

5   responded to in ten days and that's fast.  And we understood

6   that that was fast but that was part of the way in which this

7   schedule was going to be met.

8      I understand because I speak to Mr. Lee and the

9   colleagues at Morrison & Foerster more than once a day.  There

10  is no lack of communication with us.  And the fact of the

11  matter is we've been working intensely with Mr. Princi and Ms.

12  Levitt about this and my colleagues and they have been working

13  in good faith intensely for the last several weeks, it seems on

14  a daily basis, if not more, to try to deal with this.  So we're

15  not suggesting bad faith.  That's not -- I'm not accusing the

16  debtor of not acting properly.

17      The fact of the matter is that as of this morning when

18  we walked into court, we had asked on August 17th for a sample

19  of 1,500 loan files and we had 900 files this morning.  If

20  somehow magically a bunch of files showed up in our office

21  today, I don't know about that, but as of this morning, 900 of

22  1,500 were present.  Now, that is twenty to twenty-five days

23  after the request was made.

24      I understand it's difficult, but the fact of the

25  matter is it's late and I have to now figure out what to do

1    with it.

2            THE COURT:  So somebody this afternoon wants 43,000

3    loan files.  So --

4            MR. ECKSTEIN:  Your Honor, like it or not, I think we

5    have a responsibility here and somebody is going to have to lay

6    out the facts and circumstances surrounding this settlement,

7    which is historic and which is going to have significance

8    around the country in RMBS litigation and very significant

9    decisions are going to have to be made about whether or not

10   it's appropriate to approve an 8.7 billion dollar settlement.

11   That's a big settlement.  And I would imagine it needs to be

12   done rigorously.  And we believed that the foundation for doing

13   that, among other things, was making sure that we had a

14   reasonable sample.

15           This is not a very substantial sample as samples go.

16   This is about as narrow as we could come up with.  But in order

17   for us to make a proper evaluation of this settlement, we need

18   to see the sample.  Our experts need to see the sample.  And we

19   need an opportunity to evaluate it.  And the fact of the matter

20   is, it is fifteen to twenty days late right now.  I can't

21   change that fact.  And I believe that's -- that's a fact on the

22   ground and we're dealing with that right now.

23           Number two, we have a September 24th fact discovery

24   cutoff.  That's two weeks from today minus a day.  The debtor

25   simply has not responded to fact discovery relating to the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                46

1  facts and circumstances surrounding the settlement.  And there

2  is similar discovery that is out to AFI, there is similar

3  discovery out to the Patrick group, there is similar discovery

4  out to Talcott Franklin.  We have not gotten responses to that

5  discovery, period.  We don't know who negotiated the

6  settlement.  We don't know who to depose.  It is simply not

7  possible -- it is simply not possible to comply with a

8  September 24th deadline if we haven't gotten documents.

9           I've been saying this before in this case, documents

10 do not mean loading us up with truckloads of contracts.

11 Documents mean e-mails.  And until we start getting e-mails in

12 this case, frankly, the discovery is a waste of our time.  And

13 I'm -- I've been through that before, Your Honor.  And every

14 time we have a motion, I say until the e-mails come out,

15 frankly, to tell me that they produced 25,000 pages of

16 documents is not meaningful.  These contracts are long.  And so

17 when the e-mails come out, we will have gotten the discovery.

18 That is not out today.  And --

19           THE COURT:  Have they told you when you're going to

20 get them?

21           MR. ECKSTEIN:  No.  I'm told maybe in two weeks.  And

22 in all due respect, what Mr. Princi did not tell you, there's a

23 dispute about whether we're going to get any of the relevant

24 information because I'm told the facts and the circumstances

25 surrounding the settlement are not relevant or appropriate, and

RESIDENTIAL CAPITAL, LLC, ET AL.                                        47

1   number two, they're subject to a common interest privilege.

2        Now, we can do it next week or we can do it today but

3   I know the law on that as well as anybody else.  I do not

4   believe that they are inappropriate; I do not believe that

5   they're subject to the common interest privilege.  The debtor

6   and the Patrick group are adverse parties and the common

7   interest privilege will not apply, in my view, at least, to

8   those negotiations.  And we can do it next week, I'm happy to

9   do it, but it's going to further delay the discovery.

10        THE COURT:  All right.  I suggest you all look at the

11  order I entered in and adversary proceeding entitled Velo

12  Holdings, Inc. v. Paymentech LLC.  The case number is 12-01564

13  and the order is ECF Docket Number 14.  And it was in the

14  context of an injunction hearing but where a party failed to

15  produce all of the electronic discovery that the other side

16  needed to prepare for trial.  You can look at it.  In Velo, I

17  also wrote recently as a published opinion on common interest

18  privilege.

19        We're going to have our conference.  I want to see the

20  parties to this dispute next Wednesday the 19th at 10 a.m.

21  I've spent as much time on this as I'm going to now.  Okay.

22  You can all -- look, if you're going to fight about common

23  interest privilege, come fight about common interest privilege.

24        You're all risking -- the longer you take to

25  resolve -- I'll resolve these issues pretty quickly if they're

RESIDENTIAL CAPITAL, LLC, ET AL.                                    48

1    presented to me.  So I don't want to hear that you've been

2    talking for weeks about there's a common interest objection and

3    as a result they haven't produced any -- they haven't produced

4    any documents.  You'll get it resolved pretty quickly.

5            I will see you on the discovery dispute next Wednesday

6    the 19th at 10 a.m.

7            MR. ECKSTEIN:  Your Honor, I'm happy to come back and

8    defer but it's obvious that the discovery deadline is expiring

9    and we'll, obviously, have to deal with that next week but

10   we're not in a position to meet the discovery responsibilities

11   given where the facts stand today, and I respectfully do not

12   believe it is possible for us to meet those deadlines given

13   where the facts stand.

14           THE COURT:  And, you know, every case is different --

15           MR. ECKSTEIN:  And this is not a question of bad

16   faith.

17           THE COURT:  -- but go look at the order I entered in

18   that Paymentech adversary procedure.

19           MR. ECKSTEIN:  I've looked at it, Your Honor.

20           THE COURT:  And that's -- I told Mr. Princi the

21   November 5th date is hanging by a thread and if it doesn't

22   happen then, see you next year.  Okay?  I'm not -- it's not an

23   empty threat.  I mean it's -- I've got fully paid-for tickets

24   to be out of the country and I've got a full docket before and

25   I arranged those dates after these dates were all set and was

1   assured that you'd all be ready to go.  Fine.  Okay?

2           Anything else, Mr. Eckstein?

3           MR. ECKSTEIN:  I actually -- at some point, I think

4   there's a lot to say about what the issues are going to be and

5   how they're presented, but I can do that some other time, Your

6   Honor.  I think that there are substantive issues at some point

7   in time once we get past discovery, there are very important

8   substantive issues that I don't think have really been

9   discussed at any point in time in this case that are going to

10  go to the substance and the merits of the RMBS settlement, and

11  how we're going to address those, I believe, would warrant a

12  discussion before objections are filed.  And I'm happy to put

13  that off to another day but I thought that it was

14  appropriate --

15          THE COURT:  Well, I'll tell you what.

16          MR. ECKSTEIN:  -- to discuss them now.

17          THE COURT:  You can all discuss that next Wednesday.

18  I don't have anything on the calendar in the morning.  I've got

19  an afternoon calendar.  Both sides can come prepared to tell me

20  what they think the issues in this RMBS settlement hearing are

21  and how the discovery relates to it and why you think it's

22  essential that you get all of your discovery, and we'll cover

23  it then.  Okay?

24          MR. ECKSTEIN:  I think that's fine.

25          THE COURT:  You'll get your chance then.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                        50

1         MR. ECKSTEIN:  That's fine, Your Honor.

2         THE COURT:  Okay.

3         MR. ECKSTEIN:  I mean I'm happy to come back next

4    Wednesday.  I'm sure --

5         THE COURT:  It'll be after your holiday.

6         MR. ECKSTEIN:  Fortunately, I'm prepared today so I

7    won't have to --

8         THE COURT:  You'll be feeling good after the new year,

9    you'll come in and you'll --

10        MR. ECKSTEIN:  It probably will be in a very, very

11   good tone.  We'll resume next Wednesday, Your Honor.

12        THE COURT:  All right.  What's next?  Mr. Lee?  We

13   don't need another word on this, Mr. Princi.

14        MR. PRINCI:  Then --

15        THE COURT:  We don't need another word on this.

16        MR. PRINCI:  -- you won't get one.

17        MR. LEE:  Your Honor, if I may, I'm just going to

18   change the schedule up slightly so we can go to an uncontested

19   matter --

20        THE COURT:  Go ahead.

21        MR. LEE:  -- which was heavily contested.

22        Your Honor, the next item on the agenda is the

23   presentment of the stipulation and proposed order regarding

24   subservicing.

25        THE COURT:  And the objection deadline is past.  There

**RESIDENTIAL CAPITAL, LLC, ET AL.**                51

1   were no objections that were filed.  Is there anybody here who

2   thinks they should be permitted to speak to the proposed

3   stipulation?

4           MR. ECKSTEIN:  I have a brief comment I would like to

5   make, Your Honor.

6           THE COURT:  Okay.  You want to say something first,

7   Mr. --

8           MR. LEE:  Maybe I should reserve --

9           THE COURT:  Mr. Lee, go ahead.

10          MR. LEE:  Maybe, Your Honor, I should reserve thanking

11  everybody for their hard work on this until after I hear Mr.

12  Eckstein speak?

13          THE COURT:  Well, I thought that the statements that

14  were submitted in connection with the stipulation were

15  interesting, but nevertheless the stipulation was agreed to and

16  it reserves the rights that it reserves and it does what it

17  does and I've read it all.

18          MR. LEE:  Okay.

19          THE COURT:  You can --

20          MR. LEE:  I will be --

21          THE COURT:  I'll give you a chance to briefly respond.

22  Mr. Eckstein?

23          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  With

24  apologizes; I need to excuse myself.

25          THE COURT:  You're excused.  Go ahead.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    52

1          MR. ECKSTEIN:  Your Honor, I'm happy to -- I'm happy

2    to rely on the statement --

3          THE COURT:  I've read your statement.

4          MR. ECKSTEIN:  -- and it's fine.

5          THE COURT:  Interesting reading.

6          MR. ECKSTEIN:  It was an interesting subject.  The

7    point that I'm rising to make is because one of the concerns we

8    had about this was how it was presented and when it was

9    presented and disclosure and the like, there is another motion

10   that is on, and, again, Your Honor will hear that motion but

11   there is a motion that was filed on Thursday after the

12   statements were filed to authorize the debtor to retain

13   Pricewaterhouse in connection with a federal reserve board

14   settlement that now turns out dwarfs the dollars in the

15   subservicing agreement.

16         THE COURT:  I'm sorry; say that again.

17         MR. ECKSTEIN:  Dwarfs the dollars in the subservicing

18   motion.  The amount of -- the amount of money that we're

19   talking about in that motion is projected to now be in excess

20   of 250 million dollars of payments by the debtor in connection

21   with the pre-petition contract that has many of the earmarks of

22   the subservicing arrangement.  So I merely rose to alert Your

23   Honor to the fact that --

24         THE COURT:  I can't wait.

25         MR. ECKSTEIN:  -- there is another motion that got

1  filed Thursday that has a lot of similarities, and I didn't

2  want Your Honor to feel that somehow we have totally put this

3  behind us, but for better or for worse, we have another round

4  that may be coming up.  So while this settlement is fine and

5  we're satisfied with it, I just wanted to alert Your Honor to

6  the fact that we may have to, sort of, raise some of these

7  issues a second time and we'll deal with that, I think, over

8  the next couple of weeks.

9          THE COURT:  Okay.  Thank you.  All right.  The

10  stipulation is approved.

11          MR. LEE:  Thank you, Your Honor.  I just wanted to

12  note for the record that in relation to the PwC retention

13  application that the details and circumstances --

14          THE COURT:  Just speak up a little bit.

15          MR. LEE:  Sorry -- the details and circumstances

16  giving rise to the consent order was entered into as a result

17  of negotiations with a number of regulatory authorities as

18  contained in the original Whitlinger affidavit, and it was

19  certainly a settlement that was entered into after careful

20  consideration of the alternatives.  It's a fairly detailed

21  negotiation.  And I just wanted to note, Your Honor, that the

22  company needs to honor the obligations to which it committed

23  itself and we understand and respect the views regarding the

24  cost of that review and that it might, indeed, exceed by some

25  significant amount the actual amount of relief provided to

RESIDENTIAL CAPITAL, LLC, ET AL.                                    54

1   consumers.  But nonetheless, we're required, as a regulated

2   entity, to comply.  A commitment is a commitment and I just

3   wanted to make that clear for the record and we needed to do

4   so, Your Honor.

5            THE COURT:  Okay.  Thank you.

6            MR. LEE:  Thank you.

7            THE COURT:  What's next on the agenda?

8            MR. LEE:  Your Honor, next is the motion to extend

9   exclusivity.  I'll turn it over to Mr. Marinuzzi, if I may.

10           THE COURT:  Sure.

11           MR. MARINUZZI:  Good morning, Your Honor.

12           I don't know about Your Honor, but I'm having fun

13  today.

14           Your Honor, I'll try not to make Your Honor repeat

15  himself.  We heard you loud and clear in connection with the

16  status conference.

17           THE COURT:  I think you got the drift of what I'm

18  thinking.

19           MR. MARINUZZI:  The subtlety was noted.

20           Your Honor, we filed a motion seeking a nine-month

21  extension of our exclusive filing and solicitation periods

22  which would have taken the filing deadline to June 11th and the

23  solicitation period to August 10th.

24           We received four limited objections, all of which

25  agree that some extension is appropriate, three of which

RESIDENTIAL CAPITAL, LLC, ET AL.                                55

1   believe an extension measured from the time that the examiner

2   files his report is an appropriate one that request a -- or

3   agrees that an extension is appropriate but not one that takes

4   us beyond, effectively, the closing of the sale hearing.

5           So Your Honor, to start, the basis of the request was

6   really to allow the debtors and all parties-in-interest to have

7   a very keen interest in the examiner's report to deal with all

8   of the Ally issues that we're dealing with from start to

9   finish.  And we recognize, as Your Honor noted, there are other

10  things that we can and should be dealing with including the

11  plan process.  And we've committed in our motion and continue

12  to confirm that we will consult with these parties on what an

13  appropriate plan should look like.

14          THE COURT:  Well, let me ask you this, Mr. Marinuzzi.

15          MR. MARINUZZI:  Sure.

16          THE COURT:  There are -- there is a list of

17  objections, if you will, to the extension of exclusivity

18  whether they're objections, per se.  Everybody agrees there

19  ought to be some extension.

20          MR. MARINUZZI:  That's correct.  There were four

21  responses, Your Honor.

22          THE COURT:  But Aurelius, Wilmington Trust, ad hoc

23  group of junior secured noteholders, the official committee and

24  I think they pretty well all take the position that the debtor

25  has refused to engage in substantive plan negotiations to this

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    56

1    point.

2              MR. MARINUZZI:  Your Honor, they all say that.

3              THE COURT:  Is that true?

4              MR. MARINUZZI:  I don't believe that's true, Your

5    Honor, and let me explain why.  First of all, Your Honor, the

6    junior secured noteholders withdrew their objection before the

7    start of the hearing so that's one less to deal with.  They've

8    agreed with our proposal.

9              I think, Your Honor, what we're doing on, effectively,

10   a daily basis with the committee is dealing with lots of issues

11   that are relevant to the plan process and we have not sat

12   down --

13             THE COURT:  If you take that position, everything is

14   relevant to the plan process but I mean -- but go ahead, Mr.

15   Marinuzzi.

16             MR. MARINUZZI:  There are a lot of contingencies, Your

17   Honor, important contingencies, that really have to be

18   addressed that are going to shape what a plan looks like.  We

19   spent a lot of time talking about one of them and that's the

20   8.7 billion dollar settlement.  And so to formulate a plan in

21   the absence of knowing whether the Court approves that

22   settlement or not, when people are looking at value and where

23   value flows and where it lies, means that we're going to just

24   have to start over again by tweaking things.  Now, that's not

25   to say that we can't have discussions that have what I guess

RESIDENTIAL CAPITAL, LLC, ET AL.                                      57

1    maybe collars on value but we have to be very creative because

2    until things like the examiner decides that either there's

3    enough claims that are found that have value, that belong to

4    these particular debtor entities, that satisfies the committee

5    or satisfies Wilmington Trust that controls the notes issued

6    out of Holdco or finds that everything that the company did was

7    appropriate because of the way the claims lie and the damages

8    or lack of damages or the consideration provided, we -- that is

9    going to, without a question, change whatever agreements we

10   come to between now and the time that report's issued.  So it's

11   not as if we're not doing anything.

12          And, yes, it's true; when it comes to sitting down

13   with a particular document and saying this is what the plan

14   should look like, we want your comments Wilmington Trust, the

15   junior secureds, the committee, it's true; we have not sat down

16   to have that discussion.

17          THE COURT:  But what they -- what I take away from the

18   objections is that pre-petition AFI determined what plan they

19   wanted to propose effectively and you went out -- I'm not

20   saying this is what happened; this is the gist of what I take

21   away -- you went out and you negotiated the RMBS settlement,

22   that was a major component of it, and that they essentially say

23   the debtors been unwilling to negotiate off of what AFI

24   dictated.  Okay.  That's the position I'm taking.

25          MR. MARINUZZI:  Okay.  And let me respond to that,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    58

1    Your Honor.

2           First of all, I think in making that assumption, you

3    lose sight of the fundamental issue that the company had to

4    deal with before they filed for bankruptcy.  And so what the

5    company thought of was let's look at the other mortgage

6    servicing origination companies that filed for bankruptcy and

7    what happened to them.  They all liquidated.  Scrap metal

8    value; creditors got very little recovery.

9           And the company said, well, we want to do things

10   differently and we want to make sure we go into bankruptcy with

11   the support to continue operating our business, with a platform

12   that's sustainable to realize real value for creditors

13   including those creditors represented by the committee.

14          And so the committee -- I'm sorry -- the company at

15   that point determined we have to find a way to solidify our

16   financing, to obtain financing, and they did so --

17   unprecedented for this kind of a business -- one-and-a-half

18   billion dollars of financing, cash collateral usage, and

19   stalking horse purchase agreements from two bidders proposing

20   to pay nearly four billion dollars in value.  Now, that didn't

21   happen by accident.  And if you look at the history of

22   companies in this sector, it never happened before.  And why

23   did it happen?  Well, it happened because the debtors

24   determined that the AFI relationship was one they had to live

25   with for better or worse, parent subsidiary.  And while the

1  relationship has been strained and had been strained prior to

2  bankruptcy -- and nobody likes to talk about that and you'd

3  have a different perception if you only read the committee's

4  papers -- but AFI, whether we like it or not, agreed to do a

5  number of things that were necessary to give this company a

6  soft landing.  And the examiner's going to have the last word

7  on AFI.  We accept that.

8          THE COURT:  The examiner's not going to have the last

9  word on anything.

10         MR. MARINUZZI:  Your Honor, I apologize.

11         THE COURT:  That's the point, Mr. Marinuzzi.  Because

12 whatever the examiner decides, there will be various

13 stakeholders who disagree, believe that there are transactions

14 he didn't identify as giving rise to potential claims or claims

15 that he did identify that the debtors or AFI disagree.  So it

16 is not the last word.  Uncertainty is what causes negotiation.

17 It's another data point, an important data point, obviously,

18 but not the determinative factor.

19         MR. MARINUZZI:  Fair point, Your Honor.  Fair point.

20         So what did AFI do?  They agreed to serve as the

21 stalking bidder for the debtors' whole loan portfolio.  They

22 agreed to provide debtor-in-possession financing.  They agreed

23 to support the debtors' continued origination of mortgage loans

24 in bankruptcy.  They agreed to continue through a shared

25 services agreement to allow the debtors to continue to utilize

RESIDENTIAL CAPITAL, LLC, ET AL.                                    60

1   back office support, payment systems and other internal systems

2   established by the parent to operate the debtors' businesses.

3            They're working with the debtors right now to assist

4   in separating those services to allow for a seamless sale of

5   the platform.

6            Has everything with AFI gone smoothly?  Of course not.

7   Your Honor has seen it; Your Honor will continue to see it.

8            THE COURT:  And they're acting as an eleemosynary

9   institution and all their asking for is the third-party

10   nondebtor releases --

11            MR. MARINUZZI:  Your Honor, whether --

12            THE COURT:  -- to get out from under all their

13   liabilities.

14            MR. MARINUZZI:  -- whether it's motivated by

15   selfishness or selflessness, the point that I'm trying to make

16   so it's not lost is that the company had --

17            THE COURT:  Okay.  The company -- I have, what, fifty-

18   three debtors.  I don't know if that's the right number; it's

19   approximately the right number.

20            MR. MARINUZZI:  Fifty-one, I believe.

21            THE COURT:  Fifty-one?  I've got fifty-one debtors.

22   That's what's before me.  Okay.  The debtors have to move

23   forward with a plan process.

24            AFI is an important stakeholder, an important party to

25   this.  I don't underestimate their importance now, in the past,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    61

1  in the future to getting this through as a successful case.

2  But it's the debtors that are before me.  It's the debtors who

3  have exclusivity and must propose a plan unless and until

4  exclusivity is lifted.

5          Judge Gerber, in Adelphia Communications, 352 B.R. 578

6  (Bankr. S.D.N.Y 2006), identifies nine nonexclusive factors

7  that courts should examine in determining whether to extend

8  exclusivity.  I've applied those factors in the Borders case, I

9  applied those factors in a case called Lexington Precision,

10 I've applied the factors in other cases.  Among the factors

11 that the court, that Judge Gerber focused on was whether the

12 debtor has made progress in negotiations with its creditors.

13 It's not the only factor but it's one of many.  There are

14 others, I think, that bear on where we are today, but it's an

15 important factor.  And what I'm concerned about is that you

16 point to the uncertainties, some of which will hopefully --

17 will be resolved along the way if the sales of the loan

18 platform and the legacy loan portfolio are approved, it'll be a

19 major milestone.  I don't underestimate that.  You can

20 certainly proceed on the assumption that those sales will take

21 place and will close and the proceeds that they'll generate as

22 a basis for moving forward with plan negotiations now, not

23 sometime next year, now.

24          What I'm concerned about is -- it's very easy for all

25 of you to point to the uncertainties and ambiguities and

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    62

1    everything else about this case; the case is not going to sit

2    here and wait for those to clarify.  Because at the end of the

3    day, I have a feeling it will be -- they won't be clarified

4    sufficiently; particularly, the examiner.  I mean it's an

5    important -- it's important in this case; I don't underestimate

6    it.  And it will probably change the dynamics of the

7    negotiation, shifting it one way or the -- one side or the

8    other but not -- I'll be surprised whether that's -- the big --

9    the event that's going to determine everything about this case.

10   Just I don't think that's going to happen.  Okay.

11           If the debtor wants to maintain exclusivity, which no

12   one has disputed at that point of this stage, it needs to move

13   forward with negotiations with the creditors' committee and

14   other important creditor constituencies.  And I plan to keep a

15   tight leash on it.  And I plan to do that by selecting a date

16   shorter than all of you have suggested for an extension of

17   exclusivity with the full intention that if everybody's

18   cooperating and trying to move forward, I'll grant another

19   extension.  But I'm not going to extend the date to sixty days

20   past the time -- thirty days past the time of the examiner

21   reports, sixty days past the time of the examiner reports.  I'm

22   not going to do that now.  I want to keep tight reigns on all

23   of you.  I want to see that you're making progress or at least

24   making an effort to make progress.  I don't want to hear that

25   the committee or other constituencies say the debtor simply

RESIDENTIAL CAPITAL, LLC, ET AL.                                            63

1  says they're bound by the plan support agreement that was

2  entered into, and they refuse to negotiate anything other than

3  those contained in them or they're constrained by what AFI

4  insisted on.  If that's the position you want to take, we may

5  as well lift exclusivity, and you could all come forward with

6  competing plans.  I don't think that's what you want.

7          MR. MARINUZZI:  I don't think anybody wants that

8  result especially with a pending sale.

9          Your Honor, we can commit that next week we will sit

10 down and begin plan discussions with the committee and anybody

11 else that wants to begin having plan discussions.  What I would

12 like to avoid, and we have not heard the date that Your Honor's

13 prepared to extend exclusivity through, is papers -- we don't

14 want papers being filed the day before we're here in front of

15 Your Honor again taking positions that really should be

16 discussed behind closed doors.  If they're discovery issues,

17 issues that the Court should know about, they really shouldn't

18 be the subject of a pleading.  They should be discussed.  In

19 order to have fulsome successful plan negotiations, you need to

20 be able to sit down with people and have those negotiations.

21 We need to know what their concerns are.

22         THE COURT:  I don't want to hear about the details of

23 any negotiations.  They're settlement nego -- you know, a plan

24 process, a consensual plan process, in my view, they're

25 settlement negotiations.  Just like every other settlement, I

RESIDENTIAL CAPITAL, LLC, ET AL.                                    64

1   don't want to hear about what's said in the negotiations.

2   Okay.  That I want to make crystal clear to everybody.

3           MR. MARINUZZI:  That's the point I'm trying to make,

4   Your Honor.

5           THE COURT:  Okay.  Mr. Eckstein?

6           MR. ECKSTEIN:  Your Honor, we are concerned about the

7   fact that while a lot of progress has been made in the case --

8   and I do want to give the debtor credit for the fact that a lot

9   of progress has been made.  I think we know that we worked

10  intensely during June to put in place the DIP, to put in place

11  the asset sale procedures.  We worked through the Ally

12  subservicing issues.  The foundation for the sale was in place

13  by mid-June.  The Court spent many, many hours on that.  And

14  the debtor did a good job in ultimately getting us to the right

15  place.

16          That was June.  All the discovery that we had, that

17  the committee felt was necessary in connection with the AFI

18  investigation, was also known by June.

19          THE COURT:  Let me ask you this, Mr. Eckstein.  Let's

20  look forward rather than back.  All right.  We are where we are

21  in the case.  Okay.  And I'm more interested in what the major

22  constituents would like to see the process going forward.  How

23  would you like to proceed?

24          MR. ECKSTEIN:  Fine.  That's appropriate, Your Honor.

25  Your Honor, as we see it, there are probably five major

1  constituencies in the case.  You have the debtor, you have AFI,

2  then you have the junior bonds which were the subject -- at

3  least the ad hoc committee of the junior bonds were the subject

4  of a pre-petition plan support agreement.  And that's an issue

5  we should come to in a moment.

6          Within the unsecured constituency, you have the

7  trustees or certificate holders, depending upon -- well, let's

8  call them, really, a constituency, the RMBS claimants.  You

9  have the monolines, MBIA, FGIC, both of whom are members of the

10 committee plus several others.  You have a variety of claimants

11 whose claims arise out of the purchase of securities from the

12 debtor, but they're also related to the RMBS claims.  These

13 were the issuance of the RMBS claims through the public

14 issuance of securities which were underwritten.  And those

15 claimants also have claims against AFI.  Then you have an issue

16 of public debt, a billion dollars of public debt represented by

17 Wilmington Trust that is sitting at the Holdco.

18         And the fact of the matter is three of the trustees,

19 the monolines, the securities claimants and the holdco bonds

20 are also represented on the creditors' committee.  There's also

21 a representative of borrowers who have a representative on the

22 creditors' committee as well.

23         THE COURT:  I've writtend down seven.

24         MR. ECKSTEIN:  So there are actually --

25         THE COURT:  How many of the seven are represented on

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    66

1   the committee?

2           MR. ECKSTEIN:  Five of the seven are represented on --

3           THE COURT:  Which -- so it's the --

4           MR. ECKSTEIN:  The RMBS --

5           THE COURT:  RMBS, the monolines --

6           MR. ECKSTEIN:  -- the monolines, the securities

7   claimants --

8           THE COURT:  Yes.

9           MR. ECKSTEIN:  -- the holdco bonds and the borrowers.

10  They were all on the creditors' committee.

11          THE COURT:  So at least in the first instance, the

12  committee and its professionals are the -- because the bigger

13  the group the harder it is to get anything done.  So

14  realistically, you represent the committee.  The committee is

15  made up of a group of constituents, all who are important to

16  the process.  But it seems to me that in how you go forward in

17  the first instance, it's the debtor, AFI, the junior bonds, the

18  committee.  Is there any other essential player in that?

19          MR. ECKSTEIN:  I believe those are the players, Your

20  Honor.  The -- within the committee, I identified various --

21          THE COURT:  Right.

22          MR. ECKSTEIN:  -- sub-constituencies.

23          THE COURT:  Right.  And let's assume that those are

24  the constituents, at least in the first instance, how would you

25  propose to go forward if you could set out a process to go

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    67

1    forward?

2          MR. ECKSTEIN:  One more observation, Your Honor.  With

3    the exception of the holdco bonds who are at the holdco rather

4    than the opcos, all of the claimants are essentially litigation

5    or disputed claimants.  We don't really have fixed debt.  And

6    so, all of the claimants, by definition, warrant negotiation

7    and compromise in order for them to be resolved.  Otherwise,

8    the Court's going to have to litigate every claim.  So these,

9    probably more than most, really require a process where the

10   parties are going to be in the room.  And one of the --

11         THE COURT:  Yeah.  But, you know, in the first

12   instance, Mr. Eckstein -- maybe I'm mistaken.  I think if

13   there's a core group in the first instance that sits down and

14   tries to agree on, okay, here are the components that have to

15   go into it.  Here's a process how we go forward.  And maybe at

16   the end of the day, because of the litigation claimants, that

17   are probably debt holders or whatever, there has to be a direct

18   negotiation with them.  But in terms of trying to set a

19   framework for how a process should go forward, you can't get --

20   if you have everybody at this table, nothing's going to get

21   done.  Okay  I'm perfectly --

22         You know, I've been running this constant battle for

23   the last two months with construction in the building.  Can

24   somebody call Deanna and have them -- this has been a constant

25   battle.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                         68

1    You can certainly bring to bear -- at least in the

2  first instance, you can't resolve the claims of your various

3  constituents, but you can certainly be an able spokesman for

4  setting out the process of how that's going to go forward.

5  Okay?  You can consult with each of them, take their views into

6  account, represent the committee in trying to come up with a

7  process.  What I -- 'cause what I want -- and I'm going to want

8  to ask Mr. Lee the same question.  What I want is I want an

9  agreement today about how you're all going to proceed with a

10  process, and you're going to carry forward with it, and then

11  I'm going to get periodic reports, not on the detail, I don't

12  want to know the substantive details of what you're

13  negotiating, but how you're moving forward.  Okay.

14          Any other points you want to make at this point?

15          MR. ECKSTEIN:  I just want to make it clear, Your

16  Honor, I have met with each of the members of my committee

17  individually, and I can represent they're all prepared to

18  participate in a process, and I would agree that the committee

19  and the debtor need to sit down immediately and work out a

20  framework for there to be discussions among the constituencies

21  in a constructive way.  And I believe over the next ninety days

22  --

23          THE COURT:  Well, you don't --

24          MR. ECKSTEIN:  -- that's what can happen.

25          THE COURT:  The junior bonds are not represented on

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                        69

1    the committee.

2              MR. ECKSTEIN:  No.  The junior bonds are not.  We need

3    to also interact with the junior bonds.  We have issues --

4              THE COURT:  I understand.

5              MR. ECKSTEIN:  -- with the junior bonds --

6              THE COURT:  Okay.

7              MR. ECKSTEIN:  -- and we've begun a dialogue with them

8    as well.

9              THE COURT:  Let me hear from Mr. Lee.  Okay.  I'll

10   give you another chance --

11             MR. ECKSTEIN:  Okay.  Fine.

12             THE COURT:  -- Mr. Eckstein, but I want --

13             MR. LEE:  Gary Lee from Morrison & Foerster for the

14   debtors.  Your Honor, actually, Mr. Eckstein and I have already

15   begun to have this precise discussion whether it was in

16   anticipation of what Your Honor was going to say today.  And

17   from the debtors' perspective, I think what we need to do first

18   is to sit down with Mr. Eckstein once we've got through this

19   hearing.

20             I think what we need to do is actually identify the

21   issues that will stand in the way of crafting a plan before we

22   get to the components of the plan.  And we, obviously, I think,

23   all know a number of what those issues are.  We can then talk

24   about the process.

25             We have undertaken, Your Honor, to actually meet with

RESIDENTIAL CAPITAL, LLC, ET AL.                                     70

1  the full committee at the beginning of next month.  The reason

2  it's at the beginning of next month was to actually give us an

3  opportunity not just to have identified the issues, but

4  actually, you know, had some thought about what the process is

5  and the best way to bridge things.  So the idea, Your Honor,

6  was that this was not going to be frozen in time until after

7  the examiner issues his report.  We intend for this to be live

8  and engaging, and we will begin that process immediately.

9          THE COURT:  Well, here's what I want.  You're back on

10 September 27th.

11         MR. LEE:  Yes, Your Honor.

12         THE COURT:  And between now and September 27th, you'd

13 need, in this first period between now and then, to meet and

14 confer with Mr. Eckstein and try and agree on a stage process

15 going forward.  I want you to report on -- Mr. Eckstein can

16 take counsel from his various constituents on his committee.  I

17 want to assure the junior bondholders and anybody else who's

18 not represented on the committee that I'm not shutting you out

19 of this process.  But in the first instance, sit with Mr.

20 Eckstein, identify the issues that you see that are going to be

21 plan negotiation issues.  See if you can get agreement in the

22 first instance on that.  Try and come up with a proposed

23 process, an active proposed process that will go forward

24 promptly.  Report to the Court on September 27th about where

25 you are on that.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    71

1          I think it's important that AFI, and the junior

2     bondholders, and any other of the constituents that have been

3     identified that are not represented on the committee quickly be

4     included within the process, so that I don't feel like they're

5     being shut out.  But I think in the first instance, you and Mr.

6     Eckstein confer and see if you can agree, and I want a report

7     back on September 27th.

8          For now, what I'm doing is I'm going to extend

9     exclusivity to 5 p.m. Thursday, December 20th.  And --

10          MR. MARINUZZI:  Did you say December 20th, Your Honor?

11          THE COURT:  I said December 20th.

12          MR. MARINUZZI:  Thank you.

13          THE COURT:  I fully expect that I'll -- you know,

14    barring completely unforeseen circumstances, I'll grant another

15    extension before then.  I don't need lengthy papers.  I think I

16    have free complete discretion about what I do on extending

17    exclusivity.  The debtor is entitled to an opportunity if it's

18    proceeding -- if you're satisfying those factors that Judge

19    Gerber has identified that I've applied in many cases so far,

20    you'll get an extension of exclusivity, but I want to see real

21    progress.  This is not going to sit and wait.

22          So, for now, present an order that extends exclusivity

23    to 5 o'clock on December 20th.  I'll even shorten your time to

24    bring on motions to extend exclusivity before that.  Mr.

25    Marinuzzi, you're --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    72

1          MR. MARINUZZI:  Your Honor, I just want to be clear on

2    what Your Honor is ordering because we've got the plan filing

3    deadline, then we've got the solicitation deadline.  And I know

4    you extended the filing deadline to December 20th.

5          THE COURT:  Right.  Just to give the --

6          MR. MARINUZZI:  Sixty days out.

7          THE COURT:  -- corresponding --

8          MR. MARINUZZI:  Okay.

9          THE COURT:  -- sixty days.  I use that as the first of

10   the dates, yes.

11         MR. MARINUZZI:  Thank you.

12         THE COURT:  Prepare an order that appropriately has

13   the date sixty days after that.  Okay?

14         MR. MARINUZZI:  We'll do that.  Thank you, Your Honor.

15         THE COURT:   All right.

16         MR. LEE:  I mean, Your Honor, we will work with the

17   committee and ensure that we've made --

18         THE COURT:  I can't hear you, Mr. Lee.

19         MR. LEE:  I'm sorry, Your Honor.  We will work with

20   the committee and ensure that we will have made sufficient

21   progress to have both identified the issues and have a process

22   for going forward, and to the extent possible between now and

23   then, actually to have begun an active process as well.

24         THE COURT:  Okay.

25         MR. LEE:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1    THE COURT:  Mr. Marinuzzi?

2    MR. MARINUZZI:  Your Honor, unless somebody else wants

3  to be heard --

4    THE COURT:  I see people jumping up.  Mr. Goldman, you

5  wanted to be heard?

6    MR. GOLDMAN:  I do.  Thank you, Your Honor.

7    THE COURT:   Your client is --

8    MR. GOLDMAN:  Aurelius.

9    THE COURT:  -- Aurelius?

10    MR. GOLDMAN:  Thank you, Your Honor.  As I said,

11  Daniel Goldman, Akin Gump, counsel for Aurelius Capital

12  Management.  Very briefly, Your Honor.  I just wanted to point

13  out what may be a misimpression.  Aurelius is a holder of the

14  junior secured bonds.  It holds approximately eight percent or

15  165 million.  The junior secured bonds are not a monolithic

16  group.  A minority of the bonds or the ad hoc group doesn't

17  constitute a majority of the bonds, nor does the plan support

18  agreement signed by the junior secured bonds does not represent

19  a majority of the class.  So it's difficult to talk about the

20  junior secured group as one constituency.

21    The other point I'd like to make, we have no objection

22  to Your Honor's rulings both as to the date and as to the

23  process.  We believe that we will be kept well advised and well

24  informed, and we will have our opportunity at the bargaining

25  table.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                74

1    We do agree, though, Your Honor, with the point that

2    you made that this case need not stand still until the issuance

3    of the examiner's report.  That was a point we made in our

4    pleadings.  There are a whole variety of plans that could be

5    formulated here.  And the overarching issue regarding AFI and

6    claims against the AFI can be dealt with in a number of ways.

7    We're not here to say that an ultimate settlement with AFI may

8    not be the appropriate course, but there are other courses of

9    action.  If the examiner identifies potential claims against

10   AFI, they can be dealt with in connection with a post-

11   confirmation litigation trust.  It's been done numerous times.

12   I don't think that --

13           THE COURT:  You know, I would just note that the

14   Dynegy case confirmed this week, I guess, and a lot happened

15   after the examiner's report there.  And, you know, I don't know

16   what -- we'll see what happens here.  I don't know.

17           MR. GOLDMAN:  So, Your Honor, Aurelius, for its

18   position on the junior secured bonds, stands ready, willing and

19   prepared to, and anxious to start the arduous process of

20   negotiating a plan in these cases.

21           THE COURT:  Thank you, Mr. Goldman.

22           MR. GOLDMAN:  Thank you.

23           THE COURT:  Anybody else who has a burning desire to

24   say something?

25           MR. O'NEAL:  Sean O'Neal, Cleary Gottlieb, on behalf

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    75

1    of Wilmington Trust.  Just very, very short.  I think Your

2    Honor has pinpointed one of the main concerns we've had is that

3    the plan discussions should not be on hold.  I think as evident

4    by the debtors' process with respect to the holdco election and

5    the changes to the RMBS settlement agreement, we have had

6    concerns that other parties have been involved in plan

7    discussions, be it AFI, or the RMBS trustees, or the RMBS

8    investors, or the junior secured noteholders, but not

9    Wilmington Trust or any of the noteholders.  So we look forward

10   to participating in those discussions.  And we will play a

11   constructive role in that process.  We don't know if we'll

12   reach a settlement, obviously, but we do stand by ready to

13   engage in those discussions.

14          THE COURT:  Thank you very much.  Anything else on the

15   agenda, Mr. Lee?  Mr. Marinuzzi?

16          MR. MARINUZZI:  Your Honor, I'm on page 13 of the

17   agenda, on the debtors' unopposed motion for an order extending

18   the 365(d)(4) period to assume or reject executory contracts

19   and leases.

20          THE COURT:  What page are you on?  Can you tell me

21   again?

22          MR. MARINUZZI:  It's page 13 of the agenda, the

23   amended agenda.

24          THE COURT:  Yes.

25          MR. MARINUZZI:  Your Honor, there was no objection to

RESIDENTIAL CAPITAL, LLC, ET AL.                                              76

1  the motion.  It seems to --

2           THE COURT:  Anybody wish to be heard?  The motion's

3  granted.

4           MR. MARINUZZI:  Thank you, Your Honor.  Your Honor,

5  that brings us, unless I skipped something, to the committee's

6  application to expand the scope of their retention of Moelis &

7  Company.  And I'll turn it over to Kramer Levin.

8           THE COURT:  Thank you.

9           MR. BENTLEY:  Good morning, Your Honor.  For the

10 record, Philip Bentley of Kramer Levin on behalf of the

11 committee.  Your Honor, we have two retention applications

12 before the Court today.  They're both for experts that we're

13 retaining in connection with our RMBS evaluation.  I would just

14 note there are two more retention applications that we'll be

15 filing in the next few days.  That will round out and complete

16 our expert team.

17          I can explain to Your Honor how they fit together if

18 you'd like, but I'm happy to dispense without it.

19          THE COURT:  No.  Let me see.  Mr. Driscoll, are you

20 going to speak on behalf of the U.S. trustee?

21          MR. DRISCOLL:  Yes, Your Honor.

22          THE COURT:  Why don't you come on up to the

23 microphone?  I gather, in the first instance, there was an

24 issue of whether all of these experts had to be retained or

25 whether any of them would be an expanse for one of the other

RESIDENTIAL CAPITAL, LLC, ET AL.                                        77

1    experts.  The decision, I think, based on the U.S. trustee's

2    views is that they should go forward with retention

3    applications.  Do I have that correct?

4             MR. DRISCOLL:  Your Honor, we did not have discussions

5    with the committee before they filed those retentions.

6             THE COURT:  Okay.

7             MR. DRISCOLL:  They did file those retentions.  We've

8    reviewed those, and we have no objections.

9             THE COURT:  Thank you.

10            MR. DRISCOLL:  With respect to Moelis, the form of the

11   order is acceptable.  So we have no objection there.

12            With respect to San Marino, our discussions post-

13   filing of the motion was that the committee would split those

14   retentions between San Marino and Coherent to reflect an issue

15   in paragraph 21 of the application which said that there was

16   going to be a twenty percent -- San Marino would collect twenty

17   percent of Coherent's fees and billing.  So we requested that

18   that -- to address potential issues of fee sharing, we

19   requested that those retentions be split, and that's what

20   you'll see today, Your Honor.

21            THE COURT:  Okay.  Has that been -- you've got an

22   agreement on that?

23            MR. DRISCOLL:  Yes, Your Honor.  That's our

24   understanding.

25            THE COURT:  Okay.  Anybody else wish to be heard with

**RESIDENTIAL CAPITAL, LLC, ET AL.** 78

1  respect to the committee's retention application?

2          MR. DRISCOLL:  Thank you, Your Honor.

3          THE COURT:  Thank you very much, Mr. Driscoll.  Mr.

4  Marinuzzi?

5          MR. MARINUZZI:  Your Honor, I know that we went back

6  and forth with debtors' counsel to understand a little bit more

7  about the basis and need for the retentions, concerning about

8  overlap, duplication, et cetera.  We're satisfied that they've

9  been addressed in the form of order that are being presented.

10         THE COURT:  Thank you very much, Mr. Marinuzzi.

11         MR. MARINUZZI:  Thank you.

12         THE COURT:  Anybody else wish to be heard?  All right.

13  Then they're approved.

14         MR. MARINUZZI:  Thank you.

15         MR. BENTLEY:  Your Honor, we will e-mail to the Court

16  this afternoon the revised one.

17         THE COURT:  That's fine.  Thank you very much --

18         MR. BENTLEY:  Thank you, Your Honor.

19         THE COURT:  -- Mr. Bentley.  Mr. Marinuzzi, anything

20  else?

21         MR. MARINUZZI:  Your Honor, I'm trying to locate on

22  the agenda.  We had a number of lift stay motions that have

23  been resolved by stipulation.

24         THE COURT:  Right.

25         MR. MARINUZZI:  And certificates of no objection, I

RESIDENTIAL CAPITAL, LLC, ET AL.                    79

1  understand, were filed with respect to those stipulations.

2  We've received no objections or other pleadings with respect to

3  the motion.  We think everything is settled with the

4  stipulations.

5          THE COURT:  Right.  And those will be approved.

6  I saw them listed --

7          MR. MARINUZZI:  Thank you very much.

8          THE COURT:  -- on the agenda.

9          MR. MARINUZZI:  And I believe that's everything on for

10 today.

11         THE COURT:  What's the -- we're supposed to have a

12 pretrial --

13         MR. MARINUZZI:  Oh.

14         THE COURT:  -- about Green Planet.  You've resolved

15 that by stipulation, Mr. Rosenbaum?

16         MR. ROSENBAUM:  Your Honor, Norm Rosenbaum for the

17 debtors.  Yes, Your Honor approved the stipulation --

18         THE COURT:  Did I sign it already?

19         MR. ROSENBAUM:  Yes.  Yes, you did, yesterday.

20         THE COURT:  Good.

21         MR. ROSENBAUM:  Thank you.

22         THE COURT:  All right.  Anything else?

23         MR. MARINUZZI:  Your Honor, just to clarify, the pre-

24 auction objection -- the hearing on the pre-auction objection

25 is on for September --

RESIDENTIAL CAPITAL, LLC, ET AL.                    80

1        THE COURT:  I thought it's October 17th, no?

2        MR. GOREN:  Your Honor, it's -- Todd Goren, Morrison &

3   Foerster.  It's still scheduled for September 27th.  We're

4   working with the trustees.  We're hopeful we'll have a

5   resolution before the 27th that will likely require that it

6   gets kicked to the 17th to fully resolve it, but as of today,

7   it's still scheduled for the 27th.

8        THE COURT:  Thank you, Mr. Goren.  All right.  And

9   when is your -- okay.  If it's on for the 27th, what is it

10  that's going to be on for the 27th?  I thought I was told

11  earlier that the response to the pre-auction objections was due

12  on October 10th.

13       MR. GOREN:  I think that was based on an October 17th

14  hearing date.  I believe you had given us, I would have to go

15  back and double check my e-mails, September 24th for responses?

16       THE COURT:  Okay.  I just want to be sure that if it's

17  going forward, I get papers and can prepare and all that.

18       MR. GOREN:  Yes.

19       THE COURT:  Okay?  Thank you, Mr. Goren.  All right.

20  You wanted to be heard?

21       MR. FINAY:  Bradley Finay (ph.), of counsel, McCabe

22  Weisberg & Conway.  I --

23       THE COURT:  Just tell me your name one more time.

24       MR. FINAY:  I'm Bradley Finay.

25       THE COURT:  Thank you, Mr. Finay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                   81

1      MR. FINAY:  Your Honor, I just don't know what the

2   adjourned date for the lift stay motions is.  I have two lift

3   stay motions on today.  Have they been resolved?

4      THE COURT:  Talk to Mr. -- just walk over and talk to

5   Mr. Marinuzzi and Mr. Rosenbaum and see.  I thought everything

6   was adjourned until September 27th.

7      (Pause)

8      MR. FINAY:  Thank you, Your Honor.  Sorry for

9   interrupting.

10      THE COURT:  No.  It's no interruption.  That's okay.

11   All right.  Mr. Lee, the lift stays that were originally on for

12   today, they're sort of unlike the group that have come on

13   before today.  I gather these are ones where GMAC is a second

14   mortgagee, and the first mortgagee is moving to foreclose, and

15   in order to clear title, they need to have the second mortgagee

16   as a party.  Do I understand those sort of correctly?

17      MR. LEE:  Yes, Your Honor.  We filed a motion, I

18   believe, yesterday in order to establish procedures to

19   streamline --

20      THE COURT:  Okay.

21      MR. LEE:  -- this process particularly where the

22   debtors have no economic interest --

23      THE COURT:  Right.

24      MR. LEE:  -- to try and resolve that.

25      THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    82

1          MR. LEE:  Yes, Your Honor.

2          THE COURT:  And just one last question.  At the last

3    hearing, there was the issue, and I don't remember the name of

4    the case, the Alabama case, where it was scheduled for trial in

5    September.  And I directed counsel to go off and confer, and

6    see if you could resolve the issues.  I never heard anything

7    back.  Can anybody inform me of what's happened?

8          MR. LEE:  Your Honor --

9          THE COURT:  Mr. Rosenbaum?

10          MR. LEE:  -- may I turn the podium over?

11          THE COURT:  Thank you.

12          MR. ROSENBAUM:  Your Honor, it's the -- I think it was

13    called the Silvan matter pending in state court Alabama.  We

14    have been conferring with counsel for the plaintiffs.  We don't

15    have a resolution yet.  They've been somewhat difficult to get

16    a hold of.  And I think what we decided is we'd try a written

17    proposal to see if we can come to an agreement, but we have

18    been aggressively trying to get a hold of them.

19          THE COURT:  All right.  I would ask that it be put on

20    the calendar for a status conference on September 27th, that

21    you make sure that the plaintiffs' counsel in that case -- I

22    guess it's actually the defendants' counsel.  It's an action to

23    recover possession of property by GMAC.

24          MR. ROSENBAUM:  That's correct.  You're right, Your

25    Honor.

1      THE COURT:  They've asserted affirmative defenses and

2   counterclaims.  Make sure that counsel is advised of the

3   September 27th status conference, and they're authorized to

4   appear by telephone.

5      MR. ROSENBAUM:  We'll do so, Your Honor.

6      THE COURT:  Okay.  All right.  Thank you.  Mr.

7   Marinuzzi?

8      MR. MARINUZZI:  Your Honor, just one final point

9   related to this, and Your Honor reminded me of this.  We're

10  currently formulating, and we'll talk to the committee about it

11  after the hearing, some modification to the bar date papers,

12  maybe the order, because we're hearing questions from borrowers

13  asking if they don't return a proof of claim, will they lose

14  their ability to assert an affirmative defense to a

15  foreclosure.  It's not the intention of the bar date order to

16  do that.

17      THE COURT:  Right.

18      MR. MARINUZZI:  Monetary damages are different.

19  Rather than field many phone calls, we'd like to publish

20  something to let them become aware of that.

21      THE COURT:  Okay.

22      MR. MARINUZZI:  Thank you.

23      THE COURT:  I hope you can work that out.

24      All right.  Anything else for today?  All right.

25  We're adjourned.  Thank you.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    84

1          MR. MARINUZZI:  Thank you.

2          THE COURT:  See you next Wednesday.

3      (AM session concluded at 11:42 AM)

4      (Begin PM session at 2:04 PM)

5          THE COURT:  Please be seated.  All right.  We're here

6   in Residential Capital LLC, number 12-12020.  Mr. Glenn?

7          MR. GLENN:  Good afternoon, Your Honor.  Andrew Glenn,

8   Kasowitz Benson Torres & Friedman along with Kanchana Leung and

9   Daniel Fliman on behalf of the Federal Housing Finance Agency

10  acting as conservator for Freddie Mac and Fannie Mae.

11         Your Honor, we're here pursuant to the adjourned

12  motion that we filed.  We understand that the other parties to

13  the proceeding before Judge Cote have also filed a separate

14  motion seeking additional information.

15         Before we proceed, I wanted to bring one update to

16  Your Honor's attention; it was a late breaking development

17  solely from our end.  We have consulted with our sampling

18  experts in this case, and we are prepared further to cut our

19  request at this point in time by half to 2,500 loan files to be

20  selected by the expert after the conclusion of these

21  proceedings.  Otherwise, we'll be guided by Your Honor in terms

22  of how you want to proceed today given the argument that we

23  presented in the last hearing.

24         THE COURT:  Let me ask you this.  Are you introducing

25  any evidence as part of your affirmative case?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    85

1      MR. GLENN:  No, Your Honor.  We have the transmittal

2   declarations and that's all.

3      THE COURT:  What do you mean by the transmittal

4   declarations?

5      MR. GLENN:  The declarations of Ms. Leung, my partner.

6      THE COURT:  All right.  Do you want to -- I think

7   what -- if you're going to offer anything in evidence, you

8   ought to do that.  Let me ask you, are you going to cross-

9   examine the declarants that ResCap has proffered?

10     MR. GLENN:  I don't believe so, Your Honor.

11     THE COURT:  Okay.  Because this is an evidentiary

12  hearing, if there are -- if there's anything you wish to

13  introduce in evidence, offer it now, okay, including, if you're

14  offering your partner's declaration.  Identify it specifically

15  for the record, indicate the nature of the offer, et cetera.

16  Okay?

17     MR. GLENN:  We offer the two declarations of Kanchana

18  Wangkeo Leung.  One was submitted as part of our application

19  and the other one was a supplement affidavit in our reply

20  briefing.

21     THE COURT:  Can you identify those by ECF document?  I

22  mean the debtors have put everything together in a binder.  Do

23  you have that --

24     MR. GLENN:  I believe I have that --

25     THE COURT:  It looks like you've got it.  It's just I

RESIDENTIAL CAPITAL, LLC, ET AL.                                    86

1  want to be clear what is part of the record before me on which

2  I'm going to rule.

3          MR. GLENN:  Docket number 808 and 1296.

4          THE COURT:  All right.  Are there any objections to

5  those two declarations?  Mr. Haims?

6          MR. HAIMS:  No, Your Honor.

7          THE COURT:  All right.  The two Leung declarations at

8  ECF docket numbers 808 and 1296 are admitted in evidence.

9  (Declaration and supplemental declaration of Kanchana Wangkeo

10 Leung was hereby received into evidence as of this date.)

11         THE COURT:  All right.  Do you rest at this point?

12         MR. GLENN:  Well, on the evidence, Your Honor --

13         THE COURT:  Yes.

14         MR. GLENN:  -- yes, we rest.

15         THE COURT:  Okay.  All right.  Mr. Haims, are you

16 going to -- I think you ought to start by offering in evidence

17 whatever you're going to proffer.

18         MR. HAIMS:  Your Honor, I'd like to start by -- before

19 I just do the evidence, just to say that Your Honor has been

20 clear that the automatic stay applies to third party discovery.

21 And Your Honor also stated that anyone --

22         THE COURT:  I was not.  I think you misstate what I

23 said.  We'll deal with it.  I think that the Kasowitz firm

24 accurately collected -- I asked a question whether the use of

25 the term "process" in 362(a) applied to subpoenas -- third

RESIDENTIAL CAPITAL, LLC, ET AL.                                                87

1  party subpoenas.  And I may have pondered whether -- you know,

2  why didn't it.  But I asked that that issue be addressed in

3  briefs.  Kasowitz addressed it and your brief just simply

4  recites the Court has already determined that 362(a) applies.

5  I did no such thing.  I asked a question based on the language

6  of the statute.  I asked that it be addressed.  You chose in

7  your brief to address it by saying the Court's already decided

8  it.  Kasowitz addressed it by addressing the substance of it.

9  I have not decided whether 362(a) applies to subpoenas served

10  in other litigation.

11          MR. HAIMS:  Okay, Your Honor.  So I will offer into

12  evidence the following declarations.  We have the first the

13  declaration of Jeffrey Lipps, which is document number 1023 --

14  1023.

15          THE COURT:  Dash -- I'm sorry?

16          MR. HAIMS:  Dash 1.

17          THE COURT:  Dash 1.  Okay.  Go ahead.  Anything else?

18  I'll take them as --

19          MR. HAIMS:  Take -- oh, I'm sorry.

20          THE COURT:  Mr. Glenn, are you going to object to any

21  of these declarations?

22          MR. GLENN:  Your Honor, I think we have one general

23  subject matter.  After all the affidavits are proffered, we

24  would like to address those.

25          THE COURT:  That's fine.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    88

1          MR. GLENN:  Thank you.

2          THE COURT:  All right.  Go ahead, Mr. Haims.

3          MR. HAIMS:  There's the declaration of John G.

4  Mongelluzzo, which is document 1023-2, which was filed on

5  August 7th, 2012.

6          THE COURT:  Okay.

7          MR. HAIMS:  There's the declaration of John G.

8  Mongelluzzo, which is document number 1295-2, filed on August

9  28th, 2012.  There's the declaration of Mary Fahy Woehr, which

10  is document number 1295-1, filed on August 28th, 2012.  And the

11  declaration of Philip Marc Scheipe, document number 1299, filed

12  on August 28th, 2012.  Those are the declarations.

13          THE COURT:  All right.  Mr. --

14          MR. HAIMS:  We also submitted --

15          THE COURT:  No.  Go ahead.  I'm sorry.

16          MR. HAIMS:  -- a binder of exhibits.

17          THE COURT:  Yes, but let me deal with the declarations

18  first.

19          MR. HAIMS:  Okay.

20          THE COURT:  Okay.

21          MR. HAIMS:  Sure.

22          THE COURT:  Go ahead, Mr. Glenn.  You have objections?

23          MR. GLENN:  Your Honor, Ms. Leung will handle that.

24          THE COURT:  Okay.  Ms. Leung?

25          MS. LEUNG:  Kanchana Leung of Kasowitz Benson.

RESIDENTIAL CAPITAL, LLC, ET AL.                                89

1        THE COURT:  You're going to have to speak into the

2   microphone.

3        MR. GLENN:  You can sit here.

4        THE COURT:  Okay?  I want to be sure we have a clear

5   transcript.

6        MS. LEUNG:  Kanchana Leung of Kasowitz Benson.  As to

7   the declarations, we object to the paragraphs in portions of

8   the Mongelluzzo, Woehr and Scheipe declarations that purport to

9   speak as to the intent of the parties when they negotiated and

10  entered into the shared services agreement.  There has been no

11  argument by any party that the agreement is ambiguous and that

12  there is a need for any parol evidence as to intent.  And so,

13  we would, as a general subject matter objection, object to all

14  those paragraphs and ask that those be stricken and not

15  considered.

16       THE COURT:  Okay.  Mr. Haims, you want to address

17  that?

18       MR. HAIMS:  Your Honor, we agree that the language

19  says what it says, and is clear in what it says, and that it

20  doesn't provide, as we said, for these productions.  However,

21  to the extent that it doesn't and intent is an issue, we

22  respectfully disagree and think that intent is certainly an

23  issue here.  And the intent -- to the extent that Your Honor is

24  construing the language, the case law is pretty clear that you

25  could look at intent to see how the specific language is to be

RESIDENTIAL CAPITAL, LLC, ET AL.                                    90

1   construed.   Both parties here, Mr. Scheipe, on one side, and

2   the ResCap defendants on the other -- the ResCap declarants on

3   the other side, have testified as to what their intent was in

4   their negotiations in drafting the agreement.   We think it's

5   clear --

6              THE COURT:   But if the language --

7              MR. HAIMS:   We think it's clear, but if you're going

8   to get --

9              THE COURT:   Let me ask this.   Under New York -- New

10  York law governs, correct?

11             MR. HAIMS:   Correct.

12             THE COURT:   If under New York law the language of a

13  contract is clear and unambiguous, parol evidence is not

14  admissible for purposes of determining the meaning of a

15  contract.   Do you agree with that?

16             MR. HAIMS:   I agree with that.

17             THE COURT:   All right.   Here's what I'm going to do.

18  I'm going to -- all the declarations are admitted into

19  evidence.   The Court is reserving decision about the objection

20  from Ms. Leung with respect to the statements of intent.   I

21  have not fully resolved, in my own mind, this issue of whether

22  the agreement is clear and unambiguous and therefore parol

23  evidence should not be considered.   If parol is admissible, I

24  think it's fair to say this is the only evidence that's been

25  offered with respect to -- that would be parol evidence, but I

RESIDENTIAL CAPITAL, LLC, ET AL.                                    91

1  haven't decided that.  So I'm going to reserve decision on the

2  admissibility of testimony with respect to the supposed intent

3  of the parties.  Okay.

4  (Declaration of Jeffrey A. Lipps in support of debtors'

5  objection to motion of the Federal Housing Finance Agency for

6  relief from the automatic stay was hereby received into

7  evidence as of this date.)

8  (Declaration and supplemental declaration of John G.

9  Mongelluzzo in support of AFI's submission regarding the shared

10  services agreement was hereby received into evidence as of this

11  date.)

12  (Declaration of Mary Fahy Woehr in support of debtors'

13  objection to motion of the Federal Housing Finance Agency for

14  relief from the automatic stay was hereby received into

15  evidence as of this date.)

16  (Declaration of Philip Marc Scheipe in support of AFI's

17  submission regarding the shared services agreement was hereby

18  received into evidence as of this date.)

19          THE COURT:  You want to address your --

20          MR. HAIMS:  Yeah.

21          THE COURT:  -- exhibits?

22          MR. HAIMS:  Yeah.  We have an exhibit binder --

23          THE COURT:  Yes.

24          MR. HAIMS:  -- which was submitted.  It has --

25          THE COURT:  I have that here.

RESIDENTIAL CAPITAL, LLC, ET AL.                    92

1          MR. HAIMS:  -- certain exhibits listed as Exhibits 1

2    through 8.  And I'm happy to move them in as one or --

3          THE COURT:  Well, let's --

4          MR. HAIMS:  -- take them through, whatever is --

5          THE COURT:  -- do it that way.  Offer them all and

6    then I'll --

7          MR. HAIMS:  I'll offer this binder in evidence.

8          THE COURT:  Okay.  All right.  The debtors' have

9    offered and have presented to the Court an exhibit binder with

10   exhibits premarked as Exhibits 1 through 8 and have now offered

11   them in evidence.  Mr. Glenn or Ms. Leung, do you have any

12   exhibits?

13         MR. HAIMS:  These are all the exhibits that were

14   attached to our declarations.

15         MR. GLENN:  No objection.

16         MR. HAIMS:  There's no new --

17         THE COURT:  All right.  So the documents marked as

18   Exhibits 1 through 8, Debtors' Exhibits 1 through 8, are

19   admitted in evidence for purposes of the hearing.

20   (Debtors' Exhibits 1 through 8 were hereby received into

21   evidence as of this date.)

22         MR. HAIMS:  And we have no further evidence, Your

23   Honor.

24         THE COURT:  All right.  You rest?

25         MR. HAIMS:  We rest.

RESIDENTIAL CAPITAL, LLC, ET AL.                                          93

1          THE COURT:  You responded that you do rest?

2          MR. HAIMS:  Yes, Your Honor.

3          THE COURT:  Okay.  All right.  Just to be clear, Mr.

4    Glenn, do you wish to cross-examine any of the declarants?

5          MR. GLENN:  No, Your Honor.

6          THE COURT:  All right.  Do you have any rebuttal

7    evidence you wish to offer?

8          MR. GLENN:  We do not, Your Honor.

9          THE COURT:  All right.  You rest as well?

10         MR. GLENN:  We do.

11         THE COURT:  All right.  Now let me hear argument then.

12   Go ahead, Mr. Glenn.

13         MR. GLENN:  Thank you, Your Honor.  I don't want to

14   take the Court's time on issues that I know the Court has

15   examined closely and that we talked about last time that we

16   briefed on a supplemental basis.  I think the Court is in a

17   difficult situation in this case, because it is a very unique

18   case and the Court is being asked to decide a legal question

19   that could have far-reaching ramifications beyond this very

20   unique case.  And that is, does the automatic stay apply to

21   third party discovery.

22         We don't think it does for all the reasons we've set

23   forth in our papers.  We have addressed the Johns-Manville

24   case.  We've talked about all the other cases around the

25   country that go our way.  I think as a general rule --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    94

1          THE COURT:  Well, let me ask you, Hillsborough

2    Holdings which you rely on --

3          MR. GLENN:  Yes.

4          THE COURT:  Judge Paskay's decision in Florida --

5          MR. GLENN:  Yes.

6          THE COURT:   Manville.  Both of those cases involved

7    issues of discovery -- efforts to take discovery from employees

8    of the debtors in those cases, not from the debtors themselves.

9    And in this case, in its present posture, the issue is whether

10   discovery from the debtors should be permitted.

11         MR. GLENN:  That's correct.

12         THE COURT:  So you had pointed out -- at the last

13   hearing when I raised the issue about Manville, you said there

14   was an adversary pending, that you can't get an injunction

15   without an adversary proceeding, 105 -- your argument that 105

16   can't apply against FHFA.  But the issues in those cases where

17   discovery -- I mean, I don't have before me a subpoena from

18   FHFA for present or former officers or employees of any of the

19   debtors.  I have a subpoena for production of documents by the

20   debtors themselves.  Do you agree with that?

21         MR. GLENN:  Yes.

22         THE COURT:  I haven't found any decisions at all that

23   address the issue of the power of a bankruptcy court to

24   regulate or limit discovery from the debtor in connection with

25   third party actions.  Are you aware of any?

RESIDENTIAL CAPITAL, LLC, ET AL.                    95

1          MR. GLENN:  Under 362 --

2          THE COURT:  Let me just --

3          MR. GLENN:  -- the answer is no.

4          THE COURT:  Let's put 362 -- my question is really

5     more -- let's assume that I agree with the Ninth Circuit BAP.

6     There really isn't much law on this point.

7          MR. GLENN:  That's correct.

8          THE COURT:  Okay.  But let's assume I agree with the

9     Ninth Circuit BAP that 362(a) doesn't apply to third party

10    discovery from the debtor.  You did brief it.  You addressed

11    the legislative history and the wording in 362(a) itself.  But

12    what I've been pondering is whether 105 provides the Court with

13    authority not to enjoin FHFA, but to extend the protection of

14    362(a) to discovery from the debtor.  And it seemed to me in

15    thinking it through that doing so doesn't require an adversary

16    proceeding.  It doesn't require an injunction.  It is an order

17    -- it would be an order affecting the administration of the

18    case, affecting property of the estate.  You may dispute around

19    the margins on this but the estimate of the cost of

20    complying -- the only evidence I have before me with respect to

21    an estimate of the cost of the debtor to comply is probably

22    over a million dollars.  There are ranges that are given, and I

23    understand that.  I don't want to get into quibbling about the

24    exact dollars from --

25         MR. GLENN:  I would dispute that, Your Honor, insofar

RESIDENTIAL CAPITAL, LLC, ET AL.                                              96

1   as our application is concerned.  The other application is a

2   different story.

3           THE COURT:  Well --

4           MR. GLENN:  And I just want to make that clear

5   because --

6           THE COURT:  Well, you've just reduced --

7           MR. GLENN:  -- we're being punished for trying to be

8   reasonable in this case.  So our application, the way we do the

9   math, Your Honor, just to be perfectly clear, 2,500 loan files

10  times approximately, give or take, twenty-five dollars.

11          THE COURT:  Well, for the third party cost to retrieve

12  the files from the vendor --

13          MR. GLENN:  Correct.

14          THE COURT:  -- no lawyer in his right mind would

15  ever -- you would never produce documents that your office

16  hadn't screened for privilege or any other protection for here

17  issues of confidential borrower information.  I mean, you just

18  wouldn't do that.

19          MR. GLENN:  Ms. Leung is probably more qualified to

20  handle that, but as I understand it, there is no privileged

21  information in these loan files.  The loan files --

22          THE COURT:  What about personally identifiable

23  information?

24          MR. GLENN:  That there is and that can be addressed,

25  and has been addressed, through a standard confidentiality

RESIDENTIAL CAPITAL, LLC, ET AL.                                          97

1   agreement with all the other defendants.  I just don't see that

2   as -- it's an issue, but I don't think that's a cost issue.

3           I didn't mean to sidetrack, Your Honor, so much.

4           THE COURT:  No.

5           MR. GLENN:  I just wanted to make my position --

6           THE COURT:  No.  But here's --

7           MR. GLENN:  -- clear.

8           THE COURT:  Look, the non-Ally underwriters have said

9   we need all 43,000 loan files.  And I understand that Judge

10  Cote said if you think you need it, you apply for it.  Well,

11  they've now filed a motion.

12          The issue that I framed was whether 105 provides a

13  source of authority for the Court.  I'm going to very -- I want

14  to be careful about -- this is not selected accidentally --

15  regulate discovery in a third party action.  And I say

16  "regulate" because to the extent that a debtor or these debtors

17  were to argue to me that no discovery now, no discovery ever

18  from the debtors in connection with third party actions, I

19  think that's an unsupportable position to take.

20          I start with a 350 year old maxim that the public has

21  a right to every man's evidence.  It's a proposition that has

22  been repeatedly relied upon by the U.S. Supreme Court, by the

23  circuit courts including the Second Circuit.  And what the

24  courts have roughly said is that to limit that, if by statute

25  or if there is some privilege issue, it has to be a well

1  established privilege.  And the issue in my mind is about

2  regulating it.  Can the bankruptcy court, charged with

3  overseeing these Chapter 11 cases, regulate discovery?  When do

4  you want the documents?

5         MR. GLENN:  We want them as soon as we can get them.

6  I believe something in the order of sixty days would work, like

7  six -- about sixty days.

8         THE COURT:  So over the next sixty days in this case,

9  there is an enormous amount of activity that's at the very core

10  of Chapter 11 bankruptcy proceedings.  There is an auction

11  scheduled, I think, for October 23rd.  There are twenty some

12  odd parties that have signed nondisclosure agreements that are

13  engaged in due diligence.  If you or one of your colleagues was

14  here this morning, you know that there was extensive colloquy

15  about a contested hearing scheduled for November 5th for which

16  expedited discovery is underway and arguments that the debtor

17  hasn't fully complied with its obligations to produce

18  everything it was required to produce.  So there's expedited

19  discovery ongoing for a very important hearing currently

20  scheduled for November 5th, whether it happens then or at a

21  later date, remains to be seen, but it'll happen soon.  There's

22  an examiner's investigation going on.

23         There is -- what I think -- you can respond to this if

24  you'd like.  I mean -- and I invite you to.  With everything

25  that's going on in this case, the debtor has more than its

1  hands full over the next sixty days just to do what it is

2  required to do to move this Chapter 11 case forward.  And

3  diverting -- at this time, diverting the resources -- let's put

4  who pays for it aside.  Okay?  Just diverting the people and --

5  you know, there was an argument this morning about the

6  creditors' committee has asked for 1,500 loan files for their

7  sampling expert.  And there was a dispute as to whether all

8  1,500 were supposed to be produced before today, whether

9  they've now been produced or not, but that's just -- I give

10  that just as an example.  There's an enormous amount of work

11  being done.  And are you telling me the bankruptcy judge can't

12  say you, FHFA, you can't get your discovery now because of

13  everything that's going on and has to happen in this case very

14  soon.  I'm not telling you, FHFA, that you're not going to be

15  entitled to discovery from the debtors.  But I, as the judge

16  responsible for this Chapter 11, am telling you you're not

17  getting it now.  You're saying that's beyond my power to do.

18          MR. GLENN:  Let me start on a more general level, and

19  I'll try to finish there.  I think Your Honor posited the

20  question, the more general question, how can the Court regulate

21  discovery -- third party discovery in a complex -- an important

22  Chapter 11 case, such as this, such that that discovery doesn't

23  derail the fundamental purpose of Chapter 11.  And I think

24  there are plenty of cases out there that stand for that

25  proposition.  And I think that would be underpinning of Your

1   Honor's decision with respect to the other defendants granting

2   the Section 105 injunction dealing with potential

3   indemnification obligations, discovery, collateral estoppel,

4   res judicata.  Those are all the concerns that are appropriate

5   for a Section 105 injunction.  And I think that they can be

6   used to limit discovery in appropriate cases and including the

7   asbestos cases are a great example of that.  Manville -- that

8   was the central holding in Manville that apart from the bona

9   fides and the merits of the litigation itself, the avalanche of

10  that litigation, including discovery obligations, would

11  restrict, if not eliminate, the company's ability to

12  reorganize.  I think Your Honor has that general power and I

13  think that that power is well documented in a long string of

14  cases.

15           In this case, however -- and that's where I want to go

16  back to the beginning of what I said.  I think that the case

17  has far reaching ramifications if FHFA were not involved.  We

18  happen to be in the unique circumstance of being the

19  beneficiaries of this provision of --

20           THE COURT:  Well, you're not exercising police power.

21           MR. GLENN:  No, no.  But what Judge Cote held and what

22  the Second Circuit held in Colonial Realty is that Congress,

23  for the decision -- for the reasons that we've cited in our

24  papers and in the legislative history of HERA going back to

25  FIRREA has decided that FHFA's work is so important that

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    101

1  Congress did not want that work restricted by Courts outside of

2  what HERA is litigating in the Courts in which he is reporting.

3          THE COURT:  So you say that that gives FHFA a free

4  pass.  If you decided that you wanted discovery that was going

5  to cost twenty million dollars, I would have no power to

6  regulate or restrict it.  That's your view, correct?

7          MR. GLENN:  Under HERA, I think the answer is yes.

8          THE COURT:  No.  Tell me is there any source of

9  authority that I have, in your view, that would permit me to

10  restrict discovery sought from the debtors in this case by FHFA

11  if the uncontroverted evidence established that the cost was

12  twenty million dollars, and it would derail a whole series of

13  matters that are currently scheduled over the next three or

14  four months?

15          MR. GLENN:  I don't think Your Honor has to reach that

16  question because of what we've done.

17          THE COURT:  Well, I want you to answer that question.

18          MR. GLENN:  I'm going to.  The answer is no.  Your

19  Honor does not have that power.

20          THE COURT:  Okay.

21          MR. GLENN:  And I'm not here to make any value

22  judgments on that.  I'm not here to say it's right or wrong.  I

23  think that as a matter of statutory interpretation, starting

24  with Colonial Realty and Judge Cote's opinion the --

25          THE COURT:  Even though -- let's assume I agree with

1   you that under Colonial Realty, I can't -- I couldn't -- I

2   mean, the reference was withdrawn with respect to FHFA so it's

3   not an issue for me, as far as I'm concerned.  I know it's

4   being appealed, but that's -- it's just not my issue.  And what

5   I'm really asking is not an injunction against FHFA.  It is an

6   order that says, in substance, that 362(a) is hereby extended

7   so that discovery in third party actions may not be obtained

8   from the debtors absent further order of the bankruptcy court.

9   It is not specific to FHFA or FDIC.  You know, there are 1900

10  plus actions pending around the country; more than that.

11  Thousands of actions pending around the country.  The debtors

12  have, and they cited this, at least one stipulation where it

13  was fairly limited discovery.  They stipulated, and they

14  agreed.

15          And so, again, I start with the proposition I'm not --

16  they don't get a free pass on discovery in third party actions.

17  Okay.  The question is scope, context, timing, burden --

18  burden, I don't mean necessarily the dollars in costs.  Those

19  are among the factors that it would seem to me -- and you said

20  I can't take any of that into account if you decided you wanted

21  twenty million dollars.  If it was going to cost twenty million

22  dollars to comply, tough luck.  Do it.

23          MR. GLENN:  Your Honor, I think we have to divide the

24  two questions of cost and authority.

25          THE COURT:  No.  That's why I asked you a

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    103

1   hypothetical.

2          MR. GLENN:  Okay.  Your Honor, I think the solution to

3   the problem Your Honor identified is to either in this court or

4   the court in which the matter is presiding for the cost issue

5   to be resolved separately from the legal entitlement to the

6   documents.

7          THE COURT:  So you would agree that I could resolve

8   the cost issue and decide that FHFA would only be permitted its

9   discovery if it posts a bond for the estimate of costs in

10  complying and those -- and as soon as that is quantified

11  precisely that those costs will be paid.  Do you agree I have

12  the authority to do that?

13         MR. GLENN:  I'm not going to concede that Your Honor

14  has that authority, but I will concede that that's an

15  appropriate consideration --

16         THE COURT:  Well, either I have the --

17         MR. GLENN:  -- that either this Court --

18         THE COURT:  -- authority or I don't.

19         MR. GLENN:  I --

20         THE COURT:  What is your position?

21         MR. GLENN:  I think that my personal view, and we can

22  go into this further separately, is that the Court --

23         THE COURT:  No.  We're going to do it here now.  I

24  always love to talk to you, Mr. Glenn, but --

25         MR. GLENN:  Well, I know.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    104

1      THE COURT:  People will think we're related --

2      MR. GLENN:  Ms. Leung will go into --

3      THE COURT:  -- or something.

4      MR. GLENN:  Ms. Leung will go into the control issue

5   and where we think the cost should end up.  It's a -- I think

6   that the Court -- if we had a subpoena, a normal subpoena, the

7   Court who --

8      THE COURT:  You do have a normal subpoena.

9      MR. GLENN:  Well, the court out of which the subpoena

10  is issued would have the authority to determine who should pay

11  for the cost.

12     THE COURT:  Okay.  But let's just focus on that for a

13  minute, okay?  And Rule 45 specifically --

14     MR. GLENN:  Yes.

15     THE COURT:  -- talks about the Court that's issuing

16  the subpoena.  And so, that's not this Court; it's the district

17  court, right?

18     MR. GLENN:  Correct.

19     THE COURT:  Okay.  With all respect to Judge Cote, or

20  any other district judge, or any of the state judges around the

21  country, or federal judges around the country that have these

22  matters, I mean, they're not really -- first off, it's not

23  their job to worry about whether these Chapter 11 cases proceed

24  expeditiously in the ordinary course.  They have to worry about

25  their specific litigation.  One could call it a parochial

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    105

1    interest.  I think it's certainly an appropriate interest for

2    the judges.  In federal court, you know, Judge Cote could

3    address the issue of cost, but that doesn't address the issue

4    from a standpoint of a debtor whether it's a Chapter 7, or 13,

5    or 11 debtor.  That's a particular interest of the bankruptcy

6    court.

7            MR. GLENN:  Correct.

8            THE COURT:  And again, it would seem to me that when I

9    ticked off potential factors to consider, context -- you know,

10   scope, context, timing, burden, expense, those are all things

11   that a bankruptcy judge should consider.  I don't know which

12   way -- the balance they come out differently in different

13   cases.

14           Just let me back up for a second.  You didn't -- I

15   take it you resolved the issue about the loan tapes and

16   origination information?

17           MR. GLENN:  We did, subject to an issue about the

18   confidentiality agreement.

19           THE COURT: Okay.

20           MR. GLENN:  But I'm not here to --

21           THE COURT:  You're going to -- right.

22           MR. GLENN:  -- to deal with that, Your Honor.

23           THE COURT:  Okay.

24           MR. GLENN:  I think that there are a couple things I'd

25   like to observe, because we're talking both in terms of general

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                     106

1  policy considerations, Your Honor, and issues -- practical

2  issues with this dispute.  I think that the issue of who should

3  pay for this discovery in this dispute --

4          THE COURT:  I'll get to who pays.

5          MR. GLENN:  Okay.  Okay.

6          THE COURT:  I'll get to who pays.

7          MR. GLENN:  I think that if our request were

8  unreasonable, that the scope was an issue, that the cost was an

9  issue, that the timing of production was an issue, that those

10  are practical issues that the Court has -- certainly has some

11  input on just like any other Court would --

12          THE COURT:  How are --

13          MR. GLENN:  -- that was --

14          THE COURT:  What's the source of my authority for

15  input on that?

16          MR. GLENN:  Well, you would have jurisdiction to rule

17  on those issues in the first instance.

18          THE COURT:  Under what authority?

19          MR. GLENN:  Under Rule 45.

20          THE COURT:  I don't.  I mean, Rule 45 -- it

21  specifically says the Court that issued the subpoena --

22          MR. GLENN:  Well, in this case, Your Honor, the

23  district court has deferred to you.  And that's what I was

24  getting to on cost.  The Court wanted to hear your concerns

25  about the cost and whether this would derail the company's

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    107

1   reorganization.   The Court did make those comments.   I believe

2   it's in the transcript that she did want to hear from you on

3   that.   And she cited the Johns-Manville case as a circumstance

4   where those were considered.

5               THE COURT:   Let me ask you another hypothetical.

6   Let's assume not only that it was going to cost ten million

7   dollars for the debtor to comply, and we'll deal with the issue

8   of cost, you want the stuff -- you say -- let's say a district

9   judge, and this is not what Judge Cote has done, let's say the

10  district judge orders that this be produced -- the judge who

11  issues the subpoena says produce it within forty-five days.

12  And the bankruptcy judge who's got the case, not this case,

13  concludes that, you know, producing -- requiring the debtor to

14  produce documents at a cost of ten million dollars in the next

15  forty-five days guarantees this case is derailed and converts

16  to a Chapter 7 liquidation.   The bankruptcy judge has no

17  authority to do anything about it?

18               MR. GLENN:   In our --

19               THE COURT:   Yeah.

20               MR. GLENN:   -- particular circumstance --

21               THE COURT:   FHFA is the plaintiff or FDIC and says,

22  got to produce this document within forty-five days.   It's

23  going to cost ten million dollars.   And the debtor comes in

24  with uncontroverted evidence that complying with that subpoena

25  would result in conversion of the case to Chapter 7

RESIDENTIAL CAPITAL, LLC, ET AL.                    108

1   liquidation.  Bankruptcy has no power -- the bankruptcy court

2   has no power to do anything about it.

3          MR. GLENN:  It's funny, Your Honor.  If I were here

4   about nine months ago when I represented Borders, I might have

5   a different viewpoint of that --

6          THE COURT:  Really?

7          MR. GLENN:  -- case.  Yes.  But what I have to say is,

8   I have to start from the text of HERA.  And the text of HERA

9   says that no court can issue any order enjoining or limiting

10  FHFA's activities.  So I think we have to draw the line between

11  what is a regulatory -- a discovery burden weighing exercise

12  versus what is -- a court throwing down the gauntlet and

13  saying, no, I'm not infringing -- you don't get it, and I'm not

14  infringing on FHFA.

15         THE COURT:  You don't get it now.

16         MR. GLENN:  You don't get -- well, that question

17  straddles the line between --

18         THE COURT:  Does it?

19         MR. GLENN:  -- those two -- it does, Your Honor,

20  because if Your Honor said that it's going to -- you're going

21  to delay the debtors from producing documents for a year, and

22  we have a written discovery deadline of the end of the year.

23         THE COURT:  You haven't even had to have motion

24  practice in your case.  I understand.  Judge Cote issued an

25  order.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                           109

1    MR. GLENN:  I am subject to an order.  My client is

2  subject to an order today for written discovery to end at the

3  end of this year.  Whether -- if the Court said you can't get

4  the documents, whether Judge Cote would default FHFA because it

5  couldn't proceed with its case at that point in time, I would

6  hope --

7    THE COURT:  You know, I look with --

8    MR. GLENN:  -- I would hope that she would --

9    THE COURT:  I look with interest --

10    MR. GLENN:  -- be flexible about that.

11    THE COURT:  -- on -- I think you cited what I refer to

12  as Winnick I, Judge Lynch's decision in the district court.

13  There's also a Winnick II which is an interesting case.  I

14  mean, in that Luzzano case that I had called to your attention,

15  I discussed both Winnick I and Winnick II.  Winnick I, Judge

16  Lynch said you've got to produce this discovery.  In Winnick

17  II, which was -- Citibank had the documents.  It wasn't a party

18  to the case, and they claimed it was too burdensome.  And I

19  guess Judge Lynch agreed.  And so, Citibank was relieved of the

20  obligation to produce any of the documents, but Judge Lynch had

21  decided that the plaintiffs, as assignees of the claim they

22  were prosecuting, were obligated to do it.  It leaves -- I

23  mean, I guess the judge could default the defendant, but that

24  was one of the twists in the Winnick case.

25    But let's say I'm not going to just stay it for a

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    110

1   year.   I mean there's an auction at the end of October.

2   There's an RMBS settlement hearing scheduled for November 5th

3   which may or may not hold to November 5th.   There are a whole

4   slew of things sort of between now and January that are going

5   to happen in this case where if, based on the uncontroverted

6   evidence and the record in the Chapter 11 cases, I was to

7   conclude that the debtors having to comply now with the

8   subpoena would be seriously prejudiced.   It would threaten to

9   derail an important Chapter 11 case and consequently -- look,

10  what I did with respect to the 105 injunction, it runs to

11  October 31.   They may come back and say they need it extended

12  for some period or not, but it isn't going to get extended

13  indefinitely.   It was not an injunction.   You know, and I said

14  in the one that was contested and went to decision, you know,

15  parties are free to take discovery from AFI, but not from the

16  debtors while the stay is in place.

17          So --

18          MR. GLENN:   Your Honor --

19          THE COURT:   I mean, I see that -- yeah.   You want to

20  go the outlier the other way.   Judge Cote's ordered, you know,

21  a year discovery cutoff for fact discovery, and, you know, it

22  may be you got to wait three or four months before the debtor

23  has to comply.   I don't know what the appropriate period is.

24          MR. GLENN:   Those are very difficult questions.

25          THE COURT:   That's why I'm asking them, yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                        111

1        MR. GLENN:  And I'm obviously -- I understand that.

2   And I'm doing my best to help the Court.  But ultimately, Your

3   Honor has to decide this case based on the record before Your

4   Honor.  And I would point Your Honor to the Mongelluzzo

5   declarations, and I hope I haven't slaughtered that name.  But

6   what is conspicuously absent from both of those declarations,

7   and it's interesting to look at the progression between the

8   two.  The first one spoke to the situation before the last

9   hearing when it was up in the air exactly how much FHFA --

10       THE COURT:  Well, it was 105,000 files.

11       MR. GLENN:  Correct.  Correct.  So if Your Honor goes

12  to the supplemental Mongelluzzo declaration and goes back and

13  forth between the two, there's absolutely nothing in those

14  declarations that says that complying with our request, I

15  should say, with FHFA's request is going to somehow derail --

16       THE COURT:  Well, time out.

17       MR. GLENN:  -- this reorganization.

18       THE COURT:  Wait a second.  I mean, you say that the

19  statute prevents me from doing anything to regulate the

20  discovery by FHFA.  What does it do with respect to the

21  defendants' -- the nondebtor defendants in your case, to their

22  subpoena?

23       MR. GLENN:  I have no idea ,and I will leave it to

24  them to argue that.

25       THE COURT:  I see.  So, you know, they can't -- I

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                112

1  could say you can't get it, but FHFA I can't stop them.  They

2  only want, now, 2,500, you want 43,000.

3       MR. GLENN:  We don't think they want it.  We think

4  that, putting aside the burden on the debtors, the process

5  here, Your Honor, is the loan files in this litigation

6  effectively have to be re-underwritten.  Data's collected, a

7  person who has the capabilities of a loan officer who can

8  determine whether the loan is worthy and meets the underwriting

9  guidelines, has to reexamine them.

10      THE COURT:  I think I know the answer to this

11 question, but did you and your experts seek to meet and confer

12 with the defendants' counsel to see whether the experts could

13 agree on an appropriate sampling methodology?  I'm sure the

14 answer is you did and they said no, they want all 43,000 files.

15 Do I have that roughly right?

16      MR. GLENN:  Not with respect to this in particular,

17 but globally there are many, many securitizations.  And if Your

18 Honor were to look at the entire record of all the loan files

19 at issue and all the securitizations in dispute the number is

20 staggering, and we just don't think it's possible, not only

21 within Judge Cote's schedule, but with any reasonable schedule

22 to undertake this process.

23      So there are broader issues at play in the litigation.

24 We're trying to be reasonable.  We're trying to work with the

25 Court and work with the debtor to obtain a sample size that

RESIDENTIAL CAPITAL, LLC, ET AL.                    113

1   achieves our objectives with being able to prove our case with

2   minimizing and hopefully eliminating the burden on the company.

3          Some of their vendors are FHFA's vendors and there are

4   pricing and other potential efficiencies that we can take

5   advantage of.  I think today the question Your Honor has to

6   decide is do we have the legal entitlement to these documents

7   and who should bear the cost.

8          THE COURT:  Let me ask you this specifically.  Do I

9   have the authority, under Section 105, to extend to the debtors

10  protection against discovery in any action, absent further

11  order of the Court?

12         MR. GLENN:  A blanket?

13         THE COURT:  Yes.  It would -- in words or in substance

14  it would say that in light of the large number of lawsuits

15  pending around the country, from which discovery may

16  potentially be requested or is responsive, and in light of the

17  burden and expense to the debtors of complying with discovery,

18  in order to regulate discovery in aid of administration of

19  these Chapter 11 cases, the Court extends the protection of

20  362(a) to any subpoena or other request for production of

21  documents, from the debtors.

22         MR. GLENN:  Not as against FHFA, certainly, because of

23  the reasons we've articulated.  But --

24         THE COURT:  Well, but that's not an injunction against

25  FHFA.  It is saying in the administration of this case, and I'm

1   not saying FHFA can't get that stay lifted on conditions, but

2   it is not an injunction -- it's not an injunction against FHFA

3   proceeding with its action.  It is because, I'll just use the

4   hypothetical to make it easy, I know you say that the costs,

5   particularly when you get down to 2,500 loan files is

6   substantially less, if the burden and expense to the debtor of

7   complying with discovery, it will require use of property of

8   the estate.  It will affect the administration of the case, the

9   effective administration of the case, and in aid of that power

10  the Court, using 105, extends the stay, subject to further

11  order of the Court, to any discovery from the debtors.

12          That doesn't seem to me to require a 105, an

13  injunction.  It's not an injunction of any outside activity.

14  In Hillsboro Holding it was depositions of present and

15  former --

16          MR. GLENN:  Senior officers, right.

17          THE COURT:  -- officer or employees.  In Manville it

18  was, again, discovery from -- at least that decision -- Judge

19  Bryant's decision was discovery of officers and directors.

20          I understand your argument that, and I subscribe to

21  the law, that to get an injunction against any outside

22  activity, if you will, it's got to be done by adversary

23  proceeding under 7001.  But 105 is utilized other than in the

24  injunction context.  Just the words of the statute 105(a), "The

25  Court may issue any order, process or judgment that is

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    115

1  necessary and appropriate to carry out the provisions of this

2  title."

3           Well, the provisions of this title are intended, under

4  541, to marshal and protect the assets and the property of the

5  estate in Chapter 11 dealing with administration of the case.

6  The kind of order that I'm asking you about is designed

7  specifically not to extend powers beyond what the Code does,

8  but to apply the powers that the Code already contains to a

9  context that's slightly different.

10          MR. GLENN:  I think the answer is no, Your Honor,

11 unfortunately.  I think that --

12          THE COURT:  Let me just say, I haven't found any cases

13 one way or the other.

14          MR. GLENN:  I was going to say, I haven't heard of a

15 case that says that.  I think that Rule 7001 doesn't just say

16 injunction, it says other equitable relief.

17          THE COURT:  Against a third -- against some party.

18          MR. GLENN:  Yes.

19          THE COURT:  So if I -- look, it isn't even on -- the

20 debtors sought an injunction against FHFA, Judge Cote withdrew

21 the reference, she made a determination, no stay.  I'm not

22 making any effort to second guess that.

23          MR. GLENN:  I think that those are the types of

24 matters that probably have a practical solution, because what

25 Your Honor is saying that the -- given what Your Honor has

RESIDENTIAL CAPITAL, LLC, ET AL.                    116

1   either taken judicial notice of or seen in a first day hearing,

2   seen in other similar complex cases, Your Honor could establish

3   guidelines that before a party can come in and get this kind of

4   discovery they would have to prove that that is not going to

5   derail the reorganization, cost -- have a cost that's

6   prohibitive or other matters so that it would be more of a

7   controlling the docket type of approach to solve a practical

8   problem.  But as a blanket matter to issue an order that has

9   either a direct or indirect effect of enjoining third parties,

10  I don't think Your Honor could do that without an adversary

11  proceeding.

12          THE COURT:  Address the expense issue.

13          MR. GLENN:  I'm sorry?

14          THE COURT:  Address the expense issue.

15          MR. GLENN:  Your Honor, what I would like to do for

16  that is cede the podium to Ms. Leung on the control issue,

17  which I think is the issue which is the major issue of expense.

18          THE COURT:  Okay.  Fine.

19          MR. GLENN:  Thank you.

20          MR. HAIMS:  Your Honor, before she does if I could

21  make one quick, just, note.

22          THE COURT:  I can't hear you, Mr. Haims.

23          MR. HAIMS:  Oh, I'm sorry.

24          Before she starts I just want to make one quick point.

25  We just got an e-mail that the Second Circuit has stayed the

RESIDENTIAL CAPITAL, LLC, ET AL.                                117

1   FHFA case, has issued an order today, and that it's going to be

2   pending full briefing on the motion for a stay, which is going

3   to be heard on September 25th.  I just wanted to bring that to

4   your -- we just got an e-mail, and I wanted to bring that to

5   the Court's attention.

6          THE COURT:  Okay.  All right.  Thank you.  We'll

7   continue on though.  Go ahead, Ms. Leung.

8          Can I -- let me just before -- the application that I

9   understood was before the Second Circuit was in the UBS case.

10          MR. HAIMS:  The application was by UBS for all of the

11   FHFA cases.

12          THE COURT:  For all of them?  Okay.  All right.  Go

13   ahead, Ms. Leung.

14          MS. LEUNG:  And I just wanted to address that briefly.

15          As we set forth in our letter response yesterday,

16   regardless of the UBS appeal, this case was still go forward.

17          THE COURT:  Just pull the microphone a little closer.

18          MS. LEUNG:  This case would still go forward, because

19   there are fraud and aiding and abetting fraud claims again --

20          THE COURT:  Not if the Second Circuit stays it, it

21   won't.

22          MS. LEUNG:  Right.  But that's not an issue that --

23   the legal issue that's before the Court.  So --

24          THE COURT:  No, I -- it may be that the issue before

25   the Second Circuit is a narrower one, but if they stay the case

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      118

1  the case is stayed, but we'll see what they order.

2        Go ahead.

3        MS. LEUNG:  Okay.  Before I get to the control issue I

4  do want to clarify something for the record.  Before Your Honor

5  was speaking in terms of Rule 45 subpoenas.  In fact there is

6  not a Rule 45 subpoena against the debtors.  There may be some

7  confusion because several years ago, I believe in 2010, FHFA

8  issued a number of subpoenas to different servicers including

9  RFC and GMAC Mortgage LLC, which does cover loan files.  So

10 there is an outstanding subpoena to the debtors, but it wasn't

11 in the context of the litigation, and it wasn't issued out of

12 the district court as part of the litigation.

13       THE COURT:  So you're telling me there's no

14 outstanding -- I mean, they're not a party to your action,

15 correct?

16       MS. LEUNG:  Correct.

17       THE COURT:  And therefore, in order to take discovery

18 from them you have to proceed by Rule 45?

19       MS. LEUNG:  Well, not exactly, Your Honor.  We are in

20 an odd procedural posture because of the way that we got here,

21 and I think we've been very clear that FHFA's position is that

22 Ally has control over the loan files and various other

23 documents.  Ally should be producing those documents as part of

24 party discovery, whether or not it's actually in the possession

25 or custody of the debtors, and that Ally should bear the costs

RESIDENTIAL CAPITAL, LLC, ET AL.                                    119

1  of that production as a party.  And our understanding is that

2  Judge Cote wanted you to decide the bankruptcy issues in the

3  first instance, but we've always tried to get these documents

4  through party discovery, not third party discovery.

5              THE COURT:  Okay.

6              MS. LEUNG:  And the papers that were submitted by the

7  debtors don't -- or Ally, don't undercut that position at all

8  and that only confirms our position, as set forth in our

9  papers, that Ally does have control over the loan files.

10             As Your Honor correctly seized upon the last time we

11 were here, the relevant legal issue is whether Ally has access

12 or the ability to obtain the documents and the shared services

13 agreement is clear on that front.

14             The record services statement of work is clear on its

15 face that it covers litigation requests, and it's also clear

16 that it covers loan files.  In fact, in paragraph 28 of the

17 Mongelluzzo supplemental declaration, the debtors concede that

18 as part of records services they provide loan files to Ally

19 upon request.

20             It's also clear, on the face of the agreement --

21             THE COURT:  They just didn't think that 5,000, 2,500,

22 104,000, 42 -- 43,000 would have to be produced at one time?

23             MS. LEUNG:  Maybe, maybe not.  I can't speak to that.

24 But it is clear, on the face of the agreement, that ResCap does

25 not have discretion to turn down a request.  In Section 6(b) it

1    says "During the term of the statement of work ResCap will

2    provide all services under the terms and conditions of the

3    statement of work."  And ResCap argues that despite the plain

4    words of the statement of work that other provisions of the

5    agreement support their conclusion that they're not required to

6    produce the loan files.  For example, they argue that the

7    timeframe for responding to requests is a day turnaround and if

8    the parties had contemplated a request for thousands of loan

9    files, that that would make no sense.

10          But in fact ResCap bargained for more time to complete

11   services and for more staffing in Section 7(a)(5) of that

12   statement --

13          THE COURT:  Give me that section again?

14          MS. LEUNG:  7(a)(5) --

15          THE COURT:  Uh-huh.

16          MS. LEUNG:  -- of the statement of work under

17   performance standards it says, "Any references to established

18   timelines herein refers to Exhibit D.  ResCap may change such

19   established timelines and will provide AFI with an updated

20   Exhibit D.  To the extent there are material changes in

21   ResCap's established timelines, ResCap and AFI shall work

22   towards establishing mutually agreeable timelines."

23          In addition, in Section 7(b)(1), Remediation

24   Processes, it provides for additional staffing.  It says, "If

25   ResCap reasonably determines that there is inadequate staffing

RESIDENTIAL CAPITAL, LLC, ET AL.                          121

1   or staffing that lacks necessary training or skills to meet the

2   service level agreements set forth in Section 7(a), AFI agrees

3   to work reasonably with ResCap to address any such deficiencies

4   in staffing or skill sets."

5         So the agreement, on its face, provides for

6   contingencies such as large order requests for documents.  So

7   their -- the provisions they cite that say -- that they argue

8   undercut a plain reading of the statement of work, we think

9   don't support that reading, in fact quite the opposite that

10  they bargained for and gave themselves maximum flexibility for

11  things -- for unforeseen circumstances like a large request for

12  loan files.  We think that that's clear on its face.

13        As for the fee structure, the parties -- ResCap and, I

14  think, Ally also concedes that the agreement provides for Ally

15  to pay for services.  So even though there's a basis --

16        THE COURT:  I had some question whether they're

17  limited to that 50,000 dollars for document production services

18  versus potentially millions that it's going to cost to do it.

19        MS. LEUNG:  But I think the debtors clearly -- I think

20  the agreement clearly states that the pass-through costs would

21  be absorbed by Ally.  So it appears that most of these pass-

22  through costs would be the costs of the vendor to retrieve the

23  documents and not actually ResCap costs or personnel time or

24  labor in terms of identifying the loan files.  That most of

25  that cost is actually in the retrieval.

RESIDENTIAL CAPITAL, LLC, ET AL.                    122

1    THE COURT:  Is there anything in the shared services

2  agreement or the statements of work that -- let's assume that

3  AFI requested ResCap to produce 43,000 loan files, is there

4  anything in the shared services agreement or the statement of

5  work that addresses how quickly ResCap would have to comply

6  with the request?

7    MS. LEUNG:  Other than what I just read into the

8  record, not that I'm aware.  It just gives them flexibility to

9  do it in more time then what's in Exhibit D.

10   THE COURT:  Okay.  So that, for example, if Judge Cote

11  ordered Ally to produce 43,000 loan files and this Court

12  determined that yes they should produce it over a different

13  timeline, beginning ninety days from now when things settle

14  down in the case and setting out reasonable parameters as to

15  when it should be done, is there anything in the shared

16  services agreement or the statements of work that would limit

17  this Court's ability to set out that timetable?

18   MS. LEUNG:  Not that I'm aware.

19   THE COURT:  Okay.

20   MS. LEUNG:  Also, for the shared services agreement we

21  have pointed out the legal services statement of work and the

22  reason we think that that also supports ResCap's obligation to

23  provide loan files, is it shows that ResCap is required to

24  facilitate access to documents and --

25   THE COURT:  Let me put it -- let me just stop you

1   there; I'll let you go on.  I've actually read these pretty

2   carefully.

3           MS. LEUNG:  Okay.

4           THE COURT:  I think you have the much stronger side of

5   the argument on the point of whether -- I don't think you

6   can -- I mean, it's -- I don't think I can order Ally to

7   request the documents; I think Judge Cote could.  I don't think

8   if I said produce them under these documents that ResCap would,

9   as a result of my order that they produce them, would trigger

10  the response -- the obligation of Ally to pay for it.

11          I think if -- I mean, I approved the entry into the

12  shared services agreement.  I believe I can, therefore -- it

13  was presented to me by AFI and the debtors and I approved it

14  and I believe I can have the power to interpret it.  If Judge

15  Cote ordered them to it and they -- and she directed them to

16  forward that request to the debtors, I think she could

17  certainly deal with, to the extent necessary, the cost issue.

18  I think if she ordered them to do it, I think, since I approved

19  this agreement I could interpret it, hypothetically, as saying

20  okay you've got to do it, Ally's got to pay for it under these

21  sections.

22          But I'm -- you can gather from my colloquy with Mr.

23  Glenn that my focus isn't so much whether documents have to be

24  produced but when they have to be produced and who bears the

25  cost of having to do it.  Those are -- you know, I haven't

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    124

1  decided any of this at this point but those are my principal

2  concerns.

3          I just -- they're in court several times a week and we

4  have this very, very full docket, all front-loaded in this case

5  between now and the end of this year.  It may spill over into

6  early next year.  There'll be stuff that obviously goes on

7  after that but we are jam-packed with very time-intensive

8  things that are going on, such that having to comply in the

9  next sixty days with -- you say, well, you're only asking for

10 2,500 now; the other side in your cases want 43,000, a much

11 heavier burden from it.

12         The task of complying -- I don't think one side should

13 get its discovery and the other side get shut out.  So it's as

14 much an issue -- what's the scope of the request, what's the

15 context in which it's being asked, what's the timing, what's

16 the burden, what's the expense, those are the things that I'm

17 focused on.

18         I'll let Mr. Haims address the issue.  I'm not -- I'm

19 taking this under submission today.  I think you've got the

20 much stronger side of the argument about what this shared

21 services agreement requires ResCap to do if AFI asks for it.

22 That request hasn't been made yet.  And Judge Cote could order

23 AFI to request the documents from ResCap.

24         I think the issue that the debtors have raised and

25 Ally -- AFI raised it in their filing here, I don't care who

1  owns the stuff.  It doesn't make any difference who owns this

2  data or the documents.  That's a red herring issue as far as

3  I'm concerned.

4        MS. LEUNG:  Well, we agree with that.  I think that

5  where it would be helpful is for -- an interpretation of this

6  agreement would be helpful to the district court because of

7  AFI's position that they can't ask or do anything or take

8  copies of the documents, for some reason, because of the

9  bankruptcy stay.  That is the position that they have set forth

10  in terms of objecting to our document requests and in the

11  district court, that the automatic stay prevents them from

12  getting copies of these documents.

13        So we have stated very clearly we think that the

14  shared services agreement is a method by which they can request

15  the documents that Your Honor has already ruled on that.

16        THE COURT:  Well, I know Mr. Glenn disagrees with my

17  view that 105 is a potential -- I'm not deciding it yet -- the

18  potential source of power for the Court to say no discovery

19  absent further order of this Court from the debtors.  The

20  shared service agreement, not to the contrary withstanding, and

21  even though that agreement was entered into post-petition,

22  approved post-petition, I think I would still, under my

23  analysis, have the ability to regulate AFI's discovery from the

24  debtors as well.

25        Again, none of this is to say that -- I mean, I've

1  said it already.  Okay.  Anything else?

2       MS. LEUNG:  Well, to the extent that the stay does

3  apply, Your Honor already did rule on that issue when you

4  approved the shared services agreement.  There is a -- I don't

5  have it in front of me but there is a paragraph in that order

6  that says that the stay is lifted to the extent necessary to

7  fulfill the shared services agreement.

8       So to the extent that it does apply --

9       THE COURT:  So you'd say I would have -- your view is

10  I would have no -- if ResCap said look, we've got twenty-seven

11  similar lawsuits pending against us, Ally says we've got

12  twenty-seven similar lawsuits pending us around the country.

13  It involves not 43,000 loan files; it involves 105,000 or

14  200,000 loan files, every loan file that ResCap has control

15  of -- possession of -- let's put control aside -- we need them

16  and we need them in the next sixty days, you don't think I

17  would have the power to say not so fast?

18       MS. LEUNG:  Well, I'm out of my element when it comes

19  to bankruptcy law, but I believe that Your Honor ruled on the

20  basis of Section 105 as to discovery in those cases and that

21  does not apply to FHFA.

22       THE COURT:  Until October 31st.  Well, it's -- okay.

23  Thank you, Ms. Leung.

24       MS. LEUNG:  Thank you.

25       THE COURT:  Mr. Haims?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    127

1        Let me raise a couple other questions with you, while

2    you come up.

3        MR. HAIMS:  Oh, sure.

4        THE COURT:  I'll listen to your argument.  I mean, I

5    thought -- I was not particularly taken by the factual showing

6    that you made as to the -- your vendors don't have to provide

7    more than 1,500 files a month and it's going to take thirteen

8    months or thirteen years or you figure it out to provide it.  I

9    mean, you're -- the showing you made is without additional cost

10   they wouldn't produce more -- there is no judge that I know who

11   would give you several years -- let's assume that they could

12   take discovery, okay?  There's no judge I know who would say

13   okay, it may take you a year or two to produce the documents

14   because your vendor is only under contract to do 1,500 a month

15   without additional expense.  So that's unpersuasive.

16       I mean, you seem to have acknowledged, but not really

17   addressed, that you have the ability to request much more

18   expedited but costly service.  The issue of who pays for it is

19   a different issue, okay.  How quickly -- tell me this, Mr.

20   Haims, if you had to produce 43,000 loan files and somebody

21   else was going to pay for it, so cost is not an issue, how

22   quickly could you produce them?

23       MR. HAIMS:  As we say in the papers -- in the

24   documents, it's going to be nine months.

25       Now, we don't control --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    128

1      THE COURT:  Mr. Haims, I can't believe that.  I

2  just --

3          MR. HAIMS:  We don't control the vendors.  We can ask

4  the vendors.  You're right, that we -- there's additional --

5          THE COURT:  Oh, they'll be more than happy to provide

6  expedited service at a substantial cost.

7          MR. HAIMS:  Well, but there are lots of other

8  productions going on at the same time.  So this is not the only

9  -- this is not a standalone production.  Things are different,

10  for example, when the MBIA case was done several years ago --

11          THE COURT:  Why was it different?

12          MR. HAIMS:  This was pre-bankruptcy.  We didn't have

13  all of the other loan file pulls that we were doing now, the

14  governmental reviews, the committee reviews, the due diligence

15  on the sales, none of that.  So we haven't gotten the list of

16  loan files.  We don't know where those loan files are.  We

17  don't know in how many warehouses they're housed in.  We don't

18  know in what states.  We don't know whether east coast, west.

19  We don't know any of that at this point in time.

20          THE COURT:  Okay.  And tell me this --

21          MR. HAIMS:  So it's hard to say --

22          THE COURT:  -- if FHFA gives you a list -- let's put

23  FHFA aside.  The other defendants in the FHFA cases give you a

24  list of 43,000 loan files, what do the debtors have to do to

25  determine where the files are?

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1        MR. HAIMS:  The debtors have to run those 43,000 loan

2   numbers through fourteen databases, find out -- that will pull

3   up where those loan files --

4        THE COURT:  How long is it going to take to do that?

5        MR. HAIMS:  What we estimate, it's going to be about a

6   day of processing for each database.  These are batch --

7        THE COURT:  How many databases are there?

8        MR. HAIMS:  Fourteen.

9        THE COURT:  Okay.

10       MR. HAIMS:  And then --

11       THE COURT:  They can't be run simultaneously in

12   fourteen databases?

13       MR. HAIMS:  Mr. Mongelluzzo can talk better than I can

14   about that.  But the answer -- I understand the answer is --

15       THE COURT:  Do you know the answer to that?

16       MR. HAIMS:  I understand the answer to that is no.

17       THE COURT:  Why not?  Is he here?

18       MR. HAIMS:  He is here.

19       THE COURT:  Ask him the question.

20       MR. HAIMS:  Sure.

21       THE COURT:  I want to know how long -- if you -- for

22   43,000 loan files can searches of four databases --

23       MR. MONGELLUZZO:  Fourteen.

24       MR. HAIMS:  Fourteen.

25       THE COURT:  -- fourteen databases, can they be run

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    130

1  simultaneously?

2          MR. MONGELLUZZO:  There's two issues, Your Honor.  One

3  is that we would -- they -- some of the loans are in some

4  databases and some are in others.  So until you exclude it from

5  the first database you don't move to the second.  It's just the

6  way the IT batching process works, and I'm not an IT expert so

7  I can't explain to you why we have those system constraints.

8  We're dealing with multiple systems that are legacy systems.

9  So whenever we've had to do large searches like this, i.e. the

10  MBIA case, it basically takes us three to four weeks to go

11  through all of that processing and do all the reconciliation

12  till we can finally tell you exactly where everything is.

13          THE COURT:  Okay.  Thank you.  Thank you very much.

14          So let's say it takes two weeks to figure out where

15  the loan files are.  Then what does it take to get them back?

16          MR. HAIMS:  You've got to ask the vendors.

17          THE COURT:  Okay.

18          MR. HAIMS:  The vendor's got to pull them.

19          THE COURT:  And do you have -- I mean, vendors -- my

20  experience is that the vendors have -- you have a contract, and

21  I understand it limits the number that they have to do.  But

22  they've got a cost sheet, and my recollection is the cost --

23  the more quickly you need it, the greater the cost.  And so if

24  after you identify the location in your fourteen databases,

25  where the location of those files are, I don't know how many

1   vendors we're talking about.

2            MR. HAIMS:  Primarily two --

3            THE COURT:  Okay.

4            MR. HAIMS:  -- but it could be more.

5            THE COURT:  Your two vendors, if you told them we need

6   all of those files in a month, they would quote you a cost for

7   providing the expedited service of getting those files.  Mr.

8   Glenn said, what, sixty days, was that the period you were --

9            MR. GLENN:  Yes.

10           THE COURT:  Okay.  If you said we need the 43,000

11  files in sixty days, your two -- Iron Mountain is one of them?

12           MR. HAIMS:  Yes.

13           THE COURT:  And who's the other?

14           MR. HAIMS:  Kenwood, I believe.

15           THE COURT:  Okay.  Iron Mountain will give you a quote

16  for retrieving, I don't know, whatever the number is that's

17  with them and it'll be quantified as a dollar amount and it'll

18  be expensive, but they'll give you a quote.  It won't take nine

19  months to do it.  Am I right or wrong?

20           MR. HAIMS:  Assuming they're doing nothing else, and

21  again these are not necess -- this has never been done, as I

22  understand here, so with -- by the debtors.

23           THE COURT:  Oh, really?

24           MR. HAIMS:  By the debtors.

25           THE COURT:  Oh, well by the debtors.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    132

1          MR. HAIMS:  By the debtors.

2          THE COURT:  Do you know how often --

3          MR. HAIMS:  Yeah.

4          THE COURT:  -- Iron Mountain is one of the main

5    document --

6          MR. HAIMS:  Agreed.

7          THE COURT:  -- retention -- multiple facilities in the

8    country and how often in complex litigation they're getting

9    requests?  They love it because they can charge an arm and a

10   leg for doing it.

11         MR. HAIMS:  I mean, again, Mr. Mongelluzzo could

12   probably just talk about it better.  Sure.  You're going to pay

13   them whatever you want to drop everything else.  These are not

14   only our vendors, our documents are stored with other servicers

15   and other companies.  Could they do it quicker?  I would assume

16   so.  For any price someone will do something quicker.

17         THE COURT:  Okay.  So I am directing the debtors to

18   obtain a quote from their vendors for retrieving 43,000 loan

19   files sixty days -- within sixty days after the vendors get the

20   request.  Okay.  You say it's going to take you two weeks to do

21   it, to identify where they are, I don't know, you can probably

22   make some rough allocation how many Iron Mountain has and how

23   many your other vendor has, you can approximate it.  But I want

24   to see what the cost is for doing that.  Okay.  I don't want to

25   find out it's going to take nine months because it's not.  It

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      133

1    isn't going to happen.

2           I can tell you, if I rule for FHFA and this matter

3    goes back to Judge Cote, do you think she's going to give you

4    nine months to produce the documents?  I don't think so.

5           MR. HAIMS:  Okay, Your Honor.  We will do that.  When

6    would you like that?

7           THE COURT:  Within a week.

8           MR. HAIMS:  Okay.  Can I just confirm with my client?

9           THE COURT:  Yeah.  In other words, I'm not asking you

10   to figure out where the loan files are now, I'm not asking you

11   to run the fourteen databases.  What I'm asking for you is to

12   get quotes from your two vendors of what the cost would be of

13   retrieving files within a sixty-day period after you identify

14   them.

15          MR. HAIMS:  Can I consult before I agree with it?

16          THE COURT:  Yes, go ahead.  Yeah.

17          MR. HAIMS:  Okay.

18      (Pause)

19          MR. HAIMS:  Mr. Mongelluzzo raises two concerns.  One

20   is, he doesn't know whether they would do it and get us a quote

21   within a week.  But more importantly, he thinks they're going

22   to come back and say unless we know where the files are, we

23   can't -- because there are multiple locations, unless we know

24   how many files we have and where they're located we can't do

25   it.  We can ask them.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    134

1     THE COURT:  How many locations?  Do you decide where

2  the files go?

3     MR. HAIMS:  My understanding is no.  But we could ask

4  them for that information, Your Honor.

5     THE COURT:  Okay.  I want you to ask them.

6     MR. HAIMS:  Okay.  We will do that.

7     THE COURT:  And I want a written response.

8     All right.  Go ahead.  You have a reply that you want

9  to make?

10     MR. HAIMS:  Yeah.  So I don't think that the anti-

11  injunction provision is applicable here.  We are not saying --

12     THE COURT:  105 is not an anti-injunction -- is not an

13  injunction.

14     MR. HAIMS:  No, no.  I'm sorry, the hearing anti-

15  injunction provision.

16     THE COURT:  Okay.

17     MR. HAIMS:  We have not said no discovery ever.  We

18  haven't said that for anybody, in fact for -- we've given some

19  discovery to some parties, and what we're saying -- we're not

20  asking this Court for an injunction enjoining their case.

21  Their case, to the extent the Second Circuit allows it to go

22  forward, is going to go forward -- is going forward and is not

23  going to be impeded other than the deadline for document

24  production in that one case will slip.  Other than that, the

25  case itself is not being impeded.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    135

1   This is no different, I submit, to the order from

2   Judge Cote at the outset of the case, as I understand, staying

3   certain parts of the Ally case pending a decision on the motion

4   to dismiss in the UBS case.  And I don't think it's any

5   different than Judge Cote issuing an order putting the Ally

6   case in tranche 4 for trial three years down the road versus --

7   behind the UBS --

8           THE COURT:  Yes, but Judge Cote gets to decide that,

9   not me.

10          MR. HAIMS:  Agreed.  But the FHFA --

11          THE COURT:  Put it this way, if -- for example, if I

12  ruled that FHFA can't get the discovery for six months, just

13  hypothetically, and Judge Cote says that's all well and good; I

14  order that they produce all the documents in sixty days; if

15  they don't I'm going to enter their default.  That's, kind of,

16  like Winnick II (ph.).  Do you know what -- have you read

17  Winnick II?

18          MR. HAIMS:  No.  But -- I suspect --

19          THE COURT:  I mean, I don't have any control over what

20  Judge Cote does with respect to Ally; that's for her to decide.

21          MR. HAIMS:  Agree, Your Honor.  What we're saying here

22  is that I disagree with Mr. Glenn's position that you are

23  powerless to not grant their motion here because of --

24          THE COURT:  I want to see him argue that in the next

25  case he comes in.

RESIDENTIAL CAPITAL, LLC, ET AL.                    136

1        MR. HAIMS:  -- because of the anti-injunction

2  provision.  Because we haven't said -- we are not asking you

3  here to enjoin their case.  They have hundreds of subpoenas,

4  they and the underwriter defendants, to get the same loan

5  files.  They already have hundreds of thousands of loan files;

6  they may even have some of these.

7        THE COURT:  Let me stop you a second.  Are you

8  suggesting that somebody other than the debtors have these loan

9  files?

10        MR. HAIMS:  It's certainly possible that other debtors

11  have -- that people other than the debtors have copies of these

12  loan files.  Yeah, that's correct.

13        THE COURT:  Other than speculating about it, do you

14  have any --

15        MR. HAIMS:  No, because we don't know -- I don't have

16  a list of the loan files they're looking for.

17        THE COURT:  Well, do you know what the 43,000 loan

18  files that the non-Ally underwriters are talking about?

19        MR. HAIMS:  Do I have a list of those?  No, Your

20  Honor.

21        THE COURT:  Have you made any effort to ascertain what

22  loan files they're talking about?  They're specific

23  securitizations, right?

24        MR. HAIMS:  Uh-huh.  Uh-huh.

25        THE COURT:  You don't need them to tell you what the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    137

1  loans are that are in those securitization trusts?

2          MR. HAIMS:  To find the loan files, Your Honor.  The

3  loan files --

4          THE COURT:  Not to find the loan files.

5          MR. HAIMS:  The record -- again, Mr. Mongelluzzo is in

6  charge of records.  The files are not stored or sorted even by

7  securitization.  So is it possible that there are loans in the

8  securitization that we no longer have the files for?  Sure.

9          THE COURT:  It's pure speculation.

10         MR. HAIMS:  Pure speculation, sure.  But all of this

11  is until we see what the loans actually are that want.

12         THE COURT:  Okay.  You know, under Rule 45 or even

13  Rule 34, one of the factors for the Court to consider is

14  whether the documents could be obtained more easily from

15  another party.

16         MR. HAIMS:  Uh-huh.

17         THE COURT:  That's for Ally to argue with Judge Cote.

18         All right.  Go ahead.

19         MR. HAIMS:  So we don't think the anti-injunction

20  provision has any bearing on this issue.

21         Secondly, to say that this is only limited to 2,500

22  now or 5,000 is --

23         THE COURT:  All they're asking for is 2,500.

24         MR. HAIMS:  In their motion papers they specifically

25  reserve the right to ask for all 43,000.  They've -- in

RESIDENTIAL CAPITAL, LLC, ET AL.                                    138

1   communication with Judge Cote, and this is part of our

2   exhibits, have asked for -- said that they're going to be

3   asking for all e-mails and they're going to be asking for all

4   of the documents.  That dispute has already been teed up before

5   Judge Cote and they specifically said they're going to -- they

6   want those documents from the debtors.

7            THE COURT:  Do you have all of Ally's e-mail files?

8            MR. HAIMS:  There are custodians in the case.  There

9   are, I think, thirty -- from the communications that we've

10  read, there are thirty some-odd custodians in the case from

11  which they want documents.

12           THE COURT:  You know, I've got enough problems with

13  this current one.

14           MR. HAIMS:  Right.

15           THE COURT:  When the next one comes before me I'll

16  deal with that.

17           MR. HAIMS:  Well, but to say that this is limited only

18  2,500 I don't think is the case.  And I think we have to look

19  to see what's -- whether the granting of these 2,500 leads to

20  the next 43,000 and the next e-mail and when the other --

21           THE COURT:  Well, that's why I ask --

22           MR. HAIMS:  -- twenty-seven cases --

23           THE COURT:  That's why I asked Mr. Glenn just assume

24  that complying with discovery is going to cost ten million

25  dollars and tank the case if it has to be done within a

1   schedule, he adheres to his absolutist position that I have no

2   power to alter that.

3           MR. HAIMS:  I disagree with that position.  And then,

4   I guess, the last --

5           THE COURT:  That wasn't quite what he said.  Close.

6   Close.

7           MR. HAIMS:  And then the last provision -- the last

8   point I would just make is on the shared services agreement.

9   We have not taken the position that Ally, if they asked for

10  documents under the shared service agreement for the loan

11  files, they couldn't get them.

12          What we've taken the position is that would be an

13  additional service that would have to be negotiated.  There's a

14  specific provision in the agreement that says if it's a service

15  not covered by the agreement, the parties could sit down and

16  negotiate --

17          THE COURT:  Producing loan files is covered by the

18  agreement, isn't it?

19          MR. HAIMS:  Well --

20          THE COURT:  Yes or no?

21          MR. HAIMS:  Producing small numbers of loan files --

22          THE COURT:  Does it say that?

23          MR. HAIMS:  -- in the ordinary course of business.

24          THE COURT:  Does it say that?  Does it say small

25  numbers of loan files in the ordinary course of business?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    140

1          MR. HAIMS:  Well we think, and that's why we put in

2  the --

3          THE COURT:  No.  Just say it:  does it say that?

4          MR. HAIMS:  Does it specifically say?

5          THE COURT:  Yeah.

6          MR. HAIMS:  It says -- no.

7          THE COURT:  Okay.  Just go over the fee structure

8  because I was a little unclear about -- are you capped at

9  50,000 dollars a month?

10         MR. HAIMS:  For the fixed monthly costs, it's capped

11 at 50,000 dollars for the record services, yes.  And that's for

12 pulling the loan files and all of the other enumerated records.

13         THE COURT:  You pass through any third party costs?

14         MR. HAIMS:  Third party costs, correct.

15         THE COURT:  So if Iron Mountain charged three million

16 dollars, that would be a pass-through cost --

17         MR. HAIMS:  That's correct.

18         THE COURT:  -- under the shared services agreement?

19         MR. HAIMS:  Correct.  The 50,000, as I understand it,

20 deals with the time of the in-house employees to pull those

21 files.

22         THE COURT:  And if Morrison & Foerster put thirty

23 paralegals and twenty lawyers the task of reviewing those files

24 before they were produced, that would be passed-along cost?

25         MR. HAIMS:  That's correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    141

1    So what we're saying is there is provision in this

2    agreement; this is just not covered by it.

3        THE COURT:  Does Ally disagree with what you and I

4    just said?

5        MR. HAIMS:  I'd let Ally speak to themselves on that

6    one.

7        THE COURT:  Okay.  All right.  Anything else before I

8    hear from Ally's counsel?

9        MR. HAIMS:  No, Your Honor.

10       THE COURT:  Thank you, Mr. Haims.

11       MR. BROWN:  Your Honor, I'll take that as my cue.

12       Judson Brown from Kirkland & Ellis on behalf of Ally.

13   And I just want to address, for a moment, the record services

14   statement of work that you've been discussing with FHFA and the

15   debtors' counsel here.

16       It's our view that that statement of work is clear and

17   does not cover a request for the loan files at issue here, and

18   let me read a provision from that --

19       THE COURT:  Go ahead.

20       MR. BROWN:  -- statement of work for you.

21       In section 7(a), Your Honor, the final paragraph of

22   that section of the statement of work, the third sentence reads

23   as follows:  "In addition, any deliverables in this statement

24   of work must be consistent with historical practice and

25   services provided must be delivered with the same standard of

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    142

1  care, diligence, priority and frequency with which the services

2  were provided immediately prior to the date hereof."

3         THE COURT:  Let me ask you this, as AFI been a

4  defendant in any litigation in the past involving any loans?

5         MR. BROWN:  Other than the FHFA lawsuit, Your Honor?

6         THE COURT:  Yes.

7         MR. BROWN:  Has AFI?

8         THE COURT:  Yes.

9         MR. BROWN:  Sure.

10         THE COURT:  Okay.  And in any of those litigations,

11  prior into the entry into the shared services agreement, did

12  you request production of loan files from the debtors?

13         MR. BROWN:  Pursuant to this statement --

14         THE COURT:  No.

15         MR. BROWN:  -- of work or generically?

16         THE COURT:  No, no, no, generic.  Did you -- in other

17  words, you acknowledged that AFI has been a defendant in

18  lawsuits involving mortgage loans and underwriting loans and

19  all that, correct?

20         MR. BROWN:  AFI has been a defendant in those types of

21  lawsuits.

22         THE COURT:  And in any of those lawsuits, before the

23  shared services agreement was entered into, did AFI request

24  that any of the now debtors pull the loan files for them to

25  review?

RESIDENTIAL CAPITAL, LLC, ET AL.                    143

1          MR. BROWN:  For AFI?

2          THE COURT:  Yes.

3          MR. BROWN:  No, Your Honor.

4          THE COURT:  Never?

5          MR. BROWN:  No, Your Honor.  This record services

6   statement of work, Your Honor, is meant to cover loan files for

7   Ally Bank, not for AFI.  Separate and different.  And

8   historically the request for those loan files has been small in

9   nature, nothing like the ones --

10         THE COURT:  I don't want to know whether they're small

11  in nature because until the litigation bomb exploded on the

12  mortgage servicing and origination business, of course they

13  were small in number.  But that changed; changed before this

14  bankruptcy.

15         MR. BROWN:  Right.  But just to track the language of

16  this record service, consistent with historical practice,

17  Ally -- AFI has never made a request of this sort.  And so at

18  best, Your Honor --

19         THE COURT:  Yeah, but the statement of work

20  specifically covers -- I don't have the words open in front of

21  me but basically is litigation support.

22         MR. BROWN:  At best, Your Honor, this statement of

23  work is ambiguous.  What this discussion reveals is this

24  statement of work, at best, is ambiguous as to what it covers

25  and thus the testimony that the debtors have offered, from the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    144

1  various witnesses, particularly to the intent behind the shared

2  services agreement and this statement of work would thus be

3  relevant for Your Honor to consider.

4         THE COURT:  You know, at the point where -- how many

5  lawsuits was AFI a defendant in involving origination or

6  servicing of loans at the time these debtors filed their

7  Chapter 11 petitions?

8         MR. BROWN:  Your Honor, off the top of my head I don't

9  know that number for you right now.

10        THE COURT:  Quite a few?

11        MR. BROWN:  Your Honor, honestly I just don't know the

12 number.

13        THE COURT:  Mr. Haims, I'm only able to listen to one

14 at a time, okay?

15        And you're saying AFI didn't get any document requests

16 in any of those litigations before?

17        MR. BROWN:  No, and let me explain that Your Honor.

18 It's not the case that AFI was sued individually and ResCap

19 wasn't a defendant.  In those --

20        THE COURT:  Oh, I know they were defendants.  I know

21 you were all in that same pot.

22        MR. BROWN:  And so AFI didn't have to make a request

23 to ResCap for any loan files and it never did so.  ResCap was

24 in the case of the defendant and it was asked to produce those

25 loan files.  And so there is no historical practice to track

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    145

1  the language of this statement of work where AFI requests loan

2  files from the debtors.

3          Your Honor, I only wanted to address this --

4          THE COURT:  Okay.  That's fine.

5          MR. BROWN:  -- particular statement of work.  Do you

6  have anything else that I could answer?

7          THE COURT:  No, I don't.  I don't.  Thank you very

8  much.

9          MR. BROWN:  Thank you, Your Honor.

10          THE COURT:  Mr. Haims, you wanted to be heard again?

11          MR. HAIMS:  Thank you, Your Honor.  I just wanted to

12  clarify that in historical precedent the -- ResCap was a

13  defendant in all those cases.  In the MBIA case it was ResCap

14  who made the production itself, not at the direction of Ally or

15  to Ally or at its direction.

16          THE COURT:  All right.  Anybody else wish to be heard?

17          MS. MOSKOWITZ:  Yes, Your Honor.

18          THE COURT:  Come on up.

19          MS. MOSKOWITZ:  Thank you.

20          Lauren Moskowitz, I represent Credit Suisse and I'm

21  here on behalf of the non-Ally underwriter defendants.

22          If it's appropriate for this motion, I didn't know if

23  you were setting it aside separately.

24          THE COURT:  Well, I'm going to hear your motion when

25  it's on the calendar, which isn't today.  But I'll -- you did

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    146

1   file in connection with this motion so I'll certainly hear you.

2        MS. MOSKOWITZ:  Okay.  Thank you.

3        With respect to the number of loan files at issue we,

4   as Your Honor knows from our submission, do not agree that the

5   appropriate number if 5,000, let alone the 2,500.

6        THE COURT:  All right.  So let me ask you this,

7   though, let's assume -- you want 43,000 loan files.  Let's just

8   assume, hypothetically, that the cost of producing 43,000 loan

9   files is five million dollars.  Are your clients ready,

10  willing, I know they're able but -- are they ready to advance

11  the funds against an accounting after the documents are

12  provided?

13       MS. MOSKOWITZ:  Your Honor, the non-Ally underwriter

14  defendants are willing to discuss cost sharing.

15       THE COURT:  No, I didn't ask whether they're willing

16  to discuss.  If the Court were to order on an appropriate

17  timetable that ResCap provide all 43,000 files, are your

18  clients prepared to pay the debtors' costs, direct and indirect

19  costs, including the vendors' costs, the attorneys' time in

20  reviewing -- in producing the files, all of that costs, subject

21  to review by the Court, are they prepared to pay that cost?

22       MS. MOSKOWITZ:  If FHFA is contributing and the

23  other -- all defendants are contributing, yes, Your Honor, we

24  are.

25       THE COURT:  Well, Mr. Glenn only wants 2,500 files,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    147

1   you want 43,000 and Judge Cote ordered if you want more go to

2   the bankruptcy court.  So you'll soon be here asking for 43,000

3   files.  Mr. Glenn, for now, is asking for 2,500.  He has --

4   well, and what I wanted -- so if -- the factors that I talked

5   about earlier, including cost, are factors that the Court

6   considered, I mean even under Rule 45, which I don't -- it

7   might provide guidance to me but I didn't issue a subpoena, I

8   mean when I say I this Court didn't issue a subpoena.  But one

9   of the subsections of Rule 45 deals with cost.  I guess it's

10  Rule 45(b)(3)(C)(ii), (C) is specifying conditions as an

11  alternative.  In the circumstances described in Rule

12  45(c)(3)(B) "The Court may, instead of quashing or modifying

13  the subpoena, order appearance or production under specified

14  conditions if the party served," and then "(ii) ensures that

15  the subpoenaed person will be reasonably compensated."

16          Now I don't think that applies, by its terms, to what

17  I have but let's assume it provides guidance to me in deciding

18  what to -- if I were to decide that 105 allows me to regulate

19  discovery from the debtors, I look to that subsection as

20  providing guidance.  My specific question is, are you prepared

21  to pay the costs of the 43,000 files you want.

22          MS. MOSKOWITZ:  We are prepared to share reasonable

23  costs among the defendants.  Yes, Your Honor.

24          THE COURT:  All right.

25          MS. MOSKOWITZ:  With respect to how those should be

1  shared, however, we disagree that FHFA should be responsible

2  only for the 2,500.  We're happy to talk to Judge Cote about

3  that if that's the appropriate forum to discuss allocation.

4  But we disagree with the position they're taking here today,

5  with the constant reduction in the files so that they can, I

6  think the language was, one -- so that they could do what they

7  needed to do to carry their burden, but leave no room for what

8  we need to do to carry our burden and defend against the claims

9  that they've brought.  Our due process concerns are of

10 paramount concern here given that what they're effectively

11 requesting is what they want for their case but let us wait or

12 perhaps not get at all what we need for our defenses.

13          THE COURT:  And that wasn't -- my question is let's --

14 I mean, timing, as I've explained, is a factor.  But -- and

15 I -- you heard my expressions of skepticism about nine months

16 to produce the files.  But if the debtors are required to

17 provide them, I think someone else should be paying the cost,

18 okay.  It may -- it would undoubtedly take longer to produce

19 43,000 files than 2,500 files, but assuming a reasonable

20 timeframe and all that, I come back -- one thing I didn't raise

21 with Ms. Leung or with Mr. Glenn is I didn't ask whether FHFA,

22 in order to get this discovery, is prepared to agree to waive

23 any claim it wishes to file in these bankruptcy proceedings

24 because certainly the production of documents, you may need

25 them to prosecute your actions against the other defendants,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    149

1    but I don't think there's any mistake about the fact that you

2    want them to substantiate a claim to file in the bankruptcy

3    cases against the debtors.

4        In granting the 105 injunction in the one case that

5    went to decision, I believe I identified the risk of issue

6    preclusion as an appropriate -- and the cases identify that as

7    an appropriate consideration.  I don't have the 105 issue about

8    enjoining prosecution of the AFI -- the case against AFI is not

9    before me, but it does, certainly, in deciding scope context,

10   context includes whether a party wishes to -- that's seeking

11   discovery today say I need it for this other action, but do

12   they intend to use that information in the claims allowance

13   process before the Court?

14       You, on behalf of the non-Ally underwriters indicate

15   in your papers your claims for indemnification.  So the same

16   factor comes into account, you want to be able to use whatever

17   information you get, not only to defend the actions -- the

18   action -- the actions before Judge Cote, but also to bolster a

19   claim that you would assert against the debtors in this case.

20       MS. MOSKOWITZ:  No, Your Honor.  I think the

21   indemnification is for the underwriters' legal fees and any

22   ultimate liability that they suffer.  And so, to the extent

23   that we need these files to defend ourselves, we're actually

24   protecting the assets of the estate to some extent because

25   anything --

RESIDENTIAL CAPITAL, LLC, ET AL.                        150

1          THE COURT:  Are you entitled -- if there's a judgment

2     in the securities against your clients are you entitled to

3     indemnification?

4          MS. MOSKOWITZ:  Yes, Your Honor, and we have filed a

5     proof of claim in this court.

6          THE COURT:  These are 33 Act claims against your

7     client?

8          MS. MOSKOWITZ:  As well as state Blue Sky Law claims

9     as well.

10         THE COURT:  Okay.  Well, I'm not going to reach that

11    now.  But, I mean, when I'm talk about context, the context is

12    important, is the party who's seeking the discovery from the

13    debtor or the debtors' defendants in the actions before the

14    bankruptcy, have the parties seeking discovery indicated their

15    belief that they have a claim against the debtors that are

16    likely to be asserted in the claims allowance process?  Those

17    are all, it seems to me, to be factors that go to the context

18    in which the discovery request rises.

19         But with all that said, I think whether the party is a

20    plaintiff or a defendant in an action outside of the bankruptcy

21    court it's entitled to the evidence to prosecute or defend the

22    claims.  Timing becomes -- and burden and expense become a big

23    issue.

24         MS. MOSKOWITZ:  Yes, Your Honor.  And that is -- that

25    is appropriate for Your Honor to consider, and we're willing to

**RESIDENTIAL CAPITAL, LLC, ET AL.**                               151

1  work with the debtors as well in working out a schedule.

2         We also would like to get these files sooner rather

3  than later, of course, because we are subject to the same

4  timing as the FHFA is in the case that's pending in front of

5  Judge Cote.

6         THE COURT:  Okay.  Thank you.

7         MS. MOSKOWITZ:  Thank you, Your Honor.

8         THE COURT:  Anybody else want to be heard?

9         MS. FREJKA:  Good afternoon, Your Honor.  Elise

10 Frejka, Kramer, Levin, Naftalis & Frankel appearing on behalf

11 of the committee.

12        The committee wants to echo most of the comments of

13 the Court regarding the cost, the distraction, and the timing.

14 We support the debtors in this position and feel that expedited

15 discovery, at this critical time in the case, will distract the

16 debtors from the current, very important deadlines that are

17 ahead in the coming months.

18        The committee also feels that the cost should not be

19 borne by the debtors.  That these loan file expenses should be

20 borne by the defendants along the lines as just suggested.

21        THE COURT:  Well, it may be -- I mean, it -- I mean,

22 Judge Cote could well decide the expenses should be borne by

23 Ally.  Usually the -- by AFI, because usually with our system

24 is -- the issue for third party discovery is more acute about

25 expenses, but ordinarily the party bears its own costs for

RESIDENTIAL CAPITAL, LLC, ET AL.                              152

1   discovery.

2          MS. FREJKA:  And we -- the committee is aware of the

3   cost, and I think that it's probably some place between where

4   the two parties are suggesting the number is, but it does have

5   the ability to ever expand as requests expand and the committee

6   just wants to be sensitive to what those costs are and where

7   they should be allocated and passed through under the shared

8   services agreement.

9          THE COURT:  Well, other than this Court deciding that

10  under the agreement that it approved that -- if the Court were

11  to decide that AFI is -- if AFI, either because it's ordered to

12  by the district court or it decides, for its own defense, it

13  needs it,  requests 43,000 loan files, that the cost -- that

14  they bear the pass-through costs for providing it and perhaps

15  more than the 50,000 a month or not.  And it may be appropriate

16  for this Court to decide that the one thing that's clear is

17  that the debtors shouldn't bear the cost, that under the shared

18  services agreement AFI is potentially responsible for the cost.

19  But the issue of whether AFI or FHFA, I have trouble with that

20  all the time, FHFA or the other underwriter defendants should

21  bear the cost that does seem to me to be for Judge Cote to

22  decide, not for me to decide.  This is discovery in an action

23  pending before her not before me.

24         MS. FREJKA:  I don't think we disagree with that.  I

25  think we just raise the issue of the cost to the estate --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    153

1          THE COURT:  Okay.

2          MS. FREJKA:  -- as well as the timing.  And I think

3   that you've reached those same points.

4          THE COURT:  I've addressed them, let's put it that

5   way.

6          MS. FREJKA:  You've well addressed them.

7          THE COURT:  I haven't decided them, but I've addressed

8   those issues.

9          MS. FREJKA:  Yes, you have.  Thank you.

10          THE COURT:  Thank you, Ms. Frejka.  Anybody else wish

11   to be heard?  You want the last word, Mr. Haims?

12          MR. HAIMS:  Your Honor, just two quick --

13          THE COURT:  Okay.

14          MR. HAIMS:  One is on the schedule for the additional

15   submission.  Just as I was sitting here I remembered that next

16   week is Rosh Hashanah, I will not be in Monday and Tuesday.

17          THE COURT:  I won't either.

18          MR. HAIMS:  So if we could have it past that date,

19   Wednesday or Thursday when I get back.

20          THE COURT:  I thought Friday, a week from -- I'm

21   talking about the end of next week, by Friday of next week.

22          MR. HAIMS:  Thank you, Your Honor.

23          And lastly, I think we had heard from the underwriters

24   as to whether they are going to assert their claim against the

25   debtors, and I don't know if we've ever heard from FHFA whether

1  they intend to do it as well.

2          THE COURT:  I'm going to be surprised, but go ahead,

3  Mr. Glenn.

4          MR. GLENN:  Your Honor, we're not prepared to waive

5  our claims and --

6          THE COURT:  I didn't expect you to.

7          MR. GLENN:  -- in the claims allowance process the

8  irony is that we could then issue a subpoena under the rule --

9  the 7000 rules and get it as party discovery ironically.

10          THE COURT:  No, it would be a contested matter under

11  9014 and the discovery rules, subject to the way the Court

12  would regulate it, would apply.  But, of course, in the claims

13  allowance process estimation of a claim can be a much more

14  truncated and expedited proceeding than a district court

15  action.

16          MR. GLENN:  That's correct.

17          THE COURT:  So it wouldn't necessarily -- and look,

18  the completion of the litigation before Judge Cote, as

19  efficient as she is, will be, you know, with appeals is a time

20  consuming process.  I think that the estimation process is

21  designed to deal with the situation where you can't really,

22  finally quantify a claim in the time needed to resolve a case.

23  Those issues aren't before me, but one shouldn't assume that

24  the same discovery, the same process applies in the claims

25  allowance process as would apply in the district court for any

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    155

1  action.

2          MR. GLENN:  To answer the Court's question, the answer

3  is no.  We're not preparing to waive our claim.

4          THE COURT:  I didn't expect you would.

5          MR. GLENN:  Thank you.

6          THE COURT:  Thank you.

7          All right.  Anybody else wish to be heard?

8          MS. MOSKOWITZ:  Your Honor, just one procedural

9  question for you, something Your Honor said just raised a

10 question in my mind.  We did make our submission on behalf of

11 the non-Ally underwriter defendants according to Your Honor's

12 schedule for supplemental submissions --

13         THE COURT:  Right.

14         MS. MOSKOWITZ:  -- on FHFA.

15         THE COURT:  You did.

16         MS. MOSKOWITZ:  So to the extent that Your Honor is

17 taking evidence, we would move for admission of the exhibits

18 submitted.

19         THE COURT:  Well, you have a separate motion pending

20 so we'll wait till we get to your motion.

21         MS. MOSKOWITZ:  Is that scheduled for some separate --

22         THE COURT:  I don't know.  Is it on the calendar, Mr.

23 Haims?

24         MR. HAIMS:  I think it's actually noticed for today.

25         MS. MOSKOWITZ:  That's what I thought.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    156

1        THE COURT:  It is?  I'm sorry.

2        MR. HAIMS:  I think in their notice they noticed it

3   for the same day.

4        THE COURT:  I'm sorry.

5        MS. MOSKOWITZ:  I'm sorry; that's what I thought.  So

6   I was just confused.

7        THE COURT:  I apologize.

8        MS. MOSKOWITZ:  So if --

9        THE COURT:  I read everything, but I just -- I don't

10  focus, sometimes, on those little details.

11       MS. MOSKOWITZ:  Right.

12       THE COURT:  What is it that you're offering in

13  evidence?

14       MS. MOSKOWITZ:  Your Honor, we would offer the

15  submission, which is docket number 1293 and the exhibits

16  submitted thereto, which are docket numbers 1293-1 through -9,

17  which it would include the affidavits, or declarations rather,

18  of two experts, Professor Arnold Barnett and Professor Chris

19  James, which are respectively 1293-9 and 1293-8, as well as the

20  underwriter or the defendants' submission, across all actions,

21  to the court on June 6th, which was 1293 --

22       THE COURT:  When you say submissions I'm only

23  interested in the evidence.

24       MS. MOSKOWITZ:  The evidence are those two exhibits

25  that were submitted in support that I just cited to Your Honor.

1      THE COURT:  1293-8 and 1293-9?

2          MS. MOSKOWITZ:  Yes, Your Honor.

3          THE COURT:  Are there any objections to those

4  declarations?

5          MR. HAIMS:  No, Your Honor.

6          THE COURT:  Mr. Glenn?

7          MR. GLENN:  We're not a party to that motion.  I don't

8  believe that motion is directed to us.

9          THE COURT:  Okay.

10         MR. GLENN:  We're not taking any position on any of --

11 anything in their pleadings.

12         THE COURT:  Okay.  All right.  So the two declarations

13 that are ECF docket number 1293-8 and 1293-9 are admitted into

14 evidence for purposes of this hearing.

15 (Declaration of Professor Arnold Barnett was hereby received

16 into evidence as Credit Suisse's Exhibit 1293-8, as of this

17 date.)

18 (Declaration of Professor Chris James was hereby received into

19 evidence as Credit Suisse's Exhibit 1293-9, as of this date.)

20         MS. MOSKOWITZ:  Thank you, Your Honor.

21         THE COURT:  I'm going to take the matter under

22 submission.  I do -- I am working on this but I want to see the

23 specific additional information that I requested that the

24 debtors provide with respect to the cost of producing within

25 sixty days the approximately 43,000 loan files.  Okay?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    158

1          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

2          THE COURT:  All right.  We're adjourned.  Thank you

3    very much.

4          MS. MOSKOWITZ:  Thank you.

5       (Whereupon these proceedings were concluded at 3:51 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

159

1

2                        I N D E X

3                      E X H I B I T S

4   DEBTORS'   DESCRIPTION                        ID.      EVID.

5              Declaration and supplemental                  86

6                declaration of Kanchana Wangkeo

7                Leung in support of FHFA's motion

8                seeking limited discovery from the

9                debtors and relief from the

10               automatic stay

11             Declaration of Jeffrey A. Lipps               91

12               in support of debtors' objection

13               to FHFA's motion for relief from the

14               automatic stay

15             Declaration and supplemental                  91

16               declaration of John G. Mongelluzzo

17               in support of debtors' objection

18               to FHFA's motion for relief from the

19               automatic stay

20             Declaration of Mary Fahy Woehr in

21               support of debtors' objection to

22               FHFA's motion for relief from the

23               automatic stay

24             Declaration of Philip Marc Scheipe           91

25               in support of AFI's submission

160

**I N D E X**

**E X H I B I T S (cont'd)**

| DEBTORS' | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| | Debtor's Exhibits 1 through 8 | | 92 |

| CREDIT SUISSE'S | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| 1293-8 | Declaration of Prof. Arnold Barnett | | 157 |
| 1293-9 | Declaration of Prof. Chris James | | 157 |

**RULINGS**

| | Page | Line |
|---|---|---|
| Motion regarding subservicing approved | 53 | 10 |
| Exclusivity period extended to 5 p.m. Thursday, 12/20 | 71 | 9 |
| Debtors' unopposed motion for an order extending the 365(d)(4) period to assume or reject executory contracts or leases granted | 76 | 3 |
| Committee's application to retain and employ San Marino Business Partners LLC as consultants to the committee approved | 78 | 13 |
| Lift stay motions that had been resolved by stipulations are approved by the Court | 79 | 5 |

161

# C E R T I F I C A T I O N

I, Ellen S. Kolman, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

ELLEN S. KOLMAN

AAERT Certified Electronic Transcriber CET**D-568


eScribers

700 West 192nd Street, Suite #607

New York, NY 10040


Date:  September 12, 2012