**Hearing Date: September 27, 2012 at 10:00 a.m. (ET)**
**Objection Deadline: September 14, 2012 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP

1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Lorenzo Marinuzzi

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

----------------------------------------------------------------

**DEBTORS' OBJECTION TO MOTION FOR AN ORDER**
**APPOINTING AN OFFICIAL COMMITTEE OF BORROWERS**
**<u>PURSUANT TO SECTION 1102(A)(2) OF THE BANKRUPTCY CODE</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 4

    A.    General Background ................................................................................ 4

    B.    Government Agreements Regarding Servicing, Loan Modification, and
           Foreclosure Practices .......................................................................... 5

           i.    Consent Order ........................................................................... 5

           ii.    DOJ/AG Settlement ................................................................. 6

    C.    Borrowers' Notice of, and Participation in, the Cases ......................... 7

    D.    Authorization to Conduct Mortgage Loan Servicing in the Ordinary
           Course of Business and Related Relief ................................................ 7

    E.    Stay Relief Motions ............................................................................ 11

    F.    Notice and Filing of Claims ............................................................... 11

OBJECTION ....................................................................................................... 12

    A.    The Movants Have Not Alleged Any Basis That the Creditors'
           Committee's Ability to Function as Currently Constituted is Impaired and
           Thus Borrowers are Adequately Represented ...................................... 14

           i.    The Creditors' Committee is Adequately Representing
                Borrowers ................................................................................ 14

           ii.    Movants' Misrepresent Potential Conflicts of Interests
                Within the Creditors' Committee ............................................. 16

    B.    The Nature of the Cases Weighs Against Appointment of an Additional
           Official Committee of Borrowers ....................................................... 19

           i.    Servicing Orders ..................................................................... 20

           ii.    Supplemental Servicing Order ................................................. 20

           iii.    Protections Provided By Government Agreements .................... 20

    C.    Borrowers Can Be Heard Without an Official Borrowers' Committee .............. 21

    D.    Debtors' Estates Would Incur Substantial Costs Associated with the
           Appointment of an Additional Official Committee Without Alleviating the
           Burden on This Court ......................................................................... 22

    E.    Forming an Official Committee to Advance Individual Borrowers' Claims
           Against the Estate (or on Behalf of the Estate) Would be Improper ................. 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

CASES

In re Barney's, Inc., 197 B.R. 431 (Bankr. S.D.N.Y. 1996)...........................................................14

In re Dana Corp.,
    344 B.R. 35 (Bankr. S.D.N.Y. 2006)............................................................. passim

In re Enron Corp.,
    279 B.R. 671 (Bankr. S.D.N.Y. 2002)...............................................................12,13

In re Hills Stores Co.,
    137 B.R. 4 (Bankr. S.D.N.Y. 1992).......................................................................24

In re Garden Ridge Corp.,
    No. 04-10324, 2005 Bankr. LEXIS 323 (Bankr. D. Del. Mar. 2, 2005) ...............................25

Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors
    of Enron Corp.,
    No. 02-cv-6274, 2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003).................................... passim

Shaw & Levine v. Gulf & W. Indus., Inc. (In re The Bohack Corp.),
    607 F.2d 258 (2d Cir. 1979)................................................................................15

Woods v. City Nat'l Bank & Trust Co., 312 U.S. 262 (1941).......................................................15

STATUTES

11 U.S.C. § 1102(a)(2)....................................................................................................12

Fed. R. Bankr. P. 9019....................................................................................................17

OTHER AUTHORITIES

Am. Home Mortg. Holdings, Inc.,
    Case No. 07-11047 (CSS) (Bankr. D. Del. Oct. 10, 2008) [Docket No. 6220].......................18

Austin v. Chisick (In re First Alliance Mortg. Co.),
    Case No. 00-12370 (JB), (Bankr. C.D. CA. June 9, 2000) [Docket No. 426]........................18

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession (collectively, the "<u>Debtors</u>")[1] in the above-captioned cases (collectively, the "<u>Cases</u>") submit this objection (the "<u>Objection</u>") to the *Motion for an Order Appointing an Official Committee of Borrowers Pursuant to Section 1102(a)(2) of the Bankruptcy Code* [Docket No. 1264] (the "<u>Motion</u>") filed on behalf of certain individual borrowers of the Debtors ("<u>Movants</u>").  In support of the Objection, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## <u>PRELIMINARY STATEMENT</u>

1.     Movants seek the appointment of an additional official committee because the official committee of unsecured creditors appointed in the Cases (the "<u>Creditors' Committee</u>") is purportedly disabled by unfounded allegations of inherent conflicts of interest from representing borrower interests.  Beyond wholly conclusory allegations, Movants fail to furnish any valid basis why or how the Creditors' Committee, which includes a borrower member, cannot properly and fairly represent their interests as potential or actual unsecured creditors.  On the contrary, the Motion recognizes that the Creditors' Committee has, in fact, been "diligently representing the interests of unsecured creditors."  Mot., at 18.  Likewise, Movants do not allege inadequate representation of borrowers due to any violations of the Creditors' Committee's fiduciary duties.  Instead the Motion seeks formal committee status (i) purportedly to protect individual borrower interests in pending and potential foreclosure litigation throughout the nation, and (ii) to protect borrowers from some theoretical risk that the

---

[1]     The names of the Debtors in these cases and their respective tax identification numbers are identified on <u>Exhibit 1</u> to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of the Chapter 11 Petitions and First Day Pleadings, filed with the Court on the Petition Date (the "<u>Whitlinger Affidavit</u>") [Docket No. 6].

Trustee Members[2] and the Insurer Members on the Creditors' Committee will conspire to harm their interests, at a potential significant expense to the Debtors' estates. These are not valid grounds for the appointment of an official committee. Moreover, the appointment of a Borrowers' Committee is not warranted by the facts and circumstances of these Cases. As Movants have failed to offer any legally cognizable basis for the appointment of an additional committee, the Motion should be denied.

2.     The Debtors certainly agree that borrowers have legitimate concerns regarding the day-to-day servicing of their loans, opportunities for loan modifications and other forms of borrower relief. The Debtors also acknowledge that borrowers' interests in default scenarios warrant consideration. To these points, both prior to and during the administration of the Cases, the Debtors and other parties put significant programs in place to ensure that borrowers' interests are more than adequately protected.

3.     *First*, new and existing borrowers of the Debtors are protected under the DOJ/AG Settlement and the Consent Order (each as defined below and, together, the "Government Agreements"), because, among other things, they require the Debtors to adopt improved loan servicing standards. Meanwhile, defaulting and distressed borrowers of the Debtors are protected under the Government Agreements because they obligate the Debtors to commit money and efforts to address loan modifications within a specified time frame. *Second*, at the outset of these cases, the Debtors obtained virtually unprecedented relief to permit the Debtors to continue servicing mortgage loans in the ordinary course, with respect to both their existing contractual arrangements with Fannie Mae, Freddie Mac and Ginnie Mae (collectively, the "Government Agencies"), and private label transactions. That relief was both mandated and

---

2     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

supported by the Government Agencies.  *Third*, at their own initiative, under the Supplemental

Servicing Order[3] the Debtors obtained expansive borrower and debtor relief from the automatic

stay to allow borrowers to defend against foreclosures and eviction proceedings and to fully

prosecute their rights where borrowers are subject to their own bankruptcy cases.  *Fourth*, the

Debtors are monitored by 49 state attorneys general, the United States Department of Justice,

the Federal Reserve Board, and other agencies to ensure the Debtors compliance with the

Government Agreements.  Moreover, the Supplemental Servicing Order is monitored and

enforced by the Bankruptcy Court.  Accordingly, there is no need for another watchdog with

respect to the protections for borrowers.  These steps have ensured that borrowers are still

accorded meaningful rights to which they were entitled prior to the filing of the Cases.  In short,

the Debtors have preserved the rights of borrowers in far reaching ways that address more than

adequately the concerns raised by Movants as a basis for the Borrowers' Committee.  As a

consequence, there is no need for a Borrowers' Committee of the type envisioned by Movants.

        4.        Furthermore, the record of these cases belies Movants' assertions that

individual borrowers have no voice in these cases or may not have access to information that

may impact their rights and interests.  Numerous borrowers have already exercised their rights

by filing pleadings in and appearing before the Bankruptcy Court.  In addition, each borrower

has free access to the website maintained by the Debtors' claims and noticing agent Kurtzman

Carson Consultants LLC ("KCC") through which all parties in interest can monitor these cases.

Through KCC's website, the Debtors (i) have provided a toll-free hotline for borrowers (the

---

[3]   See *Final Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses,* entered on July 13, 2012 [Docket No. 774] (the "Supplemental Servicing Order").

"Hotline"), frequently asked questions, a letter to the borrowers regarding the servicing of their loans, a form for submitting inquiries, and (ii) continue, from time to time, to post relevant information regarding the Cases, including all filed pleadings.  Additionally, the Creditors' Committee proposes to provide pertinent case information to all unsecured creditors through its own website.[4]

5.    Finally, appointment of an additional official committee would exact significant costs on the Debtors' estates, would be in large part, if not entirely, duplicative of the work of the Creditors' Committee and would not make administration of the Cases more efficient or alleviate any burden on this Court.  For the foregoing reasons, and as discussed more fully below, the Motion should be denied.

## BACKGROUND

**A.    General Background**

6.    On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  The Cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").  No trustee has been appointed in the Cases.

7.    On May 16, 2012, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed a nine-member official Creditors' Committee.  In addition to several financial institutions and insurers, the U.S. Trustee appointed as a member

---

[4]    *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (A) Establishing Information Sharing Procedures, and (B) Granting Related Relief*, dated September 10, 2012 [Docket No. 1408].

Rowena L. Drennan, an attorney, as a representative for borrower-plaintiffs in a class action

[Docket No. 102].[5]

        8.     On June 20, 2012, the Court directed that an examiner be appointed

[Docket No. 454] (the "Examiner"), and on July 3, 2012, the Court approved Arthur J. Gonzalez

as the Examiner [Docket No. 674].

**B.**      **Government Agreements Regarding Servicing, Loan Modification, and
Foreclosure Practices**

      **i.**     ***Consent Order***

        9.     As a result of an examination conducted by the Federal Reserve Board

("FRB") and the Federal Deposit Insurance Company (the "FDIC"), on April 13, 2011, Debtors

Residential Capital, LLC ("ResCap") and GMAC Mortgage, LLC, and non-debtor affiliates

Ally Financial Inc. and Ally Bank entered into a Consent Order with the FRB and the FDIC (the

"Consent Order") (See Docket No. 1357, Exh. 5).  Pursuant to the Consent Order, the Debtors

are responsible for making improvements to various aspects of their residential mortgage loan

servicing business, including, among other things, compliance programs, internal audit,

communications with borrowers, vendor management, management information systems,

employee training, and oversight by the boards of directors of ResCap and GMAC Mortgage,

LLC.  Among other things, the Consent Order requires the parties to perform an extensive

review of past foreclosure proceedings with respect to loans serviced by the Debtors (the

"Foreclosure Review") with the assistance of an independent consultant, and to prepare and

submit a detailed report regarding the results of the Foreclosure Review.  The Debtors have

---

[5] Rowena L. Drennen is the attorney for a borrower plaintiff for the plaintiff in In re: Community Bank of Northern
Virginia Second Mortg. Lending Practices Litig., MDL No. 1674, (*Brian Kessler, et al.*) Case No. 03-0425, Case
No. 02-01201, Case No. 05-688, Case No. 05-1386, United States District Court for the Western District of
Pennsylvania.

recently filed an application to compensate PriceWaterhouse Coopers, LLP ("PWC") to perform the Foreclosure Review (Docket No. 1357).

### ii.    *DOJ/AG Settlement*

10.    Prior to the Petition Date, the Debtors committed to provide certain borrower relief pursuant to the settlement agreement reached between the Debtors, the four largest servicers of mortgage loans in the United States, the federal government, 49 state attorneys general, and 48 state banking departments (the "DOJ/AG Settlement").  Specifically, the Debtors are obligated under the DOJ/AG Settlement to provide a minimum of $200 million towards borrower relief for non-GA Loans[6] owned by Ally Bank and the Debtors, which includes loan modifications such as principal reductions, rate modifications and refinancing for borrowers that meet certain requirements, and to participate in certain other programs, and requires the Debtors to continue their mortgage loan servicing activities.[7]  In connection therewith, the Debtors are to implement new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters.  Compliance with the obligations under the DOJ/AG Settlement will be subject to oversight by an independent monitor, who will have authority to impose additional penalties and fines for noncompliance.  The Debtors are also required to undertake a review of their foreclosure practices pursuant to the DOJ/AG Settlement, which is being performed with the assistance of outside counsel.[8]

---

[6]    As of the Petition Date, over two thirds of the loans the Debtors service (as measured by unpaid principle balance) were owned, insured or guaranteed by the Government National Mortgage Association, Federal National Mortgage Association, or Federal Home Loan Mortgage Association (the "GA Loans").  See Whitlinger Aff. ¶ 14.

[7] To date, the Debtors have provided loan modifications and other borrower relief pursuant to the DOJ/AG Settlement having a value in excess of $200 million.  See *Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion*, July 16, 2012 [Docket No. 793].
[8] See *Statement of Debtors in Support of the Stipulation and Proposed Order Reserving Rights with Respect to Debtors Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the*

C.    **Borrowers' Notice of, and Participation in, the Cases**

11.    The Debtors' liquidity crisis and ultimate bankruptcy filing literally made

headlines.  The news story was picked up by most major news agencies, including *USA Today*,

*The New York Times*, *The Wall Street Journal*, CNBC, and *Bloomberg*.

12.    Substantially contemporaneously with the Petition Date, the Debtors also

established the Hotline for inquiries regarding the bankruptcy filings and have received tens of

thousands of calls from borrowers and creditors.  In addition, the Debtors posted information on

the website maintained by KCC, at http://www.kccllc.net/rescap.  Such information included

pertinent information regarding the bankruptcy filing and answered frequently asked questions

for their creditors.  At the Debtors' request, KCC uploads and maintains the full docket of the

Cases on this website, allowing borrowers and other parties in interest full, free access to all

filed pleadings and docket entries in the Cases.  KCC's website also provides contact

information for Debtors' counsel, Creditors' Committee counsel, and the Office of the U.S.

Trustee.

D.    **Authorization to Conduct Mortgage Loan Servicing in the Ordinary Course
of Business and Related Relief**

13.    As of March 31, 2012, the Debtors were servicing over 2.4 million

domestic mortgage loans with an aggregate unpaid principal balance in excess of $374 billion.

Whitlinger Aff. ¶ 6.  As this Court is well aware, one of the primary objectives of the Chapter

11 cases is the consummation of the going concern sale of the Debtors' mortgage loan servicing

and origination platforms.  Prior to the Petition Date, the Debtors entered into a purchase and

sale agreement with Nationstar Mortgage LLC as the proposed stalking horse bidder for the sale

*Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business*,
dated as of August 27, 2012 [Docket No. 1276].

of the servicing and origination platforms.[9]  And as a result, from the outset of the Chapter 11

cases, it has been imperative for the Debtors to continue to operate their mortgage loan

servicing business in the ordinary course.  Towards that end, the Debtors obtained relief on an

interim and final basis to continue servicing loans owned, insured or guaranteed by the

Government Agencies pursuant to the GA Servicing Order[10] and loans held in "private label"

securitizations or by third party investors pursuant to the Non-GA Servicing Order (collectively

with the GA Servicing Order, the "Servicing Orders").[11]

14.    Under the Servicing Orders, among other things, the Debtors are

authorized to continue all facets of their mortgage loan servicing business, including serving as

a primary servicer in compliance with their agreements with the Governmental Associations and

third parties.  As primary servicer, the Debtors perform functions such as the collection and

remittance of borrower payments, holding custodial funds for payments for items such as

insurance and taxes and responding to borrower inquiries.  As part of their servicing obligations,

the Debtors work with delinquent borrowers including, in appropriate circumstances, entering

into loan modifications, deferment and forbearance agreements.  The Debtors also participate in

---

[9] The original asset purchase agreement with Nationstar Mortgage LLC was amended on July 10, 2012 [Docket No.724].

[10] References to the "GA Servicing Order" means the *Final Order Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Services Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims and Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief*, dated June 15, 2012 [Docket No. 401].

[11] References to the "Non-GA Servicing Order" means the *Final Order Under Sections 105(a), 362, 363, 1107(a) and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Non-Governmental Association Loans, and (B) Sale Activities Related to Certain Loans in Foreclosure and Real Estate Owned Property, and (II) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims and Related Counter-Claims in Foreclosure and Eviction Proceedings*, dated June 15, 2012 [Docket No. 402].

the Home Affordable Modification Program and are leading participants in the program.  In addition, as described above, the Consent Order and DOJ/AG Settlement provide for expansive borrower relief and oversight.  In connection with loan servicing, the Debtors also supervise and institute mortgage loan foreclosure and post-foreclosure activities related to the maintenance and sale of the underlying properties.  Under the Servicing Orders, the Debtors are authorized to continue all of these functions in the ordinary course and are expressly authorized to honor their obligations under the Consent Order and DOJ/AG Settlement.

15.    In their capacities as the servicers and owners of residential mortgage loans, the Debtors are parties to tens of thousands of pending foreclosure and eviction proceedings throughout the country, and tens of thousands of bankruptcy cases instituted by individual borrowers in almost all circumstances under Chapter 7 or Chapter 13.  The Interim Servicing Orders were originally entered on an interim basis (collectively, the "Interim Servicing Orders"), and in connection therewith, the Debtors requested and obtained blanket stay relief to permit borrowers to prosecute claims and counter-claims as defenses in foreclosure and eviction proceedings.  Through their initial experience prosecuting foreclosure and eviction proceedings under the relief granted in the Interim Servicing Orders, and feedback obtained from, and issues raised by, the Debtors' default counsel around the country as well as borrowers' counsel, the Debtors determined that it was necessary to clarify the scope of the blanket stay relief granted under the Interim Servicing Orders.  The Debtors prepared and prosecuted the Supplemental Servicing Motion[12] pursuant to which the Debtors requested

---

[12] *Debtors' Motion* for *Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses,* dated May 31, 2012 [Docket No. 181] (the "Supplemental Servicing Motion").

expansive and detailed stay relief for borrowers subject to foreclosure and eviction proceedings
and borrowers subject to bankruptcy proceedings.  Specifically, in developing their proposed
relief requested in the Supplemental Servicing Motion, the Debtors devoted substantial efforts
to striking a fair balance between the Debtors' obligations and interests as servicers and owners
of mortgage loans and the rights of borrowers to assert those defenses available to them under
applicable state law.

16.     Following the initial hearing on the Supplemental Servicing Motion, and
in light of an objection filed by the National Association of Consumer Bankruptcy Attorneys, a
national organization dedicated to protecting the rights of consumer borrowers in bankruptcy
("NACBA"), and the concerns raised by the Court, the Court approved the Supplemental
Servicing Motion on an interim basis, but directed the Debtors to meet with representatives of,
NACBA, the Creditors' Committee, and the Executive Office of the U.S. Trustee as well as any
other interested party to review and negotiate the scope of the stay relief originally proposed by
the Debtors in the Supplemental Servicing Motion.  Thereafter, the Debtors met and
communicated with representatives of NACBA, the National Association of Chapter 13
Trustees ("NATT"), the Executive Office of the United States Trustee, the Creditors'
Committee and Ms. Heather McKeever, Esq., counsel for borrower-plaintiffs in multiple class
and consolidated actions against the Debtors and proposed by Movants as a member for a
Borrowers' Committee.  The parties engaged in a collaborative process which resulted in
revisions to the interim order approving the Supplemental Servicing Motion and to the entry of
the Supplemental Servicing Order with the consent of all of the participants.

17.     The Supplemental Servicing Order expressly delineates the scope of the
stay relief available to borrowers in foreclosure (in both judicial foreclosure and non-judicial

foreclosure jurisdictions) and eviction proceedings and in general allows such parties to assert

all valid defenses available to them under applicable state law.  In addition, the Supplemental

Servicing Order provides expansive stay relief to borrowers who are subject to their own

bankruptcy proceedings.  The Supplemental Servicing Order allows borrower-debtors or their

trustees to prosecute objections to Debtors' proofs of claim, defend motions for relief from the

automatic stay filed by the Debtors and, most notably, to commence actions to determine the

validity, priority, or extent of the Debtors' lien(s) against the borrower's property or to reduce

(including to $0) or fix the amount of the Debtors' claims or liens against such property.[13]

### E.    Stay Relief Motions

18.    To date, borrowers, proceeding either pro se or with the assistance of

counsel, have filed approximately 18 motions for relief from the automatic stay pursuant to

section 362(d) of the Bankruptcy Code to continue prepetition litigation against the Debtors'

estates.  Where feasible and consistent with the interests of the Debtors' estates and creditors,

the Debtors and the Creditors' Committee have worked with such borrowers to reach a

consensual resolution to such motions.  Where the parties were unable to reach a consensual

resolution, borrower-movants have appeared (either in person or telephonically) to litigate their

respective stay relief motions before this Court.  The Court has promptly ruled on each.

### F.    Notice and Filing of Claims

19.    By Order, dated August 29, 2012 [Docket No. 1309] (the "Bar Date

Order"), the Court established November 9, 2012 as the deadline by which any non-

---

[13] *Supplemental Order for Interim Relief Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses*, entered on June 15, 2012 (the "Interim Supplemental Servicing Order") [Docket No. 391].

governmental person or entity holding a prepetition claim against the Debtors must file a proof

of claim (the "Bar Date").  In accordance with the terms of the Bar Date Order, the Debtors

mailed notices of the Bar Date to, among others, all known entities holding prepetition claims

and to all individual borrowers whose loans are serviced by the Debtors.  Additionally, the

Debtors will publish notice in the national editions of *The Wall Street Journal* and *USA Today*.

## OBJECTION[14]

20.    Section 1102(a)(2) of the Bankruptcy Code permits the appointment of an

additional committee of creditors only if necessary to assure adequate representation of

creditors.[15]  Appointment of an additional Committee is an extraordinary remedy that courts are

reluctant to grant.  See In re Dana Corp., 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006) (citing In re

Enron Corp., 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002).  In considering this extraordinary

remedy, courts employ a two-step process.  First, a court determines whether the appointment of

an additional committee is necessary to assure the movants are adequately represented.  Mirant

Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp., No.

02-cv-6274, 2003 WL 22327118, *3 (S.D.N.Y. Oct. 10, 2003) (stating that section 1102(a) of

the Bankruptcy Code "clearly requires an initial determination of whether a party is adequately

represented.").[16]  Second, if the answer to the first question is "yes," then the court must decide

---

[14] The Debtors reserve all rights to raise further objections at the hearing on the Motion, including, but not limited to, Movants' failure to file a statement pursuant to Bankruptcy Rule 2019.

[15] Section 1102(a)(2) provides, in relevant part, that:

> On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders.

11 U.S.C. § 1102(a)(2).

[16] A copy of the opinion, as well as other unpublished decisions and orders cited herein, is attached hereto as Appendix 1.

whether it should exercise its discretion and order such appointment. See Enron Corp., 279

B.R. at 685. Even if this Court determines that borrowers are not adequately represented by the

Creditors' Committee, it is within this Court's discretion to decline to appoint an official

committee of borrowers. See Mirant, 2003 WL 22327118, *4 (declining to appoint a separate

committee of trade creditors even though they were adequately represented by the creditors'

committee).

21.    The burden is on the movant to prove that the existing committee does not

provide adequate representation. Dana Corp., 344 B.R. at 38. Although there is no framework

provided in the Bankruptcy Code for courts to determine "adequate representation," bankruptcy

courts in this district generally consider seven factors in deciding whether appointment of

additional official committee is necessary to ensure adequate representation including, (1) the

ability of the existing committee to function; (2) the nature of the case; (3) the standing and

desires of the various constituencies; (4) the ability of creditors to participate in a case without

an additional committee; (5) the delay and additional cost that would result if the court grants

the motion; (6) the tasks which a separate committee is to perform; and (7) other factors

relevant to the adequate representation issue. See id. The Debtors submit that Movants have

not satisfied their burden to show that the borrowers are not adequately represented in the

Cases. Moreover, they cannot because each of the foregoing factors weighs in favor of finding

that the Creditors' Committee adequately represents the interests of borrowers. Primarily for

the factors and reasons discussed below, the Motion should be denied. [17]

---

[17]    The Debtors reserve all rights to raise additional arguments with respect to these factors at a hearing or in an
additional pleading if permitted.

A. **The Movants Have Not Alleged Any Basis That the Creditors' Committee's Ability to Function as Currently Constituted is Impaired and Thus Borrowers are Adequately Represented**

    i.     *The Creditors' Committee is Adequately Representing Borrowers*

22. Movants argue that a Borrowers' Committee is necessary because the one borrower claimant seated on the Creditors' Committee could be overruled by the dominant Trustee Members and Insurer Members. This attack necessarily presumes—without basis—that other committee members represent only their own interests, not the interests of Movants and other unnamed borrower creditors. Movants conveniently disregard that the Creditors' Committee members' fiduciary obligations extend to **all** unsecured creditors.[18]

23. It is well settled that statutory unsecured creditors' committees owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case. See Dana Corp., 344 B.R. at 38; see also Mirant, 2003 WL 22327118, at *4 (noting that a "creditors' committee owes a fiduciary obligation to its constituency"); In re Barney's, Inc., 197 B.R. 431, 442 (Bankr. S.D.N.Y. 1996) (stating that a "committee and its members have a fiduciary duty to all creditors represented by the committee."). In Mirant, for example, despite the presence of divergent interests of the members of the Creditors' Committee, the court refused to appoint an additional committee of trade creditors and noted that the official committee of unsecured creditors in those cases was adequately representing the interests of all unsecured creditors. See Mirant, 2003 WL 22327118, at *10. Furthermore, this fiduciary obligation is present "whether or not a member of a particular group is included in its membership." Id., at *7 (citation omitted). A committee "must guide its actions so as to

---

[18]   Movants assert that other Creditors' Committee members have loyalties "and interwoven relationships [that would] supersede any loyalty to homeowners." Mot., at 7.

safeguard as much as possible the rights of minority as well as majority creditors." Shaw &
Levine v. Gulf & W. Indus., Inc. (In re The Bohack Corp.), 607 F.2d 258, 262 n.4 (2d Cir.
1979), citing Woods v. City Nat'l Bank & Trust Co., 312 U.S. 262 (1941).

24.    Further, adequate representation does not require proportionate
representation of distinct groups of creditors on a committee of unsecured creditors.  The
determinative factor is whether the official committee is serving their interests as unsecured
creditors.  See Dana Corp., 334 B.R. at 38-39 ("The issue is not whether the Official Committee
is an exact replica of the creditor body, but whether representation of various creditor types is
adequate.")  Movants fail to cite a single instance where the ability of the Creditors' Committee
to function has been impaired, and no such complaints have been made by other parties.  To the
contrary, Movants concede that the Creditors' Committee "has been diligently representing the
'interests of unsecured creditors as a general matter.'"  Mot., at 18.  Moreover, the Creditors'
Committee has worked constructively with the Debtors and other constituents to protect, where
appropriate, the rights of individual borrowers in these Cases by, among other things, actively
participating in the negotiation of the Supplemental Servicing Order and supporting its entry.

25.    Instead, Movants' arguments rely on the possibility of conflicting interests
between borrowers, to the extent they are in fact creditors of the Debtors' estates, and the other
members of the Creditors' Committee.  Movants assert that another committee must be
appointed because the Trustee Members and Insurer Members will prevent the borrower
member from pursuing borrower interests.  Mot., at 19.  That is not a sufficient basis to appoint
an additional official committee.  See Mirant, 2003 WL 22327118, at *6.  While the interests of
the individual Creditors' Committee members may not always be aligned, the presence of a
potential conflict does not require separate committees for representation to be adequate.

Differing views do not require a separate homogeneous committee unless they impair the ability to reach a consensus.  See Dana Corp., 344 B.R. at 38.  Here, Movants have not pointed to a single instance where the Creditors' Committee was unable to function properly or reach a consensus.

### ii.    *Movants' Misrepresent Potential Conflicts of Interests Within the Creditors' Committee*

26.    Movants, moreover, have not articulated how their interests would be adequately represented by a Borrowers' Committee.  Instead, Movants allege that the Trustee Members and the Insurer Members may engage in nefarious tactics to advance their own interests over those of the borrowers.  For example, Movants coin the term "committee estoppel" to suggest that the Trustee Members would block the Creditors' Committee from pursuing equitable subordination claims against such members to preserve individual interests. Mot., at 7.  Similarly, Movants state that other Creditors' Committee members would move to quash an investigation proposed to be conducted by the Borrowers' Committee to avoid their own liability.  Id.  Any such action, however, would be a breach of such member's fiduciary duty to other unsecured creditors.  In that event, borrowers have a remedy:  they can assert a claim against that Creditors' Committee member for such breach.[19]

27.    In addition, Movants argue that a Borrowers' Committee is necessary to prevent the Trustee Members and the Insurer Members from reaching secret deals.  Movants allege that the other Creditors' Committee members "may try and 'hide' behind the bankrupt entities not revealing themselves to the homeowners in the role of investor or insurer" and "quietly seek to settle claims based on repurchase obligations, defective documents, and

---

[19]    In the Motion, Movants argue that a Borrowers' Committee would be necessary because borrowers may wish to bring equitable subordination claims against the Trustee Members.  Mot., at 7.  Notwithstanding that borrowers have not identified the basis for such a claim, this is a not a valid basis to appoint an official committee because borrowers do not need an official committee to bring such claims.

indemnifications for faulty loans without proper disclosure." Mot., at 15. This concern is

unfounded. All settlements affecting property of the Debtors' estates are subject to approval by

the Bankruptcy Court only after sufficient notice and a hearing. Fed. R. Bankr. P. 9019. As

support for its theory, Movants allege that Trustee Members have attempted to effectuate a

settlement agreement regarding breach of reps and warranty claims "without any scrutiny of

other parties." Mot., at 7. Presumably, Movants refer to the Debtors' motion (the "RMBS 9019

Motion") pursuant to Rule 9019 of the Bankruptcy Rules to approve settlement agreements with

investors in residential mortgage backed securities ("RMBS") and the trustees administering

RMBS trusts (the "RMBS Settlements"), some of whom are Trustee Members.[20] One only has

to review the docket of the Cases to know that the proposed RMBS Settlements are anything but

secret. The RMBS 9019 Motion, and the scheduling order regarding discovery and litigation

with respect thereto, was publicly filed, noticed to creditors, and has been hotly contested and

highly debated in the Bankruptcy Court by multiple parties in interest in the Cases.

       28.    Movants even suggest that Trustee Members or Insurer Members may

deny borrowers applications for loan modification, and somehow might influence the Debtors

"to use the bankruptcy as a shield to conceal that the party approving or denying loan

modification may be seated on the Creditors' Committee." Mot., at 16. These wholly

unfounded and materially misleading statements are tantamount to fear mongering.

Furthermore, the mere assertion of such statements does not justify the formation of a

Borrowers' Committee.

       29.    As precedential support for the relief they seek, Movants cite to two cases

in other jurisdictions in which bankruptcy courts appointed additional official committees, one

---

[20]    Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements,
dated June 11, 2012 [Docket No. 320].

an unpublished order without a written decision in <u>In re American Home Mortgage Holdings,</u> <u>Inc.</u>,[21] and <u>Austin v. Chisick (In re First Alliance Mortgage Co.)</u>.[22]  Putting aside for a moment that this Court is not bound by these decisions, each is distinguishable on their facts from the circumstances present here.

30.    Unlike these Cases, Bankruptcy Judge Sontchi appointed an official committee of borrowers in <u>American Home Mortgage</u> where (i) there was no borrower-representative member of the official creditors' committee in that case, (ii) borrowers apparently did not have relief from the automatic stay to assert claims and counterclaims as defenses against foreclosures, evictions and borrower bankruptcy proceedings, (iii) notice of the Bar Date was provided to only those borrowers who were in active litigation with the Debtors, and (iv) the debtors had sold their mortgage loan servicing business and were liquidating, and therefore were unable to provide relief to borrowers in distress.  Here, by contrast, (a) the borrowers have a representative on the Creditors' Committee, (b) the Debtors' are continuing to operate their mortgage servicing business subject to monitoring and sanctions for noncompliance with the borrower protections provided in the Government Agreements, (c) the Debtors will provide notice of the Bar Date to all borrowers whose mortgage loans are being serviced by the Debtors, and (d) the Bankruptcy Court has provided relief from the automatic stay for borrowers pursuant to the Supplemental Servicing Order.

31.    Similarly, the <u>First Alliance</u> decisions cited in the Motion do not support the relief sought in the Motion.  These decisions do not refer to a bankruptcy court order approving the appointment of an official Borrowers' Committee and instead address the

---

[21]    Case No. 07-11047 (CSS) (Bankr. D. Del. Oct. 10, 2008) [Docket No. 6220].

[22]    Case No. 00-12370 (JB), (Bankr. C.D. CA. June 9, 2000) [Docket No. 426] (Appointment of Joint Borrowers' Committee by the U.S. Trustee).

borrowers' subsequent litigation alleging fraud against one of the <u>First Alliance</u> debtors'

mortgage securitizers.  Those decisions merely reference the fact that a Borrowers' Committee

was appointed, and do not provide legal reasoning or analysis underpinning the decision to form

an additional official committee in those cases.  Moreover, no motion was filed to appoint the

official Borrowers' Committee in that case.  Rather, the docket shows only that the United

States Trustee appointed the official committee, and it is unclear whether such decision was

opposed.[23]    Consequently, the <u>First Alliance</u> decisions do not provide any substantive guidance

on the issue of whether a Borrowers' Committee should be appointed in these Cases, and

therefore is of little value.

### B. The Nature of the Cases Weighs Against Appointment of an Additional Official Committee of Borrowers

32.    Movants' assertions that the size and complexity of the Cases warrant the

appointment of an official committee for borrowers is of no moment.  True, the Debtors' cases

are large, complex jointly administered Chapter 11 cases, but the large size of a bankruptcy case

in and of itself is not determinative of whether additional committees should be appointed.  <u>See</u>

<u>Dana</u>, 344 B.R. at 718; <u>see</u> <u>also</u> <u>Mirant</u>, 2003 Westlaw 22327118, at * 6 (refusing to appoint an

additional official committee of trade creditors even though at the time of filing the <u>Enron</u> case

was the largest bankruptcy matter in history).[24]

33.    Similarly, Movants' arguments that the possibility that the Trustee

Members and Insurer Members have conflicting interests and may disenfranchise borrowers

similarly fail.  The mere presence of a conflict of interest does not necessitate an additional

---

[23]    Because the <u>First Alliance</u> bankruptcy court order appointing the borrowers' committee in those cases was rendered in 2000, an electronic copy of that order and other relevant pleadings are not available online.  The Debtors were unable to obtain hard copies of such documents before the deadline to file this Objection.

[24]    The <u>Mirant</u> case was an appeal of the decision by the <u>Enron</u> bankruptcy court denying an ad hoc group of trade creditors' motion to appoint an additional official committee of trade creditors.

committee.  See Mirant, 2003 Westlaw 22327118 at * 6.  Unlike other groups of creditors,

individual borrowers have a representative on the Creditors' Committee.  To the extent

borrowers have individual interests other than maximizing value for general unsecured

creditors, such as the servicing of their mortgage loan, such interests are not hindered in the

absence of a Borrowers' Committee.  To the contrary, the Debtors have made material

concessions and gone to great lengths to preserve the material rights of borrowers in these Cases

at substantial cost to the Debtors' estates.

### i.        *Servicing Orders*

34.    As noted above, the interests of borrowers are protected by the Debtors'

continuing to service mortgage loans in the ordinary course of their business pursuant to the

Servicing Orders and subject to the heightened servicing and foreclosure standards imposed by

the Governmental Agreements.

### ii.       *Supplemental Servicing Order*

35.    As noted in the Motion, fundamentally, borrowers in distress or default do

not want to lose their homes or to have their claims against third parties or their rights with

respect to their loans adversely affected in the Cases.  Mot., at 15-17.  The Debtors have

preserved the rights of such borrowers to defend against foreclosure and eviction and to assert

permitted claims and counterclaims against the Debtors through the Supplemental Servicing

Order.

### iii.      *Protections Provided By Government Agreements*

36.    Pursuant to the Servicing Orders the Debtors are authorized to comply in

all respects with the Government Agreements and have committed to provide borrower relief

and to implement and maintain new servicing standards.  Pursuant to the Consent Order, the

Debtors are obligated to make comprehensive improvements to various aspects of their

mortgage loan servicing operations on a go-forward basis, as well as obligated to conduct a comprehensive review of past foreclosure proceedings, in order to prevent past servicing and foreclosure practices that gave rise to claims against their estates.  The Debtors have already begun this process and have moved to compensate PWC in order to conduct the Foreclosure Review.

37.     In addition, distressed and defaulting borrowers for loans owned by Ally Bank and the Debtors will benefit from the commitment made by the Debtors to provide borrower relief through the DOJ/AG Settlement.  Moreover, the Debtors have implemented new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters.  Because the Debtors' compliance with the DOJ/AG Settlement is policed by an independent monitor, there is no additional benefit—and no need—for the additional oversight that the Motion alleges a Borrowers' Committee would provide with respect to borrowers' rights.  Mot., at 3.  Moreover, as the Debtors may be subject to penalties and monetary fines for failure to comply with the terms of the DOJ/AG Settlement, the Debtors are strongly incentivized to comply with such terms.

### C.    Borrowers Can Be Heard Without an Official Borrowers' Committee

38.     Movant's argument that borrowers will not be heard is undercut by the record in the Cases.  Borrowers have actively participated (both in person and telephonically) in these bankruptcy proceedings, and the mere fact that they have not formed an estate-funded committee should not undercut their continued involvement.  To date in the Cases, borrowers have requested varying forms of relief, including an objection to the Debtors' application to retain estate professionals, objections to the Supplemental Servicing Order, and motions to dismiss or convert the Cases to cases pursuant to Chapter 7 of the Bankruptcy Code.  They have

affirmatively protected and pursued their interests by filing claims and seeking relief from the automatic stay to liquidate alleged claims

39.    Moreover, the Debtors and the Committee have and will continue to take steps to provide ample notice and adequate sources of information through a variety of channels to individual borrowers regarding events in the Cases that may affect their rights, including the Hotline, and information through KCC's website.  In addition, subject to court approval, the Creditors' Committee intends to share certain information regarding the Cases with all unsecured creditors.  The Debtors also will provide notice of the Bar Date to <u>all</u> borrowers whose loans are currently being serviced by the Debtor in accordance with the Bar Date Order. Unlike in <u>American Home Mortgage</u>, borrowers will not have to rely on just notice by publication.

40.    Moreover, in the event that a borrower provides a "substantial contribution" to the Debtors' estates, such borrower has the right to petition for reimbursement for their costs, including professional fees, pursuant to section 503(b) of the Bankruptcy Code at the conclusion of the Cases.  Thus, borrowers are not without redress absent an official committee.  Coupled with borrower's access to information and notice of the Bar Date, the opportunity to receive reimbursement for making a substantial contribution in the Cases appropriately balances the risks of duplication of services between two official committees and the potential that such services that may be provided for the benefit of individual borrowers, and not for the benefit of the Debtors' estates.

**D.    Debtors' Estates Would Incur Substantial Costs Associated with the Appointment of an Additional Official Committee Without Alleviating the Burden on This Court**

41.    Notwithstanding the size and complexity of the Cases, Movants argue that the costs associated with appointment of an additional official committee will be small.  Mot., at

22

20.  This assertion fails to recognize that any professional retained by an additional official committee would expend significant costs in getting "up to speed" on the multitude of issues raised, settlements reached, and the contemplated asset sales to participate effectively in the plan process.

42.      Moreover, Movants apparently have concluded that pursuit of their interests warrant yet another level of investigation in the Cases.  Mot., at 15.  Movants seek "full disclosure of the Debtors' business dealings with creditors" such as warehouse lenders, securitizers, third party servicers, and insurers, including the other Creditors' Committee members.  Id.  Movants have not articulated, however, the purpose or necessity of an investigation in addition to the exhaustive investigations currently being conducted by the Examiner and the Committee, nor have they specified how such information is relevant to their interests.  To the extent Movants seek to investigate the Debtors' servicing and foreclosure practices, such an investigation has already been conducted by federal and state governmental agencies, resulting in the relief provided pursuant to the Government Agreements.  As noted above, the Debtors' compliance with the terms of the Government Agreements is subject to continued monitoring and required by orders of this Court.  It is unclear, therefore, what benefit an additional investigation could provide.

43.      Movants have offered no basis for their assertion that the appointment of a Borrowers' Committee would make administration of the Cases more efficient or would alleviate this Court's burden with respect to issues facing individual borrowers. Mot., at 21.  As stated above, ample numbers of borrowers have exercised their rights as individual borrowers in these cases, and there is no evidence to suggest that formation of a Borrowers' Committee would stem the flow of individual borrowers filing pleadings and appearing on their own behalf before this

Court.  Furthermore, it is unclear, given the current investigations, what benefit an additional

investigation would add to the Debtors' mortgage servicing practices, particularly in light of the

Government Agreements.

> **E.      Forming an Official Committee to Advance Individual Borrowers' Claims
> Against the Estate (or on Behalf of the Estate) Would be Improper**

44.      In an apparent attempt to assuage concerns of costs and impact on the

Cases, Movants assert that the Borrowers' Committee would not be involved in all issues in the

Cases, but would be focused <u>solely</u> on issues that relate to the borrowers and their rights.  Mot.,

at 21 (emphasis in original).  Given the protections provided pursuant to the Government

Agreements and the Supplemental Servicing Orders, borrowers' interests with respect to

servicing and foreclosure are protected.  The "borrower-specific" issues that remain appear to

be the assertion of claims against the Debtors (or potential derivative claims asserted against

third parties on behalf of the Debtors).[25]  While Movants contend that borrowers require a

committee to protect their collective interests, Movants actually seek a Borrowers' Committee

to act as counsel—whose fees would be paid by the Debtors' estates—to individual borrowers

with respect to their specific claims.[26]  It would be inappropriate, however, to form a

Borrowers' Committee to advance individual borrowers' claims, because acting as de facto

counsel for borrowers would be an impermissible role for an official committee.  <u>See</u> <u>Mirant.</u>,

2003 WL 22327118 at *6.  <u>See</u> <u>id.</u>, 2003 WL 22327118, at *6 ("The principal purpose of

creditors' committees is not to advocate any particular creditor class's agenda, but rather to

'strike a proper balance between the parties such that an effective and viable reorganization of

the debtor may be accomplished.'") (quoting <u>In re Hills Stores Co.</u>, 137 B.R. 4, 7 (Bankr.

---

[25] Certain of the Movants are plaintiffs in pending litigation against the Debtors.

[26] Notably, the "proposed" members of the Borrower Committee are attorneys representing borrowers in lawsuits
against the Debtors.

S.D.N.Y. 1992)); see also In re Garden Ridge Corp., No. 04-10324, 2005 Bankr. LEXIS 323, at

*12 (Bankr. D. Del. Mar. 2, 2005) (noting that the "Official Committee is simply not intended

to represent individual creditor interests" in declining to appoint an official committee for

landlords).  Movants fail to demonstrate how they could serve as an official committee when

they see their role as advocating for borrowers on an ad hoc basis.

45.    With no demonstrated legal basis, need or justification to saddle these

already heavily burdened estates with expenses attendant to an additional official committee,

this Court should not order the appointment of a Borrowers' Committee.

46.    For all the foregoing reasons, the Motion should be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Debtors request that the Court enter an

order denying the Motion and grant such other relief as the Court deems proper.

New York, New York                      /s/ Lorenzo Marinuzzi
Dated: September 14, 2012               Gary S. Lee
                                        Norman S. Rosenbaum
                                        Lorenzo Marinuzzi
                                        MORRISON & FOERSTER LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900

                                        *Counsel to the Debtors and*
                                        *Debtors in Possession*

**EXHIBIT 1**

**<u>Appendix</u>**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                           :    Chapter 11
In re:                                     :
                                           :    Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                     :
HOLDINGS, INC., a Delaware corporation, et al.,[1]  :    Jointly Administered
                                           :
              Debtors.                     :
                                           :    Re:  D.I. 5675
-----------------------------------------------------------x
```

## ORDER GRANTING MOTION FOR AN ORDER APPOINTING
## OFFICIAL COMMITTEE OF BORROWERS
## PURSUANT TO SECTION 1102(a)(2) OF THE BANKRUPTCY CODE

Upon the motion (the "Motion") of certain individuals (the "Movants"),[2] pursuant to

section 1102(a)(2) of the Bankruptcy Code for the appointment of an Official Committee of

Borrowers in these chapter 11 cases; and the Court finding that (a) it has jurisdiction over this

matter pursuant to 28 U.S.C. § 1334; (b) this is a core proceeding pursuant 28 U.S.C. §157(b)(2);

and (c) notice of the Motion was due and proper under the circumstances; and having considered

the written objections of the Debtors and the Official Committee of Unsecured Creditors, the

statement of the Office of the United States Trustee (the "OUST"), the argument of counsel and

the record of these chapter 11 cases; and finding that the appointment of an Official Borrowers

Committee is necessary to assure adequate representation of borrowers in these chapter 11 cases;

after due deliberation and sufficient cause appearing therefor; it is hereby

---

[1]     The Debtors in these cases are: American Home Mortgage Holdings, Inc., a Delaware corporation;
American Home Mortgage Investment Corp., a Maryland corporation; American Home Mortgage Acceptance, Inc.,
a Maryland corporation; AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation;
American Home Mortgage Corp., a New York corporation; American Home Mortgage Ventures LLC, a Delaware
limited liability company; Homegate Settlement Services, Inc., a New York Corporation; and Great Oak Abstract
Corp., a New York corporation.

[2]     The Movants are Mr. Tilton Jack, Ms. Grace Mullins, Mr. and Mrs. Christopher Bilek, Mr. Sam Acquisto,
Ms. Delena Lamacchia, and Ms. Paula Rush, who were subsequently joined by Mrs. Grace Graves, Ms. Florence
Dandridge, Ms. Penny Montague, Ms. Mona Dobben, and Mr. and Mrs. John Culpepper.

1976516.1

ORDERED that, for the reasons stated on the record at the hearing on October 8, 2008, the Motion is GRANTED; and it is further

ORDERED that the OUST is hereby directed to appoint an Official Borrowers Committee; and it is further

ORDERED that the Court will convene a status conference regarding the appointment of the Borrowers Committee (including, but not limited to, any limitations on retention of professionals) and scheduling of a hearing to consider the Debtors' Disclosure Statement at the omnibus hearing scheduled for October 22, 2008, at 10:00 a.m.; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated: October _10_, 2008

The Honorable Christopher S. Sontchi
United States Bankruptcy Judge

2

1976516.1



**In re: GARDEN RIDGE CORPORATION, et al., Debtors.**

**Chapter 11, Case No. 04-10324 (DDS), Jointly Administered**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2005 Bankr. LEXIS 323*; *53 Collier Bankr. Cas. 2d (MB) 1787*; *44 Bankr. Ct. Dec. 106*

**March 2, 2005, Decided**

**DISPOSITION:**     Motions of Austin-HF, Ltd., and Wal-Mart Stores, Inc., to appoint additional official committee of landlords, denied.

**COUNSEL:** [*1] Attorneys for the Official Committee of Unsecured Creditors: Peter Feldman, Scott L. Hazan, Jenette Barrow-Bosshart, Otterbourg, Steindler, Houston & Rosen, P.C.

David M. Klauder, Office of the United States Trustee, Wilmington, DE.

**JUDGES:** Louis H. Kornreich, United States Bankruptcy Judge.

**OPINION BY:** Louis H. Kornreich

**OPINION**

**MEMORANDUM OPINION WITH RESPECT TO MOTION TO APPOINT AN OFFICIAL COMMITTEE OF LANDLORDS**

1

    1   For a complete list of the appearances, the reader is referred to the transcript of the hearing held on May 18, 2004 (Docket No. 592).

**KORNREICH, J.**

    Before me are the motions of Austin-HF, Ltd. and Wal-Mart Stores, Inc. seeking the appointment of an additional official creditors committee of landlords. Upon consideration of all relevant pleadings, oral argument, the parties' stipulation of facts and evidence, and for the reasons set forth below, the motions are denied. This Memorandum Opinion constitutes my findings of fact and conclusions of law pursuant to *Federal Rule of Bankruptcy Procedure 7052* [*2] .

**BACKGROUND**

    On February 13, 2004, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Official Committee"). The Official Committee's members include four vendors, one advertising company, and two landlords with rejected leases. 2

        2   The members of the Official Committee include: American Greetings, vendor; Framecrafters, Inc., vendor; Allstate Floral & Craft, Inc., vendor; Amscan, Inc., vendor; Fogerty Klein Monroe, advertising agency; Peter Fazio, landlord; and Humbel Garden, LLC, landlord.

    On April 7, 2004, seven of the Debtors' landlords formed an informal landlord committee (the "Informal Committee"). 3 Shortly thereafter, twelve additional landlords 4 joined this committee. The nineteen members

2005 Bankr. LEXIS 323, *2; 53 Collier Bankr. Cas. 2d (MB) 1787;
44 Bankr. Ct. Dec. 106

of the Informal Committee are parties to twenty of the Debtors' forty-seven leases.

    3    Ocwen Federal Bank, FSB, MK GRP Associates, L.P., Austin-HF, Ltd., Nashridge, LLC, Eric W. White, Wal-Mart Stores, Inc. (a landlord with two leases), and SSC Eastgate Square GR, LLC.

[*3]

    4    Greenville Industrial Park, L.P., O'Fallon Ridge, LLC, IP Atlanta-Kennesaw LLC, IP Atlanta-Norcross LLC, Carwood L.P., Weeds (OK) QRS 12-22, Inc., QRS 11-29 (TX), Inc., GR (TX) LP, Ocean Front IV, L.L.C., Fist United Leasing Corp., The Philip H. and Ruth Ann Ingber, and Catamount Virginia, LLC.

The evidence, as agreed by the parties, includes a written stipulation of facts, exhibits, and certain transcript designations from the depositions of Kirk A. Kennedy, Donald Martin, Tom Roddy, and Charles Hendricks. According to the parties' joint stipulation of facts, over 1,200 proofs of claim have been filed in this case. The Debtors' schedules indicate that there are approximately 2,100 unsecured claims.

The opposing parties [5] have jointly submitted to two preliminary summaries of general unsecured claims before the court: "Scenario A" and "Scenario B." [6] The primary difference between the two is the treatment of claims arising out of rejected leases. Under Scenario A, the rejection landlords' claims may total $ 30,449,492, which would be 27.5% of the anticipated unsecured claims, and the remaining [*4] landlords' claims may total $ 9,342,298, which would be 8.7% of the anticipated unsecured claims. Under Scenario B, the rejection landlords' claims may total $ 70,049,322, which would be 46.6% of the anticipated unsecured claims, and the remaining landlords' claims may total $ 9,342,298, which would be 6.2% of the anticipated total unsecured claims.

    5    The parties opposing the current motions are Allied Capital Corporation, the Office of the United States Trustee, the Debtors and the Official Committee.

    6    See Joint Stipulated Exhibits 1 and 2, respectfully.

Under both scenarios, other sub-groupings of unsecured claims include: (1) the vendor claims of $ 53,637,204, which would be 48.4% of the unsecured claims under Scenario A and 35.7% under Scenario B; (2) the Allied Capital claim of $ 2,513,416, which would be 2.3% of the unsecured claims under Scenario A and 1.7% under Scenario B; (3) the Employment Contract Claims of $ 3,139,581, which would be 2.9% of the unsecured claims under Scenario A and 2.1% [*5] under Scenario B; (4) the Workers' Compensation Claims of $ 1,000,000, which would be 0.9% of the unsecured claims under Scenario A and 0.7% under Scenario B; and (5) the General Liability Claims of $ 14,794,869, which would be 13.4% of the unsecured claims under Scenario A and 9.8% under Scenario B.

The landlords assert that the Official Committee cannot adequately represent their interests under either Scenario A or Scenario B. Of the seven members of the Official Committee, only two are landlords with rejected leases (28.6%), while the other members are vendors (71.4%). The landlords therefore argue that they do not have a meaningful voice on the Official Committee, especially since they believe that the vendors' interests are adverse to the landlords' interests. For this reason, the landlords ask this court to appoint an additional official committee of creditors to represent landlord interests.

## DISCUSSION

*Section 1102 of the Bankruptcy Code* [7] addresses the appointment of an additional committee of creditors, which provides, in relevant part:

> On request of a party in interest, the court *may* order the appointment of additional committees [*6] of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

*11 U.S.C. § 1102(a)(2)* (emphasis added).

    7    Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code (the "Code"), *11 U.S.C. § 101 et seq.*

In determining whether to appoint an additional committee, courts apply "similar sets of factors in analyzing the adequacy of the representation" such as "(1) the ability of the committee to function; (2) the nature of the case; and (3) the standing and desires of the

various constituencies." *In re Enron Corp., 279 B.R. 671, 685 (Bankr. S.D. N.Y. 2002)*. Other considerations include:

> the ability of creditors to participate in the case even without an official committee; . . . the potential to recover expenses pursuant to *§ 503(b)*; whether different classes may be treated [*7] differently under a plan and need representation; the motivation of the movants; the costs incurred by the appointment of additional committees; and the tasks that a committee or separate committee is to perform.

*Id.* (internal citations omitted). Some courts apply a two part test: first, whether the appointment of an additional committee is necessary to assure that the movants are adequately represented; and, second, whether the court should exercise its discretion and order the appointment. *See id.* These courts consider: "(1) the cost associated with the appointment; (2) the time of the application; (3) the potential for added complexity; and (4) the presence of other avenues for creditor participation." *Id.* (citations omitted). Regardless of the factors considered, "the decision is not to be taken lightly, and involves a delicate balancing of various and sometimes diverging interests." *Id.*

*Section 1102* provides guidance as to who shall ordinarily be members of an official committee of creditors:

> A committee of creditors appointed under subsection (a) . . . shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims [*8] against the debtor of the kinds represented on such committee, or of the members of a committee organized by creditors before the commencement of the case under this chapter, if such committee was fairly chosen and is representative of the different kinds of claims to be represented.

*11 U.S.C. § 1102(b)(1)*. *Section 1103* sets forth the official committee's power and duties:

> A committee appointed under *section 1102* of this title may --

> (1) consult with the trustee or debtor in possession concerning the administration of the case;

> (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

> (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determination as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;

> (4) request the appointment of a trustee or examiner under *section 1104* of the title; and

> (5) perform such other [*9] services as are in the interest of those represented.

*11 U.S.C. § 1103(c)*. An official committee of unsecured creditors has a duty to represent all general unsecured creditors, including landlords to the extent they that have general unsecured claims. *See Walsh v. Westmoreland Human Opportunities, Inc. (In re Life Serv. Sys.), 279 B.R. 504, 513 (Bankr. W.D. Pa. 2002)*. Specifically, the members of an official committee owe a fiduciary duty to the committee's constituents, *i.e.*, the entire class of general unsecured creditors. *See id.* The chief purpose of an official committee is to maximize distribution to this class. *See id.*

Given these considerations, the primary question for the purpose of these motions is whether the landlords are adequately represented by the Official Committee. The landlords bear the burden of proving that the Official Committee does not provide them with adequate representation. *See Enron Corp., 279 B.R. at 685* (citations omitted). Many courts are reluctant to appoint an additional committee of creditors because it is an extraordinary remedy. *In re Sharon Steel Corp., 100 B.R. 767, 777-78 (Bankr. W.D. PA. 1989)*. [*10] As a general rule, "adequate representation exists through a single

12-12020-mg    Doc 1451    Filed 09/14/12    Entered 09/14/12 16:58:23    Main Document
Pg 35 of 50

Page 4

2005 Bankr. LEXIS 323, *10; 53 Collier Bankr. Cas. 2d (MB) 1787;
44 Bankr. Ct. Dec. 106

committee so long as the diverse interests of the various creditor groups are represented on and have participated in that committee." *Id.* Further, creditor groups are adequately represented if the interests of each group "have a meaningful voice in the committee relative to their posture in the case." *In re Dow Corning Corp., 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), rev'd on other grounds, 212 B.R. 258 (Bankr. E.D. Mich. 1997); see also In re Hills Stores, 137 B.R. 4, 7 (Bankr. S.D. N.Y. 1992).*

There is no hard and fast rule requiring proportionate representation of distinct groups of creditors on a committee of unsecured creditors. *See Dow Corning, 194 B.R. at 141.* The Code specifically states that the committee of creditors "shall ordinarily consist of the persons . . . that hold the seven largest claims against the debtor of the kinds represented on such committee." *11 U.S.C. § 1102(b).* "For a particular group of creditors to be adequately represented by an existing committee, it is not necessary for the committee [*11] to be an exact reflection of that committee's designated constituents." *Dow Corning, 194 B.R. at 141.* According to the Debtors' consolidated list of unsecured creditors holding the twenty largest unsecured claims, [8] the four largest unsecured creditors are vendors, while the next three largest unsecured creditors are landlords. It appears that all but two Official Committee members are among the Debtors' twenty largest unsecured creditors.

8  Attached to the Debtors' chapter 11 petitions.

Courts generally will not authorize an additional committee of unsecured creditors unless the current committee is "hopelessly divided, unable to take a position on important matters and Ineffective. . . ." *Enron Corp., 279 B.R. at 686* (citation omitted). A committee of unsecured creditors often consists of creditors with a variety of viewpoints, and thus conflicts are not uncommon, especially when creditors are acting individually to protect their separate business interests. *See Hills Stores, 137 B.R. at 6.* [*12] Adequate representation is lacking only when these conflicts prevent an official committee from upholding its fiduciary obligations to all general unsecured creditors. *See Sharon Steel, 100 B.R. at 778.*

Here the landlords argue that the Official Committee is not representing their interests, as evidenced by member voting record on certain issues. Yet as mentioned above, the chief purpose of the Official Committee is to represent all general unsecured creditors.

See *Life Service Sys., 279 B.R. at 510.* If an Official Committee member advances its own interests through its position on the committee, that member is in breach of its fiduciary duty to committee constituents. *See id.* The Official Committee is simply not intended to represent individual creditor interests. Mere conflict between members of the Official Committee is no basis for the appointment of an additional committee of creditors. Based on the forgoing, the landlords have made no showing that the Official Committee has failed to fulfill its duty to maximize recovery to all general unsecured creditors.

It is important to keep in mind that each member of the Official Committee is free [*13] to represent its own interests in an individual capacity apart from membership in the Official Committee. *In re American Federation of Television and Radio Artists, 30 B.R. 772, 776 (Bankr. S.D. N.Y. 1983).* Each landlord has a distinct relationship with the Debtors governed by the requirements of *section 365.* Under *section 365,* the final determination of whether a lease is assumed or rejected is subject to notice and a hearing. This decision to assume or reject is subject to the business judgment rule. *See In re Vencor, Inc., 2003 Bankr. LEXIS 659, 2003 WL 21026737, at *3 (Bankr. D. Del. 2003)* (citing *In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1992)).* A landlord may challenge this determination by taking the position that the Debtors are not acting in the best interest of the estate and present related evidence with respect to each proposed lease assumption or rejection. If a lease is ultimately assumed, the particular landlord continues to have a distinct relationship with the debtor. If the lease is ultimately rejected, the concerns of the rejected landlord become, for the most part, the concerns of a general unsecured creditor represented [*14] by the Official Committee.

In an effort to represent its individual interests, a landlord may act in concert with those landlords who are members of the Informal Committee, as some of the landlords did here when they formed the Informal Committee. Those landlords who are members of the Informal Committee may continue to work collectively with that designation, and, should it choose to do so, the Informal Committee will continue to be heard as a party of interest in this case. Pursuant to *section 503(b),* the Informal Committee may later seek reimbursement for reasonable professional services and expenses, and nothing in this decision will prevent the Informal

2005 Bankr. LEXIS 323, *14; 53 Collier Bankr. Cas. 2d (MB) 1787;
44 Bankr. Ct. Dec. 106

Committee from making such application or determine the outcome of such request. *Section 503(b)* provides, in relevant part:

> After notice and a hearing, there shall be allowed administrative expenses . . ., including --
>
> (3) the actual, necessary expenses, . . . incurred by --
>
> (D) . . . a committee representing creditors . . . other than a committee appointed under *section 1102* of this title, in making a substantial contribution in a caseunder chapter 9 or 11 of this title;
>
> (4) reasonable compensation for [*15] professional services rendered by . . . an entity whose expense is allowable under paragraph (3) of this subsection, based on time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

*11U.S.C. 503(b)*.

It is noteworthy that the Code provides that "the court shall *not* allow compensation for -- (i) unnecessary duplication of services; or (ii) services that were not -- (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." *11 U.S.C. § 330(a)(4)(A)* (emphasis added). With these considerations in mind, if this court finds that the efforts of the Informal Committee have provided substantial contribution to the interests of the estate, then the Informal Committee may be entitled to reasonable compensation at the conclusion of the case.

**CONCLUSION**

For the reasons set forth above, the motions to appoint an additional official committee of landlords are DENIED. A separate order denying the motions shall enter.

Dated: March 2, 2005

[*16]  Honorable Louis H. Kornreich

United States Bankruptcy Judge

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

C

United States District Court,
S.D. New York.
MIRANT AMERICAS ENERGY MARKETING,
L.P. Appellant,
v.
THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ENRON CORP., Enron Corp., et
al., and the Office of the United States Trustees,
Appellees.

No. 02 Civ. 6274(GBD).

Oct. 10, 2003.

The Bankruptcy Court of the Southern District
of New York, Arthur J. Gonzalez, J., denied motion
of ad hoc committee of energy merchants to compel
appointment of additional creditors' committee in
ongoing Chapter 11 proceedings, 279 B.R. 671.
Creditor appealed. The District Court, Daniels, J.,
held that: (1) creditor was granted leave to appeal,
and (2) bankruptcy court's order was not abuse of
discretion.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ☞3768**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3766 Decisions Reviewable
                51k3768 k. Interlocutory Orders; Collateral Order Doctrine. Most Cited Cases

**Bankruptcy 51 ☞3772**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3772 k. Petition for Leave; Appeal as
of Right; Certification. Most Cited Cases

Creditor was granted leave to appeal bank-
ruptcy court's interlocutory order denying motion of
ad hoc committee of energy merchants to compel
appointment of additional creditors' committee in
ongoing Chapter 11 proceedings, although review-
ing court could not state without reservation that
there was substantial ground for difference of opin-
ion; motion involved controlling issue of law, offi-
cial committee and debtor did not object to appeal,
United States trustee specifically waived any objec-
tion to court's consideration of appeal, and granting
leave to appeal materially advanced ultimate de-
termination of litigation. 28 U.S.C.A. § 158(a);
Fed.Rules Bankr.Proc.Rule 8003(c), 11 U.S.C.A.

**[2] Bankruptcy 51 ☞3024**

51 Bankruptcy
    51IX Administration
        51IX(A) In General
            51k3024 k. Creditors' and Equity Security
Holders' Committees and Meetings. Most Cited
Cases

Bankruptcy court's decision, denying motion of
ad hoc committee of energy merchants to compel
appointment of additional creditors' committee in
ongoing Chapter 11 proceedings, was not abuse of
discretion, although case was very large, since rela-
tionships among debtors and creditors were com-
plex and interrelated, joint administration did not
necessarily impose threat to merchants' assets, there
was no conflict on official creditors' committee
with respect to maximizing value and merchants
had meaningful voice on committee, potential fu-
ture conflicts was speculative, and merchants had
been heard on every major issue through independ-
ent motions. 11 U.S.C.A. § 1102(a)(2).

*MEMORANDUM OPINION AND ORDER*
DANIELS, J.
***1** Mirant America's Energy Marketing, L.P.
("Appellant") appeals from a Bankruptcy Court or-
der, dated June 21, 2002, denying a motion to com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

pel the appointment of an additional creditors' committee in ongoing bankruptcy proceedings involving Enron Corp. and its subsidiaries. For the reasons stated herein, the order of the Bankruptcy Court is AFFIRMED.

## BACKGROUND

On December 20, 2001, and periodically thereafter, Enron Corp. ("Enron") and certain subsidiaries (together with Enron, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Enron is a holding company of subsidiaries that provided products and services related to the sale and delivery of natural gas, electricity and communications to wholesale and retail customers. The manner in which Enron and its affiliates conducted business was significantly interrelated. Contracts and loan facilities were often guaranteed by the parent company on behalf of its affiliates, and the corporate structure included a cash management system in which funds earned by the Enron affiliates were swept daily to Enron Corp., and then redistributed to various entities. *In re Enron, et. al.,* 279 B.R. 671, 689 (Bankr.S.D.N.Y.2002). As a result, overlapping claims exist against many of the Debtors. After filing their voluntary petitions, the Debtors have continued to operate their business and manage their property as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. Given the interrelationships among the debtors, their petitions were placed under joint administration pursuant to Bankruptcy Rule 1015(b).[FN1] Pursuant to section 1102(a) of the Bankruptcy Code, the U.S. Trustee appointed a single creditor's committee (the "Official Committee" or "Committee") to represent the interests of all unsecured creditors.

> FN1. Rule 1015(b) states in relevant part that "[i]f a joint petition or two or more petitions are pending in the same court by or against ... a debtor and an affiliate, the court may order a joint administration of the estate." *Bankr.Rule 1015(b), 11 U.S.C.* The rule specifically orders that "prior to

entering an order the court shall give consideration to protecting creditors of different estates against potential conflicts of interest." *Id.*

Certain creditors not named to the committee subsequently formed an Ad Hoc Committee of Energy Merchants (the "Ad Hoc Committee"). These creditors (the "Trading Creditors") held claims arising out of energy trading contracts entered with three specific Enron entities: Enron North America ("ENA"), Enron Power Marketing, Inc. and Enron Energy Services, Inc. (the "Trading Debtors"). The Trading Debtors traded commodities such as electric power, natural gas, and the development of power projects. *In re Enron,* 279 B.R. at 677. In mid-December and early January, the Ad–Hoc Committee requested that the U.S. Trustee appoint an additional committee composed solely of Trading Creditors.[FN2] While the Official Committee appointed by the Trustee already included creditors with claims against the Trading Debtors, the Ad Hoc Committee claimed that their interests were inadequately represented.

> FN2. Some dispute existed among the parties as to what creditors are included in the term "Trading Creditor." Appellant claims that Appellees have mistakenly assumed that the term includes all creditors of the Trading Debtors, regardless of the size or nature of their claims. (Appellant's Reply Br. at 21.) Appellant argues that "Trading Creditors" refers only to those creditors of the Trading Debtors who are energy trading companies and whose claims arise almost exclusively out of energy trading contracts. *Id.* This Court will use Appellant's definition for Trading Creditors.

Upon denial of the request by the Trustee, the Ad Hoc Committee filed a motion before the Bankruptcy Court of the Southern District of New York seeking an order compelling the appointment of a separate committee. Other creditors with claims

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

against one or more of the Trading Debtors joined the motion or filed for similar relief. On June 21, 2002, the Bankruptcy Court issued an opinion and order denying the motions. Appellant Mirant, a member of the Ad Hoc Committee appealed the Court's order in its individual capacity and as a member of the Ad Hoc Committee.

Jurisdiction

**\*2** [1] As an initial matter, Appellant appeals from an interlocutory order. *See Dubin v. S.E.C.*, ( *In re Johns–Manville Corp.*), 824 F.2d 176, 179–180 (2d Cir.1987) *dismissing appeal Albero v. S.E.C.* ( *In re Johns–Manville Corp.*), 68 B.R. 155 (Bankr.S.D.N.Y.1986) ("[A] bankruptcy court's denial of a request to appoint an official committee ... is [not] final even under the more flexible standard of finality applied in bankruptcy cases."). Interlocutory decrees and orders can only be appealed through leave of this Court. 28 U.S.C. § 158(a).

While appellant has not filed a motion for leave to appeal, this court may treat appellant's notice of appeal as such a motion. Fed. R. Bankr.P. 8003(c); *see, e.g., In re Ionosphere Clubs. Inc.,* 179 B.R. 24, 28 (S.D.N.Y.1995). When considering whether to grant leave to appeal, courts have adopted the standard set forth in 28 U.S.C. § 1292(b), pursuant to which "leave to appeal from an interlocutory order will be granted only if the order (1) involves a controlling question of law (2) over which there is a substantial ground for difference of opinion and (3) if an immediate appeal would materially advance the ultimate termination of the litigation." *Id.* Leave to appeal from interlocutory orders should be granted only in "exceptional circumstances" in order to avoid undermining "the well-established judicial policy of discouraging interlocutory appeals and avoiding the delay and disruption which results from such piecemeal litigation." *Escondido Mission Vill. v. Best Prod. Co.,* 137 B.R. 114, 116 (S.D.N.Y.1992).

While appellant's motion involves a controlling issue of law, this court cannot state without reservation that there is a substantial ground for difference

of opinion as to that issue.[FN3] However, exceptional circumstances are present in this case. Neither the Official Committee nor Enron have objected to this appeal. The United States Trustee is the only appellee to identify the jurisdictional issue and has specifically waived any objection to the Court's consideration of the appeal. (U.S. Tr.'s Br. at 1, fn. 1.) Moreover, granting leave to appeal would materially advance the ultimate determination of this litigation. It would be inefficient to have the parties proceed under the status quo and await a final order before this Court reviewed appellant's motion. In the interim a reorganization plan may be formulated, debtors' assets may be sold, and significant costs may be expended. Because appellant presents an issue of law that would materially advance the termination of this litigation and, more significantly, because all parties in interest wish to move forward with this appeal and resolve the issue before this Court, leave to appeal is granted.

> FN3. One of Appellant's contentions is that the Bankruptcy Court committed an error of law by failing to apply the law of fiduciary duty as a presumptive rule of decision when determining whether a separate committee was necessary. As this Court discusses later, the overwhelming weight of precedent does not support Appellant's contention.

DISCUSSION

I.

While a bankruptcy court's conclusions of law are subject to de novo review on appeal, "it is well settled that a bankruptcy judge's findings of fact are binding on the reviewing court unless clearly erroneous." *In re Johns–Manville Corp.,* 68 B.R. at 157–58; *see also* Bankr.Rule 8013, 11 U.S.C. Moreover, where the bankruptcy court's determination is made pursuant to its discretionary authority, the court's determination will not be set aside "absent an abuse of that discretion." *Id.*

**\*3** [2] In this case, the Bankruptcy Court refused to exercise its authority under Section

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

1102(a)(2) of the Bankruptcy Code to appoint additional committees of creditors. That statute provides that upon request of a party in interest, "the court *may* order the appointment of additional committees of creditors ... if necessary to assure adequate representation of creditors." 11 U.S.C. § 1102(a)(2) (emphasis added). The wording of the statute is instructive, particularly because other provisions of the Code clearly leave the Bankruptcy Court with no room for discretion. *See, e.g.,* 11 U.S.C. § 1104(a) (describing circumstances under which the bankruptcy court " *shall* order the appointment of a trustee") (emphasis added). Section 1102(a) "explicitly provides the bankruptcy court with discretion in this matter," *Victor v. Edison Bros. Stores,* (*In re Edison Bros. Stores* ), No. CIV.A. 96–177–SLR, 1996 WL 534853 at *3 (D.Del. Sep.17, 1996), and this Court must therefore review the bankruptcy court's decision for an abuse of discretion.

Appellant, however, argues that this Court should review the Bankruptcy Court's decision on a de novo basis because "the bankruptcy court committed a fundamental error of law." (Tr. of Oral Argument at 20.) Appellant claims that the Bankruptcy Court used a standard more appropriately applied to other circumstances. *Id.* at 21. Appellant focuses on the role of the Official Committee as fiduciary and argues that "the correct test when the dispute is between different classes [of creditors] ... is strict adherence to fiduciary duty." *Id.* at 24. Instead, according to Appellant, the Bankruptcy Court used a standard that "subordinate[d] the issue of fiduciary duties to other considerations such as pragmatism and efficiency." *Id.* at 20.

This Court, however, affirms the standard used by the Bankruptcy Court. As discussed more fully below, the alternative standard proposed by Appellant is based on questionable precedent and ignores the practice and policy of bankruptcy courts in this District.

Pursuant to Section 1102(a), a bankruptcy court may order the appointment of a new committee "if

necessary to assure adequate representation." 11 U.S.C. § 1102(a). The statute clearly requires an initial determination of whether a party is adequately represented. There is no framework provided in the Bankruptcy Code to assist in this determination. However, courts have developed a body of precedent that calls for the examination of several factors on a case-by-case basis. These include, among others, "the ability of the committee to function, the nature of the case, and the standing and desires of the various constituencies." *In re McLean Industries, Inc.,* 70 B.R. 852, 860 (Bankr.S.D.N.Y.1987); *see also In re Dow Corning, Corp.,* 194 B.R. 121, 142 (Bankr.E.D.Mich.1996) *reversed on other grounds In re Dow Corning Corp.,* 212 B.R. 258 (E.D.Mich.1997) (noting consideration of similar factors such as the nature of the case, the interests of the various creditor groups, the composition of the committee and the ability of the committee to function properly).

**\*4** In addition, several courts have adopted a bifurcated approach. Under this approach, the court first determines whether a party is adequately represented by an existing committee. If a court finds inadequate representation, it will then determine whether it should exercise its discretion under the particular circumstances of the case. This second level of analysis involves consideration of such factors as the costs involved, the time of the application, the potential for added complexity and the presence of other avenues for creditor participation. *See Dow Corning,* 194 B.R. at 141 (discussing the bifurcated approach). In this case, the Bankruptcy Court specifically used the bifurcated approach analyzing the factors outlined in *McLean. See Enron,* 279 B.R. at 685, 686–691 (discussing factors).

Appellant, however, argues that the adequacy of representation standard used by the Bankruptcy Court is appropriate only where a case involves "a routine squabble between two beneficiaries of a single estate." (Appellant's Reply Br. at 2–3.) This case, Appellant argues, involves a conflict between

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

"two separate and largely unrelated *classes* of creditors, who are both purportedly represented by a single fiduciary body." *Id.* (italics in original). Appellant claims that, absent substantive consolidation, the Enron debtors are distinct from the Trading Debtors, with separate assets, liabilities and creditor constituencies. Appellant contends that the general creditors of Enron "constitute a separate class of creditors, whose claims are, as a consequence of Enron's ownership of the Trading Debtors, structurally subordinate to the rights of the Trading Creditors against the Trading Debtors." *Id.*

More importantly, Appellant claims that the interests of the two group of creditors are diametrically opposed. Appellant argues that "it is in the interests of Enron and the other Enron Debtors and of their financial creditors, to invade the estates of the Trading Debtors and deploy their assets to enrich the estates of Enron and the other Enron Debtors." (Appellant's Br. at 20.) The existence of this inherent conflict leads Appellant to conclude that "it is doubtful *any* single creditors' committee, however composed, could represent both the Trading Creditors and the financial creditors of Enron and the other Enron Debtors with the loyalty and vigilance required [by the law of fiduciary duties]." *Id.* (italics in original). [FN4] For Appellant, the central requirement for adequacy of representation under Section 1102(a) of the Bankruptcy Code is fulfillment of the Creditors' Committee's fiduciary duties. "[B]y definition," Appellant argues, "adequate representation is not provided if the committee operates under an actual conflict of interest that causes it to breach those duties." *Id.* at 17.

> FN4. Appellant provides the Court with three specific examples of how the existing conflict of interest has resulted in a breach of the Committee's fiduciary duties. First, Appellant points to the Committee's support for the sale of Enron's Trading Desk on terms that Appellant claims offered inadequate protection of the Trading Debtors' assets. Appellant claims that members

of the Ad Hoc Committee were given no opportunity to participate in the transaction and that protective provisions were implemented only after the Ad Hoc Committee moved the Bankruptcy Court to order them. (Appellant's Br. at 9–10.) Second, Appellant points to the Committee's support for the continued use of the cash management system, which swept cash receipts from subsidiary companies such as the Trading Debtors to one centralized account. *Id.* at 11. Third, Appellant points to the Committee's failure to object to the establishment of a facility secured by a first lien on all of Enron's unencumbered assets, including assets of the Trading Debtors (the "DIP Facility"). Appellant claims that the facility produces liquid funds for the sole benefit of the Enron Debtors while encumbering assets of the Trading Debtors. *Id.* at 13–14. As discussed later, these same examples were provided to the Bankruptcy Court, which determined that such actions did not constitute a breach of fiduciary duty.

It is well settled that a creditors' committee owes a fiduciary obligation to its constituency. *See Shaw & Levine v. Gulf & Western Industries, Inc.* ( *In re matter of Bohack Corp.),* 607 F.2d 258, 262 n. 4 (2d Cir.1979) ("[T]he committee owes a fiduciary duty to the creditors, and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors."); *Johns–Manville Sales Corp. v. Doan (In re Johns–Manville Corp.),* 26 B.R. 919, 925 (Bankr.S.D.N.Y.1983) ("Conflicts of interest on the part of the representative persons or committees are ... not to be tolerated."). Appellant, however, would have this doctrine become a rule of decision "that [would make], at least in cases likely to involve substantive consolidation, simultaneous representation by a single committee of two classes of creditors whose interests are potentially in conflict ... presumptively improper." (Appellant's Br. at 23.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

**\*5** Appellant relies primarily on a footnote in a 1988 California bankruptcy case, *In re Parkway Calabasas Ltd.,* 89 B.R. 832, 835 n. 3 (Bankr.C.D.Cal.1988). In dicta, the bankruptcy court in that case adopted the presumption that it is improper to appoint a single creditors' committee, a single trustee or single trustee's counsel in four circumstances where substantive consolidation is probable. *Id.* Among those circumstances are cases where creditors have dealt with debtors as an economic unit, and where debtors' affairs are substantially entangled. *Id.* The Court argued that:

[w]here there are no separate trustees, creditors' committees or counsel, each has a hopelessly irresolvable conflict of interest on a motion for substantive consolidation ... Each is required to support the substantive consolidation for the benefit of the less solvent estate and its creditors, and to oppose it for the benefit of the more solvent estate and its creditors.

*Id.*

The presumption adopted by the bankruptcy court in *Parkway Calabasas,* however, has limited precedential value. The court's discussion in that case was tangential. *Parkway Calabasas* arrived before the bankruptcy court as a consolidated matter presenting the sole issue of whether fraudulent conveyance claims were preserved after substantive consolidation. *See id.* at 836. Appellant essentially relies on non-binding dictum outside this Circuit.

Moreover, only a few courts have adopted the presumption set forth in *Parkway Calabasas,* or any similar standard. *See In re Lee,* 94 B.R. 172, 180 (Bankr.C.D.Cal.1988) (adopting presumptive rule and citing *Parkway Calabasas* ); *cf., In re White Motor Credit Corp.,* 18 B.R. 720, 722 (Bankr.N.D.Ohio 1980) (holding that separate committees are required in each separate but jointly administered bankruptcy case).[FN5]

FN5. Significantly, the reasoning of the *White Credit Motor Corp.* Court was that

in separate but jointly administered cases, the "creditors of one debtor cannot be presumed to have a material or other qualifying interest in the assets or future of an affiliated debtor." 18 B.R. at 722. Thus, the "presence of disinterested yet voting members could easily divert attention from legitimate committee activities." *Id.* This reasoning is inapplicable in the case at bar, where there are several overlapping creditors and where, by Appellant's own argument, creditors of the Enron debtors have an interest-albeit allegedly conflicting interest-in the assets of the Trading Debtors.

In one such case, a bankruptcy court's adoption of the *Parkway Calabasas* presumption was expressly overruled on appeal. *In re BH & P, Inc.,* 949 F.2d 1300. 1310–1313 (3rd Cir.1991). *BH & P* involved an objection to interim fee applications of the trustee, attorneys and accountants in a jointly administered case. The issue before the court was whether the existence of claims by one debtor estate against another created an actual or potential conflict of interest that warranted disqualification of the trustee or a denial of compensation. As part of its decision, the Bankruptcy Court adopted the *Parkway Calabasas* presumption and applied it to cases involving inter-debtor claims. *In re BH & P, Inc.,* 103 B.R. 556. 572 (Bankr.D.N.J.1989).

The Court of Appeals for the Third Circuit saw the bankruptcy court's presumptive rule as "overbroad." *In re BH & P. Inc.,* 949 F.2d 1300, 1310, 1313 (3rd Cir.1991). The court rejected this presumption and instead adopted a "case-specific" conflicts-of-interest analysis that it "committed to the sound discretion of the bankruptcy court." *Id.* [FN6] Significantly, this case-specific analysis is consistent with the adequacy of representation standard. *Compare Id.* at 1312–14 ("Armed with knowledge of all of the relevant facts, the bankruptcy court must determine, case by case, whether [a conflict] can be tolerated under the particular circumstances.") (quoting *In re Martin,* 817 F.2d 175,

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

181 (1st Cir.1987)) *with In re Sharon Steel Corp.,* 100 B.R. 767, 778 (Bankr.W.D.Penn.1989) (finding that class of debenture holders had failed to "assert[ ] facts tending to show that diverse interests have produced an inability of the Official Committee to function in the performance of its fiduciary obligations to all unsecured creditors") *and McLean,* 70 B.R. at 852 (noting that "presence of potential conflict may not always require separate committee").

FN6. Appellant makes the assertion that while the Court of Appeals for the Third Circuit rejected the *Parkway Calabasas* presumption it nonetheless "affirmed the rule of decision established by the courts below." (Appellant's Reply Br. at 15.) Appellant misreads the court's conclusions. The Third Circuit, after rejecting the presumptive rule of decision, quoted *In re Martin,* 817 F.2d 175, 181–183 (1st Cir.1987) for the proposition that, when undertaking the preferred case-by-case analysis, a bankruptcy court must make the factual determination of whether an actual or potential conflict of interest exists. *BH & P,* 949 F.2d at 1312. A factual finding that an actual conflict exists will "present a towering obstacle" to the maintenance of a single committee, while a finding of a potential conflict must be dealt with in accordance with the Courts discretion, always resolving doubts "in favor of invalidation." *Id.* at 1312–13. In neither case does the court offer an outcome determinative rule of decision, but instead offers guidelines to be used in conjunction with other factors.

**\*6** Bankruptcy courts in this District have also rejected presumptive rules of decision in favor of a case by case analysis of adequacy of representation. *See McLean,* 70 B.R. at 861 ("[T]he need for a separate committee is to be found, not by the *per se* rule asserted by Movants, but, *inter alia,* in the nature of the case and the composition of the committee."); *In re Beker Industries Corp.,* 55 B.R. 945, 949 (Bankr.S.D.N.Y.1985) (noting that "[t]he [Bankruptcy Code] affords no test of adequate representation, leaving the bankruptcy courts with discretion to examine the facts of each case to determine if additional committees are warranted"); *In re Drexel Burnham Lambert Group. Inc.,* 118 B.R. 209, 212 (Bankr.S.D.N.Y.1990) ("The standard of adequate representation ... lies not in the uniqueness of a single claim but 'in the nature of the case and the composition of the committee.' ") (quoting *McLean,* 70 B.R. at 861); *In re Hills Stores Co.,* 137 B.R. 4, 8 (Bankr.S.D.N.Y.1992) (noting that because Bankruptcy Code "affords no 'bright-line' test for adequacy of representation, the court is armed with discretion after examining the facts to determine if additional committees are warranted"); *Johns–Manville,* 68 B.R. at 160 (noting "statutory focus" on adequacy of representation, and discussing several guidelines used in analysis).

Conflict-of-interest analysis certainly informs a court's determination under this standard. *See e.g., Dow Corning,* 194 B.R. at 142 (noting that adequacy of representation analysis must "entail [ ] a balancing of [a] group's interest against the interest of other groups in the committee," and a determination of "whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors"). Similarly, a factor that courts examine under the adequacy of representation standard is the class and characteristics of debt involved. Courts look to whether creditors have such unique and separate interests that "they impair the ability of the ... creditors' committee to reach a consensus." *McLean,* 70 B.R. at 861. Courts also examine whether "the nature of the case might affect different segments of debt ... differently." *Drexel Burnham,* 118 B.R. at 212. However, neither conflicts of interest nor classes of debt have been used as sole outcome-determinative factors. Courts have always balanced several factors and considerations when making their determination.

Moreover, courts in this District and most other

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

Districts have recognized that the adequacy of representation balancing standard promotes the policy underlying the Bankruptcy Code. The principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to "strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished." *Hills Stores,* 137 B.R. at 7. The committee is an advocate for the interests of the creditors it represents and it owes a fiduciary duty to those creditors. *Johns–Manville Corp.,* 60 B.R. at 853 n. 23 (noting that a "committee's only duty is to pursue the interest of its members."). However, those creditors will necessarily have varying and frequently conflicting interests. As one court has explained:

> **\*7** [C]reditors committees often contain creditors having a variety of viewpoints. Some members may favor liquidation; others may favor continuation of the business in order to preserve jobs or the viability of an important customer. Some debt may be contractually subordinated to the other debt.

> *Hills Stores,* 137 B.R. at 6.

"Such conflicts are not unusual in reorganization." *In re Altair Airlines, Inc.,* 727 F.2d 88, 90 (3rd Cir.1984). Indeed, "they are inherent in all bankruptcy cases," and "inevitable" in complex cases, such as the consolidated one at bar. *Sharon Steel,* 100 B.R. at 770. Yet, despite the likely conflicts, and in recognition of the greater efficiencies achieved, jointly administered cases with a single creditors' committee is commonplace. *See In re Texaco, Inc.,* 79 B.R. 560, 565 (Bankr.S.D.N.Y.1987) (noting that "one does not usually find two separate committees of unsecured creditors in one case"); *McLean,* 70 B.R. at 862 (noting concerns that arise in jointly administered cases but holding that they do not as a matter of law require separate committees); *Sharon Steel,* 100 B.R. at 778 (noting that "the reconciliation of differing interests of creditors within a single committee is the norm"); *cf. Parkway Calabasas,* 949 F.2d

at 1310–1311 (noting "the reality that a single trustee [or committee] is often able to maximize the return to jointly administered estates through increased economy and efficiency" and that "[j]oint administration by a single trustee [or committee] is commonplace in the scheme of bankruptcy administration and its positives often outweigh any negatives").

Often single committees represent what can be characterized as different "classes" of unsecured creditors.[FN7] Bankruptcy Courts have recognized that-at least prior to submission of a reorganization plan-creditors possessing claims with significantly different characteristics nonetheless continue to possess greater commonality as unsecured creditors. Courts have upheld single committees with memberships consisting of such disparate creditors as debenture holders, trade creditors and labor representatives, *Sharon Steel,* 100 B.R. at 771, 786; subordinated debenture holders and unsubordinated creditors, *McLean,* 70 B.R. at 862; and even unsecured trade creditors and partially secured institutional lenders with a "clear conflict of interest." *In re Walat Farms, Inc.,* 64 B.R. 65, 70 (Bankr.E.D.Mich.1986).

> FN7. Another problem with Appellant's position is that the notion of a "class" of unsecured creditors can be extremely ambiguous. Any unsecured creditor who feels that it has differing or conflicting claims-however slight-may claim that it represents a separate class and thus entitled to a separate committee. Even if Appellant's rule of decision were adopted, it would turn on a factual determination of whether a creditor's claims are so different as to warrant being classed separately. In this case, the Bankruptcy Court examined the "standing and desires of [the] various constituencies" involved in this case, among other factors. It ultimately concluded that Appellant and the Trading Creditors "have not met their burden of proving that the Creditors' Com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

mittee cannot adequately represent them and express their views." *In re Enron,* 279 B.R. at 690 & 694. In addition it found that a single committee allowed the creditors to be "placed on even ground in their commonality as unsecured creditors with a goal toward maximizing recovery." *Id.* at 689. The Bankruptcy Court's examination of the record, therefore, did not establish that Appellant and the Trading Creditors constituted a truly separate class for purposes of the Creditors' Committee. This Court makes no independent determination as to whether the Trading Creditors constitute a separate class of unsecured creditors. However, given the nature of the Trading Creditor's claims, the Bankruptcy Court's finding seems reasonable, and it is unlikely that this Court's conclusion would differ. Thus even under Appellant's own rule, its request for a new committee would likely fail.

Concern related to potential or actual conflicts in these circumstances "is tempered ... by the fundamental notion that a committee represents all unsecured creditors whether or not a member of a particular group is included in its membership." *McLean,* 70 B.R. at 862; *see also In re Rickel & Associates, Inc.,* 272 B.R. 74, 100 (Bankr.S.D.N.Y.2002) ("Although Committee members owe fiduciary duties, they are hybrids who serve more than one master."). While the committee represents and owes a fiduciary duty to all creditors, it "does not guarantee a favorable result for [particular creditors], it only guarantees that [their] interest[s] will be adequately represented." *Johns -Manville,* 68 B.R. at 161. Such interests are adequately represented "through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in the committee." *Sharon Steel,* 100 B.R. at 777–778. Thus, conflicts of interest, even among different "classes", neither implicate the committee's fiduciary duties nor inevitably necessitate additional committees.

**\*8** As the bankruptcy court in this case aptly stated, "[t]he question is whether such conflict hinders adequate representation." *In re Enron,* 279 B.R. at 689 (Bankr.S.D.N.Y.2002). Where the balancing standard reveals that representation is inadequate, separate committees are appropriate. *See Beker,* 55 B.R. at 949–51 (ordering separate committee for debenture holders where group had been refused admission to the Official Committee). Where representation is found to be adequate, a separate committee may not be appropriate, even if a conflict of interest among separate classes of creditors exists. *See McLean,* 70 B.R. at 862 (refusing petition for new committee where debenture holders already represented on the Committee).

A rule of decision based purely on whether separate "classes" of creditors have differing interests would lead to the unnecessary proliferation of committees "at an astronomical cost to the bankruptcy estates." *Sharon Steel,* 100 B.R. at 779. Moreover, because creditors would be balkanized into several independent committees, each furthering the interests of only certain groups, the consultation and balancing of interests necessary for a successful negotiation of a reorganization plan would be severely hampered, leading to increased costs and delays. *See id.* (noting that bankruptcy cases "succeed or fail to the extent members of the Official Committee can adjust their differences within the framework of the existing Official Committee"). Where a group of creditors is already adequately represented in light of the totality of the circumstances, the costs and delay associated with additional committees would be unjustified.

In conclusion, the Bankruptcy Court in the case at bar followed valid precedent and used the appropriate legal standard. Furthermore, the bankruptcy court was under no obligation to adopt a rule advocated only in dicta and in a limited number of cases which is inconsistent with the precedent and practice in this District. The Bankruptcy Court committed no legal error, and this Court is bound to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

review the Bankruptcy Court's determination under an abuse of discretion standard.

## II.

Appellant's alternative argument disputes the Bankruptcy Court's conclusions under the adequacy of representation standard. Appellant here argues that a proper analysis under the adequacy of representation standard "support[s] the appointment of an additional fiduciary creditors' committee." (Appellant's Br. at 23.) Appellant examines the four factors outlined in *Dow Corning* in light of its argument that the Official Committee is operating under an actual conflict of interest. *See Dow Corning,* 194 B.R. at 142 (listing factors as (i) the nature of the case, (ii) the interests of the various creditor groups, (iii) the composition of the committee and (iv) the ability of the committee to function properly). Appellant's arguments, however are not new. The same arguments were made before the Bankruptcy Court. That Court examined them carefully in light of the record and came to its own conclusions. Appellant's reiterated arguments are insufficient for this Court to find abuse of discretion or clear error.

**\*9** Under an abuse of discretion standard, the Court "does not look to what it would have done under the same circumstances, but to whether, in light of the record as a whole, the Bankruptcy Court decision was reasonable." *Constant Ltd. P'ship v. Jamesway Corp.* ( *In re Jamesway Corp.*), 179 B.R. 33, 39 (S.D.N.Y.1995). Findings of fact made by the bankruptcy court must be accorded deference and reviewed solely for clear error. *See* Bankr.R. 8013; *see also In re Wang Lab., Inc.,* 149 B.R. 1, 2 (Bankr.D.Mass.1992) (noting that the factors considered by courts when determining adequacy of representation are simply guidelines and that every case must be judged on its own facts).

A finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). While this Court may review the record in determining whether a finding is clearly erroneous, it "cannot set the bankruptcy court's findings of fact aside if the record reveals a reasonable basis for them." *Johns–Manville,* 68 B.R. at 157.

### A. The nature of the case

Examining the nature of the case, Appellant notes its size and complexity, citing the fact that at the time of its filing, this case constituted the largest bankruptcy matter in history. (Appellant's Br. at 24.) Appellant cites *Hills Stores* for the proposition that the sheer size and complexity of the matter "strongly indicate[s] the need for additional committees representing different interests." *Id.* (quoting *Hills Stores,* 137 B.R. at 6). Appellant also argues that because this matter has been placed under joint administration, careful consideration must be taken that a single creditors' committee is not overloaded with one creditor group to the detriment of another. *Id.* at 25 (citing *McLean* ).

The Bankruptcy Court analyzed the nature of the case and recognized that "this is a large and complex case." However, it also noted that "the size [or complexity] of a case alone is not determinative." *In re Enron,* 279 B.R. at 688. The Court, citing the existence of interrelated guarantees among the Enron entities, the cash management system, and the existence of overlapping claims, noted that "the way in which transactions were conducted [prepetition] indicate that the business at issue in this matter were in certain respects interrelated." *Id.* at 689. Given the complex and entangled relationships among the debtors and creditors, the Court found that "the nature of this case is such that the simple answer of appointing additional committees may not provide a solution." *Id.* at 688. On the contrary, the Court found a "more compelling need for compromise and resolution."

With regard to Appellant's concern regarding joint administration, the Bankruptcy Court concluded that "the operation of a single committee is not so distinct from the functioning of ENA [and the Trading Debtors] and Enron Corp. prepetition."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

*Id.* Joint administration, therefore, did not necessarily impose a threat to the Trading Debtors' assets. Nor did the Court find evidence of the Committee being overloaded in favor of financial creditors of Enron. Rather, the Court found that the Committee appeared to be functioning well. *Id.* at 690.

B. Interests of the Various Creditor Groups

**\*10** Appellant also examines the interests of the various creditor groups. Appellant here points to the alleged conflict of interest existing between the Trading and Enron estates, and argues that "[i]t is doubtful that any single fiduciary committee could properly represent creditors of multiple estates whose interest are in such conflict, and it is impossible for the existing Committee to do so." (Appellant's Br. at 26.) Appellant suggests that as this bankruptcy matter proceeds toward the formulation of a reorganization plan and possible substantive consolidation, the conflict of interest will further threaten the interests of the Trading Creditors. For this reason, Appellant concludes that an additional committee is necessary to protect the Trading Creditors' interests.

The Bankruptcy Court's examination of the interests and desires of the various constituencies led it to find "no evidence of a debilitating division among [the] members [of the Official Committee]." *In re Enron,* 279 B.R. at 693. Elsewhere in its opinion, the Court concluded that it found "no evidence that there is any conflict on the Creditors' Committee with respect to maximizing value and no evidence that the Movants [which included Appellant] have not had a meaningful voice." *Id.* at 688. The Bankruptcy Court's conclusion was supported by several factors discussed throughout its opinion. First, the Creditor Committee had voted unanimously on all issues. *Id.* at 686. Second, the Committee included at least three Trading Creditors and various other creditors with claims against the Trading Debtors. *Id.* Finally, an examiner had been appointed by the Bankruptcy Court specifically to protect certain interests of the Trading Debtors. *Id.* at 693.

While the Court recognized the existence of some conflict, it properly concluded that the central issue is "whether representation of various creditor types is adequate." *Id.* at 690. It concluded that it was.

Appellant's argument concerning potential future conflicts was also presented to the Bankruptcy Court. The Court properly dismissed the argument as speculative. *Id.* at 691. Indeed, even at oral argument the Official Committee was still in the process of considering substantive consolidation and had not yet taken a position. (Tr. of Oral Argument at 48–49.) The Bankruptcy Court pointed to the composition of the Committee and the Trading Creditors' participation in the bankruptcy proceedings, and the Court concluded that "there can be no doubt that the positions of the parties on substantive consolidation will be heard through their able counsel, and additionally by virtue of the Creditors' Committee." *In re Enron,* 279 B.R. at 691. The Court found no reason to believe "that the Energy Traders and [Trading] Creditors will be excluded in the determination of any future issues." *Id.*

C. Composition of the Committee

Appellant asserts that the composition of the Official Committee is heavily skewed to the detriment of the Trading Creditors. It asserts that only two current Committee members are Trading Creditors. (Appellant's Br. at 27.) Meanwhile, according to appellant ten of thirteen committee members are financial institutions "whose claims against the Trading debtors are dwarfed by their claims against Enron and the other Enron Debtors." *Id.* Appellant argues that because the Committee is overloaded with financial creditors of Enron, it has consistently taken positions detrimental to the interests of the Trading Creditors, in violation of its fiduciary duties. Appellant points to the three examples discussed earlier: the Committee's support for the sale of the Trading Desk, the Committee's support for the continuance of the cash management system, and the Committee's failure to object to the DIP facility. *See* supra note 4 (discussing examples in de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

tail).

**\*11** The Bankruptcy Court analyzed the composition of the existing committee, and saw a completely different membership than that described by Appellant on appeal. The Court found that the Official Committee at the time included as members three energy traders,[FN8] one of which was the Committee's co-chair, and that eleven of the thirteen members possess claims against the Trading Debtors. *In re Enron,* 279 B.R. at 686. This conclusion is consistent with the undisputed information provided to this Court on appeal. *See* (Creditors Comm. Ex. 1, Official Comm.'s Br. at Ex. B) (indicating that three Committee members possess claims based on contracts with Trading Debtors, and that at least another eight creditors possess some claim against at least one Trading Debtor).

> FN8. It is unclear why Appellant counts only two Trading Creditors on the Official Committee. While one Trading Creditor has resigned from the Committee since the Bankruptcy Court's order, the U.S. Trustee claims to have replaced it with another Trading Creditor. *See* (Appellee U.S. Tr. Br. at 5 fn. 5.). In any case, because Appellant appeals from the Bankruptcy Court's order, it is the membership of the Committee at the time that the Bankruptcy Court issued its ruling that is relevant.

Appellant argues that the non-Trading Creditors with claims against the Trading Debtors should be discounted because they have larger claims against the other Enron Debtors. As the Bankruptcy Court pointed out, however, the fact remains that a large proportion of the Official Committee has an interest in maximizing the value of the Trading Debtors' assets. Given the overwhelming interest in protecting the value of the Trading Debtors, the Bankruptcy Court appropriately concluded that "[t]his is not a case where the current composition and function of the Creditors' Committee is such that one group does not have a meaningful voice." *In re Enron,* 279 B.R. at 688.

The Bankruptcy Court also considered Appellant's allegation that the Committee had undermined the Trading Debtors' interests. The Court examined each instance carefully and concluded that there was no evidence of a breach of fiduciary duty. This conclusion is amply supported by the record.

The sale of the Trading Desk, for instance, was completed in accordance with a bidding process established by a Bankruptcy Court order that addressed objections made by the parties involved. *See* Order Establishing Bidding Procedures of 12/19/01, Official Comm.'s Br.App. Ex. M. The sale was found to have been "in the best interests of the Debtor parties (that is the Trading Debtors), their estates and their creditors." (Order Approving the Terms and Conditions of Agreements for the License and Related Transactions in respect of Enron's Wholesale Trading Bus. of 1/22/032 at ¶ K, Official Comm.'s Br.App. Ex. N.)

Similarly the continuation of the cash management system was found to be a mere continuation of an existing pre-petition business practice and was found by the Bankruptcy Court to be "in the best interest of the Debtors, their estates and creditors." (Am. Order Authorizing Continued use of Cash Mgmt. Sys. of 2/25/02 at 2, Official Comm.'s Br.App. Ex. I.) Moreover, the Committee was instrumental in proposing certain amendments to protect the assets of all the Debtors Estates. (Tr. of Continued Hr'g dated 2/13/02 at 261–263, Official Comm.'s Br.App. Ex. H.)

Finally, the DIP facility was found not to constitute a breach of fiduciary duty. First, the facility was initially executed nearly ten days before the Official Committee was formed. *See* (Revolving Credit and Guaranty Agreement dated 12/3/01, Official Comm.'s Br.App. Ex. J). An amended facility was entered by order of the Bankruptcy Court after the Committee was in existence. (Final Order Authorizing Post–Petition Financing of 7/2/02, Official Comm.'s Br.App. Ex. K). However, certain protections, such as a cash-collateralized letter of credit, were included as conditions to the facility.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903
**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

*Id.* at 4. Moreover, as the Bankruptcy Court noted in its opinion, "it does not appear to be disputed that one of the original purposes for entry into the [facility] was to enable the continuation of the Debtor's trading business." *In re Enron,* 279 B.R. at 690. While the trading business, or Trading Desk, was eventually sold, the fact remains that the facility was originally entered as a means of furthering the Trading Creditors' interests.

**D. The Ability of the Committee to Function Properly**

**\*12** Finally, Appellant argues that while the Official Committee seems to be functioning, it only does so by breaching its fiduciary duties to the Trading Creditors. (Appellant's Br. at 31). Appellant claims the Committee's actions against the interests of the Trading Creditors have necessitated legal intervention before the Bankruptcy Court. While some of this intervention has been successful, Appellant argues that the intent of the Bankruptcy Code calls for creditors to "participate meaningfully, not only in contested proceedings before the bankruptcy court, but *in the work of their fiduciary committee.*" (Appellant's Reply Br. at 17) (italics in original). Appellant further alleges that it and other Trading Creditors have been unable to participate effectively through the Committee because the Enron Creditors have "us[ed] the Committee as a shield against disclosure of the relevant details to any other creditors, and [have] releas[ed] information to others only when forced to do so by specific order of the Court." *Id.* at 32.

As with all of Appellant's other arguments on appeal, this issue was put before the Bankruptcy Court. As with the other arguments, the Court rejected it. The Bankruptcy Court noted that the Committee had voted unanimously on all relevant matters, including the petition to form additional committees. *In re Enron,* 279 B.R. at 686. Even Appellant has noted on appeal that no Committee member has protested that the Committee is conflicted or that any creditor's voice has been inadequately heard. (Appellant's Br. at 32 n. 11.)

The Bankruptcy Court also noted that, in addition to being represented on the Official Committee, the Trading Creditors had been heard on every major issue through independent motions brought before the Court. *In re Enron,* 279 B.R. at 666–677. Moreover, The Court found that the presence of a court-appointed examiner that oversaw matters related to ENA provided additional protection to Appellant's interests. *Id.* The Court's conclusions are well-founded. Contrary to Appellant's assertion, nothing in the Bankruptcy Code limits a court's analysis of adequacy of representation solely to an examination of a creditor's involvement with the Official Committee. Indeed, in some cases adequacy of representation may be found even when a particular creditor has little or no involvement with the Official Committee. *See Hills Stores,* 137 B.R. at 7 ("Nowhere does the Code mandate a committee must faithfully reproduce the exact complexion of the creditor body.") The Bankruptcy Court properly considered other avenues available to the Trading Creditors. Such alternate avenues have been regularly considered by courts when determining adequacy of representation. *See, e.g., id.* at 8 (noting participation of bondholders through Creditors' Committee's subcommittees); *Johns–Manville Corp.,* 68 B.R. at 163 (noting ability of creditor to appear before bankruptcy court).

**E. Other Factors**

**\*13** The Bankruptcy Court, as part of its bifurcated analysis, addressed several other factors and concluded that "the appointment of separate committees serves no practical purpose." *In re Enron,* 279 B.R. at 693. The Court noted that the Trading Creditors comprised 20% of the Official Committee and that one Trading Creditor was in fact the co-chair of the Committee. *Id.* It also noted that many of the Trading Creditors have claims against the Enron Debtors and that "the appointment of any additional committee would be comprised of creditors with claims beyond that of ENA or the Trading Debtors." *Id.; see also* (Breakdown of Ad Hoc Committee Member Claims, Official Comm. Br. Ex. D) (indicating that many of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903

**(Cite as: 2003 WL 22327118 (S.D.N.Y.))**

Trading Creditors on the Ad Hoc Committee do in fact possess claims against other Enron Debtors). The Court concluded that creating a pure committee of creditors with claims solely against the Trading Debtors would be impossible. *In re Enron,* 279 B.R. at 693.

Appellant on appeal attempts to rebut the Court's conclusions by claiming that the Trading Creditors' additional claims consist of guarantees from other Enron entities, and thus are secondary and of less value than their claims against the Trading Debtors. (Tr. of Oral Argument at 100.) Appellant's argument however is insufficient. The Court's conclusions were founded on facts undisputed by Appellant and were well within the Court's proper discretionary authority.

Ultimately, much of Appellant's argument on appeal has already been considered by the Bankruptcy Court in the first instance. The Bankruptcy Court's analysis was eminently reasonable and finds ample support in the record. This Court can find no clear error in the Bankruptcy Court's factual determinations and no abuse of discretion in the Bankruptcy Courts final conclusions.

CONCLUSION

The Bankruptcy Court committed no legal error by refusing to adopt a rule of decision that made joint administration of cases with two separate "classes" of creditors a presumptive violation of the Official Committee's fiduciary duties. The central determination required by the Bankruptcy Code is adequacy of representation. The Bankruptcy Court used the appropriate standard in determining whether Appellant was adequately represented by the Official Committee. Moreover, under an abuse of discretion standard, this Court will not overturn the Bankruptcy Court's determinations. Appellant's arguments were fully considered by the Bankruptcy Court. Its findings find ample support in the record and fall within that Court's discretion. Therefore, the Bankruptcy Court's order denying the motion to appoint an additional committee on behalf of the Trading Creditors is hereby AFFIRMED.

S.D.N.Y.,2003.

Mirant Americas Energy Marketing, L.P. v. Official Committee of Unsecured Creditors of Enron Corp.

Not Reported in F.Supp.2d, 2003 WL 22327118 (S.D.N.Y.), 51 Collier Bankr.Cas.2d 903

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.