**Hearing Date: September 27, 2012 at 10:00 a.m. (ET)**
**Objection Deadline: September 19, 2012 (by agreement)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Jeffrey S. Trachtman
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO (A) THE DEBTORS' MOTION FOR ENTRY OF AN
ORDER UNDER BANKRUPTCY CODE SECTION 363 AND BANKRUPTCY
RULE 6004 (I) AUTHORIZING THE DEBTORS TO COMPENSATE
PRICEWATERHOUSECOOPERS, LLP FOR FORECLOSURE REVIEW
SERVICES IN FURTHERANCE OF THE DEBTORS' COMPLIANCE OBLIGATIONS
UNDER FEDERAL RESERVE BOARD CONSENT ORDER AND (II) REAFFIRMING
RELIEF GRANTED IN THE GA SERVICING ORDER, (B) PEPPER HAMILTON
<u>RETENTION APPLICATION, AND (C) HUDSON COOK RETENTION APPLICATION</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...........................................................................................................6

    A.    The Consent Order and the Debtors' Prepetition Engagement of PwC........................6

    B.    The GA Servicing Motion and the Committee's Discovery Request..........................8

OBJECTION.................................................................................................................10

    A.    Continued Compliance with the Consent Order Does Not Appear to Be in
the Best Interest of the Estates .......................................................................10

    B.    To the Extent that the Debtors Must Comply with the  Consent Order,
Any Payments to PwC Should Be Borne by AFI as They Are Not
Authorized Under Section 363(b)...................................................................14

RESERVATION OF RIGHTS ........................................................................................19

CONCLUSION.............................................................................................................19

## TABLE OF AUTHORITIES

Page(s)

CASES

*In re Aerovox, Inc.*,
    269 B.R. 74 (Bankr. D. Del. 2001) ........................................................................17

*In re Bidermann Indus. U.S.A., Inc.*,
    203 B.R. 547 (Bankr. S.D.N.Y. 1997)...................................................................15

*In re Pacor, Inc.*,
    110 B.R. 686 (E.D. Pa. 1990) ...............................................................................16

*In re Wingspread Corp.*,
    92 B.R. 87 (Bankr. S.D.N.Y. 1988).......................................................................15

*Kahn v. Tremont Corp.*,
    694 A.2d 422 (Del. 1997) .....................................................................................16

*Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re
    Integrated Resources, Inc.)*,
    147 B.R. 650 (S.D.N.Y. 1992).........................................................................12, 17

*Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron
    Corp.)*,
    335 B.R. 22 (S.D.N.Y. 2005)................................................................................15

*Pereira v. Cogan*,
    267 B.R. 500 (S.D.N.Y. 2001)..........................................................................15, 16

*Solomon v. Armstrong*,
    747 A.2d 1098 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000)..........................15

*U.S. Bank, Nat'l Ass'n v. Perlmutter (In re South Side House, LLC)*,
    470 B.R. 659 ........................................................................................................16

STATUTES

11 U.S.C. § 363(b) .....................................................................................................15

11 U.S.C. §  502(e)  ................................................................................................17 n.6

OTHER AUTHORITIES

124 Cong. Rec. 11,094 (Sept. 28, 1978)....................................................................17

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby files this omnibus objection (the "Objection") to (A) the Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP  for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order (the "PwC Motion") [Docket No. 1357]; (B) Debtors' Application for an Order Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the Debtors to Employ and Retain Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues to the Debtors, *Nunc Pro Tunc* to May 14, 2012 (the "Pepper Hamilton Retention Application") [Docket No. 1426]; and (C) Debtors' Application for an Order Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 for Authorization to Employ and Retain Hudson Cook LLP as Special Counsel to the Debtors, *Nunc Pro Tunc* to May 14, 2012 (the "Hudson Cook Retention Application" [Docket No. 1427] and, together with the PwC Motion and the Pepper Hamilton Retention Application, the "Motions").[1]  In support of the Objection, the Committee respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      It is remarkable that, having finally reached an interim resolution of the Committee's significant objections to the Debtors' attempt to assume upwards of $100 million in indemnification obligations under their motion to continue servicing activities with Ally Bank

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motions.

(the "Subservicing Motion"), the Debtors now seek to assume yet another massive prepetition obligation for which their solvent parent is also liable – a remarkable $250 million or more in payments to PricewaterhouseCoopers, LLP ("PwC") for mortgage foreclosure review services expected to yield a small fraction of that amount in borrower relief.  The Motions raise serious questions regarding the best interests of the estates, not the least of which is why the Debtors – or federal regulators, for that matter – should prefer to continue these vast expenditures rather than to devise a more streamlined method to redirect more money to pay borrowers.  But even if the Court were to conclude that this costly review process must continue, there is simply no reason for the estates to bear these costs when a solvent co-obligor is available and contractually obligated to pay them.

2.      The Debtors propose to pay PwC pursuant to a prepetition engagement letter entered into in February 2012 by GMAC Mortgage, LLC ("GMAC Mortgage") and Ally Financial, Inc. ("AFI") for mortgage foreclosure review services (the "FRB Foreclosure Review") performed in connection with a consent order entered into on April 13, 2011 by AFI, Ally Bank, Residential Capital, LLC ("ResCap"), and GMAC Mortgage with the Board of Governors of the Federal Reserve System ("FRB") and the FDIC (the "Consent Order").  In addition to assuming the obligation to pay PwC postpetition, the Debtors now seek to retain *two* additional law firms, also engaged by both AFI and GMAC Mortgage, to oversee the loan review and advise the Debtors with respect to PwC's consulting services.

3.      The Debtors waited for almost four months after the Petition Date to file the Motions and have declined (reportedly at the direction of the FRB) to provide even a modest adjournment to permit the Committee to carefully evaluate the complex issues surrounding the negotiation and implementation of the Consent Order and related professional engagements, the

availability of viable alternatives, and the reasonableness of the continued expenditure of these very substantial sums.  As an initial matter, except as a result of AFI's ownership interest in the Debtors, the FRB, a regulator of bank holding companies, would not have jurisdiction over or the ability to control the postpetition actions of GMAC Mortgage, an operating subsidiary of ResCap.  In any event, the Motions present issues similar to those implicated by the Subservicing Motion, in connection with which the Court recognized the need for adequate discovery and full consideration of the facts.  The Committee has not yet had sufficient time to conduct discovery and thoroughly consider the myriad issues presented by the Motions and therefore submits that they should be heard at an evidentiary hearing following completion of discovery. Pending completion of the hearing, the Debtors should not be incurring any further obligations in connection with the retentions covered by these Motions.

4.    The issues presented by the Motions implicate the core disputes underlying these Chapter 11 Cases, including the nature of the Debtors' relationships with related parties and prepetition negotiation of agreements in which value was shifted out of (or obligations assumed by) the Debtors for the apparent benefit of AFI and its non-debtor affiliates – issues that overlap significantly with the Examiner's investigation.  The Motions also raise important policy questions concerning whether it is appropriate for an insolvent debtor to be incurring massive postpetition expenses for a historical study in lieu of funding allowed claims to creditors, including borrowers.  The sheer magnitude of the obligations imposed by the engagement of PwC to conduct the FRB Foreclosure Review warrants close scrutiny, as the amounts to be paid could have a major impact on the distributions available for the Debtors' creditors.  Leaving aside allocation of the cost, it is questionable whether the Debtors' continued performance of the Consent Order obligations is, itself, in the best interests of the estates.  Such

performance is generally *authorized* by the GA Servicing Order (an order resulting from one of the first day motions filed in this case), but not *required* if turns out not to be in the best interest of the estates.

5.      Based on the information provided thus far, it appears to be irrational to pay PwC $250 million (or more) to conduct a historical review of foreclosure proceedings expected to uncover only $35 to 60 million in remediation liabilities.  The expected fees also dwarf any potential penalties that may be assessed against the Debtors if PwC's services were terminated.  Incurring such huge costs for such scant benefit begs the question of what party actually *would* stand to benefit from the continued use of PwC's services.  The Motions give no indication whether the Debtors even considered any potential alternative for providing borrower protection at a lower cost to the estates – and given the dismal cost/benefit analysis, it is puzzling why federal regulators are not also open to other approaches.  Accordingly, the Motions provide no real basis for the Court to conclude that the retention of PwC to continue this review process is in the best interest of the estates.

6.      However, even if the Court were to conclude that the Debtors must continue to perform all Consent Order obligations in this manner, there is no reason for the Debtors to pay hundreds of millions of dollars to PwC when AFI, a solvent non-debtor, is also liable for these expenses.  As with the disputed indemnification obligations contained in the Ally Subservicing Agreement, the Debtors should have declined to continue performing the contract postpetition and AFI should have been required to honor its contractual obligation to pay these expenses and then assert a claim for contribution or indemnification against the Debtors to be adjudicated as part of an overall plan process in which the interests of *all* unsecured creditors – not just insiders – can be addressed fairly and evenhandedly.

7.        The Debtors' agreement to flip this natural presumption and advance the full amount of these expenses themselves, while merely preserving a contribution claim against their solvent parent, appears to be further evidence of the domination and overreaching by AFI that courses through these cases.    While the Debtors argue that the then-understood costs of Consent Order compliance were disclosed and blessed in connection with the GA Servicing Motion and Order, the Debtors' first day submissions were noticeably silent about the fact that the engagement letters negotiated among GMAC Mortgage, AFI, and the engaged professionals provide for shared liability between GMAC Mortgage and AFI.    The determination that the Debtors would nevertheless bear the sole responsibility for making payments to PwC and the Law Firms clearly benefits AFI.    The entire course of dealing is rife with interested party transactions that must be subject to heightened scrutiny.    As was the case with the indemnification obligations implicated by the Subservicing Motion, the instant Motions do not establish that any of these decisions were made by disinterested officers and directors motivated solely to protect the best interest of the estates.    And this is hardly surprising, since no unconflicted debtor (or insolvent party on the brink of bankruptcy) would ever agree to pay massive expenses for which a solvent third party was independently liable.    This arrangement is so clearly unfair to the estates that it could not be approved even under the lower scrutiny of the business judgment rule.    Under any standard, it would be inappropriate to authorize the Debtors to use estate assets to make any payments to PwC or the Law Firms.

8.        Finally, the suggestion that the GA Servicing Order independently authorizes – or even compels – the Debtors to make these massive payments to PwC ignores the Debtors' fundamental and ongoing obligation to protect the interests of their estates' creditors and avoid squandering estate assets on unreasonable expenditures that do not yield an

appropriate countervailing benefit. The Debtors' own recognition that a separate motion and order are necessary to warrant extraordinary expenditures of this magnitude in the presence of a joint obligation by their parent company confirms that first day motion relief in these cases should not suffice as justification for the relief now being sought.

9.    As explained more fully below, the Committee submits that the Motions should be denied in all respects. Additionally, pending a determination on the issues presented by the Motions after an evidentiary hearing, the Court should direct PwC and the Law Firms to put the FRB Foreclosure Review on hold to avoid incurring any additional fees that may prove to be inappropriate.

## BACKGROUND

### A.    The Consent Order and the Debtors' Prepetition Engagement of PwC

10.    The FRB, FDIC, Office of the Comptroller of the Currency, and Office of Thrift Supervision investigated the Debtors and their affiliates as part of a larger inquiry into alleged abuse of foreclosure processes by mortgage servicing companies.  On April 13, 2011, AFI, Ally Bank, ResCap, and GMAC Mortgage entered into a consent order with the FRB and FDIC, whereby AFI, certain of the Debtors, and Ally Bank agreed to undertake an independent review of certain of the Debtors' residential mortgage loan foreclosure litigation and foreclosure sales.  The Debtors have provided no background information relating to negotiations over the formulation and implementation of the Consent Order or the specific obligations it imposed.

11.    Pursuant to the Consent Order, GMAC Mortgage was required, within 45 days of entry of the order, to "retain one or more independent consultant(s) acceptable to the Reserve Bank to conduct an independent review of certain residential mortgage foreclosure actions (including judicial and non-judicial foreclosures and related bankruptcy proceedings, and

other related litigation) regarding individual borrowers with respect to the Servicing Portfolio." Consent Order ¶ 3. Fifteen days following the engagement of the independent consultant, but prior to commencing the FRB Foreclosure Review, GMAC Mortgage was also required to "submit to the Reserve Bank for approval an engagement letter" setting forth certain enumerated factors regarding the timing, scope, and methodology for the review. Consent Order ¶ 4.

12.    In May 2011, PwC began providing consulting services to the Debtors, and an engagement letter was executed in February 2012 (the "<u>FRB Engagement Letter</u>"). PwC Motion ¶ 14. The Debtors do not provide any additional information regarding the selection of PwC as independent consultant, nor do they explain the significant time lapse between commencing and formalizing the engagement.[2]

13.    The February 1, 2012 FRB Engagement Letter was executed by Barbara Yastine, Chief Administrative Officer of AFI (and CEO of Ally Bank), and by Stephen M. Abreu, President of GMAC Mortgage. Most significantly, the second paragraph of the FRB Engagement Letter provides that: "Both of Ally and [GMAC Mortgage] shall be jointly and severally liable for the fulfillment of any and all obligations, responsibilities, and liabilities of the Company under this Agreement." FRB Engagement Letter at 1. "Company" is defined as both AFI and GMAC Mortgage. *Id.* The FRB Engagement Letter also provides that GMAC Mortgage and AFI "shall indemnify PwC and the Beneficiaries . . . against any and all third party claims (including, without limitation, claims by the Company's external legal counsel and all other parties that may have access to the Foreclosure Report) and damages arising from or relating to the Services or the Deliverables, except to the extent finally determined to have

---

[2]  The PwC Motion does not state whether GMAC Mortgage submitted an engagement letter to the FRB for its review within 15 days of being informally engaged and prior to commencing the FRB Foreclosure Review, suggesting that GMAC Mortgage may already have violated the Consent Order requirements relating to the engagement of PwC.

resulted from PwC's gross negligence or intentional misconduct relating to such Services and/or the Deliverable." *Id.* at 21.

14.     Since its initial engagement in May 2011, the Debtors have paid approximately $51.6 million to PwC for its services in connection with the FRB Foreclosure Review, approximately $38.4 million of which was paid by the Debtors in the 90 days prepetition.  PwC Motion ¶ 25; English Aff. ¶ 25.  AFI has made no payments to PwC under the FRB Engagement Letter.

**B.    The GA Servicing Motion and the Committee's Discovery Request**

15.     On the Petition Date, the Debtors represented in the Whitlinger Affidavit that the expected cost of compliance with the Consent Order was approximately $180 million. The Whitlinger Affidavit does not disclose any obligation for such payments by AFI.

16.     On the Petition Date, the Debtors also filed the GA Servicing Motion, which described the general terms of the Consent Order and the Debtors' requirements for compliance.  The GA Servicing Motion likewise provided an estimated cost of compliance with the Consent Order of $180 million and, again, did not mention any liability for such payments by AFI.

17.     On May 30, 2012, the Debtors engaged Pepper Hamilton LLP and Hudson Cook, LLP (together, the "Law Firms") as outside counsel "for the purpose of representing Ally Financial Inc. and its subsidiary GMAC Mortgage, LLC" in connection with the foreclosure review pursuant to the Consent Order.  The Pepper Hamilton and Hudson Cook engagement letters are signed by Tammy Hamzehpour, General Counsel for GMAC Mortgage, and William B. Solomon, Group Vice President and General Counsel for AFI.  The Hudson Cook and Pepper Hamilton engagement letters provide that invoices will be submitted to GMAC Mortgage, in the

first instance, but in the event that GMAC Mortgage does not pay such invoices, AFI will be liable for any required payments.

18.    The Court entered the GA Servicing Order on June 15, 2012.  Among other things, the GA Servicing Order provides that "[t]he Debtors are authorized to honor their obligations under the Consent Order . . . and to use estate assets and take such actions as, *in their reasonable business judgment*, are necessary to comply with and adhere to the terms of the Consent Order."  GA Servicing Order ¶ 3 (emphasis added).  The GA Servicing Order did not specifically authorize the retention of PwC or continued performance under the FRB Engagement Letter.

19.    More than three months later, and almost four months postpetition, the Debtors filed the PwC Motion on September 5, 2012, seeking authority to make the payments to PwC identified in the Whitlinger Affidavit filed on the Petition Date.  In the PwC Motion, however, the Debtors revised their estimated cost for completing the FRB Foreclosure Review, now projecting upwards of $250 million in required payments.  Pursuant to the PwC Motion, the Debtors sought authority to make those payments themselves.  Significantly, the PwC Motion disclosed, for the first time, that AFI is jointly and severally liable for all $250 million expected to be paid to PwC to comply with the Consent Order.

20.    In addition, the Debtors subsequently filed the Law Firms' Retention Applications on September 12, 2012, which also revealed that AFI shared liability for any unpaid invoices assessed against GMAC Mortgage.

21.    On September 14, 2012, the Committee served the Debtors, AFI, and Ally Bank with discovery requests in connection with the Motions.  The Committee has requested information and documents in connection with the Consent Order, the negotiation and execution

of the FRB Engagement Letter, and the negotiation and execution of the engagement letters for

Pepper Hamilton and Hudson Cook.   The Committee's discovery request also sought any

information or documents in connection with the Debtors' determination to assume the

obligation to use estate assets to pay PwC and the Law Firms.  To date, the Committee has met

and conferred with the Debtors, AFI, and Ally Bank, but has not received any document

productions specifically in response to its requests.

## OBJECTION

### A.    Continued Compliance with the Consent Order
Does Not Appear to Be in the Best Interest of the Estates

22.    Significant investigation and consideration of the facts is required before

the Court could conclude that making the vast expenditures proposed by the Motions would be in

the best interest of the estates.   The Debtors seek authority to make payments in excess of a

*quarter of a billion dollars* on account of mortgage loan foreclosure review services required

under the prepetition Consent Order.   To perform these services, the Debtors and AFI have

engaged not only PwC, but also two additional law firms – Pepper Hamilton and Hudson Cook –

to advise the Debtors on issues pertaining to PwC's services.[3]  In light of the amount of the relief

requested, the involvement of AFI in prepetition negotiation of the Consent Order and retentions,

and AFI's joint obligation to pay for such costs, the Committee has numerous questions and

serious concerns about the manner in which the Consent Order was negotiated and exactly who

benefits from the Debtors' continued performance under it.   These issues warrant careful scrutiny

before granting the Debtors authorization to make any payments to PwC or any other

professional in furtherance of the Consent Order.

---

[3]  While the Debtors do not project the estimated amounts to be incurred by the Law Firms, Hudson Cook received $1,338,882.65 in the one year prior to the Petition Date. Hudson Cook Retention Application at 8. Pepper Hamilton received no payments or retainer prior to the Petition Date. Pepper Hamilton Retention Application at 8-9.

23.     Specifically, the Debtors fail to provide any background as to the negotiations behind the Consent Order and the formulation of the risk management and corporate governance procedures sought to be implemented, including the imposition of the obligation on GMAC Mortgage to engage an independent consultant to conduct a review regarding certain residential foreclosure actions and foreclosure sales prosecuted by the Debtors. As evidenced by the projected costs for the FRB Foreclosure Review, the obligations imposed by the Consent Order are significant and could continue to grow with any additional delays or the involvement of additional professionals that the Debtors seek to retain in conjunction with the project. In this regard, but for AFI's ownership interest in the Debtors, the FRB, as a regulator of bank holding companies, could not impose any obligations on or exercise postpetition jurisdiction over GMAC Mortgage, an operating company, both in terms of directing performance of the Consent Order obligations and even in insisting that the Motions be heard immediately with no adjournment for adequate investigation of the facts. Regardless, these issues should be developed more fully through discovery and set down for an evidentiary hearing. The Committee sets forth herein the basis for its preliminary conclusion that these expenditures are not in the best interest of the estates.

24.     Comparison of the projected cost of the FRB Foreclosure Review to the expected result of such review reveals serious issues not addressed by the Debtors in the PwC Motion. The Debtors previously estimated that the foreclosure review would cost approximately $180 million, but are now projecting costs in of approximately $250 million. The Debtors provide little explanation for such a large increase in projections and no breakdown or allocation among workstreams for postpetition amounts incurred or the approximately $7 million they

estimate will be assessed monthly by PwC going forward.  The most obvious question presented

is what the estates will get in return for these huge payments.

25.    The Debtors suggest that the question is beside the point because the GA

Servicing Order requires them to continue performance of these obligations.  However, that

order merely *authorizes* (but does not require) the Debtors to comply with the Consent Order and

to use estate property for that purpose, subject to showing that the payments or actions are made

with reasonable business judgment, which necessarily implies a determination that the payments

create comparably significant benefits for the estates. *See Official Comm. of Subordinated*

*Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y.

1992) ("The business judgment rule 'is a presumption that in making a business decision the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)).

26.    The current record does not support such a conclusion.  After spending in

excess of $250 million (nearly $15,000 to review each of approximately 17,000 files), "the

Debtors estimate that the remediation payments to affected borrowers required after the FRB

Foreclosure Review has been completed will be between *thirty-five and sixty million dollars*."

Pensabene Decl. ¶ 9 (emphasis added).  Absent further information, the conclusion seems

inescapable that this trade-off is simply irrational – it provides no net benefit to the estates and

drains crucial funds that presumptively could be better used to pay borrowers (following a more

streamlined and efficient review) or other creditors.

27.    It may in fact be in the best interest of the estates to cease performance of

the FRB Foreclosure Review.  The Debtors allege that failure to comply with the Consent Order

could result in delays in foreclosures and monetary penalties (PwC Motion ¶ 38), but they do not provide the magnitude of such delays and penalties and the potential cost to the estates. The Committee understands, however, that any penalties that may be assessed against the Debtors or AFI as a result of noncompliance would be small in comparison to the projected cost of compliance.[4] If that is the case, it may be in the best interests of the estates to incur such penalties and devote the balance of the funds saved to pay creditors. In addition, while the goal of maintaining good relations with government regulators is laudable, it is not clear why, as a matter of public policy, the relevant government entities are insisting on performance of the Consent Order obligations in such an inefficient and seemingly counterproductive manner and would not be open to exploring more rational and cost-effective approaches that could direct a greater proportion of the funds to actual borrower relief. Indeed, the current record does not suggest that even the Debtors themselves gave any consideration to such alternatives.

28.    The Debtors also assert that failure to comply with the Consent Obligations would violate the debtor-in-possession financing facility ("DIP") with AFI (PwC Motion ¶ 18), but given AFI's larger goal in these Chapter 11 Cases, the Committee believes AFI may be unlikely to call such an event of default – and, in any event, the Committee believes it would be inappropriate for AFI to hold its DIP financing hostage in order to leverage special benefits against the estates in other contexts. Finally, the Debtors allege more generally that "compliance with the FRB Consent Order is important to ensure smooth operation of the Debtors' businesses pending a sale in these Chapter 11 cases." PwC Motion ¶ 38. But they do not identify any specific ramifications to the sale process in the event of noncompliance.

---

[4]   To date, the Debtors have not yet responded to discovery requests seeking quantification of these penalties.

29.     The interests of fairness and the proper administration of justice in these Chapter 11 Cases require that the Committee be given a sufficient opportunity to complete discovery on each of the issues described above and that these matters be addressed at an evidentiary hearing.  To justify the relief sought, the Debtors should be required to prove, at minimum, that, after an evaluation of the alternatives, they reasonably and with due care concluded that compliance with the Consent Order and the engagement of PwC was the best option and provided sufficient tangible benefits for the estates to justify the significant cash expenditures.  As demonstrated below, the further decision to have the *Debtors*, rather than AFI, advance the funds for such services must satisfy the heightened scrutiny of the entire fairness doctrine.  Absent such showings, the Court should not authorize the payment of any estate dollars for further performance of the FRB Foreclosure Review, and the Motions should be denied.

**B.     To the Extent That the Debtors Must Comply with the
Consent Order, Any Payments to PwC Should Be Borne
by AFI as They Are Not Authorized Under Section 363(b)**

30.     Even if the Court concludes that full continued performance of the Consent Order obligations and retention and payment of more than $250 million in fees to PwC and the two Law Firms is necessary and appropriate, the Motions should still be denied unless AFI agrees to perform its contractual obligation to make these expenditures – rather than foisting them upon its insolvent subsidiaries – and to stand in line with other creditors to assert its contribution claims in the ordinary course.

31.     While the Debtors assert that their agreement to make these expenditures postpetition, rather than insisting that their solvent parent step in as contractually obligated, should be evaluated under ordinary business judgment standards, the transaction obviously involves interested insider parties and thus should be subject to heightened scrutiny to ensure that

AFI, as a controlling insider, is not taking unfair advantage of the Debtors to the detriment of the estates. *See, e.g., Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 27-29 (S.D.N.Y. 2005) ("[T]ransactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b)."); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (stating that transactions with insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse"); *In re Wingspread Corp.*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (same). If a transaction benefitting an insider is not reviewed by an independent board or special committee, it must be justified by the "entire fairness" standard, which requires a showing of the "utmost good faith and the most scrupulous inherent fairness of the bargain." *See Pereira v. Cogan*, 267 B.R. 500, 508-09 (S.D.N.Y. 2001) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)). This doctrine involves "a two-pronged inquiry into the fair process and fair price of the transaction." *Solomon v. Armstrong*, 747 A.2d 1098, 1112 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000).

32.     It is unclear from the Motions whether the Independent Consent Order Compliance Committee members who signed the FRB Engagement Letter are independent and unconflicted directors. Nor do the Motions reflect whether the Debtors employed any safeguards – such as establishment of a special committee of independent and unconflicted fiduciaries – to ensure that the decision to continue to bear the entire obligation under the FRB Engagement Letter was truly in the best interest of the estates.

33.     Yet, even if a special committee had been employed here, the Debtors would still have to satisfy the "entire fairness" standard because the transaction involves a controlling shareholder and thus requires "careful judicial scrutiny." *Kahn v. Tremont Corp.*,

694 A.2d 422, 428 (Del. 1997). Given that the determination to impose all obligations under the

PwC engagement on the Debtors ultimately benefits the solvent parent AFI by relieving it from

the obligation to pay these fees, the Debtors face a "daunting task" in proving the good faith and

fairness of their conduct and decision-making under the entire fairness standard. *Periera*, 267

B.R. at 508 (internal quotation marks omitted).

34.    Subject to further development of the facts in discovery, it certainly

appears that imposition of these huge obligations on the Debtors is inherently unfair and should

be rejected. *See U.S. Bank, Nat'l Ass'n v. Perlmutter (In re South Side House, LLC)*, 470 B.R.

659, 673 (Bankr. E.D.N.Y. 2012) ("[A] bankruptcy proceeding is meant to protect the debtor, not

third-party guarantors."). Any continued payments on account of this engagement are

unreasonable, unwarranted, and could cause significant harm to the Debtors' estates. The sole

purpose of the relief sought by the Motions is to shift the joint engagement letter obligations to

the estates, forcing the Debtors to come after AFI for contribution instead of treating AFI on the

same footing as any other third-party co-obligor by requiring it to perform its obligations and

seek to determine the Debtors' fair share through an evenhanded plan process. That is the

ordinary way that joint obligations are treated in bankruptcy. *See In re Pacor, Inc.*, 110 B.R.

686, 691 (E.D. Pa. 1990) (noting that "[a] joint tortfeasor must bear the burden of the entire debt

if an injured party cannot recover from the other joint tortfeasor," and, with respect to the ability

to seek contribution in bankruptcy, "[c]lassification of a liability as pre-petition or post-petition

does not alter the requirement that the liability be paid by the secondary debtor or co-debtor

before payment may be sought from the debtor in bankruptcy").[5] An unconflicted debtor would

---

[5]  Indeed, this concept is contemplated by Section 502(e) of the Bankruptcy Code, which allows for a co-debtor,
surety, or guarantor of an obligation of a debtor to assert a claim for contribution or indemnification once the joint
obligation is paid in full. 124 Cong. Rec. 11,094 (Sept. 28, 1978) ("The combined effect of sections 502(e)(1)(B)
and 502(e)(2) is that a surety or co-debtor is generally permitted a claim for reimbursement or contribution to the

insist on similar treatment for the type of prepetition contractual obligations involved in these cases, and the Debtors here fail to establish *any* reasonable justification for shifting all responsibility for making these very substantial payments *away* from the solvent co-obligor parent *to* the insolvent subsidiaries in bankruptcy.

35.     Certainly, on this record, the Debtors have not established the entire fairness of assuming the entire $250 million burden, while its solvent parent and co-obligor pays nothing.  But even under the less stringent business judgment standard, the Motions should be denied, because the Debtors cannot demonstrate that they "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company." *In re Integrated Resources, Inc.*, 147 B.R. at 656.  Use of estate property out of the ordinary course should be denied when the debtor's request is "so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *See In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Del. 2001).

36.     Based on the current record, the Debtors fail even this less stringent test. As noted, a debtor acting free of the domination of its parent would insist on allowing joint obligations to be satisfied by solvent non-debtor co-obligors.  The Debtors have simply failed to establish *any* valid business justification for bearing the burden of over $250 million in payments, other than to relieve AFI of such obligations to the detriment of the Debtors' other creditors.  And, in an unfortunate parallel to the facts surrounding the Subservicing Motion, the Debtors' good faith is further undercut by their earlier lack of candor regarding AFI's shared responsibility for the professional fees being incurred in connection with performing the Consent Order obligations. While the basic scope of the then-understood costs of the FRB Foreclosure

extent the surety or co-debtor has paid the assured party at the time of allowance.").  Prior to payment in full of such obligation, Section 502(e) requires that any claim for contribution or indemnification asserted by a co-obligor be disallowed. 11 U.S.C. § 502(e).

Review was disclosed in the Whitlinger Affidavit and the GA Servicing Motion, the Debtors failed to disclose – even during significant and prolonged diligence and negotiations with the Committee concerning the relief contained in the GA Servicing Order – that the obligation to pay PwC was shared jointly and severally among AFI and the Debtors.

37.     Finally, the Debtors maintain that the GA Servicing Order already authorizes them to make the payments to PwC and that they brought the Motions only out of an abundance of caution.  PwC Motion ¶ 13.  But the GA Servicing Order does *not* automatically authorize the Debtors to use estate dollars to satisfy obligations shared with AFI.  Paragraph 3 of the GA Servicing Order does no more than authorize – but not direct – the Debtors to continue to comply with their obligations under the Consent Order, subject to their ongoing and paramount obligation to exercise sound business judgment on behalf of the estates.  Nowhere does the GA Servicing Order (or the Consent Order) mandate that the Debtors must pay the fees of PwC or the Law Firms – nor do any of the relevant engagement letters mandate that GMAC Mortgage assume all responsibility, to the exclusion of AFI, for the resulting professional fees.  Even assuming that the GA Servicing Order were to be read as requiring the Debtors to continue performing their Consent Order obligations, that may be done without the Debtors themselves bearing the significant expense of paying for PwC's services, as AFI is jointly and severally liable for such fees under the engagement letter and can be required to cover all payments necessary to ensure compliance with the Consent Order.

38.     In short, regardless of the applicable standard for approval under Section 363(b) of the Bankruptcy Code, the Debtors have failed to establish good faith, entire fairness, or

even a valid business justification for the use of estate assets.[6]  It would be inappropriate for the

Debtors to continue making these payments during the pendency of these Chapter 11 Cases.

### RESERVATION OF RIGHTS

      39.    The Committee expressly reserves its rights to supplement and amend this

Objection, seek discovery with respect to same, and introduce evidence at any hearing relating to

the Motions.

### CONCLUSION

      40.    The Debtors have failed to articulate any valid business justification for

the Debtors to continue paying PwC and the Law Firms for services rendered on account of the

FRB Foreclosure Review performed in accordance with the Consent Order.  To the extent the

Court requires the Debtors to continue complying with the terms of the Consent Order, the cost

of such services must be borne by the Debtors' solvent parent, AFI, as joint obligor.

Dated: New York, New York
      September 19, 2012

                          KRAMER LEVIN NAFTALIS & FRANKEL LLP

                          /s/  Kenneth H. Eckstein
                          Kenneth H. Eckstein
                          Douglas H. Mannal
                          Jeffrey S. Trachtman
                          1177 Avenue of the Americas
                          New York, New York 10036
                          Telephone: (212) 715-9100
                          Facsimile: (212) 715-8000

                          *Counsel for the Official*
                          *Committee of Unsecured Creditors*

---

[6]   The PwC Motion indicates that the Debtors also intend to use estate assets to make payments to PwC in connection with the DOJ/AG File Review pursuant to the DOJ/AG Settlement. The Committee has not seen a work plan relating to the DOJ/AG File Review and would oppose using estate dollars to make any payments to PwC relating to such file review for which AFI is jointly liable.