Hearing Date and Time: September 27, 2010 at 10 a.m. (ET)
Objection Deadline: September 14, 2010 at 4 p.m. (ET)

**ROBERT E. BROWN, P.C.**
*Attorneys for Homeowner Claimants*
44 Wall Street, 12th Floor
New York, N.Y. 10005
Telephone: (212) 766-9779
Facsimile: (718) 979-9784

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | Case No. : 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | Jointly Administered |
| ) | |
| Debtors. ) | |
| ) | |

# OMNIBUS REPLY IN SUPPORT OF MOTION FOR AN ORDER APPOINTING AN OFFICIAL COMMITTEE OF BORROWERS PURSUANT TO SECTION 1102(a)(2) OF THE BANKRUPTCY CODE

# TABLE OF CONTENTS

I.   INTRODUCTION................................................................................................................. 1

II.  ARGUMENT....................................................................................................................... 1

II.  CONCLUSION.....................................................................................................10

# TABLE OF AUTHORITIES

**CASE**                                                                                                               **PAGE**

*In re: American Home Mortgage Holdings, Inc.*
    Case No. 07-11047 (CSS) (Bankr. D. Del. 2007)………………………    4, 5

*In re: Beker Indus. Corp.,*
    55 B.R. 945 (Bankr. S.D.N.Y 1985)………………………...……    8

*In re: Dow Corning Corp.,*
    194 B.R. 121 (Bankr. E.D. Mich. 1996),
    *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997)……………    2,3


**STATUTES**

11 U.S.C. § 503(b)……………………………………………………………    10

11 U.S.C. § 1102(a)(2) …………………………………………………….    2

**EXHIBITS**

Exhibit A –    Letter to Homeowner dated May 14, 2012

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Certain homeowners (the "Movants")[1] respectfully reply in support of their motion for the appointment of a Borrowers Committee (the "Motion") and respond to the objections filed by the Debtors and the Creditors Committee (collectively, the "Objections") and the limited objection filed by Citibank, N.A. as follows:

## I. INTRODUCTION

The Debtors raise five arguments in the Objection, which are echoed by the Committee: (a) the Motion did not allege an impairment of the Creditors Committee's ability to function; (b) the nature of the cases weigh against appointing a Borrowers Committee; (c) Borrowers can be heard without an official committee; (d) the appointment of a Borrowers Committee would lead to additional costs; and (e) an official committee to advance individual borrower's claims would be improper. Very similar arguments were raised while unsuccessfully opposing the appointment of the Examiner.[2] None of these arguments are availing.

## II. ARGUMENT

The fundamental flaw in the Objections is that they treat the borrowers as if they were sophisticated creditors with familiarity with the chapter 11 process and the resources to participate in it effectively. In fact, the borrowers are unsophisticated individuals who cannot afford to pay their mortgages, let alone retain experienced chapter 11 counsel, and although many borrowers have important monetary and non-monetary interests in the outcome of these cases, they are not capable of arguing or negotiating effectively on their own behalf. Neither Objection refutes the crucial fact that borrowers have claims, rights, and interests that differ from

---

[1] Capitalized terms that are not defined herein shall have the meanings given to such terms in the Motion.
[2] *See* Response of the Official Committee of Unsecured Creditors to the Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) Docket No. 297 (June 11, 2012) ("unnecessary expense, delay, confusion, and duplication," and unsubstantiated "potential conflict.").

1

those of other unsecured creditors. Moreover, not one case cited in either Objection specifically applies to the denial of a motion for a borrowers committee.

The Bankruptcy Code specifically authorizes the appointment of an additional committee of creditors "if necessary to assure adequate representation of creditors." *See* 11 U.S.C. § 1102(a)(2). The determination as to whether the Movants have "adequate representation" is case-specific and addresses whether the interests of the creditor constituency have a meaningful voice on the creditors' committee. *See In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997). The Court must consider all relevant factors, including (1) whether the case is large and complex, (2) how the interests of the creditor constituency balance against the interests of other groups on the committee and (3) whether the composition of the creditors' committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-making process. *See id.* at 141-42. Here, as described in detail in the Motion each of these factors favors the appointment of a Borrowers Committee.

The size of the Debtors in this case and its numerous subsidiaries who engaged in mortgage lending, servicing, and securitization is immense. The borrowers have fundamentally different interests from the other creditors. Borrowers' interests undoubtedly diverge from those of other creditors. As a result, other creditors and especially creditors with direct adverse interest cannot adequately represent the interests of borrowers. This clearly makes the borrowers' claims unique in nature and they deserve special treatment. The large financial institutions and insurers dominate the Committee and prevent borrowers from having any say in the decision making process. *See Dow Corning*, 194 B.R. at 142.

When determining whether to exercise its discretion to appoint a Borrowers Committee, The Court should consider the following discretionary factors: (1) the cost associated with the appointment, (2) the time of the application, (3) the potential for added complexity, and (4) the presence of other avenues for creditor participation. *Dow Corning*, 194 B.R. at 143. Any extra cost associated with a Borrowers Committee would be relatively small compared to the size of the Debtors' estates. Few, if any, borrowers have the financial ability to appear individually in this Court. Nor, do they have the financial wherewithal to finance an ad hoc borrowers committee. The appointment of a Borrowers Committee will not add complexity to these cases that is not already present. Instead, a Borrowers Committee will simplify matters for the Court and the United States Trustee.

The Movants have established that the Creditors' Committee is dominated by the Trustee Members and the Insurer Members. However, the Movants are not privy to the inner workings of the Committee. What is obvious, is one Committee member -- Rowena L. Drennan -- a borrower claimant attorney is clearly outnumbered by the other adverse Committee members.

Neither Objection contests the fact that borrowers' interests often diverge from those of financial-institution creditors. In some instances, a borrower's successful prosecution of a mortgage-related claim under state or federal consumer protection laws may warrant the denial of a corresponding claim by a financial institution relating to the same mortgage.

In *In re Dow Corning Corp.* 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (ED. Mich. 1997), Aside from the creditors committee, a tort claimants committee was established. *See id.* at 145. The Court appointed a separate physicians committee because the physicians were adverse to the tort claimants as well as the creditors committee. As the court explained, because "the posture of the physicians is so different

3

from the other non-tort creditors, it is likely that any plan will treat the [physician] claims differently," and the creditors committee "is in no position to negotiate for the physicians' special treatment." *Id.* at 145-146. The court noted that the creditors committee was "not at all well situated to defend [physician's] interests." *Id.* at 146.

**The Creditors Committee in this sort of case cannot possibly attempt to take up a position to represent homeowners in this venue and foreclose on them in other venues.** The Trustee Members are not fit to represent the homeowners as an adverse group. Insurer Members are also adverse to certain homeowners. Insurer Members issued mortgage insurance policies and have paid out many claims. After a claim is paid the right to collect the deficiency is assigned to one of the Insurer Members. If the insurance was not disclosed to the homeowner at closing and the Insurer Member sits on the Committee, it clearly has an interest adverse to borrower claimants.

Both Objections compare Debtors' scenario here to American Home and reach the conclusion that the *American Home Mortgage,* No. 07-11047 (Bankr. D. Del. 2007) case actually supports their position that the Borrowers Committee is unnecessary. Debtors Obj. at 18. Committee Obj. at 9. However, a true comparison reveals that the Borrowers Committee is even more necessary here.

First, *American Home Mortgage* ("AHM") filed for Bankruptcy in 2007 – before the market crashed and before the full extent of the industry practices were known. Second, the parent of AHM did not receive a bailout of $17.2 billion in loans from the Federal Government. Third, AHM did not enter into a Multi-State Settlement. Fourth, the extent of AHM's robosigning practices is unknown. Clearly, the GMAC foreclosure department was the epicenter of the

4

robosigning scandal.[3]   Fifth, here, many pooled toxic mortgages are being foreclosed upon by members of the Creditors Committee. Sixth, Debtors signed an FDIC Consent Decree regarding their practices. AHM did not. Seventh, in AHM, the borrowers committee motion was filed after 13 months. Here, the motion was filed after only a few months.

Debtors note that they posted information about this bankruptcy case on the website of Kurtzman Carson Consultants LLC ("KCC"). Debtors Obj. at 3. The website includes a letter to homeowner dated May 14, 2012. Because the Debtors did not attach the letter to their Objection, we attach it as <u>Exhibit A</u> hereto. The letter does not mention claims asserted by borrowers, nor did it mention any bar dates or even the potential for bar dates. Most tellingly, the letter stated that, "No action is required on your part, related to this restructuring." The letter was not actually mailed to customers, so it is not clear how many actually read it, but by announcing to borrowers that "[n]o action is required", the letter may have actually discouraged borrowers from monitoring these cases. This misleading letter can still be found on the KCC website.

Both Objections put great stock in the so-called hotline, purportedly set up to help borrowers. On paper, it sounds terrific, but in reality it is virtually worthless. The hotline proves precisely why a Borrowers Committee is necessary. Several calls were placed to the hotline by and/or on behalf of Movants, who encountered a pre-recorded message that said GMAC can not provide financial or legal advice. Even though at least fifteen calls were made during normal business hours, no one was available to assist the callers, and the hotline does not allow the caller to wait for an available operator. The only option was to leave a message. Messages were left, but no calls have been returned. Eventually, a live operator was contacted. The Operator

---

[3] See http://www.scribd.com/doc/28762965/Full-Deposition-of-Jeffrey-Stephan-GMAC-s-Assignment-Affidavit-Slave-10-000-Documents-a-Month

informed the caller: (a) GMAC can not provide assistance filing out the proof of claim form, (b) the only people that have to fill out the form are those who claim GMAC owes them money, (c) the hotline can not provide the identity of the entity that owns a particular note and the mortgage, (d) the hotline cannot provide any information about loan modifications and (e) the Bankruptcy Court was located in New Jersey. I intend to have testimony in an admissible form for the Court substantiating these experiences on the Hearing Date.

Debtors make the claim that it has "preserved the rights" of "borrowers to defend against foreclosure and eviction and to assert permitted claims and counterclaims against the Debtors through the Supplemental Servicing Order."[4] Debtors Obj. at 20. The Creditors Committee claims it "has been actively involved in borrower-specific issues" as some sort of champion of homeowners and offers as proof its involvement in the implementation of the Supplemental Servicing Order. Creditors Obj. at 7. This baseless claim is undermined by the Committee's own filing.[5] In fact, the Committee supported "granting the Debtors' relief from the automatic stay" to expedite foreclosures **NOT** relief for homeowners.

The Debtors' Objection describes in detail negotiations amongst several parties of the Supplemental Servicing Order. Debtors Obj. at 10. "The parties engaged in a collaborative process which resulted in ... the entry of the Supplemental Servicing Order with the consent of all of the participants. Debtors Obj. at 10. Debtors provide a perfect example of where the Borrowers Committee would fit in. None of the participants in the collaborative process had a duty of loyalty to the homeowners in general, especially those that were not in bankruptcy themselves. One glaring omission in the Supplemental Servicing Order is that it does not apply when a final judgment permitting the foreclosure or eviction has been awarded. *See*

---

[5] Omnibus Response and Reservation of Rights of the Official Committee of Unsecured Creditors to Certain of the Debtors' First Day Motions at 13 Docket No. 240 (June 6, 2012).

Supplemental Servicing Order at 7. Many times, a homeowner first becomes aware of a foreclosure action after a default judgment has been entered. In this situation, that homeowner would have to hire counsel and move to lift the stay.

The Supplemental Servicing Order, is trumpeted as "unprecedented relief" and "expansive ... relief from the automatic stay" for homeowners. Committee Obj. at 7; Debtors Obj. at 3. Tellingly, it requires the Debtors to pay the Securitization Trustee Fees and Expenses of the Trustee Members of the Committee including "costs and expenses of the Trustees in connection with reviewing and analyzing the ... any proposed Chapter 11 plan, the MBS Settlement Agreement or the Platform Sale." *See* Supplemental Servicing Order at 13-14. In reality, what the Creditors Committee characterized as "borrower-specific issues" was actually ensuring that the Trustee Members get paid out of the Debtors' estates.

Debtors' true position is made clear by the language contained in the Asset Purchase Agreement and related documents.[6] Debtors agree to "use their best efforts to ensure that any Affiliates shall not: (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Case; (2) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Case...." Obviously, Debtors intend to sell the assets stripped of all borrowers' claims and counterclaims.

Debtors claim "the interests of borrowers are protected" due "to the heightened servicing and foreclosure standards imposed by the Governmental Agreements." Debtors Obj. at 20. There is no need for "another watchdog" with respect to the protections for borrowers. Debtors

---

[6] *See, e.g.*, Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief at 61, Docket No. 61 (May 14, 2012).

Obj. at 6. However, an internal memorandum of the U.S. Department of Housing and Urban Development, Office of Inspector General, dated March 12, 2012 disturbingly notes: "Our review was significantly hindered by Ally's refusal to allow us to interview responsible personnel and its failure to provide the documentation we requested in a timely manner."[7]

Debtors boldly claim that it is a leading participant in the Home Affordable Modification Program. Debtors Obj. at 9. According to Mortgage Daily, GMAC was the fourth worst, denying 60 percent of the 267,818 requests it received.[8] Debtors also claim that "**Debtors** have provided loan modifications and other borrower relief pursuant to the DOJ/AG Settlement having a value in excess of $200 million." See Debtors Obj. at 6[9] (emphasis supplied). However, this declaration makes it clear that the many of the modifications were "to the Ally bank loan portfolio". See Declaration at 6. Based on the exhibit to the Declaration, the Debtors have only made $68.3 million in loan modifications.

Both the Debtors and the Committee suggest that no separate Borrowers Committee is needed unless the Movants establish that the Committee has breached its fiduciary duties toward borrowers. The question is not whether the Committee is performing its fiduciary duties, but whether the Committee adequately represents the interests of borrowers. Similarly, Movants need not prove that the Committee is hopelessly divided. If a major creditor constituency is effectively excluded from the Committee, as is the case here, then an additional committee maybe justified. See, e.g., In re Beker Indus. Corp., 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985).

Debtors admit there are tens of thousands of claimants in foreclosure and eviction proceedings and an additional tens of thousands more in bankruptcy. Debtors Obj. at 9.

---

[7] http://www.scribd.com/doc/85340875/2012-PH-1801ally
[8] http://www.appraisalinstitute.org/ano/newsletter/DisplayNwsLtrArticle.aspx?volume=13&numbr=15/16&id=18394
[9] Citing *Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LW, in Further Support of Debtors' Ally Servicing Motion*, July 16, 2012 [Docket No. 793].

Debtors make the exaggerated claim that "Borrowers have actively participated (both in person and telephonically) in these bankruptcy proceedings." Debtors Obj. at 21. Yet, only 18 of these tens of thousands have brought motions to lift stays. Debtors Obj. at 11. Accordingly, although both the Debtors and the Committee trumpet the aggressive role of "ample numbers of borrowers" in these cases, in reality, borrowers' participation has been extremely limited. Debtors Obj.. at 23.

The Debtors complain that the estates would incur substantial monetary costs from the appointment of a Borrowers Committee because its professionals would "expend significant costs in getting 'up to speed'". Debtors Obj. at 22. The Debtors' concern is overblown. This firm has been carefully following the docket and could quickly focus its attention on the important matters specifically affecting borrowers. The notion that the additional costs of a Borrowers Committee "cannot be justified" is laughable. Committee Obj. at 10. The costs associated with the Borrowers Committee would be a drop in the bucket compared to the costs of the Creditors Committee.

The Debtors and Creditors Committee make the same argument -- that borrowers' interests are purely "personal" interests. Debtors note that, "It would be inappropriate ... to form a Borrowers' Committee to advance individual borrowers' claims, because acting as de facto counsel for borrowers would be an impermissible role for an official committee." Debtors Obj. at 24. The Committee makes a similar argument, "the Movants seek the appointment of a borrowers' committee for an improper purpose—to advise individual borrowers holding unsecured claims as to their individual rights against the Debtors in foreclosure actions." Committee Obj. at 8. We agree. Without waiving privilege, the retainer agreement with Movants specifically notes that "this engagement does not encompass the pursuit of your claims ... against [Debtor]." If appointed, under no circumstances would this firm pursue any of the

9

individual claims of any of the Movants.

Remedies short of appointment of an official Borrowers Committee would not suffice. For instance, Debtors identify the potential to recover expenses pursuant to section 503(b) of the Bankruptcy Code as a factor that militates against the appointment of a Borrowers Committee. Debtors Obj. at 22. The notion that individual borrowers will hire contingency-fee counsel in the hope of receiving compensation at some point for making a substantial contribution is far fetched. Expecting individual homeowners to hire counsel is utterly unrealistic given the circumstances that face many borrowers.

## III. CONCLUSION

An official Borrowers Committee is necessary to provide homeowners with adequate representation and avoid inherent conflicts of interest of the seated Creditors Committee. Plainly, there will need to be important plan-related negotiations in the future. A sophisticated entity, such as a Borrowers Committee represented by experienced counsel, should be advocating for borrowers as a group with respect to these issues. Movants respectfully request that this Court appoint an official Borrowers Committee direct the United States Trustee to appoint its members.

Dated: September 21, 2012

/s/   Bennette D. Kramer

Bennette D. Kramer

**SCHLAM STONE & DOLAN LLP**
*Attorneys for Homeowner Claimants*
26 Broadway, 19th Floor
New York, New York 10004
(212) 344-5400
bdk@schlamstone.com

Respectfully Submitted,

/s/   Robert E. Brown

Robert E. Brown

**ROBERT E. BROWN, P.C.**
*Attorneys for Homeowner Claimants*
44 Wall Street, 12th Floor
New York, N.Y. 10005
(212) 766-9779
rbrown@robertbrownlaw.com