**Hearing Date and Time:  To Be Determined**
**Objection Deadline: To Be Determined**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------- x
In re:                                      :    Chapter 11
                                            :
Residential Capital, LLC, et al.,           :    Case No. 12-12020 (MG)
                                            :
Debtors.                                    :    Jointly Administered
                                            :
-------------------------------------------------------- x
```

### NOTICE OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING IT TO PROSECUTE AND SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On September 24, 2012 the Official Committee of Unsecured Creditors (the "**Committee**") of the above captioned debtors and debtors-in-possession filed the attached Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates (the "**Motion**").

2.      A hearing (the "**Hearing**") to consider the Motion shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 501 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004, on a date to be determined by the Court.

3.      A Copy of the Motion can be obtained or viewed for a fee via PACER at www.pacer.gov or (without charge) on the Debtors' restructuring website at www.kccllc.net/rescap.

Dated:   September 24, 2012
         New York, New York


/s/  Stephen D. Zide
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee
of Unsecured Creditors*

**Hearing Date and Time:  To Be Determined**
**Objection Deadline: To Be Determined**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, et al., | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

-------------------------------------------------------------- x

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING IT TO PROSECUTE AND SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION AND VENUE ................................................................................................. 6

BACKGROUND ...................................................................................................................... 6

    A.    General Background ..................................................................................... 6

    B.    The AFI Revolver, the AFI LOC, and the Junior Secured Notes ................................ 6

    C.    The Junior Secured Noteholders' Plan Support Agreement ........................................ 9

    D.    The AFI DIP Order ..................................................................................... 10

    E.    The Committee's Investigation ..................................................................... 11

STATUS OF THE COMMITTEE'S INVESTIGATION ........................................................... 14

    A.    Unencumbered Assets ................................................................................. 14

    B.    Unperfected Liens ...................................................................................... 21

    C.    Preference Claims ...................................................................................... 22

RELIEF REQUESTED ............................................................................................................ 24

BASIS FOR RELIEF REQUESTED ........................................................................................ 24

I.    The Committee Should Be Granted Standing to Pursue the Claims on Behalf of
the Estates ............................................................................................................. 24

    A.    The Debtors Are Unable to Bring the Claims, and Any Committee Demand to
Pursue Such Claims Would Be Futile ............................................................... 25

    B.    The Committee's Claims Are Colorable ........................................................... 26

    C.    The Committee's Pursuit of the Claims Will Benefit the Debtors' Estates ............... 27

II.    The Committee Should Be Granted Sole Authority to Settle the Claims. ....................... 29

III.    The Committee Should Be Granted 45 Days to File a Complaint. ................................ 29

NOTICE ................................................................................................................................ 30

CONCLUSION ...................................................................................................................... 30

## TABLE OF EXHIBITS

Exhibit A- Proposed Order

Exhibit B- Demand Letter

Exhibit C- Daniels Declaration

    Exhibit C-1- Junior Secured Notes Indenture

    Exhibit C-2 - Notes Security Agreement

    Exhibit C-3- Loan Agreement for the AFI Revolver

    Exhibit C-4- Revolver Security Agreement

    Exhibit C-5- Schedule of Bilateral Facilities

    Exhibit C-6- Master Repurchase Agreement for the BMMZ Facility

    Exhibit C-7- Quarterly Financial Statements for the Period Ended December 31, 2011

    Exhibit C-8- Quarterly Financial Statements for the Period Ended March 31, 2012

    Exhibit C-9- Schedule of Debtors' Deposit Accounts

    Exhibit C-10- Schedule of Excluded Real Property

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*,
    67 F.3d 1063 (2d Cir. 1995)......................................................................................18

*Gold Coast Leasing Co. v. California Carrots, Inc.*,
    93 Cal. App. 3d 274, 155 Cal. Rptr. 511 (Cal. Ct. App. 1979)...............................18

*In re Adelphia Commc'ns Corp.*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005).....................................................................26

*In re America's Hobby Ctr.*,
    223 B.R. 275 (Bankr. S.D.N.Y. 1998).................................................................26, 27

*In re Commodore Int'l Ltd.*,
    262 F.3d 96 (2d Cir. 2001)....................................................................................25, 28

*In re Evergreen Solar, Inc.*,
    Case No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) .............................................29, 30

*In re Evergreen Valley Resort*
    23 B.R. 659 (Bankr. D. Me. 1982).........................................................................................18

*In re First Capital Holdings Corp.*,
    146 B.R. 7 (Bankr. C.D. Cal. 1992).................................................................................25, 18

*In re KDI Holding*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999) (Gonzalez, J.)......................................................25, 26

*In re La. World Expo.*,
    832 F.2d 1391 (5th Cir. 1987) ...............................................................................................25

*In re Majestic Capital, LTD.*,
    Case No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011) ...............................................29

*In re Nat'l Forge Co.*,
    326 B.R. 532 (W.D. Pa. 2005) ...............................................................................................25

*In re Old CarCo LLC (f/k/a/ Chrysler LLC)*,
    Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009) .................................................29

*In re Open Range Commc'ns Inc.*,
    Case No. 11-13188 (KJC) (Bankr. D. Del. Jan. 13, 2012) .....................................................30

*In re Sackman Mortg. Corp.*,
    158 B.R. 926 (Bankr. S.D.N.Y. 1993).....................................................................................19

*In re STN Enters.*,
    779 F.2d 901 (2d Cir. 1985)........................................................................................... passim

*Liona Corp., Inc. v. PCH Associates*,
    949 F.2d 585 (2d Cir.1991).....................................................................................................19

*People v. The Serv. Inst., Inc.*,
    101 Misc. 2d 549, 421 N.Y.S.2d 325 (N.Y. Sup. Ct. 1979) ...................................................18

## STATUTES

11 U.S.C. § 101...................................................................................................................1

11 U.S.C. § 105...................................................................................................................2

11 U.S.C. § 105(a) ..............................................................................................................1

11 U.S.C. § 361...................................................................................................................2

11 U.S.C. § 362...................................................................................................................2

11 U.S.C. § 363 ................................................................................................................2

11 U.S.C. § 363 ................................................................................................................2

11 U.S.C. § 547(b) .............................................................................................23, 24, 27

11 U.S.C. § 547(c) ...........................................................................................................27

11 U.S.C. § 1103(c) ...........................................................................................................1

11 U.S.C. § 1109(b) .....................................................................................................1, 24

28 U.S.C. § 157 ............................................................................................................6, 1

28 U.S.C. § 157(b) .............................................................................................................1

28 U.S.C. § 157(b)(2) ........................................................................................................6

28 U.S.C. § 1334 ...........................................................................................................6, 1

28 U.S.C. § 1408 ...........................................................................................................6, 1

28 U.S.C. § 1409 ...........................................................................................................6, 1

U.C.C. § 9-104 ................................................................................................................22

U.C.C. § 9-104(a)(2) ......................................................................................................22

U.C.C. § 9-108 ................................................................................................................21

U.C.C. § 9-204 ................................................................................................................21

U.C.C. § 9-304 ................................................................................................................22

U.C.C. §  9-314 ...............................................................................................................22

## OTHER AUTHORITIES

Amended Standing Order of Reference M-431 ..................................................................1

Fed. R. Bankr. P. 9006(1) ...............................................................................................11

Fed. R. Bankr. P. 2002 ......................................................................................................2

Fed. R. Bankr. P. 4001 ......................................................................................................2

Fed. R. Bankr. P. 6004 ......................................................................................................2

Fed. R. Bankr. P. 9014 (I) .................................................................................................2

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

       The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "**Debtors**") hereby moves (the "**Motion**") for entry of an order, under sections 105(a), 1103(c), and 1109(b) of 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"), in substantially the form as annexed hereto as **Exhibit A** (the "**Proposed Order**"), authorizing the Committee to prosecute and settle certain claims on behalf of the Debtors' estates against U.S. Bank National Association, as the indenture trustee (the "**Indenture Trustee**") for the Junior Secured Noteholders (as defined below), and Wells Fargo Bank, N.A. (the "**Collateral Agent**"), as collateral agent for the Junior Secured Noteholders.  In support of the Motion, the Committee represents as follows:

## PRELIMINARY STATEMENT

       1.     The Committee brings this Motion for leave to prosecute claims of the estates against the Collateral Agent and the Indenture Trustee that the Debtors cannot assert and that may yield hundreds of millions of dollars for unsecured creditors.  The Debtors cannot pursue this litigation because, among other reasons, they already stipulated to an expansive definition of the collateral securing the Junior Secured Notes (defined below) and agreed to *waive* the claims at issue.  This is a classic situation in which a creditors' committee is the only independent fiduciary that can properly act for the estates and thus should be granted standing under *In re STN Enters.*, 779 F.2d 901 (2d Cir. 1985) – as the Debtors themselves recognized by notifying the Committee *today* that they consent to standing.

       2.     As part of the AFI DIP Order, the Debtors entered into numerous stipulations relating to the validity, enforceability, and perfection of the claims and liens of the Collateral Agent, the Indenture Trustee, and the Junior Secured Noteholders (collectively, the "**Junior**

**Secured Parties**"), and agreed to waive all claims against the Junior Secured Parties, including

avoidance actions.[1]  These stipulations and waivers become binding on all parties-in-interest,

including the Committee, unless objected to by September 24, 2012 (the "**Challenge**

**Deadline**").[2]

3.      In light of the Challenge Deadline, following the entry of the AFI DIP Order, the

Committee commenced an investigation of the claims and liens of the Junior Secured Parties,

including whether the Debtors waived any valid estate claims against the Junior Secured Parties.

Almost immediately, the Committee focused on a $1.1 billion discrepancy in the Debtors'

prepetition and postpetition disclosures concerning the collateral that secures the Junior Secured

Parties.  In the AFI DIP Order, the Debtors stipulated that the Junior Secured Notes were secured

by more than $2.4 billion in collateral, including $1.3 billion of assets identified on the Debtors'

2-29 Trial Balance Sheet (defined below) as "Ally Revolver" collateral and an additional $1.1

billion of assets identified as "Blanket" (the "**Blanket Lien Assets**").  *See* Exhibit A to the AFI

DIP Order.  In stark contrast, the Debtors' financial statements for the year ended December 31,

2011 and for the quarter ended March 31, 2012 (the most recent statements prior to the

bankruptcy filing), described the Junior Secured Notes as secured by the same collateral that

secured the AFI Revolver (defined below), which at both dates was only approximately $1.3

billion.[3]

4.      Through informal discovery from the Debtors, the Committee learned that until

---

[1] "**AFI DIP Order**" refers to the Court's Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties, dated June 25, 2012 [Docket No. 491].  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the AFI DIP Order.

[2] The Committee continues to investigate potential claims against the Junior Secured Parties.  In advance of the hearing on the Motion, the Committee will supplement the Motion with a draft complaint.

[3] The Debtors' financial statements for the quarters ended December 31, 2011 and March 31, 2012 are attached to the Declaration of Elan M. Daniels (the "**Daniels Declaration**") attached hereto as **Exhibit C**.

prior to the Petition Date the Debtors' internal collateral tracking database – consistent with their financial statements – also identified only approximately $1.3 billion in collateral for the Junior Secured Notes and the AFI Revolver (sometimes referred to as the "**Ally Revolver**").  While they had previously tracked collateral for the Junior Secured Parties and the AFI Revolver – what they called the "Primary Collateral" – only under the category "GMAC Revolver,"[4] in connection with the filing, the Debtors created a new category of collateral – the "Revolver Blanket Lien" – that purportedly also secured the Junior Secured Notes and the AFI Revolver. Far from having previously identified these assets as collateral for the Junior Secured Notes or the AFI Revolver, until the bankruptcy, the Debtors' internal database identified the lion's share of the Blanket Lien Assets as "Unpledged."

5.      According to the Debtors, this change was made in connection with the bankruptcy filing, based on their determination that any assets on their balance sheet other than certain specific assets (in particular, those pledged under other facilities, Ginnie Mae servicer advances and mortgage servicing rights, and $250 million in cash) fell within the collateral package of the Junior Secured Parties and the AFI Revolver.  The Debtors acknowledged to the Committee's professionals that, in agreeing to the stipulations contained in the AFI DIP Order, they did little independent analysis to verify whether the Junior Secured Parties had perfected liens, or any liens at all, on the assets that comprise Blanket Lien Assets or whether any such assets fell within the broad definition of "Excluded Assets" under the credit documents for the Junior Secured Parties.

6.      The $1.1 billion in Blanket Lien Assets directly benefits the Junior Secured Notes, which are junior to the AFI Revolver and, at a $1.3 billion collateral valuation, were substantially

---

[4] The "GMAC Revolver" is a reference to the predecessor of the AFI Revolver, reflecting AFI's prior name.

undersecured.[5]  The identification of so much additional collateral shortly before the Petition

Date, at a time when the Debtors and their parent, Ally Financial, Inc. ("**AFI**"), were entering

into a plan support agreement (the "**JSN PSA**") with an ad hoc group of Junior Secured

Noteholders (the "**Ad Hoc Group**"), raised substantial issues requiring Committee investigation,

including the extent to which the Blanket Lien Assets include assets that were designated as

additional collateral at the eleventh hour to induce the Ad Hoc Group to enter into the JSN PSA.

In accordance with their fiduciary duties, the Committee's professionals thus undertook a

detailed investigation of the claims and liens of the Junior Secured Parties.

7.        Based on its investigation to date, the Committee has identified several issues

with the Debtors' stipulations concerning the Junior Secured Parties' purported collateral

package, falling into two broad categories.  First, certain assets are not part of the Junior Secured

Parties' collateral package because they were explicitly carved out of the granting clause in the

operative security documents.  The Committee's investigation has disclosed that at least $40

million in assets that the Debtors stipulated were subject to valid and perfected liens in fact fell

squarely within the definition of "Excluded Assets" under the security documents.[6]  In addition,

certain assets that the Debtors stipulated were subject to valid and perfected liens were released

from the liens of the Junior Secured Parties and the AFI Revolver or are real property on which

there are no mortgages.  Second, contrary to the Debtors' stipulations, the purported collateral

package of the Junior Secured Parties includes assets on which the Junior Secured Parties do not

have properly perfected liens.  Such assets include, among others, certain restricted cash

accounts containing approximately $39 million, and various other deposit accounts containing

---

[5]  The Committee notes that the Debtors' valuation of the collateral does not include any value on account of the Debtors' intercompany claims.  The Debtors have not stipulated to the validity or value of such claims in the AFI DIP Order.  According to the Debtors, however, the intercompany claims are subject to recharacterization and will not be a source of recovery for the Junior Secured Noteholders.

[6]  See note 18 *infra*.

approximately $9.9 million.

8.    In addition to these issues, the Committee found that the Debtors transferred substantial additional collateral for the benefit of the Junior Secured Parties in the 90 days prior to the bankruptcy filing.  The Committee's preliminary estimate is that more than $350 million was added to the collateral package during this period.

9.    The Committee seeks standing to commence and prosecute an adversary proceeding against the Collateral Agent and Indenture Trustee to (i) obtain a declaratory judgment that certain assets that the Debtors stipulated constitute collateral for the Junior Secured Parties' claims are, in fact, unencumbered by their liens; (ii) avoid the unperfected liens of the Junior Secured Parties; and (iii) avoid liens on assets that were added to the Junior Secured Parties' collateral package in the 90 days prior to the Petition Date.  The Debtors are unable to prosecute such an action because they are bound to support the treatment for the Junior Secured Parties stipulated to in the AFI DIP Order, including the expanded collateral package recognized at the time that the Debtors were soliciting support from the Ad Hoc Group for the Debtors' settlement with AFI embodied in the JSN PSA.  Just hours before the filing of this Motion, the Debtors informed the Committee that they recognize the need for these claims to be adjudicated and agree that the Committee is the appropriate party to do so and should be granted standing. As explained below, the estates' claims against the Junior Secured Parties are colorable and likely to result in a substantial benefit to the estates through litigation or settlement – thus meeting the well-established *STN* test for committee standing, as well as the less rigorous standard applicable in light of the Debtors' consent.

10.    Before filing this Motion, the Committee contacted counsel for the Ad Hoc Group to seek an extension of the Challenge Deadline to allow the Committee additional time to

complete its investigation and to pursue settlement discussions with the Junior Secured Parties which might narrow or eliminate issues requiring litigation. Because the Ad Hoc Group declined to extend the Challenge Deadline, the Committee is constrained to file this Motion.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.  **General Background**

12.    On May 14, 2012 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief commencing these chapter 11 cases (the "**Chapter 11 Cases**"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

13.    On May 16, 2012, the United States Trustee appointed the Committee to represent the interests of all unsecured creditors in these Chapter 11 Cases.

### B.  **The AFI Revolver, the AFI LOC, and the Junior Secured Notes**

14.    On December 30, 2009, Debtors Residential Funding Company, LLC ("**RFC**") and GMAC Mortgage, LLC ("**GMAC Mortgage**") as borrowers, Debtor Residential Capital, LLC ("**ResCap**") as guarantor, and certain other Debtors as guarantors and co-obligors entered into an amended and restated loan agreement with AFI, as agent and lender (the "**AFI Revolver**"),[7] which amended and restated in its entirety a previous loan agreement entered into on June 4, 2008. According to the Debtors, the outstanding principal amount under the AFI Revolver as of the Petition Date was approximately $747 million.

---

[7]  The loan agreement for the AFI Revolver is attached to the Daniels Declaration.

15.    Also on December 30, 2009, RFC and GMAC Mortgage, as borrowers, and ResCap and certain other Debtors, as guarantors, entered into an amended and restated secured loan agreement with AFI as lender (the "**AFI LOC**"), which consolidated the terms and provisions of two other secured credit agreements with AFI entered into on November 20, 2008, and June 1, 2009, respectively.    According to the Debtors, the outstanding principal amount under the AFI LOC as of the Petition Date was approximately $380 million.

16.    In June 2008, the Debtors issued approximately $4 billion of 9.625% Junior Secured Notes due 2015 (the "**Junior Secured Notes**," and holders thereof, the "**Junior Secured Noteholders**") pursuant to an indenture dated as of June 6, 2008, among ResCap, as issuer, certain other Debtors, including RFC and GMAC Mortgage, as guarantors, and the Indenture Trustee as the indenture trustee.[8]    According to the Debtors, approximately $2.1 billion aggregate principal amount of Junior Secured Notes were outstanding as of the Petition Date.

17.    The Debtors granted first priority liens on certain of their assets (the "**Collateral**") to secure their obligations under the AFI Revolver under an Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009 (the "**Revolver Security Agreement**"), among RFC, GMAC Mortgage, certain other Debtor parties, AFI, and the Collateral Agent, as first priority collateral agent for the lenders.

18.    The Debtors granted second priority liens on the Collateral to secure their obligations to the Junior Secured Parties under an Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy dated as of December 30, 2009 (the "**Notes Security Agreement**," and together with the Revolver Security Agreement, the "**Security**

---

[8]  The guarantors under the Junior Secured Notes, with the exception of Executive Trustee Services, LLC, and the co-obligors are identical to those under the AFI Revolver.  The indenture for the Junior Secured Notes is attached to the Daniels Declaration.

**Agreements**")[9] among RFC, GMAC Mortgage, and certain other Debtor parties, and the Collateral Agent, as third priority collateral agent.[10]

19.    The Collateral securing the debt of the Junior Secured Parties and the AFI Revolver purportedly consists of, among other things, servicer advances, mortgage loans, claims against governmental entities (such as insurance claims against the U.S. Department of Housing and Urban Development) (the "**Governmental Insurance Claims**"), real estate owned by the Debtors as the result of foreclosures ("**REO Properties**"), other real property, financial assets, investments, depository accounts, general intangibles, commercial tort claims, equity in various Debtor and non-Debtor affiliates, and all other personal property not otherwise pledged under other facilities.

20.    Although the Security Agreements purport to grant liens on the Debtors' assets to secure the Debtors' obligations under the AFI Revolver and Junior Secured Notes, the granting clauses expressly *exclude* substantial categories of assets from the grant, including assets pledged to secure certain of the Debtors' other facilities.  Furthermore, the Security Agreements bifurcate the assets that comprise the Collateral into "Primary Collateral" and non-primary collateral.  The Primary Collateral consists of certain collateral initially pledged to the AFI Revolver and the Junior Secured Notes, as specified in the Security Agreements.

21.    The Debtors informed the Committee that, in their internal collateral tracking database, they historically tracked only the "Primary Collateral" as collateral for the Junior Secured Parties and the AFI Revolver.  Primary Collateral was identified in the database under the category "GMAC Revolver."  The rest of the Debtors' assets that, according to the Debtors,

---

[9]  The Security Agreements are attached to Daniels Declaration. The liens granted by the Notes Security Agreement were initially third priority, junior to those securing the AFI Revolver and the senior secured notes that matured in 2010.  After the repayment of the senior secured notes, they became second priority liens.

[10]  The relative priorities of the Junior Secured Parties and the AFI Revolver to the Collateral are set forth in an Intercreditor Agreement dated as of June 6, 2008, among the Collateral Agent, AFI, and the Debtors.

fell within the collateral package of the Junior Secured Parties and the AFI Revolver were identified as "Unpledged" in the database.

22.    According to the Debtors, they tracked only Primary Collateral as collateral for the Junior Secured Parties and the AFI Revolver because the Debtors had broad authority under the governing finance documents to release the liens on non-Primary Collateral of the Junior Secured Notes and the AFI Revolver.  In particular, section 8.04 of the Indenture provides that the Debtors may release Collateral so long as the release complies with the Indenture's restrictions on the sale of Primary Collateral.  The Indenture does not restrict the sale, transfer, or disposition of Collateral that is not Primary Collateral.

23.    With this flexibility, the Debtors freely released and comingled assets between the collateral packages of (i) the AFI Revolver and the Junior Secured Notes and (ii) the AFI LOC. With the consent of AFI, the Debtors took "non-primary" assets from the Collateral and repledged them in favor of the AFI LOC to meet their borrowing base requirements.  The Debtors also at times used collateral proceeds from the AFI LOC to purchase mortgage loans that were in turn pledged to the AFI Revolver and the Junior Secured Notes.

### C.  The Junior Secured Noteholders' Plan Support Agreement

24.    The day before the Petition Date, the Debtors, AFI, and the Ad Hoc Group entered into the JSN PSA.[11]  The JSN PSA specified, among other things, certain terms of the Debtors' restructuring, milestones for achieving that restructuring, the terms of the AFI DIP Order, and the distribution of the proceeds of the Collateral between AFI and the Junior Secured Noteholders (the "**Collateral Proceeds**").

25.    The agreement also tentatively established a new waterfall for the distribution of

---

[11]  A copy of the JSN PSA is attached as **Exhibit 9** to the Affidavit of James Whitlinger [Docket No. 6].  Upon information and belief, less than 50% of the Junior Secured Noteholders are part of the Ad Hoc Group.

the Collateral Proceeds. The new waterfall in pertinent part is as follows: AFI receives the first $400 million (plus accrued post-petition interest thereon) of Collateral Proceeds; the Junior Secured Noteholders receive the next $1 billion of Collateral Proceeds; and thereafter, AFI would receive 19% and the Junior Secured Noteholders would receive 81% of the remaining Collateral Proceeds until the Junior Secured Noteholders were paid in full.

26.    The JSN PSA also provides that the Junior Secured Noteholders that are party thereto agree to waive any post-petition interest accruing through December 31, 2012, so long as (i) no unsecured creditor receives post-petition interest, (ii) the JSN PSA has not terminated, and (iii) either (a) the plan of reorganization has gone effective by December 31, 2012, or (b) the Debtors have consummated the sale of their servicing platform and loan portfolio by December 31, 2012, and the plan of reorganization has gone effective by March 31, 2013.

### D.  **The AFI DIP Order**

27.    The Debtors' first day motions included a motion seeking authority to enter into a postpetition financing facility with AFI, as well as to use the cash collateral of AFI and the Junior Secured Parties (the "**AFI DIP Motion**"). On June 25, 2012, the Court entered the AFI DIP Order granting final approval of the AFI DIP Motion.

28.    In the AFI DIP Order, the Debtors agreed to several stipulations regarding the validity of the Junior Secured Notes and the security interests granted thereunder (collectively, the "**Stipulations**"), including, in pertinent part, the following: (i) the aggregate principal amount outstanding under the Junior Secured Notes as of the Petition Date is at least $2,120,452,000, plus accrued and unpaid interest and reimbursable expenses and fees; (ii) the Debtors' obligations under the Junior Secured Notes are legal, valid, and binding and are not subject to avoidance; (iii) the liens granted to the Junior Secured Parties are valid, binding, perfected, and

enforceable; (iv) the Collateral of the Junior Secured Notes includes the "Pre-Petition Ally Repo Facility" (commonly known as the "**BMMZ Facility**") and any residual value therefrom; and (v) the Collateral of the Junior Secured Notes includes the assets listed in the columns labeled "Ally Revolver" and "Blanket" on <u>Exhibit A</u> to the AFI DIP Order ("**2-29 Trial Balance Sheet**").[12] *See* AFI DIP Order ¶¶ 5(b)-(d), (g)-(j).  The Stipulations also provide that the Debtors have released the Junior Secured Parties from all causes of action in connection with the Junior Secured Notes and the Junior Secured Parties' liens on the Collateral.  *See* AFI DIP Order ¶ 5(k).

29.    The Stipulations became binding on the Debtors upon entry of the AFI DIP Order. Further, the Stipulations become binding on all other parties unless a party-in-interest objects to the Stipulations on or before the Challenge Deadline.[13]  The AFI DIP Order further provides that the Challenge Deadline shall be tolled pending the adjudication of a motion seeking standing to bring causes of action against the Junior Secured Parties.  *See* AFI DIP Order ¶ 28.  There is no deadline for any party-in-interest to challenge the claims and liens of AFI.[14]

**E.  The Committee's Investigation**

30.    Since the entry of the AFI DIP Order, the Committee has diligently investigated the liens of the Junior Secured Parties.  Driven by the size, number, and complexity of the Debtors' financing arrangements, and the range and volume of financial data underlying their assets, the Committee's investigation have been extensive and time consuming.

31.    As an initial matter, the unique form of the Stipulations – which adopted the categories of assets listed under the titles "Ally Revolver" and "Blanket" in the 2-29 Trial

---

[12]  The Committee notes that the Stipulations referred to in clause (v) related only to the assets that secured the Junior Secured Notes on February 29, 2012.  The Debtors did not stipulate to any specific assets for any other date, including the Petition Date.

[13]  The Challenge Deadline is 90 days from entry of the AFI DIP Order, which falls on Sunday, September 23, 2012.  Pursuant to Bankruptcy Rule 9006(1), this date is automatically extended to the next business day, *i.e.*, September 24, 2012.

[14]  With respect to the Debtors' postpetition credit facility with Barclays Bank plc (the "**Barclays DIP**") and the credit facility with Citibank, N.A., the deadline to seek standing to challenge the prepetition claims and liens thereon is October 24, 2012.

Balance Sheet as collateral for the Junior Secured Parties and the AFI Revolver – required the Committee to investigate whether the Debtors improperly categorized assets as Collateral for the Junior Secured Parties and the AFI Revolver.[15]  To make this determination, the Committee obtained the data behind the 2-29 Trial Balance Sheet to confirm that the AFI Revolver and the Junior Secured Parties have perfected liens on the component assets of each category of Collateral and that these assets are not "Excluded Assets."[16]  Putting aside the shear breadth and number of assets involved, this exercise was complicated because these assets – including mortgage loans, servicer advances, government insurance claims, and RMBS securities – are by nature complex and were constantly being bought and sold and shifted among the Debtors' credit facilities.

32.    Moreover, as set forth in more detail below, under the Security Agreements, assets that were pledged under another credit facility at the time of the issuance of the Junior Secured Notes were excluded from their Collateral, even if such credit facilities were later repaid in full, refinanced, or otherwise terminated.  *See infra* ¶¶ 38–43.  Thus, a key part of the Committee's investigation involved reviewing the credit facilities in place at the time of the issuance of the Junior Secured Notes and analyzing whether any of the Collateral was subject to one or more of

---

[15]  The Committee notes that the Stipulations rely on and incorporate the 2-29 Trial Balance Sheet which is an imprecise means of identifying the assets that secure the Junior Secured Notes.  For example, the Stipulations provide that the Junior Secured Parties have liens on an aggregate of $421 million of "Ally Revolver" Mortgage Loans Held For Sale, and $265 million of "Blanket" Mortgage Loans Held For Sale.  This trial balance sheet also provides that the Debtors have more than $1.2 billion of additional Mortgage Loans Held For Sale, and neither the Stipulations nor the 2-29 Trial Balance Sheet identifies which of the Mortgage Loans Held For Sale are pledged to the Junior Secured Parties.  This is true for each class of assets listed on the 2-29 Trial Balance Sheet.  As a result, as part of its confirmatory diligence, the Committee requested the Debtors identify with specificity which assets were included in the Junior Secured Parties' collateral package and the supporting data to investigate the existence of liens of the Junior Secured Parties on such assets.  Furthermore, the Committee believes that the Petition Date is the only relevant date for identifying the Junior Secured Parties' collateral package.  Accordingly, the Committee requested that the Debtors prepare a trial balance sheet that accurately identified the collateral package on that date, and the Committee has sought to reconcile the amounts and underlying data on the two trial balance sheets.

[16]  The Stipulations regarding the AFI Revolver and the Blanket Lien Assets assign a value to each of the various categories of assets that secure the Junior Secured Notes, e.g., mortgage loans, servicer advances, and governmental insurance claims.  Neither the Debtors nor the Junior Secured Parties have introduced any evidence regarding the value of the Collateral, and the Committee reserves the right to object to the Stipulations to the extent they purport to establish the value of any of the Collateral as of Petition Date or otherwise.  The Committee further reserves the right to challenge any of the Debtors' or the Junior Secured Parties' valuations to the extent any such valuations segregate accounting reserves or other adjustments to the value of any assets and thereby overstate the value of such assets.

these facilities. This was a substantial undertaking because when the Junior Secured Notes were issued, the Debtors and their non-Debtor subsidiaries had pledged assets under approximately 53 other credit facilities.[17] Many of those facilities have since been refinanced or replaced.

33.    Lastly, after informally requesting relevant information and documents from the Debtors soon after the entry of the AFI DIP Order, the Committee reviewed hundreds of documents received from the Debtors.  While the Debtors were generally responsive to the Committee's informal discovery requests, the information was supplied to the Committee on a rolling basis and as of the filing of this Motion, the Committee is still awaiting delivery of documents and information from the Debtors.  Additionally, certain critical documents were held exclusively by AFI.  The production of these documents was delayed until late-August because all documents provided by AFI and the Collateral Agent were produced only in connection with AFI's production of discovery materials to the examiner.

34.    Although the Committee's investigation has been complicated by the unique and complex nature of the Debtors' capital structure and the delay in the production of documents, the Committee has been mindful of the Challenge Deadline and the importance of completing a full and thorough investigation in a timely manner.  The Committee is also aware that the amount of proceeds generated by the Debtors' sale of their servicing platform and loan portfolio is likely to affect negotiations between the Committee and the Junior Secured Parties concerning any challenge to the Collateral.  Accordingly, in the weeks leading up to the Challenge Deadline, the Committee sought an extension of the Challenge Deadline from the Ad Hoc Group to facilitate eventual negotiations.  The Ad Hoc Group, however, rejected any extension.

35.    On September 16, 2012, the Committee sent a letter to the Debtors' counsel

---

[17]  The schedule of the Bilateral Facilities is attached to the Daniels Declaration.

outlining the issues discussed herein and requesting that the Debtors consent to Committee standing to pursue causes of action against the Junior Secured Parties in connection with the validity and enforceability of their claims and liens (the "**Demand Letter**").  A copy of the Demand Letter is attached hereto as **Exhibit B**.  Counsel to the Debtors informed counsel to the Committee today that they consent to the Committee being granted standing.

## STATUS OF THE COMMITTEE'S INVESTIGATION

36.     The Committee has identified at least three categories of claims that the estates possess against the Junior Secured Parties, including claims that relate to the Blanket Lien Assets that were reclassified by the Debtors immediately prior to the Petition Date from "Unpledged" assets to additional Collateral for the Junior Secured Parties (collectively, the "**Claims**").  As stated above, because of the complexities of the Debtors' assets and financing arrangements (and lack of specificity of the Stipulations regarding the 2-29 Trial Balance Sheet), the Committee has not yet concluded its investigation of the liens of, and all potential claims against, the Junior Secured Parties.  Further discovery will enable the Committee to determine whether additional assets may be subject to the claims it outlines against the Junior Secured Parties.

### A.  **Unencumbered Assets**

37.     The Committee has discovered that certain assets that the Debtors stipulated are part of the Collateral are, in fact, not Collateral because such assets either (i) were explicitly excluded from the pledge of assets under the Security Agreements, (ii) relate to the residual value of the BMMZ Facility (which would not be Collateral should the facility be recharacterized as a secured financing), (iii) are real estate for which the Junior Secured Parties were not granted a mortgage, or (iv) consist of other miscellaneous assets that fall outside the Junior Secured Parties' liens (collectively, the "**Unencumbered Asset Claims**").

- 14 -

### i.  Excluded Assets

38.     The Security Agreements expressly carve certain of the Debtors' assets out of the

Collateral granted to secure the Junior Secured Notes (the "**Excluded Assets**").  *See* Notes

Security Agreement §§ 2, 3, 4, and 5.  Accordingly, these Excluded Assets were never pledged

to the Junior Secured Parties under the Notes Security Agreement and are not encumbered by

their liens.  In particular, among the Excluded Assets are:

> (c) *any asset*, including any account, note, contract, lease, financing
> arrangement, general intangible, equity investment, interests in joint ventures or
> other agreement *to the extent that the grant of a security interest therein would
> violate applicable Requirements of Law, result in the invalidation thereof or
> provide any party thereto with a right of termination or default* with respect
> thereto or *with respect to any Bilateral Facility to which such asset is subject as
> of the Issue Date* (in each case, after giving effect to applicable provisions of the
> UCC and other applicable Requirements of Law and principles of equity); . . .

> (f)     proceeds and products of any and all of the foregoing excluded
> assets described in clause (a) through (e) above only to the extent such proceeds
> and products would constitute property or assets of the type described in clause
> (a) through (e) above;….

Notes Security Agreement at 6 (emphasis added).  Thus, for example, assets pledged under a

Bilateral Facility (defined in the Notes Security Agreement to include approximately 53

financing agreements under which certain Debtors or their affiliates were obligated on the date

the Junior Secured Notes were issued) and potentially products and proceeds thereof would

constitute Excluded Assets if that Bilateral Facility prohibited the Debtors from granting the

Junior Secured Parties a lien on the same assets.

39.     Importantly, the Security Agreements do not contain a "savings clause" providing

that assets treated as Excluded Assets by the provisions described above automatically become

Collateral upon the termination of a Bilateral Facility.  In the absence of such a "savings clause,"

assets pledged under a Bilateral Facility (and any products or proceeds thereof) that were

subsequently released from the lien of that Bilateral Facility (whether upon termination or

otherwise) (the "**Released Excluded Assets**"), *remain* Excluded Assets under the Security

Agreements and outside the liens of the Junior Secured Noteholders.   Indeed, under Section

7.01(q) of the AFI Revolver, such assets could have secured the liens of the AFI Revolver and

Junior Secured Notes only if the Debtors separately granted and then perfected a lien on them:

> Section 7.01. Affirmative Covenants of the Obligors. Each Obligor covenants and agrees with the Lender Parties that, until all Loans and other Obligations have been paid in full in cash and the Commitments have terminated or expired, such Obligor will perform or cause to be performed the obligations set forth below in this Article VII:
>
> …
> (q) Structuring for Eligible Collateral Acquisition, Excluded Assets, Non-UCC Assets. Such Obligor will, and will cause its Subsidiaries to, use commercially reasonable efforts to *grant and perfect a Lien to secure the Obligations*, directly or through the use of a Restricted Entity, *with respect to* (i) *US Mortgage Loans repurchased* or otherwise acquired by such Obligor or Subsidiary, *or held by such Obligor or Subsidiary and released from the Liens supporting any other facility . . .*

(emphasis added).  This provision would have been unnecessary if the Released Excluded Assets

automatically became part of the Collateral.

40.    Accordingly, in the absence of evidence of a separate lien grant and perfection,

which has not been provided to the Committee, Released Excluded Assets are not encumbered

by the liens of the Junior Secured Parties and were available prepetition, for new financings, and

are available post-petition, for potential distribution to general unsecured creditors.

41.    The purpose of excluding such assets from the Collateral is apparent from the face

of the Security Agreements – the Debtors and the Junior Secured Parties did not want the

Debtors' grant of liens securing the AFI Revolver and the Junior Secured Notes to create a

default under any of the Bilateral Facilities.  Further, by not including a "savings clause" in the

Security Agreements, the Debtors preserved a pool of collateral for future financing by

maintaining the ability to re-encumber assets pledged to a Bilateral Facility upon the release of

such an asset.

42.    To evaluate potential excluded assets,  the Committee requested from the Debtors the necessary documentation and information to enable it to ascertain (x) which of the Debtors' assets were pledged under each of the 53 Bilateral Facilities, (y) whether those assets were subsequently released from the Bilateral Facilities, and (z) whether those assets currently are stipulated as Collateral.

43.    Based on a review of the Debtors' internal collateral tracking database, the Committee's professionals identified at least $40 million of Released Excluded Assets, consisting of mortgage loans, tradable securities, real estate and Governmental Insurance Claims, that are currently listed as Collateral (among other property as to which the Committee is still investigating, including mortgage loans, Governmental Insurance Claims, servicer advances, and real estate that may have been pledged under such Bilateral Facilities).[18]

### ii.    Residual Value of the BMMZ Facility

44.    The Debtors stipulated that the Collateral included the BMMZ Facility under: (i) the Master Repurchase Agreement dated as of December 21, 2011, by and among BMMZ Holdings LLC ("**BMMZ**"),[19] ResCap, GMAC Mortgage, and RFC; and (ii) the Master Guarantee dated as of December 21, 2011, by ResCap and BMMZ, each as further amended or supplemented prior to the date hereof.  Under the BMMZ Facility, ResCap and GMAC Mortgage purported to "sell" mortgage loans with a book value of $371 million as of the Petition Date (the "**Purchased Mortgage Loans**") to BMMZ for an aggregate "purchase price" of $250 million,

---

[18]  Due to the volume of data underlying the Released Excluded Assets, a schedule of the Released Excluded Assets is not attached, but will be made available to the Court, the Debtors, AFI, and the Junior Secured Parties upon request.  The $40 million estimate includes approximately $12.5 million of mortgage loans that at one time were subject to repurchase agreements with Citibank and/or Goldman Sachs.  For the reasons explained in paragraph 47 *infra*, any lien of the Junior Secured Parties on such property was released.  The Committee has requested, but not received, evidence of any subsequent grant of a security interest in favor of the Junior Secured Parties.

[19]  BMMZ is an indirect nondebtor subsidiary of AFI.  A copy of the Master Repurchase Agreement for the BMMZ Facility is attached to the Daniels Declaration.

and agreed to "repurchase" the same loans for an amount generally equal to the purchase price plus a Price Differential (as defined in the BMMZ Facility) equal to LIBOR plus 4.75%. Based on discussions with the Debtors, the Committee understands that the Junior Secured Parties' purported security interest in the BMMZ Facility is in the Debtors' contractual right to repurchase the Purchased Mortgage Loans. Upon information and belief, the BMMZ Facility replaced repurchase agreements with Goldman Sachs and Citibank that had expired.

45.    The BMMZ Facility, which was refinanced by the Barclays DIP, was styled as a sale and repurchase of the purchased mortgage loans. However, a careful review of the terms of the facility reveals that the transaction was, for purposes of lien perfection and priority, a secured financing, and should be recharacterized as such, based on a consideration of several factors deemed relevant in the case law.[20] First, BMMZ was completely insulated from market risk by the calculation of the repurchase price for the transferred loans (which was based on the original purchase price plus a LIBOR-based rate and accordingly failed to accommodate any changes in market value). Second, the sellers retained significant economic rights in the assets following the purported transfer. For example, under the BMMZ Facility, excess cash flow from the transferred assets belonged to the sellers rather than ostensible purchaser, BMMZ. Third, the BMMZ Facility was treated as debt and the Purchased Mortgage Loans as collateral on the Debtors' prepetition balance sheet. Fourth, the purchase price for each transferred loan is significantly discounted from the actual fair market value of each loan. Fifth, notwithstanding the "purchase and sale" language used in the BMMZ Facility, it is widely recognized that courts

---

[20]  In addressing whether a transfer of assets constitutes a "true sale" or a secured financing, courts generally consider: (1) the degree of recourse granted by the seller to the buyer, *i.e.*, which party bears the risk of loss associated with the assets subject to the transaction; (2) the degree to which the seller retains post-transfer rights and ownership; (3) the accounting treatment of the transaction on the seller's books and records; (4) the adequacy of the consideration; and (5) the intent of the parties. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1068-69 (2d Cir. 1995); *Gold Coast Leasing Co. v. California Carrots, Inc.*, 93 Cal. App. 3d 274, 279, 155 Cal. Rptr. 511, 514 (Cal. Ct. App. 1979); *In re Evergreen Valley Resort*, Inc., 23 B.R. 659, 661-62 (Bankr. D. Me. 1982); *People v. The Serv. Inst., Inc.*, 101 Misc. 2d 549, 550, 421 N.Y.S.2d 325, 326 (N.Y. Sup. Ct. 1979).

should look through the form of agreement to the economic substance of the transaction as it relates to the rights of the parties against a debtor's estate to determine the parties' true intent.[21] Under these factors and considering the overall substance of the transaction, the BMMZ Facility has the characteristics of a secured financing rather than a sale.

46.     Once the BMMZ Facility is recharacterized for these limited purposes, ResCap and GMAC Mortgage did not have the right to "repurchase" the Purchased Mortgage Loans, because those loans were at all times their property.[22]  The Junior Secured Parties therefore could not have held a lien on the residual value of the Purchased Mortgage Loans.

47.     Furthermore, the Junior Secured Parties lack a perfected lien on at least a portion, if not all, of the underlying Purchased Mortgage Loans because the Collateral Agent granted a certain Partial Release of Collateral, dated as of May 17, 2010 (the "**Pledge Release**"), which released the Junior Secured Parties' liens on the Purchased Mortgage Loans, and also filed UCC-3 termination statements that released any security interest in the Purchased Mortgage Loans. The termination statements were filed in connection with entry of the repurchase facilities with Citibank and Goldman Sachs to which ResCap and GMAC Mortgage were party (which were the predecessors to the BMMZ Facility).  Even if such liens had not been released by the Pledge Release, portions of the Purchased Mortgage Loans would otherwise constitute Released Excluded Assets (as explained above) because they were pledged to secure the Debtors' obligations under Bilateral Facilities that were subsequently terminated.

---

[21] *See In re Sackman Mortg. Corp.*, 158 B.R. 926, 932-33 (Bankr. S.D.N.Y. 1993) (looking at the economic substance of transaction, as opposed to name that agreement gives transaction); *Liona Corp., Inc. v. PCH Associates*, 949 F.2d 585, 597 (2d Cir.1991) (looking at the "the economic realities. . . and not to the labels applied by the parties") (citing *Sun Oil Co. v. CIR*, 562 F.2d 258, 263 (3d Cir.1977)).

[22] ResCap and BMMZ agreed in the BMMZ Facility to treat the purchase of the Purchased Mortgage Loans as a financing for tax purposes.  The Committee is seeking authority to bring a cause of action to recharacterize the BMMZ Facility as a financing also for purposes of establishing the respective rights of the various parties in the Purchased Mortgage Loans.  The Committee does not seek to challenge the characterization of the BMMZ Repo Facility as a "Repurchase Agreement" for purposes of the safe harbor provision of the Bankruptcy Code.  The safe harbor provisions relating to repurchase agreements exist to protect the nondebtor parties to those agreements, in this case BMMZ, and the Committee is not seeking to disturb the rights of BMMZ.

### iii.    **Real Property**

48.    Pursuant to the Stipulations, the Debtors agreed that the Junior Secured Parties have valid, enforceable, perfected, and non-avoidable liens on certain real property of the Debtors.  Based on the Committee's investigation, the stipulated Collateral improperly includes approximately $9 million of real property, $12 million of REO Properties that do not appear to be held by a special-purpose vehicle (an "**SPV**"), and an unspecified amount of certain real property leasehold interests (the "**Excluded Real Property**").[23]

49.    The Uniform Commercial Code ("**UCC**") does not govern security interests in real property.  To obtain a perfected lien on real property, a secured party must be granted a mortgage (a document with a metes and bounds description of the property) and record that mortgage with the applicable county clerk in accordance with applicable state law.  Presumably to avoid the burden and expense of preparing and recording separate mortgages on each parcel of property, the Debtors are permitted to transfer real property to SPVs whose equity were pledged under the Security Agreements, in which case the Junior Secured Parties would have the benefit of the value of the properties although not a direct lien.

50.    To determine whether the Junior Secured Parties have a valid lien on the Excluded Real Property, the Committee repeatedly requested that the Debtors produce either mortgages for the Excluded Real Property or, alternatively, evidence that they were held by an SPV.  The Debtors have failed to produce such records.  Accordingly, any purported security

---

[23]  Such amounts reflect net book value (book value net of accumulated depreciation), not necessarily market value.  A schedule of Excluded Real Property (other than REO Property) is attached to the Daniels Declaration.  Due to the volume of data underlying the REO Properties, a schedule of the REO Properties is not attached, but will be made available to the Court, the Debtors, AFI, and the Junior Secured Parties upon request.  All Excluded Real Property, other than the REO Properties, was included in Exhibit A to the AFI DIP Order under the category of "Other Assets."  The Excluded Real Property includes the Debtors' interests in their data center in Eden Prairie, Minnesota and their servicing center in Waterloo, Iowa.  The Committee has requested but not yet received the underlying documents relating to the Excluded Real Property, including evidence of ownership of the REO Properties.  The real property leasehold interests that have been designated for assumption in connection with the sale of the Debtors' servicing and origination platforms all constitute Excluded Real Property.  The Committee understands that there is approximately $14 million of leasehold improvements included within the "Other Assets" category and it remains possible that such assets constitute Excluded Real Property as well.

interests in the Excluded Real Property should be declared invalid.

### iv.    Commercial Tort Claims and Assets of ETS

51.    Certain other categories of assets on which the Junior Secured Parties purportedly hold liens, including commercial tort claims and the assets of Executive Trustee Services, LLC ("**ETS**"), are also subject to challenge.  Under sections 9-108 and 9-204 of the UCC, a grant of a lien on commercial tort claims must be specifically described by the granting party.  No such claims have been specifically described in the Security Agreements.  Accordingly, the Junior Secured Parties do not have any liens on commercial tort claims.  With respect to ETS, the Junior Secured Parties do not appear to have any claims against ETS, a Debtor entity that provides foreclosure and debt collection services to the Debtors and non-affiliate third parties. [24] Furthermore, even if the Junior Secured Parties did have claims against ETS, any corresponding liens against the assets of ETS are unperfected because the Junior Secured Parties have taken no action to perfect their security interests in such assets, *e.g.*, filing a UCC-1 financing statement.

### B.  Unperfected Liens

52.    The Collateral purportedly includes certain assets in which the Junior Secured Parties do not have a perfected security interest, including certain deposit accounts, giving rise to further estate claims to reduce the Collateral (collectively, the "**Perfection Claims**").

53.    The Junior Secured Parties do not hold a perfected lien on approximately $37 million in restricted cash deposited by GMAC Mortgage with Ally Bank to satisfy Regulation W of the Federal Reserve regulations (the "**Ally Account**").  The deposit account is governed by a deposit agreement that names GMAC Mortgage as the owner of the Ally Account and prohibits GMAC Mortgage from pledging its interests in the Ally Account to other parties.

---

[24] ETS appears to have executed a joinder to the Revolver Security Agreement as a guarantor, but is not a party to the indenture for the Junior Secured Notes or Notes Security Agreement.

54.    Under sections 9-104, 9-304, and 9-314 of the UCC, a lien on a deposit account may only be perfected by "control."  *See* U.C.C. §§ 9-104, 9-304, 9-314.  When the secured party is not the depository bank or the customer on the deposit account, "control" is accomplished through the execution of a "control agreement" entered into by the depositor, the secured party, and the depository bank.  U.C.C. § 9-104(a)(2).  Under such control agreements, the depository bank agrees to follow instructions originated by a secured party without obtaining consent from the debtor-depositor.  Because Ally Bank, as the depository bank, has not signed such an agreement to give the Collateral Agent "control" over the Ally Account, the Junior Secured Parties do not have a perfected interest in the Ally Account.  Similarly, approximately $2 million of restricted cash on deposit with The Bank of New York Mellon, N.A. (the "**BONY Account**") for use in the clearing of home equity line of credit drafts is held in a deposit account that is not subject to a control agreement with the Collateral Agent.

55.    Finally, the Committee has identified certain other miscellaneous deposit accounts set forth in the Debtors' Schedules of Assets and Liabilities that were not subject to control agreements.  As of the Petition Date, these accounts held approximately $9.9 million.[25]  The Committee's investigation has revealed no account control agreements relating to these deposit accounts, and the liens therefore appear to be unperfected and avoidable.[26]

### C.  **Preference Claims**

56.    Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an

---

[25] This figure does not include approximately $252 million of cash that is restricted pursuant to Fannie Mae's requirement that servicers of its loans maintain at least $250 million in unencumbered cash to reduce counterparty risk exposure (the "**Fannie Mae Restricted Cash**").  Exhibit A to the AFI DIP Order indicates that $252 million in cash is "unpledged."  Through discussions with the Debtors, the Committee understands that this amount includes the Fannie Mae Restricted Cash, and that such funds are not subject to the Stipulations.  The schedule of miscellaneous deposit accounts, including the Ally Account and the BONY Account is attached to the Daniels Declaration.

[26] The Committee understands that certain Debtors hold equity interests in certain foreign subsidiaries and that such interests are purportedly part of the Collateral for the Junior Secured Notes.  The Committee has not been provided with copies of all such foreign-law governed equity pledge documents, so it remains uncertain whether such equity pledges are perfected in accordance with applicable foreign law.  To the extent the Committee determines that such equity pledges do not comply with the perfection requirements under applicable foreign law, the Committee may seek to avoid such liens because they would be unperfected.

interest in property of the debtor's estate if the following conditions have been met: (a) the transfer was made to or for the benefit of a creditor; (b) the transfer was for or on account of antecedent debt; (c) the transfer was made while the debtor was insolvent; (d) the transfer was made within the 90 days prior to the petition date; and (e) the transfer enabled the creditor to receive more in a chapter 7 liquidation than it would receive had the transfer not been made.

57.    The Debtors' estates appear to have substantial preference claims against the Junior Secured Parties.[27]  Based on the Committee's review of the Security Agreements and the Debtors' internal collateral tracking database, the Committee has determined that approximately $138 million in mortgage loans and approximately $212 million of other assets, including servicing advances and Governmental Insurance Claims, (collectively, the "**Preference Assets**") were added to the Collateral during the 90-day preference period.[28]

58.    Here, the transfers of the Preference Assets meet each of the elements of section 547(b), because adding the Preference Assets to the Junior Secured Parties' liens was (i) for the benefit of the Junior Secured Parties, (ii) on account of antecedent debt (*i.e.*, the Junior Secured Notes), (iii) made while the Debtors were insolvent, (iv) made within the 90-day preference period, and (v) reduced the amount by which the Junior Secured Notes were undersecured, thereby allowing the Junior Secured Parties to receive more than they would in a hypothetical chapter 7 liquidation had the Preference Assets not been added to the Collateral.[29]  Accordingly,

---

[27]  The Debtors generally prepared trial balance sheets for the end of each month (other than a special one-time, mid-month balance sheet in connection with the commencement of these cases).  Accordingly, because data was not available for 90 days prior to the Petition Date (February 14, 2012), the preference analysis described below identifies only assets that were added in the 75 days prior to the Petition Date.  There may be additional preference exposure which the Committee has not yet identified.

[28]  Due to the volume of data underlying the Preference Assets, a schedule of the Preference Assets is not attached, but will be made available to the Court, the Debtors, AFI, and the Junior Secured Parties upon request.

[29]  The Committee's professionals are currently considering whether the transfer of a large portion of the Debtors' cash management system from Wells Fargo to JPMorgan in the month preceding the Petition Date also resulted in avoidable preferences to the extent that amounts on deposit cannot be traced.  The Committee also understands that certain cash in the Debtors' deposit accounts may not have been correctly allocated to a given funding facility under the Debtors' trial balance sheets for February 29, 2012 and subsequently provided dates.  To the extent that through reallocation such cash appears to have preferentially benefited the Junior Secured Parties, the Committee reserved the right to challenge such transfers as preferences.

the Junior Secured Parties' liens on the Preference Assets should be avoided as a preference pursuant to section 547(b) of the Bankruptcy Code.

## RELIEF REQUESTED

59.    The Committee hereby requests leave, standing, and authority to commence an adversary proceeding to prosecute the Claims against the Junior Secured Parties and the sole authority to settle all or a portion of the Claims on behalf of the Debtors' estates.

## BASIS FOR RELIEF REQUESTED

### I.    The Committee Should Be Granted Standing to Pursue the Claims on Behalf of the Estates

60.    These cases present a paradigmatic situation for granting a committee standing to pursue obviously valuable and meritorious claims that a debtor simply cannot or will not pursue – here, because the Debtors abandoned the claims before the cases were even commenced, apparently as part of an effort to secure support for their pre-negotiated settlement providing a global release to their parent AFI.

61.    The Committee's implied authority to bring these claims flows from its well-recognized statutory voice in the Debtors' affairs.  Section 1109(b) of the Bankruptcy Code provides, in pertinent part, that the Committee "may raise and may appear and be heard on any issue" in the Debtors' Chapter 11 Cases.  Moreover, pursuant to section 1103(c)(2), the Committee may "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business . . . and any other matter relevant to the case or to the formulation of a plan."

62.    The Second Circuit has recognized "a qualified right for creditors' committees to initiate adversary proceedings in the name of the debtor-in-possession with the approval of the

bankruptcy court."[30]  The bankruptcy court may grant such authority where the debtor either unjustifiably fails to bring suit or consents to the creditors' committee's suit.[31]

63.     Where a debtor refuses to bring suit, the Court must decide whether such refusal is unjustified by determining whether (i) "the committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery" and (ii) "an action asserting such claim(s) is likely to benefit the reorganization estate."[32]  Where a debtor consents to a committee bringing suit, the Court still must determine whether the suit is "in the best interest of the bankruptcy estate" and "is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings."[33]  Here, the Committee readily meets both standards.

### A.  The Debtors Are Unable to Bring the Claims, and Any Committee Demand to Pursue Such Claims Would Be Futile

64.     Earlier today, the Debtors notified the Committee that they consent to standing. Even absent such consent, the threshold element of the derivative standing test would be met because the Debtors have disabled themselves from bringing these claims.  Formal demand by the Committee is excused where it is "plain from the record that no action on the part of the debtor would have been forthcoming."[34]

65.     Here, futility is established because the Stipulations prohibit the Debtors from pursuing the Claims against the Junior Secured Parties.  The Debtors agreed to numerous stipulations in the AFI DIP Order concerning the validity of Junior Secured Notes, the scope and enforceability of their related liens and a waiver of causes of action against the Junior Secured

---

[30]  *In re Commodore Int'l Ltd.*, 262 F.3d 96, 99 (2d Cir. 2001) (quoting *In re STN Enters.*, at 904) (internal quotation omitted).

[31]  *See STN*, 779 F.2d at 904 (holding that a committee may pursue claims); *Commodore*, 262 F.3d at 100; *see also In re KDI Holding*, 277 B.R. 493, 507-08, 519 (Bankr. S.D.N.Y. 1999) (Gonzalez, J.) (discussing *STN*).

[32]  *STN*, 779 F.2d at 905.

[33]  *Commodore*, 262 F.3d at 100 (internal quotation marks omitted).

[34]  *In re Nat'l Forge Co.*, 326 B.R. 532, 544 (W.D. Pa. 2005); *see also In re La. World Expo.*, 832 F.2d 1391, 1397-98 (5th Cir. 1987); *In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992).

Parties.   See AFI DIP Order ¶¶ 5(c)-(d), (g)-(j).   These agreements became binding on the Debtors upon entry of the AFI DIP Order.   *See* AFI DIP Order ¶ 28.   The Debtors therefore cannot pursue the Claims and  any demand for them to do so would be futile.   Accordingly, the first element of the *STN* test would have been satisfied even if the Debtors had not consented to standing.

### B.   The Committee's Claims Are Colorable

66.    The second element of the derivative standing test, absent consent, would require the Committee to demonstrate that colorable claims exist against the Junior Secured Parties – a relatively easy showing under applicable case law.[35]   To determine if a colorable claim exists, the Court should not conduct a mini-trial.[36]   A committee seeking standing need not lay bare its complete proof, but rather is required only to describe a facially valid claim, which will be evaluated under a standard "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."[37]

67.    Each of the Claims is colorable.   The Unencumbered Asset Claims are the result of an intensive investigation by the Committee and its professionals, including a painstaking effort to reconstruct the collateral packages for a multitude of Bilateral Facilities and other credit facilities to determine whether the Excluded Assets were excluded from the Junior Secured Parties' collateral package.   As set forth above at paragraphs 37–51, the Committee has articulated at minimum a facially plausible claim that the identified assets are properly excludable from the Collateral.   The Perfection Claims are based on an uncomplicated application of relevant nonbankruptcy law.   As set forth above at paragraphs 52–55, the

---

[35]  *See, e.g., In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 376-81 (Bankr. S.D.N.Y. 2005); *In re America's Hobby Ctr.*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (standing should be denied only if claim is "facially defective").

[36]  *See STN*, 779 F.2d at 905-06; *see also In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 369 (Bankr. S.D.N.Y. 2005).

[37]  *In re America's Hobby Ctr.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); *accord*, *KDI*, 277 B.R. at 508.

Committee has made *prima facie* showing that there are assets in which the Junior Secured Parties failed to perfect their security interest.  Similarly, the Preference Claims are based on a straightforward application of section 547(b) of the Bankruptcy Code and the Committee's review of the Debtors' internal collateral tracking database to identify the approximately $350 million of property added to the Junior Secured Parties' collateral in the 90 days prior to the Petition Date.  *See supra* ¶¶ 56–58.  While the Junior Secured Parties may assert affirmative defenses under section 547(c) of the Bankruptcy Code, this pleading is not the proper forum to address such putative defenses.  The allegations contained herein are sufficient to demonstrate that the Claims are colorable.  Accordingly, the second element of the *STN* test is satisfied.

## C.  The Committee's Pursuit of the Claims Will Benefit the Debtors' Estates

68.    As to the third condition for *STN* standing, permitting the Committee to commence actions prosecuting the Claims will also likely benefit the estates.[38]  With respect to this prong as well, the Court need not conduct a "mini-trial . . . to determine [the] likelihood of success in such a suit or the attendant fees and expenses involved."[39] The Court only needs to "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce."[40]  In other words, the Committee should be awarded standing if there is a "fair chance that the benefits to be obtained from the litigation will outweigh its costs."[41]

69.    Here, the Court can be assured that the Claims have a strong likelihood of success, and that the potential benefits outweigh the likely cost of litigation.  Based on the detailed discussion above, the likelihood of success on the colorable claims mentioned by the Committee

---

[38]  *See STN*, 779 F.2d at 905.

[39]  *Id.*

[40]  *Id.* at 906.

[41]  *America's Hobby Ctr., Inc.*, 223 B.R. at 284.

is high.  On the other hand, the Committee believes that the costs of litigating the Claims  are likely to be far outweighed by the potential recovery for general unsecured creditors.  If successful, the Committee will avoid the liens of the Junior Secured Parties on $459 million in assets or proceeds, if not more, consisting of at least $61 million in Unencumbered Asset Claims, $48 million in Perfection Claims, and $350 million in Preference Claims that may be available for general unsecured creditors after satisfaction of claims of other potential secured creditors.  Such amounts would be in addition to the excess value of the BMMZ Facility which, if the Junior Secured Parties' asserted lien is avoided, could provide direct and/or indirect benefits to unsecured creditors.  Recoveries could increase directly to the extent there is excess value available for unsecured creditors after the Barclays DIP is repaid.  Recoveries could increase indirectly to the extent Adequate Protection Claims, Replacement Liens or 507(b) Claims are decreased because of an elimination of the alleged BMMZ Facility's "residual value" from the property that was entitled to protection from diminution in value.  Either way, the expected value of the Claims, even applying a conservative litigation discount factor, would greatly exceed any cost of litigating them.

70.    Moreover, given the Debtors' consent to the Committee's standing, a less rigorous standard applies – merely that the proposed suit is in the best interests of the estates and necessary and beneficial to the bankruptcy proceedings.[42]  The discussion above confirms the benefits likely to flow to the estates from pursuit of the Claims.  In addition, the Debtors have acknowledged to the Committee that the Claims will need to be resolved in these cases and that, in view of their Stipulations, the Committee is the appropriate party to litigate the Claims.

71.    In short, the Claims that the Committee seeks to assert are colorable, likely to

---

[42] *Commodore*, 262 F.3d at 100.

result in substantial benefit to the estates, and in any event need to be resolved before these cases can be successfully completed. As a result, the Committee should be granted standing under *STN* to prosecute the Claims on behalf of the estates.

## II.    The Committee Should Be Granted Sole Authority to Settle the Claims.

72.    The Debtors' inability to bring the Claims also disables them from effectively managing or settling any resulting litigation. As noted, the Debtors are effectively hamstrung by the Stipulations contained in the AFI DIP Order, barred from seeking to avoid or otherwise challenge the validity, priority, and extent of the Debtors' obligations to the Junior Secured Parties and the liens granted thereunder. As a result, the Debtors should not retain any rights to settle and compromise any Claims the Committee is granted leave to commence.

73.    The Committee's ability to litigate the Claims will be hindered if the Debtors retain the right to propose a settlement because, among other things, it likely will reduce incentives for the Junior Secured Parties to enter into settlement negotiations with the Committee. Granting the Committee the sole right to negotiate a settlement with the Junior Secured Parties diminishes these concerns and makes clear to all potential defendants that the party in control of the litigation controls any potential settlement thereof. Similar relief has also been granted by this and other courts.[43]

## III.    The Committee Should Be Granted 45 Days to File a Complaint

74.    The Committee seeks a period of 45 days from the Court's entry of the Proposed Order to commence an adversary proceeding against the Junior Secured Parties. As noted above, the Committee has not yet completed its investigation. This time period will allow the Committee sufficient time both to complete its analysis and to engage in substantive discussions

---

[43]    *See e.g., In re Majestic Capital, LTD.*, Case No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011) [Docket No. 211 at ¶ 3]; *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) [Docket No. 382 at ¶ 3]; *In re Old CarCo LLC (f/k/a/ Chrysler LLC)*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009) [Docket No. 5151 at ¶ 2].

with the Junior Secured Parties to narrow the potential issues on a consensual basis.  Courts in

neighboring jurisdictions have granted similar relief even on a non-consensual basis.[44]

## NOTICE

75.    In accordance with the Case Management Order, notice of this Motion has been

given to all parties listed on the Monthly Service List (as defined in the Case Management

Order), including the Debtors, counsel to AFI, counsel to the Indenture Trustee, counsel to the

Collateral Agent and counsel to the Ad Hoc Group.  The Committee submits that such notice is

sufficient and that no further notice of the relief requested in the Motion need be provided.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court: (i) enter an

order granting the relief sought herein in the same form or substantially the same form attached

hereto as **Exhibit A**; and (ii) grant such other and further relief as the Court deems just and

proper.

Dated:    September 24, 2012
          New York, New York

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP

                              /s/ Kenneth H. Eckstein
                              Kenneth H. Eckstein
                              Douglas H. Mannal
                              Stephen D. Zide
                              1177 Avenue of the Americas
                              New York, New York  10036
                              Telephone: (212) 715-9100
                              Facsimile: (212) 715-8000

                              *Counsel for the Official Committee
                              of Unsecured Creditors*

---

[44] *See, e.g., In re Open Range Commc'ns Inc.*, Case No. 11-13188 (KJC) (Bankr. D. Del. Jan. 13, 2012) [Docket No. 493 at ¶ 2]
(34-day period for Committee to file complaint following standing order); *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW)
(Bankr. D. Del. Oct. 28, 2011) [Docket No. 382 at ¶ 2] (31-day period for Committee to file complaint following standing order).

**<u>Exhibit A</u>**

**<u>Proposed Order</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:                                    :        Chapter 11
                                          :
Residential Capital, LLC, <u>et</u> <u>al.</u>,        :        Case No. 12-12020 (MG)
                                          :
                        Debtors.          :        Jointly Administered
                                          :
------------------------------------------------------------ x

## ORDER AUTHORIZING THE OFFICIAL COMMITTEE
## OF UNSECURED CREDITORS TO PROSECUTE AND SETTLE
## <u>CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES</u>

Upon consideration of the motion (the "**Motion**")[1] of the Official Committee of

Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-

possession (the "**Debtors**"), for entry of an order, pursuant to sections 105(a), 1103(c), and

1109(b) of the Bankruptcy Code, authorizing the Committee to prosecute and settle certain

claims on behalf of the Debtors' estates against the Collateral Agent and the Indenture Trustee;

and this Court having jurisdiction to order the relief provided herein in accordance with 28

U.S.C. §§ 157 and 1334 and Amended Standing Order of Reference M-431, dated January 31,

2012 (Preska, Acting C.J.); and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

been given, and no other or further notice need be provided; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors' estates, and

that the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

**IT IS HEREBY FOUND ORDERED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      All objections, if any, to the Motion or the relief requested there, that have not been withdrawn, waived, or settled are overruled.

3.      The Committee is granted standing and is authorized on behalf of the Debtors' estates to commence and prosecute to conclusion the Claims, or any other matter arising out of the Committee's investigation of the Collateral, with the full rights and privileges of, and in the stead of, the Debtors.

4.      The time for the Committee to commence an adversary proceeding shall be 45 days from the date hereof.

5.      The Committee shall have the exclusive right and authority to negotiate and enter into settlements on behalf of the Debtors' estates with respect to the Claims.

6.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: New York, New York
_____, 2012

_____
United States Bankruptcy Judge

- 2 -

**Exhibit B**

**Demand Letter**

KRAMER LEVIN NAFTALIS & FRANKEL LLP

P. BRADLEY O'NEILL
PARTNER
PHONE 212-715-7583
FAX 212-715-8000
BONeill@KRAMERLEVIN.COM

September 16, 2012

BY EMAIL

Todd M. Goren, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050

> Re:    In re Residential Capital, LLC, *et al.*, Case No. 12-12020 (MG)
> United States Bankruptcy Court, Southern District of New York

Dear Todd:

I am writing to you in my capacity as counsel to the Official Committee of Unsecured Creditors (the "**Committee**") of Residential Capital, LLC ("**ResCap**") along with its affiliates (collectively, the "**Debtors**") in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**").[1]

As you know the Committee has been investigating the liens and claims of the holders of the 9.625% Junior Secured Notes due 2015. Although the Committee has not yet completed its investigation, it has identified several issues with the collateral package of the Junior Secured Parties stipulated to by the Debtors in the AFI DIP Order. In addition, the Committee believes that the Debtors' estates possess valuable claims against the Junior Secured Parties that should be pursued for the benefit of the estates. Among other things, the Committee has identified the following issues to date:

- **Excluded Assets**. The security agreement for the Junior Secured Notes explicitly carves certain of the Debtors' assets out of the lien granted to the Junior Secured Parties, including assets whose pledge would violate either "Requirements of Law" or the terms of the Debtors' so-called "Bilateral Facilities" in effect as of the date of the security agreement. Based on our review of the Debtors' records, at least $40 million of mortgage loans that are currently identified by the Debtors as collateral were

---

[1]  Capitalized terms used but not otherwise defined here shall have the meanings ascribed to such terms in the Court's Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Bases, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties, dated June 25, 2012 [Docket No. 491] (the "**AFI DIP Order**").

September 16, 2012
Page 2

pledged to a Bilateral Facility that prohibited any further encumbrance of the assets as of the date of the security agreement, and have since been released from such pledge to a Bilateral Facility. Accordingly, the Junior Secured Parties were not granted and do not have a valid and enforceable lien on these mortgage loans.

- **BMMZ Repo Facility**. The Debtors stipulated in the AFI DIP Order that the collateral for the Junior Secured Notes includes the "Pre-Petition Ally Repo Facility" (commonly referred to as the "**BMMZ Repo Facility**") and any residual value therefrom. Based on our review, the transaction that created the BMMZ Repo Facility appears not to be a true sale of mortgage loans, but rather a disguised financing, and the Junior Secured Parties failed to properly perfect their interests in the mortgage loans pledged to the BMMZ Repo Facility. Furthermore, certain of the assets that were pledged to the BMMZ Repo Facility were previously pledged to a Bilateral Facility and are thus an "Excluded Asset" under the security agreement. Accordingly, the BMMZ Repo Facility and its residual value are not collateral.

- **Unperfected Liens**. The Debtors identified a number of assets as collateral, the liens of which have not been perfected. These assets include (i) approximately $37 million in restricted cash deposited by Debtor GMAC Mortgage LLC ("**GMAC Mortgage**") with Ally Bank because the governing deposit agreement prohibits GMAC Mortgage from pledging the account as Collateral, (ii) approximately $2 million of restricted cash on deposit with The Bank of New York Mellon, N.A. which is not subject to a control agreement in favor of the Junior Secured Parties, (iii) other depository accounts for which the Junior Secured Parties do not have a control agreement, (iv) the assets of Debtor Executive Trustee Services because the Junior Secured Parties have failed to file a UCC-1 financing statement in connection thereto, and (v) commercial tort claims of the Debtors, if any, because neither the security agreement nor the financing statements specifically describe any such claim. The liens on these assets should be avoided pursuant to section 544(a) of the Bankruptcy Code.

- **REO Properties**. The Debtors identified a number of real estate owned properties as collateral (the "**REO Properties**"). While the Junior Secured Parties have a lien in the equity of certain special-purpose vehicles to which some of the REO Properties were transferred, approximately $12 million of REO Properties are not held by special-purpose vehicles. You have informed us that no mortgages were prepared, signed or filed in respect of these properties. Accordingly, the Junior Secured Parties have no perfected liens upon them and they are not collateral.

- **Preferential Liens**. Based on our review of the Debtors' records, approximately $137 million of mortgage loans, among other property, were added to the collateral in the 90 days prior to the commencement of the Chapter 11 Cases. Accordingly, the Debtors should seek to avoid the Junior Secured Parties liens on such property pursuant to section 547(b) of the Bankruptcy Code.

September 16, 2012
Page 3

The Committee believes that it would be appropriate and beneficial to the Debtors' estates to either (i) obtain the agreement of the Junior Secured Parties that they do not have valid, enforceable and unavoidable liens on any of the above assets, or (ii) seek a judgment from the Court that the Junior Secured Parties do not have such liens. However, in light of the Debtors' stipulations to the validity and enforceability of the liens and claims of the Junior Secured Parties in the AFI DIP Order, it would be futile for the Committee to demand that the Debtors commence a cause of action against the Junior Secured Parties. Accordingly, the Committee hereby requests that the Debtors consent to the Committee being granted standing on behalf of the Debtors' estates to prosecute and resolve (including the sole authority to settle) causes of action against the Junior Secured Parties concerning the validity and enforceability of the claims and liens discussed above. The Committee has not yet completed its investigation and reserves all of its rights to raise additional issues in connection with any action against the Junior Secured Parties or to seek related relief from the Bankruptcy Court.

Given the current deadline of September 24, 2012, for the Committee to seek standing to challenge the claims and liens of the Junior Secured Parties, please respond to this request **no later than September 18, 2012 at 5:00 p.m. (prevailing Eastern Time)**. Please contact me if you have any questions.

Very truly yours,

P. Bradley O'Neill

**<u>Exhibit C</u>**

**<u>Daniels Declaration</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
In re:                                          :    Chapter 11
                                                :
Residential Capital, LLC, <u>et</u> <u>al.</u>,           :    Case No. 12-12020 (MG)
                                                :
                         Debtors.               :    Jointly Administered
                                                :
------------------------------------------------------------- x

<u>**DECLARATION OF ELAN M. DANIELS**</u>

I, Elan M. Daniels, declare as follows:

1.       I am an associate of the law firm Kramer Levin Naftalis & Frankel LLP
("**<u>Kramer Levin</u>**"), counsel to the Official Committee  of Unsecured Creditors (the
"**<u>Committee</u>**") of the above-captioned debtors and debtors-in-possession in these chapter 11
cases (collectively, the "**<u>Debtors</u>**").

2.       I respectfully submit this declaration in support of the *Motion of the*
*Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute*
*and Settle Certain Claims on Behalf of the Debtors' Estates* (the "**<u>Motion</u>**"),[1] and solely to
present the following documents to the Court.

3.       Attached hereto as **<u>Exhibit C-1</u>** is a true and correct copy of the indenture
for the Junior Secured Notes as provided to the Committee by the Debtors.

4.       Attached hereto as **<u>Exhibit C-2</u>** is a true and correct copy of the Notes
Security Agreement as provided to the Committee by the Debtors.

5.       Attached hereto as **<u>Exhibit C-3</u>** is a true and correct copy of the loan
agreement for the AFI Revolver as provided to the Committee by the Debtors.

---

[1] Terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

6.      Attached hereto as **Exhibit C-4** is a true and correct copy of the Revolver Security Agreement as provided to the Committee by the Debtors.

7.      Attached hereto as **Exhibit C-5** is a true and correct copy of the schedule of Bilateral Facilities as attached to SEC Form 10K for Residential Capital, LLC, dated Aug. 8, 2008.

8.      Attached hereto as **Exhibit C-6** is a true and correct copy of the master repurchase agreement for the BMMZ Facility as provided to the Committee by the Debtors.

9.      Attached hereto as **Exhibit C-7** is a true and correct copy of the Debtors' quarterly financial statements for the period ended December 31, 2011, as provided to the Committee by the Debtors.

10.     Attached hereto as **Exhibit C-8** is a true and correct copy of the Debtors' quarterly financial statements for the period ended March 31, 2012, as provided to the Committee by the Debtors.

11.     Attached hereto as **Exhibit C-9** is a schedule of the Debtors' deposit accounts, including restricted cash accounts, that based on the Committee's investigation to date, do not appear to be subject to control agreements in favor of the Junior Secured Parties.

12.     Attached hereto as **Exhibit C-10** is a schedule of Excluded Real Property, other than REO Properties, compiled based on [Docket Nos. 550, 556, 924, 1459], that based on the Committee's investigation to date, is not subject to mortgages in favor of the Junior Secured Parties.

*        *        *

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed at New York, NY on September 24, 2012

/s/ Elan M. Daniels
Elan M. Daniels

**<u>Exhibit C-1</u>**

**<u>Junior Secured Notes Indenture</u>**

EX-4.4 5 c26768exv4w4.htm INDENTURE

**Exhibit 4.4**

---

RESIDENTIAL CAPITAL, LLC

AND EACH OF THE GUARANTORS FROM TIME TO TIME PARTY HERETO

9.625% JUNIOR SECURED GUARANTEED NOTES DUE 2015

---

INDENTURE

Dated as of June 6, 2008

---

U.S. Bank National Association

Trustee

---

Confidential

## CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310 (a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313(a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06; 7.07 |
| (c) | 7.06; 12.02 |
| (d) | 7.06 |
| 314(a) | 4.03;12.02; 12.05 |
| (b) | N.A |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 12.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05; 12.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 12.01 |
| (b) | N.A. |
| (c) | 12.01 |

---

N.A. means not applicable.

*      This Cross Reference Table is not part of the Indenture.

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### DEFINITIONS AND INCORPORATION
### BY REFERENCE

Section 1.01 Definitions                                                          1
Section 1.02 Other Definitions                                                  19
Section 1.03 Incorporation by Reference of Trust Indenture Act                  19
Section 1.04 Rules of Construction                                             20
Section 1.05 Retroactive Effect of Indenture with respect to Certain Transactions    20

### ARTICLE II
### THE NOTES

Section 2.01 Form and Dating                                                   20
Section 2.02 Execution and Authentication                                      21
Section 2.03 Registrar and Paying Agent                                        22
Section 2.04 Paying Agent to Hold Money in Trust                               22
Section 2.05 Holder Lists                                                      22
Section 2.06 Transfer and Exchange                                            23
Section 2.07 Replacement Notes                                                 37
Section 2.08 Outstanding Notes                                                 37
Section 2.09 Treasury Notes                                                    37
Section 2.10 Temporary Notes                                                   38
Section 2.11 Cancellation                                                      38
Section 2.12 Defaulted Interest                                                38
Section 2.13 Withholding Taxes                                                 38

### ARTICLE III
### REDEMPTION AND PREPAYMENT

Section 3.01 Notices to Trustee                                                39
Section 3.02 Selection of Notes to Be Redeemed                                39
Section 3.03 Notice of Redemption                                             40
Section 3.04 Effect of Notice of Redemption                                   40
Section 3.05 Deposit of Redemption                                            41
Section 3.06 Notes Redeemed in Part                                           41
Section 3.07 Optional Redemption                                              41
Section 3.08 Offer to Purchase by Application of Excess Proceeds              42
Section 3.09 Mandatory Redemption                                             44

-i-

**Page**

### ARTICLE IV
### COVENANTS

| | |
|---|---|
| Section 4.01 Payment of Notes | 44 |
| Section 4.02 Maintenance of Office or Agency | 44 |
| Section 4.03 Reports | 45 |
| Section 4.04 Compliance Certificate | 46 |
| Section 4.05 Taxes | 46 |
| Section 4.06 Stay, Extension and Usury Laws | 46 |
| Section 4.07 Restricted Payments | 47 |
| Section 4.08 [Reserved] | 48 |
| Section 4.09 Incurrence of Indebtedness | 48 |
| Section 4.10 Asset Sales | 49 |
| Section 4.11 Transactions with Affiliates | 50 |
| Section 4.12 Liens | 51 |
| Section 4.13 Maintenance of the Company as a Holding Company | 52 |
| Section 4.14 Corporate Existence | 52 |
| Section 4.15 [Reserved] | 52 |
| Section 4.16 [Reserved] | 52 |
| Section 4.17 Future Guarantors | 52 |

### ARTICLE V
### SUCCESSORS

| | |
|---|---|
| Section 5.01 Merger, Consolidation, or Sale of Assets | 53 |
| Section 5.02 Successor Corporation Substituted | 54 |

### ARTICLE VI
### DEFAULTS AND REMEDIES

| | |
|---|---|
| Section 6.01 Events of Default | 54 |
| Section 6.02 Acceleration | 56 |
| Section 6.03 Other Remedies | 56 |
| Section 6.04 Waiver of Past Defaults | 56 |
| Section 6.05 Control by Majority | 57 |
| Section 6.06 Limitation on Suits | 57 |
| Section 6.07 Rights of Holders of Notes to Receive Payment | 57 |
| Section 6.08 Collection Suit by Trustee | 58 |
| Section 6.09 Trustee May File Proofs of Claim | 58 |
| Section 6.10 Priorities | 58 |
| Section 6.11 Undertaking for Costs | 59 |

### ARTICLE VII
### TRUSTEE

| | |
|---|---|
| Section 7.01 Duties of Trustee | 59 |

-ii-

Confidential

**Page**

Section 7.02 Rights of Trustee                                                         60
Section 7.03 Individual Rights of Trustee                                              61
Section 7.04 Trustee's Disclaimer                                                      62
Section 7.05 Notice of Defaults                                                        62
Section 7.06 Reports by Trustee to Holders of the Notes                               62
Section 7.07 Compensation and Indemnity                                               62
Section 7.08 Replacement of Trustee                                                   64
Section 7.09 Successor Trustee by Merger, etc                                         65
Section 7.10 Eligibility; Disqualification                                            65
Section 7.11 Preferential Collection of Claims Against Company                        65
Section 7.12 Patriot Act                                                              65
Section 7.13 Payment of Additional Interest                                           65

ARTICLE VIII
COLLATERAL

Section 8.01 Security Documents                                                       66
Section 8.02 Agents                                                                   66
Section 8.03 Authorization of Actions to Be Taken                                     66
Section 8.04 Release of Collateral                                                    67
Section 8.05 Filing, Recording and Opinions                                           68
Section 8.06 Powers Exercisable by Receiver or Trustee                                69
Section 8.07 Release upon Termination of the Company's Obligations                    69

ARTICLE IX
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01 Without Consent of Holders of Notes                                      69
Section 9.02 With Consent of Holders of Notes                                         70
Section 9.03 Compliance with Trust Indenture Act                                      71
Section 9.04 Revocation and Effect of Consents                                        72
Section 9.05 Notation on or Exchange of Notes                                         72
Section 9.06 Trustee to Sign Amendments, etc                                          72

ARTICLE X
GUARANTEES

Section 10.01 Guarantee                                                               72
Section 10.02 Limitation on Guarantor Liability                                       73
Section 10.03 Execution and Delivery of Guarantee                                     74
Section 10.04 Guarantors May Consolidate, etc., on Certain Terms                      74
Section 10.05 Releases                                                                75

-iii-

                                                                                    **Page**

ARTICLE XI
SATISFACTION AND DISCHARGE

Section 11.01 Satisfaction and Discharge                                              75
Section 11.02 Application of Trust Money                                              76


ARTICLE XII
MISCELLANEOUS

Section 12.01 Trust Indenture Act Controls                                            77
Section 12.02 Notices                                                                 77
Section 12.03 Communication by Holders of Notes with Other Holders of Notes           78
Section 12.04 Certificate and Opinion as to Conditions Precedent                      78
Section 12.05 Statements Required in Certificate or Opinion                           79
Section 12.06 Rules by Trustee and Agents                                             79
Section 12.07 No Personal Liability of Directors, Officers, Employees and Stockholders 79
Section 12.08 Governing Law                                                           79
Section 12.09 No Adverse Interpretation of Other Agreements                           80
Section 12.10 Successors                                                              80
Section 12.11 Severability                                                            80
Section 12.12 Counterpart Originals                                                   80
Section 12.13 Table of Contents, Headings, etc                                        80
Section 12.14 Third-Party Beneficiaries                                               80


ARTICLE XIII

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 13.01 Option to Effect Legal Defeasance or Covenant Defeasance                80
Section 13.02 Legal Defeasance and Discharge                                          80
Section 13.03 Covenant Defeasance                                                     81
Section 13.04 Conditions to Legal or Covenant Defeasance                              82
Section 13.05 Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous
   Provisions                                                                         83
Section 13.06 Repayment to the Company                                                84
Section 13.07 Reinstatement                                                           84


EXHIBITS
Exhibit A FORM OF NOTE
Exhibit B FORM OF CERTIFICATE OF TRANSFER
Exhibit C FORM OF CERTIFICATE OF EXCHANGE
Exhibit D FORM OF NOTATION OF GUARANTEE
Exhibit E FORM OF SUPPLEMENTAL INDENTURE
Exhibit F FORM OF OFFICERS' CERTIFICATE FOR RELEASE OF COLLATERAL
Exhibit G FORM OF OPINION OF COUNSEL FOR RELEASE OF COLLATERAL

-iv-

Confidential

INDENTURE dated as of June 6, 2008 among Residential Capital, LLC, a Delaware corporation, each of the Guarantors and U.S. Bank National Association, a national banking association, as Trustee.

The Company and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the 9.625% Junior Secured Guaranteed Notes due 2015 (the "*Notes*"):

# ARTICLE I
# DEFINITIONS AND INCORPORATION
# BY REFERENCE

Section 1.01 *Definitions*.

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee.

"*Acquired Indebtedness*" means Indebtedness of a Person existing at the time such Person becomes a Subsidiary or assumed in connection with the acquisition of assets from such Person.

"*Additional Interest*" has the meaning given to such term in the Registration Rights Agreement.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Sections 2.02 and 4.09 hereof, as part of the same series as the Initial Notes.

"*Affiliates*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Agent*" means any Registrar, Collateral Agent, co-registrar, Paying Agent or additional paying agent.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary that apply to such transfer or exchange.

"*Asset Sale*" means any sale, securitization financing, exchange or other disposition by the Company or any Subsidiary of any Collateral or Supporting Assets to any Person (collectively, for purposes of this definition, a "transfer"), *provided* that if any such transaction constitutes part of a series of related transactions, all of the transactions in such series shall

Confidential

constitute a single transfer. For purposes of this definition, the term "Asset Sale" shall not include:

(a) transfers of cash or cash equivalents representing payments received in the ordinary course of business from any obligor under such Collateral;

(b) the write-off or forgiveness of investments in the ordinary course of business;

(c) the creation of any Lien permitted under this Indenture; and

(d) any transfer of assets of Model Home or its Subsidiaries (other than any Collateral or Supporting Assets with respect to which the Company has relied on clause (3) of the second paragraph of Section 4.10) other than to the Company or a Subsidiary (other than a Financing SPV).

"*Bankruptcy Law*" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Board of Directors*" means:

(1) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2) with respect to a partnership, the board of directors of the general partner of the partnership;

(3) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4) with respect to any other Person, the board or committee of such Person serving a similar function.

"*Broker-Dealer*" has the meaning set forth in the Registration Rights Agreement.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City or the State of Minnesota.

-2-

Confidential

"*Capital Lease*" means, with respect to any Subsidiary, any lease of (or other agreement conveying the right to use) any real or personal property by such Subsidiary that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Subsidiary.

"*Capital Stock*" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Collateral*" means all of the existing and after-acquired collateral described in the Security Documents; *provided* that for purposes of Sections 4.10 and 4.12 the "Collateral" shall include only *Primary Collateral* (as defined in the Security Agreement).

"*Collateral Agent*" means Wells Fargo Bank, N.A. in its capacity as Third Priority Collateral Agent under the Security Documents.

"*Collateral Control Agent*" has the meaning set forth in the Intercreditor Agreement.

"*Company*" means Residential Capital, LLC and any and all successors thereto.

"*Consolidated Net Income*" for any period means the net income (or loss) of the Company and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(a) the net income (or loss) of any Person that is not a Subsidiary, except to the extent that cash in an amount equal to any such income has actually been received by the Company or, subject to clause (c) below, any Subsidiary during such period;

(b) except to the extent includible in the consolidated net income of the Company pursuant to the foregoing clause (a), the net income (or loss) of any Person that accrued prior to the date that (i) such Person becomes a Subsidiary or is merged into or consolidated with the Company or any Subsidiary or (ii) the assets of such Person are acquired by the Company or any Subsidiary;

-3-

Confidential

(c) the net income of any Subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that income is not permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary during such period, except that the Company's equity in a net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

(d) in the case of a successor to the Company by consolidation, merger or transfer of its assets, any income (or loss) of the successor prior to such merger, consolidation or transfer of assets; and

(e) without duplication of amounts otherwise deducted in determining Consolidated Net Income, the amount of Permitted Tax Distributions for such period.

"*Corporate Trust Office of the Trustee*" means a principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at U.S. Bank National Association, 60 Livingston Avenue, EP-MN-WS3C, St. Paul, MN 55107-2292, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"*corporation*" means a corporation, limited liability company, statutory trust, limited partnership or similar limited liability entity.

"*Custodian*" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"*Dealer Managers*" means Banc of America Securities LLC, Citigroup Global Markets, Inc., Barclays Capital Inc., Deutsche Bank Securities Inc. and Lehman Brothers Inc.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, DTC, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Disqualified Equity Interests*" means any class of Equity Interests of the Company or such Subsidiary that, by its terms, or by the terms of any related agreement or of any security into which it is convertible, puttable or exchangeable, is, or upon the happening of any event or the passage of time would be, required to be redeemed by the Company or such Subsidiary,

-4-

Confidential

whether or not at the option of the holder thereof, or matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, on or prior to the date which is 91 days after the final maturity date of the Notes.

"*Equity Interests*" of any Person means (1) any and all shares or other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such Person and (2) all rights to purchase, warrants or options (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such Person.

"*Event of Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an event of Event of Default.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exchange Offer*" has the meaning set forth in the Registration Rights Agreement.

"*Exchange Offer Registration Statement*" has the meaning set forth in the Registration Rights Agreement.

"*Exchange Securities*" has the meaning given such term by the Registration Rights Agreement.

"*Excluded Subsidiary*" means (i) GMAC Bank, (ii) a Foreign Subsidiary, (iii) any Subsidiary that is effectively restricted from guaranteeing the Notes by law or regulation, (iv) any Financing SPV or (v) any Subsidiary that is effectively restricted from guaranteeing the Notes by its charter, so long as such Subsidiary referred to in this clause (v) is required to make dividends of all cash legally available therefor that is not required to pay current obligations of such Subsidiary; *provided*, that (x) no Subsidiary under (i), (ii), (iii) or (v) above shall be deemed an Excluded Subsidiary if it guarantees any Indebtedness of the Company or any unsecured Indebtedness of any Guarantor for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments and (y) no Subsidiary the Equity Interests of which are directly owned by the Company shall be an Excluded Subsidiary.

"*Existing Notes*" means any series of the Company's existing senior and senior subordinated notes which were the subject of the exchange offers contemplated by the Offering Memorandum.

"*Fair Value*" means, with respect to any Collateral or Supporting Assets at any time, the fair market value of such Collateral or Supporting Assets at such time (taking into account, among other things, current market conditions and whether such Collateral or Supporting Assets are subject to senior claims or set-off rights).

"*Financing Assets*" means whole loan mortgages, residual interests, securities (including Equity Interests or Indebtedness of Subsidiaries that are Financing SPVs but excluding Equity Interests of other Subsidiaries) and other financial assets or any related assets, rights or property or the proceeds therefrom.

-5-

Confidential

"*Financing SPV*" means a special purpose vehicle formed for financing purposes by the Company or any Subsidiary in accordance with past practice of the Company (or any reasonable extension or modification of such past practice including for purposes of financing other types of financial assets) that does not guarantee any Indebtedness of the Company or any Subsidiary other than Indebtedness of another Financing SPV and substantially all of the assets of which consist of Financing Assets.

"*First Priority Collateral Agent*" means Wells Fargo Bank, N.A., in its capacity as collateral agent for the holder of Permitted First Lien Indebtedness.

"*Foreign Subsidiary*" means (x) a Subsidiary that is not organized within one of the 50 states of the United States of America or any jurisdiction that hereafter becomes a state and (y) any Subsidiary of a Subsidiary referred to in clause (x) above.

"*GAAP*" means United States generally accepted accounting principles as in effect from time to time and as applied by the Company in the preparation of its financial statements.

"*Global Note Legend*" means the legend set forth in Section 2.06(g)(2) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes registered in the name of the Depositary or its nominee, deposited with the Trustee, as custodian for the Depositary substantially in the form of Exhibit A hereto and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.06(b)(3), 2.06(b)(4), 2.06(d)(2) or 2.06(f) hereof.

"*GMAC*" means GMAC LLC, a Delaware Limited Liability company.

"*GMAC Bank*" means GMAC Bank IB, an industrial bank corporation chartered by the State of Utah.

"*GMAC Parties*" means GMAC (and its successors) and its Affiliates (other than the Company and the Company's Subsidiaries and IB Finance).

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"*Guarantee*" means the full and unconditional guarantee of the payment of principal, interest and premium, if any, on the Notes as set forth in this Indenture.

"*guarantee*" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to

-6-

Confidential

take or pay or to maintain financial statement conditions or otherwise); and when used as a verb, "guarantee" and conjugations thereof shall have correlative meanings.

"*Guarantor*" means (i) each of the Subsidiaries of the Company that is a party to this Indenture, and (ii) any other Subsidiary that executes a supplemental indenture in accordance with the provisions of this Indenture.

"*Holder*" means the Person in whose name a Note is registered on the registration books kept for that purpose in accordance with Section 2.03.

"*IB Finance*" means IB Finance Holding Company, LLC, a Delaware limited liability company.

"*Indebtedness*" means, with respect to any Person, without duplication: (i) all indebtedness of such Person for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments; (ii) all obligations of such Person as lessee under Capital Leases that have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP and all obligations of such Person as lessee under any so-called synthetic, off-balance sheet or tax retention lease; (iii) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business); (iv) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; (v) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit and banker's acceptances issued for the account of such Person; (vi) all Disqualified Equity Interests of such Person; (vii) all Suretyship Liabilities of such Person in respect of obligations of others of the type described in clauses (i) through (vi) above; and (viii) all indebtedness of any partnership of which such Person is a general partner, to the extent of such liability; provided, that Indebtedness shall not include (x) obligations arising from agreements of the Company or a Subsidiary providing for indemnification, contribution, earnout, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets or Equity Interests of a Subsidiary otherwise permitted under this Indenture and not required to be reflected as a liability on a consolidated balance sheet of the Company; or (y) obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" means $4,010,280,000 aggregate principal amount of Notes issued under this Indenture on the Issue Date.

"*Intercreditor Agreement*" means the intercreditor agreement, dated as of the Issue Date, by and between the Company, the Guarantors, the subsidiaries of the Company party thereto, the

-7-

Confidential

Collateral Agent, the First Priority Collateral Agent, the Second Priority Collateral Agent and the Collateral Control Agent party thereto and the other parties thereof, as the same may be amended, amended and restated or otherwise supplemented in accordance with the terms hereof and thereof.

"*Investments*" of any Person means:

(a) all direct or indirect investments by such Person in any other Person in the form of loans, advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers, directors and employees) or other credit extensions constituting Indebtedness of such other Person, and any guarantee of Indebtedness of any other Person;

(b) all purchases (or other acquisitions for consideration) by such Person of Indebtedness, Equity Interests or other securities of any other Person (other than any such purchase that constitutes a Restricted Payment of the type described in clause (b) of the definition thereof); and

(c) all other items that would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP (including, if required by GAAP, purchases of assets outside the ordinary course of business).

Except as otherwise expressly specified in this definition, the amount of any Investment (other than an Investment made in cash) shall be the fair market value thereof on the date such Investment is made.

"*Issue Date*" means June 6, 2008.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in the City of New York or at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment may be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervening period.

"*Letter of Transmittal*" means the letter of transmittal to be prepared by the Company and sent to all Holders of the Notes for use by such Holders in connection with the Exchange Offer.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"*Model Home*" means GMAC Model Home Finance, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Residential Funding Capital, LLC, and its successors and assigns (including its successor or assign formed as a result of a transaction in

-8-

Confidential

which GMAC Model Home Finance, LLC becomes a wholly-owned Subsidiary of a holding company that is a wholly-owned Subsidiary of Residential Funding Capital, LLC).

"*Net Cash Proceeds*" means, with respect to any Asset Sale of Collateral, the proceeds thereof in the form of cash or cash equivalents, net of:

(a) brokerage commissions and other fees and expenses (including fees, discounts and expenses of legal counsel, accountants and investment banks, consultants and placement agents) of such Asset Sale;

(b) provisions for taxes payable as a result of such Asset Sale (after taking into account any available tax credits or deductions and any tax sharing arrangements);

(c) amounts required to be paid to any Person (other than the Company or any Subsidiary) owning a beneficial interest in the assets subject to the Asset Sale or having a Lien thereon (excluding the Senior Secured Credit Facility, the Notes and the Senior Secured Notes);

(d) payments of unassumed liabilities (not constituting Indebtedness) relating to the assets sold at the time of, or within 30 days after the date of, such Asset Sale; and

(e) appropriate amounts to be provided by the Company or any Subsidiary, as the case may be, as a reserve required in accordance with GAAP against any adjustment in the sale price of such asset or assets or liabilities associated with such Asset Sale and retained by the Company or any Subsidiary, as the case may be, after such Asset Sale, including pensions and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an Officers' Certificate delivered to the Trustee.

"*Non-U.S. Person*" means a Person who is not a U.S. Person.

"*Notes*" has the meaning assigned to it in the preamble to this Indenture. The Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"*obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages, guarantees and other liabilities payable under the documentation governing any debt, in each case, whether now or hereafter existing, renewed or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether or not arising on or after the commencement of a case under Title 11, U.S. Code or any similar federal or state law for the relief of debtors (including post-petition interest) and whether or not allowed or allowable as a claim in any such case.

"*Offering Memorandum*" means the confidential offering memorandum and consent solicitation statement dated May 5, 2008, as amended and supplemented by Supplement No. 1 dated May 14, 2008 and Supplement No. 2 dated May 29, 2008.

-9-

Confidential

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary, any Assistant Secretary or any Vice-President of such Person.

"*Officers' Certificate*" means a certificate signed on behalf of the Company by two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Company, that meets the requirements of Section 12.05 hereof.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 12.05 hereof. The counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

"*Pari Passu Third Lien Indebtedness*" means Permitted Refinancing Indebtedness of the type described in clause (v) of the definition of Permitted Refinancing Indebtedness that is secured by a Lien on the Collateral ranking *pari passu* with the Notes.

"*Participant*" means, with respect to the Depositary, a Person who has an account with the Depositary.

"*Permitted Consideration*" means, with respect to an Asset Sale, cash, cash equivalents and/or assets that, concurrently with such Asset Sale, become Collateral or Supporting Assets for Collateral.

"*Permitted First Lien Indebtedness*" means Indebtedness under the Senior Secured Credit Facility permitted by Section 4.09(b)(1).

"*Permitted Funding Indebtedness*" means Indebtedness incurred in the ordinary course through financing, securitization and hedging activities, including customary lines of credit, repurchase transactions or warehouse financings involving residential mortgage loans, home equity loans or second lien loans (including any reasonable extension or evolution of such activities including for purposes of financing other types of financial assets) and other Indebtedness on terms at least as favorable to the Company or the applicable Subsidiary than would be available on an arms-length basis.

"*Permitted Liens*" means:

(a) Liens existing at the Issue Date;

(b) Liens that secure Obligations incurred pursuant to Section 4.09(b)(1); *provided* that such Liens are subject to the provisions of the Intercreditor Agreement;

(c) any Lien for taxes or assessments or other governmental charges or levies not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such taxes are owed or the third party obligated to pay such taxes and for which adequate reserves are being maintained, to the extent required by GAAP and such

-10-

Confidential

proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(d) any warehousemen's, materialmen's, landlord's or other similar Liens arising by law for sums not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such sums are owed or the third party obligated to pay such sums and with respect to which adequate reserves are being maintained, to the extent required by GAAP and such proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(e) survey exceptions, encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other similar restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not individually or in the aggregate materially adversely affect the value of the Company and its Subsidiaries or materially impair the operation of the business of such Person;

(f) pledges or deposits (i) in connection with workers' compensation, unemployment insurance and other types of statutory obligations or the requirements of any official body, or (ii) to secure the performance of tenders, bids, surety or performance bonds, leases, purchase, construction, sales or servicing contracts and other similar obligations incurred in the normal course of business consistent with industry practice or (iii) to obtain or secure obligations with respect to letters of credit, guarantees, bonds or other sureties or assurances given in connection with the activities described in clauses (i) and (ii) above, in each case not incurred or made in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property or services or imposed by ERISA or the Internal Revenue Code of 1986, as amended, in connection with a "plan" (as defined in ERISA) or (iv) arising in connection with any attachment unless such Liens shall not be satisfied or discharged or stayed pending appeal within 60 days after the entry thereof or the expiration of any such stay;

(g) Liens securing Indebtedness of the Company or a Subsidiary to the extent such secured Indebtedness is pledged as Collateral;

(h) Liens to secure any Permitted Refinancing Indebtedness secured by Liens referred to in clause (a) above; *provided* that such Liens do not extend to any other property or assets and the principal amount of the obligations secured by such Liens is not increased;

(i) licenses of intellectual property granted in the ordinary course of business;

(j) Liens (i) that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Company or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations and other cash management activities incurred in the ordinary course of business of the Company and / or any of its

-11-

Confidential

Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Company or any of its Subsidiaries in the ordinary course of business and (ii) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (Y) encumbering reasonable customary initial deposits and margin deposits and attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business, and (Z) in favor of banking institutions arising as a matter of law or pursuant to customary account agreements encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(k) Deposits made in the ordinary course of business to secure liability to insurance carriers;

(l) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business so long as such leases, subleases, licenses or sublicenses are subordinate in all respects to the Liens granted and evidenced by the Security Documents and which do not materially interfere with the ordinary conduct of the business of the Company or any Subsidiaries and do not secure any Indebtedness;

(m) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company or any Subsidiary in the ordinary course of business;

(n) Liens on the assets (other than any Primary Collateral (as defined in the Security Agreement) or Supporting Assets (as defined in the Security Agreement) with respect to Primary Collateral) of a Subsidiary that is not a Guarantor securing Indebtedness and other obligations of such Subsidiary incurred in compliance with this Indenture;

(o) Liens on the Collateral granted under the Security Documents and the Second Priority Security Documents in favor of the Collateral Agent and the Second Priority Collateral Agent to secure the Notes and the Senior Secured Notes, the Guarantees and any Pari Passu Third Lien Indebtedness; *provided* that such Liens are subject to the terms of the Intercreditor Agreement;

(p) Liens on Financing Assets securing Permitted Funding Indebtedness; provided that such Liens on Financing Assets shall be deemed to be a sale of such Financing Assets for all purposes of this Indenture, including without limitation, Section 4.10 and Section 8.04 and, in the case of Primary Collateral (including any required replacement thereof), shall be permitted only to the extent that such sale and the use of proceeds thereof would comply with Section 4.10; and

(q) any extensions, substitutions, replacements or renewals of the foregoing.

"*Permitted Refinancing Indebtedness*" means Indebtedness that refunds, refinances, renews, replaces or extends any Indebtedness permitted to be incurred by the Company or any Subsidiary pursuant to the terms of this Indenture, whether involving the same or any other lender or creditor or group of lenders or creditors, but only to the extent that:

-12-

(i) the Permitted Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Indebtedness being refunded, refinanced or extended or (b) at least 91 days after the maturity date of the Notes,

(ii) the Permitted Refinancing Indebtedness has a weighted average life to maturity that is equal to or greater than the remaining weighted average life to maturity of the Indebtedness being refunded, refinanced, renewed, replaced or extended,

(iii) such Permitted Refinancing Indebtedness is in an aggregate principal amount that is less than or equal to the sum of (a) the aggregate principal or accreted amount (in the case of any Indebtedness issued with original issue discount, as such) then outstanding under the Indebtedness being refunded, refinanced, renewed, replaced or extended, (b) the amount of accrued and unpaid interest, if any, and premiums owed, if any, not in excess of preexisting prepayment provisions on such Indebtedness being refunded, refinanced, renewed, replaced or extended and (c) the amount of reasonable and customary fees, expenses and costs related to the incurrence of such Permitted Refinancing Indebtedness,

(iv) such Permitted Refinancing Indebtedness is incurred by the same Person (or its successor) that initially incurred the Indebtedness being refunded, refinanced, renewed, replaced or extended or by the Company or a Guarantor; and

(v) if the Indebtedness is Additional Notes or is unsecured such Refinancing Indebtedness is either unsecured or is in the form of Notes or Indebtedness ranking pari passu with the Notes.

"*Permitted Tax Distributions*" means, with respect to any period during which the Company is treated as a disregarded entity or partnership for U.S. federal, state and/or local income tax purposes, distributions to the Company's direct owner(s) (whether pursuant to a tax sharing agreement or otherwise) to fund the income tax liabilities of such owner(s) (or, if a direct owner is a pass-through entity, of an indirect owner) resulting from the Company being a partnership or disregarded entity for federal, state and/or local income tax purposes, in an aggregate amount not to exceed the product of (i) the net taxable income of the Company for such period, calculated in accordance with applicable law, reduced by any cumulative net taxable loss with respect to all prior post-closing periods (determined as if all such periods were one period) to the extent such cumulative net taxable loss is of a character (ordinary or capital) that would permit such loss to be deducted against the income of the current period and (ii) the highest combined marginal federal, state and/or local income tax rate (taking into account the deductibility of state and local income taxes for federal income tax purposes and the character of the taxable income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any such direct or indirect owner of the Company. Permitted Tax Distributions may be made quarterly based on the Company's good faith estimate of its taxable income, with appropriate adjustments to be made on an annual basis based upon the determination of the Company's actual taxable income.

-13-

Confidential

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Preferred Units*" means the non-cumulative, non-participating, perpetual preferred membership interests of the Company, the designation of which is as set forth in the Amended and Restated Operating Agreement of the Company.

"*Private Placement Legend*" means the legend set forth in Section 2.06(g)(1) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified Equity Interests*" means Equity Interests of the Company other than Disqualified Equity Interests.

"*Redemption Date*" means the applicable date on which Notes are to be redeemed pursuant to Section 3.07 or Section 3.09.

"*Registration Rights Agreement*" means the registration rights agreement relating to the Notes entered into by the Company and the Trustee.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee.

"*Responsible Officer,*" when used with respect to the Trustee, means any officer within the Corporate Trust Services of the Trustee (or any successor group of the Trustee), including any vice president, assistant treasurer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"*Restricted Definitive Note*" means a Definitive Note that is a Restricted Note.

"*Restricted Global Note*" means a Global Note that is a Restricted Note.

"*Restricted Note*" has the meaning set forth in Rule 144(a)(3) under the Securities Act for the term "restricted securities"; *provided*, *however*, that the Trustee shall be entitled to request and conclusively rely upon an Opinion of Counsel with respect to whether any Note is a Restricted Note. Restricted Notes are required to bear the Private Placement Legend.

-14-

"*Restricted Payment*" is defined to mean any of the following:

(a) any dividend or other distribution declared and paid on the Equity Interests of the Company or on the Equity Interests in any Subsidiary of the Company that are held by, or declared and paid to, any Person other than the Company or a Subsidiary of the Company other than

(i) dividends, distributions or payments made solely in Qualified Equity Interests of the Company); and

(ii) dividends or distributions payable to the Company or a Subsidiary of the Company or to other holders of Equity Interests of a Subsidiary (other than the GMAC Parties) on a *pro rata* basis;

(b) any payment made by the Company or any of its Subsidiaries to purchase, redeem, acquire or retire any Equity Interests in the Company or any of its Subsidiaries (including any issuance of Indebtedness in exchange for such Equity Interests or the conversion or exchange of such Equity Interests into or for Indebtedness) other than any such Equity Interests owned by the Company or any Subsidiary and other than the redemption of Equity Interests of IB Finance for up to the fair market value thereof at the time of redemption (it being understood that any excess over such fair market value which is paid shall be deemed to be a Restricted Payment and shall be permitted to be paid to the extent otherwise in compliance with Section 4.07);

(c) any payment made by the Company or any of its Subsidiaries (other than payments out of the proceeds of, or in exchange for, Notes, Senior Secured Notes or Permitted Refinancing Indebtedness) to redeem, repurchase, defease (including an in substance or legal defeasance) or otherwise acquire or retire for value (including pursuant to mandatory repurchase covenants), prior to any scheduled maturity, scheduled sinking fund or mandatory redemption payment, Existing Notes, unsecured Permitted Refinancing Indebtedness of the Existing Notes or subordinated Indebtedness of the Company or any Guarantor except, in each case, payments of principal required in order to satisfy a scheduled maturity date on the date such payment is due; and

(d) any Investment by the Company or any of its Subsidiaries in any GMAC Party.

"*Restricted Period*" means the 40-day distribution compliance period as defined in Regulation S.

"*Retained Proceeds*" means Net Cash Proceeds in an aggregate amount of $450 million in the aggregate following the Issue Date which the Company elects to treat as Retained Proceeds.

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 405*" means Rule 405 promulgated under the Securities Act.

-15-

Confidential

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*SEC*" means the Securities and Exchange Commission.

"*Second Priority Collateral Agent*" means Wells Fargo Bank, N.A., in its capacity as collateral agent under the Second Priority Security Documents.

"*Second Priority Security Documents*" means the Second Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of the Issue Date, by and among the Company, the Guarantors, the other Subsidiaries of the Company party thereto and the Second Priority Collateral Agent, any mortgages, the Intercreditor Agreement and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of the Second Priority Collateral Agent or the Collateral Control Agent for its benefit and for the benefit of the trustee under the Senior Secured Notes Indenture and the holders of the Senior Secured Notes.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Security Agreement*" means the Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of the Issue Date, by and among the Company, the Guarantors, the other subsidiaries of the Company party thereto and the Collateral Agent.

"*Security Documents*" means the Security Agreement, any mortgages, the Intercreditor Agreement and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of the Collateral Agent or the Collateral Control Agent for its benefit and for the benefit of the Trustee and the Holders of the Notes.

"*Senior Secured Credit Facility*" means the senior secured credit facility dated as of June 4, 2008 by and among the Company, GMAC and the Guarantors as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

"*Senior Secured Notes*" means the senior secured guaranteed notes issued pursuant to an indenture dated as of the Issue Date by and among the Company, the Guarantors and U.S. Bank National Association as Trustee.

"*Senior Secured Notes Indenture*" means the indenture, dated the Issue Date, governing the Senior Secured Notes.

-16-

Confidential

"*Shelf Registration Statement*" means the Shelf Registration Statement as defined in the Registration Rights Agreement.

"*Significant Subsidiary*" means any Subsidiary of the Company (or group of Subsidiaries as to which a specified condition applies) which meets any of the following conditions:

(1) the Company's and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Subsidiary exceeds 10 percent of the total assets of the Company and its Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

(2) the Subsidiary's income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle exceeds 10 percent of such income of the Company and its Subsidiaries on a consolidated basis for the most recently completed fiscal year.

For purposes of this definition, a Subsidiary shall mean a Person that is controlled by the Company directly or indirectly through one or more intermediaries. For purposes of making any determination or calculations, this definition shall be interpreted in accordance with the rules and instructions of Rule 1-02 of Regulation S-X under the Securities Act as in effect on the Issue Date.

"*Subsidiary*" means any corporation, partnership, limited liability company, association or other entity of which at least a majority of the outstanding stock or other interest having by its terms ordinary voting power to elect a majority of the board of directors, managers or trustees of such corporation, partnership, limited liability company, association or other entity (irrespective of whether or not at the time stock or other interest of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time owned by the Company, or owned by one or more Subsidiaries, or owned by the Company and one or more Subsidiaries (it being understood that GMAC Bank is not a Subsidiary).

"*Supporting Assets*": With respect to any Collateral (a "*Subject Asset*") means:

(i) if such Subject Asset consists of an Equity Interest in any Person, the assets of such Person;

(ii) if such Subject Asset consists of a note or other security backed by financial assets and related property, such assets and property; and

(iii) with respect to any Subject Asset, any other asset or claim that constitutes a primary source of the funds expected to repay the investment in, and return on, such Subject Asset.

"*Suretyship Liability*" means any agreement, undertaking or arrangement by which any Subsidiary guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to or otherwise to invest in a debtor, or otherwise to assure a creditor against loss) any Indebtedness,

-17-

Confidential

obligation or other liability of any other Subsidiary (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the shares of any other Subsidiary. The amount of any Subsidiary's obligation in respect of any Suretyship Liability shall (subject to any limitation set forth therein) be deemed to be the principal amount of the debt, obligation or other liability supported thereby.

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Treasury Yield*" means, with respect to any Notes being redeemed, the yield to maturity implied by (i) the yields reported as of the second Business Day prior to the Redemption Date, on (a) the Bloomberg Financial Markets News screen PX1 or the equivalent screen provided by Bloomberg Financial Markets News, or (b) if such on-line market data is not at that time provided by Bloomberg Financial Markets News, on the display designated as "Page 500" on the Moneyline Telerate service (or such other display as may replace Page 500 on the Moneyline Telerate service), in any case for actively traded U.S. Treasury securities having a maturity equal to May 15, 2010, or (ii) if such yields are not reported at that time or the yields reported as of that time are not ascertainable (including by way of interpolation), the Treasury Constant Maturity Series yields reported, for the latest day for which such yields have been so reported at that time, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity equal to May 15, 2010. Such implied yield will be determined, if necessary, by (x) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (y) interpolating linearly between (1) the actively traded U.S. Treasury security with a maturity closest to and greater than May 15, 2010 and (2) the actively traded U.S. Treasury security with a maturity closest to and less than May 15, 2010.

"*Trustee*" means U.S. Bank National Association until a successor replaces it in accordance with Section 7.08 and Section 7.09 and thereafter means the successor serving hereunder.

"*Unrestricted Definitive Note*" means a Definitive Note that is an Unrestricted Note.

"*Unrestricted Global Note*" means a Global Note that is an Unrestricted Note.

"*Unrestricted Notes*" means one or more Notes that do not and are not required to bear the Private Placement Legend including, without limitation, the Exchange Securities, any Notes sold in connection with an effective Shelf Registration Statement pursuant to the Registration Rights Agreement, any Notes from which the Private Placement Legend has been removed in accordance with Sections 2.07(g) and, with respect to Unrestricted Global Notes, Notes in which a Holder acquires an interest pursuant to Section 2.07(j).

"*U.S. Person*" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

-18-

Confidential

Section 1.02 *Other Definitions*.

| Term | Defined in Section |
|------|--------------------|
| "*Affiliate Transaction*". | 4.11 |
| "*Asset Sale Offer*" | 3.08 |
| "*Authentication Order*" | 2.02 |
| "*Covenant Defeasance*" | 13.03 |
| "*DTC*" | 2.03 |
| "*Event of Default*" | 6.01 |
| "*Excess Proceeds*" | 4.10 |
| "*Legal Defeasance*" | 13.02 |
| "*Offer Amount*" | 3.08 |
| "*Offer Period*" | 3.08 |
| "*Paying Agent*" | 2.03 |
| "*Permitted Indebtedness*" | 4.09 |
| "*Primary Collateral*" | definition of "*Collateral*" |
| "*Purchase Date*" | 3.08 |
| "*Registrar*" | 2.03 |
| "*Subject Asset*" | definition of "*Supporting Assets*" |

Section 1.03 *Incorporation by Reference of Trust Indenture Act*.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"*indenture securities*" means the Notes;

"*indenture security Holder*" means a Holder of a Note;

"*indenture to be qualified*" means this Indenture;

"*indenture trustee*" or "*institutional trustee*" means the Trustee; and

"*obligor*" on the Notes and the Guarantees means the Company and the Guarantors, respectively, and any successor obligor upon the Notes and the Guarantees, respectively.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings so assigned to them.

-19-

Confidential

Section 1.04 *Rules of Construction*.

Unless the context otherwise requires:

(1) a term has the meaning assigned to it;

(2) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3) "or" is not exclusive;

(4) words in the singular include the plural, and in the plural include the singular;

(5) "will" shall be interpreted to express a command;

(6) provisions apply to successive events and transactions; and

(7) references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

Section 1.05 *Retroactive Effect of Indenture with respect to Certain Transactions*.

Solely with respect to any transaction described in Item 1.01 or clauses (a) through (d) of Item 8.01 of the Company's Form 8-K filed with the Securities and Exchange Commission June 3, 2008 and consummated prior to the Issue Date, this Indenture shall be deemed to have been in effect prior to the Issue Date or the consummation of any such transaction (except that any documents required to be delivered to the Trustee pursuant to Section 4.11 of this Indenture may be delivered within 15 days following the Issue Date). For the avoidance of doubt the Trustee shall not have any obligations under this Indenture prior to the date of this Indenture.

## ARTICLE II
## THE NOTES

Section 2.01 *Form and Dating*.

(a) *General*. The Notes and the Trustee's certificate of authentication will be substantially in the form of Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note will be dated the date of its authentication. The Notes shall be in initial denominations of $2,000 and integral multiples thereof.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

-20-

Confidential

However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b) *Global Notes*. Notes offered and sold in reliance on Rule 144A shall be issued initially in the form of one or more permanent Restricted Global Notes. Notes in global form will be substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes initially issued to or transferred to affiliates (as defined in Rule 144) of the Company shall only be issued in definitive form and shall be substantially in the form of Exhibit A hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof. Unless and until exchanged for an Exchange Note or sold in connection with an effective Shelf Registration Statement pursuant to the Registration Rights Agreement, affiliates of the Company may only hold an interest in Notes in the form of Definitive Notes and are prohibited from taking a beneficial interest in one or more Global Notes.

Section 2.02 *Execution and Authentication*.

At least one Officer must sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by at least two Officers (an "*Authentication Order*"), authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes. The Authentication Order shall set forth the number of separate Notes certificates, the principal amount of each of the Notes to be authenticated, the date on which the Notes are to be authenticated, the registered holder of each of the Notes and instructions as to where such Notes shall be delivered. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Company pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may

-21-

do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Company.

Section 2.03 *Registrar and Paying Agent*.

The Company will maintain an office or agency where Notes shall be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar will keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

Section 2.04 *Paying Agent to Hold Money in Trust*.

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium or Additional Interest, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) will have no further liability for the money. If the Company or a Subsidiary acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee will serve as Paying Agent for the Notes.

Section 2.05 *Holder Lists*.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Company shall otherwise comply with TIA § 312(a).

-22-

Confidential

Section 2.06 *Transfer and Exchange*.

(a) *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if:

(1) the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 90 days after the date of such notice from the Depositary; or

(2) there has occurred and is continuing a Default with respect to the Notes and any Holder so requests.

Upon the occurrence of either of the preceding events in (1) or (2) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof.

(b) *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1) *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided*, *however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2) *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar either:

-23-

Confidential

(A) both:

(i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii) instructions from the Depositary given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(B) both:

(i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above.

Upon consummation of an Exchange Offer by the Company in accordance with Section 2.06(f) hereof, the requirements of this Section 2.06(b)(2) shall be deemed to have been satisfied upon receipt by the Registrar of the instructions contained in the Letter of Transmittal delivered by the Holder of such beneficial interests in the Restricted Global Notes. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(h) hereof.

(3) *Transfer of Beneficial Interests to Another Restricted Global Note*. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A) if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B) if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

-24-

(4) *Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note.* A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(2) above and:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of the beneficial interest to be transferred, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(ii) if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate

-25-

one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c) *Transfer or Exchange of Beneficial Interests for Definitive Notes*.

(1) *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes*. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of written instructions from the Depositary, including registration instructions and the following documentation:

(A) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B) if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C) if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D) if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E) if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F) if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered

-26-

in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(2) *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes*. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of such beneficial interest, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(ii) if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

-27-

Confidential

(3) *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes*. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(2) hereof, the Trustee will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Company will execute and the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will not bear the Private Placement Legend.

(d) *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

(1) *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes*. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A) if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B) if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C) if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D) if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E) if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

-28-

Confidential

(F) if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee will, upon surrender of the Restricted Definitive Note, cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, and in the case of clause (C) above, the Regulation S Global Note.

(2) *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(ii) if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

-29-

Confidential

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(2) and surrender of the Definitive Notes to the Trustee, the Trustee will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(3) *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer and surrender of such Unrestricted Definitive Note, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (2)(B), (2)(D) or (3) above at a time when an Unrestricted Global Note has not yet been issued, the Company will issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e) *Transfer and Exchange of Definitive Notes for Definitive Notes*. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in a form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1) *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B) if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(C) if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver

-30-

a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(2) *Restricted Definitive Notes to Unrestricted Definitive Notes.* Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) any such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) any such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(ii) if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3) *Unrestricted Definitive Notes to Unrestricted Definitive Notes.* A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

-31-

Confidential

(f) *Exchange Offer*. Upon the occurrence of the Exchange Offer in accordance with the Registration Rights Agreement, the Company will issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee will authenticate:

(1) one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of the beneficial interests in the Restricted Global Notes accepted for exchange in the Exchange Offer by Persons that certify in the applicable Letters of Transmittal that (A) they are not Broker-Dealers, (B) they are not participating in a distribution of the Exchange Securities and (C) they are not affiliates (as defined in Rule 144) of the Company; and

(2) Unrestricted Definitive Notes in an aggregate principal amount equal to the principal amount of the Restricted Definitive Notes accepted for exchange in the Exchange Offer by Persons that certify in the applicable Letters of Transmittal that (A) they are not Broker-Dealers, (B) they are not participating in a distribution of the Exchange Securities and (C) they are not affiliates (as defined in Rule 144) of the Company.

Concurrently with the issuance of such Notes, the Trustee will cause the aggregate principal amount of the applicable Restricted Global Notes to be reduced accordingly, and the Company will execute and the Trustee will authenticate and deliver to the Persons designated by the Holders of Definitive Notes so accepted Unrestricted Definitive Notes not bearing the Private Placement Legend in the appropriate principal amount.

(g) *Legends*. The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1) *Private Placement Legend*.

(A) Unless and until (x) a Note is exchanged for an Exchange Note or sold in connection with an effective Shelf Registration Statement pursuant to the Registration Rights Agreement, (y) with respect to a Restricted Global Note, all of the beneficial interests in such Restricted Global Note have been exchanged for beneficial interests in the Unrestricted Global Note in accordance with Section 2.06(j) or the Private Placement Legend has been removed from such Restricted Global Note in accordance with Section 2.06(d)(2) or 2.06(e)(2), or (z) the Company determines and there is delivered to the Trustee an Opinion of Counsel reasonably satisfactory to the Trustee and a letter of representation of the Company reasonably satisfactory to the Trustee to the effect that the following legend and the related restrictions on transfer are not required in order to maintain compliance with the provisions of the Securities Act, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT")

-32-

Confidential

AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER:

(1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB") OR (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT,

(2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB, IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (E) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND

(3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2 (E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

(B) Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(4), (c) (2), (c)(3), (d)(2), (d)(3), (e)(2), (e)(3) or (f) of this

-33-

Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(2) *Global Note Legend*. Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ('*DTC*'), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(h) *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global

-34-

Confidential

Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(i) *General Provisions Relating to Transfers and Exchanges.*

(1) To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(2) No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.08, 4.10 and 9.05 hereof).

(3) The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4) All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5) Neither the Registrar nor the Company will be required:

(A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection;

(B) to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C) to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

-35-

Confidential

(6) Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7) The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(8) All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(j) *Automatic Exchange from Restricted Global Note to Unrestricted Global Note.* Upon compliance with the following procedures, all of the beneficial interests in a Restricted Global Note shall be exchanged for beneficial interests in the Unrestricted Global Note. In order to effect such exchange, the Issuer shall provide written notice to the Trustee instructing the Trustee to (i) direct the Depositary to transfer all of the outstanding beneficial interests in a particular Restricted Global Note to the Unrestricted Global Note and provide the Depositary with all such information as is necessary for the Depositary to appropriately credit and debit the relevant Holder accounts and (ii) provide prior written notice to all Holders of such exchange, which notice must include the date such exchange is to occur, the CUSIP number of the relevant Restricted Global Note and the CUSIP number of the Unrestricted Global Note into which such Holders' beneficial interests will be exchanged. As a condition to any such exchange pursuant to this Section 2.06(j), the Trustee shall be entitled to receive from the Issuer, and rely conclusively without any liability, upon an Officers' Certificate and an Opinion of Counsel to the Issuer, in form and in substance reasonably satisfactory to the Trustee, to the effect that such transfer of beneficial interests to the Unrestricted Global Note shall be effected in compliance with the Securities Act. Upon such exchange of beneficial interests pursuant to this Section 2.06(j), the Registrar shall endorse Schedule A to the relevant Notes and reflect on its books and records the date of such transfer and a decrease and increase, respectively, in the principal amount of the applicable Restricted Global Note(s) and the Unrestricted Global Note, respectively, equal to the principal amount of beneficial interests transferred. Following any such transfer pursuant to this Section 2.06(k), the relevant Restricted Global Note shall be cancelled.

(k) <u>Transfers of Notes Held by Affiliates</u>. Any certificate (i) evidencing a Note that has been transferred to an affiliate (as defined in Rule 405) of an Issuer within one year after the Issue Date, as evidenced by a notation on the assignment form for such transfer or in the representation letter delivered in respect thereof or (ii) evidencing a Note that has been acquired from an affiliate (other than by an affiliate) in a transaction or a chain of transactions not involving any public offering, shall, until one year after the last date on which either the Issuer or any affiliate of the Issuer was an owner of such Note, in each case, be in the form of a permanent Definitive Note and bear the Private Placement Legend subject to the restrictions in Section 2.06(g). The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.06. The Issuer, at its sole cost and expense,

-36-

Confidential

shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

Section 2.07 *Replacement Notes*.

If any mutilated Note is surrendered to the Trustee or the Company and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss or liability that any of them may suffer if a Note is replaced and subsequently presented or claimed for payment. The Company may charge for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08 *Outstanding Notes*.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it will be deemed outstanding only if the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser within the meaning of Section 8-303 of the New York Uniform Commercial Code.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds, on a Redemption Date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09 *Treasury Notes*.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company or any Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Guarantor, will be considered as though not

-37-

outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee knows are so owned will be so disregarded.

Section 2.10 *Temporary Notes*.

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11 *Cancellation*.

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of canceled Notes in accordance with its customary procedures (subject to the record retention requirement of the Exchange Act). The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12 *Defaulted Interest*.

If the Company defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof. The Company will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company will fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) will mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Section 2.13 *Withholding Taxes*.

The right of any Holder to receive interest on or principal of any Note shall be subject to any applicable withholding or deduction imposed pursuant to the Internal Revenue Code of 1986, as amended, or other applicable tax law, including foreign withholding and deduction. Any amounts properly so withheld or deducted shall be treated as actually paid to the appropriate Holder.

-38-

Confidential

## ARTICLE III
## REDEMPTION AND PREPAYMENT

Section 3.01 *Notices to Trustee*.

If the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 or Section 3.09 hereof, it must furnish to the Trustee, at least 35 days but not more than 60 days before a Redemption Date (or such shorter period as may be agreed between the Company and the Trustee), an Officers' Certificate setting forth:

(1) the provision of this Indenture pursuant to which the redemption shall occur;

(2) the Redemption Date;

(3) the principal amount of Notes to be redeemed; and

(4) the redemption price.

Section 3.02 *Selection of Notes to Be Redeemed*.

If less than all of the Notes are to be redeemed at any time, the Trustee will select Notes for redemption *pro rata*, by lot or by such other method in accordance with the procedures of the Depositary except:

(1) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2) if otherwise required by law.

In the event of partial redemption, the particular Notes to be redeemed will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the Redemption Date by the Trustee from the outstanding Notes not previously called for redemption.

The Trustee will promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof to be redeemed. Notes and portions of Notes selected will be in amounts of $1,000 or whole multiples of $1,000; except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

-39-

Confidential

Section 3.03 *Notice of Redemption*.

Subject to the provisions of Section 3.08 hereof, at least 30 days but not more than 60 days before a Redemption Date, the Company will mail a notice of redemption to the Depositary and to each Holder whose Notes are to be redeemed at their registered address. The Company will not provide notice of redemption to any party other than the Depositary and the Holders. Any notice of redemption provided to Participants or Indirect Participants will be provided at the discretion of the Depositary and pursuant to the Depositary's internal policies.

The notice will identify the Notes to be redeemed (including the CUSIP number) and will state:

(1) the Redemption Date;

(2) the redemption price;

(3) if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note; and

(4) the name and address of the Paying Agent;

(5) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6) that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(7) the paragraph of the Notes and/or section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(8) that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee will give the notice of redemption in the Company's name and at its expense; *provided, however*, that the Company has delivered to the Trustee, at least 35 days prior to the Redemption Date (or such shorter period as may be agreed between the Company and the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04 *Effect of Notice of Redemption*.

Once notice of redemption is mailed in accordance with Section 3.03 hereof, the Notes or portions of Notes called for redemption will become due and payable on the date and at the place

-40-

Confidential

of payment stated in the notice at the applicable redemption price, together with interest, if any, accrued to the date fixed for redemption.

Section 3.05 *Deposit of Redemption*.

One Business Day prior to the Redemption Date, the Company will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of and accrued interest and Additional Interest, if any, on all Notes to be redeemed on that date. The Trustee or the Paying Agent will promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption price of, and accrued interest and Additional Interest, if any, on, all Notes to be redeemed.

If the Company complies with the provisions of the preceding paragraph, on and after the Redemption Date, interest will cease to accrue on the Notes or the portions of Notes called for redemption. If a Note is redeemed on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption is not so paid upon surrender for redemption because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the Redemption Date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06 *Notes Redeemed in Part*.

Upon surrender and cancellation of a Note that is redeemed in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Company a new Note in a principal amount equal to the unredeemed portion of the Note surrendered and cancelled.

Section 3.07 *Optional Redemption*.

(a) The Company may redeem the Notes at any time, in whole or in part, at a redemption price equal to the greater of:

(1) 100% of the principal amount of the Notes being redeemed, or

(2) the present value of the sum of (A) the redemption price of the Notes on May 15, 2010 (such redemption price being as set forth in the table in clause (b) below) and (B) all remaining scheduled payments of interest on the Notes being redeemed through May 15, 2010 (excluding accrued interest through the Redemption Date), in each case, discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at a rate equal to the Treasury Yield plus 50 basis points,

-41-

Confidential

plus, in either case, accrued and unpaid interest, if any, to the Redemption Date on the principal amount of the Notes being redeemed (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date).

(b) The Company may redeem the Notes in whole or in part, at any time on or after May 15, 2010, upon not less than 30 nor more than 60 days' notice at the redemption prices (expressed as percentages of the principal amount to be redeemed) set forth below, plus accrued and unpaid interest, if any, to, but not including, the Redemption Date (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date), if redeemed during the 12-month period beginning on May 15 of the years indicated:

| Year | Redemption Price |
|---|---|
| 2010 | 104.813% |
| 2011 | 102.407% |
| 2012 and thereafter | 100.000% |

Section 3.08 *Offer to Purchase by Application of Excess Proceeds*.

In the event that, pursuant to Section 4.10 hereof, the Company is required to commence an offer to all Holders to purchase Notes (an "*Asset Sale Offer*"), it will follow the procedures specified below.

The Asset Sale Offer shall be made to all Holders and will remain open for a period of at least 20 Business Days following its commencement and not more than 30 Business Days, except to the extent that a longer period is required by applicable law (the "*Offer Period*"). No later than three Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Company will apply all Excess Proceeds (the "*Offer Amount*") to the purchase of Notes (on a *pro rata* basis, if applicable) or, if less than the Offer Amount has been tendered, all Notes tendered in response to the Asset Sale Offer. Payment for any Notes so purchased will be made in the same manner as interest payments are made.

If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest and Additional Interest, if any, will be paid to the Person in whose name a Note is registered at the close of business on such record date, and no Additional Interest will be payable to Holders who tender Notes pursuant to the Asset Sale Offer.

Upon the commencement of an Asset Sale Offer, the Company will send, by first class mail, a notice to the Trustee, the Depositary and each of the Holders. The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer. The notice, which will govern the terms of the Asset Sale Offer, will state:

(1) that the Asset Sale Offer is being made pursuant to this Section 3.08 and Section 4.10 hereof and the length of time the Asset Sale Offer will remain open;

(2) the Offer Amount, the purchase price and the Purchase Date;

-42-

(3) that any Note not tendered or accepted for payment will continue to accrue interest;

(4) that, unless the Company defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest after the Purchase Date;

(5) that Holders electing to have less than all of its Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased in integral multiples of $1,000 only;

(6) that Holders electing to have Notes purchased pursuant to any Asset Sale Offer will be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Company, a Depositary, if appointed by the Company, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(7) that Holders will be entitled to withdraw their election if the Company, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a telegram, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(8) that, if the aggregate principal amount of Notes surrendered by Holders thereof exceeds the Offer Amount, the Company will select the Notes to be purchased on a *pro rata* basis based on the principal amount of Notes surrendered (with such adjustments as may be deemed appropriate by the Company so that only Notes in denominations of $1,000 or integral multiples thereof, will be purchased unless all of a Holder's Note is being purchased); and

(9) that Holders whose Notes were purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer).

On or before the Purchase Date, the Company will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Asset Sale Offer, or if less than the Offer Amount has been tendered, all Notes tendered, and will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating that such Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.08. The Company, the Depositary or the Paying Agent, as the case may be, will promptly (but in any case not later than five days after the Purchase Date) mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Company for purchase, and the Company will promptly issue a new Note, and the Trustee, upon written request from the Company, will authenticate and mail or deliver (or cause to be transferred by book entry) such new Note to such Holder, in a principal amount equal to

-43-

Confidential

any unpurchased portion of the Note surrendered. Any Note not so accepted shall be promptly mailed or delivered by the Company to the Holder thereof. The Company will publicly announce the results of the Asset Sale Offer on the Purchase Date.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the Asset Sale provisions of this Indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Asset Sale provisions of this Indenture by virtue of such compliance.

Section 3.09 *Mandatory Redemption*.

The Company will mandatorily redeem one-third of the principal amount of each Note originally issued (or, if less, the entire then remaining principal amount of Notes) on each of May 15, 2013, May 15, 2014 and May 15, 2015 at a redemption price equal to the principal amount thereof plus accrued interest to the Redemption Date (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date).

# ARTICLE IV
# COVENANTS

Section 4.01 *Payment of Notes*.

The Company will pay or cause to be paid the principal of, premium, if any, and interest and Additional Interest, if any, on, the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest and Additional Interest, if any will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 12:00 p.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due. The Company will pay all Additional Interest, if any, in the same manner on the dates and in the amounts set forth in the Registration Rights Agreement.

The Company will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without regard to any applicable grace period) at the same rate to the extent lawful.

Section 4.02 *Maintenance of Office or Agency*.

The Company will maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or

-44-

Confidential

co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission will in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New York for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the office of U.S. Bank Trust National Association at 100 Wall Street, 16th Floor, New York, New York as one such office or agency of the Company in accordance with Section 2.03 hereof.

Section 4.03 *Reports*.

(a) The Company will file with the Trustee, within 15 days of being required to file the same with the SEC, copies of its annual reports and of the information, documents and other reports that it may be required to file with the SEC pursuant to Section 13 or Section 15(d) of the Exchange Act.

(b) If the Company is not required to file information, documents or reports with the SEC pursuant to Section 13 or Section 15(d) of the Exchange Act, the Company will file with the Trustee and the SEC, in accordance with rules and regulations prescribed from time to time by the SEC, such of the supplementary and periodic information, documents and reports which may be required pursuant to Section 13 of the Exchange Act in respect of a security listed and registered on a national securities exchange as may be prescribed from time to time in those rules and regulations. At any time when the reports referred to herein are not filed with the SEC, the Company will maintain a non-public website on which Holders of Notes, prospective investors and securities analysts may access the quarterly and annual financial information of the Company, and the Company will direct Holders of Notes, prospective investors and securities analysts on its publicly available website to contact the Company's Chief Financial Officer to obtain access to the non-public website.

(c) Delivery of the reports, information and documents described in this Section 4.03, to the Trustee are for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates). The Trustee is under no duty to examine such reports, information or documents to ensure

-45-

Confidential

compliance with the provisions of this Indenture or to ascertain the correctness or otherwise of the information or the statements contained therein. The Trustee is entitled to assume such compliance and correctness unless a Responsible Officer of the Trustee is informed otherwise.

Section 4.04 *Compliance Certificate.*

(a) The Company and each Guarantor (to the extent that such Guarantor is so required under the TIA) shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officers' Certificate stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in Default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto. Except with respect to notice of a Default or Event of Default contained in the Officer's Certificate delivered to it pursuant to this Section 4.04, the Trustee shall have no duty to review, ascertain or confirm the Company's compliance with, or the breach of any representation, warranty or covenant made in this Indenture.

(b) So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default, what action the Company is taking or proposes to take with respect thereto and whether additional premium is payable pursuant to Section 6.02 hereof.

Section 4.05 *Taxes.*

The Company will pay, and will cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06 *Stay, Extension and Usury Laws.*

The Company and each of the Guarantors covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and each of the Guarantors (to the extent that it may lawfully do so) hereby expressly

-46-

waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07 *Restricted Payments*.

(a) The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly make any Restricted Payment unless, at the time of and after giving effect to such Restricted Payment:

(1) no Default or Event of Default shall have occurred and be continuing or will occur as a consequence thereof;

(2) after giving effect to such Restricted Payment on a pro forma basis, the aggregate amount expended or declared for all Restricted Payments made on or after the Issue Date (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6) and (7) of clause (b) of this Section 4.07), shall not exceed the sum (without duplication) of:

(A) 50% of the Consolidated Net Income (or, if Consolidated Net Income shall be a deficit, minus 100% of such deficit) of the Company accrued on a cumulative basis during the period (taken as one accounting period) from the beginning of the first full fiscal quarter following the fiscal quarter in which the Issue Date occurs and ending on the last day of the fiscal quarter immediately preceding the date of such Restricted Payment, *plus*

(B) 100% of the aggregate net cash proceeds received by the Company subsequent to the Issue Date either (i) as a contribution to its common equity capital or (ii) from the issuance and sale (other than to a Subsidiary) of Qualified Equity Interests, including Qualified Equity Interests issued upon the conversion of Indebtedness of the Company, and from the exercise of options, warrants or other rights to purchase such Qualified Equity Interests (other than, in each case, Equity Interests or Indebtedness sold to a Subsidiary of the Company),

(C) minus $859.0 million.

(b) Notwithstanding the foregoing provisions, the Company and its Subsidiaries may take the following actions:

(1) the payment of any dividend on Equity Interests in the Company or a Subsidiary within 60 days after declaration thereof if at the declaration date such payment would not have been prohibited by the foregoing provisions of this Section 4.07;

(2) the retirement of any Equity Interests of the Company by conversion into, or by or in exchange for, Qualified Equity Interests, or out of net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of other Qualified Equity Interests;

-47-

Confidential

(3) the redemption, defeasance, repurchase or acquisition or retirement for value of any Indebtedness of the Company or a Guarantor in exchange for or out of the net cash proceeds of a substantially concurrent issue and sale (other than to a Subsidiary of the Company) of (x) Qualified Equity Interests or (y) Permitted Refinancing Indebtedness;

(4) *[Reserved]*;

(5) Permitted Tax Distributions;

(6) the exchange of the Preferred Units of the Company existing as of the Issue Date for any property into which such Preferred Units are exchangeable in accordance with their terms; and

(7) Restricted Payments in an amount not to exceed $250 million per year.

Section 4.08 *[Reserved]*.

Section 4.09 *Incurrence of Indebtedness*.

(a) The Company will not, nor will it permit any Subsidiary to, at any time create, issue, incur (by conversion, exchange or otherwise), assume, guarantee or otherwise become liable in respect of any Indebtedness (including Acquired Indebtedness) other than Permitted Indebtedness (as defined below).

(b) The provisions of Section 4.09(a) hereof will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "*Permitted Indebtedness*"):

(1) Indebtedness under the Senior Secured Credit Facility in an aggregate principal amount not to exceed $3,500.0 million less the aggregate principal amount of Indebtedness under the Senior Secured Credit Facility permanently repaid (which, if such Indebtedness under the Senior Secured Credit Facility is revolving credit Indebtedness, is accompanied by a corresponding reduction of the commitment with respect thereto) with the Net Cash Proceeds from any Asset Sale of Collateral;

(2) Indebtedness (other than Indebtedness described in the foregoing clause (1)) outstanding on the Issue Date and up to $2,150.0 million of Senior Secured Notes (including Senior Secured Notes issued on the Issue Date) issued in exchange for Existing Notes maturing prior to December 31, 2009 and up to $6,250.0 million of Notes (including the Initial Notes) issued in exchange for any other Existing Notes;

(3) Permitted Funding Indebtedness;

(4) Indebtedness among the Company and its Subsidiaries;

-48-

Confidential

(5) Indebtedness under interest rate agreements and currency exchange agreements entered into in the ordinary course of business and not for speculative purposes;

(6) Permitted Refinancing Indebtedness in respect of Indebtedness outstanding in reliance on clauses (2) and (3) above and this clause (6);

(7) Indebtedness of the Company and the Guarantors that is subordinated to the Notes and the Guarantees;

(8) Indebtedness to the GMAC Parties incurred in accordance with the provisions described in Section 4.11, *provided* that such Indebtedness is not secured by any Collateral; and

(9) Indebtedness of the Company or any Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount and liquidation preference of all other Indebtedness then outstanding and incurred pursuant to this clause (9), does not at any one time outstanding exceed $500.0 million.

For purposes of determining compliance with this Section 4.09, and the outstanding principal amount of any particular Indebtedness incurred pursuant to and in compliance with, this Section 4.09: (x) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (1) through (9) of this Section 4.09(b), the Company will, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness in any manner that complies with this Section 4.09 and such item of Indebtedness will be treated as having been incurred pursuant to only one of such clauses or pursuant to this covenant (provided that all Indebtedness outstanding under the Senior Secured Credit Facility will at all times be deemed to be outstanding pursuant to Section 4.09(b)(1) above); and (y) the principal amount of any Disqualified Equity Interests will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof.

Section 4.10 *Asset Sales*.

(a) The Company will not, and will not permit any of its Subsidiaries to, consummate an Asset Sale unless:

(1) the Company (or the applicable Subsidiary, as the case may be) receives consideration in the form of Permitted Consideration; and

(2) at the time of the Asset Sale, the Permitted Consideration received in such Asset Sale by the Company or such Subsidiary is at least equal to the Fair Value of the Collateral or Supporting Assets issued or sold or otherwise disposed of.

(b) Within 270 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Company or the applicable Subsidiary, as the case may be, may:

-49-

Confidential

(1) apply such Net Cash Proceeds at its option to permanently repay Permitted First Lien Indebtedness and, if such Permitted First Lien Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto;

(2) apply such Net Cash Proceeds at its option to repurchase, optionally redeem or optionally prepay Senior Secured Notes or the Notes; or

(3) provide additional Collateral or Supporting Assets (including by way of an increase in any advance or Equity Interest which is existing Collateral or Supporting Assets) with a Fair Value substantially equivalent to the Net Cash Proceeds received in such Asset Sale.

(c) Any Net Cash Proceeds from Asset Sales in excess of Retained Proceeds, that are not applied or invested as provided in the preceding paragraph of this Section 4.10 will constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $50.0 million, within 30 days thereof, the Company will make an offer to purchase (an "Asset Sale Offer") to all Holders and holders of Pari Passu Third Lien Indebtedness in an amount equal to the Excess Proceeds in accordance with Section 3.08. The offer price in any Asset Sale Offer will be equal to 100% of the principal amount plus accrued and unpaid interest to the date of purchase, and will be payable in cash. If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture. If the sum total of the aggregate principal amount of Notes and Pari Passu Third Lien Indebtedness tendered into an Asset Sale Offer, when aggregated, exceeds the amount of Excess Proceeds, the Trustee will select the Notes and Pari Passu Third Lien Indebtedness to be purchased on a *pro rata* basis. Upon completion of an Asset Sale Offer, the amount of Excess Proceeds will be reset at zero. The Company may, at its election, make an Asset Sale Offer concurrently for the Senior Secured Notes, the Notes, and, if applicable, Pari Passu Third Lien Indebtedness; provided however, that in the event such Asset Sale Offer is oversubscribed, the Company shall first purchase all Senior Secured Notes tendered in such offer prior to purchasing any Notes or Pari Passu Third Lien Indebtedness.

Section 4.11 *Transactions with Affiliates*.

(a) The Company will not, and will not permit any of its Subsidiaries (other than any Excluded Subsidiary) to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of related transactions, contract, agreement, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company involving aggregate consideration in excess of $10.0 million (each of the foregoing, an "*Affiliate Transaction*"), unless:

(1) such Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Subsidiary than those that could reasonably have been obtained in a comparable arm's length transaction by the Company or such Subsidiary with an unaffiliated party; and

-50-

Confidential

(2) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $250.0 million, the Company delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Company approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (1) of this Section 4.11(a); and:

(3) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $500.0 million, the Company must obtain and deliver the Trustee a written opinion of a nationally recognized investment banking, accounting or appraisal firm stating that the transaction is fair to the Company or such Subsidiary, as the case may be, from a financial point of view.

(b) The provisions of Section 4.11(a) shall not apply to:

(1) Restricted Payments that are permitted by Section 4.07;

(2) the payment of reasonable and customary fees and indemnities to members of the Board of Directors of the Company or a Subsidiary;

(3) the payment of reasonable and customary compensation and other benefits (including retirement, health, option, deferred compensation and other benefit plans) and indemnities to Officers and employees of the Company or any Subsidiary;

(4) transactions between or among the Company and/or its Subsidiaries;

(5) the issuance of Equity Interests (other than Disqualified Equity Interests) of the Company otherwise permitted hereunder and capital contributions to the Company;

(6) any agreement or arrangement as in effect on the Issue Date and any amendment or modification thereto so long as such amendment or modification is not more disadvantageous to the Holders of the Notes in any material respect; and

(7) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and consistent with past practice and on terms that are no less favorable to the Company or such Subsidiary, as the case may be, as determined in good faith by the Company, than those that could be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of the Company.

Section 4.12 *Liens*.

The Company will not, nor will it permit any Subsidiary to, at any time create or suffer to exist any Lien (other than any Permitted Liens) on any Collateral (whether now owned or hereafter acquired) to secure any Indebtedness or other contractual obligations of the Company or any Subsidiary unless the Notes have a third Lien on such Collateral junior to the first Liens

-51-

Confidential

securing Permitted First Lien Indebtedness and the Liens securing the Senior Secured Notes but not to any other Indebtedness or contractual obligations.

The Company shall not, nor shall it permit any Subsidiary to, at any time create or suffer to exist any Lien on any assets or property of the Company or any Subsidiary (whether now owned or hereafter acquired) which is not Collateral without thereby expressly securing the due and punctual payment of the principal of (premium, if any) and interest on the Notes and all other payments thereunder or hereunder in the order of priority set forth in the Intercreditor Agreement and, in any event, with the Notes being secured at least equally and ratably with any and all other obligations and Indebtedness secured by such pledge or Lien (other than Permitted First Lien Indebtedness and the Senior Secured Notes), for so long as any such other obligations and Indebtedness shall be so secured; provided, however, that this restriction shall not apply to Permitted Liens.

In no event shall any Lien on any assets of the Company or any Subsidiary for the benefit of the holders of Existing Notes be permitted.

Section 4.13 *Maintenance of the Company as a Holding Company.*

The Company shall act as a passive holding company of its Subsidiaries and shall not own any material assets other than (i) Equity Interests of Guarantors, (ii) assets in respect of hedging agreements, (iii) so long as no Event of Default has occurred and is continuing, cash and cash equivalents and other immaterial assets in the ordinary course of business consistent with past practice and (iv) assets which are subject to a perfected Lien as Collateral for the Notes.

Section 4.14 *Corporate Existence.*

Subject to Article V hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. The Company shall not, however, be required to preserve any rights or franchises if its Board of Directors determines that the preservation thereof is no longer desirable in the conduct of the Company's business and that the loss thereof is not disadvantageous in any material respect to the Holders.

Section 4.15 *[Reserved].*

Section 4.16 *[Reserved].*

Section 4.17 *Future Guarantors.*

The Company shall:

(a) within 45 days after the end of each of the first three fiscal quarters of each year and 90 days after the end of each fiscal year,

(b) contemporaneously with the acquisition of any Person which upon such acquisition is, or of any asset which causes the Subsidiary acquiring such assets (without regard

-52-

Confidential

to any other assets of such Subsidiary) to be, a Significant Subsidiary (other than an Excluded Subsidiary), and

(c) contemporaneously with the guarantee by any Subsidiary of any Indebtedness of the Company or any Guarantor,

cause (i) in the case of 4.17(a) above, each Person that is a Significant Subsidiary (other than an Excluded Subsidiary) as of the end of such quarter or fiscal year and is not already a Guarantor, (ii) in the case of the 4.17(b) above, such Significant Subsidiary and (iii) in the case of 4.17(c) above, such Subsidiary, to execute and deliver to the Trustee a supplemental indenture pursuant to this Indenture whereby such Subsidiary unconditionally guarantees the principal of (premium, if any), and interest on the Notes and all other amounts payable by the Company and shall agree to be bound by this Indenture.

## ARTICLE V
## SUCCESSORS

Section 5.01 *Merger, Consolidation, or Sale of Assets.*

The Company shall not merge or consolidate with any other corporation or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, unless:

(1) either the Company is the continuing corporation, or the successor Person (if other than the Company) is a corporation organized and existing under the laws of the United States or a state thereof and such corporation expressly assumes the due and punctual payment of the principal of (and premium, if any), interest, if any, all the Notes and any coupons, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by the Company by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such corporation;

(2) each Guarantor, by supplemental indenture, confirms that their Guarantee shall apply to the surviving entity's obligations under the Notes and this Indenture, as modified by such supplemental indenture, and confirms the due and punctual performance of the Guarantee and the covenants of the Guarantor in this Indenture; and

(3) immediately after such merger or consolidation, or such sale or conveyance, no Event of Default has occurred and is continuing.

For purposes of Section 5.01, any sale, assignment, transfer, lease or other conveyance or conveyance of the properties and assets of one or more Significant Subsidiaries (other than to the Company or another Subsidiary), which, if such assets were owned by the Company, would constitute all or substantially all of the Company's properties and assets, will be deemed to be the transfer of all or substantially all of the Company's properties and assets.

-53-

Confidential

Section 5.02 *Successor Corporation Substituted.*

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein; *provided*, *however*, that the predecessor Company shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a sale of all of the Company's assets in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof.

<div align="center">

**ARTICLE VI**
**DEFAULTS AND REMEDIES**

</div>

Section 6.01 *Events of Default.*

Each of the following is an "*Event of Default*":

(1) the Company's failure to (x) pay principal (or premium, if any, on) any of the Notes as and when the same shall become due and payable either at maturity, upon redemption, by declaration or otherwise or (y) consummate a mandatory redemption of the Notes pursuant to Section 3.09 on any date required by such Section;

(2) the Company's failure to pay any installment of interest, upon any of the Notes as and when due and payable, which such failure continues for a period of 30 days;

(3) the Company's failure to observe or perform any of the covenants or agreements described in Sections 4.07, 4.09, 4.10, 4.11, 4.12, 4.13, 4.17 and 5.01 of this Indenture for a period of 30 days after the date on which the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of its failure to perform;

(4) the Company's failure, or the failure of any Guarantor, to perform any other covenant in this Indenture, which failure continues for 90 days after the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of the Company's, or such Guarantor's, failure to perform;

(5) (x) the Company's failure, or failure by any of the Company's Subsidiaries, to perform any term or provision of any evidence of Indebtedness (excluding Indebtedness of any of the Company's Subsidiaries that is a Financing SPV), whether such Indebtedness now exists or shall hereafter be created, or any other condition shall occur, and as a result of the occurrence of which default or condition any such

<div align="center">

-54-

</div>

Confidential

Indebtedness in an amount in excess of $50,000,000 shall become or be declared to be due and payable, or the Company, or any of the Company's Subsidiaries, shall be obligated to purchase any such Indebtedness, prior to the date on which it would otherwise become due and payable, (y) any Indebtedness of the Company or any of its Subsidiaries (excluding Indebtedness of any of the Company's Subsidiaries that is a Financing SPV) in an amount in excess of $50,000,000 shall not be paid when due at its stated maturity or (z) an "Event of Default" occurs and is continuing under any indenture governing the Existing Notes;

(6) the entry against the Company or any Significant Subsidiary of a final judgment or final judgments for the payment of money in an aggregate amount in excess of $50,000,000, by a court or courts of competent jurisdiction, which judgments remain undischarged, unwaived, unstayed, unbonded or unsatisfied for a period of 60 consecutive days;

(7) any Security Document or Intercreditor Agreement is held to be unenforceable or invalid for any reason, the security interest purported to be created by the Security Documents are held to be unenforceable, invalid or impaired with respect to a material portion of the Collateral, the Company, any Guarantor or any Grantor (as defined in the Security Agreement) defaults in the performance of the terms of any of the Security Documents or the Intercreditor Agreement in a manner that adversely affects the enforceability or validity of the security interest on a material portion of the Collateral or in a manner that adversely affects the condition or value of a material portion of the Collateral, or the Company, any Guarantor or any Grantor (as defined in the Security Agreement) repudiates or disaffirms any of its obligations under any of the Security Documents or the Intercreditor Agreement;

(8) the Company, any Significant Subsidiary or any Guarantor shall commence a voluntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or shall consent to the entry of a decree or order for relief in an involuntary case or proceeding against the Company, such Significant Subsidiary or such Guarantor, or the filing by the Company, any Significant Subsidiary or any Guarantor of a petition or answer to consent seeking reorganization or relief under any such applicable federal or state law, or the consent by the Company, any Significant Subsidiary or any Guarantor to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of the Company, such Significant Subsidiary or any Guarantor or of any substantial part of its property, or the making by the Company, any Significant Subsidiary or any Guarantor of any general assignment for the benefit of creditors, or the taking of action by the Company, any Significant Subsidiary or any Guarantor in furtherance of any such action;

(9) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Company, any Significant Subsidiary or any Guarantor in an involuntary case under any applicable bankruptcy, insolvency, reorganization or other

-55-

similar law now or hereafter in effect, or a decree or order adjudging the Company, such Significant Subsidiary or such Guarantor a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of or in respect of the Company, such Significant Subsidiary or Guarantor or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Company, such Significant Subsidiary or such Guarantor or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, shall have been entered and such decree or order shall remain unstayed and in effect for a period of ninety (90) days; or

    (10) any Guarantee shall cease to be in full force and effect (unless such Guarantee has been released in accordance with this Indenture).

Section 6.02 *Acceleration*.

    If any Event of Default other than an Event of Default specified in clause (8) or (9) of Section 6.01 hereof, has occurred and is continuing, either the Trustee or the Holders of not less than 25% in aggregate principal amount of Notes then outstanding under this Indenture may declare the principal of the Notes and all accrued interest thereon to be due and payable immediately. If an Event of Default specified in clause (8) or (9) of Section 6.01 hereof occurs, the principal of all outstanding Notes and all accrued interest thereon shall be due and payable, without further action or notice on the part of the Trustee or any Holder.

    The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration and its consequences, if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest or premium or Additional Interest, if any, that has become due solely because of the acceleration) have been cured or waived.

Section 6.03 *Other Remedies*.

    If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium and Additional Interest, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

    The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04 *Waiver of Past Defaults*.

    Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may, on behalf of the Holders of all of the Notes, waive any existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of, premium and Additional Interest, if any,

-56-

Confidential

or interest on, the Notes (including in connection with an offer to purchase); *provided*, *however*, that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration in accordance with Section 6.02. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05 *Control by Majority*.

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that the Trustee determines may be unduly prejudicial to the rights of other Holders of Notes or that may involve the Trustee in personal liability.

Section 6.06 *Limitation on Suits*.

A Holder may pursue a remedy with respect to this Indenture or the Notes only if:

(1) such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2) Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested that the Trustee pursue the remedy;

(3) such Holder or Holders have offered the Trustee satisfactory indemnity against any loss, liability or expense;

(4) the Trustee has not complied with such request within 60 days after receipt of the request and the offer of indemnity; and

(5) Holders of a majority in aggregate principal amount of the then outstanding Notes have not given the Trustee a direction inconsistent with such request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07 *Rights of Holders of Notes to Receive Payment*.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium and Additional Interest, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

-57-

Confidential

Section 6.08 *Collection Suit by Trustee*.

If an Event of Default specified in Section 6.01(1) or (2) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, premium and Additional Interest, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09 *Trustee May File Proofs of Claim*.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10 *Priorities*.

If the Trustee collects any money pursuant to this Article VI or pursuant to the Security Documents, it shall pay out the money in the following order:

*First*: pro rata to the Trustee, its agents and attorneys for amounts due under Section 7.07 hereof, and the Collateral Agent and Collateral Control Agent, their agents and attorneys for amounts due under the Security Documents including, in each case, payment of all compensation, expenses and liabilities incurred by the Trustee, the Collateral Agent and the Collateral Control Agent and the costs and expenses of collection;

-58-

*Second*: to Holders of Notes for amounts due and unpaid on the Notes for principal, premium and Additional Interest, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium and Additional Interest, if any and interest, respectively; and

*Third*: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11 *Undertaking for Costs*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

**ARTICLE VII**
**TRUSTEE**

Section 7.01 *Duties of Trustee*.

(a) If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(1) the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture. The Trustee shall have no obligation to check or verify the mathematical accuracy of any calculations or financial information contained therein.

-59-

Confidential

(c) The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1) this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2) the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3) the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d) Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.01.

(e) No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability. The Trustee will be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holders, unless such Holder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f) The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02 *Rights of Trustee*.

(a) The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c) The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

-60-

Confidential

(e) Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Officer of the Company.

(f) The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee reasonable indemnity or security reasonably satisfactory to the Trustee against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g) In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(h) The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event that is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(i) The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j) The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(k) The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(l) The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God, earthquakes, fire, flood, terrorism, wars and other military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunction of utilities, computer (hardware or software) or communication services, accidents, labor disputes, acts of civil or military authorities and governmental action.

Section 7.03 *Individual Rights of Trustee*.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any conflicting interest (as defined in the TIA) it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee (if this Indenture has been qualified under the

-61-

Confidential

TIA) or resign. Any Agent may do the same with like rights and duties. The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04 *Trustee's Disclaimer*.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05 *Notice of Defaults*.

If a Default or Event of Default occurs and is continuing and if it is actually known to a Responsible Officer of the Trustee, the Trustee will mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, premium or Additional Interest, if any, or interest on, any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06 *Reports by Trustee to Holders of the Notes*.

(a) Within 60 days after each February 15 beginning with the February 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee will mail to the Holders of the Notes a brief report dated as of such reporting date that complies with TIA § 313(a) (but if no event described in TIA § 313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The Trustee also will comply with TIA § 313(b)(2). The Trustee will also transmit by mail all reports as required by TIA § 313(c).

(b) A copy of each report at the time of its mailing to the Holders of Notes will be mailed by the Trustee to the Company and filed by the Trustee with the SEC and each stock exchange on which the Notes are listed in accordance with TIA § 313(d). The Company will promptly notify the Trustee when the Notes are listed on or delisted from any stock exchange.

Section 7.07 *Compensation and Indemnity*.

(a) The Company will pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as shall be agreed in writing by the Company and the Trustee. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. The Company will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

-62-

(b) The Company and the Guarantors will indemnify the Trustee and any predecessor Trustee against any and all losses, liabilities, damages, claims or expenses, including taxes (other than those based upon, measured by or determined by the income of the Trustee) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the reasonable costs and expenses of enforcing this Indenture against the Company and the Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Company, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Trustee will notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company will not relieve the Company or any of the Guarantors of their obligations hereunder. The Company or such Guarantor will defend the claim and the Trustee will cooperate in the defense. The Trustee may have separate counsel and the Company will pay the reasonable fees and expenses of such counsel. Neither the Company nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c) The obligations of the Company and the Guarantors under this Section 7.07 will survive the satisfaction and discharge of this Indenture and the resignation or removal of the Trustee.

(d) To secure the Company's and the Guarantors' payment obligations in this Section 7.07, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will constitute a Permitted Lien and will survive the satisfaction and discharge of this Indenture.

(e) When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(8) or (9) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

(f) The Trustee will comply with the provisions of TIA § 313(b)(2) to the extent applicable.

(g) The Company and the Guarantors will indemnify the Collateral Agent and the Collateral Control Agent and any predecessor Collateral Agent and the Collateral Control Agent against any and all losses, liabilities, damages, claims or expenses (including costs and expenses of counsel), including taxes incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the reasonable costs and expenses of enforcing this Indenture against the Company and the Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Company, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Collateral Agent and the Collateral Control Agent will notify the Company promptly of any claim for which it may seek indemnity. Failure by the

-63-

Collateral Agent or the Collateral Control Agent to so notify the Company will not relieve the Company or any of the Guarantors of their obligations hereunder. The Company or such Guarantor will defend the claim and the Collateral Agent and the Collateral Control Agent will cooperate in the defense. The Collateral Agent or the Collateral Control Agent may have separate counsel and the Company will pay the reasonable fees and expenses of such counsel. Neither the Company nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

Section 7.08 *Replacement of Trustee*.

(a) A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b) The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company. The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company in writing. The Company may remove the Trustee if:

(1) the Trustee fails to comply with Section 7.10 hereof;

(2) the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3) a custodian or public officer takes charge of the Trustee or its property; or

(4) the Trustee becomes incapable of acting.

(c) If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company will promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

(d) If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction (at the expense of the Company) for the appointment of a successor Trustee.

(e) If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and

Confidential

duties of the Trustee under this Indenture. The successor Trustee will mail a notice of its succession to Holders. The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof will continue for the benefit of the retiring Trustee.

Section 7.09 *Successor Trustee by Merger, etc.*

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee.

Section 7.10 *Eligibility; Disqualification*.

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100.0 million as set forth in its most recent published annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of TIA § 310(a)(1), (2) and (5). The Trustee is subject to TIA § 310(b).

Section 7.11 *Preferential Collection of Claims Against Company*.

The Trustee is subject to TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b). A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated therein.

Section 7.12 *Patriot Act*.

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each individual person who opens an account. For a non-individual person such as a business entity, a charity, a trust or other legal entity the Trustee will ask for documentation to verify its formation and existence as a legal entity. The Trustee may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

Section 7.13 *Payment of Additional Interest*.

If Additional Interest is payable, the Company shall deliver to the Trustee a certificate to that effect stating (a) the amount of such Additional Interest that is payable and (b) the date on which such Additional Interest is payable. Unless and until a Responsible Officer of the Trustee receives at the Corporate Trust Office such a certificate, the Trustee may assume without inquiry that no such Additional Interest is payable. If the Company has paid Additional Interest directly

-65-

to the Persons entitled to it, the Company shall deliver to the Trustee a certificate setting forth the particulars of such payment.

<div align="center">

**ARTICLE VIII**
**COLLATERAL**

</div>

Section 8.01 *Security Documents.*

The payment of the principal of and interest and premium, if any, on the Notes when due, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise and whether by the Company pursuant to the Notes or by any Guarantor pursuant to its Guarantee and the payment and performance of all other obligations of the Company and the Guarantors under this Indenture, the Notes, the Guarantees and the Security Documents are secured as provided in the Security Documents which the Company, the Guarantors and certain other Subsidiaries of the Company have entered into simultaneously with the execution of this Indenture and will be secured by Security Documents hereafter delivered as required or permitted by this Indenture. The Company shall, and shall cause each Guarantor and each Grantor (as defined in the Security Agreement) to, and each Guarantor shall, do all filings (including filings of continuation statements and amendments to Uniform Commercial Code financing statements that may be necessary to continue the effectiveness of such Uniform Commercial Code financing statements) and all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Company and the Guarantors) the security interest created by the Security Documents in the Collateral as a perfected security interest, subject only to Permitted Liens.

Section 8.02 *Agents.*

Subject to Section 7.01 hereof and Sections 13 and 14 of the Security Agreement, neither the Trustee nor any of its officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any Lien securing the Notes or the Guarantees, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any such Liens or Security Documents or any delay in doing so.

Section 8.03 *Authorization of Actions to Be Taken.*

(a) Each Holder of Notes, by its acceptance thereof, consents and agrees to be bound by the terms of each Security Document and the Intercreditor Agreement, as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Documents to which it is a party, authorizes and empowers the Trustee and the Collateral Agent to enter into, execute and deliver, the Intercreditor Agreement, and authorizes and empowers the Trustee and the Collateral Agent to bind the Holders of Notes as set forth in the Security Documents to which either of them is a party and the Intercreditor

<div align="center">-66-</div>

Confidential

Agreement and to perform their obligations and exercise their rights and powers thereunder and to make the representations set forth therein on behalf of the Holders.

(b) The Collateral Agent, the Collateral Control Agent and the Trustee are authorized and empowered to receive for the benefit of the Holders of Notes any funds collected or distributed under the Security Documents or the Intercreditor Agreement to which the Collateral Agent or Trustee is a party and, subject to the terms of the Security Documents and the Intercreditor Agreement, to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture.

(c) Subject to the provisions of Sections 7.01 and Section 7.02 and the Intercreditor Agreement, the Trustee may, in its sole discretion and without the consent of the Holders (but is not obligated to), direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1) foreclose upon or otherwise enforce any or all of the Liens;

(2) enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(3) collect and receive payment of any and all amounts under the Notes and the Guarantees.

Subject to Sections 7.01 and 7.02 and the Intercreditor Agreement and at the Company's sole cost and expense, the Trustee is authorized and empowered (but not obligated) to institute and maintain, or direct the Collateral Agent or Collateral Control Agent to institute and maintain, such suits and proceedings as it may deem reasonably expedient to protect or enforce the Liens under the Security Documents or the Security Documents to which the Collateral Agent or Collateral Control Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Collateral Control Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent or Collateral Control Agent may deem reasonably expedient, at the Company's sole cost and expense, to preserve or protect its interests and the interests of the Holders of Notes in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of Holders, the Trustee, the Collateral Agent, or the Collateral Control Agent.

Section 8.04 *Release of Collateral*.

(a) Collateral may be released from the Lien and security interest created by the Security Documents at any time or from time to time in accordance with the provisions of the Intercreditor Agreement. In addition, the Liens on any Collateral shall be released (and upon the request of the Company pursuant to an Officers' Certificate in the form of Exhibit F and Opinion of Counsel in the form of Exhibit G certifying that all conditions precedent hereunder

-67-

Confidential

have been met, the Trustee shall take such actions as may be requested by the Company to evidence such release at the Company's sole cost and expense) under any one or more of the following circumstances:

> (i) upon the sale, transfer or other disposition of such property or assets (other than to the Company or a Guarantor) to the extent not prohibited under Section 4.10 hereof, the Lien of the Security Documents shall be released on the assets so transferred;

> (ii) upon the release of a Guarantor from its Guarantee pursuant Section 10.05, the property and assets of such Guarantor shall be released from the Lien of the Security Documents; or

> (iii) in connection with any release of Liens pursuant to any amendment complying with Article IX hereof.

No purchaser or grantee of any property or rights purporting to be released shall be bound to ascertain the authority of the Trustee to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority so long as the conditions set forth in Section 10.4 have been satisfied.

(b) The Liens on any Collateral securing the Notes and the Guarantees and the other obligations under this Indenture will terminate and be released automatically upon any satisfaction and discharge of this Indenture pursuant to Section 11.01 or any Legal Defeasance or Covenant Defeasance in compliance with Article XIII.

Section 8.05 *Filing, Recording and Opinions.*

(a) The Company will comply with the provisions of Trust Indenture Act Sections 314(b) and 314(d) (including, without limitation, the provision of an initial and annual Opinion of Counsel under Section 314(b)), in each case following qualification of this Indenture pursuant to the Trust Indenture Act, except to the extent not required as set forth in any SEC regulation or interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Company or any other Person). Following such qualification, to the extent the Company is required to furnish to the Trustee an Opinion of Counsel pursuant to Trust Indenture Act Section 314(b)(2), the Company will furnish such opinion not more than 60 but not less than 30 days prior to each September 30.

(b) Following qualification of this Indenture pursuant to the Trust Indenture Act, if any Collateral is released in accordance with this Indenture or any Security Document, the Trustee will determine whether it has received all documentation required by Trust Indenture Act Section 314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 11.04(a), will, upon request, deliver a certificate to the Collateral Agent, the Collateral Control Agent and the Company setting forth such determination.

-68-

Confidential

Section 8.06 *Powers Exercisable by Receiver or Trustee.*

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article VIII upon the Company or a Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Company or a Guarantor or of any Officer or Officers thereof required by the provisions of this Article VIII; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

Section 8.07 *Release upon Termination of the Company's Obligations.*

In the event that the Company delivers to the Trustee, in a form acceptable to it, an Officers' Certificate and Opinion of Counsel certifying that the conditions set forth in Section 8.04 have been satisfied, the Trustee shall deliver to the Company, the Collateral Agent and the Collateral Control Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent and the Collateral Control Agent of such notice, the Collateral Agent and the Collateral Control Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done, at the Company's sole cost and expense, all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

# ARTICLE IX
# AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01 *Without Consent of Holders of Notes.*

Notwithstanding Section 9.02 hereof, the Company, the Guarantors and the Trustee may amend and change this Indenture and the Security Documents and may consent to without the consent of the Holders in order to:

(a) evidence the succession of another corporation to the Company or each Guarantor or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations;

(b) add to the covenants of the Company for the benefit of the Holders;

(c) cure any ambiguity, omission, defect or inconsistency, *provided* that such action does not adversely affect the interests of the Holders;

(d) convey, transfer, assign, mortgage or pledge any property to or with the Trustee;

(e) evidence and provide the acceptance of the appointment of a successor Trustee under this Indenture; and

-69-

Confidential

(f) (i) evidence the succession of another corporation to each Guarantor, or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations; (ii) add to the covenants of a Guarantor for the benefit of the Holders; (iii) evidence and provide for any new Guarantees with respect to the Notes or the release of any Guarantor pursuant to the Indenture; (iv) provide for additional Collateral; (v) release Collateral in accordance with this Indenture and the Security Documents; and (vi) to secure any Pari Passu Third Lien Indebtedness.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee or the Collateral Agent will join with the Company and the Guarantors in the execution of any amended or supplemental indenture or other amendment authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and Collateral Agent will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02 *With Consent of Holders of Notes*.

Except as provided below in this Section 9.02, the Company, the Trustee and the Collateral Agent may amend or supplement this Indenture (including, without limitation, Sections 3.08 and 4.10 hereof) and the Notes, the Intercreditor Agreement, the Security Documents and the Guarantees with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default (other than a Default in the payment of the principal of, premium or Additional Interest, if any, or interest on, the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Notes, the Security Documents or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes). Section 2.08 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee or the Collateral Agent will join with the Company and the Guarantors in the execution of such amended or supplemental indenture or other amendment unless such amended or supplemental indenture directly affects the Trustee's or the Collateral Agent's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee or the Collateral

-70-

Confidential

Agent may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture or amendment.

It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company will mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to Sections 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class may waive compliance in a particular instance by the Company with any provision of this Indenture or the Notes or the Guarantees. However, without the consent of each Holder affected, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1) change the fixed maturity of the Notes;

(2) reduce the principal amount of, or premium, if any, or reduce the rate of, or extend the time of payment of interest on, the Notes;

(3) reduce any amount due and payable upon acceleration of the Notes or the amount provable in bankruptcy;

(4) make the principal of, or premium, if any, or interest, if any, on the Notes payable in any currency other than as provided in the Notes;

(5) impair the right to institute suit for the enforcement of any payment on or after its stated maturity, or in the case of redemption, on or after the Redemption Date;

(6) reduce the percentage in aggregate principal amount of outstanding Notes necessary to modify or amend this Indenture;

(7) reduce the percentage in aggregate principal amount of outstanding Notes necessary to waive Event of Defaults as described in Section 6.01; or

(8) release all or substantially all of the Collateral from the Lien of the Security Documents (other than in accordance with Article VIII) or release all or substantially all of the value of the Guarantees (other than in accordance with Section 10.05).

Section 9.03 *Compliance with Trust Indenture Act*.

Every amendment or supplement to this Indenture or the Notes will be set forth in a amended or supplemental indenture that complies with the TIA as then in effect.

-71-

Confidential

Section 9.04 *Revocation and Effect of Consents*.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

Section 9.05 *Notation on or Exchange of Notes*.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06 *Trustee to Sign Amendments, etc.*

The Trustee will sign any amended or supplemental indenture authorized pursuant to this Article IX if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Company may not sign an amended or supplemental indenture until the Board of Directors of the Company approves it. In executing any amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Section 12.04 hereof, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.

## ARTICLE X
## GUARANTEES

Section 10.01 *Guarantee*.

(a) Subject to this Article X, each of the Guarantors hereby, jointly and severally, unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder, that:

(1) the principal of, premium and Additional Interest, if any, and interest on, the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

-72-

Confidential

(2) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b) The Guarantors hereby agree that their obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenant that this Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(c) If any Holder or the Trustee is required by any court or otherwise to return to the Company, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Company or the Guarantors, any amount paid by the Company or any Guarantor either to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d) Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VI hereof for the purposes of this Guarantee notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article VI hereof, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Guarantee. The Guarantors will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Section 10.02 *Limitation on Guarantor Liability*.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Law, the Uniform Fraudulent

-73-

Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article X, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent transfer or conveyance.

Section 10.03 *Execution and Delivery of Guarantee.*

To evidence its Guarantee set forth in Section 10.01 hereof, each Guarantor hereby agrees that a notation of such Guarantee substantially in the form attached as Exhibit E hereto will be endorsed by an Officer of such Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture will be executed on behalf of such Guarantor by one of its Officers.

Each Guarantor hereby agrees that its Guarantee set forth in Section 10.01 hereof will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

If an Officer whose signature is on this Indenture or on the Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Guarantee is endorsed, the Guarantee will be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, will constitute due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantors.

Section 10.04 *Guarantors May Consolidate, etc., on Certain Terms.*

For the benefit of the Notes, no Guarantor shall merge or consolidate with any other corporation or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, unless either:

(a) (x) either such Guarantor is the continuing corporation, or the successor Person (if other than the Guarantor) is a corporation or limited liability company organized and existing under the laws of the United States or a state thereof and, such corporation or limited liability company expressly assumes the Guarantee of such Guarantor by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such corporation; and

(y) immediately after such merger or consolidation, or such sale or conveyance, no Event of Default has occurred and is continuing; or

(b) such merger, consolidation, lease, transfer or conveyance complies with Section 4.10 hereof.

-74-

Confidential

In case of any such consolidation, merger, sale or conveyance and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Guarantor, such successor Person will succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor. Such successor Person thereupon may cause to be signed any or all of the Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee. All the Guarantees so issued will in all respects have the same legal rank and benefit under this Indenture as the Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Guarantees had been issued at the date of the execution hereof.

Except as set forth in Articles IV and V hereof, and notwithstanding clauses 2(a) and (b) above, nothing contained in this Indenture or in any of the Notes will prevent any consolidation or merger of a Guarantor with or into the Company or another Guarantor, or will prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety to the Company or another Guarantor.

Section 10.05 *Releases*.

The Guarantee of a Guarantor will be released (so long as no Event of Default has occurred and is continuing) with respect to the Notes:

(a) in connection with any sale, exchange or transfer of all of the stock of the Guarantor to any Person (other than the Company or a Subsidiary or Affiliate of the Company), *provided* such sale is not prohibited under this Indenture;

(b) upon the payment in full of the Notes; or

(c) upon Legal Defeasance or satisfaction and discharge of the Indenture as provided below in Articles XI and XIII.

## ARTICLE XI
## SATISFACTION AND DISCHARGE

Section 11.01 *Satisfaction and Discharge*.

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1) either:

(a) all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment

-75-

Confidential

money has been deposited in trust and thereafter repaid to the Company, have been delivered to the Trustee for cancellation; or

(b) all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government Securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium and Additional Interest, if any, and accrued interest to the date of maturity or redemption;

(2) no Default has occurred and is continuing on the date of the deposit (other than a Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound;

(3) the Company or any Guarantor has paid or caused to be paid all sums payable by the Company and/or the Guarantors under this Indenture; and

(4) the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or on the Redemption Date, as the case may be.

In addition, the Company must deliver an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (b) of clause (1) of this Section 11.01, the provisions of Sections 11.02 and 8.06 hereof will survive. In addition, nothing in this Section 11.01 will be deemed to discharge those provisions of Section 7.07 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

Section 11.02 *Application of Trust Money*.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 11.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium and Additional Interest, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

-76-

Confidential

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 11.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.01 hereof; *provided* that if the Company has made any payment of principal of, premium or Additional Interest, if any, or interest on, any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01 *Trust Indenture Act Controls*.

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA §318(c), the imposed duties will control, provided that the provisions under Sections 314(b) and 314(d) shall only apply following qualification of this Indenture pursuant to the Trust Indenture Act.

Section 12.02 *Notices*.

Any notice or communication by the Company, any Guarantor or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company and/or any Guarantor:

Residential Capital, LLC
7501 Wisconsin Avenue, Suite 900
Bethesda, MD 20814
Facsimile No.: (301) 664-6999
Attention: Hu Benton, Managing Director,
    VP and Associate Counsel

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Attention: Casey Fleck, Esq.

If to the Trustee:

U.S. Bank National Association

-77-

Confidential

60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107-2292
Facsimile No.: (651) 495-8097
Attention: Richard Prokosch

The Company, any Guarantor or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder will be sent by first class mail, certified or registered, return receipt requested, sent by overnight air courier guaranteeing next day delivery, or sent electronically to the Holder at the Holder's address as it appears on the registration books of the Registrar. Any notice or communication will also be sent by first class mail, certified or registered, return receipt requested, or by overnight air courier to any Person described in TIA § 313(c), to the extent required by the TIA. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

If a notice or communication is sent in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company sends a notice or communication to Holders, it will at the same time send to the Trustee and each Agent a copy of such notice or communication by first class mail, certified or registered, return receipt requested, or by overnight air courier.

Section 12.03 *Communication by Holders of Notes with Other Holders of Notes*.

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes. The Company, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

Section 12.04 *Certificate and Opinion as to Conditions Precedent*.

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(1) an Officers' Certificate in a form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

-78-

Confidential

(2) an Opinion of Counsel in a form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 12.05 *Statements Required in Certificate or Opinion.*

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA § 314(a)(4)) must comply with the provisions of TIA § 314(e) and must include:

(1) a statement that the Person making such certificate or opinion has read such covenant or condition;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 12.06 *Rules by Trustee and Agents.*

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 12.07 *No Personal Liability of Directors, Officers, Employees and Stockholders.*

No director, Officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, this Indenture or the Guarantees, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

Section 12.08 *Governing Law.*

THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE, THE NOTES, THE SECURITY AGREEMENT AND THE GUARANTEES INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

-79-

Section 12.09 *No Adverse Interpretation of Other Agreements.*

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 12.10 *Successors.*

All agreements of the Company in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its successors. All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 10.05 hereof.

Section 12.11 *Severability.*

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 12.12 *Counterpart Originals.*

The parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement.

Section 12.13 *Table of Contents, Headings, etc.*

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 12.14 Third-Party Beneficiaries.

The Collateral Agent and Collateral Control Agent are express intended third-party beneficiaries of this Indenture.

## ARTICLE XIII

## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 13.01 <u>Option to Effect Legal Defeasance or Covenant Defeasance</u>. The Company may, at its option and at any time, elect to have either Section 13.02 or 13.03 hereof applied to all outstanding Notes upon compliance with the conditions set forth below in this Article XIII.

Section 13.02 <u>Legal Defeasance and Discharge</u>. Upon the Company's exercise under Section 13.01 hereof of the option applicable to this Section 13.02, the Company and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 13.04

-80-

Confidential

exv4w4                    Page 87 of 117

12-12020-mg  Doc 1546  Filed 09/24/12  Entered 09/24/12 22:04:57  Main Document
Pg 136 of 785

hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes and Guarantees and with respect to the Security Documents on the date the conditions set forth below are satisfied ("Legal Defeasance"). For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of Section 13.05 hereof and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes and this Indenture including that of the Guarantors (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which shall survive until otherwise terminated or discharged hereunder:

> (a) the rights of Holders of Notes to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due solely out of the trust created pursuant to this Indenture referred to in Section 13.04 hereof;

> (b) the Company's obligations with respect to Notes concerning issuing temporary Notes, registration of such Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

> (c) the rights, powers, trusts, duties and immunities of the Trustee, and the obligations of the Company and Guarantors in connection therewith; and

> (d) this Section 13.02.

If the Company exercises under Section 13.01 the option applicable to this Section 13.02, subject to satisfaction of the conditions set forth in Section 13.04 hereof, payment of the Notes may not be accelerated because of an Event of Default under clauses (3), (4), (5), (6), (7), (8), (9) or (10) of Section 6.01. Subject to compliance with this Article VIII, the Company may exercise its option under this Section 13.02 notwithstanding the prior exercise of its option under Section 13.03 hereof.

   Section 13.03 Covenant Defeasance. Upon the Company's exercise under Section 13.01 hereof of the option applicable to this Section 13.03, the Company and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 13.04 hereof, be released from their obligations under the covenants contained in Sections 4.03, 4.04, 4.05, 4.06, 4.07, 4.09, 4.10, 4.11, 4.12, 4.13, 4.14 and 4.17 hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 13.04 hereof are satisfied ("Covenant Defeasance"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly,

-81-

by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby. In addition, upon the Company's exercise under Section 13.01 hereof of the option applicable to this Section 13.03 hereof, subject to the satisfaction of the conditions set forth in Section 13.04 hereof, Sections 6.01(3), 6.01(4), 6.01(5), 6.01(6), 6.01(7), 6.01(8), 6.01(9) and 6.01(10) hereof shall not constitute Events of Default.

Section 13.04 <u>Conditions to Legal or Covenant Defeasance</u>. The following shall be the conditions to the application of either Section 13.02 or 13.03 hereof to the outstanding Notes:

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Notes:

(a) the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal amount of, premium, if any, and interest due on the Notes on the stated maturity date or on the Redemption Date, as the case may be, of such principal amount, premium, if any, or interest on such Notes and the Company must specify whether such Notes are being defeased to maturity or to a particular Redemption Date;

(b) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the Company has complied with all conditions precedent relating to Legal Defeasance and Covenant Defeasance;

(c) in the case of Legal Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that,

(1) the Company has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

(2) since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred.

The Company will not have to deliver the Opinion of Counsel required in the immediately preceding paragraph with respect to Legal Defeasance if all the Notes that

-82-

Confidential

have not at that time been delivered to the Trustee for cancellation (1) are delivered by us to the Trustee for cancellation (other than mutilated, destroyed, lost or stolen New Notes), (2) have become due and payable or (3) will by their terms become due and payable within one year, or are to be called for redemption within one year;

(d) no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit with respect to this Indenture;

(e) such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, the Senior Credit Facilities or any other material agreement or instrument (other than this Indenture) to which the Company or any Restricted Guarantor is a party or by which the Company or any Restricted Guarantor is bound (other than that resulting from any borrowing of funds to be applied to make the deposit required to effect such Legal Defeasance or Covenant Defeasance and any similar and simultaneous deposit relating to other Indebtedness, and the granting of Liens in connection therewith);

(f) the Company shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or any Restricted Guarantor or others; and

(g) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

Section 13.05 <u>Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions</u>. Subject to Section 13.06 hereof, all money and Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 13.05, the "<u>Trustee</u>") pursuant to Section 13.04 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company or a Guarantor acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or Government Securities deposited pursuant to Section 13.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

-83-

Confidential

Anything in this Article XIII to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the request of the Company any money or Government Securities held by it as provided in Section 13.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 13.04(a) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 13.06 <u>Repayment to the Company</u>. Subject to any applicable abandoned property law, any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest on any Note and remaining unclaimed for two years after such principal, and premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease.

Section 13.07 <u>Reinstatement</u>. If the Trustee or Paying Agent is unable to apply any United States dollars or Government Securities in accordance with Section 13.02 or 13.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 13.02 or 13.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 13.02 or 13.03 hereof, as the case may be; <u>provided</u> that, if the Company makes any payment of principal of, premium, if any, or interest on any Note following the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

[Signature Pages Follow]

-84-

Confidential

Dated as of June 6, 2008                    RESIDENTIAL CAPITAL, LLC

                                            By:   /s/ James N. Young
                                                  Name: James N. Young
                                                  Title: Chief Financial Officer

Confidential

Dated as of June 6, 2008

**GUARANTORS**:

GMAC RESIDENTIAL HOLDING COMPANY, LLC

By:   /s/ James N. Young
   Name: James N. Young
   Title: Chief Financial Officer

GMAC-RFC HOLDING COMPANY, LLC

By:   /s/ James N. Young
   Name: James N. Young
   Title: Chief Financial Officer

GMAC MORTGAGE, LLC

By:   /s/ James N. Young
   Name: James N. Young
   Title: Chief Financial Officer

RESIDENTIAL FUNDING COMPANY, LLC

By:   /s/ James N. Young
   Name: James N. Young
   Title: Chief Financial Officer

HOMECOMINGS FINANCIAL, LLC

By:   /s/ James N. Young
   Name: James N. Young
   Title: Chief Financial Officer

Confidential

Dated as of June 6, 2008                          **U.S. BANK NATIONAL ASSOCIATION**

                                                  By:    /s/ Richard Prokosch
                                                         Name: Richard Prokosch
                                                         Title: Vice President

**EXHIBIT A**

**[FACE OF NOTE]**

CUSIP/CINS _____

9.625% Junior Secured Guaranteed Note due 2015

No. ___                                                                        $_____

Residential Capital, LLC

promises to pay to [              ] or registered assigns,

the principal sum of _____ on May 15, 2015, or if less, the aggregate principal amount then outstanding.

Interest Payment Dates: May 15 and November 15 (or, if any such day is not a Business Day, the next succeeding Business Day)

Record Dates: May 1 and November 1

Dated: [        ]

Residential Capital, LLC

By: _____
         Name:
         Title:

This is one of the Notes referred to
in the within-mentioned Indenture:

U.S. BANK NATIONAL ASSOCIATION
     as Trustee

By: _____
     Authorized Signatory

A-1

Confidential

9.625% Junior Secured Guaranteed Note due 2015

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) INTEREST. Residential Capital, LLC, a Delaware limited liability company (the "*Company*"), promises to pay interest on the principal amount of this Note at a rate of 9.625% per annum in cash from June 6, 2008 until maturity and shall pay the Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below. The Company will pay interest and Additional Interest, if any, semiannually in arrears on May 15 and November 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*"). Except as specifically provided with respect to any Additional Notes, interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance. The first Interest Payment Date shall be November 15, 2008. The Company will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate of 9.625% per annum; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest, if any, (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. Interest will be computed on the basis of a 360 day year comprised of twelve 30-day months.

(2) METHOD OF PAYMENT. The Company will pay interest on the Notes (except defaulted interest) and Additional Interest, if any, to the Persons who are registered Holders of Notes at the close of business on the May 1 and November 1 next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium and Additional Interest, if any, and Cash Interest at the office or agency of the Company maintained for such purpose within or without the City and State of New York, or, at the option of the Company, payment of interest and Additional Interest, if any, may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and Cash Interest, premium and Additional Interest, if any, on, all Global Notes and all other Notes the Holders of which will have provided wire transfer instructions to the Company or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

A-2

(3) *PAYING AGENT AND REGISTRAR*. Initially, U.S. Bank National Association, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company or any of its Subsidiaries may act in any such capacity.

(4) *INDENTURE*. The Company issued the Notes under an Indenture dated as of June 6, 2008 (the "*Indenture*") among the Company, the Guarantors and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the TIA. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Indenture does not limit the aggregate principal amount of Notes that may be issued thereunder.

(5) *OPTIONAL REDEMPTION*. The Company may redeem the Notes at any time, in whole or in part, at a redemption price specified in Section 3.07 of the Indenture.

(6) *MANDATORY REDEMPTION*. The Company will mandatorily redeem one-third of the principal amount of each Note originally issued (or, if less, the entire then remaining principal amount of Notes) on each of May 15, 2013, May 15, 2014 and May 15, 2015 at a redemption price equal to the principal amount thereof plus accrued interest to Redemption Date (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date).

(7) *REPURCHASE AT THE OPTION OF THE HOLDER*. The Company may be required to repurchase Notes pursuant to Section 4.10 of the Indenture.

(8) *DENOMINATIONS, TRANSFER, EXCHANGE*. The Notes are in registered form without coupons in initial denominations of $2,000 and integral multiples of $1,000. The transfer of Notes, including transfers to affiliates, shall be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

(9) *PERSONS DEEMED OWNERS*. The registered Holder of a Note shall be treated as its owner for all purposes.

(10) *AMENDMENT, SUPPLEMENT AND WAIVER*. Subject to certain exceptions, the Indenture, the Notes, the Security Documents or the Guarantees may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal

A-3

Confidential

amount of the then outstanding Notes including Additional Notes, if any, voting as a single class, and any existing Default or Event or Default or compliance with any provision of the Indenture, the Notes or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes including Additional Notes, if any, voting as a single class. Without the consent of any Holder, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Guarantees to (i) evidence the succession of another corporation to the Company or each Guarantor or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations; (ii) add to the covenants of the Company for the benefit of the Holders; (iii) cure any ambiguity, omission, defect or inconsistency, provided that such action does not adversely affect the interests of the Holders; (iv) convey, transfer, assign, mortgage or pledge any property to or with the Trustee; (v) evidence and provide the acceptance of the appointment of a successor trustee under the Indenture; and (vi) (x)evidence the succession of another corporation to each Guarantor, or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations; (y) add to the covenants of a Guarantor for the benefit of the Holders; (z) evidence and provide for any new Guarantees with respect to the Notes or the release of any Guarantor pursuant to the Indenture; (xx) provide for additional Collateral; (yy) release Collateral in accordance with the Indenture and the Security Documents and (zz) secure any Pari Passu Third Lien Indebtedness.

(11) *DEFAULTS AND REMEDIES.* Events of Default include: (i) the Company's failure to (x) pay principal (or premium, if any, on) any of the Notes as and when the same shall become due and payable either at maturity, upon redemption, by declaration or otherwise or (y) consummate a mandatory redemption of the Notes pursuant to Section 3.09 of the Indenture on any date required by such Section; (ii) the Company's failure to pay any installment of interest, upon any of the Notes as and when due and payable, which such failure continues for a period of 30 days; (iii) the Company's failure to observe or perform any of the covenants or agreements described in Sections 4.07, 4.09, 4.10, 4.11, 4.12, 4.13, 4.17 and 5.01 of the Indenture for a period of 30 days after the date on which the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of its failure to perform; (iv) the Company's failure, or the failure of any Guarantor, to perform any other covenant in the Indenture, which failure continues for 90 days after the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of the Company's, or such Guarantor's, failure to perform; (v) (x) the Company's failure, or failure by any of the Company's Subsidiaries, to perform any term or provision of any evidence of Indebtedness (excluding Indebtedness of any of the Company's Subsidiaries that is a Financing SPV), whether such Indebtedness now exists or shall hereafter be created, or any other condition shall occur, and as a result of the occurrence of which default or condition any Indebtedness in an amount in excess of $50,000,000 shall become or be declared to be due and payable, or the Company, or any of the Company's Subsidiaries, shall be obligated to purchase any such Indebtedness, prior to the date on which it would otherwise become due and payable, (y) any Indebtedness in an amount in excess of $50,000,000 shall not be paid when due at its stated maturity or (z) an "Event

A-4

Confidential

of Default" occurs and is continuing under any indenture governing the Existing Notes; (vi) the entry against the Company or any Significant Subsidiary of a final judgment or final judgments for the payment of money in an aggregate amount in excess of $50,000,000, by a court or courts of competent jurisdiction, which judgments remain undischarged, unwaived, unstayed, unbonded or unsatisfied for a period of 60 consecutive days; (vii) any Security Document or Intercreditor Agreement is held to be unenforceable or invalid for any reason, the security interest purported to be created by the Security Documents are held to be unenforceable, invalid or impaired with respect to a material portion of the Collateral, the Company or any Guarantor defaults in the performance of the terms of any of the Security Documents or the Intercreditor Agreement in a manner that adversely affects the enforceability or validity of the security interest on a material portion of the Collateral or in a manner that adversely affects the condition or value of a material portion of the Collateral, or the Company or any Guarantor repudiates or disaffirms any of its obligations under any of the Security Documents or the Intercreditor Agreement; (viii) certain events of Bankruptcy with respect to the Company, any Guarantor or any Significant Subsidiary; and (ix) any Guarantee shall cease to be in full force and effect (unless such Guarantee has been released in accordance with the Indenture). If any Event of Default other than an event of Bankruptcy as specified in clauses (8) and (9) of Section 6.01 of the Indenture has occurred and is continuing, either the Trustee or the Holders of not less than 25% in aggregate principal amount of Notes then outstanding under the Indenture may declare the principal of the Notes and all accrued interest thereon to be due and payable immediately. If an Event of Default that is an event of Bankruptcy as specified in clauses (8) and (9) of Section 6.01 of the Indenture occurs, the principal of all outstanding Notes and all accrued interest thereon shall be due and payable, without further action or notice on the part of the Trustee or any Holder. The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration and its consequences, if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest or premium or Additional Interest, if any, that has become due solely because of the acceleration) have been cured or waived.

(12) *TRUSTEE DEALINGS WITH COMPANY*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(13) *SECURITY DOCUMENTS AND INTERCREDITOR AGREEMENT*. The obligations of the Company and the Guarantors under the Indenture, the Notes and the Guarantees are secured by a Lien on the Collateral pursuant to the Security Documents. The provisions of the Indenture and the Security Documents are subject to the Intercreditor Agreement.

(14) *NO RECOURSE AGAINST OTHERS*. A director, Officer, employee, incorporator or stockholder of the Company or any Guarantors, as such, will not have any liability for any obligations of the Company or the Guarantors under the Notes, the Guarantees or the Indenture or for any claim based on, in respect of, or by reason of, such

A-5

obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

(15) AUTHENTICATION. This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(16) ABBREVIATIONS. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(17) ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES. In addition to the rights provided to Holders of Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes will have, subject to the terms thereof, all the rights set forth in the Registration Rights Agreement dated as of June 6, 2008, by the Company and the Guarantors, as such agreement may be amended, modified or supplemented from time to time. And, with respect to any Additional Notes, Holders of Restricted Global Notes and Restricted Definitive Notes will have, subject to the terms thereof, the rights set forth in one or more registration rights agreements, if any, by the Company, the Guarantors and the other parties thereto, as such agreement(s) may be amended, modified or supplemented from time to time, relating to rights given by the Company to the purchasers of Additional Notes to register such Additional Notes under the Securities Act (collectively, the "*Registration Rights Agreement*").

(18) CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(19) GOVERNING LAW. THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THIS NOTE AND THE GUARANTEES INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

The Company will furnish to any Holder upon written request and without charge a copy of the Indenture, the Security Documents, the Intercreditor Agreement and/or the Registration Rights Agreement. Requests may be made to:

<div align="center">A-6</div>

Confidential

Residential Capital, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423
Attention: Hu Benton, Managing Director,
       VP and Associate Counsel

<div align="center">A-7</div>

Confidential

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

                                        (Insert assignee's legal name)


_____

                              (Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

                    (Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Note on the books of the Company.
The agent may substitute another to act for him.

Date: _____

                        Your Signature: _____

                                        (Sign exactly as your name appears on the face of this
                                        Note)

Signature Guarantee*: _____

_____

*  Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the
   Trustee).

                                        A-8

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 4.10 of the Indenture, check the box below:

☐ Section 4.10

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.10 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
                        (Sign exactly as your name appears on the face of this
                        Note)

Tax Identification No.: _____

Signature Guarantee*: _____

_____

*   Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the
    Trustee).

A-9

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |
|  |  |  |  |  |

---

\* *This schedule should be included only if the Note is issued in global form.*

A-10

Confidential

EXHIBIT B

**FORM OF CERTIFICATE OF TRANSFER**

Residential Capital, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107-2292
Attention: Richard Prokosch

Re: <u>9.625% Junior Secured Guaranteed Notes due 2015</u>

Reference is hereby made to the Indenture, dated as of June 6, 2008 (the "*Indenture*"), among Residential Capital, LLC, as issuer (the "*Company*"), each of the Guarantors and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1. ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

B-1

Confidential

2. ☐ **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser). Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3. ☐ **Check and complete if Transferee will take delivery of a beneficial interest in a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S**. The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a) ☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b) ☐ such Transfer is being effected to the Company or a Subsidiary thereof;

or

(c) ☐ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

4. ☐ **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note**.

(a) ☐ **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in

B-2

Confidential

compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b) ☐ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c) ☐ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____
[Insert Name of Transferor]

By: _____
    Name:
    Title:

Dated: _____

B-3

### ANNEX A TO CERTIFICATE OF TRANSFER

1.   The Transferor owns and proposes to transfer the following:

<div align="center">[CHECK ONE OF (a) OR (b)]</div>

(a)   ☐ a beneficial interest in the:

    (i)   ☐ 144A Global Note (CUSIP ____), or

    (ii)   ☐ Regulation S Global Note (CUSIP ____), or

(b)   ☐ a Restricted Definitive Note.

2.   After the Transfer the Transferee will hold:

<div align="center">[CHECK ONE]</div>

(a)   ☐ a beneficial interest in the:

    (i)   ☐ 144A Global Note (CUSIP ____), or

    (ii)   ☐ Regulation S Global Note (CUSIP ____), or

    (iii)   ☐ Unrestricted Global Note (CUSIP ____); or

(b)   ☐ a Restricted Definitive Note; or

(c)   ☐ an Unrestricted Definitive Note,

in accordance with the terms of the Indenture.

<div align="center">B-4</div>

Confidential

## EXHIBIT C

## FORM OF CERTIFICATE OF EXCHANGE

Residential Capital, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107-2292
Attention: Richard Prokosch

    Re: <u>9.625% Junior Secured Guaranteed Notes due 2015</u>

(CUSIP _____)

    Reference is hereby made to the Indenture, dated as of June 6, 2008 (the "*Indenture*"), among Residential Capital, LLC, as issuer (the "*Company*"), each of the Guarantors and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

    1. **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

    (a) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

    (b) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial

C-1

interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c) ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d) ☐ **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2. **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b) ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐ 144A Global Note,

<div align="center">C-2</div>

Confidential

☐ Regulation S Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____
[Insert Name of Transferor]

By: _____
        Name:
        Title:

Dated: _____

C-3

**EXHIBIT D**

**FORM OF NOTATION OF GUARANTEE**

For value received, each Guarantor (which term includes any successor Person under the Indenture) has, jointly and severally, unconditionally guaranteed, to the extent set forth in the Indenture and subject to the provisions in the Indenture dated as of June 6, 2008 (the "*Indenture*") among Residential Capital, LLC (the "*Company*") and U.S. Bank National Association, as Trustee (the "*Trustee*"), (a) the due and punctual payment of the principal of, premium and Additional Interest, if any, and interest on, the Notes, whether at maturity, by acceleration, redemption or otherwise, the due and punctual payment of interest on overdue principal of and interest on the Notes, if any, if lawful, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms of the Indenture and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. The obligations of the Guarantors to the Holders of Notes and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article X of the Indenture and reference is hereby made to the Indenture for the precise terms of the Guarantee.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

[NAME OF GUARANTOR(S)]

By: _____

　　　Name:
　　　Title:

D-1

Confidential

**EXHIBIT E**

**FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS**

Supplemental Indenture (this "*Supplemental Indenture*"), dated as of _____, 200___, among _____ (the "*Guaranteeing Subsidiary*"), a Subsidiary of Residential Capital, LLC (or its permitted successor), a Delaware Limited Liability Company (the "*Company*") the other Guarantors (as defined in the Indenture referred to herein) and U.S. Bank National Association, as Trustee under the Indenture referred to below (the "*Trustee*").

W I T N E S S E T H

WHEREAS, the Company has heretofore executed and delivered to the Trustee an indenture (the "*Indenture*"), dated as of June 6, 2008, providing for the issuance of 9.625% Junior Secured Guaranteed Notes due 2015 (the "*Notes*");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Company's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the "*Guarantee*"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1. CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. AGREEMENT TO GUARANTEE. The Guaranteeing Subsidiary hereby agrees to and does hereby provide an unconditional guarantee on the terms and subject to the conditions set forth in the Guarantee and in the Indenture including but not limited to Article X thereof.

3. NO RECOURSE AGAINST OTHERS. No director, Officer, employee, incorporator or stockholder of the Guaranteeing Subsidiary, as such, shall have any liability for any obligations of the Company or any Guaranteeing Subsidiary under the Notes, any Guarantees, the Indenture or this Supplemental Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws.

E-1

Confidential

4. NEW YORK LAW TO GOVERN. THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS SUPPLEMENTAL INDENTURE WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

5. COUNTERPARTS. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

6. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

7. THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary and the Company.

[Signature Pages Follow]

E-2

Confidential

    IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____, 20\_\_\_

[GUARANTEEING SUBSIDIARY]

By: _____
    Name:
    Title:

Residential Capital, LLC

By: _____
    Name:
    Title:

U.S. Bank National Association
as Trustee

By: _____
    Authorized Signatory

E-3

## EXHIBIT F

## FORM OF OFFICERS' CERTIFICATE FOR RELEASE OF COLLATERAL

Officer's Certificate

[NAME OF GRANTOR]

Dated as of: [_____]

The undersigned, being a [title] of [Name of Grantor], a [_____] (the "Grantor"), does hereby certify that:

1. [He][She] is a duly appointed and qualified [Title] of the Grantor and is authorized to execute and deliver this Certificate.

2. The Grantor is requesting the release by Wells Fargo Bank, N.A., as Third Priority Collateral Agent, of the property described on Annex A hereto (the "Property") from the security interest created by the Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Third Priority Security Agreement"), dated as of June 6, 2008, among Residential Capital, LLC, certain of its affiliates from time to time parties thereto, U.S. Bank National Association, as Trustee, and Wells Fargo Bank, N.A., as Third Priority Collateral Agent.

3. The conditions specified in (i) Section [      ] of the Indenture, dated as of June 6, 2008, among Residential Capital, LLC, the Guarantors and U.S. Bank National Association, as Trustee, applicable to the release by the Third Priority Collateral Agent of the Property from the security interest of the Third Priority Security Agreement [and (ii) Section [      ] of [            ]][1] have been satisfied.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first set forth above.

[NAME OF GRANTOR]

By: _____
              Name:
              Title:

_____

[1]    To be updated to include appropriate references to collateral release provisions of agreements governing Pari Passu Third Lien Indebtedness, if applicable.

F-1

**EXHIBIT G**

**FORM OF OPINION OF COUNSEL FOR RELEASE OF COLLATERAL**

[Letterhead of Counsel to Grantor]

[DATE]

Wells Fargo Bank, N.A.
[address]
[address]
Attention: [_____]

U.S. Bank National Association, as Trustee
[address]
[address]
Attention: [_____]

Re:    Third Priority Pledge and Security Agreement and Irrevocable Proxy and Indenture for 9.625% Junior Secured
           Guaranteed Notes due 2015

Ladies and Gentlemen:

[I][We] have acted as [special] [other capacity] counsel to [_____], a [_____] (the "Grantor"), in connection with the requested release of [describe assets to be released] more particularly describe in Annex A to the Officer's Certificate referred to below (the "Property") from the security interest created by the Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Third Priority Security Agreement"), dated as of June 6, 2008, among Residential Capital, LLC (the "Company"), certain of its affiliates from time to time parties thereto, U.S. Bank National Association, as Trustee (the "Trustee"), and Wells Fargo Bank, N.A., as Third Priority Collateral Agent. This opinion is being furnished to you pursuant to Section 10 of the Third Priority Security Agreement and Section 8.04 of that certain Indenture (the "Indenture") dated as of June 6, 2008 among the Company, the guarantors names therein and the Trustee. [2]

In [my][our] examination, [I][we] have assumed the genuineness of all signatures including endorsements, the legal capacity of natural persons, the authenticity of all documents

---

[2]    To be updated to include appropriate references to agreements governing Pari Passu Third Lien Indebtedness, if
         applicable.

G-1

Confidential

submitted to [me][us] as originals, the conformity to original documents of all documents submitted to us as facsimile, electronic, certified or photostatic copies, and the authenticity of the originals of such copies. As to any facts material to this opinion which [I][we] did not independently establish or verify, [I][we] have relied upon statements and representations of the Grantor and their respective officers and other representatives and of public officials, including the facts and conclusions set forth therein.

Except as otherwise specified herein or as the context may otherwise require, capitalized terms used but not otherwise defined herein are defined in the Third Priority Security Agreement.

In rendering the opinions set forth herein, [I][we] have examined and relied on originals or copies of the following:

(a) the Third Priority Security Agreement

(b) the Indenture; and

(c) an Officer's Certificate of [_____], a [title], of [name of applicable Grantor], dated [_____] (the "Officer's Certificate") delivered by [name of applicable Grantor] pursuant to Section 10 of the Third Priority Security Agreement and Section 8.04 of the Indenture (a copy of which is attached as Exhibit A hereto).

We express no opinion as to the laws of any jurisdiction other than the Applicable Laws of the State of [_____].

"Applicable Laws" means those laws, rules and regulations which, in [my][our] experience, are normally applicable to transactions of the type contemplated by the Third Priority Security Agreement but without [my][our] having made any special investigation as to the applicability of any specific law, rule or regulation, and which are not the subject of a specific opinion herein referring expressly to a particular law or laws.

Based upon the foregoing and subject to the limitations, qualifications, exceptions and assumptions set forth herein, [I] [we] are of the opinion that the Officer's Certificate is in the form required by Section [        ] of the Indenture and no other documents, instruments or certificates are required to be delivered to the Third Priority Collateral Agent or the Trustee as a condition to the requested release.

[I][We] have made no investigation and express no opinion regarding any conclusion set forth in the Officer's Certificate.

[My][Our] opinion herein stated is based on the assumptions specified above.

This opinion is furnished to you solely for your benefit and is not to be used, circulated, quoted or otherwise referred to for any other purpose or relied upon by any other person or entity for any purpose without [my][our] prior written consent.

Very truly yours,

G-2

Confidential

**Exhibit C-2**

**Notes Security Agreement**

EXECUTION COPY

---

AMENDED AND RESTATED THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT
AND IRREVOCABLE PROXY

dated as of

December 30, 2009

among

RESIDENTIAL CAPITAL, LLC,
and certain of its Affiliates from time to time parties hereto,
as Grantors

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

and

WELLS FARGO BANK, N.A.,
as Third Priority Collateral Agent
and Collateral Control Agent

---

1534209.04-New York Server 7A - MSW

Confidential

# TABLE OF CONTENTS

**Page**

1.  Definitions.................................................................................................................2
2.  Grant of Security Interest by the Company and the Guarantors ......................................13
3.  Grant of Security Interest by Equity Pledgors .............................................................15
4.  Grant of Security Interest by FABS Grantors...............................................................16
5.  Grant of Security Interest by Additional Account Parties .............................................17
6.  Third Priority Nature of Liens....................................................................................18
7.  Representations and Warranties ..................................................................................18
8.  Grantor Remains Liable; Nature of Security Interest; Subrogation, etc..........................22
9.  Collections, etc.........................................................................................................23
10.  Release ....................................................................................................................24
11.  Agreements of the Grantors .......................................................................................24
12.  Agreement as to Investment Property; Voting...............................................................28
13.  Defaults and Events of Default; Remedies ...................................................................32
14.  Limitation on Duty in Respect of Collateral.................................................................35
15.  Special Provisions Relating to the Third Priority Collateral Agent .................................36
16.  Special Provisions Relating to the Collateral Control Agent..........................................44
17.  General.....................................................................................................................44
18.  Amendment and Restatement .....................................................................................48
19.  Foreign Pledge Agreements........................................................................................48
20.  Pari Passu Third Lien Indebtedness ............................................................................49
21.  Intercreditor Matters .................................................................................................49

SCHEDULES

Schedule I           Grantor Information
Schedule II          Additional Places of Business
Schedule III         Trade Names; Prior Legal Names; Mergers
Schedule IV          Intellectual Property
Schedule V           Commercial Tort Claims
Schedule VI          Initial Collateral
Schedule VII         Direct Subsidiaries
Schedule VIII        Excluded Significant Subsidiaries
Schedule IX          Bailment Collateral
Schedule X           Deposit Accounts and Securities Accounts
Schedule XI          Notice Information

ATTACHMENTS

Attachment I         Pledged Equity and Pledged Notes
Attachment II        Form of Joinder Agreement

-i-

Confidential

## AMENDED AND RESTATED THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY

THIS AMENDED AND RESTATED THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY (this "Agreement"), dated as of December 30, 2009, is among

(i)        Residential Capital, LLC, a Delaware limited liability company (the "Company");

(ii)       GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage"), Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), HomeComings Financial, LLC, a Delaware limited liability company ("Homecomings"), GMAC-RFC Holding Company, LLC, a Delaware limited liability company ("RFC Holdings"), and GMAC Residential Holding Company, LLC, a Delaware limited liability company ("Residential"; and each of GMAC Mortgage, RFC, Homecomings, RFC Holdings and Residential being a "Guarantor" and collectively, the "Guarantors");

(iii)      GMAC Model Home Finance I, LLC, a Delaware limited liability company ("Model Home I"), Developers of Hidden Springs, LLC, a Delaware limited liability company ("Developers"), DOA Holding Properties, LLC, a Delaware limited liability company ("DOA"), Equity Investment IV, LLC, a Delaware limited liability company ("Equity IV"), RFC Construction Funding, LLC ("RFC Construction"), RFC Asset Holdings II, LLC, a Delaware limited liability company ("RAHI"), and Passive Asset Transactions, LLC, a Delaware limited liability company ("PATI"; and each of Model Home I, Developers, DOA, Equity IV, RFC Construction, RAHI and PATI being an "Equity Pledgor" and collectively, the "Equity Pledgors");

(iv)       each of RAHI and PATI in its capacity as a "FABS Grantor" (collectively, the "FABS Grantors");

(v)        the various other parties signatory hereto as additional account parties (each an "Additional Account Party" and collectively, the "Additional Account Parties");

(vi)       each other Person that agrees to become a "Grantor" by executing and delivering a Joinder Agreement, pursuant to Section 17 (the Company, each Guarantor, each Equity Pledgor, each FABS Grantor, each Additional Account Party and each such other Person is herein a "Grantor" and collectively, the "Grantors");

(vii)      U.S. Bank National Association, as Trustee under the Indenture (the "Trustee"); and

(viii)     Wells Fargo Bank, N.A., as third priority collateral agent (together with its successor(s) thereto in such capacity, the "Third Priority Collateral Agent") for the Notes Parties, and Collateral Control Agent (as defined in the Intercreditor Agreement described below).

1534209.04-New York Server 7A - MSW

Confidential

<u>W I T N E S S E T H</u>:

WHEREAS, the Company issued its 9.625% Junior Secured Guaranteed Notes Due 2015 (the "<u>Notes</u>") pursuant to an Indenture, dated as of June 6, 2008, among the Company, the Guarantors, and the Trustee (as amended, supplemented, restated or otherwise modified from time to time, the "<u>Indenture</u>");

WHEREAS, the Guarantors have pursuant to Article X of the Indenture, among other things, unconditionally guaranteed the obligations of the Company under the Indenture and the Notes (each such guarantee so made by a Guarantor herein its "<u>Guaranty</u>");

WHEREAS, following the Issue Date, the Company and its Subsidiaries may incur Pari Passu Third Lien Indebtedness (as defined in the Indenture) which are secured equally and ratably with the Notes in accordance with <u>Section 19</u> of this Agreement;

WHEREAS, pursuant to Section 8.01 of the Indenture, the Grantors entered into the Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of June 6, 2008 (as amended, supplemented, restated or otherwise modified from time to time prior to the date hereof, the "<u>Original Security Agreement</u>"); and

WHEREAS, the parties to the Original Security Agreement wish to amend and restate the Original Security Agreement in its entirety.

NOW, THEREFORE, for and in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Definitions</u>.  When used herein and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined herein have the meanings assigned to such terms in the Indenture; (b) the terms Account, Account Debtor, Certificated Security, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Assets, Fixture, General Intangibles, Goods, Health Care Insurance Receivables, Instrument, Inventory, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangible, Proceeds, Securities Account, Security, Security Entitlement, Supporting Obligations and Uncertificated Security have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below); and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

<u>Account Control Agreements</u> has the meaning given to such term in the Senior Secured Credit Facility.

<u>Amendment Closing Date</u> means December 30, 2009.

<u>Ancillary Income</u> means all money which is due and payable in connection with each mortgage loan other than the servicing fee and specifically including, without limitation, late charge fees, assignment transfer fees, insufficient funds check charges, amortization schedule fees, interest from escrow accounts and all other incidental fees

-2-

Confidential

and charges and any Float Benefit, in each case, to the extent such amounts are allocable to a mortgage loan.

Assets has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Amendment Closing Date.

Assigned Documents means the Note Issuance Facility Deed, the Deed of Charge, the UK Note and any other Transaction Document (as defined in the Master Definitions Schedule dated as of June 4, 2008 relating to the Warehouse Facility of English Sellers) governed by English law to which the Company is a party.

Bailment Collateral has the meaning given such term in the Intercreditor Agreement.

Bilateral Facility means the facilities listed in Schedule 7.01(t) to the Senior Secured Credit Facility on the Issue Date.

Carrying Value has the meaning given such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Collateral means, with respect to any Grantor, all property and rights of such Grantor in which a security interest is granted pursuant to Sections 2, 3, 4 and 5.

Collateral Control Agent has the meaning given such term in the Intercreditor Agreement.

Computer Hardware and Software means, with respect to any Grantor, all of such Grantor's rights (including rights as licensee and lessee) with respect to: (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, features, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including, without limitation, all operating system software, utilities and application programs in whatsoever form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; and (d) any documentation for hardware, software and firmware described in clauses (a), (b) and (c) above, including, without limitation, flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

Controlled Collateral means any assets of the Grantors:

(i)     consisting of Deposit Accounts, Securities Accounts or Property deposited or carried therein or credited thereto,

(ii)    described as subject to, or purported to be subject to, (A) Liens in favor of, or for the benefit of, the Collateral Control Agent or (B) control by the

-3-

Confidential

Collateral Agent, in each case in or under the Intercreditor Agreement, the Account Control Agreements (as defined in the Senior Secured Credit Facility), the Real Estate Security Documents (as defined in the Senior Secured Credit Facility), the Mexican Security Documents or any other Notes Document, excluding Sections 2, 3, 4 and 5 of this Agreement, or

(iii)    in the possession or purported to be in the possession of the Collateral Control Agent (including Bailment Collateral), in each case in or under the Intercreditor Agreement, the Account Control Agreements (as defined in the Senior Secured Credit Facility), the Real Estate Security Documents (as defined in the Senior Secured Credit Facility), the Mexican Security Documents or any other Notes Document, excluding Sections 2, 3, 4 and 5 of this Agreement.

Deed of Charge means the deed of charge and assignment dated as of June 4, 2008 between, among others, the UK SPE, the Company and the English Security Trustee as amended, amended and restated, supplemented or modified from time to time.

Default means a "Default" as defined in the Indenture or under any Pari Passu Third Lien Indebtedness Agreement.

Discharge of First Priority Claims has the meaning given to such term in the Intercreditor Agreement.

Discharge of Second Priority Claims has the meaning given to such term in the Intercreditor Agreement.

Distributions means all dividends of stock, membership interests or other ownership interests, liquidating dividends, shares of stock resulting from (or in connection with the exercise of) stock splits, reclassifications, warrants, options, non-cash dividends, mergers, consolidations, and all other distributions (whether similar or dissimilar to the foregoing) on or with respect to any Pledged Share, Pledged Interest or other shares of capital stock, member interest or other ownership interests or security entitlements constituting Collateral, but shall not include Dividends.

Dividends means cash dividends and cash distributions with respect to any Pledged Share or any Pledged Interest made in the ordinary course of business and not as a liquidating dividend.

Dutch Assets means the Dutch Membership Interests and Dutch VFLN Receivables.

Dutch Membership Interests means 65% of any and all rights, claims (vorderingsrechten) and interests of each of Residential Funding Company, LLC and GMAC-RFC Holding Company, LLC in their capacity as member (lid) of GMAC RFC International Holdings Coöperatief U.A. under or in connection with their membership (lidmaatschap).

-4-

Confidential

Dutch Security Documents means Dutch VFLN Agreement and the Dutch VFLN Note.

Dutch VFLN Agreement means that certain variable funding loan note agreement dated June 4, 2008 and entered into by and between, among others, the Company, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding.

Dutch VFLN Note means any note issued by GX CE Funding B.V. to the Company under or pursuant to the Dutch VFLN Agreement.

Dutch VFLN Receivables means any and all rights and claims (*vorderingsrechten*) (including but not limited to a right of recourse (*regres*) or subrogation (*subrogatie*)), whether present or future, whether actual or contingent, of the Company under or in connection with (i) the Dutch VFLN Agreement, (ii) each Dutch VFLN Note and (iii) the Dutch VFLN Trust Deed.

Dutch VFLN Trust Deed means that certain trust deed dated June 4, 2008 entered into by and between, among others, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding in relation to the Dutch VFLN Agreement.

English Loan Sale and Purchase Agreement means the loan sale and purchase agreement dated June 4, 2008 between the SPE, the English Sellers and the English Security Trustee.

English Security Documents means the English Loan Sale and Purchase Agreement, the Note Issuance Facility Deed, the English Shares Charge, the UK Third Priority Deed of Assignment and each and every other document, agreement and deed entered into by the Company and/or the English Security Trustee in connection with the purchase of certain residential mortgage loans and development loans, the issuance of the UK Note and creation of security in respect of the UK Note in favor of the English Security Trustee, in each case, by the UK SPE.

English Security Trustee means Deutsche Trustee Company Limited (in its capacity as security trustee in respect of the UK Note).

English Sellers means GMAC-RFC Limited and GMAC-RFC Property Finance Limited.

English Shares Charge means the Third Priority Shares Charge dated June 6, 2008 and entered into by RFC and the Third Priority Collateral Agent.

ERISA has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Event of Default means an "Event of Default" as defined in the Indenture or under any Pari Passu Third Lien Indebtedness Agreement.

-5-

Confidential

Excluded Assets means, with respect to any Grantor and to the extent such Property does not constitute Primary Collateral, the following Property: (a) Goods securing purchase money indebtedness or capital lease obligations existing as of the Issue Date to the extent such purchase money indebtedness or capital lease obligations prohibit the granting of a security interest on such assets; (b) voting capital stock of controlled foreign corporations (as defined in the Internal Revenue Code) in excess of sixty-five percent (65%) of the voting rights of such corporations including without limitation GMAC-RFC Australia Pty Limited and GMAC RFC International Holdings Coöperatief U.A. (or any other controlled foreign corporation identified in writing by a Grantor to the Third Priority Collateral Agent); (c) any asset, including any account, note, contract, lease, financing arrangement, general intangible, equity investment, interests in joint ventures or other agreement to the extent that the grant of a security interest therein would violate applicable Requirements of Law, result in the invalidation thereof or provide any party thereto with a right of termination or default with respect thereto or with respect to any Bilateral Facility to which such asset is subject as of the Issue Date (in each case, after giving effect to applicable provisions of the UCC and other applicable Requirements of Law and principles of equity); (d) any trademark applications filed in the United States Patent and Trademark Office on the basis of such Grantor's "intent-to-use" such trademark, unless and until acceptable evidence of use of the trademark had been filed with the United States Patent and Trademark Office pursuant to Section 1(c) or 1(d) of the Lanham Act (15 U.S.C. 1051, et seq.) to the extent that granting a lien in such trademark application prior to such filing would adversely affect the enforceability of validity of such trademark application, (e) Mortgage Loans (the "LOC Mortgage Loans") and assets, rights and property related to such Mortgage Loans, in each case to the extent that, during the period between December 28, 2009 and January 31, 2010, (i) such LOC Mortgage Loans are contributed or otherwise transferred by GMAC, Inc. or its Subsidiary to the Company, and contributed or otherwise transferred by the Company or its Subsidiary to RFC or GMAC Mortgage and (ii) such LOC Mortgage Loans and related rights, assets and property are pledged by RFC or GMAC Mortgage as collateral under the LOC Related Documents; (f) proceeds and products of any and all of the foregoing excluded assets described in clause (a) through (e) above only to the extent such proceeds and products would constitute property or assets of the type described in clause (a) through (e) above; and (g) the Exempt Cash Reserve Account and any proceeds and products thereof. In addition, solely for purposes of each grant of a security interest under the First Priority Security Agreement to secure Hedge Obligations (as defined in the First Priority Security Agreement), Excluded Assets also means any asset that does not constitute a Financing Asset (as defined in the Indenture, as in effect as of August 1, 2008) whether or not such asset constitutes Primary Collateral, to the extent (if any) that the grant of a security interest therein to secure the Hedge Obligations (as defined in the First Priority Security Agreement) in such asset would violate any provision of, or cause a default under, the Indenture.

Exempt Cash Reserve Account has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Financial Asset-Backed Security means a collateralized mortgage obligation, a collateralized bond obligation, a collateralized loan obligation or any other security the

-6-

Confidential

payments on which depend primarily on the cash flow from a specified pool of financial assets.

First Priority Collateral Agent has the meaning given to such term in the Intercreditor Agreement.

First Priority Security Agreement means the First Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of June 4, 2008, among RFC and GMAC Mortgage, as borrowers, and certain of their Affiliates as grantors thereunder, GMAC Inc., as agent for the lenders, and the First Priority Collateral Agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

Float Benefit means the net economic benefit resulting from investments of funds representing escrow and custodial deposits held for the account of a servicer relating to the mortgage loans.

General Intangibles means, with respect to any Grantor, all of such Grantor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Grantor's licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Governmental Authority means any nation or government, any state or other political subdivision thereof, any municipality and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government. Without limiting the generality of the foregoing, with respect to the United States, a "Governmental Authority" shall include any United States federal, state, county, municipal or other local governmental, judicial or regulatory authority, agency, arbitration board, body, commission, instrumentality, court or quasi-governmental authority or tribunal.

Hedge Obligations has the meaning given to such term in the First Priority Security Agreement.

Incremental Advance means an advance made by a Grantor (i) with respect to a construction loan facility or a construction project to complete, or maintain the value of, the related construction project or (ii) under a mezzanine or working capital loan facility under which such Grantor of such Incremental Advance has a legally binding commitment to make such advance.

Initial Collateral means assets of the Company and the Grantors that are listed on, or of a type described on, Schedule VI hereto and that exist on the Issue Date.

Intellectual Property means all past, present and future: trade secrets and other proprietary information; rights in customer lists; trademarks, service marks, business names, trade names, domain names, designs, logos, and/or other source and/or business identifiers and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world (including without limitation the trade name "DITECH");

-7-

Confidential

copyrights (including, without limitation, copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world; inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; rights in license agreements related to any of the Intellectual Property and income therefrom; the right to sue for all past, present and future infringements of any of the foregoing; all common law and other rights throughout the world in and to all of the foregoing; and the right to obtain all reissues, extensions or renewals of the foregoing.

Internal Revenue Code means the Internal Revenue Code of 1986, as amended.

Line of Credit Agreement means that certain Loan Agreement dated as of the Amendment Closing Date between GMAC Mortgage and RFC as borrowers and certain of their affiliates as guarantors, GMAC Inc., as initial lender and as lender agent and certain other financial institutions and persons from time to time party thereto as lenders; provided that if at any time such agreement shall cease to be in effect, references herein to the Line of Credit Agreement or terms defined therein shall be references to such agreement or terms as in effect immediately prior to the time at which such agreement ceased to be in effect.

LOC Mortgage Loans has the meaning given such term in clause (e) of the definition of Excluded Assets.

LOC Related Documents means the Line of Credit Agreement and all security documents, sale documents, licenses, service agreements and other agreements and documents to be execute and delivered by the Company and its Subsidiaries in connection with any of the foregoing.

Mexican Security Documents means the Stock Pledge Agreement to be executed by RFC for the benefit of the Collateral Control Agent whereby RFC pledges (i) shares, each with a par value of $1.00 (one Peso 00/100) legal currency of Mexico, representing the corporate capital stock of GMAC RFC Auritec, S.A., (ii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Hipotecaria, S.A. de C.V., S.F.O.L., and (iii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Financiera, S.A. de C.V., S.F.O.L. and any and all notices, certificates, agreements and other documents to be executed and delivered by RFC pursuant to the foregoing or otherwise in connection with the transactions contemplated by the Stock Pledge Agreement.

Mortgage Loan has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Amendment Closing Date.

Non-Tangible Collateral means, with respect to any Grantor, collectively, such portion of such Grantor's Collateral that constitutes Accounts, Chattel Paper, Deposit

-8-

Confidential

Accounts, Documents, General Intangibles, Payment Intangibles, Investment Property, Letter-of-Credit Rights, Letters of Credit and Supporting Obligations.

Note Issuance Facility Deed means the note issuance facility deed dated June 4, 2008 between, among others, Residential Capital, LLC and the UK SPE, as amended, amended and restated, supplemented or modified from time to time.

Notes Documents means the Indenture, the Notes, the Security Documents and all notices, certificates, financing statements, agreements and other documents to be executed and delivered by the Company or any other Grantor pursuant to the foregoing or otherwise in connection with the transactions contemplated by the Indenture.

Notes Parties means the Third Priority Collateral Agent, the Collateral Control Agent, the Trustee and the Holders

Obligations means any principal, interest, penalties, fees, indemnifications, reimbursements, damages, guarantees and other liabilities payable under the Notes (other than any Additional Notes except to the extent constituting Pari Passu Third Lien Indebtedness), the Indenture, this Agreement, any other Notes Document and any Pari Passu Third Lien Indebtedness Agreement, in each case, whether now or hereafter existing, renewed or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether or not arising on or after the commencement of a case under Title 11, U.S. Code or any similar federal or state law for relief of debtors (including post-petition interest) and whether or not allowed or allowable as a claim in any such case; provided that no obligations in respect of any Pari Passu Third Lien Indebtedness Agreement (other than Additional Notes) shall constitute "Obligations" unless the Pari Passu Third Lien Indebtedness Agent for the holders of such Indebtedness has executed a Pari Passu Third Lien Indebtedness Joinder Agreement.

Pari Passu Third Lien Indebtedness Agent means the Person appointed or designated to act as trustee, agent or representative for the holders of Indebtedness under any Pari Passu Third Lien Indebtedness Agreement pursuant to the terms of such agreement.

Pari Passu Third Lien Indebtedness Agreement means the indenture, credit agreement or other agreement under which any Pari Passu Third Lien Indebtedness (other than Additional Notes) are incurred and any notes or other instruments representing such Pari Passu Third Lien Indebtedness.

Pari Passu Third Lien Indebtedness Joinder Agreement means an agreement substantially in the form of Attachment V hereto.

Pledged Interest Issuer means each Person identified in Item B of Attachment I hereto as the Pledged Interest Issuer.

Pledged Interests means all member interests, general or limited partnership interests or other ownership interests of any Pledged Interest Issuer described in Item B of Attachment I hereto, whether now existing or hereafter arising (other than Excluded

-9-

Confidential

Assets); all other member interests, general or limited partnership interests or other ownership interests issued by any Pledgor's Subsidiaries (other than Excluded Assets) that is hereafter from time to time pledged as Collateral under this Agreement by a Pledgor; all registrations, certificates, articles or agreements governing or representing any such interests; all options and other rights, contractual or otherwise, at any time existing with respect to such interests; all distributions, cash, instruments and other property now or hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such interests; and all proceeds of the foregoing.

    Pledged Note Issuer means each Person identified in Item D of Attachment I hereto as the issuer of the Pledged Note identified opposite the name of such Person.

    Pledged Note Lien means any and all liens or security interests securing the obligation of a Pledged Note Issuer evidenced by the applicable Pledged Note, and all collateral subject to such liens and security interests.

    Pledged Notes means all of the promissory notes described in Item D of Attachment I hereto, and all other promissory notes of any Pledged Note Issuer, issued by a Pledged Note Issuer, as such promissory notes, in accordance with Section 12(j), are amended, restated, modified or supplemented from time to time; any promissory note of any Pledged Note Issuer taken in extension or renewal thereof or substitution therefor; all instruments or agreements governing or representing all or any of such notes; all rights, contractual or otherwise, at any time existing with respect to such notes; all distributions, cash, instruments and other property now or hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such notes; and all proceeds of the foregoing.

    Pledged Property means all Pledged Interests, all Pledged Notes, all Pledged Shares, all other securities, all assignments of any amounts due or to become due, all other instruments which are now being delivered by any Pledgor to the Third Priority Collateral Agent, the First Priority Collateral Agent, the Second Priority Collateral Agent or the Collateral Control Agent or may from time to time hereafter be delivered by any Pledgor to the Third Priority Collateral Agent or the Collateral Control Agent for the purpose of pledge under this Agreement or any other Notes Document or Pari Passu Third Lien Indebtedness Agreement, and all proceeds of any of the foregoing.

    Pledged Share Issuer means each Person identified in Item A of Attachment I hereto as the issuer of the Pledged Shares identified opposite the name of such Person.

    Pledged Shares means all shares of capital stock of any Pledged Share Issuer, whether now existing or hereafter arising (other than Excluded Assets) and all other shares of capital stock of any direct Subsidiary of a Pledgor that is hereafter from time to time pledged as Collateral under this Agreement by a Pledgor; all registrations, certificates, articles, or agreements governing or representing any such interest; all options and other rights, contractual or otherwise, at any time existing with respect to all or any of such shares; all distributions, cash, instruments and other property now or

-10-

Confidential

hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares; and all proceeds of the foregoing.

Pledgor means the Company, any Guarantor or any Equity Pledgor.

Primary Collateral means Initial Collateral, REO Property acquired as the result of foreclosure on Primary Collateral, Reinvestment Collateral, any assets acquired as a result of exercising remedies under any Initial Collateral or Reinvestment Collateral that was designated as such prior to the Amendment Closing Date or Substitute Collateral, and all proceeds of the foregoing.

Property means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

Real Estate Security Documents has the meaning given to such term in the Senior Secured Credit Facility.

Reinvestment Collateral means additional Collateral or Supporting Assets provided pursuant to Section 4.10(b)(3) of the Indenture.

REO Property means real estate owned property (i.e., a mortgaged property acquired through foreclosure or deed in lieu of foreclosure).

Required Secured Parties means the holders of a majority in aggregate principal amount. voting as a single class, of (i) the Notes and (ii) any Indebtedness under Pari Passu Third Lien Agreements, in each case, excluding any holder of such Indebtedness whose vote is required to be disregarded under the Indenture or the applicable Pari Passu Third Lien Indebtedness Agreement.

Requirements of Law means, with respect to any Person or any of its property, the certificate of incorporation or articles of association and by-laws, certificate of limited partnership, limited partnership agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether federal, state or local (including, without limitation, usury laws, the Federal Truth in Lending Act and retail installment sales acts).

Sales Proceeds Accounts has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Second Priority Collateral Agent means Wells Fargo Bank, N.A. in its capacity as collateral agent under the security agreement for the Senior Secured Notes.

Secured Parties means the Third Priority Collateral Agent, the Trustee, the Holders, each Pari Passu Third Lien Indebtedness Agent and any holders of Obligations under any Pari Passu Third Lien Indebtedness Agreement.

-11-

Confidential

Servicing Contract means any agreement, whether titled a "servicing agreement," a "pooling and servicing agreement," a "sale and servicing agreement," or otherwise, pursuant to which any Grantor is obligated to perform collection, enforcement or foreclosure services with respect to, or to maintain and remit any funds collected from, persons obligated on any mortgage loan or pool of mortgage loans.

Servicing P&I Advance has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Servicing Rights means all right, title and interest of the Company and Guarantors in, to and under any Servicing Contract, whether now or hereafter existing, acquired or created, whether or not yet accrued, earned, due or payable, as well as all other present and future right and interest under such Servicing Contract, including, without limitation, the right (i) to receive the servicing fee income payable (including without limitation, any uncollected fees), (ii) to receive reimbursement for any Advances, (iii) any and all Ancillary Income, (iv) to hold and administer the related escrow account balances, (v) to hold and administer, in accordance with the applicable Servicing Contract, the related principal and interest custodial account, the custodial file, and the mortgage file arising from or connected to the servicing of such mortgage loan and (vi) all proceeds, income, profits, rents and products of any of the foregoing.

Servicing T&I Advance has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, as used in Section 11 hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

UK Note means the notes issued to the Company from time to time by the UK SPE pursuant to the Note Issuance Facility Deed (there being only one note outstanding at any time).

UK Note Related Security means all Liens created in favor of the English Security Trustee by the UK SPE in connection with the issuance of the UK Note.

UK Pledged Shares means the UK Pledged Shares in each UK Pledged Shares Company which are held by Residential Funding Company, LLC and represented by the certificates listed in Item C of Attachment 1 hereto and which represent 65% of the UK Pledged Shares held by Residential Funding Company, LLC in the relevant UK Pledged Shares Company together with all other shares and other assets, including any moneys and other Derivative Rights (as defined in the English Security Documents) from time to time charged to the Third Priority Collateral Agent.

UK Pledged Shares Companies means:

(a)     GMAC-RFC Holdings Limited, a company incorporated in England and Wales (registered number 03471082) whose registered office is at

-12-

Confidential

Eastern Gate, Brants Bridge, Bracknell, Berkshire RG12 9BZ ("GMAC Holdings"); and

(b)    GMAC-RFC Europe Limited, a company incorporated in England and Wales (registered number 03987700) whose registered office is at Eastern Gate, Brants Bridge, Bracknell, Berkshire RG12 9BZ; ("GMAC Europe");

and UK Pledged Shares Company means any of them.

UK Third Priority Deed of Assignment means that certain Third Priority Deed of Assignment dated June 6, 2008 and entered into by and between the Company as Chargor and the Third Priority Collateral Agent.

UK SPE means Viaduct (No. 7) Limited.

2.    Grant of Security Interest by the Company and the Guarantors.  As security for the prompt payment in full in cash and performance of all Obligations, the Company and each of the Guarantors and each other Grantor (other than a Grantor that is an Equity Pledgor, a FABS Grantor or an Additional Account Pledgor) hereby pledges to the Third Priority Collateral Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties in, all of the Company's, such Guarantor's or any such other Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Assets including, without limitation, all Financial Asset-Backed Securities, Servicing P&I Advances, Servicing T&I Advances, Mortgage Loans and Incremental Advances of a type specified in, or otherwise described in Schedule VI to this Agreement, and all other Property described in Schedule VI to this Agreement;

(b)    Accounts, including Health Care Insurance Receivables;

(c)    Chattel Paper, including Electronic Chattel Paper;

(d)    Commercial Tort Claims described on Schedule V hereto, as such schedule may be supplemented from time to time by any applicable Grantor in accordance with this Agreement;

(e)    Computer Hardware and Software and all rights with respect thereto, including, without limitation, any and all rights in licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

(f)    Deposit Accounts;

(g)    Documents;

-13-

Confidential

(h)    Financial Assets, including, without limitation, (A) all Deposit Accounts and Securities Accounts in which any Financial Assets are carried or credited, and all Investment Property (including all Security Entitlements), Instruments, Money, and other property on deposit therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited to such Deposit Accounts or Securities Accounts, (B) all agreements, contracts, documents and instruments evidencing, arising from, relating to or other otherwise delivered pursuant to or in connection with Financial Assets, (C) all cash and funds delivered to a Grantor (or its bailee or agent) in respect of such Financial Assets and any collateral securing the same, and (D) to the extent not included in the foregoing, all Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Payment Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, and Money, consisting of, arising from, or relating to or delivered pursuant to, any of the foregoing;

(i)    General Intangibles (including, without limitation, all Payment Intangibles and all rights, titles and interests in the English Security Documents, the Dutch Security Documents and the Mexican Security Documents);

(j)    Goods (including, without limitation, all its Equipment, Fixtures and Inventory), together with all embedded software, accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

(k)    Instruments;

(l)    Intellectual Property;

(m)    (i) (A) all issued and outstanding shares of capital stock of each Pledged Share Issuer identified in Item A of Attachment I hereto, (B) all other Pledged Shares issued from time to time, (C) all Pledged Notes of each Pledged Note Issuer identified in Item D of Attachment I hereto (including, without limitation, the UK Note and the Dutch VFLN Note), (D) all other Pledged Notes issued from time to time, (E) all Pledged Note Liens, (F) all issued and outstanding member interests, general or limited partnership interests or other ownership interests of each Pledged Interest Issuer identified in Item B of Attachment I hereto, (G) all other Pledged Interests issued from time to time, (H) all other Pledged Property, whether now or hereafter delivered to the Third Priority Collateral Agent, the Collateral Control Agent, the First Priority Collateral Agent or the Second Priority Collateral Agent in connection with this Agreement, and (I) all Dividends, Distributions, interest, and other payments and rights with respect to any Pledged Property; (ii) all Sales Proceeds Accounts and all funds, properties and assets (including financial assets) deposited therein or carried in or credited thereto; and (iii) to the extent not included in the foregoing clause (m)(i), all other Investment Property (including, without limitation, Commodity Accounts, Commodity Contracts, Securities (whether Certificated Securities or Uncertificated Securities), Security Entitlements and Securities Accounts);

(n)    Letter-of-Credit Rights and Letters of Credit;

(o)    Money (of every jurisdiction whatsoever);

(p)    Dutch Assets;

-14-

1534209.04-New York Server 7A - MSW

Confidential

(q)    UK Pledged Shares and UK Note;

(r)    Supporting Obligations;

(s)    Servicing Rights and Servicing Contracts;

(t)    Investment Property; and

(u)    to the extent not included in the foregoing, all other personal assets and property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to, any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing; provided that, notwithstanding the foregoing, the "Collateral" described in this Section 2 shall not include Excluded Assets.

To the extent any of the Collateral described in this Section 2 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Company and each of the Guarantors and each other Grantor (other than a Grantor that is an Equity Pledgor, a FABS Grantor or an Additional Account Pledgor) hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in, all of each such Company's or Guarantor's or any such other Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

The Company agrees with the Third Priority Collateral Agent and undertakes to pledge or, as the case may be, to pledge in advance the Dutch VFLN Receivables and each of RFC and RFC Holdings agrees with the Third Priority Collateral Agent and undertakes to pledge or, as the case may be, to pledge in advance the respective Dutch Membership Interests.

3.    Grant of Security Interest by Equity Pledgors.  As security for the prompt payment in full in cash and performance of all Obligations, each of the Equity Pledgors hereby pledges to the Third Priority Collateral Agent for the benefit of the Secured Parties, and grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties in, all of each such Equity Pledgor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Pledged Shares of each Pledged Share Issuer identified in Item A of Attachment I hereto;

(b)    all other Pledged Shares issued by any Pledged Share Issuer and pledged hereunder by any Equity Pledgor from time to time;

-15-

Confidential

(c)     all promissory notes, if any, of each Pledged Note Issuer identified in Item D of Attachment I hereto;

(d)     all other Pledged Notes, if any, issued by any Pledged Note Issuer from time to time;

(e)     all Pledged Note Liens, if any;

(f)     all Pledged Interests of each Pledged Interest Issuer identified in Item B of Attachment I hereto;

(g)     all other Pledged Interests issued by any Pledged Interest Issuer and pledged hereunder by any Equity Pledgor from time to time;

(h)     all Dividends, Distributions, interest, and other payments and rights with respect to any Pledged Shares or Pledged Interests;

(i)     all Deposit Accounts and all Property deposited or carried therein or credited thereto, and solely with respect to RAHI and PATI only to the extent related to any of the Property described in clauses (a) through (h) of this Section 3 or in which any of such Property (or proceeds of such Property) are deposited, carried or credited; and

(j)     all Securities Accounts and all Property (including all Investment Property and Financial Assets) deposited or carried therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited to such Securities Accounts, and solely with respect to RAHI and PATI only to the extent related to any of the Property described in clauses (a) through (h) of this Section 3 or in which any of such Property (or proceeds of such Property) are deposited, carried or credited;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to, any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing; provided that, notwithstanding the foregoing, the "Collateral" described in this Section 3 shall not include Excluded Assets.

To the extent any of the Collateral described in this Section 3 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Equity Pledgors hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in, all of each such Equity Pledgor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

4.     Grant of Security Interest by FABS Grantors.  As security for the prompt payment in full in cash and performance of all Obligations, each of the FABS Grantors hereby pledges to

-16-

Confidential

the Third Priority Collateral Agent for the benefit of the Secured Parties, and grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties, in all of each such FABS Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Financial Assets, including without limitation all Financial Asset-Backed Securities;

(b)    all Deposit Accounts and Securities Accounts in which any Financial Assets are carried or credited, and all Investment Property (including all Security Entitlements), Instruments, Money, and other Property on deposit or carried therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited thereto, and in any event the Securities Accounts identified opposite such FABS Grantor's name on Schedule X hereto;

(c)    all agreements, contracts, documents and instruments evidencing, arising from, relating to or other otherwise delivered pursuant to or in connection with Financial Assets;

(d)    all cash and funds delivered to each FABS Grantor (or its bailee or agent) in respect of such Financial Assets and any collateral securing the same; and

(e)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Payment Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, and Money, consisting of, arising from, or relating to or delivered pursuant to, any of the foregoing;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing; provided that, notwithstanding the foregoing, the "Collateral" described in this Section 4 shall not include Excluded Assets.

To the extent any Collateral described in this Section 4 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the FABS Grantors hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in all of each such FABS Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

5.    Grant of Security Interest by Additional Account Parties.  As security for the prompt payment in full in cash and performance of all Obligations, each of the Additional Account Parties hereby pledges to the Third Priority Collateral Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties in, all of each such Additional Account Party's right,

-17-

Confidential

title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

     (a)     all Deposit Accounts identified opposite such Additional Account Party's name on Schedule X hereto and in any Property deposited or carried therein or credited thereto; and

     (b)     all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing;

provided that, notwithstanding the foregoing, the "Collateral" described in this Section 5 shall not include Excluded Assets.

To the extent any Collateral described in this Section 5 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Additional Account Parties hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in all of each such Additional Account Party's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

     6.     Third Priority Nature of Liens. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Third Priority Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Third Priority Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control. Notwithstanding anything herein to the contrary, prior to the Discharge of First Priority Claims and the Discharge of Second Priority Claims, (i) the requirements of this Agreement to endorse, sign or deliver or give "control" as to, Collateral or proceeds thereof, to the Third Priority Collateral Agent or the Collateral Control Agent shall be deemed satisfied by endorsement, assignment or delivery of or the giving of "control" to, such Collateral or proceeds to the First Priority Collateral Agent, Second Priority Collateral Agent or Collateral Control Agent (in each case, as bailee or agent for the Third Priority Collateral Agent) and (ii) any endorsement, assignment or delivery to the First Priority Collateral Agent, Second Priority Collateral Agent or Collateral Control Agent (in each case, as bailee or agent for the Third Priority Collateral Agent) shall be deemed an endorsement, assignment or delivery to the Third Priority Collateral Agent for all purposes hereunder.

     7.     Representations and Warranties.

(a)     Each Grantor represents and warrants that:

     (i)     no financing statement (other than any which may have been filed on behalf of the Third Priority Collateral Agent or in connection with Permitted Liens) covering any of the Collateral is on file in any public office;

     (ii)     (1) such Grantor is and will be the lawful owner of all Collateral, free of all Liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, with full power and authority to execute and deliver this Agreement and perform

-18-

Confidential

such Grantor's obligations hereunder, and to subject the Collateral to the security interest hereunder and (2) none of the Collateral of such Grantor that constitutes Primary Collateral is subject to any Liens securing Indebtedness for borrowed money other than Permitted Liens securing Permitted First Lien Indebtedness and the Junior Secured Notes on the Issue Date;

(iii)    all information with respect to the Collateral and Account Debtors set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by such Grantor to the Third Priority Collateral Agent or any Secured Party is and will be true and correct in all material respects as of the date specified therein (or, if no date is so specified, as of the date furnished);

(iv)    such Grantor's true legal name as registered in the jurisdiction in which such Grantor is organized or incorporated, jurisdiction of organization or incorporation, federal employer identification number, organizational identification number, if any, as designated by the state of its organization, formation or incorporation, chief executive office and principal place of business are as set forth on Schedule I hereto (and such Grantor has not maintained its chief executive office and principal place of business at any other location at any time after January 1, 2003 except as otherwise disclosed in writing to the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent);

(v)    each other location where such Grantor maintains a place of business is set forth on Schedule II hereto or as otherwise disclosed in writing to the Third Priority Collateral Agent and , the Trustee and each Pari Passu Third Lien Indebtedness Agent;

(vi)    except as disclosed on Schedule III hereto, such Grantor is not now known and during the five years preceding the date hereof has not previously been known by any trade name;

(vii)    except as disclosed on Schedule III hereto, during the five years preceding the date hereof such Grantor has not been known by any legal name different from the one set forth on the signature page of this Agreement nor has such Grantor been the subject of any merger or other corporate reorganization;

(viii)    Schedule IV hereto contains a complete listing of all of such Grantor's material Intellectual Property which is subject to a registration;

(ix)    Schedule V hereto contains a complete listing of all of such Grantor's Commercial Tort Claims in excess of $10,000,000 in value;

(x)    Schedule VII hereto identifies all direct Subsidiaries of the Company, Guarantors and each Equity Pledgor;

(xi)    Schedule IX hereto lists all Bailment Collateral currently held by the Third Priority Collateral Agent, the Collateral Control Agent, the First Priority Collateral Agent or the Second Priority Collateral Agent as of the Amendment Closing Date, such Schedule IX to be updated at any time additional Bailment Collateral may be so delivered;

-19-

Confidential

(xii)     such Grantor is a corporation, limited partnership or limited liability company as specified in <u>Schedule I</u> hereto and is duly organized, validly existing and in good standing under the laws of the state of its incorporation, formation or organization;

(xiii)    the execution and delivery of this Agreement, the grant of the security interest, proxy and other rights granted herein and the performance by such Grantor of its obligations hereunder are within such Grantor's corporate, partnership or limited liability company powers, have been duly authorized by all necessary corporate, partnership or limited liability company action, have received all necessary governmental approvals (if any shall be required), and do not and will not contravene or conflict with any provision of law or of the charter or by-laws or other organizational documents of such Grantor or any judgment, order or decree, which is binding upon such Grantor and will not cause a breach, default or event of default under any agreement, indenture, instrument or other document to which such Grantor is a party;

(xiv)    this Agreement is a legal, valid and binding obligation of such Grantor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law);

(xv)     such Grantor has not performed any act which might prevent the Third Priority Collateral Agent from enforcing any of the terms of this Agreement or which could limit the Third Priority Collateral Agent in any such enforcement;

(xvi)    no Collateral is in the possession of any Person (other than such Grantor or a custodian, securities intermediary or account bank appointed by such Grantor) asserting any claim thereto or security interest therein (other than Permitted Liens), except that the Third Priority Collateral Agent or the Collateral Control Agent or their designee or agents may have possession of Collateral as contemplated pursuant to the Notes Documents;

(xvii)   this Agreement creates a valid security interest in the Collateral, securing the payment of the Obligations, and all filings and other actions necessary to perfect and protect such security interest have been duly taken and such security interest shall be a third priority security interest as to all Collateral (except (A) to the extent of actions to be taken post-closing, as described in Schedule 8.01(m) of the Senior Secured Credit Facility, and (B) for Permitted Liens);

(xviii)  in the case of any Pledged Shares constituting Collateral, all of such Pledged Shares are duly authorized and validly issued, fully paid, and non-assessable, and constitute all of the issued and outstanding shares of capital stock of each Pledged Share Issuer owned by the Pledgor set forth across from the name of such Pledged Share Issuer on <u>Attachment I</u> hereto, except as otherwise set forth thereon;

-20-

Confidential

(xix)    in the case of each Pledged Note and the Pledged Note Liens, all of such Pledged Notes and Pledged Note Liens, if any, have been duly authorized, executed, endorsed, issued and delivered, and are the legal, valid and binding obligation of the issuers thereof, and are not in default;

(xx)    in the case of any Pledged Interests constituting Collateral, such Pledged Interests constitute one hundred percent (100%) of the Pledgor's interest in the Pledged Interest Issuer (other than Excluded Assets) and the percentage of the total membership, partnership or other equity interests in the Pledged Interest Issuer indicated on Attachment I, except as otherwise set forth thereon. The Pledged Interests indicated on Attachment I are duly registered in the permanent ownership records of the respective Pledged Interests Issuer, and such registration is maintained in the principal office of such issuer. Such registration continues valid and genuine and has not been altered. All Pledged Interests have been duly authorized and validly issued, are fully paid and non-assessable, and were not issued in violation of the preemptive rights, if any, of any Person or of any agreement by which any Pledgor is bound. All documentary, stamp or other taxes or fees owing in connection with the registration, issuance, transfer or pledge of Collateral have been paid. No restrictions or conditions exist with respect to the registration, transfer, voting or pledge of any Pledged Interests (other than usual or customary securities laws or ERISA restrictions). All requisite formalities for the granting of a security interest in the Pledged Interests required pursuant to the organizational documents of the Pledgors or the Pledged Interest Issuer have been complied with on or prior to the execution and delivery of this Agreement. Each Pledgor represents that, as of the date hereof, none of the Pledged Interests is dealt with or traded on any securities exchange or in any securities market;

(xxi)    Schedule X attached hereto includes all of the Deposit Accounts and Securities Accounts that are, and that under the terms of the Senior Secured Credit Facility are required to be, subject to Account Control Agreements; and

(xxii)    the information set forth on Schedule XI hereto is true and correct in all material respects.

(b)    RFC represents and warrants, with respect to the UK Pledged Shares, that:

(i)    it is the sole legal and beneficial owner of the UK Pledged Shares free from all Liens other than Permitted Liens;

(ii)    the UK Pledged Shares are fully paid;

(iii)    there are no moneys or liabilities outstanding or payable in respect of the UK Pledged Shares or any of them;

(iv)    it is lawfully entitled to create the security over the UK Pledged Shares constituted by this Agreement in favor of the Third Priority Collateral Agent;

(v)    together the UK Pledged Shares constitute 65% of the issued share capital of each UK Pledge Shares Company; and

-21-

Confidential

(vi)    the UK Pledged Shares are fully transferable to the Third Priority
Collateral Agent (or any other Person as the Third Priority Collateral Agent shall direct)
without restriction and in particular in respect of any preemption rights or restrictions in
the articles of association of any UK Pledged Shares Company all appropriate waivers
have been obtained in respect of them from all other shareholders of that UK Pledged
Shares Company, which are unconditional, irrevocable and legally binding and
enforceable.

8.    Grantor Remains Liable; Nature of Security Interest; Subrogation, etc.

(a)    Anything herein to the contrary notwithstanding, (i) each Grantor shall remain
liable under the contracts and agreements included in the Collateral to the extent set forth therein,
and will perform all of its duties and obligations under such contracts and agreements to the
same extent as if this Agreement had not been executed, (ii) the exercise by the Third Priority
Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its
duties or obligations under any such contracts or agreements included in the Collateral, and (iii)
neither the Third Priority Collateral Agent nor any other Secured Party shall have any obligation
or liability under any contracts or agreements included in the Collateral by reason of this
Agreement, nor shall the Third Priority Collateral Agent nor any other Secured Party be
obligated to perform any of the obligations or duties of any Grantor thereunder or to take any
action to collect or enforce any claim for payment assigned hereunder.

(b)    This Agreement shall in all respects be a continuing, absolute, unconditional and
irrevocable grant of security interest, and shall remain in full force and effect as set forth in
Section 16. All rights of the Secured Parties and the security interests granted to the Third
Priority Collateral Agent (for its benefit and the benefit of each other Secured Party) hereunder,
and all obligations of the Grantors hereunder, shall, in each case, be absolute, unconditional and
irrevocable irrespective of (i) any lack of validity, legality or enforceability of any Notes
Document or Pari Passu Third Lien Indebtedness Agreement, (ii) the failure of any Secured
Party (A) to assert any claim or demand or to enforce any right or remedy against any Grantor or
any other Person under the provisions of any Notes Document, Pari Passu Third Lien
Indebtedness Agreement or otherwise, or (B) to exercise any right or remedy against any other
guarantor of, or collateral securing, any Obligations, (iii) any change in the time, manner or place
of payment of, or in any other term of, all or any part of the Obligations, or any other extension,
compromise or renewal of any Obligations, (iv) any reduction, limitation, impairment or
termination of any Obligations (except until all Obligations have been paid in full in cash) for
any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall
not be subject to (and each Grantor hereby waives any right to or claim of) any defense or setoff,
counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality,
nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence
affecting, any Obligations or otherwise, (v) any amendment to, rescission, waiver, or other
modification of, or any consent to or departure from, any of the terms of any Notes Document or
Pari Passu Third Lien Indebtedness Agreement, (vi) any addition, exchange or release of any
Collateral of the Obligations, or any surrender or non-perfection of any Collateral, or any
amendment to or waiver or release or addition to, or consent to or departure from, any other
guaranty held by any Secured Party securing any of the Obligations, or (vii) any other

-22-

Confidential

circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of, any Grantor, any surety or any guarantor.

(c)    Until one year and one day after all Obligations have been paid in full in cash, each Grantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against the Company or any other Grantor that arise from the existence, payment, performance or enforcement of such Grantor's obligations under this Agreement, any other Notes Document or Pari Passu Third Lien Indebtedness Agreement, including any right of subrogation, reimbursement, exoneration or indemnification, any right to participate in any claim or remedy of any Secured Party against the Company or any other Grantor or any Collateral which any Secured Party now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including the right to take or receive from the Company or any Grantor, directly or indirectly, in cash or other property or by set-off or in any manner, payment or security on account of such claim or other rights.  If any amount shall be paid to any Grantor in violation of the preceding sentence and the Obligations shall not have been indefeasibly paid in full in cash, then such amount shall be deemed to have been paid to such Grantor for the benefit of, and held in trust for, the Third Priority Collateral Agent (on behalf of the Secured Parties), and shall forthwith be paid to the Third Priority Collateral Agent to be credited and applied upon the Obligations, whether matured or unmatured.  Each Grantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and each Pari Passu Third Lien Indebtedness Agreement and that the waiver set forth in this Section 8(c) is knowingly made in contemplation of such benefits.

(d)    Except as otherwise provided in the Indenture or any Pari Passu Third Lien Indebtedness Agreement, if any Secured Party may, under applicable Requirements of Law, proceed to realize its benefits under this Agreement, the other Notes Documents or any Pari Passu Third Lien Indebtedness Agreement giving any Secured Party a lien upon any Collateral, either by judicial foreclosure or by non-judicial sale or enforcement, such Secured Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Agreement.  If, in the exercise of any of its rights and remedies, any Secured Party shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Grantor or any other Person, whether because of any applicable Requirements of Law pertaining to "election of remedies" or the like, each Grantor hereby consents to such action by such Secured Party and waives any claim based upon such action, even if such action by such Secured Party shall result in a full or partial loss of any rights of subrogation that such Grantor might otherwise have had but for such action by such Secured Party.

9.    Collections, etc.  Until such time during the existence of an Event of Default as the Third Priority Collateral Agent shall notify such Grantor of the revocation of such power and authority, each Grantor (a) will, at its own expense, endeavor to collect, as and when due, all amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as the Third Priority Collateral Agent may reasonably request or, in the absence of such request, as such Grantor may deem advisable; and (b) may grant, in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-

-23-

Confidential

Tangible Collateral. The Third Priority Collateral Agent, however, may, at any time that an Event of Default has occurred and is continuing, whether before or after any revocation of such power and authority or the maturity of any of the Obligations, notify any party obligated on any of the Non-Tangible Collateral to make payment or otherwise render performance to or for the benefit of the Third Priority Collateral Agent and enforce, by suit or otherwise, the obligations of any such party obligated on any Non-Tangible Collateral. In connection therewith, the Third Priority Collateral Agent may surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. Upon request of the Third Priority Collateral Agent following the occurrence and during the continuation of an Event of Default, each Grantor will, at its own expense, notify any party obligated on any of the Non-Tangible Collateral to make payment to the Third Priority Collateral Agent of any amounts due or to become due thereunder.

    10.    Release. Collateral shall from time to time be released from the security interest created by this Agreement pursuant to and in accordance with the provisions of both the Indenture and each Pari Passu Third Lien Indebtedness Agreement. Upon any such release, the Trustee and the applicable Pari Passu Third Lien Indebtedness Agent will, at the Grantors' joint and several expense, cause the Third Priority Collateral Agent to deliver to the relevant Grantor, without any representations, warranties or recourse of any kind whatsoever, such released Collateral held by the Third Priority Collateral Agent or Collateral Control Agent hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such release. With respect to any such release, the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent shall be entitled to rely conclusively upon an Officer's Certificate and an Opinion of Counsel delivered in connection with such release, which Officer's Certificate and an Opinion of Counsel shall be in the form of Attachments III and IV, respectively.

    11.    Agreements of the Grantors.

    (a)    Each Grantor:

        (i)    will execute such financing statements (or any equivalent filings in the United Kingdom and the Netherlands) and other documents (and pay the cost of filing or recording the same in all public offices reasonably determined to be appropriate by the Third Priority Collateral Agent or the Trustee or any Pari Passu Third Lien Indebtedness Agent) and do such other acts and things (including, without limitation, delivery to the Third Priority Collateral Agent or the Collateral Control Agent of any Instruments and Certificated Securities which constitute Collateral), all as the Third Priority Collateral Agent or the Trustee or any Pari Passu Third Lien Indebtedness Agent may from time to time reasonably request, to establish and maintain a valid perfected security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Permitted Liens) to secure the payment of the Obligations (and each Grantor authorizes the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent to file, without limitation, any financing statement (or any equivalent filings in the United Kingdom and the Netherlands) that (i) indicates the Collateral (x) as "all property" or "all assets" of such Grantor or words of similar effect, regardless of

-24-

Confidential

whether any particular asset in the Collateral falls within the scope of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed, or (y) as being of an equal or lesser scope or with greater detail, and (ii) contains any other information required by Section 5 of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed regarding the sufficiency or filing office acceptance of any financing statement (or any equivalent filings in the United Kingdom and the Netherlands), including (x) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (y) in the case of a financing statement (or any equivalent filings in the United Kingdom and the Netherlands) filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates; provided that, in any event, each Grantor shall take any such action, and any action listed in clauses (x) and (xi) below, for the benefit of the Third Priority Collateral Agent to the extent and at the time it is taking the same action for the benefit of the First Priority Collateral Agent or Second Priority Collateral Agent;

(ii)    will keep all its records regarding Collateral at, and will not maintain any place of business at any location other than, its address(es) shown on Schedules I and II hereto or at such other addresses of which such Grantor shall have given the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent not less than 30 days' prior written notice;

(iii)    will not change its state of organization or incorporation and will not change its name, identity or corporate structure or its organizational identification number for the state of its incorporation, formation or organization, in each case such that any financing statement filed to perfect the Third Priority Collateral Agent's interests under this Agreement would become seriously misleading, unless such Grantor shall have given the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent not less than 30 days' prior notice of such change (provided that this Section 11(a)(iii) shall not be deemed to authorize any change or transaction prohibited under the Indenture or any Pari Passu Third Lien Indebtedness Agreement) and shall have taken or will timely take all action necessary to maintain continued perfection and priority of the security interest created hereunder following such change;

(iv)    to the extent practicable, will keep its records concerning the Collateral in such a manner as will enable the Third Priority Collateral Agent or its designees to determine at any time the status of the Collateral;

(v)    to the extent practicable, will furnish the Third Priority Collateral Agent such information as is available to such Grantor concerning such Grantor, the Collateral and the Account Debtors as the Third Priority Collateral Agent may from time to time reasonably request;

(vi)    will permit the Third Priority Collateral Agent, the Trustee, each Pari Passu Third Lien Indebtedness Agent and their designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice if a Default has occurred and is continuing) to inspect, audit

-25-

Confidential

and make copies of and extracts from all records and all other papers in the possession of such Grantor pertaining to the Collateral and the Account Debtors, and will, upon request of the Third Priority Collateral Agent during the existence of a Default and to the extent practicable, deliver to the Third Priority Collateral Agent all of such records and papers;

(vii)    will not sell, lease or assign any Collateral except as permitted by both the Notes Documents and each then extant Pari Passu Third Lien Indebtedness Agreement or create or permit to exist any Lien on any Collateral other than Permitted Liens;

(viii)    will at all times keep all of its Inventory and other Goods insured under policies maintained with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated, following the Discharge of First Priority Claims and Discharge of Second Priority Claims, and cause all such policies to provide that loss thereunder shall be payable to the Third Priority Collateral Agent as its interest may appear (it being understood that (A) so long as no Default shall be continuing, the Third Priority Collateral Agent shall deliver any proceeds of such insurance which may be received by it to such Grantor and (B) upon the occurrence and during the continuance of a Default shall be continuing, the Required Secured Parties may direct (in writing) the Third Priority Collateral Agent to apply any proceeds of such insurance which may be received by it toward payment of the Obligations, whether or not due, in such order of application as the Required Secured Parties may determine) and such policies or certificates thereof shall, if the Third Priority Collateral Agent so requests, be deposited with or furnished to the Third Priority Collateral Agent;

(ix)    will keep all of the Collateral granted by such Grantor, Deposit Accounts and Investment Property in the United States or at such other locations outside of the United States as may be specified in writing to the Trustee and each Pari Passu Third Lien Indebtedness Agent;

(x)    will promptly notify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent in writing upon incurring or otherwise obtaining a Commercial Tort Claim which is claiming damages in excess of $10,000,000 (or any lesser amount specified in writing by the Trustee and each Pari Passu Third Lien Indebtedness Agent or the Third Priority Collateral Agent, if a Default has occurred and is continuing) after the date hereof against any third party, and concurrently therewith deliver to the Trustee, in form and substance satisfactory to the Trustee, a supplement to Schedule V sufficiently identifying such Commercial Tort Claim for purposes of Section 9-108 of the UCC;

(xi)    will promptly notify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent in writing upon becoming the beneficiary under any letter of credit in excess of $10,000,000 (or any lesser amount specified in writing by the Required Secured Parties or the Third Priority Collateral Agent, if a Default has occurred and is continuing) and, at the request of the Third Priority Collateral Agent following the Discharge of First Priority Claims and Discharge of Second Priority Claims, pursuant to an agreement in form and substance satisfactory to the Third Priority

-26-

Confidential

Collateral Agent, either (A) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to the Third Priority Collateral Agent of such letter of credit or (B) arrange for the Third Priority Collateral Agent to become the transferee beneficiary of such letter of credit;

(xii)    will promptly notify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent in writing if such Grantor holds or acquires an interest in any Electronic Chattel Paper and, at the request of the Third Priority Collateral Agent take such action as the Third Priority Collateral Agent or the Trustee or any Pari Passu Third Lien Indebtedness Agent may reasonably request to vest control, under Section 9-105 of the UCC, of such Electronic Chattel Paper in the Third Priority Collateral Agent or the Collateral Control Agent;

(xiii)    if any Grantor (i) obtains any rights to any additional Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office or (ii) becomes entitled to the benefit of any additional Intellectual Property constituting Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office, or any improvement on any Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office, such Grantor will notify the Third Priority Collateral Agent in writing and use commercially reasonable efforts to cause a short form security agreement in favor of the Third Priority Collateral Agent to be filed in the United States Copyright Office or the Unites States Patent & Trademark Office, as the case may be, with respect to such Intellectual Property; provided that this covenant shall not apply to "off-the-shelf" license rights of any Grantor in any Intellectual Property or any other license rights that are not material to such Grantor;

(xiv)    acknowledges and agrees that it is not authorized to file any financing statement in favor of the Third Priority Collateral Agent without the prior written consent of the Third Priority Collateral Agent and that it will not do so without the prior written consent of the Third Priority Collateral Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC;

(xv)    agrees that, in the event any Grantor takes any action to grant or perfect a Lien in favor of the First Priority Collateral Agent in any assets (other than the delivery of possessory Collateral or the grant of "control" over any Collateral to the Collateral Control Agent but including actions to perfect security interests under the laws of foreign jurisdictions), such Grantor shall also take such action to grant or perfect a Lien in favor of the Third Priority Collateral Agent to secure the Obligations;

(xvi)    will facilitate the realization of the Collateral and the exercise of all powers, authorities and discretions vested by this Agreement in the Third Priority Collateral Agent; and

-27-

Confidential

(xvii)    shall in particular promptly execute all transfers, conveyances, assignments and assurances which the Third Priority Collateral Agent may reasonably request in order to preserve or protect its interest in the Collateral.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne jointly and severally by the Grantors.  Upon the occurrence and during the continuation of an Event of Default, the Third Priority Collateral Agent shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event the applicable Grantor shall at the request of the Third Priority Collateral Agent do any and all lawful acts and execute any and all proper documents reasonably requested by the Third Priority Collateral Agent, the Trustee or any Pari Passu Third Lien Indebtedness Agent in aid of such enforcement and such Grantor shall promptly, upon demand, reimburse and indemnify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent for all costs and expenses incurred by either of them in the exercise of their rights under this Section 11. Notwithstanding the foregoing, the Third Priority Collateral Agent shall have no obligation or liability regarding the Collateral or any proceeds thereof by reason of, or arising out of, this Agreement.

(b)    Each of RFC and RFC Holding (i) shall execute a written declaration as referred to in clause 19.12 of the articles of association (*statuten*) of GMAC RFC International Holdings Coöperatief U.A. pursuant to which it terminates its membership (*lidmaatschap*) of GMAC RFC International Holdings Coöperatief U.A., subject to the occurrence of an Event of Default or the delivery of a notice in accordance with Section 6.02 of the Indenture or the delivery of a notice of acceleration with respect to any Pari Passu Third Lien Indebtedness and (ii) shall not revoke such written declaration or otherwise take any action that results in such written declaration being nullified or declared null and void.

(c)    The Company acknowledges and agrees that (a) it shall (1) not waive any rights under nor amend, novate, repudiate, rescind or otherwise terminate or permit to be terminated any Assigned Document without the prior written consent of the Third Priority Collateral Agent; (2) diligently pursue any remedies available to it for any breach of, or in respect of any claim in relation to, any Assigned Document; (3) deposit the UK Note and any UK Note Related Security issued in relation to a UK Note pursuant to Clause 8.2 (New Note Certificate) of the Note Issuance Facility Deed with the Third Priority Collateral Agent or Collateral Control Agent; and (4) procure that the UK SPE complies with its obligations under Clause 8.2 (New Note Certificate) of the Note Issuance Facility Deed, including, without limitation, granting a power of attorney in favor of the Third Priority Collateral Agent or Collateral Control Agent in a form set out in Schedule 9 to the Note Issuance Facility Deed; and (b) all payments received by it in connection with the UK Note, including the proceeds of any redemption of the UK Note whether as a result of a disposal of any assets or otherwise, shall be deposited into an account specified by the Third Priority Collateral Agent pursuant to the written direction of the Trustee from time to time.

12.    Agreement as to Investment Property; Voting.

(a)    All certificates or Instruments, if any, representing or evidencing any Primary Collateral, including any Pledged Property, shall be delivered to and held by or on behalf of (and,

-28-

Confidential

in the case of the Pledged Notes, endorsed to the order of) the Collateral Control Agent pursuant hereto, shall be in suitable form for transfer by delivery, and shall be accompanied by all necessary endorsements or instruments of transfer or assignment, duly executed in blank; provided that notes evidencing individual residential mortgage loans included in Primary Collateral need not be so delivered before September 15, 2008; and provided further that notes evidencing individual residential mortgage loans that are not included in Primary Collateral need not be so delivered.

(b)    To the extent any of its Primary Collateral constitutes a "certificated security" (as defined in Section 8-102(a)(4) of the UCC), each Grantor shall take such other actions as necessary to grant "control" (as defined in Section 8-106 of the UCC) to the Third Priority Collateral Agent or Collateral Control Agent over such Collateral.

(c)    To the extent any of its Primary Collateral constitutes an "uncertificated security" (as defined in Section 8-102(a)(18) of the UCC) with a Carrying Value of $10,000,000 or more, each Grantor shall take and cause the appropriate Person (including any issuer, entitlement holder or securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of the UCC) to the Collateral Control Agent over such Primary Collateral including, without limitation, causing delivery of such Primary Collateral or causing the issuer of such Primary Collateral, as appropriate, to agree to comply with the instructions originated by the Collateral Control Agent without further consent by the registered owner thereof.

(d)    To the extent any of its Primary Collateral constitutes a "security entitlement" or a "securities account" (as such terms are defined in Sections 8-102(a)(17) and 8-501(a), respectively, of the UCC), each Grantor shall take and cause the appropriate Person (including any securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of the UCC) to the Collateral Control Agent over such Primary Collateral including, without limitation, causing to be delivered to the Collateral Control Agent an agreement, executed by the securities intermediary thereof whereby such securities intermediary agrees (i) that it will comply with entitlement orders originated by the Collateral Control Agent without further consent by such Grantor or any other Person with respect to all such Primary Collateral (it being understood that such agreement may provide that at all times when such securities intermediary has not been notified by the Collateral Control Agent to the contrary, the securities intermediary may comply with entitlement orders of such Grantor), (ii) to subordinate any security interest it may have in and to all such Primary Collateral to the security interest of the Collateral Control Agent therein, and (iii) that it will not agree with any Person other than the Collateral Control Agent in any manner that would grant such Person "control" over any such Primary Collateral without the Required Secured Parties' prior written consent.

(e)    Each Pledgor will, from time to time upon the request of the Collateral Control Agent or the Third Priority Collateral Agent, promptly deliver to the Collateral Control Agent such stock powers, instruments, and similar documents, satisfactory in form and substance, following the Discharge of First Priority Claims and the Discharge of Second Priority Claims, to the Trustee and the Third Priority Collateral Agent, with respect to the Collateral as the Collateral Control Agent or the Third Priority Collateral Agent may reasonably request and will, from time to time upon the request of the Collateral Control Agent or the Third Priority

-29-

Confidential

Collateral Agent after the occurrence of any Default, promptly transfer any Pledged Shares, Pledged Interests or other shares of common stock, member interests or other ownership interests constituting Collateral into the name of any nominee, designated by the Trustee following the Discharge of First Priority Claims and Discharge of Second Priority Claims.

(f)    Subject to clause (g) below, each Pledgor will, at all times, keep pledged to the Third Priority Collateral Agent or Collateral Control Agent, as the case may be, pursuant to the Intercreditor Agreement, all Pledged Shares, Pledged Interests and all other shares of capital stock, member interests or other ownership interests constituting Collateral, and all securities, security entitlements and securities accounts constituting Collateral, Dividends and Distributions with respect thereto, all Pledged Notes, all interest, principal and other proceeds received by the Third Priority Collateral Agent with respect to the Pledged Notes, all Pledged Note Liens and all other Collateral and other securities, instruments, security entitlements, financial assets, investment property, proceeds, and rights from time to time received by or distributable to a Pledgor in respect of any Collateral.

(g)    In the event that any Dividend or Distribution is to be paid on any Pledged Share or any Pledged Interest or any payment of principal or interest is to be made on any Pledged Note at a time when no Event of Default has occurred and is continuing, such Dividend, Distribution or payment may be paid directly to the relevant Grantor.  If any Event of Default has occurred and is continuing, then any such Dividend, Distribution or payment shall following the Discharge of First Priority Claims and Discharge of Second Priority Claims be paid directly to the Third Priority Collateral Agent in accordance with Section 12(h).

(h)    Following the Discharge of First Priority Claims and Discharge of Second Priority Claims, each Pledgor agrees:

(i)    following the occurrence and during the continuance of any Event of Default, promptly upon receipt thereof by any Pledgor and without any request therefor by the Third Priority Collateral Agent, to deliver (properly endorsed where required hereby or requested by the Third Priority Collateral Agent) to the Third Priority Collateral Agent all Dividends, Distributions, all interest, all principal, all other cash payments, and all proceeds of the Collateral, all of which shall be held by the Third Priority Collateral Agent as additional Collateral for use in accordance with Section 13(f); and

(ii)    after any Event of Default shall have occurred and be continuing and the Third Priority Collateral Agent has notified the relevant Pledgor of the Third Priority Collateral Agent's intention to exercise its voting power under this clause (ii), (A) the Third Priority Collateral Agent may exercise (to the exclusion of such Pledgor) the voting power and all other incidental rights of ownership with respect to any Pledged Shares, Pledged Interests or other shares of capital stock, member interests or other ownership interests constituting Collateral and EACH PLEDGOR HEREBY GRANTS THE THIRD PRIORITY COLLATERAL AGENT AN IRREVOCABLE PROXY, EXERCISABLE UNDER SUCH CIRCUMSTANCES, TO VOTE THE PLEDGED SHARES, THE PLEDGED INTERESTS AND SUCH OTHER COLLATERAL, WITH SUCH PROXY TO REMAIN VALID UNTIL THE PAYMENT IN FULL IN CASH OF

-30-

Confidential

ALL OBLIGATIONS; and (B) promptly to deliver to the Third Priority Collateral Agent such additional proxies and other documents as may be necessary to allow the Third Priority Collateral Agent to exercise such voting power.

(i)      All Dividends, Distributions, interest, principal, cash payments, and proceeds and all rights under the UK Note and the UK Note Related Security which may at any time and from time to time be held by a Pledgor but which such Pledgor is then obligated to deliver to the Third Priority Collateral Agent, shall, until delivery to the Third Priority Collateral Agent, be held by such Pledgor separate and apart from its other property in trust for the Third Priority Collateral Agent. The Third Priority Collateral Agent agrees that unless it has received written notice from the Required Secured Parties that an Event of Default shall have occurred and be continuing and the Third Priority Collateral Agent shall have given the notice referred to in Section 12(h)(ii), such Pledgor shall have the exclusive voting power with respect to any shares of capital stock, member interests or other ownership interest (including any of the Pledged Shares, Pledged Interests or UK Pledged Shares) constituting Collateral and the Third Priority Collateral Agent shall, upon the written request of such Pledgor, promptly deliver (at the Grantors' joint and several expense) such proxies and other documents, if any, as shall be reasonably requested by such Pledgor which are necessary to allow such Pledgor to exercise voting power with respect to any such share of capital stock, member interests or other ownership interests (including any of the Pledged Shares, Pledged Interests or UK Pledged Shares) constituting Collateral; provided, however, that no vote shall be cast, or consent, waiver, or ratification given, or action taken by any Pledgor that could reasonably be expected to be adverse in any material respect to the interests of the Third Priority Collateral Agent and the other Secured Parties or be inconsistent with or violate any provision of the Indenture, any other Notes Document (including this Agreement) or any Pari Passu Third Lien Indebtednesss Agreement.

(j)      No Pledgor will, without the prior written consent of the Trustee and each Pari Passu Third Lien Indebtedness Agent: (A) enter into any agreement amending, supplementing, or waiving in any material respect any provision of any Pledged Note, any Pledged Note Lien or any UK Pledged Share (including the underlying instrument pursuant to which such Pledged Note, Pledged Note Lien or UK Pledged Share is issued) or compromising or releasing or extending the time for payment of any obligation of the maker thereof, (B) take or omit to take any action the taking or the omission of that would result in any impairment or alteration of any obligation of the maker of Pledged Note, Pledged Note Lien, UK Pledged Share or other instrument constituting Collateral, (C) permit the issuance of (x) any additional equity interests of any Pledged Share Issuer or Pledged Interest Issuer (unless immediately upon such issuance the same are pledged and delivered to the Third Priority Collateral Agent, the Collateral Control Agent, the First Priority Collateral Agent or the Second Priority Collateral Agent pursuant to the terms hereof and the Intercreditor Agreement to the extent necessary to give the Third Priority Collateral Agent a security interest after such issue in at least the same percentage of such Pledgor's outstanding interests as before such issue), (y) any securities or other ownership interests convertible voluntarily by the holder thereof or automatically upon the occurrence or non-occurrence of any event or condition into, or exchangeable for, any such shares or other ownership interests, or (z) any warrants, options, contracts or other commitments entitling any Person to purchase or otherwise acquire any such shares or other ownership interests, or (D) enter into any agreement creating or otherwise permit to exist, any restriction or condition upon the transfer, voting or control of any Pledged Share, Pledged Interest or UK Pledged Share that

-31-

Confidential

could reasonably be deemed to be adverse to the Secured Parties.  Each Pledgor shall provide, or cause the relevant Pledged Share Issuer or Pledged Interest Issuer to provide, the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent with a copy of any amendment or supplement to, or modification or waiver of, any term or provision of any of the organizational documents of such relevant Pledged Share Issuer or Pledged Interest Issuer; provided that such Pledgor shall not enter into any such amendment, supplement, modification or waiver of the organizational documents of such relevant Pledged Share Issuer or Pledged Interest Issuer which could reasonably be expected to be adverse to the interests of the Secured Parties. The Pledgors covenant and agree that they shall not consent to or permit (1) any Pledged Interest to be dealt with or traded on any securities exchanges or in any securities market or (2) any Pledge Interest Issuer to elect to have its Pledged Interests treated as a "security" under Article 8 of the UCC unless the relevant Pledgors have (I) caused such Pledged Interest to be certificated and (II) delivered all certificates evidencing such Pledged Interest to the Collateral Control Agent, together with duly executed undated blank transfer powers, or other equivalent instruments of transfer.

(k)    Each Pledgor shall take such actions such that its Collateral consisting of Pledged Interests and Pledged Shares at all times shall be duly authorized, validly registered, fully paid and non-assessable, and shall not be registered in violation of the organic documents of the Pledgors or the preemptive rights of any Person, if any, or of any agreement by which the Pledgors or any Pledged Share Issuer or Pledged Interest Issuer is bound.

13.    Defaults and Events of Default; Remedies.

(a)    Each Grantor hereby irrevocably appoints the Third Priority Collateral Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time, upon the occurrence and during the continuation of an Event of Default, to take any action and to execute any instrument which the Third Priority Collateral Agent may request to accomplish the purposes of this Agreement, including (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (ii) to receive, endorse, and collect any drafts or other Collateral in connection with clause (i) above, (iii) to file any claims or take any action or institute any proceedings which the Third Priority Collateral Agent may request for the collection of any of the Collateral or otherwise to enforce the rights of the Third Priority Collateral Agent and the other Secured Parties with respect to any of the Collateral, and (iv) to perform the affirmative obligations of such Grantor hereunder. **EACH GRANTOR HEREBY ACKNOWLEDGES, CONSENTS AND AGREES THAT THE POWER OF ATTORNEY GRANTED PURSUANT TO THIS SECTION 13 IS IRREVOCABLE AND COUPLED WITH AN INTEREST AND SHALL BE EFFECTIVE UNTIL ALL OBLIGATIONS HAVE BEEN PAID IN FULL IN CASH.**

(b)    If an Event of Default shall have occurred and be continuing, in addition to its rights in the foregoing clause (a) and without limiting the generality of such clause, the Third Priority Collateral Agent may exercise from time to time any rights and remedies available to it under the UCC, under any other applicable Requirements of Law and in the clauses (c) through (g) set forth below in this Section 13.

-32-

Confidential

(c)    Each Grantor agrees, (i) at the Trustee or any Pari Passu Third Lien Indebtedness Agent's request if a Default has occurred and is continuing, to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) and all records for all Collateral at a convenient place or places acceptable to the Required Secured Parties, and (ii) if an Event of Default has occurred and is continuing, at the Third Priority Collateral Agent's or Required Secured Parties' request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable the Third Priority Collateral Agent or its nominee to be registered as owner of the Intellectual Property with any competent registration authority.

(d)    Notice of the intended disposition of any Collateral may be given by first-class mail, hand-delivery (through a delivery service or otherwise), facsimile or E-mail, and shall be deemed to have been "sent" upon deposit in the U.S. mails with adequate postage properly affixed, upon delivery to an express delivery service, upon the electronic submission through telephonic services or, if by facsimile transmission, when sent against mechanical confirmation of successful transmission, as applicable. Each Grantor hereby agrees and acknowledges that: (i) with respect to Collateral that is (A) perishable or threatens to decline speedily in value or (B) is of a type customarily sold on a recognized market, no notice of disposition need be given; and (ii) with respect to Collateral not described in clause (i) above, notification sent after default and at least ten days before any proposed disposition provides notice within a reasonable time before disposition.

(e)    Each Grantor hereby agrees and acknowledges that a commercially reasonable disposition of Inventory, Equipment, Computer Hardware and Software, or Intellectual Property may be by lease or license of, in addition to the sale of, such Collateral. Each Grantor further agrees and acknowledges that a disposition (i) made in the usual manner on any recognized market, (ii) at the price current in any recognized market at the time of disposition or (iii) in conformity with reasonable commercial practices among dealers in the type of property subject to the disposition shall, in each case, be deemed commercially reasonable.

(f)    Any cash proceeds of any disposition by the Third Priority Collateral Agent of any of the Collateral shall be applied by the Third Priority Collateral Agent first to payment of the Third Priority Collateral Agent's and Collateral Control Agent's fees and expenses in connection with the Collateral, including, without limitation, attorneys' fees and legal expenses, second without duplication of amounts applied pursuant to clause first above, to the indefeasible payment in full in cash, pro rata, based on the amount of Obligations outstanding under the Indenture and each Pari Passu Third Lien Indebtedness Agreement and then due and owing to (i) the Trustee to be applied as provided in the Indenture, and (ii) each Pari Passu Third Lien Indebtedness Agent to be applied as provided in the applicable Pari Passu Third Lien Indebtedness Agreement; and, the balance, if any, to such Grantor or as otherwise directed by a court of competent jurisdiction. Neither the Third Priority Collateral Agent nor any other Secured Party need apply or pay over for application noncash proceeds of collection and enforcement unless (i) the failure to do so would be commercially unreasonable and (ii) the applicable Grantor has provided the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent with a written demand to apply or pay over such noncash proceeds on such basis. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Third Priority Collateral Agent arising out of the exercise by the Third Priority Collateral Agent of any rights hereunder.

-33-

Confidential

(g)    [Reserved].

(h)    If any Event of Default has occurred and is continuing, the Third Priority Collateral Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) and also may, without notice except as specified below (or, if notice cannot be waived under the UCC, as required to be provided by the UCC) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Third Priority Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Third Priority Collateral Agent may deem commercially reasonable.  Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' prior notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  The Third Priority Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  The Third Priority Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(i)    If any Event of Default has occurred and is continuing, the Third Priority Collateral Agent may transfer all or any part of the Collateral into the name of the Third Priority Collateral Agent or its nominee, with or without disclosing that such Collateral is subject to the lien and security interest hereunder, notify the parties obligated on any of the Collateral to make payment to the Third Priority Collateral Agent of any amount due or to become due thereunder, enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, endorse any checks, drafts, or other writings in any Grantor's name to allow collection of the Collateral, take control of any proceeds of the Collateral, and execute (in the name, place and stead of each Grantor) endorsements, assignments, transfer powers and other instruments of conveyance or transfer with respect to all or any of the Collateral.

(j)    Each Grantor agrees that in any sale of any of the Collateral whenever an Event of Default shall have occurred and be continuing, the Third Priority Collateral Agent is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable Requirements of Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any governmental regulatory authority or official, and each Grantor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Third Priority Collateral Agent be liable nor accountable to the Grantors for any discount allowed by the reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.  The Third Priority Collateral Agent may sell the Collateral without giving any warranties or representations

-34-

Confidential

as to the Collateral.  The Third Priority Collateral Agent may disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

      14.    <u>Limitation on Duty in Respect of Collateral</u>.  Beyond the exercise of reasonable care in the custody and preservation thereof, neither the Third Priority Collateral Agent nor any other Secured Party will have any duty as to any Collateral in its possession or control or in the possession or control of any sub-agent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto.  The Third Priority Collateral Agent will be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equal to that which it accords similar property held for third parties, and will not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of any act or omission of any sub-agent or bailee selected by the Third Priority Collateral Agent in good faith or by reason of any act or omission by the Third Priority Collateral Agent pursuant to instructions from the Trustee, except to the extent that such liability arises from the Third Priority Collateral Agent's gross negligence or willful misconduct.

To the extent that applicable law imposes duties on the Third Priority Collateral Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is commercially reasonable for the Third Priority Collateral Agent (a) to fail to incur expenses reasonably deemed significant by the Required Secured Parties or to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantors, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, including, without limitation, any warranties of title, (k) to purchase insurance or credit enhancements to insure the Third Priority Collateral Agent against risks of loss, collection or disposition of Collateral, or to provide to the Third Priority Collateral Agent a guaranteed return from the collection or disposition of Collateral or (l) to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Third Priority Collateral Agent in the collection or disposition of any of the Collateral.  Each Grantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Third Priority Collateral Agent would not be commercially unreasonable in the Third Priority Collateral Agent's exercise of remedies against the Collateral

<center>-35-</center>

Confidential

and that other actions or omissions by the Third Priority Collateral Agent shall not be deemed commercially unreasonable solely on account of not being specifically referred to in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any right to a Grantor or to impose any duties on the Third Priority Collateral Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section.

15.    Special Provisions Relating to the Third Priority Collateral Agent. The following provisions shall govern the Third Priority Collateral Agent's rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a)    The Third Priority Collateral Agent shall have no duty to act, consent or request any action of the Grantors or any other Person in connection with this Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy (including all schedules and exhibits attached hereto) unless the Third Priority Collateral Agent shall have received written direction from the Trustee and/or other Pari Passu Third Lien Indebtedness Agents, in each case, acting on behalf of the Required Secured Parties.

(b)    All indemnities to be paid under this Agreement shall be payable immediately when due in U.S. dollars ("Dollars") in the full amount due, without deduction for any variation in any Rate of Exchange (as defined below). The Grantors hereby agree to jointly and severally indemnify the Third Priority Collateral Agent against any losses, damages, penalties, costs, expenses or disbursements of any kind or nature whatsoever, including, without limitation, attorney's fees and expenses, incurred by the Third Priority Collateral Agent as a result of any judgment or order being given or made for the amount due hereunder and such judgment or order being expressed and paid in a currency (the "Judgment Currency") other than Dollars and as a result of any variation as between (i) the rate of exchange at which the dollar amount is converted into Judgment Currency for the purpose of such judgment or order, and (ii) the Rate of Exchange at which the Third Priority Collateral Agent is then able to purchase Dollars with the amount of the Judgment Currency actually received by the Third Priority Collateral Agent. The indemnity set forth in this paragraph shall constitute a separate and independent obligation of the Grantors and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "Rate of Exchange" means the rate at which the Third Priority Collateral Agent is able to purchase Dollars with the Judgment Currency on the foreign exchange market on the relevant date and shall include any premiums and other reasonable costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency. The indemnification set forth in this Section 15 shall survive the termination or assignment of this Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy and the resignation or removal of the Third Priority Collateral Agent.

(c)    For the avoidance of doubt, if there is any inconsistency between the terms of this Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy and those of the Intercreditor Agreement, the terms of the Intercreditor Agreement shall prevail.

(d)    Each of the Trustee, the Holders, each Pari Passu Third Lien Indebtedness Agent and each holder of Pari Passu Third Lien Indebtedness hereby designate and appoint Wells Fargo Bank, N.A. to act as the Third Priority Collateral Agent under this Agreement, the other Notes

-36-

Confidential

Documents and any Pari Passu Third Lien Indebtedness Agreement to which it is a party, and hereby authorize the Third Priority Collateral Agent to take such actions on its behalf under the provisions of this Agreement, such other Notes Documents and each Pari Passu Third Lien Indebtedness Agreement and to exercise such powers and perform such duties as are expressly delegated to the Third Priority Collateral Agent by the terms of this Agreement, such other Notes Documents and each Pari Passu Third Lien Indebtedness Agreement. Notwithstanding any provision to the contrary elsewhere in this Agreement, any other Notes Document or any such Pari Passu Third Lien Indebtedness Agreement, the Third Priority Collateral Agent shall not have any duties or responsibilities, except those expressly set forth in this Agreement, such other Notes Documents and each such Pari Passu Third Lien Indebtedness Agreement or any fiduciary relationship with the Secured Parties, and no implied covenants, functions or responsibilities shall be read into this Agreement or otherwise exist against the Third Priority Collateral Agent.

(e)     The trustee agrees to render to the Third Priority Collateral Agent, at any time upon request of the Third Priority Collateral Agent, an accounting of the amounts of the Obligations owing to the Holders and such other information with respect to the Obligations owing to each such Person as the Third Priority Collateral Agent may reasonably request in order to give effect to the terms and conditions of this Agreement. In the event that the Trustee fails to provide any information required to be provided by it to the Third Priority Collateral Agent, then the Third Priority Collateral Agent may (but shall not be obligated to) (i) take such actions as are required to be taken by it based on the most recent information available to it or (ii) in the case of any distributions to be made pursuant to the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, hold the Holders' share or purported share in escrow (without obligation to pay interest thereon) until the Trustee provides the required information.

(f)     Notwithstanding anything herein to the contrary, in no event shall the Third Priority Collateral Agent have any obligation to inquire or investigate as to the correctness, veracity, or content of any instruction received from the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties. In no event shall the Third Priority Collateral Agent have any liability in respect of any such instruction received by it and relied on with respect to any action or omission taken pursuant thereto.

(g)     The Third Priority Collateral Agent may execute any of its duties under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement by or through agents, experts or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Third Priority Collateral Agent shall not be responsible for the negligence or misconduct of any agents, experts or attorneys-in-fact selected by it in good faith.

(h)     Neither the Third Priority Collateral Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it under or in connection with this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement (except for its gross negligence or willful misconduct), or (ii) responsible in any manner to any Secured Party for any recitals, statements, representations or warranties (other than its own recitals, statements, representations or warranties) made in this Agreement, any of the Notes Documents or Pari Passu Third Lien Indebtedness Agreement or in any certificate, report, statement or other

-37-

1534209.04-New York Server 7A - MSW

Confidential

document referred to or provided for in, or received by the Third Priority Collateral Agent under or in connection with, this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or for any failure of the Grantors or any other Person to perform their obligations hereunder and thereunder.  The Third Priority Collateral Agent shall not be under any obligation to any Secured Party or any other Person to ascertain or to inquire as to (i) the observance or performance of any of the agreements contained in, or conditions of, this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or to inspect the properties, books or records of the Grantors, (ii) whether or not any representation or warranty made by any Person in connection with this Agreement, any Notes Document or any Pari Passu Third Lien Indebtedness Agreement is true, (iii) the performance by any Person of its obligations under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or (iv) the breach of or default by any Person of its obligations under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement.

(i)     The Third Priority Collateral Agent shall not be bound to (i) account to any Person for any sum or the profit element of any sum received for its own account; (ii) disclose to any other Person any information relating to the Person if such disclosure would, or might, constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person; (iii) be under any fiduciary duties or obligations other than those for which express provision is made in this Agreement, in any of the Notes Documents or in any Pari Passu Third Lien Indebtedness Agreement to which it is a party; or (iv) be required to take any action that it believes, based on advice of counsel, is in conflict with any applicable law, this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, or any order of any court or administrative agency.

(j)     Beyond the exercise of reasonable care in the custody thereof and except as otherwise specifically stated in this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, the Third Priority Collateral Agent shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or as to preservation of rights against prior parties or any other rights pertaining thereto.

(k)     The Third Priority Collateral Agent shall be authorized to but shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or monitoring or maintaining the perfection of any security interest in the Collateral.  It is expressly agreed, to the maximum extent permitted by applicable law, that the Third Priority Collateral Agent shall have no responsibility for (i) taking any necessary steps to preserve rights against any Person with respect to any Collateral or (ii) taking any action to protect against any diminution in value of the Collateral, but, in each case (A) subject to the requirement that the Third Priority Collateral Agent may not act or omit to take any action if such act or omission would constitute gross negligence, bad faith or willful misconduct and (B) the Third Priority Collateral Agent may do so and all expenses reasonably incurred in connection therewith shall be part of the Obligations.

-38-

Confidential

(l)     The Third Priority Collateral Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Third Priority Collateral Agent in good faith, except to the extent of the Third Priority Collateral Agent's gross negligence, bad faith or willful misconduct.

(m)     The Third Priority Collateral Agent shall not be responsible for, nor incur any liability with respect to, (i) the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Third Priority Collateral Agent, (ii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iii) the validity of the title of the Grantors to the Collateral, (iv) insuring the Collateral or (v) the payment of taxes, charges or assessments upon the Collateral or otherwise as to the maintenance of the Collateral.

(n)     Notwithstanding anything in this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement to the contrary, (i) in no event shall the Third Priority Collateral Agent or any officer, director, employee, representative or agent of the Third Priority Collateral Agent be liable under or in connection with this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits or loss of opportunity, whether or not foreseeable, even if the Third Priority Collateral Agent has been advised of the possibility thereof and regardless of the form of action in which such damages are sought; and (ii) the Third Priority Collateral Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the Notes Documents and each Pari Passu Third Lien Indebtedness Agreement to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such Notes Document or Pari Passu Third Lien Indebtedness Agreement, as applicable. In no event shall the Third Priority Collateral Agent be obligated to invest any amounts received by it hereunder.

(o)     The Third Priority Collateral Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any note, writing, resolution, request, direction, certificate, notice, consent, affidavit, letter, cablegram, telegram, telecopy, email, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and/or upon advice and/or statements of legal counsel, independent accountants and other experts selected by the Third Priority Collateral Agent and need not investigate any fact or matter stated in any such document. Any such statement of legal counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in accordance therewith. Any statement or advice of counsel may be based, insofar as it relates to factual matters, upon a certificate of an officer of the Trustee. In connection with any request or direction of the Trustee, the Third Priority Collateral Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any instruction delivered by the Trustee. The

-39-

1534209.04-New York Server 7A - MSW

Confidential

Third Priority Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement (i) if such action would, in the reasonable opinion of the Third Priority Collateral Agent (which may be based on the opinion of legal counsel), be contrary to applicable law, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, (ii) if such action is not specifically provided for in this Agreement or any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, (iii) if, in connection with the taking of any such action hereunder or under any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement that would constitute an exercise of remedies hereunder, under any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement it shall not first be indemnified to its satisfaction by the Trustee and/or Holders against any and all risk of nonpayment, liability and expense that may be incurred by it, its agents or its counsel by reason of taking or continuing to take any such action, or (iv) if, notwithstanding anything to the contrary contained in this Agreement, in connection with the taking of any such action that would constitute a payment due under any agreement or document, it shall not first have received from the Trustee and/or Holders or the Grantors funds equal to the amount payable.  The Third Priority Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement in accordance with a request of the Trustee, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the other Secured Parties.

(p)    If, with respect to a proposed action to be taken by it, a Third Priority Collateral Agent shall determine in good faith that the provisions of this Agreement, any other Notes Document or any Pari Passu Third Lien Indebtedness Agreement relating to the functions or responsibilities or discretionary powers of the Third Priority Collateral Agent are or may be ambiguous or inconsistent, the Third Priority Collateral Agent shall notify the Trustee and each Pari Passu Third Lien Indebtedness Agent, identifying the proposed action, and may decline either to perform such function or responsibility or to take the action requested unless it has received the written confirmation of the Trustee and each Pari Passu Third Lien Indebtedness Agent that the action proposed to be taken by the Third Priority Collateral Agent is consistent with the terms of this Agreement, the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or is otherwise appropriate.  The Third Priority Collateral Agent shall be fully protected in acting or refraining from acting upon the confirmation of the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties, in this respect, and such confirmation shall be binding upon the Secured Parties.

(q)    The Third Priority Collateral Agent shall not be deemed to have actual, constructive, direct or indirect knowledge or notice of the occurrence of any Default unless and until the Third Priority Collateral Agent has received a written notice or a certificate from the Trustee, any Pari Passu Third Lien Indebtedness Agent or the Grantors stating that a Default has occurred.  The Third Priority Collateral Agent shall have no obligation whatsoever either prior to or after receiving such notice or certificate to inquire whether a Default has in fact occurred and shall be entitled to rely conclusively, and shall be fully protected in so relying, on any notice or certificate so furnished to it.  No provision of this Agreement, the Intercreditor Agreement or any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement shall require the Third Priority Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Agreement, any of the Notes

-40-

Confidential

Documents, under any Pari Passu Third Lien Indebtedness Agreement or the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability including an advance of moneys necessary to perform work or to take the action requested is not reasonably assured to it, the Third Priority Collateral Agent may decline to act unless it receives indemnity satisfactory to it in its sole discretion, including an advance of moneys necessary to take the action requested. The Third Priority Collateral Agent shall be under no obligation or duty to take any action under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or otherwise if taking such action (i) would subject the Third Priority Collateral Agent to a tax in any jurisdiction where it is not then subject to a tax or (ii) would require the Third Priority Collateral Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(r)    Notwithstanding that the Third Priority Collateral Agent is appointed by and acting for and at the direction of the Secured Parties, the Grantors will jointly and severally pay upon demand to the Third Priority Collateral Agent the amount of any and all reasonable fees (including any as set forth in one or more separate fee letters of the Third Priority Collateral Agent) and out-of-pocket expenses, including the reasonable fees and expenses of its counsel, that the Third Priority Collateral Agent may incur in connection with (i) the negotiation, performance or administration of this Agreement, the Notes Documents and each Pari Passu Third Lien Indebtedness Agreement to which it is a party, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement (whether through negotiations, legal proceedings or otherwise) of any of the rights of the Third Priority Collateral Agent or the other Secured Parties hereunder, under the Notes Documents or under any Pari Passu Third Lien Indebtedness Agreement or (iv) the failure by the Grantors to perform or observe any of the provisions hereof or of any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement. The provisions of this section shall survive the termination of this Agreement and resignation or removal of the Third Priority Collateral Agent. The expenses of the Third Priority Collateral Agent incurred in connection with actions undertaken as provided in this <u>Section 15</u> shall be payable jointly and severally by the Grantors to the Third Priority Collateral Agent upon demand therefor (which demand shall be accompanied by an appropriate invoice).

(s)    Each of the Secured Parties expressly acknowledges that neither the Third Priority Collateral Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it (except as expressly provided herein) and that no act by the Third Priority Collateral Agent hereafter taken, including any review of the Grantors, shall be deemed to constitute any representation or warranty by the Third Priority Collateral Agent to any Secured Party. The Trustee and the Holders represent to the Third Priority Collateral Agent that it has, independently and without reliance upon the Third Priority Collateral Agent or any other Secured Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Grantors. The Trustee and the Holders also represent that each will, independently and without reliance upon the Third Priority Collateral Agent or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems

-41-

Confidential

necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Grantors. Except for notices, reports and other documents expressly required to be furnished to the Secured Parties by the Third Priority Collateral Agent hereunder, the Third Priority Collateral Agent shall not have any duty or responsibility to provide any Secured Party with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of the Grantors which may come into the possession of the Third Priority Collateral Agent or any of its officers, directors, employees, agents or attorneys-in-fact.

(t)     The Grantors, jointly and severally, agree to indemnify each of the Third Priority Collateral Agent and its officers, directors, employees, agents or attorneys-in-fact (collectively, the "Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorneys' fees and expenses) or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against any Indemnified Party in any way relating to or arising out of this Agreement, the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement; provided that the Grantors shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing result from any such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction beyond all applicable appeals.

(u)     Subject to clause (bb) below, neither the Third Priority Collateral Agent, any Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Grantors or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. Subject to clause (bb) below, the powers conferred on the Third Priority Collateral Agent hereunder are solely to protect the Third Priority Collateral Agent's and the Secured Parties' interests in the Collateral and shall not impose any duty upon the Third Priority Collateral Agent to exercise any such powers. The Third Priority Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Grantors for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

(v)     Pursuant to any applicable law, the Grantors authorize the Third Priority Collateral Agent without obligation to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signatures of the Grantors in such form and in such offices as the Trustee or any Pari Passu Third Lien Indebtedness Agent determines appropriate to perfect the security interests of the Third Priority Collateral Agent under this Agreement. The Grantors hereby ratify and authorize the filing by the Third Priority Collateral Agent of any financing statement with respect to the Collateral made prior to the date hereof. Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, in no event shall the Third Priority Collateral Agent have any duty or obligation to monitor the perfection, continuation of perfection or the sufficiency or validity of

-42-

Confidential

any security interest in or related to the Collateral or to prepare or file any Uniform Commercial Code financing statement or continuation statement.

(w)    The Grantors acknowledge that the rights and responsibilities of the Third Priority Collateral Agent under this Agreement with respect to any action taken by the Third Priority Collateral Agent or the exercise or non-exercise by the Third Priority Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Third Priority Collateral Agent and the Secured Parties, be governed by such agreements with respect thereto as may exist from time to time among them, but, as between the Third Priority Collateral Agent and the Grantors, the Third Priority Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and the Grantors shall not be under any obligation, or entitlement, to make any inquiry respecting such authority.

(x)    Any corporation into which the Third Priority Collateral Agent may be merged, or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Third Priority Collateral Agent shall be a party, shall become a Third Priority Collateral Agent under this Agreement without the execution or filing of any paper or any further act on the part of the parties hereto.

(y)    The Third Priority Collateral Agent may resign as Third Priority Collateral Agent at any time upon written notice to the Trustee, each Pari Passu Third Lien Indebtedness Agent and the Grantors and may be removed at any time with or without cause by the Trustee and/or any Pari Passu Third Lien Indebtedness Agent in each case acting on behalf of the Required Secured Parties, with any such resignation or removal to become effective only upon the appointment of a successor Third Priority Collateral Agent under this Section. If the Third Priority Collateral Agent shall provide notice of its resignation or be removed as Third Priority Collateral Agent, then the Required Secured Parties (and if no such successor shall have been appointed within 45 days of the Third Priority Collateral Agent's resignation or removal, the Third Priority Collateral Agent may) appoint a successor agent for the Secured Parties, which successor agent shall, in the case of any appointment by the Third Priority Collateral Agent, be reasonably acceptable to the Trustee and/or any Pari Passu Third Lien Indebtedness Agent in each case acting on behalf of the Required Secured Parties, and the former Third Priority Collateral Agent's rights, powers and duties as Third Priority Collateral Agent shall be terminated, without any other or further act or deed on the part of such former Third Priority Collateral Agent (except that the resigning Third Priority Collateral Agent at the joint and several expense of the Grantors shall deliver all Collateral then in its possession to the successor Third Priority Collateral Agent and shall execute and deliver to the successor Third Priority Collateral Agent such instruments of assignment and transfer and other similar documents as such successor Third Priority Collateral Agent shall deem necessary or advisable) or any of the Secured Parties. After any retiring Third Priority Collateral Agent's resignation or removal hereunder as Third Priority Collateral Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Third Priority Collateral Agent. In the event that a successor Third Priority Collateral Agent is not appointed within the time period specified in this Section 15 following the provision of a notice of resignation or removal of the Third Priority Collateral Agent, the Third Priority Collateral Agent or any

-43-

Confidential

Secured Party may petition a court of competent jurisdiction for the appointment of a successor Third Priority Collateral Agent (at the joint and several expense of the Grantors).

(z)    The Third Priority Collateral Agent shall maintain accurate and complete accounts, books, records and computer systems with respect to all matters related directly to the administration of the Collateral, in each case consistent with the customary procedures of the Third Priority Collateral Agent.

(aa)    The Third Priority Collateral Agent shall at the Grantors' joint and several expense make available to the Trustee, each Pari Passu Third Lien Indebtedness Agent and their duly authorized representatives, attorneys and auditors, the files and accounts, books, records and computer systems maintained by the Third Priority Collateral Agent or any subcontractor or agent thereof in respect of the Collateral at the locations where such files, accounts, books, records and computer systems are maintained pursuant to this Agreement and the other Notes Documents and any Pari Passu Third Lien Indebtedness Agreement, during normal business hours and subject to reasonable prior written notice.

(bb)    Upon receipt of indemnity requested by the Third Priority Collateral Agent and assuming the requested action does not conflict with other clauses of this Section 15, the Third Priority Collateral Agent shall act upon the specific instructions of the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties, except for any instructions that in the good faith judgment of the Third Priority Collateral Agent may be contrary to any Security Document or applicable law.

For the sake of clarity, the parties intend that the term "Notes Documents" includes all English Security Documents and Account Control Agreements (as defined in the Senior Secured Credit Facility as in effect on the Issue Date).

16.    Special Provisions Relating to the Collateral Control Agent.  The Collateral Control Agent shall be entitled to all of the same rights, protections, immunities and indemnities under this Agreement as are afforded to it under the Intercreditor Agreement, as if fully set forth herein.

17.    General.

For the avoidance of doubt, only the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties are entitled to direct the Collateral Control Agent to act, consent or request any action in connection with this Agreement.

With respect to each Subsidiary that becomes a Guarantor pursuant to Section 4.17 of the Indenture or as otherwise required by the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, the Grantors shall and at the option of the relevant Grantor, with respect to any Subsidiary that is not a Grantor, a Grantor may, cause such Subsidiary to become a Grantor hereunder, and such Subsidiary shall execute and deliver to the Third Priority Collateral Agent (with a copy to the Trustee, each Pari Passu Third Lien Indebtedness Agent and the Collateral Control Agent) a joinder agreement substantially in the form of Attachment II (each a "Joinder Agreement") and such Subsidiary shall thereafter for all purposes be a party hereto and have the same rights and obligations as a Grantor party hereto on the Issue Date.

-44-

Confidential

Each Grantor agrees that a carbon, photographic or other reproduction of this Agreement is sufficient as a financing statement. The Grantors hereby ratify their authorization contained in Section 11(a) for the Third Priority Collateral Agent to have filed in any Uniform Commercial Code jurisdiction prior to the date hereof any financing statement or amendment thereto filed prior to the date hereof.

All notices hereunder shall be in writing (including facsimile transmission) and shall be sent, in the case of any Grantor, to the address of such Grantor shown in Schedule I hereto and, in the case of the Third Priority Collateral Agent, at its address set forth beneath its signature page hereto, or to such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose. Notices sent by facsimile transmission or e-mail shall be deemed to have been given when sent against mechanical confirmation of successful transmission; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier shall be deemed to have been given when received.

Each of the Grantors agrees to pay, jointly and severally, all fees and expenses, including attorneys' fees paid or incurred by the Third Priority Collateral Agent, the Trustee or any Pari Passu Third Lien Indebtedness Agent in endeavoring to collect all or any portion of the Obligations, or any part thereof, and in enforcing this Agreement against such Grantor, and all such fees and expenses shall constitute Obligations.

No delay on the part of the Third Priority Collateral Agent in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Third Priority Collateral Agent of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Agreement shall remain in full force and effect until both (i) occurrence of the earlier of (a) the discharge of the Indenture pursuant to Article XI thereof and (b) the satisfaction of the conditions in Article XIII of the Indenture with respect to a Legal Defeasance or Covenant Defeasance of the Indenture and (ii) in the case of each Pari Passu Third Lien Indebtedness Agreement, the repayment of the Pari Passu Third Lien Indebtedness under such agreement which entitles the Grantors to obtain a release of the Liens securing such Pari Passu Third Lien Indebtedness under the Security Documents. If at any time all or any part of any payment theretofore applied by the Third Priority Collateral Agent or any Secured Party to any of the Obligations is or must be rescinded or returned by the Third Priority Collateral Agent or such Secured Party for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of any Grantor), such Obligations shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Third Priority Collateral Agent or such Secured Party, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Obligations, all as though such application by the Third Priority Collateral Agent or such Secured Party had not been made.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Requirements of Law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be

-45-

Confidential

ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  Consistent with the foregoing, and notwithstanding any other provision of this Agreement to the contrary, in the event that any action or proceeding is brought in whatever form and in whatever forum seeking to invalidate any Grantor's obligations under this Agreement under any fraudulent conveyance, fraudulent transfer theory, or similar avoidance theory, whether under state or federal law, such Grantor (the "Affected Person"), automatically and without any further action being required of such Affected Person or any Secured Party, shall be liable under this Agreement only for an amount equal to the maximum amount of liability that could have been incurred under applicable law by such Affected Person under any pledge to secure the Obligations (or any portion thereof) at the time of the execution and delivery of this Agreement (or, if such date is determined not to be the appropriate date for determining the enforceability of such Affected Person's obligations hereunder for fraudulent conveyance or transfer (or similar avoidance) purposes, on the date determined to be so appropriate) without rendering such a hypothetical pledge voidable under applicable Requirements of Law relating to fraudulent conveyance, fraudulent transfer, or any other grounds for avoidance (such highest amount determined hereunder being any such Affected Person's "Maximum Amount"), and not for any greater amount, as if the stated amount of this Pledge Agreement as to such Affected Person had instead been the Maximum Amount.  This paragraph is intended solely to preserve the rights of Secured Parties under this Agreement to the maximum extent not subject to avoidance under applicable Requirements of Law, and neither any Affected Person nor any other person or entity shall have any right or claim under this Section with respect to the limitation described in this Agreement, except to the extent necessary so that the obligations of any Affected Person under this Agreement shall not be rendered voidable under applicable Requirements of Law.  Without limiting the generality of the foregoing, the determination of a Maximum Amount for any Affected Person pursuant to the provisions of the second preceding sentence of this Section shall not in any manner reduce or otherwise affect the obligations of any other Grantor (including any other Affected Person) under the provisions of this Agreement.

This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until both (1) the occurrence of the earlier of (a) the discharge of the Indenture pursuant to Article XI thereof and (b) the satisfaction of the conditions in Article XIII of the Indenture with respect to a Legal Defeasance or Covenant Defeasance of the Indenture and (2) in the case of each Pari Passu Third Lien Indebtedness Agreement, the repayment of the Pari Passu Third Lien Indebtedness under such agreement which entitles the Grantors to obtain a release of the Liens securing such Pari Passu Third Lien Indebtedness under the Security Documents, (b) be binding upon each Grantor and its successors, transferees and assigns, and (c) inure, together with the rights and remedies of the Third Priority Collateral Agent hereunder, to the benefit of the Third Priority Collateral Agent and each other Secured Party and its respective successors, transferees and assigns.  No Grantor may assign (unless otherwise permitted under the terms of the Notes Documents and any extant Pari Passu Third Lien Indebtedness Agreement) any of its obligations hereunder without the prior written consent of the Trustee and each Pari Passu Third Lien Indebtedness Agent.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.  At any

-46-

Confidential

time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the Third Priority Collateral Agent a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery. Immediately upon such execution and delivery (and without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).

EACH PARTY HEREBY REPRESENTS AND WARRANTS THAT IT HAS NO RIGHT TO IMMUNITY FROM THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT OR FROM EXECUTION OF ANY JUDGMENT OR FROM THE EXECUTION OR ENFORCEMENT THEREIN OF ANY ARBITRATION DECISION IN RESPECT OF ANY SUIT, ACTION, PROCEEDING OR ANY OTHER MATTER ARISING OUT OF OR RELATING TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND TO THE EXTENT THAT ANY PARTY IS OR BECOMES ENTITLED TO ANY SUCH IMMUNITY WITH RESPECT TO THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT, AND TO THE EXTENT PERMITTED BY LAW, IT DOES HEREBY AND WILL IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO PLEAD OR CLAIM ANY SUCH IMMUNITY WITH RESPECT TO ITS OBLIGATIONS OR ANY OTHER MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT

-47-

Confidential

REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES.  THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.

EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, the holders of Obligations and their respective successors and permitted assignees; provided that the Trustee shall enforce this Agreement on behalf of all holders of Obligations.

This Agreement is a Notes Documents and a Third Priority Security Document (as defined in the Intercreditor Agreement) and may only be amended, waived or otherwise modified by written agreement with the prior written consent of the Grantors, the Trustee, each Pari Passu Third Lien Indebtedness Agent and the Third Priority Collateral Agent subject to the provisions of Article IX of the Indenture and the requirements of any Pari Passu Third Lien Indebtedness Agreement; provided, however, that this Agreement may be supplemented by Joinder Agreements duly executed by the Third Priority Collateral Agent, the Collateral Control Agent, the Trustee and each Grantor directly affected thereby and by updates or supplements to any Schedules, Attachments or Annexes hereto delivered in accordance with this Agreement.

18.    Amendment and Restatement.  This Agreement amends and restates in its entirety the Original Security Agreement.  This amendment and restatement of the Original Security Agreement shall not effectuate a novation, release or extinguishment of the obligations or security interests outstanding under the Original Security Agreement, the Indenture or any other Security Document (other than any security interest that may have attached on or prior to the date hereof to the LOC Mortgage Loans), but rather are an amendment and restatement of certain terms governing such obligations and security interests.  As of date hereof, each reference in the Notes Documents to the "Security Agreement" shall mean this Agreement, as amended, restated or modified from time to time.

19.    Foreign Pledge Agreements.

(a)    Notwithstanding anything to the contrary contained herein or in any other Notes Document or any Pari Passu Third Lien Indebtedness Agreement, in the event that any Collateral is also pledged to the Third Priority Collateral Agent to secure the Obligations by any Grantor pursuant to any security, pledge or similar agreement governed by foreign law (a "Foreign Pledge Agreement") and the provisions of such Foreign Pledge Agreement conflict with the provisions of this Agreement, the applicable Grantor shall comply with the provisions of such Foreign Pledge Agreement and shall not be deemed to have breached any representation or covenant contained herein or in any other Notes Document or any Pari Passu Third Lien Indebtedness Agreement as a result thereof.

-48-

Confidential

(b)    If Supporting Assets with respect to the Dutch VFLN Receivables or the UK Note are transferred at a time when (x) the fair market value of such Supporting Assets is less than (y) the Carrying Value thereof as of the Issue Date (the difference between such amounts beings the "Adjustment Amount"); the Company shall be entitled, following consultation with the Trustee, to reduce the outstanding principal balance of the Dutch VFLN Receivables or the UK Note, as applicable, by the Adjustment Amount; provided that such transfer complies with the applicable requirements of the Indenture and each then extant Pari Passu Third Lien Indebtedness Agreement.

20.    Pari Passu Third Lien Indebtedness.

On or after the Issue Date, the Company may from time to time designate additional obligations as Pari Passu Third Lien Indebtedness by delivering to the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent (a) a certificate signed by the chief financial officer of the Company (i) identifying the obligations so designated and the aggregate principal amount or face amount thereof, stating that such obligations are designated as "Pari Passu Third Lien Indebtedness" for purposes hereof, (ii) representing that such designation complies with the terms of the Indenture and each then extant Pari Passu Third Lien Indebtedness Agreement, (iii) specifying the name and address of the Pari Passu Third Lien Indebtedness Agent for such obligations (if other than the Trustee) and (iv) stating that the Grantors have complied with their obligations under Sections 11 and 12; (b) except in the case of Additional Notes, a fully executed Pari Passu Third Lien Indebtedness Joinder Agreement; and (c) an Opinion of Counsel to the effect that the designation of such obligations as "Pari Passu Third Lien Indebtedness" does not violate the terms of the Indenture and each then extant Pari Passu Third Lien Indebtedness Agreement (upon which the Third Priority Collateral Agent and the Trustee may conclusively and exclusively rely).

21.    Intercreditor Matters.

By accepting the benefits of this Agreement, the other Security Documents and any Pari Passu Third Lien Indebtedness Agreement, as applicable, each Secured Party agrees that it is bound by the terms of the Intercreditor Agreement applicable to such Secured Party. Each of the Secured Parties acknowledges and agrees that notwithstanding the date, time or creation of any Liens securing any of the Obligations under the Security Agreement or the Security Documents, the Obligations shall be equally and ratably secured by the Liens of the Security Agreement and the Security Documents and all Liens securing any of the Obligations (and any proceeds received from the enforcement of any such Liens) shall be for the equal and ratable benefit of all Secured Parties shall be applied as provided in Section 13(f). Each Secured Party, by its acceptance of the benefits hereunder and of the Security Documents, hereby agrees for the benefit of the other Secured Parties that, to the extent any additional or substitute collateral for any of the Obligations is delivered by a Grantor to or for the benefit of any Secured Party, such collateral shall be subject to the provisions of this Section 20. Each of the Secured Parties hereby agrees not to challenge or question in any proceeding the validity or enforceability of any Security Document (in each case as a whole or any term or provision contained therein) or the validity of any Lien or financing statement in favor of the Third Priority Collateral Agent for the benefit of the Secured Parties as provided in the Security Agreement and the other Security Documents, or the relative priority of any such Lien. Subject to the Third Priority Collateral Agent's rights

-49-

Confidential

under <u>Section 15</u>, the Required Secured Parties may direct the Third Priority Collateral Agent in exercising any remedy available to the Third Priority Collateral Agent under this Agreement or any Security Document.  In the absence of any such instruction, the Third Priority Collateral Agent may (but shall be under no obligation to) exercise such rights and remedies in any manner that complies with <u>Section 15</u>.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-50-

Confidential

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

*Grantors (other than Additional Account Parties)*

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE, LLC
RESIDENTIAL CAPITAL, LLC
HOMECOMINGS FINANCIAL, LLC
GMAC-RFC HOLDING COMPANY, LLC
GMAC RESIDENTIAL HOLDING COMPANY, LLC
GMAC MODEL HOME FINANCE I, LLC
DEVELOPERS OF HIDDEN SPRINGS, LLC
DOA HOLDING PROPERTIES, LLC
EQUITY INVESTMENT IV, LLC
RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC

By: _____
Name:  Michelle Switzer
Title:  Assistant Treasurer

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

Confidential

RFC CONSTRUCTION FUNDING LLC

By: _____

Name:   Michelle Switzer

Title:   Authorized Person

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

Confidential

*Additional Account Parties*

RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC
RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC
HOMECOMINGS FINANCIAL REAL ESTATE
HOLDINGS, LLC
AMERILAND, LLC

BY:     REG-PFH, LLC,
        its sole member

REG-PFH, LLC
HOME CONNECTS LENDING SERVICES, LLC
GMACR MORTGAGE PRODUCTS, LLC
DITECH, LLC
RESIDENTIAL CONSUMER SERVICES, LLC
GMAC MORTGAGE USA CORPORATION
RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.
RFC ASSET MANAGEMENT, LLC
RFC SFJV-2002, LLC

By:     RFC ASSET MANAGEMENT, LLC,
        its sole member

RCSFJV2004, LLC

By:     RFC ASSET MANAGEMENT, LLC,
        its sole member

By: _____
Name:   Michelle Switzer
Title:  Assistant Treasurer

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

Confidential

U.S. Bank National Association,
as Trustee

By: _____

Name:

Title:     Richard Prokosch
       Vice President

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

Confidential

DEC. 29. 2008  5:42PM   WELLS FARGO                                    NO. 054   P. 1

WELLS FARGO BANK, N.A.,
as Third Priority Collateral Agent

By: _____

Name:

Title:      Michael Pinzon
            Vice President


WELLS FARGO BANK, N.A.,
as Collateral Control Agent

By: _____

Name:

Title:      Michael Pinzon
            Vice President


*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

12/29/2009  3:14PM  (GMT-07:00)

Confidential

**Exhibit C-3**

**Loan Agreement for the AFI Revolver**

EXECUTION COPY

AMENDED AND RESTATED LOAN AGREEMENT

by and among

RESIDENTIAL FUNDING COMPANY, LLC,
as Borrower,

GMAC MORTGAGE, LLC,
as Borrower,

RESIDENTIAL CAPITAL, LLC AND CERTAIN OTHER
AFFILIATES OF THE BORROWERS,
as Guarantors,

Certain Affiliates of the Borrowers and the Guarantors
party hereto as Obligors,

GMAC Inc.,

as Initial Lender and as Lender Agent

and

Certain Other Financial Institutions and Persons from
time to time party hereto as Lenders

Dated as of December 30, 2009

**(Senior Debt Loan Agreement)**

5254280.33 08048307

# TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS AND ACCOUNTING MATTERS ........................... 1

Section 1.01.          Definitions; Construction ...................................... 1
Section 1.02.          Accounting Matters ............................................... 2

ARTICLE II          COMMITMENTS, LOANS, BORROWING, PREPAYMENT ........ 2

Section 2.01.          Loans .................................................................. 2
Section 2.02.          Note .................................................................... 2
Section 2.03.          Permanent Paydowns ........................................... 3
Section 2.04.          Borrowing Base .................................................. 3
Section 2.05.          Interest ............................................................... 4
Section 2.06.          [Reserved] ........................................................... 4
Section 2.07.          Alternate Rate of Interest; Increased Costs ............... 5
Section 2.08.          Mandatory Repayment of Loans ............................. 6
Section 2.09.          Optional Prepayment ........................................... 7
Section 2.10.          Termination of Commitments and Reduction of
                       Aggregate Commitment Amount ............................. 8

ARTICLE III          PAYMENTS; COMPUTATIONS; TAXES; EXPENSES ................. 8

Section 3.01.          Payments and Computations, Etc ........................... 8
Section 3.02.          Taxes ................................................................ 10
Section 3.03.          Fees and Expenses .............................................. 13
Section 3.04.          Setoff ................................................................ 13

ARTICLE IV          ACCOUNTS AND COLLECTIONS ............................................ 13

Section 4.01.          Concentration Accounts ....................................... 13
Section 4.02.          Sales Proceeds Accounts ...................................... 13
Section 4.03.          Collections Deposited to Collection Accounts ...................... 14
Section 4.04.          Withdrawals from Designated Accounts; Account
                       Notices ............................................................... 15
Section 4.05.          Cash and Cash Equivalents .................................. 15

ARTICLE V          CONDITIONS PRECEDENT ......................................... 15

Section 5.01.          Conditions Precedent to Effectiveness .................... 15

ARTICLE VI          REPRESENTATIONS AND WARRANTIES ................................. 15

Section 6.01.          Representations and Warranties of the Obligors ................. 15

ARTICLE VII          COVENANTS ......................................................... 20

Section 7.01.          Affirmative Covenants of the Obligors .................... 20
Section 7.02.          Negative Covenants of the Obligors ....................... 28
Section 7.03.          Notice of Certain Occurrences ............................. 32

Confidential

**TABLE OF CONTENTS**
(continued)

Page

| ARTICLE VIII | EVENTS OF DEFAULT | 36 |
|---|---|---|
| Section 8.01. | Events of Default | 36 |
| Section 8.02. | Remedies | 38 |
| ARTICLE IX | ASSIGNMENT, PARTICIPATION | 40 |
| Section 9.01. | Assignments | 40 |
| Section 9.02. | Evidence of Assignment | 40 |
| Section 9.03. | Rights of Assignee, Evidence of Assignment | 41 |
| Section 9.04. | Participations | 41 |
| ARTICLE X | INDEMNIFICATION | 42 |
| Section 10.01. | Indemnities by the Borrowers | 42 |
| Section 10.02. | General Provisions | 43 |
| ARTICLE XI | GUARANTEE | 43 |
| Section 11.01. | Unconditional Guarantee | 43 |
| Section 11.02. | Nature of Guarantee | 44 |
| Section 11.03. | Certain Agreements; Waivers of Certain Notices | 44 |
| Section 11.04. | Waiver of Subrogation | 45 |
| Section 11.05. | Taxes | 45 |
| Section 11.06. | Payments | 45 |
| Section 11.07. | Severability of Article XI | 45 |
| Section 11.08. | Acceleration of Guarantee | 46 |
| Section 11.09. | Election of Remedies | 46 |
| Section 11.10. | Benefit to Guarantor | 47 |
| ARTICLE XII | LENDER AGENT | 47 |
| Section 12.01. | Appointment and Authorization | 47 |
| Section 12.02. | Delegation of Duties | 47 |
| Section 12.03. | Liability of Lender Agent | 47 |
| Section 12.04. | Reliance by Lender Agent | 48 |
| Section 12.05. | Notice of Default | 48 |
| Section 12.06. | Credit Decision | 48 |
| Section 12.07. | Indemnification | 49 |
| Section 12.08. | Lender Agent in Individual Capacity | 49 |
| Section 12.09. | Successor Lender Agent | 49 |
| Section 12.10. | [Reserved] | 50 |
| Section 12.11. | Security Matters; Release of Collateral | 50 |
| ARTICLE XIII | MISCELLANEOUS | 51 |
| Section 13.01. | Amendments, Etc | 51 |
| Section 13.02. | Notices, Etc | 52 |
| Section 13.03. | No Waiver; Remedies | 52 |

Confidential

**TABLE OF CONTENTS**
(continued)

**Page**

Section 13.04.        Binding Effect; Assignability ................................................ 53
Section 13.05.        GOVERNING LAW; SUBMISSION TO
                      JURISDICTION ....................................................................... 53
Section 13.06.        Entire Agreement .................................................................... 53
Section 13.07.        Acknowledgment .................................................................... 54
Section 13.08.        Captions and Cross References................................................ 54
Section 13.09.        Execution in Counterpart; Effectiveness ............................... 54
Section 13.10.        Confidentiality ....................................................................... 54
Section 13.11.        Survival ................................................................................... 55
Section 13.12.        Joint and Several Liability of Borrowers ............................... 55
Section 13.13.        Obligors Bound by Intercreditor Agreement ......................... 56
Section 13.14.        Third-Party Beneficiaries....................................................... 57
Section 13.15.        First Priority Collateral Agent; Capacity under this
                      Agreement and Protections Afforded ..................................... 57

Confidential

## SCHEDULES

Schedule 1.01          Definitions
Schedule 2.04          Collateral Value Calculations
Schedule 5.01          Conditions Precedent
Schedule 7.01(g)       Required Reports
Schedule 7.01(t)       Bilateral Facilities
Schedule 8.01(m)       Post-Closing Requirements
Schedule 13.02         Notices

## EXHIBITS

Exhibit A              Eligibility Requirements
Exhibit B              Eligibility Requirements for Substitute Collateral
Exhibit C              Initial Permitted Funding Indebtedness
Exhibit 2.02(a)        Form of Note
Exhibit 2.04(a)        Form of Collateral Value Report
Exhibit 2.08(b)        Form of Repayment Notice
Exhibit 2.09(a)        Form of Optional Prepayment Notice
Exhibit 7.01           Form of Compliance Certificate
Exhibit 7.01(s)        Form of Joinder
Exhibit 9.01           Form of Assignment and Acceptance
Exhibit 9.02           Form of Release Documents

Confidential

This AMENDED AND RESTATED LOAN AGREEMENT (as amended or supplemented from time to time, this "<u>Agreement</u>") dated as of December 30, 2009, is by and among Residential Funding Company, LLC, a Delaware limited liability company ("<u>RFC</u>"), GMAC Mortgage, LLC, a Delaware limited liability company ("<u>GMAC Mortgage</u>", and together with RFC, each a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), Residential Capital, LLC and the other Affiliates of the Borrowers listed on the signature pages hereto or that otherwise become party hereto as Guarantors (each, a "<u>Guarantor</u>"), the various other parties signatory hereto as obligors (the "<u>Obligors</u>"), GMAC Inc., a Delaware limited liability company (the "<u>Initial Lender</u>"), the financial institutions and other Persons that are or may from time to time become parties hereto as Lenders (together with the Initial Lender and their respective successors and assigns, each a "<u>Lender</u>" and collectively, the "<u>Lenders</u>"), and GMAC Inc., a Delaware limited liability company, as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "<u>Lender Agent</u>") and Wells Fargo Bank, N.A., solely with respect to <u>Section 12.11(b)</u> and in its capacity as First Priority Collateral Agent.

<div align="center">BACKGROUND</div>

The Borrowers, the Guarantors, the Obligors, the Lenders, the Lender Agent  and Wells Fargo Bank, N.A., solely with respect to <u>Section 12.11(b)</u> and in its capacity as First Priority Collateral Agent, are parties to that certain Loan Agreement dated as of June 4, 2008, as amended from time to time (the "Original Loan Agreement").

The parties to the Original Loan Agreement wish to amend and restate the Original Loan Agreement in its entirety.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">DEFINITIONS AND ACCOUNTING MATTERS</div>

Section 1.01.  <u>Definitions; Construction</u>.  (a)  Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in <u>Schedule 1.01</u>.

(b)    All capitalized terms used herein, and not specifically defined herein, are used herein as defined in Article 9 of the UCC to the extent defined therein.

(c)    Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

(d)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.

(e)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

*Senior Debt Loan Agreement*

Confidential

(f)      The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".

(g)      Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or other modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, provided that such successors and assigns are not prohibited by the Facility Documents, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.02.  Accounting Matters.  Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lenders hereunder shall be prepared, in accordance with GAAP applied in a manner consistent with that used in preparing the financial statements described in Section 7.01(f) hereof.

ARTICLE II

COMMITMENTS, LOANS, BORROWING, PREPAYMENT

Section 2.01.  Loans.  The Borrowers and the Lenders acknowledge that on the Amendment Closing Date, the Loans outstanding to the Borrowers under (and as defined in) the Original Loan Agreement shall continue in existence as loans hereunder (relative to each Lender, its "Loans"). The Borrowers hereby certify that (i) as of the opening of business on the Amendment Closing Date, the Aggregate Commitment Amount is $1,592,640,818 and (ii) as of the Amendment Closing Date, the Outstanding Aggregate Loan Amount is equal to $1,545,587,924.

Section 2.02.  Note.  (a)  The Loans made by each Lender shall be evidenced by a promissory note executed by each Borrower substantially in the form of Exhibit 2.02(a) hereto (a "Note"), dated the date hereof, payable to the applicable Lender in a maximum principal amount equal to such Lender's Pro Rata Share of the Outstanding Aggregate Loan Amount, which Note shall be an amendment and restatement of the original revolving note dated June 4, 2008 which evidenced the Loans under the Original Loan Agreement. The Borrowers hereby irrevocably authorize each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Lender Agent in the Register, be conclusive and binding

Confidential

on each Obligor absent manifest error; <u>provided</u> that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Obligor.

(b)    The Borrowers hereby designate the Lender Agent to serve as the Borrowers' agent, solely for the purpose of this clause, to maintain a register (the "<u>Register</u>") on which the Lender Agent will record each Lender's Commitments, the Loans (and interest due thereon) made by each Lender and each repayment in respect of the principal amount of the Loans, annexed to which the Lender Agent shall retain a copy of each Assignment and Acceptance, and each participation (as described in <u>Section 9.04</u>), delivered to the Lender Agent pursuant to <u>Article IX</u>.  Failure to make any recordation, or any error in such recordation, shall not affect any Obligor's Obligations.  The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrowers, the Obligors, the Lender Agent and the other Lender Parties shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Facility Documents, notwithstanding notice or any provision herein to the contrary.  Any assignment or transfer of a Commitment or the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Lender Agent of an Assignment and Acceptance that has been executed by the requisite parties pursuant to <u>Article IX</u>.  Upon its receipt of a duly completed Assignment and Acceptance, the Lender Agent shall record the information contained therein in the Register.  No assignment or transfer of a Lender's Commitment or Loans, including those transfers or assignments to an Affiliate, shall be effective unless such assignment or transfer shall have been recorded in the Register by the Lender Agent as provided in this Section.

(c)    The Register shall be available for inspection by the Borrowers or any Lender (but in each case only as to its relevant portion of the Register), at any reasonable time and from time to time upon reasonable prior notice.

Section 2.03.  <u>Permanent Paydowns</u>.  No principal amounts repaid under this Agreement may be reborrowed.

Section 2.04.  <u>Borrowing Base</u>.  (a) [Reserved].

(b)    The Borrowers shall deliver to the Lender Agent and the Valuation Agent an updated Monthly Collateral Report no less frequently than once per calendar month and no later than the eleventh Business Day of each calendar month (commencing with January 2010).  Each Collateral Value Report delivered by the Borrowers shall be effective (subject to <u>Sections 2.04(c)</u> and <u>(d)</u> below) until such time as the Borrowers shall deliver a subsequent Collateral Value Report.  For purposes of preparing each Collateral Value Report, the Borrowers shall calculate the Collateral Value of the Primary Collateral described in the related Electronic File in accordance with <u>Schedule 2.04</u>.

(c)    If requested to do so by the Lender Agent, within two Business Days after receipt of a Collateral Value Report pursuant to <u>Section 2.04(a)</u> or <u>(b)</u>, as the case may be, together with the related Electronic Files, the Valuation Agent shall, to the extent such Collateral Value calculation relies on market value rather than Carrying Value, verify the Collateral Value for the Primary Collateral and shall notify the Lender Agent and the Borrowers of the amount of such Collateral Value.

Confidential

(d)        Within three Business Days after receipt of a Collateral Value Report pursuant to Section 2.04(a) or (b), the Lender Agent shall determine (taking into account any information provided by the Valuation Agent pursuant to Section 2.04(c)) the Borrowing Base and notify the Lenders and the Borrowers of such determination.  Such determination shall be effective as of the Business Day specified in such written notice from the Lender Agent (or, if no effective date is specified in such written notice, the next Business Day following delivery of such written notice) and such Borrowing Base shall remain in effect until the next determination or redetermination of the Borrowing Base in accordance with this Agreement.

(e)        At the request of the Lender Agent, the Borrowers shall provide any reports, files, spreadsheets or other materials used by the Obligors in calculating the Borrowing Base or Adjusted Borrowing Base as of any date of determination. If the Lender Agent and the Borrowers shall disagree as to the calculation of the Borrowing Base or Adjusted Borrowing Base as of any date of determination, the calculation by the Lender Agent of such Borrowing Base shall be binding for all purposes hereunder and the Borrowers shall make the payment, if any, required by Section 2.08(b) in connection with such recalculated Borrowing Base or Adjusted Borrowing Base.

Section 2.05.  <u>Interest</u>.  Interest shall accrue on each Loan prior to its maturity for each day during the related Interest Period at a rate equal to (a) the sum of (x) the applicable LIBOR Rate for such Interest Period and (y) the Applicable Margin, divided by (b) 360 days.  Interest shall accrue on the Loans after their maturity (whether by acceleration or otherwise) and on any other amount not paid when due under the Facility Documents (including without limitation any prepayment due under Section 2.08(b)) for each day during a related Interest Period at a rate equal to (a) the Default Rate, divided by (b) 360 days.  Interest shall be payable (i) in arrears with respect to each Interest Period through the final day of each Interest Period (regardless of whether such day is a Business Day), such amount to be payable on the first Business Day following the end of such Interest Period, (ii) on the applicable Loan Repayment Date, or (iii) on that portion of Loans the maturity of which is accelerated pursuant to Section 8.02, immediately upon such acceleration.  The Lender Agent shall determine the LIBOR Rate for each Loan prior to the beginning of each Interest Period, as set forth in the definition of "LIBOR Rate."  The Lender Agent shall also calculate the amount of interest and, if applicable, any Breakage Costs or other amounts due to be paid by the Borrowers from time to time hereunder (including in connection with any prepayment or repayment of Loans permitted hereunder) and shall provide a written statement thereof to the Borrowers at least two Business Days prior to the due date of such payment (or the relevant repayment or prepayment after having received a notice thereof); provided that failure to provide such statements on a timely basis shall not relieve the Borrowers of the obligation to pay any interest and principal due on the applicable payment date (based upon their good faith calculation of the amount due, such amount to be promptly reconciled after receipt of a subsequent statement from the Lender Agent) and other such amounts hereunder promptly upon receipt of such statement.

Section 2.06.  [Reserved].

Section 2.07.  <u>Alternate Rate of Interest; Increased Costs</u>.  (a)  If, prior to the commencement of any Interest Period, the Lender Agent determines (which determination shall be conclusive absent manifest error) (i) that adequate and reasonable means do not exist for

4                        *Senior Debt Loan Agreement*

Confidential

ascertaining the LIBOR Rate for such Interest Period; or (ii) that the LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to any Lender of making or maintaining its Loans; or (iii) that, after notice from an affected Lender, it has become unlawful for such Lender to honor its obligation to make or maintain Loans hereunder using the LIBOR Rate, then the Lender Agent shall give notice thereof to the Borrowers by telephone, facsimile, or other electronic means as promptly as practicable thereafter and, commencing with the Interest Period immediately following the Interest Period during which such notice is provided to the Borrowers until the Lender Agent notifies the Borrowers that the circumstances giving rise to such notice no longer exist, all Loans shall bear interest at a rate per annum equal to the Applicable Margin plus the rate per annum that the Lender Agent determines in its reasonable discretion adequately reflects the cost to the Lenders of making or maintaining the Loans for such Interest Period.

(b)      The Borrowers jointly and severally agree to reimburse each Lender for any increase in the cost to such Lender of, or any reduction in the amount of any sum receivable by such Lender in respect of, such Lender's Commitments and the making, continuing, maintaining or conversion of Loans hereunder that arise in connection with any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in after the Closing Date of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority; provided, however, that any such changes with respect to increased capital costs and taxes shall be governed by the terms of Sections 2.07(c) and 3.02, respectively.  For the purposes of this Section 2.07(b), taxes shall include all present or future taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.  Each affected Lender shall promptly notify the Lender Agent and the Borrowers in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Lender for such increased cost or reduced amount.  Such additional amounts shall be payable jointly and severally by the Borrowers directly to such Lender within ten (10) days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrowers.

(c)      If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Lender or any Person controlling such Lender, and such Lender determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Commitments or the Loans made by such Lender is reduced to a level below that which such Lender or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Lender to the Borrowers (with a copy to the Lender Agent), the Borrowers shall within ten (10) days following receipt of such notice jointly and severally pay directly to such Lender additional amounts sufficient to compensate such Lender or such controlling Person for such reduction in rate of return.  A statement of such Lender as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrowers.  In determining such amount, such Lender may use any method of averaging and attribution that it (acting reasonably) shall deem applicable.

Confidential

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.07 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to Sections 2.07(a), (b) or (c) for any such increased cost or reduction incurred more than one hundred and eighty (180) days prior to the date that such Lender demands, or notifies the Borrowers of its intention to demand, compensation therefor, provided further that, if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)      If any Lender requests compensation under this Section 2.07, then such Lender will, if requested by the Borrowers, use commercially reasonable efforts to designate another lending office for any Loan affected by such event; provided that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage, and provided further that nothing in this Section 2.07(e) shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Sections 2.07(a), (b), (c) or (d).

Section 2.08.  Mandatory Repayment of Loans.  (a)  The Borrowers shall jointly and severally repay the Outstanding Aggregate Loan Amount with respect to all Loans and all other amounts owing under this Agreement in full on the Loan Repayment Date.

(b)      If, on any Business Day (a "Borrowing Base Shortfall Day"), the Outstanding Aggregate Loan Amount on such day exceeds the Borrowing Base or (if a determination is requested by the Lender Agent) Adjusted Borrowing Base on such day by an amount equal to or greater than $250,000 (such circumstance, a "Borrowing Base Deficiency"), the Borrowers shall, within one (1) Business Day after the Borrowing Base Shortfall Day, jointly and severally repay outstanding Loans in an amount equal to the amount of the Borrowing Base Deficiency; provided, however, that to the extent a Borrowing Base Deficiency results from a write-down of the Collateral Value of any Primary Collateral in accordance with ResCap's standard valuation practices applied to its assets as a whole as then in effect (such valuation practices to be consistent with the methodology used in the preparation of ResCap's GAAP financial statements), the obligation of the Borrowers to repay outstanding Loans pursuant to this sentence will be reduced by the Collateral Value of any Eligible Assets which the Borrower designates as Primary Collateral not later than one (1) Business Day following the applicable Borrowing Base Shortfall Day by written notice to the Lender Agent or in the related Repayment Notice (any such collateral, "Substitute Collateral"). It is understood and agreed that the Lender Agent shall have the right to adjust the Specified Percentage used to calculate the Collateral Value for any category of Primary Collateral, whether as a result of the addition of Substitute Collateral or otherwise, in its good faith discretion, taking into account estimated collections, market value, legal risks, cost of recovery and other matters customarily considered by commercial lenders when determining such values, at any time by written notice to the Borrowers. The Borrowers shall deliver a Repayment Notice with respect to each repayment of outstanding Loan amounts and/or designation of Substitute Collateral made pursuant to this paragraph by 1:00 p.m. (New York time) on the day such repayment is due.

The parties shall cause the Valuation Agent (i) at approximately 3:00 p.m. New York City time on each Valuation Date, to calculate the MTM Amount and the Hedge Support

Confidential

Requirement, and (ii) to report to the Initial Lender, ResCap, the Lender Agent and the ResCap Counterparty such MTM Amount and the Hedge Support Requirement no later than 6:00 p.m. New York City time on such Valuation Date. If, on any Valuation Date (which is not a Borrowing Base Shortfall Day) the MTM Amount is equal to or greater than the Minimum Adjustment Amount, the Borrowers shall, within one (1) Business Day after such Valuation Date, jointly and severally repay outstanding Loans in an amount equal to the amount of the MTM Amount as of such Valuation Date.

(c)     The Borrowers shall, on each Mandatory Repayment Date with respect to a Collateral Disposition (the "Subject Disposition"), repay outstanding Loans in an amount (if greater than zero) equal to (i) Net Cash Proceeds in the aggregate received by the Obligors in respect of the Subject Disposition minus (ii) at the Borrower's discretion, all or a portion of the MTM Credit as of such day. It is understood and agreed that the use of the MTM Credit to reduce the repayment of Loans pursuant to the immediately preceding sentence shall be deemed to satisfy the Borrowers' requirement to apply Net Cash Proceeds of a Collateral Dispositions to the permanent reduction of the outstanding principal amount of the Loans.

(d)     The Borrowers shall not be required to pay any Breakage Costs incurred by the Lenders in connection with a mandatory repayment pursuant to this Section 2.08.

Section 2.09.  Optional Prepayment.  The Borrowers may, at their option, prepay any Loan advanced hereunder in full or in part (as well as all interest accrued and unpaid thereon through the end of the related Interest Period) on the last Business Day of any Interest Period related thereto (each an "Optional Prepayment Date"); provided that the Borrowers deliver a Prepayment Notice to each Lender and the Lender Agent, no later than 2:00 p.m. New York City time on a Business Day that is at least two (2) Business Days preceding the Optional Prepayment Date.  Any such partial prepayment shall be in a minimum principal amount of not less than $10,000,000 and in increments of $1,000,000 (or, if less, the Outstanding Aggregate Loan Amount).  Any such prepayment shall be paid over to the Lender Agent for the account of the Lenders by the Borrowers by 2:00 p.m. (New York City time) on such Optional Prepayment Date, and shall be in an amount equal to the sum of (a) the Loan amount being prepaid on the date of such prepayment, plus (b) all accrued and unpaid interest on such Loan being prepaid as of the date of such prepayment, plus (c) the allocable portion (determined by the Lender Agent in its sole reasonable discretion) of all other amounts due from the Borrowers hereunder.  The Borrowers may make a partial or full prepayment on any date other than an Optional Prepayment Date; provided that the Borrowers make a timely delivery of a Prepayment Notice, and in addition to the amount required under items (a), (b), and (c) above, the Borrowers must pay, without duplication, (x) all Breakage Costs, if any, actually incurred by the Lenders and resulting from such prepayment and (y) all accrued and unpaid interest on such Loan being prepaid following the prepayment.  In the absence of a timely delivered Prepayment Notice, the Lenders shall automatically and without further action by the Borrowers continue each Loan at the termination of each Interest Period for a successive Interest Period beginning on the day immediately following the final day of the immediately preceding Interest Period.

Section 2.10.  Termination of Commitments and Reduction of Aggregate Commitment Amount.  (a)  Unless previously terminated, the Commitments shall terminate on the

Confidential

Commitment Termination Date.  If at any time the Borrowing Base is reduced to zero, then the Commitments shall terminate on the effective date of such reduction.

(b)      [Reserved].

(c)      In the event that the Borrowers repay outstanding Loans, the Aggregate Commitment Amount shall be permanently reduced by the amount of any principal payments with respect to the Loans.

Section 2.11    Tracking of Paydown Amounts. The Borrowers shall produce regular reports tracking on a daily basis the reductions in the Outstanding Aggregate Loan Amount pursuant to Section 2.10(c) together with necessary supporting information in spreadsheet form (including, but not limited to, information containing separate tracking of  the then current Outstanding Aggregate Loan Amount) (the "Permanent Paydown Report"). The Permanent Paydown Report shall be in the form previously provided to the Lender Agent, which form may be periodically changed by the Borrowers from time to time; provided that after any such changes, the Lender Agent may request reasonable modifications to the modified form to clarify or maintain the information provided in such report prior to the Borrower's changes. The Borrowers shall provide the current Permanent Paydown Report at any time to the Lender Agent at the Lender Agent's request. A Permanent Paydown Report shall be delivered in connection with each Monthly Collateral Report, and such Permanent Paydown Report shall be included in any certifications in connection with the Monthly Collateral Report. If any Lender shall question the validity of the dates or amounts of any actual or scheduled permanent reductions in the Outstanding Aggregate Loan Amount pursuant to Section 2.10(c) reported in a Permanent Paydown Report, the Borrowers shall work with the Lender Agent in good faith to resolve such question; provided that if such question cannot be resolved in 30 days, the determination of the Lender Agent as to the disputed information shall govern and be binding on the parties hereto.

## ARTICLE III

## PAYMENTS; COMPUTATIONS; TAXES; EXPENSES

Section 3.01.  Payments and Computations, Etc.  (a)  Unless otherwise expressly stated herein, all amounts to be paid or deposited hereunder shall be paid or deposited in accordance with the terms hereof no later than 1:00 p.m. (New York City time) on the day when due in lawful money of the United States of America in same day funds (and all funds received after such time shall be deemed to have been received on the next succeeding Business Day).

(b)      The Borrowers shall, to the extent permitted by law, jointly and severally pay interest on all amounts (including principal, interest and fees) due but not paid on the date such payment is due hereunder as provided herein, for the period from, and including, such due date until, but excluding, the date paid, at the applicable Default Rate, payable on demand; provided, however, that such interest rate shall not at any time exceed the maximum rate permitted by applicable law.

Confidential

(c)    All computations of interest and fees hereunder shall be made on the basis of a year of 360 days for the actual number of days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

(d)    Each Borrower agrees that the principal of and interest on the Loans and all other monetary Obligations shall be the joint and several recourse obligations of the Borrowers.

(e)    Except as set forth in <u>Section 3.02</u>, all payments made by the Borrowers or the other Obligors under this Agreement or any other Facility Document shall be made without set-off, deduction or counterclaim.

(f)    After the occurrence and during the continuance of an Event of Default, the Lender Agent may, and upon direction from the Required Lenders, shall, apply all amounts received under the Facility Documents (including from the proceeds of Collateral securing the Obligations) or under applicable Requirements of Law upon receipt thereof to the Obligations as follows: (i) first, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the First Priority Collateral Agent and the Control Collateral Agent, (including the out-of-pocket expenses and reasonable fees of counsel to each), (ii) second after payment in full of the amounts specified in <u>clause (f)(i)</u>, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Lender Agent, in its capacity as the Lender Agent (including the out-of-pocket expenses and reasonable fees of counsel to the Lender Agent), (iii) third, after payment in full in cash of the amounts specified in <u>clause (f)(i)</u> and <u>(f)(ii)</u>, to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing under the Facility Documents, and all costs and expenses owing to the Lender Parties pursuant to the terms of the Facility Documents, until paid in full in cash, (iv) fourth, after payment in full in cash of the amounts specified in <u>clauses (f)(i)</u> through <u>(f)(iii)</u>, to the ratable payment of the principal amount of the Loans then outstanding, (v) fifth, after payment in full in cash of the amounts specified in <u>clauses (f)(i)</u> through <u>(f)(iv)</u>, to the ratable payment of all other Obligations owing to the Lender Parties, and (vi) sixth, after payment in full in cash of the amounts specified in <u>clauses (f)(i)</u> through <u>(f)(v)</u>, and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus or as may be directed by a court of competent jurisdiction.  Proceeds of Collateral shall be allocated among the Lender Parties in such manner as the Lender Agent shall determine in its sole discretion.

(g)    If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loans (other than pursuant to the terms of <u>Sections 2.07(b)</u>, <u>2.07(c)</u>, <u>3.02</u>, <u>Article X</u> or in respect of Breakage Costs) in excess of its <u>pro rata</u> share of payments obtained by all Lender, such Lender shall purchase from the other Lender such participations in Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably (to the extent such other Lenders were entitled to receive a portion of such payment or recovery) with each of them; <u>provided</u> that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and each Lender that has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such recovery together with an amount equal to such

9                 *Senior Debt Loan Agreement*

Confidential

selling Lender's ratable share (according to the proportion of (i) the amount of such selling Lender's required repayment to the purchasing Lender to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  Each of the Obligors agrees that any Lender purchasing a participation from another Lender pursuant to this clause (g) may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 3.04) with respect to such participation as fully as if such Lender were the direct creditor of the Obligors in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law any Lender receives a secured claim in lieu of a setoff to which this Section applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section to share in the benefits of any recovery on such secured claim.

Section 3.02.  Taxes.  (a)  All payments by the Borrowers or Guarantors (each a "Credit Party") of principal of, and interest on, the Loans and all other amounts payable hereunder (including fees) shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges of any nature whatsoever imposed by any Governmental Authority, but excluding, (i) taxes imposed on or measured by the overall net income, overall receipts or overall assets of any Lender by any Governmental Authority, (ii) franchise taxes or branch profits taxes or any similar tax imposed on any Lender by the United States of America (or any political subdivision thereof) of the jurisdiction of the Lender, as the case may be, in which it is organized or is operating or is otherwise subject to tax as a result of any connection unrelated to this Agreement, and (iii) any U.S. backup withholding taxes (other than due to a change in law as provided in Section 3.02(f)) (such non-excluded taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges, herein "Taxes").  Notwithstanding the foregoing sentence, in the event that any such Taxes are required to be deducted or withheld from any payment required to be made to any Lender as a result of Requirements of Law, the Credit Party shall (a) promptly notify the applicable Lender, in writing, of such requirement, (b) pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid to the applicable Lender pursuant to this paragraph), and (c) jointly and severally pay to the applicable Lender such additional amounts as may be necessary in order that the net amount received by such Lender after such withholding or deduction shall equal the full amounts of moneys which would have been received by such Lender in the absence of such withholding or deduction.  Notwithstanding the foregoing, the Credit Party shall not be required to increase any amounts payable to a Lender that is a Non-U.S. Lender (as defined in Section 3.02(f)) with respect to any Taxes (x) if and to the extent that such taxes would not have been imposed but for such Non-U.S. Lender's failure to provide (or the Lender Agent's failure to provide) to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to Section 3.02(f) or (y) that are imposed on amounts payable to such Non-U.S. Lender at the time such Non-U.S. Lender becomes a party hereto (or designates a new lending office) other than due to a change in law as provided in Section 3.02(f).

(b)    In addition, the Borrowers agree to pay any current or future stamp, recording, documentary, excise or property or similar taxes, charges or levies (including, without limitation, mortgage recording taxes and similar fees, but excluding such amounts imposed as a result of an

Confidential

assignment or the transfer of a participation) imposed by any Governmental Authority that arise from any payment made under this Agreement or any other Facility Document, or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Facility Document and the transactions contemplated thereunder ("Other Taxes").

(c)    The Borrowers shall indemnify each Lender for the full amount of Taxes and Other Taxes (including, without limitation, any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 3.02) paid by such Lender and any liability (including taxes, penalties, interest and expenses) arising therefrom or with respect thereto; provided, however, that when making a demand for indemnity payment a Lender shall provide each Borrower, at its address referred to in Schedule 13.02, with a certificate from the relevant taxing authority or from a Responsible Officer of such party stating or otherwise evidencing, in reasonable detail, that such Lender has made payment of (and the basis of calculation for) such Taxes or Other Taxes.  This indemnification shall be made within thirty (30) days from the date a Lender provides written demand therefor, accompanied by the aforementioned certificate.

(d)    Within thirty (30) days after the date of receiving an official receipt for any payment of Taxes or Other Taxes contemplated by this Section 3.02, the Borrower shall furnish to the relevant Lenders, at their addresses set forth in Schedule 13.02 (or such other address as provided by a Lender, in the case of an assignee), appropriate evidence of payment thereof.

(e)    If a Lender shall become aware that it is entitled to receive a refund or credit (such credit to include any increase in any foreign tax credit) as a result of Taxes (including any penalties or interest with respect thereto) as to which it has been indemnified by a Borrower or with respect to which a Borrower has paid additional amounts pursuant to this Section 3.02, it shall promptly notify such Borrower of the availability of such refund or credit and shall, within 30 days after receipt of a request by such Borrower, apply for such refund or credit at such Borrower's expense, and in the case of any application for such refund or credit by such Borrower, shall, if legally able to do so, deliver to the Borrower such certificates, forms or other documentation as may be reasonably necessary to assist such Borrower in such application.  If a Lender has determined in its sole judgment that it has received a refund or credit (such credit to include any increase in any foreign tax credit) in respect to any Taxes as to which it has been indemnified by the Borrowers or with respect to which a Borrower has paid additional amounts pursuant to this Section 3.02, it shall promptly notify the Borrowers of such refund or credit and shall, within sixty (60) days after receipt of such refund or the benefit of such credit (such benefit to include any reduction of the Taxes for which a Lender would otherwise be liable due to any increase in any foreign tax credit available to a Lender), repay the amount of such refund or benefit of such credit (with respect to the credit, as determined by a Lender in its sole, reasonable judgment) to the Borrowers (to the extent of amounts that have been paid by a Borrower under this Section 3.02 with respect to Taxes giving rise to such refund or credit), plus any interest received with respect thereto, net of all reasonable out-of-pocket expenses of the Lender and without interest (other than interest actually received from the relevant taxation authority or other Governmental Authority with respect to such refund or credit); provided, however, that each Borrower, upon the request of the Lender, agrees to return the amount of such refund or benefit of such credit (plus interest) to the Lender in the event the Lender is required to repay the amount of such refund or benefit of such credit to the relevant taxation authority or other Governmental Authority.

Confidential

(f)        If a Lender is not a United States Person (within the meaning of Section 7701(a)(30) of the Internal Revenue Code) (a "Non-U.S. Lender"), it shall, on or prior to the Closing Date or, in the case of a Non-U.S. Lender that is an assignee, on the date of such assignment to such Non-U.S. Lender, provide to the Borrowers and Lender Agent (i) two (2) accurate and complete original signed copies of Internal Revenue Service Form W-8ECI or Form W-8BEN (or successor forms) certifying that such Non-U.S. Lender is entitled as of such date to a complete exemption from United States withholding tax pursuant to an applicable income tax treaty with respect to payments of interest to be made under this Agreement (or, in the case of an assignee, entitlement to a withholding tax rate that does not exceed the withholding tax rate in respect of those Taxes in respect of interest for which the assignor was entitled to additional payments under Section 3.02(a) at the time of the assignment), (ii) with respect to a Non-U.S. Lender claiming exemption from United States withholding tax pursuant to its portfolio interest exception, (x) a statement of such Non-U.S. Lender, signed under penalty of perjury, that it is not (A) a "bank" as described in Section 881(c)(3)(A) of the Internal Revenue Code, (B) a 10% shareholder of a Borrower (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code), or (C) a controlled foreign corporation related to a Borrower within the meaning of Section 864(d)(4) of the Internal Revenue Code (an "Exemption Certificate"), and (y) two properly completed and executed original signed copies of Internal Revenue Service Form W-8BEN (or successor form) certifying that such Non-U.S. Lender is entitled as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement, (iii) two (2) accurate and complete original signed copies of Internal Revenue Service Form W-8IMY with any accompanying statement and certificate, or (iv) two (2) accurate and complete original signed copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from United States federal withholding tax, with such supplementary documentation as may be prescribed by Requirements of Law to permit Borrowers to determine the withholding or deduction required to be made.  In addition, each Non-U.S. Lender agrees that from time to time after the Closing Date, when the passage of time or a change in facts or circumstances renders the previous certification obsolete or inaccurate in any material respect, or on the Borrowers' reasonable request, such Non-U.S. Lender will deliver to the Borrowers two (2) new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to a complete exemption under an income tax treaty), Form W-8BEN (with respect to the portfolio interest exemption) and an Exemption Certificate, or Form W-8IMY with any accompanying statement or certificate, as the case may be, and such other forms as may be required in order to confirm or establish that such Non-U.S. Lender is entitled to a continued exemption from United States withholding tax with respect to payments under this Agreement, or such Non-U.S. Lender shall immediately notify the Borrowers of its inability to deliver any such form or Exemption Certificate, in which case such Non-U.S. Lender shall not be required to deliver any such form or Exemption Certificate.  Notwithstanding anything to the contrary contained in this Section 3.02, the Borrowers agree to pay any additional amounts and to indemnify each Non-U.S. Lender in the manner set forth in Sections 3.02(a) and (c) in respect of any United States Taxes deducted or withheld by the Borrowers or paid by a Lender, if and to the extent that such Taxes would not have been deducted or withheld or payable (and in the case of a payment by a Lender, no exception is available to the making of such payment, as determined in the sole discretion of such Lender) but for any change after the Closing Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof.  Prior to

Confidential

withholding any amount due a non-U.S. Lender because of such Lender's failure to provide tax forms or certifications under this Section 3.02, the Borrowers shall notify such non-U.S. Lender of its intention to withhold not less than five (5) Business Days prior to such withholding.

(g)    Notwithstanding anything to the contrary contained in this Agreement, this Section 3.02 shall govern exclusively any increased costs relating to Taxes resulting from any change in law.

Section 3.03.  Fees and Expenses.  The Borrowers agree to jointly and severally pay to the Lender Agent and the Lenders any expenses (including reasonable fees and expenses of each Lender's counsel) incurred in connection with the negotiation, execution, delivery, administration and enforcement of this Agreement and the Facility Documents (and any amendments, supplements, modifications, consents or waivers thereto), including the reasonable fees and expenses (including, without limitation, attorneys' fees and expenses) of the First Priority Collateral Agent, the Collateral Control Agent and the Valuation Agent.

Section 3.04.  Setoff.  The Obligors agree that each Lender has all rights of set off provided by applicable law, and in addition thereto, the Obligors agree that at any time any Default exists, each Lender may appropriate and apply to the payment of any obligations of the Obligors hereunder owed to it, whether or not then due, any and all balances, credits, deposits, accounts or moneys of the Obligors then or thereafter maintained with or held by such Lender; provided that any such appropriation and application shall be subject to Section 3.01(g).  Each Lender shall promptly notify the applicable Obligors after making such exercise of the right of set off; provided that failure to give such notice shall not affect the validity of the set-off.

ARTICLE IV

ACCOUNTS AND COLLECTIONS

Section 4.01.  Concentration Accounts.  Subject to Account Exceptions, ResCap and its Subsidiaries shall continue to administer their cash collection system in good faith and in a manner consistent with the requirements of this Agreement.  To the extent in place on or prior to the Closing Date, such administration shall include the sweep of cash from accounts in the system to the Concentration Accounts.  The Obligors will cause the Concentration Accounts to be subject to the Account Control Agreements at all times at and after the Closing Date.

Section 4.02.  Sales Proceeds Accounts.  (a)  On or before the Closing Date, the Borrowers and the Lender Agent established the Sales Proceeds Accounts.  The Obligors hereby agree that the Collateral Control Agent shall have exclusive control of the Sales Proceeds Accounts.  Any Net Cash Proceeds of Collateral Dispositions received by an Obligor shall be deposited in the Sales Proceeds Accounts, no later than the Applicable Deposit Date; provided, however, for the avoidance of doubt, prior to the Applicable Deposit Date, all Net Cash Proceeds of a Collateral Disposition relating to European Reporting Assets underlying the English Note or the Dutch Note shall be deposited into and held, in accordance with the English Security Documents or the Dutch Security Documents, as applicable, in the Blocked Account (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) with respect to the English SPE or the Blocked Account (as defined in the Master Definitions

Confidential

Agreement dated June 4, 2008, as amended from time to time) with respect to the Dutch SPE. Such Net Cash Proceeds shall be held in the Sales Proceeds Accounts pending application of such proceeds in accordance with this Section 4.02(a), and any such Net Cash Proceeds which for any reason have not yet been deposited into the Sales Proceeds Accounts shall be deemed to be held by such Obligor in trust for the Lenders and shall not be used by any Obligor for any purposes whatsoever.  Net Cash Proceeds on deposit in the Sales Proceeds Accounts (including funds consisting of Net Cash Proceeds of Collateral Dispositions on deposit in the Servicing Advances Accounts) shall be used to make mandatory repayments of Loans in accordance with Section 2.08(c); provided that an amount equal to the portion of the Available MTM Credits applied to reduce the amount of such mandatory prepayment shall be released to the Borrowers in accordance with Section 2.08(c) if no Default has occurred and is continuing.  To the extent that the Borrowers subsequently document in a manner acceptable to the Lender Agent in its discretion that funds were incorrectly deposited into a Sales Proceeds Account and used to repay Loans in accordance with Section 2.08(c), the Lender Agent will authorize the Borrowers to (i) withdraw funds then on deposit in the Sales Proceeds Accounts in an amount equal to such incorrect deposit and/or (ii) net the excess amount against future deposits to the Sales Proceeds Accounts up to an amount equal to such incorrect deposit, rather than use such funds to repay Loans as otherwise required by this Section 4.02(a) and Section 2.08(c).

(b)    The Borrowers shall designate one or more of the Sales Proceeds Accounts as "Servicing Advances Accounts".  Any amounts received in respect of the repayment of Primary Collateral consisting of Servicing Advances received by an Obligor shall be deposited in the Servicing Advances Accounts no later than the Applicable Deposit Date and shall be held in the Servicing Advances Accounts pending application of such proceeds in accordance with this Section 4.02(b). No funds other than Net Cash Proceeds of Collateral Dispositions with respect to Servicing Advances or amounts received in respect of the repayment of Primary Collateral consisting of Servicing Advances shall be deposited in the Servicing Advances Accounts. The Borrowers may withdraw Collections (other than Net Cash Proceeds) on deposit in the Servicing Advances Accounts, provided that no Default has occurred and is continuing and no Default would result from such withdrawal, (i) to make Servicing Advances with respect to Eligible Servicing Advances Agreements (which Servicing Advances, for the avoidance of doubt, shall constitute Primary Collateral) or (ii) to make prepayments of any Loan in accordance with Section 2.08(c) or Section 2.09.

Section 4.03.  Collections Deposited to Collection Accounts.  The Obligors agree, subject to the Account Exceptions, to use all commercially reasonable efforts to maintain their cash management system so as to enable the Collateral Control Agent to exercise control, pursuant to Account Control Agreements, over all material U.S. located bank and securities accounts of ResCap and its Subsidiaries intended to contain solely funds and securities of ResCap and its Subsidiaries (excluding the Exempt Cash Reserve Account, accounts of Financing SPVs, accounts of independent third parties, accounts setup for Bilateral Facilities and accounts holding funds held on account for, in trust for, or by ResCap or a Subsidiary as a custodian for, any third party) and cause all liquidity reserves (other than funds permitted to be held in the Exempt Cash Reserve Account) of ResCap and its Subsidiaries to be on deposit in such accounts, subject to such exceptions as the Lender Agent shall agree in writing.  Subject to the Account Exceptions and Section 4.02, the Obligors shall arrange for (a) all Collections in respect of the Collateral to be deposited in a Collection Account no later than the Applicable Deposit Date, (b) all liquidity

Confidential

reserves of ResCap and its Subsidiaries to be held (subject to the Account Exceptions) in the Collection Accounts. To the extent that any funds are not deposited or held in the Collections Accounts in accordance with the preceding sentence, such funds shall be deemed to be held by such Obligor, in trust for the Lenders and shall not be used by any Obligor for any purposes whatsoever. For the avoidance of doubt, all Collections (other than Net Cash Proceeds from a Collateral Disposition) relating to European Reporting Assets underlying the English Note or the Dutch Note shall be deposited into and held in the Transaction Account (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) for the English SPE or the Transaction Account (as defined in the Master Definitions Agreement dated June 4, 2008, as amended from time to time) for the Dutch SPE, as applicable.

Section 4.04.  <u>Withdrawals from Designated Accounts; Account Notices</u>.  So long as no Default has occurred and is continuing or would result from such withdrawal, the Lender Agent and Lenders shall permit the Obligors to withdraw funds from each Concentration Account, Collection Account and (to the extent permitted under <u>Section 4.02</u>) Sales Proceeds Accounts from time to time and the Lender Agent agrees that it will not direct the Collateral Control Agent to provide any notice to any account bank directing such account bank not to honor a request or instruction from any Obligor with respect to any Concentration Account, Collection Account or Sales Proceeds Account prior to such time.

Section 4.05.  <u>Cash and Cash Equivalents</u>.  Deposits in each Concentration Account, Collection Account or Sales Proceeds Account may be held in cash or Cash Equivalents.  To the extent that any funds that do not constitute Collateral or proceeds of Collateral are deposited to any of such Accounts, as such funds are reasonably identified to the Lender Agent in a timely manner, the Lender Agent shall instruct the Collateral Control Agent to release such funds from the Lien of the Security Agreement.

ARTICLE V

CONDITIONS PRECEDENT

Section 5.01.  <u>Conditions Precedent to Effectiveness</u>.  The amendment and restatement of this Agreement shall become effective upon the satisfaction of (a) the condition precedent that the Lender Agent shall have received (or waived delivery of) each of the items set forth in <u>Schedule 5.01</u> (unless otherwise indicated) dated such date, and in such form and substance, as is satisfactory to the Lender Agent and (b) the other conditions specified in <u>Schedule 5.01</u> have been satisfied or waived by the Lender Agent.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

Section 6.01.  <u>Representations and Warranties of the Obligors</u>.  Each Obligor represents and warrants to each Lender Party that throughout the term of this Agreement (including but not limited to as of the date of each Collateral Disposition):

Confidential

(a)    <u>Organization and Good Standing</u>.  Each of such Obligor and each of its Subsidiaries has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of organization, and has all requisite corporate or limited liability company power and authority to own its properties and to conduct its business as such properties are presently owned and such business is presently conducted, and had at all relevant times, and now has, all necessary power, authority and legal right to own the portion of the Collateral that it owns.

(b)    <u>Due Qualification</u>.  Each of such Obligor and each of its Subsidiaries is duly qualified to do business, and has obtained all necessary licenses and approvals, in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification, licenses or approvals, except to the extent failure to so qualify or to obtain licenses and approvals could not reasonably be expected to have a Material Adverse Effect.

(c)    <u>Power and Authority; Due Authorization</u>.  Each of such Obligor and each of its Subsidiaries (i) has all necessary power and authority and legal right to (A) execute and deliver each of the Facility Documents to be executed and delivered by it in connection herewith, (B) carry out the terms of the Facility Documents to which it is a party and (C) borrow the Loans or provide the Guarantee hereunder (as applicable) and grant a security interest or lien in the portion of the Collateral that it owns on the terms and conditions herein provided or as otherwise required by the Facility Documents and (ii) has taken all necessary corporate, partnership or limited liability company action to duly authorize (A) such borrowing, guarantee and/or grant, as appropriate and (B) the execution, delivery, and performance of this Agreement and all of the Facility Documents to which it is a party.

(d)    <u>Binding Obligations</u>.  Each Facility Document to which such Obligor and any of its Subsidiaries is a party constitutes, or when duly executed and delivered by such Obligor or Subsidiary will constitute, the legal, valid and binding obligations of such Obligor or such Subsidiary enforceable against it in accordance with its respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(e)    <u>No Violation</u>.  Except for those consents required in connection with the Lenders exercising their rights under <u>Section 8.02</u> hereof, neither the execution and delivery of the Facility Documents, nor the consummation of the transactions contemplated hereby and thereby, will conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice, lapse of time or both) a default under, its organizational documents or any indenture, loan agreement, mortgage, deed of trust, or other material agreement or instrument to which such Obligor or any of its Subsidiaries is a party or by which any of them or their property is otherwise bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument, other than this Agreement and the Security

Confidential

Documents, or violate any Requirements of Law applicable to it of any Governmental Authority having jurisdiction over it or any of its properties if such violation, individually or in the aggregate, is reasonably likely to result in a Material Adverse Effect.

(f)    No Proceedings.  There are no proceedings or investigations pending, or to the best of such Obligor's knowledge threatened in writing, against it before any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality (i) asserting the invalidity of any Facility Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by any Facility Document, or (iii) seeking any determination or ruling that could reasonably be expected to have a Material Adverse Effect; provided, however, that this representation shall not apply to (x) matters that have been disclosed to the Lender Agent in writing prior to closing, or (y) matters arising from the attempts of the Obligors to enforce their rights with respect to the Collateral other than purported or certified class action law suits involving any portion of the Collateral or Supporting Assets consisting of mortgage loans which have a material impact on the enforceability or value of such mortgage loans or the Lender's security therein.

(g)    Government Approvals.  No authorization, consent, approval, or other action by, and no notice to or filing with, any court, governmental authority or regulatory body or other Person, domestic or foreign, is required for the due execution, delivery or performance of any Facility Document to which such Obligor is a party except for (i) consents that have been obtained in connection with transactions contemplated by the Facility Documents, it being understood that consents to the pledge of interests in BCG Joint Ventures were initially verbal consents, to be followed by written consents in accordance with the Post-Closing Requirements, (ii) filings to perfect the security interest created by the Security Documents and (iii) consents required in connection with the First Priority Collateral Agent exercising its rights under Section 8.02 hereof.

(h)    Solvent: Fraudulent Conveyance.  ResCap and its Subsidiaries, on a consolidated basis, are Solvent and will not cease to be Solvent due to any Loan or any guaranty hereunder (both immediately before and after giving effect to such Loan or guaranty).  The amount of consideration being received by an Obligor upon its pledge or provision of any Collateral to the First Priority Collateral Agent for the benefit of the Lender Parties constitutes reasonably equivalent value and fair consideration for such Collateral.  No Obligor is pledging or providing any Collateral with any intent to hinder, delay, or defraud any of its creditors.

(i)    Margin Regulations.  Margin Stock (as defined in the regulations of the Board) constitutes less than 25% of the value of those assets of it that are subject to any limitation on sale, pledge, or other restriction hereunder.  No Obligor is engaged in the business of extending credit for the purpose of buying or carrying Margin Stock, and no proceeds of Loans will be used to purchase or carry Margin Stock or otherwise for a purpose that violates, or would be inconsistent with, F.R.S. Board Regulations T, U or X.

Confidential

(j)    Accurate Reports.  No written information, exhibit, financial statement, document, book, record, or report furnished or to be furnished or caused to be furnished by such Obligor to the Lender Agent or any Lender in connection with the Facility Documents was inaccurate in any material respect as of the date it was dated or (except as otherwise disclosed in writing to the Lenders or the Lender Agent at such time) as of the date so furnished, or contained any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading; provided that any such inaccuracy, misstatement or omission in any Permanent Paydown Report not included in the Monthly Collateral Report or any daily report regularly provided to the Lender Agent in connection with this Loan Agreement shall not constitute a breach of this Section 6.01(j) if such calculation was prepared in good faith, based on the actual knowledge of ResCap Treasury available at the time and in accordance with ResCap's general accounting and business policies as in effect as of the date such information was furnished.

(k)    No Default.  No Default has occurred and is continuing.

(l)    Investment Company Act.  Neither such Obligor nor any of its Subsidiaries is required to register as an "investment company" under the Investment Company Act.

(m)    Taxes.  Each of such Obligor and each of its Subsidiaries has filed all material United States federal tax returns and all other material returns that are required to be filed, and has paid all material taxes due pursuant to said returns or pursuant to any assessment received by it, except such taxes, if any, as are being contested in good faith by appropriate proceedings diligently conducted and as to which adequate reserves have been provided in accordance with GAAP.  The charges, accruals and reserves on the books of such Obligor in respect of taxes and other governmental charges are, in the opinion of such Obligor, adequate.

(n)    Approved Servicer.  Except as disclosed to the Lender Agent prior to the Amendment Closing Date, (i) with respect to the Borrowers only, each Borrower is approved by Fannie Mae as an approved lender, (ii) GMAC Mortgage is approved by each of Freddie Mac and Ginnie Mae as an approved seller, HUD pursuant to Sections 203 and 211 of the National Housing Act, the FHA as an FHA Approved Mortgagee and Servicer, and the VA as a VA Approved Lender, (iii) GMAC Mortgage is approved by Freddie Mac, Fannie Mae and Ginnie Mae as an approved servicer, (iv) each Borrower is in good standing with Freddie Mac, Ginnie Mae, HUD, the FHA, and/or the VA, as applicable, (v) no circumstances exist that would either entitle Freddie Mac, Ginnie Mae, HUD, the FHA or the VA to revoke or suspend any such approvals or entitle Freddie Mac or Ginnie Mae to terminate any Borrower as servicer for cause under any servicing arrangement, (vi) no Borrower has received from Freddie Mac, Ginnie Mae, HUD, the FHA or the VA any notice revoking or suspending, or indicating any intent to revoke or suspend or indicating any adverse fact or circumstance which could reasonably be expected to entitle Freddie Mac, Ginnie Mae, HUD, the FHA or the VA, as the case may be, to revoke or suspend any of the

Confidential

aforementioned approvals, and (vii) each FHA Insurance Contract and VA Guaranty Agreement applicable to the Borrowers or any other Obligor or their Subsidiaries is in full force and effect.

(o)    Financial Statements.  (i) ResCap has delivered to the Lender Agent a copy of (1) ResCap's audited, consolidated financial statements dated as of December 31, 2008, comprised of the consolidated statements of income or operations and cash flows for the preceding twelve (12) month period and the consolidated balance sheet as at December 31, 2008, and (2) ResCap's quarterly consolidated financial report for the period ended September 30, 2009; each was prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, subject to ordinary, good faith year-end audit adjustments; and each of (1) and (2) are correct in all material respects and fairly present the consolidated financial condition of ResCap and its consolidated Subsidiaries, as of the dates thereof and consolidated results of operations for the periods covered thereby and (ii) As of the date of this Agreement, since September 30, 2009, other than as has been previously disclosed by the Borrowers or ResCap to the Lenders or the Lender Agent prior to the date hereof, there has been no change in such financial condition or results of operation that is reasonably likely to have a Material Adverse Effect.  Except as discussed in the financial statements, it is not subject to any contingent liabilities or commitments that, individually, or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect.

(p)    Chief Executive Office.  RFC's chief executive office is located at One Meridian Crossings, Suite 100, Minneapolis, MN 55423 or at such other location as hereafter disclosed to the Lender Agent in writing.  GMAC Mortgage's chief executive office is located at 1100 Virginia Drive, Fort Washington, PA 19034 or at such other location as hereafter disclosed to the Lender Agent in writing.  The chief executive office of the Guarantors are as set forth in Schedule II to the Security Agreement or at such other locations as hereafter disclosed to the Lender Agent in writing.

(q)    Location of Books and Records.  The location where such Obligor keeps its books and records, including all electronic files and records relating to the Collateral that it owns, is its chief executive office or such other location as disclosed to the Lender Agent in writing.

(r)    Compliance with Laws.  It is in compliance in all material respects with all applicable Requirements of Law; provided that any such failure to comply with applicable Requirements of Law with respect to MHF Assets resulting solely from a default by a third-party customer of MHF in the performance of its obligations (including any obligation to comply with law) to MHF shall not constitute an Event of Default unless such failure to comply could reasonably be expected to give rise to liabilities payable out of Collateral other than MHF Assets.

(s)    Representations and Warranties under the Security Documents. Each of the representations and warranties it has made or any of its Subsidiaries has made under the Security Documents are true and correct in all material respects, and to the

Confidential

best of its knowledge all of the representations and warranties of all other parties to such agreements are true and correct in all material respects.

(t)    ERISA.  Each Pension Plan is in compliance in all material respects with, and has been administered in all material respects in compliance with, the applicable provisions of ERISA, the Internal Revenue Code and all other applicable Federal and State laws, and no event has occurred or is reasonably expected to occur with respect to any such Pension Plan or any Multiemployer Plan that has resulted in or is reasonably expected to result in a Material Adverse Effect.

(u)    Servicing Advances. Each Borrower has provided to GMAC (whether pursuant to this Agreement or another Related Document), as of the date hereof, all relevant information about any circumstance, including but not limited to the servicer status under each of the Borrowers' mortgage loan servicing contracts, that may affect the timely payment of all amounts owed with respect to the Advances included in the Primary Collateral, Supporting Assets or RE Assets, provided such circumstances involve an Agency, a securitization trustee or (to the extent such circumstance could reasonably be expected to give rise to a Material Adverse Effect) any other Person.

(v)    Underlying Documents; Restricted Entities.  The Obligors have provided to the Lender Agent, or made available to the Lender Agent on a website to which the Lender Agent will have access while the related Collateral is held by the Obligors, true, accurate, and complete copies of each Underlying Document, each as amended, restated, supplemented or otherwise modified as of the Amendment Closing Date, and will promptly provide the Lender Agent with written notice of modifications or terminations thereof (other than Permitted Actions); and all Indebtedness (other than Excluded Debt and Permitted Indebtedness described in clause (c) or (h) of the definition of Permitted Indebtedness) owed by Restricted Entities is reflected in the Carrying Value of Primary Collateral related to such entities.

ARTICLE VII

COVENANTS

Section 7.01.  Affirmative Covenants of the Obligors.  Each Obligor covenants and agrees with the Lender Parties that, until all Loans and other Obligations have been paid in full in cash and the Commitments have terminated or expired, such Obligor will perform or cause to be performed the obligations set forth below in this Article VII:

(a)    Compliance with Laws, Etc.  Each of such Obligor and each of its Subsidiaries shall comply in all material respects with all applicable Requirements of Law, provided that any such failure to comply with applicable Requirements of Law with respect to MHF Assets resulting solely from default by a third-party customer of MHF in the performance of its obligations (including any obligation to comply with law) to MHF shall not constitute an Event of Default unless such failure to comply could reasonably be expected to give rise to liabilities payable out of Collateral other than MHF Assets.

Confidential

(b)    <u>Performance and Compliance with Agreements</u>.  Each Obligor and each Subsidiary thereof shall comply with all provisions, covenants and other promises required to be observed by it under each of the Facility Documents to which it is a party (subject to all applicable grace periods as provided therein).

(c)    <u>Taxes</u>.  Each of such Obligor and each of its Subsidiaries shall pay and discharge promptly when due all material taxes and governmental charges imposed upon it or upon its income or profits or in respect of its property, in each case before the same shall become delinquent or in default and before penalties accrue thereon, unless and to the extent such taxes are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves shall, to the extent required by GAAP, have been set aside.

(d)    <u>Due Diligence</u>.  Such Obligor agrees and acknowledges that (i) the Lender Agent, at the Lender Agent's own expense except as set forth as provided herein, has the right to perform continuing due diligence reviews with respect to the Collateral, for purposes of verifying compliance with the representations, warranties, and specifications made hereunder and under the other Facility Documents, or otherwise, and (ii) the Lender Agent and its Responsible Officers will be permitted during normal business hours to examine, inspect, make copies of, and make extracts of, any and all documents, records, agreements, instruments or information relating to the Collateral in its possession.  Notwithstanding anything to the contrary herein, the Borrowers shall jointly and severally reimburse the Lender Agent for any and all out-of-pocket costs and expenses reasonably incurred by such party and its respective designees and agents in connection with the ongoing due diligence and auditing activities (A) not more than once a year, if no Event of Default has occurred and is continuing and (B) at all times during any period in which an Event of Default has occurred and is continuing.

(e)    <u>Legal Existence, etc</u>.  Such Obligor shall (i) preserve and maintain its legal existence and good standing and the legal existence and good standing of its Subsidiaries, except to the extent such failure to so preserve and maintain is in connection with a Permitted Dissolution, (ii) preserve and maintain all of its rights, privileges, authorizations, approvals, licenses and franchises, except to the extent such failure to so preserve and maintain relates to a Permitted Dissolution or is not reasonably expected to have a Material Adverse Effect; and (iii) keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied (or, in the case of Obligors or Subsidiaries organized outside of the United States, in accordance with GAAP and/or applicable local accounting standards, consistently applied) and local law.

(f)    <u>Financial Statements</u>.  ResCap shall deliver each of the following to the Lender Agent:

(i)    as soon as available, but not later than forty-five (45) calendar days after the end of each fiscal quarter ending on March 31, June 30 and September 30, ResCap's unaudited consolidated balance sheet as at the end of such fiscal

Confidential

quarter, the related unaudited, consolidated statement of income for such quarter and the portion of the fiscal year through the end of such quarter and the related unaudited consolidated statements of retained earnings and cash flows for the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year;

(ii)    as soon as available, but not later than ninety (90) days after the end of each fiscal year ResCap's audited consolidated balance sheet as at the end of such fiscal year and the related consolidated statements of income and retained earnings and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous year, and accompanied by the opinion of an independent certified public accountant of recognized national standing, which report shall state that such consolidated financial statements present fairly ResCap's consolidated financial position and the results of its operations for the periods indicated in conformity with GAAP.  Such opinion shall not be qualified or limited because of a restricted or limited examination by the independent auditor of any material portion of its books and records and shall have no "going concern" qualification;

(iii)    as soon as available, but not later than thirty (30) days after the end of each calendar month ResCap's consolidated balance sheet as of the end of such calendar month and the related consolidated statements of income for such calendar month, setting forth in each case in comparative form the figures for the previous calendar month, fairly presenting in all material respects, in accordance with GAAP, as at the end of, and for such period, ResCap's consolidated financial position and the results of ResCap's consolidated operations; and

(iv)    concurrently with the delivery of the financial statements referred to in subsections 7.01(f)(i), (ii), and (iii), a duly completed Compliance Certificate executed by a Responsible Officer of ResCap.

(g)    Required Reports; Additional Information.  The Borrowers will at the times specified in Schedule 7.01(g) attached hereto deliver to the Lender Agent the reports identified in such schedule, and promptly furnish to the Lender Agent all notices of all final written audits, examinations, evaluations, reviews and reports of the Obligors' origination and servicing operations by any state mortgage banking licensing agency or instrumentality (including those prepared on a contract basis for any such agency) in which there are material adverse findings, including without limitation notices of termination or impairment of approved status, and notices of probation, suspension or non-renewals, and such other information, documents, records or reports with respect to the Collateral or the conditions or the Obligors' operations, financial or otherwise, as the Lender Agent may from time to time reasonably request.

(h)    Peak Score.  GMAC Mortgage shall maintain either (i)(1) at all times while Fannie Mae is utilizing the monthly Peak Score rating system, a monthly Peak Score which equates to "Excellent" or better or (2) at all times after Fannie Mae has developed and implemented a replacement rating system for the monthly Peak Score

Confidential

rating system, a score or rating in respect of such replacement rating system that is reasonably equivalent to a monthly Peak Score of "Excellent" or better, as agreed upon by the Lender Agent and GMAC Mortgage, or (ii) an Investor Reporting and Remitting rating from Freddie Mac which equates to "Tier 2" or better.

(i)      Quality Control.  Such Obligor and each of its Subsidiaries shall conduct quality control reviews of its servicing operations in accordance with industry standards and past practice.  Each Obligor shall report to the Lender Agent quality control findings that could reasonably be expected to give rise to a Material Adverse Effect as such reports are produced and upon reasonable request by the Lender Agent.

(j)      Insurance.  Such Obligor shall maintain such insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities.

(k)      Use of Proceeds and Withdrawals.  The Borrowers shall use the proceeds of the Loans and any funds withdrawn from the Concentration Accounts, the Collection Accounts and (to the extent permitted under Section 4.02) Sales Proceeds Account in accordance with Section 4.04 for budgeted working capital and general corporate expenses in the ordinary course of business.

(l)      Accounts.  (i) ResCap shall not hold in the Exempt Cash Reserve Account any amount in excess of the sum of $250,000,000 and any investment earnings on such amount accrued and retained therein, and (ii) the Obligors will (subject to the provisions of Sections 4.02 and 4.03 and the Account Exceptions) insure that all Collections with respect to Collateral (other than funds deposited in the Exempt Cash Reserve Account as described above) are deposited directly into the Collection Accounts.

(m)      Custodial Procedures.  The Borrowers and Obligors have entered into and will maintain one or more custody agreements (as the same may be amended, supplemented, modified or restated from time to time, the "Custody Agreement") governing the custody of certain documentation for Collateral consisting of US Mortgage Loans, which Custody Agreement appoints Wells Fargo Bank National Association as custodian.  At the Lender Agent's request, the Borrowers hereby agree to update the Lender Agent on the applicable custodian's exception report.  The Lender Agent may at any time specify that any US Mortgage Loans included in the applicable custodian's exception report shall no longer constitute Eligible Assets.  It is understood and agreed that the Lender Agent may adjust the Specified Percentage of all or a portion of the US Mortgage Loans in response to the exceptions described therein.

(n)      Collections and Net Cash Proceeds Reporting.  The Borrowers will, within eleven Business Days of the end of each calendar month, provide a written statement to the Lender Agent and each Lender of (i) the aggregate Net Cash Proceeds of all Collateral Dispositions of the Obligors and their Subsidiaries, (ii) the aggregate

Confidential

Collections received relating to Primary Collateral, in each case during the immediately preceding calendar month, and (iii) the Carrying Value of the Primary Collateral of each Obligor at the beginning of such calendar month and at the end of such calendar month.

(o)    REO Property.  With respect to any Primary Collateral consisting of REO Property (other than REO Property held by BCG), the Obligors will obtain a broker price opinion every ninety (90) days to the extent required under the Servicing Guidelines for so long as such Primary Collateral is retained.

(p)    Servicing of Collateral, RE Assets, Supporting Assets.  Such Obligor will ensure, and will direct its Subsidiaries to ensure, that the Collateral, Supporting Assets and RE Assets owned or serviced by it or its Subsidiaries (as applicable) is serviced and administered by it or its Subsidiaries as servicer or administered at all times in accordance with the procedures (including but not limited to collection and enforcement procedures, the maintenance of insurance, custodial arrangements, documentation retention, and the making of servicer advances, including servicer advances with respect to residential mortgage assets) that each Borrower or other Obligor (as the case may be) customarily employs and exercises (or requires to be employed or exercised by those servicing its other assets) in its good faith business judgment and which are normal and usual in the servicing of its other assets, and that such servicing and administration is conducted in the best interest of and for the benefit of the Lender Parties.

(q)    Structuring for Eligible Collateral Acquisition, Excluded Assets, Non-UCC Assets.  Such Obligor will, and will cause its Subsidiaries to, use commercially reasonable efforts to grant and perfect a Lien to secure the Obligations, directly or through the use of a Restricted Entity, with respect to (i) US Mortgage Loans repurchased or otherwise acquired by such Obligor or Subsidiary, or held by such Obligor or Subsidiary and released from the Liens supporting any other facility, (ii) Mortgage Loans denominated in other currencies, provided that, with respect to Mortgage Loans that are denominated in Pounds Sterling or Euros, the covenant contained in this clause (ii) shall not take effect until the third-party credit facility in place on the Amendment Closing Date for financing Mortgage Loans in such currency has been terminated (by prepayment, at maturity or otherwise), and (iii) each of their unencumbered assets with a Carrying Value (in the case of this clause (iii)) greater than $50,000,000.  Without limiting the foregoing and unless the Lender Agent shall agree otherwise, upon the termination of the Conduit (No. 2) Facility, the Obligors will, and will cause its Subsidiaries to (i) transfer the Mortgage Loans pledged under the Conduit (No. 2) Facility and any other unencumbered repurchased Mortgage Loan denominated in Pounds Sterling or Euros to be transferred to a Restricted Entity, (ii) cause such Restricted Entity to issue notes secured by such Mortgage Loans, and (iii) pledge such notes as Collateral under the Security Agreement; provided that unless the Borrowers and the Lender Agent agree, such notes and Mortgage Loans shall not be Primary Collateral or Supporting Assets.

Confidential

(r)  <u>Further Assurances</u>.  Such Obligor will, and will cause each of its Subsidiaries to, at its own expenses promptly execute and deliver to the Lender Agent, the First Priority Collateral Agent or the Collateral Control Agent all such other documents, agreements and instruments reasonably requested by the Lender Agent, the First Priority Collateral Agent or the Collateral Control Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrowers and the Guarantors in the Facility Documents, if requested, or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Agreement or the Facility Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to any of the Security Documents or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Lender Agent, in connection therewith.  Each Obligor hereby authorizes, without obligation, the Lender Parties to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of any Collateral or any part thereof or any other collateral without the signature of any Obligor where permitted by law.  Without limiting the foregoing, each Obligor agrees that the Lender Agent and the First Priority Collateral Agent are hereby authorized to file, at such times as the Lender Agent deems necessary or desirable, UCC financing statements naming it and its Subsidiaries as debtor and describing the collateral as "all personal property" or "all assets" of such debtor whether now or hereafter acquired, or words of like import.

(s)  <u>Additional Guarantors</u>.

(i)  ResCap and the Borrowers will, contemporaneously with the direct or indirect acquisition of any Person which upon such acquisition is, or of any asset which causes the Subsidiary acquiring such assets (without regard to any other assets of such Subsidiary) to be, a Significant Subsidiary (other than an Excluded Subsidiary), cause such Person or Subsidiary to execute a joinder agreement in substantially the form of Exhibit 7.01(t) whereby such Person or Subsidiary unconditionally agrees to become a party to, and assume all obligations under, this Agreement as a Guarantor.

(ii)  ResCap and the Borrowers will, contemporaneously with the guarantee by any Subsidiary of any Indebtedness of ResCap or any other Guarantor, cause such Subsidiary (unless such Subsidiary is already a Guarantor) to execute a joinder agreement in substantially the form of Exhibit 7.01(t) whereby such Subsidiary unconditionally agrees to become a party to, and assume all Obligations as a Guarantor.

(iii)  ResCap and the Borrowers will, within forty-five (45) days after the end of each of the first three fiscal quarters of each year and ninety (90) days after the end of each fiscal year, cause each Person that is a Significant Subsidiary (other than an Excluded Subsidiary) as of the end of such quarter or fiscal year that is not already a Guarantor to execute a joinder agreement in substantially the

Confidential

form of Exhibit 7.01(t) whereby such Person unconditionally agrees to become a party to, and assume all obligations under, this Agreement as a Guarantor.

(t)     _Terms of Other Debt Facilities_.  The Obligors shall (i) give not less than ten (10) Business Days' prior written notice to the Lender Agent of any amendment of any Bilateral Facility or the execution of any other facility under which ResCap or any of its Subsidiaries incur Indebtedness, which amendment or facility varies from this Agreement as to (v) whether Obligors other than ResCap make representations as to, or are required to be, Solvent, (w) the definition of "Solvent" or an equivalent or any representation relating to solvency, (x) the definition of "Change of Control" or the equivalent in any such facility, (y) any financial covenant (including the imposition of a new financial covenant), or (z) any of the definitions of the terms referenced in the provisions described in <u>clauses (w)</u>, <u>(x)</u> or <u>(y)</u> above, and (ii) within five (5) Business Days after such provision(s) shall become effective, enter into such amendments hereto as may be required by the Lender Agent to conform in all material respects to the related provisions of this Agreement to such amendment(s).

(u)     _Transfer of Rights or Benefits_. If requested to do so by the Lender Agent, the Obligors will cooperate, to the fullest extent reasonably possible, with actions taken by a lender under the Dutch Security Documents and the English Security Documents that enable such lender to effect a transfer of servicing, legal title or other rights or benefits in an efficient and orderly manner upon exercise of remedies pursuant to the Dutch Security Documents or the English Security Documents, as applicable, with respect to any collateral maintained for such lender's benefit.

(v)     _Underlying Documents Obligations and Contractual Exercise of Rights and Remedies_.  Each Obligor shall, and shall cause its Subsidiaries to, (i) perform all of its obligations under the Underlying Documents, except where failure to perform could not reasonably be expected to give rise to a Material Adverse Effect; and (ii) take such actions to exercise the rights and remedies of any ResCap Subsidiary with respect to the Underlying Documents as the Lender Agent shall direct in accordance with the terms of the applicable agreement, <u>provided</u> that, absent such direction, the Obligors and such Subsidiaries may take or permit to occur Permitted Actions.

(w)     _Underlying Documents Reports and Notices_.  The Obligors shall promptly deliver to the Lender Agent (i) with respect to the English Security Documents and the Dutch Security Documents, all reports, notices and certificates required thereunder and (ii) with respect to all other Underlying Documents, all reports, notices and certificates which describe events or circumstances that could reasonably be expected to give rise to a Material Adverse Effect.

(x)     _Additional Collateral_.  The Obligors shall provide as soon as practicable prior written notice to the Lender Agent of any proposed Substitute Collateral which they request to be added to the Primary Collateral.  The Obligors shall deliver such documents, agreements, schedules, other information and opinions as the Lender Agent shall reasonably request in connection with any such proposed additional

Confidential

Collateral including, without limitation, all reasonable information with respect to any equity in joint ventures or other Assets acquired by a Restricted Entity.  The Lender Agent shall act in good faith to discuss any such request from the Obligors.

The Obligors shall cooperate with the Lender Agent with respect to any due diligence the Lender Agent reasonably requires with respect to such proposed Substitute Collateral and shall enter into any amendments to the existing Security Documents, and enter into any additional documentation or authorize any filings with respect to the Lender Agent's security interest in any such Substitute Collateral, as the Lender Agent shall reasonably request.

No proposed Substitute Collateral shall become Substitute Collateral without the prior written consent of the Lender Agent, as evidenced by its execution of a Collateral Addition Designation Notice, which notice may set out certain terms and conditions governing the Collateral Value of such Substitute Collateral and additional covenants, representations or eligibility requirements, which additional terms shall apply to such Substitute Collateral as if set forth hereunder unless otherwise later specified by the Lender Agent in writing.

In addition, with respect to the Obligors' request to add US Mortgage Loans, the Obligors shall deliver to the Lender Agent a data file identifying those loans requested to be included on the Mortgage Schedule and be included in the Primary Collateral at the time such Mortgage Schedule is delivered, which data file shall include loan data, with the same detail and in the same format, as the data file delivered to the Lender Agent on May 19, 2009 in connection with the Line of Credit Agreement (or such other data, detail or format as the Lender Agent and the Obligors shall mutually agree), and in any event sufficient data to identify each US Mortgage Loan thereon. If the Lender Agent approves such addition of US Mortgage Loans, the Obligors shall (i) deliver a Mortgage Schedule to the Lender Agent and a final data file, but containing only those loans included in the Mortgage Schedule and those loans to be included in the Primary Collateral  at the time such Mortgage Schedule is delivered, (ii) prepare and file a UCC-3 financing statement adding a description of the Mortgage Schedule to the financing statements outstanding at such time, which shall be in form and substance acceptable to the Lender Agent and its counsel and (iii) deliver any lien releases and related UCC-3 financing statements required to release any outstanding liens on such US Mortgage Loans, which shall be in form and substance acceptable to the Lender Agent and its counsel.  Each Obligor shall promptly mark its books and records to indicate that all US Mortgage Loans included on a Mortgage Schedule have been pledged to the Lender Agent for so long as such US Mortgage Loan constitutes Primary Collateral. The Lender Agent may, in its sole discretion, require updated data files of the US Mortgage Loans included in the Collateral or the Primary Collateral at any time.

(y)    ResCap Liquidity Balance Rollforward.  The Obligors will provide to the Lender Agent, on a daily basis, the ResCap Liquidity Balance Rollforward, prepared in a manner consistent with the methods used by the management of the Guarantors prior to the Amendment Closing Date.

Confidential

(z)      <u>Instructions Under Underlying Documents</u>. ResCap shall, at the specific written direction of the Lender Agent, give (or refrain from giving) any instructions permitted to be given under the Underlying Documents.

Section 7.02.  <u>Negative Covenants of the Obligors</u>.  Each Obligor covenants and agrees with the Lender Parties that, until all Loans and other Obligations have been paid in full in cash and the Commitments have terminated or expired, it shall not, and shall not permit any Subsidiary to:

(a)      other than in accordance with <u>Section 7.02(k)</u>, take any action that would directly or indirectly materially impair or adversely affect its title to, or the value of, the Collateral or Supporting Assets in a manner that could reasonably be expected to give rise to a Material Adverse Effect; <u>provided</u> that (i) actions in accordance with the Credit and Collection Policies, (ii) modifications implemented in a good faith attempt to increase the recovery on, or collectibility of, delinquent or distressed Collateral or Supporting Assets, or (iii) Collateral Dispositions or Permitted Actions otherwise permitted hereunder shall not constitute a violation of this <u>Section 7.02(a)</u>;

(b)      engage in any line of business activity other than the businesses in substantially the same fields of enterprise are conducted on the date hereof; <u>provided</u>, <u>however</u>, if an entity is substantially dormant, then such entity may engage in any line of business activity other than the businesses in substantially the same fields of enterprise as are conducted on the date hereof by any Obligor or Subsidiary of an Obligor;

(c)      amend, modify or waive any term or condition of any Facility Document, or consent to any amendment, modification or waiver of any term or condition of any Facility Document, without the prior written consent of the requisite Lenders (as specified in <u>Section 13.01</u>);

(d)      change its name, organizational identification number, organizational structure or its state of incorporation, organization or formation unless it shall have given the Lender Agent at least thirty (30) days' prior written notice thereof and unless, prior to any such change, it shall have filed, or caused to be filed, such financing statements or amendments and taken such further action as any Lender or the Lender Agent determines may be reasonably necessary to continue the perfection and priority of the Lender Agent's interest (on behalf of the Lender Parties) in the Collateral, provided however that this <u>Section 7.02(d)</u> shall only apply to Obligors and issuers of notes, securities or other interests included in the Schedules to the Security Agreement;

(e)      ResCap shall not, and shall not permit the ResCap Counterparty to, (i) reduce the notional amount of any Hedge Transaction, (ii) terminate in whole or in part any Hedge Transaction, or (iii) otherwise modify any Hedge Transaction without the prior written consent of the Initial Lender unless (A) following the closing date for such Hedge Transaction, there has been a reduction in the aggregate outstanding

Confidential

balance of the exposure intended to be hedged by such Hedge Transaction in an amount at least equal to the Minimum Notional Reduction, and (B) such modification to the Hedge Transaction effects a reduction in the notional amount of the applicable Hedge Transaction which is approximately proportionate to the aggregate reduction in the exposure intended to be hedged by such Hedge Transactions since the closing date of such Hedge Transaction;

(f) at any time (i) create, issue, incur (by conversion, exchange or otherwise), assume, guarantee or otherwise become liable in respect of any Indebtedness (including Acquired Indebtedness) other than Permitted Indebtedness, or (ii) permit any Restricted Entity to create, issue, incur (by conversion or otherwise), assume, guarantee or otherwise become liable in respect of Indebtedness (other than Excluded Debt and Permitted Indebtedness described in clause (c) or (h) of the definition of Permitted Indebtedness);

(g) (1) directly or indirectly, make any Restricted Payment unless, at the time of and after giving effect to the proposed Restricted Payment either (i) (A) no Default shall have occurred and be continuing or will occur as a consequence thereof and (B) after giving effect to such Restricted Payment on a pro forma basis, the aggregate amount expended or declared for all Restricted Payments made on or after the Closing Date (excluding Restricted Payments described in clauses (b), (c), (d), (e), (f) and (g) of the definition of Permitted Restricted Payments), shall not exceed the Restricted Payment Maximum Amount or (ii) such Restricted Payment is a Permitted Restricted Payment; or (2) without the written consent of the Lender Agent, permit any Restricted Entity to (i) make any dividend or distribution of the RE Assets, except for Ordinary RE Transactions, without the written consent of the Lender Agent, (ii) repurchase any outstanding equity interest issued by a Restricted Entity or (iii) other than as contemplated by Section 7.02(f), Article XI or the Security Documents, act as guarantor or surety with respect to any Indebtedness incurred by the Obligors or any of their Subsidiaries or Affiliates;

(h) at any time create or suffer to exist any Lien (other than any Permitted Liens) on any of its assets or property (whether now owned or hereafter acquired) which are Collateral or Supporting Assets; or permit any Restricted Entity to at any time create or suffer to exist any Lien on any of its assets or property (whether now owned or hereafter acquired) which are Supporting Assets or RE Assets, other than Permitted Liens; provided that, in the case of a ResCap Subsidiary other than a BCG Joint Venture, such Permitted Liens shall be in favor of GMAC or described in clause (b) through (f), (i), (j), (k), (l), (m) or (o) of the definition of Permitted Lien;

(i) if, on any Business Day, the aggregate amount of Consolidated Liquidity shall be less than $750,000,000, ResCap shall within two (2) Business Days (if such Business Day is a Remittance Date) or (in all other cases) one (1) Business Day, cause the aggregate amount of Consolidated Liquidity to be not less than $750,000,000; provided that, at no time shall ResCap permit the aggregate amount of Consolidated Liquidity to be less than $450,000,000; provided further that, at no time shall ResCap permit the aggregate amount of unrestricted and unencumbered (x) cash

Confidential

(consisting solely of United States dollars held at all times in the United States by ResCap on a consolidated basis, and (y) Cash Equivalents held by ResCap on a consolidated basis (consisting solely of (A) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, and (B) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of <u>clause (y)(A)</u>) to be less than $250,000,000;

(j)     permit, as of the last Business Day of each fiscal month of ResCap, the Consolidated Tangible Net Worth of ResCap to be less than $250,000,000;

(k)     consummate a Collateral Disposition unless (i) it (or the applicable Subsidiary, as the case may be) receives consideration in the form of Permitted Consideration, and (ii) at the time of the Collateral Disposition, the Permitted Consideration received in such Collateral Disposition by it or such Subsidiary is at least substantially equivalent to the Fair Value of the Primary Collateral or Supporting Assets issued or sold or otherwise disposed of; <u>provided</u> that this <u>clause (k)</u> will not apply to MHF Assets;

(l)     except for Affiliate Transactions engaged by or with any Excluded Subsidiary, directly or indirectly, engage in any Affiliate Transaction which is not a Permitted Affiliate Transaction unless (i) such Affiliate Transaction is on terms that are not materially less favorable to it or the relevant Subsidiary than those that could reasonably have been obtained in a comparable arm's length transaction by it or such Subsidiary with an unaffiliated party (<u>provided</u> that any transactions between Obligors shall be in compliance with the corporate governance policies of each such Obligor), (ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $250,000,000, it delivers to the Lender Agent a resolution adopted in good faith by the majority of its Board of Directors approving such Affiliate Transaction and set forth in an officers' certificate certifying that such Affiliate Transaction complies with <u>clause (i)</u> above, and (iii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $500,000,000, it obtains and delivers to the Lender Agent a written opinion of a nationally recognized independent third-party investment banking, accounting or appraisal firm acceptable to the Lender Agent stating that the transaction is fair to it or such Subsidiary, as the case may be, from a financial point of view;

(m)     amend or otherwise modify its organizational documents if the result would have a material adverse effect on the Lender Parties (including on the rights or remedies of the Lender Parties);

(n)     amend or otherwise modify the 2010 Indenture or the 2015 Indenture if the result of such amendment or modification could reasonably be expected to result in a Material Adverse Effect or materially adversely effect the Lender Parties or their rights, priority and/or remedies under the Facility Documents;

Confidential

(o)      enter into any agreement (other than a Facility Document) prohibiting, restricting or otherwise limiting (i) the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired (other than limits arising from the 2010 Indenture or the 2015 Indenture or agreements governing Permitted Funding Indebtedness and Permitted Refinancing Indebtedness restricting Liens on any collateral covered by Permitted Liens arising under such agreements), (ii) the ability of any Obligor to amend or otherwise modify any Facility Document, or (iii) the ability of any Obligor or other Significant Subsidiary to make any payments, directly or indirectly, to the Borrowers or any Guarantor, including by way of dividends, distributions, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments (including, without limitation, entering into any agreement by any Obligor or other Significant Subsidiary that requires distributions otherwise payable to the Borrowers to be escrowed or to be subject to a sinking fund or other similar restriction or to be paid to another Person);

(p)      permit ResCap, the Borrowers, any other Obligor, any Restricted Entity or any Significant Subsidiary of ResCap to merge or consolidate with any other corporation or other entity or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, or permit any Subsidiary of such foregoing entities to do so, unless (i) such entity is not a Restricted Entity; (ii) such entity is the survivor or such entity's successor is a person organized and existing under the laws of the United States or a state thereof and expressly assumes all of such entity's obligations under this Agreement and the other Facility Documents; (iii) immediately after giving effect to such consolidation, merger, sale or conveyance, no Default shall have occurred and be continuing; and (iv) each Obligor confirms that each of its obligations with respect to the Facility Documents shall remain in full force and effect;

(q)      permit ResCap to directly own any assets other than (i) Equity Interests of the other Obligors, (ii) assets in respect of hedging arrangements, (iii) so long as no Event of Default has occurred and is continuing, cash and cash equivalents and other immaterial assets in the ordinary course of business consistent with past practice, (iv) assets which are subject to a Lien as Collateral under the Security Documents and (v) the Exempted Cash Reserve Account;

(r)      without the written consent of the Lender Agent, agree to amend, modify or waive any provision of the organizational documents of any Restricted Entity (i) relating to the independent directors, the filing of insolvency proceedings or (ii) relating to any other matters unless, in the case of this clause (ii), such modification could not be reasonably expected to be materially adverse to the interests of the Lenders or the Lender Agent;

(s)      without the prior written consent of the Lender Agent, terminate the administrator under the English Security Documents or the Dutch Security Agreements or take any other action under the English Security Documents or the Dutch Security Agreements which could reasonably be expected to adversely affect the Lender or the

Confidential

Lender Agent or the value of the related English Note or the Dutch Note, _provided_, however, that this Section shall not apply to automatic termination of the administrator under the applicable agreements;

(t)      except for Permitted Actions, agree to amend, modify or waive any provision of any Underlying Document  without the written consent of the Lender Agent which consent shall not be unreasonably withheld; and

(u)      except for Permitted Actions, agree to terminate any Underlying Document without the written consent of the Lender Agent.

Section 7.03.  _Notice of Certain Occurrences_.  Each Obligor covenants and agrees with the Lender Parties that, until all Loans and other Obligations have been paid in full in cash and the Commitments have terminated or expired:

(a)      _Defaults_.  As soon as possible, but in any event within one Business Day, after any Obligor obtains knowledge of any Default, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent a written statement of a Responsible Officer of the Borrowers setting forth details of such Default and the action that it proposes to take with respect thereto;

(b)      _Litigation_.  As soon as possible, but in any event within ten (10) Business Days, after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice of any material action, suit or proceeding instituted by or against it or any of its Subsidiaries in any federal or state court or before any commission, regulatory body or Governmental Authority, and of any material adverse development in any such action, suit or proceeding which either (i) arises with respect to any Indebtedness of ResCap or its Subsidiaries, or arises under any servicing contract pursuant to which a Guarantor services assets for a third party owner of such assets (including an Agency or special purpose vehicle and other securitization vehicle) and is instituted by such owner, or a trustee or administrator on such owner's behalf, or an insurer or guarantor with respect to amounts owed to or by such owner; provided that with respect to servicing contracts related to whole loan mortgage sales to an entity other than an Agency, a special purpose vehicle or any other securitization vehicle, such notice shall only be required if the applicable material adverse development could reasonably be expected to give rise to a Material Adverse Effect, or (ii) in all cases, is reasonably likely to result in a Material Adverse Effect;

(c)      _Material Adverse Effect_.  Within one Business Day of it becoming aware of any event or circumstance that could reasonably be expected to have a Material Adverse Effect, it shall furnish or caused to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent written notice of such event or circumstance;

Confidential

(d)     Change of Control.  It shall furnish or caused to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice of any Change of Control upon the occurrence of such event;

(e)     Event of Default.  Within three Business Days after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent the First Priority Collateral Agent and the Collateral Control Agent notice of any default or event of default under any organizational or constitutive document of any Obligor;

(f)     Adverse Judgment.  Within three Business Days after the entry of a judgment or decree against any Obligor in an amount in excess of $25,000,000, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice thereof;

(g)     Accounting Policies.  It shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent within three Business Days notice of any material change in accounting policies or financial reporting practices of the Obligor, except for those changes that are in conformity with new or revised GAAP;

(h)     Rating.  Within three Business Days after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent the First Priority Collateral Agent and the Collateral Control Agent notice of any decrease in the servicer rating of any Servicer by any Agency;

(i)     Agency Termination.  Upon the receipt by any Obligor of any notice received from Freddie Mac, Fannie Mae or Ginnie Mae terminating, or indicating any intent to terminate, or indicating any adverse fact or circumstance which could reasonably be expected to entitle Freddie Mac, Fannie Mae or Ginnie Mae to terminate, such Obligor for cause from any servicing arrangement with such agency, it shall furnish or cause to be furnished to the Lender Agent unless it shall have provided GMAC notice thereof pursuant to a Related Document;

(j)     Agency Suspension.  Upon the receipt by any Obligor of any notice received from any Freddie Mac, Fannie Mae, Ginnie Mae, HUD, the FHA or the VA revoking or suspending, or indicating any intent to revoke or suspend, or indicating any adverse fact or circumstance which could reasonably be expected to entitle such agency to revoke or suspend any of the approvals granted to such Obligor that are referenced in Section 6.01(n) hereof, it shall furnish or cause to be furnished to the Lender Agent unless it shall have provided GMAC notice thereof pursuant to a Related Document;

(k)     Insurance Coverage.  Within three Business Days after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice of any material change in the insurance coverage maintained by such Obligor or any other

Confidential

person to comply with the requirements of this Agreement, with a copy of evidence of the same.

(l)     ERISA.  As soon as reasonably possible, and in any event within thirty (30) days after a Responsible Officer of any Obligor knows, or with respect to any Pension Plan or Multiemployer Plan to which any Obligor or any of their respective Subsidiaries makes direct contributions, has reason to believe, that any of the events or conditions specified below with respect to any such Pension Plan or Multiemployer Plan has occurred or exists, such Obligor will deliver to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent a statement signed by a senior financial officer of the relevant Obligor setting forth details respecting such event or condition and the action, if any, that such Obligor or one of its Subsidiaries proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by the Obligor or such Subsidiary with respect to such event or condition):

(A)     any reportable event, as defined in Section 4043(b) of ERISA, with respect to a Pension Plan, as to which the PBGC has not by regulation or otherwise waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event (provided that a failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code or Section 302 of ERISA, such that Section 430(k) of the Internal Revenue Code would apply, shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(c) of the Internal Revenue Code) and any request for a waiver under Section 412(c) of the Internal Revenue Code for any Pension Plan;

(B)     the distribution under Section 4041(c) of ERISA of a notice of intent to terminate any Pension Plan or any action taken by any Obligor or one of their respective Subsidiaries to terminate any Pension Plan;

(C)     the institution by the PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, or the receipt by any Obligor or one of their respective Subsidiaries of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan;

(D)     the complete or partial withdrawal from a Multiemployer Plan by any Obligor or any of their respective subsidiaries that results in liability to such Obligor or Subsidiary under Section 4201 or 4204 of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by any Obligor from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA;

Confidential

(E)      the institution of a proceeding by a fiduciary of any Multiemployer Plan against any Obligor or one of their subsidiaries to enforce Section 515 of ERISA, which proceeding is not dismissed within thirty (30) calendar days;

(F)      the failure of any Pension Plan to meet the requirements of Section 436 of the Internal Revenue Code, resulting in a loss of tax-exempt status of the trust of which such Pension Plan is a part under Section 401(a)(29) of the Internal Revenue Code; and

(G)      any written notice from the PBGC to any Obligor that it intends to place a Lien on the assets of any Obligor, whether or not in connection with a Pension Plan.

(m)      <u>Collateral Impairment</u>. Promptly after ResCap Treasury obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent notice of any fact, circumstance or development could reasonably be expected to result in a material reduction in the market value of any material portion of the Primary Collateral or the ability of the Obligors or the Lender Agent to realize the market value in respect of any material portion of the Primary Collateral.

(n)      <u>Underlying Documents</u>.  Promptly after ResCap Treasury obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent notice of any default by any Person in the performance of such Person's obligations in the Underlying Documents that could reasonably be expected to give rise to a Material Adverse Effect.

(o)      <u>Indebtedness Restricted Entity</u>. Promptly upon ResCap Treasury's obtaining notice thereof, it shall furnish or cause to be furnished to the Lender Agent notice of any failure of a BCG Joint Venture or any other Restricted Entity to pay any principal or interest when due (whether by acceleration or otherwise, but subject to applicable grace periods) on any Indebtedness of such Person (other than Ordinary RE Transactions) in excess of $5,000,000.

(p)      <u>Servicing Arrangements</u>. Upon ResCap Treasury obtaining knowledge of any notice terminating, or indicating any intent to terminate, or indicating any adverse fact or circumstance which could reasonably be expected to result in the termination of any Obligor for cause from any mortgage loan servicing arrangement with an Agency, a securitization trustee or (if termination could reasonably be expected to give rise to a Material Adverse Effect) any other Person, it shall furnish or cause to be furnished to the Lender Agent written notice thereof unless an Obligor shall have notified GMAC thereof in writing under the Related Documents.

(q)      <u>Other</u>.  Promptly, from time to time, it will furnish to the Lender Agent, each Lender, the First Priority Collateral Agent and the Collateral Control Agent such other information, documents, records or reports with respect to the Collateral or its corporate affairs, conditions or operations, financial or otherwise, as the Lender Agent,

Confidential

any Lender, the First Priority Collateral Agent or the Collateral Control Agent may from time to time reasonably request.

ARTICLE VIII

EVENTS OF DEFAULT

Section 8.01.  <u>Events of Default</u>.  The following events shall be "<u>Events of Default</u>":

(a)    The Borrowers shall fail to pay the principal of, or interest on, any Loan when due (whether at stated maturity, in accordance with <u>Section 2.08(b)</u>, upon acceleration or otherwise); any Obligor shall fail to make any other payment or deposit to be made by them hereunder or under any Facility Document when due and such failure shall continue for two (2) Business Days; <u>provided</u> that if (i) an Obligor shall fail to deposit a Specified Amount, and (ii) such failure results from good faith administrative error in the ordinary course of business, such failure (and any related failure to apply Collateral Disposition Proceeds to the repayment of Loans by the related Mandatory Repayment Date) will not become an Event of Default if such Net Cash Proceeds are deposited by the earlier of (x) the thirteenth Business Day of the calendar month following the month in which such Collateral Disposition occurred and (y) two (2) Business Days after actual knowledge of such failure and (with respect to Collateral Disposition Proceeds) are applied to the repayment of Loans on the next Business Day;

(b)    Any representation or warranty made or deemed to be made by an Obligor or its Subsidiary (or any of such Person's officers) under or in connection with this Agreement or any other Facility Document, or any written information, certificate, or report delivered pursuant hereto or to any Facility Document shall prove to have been false or misleading in any material respect when made or repeated or deemed to have been made, furnished or repeated after the earlier of (i) such Obligor having actual knowledge thereof and (ii) written notice of such default from any Lender or the Lender Agent;

(c)    Any Obligor or its Subsidiary (i) shall fail to comply with the requirements of any of <u>Section 7.01(e)</u>, <u>7.01(k)</u>, <u>7.02(a)</u>, <u>7.02(h)</u> through <u>(l)</u>, <u>7.02(p)</u>, <u>7.03(a)</u>, <u>7.03(c)</u>, <u>7.03(i)</u> or <u>7.03(j)</u> hereof or (ii) shall fail to perform or observe any term, covenant or agreement contained in this Agreement or any other Facility Document (other than with respect to the making of any payment or other breach under this Article VIII or as set forth in <u>clause (i)</u> of this <u>Section 8.01(c)</u>) on its part to be performed or observed and any such failure shall remain unremedied for ten (10) Business Days after the earlier of (x) any Obligor having actual knowledge thereof and (y) written notice of such default from the Lender Agent or any Lender to the Borrowers;

(d)    An Event of Bankruptcy shall have occurred with respect to any Obligor or Restricted Entity;

Confidential

(e)    With respect to any Indebtedness arising under (i) a Bilateral Facility or any other Indebtedness (excluding Non-Recourse Debt) of ResCap or any of its Subsidiaries in excess of $25,000,000, individually or in the aggregate, or (ii) a Related Document, such Indebtedness (x) is not paid when due or within any applicable cure period set forth in any agreement or instrument relating to such indebtedness, (y) is declared due and payable before its normal or agreed maturity by reason of default (however described) or (z) is the subject of any other "event of default" or other breach or failure to perform, in either case which remains after the expiration of any applicable grace period under such agreement;

(f)    The failure by any Obligor to pay one or more final judgments for the payment of money aggregating in excess of $25,000,000 rendered against such Person which are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 30 days after the expiration of such stay;

(g)    This Agreement, any Note, any Facility Document or any Security Document (other than the Intercreditor Agreement) shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor or Restricted Entity party thereto, or the Lien granted under the Security Documents ceases to be in full force and effect or, in each case, any Obligor, Restricted Entity or other Person shall contest in any manner such effectiveness, validity, binding nature or enforceability;

(h)    The Collateral Control Agent or the First Priority Collateral Agent (for the benefit of the Lender Parties) does not, or ceases to, have a perfected first priority security interest in the Collateral or any material part thereof (other than with respect to Permitted Liens) other than as a result of a release of such security interest by the First Priority Collateral Agent in accordance with the Facility Documents, and such default continues unremedied for a period of one (1) Business Day after the earlier of (i) either Borrower having actual knowledge thereof and (ii) written notice of such default from the Lender Agent, the First Priority Collateral Agent or any Lender to the Borrowers;

(i)    A Change of Control shall occur with respect to any Obligor, without the prior written consent of each Lender, which consent shall not be unreasonably withheld;

(j)    An event of default, early amortization event, termination event or other similar event occurs under (i) Security Document, (ii) a Related Document, (iii) Hedge Document, or (iv) Underlying Document (provided that, in the case of an Underlying Document, such event could reasonably be expected to have a Material Adverse Effect), and the Lender Agent specifies such failure as an Event of Default in writing;

(k)    (i) Any Person shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Pension Plan; (ii) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Pension Plan, that has not been waived, shall exist with

Confidential

respect to any Pension Plan; (iii) any Lien in favor of the PBGC or a Pension Plan shall arise on the assets of any Obligor; (iv) a reportable event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Pension Plan, which reportable event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender Agent, likely to result in the termination of such Pension Plan for purposes of Title IV of ERISA; (v) any Pension Plan shall terminate for purposes of Title IV of ERISA in a distress termination as defined in Section 4041 of ERISA; (vi) any Obligor shall, or in the reasonable opinion of the Lender Agent is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization of, a Multiemployer Plan; (vii) if the assets of any Obligor are treated as "plan assets" within the meaning of 29 C.F.R. 2510.3-101 as modified by Section 3(42) of ERISA; (viii) any other event or condition shall occur or exist with respect to a Pension Plan or Multiemployer Plan; and in each case in <u>clauses (i)</u> through <u>(vii)</u> above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect or a material adverse effect on the Collateral, or any of the Lenders' rights therein; or (ix) if the PBCG demands payment from any Obligor or any of its Subsidiaries for payment of unfunded liabilities under any pension or employee benefit plan (whether or not established by ResCap or its Subsidiaries) as to which any Obligor or any of its Subsidiaries has liability or (x) the PBGC gives any Obligor written notice of its intent to impose any Lien in favor of the PBGC on the assets of any Obligor or any of its Subsidiaries.

(l)     Any of the following shall occur:  (i) the Intercreditor Agreement or any provision thereof shall cease to be in full force and effect, or (ii) any Lien securing or purporting to secure Second Priority Claims (as defined in the Intercreditor Agreement) or Third Priority Claims (as defined in the Intercreditor Agreement) or any other obligations of any Obligor to any party (other than a "First Priority Secured Party" as defined in the Intercreditor Agreement) subject to the Intercreditor Agreement shall, for any reason, cease to be subordinated to the Lien securing or purporting to secure the First Priority Claims (as defined in the Intercreditor Agreement) in accordance with the terms of the Intercreditor Agreement; or

(m)     The Lender Agent shall notify the Borrowers that an Event of Default has occurred as a result of failure by the Obligors to satisfy any of the Post-Closing Requirements in all material respects.

Section 8.02.  <u>Remedies</u>.

(a)     <u>Optional Acceleration</u>.  Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 8.01(d)</u>), the Lender Agent may (and shall if directed by the Required Lenders) by written notice to the Borrowers, terminate the Facility, terminate the Commitments, and declare all Loans and all other Obligations to be immediately due and payable.

Confidential

(b)    <u>Automatic Acceleration</u>.  Upon the occurrence of an Event of Default described in <u>Section 8.01(d)</u>, the Commitments shall automatically terminate and the Loans and all other Obligations shall be immediately due and payable, without demand or notice of any kind.

(c)    <u>Remedies</u>.  Upon any acceleration of the Loans pursuant to this <u>Section 8.02</u>, the Lender Parties, in addition to all other rights and remedies under this Agreement or otherwise, shall have all other rights and remedies provided under the UCC of each applicable jurisdiction and other applicable laws, which rights shall be cumulative.  Each of the Obligors agrees, upon the occurrence of an Event of Default and notice from the Lender Agent, to assemble, at their expense, all of the Collateral that is in their possession (whether by return, repossession, or otherwise) at a place designated by the Lender Agent.  All costs incurred by the Lender Parties in the collection of all Obligations, and the enforcement of their rights hereunder, including attorneys' fees and legal expenses, shall constitute Obligations and be paid out of the Collateral.  Without limiting the foregoing, upon the occurrence of an Event of Default and the acceleration of the Loans pursuant to this <u>Section 8.02</u>, the Lender Agent, the Collateral Control Agent, the First Priority Collateral Agent and any Lender may, to the fullest extent permitted by applicable law, without notice, advertisement, hearing or process of law of any kind, (i) enter upon any premises where any of the Collateral which is in the possession of any Obligor (whether by return, repossession, or otherwise) may be located and take possession of and remove such Collateral, (ii) sell any or all of such Collateral, free of all rights and claims of the Obligors therein and thereto, at any public or private sale, and (iii) bid for and purchase any or all of such Collateral at any such sale.  Any such sale shall be conducted in a commercially reasonable manner and in accordance with applicable law.  Each of the Obligors hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings or process of law in connection with the exercise by the Lender Parties of any of their rights and remedies upon the occurrence of an Event of Default.  Each of the Lender Parties and the Obligors shall have the right (but not the obligation) to bid for and purchase any or all Collateral at any public or private sale.  Each of the Obligors hereby agrees that in any sale of any of the Collateral, the Lender Parties are hereby authorized to comply with any limitation or restriction in connection with such sale as they may be advised by counsel is necessary in order to avoid any violation of applicable law (including, without limitation, compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any Governmental Authority, and each of the Obligors further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner.  The Lender Parties shall not be liable for any sale, private or public, conducted in accordance with this <u>Section 8.02(c)</u>.  If an Event of Default occurs, and upon acceleration of the Loans hereunder, the Loans and all other Obligations shall be immediately due and payable, and collections on the Collateral and proceeds of sales and securitizations of Collateral will be used to pay the Obligations.  At any time after an Event of Default has occurred and is continuing, the Lender Agent may (and shall at the direction of any Lender) appoint, at its own expense, one or more third parties to service all or a portion of the Collateral by giving written notice thereof to the Obligors; <u>provided</u> that any such appointment shall not conflict with any existing contractual servicing arrangements with respect to the Collateral.  Each Obligor agrees that it will cooperate

Confidential

with and assist any such third-party servicer (including providing access to, and transferring, all records and allowing the new servicer to use (to the extent legally permissible) all licenses, hardware or software necessary or desirable to service the Collateral).

<div align="center">ARTICLE IX</div>

<div align="center">ASSIGNMENT, PARTICIPATION</div>

Section 9.01.  Assignments.  (a)  No Obligor may assign its rights, interests, liabilities or obligations hereunder or under the other Facility Documents without the prior written consent of each Lender.

(b)      Any Lender may at any time assign and delegate to one or more commercial banks or financial institutions or other Eligible Assignees (an "Assignee") all or any fraction of such Lender's rights under this Agreement (including all or a portion of its outstanding Loans and Commitment); provided that the Lender Agent shall have consented to such assignment in writing and, if such Assignee is not an Affiliate of such Lender and no Event of Default exists, the Borrowers shall have consented to such assignment in writing, which consent of the Borrowers shall not be unreasonably withheld, delayed or conditioned.

(c)      Upon acceptance thereof by the Lender Agent, from and after the effective date specified in each Assignment and Acceptance, (i) the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, subject to Section 13.11, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement that by their terms survive the termination of this Agreement).  If the consent of the Borrowers to an assignment is required hereunder, each Borrower shall be deemed to have given its consent ten (10) days after the date notice thereof has been delivered by the assigning Lender unless such consent is expressly refused by a Borrower prior to such tenth day.

(d)      The Lender Agent shall record each assignment made in accordance with this Section in the Register pursuant to Section 2.02(b) and periodically give the Borrowers notice of such assignments.  The Register shall be available for inspection by the Borrowers and any Lender, as to its Commitment and outstanding Loans only, at any reasonable time and from time to time upon reasonable prior notice.

(e)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Confidential

(f)    Any attempted assignment and delegation not made in accordance with this Section 9.01 shall be null and void.

Section 9.02.  <u>Evidence of Assignment</u>.  Within five (5) Business Days after effectiveness of any assignment, the Borrowers shall execute and deliver to the Lender Agent (a) for delivery to the Assignee, a new Note or, if the Assignee was already a holder of a Note immediately prior to such effectiveness, a replacement Note in the appropriate principal amount based on such Assignee's Commitments after giving effect to such assignment; and (b) if the assigning Lender still holds any Commitment, for delivery to the assigning Lender, a replacement Note in the appropriate principal amount based on such Assignee's Commitments after giving effect to such assignment.  Each such Note shall be dated the effective date of such assignment.

Section 9.03.  <u>Rights of Assignee, Evidence of Assignment</u>.  From and after the date on which the conditions described in <u>Section 9.01(b)</u> have been met, the assigning Lender shall be released from its obligations hereunder to the extent of the rights and obligations hereunder that have been assigned.  Upon the assignment by the Lender of all of its rights and obligations hereunder, under the Note and under the other Facility Documents to an assignee in accordance with <u>Section 9.01</u>, such assignee shall have all such rights and obligations of the Lender as set forth in such assignment or delegation, as applicable, and all references to the Lender in this Agreement or any Facility Document shall be deemed to apply to such assignee to the extent of such interest.

Section 9.04.  <u>Participations</u>.  (a)  Any Lender may at any time sell to one or more commercial banks or other Persons participating interests in any Loan owing to such Lender, any Note held by any Lender, the obligations to make Loans of such Lender or any other interest of such Lender hereunder (any Person purchasing any such participating interest being herein called a "<u>Participant</u>") <u>provided</u> that so long as no Default exists any such participation (other than a participation to General Motors Corporation, Cerberus Capital Management, L.P., or any of their Affiliates) shall be subject to the consent of each Borrower (such consent not to be unreasonably withheld, delayed or conditioned).  In the event of a sale by any Lender of a participating interest to a Participant, (a) such Lender shall remain the holder of its Note for all purposes of this Agreement, (b) the Obligors shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and (c) all amounts payable by the Obligors shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  No Participant shall have any direct voting rights hereunder.  The Obligors agree that if amounts outstanding under this Agreement and the Notes are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement and any Note to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement or such Note; <u>provided</u> that if any Lender or any Participant shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or offset or otherwise) on account of principal of or interest on any Loan in excess of its <u>pro rata</u> share of payments (after giving effect to all participations hereunder) and other recoveries obtained by such Lender and the Participants on account of principal of and interest on the Loans then held by them, such Lender or the applicable Participant (as the case may be) shall purchase from the other party or parties such participations in the Loans held by them as shall be necessary to cause such purchasing Person to share the excess payment or other recovery

Confidential

ratably with each of them; provided that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Person, the purchase shall be rescinded and the purchase price restored to the extent of such recovery. Each Obligor also agrees that each Participant shall be entitled to the benefits of Sections 2.07(b), 2.07(c) and 3.02 as if it were a Lender and had acquired its interest by assignment (provided that such Participant shall have complied with the requirements of said Section as though it were a Lender that acquired its interest by assignment).

(b)    In the event that a Lender sells participations in any Loan, Note or the obligation to make Loans or any interest of such Lender, such Lender shall maintain a register on which it enters the name of all participants in the Loan or Note held by it and the principal amount (and interest thereon) of the portion of the Loan or Note which is the subject of the participation (the "Participant Register"). A Loan or Note may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Loan or Note may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrowers at any reasonable time and from time to time upon reasonable prior notice.

ARTICLE X

INDEMNIFICATION

Section 10.01.  Indemnities by the Borrowers.  Without limiting any other rights which any such Person may have hereunder or under applicable law, and in consideration of the execution and delivery of this Agreement and the Facility evidenced by the Facility Documents, the Borrowers hereby agree to jointly and severally indemnify the Lenders, the Lender Agent, the First Priority Collateral Agent, the Collateral Control Agent and their respective Affiliates, successors, permitted transferees and assigns and all officers, directors, shareholders, controlling persons, employees and agents of any of the foregoing (each an "Indemnified Party"), forthwith on demand, from and against any and all damages, losses, claims, liabilities, obligations penalties, causes of action, demands, judgments, suits and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by any of them arising out of or as a result of (a) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of any Loan; (b) the entering into and performance of any Facility Document by any of the Indemnified Parties; (c) the Facility Documents, the Loans and the extension of the Commitments, the failure of any Obligor or Restricted Entity to comply with the terms of the Facility Documents or Requirements of Law, the inaccuracy of any representation or warranty of any Obligor or Restricted Entity set forth in the Facility Documents or in a certificate, instrument or document delivered in connection therewith, and the use by any Obligor of the proceeds of any Loans; (d) any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof of all or any portion of the capital stock or assets of any Person, whether or not an Indemnified Party is party thereto; and (e) any transaction contemplated under the Facility Documents; excluding, however, (i) Indemnified Amounts to the extent a court of competent jurisdiction in a final non-appealable judgment determines that they resulted from gross negligence, bad faith or willful misconduct on the part

Confidential

of such Indemnified Party; (ii) any lost profits (other than in connection with Breakage Costs) or indirect, exemplary, punitive or consequential damages of any Indemnified Party; and (iii) any and all present or future taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto, which shall be governed by the terms of Section 3.02.  Without limiting the foregoing, in any suit, proceeding or action brought by any Indemnified Party in connection with any Collateral for any sum owing thereunder, or to enforce any provisions of any Collateral, the Borrowers will save, indemnify and hold the applicable Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by either Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Borrowers.  The Borrowers also agree to reimburse the Indemnified Parties as and when billed by such party for all out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with the enforcement or the preservation of such party's rights under or in connection with this Agreement, the Notes, any other Facility Document, any Security Document, any Collateral or any transaction contemplated hereby or thereby, including without limitation the fees and disbursements of its counsel.  The Borrowers hereby acknowledge that, notwithstanding the fact that the Notes are secured by the Collateral, the obligation of the Borrowers under the Notes are recourse obligations of the Borrowers.  Under no circumstances shall any Indemnified Party be liable to the Borrowers for any lost profits (other than in connection with Breakage Costs) or indirect, exemplary, punitive or consequential damages.

Section 10.02.  General Provisions.  If for any reason the indemnification provided above in Section 10.01 (and subject to the limitations on indemnification contained therein) is unavailable to an Indemnified Party or is insufficient to hold an Indemnified Party harmless on the basis of public policy, then the Borrowers shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect not only the relative benefits received by such Indemnified Party on the one hand and the Borrowers on the other hand but also the relative fault of such Indemnified Party as well as any other relevant equitable considerations.

The provisions of this Article X shall survive the termination or assignment of this Agreement, the payment of the Obligations and the resignation or removal of any of the Indemnified Parties.

ARTICLE XI

GUARANTEE

Section 11.01.  Unconditional Guarantee.  To induce the Lenders to enter into this Agreement, each of the Guarantors jointly and severally, absolutely, unconditionally and irrevocably guarantees to the Lender Parties and their successors and permitted assigns (a) the prompt and complete payment and performance when due (whether at stated maturity, or otherwise by required prepayment, declaration, acceleration, demand or otherwise), of the Obligations now or hereafter owing; and (b) all renewals, rearrangements, increases, extensions

Confidential

for any period, substitutions, modification, amendments or supplements in whole or in part of any of the Facility Documents or obligations (in each case including all such amounts which would become due but for the operation of the automatic stay under Section 362(a) of the United States Bankruptcy Code, 11 U.S.C. §362(a), and the operation of Sections 502(b) and 506(b) of the United States Bankruptcy Code, 11 U.S.C. §502(b) and §506(b)).

Section 11.02. <u>Nature of Guarantee</u>. Each Guarantor's obligations hereunder (a) are continuing, absolute, unconditional and irrevocable; (b) shall remain in full force and effect until all Obligations are paid in full in cash and the Commitments have terminated or expired (unless this Guarantee is reinstated pursuant to the terms of this <u>Article XI</u>); and (c) shall not be affected by (i) the existence, validity, enforceability, perfection or extent of any collateral therefor, the validity, regularity or enforceability of the Facility Documents, (ii) the absence of any action to enforce any Obligor's or other Person's obligations under any of the Facility Documents or to otherwise assert any claim or enforce any right of any Lender Party under the Facility Documents or in or to the Collateral, (iii) any waiver or consent by any Obligor with respect to any provisions of this Agreement or any other Facility Document, (iv) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other extension, increase, compromise or renewal of any Obligation, (v) any reduction, limitation, impairment or termination of any Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and each Guarantor hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Obligations, (vi) any amendment to, extension, variance, alteration, rescission, waiver, increase, or other modification of, or any consent to departure from, any of the terms of this Agreement or any other Facility Document including, without limitation, any increase or reduction to the rate of interest on all or any of the Obligations, (vii) any addition, exchange, release, surrender or non-perfection of any Collateral, or any amendment to or waiver or release or addition of, or consent to departure from, any other guaranty or any other security document, held by a Lender Party, (viii) the insolvency of any other Obligor, or (ix) any other circumstance relating to the Obligations that might otherwise constitute a legal or equitable discharge of or defense to this Guarantee. Each of the Guaranties under this <u>Article XI</u> is a guarantee of payment and not a guarantee of collection, and each Guarantor jointly and severally agrees that any Lender Party may resort to such Guarantor for payment of any of the Obligations owed to it whether or not such Lender Party shall have resorted to any collateral therefor or shall have proceeded against any Person principally or secondarily liable for any of the Obligations, including any Obligor, and whether or not such Lender Party has pursued any other remedy available to it. No Lender Party shall be obligated to file any claim relating to the Obligations in the event that any Obligor becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the applicable Lender Party to so file shall not affect any obligation of a Guarantor hereunder. In the event that any payment to the Lender Parties in respect of any Obligations owed to them is rescinded or must otherwise be returned for any reason whatsoever, the Guarantors shall remain jointly and severally liable hereunder with respect to such Obligations as if such payment had not been made and the Guarantee shall be reinstated, if applicable. At any time and from time to time, upon the written request of any Lender Party, and at the sole expense of the Guarantors, the Guarantors will furnish such information regarding the financial well-being of the Guarantors as may be reasonably requested by such Lender Party.

Confidential

Section 11.03.  <u>Certain Agreements; Waivers of Certain Notices</u>.  Each Guarantor authorizes each Lender Party, without notice or demand and without affecting its liability hereunder, from time to time, to forbear, indulge or take other action or inaction in respect of this Guarantee or the Obligations, or to exercise or not exercise any right or remedy hereunder or otherwise with respect to the Obligations.  Each Guarantor waives (a) promptness, diligence, presentment, notice of acceptance and any other notice with respect to any of the Obligations and this <u>Article XI</u> and any requirement that any Lender Party protect, secure, perfect or insure any security interest or Lien, or any property subject thereto, or exhaust any right or take any action against the Borrower, any Guarantor or any other Person (including any other guarantor) or any collateral securing the Obligations; (b) all rights that it may have now or in the future under any statute, or at common law, or in law or equity, or otherwise, to the extent allowed under Requirements of Law, to compel any Lender Party to marshal assets or to proceed in respect of Obligations guaranteed hereunder or under any Facility Document against any Borrower or any other Guarantor, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Guarantor; and (c) each and every right to which it may be entitled by virtue of the suretyship under Requirements of Law.  It is agreed among each Guarantor and the Lender Parties that the foregoing waivers and the other waivers contained in this Agreement are of the essence of the transaction contemplated by this Agreement (including <u>Article XI</u>) and the Facility Documents and that, but for the provisions of this <u>Section 11.03</u> and such waivers, the Lender Parties would decline to enter into this Agreement.

Section 11.04.  <u>Waiver of Subrogation</u>.  Until two years and one day after the Obligations are repaid in full in cash and the Commitments have expired or terminated, each Guarantor hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor.  If any amounts are paid to the Guarantors in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Lender Parties and shall forthwith be paid to the Lender Agent for the account of the Lender Parties to reduce the amount of outstanding Obligations, whether matured or unmatured.  Subject to the foregoing, upon payment of any of the Obligations, the Guarantors shall be subrogated to the rights of the Lender Parties against other Obligors with respect to such Obligations.

Section 11.05.  <u>Taxes</u>.  All payments by the Guarantors hereunder will be subject to <u>Section 3.02</u>.

Section 11.06.  <u>Payments</u>.  Each Guarantor hereby jointly and severally guarantees that the Obligations will be paid to each Lender Party without set-off or counterclaim, in lawful currency of the United States of America at the offices of each Lender Party specified by each Lender Party for such payment.  The obligations of the Guarantors hereunder shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency except to the extent to which such tender or recovery shall result in the effective receipt by each applicable Lender Party of the full amount of the currency or currencies owing under this Guarantee, and the Guarantors shall jointly and severally indemnify each applicable Lender Party (as an alternative or additional cause of action) for the amount (if any) by which such effective receipt shall fall short of the full amount of currency or currencies

Confidential

owing under this Guarantee and such obligation to indemnify shall not be affected by judgment being obtained for any other sums due hereunder.

Section 11.07.  <u>Severability of Article XI</u>.  Wherever possible, each provision of this <u>Article XI</u> will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this <u>Article XI</u> is prohibited by or invalid under such law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this <u>Article XI</u>.  Consistent with the foregoing, and notwithstanding any other provision of this <u>Article XI</u> to the contrary, in the event that any action or proceeding is brought in whatever form and in whatever forum seeking to invalidate any Guarantor's obligations under this <u>Article XI</u> under any fraudulent conveyance, fraudulent transfer theory, or similar avoidance theory, whether under state or federal law, such Guarantor (the "<u>Affected Guarantor</u>"), automatically and without any further action being required of such Affected Guarantor or any Lender Party, shall be liable under this <u>Article XI</u> only for an amount equal to the maximum amount of liability that could have been incurred under applicable law by such Affected Guarantor under any guaranty of the Obligations (or any portion thereof) at the time of the execution and delivery of this <u>Article XI</u> (or, if such date is determined not to be the appropriate date for determining the enforceability of such Affected Guarantor's obligations hereunder for fraudulent conveyance or transfer (or similar avoidance) purposes, on the date determined to be so appropriate) without rendering such a hypothetical guaranty voidable under applicable law relating to fraudulent conveyance, fraudulent transfer, or any other grounds for avoidance (such highest amount determined hereunder being any such Affected Guarantor's "<u>Maximum Guaranty Amount</u>"), and not for any greater amount, as if the stated amount of this <u>Article XI</u> as to such Affected Guarantor had instead been the Maximum Guaranty Amount.  This <u>Section 11.07</u> is intended solely to preserve the rights of the Lender Parties under this <u>Article XI</u> to the maximum extent not subject to avoidance under applicable law, and neither any Affected Guarantor nor any other person or entity shall have any right or claim under this <u>Section 11.07</u> with respect to the limitation described in this <u>Article XI</u>, except to the extent necessary so that the obligations of any Affected Guarantor under this <u>Article XI</u> shall not be rendered voidable under applicable law.  Without limiting the generality of the foregoing, the determination of a Maximum Guaranty Amount for any Affected Guarantor pursuant to the provisions of the second preceding sentence of this <u>Section 11.07</u> shall not in any manner reduce or otherwise affect the obligations of any other Guarantor (including any other Affected Guarantor) under the provisions of this <u>Article XI</u>.

Section 11.08.  <u>Acceleration of Guarantee</u>.  Each Guarantor agrees that, in the event of the dissolution or insolvency of any Obligor, or the inability or failure of any Obligor to pay debts as they become due, or an assignment by any Obligor for the benefit of creditors, or the commencement of any case or proceeding in respect of any Obligor under any bankruptcy, insolvency or similar laws, and if such event shall occur at a time when any of the Obligations of any Obligor may not then be due and payable, such Guarantor will pay to the Lender Agent for the account of the Lender Parties forthwith the full amount which would be payable hereunder by such Guarantor if all such Obligations were then due and payable.

Section 11.09.  <u>Election of Remedies</u>.  Except as otherwise provided in this Agreement, if any Lender Party proceeds to realize its benefits under any Facility Documents giving any Lender or the First Priority Collateral Agent a Lien upon any Collateral, either by judicial

                                                                   *Senior Debt Loan Agreement*

Confidential

foreclosure or by non-judicial sale or enforcement, such Lender Party may, at its option acting in its sole discretion, determine which remedies or rights it may pursue without affecting any of its rights and remedies under this Article XI.  If, in the exercise of any of its rights and remedies, any Lender Party shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Obligor or any other Person, whether because of any Requirements of Law pertaining to "election of remedies" or the like, each Guarantor hereby consents to such action and waives any claim based upon such action, even if such action by the applicable Lender or First Priority Collateral Agent shall result in a full or partial loss of any rights of subrogation that such Guarantor might otherwise have had but for such action by such Lender Party.  Any election of remedies that results in the denial or impairment of the right of any Lender Party to seek a deficiency judgment against any other Obligor shall not impair any Guarantor's obligation to pay the full amount of the Obligations under this Article XI.

Section 11.10.  Benefit to Guarantor.  Each Guarantor represents and agrees that (a) its business is integrally related to the business of the Borrowers and that it is in the best interests of the Guarantor to execute this Agreement and the Security Documents to which it is a party inasmuch as such Guarantor will derive substantial direct and indirect benefits from the Loans made from time to time to the Borrowers; (b) such Guarantor is willing to guarantee the Obligations; and (c) such Guarantor agrees that the Lender Parties are relying on this representation in agreeing to make Loans to the Borrower.

<div align="center">ARTICLE XII

LENDER AGENT</div>

Section 12.01.  Appointment and Authorization.  Each Lender hereby irrevocably (subject to Section 12.09) appoints and designates GMAC Inc. as the Lender Agent under and for purposes of the Facility Documents and hereby authorizes the Lender Agent to take such action on its behalf under the provisions of this Agreement and each other Facility Document and to exercise such powers and perform such duties as are expressly delegated to or required of it by the terms of this Agreement or any other Facility Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Facility Document, the Lender Agent shall not have any duty or responsibility except those expressly set forth herein, nor shall the Lender Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Facility Document or otherwise exist against the Lender Agent.

Section 12.02.  Delegation of Duties.  The Lender Agent may execute any of its duties under this Agreement or any other Facility Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Lender Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects with reasonable care.

Section 12.03.  Liability of Lender Agent.  None of the Lender Agent nor any of its directors, officers, employees or agents shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Facility Document

Confidential

or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by the Obligors or any Subsidiary or Affiliate of the Obligors, or any officer thereof, contained in this Agreement or in any other Facility Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Lender Agent under or in connection with, this Agreement or any other Facility Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Facility Document, or for any failure of the Obligors or any other party to any Facility Document to perform its obligations hereunder or thereunder.  The Lender Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Facility Document, or to inspect the properties, books or records of the Obligors or any of the Obligors' Subsidiaries or Affiliates.

Section 12.04.  <u>Reliance by Lender Agent</u>.  The Lender Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, email, telex or telephone message, statement or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Obligors), independent accountants and other experts selected by the Lender Agent.  The Lender Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Facility Document unless it shall first receive such advice or concurrence of each Lender as it deems appropriate and, if it so requests, confirmation from the Lenders of their obligation to indemnify the Lender Agent against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Lender Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Facility Document in accordance with a request or consent of the Required Lenders or, to the extent expressly required by <u>Section 13.01</u> or any other provision of the Facility Documents, all Lenders.

Section 12.05.  <u>Notice of Default</u>.  The Lender Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Borrowing Base Deficiency, unless the Lender Agent shall have received written notice from a Lender or the Borrowers referring to this Agreement, describing such Default and stating that such notice is a "notice of default" or describing such Borrowing Base Deficiency.  The Lender Agent will notify the Lenders of its receipt of any such notice.  The Lender Agent shall take such action with respect to such Default as may be requested by the Required Lenders in accordance with <u>Section 8.02</u>; <u>provided</u> that, unless and until the Lender Agent has received any such request, the Lender Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable or in the best interest of the Lenders (except to the extent that this Agreement expressly requires that such action be taken, or not taken, only with the consent of the Required Lenders or all Lenders).

Section 12.06.  <u>Credit Decision</u>.  Each Lender acknowledges that the Lender Agent has not made any representation or warranty to it, and that no act by the Lender Agent hereafter taken, including any review of the affairs of the Obligors and their Subsidiaries, shall be deemed to constitute any representation or warranty by the Lender Agent to any Lender.  Each Lender

Confidential

represents to the Lender Agent that it has, independently and without reliance upon the Lender Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors, and made its own decision to enter into this Agreement and to extend credit to the Borrowers hereunder.  Each Lender also represents that it will, independently and without reliance upon the Lender Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Facility Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors.  Except for notices, reports and other documents expressly herein required to be furnished to the Lenders by the Lender Agent, the Lender Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial or other condition or creditworthiness of the Borrowers that may come into the possession of the Lender Agent.

Section 12.07.  <u>Indemnification</u>.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Lender Agent and its directors, officers, employees and agents (to the extent not reimbursed by or on behalf of the Obligors and without limiting the obligation of the Obligors to do so), <u>pro rata</u> based on their Pro Rata Shares, from and against any and all Indemnified Amounts; <u>provided</u> that, no Lender shall be liable for any payment to any such Person of any portion of the Indemnified Amounts resulting from such Person's gross negligence or willful misconduct.  Without limitation of the foregoing, each Lender shall reimburse the Lender Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorney costs) incurred by the Lender Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Facility Document, or any document contemplated by or referred to herein, to the extent that the Lender Agent is not reimbursed for such expenses by or on behalf of the Obligors.  The undertaking in this Section shall survive repayment of the Loans, termination of the Commitments, cancellation of the Notes, any foreclosure under, or modification, release or discharge of, any or all of the Collateral Documents, termination of this Agreement and the resignation or replacement of the Lender Agent.

Section 12.08.  <u>Lender Agent in Individual Capacity</u>.  The Lender Agent and its Affiliates may make loans to, acquire equity interests in and generally engage in any kind of business with the Obligors and their respective Subsidiaries and Affiliates as though the Lender Agent were not the Lender Agent hereunder and without notice to or consent of the Lenders.  Each of the Lenders acknowledges that, pursuant to such activities, the Lender Agent or its Affiliates may receive information regarding the Obligors or their respective Affiliates (including information that may be subject to confidentiality obligations in favor of the Obligors or their Affiliates) and acknowledges that the Lender Agent shall be under no obligation to provide such information to them.  With respect to their Loans (if any), the Lender Agent and its Affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though the Lender Agent were not the Lender Agent, and the terms "Lender" and "Lenders"

Confidential

include the Lender Agent and its Affiliates, to the extent applicable, in their individual capacities.

Section 12.09.  Successor Lender Agent.  The Lender Agent may resign as Lender Agent upon 30 days' notice to the Lenders.  If the Lender Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of the Lender Agent, the Lender Agent may appoint, after consulting with (but without the consent of) the Lenders, a successor agent which shall be a Lender or a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, and having a combined capital and surplus of at least $250,000,000.  Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Lender Agent and the term "Lender Agent" shall mean such successor agent, and the retiring Lender Agent's appointment, powers and duties as Lender Agent shall be terminated.  After any retiring Lender Agent's resignation hereunder as Lender Agent, the provisions of this Article XII and Article X shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Lender Agent under this Agreement.  If no successor agent has accepted appointment as Lender Agent by the date that is 30 days following a retiring Lender Agent's notice of resignation, the retiring Lender Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Lender Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

Section 12.10.  [Reserved].

Section 12.11.  Security Matters; Release of Collateral.  (a)  Each Lender and other Lender Party (by their acceptance of the benefits of any Collateral) acknowledges and agrees that the Lender Agent, the Collateral Control Agent and/or the First Priority Collateral Agent have entered into the Security Documents (including, without limitation, the Intercreditor Agreement) on behalf of the Lender Parties, and the Lender Parties hereby agree to be bound by the terms of such Security Documents, acknowledge receipt of copies of such Security Documents and consent to the rights, powers, remedies, indemnities and exculpations given to the Lender Agent, the First Priority Collateral Agent and/or the Collateral Control Agent thereunder.  All rights, powers and remedies available to the Lender Agent, the First Priority Collateral Agent, the Collateral Control Agent and the Lender Parties with respect to the Collateral, or otherwise pursuant to the Security Documents, shall be subject to the provisions of such Security Documents.  In the event of any conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of such Security Documents, the terms and provisions of such Security Documents shall govern and control except that this Agreement shall govern and control the rights, powers, duties, immunities and indemnities of the Lender Agent.  Each Lender and other Lender Party (by their acceptance of the benefits of any Collateral) hereby authorizes the Lender Agent, the Collateral Control Agent and/or the First Priority Collateral Agent to release (or authorize the release of) any collateral that is permitted to be sold or released pursuant to the terms of the Facility Documents.  Each Lender hereby authorizes the First Priority Collateral Agent and the Collateral Control Agent to execute and deliver to the Borrowers, at the Borrowers' joint and several cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrowers

Confidential

in connection with any sale or other disposition of property to the extent such sale or other disposition is permitted by the terms of this Agreement or is otherwise authorized by the terms of the Facility Documents. Each release of Collateral shall be substantially in the form of Exhibit 9.02 hereto.

(b)    No Collateral shall be released from the security interest created by the Security Agreement without the prior written consent of the Lender Agent unless:

(i)    If Financing Assets are sold or financed in the ordinary course of an Obligor's business pursuant to a Bilateral Facility, the Lien on such Asset shall be released automatically concurrently with sale or financing;

(ii)    If Financing Assets with a Carrying Value of less than $100,000,000 are sold or financed in the ordinary course of an Obligor's business, the Lien on such Asset shall be released automatically concurrently with sale or financing; or

(iii)    If an Agency Asset is sold in the ordinary course of an Obligor's trading activities to a Person that is not an Affiliate of an Obligor, such Agency Asset shall be automatically released concurrently with such sale.

Any such release shall not become effective unless an Obligor shall have directed the First Priority Collateral Agent to release the applicable Collateral by delivering a Collateral Release Certificate to the First Priority Collateral Agent. In connection with any release effectuated pursuant to this Section 12.11 hereof, the First Priority Collateral Agent shall be entitled to conclusively rely, and shall be fully protected in relying, upon any such Collateral Release Certificate, and shall incur no liability to any Person in connection with acting in reliance thereon.

(c)    This amendment and restatement of the Original Loan Agreement shall not effectuate a novation or extinguishment of the Liens securing obligations outstanding under the Original Agreement, and the obligations under this Agreement shall be secured by the Liens securing the obligations under the Original Agreement.

ARTICLE XIII

MISCELLANEOUS

Section 13.01.  Amendments, Etc.  The provisions of each Facility Document may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrowers and the Required Lenders; provided that no such amendment, modification or waiver shall:

(a)    modify Section 3.01(f), Section 3.01(g) (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

(b)    increase the aggregate amount of any Loans required to be made by a Lender pursuant to its Commitments, extend the Commitment Termination Date or extend the Loan Repayment Date, in each case without the consent of each Lender (it

Confidential

being agreed, however, that any vote to rescind any acceleration made pursuant to Section 8.02 of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders);

(c)       reduce the principal amount of or reduce the rate of interest on any Lender's Loans, reduce any fees described in Section 2.06 payable to any Lender or extend the date on which principal, interest or fees are payable in respect of such Lender's Loans, in each case without the consent of such Lender (provided that, the vote of Required Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under Section 3.01(b));

(d)       reduce the percentage set forth in the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders;

(e)       except as otherwise expressly permitted under a Facility Document, release (i) either Borrower from its Obligations under the Facility Documents or any Guarantor from its obligations under a Guarantee or (ii) all or substantially all of the Collateral under the Facility Documents, in each case without the consent of all Lenders; or

(f)       affect adversely the interests, rights, protections or obligations of the Lender Agent (in its capacity as the Lender Agent), the First Priority Collateral Agent (in its capacity as the First Priority Collateral Agent) or the Collateral Control Agent (in its capacity as the Collateral Control Agent) unless consented to by the Lender Agent, the First Priority Collateral Agent or the Collateral Control Agent, respectively.

Section 13.02.  Notices, Etc.  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including facsimile communication and electronic mail) and shall be personally delivered or sent by certified mail or overnight air courier, postage prepaid, or by facsimile, to the intended party at the address or facsimile number of such party set forth opposite its name on Schedule 13.02 or at such other address or facsimile number as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall be effective, (i) if personally delivered, when received, (ii) if sent by overnight air courier, the next Business Day after delivery to the related air courier service, if delivery is guaranteed as of the next Business Day, (iii) if sent by certified mail, three Business Days after having been deposited in the mail, postage prepaid, and (iv) if transmitted by facsimile, when sent, receipt confirmed by telephone or electronic means, if sent during business hours (if sent after business hours, then on the next Business Day) except that notices and communications pursuant to Article I shall not be effective until received.

Section 13.03.  No Waiver; Remedies.  No failure on the part of any Lender Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Lender Party under any Facility Document shall, except as may be otherwise stated in

Confidential

such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 13.04.  <u>Binding Effect; Assignability</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, <u>provided, however</u>, that nothing in the foregoing shall be deemed to authorize any assignment not permitted in <u>Section 9.01</u>.

Section 13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).  EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.

EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 13.06.  <u>Entire Agreement</u>.  This Agreement amends and restates in its entirety the Original Loan Agreement. As so amended, this Agreement and the Facility Documents embody the entire agreement and understanding of the parties hereto and supersede any and all prior agreements, arrangements and understanding of such parties, verbal or written, relating to the matters provided for herein. This amendment and restatement of the Original Loan Agreement shall not effectuate a novation or extinguishment of the obligations outstanding under the

Confidential

Original Loan Agreement, but rather are an amendment and restatement of certain terms governing such obligations. As of the Amendment Closing Date, each reference in any Facility Document to the "Loan Agreement" shall mean this Agreement, as it may hereinafter be amended, restated or otherwise modified.

Section 13.07.  Acknowledgment.  Each Obligor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and deliver of this Agreement, the Notes and the other Facility Documents to which it is a party;

(b)    no Lender Party has a fiduciary relationship to it, and the relationship between it and each Lender is solely that of debtor and creditor; and

(c)    no joint venture exists among or between it and any Lender Party.

Section 13.08.  Captions and Cross References.  The various captions (including, without limitation, the table of contents) in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.  References in this Agreement to any underscored Section or Exhibit are to such Section or Exhibit of this Agreement, as the case may be.

Section 13.09.  Execution in Counterpart; Effectiveness.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any Note) and all of which when taken together shall constitute one and the same agreement.  This Agreement shall become effective (i) with respect to all parties (other than the Affected Subsidiaries) when counterparts hereof executed on behalf of the parties hereto (other than the Affected Subsidiaries) shall have been received by the Lender Agent, and (ii) with respect to an Affected Subsidiary, when a counterpart hereof and an Authorization Notice, each executed by such Affected Subsidiary, shall have been received by the Lender Agent.  The parties hereto agree that delivery of a counterpart of a signature page to this Agreement and each other Facility Document (except for any Note) by facsimile or electronic transmission shall be effective as delivery of an original executed counterpart of this Agreement or such other Facility Document.

Section 13.10.  Confidentiality.  Each party hereto agrees that it will hold any confidential information received from the other party pursuant to this Agreement or any other Facility Document, it being understood that this Agreement is confidential information of the Lender, in strict confidence, as long as such information remains confidential, except for disclosure to (a) its Affiliates; (b) its legal counsel, accountants, and other professional advisors or to a permitted assignee or participant; (c) regulatory officials or Governmental Authorities; (d) any Person as requested pursuant to or as required by law, regulation, or legal process; (e) any Person in connection with any legal proceeding to it is a party; (f) rating agencies if requested or required by such agencies in connection with a rating; (g) the Lender Agent; (h) any pledgee referred to in Section 9.01(e) or any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes, Loans or Commitments or

Confidential

any interest therein by such Lender, <u>provided</u> that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section; and (i) any Person as permitted pursuant to the terms of this Agreement and the other Facility Documents; <u>provided</u>, <u>however</u>, that no Lender Party shall be liable for any disclosure of confidential information to the extent that such Lender Party followed its customary procedures and practices with respect to confidential information.  This <u>Section 13.10</u> shall survive termination of this Agreement.  Notwithstanding anything to the contrary in this Agreement, the tax treatment and the tax structure of the transactions contemplated under this Agreement shall not be treated as confidential information.

Section 13.11.  <u>Survival</u>.  The obligations of the Obligors under <u>Sections 3.02</u> and <u>13.10</u> and <u>Article X</u> hereof, and the obligations of the Lenders under <u>Section 12.07</u>, shall survive the repayment in full in cash of the Obligations and the termination of this Agreement.  In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Lenders shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lenders may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

Section 13.12.  <u>Joint and Several Liability of Borrowers</u>.  (a)  Each Borrower has determined that it is in its best interest and in pursuance of its legitimate business purposes to induce the Lenders to make Loans to the Borrowers pursuant to this Agreement.  Each Borrower acknowledges and represents that its business is integrally related to the business of the other Borrower, that the availability of the Commitments benefits each Borrower individually and that the Loans made will be for and inure to the benefit of each of the Borrowers individually and as a group.  Accordingly, each Borrower shall be jointly and severally liable (as a principal and not as a surety, guarantor or other accommodation party) for each and every representation, warranty, covenant and obligation (including payment, indemnification and reimbursement obligations) to be performed by the Borrowers under this Agreement, the Notes and the other Facility Documents, and each Borrower acknowledges that in extending the credit provided herein the Lenders are relying upon the fact that the obligations of each Borrower hereunder are the joint and several obligations of a principal.  The invalidity, unenforceability or illegality of this Agreement, the Notes or any other Facility Document as to one Borrower or the release by the Lender Parties of a Borrower hereunder or thereunder shall not affect the Obligations of the other Borrower under this Agreement, the Notes or the other Facility Documents, all of which shall otherwise remain valid and legally binding obligations of the other Borrower.  Any Borrower that makes a payment or distribution hereunder will be entitled to a contribution from the other Borrower in a <u>pro rata</u> amount, based on the adjusted net assets of each Borrower determined in accordance with GAAP (<u>provided</u> that such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder until one year and one day after the Obligations have been repaid in full in cash and the Commitments have terminated or expired).  The provisions of this <u>Section 13.12</u> shall in no respect limit the obligations and liabilities of each Borrower to the Lender Parties, and each Borrower shall remain liable to the Lender Parties for the full amount of the Obligations.

Confidential

(b)    Notwithstanding any provision herein contained to the contrary, each Borrower's obligations under this Section 13.12 (which obligations are in any event in addition to all liabilities in respect of Loans advanced to such Borrower) shall be limited to an amount not to exceed as of any date of determination the greater of: (i) the net amount of all Loans advanced to or for the account of the other Borrower under this Agreement and then re-loaned or otherwise transferred to such Borrower; and (ii) the amount that could be claimed by any Lender Party from such Borrower under this Section 13.12 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from the other Borrower.

(c)    Each Borrower assumes responsibility for keeping itself informed of the financial condition of each other Borrower, and each Borrower agrees that the Lender Parties shall not have any duty to advise such Borrower of information known to the Lender Parties regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine.  If the Lender Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Borrower, such Lender Party shall be under no obligation to update any such information or to provide any such information to such Borrower on any subsequent occasion.

(d)    If (i) one or both Borrowers are entitled to a return of excess interest or other amounts or payments delivered under the Facility Documents, or the return of surplus funds or monies from bank accounts maintained in accordance with the requirements of the Facility Documents or the return of any other Collateral or any other proceeds of Collateral (a "Returned Amount"), and (ii) the Lender Parties are uncertain as to which Borrower is entitled to the Returned Amount, in the absence of a promptly delivered joint notice from the Borrowers regarding the return of such Returned Amount, the Lender Parties may either return the Returned Amount to the Borrower they in good faith believe to be entitled to the same (and the Lender Parties shall not be liable for so doing; provided that the Lender Parties acted in good faith) or, at the joint and several expense of the Borrowers, interplead such Returned Amount or take such other actions or exercise such rights or remedies as permitted by Requirements of Law.

(e)    Each Borrower agrees that any notices and information to be provided to any Borrower or both Borrowers by any Lender Party under the Facility Documents may be sent to both Borrowers or either Borrower, regardless of whether or not a receiving Borrower is actually the relevant Borrower or the appropriate person or persons to whom such notice or information should be addressed or delivered (and each Borrower hereby agrees that no Lender Party will be liable to the Borrowers for the failure to deliver such notice or information to the appropriate recipient).  Each Borrower hereby waives all confidentiality rights with respect to the delivery of all such notices and information and agrees that no Lender Party shall be liable for delivering a notice or information to a Borrower that is not the relevant Borrower or the appropriate recipient of such notice or information.  Each Borrower acknowledges and agrees that it has received full and sufficient consideration for this provision and that this provision is a material inducement for the Lender Agent and each Lender entering into the loan documents.

Confidential

Section 13.13.  <u>Obligors Bound by Intercreditor Agreement</u>.  Each Obligor agrees that ResCap and the Borrowers are entering into the Intercreditor Agreement on behalf of all the Obligors, and further agrees to be bound by the terms and provisions of the Intercreditor Agreement (including any amendments, supplements, restatements or other modifications thereto) is if it were a signatory thereto.

Section 13.14.  <u>Third-Party Beneficiaries</u>.  Each of the First Priority Collateral Agent and the Collateral Control Agent is an express third-party beneficiary hereof.

Section 13.15.  <u>First Priority Collateral Agent; Capacity under this Agreement and Protections Afforded</u>.  Wells Fargo Bank, N.A. is party to this Agreement solely in its capacity as First Priority Collateral Agent under the Security Agreement and solely for purposes of <u>Section 12.11(b)</u> herein.  The First Priority Collateral Agent shall be fully protected under this Agreement with respect to any action or inaction hereunder by the indemnities, costs, expenses and other protective provisions set forth for its benefit under the Security Agreement.

Confidential

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

RESIDENTIAL FUNDING COMPANY, LLC
as Borrower
GMAC MORTGAGE, LLC
as Borrower
RESIDENTIAL CAPITAL, LLC
as Guarantor
GMAC RESIDENTIAL HOLDING COMPANY,
LLC, as Guarantor
GMAC-RFC HOLDING COMPANY, LLC
as Guarantor
HOMECOMINGS FINANCIAL, LLC
as Guarantor
RESIDENTIAL MORTGAGE REAL ESTATE
HOLDINGS, LLC, as Obligor
RESIDENTIAL FUNDING REAL ESTATE
HOLDINGS, LLC, as Obligor
HOMECOMINGS FINANCIAL REAL ESTATE
HOLDINGS, LLC, as Obligor
DEVELOPERS OF HIDDEN SPRINGS, LLC
as Obligor
DOA HOLDING PROPERTIES, LLC
as Obligor
RFC ASSET HOLDINGS II, LLC
as Obligor
PASSIVE ASSET TRANSACTIONS, LLC
as Obligor
GMAC MODEL HOME FINANCE I, LLC
as Obligor
EQUITY INVESTMENT IV, LLC
as Obligor
AMERILAND, LLC
as Obligor
  By: REG-PFH, LLC, its sole member
REG-PFH, LLC
as Obligor
HOME CONNECTS LENDING SERVICES, LLC
as Obligor
GMACR MORTGAGE PRODUCTS, LLC
as Obligor
DITECH, LLC
as Obligor
RESIDENTIAL CONSUMER SERVICES, LLC
as Obligor

S-1

*Senior Debt Loan Agreement*

Confidential

GMAC MORTGAGE USA CORPORATION
as Obligor
RESIDENTIAL FUNDING MORTGAGE
SECURITIES I, INC.
as Obligor
RFC ASSET MANAGEMENT, LLC
as Obligor
RFC SFJV-2002, LLC
as Obligor
  By: RFC ASSET MANAGEMENT, LLC
  its sole member
RCSFJV2004, LLC
as Obligor
  By: RFC ASSET MANAGEMENT, LLC
  its sole member

By: _____

  Name:  Michelle Switzer
  Title:  Assistant Treasurer

Confidential

RFC CONSTRUCTION FUNDING, LLC
as Obligor
RC PROPERTIES I, LLC
as Obligor
RC PROPERTIES II, LLC
as Obligor
RC PROPERTIES III, LLC
as Obligor
RC PROPERTIES IV, LLC
as Obligor
RC PROPERTIES V, LLC
as Obligor
RC PROPERTIES VI, LLC
as Obligor
RC PROPERTIES VII, LLC
as Obligor
RC PROPERTIES VIII, LLC
as Obligor
RC PROPERTIES IX, LLC
as Obligor
RC PROPERTIES X, LLC
as Obligor
RC PROPERTIES XI, LLC
as Obligor
RC PROPERTIES XII, LLC
as Obligor
RC PROPERTIES XIII, LLC
as Obligor
RC PROPERTIES XIV, LLC
as Obligor
RC PROPERTIES XV, LLC
as Obligor
RC PROPERTIES XVI, LLC
as Obligor
RC PROPERTIES XVII, LLC
as Obligor
RC PROPERTIES XVIII, LLC
as Obligor
RC PROPERTIES XIX, LLC
as Obligor
RC PROPERTIES XX, LLC
as Obligor
DOA PROPERTIES I, LLC
as Obligor

Confidential

DOA PROPERTIES II, LLC
as Obligor
DOA PROPERTIES III (MODELS), LLC
as Obligor
DOA PROPERTIES IV, LLC
as Obligor
DOA PROPERTIES V (LOTS-CA), LLC
as Obligor
DOA PROPERTIES VI, LLC
as Obligor
DOA PROPERTIES VII (LOTS-NV), LLC
as Obligor
DOA PROPERTIES VIII, LLC
as Obligor
DOA PROPERTIES IX (LOTS-OTHER), LLC
as Obligor

By: _____

Name:   Michelle Switzer
Title:   Authorized Person

Confidential

GMAC INC.,
as Lender Agent and as Initial Lender

By:_____

   Name:

   Title:     **Jeff Brown**
                  **Corporate Treasurer**

Confidential

For purposes of Sections 12.11(b):

WELLS FARGO BANK, N.A., solely in its
capacity as First Priority Collateral Agent under the
Security Agreement

By:_____

    Name:
    Title:          **Michael Pinzon**
                    **Vice President**

12/29/2009   3:14PM (GMT-07:00)

Confidential

<div align="right">SCHEDULE 1.01</div>

<div align="center">DEFINITIONS</div>

1.1.    <u>Definitions</u>.  As used in this Agreement the following terms have the meanings as indicated:

"<u>2010 Notes</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>2010 Indenture</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>2015 Notes</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>2015 Indenture</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>Account Control Agreements</u>" means securities account control agreements and deposit account control agreements  in form and substance satisfactory to the Lender Agent in its sole discretion covering the Concentration Accounts, the Collection Accounts and the Sales Proceeds Accounts.

"<u>Account Exceptions</u>" means:  (a) ResCap shall be entitled to hold in the Exempt Cash Reserve Account, free of any Liens or control rights in favor of either the First Priority Collateral Agent or the Collateral Control Agent, up to $250,000,000 and investment earnings on such amount; and (b) the Obligors may make such other exceptions to <u>Sections 4.01</u> and <u>4.03</u> as the Lender Agent shall agree in writing.

"<u>Acquired Indebtedness</u>" means Indebtedness of a Person existing at the time such Person becomes a Subsidiary or assumed in connection with the acquisition of assets from such Person.

"<u>Adjusted Borrowing Base</u>" means, as of any date of determination, the <u>sum</u> of:

(a)    the aggregate Collateral Value of all Primary Collateral determined in accordance with <u>Section 2.04</u> as of the Cut-Off Date which is the subject of the then most recently delivered Collateral Value Report, <u>plus</u>

(b)    the aggregate Collateral Value determined in accordance with Section 2.04 and Schedule 2.04 of Eligible Assets that were designated as Primary Collateral or Supporting Assets of Primary Collateral in accordance with the Loan Agreement since the applicable Cut-Off Date, <u>plus</u>

(c)    the aggregate amount of funds on deposit in the Sales Proceeds Accounts as of such date, <u>minus</u>

(d)    the Hedge Support Requirement in effect as of such date, <u>minus</u>

5254280.33 08048307

Confidential

(e)      the aggregate Collateral Value of all Primary Collateral or Supporting Assets that have been subject to a Collateral Disposition since the applicable Cut-Off Date, <u>minus</u>

(f)      with respect to each category of Primary Collateral set forth on Schedule 2.04, the aggregate amount of Collections (other than Net Cash Proceeds) received since the applicable Cut-Off Date with respect to such Primary Collateral multiplied by the applicable advance rate represented by the percentage for such category of Primary Collateral set forth on Schedule 2.04, <u>minus</u>

(g)      any Reserves applicable on such date.

An Adjusted Borrowing Base shall be prepared promptly, and in any event within four (4) Business Days, following request by the Lender Agent, <u>provided</u> that such request may not be furnished during the first 11 Business Days of any month; <u>provided further</u>, that any Adjusted Borrowing Base calculation may be based upon the actual knowledge of the ResCap Treasury Group available at the time of calculation, and any resulting inaccuracy in the Adjusted Borrowing Base (or a related Borrowing Base Deficiency) shall not result in a breach of this Agreement, if such calculation was prepared in good faith, and in accordance with ResCap's general accounting and business policies as in effect as of the date such information was furnished.

"<u>Advances</u>" means any advance relating to domestic Mortgage Loans or REO Property made by a Borrower: (i) to inspect, protect, preserve or repair properties that secure defaulted Mortgage Loans or that have been acquired through foreclosure or deed in lieu of foreclosure or other similar action pending disposition thereof, or for similar or related purposes, including, but not limited to, necessary legal fees and costs expended or incurred by such servicer in connection with foreclosure, bankruptcy, eviction or litigation actions, as well as costs to obtain clear title to such a property, to protect the priority of the lien created by a Mortgage Loan on such a property, and to dispose of properties taken through foreclosure or by deed in lieu thereof or other similar action, or any other out of pocket expenses incurred as servicer and in the ordinary course of business to maintain or maximize the value of a Mortgage Loan or REO Property; (ii) of delinquent interest and/or principal on the related Mortgage Loan to the extent such advance is funded out of a Borrower's own funds and not using amounts held for future distribution; or (iii) with respect to a Mortgage Loan of real estate taxes and assessments, or of hazard, flood or primary mortgage insurance premiums, required to be paid by the related payor under the terms of the related Mortgage Loan.

"<u>Affected Subsidiaries</u>" shall mean DOA Properties I, LLC, DOA Properties II, LLC, RC Properties I, LLC, RC Properties II, LLC, RC Properties III, LLC, RC Properties IV, LLC, RC Properties V, LLC, RC Properties VI, LLC, RC Properties VII, LLC, RC Properties VIII, LLC, RC Properties IX, LLC, RC Properties X, LLC, RC Properties XI, LLC, RC Properties XII, LLC, RC Properties XIII, LLC, RC Properties XIV, LLC, RC Properties XV, LLC, RC Properties XVI, LLC, RC Properties XVII, LLC, RC Properties XVIII, LLC, RC Properties XIX, LLC and RC Properties XX, LLC.

"<u>Affected Guarantor</u>" has the meaning set forth in <u>Section 11.07</u>.

Confidential

"Affiliate" means, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power (a) to vote 20% or more of the securities (on a fully diluted basis) having ordinary voting power for the directors or managing general partners (or their equivalent) of such Person, or (b) to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

"Affiliate Transaction" means, with respect to any Person any direct or indirect payment to, or sale, lease, transfer or disposal of any of its properties or assets to, or purchase of any property or assets from, or entry into or amend any transaction or series of related transactions, contract, agreement, loan, advance or guarantee with, or for the benefit of, any Affiliate of ResCap involving aggregate consideration in excess of $10,000,000.

"Agency" means Freddie Mac, Fannie Mae or Ginnie Mae.

"Agency Assets" means whole loans eligible for delivery to, or securities issued by and guaranteed by, Fannie Mae, Ginnie Mae or Freddie Mac.

"Aggregate Commitment Amount" means, at any time commencing on the opening of business on the Amendment Closing Date, the sum of (i) $1,592,640,818, minus (ii) the amount of any reductions to the Aggregate Commitment Amount pursuant to Section 2.10(c) in connection with a repayment of principal of the Loans, minus (iii) the amount of MTN Credits applied to reduce the amount of mandatory repayments of Loans pursuant to Section 4.02(a).

"Agreement" has the meaning set forth in the preamble.

"Ally Bank" means, collectively, (i) IB Finance Holding Company, LLC, (ii) Ally Bank, formerly known as GMAC Bank and (iii) any successor thereto.

"Amendment Closing Date" means December 30, 2009.

"Applicable Deposit Date" means:

(i) in the case of any Net Cash Proceeds of a Collateral Disposition or other Collections relating to an Asset (other than with respect to Net Cash Proceeds relating to Servicing Advances or U.S. residential REO Property and Net Cash Proceeds and Collections relating to the European Reporting Assets underlying the English Note and the Dutch Note), (a) the day such funds are received if such Net Cash Proceeds or Collections exceed $100,000,000 or (b) in all other cases, three Business Days after such funds are received;

(ii) in the case of any Net Cash Proceeds of a Collateral Disposition relating to Servicing Advances, (a) the day such funds are received if such Net Cash Proceeds exceed $100,000,000 or (b) in all other cases, three Business Days after such funds are received;

(iii) in the case of any Net Cash Proceeds of a Collateral Disposition or other Collections relating to any European Reporting Assets underlying the English Note and the Dutch Note:

Confidential

(a) one (1) Business Day after (x) such funds are received in relation to the European Reporting Assets underlying the English Note if such Net Cash Proceeds or other Collections exceed $100,000,000; or (y) such funds are received in relation to the European Reporting Assets underlying the Dutch Note if such Net Cash Proceeds or other Collections exceed $100,000,000;

(b) in all other cases relating to Net Cash Proceeds of a Collateral Disposition, not later than five Business Days after the earlier of (x) the next monthly Distribution Date or Redemption Date (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) with respect to Collateral Dispositions of European Reporting Assets relating to the English Note or the Note Payment Date (as defined in the Master Definitions Agreement dated June 4, 2008, as amended from time to time) with respect to Collateral Dispositions of European Reporting Assets relating to the Dutch Note or (y) the date the amount of Net Cash Proceeds on deposit in (1) the applicable accounts relating to the English SPE exceeds £5,000,000 in the aggregate or (2) the applicable accounts relating to the Dutch SPE exceeds EUR5,000,000 in the aggregate, as applicable; and

(c) in all other cases relating to Collections (excluding Net Cash Proceeds), not later than five Business Days after the next monthly Distribution Date (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) with respect to Collections (excluding Net Cash Proceeds) with respect to European Reporting Assets relating to the English Note or the Note Payment Date (as defined in the Master Definitions Agreement dated June 4, 2008, as amended from time to time) with respect to Collections (excluding Net Cash Proceeds) with respect to European Reporting Assets relating to the Dutch Note; and

(iv) in the case of any Net Cash Proceeds of a Collateral Disposition relating to a U.S. residential REO Property (1) the day such funds are received if such Net Cash Proceeds exceed $100,000,000 or (2) five Business Days after receipt of such funds, provided, however, that if the Collateral Disposition has occurred within the first nine Business Days of a month, the earlier of (x) the 14th Business  Day of such month or (y) 5 Business Days after ResCap Treasury has actual knowledge of the receipt of the related funds.

"Applicable Margin" means 2.75% (275 basis points).

"Approved Exceptions" means, with respect to an Asset, any irregularity in the documentation, underwriting or origination for such Asset, such irregularity (i) does not make the related Contracts unenforceable and is not reasonably expected to impair the practical realization of benefits intended to be created by such Contracts (determined without giving effect to any indemnification from the related Originator), (ii) with respect to Substitute Collateral, has been taken into account by the Obligors in determining the Carrying Value of such Asset in accordance with its usual and customary business practices, and (iii) with respect to Substitute Collateral, has been disclosed to the Lender Agent, it being understood and agreed that disclosure may be in the form of discussion between the Obligors and the Lender in the context of the Lender Agent's determination of whether to include such Asset in a Collateral Designation Notice and establishment of a related Specified Percentage (as defined in Schedule 2.04);

Schedule 1.01-4

Confidential

provided that the Obligors' description of such irregularity is sufficiently clear and detailed to enable the Lender to reasonably evaluate the risks with respect to such Asset.

"Approved Fund" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business; and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"Asset" means (i) a Mortgage Loan, (ii) a Financial Asset-Backed Security, (iii) a Servicing P&I Advance, a Servicing T&I Advance or a Servicing Corporate Advance, (iv) an Incremental Advance, (v) an Agency Asset, (vi) an Equity Interest in a BCG Subsidiary, an REO Owner or, subject to the written approval of the Lender Agent, any other Person, (vii) the Equity Interest in GMAC Residential Holding Company, LLC, or (viii) an "Asset" as defined in the Line of Credit Agreement.

"Assignee" has the meaning set forth in Section 9.01.

"Assignment and Acceptance" means an assignment and acceptance agreement entered into by a Lender, an Eligible Assignee and the Agent, pursuant to which such Eligible Assignee may become a party to this Agreement, in substantially the form of Exhibit 9.01.

"Authorization Notice" means a written notice from an Affected Subsidiary to the Lender Agent, (ii) confirming that such Affected Subsidiary's execution and delivery of the Facility Documents to which it is a party have been duly authorized in accordance with such Affected Subsidiary's limited liability company agreement, as the same is modified prior to the date of such notice, and (ii) providing to the Lender Agent a copy of such limited liability agreement, as so modified.

"Base Currency" means Dollars unless otherwise specified in a Confirmation.

"BCG" means the Business Capital Group division of ResCap.

"BCG Assets" means the assets of BCG and its Subsidiaries which are not Excluded Assets.

"BCG Joint Venture" means a joint venture to which a ResCap Subsidiary is a party (i) that either existed on the Closing Date or was formed with the Lender Agent's written consent in connection with a workout of BCG Assets, and (ii) that is the asset, or holds the assets, constituting a primary source of funds expected to pay the investment in, and return on, Primary Collateral or Supporting Assets.

"BCG REO Subsidiaries" means (a) DOA Holdings; DOA Holdings NoteCo, LLC; DOA Properties I, LLC; DOA Properties II, LLC; DOA Properties III (Models), LLC; DOA Properties IV, LLC; DOA Properties V, LLC (Lots-CA); DOA Properties VII, LLC (Lots-NV); DOA Properties IX (Lots-Other), LLC; (b) any special purpose vehicle which (i) has been designated by the Borrowers and either approved in writing by the Lender Agent or is established with

Confidential

organizational documents in a form approved by the Lender Agent in writing, and (ii) is a subsidiary of DOA Holdings and (c) the WestLB Program Subsidiaries.

"BCG Subsidiary" means (i) a BCG REO Subsidiary, (ii) MHFI, (iii) any Subsidiary of any of the foregoing, or (iv) any other Subsidiary that is party to, or owns a Person that is party to, a BCG Joint Venture.

"Bilateral Facility" means the facilities listed in Schedule 7.01(t), as such Schedule may be amended, supplemented or otherwise modified with the consent of the Lender Agent in its sole and absolute discretion.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning set forth in the preamble.

"Borrowing Base" means, as of any date of determination, an amount determined as of the Cut-Off Date and reported in the related Collateral Value Report to be equal to the lesser of (a) the Hedge Adjusted Available Amount and (b) the sum of (i) the aggregate Collateral Value of all Primary Collateral as of the Cut-Off Date as determined in accordance with Section 2.04, plus (ii) the amount of funds on deposit in the Sales Proceeds Accounts on such Cut-Off Date minus (iii) (for any determination after the initial determination of the Borrowing Base) any Reserves applicable on such date and minus (iv) the Hedge Support Requirement in effect on such Cut-Off Date.

"Borrowing Base Deficiency" has the meaning set forth in Section 2.08(b).

"Borrowing Base Shortfall Day" has the meaning set forth in Section 2.08(b).

"Breakage Costs" means those amounts payable by the Borrowers to the Lenders in the event of (a) the payment of any principal of any Loan bearing interest at the LIBOR Rate other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default); (b) the failure to borrow, continue or prepay any such Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked hereunder and is in fact revoked); or (c) any circumstance described in Section 2.07. In any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event, such compensation to include an amount determined by each such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the LIBOR Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for such Loan (not taking into effect any Applicable Margin applicable thereto)), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the applicable Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the LIBOR market (not taking into effect any Applicable Margin applicable thereto); provided that each Lender agrees to take commercially reasonable steps to avoid the

Confidential

need for, or reduce the amount of, such compensation, in a manner that will not, in the good faith opinion of applicable Lender, be disadvantageous to such Lender.

"Business Day" means any day other than (a) a Saturday or Sunday; or (b) a day on which banking institutions in the States of New York, Minnesota or Pennsylvania are required or authorized by law to be closed.

"Capital Lease" means, with respect to any Subsidiary, any lease of (or other agreement conveying the right to use) any real or personal property by such Subsidiary that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Subsidiary.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests, including, without limitation, limited and general partnership interests, in a person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carrying Value" means, with respect to any asset and for purposes of determining Collateral Value, the carrying value of such asset as determined by ResCap in accordance with its standard valuation practices as applied to its assets as a whole as then in effect (such valuation practices to be consistent with the methodology used in the preparation of ResCap's GAAP financial statements).

"Cash Equivalents" means (i) securities with weighted average maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (ii) certificates of deposit and eurodollar time deposits with weighted average maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000 and a rating of at least A+ and A1 from S&P and Moody's, respectively, (iii) repurchase obligations of any commercial bank satisfying the requirements of clause (ii) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (iv) securities with weighted average maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (v) securities with weighted average maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (ii) of this definition or, (vi) shares of 2-a7 money market mutual funds rated AAA by Moody's and S&P that have a weighted average maturity of 90 days or less or similar funds which invest exclusively in assets satisfying the requirements of clauses (i) through (v) of this definition.

"Change of Control" means the occurrence of any of the following events: (i) any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act), other than the Investors, the United States Department of the Treasury, the GM Trusts, or any purchaser of the beneficial interest of General Motors in the GM Trusts, shall acquire ownership, directly or

Schedule 1.01-7

Confidential

indirectly, beneficially or of record, in the aggregate, Capital Stock representing a majority of the Voting Stock of ResCap; or (ii) at any time, ResCap shall fail to own, directly or indirectly, 100% of the aggregate issued and outstanding Capital Stock of the Obligors.

"Closing Date" means June 4, 2008.

"Collateral" means all property and rights of the Obligors in which a security interest is granted under the Security Agreement.

"Collateral Addition Date" means, with respect to any Substitute Collateral, the date specified in the applicable Collateral Addition Designation Notice as the date such Substitute Collateral may constitute Primary Collateral hereunder.

"Collateral Addition Designation Notice" means a notice in writing (which may be electronic) delivered by the Lender Agent at a Borrower's request with respect to Substitute Collateral, which notice shall approve or designate a Collateral Addition Date for such Substitute Collateral as well as any applicable advance rates, additional eligibility requirements, opinion requirements, or other restrictions, terms or conditions as the Lender Agent may specify in its discretion; it being understood that this Agreement and the other Facility Documents may refer to a category of Collateral prior to the Collateral Addition Date therefor, but that such references will not be given effect until such Collateral Addition Date.

"Collateral Control Agent" means the "Collateral Control Agent" as defined in the Intercreditor Agreement.

"Collateral Disposition" means any Transfer, provided that if any such transaction constitutes part of a series of related transactions, all of the transactions in such series shall constitute a single Transfer. Collateral Disposition shall not include: (a) the write-off or forgiveness of investments in the ordinary course of business; (b) any sale of MHF Assets in the ordinary course of business; (c) the collection of regularly scheduled payments of principal and interest on an Asset, (d) the foreclosure (or deed in lieu of foreclosure) of a Mortgage Loan, construction loan, mezzanine loan, working capital loan or commercial loan, provided that (i) ownership of any resulting REO Property shall be transferred to a REO Owner or (in the case of construction loans or commercial loans which are BCG Assets) to a BCG REO Subsidiary as soon as reasonably practicable and shall become part of Primary Collateral (or Supporting Assets for Primary Collateral in the case of BCG Assets) and (ii) in the case of REO Property (other than residential REO Property obtained by exercise of remedies under individual consumer Mortgage Loans), a mortgage or deed of trust shall have been recorded or sent for recording immediately following the acquisition thereof by the resulting owner thereof for the benefit of the First Priority Collateral Agent, and such mortgage or deed of trust shall be in a form substantially consistent with the forms approved by the Lender Agent and will secure an amount of at least the Carrying Value of such REO Property.

"Collateral Release Certificate" means a certificate, in such form as the Lender Agent and the Borrowers shall agree from time to time and notified to the First Priority Collateral Agent, executed by an Obligor and delivered to the First Priority Collateral Agent pursuant to Section 12.11(b).

Confidential

"Collateral Value" means the value of the Primary Collateral (or a portion thereof) calculated in accordance with Schedule 2.04.

"Collateral Value Report" means a Collateral Value Report, substantially in the form of Exhibit 2.04(a), delivered by the Borrowers to the Lender Agent in accordance with Sections 2.04(a)-(b).

"Collection Accounts" means each segregated trust account established in the name of an Obligor and subject to the control of the Collateral Control Agent in a manner satisfactory to the Lender Agent.

"Collections" means all payments or proceeds with respect to the Collateral or Supporting Assets received by the Borrowers or the Guarantors and not required to be retained or distributed to third parties pursuant to the terms of the documents governing any applicable Permitted Funding Indebtedness.

"Commitment" means the commitment of each Lender, subject to the terms and conditions hereof, to make Loans to the Borrowers pursuant to Article II.

"Commitment Termination Date" means the earlier of (a) the Loan Repayment Date; and (b) the date on which the Commitments are terminated in full or the Aggregate Commitment Amount is reduced to zero pursuant to the terms of this Agreement (including pursuant to Section 2.10 or Section 8.02).

"Compliance Certificate" means a certificate substantially in the form of Exhibit 7.01 hereto or such other form as acceptable to the Lender Agent.

"Concentration Accounts" means the deposit accounts listed on Schedule X(a) to the Security Agreement.

"Conduit No. 2 Facility" means the mortgage loan financing facility contemplated by (i) that certain Amended and Restated Note Issuance Facility Deed, dated November 7, 2008, among Conduit (No. 2) Limited, as SPE, Scaldis Capital Limited, Regency Assets Limited, Form Limited, Rheingold No. 14 (Jersey) Limited and Gresham Receivables (No. 1) Limited, as Original Bank Conduit Vehicles, Deutsche Trustee Company Limited, as Security Trustee, GMAC-RFC Limited, as Administrator and Originator, Silo No. 2 Limited, as Subordinated Loan Provider, and Residential Capital, LLC, as Guarantor, and (ii) all other agreements, contracts, documents and instruments evidencing or relating thereto.

"Confirmation" means written confirmation of the specific terms of a Hedge Transaction executed by the ResCap Counterparty and the Initial Lender.

"Conforming Loan" means a Mortgage Loan which conforms to the Guidelines as such guidelines have been modified by Freddie Mac, Fannie Mae, any FHLB, and Ginnie Mae with respect to a Mortgage Loan originated or purchased by a GMAC Originator.

"Consolidated Liquidity" means the cash and cash equivalents of ResCap, determined on a consolidated basis.

Confidential

"Consolidated Net Income" for any period means the net income (or loss) of ResCap and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(a)     the net income (or loss) of any Person that is not a Subsidiary, except to the extent that cash in an amount equal to any such income has actually been received by ResCap or, subject to clause (c) below, any Subsidiary during such period;

(b)     except to the extent includible in the consolidated net income of ResCap pursuant to the foregoing clause (a), the net income (or loss) of any Person that accrued prior to the date that (i) such Person becomes a Subsidiary or is merged into or consolidated with ResCap or any Subsidiary or (ii) the assets of such Person are acquired by ResCap or any Subsidiary;

(c)     the net income of any Subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary on that income is not permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary during such period, except that ResCap's equity in a net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

(d)     in the case of a successor to ResCap by consolidation, merger or transfer of its assets, any income (or loss) of the successor prior to such merger, consolidation or transfer of assets; and

(e)     without duplication of amounts otherwise deducted in determining Consolidated Net Income, the amount of Permitted Tax Distributions for such period.

"Consolidated Net Worth" means, at any date, the amount which would appear in accordance with GAAP on a consolidated balance sheet of ResCap and its Subsidiaries opposite the heading "equity" (or any similar item), but not including the equity of GMAC Bank to the extent included in such consolidated balance sheet equity.

"Consolidated Tangible Net Worth" means, at any date, the result of (a) Consolidated Net Worth, minus (b) the net book value of all assets on the consolidated balance sheet of ResCap used to calculate Consolidated Net Worth that would be treated as intangible assets under GAAP (including goodwill, trademarks, trade names, service marks, service names, copyrights, patents, organizational expenses and the excess of any equity in any subsidiary over the cost of the investment in such subsidiary, but not including mortgage servicing rights or any retained interest in securitized receivables), all as determined on a consolidated basis in accordance with GAAP.

"Contract" means, with respect to any Asset, the loan agreement, indenture or other agreement pursuant to which such Asset has been issued or created, and each other agreement that governs the terms of, or secures the obligations represented by such Asset.

Confidential

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control that, together with a Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Internal Revenue Code or Section 4001 of ERISA.

"Credit and Collection Policies" means, with respect to an Asset, the credit and collection policies, including loan modification policies, of the related Obligor applicable to origination and servicing of assets of that type, as the same may be amended from time to time in accordance with its usual and customary practices.

"Credit Party" has the meaning set forth in Section 3.02(a).

"Credit Risk Asset" means any Asset with respect to which:

(a)     an Obligor has determined that a default, other than a payment default, as defined under the related Contract has occurred and such non-payment default continues unremedied for at least 100 days after notice thereof to the Payor thereof;

(b)     an Obligor learns that the Payor in respect of such Asset has defaulted in the payment of principal or interest on any other Indebtedness and such default has not been cured within 100 days; or

(c)     if such Asset is a Financial Asset-Backed Security that was originally rated by any nationally recognized rating agency, the rating on such security shall have been reduced by more than two notches by such rating agency.

"Cumulative Substitute Collateral Schedule" means a schedule setting forth, on a cumulative basis after the Amendment Closing Date, the Substitute Collateral, which schedule shall be in such form as the Lender Agent may approve from time to time in its discretion after consultation with the Borrowers.

"Cut-Off Date" means, for any date of determination, the last day of the immediately prior calendar month.

"Default" means an Event of Default or an Unmatured Event of Default.

"Default Rate" means, with respect to any Loan for any Interest Period, and any late payment of fees or other amounts due hereunder, the LIBOR Rate for the related Interest Period (or for all successive Interest Periods during which such fees or other amounts were delinquent), plus the Applicable Margin, plus 2% per annum.

"Defaulted Asset" means any Asset arising under a Contract for which:

(a)     all or a portion of a scheduled payment is more than 120 days past due (based on its original due date),

(b)     the related Obligor has determined in accordance with its customary practices that such Asset is uncollectible,

Confidential

(c)    the related Payor is subject to an Event of Bankruptcy, or

(d)    such Asset is rated "C" or less by Moody's Investors Service or "CC" or less by Standard & Poor's.

"Disposition Offset" means, with respect to a Collateral Disposition, the amount by which the portion of related Net Cash Proceeds required to be applied to the repayment of the principal of Loans is reduced on account of the application of the MTM Credit pursuant to Section 2.08(c).

"Disqualified Equity Interests" means any class of Equity Interests of ResCap or any of its Subsidiaries that, by its terms, or by the terms of any related agreement or of any security into which it is convertible, puttable or exchangeable, is, or upon the happening of any event or the passage of time would be, required to be redeemed by ResCap or such Subsidiary, whether or not at the option of the holder thereof, or matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, on or prior to the date which is 91 days after the date set forth in Clause (a) of the definition of Loan Repayment Date.

"DOA Holdings" means DOA Holdings Properties, LLC, a Delaware limited liability company.

"Dollars" or "$" means dollars in lawful money of the United States of America.

"Dutch Note" means any note issued by GX CE Funding B.V. to ResCap under or pursuant to the Dutch VFLN Agreement.

"Dutch SPE" means GX CE Funding B.V.

"Dutch Security Documents" means the Dutch VFLN Agreement and the Dutch Note.

"Dutch VFLN Agreement" means that certain variable funding loan note agreement dated June 4, 2008 and entered into by and between, amongst others, ResCap, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding.

"Electronic Files" means (i) the electronic data file delivered by the Borrowers to the Lender Agent immediately prior to the Closing Date with respect to the Initial Collateral, and (ii) an electronic data file related to any Collateral Value Report, substantially in the form of the file described in clause (i).

"Eligibility Requirements" are defined in (i) Exhibit B with respect to Substitute Collateral, and (ii) Exhibit A with respect to other Collateral.

"Eligible Asset" means an Asset which satisfies the following criteria:

(a)    such Asset (i) is a Conforming Loan, Jumbo Loan, Wet Loan, Second Lien Loan, HELOC Loan, High LTV Loan, Scratch and Dent Loan, (ii) is an Agency Asset, (iii) is a Financial Asset-Backed Security secured by Conforming Loans, Jumbo Loans, Wet Loans, Second Lien Loans, HELOC Loans, High LTV Loans, Scratch and

Schedule 1.01-12

Confidential

Dent Loans or is an RMBS, CMBS, CDO or CLO, (iv) is an Equity Interest in a BCG Subsidiary, (v) is an Equity Interest in REO Owner, (vi) is an Incremental Advance; (vii) is an Equity Interest in a joint venture or an Equity Interest in a wholly owned Subsidiary owning Equity Interests in a BCG Joint Venture; (viii) is a Servicing Corporate Advance, Servicing T&I Advance or Servicing P&I Advance; (ix) is REO Property which has been transferred to an REO Owner, (x) an increase in the aggregate outstanding principal balance of the English Notes or Dutch Notes in accordance with the terms of the applicable Security Documents as a result of transferring Eligible UK Assets or Eligible Dutch Assets to the English SPV or Dutch SPV, (xi) in the case of Substitute Collateral, a Substitute Eligible Asset or (xii) with the written consent of the Lender Agent, is an Equity Interest in a Financing SPV that holds Assets that consist of Conforming Loans, Jumbo Loans, Wet Loans, Second Lien Loans, HELOC Loans, High LTV Loans, Scratch and Dent Loans or RMBS, CMBS, CDOs or CLOs.

(b)    such Asset is either (i) owned by a Borrower or Guarantor; (ii) owned by an Obligor and is an Incremental Advance or (iii) with respect to clause (a)(iv), (v), (vii) and (xii) above is owned by an Obligor;

(c)    such Asset does not arise from, and is not subject to, Permitted Funding Indebtedness; and

(d)    such Asset satisfies the Eligibility Requirements.

"Eligible Assignee" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; or (d) any other Person; provided that the Borrowers have consented to such other Person (which consent shall not be unreasonably withheld, delayed or conditioned and shall not be required if a Default has occurred and is continuing).

"Eligible Dutch Assets" means, as of any date on which Substitute Collateral are to be designated as Primary Collateral, residential mortgage loans denominated in Euros and originated or acquired by Subsidiaries of the Borrowers in the ordinary course of business, provided in each case that such loans satisfy the eligibility criteria set forth in the Dutch Security Documents.

"Eligible Servicing Advances Agreement" means (i) the agreements giving rise to Servicing Advances of the type described as Initial Collateral in the Schedules to the Security Agreement, and (ii) other agreements identified as such on a Substitute Collateral Certificate approved by the Lender Agent in writing.

"Eligible UK Assets" means, as of any date on which Substitute  Collateral are to be designated as Primary Collateral, residential mortgage loans denominated in Pounds Sterling and originated or acquired by Subsidiaries of the Borrowers in the ordinary course of business, provided in each case that such loans satisfy the eligibility criteria set forth in the English Security Documents.

"English Deed of Assignment" means the First Priority Deed of Assignment, dated on June 4, 2008, between ResCap and the First Priority Collateral Agent.

Confidential

"English Loan Sale and Purchase Agreement" means the loan sale and purchase agreement dated on June 4, 2008 between the SPE, the English Sellers and the English Security Trustee.

"English Note" means the notes issued from time to time under and in accordance with the English Note Issuance Facility Deed.

"English Note Issuance Facility Deed" means the note issuance facility deed dated on June 4, 2008 between English SPE, ResCap, the English Security Trustee and the English Sellers, as the same may be amended or modified from time to time with the prior written consent of the Lender Agent.

"English Security Documents" means the English Loan Sale and Purchase Agreement, the English Note Issuance Facility Deed, the English Shares Charge, the English Deed of Assignment, and each and every other document, agreement and deed entered into by ResCap, its Subsidiary and/or the English Security Trustee in connection with the purchase of certain residential mortgage loans and development loans, the issuance of the English Note and creation of security in respect of the English Note in favor of the English Security Trustee, in each case, by the English SPE.

"English Security Trustee" means Deutsche Trustee Company Limited (in its capacity as security trustee in respect of the English Note).

"English Sellers" means GMAC-RFC Limited and GMAC-RFC Property Finance Limited.

"English Shares Charge" means the First Priority Shares Charge, dated on or about the Closing Date, between RFC and the First Priority Collateral Agent.

"English SPE" means Viaduct (No.7) Limited.

"Equity Interests" of any Person means (a) any and all shares or other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such Person; and (b) all rights to purchase, warrants or options (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such Person.

"Equivalent" means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Hedge Valuation Agent for Value on such Valuation Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of ERISA also refer to any successor sections thereto.

Schedule 1.01-14

Confidential

"European Documents" means Underlying Documents described in clause (a) or (b) of the definition of Underlying Documents and any other document designated as such in a Collateral Addition Designation Notice.

"European Reporting Assets" means Supporting Assets for the Primary Collateral consisting of the Dutch Notes and the English Notes.

"European SPV Accounts" means each account held in the name the English SPE or the Dutch SPE pursuant to the terms of the English Security Documents or the Dutch Security Documents (as applicable) and any other account designated as such in a Collateral Addition Designation Notice.

"Event of Bankruptcy" shall be deemed to have occurred with respect to a Person if either:

(a)    such Person files a voluntary petition in bankruptcy, seeks relief under any provision of any Insolvency Law or consents to the filing of any petition against it under any such law;

(b)    a proceeding shall have been instituted by any Affiliate of such Person in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Person in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Person, or for any substantial part of its property, or for the winding-up or liquidation of its affairs;

(c)    a proceeding shall have been commenced, without the application or consent of such Person, in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Person in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Person, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs and such Person shall have failed to obtain a relief (including, without limitation, a dismissal) or a stay of such involuntary proceeding within thirty (30) days;

(d)    the admission in writing by such Person of its inability to pay its debts as they become due;

(e)    such Person consents to the appointment of or taking possession by a custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official, of all or any part of its Property, or any custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official takes possession of all or any part of the Property of such Person;

(f)    such Person makes an assignment for the benefit of any of its creditors; or

(g)    such Person generally fails to pay its debts as they become due.

Confidential

"Event of Default" has the meaning set forth in Section 8.01.

"Exchange Offer" means the $14,040,000,000 bond exchange and tender offer by ResCap as substantially described in the Exchange Offer OM pursuant to which, among other things, ResCap exchanged certain unsecured bonds issued by it for secured bonds, which closed on June 6, 2008.

"Exchange Offer Notes" means any series of ResCap's senior and senior subordinated notes which were the subject of, or issued pursuant to, the exchange offer contemplated by the Exchange Offer OM.

"Exchange Offer OM" means the Confidential Offering Memorandum and Consent Solicitation Statement of ResCap dated as of May 5, 2008 as supplemented on May 14, 2008.

"Excluded Assets" has the meaning set forth in the Security Agreement.

"Excluded Debt" means Indebtedness owed by a Restricted Entity to a Specified Affiliate.

"Excluded Subsidiary" means (a) a Foreign Subsidiary; (b) any Subsidiary that is effectively restricted from offering a Guarantee hereunder by law or regulation; (c) any Financing SPV; or (d) any Subsidiary that is effectively restricted from offering a Guarantee hereunder by its charter, so long as such Subsidiary referred to in this clause (e) is required to make dividends of all cash legally available therefor that is not required to pay current obligations of such Subsidiary; provided that (i) no Subsidiary under clause (a), (b), (c) or (e) above shall be deemed an Excluded Subsidiary if it guarantees any Indebtedness of ResCap or any unsecured Indebtedness of any Guarantor for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments and (ii) no Subsidiary the Equity Interests of which are directly owned by ResCap shall be an Excluded Subsidiary.

"Exempt Cash Reserve Account" means (a) (i) account number 2000042898508 maintained by ResCap at Wachovia Bank, N.A. or (ii) account number 2000042898511 maintained by ResCap at Wachovia Bank, N.A., or (b) an account maintained by ResCap at another financial institution in lieu of the accounts described in clause (a), provided that (i) ResCap shall have notified the Lender Agent in writing of the designation of such account and (ii) at any time there shall only be one Exempt Cash Reserve Account.

"Exemption Certificate" has the meaning set forth in Section 3.02(f).

"Facility" means the loan facility provided to the Borrowers by the Lenders pursuant to this Agreement.

"Facility Documents" means this Agreement, the Notes, the Security Documents, the Intercreditor Agreement, the Hedge Documents and all notices, certificates, financing statements, agreements and other documents to be executed and delivered by the Borrowers or ResCap pursuant to the foregoing or otherwise in connection with this Agreement or the extension of financing by the Lenders contemplated hereunder.

Confidential

"Fair Value" means with respect to (i) any Permitted Consideration received in connection with, or acquired with the proceeds of, a Collateral Disposition, the fair market value of such Permitted Consideration (determined as of the date a binding commitment to acquire such Permitted Consideration was entered into and taking into account, among other things, current market conditions and whether such Permitted Consideration is subject to senior claims or set-off rights), and (ii) any Primary Collateral or Supporting Assets that are the subject of a Collateral Disposition, the fair market value of such Primary Collateral or Supporting Assets (determined as of the date a binding commitment to effect such Collateral Disposition was entered into and taking into account, among other things, current market conditions and whether such Primary Collateral or Supporting Assets are subject to senior claims or set-off rights); provided that the Fair Value of a Residual Right in which the holder of an interest senior to the holders of Obligations has not waived its rights of offset and cross collateralization shall be zero.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"FHA" shall mean The Federal Housing Administration, an agency within the United States Department of Housing and Urban Development, or any successor thereto and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the applicable FHA regulations.

"FHA Approved Mortgagee" shall mean an institution which is approved by the FHA to act as mortgagee and servicer of record, pursuant to applicable FHA regulations.

"FHA Insurance Contract" shall mean the contractual obligation of FHA respecting the insurance of an FHA mortgage loan pursuant to the National Housing Act, as amended.

"FHLB" means any Federal Home Loan Bank, or any successor thereto.

"Financial Asset-Backed Security" means a collateralized mortgage obligation, a collateralized bond obligation, a collateralized loan obligation or any other security the payments on which depend primarily on the cash flow from a specified pool of financial assets.

"Financing Assets" means whole loan mortgages, Residual Rights, securities (including Equity Interests or Indebtedness of Subsidiaries that are Financing SPVs but excluding Equity Interests of other Subsidiaries) and other financial assets or any related assets, rights or property or the proceeds therefrom.

"Financing SPV" means a special purpose vehicle formed for financing purposes by ResCap or any Subsidiary in accordance with past practice of ResCap (or any reasonable extension or modification of such past practice, including for purposes of financing other types of financial assets) that does not guarantee any Indebtedness of ResCap or any Subsidiary other than Indebtedness of another Financing SPV and substantially all of the assets of which consist of Financing Assets.

"First Priority Collateral Agent" means Wells Fargo Bank, N.A., in its capacity as First Priority Collateral Agent under the Security Agreement, and its permitted successors and assigns thereunder.

Confidential

"Foreign Subsidiary" means (a) a Subsidiary that is not organized within one of the 50 states of the United States of America or any jurisdiction that hereafter becomes a state; and (b) any Subsidiary of a Subsidiary referred to in clause (a) above.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"GAAP" means, United States generally accepted accounting principles as in effect from time to time and as applied by ResCap in the preparation of its financial statements.

"Ginnie Mae" means Ginnie Mae, formerly known as The Government National Mortgage Association, or any successor thereto.

"GM Trusts" means one or more trusts initially naming General Motors as beneficiary thereof that were or will be established to hold Capital Stock in GMAC held directly or indirectly by General Motors as of May 20, 2009.

"GMAC" means GMAC Inc., a Delaware corporation, in its individual capacity.

"GMAC Mortgage" has the meaning set forth in the preamble.

"GMAC Originator" means RFC, GMAC Mortgage or any other Subsidiary of ResCap that originates or purchases Mortgage Loans in the ordinary course of business.

"GMAC Parties" means GMAC Inc. (and its successors) and its Affiliates (other than ResCap and ResCap's Subsidiaries and Ally Bank).

"Government Mortgage Loan" means a Mortgage Loan insured by the FHA or VA.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any municipality and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.  Without limiting the generality of the foregoing, with respect to the United States, a "Governmental Authority" shall include any United States federal, state, county, municipal or other local governmental, judicial or regulatory authority, agency, arbitration board, body, commission, instrumentality, court or quasi-governmental authority or tribunal.

"Guarantee" means the guarantee set forth in Article XI.

"Guarantor" means (a) ResCap; (b) each of the Subsidiaries of ResCap that is a signatory hereto as a Guarantor; (c) any other Subsidiary that executes a joinder agreement to become a party as Guarantor to this Agreement.

"Guidelines" means the Freddie Mac Guides, Fannie Mae Guides, FHLB Guides or Ginnie Mae Guides, as such guides have been amended from time to time with respect to each Seller.

Confidential

"Hedge Adjusted Available Amount" means, on any Business Day, an amount equal to the then current Aggregate Commitment Amount <u>minus</u> the Hedge Support Requirement.

"Hedge Documents" shall mean (i) the Primary Hedge Documents as supplemented by the Confirmations; and (ii) the Hedge Security Agreement.

"Hedge Exposure" means, on a Valuation Date, the amount, if any, that would be payable to the Initial Lender by the ResCap Counterparty (expressed as a positive number) or by the Initial Lender to the ResCap Counterparty (expressed as a negative number) pursuant to the Hedge Documents if all Hedge Transactions were being terminated as of the relevant Valuation Date, on the basis that (i) the Initial Lender is not the Affected Party (as defined in the Hedge Documents) and (ii) the Termination Currency (as defined in the Hedge Documents) is Dollars; *provided* that Market Quotations will be determined by the Hedge Valuation Agent using the applicable forward rate of exchange for the applicable currencies appearing on the "FRD" Bloomberg page as of 3pm New York time on such Valuation Date (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided by such service); provided further that if no such page or service is available for any reason the ResCap Counterparty, the Initial Lender and the Hedge Valuation Agent shall mutually agree in good faith to an alternative method of objectively determining the applicable forward rate of exchange to calculate Market Quotation and, if no such alternative can be agreed, the Hedge Valuation Agent shall use its estimates of the applicable mid-market forward rates of exchange, in each case for the amounts that would be paid for Replacement Hedge Transactions (as that term is defined in the definition of "Market Quotation").

"Hedge Exposure Decrease" for any Valuation Date will equal the amount by which (i) the Hedge Support Requirement in effect on the immediately prior Business Day exceeds (ii) the Hedge Support Requirement on such Valuation Date.

"Hedge Exposure Increase" for any Valuation Date will equal the amount by which (i) the Hedge Support Requirement on such day exceeds (ii) the Hedge Support Requirement in effect on the immediately prior Business Day.

"Hedge Security Agreement" means the Security and Pledge Agreement dated as of August 14, 2008 among the Obligors and the Initial Lender, as amended and restated as of the Amendment Closing Date and as further amended, amended and restated or otherwise modified from time to time.

"Hedge Settlement Amount" means (i) a payment due to the Initial Lender at the maturity of a Hedge Transaction, and (ii) a payment due to the Initial Lender upon the early termination of a Hedge Transaction pursuant to <u>Section 6(e)</u> of the Primary Hedge Documents.

"Hedge Support Requirement" means, on a Valuation Date, the sum of (a) the Independent Amount, plus (b) if positive, the Hedge Exposure.

"Hedge Transaction" means one or more hedge transactions subject to, and governed by, the Hedge Documents between the ResCap Counterparty and the Initial Lender and consented to in writing by the Lender Agent and the other Lenders.

Schedule 1.01-19

Confidential

"Hedge Valuation Agent" means GMAC Investment Management LLC, a Delaware limited liability company.

"HELOC Loan" means an open-end, revolving, home equity line of credit.

"HLTV Loan" means any Mortgage Loan with a Loan-to-Value Ratio of 100% or more at the time of its origination.

"Homecomings" means Homecomings Financial, LLC.

"HUD" shall mean the U.S. Department of Housing and Urban Development.

"IBG" means International Business Group, a division of ResCap.

"IBG Assets" means the assets of IBG and its Subsidiaries which are not Excluded Assets.

"Identified Lien Exceptions" means the exceptions listed on Schedule VI(a) to the Security Agreement.

"Incremental Advance" means an advance made by an Obligor (i) with respect to a construction loan facility or a construction project to complete, or maintain the value of, the related construction project or (ii) under a mezzanine or working capital loan facility under which such Obligor of such Incremental Advance has a legally binding commitment to make such advance.

"Indebtedness" means, with respect to any Person, without duplication: (a) all indebtedness of such Person for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments; (b) all obligations of such Person as lessee under Capital Leases that have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP and all obligations of such Person as lessee under any so-called synthetic, off-balance sheet or tax retention lease; (c) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business); (d) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; (e) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit and banker's acceptances issued for the account of such Person; (f) all Disqualified Equity Interests of such Person; (g) obligations of such Person under a Bilateral Facility; (h) all Suretyship Liabilities of such Person in respect of obligations of others of the type described in clauses (a) through (g) above; and (i) all indebtedness of any partnership of which such Person is a general partner, to the extent of such liability; provided that Indebtedness shall not include (i) obligations arising from agreements of ResCap or a Subsidiary providing for indemnification, contribution, earnout, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets or Equity Interests of a Subsidiary otherwise permitted under this Agreement and not required to be reflected as a liability on a consolidated balance sheet of ResCap; or (ii) obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against

Schedule 1.01-20

Confidential

insufficient funds in the ordinary course of business; <u>provided</u>, <u>however</u>, that such Indebtedness is extinguished within five business days of incurrence.

"<u>Indemnified Amounts</u>" has the meaning set forth in <u>Section 10.01</u>.

"<u>Indemnified Party</u>" has the meaning set forth in <u>Section 10.01</u>.

"<u>Independent Amount</u>" means the sum of (i) 5% of the notional amount of the Hedge Transactions plus (ii) any additional amount determined by agreement of the Lender Agent, the Initial Lender and the ResCap Counterparty in connection with the execution of a Hedge Transaction.

"<u>Initial Collateral</u>" means assets of the Borrowers, the Guarantors and the Subsidiary Pledgors that are listed on, or of a type described on, Schedule VI to the Security Agreement and that exist on the Closing Date.

"<u>Initial Lender</u>" has the meaning set forth in the <u>preamble</u>.

"<u>Insolvency Law</u>" means any bankruptcy, reorganization, moratorium, delinquency, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction in effect at any time during the term of this Agreement.

"<u>Intercreditor Agreement</u>" means the Intercreditor Agreement, dated as of a date on or before June 6, 2008, among the Senior Secured Collateral Agent, as First Priority Collateral Agent, Second Priority Collateral Agent and Third Priority Collateral Agent thereunder, the Collateral Control Agent, the Lender Agent, U.S. Bank National Association, as Trustee under the 2010 Indenture, U.S. Bank National Association, as Trustee under the 2015 Indenture, the Borrowers and Guarantors signatories thereto.

"<u>Interest Period</u>" means, for any Loan, a period beginning on the first day of each calendar month and ending on the earlier of (i) the last day of the same calendar month in which such Interest Period began and (ii) the Loan Repayment Date.

"<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended, together with the rules and regulations promulgated thereunder.

"<u>Investments</u>" of any Person means:

      (a)     all direct or indirect investments by such Person in any other Person in the form of loans, advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers, directors and employees) or other credit extensions constituting Indebtedness of such other Person, and any guarantee of Indebtedness of any other Person;

      (b)     all purchases (or other acquisitions for consideration) by such Person of Indebtedness, Equity Interests or other securities of any other Person (other than any

Confidential

such purchase that constitutes a Restricted Payment of the type described in <u>clause (b)</u> of the definition thereof); and

  (c) all other items that would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP (including, if required by GAAP, purchases of assets outside the ordinary course of business).

Except as otherwise expressly specified in this definition, the amount of any Investment (other than an Investment made in cash) shall be the fair market value thereof on the date such Investment is made.

"<u>Investors</u>" means the collective reference to General Motors and the Sponsor.

"<u>Jumbo Loan</u>" means a Mortgage Loan which substantially conforms to the Guidelines except (i) the principal amount thereof may exceed the principal amount of loans which conform to the Guidelines or (ii) for other specified exceptions to the Guidelines that are consistent with the customary practices of the applicable GMAC Originator.

"<u>Kick-Out Loan</u>" means a Mortgage Loan repurchased by an Obligor from a Financing SPV.

"<u>Lender</u>" has the meaning set forth in the <u>preamble</u>.

"<u>Lender Agent</u>" means, initially, GMAC Inc. and thereafter any successor Lender Agent appointed pursuant to <u>Section 12.09</u>.

"<u>Lender Parties</u>" means the Lender Agent, the First Priority Collateral Agent, the Collateral Control Agent, the Lenders, the Initial Lender (as counterparty under the Hedge Documents) and the other Indemnified Parties.

"<u>LIBOR Rate</u>" means, with respect to any Loan for any Interest Period, the rate appearing on Page 3750 of the Dow Jones "Markets" screen (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Lender Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity of one (1) month. In the event that such rate is not available at such time for any reason, then the "LIBOR Rate" with respect to such Interest Period shall be the rate at which dollar deposits of an amount comparable to the amount of the requested Loan and for a maturity of one (1) month are offered by the principal London office of JPMorgan Chase Bank in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period.

"<u>Lien</u>" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a

   Schedule 1.01-22

Confidential

security interest in and any filing of or agreement to give any financing statement under the UCC of any jurisdiction.

"<u>Line of Credit Agreement</u>" means that certain Loan Agreement dated as of the Amendment Closing Date between GMAC Mortgage and RFC as borrowers and certain of their affiliates as guarantors, GMAC Inc., as initial lender and as lender agent and certain other financial institutions and persons from time to time party thereto as lenders; provided that if at any time such agreement shall cease to be in effect, references herein to the Line of Credit Agreement or terms defined therein shall be references to such agreement or terms as in effect immediately prior to the time at which such agreement ceased to be in effect.

"<u>Line of Credit Asset</u>" means any "Asset" as defined in the Line of Credit Agreement.

"<u>Loan Repayment Date</u>" means the earliest to occur of (a) the Scheduled Loan Repayment Date; (b) the date that the Loans are declared to be due and payable in accordance with <u>Section 8.02(a)</u>; or (c) the date of the occurrence of an Event of Default described in <u>Section 8.01(d)</u>; <u>provided</u>, <u>however</u>, that the Loan Repayment Date may be extended or accelerated by the mutual agreement of each Lender and the Borrowers.

"<u>Loans</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Loan-to-Value Ratio</u>" means with respect to a Mortgage Loan, a fraction, expressed as a percentage, the numerator of which is the then current principal balance of such Mortgage Loan on such date, and the denominator of which is the appraised value of the related mortgaged property on such date.

"<u>Mandatory Repayment Date</u>" means, with respect to any Collateral Disposition, the Business Day immediately following the earlier of (a) the Business Day the Net Cash Proceeds of such Collateral Disposition are deposited in the Wachovia Sweep Account and (b) the related Applicable Deposit Date.

"<u>Market Quotation</u>" has the meaning set forth in the Hedge Documents.

"<u>Material Adverse Effect</u>" means any event which has had or would reasonably be expected to have a material adverse effect on (i) the business, assets or financial condition of any Obligor or any such Obligor and its Subsidiaries taken as a whole since September 30, 2009, other than as disclosed in the Obligor's financial statements as detailed in <u>Section 6.01(o)</u> or as disclosed to the Lender Agent prior to the Amendment Closing Date, (ii) the validity or enforceability of any of the Facility Documents or the rights or remedies of the Lender Parties thereunder, or (iii) the value, validity, enforceability, saleability or collectibility of the Collateral or a material portion thereof, or the enforceability, perfection or priority of the First Priority Collateral Agent's security interest on behalf of the Lender Parties in the Collateral; <u>provided</u>, <u>however</u>, that a Material Adverse Effect shall not be determined to include effects arising out of, relating to or resulting from the occurrence of a ratings downgrade of GMAC Inc. or any of its Affiliates (including ResCap) or any of their outstanding debt (it being understood that the events giving rise to such downgrade shall not be excepted from the definition of Material Adverse Effect).

Schedule 1.01-23

Confidential

"Maximum Guaranty Amount" has the meaning set forth in Section 11.07.

"Mexican Security Documents" means the Stock Pledge Agreement dated October 2, 2008 executed by RFC for the benefit of the Collateral Control Agent whereby RFC pledges (i) shares, each with a par value of $1.00 (one Peso 00/100) legal currency of Mexico, representing the corporate capital stock of GMAC RFC Auritec, S.A., (ii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Hipotecaria, S.A. de C.V., S.F.O.L., and (iii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Financiera, S.A. de C.V., S.F.O.L. and any and all notices, certificates, agreements and other documents to be executed and delivered by RFC pursuant to the foregoing or otherwise in connection with the transactions contemplated by the Stock Pledge Agreement.

"MHF" means GMAC Model Home Finance, LLC, a Delaware limited liability company, and its successors in interest.

"MHFI" means GMAC Model Home Finance I, LLC, a Delaware limited liability company.

"MHF Assets" means (i) the assets of MHF, its Subsidiaries and any entity which was a Subsidiary of MHF as of the Closing Date, other than the Equity Interests in such Subsidiaries to the extent such assets were held by MHF or such Subsidiaries on the Closing Date or arise out of assets, properties or rights that were so held on the Closing Date, or (ii) if the Equity Interest in MHF or its Subsidiary shall have been the subject of a Collateral Disposition, assets that were MHF Assets at the time of such Collateral Disposition.

"Minimum Adjustment Amount" means $5,000,000.

"Minimum Notional Reduction" means (i) with respect to the Hedge Transaction executed as of August 14, 2008, 25,000,000 Euro, and (ii) with respect to any other Hedge Transaction, the amount agreed in writing by the Lender Agent, the Initial Lender and the ResCap Counterparty concurrently with the execution of such Hedge Transaction.

"Model Home" means a model home, the construction of which was financed by BCG, located on real property owned wholly or partially by BCG.

"Monthly Collateral Report" shall mean a Collateral Value Report together with the related Substitute Collateral Schedule and Electronic File.

"Mortgage Loan" means (a) any first or second lien mortgage loan subject to the terms of this Agreement, and (b) any collateral, insurance, guaranty or other credit support arrangement related thereto.

"Mortgage Schedule" means any schedule of mortgage loans delivered by the Obligors in connection with a Collateral Addition Designation Notice relating to US Mortgage Loans in the form of a data tape, CD Rom or other tangible medium identifying for each mortgage loan: (i) the loan number, (ii) the name of the borrower, (iii) the address of the property securing such mortgage loan, and (iv) the original principal amount of such mortgage loan.

Schedule 1.01-24

Confidential

"MTM Amount" means, with respect to a Valuation Date, the sum of the aggregate of all Hedge Exposure Increases that have occurred since the last MTM Reset Date, minus the aggregate of all Hedge Exposure Decreases that have occurred since the last MTM Reset Date, plus the aggregate amount of Disposition Offsets since the last MTM Reset Date; provided that the MTM Amount shall not be less than zero.

"MTM Credit" means, with respect to a Valuation Date, the sum of the aggregate amount of all Hedge Exposure Decreases that have occurred since the last MTM Reset Date, minus the aggregate amount of all Hedge Exposure Increases that have occurred since the last MTM Reset Date, minus the aggregate amount of Disposition Offsets since the last MTM Reset Date; provided that the MTM Credit shall not be less than zero.

"MTM Reset Date" means each date on which the Borrowers repay outstanding Loans in connection with a Hedge Exposure Increase pursuant to the second paragraph of Section 2.08(b).

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA which (i) has been established by ResCap or its Subsidiaries, and (ii) is not maintained for the benefit of employees of GMAC or its Subsidiaries, other than ResCap and its Subsidiaries.

"Net Cash Proceeds" means, with respect to any Collateral Disposition, the proceeds thereof in the form of cash or cash equivalents, net of:

(a)    brokerage commissions and other fees and expenses (including fees, discounts and expenses of legal counsel, accountants and investment banks, consultants and placement agents) of such Collateral Disposition;

(b)    provisions for taxes payable as a result of such Collateral Disposition (after taking into account any available tax credits or deductions and any tax sharing arrangement);

(c)    amounts required to be paid to any Person (other than ResCap or any Subsidiary thereof) owning a beneficial interest in the assets subject to the Collateral Disposition or having a Lien thereon (excluding the Lien under the Security Agreement);

(d)    payments of unassumed liabilities (not constituting Indebtedness) relating to the assets sold at the time of, or within 30 days after the date of, such Collateral Disposition; and

(e)    appropriate amounts to be provided by any Obligor, as the case may be, as a reserve required in accordance with GAAP against any adjustment in the sale price of such asset or assets or liabilities associated with such Collateral Disposition and retained by any Obligor, as the case may be, after such Collateral Disposition, including pensions and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Collateral Disposition, all as reflected in an officers' certificate delivered to the Lender Agent.

Confidential

"Non-Agency MSR Loan Agreement" means the Loan and Security Agreement, dated as of April 18, 2008, between RFC and GMAC Mortgage, as borrowers, and GMAC Inc. as lender.

"Non-Recourse Debt" means Indebtedness of any Subsidiaries of ResCap that are special purpose vehicles acting as sellers or borrowers under an asset securitization; provided that no Bilateral Facility shall be Non-Recourse Debt.

"Non-UCC Assets" means (a) assets of the Borrowers and the other Obligors located outside the United States to the extent a Lien on such assets cannot be perfected by the filing of UCC financing statement in the jurisdictions of organization of the Borrowers and such Obligors; (b) all of the Borrowers' and the other Obligors' right, title and interest in owned real property; and (c) motor vehicles and other assets subject to certificates of title to the extent that a Lien therein cannot be perfected by the filing of UCC financing statement in the jurisdiction of organization of the Borrowers or the other Obligors.

"Non-U.S. Lender" has the meaning set forth in Section 3.02(f).

"Note" means any promissory note of the Borrowers issued to a Lender, in substantially the form of Exhibit 2.02(a), as amended from time to time, and any replacements thereof or substitution therefor.

"Obligations" means obligations, indebtedness, fees, expenses (including, without limitation, attorneys' fees and expenses) and liabilities of any Borrower, any Guarantor or any other Obligor to any Lender Party, now existing or hereafter arising under or in connection with any Facility Document, whether monetary or otherwise, matured or unmatured, direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligations, indebtedness and liabilities of the Borrowers under the Notes or otherwise pursuant to the terms of the other Facility Documents, and all interest accruing thereon (including any interest that accrues after the commencement of any proceeding by or against any Borrower, any Obligor or any other Person under any bankruptcy, insolvency, liquidation, moratorium, receivership, reorganization or other debtor relief law) and all attorneys' fees and other expenses incurred in the collection or enforcement thereof.

"Obligors" means, collectively, ResCap, the Subsidiary Pledgors, the Guarantors, the Borrowers, any party signatory as an Obligor hereto, and any other Person designated as an "Obligor" in a Collateral Addition Designation Notice.

"Optional Prepayment Date" has the meaning set forth in Section 2.09.

"Ordinary RE Transactions" means the transfer of funds by a Restricted Entity to a Specified Affiliate, or by a Specified Affiliate to a Restricted Entity, whether in the form of an intercompany loan, intercompany loan repayment, dividend, distribution, contribution, remittance of proceeds of the sale of assets or another form provided under the cash management and accounting systems of ResCap, provided that such transfer is made in good faith in the ordinary course of business and in a manner consistent with the requirements of this Agreement.

"Originator" means a Person (other than an Obligor) from which an Obligor (or its predecessor in interest) acquired an interest in an Asset.

Confidential

"Other Receivables" means receivables due to affiliates of ResCap from either the FHA or the VA relating to a pool of loans subject to FHA Insurance Contracts or VA Guaranty Agreements that either: (i) are more than ninety (90) days delinquent, (ii) are in the foreclosure process, or (iii) have completed the foreclosure process.

"Other Taxes" has the meaning set forth in Section 3.02(b).

"Outstanding Aggregate Loan Amount" means, at any time, the aggregate of the Outstanding Lender Loan Amount of all the Lenders.

"Outstanding Lender Loan Amount" means, at any time with respect to any Lender, the aggregate principal amount of all then outstanding Loans advanced by such Lender.

"Par Value" means, with respect to any Asset and for purposes of determining Collateral Value, the par value of such Asset as determined by ResCap in accordance with its customary practices in effect on the Closing Date.

"Participant" shall have the meaning set forth in Section 9.04.

"Payor" means any Person required to make payments representing the return of an Obligor's investment in an Asset.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA (other than a Multiemployer Plan) established by ResCap or its Subsidiary, and to which any Obligor or any corporation, trade or business that is, along with the Obligor, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA; provided that such plan is not maintained for the benefit of GMAC and its Subsidiaries, other than ResCap and its Subsidiaries.

"Permanent Paydown Report" has the meaning set forth in Section 2.11(a).

"Permitted Action" means, with respect to an Underlying Document, (i) scheduled termination of such document in accordance with its terms for reasons other than cause, (ii) except with respect to the European Documents, enforcement of rights or remedies by a ResCap Subsidiary against a Person that is not an Affiliate of ResCap; provided that such exercise could not be reasonably expected to give rise to a Material Adverse Effect, and (iii) except with respect to the European Documents, any amendment, waiver or other modification of such Underlying Document if such action, taken together with related actions, could not reasonably be expected to give rise to a Material Adverse Effect.

"Permitted Affiliate Transaction" means an Affiliate Transaction constituting or involving (a) a Restricted Payment permitted pursuant to Section 7.02(g); (b) the payment of reasonable and customary fees and indemnities to members of the Board of Directors of ResCap or a Subsidiary; (c) the payment of reasonable and customary compensation and other benefits

Confidential

(including retirement, health, option, deferred compensation and other benefit plans) and indemnities to officers and employees of ResCap or any Subsidiary; (d) transactions between or among ResCap and/or its Subsidiaries; (e) the issuance of Equity Interests (other than Disqualified Equity Interests) of ResCap otherwise permitted hereunder and capital contributions to ResCap by its equity owners; (f) any agreement or arrangement as in effect on the Closing Date and any amendment or modification thereto so long as such amendment or modification is consented to in writing by each Lender; and (g) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and consistent with past practice and on terms that are no less favorable to ResCap or the applicable Subsidiary, as the case may be, as determined in good faith by ResCap, than those that could be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of ResCap.

"Permitted Consideration" means, with respect to each Collateral Disposition, (i) cash, cash equivalents and/or (ii) with the prior consent of the Lender Agent, Eligible Assets that, concurrently with such Collateral Disposition, become Primary Collateral or Supporting Assets for Primary Collateral.

"Permitted Dissolution" means a dissolution and termination of the legal existence of (a) an Obligor with the prior written consent of the Lender Agent, which consent shall not be unreasonably withheld, and (b) a Subsidiary of an Obligor which is not itself an Obligor which (i) does not have any material assets (other than assets transferred to an Obligor or a Subsidiary of an Obligor or assets contractually required to be paid to third parties prior to dissolution) and (ii) does not own or have title to any Primary Collateral, Supporting Assets or RE Assets (other than any such assets transferred to an Obligor).

"Permitted Funding Indebtedness" means the Bilateral Facilities, the Indebtedness listed on Exhibit C hereto and any Indebtedness incurred in the ordinary course of the business of ResCap and its Subsidiaries (other than Restricted Entities) through financing, securitization and hedging activities (and provided that hedging activities cannot be for speculative purposes), including customary lines of credit, asset swaps, repurchase transactions or warehouse financings involving residential mortgage loans, home equity loans or second lien loans (including any reasonable extension or evolution of such activities including for purposes of financing other types of financial assets) and other Indebtedness on terms at least as favorable to ResCap or the applicable Subsidiary than would be available on an arm's-length basis.

"Permitted Indebtedness" means,

> (a)    the Obligations;

> (b)    other Indebtedness of the Obligors and their Subsidiaries outstanding on the Closing Date and up to $3,050,000,000 of 2010 Notes and up to $7,700,000,000 of 2015 Notes issued pursuant to the Exchange Offer;

> (c)    Permitted Funding Indebtedness of the Obligors and their Subsidiaries; provided that the Borrowers shall have given the Lender Agent written notice of any such Indebtedness incurred by a Restricted Entity that is a BCG Joint Venture prior to

Confidential

the Amendment Closing Date or, in the case of Indebtedness incurred after such date, within five (5) Business Days of ResCap Treasury obtaining knowledge thereof; and provided further that any other Restricted Entities may not incur or be liable with respect to Permitted Funding Indebtedness (other than Ordinary RE Transactions) without the prior written consent of the Lender Agent; and provided further that any such Permitted Funding Indebtedness (other than Excluded Debt) shall have been taken into account in determining the Collateral Value of Assets securing such indebtedness;

(d)    unsecured Indebtedness among ResCap and its Subsidiaries; provided that if a Restricted Entity has not subjected substantially all of its assets to a perfected security interest or a mortgage or deed of trust that is or has submitted for recording in favor of the First Priority Collateral Agent or its designee (unless the Lender Agent shall otherwise consent in writing) Intercompany Indebtedness owed by such Restricted Entity shall be limited to obligations incurred in the ordinary course operation of ResCap's cash management system and obligations recorded in ResCap's accounting system in connection with the accounting for proceeds of a Collateral Disposition, in each case in a manner consistent with the other terms of this Agreement;

(e)    Indebtedness of the Obligors and their Subsidiaries under interest rate agreements and currency exchange agreements entered into in the ordinary course of business and not for speculative purposes;

(f)    Permitted Refinancing Indebtedness of the Obligors and their Subsidiaries in respect of Indebtedness outstanding in reliance on clauses (b) and (c) above and this clause (f);

(g)    Indebtedness of the Obligor and their Subsidiaries to the GMAC Parties incurred in accordance with Section 7.02(l), provided that such Indebtedness is not secured by any Collateral, Supporting Assets or RE Assets; and

(h)    Indebtedness of the Borrowers or any of their Subsidiaries not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount and liquidation preference of all other Indebtedness then outstanding and incurred pursuant to this clause (h), does not at any one time outstanding exceed $500,000,000; provided (i) ResCap Treasury shall have given the Lender Agent notice of any such Indebtedness of a BCG Joint Venture promptly upon obtaining knowledge thereof and (ii) such Indebtedness shall not be incurred by any other Restricted Entity unless the Lender Agent shall have consented thereto.

it being understood that (i) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (a) through (g) of this definition, ResCap will, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness in any manner that complies with this definition and such item of Indebtedness will be treated as having been incurred pursuant to only one of such clauses

Schedule 1.01-29

Confidential

or pursuant to this definition (provided that all Indebtedness outstanding under this Agreement will at all times be deemed to be outstanding pursuant to clause (a) above); and (ii) the principal amount of any Disqualified Equity Interests will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof.

"Permitted Liens" means:

(a)    Liens against the Obligors and their Subsidiaries existing at the Closing Date and arising under the Bilateral Facilities;

(b)    (i) Liens that secure Obligations; and (ii) Liens that secure Indebtedness under the 2010 Notes and the 2010 Indenture and the 2015 Notes and the 2015 Indenture; provided that the Liens in clause (ii) are subordinated in priority to the Liens in clause (i) in accordance with, and subject to the terms of, the Intercreditor Agreement;

(c)    any Lien for taxes or assessments or other governmental charges or levies not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such taxes are owed or the third party obligated to pay such taxes and for which adequate reserves are being maintained, to the extent required by GAAP and such proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(d)    any warehousemen's, materialmen's, landlord's or other similar Liens arising by law for sums not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such sums are owed or the third party obligated to pay such sums and with respect to which adequate reserves are being maintained, to the extent required by GAAP and such proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(e)    survey exceptions, encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other similar restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not individually or in the aggregate materially adversely affect the value of ResCap and its Subsidiaries or materially impair the operation of the business of such Person;

(f)    pledges or deposits (i) in connection with workers' compensation, unemployment insurance and other types of statutory obligations or the requirements of any official body, or (ii) to secure the performance of tenders, bids, surety or performance bonds, leases, purchase, construction, sales or servicing contracts and other similar obligations incurred in the normal course of business consistent with industry practice, or (iii) to obtain or secure obligations with respect to letters of credit,

guarantees, bonds or other sureties or assurances given in connection with the activities described in clauses (f)(i) and (f)(ii) above, in each case not incurred or made in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property or services or imposed by ERISA or the Internal Revenue Code, in connection with a "plan" (as defined in ERISA), or (iv) arising in connection with any attachment unless such Liens shall not be satisfied or discharged or stayed pending appeal within sixty (60) days after the entry thereof or the expiration of any such stay;

(g)    Liens securing Indebtedness of ResCap or a Subsidiary thereof to the extent such secured Indebtedness is pledged as Collateral pursuant to the Facility Documents;

(h)    Liens to secure any Permitted Refinancing Indebtedness secured by Liens referred to in clause (a) above; provided that such Liens do not extend to any other property or assets and the principal amount of the obligations secured by such Liens is not increased;

(i)    licenses of intellectual property granted in the ordinary course of business;

(j)    Liens (i) that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of ResCap or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations and other cash management activities incurred in the ordinary course of business of ResCap and or any of its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of ResCap or any of its Subsidiaries in the ordinary course of business, and (ii) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (A) encumbering reasonable customary initial deposits and margin deposits and attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business, and (B) in favor of banking institutions arising as a matter of law or pursuant to customary account agreements encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(k)    deposits made in the ordinary course of business to secure liability to insurance carriers;

(l)    leases, subleases, licenses or sublicenses granted to others in the ordinary course of business so long as such leases, subleases, licenses or sublicenses are subordinate in all respects to the Liens granted and evidenced by the Security Documents and which do not materially interfere with the ordinary conduct of the business of ResCap or any Subsidiaries and do not secure any Indebtedness;

Confidential

(m)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by ResCap or any Subsidiary thereof in the ordinary course of business;

(n)     Liens on the assets of a Subsidiary that is not a Guarantor securing Indebtedness and other obligations of such Subsidiary incurred in compliance with this Agreement; provided that such Liens shall not attach to (i) Primary Collateral, (ii) Supporting Assets, (iii) RE Assets held by a BCG Joint Venture unless the Lender Agent shall have received written notice thereof prior to the Amendment Closing Date or, with respect to Liens incurred after such date, within five (5) Business Days of ResCap Treasury obtaining knowledge thereof, or (iv) any other RE Assets without written consent of the Lender Agent;

(o)     Liens on the Collateral granted under the Security Documents in favor of the First Priority Collateral Agent to secure the Obligations and the notes issued pursuant to the Exchange Offer; provided that such Liens are subject to the terms of the Intercreditor Agreement;

(p)     Liens on Financing Assets securing Permitted Funding Indebtedness; provided that such Liens shall not attach to (i) Primary Collateral, (ii) Supporting Assets, (iii) RE Assets held by a BCG Joint Venture unless the Lender Agent shall have received written notice thereof prior to the Amendment Closing Date or, with respect to Liens incurred after such date, within five (5) Business Days of ResCap Treasury obtaining knowledge thereof, or (iv) any other RE Assets without consent of the Lender Agent;

(q)     any extensions, substitutions, replacements or renewals of the foregoing; and

(r)     Identified Lien Exceptions denoted with an asterix on Schedule VI(a) to the Security Agreement.

"Permitted Refinancing Indebtedness" means Indebtedness that refunds, refinances, renews, replaces or extends any Indebtedness permitted to be incurred by ResCap or any Subsidiary pursuant to the terms of this Agreement, whether involving the same or any other lender or creditor or group of lenders or creditors, but only to the extent that:

(a)     the Permitted Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Indebtedness being refunded, refinanced or extended or (b) at least 91 days after the Scheduled Loan Repayment Date,

(b)     the Permitted Refinancing Indebtedness has a weighted average life to maturity that is equal to or greater than the remaining weighted average life to maturity of the Indebtedness being refunded, refinanced, renewed, replaced or extended,

(c)     such Permitted Refinancing Indebtedness is in an aggregate principal amount that is less than or equal to the sum of (i) the aggregate principal or accreted amount (in the case of any Indebtedness issued with original issue discount) then

Confidential

outstanding under the Indebtedness being refunded, refinanced, renewed, replaced or extended, (ii) the amount of accrued and unpaid interest, if any, and premiums owed, if any, not in excess of preexisting prepayment provisions on such Indebtedness being refunded, refinanced, renewed, replaced or extended and (iii) the amount of reasonable and customary fees, expenses and costs related to the incurrence of such Permitted Refinancing Indebtedness,

(d)    such Permitted Refinancing Indebtedness is incurred by the same Person (or its successor) that initially incurred the Indebtedness being refunded, refinanced, renewed, replaced or extended or by ResCap or a Guarantor; and

(e)    if the Indebtedness is unsecured, such Permitted Refinancing Indebtedness is unsecured.

"Permitted Restricted Payments" means any of the following:

(a)    the payment of any dividend on Equity Interests in ResCap or a Subsidiary within sixty (60) days after declaration thereof if on the declaration date after giving effect to such Restricted Payment on a pro forma basis, the aggregate amount expended or declared for all Restricted Payments made on or after the Closing Date (excluding Restricted Payments described in clauses (b), (c), (d), (f) and (g) and of this definition), shall not exceed the Restricted Payment Maximum Amount;

(b)    the retirement of any Equity Interests of ResCap by conversion into, or by or in exchange for, Qualified Equity Interests, or out of net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of ResCap) of other Qualified Equity Interests;

(c)    the redemption, defeasance, repurchase or acquisition or retirement for value of any Indebtedness of ResCap or a Guarantor in exchange for or out of the net cash proceeds of a substantially concurrent issue and sale (other than to a Subsidiary of ResCap) of (i) Qualified Equity Interests or (ii) Permitted Refinancing Indebtedness;

(d)    in the case of a Collateral Disposition, the repurchase or other acquisition out of Net Cash Proceeds of notes issued pursuant to the Exchange Offer to the extent required under the terms thereof and not otherwise required to make payments or reinvestments pursuant to Section 2.08(c);

(e)    Permitted Tax Distributions;

(f)    the exchange of, the Preferred Units of ResCap existing as of the Closing Date for any property into which such Preferred Units are exchangeable in accordance with their terms; and

(g)    if no Default is continuing, Restricted Payments not otherwise Permitted Restricted Payments in an amount not to exceed $250,000,000 per year.

Confidential

"Permitted Tax Distributions" means, with respect to any period during which ResCap is treated as a disregarded entity or partnership for U.S. federal, state and/or local income tax purposes, distributions to ResCap's direct owner(s) (whether pursuant to a tax sharing agreement or otherwise) to fund the income tax liabilities of such owner(s) (or, if a direct owner is a pass-through entity, of an indirect owner) resulting from ResCap being a partnership or disregarded entity for federal, state and/or local income tax purposes, in an aggregate amount not to exceed the product of (a) the net taxable income of ResCap for such period, calculated in accordance with applicable law, reduced by any cumulative net taxable loss with respect to all prior post-closing periods (determined as if all such periods were one period) to the extent such cumulative net taxable loss is of a character (ordinary or capital) that would permit such loss to be deducted against the income of the current period; and (b) the highest combined marginal federal, state and/or local income tax rate (taking into account the deductibility of state and local income taxes for federal income tax purposes and the character of the taxable income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any such direct or indirect owner of ResCap. Permitted Tax Distributions may be made quarterly based on ResCap's good faith estimate of its taxable income, with appropriate adjustments to be made on an annual basis based upon the determination of ResCap's actual taxable income.

"Person" means any individual, corporation, estate, partnership, limited liability company, limited liability partnership, joint venture, association, joint-stock company, business trust, trust, unincorporated organization, government or any agency or political subdivision thereof, or other entity of a similar nature.

"Post-Closing Requirements" means the delivery of the items specified on Schedule 8.01(m) in form and substance satisfactory to the Lender Agent in its reasonable discretion within the time frame specified in such schedule for each such item.

"Preferred Units" means the non-cumulative, non-participating, perpetual preferred membership interests of ResCap, the designation of which is as set forth in the Amended and Restated Operating Agreement of ResCap.

"Prepayment Notice" means a notice substantially in the form of Exhibit 2.09(a).

"Primary Collateral" means Initial Collateral, REO Property acquired as the result of foreclosure on Primary Collateral, Reinvestment Collateral, Substitute Collateral, any assets acquired as a result of exercising remedies under any Initial Collateral, Reinvestment Collateral that was designated as such prior to the Amendment Closing Date or Substitute Collateral, and all proceeds of the foregoing.

"Primary Hedge Documents" means the ISDA master agreement and related schedule in the form set forth in Exhibit A hereto and entered into between the ResCap Counterparty and the Initial Lender, as such documents are amended or modified from time to time.

"Pro Rata Share" means, relative to any Lender, the percentage set forth below its name on its signature page hereto or set forth in an Assignment and Acceptance under the "Pro Rata Share" column, as such percentage may be adjusted from time to time pursuant to Assignment

Confidential

and Acceptances executed by such Lender and its assignee and delivered pursuant to Section 9.01. A Lender shall not have any Commitment if its Pro Rata Share is zero.

"Qualified Equity Interests" means Equity Interests of ResCap other than Disqualified Equity Interests.

"Real Estate Security Documents" means (i) the RE Pledge Agreement and (ii) mortgages, deeds of trust and similar documents executed by ResCap Subsidiaries to create Liens on REO Property and/or other real estate to secure, among other things, the Obligations, as contemplated by this Agreement, together with any guarantees executed by such Subsidiaries in connection therewith.

"RE Assets" means the assets of a Restricted Entity, to the extent such assets constitute the basis for attributing Collateral Value to any Asset.

"RE Pledge Agreement" means the Real Estate Subsidiary Pledge and Security Agreement and Irrevocable Proxy, dated as of the Amendment Closing Date, among the Collateral Control Agent and certain subsidiaries of ResCap.

"Register" has the meaning set forth in Section 2.02(b).

"Reinvestment Collateral" means (i) Eligible Assets acquired as Permitted Consideration for a Collateral Disposition prior to the Amendment Closing Date, (ii) Servicing P&I Advances, Servicing Corporate Advances and Servicing T&I Advances arising under an Eligible Servicing Advances Agreement, (iii) REO Property, ownership of which has been transferred to an REO Owner, and (iv) other Eligible Assets acquired with Net Cash Proceeds of a Collateral Disposition or otherwise designated by the Borrowers as new Primary Collateral or Supporting Assets to replace the assets subject to a Collateral Disposition, which Reinvestment Collateral shall be included in any Permanent Paydown Reports prior to the Amendment Closing Date; provided that the failure to include such Reinvestment Collateral on any Permanent Paydown Report shall not relieve the Obligors of any of their obligations to treat assets acquired as Permitted Consideration for a Collateral Disposition or with Net Cash Proceeds of a Collateral Disposition as Primary Collateral or to comply with the provisions of the Facility Documents relating to Primary Collateral.

"Related Documents" means the Line of Credit Agreement and all security documents, sale documents, licenses, service agreements and other agreements and documents to be execute and delivered by ResCap and its Subsidiaries in connection with any of the foregoing.

"Remittance Date" means the 18th calendar day of each month (or if such day is not a Business Day, the first Business Day preceding such date) on which servicing advances are due under the applicable servicing agreement by a servicing Subsidiary of ResCap.

"REO Owner" means (i) Residential Mortgage Real Estate Holdings, LLC, a Delaware limited liability company, (ii) Residential Funding Real Estate Holdings, LLC, a Delaware limited liability company, (iii) Homecomings Financial Real Estate Holdings, LLC, a Delaware limited liability company, and (iv) any other company approved in writing by the Lender Agent.

Confidential

"<u>REO Property</u>" means real estate owned property (i.e., a mortgaged property acquired through foreclosure or deed-in-lieu of foreclosure).

"<u>Repayment Notice</u>" means a notice substantially in the form of <u>Exhibit 2.08(b)</u>.

"<u>Requirements of Law</u>" means, with respect to any Person or any of its property, the certificate of incorporation of articles of association and by-laws, certificate of limited partnership, limited partnership agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether Federal, state or local (including, without limitation, usury laws, the Federal Truth in Lending Act and retail installment sales acts).

"<u>Required Lenders</u>" means, at any time, Lenders holding more than 67% of the sum of the Outstanding Aggregate Loan Amount.

"<u>ResCap</u>" means Residential Capital, LLC, a Delaware limited liability company, and its successors in interest.

"<u>ResCap Counterparty</u>" means ResCap and any successor to ResCap as counterparty under the Hedge Documents.

"<u>ResCap Liquidity Balance Rollforward</u>" means the liquidity balance rollforward data delivered daily by the Obligors pursuant to <u>Section 2.4</u> of the Consent Agreement dated as of October 17, 2008 among GMAC, as lender, as initial lender and as Lender Agent, RFC and GMAC Mortgage, as borrowers, ResCap, as guarantor and certain other parties thereto.

"<u>ResCap Treasury</u>" means the ResCap treasury operations group located in the Chief Executive Office of ResCap.

"<u>Reserves</u>" shall mean as of any date of determination, such amounts as the Lender Agent may, from time to time and acting reasonably, establish and revise reducing the amount of Loans which would otherwise be available to Borrowers under the lending formula(s) provided for under <u>Schedule 2.04</u>:  (a) to reflect events, conditions, contingencies or risks which, as reasonably determined by the Lender Agent, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Primary Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of any Borrower or any Guarantor or (iii) the security interests and other rights of the Lender Parties in the Primary Collateral (including the enforceability, perfection and priority thereof); or (b) to reflect the Lender Agent's reasonable belief that any collateral report or financial information furnished by or on behalf of any Borrower or any Guarantor to the Lenders is or may have been incomplete, inaccurate or misleading in any material respect; or (c) in respect of any state of facts which the Lender Agent reasonably determines constitutes a Default or an Event of Default.  To the extent the Lender Agent may revise the lending formulas used to determine the Borrowing Base or establish new criteria or revise existing criteria for Eligible Assets so as to address any circumstances, condition, event or contingency in a manner satisfactory to the Lender Agent, the Lender Agent shall not establish a Reserve for the same purpose.  The amount of any Reserve

Schedule 1.01-36

Confidential

established by the Lender Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such reserve as reasonably determined by the Lender Agent.

"Residual Rights" means (i) in the case of loans secured by mortgage loans or mortgage related securities, rights in the mortgage loans or mortgage-related securities securing such loan after taking into account senior claims thereon, (ii) in the case of repurchase agreements, both the rights under the repurchase agreement (or any transaction thereunder) and rights in the mortgage loans or mortgage-related securities transferred pursuant to the provisions of the repurchase agreement (or any transaction thereunder) after taking into account any senior claim claims, thereon, and (iii) in the case of any other Collateral or Supporting Assets, rights in such Collateral or Supporting Assets after taking into account senior claims thereon.

"Responsible Officer" means (a) with respect to each Borrower and each Obligor, the chief executive officer, president, chief financial officer, treasurer, assistant vice president, assistant treasurer, secretary or assistant secretary of such Borrower, or any other officer having substantially the same authority and responsibility; provided that with respect specifically to the obligations of each Borrower or ResCap set forth in Section 7.01(f) hereof, only the chief financial officer, treasurer, assistant treasurer, or controller and chief accounting officer of such Person shall be deemed to be a Responsible Officer; and (b) with respect to any Lender, a lending officer charged with responsibility for the day to day management of the relationship of such institution with the Borrowers.

"Restricted Entity" means (i) English SPE, (ii) Dutch SPE, (iii) each BCG REO Subsidiary, (iii) each REO Owner, (iv) each Person whose equity has been designated as Primary Collateral or Supporting Assets (other than GMAC Mortgage), (v) each Person designated as a Restricted Entity in a Collateral Addition Designation Notice in connection with the designation of Substitute Collateral, and (vi) any Subsidiary of any of the foregoing.

"Restricted Payment" is defined to mean any of the following:

(a)    any dividend or other distribution declared and paid on the Equity Interests of ResCap or on the Equity Interests in any Subsidiary of ResCap that are held by, or declared and paid to, any Person other than ResCap or a Subsidiary of ResCap or any GMAC Party other than (i) dividends, distributions or payments made solely in Qualified Equity Interests of ResCap; and (ii) dividends or distributions payable to ResCap or a Subsidiary of ResCap or to other holders of Equity Interests of ResCap or a Subsidiary (other than the GMAC Parties) on a pro rata basis;

(b)    any payment made by ResCap or any of its Subsidiaries to purchase, redeem, acquire or retire any Equity Interests in ResCap or any of its Subsidiaries (including any issuance of Indebtedness in exchange for such Equity Interests or the conversion or exchange of such Equity Interests into or for Indebtedness) other than any such Equity Interests owned by ResCap or any Subsidiary and other than the redemption of Equity Interests of IB Finance for up to the fair market value thereof at the time of redemption (it being understood that any excess over such fair market value which is paid shall be deemed to be a Restricted Payment and shall be permitted to be paid to the extent otherwise in compliance with Section 7.02(g));

Confidential

(c)      any payment made by ResCap or any of its Subsidiaries (other than payments out of the proceeds of, or in exchange for, the notes issued pursuant to the Exchange Offer or Permitted Refinancing Indebtedness) to redeem, repurchase, defease (including in substance or legal defeasance) or otherwise acquire or retire for value (including pursuant to mandatory repurchase covenants), prior to any scheduled maturity, scheduled sinking fund or mandatory redemption payment, Exchange Offer Notes, unsecured Permitted Refinancing Indebtedness of Exchange Offer Notes or subordinated indebtedness of any Obligor, except, in each case, payments of principal required in order to satisfy a scheduled maturity date on the date such payment is due; and

(d)      any Investment by ResCap or any of its Subsidiaries in any GMAC Party.

"Restricted Payment Maximum Amount" means the sum (without duplication) of (a) 50% of the Consolidated Net Income (or, if Consolidated Net Income shall be a deficit, minus 100% of such deficit) of ResCap accrued on a cumulative basis during the period (taken as one accounting period) from the beginning of the first full fiscal quarter following the fiscal quarter in which the Closing Date occurs and ending on the last day of the fiscal quarter immediately preceding the date of such Restricted Payment; plus (b) 100% of the aggregate net cash proceeds received by ResCap subsequent to the Closing Date either (i) as a contribution to its common equity capital or (ii) from the issuance and sale (other than to a Subsidiary) of Qualified Equity Interests, including Qualified Equity Interests issued upon the conversion of Indebtedness of ResCap, and from the exercise of options, warrants or other rights to purchase such Qualified Equity Interests (other than, in each case, Equity Interests or Indebtedness sold to a Subsidiary of ResCap); minus (c) $859,000,000.

"Returned Amount" has the meaning set forth in Section 13.12(d).

"RFC" means Residential Funding Company, LLC, and its successors in interest.

"RFC Construction Funding" means RFC Construction Funding, LLC, a Delaware limited liability company.

"Sales Proceeds Accounts" means the accounts listed on Schedule X(b) of the Security Agreement; provided that to the extent any Net Cash Proceeds are required to be held in the European SPV Accounts under the Dutch Security Documents and the English Security Documents, the European SPV Accounts shall constitute Sales Proceeds Accounts with respect to such funds for the purposes of Section 4.02(a); provided further that the Wachovia Sweep Account shall constitute a Sales Proceeds Account solely for the purpose of receiving Net Cash Proceeds and using such Net Cash Proceeds to make mandatory repayments of Loans in accordance with Section 2.08(c).

"Scheduled Loan Repayment Date" means May 1, 2010.

"Scratch and Dent Mortgage Loans" means mortgage loans acquired by the Borrowers or their Subsidiaries in the ordinary course of business which are not saleable to FNMA, FHLMC, or in the normal whole loan and securitization markets in the ordinary course of business as

Confidential

newly originated, non-defective mortgage loans, which loans include but are not limited to Kick-Out Loans, aged mortgage loans, nonperforming mortgage loans and mortgage loans which have defects in their documentation or underwriting.

"Second Lien Loan" means any Mortgage Loan secured by a second lien on or second priority interest in a mortgaged property securing a mortgage note.

"Secured Parties" means the Lender Agent, the Lenders, the Indemnified Parties and each other Person identified as a "Secured Party" in the Security Agreement.

"Security Agreement" means the First Priority Pledge and Security Agreement and Irrevocable Proxy, dated June 4, 2008, among the Borrowers and certain of their Affiliates, as grantors thereunder, the Lender Agent and the First Priority Collateral Agent, as amended and restated as of the Amendment Closing Date and as further amended, amended and restated or otherwise modified from time to time.

"Security Documents" means the Security Agreement, the Hedge Security Agreement, the Intercreditor Agreement, the Account Control Agreements, the Dutch Security Documents, the English Security Documents, the Mexican Security Documents, the Real Estate Security Documents, all documents delivered in satisfaction of the Post Closing Requirements, and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of, or for the benefit of, the First Priority Collateral Agent or the Collateral Control Agent for its benefit and for the benefit of the Lender Parties.

"Servicing Advances" means Servicing T&I Advances, Servicing P&I Advances and Servicing Corporate Advances.

"Servicing Advances Accounts" means the Sales Proceeds Accounts designated as such in accordance with Section 4.02(b).

"Servicing Corporate Advances" means any Advance relating to domestic Mortgage Loans or REO Property made by an Obligor made (except with respect to Servicing Corporate Advances which constitute Substitute Collateral) pursuant to an Eligible Servicing Advances Agreement in the ordinary course of business to maintain or maximize the value of a Mortgage Loan or REO Property, which Advance is described in clause (i) of the definition of Advance.

"Servicing Guidelines" means the policies and procedures of ResCap, its Subsidiaries and subservicers in servicing Mortgage Loans and REO properties, which policies and procedures meet the parameters set forth in Section 7.01(p).

"Servicing P&I Advance" means any Advance relating to domestic Mortgage Loans or REO Property made by an Obligor made (except with respect to Servicing P&I Advances) which constitute Substitute Collateral, pursuant to an Eligible Servicing Advances Agreement which is described in clause (ii) of the definition of Advance.

"Servicing T&I Advance" means any Advance relating to domestic Mortgage Loans or REO Property made by an Obligor (made in accordance with a contractual obligation and, except

Confidential

with respect to Servicing T&I Advances which constitute Substitute Collateral, pursuant to an Eligible Servicing Advances Agreement) which is described in <u>clause (iii)</u> of the definition of Advance.

"<u>Significant Subsidiary</u>" means any Subsidiary of ResCap (or group of Subsidiaries as to which a specified condition applies) which meets any of the following conditions:

>          (a)          ResCap's and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Subsidiary exceeds 10 percent of the total assets of ResCap and its Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

>          (b)          the Subsidiary's income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle exceeds 10 percent of such income of ResCap and its Subsidiaries on a consolidated basis for the most recently completed fiscal year.

For purposes of this definition, a "<u>Subsidiary</u>" shall mean a Person that is controlled by ResCap directly or indirectly through one or more intermediaries.  For purposes of making any determination or calculations, this definition will be interpreted in accordance with the rules and instructions of Rule 1-02 of Regulation S-X under the Securities Act as in effect on the date hereof.

"<u>Solvent</u>" means, with respect to the Obligors on a particular date, that on such date (i) the most recently reported value of the assets pursuant to <u>Section 7.01(f)</u> of such Obligor, taking into account the fair value of assets accounted for on a fair value basis and the carrying value of other assets, is greater than the total amount of the most recently reported liabilities of such Obligor (including the fair value of liabilities reported on a fair value basis), (ii) after giving effect to each Loan, such Obligor is able to realize upon its assets and pay its debts and other liabilities as they mature, assuming an orderly disposition, and (iii) such Obligor does not have unreasonably small capital with which to conduct its business.

"<u>Specified Affiliate</u>" means a Borrower, a Guarantor or, during the first six weeks following the Amendment Closing Date, any other Subsidiary of ResCap.

"<u>Specified Amount</u>" means (i) the Net Cash Proceeds of a Collateral Disposition, which Net Cash Proceeds are less than $10,000,000 or (ii) Collections (other than Net Cash Proceeds) in respect of an Asset or group of Assets for which Collections (other than Net Cash Proceeds) are processed in the same operations department, provided that such Collections (other than Net Cash Proceeds) are less than $1,000,000.

"<u>Specified Percentage</u>" has the meaning set forth in <u>Schedule 2.04</u>.

"<u>Sponsor</u>" means Cerberus Capital Management, L.P., any of its affiliates and any affiliated investment funds or managed accounts which are managed or advised by Cerberus Capital Management, L.P. or any of its affiliates.

"<u>Subject Asset</u>" means an Asset which is an Eligible Asset or Primary Collateral.

Confidential

"Subsidiary" of any Person means any corporation, partnership, limited liability company, association or other entity of which at least a majority of the outstanding stock or other interest having by its terms ordinary voting power to elect a majority of the board of directors, managers or trustees of such corporation, partnership, limited liability company, association or other entity (irrespective of whether or not at the time stock or other interest of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person, or owned by one or more Subsidiaries of such Person (provided that, it is understood that Ally Bank is not a Subsidiary of either Borrower).

"Subsidiary Pledgor" means any Subsidiary that executes or delivers a Security Document pursuant to the Facility Documents or otherwise becomes a party under a Security Document as a grantor, pledgor, mortgagor, guarantor, provider of credit support or other obligor.

"Substitute Collateral" has the meaning set forth in Section 2.08(b).

"Substitute Collateral Certificate" means a certificate of a Responsible Officer of the relevant Obligor (i) identifying the Primary Collateral and/or Supporting Assets that has been the subject of a write-down, (ii) identifying any Substitute Collateral designated as Primary Collateral and all related Supporting Assets, Restricted Entities, and Underlying Documents, (iii) certifying that such write-down complied with ResCap's standard valuation practices applied to its assets as a whole as then in effect (such valuation practices to be consistent with the methodology used in the preparation of ResCap's GAAP financial statements), and (iv) certifying that such Primary Collateral constitutes Eligible Assets.

"Substitute Collateral Schedule" means a schedule setting forth the Substitute Collateral added since the cutoff date relating to the most recently delivered Substitute Collateral Schedule, which schedule shall be in such form as the Lender Agent may approve from time to time in its discretion after consultation with the Borrowers.

"Substitute Eligible Asset" means (i) an Eligible Asset, or (ii) a Line of Credit Asset which is an "Eligible Asset" as defined in the Line of Credit Agreement.

"Supporting Assets" means, with respect to any Primary Collateral or Eligible Asset, (a) if such Subject Asset consists of an Equity Interest in any Person, the assets of such Person; (b) if such asset consists of a direct or indirect ownership interest in a Restricted Entity, such entity's RE Assets, (c) if such Subject Asset consists of a note or other security backed by financial assets and related property, such assets and property; and (d) with respect to any Subject Asset, any other asset or claim that constitutes a primary source of the funds expected to repay the investment in, and return on, such Subject Asset.

"Suretyship Liability" means any agreement, undertaking or arrangement by which any Subsidiary guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to or otherwise to invest in a debtor, or otherwise to assure a creditor against loss) any Indebtedness, obligation or other liability of any other Subsidiary (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon

Schedule 1.01-41

Confidential

the shares of any other Subsidiary.  The amount of any Subsidiary's obligation in respect of any Suretyship Liability will (subject to any limitation set forth therein) be deemed to be the principal amount of the debt, obligation or other liability supported thereby.

"Transfer" means any sale, securitization, financing, exchange, creation of lien, pledge or encumbrance or other disposition by ResCap or any Subsidiary of any Primary Collateral or Supporting Assets to any Person, provided that Transfers shall exclude any foreclosure by ResCap or any of its Affiliates to the extent that ownership of any REO Property resulting from such foreclosure shall be transferred to an REO Owner or a BCG REO Subsidiary as soon as reasonably practicable and shall become part of Supporting Assets.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Underlying Documents" means:

(a) the English Note and the English Security Documents;

(b) the Dutch Note and the Dutch Security Documents;

(c) with respect to the BCG Subsidiaries whose equity is part of Primary Collateral or Supporting Assets, each of the following agreements to which such BCG Subsidiary is a party:  (i) joint venture agreement or other agreement with other equity investors, (ii) land acquisition, development, construction or similar agreement with a Person or Persons primarily responsible for the development of a real estate project, including the Master Sale and Rental Agreements, lot option agreements and agreements to share profits and losses, including any Master Sale and Rental Agreement, lot option agreement or related promissory notes, and (ii) any agreement under which such BCG Subsidiary extends credit (other than trade credit in the ordinary course of business) to another Person and the primary collateral documents securing such extension of credit;

(d) each agreement or document designated as an Underlying Document in a Collateral Addition Designation Notice;

(e) with respect to any Substitute Collateral previously pledged as collateral under the Line of Credit Agreement, all "Underlying Documents" (as defined in the Line of Credit Agreement) with respect to such Substitute Collateral; and

(f) any other material agreement or document that relates to Primary Collateral, Supporting Assets, RE Assets or Restricted Entities, whose termination, material breach or material modification could reasonably be expected to give rise to a Material Adverse Effect.

"Unmatured Event of Default" means any event that, with the giving of notice or lapse of time, or both, would become an Event of Default.

"VA" means the U.S. Department of Veterans Affairs, an agency of the United States of America, or any successor thereto.

Confidential

"VA Approved Lender" means those lenders which are approved by the VA to act as a lender in connection with the origination of any mortgage loan subject to a VA Guaranty Agreement.

"VA Guaranty Agreement" means the obligation of the United States to pay a specific percentage of a mortgage loan (subject to a maximum amount) upon default of the mortgagor pursuant to the Serviceman's Readjustment Act, as amended.

"Valuation Agent" means the Person selected by the Lender Agent from time to time in its sole discretion whose responsibility is to calculate the Collateral Value from time to time.

"Valuation Date" means each Business Day.

"Value" means (a) with respect to Conforming Loans, Jumbo Loans, Wet Loans, Second Lien Loans or HELOC Loans that are being held for sale, HLTV Loans that are being held for sale, Scratch and Dent Loans that are being held for sale and Financial Asset-Backed Securities, the lower of market value or Par Value; and (b) with respect to Servicing P&I Advances, Servicing T&I Advances, Servicing Corporate Advances, Other Receivables, IBG Assets, BCG Assets, Residual Rights, Second Lien Loans that are being held for investment, REO Properties, Kick-Out Loans, Model Homes and HLTV Loans that are being held for investment, the Carrying Value.

"Voting Stock" means, with respect to any person, such person's Capital Stock having the right to vote for election of directors (or the equivalent thereof) of such person under ordinary circumstances.

"Wachovia Sweep Account" means account number 2000042898663 at Wachovia Bank, National Association in the name of Residential Capital, LLC Concentration Account for the benefit of Wells Fargo Bank N.A. as Collateral Control Agent.

"WestLB Program Subsidiary" means a special purpose vehicle which has (a) has been designated by the Borrowers and either approved in writing by the Lender Agent or is established with organizational documents in substantially the same form as the organizational documents for RC Properties VI, LLC or another form approved by the Lender Agent in writing and (b) is a subsidiary of RFC Construction Funding.

"Wet Loan" means a Mortgage Loan for which the related mortgage file has not been delivered to the applicable mortgage loan custodian.

Confidential

<div align="right">SCHEDULE 2.04</div>

<div align="center">COLLATERAL VALUE CALCULATIONS</div>

1.      <u>Collateral Value</u>.  The Collateral Value of the Assets comprising the Primary Collateral shall be calculated by the Borrower on a monthly basis in accordance with <u>Section 2.04</u>.  Upon such calculation, the Valuation Agent shall promptly notify the Lender Agent and Borrowers of its calculation of Collateral Value.  In the event that the Valuation Agent is uncertain as to whether a particular Asset constitutes Primary Collateral, or as to whether the documents relating to a particular Assets is in form and substance satisfactory to the Lender Agent, the Valuation Agent shall rely on the direction of the Lender Agent which direction shall be conclusive and binding on the Valuation Agent absent manifest error.  The Carrying Value of all Primary Collateral shall be included by the Obligors in the Collateral Value Report.

2.      <u>Definitions</u>.  Capitalized terms used herein and not otherwise defined shall have the meanings given to them in <u>Schedule 1.01</u> to the Loan Agreement to which this <u>Schedule 2.04</u> is attached.  In addition, the following terms shall have the meanings as indicated.

3.      <u>Collateral Value Determination</u>.  "Collateral Value" means, as of any date of determination and solely with respect to Primary Collateral or Supporting Assets for Primary Collateral, the sum of the amounts determined (with respect to each category of Primary Collateral or such Supporting Assets but without duplication) to be the Specified Percentage of the Value of such Primary Collateral or Supporting Assets; <u>provided</u> that Collateral Value shall be adjusted to take into account the restrictions in <u>Part 5</u> below.

As of the Amendment Closing Date and until such time as the Lender Agent shall notify the Borrowers in writing to the contrary, the Specified Percentage for Primary Collateral or Supporting Assets designated as such prior to the Amendment Closing Date shall be as set forth below.

     (a)      90% for Conforming Loans;

     (b)      80% for Jumbo Loans;

     (c)      85% for Wet Loans;

     (d)      50% for Second Lien Loans and HELOC Loans that are held for sale;

     (e)      50% for HLTV Loans that are held for sale;

     (f)      50% for Scratch and Dent Loans that are held for sale;

     (g)      50% for Financial Asset-Backed Securities;

     (h)      80% for Servicing P&I Advances to the extent that the documents relating to such Servicing P&I Advances are in form and substance satisfactory to the Lender Agent and its counsel;

5254280.33 08048307

Confidential

(i)      70% for Servicing T&I Advances to the extent that the documents relating to such Servicing T&I Advances are in form and substance satisfactory to the Lender Agent and its counsel;

(j)      70% for Servicing Corporate Advances to the extent that the documents relating to such Servicing Corporate Advances and Corporate Advances are in form and substance satisfactory to the Lender Agent and its counsel;

(k)      50% for Other Receivables;

(l)      50% for IBG Assets;

(m)      50% for BCG Assets (including, for the avoidance of doubt, BCG Assets consisting of REO Property);

(n)      50% for Residual Rights;

(o)      50% for Second Lien Loans and HELOC Loans and are being held for investment;

(p)      50% for Scratch and Dent Loans that are being held for investment;

(q)      50% for Kick-Out Loans;

(r)      50% for HLTV Loans that are being held for investment;

(s)      50% for (i) REO Property (A) included in the Supporting Assets for Primary Collateral, (B) arising from the foreclosure of Mortgage Loans previously included in Primary Collateral or (C) transferred to a REO Subsidiary prior to December 1, 2009, or (ii) Model Homes owned by MHFI or its Subsidiary, provided in each case that such ownership interest has been submitted for recordation in the applicable real estate records; and 0% for all other REO Property.

4.      Specified Percentage Determination.  "Specified Percentage" means, with respect to any group of Assets, the percentage specified in the most recent written notice from the Lender Agent to the applicable Obligor, whether such notice is given at the inclusion of such Assets in the Borrowing Base or at any time thereafter.  It is understood and agreed that the Lender Agent shall have right to adjust the Specified Percentage for any group of Collateral in its reasonable discretion, taking into account estimated collections, market value, legal risks, cost of recovery and other matters customarily considered by commercial lenders when determining advance rates.

With respect to Mortgage Loans that are Supporting Assets for the English Note or the Dutch Note, it is understood that Mortgage Loans secured by real estate in different countries may have different Specified Percentages, even though such Mortgage Loans are Supporting Assets for a single security.

Confidential

5.      <u>Restrictions</u>.  The Collateral Value shall be adjusted to reflect the following restrictions:

(i)      The aggregate amount included in the Collateral Value with respect to REO Property at any time shall not exceed the lesser of (x) $30,000,000 or (y) 5% of the aggregate Collateral Value of all Primary Collateral included in the Borrowing Base.

(ii)      At any time the aggregate value included in Collateral Value with respect to any Asset that was not an Eligible Asset as of the Closing Date (in the case of Initial Collateral) or as of the date it became Collateral shall in each case be zero.

(iii)      The aggregate value included in Collateral Value with respect to any Mortgage Loan shall be zero following the day on which such Mortgage Loan is shown in a Collateral Value Report as having become REO Property, and no calculation of the Borrowing Base or Adjusted Borrowing Base shall include Collateral Value for both such Mortgage Loan and such REO Property.

(iv)      The Collateral Value for the equity of a Restricted Entity shall not be increased due to acquisition of any Asset by such Person unless (i) such REO results from the foreclosure (or deed in lieu of foreclosure) of Assets previously designated as Primary Collateral or Supporting Assets and satisfies the requirements set forth in <u>clause (x)</u> of <u>Exhibit A</u>, <u>clause (z)</u> of <u>Exhibit A</u>, <u>clause (v)</u> of <u>Exhibit B</u> or <u>clause (y)</u> of <u>Exhibit B</u> (as applicable), or (ii) such Asset is an Eligible Asset proposed to be a Supporting Asset by a Borrower and has been approved by the Lender Agent in writing.

Confidential

<div align="right">SCHEDULE 5.01</div>

<div align="center">CONDITIONS PRECEDENT</div>

(a)    This Agreement duly executed by the parties hereto;

(b)    A replacement Note dated as of the Amendment Closing Date payable to the order of the initial Lender in an amount equal to the Outstanding Aggregate Loan Amount on such date;

(c)    The Security Agreement, the RE Pledge Agreement and the Hedge Security Agreement executed by the parties thereto, together with all related amendments to the financing statements filed in connection therewith;

(d)    The Intercreditor Agreement shall have been amended to expand the role of the Collateral Control Agent, as contemplated by the Real Estate Security Documents, in such manner as the Lender Agent shall require;

(e)    All conditions precedent to the effectiveness of the Related Documents shall have been satisfied or waived by GMAC Inc. and any other Person whose waiver is required;

(f)    A certificate of a secretary or assistant secretary of each Borrower, ResCap and each other Guarantor and each other Obligor, each (i) certifying the names and true signatures of the persons authorized on such party's behalf to sign, as applicable, this Agreement, the initial Note (if applicable) and the other Facility Documents to be delivered by such party in connection herewith and (ii) attaching true and correct copies of the authorizing resolutions of the foregoing in form and substance satisfactory to the Lender Agent;

(g)    A certificate of a Responsible Officer of each Borrower, ResCap and each other Guarantor and each other Obligor, each certifying as to (i) the accuracy and completeness of each of the representations and warranties contained in each Facility Document to which such entity is a party (except for representations and warranties made in respect of specific mortgage loans), (ii) the absence of any Default under such Facility Documents to which such entity is a party as of the Amendment Closing Date and (iii) the absence of any event or circumstances (other than those disclosed to the Lender Agent) since December 31, 2008 that could reasonably be expected to give rise to a Material Adverse Effect;

(h)    A certificate of a Responsible Officer of each Borrower, ResCap and each other Obligor (i) if such Obligor was party to the Original Loan Agreement, certifying as to the accuracy and completeness and absence of changes, as of the Amendment Closing Date, in (A) the certificate of incorporation or formation of each entity provided to the Lender Agent on the Closing Date and (B) its limited liability company agreement or bylaws provided to the Lender Agent on the Closing Date, and (iii) otherwise certifying that the attached certificate of incorporation or formation, limited liability company agreement and bylaws are accurate and complete;

(i)    A (i) good standing certificate issued by the Secretary of State of the State of Delaware certifying that RFC, GMAC Mortgage and ResCap are validly existing and in good

Confidential

standing and (ii) good standing certificate issued by appropriate authority in the jurisdiction of each other Obligor's formation, certifying that such Obligor is validly existing and in good standing;

(j)        The filing of proper financing statements (Form UCC-1) or amendments to financing statements (Form UCC-3), naming each Obligor as debtor and the First Priority Collateral Agent as the secured party, or other, similar instruments or documents, and the taking of all actions under the UCC or any Requirements of Law (including under English law) as necessary or reasonably requested by the Lender Agent to perfect the First Priority Collateral Agent's interest in the Collateral;

(k)        Opinions of external and/or in-house counsel for the Borrowers, the Guarantors and each Subsidiary Pledgor and each other Obligor covering such matters as may be reasonably requested by the Lender Agent;

(l)        All documents executed or submitted pursuant hereto by or on behalf of any Obligor shall be reasonably satisfactory in form and substance to the Lender Agent; and the Lenders and their counsel shall have received all information, approvals, opinions, documents or instruments as the Lenders or their legal counsel may reasonably request; and

(m)        To the extent not previously delivered to the Lender Agent, the Lender Agent shall have received, or shall have been granted website access to, true and correct copies of the Underlying Documents.

Confidential

SCHEDULE 7.01(g)

<div align="center">REQUIRED REPORTS</div>

A.    Monthly Collateral Report, to be in detail satisfactory to the Lender Agent and delivered by the eleventh Business Day of each month, comprising:

    1.    Collateral Value Report

    2.    Substitute Collateral Schedule

    3.    Electronic File

    4.    Permanent Paydown Report

B.    Within two (2) Business Days after the delivery of each Monthly Collateral Report, a Cumulative Substitute Collateral Schedule.

5254280.33 08048307

SCHEDULE 7.01(t)

BILATERAL FACILITIES

(See Attached)

5254280.33 08048307

Confidential

T215

**BILATERAL FACILITIES**

| T# | Company Name | Internal Contract Number | Expiration Date | Description | Legal Entity Name |
|---|---|---|---|---|---|
| T005 | Fannie Mae | FNM-06863 | Perpetual | FNMA; Off-balance sheet (Gestation Repo); As Soon As Pooled Sale Agreement, dated July 28, 2003 | X- GMAC Mortgage Corporation |
| T009 | Fannie Mae | FAN-06642 | 6/30/10 | Fannie Mae; Off Balance Sheet; Master Agreement No. MP04297.1 4/24/2009 | GMAC LLC, Residential Capital, LLC, GMAC Mortgage, LLC |
| T223 | GMAC LLC | GMA-11089 | 4/30/10 | GMAC; Intercompany; Amended and Restated Loan Agreement dated December 30, 2009 | GMAC LLC, GMAC Mortgage, LLC, Passive Asset Transaction, LLC, Residential Capital, LLC, RFC Asset Holdings II, Inc, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, and Equity Investment I, LLC |
| T610 | Deutsche Trustee Company Limited | DEU-10963 | 5/31/10 | Deutsche Trustee; Secured Aggregation Facility; Amended and Restated Note Issuance Facility Deed dated November 7, 2008 | Residential Capital, LLC, GMAC-RFC Limited, CONDUIT (NO. 2) LIMITED, SILO N0.2 LIMITED |
| T622 | The Royal Bank of Scotland PLC | PRE-12357 | 3/16/10 | Preemac II; Secured Aggregation; Class D Variable Funding Loan Note Agreement dated March 19, 2009 | GMAC RFC Investments B.V.; GMAC-RFC Nederland B.V.; Preemac II, NL B.V.; Residential Capital, LLC |
| T711 | International Finance Company | INT-06675 | 5/27/10 | IFC; Whole Loan Repo; Amended & Restated Local Currency Revolving Loan Agreement dated April 16, 2007 | Residential Funding Company, LLC, GMAC Financiera, S.A. |
| T909 | Barclays Bank PLC | BAR-07730 | 2/24/10 | Barclays - GSAP; Other Secured Borrowings; Second Amended and Restated Indenture dated March 6, 2008 | GMACR Mortgage Products, Inc., GMAC Mortgage, LLC, GMAC Bank, Residential Funding Company, LLC |
| T924 | Lehman Commercial Paper Inc | LEH-08871 | 1/29/10 | Lehman; Other Secured Borrowing; Second Amended & Restated Master Repurchase Agreement dated June 4, 2008 | Residential Funding Company, LLC and Residential Capital, LLC |
| T932 | Citibank, NA | CIT-06399 | 5/31/10 | Citibank; Mortgage Servicing Rights; Loan and Security Agreement dated September 10, 2007 | Residential Capital, LLC, GMAC Mortgage, LLC |

**Note**   Schedule excludes ResCap intercompany agreements, bank lines and loans, bonds and deposit liabilities.

1

SCHEDULE 8.01(m)

POST-CLOSING REQUIREMENTS

*(All of the documents described below are required to be executed and delivered within the time specified below and are required to be in form and substance satisfactory to the Lender Agent.)*

A.      Within 30 days from the Amendment Closing Date, the Obligors shall, and shall cause their Subsidiaries to, execute and deliver such mortgages and deeds of trust in favor of the Collateral Control Agent or its representative for the benefit of the Lender Parties with respect to real estate held by the Restricted Entities as the Lender Agent shall require, together with evidence that such documents have been submitted for recording together with all amounts necessary to pay recording and similar taxes.

B.      Within 30 days from the Amendment Closing Date, Obligors shall cause the Custodial Agreement Supplement to be amended to provide for the delivery of mortgage loan notes, guaranties, mortgages, deeds of trust and related releases by the BCG Subsidiaries.

C.      Within 15 days from the Amendment Closing Date, the BCG Subsidiaries shall have delivered to the Lender Agent all third party consents required in connection with the pledge of interests in BCG Joint Ventures.

D.      Within 30 days from the Amendment Closing Date, the Obligors shall, and shall cause their Subsidiaries to, cause the account control agreements executed under the MSR Loan Agreement to be amended to grant control of the accounts subject thereto to the Collateral Control Agent.

E.      Within 30 days of the Amendment Closing Date, each Restricted Entity (other than Developers of Hidden Springs, LLC) that is not party to the RE Pledge Agreement and is not a BCG Joint Venture shall have modified its organization documents, in a manner satisfactory to the Lender Agent, so as to require at least one independent director and shall have appointed such director.

F.      Within 30 days of the Amendment Closing Date, the Obligors will cause the English Security Documents to be amended to require the consent of the Lender Agent to certain actions, and to permit the Lender Agent to exercise certain rights (in a manner discussed by the Lender Agent and the Borrowers in anticipation of establishing a new Restricted Entity to hold UK Mortgage Loans), and to otherwise reflect the changes herein from the Original Loan Agreement; provided that such 30-day period may be extended by an additional 30 days if, in the Lender Agent's reasonable judgment, the Obligors have used commercially reasonable efforts to cause such amendments to be executed.

G.      Within 15 days of the Amendment Closing Date, the Obligors shall deliver to the Lender Agent copies of all Contracts relating to the third party servicing of Mortgage Loans held by the Dutch SPE or the English SPE; provided that such 15 day period may be extended by an additional 15 days due to a delay in obtaining any necessary consents if, in the Lender Agent's reasonable discretion, the Obligors have used commercially reasonable efforts to obtain such consents.

5254280.33 08048307

Confidential

H.      As soon as practicable, and in any event no later than January 10, 2010, the Obligors will cause each Affected Subsidiary to deliver an Authorization Notice to the Lender Agent.

I.      As soon as practicable, and in any event no later than January 15, 2010, the Obligors will deliver notes evidencing loans pledged by certain ResCap Subsidiaries which are party to the RE Pledge Agreement together with related allonges executed in blank, to the initial Lender Agent or its designee.

J.      Within 10 days of the Amendment Closing Date, the Obligors shall deliver to the First Priority Collateral Agent the limited liability company interest certificate for RAHI A, LLC and PATI A, LLC along with the appropriate membership interest power.

Confidential

SCHEDULE 13.02

NOTICES

The Borrowers:

Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: Jerry.Lombardo@gmacrescap.com

With copy to:

GMAC Mortgage, LLC
c/o Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: Jerry.Lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax: (866) 572-7524
Email: tammy.hamzehpour@gmacrescap.com

5254280.33 08048307

The Lender:

GMAC Inc.
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Phone: 704-540-6133
Fax: 704-540-6549
Email: Jeff.Brown@gmacfs.com

With copy to:

William B. Solomon, VP and General Counsel
Phone: (313) 656-6128
Fax: (313) 656-6124
Email: William.b.solomon@gm.com

Guarantors:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax: (866) 572-7524
Email: tammy.hamzehpour@gmacrescap.com

Homecomings Financial, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-7359
Fax: (952) 921-4230
Email:  Jerry.Lombardo@gmacrescap.com

GMAC-RFC Holding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-7359
Fax: (952) 921-4230
Email:  Jerry.Lombardo@gmacrescap.com

5254280.33 08048307                    Schedule 13.02-2

Confidential

GMAC Residential Holding Company, LLC
3993 Howard Hughes Parkway
Suite 250
Las Vegas, NV  89169
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: Jerry.Lombardo@gmacrescap.com

Confidential

EXHIBIT A

ELIGIBILITY REQUIREMENTS

Capitalized terms used in this Exhibit A have the meaning set forth in Schedule 1.01 to the Loan Agreement to which the Exhibit A is a part.

An Asset shall be deemed to satisfy the Eligibility Requirements if such Asset meets the following requirements:

(a)     each related Contract constitutes a legal, valid and binding obligation of the related Payor, enforceable against the Payor in accordance with its terms and is not subject to any right of rescission, set-off, counterclaim or other defense of the related Payor (except as enforceability may be limited or defenses may arise by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors', mortgagees' or lessors' rights in general and general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law); provided however that this requirement shall not apply in the case of REO Property;

(b)     each related Contract was originated and has been administered in accordance with Applicable Law (including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, warehousing and disclosure laws); provided however that this requirement shall not apply in the case of REO Property;

(c)     each related Contract was originated by an Obligor or acquired by an Obligor in the ordinary course of business; provided however that this requirement shall not apply in the case of REO Property;

(d)     each related Contract has been underwritten and serviced by an Obligor in accordance with the Credit and Collection Policies pursuant to (i) documentation acceptable to prudent lending institutions or investors, subject to Approved Exceptions and Permitted Liens in the case of Mortgage Loans, and (ii) origination practices that are customary for the origination of assets of such type as of the time such Asset was originated; provided however that this requirement will not apply to REO Property;

(e)     such Asset has been selected for inclusion in the Primary Collateral using no selection procedures adverse to the Secured Parties;

(f)     such Asset is not a Defaulted Asset or a Credit Risk Asset; provided however that this requirement shall not apply in the case of REO Property;

(g)     the First Priority Collateral Agent acquired and has good title and a valid and perfected security interest in such Asset, free of any Lien (other than Permitted Liens) of a type described in clauses (b) through (f), (i), (j), (k), (l), (m) or (o) of the definition of Permitted Liens; provided however that this requirement shall not apply in the case of REO Property;

5254280.33 08048307

(h)      the obligations of the Payor under the related Contract are irrevocable, unconditional and non-cancelable; provided however that this requirement shall not apply in the case of REO Property;

(i)      the related Contract is denominated and payable in (A) Dollars by a Payor in the United States of America, (B) in the case of an increase in the aggregate outstanding balance of the English Notes, Pounds Sterling by the English SPV, provided that in the case of any such increase in the aggregate outstanding balance of the English Notes, the English SPV shall have acquired Eligible UK Assets with a Carrying Value equal to or greater than the amount of such increase, or (C) in the case of an increase in the aggregate outstanding balance of the Dutch Notes) Euros by the Dutch SPV, provided that in the case of any such increase in the aggregate outstanding balance of the Dutch Notes, the Dutch SPV shall have acquired Eligible Dutch Assets with a Carrying Value equal to or greater than the amount of such increase; and provided further that this requirement shall not apply in the case of REO Property;

(j)      the related Contract would be characterized as "chattel paper", an "account", an "instrument", a "general intangible" or "investment property" under the UCC; provided however that this requirement shall not apply in the case of REO Property;

(k)      the pledge of the Asset or any interest therein by the relevant Obligor to the First Priority Collateral Agent does not require the consent of any Person that has not been obtained and does not otherwise violate the terms of any other agreement binding on the Obligors;

(l)      such Asset is not subject to an offer of exchange or tender by its issuer or by any other Person for securities or any other type of consideration other than cash, and such Asset does not provide at any time over its life of the payment of any amounts due to be made by delivery of an equity security or mandatory conversion into an equity security; provided however that this requirement shall not apply in the case of REO Property;

(m)      either (i) no payments of principal or interest on such security are subject to withholding taxes imposed by any jurisdiction or (ii) if any such payments are subject to withholding tax imposed by any jurisdiction, the obligor thereunder is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis; provided however that this requirement shall not apply in the case of REO Property;

(n)      [Reserved];

(o)      either (i) future advances are not required to be made by the holder of such Asset, or (ii) if future advances are required to be made, the Obligors have adequate means with which to make future advances;

(p)      the related Payor with respect to such Asset is organized or incorporated under the laws of a country that does not impose foreign exchange restrictions effectively

Ex. A-2

Confidential

limiting the availability or use of U.S. Dollars to make scheduled payments of principal or interest on such Asset; provided however that this requirement shall not apply in the case of REO Property;

(q)        such Asset requires the payment of a fixed amount of principal in cash no later than its stated maturity or termination date, and such Asset is not callable for less than its face amount; provided however that this requirement shall not apply in the case of REO Property;

(r)        such Asset is not an operating lease or financing by a debtor-in-possession in an insolvency proceeding;

(s)        the terms of such Asset have not been impaired, waived, altered or modified in any respect, except (i) in accordance with the Credit and Collection Policy with a view to maximizing the value of such Asset or (ii) as required by Applicable Law; provided however that this requirement shall not apply in the case of REO Property;

(t)        if such Asset is a Mortgage Loan, the related mortgage has not been satisfied, canceled, subordinated or rescinded and the related mortgage property has not been released from the lien of the mortgage;

(u)        in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, the related Obligor reasonably believes that such advance is recoverable from the proceeds of the sale of the related real estate;

(v)        in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, such Asset arises under an Eligible Servicing Advances Agreement;

(w)        in the case of an Asset that is an Incremental Advance, the related Obligor reasonably believes that it is contractually obligated to make such advance or that such advance is necessary to maximize its recovery on the related collateral;

(x)        in the case of an Asset that is an Equity Interest in a Subsidiary or BCG Joint Venture that holds parcels of real estate, such Equity Interest shall be considered to be an Eligible Asset to the extent of the Value of parcels for which (i) an enforceable deed evidencing such Subsidiary's or joint venture's ownership interest in such parcel has been submitted for recording in the appropriate filing office, (ii) such parcel is not subject to any Liens other than Permitted Liens, provided that with respect to a parcel owned by a ResCap Subsidiary such Permitted Liens are described in clauses (b) through (f), (i), (j), (k), (l), (m) or (o) of the definition of Permitted Liens, and (iii) in the case of any parcel of real estate owned by a ResCap Subsidiary (other than individual parcels of residential real estate acquired by a ResCap Subsidiary through foreclosure or deed in lieu of foreclosure on a Mortgage Loan), a mortgage or deed of trust on such real estate in favor of the First Priority Collateral Agent or its designee shall have been recorded or submitted for recording within 30 days of the Amendment Closing Date, which mortgage or deed of trust shall be in a form substantially similar to the forms approved in writing

Ex. A-3

Confidential

by the Lender Agent and shall secure Obligations in an amount not less than the Carrying Value of such real estate at the time such mortgage or deed of trust was prepared;

(y)      if such Asset represents the right to be paid by the VA or the FHA in respect of servicing costs on an insured Mortgage Loan, such Mortgage Loan shall have been included in Primary Collateral;

(z)      is REO Property or supported by REO Property, (i) the related REO Owner, BCG REO Subsidiary or WestLB Program Subsidiary has good and marketable title to such REO Property, free of any Lien (other than Permitted Liens), (ii) if such REO was part of the Initial Collateral or acquired through the foreclosure of a Mortgage Loan which constituted Primary Collateral, the Collateral Value of such REO and any other Primary Collateral related thereto is calculated without double counting, (iii) the Obligors do not have actual knowledge that any such REO Property has suffered material uninsured damage due to hurricane, flood, tornado or other natural disaster or environmental hazard; it being understood that if any such damage is subsequently discovered, the Value of the REO Property will be reduced to reflect such damage, and (iv) such REO Property is located in the United States or a territory thereof; and

(aa)      such Asset is not an Excluded Asset.

For the avoidance of doubt, with respect to any REO Property, the related Contract shall be the Contract relating to the loan or financing pursuant to which such property was acquired through foreclosure or deed in lieu of foreclosure.

Ex. A-4

Confidential

<div align="right">EXHIBIT B</div>

## ELIGIBILITY REQUIREMENTS
## FOR SUBSTITUTE COLLATERAL

Capitalized terms used in this <u>Exhibit B</u> but not otherwise defined in this Agreement have the meaning set forth in <u>Schedule 1.01</u> to the Line of Credit Agreement.

An Asset shall be deemed to satisfy the Eligibility Requirements for Substitute Collateral if such Asset meets the following requirements,

(a) each related Contract constitutes a legal, valid and binding obligation of the related Payor, enforceable against the Payor in accordance with its terms and is not subject to any right of rescission, set-off, counterclaim or other defense of the related Payor (except as enforceability may be limited or defenses may arise by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors', mortgagees' or lessors' rights in general and general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law);

(b) subject to Approved Exceptions, each related Contract was originated and has been administered in accordance with Applicable Law (including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, warehousing and disclosure laws);

(c) each related Contract was originated by an Obligor or acquired by an Obligor in the ordinary course of business;

(d) subject to Approved Exceptions, each related Contract has been underwritten and serviced by an Obligor in accordance with the Credit and Collection Policies pursuant to (i) documentation acceptable to prudent lending institutions or investors, and (ii) origination practices that are customary for the origination of assets of such type as of the time such Asset was originated;

(e) except with respect to US Mortgage Loans, and subject to Approved Exceptions, such Asset has been selected for inclusion in the Collateral using no selection procedures adverse to the Lender Parties;

(f) the First Priority Collateral Agent acquired and has good title and a valid and perfected security interest in such Asset, free of any Lien (other than Permitted Liens);

(g) the obligations of the Payor under the related Contract are irrevocable, unconditional and non-cancelable;

(h) the related Contract is denominated and payable in Dollars by a Payor in the United States of America or, in the case of a European Note, the currency of the jurisdiction where the real estate securing the related Supporting Assets is located;

5254280.33 08048307

Confidential

provided that in the case of any such increase in the aggregate outstanding balance of a European Note, the related European SPV shall have acquired Assets that satisfy the eligibility criteria in the related English Security Documents and Dutch Security Documents with a Carrying Value equal to or greater than the amount of such increase;

(i)    the related Contract would be characterized as "chattel paper", an "account", an "instrument", a "general intangible" or "investment property" under the UCC;

(j)    the pledge of the Asset or any interest therein by the relevant Obligor to the Lender does not require the consent of any Person that has not been obtained and does not otherwise violate the terms of any other agreement binding on the Obligors;

(k)    such Asset is not subject to an offer of exchange or tender by its issuer or by any other Person for securities or any other type of consideration other than cash, and such Asset does not provide at any time over its life of the payment of any amounts due to be made by delivery of an equity security or mandatory conversion into an equity security;

(l)    either (i) no payments of principal or interest on such security are subject to withholding taxes imposed by any jurisdiction or (ii) if any such payments are subject to withholding tax imposed by any jurisdiction, the obligor thereunder is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis;

(m)    either (i) future advances are not required to be made by the holder of such Asset, or (ii) if future advances are required to be made, the Obligors have adequate means with which to make future advances;

(n)    the related Payor is organized or incorporated under the laws of a country that does not impose foreign exchange restrictions effectively limiting the availability or use of U.S. Dollars to make scheduled payments of principal or interest on such Asset;

(o)    except with respect to the equity in Equity Investment I, LLC or a Restricted Entity, such Asset requires the payment of a fixed amount of principal in cash no later than its stated maturity or termination date, and such Asset is not callable for less than its face amount;

(p)    such Asset is not an operating lease or financing by a debtor-in-possession in an insolvency proceeding;

(q)    the terms of such Asset have not been impaired, waived, altered or modified in any respect, except (i) in accordance with the Credit and Collection Policy with a view to maximizing the Value of such Asset, (ii) as required by Applicable Law, (iii) pursuant to the conversion of the First Security Credit Agreement, in whole or in part, to the First Security Repurchase Agreement as contemplated by the related Collateral Addition Designation Notice, and (iv) as are permitted with respect to an Asset by Approved Exceptions;

Confidential

(r)      if such Asset is a Mortgage Loan, the related mortgage has not been satisfied, canceled, subordinated or rescinded and the related mortgage property has not been released from the lien of the mortgage;

(s)      in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, the related Obligor reasonably believes that such advance is recoverable from the proceeds of the sale of the related real estate;

(t)      in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, such Asset arises under an Eligible Servicing Advances Agreement;

(u)      in the case of an Asset that is an Incremental Advance, the related Obligor reasonably believes that it is contractually obligated to make such advance or that such advance is necessary to maximize its recovery on the related collateral;

(v)      in the case of an Asset that is an Equity Interest in a Subsidiary or BCG Joint Venture that holds parcels of real estate, such Equity Interest shall be considered to be an Eligible Asset to the extent of the Value of parcels for which (i) an enforceable deed evidencing such Subsidiary's or joint venture's ownership interest in such parcel has been submitted for recording in the appropriate filing office, (ii) such parcel is not subject to any Liens other than Permitted Liens; provided that with respect to a parcel owned by a ResCap Subsidiary such Permitted Liens are described in clauses (b) through (f), (i), (l) or (o) of the definition of Permitted Liens, and (iii) in the case of any parcel of real estate owned directly by a ResCap Subsidiary (other than individual parcels of residential real estate acquired by a ResCap Subsidiary through foreclosure or deed in lieu of foreclosure on a Mortgage Loan), a mortgage or deed of trust on such real estate in favor of the First Priority Collateral Agent or its designee shall have been recorded or submitted for recording, which mortgage or deed of trust shall be in a form substantially similar to the forms approved in writing by the Lender Agent and shall secure Obligations in an amount not less than the Carrying Value of such real estate at the time such mortgage or deed of trust was prepared;

(w)      if such Asset represents the right to be paid by the VA or the FHA in respect of servicing costs on an insured Mortgage Loan, such Mortgage Loan shall have been included in Primary Collateral;

(x)      if such Asset is a US Mortgage Loan, (i) such Asset has been identified to be pledged as Collateral under this Agreement in a Mortgage Schedule provided by the related Obligor to the Lender Agent, (ii) the Obligor has marked its books and record to indicate that such Mortgage Loan has been pledged to the Lender Agent, and (iii) such Asset has been approved by the Lender Agent as an Eligible Asset prior to the initial inclusion of such Asset in the Borrowing Base; and

(y)      if such Asset is REO Property or supported by REO Property, (i) the related REO Subsidiary has good and marketable title to such REO Property, free of any Lien (other than Permitted Liens described in clauses (b) through (f), (i), (l) and (o) of the

Confidential

definition of Permitted Liens), (ii) if such REO was acquired through the foreclosure of a Mortgage Loan which constituted Collateral, the Collateral Value of such REO Property and any other Collateral related thereto is calculated without double counting, (iii) the Obligors do not have actual knowledge that any such REO Property has suffered material uninsured damage due to hurricane, flood, tornado or other natural disaster or environmental hazard; it being understood that if any such damage is subsequently discovered, the Carrying Value of the REO Property will be reduced to reflect such damage, and (iv) such REO Property is located in the United States or a territory thereof.

Confidential

EXHIBIT C

## INITIAL PERMITTED FUNDING INDEBTEDNESS

1.    Description of Notes

    (a)    Floating Rate Notes due June 9, 2008; Floating Rate Notes due November 21, 2008; 8.125% Notes due November 21, 2008; Floating Rate Notes due April 17, 2009; Floating Rate Subordinated Notes due April 17, 2009; Floating Rate Notes due May 22, 2009; 8.375% Notes due June 30, 2010; Floating Rate Notes due September 27, 2010; 8.000% Notes due February 22, 2011; 7.125% Notes due May 17, 2012; 8.500% Notes due June 1, 2012; 8.500% Notes due April 17, 2013; 8.375% Notes due May 17, 2013; 9.875% Notes due July 1, 2014; and 8.875% Notes due June 30, 2015.

2.    Term Loan Agreement

    (a)    Term Loan Facility dated as of July 28, 2005 among ResCap, the lenders thereunder, Citibank, N.A., as syndication agent, the documentation agents thereunder, and JPMorgan Chase Bank, N.A., as administrative agent, from the lenders thereunder

3.    Related Documents

    (a)    Indebtedness outstanding under the Related Documents

4.    Other

    (a)    Any indebtedness referenced in Residential Capital, LLC's Current Report on Form 8-K filed with the Securities and Exchange Commission prior to October 31, 2009.

    (b)    Indebtedness under agreements listed in Schedule 7.01(t)

    (c)    The 2010 Notes and the 2015 Notes

Confidential

EXHIBIT 2.02(a)

FORM OF NOTE

December 30, 2009

$1,545,587,924

        FOR VALUE RECEIVED, Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), and GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage" and together with RFC, each a "Borrower" and collectively, the "Borrowers"), jointly and severally promise to pay to the order of GMAC Inc. (the "Lender") on or before the Loan Repayment Date the principal amount of ONE BILLION FIVE HUNDRED FORTY FIVE MILLION FIVE HUNDRED EIGHTY SEVEN THOUSAND NINE HUNDRED TWENTY FOUR DOLLARS ($1,545,587,924), or such lesser amount as shall reflect the Outstanding Aggregate Loan Amount of the Loans (each as defined in the Loan Agreement referred to below) made by the Lender to the Borrower.

        The Borrowers further promise to pay interest on the unpaid principal amount of this Note from time to time outstanding, payable as provided in the Loan Agreement (referred to below), at the rates per annum provided in the Loan Agreement; provided, however, that such interest rate shall not at any time exceed the maximum rate permitted by law.  All payments of principal of and interest on this Note shall be payable in lawful currency of the United States of America at the office of the Lender as provided above or such other address as the holder hereof shall have designated to the Borrowers, in immediately available funds.

        The date, amount and interest rate of each Loan made by the Lender to the Borrowers, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof; provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrowers to make a payment when due of any amount owing under the Loan Agreement or hereunder in respect of the Loans made by the Lender.

        This Note is one of the Notes referred to in the Amended and Restated Loan Agreement dated December 30, 2009 between the Borrowers, GMAC Inc., as Lender Agent, the Lender and certain other lenders and guarantors party thereto (the "Loan Agreement").  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.  Upon occurrence of any Event of Default, the principal hereof, and all accrued interest thereon, may be declared or shall automatically become, due and payable pursuant to the Loan Agreement.

        This Note amends and restates in its entirety the promissory notes, dated June 4, 2008, in the original principal amount of $3,500,000,000, payable by the Borrowers to the order of the Lender (the "Original Notes").  This amendment and restatement of the Original Notes shall not effectuate a novation or extinguishment of the obligations outstanding under the Original Notes or a release of any lien or security interest securing the Original Notes.  Each reference in the Loan Agreement or in any other Facility Document to the "Note" shall include this Note as hereinafter amended, restated or otherwise modified.

5254280.33 08048307

Ex. 2.02 (a)-1

The Borrowers agree to pay all the Lender's costs of collection and enforcement (including reasonable attorneys' fees and disbursements of lender's counsel) in respect of this Note when incurred, including, without limitation, reasonable attorneys' fees through appellate proceedings.

Notwithstanding the pledge of the Collateral, the Borrowers hereby acknowledge, admit and agree that the Borrowers' obligations under this Note are recourse obligations of the Borrowers to which the Borrowers pledge their full faith and credit.

The Borrowers, and any indorsers or guarantors hereof, (a) severally waive diligence, presentment, protest and demand and also notice of protest, demand, dishonor and nonpayment of this Note, (b) expressly agree that this Note, or any payment hereunder, may be extended from time to time, and consent to the acceptance of further Collateral, the release of any Collateral for this Note, the release of any party primarily or secondarily liable hereon, and (c) expressly agree that it will not be necessary for the Lender, in order to enforce payment of this Note, to first institute or exhaust the Lender's remedies against the Borrowers or any other party liable hereon or against any Collateral for this Note.  No extension of time for the payment of this Note, or any installment hereof, made by agreement by the Lender with any person now or hereafter liable for the payment of this Note, shall affect the liability under this Note of the Borrowers, even if the Borrowers are not a party to such agreement; provided, however, that the Lender and the Borrowers, by written agreement between them, may affect the liability of the Borrowers.

This Note may be assigned in whole or in part only by registration of such assignment or sale on the Register.  Any participation in respect of this Note may be effected only by the registration of such participation on the Participant Register.

Any reference herein to the Lender shall be deemed to include and apply to every subsequent holder of this Note.  Reference is made to the Loan Agreement and Security Agreement for provisions concerning optional and mandatory prepayments, Collateral, acceleration and other material terms affecting this Note.

Any enforcement action relating to this Note may be brought by motion for summary judgment in lieu of a complaint pursuant to Section 3213 of the New York Civil Practice Law and with respect to this Note and waives any right with respect to the doctrine of forum non conveniens with respect to such transactions.

**This Note shall be governed by and construed in accordance with the laws of the state of New York without regard to conflicts of laws principles (but with reference to section 5-1401 of the New York General Obligation law) whose laws the Borrowers expressly elect to apply to this Note.  Each party hereto hereby submits to the nonexclusive jurisdiction of the United States District Court for the Southern District of New York for purposes of all legal proceedings arising out of or relating to this Note.  The Borrowers irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Borrowers hereby consent to process being served in any suit, action or proceeding with respect to this agreement, or any document delivered pursuant hereto by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to its respective address specified at the time for notices under the**

Confidential

**Loan Agreement or to any other address of which it shall have given written or electronic notice to the Lender.  The foregoing shall not limit the ability of Lender to bring suit in the courts of any jurisdiction.**

**The Borrowers hereby irrevocably waive any and all right to a trial by jury with respect to any legal proceeding arising out of or relating to this Note.**

IN WITNESS WHEREOF, the undersigned has caused this Note to be executed by its duly authorized officer as of the day and year first above written.

Residential Funding Company, LLC

By: _____
    Name:
    Title:

GMAC Mortgage, LLC

By: _____
    Name:
    Title:

Confidential

EXHIBIT 2.04(a)

FORM OF COLLATERAL VALUE REPORT

GMAC Inc.,
  as Lender Agent
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Fax: 704-540-6549

Re: Residential Funding Company, LLC, and GMAC Mortgage, LLC

Gentlemen and Ladies:

This Collateral Value Report is delivered to you pursuant to Section 2.04(b) and Section 7.01(g) of the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the "Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent").  Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein have the meanings provided in the Loan Agreement.

The information contained herein is as of the [●]  day of [●] , [●]  (the "Cutoff Date.")

The Borrowers hereby certify a Collateral Value of $[●].  The related Collateral Value Report is attached hereto as Exhibit A.

The Borrowers hereby certify that the Collateral Dispositions that have occurred since the date of the previously delivered Collateral Value Report have occurred in compliance with Section 7.02(k).  The Primary Collateral which was the subject of such Collateral Dispositions is set forth on Exhibit B hereto.

Since the date of the previously delivered Collateral Value Report, $[●] of Net Cash Proceeds have been received with respect to Collateral Dispositions. The total amount of Net Cash Proceeds, including amounts designated as such since the previously delivered Collateral Value Report is $[●].

The Net Cash Proceeds have either been utilized to repay outstanding Loans in accordance with Section 2.08(c) or are being held pending application in accordance with the terms of the Loan Agreement.

5254280.33 08048307

Since the date of the previously delivered Collateral Value Report, valuation adjustments of $[●] have decreased the Collateral Value of Primary Collateral and Supporting Assets in accordance with GAAP and the normal business practices of ResCap as of the date hereof.  The resulting Borrowing Base Shortfall is $[_____].  The Eligible Assets which have been designated as Substitute Collateral in accordance with Section 2.08 of the Loan Agreement since the cut-off date of the previously delivered Collateral Value Report are set forth on Exhibit C hereto and the Collateral Value included in the Collateral Value Report delivered herewith is $[●].

The Borrowers have caused this Collateral Value Report to be executed and delivered, and the certification and warranties contained herein to be made, on this [●]day of [●], [●].

Residential Funding Company, LLC

By: _____
Name: James Young
Title: Chief Financial Officer

GMAC Mortgage, LLC

By: _____
Name: James Young
Title: Chief Financial Officer

Confidential

EXHIBIT 2.08(b)

FORM OF REPAYMENT NOTICE

[●], 200[●]

TO:    The Lender Agent as defined in the Loan Agreement referred to below

Reference is hereby made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent"). Capitalized terms not otherwise defined herein are used herein as defined in the Loan Agreement.

The Borrowers hereby notify you that, pursuant to Section 2.08[(a)/(b)] of the Loan Agreement, it shall make a repayment of the Loans outstanding under the Loan Agreement to the Lender on [●], 200[●] in the amount of $[●].

Also included in the repayment amount shall be accrued and unpaid interest, Breakage Costs (as determined by the Lender Agent and provided to the undersigned) and other amounts due and owing to the Lenders in the amount of $[●].

The undersigned has caused this Repayment Notice to be executed and delivered by its duly authorized officer this [●] day of [●], 200[●].

Residential Funding Company, LLC


By: _____
        Name:
        Title:


GMAC Mortgage, LLC


By:_____
        Name:
        Title:

5254280.33 08048307

EXHIBIT 2.09(a)

FORM OF OPTIONAL PREPAYMENT NOTICE

[●], 200[●]

TO:  The Lender Agent as defined in the Loan Agreement referred to below

Reference is hereby made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent"). Capitalized terms not otherwise defined herein are used herein as defined in the Loan Agreement.

The Borrowers hereby notify you that pursuant to and in compliance with Section 2.09 of the Loan Agreement, it shall make a prepayment of Loans outstanding under the Loan Agreement on [●], 200[●] in the amount of $[●].

Also included in the prepayment amount shall be accrued and unpaid interest, Breakage Costs (as determined by the Lender Agent and provided to the undersigned) and other amounts due and owing to the Lenders in the amount of $[●].

The undersigned has caused this Prepayment Notice to be executed and delivered by its duly authorized officer this [●]day of [●], 200[●].

Residential Funding Company, LLC


By: _____
      Name:
      Title:


GMAC Mortgage, LLC


By:_____
      Name:
      Title:


5254280.33 08048307

EXHIBIT 7.01

## FORM OF COMPLIANCE CERTIFICATE

GMAC Inc.,
    as Lender Agent
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Fax: 704-540-6549

Re: _____ Reporting Date

      Reference is made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent"). Terms defined in the Loan Agreement and not otherwise defined herein are used herein as defined in the Loan Agreement.

      Pursuant to Section 7.01(f) of the Loan Agreement, ResCap is furnishing to you herewith (or has most recently furnished to you) the financial statements of ResCap for the fiscal period ended as of the reporting date shown above (the "Reporting Date"). Such financial statements have been prepared in accordance with generally accepted accounting principles and present fairly, in all material respects, the financial position of ResCap covered thereby at the date thereof and the results of its operations for the period covered thereby, subject in the case of interim statements only to normal year-end audit adjustments and the addition of footnotes.

      The undersigned Responsible Officer of ResCap has caused the provisions of the Loan Agreement to be reviewed and certifies to the Lenders that: (a) as of the Reporting Date, (i) the aggregate amount of Consolidated Liquidity was $[_____], (ii) the aggregate amount of unrestricted and unencumbered Consolidated Liquidity was $[_____], and (iii) the Consolidated Tangible Net Worth of ResCap was $[_____], (b) the undersigned has no knowledge of any Default or Event of Default, (c) attached hereto are the computations necessary to determine that ResCap is in compliance with the provisions of the Loan Agreement as of the Reporting Date referenced thereon, and (d) to the best of the undersigned's knowledge no event has occurred since the date of the most recent financial statements upon which such covenant compliance was calculated that would cause ResCap to no longer be in compliance with said provisions.

5254280.33 08048307

Confidential

The statements made herein (and in the Schedule attached hereto) shall be deemed to be representations and warranties made in a document for the purposes of Section 6.01(j) of the Loan Agreement.

IN WITNESS WHEREOF, the undersigned Responsible Officer of ResCap has set [his/her] hand this [●], 200[●].

Residential Capital, LLC

By: _____

    Name:

    Title:

5254280.33 08048307

Confidential

EXHIBIT 7.01(s)

## FORM OF JOINDER

[Date]

GMAC Inc.
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Fax: 704-540-6549

Ladies and Gentlemen:

      Reference is made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "<u>Loan Agreement</u>"), by and among Residential Funding Company, LLC ("<u>RFC</u>"), GMAC Mortgage, LLC ("<u>GMAC Mortgage</u>" and together with RFC, the "<u>Borrowers</u>"), GMAC Inc. (the "<u>Initial Lender</u>"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "<u>Guarantor</u>"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "<u>Lender</u>" and collectively, the <u>Lenders</u>") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "<u>Lender Agent</u>"); and to the First Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of June 4, 2008 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "<u>Security Agreement</u>"), by and among the Lenders, Wells Fargo Bank, N.A., as First Priority Collateral Agent, the Borrowers and the Guarantors. Terms defined in the Loan Agreement and not otherwise defined herein are used herein as defined in the Loan Agreement in.

      The undersigned, [name of new Guarantor], a [jurisdiction of incorporation] corporation (the "<u>New Guarantor</u>"), and the Borrowers hereby elect that the New Guarantor shall be a Guarantor for purposes of the Loan Agreement and the Security Agreement, effective from the date hereof [until a Consent to Terminate shall have been delivered by the Lender Agent in respect of the New Guarantor in accordance with the Loan Agreement]. The Borrowers and the New Guarantor confirm that the representations and warranties set forth in Article VI of the Credit Agreement and Section 6 of the Security Agreement are true and correct in all material respects as to the New Guarantor as of the date hereof as though such representations and warranties had been made on and as of the date hereof unless stated to relate to a specific earlier date in which case such representations and warranties specifically relating to an earlier date shall be true and correct in all material respects as of such earlier date, and the New Guarantor agrees to perform all the obligations of a Guarantor under, and to be bound in all respects by the terms of, the Loan Agreement, the Security Agreement, the Hedge Security Agreement and the Intercreditor Agreement as if the New Guarantor were a signatory party thereto. The New Guarantor acknowledges receipt of copies of the Loan Agreement, the Security Agreement, the Hedge Security Agreement and the Intercreditor Agreement.

5254280.33 08048307

Confidential

The New Guarantor acknowledges that all notices to it under the Loan Agreement or the Security Agreement are to be given to it in care of the Borrowers as provided in the Loan Agreement.  This instrument shall be construed in accordance with and governed by the laws of the State of New York.

Very truly yours,

[NAME OF GUARANTOR]


By: _____
    Name:
    Title:


Residential Funding Company, LLC


By: _____
    Name:
    Title:


GMAC Mortgage, LLC


By:_____
    Name:
    Title:

Confidential

Receipt of the above Joinder is acknowledged on and as of the date set forth above.

GMAC Inc.,
as Lender Agent,

By:_____
    Name:
    Title:

5254280.33 08048307            Ex. 7.01(s)-3

Confidential

EXHIBIT 9.01

FORM OF ASSIGNMENT AND ACCEPTANCE

ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment Agreement") dated as of [_____], between [_____] ("Assignor") and [_____] ("Assignee"). All capitalized terms used herein and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement (as defined below).

WHEREAS, Assignor is a party to a Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent");

WHEREAS, the aggregate Commitments of the Lenders and the aggregate principal amount of outstanding Loans pursuant to the Loan Agreement as at the date hereof are set forth in Item 6(a) of Annex I hereto; and

WHEREAS, the Assignee proposes to assume all of the rights and obligations of the Assignor under the Loan Agreement and the other Facility Documents in respect of the portion of the Assignor's Commitment and outstanding Loans under the Loan Agreement as set forth in Item 6(c) of Annex I (the "Assignee's Share");

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1.    Assignment.  Effective on the Assignment Effective Date (as defined below), Assignor hereby assigns to Assignee, without recourse and without representation or warranty (other than as expressly provided herein), that Dollar amount listed in Item 6(c) of Annex I hereto as the Assignee's Share of all of the Assignor's rights, title and interest arising under the Loan Agreement and the other Facility Documents in respect of the Assignor's Commitment including, without limitation (but subject to Section 5) all rights with respect to Assignee's Share of such outstanding Loans.

2.    Assumption.  Effective on the Assignment Effective Date, Assignee hereby assumes from Assignor all of Assignor's obligations arising under the Loan Agreement relating to Assignee's Share.  Effective on the Assignment Effective Date, Assignor shall be released from all of its obligations under the Loan Agreement relating to Assignee's Share pursuant to Article IX the terms of the Loan Agreement, but subject to Section 13.11 thereof.

5254280.33 08048307

3.      Assignments; Participation.  On and after the Assignment Effective Date, the Assignee may assign all or any part of the rights granted to it as an Assignee hereunder in accordance with the applicable provisions of Section 9.01 of the Loan Agreement.  On and after the Assignment Effective Date, the Assignee may sell or grant participations in all or any part of the rights granted to it as an Assignee hereunder in accordance with the applicable provisions of Section 9.04 of the Loan Agreement.

4.      Payment of Interest to Assignee.  (a) Interest is payable by the Borrowers in respect to the Assignee's Share of the Loans at the applicable rates set forth in Section 2.05 of the Loan Agreement. Notwithstanding anything to the contrary contained above, all payments with respect to the Assignee's Share made or accrued to, but excluding, the Assignment Effective Date shall be for the account of the Assignor.

(b)      Notwithstanding anything to the contrary contained in this Assignment Agreement, if and when the Assignor receives or collects any payment of interest on any Loan attributable to the Assignee's Share or any payment of commitment fee attributable to the Assignee's Share which, in any such case, is required to be paid to the Assignee as described in Section 4(a) above, the Assignor shall distribute to the Assignee such payment but only to the extent such interest or commitment fee accrued on or after the Assignment Effective Date.

(c)      Notwithstanding anything to the contrary contained in this Assignment Agreement, if and when the Assignee receives or collects any payment of interest on any Loan attributable to the Assignor's Share which, in any such case, is required to be paid to the Assignor as described in Section 4(a) above, the Assignee shall distribute to the Assignor such payment but only to the extent such interest or commitment fee accrued prior to the Assignment Effective Date.

5.      Payments on Effective Date.  In consideration of the assignment by the Assignor to the Assignee of the Assignee's Share the Assignee agrees to pay to the Assignor on or prior to the Assignment Effective Date an amount specified by the Assignor in writing on or prior to the Assignment Effective Date which represents the Assignee's Share of the principal amount, if any, of the Loans made by the Assignor pursuant to the Loan Agreement and outstanding on the Assignment Effective Date.

6.      Effectiveness.  The Assignment Agreement hereunder shall become effective on the date (the "Assignment Effective Date") on which (i) the Assignor and the Assignee shall have signed a copy hereof (whether the same or different copies) and, in the case of the Assignee, shall have delivered same to the Assignor, (ii) the Assignee shall have paid to the Assignor the amount specified in writing by the Assignor in accordance with Section 5 hereof, (iii) the Borrowers and the Lender shall have received a copy hereof, (iv)  the Lender Agent shall have received a processing and recordation fee in the amount of $3,500 (unless such fee is waived or reduced by the Lender Agent in its sole discretion), and (v) the Lender Agent shall have recorded the Assignment in accordance with Section 9.01 of the Loan Agreement.

7.      Issuance of New Promissory Notes on the Assignment Effective Date.  In accordance with the requirements of Section 9.02 of the Loan Agreement, within five (5)

Ex. 9.01-2

Confidential

Business Days of the Assignment Effective Date, a new Note will be issued by the Borrowers to the Assignor and/or the Assignee, as the case may be.  On the Assignment Effective Date, the Assignee shall be deemed a Lender for all purposes under the Loan Agreement and the other Facility Documents, and shall be subject to and shall benefit from all of the rights and obligations of a Lender under the Loan Agreement and the other Facility Documents, and the address of the Assignee for notice purposes shall be as set forth in Item 7 of Annex I hereto.

8.    Representations and Warranties.  (a) Each of Assignor and Assignee represents and warrants to the other parties as follows:

(i)    it has full power and authority, and has taken all actions necessary, to execute and deliver this Assignment Agreement and to fulfill its obligations under, and to consummate the transactions contemplated by, this Assignment Agreement,

(ii)    the making and performance by it of this Assignment Agreement and all documents required to be executed and delivered by it hereunder do not and will not violate any law or regulation of the jurisdiction of its incorporation or any other law or realization applicable to it,

(iii)    this Assignment Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding, obligation, enforceable in accordance with its terms; and

(iv)    all approvals, authorizations, or other actions by, or filings with, any governmental authority or regulatory body or any other third party necessary for the validity or enforceability of its obligations under this Assignment Agreement have been obtained.

(b)    Assignor represents and warrants to Assignee that Assignee's Share and the Loans attributable to Assignee's Share are subject to no liens or security interests created by Assignor.

9.    Expenses.  Assignor and Assignee agree that each party shall bear its own expenses in connection with the preparation and execution of this Assignment Agreement.

10.    Miscellaneous.  (a) Neither the Lender Agent nor the Assignor shall be responsible to the Assignee for the execution (by any party other than the Assignor or the Lender Agent, as the case may be), effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of any of the Loan Agreement or the other Facility Documents or for any representations, warranties, recitals or statements made therein or in any written or oral statement or in any financial or other statements, instruments, reports, certificates or any other documents made or furnished or made available by the Assignor to the Assignee or by or on behalf of the Borrowers to the Assignor or the Assignee in connection with the Loan Agreement or the other Facility Documents and the transactions contemplated thereby.  Neither the Lender Agent nor the Assignor shall be required to ascertain or inquire as to the performance or observance of any of the terms,

Confidential

conditions, provisions, covenants or agreements contained in any of the Loan Agreement or the other Facility Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default.

(b)    The Assignee represents and warrants that it (i) has made its own independent investigation, without reliance upon the Lender Agent, the Assignor or any other Purchaser Liquidity Bank, of the financial condition and affairs of the Borrowers in connection with this Assignment Agreement, the making of the Loans and the Assignment of the Assignee's Share of the Assignor's Commitment and of the Loans to the Assignee hereunder and (ii) has made and shall continue to make its own appraisal of the creditworthiness of the Borrowers.  Neither the Lender Agent nor the Assignor shall have any duty or responsibility either initially or on a continuing basis to make any such investigation or any such appraisal on behalf of the Assignee or to provide the Assignee with any credit or other information with respect thereto whether coming into its possession before the making of any Loan or at any time or times thereafter and shall further have no responsibility with respect to the accuracy of, or the completeness of, any information provided to the Assignee, whether by the transferor or by or on behalf of any other person.

(c)    GOVERNING LAW.  THIS ASSIGNMENT AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(d)    WAIVER OF JURY TRIAL.  THE PARTIES TO THIS ASSIGNMENT AGREEMENT KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS ASSIGNMENT AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE PARTIES HERETO ACKNOWLEDGE THAT THE PROVISIONS OF THIS SECTION 10(d) HAVE BEEN BARGAINED FOR AND THAT EACH SUCH PARTY HAS BEEN REPRESENTED BY COUNSEL IN CONNECTION HEREWITH.

(e)    (i)    Submission to Jurisdiction.  With respect to any claim or action arising hereunder, the parties (a) irrevocably submit to the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in The City of New York, New York, and appellate courts from any thereof, and (b) irrevocably waive any objection which such party may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this Assignment Agreement brought in any such court, and irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

[(ii)    (A)  The Assignor hereby irrevocably designates, appoints and empowers [_____] with offices at [_____] and (B) the Assignee hereby irrevocably designates, appoints and empowers [_____] with offices at [_____], as its respective designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and its properties, assets and revenues, service for any and all legal process, summons, notices and documents which may be served in

Confidential

any such action, suit or proceeding brought in the courts listed in <u>Section 10(e)(i)</u> hereof which may be made on such designee, appointee and agent in accordance with legal procedures prescribed for such courts.]

(f)    <u>Amendments</u>.  This Assignment Agreement may be supplemented, modified or amended by written instrument signed on behalf of both parties thereto.

(g)    <u>Facsimile and Counterparts</u>.  This Assignment Agreement may be executed by facsimile in any number of counterparts and by different parties thereto on separate counterparts, each of which counterparts, when executed and delivered, shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same agreement.

(h)    <u>Assignment</u>.  The Assignor may at any time or from time to time grant to others assignments or participations in its Commitment or Loans but not in the portions thereof sold as an assignment to the Assignee pursuant to this Assignment Agreement.

(i)    <u>Payments</u>.  All payments hereunder or in connection herewith shall be made in Dollars and in immediately available funds, if payable to the Assignor, to the account of the Assignor at its offices as designated in <u>Item 8</u> of <u>Annex I</u> hereto, and, if payable to the Assignee, to the account of the Assignee, as designated in <u>Item 8</u> of <u>Annex I</u> hereto.

(j)    <u>Binding Effect</u>.  This Assignment Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Neither of the parties hereto may assign or transfer any of its rights or obligations under this Assignment Agreement without the prior consent of the other party.  The preceding sentence shall not limit the right of the Assignee to assign all or part of the Assignee's Share of the Assignor's Commitment and outstanding Loans, if assigned under this Assignment Agreement in the manner contemplated by the Loan Agreement and <u>Section 3</u> hereof.

(k)    <u>Survival</u>.  All representations and warranties made herein and indemnities provided for herein shall survive the consummation of the transactions contemplated hereby.

(l)    <u>Severability</u>.  Any provision of this Assignment Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability, without invalidating the remaining provisions hereof or affecting the validity or enforceability, of such provision in any other jurisdiction.

(m)    <u>Headings</u>.  The headings contained in this Assignment Agreement are for convenience of reference only and shall not affect the construction or interpretation of any provision of this Assignment Agreement.

(n)    <u>Successors</u>.  This Assignment Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(o)    <u>Cumulative Rights, No Waiver</u>.  The rights, powers and remedies of the each party under this Assignment Agreement are cumulative and in addition to all rights, powers and remedies provided under any and all agreements between the parties relating thereto, at law, in equity or otherwise.  Neither any delay nor any omission by the parties to exercise any right,

Ex. 9.01-5

Confidential

power or remedy shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or any exercise of any other right, power or remedy.

(p)     No Payments.  The Assignee hereby acknowledges and agrees that, at any time that the Loans are outstanding and no Event of Default has occurred and is continuing, (i) the Borrowers shall not make any payment to the Assignee, (ii) the Borrowers shall have no duty, liability or obligation to make any such payment to the Assignee, (iii) no such payment shall be due from the Borrowers and (iv) the Assignee shall not have any right to enforce any claim against the Borrowers in respect of any payment, in each case (w) except for those costs to be reimbursed by the Borrowers to the Lenders pursuant to Section 2.07(b) of the Loan Agreement; (w) unless and to the extent that the Lender Agent has provided written notice to the Borrowers of a Borrowing Base Deficiency pursuant to Section 2.08 of the Loan Agreement; (x) unless and to the extent that the Borrowers have delivered a Prepayment Notice pursuant to Section 2.09 of the Loan Agreement; or (z) the Loan Repayment Date has occurred.

(q)     Limited Recourse.  No recourse under or with respect to any obligation, covenant or agreement (including, without limitation, any obligation or agreement to pay fees or any other amount) of the Borrowers contained in this Assignment Agreement or any other agreement, instrument or document entered into by it pursuant hereto or in connection herewith shall be had against any affiliate, stockholder, officer, member, manager, partner, employee or director of the Borrowers, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that the agreements of the Borrowers contained in this Assignment Agreement and all of the other agreements, instruments and documents entered into by it pursuant hereto or in connection herewith are, in each case, solely the obligations of the Borrowers, and that no personal liability whatsoever shall attach to or be incurred by any stockholder, affiliate, officer, member, manager, partner, employee or director of the Borrowers, or any of them, under or by reason of any of the obligations, covenants or agreements of the Borrowers contained in this Assignment Agreement or in any other such instrument, document or agreement, or which are implied therefrom, and that any and all personal liability of the Borrowers and every such stockholder, affiliate, officer, employee, member, manager, partner or director of the Borrowers for breaches by the Borrowers of any such obligations, covenants or agreements, which liability may arise either at common law or at equity, by statute or constitution, or otherwise, is hereby expressly waived as a condition of and in consideration for the execution of this Assignment Agreement.  Unpaid amounts hereunder shall not constitute a "claim" for purposes of Section 101(5) of the U.S. Bankruptcy Code or similar law affecting creditors' rights.  The provisions of this Section 10(q) shall survive the termination of this Assignment Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Confidential

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement as of the date first above written.

_____

as Assignor


By:_____
    Name:
    Title:


_____

as Assignee


By: _____
    Name:
    Title:


We hereby consent to the foregoing
assignment and acknowledge receipt
of notice thereof.


GMAC Inc.
as Lender Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


[Assignment and Assumption Agreement Signature Page]


5254280.33 08048307            Ex. 9.01-7

Confidential

ANNEX I
to
Assignment and Assumption Agreement

1.      Borrowers:      Residential Funding Company, LLC

                      GMAC Mortgage, LLC

2.      Date of Loan Agreement: December 30, 2009

3.      Assignor:

4.      Assignee:

5.      Date of Assignment and Assumption Agreement:

6.

(a)      Aggregate Amount for all Lenders: U.S.$

(b)      Assignee's Assigned Percentage of Aggregate: U.S.$

(c)      Assignee's Share: U.S.$

(d)      Assignor's Retained
        Percentage of Aggregate: U.S.$

(e)      Assignor's Share: U.S.$

7.      Notice Instructions for Assignee:

        Attention:
        Address:
        Telephone:
        Fax:
        Additional Contacts:

8.      Payment Instructions:

(a)      Assignor:

        Administrative Contact:
        Address:
        Telephone:
        Fax:
        Payment Information:

Confidential

Bank Name:
Account Name:
Account Number:
Reference:

(b)     Assignee:

Administrative Contact:
Address:
Telephone:
Fax:
Payment Information:

Bank Name:
Account Name:
Account Number:
Reference:

Accepted and Agreed:

     as Assignee                 as Assignor

By:_____    By:_____
Name:_____    Name:_____
Title:  as Assignor           Title:  as Assignor

Confidential

Exhibit 9.02

**FORM OF RELEASE DOCUMENTS**

**REQUEST FOR COLLATERAL RELEASE**

(_____)

[date]

     This Request for Collateral Release is being made on behalf of [Name of Borrower] (the "Debtor") pursuant to Section 12.11(b) of the Amended and Restated Loan Agreement, (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), dated December 30, 2009, by and among Residential Funding Company, LLC and GMAC Mortgage, LLC, as borrowers; Residential Capital, LLC ("ResCap"), GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, as guarantors, certain other of their affiliates party thereto, as obligors, Wells Fargo Bank, N.A. as first priority collateral agent (the "First Priority Collateral Agent"), and GMAC Inc., as initial lender and as lender agent (the "Lender Agent"). All capitalized terms used and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement.

     The Debtor hereby notifies the Lender Agent that in connection with certain transactions (collectively, the "Transactions" ) contemplated by [_____], by and among [_____], the Debtor intends to sell the Released Collateral (as defined below) to [_____].

     The Debtor hereby represents and warrants to the Lender Agent [that it will receive Fair Value in the form of Permitted Consideration for the Released Collateral in connection with the Transactions,] that any other conditions precedent to the Transactions required pursuant to the Facility Documents have been satisfied and that the Transactions otherwise comply with the terms of the Facility Documents.

     So as to consummate the Transactions, the Debtor hereby requests that the Lender Agent execute and deliver to the First Priority Collateral Agent the Consent and Direction to Release Collateral (the "Direction") attached hereto as Annex A, pursuant to which the Lender Agent shall:

1.  authorize the First Priority Collateral Agent to release and terminate all of its liens and security interests and all of its right, title and interest in and to the assets of [___] described on Exhibit A to the Direction (the "Released Collateral") and evidenced by the UCC Financing Statement(s) attached as Exhibit B to the Direction and (b) direct ResCap to file UCC-3 Financing Statement(s) attached as Exhibit C to the Direction; provided that ResCap shall return file stamped copies of such UCC-3 Financing Statement(s) to the Lender Agent within ten (10) Business Days of filing;

2.  authorize the First Priority Collateral Agent to execute and deliver the Partial Release of Collateral attached as Exhibit D to the Direction; and

Confidential

3.  authorize and direct the First Priority Collateral Agent to take all actions which are requested in writing and are reasonable or appropriate to effectuate the release of the liens on the Released Collateral.

Confidential

In witness whereof, the undersigned has executed this Request for Collateral Release as of the date first written above.

[_____]

By:_____

Name:

Title:

Confidential

**ANNEX A**
**CONSENT AND DIRECTION TO RELEASE COLLATERAL**

Confidential

## CONSENT AND DIRECTION TO RELEASE COLLATERAL

(_____)

[date]

We hereby reference the Request for Collateral Release dated [_____] (the "Request for Collateral Release") submitted by [_____] (the "Debtor") pursuant to Section 12.11(b) of the Amended and Restated Loan Agreement, dated December 30, 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC and GMAC Mortgage, LLC as borrowers; Residential Capital, LLC ("ResCap"), GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, as guarantors; certain other of their affiliates party thereto, as obligors, Wells Fargo Bank, N.A. as first priority collateral agent (the "First Priority Collateral Agent"), and GMAC Inc., as initial lender and as lender agent (the "Lender Agent"). All capitalized terms used and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement.

As requested in the Request for Collateral Release, the Lender Agent hereby consents and authorizes and directs the First Priority Collateral Agent to:

1. (a) release and terminate all of its liens and security interests and all of its right, title and interest in and to the assets of the Debtor described on Exhibit A attached hereto (the "Released Collateral") and evidenced by the UCC Financing Statement(s) attached hereto as Exhibit B and (b) direct ResCap to file UCC-3 Financing Statement(s) attached as Exhibit C hereto; provided that ResCap shall return file stamped copies of such UCC-3 Financing Statement(s) to the Lender Agent within ten (10) Business Days of filing;

2. execute and deliver the Partial Release of Collateral attached as Exhibit D hereto; and

3. take all actions which are requested in writing by the Lender Agent and are reasonable or appropriate to effectuate the release of the liens on the Released Collateral.

5254280.33 08048307                              Ex. 9.02-5

Confidential

In witness whereof, the undersigned has executed this Consent and Direction to Release Collateral as of the date first written above.

GMAC Inc., as Lender Agent

By:_____
Name:
Title:

Confidential

# EXHIBIT A

# RELEASED COLLATERAL

Confidential

**EXHIBIT B**
**FILED UCC FINANCING STATEMENTS**

Ex. 9.02-8

Confidential

**EXHIBIT C**
**UCC-3 FINANCING STATEMENTS**

Confidential

**EXHIBIT D**
**PARTIAL RELEASE OF COLLATERAL**

Confidential

# PARTIAL RELEASE OF COLLATERAL

(_____)

[date]

We hereby reference (i) the Consent and Direction to Release, dated [_____], (the "Direction") provided by GMAC Inc. (the "Lender Agent") pursuant to Section 12.11(b) of the Amended and Restated Loan Agreement, dated December 30, 2009, (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement") by and among Residential Funding Company, LLC and GMAC Mortgage, LLC, as borrowers; Residential Capital, LLC ("ResCap"), GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, as guarantors; certain other of their affiliates party thereto, as obligors, Wells Fargo Bank, N.A. as first priority collateral agent (the "First Priority Collateral Agent"), and GMAC Inc., as initial lender and as lender agent, attached hereto as Exhibit A; (ii) the Officer's Certificates each dated as of [_____], attached hereto as Exhibit B (collectively, the "Officer's Certificates"); and (iii) the Legal Opinions each dated as of [_____], attached hereto as Exhibit C (collectively, the "Legal Opinions"). All capitalized terms used and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement.

The First Priority Collateral Agent, as directed by the Lender Agent in the Direction, hereby releases and terminates all of its liens and security interests and all of its right, title and interest in and to the assets of [_____] described on Exhibit D attached hereto (the "Released Collateral") and evidenced by the UCC Financing Statement(s) attached in the Direction as Exhibit B.

Each of the Second Priority Collateral Agent and the Third Priority Collateral Agent, in reliance upon each of the Officer's Certificates and the Legal Opinions hereby release and terminate all of its liens and security interests and all of its right, title and interest in and to the Released Collateral and evidenced by the UCC Financing Statement(s) attached in each of the Officers Certificates as Exhibit B.

Ex. 9.02-11

Confidential

IN WITNESS WHEREOF, the undersigned has executed this Release of Collateral as of the date first set forth above.

<div style="margin-left: 50%;">

Wells Fargo Bank, N.A.,
as First Priority Collateral Agent

By:_____
Name:
Title:

Wells Fargo Bank, N.A.,
as Second Priority Collateral Agent

By:_____
Name:
Title:

Wells Fargo Bank, N.A.,
as Third Priority Collateral Agent

By:_____
Name:
Title:

</div>

5254280.33 08048307                    Ex. 9.02-12

Confidential

**EXHIBIT A**

**CONSENT AND DIRECTION TO RELEASE**

Confidential

**EXHIBIT B**

**OFFICER'S CERTIFICATES**

Confidential

**EXHIBIT C**

**LEGAL OPINIONS**

Confidential

**EXHIBIT D**

**RELEASED COLLATERAL**

Confidential

**<u>Exhibit C-4</u>**

**<u>Revolver Security Agreement</u>**

T215

**EXECUTION COPY**

AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY AGREEMENT
AND IRREVOCABLE PROXY

dated as of

December 30, 2009

among

RESIDENTIAL FUNDING COMPANY, LLC,
GMAC MORTGAGE, LLC
and certain of their Affiliates from time to time parties hereto,
as Grantors

GMAC INC., as Lender and
Lender Agent

and

WELLS FARGO BANK, N.A.,
as First Priority Collateral Agent
and Collateral Control Agent

(Senior Debt Loan Agreement)

5256336.18 08048307

# TABLE OF CONTENTS

**Page**

1.   Definitions ...................................................................................................................2

2.   Grant of Security Interest by Borrowers and the Guarantors ..................................9

3.   Grant of Security Interest by Equity Pledgors ......................................................12

4.   Grant of Security Interest by FABS Grantors .......................................................13

5.   Grant of Security Interest by Additional Account Parties......................................14

6.   Representations and Warranties .............................................................................15

7.   Grantor Remains Liable; Nature of Security Interest; Subrogation, etc ...............18

8.   Collections, etc .......................................................................................................19

9.   Release ...................................................................................................................20

10.   Agreements of the Grantors ...................................................................................20

11.   Agreement as to Investment Property; Voting.......................................................24

12.   Defaults and Events of Default; Remedies ............................................................27

13.   Limitation on Duty in Respect of Collateral .........................................................30

14.   Special Provisions Relating to the First Priority Collateral Agent........................31

15.   Special Provisions Relating to the Collateral Control Agent .................................39

16.   General ...................................................................................................................39

17.   Amendment and Restatement.................................................................................42

18.   Foreign Pledge Agreements ...................................................................................43

5256336.18 08048307

<u>SCHEDULES</u>

| | |
|---|---|
| Schedule I | Grantor Information |
| Schedule II | Additional Places of Business |
| Schedule III | Trade Names; Prior Legal Names; Mergers |
| Schedule IV | Intellectual Property |
| Schedule V | Commercial Tort Claims |
| Schedule VI | Initial Collateral |
| Schedule VI(a) | Financing Statements –Disclosure Schedule |
| Schedule VII | Direct Subsidiaries |
| Schedule VIII | Excluded Significant Subsidiaries |
| Schedule IX | Bailment Collateral |
| Schedule X | Deposit Accounts and Securities Accounts |
| Schedule XI | Notice Information |

<u>ATTACHMENTS</u>

| | |
|---|---|
| Attachment I | Pledged Equity and Pledged Notes |
| Attachment II | Form of Joinder Agreement |

*First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

## AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY

THIS AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY (this "Agreement") dated as of December 30, 2009, is among

(i)    Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), and GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage; and together with RFC, each a "Borrower" and collectively, the "Borrowers");

(ii)    Residential Capital, LLC, a Delaware limited liability company ("ResCap"), Homecomings Financial, LLC, a Delaware limited liability company ("Homecomings"), GMAC-RFC Holding Company, LLC, a Delaware limited liability company ("RFC Holdings"), and GMAC Residential Holding Company, LLC, a Delaware limited liability company ("Residential"; and each of ResCap, Homecomings, RFC Holdings, and Residential being a "Guarantor" and collectively, the "Guarantors");

(iii)    GMAC Model Home Finance I, LLC, a Delaware limited liability company ("Model Home I") Developers of Hidden Springs, LLC, a Delaware limited liability company ("Developers"), DOA Holding Properties, LLC, a Delaware limited liability company ("DOA"), Equity Investment IV, LLC, a Delaware limited liability company ("Equity IV"), RFC Construction Funding, LLC a Delaware limited liability company ("RFC Construction"), RFC Asset Holdings II, LLC, a Delaware limited liability company ("RAHI"), and Passive Asset Transactions, LLC, a Delaware limited liability company ("PATI"; and each of Model Home I, Developers, DOA Equity IV, RFC Construction, RAHI and PATI being an  "Equity Pledgor" and collectively, the "Equity Pledgors");

(v)    each of RAHI and PATI in its capacity as a "FABS Grantor" (collectively, the "FABS Grantors");

(vi)    the various other parties signatory hereto as additional account parties (each an "Additional Account Party" and collectively, the "Additional Account Parties");

(vii)    each other Person that agrees to become a "Grantor" by executing and delivering a Joinder Agreement pursuant to Section 16 (each Borrower, each Guarantor, each Equity Pledgor, each FABS Grantor, each Additional Account Party and each such other Person is herein a "Grantor" and collectively, the "Grantors"); and

(viii)    GMAC Inc., a Delaware corporation, as Lender Agent under the Loan Agreement (as defined below) (the "Lender Agent") and as Lender under the Loan Agreement (as defined below) (the "Lender"); and Wells Fargo Bank, N.A., as first priority collateral agent for the Lender Parties (together with its successor(s) thereto in such capacity, the "First Priority Collateral Agent") and Collateral Control Agent (as defined in the Intercreditor Agreement described below).

*First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

W I T N E S S E T H:

WHEREAS, the Borrowers, the Guarantors, the Equity Pledgors, the FASB Grantors, the Additional Account Parties and GMAC Inc., as Lender Agent and initial Lender, and certain other financial institutions and Persons from time to time party thereto as Lenders are parties to that certain Loan Agreement dated as of June 4, 2008 (as amended, supplemented, restated or otherwise modified from time to time, the "Original Loan Agreement");

WHEREAS, as a requirement under the Original Loan Agreement and the making of the Loans under the Original Loan Agreement, the Grantors entered into the First Priority Pledge and Security Agreement and Irrevocable Proxy dated as of June 4, 2008 (as amended, supplemented, restated or otherwise modified from time to time, the "Original Security Agreement");

WHEREAS, the parties to the Original Loan Agreement amended and restated the Original Loan Agreement in its entirety as of the date hereof (the Original Loan Agreement, as so amended and restated, and as the same may be further amended, restated or otherwise modified, being the "Loan Agreement"); and

WHEREAS, the parties to the Original Security Agreement wish to amend and restate the Original Security Agreement in its entirety.

NOW, THEREFORE, for and in consideration of any loan, advance or other financial accommodation heretofore or hereafter made to the Borrowers and/or the Grantors under or in connection with the Original Loan Agreement and the Loan Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Definitions.    When used herein and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined herein have the meanings assigned to such terms in Schedule 1.01 to the Loan Agreement; (b) the terms Account, Account Debtor, Certificated Security, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Assets, Fixture, General Intangibles, Goods, Health Care Insurance Receivables, Instrument, Inventory, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangible, Proceeds, Security, Security Entitlement, Securities Account, Supporting Obligations and Uncertificated Security have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below); and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

Ancillary Income means all money which is due and payable in connection with each mortgage loan other than the servicing fee and specifically including, without limitation, late charge fees, assignment transfer fees, insufficient funds check charges, amortization schedule fees, interest from escrow accounts and all other incidental fees and charges and any Float Benefit, in each case, to the extent such amounts are allocable to a mortgage loan.

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

Confidential

Assigned Documents means the Note Issuance Facility Deed, the Deed of Charge, the UK Note and any other Facility Document governed by English law to which Residential Capital, LLC is a party.

Bailment Collateral shall have the meaning given such term in the Intercreditor Agreement.

Collateral means, with respect to any Grantor, all property and rights of such Grantor in which a security interest is granted pursuant to Sections 2, 3, 4 and 5.

Collateral Control Agent shall have the meaning given such term in the Intercreditor Agreement.

Computer Hardware and Software means, with respect to any Grantor, all of such Grantor's rights (including rights as licensee and lessee) with respect to: (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, features, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including, without limitation, all operating system software, utilities and application programs in whatsoever form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; and (d) any documentation for hardware, software and firmware described in clauses (a), (b) and (c) above, including, without limitation, flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

Controlled Collateral means any assets of the Grantors:

(i) consisting of Deposit Accounts, Securities Accounts or Property deposited or carried therein or credited thereto,

(ii) described as subject to, or purported to be subject to, (A) Liens in favor of, or for the benefit of, the Collateral Control Agent or (B) control by the Collateral Agent, in each case in or under the Intercreditor Agreement, the Account Control Agreements, the Real Estate Security Documents, the Mexican Security Documents or any other Facility Document, excluding Sections 2, 3, 4 and 5 of this Agreement, or

(iii) in the possession or purported to be in the possession of the Collateral Control Agent (including Bailment Collateral), in each case in or under the Intercreditor Agreement, the Account Control Agreements, the Real Estate Security Documents, the Mexican Security Documents or any other Facility Document, excluding Sections 2, 3, 4 and 5 of this Agreement.

Deed of Charge means the deed of charge and assignment dated as of June 4, 2008 between, amongst others, the UK SPE, Residential Capital, LLC and the Security Trustee as amended, amended and restated, supplemented or modified from time to time.

3          *First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

Distributions means all dividends of stock, membership interests or other ownership interests, liquidating dividends, shares of stock resulting from (or in connection with the exercise of) stock splits, reclassifications, warrants, options, non-cash dividends, mergers, consolidations, and all other distributions (whether similar or dissimilar to the foregoing) on or with respect to any Pledged Share, Pledged Interest or other shares of capital stock, member interest or other ownership interests or security entitlements constituting Collateral, but shall not include Dividends.

Dividends means cash dividends and cash distributions with respect to any Pledged Share or any Pledged Interest made in the ordinary course of business and not as a liquidating dividend.

Dutch Assets means the Dutch Membership Interests and Dutch VFLN Receivables.

Dutch Membership Interests means 65% of any and all rights, claims (vorderingsrechten) and interests of each of Residential Funding Company, LLC and GMAC-RFC Holding Company, LLC in their capacity as member (lid) of GMAC RFC International Holdings Coöperatief U.A. under or in connection with their membership (lidmaatschap).

Dutch VFLN Receivables means any and all rights and claims (vorderingsrechten) (including but not limited to a right of recourse (regres) or subrogation (subrogatie)) whether present or future, whether actual or contingent, of Residential Capital, LLC under or in connection with (i) the VFLN Agreement, (ii) each VFLN Note and (iii) the VFLN Trust Deed.

Excluded Assets means, with respect to any Grantor and to the extent such Property does not constitute Primary Collateral, the following Property:

(a) Goods securing purchase money indebtedness or capital lease obligations to the extent such purchase money indebtedness or capital lease obligations prohibit the granting of a security interest on such assets;

(b) voting capital stock of controlled foreign corporations (as defined in the Internal Revenue Code) in excess of sixty-five percent (65%) of the voting rights of such corporations including without limitation GMAC-RFC Australia Pty Limited and GMAC RFC International Holdings Coöperatief U.A. (or any other controlled foreign corporation identified in writing by a Grantor to the First Priority Collateral Agent);

(c) any asset, including any account, note, contract, lease, financing arrangement, general intangible, equity investment, interests in joint ventures or other agreement to the extent that the grant of a security interest therein would violate applicable Requirements of Law, result in the invalidation thereof or provide any party thereto with a right of termination or default with respect thereto or with respect to any Bilateral Facility to which such asset is subject as of the Closing Date (in each case, after giving effect to applicable provisions of the UCC and other applicable Requirements of Law and principles of equity);

(d) any trademark applications filed in the United States Patent and Trademark Office on the basis of such Grantor's "intent-to-use" such trademark, unless and until acceptable evidence of use of the trademark had been filed with the United States Patent and Trademark Office pursuant to Section 1(c) or 1(d) of the Lanham Act (15 U.S.C. 1051, et

4    *First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

seq.) to the extent that granting a lien in such trademark application prior to such filing would adversely affect the enforceability of validity of such trademark application;

(e) Mortgage Loans (the "<u>LOC Mortgage Loans</u>") and assets, rights and property related to such Mortgage Loans, in each case to the extent that, during the period between December 28, 2009 and January 31, 2010, (i) such LOC Mortgage Loans are contributed or otherwise transferred by GMAC or its Subsidiary to ResCap, and contributed or otherwise transferred by ResCap or its Subsidiary to RFC or GMAC Mortgage and (ii) such LOC Mortgage Loans and related rights, assets and property are pledged by RFC or GMAC Mortgage as collateral under the Related Documents;

(f) proceeds and products of any and all of the foregoing excluded assets described in <u>clause (a)</u> through <u>(e)</u> above only to the extent such proceeds and products would constitute property or assets of the type described in <u>clause (a)</u> through <u>(e)</u> above; and

(g) the Exempt Cash Reserve Account and any proceeds and products thereof.

In addition, solely for purposes of each grant of a security interest hereunder to secure Hedge Obligations, Excluded Assets also means any asset that does not constitute a Financing Asset (as defined in the 2010 Indenture or the 2015 Indenture, in each case as in effect as of August 1, 2008) whether or not such asset constitutes Primary Collateral, to the extent (if any) that the grant of a security interest therein to secure the Hedge Obligations in such asset would violate any provision of, or cause a default under, the 2010 Indenture or the 2015 Indenture.

<u>Float Benefit</u> means the net economic benefit resulting from investments of funds representing escrow and custodial deposits held for the account of a servicer relating to the mortgage loans.

<u>General Intangibles</u> means, with respect to any Grantor, all of such Grantor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Grantor's licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

<u>Hedge Obligations</u> means obligations, indebtedness, fees, expenses (including, without limitation, attorneys' fees and expenses) and liabilities of the ResCap Hedge Counterparty or of any other Obligor now existing or hereafter arising under or in connection with any Hedge Document, whether monetary or otherwise, matured or unmatured, direct, indirect, related, unrelated, fixed, contingent, liquidated unliquidated, joint, several, or joint and several, including all interest accruing thereon (including any interest that accrues after the commencement of any proceeding by or against any Obligor under any bankruptcy, insolvency, liquidation, moratorium, receivership, reorganization or other debtor relief law) and all attorneys' fees and other expenses incurred in the collection or enforcement thereof.

<u>Intellectual Property</u> means all past, present and future: trade secrets and other proprietary information; rights in customer lists; trademarks, service marks, business names, trade names, domain names, designs, logos, and/or other source and/or business identifiers and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world (including without

<div align="center">5</div>

<div align="right"><i>First Priority Pledge and Security Agreement<br>and Irrevocable Proxy</i></div>

5256336.18 08048307

limitation the tradename "DITECH"); copyrights (including, without limitation, copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world; inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; rights in license agreements related to any of the Intellectual Property and income therefrom; the right to sue for all past, present and future infringements of any of the foregoing; all common law and other rights throughout the world in and to all of the foregoing; and the right to obtain all reissues, extensions or renewals of the foregoing.

Intercreditor Agreement means that certain Intercreditor Agreement, dated as of June 6, 2008, among Wells Fargo Bank, N.A., in its capacity as First Priority Collateral Agent, Wells Fargo Bank, N.A., in its capacity as Second Priority Collateral Agent, Wells Fargo Bank, N.A., in its capacity as Third Priority Collateral Agent, the Lender Agent and the other parties thereto, as amended, amended and restated, supplemented or otherwise modified from time to time.

Lender Parties shall have the meaning given such term in the Loan Agreement.

LOC Mortgage Loans shall have the meaning given such term in clause (e) of the definition of Excluded Assets.

Net Hedge Settlement Amount shall mean, at any time, the excess (if any) of (x) the aggregate amount of Hedge Settlement Amounts due from the ResCap Counterparty to the Initial Lender, minus (y) the aggregate amounts due from the Initial Lender to the ResCap Counterparty (i) at the maturity of Hedge Transactions, or (ii) pursuant to Section 6(e) of the Primary Hedge Documents due to the early termination of Hedge Transactions. It is understood and agreed that, at any time, no portion of the Hedge Exposure is "due" for purposes of this definition unless the related Hedge Transaction has been terminated or an Event of Bankruptcy shall have occurred with respect to the ResCap Counterparty.

Non-Tangible Collateral means, with respect to any Grantor, collectively, such portion of such Grantor's Collateral that constitutes Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Payment Intangibles, Investment Property, Letter-of-Credit Rights, Letters of Credit and Supporting Obligations.

Note Issuance Facility Deed means the note issuance facility deed dated June 4, 2008 between, amongst others, Residential Capital, LLC and the UK SPE, as amended, amended and restated, supplemented or modified from time to time.

Obligations means the Obligations (as defined in the Loan Agreement).

Pledged Interest Issuer means each Person identified in Item B of Attachment I hereto as the Pledged Interest Issuer.

Pledged Interests means all member interests, general or limited partnership interests or other ownership interests of any Pledged Interest Issuer described in Item B of Attachment I hereto, whether now existing or hereafter arising (other than Excluded Assets); all other member interests, general or limited partnership interests or other ownership interests issued by any Pledgor's Subsidiaries (other than Excluded Assets) that is hereafter from time to time pledged as Collateral

Confidential

under this Agreement by a Pledgor; all registrations, certificates, articles or agreements governing or representing any such interests; all options and other rights, contractual or otherwise, at any time existing with respect to such interests; all distributions, cash, instruments and other property now or hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such interests; and all proceeds of the foregoing.

Pledged Note Issuer means each Person identified in Item D of Attachment I hereto as the issuer of the Pledged Note identified opposite the name of such Person.

Pledged Note Lien means any and all liens or security interests securing the obligation of a Pledged Note Issuer evidenced by the applicable Pledged Note, and all collateral subject to such liens and security interests.

Pledged Notes means all of the promissory notes described in Item D of Attachment I hereto, and all other promissory notes of any Pledged Note Issuer, issued by a Pledged Note Issuer, as such promissory notes, in accordance with Section 11(j), are amended, restated, modified or supplemented from time to time; any promissory note of any Pledged Note Issuer taken in extension or renewal thereof or substitution therefor; all instruments or agreements governing or representing all or any of such notes; all rights, contractual or otherwise, at any time existing with respect to such notes; all distributions, cash, instruments and other property now or hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such notes; and all proceeds of the foregoing.

Pledged Property means all Pledged Interests, all Pledged Notes, all Pledged Shares, all other securities, all assignments of any amounts due or to become due, all other instruments which are now being delivered by any Pledgor to the First Priority Collateral Agent or the Collateral Control Agent or may from time to time hereafter be delivered by any Pledgor to the First Priority Collateral Agent or Collateral Control Agent for the purpose of pledge under this Agreement or any other Facility Document, and all proceeds of any of the foregoing.

Pledged Share Issuer means each Person identified in Item A of Attachment I hereto as the issuer of the Pledged Shares identified opposite the name of such Person.

Pledged Shares means all shares of capital stock of any Pledged Share Issuer, whether now existing or hereafter arising (other than Excluded Assets), and all other shares of capital stock of any direct Subsidiary of a Pledgor that is hereafter from time to time pledged as Collateral under this Agreement by a Pledgor; all registrations, certificates, articles, or agreements governing or representing any such interest; all options and other rights, contractual or otherwise, at any time existing with respect to all or any of such shares; all distributions, cash, instruments and other property now or hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares; and all proceeds of the foregoing.

Pledgor means any Borrower, any Guarantor or any Equity Pledgor.

Property means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

<div align="center">7</div>

<div align="right">*First Priority Pledge and Security Agreement
and Irrevocable Proxy*</div>

Confidential

Security Trustee means Deutsche Trustee Company Limited in its capacity as security trustee for the Secured Creditors (as defined in the English Security Documents).

Servicing Contract means any agreement, whether titled a "servicing agreement," a "pooling and servicing agreement," a "sale and servicing agreement," or otherwise, pursuant to which any Grantor is obligated to perform collection, enforcement or foreclosure services with respect to, or to maintain and remit any funds collected from, persons obligated on any mortgage loan or pool of mortgage loans.

Servicing Rights means all right, title and interest of the Borrowers and Guarantors in, to and under any Servicing Contract, whether now or hereafter existing, acquired or created, whether or not yet accrued, earned, due or payable, as well as all other present and future right and interest under such Servicing Contract, including, without limitation, the right (i) to receive the servicing fee income payable (including without limitation, any uncollected fees), (ii) to receive reimbursement for any Advances, (iii) any and all Ancillary Income, (iv) to hold and administer the related escrow account balances, (v) to hold and administer, in accordance with the applicable Servicing Contract, the related principal and interest custodial account, the custodial file, and the mortgage file arising from or connected to the servicing of such mortgage loan and (vi) all proceeds, income, profits, rents and products of any of the foregoing.

Significant Subsidiary means any Subsidiary of the ResCap (or group of Subsidiaries as to which a specified condition applies) which meets any of the following conditions:

> (a)    ResCap's and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Subsidiary exceeds 10 percent of the total assets of ResCap and its Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

> (b)    the Subsidiary's income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle exceeds 10 percent of such income of ResCap and its Subsidiaries on a consolidated basis for the most recently completed fiscal year.

For purposes of this definition, a Subsidiary shall mean a Person that is controlled by ResCap directly or indirectly through one or more intermediaries.    For purposes of making any determination or calculations, this definition shall  be interpreted in accordance with the rules and instructions of Rule 1-02 of Regulation S-X under the Securities Act of 1933 as in effect on the Closing Date.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, as used in Section 10(a) hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

UK Note means the notes issued to Residential Capital, LLC from time to time by the UK SPE pursuant to the Note Issuance Facility Deed (there being only one note outstanding at any time).

<div align="center">8</div>

<div align="right">*First Priority Pledge and Security Agreement
and Irrevocable Proxy*</div>

Confidential

UK Note Related Security means all Liens created in favor of the Security Trustee by the UK SPE in connection with the issuance of the UK Note.

UK Pledged Shares means the UK Pledged Shares in each UK Pledged Shares Company which are held by Residential Funding Company, LLC and represented by the certificates listed in Item C of Attachment I hereto and which represent 65% of the UK Pledged Shares held by Residential Funding Company, LLC in the relevant UK Pledged Shares Company together with all other shares and other assets, including any moneys and other Derivative Rights (as defined in the English Security Documents) from time to time charged to the First Priority Collateral Agent.

UK Pledged Shares Companies means:

(a)    GMAC-RFC Holdings Limited a company incorporated in England and Wales (registered number 03471082) whose registered office is at Eastern Gate, Brants Bridge, Bracknell, Berkshire  RG12 9BZ ("GMAC Holdings"); and

(b)    GMAC-RFC Europe Limited a company incorporated in England and Wales (registered number 03987700) whose registered office is at Eastern Gate, Brants Bridge, Bracknell, Berkshire  RG12 9BZ; ("GMAC Europe");

and UK Pledged Shares Company means any of them.

UK SPE means Viaduct No. 7 Limited.

VFLN Agreement means that certain variable funding loan note agreement dated June 4, 2008 and entered into by and between, amongst others, Residential Capital, LLC, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding.

VFLN Note means any note issued by GX CE Funding B.V. to Residential Capital, LLC under or pursuant to the VFLN Agreement.

VFLN Trust Deed means that certain trust deed entered into by and between, amongst others, GX CE Funding B.V. and the Security Trustee GX CE Funding in relation to the VFLN Agreement.

2.    Grant of Security Interest by Borrowers and the Guarantors.  As security for the prompt payment in full in cash and performance of all Obligations, each of the Borrowers and the Guarantors and each other Grantor (other than a Grantor that is an Equity Pledgor, an FABS Grantor or an Additional Account Pledgor) hereby pledges to the First Priority Collateral Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the First Priority Collateral Agent for the benefit of the Lender Parties in, all of each such Borrower's or Guarantor's or any such other Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Assets including, without limitation, all Financial Asset-Backed Securities, Servicing P&I Advances, Servicing T&I Advances, Mortgage Loans and

5256336.18 08048307

Confidential

Incremental Advances of a type specified in, or otherwise described in <u>Schedule VI</u> to this Agreement, and all other Property described in <u>Schedule VI</u> to this Agreement;

(b)    Accounts, including Health Care Insurance Receivables;

(c)    Chattel Paper, including Electronic Chattel Paper;

(d)    Commercial Tort Claims described on <u>Schedule V</u> hereto, as such schedule may be supplemented from time to time by any applicable Grantor in accordance with this Agreement;

(e)    Computer Hardware and Software and all rights with respect thereto, including, without limitation, any and all rights in licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

(f)    Deposit Accounts;

(g)    Documents;

(h)    Financial Assets, including, without limitation, (A) all Deposit Accounts and Securities Accounts in which any Financial Assets are carried or credited, and all Investment Property (including all Security Entitlements), Instruments, Money, and other property on deposit therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited to such Deposit Accounts or Securities Accounts, (B) all agreements, contracts, documents and instruments evidencing, arising from, relating to or other otherwise delivered pursuant to or in connection with Financial Assets, (C) all cash and funds delivered to a Grantor (or its bailee or agent) in respect of such Financial Assets and any collateral securing the same, and (D) to the extent not included in the foregoing, all Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Payment Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, and Money, consisting of, arising from, or relating to or delivered pursuant to, any of the foregoing;

(i)    General Intangibles (including, without limitation, all Payment Intangibles and all rights, titles and interests in the English Security Documents, the Dutch Security Documents and the Mexican Security Documents);

(j)    Goods (including, without limitation, all its Equipment, Fixtures and Inventory), together with all embedded software, accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

(k)    Instruments;

(l)    Intellectual Property;

10    *First Priority Pledge and Security Agreement and Irrevocable Proxy*

Confidential

(m)    (i) (A) all issued and outstanding shares of capital stock of each Pledged Share Issuer identified in <u>Item A</u> of <u>Attachment I</u> hereto, (B) all other Pledged Shares issued from time to time, (C) all Pledged Notes of each Pledged Note Issuer identified in <u>Item D</u> of <u>Attachment I</u> hereto (including, without limitation, the English Note and the Dutch Note), (D) all other Pledged Notes issued from time to time, (E) all Pledged Note Liens, (F) all issued and outstanding member interests, general or limited partnership interests or other ownership interests of each Pledged Interest Issuer identified in <u>Item B</u> of <u>Attachment I</u> hereto, (G) all other Pledged Interests issued from time to time, (H) all other Pledged Property, whether now or hereafter delivered to the First Priority Collateral Agent in connection with this Agreement, and (I) all Dividends, Distributions, interest, and other payments and rights with respect to any Pledged Property; (ii) all Sales Proceeds Accounts and all funds, properties and assets (including financial assets) deposited therein or carried in or credited thereto, and (iii) to the extent not included in the foregoing <u>clause (m)(i)</u>, all other Investment Property (including, without limitation, Commodity Accounts, Commodity Contracts, Securities (whether Certificated Securities or Uncertificated Securities), Security Entitlements and Securities Accounts);

(n)    Letter-of-Credit Rights and Letters of Credit;

(o)    Money (of every jurisdiction whatsoever);

(p)    Dutch Assets;

(q)    UK Pledged Shares and UK Notes;

(r)    Supporting Obligations;

(s)    Servicing Rights and Servicing Contracts;

(t)    Investment Property; and

(u)    to the extent not included in the foregoing, all other personal assets and property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing;

<u>provided</u> that, notwithstanding the foregoing, the "<u>Collateral</u>" described in this <u>Section 2</u> shall not include Excluded Assets.

To the extent any of the Collateral described in this <u>Section 2</u> constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Borrowers and the Guarantors and each other Grantor (other than a Grantor

11                     *First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

that is an Equity Pledgor, a FABS Grantor or an Additional Account Party) hereby pledges to the Collateral Control Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Lender Parties in, all of each such Borrower's or Guarantor's or any such other Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

Residential Capital, LLC agrees with the First Priority Collateral Agent and undertakes to pledge or, as the case may be, to pledge in advance the Dutch VFLN Receivables. Each of Residential Funding Company, LLC and GMAC-RFC Holding Company, LLC agrees with the First Priority Collateral Agent and undertakes to pledge or, as the case may be, to pledge in advance the respective Dutch Membership Interests.

3. <u>Grant of Security Interest by Equity Pledgors</u>. As security for the prompt payment in full in cash and performance of all Obligations, each of the Equity Pledgors hereby pledges to the First Priority Collateral Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the First Priority Collateral Agent for the benefit of the Lender Parties in, all of each such Equity Pledgor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Pledged Shares of each Pledged Share Issuer identified in <u>Item A</u> of <u>Attachment I</u> hereto;

(b)    all other Pledged Shares issued by any Pledged Share Issuer and pledged hereunder by any Equity Pledgor from time to time;

(c)    all promissory notes, if any, of each Pledged Note Issuer identified in <u>Item D</u> of <u>Attachment I</u> hereto;

(d)    all other Pledged Notes, if any, issued by any Pledged Note Issuer from time to time;

(e)    all Pledged Note Liens, if any;

(f)    all Pledged Interests of each Pledged Interest Issuer identified in <u>Item B</u> of <u>Attachment I</u> hereto;

(g)    all other Pledged Interests issued by any Pledged Interest Issuer and pledged hereunder by any Equity Pledgor from time to time;

(h)    all Dividends, Distributions, interest, and other payments and rights with respect to any Pledged Shares or Pledged Interests;

(i)    all Deposit Accounts and all Property deposited or carried therein or credited thereto, and solely with respect to RAHI and PATI only to the extent related to any of the Property described in clauses (a) through (h) of this <u>Section 3</u> or in which any of such Property (or proceeds of such Property) are deposited, carried or credited; and

12                 *First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

(j)      all Securities Accounts and all Property (including all Investment Property and Financial Assets) deposited or carried therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited to such Securities Accounts, and solely with respect to RAHI and PATI only to the extent related to any of the Property described in clauses (a) through (h) of this <u>Section 3</u> or in which any of such Property (or proceeds of such Property) are deposited, carried or credited;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing;

<u>provided</u> that, notwithstanding the foregoing, the "<u>Collateral</u>" described in this <u>Section 3</u> shall not include Excluded Assets.

To the extent any of the Collateral described in this <u>Section 3</u> constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Equity Pledgors hereby pledges to the Collateral Control Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Lender Parties in, all of each such Equity Pledgor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

4.      <u>Grant of Security Interest by FABS Grantors</u>.  As security for the prompt payment in full in cash and performance of all Obligations, each of the FABS Grantors hereby pledges to the First Priority Collateral Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the First Priority Collateral Agent for the benefit of the Lender Parties in all of each such FABS Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)      all Financial Assets, including without limitation all Financial Asset-Backed Securities;

(b)      all Deposit Accounts and Securities Accounts in which any Financial Assets are carried or credited, and all Investment Property (including all Security Entitlements), Instruments, Money, and other Property on deposit or carried therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited thereto, and in any event the Securities Accounts identified opposite such FABS Grantor's name on <u>Schedule X</u> hereto;

(c)      all agreements, contracts, documents and instruments evidencing, arising from, relating to or other otherwise delivered pursuant to or in connection with Financial Assets;

<div align="center">13</div>

*First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

(d)    all cash and funds delivered to FABS Grantor (or its bailee or agent) in respect of such Financial Assets and any collateral securing the same; and

(e)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Payment Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, and Money, consisting of, arising from, or relating to or delivered pursuant to, any of the foregoing;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing;

provided that, notwithstanding the foregoing, the "Collateral" described in this Section 4 shall not include Excluded Assets.

To the extent any Collateral described in this Section 4 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the FABS Grantors hereby pledges to the Collateral Control Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Lender Parties in all of each such FABS Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

5.    Grant of Security Interest by Additional Account Parties.  As security for the prompt payment in full in cash and performance of all Obligations, each of the Additional Account Parties hereby pledges to the First Priority Collateral Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the First Priority Collateral Agent for the benefit of the Lender Parties in all of each such Additional Account Party's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Deposit Accounts identified opposite such Additional Account Party's name on Schedule X hereto and any Property deposited or carried therein or credit thereto and any replacement account therefor; and

(b)    all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing;

provided that, notwithstanding the foregoing, the "Collateral" described in this Section 5 shall not include Excluded Assets.

To the extent any Collateral described in this Section 5 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the

14                        *First Priority Pledge and Security Agreement*
                                        *and Irrevocable Proxy*

Confidential

Additional Account Parties hereby pledges to the Collateral Control Agent for the benefit of the Lender Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Lender Parties in all of each such Additional Account Party's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

6.      Representations and Warranties.

(a)      Each Grantor represents and warrants that:

(i)      no financing statement (other than any which may have been filed on behalf of the First Priority Collateral Agent or in connection with Liens expressly permitted by the Loan Agreement ("Permitted Liens")) covering any of the Collateral is on file in any public office, except those financing statements identified on Schedule VI(a) hereto;

(ii)      such Grantor is and will be the lawful owner of all Collateral, free of all Liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, except those Liens and claims identified on Schedule VI(a) hereto, with full power and authority to execute and deliver this Agreement and perform such Grantor's obligations hereunder, and to subject the Collateral to the security interest hereunder and (ii) none of the Collateral of such Grantor that constitutes Collateral is subject to any Liens other than Permitted Liens;

(iii)      all information with respect to the Collateral and Account Debtors set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by such Grantor to the First Priority Collateral Agent or any Lender Party is and will be true and correct in all material respects as of the date specified therein (or, if no date is so specified, as of the date furnished);

(iv)      such Grantor's true legal name as registered in the jurisdiction in which such Grantor is organized or incorporated, jurisdiction of organization or incorporation, federal employer identification number, organizational identification number, if any, as designated by the state of its organization, formation or incorporation, chief executive office and principal place of business are as set forth on Schedule I hereto (and such Grantor has not maintained its chief executive office and principal place of business at any other location at any time after January 1, 2003 except as otherwise disclosed in writing to the First Priority Collateral Agent and Lender Agent);

(v)      each other location where such Grantor maintains a place of business is set forth on Schedule II hereto or as otherwise disclosed in writing to the First Priority Collateral Agent and Lender Agent;

(vi)      except as disclosed on Schedule III hereto, such Grantor is not now known and during the five years preceding the date hereof has not previously been known by any trade name;

(vii)      except as disclosed on Schedule III hereto, during the five years preceding the date hereof such Grantor has not been known by any legal name different from the one

<div align="center">15</div>

<div align="right">*First Priority Pledge and Security Agreement
and Irrevocable Proxy*</div>

5256336.18 08048307

Confidential

set forth on the signature page of this Agreement nor has such Grantor been the subject of any merger or other corporate reorganization;

(viii)    Schedule IV hereto contains a complete listing of all of such Grantor's material Intellectual Property which is subject to a registration;

(ix)    Schedule V hereto contains a complete listing of all of such Grantor's Commercial Tort Claims in excess of $10,000,000 in value;

(x)    Schedule VII hereto identifies all direct Subsidiaries of each Borrower, Guarantor and Equity Pledgor;

(xi)    Schedule IX hereto lists all Bailment Collateral currently held by the First Priority Collateral Agent and Lender Agent as of the Amendment Closing Date, such Schedule IX to be updated at any time additional Bailment Collateral may be so delivered;

(xii)    such Grantor is a corporation, limited partnership or limited liability company as specified in Schedule I hereto and is duly organized, validly existing and in good standing under the laws of the state of its incorporation, formation or organization;

(xiii)    the execution and delivery of this Agreement, the grant of the security interest, proxy and other rights granted herein and the performance by such Grantor of its obligations hereunder are within such Grantor's corporate, partnership or limited liability company powers, have been duly authorized by all necessary corporate, partnership or limited liability company action, have received all necessary governmental approvals (if any shall be required), and do not and will not contravene or conflict with any provision of law or of the charter or by-laws or other organizational documents of such Grantor or any judgment, order or decree, which is binding upon such Grantor and will not cause a breach, default or event of default under any agreement, indenture, instrument or other document to which such Grantor is a party;

(xiv)    this Agreement is a legal, valid and binding obligation of such Grantor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law);

(xv)    such Grantor has not performed any act which might prevent the First Priority Collateral Agent from enforcing any of the terms of this Agreement or which could limit the First Priority Collateral Agent in any such enforcement;

(xvi)    no Collateral is in the possession of any Person (other than such Grantor or a custodian, securities intermediary or account bank appointed by such Grantor) asserting any claim thereto or security interest therein (other than Permitted Liens), except that the First Priority Collateral Agent or its designee or agents may have possession of Collateral as contemplated pursuant to the Facility Documents;

16    *First Priority Pledge and Security Agreement
and Irrevocable Proxy*

5256336.18 08048307

(xvii)  this Agreement creates a valid security interest in the Collateral, securing the payment of the Obligations, and all filings and other actions necessary to perfect and protect such security interest have been duly taken and such security interest shall be a first priority security interest as to all Collateral, (except (A) to the extent of actions to be taken post-closing, as described in Schedule 8.01(m) of the Loan Agreement, (B)  for Permitted Liens and, (C) as to priority, to the Liens evidenced by the financial statements specified in Schedule VI(a)).

(xviii)  in the case of any Pledged Shares constituting Collateral, all of such Pledged Shares are duly authorized and validly issued, fully paid, and non-assessable, and constitute all of the issued and outstanding shares of capital stock of each Pledged Share Issuer owned by the Pledgor set forth across from the name of such Pledged Share Issuer on Attachment I hereto, except as otherwise set forth thereon;

(xix)   in the case of each Pledged Note and the Pledged Note Liens, all of such Pledged Notes and Pledged Note Liens, if any, have been duly authorized, executed, endorsed, issued and delivered, and are the legal, valid and binding obligation of the issuers thereof, and are not in default;

(xx)   in the case of any Pledged Interests constituting Collateral, such Pledged Interests constitute one hundred percent (100%) of the Pledgor's interest in the Pledged Interest Issuer (other than Excluded Assets) and the percentage of the total membership, partnership or other equity interests in the Pledged Interest Issuer indicated on Attachment I, except as otherwise set forth thereon.  The Pledged Interests indicated on Attachment I are duly registered in the permanent ownership records of the respective Pledged Interests Issuer, and such registration is maintained in the principal office of such issuer.  Such registration continues valid and genuine and has not been altered.  All Pledged Interests have been duly authorized and validly issued, are fully paid and non-assessable, and were not issued in violation of the preemptive rights, if any, of any Person or of any agreement by which any Pledgor is bound.  All documentary, stamp or other taxes or fees owing in connection with the registration, issuance, transfer or pledge of Collateral have been paid.  No restrictions or conditions exist with respect to the registration, transfer, voting or pledge of any Pledged Interests (other than usual or customary securities laws or ERISA restrictions).  All requisite formalities for the granting of a security interest in the Pledged Interests required pursuant to the organizational documents of the Pledgors or the Pledged Interest Issuer have been complied with on or prior to the execution and delivery of this Agreement.  Each Pledgor represents that, as of the date hereof, none of the Pledged Interests is dealt with or traded on any securities exchange or in any securities market; and

(xxi)   Schedule X attached hereto includes all of the Deposit Accounts and Securities Accounts that are, and that under the terms of the Loan Agreement are required to be, subject to Account Control Agreements.

(b)     RFC represents and warrants, with respect to the UK Pledged Shares, that:

(i)      it is the sole legal and beneficial owner of the UK Pledged Shares free from all Liens other than Permitted Liens;

<div align="center">17</div>

*First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

5256336.18 08048307

(ii)     the UK Pledged Shares are fully paid;

(iii)    there are no moneys or liabilities outstanding or payable in respect of the UK Pledged Shares or any of them;

(iv)    it is lawfully entitled to create the security over the UK Pledged Shares constituted by this Agreement in favor of the First Priority Collateral Agent;

(v)     together the UK Pledged Shares constitute 65% of the issued share capital of each UK Pledged Shares Company; and

(vi)    the UK Pledged Shares are fully transferable to the First Priority Collateral Agent (or any other person as the First Priority Collateral Agent shall direct) without restriction and in particular in respect of any pre-emption rights or restrictions in the articles of association of any UK Pledged Shares Company all appropriate waivers have been obtained in respect of them from all other shareholders of that UK Pledged Shares Company, which are unconditional, irrevocable and legally binding and enforceable.

7.      <u>Grantor Remains Liable; Nature of Security Interest; Subrogation, etc</u>.

(a)     Anything herein to the contrary notwithstanding, (i) each Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein, and will perform all of its duties and obligations under such contracts and agreements to the same extent as if this Agreement had not been executed, (ii) the exercise by the First Priority Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under any such contracts or agreements included in the Collateral, and (iii) neither the First Priority Collateral Agent nor any other Lender Party shall have any obligation or liability under any contracts or agreements included in the Collateral by reason of this Agreement, nor shall the First Priority Collateral Agent nor any Lender Party be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(b)     This Agreement shall in all respects be a continuing, absolute, unconditional and irrevocable grant of security interest, and shall remain in full force and effect until all Obligations have been paid in full in cash and all Commitments have terminated.  All rights of the Lender Parties and the security interests granted to the First Priority Collateral Agent (for its benefit and the benefit of each other Lender Party) hereunder, and all obligations of the Grantors hereunder, shall, in each case, be absolute, unconditional and irrevocable irrespective of (i) any lack of validity, legality or enforceability of any Facility Document, (ii) the failure of any Lender Party (A) to assert any claim or demand or to enforce any right or remedy against any Grantor or any other Person under the provisions of any Facility Document or otherwise, or (B) to exercise any right or remedy against any other guarantor of, or collateral securing, any Obligations, (iii) any change in the time, manner or place of payment of, or in any other term of, all or any part of the Obligations, or any other extension, compromise or renewal of any Obligations, (iv) any reduction, limitation, impairment or termination of any Obligations (except until all Obligations have been paid in full in cash and all Commitments have terminated) for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and each Grantor hereby waives

18                          *First Priority Pledge and Security Agreement*
                            *and Irrevocable Proxy*

5256336.18 08048307

any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Obligations or otherwise, (v) any amendment to, rescission, waiver, or other modification of, or any consent to or departure from, any of the terms of any Facility Document, (vi) any addition, exchange or release of any Collateral of the Obligations, or any surrender or non-perfection of any Collateral, or any amendment to or waiver or release or addition to, or consent to or departure from, any other guaranty held by any Lender Party securing any of the Obligations, or (vii) any other circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of, any Grantor or any other Grantor, any surety or any guarantor.

(c)      Until one year and one day after all Obligations have been paid in full in cash and all Commitments have terminated, each Grantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against any Borrower, any other Grantor or any other Grantor that arise from the existence, payment, performance or enforcement of such Grantor's obligations under this Agreement or any other Facility Document, including any right of subrogation, reimbursement, exoneration or indemnification, any right to participate in any claim or remedy of any Lender Party against any Borrower, any other Grantor or any other Grantor or any Collateral which any Lender Party now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including the right to take or receive from any Borrower, any Grantor or any other Grantor, directly or indirectly, in cash or other property or by set-off or in any manner, payment or security on account of such claim or other rights. If any amount shall be paid to any Grantor in violation of the preceding sentence and the Obligations shall not have been indefeasibly paid in full in cash or all Commitments have not been terminated, then such amount shall be deemed to have been paid to such Grantor for the benefit of, and held in trust for, the First Priority Collateral Agent (on behalf of the Lender Parties), and shall forthwith be paid to the First Priority Collateral Agent to be credited and applied upon the Obligations, whether matured or unmatured. Each Grantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Loan Agreement and that the waiver set forth in this Section 7(c) is knowingly made in contemplation of such benefits.

(d)      Except as otherwise provided in the Loan Agreement, if any Lender Party may, under applicable Requirements of Law, proceed to realize its benefits under this Agreement or the other Facility Documents giving any Lender Party a lien upon any Collateral, either by judicial foreclosure or by non-judicial sale or enforcement, such Lender Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Agreement. If, in the exercise of any of its rights and remedies, any Lender Party shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Grantor or any other Grantor or any other Person, whether because of any applicable Requirements of Law pertaining to "election of remedies" or the like, each Grantor hereby consents to such action by such Lender Party and waives any claim based upon such action, even if such action by such Lender Party shall result in a full or partial loss of any rights of subrogation that such Grantor might otherwise have had but for such action by such Lender Party.

8.      Collections, etc. Until such time during the existence of an Event of Default as the First Priority Collateral Agent shall notify such Grantor of the revocation of such power and authority, each Grantor (a) will, at its own expense, endeavor to collect, as and when due, all

Confidential

amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as the First Priority Collateral Agent may reasonably request or, in the absence of such request, as such Grantor may deem advisable; and (b) may grant, in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-Tangible Collateral. The First Priority Collateral Agent, however, may, at any time that an Event of Default has occurred and is continuing, whether before or after any revocation of such power and authority or the maturity of any of the Obligations, notify any party obligated on any of the Non-Tangible Collateral to make payment or otherwise render performance to or for the benefit of the First Priority Collateral Agent and enforce, by suit or otherwise the obligations of any such party obligated on any Non-Tangible Collateral. In connection therewith, the First Priority Collateral Agent may surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. Upon request of the First Priority Collateral Agent following the occurrence and during the continuation of an Event of Default, each Grantor will, at its own expense, notify any party obligated on any of the Non-Tangible Collateral to make payment to the First Priority Collateral Agent of any amounts due or to become due thereunder.

9.    Release.  Collateral shall from time to time be released from the security interest created by this Agreement pursuant to and in accordance with the provisions of the Loan Agreement. Upon any such release, the Lender Agent will, at the Grantors' joint and several expense, cause the First Priority Collateral Agent to deliver to the relevant Grantor, without any representations, warranties or recourse of any kind whatsoever, such released Collateral held by the First Priority Collateral Agent or Collateral Control Agent hereunder, and execute and deliver to the Grantor such documents as such Grantor shall reasonably request to evidence such release.

10.    Agreements of the Grantors.  (a) Each Grantor:

(i)    will execute such financing statements (or any equivalent filings in the United Kingdom and the Netherlands) and other documents (and pay the cost of filing or recording the same in all public offices reasonably determined to be appropriate by the First Priority Collateral Agent or the Lender Agent) and do such other acts and things (including, without limitation, delivery to the First Priority Collateral Agent of any Instruments and Certificated Securities which constitute Collateral), all as the First Priority Collateral Agent or the Lender Agent may from time to time reasonably request, to establish and maintain a valid perfected security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Permitted Liens) to secure the payment of the Obligations (and each Grantor authorizes the First Priority Collateral Agent and the Lender Agent to file, without limitation, any financing statement (or any equivalent filings in the United Kingdom and the Netherlands) that (i) indicates the Collateral (x) as "all property" or "all assets" of such Grantor or words of similar effect, regardless of whether any particular asset in the Collateral falls within the scope of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed, or (y) as being of an equal or lesser scope or with greater detail, and (ii) contains any other information required by Section 5 of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed regarding the sufficiency or filing office acceptance of any financing statement (or any equivalent filings

5256336.18 08048307

in the United Kingdom and the Netherlands), including (x) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (y) in the case of a financing statement (or any equivalent filings in the United Kingdom and the Netherlands) filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates;

(ii)     will keep all its records regarding Collateral at, and will not maintain any place of business at any location other than, its address(es) shown on Schedules I and II hereto or at such other addresses of which such Grantor shall have given the First Priority Collateral Agent and the Lender Agent not less than 30 days' prior written notice;

(iii)     will not change its state of organization or incorporation and will not change its name, identity or corporate structure or its organizational identification number for the state of its incorporation, formation or organization, in each case such that any financing statement filed to perfect the First Priority Collateral Agent's interests under this Agreement would become seriously misleading, unless such Grantor shall have given the First Priority Collateral Agent and the Lender Agent not less than 30 days' prior notice of such change (provided that this Section 10(a)(iii) shall not be deemed to authorize any change or transaction prohibited under the Loan Agreement) and shall have taken or will timely take all action necessary to maintain continued perfection and priority of the security interest created hereunder following such change;

(iv)     to the extent practicable, will keep its records concerning the Collateral in such a manner as will enable the First Priority Collateral Agent or its designees to determine at any time the status of the Collateral;

(v)     to the extent practicable, will furnish the First Priority Collateral Agent such information as is available to such Grantor concerning such Grantor, the Collateral and the Account Debtors as the First Priority Collateral Agent may from time to time reasonably request;

(vi)     will permit the First Priority Collateral Agent, the Lender Agent and their designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice if a Default has occurred and is continuing) to inspect, audit and make copies of and extracts from all records and all other papers in the possession of such Grantor pertaining to the Collateral and the Account Debtors, and will, upon request of the First Priority Collateral Agent during the existence of a Default and to the extent practicable, deliver to the First Priority Collateral Agent all of such records and papers;

(vii)     will not sell, lease or assign any Collateral except as permitted by the Facility Documents or create or permit to exist any Lien on any Collateral other than Permitted Liens;

(viii)     without limiting the provisions of Section 7.01(j) of the Loan Agreement, will at all times keep all of its Inventory and other Goods insured under policies maintained

<div align="center">21</div>

<div align="right">*First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*</div>

5256336.18 08048307

with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated, and cause all such policies to provide that loss thereunder shall be payable to the First Priority Collateral Agent as its interest may appear (it being understood that (A) so long as no Default shall be continuing, the First Priority Collateral Agent shall deliver any proceeds of such insurance which may be received by it to such Grantor and (B) upon the occurrence and during the continuance of a Default shall be continuing, the Lender Agent may direct (in writing) the First Priority Collateral Agent to apply any proceeds of such insurance which may be received by it toward payment of the Obligations, whether or not due, in such order of application as the Lender Agent may determine) and such policies or certificates thereof shall, if the First Priority Collateral Agent so requests, be deposited with or furnished to the First Priority Collateral Agent;

(ix)    will keep all of the Collateral granted by such Grantor, Deposit Accounts and Investment Property in the United States or at such other locations outside of the United States as may be specified in writing to the Lender Agent;

(x)    will promptly notify the Lender Parties in writing upon incurring or otherwise obtaining a Commercial Tort Claim which is claiming damages in excess of $10,000,000 (or any lesser amount specified in writing by the Lender Agent or the First Priority Collateral Agent, if a Default has occurred and is continuing) after the date hereof against any third party, and concurrently with deliver to the Lender Agent, in form and substance satisfactory to the Lender Agent, a supplement to <u>Schedule V</u> sufficiently identifying such Commercial Tort Claim for purposes of Section 9-108 of the UCC;

(xi)    will promptly notify the Lender Parties in writing upon becoming the beneficiary under any letter of credit in excess of $10,000,000 (or any lesser amount specified in writing by the Lender Agent or the First Priority Collateral Agent, if a Default has occurred and is continuing) and, at the request of the First Priority Collateral Agent, pursuant to an agreement in form and substance satisfactory to the First Priority Collateral Agent, either (A) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to the First Priority Collateral Agent of such letter of credit or (B) arrange for the First Priority Collateral Agent to become the transferee beneficiary of such letter of credit;

(xii)    will promptly notify the Lender Parties in writing if such Grantor holds or acquires an interest in any Electronic Chattel Paper and, at the request of the First Priority Collateral Agent, take such action as the First Priority Collateral Agent or the Lender Agent may reasonably request to vest control, under Section 9-105 of the UCC, of such Electronic Chattel Paper in the First Priority Collateral Agent or the Collateral Control Agent;

(xiii)    if any Grantor (i) obtains any rights to any additional Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office or (ii) becomes entitled to the benefit of any additional Intellectual Property constituting Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property constituting Collateral which is registered with the United States Copyright Office

<div align="center">22</div>

<div align="right"><i>First Priority Pledge and Security Agreement
and Irrevocable Proxy</i></div>

5256336.18 08048307

or the United States Patent & Trademark Office, or any improvement on any Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office, such Grantor will notify the First Priority Collateral Agent in writing and use commercially reasonable efforts to cause a short form security agreement in favor of the First Priority Collateral Agent to be filed in the United States Copyright Office or the Unites States Patent & Trademark Office, as the case may be, with respect to such Intellectual Property; provided that this covenant shall not apply to "off-the-shelf" license rights of any Grantor in any Intellectual Property or any other license rights that are not material to such Grantor;

(xiv)    acknowledges and agrees that it is not authorized to file any financing statement in favor of the First Priority Collateral Agent without the prior written consent of the First Priority Collateral Agent and that it will not do so without the prior written consent of the First Priority Collateral Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC;

(xv)    agrees that no Grantor will take any action to grant or perfect a Lien in favor of the Second Priority Collateral Agent (as defined in the Intercreditor Agreement) or Third Priority Collateral Agent (as defined in the Intercreditor Agreement) in any asset without first taking such action in favor of the First Priority Collateral Agent or Collateral Control Agent as directed by the Lender Agent;

(xvi)    will facilitate the realization of the Collateral and the exercise of all powers, authorities and discretions vested by this Agreement in the First Priority Collateral Agent; and

(xvii)    shall in particular promptly execute all transfers, conveyances, assignments, assurances which the First Priority Collateral Agent may reasonably request in order to preserve or protect its interest in the Collateral.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne jointly and severally by the Grantors.  Upon the occurrence and during the continuation of an Event of Default, the First Priority Collateral Agent shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event the applicable Grantor shall at the request of the First Priority Collateral Agent do any and all lawful acts and execute any and all proper documents reasonably requested by the First Priority Collateral Agent or the Lender Agent in aid of such enforcement and such Grantor shall promptly, upon demand, reimburse and indemnify the First Priority Collateral Agent and Lender Agent for all costs and expenses incurred by either of them in the exercise of their rights under this Section 10.  Notwithstanding the foregoing, the First Priority Collateral Agent shall have no obligation or liability regarding the Collateral or any proceeds thereof by reason of, or arising out of, this Agreement.

(b)    Each of RFC and RFC Holding (i) shall execute a written declaration as referred to in clause 19.12 of the articles of association (*statuten*) of GMAC RFC International Holdings Coöperatief U.A pursuant to which it terminates its membership (*lidmaatschap*) of GMAC RFC International Holdings Coöperatief U.A., subject to the occurrence of an Event of Default or the delivery of a notice in accordance with Section 8.02 (Remedies) of the Loan Agreement and (ii)

23                *First Priority Pledge and Security Agreement*
                *and Irrevocable Proxy*

5256336.18 08048307

Confidential

shall not revoke such written declaration or otherwise take any action that results in such written declaration being nullified or declared null and void.

(c)   ResCap acknowledges and agrees that (a) it shall (1) not waive any rights under nor amend, novate, repudiate, rescind or otherwise terminate or permit to be terminated any Assigned Document without the prior written consent of the First Priority Collateral Agent; (2) diligently pursue any remedies available to it for any breach of, or in respect of any claim in relation to, any Assigned Document; (3) deposit the UK  Note and any UK Note Related Security issued in relation to a UK Note pursuant to Clause 8.2 (New Note Certificate) of the Note Issuance Facility Deed with the First Priority Collateral Agent or the Collateral Control Agent and (4) procure that the UK SPE complies with its obligations under Clause 8.2 (New Note Certificate) of the Note Issuance Facility Deed, including, without limitation, granting a power of attorney in favor of the First Priority Collateral Agent or the Collateral Control Agent in a form set out in Schedule 9 to the Note Issuance Facility Deed; and (b) all payments received by it in connection with the UK Note, including the proceeds of any redemption of the UK Note whether as a result of a disposal of any assets or otherwise, shall be deposited into an account specified by the First Priority Collateral Agent from time to time in accordance with Section 4.02 of the Loan Agreement.

11.   <u>Agreement as to Investment Property; Voting</u>.

(a)   All certificates or Instruments, if any, representing or evidencing any Primary Collateral, including any Pledged Property, shall be delivered to and held by or on behalf of (and, in the case of the Pledged Notes, endorsed to the order of) the Collateral Control Agent pursuant hereto, shall be in suitable form for transfer by delivery, and shall be accompanied by all necessary endorsements or instruments of transfer or assignment, duly executed in blank; <u>provided</u> that notes evidencing individual residential mortgage loans included in Primary Collateral need not be so delivered before September 15, 2008; and <u>provided</u> <u>further</u> that notes evidencing individual residential mortgage loans that are not included in Primary Collateral need not be so delivered.

(b)   To the extent any of its Primary Collateral constitutes a "certificated security" (as defined in Section 8-102(a)(4) of the UCC), each Grantor shall take such other actions as necessary to grant "control" (as defined in Section 8-106 of the UCC) to the First Priority Collateral Agent over such Collateral.

(c)   To the extent any of its Collateral constitutes an "uncertificated security" (as defined in Section 8-102(a)(18) of the UCC) with a Carrying Value of $10,000,000 or more, each Grantor shall take and cause the appropriate Person (including any issuer, entitlement holder or securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of the UCC) to the Collateral Control Agent over such Collateral including, without limitation, causing delivery of such Collateral or causing the issuer of such Collateral, as appropriate, to agree to comply with the instructions originated by the Collateral Control Agent without further consent by the registered owner thereof;

(d)   To the extent any of its Collateral constitutes a "security entitlement" or a "securities account" (as such terms are defined in Sections 8-102(a)(17) and 8-501(a), respectively, of the UCC), each Grantor shall take and cause the appropriate Person (including any securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of

5256336.18 08048307

the UCC) to the Collateral Control Agent over such Collateral including, without limitation, causing to be delivered to the Collateral Control Agent an agreement, in form and substance satisfactory to the Lender Agent, executed by the securities intermediary thereof whereby such securities intermediary agrees (i) that it will comply with entitlement orders originated by the Collateral Control Agent without further consent by such Grantor or any other Person with respect to all such Collateral (it being understood that such agreement may provide that at all times when such securities intermediary has not been notified by the Collateral Control Agent to the contrary, the securities intermediary may comply with entitlement orders of such Grantor), (ii) to subordinate any security interest it may have in and to all such Collateral to the security interest of the Collateral Control Agent therein, and (iii) that it will not agree with any Person other than the Collateral Control Agent in any manner that would grant such Person "control" over any such Collateral without the Lender Agent's prior written consent.

(e)    Each Pledgor will, from time to time upon the request of the Collateral Control Agent or the First Priority Collateral Agent, promptly deliver to the Collateral Control Agent such stock powers, instruments, and similar documents, satisfactory in form and substance to the Lender Agent and the First Priority Collateral Agent, with respect to the Collateral as the Collateral Control Agent or the First Priority Collateral Agent may reasonably request and will, from time to time upon the request of the Collateral Control Agent or the First Priority Collateral Agent after the occurrence of any Default, promptly transfer any Pledged Shares, Pledged Interests or other shares of common stock, member interests or other ownership interests constituting Collateral into the name of any nominee designated by the Lender Agent.

(f)    Subject to <u>clause (g) below</u>, each Pledgor will, at all times, keep pledged to the First Priority Collateral Agent or Collateral Control Agent, as the case may be, pursuant to the Intercreditor Agreement, all Pledged Shares, Pledged Interests and all other shares of capital stock, member interests or other ownership interests constituting Collateral, and all securities, security entitlements and securities accounts constituting Collateral, Dividends and Distributions with respect thereto, all Pledged Notes, all interest, principal and other proceeds received by the First Priority Collateral Agent with respect to the Pledged Notes, all Pledged Note Liens and all other Collateral and other securities, instruments, security entitlements, financial assets, investment property, proceeds, and rights from time to time received by or distributable to a Pledgor in respect of any Collateral.

(g)    In the event that any Dividend or Distribution is to be paid on any Pledged Share or any Pledged Interest or any payment of principal or interest is to be made on any Pledged Note at a time when no Event of Default has occurred and is continuing, such Dividend, Distribution or payment may be paid directly to the relevant Grantor.  If any Event of Default has occurred and is continuing, then any such Dividend, Distribution or payment shall be paid directly to the First Priority Collateral Agent in accordance with <u>Section 11(h)</u>.

(h)    Each Pledgor agrees:

(i)    following the occurrence and during the continuance of any Event of Default, promptly upon receipt thereof by any Pledgor and without any request therefor by the First Priority Collateral Agent, to deliver (properly endorsed where required hereby or requested by the First Priority Collateral Agent) to the First Priority Collateral Agent all Dividends,

<div align="center">25</div>

<div align="right"><i>First Priority Pledge and Security Agreement<br>and Irrevocable Proxy</i></div>

5256336.18 08048307

Confidential

Distributions, all interest, all principal, all other cash payments, and all proceeds of the Collateral, all of which shall be held by the First Priority Collateral Agent as additional Collateral for use in accordance with <u>Section 12(f)</u>; and

(ii)     after any Event of Default shall have occurred and be continuing and the First Priority Collateral Agent has notified the relevant Pledgor of the First Priority Collateral Agent's intention to exercise its voting power under this <u>clause (ii)</u>, (A) the First Priority Collateral Agent may exercise (to the exclusion of such Pledgor) the voting power and all other incidental rights of ownership with respect to any Pledged Shares, Pledged Interests or other shares of capital stock, member interests or other ownership interests constituting Collateral and EACH PLEDGOR HEREBY GRANTS THE FIRST PRIORITY COLLATERAL AGENT AN IRREVOCABLE PROXY, EXERCISABLE UNDER SUCH CIRCUMSTANCES, TO VOTE THE PLEDGED SHARES, THE PLEDGED INTERESTS AND SUCH OTHER COLLATERAL, WITH SUCH PROXY TO REMAIN VALID UNTIL THE PAYMENT IN FULL IN CASH OF ALL OBLIGATIONS, THE TERMINATION OR EXPIRATION OF ALL COMMITMENTS; and (B) promptly to deliver to the First Priority Collateral Agent such additional proxies and other documents as may be necessary to allow the First Priority Collateral Agent to exercise such voting power;

(i)     All Dividends, Distributions, interest, principal, cash payments, and proceeds and all rights under the UK Note and the UK Note Related Security which may at any time and from time to time be held by a Pledgor but which such Pledgor is then obligated to deliver to the First Priority Collateral Agent, shall, until delivery to the First Priority Collateral Agent, be held by such Pledgor separate and apart from its other property in trust for the First Priority Collateral Agent.  The First Priority Collateral Agent agrees that unless it has received written notice from the Lender Agent or any Lender that an Event of Default shall have occurred and be continuing and the First Priority Collateral Agent shall have given the notice referred to in <u>Section 11(h)(ii)</u>, such Pledgor shall have the exclusive voting power with respect to any shares of capital stock, member interests or other ownership interest (including any of the Pledged Shares, Pledged Interests or UK Pledged Shares) constituting Collateral and the First Priority Collateral Agent shall, upon the written request of such Pledgor, promptly deliver (at the Grantors' joint and several expense) such proxies and other documents, if any, as shall be reasonably requested by such Pledgor which are necessary to allow such Pledgor to exercise voting power with respect to any such share of capital stock, member interests or other ownership interests (including any of the Pledged Shares, Pledged Interests or UK Pledged Shares) constituting Collateral; <u>provided</u>, <u>however</u>, that no vote shall be cast, or consent, waiver, or ratification given, or action taken by any Pledgor that could reasonably be expected to be adverse in any material respect to the interests of the First Priority Collateral Agent and the other Lender Parties or be inconsistent with or violate any provision of the Loan Agreement or any other Facility Document (including this Agreement).

(j)     No Pledgor will, without the prior written consent of the Lender Agent:  (A) enter into any agreement amending, supplementing, or waiving in any material respect any provision of any Pledged Note, any Pledged Note Lien or any UK Pledged Share (including the underlying instrument pursuant to which such Pledged Note, Pledged Note Lien or UK Pledged Share is issued) or compromising or releasing or extending the time for payment of any obligation of the maker thereof, (B) take or omit to take any action the taking or the omission of that would result in any impairment or alteration of any obligation of the maker of Pledged Note, Pledged Note Lien,

<div align="center">26</div>

<div align="right"><i>First Priority Pledge and Security Agreement
and Irrevocable Proxy</i></div>

Confidential

UK Pledged Share or other instrument constituting Collateral, (C) permit the issuance of (x) any additional equity interests of any Pledged Share Issuer or Pledged Interest Issuer (unless immediately upon such issuance the same are pledged and delivered to the First Priority Collateral Agent pursuant to the terms hereof (or the Collateral Control Agent, if required pursuant to the Intercreditor Agreement) to the extent necessary to give the First Priority Collateral Agent a security interest after such issue in at least the same percentage of such Pledgor's outstanding interests as before such issue), (y) any securities or other ownership interests convertible voluntarily by the holder thereof or automatically upon the occurrence or non-occurrence of any event or condition into, or exchangeable for, any such shares or other ownership interests, or (z) any warrants, options, contracts or other commitments entitling any Person to purchase or otherwise acquire any such shares or other ownership interests, or (D) enter into any agreement creating or otherwise permit to exist, any restriction or condition upon the transfer, voting or control of any Pledged Share, Pledged Interest or UK Pledged Share that could reasonably be deemed to be adverse to the Lender Parties.  Each Pledgor shall provide, or cause the relevant Pledged Share Issuer or Pledged Interest Issuer to provide, the First Priority Collateral Agent and the Lender Agent with a copy of any amendment or supplement to, or modification or waiver of, any term or provision of any of the organizational documents of such relevant Pledged Share Issuer or Pledged Interest Issuer, provided that such Pledgor shall not enter into any such amendment, supplement, modification or waiver of the organizational documents of such relevant Pledged Share Issuer or Pledged Interest Issuer which could reasonably be expected to be adverse to the interests of the Lender Parties.  The Pledgors covenant and agree that they shall not consent to or permit (1) any Pledged Interest to be dealt with or traded on any securities exchanges or in any securities market or (2) any Pledge Interest Issuer to elect to have its Pledged Interests treated as a "security" under Article 8 of the UCC unless the relevant Pledgors have (I) caused such Pledged Interest to be certificated and (II) delivered all certificates evidencing such Pledged Interest to the Collateral Control Agent, together with duly executed undated blank transfer powers, or other equivalent instruments of transfer acceptable to the Collateral Control Agent and the Lender Agent.

(k)     Each Pledgor shall take such actions such that its Collateral consisting of Pledged Interests and Pledged Shares at all times shall be duly authorized, validly registered, fully paid and non-assessable, and shall not be registered in violation of the organic documents of the Pledgors or the preemptive rights of any Person, if any, or of any agreement by which the Pledgors or any Pledged Share Issuer or Pledged Interest Issuer is bound.

12.     Defaults and Events of Default; Remedies.

(a)     Each Grantor hereby irrevocably appoints the First Priority Collateral Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time, upon the occurrence and during the continuation of an Event of Default, to take any action and to execute any instrument which the First Priority Collateral Agent may request to accomplish the purposes of this Agreement, including (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (ii) to receive, endorse, and collect any drafts or other Collateral in connection with clause (i) above, (iii) to file any claims or take any action or institute any proceedings which the First Priority Collateral Agent may request for the collection of any of the Collateral or otherwise to enforce the rights of the First Priority Collateral Agent and the other Lender Parties with respect to any of the Collateral, and (iv) to

*First Priority Pledge and Security Agreement and Irrevocable Proxy*

5256336.18 08048307

Confidential

perform the affirmative obligations of such Grantor hereunder. **EACH GRANTOR HEREBY ACKNOWLEDGES, CONSENTS AND AGREES THAT THE POWER OF ATTORNEY GRANTED PURSUANT TO THIS <u>SECTION 12</u> IS IRREVOCABLE AND COUPLED WITH AN INTEREST AND SHALL BE EFFECTIVE UNTIL ALL OBLIGATIONS HAVE BEEN PAID IN FULL IN CASH AND ALL COMMITMENTS HAVE TERMINATED.**

(b)     If an Event of Default shall have occurred and be continuing, in addition to its rights in the foregoing <u>clause (a)</u> and without limiting the generality of such clause, the First Priority Collateral Agent may exercise from time to time any rights and remedies available to it under the UCC, under any other applicable Requirements of Law and in the <u>clauses (c)</u> through <u>(g)</u> set forth below in this <u>Section 12</u>.

(c)     Each Grantor agrees, (i) at the Lender Agent's request if a Default has occurred and is continuing, to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) and all records for all Collateral at a convenient place or places acceptable to the Lender Agent, and (ii) if an Event of Default has occurred and is continuing, at the First Priority Collateral Agent's or Lender Agent's request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable the First Priority Collateral Agent or its nominee to be registered as owner of the Intellectual Property with any competent registration authority.

(d)     Notice of the intended disposition of any Collateral may be given by first-class mail, hand-delivery (through a delivery service or otherwise), facsimile or E-mail, and shall be deemed to have been "sent" upon deposit in the U.S. mails with adequate postage properly affixed, upon delivery to an express delivery service, upon the electronic submission through telephonic services or, if by facsimile transmission, when sent against mechanical confirmation of successful transmission, as applicable. Each Grantor hereby agrees and acknowledges that: (i) with respect to Collateral that is (A) perishable or threatens to decline speedily in value or (B) is of a type customarily sold on a recognized market, no notice of disposition need be given; and (ii) with respect to Collateral not described in <u>clause (i)</u> above, notification sent after default and at least ten days before any proposed disposition provides notice within a reasonable time before disposition.

(e)     Each Grantor hereby agrees and acknowledges that a commercially reasonable disposition of Inventory, Equipment, Computer Hardware and Software, or Intellectual Property may be by lease or license of, in addition to the sale of, such Collateral. Each Grantor further agrees and acknowledges that a disposition (i) made in the usual manner on any recognized market, (ii) at the price current in any recognized market at the time of disposition or (iii) in conformity with reasonable commercial practices among dealers in the type of property subject to the disposition shall, in each case, be deemed commercially reasonable.

(f)     Any cash proceeds of any disposition by the First Priority Collateral Agent of any of the Collateral shall be applied by the First Priority Collateral Agent, first, to payment of the First Priority Collateral Agent's and Collateral Control Agent's fees and expenses in connection with the Collateral, including without limitation, attorneys' fees and legal expenses, and, second, to payment of the Lender Agent's expenses in connection with the Collateral, including attorneys' fees and legal expenses, and thereafter to the payment of any and all of the Obligations in such order of application as the Lender Agent may from time to time direct, and thereafter any surplus will be paid to the applicable Grantor or as a court of competent jurisdiction shall direct. Neither the First

28                 *First Priority Pledge and Security Agreement*
                                        *and Irrevocable Proxy*

5256336.18 08048307

Confidential

Priority Collateral Agent nor any other Lender Party need apply or pay over for application noncash proceeds of collection and enforcement unless (i) the failure to do so would be commercially unreasonable and (ii) the applicable Grantor has provided the First Priority Collateral Agent and the Lender Agent with a written demand to apply or pay over such noncash proceeds on such basis. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the First Priority Collateral Agent arising out of the exercise by the First Priority Collateral Agent of any rights hereunder.

(g)    [Reserved]

(h)    If any Event of Default has occurred and is continuing, the First Priority Collateral Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) and also may, without notice except as specified below, (or, if notice cannot be waived under the UCC, as required to be provided by the UCC) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the First Priority Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the First Priority Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' prior notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The First Priority Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The First Priority Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(i)    If any Event of Default has occurred and is continuing, the First Priority Collateral Agent may transfer all or any part of the Collateral into the name of the First Priority Collateral Agent or its nominee, with or without disclosing that such Collateral is subject to the lien and security interest hereunder, notify the parties obligated on any of the Collateral to make payment to the First Priority Collateral Agent of any amount due or to become due thereunder, enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, endorse any checks, drafts, or other writings in any Grantor's name to allow collection of the Collateral, take control of any proceeds of the Collateral, and execute (in the name, place and stead of each Grantor) endorsements, assignments, transfer powers and other instruments of conveyance or transfer with respect to all or any of the Collateral.

(j)    Each Grantor agrees that in any sale of any of the Collateral whenever an Event of Default shall have occurred and be continuing, the First Priority Collateral Agent is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable Requirements of Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

Confidential

of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any governmental regulatory authority or official, and each Grantor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the First Priority Collateral Agent be liable nor accountable to the Grantors for any discount allowed by the reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.  The First Priority Collateral Agent may sell the Collateral without giving any warranties or representations as to the Collateral.  The First Priority Collateral Agent may disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(k)     If an Event of Default shall occur and the Collateral Control Agent or the First Priority Agent shall exercise its rights in respect of the Collateral, the maximum amount of the proceeds of Collateral applied to the principal amount of Loans and Net Hedge Settlement Amount that become due (whether by acceleration, maturity, early termination or otherwise) after such Event of Default shall not exceed the Aggregate Commitment Amount in effect immediately prior to such occurrence of such Event of Default.

13.     <u>Limitation on Duty in Respect of Collateral</u>.  Beyond the exercise of reasonable care in the custody and preservation thereof, neither the First Priority Collateral Agent nor any other Lender Party will have any duty as to any Collateral in its possession or control or in the possession or control of any sub-agent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto.  The First Priority Collateral Agent will be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equal to that which it accords similar property held for third parties, and will not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of any act or omission of any sub-agent or bailee selected by the First Priority Collateral Agent and the Lender Agent in good faith or by reason of any act or omission by the First Priority Collateral Agent pursuant to instructions from the Lender Agent, except to the extent that such liability arises from the First Priority Collateral Agent's gross negligence or willful misconduct.

To the extent that applicable law imposes duties on the First Priority Collateral Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is commercially reasonable for the First Priority Collateral Agent (a) to fail to incur expenses reasonably deemed significant by the Lender Agent to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantors, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a

<div align="center">30</div>

<div align="right"><i>First Priority Pledge and Security Agreement
and Irrevocable Proxy</i></div>

5256336.18 08048307

specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, including, without limitation, any warranties of title, (k) to purchase insurance or credit enhancements to insure the First Priority Collateral Agent against risks of loss, collection or disposition of Collateral, or to provide to the First Priority Collateral Agent a guaranteed return from the collection or disposition of Collateral or (l) to obtain the services of brokers, investment bankers, consultants and other professionals to assist the First Priority Collateral Agent in the collection or disposition of any of the Collateral.  Each Grantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the First Priority Collateral Agent would not be commercially unreasonable in the First Priority Collateral Agent's exercise of remedies against the Collateral and that other actions or omissions by the First Priority Collateral Agent shall not be deemed commercially unreasonable solely on account of not being specifically referred to in this Section.  Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any right to a Grantor or to impose any duties on the First Priority Collateral Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section.

14.    <u>Special Provisions Relating to the First Priority Collateral Agent</u>.  The following provisions shall govern the First Priority Collateral Agent's rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a)    The First Priority Collateral Agent shall have no duty to act, consent or request any action of the Grantors or any other Person in connection with this Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy (including all schedules and exhibits attached hereto) unless the First Priority Collateral Agent shall have received written direction from the Lender Agent.

(b)    All indemnities to be paid under this Agreement shall be payable immediately when due in U.S. dollars ("<u>Dollars</u>") in the full amount due, without deduction for any variation in any Rate of Exchange (as defined below).  The Grantors hereby agree to jointly and severally indemnify the First Priority Collateral Agent against any losses, damages, penalties, costs, expenses or disbursements of any kind or nature whatsoever, including, without limitation, attorney's fees and expenses, incurred by the First Priority Collateral Agent as a result of any judgment or order being given or made for the amount due hereunder and such judgment or order being expressed and paid in a currency (the "<u>Judgment Currency</u>") other than Dollars and as a result of any variation as between (i) the rate of exchange at which the dollar amount is converted into Judgment Currency for the purpose of such judgment or order, and (ii) the Rate of Exchange at which the First Priority Collateral Agent is then able to purchase Dollars with the amount of the Judgment Currency actually received by the First Priority Collateral Agent.  The indemnity set forth in this paragraph shall constitute a separate and independent obligation of the Grantors and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid.  The term "Rate of Exchange" means the rate at which the First Priority Collateral Agent is able to purchase Dollars with the Judgment Currency on the foreign exchange market on the relevant date and shall include any premiums and other reasonable costs of exchange

<div align="center">31</div>

<div align="right"><i>First Priority Pledge and Security Agreement
and Irrevocable Proxy</i></div>

Confidential

payable in connection with the purchase or, or conversion into, the relevant currency.  The indemnification set forth in this Section 14 shall survive the termination or assignment of this Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy and the resignation or removal of the First Priority Collateral Agent.

(c)    For the avoidance of doubt, if there is any inconsistency between the terms of this Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy and those of the Intercreditor Agreement, the terms of the Intercreditor Agreement shall prevail.

(d)    Each of the Lender Agent and the Lenders hereby designate and appoint Wells Fargo Bank, N.A. to act as the First Priority Collateral Agent under this Agreement and the other Facility Documents to which it is a party, and hereby authorize the First Priority Collateral Agent to take such actions on its behalf under the provisions of this Agreement and such other Facility Documents and to exercise such powers and perform such duties as are expressly delegated to the First Priority Collateral Agent by the terms of this Agreement and such other Facility Documents.  Notwithstanding any provision to the contrary elsewhere in this Agreement or any other Facility Document, the First Priority Collateral Agent shall not have any duties or responsibilities, except those expressly set forth in this Agreement or such other Facility Documents any fiduciary relationship with the Lender Parties, and no implied covenants, functions or responsibilities shall be read into this Agreement or otherwise exist against the First Priority Collateral Agent.

(e)    Each Lender Party agrees to render to the First Priority Collateral Agent, at any time upon request of the First Priority Collateral Agent, an accounting of the amounts of the Obligations owing to it and such other information with respect to the Obligations owing to each such Person as the First Priority Collateral Agent may reasonably request in order to give effect to the terms and conditions of this Agreement.  In the event that any Lender Party fails to provide any information required to be provided by it to the First Priority Collateral Agent, then the First Priority Collateral Agent may (but shall not be obligated to) (i) take such actions as are required to be taken by it based on the most recent information available to it or (ii) in the case of any distributions to be made pursuant to the Facility Documents, hold such Lender Party's share or purported share in escrow (without obligation to pay interest thereon) until such Lender Party provides the required information.

(f)    Notwithstanding anything herein to the contrary, in no event shall the First Priority Collateral Agent have any obligation to inquire or investigate as to the correctness, veracity, or content of any instruction received from the Lender Agent or any Lender.  In no event shall the First Priority Collateral Agent have any liability in respect of any such instruction received by it and relied on with respect to any action or omission taken pursuant thereto.

(g)    The First Priority Collateral Agent may execute any of its duties under this Agreement or any of the Facility Documents by or through agents, experts or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The First Priority Collateral Agent shall not be responsible for the negligence or misconduct of any agents, experts or attorneys-in-fact selected by it in good faith.

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

Confidential

(h)      Neither the First Priority Collateral Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it under or in connection with this Agreement or any of the Facility Documents (except for its gross negligence or willful misconduct), or (ii) responsible in any manner to any Lender Party for any recitals, statements, representations or warranties (other than its own recitals, statements, representations or warranties) made in this Agreement or any of the Facility Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the First Priority Collateral Agent under or in connection with, this Agreement or any of the Facility Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any of the Facility Documents or for any failure of the Grantors or any other Person to perform their obligations hereunder and thereunder.  The First Priority Collateral Agent shall not be under any obligation to any Lender Party or any other Person to ascertain or to inquire as to (i) the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Facility Documents or to inspect the properties, books or records of the Grantors, (ii) whether or not any representation or warranty made by any Person in connection with this Agreement or any Facility Document is true, (iii) the performance by any Person of its obligations under this Agreement or any of the Facility Documents or (iv) the breach of or default by any Person of its obligations under this Agreement or any of the Facility Documents.

(i)      The First Priority Collateral Agent shall not be bound to (i) account to any Person for any sum or the profit element of any sum received for its own account; (ii) disclose to any other Person any information relating to the Person if such disclosure would, or might, constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person; (iii) be under any fiduciary duties or obligations other than those for which express provision is made in this Agreement or in any of the Facility Documents to which it is a party; or (iv) be required to take any action that it believes, based on advice of counsel, is in conflict with any applicable law, this Agreement or any of the Facility Documents, or any order of any court or administrative agency.

(j)      Beyond the exercise of reasonable care in the custody thereof and except as otherwise specifically stated in this Agreement or any of the Facility Documents, the First Priority Collateral Agent shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or as to preservation of rights against prior parties or any other rights pertaining thereto.

(k)      The First Priority Collateral Agent shall be authorized to but shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or monitoring or maintaining the perfection of any security interest in the Collateral.  It is expressly agreed, to the maximum extent permitted by applicable law, that the First Priority Collateral Agent shall have no responsibility for (i) taking any necessary steps to preserve rights against any Person with respect to any Collateral or (ii) taking any action to protect against any diminution in value of the Collateral, but, in each case (A) subject to the requirement that the First Priority Collateral Agent may not act or omit to take any action if such act or omission would constitute gross negligence, bad faith or willful misconduct and

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

Confidential

(B) the First Priority Collateral Agent may do so and all expenses reasonably incurred in connection therewith shall be part of the Obligations.

(l)    The First Priority Collateral Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the First Priority Collateral Agent in good faith, except to the extent of the First Priority Collateral Agent' gross negligence, bad faith or willful misconduct.

(m)    The First Priority Collateral Agent shall not be responsible for, nor incur any liability with respect to, (i) the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part under this Agreement or any of the Facility Documents, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the First Priority Collateral Agent, (ii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iii) the validity of the title of the Grantors to the Collateral, (iv) insuring the Collateral or (v) the payment of taxes, charges or assessments upon the Collateral or otherwise as to the maintenance of the Collateral

(n)    Notwithstanding anything in this Agreement or any of the Facility Documents to the contrary, (i) in no event shall the First Priority Collateral Agent or any officer, director, employee, representative or agent of the First Priority Collateral Agent' be liable under or in connection with this Agreement or any of the Facility Documents for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits or loss of opportunity, whether or not foreseeable, even if the First Priority Collateral Agent has been advised of the possibility thereof and regardless of the form of action in which such damages are sought; and (ii) the First Priority Collateral Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the Facility Documents to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such Facility Document.  In no event shall the First Priority Collateral Agent be obligated to invest any amounts received by it hereunder.

(o)    The First Priority Collateral Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any note, writing, resolution, request, direction, certificate, notice, consent, affidavit, letter, cablegram, telegram, telecopy, email, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and/or upon advice and/or statements of legal counsel, independent accountants and other experts selected by the First Priority Collateral Agent and need not investigate any fact or matter stated in any such document.  Any such statement of legal counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in accordance therewith.  Any statement or advice of counsel may be based, insofar as it relates to factual matters, upon a certificate of an officer of the Lender Agent. In connection with any request or direction of the Lender Agent, the First Priority Collateral Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

5256336.18 08048307

Confidential

instruction delivered by the Lender Agent.  The First Priority Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any of the Facility Documents (i) if such action would, in the reasonable opinion of the First Priority Collateral Agent (which may be based on the opinion of legal counsel), be contrary to applicable law or any of the Facility Documents, (ii) if such action is not specifically provided for in this Agreement or any of the Facility Documents, (iii) if, in connection with the taking of any such action hereunder or under any of the Facility Documents that would constitute an exercise of remedies hereunder or under any of the Facility Documents it shall not first be indemnified to its satisfaction by the Lender Agent and/or the Lenders against any and all risk of nonpayment, liability and expense that may be incurred by it, its agents or its counsel by reason of taking or continuing to take any such action, or (iv) if, notwithstanding anything to the contrary contained in this Agreement, in connection with the taking of any such action that would constitute a payment due under any agreement or document, it shall not first have received from the Lender Agent, the Lenders or the Grantors funds equal to the amount payable.  The First Priority Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any of the Facility Documents in accordance with a request of the Lender Agent, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the other Lender Parties.

(p)     If, with respect to a proposed action to be taken by it, a First Priority Collateral Agent shall determine in good faith that the provisions of this Agreement or any other Facility Document relating to the functions or responsibilities or discretionary powers of the First Priority Collateral Agent are or may be ambiguous or inconsistent, the First Priority Collateral Agent shall notify the Lender Agent, identifying the proposed action, and may decline either to perform such function or responsibility or to take the action requested unless it has received the written confirmation of the Lender Agent that the action proposed to be taken by the First Priority Collateral Agent is consistent with the terms of this Agreement or of the Facility Documents or is otherwise appropriate.  The First Priority Collateral Agent shall be fully protected in acting or refraining from acting upon the confirmation of the Lender Agent, in this respect, and such confirmation shall be binding upon the First Priority Collateral Agent and the other Lender Parties.

(q)     The First Priority Collateral Agent shall not be deemed to have actual, constructive, direct or indirect knowledge or notice of the occurrence of any Default unless and until the First Priority Collateral Agent has received a written notice or a certificate from the Lender Agent or the Grantors stating that a Default has occurred.  The First Priority Collateral Agent shall have no obligation whatsoever either prior to or after receiving such notice or certificate to inquire whether a Default has in fact occurred and shall be entitled to rely conclusively, and shall be fully protected in so relying, on any notice or certificate so furnished to it.  No provision of this Agreement, the Intercreditor Agreement or any of the Facility Documents shall require the First Priority Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Agreement, any of the Facility Documents or the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability including an advance of moneys necessary to perform work or take the action requested is not reasonably assured to it, the First Priority

35                          *First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

5256336.18 08048307

Collateral Agent may decline to act unless it receives indemnity satisfactory to it in its sole discretion, including an advance of moneys necessary to take the action requested. The First Priority Collateral Agent shall be under no obligation or duty to take any action under this Agreement or any of the Facility Documents or otherwise if taking such action (i) would subject the First Priority Collateral Agent to a tax in any jurisdiction where it is not then subject to a tax or (ii) would require the First Priority Collateral Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(r)     Notwithstanding that the First Priority Collateral Agent is appointed by and acting for and at the direction of the Lender Parties, the Grantors will jointly and severally pay upon demand to the First Priority Collateral Agent the amount of any and all reasonable fees (including any as set forth in one or more separate fee letters of the First Priority Collateral Agent) and out-of-pocket expenses, including the reasonable fees and expenses of its counsel, that the First Priority Collateral Agent may incur in connection with (i) the negotiation, performance or administration of this Agreement and the Facility Documents to which it is a party, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement (whether through negotiations, legal proceedings or otherwise) of any of the rights of the First Priority Collateral Agent or the other Lender Parties hereunder or under the Facility Documents or (iv) the failure by the Grantors to perform or observe any of the provisions hereof or of any of the Facility Documents. The provisions of this section shall survive the termination of this Agreement and resignation or removal of the First Priority Collateral Agent. The expenses of the First Priority Collateral Agent incurred in connection with actions undertaken as provided in this Section 14 shall be payable jointly and severally by the Grantors to the First Priority Collateral Agent upon demand therefore (which demand shall be accompanied by an appropriate invoice).

(s)     Each of the Lender Parties expressly acknowledges that neither the First Priority Collateral Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it (except as expressly provided herein) and that no act by the First Priority Collateral Agent hereafter taken, including any review of the Grantors, shall be deemed to constitute any representation or warranty by the First Priority Collateral Agent to any Lender Party. Each Lender Party represents to the First Priority Collateral Agent that it has, independently and without reliance upon the First Priority Collateral Agent or any other Lender Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Grantors. Each Lender Party also represents that it will, independently and without reliance upon the First Priority Collateral Agent or any other Lender Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Grantors. Except for notices, reports and other documents expressly required to be furnished to the Lender Parties by the First Priority Collateral Agent hereunder, the First Priority Collateral Agent shall not have any duty or responsibility to provide any Lender Party with any credit or other information concerning the business, operations, property,

36                    *First Priority Pledge and Security Agreement
and Irrevocable Proxy*

5256336.18 08048307

financial and other condition or creditworthiness of the Grantors which may come into the possession of the First Priority Collateral Agent or any of its officers, directors, employees, agents or attorneys-in-fact.

(t)      The Grantors, jointly and severally, agree to indemnify each of the First Priority Collateral Agent and its officers, directors, employees, agents or attorneys-in-fact (collectively, the "Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorneys' fees and expenses) or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against any Indemnified Party in any way relating to or arising out of this Agreement or the Facility Documents; provided that the Grantors shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing result from any such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction beyond all applicable appeals.

(u)      Neither the First Priority Collateral Agent, any Lender Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Grantors or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the First Priority Collateral Agent hereunder are solely to protect the First Priority Collateral Agent's and the Lender Parties' interests in the Collateral and shall not impose any duty upon the First Priority Collateral Agent to exercise any such powers.  The First Priority Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Grantors for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

(v)      Pursuant to any applicable law, the Grantors authorize the First Priority Collateral Agent without obligation to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signatures of the Grantors in such form and in such offices as the Lender Agent determines appropriate to perfect the security interests of the First Priority Collateral Agent under this Agreement. The Grantors hereby ratify and authorize the filing by the First Priority Collateral Agent of any financing statement with respect to the Collateral made prior to the date hereof. Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, in no event shall the First Priority Collateral Agent have any duty or obligation to monitor the perfection, continuation of perfection or the sufficiency or validity of any security interest in or related to the Collateral or to prepare or file any Uniform Commercial Code financing statement or continuation statement.

(w)      The Grantors acknowledge that the rights and responsibilities of the First Priority Collateral Agent under this Agreement with respect to any action taken by the First Priority Collateral Agent or the exercise or non-exercise by the First Priority Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for

<div align="center">37</div>

<div align="right">*First Priority Pledge and Security Agreement
and Irrevocable Proxy*</div>

Confidential

herein or resulting or arising out of this Agreement shall, as between the First Priority Collateral Agent and the Lender Parties, be governed by such agreements with respect thereto as may exist from time to time among them, but, as between the First Priority Collateral Agent and the Grantors, the First Priority Collateral Agent shall be conclusively presumed to be acting as agent for the Lender Parties with full and valid authority so to act or refrain from acting, and the Grantors shall not be under any obligation, or entitlement, to make any inquiry respecting such authority.

(x)    Any corporation into which the First Priority Collateral Agent may be merged, or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the First Priority Collateral Agent shall be a party, shall become a First Priority Collateral Agent under this Agreement without the execution or filing of any paper or any further act on the part of the parties hereto.

(y)    The First Priority Collateral Agent may resign as First Priority Collateral Agent at any time upon written notice to the Lender Agent and Grantors and may be removed at any time with or without cause by the Lender Agent, with any such resignation or removal to become effective only upon the appointment of a successor First Priority Collateral Agent under this Section.  If the First Priority Collateral Agent shall provide notice of its resignation or be removed as First Priority Collateral Agent, then the Lender Agent (and if no such successor shall have been appointed within 45 days of the First Priority Collateral Agent's resignation or removal, the First Priority Collateral Agent may) appoint a successor agent for the Lender Parties, which successor agent shall, in the case of any appointment by the First Priority Collateral Agent, be reasonably acceptable to the Lender Agent, and the former First Priority Collateral Agent's rights, powers and duties as First Priority Collateral Agent shall be terminated, without any other or further act or deed on the part of such former First Priority Collateral Agent (except that the resigning First Priority Collateral Agent shall at the joint and several expense of the Grantors deliver all Collateral then in its possession to the successor First Priority Collateral Agent and shall execute and deliver to the successor First Priority Collateral Agent such instruments of assignment and transfer and other similar documents as such successor First Priority Collateral Agent shall deem necessary or advisable) or any of the Lender Parties.  After any retiring First Priority Collateral Agent's resignation or removal hereunder as First Priority Collateral Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was First Priority Collateral Agent.  In the event that a successor First Priority Collateral Agent is not appointed within the time period specified in this Section 14 following the provision of a notice of resignation or removal of the First Priority Collateral Agent, the First Priority Collateral Agent or any Lender Party may petition a court of competent jurisdiction for the appointment of a successor First Priority Collateral Agent (at the joint and several expense of the Grantors).

(z)    The First Priority Collateral Agent shall maintain accurate and complete accounts, books, records and computer systems with respect to all matters related directly to the administration of the Collateral, in each case consistent with the customary procedures of the First Priority Collateral Agent.

<div align="center">38</div>

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

Confidential

(aa)   The First Priority Collateral Agent shall at the Grantors' joint and several expense make available to the Lender Agent and its duly authorized representatives, attorneys and auditors, the files and accounts, books, records and computer systems maintained by the First Priority Collateral Agent or any subcontractor or agent thereof in respect of the Collateral at the locations where such files, accounts, books, records and computer systems are maintained pursuant to this Agreement and the other Facility Documents, during normal business hours and subject to reasonable prior written notice.

For sake of clarity, the parties intend that the term Facility Documents includes all English Security Documents and Account Control Agreements (as those terms are defined in the Loan Agreement).

15.   <u>Special Provisions Relating to the Collateral Control Agent</u>.  The Collateral Control Agent shall be entitled to all of the same rights, protections, immunities and indemnities under this Agreement as are afforded to it under the Intercreditor Agreement, as if fully set forth herein.

16.   <u>General</u>.

For the avoidance of doubt, only the Lender Agent or First Priority Collateral Agent are entitled to direct the Collateral Control Agent to act, consent or request any action in connection with this Agreement.

If, at the option of the relevant Grantor or as required pursuant to the Facility Documents, a Grantor shall cause any Subsidiary that is not a Grantor to become a Grantor hereunder, such Subsidiary shall execute and deliver to the First Priority Collateral Agent (with a copy to the Lender Agent and the Collateral Control Agent) a joinder agreement substantially in the form of <u>Attachment II</u> with such other changes as may be acceptable to the First Priority Collateral Agent at the direction of the Lender Agent (each a "<u>Joinder Agreement</u>") and shall thereafter for all purposes be a party hereto and have the same rights and obligations as a Grantor party hereto on the Closing Date.

Each Grantor agrees that a carbon, photographic or other reproduction of this Agreement is sufficient as a financing statement.  The Grantors hereby ratify their authorization contained in <u>Section 10(a)(i)</u> for the First Priority Collateral Agent to have filed in any Uniform Commercial Code jurisdiction prior to the date hereof any financing statement or amendment thereto filed prior to the date hereof.

All notices hereunder shall be in writing (including facsimile transmission) and shall be sent, in the case of any Grantor, to the address of such Grantor shown on <u>Schedule XI</u> hereto and, in the case of the First Priority Collateral Agent, at its address set forth on <u>Schedule XI</u> and, in the case of the Lender Agent, at its address set forth on <u>Schedule XI</u>, or to such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose. Notices sent by facsimile transmission or e-mail shall be deemed to have been given when sent against mechanical confirmation of successful transmission; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier shall be deemed to have been given when received.

<div align="center">39</div>

<div align="right"><i>First Priority Pledge and Security Agreement<br>and Irrevocable Proxy</i></div>

Confidential

Each of the Grantors agrees to pay, jointly and severally, all fees and expenses, including reasonable attorneys' fees, paid or incurred by the Lender Agent in endeavoring to collect all or any portion of the Obligations of any Grantor and in enforcing this Agreement against any Grantor, and all such fees and expenses shall constitute Obligations.

No delay on the part of the First Priority Collateral Agent in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the First Priority Collateral Agent of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Agreement shall remain in full force and effect until all Obligations have been paid in full in cash and all Commitments have terminated. If at any time all or any part of any payment theretofore applied by the First Priority Collateral Agent or any Lender Party to any of the Obligations is or must be rescinded or returned by the First Priority Collateral Agent or such Lender Party for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of any Grantor), such Obligations shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the First Priority Collateral Agent or such Lender Party, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Obligations, all as though such application by the First Priority Collateral Agent or such Lender Party had not been made.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Requirements of Law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Consistent with the foregoing, and notwithstanding any other provision of this Agreement to the contrary, in the event that any action or proceeding is brought in whatever form and in whatever forum seeking to invalidate any Grantor's obligations under this Agreement under any fraudulent conveyance, fraudulent transfer theory, or similar avoidance theory, whether under state or federal law, such Grantor (the "Affected Person"), automatically and without any further action being required of such Affected Person or any Lender Party, shall be liable under this Agreement only for an amount equal to the maximum amount of liability that could have been incurred under applicable law by such Affected Person under any pledge to secure the Obligations (or any portion thereof) at the time of the execution and delivery of this Agreement (or, if such date is determined not to be the appropriate date for determining the enforceability of such Affected Person's obligations hereunder for fraudulent conveyance or transfer (or similar avoidance) purposes, on the date determined to be so appropriate) without rendering such a hypothetical pledge voidable under applicable Requirements of Law relating to fraudulent conveyance, fraudulent transfer, or any other grounds for avoidance (such highest amount determined hereunder being any such Affected Person's "Maximum Amount"), and not for any greater amount, as if the stated amount of this Pledge Agreement as to such Affected Person had instead been the Maximum Amount. This paragraph is intended solely to preserve the rights of Lender Parties under this Agreement to the maximum extent not subject to avoidance under applicable Requirements of Law, and neither any Affected Person nor any other person or entity shall have any right or claim under this Section with respect to the limitation described in this Agreement, except to the extent necessary so that the obligations of any Affected Person under this

<div style="text-align:center">40</div>

<div style="text-align:right"><em>First Priority Pledge and Security Agreement<br>and Irrevocable Proxy</em></div>

Confidential

Agreement shall not be rendered voidable under applicable Requirements of Law.  Without limiting the generality of the foregoing, the determination of a Maximum Amount for any Affected Person pursuant to the provisions of the second preceding sentence of this Section shall not in any manner reduce or otherwise affect the obligations of any other Grantor (including any other Affected Person) under the provisions of this Agreement.

This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until all Obligations have been paid in full in cash and all Commitments shall have terminated, (b) be binding upon each Grantor and its successors, transferees and assigns, and (c) inure, together with the rights and remedies of the First Priority Collateral Agent hereunder, to the benefit of the First Priority Collateral Agent and each other Lender Party and its respective successors, transferees and assigns.  No Grantor may assign (unless otherwise permitted under the terms of the Facility Documents) any of its obligations hereunder without the prior written consent of the Lender Agent.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.  At any time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the First Priority Collateral Agent a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery.  Immediately upon such execution and delivery (and without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).**

**EACH PARTY HEREBY REPRESENTS AND WARRANTS THAT IT HAS NO RIGHT TO IMMUNITY FROM THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT OR FROM EXECUTION OF ANY JUDGMENT OR FROM THE EXECUTION OR ENFORCEMENT THEREIN OF ANY ARBITRATION DECISION IN RESPECT OF ANY SUIT, ACTION, PROCEEDING OR ANY OTHER MATTER ARISING OUT OF OR RELATING TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND TO THE EXTENT THAT ANY PARTY IS OR BECOMES ENTITLED TO ANY SUCH IMMUNITY WITH RESPECT TO THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT, AND TO THE EXTENT PERMITTED BY LAW, IT DOES HEREBY AND WILL IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO PLEAD OR CLAIM ANY SUCH IMMUNITY WITH RESPECT TO ITS OBLIGATIONS OR ANY OTHER MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

5256336.18 08048307

Confidential

**EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.**

**EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, the holders of Obligations and their respective successors and permitted assignees; provided that the Lender Agent shall enforce this Agreement on behalf of all holders of Obligations.

This Agreement is a Facility Document and a First Priority Security Document (as defined in the Intercreditor Agreement), and may only be amended, waived or otherwise modified by written agreement with the prior written consent of the Lender Agent and the First Priority Collateral Agent and the Borrowers; provided, however, that this Agreement may be supplemented by Joinder Agreements duly executed by the First Priority Collateral Agent, the Collateral Control Agent, the Lender Agent and each Grantor directly affected thereby and by updates or supplements to any Schedules, Attachments or Annexes hereto delivered in accordance with this Agreement.

17.    <u>Amendment and Restatement</u>.  This Agreement amends and restates in its entirety the Original Security Agreement. This amendment and restatement of the Original Security Agreement shall not effectuate a novation, release or extinguishment of the obligations or security interests outstanding under the Original Security Agreement or any other Facility Document (other than any security interest that may have attached on or prior to the date hereof to the LOC Mortgage Loans), but rather are an amendment and restatement of certain terms governing such obligations and security interests. As of date hereof, each reference in any Facility Document to the "Security Agreement" shall mean this Agreement, as amended, restated or modified from time to time.

<div align="center">42</div>

<div align="right"><em>First Priority Pledge and Security Agreement<br>and Irrevocable Proxy</em></div>

Confidential

18.    <u>Foreign Pledge Agreements</u>.

(a)    Notwithstanding anything to the contrary contained herein or in any other Facility Document, in the event that any Collateral is also pledged to the First Priority Collateral Agent to secure the Obligations by any Grantor pursuant to any security, pledge or similar agreement governed by foreign law (a "<u>Foreign Pledge Agreement</u>") and the provisions of such Foreign Pledge Agreement conflict with the provisions of this Agreement, the applicable Grantor shall comply with the provisions of such Foreign Pledge Agreement and shall not be deemed to have breached any representation or covenant contained herein or in any other Facility Document as a result thereof.

(b)    If Supporting Assets with respect to the Dutch VFLN Receivables or the UK Note are the subject of a Collateral Disposition at a time when (x) the Fair Market Value of such Supporting Assets is less than (y) the Carrying Value thereof as of the Closing Date (the difference between such amounts beings the "<u>Adjustment Amount</u>"); ResCap shall be entitled, following consultation with the Lender Agent, to reduce the outstanding principal balance of the Dutch VFLN Receivables or the UK Note, as applicable, by the Adjustment Amount; <u>provided</u> that such Collateral Disposition complies with the applicable requirements of the Loan Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

43          *First Priority Pledge and Security Agreement*
*and Irrevocable Proxy*

Confidential

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

*Grantors (other than Additional Account Parties)*

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE, LLC
RESIDENTIAL CAPITAL, LLC
HOMECOMINGS FINANCIAL, LLC
GMAC-RFC HOLDING COMPANY, LLC
GMAC RESIDENTIAL HOLDING COMPANY, LLC
GMAC MODEL HOME FINANCE I, LLC
DEVELOPERS OF HIDDEN SPRINGS, LLC
DOA HOLDING PROPERTIES, LLC
EQUITY INVESTMENT IV, LLC
RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC

By: _____
Name:  Michelle Switzer
Title:   Assistant Treasurer

S-1    *First Priority Pledge and Security Agreement
and Irrevocable Proxy*

Confidential

RFC CONSTRUCTION FUNDING, LLC

By: _____

Name: Michelle Switzer

Title: Authorized Person

S-2

*First Priority Pledge and Security Agreement
and Irrevocable Proxy*

Confidential

*Additional Account Parties*

RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC
RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC
HOMECOMINGS FINANCIAL REAL ESTATE
HOLDINGS, LLC
AMERILAND, LLC

BY:    REG-PFH, LLC,
      its sole member

REG-PFH, LLC
HOME CONNECTS LENDING SERVICES, LLC
GMACR MORTGAGE PRODUCTS, LLC
DITECH, LLC
RESIDENTIAL CONSUMER SERVICES, LLC
GMAC MORTGAGE USA CORPORATION
RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.
RFC ASSET MANAGEMENT, LLC
RFC SFJV-2002, LLC

By:    RFC ASSET MANAGEMENT, LLC,
      its sole member

RCSFJV2004, LLC

By:    RFC ASSET MANAGEMENT, LLC,
      its sole member

By: _____

Name:    Michelle Switzer
Title:    Assistant Treasurer

Confidential

GMAC INC.,
as Lender and Lender Agent

By: _____

Name: _____

Title: _____

Jeff Brown
Corporate Treasurer

Confidential

WELLS FARGO BANK, N.A.,
as First Priority Collateral Agent

By: _____
Name:     Michael Pinzon
Title:      Vice President

WELLS FARGO BANK, N.A.,
as Collateral Control Agent

By: _____
Name:
Title:      Michael Pinzon
              Vice President

12/29/2009   3:14PM  (GMT-07:00)

Confidential

## SCHEDULE I

## TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY

## GRANTOR INFORMATION

*Borrowers*

### RESIDENTIAL FUNDING COMPANY, LLC

Jurisdiction of Formation:  Delaware
FEIN:  93-0891336
State organization ID number:  2059477
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423-3940

### GMAC MORTGAGE, LLC

Jurisdiction of Formation:  Delaware
FEIN:  23-1694840
State organization ID number:  4143873
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA  19034-3200

*Guarantors*

### RESIDENTIAL CAPITAL, LLC

Jurisdiction of Formation:  Delaware
FEIN:  20-1770738
State organization ID number:  3821622
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423-3940

Confidential

## HOMECOMINGS FINANCIAL, LLC

Jurisdiction of Formation:  Delaware
FEIN:  51-0369458
State organization ID number:  2550221
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423-3940

## GMAC-RFC HOLDING COMPANY, LLC

Jurisdiction of Formation:  Delaware
FEIN:  23-2593763
State organization ID number:  4168620
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423-3940

## GMAC RESIDENTIAL HOLDING COMPANY, LLC

Jurisdiction of Formation:  Delaware
FEIN:  91-1902190
State organization ID number:  4176389
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423-3940

*Equity Pledgors*

## GMAC MODEL HOME FINANCE I, LLC

Jurisdiction of Formation:  Delaware
FEIN: 26-2748469
State organization ID number: 4555820
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100
Minneapolis, MN  55423-3940

## DEVELOPERS OF HIDDEN SPRINGS, LLC

Jurisdiction of Formation:  Delaware
FEIN:  80-0022985
State organization ID number:  4183059
Chief Executive Office/Principal place of business:

Confidential

One Meridian Crossings, Suite 100
Minneapolis, MN  55423-3940

## DOA HOLDING PROPERTIES, LLC

Jurisdiction of Formation:  Delaware
FEIN: 26-1424257
State organization ID number:  4454997
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100
Minneapolis, MN  55423-3940

## EQUITY INVESTMENT IV, LLC

Jurisdiction of Formation: Delaware
FEIN: 26-3123655
State organization ID number: 4572829
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100
Minneapolis, MN 55423-3940

## RFC CONSTRUCTION FUNDING, LLC

Jurisdiction of Formation: Delaware
FEIN: 41-1925730
State organization ID number: 2945612
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100,
Minneapolis, Minnesota 55423-3940

*FABS Grantors*

## RFC ASSET HOLDINGS II, LLC

Jurisdiction of Formation:  Delaware
FEIN:  41-1984034
State organization ID number:  4189232
Chief Executive Office:
One Meridian Crossings, Suite 100
Minneapolis, MN 55423

3993 Howard Hughes Parkway
Suite 250
Las Vegas, NV 89169

Confidential

**PASSIVE ASSET TRANSACTIONS, LLC**

Jurisdiction of Formation:  Delaware
FEIN:  51-0404130
State organization ID number:  3306533
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA  19034

*Additional Account Parties*

**RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC**

Jurisdiction of Formation:  Delaware
FEIN: 26-2736505
State organization ID number: 4551018
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100
Minneapolis, MN  55423-3940

**RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC**

Jurisdiction of Formation:  Delaware
FEIN: 26-2737180
State organization ID number: 4551021
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA  19034

**HOMECOMINGS FINANCIAL REAL ESTATE HOLDINGS, LLC**

Jurisdiction of Formation:  Delaware
FEIN: 26-2736869
State organization ID number: 4551020
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100
Minneapolis, MN  55423-3940

**AMERILAND, LLC**

Jurisdiction of Formation: Colorado
FEIN: 84-1470699
State organization ID number: 19971200811
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100
Minneapolis, MN 55423-3940

Confidential

## REG-PFH, LLC

Jurisdiction of Formation: Delaware
FEIN: 42-1562699
State organization ID number: 3559343
Chief Executive Office/Principal place of business:
One Meridian Crossings, Suite 100
Minneapolis, MN 55423-3940

## HOME CONNECTS LENDING SERVICES, LLC

Jurisdiction of Formation: Pennsylvania
FEIN: 25-1849412
State organization ID number: 2909825
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA 19034-3200

## GMACR MORTGAGE PRODUCTS, LLC

Jurisdiction of Formation: Delaware
FEIN: 03-0536369
State organization ID number: 3752757
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA 19034-3200

## DITECH, LLC

Jurisdiction of Formation: Delaware
FEIN: 23-2887228
State organization ID number: 2721623
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA 19034-3200

## RESIDENTIAL CONSUMER SERVICES, LLC

Jurisdiction of Formation: Delaware
FEIN: 20-4812167
State organization ID number: 4150635
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA 19034-3200

Confidential

## GMAC MORTGAGE USA CORPORATION

Jurisdiction of Formation: Delaware
FEIN: 20-4796930
State organization ID number: 4149107
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA 19034-3200

## RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.

Jurisdiction of Formation: Delaware
FEIN: 75-2006294
State organization ID number: 2053532
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423

## RFC ASSET MANAGEMENT, LLC

Jurisdiction of Formation: Delaware
FEIN: 06-1664678
State organization ID number: 3110518
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423

## RFC SFJV-2002, LLC

Jurisdiction of Formation: Nevada
FEIN: 06-1664670
State organization ID number: LLC14621-2002
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423

3993 Howard Hughes Parkway
Suite 250
Las Vegas, NV 89169

Confidential

**RCSFJV2004, LLC**

Jurisdiction of Formation: Nevada
FEIN: 20-3802722
State organization ID number: E0669262005-6
Chief Executive Office/Principal place of business:
One Meridian Crossings
Suite 100
Minneapolis, MN  55423

3993 Howard Hughes Parkway
Suite 250
Las Vegas, NV 89169

Confidential

**SCHEDULE II**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY
AGREEMENT AND IRREVOCABLE PROXY**

**ADDITIONAL PLACES OF BUSINESS**

None.

5256336.18 08048307

**SCHEDULE III**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY**
**AGREEMENT AND IRREVOCABLE PROXY**

**TRADE NAMES; PRIOR LEGAL NAMES; MERGERS**

1.      Trade Names; Prior Legal Names

**RESIDENTIAL FUNDING COMPANY, LLC**

Prior Names:   Residential Funding Corporation
                        RFC Acquisition Corporation

**GMAC MORTGAGE, LLC**

Prior Names:   GMAC Mortgage Corporation

**RESIDENTIAL CAPITAL, LLC**

Prior Names:   Residential Capital Corporation

**HOMECOMINGS FINANCIAL, LLC**

Prior Names:   Homecomings Financial Network, Inc.
                        Residential Money Centers, Inc.

**GMAC-RFC HOLDING COMPANY, LLC**

Prior Names:   GMAC-RFC Holding Corp.
                        GMAC RF, Inc.

**GMAC RESIDENTIAL HOLDING COMPANY, LLC**

Prior Names:   GMAC Residential Holding Corp.

**GMAC MODEL HOME FINANCE I, LLC**

Prior Names:   None

**DEVELOPERS OF HIDDEN SPRINGS, LLC**

Prior Names:   Developers of Hidden Springs, Inc.

**DOA HOLDING PROPERTIES, LLC**

Prior Names:   None

Confidential

**EQUITY INVESTMENT IV, LLC**

Prior names:   None

**RFC CONSTRUCTION FUNDING, LLC**

Prior names:   RFC Construction Funding Corp.

**RFC ASSET HOLDINGS II, LLC**

Prior Names:   RFC Asset Holdings II, Inc.

**PASSIVE ASSET TRANSACTIONS, LLC**

Prior Names:   Passive Asset Transactions, Inc.

**RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC**

Prior Names:   None

**RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC**

Prior Names:   None

**HOMECOMINGS FINANCIAL REAL ESTATE HOLDINGS, LLC**

Prior Names:   None

**AMERILAND, LLC**

Prior names:   None

**REG-PFH, LLC**

Prior names:   REG-PFH, Inc.

**HOME CONNECTS LENDING SERVICES, LLC**

Prior names:   ATM, LLC

**GMACR MORTGAGE PRODUCTS, LLC**

Prior names:   GMACR Mortgage Products, Inc.

**DITECH, LLC**

Prior names:

02/25/1997-06/18/1999  GMAC Mortgage Venture, Inc.

Confidential

06/18/1999-03/01/2006  ditech.com, Inc.

03/01/2006-01/29/2008  ditech.com, LLC

### RESIDENTIAL CONSUMER SERVICES, LLC

Prior names:   Residential Consumer Services, Inc.

### GMAC MORTGAGE USA CORPORATION

Prior names:   None

### RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.

Prior names:   Salomon Brothers Mortgage Securities IV, Inc.

### RFC ASSET MANAGEMENT, LLC

Prior names:   RFC Asset Management, Inc.

### RFC SFJV-2002, LLC

Prior names:   None

### RCSFJV2004, LLC

Prior names:   RCFSJV2004, LLC
               RFC SFJV2004, LLC

2.    Mergers

### GMAC MORTGAGE, LLC

On October 25, 2006, GMAC Mortgage, LLC merged with GMAC Mortgage Corporation.

### GMAC-RFC HOLDING COMPANY, LLC

On July 11, 2006, GMAC-RFC Holding Company, LLC merged with GMAC-RFC Holding Corp.

### DEVELOPERS OF HIDDEN SPRINGS, LLC

On August 10, 2006, Developers of Hidden Springs, LLC merged with Developers of Hidden Springs, Inc.

Confidential

**SCHEDULE IV**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY AGREEMENT**
**AND IRREVOCABLE PROXY**

**INTELLECTUAL PROPERTY**

**Trademarks**

| Serial No. | Mark | Owner | Filing Date | Status | Reg No. | Reg Date |
|---|---|---|---|---|---|---|
| 78063551 | EXPATSPOUSE.COM (&DESIGN) | Expatspouse, Inc. | 2001/05/15 | Registered | 2615473 | 2002/09/19 |
| 78063550 | EXPATSPOUSE.COM | Expatspouse, Inc. | 2001/05/15 | Registered | 2656607 | 2002/12/03 |
| 76249336 | ENGENIOUS | GENERAL MOTORS ACCEPTANCE CORPORATION | 2001/03/14 | Registered | 2872100 | 2004/08/10 |
| 78168505 | LOANVIEW | GMAC COMMERCIAL MORTGAGE CORPORATION | 2002/09/27 | Registered | 2747381 | 2003/08/05 |
| 77136814 | PEOPLE ARE SMART | GMAC LLC | 2007/03/21 | Allowed | | |
| 78064065 | LENDSCAPE | GMAC LLC | 2001/05/17 | Registered | 2730651 | 2003/06/24 |
| 78151821 | ASSETDELIVERY | GMAC LLC | 2002/08/07 | Registered | 2804748 | 2004/01/13 |
| 77213094 | AssetWise | GMAC Mortgage Group, LLC | 2007/06/22 | Published | | |
| 77213035 | AssetWise Direct | GMAC Mortgage Group, LLC | 2007/06/22 | Published | | |
| 77213131 | SLEEP EZ LOAN | GMAC Mortgage Group, LLC | 2007/06/22 | Registered | 3384760 | 2008/02/19 |
| 77213067 | PropertyWise | GMAC Mortgage Group, LLC | 2007/06/22 | Registered | 3401104 | 2008/03/25 |
| 77213163 | ditech (logo) | GMAC Mortgage Group, LLC | 2007/06/22 | Registered | 3417288 | 2008/04/29 |
| 78601736 | EQUITYWISE | GMAC MORTGAGE LLC | | Allowed | | |
| 76546683 | HOME COMMAND | GMAC MORTGAGE LLC | 2003/09/24 | Allowed | | |
| 75278616 | DITECH | GMAC MORTGAGE LLC | 1997/04/21 | Registered | 2158800 | 1998/05/19 |
| 78559960 | 105 SELECT | GMAC MORTGAGE LLC | 2005/02/03 | Registered | 3298930 | 2007/09/25 |
| 76434684 | DITECH.COM – YOUR MORTGAGE SOLUTION DELIVERED | GMAC MORTGAGE LLC | 2002/07/26 | Registered | 2721143 | 2003/06/03 |
| 76434953 | I LOST ANOTHER LOAN TO DITECH | GMAC MORTGAGE LLC | 2002/07/26 | Registered | 2721148 | 2003/06/03 |
| 78106868 | DITECH.COM – YOUR 24/7 MORTGAGE SOLUTION | GMAC MORTGAGE LLC | 2002/02/05 | Registered | 2702661 | 2003/04/01 |
| 75604188 | DITECH.COM | GMAC MORTGAGE LLC | 1998/12/09 | Registered | 2696027 | 2003/03/11 |
| 76463368 | CALDIRECT HOMES LOANS | GMAC MORTGAGE LLC | 2002/10/31 | Registered | 2846071 | 2004/05/25 |
| 76492563 | HOMESTRENGTH | GMAC MORTGAGE LLC | 2003/02/26 | Registered | 2846225 | 2004/05/25 |
| 76515655 | DITECH.COM – SPEED GUARANTEED | GMAC MORTGAGE LLC | 2003/05/20 | Registered | 2861149 | 2004/07/06 |
| 76579265 | BUILDER POWER (& DESIGN) | GMAC MORTGAGE LLC | 2004/03/05 | Registered | 2927621 | 2005/02/22 |

IV-1

Confidential

| Serial No. | Mark | Owner | Filing Date | Status | Reg No. | Reg Date |
|---|---|---|---|---|---|---|
| 76579614 | CALDIRECT | GMAC MORTGAGE LLC | 2004/03/08 | Registered | 2928628 | 2005/03/01 |
| 76580149 | DITECH RACING | GMAC MORTGAGE LLC | 2004/03/10 | Registered | 2928640 | 2005/03/01 |
| 76603778 | DITECH.COM HOME LOANS | GMAC MORTGAGE LLC | 2004/07/23 | Registered | 2928647 | 2005/03/01 |
| 76603959 | DITECH.COM HOME LOANS (& DESIGN) | GMAC MORTGAGE LLC | 2004/07/26 | Registered | 2928648 | 2005/03/01 |
| 76579639 | MOVE IN AMERICA | GMAC MORTGAGE LLC | 2004/03/08 | Registered | 2930402 | 2005/03/08 |
| 76579638 | MOVE IN AMERICA (& DESIGN) | GMAC MORTGAGE LLC | 2004/03/08 | Registered | 2941383 | 2005/04/19 |
| 78646165 | DITECH AT WORK | GMAC MORTGAGE LLC | 2005/06/08 | Registered | 3122167 | 2006/07/25 |
| 78656722 | BUYLINE | GMAC MORTGAGE LLC | 2005/06/23 | Registered | 3234981 | 2007/04/24 |
| 76593441 | DITECH.COM FREEDOM LOAN | GMAC MORTGAGE LLC | 2004/05/21 | Registered | 3291310 | 2007/09/11 |
| 76597261 | GO FAST | GMAC MORTGAGE LLC | 2004/06/14 | Registered | 3325181 | 2007/10/30 |
| 78917057 | DITECH ESIGNATURE | GMAC MORTGAGE LLC | 2006/06/26 | Registered | 3396372 | 2008/03/11 |
| 78883555 | REAL LIFE. REAL SOLUTIONS. | GMAC MORTGAGE LLC | 2006/05/15 | Registered | 3314584 | 2007/10/16 |
| 78887861 | DITECH GUARANTEE | GMAC MORTGAGE, LLC | 2006/05/19 | Allowed | | |
| 78679328 | DITECH MORTGAGE SOLUTIONS | GMAC MORTGAGE, LLC | 2005/07/27 | Allowed | | |
| 78113601 | HOME DREAMS ONLINE | GMAC MORTGAGE, LLC | 2002/03/08 | Registered | 2880218 | 2004/08/31 |
| 78127454 | BUILDER POWER | GMAC MORTGAGE, LLC | 2002/05/09 | Registered | 2896306 | 2004/10/19 |
| 76495996 | CAL DIRECT HOME LOANS (& DESIGN) | GMAC MORTGAGE, LLC | 2003/03/10 | Registered | 2903746 | 2004/11/16 |
| 76560776 | PATHWAYS | GMAC MORTGAGE, LLC | 2003/11/20 | Registered | 2910065 | 2004/12/14 |
| 76561220 | THE HOMESTRETCH PLAN | GMAC MORTGAGE, LLC | 2003/11/21 | Registered | 2910069 | 2004/12/14 |
| 76586655 | CUOTA UNICA DITECH | GMAC MORTGAGE, LLC | 2004/04/14 | Registered | 2947511 | 2005/05/10 |
| 76586659 | SMARTWATCH | GMAC MORTGAGE, LLC | 2004/04/14 | Registered | 2982713 | 2005/08/09 |
| 76492773 | HOMEFLEX | GMAC MORTGAGE, LLC | 2003/02/26 | Registered | 2992858 | 2005/09/06 |
| 76576481 | DITECH FLAT FEE | GMAC MORTGAGE, LLC | 2004/02/20 | Registered | 3007701 | 2005/10/18 |
| 76598815 | SETTLE AMERICA | GMAC MORTGAGE, LLC | 2004/06/23 | Registered | 3025621 | 2005/12/13 |
| 76586657 | BORRON Y CUENTA NUEVA | GMAC MORTGAGE, LLC | 2004/04/14 | Registered | 3047591 | 2006/01/24 |
| 78113668 | HELPING YOU MANAGE THE INVESTMENT IN YOUR HOME | GMAC MORTGAGE, LLC | 2002/03/08 | Registered | 3068871 | 2006/03/14 |
| 76610623 | FLEXSELECT | GMAC MORTGAGE, LLC | 2004/09/09 | Registered | 3071594 | 2006/03/21 |
| 76560283 | POWER PUNCH | GMAC MORTGAGE, LLC | 2003/11/17 | Registered | 3077130 | 2006/04/04 |
| 76575312 | DITECH-1 | GMAC MORTGAGE, LLC | 2004/02/12 | Registered | 3080195 | 2006/04/11 |
| 78622953 | LA ULTIMA PALABRA EN PRESTAMOS | GMAC MORTGAGE, LLC | 2005/05/04 | Registered | 3082700 | 2006/04/18 |
| 78623519 | CLOSE FOR A CAUSE | GMAC MORTGAGE, LLC | 2005/05/05 | Registered | 3085260 | 2006/04/25 |
| 76609555 | Warehouse Express | GMAC MORTGAGE, LLC | 2004/09/01 | Registered | 3325194 | 2007/10/30 |
| 74279689 | HOMECOMINGS | GMAC MORTGAGE, LLC | 1992/05/28 | Registered | 1792907 | 1993/09/14 |
| 77180955 | HOMEOWNERS HOPE | Homeownership Preservation Foundation | 2007/05/15 | Allowed | | |
| 76576712 | P | GMAC RESIDENTIAL HOLDING COMPANY, LLC | 2004/02/23 | Registered | 3361159 | 2008/01/01 |

IV-2

Confidential

| Serial No. | Mark | Owner | Filing Date | Status | Reg No. | Reg Date |
|---|---|---|---|---|---|---|
| 77127127 | KEYCHAIN ALLIANCE | RESIDENTIAL CAPITAL, LLC | | Published | | |
| 78139312 | QUICKWISE | RESIDENTIAL FUNDING COMPANY, LLC | 2002/06/27 | Registered | 2707254 | 2003/04/15 |
| 74348910 | GOAL LINE | RESIDENTIAL FUNDING COMPANY, LLC | 1993/01/15 | Registered | 1829015 | 1994/03/29 |
| 74713806 | GOAL LOAN | RESIDENTIAL FUNDING COMPANY, LLC | 1995/08/10 | Registered | 1995345 | 1996/08/20 |
| 78023446 | LINE@PRIME | RESIDENTIAL FUNDING COMPANY, LLC | 2000/08/29 | Registered | 2552727 | 2002/03/26 |
| 74275769 | RFC | RESIDENTIAL FUNDING COMPANY, LLC | 1992/05/15 | Registered | 1840863 | 1994/06/21 |
| 78096942 | ALTERNET | RESIDENTIAL FUNDING COMPANY, LLC | 2001/12/06 | Pending | | |
| 78591546 | A BANK OF GREAT INTEREST | GMAC BANK | 2005/03/21 | Registered | 3209670 | 2007/02/13 |

5256336.18 08048307

Confidential

**Patents**

| COUNTRY/TYPE | TITLE | SERIAL NO. | FILED | STATUS | PATENT NO. | ISSUED | Assignment Status |
|---|---|---|---|---|---|---|---|
| US – UTILITY | SIMULATION TECHNIQUE FOR GENERATION OF AVM AND COLLATERAL RISK INDICATOR RULE SET | 11484262 | 2006/07/11 | PUBLISHED | | | Assignment to Residential Funding Corporation by Susan Allen and Beth Harasimowicz |
| PCT | GENERATION OF AVM AND COLLATERAL RISK INDICATOR RULE SET | PCTUS0715793 | 2007/07/11 | PUBLISHED | | | Covered by the assignment in Serial Number 11484262 |
| US – UTILITY | SYSTEM AND METHOD FOR EVALUATING SECONDARY MARKET OPTIONS FOR LOANS | 10688321 | 2003/10/17 | OFFICE ACTION PENDING | | | Assignment to GMAC RFC by Dan Bettenburg and Frank Doherty.  This will be fixed to show assignment to Residential Funding Company, LLC |
| US – UTILITY | STORED, TEMPORARY ALTERATION OF BUSINESS LOGIC | 09952995 | 2001/09/14 | APPEALED | | | Assignment to Residential Funding Corporation by Peter (Ken) Cychosz and Brian Gilkay |
| US – UTILITY | TABLE IMPLEMENTED PROCEDURES WITH ATTRIBUTE CALLS INITIATING BUSINESS RULES | 09953491 | 2001/09/14 | OFFICE ACTION PENDING | | | |
| US - PROVISIONAL | BUSINESS RULES MANAGEMENT SYSTEM AND METHOD | 61068221 | 2008/03/05 | PENDING | | | |

5256336.18 08048307

Confidential

**SCHEDULE V**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY
AGREEMENT AND IRREVOCABLE PROXY**

**COMMERCIAL TORT CLAIMS**

None.

5256336.18 08048307

**SCHEDULE VI
TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY
AGREEMENT AND IRREVOCABLE PROXY**

**INITIAL COLLATERAL**

1.    <u>Mortgage Loans</u>

   (a)    All mortgage loans identified in the ATS (as hereinafter defined) under the column "ATS  FF" by the Code T215.  "ATS" means the internal database maintained by Residential Funding Company, LLC for the purposes of tracking the facility to which unsold mortgage loans are pledged.

   (b)    Mortgage loans (i) secured by real estate located in Canada and for which the mortgage notes are in the possession of Computershare Trust Company of Canada and (ii) sold to Residential Funding Company, LLC on or prior to the Closing Date.

   (c)    Mortgage loans insured by the Federal Housing Administration ("FHA") or the U.S. Department of Veterans Affairs ("VA") and as to which the applicable borrower has defaulted and a claim exists against either the VA or the FHA.

2.    <u>Servicing Advances</u>

   All right, title and interest of either Residential Funding Company, LLC or GMAC Mortgage, LLC in and to Servicing P&I Advances and Servicing T&I Advances or Servicing Corporate Advances other than (i) Servicing Contracts with FNMA, Freddie Mac or GNMA or (ii) in the case of  GMAC Mortgage, LLC any rights in any Servicing Contract transferred to GMACR MORTGAGE PRODUCTS, LLC prior to the Closing Date, and (iii) in the case of Residential Funding Company, LLC, any interest in any Servicing Contract transferred to RFC-GSAP Servicer Advance, LLC prior to the Closing Date.

3.    Securities Accounts – see attached Exhibit A to this Schedule VI.

4.    Pledged Interests – see attached Exhibit B to this Schedule VI.

5.    Pledged Notes – see attached Exhibit C to this Schedule VI.

Confidential

6.   Construction, Mezzanine and Working Capital Loans – (i) all first lien construction loans, including distressed construction loans, (ii) all mezzanine loans, including distressed loans, secured by equity interests in entities owning real estate and real estate-related assets, and (iii) all working capital loans which were unencumbered as of February 29, 2008.

Confidential

## EXHIBIT A TO SCHEDULE VI

## SECURITIES ACCOUNTS

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| GMAC Mortgage, LLC | JP Morgan | G08567 | GMAC Mortgage, LLC MSR Securities and HEQ Residual Account |
| GMAC Mortgage, LLC | JP Morgan | G54823 | GMAC Mortgage, LLC Direct Pair Off Account |
| Passive Asset Transactions, LLC | JP Morgan | P66230 | Passive Asset Transactions, LLC |
| Residential Funding Company, LLC | State Street | BGLS | Residential Funding Company, LLC Capital Markets Pledged RFC |
| Residential Funding Company, LLC | State Street | BGLX | Residential Funding Company, LLC PIA Pledged RFC |
| Residential Funding Company, LLC | State Street | BGLY | Residential Funding Company, LLC RIF Pledged RFC |
| RFC Asset Holdings II, LLC | State Street | BGLU | CAPITAL MARKETS PLEDGED RAHI II |
| RFC Asset Holdings II, LLC | State Street | BGLV | RIF PLEDGED RAHI II |
| RFC Asset Holdings II, LLC | State Street | BGLW | PIA PLEDGED RAHI II |

Confidential

**EXHIBIT B TO SCHEDULE VI**

**PLEDGED INTERESTS**

| Pledged Interests  Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
| | Type of Interest | Interests Owned by Pledgor | | |
| --- | --- | --- | --- | --- |
| CMH Holdings, LLC | Class B Junior Preferred Units | 100% | GMAC Model Home Finance I, LLC | 100% |
| DOA Properties I, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties II, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties III (Models), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties IV, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties V (Lots-CA), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties VI, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties VII (Lots-NV), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties VIII, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties IX (Lots-Other), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |

Confidential

| Pledged Interests  Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
|---|---|---|---|---|
| | Type of Interest | Interests Owned by Pledgor | | |
| Marbella Lakes Associates, LLC (f/k/a DOA Properties VIII (Marbella Lakes), LLC | Limited Liability Company | 66.67% | Equity Investment IV, LLC | 100% |
| Homecomings Financial Real Estate Holdings, LLC | Limited Liability Company | 100% | Homecomings Financial, LLC | 100% |
| GMAC Residential Holding Company, LLC | Limited Liability Company | 100% | Residential Capital, LLC | 100% |
| Residential Mortgage Real Estate Holdings, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| Developers of Hidden Springs, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| DOA Holding Properties, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| GMAC Model Home Finance I, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| RFC Construction Funding, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Residential Funding Real Estate Holdings, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Equity Investment IV, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| RC Properties I, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties II, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |

Confidential

| Pledged Interests  Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
|---|---|---|---|---|
| | Type of Interest | Interests Owned by Pledgor | | |
| RC Properties III, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties IV, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties V, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties VI, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties VII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties VIII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties IX, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties X, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XI, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XIII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |

Confidential

| Pledged Interests  Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
| --- | --- | --- | --- | --- |
| | Type of Interest | Interests Owned by Pledgor | | |
| RC Properties XIV, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XV, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XVI, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XVII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XVIII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XIX, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XX, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |

Confidential

**EXHIBIT C TO SCHEDULE VI**

**PLEDGED NOTES**

| Pledged Note  Issuer | Pledged Note | Pledged Note Holder |
|---|---|---|
| GX CE Funding B.V. | All VFLN Notes, including, without limitation, that certain VFLN Note (Note Certificate No. 1) dated 4 June 2008 in the principal amount of EUR 556,992,836.00 constituted by and issued pursuant to the Variable Funding Loan Note Agreement dated 4 June 2008 and made between, amongst others, Residential Capital, LLC, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding. | Residential Capital, LLC |
| Viaduct (No. 7) Limited | All UK Notes, including, without limitation, that certain UK Note dated 4 June 2008 in the principal amount of £658,116,612.47 constituted by and issued pursuant to the Note Issuance Facility Deed dated 4 June 2008 and made between, amongst others, Residential Capital, LLC and Viaduct No. 7 Limited. | Residential Capital, LLC |

Confidential

## SCHEDULE VI(a)
## TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY

### FINANCING STATEMENTS DISCLOSURE SCHEDULE

#### Filing #; Filing Date; Jurisdiction; Debtor; Secured Party

1. Initial Filing # 2007 4676119; filed on 12/11/2007; jurisdiction Delaware; GMAC Mortgage, LLC as Debtor and JPMorgan Chase Bank, N.A. as Secured Party*;

2. Initial Filing # 6413972 1; filed on 11/28/2006; jurisdiction Delaware; Residential Funding Company, LLC as Debtor and Credit Suisse First Boston Mortgage Capital LLC as Secured Party*;

3. Initial Filing # 6413972 1 as amended by 2008 1486503; filed on 04/29/2008; jurisdiction Delaware; Residential Funding Company, LLC as Debtor and Credit Suisse First Boston Mortgage Capital LLC as Secured Party*;

4. Initial Filing # 6448982 9; filed on 12/21/2006 ; jurisdiction Delaware; GMCMTH, LLC as Debtor and GMAC Model Home Finance, LLC as Secured Party*;

5. Initial Filing # 4362538 3; filed on 12/22/2004 ; jurisdiction Delaware; Homecomings Financial, LLC as Debtor and Residential Funding Company, LLC as Additional Debtor and Credit Suisse First Boston Mortgage Capital LLC as Secured Party*;

6. Initial Filing # 4362538 3 as amended by 2008 1486461; filed on 04/29/2008; jurisdiction Delaware; Homecomings Financial, LLC as Debtor and Residential Funding Company, LLC as Additional Debtor and Credit Suisse First Boston Mortgage Capital LLC as Secured Party*;

7. Initial Filing # 2007 4328083; filed on 11/14/2007; jurisdiction Delaware; GMAC Mortgage, LLC as Debtor and Federal National Mortgage Association (a/k/a Fannie Mae) as Secured Party*;

8. Initial Filing # 2007 4692207; filed on 12/12/2007; jurisdiction Delaware; GMAC Mortgage, LLC as Debtor and Federal National Mortgage Association (a/k/a Fannie Mae) as Secured Party*;

9. Initial Filing # 5238450 2; filed on 07/28/2005; jurisdiction Delaware; Residential Funding Corporation as Debtor and Federal National Mortgage Association (a/k/a Fannie Mae) as Secured Party*;

10. Initial Filing # 5238450 2 as amended by 6187890 9; filed on 06/02/2006; jurisdiction Delaware; Residential Funding Corporation as Debtor and Federal National Mortgage Association (a/k/a Fannie Mae) as Secured Party*;

11. Initial Filing # 2007 4692215; filed on 12/12/2007; jurisdiction Delaware; Homecomings Financial, LLC as Debtor and Federal National Mortgage Association (a/k/a Fannie Mae) as Secured Party*;

Confidential

12. Initial Filing # 2008 0785533; filed on 03/04/2008; jurisdiction Delaware; GMAC Mortgage, LLC as Debtor and Credit Suisse First Boston, New York Branch as Secured Party;

13. Initial Filing # 2008 1437654; filed on 04/24/2008; jurisdiction Delaware; Residential Funding Company, LLC as Debtor and Residential Funding Mortgage Securities II, Inc. as Secured Party;

14. Initial Filing # 2007 3119855; filed on 07/30/2007; jurisdiction Delaware; GMAC Mortgage, LLC as Debtor and Comerica Bank as Secured Party;

15. Initial Filing # 2007 0405653; filed on 01/31/2007; jurisdiction Delaware; GMAC Mortgage, LLC as Debtor and Bank of America, N.A. as Secured Party; and

16. Initial Filing # 2007 2212677; filed on 06/12/2007; jurisdiction Delaware; Homecomings Financial, LLC as Debtor and Sherman Originator LLC as Secured Party.

Confidential

**SCHEDULE VII**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY
AGREEMENT AND IRREVOCABLE PROXY**

**DIRECT SUBSIDIARIES**

| Parent | Subsidiary | Jurisdiction of Incorporation (Subsidiary) |
|---|---|---|
| **GMAC Mortgage, LLC** | CAP RE of Vermont, LLC | Vermont |
| | Ditech, LLC | Delaware |
| | Executive Trustee Services, LLC | Delaware |
| | GMAC Mortgage USA Corporation | Delaware |
| | GMAC Mortgage, LLC of TN | Delaware |
| | GMACR Mortgage Products, LLC | Delaware |
| | Ladue Associates, Inc. | Pennsylvania |
| | Passive Asset Transactions, LLC | Delaware |
| | Residential Consumer Services, LLC | Delaware |
| | Residential Mortgage Real Estate Holdings, LLC | Delaware |
| | Walnut Grove Funding, LLC | Delaware |
| | Asset Management Performance Services, LLC | Delaware |
| | Developers of Hidden Springs, LLC | Delaware |
| | DOA Holding Properties, LLC | Delaware |
| | EPRE LLC | Delaware |
| | Equity Investments II, LLC | Delaware |
| | Equity Investment III, LLC | Delaware |
| | Equity Investment IV, LLC | Delaware |
| | GMAC Model Home Finance I, LLC | Delaware |
| | GMAC-RFC Europe Limited | U.K. |
| | GMAC-RFC Holdings Limited | U.K. |
| | Homecomings Financial, LLC | Delaware |
| | REG-PFH, LLC | Delaware |
| | Residential Funding Mortgage Exchange, LLC | Delaware |
| | Residential Funding Real Estate Holdings, LLC | Delaware |
| | RFC - GSAP Servicer Advance, LLC | Delaware |
| | RFC Asset Holdings II, LLC | Delaware |
| | RFC Asset Management, LLC | Delaware |
| | RFC Construction Funding, LLC | Delaware |
| **GMAC-RFC Holding Company, LLC** | Residential Accredit Loans, Inc. | Delaware |
| | Residential Asset Mortgage Products, Inc. | Delaware |
| | Residential Asset Securities Corporation | Delaware |
| | Residential Funding Company, LLC | Delaware |
| | Residential Funding Mortgage Securities I, Inc. | Delaware |
| | Residential Funding Mortgage Securities II, Inc. | Delaware |

Confidential

| Parent | Subsidiary | Jurisdiction of Incorporation (Subsidiary) |
|---|---|---|
| **Residential Capital, LLC** | GMAC Residential Holding Company, LLC | Delaware |
| | GMAC-RFC Holding Company, LLC | Delaware |
| **Homecomings Financial, LLC** | HFN REO Sub II, LLC | Delaware |
| | Homecomings Financial Real Estate Holdings, LLC | Delaware |
| **GMAC Residential Holding Company, LLC** | GMAC Mortgage, LLC | Delaware |
| | GMACRH Settlement Services, LLC | Delaware |
| **DOA Holding Properties, LLC** | DOA Properties I, LLC | Delaware |
| | DOA Properties II, LLC | Delaware |
| | DOA Properties III (Models), LLC | Delaware |
| | DOA Properties IV, LLC | Delaware |
| | DOA Properties V (Lots-CA), LLC | Delaware |
| | DOA Properties VI, LLC | Delaware |
| | DOA Properties VII (Lots-NV), LLC | Delaware |
| | DOA Properties VIII, LLC | Delaware |
| | DOA Properties IX (Lots-Other), LLC | Delaware |
| | DOA Holdings NoteCo, LLC | Delaware |
| **Equity Investment IV, LLC (owns 66.67%)** | Marbella Lakes Associates, LLC (f/k/a DOA Properties VIII (Marbella Lakes), LLC | Delaware |
| **GMAC Model Home Finance I, LLC** | CHM Holdings, LLC | Delaware |
| **Residential Funding Company, LLC (99.99%)** | GMAC Financiera, S.A. de C.V. | Mexico |
| **Residential Funding Company, LLC (99.99999968%)** | GMAC-RFC Auritec, S.A. | Mexico |
| **Residential Funding Company, LLC (99%)** | GMAC RFC International Holdings Cooperatief U.A. | Netherlands |
| **GMAC-RFC Holding Company, LLC (0.01%)** | GMAC RFC International Holdings Cooperatief U.A. | Netherlands |
| **Homecomings Financial, LLC (0.00000032%)** | GMAC-RFC Auritec, S.A. | Mexico |
| **RFC Construction Funding, LLC** | RC Properties I, LLC | Delaware |
| | RC Properties II, LLC | Delaware |
| | RC Properties III, LLC | Delaware |
| | RC Properties IV, LLC | Delaware |
| | RC Properties V, LLC | Delaware |
| | RC Properties VI, LLC | Delaware |
| | RC Properties VII, LLC | Delaware |
| | RC Properties VIII, LLC | Delaware |
| | RC Properties IX, LLC | Delaware |

Confidential

| Parent | Subsidiary | Jurisdiction of Incorporation (Subsidiary) |
|---|---|---|
| | RC Properties X, LLC | Delaware |
| | RC Properties XI, LLC | Delaware |
| | RC Properties XII, LLC | Delaware |
| | RC Properties XIII, LLC | Delaware |
| | RC Properties XIV, LLC | Delaware |
| | RC Properties XV, LLC | Delaware |
| | RC Properties XVI, LLC | Delaware |
| | RC Properties XVII, LLC | Delaware |
| | RC Properties XVIII, LLC | Delaware |
| | RC Properties XIX, LLC | Delaware |
| | RC Properties XX, LLC | Delaware |

Confidential

**SCHEDULE VIII**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY**
**AGREEMENT AND IRREVOCABLE PROXY**

**EXCLUDED SIGNIFICANT SUBSIDIARIES**

None.

5256336.18 08048307

**SCHEDULE IX**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY**
**AGREEMENT AND IRREVOCABLE PROXY**

**BAILMENT COLLATERAL**

1. Stock Certificate dated May 8, 1995, certifying that GMAC-RFC Holding Company, LLC (formerly known as GMAC RF, Inc.) owns one thousand (1,000) shares of common stock, par value $0.01 per share, of Residential Funding Mortgage Securities II, Inc., a corporation formed under the laws of the State of Delaware (the "Company"), standing in its name on the books of the Company, which is represented by Certificate No. 1, along with an undated Irrevocable Stock Power executed by GMAC-RFC Holding Company, LLC authorizing transfer to Wells Fargo Bank, N.A.

2. Stock Certificate dated December 7, 1994, certifying that GMAC-RFC Holding Company, LLC (formerly known as GMAC RF, Inc.) owns one thousand (1,000) shares of common stock, par value $0.01 per share, of Residential Asset Securities Corporation, a corporation formed under the laws of the State of Delaware (the "Company"), standing in its name on the books of the Company, which is represented by Certificate No. 1, along with an undated Irrevocable Stock Power executed by GMAC-RFC Holding Company, LLC authorizing transfer to Wells Fargo Bank, N.A.

3. Stock Certificate dated August 14, 1995, certifying that GMAC-RFC Holding Company, LLC (formerly known as GMAC RF, Inc.) owns one thousand (1,000) shares of common stock, par value $0.01 per share, of Residential Accredit Loans, Inc., a corporation formed under the laws of the State of Delaware (the "Company"), standing in its name on the books of the Company, which is represented by Certificate No. 1, along with an undated Irrevocable Stock Power executed by GMAC-RFC Holding Company, LLC authorizing transfer to Wells Fargo Bank, N.A.

4. Stock Certificate dated April 20, 2006, certifying that GMAC Mortgage, LLC (formerly known as GMAC Mortgage Corporation) owns three thousand (3,000) shares of common stock, par value $0.01 per share, of GMAC Mortgage USA Corporation, a corporation formed under the laws of the State of Delaware (the "Company"), standing in its name on the books of the Company, which is represented by Certificate No. 1, along with an undated Irrevocable Stock Power executed by GMAC Mortgage, LLC authorizing transfer to Wells Fargo Bank, N.A.

5. Dutch Note (Note Certificate No. 1) dated 4 June 2008 in the principal amount of EUR 556,992,836.00 due 3 June 2009 issued under the Variable Funding Loan Note Agreement dated 4 June 2008 between GX CE Funding B.V., as issuer, and Residential Capital, LLC, as subscriber.

Confidential

6.  UK Note Certificate dated 4 June 2008 in the principal amount of £658,116,612.47 due 18 June 2008, issued under the Note Issuance Facility Deed dated 4 June 2008 between Viaduct (No. 7) Limited, as issuer, and Residential Capital, LLC, as noteholder.

7.  Stock Certificate dated June 9, 2008, certifying that GMAC Mortgage, LLC (formerly known as GMAC Mortgage Corporation) owns one hundred (100) shares of common stock, without par value, of Ladue Associates, Inc., a corporation formed under the laws of the State of Delaware (the "Company"), standing in its name on the books of the Company, which is represented by Certificate No. 1; along with an Irrevocable Stock Power executed by GMAC Mortgage, LLC authorizing transfer to Wells Fargo Bank, N.A dated June 9, 2008.

8.  Stock Certificate dated June 13, 2008, certifying that GMAC-RFC Holding Company, LLC (formerly known as GMAC RF, Inc.) owns one thousand (1,000) shares of common stock, par value $0.01 per share, of Residential Asset Mortgage Products, Inc., a corporation formed under the laws of the State of Delaware (the "Company"), standing in its name on the books of the Company, which is represented by Certificate No. 2; along with an Irrevocable Stock Power executed by GMAC-RFC Holding Company, LLC authorizing transfer to Wells Fargo Bank, N.A dated June 13, 2008.

9.  Stock Certificate dated June 13, 2008, certifying that GMAC-RFC Holding Company, LLC (formerly known as GMAC RF, Inc.) owns one thousand (1,000) shares of common stock, par value $0.01 per share, of Residential Funding Mortgage Securities I, Inc., a corporation formed under the laws of the State of Delaware (the "Company"), standing in its name on the books of the Company, which is represented by Certificate No. 2; along with an Irrevocable Stock Power executed by GMAC-RFC Holding Company, LLC authorizing transfer to Wells Fargo Bank, N.A dated June 13, 2008.

10. Stock Certificate[1], undated, certifying that RFC LLC is the Registered Proprietor of 122,276,661 ordinary shares, of £1 each, of GMAC-RFC Holdings Limited, a company incorporated in England and Wales (registered number 03471082) whose registered office is at Eastern Gate, Brants Bridge, Bracknell, Berkshire  RG12 9BZ ("GMAC Holdings"), which is represented by Certificate No. 1; along with an undated Stock Transfer Form executed by Residential Funding Company, LLC with transferee information blank.

11. Stock Certificate[†], undated, certifying that RFC LLC is the Registered Proprietor of 65 ordinary shares, of £1 each, of GMAC-RFC Europe Limited, a company incorporated in England and Wales (registered number 03987700) whose registered office is at Eastern Gate, Brants Bridge, Bracknell, Berkshire  RG12 9BZ ("GMAC Europe"), which is

---

[1] Notes printed in black and white with original signature.

Confidential

represented by Certificate No. 1; along with an undated Stock Transfer Form executed by Residential Funding Company, LLC with transferee information blank.

12. Stock Certificate No. 1, dated July 20, 2009, certifying that Residential Funding Company, LLC owns 205,360,746 (two hundred five million three hundred sixty thousand seven hundred forty six) shares, each with a par value of $1.00 (one Peso 00/100) legal currency of Mexico, representing the corporate capital stock of GMAC-RFC Auritec, S.A. (the "GMAC Auritec Shares"); along with an endorsement, dated July 20, 2009, executed by James N. Young on behalf of Residential Funding Company, LLC.

13. Stock Certificate No. 1, dated April 7, 2009, certifying that Residential Funding Company, LLC owns 57,198 (fifty seven thousand one hundred ninety eight) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100) representing the fixed portion the corporate capital stock of GMAC Financiera, S.A. de C.V., SOFOM, E.N.R. (the "GMAC Financiera Shares"); along with an endorsement, dated April 7, 2009, executed by James N. Young on behalf of Residential Funding Company, LLC.

14. Limited Liability Company Interest Number 001 certifying that Residential Capital, LLC ("ResCap") is, and has been since June 2, 2006, a member and the owner of 100 fully paid and non-assessable interests of GMAC-RFC Holding Company, LLC, a limited liability company formed under the laws of the State of Delaware ("GMAC-RFC"), executed by the chief financial officer and secretary assistant secretary of GMAC-RFC on March 31, 2009. Along with a Membership Interest Power certifying that ResCap thereby sells, assigns and transfers unto Wells Fargo Bank, N.A., as first priority collateral agent, 100 interests of the limited liability company membership interests of GMAC-RFC, standing in the name of ResCap on the books of GMAC-RFC represented by Certificate No. 1 therewith, executed by James N. Young, CFO of ResCap, on March 31, 2009.

15. Limited Liability Company Interest Number 001 certifying that GMAC-RFC is, and has been since June 2, 2006, a member and the owner of 100 fully paid and non-assessable interests of Residential Funding Company, LLC, a limited liability company formed under the laws of the State of Delaware ("Residential"), executed by the chief financial officer and assistant secretary of Residential on March 31, 2009. Along with a Membership Interest Power certifying that GMAC-RFC thereby sells, assigns and transfers unto Wells Fargo Bank, N.A., as first priority collateral agent, 100 interests of the limited liability company membership interests of Residential, standing in the name of GMAC-RFC on the books of Residential represented by Certificate No. 1 therewith, executed by James N. Young, CFO of GMAC-RFC, on March 31, 2009.

16. Limited Liability Company Interest Number 1 certifying that RAHI is, and has been since November 14, 2008, a member and the owner of 100 fully paid and non-assessable interests of RAHI A, LLC, a limited liability company formed under the laws of the State

Confidential

of Delaware ("RAHI A"), executed by the chief executive officer and assistant secretary of RAHI A on November 14, 2008. Along with a Membership Interest Power certifying that RAHI thereby sells, assigns and transfers unto Wells Fargo Bank, N.A., as first priority collateral agent, 100 interests of the limited liability company membership interests of RAHI A, standing in the name of RAHI on the books of RAHI A represented by Certificate No. 1 therewith, executed by James N. Young, CFO of RAHI, on December 30, 2009.

17.  Limited Liability Company Interest Number 1 certifying that PATI is, and has been since November 14, 2008, a member and the owner of 100 fully paid and non-assessable interests of PATI A, LLC, a limited liability company formed under the laws of the State of Delaware ("PATI A"), executed by the chief executive officer and assistant secretary of PATI A on November 14, 2008. Along with a Membership Interest Power certifying that PATI thereby sells, assigns and transfers unto Wells Fargo Bank, N.A., as first priority collateral agent, 100 interests of the limited liability company membership interests of PATI A, standing in the name of PATI on the books of PATI A represented by Certificate No. 1 therewith, executed by James N. Young, CFO of PATI, on December 30, 2009.

.

Confidential

**SCHEDULE X**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY**
**AGREEMENT AND IRREVOCABLE PROXY**

**DEPOSIT ACCOUNTS AND SECURITIES ACCOUNTS**

(a)    Concentration Accounts

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Capital, LLC | Bank of America | 12354-69131 | |
| Home Connects Lending Services, LLC | Bank of America | 1233904474 | Home Connects Lending Svcs Concentration |
| GMAC Residential Holding Company, LLC | Bank of America | 990126021 | GMAC Residential Hldg Corp Nevada Concentration |
| Residential Capital, LLC | Wachovia | 2000042911388 | Residential Capital, LLC Serv Advances Concentration Account for the benefit of Wells Fargo, N.A. as Collateral Control Agent |
| GMAC Mortgage, LLC | Wachovia | 2000042898689 | GMAC Mortgage, LLC Concentration Account for the benefit of Wells Fargo, N.A. as Collateral Control Agent |
| Residential Capital, LLC | Wachovia | 2000042898663 | Residential Capital, LLC Concentration Account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Residential Capital, LLC | Wachovia | 2000041713626 | Residential Capital, LLC IBG Concentration Account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Funding Company, LLC | Wachovia | 2000042898676 | Residential Funding Company, LLC Concentration Account for the benefit of Wells Fargo, N.A. as Collateral Control Agent |
| GMAC Mortgage USA Corporation | Deutsche Bank | 451530 | GMAC Mortgage USA Corporation Concentration |
| GMAC Mortgage, LLC | Deutsche Bank | 00-392446 | **GMAC CONCENTRATION WIRE** |
| GMAC Mortgage, LLC | Citibank | 30609909 | **GMAC MORTGAGE WIRE CONC** |

(b)     Sales Proceeds Accounts

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Capital, LLC | Bank of America | 1235582255 | |
| Residential Funding Company, LLC[2] | Wachovia | 2000041713671 | Residential Funding Company, LLC |
| Residential Funding Company, LLC | Wachovia | 2000041713451 | Residential Funding Company, LLC Sales Proceeds Account for the benefit of Wells Fargo, N.A. as Collateral Control Agent |

---

[2]     This is a Servicing Advances Account

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Mortgage Real Estate Holdings, LLC | Wachovia | 2000041713969 | Residential Mortgage Real Estate Holdings, LLC Sales Proceeds Account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Residential Funding Real Estate Holdings, LLC | Wachovia | 2000041713972 | Residential Funding Real Estate Holdings, LLC Sales Proceeds Account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Homecomings Financial Real Estate Holdings, LLC | Wachovia | 2000041713985 | Homecomings Financial Real Estate Holdings, LLC Sales Proceeds Account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |

c)      Collection Accounts

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| GMAC Mortgage, LLC | Bank of America | 7765600532 | GMAC MORTGAGE CORP |
| GMAC Mortgage, LLC | Bank of America | 725377.1 | GMACM/GMAC Servicing Rights Collection Acct |
| Residential Capital, LLC | Bank of America | 1235469131 | |
| Residential Funding Company, LLC | Bank of America | 725378.1 | RFC/GMAC Servicing Rights Collection Acct |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| GMAC Residential Holding Company, LLC | Bank of America | 1235617150 | GMAC RESIDENTIAL HOLDING |
| Residential Capital, LLC | Banc of America Securities, LLC | 24901052 | |
| GMAC Mortgage, LLC | JP Morgan | 0728408567 | GMACM MSR Securities and HEQ Residual Account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| GMAC Mortgage, LLC | JP Morgan | 0728454823 | GMACM Direct Pairoff Account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| Passive Asset Transactions, LLC | JP Morgan | 0777163338 | Passive Asset Transactions, LLC for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| Developers of Hidden Springs, LLC | JP Morgan | 1106335 | Developers of Hidden Springs, LLC account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Developers of Hidden Springs, LLC | JP Morgan | 1106780 | Developers of Hidden Springs, LLC account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| DOA Holding Properties, LLC | JP Morgan | 765905476 | DOA Holding Properties, LLC account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| DOA Holding Properties, LLC | JP Morgan | 765905468 | DOA Holding Properties, LLC account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Homecomings Financial, LLC | JP Morgan | 1134675 | Homecomings Financial, LLC account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Homecomings Financial, LLC | JP Morgan | 5113180 | Homecomings Financial, LLC account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Residential Funding Company, LLC | JP Morgan | 1099928 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A. as Collateral Control Agent |
| Residential Funding Company, LLC | JP Morgan | 1103613 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| Residential Funding Company, LLC | JP Morgan | 5218640 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| Residential Funding Company, LLC | JP Morgan | 708081617 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| Residential Funding Company, LLC | JP Morgan | 5750873 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| Residential Funding Company, LLC | JP Morgan | 5315476 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Funding Company, LLC | JP Morgan | 777175639 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| Residential Funding Company, LLC | JP Morgan | 5531225 | Residential Funding Company, LLC account for the benefit of Wells Fargo Bank, N.A., as Collateral Control Agent |
| RFC Construction Funding, LLC | JP Morgan | 5581966 | RFC Construction Funding LLC a Delaware Limited Liability Company |
| Residential Funding Company, LLC | State Street | 004 35 131 | Residential Funding Company, LLC Capital Markets Pledged RFC |
| Residential Funding Company, LLC | State Street | 004 351 72 | Residential Funding Company, LLC PIA Pledged RFC |
| Residential Funding Company, LLC | State Street | 004 351 80 | Residential Funding Company, LLC RIF Pledged RFC |
| RFC Asset Holdings II, LLC | State Street | 00435149 | RFC ASSETS HOLDINGS II, LLC CAPITAL MARKETS PLEDGED RAHI II |
| RFC Asset Holdings II, LLC | State Street | 00435156 | RFC ASSETS HOLDINGS II, LLC-RIF PLEDGED RAHI II |
| RFC Asset Holdings II, LLC | State Street | 00435164 | RFAH-PIA PLEDGED RAHI II |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Funding Company, LLC | State Street | 00076174 | RFC Principal Inv. Activities |
| RFC Asset Holdings II, LLC | State Street | 00100453 | RFAH Principal Inv. Activities Loans |
| RFC Asset Holdings II, LLC | State Street | 00100446 | RFC Asset Holdings II, LLC |
| Residential Funding Company, LLC | State Street | 00100461 | GMAC-RFC, LLC Securities |
| Passive Asset Transactions, LLC | Wachovia | 2000041713781 | Passive Asset Transactions, LLC |
| RFC Asset Holdings II, LLC | Wachovia | 2000041713956 | RFC Asset Holdings II, LLC |
| Ditech, LLC | Wachovia | 200001330105 | Ditech, LLC |
| GMAC Mortgage USA Corporation | Wachovia | 2079951058907 | GMAC Mortgage USA Corporation |
| Residential Consumer Services, LLC | Wachovia | 2000201447570 | Residential Consumer Services, LLC |
| Residential Funding Company, LLC | Wachovia | 2000042911870 | Residential Funding Company, LLC |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Funding Company, LLC | Wachovia | 2000014428825 | Residential Funding Company, LLC |
| Residential Funding Company, LLC | Wachovia | 2000041714706 | Residential Funding Company, LLC |
| Residential Funding Company, LLC | Wachovia | 2000045277621 | Residential Funding Company, LLC |
| GMAC Mortgage, LLC | Wachovia | 2000041714353 | GMAC Mortgage, LLC |
| GMAC Mortgage, LLC | Wachovia | 2000041713668 | GMAC Mortgage, LLC |
| GMAC Mortgage, LLC | Wachovia | 2000042911867 | GMAC Mortgage, LLC |
| GMAC Mortgage, LLC | Wachovia | 2079950083067 | GMAC Mortgage, LLC |
| GMAC Mortgage, LLC | Wachovia | 2079950061474 | GMAC Mortgage, LLC |
| GMAC Mortgage, LLC | Wachovia | 2079950061461 | GMAC Mortgage, LLC |
| GMAC Mortgage, LLC | Wachovia | 2100012764397 | GMAC Mortgage, LLC |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| GMAC Mortgage, LLC | Wachovia | 2000042900616 | GMAC Mortgage, LLC |
| GMAC Mortgage, LLC | Wachovia | 2100012536910 | GMAC Mortgage, LLC |
| Residential Funding Mortgage Securities I, Inc. | US Bank | 152100013209 | Residential Funding Mortgage |
| RFC Asset Holdings II, LLC | US Bank | 153910004800 | RFC Asset Holdings 2 LLC |
| RFC Asset Management, LLC | US Bank | 153910011920 | RFC Asset Management Inc |
| RFC SFJV-2002, LLC | US Bank | 153910011938 | RFC SFJV 2002 LLC |
| RCSFJV 2004, LLC | US Bank | 10479189443 | RCSFJV2004 LLC |
| Homecomings Financial, LLC | US Bank | 152100013217 | HOMECOMINGS FINANCIAL NETWORK INC |
| Residential Funding Company, LLC | US Bank | 104756807830 | RESIDENTIAL FUNDING COMPANY, LLC |
| Residential Funding Company, LLC | US Bank | 104757811591 | RESIDENTIAL FUNDING COMPANY, LLC |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Funding Company, LLC | US Bank | 152100013191 | RESIDENTIAL FUNDING COMPANY, LLC |
| GMAC Mortgage USA Corporation | Deutsche Bank | 00451549 | GMAC Mortgage USA Corp First Mtge Wires |
| GMAC Mortgage USA Corporation | Deutsche Bank | 00451557 | GMAC Mortgage USA Corp 2nd Mtge Wires |
| GMAC Mortgage, LLC | Deutsche Bank | 00-318756 | GMAC MORTGAGE CORPORATION |
| GMAC Mortgage, LLC | Deutsche Bank | 00-330608 | GMAC MTG CORP/DITECH WIR |
| GMAC Mortgage, LLC | Deutsche Bank | 00-374678 | GMAC MORTGAGE CORPORATION |
| GMAC Mortgage, LLC | Deutsche Bank | 00-389706 | GMAC HOME EQUITY FUNDING |
| GMAC Mortgage, LLC | Deutsche Bank | 00-407599 | GMAC BTCHEQUE MASTER FUN |
| GMAC Mortgage, LLC | Deutsche Bank | 00-389722 | GMAC CONSTRUCTION FUNGIN |
| GMACR Mortgage Products, LLC | GMAC Bank | 2210115628 | GMACR Mortgage Products, LLC |
| GMAC Mortgage, LLC | Citibank | 30609933 | GMAC WHOLESALE LENDING |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Capital, LLC | Citibank | 11215175 | Residential Capital LLC EUR Operating |
| Residential Capital, LLC | Citibank. | 11215183 | Residential Capital LLC GBP Operating |
| Residential Capital, LLC | Citibank | 11216643 | Residential Capital LLC MXN Operating |
| Residential Capital, LLC | Citibank | 11902075 | Residential Capital LLC CAD Operating |
| Residential Capital, LLC | Citibank | 11902083 | Residential Capital LLC AUD Operating |
| Residential Capital, LLC | Evergreen Service Company, LLC | 497-1009371602 | Residential Capital, LLC |
| Residential Capital, LLC | Evergreen Service Company, LLC | 497-1009371627 | Residential Capital, LLC |

(d)    Securities Accounts

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Passive Asset Transactions, LLC | JP Morgan | P66230 | Passive Asset Transactions, LLC |
| GMAC Mortgage, LLC | JP Morgan | G54823 | GMAC Mortgage, LLC Direct Pair Off Account |
| GMAC Mortgage, LLC | JP Morgan | G08567 | GMAC Mortgage, LLC MSR Securities and HEQ Residual Account |
| RFC Asset Holdings II, LLC | State Street | BGLG | RFAH PRINCIPAL INV. ACTIVITIES LOAN |
| RFC Asset Holdings II, LLC | State Street | BGLF | RFC ASSET HOLDINGS II, LLC |
| RFC Asset Holdings II, LLC | State Street | BGLU | CAPITAL MARKETS PLEDGED RAHI II |
| RFC Asset Holdings II, LLC | State Street | BGLV | RIF PLEDGED RAHI II |
| RFC Asset Holdings II, LLC | State Street | BGLW | PIA PLEDGED RAHI II |
| Residential Funding Company, LLC | State Street | BGLM | GMAC-RFC, LLC SECURITIES |
| Residential Funding Company, LLC | State Street | BGLS | Residential Funding Company, LLC Capital Markets Pledged RFC |

Confidential

| Account Owner | Financial Institution | Account Number | Account Name |
|---|---|---|---|
| Residential Funding Company, LLC | State Street | BGLX | Residential Funding Company, LLC PIA Pledged RFC |
| Residential Funding Company, LLC | State Street | BGLY | Residential Funding Company, LLC RIF Pledged RFC |
| Residential Funding Company, LLC | State Street | BGLJ | RFC Principal Inv. Activities |

Confidential

## SCHEDULE XI
## TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY
## AGREEMENT AND IRREVOCABLE PROXY

### NOTICE INFORMATION

The Borrowers:

Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

GMAC Mortgage, LLC
c/o Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn:  Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:     (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Guarantors:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Homecomings Financial, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

GMAC-RFC Holding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

GMAC Residential Holding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Equity Pledgors:

GMAC Model Home Finance I, LLC
One Meridian Crossings, Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:     (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Developers of Hidden Springs, LLC
One Meridian Crossings, Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

DOA Holding Properties, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Equity Investment IV, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

RFC Construction Funding, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com


With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, Minnesota 55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: tammy.hamzehpour@gmacrescap.com

FABS Grantors:

RFC Asset Holdings II, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Passive Asset Transactions, LLC
1100 Virginia Drive
Fort Washington, PA 19034

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Additional Account Parties:

Residential Funding Real Estate Holdings, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423

Confidential

Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Residential Mortgage Real Estate Holdings, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Homecomings Financial Real Estate Holdings, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Confidential

Ameriland, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

REG-PFH, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Home Connects Lending Services, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo

Confidential

Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

GMACR Mortgage Products, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Ditech, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Residential Consumer Services, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

GMAC Mortgage USA Corporation
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

5256336.18 08048307                              XI-10

Confidential

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

Residential Funding Mortgage Securities I, Inc.
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

RFC Asset Management, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

RFC SFJV-2002, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

RCSFJV2004, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: jerry.lombardo@gmacrescap.com

Confidential

With Copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax:    (866) 572-7524
Email: treasurer@gmacrescap.com
Email: tammy.hamzehpour@gmacrescap.com

The Lender Agent:

GMAC Inc.
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Phone: 704-540-6133
Fax: 704-540-6549
Email: Jeff.Brown@gmacfs.com

With copy to:

William B. Solomon, VP and General Counsel
Phone: (313) 656-6128
Fax: (313) 656-6124
Email: William.b.solomon@gmacfs.com

The First Priority Collateral Agent:

Wells Fargo Bank, N.A.
Attn:  ResCap-GMAC: Michael Pinzon, Vice President
45 Broadway, 14th Floor
New York, NY 10006
Tel: 212-515-5264   Fax: 212-515-1576
Email: michael.d.pinzon@wellsfargo.com


The Collateral Control Agent:

Wells Fargo Bank, N.A.
Attn:  ResCap-GMAC: Michael Pinzon, Vice President
45 Broadway, 14th Floor
New York, NY 10006
Tel: 212-515-5264   Fax: 212-515-1576
Email: michael.d.pinzon@wellsfargo.com

Confidential

**ATTACHMENT I**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY**
**AGREEMENT AND IRREVOCABLE PROXY**

**PLEDGED EQUITY AND PLEDGED NOTES**

Item A.        Pledged Shares

| Pledged Share Issuer | Common Stock | | Beneficial Owner | % of Shares Pledged |
|---|---|---|---|---|
| | Authorized Shares | Outstanding Shares | | |
| GMAC Mortgage USA Corporation | 3,000 | 3,000 | GMAC Mortgage, LLC | 100% |
| Ladue Associates, Inc. | 100 | 100 | GMAC Mortgage, LLC | 100% |
| Residential Accredit Loans, Inc. | 1,000 | 1,000 | GMAC-RFC Holding Company, LLC | 100% |
| Residential Asset Mortgage Products, Inc. | 1,000 | | GMAC-RFC Holding Company, LLC | 100% |
| Residential Asset Securities Corporation | 1,000 | 1,000 | GMAC-RFC Holding Company, LLC | 100% |
| Residential Funding Mortgage Securities I, Inc. | 1,000 | | GMAC-RFC Holding Company, LLC | 100% |
| Residential Funding Mortgage Securities II, Inc. | 1,000 | 1,000 | GMAC-RFC Holding Company, LLC | 100% |

Confidential

Item B.          Pledged Interests

| Pledged Interests Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
|---|---|---|---|---|
| | Type of Interest | Interests Owned by Pledgor | | |
| Hidden Springs Sewer Company, LLC | Limited Liability Company | 100% | Developers of Hidden Springs, LLC | 100% |
| DOA Properties I, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties II, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties III (Models), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties IV, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties V (Lots-CA), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties VI, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties VII (Lots-NV), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties VIII, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties IX (Lots-Other), LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |
| DOA Properties NoteCo, LLC | Limited Liability Company | 100% | DOA Holding Properties, LLC | 100% |

Confidential

| Pledged Interests Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
| | Type of Interest | Interests Owned by Pledgor | | |
| --- | --- | --- | --- | --- |
| Marbella Lakes Associates, LLC (f/k/a DOA Properties VIII (Marbella Lakes), LLC | Limited Liability Company | 66.67% | Equity Investment IV, LLC | 100% |
| RC Properties I, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties II, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties III, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties IV, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties V, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties VI, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties VII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties VIII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties IX, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties X, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |

Confidential

| Pledged Interests Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
| | Type of Interest | Interests Owned by Pledgor | | |
|---|---|---|---|---|
| RC Properties XI, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XIII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XIV, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XV, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XVI, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XVII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XVIII, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XIX, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| RC Properties XX, LLC | Limited Liability Company | 100% | RFC Construction Funding, LLC | 100% |
| CAP RE of Vermont, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| Ditech, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |

5256336.18 08048307                                   Attachment I-4

Confidential

| Pledged Interests Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
| | Type of Interest | Interests Owned by Pledgor | | |
|---|---|---|---|---|
| Executive Trustee Services, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| GMAC Mortgage, LLC of TN | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| GMACR Mortgage Products, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| Passive Asset Transactions, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| Residential Consumer Services, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| Residential Mortgage Real Estate Holdings, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| Walnut Grove Funding, LLC | Limited Liability Company | 100% | GMAC Mortgage, LLC | 100% |
| CHM Holdings, LLC | Class B Junior Preferred Units | 100% | GMAC Model Home Finance I, LLC | 100% |
| GMAC Mortgage, LLC | Limited Liability Company | 100% | GMAC Residential Holding Company, LLC | 100% |
| GMACRH Settlement Services, LLC | Limited Liability Company | 100% | GMAC Residential Holding Company, LLC | 100% |
| Residential Funding Company, LLC | Limited Liability Company | 100% | GMAC-RFC Holding Company, LLC | 100% |

Confidential

| Pledged Interests Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
| | Type of Interest | Interests Owned by Pledgor | | |
|---|---|---|---|---|
| HFN REO Sub II, LLC | Limited Liability Company | 100% | Homecomings Financial, LLC | 100% |
| Homecomings Financial Real Estate Holdings, LLC | Limited Liability Company | 100% | Homecomings Financial, LLC | 100% |
| GMAC Residential Holding Company, LLC | Limited Liability Company | 100% | Residential Capital, LLC | 100% |
| GMAC-RFC Holding Company, LLC | Limited Liability Company | 100% | Residential Capital, LLC | 100% |
| Asset Management Performance Services, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Developers of Hidden Springs, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| DOA Holding Properties, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| EPRE LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Equity Investments II, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Equity Investment III, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Equity Investment IV, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| GMAC Model Home Finance I, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |

Confidential

| Pledged Interests Issuer | Interest | | Pledgor | % of Interests of Pledgor Pledged |
| --- | --- | --- | --- | --- |
| | Type of Interest | Interests Owned by Pledgor | | |
| Homecomings Financial, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| REG-PFH, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Residential Funding Mortgage Exchange, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| Residential Funding Real Estate Holdings, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| RFC Asset Holdings II, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| RFC Asset Management, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| RFC Construction Funding, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| RFC - GSAP Servicer Advance, LLC | Limited Liability Company | 100% | Residential Funding Company, LLC | 100% |
| RAHI A, LLC | Limited Liability Company | 100% | RFC Asset Holdings II, LLC | 100% |
| PATI A, LLC | Limited Liability Company | 100% | Passive Asset Transactions, LLC | 100% |
| GMAC RFC International Holdings Cooperatief U.A. | Membership Interests | 100% | Residential Funding Company, LLC (99%); GMAC-RFC Holding Company, LLC (0.01%) | 65% |

Attachment I-7

Confidential

Item C.        UK Pledged Shares

| Pledged Share Issuer | Total Number of Shares Issued | Shares Certificate Number | Beneficial Owner | % of Shares Pledged |
|---|---|---|---|---|
| GMAC-RFC Holdings Limited | 188,117,940 | 1 | Residential Funding Company, LLC | 65% |
| GMAC-RFC Europe Limited | 100 | 1 | Residential Funding Company, LLC | 65% |

Attachment I-8

Confidential

Item D.        Pledged Notes

| Pledged Note  Issuer | Pledged Note | Pledged Note Holder |
|---|---|---|
| GX CE Funding B.V. | All VFLN Notes, including, without limitation, that certain VFLN Note (Note Certificate No. 1) dated 4 June 2008 in the principal amount of EUR 556,992,836.00 constituted by and issued pursuant to the Variable Funding Loan Note Agreement dated 4 June 2008 and made between, amongst others, Residential Capital, LLC, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding. | Residential Capital, LLC |
| Viaduct (No. 7) Limited | All UK Notes, including, without limitation, that certain UK Note dated 4 June 2008 in the principal amount of £658,116,612.47 constituted by and issued pursuant to the Note Issuance Facility Deed dated 4 June 2008 and made between, amongst others, Residential Capital, LLC and Viaduct No. 7 Limited. | Residential Capital, LLC |

Confidential

**ATTACHMENT II**
**TO AMENDED AND RESTATED FIRST PRIORITY PLEDGE AND SECURITY**
**AGREEMENT AND IRREVOCABLE PROXY**

Form of Joinder Agreement

This Joinder Agreement, dated as of [_____] is delivered pursuant to:

(i)      Section 16 of the Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented, restated or otherwise modified from time to time, the "First Priority Pledge and Security Agreement"), dated as of December 30, 2009, among Residential Funding Company, LLC, GMAC Mortgage, LLC, certain of their Affiliates from time to time parties thereto as Grantors, GMAC Inc. (f/k/a GMAC LLC), as Lender and Lender Agent (in such capacity, the "First Priority Lender"), and Wells Fargo Bank, N.A., as First Priority Collateral Agent (in such capacity, the "First Priority Collateral Agent");

(ii)      Section 16 of the Amended and Restated Second Priority Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented, restated or otherwise modified from time to time, the "Second Priority Pledge and Security Agreement"), dated as of December 30, 2009, among Residential Capital, LLC, certain of its affiliates from time to time parties thereto as Grantors, U.S. Bank National Association, as Trustee (the "2010 Trustee"), and Wells Fargo Bank, N.A., as Second Priority Collateral Agent (in such capacity, the "Second Priority Collateral Agent");

(iii)      Section 16 of the Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented, restated or otherwise modified from time to time, the "Third Priority Pledge and Security Agreement"), dated as of December 30, 2009, among Residential Capital, LLC, certain of its affiliates from time to time parties thereto as Grantors, U.S. Bank National Association, as Trustee (the "2015 Trustee"), and Wells Fargo Bank, N.A., as Second Priority Collateral Agent (in such capacity, the "Third Priority Collateral Agent");

(iv)      Section 16 of the Amended and Restated Hedge Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented, restated or otherwise modified from time to time, the "Hedge Pledge and Security Agreement" and, together with the First Priority Pledge and Security Agreement, Second Priority Security Agreement and Third Priority Security Agreement, each a "Security Agreement" and collectively, the "Security Agreements"), dated as of December 30, 2009, among Residential Funding Company, LLC, GMAC Mortgage, LLC, certain of their Affiliates from time to time parties thereto as Grantors, and GMAC Inc. (f/k/a GMAC LLC) (in such capacity, the "Hedge Counterparty"); and

(v)      Section 8.10 of the Intercreditor Agreement (as amended, supplemented, restated or otherwise modified from time to time, the "Intercreditor Agreement"), dated as of June 6, 2008, among Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, certain of their affiliates from time to time parties thereto, the First Priority Lender, the 2010 Trustee, the 2015 Trustee, the First Priority Collateral Agent, the Second Priority Collateral

5256336.18 08048307                    Attachment II-1

Agent, the Third Priority Collateral Agent, and Wells Fargo Bank, N.A., as collateral control agent (in such capacity, the "Collateral Control Agent").

WHEREAS, [Reference to collateral being added under the First Priority Pledge and Security Agreement];

WHEREAS, Section 11(a)(xv) of the Second Priority Pledge and Security Agreement requires that if any Obligor takes action to grant the First Priority Collateral Agent additional collateral it shall do the same for the Second Priority Collateral Agent; and

WHEREAS, Section 11(a)(xv) of the Third Priority Pledge and Security Agreement, which requires that if any Obligor takes action to grant the First Priority Collateral Agent additional collateral it shall do the same for the Third Priority Collateral Agent.

Capitalized terms used herein without definition are used as defined in the First Pledge and Security Agreement.

By executing and delivering this Joinder Agreement, [name of pledgor(s)] (the "[_____]"):

(a)      as provided in Section 16 of the First Priority Pledge and Security Agreement, hereby becomes a party to the First Priority Pledge and Security Agreement as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] thereunder with the same force and effect as if originally named as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party]  therein and, without limiting the generality of the foregoing, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, hereby mortgages, pledges, assigns, transfers and hypothecates to the First Priority Collateral Agent for the benefit of the Lender Parties, and grants to the First Priority Collateral Agent for the benefit of the Lender Parties a lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party]  described in Annex A and expressly assumes all obligations and liabilities of a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party]  thereunder.  The [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby agrees to be bound as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] for the purposes of the First Priority Pledge and Security Agreement;

(b)      as provided in Section 16 of the Second Priority Pledge and Security Agreement, hereby becomes a party to the Second Priority Pledge and Security Agreement as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] thereunder with the same force and effect as if originally named as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] therein and, without limiting the generality of the foregoing, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations (as defined in the Second Priority Pledge and Security Agreement), hereby mortgages, pledges, assigns, transfers and hypothecates to the Second Priority Collateral Agent for the benefit of the Notes Parties (as defined in the Second Priority Pledge and Security Agreement), and grants to the Second Priority Collateral Agent for the benefit of the Notes Parties (as defined in the Second Priority Pledge and Security Agreement) a lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] described in Annex A and expressly assumes all obligations and liabilities of a [Grantor] [Equity

Attachment II-2

Confidential

Pledgor ][FASB Grantor] [Additional Account Party] thereunder.  The [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby agrees to be bound as an Equity Pledgor for the purposes of the Second Priority Pledge and Security Agreement;

(c)    as provided in Section 16 of the Third Priority Pledge and Security Agreement, hereby becomes a party to the Third Priority Pledge and Security Agreement as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] thereunder with the same force and effect as if originally named as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] therein and, without limiting the generality of the foregoing, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations (as defined in the Third Priority Pledge and Security Agreement), hereby mortgages, pledges, assigns, transfers and hypothecates to the Third Priority Collateral Agent for the benefit of the Secured Parties (as defined in the Third Priority Pledge and Security Agreement), and grants to the Third Priority Collateral Agent for the benefit of the Secured Parties (as defined in the Third Priority Pledge and Security Agreement) a lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] described in Annex A and expressly assumes all obligations and liabilities of a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] thereunder.  The [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby agrees to be bound as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] for the purposes of the Third Priority Pledge and Security Agreement.

(d)    as provided in Section 16 of the Hedge Pledge and Security Agreement, hereby becomes a party to the Hedge Pledge and Security Agreement as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] thereunder with the same force and effect as if originally named as a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] therein and, without limiting the generality of the foregoing, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations (as defined in the Hedge Pledge and Security Agreement), hereby mortgages, pledges, assigns, transfers and hypothecates to the Hedge Counterparty, and grants to the Hedge Counterparty a lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] described in Annex A and expressly assumes all obligations and liabilities of a [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] thereunder.  The [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby agrees to be bound as an Equity Pledgor for the purposes of the Hedge Pledge and Security Agreement; and

(e)    as provided in Section 8.10 of the Intercreditor Agreement, hereby becomes a party to the Intercreditor Agreement as an Obligor thereunder with the same force and effect as if originally named as an Obligor therein and, without limiting the generality of the foregoing, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations (as defined in the Intercreditor Agreement), hereby mortgages, pledges, assigns, transfers and hypothecates to the Collateral Control Agent, and grants to the Collateral Control Agent a lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] described in Annex A  to the extent it constitutes Controlled Collateral (as defined in the Intercreditor Agreement) and expressly assumes all obligations and

Confidential

liabilities of an Obligor thereunder.  The [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby agrees to be bound as an Obligor for the purposes of the Intercreditor Agreement.

In addition to the foregoing, the [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby agrees to be bound by the terms and conditions of the Loan Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time) as if it had signed as an Obligor thereunder.

The information set forth in Annex B is hereby added to the information set forth in Schedules I through XI and Attachment I to each Security Agreement.  By acknowledging and agreeing to this Joinder Agreement, the [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby agrees that this Joinder Agreement may be attached to each Security Agreement and that the Collateral listed on Annex A to this Joinder Amendment shall be and become part of the Collateral referred to in each Security Agreement and shall secure all Obligations (as defined in the Security Agreements).

The [Grantor] [Equity Pledgor ][FASB Grantor] [Additional Account Party] hereby represents and warrants that each of the representations and warranties contained in (i) Section 6 of the First Priority Pledge and Security Agreement applicable to it, (ii) Section 7 of the Second Priority Pledge and Security Agreement applicable to it, (iii) Section 7 of the Third Priority Pledge and Security Agreement applicable to it, and (iv) Section 7 of the Hedge Pledge and Security Agreement applicable to it, is true and correct on and as the date hereof as if made on and as of such date.

Confidential

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR(S)]

By: _____
Name:
Title:

ACKNOWLEDGED AND AGREED
as of the date first above written:

GMAC INC.
as Lender Agent

By: _____
Name:
Title:

GMAC INC.
as Hedge Counterparty

By: _____
Name:
Title:

Confidential

WELLS FARGO BANK, N.A.,
as First Priority Collateral Agent


By: _____
Name:
Title:

WELLS FARGO BANK, N.A.,
as Second Priority Collateral Agent


By: _____
Name:
Title:


WELLS FARGO BANK, N.A.,
as Third Priority Collateral Agent


By: _____
Name:
Title:


WELLS FARGO BANK, N.A.,
as Collateral Control Agent


By: _____
Name:
Title:

Confidential

ACKNOWLEDGED AND AGREED FOR
PURPOSES OF THE LOAN AGREEMENT
as of the date first above written:


GMAC MORTGAGE, LLC


By:  _____
Name:
Title:


RESIDENTIAL FUNDING COMPANY, LLC


By:  _____
Name:
Title:

Confidential

ANNEX A
TO JOINDER AGREEMENT

<u>Description of Collateral</u>

As used in the Joinder Agreement to which this Annex A is attached, the "Collateral" of the Grantor(s) executing this Joinder Agreement shall mean with respect to each such Grantor:

All of such Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

The Grantors shall, from time to time, execute and deliver to the Lender Agent, as the Lender Agent may reasonably request, all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as the Lender Agent reasonably deems necessary or advisable to ensure a first priority, perfected security interest in all or any portion of the Collateral.

[Describe pledged collateral, which should be consistent with the collateral descriptions in Sections 2, 3, 4 or 5 of each Security Agreement as appropriate]

Confidential

ANNEX B
TO JOINDER AGREEMENT

<u>Updated Information to Schedules I-XI and Attachment I
to each Security Agreement</u>

Confidential

## **Exhibit C-5**

## **Schedule of Bilateral Facilities**

SCHEDULE 7.01(t)

BILATERAL FACILITIES

| T# | Company Name | Internal Contract Number | Initial Termination Date | Description | Legal Entity Name |
|---|---|---|---|---|---|
| T212 | GMAC LLC | RES-07521 | 8/21/2008 | Credit Agreement between RFC LLC and GMAC LLC dated February 21, 2008 | Residential Capital, LLC, Residential Funding Company, LLC |
| T303 | Residential Capital, LLC | BUI-06824 | | Treasury form letter | Residential Capital, LLC |
| T912 | WestLB, AG, New York Branch | WES-03410 | 4/11/2008 | Seventh Amended and Restated Receivables Funding Agreement dated June 22, 2005 | RFC Construction Funding LLC, Residential Funding Company, LLC |
| T913 | WestLB, AG, New York Branch | WES-06779 | 4/11/2008 | Payout Agreement from RFC Construction to payout Alpine dated February 12, 2004 | X- Residential Funding Corporation, RFC Construction Funding LLC |
| T914 | Deutsche Bank AG | DEU-06544 | 6/30/2008 | Loan and Security Agreement between Resort Funding, DB & various lenders & agents dated January 26, 2006 | X- Residential Funding Corporation, RFC Resort Funding LLC, Residential Funding Company, LLC |
| T928 | Westpac Banking Corporation | WES-04893 | 7/2/2008 | GMAC-RFC Westpac Warehouse Trust Warehouse Subscription Agmt; GMAC-RFC Mgmt, Perpetual Trustee, GMAC-RFC Australia, Westpac Banking; dated September 6, 2006 | GMAC-RFC Australia Pty Ltd, GMAC-RFC Management Pty Limited |
| T410 | Unibanco—Uniao de Bancos Brasileiros S.A. | UNI-06200 | 8/15/2009 | Uncommitted Facility Agreement (English template) Unibanco and GMAC-RFC Brazil, dated July 17, 2006 | Residential Capital, LLC, GMAC-RFC Brazil Ltd. |
| T916 | Canadian Imperial Bank of Commerce | CAN-06859 | 8/30/2008 | Mortgage Purchase Agreement between Canadian Imperial Bank of Commerce & GMAC Residential Funding of Canada dated March 16, 2006 | X- Residential Funding Corporation, GMAC Residential Funding of Canada, Limited |
| T620 | The Royal Bank of Scotland PLC | THE-06201 | 5/31/2008 | Commitment Increase Notice to the Class C Variable Funding Note Loan Agreement from PREEMAC to RBS, dated June 18, 2007 | GMAC RFC Investements B.V., Preemac II, NL B.V. |
| T712 | RM Cheshire Limited | DEU-06214 | 12/15/2008 | Master Repurchase Agreement Extension: RM Cheshire Limited and GMAC, dated November 27, 2006 | Residential Funding Company, LLC, GMAC RFC Investements B.V. |
| T720 | RBS | | | | |
| T308 | Scotia Inveriat Casa De Bolsa, S.A. de | MEX-06825 | | Dual revolving certificates (spanish); GMAC Hipotecaria | GMAC Hipotecaria, S.A. |

C.V.                                                              dated December 15, 2005

| | | | | |
|---|---|---|---|---|
| T309 | Mexico Mtn Line | MEX-06826 | 12/15/2009 | Dual Revolving Certificate Program $5B (spanish); GMAC Financiera dated December 15, 2005 | GMAC Financiera, S.A. |
| T407 | Scotiabank Inverlat S.A. | MEX-06833 | | Uncommitted Facility Agreement; Scotiabank Inverlat, GMAC Mexicana, dated May 3, 2001 | X- Residential Capital Corporation, GMAC Financiera, S.A., GMAC Hipotecaria, S.A. |
| T413 | Banco Inbursa | BAN-06192 | 5/12/2008 | Current Account Credit Agreement (English) among Banco Inbursa & GMAC Financiera & GMAC Hipotecaria dated March 12, 2007 | GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, GMAC Financiera, S.A., GMAC Hipotecaria, S.A., Residential Funding Company, LLC, GMAC Mortgage, LLC, Residential Capital, LLC, GMAC — RFC Holding Company, LLC |

Schedule 7.01(t)-1

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

| T# | Company Name | Internal Contract Number | Initial Termination Date | Description | Legal Entity Name |
|---|---|---|---|---|---|
| T414 | Banco Del Bajio | BAN-06191 | 2/14/2013 | Current Account Credit Agreement among Banco Del Bajio & GMAC Hipotecaria & GMAC Financiera (English) dated February 15, 2007 | GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, Residential Capital, LLC, GMAC Financiera, S.A., GMAC Hipotecaria, S.A. |
| T416 | Banco Mercantil Del Norte, S. A.,y | BAN-06189 | 12/18/2009 | Bank Credit Line (English); Banco Mercantil Del Norte & GMAC Financiera dated December 19, 2006 | Residential Capital, LLC, GMAC Financiera, S.A., GMAC Hipotecaria, S.A. |
| T711 | International Finance Company | INT-06675 | 5/27/2010 | Trust Agreement Amendment (Spanish) dated March 30, 2007 | Residential Funding Company, LLC, GMAC Financiera, S.A. |
| T610 | Deutsche Trustee Company Limited | DEU-06230 | 11/7/2008 | Note Issuance Facility Deed - Deed of Amendment & Amended and Restated Agreement: GMAC-RFC, Silo No2, Conduit No2, Deutsche and others, dated October 4, 2005 | GMAC-RFC Limited, CONDUIT (NO. 2) LIMITED |
| T618 | Deutsche Bank Ag London | DEU-06193 | 12/11/2008 | Note Issuance Facility Deed among GRID (no5) Ltd, RM AYR Ltd, DB & GMAC-RFC Prop Fin Ltd dated Dec. 12, 2006 | GMAC-RFC Property Finance Limited |
| T619 | JPMorgan Chase Bank, National Association | JPM-06196 | 5/9/2008 | Note Issuance Facility Deed among Canal No. 6, Chariot Funding, Jupiter Securitization, JPM, Deutsche Trustee & GMAC-RFC Ltd dated Feb. 9, 2007 | GMAC-RFC Limited, CANAL (NO. 6) Limited |
| T919 | Morgan Stanley & Co. International Limited | RES-06862 | 9/28/2029 | Deferred Consideration Sale Agreement: Morgan Stanley & GMAC-RFC LTD, dated September 28, 2005 | GMAC-RFC Limited |
| T005 | Fannie Mae | FNM-06863 | | As Soon As Pooled Sale Agreement (FNMA-Gestation Repo)with Fannie Mae dated July 28, 2003 | X- GMAC Mortgage Corporation |
| T006 | JPMorgan Chase Bank, National Association | JPM-06864 | | Mortgage Loan Participation Sale Agreement; JP Morgan Chase, dated December 17, 2004 | GMAC Mortgage, LLC, GMAC Bank |
| T803 | Donaldson, Lufkin & Jenrette Securities Corp. | CRE-06557 | | Master Repurchase Agreement between Donaldsom, Lufkin & Jenrette Securities & Residential Funding Securities dated May 25, 2000 | Residential Funding Securities, LLC |

| | | | | | |
|---|---|---|---|---|---|
| T805 | Merrill Lynch Government Securities Inc. | MER-06615 | | Master Repurchase Agreement between Merrill Lynch Government Securities & Residential Funding Securities dated October 16, 2000 | Residential Funding Securities, LLC |
| T813 | Daiwa Securities America Inc. | DAI-03573 | | Master Repurchase Agreement between Daiwa Securities & Residential Funding Securities dated August 9, 2006 | Residential Funding Securities, LLC |
| T814 | FIMAT USA, LLC | FIM-03574 | | Master Repurchase Agreement between Fimat & Residential Funding Securities dated October 23, 2006 | Residential Funding Securities, LLC |
| T906 | Natixis Real Estate Capital Inc. | IXI-06809 | 11/28/2008 | Amended and Restated Loan and Security Agreement, IXIS dated September 30, 2005 | X- GMAC Mortgage Corporation |

Schedule 7.01(t)-2

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

| T# | Company Name | Internal Contract Number | Initial Termination Date | Description | Legal Entity Name |
|---|---|---|---|---|---|
| T932 | Citibank, NA | CIT-06399 | 6/10/2008 | Loan and Security Agreement, GMACM and Citibank dated September 10, 2007 | GMAC Mortgage, LLC, Residential Capital, LLC |
| T816 | BNP Paribas Securities Corp. | BNP-06176 | | Master Repurchase Agreement with BNP Paribas dated August 15, 2007 | Residential Funding Securities, LLC |
| T819 | Credit Suisse Securities (Europe) Limited | CRE-04745 | | Master Repurchase Agreement between Credit Suisse Securities (Europe) Ltd & RFC, LLC dated January 11, 2007 | Residential Funding Company, LLC |
| T922 | Credit Suisse Securities (USA) LLC | CSF-06561 | | Master Repurchase Agreement between Credit Suisse Securities & RFC dated May 16, 2006 | Residential Funding Company, LLC |
| T929 | Lehman Brothers Inc. | LEH-06634 | | Master Repurchase Agreement between Lehman & RFC dated March 14, 2006 | X- Residential Funding Corporation |
| T008 | Fannie Mae | FAN-06641 | | Master Repurchase Agreement # MP03986.1 — Amendment #43 dated October 23, 2007 | GMAC Mortgage, LLC, Residential Capital, LLC, GMAC LLC |
| T009 | Fannie Mae | FAN-06642 | | Master Repurchase Agreement Amendment 26 between Fannie Mae and GMAC Mortgage, dated October 23, 2007 | GMAC Mortgage, LLC, Residential Capital, LLC, GMAC LLC |
| T905 | Bear, Stearns & Co Inc | GMA-06810 | 2/25/2031 | Indenture between GMACM Home Equity Notes 2004 Variable Funding Trust & WF Bank dated February 24, 2004 | X- GMAC Mortgage Corporation, GMACR Mortgage Products, Inc., GMACM Home Equity Notes 2004 Variable Funding Trust |
| T909 | Barclays Bank PLC | BAR-07730 | 12/26/2008 | Second Amended and Restated Indenture between GMAC Servicer, BoNY, GMACM and RFC, LLC dated March 6, 2008 | Residential Funding Company, LLC, GMAC Mortgage Group, LLC, GMACR Mortgage Products, Inc. |
| T411 | JPMorgan Chase Bank, National Association | JPM-05093 | 7/31/2008 | Offer of Discretionary Line of Credit from JPM to GMACM dated March 6, 2007 | X- GMAC Mortgage Corporation |
| T412 | US Bank National Association | USB-05237 | | Letter for $1M Credit Facility; US Bank, dated October 26, 2006 | X- GMAC Mortgage Corporation |
| T214 | GMAC LLC | GMA-08354 | 10/17/2008 | Loan and Security Agreement between GMAC, RFC and GMACM dated April 18, 2008 | Residential Funding Company, LLC, GMAC Mortgage, LLC, Residential Capital, LLC, GMAC LLC |

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

| | | | | |
|---|---|---|---|---|
| T906 | Natixis Real Estate Capital Inc. | IXI-06809 | 11/28/2008 | Amended and Restated Loan and Security Agreement, IXIS dated September 30, 2005 | X- GMAC Mortgage Corporation |
| T932 | Citibank, NA | CIT-06399 | 6/10/2008 | Loan and Security Agreement, GMACM and Citibank dated September 10, 2007 | GMAC Mortgage, LLC, Residential Capital, LLC |
| T934 | | | | | |
| T215 | GMAC LLC | | | | |
| T903 | Credit Suisse First Boston Mortgage Capital LLC | CRE-06778 | 5/28/2008 | Master Repurchase Agreement: Credit Suisse First Boston (CSFB) dated December 20, 2004 | X- Homecomings Financial Network, Inc., X- Residential Funding Corporation, X- GMAC Mortgage Corporation |
| T921 | The Royal Bank of Scotland PLC | GRE-03367 | 6/19/2008 | Master Repurchase Agreement between Greenwich Capital Financial & RFC dated September 20, 2006 | Residential Funding Company, LLC, X- Homecomings Financial Network, Inc., Residential Capital, LLC |
| T924 | Lehman Commercial Paper Inc | LEH-04528 | 5/30/2008 | Master Repurchase Agmt: Lehman Commercial Paper & RFC, dated November 30, 2006 | Residential Funding Company, LLC |
| T930 | Bear Stearns Mortgage Capital Corporation | BEA-05001 | 6/19/2008 | Master Repurchase Agreement with Bear Stearns Mort Cap Co. dated March 12, 2007 | Residential Capital, LLC, Residential Funding Company, LLC |

Schedule 7.01(t)-3

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

| T# | Company Name | Internal Contract Number | Initial Termination Date | Description | Legal Entity Name |
|---|---|---|---|---|---|
| T002 | Bear Stearns International Limited | BAN-07104 | 10/31/2007 | Servicing Agreement among GMACM, Walnut Grove, and Bank One as Trustee dated January 31, 2003 | X- GMAC Mortgage Corporation |
| T003 | Bank of America, NA | HOR-06813 | 11/30/2007 | Mortgage Loan Purchase and Sale Agreement Amendment #1; BofA, Bank One, Horsham, GMACM dated June 20, 2002 | X- GMAC Mortgage Corporation |
| T716 | Bank of America, NA | BAN-06178 | 08/15/08 | Master Repurchase Agreement with BoA dated August 17, 2007 | GMAC Bank, GMAC Mortgage, LLC |
| T717 | JPMorgan Chase Bank, National Association | JPM-06733 | 8/11/2008 | MRA between JPMorgan & GMACM dated December 7, 2007 | GMAC Bank, GMAC Mortgage, LLC |
| T719 | Bank of America, NA and various other financial institutions | | | MRA dated on or about 6/24/2008 | |
| | Greenwich Capital Financial Products, Inc | | | | Residential Capital, LLC |

Excludes ResCap intercompany agreements, bank lines and loans.

Schedule 7.01(t)-4

**<u>Exhibit C-6</u>**

**<u>Master Repurchase Agreement for the BMMZ Facility</u>**

Confidential

**EXECUTION COPY**

# MASTER REPURCHASE AGREEMENT

**Dated as of December 21, 2011**

**By and Among:**

**BMMZ HOLDINGS LLC**, as Buyer

and

**GMAC MORTGAGE, LLC,** as Seller and Servicer

**RESIDENTIAL FUNDING COMPANY, LLC,** as Seller

and

**RESIDENTIAL CAPITAL, LLC,** as Guarantor

700900240 08048307

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Applicability | 1 |
| 2. | Definitions | 1 |
| 3. | Initiation; Request/Confirmation; Termination | 19 |
| 4. | Margin Maintenance | 25 |
| 5. | Income Payments | 26 |
| 6. | Grant and Release of Security Interest; Power of Attorney Grant | 27 |
| 7. | Payments and Computation | 31 |
| 8. | Segregation of Documents Relating to Purchased Mortgage Loans | 31 |
| 9. | Reserved | 31 |
| 10. | Representations, Warranties and Covenants | 31 |
| 11. | Events of Default | 46 |
| 12. | Servicing of the Purchased Mortgage Loans During the Interim Servicing Period | 51 |
| 13. | Reserved | 53 |
| 14. | Single Agreement | 53 |
| 15. | Notices and Other Communications | 53 |
| 16. | Joint and Several Liability of the Seller Parties | 54 |
| 17. | Further Assurances; Additional Information | 54 |
| 18. | Taxes | 54 |
| 19. | Wire Instructions | 55 |
| 20. | Entire Agreement; Severability | 55 |
| 21. | Non-assignability | 56 |
| 22. | Counterparts | 56 |
| 23. | Governing Law | 56 |
| 24. | No Waivers, Etc.; Amendment | 56 |
| 25. | Intent | 57 |
| 26. | Reserved | 57 |
| 27. | Hypothecation or Pledge of Repurchase Assets | 57 |
| 28. | Set-Off | 58 |
| 29. | JURISDICTION; WAIVERS | 59 |
| 30. | Indemnification and Expenses | 59 |
| 31. | General Interpretive Principles | 61 |
| 32. | Survival | 62 |
| 33. | No Reliance; Disclaimers | 62 |
| 34. | Termination | 63 |
| 35. | Periodic Due Diligence Review | 63 |
| 36. | Confidentiality | 64 |

- i -

Confidential

## SCHEDULES

SCHEDULE 1    MARKET VALUE

SCHEDULE 2    RESERVED

SCHEDULE 3    RESPONSIBLE OFFICERS

SCHEDULE 4    MORTGAGE SCHEDULE

SCHEDULE 5    LIST OF SERVICERS OF SERVICING RETAINED LOANS

## EXHIBITS

EXHIBIT A   FORM OF REQUEST/CONFIRMATION

EXHIBIT B   REPRESENTATIONS AND WARRANTIES RELATING TO THE
PURCHASED MORTGAGE LOANS

EXHIBIT C   FORM OF CUSTODIAL AGREEMENT

EXHIBIT D   [RESERVED]

EXHIBIT E   FORM OF GUARANTEE

EXHIBIT F   FORM OF BLOCKED ACCOUNT SERVICE AGREEMENT

EXHIBIT G   FORM OF SECURITY RELEASE CERTIFICATION

EXHIBIT H   FORM OF SERVICER ACKNOWLEDGMENT AND INSTRUCTION LETTER
(SERVICING RETAINED MORTGAGE LOANS)

EXHIBIT I   FORM OF OFFICER'S CERTIFICATE

700900240 08048307

Confidential

<div align="center">

**MASTER REPURCHASE AGREEMENT**

</div>

**Dated as of  December 21, 2011**

**Among:**

**BMMZ HOLDINGS LLC**, as buyer ( "Buyer"),

**GMAC MORTGAGE, LLC,** as seller and servicer ("GMACM", "Seller" or "Servicer", as the context shall require),

**RESIDENTIAL FUNDING COMPANY, LLC,** as seller, ("RFC", "Seller" and together with GMAC Mortgage, LLC, "Seller" or "Sellers"),

and

**RESIDENTIAL CAPITAL, LLC**, as Guarantor.

1.      **Applicability**

Subject to satisfaction of the conditions set forth herein and to the other provisions of this Agreement, the parties hereto shall enter into transactions in which the Sellers agree to transfer to Buyer, certain fixed and adjustable rate residential first and second lien mortgage loans, either servicing released or servicing retained, constituting Eligible Mortgage Loans, against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to such Seller such Eligible Mortgage Loans at a date certain, against the transfer of funds by such Seller.  Each such transaction shall be referred to herein as a "Transaction" and shall be governed by this Agreement, as the same shall be amended from time to time.

2.      **Definitions**

"Accepted Servicing Practices" shall mean with respect to any Mortgage Loan, those mortgage servicing practices which are in accordance with the applicable Guidelines.

"Adjustable Rate Mortgage Loan" shall mean a Mortgage Loan which provides for the adjustment of the Mortgage Interest Rate payable in respect thereto.

"Affiliate" shall mean with respect to any Person, any "affiliate" of such Person, as such term is defined in the Bankruptcy Code; provided, that the foregoing shall not include any special purpose entity that is an issuer, depositor, or borrower in any non recourse structured finance transaction.

"Agency" shall mean Freddie Mac, Fannie Mae or Ginnie Mae, as applicable.

"Agreement" shall mean this Master Repurchase Agreement, as it may be amended, supplemented or otherwise modified from time to time.

700900240 08048307

"Ally Financial" shall mean Ally Financial, Inc., a Delaware corporation, formerly known as GMAC Inc.

"Applicable Law" shall mean as to any Person, any law, treaty, rule or regulation (including the Investment Company Act of 1940, as amended) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Applicable Margin" shall have the meaning set forth in the Pricing Side Letter.

"Applicable Percentage" shall have the meaning set forth in the Pricing Side Letter.

"Appraised Value" shall mean, with respect to any Mortgaged Property, the lesser of (i) the appraised value thereof based upon the appraisal made at the time of origination of the related Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac, and (ii) the sales price of the related Mortgaged Property at such time of origination, except in the case of a Mortgaged Property securing a refinanced or modified Mortgage Loan, as to which it is either the appraised value determined above, or the appraised value determined in an appraisal at the time of refinancing or modification, as the case may be.

"Approved Trust Receipt" shall mean, a Trust Receipt issued by the Custodian to Buyer pursuant to the Custodial Agreement, evidencing delivery of a Note-Only Mortgage File or Complete Mortgage File, as the case may be, with respect to any Purchased Mortgage Loan and subject only to those Exceptions approved by Buyer in its sole discretion.

"AVM" shall mean an automated valuation model.

"Backup Servicer" means an entity acting as backup servicer agreed to by Buyer.

"Bankruptcy Code" shall mean the United States Bankruptcy Code of 1978, as amended from time to time.

"Blocked Account Service Agreement" means each Blocked Account Service Agreement among Buyer, Seller and the Control Bank with respect to the Collection Accounts, in substantially the form attached hereto as Exhibit F, together with all amendments, supplements and modifications from time to time entered into with respect thereto.

"BMMZ Holdings" shall mean BMMZ Holdings LLC, a Delaware limited liability company and a direct non-bank wholly-owned subsidiary of Ally Financial.

"Broker's Price Opinion" shall mean, with respect to a Mortgaged Property, a broker's price opinion prepared by a duly licensed real estate broker who has no interest, direct or indirect, in the related Mortgaged Property or in either Seller or any Affiliate of either Seller and whose compensation is not affected by the results of the broker's price opinion and which valuation indicates the expected proceeds for a sale of the related Mortgaged Property and, includes certain assumptions, including those as to the condition of the interior of the applicable Mortgaged Property and marketing time.

-2-

700900240 08048307

Confidential

"Business Day" shall mean any day other than (i) a Saturday or Sunday, and (ii) any day on which the New York Stock Exchange, the Federal Reserve Bank of New York or banking and savings and loan institutions located in the State of New York and the State of Minnesota, and other than for purposes of Section 4, Section 5, Section 10(iii)(r) and Section 11 of this Agreement, the State of Pennsylvania or the State of California, are authorized or required to close for business.

"Buyer's Interest" means, with respect to any Purchased Mortgage Loan, all of Buyer's right, title and interest to such Purchased Mortgage Loan pursuant this Agreement and the other Program Agreements, together with Buyer's precautionary security interest in the related Repurchase Assets.

"Capital Stock" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests, including, without limitation, limited and general partnership interests, in a person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents" shall mean (i) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States government or any agency thereof, (ii) certificates of deposit and eurodollar time deposits with weighted average maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000 and a rating of at least A+ and A1 from S&P and Moody's, respectively, (iii) repurchase obligations of any commercial bank satisfying the requirements of clause (ii) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (iv) securities with weighted average maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A+ by S&P or A1 by Moody's, (v) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (ii) of this definition or, (vi) shares of 2-a7 money market mutual funds rated AAA by Moody's & S&P that have a weighted average maturity of 90 days or less or similar funds which invest exclusively in assets satisfying the requirements of clauses (i) through (v) of this definition.

"Change of Control" means (i) the Disposition of all or substantially all of the assets of the Sellers and the Guarantor, taken as a whole (excluding any Dispositions of Purchased Mortgage Loans permitted pursuant to this Agreement), (ii) the Disposition of any material portion of the Sellers' and/or the Guarantor's servicing operations, taken as a whole, (iii) any "person" or "group" (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934), other than General Motors, Cerberus Capital Management, L.P., any of its affiliates or any affiliated funds or managed accounts, the United State Department of the Treasury, the GM Trusts, or any purchaser of the beneficial interest of General Motors in the GM Trusts, shall acquire ownership, directly or indirectly, beneficially or of record, in the aggregate, Capital

-3-

700900240 08048307

Confidential

Stock representing a majority of the Voting Stock of the Guarantor; or (iv) at any time, the Guarantor shall fail to own, directly or indirectly, 100% of the aggregate issued and outstanding Capital Stock of either Seller.

"Closing Date" December 21, 2011.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collection Accounts" shall mean the following accounts established by Sellers in accordance with Section 10(iii)(p) for the benefit of Buyer, "GMAC Mortgage, LLC - For Benefit of BMMZ Holdings LLC – Account # 796681807 and  "Residential Funding Company, LLC – For Benefit of BMMZ Holdings LLC – Account # 796681815."

"Complete Mortgage File" shall have the meaning set forth in the Custodial Agreement.

"Consolidated Liquidity" means the unrestricted and unencumbered cash and Cash Equivalents of the Guarantor, determined on a consolidated basis.

"Consolidated Net Worth" shall mean, at any date, the amount which would appear in accordance with GAAP on a consolidated balance sheet of Guarantor and its Subsidiaries opposite the heading "equity" (or any similar item).

"Consolidated Tangible Net Worth" shall mean, at any date, the result of (a) Consolidated Net Worth, minus (b) the net book value of all assets on the consolidated balance sheet of Guarantor used to calculate Consolidated Net Worth that would be treated as intangible assets under GAAP (including goodwill, trademarks, trade names, service marks, service names, copyrights, patents, organizational expenses and the excess of any equity in any Subsidiary over the cost of the investment in such Subsidiary, but not including mortgage servicing rights or any retained interest in securitized receivables), all as determined on a consolidated basis in accordance with GAAP.

"Control Bank" shall mean JPMorgan Chase Bank, N.A.

"Credit Limit" shall mean, with respect to each HELOC, the maximum amount permitted under the terms of the related Credit Line Agreement.

"Credit Line Agreement" shall mean, with respect to each HELOC, the related home equity line of credit agreement, account agreement and promissory note (if any) executed by the related Mortgagor and any amendment or modification thereof.

"Current" shall mean a Mortgage Loan, with respect to which no payment is currently Delinquent.

"Current Modified Mortgage Loan" shall mean a Current Mortgage Loan which (i) has been modified pursuant to a modification agreement executed on any determination date in the immediately preceding twelve (12) months or (ii) which has been modified pursuant to a modification agreement in existence for at least twelve (12) months (as determined on the related

-4-

Confidential

determination date) for which the related Mortgagor has been Delinquent at any time in the six months immediately preceding any determination date.

"Current Unmodified Mortgage Loan" shall mean a Current Mortgage Loan which (i) has not been modified at any time or (ii) which has been modified pursuant to a modification agreement in existence for at least twelve (12) months from the related determination date and for which the related Mortgagor has not been Delinquent at any time in the six months immediately preceding such determination date.

"Custodian" shall mean, Wells Fargo Bank, N.A. and any permitted successor thereto.

"Custodial Agreement" shall mean the Custodial Agreement entered into as of December 21, 2011, among Buyer, Sellers and Custodian, and all amendments, supplements and modifications from time to time entered into with respect thereto, providing for the custody of Mortgage Files relating to the Purchased Mortgage Loans.

"Default" shall mean an event that with notice or lapse of time or both would become an Event of Default.

"Delinquent" shall mean a Mortgage Loan that is thirty (30) days or more delinquent using the Mortgage Banker Association delinquency calculation method or with respect to which the related Mortgage Loan is a Lost Note Mortgage Loan.

"Disposition" shall mean, with respect to any Person, any sale or other whole or partial conveyance of all or any portion of such Person's Property, or any direct or indirect interest therein to a third party (other than in connection with the transfer of a Purchased Mortgage Loan to Buyer in accordance herewith), including the granting of any purchase options, rights of first refusal, rights of first offer or similar rights in respect of any portion of such assets or the subjecting of any portion of such assets to restrictions on transfer, but not including the grant of any Lien permitted pursuant to this Agreement.

"Draw" means, with respect to each HELOC, an additional borrowing by the Mortgagor in accordance with the related Credit Line Agreement.

"Electronic Tracking Agreement" shall mean an electronic tracking agreement entered into among Buyer, Sellers, MERSCORP, Inc. and Mortgage Electronic Registration, Systems, Inc., in form and substance acceptable to Buyer, and all amendments, supplements and modifications from time to time entered into with respect thereto.

"Eligible Mortgage Loans" shall have the meaning set forth in the Pricing Side Letter.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations promulgated thereunder.

"ERISA Affiliate" shall mean any corporation or trade or business that is treated as a single employer with any Seller Party within the meaning of Section 414(b), (c), (m) or (o) of the Code.

-5-

Confidential

"Event of Default" shall mean any of the events set forth in Section 11(i) hereof.

"Exception" shall have the meaning set forth in the Custodial Agreement.

"Expiration Date" shall mean the earlier of (a) the "Commitment Termination Date" (as defined in the LOC Agreement) and (b) December 19, 2012.

"Fannie Mae" shall mean the entity formerly known as the Federal National Mortgage Association, or any successor thereto.

"Fannie Mae Guides" shall mean the Fannie Mae Seller's Guide, the Fannie Mae Servicing Guide and all amendments and additions thereto.

"FHA" shall mean The Federal Housing Administration, an agency within the United States Department of Housing and Urban Development, or any successor thereto and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the FHA Regulations.

"Freddie Mac" shall mean the entity formerly known as the Federal Home Loan Mortgage Corporation, or any successor thereto.

"Freddie Mac Guides" shall mean the Freddie Mac Seller/Servicer Guide, and all amendments and additions thereto.

"GAAP" shall mean United States Generally Accepted Accounting Principles inclusive of, but not limited to, applicable statements of Financial Accounting Standards issued by the Financial Accounting Standards Board, its predecessors and successors and SEC Staff Accounting Guidance as in effect from time to time applied on a consistent basis.

"Ginnie Mae" shall mean the Government National Mortgage Association, or any successor thereto.

"Ginnie Mae Guides" shall mean the Ginnie Mae Handbook 5500.3 and all amendments and additions thereto.

"GMAC Facilities" means (i) that certain $1,600,000,000 line of credit facility provided by Ally Financial to the Sellers and (ii) that certain senior debt loan agreement provided by Ally Financial to the Sellers, each as in effect on the date hereof and as amended from time to time.

"GMAC-RFC Servicer Guide" the Servicer Guide for Residential Funding Company, LLC's mortgage loan purchase and conduit servicing program and all supplements and amendments thereto published by Residential Funding Company, LLC from time to time.

"GM Trusts" shall mean, one or more trusts initially naming General Motors as beneficiary thereof that were or will be established to hold Capital Stock in GMAC held directly or indirectly by General Motors as of May 20, 2009.

-6-

700900240 08048307

Confidential

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof or any governmental body, agency, authority, department or commission (including, without limitation, any taxing authority) or any instrumentality or officer of any of the foregoing (including, without limitation, any court or tribunal) exercising executive, legislative, judicial, regulatory or administrative functions over Buyer or any Seller Party.

"Government Modification Program" means the HAMP, the Home Affordable Unemployment Program, the Home Affordable Foreclosure Alternatives Program, the Second Lien Modification Program or any similar federal, state or local program providing for the modification of Mortgage Loans.

"Guarantor" shall mean Residential Capital, LLC.

"Guarantee" shall mean the master guarantee of Guarantor dated as of December 21, 2011, in substantially the form attached hereto as Exhibit E, together with all amendments, supplements and modifications from time to time entered into with respect thereto.

"Guidelines" shall mean the Freddie Mac Guides, the Fannie Mae Guides, the Ginnie Mae Guides or the GMAC-RFC Servicer Guide, as applicable, as such guides have been amended from time to time in accordance with this Agreement.

"HAMP" shall mean the Home Affordable Modification Program established pursuant to Sections 101 and 109 of the Emergency Economic Stabilization Act of 2008, as such program may be amended or modified from time to time.

"HELOC" shall mean a home equity revolving line of credit secured by a mortgage, deed of trust or other instrument creating a second lien on the related Mortgaged Property, which lien secures the related line of credit which shall include all Draws funded by the Sellers or Servicer, as applicable after the date hereof.

"Income" shall mean with respect to any Purchased Mortgage Loan, at any time, any principal payments and/or interest thereon, and Net Liquidation Proceeds thereof, but excluding: (a) escrow payments received on all Purchased Mortgage Loans; (b) servicing fees on Servicing Retained Mortgage Loans; (c) reimbursements of any servicing advances with respect to such Servicing Retained Mortgage Loans; (d) any incentive payments or recovery fees received (or, in the case of Servicing Retained Mortgage Loans, earned) by any servicer for loss mitigation efforts or collection efforts authorized by the Guidelines on any Purchased Mortgage Loan, including any incentives paid to the applicable servicer by HAMP; and  (e) late charges or other ancillary income customarily charged by servicers (and in the case of Servicing Released Mortgage Loans, to the extent received), such as fees on any Purchased Mortgage Loan, including, without limitation, to prepare demand statements, lien releases and subordination agreements.

"Indebtedness" shall mean, with respect to any Person at any date, the amount outstanding on such date under notes, bonds, debentures, or other similar evidences of indebtedness for money borrowed (including, without limitation, indebtedness for borrowed money evidenced by a loan account, guarantee or repurchase agreement).

-7-

700900240 08048307

Confidential

"Insolvency Law" shall mean any bankruptcy, reorganization, moratorium, delinquency, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction in effect at any time during the term of this Agreement.

"Interim Servicing Period" with respect to each Purchased Mortgage Loan that is a Servicing Released Mortgage Loan, the period of time from the Purchase Date to but not including the earlier of (i) the Servicing Transfer Date and (ii) the Termination Date.

"LIBOR" shall mean, with respect to each day on which any Transaction is outstanding (or if such day is not a Business Day, the next succeeding Business Day) and determined daily by Buyer, the offered rate for thirty (30) day U.S. dollar deposits, as the applicable rate appears on Reuters Screen LIBOR01 Page as of 11:00 a.m. (London time) on such date (rounded up to the nearest whole multiple of 1/100%); provided that if the applicable rate does not appear on Reuters Screen LIBOR01 Page, the rate for such date will be based upon the offered rates of the Reference Banks for U.S. dollar deposits as of 11:00 a.m. (London time) on such date.  In such event, Buyer will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If on such date, two or more Reference Banks provide such offered quotations, LIBOR shall be the arithmetic mean of all such offered quotations (rounded to the nearest whole multiple of 1/100%). If on such date, fewer than two Reference Banks provide such offered quotations, LIBOR shall be the higher of (i) LIBOR as determined on the immediately preceding day that LIBOR is available and (ii) the Reserve Interest Rate.  With respect to each Transaction, on the related Purchase Date and for each day that such Transaction is outstanding, LIBOR shall be calculated as specified in the related Request/Confirmation.

"Lien" shall mean any mortgage, lien, pledge, charge, security interest or similar encumbrance.

"LOC Agreement" means that certain Amended and Restated Loan Agreement (Line of Credit Agreement) dated as of December 30, 2009, between GMACM and RFC as borrowers, certain of their affiliates as guarantors, Ally Financial, as initial lender and as lender agent, and certain other financial institutions and persons from time to time party thereto as lenders, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, which governs the credit facility described in clause (i) of the definition of "GMAC Facilities."

"Lost Note Mortgage Loan" shall mean a Purchased Mortgage Loan for which the original Note has been permanently lost or destroyed and the related Mortgage File contains a duly executed lost note affidavit containing customary indemnities.

"Margin Call" has the meaning specified in Section 4(i) hereof.

"Margin Amount" means, with respect to any Transaction, as of any date of determination, the amount obtained by application of the Margin Percentage to the Repurchase Price for such Transaction as of such date.

"Margin Deficit" has the meaning specified in Section 4(i) hereof.

"Margin Percentage" shall have the meaning assigned thereto in the Pricing Side Letter.

-8-

Confidential

"Market Value" shall mean the value, determined by Buyer in its sole discretion, of the Mortgage Loans (including the related Servicing Rights except with respect to the Servicing-Retained Mortgage Loans), which may be determined by Buyer as if such Mortgage Loans are sold in their entirety to a single third-party purchaser and/or taking into account the fact that the Mortgage Loans may be sold under circumstances in which Seller, as originator or servicer of the Mortgage Loans is in default under this Agreement.  The initial Market Value of the Mortgage Loans shall equal the amounts set forth on Schedule 1.  The initial Market Value of the Mortgage Loans shall have no effect on Buyer's right to determine Market Value in its sole discretion as contemplated by this definition.  The Buyer's determination of Market Value shall be conclusive upon the parties, absent manifest error on the part of the Buyer.  The Buyer shall have the right to determine the Market Value of the Mortgage Loans on a daily basis, which Market Value may be determined to be zero with respect to one or more of the Mortgage Loans.  Sellers acknowledge that Buyer's determination of Market Value is for the limited purpose of determining the value of the Purchased Mortgage Loans which are subject to Transactions hereunder without the ability to perform customary purchaser's due diligence and is not necessarily equivalent to a determination of the fair market value of the Mortgage Loans achieved by obtaining competing bids in an orderly market in which the originator/servicer is not in default under a debt facility and the bidders have adequate opportunity to perform customary loan and servicing due diligence.  Sellers further acknowledge and agree that, notwithstanding any adjustments made to the Applicable Percentage with respect to a Purchased Mortgage Loan in accordance with the Pricing Side Letter, Buyer may concurrently re-determine the Market Value of such Purchased Mortgage Loan, including without, limitation, if such Purchased Mortgage Loan becomes a Note-Only Mortgage Loan or as a result of any adverse due diligence results or the Mortgagor or related Mortgaged Property or any portion thereof is subject to any bankruptcy proceeding or foreclosure proceeding.  For the purpose of determining the related Market Value, Buyer shall have the right to request at any time from each Seller, an updated valuation for each Mortgaged Property, in a form acceptable to Buyer in its sole discretion, not more than once in any three-month period.  The Market Value shall be deemed to be zero with respect to each Mortgage Loan for which such valuation is not provided within thirty (30) days after Buyer's request therefor.  Without limiting the foregoing, the Market Value shall be deemed to be zero with respect to each Mortgage Loan:

(1)     in respect of which there is a material breach of a representation and warranty set forth on Exhibit B to this Agreement (assuming each representation and warranty is made as of the date Market Value is determined);

(2)     which has been released from the possession of the Custodian under Section 5 of the Custodial Agreement to Seller or its bailee for a period in excess of the time limit set forth in the Custodial Agreement;

(3)     which has been released from the possession of the Custodian (i) under Section 5 of the Custodial Agreement under any Transmittal Letter in excess of the time period stated in such Transmittal Letter for release, or (ii) under Section 5 of the Custodial Agreement under an Attorney Bailee Letter, from and after the date such Attorney Bailee Letter is terminated or ceases to be in full force and effect;

-9-

700900240 08048307

Confidential

(4)     in respect of which (a) the related Note has been extinguished under relevant state law in connection with a judgment of foreclosure or foreclosure sale or otherwise or (b) the related Mortgage Property has become an REO Property;

(5)     [reserved];

(6)     if such Mortgage Loan has been modified, in respect of which the Custodian is not in possession of an original Note and the applicable modification agreements;

(7)     in respect of which the Mortgage Loan is a first lien Mortgage Loan that is Delinquent and a new Broker's Price Opinion has not been received by the one-hundred and twentieth (120th) day of delinquency;

(8)     in respect of which the Mortgage Loan is a second lien Mortgage Loan or HELOC and such Mortgage Loan is Delinquent;

(9)     which has been determined by Buyer (in its sole discretion) to be ineligible after a diligence review of the Mortgage Loan;

(10)    [reserved];

(11)    if such Mortgage Loan is a second lien Mortgage Loan, a HELOC or a Delinquent Mortgage Loan and the Purchase Price of such Mortgage Loan, when added to the aggregate Purchase Price of all other second lien Mortgage Loans, HELOCs and Delinquent Mortgage Loans then subject to outstanding Transactions (without double counting) exceeds 35% of the aggregate Purchase Price for all Transactions then outstanding in Buyer's sole determination; or

(12)    if a Servicer Acknowledgment and Instruction Letter has not been delivered on or before January 30, 2012 for such Servicing Retained Mortgage Loan by the applicable servicer listed on Schedule 5 hereto.

For the avoidance of doubt, the Market Value for any Mortgage Loan shall never exceed the value of such Mortgage Loan after taking into account any principal reductions, principal forgiveness or any other value reduction mandated by any Government Modification Program.

"Material Adverse Effect" shall mean a material adverse effect since December 31, 2010 on (a) the property, business, operations, financial condition or prospects of Guarantor and its Subsidiaries taken as a whole, (b) the ability of either Seller or Guarantor to perform its obligations under any of the Program Agreements to which it is a party, (c) the validity or enforceability of any of the Program Agreements, (d) the rights and remedies of Buyer under any of the Program Agreements, (e) the timely repurchase of the Purchased Mortgage Loans or payment of other amounts payable in connection therewith or (f) the Repurchase Assets; provided, however, that a Material Adverse Effect shall not include the occurrence of a ratings downgrade of Ally Financial, or any of its Affiliates (including Guarantor) or any of their

-10-

Confidential

outstanding debt (it being understood that the events giving rise to such downgrade may constitute a Material Adverse Effect).

"Material Affiliate" shall mean any or all of GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC and any Subsidiary of Guarantor which meets either of the following conditions: (i) the Guarantor and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of such Subsidiary exceeds 10% of the total assets of the Guarantor and its Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or (ii) such Subsidiary's income from continuing operations before income taxes, extraordinary items and the cumulative effect of a change in accounting principles exceeds 10% percent of such income of the Guarantor and its Subsidiaries on a consolidated basis for the most recently completed fiscal year; *provided that* the foregoing shall not include any special purpose entity that is an issuer, depositor, purchaser or borrower in any non-recourse structured finance transaction, or (z) any entity organized under the laws of any jurisdiction other than the United States, any state thereof, and the District of Columbia.

"Maximum Facility Amount" shall have the meaning set forth in the Pricing Side Letter.

"MERS" shall have the meaning assigned thereto in the Custodial Agreement.

"MERS Mortgage Loan" shall mean any Mortgage Loan as to which the related Mortgage or assignment of Mortgage has been recorded in the name of MERS, as agent for the holder from time to time of the Note, and which is identified as a MERS Mortgage Loan on the related Mortgage Schedule.

"Minimum Release Price" shall have the meaning set forth in Section 6(iv).

"Moody's" shall mean  Moody's Investors Service, or its successor in interest.

"Monthly Delivery Date" means the twelfth (12th) Business Day of each calendar month.

"Mortgage" shall mean the mortgage, deed of trust or other instrument creating a lien on an estate in fee simple interest (including a leasehold estate) in real property securing a Note.

"Mortgage File" has the meaning given to it in the Custodial Agreement.

"Mortgage Identification Number" shall mean the eighteen digit number permanently assigned by MERS to each Purchased Mortgage Loan which is a MERS Mortgage Loan.

"Mortgage Interest Rate" shall mean with respect to each Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Note.

"Mortgage Loan" shall mean a first lien mortgage loan or second lien mortgage loan (including without limitation, an Adjustable Rate Mortgage Loan, HELOC or an Option ARM Mortgage Loan), which Custodian has been instructed to hold for Buyer pursuant to the Custodial Agreement, and which Mortgage Loan includes, without limitation, (i) a Note, the related Mortgage and all other Mortgage Loan documents, (ii) all right, title and interest of

-11-

Confidential

Sellers in and to the Mortgaged Property covered by such Mortgage and (iii) with respect to each Servicing Released Mortgage Loan, the related Servicing Rights.

"Mortgaged Property" shall mean the real property securing repayment of the debt evidenced by a Note.

"Mortgage Schedule" shall mean, the "collateral tape" identifying the Purchased Mortgage Loans in hard copy or electronic format incorporating the fields mutually agreed to by Buyer and Seller from time to time, as the same shall be amended from time to time in accordance with this Agreement.

"Mortgagor" shall mean the obligor or obligors on a Note, including any Person who has assumed or guaranteed the obligations of the obligor thereunder.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by Sellers or any ERISA Affiliate and that is covered by Title IV of ERISA.

"Negative Amortization" shall mean with respect to a Mortgage Loan, that portion of interest accrued at the Mortgage Interest Rate in any month which exceeds the monthly payment on the related Mortgage Loan for such month and which, pursuant to the terms of the Note, is added to the principal balance of the Mortgage Loan.

"Negative Amortization Loan" shall mean each Mortgage Loan that may be subject to Negative Amortization.

"Net Cash Proceeds" means, with respect to any Disposition of Purchased Mortgage Loans, the proceeds thereof in the form of cash or cash equivalents, net of brokerage commissions and other fees and expenses (including fees, discounts and expenses of legal counsel, accountants and investment banks, consultants and placement agents) of such Disposition previously approved by Buyer in its sole discretion and reduced by amounts owed to the servicer for expenses and advances on the related Purchased Mortgage Loan as allowed by the Guidelines.

"Net Liquidation Proceeds" shall mean any proceeds from prepayments in full, short payoffs, note sale, or third party foreclosure sale, hazard insurance proceeds, mortgage insurance proceeds or other similar collections on a Purchased Mortgage Loan reduced by amounts owed to the servicer for expenses and advances on the related Purchased Mortgage Loan as allowed by the Guidelines.

"Note" shall mean either (i) an original promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan or (ii) a copy of a promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan accompanied by a duly executed lost note affidavit (containing customary indemnities).

"Note-Only Mortgage File" means a Mortgage File for any Mortgage Loan that is not a Complete Mortgage File, but with respect to which the Custodian is able to certify possession of

-12-

700900240 08048307

Confidential

the original Mortgage Note (and any intervening endorsements) and (if applicable) any related loan modification agreements.

"Note-Only Mortgage Loan" means a Purchased Mortgage Loan with respect to which a Note-Only Mortgage File has been delivered to the Custodian (and an Approved Trust Receipt issued to the Buyer), but a Complete Mortgage File has not been delivered to the Custodian for such Purchased Mortgage Loan.  For avoidance of doubt, if a Complete Mortgage File with respect to any Note-Only Mortgage Loan shall be delivered to the Custodian (and an Approved Trust Receipt issued to the Buyer), such Mortgage Loan shall cease to be a Note-Only Mortgage Loan for all purposes of this Agreement and the other Program Agreements.

"Obligations" shall mean (a) all of Sellers' joint and several obligations to pay the Repurchase Price on the Repurchase Date and other obligations and liabilities of Sellers to Buyer, its Affiliates, the Custodian or any other Person arising under, or in connection with, the Program Agreements or directly related to the Purchased Mortgage Loans, whether now existing or hereafter arising, together with interest thereon (including interest which would be payable as post-petition interest in connection with any bankruptcy or similar proceeding); (b) any and all sums paid by Buyer or on behalf of Buyer pursuant to the Program Agreements in order to preserve any Purchased Mortgage Loan or its interest therein; (c) in the event of any proceeding for the collection or enforcement of any of Sellers' obligations or liabilities referred to in clause (a), the reasonable expenses of retaking, holding, collecting, preparing for sale, selling or otherwise disposing of or realizing on any Purchased Mortgage Loan, or of any exercise by Buyer or any Affiliate of Buyer of its rights under the Program Agreements, including without limitation, reasonable attorneys' fees and disbursements and court costs; (d) all of Sellers' indemnity obligations to Buyer pursuant to the Program Agreements; and (e) all other obligations or amounts owed by Seller or Guarantor to Buyer under any other contract or agreement, in each case, whether such amounts or obligations owed are direct or indirect, absolute or contingent, matured or unmatured.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury.

"Option ARM Mortgage Loan" shall mean an Adjustable Rate Mortgage Loan in respect of which the related Note provides the Mortgagor with multiple monthly payment options.

"Payment Date" shall mean, (i) the 20th day of each calendar month commencing in January 2012, or, if such day is not a Business Day, the next succeeding Business Day or (ii) any other Business Day designated by Seller in accordance with Section 5(iii).

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permitted Tax Distributions" shall mean with respect to any period during which Guarantor is treated as a disregarded entity or partnership for U.S. federal, state and/or local income tax purposes, distributions to Guarantor's direct owner(s) (whether pursuant to a tax sharing agreement or otherwise) to fund the income tax liabilities of such owner(s) (or, if a direct owner is a pass-through entity, of an indirect owner) resulting from Guarantor being a

-13-

Confidential

partnership or a disregarded entity for federal, state and/or local income tax purposes, in an aggregate amount not to exceed the product of (a) the net taxable income of Guarantor for such period, calculated in accordance with applicable law, reduced by any cumulative net taxable loss with respect to all prior post-closing periods (determined as if all such periods were one period) to the extent such cumulative net taxable loss is of a character (ordinary or capital) that would permit such loss to be deducted against the income of the current period; and (b) the highest combined marginal federal, state and/or local income tax rate (taking into account the deductibility of state and local income taxes for federal income tax purposes and the character of the taxable income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any such direct or indirect owner of Guarantor. Permitted Tax Distributions may be made quarterly based on Guarantor's good faith estimate of its taxable income, with appropriate adjustments to be made on an annual basis based upon determination of Guarantor's actual taxable income.

"Person" shall mean an individual, partnership, corporation (including a business trust), limited liability company, unlimited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Plan" shall mean an employee benefit or other plan as defined in Section 3(3) of ERISA established or maintained by either Seller or any ERISA Affiliate and that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"Portfolio Remittance Report" shall mean, a report in form and substance satisfactory to Sellers and Buyer with respect to each Seller (in electronic form) listing, among other things any prepayments in whole or in part with respect to the Mortgage Loans and any repurchases by the related Seller and any Purchased Mortgage Loan for which the Mortgagor or the related Mortgaged Property or any portion thereof is subject to any bankruptcy proceeding or foreclosure proceeding (and indicating any such Purchased Mortgage Loans with a dated bankruptcy proceeding or foreclosure proceeding which have been added to such report from the last Portfolio Remittance Report).

"Post Default Rate" shall mean, in respect of the Repurchase Price for any Transaction or any other amount under this Agreement, or any other Program Document that is not paid when due to Buyer (whether at stated maturity, by acceleration or mandatory prepayment or otherwise), a rate per annum during the period from and including the due date to but excluding the date on which such amount is paid in full equal to 5.00% per annum, plus the Pricing Rate otherwise applicable to such Loan or other amount (which amount shall include the Applicable Margin).

"Price Differential" shall mean with respect to any Transaction hereunder as of any date, the aggregate amount obtained by daily application of the Pricing Rate (or during the continuation of an Event of Default, by daily application of the Post Default Rate) for such Transaction to the Repurchase Price (excluding accrued and unpaid Price Differential) as of the first day of any applicable accrual period for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any

-14-

Confidential

amount of such Price Differential previously paid by Sellers to Buyer with respect to such Transaction).

"Pricing Rate" shall mean for any Transaction, the per annum percentage rate for determination of the Price Differential, which rate shall be equal to the sum of (i) LIBOR as of such date of determination plus (ii) the Applicable Margin.

"Pricing Side Letter" that certain Pricing Side Letter, dated as of December 21, 2011 by and between Sellers, Buyer and Guarantor (as may be amended, modified or supplemented from time to time).

"Primary Seller Party" shall mean any or all of Sellers and Servicer.

"Program Agreements" shall mean this Repurchase Agreement, the Pricing Side Letter, the Blocked Account Service Agreements, the Custodial Agreement, all Request/Confirmations, the Electronic Tracking Agreement, the Guarantee, the Servicer Acknowledgment and Instruction Letters and any other agreement, document or instrument entered into in connection with the transactions contemplated herein or therein.

"Prohibited Jurisdiction" means, any country or jurisdiction, from time to time, that is the subject of a prohibition order (or any similar order or directive), sanctions or restrictions promulgated or administered by any Governmental Authority of the United States.

"Prohibited Person" shall mean any Person:

     (i)     listed in the Annex to (the "Annex"), or otherwise subject to the provisions of, the Executive Order;

     (ii)     that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

     (iii)     with whom the Buyer is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

     (iv)     who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

     (v)     that is named as a "specially designated national and blocked person" on the most current list published by the OFAC at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

     (vi)     who is an Affiliate of a Person listed above.

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

-15-

Confidential

"Purchase Date" shall mean the date with respect to each Transaction on which Mortgage Loans are sold by Sellers to Buyer hereunder.

"Purchase Price" shall have the meaning set forth in the Pricing Side Letter.

"Purchased Mortgage Loans" shall mean the Mortgage Loans sold by a Seller to Buyer in a Transaction hereunder, together with the related Servicing Records and the Servicing Rights appurtenant to such Mortgage Loans; provided, however that with respect to any Servicing Retained Mortgage Loans, "Purchased Mortgage Loans" shall not include such Servicing Rights or the related Servicing Records, but shall include any and all rights such Seller has under any servicing agreement or sub-servicing agreement including the right of such Seller to terminate any servicer or subservicer with or without payment of a termination fee and/or any right to purchase the Servicing Rights from the owner of such Servicing Rights.

"Records" means all instruments, agreements and other books, records, reports and data generated by other media for the storage of information maintained by Sellers, any of its Affiliates or agents, or its servicer or custodian with respect to a Purchased Mortgage Loan. Records shall include the Mortgage File, the Servicing Records, the credit file and any other instruments necessary to document or service a Purchased Mortgage Loan, including, without limitation, the complete payment and modification history of each Purchased Mortgage Loan.

"Reference Banks" shall mean any leading banks selected by Buyer which are engaged in transactions in Eurodollar deposits in the international Eurocurrency market with an established place of business in London.

"REO Property" shall mean real property improved by a residential dwelling, which was acquired by foreclosure, by deed in lieu of foreclosure, or by power of sale together with all buildings, fixtures and improvements thereon and all other rights, benefits and proceeds arising from and in connection with such property.

"Reporting Date" shall have the meaning specified in Section 10(iii)(a)(6).

"Repurchase Assets" has the meaning specified in Section 6(i).

"Repurchase Date" shall mean the earlier to occur of (i) for any Purchased Mortgage Loan, the "Repurchase Date" specified in the related Request/Confirmation and (ii) the Termination Date; provided, however, that the Repurchase Date shall also occur on any date requested by Seller with three (3) Business Day's prior notice to Buyer in connection with a repurchase of Purchased Mortgage Loans in accordance with Section 6(iv) of this Agreement.

"Repurchase Price" shall mean, with respect to any Purchased Mortgage Loan or the related Transaction, the price at which Purchased Mortgage Loans are to be resold by Buyer to a Seller upon termination of a Transaction, which will be determined in each case as the sum of the Purchase Price and the Price Differential as of the date of such determination, (i) as increased by any amount determined by the application of the provisions of Section 6 or Section 11 (if applicable) and which shall be payable to Buyer and (ii) as reduced by any payments made by Seller and applied pursuant to Section 5 and Section 6 (if applicable).

-16-

700900240 08048307

Confidential

"Request/Confirmation" shall mean the request and confirmation substantially in the form of Exhibit A hereto delivered pursuant to Section 3.

"Required Documents" shall have the meaning set forth in the Custodial Agreement.

"Reserve Interest Rate" shall mean with respect to any LIBOR determination date, the rate per annum that Buyer determines to be either (i) the arithmetic mean (rounded to the nearest whole multiple of 1/100%) of the one-month or overnight U.S. dollar lending rates (as applicable) which New York City banks selected by Buyer are quoting on the relevant LIBOR determination date to the principal London offices of leading banks in the London interbank market or (ii) in the event that Buyer can determine no such arithmetic mean, the lowest one-month or overnight U.S. dollar lending rate (as applicable) which New York City banks selected by Buyer are quoting on such LIBOR determination date to leading European banks.

"Responsible Officer" shall mean, as to any Person, the chief executive officer, the chief financial officer, the chief operating officer, treasurer, assistant treasurer, senior treasury services officer or chief accounting officer of such Person as set forth in Schedule 3 hereof or as to which a duly executed incumbency certificate has been delivered to Buyer.

"Restricted Payment" shall mean with respect to any Person, collectively, all dividends or other distributions of any nature (cash, securities, assets or otherwise), and all payments, by virtue of redemption or otherwise, on any class of equity securities (including, warrants, options or rights therefor) issued by such Person, which may hereafter be authorized or outstanding and any distribution in respect of any of the foregoing, whether directly or indirectly other than payments made in the ordinary course solely for the purpose of originating, servicing and/or administrating Mortgage Loans.

"Revolving Period"  means, with respect to a HELOC, the initial period during which the Mortgagor is required to make monthly payments of interest pursuant to the Credit Line Agreement.

"S&P" shall mean  Standard & Poor's, a division of the McGraw-Hill Companies, Inc., or its successor in interest.

"Section 404 Notice" shall mean the notice required pursuant to Section 404 of the Helping Families Save Their Homes Act of 2009 (P.L. 111-22), which amends 15 U.S.C. Section 1641 et seq., to be delivered by a creditor that is an owner or an assignee of a mortgage loan to the related Mortgagor within thirty (30) days after the date on which such mortgage loan is sold or assigned to such creditor.

"Security Release Certification" shall mean a security release certification in substantially the form set forth in Exhibit G hereto, or such other form as may be provided for in the documentation pursuant to which a Lien is created and authorized to be released.

"Seller Party" shall mean any or all of Guarantor, Sellers and Servicer.

"Servicer" shall mean GMAC Mortgage, LLC in its capacity as servicer of the Servicing Released Mortgage Loans.

-17-

700900240 08048307

"Servicer Acknowledgment and Instruction Letter" shall mean, with respect to all Servicing Retained Mortgage Loans, a letter in the form of Exhibit H executed by the Seller and acknowledged by the servicer or subservicer of such Servicing Retained Mortgage Loans.

"Servicer's Tape" a data file which shall contain all relevant information customarily included on a "servicer's tape" as mutually agreed by Buyer and Sellers.

"Servicing Delivery Requirement" shall have the meaning set forth in Section 10(iii)(v).

"Servicing Fee" shall have the meaning set forth in Section 5(ii).

"Servicing Records" shall have the meaning set forth in Section 12(ii) hereof.

"Servicing Released Mortgage Loans" shall mean those certain Mortgage Loans sold or proposed to be sold by a Seller to Buyer on a servicing released basis as indicated on the Mortgage Schedule by a listing of "GMACM(MortgageServ)" under the column titled "SERVICER_NAME".

"Servicing Retained Mortgage Loans" shall mean those certain Mortgage Loans sold or proposed to be sold by a Seller to Buyer on a servicing retained basis as indicated on the Mortgage Schedule by a listing of a servicer other than "GMACM(MortgageServ)" under the column titled "SERVICER_NAME".

"Servicing Rights" means contractual, possessory or other rights of Sellers and/or Servicer to administer or service any Purchased Mortgage Loans (or to possess any Records relating thereto), except with respect to the Servicing Retained Mortgage Loans, including: (i) the rights to service the Purchased Mortgage Loans; (ii) the right to receive compensation (whether direct or indirect) for such servicing, including the right to receive and retain the related servicing fee and all other fees with respect to such Purchased Mortgage Loans; and (iii) all rights, powers and privileges incidental to the foregoing, together with all Records relating thereto.

"Servicing Transfer Date" shall mean, with respect to the Servicer of the Servicing Released Mortgage Loans, the date that is forty-five (45) days after the earlier of (i) the termination of Servicer as servicer of the Servicing Released Mortgage Loans pursuant to Section 12 hereof, and (ii) the Purchase Date or any subsequent Payment Date on which the Interim Servicing Period is extended as provided in Section 12(iii).

"Subject Assets" shall mean real estate, mortgage loans or other assets acquired by a Seller Party or any of its Subsidiaries in the ordinary course of its business with customers.

"Sublimit Compliance Report" shall mean a schedule, reasonably acceptable to Buyer, demonstrating the compliance of the Purchased Mortgage Loans with Market Value limitations.

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of

-18-

700900240 08048307

whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"Termination Date" shall have the meaning assigned thereto in Section 34 hereof.

"Termination Event" shall have the meaning assigned thereto in Section 34 hereof.

"Trust Receipt" shall mean the receipt and certification for Mortgage Loans as further described in the Custodial Agreement.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the precautionary security interest in any Repurchase Asset is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"VA" shall mean the U.S. Department of Veterans Affairs, an agency of the United States of America, or any successor thereto.

"Voting Stock" shall mean, with respect to any Person, the Capital Stock issued by such Person that grants the holder or owner of such Capital Stock the right to vote for election of directors (or the equivalent thereof) of such Person under ordinary circumstances.

## 3. Initiation; Request/Confirmation; Termination

(i) With respect to the Transactions hereunder, Sellers shall deliver to Buyer on or prior to the proposed Purchase Date, a Request/Confirmation duly executed by such Seller and a Mortgage Schedule with respect to the Mortgage Loans proposed to be sold to Buyer; provided, that the Purchase Price for the proposed Transaction shall not exceed the Maximum Facility Amount. Notwithstanding anything in this Agreement to the contrary, Buyer shall be under no obligation to purchase any Mortgage Loan that is not an Eligible Mortgage Loan. Buyer shall, upon its receipt and approval thereof and satisfaction of the conditions set forth herein, execute and return the signed Request/Confirmation to such Seller to evidence the parties' agreement for the sale of Mortgage Loans described therein in accordance with this Agreement. In determining the Purchase Price to be set forth in the applicable Request/Confirmation, Buyer shall use the Market Value determined on the Purchase Date. Seller acknowledges and agrees that the Purchase Price paid in connection with each Purchased Mortgage Loan that is purchased in any Transaction (except for the Servicing Retained Mortgage Loans) includes a mutually negotiated premium allocable to the portion of such Purchased Mortgage Loans that constitutes the related Servicing Rights. Seller acknowledges and agrees that the Purchase Price paid for each Purchased Mortgage Loan that is a Servicing Retained Mortgage Loan includes a mutually negotiated premium allocable to the portion of such Purchased Mortgage Loans that constitutes any and all rights such Seller may have in the servicing agreement or sub-servicing agreement,

-19-

700900240 08048307

Confidential

with respect to such Mortgage Loan, including any right of such Seller to terminate any servicer or subservicer with or without payment of a termination fee and/or any right to purchase the related Servicing Rights from the owner of such Servicing Rights.

(ii)     [reserved]

(iii)     Not later than 11:00 a.m. (New York City time) on the Purchase Date, or such later time as Buyer allows, each Seller shall cause Custodian to deliver to Buyer by telecopier or electronic mail (with hard copy to follow on the following Business Day) an Approved Trust Receipt for the Mortgage Loans to be so purchased, reflecting delivery of a Note-Only Mortgage File or a Complete Mortgage File with respect to each Mortgage Loan.

(iv)     In the event of any conflict between the terms of a Request/Confirmation and this Agreement, such Request/Confirmation shall prevail.

(v)     [reserved]

(vi)     [reserved]

(vii)     <u>Conditions Precedent</u>.

(a) Notwithstanding anything herein to the contrary, as conditions precedent to the effectiveness of the Transactions under this Agreement, Buyer shall have received on or before the Closing Date the following in form and substance reasonably satisfactory to Buyer:

(1)     the Program Agreements (except the Electronic Tracking Agreement, the Servicer Acknowledgement and Instruction Letters and the Blocked Account Service Agreements) duly executed and delivered by the parties thereto which shall include a complete Schedule 5 listing each servicer with respect to the Servicing Retained Mortgage Loans;

(2)     any fees and expenses due and owing by Sellers and their Affiliates to Buyer and any of its Affiliates pursuant to the Pricing Side Letter or this Agreement,

(3)     an original good standing certificate for each Seller Party dated no earlier than five (5) Business Days prior to the initial Transaction, certified copies of the organizational documents for each Seller Party, certified copies of the corporate or limited liability company resolutions, as the case may be, for each Seller Party in which the Program Agreements and the transactions thereunder are approved, and all documents evidencing all other necessary corporate or limited liability company action and government approvals as may be required in connection with the execution and delivery of the Program Agreements;

(4)     an incumbency certificate of each Responsible Officer and secretary of each Seller Party (or person holding similar office or otherwise authorized) certifying the names, the signatures and titles of representatives duly

-20-

700900240 08048307

authorized to request Transactions hereunder and to execute this Agreement and any other documents to be delivered hereunder;

(5)    evidence that all actions necessary or in the opinion of Buyer desirable to perfect and protect Buyer's interest in the Repurchase Assets have been taken, including, without limitation, duly filed UCC financing statements on Form UCC-1 and receipt by Buyer of UCC lien searches of each Seller;

(6)    an officer's certificate certifying (i) that no material breach of any representations and warranties has occurred by any of the Seller Parties, (ii) that no Default or Event of Default shall have occurred and be continuing with respect to any Seller Party and (iii) to the Solvency of each of the Seller Parties;

(7)    [reserved];

(8)    an opinion of counsel to each Seller Party as to such matters as Buyer may reasonably request (including, without limitation, a standard closing opinion, a "repurchase agreement" opinion, enforceability of the Program Agreements, perfection and priority of the precautionary security interest in the Repurchase Assets, certain matters related to this Agreement, Title 11 of the United States Code and the Investment Company Act of 1940, as amended);

(9)    evidence of the establishment of the Collection Accounts and the deposit therein of all Income required on the Purchase Date pursuant to Section 5(i);

(10)    Buyer shall have determined that no Material Adverse Effect with respect to any of the Seller Parties has occurred and is continuing; and

(11)    [reserved];

(12)    [reserved];

(13)    [reserved];

(14)    [reserved];

(15)    [reserved];

(16)    such other documents as are reasonably requested by Buyer.

(b) Notwithstanding anything herein to the contrary, as conditions precedent to Buyer's performance on the Purchase Date:

(1)    no Margin Deficit shall be in existence immediately prior to entering into the requested Transaction;

-21-

Confidential

(2)    the aggregate Purchase Price for all Purchased Mortgage Loans, when added to the Purchase Price for the requested Transaction, shall not exceed the Maximum Facility Amount;

(3)    Buyer shall have received all fees and expenses due and owing to them and unpaid by Sellers, which fees and expenses may be netted out of any purchase proceeds paid by Buyer hereunder;

(4)    no Default or Event of Default shall have occurred or be continuing with respect to any Seller Party;

(5)    Buyer shall have received the Request/Confirmation duly executed by a Seller as provided in Section 3(i);

(6)    Buyer shall have received by 11:00 a.m. New York City time on each Purchase Date (A) the Sublimit Compliance Report, (B) the related Mortgage Schedule, (C) the Servicer's Tape and (D) such other information as reasonably requested by Buyer;

(7)    Buyer shall have received an Approved Trust Receipt with respect to all of the Mortgage Loans subject to the Transactions in accordance with Section 3(iii) above;

(8)    [reserved];

(9)    [reserved];

(10)    with respect to each Purchased Mortgage Loan that is subject to a security interest (including any precautionary security interest) immediately prior to the Purchase Date, Buyer shall have received a Security Release Certification for such Purchased Mortgage Loan that is duly executed by the related secured party and the applicable Seller;

(11)    no Material Adverse Effect shall have occurred;

(12)    (i) the Consolidated Tangible Net Worth of the Guarantor most recently reported shall be greater than or equal to $250,000,000 and (ii) the Consolidated Liquidity of Guarantor most recently reported shall be greater than or equal to $250,000,000;

(13)    None of the following shall have occurred and/or be continuing:

    (A)    an event or events shall have occurred in the good faith determination of the Buyer resulting in the effective absence of a "repo market" or comparable "lending market" for financing debt obligations secured by mortgage loans or an event or events shall have occurred resulting in the Buyer not being able to finance Purchased Mortgage

-22-

700900240 08048307

Confidential

Loans through the "repo market" or "lending market" with traditional counterparties at rates which would have been reasonable prior to the occurrence of such events or events; or

(B)    an event or events shall have occurred resulting in the effective absence of a "securities market" for securities backed by mortgage loans or an event or events shall have occurred resulting in the Buyer not being able to sell securities backed by mortgage loans at prices which would have been reasonable prior to such event or events; or

(C)    there shall have occurred (i) a material change in financial markets, an outbreak or escalation of hostilities or a material change in national or international political, financial or economic conditions; (ii) a general suspension of trading on major stock exchanges; or (iii) a disruption in or moratorium on commercial banking activities or securities settlement services; and

(14)    The Buyer shall not have received notice of any action, suit, arbitration, proceeding or investigation (or that to its knowledge is threatened) by or before any Governmental Authority affecting any of the Guarantor, any Seller, or any of their Subsidiaries or affecting any of the Property of any of them which, in the Buyer's good faith judgment, is reasonably likely to be adversely determined and which, if decided adversely, would have a reasonable likelihood or having a Material Adverse Effect.

(viii)    [reserved]

(ix)    On the Purchase Date, subject to satisfaction of the conditions precedent set forth herein, Buyer shall purchase the Purchased Mortgage Loans by remitting the Purchase Price to the applicable Seller by no later than 3:00 p.m. (New York City time) on such Purchase Date, and such Seller shall transfer such Purchased Mortgage Loans to Buyer or Custodian, as applicable.  Sellers shall repurchase the Purchased Mortgage Loans from Buyer at the related Repurchase Price, together with any other amounts payable hereunder, on the Repurchase Date in accordance with this Agreement.  On the related Repurchase Date, the applicable Seller shall remit the Repurchase Price, together with any other amounts payable hereunder, to Buyer not later than 3:00 p.m. (New York City time) and upon payment of such amounts by or on behalf of Seller to Buyer, Buyer shall re-transfer the Purchased Mortgage Loans to such Seller.  Such obligation to repurchase exists without regard to any prior or intervening liquidation or foreclosure with respect to any Purchased Mortgage Loans.

(x)    [reserved].

(xi)    [reserved].

(xii)    [reserved].

-23-

700900240 08048307

(xiii)   If a Seller fails to pay any amount payable by it hereunder within the applicable time period provided herein, such Seller shall pay to Buyer (in addition to, and together with, the amount of such Repurchase Price) interest on any unpaid Obligations at a rate per annum equal to the Post Default Rate until the amount of such Obligations is received in full by Buyer.  In no event shall interest payable hereunder at any time exceed the maximum rate permitted by applicable law.

(xiv)   Anything in this Agreement to the contrary notwithstanding, if, on or prior to the determination of the Pricing Rate with respect to any Transaction, (x) Buyer determines, which determination shall be conclusive and binding upon each Seller, that quotations of interest rates for the relevant deposits referred to in the definition of "Pricing Rate" herein are not being provided in the relevant amounts or for the relevant maturities for purposes of determining the Pricing Rate, or that as a result of any legal, accounting or regulatory change, the margin plus the relevant rate of interest referred to in the definition of "Pricing Rate" herein will not adequately cover the cost to Buyer of entering into or maintaining Transactions, or (y) Buyer determines, which determination shall be conclusive and binding upon Seller, that it has become unlawful for Buyer to honor its obligation to enter into or maintain Transactions hereunder using the Pricing Rate contemplated by this Agreement, then, in any such case, Buyer shall give such Seller prompt notice thereof and, so long as such condition remains in effect, Buyer shall be under no obligation to enter into additional Transactions, and such Seller shall, at its option, either within two (2) Business Days of receipt of such notice repurchase all Purchased Mortgage Loans then owned by Buyer or agree to repurchase such Purchased Mortgage Loans on the applicable Repurchase Date at a Repurchase Price determined by Buyer taking into account the increased cost to Buyer of maintaining the Transactions.

(xv)   Anything in this Agreement to the contrary notwithstanding, if any Applicable Law or any change in the interpretation or application thereof or compliance by Buyer with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof, (x) shall subject Buyer to any tax of any kind whatsoever with respect to this Agreement (excluding net income taxes imposed by the jurisdiction of its respective organization or where its respective commitment is booked) or change the basis of taxation of payments to Buyer in respect thereof, (y) shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by deposits or other liabilities in or for the account of entering into Transactions under this Agreement which is not otherwise included in the determination of the Pricing Rate hereunder, or (z) shall impose on Buyer any other condition, and the result of any of the foregoing is to increase the cost to Buyer, by an amount which Buyer deems to be material, of entering into, continuing or maintaining any Transaction or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Sellers shall promptly (but in any event within two (2) Business Days after receipt of notice thereof as provided in Section 3(xvii)) pay Buyer such additional amount or amounts as will compensate Buyer for such increased cost or reduced amount receivable thereafter incurred.

(xvi)   Anything in this Agreement to the contrary notwithstanding, if Buyer shall have determined that the adoption of or any change in any Applicable Law (other than with respect to any amendment made to Buyer's certificate of incorporation, by-laws or other organizational or governing documents) regarding capital adequacy or in the interpretation or application thereof

-24-

700900240 08048307

or compliance by Buyer or any corporation controlling Buyer with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Buyer's or such corporation's capital as a consequence of its obligations hereunder to a level below that which Buyer or such corporation (taking into consideration Buyer's or such corporation's policies with respect to capital adequacy) would have achieved but for such adoption or change, by an amount deemed by Buyer to be material, then from time to time, Sellers shall promptly (but in any event within two (2) Business Days after receipt of notice thereof as provided in Section 3(xvii)) pay to Buyer such additional amount or amounts as will thereafter compensate Buyer for such reduction.

(xvii)   Anything in this Agreement to the contrary notwithstanding, if Buyer becomes entitled to claim any additional amounts pursuant to subsections (xiv), (xv) or (xvi) of this Section 3, Buyer shall promptly notify Sellers of the event by reason of which it has become so entitled and shall give Sellers two (2) Business Days' notice prior to the application by Buyer of such increased costs to Sellers.  A certificate as to any additional amounts payable pursuant to any such subsections submitted by Buyer to Sellers shall be conclusive and binding on Sellers in the absence of manifest error.

## 4.    __Margin Maintenance__

(i)     At any time, or from time to time, if either (a) the aggregate Market Value or (b) the aggregate unpaid principal balance of all Purchased Mortgage Loans subject to all Transactions is less than the aggregate Margin Amount for all such Transactions (either such event, a "Margin Deficit"), then the Buyer may, by notice to Seller, require Seller in such Transactions to make a payment to Buyer to be applied to the outstanding Repurchase Price within the time period specified in clause (ii) below, so that both (x) the aggregate Market Value of the Purchased Mortgage Loans will thereupon equal or exceed such aggregate Margin Amount and (y) the unpaid principal balance of such Purchased Mortgage Loans will thereupon equal or exceed such aggregate Margin Amount (either such requirement, a "Margin Call").

(ii)    Notice of a Margin Call shall be given no later than 3:00 p.m. New York City time on any Business Day (and, if given later, shall be deemed given on the following Business Day) by email to all of the following Seller Party representatives:

| | |
|---|---|
| Collateral Management | ATS-CM@gmacrescap.com |
| Randy Newman | randall.newman@ally.com |
| Tim Pacitto | timothy.pacitto@ally.com |
| Jeff Oravec | jeffrey.oravec@ally.com |
| Khalifa Abdallah | Khalifa.abdallah@ally.com |
| Matt McAnally | Mathew.mcanally@ally.com |
| Scott McClellan | William.mcclellan@ally.com |
| Collateral Management | ATS-CM@gmacrescap.com |

Sellers may revise such list of representatives at any time by a Notice to Buyer given in accordance with Section 15 hereof. Any such Margin Call shall be satisfied no later than 3:00

-25-

Confidential

p.m. (New York City time) on the Business Day following the date on which such notice is given or deemed given.  The failure of Buyer, on any one or more occasions, to exercise its rights under this Section 4, shall not change or alter the terms and conditions of this Agreement or limit the right of Buyer to do so at a later date.  Sellers and Buyer each agree that a failure or delay by Buyer to exercise its rights hereunder shall not limit or waive Buyer's rights under this Agreement or otherwise existing by law or in any way create additional rights for Sellers.

5.    **Income Payments**

(i)    Sellers and Servicer shall cause all Income received on the Purchased Mortgage Loans from and including the applicable Purchase Date to be deposited into the applicable Collection Accounts.  Sellers and Servicer shall cause all Income with respect to the Purchased Mortgage Loans to be deposited directly in the applicable Collection Accounts no later than 5:00 p.m. (New York City time) on the second Business Day following the receipt thereof by (a) in the case of Servicing Released Mortgage Loans, the Servicer, or (b) in the case of Servicing Retained Mortgage Loans, any Seller Party; provided that in the case of the initial deposit of Income by the Servicer or the Seller Parties, as applicable, such deposit may be made no later than December 30, 2011.  Income in the Collection Accounts should not be invested.  All Income received by any Seller Party shall be the property of Buyer and shall be deemed held by such Seller Party solely in trust for Buyer pending the repurchase on the Repurchase Date.

(ii)    On each Payment Date prior to the occurrence and continuance of an Event of Default or a Termination Event, all Income on deposit in the Collection Accounts in respect of the Purchased Mortgage Loans as of the date set forth in the most recent Portfolio Remittance Report shall be applied for the following purposes and in the following order of priority:

(a) to Buyer, all accrued and unpaid expenses, fees and other amounts due and payable by Seller pursuant to this Agreement;

(b) if a Margin Deficit then exists, the amount such Margin Deficit;

(c) to Buyer, the applicable accrued and unpaid Price Differential accrued from and including the prior Payment Date (or in the case of the initial Payment Date, the Purchase Date) to but excluding such Payment Date;

(d) to Servicer, a servicing fee in an amount equal to 0.25% per annum on the outstanding principal balance of the Servicing Released Mortgage Loans (the "Servicing Fee"), as of the first day of the prior calendar month, payable monthly in arrears, to the extent accrued and unpaid; and

(e) all remaining funds to the applicable Seller.

(iii)    [reserved]

(iv)    If on any Payment Date, the amounts deposited in the Collection Accounts shall not be sufficient to make the payments required under clauses (a) through (d) of Section 5(ii), Sellers shall remit such shortfall to Buyer on such date.  On each monthly Payment Date to the extent not otherwise paid from the Collection Accounts pursuant to Section 5(ii), (a) Seller shall

-26-

700900240 08048307

Confidential

pay to Buyer the amount of all accrued and unpaid Price Differential calculated through but excluding such Payment Date and (b) to the extent the aggregate Repurchase Price for all Purchased Mortgage Loans is greater than the Maximum Facility Amount, Seller shall pay to Buyer an amount sufficient to reduce the aggregate Repurchase Price of all Purchased Mortgage Loans to an amount equal to or less than the Maximum Facility Amount in effect on such Payment Date.

(v)     Upon the occurrence and during the continuance of an Event of Default or a Termination Event, Buyer may apply any and all Income, including any funds in the Collection Accounts, to satisfy the Obligations in such order as Buyer may elect in its sole discretion until the Obligations have been paid in full.  Upon the occurrence and during the continuance of an Event of Default or a Termination Event, the Servicing Fee will stop accruing and the Servicer shall not be entitled to any Servicing Fee which is due and owing until all Obligations under this Agreement have been paid in full.

**6.     Grant and Release of Security Interest; Power of Attorney Grant**

(i)     Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, (a) as security for the performance by Seller of its obligations under the Program Agreements, each Seller hereby grants and pledges to Buyer a first priority security interest in all of its respective rights, title and interest in and to the following property whether now owned or existing, hereafter acquired or arising, or in which the Seller now or hereafter has any rights, and wheresoever located: (1) all of the Purchased Mortgage Loans, including all related Servicing Rights with respect to the Servicing Released Mortgage Loans and, with respect to the Servicing Retained Mortgage Loans, any rights such Seller has under any servicing agreement or sub-servicing agreement, including any right of such Seller to terminate any servicer or subservicer with or without payment of a termination fee and/or any right to purchase the related servicing rights from the owner of such servicing rights, and including all future Draws on any Purchased Mortgage Loans consisting of HELOCS; (2) all rights of each Seller to receive from any third party or to take delivery of any Servicing Records or other documents which constitute a part of the Mortgage File or servicing file, all rights of each Seller to receive from any third party or to take delivery of any Records or other documents which constitute a part of the Mortgage File or servicing file; (3) all insurance policies and insurance proceeds relating to any Purchased Mortgage Loans or the related Mortgaged Property, including, but not limited to, any payments or proceeds under any related primary mortgage insurance or hazard insurance; (4) all related Income, the Collection Accounts and all funds on deposit in and investments credited to, the Collection Accounts; (5) all other contract rights, accounts, payments, rights to payment (including payments of interest or finance charges), general intangibles and other assets relating to the Purchased Mortgage Loans (including, without limitation, any other accounts) and all other interests in the Purchased Mortgage Loans; (6) any other property, rights, title or interests as are specified on the Request/Confirmation and/or Trust Receipt, in all instances, whether now owned or hereafter acquired, now existing or hereafter created; and (7) all replacements, substitutions or distributions on or proceeds, payments or profits of any and all of the foregoing (collectively, with the assets set forth in clause (b) of this Section, the "Repurchase Assets") with respect to all Transactions hereunder and all proceeds thereof, and (b) notwithstanding that Servicer has no rights to the Servicing Rights relating to any Purchased Mortgage Loans (except for the

-27-

Confidential

Servicing Rights related to the Servicing Retained Mortgage Loans) or any appurtenant rights, to the extent that a court determines that Servicer has rights with respect to any such Servicing Rights (except for the Servicing Rights related to the Servicing Retained Mortgage Loans) and appurtenant rights, and as security for the performance by Servicer of its obligations under the Program Agreements, Servicer hereby grants and pledges to Buyer a first priority security interest in all of its rights, title and interest in and to the following property: (1) the Servicing Rights related to the Purchased Mortgage Loans (other than the Servicing Rights related to the Servicing Retained Mortgage Loans); (2) all rights of Servicer to receive from any third party or to take delivery of any servicing of the Purchased Mortgage Loans (other then the Servicing Retained Mortgage Loans); (3) all rights of Servicer to receive from any third party or to take delivery of all related Records (including Servicing Records and all other documents which constitute a part of the related Mortgage Files) (except for the Records related to the Servicing Retained Mortgage Loans); (4) all rights of Servicer to recover from any third party or to take delivery of any of the foregoing, in all instances, whether now owned or hereafter acquired, now existing or hereafter created; and (5) all replacements, substitutions or distributions on or proceeds, payments or profits of any and all of the foregoing.

(ii)     [reserved];

(iii)    Sellers hereby irrevocably authorize Buyer from time to time in Buyer's discretion to file financing statements relating to the Repurchase Assets and the precautionary security interest granted by Servicer, as Buyer may deem appropriate.  Sellers shall pay all fees and expenses associated with perfecting such security interest including, without limitation, the cost of filing financing statements under the UCC.

(iv)     At any time and from time to time prior to the payment in full of the Repurchase Price and all other Obligations payable by Sellers to Buyer hereunder, Sellers may repurchase any Purchased Mortgage Loan and request that the Buyer release Buyer's Interest in such Purchased Mortgage Loan by paying to the Buyer an amount equal to the Repurchase Price for such Purchased Mortgage Loan (such amount, the "Minimum Release Price"); provided that, in connection with Sellers' exercise of its right to repurchase any of the Purchased Mortgage Loans, the Minimum Release Price therefor shall not be drawn from or directly or indirectly be sourced from any of the GMAC Facilities, unless (a) Seller has arranged for a sale, other disposition or new financing transaction with respect to such Purchased Mortgage Loan that is scheduled to close no later than two (2) Business Days after the date of repurchase of such Purchased Mortgage Loan (and Seller reasonably believes that all conditions to the closing of such sale, other disposition or new financing transaction will be met on such schedule closing date) and the repurchase of such Purchased Mortgage Loan prior to the scheduled closing date of such other sale, other disposition or new financing transaction is reasonably advisable to effectuate such sale, other disposition or new financing transaction, (b) such Purchased Mortgage Loan has been referred for foreclosure or other liquidation (other than an sale of such Purchased Mortgage Loan) and the repurchase of such Purchased Mortgage Loan is reasonably advisable to facilitate such foreclosure or other liquidation, (c) as a result of Buyer's exercise of its rights under this Agreement to reduce the Market Value for any Purchased Mortgage Loan, the applicable Seller has reasonably determined in good faith that the financial terms of this Agreement are materially worse than the terms that Seller could otherwise obtain from a third party with respect to such Purchased Mortgage Loan, or (d) the aggregate Minimum Release Price for all such Purchased

-28-

Confidential

Mortgage Loans not described in clauses (a), (b) or (c) above that have been repurchased does not exceed $10,000,000; but provided, further, that the Sellers shall not repurchase any Purchased Mortgage Loan pursuant to the preceding proviso in anticipation of, related to, or in conjunction with, the commencement of a proceeding against either Seller or Guarantor or any Affiliate under any Insolvency Law.  On the applicable Repurchase Date, upon receipt of the Minimum Release Price by Buyer, Buyer shall redeliver the applicable Purchased Mortgage Loan to the applicable Seller and shall simultaneously release Buyer's Interest in such Purchased Mortgage Loan subject to the satisfaction of the conditions set forth in this Agreement for the release of Buyer's Interest.  The Minimum Release Price paid in connection with the release of Buyer's Interest in such Purchased Mortgage Loan shall be applied to repay the Repurchase Price with respect to such Purchased Mortgage Loan.  Notwithstanding anything to the contrary hereinabove or elsewhere in this Agreement, Buyer shall not redeliver any Purchased Mortgage Loan to Sellers nor shall it have any obligation to release Buyer's Interest in any Purchased Mortgage Loan if, prior to the payment of the Minimum Release Price by Seller, a Default or an Event of Default shall have occurred and be continuing or if such release would give rise to or perpetuate a Margin Deficit (except, in the case of a Default or a Margin Deficit, if such event is cured after giving effect to such repurchase).  For each Purchased Mortgage Loan for which the Market Value has been reduced to zero, Sellers shall have the right to request Buyer to release its Buyer's Interest in such Purchased Mortgage Loan and Buyer shall release Buyer's Interest so long as no Margin Deficit, Default or Event of Default shall have occurred.

(v)    [reserved]

(vi)    Sellers hereby irrevocably constitute and appoint Buyer and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact and agent with full irrevocable power and authority in the place and stead of Sellers and in the name of Sellers or in its own name, from time to time in Buyer's discretion, for the purpose of carrying out the terms of this Agreement, including without limitation, protecting, preserving and realizing upon the Repurchased Assets, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, including without limitation, to protect, preserve and realize upon the Purchased Mortgage Loans, provided, however, that Buyer shall not exercise such power of attorney unless an Event of Default has occurred and is continuing.  If an Event of Default shall have occurred and be continuing, for the purpose of carrying out the terms of this Agreement, Buyer may take any and all appropriate action and to execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, Sellers hereby grant Buyer the power and right, on behalf of Sellers, without assent by, but with notice to, the Primary Seller Parties to do the following:

(a)    in the name of a Seller, or in its own name, or otherwise to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any Repurchase Assets and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Buyer for the purpose of collecting any and all such moneys due with respect to any Purchased Mortgage Loans whenever payable;

700900240 08048307

Confidential

(b)    to obtain physical possession, and to commence an action to obtain physical possession of all documents relating to the Purchased Mortgage Loans;

(c)    to pay or discharge taxes and Liens levied or placed on or threatened against the Repurchase Assets;

(d)    subject to (y) applicable laws with respect to the servicing of residential mortgage loans and (z) in the case of Servicing Retained Mortgage Loans, the servicing rights of the party that owns them, (1) to direct any party liable for any payment under any Repurchase Assets to make payment of any and all moneys due or to become due thereunder directly to Buyer or as Buyer shall direct including, without limitation, the right to send "hello" letters or direct "goodbye" letters and Section 404 Notices on behalf of Sellers; (2) to ask or demand for, collect, receive payment of and receipt for any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Repurchase Assets; (3) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any Repurchase Assets; (4) to commence and prosecute (either in its name or the name of the applicable Seller Party) any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Repurchase Assets or any proceeds thereof and to enforce any other right in respect of any Repurchase Assets; (5) to defend any suit, action or proceeding (other than any class action or other suit alleging fraud, negligence or non-compliance with law or regulations, or similar allegations however pleaded with respect to origination, distribution or servicing of the Purchased Mortgage Loans, provided that Sellers shall execute such instruments as are necessary to, and authorize Buyer to, intervene in such proceedings to defend the interests of Buyer brought against Sellers with respect to any Repurchase Assets; (6) to settle, compromise or adjust any suit, action or proceeding described in clause (5) above and, in connection therewith, to give such discharges or releases as Buyer may deem appropriate; (7) to execute any endorsements, assignments or other instruments of conveyance or transfer with respect to the Repurchase Assets in connection with any sale provided for in Section 11(iv) hereof; and (8) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any Repurchase Assets as fully and completely as though Buyer was the absolute owner thereof for all purposes, and to do, at Buyer's option and Sellers' expense, at any time and from time to time following the occurrence and during the continuation of an Event of Default, all acts and things which Buyer deems necessary to protect, preserve or realize upon the Repurchase Assets and the Buyer's Interest thereon, all as fully and effectively as Sellers might do.

Sellers hereby ratify all that said attorneys and agents shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.  This power of attorney is a power coupled with an interest and shall be irrevocable.

Sellers also authorize Buyer, if a Default or Event of Default shall have occurred and be continuing, from time to time, to execute, in connection with any sale, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Purchased Mortgage Loans.

(vii)    At Buyer's sole option, exercisable prospectively or retrospectively with respect to the Purchased Mortgage Loans in whole or in part, and without notice to Sellers or any other

-30-

Confidential

person, (i) the sale of the Purchased Mortgage Loans to Buyer on each Purchase Date may be deemed a sale of a 100% participation interest, constituting 100% beneficial ownership, of the related Purchased Mortgage Loans, in lieu of a sale to the Buyer of the Purchased Mortgage Loans themselves, (ii) to such extent such Seller is deemed to retain legal title to the Purchased Mortgage Loans solely to service or supervise the servicing thereof and (iii) this Agreement will be deemed the related participation agreement in such event.

**7.    Payments and Computation**

(i)    Payments.  Except to the extent otherwise provided herein, all payments to be made by Sellers under this Agreement shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to Buyer at the following account maintained by the Buyer at Bank of America, Account Number 1257064883, For the A/C of BMMZ Holdings LLC Operating Account, ABA# 026009593, Reference: ResCap, not later than 3:00 p.m., New York City time, on the date on which such payment shall become due (each such payment made after 3:00 p.m. New York City time, on any day shall be deemed to have been made on the next succeeding Business Day). Sellers acknowledge that they have no rights of withdrawal from the foregoing account.

(ii)    Computations.  The Price Differential shall be computed on the basis of a 360-day year for the actual days elapsed (including the first day but excluding the last day) occurring in the period for which payable.   The Servicing Fee payable to the Servicer pursuant to Section 5(ii)(e) shall be computed for each calendar month on the basis of a 360-day year and the actual days in the month.

**8.    Segregation of Documents Relating to Purchased Mortgage Loans**

The books and records of the Primary Seller Parties shall identify the Purchased Mortgage Loans and all Records related thereto as being subject to this Agreement and the first-priority Buyer's Interest. Each Primary Seller Party will hold all such Records in its possession in trust for Buyer and shall maintain such Records in good and complete condition in accordance with the Guidelines and preserve them against loss.  Upon reasonable  notice from Buyer, the Primary Seller Parties shall make any and all such Records available to Buyer or its designee for examination, either by its own officers or employees, or by agents or contractors, or both, and make copies of all or any portion thereof.  Primary Seller Parties shall deliver all such Records to Buyer upon the occurrence of an Event of Default.

**9.    Reserved**

**10.    Representations, Warranties and Covenants**

(i)    Representations and Warranties.  Seller Parties hereby represent and warrant to Buyer at all times while the Program Agreements and any Transaction hereunder are in full force and effect:

(a) Existence.  Each Seller Party is duly formed, validly existing and in good standing under the laws of the jurisdiction in which it was formed.

-31-

Confidential

(b) <u>Power and Authority</u>.  Each Seller Party (a) has all requisite corporate or other power, and (b) has all governmental licenses, authorizations, consents and approvals, necessary in all material respects to own its assets and carry on its respective business as now being or as proposed to be conducted and any such licenses, authorizations, consents and approvals are in full force and effect, except to the extent that the failure to have any license, authorization, consent or approval shall not materially and adversely affect the validity or enforceability of the Program Agreements, or the value, saleability or collectability of the Purchased Mortgage Loans (<u>provided</u>, <u>that</u>, if promptly (but in any event within two (2) Business Days) upon discovery of the breach of this representation Sellers repurchase such affected Purchased Mortgage Loans, such breach in and of itself shall not constitute an Event of Default), or a Seller Party's ability to perform under the Program Agreements.

(c) <u>Good Standing</u>.  Each Seller Party is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by such Person makes such qualification necessary.

(d) <u>Compliance with Law</u>.  Each Seller Party is in compliance in all material respects with all applicable Requirements of Law.

(e) <u>Incumbency</u>.  The Person signing any Program Agreement on the behalf of any Seller Party has all requisite authority to do so and to bind such Seller Party.

(f) <u>Delivery of Financial Statements</u>.  The Guarantor has furnished to Buyer a copy of (1) the audited, consolidated financial statements of such Guarantor dated as of December 31, 2010, comprised of the consolidated statements of income or operations and cash flows for the preceding twelve (12) month period and the consolidated balance sheet as at December 31, 2010, and (2) the quarterly consolidated financial report of the Guarantor for the period ended September 30, 2011, each as prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, subject to ordinary, good faith year-end audit adjustments; and each of (1) and (2) are correct in all material respects and fairly present the consolidated financial condition of such Guarantor and its consolidated subsidiaries, as of the date thereof and consolidated results of operations for the period covered thereby.

(g) <u>No Litigation</u>.  There are no actions, suits, arbitrations, investigations or proceedings pending or, to its knowledge, threatened against any Seller Party or any Material Affiliate or affecting any of their respective Property before any Governmental Authority, (1) as to which there is a reasonable likelihood of an adverse decision, and which, in the event of an adverse decision, would reasonably be likely to have a Material Adverse Effect, (2) which questions the validity or enforceability of any of the Program Agreements, or (3) which seeks to prevent the consummation of any of the transactions contemplated by any Program Agreements; <u>provided</u>, <u>however</u>, that this representation shall not apply to (x) matters that have been disclosed to Buyer or Ally Financial prior to closing, or (y) matters arising from the attempts of  Sellers or their respective Subsidiaries to enforce obligations of

-32-

Confidential

Collateral Parties other than purported or certified class action law suits involving the Purchased Mortgage Loans taken as a whole which have a material impact on the enforceability, value, saleability or collectability of the Purchased Mortgage Loans or Buyer's interests in the Purchased Mortgage Loans.

(h) <u>No Breach</u>.    Neither the execution and delivery of the Program Agreements, nor the consummation of the transactions therein contemplated in compliance with the terms and provisions thereof will conflict with or result in a breach of (1) any of the organizational or constitutive documents of any Seller Party, (2) any Applicable Law, (3) any order, writ, injunction or decree of any Governmental Authority, (4) any other material agreement or instrument to which such Seller Party is a party or by which any of them or any of their Property is bound or to which any of them or their Property is subject, or (5) result in the creation or imposition of any Lien upon any Property of any Seller Party, pursuant to the terms of any such material agreement or instrument.

(i) <u>Valid and Binding Obligation</u>.    (1) Each Seller Party has all necessary authority and legal right to execute, deliver and perform its obligations under each of the Program Agreements to which it is a party; (2) the execution, delivery and performance by it of each of the Program Agreements to which any Seller Party is a party has been duly authorized by all necessary corporate or other action on its part; and (3) each Program Agreement to which any Seller Party is a party has been duly and validly executed and delivered by such Person and constitutes the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency marshalling and other similar laws governing the rights of creditors generally and by general principles of equity.

(j) <u>No Consents</u>.    No authorizations, approvals or consents of, and no filings or registrations with or notice to, any Governmental Authority or any other Person are necessary for (1) the execution, delivery or performance by any Seller Party of the Program Agreements to which such Person is a party, or (2) the legality, validity or enforceability of any such Program Agreement, that have not been obtained, except for filings and recordings in respect of the precautionary Liens created in favor of Buyer.

(k) <u>Taxes</u>.    Each Seller Party has filed all federal income tax returns and all other material tax returns that are required to be filed by them and have paid all taxes due pursuant to such returns or pursuant to any assessment received by any of them, except for any such taxes, if any, that are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided.  The charges, accruals and reserves on the books of such Seller Party in respect of taxes and other governmental charges are, in the opinion of such Seller Party, adequate.  Any taxes, fees and other governmental charges due and payable by such Seller Party in connection with the execution and delivery of each of the Program Agreements to which such Seller Party is a party have been paid.

-33-

Confidential

(l) <u>Investment Company</u>.  None of the Seller Parties or any of their respective Subsidiaries is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(m) <u>No Default or Event of Default</u>.  No Default or Event of Default has occurred and is continuing other than any such Default or purported Default that has been disclosed to Buyer in writing prior to the date hereof.

(n) <u>Location</u>.  The chief executive office and chief operating office of the Guarantor on the date hereof is located at 1100 Virginia Drive, Fort Washington, PA 19034. The chief executive office and chief operating office of GMACM on the date hereof is located at 1100 Virginia Drive, Fort Washington, PA 19034.  The chief executive office and chief operating office of RFC on the date hereof is located at 1100 Virginia Drive, Fort Washington, PA 19034.

(o) <u>Location of Books and Records</u>.  The location where each Seller keeps its corporate books and records is its chief executive office or chief operating office.

(p) <u>Accuracy of Information</u>.  The information, reports, financial statements, exhibits, projections and schedules furnished in writing by or with the written consent of any Seller Party in connection with the negotiation, preparation, delivery or administration of this Agreement and the other Program Agreements or otherwise with respect to the Repurchase Assets, any Mortgage Loans proposed to be sold to Buyer hereunder or delivered pursuant hereto or thereto, or any of the transactions contemplated hereby and thereby as of the date on which such information is stated or certified do not contain any untrue statement of material fact or omit to state any material fact necessary to make statements therein not misleading in light of the circumstances under which they were made.  All written information furnished after the date hereof by or with the written consent of any Seller Party in connection with this Agreement and the other Program Agreements and the transactions contemplated hereby and thereby will be true and correct in every material respect, or (in the case of projections) based on assumptions believed by a Responsible Officer or financial advisor of the Seller Parties in good faith to be reasonable, on the date as of which such information is stated or certified.  All Servicer Tapes furnished to Buyer by any Seller Party, prior to the date hereof, or after the date hereof, are true and correct in every material respect.

(q) <u>ERISA</u>.  Each Plan is in compliance in all material respects with, and has been administered in all material respects in compliance with, the applicable provisions of ERISA, the Code and all other applicable Federal and State laws, and no liability has been incurred with respect to a Multiemployer Plan, except as would not reasonably be expected to have a Material Adverse Effect or a material adverse effect on the value, collectability, saleability, validity or enforceability of a material portion of any Purchased Mortgage Loans or any of Buyer's rights therein or any Lien on the Repurchase Assets created in favor of Buyer.  None of the Seller Parties is acting on behalf of or using the assets of a Plan.

-34-

700900240 08048307

Confidential

(r) <u>Solvency; Fraudulent Conveyance</u>.   Each of the Seller Parties and its Subsidiaries are Solvent and will not cease to be Solvent due to any Transaction hereunder or the Guarantee (both immediately before and after giving effect to such Transaction or Guarantee).   The amount of consideration being received by Sellers upon their sale or transfer of any Purchased Mortgage Loan to Buyer constitutes reasonably equivalent value and fair consideration for such Purchased Mortgage Loan.   Sellers are not selling or transferring any Purchased Mortgage Loan with any intent to hinder, delay, or defraud any of its creditors. As used herein, the term "Solvent" means, with respect to the Seller Parties on a particular date, that on such date (i) the most recently reported value of the assets pursuant to Section 10(iii)(a) hereof of such Seller Party, taking into account the fair value of assets accounted for on a fair value basis and the carrying value of other assets, is greater than the total amount of the most recently reported liabilities pursuant to Section 10(iii)(a) hereof of such Seller Party (including the fair value of liabilities reported on a fair value basis), (ii) after giving effect to each Transaction, such Seller Party is able to realize upon its assets and pay its debts and other liabilities as they mature, assuming an orderly disposition, and (iii) such Seller Party does not have unreasonably small capital with which to conduct its business.

(s) <u>No Bankruptcy</u>.   During the preceding five years, no Seller Party has filed or had filed against it any bankruptcy, receivership or similar petitions nor has it made any assignments for the benefit of its creditors.

(t) <u>Margin Regulations</u>.   The use of funds by Sellers under this Agreement will not conflict with or contravene any of Regulation T, U or X promulgated by the Board of Governors of the Federal Reserve System as the same may be amended, supplemented or otherwise modified from time to time.

(u) <u>Mortgage File Documents</u>.   All Mortgage File documents disclosed by any Seller to Buyer pursuant to the Program Agreements or transferred to Buyer by delivery to Custodian pursuant to the Custodial Agreement are either original documents or true copies thereof.

(v) <u>Good Title; First Lien</u>.   The related Seller is, at the time it transfers to Buyer any Mortgage Loans for any Transaction, the sole legal and beneficial owner of such Mortgage Loans and has good and marketable title thereto, free of any Lien, security interest, option or encumbrance.   The provisions of this Agreement are effective to create in favor of Buyer a valid precautionary security interest in all right, title and interest of the related Seller in, to and under the Repurchase Assets.   Upon possession (as defined in the applicable UCC) by Custodian of each Note, endorsed in blank by a duly authorized officer of the related Seller, Buyer's Interest shall be a fully-perfected first-priority security interest therein, in the Purchased Mortgage Loan evidenced thereby and in the related Seller's interest in the related Mortgaged Property.   Upon the filing of financing statements on Form UCC-1 naming Buyer as "Secured Party" and each Seller as "Debtor", and describing the Repurchase Assets, in the jurisdiction of organization of each Seller, and the execution and delivery of all required Security Release Certifications, the precautionary security interests granted

-35-

700900240 08048307

Confidential

hereunder in the Repurchase Assets will constitute fully-perfected first-priority security interests under the UCC in all right, title and interest of such Seller in, to and under such Repurchase Assets, to the extent the same can be perfected by filing under the UCC.

(w) <u>No Material Adverse Effect</u>.  There has been no Material Adverse Effect since the date set forth in the most recent financial statements supplied to Buyer and no Seller Party is aware of any facts which (with notice or the lapse of time) would reasonably be expected to result in any such Material Adverse Effect.

(x) <u>Reserved</u>.

(y) <u>MERS</u>.  Each Seller is a member of MERS in good standing.

(z) <u>HELOC Provisions</u>.  With respect to each HELOC, each related Servicing Agreement shall require Seller or Servicer, as applicable, to (a) fund any related Draws, (b) to invoice Seller on a daily basis as draws occur for the additional balances so created and (c) to be deemed to have conveyed the additional balances to Seller upon any such funding.  Notwithstanding anything to the contrary herein, in no event shall Buyer have any obligation to either (a) fund any Draws with respect to any HELOC or (b) reimburse any Servicer for the funding of any Draws, which obligations shall be retained by Seller, or Servicer on behalf of Seller; provided that with respect to any HELOC sold to Buyer in a Transaction, such HELOC shall include all Draws made after the date of the initial Transaction.  With respect to each HELOC, if a Mortgagor requests an increase in the related Credit Limit, Seller shall cause Servicer to, in its sole discretion, either accept or reject the Mortgagor's request in accordance with the applicable servicing agreement and the Credit Line Agreement.  If the request for a Credit Limit increase is accepted, the increase will be effected by Seller, or Servicer on behalf of Seller, through modification of the HELOC with the Mortgagor.  Seller shall update the Mortgage Schedule to reflect the modification to the HELOC and shall deliver any modified Loan Documents to the Custodian.

(aa)      <u>USA Patriot Act; OFAC</u>.  No Seller Party nor any of its Affiliates is a Prohibited Person and each Seller Party is in full compliance with all applicable orders, rules, regulations and recommendations of OFAC.  No Seller Party nor any of its members, directors, executive officers, parents or Subsidiaries: (1) are subject to U.S. or multilateral economic or trade sanctions currently in force; (2) are owned or controlled by, or act on behalf of, any governments, corporations, entities or individuals that are subject to U.S. or multilateral economic or trade sanctions currently in force; (3) is a Prohibited Person or is otherwise named, identified or described on any blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other list of individuals or entities with whom U.S. persons may not conduct business, including but not limited to lists published or maintained by OFAC, lists published or maintained by the U.S. Department of Commerce, and lists published or maintained by the U.S. Department of State.  Each Seller Party has established an anti-money laundering

-36-

700900240 08048307

Confidential

compliance program as required by all applicable anti-money laundering laws and regulations, including without limitation the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "USA PATRIOT ACT") (collectively, the "Anti-Money Laundering Laws").

(bb)    Servicing Released/Servicing Retained Mortgage Loans. All of the Purchased Mortgage Loans serviced by the Servicer are Servicing Released Mortgage Loans and all Purchased Mortgage Loans serviced by a third-party servicer are Servicing Retained Mortgage Loans as set forth on the Mortgage Schedule delivered on the Purchase Date.

(ii)    Loan Level Representations and Warranties and Repurchase of Purchased Mortgage Loans. Sellers make the representations and warranties set forth at Exhibit B with respect to each Purchased Mortgage Loan as of the Purchase Date and at all times such Purchased Mortgage Loan is subject to a Transaction hereunder. Buyer acknowledges that Sellers are making certain of the representations and warranties on Exhibit B without actual knowledge whether those representations and warranties are true or false, and Sellers are making such representations and warranties solely as a means of allocating the risk of such matters not being true to the Sellers rather than the Buyer and to give the Buyer the remedies set forth in this Section 10(ii) if such representations and warranties are not true. Upon discovery by either Seller of a breach of any of the representations and warranties set forth on Exhibit B to this Agreement, Sellers shall give prompt written notice thereof to Buyer. Upon any such discovery by Buyer, Buyer will notify Sellers. It is understood and agreed that the representations and warranties set forth in Exhibit B to this Agreement with respect to the Purchased Mortgage Loans shall survive delivery of the respective Mortgage Files to Custodian or Buyer, as applicable, and shall inure to the benefit of Buyer. The fact that Buyer has conducted or has failed to conduct any partial or complete due diligence investigation in connection with the purchase of any Mortgage Loan hereunder shall not affect Buyer's right to demand repurchase as provided under this Agreement. Sellers shall, promptly (but in any event within two (2) Business Days) upon the earlier of discovery or receipt of notice with respect to any Purchased Mortgage Loan of any breach of a representation or warranty contained in Exhibit B of this Agreement, repurchase such Purchased Mortgage Loan at a purchase price equal to the applicable Repurchase Price. In the event that it is discovered that the circumstances with respect to any Purchased Mortgage Loan are not accurately reflected in any of the applicable representations and warranties made by Sellers set forth in Exhibit B hereto, notwithstanding the actual knowledge or lack of knowledge of Sellers, and notwithstanding that such representation and warranty is made "to the best of Sellers' knowledge," then such representation and warranty shall be deemed to be breached, such Purchased Mortgage Loan shall cease to be an Eligible Mortgage Loan, and Sellers shall repurchase the affected Purchased Mortgage Loan. Without limiting the rights of Buyer pursuant to Section 30, the remedies set forth in this Section 10(ii) shall be the sole remedies with respect to a breach of a representation or warranty set forth in Exhibit B.

(iii)    Covenants. On and as of the date of this Agreement and each day until this Agreement is no longer in force, each Seller Party (except where expressly stated otherwise) covenants as follows:

-37-

Confidential

(a) <u>Financial Statements; Other Reporting</u>.  The Sellers shall deliver to Buyer:

(1)    As soon as available and in any event within thirty (30) days after the end of each calendar month the consolidated balance sheets of the Guarantor as at the end of such calendar month and the related consolidated statements of income for the Guarantor for such month, setting forth in each case in comparative form the figures for the previous month;

(2)    As soon as available and in any event within forty-five (45) days after the end of each of the first three quarterly fiscal periods of each fiscal year of the Guarantor, the unaudited consolidated balance sheet of the Guarantor as at the end of such period, the related unaudited, consolidated statement of income for the Guarantor for such period and the portion of the fiscal year through the end of such period, and the related unaudited, consolidated statements of retained earnings and of cash flows for the Guarantor for the portion of the fiscal year through the end of such period, in each case setting forth in comparative form the figures for the previous year;

(3)    As soon as available and in any event within ninety (90) days after the end of each fiscal year of the Guarantor, the consolidated balance sheets of the Guarantor as at the end of such fiscal year and the related consolidated statements of income and retained earnings and of cash flows for the Guarantor for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall not be qualified as to scope of audit and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Guarantor at the end of, and for, such fiscal year in accordance with GAAP;

(4)    On or before March 31st of each year beginning March 31, 2012, the Servicer, at its expense, shall either (a) cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Buyer to the effect that such firm has examined certain documents and records for the preceding fiscal year (or during the period from the date of commencement of such Servicer's duties hereunder until the end of such preceding fiscal year in the case of the first such certificate), and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Servicer's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement, or (b) furnish to Buyer the Servicer's assessment of Servicer's compliance with the servicing criteria set forth in Section 1122(d) of Securities and Exchange Commission Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be

-38-

Confidential

attested to by a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants;

(5)     Together with each set of the financial statements delivered under clauses (a)(1) through (a)(3) above, a certificate of a Responsible Officer of each Seller (in substantially similar form as the certificate set forth in Exhibit I hereto) certifying (y) such Seller's compliance with the Consolidated Tangible Net Worth requirement and the Consolidated Liquidity requirement and setting forth the calculations demonstrating compliance the Consolidated Tangible Net Worth requirement and the Consolidated Liquidity requirement as of the close of business on the Business Day immediately preceding the date such certificate is delivered to Buyer, and (z) that no Default or Event of Default exists under any Program Agreement or the GMAC Facilities as of the date of such;

(6)     (i)     With respect to Servicing Retained Mortgage Loans, within one (1) Business Day of receipt by the applicable Seller Party, but in no event later than the tenth (10th) Business Day of each calendar month, Sellers shall deliver to Buyer a Mortgage Schedule and a Portfolio Remittance Report for such Servicing Retained Mortgage Loans; and

(ii)     With respect to the Servicing Released Mortgage Loans, (A) not later than the fifth (5th) Business Day of each calendar month, Servicer shall deliver to the Buyer, the Servicing Tape with respect to the Servicing Released Mortgage Loans and (B) not later than the eighth (8th) Business Day of each calendar month, Servicer shall deliver to the Buyer a Mortgage Schedule and a Portfolio Remittance Report for such Servicing Released Mortgage Loans (clause (i) and (ii) together, the "Reporting Dates");

(7)     From time to time such other information regarding the Purchased Mortgage Loans, financial condition, operations, or business of any or all of the Seller Parties, as Buyer may reasonably request;

(8)     As soon as is available, and in any event, (i) with respect to Purchased Mortgage Loans that become Delinquent, within one-hundred and twenty (120) days of such Delinquency and (ii) otherwise, if requested by Buyer, within seven (7) Business Days of the fifteenth (15th) day and the last day of each calendar month, copies of any appraisals, evaluation reports or Broker's Price Opinions obtained by Sellers or Servicers with respect to such Purchased Mortgage Loans in accordance with Accepted Servicing Practices;

(9)     As soon as reasonably possible, and in any event within thirty (30) days after a Responsible Officer of any Seller Party knows, or with respect to any Plan or Multiemployer Plan to which any Seller Party or any of their respective ERISA Affiliates makes direct contributions, has reason to believe, that any of the events or conditions specified below with respect to any such Plan or Multiemployer Plan has occurred or exists, a statement signed by a senior

-39-

Confidential

financial officer of the relevant Seller Party setting forth details respecting such event or condition and the action, if any, that such Seller Party or one of its ERISA Affiliates proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by the Seller Party or such ERISA Affiliates with respect to such event or condition):

(A)    any reportable event, as defined in Section 4043(c) of ERISA, with respect to a Plan, as to which the PBGC has not by regulation or otherwise waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event (provided that a failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, such that Section 430(k) of the Code would apply, shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(c) of the Code) and any request for a waiver under Section 412(c) of the Code for any Plan (each, a "Reportable Event");

(B)    the distribution under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or any action taken by any Seller Party or one of their respective ERISA Affiliates to terminate any Plan;

(C)    the institution by the PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by any Seller Party or one of their respective ERISA Affiliates of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan;

(D)    the complete or partial withdrawal from a Multiemployer Plan by any Seller Party or any of their respective ERISA Affiliates that results in liability to such Seller Party or ERISA Affiliate under Section 4201 or 4204 of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by any Seller Party from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA;

(E)    the institution of a proceeding by a fiduciary of any Multiemployer Plan against any Seller or any Guarantor or one of their subsidiaries to enforce Section 515 of ERISA, which proceeding is not dismissed within thirty (30) calendar days; and

(F)    the failure of any Plan to meet the requirements of Section 436 of the Code resulting in a loss of tax-exempt status of the trust of which such Plan is part under Section 401(a)(29) of the Code.

-40-

700900240 08048307

Confidential

The Guarantor may, in its sole discretion, satisfy its obligations under subclauses (2) and (3) above by filing with the Securities and Exchange Commission annual reports on Form 10-K and quarterly reports on Form 10-Q at such times and in accordance with the Securities and Exchange Commission's rules (subject to any discretionary extensions) and the instructions accompanying such forms; provided, however, that such obligations shall not be deemed to be fulfilled until Buyer shall have received notice of any such filing by such Guarantor (which notice shall be promptly communicated to Buyer).

(b) Preservation of Existence, Etc.  Each Seller Party will preserve, renew and keep in full force and effect its corporate existence and take all reasonable action to maintain all its rights, privileges and franchises necessary in the normal conduct of its business activities, except as otherwise permitted hereunder.

(c) No Merger.  No Seller Party will (1) merge or consolidate with or into, any other person, or (2) liquidate, wind up or dissolve (or suffer any liquidation, winding up or dissolution) or (3) sell or convey all or substantially all of its assets to any person, unless: in the case of (1) above (x) such Seller Party is the survivor or such Seller Party's successor is a person organized and existing under the laws of the United States or a state thereof and expressly assumes all of such Seller Party's obligations under the Program Agreements; (y) immediately after giving effect to such consolidation, merger, sale or conveyance, no Default or Event of Default shall have occurred and be continuing; and (z) the Guarantor confirms that the Guarantee shall remain in full force and effect.

(d) No Transactions with Affiliates.  No Seller Party shall enter into any transaction with any of its Affiliates (other than another Seller Party) unless such transaction complies with Section 7.07(l) of the LOC Agreement.

(e) No Restricted Payments.  No Seller Party shall make any Restricted Payments other than Permitted Tax Distributions, unless such Permitted Tax Distributions would cause the occurrence of a Default or Event of Default under this Agreement.

(f) Maintenance of Property.  Each Seller Party shall keep all Property useful and necessary in its business in good working order and condition.  Each Primary Seller Party shall maintain a fidelity bond and be covered by insurance of the kinds and in the amounts customarily maintained by similarly situated entities in the same jurisdiction and industry as such Person.

(g) Maintenance of Existence; Insurance.  Each Seller Party (other than Servicer to which Section 12(iv) hereof shall apply) shall (1) maintain all licenses, permits or other approvals necessary for it to conduct its business and to perform its respective obligations under the Program Agreements, except to the extent that the failure to have any license, authorization, consent or approval shall not have a Material Adverse Effect (provided, that, if promptly (but in any event with two (2) Business Days) upon discovery of the breach of this representation Sellers shall

-41-

Confidential

repurchase such affected Purchased Mortgage Loans, such breach in and of itself shall not constitute an Event of Default), and (2) remain in good standing under the laws of each state in which it conducts business.  Each Seller Party shall, and shall ensure that each subservicer, maintain errors and omissions insurance with fidelity bond and/or mortgage impairment insurance and blanket bond coverage in an amount customarily required by Fannie Mae and Freddie Mac (as disclosed to Buyer in writing) and shall not reduce such coverage except in accordance with the Fannie Mae Guides or Freddie Mac Guides, as applicable, and shall also maintain such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities.

(h) Taxes.  Each Seller Party shall pay and discharge or cause to be paid and discharged, when due, all taxes, assessments and governmental charges or levies imposed upon it or upon its income and profits or upon any of its Property, real, personal or mixed or upon any part thereof, as well as any other lawful claims which, if unpaid, might become a Lien upon such Properties or any part thereof, except for any such taxes, assessments and governmental charges, levies or claims as are appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are provided.  Each Primary Seller Party shall file on a timely basis all federal, and material state and local tax and information returns, reports and any other information statements or schedules required to be filed by or in respect of it.

(i) [Reserved].

(j) Preservation of Documents.  All documents with respect to the Purchased Mortgage Loans that are not delivered to Custodian are and shall be in the possession of any Seller Party and shall be held in trust by such Seller Party for the benefit of Buyer as the owner thereof.

(k) Delivery of Imaged Mortgage Files.  Sellers shall use reasonable efforts to provide imaged copies of the documents comprising the  Mortgage File for each Purchased Mortgage Loan within twelve (12) Business Days after the reasonable request therefor by Buyer.

(l) No Subservicers.  With respect to Servicing Released Mortgage Loans, no Primary Seller Party will appoint any subservicer with respect to the Purchased Mortgage Loans without the consent of Buyer.  With respect to Servicing Retained Mortgage Loans, each Primary Seller Party will provide Buyer with a list of all servicers and subservicers as required pursuant to Schedule 5 of this Agreement and shall not consent to any change in servicer or subservicer with respect to the Servicing Retained Mortgage Loans without the prior consent of Buyer and the concurrent delivery to Buyer of a Servicer Acknowledgment and Instruction Letter duly executed by such successor servicer or subservicer.

-42-

700900240 08048307

(m) <u>Preservation of Repurchase Assets</u>.  No Primary Seller Party shall:

(1)    take any action that would directly or indirectly materially impair or materially adversely affect its respective title to, or the value of, any of the Repurchase Assets;

(2)    create, incur or permit to exist any Lien in or on the Repurchase Assets other than the first-priority Lien granted to Buyer hereunder; or

(3)    sell, lease or otherwise dispose of any Repurchase Assets except as may otherwise be expressly permitted herein.

(n) <u>Compliance with Law</u>.  Each Seller Party shall comply with all applicable Requirements of Laws (including, without limitation, all environmental laws), whether now in effect or hereafter enacted or promulgated by any applicable Governmental Authority to the extent required to avoid a Material Adverse Effect.

(o) <u>Maintenance of Books and Records</u>.  Each Seller Party shall keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied.

(p) <u>Collection Accounts</u>.  On the initial Purchase Date, Sellers shall establish the Collection Accounts in Buyer's name for the sole and exclusive benefit of Buyer. The Collection Accounts shall be held at an institution acceptable to Buyer and Sellers and subject to a Blocked Account Service Agreement.  The Primary Seller Parties shall deposit, or credit to the Collection Accounts, all Income.  Such amounts deposited or credited shall be invested as provided in the Blocked Account Agreement.  No amounts on deposit or invested in any Collection Account shall be removed by any Seller Party at any time without Buyer's prior written consent.  All amounts on deposit in the Collection Accounts shall be applied as set forth in Section 5.

(q) <u>MERS</u>.  Each Primary Seller Party will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Purchased Mortgage Loans for as long as such Purchased Mortgage Loans are registered with MERS.

(r) <u>Notice of Material Events</u>.  The Seller Parties shall provide written notice to Buyer of any of the following:

(1)    Promptly (and in any event, within one (1) Business Day of any Primary Seller Party's knowledge of occurrence of such event) upon the occurrence of any Default or Event of Default;

(2)    Within three (3) Business Days of any Seller Party becoming aware of any default or event of default under any organizational or constitutive document of any Seller Party;

-43-

Confidential

(3)      Within ten (10) Business Days after (x) service of process is made on any Seller Party or any of their respective Subsidiaries or any agent thereof for service of process in respect of any legal or arbitrable proceedings affecting any Seller Party or any of its respective Subsidiaries, or (y) any Seller Party becomes aware of any investigation, regulatory action or proceeding that is pending or threatened by or against it or any of its respective Subsidiaries, in each case, that questions or challenges the validity or enforceability of any of the Program Agreements to which it is a party or as to which the matter in controversy exceeds $25,000,000;

(4)      Within one (1) Business Day of any Seller Party's becoming aware of any Material Adverse Effect or any event or change in circumstances which could reasonably be expected to have a Material Adverse Effect;

(5)      Within three (3) Business Days upon the entry of a judgment or decree against any Guarantor or any of its Subsidiaries in an amount in excess of $25,000,000;

(6)      Within three (3) Business Days upon any material change in accounting policies or financial reporting practices of either Guarantor, except for those changes that are in conformity with new or revised GAAP;

(7)      [reserved];

(8)      Any material change in the insurance coverage maintained by any Seller Party or any other person to comply with the requirements of this Agreement, with a copy of evidence of the same.

(9)      The removal of any Purchased Mortgage Loan from a proposed Disposition of Purchased Mortgage Loans along with the reason for such removal, promptly, but in no event more than thirty (30) days after such removal.

Each notice hereunder (except with respect to notices delivered pursuant to clause (7) above) shall be (i) accompanied by a statement of a Responsible Officer of the applicable Seller Party setting forth details of the occurrence referred to therein, and (ii) followed (within three (3) Business Days thereafter) by a statement of a such Responsible Officer stating what action such Seller Party has taken or proposes to take with respect thereto.

(s)  Defense of Title.  Each Seller warrants and will defend the right, title and interest of Buyer in and to all Repurchase Assets against all adverse claims and demands of all Persons whomsoever and Sellers shall take all necessary actions to establish and preserve Buyer's security interest in the Purchased Mortgage Loans.

(t)  [Reserved].

(u)  [Reserved].  .

-44-

Confidential

(v) <u>Delivery of Servicing Rights and Servicing Records</u>.  With respect to the Servicing Rights appurtenant to each Purchased Mortgage Loan that is a Servicing Released Mortgage Loan, Buyer shall own, and Sellers shall fully convey ownership of such Servicing Rights to Buyer on the related Purchase Date.  Sellers shall deliver (or cause the related subservicer to deliver) the Servicing Records (including any FHA or VA required records) and the physical and contractual servicing of each Purchased Mortgage Loan that is a Servicing Released Mortgage Loan, to Buyer or its designee upon the termination of Sellers or subservicer as the servicer or subservicer, respectively, pursuant to Section 12.  In addition, with respect to the Servicing Records for each Purchased Mortgage Loan that is a Servicing Released Mortgage Loan and the physical and contractual servicing of each such Purchased Mortgage Loan, the applicable Seller shall deliver (or cause the related subservicer to deliver) such Servicing Records and, to the extent applicable, the servicing to Buyer or its designee within thirty (30) days of the earlier of (i) the termination of Sellers or subservicer as the servicer or subservicer, respectively, of such Purchased Mortgage Loans and (ii) the related Purchase Date for each such Purchased Mortgage Loan (the "<u>Servicing Delivery Requirement</u>").  Notwithstanding the foregoing, such Servicing Delivery Requirement will be deemed restated for each such Purchased Mortgage Loan on each Payment Date (and the immediately preceding delivery requirement will be deemed to be rescinded), and a new 30 day Servicing Delivery Requirement will be deemed to commence for such Purchased Mortgage Loans as of such Payment Date upon written notice from Buyer of such reinstatement of such Servicing Delivery Requirement. Further, the Servicing Delivery Requirement will no longer apply to any Purchased Mortgage Loan that is a Servicing Released Mortgage Loan that is repurchased in full by Sellers or released by Buyer in accordance with the provisions of this Agreement and is no longer subject to a Transaction.  With respect to all Servicing Released Mortgage Loans, Sellers' transfer of the Servicing Rights, Servicing Records and the physical and contractual servicing under this Section shall be in accordance with customary standards in the industry and such transfer shall include the transfer of the gross amount of all escrows held for the related mortgagors (without reduction for unreimbursed advances or "negative escrows").

(w) [Reserved].

(x) <u>Material Change</u>.  Each Seller Party covenants that it shall not commence any  material business lines or activities not related to the servicing, origination, disposition or management of residential mortgage loans.

(y) <u>OFAC</u>.  At all times throughout the term of this Agreement, each Seller Party (a) shall be in full compliance with all applicable orders, rules, regulations and recommendations of OFAC and (b) shall not permit any Repurchase Assets to be maintained, insured, traded, or used (directly or indirectly) in violation of any United States statutes, rules or regulations, in a Prohibited Jurisdiction or by a Prohibited Person.

(z) <u>Reserved</u>.

-45-

Confidential

**11.**    **Events of Default** Each of the following events shall constitute an event of default (each an "Event of Default") hereunder:

(A)    Any Seller shall default in (1) the payment of Margin Deficit, Repurchase Price or Price Differential by the deadline set forth herein on the date such payment becomes due and payable, (2) the remittance of Income to the Collection Accounts in accordance with Section 5 or the remittance of any amounts required under Section 5(iv), or (3) any indemnity payment or other payment obligations of any kind (other than those set forth in clauses (1) and (2) above) owed to Buyer under any Program Agreement within two (2) Business Days of when the same shall become due any payable;

(B)    [Reserved];

(C)    The Guarantor shall default in the payment of any amount with respect to its obligations under the Program Agreements;

(D)    Any representation, warranty or certification made or deemed made in this Agreement by any Seller Party (other than the representations and warranties set forth in Exhibit B hereto which shall be considered solely for the purpose of determining the Market Value of the Purchased Mortgage Loans; unless (1) such Seller shall have made any such representations and warranties with knowledge that they were materially false or misleading at the time made, or (2) any such representations and warranties have been determined by Buyer in its sole discretion to be materially false or misleading on a regular basis after discovery by such Seller or notice to such Seller, notwithstanding the fact that such representations and warranties shall have been made to such Seller's knowledge or to the best of such Seller's knowledge), or any certificate furnished to Buyer pursuant to the requirements of any Program Agreement shall prove to have been false or misleading in any material respect as of the time made or furnished after the earlier of (1) receipt by such Seller Party of notice thereof from Buyer or (2) the discovery of such failure by any Seller Party;

(E)    Any Seller Party shall fail to comply with the requirements of any of (1) Section 10(iii)(a)(9), Section 10(iii)(b), Section 10(iii)(c), Section 10(iii)(d), Section 10(iii)(e), Section 10(iii)(j), Section 10(iii)(l), Section 10(iii)(m) Section 10(iii)(p), Section 10(iii)(t), Section 10(iii)(x) or Section 10(iii)(bb), (2) Section 10(iii)(a)(6), Section 10(iii)(y) or Section 10(iii)(w) and such failure to comply with the requirements of such section continue unremedied for a period of one (1) Business Day after the date required for performance, or (3) Section 10(iii)(a)(8) and such failure to comply with the requirements of such section continue unremedied for a period of two (2) Business Day after such failure occurs.

(F)    Any Seller Party shall otherwise fail to observe or perform any other obligation or covenant contained in this Agreement and not otherwise addressed in this Section 11, and such failure to observe or perform shall continue unremedied for a period of ten (10) Business Days after the earlier of (1) receipt by such Seller Party of notice thereof from Buyer or (2) the discovery of such failure by any Seller Party;

-46-

700900240 08048307

Confidential

(G)     Any judgment or order for the payment of money in excess of $25,000,000 shall be rendered against any Seller Party or any Material Affiliate, by a court, administrative tribunal or other body having jurisdiction over them and the same shall not be satisfied or discharged (or provisions shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within thirty (30) days from the date of entry thereof or, if a stay of execution is procured, thirty (30) days from the date such stay is lifted;

(H)     Any Seller Party shall admit in writing its inability to, or intention not to, perform any of its obligations under one or more Program Agreements;

(I)     (1) Any Seller Party or any Material Affiliate files a voluntary petition in bankruptcy, seeks relief under any provision of any Insolvency Law or consents to the filing of any petition against it under any such law; (2) a proceeding shall have been instituted by any Affiliate of any Seller Party or Material Affiliate in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Seller Party or Material Affiliate in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Seller Party or Material Affiliate, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs; (3) a proceeding shall have been instituted by any Person (other than an Affiliate of such Seller Party or Material Affiliate) in a court having jurisdiction in the premises seeking a decree or order for relief in respect of any Seller Party or any Material Affiliate in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Seller Party or Material Affiliate, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs and such proceeding or petition (a) results in judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for such Seller Party's or Material Affiliate's winding-up or liquidation or (b) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof, (4) the admission in writing by any Seller Party or any Material Affiliate of its inability to pay such its debts as they become due, (5) any Seller Party or any Material Affiliate consents to the appointment of or taking possession by a custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official, of all or any part of its Property or any custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official takes possession of all or any part of the Property of any Seller Party or any Material Affiliate; (6) any Seller Party or any Material Affiliate makes an assignment for the benefit of any of its creditors; (7) any Seller Party or any Material Affiliate generally fails to pay its debts as they become due; or (8) any action of any Seller Party or any Material Affiliate to authorize any of the foregoing;

(J)     Any Governmental Authority or any Person, agency or entity acting or purporting to act under Governmental Authority (including any Agency) shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the Property of any Seller Party or any Material Affiliate, or shall have taken any action to displace the management of any Seller Party or any Material Affiliate

-47-

Confidential

or to curtail any Seller Party's or any Material Affiliate's authority in the conduct of its business;

(K)    (i) Any Seller Party or any ERISA Affiliate shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) a determination that a Plan is "at risk" (within the meaning of Section 303 of ERISA) or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Seller or any ERISA Affiliate, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Buyer, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Plan shall terminate for purposes of Title IV of ERISA, (v) any Seller or any ERISA Affiliate shall, or in the reasonable opinion of the Buyer is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization of, a Multiemployer Plan, (vi) any Seller or any ERISA Affiliate shall file an application for a minimum funding waiver under Section 302 of ERISA or Section 412 of the Code with respect to any Plan, (vii) any obligation for post-retirement medical costs (other than as required by COBRA) exists, or (viii) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect;

(L)    The Electronic Tracking Agreement has not been duly executed and delivered by the parties thereto within ten (10) Business Days of notice from Buyer to Seller that Buyer is a member of MERS.

(M)    Any "event of default" or other breach or failure to perform shall have occurred and shall be continuing beyond the expiration of any applicable grace period under the GMAC Facilities;

(N)    Any "event of default" or other breach or failure to perform shall have occurred and shall be continuing beyond the expiration of any applicable grace period under the terms of any repurchase agreement or loan and security agreement or similar credit facility or agreement for borrowed funds entered into by any Seller Party or any Material Affiliate on the one hand and any third party (including an Affiliate of any Seller Party), which relates to the Indebtedness or other obligations of such Seller Party or any Material Affiliate in an amount individually or in the aggregate greater than $25,000,000;

(O)    The Blocked Account Control Agreements have not been duly executed and delivered by Sellers and Control Bank to Buyer on or prior to December 30, 2011;

(P)    Buyer's Interest is not or ceases to be a first-priority perfected interest in the Purchased Mortgage Loans and the Repurchase Assets;

(Q)    A Material Adverse Effect shall have occurred;

-48-

Confidential

(R)    The Guarantor's (i) Consolidated Tangible Net Worth as of the last Business Day of each fiscal month shall be less than $250,000,000 or (ii) Consolidated Liquidity as of any Business Day shall be less than $250,000,000; provided the Seller Parties agree that any proposed change to the GMAC Facilities or any other financing facility which has the effect of imposing a financial covenant which is more restrictive or in addition to this subsection 11(i)(R) shall be notified to Buyer two (2) Business Days prior to its effectiveness and if in the sole judgment of Buyer such proposed change is more restrictive or in addition to the financial covenant contained in this subsection 11(i)(R), such financial covenant(s) shall be deemed to be incorporated by reference into this subsection 11(i)(R), and shall thereafter continue in effect for purposes of this Agreement.  Any such incorporation by reference into this subsection 11(i)(R) shall take effect concurrently with the effectiveness of the relevant provision in the GMAC Facilities.  Notice of such incorporation shall be provided by Buyer to the parties hereto.

(ii)    If an Event of Default shall have occurred and be continuing then Buyer, shall notify Sellers that the commitments hereunder are terminated and/or the Repurchase Date for each Transaction hereunder shall be deemed to have immediately occurred (which option shall be deemed to have been exercised, even if no notice is given, immediately upon the occurrence of an Event of Default under Section 11(i)(H), 11(i)(I) or 11(i)(J) with respect to any Seller Party).

(iii)    If Buyer has or is deemed to have exercised the option referred to in subsection (ii) of this Section, (a) Sellers' obligations hereunder to repurchase all Purchased Mortgage Loans in such Transactions shall thereupon become immediately due and payable, (b) to the extent permitted by applicable law, the Repurchase Price with respect to each such Transaction shall be increased by the aggregate amount obtained by daily application of (x) the Post Default Rate to (y) the Purchase Price for such Transaction as of the Repurchase Date as determined pursuant to subsection (ii) of this Section (decreased as of any day by (1) any amounts retained by Buyer with respect to such Repurchase Price, (2) any proceeds from the sale of Purchased Mortgage Loans applied to the Repurchase Price pursuant to subsection (iv) of this Section, and (3) any amounts credited to the account of a Seller) on a 360 day-year basis for the actual number of days during the period from and including the date of the Event of Default giving rise to such option to but excluding, the date of payment of the Repurchase Price as so increased, (c) all Income paid after such exercise or deemed exercise shall be payable to and retained by Buyer and applied to the aggregate unpaid Repurchase Prices and any other amounts owed by Sellers under the Program Agreements, (d) Primary Seller Parties shall immediately deliver or cause Custodian to deliver to Buyer any Purchased Mortgage Loans and all related Records then in the Primary Seller Parties' possession or control and (e) all right, title and interest in and entitlement to such Purchased Mortgage Loans and Servicing Rights (with respect to the Servicing Released Mortgage Loans) and, with respect to Servicing Retained Mortgage Loans, any and all rights Sellers may have in the servicing agreement or sub-servicing agreement, with respect to such Mortgage Loan, including any right of such Seller to terminate any servicer or subservicer with or without payment of a termination fee and/or any right to purchase the related Servicing Rights from the owner of such Servicing Rights, shall be owned by Buyer or its designee free and clear of any interest of Sellers except as set forth in Section 11(iv).  Buyer shall be entitled to specific performance of all agreements of Sellers contained in the Program Agreements.

-49-

700900240 08048307

Confidential

(iv)    Upon notice to Sellers (which notice need not be given if an Event of Default under Section 11(i)(H), 11(i)(I) or Section 11(i)(J) shall have occurred with respect to any Seller Party) and which may be the notice given under subsection (ii) of this Section), Buyer shall have all of the power of attorney rights set forth in Section 6(vi) hereof and may:  (1) sell, (A) on a servicing released basis with respect to the Servicing Released Mortgage Loans and (B) on a servicing retained basis with respect to the Servicing Retained Mortgage Loans, in a recognized market at such price or prices as Buyer may deem satisfactory in its sole discretion, any or all Purchased Mortgage Loans subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by Sellers hereunder, as provided below or (2) in lieu of selling all or a portion of such Purchased Mortgage Loans, to give Sellers credit for such Purchased Mortgage Loans in an amount equal to the Market Value of the Purchased Mortgage Loans against the aggregate unpaid Repurchase Price and any other amounts owing by Sellers.  The proceeds of any disposition of Purchased Mortgage Loans effected pursuant to this Section 11(iv) shall be applied, in such order as Buyer shall determine in its sole discretion, (v) to the costs and expenses incurred by Buyer in connection with Sellers' default; (w) to costs of cover and/or hedging transactions, if any; (x) to the Repurchase Price; (y) to any other outstanding obligation of Sellers to Buyer or its Affiliates pursuant to the Program Agreements or otherwise, to the extent permitted by Section 28 hereof; and (z) the balance, if any, to Sellers.  In the event that Buyer shall not have received repayment in full of the aggregate Repurchase Price and the other Obligations of the Seller Parties under the Program Agreements following its liquidation of the Purchased Mortgage Loans, Buyer may, in its sole discretion, pursue the Seller Parties for all or any part of any deficiency.

(v)    The parties recognize that it may not be possible to purchase or sell all of the Purchased Mortgage Loans on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Purchased Mortgage Loans may not be liquid.  In view of the nature of the Purchased Mortgage Loans, the parties agree that, to the extent permitted by applicable law, liquidation of the Transactions or the Purchased Mortgage Loans shall not require a public purchase or sale and that a good faith private purchase or sale shall be deemed to have been made in a commercially reasonable manner.  Accordingly, Buyer may elect, in its sole discretion, the time and manner of liquidating any Purchased Mortgage Loans, and nothing contained herein shall (A) obligate Buyer to liquidate any Purchased Mortgage Loans on the occurrence and during the continuance of an Event of Default or to liquidate all of the Purchased Mortgage Loans in the same manner or on the same Business Day or (B) constitute a waiver of any right or remedy of Buyer.

(vi)    Buyer shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.  All rights and remedies arising under this Agreement are cumulative and not exclusive of any other rights or remedies which Buyer may have.

(vii)    Buyer may enforce its rights and remedies hereunder without prior judicial process or hearing, and Sellers hereby expressly waive, to the extent permitted by law, any rights Sellers might otherwise have to require Buyer to enforce their rights by judicial process.  Sellers also waive, to the extent permitted by law, any defense Sellers might otherwise have arising from the use of nonjudicial process, enforcement and sale of all or any portion of the Repurchase Assets, or from any other election of remedies.  Sellers recognize that nonjudicial remedies are

-50-

Confidential

consistent with the usages of the trade, are responsive to commercial necessity and are the result of a bargain at arm's length.

**12.    Servicing of the Purchased Mortgage Loans During the Interim Servicing Period**

(i)    The parties hereto agree and acknowledge that, the Purchased Mortgage Loans (except for the Servicing Retained Mortgage Loans) will be sold by Sellers to Buyer on a servicing released basis.  In furtherance of the foregoing, each of the Sellers and the Servicer hereby agree and confirm that from and after the date hereof that this Section 12 shall solely govern the servicing of the Servicing Released Mortgage Loans and any prior agreement between Sellers and Servicer or otherwise with respect to such servicing is hereby superceded in all respects.  With respect to the Servicing Released Mortgage Loans, during the related Interim Servicing Period, Servicer shall service the Purchased Mortgage Loans for the benefit of or on behalf of Buyer; provided, however, that the obligation of Servicer to service any Purchased Mortgage Loan for the benefit of or on behalf of Buyer as aforesaid shall cease upon the payment to Buyer of the Minimum Release Price therefor or the release of such Mortgage Loan following the reduction of Market Value thereof to zero pursuant to Section 6(iv).  In the event that the preceding language is interpreted as constituting one or more servicing contracts, each such servicing contract shall terminate automatically upon the earliest of (a) the termination thereof by Buyer pursuant to subsection (iii) below, (b) forty-five (45) days after the Purchase Date of Purchased Mortgage Loans or any subsequent date on which the Interim Servicing Period is extended pursuant to Section 12(iii), (c) [reserved], or (d) the transfer of servicing to the Backup Servicer or any other entity approved by Buyer and the assumption thereof by such entity.  Notwithstanding the other provisions of this Agreement, Servicer agrees to continue to service the Servicing Released Mortgage Loans until such time as the servicing of such Purchased Mortgage Loans is transferred to the Backup Servicer or any other entity designated by Buyer.

(ii)    With respect to the Servicing Released Mortgage Loans, during the period Servicer is servicing the Purchased Mortgage Loans, (a) Servicer agrees that Buyer is the owner of all Records relating to servicing, including but not limited to any and all servicing agreements, files, documents, records, computer tapes, copies of computer tapes, proof of insurance coverage, insurance policies, appraisals, other closing documentation, payment history records, and any other records relating to or evidencing the servicing of such Mortgage Loans (the "Servicing Records"), and (b) Servicer grants to Buyer, a precautionary security interest in such Servicing Records pursuant to Section 6 hereof.  At all times during the term of this Agreement, the Primary Seller Parties covenant to hold such Servicing Records related to Servicing Released Mortgage Loans in trust for Buyer and to safeguard such Servicing Records and to deliver them promptly to Buyer or Buyer's designee (including Custodian) at the address set forth on the signature page of Buyer as required by this Agreement.

(iii)    With respect to the Servicing Records for each Purchased Mortgage Loan that is a Servicing Released Mortgage Loan and the physical and contractual servicing of each Purchased Mortgage Loan that is a Servicing Released Mortgage Loan, Servicer shall deliver such Servicing Records and, to the extent applicable, the servicing to the Backup Servicer or such other successor as may be designated by Buyer on the Servicing Transfer Date.  Notwithstanding the foregoing, the Interim Servicing Period with respect to the Servicing Released Mortgage

-51-

700900240 08048307

Confidential

Loans automatically terminate on each Payment Date unless reinstated for each such Purchased Mortgage Loan pursuant to written notice of Buyer of such reinstatement (and thereafter the immediately preceding delivery requirement will be deemed to be rescinded), and a new 45-day Interim Servicing Period will be deemed to commence for such Purchased Mortgage Loan as of such Payment Date upon receipt of such written notice from Buyer.  If the Interim Servicing Period terminates with respect to the Servicing Released Mortgage Loans, the Servicer shall be terminated and shall transfer such servicing in accordance with Section 12(vii) below.  Sellers' and Servicer's transfer and delivery of the Servicing Rights, Servicing Records and the physical and contractual servicing under this Section, as applicable, shall be in accordance with customary standards in the industry and such transfer shall include the transfer of the gross amount of all escrows held for the related mortgagors (without reduction for unreimbursed advances or "negative escrows").

(iv)    Servicer shall service and administer the Servicing Released Mortgage Loans in accordance with this Agreement and Accepted Servicing Practices and shall have full power and authority, acting alone, to do any and all things in connection with such servicing which Servicer may deem necessary or desirable and consistent with the terms of this Agreement, provided, however, that absent specific authorization from Buyer, Servicer's servicing activities shall be limited to such servicing and collection activities as are necessary for preserving and collecting the Servicing Released Mortgage Loans on an interim basis, it being understood that the servicing is to be transferred on the relevant Servicing Transfer Date.  Servicer, in administering and servicing the Servicing Released Mortgage Loans, shall (a) comply with all Requirements of Law, (b) maintain all state and federal licenses necessary for servicing the Servicing Released Mortgage Loans, (c) not impair the rights of Buyer in any Purchased Mortgage Loan or any payment thereunder, (d) shall service in accordance with Accepted Servicing Practices and (e) shall service in accordance with any applicable Government Modification Program.

(v)    After the Purchase Date, until the Repurchase Date, no Primary Seller Party will have the right to modify or alter the terms of a Purchased Mortgage Loan or consent to the modification or alteration of the terms of any Purchased Mortgage Loan (other than with respect to modifications consistent with Accepted Servicing Practices, HAMP or other Government Modification Programs), and no Primary Seller Party will have any right to repossess any Purchased Mortgage Loan or substitute another Mortgage Loan, except as expressly provided herein or in any Custodial Agreement.

(vi)    Servicer shall permit Buyer to inspect upon prior written notice at a mutually convenient time, the servicing facilities, for the purpose of satisfying Buyer that Servicer has the ability to service the Mortgage Loans as provided in this Agreement.

(vii)    Buyer may, in its sole discretion if an Event of Default shall have occurred and be continuing, sell the Purchased Mortgage Loans that are Servicing Released Mortgage Loans identified on the Mortgage Schedule as being serviced directly by Servicer on a servicing released basis without payment of any termination fee or any other amount to Servicer.  Upon the occurrence of an Event of Default hereunder, Buyer shall have the right immediately to terminate Servicer's right to service the Purchased Mortgage Loans that are Servicing Released Mortgage Loans without payment of any penalty or termination fee.  If Servicer shall be terminated under any of Section 12(iii), this Section 12(vii) or as otherwise provided hereunder,

-52-

700900240 08048307

Servicer shall transfer such servicing with respect to such Purchased Mortgage Loans that are Servicing Released Mortgage Loans to the Backup Servicer or such other successor designated by Buyer by the Servicing Transfer Date, at no cost or expense to Buyer.  The Primary Seller Parties each agree to cooperate with Buyer in connection with the termination of Servicer under the terms of this Section 12 and transfer of servicing.

(viii)   [Reserved].

(ix)   No later than the Reporting Dates, and from time to time reasonably promptly following Buyer's request, Servicer shall deliver to Buyer the Servicing Tape with respect to the Servicing Released Mortgage Loans including those fields reasonably requested by Buyer.

## 13.    <u>Reserved</u>

## 14.    <u>Single Agreement</u>

The parties hereto acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other.  Accordingly, each of the parties hereto agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to (x) set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (y) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with any Transaction and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 15.    <u>Notices and Other Communications</u>

Except as otherwise expressly provided herein, all such notices or communications shall be in writing (including, without limitation, telegraphic, facsimile, electronic mail or telex communication) or confirmed in writing and such notices and other communications shall, when mailed, telegraphed, communicated by facsimile transmission or electronic mail or sent by overnight courier, be effective when received at the address for notices for the party to whom such notice or communications is to be given as forth below its name on the signature page hereto.

Notwithstanding the foregoing, however, a facsimile transmission shall be deemed to be received when transmitted so long as the transmitting machine has provided an electronic confirmation of such transmission.  Any party may revise any contact or notice information relating to it by notice in writing to the other party, which notice shall be effective on the third business day following receipt thereof.

700900240 08048307

Confidential

## 16.    Joint and Several Liability of the Seller Parties

The liability of the Seller Parties hereunder is joint and several.  Each of the Seller Parties hereby acknowledges and agrees that Buyer and Custodian shall have no obligation to proceed against one Seller Party before proceeding against the other Seller Parties and waives any right of subrogation or ability to proceed against any Person until the obligations under the Program Agreements are paid in full and the Program Agreements are terminated in accordance with the terms thereof.  Each of the Seller Parties hereby waives any defense to their respective obligations under this Agreement based upon or arising out of (i) any adjustment, indulgence, forbearance or compromise that might be granted or given by Buyer to any other Seller Party; (ii) the insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of any other Seller Party; (iii) the dissolution of any other Seller Party; (iv) the sale, lease or transfer of any or all of the assets of any other Seller Party; (v) any changes in the shareholders, partners or members of any other Seller Party; (vi) any reorganization of any other Seller Party; (vii) the invalidity, illegality or unenforceability against any other Seller Party of all or any part of the Program Agreements; (viii) any full or partial release of the liability of any other Seller Party from its obligations under this Agreement, or any part thereof; (ix) the fact that any payment by any other Seller Party to Buyer is held to constitute a preference under any Insolvency Law, or for any reason Buyer is required to refund such payment or pay such amount to any other Seller Party or someone else; or (x) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Seller Party or any other Person with respect to the its obligations under this Agreement.  A Seller Parties' subrogation claim arising from payments to Buyer shall be subordinated to and postponed in favor of any claims of Buyer with respect to such Seller Party.

## 17.    Further Assurances; Additional Information

Sellers shall promptly provide such further assurances or agreements as Buyer may request in order to effect the purposes of this Agreement.

## 18.    Taxes

(i)    All payments made by Sellers under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities (including penalties, interest and additions to tax) with respect thereto imposed by any Governmental Authority therewith or thereon, excluding income taxes, branch profits taxes, franchise taxes or any other tax imposed on net income by the United States, a state or a foreign jurisdiction under the laws of which Buyer is organized or of its applicable lending office, or any political subdivision thereof (collectively, "Taxes"), all of which shall be paid by Sellers for its own account not later than the date when due.  If Sellers are required by law or regulation to deduct or withhold any Taxes from or in respect of any amount payable hereunder, they shall: (a) make such deduction or withholding, (b) pay the amount so deducted or withheld to the appropriate Governmental Authority not later than the date when due, (c) deliver to Buyer promptly, original tax receipts and other evidence satisfactory to Buyer of the payment when due of the full amount of such Taxes; and (d) pay to Buyer for the benefit of the applicable Buyer such additional amounts as may be necessary so that Buyer receives, free and clear of all Taxes, a net amount equal to the

-54-

Confidential

amount it would have received under this Agreement, as if no such deduction or withholding had been made.

(ii)    In addition, Sellers agree to pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including, without limitation, mortgage recording taxes, transfer taxes and similar fees) imposed by the United States or any taxing authority thereof or therein that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement ("Other Taxes").

(iii)    Sellers agree to indemnify Buyer for the full amount of Taxes (including additional amounts with respect thereto) and Other Taxes, and the full amount of Taxes of any kind imposed by any jurisdiction on amounts payable under this Section 18, and any liability (including penalties, interest and expenses arising thereon or with respect thereto) arising therefrom or with respect thereto, provided that Buyer shall have provided Sellers with evidence, reasonably satisfactory to Sellers, of payment of Taxes or Other Taxes, as the case may be.

(iv)    Without prejudice to the survival or any other agreement of Sellers hereunder, the agreements and obligations of Sellers contained in this Section 18 shall survive the termination of this Agreement.  Nothing contained in this Section 18 shall require Buyer to make available any of its tax returns or other information that it deems to be confidential or proprietary.

## 19.    Wire Instructions

(i)    Any amounts to be transferred by Buyer to Sellers hereunder shall be sent by wire transfer in immediately available funds to the account of the Sellers at:

| | |
|---|---|
| Bank: | Bank of America |
| ABA#: | 026009593 |
| Account: | 1235469131 |
| Account #: | Rescap Operating Account |

(ii)    Any amounts to be transferred by Sellers to Buyer hereunder shall be sent by wire transfer in immediately available funds to the account of Buyer below:

| | |
|---|---|
| Bank: | Bank of America |
| ABA#: | 026009593 |
| Account: | BMMZ Holdings LLC Operating Account |
| Account #: | 1257064883 |
| Ref: | ResCap |

Amounts received after 5:30 p.m.(New York City time) on any Business Day shall be deemed to have been paid and received on the next succeeding Business Day.

## 20.    Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for Transactions hereunder.  Each provision and agreement herein

-55-

Confidential

shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 21.    Non-assignability

The rights and obligations of the Seller Parties under this Agreement and under any Transaction shall not be assigned without the prior written consent of Buyer in its sole discretion. The rights and obligations of Buyer under this Agreement and under any Transaction may be assigned, in whole or in part, without the prior written consent of the Seller Parties. Notice of such assignment shall be given in writing to Sellers and Buyer, which notice shall include the full legal name, and contact details for, the assignee. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

Buyer may, in accordance with applicable law, at any time sell to one or more entities participating interests in any Transaction. In the event of any such sale by Buyer of participating interests to a participant, such Buyer's obligations under this Agreement to Sellers shall remain unchanged, Buyer shall remain solely responsible for the performance thereof, Buyer shall remain the owner of its respective interests in the Purchased Mortgage Loans for all purposes under this Agreement and the other Program Agreements, and Sellers shall continue to deal solely and directly with Buyer in connection with Buyer's rights and obligations under this Agreement and the other Program Agreements.

## 22.    Counterparts

This Agreement may be executed in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

## 23.    Governing Law

This Agreement and all matters relating hereto shall be governed by the laws of the State of New York without giving effect to the conflicts of law principles thereof (other than Section 5-1401 of the New York General Obligations Law).

## 24.    No Waivers, Etc.; Amendment

(i)    No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. Without limitation on any of the foregoing, the failure to give a notice pursuant to Section 4(i) will not constitute a waiver of any right to do so at a later date.

(ii)    No amendment or modification of any provision of this Agreement shall be effective unless and until such shall be in writing and duly executed by the Seller Parties and Buyer. No waiver of any provision of this Agreement and no consent by any party to a departure

-56-

Confidential

herefrom shall be effective unless and until such shall be in writing and duly executed by the Seller Parties and Buyer.

## 25.   Intent

(i)      The parties intend and acknowledge that each Transaction is a "repurchase agreement" as that term is defined in Section 101(47A)(i) of Title 11 of the Bankruptcy Code, a "master netting agreement" as that term is defined in Section 101(38A)(A) of the Bankruptcy Code and a "securities contract" as that term is defined in Section 741(7)(A)(i) of the Bankruptcy Code.

(ii)     The parties intend and acknowledge that the Guarantee is a "repurchase agreement" as that term is defined in Section 101(47A)(v) of the Bankruptcy Code and a "securities contract" as that term is defined in Section 741(7)(A)(ix) of the Bankruptcy Code.

(iii)    It is understood and agreed that any party's right to cause the termination, liquidation or acceleration of, or to offset net termination values, payment amounts or other transfer obligations arising under or in connection with this Agreement or any Transaction hereunder is in each case a contractual right to cause the termination, liquidation, or acceleration of, or to offset net termination values, payment amounts or other transfer obligations arising under or in connection with this Agreement or any Transaction hereunder as described in Sections 555, 559 and 561 of the Bankruptcy Code.

(iv)    The parties hereby agree that any provisions hereof or in any other document, agreement or instrument that is related in any way to the servicing of the Purchased Mortgage Loans shall be deemed "related to" this Agreement within the meaning of Sections 101(38A)(A) and 101(47)(A)(v) of the Bankruptcy Code and part of the "contract" as such term is used in Section 741 of the Bankruptcy Code.

(v)     Each party hereby acknowledges that it is its intent for purposes of U.S. federal, state and local income and franchise taxes to treat each Transaction as indebtedness of the related Seller that is secured by the Purchased Mortgage Loans and that the Purchased Mortgage Loans are owned by the related Seller in the absence of a Default by Sellers.  All parties to this Agreement agree to such treatment and agree to take no action inconsistent with this treatment, unless required by law.

## 26.   Reserved

## 27.   Hypothecation or Pledge of Repurchase Assets

Buyer shall have free and unrestricted use of all Purchased Mortgage Loans and Repurchase Assets and nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Mortgage Loans and Repurchased Assets or otherwise selling, pledging, repledging, transferring, assigning, hypothecating, rehypothecating or otherwise conveying the Purchased Mortgage Loans and Repurchase Assets; provided, that no such selling, pledging, transferring or hypothecation shall relieve Buyer of its obligations to deliver the Repurchased Assets to Sellers subject to the terms of this Agreement on the applicable Repurchase Date upon payment of the Repurchase Price by Sellers and full

-57-

Confidential

compliance by Sellers with the terms of the Agreement. Nothing contained in this Agreement shall obligate Buyer to segregate any Purchased Mortgage Loans or Repurchase Assets delivered to Buyer by Sellers.

## 28.    Set-Off

In addition to any rights and remedies of Buyer provided by law, Buyer shall have the right, without prior notice to any Seller Party, any such notice being expressly waived by the Seller Parties to the extent permitted by applicable law upon any Obligation becoming due and payable by any Seller Party hereunder or under any Program Agreement (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such Obligation any and all Property and deposits (general or special, time or demand, provisional or final, excluding, however any and all escrow deposits), in any currency, and any other obligations (including to return excess margin), credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by or due from Buyer to or for the credit or the account of Seller, Guarantor or any Material Affiliate thereof. Buyer may set-off cash, the proceeds of the liquidation of any Repurchase Assets and all other sums or obligations owed by Buyer to Sellers against all of Sellers' obligations to Buyer, whether under this Agreement or under any other agreement between the parties, or otherwise, whether or not such obligations are then due, without prejudice to Buyer's right to recover any deficiency. Buyer agrees promptly to notify the Seller Parties after any such set-off and application is made; provided, that the failure to give such notice shall not affect the validity of such set-off and application.

Notwithstanding anything in this Agreement to the contrary, (a) in the event of any assignment, rehypothecation, participation or other transfer by the Buyer to Ally Financial or any Subsidiary of Ally Financial (an "Affiliate Transferee"), or to any "Lender" under the GMAC Facilities (a "Lender Transferee"), (i) no such Affiliate Transferee or Lender Transferee may exercise any right of setoff under the foregoing paragraph of this Section 28, (ii) clause (e) of the definition of Obligations shall not apply to any such Affiliate Transferee or Lender Transferee as a "Buyer" hereunder, and (iii) no provision of the GMAC Facilities or any other agreement between an Affiliate Transferee and a Seller Party shall permit application by such Affiliate Transferee or Lender Transferee of amounts otherwise required to be paid by Buyer to Seller under this Agreement to the GMAC Facilities or any other amount owed by a Seller Party to such Affiliate Transferee and (b) in the event that Buyer becomes a "Lender" under a GMAC Facility, no provision of this Agreement or the applicable GMAC Facility shall permit application by Buyer of amounts otherwise required to be paid by Buyer to Seller under this Agreement to such GMAC Facility.

Buyer shall at any time have the right, in each case until such time as Buyer determines otherwise, to retain, to suspend payment or performance of, or to decline to remit, any amount or property that Buyer would otherwise be obligated to pay, remit or deliver to Sellers hereunder if a Default or Event of Default has occurred and is continuing with respect to Sellers or Guarantor.

-58-

Confidential

29.    **JURISDICTION; WAIVERS**

**EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

(i)    **SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER PROGRAM AGREEMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS IN NEW YORK COUNTY IN THE STATE OF NEW YORK, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;**

(ii)    **CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;**

(iii)    **AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH BUYER SHALL HAVE BEEN NOTIFIED;**

(iv)    **AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION; AND**

(v)    **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER PROGRAM AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

30.    **Indemnification and Expenses**

(i)    The Seller Parties agree to hold Buyer, its Affiliates and each of their respective officers, directors, employees, agents and advisors (each a "Buyer Indemnified Party") harmless from and indemnify each Buyer Indemnified Party against all liabilities, losses, damages, judgments, costs and expenses of any kind (collectively "Costs") that may be imposed on, incurred by or asserted against such Buyer Indemnified Party relating to or arising from the Program Agreements or any transaction contemplated thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of the Program Agreements, except to the extent relating to or arising out of such Buyer Indemnified Party's gross negligence or

-59-

Confidential

willful misconduct. Without limiting the generality of the foregoing, the Seller Parties agree to hold any Buyer Indemnified Party harmless from and indemnify such Buyer Indemnified Party against all Costs with respect to all Purchased Mortgage Loans relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including without limitation laws with respect to unfair or deceptive lending practices and predatory lending practices, the Truth in Lending Act and/or the Real Estate Settlement Procedures Act, that, in each case, results from anything other than such Buyer Indemnified Party's gross negligence or willful misconduct. In any suit, proceeding or action brought by a Buyer Indemnified Party in connection with any Purchased Mortgage Loan for any sum owing thereunder, or to enforce any provisions of any Purchased Mortgage Loan, the Seller Parties will save, indemnify and hold such Buyer Indemnified Party harmless from and against all Costs suffered by reason of any defense, set-off, counterclaim, recoupment or reduction of liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by the Seller Parties of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Seller Parties. The Seller Parties also agree to reimburse any Buyer Indemnified Party as and when billed by such Buyer Indemnified Party for all such Buyer Indemnified Party's Costs incurred in connection with the enforcement or the preservation of such Buyer Indemnified Party's rights under Program Agreements or any transaction contemplated thereby, including without limitation the reasonable fees and disbursements of its counsel. The Seller Parties hereby acknowledges that the obligations of the Seller Parties under this Agreement are recourse obligations of the Seller Parties.

(ii)    The Seller Parties agree to pay as and when billed by Buyer all of the out-of-pocket costs and expenses incurred by Buyer in connection with the development, preparation, negotiation, administration, enforcement and execution of, and any amendment, waiver, supplement or modification to, this Agreement, any other Program Agreement or any other documents prepared in connection herewith or therewith. The Seller Parties agree to pay as and when billed by Buyer all of the reasonable out-of-pocket costs and expenses incurred in connection with the consummation and administration of the transactions contemplated hereby and thereby including, without limitation, (i) all the reasonable fees, disbursements and expenses of counsel to Buyer, and (ii) all the due diligence, inspection, testing and review (including but not limited to any loan level file review of any Mortgage Loans and all on-going due diligence costs) and expenses incurred by Buyer with respect to Purchased Mortgage Loans under this Agreement. The Seller Parties also agree not to assert any claim against Buyer or any of its Affiliates, or any of their respective officers, directors, employees, attorneys and agents, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Program Agreement, the actual or proposed use of the proceeds of the Transactions, this Agreement or any of the transactions contemplated hereby or thereby. THE FOREGOING INDEMNITY AND AGREEMENT NOT TO ASSERT CLAIMS EXPRESSLY APPLIES, WITHOUT LIMITATION, TO THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF THE BUYER INDEMNIFIED PARTIES.

(iii)    If the Seller Parties fail to pay when due any costs, expenses or other amounts payable by it under this Agreement, including, without limitation, reasonable fees and expenses of counsel and indemnities, such amount may be paid on behalf of the Seller Parties by Buyer, in its sole discretion and the Seller Parties shall remain liable for any such payments by Buyer

-60-

Confidential

together with interest thereon at a rate equal to the Post-Default Rate.  No such payment by Buyer shall be deemed a waiver of any of Buyer's rights under the Program Agreements.

(iv)      Without prejudice to the survival of any other agreement of the Seller Parties hereunder, the covenants and obligations of the Seller Parties contained in this Section 30 shall survive the termination of this Agreement, the payment in full of the Repurchase Price and all other amounts payable hereunder and delivery of the Purchased Mortgage Loans by Buyer against full payment therefor.

## 31.      General Interpretive Principles

(i)      Headings are for convenience only and do not affect interpretation.  The following rules of this Section 31(i) apply unless the context requires otherwise.  The singular includes the plural and conversely.  A gender includes all genders.  Where a word or phrase is defined, its other grammatical forms have a corresponding meaning.  A reference to a subsection, Section, Annex or Exhibit is, unless otherwise specified, a reference to a section of, or annex or exhibit to, this Agreement.  A reference to a party to this Agreement or another agreement or document includes the party's successors and permitted substitutes or assigns. A reference to an agreement or document is to the agreement or document as amended, modified, novated, supplemented or replaced, except to the extent prohibited by any Program Agreement.  A reference to legislation or to a provision of legislation includes any modification or re-enactment of it, a legislative provision substituted for it and a regulation or statutory instrument issued under it.  A reference to writing includes a facsimile transmission and any means of reproducing words in a tangible and permanently visible form, including electronic mail.  A reference to conduct includes, without limitation, an omission, statement or undertaking, whether or not in writing.  An Event of Default exists until it has been waived in writing by Buyer or has been timely cured.  The words "hereof", "herein", "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement.  The term "including" is not limiting and means "including without limitation".  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".  This Agreement may use several different limitations, tests or measurements to regulate the same or similar matters.   All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.  Unless the context otherwise clearly requires, all accounting terms not expressly defined herein shall be construed, and all financial computations required under this Agreement shall be made, in accordance with GAAP, consistently applied. References herein to "fiscal year" and "fiscal quarter" refer to such fiscal periods of Guarantor;

(ii)      Except where otherwise provided in this Agreement, any determination, consent, approval, statement or certificate made or confirmed in writing with notice to Seller by Buyer or an authorized officer of Buyer as required by this Agreement is conclusive and binds the parties in the absence of manifest error;

(iii)      A reference to a document includes an agreement (as so defined) in writing or a certificate, notice, instrument or document, or any information recorded in electronic form. Where Seller is required to provide any document to Buyer under the terms of this Agreement,

-61-

700900240 08048307

Confidential

the relevant document shall be provided in writing or printed form unless Buyer request otherwise. At the request of Buyer the document shall be provided in electronic form or both printed and computer disk form;

(iv)    This Agreement is the result of negotiations among, and has been reviewed by counsel to, Buyer and Seller, and is the product of all parties. In the interpretation of this Agreement, no rule of construction shall apply to disadvantage one party on the ground that such party proposed or was involved in the preparation of any particular provision of this Agreement or this Agreement itself. Except where otherwise expressly stated, Buyer may give or withhold, or give conditionally, approvals and consents and may form opinions and make determinations in its absolute sole discretion.

## 32.    Survival

The obligations of the Seller Parties under Sections 14, 16, 18, 25 and 30 hereof and any other reimbursement or indemnity obligation of the Seller Parties to Buyer pursuant to this Agreement or any other Program Agreement shall survive the repurchase of the Mortgage Loans hereunder and the termination of this Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a purchase, herein or pursuant hereto shall survive the making of such representation and warranty, and Buyer shall not be deemed to have waived, by reason of purchasing any Mortgage Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that Buyer may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such purchase was made.

## 33.    No Reliance; Disclaimers

Each of Buyer and each Seller Party hereby acknowledges, represents and warrants to the other that, in connection with the negotiation of, the entering into, and the performance under, the Program Agreements and each Transaction thereunder:

(i)    It is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of any other party to the Program Agreements, other than the representations expressly set forth in the Program Agreements.

(ii)    It has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent that it has deemed to be necessary, and it has made its own investment, hedging and trading decisions (including decisions regarding the suitability of any Transaction) based upon its own judgment and upon any advice from such advisors as it has deemed to be necessary and not upon any view expressed by any other party to the Program Agreements.

(iii)    It is a sophisticated and informed Person that has a full understanding of all the terms, conditions and risks (economic and otherwise) of the Program Agreements and each Transaction thereunder and is capable of assuming and willing to assume (financially and otherwise) those risks.

-62-

Confidential

(iv)    It is entering into the Program Agreements and each Transaction thereunder for the purposes of managing its borrowings or investments or hedging its underlying assets or liabilities and not for purposes of speculation.

It is not acting as a fiduciary or financial, investment or commodity trading advisor for the other party and has not given any other party to the Program Agreements (directly or indirectly through any other Person) any assurance, guaranty or representation whatsoever as to the merits (either legal, regulatory, tax, business, investment, financial accounting or otherwise) of the Program Agreements or any Transaction thereunder.

## 34.    Termination

This Agreement shall remain in effect until the earliest to occur of (i) the Expiration Date, (ii) a Change of Control of any Seller Party, or (iii) at Buyer's option, the occurrence of an Event of Default (such date, the "Termination Date" and any such event, a "Termination Event").  The outstanding Repurchase Price shall be immediately due and payable upon the Termination Date.  However, no such termination shall affect any outstanding obligations of any Seller Party to Buyer at the time of such termination, or of Buyer to any Seller Party.

## 35.    Periodic Due Diligence Review

The Primary Seller Parties agree promptly to provide Buyer and its agents with access to, and to permit such Persons, at the expense of the Seller Parties, copies of and extracts from any and all documents, records, agreements, instruments or information (including, without limitation, any of the foregoing in computer data banks and computer software systems) relating to the business, operations, servicing and financial condition of each Seller Party and the performance of their respective obligations under the Program Agreements.  In addition, Sellers acknowledge that Buyer has the right to perform continuing due diligence reviews with respect to the Purchased Mortgage Loans and the Servicing Rights (and have a right to appoint a third party to perform such diligence review), for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and Sellers agree that upon reasonable prior notice (unless an Event of Default in respect of Sellers shall have occurred and be continuing, in which case no such notice is required), Buyer, or its authorized representatives will be permitted during normal business hours to examine, inspect, and make copies and extracts of, the Mortgage Files and any and all Records or other documents, instruments or information relating to such Purchased Mortgage Loans in the possession or under the control of the Primary Seller Parties.  In addition, with respect to any subservicer which is not an Affiliate of Sellers, Sellers shall use their best efforts to enable Buyer to inspect the servicing facilities of such subservicer and to cause such subservicer to cooperate with Buyer and/or its designees in connection with any due diligence performed by Buyer and/or such designees.  Sellers shall make available to Buyer a knowledgeable financial or accounting officer for the purpose of answering questions respecting the Mortgage Files and the Purchased Mortgage Loans.

Without limiting the generality of the foregoing, Sellers acknowledge that Buyer may purchase Mortgage Loans from Sellers based solely upon the information provided by Sellers to Buyer in the Mortgage Schedule and the representations, warranties and covenants contained

-63-

700900240 08048307

herein, and that Buyer, at its option, has the right at any time to conduct a partial or complete due diligence review on some or all of the Mortgage Loan purchased in a Transaction, including, without limitation, ordering Broker's Price Opinions, new credit reports and new appraisals on the related Mortgaged Properties and otherwise regenerating the information used to originate such Mortgage Loan. Buyer may re-underwrite such Mortgage Loans itself or engage a third party underwriter to perform such underwriting. Sellers agree to cooperate with Buyer and any third party underwriter in connection with such underwriting, including, but not limited to, providing Buyer and any third party underwriter with access to any and all documents, records, agreements, instruments or information relating to such Mortgage Loans in the possession, or under the control, of Sellers or Servicer.

Sellers further agree that Sellers shall pay all expenses incurred by Buyer in connection with the due diligence activities conducted pursuant to this Section 35.

Any such diligence conducted by Buyer shall not reduce or limit any of Sellers' or Servicer's representations, warranties and covenants set forth herein.

## 36.    Confidentiality

Buyer, Sellers and Servicer hereby acknowledge and agree that all written or computer-readable information provided by one party to the other regarding the terms set forth in any of the Program Agreements or the transactions contemplated thereby (the "Confidential Terms") shall be kept confidential and shall not be divulged to any party without the prior written consent of such other party except to the extent that (i) it is necessary to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies or regulatory bodies or in order to comply with any applicable federal or state laws, (ii) any of the Confidential Terms are in the public domain other than due to a breach of this covenant, (iii) such information is disclosed in connection with an assignment of or participation in this Agreement and the party to whom such information is disclosed agrees to retain the information received by it as confidential, (iv) [reserved], (v) it is compelled in connection with any judicial, regulatory or administrative proceeding (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation demand or similar process) or (vi) in the Event of a Default, Buyer determines such information necessary to disclose in connection with the marketing and sales of the Purchased Mortgage Loans or otherwise to enforce or exercise their rights hereunder. Notwithstanding the foregoing or anything to the contrary contained herein or in any other Program Agreement, the parties hereto may disclose to any and all Persons, without limitation of any kind, the U.S. federal, state and local tax treatment of the Transactions, any fact that may be relevant to understanding the U.S. federal, state and local tax treatment of the Transactions, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state and local tax treatment and that may be relevant to understanding such tax treatment; provided that no Seller Party may disclose the name of or identifying information with respect to Buyer or any pricing terms (including, without limitation, the Pricing Rate, Applicable Percentage and Purchase Price) or other nonpublic business or financial information (including any sublimits and financial covenants) that is unrelated to the U.S. federal, state and local tax treatment of the Transactions and is not relevant to understanding the U.S. federal, state and local tax treatment of the Transactions, without the prior written consent of Buyer. The

700900240 08048307

Confidential

provisions set forth in this Section 36 shall survive the termination of this Agreement for a period of one year following such termination.

[NO FURTHER TEXT; SIGNATURE PAGES FOLLOW]

-65-

700900240 08048307

Confidential

**RESIDENTIAL FUNDING COMPANY, LLC,**
as a Seller

By: _____

Name:  Jerry Lombardo
Title:   Chief Treasury Management Officer


Notice to:
Residential Funding Company, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention: General Counsel
Email: tammy.hamzehpour@ally.com
Phone: (215) 682-1307
Facsimile: (866) 572-7524


**GMAC MORTGAGE, LLC,**
as a Seller and Servicer

By: _____

Name:  Jerry Lombardo
Title:   Chief Treasury Management Officer


Notice to:
GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention: General Counsel
Email: tammy.hamzehpour@ally.com
Phone: (215) 682-1307
Facsimile: (866) 572-7524

700900240 08048307

**RESIDENTIAL CAPITAL, LLC,**
as Guarantor

By: _____

Name: Jerry Lombardo
Title:   Treasury Executive


Address for Notices:
Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention: General Counsel
Email: tammy.hamzehpour@ally.com
Phone: (215) 682-1307
Facsimile: (866) 572-7524

700900240 08048307

**BMMZ HOLDINGS LLC,**
as a Buyer

By: _____

Name: _Bradley J. Brown_

Title: _Vice President of Repurchase Operations_

Address for Notices
BMMZ Holdings LLC
c/o Ally Financial Inc.
200 Renaissance Center
Detroit, MI 48265-2000
Mail Code: 482-B12-B96
Attn: Courtney Lowman
Email:  courtney.lowman@ally.com
Phone: (313) 656-6711

700900240 08048307

Confidential

**SCHEDULE 1**

**MARKET VALUE AS OF THE PURCHASE DATE**

| | Loan Count | Unpaid Principal Balance | Carry Value | Fair Market Value | Proposed Advance Rate | Capacity |
|---|---|---|---|---|---|---|
| **First Lien – Current Unmodified** | 1,254 | $395,359,173 | $168,478,833 | $240,064,389 | 70.0% | $168,045,072 |
| **First Lien – Current Modified** | 234 | $69,323,494 | $27,844,166 | $37,010,625 | 60.0% | $22,206,375 |
| **First Lien Delinquent** | 355 | $111,352,260 | $42,644,864 | $56,551,264 | 40.0% | $22,620,505 |
| **Second Lien Current** | 7,391 | $313,250,708 | $149,389,732 | $150,441,871 | 60.0% | $90,265,123 |
| **Second Lien Delinquent** | 0 | $0 | $0 | $0 | 0.0% | $0 |
| **HELOC Current** | 785 | $43,235,361 | $16,203,490 | $14,698,174 | 45.0% | $6,614,178 |
| **HELOC Delinquent** | 0 | $0 | $0 | $0 | 0.0% | $0 |
| **Total** | **10,019** | **$932,520,995** | **$404,561,085** | **$498,766,323** | **62.10%** | **$309,751,254** |

Confidential

**SCHEDULE 2**

**RESERVED**

Confidential

Confidential

**SCHEDULE 3**

**LIST OF RESPONSIBLE OFFICERS**

**1.      GMAC Mortgage, LLC**

| Name | Title |
|------|-------|
| Steven M. Abreu | President |
| James M. Whitlinger | Chief Financial Officer |
| Jerry Lombardo | Treasurer and Treasury Executive |
| Randall Newman | Chief Treasury Management Officer |
| Timothy Pacitto | Senior Treasury Services Officer |
| Jeffrey Oravec | Assistant Treasury Services Officer |

**2.      Residential Funding Company, LLC**

| Name | Title |
|------|-------|
| Steven M. Abreu | President |
| James M. Whitlinger | Chief Financial Officer |
| Jerry Lombardo | Treasurer and Treasury Executive |
| Randall Newman | Chief Treasury Management Officer |
| Timothy Pacitto | Senior Treasury Services Officer |
| Jeffrey Oravec | Assistant Treasury Services Officer |

Confidential

3.      **Residential Capital, LLC**

| **Name** | **Title** |
|---|---|
| Thomas F. Marano | Chief Executive Officer |
| James M. Whitlinger | Chief Financial Officer |
| Jerry Lombardo | Treasury Executive |

Confidential

**SCHEDULE 4**

**RESERVED**

Confidential

**SCHEDULE 5**

## LIST OF SERVICERS

(a)   PNC Bank

(b)   Wells Fargo Bank, N.A.

(c)   HSBC Home Mortgage Corp.

(d)   BAC Home Loans

(e)   BB&T of Virginia

Confidential

**SCHEDULE 6**

**RESERVED**

Confidential

**SCHEDULE 7**

**RESERVED**

Schedule 7-1

Confidential

**EXHIBIT A**

**REQUEST/CONFIRMATION**

DATE:

TO:     BMMZ Holdings LLC, as Buyer

Pursuant to the Master Repurchase Agreement ("Agreement") between GMAC Mortgage, LLC as a Seller and BMMZ Holdings LLC, as Buyer, dated as of December 21, 2011, we hereby give notice of our election to sell to Buyer the following:

Loan count:

Purchase Date:

Repurchase Date:

Original amount:

Unpaid Principal balance:

Subject to a Approved Trust Receipt on Purchase Date:

Market Value:

Pricing Rate:  LIBOR[/Commercial Paper Rate] plus 4.75%

Purchase Price:  $ _____ amount to wire to Seller (wire instructions attached herein and in Agreement).

Seller Wiring Instructions:

|  |  |
|---|---|
| Bank: | [_____] |
| ABA#: | [_____] |
| Account: | [_____] |
| Account #: | [_____] |

Seller hereby certifies, as of such Purchase Date, that:

(a)     no Default or Event of Default has occurred and is continuing on the date hereof nor will occur after giving effect to such Transaction as a result of such Transaction;

A-1

700900240 08048307

(b)      each of the representations and warranties made by Seller in or pursuant to the Program Agreements is true and correct in all material respects on and as of the date hereof (in the case of the representations and warranties in respect of Mortgage Loans, solely with respect to Mortgage Loans being purchased on the Purchase Date); and

(c)      Seller has satisfied all conditions precedent in Section 3(vi) and Section 3(vii) of the Repurchase Agreement and all other requirements of the Program Agreements.

Requested by: _____
                        Authorized Signature
                        [Residential Funding Company, LLC][GMAC Mortgage, LLC]


We acknowledge and agree to the terms of this Request/Confirmation


                              BMMZ HOLDINGS LLC, as Buyer

                              By: _____
                              Name: _____
                              Title: _____

A-2

Confidential

**EXHIBIT B**

**REPRESENTATIONS AND WARRANTIES
RELATING TO THE PURCHASED MORTGAGE LOANS**

(i)     <u>Mortgage Loan Schedule</u>.  The information set forth in the Mortgage Schedule is true, complete and correct in all material respects as of the Purchase Date;

(ii)     <u>Document Delivery</u>.  For each Purchased Mortgage Loan, all documents required to be delivered under the Custodial Agreement pursuant to Section 2 thereof for each Purchased Mortgage Loan have been delivered to Custodian.  Seller or its agents is in possession of a true and materially accurate Note-Only Mortgage File or Complete Mortgage File in compliance with the Custodial Agreement, except for such documents the originals of which have been delivered to Custodian;

(iii)     <u>Valid Lien</u>.  The Mortgage creates a first or second lien on an estate in fee simple or a leasehold interest in real property securing the related Note, free and clear of all adverse claims, liens and encumbrances having priority over the lien of the Mortgage subject only to (a) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording which are acceptable to mortgage lending institutions generally, (c) with respect to each mortgage Loan that is a second lien mortgage loan, the lien of the first mortgage on the Mortgaged Property and (d) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property;

(iv)     <u>Ownership</u>.  Each Purchased Mortgage Loan is a whole loan and not a participation interest in a mortgage loan. Immediately prior to the sale to Buyer pursuant to this Agreement, Seller will have good title to, and is the sole owner of, each Purchased Mortgage Loan and has full right, power and authority to transfer, pledge and assign each of the Purchased Mortgage Loans to Buyer free and clear of any and all pledges, liens, charges, security interests and/or other encumbrances. To the best of Seller's knowledge, each subsequent holder, originator and servicer of the Purchased Mortgage Loan was qualified and appropriately licensed (or was exempt from such qualification or license) to transact business in the jurisdiction in which the related Mortgaged Property is located at the time such entity had possession of the Note except where the failure to be qualified or licensed would not reasonably be expected to have a Material Adverse Effect.  None of the Required Documents restricts Seller's right to sell the Purchased Mortgage Loan to Buyer;

(v)     <u>No Outstanding Charges</u>.  There are no delinquent taxes which are due and payable, ground rents, assessments or other outstanding charges affecting the related Mortgaged Property;

700900240 08048307

Confidential

(vi)    <u>Original Terms Unmodified</u>. The Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded or submitted for recording to the extent any such recordation is required by applicable law or is necessary to protect the interests of Buyer, and which have been approved by the title insurer and the primary mortgage insurer, as applicable, and copies of which written instruments are included in the Mortgage File.  No other instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released by Seller, or to the best of Seller's knowledge by any other person, in whole or in part, from the terms thereof except in connection with an assumption agreement, which assumption agreement is part of the Mortgage File and the terms of which are reflected on the Mortgage Schedule;

(vii)    <u>No Defenses</u>.  There is no valid offset, defense or counterclaim to any Note or Mortgage, or to any obligation of the mortgagor to pay the unpaid principal of or interest on such Note.  The Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Note and the Mortgage, or the exercise of any right thereunder, render the Note or Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(viii)    <u>Payment Terms</u>.  Except as disclosed in the Mortgage Schedule delivered to Buyer on the Purchase Date, (i) with respect to each Adjustable Rate Mortgage Loan, on each adjustment date, the Mortgage Interest Rate will be adjusted to equal the index plus the margin, rounded to the nearest 0.125%, subject to the periodic rate cap, the maximum rate and the minimum rate and (ii) the related Note is payable on the first day of each month in monthly installments of principal and/or interest, with interest payable in arrears,

(ix)    <u>Hazard Insurance</u>.  The improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy which conforms in all respects to the requirements of the Buyer. All individual insurance policies and flood policies referred to in clause (x) below contain a standard mortgagee clause naming Seller or the original mortgagee, and its successors in interest, as mortgagee, and Seller has received no notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance, including flood insurance (if required), at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor, except as may be limited or restricted by applicable law. Where required by state law or regulation, the Mortgagor has been given an opportunity to choose the carrier of the required hazard insurance, provided the policy is not a "master" or "blanket" hazard insurance policy covering a condominium, or any hazard insurance policy covering the common facilities of a planned unit development.  The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of the Buyer upon the consummation of the transactions contemplated by this Agreement.  The Seller has not engaged in, and has no knowledge of the Mortgagor's or any servicer's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for herein, or the validity and binding effect of such policy, including, without limitation, no unlawful fee, commission,

B-2

Confidential

kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by the Seller;

(x)    Flood Insurance.  If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property with a generally acceptable carrier and conforms in all respects to the Agency requirements;

(xi)    Compliance with Laws.  Each Purchased Mortgage Loan as of the time of its origination complied in all material respects with all applicable local, state and federal laws, including, without limitation, usury, unfair collection practice, equal credit opportunity, fair housing and regulations, real estate settlement procedures, all applicable predatory lending laws (including, for the avoidance of doubt, laws regarding the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit which has no apparent benefit to the Mortgagor), truth-in-lending and disclosure laws applicable to the solicitation, origination, collection and servicing of such Purchased Mortgage Loan and any obligations of the holder of the Note, Mortgage and other loan documents have been complied with in all material respects and the consummation of the transaction contemplated hereby will not involve the violation of any such laws or regulations, and Seller shall maintain in its possession, available for inspection of Buyer or its designee, and shall deliver to Buyer or its designee, upon reasonable request, such evidence of compliance with such requirements as are customary or otherwise required by applicable law;

(xii)    No Satisfaction of Mortgage.  The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part nor has any instrument been executed that would effect any such satisfaction, release, cancellation, subordination or rescission;

(xiii)    Validity of Mortgage Loan Documents.  The Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency and other laws of general application affecting the rights of creditors.  All parties to the Note and the Mortgage had the legal capacity to enter into the Purchased Mortgage Loan and to execute and deliver the Note and the Mortgage and each Mortgagor is an individual or natural person.  The Note and the Mortgage have been duly and properly executed by such parties. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading to the best of Seller's knowledge;

(xiv)    Full Disbursements of Proceeds.  Except in the case of a HELOC, the proceeds of each Purchased Mortgage Loan have been fully disbursed, there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making, closing or recording the Purchased Mortgage

B-3

Confidential

Loans were paid and the Mortgagor is not entitled to any refund of any amounts paid or due under the Note or Mortgage;

     (xv)   <u>Transfer of Mortgage Loans/Recordation</u>.  Each Mortgage other than MERS Mortgage Loans was recorded and the assignment of mortgage is in recordable form and (other than with respect to the blank assignee and the lack of mortgage recordation) is acceptable for recording under the laws of the jurisdiction in which Mortgaged Property is located;

     (xvi)   <u>Environmental Matters</u>.  To the best of Seller's knowledge, the Mortgaged Property is in material compliance with all applicable environmental laws, and is free from any and all toxic or hazardous substances, other than those commonly used for homeowner repair and maintenance and/or household purposes, and there exists no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue;

     (xvii)   <u>Title Insurance</u>.  Except with respect to Purchased Mortgage Loans secured by second Liens with an original principal balance of less than $200,000, the Purchased Mortgage Loan is covered by an ALTA lender's title insurance policy or other generally acceptable form of policy of insurance, as the case may be, with all necessary endorsements, issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in clause (iii) (a), (b) and (c) above) Seller, its successors and assigns, as to the first priority lien or second priority lien of the Mortgage, as applicable, in the original principal amount of the Purchased Mortgage Loan.  Such title insurance policy affirmatively insures ingress and egress and against encroachments by or upon the Mortgaged Property or any interest therein. In the case of Adjustable Rate Mortgage Loans, such title insurance policy also affirmatively insures against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment to the Mortgage Interest Rate. Seller is the sole insured of such lender's title insurance policy, such title insurance policy has been duly and validly endorsed to Buyer or the assignment to Buyer of Seller's interest therein does not require the consent of or notification to the insurer and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy. The underwriting standards with respect to the origination of each second Lien Mortgage Loan did not require title insurance for second Lien Mortgage Loans with an original principal balance of less than $200,000;

     (xviii)   <u>No Default</u>.  To the best of Seller's knowledge, except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, there is no default, breach, violation or event of acceleration existing under the Mortgage or the related Note and, to the best of Seller's knowledge, no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration; and neither Seller nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration;

Confidential

(xix)   No Mechanic's Liens.  To the best of Seller's knowledge, there are no mechanics, or similar liens or claims which have been filed for work, labor or material affecting the related Mortgaged Property which are or may be liens prior to or equal to the lien of the related Mortgage;

(xx)   Mortgaged Property Undamaged.   To the best of Seller's knowledge, the Mortgaged Property for each Purchased Mortgage Loan is free of material damage and is in good repair and condition and free of any structural deficiencies or deferred maintenance that would influence the originator's decision to originate any such Purchased Mortgage Loan or Buyer's decision to accept such Purchased Mortgage Loan as collateral hereunder. As of the date of its origination, there was no proceeding pending for the total or partial condemnation of any related Mortgaged Property that materially affects the value thereof. All of the improvements which were included for the purpose of determining the appraised value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the Mortgaged Property, except those, if any, which are considered de minimis by the Fannie Mae Guides or are insured against by the title insurance policy referred to in (xxii) above;

(xxi)   Occupancy of the Mortgaged Property.  All inspections, licenses and certificates required in connection with the origination of the Purchased Mortgage Loans to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities and the Mortgaged Property is lawfully occupied under applicable law;

(xxii)   Location of Mortgaged Property.   The Purchased Mortgage Loan is not (a) secured by a lien other than a first lien on Mortgaged Property located in Minnesota unless the original principal balance thereof was greater than or equal to $100,000 or (b) secured by a Mortgaged Property located in Puerto Rico, the Virgin Islands or Guam or any other jurisdiction for which Buyer does not have all licenses required to purchase, hold and sell such Purchased Mortgage Loan;

(xxiii)   Reserved.

(xxiv)   Due on Sale.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, the Purchased Mortgage Loan contains the usual and enforceable provisions of the originator at the time of origination for the acceleration of the payment of the unpaid principal amount if the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder.

(xxv)   Customary Provisions.   The related Mortgage contains enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) otherwise by judicial foreclosure. Upon default by a Mortgagor on a Mortgage Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures, the holder of the Mortgage Loan will be able to deliver good and marketable title to the Mortgaged Property. To the best of

B-5

Confidential

Seller's knowledge, there is no homestead or other exemption available to the Mortgagor that would materially interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage. The Mortgagor has not notified Seller and Seller has no actual knowledge of any relief requested or allowed to the Mortgage under the Servicemembers Relief Act of 1940;

(xxvi)  Deeds of Trust.  If the Mortgage constitutes a deed of trust, a trustee, duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Buyer to the trustee under the deed of trust, except in connection with a trustees sale or attempted sale after default by the Mortgagor;

(xxvii)  Reserved.

(xxviii) Location and Type of Mortgage Property.  Each of the Mortgaged Properties consists of a single parcel of real property improved by a one-to-four-family residential dwelling, including condominium units and dwelling units in planned unit developments. The Purchased Mortgage Loans are not secured by a manufactured home, co-op, mobile home, condotel, multifamily, mixed use or commercial structure.  None of the Purchased Mortgage Loans are on commercial, industrial, agricultural or undeveloped property, or on any property located anywhere except the continental United States, Alaska or Hawaii.

(xxix)  LTV.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, the ratio of the original outstanding principal amount of the Purchased Mortgage Loan to the lesser of the appraised value (or stated value if an appraisal was not a requirement of the applicable processing style) of the Mortgaged Property at origination or the purchase price of the Mortgaged Property securing each Purchased Mortgage Loan (the "Loan-to-Value Ratio") is not in excess of 100%;

(xxx)  Reserved.

(xxxi)  Reserved.

(xxxii)  Origination and Collection Practices; Escrow Deposits.  The origination, collection and servicing practices with respect to each Note and Mortgage have been in all material respects proper, reasonable and customary in the mortgage origination and servicing business.  With respect to escrow deposits and payments that Seller collects, all such payments are in the possession of, or under the control of, Seller, and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made.  No escrow deposits or other charges or payments due under the Note have been capitalized under any Mortgage or the related Note;

(xxxiii) No Additional Security.  There is no pledged account or other security other than real estate securing the Mortgagor's obligations;

(xxxiv) Buydown Mortgage Loans.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date,  no Purchased Mortgage Loan contains provisions pursuant to which monthly payments are (a) paid or partially paid with funds deposited in any

700900240 08048307

Confidential

separate account established by Seller, the mortgagor, or anyone on behalf of the mortgagor, (b) paid by any source other than the mortgagor or (c) contains any other similar provisions which may constitute a "buydown" provision.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, no Purchased Mortgage Loan is a graduated payment mortgage loan and the Purchased Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(xxxv) <u>No Reverse Mortgage Loan</u>.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, no Purchased Mortgage Loan is a reverse mortgage loan;

(xxxvi) <u>No Additional Payments</u>.  There is no obligation on the part of Seller or any other party under the terms of the Mortgage or related Note to make payments in addition to those made by the Mortgagor;

(xxxvii)    <u>Consolidation of Advances</u>.  Any advances made prior to the related Purchase Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the related Mortgage Schedule. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second, as applicable, lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Buyer. The consolidated principal amount does not exceed the maximum principal amount of the Purchased Mortgage Loan;

(xxxviii)    <u>No Error, Omission, Fraud etc</u>.  No material error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Purchased Mortgage Loan has taken place on the part of Seller, or to the best of Sellers' knowledge, on the part of any person, including, without limitation, the related Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Purchased Mortgage Loan or in the application of any insurance in relation to such Purchased Mortgage Loan;

(xxxix)<u>Leasehold Interests</u>.  If any of the Purchased Mortgage Loans are secured by a leasehold interest, with respect to each leasehold interest: (1) the lessor under the lease holds a fee simple interest in the land; (2) the terms of such lease expressly permit the mortgaging of the leasehold estate, the assignment of the lease without the lessor's consent and the acquisition by the holder of the Mortgage of the rights of the lessee upon foreclosure or assignment in lieu of foreclosure or provide the holder of the Mortgage with substantially similar protections; (3) the terms of such lease do not (a) allow the termination thereof upon the lessee's default without the holder of the Mortgage being entitled to receive written notice of, and opportunity to cure, such default, (b) allow the termination of the lease in the event of damage or destruction as long as the Mortgage is in existence, (c) prohibit the holder of the Mortgage from being insured (or receiving proceeds of insurance) under the hazard insurance policy or policies relating to the Mortgaged Property or (d) permit any increase in rent other than pre-established increases set forth in the lease; (4) the residential property in such area consisting of leasehold estates is readily marketable; (5) the lease is recorded and is in full force and effect and is not subject to any prior lien or encumbrance by which the leasehold could be terminated or subject to any

B-7

Confidential

charge or penalty; and (6) the remaining term of the lease does not terminate less than ten years after the maturity date of such Purchased Mortgage Loan;

(xl)     No Bankruptcy Proceedings.     The related Mortgagor was not subject to a proceeding under applicable bankruptcy laws at the time the Purchased Mortgage Loan was originated, except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date.

(xli)     HOEPA.     No Purchased Mortgage Loan is (a) subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended ("HOEPA"), or has an "annual percentage rate" or "total points and fees" payable by the borrower (as each such term is defined under HOEPA) that equals or exceeds the applicable thresholds defined under HOEPA (Section 32 of Regulation Z, 12 C.F.R. Section 226.32(a0(1)(i) and (ii)), (b) a "high cost" mortgage loan, "covered" mortgage loan, "high risk home" mortgage loan, or "predatory" mortgage loan or any other comparable term, or a similarly classified loan using different terminology under any federal, state or local law, (c) subject to any comparable federal, state or local statutes or regulations, or any other statute or regulation providing for heightened regulatory scrutiny or assignee liability to holders of such mortgage loans, or (d) a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the current Standard & Poor's LEVELS® Glossary Revised, Appendix E) (in the case of state or local law, as determined without giving effect to any available federal preemption, other than any exemptions specifically provided for in the relevant state or local law);

(xlii)     Lost-Note Mortgage Loan.     No Purchased Mortgage Loan is a Lost-Note Mortgage Loan;

(xliii)     Interest -Only Mortgage Loan.     Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, no Purchased Mortgage Loan is an interest only mortgage loan;

(xliv)     No Credit Life Policies.     No borrower was required to purchase any single premium credit insurance policy (e.g., life, mortgage, disability, accident, unemployment, or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit.     No borrower obtained a prepaid single premium credit insurance policy (e.g., life, mortgage, disability, accident, unemployment, or health insurance product) or debt cancellation agreement in connection with the origination of the Purchased Mortgage Loan. No proceeds from any Purchased Mortgage Loan were used to purchase single premium credit insurance policies (e.g., life, mortgage, disability, accident, unemployment, or health insurance product) or debt cancellation agreements as part of the origination of, or as a condition to closing, such Purchased Mortgage Loan;

(xlv)     Reserved.

(xlvi)     Reserved.

(xlvii)     MERS Mortgage Loans.     With respect to each Purchased Mortgage Loan that is a MERS Mortgage Loan, a Mortgage Identification Number has been assigned by MERS and such Mortgage Identification Number is accurately provided on the Mortgage Schedule.     The related

700900240 08048307

Confidential

Mortgage Assignment (unless such loan was originated in the name of MERS) to MERS has been duly and properly recorded.  With respect to each MERS Mortgage Loan, no Mortgagor has received any notice of liens or legal actions with respect to such Purchased Mortgage Loan and no such notices have been electronically posted by MERS;

(xlviii)  No Proceedings; Adverse Affect.  There are no actions, suits or proceedings before any court, administrative agency or arbitrator concerning any Purchased Mortgage Loan, Mortgagor or related Mortgaged Property that could reasonably be expected to adversely affect title to the Mortgaged Property or the validity or enforceability of the related Mortgage or that could reasonably be expected to materially and adversely affect the value of the Mortgaged Property as security for the Purchased Mortgage Loan or the use for which the premises were intended;

(xlix)  Reserved.

(l)  Prepayment Charges.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, no Mortgage Loan contains a provision permitting imposition of a penalty upon a prepayment prior to maturity.

(li)  Credit Reporting.  The servicer for each Purchased Mortgage Loan has fully furnished accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis and in accordance with the Fair Credit Reporting Act and its implementing regulations;

(lii)  Eligible Products.  With respect to each Purchased Mortgage Loan, the borrower was not encouraged or required to select a Purchased Mortgage Loan product offered by the Purchased Mortgage Loan's originator which is a higher cost product designed for less creditworthy borrowers, taking into account such facts as, without limitation, the Purchased Mortgage Loan's requirements and the borrower's credit history, income, assets and liabilities. For a borrower who seeks financing through a Purchased Mortgage Loan originator's higher-priced subprime lending channel, the borrower should be directed towards or offered the Purchased Mortgage Loan originator's standard mortgage line if the borrower is able to qualify for one of the standard products;

(liii)  Reserved.

(liv)  Underwriting Methodology.  The methodology used in underwriting the extension of credit for each Purchased Mortgage Loan in the trust did not rely solely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed related objective criteria such as the borrower's income, assets, and liabilities to the proposed mortgage payment and, based on such methodology, the Purchased Mortgage Loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Purchased Mortgage Loan;

(lv)  Points and Fees.  No borrower of a Purchased Mortgage Loan that is secured by the borrower's principal residence was charged "points and fees" in an amount greater than (a)

B-9

Confidential

$1,000 or (b) 5% of the principal amount of such Purchased Mortgage Loan, whichever is greater.  For purposes of this representation, "points and fees" (x) include origination, underwriting, broker and finder's fees and charges that the lender imposed as a condition of making the Purchased Mortgage Loan, whether they are paid to the lender or a third party; and (y) exclude bona fide discount points, fees paid for actual services rendered in connection with the origination of the mortgage (such as attorneys' fees, notaries fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections); the cost of mortgage insurance or credit-risk price adjustments; the costs of title, hazard, and flood insurance policies; state and local transfer taxes or fees; escrow deposits for the future payment of taxes and insurance premiums; and other miscellaneous fees and charges, which miscellaneous fees and charges, in total, do not exceed 0.25 percent of the loan amount;

(lvi)    Reserved.

(lvii)    Truth in Lending Act.  No Purchased Mortgage Loan that is a "residential mortgage transaction" within the meaning of the federal Truth in Lending Act, Regulation Z, 12 C.F.R. 226.2, has either an "annual percentage rate" or "total points and fees" payable by the borrower that exceeds the applicable thresholds under HOEPA;

(lviii)    No Negative Amortization Loans.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, no Purchased Mortgage Loan is a Negative Amortization Loan;

(lix)    No Balloon Loans.  Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, no Purchased Mortgage Loan is a balloon Mortgage Loan;

(lx)    No Arbitration.  With respect to each Purchased Mortgage Loan, neither the related Mortgage nor the related Note requires the Mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Purchased Mortgage Loan; No Mortgagor agreed to submit to arbitration to resolve any dispute arising out of or relating in any way to the Purchased Mortgage Loan;

(lxi)    Fees and Charges.  All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Purchased Mortgage Loan has been disclosed in writing to the borrower in accordance with applicable state and federal law and regulation;

(lxii)    Reserved.

(lxiii)    Anti-Money Laundering.  Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"). Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Purchased Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the

B-10

Confidential

applicable Mortgagor for purposes of the Anti-Money Laundering Laws; no Purchased Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "Executive Order") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the "OFAC Regulations") or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

(lxiv)    Compliance with Interagency Guidance.  Each Purchased Mortgage Loan that is a "nontraditional mortgage loan" within the meaning of the Interagency Guidance on Nontraditional Mortgage Product Risks, 71 FR 58609 (October 4, 2006), and that has a residential loan application date on or after September 13, 2007 (or, if such date cannot be determined, an origination date on or after October 1, 2007), complies in all respects with such guidance, including any interpretations, applications or implementation plans with respect thereto that have been communicated and/or agreed to by an institution's regulator, regardless of whether the Purchased Mortgage Loan's originator or seller is subject to such guidance;

(lxv)    Compliance with Subprime Statement.  No Purchased Mortgage Loan that is an Adjustable Rate Mortgage Loan and that has a residential loan application date on or after September 13, 2007, is subject to the Interagency Statement on Subprime Mortgage Lending, 72 FR 37569 (July 10, 2007) as defined by Fannie Mae in  the Lender Letter 03-07 (August 15, 2007) or by Freddie Mac in  Freddie Mac Single Family Advisory (September 7, 2007) and Freddie Mac Bulletin 2007-4);

(lxvi)    High Cost Loans.  No Purchased Mortgage Loan is (a) subject to the provisions of the Home Ownership and Equity Protection Act of 1994 as amended ("HOEPA") or has an "annual percentage rate" or "total points and fees" payable by the borrower that exceeds the applicable thresholds defined under HOEPA and its implementing regulations, including 12 C.F.R. Section 226.32(a)(1)(i) and (ii), or (b) a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the current Standard & Poor's LEVELS® Glossary Revised, Appendix E) or (c) subject to any comparable federal, state or local statutes or regulations or any other statute or regulation providing assignee liability to holders of such Purchased Mortgage Loans or subjecting the parties to heightened scrutiny.  No Purchased Mortgage Loan is considered a "high-cost" or "covered" loan under the Georgia Fair Lending Act or the New York Banking Law, Section 6-1, or under any federal, state or local law, or if located in the state of New Jersey, the Purchased Mortgage Loans were not originated subsequent to November 26, 2003 and considered "high cost", "covered refinancings", "home improvement loans" or loans secured by manufactured housing, within the meaning of the New Jersey Home Ownership Security Act of 2002;

(lxvii)    Georgia.  No Mortgage Loan was originated in the state of Georgia between October 1, 2002 and March 6, 2003;

(lxviii)    Payments Current. Except as disclosed in the Mortgage Schedule delivered to the Buyer on the Purchase Date, other than any Mortgage Loan that is Delinquent, no payment required under the Mortgage Loan is 30 days or more delinquent.  With respect to Delinquent Mortgage Loans no payment required under the Mortgage Loan is 60 days or more delinquent;

700900240 08048307

Confidential

(lxix)  <u>No Defense to Insurance Coverage</u>.  The Seller has caused or will cause to be performed any and all acts required to preserve the rights and remedies of the Buyer in any insurance policies applicable to the Mortgage Loans including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of the Buyer.  No action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed on or prior to the Purchase Date (whether or not known to the Seller on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under any applicable, special hazard insurance policy, primary mortgage guarantee insurance policy or bankruptcy bond (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence, or fraud of the Seller, the related Mortgagor or any party involved in the application for such coverage, including the appraisal, plans and specifications and other exhibits or documents submitted therewith to the insurer under such insurance policy, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay;

(lxx)  <u>Credit Information</u>.  As to each consumer report (as defined in the Fair Credit Reporting Act, Public Law 91-508) or other credit information furnished by the Seller to the Buyer, that Seller has full right and authority and is not precluded by law or contract from furnishing such information to the Buyer and the Buyer is not precluded from furnishing the same to any subsequent or prospective purchaser of such Mortgage.  The Seller shall hold the Buyer harmless from any and all damages, losses, costs and expenses (including attorney's fees) arising from disclosure of credit information in connection with the Buyer's secondary marketing operations and the purchase and sale of mortgages or Servicing Rights thereto;

(lxxi)  <u>Tax Service Contract; Flood Certification Contract</u>.  Each Mortgage Loan is covered by a paid in full, life of loan, tax service contract and a paid in full, life of loan, flood certification contract and each of these contracts is assignable to the Buyer; and

(lxxii)  <u>Regarding the Mortgagor</u>.  The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "<u>living trust</u>" and such "<u>living trust</u>" is in compliance with Fannie Mae guidelines for such trusts.

700900240 08048307

Confidential

**EXHIBIT C**

**FORM OF CUSTODIAL AGREEMENT**

[SEE ATTACHED]

700900240 08048307

**EXHIBIT D**

**RESERVED**

D-1

Confidential

**EXHIBIT E**

**FORM OF GUARANTEE**

[SEE ATTACHED]

700900240 08048307

Confidential

**EXHIBIT F**

## FORM OF BLOCKED ACCOUNT SERVICE AGREEMENT

[SEE ATTACHED]

F-1

Confidential

**EXHIBIT G**

**FORM OF SECURITY RELEASE CERTIFICATION**

[insert date]

BMMZ Holdings LLC
[●]
[●]
Attention: _____

    Re:    <u>Security Release Certification</u>

    Effective as of ___[DATE]_____ [_____ ] hereby relinquishes any and all right, title and interest it may have in and to the Loans described in <u>Exhibit A</u> attached hereto upon purchase thereof by BMMZ Holdings LLC ("Buyer") from Seller named below pursuant to that certain Master Repurchase Agreement, dated as of December 21, 2011 as of the date and time of receipt by [_____] of  $_____  for such Loans (the "Date and Time of Sale") and certifies that all notes, mortgages, assignments and other documents in its possession relating to such Loans have been delivered and released to Seller named below or its designees as of the Date and Time of Sale.

    Name and Address of Lender:

        [Custodian]
        [        ]
        For Credit Account No. [        ]
        Attention: [        ]
        Phone: [        ]
        Further Credit – [        ]

        [NAME OF WAREHOUSE LENDER]

        By:_____
        Name:
        Title:

G-1

Seller named below hereby certifies to Buyer that, as of the Date and Time of Sale of the above mentioned Loans to Buyer, the interests in the Loans released by the above named [corporation] comprise all security or other adverse interests relating to or affecting any and all such Loans. Seller warrants that, as of such time, there are and will be no other security or other adverse interests affecting any or all of such Loans.

[SELLER]

By:_____
Name:
Title:

G-2

700900240 08048307

## EXHIBIT TO SECURITY RELEASE CERTIFICATION

[List of Loans]

G-3

700900240 08048307

**EXHIBIT H**

**FORM OF SERVICER ACKNOWLEDGMENT AND INSTRUCTION LETTER
(SERVICING RETAINED MORTGAGE LOANS)**

December [__], 2011

[_____], as Subservicer
[ADDRESS]
[ADDRESS]
Attn: [_____]

Re:    Master Repurchase Agreement, dated as of December [●], 2011 by and between GMAC Mortgage, LLC as seller ("GMACM" or "Seller"), Residential Capital, LLC as guarantor ("ResCap" or "Guarantor") and BMMZ Holdings LLC as buyer ("Buyer").

Ladies and Gentlemen:

As servicer of certain mortgage loan assets (the "Assets") pursuant to that certain [Servicing Agreement], dated as of [_____], 20[__], between [_____] ("You") and the undersigned Seller, a copy of which is attached hereto as Exhibit A, as such agreement may be amended or modified (the "Servicing Agreement"), You are hereby notified pursuant to this instruction letter (the "Letter Agreement") that the undersigned Seller is selling or has sold to the Buyer certain Assets pursuant to that certain Master Repurchase Agreement, dated as of December 21, 2011 (the "Repurchase Agreement"), by and between the Buyer, the Seller and the Guarantor, as more specifically described on Exhibit B.

You agree to service the Assets in accordance with the terms of the Servicing Agreement for the benefit of the Buyer and the Seller, but, except as otherwise provided herein, You shall continue to remit funds to and take instructions from Seller under the Servicing Agreement until you receive a "Default Notice" (as defined below) from Buyer.

You further agree that, upon your receipt of written notification (a "Default Notice"), from the Buyer that an Event of Default has occurred under the Repurchase Agreement, Buyer shall assume any rights the Seller has under the Servicing Agreement, including any right to terminate You with or without payment of a termination fee and/or any right to purchase the related Servicing Rights from You. Subject to the terms of the Servicing Agreement, from and after Your receipt of a Default Notice, You shall (x) remit any and all payments and distributions made in respect of the Assets described in such Default Notice, net of servicing fees, incentive payments and reimbursements for expenses and advances as provided in the Servicing Agreement, in accordance with the Buyer's wiring instructions set forth in such Default Notice, (y) follow the instructions of Buyer with respect to the Assets and deliver to Buyer any

H-1

Confidential

information with respect to the Assets reasonably requested by Buyer, and (z) treat this Letter Agreement as a separate and distinct servicing agreement between You and Buyer (incorporating the terms of the Servicing Agreement by reference), subject to no setoff or counterclaims arising in Your favor (or the favor of any third party claiming through You) under any other agreement or arrangement between You and Seller or otherwise.  Notwithstanding anything to the contrary herein or in the Servicing Agreement, in no event shall Buyer be liable for any fees, indemnities, costs, reimbursements or expenses incurred by You prior to Your receipt of a Default Notice or otherwise owed to You in respect of the period of time prior to such Event of Default, other than servicing fees, incentive payments and reimbursements retained by You as set forth above.

**[NO FURTHER TEXT ON THIS PAGE]**

700900240 08048307

Confidential

Please acknowledge receipt of this Letter Agreement by signing in the signature block below and forwarding an executed copy to the Buyer promptly upon receipt. Any notices to the Buyer should be delivered to the following address: BMMZ Holdings LLC, c/o Ally Financial Inc., 200 Renaissance Center, Detroit, MI 48265-2000, Mail Code: 482-B12-B96, Attention: Courtney Lowman, Email: courtney.lowman@ally.com, Telephone No.: (313) 656-6711.

Very truly yours,

GMAC MORTGAGE, LLC, as Seller

By:_____
Name:
Title:

Acknowledged and Agreed as of this __ day of _____, 20__:

[_____], as [Servicer][Subservicer]

By:_____
Name:
Title:

BMMZ HOLDINGS LLC,
as Buyer

By:_____
Name:
Title:

H-3

Confidential

**EXHIBIT I**

**FORM OF OFFICER'S CERTIFICATE**

[insert date]

BMMZ Holdings, LLC
[Ally Address]
[Ally City/State]
Attention: [●]

Re: _____ Reporting Date

Reference is made to the Master Repurchase Agreement, dated as of December 21, 2011 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Repurchase Agreement"), by and among GMAC Mortgage, LLC ("GMAC Mortgage"), Residential Capital, LLC as Guarantor (the "Guarantor") and BMMZ Holdings, LLC (the "Buyer"). Terms defined in the Repurchase Agreement and not otherwise defined herein are used herein as defined in the Repurchase Agreement.

Pursuant to Section 10(iii)(a)(5) of the Repurchase Agreement, the Guarantor is furnishing to you herewith (or has most recently furnished to you) the financial statements of the Guarantor for the fiscal period ended as of the reporting date shown above (the "Reporting Date"). Such financial statements have been prepared in accordance with generally accepted accounting principles and present fairly, in all material respects, the financial position of the Guarantor covered thereby at the date thereof and the results of its operations for the period covered thereby, subject in the case of interim statements only to normal year-end audit adjustments and the addition of footnotes.

The undersigned Responsible Officer of the Guarantor has caused the provisions of the Repurchase Agreement to be reviewed and certifies to the Buyer that: (a) as of the Reporting Date, (i) the Consolidated Liquidity was $[_____], (ii) the Consolidated Tangible Net Worth was $[_____], (b) no Default or Event of Default exists under any Program Agreement or the GMAC Facilities, (c) the GMAC Facilities have not been amended, modified or supplemented other than in accordance with the terms of the Repurchase Agreement, (d) attached hereto are the computations necessary to determine that the Guarantor is in compliance with the provisions of the Repurchase Agreement as of the Reporting Date referenced thereon, (e) to the best of the undersigned's knowledge no event has occurred since the date of the most recent financial statements upon which such covenant compliance was calculated that would cause the Guarantor to no longer be in compliance with said provisions.

The statements made herein (and in any schedules attached hereto) shall be deemed to be representations and warranties made in a document for purposes of Section 10(i)(p) of the Repurchase Agreement.

I-1

700900240 08048307

IN WITNESS WHEREOF, the undersigned Responsible Officer of the Guarantor has set [his/her] hand this _____, 20___.

**RESIDENTIAL CAPITAL, LLC,**
as Guarantor


By:_____
Name:
Title:

I-2

700900240 08048307

**<u>Exhibit C-7</u>**

**<u>Quarterly Financial Statements for the Period Ended December 31, 2011</u>**

# RESIDENTIAL CAPITAL, LLC

**Consolidated Financial Statements for the Years Ended
December 31, 2011 and 2010**

|                                                                      | Page |
|----------------------------------------------------------------------|------|
| Table of Contents                                                    | 2    |
| Independent Auditors' Report                                         | 3    |
| Consolidated Balance Sheet                                           | 4    |
| Consolidated Statement of Income                                     | 5    |
| Consolidated Statement of Comprehensive Income                       | 6    |
| Consolidated Statement of Changes in Equity                          | 7    |
| Consolidated Statement of Cash Flows                                 | 8    |
| Notes to Consolidated Financial Statements                           |      |
|   1. Description of Business and Significant Accounting Policies      | 10   |
|   2. Discontinued Operations                                         | 21   |
|   3. Mortgage Loans Held–for–sale                                    | 21   |
|   4. Finance Receivables and Loans, Net                              | 22   |
|   5. Securitizations and Variable Interest Entities                  | 25   |
|   6. Servicing Activities                                            | 32   |
|   7. Accounts Receivable, Net                                        | 36   |
|   8. Other Assets                                                    | 36   |
|   9. Borrowings                                                      | 37   |
|   10. Other Liabilities                                              | 41   |
|   11. Other Revenue, Net                                             | 42   |
|   12. Other Noninterest Expense                                     | 42   |
|   13. Other Comprehensive Income                                     | 42   |
|   14. Income Taxes                                                    | 43   |
|   15. Employee Benefit Plans                                         | 45   |
|   16. Fair Value                                                     | 46   |
|   17. Derivative Instruments and Hedging Activities                  | 58   |
|   18. Higher Risk Mortgage Loans and Credit Quality                  | 61   |
|   19. Guarantees, Commitments and Contingencies                      | 63   |
|   20. Related Party Transactions                                     | 76   |
|   21. Regulatory Matters                                             | 80   |
|   22. Subsequent Events                                              | 80   |

# Independent Auditors' Report

Residential Capital, LLC

To the Board of Directors and Member of Residential Capital, LLC:

We have audited the accompanying Consolidated Balance Sheets of Residential Capital, LLC (the "Company") (a wholly-owned subsidiary of Ally Financial Inc.) as of December 31, 2011 and 2010, and the related Consolidated Statements of Income, Comprehensive Income, Changes in Equity, and Cash Flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 20 to the financial statements, the Company has entered into a number of significant agreements and transactions with its affiliates.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2011 and 2010, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company's liquidity and capital needs, combined with conditions in the marketplace, raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 1 to the financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Deloitte & Touche LLP
March 28, 2012
Detroit, Michigan

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | **$618,699** | $672,204 |
| Mortgage loans held–for–sale ($56,976 and $21,828 fair value elected) | **4,249,625** | 4,654,907 |
| Finance receivables and loans, net | | |
| Consumer ($835,192 and $1,014,703 fair value elected) | **1,022,730** | 1,313,702 |
| Commercial | **38,017** | 117,316 |
| Allowance for loan losses | **(28,616)** | (42,810) |
| Total finance receivables and loans, net | **1,032,131** | 1,388,208 |
| Mortgage servicing rights | **1,233,107** | 1,991,586 |
| Accounts receivable, net | **3,051,748** | 2,640,059 |
| Other assets | **6,628,152** | 5,485,201 |
| Total assets | **$16,813,462** | $16,832,165 |
| **Liabilities** | | |
| Borrowings | | |
| Borrowings from parent and affiliate | **$1,189,364** | $1,526,775 |
| Collateralized borrowings in securitization trusts ($829,940 and $972,068 fair value elected) | **830,318** | 1,057,287 |
| Other borrowings | **4,705,404** | 5,464,454 |
| Total borrowings | **6,725,086** | 8,048,516 |
| Other liabilities | **9,996,026** | 7,937,485 |
| Total liabilities | **16,721,112** | 15,986,001 |
| **Equity** | | |
| Member's interest | **11,433,776** | 11,324,371 |
| Accumulated deficit | **(11,279,560)** | (10,434,497) |
| Accumulated other comprehensive loss | **(61,866)** | (43,710) |
| Total equity | **92,350** | 846,164 |
| Total liabilities and equity | **$16,813,462** | $16,832,165 |

The assets of consolidated variable interest entities that can be used only to settle obligations of the consolidated variable interest entities and the liabilities of these entities for which creditors (or beneficial interest holders) did not have recourse to our general credit at December 31, 2011 and 2010, were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held–for–sale | **$8,658** | $21,482 |
| Finance receivables and loans, net | | |
| Consumer ($835,192 and $1,014,703 fair value elected) | **998,509** | 1,213,050 |
| Allowance for loan losses | **(10,126)** | (18,397) |
| Total finance receivables and loans, net | **988,383** | 1,194,653 |
| Accounts receivable, net | **1,027,411** | 1,167,976 |
| Other assets | **29,494** | 47,578 |
| Total assets | **$2,053,946** | $2,431,689 |
| **Liabilities** | | |
| Borrowings | | |
| Collateralized borrowings in securitization trusts ($829,940 and $972,068 fair value elected) | **$830,318** | $1,047,588 |
| Other borrowings | **855,631** | 903,601 |
| Total borrowings | **1,685,949** | 1,951,189 |
| Other liabilities | **29,099** | 29,271 |
| Total liabilities | **$1,715,048** | $1,980,460 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

| Year ended December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| **Revenue** | | |
| Interest income | **$390,840** | $860,976 |
| Interest expense | **433,492** | 629,600 |
| Net financing revenue | **(42,652)** | 231,376 |
| **Other revenue** | | |
| Servicing fees | **839,640** | 972,533 |
| Servicing asset valuation and hedge activities, net | **(355,715)** | 222,571 |
| Total servicing income, net | **483,925** | 1,195,104 |
| Gain on mortgage loans, net | **222,159** | 650,490 |
| Real estate related revenues, net | **15,254** | 8,832 |
| (Loss) gain on foreclosed real estate | **(15,803)** | 32,764 |
| Other revenue, net | **(30,324)** | (67,534) |
| Total other revenue | **675,211** | 1,819,656 |
| **Total net revenue** | **632,559** | 2,051,032 |
| **Provision for loan losses** | **24,021** | (7,289) |
| **Noninterest expense** | | |
| Representation and warranty expense, net | **324,070** | 670,452 |
| Compensation and benefits | **319,602** | 261,785 |
| Mortgage fines and penalties | **204,000** | — |
| Professional fees | **118,549** | 73,234 |
| Data processing and telecommunications | **79,682** | 113,966 |
| Occupancy | **24,829** | 20,125 |
| Advertising | **18,162** | 369 |
| Other noninterest expense, net | **349,236** | 386,617 |
| Total noninterest expense | **1,438,130** | 1,526,548 |
| **(Loss) income before income taxes** | **(829,592)** | 531,773 |
| Income tax expense | **15,471** | 6,914 |
| **Net (loss) income from continuing operations** | **(845,063)** | 524,859 |
| Income from discontinued operations, net of tax | **—** | 50,216 |
| **Net (loss) income** | **($845,063)** | $575,075 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

| Year ended December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| **Net (loss) income** | **($845,063)** | $575,075 |
| **Other comprehensive income, net of tax** | | |
| Unrealized gains on investment securities | | |
| Net unrealized (losses) gains arising during the period | **(666)** | 1,606 |
| Net realized (losses) gains reclassified to net (loss) income | **(676)** | — |
| Net change | **(1,342)** | 1,606 |
| Translation adjustments | | |
| Translation | **53** | 21,729 |
| Net change | **53** | 21,729 |
| Defined benefit pension plans | | |
| Net (losses) and prior service costs arising during the period | **(16,867)** | (22,977) |
| Net gain (loss) and prior service costs reclassified to net (loss) income | **—** | — |
| Net change | **(16,867)** | (22,977) |
| **Other comprehensive income, net of tax** | **(18,156)** | 358 |
| Cumulative effect of change in accounting principle | **—** | — |
| **Comprehensive income** | **($863,219)** | $575,433 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

# Consolidated Statement of Changes in Equity
Residential Capital, LLC

| ($ in thousands) | Member's interest | Accumulated deficit | Accumulated other comprehensive loss | Total equity |
|---|---|---|---|---|
| **Balance at January 1, 2010** | $11,324,371 | ($11,005,303) | ($44,068) | $275,000 |
| Cumulative effect of change in accounting | | | | |
| Adoption of ASU 2009-17 | — | (4,269) | — | (4,269) |
| Net income | — | 575,075 | — | 575,075 |
| Other comprehensive income, net of tax | — | — | 358 | 358 |
| **Balance at December 31, 2010** | $11,324,371 | ($10,434,497) | ($43,710) | $846,164 |
| **Balance at January 1, 2011** | **$11,324,371** | **($10,434,497)** | **($43,710)** | **$846,164** |
| Net loss | — | **(845,063)** | — | **(845,063)** |
| Capital contribution | **109,405** | — | — | **109,405** |
| Other comprehensive income, net of tax | — | — | **(18,156)** | **(18,156)** |
| **Balance at December 31, 2011** | **$11,433,776** | **($11,279,560)** | **($61,866)** | **$92,350** |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

# Consolidated Statement of Cash Flows

Residential Capital, LLC

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Operating activities** | | |
| Net (loss) income | **($845,063)** | $575,075 |
| Reconciliation of net income (loss) to net cash provided by (used in) operating activities | | |
| Depreciation and amortization | **27,245** | 32,975 |
| Accretion of deferred concession on secured notes | **(101,113)** | (110,009) |
| Provision for loan losses | **24,021** | 14,618 |
| Gain on mortgage loans, net | **(222,159)** | (482,187) |
| Net loss (gain) on other assets | **16,134** | (36,385) |
| Recovery of held-for-sale platforms | **—** | (54,609) |
| Equity in earnings of investees in excess of cash received | **—** | (973) |
| Change in fair value of mortgage servicing rights | **812,435** | 725,351 |
| Originations and purchases of mortgage loans held–for–sale | **(60,675,667)** | (70,295,821) |
| Proceeds from sales and repayments of mortgage loans held–for–sale | **59,613,292** | 70,342,416 |
| Net change in | | |
| Deferred income taxes | **(4,636)** | — |
| Accounts receivable | **752,588** | 393,032 |
| Other assets | **(1,438,938)** | (3,737,896) |
| Other liabilities | **2,470,237** | 3,068,161 |
| Net cash provided by operating activities | **428,376** | 433,708 |
| **Investing activities** | | |
| Net decrease in commercial finance receivables and loans | **46,432** | 214,989 |
| Net decrease in consumer mortgage finance receivables and loans | **546,135** | 2,493,434 |
| Net decrease in investments in real estate and other | **4,543** | 107,187 |
| Proceeds from sales of foreclosed and owned real estate | **108,349** | 404,019 |
| Proceeds from sale of business units, net (a) | **—** | (122,782) |
| Other, net | **173,110** | 906,662 |
| Net cash provided by investing activities | **878,569** | 4,003,509 |
| **Financing activities** | | |
| Net decrease in borrowings from parent and affiliate | **(228,007)** | (362,017) |
| Proceeds from issuance of collateralized borrowings in securitization trusts | **—** | 232,754 |
| Repayments of collateralized borrowings in securitization trusts | **(466,636)** | (2,178,383) |
| Proceeds from other long–term borrowings | **787,325** | 471,395 |
| Repayments of other long–term borrowings | **(1,052,703)** | (2,083,745) |
| Net decrease in other short-term borrowings | **(386,639)** | (830,446) |
| Net cash used in financing activities | **(1,346,660)** | (4,750,442) |
| Effect of changes in foreign exchange rates on cash and cash equivalents | **(13,790)** | 64,695 |
| Net decrease in cash and cash equivalents | **(53,505)** | (248,530) |
| Change in cash and cash equivalents of operations held–for–sale | **—** | 155,473 |
| Cash and cash equivalents at beginning of year | **672,204** | 765,261 |
| Cash and cash equivalents at end of year | **$618,699** | $672,204 |

(a)  The amount for the year ended December 31, 2010 is net of cash and cash equivalents of $452.1 million, of business units at the time of disposition.

8

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---:|---:|
| **Supplemental disclosures** | | |
| Cash paid for | | |
| Interest | **$442,175** | $782,718 |
| Income taxes | **37,648** | 3,650 |
| Non cash items | | |
| Mortgage loans held–for–sale transferred to consumer finance receivables and loans | **4,756** | 30,535 |
| Consumer finance receivables and loans transferred to mortgage loans held–for–sale | **72,876** | 326,939 |
| Consumer finance receivables and loans transferred to other assets | **16,098** | 199,011 |
| Mortgage loans held–for–sale transferred to other assets | **47,073** | 107,540 |
| Mortgage loans held–for–sale transferred to accounts receivable | **1,169,108** | 655,836 |
| Mortgage servicing rights recognized upon the transfer of financial assets | **54,426** | 184,494 |
| Capital contributions through forgiveness of borrowings from Ally Inc | **109,405** | — |
| Change upon initial adoption of new accounting standard (ASU 2009-17): | | |
| Increase in assets of operations held–for–sale | — | 10,242,675 |
| Increase in liabilities of operations held–for–sale | — | 10,079,011 |
| Increase in consumer finance receivables and loans | — | 1,210,769 |
| Increase in collateralized borrowings in securitization trusts | — | 1,143,766 |
| Decrease in consumer finance receivables and loans upon deconsolidation | — | 1,968,859 |
| Decrease in collateralized borrowings upon deconsolidation | — | 1,545,409 |
| Other disclosures | | |
| Proceeds from sales and repayments of consumer finance receivables and loans originally designated as mortgage loans held–for–sale | **157,228** | 1,247,754 |
| Reconciliation of mortgage loans held–for–sale | | |
| Mortgage loans held–for–sale at beginning of year | **$ 4,654,907** | $ 5,309,529 |
| Originations and purchases of mortgage loans | **60,675,667** | 70,295,821 |
| Gain on sale of mortgage loans, net | **222,159** | 448,721 |
| Proceeds from sales and repayments of mortgage loans | **(59,613,292)** | (70,342,416) |
| Proceeds from sales and repayments of loans transferred from consumer finance receivables and loans | **(225,421)** | (906,238) |
| Originations of mortgage servicing rights | **(54,426)** | (184,494) |
| Transfers to consumer finance receivables and loans | **(4,756)** | (30,535) |
| Transfers from consumer finance receivables and loans | **72,876** | 326,939 |
| Transfers to accounts receivable | **(1,169,108)** | (655,836) |
| Transfers to other assets | **(47,073)** | (107,540) |
| Net change in delinquent loans subject to repurchase option | **(102,247)** | 540,934 |
| Other, net | **(159,661)** | (39,978) |
| Mortgage loans held–for–sale at end of year | **$4,249,625** | $4,654,907 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

## 1. Description of Business and Significant Accounting Policies

Residential Capital, LLC (ResCap, we, our, or us) is a wholly owned subsidiary of GMAC Mortgage Group, LLC (GMAC Mortgage Group) which is a wholly owned subsidiary of Ally Financial Inc. (Ally Inc.).

Our operations are principally conducted through our subsidiaries Residential Funding Company, LLC (RFC) and GMAC Mortgage, LLC (GMAC Mortgage). We purchase, sell, securitize, and service residential mortgage loans in the United States. We broker virtually all of the loan production from our origination channels to our affiliate, Ally Bank. Virtually all of our purchases are executed with our affiliate, Ally Bank. Purchased loans are primarily agency eligible or government insured loans. Prime credit quality loans originated in conformity with the underwriting guidelines of the Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac) are generally sold to one of these government-sponsored entities in the form of agency–sponsored securitizations. Prime credit quality loans originated in conformity with the underwriting guidelines of the Federal Housing Administration (FHA) and Department of Veterans Affairs (VA) are generally sold into securitizations guaranteed by the Government National Mortgage Association (Ginnie Mae with Fannie Mae and Freddie Mac, collectively, the GSEs).

On November 2, 2011, Ally Inc. announced that in order to proactively address changes in the mortgage industry as a whole, Ally Bank would be taking immediate action to reduce its focus on its correspondent mortgage lending channel. The correspondent lending channel represented approximately 84% of Ally Bank's 2011 mortgage loan originations. For the year ended December 31, 2011, we purchased $56.7 billion of mortgage loans from Ally Bank, which represents 93% of our total originations and purchases of consumer mortgage loans of $60.7 billion. We do not expect this action to have a material adverse impact on our financial condition, results of operations or cash flows. We do, however, expect the level of mortgage loan purchases from Ally Bank to decline in future periods, potentially significantly.

Our legacy business included non–conforming domestic and international residential mortgage loan originations, purchases, sales, and securitization activities; our captive mortgage reinsurance portfolio; and our domestic and international commercial-lending activities. In 2010, we effectively exited the European mortgage market through the sale of our United Kingdom and continental Europe platforms. See Note 2 - Discontinued Operations for additional information. In 2010, we also completed the sale of certain domestic and international mortgage assets, including consumer mortgage loans and retained interests, and settled representation and warranty claims with certain counterparties. See Note 19 - Guarantees, Commitments and Contingencies for additional information related to our representation and warranty settlements. The remaining legacy portfolios, which include limited international operations in Mexico, Canada and the United Kingdom, are being run-off, with periodic asset sales, workouts, or consideration and execution of other strategic disposition transactions to maximize our return.

We have been negatively impacted by the events and conditions in the mortgage banking industry and the broader economy, both domestically and internationally. The market deterioration led to fewer sources and significantly reduced levels of liquidity to finance our operations. We are highly leveraged relative to our cash flow and previously recognized credit and valuation losses that resulted in a significant deterioration in capital. We have been, and may continue to be, negatively impacted by exposure to representation and warranty obligations, adverse outcomes with respect to current or future litigation, fines, penalties or settlements related to our business activities and additional expenses to address regulatory requirements. Our ability to continue to purchase, sell, securitize and service residential mortgage loans could be negatively impacted by any change in our access to programs available to us under our agreements with the GSEs.

We received capital support in the form of debt forgiveness from Ally Inc. of $109.4 million during the year ended December 31, 2011. We also entered into a new $250.0 million secured financing agreement with BMMZ Holdings, LLC (BMMZ), a wholly owned subsidiary of Ally Inc., in December 2011, which replaced secured financing agreements with unaffiliated third-party liquidity providers. We remain heavily dependent on our parent and affiliates for funding and capital support, and except as noted in these financial statements, our parent and affiliates are under no obligation to provide such support and there can be no assurance that they will continue such actions. Consequently, there remains substantial doubt about our ability to continue as a going concern. Should Ally Inc. no longer continue to support our capital or liquidity needs or should we be unable to successfully execute other initiatives, it would have a material adverse effect on our business, financial condition and results of operations.

On February 9, 2012, Ally Inc. and ResCap entered into agreements with the Federal Government, State Attorneys General and state banking departments (the Settlement) in connection with investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage foreclosure home sales and evictions. On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia. We separately reached an independent settlement with Oklahoma, which did not participate in the broader settlement and agreements with two other states for other releases. The Settlement requires cash payments of $110.0 million and borrower relief of $200.0 million, subject to an upward adjustment, over a three year period. We are also required to make cash payments of approximately $2.5 million in connection with separate state

10

agreements. Borrower relief will include loan modifications, including principal reductions, rate modifications and refinancing for borrowers that meet certain criteria, and participation in certain other programs. The Settlement does not prevent state and federal authorities from pursuing criminal enforcement actions, securities-related claims (including actions related to securitization activities and Mortgage Electronic Registration Systems, or MERS), loan origination claims, certain claims brought by the Federal Deposit Insurance Corporation (FDIC) and the GSEs, and certain other matters. The Settlement also does not prevent claims that may be brought by individual borrowers.

On February 9, 2012, Ally Inc. and ResCap also agreed in principle with the Board of Governors of the Federal Reserve on a civil monetary penalty (CMP) of $207.0 million related to the same activities that were the subject of the Settlement. This amount will be reduced dollar-for-dollar in connection with certain aspects of our satisfaction of the required monetary payment and borrower relief obligations included within the Settlement. For the year ended December 31, 2011, we recognized $211.5 million of expense related to the Settlement and separate state agreements. On January 30, 2012, we received $196.5 million in capital support from Ally Inc. in connection with the settlement agreements and CMP in the form of debt forgiveness. See Note 19 - Guarantees, Commitments, and Contingencies for additional information.

On January 30, 2012, we entered into an agreement with Ally Inc. (the Letter Agreement) whereby in addition to the $196.5 million of capital support in connection with the settlement agreements and CMP, and as further consideration for the Letter Agreement, and in accordance with, and subject to, the authorization of the Board of Directors of Ally Inc., Ally Inc. committed to contribute capital to us in an amount necessary for us to exceed our consolidated tangible net worth covenant by $25.0 million as of and for the period ended January 31, 2012, provided such capital contribution was required as a result of operating losses in the ordinary course of business and did not exceed $100.0 million. We did not require capital support as of January 31, 2012.

In consideration of this Letter Agreement we have agreed to certain terms and conditions, including but not limited to, agreeing to meet our obligations to regulatory bodies or governmental agencies in connection with certain settlements and penalties (including the required payment under the Settlement described above), to negotiate in good faith an amendment to our subservicing agreement with Ally Bank and to negotiate in good faith such documents as are necessary to terminate certain other of our agreements with Ally Bank and to enter into new agreements with Ally Investment Management Inc. (Ally IM), a wholly owned subsidiary of Ally Inc. Refer to Note 20 - Related Party Transactions for additional information.

All of our credit facilities and certain other agreements contain covenants that require us to maintain consolidated tangible net worth of $250.0 million as of each month end. There are cross default provisions included within and among our credit facilities and our senior unsecured and junior secured debt and certain other agreements. A default under any one of these agreements can, through cross default provisions, create defaults in all of our other agreements. Failure to meet this covenant represents an event of default and may result in, among other things, an acceleration of the facility's maturity and/or may trigger an early amortization event. See Note 9 - Borrowings for additional information related to our financial covenants and counterparties remedies in an event of default.

We recorded net losses of $845.1 million for the year ended December 31, 2011, and our consolidated tangible net worth, as defined, as of December 31, 2011 was $92.4 million, which constitutes an event of default under our credit facilities and certain other agreements. We obtained waivers or acknowledgment letters from each of our liquidity providers in connection with our credit facilities and counterparties to agreements with financial covenants under which they agreed not to pursue their contractual remedies with respect to the default. These waivers were predicated, in part, on the January 30, 2012 capital contribution we received from Ally Inc. We are in compliance with any conditions with respect to these waivers and acknowledgment letters. We are in compliance with all of our financial covenants as of March 28, 2012, the date of issuance of these Consolidated Financial Statements.

We seek to manage our liquidity and capital positions and explore initiatives to address our ongoing debt covenant compliance and liquidity needs, including debt maturing in the next twelve months and other risks and uncertainties. We have $2.0 billion in debt maturing in 2012, including $323.0 million in mortgage servicing rights secured funding facility borrowings maturing in March 2012 and $1.2 billion in secured borrowings from Ally Inc. and its subsidiaries maturing in April 2012. These initiatives could include, but are not limited to, the following: continuing to work with key credit providers to optimize all available liquidity options; continued exploration of funding and capital support from our parent and affiliates; and further reductions in assets or other restructuring activities, which could include a restructuring achieved through a Chapter 11 bankruptcy filing. In this context, we typically consider a number of factors to the extent applicable and appropriate including, without limitation, our financial condition, results of operations, and prospects, our ability to obtain third-party financing, tax considerations, the current and anticipated future trading price levels of our debt instruments, conditions in the mortgage banking industry and general economic conditions, and other investment and business opportunities available to us.

The outcomes of certain of these initiatives are, to a great extent, outside of our control, resulting in increased uncertainty as to their successful execution. There continues to be a risk that we may not be able to meet our debt service obligations, may default on our financial debt covenants due to insufficient capital, and/or may be in a negative liquidity position in future periods.

Residential Capital, LLC

## Consolidation and Basis of Presentation

The accompanying Consolidated Financial Statements were prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Consolidated Financial Statements include our accounts and accounts of our majority–owned subsidiaries after eliminating all significant intercompany balances and transactions and include all variable interest entities (VIEs) in which we are the primary beneficiary. See Note 5 — Securitization and Variable Interest Entities for additional information. Our accounting and reporting policies conform to accounting principles generally accepted in the United States of America.

We operate our international subsidiaries in a similar manner as we operate in the United States of America (U.S. or United States), subject to local laws or other circumstances that may cause us to modify our procedures accordingly. The financial statements of subsidiaries that operate outside of the United States are measured using the local currency as the functional currency. All assets and liabilities of foreign subsidiaries are translated into U.S. dollars at year–end exchange rates. The resulting translation adjustments are recorded in accumulated other comprehensive income, a component of equity. Income and expense items are translated at average exchange rates prevailing during the reporting period.

Certain amounts in prior periods have been reclassified to conform to the current period presentation. During 2011, interest paid to investors of $57.2 million in connection with consumer mortgage loans that were paid off prior to their stated maturity and interest paid to borrowers of $5.4 million in connection with escrow deposits, both of which were included in interest expense in prior periods, have been reclassified to servicing fees in the Consolidated Statement of Income. Additionally, interest paid on loans of $57.9 million that we repurchased out of Ginnie Mae securitizations, which was included in interest expense, has been reclassified to interest income in the Consolidated Statement of Income. These reclassifications have no impact to our consolidated financial position or results of operations.

During 2011, we identified errors in periods prior to 2011 which were not material to those prior periods. As a result, we corrected those errors in 2011 resulting in additional expense of $72.9 million, an increase in payables to affiliates of $47.4 million, and a net cash payment of $ 25.5 million. The misstatement had no impact on our consolidated financial condition at December 31, 2011.

## Use of Assumptions and Critical Accounting Estimates

The preparation of financial statements in conformity with Generally Accepted Accounting Principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and income and expenses during the reporting period and related disclosures and critical accounting estimates. In developing these estimates and assumptions, management uses available evidence at the time of the financial statements. Because of uncertainties associated with estimating the amounts, timing and likelihood of possible outcomes, actual results could differ from our estimates. An accounting estimate is considered critical if the estimate requires management to make assumptions about matters that were highly uncertain at the time the accounting estimate was made, and if different estimates reasonably could have been used or changes in the accounting estimate are reasonably likely to occur from period to period that would have a material impact on our financial condition, results of operations or cash flows. If actual results differ from our assumptions, it may have an adverse impact on the results of operations and cash flows.

### Valuation of Mortgage Loans Held–for–Sale

Mortgage loans held–for–sale are typically pooled together and sold into certain exit markets depending on the underlying attributes of the loan, product type, interest rate, and credit quality. To the extent observable market prices are not available, we will determine the fair value of mortgage loans held–for–sale using internally developed valuation models. These loans are valued on a discounted cash flow basis utilizing cash flow projections from internally developed models that require prepayment, default and discount rate assumptions. To the extent available, we will utilize market observable inputs such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates. While numerous controls exist to calibrate, corroborate and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's estimated fair value.

12

## Valuation of Mortgage Servicing Rights

Mortgage servicing rights (MSRs) represent the capitalized value of the right to receive future cash flows from the servicing of mortgage loans for others. MSRs are a significant source of value derived from originating or acquiring mortgage loans. Because residential mortgage loans typically contain a prepayment option, borrowers often elect to prepay their mortgage loans by refinancing at lower rates during declining interest rate environments. The borrower's ability to prepay is at times impacted by other factors in the current environment that may limit their eligibility to access a refinance (e.g. a high loan to value ratio). When this occurs, the stream of cash flows generated from servicing the original mortgage loan is terminated. As such, the market value of MSRs has historically been very sensitive to changes in interest rates and tends to decline as market interest rates decline and increase as interest rates rise. We capitalize MSRs on residential mortgage loans that we have originated and purchased based upon the fair value of the servicing rights associated with the underlying mortgage loans at the time the loans are sold or securitized. GAAP requires that the value of MSRs be determined based on market transactions for comparable servicing assets, if available. In the absence of representative market trade information, valuations should be based on other available market evidence and modeled market expectations of the present value of future estimated net cash flows that market participants would expect from servicing. When observable prices are not available, management uses internally developed discounted cash flow models to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants combined with market–based assumptions for loan prepayment rates, interest rates, default rates, and discount rates that management believes approximate yields required by investors for these assets. Servicing cash flows primarily include servicing fees, ancillary income, and late fees less operating costs to service the loans. The estimated cash flows are discounted using an option–adjusted spread-derived discount rate. Management considers the best available information and exercises significant judgment in estimating and assuming values for key variables in the modeling and discounting process. All of our MSRs are carried at estimated fair value.

We use the following key assumptions in our valuation approach:

- **Prepayment** — The most significant drivers of MSR value are actual and forecasted portfolio prepayment behavior. Prepayment speeds represent the rate at which borrowers repay their mortgage loans prior to scheduled maturity. The most significant factor influencing prepayment speeds is the interest rate environment. However, prepayment speeds are influenced by a number of factors such as the value of the collateral, government programs, and other market factors. As interest rates rise, prepayment speeds generally slow, and as interest rates decline, prepayment speeds generally accelerate. When mortgage loans are paid or expected to be paid earlier than originally estimated, the expected future cash flows associated with servicing such loans are reduced. We primarily use third–party models to project residential mortgage loan payoffs. In other cases, we estimate prepayment speeds based on historical and expected future prepayment rates. We measure model performance by comparing prepayment predictions against actual results at both the portfolio and product level.

- **Discount rate** — The cash flows of our MSRs are discounted utilizing appropriate risk-adjusted yield assumptions that, when applied to projected cash flows, produce benchmarked fair value.

- **Base mortgage rate** — The base mortgage rate represents the current market interest rate for newly originated mortgage loans. This rate is a key component in estimating prepayment speeds of our portfolio because the difference between the current base mortgage rate and the interest rates on existing loans in our portfolio is an indication of the borrower's likelihood to refinance.

- **Cost to service** — In general, servicing cost assumptions are based on actual expenses directly related to servicing. These servicing cost assumptions are compared to market-servicing costs when market information is available. Our servicing cost assumptions include expenses associated with our activities related to loans in default.

- **Volatility** — Volatility represents the expected rate of change of interest rates. The volatility assumption used in our valuation methodology is intended to estimate the range of expected outcomes for future interest rates. We use implied volatility assumptions in connection with the valuation of our MSRs. Implied volatility is defined as the expected rate of change in interest rates derived from the prices at which options on interest rate swaps or swaptions are trading.

We also periodically perform a series of reasonableness tests as we deem appropriate, including the following:

- **Review and compare data provided by an independent third–party broker.** We evaluate and compare our fair value price, multiples, and underlying assumptions to data, including prepayment speeds, discount rates, and cost to service provided by an independent third–party broker.

- **Review and compare pricing of publicly traded interest-only securities.** We evaluate and compare our fair value to publicly traded interest-only stripped mortgage-backed securities by age and coupon for reasonableness.

- *Review and compare fair value price and multiples.* We evaluate and compare our fair value price and multiples to market fair value price and multiples in external surveys produced by third–parties.

- *Compare actual monthly cash flows to projections.* We compare actual monthly cash flows to those projected in the MSR valuation. Based upon the results of this comparison, we assess the need to modify the individual assumptions used in the valuation. This process calibrates the model to actual servicing cash flow results.

- *Review and compare recent bulk mortgage servicing right acquisition activity.* We evaluate market trades for reliability and relevancy and then consider, as appropriate, our estimate of fair value of each significant transaction to the traded price. Currently, there is a lack of comparable transactions between willing buyers and sellers in the bulk acquisition market, which are the best indicators of fair value. However, we continue to monitor and track market activity on an ongoing basis.

We generally expect our valuation to be within a reasonable range of these comparisons. Changes in these assumptions could have a significant impact on the determination of fair value. In order to develop our best estimate of fair value, management reviews and analyzes the output from the models and makes adjustments to the valuation to take into consideration other factors that may not be captured. If we determine our valuation has exceeded the reasonable range, we may adjust it accordingly.

The assumptions used in modeling expected future cash flows of MSRs have a significant impact on the fair value of MSRs and potentially a corresponding impact to earnings. See Note 6 — Servicing Activities for sensitivity analysis. At December 31, 2011, based on the market information obtained, we determined that our MSR valuations and the assumptions used to value those servicing rights were reasonable and consistent with what an independent market participant would use to value the assets.

## Legal and Regulatory Reserves

Our legal and regulatory reserves reflect management's best estimate of probable losses in connection with legal and regulatory matters. As a legal or regulatory matter develops, management, in conjunction with internal and external counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is both probable and estimable. If, at the time of evaluation, the loss contingency related to a legal or regulatory matter is not both probable and estimable, the matter will continue to be monitored for further developments that would make such loss contingency both probable and estimable. When the loss contingency related to a legal or regulatory matter is deemed to be both probable and estimable, we will establish a liability with respect to such loss contingency and record a corresponding amount to other noninterest expense, net. To estimate the probable loss, we evaluate the individual facts and circumstances of the case including information learned through the discovery process, rulings on dispositive motions, settlement discussions, our prior history with similar matters and other rulings by courts, arbitrators or others. The reserves are continuously monitored and updated to reflect the most recent information related to each matter.

Additionally, in matters for which a loss contingency is not deemed probable, but rather reasonably possible to occur, we would attempt to estimate a loss or range of loss related to that event, if possible. For these matters, we do not record a liability. However, if we are able to estimate a loss or range of loss, we would disclose this loss if it is material to our consolidated financial statements. To estimate a range of probable or reasonably possible loss, we evaluate each individual case in the manner described above. We do not accrue for matters for which a loss event is deemed remote.

For details regarding the nature of all material contingencies, refer to Note 19 — Guarantees, Commitments and Contingencies.

## Liability for Representation and Warranty Obligations

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we have limited or no current or historical demand experience with an investor, because of the inherent difficulty in predicting the level and timing of future demands, if any, losses cannot be reasonably estimated, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue with counterparties.

## Significant Accounting Policies

### Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and certain highly liquid investment securities with maturities of three months or less from the date of purchase. Cash and cash equivalents that have restrictions as to our ability to withdraw the funds are included in other assets. The fair value of cash equivalents approximates book value because of the short maturities of these instruments.

**Securitizations and Variable Interest Entities**

We securitize, sell, and service consumer mortgage loans.  Securitization transactions typically involve the use of variable interest entities and are accounted for either as sales or secured financings.  Economic interests in the securitized and sold assets are generally retained in the form of senior or subordinated interests, interest– or principal–only strips, cash reserve accounts, residual interests, and servicing rights.

In order to conclude whether or not a variable interest entity is required to be consolidated, careful consideration and judgment must be given to our continuing involvement with the variable interest entity.  In circumstances where we have both the power to direct the activities of the entity that most significantly impact the entity's performance and the obligation to absorb losses or the right to receive benefits of the entity that could be significant, we consolidate the entity, which would also preclude us from recording an accounting sale on the transaction.  In the case of a consolidated variable interest entity, the accounting is consistent with a secured financing, that is, we continue to carry the loans and we record the securitized debt on our balance sheet.  Further, there is no specific accounting record of our economic interests; rather, they are captured as the difference between the recognized assets and liabilities.

In transactions where either one or both of the power or economic criteria mentioned above are not met, we determine whether or not we achieve a sale for accounting purposes.  In order to achieve sale for accounting purposes, the assets being transferred must be legally isolated, not be constrained by restrictions from further transfer, and be deemed to be beyond our control. If we were to fail any of the three criteria for sale accounting, the accounting would be consistent with the preceding paragraph (i.e., a secured borrowing).  However, if we meet the criteria, the transaction would be recorded as a sale, and the variable interest entity would not be consolidated.  See Note 5 — Securitizations and Variable Interest Entities for discussion on variable interest entities.

Gains or losses on off–balance sheet securitizations take into consideration the fair value of the retained interests including the value of certain servicing assets or liabilities, which are initially recorded at fair value at the date of sale.  The estimate of the fair value of the retained interests and servicing requires us to exercise significant judgment about the timing and amount of future cash flows from the interests.  See Note 16 — Fair Value for a discussion of fair value estimates.

Gains or losses on off–balance sheet securitizations are reported in gain on mortgage loans, net.  Changes in the fair value of retained interests are reflected in other revenue, net.  Retained interests, as well as any purchased securities, are included in other assets.  Securities that are noncertificated and cash reserve accounts related to securitizations are included in other assets.

We generally retain master servicing for our non-agency consumer mortgage loan securitizations.  We may receive servicing fees based on the securitized loan balances and certain ancillary fees, all of which are reported in servicing fees.  We also retain the right to service the consumer mortgage loans sold in securitization transactions involving Ginnie Mae, Fannie Mae, Freddie Mac, and private investors.

Whether on or off balance sheet, the investors in the securitization trusts generally have no recourse to our assets outside of customary market representation and warranty provisions.

**Mortgage Loans Held–for–sale**

Loans held-for-sale are carried at lower of cost or fair value or at estimated fair value.  The majority of held-for-sale loans are pooled together for purposes of determining the lower of cost or fair value based on loan characteristics.  Loan origination fees, as well as discount points and incremental direct origination costs, are initially recorded as an adjustment of the cost of the loan and are reflected in the gain or loss on sale of loans when sold.  Fair value is determined by type of loan and is generally based on contractually established commitments from investors, current investor yield requirements, current secondary market pricing, or cash flow models using market–based yield requirements.  Our fair value option election loans primarily consist of conforming and government-insured mortgage loans.  See Note 16 — Fair Value for details on fair value measurement.

We hold conditional repurchase options in off-balance sheet securitizations that allow us to repurchase a loan at par if it exceeds a certain pre-specified delinquency level (e.g. 90 days). We have discretion regarding when or if we will exercise these options, but generally we will do so only when it is in our best interest.  We recognize those assets that can be repurchased under the conditional repurchase option (and any related liability to pay the trust) once the condition has been satisfied, but only in those situations where we have determined that we would have a more than trivial benefit.  The assets are recorded in mortgage loans held-for-sale with a corresponding liability in other liabilities.  We do not record the asset (and related liability to pay the trust) when delinquent loan repurchase options are both quantitatively and qualitatively deep out of the money, because we would not have a more than trivial benefit from the options.

**Finance Receivables and Loans**

We classify finance receivables and loans either as held-for-sale or held-for-investment based on management's assessment of its intent and ability to hold for the foreseeable future or until maturity. Management's intent and ability may change from time

15

to time depending on a number of factors including economic, liquidity, and capital conditions. Management's view of the foreseeable future is generally a twelve–month period based on the longest reasonably reliable net income, liquidity, and capital forecast period.

We elected the fair value option for consumer mortgage finance receivables and loans related to certain of our on–balance sheet securitizations, including those securitization trusts that were consolidated upon the adoption of ASU 2009–17. These securitized mortgage loans are legally isolated from us and are beyond the reach of our creditors. They are measured at fair value using a portfolio approach, or an in-use premise. The values for loans held on an in-use basis may differ considerably from loans held–for–sale that can be sold in the whole-loan market. This difference arises primarily due to the liquidity of the asset-backed (ABS) or mortgage-backed (MBS) security market and is evident in the fact that spreads applied to lower rated ABS/MBS are considerably wider than spreads observed on senior bond classes and in the whole-loan market. The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations. See Note 16 — Fair Value for details on fair value measurement.

The balance of our consumer finance receivables and loans are reported at the principal amount outstanding, net of unearned income, premiums and discounts, and allowances. Unearned income, which includes deferred origination fees reduced by origination costs, is amortized over the contractual life of the related finance receivable or loan using the interest method. Loan commitment fees are deferred and amortized over the commitment period.

Our portfolio segments are based on the level at which we develop and document our methodology for determining the allowance for loan losses. Additionally, the classes of finance receivables are based on several factors including the method for monitoring and assessing credit risk, the method of measuring carrying value, and the risk characteristics of the finance receivable. Based on an evaluation of our process for developing the allowance for loan losses including the nature and extent of exposure to credit risk arising from our finance receivables, we have determined our portfolio segments to be consumer and commercial.

- **Consumer mortgage** — Consists of the following classes of finance receivables.

  - *1st Mortgage* — Consists of residential mortgage loans that are secured in a first–lien position and have priority over all other liens or claims on the respective collateral.

  - *Home equity* — Consists of residential home equity loans or mortgages with a subordinate–lien position.

- **Commercial** — Consists of the following classes of finance receivables.

  - *Commercial and Industrial Mortgage* — Consists primarily of warehouse lending.

  - *Commercial Real Estate Mortgage* — Related primarily to activities within our international operations which provided financing to residential land developers and homebuilders.

## Impaired Loans

For all classes of consumer loans, impaired loans are loans that have been modified in troubled debt restructuring (TDR). All classes of commercial loans are considered impaired on an individual basis and reported when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement, including TDR. Income recognition is consistent with that of nonaccrual loans.

## Nonaccrual Loans

Generally, we recognize all classes of loans as past due when they are 30 days delinquent. Revenue recognition is suspended when loans are placed on nonaccrual status. Generally, all classes of consumer loans are placed on nonaccrual status when delinquent for more than 60 days or when determined not to be probable of full collection. All commercial loans are placed on nonaccrual status when delinquent for more than 90 days. Revenue accrued, but not collected, at the date loans are placed on nonaccrual status is reversed and subsequently recognized only to the extent it is received in cash or until the loan qualifies for return to accrual status. Where there is doubt regarding the ultimate collectability of loan principal, all cash received is applied to reduce the carrying value of the loan. Loans are restored to accrual status only when contractually current and the collection of future payments is reasonably assured. Typically, this requires a sustained period of repayment performance of at least six consecutive months by the borrower.

## Charge–offs

Consumer first–lien mortgage loans, which consist of our entire 1st mortgage class and a subset of our home equity class that are secured by real estate, are written down to the estimated fair value of the collateral, less costs to sell, once a mortgage loan becomes 180 days past due. Second-lien consumer mortgage loans within our consumer home equity class are charged off at 180 days past due. First and second–lien consumer mortgage loans in bankruptcy that are 60 days past due are written down to the estimated fair value of the collateral, less costs to sell, within 60 days of receipt of notification of filing from the bankruptcy court. Loans are

considered collateral dependent at the time foreclosure proceedings begin and are charged off to the estimated fair value of the collateral, less costs to sell.

Commercial loans are individually evaluated and where collectability of the recorded balance is in doubt are written down to estimated fair value of the collateral, less costs to sell. Generally, all commercial loans, both collateral and noncollateral dependent, are charged off when they are 360 days or more past due.

## Allowance for Loan Losses

The allowance for loan losses (the allowance) is management's estimate of incurred losses on the consumer and commercial finance receivable and loan portfolios. We determine the amount of the allowance required for each of our portfolio segments based on its relative risk characteristics. The evaluation of these factors for both consumer and commercial finance receivables and loans involves complex, subjective judgments. Additions to the allowance are charged to current period earnings through the provision for loan losses; amounts determined to be uncollectible are charged directly against the allowance, net of amounts recovered on previously charged–off accounts.

The allowance is comprised of two components: reserves established for specific loans evaluated as impaired and portfolio-level reserves established for large groups of typically smaller balance homogenous loans that are collectively evaluated for impairment. We evaluate the adequacy of the allowance based on the combined total of these two components. Determining the appropriateness of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. It is possible that others, given the same information, may at any point in time reach different reasonable conclusions.

Measurement of impairment for specific reserves is generally determined on a loan–by–loan basis. An individual loan is considered impaired when, based on current information and events, it is probable that we will be unable to collect all amounts due (both principal and interest) according to the contractual terms of the agreement. Loans determined to be specifically impaired are measured based on the present value of expected future cash flows discounted at the loan's effective interest rate, an observable market price, or the estimated fair value of the collateral less estimated costs to sell whichever is determined to be the most appropriate. When these measurement values are lower than the carrying value of that loan, impairment is recognized. Loans that are deemed not to be individually impaired are pooled with other loans with similar risk characteristics for evaluation of impairment for the portfolio-level allowance.

For the purpose of calculating portfolio-level reserves, we have determined logical grouping of loans into two portfolio segments: consumer mortgage and commercial. The allowance consists of the combination of a quantitative assessment component based on statistical models, a retrospective evaluation of actual loss information to loss forecasts, and may include a qualitative component based on management judgment. Management takes into consideration relevant qualitative factors, including external and internal trends such as the impacts of changes in underwriting standards, collections and account management effectiveness, geographic concentrations, and economic events, among other factors, that have occurred but are not yet reflected in the quantitative assessment component. All qualitative adjustments are adequately documented, reviewed, and approved through our established risk governance processes.

## Mortgage Servicing Rights

Primary servicing rights represent our right to service consumer residential mortgage loans. Primary servicing involves the collection of payments from individual borrowers and the distribution of these payments to the master servicer. Master servicing rights represent our right to service mortgage–and asset–backed securities and whole–loan packages issued for investors. Master servicing involves the collection of borrower payments from primary servicers and the distribution of those funds to investors. We may at times purchase and sell primary and master servicing rights through transactions with other market participants.

We capitalize the value expected to be realized from performing specified mortgage servicing activities for others as MSRs when the expected future cash flows from servicing are projected to be more than adequate compensation for such activities. These capitalized servicing rights are purchased or retained upon sale or securitization of mortgage loans. MSRs are not recorded on securitizations accounted for as secured financings.

We measure all mortgage servicing assets at fair value. We define our servicing rights based on the availability of market inputs and the manner in which we manage the risks of our servicing assets. We leverage available relevant market data to determine the fair value of our recognized servicing assets.

## Accounts Receivable

Accounts receivable are recorded at net realizable value and include servicer advances and receivables. Servicer advances arise in the ordinary course of business as we make advances to investors in mortgage loans serviced by us. Such advances are generally made to maintain scheduled investor cash flows in the event of borrower default or delinquency and may reflect payments of property taxes and insurance premiums in advance of collection from borrowers; principal and interest payments to investors

17

prior to their collection from borrowers; and amounts advanced for mortgages in foreclosure. Servicer advances receive priority cash flows, including contractual interest, in the event of foreclosure or liquidation. As a result, the collection of the advances is reasonably assured. We establish a reserve for any servicing advances where collectability is in doubt.

## Derivative Instruments and Hedging Activities

We use derivative instruments for risk management purposes. Certain of our derivative instruments were designated as qualifying hedge accounting relationships; other derivative instruments do not qualify for hedge accounting or have not been elected to be designated as a qualifying hedging relationship. All derivative financial instruments, whether designated for hedge accounting or not, are recorded as other assets or other liabilities and are measured at fair value. Additionally, we report derivative financial instruments on a gross basis.

At inception of a hedging relationship, we designate each qualifying derivative financial instrument as a hedge of the fair value of a specifically identified asset or liability (fair value hedge), as a hedge of the variability of cash flows to be received or paid related to a recognized asset or liability (cash flow hedge), or as a hedge of the foreign currency exposure of a net investment in a foreign operation. We formally document all relationships between hedging instruments and hedged items and risk management objectives for undertaking various hedge transactions. Both at the hedge's inception and on an ongoing basis, we formally assess whether the derivatives designated in hedging relationships are highly effective in offsetting changes in the fair values or cash flows of hedged items.

Changes in the fair value of derivative financial instruments that are designated and qualify as fair value hedges, along with the gain or loss on the hedged asset or liability attributable to the hedged risk, are recorded in current period earnings. For qualifying cash flow hedges, the effective portion of the change in the fair value of the derivative financial instrument is recorded in accumulated other comprehensive income, a component of equity, and recognized in the income statement when the hedged cash flows affect earnings. For a derivative designated as hedging the foreign currency exposure of a net investment in a foreign operation, the gain or loss is reported in accumulated other comprehensive income, a component of equity, as part of the cumulative translation adjustment with the exception of the spot to forward difference, which is recorded in current period earnings. The ineffective portions of fair value, cash flow, and net investment hedges are immediately recognized in earnings, along with the portion of the change in fair value that is excluded from the assessment of hedge effectiveness, if any.

The hedge accounting treatment described herein is no longer applied if a derivative financial instrument is terminated, or the hedge designation is removed or is assessed to be no longer highly effective. For these terminated fair value hedges, any changes to the hedged asset or liability remain as part of the basis of the asset or liability and are recognized into income over the remaining life of the asset or liability. For cash flow hedges, unless it is probable that the forecasted cash flows will not occur within a specified period, any changes in fair value of the derivative financial instrument previously recognized remain in other comprehensive income, a component of equity, and are reclassified into earnings in the same period that the hedged cash flows affect earnings. Any previously recognized net derivative gain or loss for a terminated net investment hedge should remain in accumulated other comprehensive income, a component of equity, until earnings are impacted by a sale or liquidation of the associated foreign operation. In all instances, any subsequent changes in fair value of the derivative instrument are recorded in current period earnings.

Changes in the fair value of derivative financial instruments held for risk management purposes that are not designated as hedges under GAAP are reported in current period earnings.

## Foreclosed Assets

Assets are classified as foreclosed and included in other assets when physical possession of the collateral is taken regardless of whether foreclosure proceedings have taken place. Foreclosed assets are carried at the lower of the outstanding balance at the time of foreclosure or the fair value of the asset less estimated costs to sell. Losses on the revaluation of foreclosed assets are charged to gain on mortgage loans, net at the time of foreclosure. Declines in value after foreclosure are charged to gain (loss) on foreclosed real estate.

## Property and Equipment

Property and equipment, stated at cost, net of accumulated depreciation and amortization, are reported in other assets. Included in property and equipment are certain buildings, furniture and fixtures, leasehold improvements, IT hardware and software, and capitalized software costs. Depreciation is computed on the straight–line basis over the estimated useful lives of the assets, which generally ranges from 3 to 30 years. Capitalized software is generally amortized on a straight–line basis over its useful life, which generally ranges from three to five years. Capitalized software that is not expected to provide substantive service potential or for which development costs significantly exceed the amount originally expected is considered impaired and written down to fair value. Software expenditures that are considered general, administrative, or of a maintenance nature are expensed as incurred.

18

## Legal and Regulatory Reserves

Reserves for legal and regulatory matters are established when those matters present loss contingencies that are both probable and estimable, with a corresponding amount recorded to noninterest expense. In cases where we have an accrual for losses, it is our policy to include within that estimate, an estimate for probable and estimable legal expenses related to the case. If, at the time of evaluation, the loss contingency related to a litigation or regulatory matter is not both probable and estimable, we do not establish an accrued liability. We continue to monitor legal and regulatory matters for further developments that could affect the requirement to establish a liability or that may impact the amount of a previously established liability. There may be exposure to loss in excess of any amounts recognized. For certain other matters where the risk of loss is determined to be reasonably possible, estimable, and material to the financial statements, disclosure regarding details of the matter and an estimated range of loss is required. The estimated range of possible loss does not represent our maximum loss exposure. Financial statement disclosure is also required for matters that are deemed probable or reasonably possible, material to the financial statements, but for which an estimated range of loss is not possible to determine. While we believe our reserves are adequate, the outcome of legal and regulatory proceedings is extremely difficult to predict and we may settle claims or be subject to judgments for amounts that differ from our estimates. For details regarding the nature of all material contingencies, see Note 19 — Guarantees, Commitments and Contingencies.

## Liability for Representation and Warranty Obligations

We sell loans that take the form of securitizations guaranteed by the GSEs and to whole–loan purchasers. In addition, we infrequently sell securities to investors through private-label securitizations. In prior years, our volume of private label securitization issuance was considerably larger and included securitized loans where monolines insured the related bonds. In connection with these activities we provide to the GSEs, investors, monoline, and whole–loan purchasers various representations and warranties related to the loans sold. These representations and warranties generally relate to, among other things, the ownership of the loan; the validity of the lien securing the loan; the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer; ability to deliver required documentation; and compliance with applicable laws. Generally, these representations and warranties may be enforced at any time over the life of the loan. We also assume all of the customary representation and warranty obligations for loans we purchase from Ally Bank and subsequently sell into the secondary market.

Upon a breach of a representation, we correct the breach in a manner conforming to the provisions of the sale agreement. This may require us either to repurchase the loan, to indemnify (make–whole) a party for incurred losses, or provide other recourse to a GSE, monoline, or investor. Repurchase demands and claims for indemnification payments are generally reviewed on a loan–by–loan basis to validate if there has been a breach requiring repurchase or a make–whole payment. We actively contest claims to the extent we do not consider them valid. In cases where we repurchase loans, we bear the subsequent credit loss on the loans. Repurchased loans are classified as held–for–sale and initially recorded at fair value. Any initial impairment is charged to the liability for representation and warranty obligations. We seek to manage the risk of repurchase and associated credit exposure through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability throughout the life of the sold loans, as necessary, when additional relevant information becomes available. Changes in the liability are recorded as representation and warranty expense.

## Reinsurance Arrangements

We have entered into excess layer reinsurance agreements with non-affiliated private mortgage insurance (PMI) companies that provide PMI for certain of our mortgage loan servicing portfolio. We assume the risk of loss over a specified first loss percentage for covered loans and in return earn a portion of the PMI premium associated with those mortgage loans. We reserve for loss and loss adjustment expenses when notices of default on insured mortgage loans are received and the specified first loss percentage covered by the ceding company is exhausted.

## Income Taxes

We are a division of Ally Inc, a corporation, for income tax purposes. We are subject to corporate U.S. Federal, state and local taxes and are included in the consolidated Ally Inc. U.S. Federal and unitary and/or consolidated state income tax returns. We provide for our U.S. Federal and state taxes on a stand alone basis, which is consistent with the applicable tax sharing agreement between us and our Parent. The tax sharing agreement requires taxes to be based on the income tax liability determined as if we were a separate affiliated group of corporations filing consolidated U.S. Federal and state income tax returns. Our foreign businesses have been and continue to operate as corporations and are subject to, and provide for, U.S. Federal, state, and/or foreign income tax.

Income taxes are accounted for using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing

19

assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Deferred tax assets are recognized subject to management's judgment that realization is more likely than not.

## Recently Adopted Accounting Standards

### Comprehensive Income - Presentation of Comprehensive Income (ASU 2011-05)

As of December 31, 2011, we early adopted Accounting Standards Update (ASU) 2011-05, which amended Accounting Standards Codification (ASC) 220, Comprehensive Income. The amendments increased the prominence of items reported in other comprehensive income and facilitated convergence between GAAP and International Financial Reporting Standards (IFRS). This ASU required that nonowner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. We elected to early adopt ASU 2011-05, including the deferral permitted under ASU 2011-12. (*Comprehensive Income - Deferral of the Effective Date for Amendments to the Presentation of Reclassifications of Items Out of Accumulated Other Comprehensive Income in Accounting Standards Update No. 2011-05*), by retrospective application for the two years ended December 31, 2011, and 2010. Because this ASU impacts only presentation, there was not a material impact to our financial condition or results of operations.

### Receivables - A Creditor's Determination of Whether a Restructuring Is a Troubled Debt Restructuring (ASU 2011-02)

As of July 1, 2011, we adopted ASU 2011-02, which amends ASC 310, Receivables. ASU 2011-02 clarifies which loan modifications constitute a TDR. It is intended to assist creditors in determining whether a modification of the terms of a receivable meets the criteria to be considered a troubled debt restructuring, both for purposes of recording an impairment loss and for disclosure of TDRs. The ASU must be applied retrospectively to modifications made to the beginning of the annual period of adoption, which for us is January 1, 2011.

Effective September 30, 2011, ASU 2011-02 also required us to disclose the total amount of receivables and the allowance for credit losses related to those receivables that are newly considered impaired for which impairment was previously measured under ASC 450-20, Contingencies - Loss Contingencies. Refer to Note 4 — Finance Receivables and Loans, Net for additional information regarding TDRs.

The adoption did not have a material impact to our consolidated financial condition or results of operations.

### Receivables - Disclosures about the Credit Quality of Financing Receivables and the Allowance for Credit Losses (ASU 2010-20)

ASU 2010-20 was implemented in three distinct components as required by the ASU. Beginning with the three months ended September 30, 2011 and in conjunction with the requirements of ASU 2011-02, the deferral of TDR related disclosures within ASU 2010-20 prescribed by ASU 2011-01, *Deferral of the Effective Date of Disclosures about Troubled Debt Restructurings in Update No. 2010-20*, was ended, which required us to expand our TDR disclosures to include more information on modifications that are classified as TDRs. Beginning with the three months ended March 31, 2011, ASU 2010-20 required us to disclose a rollforward of the allowance for loan losses and additional activity-based disclosures for both financing receivables, and the allowance for each reporting period. We early adopted the rollforward requirement during the December 31, 2010, reporting period along with the initial expansion of disclosures related to the credit quality of finance receivables and loans. Since the guidance relates only to disclosures, adoption of each of the phases did not have a material impact on our consolidated financial condition or results of operations.

## Recently Issued Accounting Standards

### Fair Value Measurement - Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS (ASU 2011-04)

In May 2011, the FASB issued ASU 2011-04, which amends ASC 820, Fair Value Measurements. The amendments in this ASU clarify how to measure fair value. It is intended to improve the comparability of fair value measurements presented and disclosed in financial statements prepared in accordance with GAAP and IFRS. The ASU will be effective for us on January 1, 2012, and must be applied prospectively. Early adoption is not permitted. We do not expect the adoption to have a material impact to our consolidated financial condition or results of operations.

### Balance Sheet - Disclosures about Offsetting Assets and Liabilities (ASU 2011-11)

In December 2011, the FASB issued ASU 2011-11, which contains new disclosure requirements regarding the nature of an entity's rights of setoff and related arrangements associated with its financial instruments and derivative instruments. The new

disclosures will give financial statement users information about both gross and net exposures. ASU 2011-11 is effective for us on January 1, 2013, and retrospective application is required. Since the guidance relates only to disclosures, adoption is not expected to have a material impact on our consolidated financial condition or results of operations.

## 2. Discontinued Operations

On October 1, 2010, we completed the sale of our United Kingdom (U.K.) and continental Europe (CE) platforms. These platforms included residential mortgage loan origination, acquisition, servicing, asset management, sale, and securitizations in the United Kingdom and continental Europe (the Netherlands and Germany).

The associated operations and cash flows have been eliminated from our operations, and we do not have any significant continuing involvement in these platforms. For all periods presented, all of the operating results were removed from continuing operations and are presented separately as discontinued operations, net of tax. The Notes to our Consolidated Financial Statements were adjusted to exclude discontinued operations unless otherwise noted.

Selected financial information for these discontinued operations is summarized below.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Total net revenue | $— | $60,206 |
| Provision for loan losses | — | 21,907 |
| Noninterest expense, net | — | (8,768) |
| Income before income taxes including direct costs to transact a sale | — | 47,067 |
| Income tax benefit | — | (3,149) |
| Net income from discontinued operations | $— | $50,216 |

## 3. Mortgage Loans Held–for–sale

The composition of residential mortgage loans held–for–sale reported at carrying value, were as follows.

| December 31, ($ in thousands) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Domestic (a) (b) | Foreign | Total | Domestic (a) (b) | Foreign | Total |
| 1st Mortgage | $3,497,392 | $12,011 | $3,509,403 | $3,788,748 | $10,461 | $3,799,209 |
| Home equity | 740,222 | — | 740,222 | 855,566 | 132 | 855,698 |
| Total loans held–for–sale (c) | $4,237,614 | $12,011 | $4,249,625 | $4,644,314 | $10,593 | $4,654,907 |

(a) Includes mortgage loans subject to conditional repurchase options of $2.3 billion and $2.3 billion sold to Ginnie Mae guaranteed securitizations and $105.8 million and $145.7 million sold to off-balance sheet private-label securitization trusts at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities. See Note 5 — Securitizations and Variable Interest Entities for additional information.

(b) Includes mortgage loans for which we have elected the fair value option of $57.0 million and $21.8 million at December 31, 2011 and December 31, 2010, respectively. See Note 16 — Fair Value for additional information.

(c) The carrying values are net of discounts of $313.1 million and $295.1 million, fair value adjustments of ($28.0) million and ($0.9) million, lower of cost or fair value adjustments of $60.2 million and $48.4 million, and UPB write-downs of $1.5 billion and $1.8 billion at December 31, 2011 and 2010, respectively.

## 4. Finance Receivables and Loans, Net

The composition of finance receivables and loans, net reported at carrying value before allowance for loan losses, were as follows.

| December 31, ($ in thousands) | 2011 Domestic | Foreign | Total | 2010 Domestic | Foreign | Total |
|---|---|---|---|---|---|---|
| Consumer | | | | | | |
| 1st Mortgage | $130,024 | $256,494 | $386,518 | $140,998 | $452,435 | $593,433 |
| Home equity | 636,212 | — | 636,212 | 720,269 | — | 720,269 |
| Total consumer (a) (b) | 766,236 | 256,494 | 1,022,730 | 861,267 | 452,435 | 1,313,702 |
| Commercial | | | — | | | |
| Commercial and industrial | — | 23,860 | 23,860 | — | 40,771 | 40,771 |
| Commercial real estate | — | 14,157 | 14,157 | 554 | 75,991 | 76,545 |
| Total commercial | — | 38,017 | 38,017 | 554 | 116,762 | 117,316 |
| Total finance receivables and loans | $766,236 | $294,511 | $1,060,747 | $861,821 | $569,197 | $1,431,018 |

(a) Consumer mortgages include $835.2 million and $1.0 billion at fair value as a result of fair value option elections as of December 31, 2011 and 2010, respectively. See Note 16 — Fair Value for additional information.

(b) The gross carrying value is net of fair value adjustments of $1.6 billion and $1.9 billion and UPB write-downs of $8.0 million and $10.5 million at December 31, 2011 and 2010, respectively.

The following table presents an analysis of the activity in the allowance for loan losses on finance receivables and loans, net.

| ($ in thousands) | 2011 Consumer | Commercial | Total | 2010 Consumer | Commercial | Total |
|---|---|---|---|---|---|---|
| Allowance at January 1, | $17,681 | $25,129 | $42,810 | $38,602 | $133,779 | $172,381 |
| Provision for loan losses | | | | | | |
| From continuing operations | 680 | 23,341 | 24,021 | 10,356 | (17,645) | (7,289) |
| From discontinued operations | | — | — | — | — | — |
| Charge-offs | | | | | | |
| Domestic | (6,453) | — | (6,453) | (19,171) | (49,740) | (68,911) |
| Foreign | (3,410) | (42,018) | (45,428) | (2,347) | (50,370) | (52,717) |
| Total charge-offs | (9,863) | (42,018) | (51,881) | (21,518) | (100,110) | (121,628) |
| Recoveries | | | | | | |
| Domestic | 5,140 | 1,716 | 6,856 | 6,221 | 9,052 | 15,273 |
| Foreign | — | 6,810 | 6,810 | — | 53 | 53 |
| Total recoveries | 5,140 | 8,526 | 13,666 | 6,221 | 9,105 | 15,326 |
| Net charge-offs | (4,723) | (33,492) | (38,215) | (15,297) | (91,005) | (106,302) |
| Deconsolidations (a) | — | — | — | (15,980) | — | (15,980) |
| Allowance at December 31, | $13,638 | $14,978 | $28,616 | $17,681 | $25,129 | $42,810 |
| Allowance for loan losses | | | | | | |
| Individually evaluated for impairment | $3,035 | $14,978 | $18,013 | $3,626 | $23,799 | $27,425 |
| Collectively evaluated for impairment | $10,603 | $— | $10,603 | $14,055 | $1,330 | $15,385 |
| Finance receivables and loans | | | | | | |
| Individually evaluated for impairment | $8,055 | $38,017 | $46,072 | $7,232 | $109,171 | $116,403 |
| Collectively evaluated for impairment | $179,483 | $— | $179,483 | $291,766 | $8,145 | $299,911 |

(a) In the fourth quarter of 2010, we deconsolidated various securitization trusts. See Note 5 — Securitizations and Variable Interest Entities for additional information.

The following table presents an analysis of our past due finance receivables and loans at gross carrying value.

| ($ in thousands) | 30-59 days past due | 60-89 days past due | 90 days or more past due | Total past due | Current | Total |
|---|---|---|---|---|---|---|
| **December 31, 2011** | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $29,730 | $14,664 | $158,255 | $202,649 | $183,869 | $386,518 |
| Home equity | 13,064 | 6,488 | 11,850 | 31,402 | 604,810 | 636,212 |
| Total consumer | 42,794 | 21,152 | 170,105 | 234,051 | 788,679 | 1,022,730 |
| Commercial | | | | | | |
| Commercial and industrial | — | — | 322 | 322 | 23,538 | 23,860 |
| Commercial real estate | — | 1,736 | 12,212 | 13,948 | 209 | 14,157 |
| Total commercial | — | 1,736 | 12,534 | 14,270 | 23,747 | 38,017 |
| Total | $42,794 | $22,888 | $182,639 | $248,321 | $812,426 | $1,060,747 |
| December 31, 2010 | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $40,840 | $27,166 | $178,909 | $246,915 | $346,518 | $593,433 |
| Home equity | 16,531 | 7,344 | 12,659 | 36,534 | 683,735 | 720,269 |
| Total consumer | 57,371 | 34,510 | 191,568 | 283,449 | 1,030,253 | 1,313,702 |
| Commercial | | | | | | |
| Commercial and industrial | — | 35,671 | 3,970 | 39,641 | 1,130 | 40,771 |
| Commercial real estate | — | — | 69,529 | 69,529 | 7,016 | 76,545 |
| Total commercial | — | 35,671 | 73,499 | 109,170 | 8,146 | 117,316 |
| Total | $57,371 | $70,181 | $265,067 | $392,619 | $1,038,399 | $1,431,018 |

The following table presents the gross carrying value of our finance receivables and loans in nonaccrual status.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Consumer mortgage (a) | | |
| 1st Mortgage | $199,702 | $313,455 |
| Home equity | 36,651 | 51,936 |
| Total consumer | 236,353 | 365,391 |
| Commercial (b) | | |
| Commercial and industrial | 322 | 39,641 |
| Commercial real estate | 12,212 | 69,529 |
| Total commercial | 12,534 | 109,170 |
| Total | $248,887 | $474,561 |

(a) Interest revenue that would have been accrued on total nonaccrual consumer mortgage finance receivables and loans at original contractual rates was $31.6 million and $24.5 million during the year ended December 31, 2011 and 2010, respectively. Interest income recorded for these nonaccrual loans was $9.0 million and $18.4 million during the year ended December 31, 2011 and 2010, respectively.

(b) Interest revenue that would have been accrued on total nonaccrual commercial mortgage finance receivables and loans at original contractual rates was $4.5 million and $8.3 million during the year ended December 31, 2011 and 2010, respectively. Interest income recorded for these nonaccrual loans was $0.7 million and $7.6 million during the year ended December 31, 2011 and 2010, respectively.

Management performs a quarterly analysis of its consumer and commercial finance receivable and loan portfolios using a range of credit quality indicators to assess the adequacy of the allowance based on historical and current trends. Based on our allowance methodology, our credit quality indicators for consumer mortgage loans are performing and nonperforming and for commercial mortgage finance receivables and loans are pass and criticized.

The following table presents the credit quality indicators for our consumer mortgage loan portfolio at gross carrying value.

| December 31, ($ in thousands) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Performing | Nonperforming | Total | Performing | Nonperforming | Total |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $186,816 | $199,702 | $386,518 | $279,978 | $313,455 | $593,433 |
| Home equity | 599,561 | 36,651 | 636,212 | 668,333 | 51,936 | 720,269 |
| Total consumer mortgage | $786,377 | $236,353 | $1,022,730 | $948,311 | $365,391 | $1,313,702 |

23

The following table presents the credit quality indicators for our commercial finance receivable and loan portfolio at gross carrying value.

| December 31, ($ in thousands) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Pass | Criticized (a) | Total | Pass | Criticized (a) | Total |
| Commercial | | | | | | |
| Commercial and industrial | $— | $23,860 | $23,860 | $— | $40,771 | $40,771 |
| Commercial real estate | 209 | 13,948 | 14,157 | 198 | 76,347 | 76,545 |
| Total commercial | $209 | $37,808 | $38,017 | $198 | $117,118 | $117,316 |

(a) Includes loans classified as special mention, substandard, or doubtful. These classifications are based on regulatory definitions and generally represent loans in our portfolio that are of higher default risk.

As of December 31, 2011, the five largest state concentrations based on carrying value for our U.S.–only finance receivables and loans, net were as follows.

| December 31, 2011 | |
|---|---|
| California | 10.8% |
| Michigan | 6.5% |
| Ohio | 6.3% |
| Texas | 4.9% |
| Florida | 4.4% |
| All other | 67.1% |
| Total | 100% |

## Impaired Loans and Troubled Debt Restructurings

### Impaired Loans

Loans are considered impaired when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement or if the loan has been modified under a troubled debt restructuring.

The following table presents information about our impaired finance receivables and loans recorded at historical cost.

| ($ in thousands) | Unpaid principal balance (a) | Carrying value before allowance | Impaired with no allowance | Impaired with an allowance | Allowance for impaired loans |
|---|---|---|---|---|---|
| **December 31, 2011** | | | | | |
| Consumer mortgage | | | | | |
| 1st Mortgage | $436 | $436 | $— | $436 | $109 |
| Home equity | 7,619 | 7,619 | 173 | 7,446 | 2,926 |
| Total consumer | 8,055 | 8,055 | 173 | 7,882 | 3,035 |
| Commercial | | | | | |
| Commercial and industrial | 322 | 322 | — | 322 | 202 |
| Commercial real estate | 12,271 | 12,212 | 1,442 | 10,770 | 4,592 |
| Total commercial | 12,593 | 12,534 | 1,442 | 11,092 | 4,794 |
| Total | $20,648 | $20,589 | $1,615 | $18,974 | $7,829 |
| December 31, 2010 | | | | | |
| Consumer mortgage | | | | | |
| 1st Mortgage | $512 | $512 | $— | $512 | $257 |
| Home equity | 6,720 | 6,720 | — | 6,720 | 3,369 |
| Total consumer | 7,232 | 7,232 | — | 7,232 | 3,626 |
| Commercial | | | | | |
| Commercial and industrial | 44,410 | 39,641 | — | 39,641 | 14,043 |
| Commercial real estate | 69,651 | 69,529 | 28,154 | 41,375 | 9,756 |
| Total commercial | 114,061 | 109,170 | 28,154 | 81,016 | 23,799 |
| Total | $121,293 | $116,402 | $28,154 | $88,248 | $27,425 |

(a) Unpaid principal balance represents gross carrying value adjusted for UPB write-downs on transfers or charge offs in accordance with our policy.

The following table presents information about our impaired finance receivables and loans excluding loans carried at fair value due to fair value option elections.

| Year ended December, 31, ($ in thousands) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Consumer | Commercial | Total | Consumer | Commercial | Total |
| Average balance of impaired loans | **$7,756** | **$58,006** | **$65,762** | $34,006 | $189,354 | $223,360 |
| Interest income recognized on impaired loans | **$379** | **$6,364** | **$6,743** | $1,723 | $7,627 | $9,350 |

At December 31, 2011 and 2010, there were no commercial commitments to lend additional funds to debtors owing receivables whose terms have been modified in a troubled debt restructuring.

***Troubled Debt Restructurings***

As part of our loss mitigation efforts and participation in certain governmental programs (e.g., the Making Home Affordable Program), we may offer loan modifications to borrowers experiencing financial difficulties (TDRs). Loan modifications can include any or all of the following; principal forgiveness, maturity extensions, delinquent interest capitalization, and changes to contractual interest rates. Modifications can be either temporary or permanent. Temporary loan modifications are generally used to monitor the borrower's ability to perform under the revised terms over a specified trial period; if the borrower performs, it may become a permanent loan modification. The majority of loan modifications are completed under proprietary programs. Total TDRs recorded at historical cost and reported at gross carrying value are $33.6 million and $16.7 million at December 31, 2011, and 2010, respectively.

The following table presents information related to finance receivables and loans recorded at historical cost modified in connection with a troubled debt restructuring during the period.

| Year Ended December 31, 2011 ($ in thousands) | Number of Loans | Pre-modification gross carrying value | Post-modification gross carrying value |
|---|---|---|---|
| Consumer mortgage | | | |
| 1st Mortgage | **4** | **$196** | **$164** |
| Home equity | **71** | **2,511** | **2,347** |
| Total consumer mortgage | **75** | **2,707** | **2,511** |
| Commercial | | | |
| Commercial and industrial | **1** | **37,550** | **27,789** |
| Commercial real estate | **2** | **3,426** | **3,098** |
| Total commercial | **3** | **40,976** | **30,887** |
| Total | **78** | **$43,683** | **$33,398** |

The following table presents information related to finance receivables and loans recorded at gross carrying value that redefaulted (180 days or more delinquent) on or before the one year anniversary of being modified. The charge-off amount is determined in accordance with our charge-off policy.

| December 31, 2011 ($ in thousands) | Number of Loans | Gross carrying value | Charge-off amount |
|---|---|---|---|
| Consumer mortgage | | | |
| Home equity | **5** | **$96** | **$56** |
| Total consumer mortgage | **5** | **$96** | **$56** |

# 5. Securitizations and Variable Interest Entities

## Overview

We are involved in several types of securitization and financing transactions that utilize special–purpose entities (SPEs). A SPE is an entity that is designed to fulfill a specified limited need of the sponsor. Our principal use of SPEs is to obtain liquidity by securitizing certain of our financial assets.

The SPEs involved in securitization and other financing transactions are generally considered variable interest entities (VIEs). VIEs are entities that have either a total equity investment that is insufficient to permit the entity to finance its activities without additional subordinated financial support or whose equity investors lack the ability to control the entity's activities.

## Securitizations

We provide a wide range of consumer mortgage loan products to a diverse customer base. We often securitize these loans through the use of securitization entities, which may or may not be consolidated on our Consolidated Balance Sheet. We securitize consumer mortgage loans through either the GSEs or private–label (nonagency) securitizations. For the periods presented our consumer mortgage loans were primarily securitized through the GSEs.

In executing a securitization transaction, we sell pools of financial assets to a wholly owned, bankruptcy–remote SPE, which then transfers the financial assets to a separate, transaction–specific securitization entity for cash, servicing rights, and in some transactions, other retained interests. The securitization entity is funded through the issuance of beneficial interests in the securitized financial assets. The beneficial interests take the form of either notes or trust certificates that are sold to investors and/or retained by us. These beneficial interests are collateralized by the transferred loans and entitle the investors to specified cash flows generated from the securitized loans. In the aggregate, these beneficial interests have the same average life as the transferred financial assets. In addition to providing a source of liquidity and cost–efficient funding, securitizing these financial assets also reduces our credit exposure to the borrowers beyond any economic interest we may retain. We securitize conforming residential mortgage loans through GSE securitizations and we historically securitized nonconforming mortgage loans through private-label securitizations.

Each securitization is governed by various legal documents that limit and specify the activities of the securitization entity. The securitization entity is generally allowed to acquire the loans, to issue beneficial interests to investors to fund the acquisition of the loans, and to enter into derivatives or other yield maintenance contracts (e.g., coverage by monoline bond insurers) to hedge or mitigate certain risks related to the financial assets or beneficial interests of the entity. A servicer, who is generally us, is appointed pursuant to the underlying legal documents to service the assets the securitization entity holds and the beneficial interests it issues. Servicing functions include, but are not limited to, making certain payments of property taxes and insurance premiums, default and property maintenance payments, as well as advancing principal and interest payments before collecting them from individual borrowers. Our servicing responsibilities, which constitute continued involvement in the transferred financial assets, consist of primary servicing (i.e., servicing the underlying transferred financial assets) and/or master servicing (i.e., servicing the beneficial interests that result from the securitization transactions). Certain securitization entities also require the servicer to advance scheduled principal and interest payments due on the beneficial interests issued by the entity regardless of whether cash payments are received on the underlying transferred financial assets. Accordingly, we are required to provide these servicing advances when applicable. See Note 6 — Servicing Activities for additional information regarding our servicing rights.

The GSEs provide a guarantee of the payment of principal and interest on the beneficial interests issued in securitizations. In private-label securitizations, cash flows from the assets initially transferred into the securitization entity represent the sole source for payment of distributions on the beneficial interests issued by the securitization entity and for payments to the parties that perform services for the securitization entity, such as the servicer or the trustee. In certain private-label securitization transactions, a liquidity facility may exist to provide temporary liquidity to the entity. The liquidity provider generally is reimbursed prior to other parties in subsequent distribution periods. Monoline insurance may also exist to cover certain shortfalls to certain investors in the beneficial interests issued by the securitization entity. As noted above, in certain private-label securitizations, the servicer is required to advance scheduled principal and interest payments due on the beneficial interests regardless of whether cash payments are received on the underlying transferred financial assets. The servicer is allowed to reimburse itself for these servicing advances. Additionally, certain private-label securitization transactions may allow for the acquisition of additional loans subsequent to the initial loan transfer. Principal collections on other loans and/or the issuance of new beneficial interests, such as variable funding notes, generally fund these loans; we are often contractually required to invest in these new interests.

We may retain beneficial interests in our private-label securitizations, which may represent a form of significant continuing economic interest. These retained interests include, but are not limited to, senior or subordinate mortgage– or asset–backed securities, interest–only strips, principal–only strips, and residuals. Certain of these retained interests provide credit enhancement to the trust as they may absorb credit losses or other cash shortfalls. Additionally, the securitization agreements may require cash flows to be directed away from certain of our retained interests due to specific over–collateralization requirements, which may or may not be performance–driven.

We generally hold certain conditional repurchase options that allow us to repurchase assets from the securitization entity. The majority of the securitizations provide us, as servicer, with a call option that allows us to repurchase the remaining transferred financial assets or outstanding beneficial interests at our discretion once the asset pool reaches a predefined level, which represents the point where servicing becomes burdensome (a clean–up call option). The repurchase price is typically the par amount of the loans plus accrued interest. Additionally, we may hold other conditional repurchase options that allow us to repurchase a transferred

26

financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a certain prespecified delinquency level. We have discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest.

Other than our customary representation and warranty obligations, these securitizations are nonrecourse to us, thereby transferring the risk of future credit losses to the extent the beneficial interests in the securitization entities are held by third parties. Representation and warranty provisions generally require us to repurchase loans or indemnify the investor or other party for incurred losses to the extent it is determined that the loans were ineligible or were otherwise defective at the time of sale. See Note 19 — Guarantees, Commitments and Contingencies for detail on representation and warranty provisions. We did not provide any noncontractual financial support to any of these entities during the year-ended December 31, 2011 and 2010.

## Other Variable Interest Entities

*Servicer Advance Funding Entity* — To assist in the financing of our servicer advance receivables, we formed a SPE that issues term notes and variable funding notes to third–party investors that are collateralized by servicer advance receivables. These servicer advance receivables are transferred to the SPE and consist of delinquent principal and interest advances we made as servicer to various investors; property taxes and insurance premiums advanced to taxing authorities and insurance companies on behalf of borrowers; and amounts advanced for mortgages in foreclosure. The SPE funds the purchase of the receivables through financing obtained from the third–party investors and subordinated loans or an equity contribution from us. This SPE is consolidated on our balance sheet at December 31, 2011 and 2010. The beneficial interest holder of this SPE does not have legal recourse to our general credit. We do not have a contractual obligation to provide any type of financial support in the future, nor have we provided noncontractual financial support to the entity during the years ended December 31, 2011 and 2010.

*Home Equity Funding Entity* — To assist in the financing of certain of our home equity mortgage loans, we formed a SPE that issued variable funding notes to third–party investors that are collateralized by home equity loans and revolving lines of credit. This SPE is consolidated on our balance sheet at December 31, 2011 and 2010. The beneficial interest holder of this VIE does not have legal recourse to our general credit. We do not have a contractual obligation to provide any type of financial support in the future, nor have we provided noncontractual financial support to the entity during the years ended December 31, 2011 and 2010.

*Other* — We have involvement with other immaterial on-balance sheet VIEs. Most of these VIEs are used for additional liquidity whereby we sell certain financial assets to the VIE and issue beneficial interests to third parties for cash.

## Involvement with Variable Interest Entities

The determination of whether financial assets transferred by us to VIEs (and related liabilities) are consolidated on our balance sheet (also referred to as on–balance sheet) or not consolidated on our balance sheet (also referred to as off–balance sheet) depends on the terms of the related transaction and our continuing involvement (if any) with the SPE. We are deemed the primary beneficiary and, therefore, consolidate VIEs for which we have both (a) the power through voting rights or similar rights to direct the activities that most significantly impact the VIE's economic performance, and (b) a variable interest (or variable interests) that (i) obligates us to absorb losses that could potentially be significant to the VIE and/or (ii) provides us the right to receive residual returns of the VIE that could potentially be significant to the VIE. We determine whether we hold a significant variable interest in a VIE based on a consideration of both qualitative and quantitative factors regarding the nature, size, and form of our involvement with the VIE. We assess whether we are the primary beneficiary of a VIE on an ongoing basis. Our involvement with consolidated and nonconsolidated VIEs in which we hold a variable interest as of December 31, 2011 and 2010, is presented below.

| ($ in thousands) | Consolidated involvement with VIEs | Assets of nonconsolidated VIEs, net (a) | Maximum exposure to loss in nonconsolidated VIEs (b) |
|---|---|---|---|
| **December 31, 2011** | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | **$939,159** | **$—** | **$—** |
| Servicer Advance Funding | **955,823** | **—** | **—** |
| Home Equity Funding | **156,423** | **—** | **—** |
| Other | **2,541** | **—** | **—** |
| Off–balance sheet variable interest entities | | | |
| Ginnie Mae securitizations | **2,651,939** (c) | **44,126,607** | **44,126,607** |
| Private-label securitizations | **140,709** (d) | **4,408,206** | **4,408,206** |
| Total | **$4,846,594** | **$48,534,813** | **$48,534,813** |
| December 31, 2010 | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | $1,211,055 | $— | $— |
| Servicer Advance Funding | 1,022,749 | — | — |
| Home Equity Funding | 186,368 | — | — |
| Other | 11,517 | — | — |
| Off–balance sheet variable interest entities | | | |
| Ginnie Mae securitizations | 2,908,823 (c) | 43,594,804 | 43,594,804 |
| Private-label securitizations | 183,323 (d) | 5,371,282 | 5,371,282 |
| Total | $5,523,835 | $48,966,086 | $48,966,086 |

(a) Asset values represent the current UPB of outstanding consumer mortgage loans within the VIEs.

(b) Maximum exposure to loss represents the current UPB of outstanding consumer mortgage loans based on our customary representation and warranty provisions. This measure is based on the unlikely event that all of the loans have underwriting defects or other defects that trigger a representation and warranty provision and the collateral supporting the loans are worthless. This required disclosure is not an indication of our expected loss.

(c) Includes $377.8 million and $569.0 million classified as MSRs and $2.3 billion and $2.3 billion of mortgage loans held–for–sale that are subject to conditional repurchase options at December 31, 2011 and 2010, respectively. The corresponding liability related to conditional repurchase option loans is recorded in other liabilities.

(d) Includes $26.5 million and $37.6 million classified as other assets, $8.4 million and $0.0 million classified as mortgage servicing rights and $105.8 million and $145.7 million of mortgage loans held–for–sale that are subject to conditional repurchase options at December 31, 2011 and 2010, respectively. The corresponding liability related to conditional repurchase option loans is recorded in other liabilities.

## On–balance Sheet Variable Interest Entities

We engage in securitization and other financing transactions that do not qualify for off–balance sheet treatment. In these situations, we hold beneficial interests or other interests in the VIE, which represents a form of significant continuing economic interest. The interests held include, but are not limited to, senior or subordinate mortgage– or asset–backed securities, interest–only strips, principal–only strips, residuals, and servicing rights. Certain of these retained interests provide credit enhancement to the securitization entity as they may absorb credit losses or other cash shortfalls. Additionally, the securitization documents may require cash flows to be directed away from certain of our retained interests due to specific over–collateralization requirements, which may or may not be performance–driven. Because these securitization entities are consolidated, these retained interests and servicing rights are not recognized as separate assets on our Consolidated Balance Sheet.

We consolidate certain of these entities because we have a controlling financial interest in the VIE, primarily due to our servicing activities, and because we hold a significant variable interest in the VIE. We are the primary beneficiary of certain private-label securitization entities for which we perform servicing activities and have retained a significant variable interest in the form of a beneficial interest. In cases where we did not meet sale accounting under previous guidance, unless we have made modifications to the overall transaction, we do not meet sale accounting under current guidance as we are not permitted to revisit sale accounting guidelines under the current guidance. In cases where substantive modifications are made, we then reassess the transaction under the amended guidance based on the new circumstances.

28

Consolidated VIEs represent separate entities with which we are involved. The third–party investors in the obligations of consolidated VIEs have legal recourse only to the assets of the VIEs and do not have recourse to us, except for customary representation and warranty provisions or situations where we are the counterparty to certain derivative transactions involving the VIE. Cash flows from the assets are restricted only to pay such liabilities. Thus, our economic exposure to loss from outstanding third–party financing related to consolidated VIEs is significantly less than the carrying value of the consolidated VIE assets. All assets are restricted for the benefit of the beneficial interest holders. See Note 16 — Fair Value for discussion of the assets and liabilities for which the fair value option has been elected.

## Off-balance Sheet Variable Interest Entities

The nature, purpose, and activities of nonconsolidated securitization entities are similar to those of our consolidated securitization entities with the primary difference being the nature and extent of our continuing involvement. The cash flows from the assets of nonconsolidated securitization entities generally are the sole source of payment on the securitization entities' liabilities. The creditors of these securitization entities have no recourse to us with the exception of market customary representation and warranty provisions as described in Note 19 — Guarantees, Commitments and Contingencies.

Nonconsolidated VIEs include entities for which we either do not hold significant variable interests or do not provide servicing or asset management functions for the financial assets held by the securitization entity. Additionally, to qualify for off–balance sheet treatment, transfers of financial assets must meet sale accounting conditions in ASC 860. Our residential mortgage loan securitizations consist of GSE and private-label securitizations. We are not the primary beneficiary of any GSE loan securitization transaction because we do not have the power to direct the significant activities of such entities. Additionally, we do not consolidate certain private-label securitizations because we do not have a variable interest that could potentially be significant or we do not have power to direct the activities that most significantly impact the performance of the VIE.

For nonconsolidated securitization entities, the transferred financial assets are removed from our balance sheet provided the conditions for sale accounting are met. The financial assets obtained from the securitization are primarily reported as cash, servicing rights, or retained interests (if applicable). As an accounting policy election, we elected fair value treatment for our MSR portfolio. Liabilities incurred as part of these securitization transactions, such as representation and warranty provisions, are recorded at fair value at the time of sale and are reported as other liabilities on our Consolidated Balance Sheet. Upon the sale of the loans, we recognize a gain or loss on sale for the difference between the assets recognized, the assets derecognized, and the liabilities recognized as part of the transaction.

The following summarizes the pretax gains and losses recognized on financial assets sold into nonconsolidated securitization and similar asset-backed financing entities.

| Year ended December 31,   ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Consumer mortgage — GSEs | $686,833 | $718,632 |
| Total pretax (loss) gain | $686,833 | $718,632 |

Notes to Consolidated Financial Statements
Residential Capital, LLC

The following table summarizes cash flows received from and paid to securitization entities that are accounted for as a sale and in which we have a continuing involvement with the transferred assets (e.g., servicing) that were outstanding during 2011 and 2010. This table contains information regarding cash flows received from and paid to nonconsolidated securitization entities that existed during each period.

| Year ended December 31, *($ in thousands)* | Consumer mortgage | |
| | GSEs | Nonagency |
|---|---|---|
| **2011** | | |
| Cash proceeds from transfers completed during the year | **$59,814,651** | **$—** |
| Cash flows received on retained interests in securitization entities | **—** | **17,132** |
| Servicing fees | **518,084** | **194,882** |
| Purchases of previously transferred financial assets | | |
| Representation and warranty obligations | **(143,340 )** | **(37,386 )** |
| Other repurchases | **(2,537,257 )** | **(145,798 ) (a)** |
| Other cash flows | **(6,302 )** | **186,637** |
| Total net cash flows | **$57,645,836** | **$215,467** |
| **2010** | | |
| Cash proceeds from transfers completed during the year | $68,821,918 | $— |
| Cash flows received on retained interests in securitization entities | — | 27,559 |
| Servicing fees (b) | 476,901 | 188,553 |
| Purchases of previously transferred financial assets | | |
| Representation and warranty obligations | (388,873 ) | (13,343 ) |
| Other repurchases | (1,865,408 ) | (260,638 ) (a) |
| Other cash flows | (25,200 ) | (20,165 ) |
| Total net cash flows | $67,019,338 | ($78,034 ) |

(a) Includes repurchases in connection with clean up call options.
(b) We determined the amounts previously disclosed related to servicing fees for the year ended December 31, 2010, were misstated. Previously disclosed servicing fees were $733.1 million for GSEs and $203.8 million for nonagency. These amounts were corrected in the presentation above. The misstatement had no impact on our consolidated financial condition or results of operations.

The following table represents on–balance sheet mortgage loans held–for–sale and consumer finance receivable and loans, off–balance sheet securitizations, and whole–loan sales where we have continuing involvement. The tables present information about delinquencies and net credit losses. See Note 6 — Servicing Activities for further detail on total serviced assets.

| December 31, ($ in thousands) | Total UPB | | Amount 60 days or more past due | | Net credit losses (recoveries) | |
|---|---|---|---|---|---|---|
| | **2011** | 2010 | **2011** | 2010 | **2011** | 2010 |
| On–balance sheet loans | | | | | | |
| Consumer mortgage held–for–sale | **$4,650,917 (a)** | $4,999,392 (a) | **$3,049,234 (a)** | $3,078,832 (a) | **$30,580** | ($43,446) (b) |
| Consumer mortgage finance receivables and loans | **2,623,763** | 3,203,724 | **422,017** | 448,280 | **131,297** | 214,120 |
| Total on–balance sheet loans | **7,274,680** | 8,203,116 | **3,471,251** | 3,527,112 | **161,877** | 170,674 |
| Off–balance sheet securitization entities | | | | | | |
| Consumer mortgage — GSEs (c) | **131,751,844** | 152,516,605 | **7,675,811** | 11,956,110 | **n/m** | n/m |
| Consumer mortgage — nonagency | **60,768,935** | 69,416,571 | **11,232,126** | 12,145,511 | **3,981,684** | 4,604,781 |
| Total off–balance sheet securitization entities | **192,520,779** | 221,933,176 | **18,907,937** | 24,101,621 | **3,981,684** | 4,604,781 |
| Whole-loan transactions (d) | **17,516,446** | 18,549,877 | **2,209,088** | 2,843,642 | **695,066** | 1,030,113  (b) |
| Total | **$217,311,905** | $248,686,169 | **$24,588,276** | $30,472,375 | **$4,838,627** | $5,805,568 |

n/m = not meaningful

(a)   Includes loans subject to conditional repurchase options of $2.3 billion and $2.3 billion guaranteed by Ginnie Mae, and $131.8 million and $145.7 million sold to certain nonagency mortgage securitization entities at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities.

(b)   We determined the amounts previously disclosed related to net credit losses for the year ended December 31, 2010,  were misstated. Previously disclosed net credit losses were $119.3 million for on-balance sheet mortgage loans held-for-sale and $61.1 million for whole-loan transactions. These amounts were corrected in the presentation above. The misstatement had no impact on our consolidated financial condition or results of operations.

(c)   Anticipated credit losses are not meaningful due to the GSEs guarantees.

(d)   Whole-loan transactions are not part of a securitization transaction, but represent pools of consumer mortgage loans sold to investors.

## Changes in Accounting for Variable Interest Entities

ASU 2009–17 became effective on January 1, 2010, and upon adoption, we consolidated certain securitization entities that were previously held off–balance sheet. On January 1, 2010, we recognized a net increase of $11.5 billion to assets and liabilities on our Consolidated Balance Sheet ($10.1 billion of the increase relates to operations classified as held–for–sale and ultimately sold).

We previously held on our Consolidated Balance Sheet certain mortgage securitization entities, which were on–balance sheet prior to the adoption of ASU 2009–17 because we did not meet the sale accounting requirements at the inception of the transactions. Specific provisions inherent in these deals, included but were not limited to, the ability of the trust to enter into a derivative contract and the inclusion of a five loan repurchase right. The existence of the ability to enter into a derivative precluded the entities from being deemed a QSPE and the existence of the five loan repurchase right precluded sale accounting treatment. These two provisions, when used in combination, were deemed substantive and precluded sale accounting. We also retained servicing and, in most cases, retained an economic interest in the entities in the form of economic residuals, subordinate bonds, and/or IO strips. During 2010,

31

we completed the sale of 100% of our retained residuals and subordinate bonds related to certain of these on–balance sheet securitization entities. In addition, any repurchase rights associated with these structures were removed from these deals through exercise of such right. These collective actions were deemed to be substantial to warrant a recharacterization of the original transactions, and as such, they were reassessed under ASC 860, and it was concluded that the securitization entities satisfied sale accounting requirements. Furthermore, the sale of the 100% economic interests resulted in the loss of a controlling financial interest in the securitization entities and accordingly consolidation was not required. The combination of these actions resulted in the derecognition of assets previously sold to these securitization entities. Consolidated assets and consolidated liabilities of $1.2 billion and $1.2 billion, respectively, associated with this transaction were derecognized, and a gain of $51.3 million was recorded. During 2010, we completed the sale of our significant retained residuals and subordinate bonds related to certain other on-balance sheet securitization entities, which were consolidated upon adoption of ASU 2009–17 (but were not consolidated prior to the adoption of ASU 2009–17). Since we disposed of our variable interests in these securitization entities to unrelated third parties, a reassessment was required to determine whether we continued to hold a controlling financial interest. All subordinate retained economic interests in these entities were sold, and therefore, we no longer held a controlling financial interest. All assets and liabilities associated with the trust were derecognized and all retained interests in the entities, including insignificant retained senior interests and mortgage servicing rights, were recorded at their fair values at the date of deconsolidation. Consolidated assets and consolidated liabilities of $709.2 million and $707.1 million, respectively, associated with this transaction were derecognized and a gain of $1.4 million was recorded.

We continue to hold servicing rights associated with these deconsolidation transactions; however retained servicing does not preclude deconsolidation because the retained servicing we hold does not absorb a potentially significant level of variability in the securitization entities. Upon deconsolidation, $8.9 million of servicing rights and $1.3 million of retained interests associated with these transaction were recorded.

## 6. Servicing Activities

## Mortgage Servicing Rights

The following table summarizes our activity related to MSRs. Although there are no market transactions that are directly observable, management estimates fair value based on the price it believes would be received to sell the MSR asset in an orderly transaction under current market conditions.

| ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Estimated fair value at January 1, | $1,991,586 | $2,539,588 |
| Additions recognized on sale of mortgage loans | 54,357 | 184,494 |
| Subtractions from sales of servicing assets | (401) | (550) |
| Changes in fair value | | |
| Due to changes in valuation inputs or assumptions used in the valuation model | (552,970) | (148,973) |
| Other changes in fair value | (259,465) | (576,378) |
| Other changes that affect the balance (a) (b) | — | (6,595) |
| Estimated fair value at December 31, | $1,233,107 | $1,991,586 |

(a) In 2010 we derecognized $18.8 million of MSRs upon initial adoption of ASU 2009–17.
(b) In 2010 we deconsolidated certain VIEs resulting in the recognition of $8.9 million of MSRs. See Note 5 — Securitizations and Variable Interest Entities for additional information.

Changes in fair value due to changes in valuation inputs or assumptions used in the valuation models include all changes due to a revaluation by a model or by a benchmarking exercise. Other changes in fair value primarily include the accretion of the present value of the discount related to forecasted cash flows and the economic run-off of the portfolio.

Notes to Consolidated Financial Statements
Residential Capital, LLC

The key economic assumptions and the sensitivity of the fair value of MSRs to immediate 10% and 20% adverse changes in those assumptions were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Weighted average life (in years) | 4.3 | 5.8 |
| Weighted average prepayment speed | 18.0% | 12.2% |
| Impact on fair value of 10% adverse change | $(71,223) | $(91,142) |
| Impact on fair value of 20% adverse change | (135,292) | (172,307) |
| Weighted average discount rate | 9.5% | 13.2% |
| Impact on fair value of 10% adverse change | $(25,396) | $(43,670) |
| Impact on fair value of 20% adverse change | (48,913) | (85,104) |

These sensitivities are hypothetical and should be considered with caution. Changes in fair value based on a 10% and 20% variation in assumptions generally cannot be extrapolated because the relationship of the change in assumptions to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value is calculated without changing any other assumption. In reality, changes in one factor may result in changes in another (e.g., increased market interest rates may result in lower prepayments and increased credit losses) that could magnify or counteract the sensitivities. Further, these sensitivities show only the change in the asset balances and do not show any expected change in the fair value of the instruments used to manage the interest rate and prepayment risks associated with these assets.

**Risk–mitigation Activities**

The primary economic risk related to our MSR is interest rate risk and the resulting impact on prepayment speeds. A significant decline in interest rates could lead to higher than expected prepayments that could reduce the value of the MSRs. We economically hedge the impact of this risk with both derivative and nonderivative financial instruments. These instruments include interest rate swaps, caps and floors, options to purchase these items, futures and forward contracts, constant monthly maturity (index trades), synthetic interest only and principal only securities and/or to–be–announced (TBAs) securities. The net fair value of derivative financial instruments used to mitigate this risk amounted to $(199.8) million and $(207.6) million at December 31, 2011 and 2010, respectively. See Note 17 — Derivative Instruments and Hedging Activities for additional information.

The components of servicing valuation and hedge activities, net, were as follows.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Change in estimated fair value of mortgage servicing rights | ($812,435) | ($725,351) |
| Change in fair value of derivative financial instruments | 456,720 | 947,922 |
| Servicing valuation and hedge activities, net | ($355,715) | $222,571 |

**Mortgage Servicing Fees**

The components of servicing fees were as follows.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Contractual servicing fees (net of guarantee fees and including sub servicing) | $638,406 | $725,864 |
| Late fees | 55,822 | 69,822 |
| Ancillary fees | 145,412 | 176,847 |
| Total | $839,640 | $972,533 |

**Mortgage Servicer Advances**

In connection with our primary servicing activities (i.e., servicing of mortgage loans), we make certain payments for property taxes and insurance premiums, default and property maintenance payments, as well as advances of principal and interest payments before collecting them from individual borrowers. Servicer advances, including contractual interest are priority cash flows in the event of a loan principal reduction or foreclosure and ultimate liquidation of the real estate–owned property, thus making their collection reasonably assured. These servicer advances are included in accounts receivable and totaled $1.8 billion and $1.8 billion at December 31, 2011 and 2010, respectively. We maintain an allowance for uncollectible primary servicer advances, which totaled $42.5 million and $25.0 million at December 31, 2011 and 2010, respectively. Our potential advance obligation is influenced by a borrower's performance and credit quality. Additionally, we have fiduciary responsibility for mortgage escrow and custodial funds of approximately $4.4 billion and $4.2 billion at December 31, 2011 and 2010, respectively. These amounts are segregated in custodial bank accounts, which are not included on our Consolidated Balance Sheet.

Notes to Consolidated Financial Statements
Residential Capital, LLC

We advance funds for various activities related to the foreclosure process principally related to attorney fees and costs, appraisals, escrow, insurance and property preservation, in the event we, or the investor, determine foreclosure is the most appropriate loss mitigation strategy. In the current environment, many states and local jurisdictions are requiring us to alter our processes in connection with foreclosures and in some circumstances this can result in restarting the foreclosure process entirely or repeating certain of the required steps (foreclosure restarts). To the extent we restart the process, in whole or in part, we will not be reimbursed for advances in connection with the original activities. The circumstances and extent of any foreclosure restart are specific and unique to each state and/or local jurisdiction. During the year ended December 31, 2011, we recognized losses of $22.1 million in connection with foreclosure restarts. These losses are recorded in other noninterest expense, net. At December 31, 2011, we had an allowance for uncollectible advances in connection with estimated foreclosure restarts of $9.9 million.

At December 31, 2011, we had an allowance for uncollectible primary servicer advances of $7.5 million related to expected loan modification activities in connection with our February 9, 2012 settlement agreement. See Note — 19 Guarantees, Commitments and Contingencies for additional information. To the extent amounts had been advanced for loans that are expected to be modified in connection with the settlement, these amounts will not be collected. The amount of this allowance is management's best estimate given the anticipated modification activity.

When we act as a subservicer of mortgage loans we perform the responsibilities of a primary servicer but do not own the corresponding primary servicing rights. We receive a fee from the primary servicer for such services. As the subservicer, we would have the same responsibilities of a primary servicer in that we would make certain payments of property taxes and insurance premiums, default and property maintenance, as well as advances of principal and interest payments before collecting them from individual borrowers. As of December 31, 2011 and 2010, outstanding servicer advances related to subserviced loans were $124.9 million and $140.0 million and we had a reserve for uncollectible subservicer advances of $1.1 million and $0.5 million, respectively.

In many cases where we act as master servicer we also act as primary servicer. In connection with our master servicing activities, we service the mortgage–backed and mortgage–related asset–backed securities and whole–loan packages sold to investors. As the master servicer, we collect mortgage loan payments from primary servicers and distribute those funds to investors in mortgage–backed and asset–backed securities and whole–loan packages. As the master servicer, we are required to advance scheduled payments to the securitization trust or whole–loan investors. To the extent the primary servicer does not advance the payments, we are responsible for advancing the payment to the trust or whole–loan investors. Master servicer advances, including contractual interest, are priority cash flows in the event of a default, thus making their collection reasonably assured. In most cases, we are required to advance these payments to the point of liquidation of the loan or reimbursement of the trust or whole–loan investors. We had outstanding master servicer advances of $158.2 million and $90.4 million as of December 31, 2011 and 2010, respectively. We had no reserve for uncollectible master servicer advances at December 31, 2011 or 2010.

**Serviced Mortgage Assets**

In many cases, we act as both the primary and master servicer. However, in certain cases, we also service loans that have been purchased and subsequently sold through a securitization trust or whole–loan sale whereby the originator retained the primary servicing rights and we retained the master servicing rights.

The unpaid principal balance of total serviced mortgage assets was as follows.

| December 31, ($ in millions) | 2011 | 2010 (d) |
|---|---|---|
| On–balance sheet mortgage loans (a) | | |
| Held–for–sale and investment | **$6,828** | $8,310 |
| Off–balance sheet mortgage loans | | |
| Loans held by third–party investors | | |
| Consumer mortgage private-label | **50,886** | 59,463 |
| Consumer mortgage agency | **131,635** | 152,374 |
| Consumer mortgage whole-loan portfolios | **15,104** | 17,888 |
| Purchased servicing rights (b) | **3,247** | 3,946 |
| Total primary serviced mortgage loans | **207,700** | 241,981 |
| Subserviced mortgage loans (c) | **169,531** | 136,812 |
| Master servicing only mortgage loans | **8,557** | 10,548 |
| Total serviced mortgage loans | **$385,788** | $389,341 |

(a) Includes on–balance sheet securitization consumer finance receivables and loans. See Note 4 — Finance Receivables and Loans, net, for additional information.

(b) There is no recourse to us outside of customary contractual provisions relating to the execution of the services we provide.

(c) Includes loans where we act as a subservicer under contractual agreements with the primary servicer. As subservicer, there is no recourse to us outside of customary contractual provisions relating to the execution of the services we provide, except for loans subserviced on behalf of Ally Bank. See Note 20 — Related Party Transactions for additional information.

(d) We have reclassified conditional repurchase option loans of $2.3 billion from off–balance sheet mortgage loans to on–balance sheet mortgage loans and $364.0 million of foreign mortgage loans from subserviced mortgage loans to primary serviced mortgage loans. These corrections had no impact on the total serviced mortgage loans.

The following table sets forth information concerning the delinquency experience in our domestic consumer mortgage loan primary servicing portfolio, including pending foreclosures.

| | December 31, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| ($ in millions) | Number of loans | Unpaid principal balance | Number of loans (a) | Unpaid principal balance (a) |
| Total U.S. mortgage loans primary serviced | **1,587,113** | **$207,380** | 1,802,172 | $241,391 |
| Period of delinquency | | | | |
| 30 to 59 days | **67,239** | **$9,289** | 75,324 | 10,488 |
| 60 to 89 days | **25,138** | **3,695** | 29,106 | 4,303 |
| 90 days or more | **27,570** | **4,467** | 28,079 | 4,413 |
| Foreclosures pending | **68,166** | **13,018** | 76,582 | 14,934 |
| Bankruptcies | **34,956** | **4,869** | 35,889 | 4,809 |
| Total delinquent loans | **223,069** | **$35,338** | 244,980 | $38,947 |
| Percent of U.S. mortgage loans primary serviced | **14.1%** | **17.0%** | 13.6% | 16.1% |

(a) We have reclassified resolved bankruptcies, previously reported in Bankruptcies, to their corresponding delinquency status at December 31, 2010. This classification is consistent with the December 31, 2011 presentation.

Certain of our subsidiaries which conduct our primary and master servicing activities are required to maintain certain servicer ratings in accordance with master agreements entered into with a GSE. At December 31, 2011, we are in compliance with the servicer rating requirements of the master agreements.

We are also required to maintain consolidated tangible net worth, as defined, of $250.0 million, under our agreements with a GSE. In the event of default, the GSE could require posting collateral in an amount based on repurchase demands outstanding plus recourse obligations; termination or suspension of our selling and servicing contract; require additional or more frequent financial and operational reporting; limit early funding programs or trading desk transactions; accelerate rebuttal time periods for outstanding repurchase demands; or take other actions permitted by law. Should we or our subsidiaries fail to remain in compliance with these requirements and as a result should our mortgage selling and servicing contract be terminated, cross default provisions within certain credit and bilateral facilities could be triggered. Our consolidated tangible net worth at December 31, 2011, was $92.4 million, in

breach of our contractual covenant. We received a letter of acknowledgment from the GSE indicating they would take no immediate action in connection with the breach. We are in compliance with the contractual covenant as of March 28, 2012, the date of issuance of these Consolidated Financial Statements.

At December 31, 2011, domestic insured private-label securitizations with an unpaid principal balance of $6.0 billion contain provisions entitling the monoline or other provider of contractual credit support (surety providers) to declare a servicer default and terminate the servicer upon the failure of the loans to meet certain portfolio delinquency and/or cumulative loss thresholds. Securitizations with an unpaid principal balance of $5.4 billion had breached a delinquency and/or cumulative loss threshold. While we continue to service these loans and receive service fee income with respect to these securitizations, the value of the related MSR is zero at December 31, 2011. Securitizations with an unpaid principal balance of $607.3 million have not yet breached a delinquency or cumulative loss threshold. The value of the related MSR is $2.8 million at December 31, 2011.

## 7. Accounts Receivable, Net

| December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| Servicer advances, net (a) | **$2,045,446** | $2,026,128 |
| Loan insurance guarantee receivable, net (b) | **745,396** | 392,384 |
| Due from brokers for derivative trades | **94,024** | 9,749 |
| Servicing fees receivable | **87,208** | 110,195 |
| Accrued interest receivable | **37,962** | 48,315 |
| Other | **41,712** | 53,288 |
| Total accounts receivable, net | **$3,051,748** | $2,640,059 |

(a) The allowance for uncollectible servicer advances was $43.7 million and $25.5 million at December 31, 2011 and 2010, respectively.
(b) Represents mortgage loans in foreclosure for which a guarantee from Ginnie Mae exists, net of a reserve for uncollectible guaranteed receivables of $21.8 million and $15.1 million at December 31, 2011 and 2010, respectively.

## 8. Other Assets

| December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| Property and equipment at cost | **$252,890** | $366,312 |
| Accumulated depreciation and amortization | **(207,645)** | (325,602) |
| Net property and equipment | **45,245** | 40,710 |
| Fair value of derivative contracts in receivable position | **4,877,197** | 3,298,622 |
| Collateral placed with derivative counterparties | **1,095,287** | 1,244,398 |
| Restricted cash (a) | **448,819** | 609,594 |
| Foreclosed assets | **71,485** | 132,655 |
| Trading securities | **33,303** | 46,914 |
| Interests retained in financial asset sales | **23,102** | 20,588 |
| Income taxes receivable | **5,111** | — |
| Available for sale securities | **—** | 27,670 |
| Other | **28,603** | 64,050 |
| Total other assets | **$6,628,152** | $5,485,201 |

(a) At December 31, 2011, $93.8 million for a GSE collateral account, $126.1 million related to a cash reserve account for our reinsurance business, $3.9 million for appeals bond for legal proceedings, $112.0 million related to collateral posted with Ally Bank, and $76.1 million related to funds collected, but not yet distributed to a third–party. At December 31, 2010, restricted cash included $91.7 million for a GSE collateral account, $177.8 million related to a cash reserve account for our reinsurance business, $127.5 million for appeals bond for legal proceedings, $110.9 million related to collateral posted with Ally Bank, and $72.7 million related to funds collected, but not yet distributed to a third–party.

Notes to Consolidated Financial Statements
Residential Capital, LLC

## 9. Borrowings

Borrowings were as follows.

| ($ in thousands) | Weighted average end of period interest rates | | | December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | December 31, | | | 2011 | | | 2010 | | |
| | 2011 | 2010 | Unsecured | Secured | Total | Unsecured | Secured | Total |
| Short-term borrowings | | | | | | | | |
| Borrowings from parent | 3.0% | 3.0% | $— | $183,595 | $183,595 | $— | $681,000 | $681,000 |
| Borrowings from affiliate | 5.1% | —% | — | 250,000 | 250,000 | — | — | — |
| Other short-term borrowings | 6.3% | 4.5% | — | 323,000 | 323,000 | 13,363 | 955,811 | 969,174 |
| Total short-term borrowings | 5.0% | 3.9% | — | 756,595 | 756,595 | 13,363 | 1,636,811 | 1,650,174 |
| Long-term borrowings | | | | | | | | |
| Borrowings from parent | 3.0% | 3.0% | — | 755,769 | 755,769 | — | 845,775 | 845,775 |
| Collateralized borrowings in securitization trusts (a) | 4.7% | 5.0% | — | 830,318 | 830,318 | — | 1,057,287 | 1,057,287 |
| Other long-term borrowings | 8.0% | 8.3% | 1,096,789 | 3,285,615 | 4,382,404 | 1,342,167 | 3,153,113 | 4,495,280 |
| Total long-term borrowings | 6.9% | 7.1% | 1,096,789 | 4,871,702 | 5,968,491 | 1,342,167 | 5,056,175 | 6,398,342 |
| Total borrowings | 6.7% | 6.4% | $1,096,789 | $5,628,297 | $6,725,086 | $1,355,530 | $6,692,986 | $8,048,516 |

(a)  Collateralized borrowings with an outstanding balance of $2.6 billion and $3.0 billion were recorded at fair value of $829.9 million and $972.1 million as of December 31, 2011 and 2010, respectively.  See Note 16 — Fair Value for additional information.

The following table summarizes the maturity profile of our borrowings by type.  Amounts represent the scheduled maturity of debt, assuming no early redemptions occur.  For sources of borrowings without a stated maturity date (as is the case with uncommitted agreements), the maturities are assumed to occur within 2012.

| December 31, 2011 ($ in millions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 and thereafter | Total |
|---|---|---|---|---|---|---|---|
| Secured borrowings | | | | | | | |
| Borrowings from parent | $939.4 | $— | $— | $— | $— | $— | $939.4 |
| Borrowings from affiliate | 250.0 | — | — | — | — | — | 250.0 |
| Collateralized borrowings in securitization trusts (a) | — | — | — | — | — | 830.3 | 830.3 |
| Other secured borrowings | 428.3 | 853.7 | 752.7 | 719.3 | — | 854.6 | 3,608.6 |
| Total secured borrowings | 1,617.7 | 853.7 | 752.7 | 719.3 | — | 1,684.9 | 5,628.3 |
| Unsecured borrowings | 337.7 | 537.1 | 107.6 | 114.4 | — | — | 1,096.8 |
| Total borrowings | $1,955.4 | $1,390.8 | $860.3 | $833.7 | $— | $1,684.9 | $6,725.1 |

(a)  The principal on the debt securities is paid using cash flows from underlying collateral (mortgage loans).  Accordingly, the timing of the principal payments on these debt securities is dependent on the payments received, and as such, we elected to represent the full term of the securities in the 2017 and thereafter time frame.

The most restrictive financial covenants in our credit facilities require us to maintain consolidated tangible net worth of $250.0 million as of the end of each month, consolidated liquidity of $250.0 million daily, and unrestricted liquidity of $250.0 million daily.  For these purposes, consolidated tangible net worth is defined as our consolidated equity excluding intangible assets. Unrestricted liquidity is defined as certain unrestricted and unencumbered cash balances in U.S. dollars and cash equivalents on a consolidated basis. We view unrestricted liquidity as cash readily available to cover operating demands across our business operations. These financial covenants are included in certain of our bilateral facilities.  Should we fail to remain in compliance with these requirements, remedies include but are not limited to, at the option of the facility provider, termination of further funding, acceleration of outstanding obligations, rights to realize against the assets securing or otherwise supporting the facility, and other legal remedies. Our liquidity providers can waive their contractual rights in the event of a default.

37

We are required to maintain consolidated tangible net worth, as defined, of $250.0 million, under our agreements with a GSE. In the event of default, the GSE could require posting collateral in an amount based on repurchase demands outstanding plus recourse obligations; termination or suspension of our selling and servicing contract; require additional or more frequent financial and operational reporting; limit early funding programs or trading desk transactions; accelerate rebuttal time periods for outstanding repurchase demands; or take other actions permitted by law. We and certain of our subsidiaries are also required to maintain certain servicer ratings. Should we or our subsidiaries fail to remain in compliance with these requirements and as a result should our mortgage selling and servicing contract be terminated, cross default provisions within certain credit and bilateral facilities could be triggered.

As of December 31, 2011, we were in compliance with our consolidated and unrestricted liquidity requirements and required servicer ratings.

At December 31, 2011, our consolidated tangible net worth, as defined, was $92.4 million, a breach of our covenants. On January 30, 2012, we received capital support from Ally Inc. of $196.5 million through forgiveness of debt. We received waivers in connection with this breach from each of our credit providers, including Ally Inc. and BMMZ (see Note 20 – Related Party Transactions), and an acknowledgment letter from the GSE indicating they would take no immediate action as a result of the breach. We are in compliance with the provisions of such waivers and acknowledgments. We are in compliance with all of our financial covenants at March 28, 2012, the date of issuance of these Consolidated Financial Statements.

The following table summarizes the outstanding, unused, and total capacity of our funding facilities at December 31, 2011. We use both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not legally obligated to advance funds under them.

| December 31, 2011 *($ in thousands)* | Outstanding | Unused capacity | Total capacity |
|---|---|---|---|
| Facilities with parent | | | |
| Ally Inc. Senior Secured Credit Facility | $755,769 | $— | $755,769 |
| Ally Inc. LOC | 183,595 | 1,416,405 | 1,600,000 |
| Total facilities with parent | 939,364 | 1,416,405 | 2,355,769 |
| Facilities with affiliate | | | |
| Secured financing agreement - BMMZ | 250,000 | — | 250,000 |
| Secured funding facilities - committed | | | |
| Secured financing agreement | — | 250,000 | 250,000 |
| Mortgage servicing rights facility | 323,000 | 177,000 | 500,000 |
| Servicer advance funding facilities | 780,385 | 144,615 | 925,000 |
| Home equity funding facility | 135,800 | — | 135,800 |
| Other funding facilities | — | 11,000 | 11,000 |
| Total committed | 1,489,185 | 582,615 | 2,071,800 |
| Secured funding facilities - uncommitted | | | |
| Mortgage servicing rights facility | — | 50,000 | 50,000 |
| Total uncommitted | — | 50,000 | 50,000 |
| Total secured funding facilities | 1,489,185 | 632,615 | 2,121,800 |
| Total funding facilities | $2,428,549 | $2,049,020 | $4,477,569 |

## Facilities with Parent and Affiliates

### Ally Inc. Senior Secured Credit Facility

The Ally Inc. Senior Secured Credit Facility matures on April 13, 2012. The borrowers, RFC and GMAC Mortgage (collectively, the Borrowers), no longer have the ability to request revolving loans under the facility. The facility is secured by certain domestic whole loans, accounts receivable, notes receivable, securities, and equity investments of the Borrowers. The facility contains limitations on the use of proceeds from sales of pledged collateral with any such proceeds required to be paid to Ally Inc. to reduce the balance outstanding.

### Ally Inc. LOC

The Ally Inc. Line of Credit (LOC) matures on April 13, 2012. The maximum capacity of the LOC is $1.6 billion, comprised of $1.1 billion of secured capacity and $500.0 million of unsecured capacity. GMAC Mortgage and RFC (collectively, the Borrowers) are borrowers under this facility. Certain domestic whole loans, accounts receivable, notes receivable, mortgage servicing rights, securities, and equity investments of the Borrowers secure draws under the secured portion of the LOC, which are available to the

extent there is sufficient collateral securing the draw. Draws on the unsecured portion of the LOC are available only after the secured portion has been fully utilized. Draws under the LOC are available only if certain unrestricted and unencumbered balances in U.S. dollars and cash equivalents of us and our subsidiaries are less than $300.0 million. The available amount and the borrowing base of the LOC will both be reduced by the amount of any collateral posted or delivered by Ally IM to the Borrowers or us pursuant to certain derivative transaction agreements with Ally IM. The obligations under the LOC and the Ally IM Derivative Agreements are cross-collateralized for the benefit of Ally Inc. On December 30, 2011, Ally Inc. forgave$109.4 million of the outstanding balance of this facility. In addition, on January 30, 2012, Ally Inc. forgave $196.5 million of the outstanding balance of this facility.

**BMMZ Holdings, LLC Secured Financing Agreement**

On December 21 2011, the Borrowers entered into a secured financing agreement with our affiliate BMMZ Holdings LLC (BMMZ) a wholly-owned subsidiary of Ally Inc. The initial aggregate facility amount is $250.0 million. The secured financing agreement is collateralized by domestic mortgage loan assets. The maturity date is the earlier of the maturity date of the LOC agreement or December 19, 2012.

## Secured Funding Facilities

### Secured Financing Agreement

Our secured financing agreement had a maximum facility amount of $250.0 million and was to mature on May 30, 2013. The secured financing agreement was collateralized by domestic mortgage loan assets. This facility was terminated on January 27, 2012.

### Mortgage Servicing Rights Facility

As of December 31, 2011, we have $500.0 million of committed funding capacity and $50.0 million of uncommitted capacity through which eligible mortgage servicing rights are funded. The facility matures on March 30, 2012. On February 1, 2012, this facility was amended and the committed amount was reduced to $300.0 million and the uncommitted amount was increased to $250.0 million.

### Servicer Advance Funding Facilities

As of December 31, 2011, a secured facility to fund mortgage servicer advances had total capacity of $800.0 million, consisting of term notes in the amount of $450.0 million and a variable funding note of $350.0 million. On March 13, 2012, a new variable funding note was issued with a total capacity of $800.0 million with the proceeds used to pay down the existing variable funding note and term notes on March 13, and March 15, 2012, respectively. The variable funding note will begin amortizing on March 12, 2013.

A second secured facility to fund mortgage servicer advances has capacity of $125.0 million. On August 1, 2012, the scheduled revolving period will end, after which date no new advances will be funded and the 18–month repayment period will begin. Termination will occur upon the earlier of the end of the repayment period or the date the outstanding loan amount is paid in full.

### Home Equity Funding Facility

As of December 31, 2011, the secured facility to fund home equity mortgage loans consisted of $135.8 million in variable funding notes due to mature on February 25, 2031.

## Collateralized Borrowings in Securitization Trusts

We previously sold pools of consumer mortgage loans through private-label securitization transactions. The purpose of these securitizations was to provide permanent funding and exit for these assets. Certain of these securitizations were accounted for as secured borrowings, and therefore, the debt is reflected on our Consolidated Balance Sheet.

## Other Borrowings

### Junior Secured Notes

As of December 31, 2011, $2.1 billion of outstanding junior secured notes maturing in May 2015. The unamortized balance of deferred concession recognized as a result of our 2008 exchange offer was $246.1 million. The deferred concession is being amortized over the life of the secured notes using the effective yield method. For the years ended December 31, 2011 and 2010, $101.1 million and $110.0 million, respectively, of deferred concession were amortized into current period earnings as a reduction of interest expense.

GMAC Mortgage, its immediate parent, GMAC Residential Holding Company, LLC (Res Holdings), RFC, its immediate

parent, GMAC-RFC Holding Company, LLC (RFC Holdings), and Homecomings Financial, LLC (Homecomings), a wholly owned subsidiary of RFC, are all guarantors with respect to the junior secured notes.

Upon repayment in full of the Ally Inc. Senior Secured Credit Facility, net cash proceeds from sales of assets that were previously pledged as collateral to the Ally Inc. Senior Secured Credit Facility may be used to repurchase, optionally redeem or optionally prepay the junior secured notes. In the event net cash proceeds are not used to repurchase or optionally redeem or prepay the junior secured notes, or to reinvest in permissible collateral with a fair value substantially equivalent to the net cash proceeds (collectively, the Reinvested Proceeds), under certain circumstances, we may be required to make an offer to all holders of the junior secured notes to purchase notes in an amount equal to the excess of the net cash proceeds over the Reinvested Proceeds.

## Unsecured Notes

As of December 31, 2011, senior unsecured notes include $675.1 million of U.S. dollar-denominated notes maturing between June 2012 and June 2015, $128.6 million euro denominated notes maturing in May 2012 and $164.2 million U.K. sterling-denominated notes maturing between May 2013 and July 2014. We hedge a portion of the interest rate risk associated with our fixed-rate euro and U.K. sterling notes. As of December 31, 2011, we had interest rate swap agreements in place with notional amounts of $143.6 million and $101.2 million for our euro and U.K sterling denominated notes, respectively.

## Medium-term Unsecured Notes

As of December 31, 2011, medium-term unsecured notes include $128.8 million of peso-denominated notes issued by our wholly-owned subsidiary GMAC Financiera S.A de C.V. maturing in June 2012. ResCap, GMAC Mortgage, Res Holdings, RFC, RFC Holdings, and Homecomings are guarantors of the medium-term unsecured notes.

## Collateral for Secured Debt

The following table summarizes the carrying value of assets that are restricted, pledged, or for which a security interest has been granted as collateral for the payment of certain debt obligations.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Cash and cash equivalents | $82,389 | $102,825 |
| Mortgage loans held–for–sale | 1,688,037 | 1,940,690 |
| Finance receivables and loans, net | | |
|   Consumer | 1,005,982 | 1,288,556 |
|   Commercial | 4,226 | 45,016 |
| Total finance receivables and loans, net | 1,010,208 | 1,333,572 |
| Mortgage servicing rights | 855,343 | 1,422,298 |
| Accounts receivable, net | 2,404,231 | 2,203,855 |
| Other assets | 81,960 | 142,161 |
| Total assets restricted as collateral | 6,122,168 | 7,145,401 |
| Related secured debt | $5,628,297 | $6,692,986 |

A portion of the assets included in the table above represent assets of subsidiaries whose equity has been pledged to secure the Ally Inc. Senior Secured Credit Facility and the Ally Inc. LOC. At December 31, 2011, there were $3.4 million of equity interests of these subsidiaries pledged to the Ally Inc. Senior Secured Credit Facility. We have also provided a lien on certain of our consolidated assets, as specified in the Ally Inc. Senior Secured Credit Facility agreements, for the benefit of the Ally Inc. Senior Secured Credit Facility and the Junior Secured Notes. Included in the table above are $2.0 billion and $2.2 billion at December 31, 2011 and 2010, respectively, of collateral pledged that can be re–hypothecated or re–pledged by the secured party.

Notes to Consolidated Financial Statements
Residential Capital, LLC

The following table summarizes the carrying value of assets pledged and the amount of related debt outstanding by our secured borrowing types.

| December 31, ($ in thousands) | 2011 | | 2010 | |
| | Total assets restricted as collateral | Related secured debt | Total assets restricted as collateral | Related secured debt |
|---|---|---|---|---|
| Borrowings from parent and affiliate | | | | |
| Ally Inc. Senior Secured Credit Facility | $1,340,954 | $755,769 | $1,521,660 | $845,775 |
| Ally Inc. LOC | 1,582,033 | 183,595 | 1,507,387 | 681,000 |
| Borrowings from affiliate | 401,118 | 250,000 | — | — |
| Collateralized borrowings in securitization trusts | 918,232 | 830,318 | 1,200,201 | 1,057,288 |
| Other secured borrowings | | | | |
| Junior Secured Notes (a) | — | 2,366,600 | — | 2,467,714 |
| Secured financing agreements | — | — | 549,812 | 195,322 |
| Mortgage servicing rights facility | 634,345 | 323,000 | 1,054,796 | 500,000 |
| Servicer advance funding facilities | 1,086,011 | 780,385 | 1,118,357 | 768,489 |
| Home equity funding facility | 153,191 | 135,800 | 181,671 | 177,398 |
| Other secured facility | 6,284 | 2,830 | 11,517 | — |
| Total | $6,122,168 | $5,628,297 | $7,145,401 | $6,692,986 |

(a) The Junior Secured Notes are secured by the same collateral that secures the Ally Inc. Senior Secured Credit facility.

## 10. Other Liabilities

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Fair value of derivative instruments | $5,113,531 | $3,259,749 |
| Liability for option to repurchase assets (a) | 2,386,734 | 2,499,857 |
| Liability for representation and warranty obligations | 824,776 | 830,021 |
| Collateral received from derivative counterparties | 656,109 | 587,120 |
| Accounts payable | 360,726 | 248,416 |
| Mortgage foreclosure settlement | 204,000 | — |
| Reserve for legal proceedings | 94,516 | 112,737 |
| Reserve for insurance losses | 91,615 | 162,564 |
| Employee compensation and benefits | 87,542 | 60,509 |
| Interest payable | 62,225 | 69,795 |
| Liability for assets sold with recourse | 32,156 | 40,249 |
| Ally Inc. management fee (b) | 31,020 | 23,986 |
| Payable to Ally Bank | 21,001 | — |
| Restructuring reserve | 4,342 | 7,494 |
| Income taxes | — | 8,876 |
| Other | 25,733 | 26,112 |
| Total other liabilities | $9,996,026 | $7,937,485 |

(a) We recognize a liability for the conditional repurchase option on certain assets held by off-balance sheet securitization trusts. The corresponding asset is recorded in mortgage loans held for sale. See Note 3 — Mortgage Loans Held–for–Sale and Note 5 — Securitizations and Variable Interest Entities for additional information.

(b) Includes costs for personnel, information technology, communications, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to us. See Note 20 — Related Party Transactions for additional information.

Notes to Consolidated Financial Statements
Residential Capital, LLC

## 11. Other Revenue, net

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Change due to fair value option elections | | |
| Consumer mortgage finance receivables and loans, net | $143,614 | $1,350,729 |
| Collateralized borrowings | (253,329) | (1,567,508) |
| Loan broker fee from Ally Bank | 55,622 | 64,543 |
| Insurance income | 21,540 | 35,462 |
| Trading securities income | 1,639 | 10,640 |
| (Loss) gain on interests retained in financial assets sales | (5,182) | 3,811 |
| Other | 5,772 | 34,789 |
| Total other revenue, net | ($30,324) | ($67,534) |

## 12. Other Noninterest Expense, net

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Loan administration fees | $70,345 | $71,547 |
| Legal fees | 68,976 | 29,089 |
| Ally Inc. management fees (a) | 67,672 | 93,263 |
| Insurance losses | 31,388 | 36,113 |
| Equipment and supplies | 30,624 | 32,249 |
| Restructuring expense (reversals) | 3,048 | 17,410 |
| Real estate owned expense | 2,572 | 30,484 |
| Other | 74,611 | 76,462 |
| Total other noninterest expense, net | $349,236 | $386,617 |

(a)   Includes allocated costs for personnel, information technology, communication, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to us. See Note 20 — Related Party Transactions for additional information.

## 13. Other Comprehensive Income

The following table summarizes our activity related to the components of other comprehensive income.

| ($ in thousands) | Unrealized gain (loss) on available for sale securities (a) | Foreign currency translation adjustment (b) | Defined benefit pension plans over (under) funded (c) | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|
| Balance at January 1, 2010 | ($265) | $5,637 | ($49,440) | ($44,068) |
| 2010 net change | 1,607 | 21,728 | (22,977) | 358 |
| Balance at December 31, 2010 | $1,342 | $27,365 | ($72,417) | ($43,710) |
| 2011 net change | (1,342) | 53 | (16,867) | (18,156) |
| Balance at December 31, 2011 | $— | $27,418 | ($89,284) | ($61,866) |

(a)   Represents the after-tax difference between the fair value and amortized cost of available for sale securities.
(b)   Includes after-tax gains and losses on foreign currency translation from operations for which the functional currency is other than the U.S. dollar. There was zero tax impact to the net change amounts for the years ended December 31, 2011 and 2010, respectively.
(c)   Includes after-tax impact of the over(under)-funded status of our defined benefit plans. See Note 15 — Employee Benefit Plans for additional information.

42

Notes to Consolidated Financial Statements

Residential Capital, LLC

The net changes in the following table represent the sum of net unrealized gains or losses on available for sale securities with the respective reclassification adjustments. Reclassification adjustments are amounts recognized in net income during the year due to realized gains or losses.

| Year Ended December 31, *($ in thousands)* | Pretax | Tax effect | Net of tax |
|---|---|---|---|
| **2011** | | | |
| Available for sale securities | | | |
| Net unrealized losses arising during the year | **($90)** | **($576)** | **($666)** |
| Reclassification of net losses included in net income | **(676)** | **—** | **(676)** |
| Net unrealized losses arising during the year, net of reclassification adjustment | **($766)** | **($576)** | **($1,342)** |
| 2010 | | | |
| Available for sale securities | | | |
| Net unrealized gains arising during the year | $1,031 | $576 | $1,607 |
| Net unrealized gains arising during the year, net of reclassification adjustment | $1,031 | $576 | $1,607 |

## 14. Income Taxes

The following table summarizes income (loss) from continuing operations before income tax expense.

| Year ended December 31, *($ in millions)* | 2011 | 2010 |
|---|---|---|
| U.S. (loss) | **($733)** | ($116) |
| Non-U.S. income (loss) | **(97)** | 648 |
| Income (loss) from continuing operations before income tax expense | **($830)** | $532 |

The significant components of income tax expense from continuing operations were as follows.

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Current income tax expense (benefit) | | |
| U.S. Federal | **$14,362** | $11,929 |
| Foreign | **1,496** | (2,569) |
| State and local | **4,249** | (2,446) |
| Total current expense | **20,107** | 6,914 |
| Deferred income tax (benefit) | | |
| U.S. Federal | **—** | — |
| Foreign | **(4,636)** | — |
| State and local | **—** | — |
| Total deferred tax (benefit) | **(4,636)** | — |
| Total income tax expense from continuing operations | **$15,471** | $6,914 |

A reconciliation of the statutory U.S. Federal income tax rate to the effective income tax rate for continuing operations is shown in the following table.

| Year ended December 31, | 2011 | 2010 |
|---|---|---|
| Statutory U.S. Federal rate | **35.0%** | 35.0% |
| Change in tax rate resulting from | | |
| State and local income taxes, net of federal income tax benefit | **3.1** | 2.8 |
| Foreign capital loss | **—** | (0.2) |
| Effect of valuation allowance change | **(37.5)** | (34.0) |
| Other | **(2.5)** | (2.3) |
| Effective tax rate | **(1.9)%** | 1.3% |

Consolidated tax expense does not naturally correspond with consolidated pretax income because we apply a valuation allowance to our domestic and foreign net deferred tax assets. For the year ended December 31, 2011 consolidated tax expense of $15.5 million, is largely driven by certain U.S. taxes that are not eligible for offset by U.S. net operating losses.

43

At December 31, 2011, we had U.S. Federal and state net operating loss carryforwards and capital loss carryforwards of $844.2 million and $1.4 billion, respectively. The federal net operating loss carryforwards expire in the years 2029–2031. The capital loss carryforwards expire in the years 2014–2016. The corresponding expiration periods for the state operating and capital loss carryforwards are 2014–2031 and 2014–2016, respectively.

At December 31, 2011, we had foreign net operating loss carryforwards of $143.9 million. The foreign net operating loss carryforwards in the U.K. of $65.2 million have an indefinite carryforward period with the remaining net operating loss carryforward of $78.7 million expiring in the years 2012–2031.

At December 31, 2011 and 2010, a valuation allowance has been established against the deferred tax asset to the extent it exceeds the deferred tax liability. A valuation allowance has been established because we have determined that it is more likely than not that all such tax assets will not be realized. The change in the valuation allowance is primarily the result of pretax net operating losses.

The significant components of deferred tax assets and liabilities were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Deferred tax assets | | |
| Tax loss carryforwards | $854,485 | $719,455 |
| Provision for loan losses | 348,338 | 303,193 |
| Debt transactions | 251,886 | 341,773 |
| State and local taxes | 134,670 | 121,285 |
| MSRs | 94,627 | — |
| Mark–to–market on finance receivables and loans | 83,709 | 109,820 |
| Basis difference in subsidiaries | 62,192 | 60,826 |
| Accruals not currently deductible | 49,651 | 36,856 |
| Pension | 31,282 | 25,379 |
| Other | 4,978 | 3,714 |
| Gross deferred tax assets | 1,915,818 | 1,722,301 |
| Valuation allowance | (1,651,489) | (1,337,285) |
| Net deferred tax assets | 264,329 | 385,016 |
| Deferred tax liabilities | | |
| Unrealized gains on securities | 223,235 | 282,828 |
| Sales of finance receivables and loans | 41,094 | 48,455 |
| MSRs | — | 53,733 |
| Gross deferred tax liabilities | 264,329 | 385,016 |
| Net deferred tax assets (liabilities) | $— | $— |

At December 31, 2011, there were no indefinitely reinvested earnings in foreign subsidiaries.

Tax benefits related to positions considered uncertain are recognized only if, based upon the technical merits of the issue, it is more likely than not that we will sustain the position and then at the largest amount that is greater than 50% likely to be realized upon ultimate settlement.

The following table reconciles the beginning and ending amount of unrecognized tax benefits.

| ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $3,936 | $3,482 |
| Additions for tax positions of prior years | 3,304 | 1,889 |
| Reductions for tax positions of prior years | — | — |
| Settlements | (889) | (16) |
| Expiration of statute of limitations | — | (1,419) |
| Balance at December 31, | $6,351 | $3,936 |

As of December 31, 2011 and 2010, the balance of unrecognized tax benefits that, if recognized, would affect our effective tax rate, is $6.4 million and $3.9 million, respectively.

Notes to Consolidated Financial Statements
Residential Capital, LLC

We recognize accrued interest and penalties related to uncertain income tax positions in interest expense and other noninterest expense, respectively. For the years ended December 31, 2011 and 2010, $0.7 million and $0.4 million, respectively, were accrued for interest and penalties with the cumulative accrued balances totaling $2.4 million and $2.2 million at December 31, 2011 and 2010, respectively.

We anticipate the examination of various U.S. income tax returns along with the examinations by various foreign, state, and local jurisdictions will be completed within the next twelve months. As such, it is reasonably possible that certain tax positions may be settled and the unrecognized tax benefits would decrease by approximately $1.2 million.

We file tax returns in the U.S. Federal, various states and foreign jurisdictions. For the most significant operations, at December 31, 2011, the following summarizes the oldest tax years that remain subject to examination.

| Jurisdiction | Tax Year |
|---|---|
| U.S. | 2007 |
| Canada | 2004 |
| United Kingdom | 2008 |
| Mexico | 2005 |
| Netherlands | 2009 |

## 15. Employee Benefit Plans

We participate in the GMAC Mortgage Group defined benefit retirement plan. Effective December 31, 2006, benefit accrual of the defined benefit retirement plan was frozen. No further benefits accrued for participants subsequent to that date and no new entrants have been permitted to enter the plan. Based on the December 31, 2011 actuarial assessment, there is no contribution expected during 2012.

We participate in Ally Inc.'s defined contribution savings plan for domestic employees meeting certain eligibility requirements. Employees may contribute a percentage of eligible compensation to the plan, not to exceed annual IRS limits. Based on certain employee eligibility and vesting requirements and eligible compensation as defined by the plan, we contribute toward employees post-retirement benefits in three ways. We contribute a 2% retirement contribution every pay period, a dollar for dollar matching contribution up to 6% each year, and an additional discretionary contribution of up to 2% based upon Ally Inc.'s performance. Funds contributed to, and earned by, the defined contribution savings plans can be withdrawn by participants only under specific conditions.

The following table summarizes information related to employee benefit plan expense from continuing operations.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Defined benefit retirement plan | ($4,163) | ($6,218) |
| Defined contribution savings plan | 17,058 | 13,117 |
| (Revenue) Expense total | $12,895 | $6,899 |

The following table summarizes information related to the defined benefit retirement plan.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Benefit obligation | ($274,802) | ($251,489) |
| Fair value of plan assets | 254,611 | 238,974 |
| Under funded status | ($20,191) | ($12,515) |

45

Notes to Consolidated Financial Statements
Residential Capital, LLC

A reconciliation of the beginning and ending balances of the benefit obligation and fair value of plan assets is as follows.

| ($ in thousands) | Benefit obligation | Plan assets | Funded status |
|---|---|---|---|
| Balance at January 1, 2010 | $216,767 | $220,106 | $3,339 |
| Interest cost | 12,973 | — | (12,973) |
| Net actuarial gain due to assumption changes | 26,209 | — | (26,209) |
| Net actuarial gain due to plan experience | 1,345 | — | (1,345) |
| Benefit payments | (5,805) | (5,805) | — |
| Actual return on assets | — | 24,673 | 24,673 |
| Balance at December 31, 2010 | $251,489 | $238,974 | ($12,515) |
| Interest cost | 14,317 | — | (14,317) |
| Net actuarial gain due to assumption changes | 22,914 | — | (22,914) |
| Net actuarial loss due to plan experience | (691) | — | 691 |
| Benefit payments | (13,227) | (13,227) | — |
| Actual return on assets | — | 28,864 | 28,864 |
| **Balance at December 31, 2011** | **$274,802** | **$254,611** | **($20,191)** |

The expected long–term return on plan assets is an estimate we determine by summing the expected inflation and the expected real rate of return on stocks and bonds based on allocation percentages within the trust. As of December 31, 2011, the target allocation of assets was 55% debt securities, 38% equity securities, 4% real estate and 3% other. The weighted average assumptions used for determining the net periodic benefit cost were as follows.

| Year ended December 31, | 2011 | 2010 |
|---|---|---|
| Discount rate | 5.5% | 6.0% |
| Expected long-term return on plan assets | 8.0% | 8.5% |

The following table presents the scheduled benefits expected to be paid in each of the next five years and an aggregate to be paid thereafter.

| Year ending December 31, ($ in thousands) | Expected payments of benefits |
|---|---|
| 2012 | $6,419 |
| 2013 | $6,679 |
| 2014 | $7,080 |
| 2015 | $7,504 |
| 2016 | $8,017 |
| Five year period thereafter | $51,929 |

## 16. Fair Value

### Fair Value Measurements

Fair value is defined as the exchange price that would be received to sell an asset or paid to transfer a liability (exit price) in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. Fair value is based on the assumptions market participants would use when pricing an asset or liability. Additionally, entities are required to consider all aspects of nonperformance risk, including the entity's own credit standing, when measuring the fair value of a liability.

A three–level hierarchy is used when measuring and disclosing fair value. The fair value hierarchy gives the highest priority to quoted prices available in active markets (i.e., observable inputs) and the lowest priority to data lacking transparency (i.e., unobservable inputs). An instrument's categorization within the fair value hierarchy is based on the lowest level of significant input to its valuation. The following is a description of the three hierarchy levels.

Level 1    Inputs are quoted prices in active markets for identical assets or liabilities at the measurement date. Additionally, we must have the ability to access the active market, and the quoted prices cannot be adjusted by us.

| Level 2 | Inputs are other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices in active markets for similar assets or liabilities; quoted prices in inactive markets for identical or similar assets or liabilities; or inputs that are observable or can be corroborated by observable market data by correlation or other means for substantially the full term of the assets or liabilities. |
|---|---|
| Level 3 | Unobservable inputs are supported by little or no market activity. The unobservable inputs represent management's best assumptions of how market participants would price the assets or liabilities. Generally, Level 3 assets and liabilities are valued using pricing models, discounted cash flow methodologies, or similar techniques that require significant judgment or estimation. |
| Transfers | Transfers into or out of any hierarchy level are recognized at the end of the reporting period in which the transfer occurred. There were no significant transfers between any levels during the year ended December 31, 2011. |

Following are descriptions of the valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models and significant assumptions utilized.

- **Mortgage loans held–for–sale** – We originate and purchase residential mortgage loans that we intend to sell to the GSEs. We also own nonagency eligible residential mortgage loans that were originated or purchased in prior years. Consumer mortgage loans we intend to sell to the GSEs are carried at fair value as a result of a fair value election. Our nonagency eligible residential mortgage loans are accounted for at the lower of cost or fair value. We elected to fair value nongovernment eligible mortgage loans held–for–sale subject to conditional repurchase options recognized on or after January 1, 2011. Only those non-fair value elected loans that are currently being carried at fair value are included within our nonrecurring fair value measurement tables. Mortgage loans held–for–sale account for 7.0% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

  Mortgage loans held–for–sale are typically pooled together and sold into certain exit markets, depending upon underlying attributes of the loan, such as agency eligibility, product type, interest rate, and credit quality. Two valuation methodologies are used to determine the fair value of mortgage loans held–for–sale. The methodology used depends on the exit market as described below.

  Loans valued using observable market prices for identical or similar assets (a Level 2 fair value) - Includes all agency–eligible mortgage loans carried at fair value due to fair value option election, which are valued predominantly using published forward agency prices. Also includes any domestic loans and foreign loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available. As of December 31, 2011, we classified 47.8% of our mortgage loans held–for–sale that are being carried at fair value on a recurring basis as Level 2.

  Loans valued using internal models (a Level 3 fair value) - Includes all conditional repurchase option loans carried at fair value due to the fair value option election and all nonagency eligible residential mortgage loans that are accounted for at the lower of cost or fair value. The fair value of these residential mortgage loans are determined using internally developed valuation models because observable market prices were not available. The loans are priced on a discounted cash flow basis utilizing cash flow projections from internally developed models that utilize prepayment, default, and discount rate assumptions. To the extent available, we will utilize market observable inputs such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates. While numerous controls exist to calibrate, corroborate, and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's fair value. As of December 31, 2011, 100% of our mortgage loans held–for–sale that are currently being carried at fair value on a nonrecurring basis and 52.2% of our mortgage loans held-for-sale that are carried at fair value on a recurring basis are classified as Level 3.

- **Consumer Finance receivables and loans, net** — We elected the fair value option for consumer mortgage finance receivables and loans related to certain of our on–balance sheet securitizations including those securitization trusts that were consolidated upon the adoption of ASU 2009–17. A complete description of these securitizations is provided in the On-balance sheet securitization debt section later in this Note. The remaining balance of our consumer finance receivables and loans are reported on the balance sheet at their principal amount outstanding, net of charge-offs, allowance for loan losses, and net premiums/discounts.

  For the securitization trusts for which we elected fair value option, the loans are measured at fair value using a portfolio approach or an in-use premise. The values for loans held on an in-use basis may differ considerably from loans held–for–sale that can be sold in the whole-loan market. This difference arises primarily due to the liquidity of the ABS/MBS

47

market and is evident in the fact that spreads applied to lower rated ABS/MBS are considerably wider than spreads observed on senior bond classes and in the whole-loan market. The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations. As a result of reduced liquidity in the capital and secondary markets for securitized bonds, values of these consumer mortgage finance receivables and loans and the related securitized bonds are expected to be volatile. As of December 31, 2011, we classified 100% of our fair value elected consumer mortgage finance receivables and loans as Level 3. These loans account for 11.0% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Mortgage servicing rights* — MSRs currently do not trade in an active market with observable prices, therefore we use internally developed discounted cash flow models to estimate the fair value of MSRs. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that management believes approximate yields required by investors in this asset. Cash flows primarily include servicing fees, float income, and late fees, in each case less estimated operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread derived discount rate. At December 31, 2011, 100% of our MSRs are classified as Level 3 and account for 16.2% of all recurring and nonrecurring assets reported at fair value.

- *Derivative instruments* — We enter into a variety of derivative financial instruments as part of our risk management strategies. Derivative assets account for 64.1% of all recurring and nonrecurring assets and derivative liabilities account for 85.6% of all recurring and nonrecurring liabilities reported at fair value at December 31, 2011.

    Certain of these derivatives are exchange traded, such as Eurodollar futures. To determine the fair value of these instruments, we utilize the exchange prices for the particular derivative contract; therefore, we classified these contracts as Level 1. We classified 1.3% of the derivative assets and less than 1% of the derivative liabilities reported at fair value as Level 1 at December 31, 2011.

    We also execute over–the–counter derivative contracts, such as interest rate swaps, swaptions, forwards, caps, floors and agency-to-be-announced (TBAs) securities. We utilize third–party–developed valuation models that are widely accepted in the market to value our over–the–counter derivative contracts. The specific terms of the contract and market observable inputs (such as interest rate forward curves and interpolated volatility assumptions) are used in the model. We classified 98.0% of the derivative assets and nearly 100% of the derivative liabilities reported at fair value as Level 2 at December 31, 2011.

    We also hold certain derivative contracts that are structured specifically to meet a particular hedging objective. These derivative contracts often are utilized to hedge risks inherent within certain on–balance sheet securitizations. To hedge risks on particular bond classes or securitization collateral, the derivative's notional amount is often indexed to the hedged item. As a result, we typically are required to use internally developed prepayment assumptions as an input into the model to forecast future notional amounts on these structured derivative contracts. Accordingly, we classified these derivative contracts as Level 3. These derivative contracts accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at December 31, 2011.

    We are counterparty to a forward flow agreement with Ally Bank, which effectively transfers the exposure to changes in fair value of specified pools of Ally Bank's mortgage loans held–for–sale and interest rate lock commitments to us. In addition, we are counterparty to a total return swap agreement with Ally Bank that effectively transfers the total economic return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. The underlying reference assets that support the value of the swap agreements are valued using internally developed valuation assumptions; therefore the swaps are classified as Level 3. These agreements accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at December 31, 2011. See Note 20 — Related Party Transactions for additional information.

    We are required to consider all aspects of nonperformance risk, including our own credit standing, when measuring fair value of a liability. We reduce credit risk on the majority of our derivatives by entering into legally enforceable agreements that enable the posting and receiving of collateral associated with the fair value of our derivative positions on an ongoing basis. In the event that we do not enter into legally enforceable agreements that enable the posting and receiving of collateral, we will consider our credit risk and the credit risk of our counterparties in the valuation of derivative instruments through a credit valuation adjustment (CVA), if warranted.

- *Trading securities and interests retained in financial asset sales* —Trading securities or interests retained in financial asset sales are recorded at fair value within other assets. The securities may be mortgage-backed or mortgage-related asset–backed securities (including senior and subordinated interests), interest-only, principal-only, or residual interests

and may be investment grade, non-investment grade, or unrated securities. We base valuations on internally developed discounted cash flow models that use a market-based discount rate. In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses. As of December 31, 2011, we classified 98.7% of our trading securities and 100.0% of our interests retained in financial asset sales as Level 3. Trading securities and interests retained in financial asset sales account for 1% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Foreclosed assets* — Through the normal course of business, we may foreclose upon real estate assets to the extent borrowers default under the terms of their agreements with us. Foreclosed properties are carried at the lower of cost or fair value less costs to sell within other assets. Only those assets that are being carried at fair value less costs to sell are included in the non-recurring fair value disclosures.

  Foreclosed assets that are valued based upon independent third-party appraisals less costs to sell are classified as Level 2. When third–party appraisals are not obtained, valuations are typically obtained from a third-party broker price opinion; however, depending upon the circumstances, the property list price or other sales price information may be used in lieu of a broker price opinion. We typically adjust a broker price opinion or other price source, as appropriate, in order to take into account damage and other factors that typically cause the actual liquidation value of foreclosed assets to be less than the broker price opinion or other price source. This valuation adjustment is based upon our historical experience and is necessary to ensure the valuation ascribed to these assets takes into account the unique factors and circumstances surrounding a foreclosed asset. Because we apply an internally developed adjustment to the third-party provided valuation of the foreclosed asset, these assets are classified as Level 3. As of December 31, 2011, 62.1% and 37.9% of our foreclosed assets that are being carried at fair value less costs to sell are classified as Level 2 and Level 3, respectively. Foreclosed assets account for 1% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *On-balance sheet securitizations* — We elected the fair value option for certain consumer mortgage finance receivables and loans, and securitization debt for certain of our on-balance sheet securitizations. The objective in measuring these loans and related securitization debt at fair value is to approximate our economic exposure to the collateral securing the securitization debt. The remaining on-balance sheet securitization debt that was not fair value option–elected is reported on the balance sheet at cost, net of premiums or discounts and all issuance costs.

  We value securitization debt that was fair value option–elected, as well as any trading securities or interests retained in financial asset sales, using market observable prices whenever possible. The securitization debt is principally in the form of asset-backed and mortgage-backed securities collateralized by the underlying consumer mortgage finance receivables and loans. Due to the attributes of the underlying collateral and current capital market conditions, observable prices for these instruments are typically not available in active markets. We base valuations on internally developed discounted cash flow models that use a market-based discount rate. In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses. As a result of the reliance on significant assumptions and estimates for model inputs, at December 31, 2011, 100.0% of fair value option–elected securitization debt is classified as Level 3. On-balance sheet securitization debt accounts for 13.9% of all recurring and nonrecurring liabilities reported at fair value at December 31, 2011.

- *Liability for option to repurchase assets* – We elected the fair value option for the liability associated with our nongovernment–eligible mortgage loans held–for–sale subject to the conditional repurchase option recognized on or after January 1, 2011. We use an asset–based 'in use premise' approach to valuing this liability. The fair value of the liability will be equal to the fair value of the assets. The fair value of the assets are determined using internally developed discounted cash flow models as discussed in the *Mortgage loans held–for–sale* section earlier in this Note. As of December 31, 2011, 100.0% of the liability that is being carried at fair value is classified as Level 3. The liability for option to repurchase assets accounts for less than 1% of all recurring and nonrecurring liabilities reported at fair value at December 31, 2011.

**Recurring Fair Value**

The following tables display the assets and liabilities measured at fair value on a recurring basis, including financial instruments for which we elected the fair value option. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The table below displays the hedges separately from the hedged items and, therefore, does not directly display the impact of our risk management activities.

| December 31, 2011 ($ in thousands) | Recurring fair value measurements | | | |
| | Level 1 | Level 2 | Level 3 | Total |
| --- | --- | --- | --- | --- |
| **Assets** | | | | |
| Mortgage loans held–for–sale (a) | $— | $27,253 | $29,723 | $56,976 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 835,192 | 835,192 |
| Mortgage servicing rights | — | — | 1,233,107 | 1,233,107 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 61,025 | 4,780,995 | 35,038 | 4,877,058 |
| Foreign currency contracts | — | 139 | — | 139 |
| Trading securities | | | | |
| Mortgage and asset backed residential | — | 434 | 32,869 | 33,303 |
| Interests retained in financial asset sales | — | — | 23,102 | 23,102 |
| Total assets | $61,025 | $4,808,821 | $2,189,031 | $7,058,877 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | $— | $— | ($829,940) | ($829,940) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (18,445) | (5,089,201) | (24) | (5,107,670) |
| Foreign currency contracts | — | (5,861) | — | (5,861) |
| Liability for option to repurchase assets (a) | — | — | (28,504) | (28,504) |
| Total liabilities | ($18,445) | ($5,095,062) | ($858,468) | ($5,971,975) |

(a)  Carried at fair value due to fair value option election.

Notes to Consolidated Financial Statements
Residential Capital, LLC

| December 31, 2010 *(\$ in thousands)* | Recurring fair value measurements | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Mortgage loans held–for–sale (a) | \$— | \$17,744 | \$4,084 | \$21,828 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 1,014,703 | 1,014,703 |
| Mortgage servicing rights | — | — | 1,991,586 | 1,991,586 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 237,174 | 2,882,448 | 178,629 | 3,298,251 |
| Foreign currency contracts | — | 372 | — | 372 |
| Interests retained in financial asset sales | — | — | 20,588 | 20,588 |
| Available for sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | — | 2,028 | — | 2,028 |
| Mortgage-backed residential | — | 24,653 | 989 | 25,642 |
| Trading securities | | | | |
| U.S. Treasury | 2,303 | — | — | 2,303 |
| Mortgage and asset-backed residential | 153 | 330 | 44,128 | 44,611 |
| Total assets | \$239,630 | \$2,927,575 | \$3,254,707 | \$6,421,912 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | \$— | \$— | (\$972,068) | (\$972,068) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (187,135) | (2,958,792) | (109,276) | (3,255,203) |
| Foreign currency contracts | — | (4,546) | — | (4,546) |
| Total liabilities | (\$187,135) | (\$2,963,338) | (\$1,081,344) | (\$4,231,817) |

(a)  Carried at fair value due to fair value option election.

Notes to Consolidated Financial Statements
Residential Capital, LLC

The following tables present the reconciliation for all Level 3 assets and liabilities measured at fair value on a recurring basis. Transfers into or out of Level 3 were recognized as of the end of the reporting period in which the transfer occurred. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The Level 3 items presented below may be hedged by derivatives and other financial instruments that are classified as Level 1 or Level 2. Thus, the following tables do not fully reflect the impact of our risk management activities.

| | | Level 3 recurring fair value measurements | | | | | | | |
| | | Net gains/(losses) included in earnings | | | | | | | |
| ($ in thousands) | January 1, 2011 Level 3 fair value | realized gains (losses) | unrealized gains (losses) | Other comprehensive income (loss) | Purchases | Sales | Issuances | Settlements | December 31, 2011 Level 3 fair value |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Mortgage loans held–for–sale | $4,084 | $271 | ($1,407) | $— | $46,520 (a) | ($1,388) | $— | ($18,357) | $29,723 |
| Consumer mortgage finance receivables and loans, net | 1,014,703 | 217,293 (b) | 135,203 (b) | — | — | — | — | (532,007) | 835,192 |
| Mortgage servicing rights | 1,991,586 | (173) (c) | (812,435) (c) | — | — | (401) | 54,357 | 173 | 1,233,107 |
| Other assets | | | | | | | | | |
| Fair value of derivative contracts in receivable position, net | | | | | | | | | |
| Interest rate contracts | 69,353 | (377,100) (d) | 255,705 (d) | — | — | — | — | 87,056 | 35,014 |
| Trading securities | | | | | | | | | |
| Mortgage– and asset–backed residential | 44,128 | (8,300) (e) | 13,305 (e) | — | — | — | 678 | (16,942) | 32,869 |
| Available for sale securities | | | | | | | | | |
| Debt securities | | | | | | | | | |
| Mortgage-backed residential | 989 | (150) | — | 491 | — | (1,007) | — | (323) | — |
| Interests retained in financial asset sales | 20,588 | (1,963) (f) | (3,270) (f) | — | — | — | — | 7,747 | 23,102 |
| Total assets | $3,145,431 | ($170,122) | ($412,899) | $491 | $46,520 | ($2,796) | $55,035 | ($472,653) | $2,189,007 |
| **Liabilities** | | | | | | | | | |
| Collateralized borrowings | | | | | | | | | |
| On-balance sheet securitization debt | ($972,068) | $ (187,395) (b) | $ (184,701) (b) | $— | $— | $— | $— | $514,224 | ($829,940) |
| Other liabilities | | | | | | | | | |
| Liability for option to repurchase assets | — | (99) | 1,890 | — | (46,662) (a) | — | — | 16,367 | (28,504) |
| Total liabilities | ($972,068) | ($187,494) | ($182,811) | $— | ($46,662) | $— | $— | $530,591 | ($858,444) |

(a) Includes newly recognized fair value option elected conditional repurchase loans and the related liability. See Note 5 — Securitizations and Variable Interest Entities for additional information.
(b) Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.
(c) Fair value adjustment reported in servicing asset valuation and hedge activities, net.
(d) See Note 17 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Consolidated Statement of Income.
(e) Fair value adjustment reported in gain (loss) on investment securities, net. Interest accretion on these assets is reported in interest income.
(f) Fair value adjustment reported in other revenue, net, and interest accretion on these assets is reported in interest income.

52

Notes to Consolidated Financial Statements
Residential Capital, LLC

| ($ in thousands) | January 1, 2010 Level 3 fair value | Net gains/(losses) included in earnings | | Other comprehensive income (loss) | Purchases, sales, issuances, and settlements, net (e) (f) | December 31, 2010 Level 3 fair value |
|---|---|---|---|---|---|---|
| | | realized gains (losses) | unrealized gains (losses) | | | |
| | | **Level 3 recurring fair value measurements** | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale | $— | $76 | $2,735 | $— | $1,273 | $4,084 |
| Trading securities | | | | | | |
| Mortgage and asset backed residential | 97,916 | (16,490) (a) | 23,994 (a) | — | (61,292) | 44,128 |
| Consumer mortgage finance receivables and loans, net | 1,303,187 | 713,489 (b) | 1,188,999 (b) | — | (2,190,972) | 1,014,703 |
| Mortgage servicing rights | 2,539,588 | (626) (c) | (725,352) (c) | — | 177,976 | 1,991,586 |
| Other assets | | | | | | |
| Fair value of derivative contracts in receivable (liability) position, net | | | | | | |
| Interest rate contracts | (16,509) | 455,343 (d) | (43,619) (d) | — | (325,862) | 69,353 |
| Interests retained in financial asset sales | 58,793 | — | — | — | (38,205) | 20,588 |
| Available for sale securities | | | | | | |
| Debt securities | | | | | | |
| Mortgage-backed residential | 5,585 | 6 | — | (1,820) | (2,782) | 989 |
| Total assets | $3,988,560 | $1,151,798 | $446,757 | ($1,820) | ($2,439,864) | $3,145,431 |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitization debt | ($1,294,076) | (493,321) (b) | (1,387,357) (b) | $— | $2,202,686 | ($972,068) |
| Total liabilities | ($1,294,076) | ($493,321) | ($1,387,357) | $— | $2,202,686 | ($972,068) |

(a)   Fair value adjustment reported in other noninterest expense, net. Interest accretion on these assets is reported in interest income.
(b)   Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.
(c)   Fair value adjustment reported in servicing asset valuation and hedge activities, net.
(d)   See Note 17 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Consolidated Statement of Income.
(e)   These amounts include the removal of $34.1 million of trading securities and $18.8 million of MSRs, as well as the additions of $816.6 million of consumer mortgage finance receivables and loans, $2.4 million of derivative assets, net, and $757.0 million of collateralized borrowings upon the adoption of ASU 2009-17.
(f)   These amounts include the removal of $2.0 billion of consumer mortgage finance receivables and loans, and $1.9 billion of collateralized borrowings as well as the addition of $8.9 million of MSRs in connection with our deconsolidation activity.  See Note 5 — Securitizations and Variable Interest Entities for additional information.

Notes to Consolidated Financial Statements
Residential Capital, LLC

## Nonrecurring Fair Value

We may be required to measure certain assets or liabilities at fair value from time-to-time. These periodic fair value measures typically result from application of lower of cost or fair value or certain impairment measures. These items would constitute nonrecurring fair value measures. The table below presents those items which we measured at fair value on a nonrecurring basis.

| December 31, ($ in thousands) | Nonrecurring fair value measures | | | Total estimated fair value | Lower of cost or fair value or valuation allowance | Total gains included in income from continuing operations for the year ended | |
|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | | | | |
| **2011** | | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $478,760 | $478,760 | ($60,233) | n/m | (e) |
| Commercial finance receivables and loans, net (b) | — | 1,442 | 21,597 | 23,039 | (14,978) | n/m | (e) |
| Other assets | | | | | | | |
| Foreclosed assets (c) | — | 27,591 | 16,823 | 44,414 | (12,581) | n/m | (e) |
| Real estate and other investments (d) | — | — | — | | n/m | $380 | (f) |
| Total | $— | $29,033 | $517,180 | $546,213 | ($87,792) | $380 | |
| **2010** | | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $843,873 | $843,873 | ($48,440) | n/m | (e) |
| Commercial finance receivables and loans, net (b) | — | 28,708 | 56,663 | 85,371 | (23,799) | n/m | (e) |
| Other assets | | | | | | | |
| Foreclosed assets (c) | — | 38,169 | 26,210 | 64,379 | (8,224) | n/m | (e) |
| Real estate and other investments (d) | — | 4,501 | 250 | 4,751 | n/m | $209 | (f) |
| Total | $— | $71,378 | $926,996 | $998,374 | ($80,463) | $209 | |

n/m = not meaningful

(a) Represents loans or pools of loans held–for–sale that are required to be measured at lower of cost or fair value. Only loans or pools of loans with fair values below cost are included in the table above. The related valuation allowance represents the cumulative adjustment to fair value of those loans and pool of loans.

(b) Represents the portion of the commercial portfolio that has been specifically impaired. The related valuation allowance represents the cumulative adjustment to fair value of those specific commercial finance receivables and loans and represents the most relevant indicator of the impact on earnings caused by the fair value measurement. The carrying values are inclusive of the respective loan loss allowance.

(c) The allowance provided for foreclosed assets represents any cumulative valuation adjustments recognized to adjust the assets to fair value less costs to sell.

(d) Certain assets within the model home portfolio have been impaired and are being carried at (a) estimated fair value if the model home is under lease or (b) estimated fair value less costs to sell if the model home is being marketed for sale.

(e) We consider the applicable valuation to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation.

(f) The total loss included in earnings is the most relevant indicator of the impact on earnings caused by the fair value measurement.

## Fair Value Option for Financial Assets and Financial Liabilities

We have elected to value certain financial assets and liabilities at fair value consistent with our intent to mitigate a divergence between our accounting results and our retained economic exposure related to these assets and liabilities.

Financial assets and liabilities elected to be measured at fair value are as follows.

- *On-balance sheet securitizations –* We elected the fair value option for certain domestic on-balance sheet securitization trusts in which we estimated that the credit reserves pertaining to securitized assets could have exceeded or already had exceeded our economic exposure. The fair value option election was made at a securitization level and thus the election was made for both the consumer mortgage finance receivable and loans and the related securitization debt. We elected the fair value option for all securitization trusts that were required to be consolidated upon the adoption of ASU 2009-17.

  The fair value elected loan balances are recorded within consumer finance receivables and loans, net, unless they are repurchased from a securitization trust in which case they are recorded in mortgage loans held-for-sale. Our policy is to

54

Notes to Consolidated Financial Statements
Residential Capital, LLC

separately record interest income on these fair value elected loans. The fair value adjustment recorded for consumer finance receivables and loans is classified as other revenue, net, and the fair value adjustment for mortgage loans held-for-sale is classified as gain or loss on mortgage loans.

The fair value elected securitization debt balances are recorded within collateralized borrowings in securitization trusts. Our policy is to separately record interest expense on the fair value elected securitization debt, which is classified as interest expense in our Consolidated Statement of Income. The fair value adjustment recorded for this debt is classified as other revenue, net.

- **Government – and agency – eligible loans** – We elected the fair value option for government– and agency–eligible consumer mortgage loans held–for–sale. This election includes government– and agency–eligible loans we fund directly to borrowers and government– and agency–eligible loans we purchase from Ally Bank. The fair value option was elected to mitigate earnings volatility by better matching the accounting for the assets with the related hedges and to maintain consistency with the fair value option election by Ally Bank given the level of affiliate loan purchase and sale activity between the entities. See Note 20 — Related Party Transactions for additional information.

The fair value option was not elected for certain government– and agency–eligible loans held–for–sale, as described below:

- *Government– and agency–eligible loans funded on or before July 31, 2009* — the fair value option election must be made at the time of funding. As such, these loans could not be fair value option–elected at a subsequent date.

- *Repurchased/Rerecognized government–and agency–eligible loans* — Loans are repurchased or rerecognized due to representation and warranty or conditional repurchase options. We typically will be unable to resell these repurchased/rerecognized loans through regular channels due to characteristics of the loans. The fair value of these loans will be influenced by factors that cannot be effectively hedged by us; accordingly, we do not intend to elect the fair value option for any repurchased or rerecognized loans.

We carry fair value option–elected government– and agency–eligible loans within mortgage loans held–for–sale. Our policy is to separately record interest income on these fair value elected loans. Upfront fees and costs related to the fair value elected loans are not deferred or capitalized. The fair value adjustment recorded for these fair value option–elected loans is reported in gain or loss on mortgage loans, net. The fair value option election is irrevocable once the loan is funded even if it is subsequently determined that a particular loan cannot be sold.

- **Conditional repurchase option loans and liabilities** – As of January 1, 2011, we elected the fair value option for both nongovernment eligible mortgage loans held–for–sale subject to conditional repurchase options and the related liability. The conditional repurchase option allows us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a prespecified delinquency level. We have complete discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest. We are required to record the asset and the corresponding liability on our balance sheet when the option becomes exercisable. The fair value option election must be made at initial recording. As such, the conditional repurchase option loans and liabilities that were recorded prior to January 1, 2011, were not fair value elected.

The fair value elected conditional repurchase option loans are recorded within mortgage loans held–for–sale. The fair value adjustment is classified as other revenue, net. We do not recognize interest income on conditional repurchase option loans until the option is exercised and the loan is repurchased.

The corresponding fair value elected liability is recorded in other liabilities. The fair value adjustment recorded for this liability is classified as other revenue, net.

The following table summarizes the fair value option elections and information regarding the amounts recognized in earnings for each fair value option–elected item.

| December 31, ($ in thousands) | Interest income (expense) (f) | Gain on mortgage loans, net | Other revenue, net | Total included in net income | Change in fair value due to credit risk | (a) |
|---|---|---|---|---|---|---|
| **Changes included in our Consolidated Statement of Income** | | | | | | |
| **2011** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (b) | **$829** | **$759,707** | **$483** | **$761,019** | **($305)** | **(c)** |
| Consumer mortgage finance receivables and loans, net | **199,970** | **—** | **152,526** | **352,496** | **(119,193)** | **(d)** |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitizations | **(115,630)** | **—** | **(256,468)** | **(372,098)** | **(19,586)** | **(e)** |
| Liability for option to repurchase assets | **—** | **—** | **1,792** | **1,792** | **305** | **(c)** |
| Total | | | | **$743,209** | | |
| **2010** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (b) | $1,025 | $905,940 | $2,778 | $909,743 | $134 | (c) |
| Consumer mortgage finance receivables and loans, net | 554,539 | — | 1,347,949 | 1,902,488 | (7,972) | (d) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | — | — | — | — | | |
| On-balance sheet securitizations | (313,170) | — | (1,567,508) | (1,880,678) | 28,881 | (e) |
| Total | | | | $931,553 | | |

(a)  Factors other than credit quality that impact the fair value include changes in market interest rates and the liquidity or marketability in the current marketplace.  Lower levels of observable data points in illiquid markets generally result in wide bid/offer spreads.

(b)  Includes the gain/loss recognized on fair value option–elected government– and agency–eligible assets purchased from Ally Bank.

(c)  The credit impact for mortgage loans held–for–sale that are currently GSE eligible is currently zero because the fair value option–elected GSE loans are salable, and any unsalable assets are currently covered by a government guarantee.  The credit impact for non-agency eligible loans and related liability was quantified by applying internal credit loss assumptions to cash flow models.

(d)  The credit impact for consumer mortgage finance receivables and loans was quantified by applying internal credit loss assumptions to cash flow models.

(e)  The credit impact for on-balance sheet securitization debt is assumed to be zero until our economic interests in a particular securitization is reduced to zero, at which point the losses in the underlying collateral will be expected to be passed through to third-party bondholders.  Losses allocated to third-party bondholders, including changes in the amount of losses allocated, will result in fair value changes due to credit.  We also monitor credit ratings and may make credit adjustments to the extent any bond classes are downgraded by rating agencies.

(f)  Interest income on consumer mortgage finance receivables and loans and mortgage loans held–for–sale is measured by multiplying the unpaid principal balance on the loans by the coupon rate and the number of days of interest due.  Interest expense on the on-balance sheet securitizations is measured by multiplying the bond principal by the coupon rate and days interest due to the investor.

The table below provides the fair value and the unpaid principal balance for our fair value option–elected loans and related collateralized borrowings.

| December 31, ($ in thousands) | 2011 Unpaid principal balance | 2011 Fair value (a) | 2010 Unpaid principal balance | 2010 Fair value (a) |
|---|---|---|---|---|
| Mortgage loans held–for–sale | | | | |
| Total loans | $84,099 | $56,975 | $22,398 | $21,828 |
| Nonaccrual loans | 53,502 | 27,297 | 652 | 371 |
| Loans 90+ days past due (b) | 53,312 | 27,179 | 133 | 44 |
| Consumer mortgage finance receivables and loans, net | | | | |
| Total loans | $2,436,218 | $835,192 | $2,904,720 | $1,014,703 |
| Nonaccrual loans | 506,300 | 209,371 (c) | 585,500 | 260,964 (c) |
| Loans 90+ days past due (b) | 362,002 | 162,548 (c) | 365,569 | 184,368 (c) |
| Collateralized borrowings | | | | |
| On-balance sheet securitizations | ($2,559,093) | ($829,940) | ($2,978,891) | ($972,068) |
| Other liabilities | | | | |
| Liability for option to repurchase assets | ($56,568) | ($28,504) | $— | $— |

(a) Excludes accrued interest receivable.
(b) Loans 90+ days past due are also presented within the nonaccrual loans and total loans except those that are government insured and still accruing.
(c) The fair value of consumer mortgage finance receivables and loans is calculated on a pooled basis; therefore, we allocated the fair value of nonaccrual loans and 90+ days past due to individual loans based on the unpaid principal balances.

**Fair Value of Financial Instruments**

The following table presents the carrying and estimated fair value of assets and liabilities that are considered financial instruments. Accordingly, items that do not meet the definition of a financial instrument are excluded from the table. When possible, we use quoted market prices to determine fair value. Where quoted market prices are not available, the fair value is internally derived based on appropriate valuation methodologies with respect to the amount and timing of future cash flows and estimated discount rates. However, considerable judgment is required in interpreting market data to develop estimates of fair value, so the estimates are not necessarily indicative of the amounts that could be realized or would be paid in a current market exchange. The effect of using different market assumptions or estimation methodologies could be material to the estimated fair values. Fair value information presented herein was based on information available at December 31, 2011 and 2010.

| December 31, ($ in thousands) | 2011 Carrying value | 2011 Fair value | 2010 Carrying value | 2010 Fair value |
|---|---|---|---|---|
| **Assets** | | | | |
| Mortgage loans held–for–sale | $ 4,249,625 | $ 4,365,593 | $ 4,654,907 | $ 4,684,640 |
| Finance receivables and loans, net | 1,032,131 | 978,863 | 1,388,208 | 1,303,019 |
| **Liabilities** | | | | |
| Borrowings from Parent and Affiliate | $1,189,364 | $1,189,364 | $1,526,775 | $1,526,775 |
| Other borrowings | 4,705,404 | 3,734,978 | 5,464,454 | 5,444,566 |

The following describes the methodologies and assumptions used to determine fair value for the respective classes of financial instruments. In addition to the valuation methods discussed below, we also followed guidelines for determining whether a market was not active and a transaction was not distressed. As such, we assumed the price that would be received in an orderly transaction (including a market–based return) and not in forced liquidation or distressed sale.

- *Mortgage loans held–for–sale* — Carrying value differs from fair value as certain loans may be required to be carried at cost under lower of cost or fair value measurements (i.e. fair value is greater than cost). See discussion of valuation methods and assumptions used for mortgage loans held for sale within the Fair Value Measurement section of this Note.

- *Consumer mortgage finance receivables and loans, net* — Consumer mortgage finance receivables and loans that are not securitized and fair value elected use valuation methods and assumptions similar to those used for mortgage loans held–for–sale. These valuations take into account the unique attributes of the respective mortgage loans, such as geography, delinquency status, product type, and other factors.

- **Commercial mortgage finance receivables and loans** — Performing commercial mortgage finance receivables and loans are generally valued by discounting expected future cash flows using our best estimate of a market-based discount rate. The majority of our performing commercial mortgage finance receivables and loans are held short-term at variable interest rates. For those receivables held short-term, carrying value equals fair value. Non-performing commercial mortgage finance receivables and loans are generally valued using our best estimate of the ultimate recoverable value of the receivable, which is predominantly a function of underlying collateral value, and factoring in an anticipated market-based return.

- **Parent and Affiliate borrowings** — Parent and affiliate borrowings have been executed to approximate arms-length terms. These borrowing arrangements generally charge floating interest rates based on an index plus a market-based spread. There are frequent negotiations and restructuring activities around these borrowing arrangements. Accordingly, the interest rates on these borrowings would be equivalent to those demanded in the market and thus carrying value approximates fair value.

- **Other borrowings** — Primarily represents our secured and unsecured notes, but also includes our third-party funding facilities. Our secured and unsecured notes are valued based on market observable prices when available. Our third-party funding facilities have floating rates based on an index plus a spread. These borrowings have recently been negotiated or amended and the credit spread would be consistent with those demanded in the market. Accordingly, the interest rates on these borrowings would be at market and thus carrying value would approximate fair value.

## 17. Derivative Instruments and Hedging Activities

We transact interest rate and foreign currency swaps, futures, forwards, options, swaptions, and TBAs in connection with our risk management activities. Our primary objective for executing these financial instruments is to mitigate our economic exposure to future events that are outside our control. These financial instruments are utilized principally to manage market risk and cash flow volatility associated with mortgage loans held–for–sale and MSRs, including our total return and forward flow agreements with Ally Bank. See Note 20 — Related Party Transactions for additional information. We do not transact derivative instruments for reasons beyond risk management.

In addition to derivatives transacted as part of our risk management activities, we create derivative contracts as part of our ongoing operations. In particular, we frequently execute forward mortgage loan purchase and sale commitments with Ally Bank and financial institutions, respectively, principally to provide a future source of mortgage volume and dedicated exit channels.

Additionally, we enter into commitments with mortgage borrowers that require us to originate a mortgage at a stated amount and rate; these are derivative contracts if our intent is ultimately to hold the originated loan for sale. We refer to commitments to purchase mortgage loans from Ally Bank and commitments to originate mortgage loans held–for–sale, collectively, as interest rate lock commitments (IRLCs).

The following summarizes our significant asset and liability classes, the risk exposures for these classes, and our risk management activities utilized to mitigate certain of these risks. The discussion includes both derivative and nonderivative financial instruments utilized as part of these risk management activities.

## Interest Rate Sensitive Assets/Liabilities

- **Mortgage loan commitments and loans held–for–sale** — We are exposed to interest rate risk from the time an IRLC is made, either directly or indirectly through the forward flow agreement with Ally Bank, until the time the mortgage loan is sold. Changes in interest rates impact the market price for the mortgage loan; as market interest rates decline, the value of existing IRLCs and mortgage loans held–for–sale increase and vice versa. The primary objective of our risk management activities related to IRLCs and mortgage loans held–for–sale is to eliminate or reduce any interest rate risk associated with these assets.

  We enter into forward sale contracts of mortgage-backed securities, primarily agency TBAs, as our primary strategy to mitigate this risk. These contracts are typically entered into at the time the interest rate lock commitment is made. The value of the forward sales contracts moves in the opposite direction of the value of our IRLCs and mortgage loans held–for–sale. We may also use other derivatives, such as options, and futures, to economically hedge certain portions of the portfolio. Nonderivative instruments, such as short positions on U.S. Treasuries, may also be used to economically hedge the portfolio. We monitor and actively manage our risk on a daily basis; therefore trading volume can be significant.

  We do not apply hedge accounting to our derivative portfolio held to economically hedge our IRLCs and mortgage loans held–for–sale. Included in the derivatives on IRLCs and mortgage loans held–for–sale is the forward flow agreement with Ally Bank having a fair value of $16.4 million and an outstanding notional of $9.8 billion at December 31, 2011.

Under the terms of the forward flow agreement, Ally Bank transfers the exposure to changes in fair value of specified pools of assets, in this case IRLCs and mortgage loans held–for–sale, to us. See Note 20 — Related Party Transactions for additional information.

- ***Mortgage servicing rights and other retained interests*** — Our MSRs and retained interests are generally subject to loss in value when mortgage rates decline. Declining mortgage rates generally result in an increase in refinancing activity, which increases prepayments and results in a decline in the value of MSRs and other retained interests. To mitigate the impact of this risk, we maintain a portfolio of financial instruments, primarily derivatives, which increase in value when interest rates decline. The primary objective is to minimize the overall risk of loss in the value of MSRs and other retained interests due to the change in fair value caused by interest rate changes and their interrelated impact to prepayments.

  We use a variety of derivative instruments to manage the interest rate risk related to MSRs and other retained interests. These include, but are not limited to, interest rate futures, call or put options on U.S. Treasuries, swaptions, mortgage–backed securities (MBS) futures, U.S. Treasury futures, interest rate swaps, interest rate floors and caps. While we do not currently utilize nonderivative instruments (i.e., U.S. Treasuries) to hedge this portfolio, we have utilized them in the past and may utilize them again in the future. We monitor and actively manage our risk on a daily basis, and therefore trading volume can be significant.

  Included in the derivatives hedging MSRs and retained interests is a total return swap with Ally Bank having a fair value of $17.7 million at December 31, 2011. Under the terms of the total return swap, Ally Bank transfers the total economic return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. See Note 20 — Related Party Transactions for additional information.

- ***Debt*** — We monitor our mix of fixed and floating rate debt in relation to the rate profile of our assets. When it is cost effective to do so, we may enter into interest rate swaps to manage the interest rate composition of our debt portfolio. Typically, the significant terms of the interest rate swaps match the terms of the underlying debt resulting in an effective conversion of the rate of the related debt.

  We hold interest rate swaps or interest rate caps in certain of our consolidated variable interest entities. These swaps or caps were generally required to meet certain rating agency requirements or were required by the facility lender/provider. The interest rate swaps and/or caps are generally entered into when the debt is issued; accordingly, trading volume on this particular derivative portfolio is minimal. Additionally, effective January 1, 2010, the derivatives that were hedging off–balance sheet securitization activities are now hedging these as on–balance sheet securitization activities. We consolidated the off–balance sheet securitizations on January 1, 2010, upon the adoption of ASU 2009–17.

  In addition to these economic hedges, we also hold interest rate swaps that are hedging a portion of our fixed-rate senior unsecured notes. We utilize the interest rate swaps to hedge the fair value of the hedged debt balances. We elected to designate these as fair value hedges at inception. At December 31, 2011, we desigdated our fair value swaps due to ineffectiveness. Interest income on these swaps was $9.7 million for the year ended December 31, 2011, and was recorded as a reduction to interest expense. We recognized a gain of $0.2 million of ineffectiveness on the fair value hedge during the year ended December 31, 2011.

## Foreign Currency Risk

We have operations outside the United States. Our foreign subsidiaries maintain both assets and liabilities in local currencies that are deemed to be the functional currencies of these subsidiaries for accounting purposes. Foreign currency exchange rate gains and losses arise when assets or liabilities are denominated in currencies that differ from the entities functional currency and are revalued into the functional currency. In addition, our equity is impacted by the cumulative translation adjustments recognized in other comprehensive income resulting from the translation of foreign subsidiary results to U.S. dollars. Foreign currency risk is reviewed as part of our risk management process. The principal currencies creating foreign exchange risk are the U.K. Sterling and the Euro.

Our current strategy is to economically hedge foreign currency risk related to assets and liabilities that are denominated in currencies on our U.S. dollar functional currency entities. The principal objective of the foreign currency hedges is to mitigate the earnings volatility specifically created by foreign currency exchange rate gains and losses. We hold forward currency contracts to mitigate risk against currency fluctuation in the U.K. Sterling and the Euro. We have not elected to treat any foreign currency swaps as hedges for accounting purposes, principally because the changes in the fair values of the foreign currency swaps are substantially offset by the foreign currency revaluation gains and losses of the underlying assets and liabilities.

## Credit Risk and Collateral Arrangements

Derivative financial instruments contain an element of credit risk if counterparties, including affiliates, are unable to meet the terms of their agreements. Credit risk associated with derivative financial instruments is measured as the net replacement cost should the counterparties that owe us under the contracts completely fail to perform under the terms of those contracts, assuming there are no recoveries of underlying collateral, as measured by the fair value of the derivative financial instruments. At December 31, 2011 and December 31, 2010, the fair value of derivative financial instruments in an asset, or receivable position, were $4.9 billion and $3.3 billion, including $3.2 billion and $2.2 billion with affiliates, respectively. See Note 20 — Related Party Transactions for additional information.

We minimize the credit risk exposure by limiting our counterparties to those major banks and financial institutions that meet established credit guidelines and transacting with and through affiliates. Additionally, we reduce credit risk on the majority of our derivative financial instruments by entering into legally enforceable agreements that permit the closeout and netting of transactions with the same counterparty upon occurrence of certain events. To further mitigate the risk of counterparty default, we execute collateral agreements with counterparties. The agreements require both parties to maintain cash deposits in the event the fair values of the derivative financial instruments meet established thresholds. We have received cash deposits from counterparties totaling $656.1 million and $587.1 million at December 31, 2011 and, 2010, respectively, for derivative positions in an asset position to us. We have placed cash deposits totaling $1.1 billion and $1.2 billion at December 31, 2011 and 2010, respectively, in accounts maintained by counterparties for derivative positions in a liability position to us. The cash deposits placed and received are included in accounts receivable, other assets, and other liabilities.

We are not exposed to credit risk related contingent features in any of our derivative contracts that could be triggered and potentially could expose us to future loss.

## Consolidated Balance Sheet Presentation

The following table summarizes the location and fair value amounts of derivative instruments reported on our Consolidated Balance Sheet. The fair value amounts are presented on a gross basis and are segregated between derivatives that are designated and qualifying as hedging instruments and those that are not and further segregated by type of contract within those two categories.

| | 2011 | | | 2010 | | |
| | Fair value of derivative contracts in | | | Fair value of derivative contracts in | | |
| December 31, ($ in thousands) | receivable position (a) | payable position (b) | Notional amount | receivable position (a) | payable position (b) | Notional amount |
|---|---|---|---|---|---|---|
| Qualifying accounting hedges | | | | | | |
| Interest rate risk | | | | | | |
| Fair value accounting hedges | $— | $— | $— | $8,690 | $— | $147,982 |
| Total qualifying accounting hedges | | | | 8,690 | $— | 147,982 |
| Economic hedges | | | | | | |
| Interest rate risk | | | | | | |
| MSRs and retained interests | 4,811,804 | (5,011,576) | 523,142,192 | 2,893,023 | (3,115,353) | 325,870,869 |
| Mortgage loans held–for–sale | 8,770 | (96,077) | 17,323,000 | 198,855 | (30,682) | 30,476,696 |
| Debt | 21,066 | — | 251,790 | 19,232 | (194) | 286,134 |
| Total interest rate risk | 4,841,640 | (5,107,653) | 540,716,982 | 3,111,110 | (3,146,229) | 356,633,699 |
| Foreign exchange risk | 520 | (5,873) | 3,157,000 | 372 | (4,545) | 154,784 |
| Other contracts | — | — | — | — | — | — |
| Non–risk management derivatives | | | | | | |
| Bank MSR swap | 17,681 | — | 1,384,835 | 86,818 | (72,215) | 3,477,747 |
| Bank forward flow agreement | 16,423 | — | 9,825,783 | 91,414 | (36,745) | 13,413,484 |
| Mortgage loan commitments | 933 | (5) | 77,633 | 218 | (15) | 20,169 |
| Total economic hedges | 4,877,197 | (5,113,531) | 555,162,233 | 3,289,932 | (3,259,749) | 373,699,883 |
| Total derivatives | $4,877,197 | ($5,113,531) | $555,162,233 | $3,298,622 | ($3,259,749) | $373,847,865 |

(a)  Presented in other assets.
(b)  Presented in other liabilities.

## Consolidated Statement of Income Presentation

The following table summarizes the location and amount of gains and losses from continuing operations reported in our Consolidated Statement of Income related to derivative instruments. Gains and losses are presented separately for derivative instruments designated and qualifying as hedging instruments in fair value hedges and non-designated hedging instruments. We currently do not have qualifying cash flow or foreign currency hedges.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Qualifying accounting hedges | | |
| Gain (loss) recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Interest income | **($3,411)** | $1,918 |
| Gain (loss) recognized in earnings on hedged item | | |
| Interest rate contracts | | |
| Interest expense | **3,654** | 3,489 |
| Total qualifying accounting hedges | **243** | 5,407 |
| Economic hedges | | |
| Risk management derivatives | | |
| Gain (loss) recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Interest expense | **(2,512)** | (10,389) |
| Gain on mortgage loans, net | **(721,939)** | (336,417) |
| Servicing asset valuation and hedge activities, net | **816,243** | 477,977 |
| Other revenue, net | **(11,956)** | (3) |
| Total interest rate contracts | **79,836** | 131,168 |
| Foreign exchange contracts | | |
| Other noninterest expense, net | **(21,296)** | 37,813 |
| Non-risk management derivatives | | |
| Gain on mortgage loans, net | **238,024** | (65,474) |
| Servicing asset valuation and hedge activities, net | **(359,523)** | 469,945 |
| Total derivatives | **($62,716)** | $578,859 |

Our derivative portfolios generally are reflected in the operating activities section of our Consolidated Statement of Cash Flows. Derivative fair value adjustments are captured in our Consolidated Statement of Income line items described in the table above and, accordingly, are generally reflected within the respective line items within the reconciliation of net income (loss) to net cash provided by operating activities section of our Consolidated Statement of Cash Flows. The remaining changes in derivative portfolio values are generally reflected within the "net change in other assets" or "net change in other liabilities" line items on our Consolidated Statement of Cash Flows.

## 18. Higher Risk Mortgage Loans and Credit Quality

Historically, we originated and purchased mortgage loans that had contractual features that may increase our exposure to credit risk and thereby result in a concentration of credit risk. These mortgage loans include loans that may subject borrowers to significant payment increases in the future, have negative amortization of the principal balance or have high loan–to–value ratios.

The following table summarizes the gross carrying value of our higher-risk mortgage loans classified as held–for–sale and finance receivables and loans.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| High loan-to-value (greater than 100%) mortgage loans | **$488,627** | $534,071 |
| Payment option adjustable rate mortgage loans | **12,140** | 16,805 |
| Interest-only mortgage loans | **293,975** | 459,714 |
| Below market initial rate mortgage loans | **259,177** | 244,416 |
| Total carrying value of higher-risk mortgages | **$1,053,919** | $1,255,006 |

Included in the table above is $362.5 million and $410.2 million of high-risk mortgage loans held in on-balance sheet securitizations at December 31, 2011 and 2010, respectively. Our exposure on these loans is limited to the value of our retained interest.

Notes to Consolidated Financial Statements
Residential Capital, LLC

As part of our loss mitigation efforts and participation in certain governmental programs (e.g., the Making Home Affordable program), we may offer loan restructurings to borrowers. Due to the nature of restructurings, these loans are generally considered higher risk. Loan modifications can include any or all of the following: principal forgiveness, maturity extensions, delinquent interest capitalization and changes to contractual interest rates. Modifications can be either temporary or permanent. Temporary loan modifications are generally used to monitor the borrower's ability to perform under the revised terms over a specified trial period; if the borrower performs, it may become a permanent loan modification. We have historically performed loan modifications under our private modification program; however, more recently the majority of loan modifications are completed under government programs. The carrying value of our on-balance sheet modified mortgage loans was $1.2 billion and $948.8 million as of December 31, 2011 and 2010, respectively. These modified mortgage loans are included within mortgage loans held–for–sale and consumer finance receivables and loans.

## Nonperforming Assets

Nonperforming assets include nonaccrual loans and foreclosed assets. The classification of a loan as nonperforming does not necessarily indicate that the principal amount of the loan is ultimately uncollectible in whole or in part. In certain cases, borrowers make payments to bring their loans contractually current and, in all cases, our mortgage loans are collateralized by residential real estate. As a result, our experience has been that any amount of ultimate loss for mortgage loans other than home equity loans is substantially less than the unpaid principal balance of a nonperforming loan.

Delinquent loans expose us to higher levels of credit losses and therefore are considered higher risk loans. The determination as to whether a loan falls into a particular delinquency category is made as of the close of business on the balance sheet date. The following table sets forth information concerning the delinquency experience in our mortgage loans held–for–sale and consumer finance receivable and loans at carrying value.

| December 31, ($ in thousands) | 2011 Amount | % of total | 2010 Amount | % of total |
|---|---|---|---|---|
| Current | $2,003,928 | 38.0% | $2,205,585 | 36.9% |
| Past due | | | | |
| 30 to 89 days | 137,590 | 2.6% | 101,635 | 1.7% |
| 90 days or more and still accruing interest (a) | 73,661 | 1.4% | 24,514 | 0.4% |
| 90 days or more conditional repurchase option loans (b) | 2,379,926 | 45.1% | 2,485,535 | 41.6% |
| Nonaccrual | 677,250 | 12.9% | 1,151,340 | 19.4% |
| Total | 5,272,355 | 100% | 5,968,609 | 100% |
| Allowance for loan losses | (13,638) | | (17,682) | |
| Total, net | $5,258,717 | | $5,950,927 | |

(a) Loans that are 90 days or more delinquent and still accruing interest are government insured.
(b) We do not record interest income on conditional repurchase option loans. If these options were exercised and we acquired the loans, $2.3 billion and $2.3 billion would be classified as 90 days or more and still accruing due to government guarantees at December 31, 2011 and 2010, respectively. The private-label conditional repurchase option loans of $105.8 million and $145.7 million would be classified as nonaccrual at December 31, 2011 and 2010, respectively.

The following table presents the net carrying value of nonperforming assets.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Nonaccrual consumer | | |
| 1st Mortgage | $462,275 | $582,267 |
| Home equity | 71,787 | 320,615 |
| Foreign | 143,188 | 248,458 |
| Total nonaccrual consumer (a) | 677,250 | 1,151,340 |
| Nonaccrual commercial | | |
| Domestic | — | 554 |
| Foreign | 12,534 | 108,616 |
| Total nonaccrual commercial | 12,534 | 109,170 |
| Foreclosed assets | 71,485 | 132,655 |
| Total nonperforming assets | $761,269 | $1,393,165 |

(a) Excludes loans subject to conditional repurchase options of $2.3 billion and $2.3 billion sold to Ginnie Mae guaranteed securitizations and $105.8 million and $145.7 million sold to off-balance sheet private-label securitization trusts at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities. See Note 5 — Securitizations and Variable Interest Entities for additional information.

Notes to Consolidated Financial Statements
Residential Capital, LLC

## 19. Guarantees, Commitments and Contingencies

## Guarantees

Guarantees are defined as contracts or indemnification agreements that contingently require us to make payments to third-parties based on changes in an underlying agreement that is related to a guaranteed party. The following summarizes our outstanding guarantees made to third parties.

| December 31, *($ in thousands)* | 2011 | | 2010 | |
|---|---|---|---|---|
| | Maximum liability | Carrying value of liability | Maximum liability | Carrying value of liability |
| Off-balance sheet guarantees | | | | |
| HLTV securitizations | $10,369 | $— | $12,881 | $— |
| Credit enhancement guarantees | 3,128 | 255 | 3,890 | 372 |

### HLTV securitizations

We have entered into agreements to provide credit loss protection for HLTV securitization transactions. The maximum potential obligation under certain of these agreements is equal to the lesser of a specified percentage of the original loan pool balance or a specified percentage of the current loan pool balance. We are required to perform on our guaranty obligation when losses exceed cash available in each period. We have pledged trading securities of $4.0 million and $5.4 million as collateral for these obligations at December 31, 2011 and 2010, respectively.

For certain other HLTV securitizations, the maximum potential obligation is equivalent to the pledged collateral amount. We have pledged cash deposits of $4.9 million and $4.9 million as of December 31, 2011 and 2010, respectively. Our guaranty obligation is triggered when the security credit enhancements are exhausted and losses are passed through to over-the-counter dealers. The guaranty obligations terminate the first calendar month during which the security aggregate note amount is reduced to zero.

### Credit enhancement

We have sold certain mortgage loans to investors which contain a guarantee for the payment of the third-party debt in the event of default or loss.

## Financing Commitments

The contract amount of financing commitments were as follows.

| December 31, *($ in thousands)* | Contract amount | |
|---|---|---|
| | 2011 | 2010 |
| Commitments to | | |
| Originate/purchase mortgage loans or securities | $9,903,415 | $13,484,045 |
| Sell mortgage loans or securities (a) | 12,632,000 | 14,348,696 |
| Home equity lines of credit | 1,648,388 | 2,296,801 |
| Provide capital to investees | 9,000 | 47,500 |

(a) Includes $6.3 billion and $1.7 billion as of December 31, 2011 and 2010, respectively, of commitments to sell securities to Ally IM under outstanding TBA transactions. Ssee Note 17 - Derivative Instruments and Hedging Activities for additional information.

### Commitments to originate/purchase mortgage loans or securities

Prior to mortgage funding we commit to originate loans under IRLCs with borrowers whereby we commit to fund loans at a set interest rate, provided the borrower elects to close the loan. We also commit to purchase loans from Ally Bank. The estimated fair value for these commitments is the current estimated fair value of the underlying mortgage loan less the par value of committed loan amount, adjusted for anticipated net origination costs and fees and any loans that are not expected to be funded based on our historical experience. The determination of the underlying mortgage loan fair value is estimated using published market information associated with commitments to sell similar instruments. All of these commitments were accounted for as derivatives at December 31, 2011 and 2010.

## Commitments to sell mortgage loans or securities

We enter into forward delivery commitments to sell mortgages and MBS to third party investors. The forward sale commitments obligate us to sell a certain amount of loans or securities within a certain range of interest rates in a specified time period. Due to the nature of the commitment, we are exposed to interest rate and market rate risk during the commitment period. All of these commitments were accounted for as derivatives at December 31, 2011 and 2010.

## Home equity lines of credit

We have commitments to fund the remaining undrawn balances on home equity lines of credit. The unused lines of credit reset at prevailing market rates and, as such, approximate market value. Included in the home equity lines of credit are both lines of credit on our Consolidated Balance Sheet, and those within certain of our off-balance sheet securitizations. As provided by the securitization structure, we become obligated to fund any incremental draws, subject to customary borrower requirements, on home equity lines of credit by borrowers if certain triggers are met. These draws are referred to as excluded amounts and are funded directly to the borrower by us. In return, our lending balances are collected from our percentage of the remitted funds for specific borrowers within the securitization trust. We actively manage the available lines of credit within these securitization trusts to reduce potential funding risk. At December 31, 2011 and 2010, the cumulative funds drawn were $391.1 million and $408.0 million, respectively. At December 31, 2011 and 2010, the commitments to fund home equity lines of credit in off-balance sheet securitizations represented $0.7 billion and $1.0 billion, respectively, of our total unfunded commitments of $1.6 billion and $2.2 billion, respectively. We estimate and record a liability for the incurred credit losses on our unfunded home equity line of credit commitments. These anticipated credit losses are classified within other liabilities. At December 31, 2011 and 2010, we had a liability of $1.4 million and $3.9 million, respectively, recorded for incurred credit losses on our unfunded home equity line of credit commitments.

## Commitments to provide capital to equity method investees

We are committed to provide equity capital to certain private equity funds; however, our ability to do so may be limited due to certain equity investments being identified as inadmissible activities under bank holding company regulations.

# Other Commitments and Contingencies

We believe it is reasonably possible that losses beyond amounts currently recorded for litigation matters and potential representation and warranty obligations and related claims described below could occur, and such losses could have a material adverse impact on our results of operations, financial condition or cash flows. However, based on currently available information, we are unable to estimate a range of reasonably possible losses above amounts that have been recorded at December 31, 2011.

## Loan Repurchases and Obligations Related to Loan Sales

### Overview

We sell loans that take the form of securitizations guaranteed by the GSEs, securitizations sold to private investors, and to whole–loan investors. In connection with a portion of our private-label securitizations, the monolines insured all or some of the related bonds and guaranteed timely repayment of bond principal and interest when the issuer defaults. In connection with securitizations and loan sales, the trustee for the benefit of the related security holders and, if applicable, the related monoline insurers are provided various representations and warranties related to the loans sold. The specific representations and warranties vary among different transactions and investors but typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws. In general, the representations and warranties described above may be enforced at any time unless a sunset provision is in place. Upon discovery of a breach of a representation or warranty, the breach is corrected in a manner conforming to the provisions of the sale agreement. This may require us to repurchase the loan, indemnify the investor for incurred losses, or otherwise make the investor whole. We have entered into settlement agreements with both Fannie Mae and Freddie Mac that, subject to certain exclusions, limit our remaining exposure with the GSEs. See *Government-sponsored Enterprises* below. We assume all of the customary representation and warranty obligations for loans purchased from Ally Bank and subsequently sold into the secondary market, generally through securitizations guaranteed by the GSEs.

Notes to Consolidated Financial Statements
Residential Capital, LLC

### Originations

The total exposure to mortgage representation and warranty claims is most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards and risk–mitigation actions implemented in 2008 and forward.  Since 2009, we have focused primarily on purchasing prime conforming and government–insured mortgages.  In addition, we ceased offering interest–only jumbo mortgages in 2010.  Representation and warranty risk mitigation strategies include, but are not limited to, pursuing settlements with investors where economically beneficial in order to resolve a pipeline of demands in lieu of loan-by-loan assessments that could result in repurchasing loans, aggressively contesting claims we do not consider valid (rescinding claims), and seeking recourse against correspondent lenders from whom we purchased loans wherever appropriate.

### Demand/Claim Process

After receiving a claim under representation and warranty obligations, we review the claim to determine the appropriate response (e.g. appeal, and provide or request additional information) and take appropriate action (rescind, repurchase the loan, or remit indemnification payment).  Historically, repurchase demands were generally related to loans that became delinquent within the first few years following origination.  As a result of market developments over the past several years, investor repurchase demand behavior has changed significantly. GSEs and investors are more likely to submit claims for loans at any point in their life cycle. Investors are more likely to submit claims for loans that become delinquent when a loss is incurred.  Representation and warranty claims are generally reviewed on a loan–by–loan basis to validate if there has been a breach requiring a potential repurchase or indemnification payment.  We actively contest claims to the extent they are not considered valid.  We are not required to repurchase a loan or provide an indemnification payment where claims are not valid.

The risk of repurchase or indemnification, and the associated credit exposure, is managed through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards.  We believe that, in general, the longer a loan performs prior to default, the less likely it is that an alleged breach of representation and warranty will be found to have a material and adverse impact on the loan's performance.  When loans are repurchased, we bear the related credit loss on the loans.  Repurchased loans are classified as held–for–sale and initially recorded at fair value.

The following table includes amounts paid to investors and monolines with respect to representation and warranty obligations.

| December 31, *($ in thousands)* | **2011** | 2010 |
|---|---:|---:|
| Loan repurchases (UPB) | | |
| GSEs | **$143,340** | $388,873 |
| Private–label securitizations insured (monolines) | **829** | 13,343 |
| Private–label securitizations uninsured | **36,557** | — |
| Whole–loan investors | **9,285** | 81,817 |
| Total | **$190,011** | $484,033 |
| Indemnifications (make wholes) by investor | | |
| GSEs | **$59,269** | $227,994 |
| Private–label securitizations insured (monolines) | **12,474** | 27,315 |
| Private–label securitizations uninsured | **167,354** | — |
| Whole–loan investors | **25,439** | 11,133 |
| Total | **$264,536** | $266,442 |

65

The following table presents the total number and original unpaid principal balance of loans related to unresolved representation and warranty demands (indemnification claims and/or repurchase demands). The table includes demands that we have requested be rescinded but which have not yet been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews.

| December 31, *($ in millions)* | 2011 | | 2010 | |
|---|---|---|---|---|
| | **Number of loans** | **Dollar amount of loans** | Number of loans | Dollar amount of loans |
| Unresolved repurchase demands previously received | | | | |
| GSEs | **357** | **$71** | 833 (a) | $170 (a) |
| Monolines | | | | |
| MBIA Insurance Corporation | **7,314** | **490** | 6,819 | 466 |
| Financial Guaranty Insurance Company | **4,608** | **369** | 1,109 | 164 |
| Other | **730** | **58** | 278 | 31 |
| Other investors | **513** | **81** | 392 | 88 |
| Total unpaid principal balance | **13,522** | **$1,069** | 9,431 | $919 |

(a) This amount is gross of any demands that would be removed due to the Fannie Mae settlement. At December 31, 2010, $48.0 million of outstanding claims were covered under the Fannie Mae settlement agreement.

We are currently in litigation with MBIA Insurance Corporation (MBIA) and Financial Guaranty Insurance Company (FGIC) with respect to certain representation and warranty matters related to certain of our private-label securitizations. Historically we have requested that most of the demands be rescinded, consistent with the claim/demand process described above. As the litigation process proceeds, additional loan reviews are expected and will likely result in additional repurchase demands.

### *Liability for Representation and Warranty Obligations*

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we do not have or have limited current or historical demand experience with an investor, it is difficult to predict and estimate the level and timing of any potential future demands. In such cases, we may not be able to reasonably estimate losses, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability when additional relevant information becomes available. Changes in the liability are recorded as representation and warranty expense, net. At December 31, 2011, the liability relates primarily to non–GSE exposure. The following table summarizes the changes in our liability for representation and warranty obligations.

| *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | **$830,021** | $1,262,918 |
| Provision for representation and warranty obligations | | |
| Loan sales | **18,924** | 70,455 |
| Change in estimate | **324,070** | 670,452 |
| Total additions | **342,994** | 740,907 |
| Realized losses (a) | **(359,658)** | (1,185,549) |
| Recoveries | **11,419** | 11,745 |
| Balance at December 31, | **$824,776** | $830,021 |

(a) Includes principal losses and accrued interest on repurchased loans, indemnification payments, and settlements with investors.

### *Government–sponsored Entities*

Between 2004 and 2011, we sold $430.8 billion of loans to the GSEs. Each GSE has specific guidelines and criteria for sellers and servicers of loans underlying their securities. In addition, the risk of credit loss of the loans sold was generally transferred to investors upon sale of the securities into the secondary market. Conventional conforming loans were sold to either Freddie Mac or Fannie Mae, and government–insured loans were securitized with Ginnie Mae. Our representation and warranty obligation liability

66

with respect to the GSEs considers the existing unresolved claims and the best estimate of future claims that could be received. We consider our experiences with the GSEs in evaluating our liability. During 2010, we reached agreements with Freddie Mac and Fannie Mae that, subject to certain exclusions, limits our remaining exposure to each counterparty.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our GSE exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $170 | $296 |
| New claims | 441 | 842 |
| Resolved claims (a) | (349) | (756) |
| Rescinded claims/other | (191) | (212) |
| Balance at December 31, | $71 | $170 |

(a)   Includes settlements, repurchased loans and claims under which indemnification payments are made.

In March 2010, we entered into an agreement with Freddie Mac under which we made a one-time payment to Freddie Mac for the release of repurchase obligations relating to most of the mortgage loans sold to Freddie Mac prior to January 1, 2009. This agreement does not release any of our obligations with respect to exposure for private-label MBS in which Freddie Mac had previously invested, loans where our affiliate, Ally Bank is the owner of the servicing, as well as defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Freddie Mac, including all indemnification obligations that may arise in connection with the servicing of the mortgages. These other specified categories include (i) loans subject to certain state predatory lending and similar laws; (ii) groups of 25 or more mortgage loans purchased, originated, or serviced by one of our subsidiaries, the purchase, origination, or sale of which all involve a common actor who committed fraud; (iii) "non-loan-level" representations and warranties which refer to representations and warranties that do not relate to specific mortgage loans (examples of such non-loan-level representations and warranties include the requirement that our subsidiaries meet certain standards to be eligible to sell or service loans for Freddie Mac or our subsidiaries sold or serviced loans for market participants that were not acceptable to Freddie Mac); and (iv) mortgage loans that are ineligible for purchase by Freddie Mac under its charter and other applicable documents. If, however, a mortgage loan was ineligible under Freddie Mac's charter solely because mortgage insurance was rescinded (rather than for example, because the mortgage loan is secured by a commercial property), and Freddie Mac required us or our subsidiary to repurchase that loan because of the ineligibility, Freddie Mac would pay any net loss we suffered on any later liquidation of that mortgage loan.

We have received subpoenas in July 2010 from the Federal Housing Finance Agency (FHFA), which is the conservator of Fannie Mae and Freddie Mac. The subpoenas relating to Fannie Mae investments have been withdrawn with prejudice. The FHFA indicated that documents provided in response to the remaining subpoenas will enable the FHFA to determine whether they believe issuers of private-label MBS are potentially liable to Freddie Mac for losses they might have incurred. The FHFA has commenced securities and related common law fraud litigation with respect to certain of Freddie Mac's private-label securities investments. Refer to *Legal Proceedings* described below for additional information.

In December 2010, we entered into an agreement with Fannie Mae under which we made a one-time payment to Fannie Mae for the release of repurchase obligations related to most of the mortgage loans we sold to Fannie Mae prior to June 30, 2010. The agreement also covers potential exposure for private-label MBS in which Fannie Mae had previously invested. This agreement does not release any of our obligations with respect to loans where our affiliate, Ally Bank, is the owner of the servicing, as well as for defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Fannie Mae, including all indemnification obligations that may arise in connection with the servicing of the mortgages, and we continue to be obligated to indemnify Fannie Mae for litigation or third party claims (including by borrowers) for matters that may amount to breaches of selling representations and warranties. These other specified categories include, among others, (i) those that violate anti-predatory laws or statutes or related regulations or that otherwise violate other applicable laws and regulations; (ii) those that have non-curable defects in title to the secured property, or that have curable title defects, to the extent our subsidiaries do not cure such defects at our subsidiary's expense; (iii) any mortgage loan in which title or ownership of the mortgage loan was defective; (iv) groups of 13 or more mortgage loans, the purchase, origination, sale or servicing of which all involve a common actor who committed fraud; and (v) mortgage loans not in compliance with Fannie Mae Charter Act requirements (e.g., mortgage loans on commercial properties or mortgage loans without required mortgage insurance coverage). If a mortgage loan falls out of compliance with Fannie Mae Charter Act requirements because mortgage insurance coverage has been rescinded and not reinstated or replaced, upon the borrower's default our subsidiaries would have to pay to Fannie Mae the amount of insurance proceeds that would have been paid by the mortgage insurer with respect to such mortgage loan. If the amount of the loss exceeded the amount of insurance

Notes to Consolidated Financial Statements
Residential Capital, LLC

proceeds, Fannie Mae would be responsible for such excess.

### Monoline Insurers

Historically, we have securitized loans where the monolines insured all or some of the related bonds and guaranteed the timely repayment of bond principal and interest when the issuer defaults. Typically, any alleged breach requires the insurer to have both the ability to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holders or the insurer. For the period 2004 through 2007, we sold $42.7 billion of loans into these monoline–wrapped securitizations.

We are currently in litigation with MBIA and FGIC in connection with our representation and warranty obligations, and additional litigation with other monolines is likely.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our Monoline exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $661 | $553 |
| New claims  (a) | 265 | 151 |
| Resolved claims (b) | (20) | (36) |
| Rescinded claims/other | 11 | (7) |
| Balance at December 31, | $917 | $661 |

(a)   Substantially all relate to claims associated with the 2004 through 2007 vintages.
(b)   Includes settlements, repurchased loans and claims under which indemnification payments are made.

### Private–label Securitization

In general, representations and warranties provided as part of our private–label securitization activities are less rigorous than those provided to the GSEs and generally impose higher burdens on investors seeking repurchase. In order to successfully assert a claim, it is our position that a claimant must prove a breach of the representations and warranties that materially and adversely affects the interest of the investor in the allegedly defective loan. Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally are required to coordinate with other investors in that class comprising no less than 25% and in some cases 50% of the percentage interest constituting a class of securities of that class issued by the trust to pursue claims for breach of representations and warranties. In addition, our private-label securitizations generally require that the servicer or trustee give notice to the other parties whenever it becomes aware of facts or circumstances that reveal a breach of representation that materially and adversely affects the interest of the certificate holders.

Regarding our securitization activities, we have exposure to potential losses primarily through two avenues. First, investors, through trustees to the extent required by the applicable agreements (or monoline insurers in certain transactions), may request pursuant to applicable agreements that we repurchase loans or make the investor whole for losses incurred if it is determined that we violated representations and warranties made at the time of the sale, provided that such violations materially and adversely impacted the interest of the investor. Contractual representations and warranties are different based on the specific deal structure and investor. It is our position that litigation of these matters must proceed on a loan by loan basis. This issue is being disputed throughout the industry in various pending litigation matters. Similarly in dispute as a matter of law is the degree to which claimants will have to prove that the alleged breaches of representations and warranties actually caused the losses they claim to have suffered. Ultimate resolution by courts of these and other legal issues will impact litigation and treatment of non-litigated claims pursuant to similar contractual provisions. Second, investors in securitizations may attempt to achieve rescission of their investments or damages through litigation by claiming that the applicable offering documents were materially deficient. If an investor properly made and proved its allegations, the investor might attempt to claim that damages could include loss of market value on the investment even if there were little or no credit loss in the underlying loans.

### Whole–loan Sales

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect to our whole-loan exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | **2011** | 2010 |
|---|---|---|
| Balance at January 1, | **$88** | $70 |
| New claims (a) | **84** | 126 |
| Resolved claims (b) | **(34)** | (44) |
| Rescinded claims/other | **(57)** | (64) |
| Balance at December 31, | **$81** | $88 |

(a)   Includes $82.6 million and $120.0 million in new claims associated with the 2004 through 2007 vintages in 2011 and 2010, respectively.
(b)   Includes settlements, repurchased loans and claims under which indemnification payments are made.

### *Private Mortgage Insurance*

Mortgage insurance is required for certain consumer mortgage loans sold to the GSEs and certain securitization trusts and may have been in place for consumer mortgage loans sold to whole-loan investors. Mortgage insurance is typically required for first-lien consumer mortgage loans having a loan-to-value ratio at origination of greater than 80 percent. Mortgage insurers are, in certain circumstances, permitted to rescind existing mortgage insurance that covers consumer loans if they demonstrate certain loan underwriting requirements have not been met. Upon receipt of a rescission notice, we assess the notice and if appropriate, we refute the notice, or if the notice cannot be refuted, we attempt to remedy the defect. In the event the mortgage insurance cannot be reinstated, we may be obligated to repurchase the loan or provide an indemnification payment in the event of a loss, subject to contractual limitations. While we make every effort to reinstate the mortgage insurance, we have had limited success and as a result, most of these requests result in rescission of the mortgage insurance. At December 31, 2011, we have approximately $227.4 million in original unpaid principal balance of outstanding mortgage insurance rescission notices where we have not received a repurchase demand. However, this unpaid principal amount is not representative of expected future losses.

### *Private–label Securitizations – Other Potential Repurchase Obligations*

When we sell mortgage loans through whole-loan sales or securitizations, we are required to make customary representations and warranties about the loans to the purchaser and/or securitization trust. These representations and warranties relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, ability to deliver required documentation, and compliance with applicable laws. Generally, the representations and warranties described above may be enforced at any time over the life of the loan. Breaches of these representations and warranties have resulted in a requirement that we repurchase mortgage loans. As the mortgage industry continues to experience higher repurchase requirements and additional investors begin to attempt to put back loans, a significant increase in activity beyond that experienced today could occur, resulting in additional future losses.

### Mortgage Foreclosure Matters

On February 9, 2012, Ally Inc., ResCap, and certain of our subsidiaries reached an agreement in principle with the federal government, 49 state attorneys general, and 45 state banking departments with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage origination and servicing activities and foreclosure home sales and evictions (the Settlement). On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia. In addition, we separately reached an independent settlement with Oklahoma, which did not participate in the broader settlement described below, and agreements with two other states for other releases.

The Settlement requires us to pay approximately $110.0 million to a trustee, who will then distribute these funds to federal and state governments. This amount is payable upon the filing of the consent judgment. We are also required to make cash payments of approximately $2.5 million in connection with the separate state agreements. In addition, we are obligated to provide $200.0 million towards borrower relief, subject to possible upward adjustments as described below. This obligation for borrower relief will include loan modifications, including principal reductions, rate modifications, and refinancing for borrowers that meet certain requirements, and participation in certain other programs. Generally, if certain basic criteria are met, borrowers that are either delinquent or at imminent risk of default and owe more on their mortgages than their homes are worth could be eligible for principle reductions, and borrowers that are current on their mortgages but who owe more on their mortgage than their homes are worth could be eligible for refinancing opportunities. Further, we have agreed to solicit all borrowers that are eligible for rate and principal modifications as of March 1, 2012. We are committed to provide loan modifications to all borrowers who accept a modification offer within three months of the solicitation. We have also agreed to provide loan modifications to borrowers who accept a modification offer within six months of the solicitation, unless and until total borrower relief provided exceeds $250.0 million.

We currently expect that loans totaling approximately $550.0 million in outstanding unpaid principal balance will be modified in connection with these programs. This estimate was determined by identifying loans that appear to meet the program eligibility requirements, and applying various assumptions with respect to anticipated modifications. Given that we have limited historical experience upon which to base our assumptions, the actual unpaid principal balance of loans ultimately modified could be significantly different.

The Settlement provides incentives for borrower relief that is provided within the first twelve months, and all obligations must be met within three years from the date the consent judgment is filed. In addition to the foregoing, we will be required to implement new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters. Compliance with these obligations will be overseen by an independent monitor, who will have authority to impose additional penalties and fines if we fail to meet established timelines or fail to implement required servicing standards.

The Settlement generally resolves potential claims arising out of origination and servicing activities and foreclosure matters, subject to certain exceptions. The Settlement does not prevent state and federal authorities from pursuing criminal enforcement actions, securities-related claims (including claims related to securitization activities and Mortgage Electronic Registration Systems, or MERS), loan origination claims, claims brought by the FDIC, and certain other matters. The Settlement also does not prevent claims that may be brought by individual borrowers.

The Settlement is subject to ongoing discussions among the parties and the completion of definitive documentation as well as required regulatory and court approvals.

On February 9, 2012, Ally Inc. and ResCap also agreed with the Board of Governors of the Federal Reserve (FRB) on a civil money penalty (CMP) of $207.0 million related to the same activities that were the subject of the Settlement. This amount will be reduced dollar-for-dollar in connection with certain aspects of our satisfaction of the required monetary payment and borrower relief obligations included within the Settlement, as well as our participation in other similar programs that may be approved by the FRB. While additional future cash payments related to the CMP are possible if we are unable to satisfy the borrower relief requirements of the Settlement within two years, we currently expect that the full amount of the CMP will be satisfied through our commitments in connection with the Settlement.

For the year ended December 31, 2011, we recognized losses of $211.5 million related to the matters described above. While we may forgo future interest payments received related to modified loans that we may not have otherwise agreed without the Settlement, we do not expect the borrower relief modifications required by the Settlement to have a significant impact on future interest. Further, we do not expect our borrower relief commitments overall will have a material adverse effect on our consolidated financial condition, results of operations, or cash flows.

**Other Mortgage Foreclosure Matters**
*Consent Order*

As a result of an examination conducted by the FRB and FDIC, on April 13, 2011 we entered into a Consent Order (the Consent Order) with the FRB and the FDIC. The Consent Order requires that we make improvements to various aspects of our residential mortgage loan-servicing business, including compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight by our Board of Directors.

The Consent Order further requires GMAC Mortgage to retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions. We cannot estimate the ultimate impact of any deficiencies that have been or may be identified in our historical foreclosure procedures. There are potential risks related to these matters that extend beyond potential liability on individual foreclosure actions. Specific risks could include, for example, claims and litigation related to foreclosure remediation and resubmission; claims from investors that hold securities that become adversely impacted by continued delays in the foreclosure process; the reduction in foreclosure proceeds due to delay, or by challenges to completed foreclosure sales to the extent, if any, not covered by title insurance obtained in connection with such sales; actions by courts, state attorneys general, or regulators to delay further the foreclosure process after submission of corrected affidavits, or to facilitate claims by borrowers alleging that they were harmed by our foreclosure practices (by, for example, foreclosing without offering an appropriate range of alternative home preservation options); additional regulatory fines, sanctions, and other additional costs; and reputational risks. To date we have borne all out-of-pocket costs associated with the remediation rather than passing any such costs through to investors for whom we service the related mortgages, and we expect that we will continue to do so.

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are occasionally involved in governmental proceedings arising in connection with our businesses. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the payments can be reasonably estimated. Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims. We recorded a liability for probable legal claims of $94.5 million at December 31, 2011, and $112.7 million at December 31, 2010. At December 31, 2011 and 2010, we had $3.9 million and $127.5 million of appeals bonds related to legal proceedings, respectively.

## Mortgage-backed Securities Litigation

### Private-label Securities Litigation

We and certain of our subsidiaries have been named as defendants in several cases relating to our various roles in MBS offerings. The plaintiffs generally allege that the defendants made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to the MBS offerings. The alleged misstatements and omissions typically concern underwriting standards for residential mortgage loans. Plaintiffs generally claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud. Plaintiffs seek monetary damages and rescission. Set forth below are descriptions of the most significant of these legal proceedings.

### Allstate Litigation

On February 14, 2011, the Allstate Insurance Company and various of its subsidiaries and affiliates (collectively, Allstate) filed a complaint in Hennepin County District Court, Minnesota, against GMAC Mortgage; RFC; Residential Funding Securities LLC (RFS); Residential Accredit Loans Inc. (RALI); Residential Asset Mortgage Products, Inc (RAMP); Residential Funding Mortgage Securities I Inc. (RFMSI); Residential Funding Mortgage Securities II Inc. (RFMSII); and Residential Asset Securities Corporation (RASC) (collectively, the defendants). The complaint alleges that the defendants misrepresented in the offering materials the riskiness and credit quality of, and omitted material information related to, residential MBS Allstate purchased. The complaint asserts claims for fraud and negligent misrepresentation and seeks money damages and costs, including attorneys' fees. Discovery in this case is underway.

### Charles Schwab Litigation

On August 2, 2010, The Charles Schwab Corporation (Schwab) filed a complaint in San Francisco County Superior Court against RALI and RAMP (collectively, the defendants). The complaint alleges that the defendants made false representations and omissions of material facts in the offering documents of various securitization trusts backed by residential mortgage loans and seeks rescission and money damages for negligent misrepresentation and violations of state and federal securities laws. The defendants' demurrer is pending.

### DZ Bank

On December 13, 2011, DZ Bank and DG Holding Trust filed a Summons with Notice in New York County Supreme Court directed at numerous defendants including Ally Inc; ResCap; GMAC-RFC Holding Company LLC (GMAC-RFC); RFC; Ally Securities LLC (Ally Securities); RAMP; RASC; and RALI (collectively, the defendants). The Summons alleges that the offering materials issued by the defendants for MBS purchased by DZ Bank and DG Holding Trust contained material misrepresentations and omissions related to the originator's underwriting guidelines and the credit quality and characteristics of the mortgage loans underlying the securities. It also notices the defendants of the plaintiffs' claims for damages. Such claims include common law fraud, fraudulent inducement, negligent misrepresentation, and aiding and abetting fraud. The Summons has not been served.

### FHFA Litigation

On September 2, 2011, the FHFA, as conservator for Freddie Mac, filed a complaint against Ally Inc.; GMAC Mortgage Group; ResCap; GMAC-RFC; RFC; RAMP; RASC; and RALI and certain unaffiliated underwriters (collectively, the defendants), in New York County Supreme Court. The complaint alleges that Freddie Mac purchased over $6.0 billion of residential MBS issued in connection with twenty-one securitizations sponsored and/or underwritten by the defendants. It further alleges that the registration statements, prospectuses, and other offering materials associated with these transactions contained false and misleading statements

71

and omissions of material facts. The complaint asserts claims for negligent misrepresentation, fraud, and violations of state and federal securities laws, and seeks rescission and recovery of the consideration Freddie Mac paid for the securities, as well as other compensatory and punitive damages. Ally Inc. and ResCap removed the case to the United States Court for the Southern District of New York. The FHFA has moved to remand this case to state court. That motion is still pending.

*Federal Home Loan Bank (FHLB) Litigation*

On July 14, 2011, FHLB of Indianapolis filed an Amended Complaint in Marion County Superior Court for rescission and damages asserting claims for common law negligence and violations of state and federal securities laws, and names RFMSI and GMAC Mortgage Group, among other defendants (collectively, the defendants). The complaint alleges that the offering documents for the securities underwritten and issued by the defendants contained material misrepresentations of fact, evidenced by high default and foreclosure rates, and seeks unspecified damages and an order voiding the transactions at issue. The defendants' motion to dismiss is pending.

On April 20, 2011, FHLB of Boston filed a complaint in Suffolk County Superior Court, naming numerous defendants including GMAC Mortgage Group; RALI; and RFC (collectively, the defendants). The complaint alleges that the defendants collectively packaged, marketed, offered, and sold private label MBS, and FHLB of Boston purchased such securities in reliance upon misstatements and omissions of material facts in the offering documents. The complaint seeks rescission and damages for negligent misrepresentation and violations of the Massachusetts Uniform Securities Act, among other claims. The defendants removed this case to federal court, and FHLB of Boston's motion to remand is pending.

On October 15, 2011, FHLB of Chicago filed a Corrected Amended Complaint for Rescission and Damages in Cook County Circuit Court, which names, among other defendants, GMAC Mortgage Group; RFC; RAMP; RASC; and RFMSI (collectively, the defendants). The complaint alleges that the offering documents for the securities underwritten and issued by defendants contained material misrepresentations of fact and asserts claims for violations of state securities law and negligent misrepresentation. The complaint seeks rescission of the transactions at issue and damages in an amount to be determined at trial. The defendants' motion to dismiss is pending.

*Huntington Bancshares Litigation*

On October 11, 2011, Huntington Bancshares, Inc. commenced a lawsuit against GMAC Mortgage; RALI; ResCap; GMAC-RFC; RFC; and several individuals (collectively, the defendants). The complaint alleges that the defendants made misrepresentations and omissions of material facts related to the originator's loan underwriting guidelines in the offering materials for five residential mortgaged-backed securities. The complaint asserts claims for fraud, aiding and abetting fraud, negligent misrepresentation, and violation of the Minnesota Securities Act and seeks rescission, money damages, and costs. The defendants' motion to dismiss is pending.

*Massachusetts Mutual Life Insurance Company Litigation*

On February 9, 2011, the Massachusetts Mutual Life Insurance Company (MassMutual) filed a complaint in the United States District Court for the District of Massachusetts against numerous defendants including RFC; RALI; RAMP; and RASC (collectively, the defendants). The complaint alleges that the defendants' public filings and offering documents associated with MBS MassMutual purchased contained false statements and omissions of material facts. MassMutual asserts claims for violations of the Massachusetts Uniform Securities Act and seeks both compensatory and statutory damages. The defendants' motion to dismiss was granted in February 2012, subject to certain additional provisions, which has resulted in certain of the original counts being reinstated against us.

*National Credit Union Administration Board (NCUAB) Litigation*

On August 9, 2011, NCUAB filed a complaint as liquidating agent of U.S. Central Federal Credit Union (U.S. Central) and Western Corporate Federal Credit Union (WesCorp) against Goldman, Sachs & Co. as underwriter and seller, and Fremont Mortgage Securities Corp., GS Mortgage Securities Corp., Long Beach Securities Corp., and RALI, as issuers, with respect to certain residential MBS purchased by U.S. Central and WesCorp. Previously, on June 20, 2011, the NCUAB filed a complaint as liquidating agent of U.S. Central against numerous defendants including RFMSII. The complaints assert claims under the California securities laws and Sections 11 and 12 of the Securities Act of 1933, alleging the offering documents associated with the underlying transactions contained untrue statements and omissions of material facts, and seek money damages and costs. The defendants have moved to dismiss both complaints, and those motions are pending.

*New Jersey Carpenters Litigation*

On January 3, 2011, New Jersey Carpenters Health Fund, New Jersey Carpenters Vacation Fund, and Boilermaker Blacksmith National Pension Trust, on behalf of themselves and a putative class (collectively, New Jersey Carpenters), along with several intervenor plaintiff pension funds, filed a Consolidated Second Amended Securities Class Action Complaint against numerous defendants including ResCap; RFC; RALI; Residential Funding Securities Corporation d/b/a GMAC RFC Securities and several individual defendants (collectively, the defendants). The complaint alleges that the plaintiffs and the class purchased MBS between June 28, 2006, and May 30, 2007, and asserts that the offering documents associated with these transactions contained misrepresentations and omitted material information in violation of Sections 11, 12, and 15 of the Securities Act of 1933. The complaint seeks compensatory damages, rescission or a rescissory measure of damages, and attorneys' fees and costs, among other relief. New Jersey Carpenters moved for class certification. The court denied the plaintiffs' motion, and an appeal of that decision is pending.

### Private-label Monoline Bond Insurer Litigation

*MBIA Litigation*

MBIA brought two cases in New York County Supreme Court: MBIA Insurance Corporation v. RFC (filed December 4, 2008) and MBIA Insurance Corporation v. GMAC Mortgage (filed April 1, 2010) (RFC and GMAC Mortgage collectively the defendants). The complaints allege that defendants breached their contractual representations and warranties relating to the characteristics of mortgage loans contained in certain insured MBS offerings. The complaints further allege that the defendants failed to follow specific remedy procedures set forth in the contracts and improperly serviced the mortgage loans. Along with claims for breach of contract, MBIA also alleges fraud. MBIA seeks, among other remedies, repurchase of certain loans, payments on current and future claims under the relevant policies, indemnification for attorneys' fees and costs, and punitive damages. Both cases are in discovery.

*FGIC Litigation*

On November 29, 2011, FGIC filed three complaints against ResCap in New York County Supreme Court. In two of these cases, both entitled Financial Guaranty Insurance Company v. RFC et al., FGIC alleges that defendants breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured MBS offerings. FGIC further alleges that the defendants breached their contractual obligations to permit access to loan files and certain books and records.

In the third case, entitled Financial Guaranty Insurance Company v. GMAC Mortgage LLC, et al., FGIC makes similar contract allegations against GMAC Mortgage and ResCap, as well as a claim against GMAC Mortgage for fraudulent inducement. In addition, FGIC alleges aiding and abetting fraudulent inducement against Ally Bank, which originated a large portion of the loans in the disputed pool, and breach of the custodial agreement for failing to notify FGIC of the claimed breaches of representations and warranties. In each of these cases, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages.

On December 15, 2011, FGIC filed a fourth complaint in New York County Supreme Court related to insurance policies issued in connection with a RFC-sponsored transaction. This complaint, entitled Financial Guaranty Insurance Company v. Ally Financial, Inc., et al., names RFC and ResCap, and seeks various forms of declaratory and monetary relief. The complaint alleges that the defendants are alter egos of one another, fraudulently induced FGIC's agreement to provide insurance by misrepresenting the nature of RFC's business practices and the credit quality and characteristics of the underlying loans, and have now materially breached their agreement with FGIC by refusing its requests for information and documents.

On December 27, 2011, FGIC filed three additional complaints in New York County Supreme Court against ResCap and RFC. These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations. In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same. There are currently twelve FGIC lawsuits pending against the us and our affiliates, all in the U.S. District Court for the Southern District of New York.

## Other Litigation

*Kessler Litigation*

Several putative class actions filed in 2001-2003, all alleging that originators Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee charged certain interest rates and fees in violation of the applicable Secondary Mortgage Loan Act, were consolidated for settlement purposes in the U.S. District Court for the Western District of Pennsylvania. On September 22, 2010, the Third Circuit Court of Appeals vacated an order approving the settlement and remanded the case to the trial court for

Notes to Consolidated Financial Statements
Residential Capital, LLC

further proceedings.  On October 10, 2011, plaintiffs filed a joint consolidated amended class action complaint against, among others, RFC alleging violations of the Real Estate Settlement Procedures Act; the Truth in Lending Act, as amended by the Home Ownership and Equity Protection Act; and the Racketeer Influenced and Corrupt Organizations Act.  RFC's motion to dismiss is outstanding, and the company intends to vigorously defend against these claims.

*Mitchell Litigation*

In this statewide class action, plaintiffs alleged that Mortgage Capital Resources, Inc. (MCR) violated the Missouri Second Mortgage Loan Act by charging Missouri borrowers fees and interest not permitted by the Act.  RFC and Homecomings Financial LLC (HFN), among others, were named as defendants in their role as assignees of certain of the MCR loans.  Following a trial concluded in January 2008, the jury returned verdicts against all defendants, including an award against RFC and HFN for $4.3 million in compensatory damages (plus pre and post-judgment interest and attorneys' fees) and against RFC for $92 million in punitive damages.  In a November 2010 decision, the Missouri Court of Appeals affirmed the compensatory damages but ordered a new trial on punitive damages.  Upon remand, the company paid $12.8 million in compensatory damages (including interest and attorneys' fees).  In February 2012, RFC entered into an agreement in principle, subject to documentation and court approval, to settle all of plaintiffs' remaining claims, including plaintiffs' already-awarded attorneys' fees on appeal, for a total of $17.3 million

*Commonwealth of Massachusetts*

On December 1, 2011, the Commonwealth of Massachusetts filed an enforcement action in the Suffolk County Superior Court against GMAC Mortgage and several other lender/servicers.  The Commonwealth claims that certain aspects of defendants' foreclosure processes are unlawful, that defendants do not always process loan modifications accurately, and that defendants' use of the Mortgage Electronic Registration Systems (MERS) has damaged the integrity of the Commonwealth's Torrens recording system.  The Commonwealth seeks civil penalties, injunctive relief, costs, and attorneys' fees.  In connection with the settlement with the federal government and state attorneys general announced on February 9, 2012, the Commonwealth of Massachusetts agreed to settle all servicing-related claims asserted in this action and to certain limits on monetary damages, if any.  However, the Commonwealth of Massachusetts continues to pursue claims related to MERS and certain foreclosure-related matters.

## Regulatory

Our origination, purchase, sale, securitization and servicing business activities expose us to risks of noncompliance with extensive federal, state, local and foreign laws, rules and regulations.  Our business activities are also governed by, among other contracts, primary and master servicing agreements that contain covenants and restrictions regarding the performance of our servicing activities.  Our failure to comply with these laws, rules, regulations and contracts can lead to, among other things, loss of licenses and approvals, an inability to sell or securitize loans, demands for indemnification or loan repurchases from purchasers of loans, demands for indemnification or other compensation from investors in our securitizations, fines, penalties, litigation, including class action lawsuits, and governmental investigations and enforcement actions, including, in the case of some violations of law, possible criminal liability.

GMAC Financiera, S.A. de C.V., SOFOM, ENR (GMAC Financiera), our wholly-owned subsidiary operating in Mexico, incurred losses during the year which reduced its capital stock and its shareholders equity by more than two-thirds. At December 31, 2011, the amount of the deficiency is $62.0 million. Until this deficiency is cured, GMAC Financiera falls within one of the causes for dissolution under Mexican law.

## Operating leases

As of December 31, 2011, we were obligated under non-cancelable operating leases for office space and equipment.  Future minimum rental payments, including escalation clauses, under leases with terms of one year or more at December 31, 2011, were as follows.

| Year Ended December 31,  ($ in thousands) | Leases as part of ongoing operation |
|---|---|
| 2012 | $23,345 |
| 2013 | $20,195 |
| 2014 | $17,867 |
| 2015 | $14,183 |
| 2016 | $12,596 |
| 2017 and thereafter | $33,657 |
| | $121,843 |

74

The above table includes all rental payments we are obligated to pay under non-cancelable operating leases for office space. These payments exclude amounts we expect to collect through subleases or contract terminations as a result of our restructuring efforts.

Rental expense recorded by us for the years ended December 31, 2011 and 2010, was $11.3 million and $13.3 million, respectively.  These amounts exclude any leases included in the restructuring activities and discontinued operations.

## Other Commitments

We have a commitment with a third-party information technology provider for use of their integrated loan servicing platform and data warehouse product.  This agreement is for $5.1 million per year and expires on May 31, 2012.

## Other Contingencies

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies.  We establish reserves for these contingencies when the item becomes probable and the costs can be reasonably estimated.  The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item.  Based on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse effect on our consolidated financial condition, results of operations, or cash flows.

## 20. Related Party Transactions

## Balance Sheet

A summary of the balance sheet effect of our transactions with Ally Inc., Ally Bank, and other affiliates were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held–for–sale — purchased from Ally Bank | **$13,518** | $16,951 |
| Mortgage loans held-for-sale — contributions from Ally Inc. (carry value) (a) | **645,357** | 812,954 |
| Other Assets | | |
| Restricted cash deposits — Ally Bank | **112,458** | 111,354 |
| Derivative collateral placed with Ally IM | **1,008,262** | 920,808 |
| Fair value of derivative instruments | | |
| Forward flow agreement — Ally Bank | **16,423** | 54,669 |
| MSR swap — Ally Bank | **17,681** | 14,603 |
| Receivable from other affiliates | **2,046** | 1,958 |
| **Liabilities** | | |
| Borrowings — Ally Inc. Senior Secured Credit Facility (b) | **$757,767** | $845,775 |
| Borrowings — Ally Inc. LOC (b) | **185,064** | 681,000 |
| Borrowings — BMMZ Repo (b) | **250,351** | — |
| Other Liabilities | | |
| Liability for loans sold with recourse — Ally Bank (c) | **6,773** | 6,668 |
| Fair value of derivative instruments | | |
| Ally IM (d) | **1,049,420** | 565,878 |
| Payable to Ally Inc. (e) | **31,019** | 23,986 |
| Payable, net — Ally Bank | **21,001** | (11,656) |
| **Other activity** | | |
| Loans purchased (UPB) under the MMLPSA — Ally Bank (f) | **$56,680,164** | $66,310,743 |
| Loans sold (UPB) under the MMLPSA — Ally Bank | **27,041** | 94,811 |
| Loans (UPB) sub-serviced — Ally Bank | **143,172,634** | 113,904,266 |
| Servicing escrow/deposits for off-balance sheet loans — Ally Bank | **2,003,745** | 2,069,527 |
| Home Equity Loans (UPB) subject to indemnifications — Ally Bank (c) | **58,512** | 68,017 |
| Income tax settled with Ally Inc. (g) | **37,498** | — |

(a)   Amount represents the carrying value of the loans contributed from Ally Inc. in 2009.  The UPB of these loans is $1.6 billion and $2.0 billion at December 31, 2011 and 2010, respectively.

(b)   Includes principal balance of debt outstanding plus accrued interest.

(c)   Relates to an indemnification agreement with respect to a portfolio of second lien home equity loans with an original UPB of $166.0 million.

(d)   Includes the fair value of forwards, TBAs and swaptions executed in connection with hedging of our mortgage loans held–for–sale, retained interests and MSRs. Also includes the fair value of hedges related to our foreign currency exposure.  See Note 17 — Derivative Instruments and Hedging Activities for additional information.

(e)   Includes costs for personnel, information technology, communications, corporate marketing, procurement and services related to facilities incurred by Ally Inc. and allocated to us.

(f)   Includes repurchased loans of $11.7 million and  $19.8 million as of December 31, 2011 and 2010, respectively.

(g)   See Note 14 - Income taxes for additional information.

Notes to Consolidated Financial Statements
Residential Capital, LLC

## Statement of Income

A summary of the income statement effect of our transactions with Ally Inc., Ally Bank and other affiliates were as follows.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Net financing revenue** | | |
| Interest income on cash deposits — Ally Bank | **$1,104** | $1,267 |
| Interest expense — Ally Inc. Senior Secured Credit Facility | **23,739** | 35,864 |
| Interest expense — Ally Inc. LOC | **16,406** | 7,358 |
| Interest expense — BMMZ Repo | **351** | — |
| Interest expense — Ally Bank | **4,022** | — |
| Amortization expense of deferred issuance costs — Ally Inc. | **—** | 3,044 |
| **Other revenue** | | |
| Gain (loss) on mortgage loans, net — derivative instruments with Ally IM | **($68,288)** | $10,281 |
| Gain (loss) on mortgage loans, net — Ally Bank | **189,902** | (70,058) |
| Gain (loss) on mortgage loans, net — Ally Securities, LLC (c) | **174,968** | 79,101 |
| Servicing fees — Ally Bank | **34,895** | 24,060 |
| Servicing assets valuation and hedge activities, net — derivative instruments with Ally IM | **172,819** | 97,260 |
| Servicing assets valuation and hedge activities, net — derivative instruments with Ally Bank | **(359,523)** | 469,945 |
| Loan brokerage fees — Ally Bank (a) | **55,622** | 64,543 |
| **Provision expense — Ally Bank (b)** | **$2,868** | $7,657 |
| **Noninterest expense** | | |
| Gain (loss) on foreign currency — derivative instruments with Ally Inc. | **$21,021** | ($948) |
| Management fees — Ally Inc. | **69,714** | 93,263 |
| Custodial fees — Ally Bank | **7,732** | 7,519 |
| Allocated expenses — Ally Bank | **452** | 691 |

(a)   Under the terms of a broker agreement with Ally Bank, we provide loan processing services to support Ally's loan origination and purchase activities as well as loan closing services.
(b)   Relates to provision expenses associated with the indemnification agreement with respect to a portfolio of second lien home equity loans.
(c)   Relates to mortgage and asset–backed securities brokered to Ally Securities, LLC for underwriting, distribution and capital markets liquidity services.

## Statement of Changes in Equity

A summary of the changes to the statement of equity related to our transactions with Ally Inc., Ally Bank and other affiliates were as follows.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Equity** | | |
| Capital contributions — Ally Inc. (a) | **$109,405** | $— |

(a)   Represents capital contributions from Ally Inc. through the forgiveness of Ally Inc. LOC borrowings.

On January 30, 2012, we received a capital contribution of $196.5 million from Ally Inc. through the forgiveness of Ally Inc. LOC borrowings.  See Other Significant Affiliate Agreements, below, for additional information with respect to the terms and conditions agreed in connection with the capital contribution.

## Other Significant Affiliate Agreements

We are party to an ISDA 2002 Master Agreement with Ally IM, a subsidiary of Ally Inc., whereby we enter into foreign exchange and interest rate hedging transactions (the ISDA Agreement and a Master Securities Forward Transaction Agreement (the Forward

77

Agreement) (together with the ISDA Agreement, the Derivative Agreements)) whereby we agree to sell certain mortgage–backed securities to Ally IM from time to time on a forward basis. We also entered into a Guarantee and Master Netting Agreement with Ally IM whereby the parties agreed to aggregate, net, and set off the Derivative Agreements and the Ally Inc. LOC. In connection with these agreements, we cross-collateralize the respective obligations and granted a security interest to Ally IM in any cash or other property posted, or required to be posted, as collateral by us.

On December 5, 2011, we entered into an agreement with Ally Inc. and GMAC Mortgage Group (the Agreement), whereby we agreed to certain terms and conditions in respect of ongoing loan sales by Ally Bank to us under the terms of our Master Mortgage Loan Purchase and Sale Agreement (MMLPSA) with Ally Bank. In accordance with the Agreement, we have instructed the GSEs to deliver, free and clear of all liens and encumbrances, mortgage-backed securities received from the GSEs in connection with our loan sales to them (New MBS) directly upon issuance into an account of Ally IM for the benefit of Ally Bank and GMAC Mortgage Group. We grant Ally Bank and GMAC Mortgage Group security interests in loans purchased from Ally Bank and all proceeds from the sale of the New MBS. All proceeds from the sale of the New MBS are paid without setoff, recoupment or other reduction by Ally IM directly to Ally Bank. Ally Bank remits to us proceeds, if any, in excess of the purchase price of loans sold to us under the MMLPSA, and we remit to Ally Bank the amount of any shortfall in such proceeds necessary to pay the purchase price of the loans. In connection with these conditions, we are negotiating a Pledge and Security Agreement among ResCap, GMAC Mortgage, Ally Inc., GMAC Mortgage Group, Ally Bank and Ally IM (the Pipeline Security Agreement).

In accordance with the terms of the Agreement, and to assist us with our liquidity needs, Ally Inc. provided us with $250.0 million of new financing through a secured financing agreement with its subsidiary BMMZ Holdings, and a commitment for capital support at November 30, 2011. We did not require any capital support from Ally Inc. as of November 30, 2011. In accordance with the terms of the Agreement, and to assist us with our hedging activities, existing counterparty derivative transactions were novated to Ally IM, to the extent possible, and new derivative transactions were executed between us and Ally IM on terms substantially the same as the novated trades. New derivative transactions will be executed with Ally IM. We expect to transact virtually all of our hedging transactions with Ally IM in the future.

On January 30, 2012, we entered into an agreement (the Letter Agreement) with Ally Inc. pursuant to which Ally Inc. agreed to provide capital support to us in connection with potential obligations in connection with mortgage foreclosure fines and penalties. Under the terms of the Letter Agreement, Ally Inc. agreed to provide us with immediate capital support of $196.5 million through forgiveness of debt, and to provide, and cause BMMZ to provide, waivers of any breach of or default under the Ally Inc. Senior Secured, LOC, and BMMZ Secured Financing Agreement credit facilities, where the breach or default results from amounts recorded with respect to such potential obligations. Ally Inc. also agreed, in accordance with, and subject to, the approval of the Ally Inc. Board of Directors, to contribute capital to us in the form of debt forgiveness in an amount necessary for us to exceed our consolidated tangible net worth covenants by $25.0 million as of January 31, 2012, provided that such capital contribution is a result of net operating losses in the ordinary course of business and does not exceed $100.0 million.

In connection with the Letter Agreement, we agreed to promptly perform all obligations that might be required in connection with mortgage foreclosure fines and penalties, including the timely remittance of any cash payments that might be owed to the applicable government authorities and any borrower relief that might be agreed in connection with any mortgage foreclosure settlement with the federal government, state attorneys general and state banking departments and in connection with any civil monetary penalty issued by the FRB. We also agreed to amend our subservicing agreement with Ally Bank to permit us to implement modifications and other loss mitigation activities in connection with any borrower relief obligations that might be required. Under the pending amendment, any uncured breach of our obligations with respect to the terms of any settlement or penalty would constitute an event of default and entitle Ally Bank to immediately terminate the subservicing agreement upon written notice. We have also agreed to renegotiate the terms of our forward flow and MSR Swap agreements with Ally Bank, whereby Ally Bank may novate the agreements with us to Ally IM or Ally Bank may terminate the agreements. In the event Ally Bank terminates the agreements, we may enter into new agreements with Ally IM.

## Transactions with Ally Bank

Following are descriptions of our substantive affiliate agreements with Ally Bank. Certain of these agreements are expected to be renegotiated, novated or otherwise terminated in connection with agreements we have entered into with Ally Inc. See Other Significant Affiliate Agreements for additional information.

Under the terms of the Broker Agreement, we act in a broker capacity and provide loan processing services to Ally Bank to support its origination and purchase of loans as well as loan closing services. The Broker Agreement has no mandatory expiration date and can be terminated by either party with 30-days notice. Under the terms of the Broker Agreement, loans meeting the underwriting standards of Ally Bank are originated (funded) by Ally Bank, while loans not meeting those standards may be originated by us and sold directly into the secondary market. We also provide certain representations and warranties and indemnifications to Ally Bank with respect to brokered loans.

Under the terms of the MMLPSA with Ally Bank, we purchase first- and second-lien mortgage loans held-for-sale from Ally Bank. We sell and deliver such mortgage loans into the secondary market primarily through agency securitizations and whole-loan sales. The MMLPSA has no mandatory expiration date and can be terminated on 30 days notice by Ally Bank or immediately if agreed by both parties. Under the MMLPSA, we purchase loans from Ally Bank and recognize gains or losses on the sale of mortgage loans as they are sold by us into the secondary market. Loans purchased by us pursuant to the MMLPSA include mortgage loans originated by third parties and purchased by Ally Bank (correspondent lending); loans originated directly by Ally Bank; and mortgage loans originated by us and sold to Ally Bank pursuant to a loan sale agreement (the Client Agreement).

Under the terms of the Pipeline Security Agreement, Ally Bank is granted security interests in loans sold to us under the MMLPSA and all proceeds from the sale of New MBS in connection with the sale of such loans to the GSEs. All proceeds from the sale of New MBS are paid without setoff, recoupment or other reduction directly to Ally Bank. Ally Bank remits to us proceeds, if any, in excess of the purchase price of the loans sold to us under the MMLPSA, and we remit to Ally Bank the amount of any shortfall in such proceeds necessary to pay the purchase price of the loans. At December 31, 2011, there were no amounts due to or from Ally Bank in connection with this agreement.

We purchase loans from Ally Bank under the MMLPSA on a nonrecourse basis, either servicing released or servicing retained. If servicing is retained, Ally Bank retains the mortgage servicing rights and designates us as subservicer, pursuant to a servicing agreement between Ally Bank and us.

We are counterparty to a forward flow agreement for mortgage loans held-for-sale and interest rate lock commitments held by Ally Bank that ultimately will be sold to us under the MMLPSA. The forward flow agreement transfers the exposure to changes in fair value of Ally Bank's mortgage loans held-for-sale and interest rate lock commitments to us. We hedge our exposure to the forward flow agreement consistent with the hedging of our own mortgage loans held-for-sale and interest rate lock commitments. The forward flow agreement has no mandatory expiration date and can be terminated with 30 days notice from Ally Bank or immediately if agreed by both parties. In connection with our Letter Agreement with Ally Inc., we expect the forward flow agreement will be novated to Ally IM or terminated.

We are counterparty to a MSR Total Return Swap (the MSR Swap) which transfers the total economic return of MSRs owned by Ally Bank to us in exchange for a variable payment based upon a fixed spread to LIBOR. The fixed spread to LIBOR is periodically evaluated against available market data. Effective July 1, 2010, the fixed spread was increased to 325 basis points. We hedge our exposure to the MSR Swap consistent with the hedging of our own MSRs. The MSR Swap has no mandatory expiration date and can be terminated with 30 days notice from Ally Bank or immediately if agreed by both parties. In connection with our Letter Agreement with Ally Inc., we expect the MSR Swap will be novated to Ally IM or terminated.

We are party to an ISDA 2002 Master Agreement with Ally Bank governing the forward flow agreement and MSR Swap. We have also entered into an Agreement to Set Off Obligations (the Netting Agreement) which provides Ally Bank the right, but not the obligation, to set off any obligation that we have to Ally Bank against any obligation of Ally Bank to us. The Netting Agreement can be terminated by either party with 30 days notice. To the extent the forward flow agreement and MSR swap are novated or terminated, the ISDA 2002 Master Agreement and Netting Agreement may be terminated.

Under the GSE servicer guides, the seller and servicer of mortgage loans equally share in customary representation and warranty obligations. We assume all of the representation and warranty obligations for loans we purchased from Ally Bank that we subsequently sell through Agency securitization or otherwise sell into the secondary market. To the extent these loans were originated by third-parties and purchased by Ally Bank and subsequently sold to us under the MMLPSA, we pursue recovery of losses from the third-parties under breach of customary representation and warranties. Pursuant to the Client Agreement, we also provide certain representations and warranties and indemnifications to Ally Bank with respect to those loan transactions. For loans that are not eligible to be sold to the GSEs that reach certain delinquency thresholds or which are otherwise in breach of sale representations and warranties contained in the client agreement, we repurchase loans from Ally Bank at their carrying cost.

In the first quarter of 2008, Ally Bank purchased a portfolio of second-lien home equity loans from us. We provided an indemnification to Ally Bank whereby we reimburse Ally Bank at such time as any of the loans covered by this agreement are charged off, typically when the loan becomes 180 days delinquent. This indemnification is limited to loans with an original unpaid principal balance of $166.0 million. In December 2009, Ally Bank sold approximately $3.5 billion of loans to Ally Inc. of which $52.6 million were covered under the indemnification. The indemnification associated with these loans did not transfer to Ally Inc. and was effectively retired.

In connection with our Settlement obligations (See Note 19 – Guarantees, Commitments, and Contingencies for additional information related to the Settlement) and as part of the Letter Agreement, Ally Bank has agreed to participate in borrower relief programs and activities with respect to their loan portfolios. We recognized a liability of $83.5 million at December 31, 2011, in connection with losses Ally Bank is expected to incur in connection with the programs. To the extent activities under the borrower

79

relief programs are consistent with activities currently permitted under our servicing agreement. Ally Bank will not seek to be reimbursed, or indemnified, for any losses it incurs in connection with these borrower relief activities.

We have short-term receivables due from Ally Bank that primarily consist of amounts due from Ally Bank related to miscellaneous mortgage loan funding transactions and accounts payable transactions, and are generally settled on a monthly basis.

We have cash collateral on deposit with Ally Bank, primarily related to certain of our transactions that are deemed to be covered under Section 23A of Reg. W, which governs affiliate transactions for banks.

We deposit certain escrow funds for taxes and insurance collected from borrowers as part of our servicing activities in noninterest bearing accounts with Ally Bank.

We provide office facilities and a wide range of administrative services, including legal, risk, capital markets, finance and accounting, and information technology support to Ally Bank under an administrative services agreement. No fees were collected during the years ended December 31, 2011 and 2010, for these facilities and services. We also contract with Ally Bank to provide document custody services including, certifications, releases, reinstatements and file maintenance.

## 21. Regulatory Matters

Certain subsidiaries associated with our mortgage and real estate operations are required to maintain regulatory net worth requirements. See Note 9 — Borrowings for additional information. Failure to meet minimum capital requirements can initiate certain mandatory actions by federal, state, and foreign agencies that could have a material effect on our results of operations and financial condition. These entities were in compliance with these requirements as of December 31, 2011.

Certain of our foreign subsidiaries operate in local markets as either banks or regulated finance companies and are subject to regulatory restrictions. These regulatory restrictions, among other things, require that our subsidiaries meet certain minimum capital requirements and may restrict dividend distributions and ownership of certain assets. As of December 31, 2011, compliance with these various regulations has not had a material adverse effect on our financial condition, results of operations or cash flows.

## 22. Subsequent Events

Events subsequent to December 31, 2011, were evaluated through March 28, 2012, the date on which these Consolidated Financial Statements were issued.

On February 9, 2012 we entered into an agreement in principle with federal agencies, 49 state attorneys general and 45 state banking departments with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage foreclosure homes sales and evictions. On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia. On February 9, 2012, we also agreed in principle with the FRB on a civil monetary penalty related to these same activities. At December 31, 2011, we recorded a liability of $204.0 million related to these agreements. See Note - 19 Guarantees, Commitments and Contingencies for additional information.

On January 30, 2012, we received a $196.5 million capital contribution from Ally Inc. in the form of debt forgiveness of the Ally Inc. LOC. See Note 20 – Related Party for additional information.

**<u>Exhibit C-8</u>**

**<u>Quarterly Financial Statements for the Period Ended March 31, 2012</u>**

# RESIDENTIAL CAPITAL, LLC

**Condensed Consolidated Financial Statements for the Periods Ended
March 31, 2012 and 2011
(Unaudited)**

Condensed Consolidated Balance Sheet (unaudited)
Residential Capital, LLC

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | **$652,704** | $618,699 |
| Mortgage loans held–for–sale ($46,419 and $56,976 fair value elected) | **4,270,826** | 4,249,625 |
| Finance receivables and loans, net | | |
| Consumer ($832,094 and $835,192 fair value elected) | **996,559** | 1,022,730 |
| Commercial | **41,145** | 38,017 |
| Allowance for loan losses | **(28,788)** | (28,616) |
| Total finance receivables and loans, net | **1,008,916** | 1,032,131 |
| Mortgage servicing rights | **1,254,497** | 1,233,107 |
| Accounts receivable, net | **3,157,256** | 3,051,748 |
| Other assets | **5,331,372** | 6,628,152 |
| Total assets | **$15,675,571** | $16,813,462 |
| **Liabilities** | | |
| Borrowings | | |
| Borrowings from parent and affiliate | **$1,409,873** | $1,189,364 |
| Collateralized borrowings in securitization trusts ($828,418 and $829,940 fair value elected) | **828,418** | 830,318 |
| Other borrowings | **4,468,776** | 4,705,404 |
| Total borrowings | **6,707,067** | 6,725,086 |
| Other liabilities | **8,569,161** | 9,996,026 |
| Total liabilities | **15,276,228** | 16,721,112 |
| **Equity** | | |
| Member's interest | **11,630,276** | 11,433,776 |
| Accumulated deficit | **(11,166,544)** | (11,279,560) |
| Accumulated other comprehensive loss | **(64,389)** | (61,866) |
| Total equity | **399,343** | 92,350 |
| Total liabilities and equity | **$15,675,571** | $16,813,462 |

The assets of consolidated variable interest entities that can be used only to settle obligations of the consolidated variable interest entities and the liabilities of these entities for which creditors (or beneficial interest holders) did not have recourse to our general credit at March 31, 2012 and December 31, 2011, were as follows.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held–for–sale | **$7,944** | $8,658 |
| Finance receivables and loans, net | | |
| Consumer ($832,094 and $835,192 fair value elected) | **987,869** | 998,509 |
| Allowance for loan losses | **(8,732)** | (10,126) |
| Total finance receivables and loans, net | **979,137** | 988,383 |
| Accounts receivable, net | **1,026,867** | 1,027,411 |
| Other assets | **32,934** | 29,494 |
| Total assets | **$2,046,882** | $2,053,946 |
| **Liabilities** | | |
| Borrowings | | |
| Collateralized borrowings in securitization trusts ($828,418 and $829,940 fair value elected) | **$828,418** | $830,318 |
| Other borrowings | **806,292** | 855,631 |
| Total borrowings | **1,634,710** | 1,685,949 |
| Other liabilities | **28,833** | 29,099 |
| Total liabilities | **$1,663,543** | $1,715,048 |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

Residential Capital, LLC

| Three months ended March 31, *($ in thousands)* | 2012 | 2011 |
|---|---|---|
| **Revenue** | | |
| Interest income | **$94,605** | $110,240 |
| Interest expense | **103,218** | 116,991 |
| Net financing revenue | **(8,613)** | (6,751) |
| **Other revenue** | | |
| Servicing fees | **188,941** | 217,664 |
| Servicing asset valuation and hedge activities, net | **115,316** | 48,911 |
| Total servicing income, net | **304,257** | 266,575 |
| Gain on mortgage loans, net | **106,493** | 35,200 |
| Gain (loss) on foreclosed real estate | **4,488** | (2,702) |
| Other revenue, net | **20,032** | 6,031 |
| Total other revenue | **435,270** | 305,104 |
| **Total net revenue** | **426,657** | 298,353 |
| **Provision for loan losses** | **(1,302)** | 5,632 |
| **Noninterest expense** | | |
| Representation and warranty expense, net | **19,459** | 26,000 |
| Compensation and benefits | **103,233** | 81,676 |
| Professional fees | **57,343** | 18,962 |
| Data processing and telecommunications | **20,363** | 20,203 |
| Occupancy | **7,115** | 5,633 |
| Advertising | **2,046** | 8,747 |
| Other noninterest expense, net | **99,504** | 82,101 |
| Total noninterest expense | **309,063** | 243,322 |
| **Income before income taxes** | **118,896** | 49,399 |
| Income tax expense | **5,880** | 8,946 |
| **Net income** | **$113,016** | $40,453 |
| Other comprehensive income, net of tax | **(2,523)** | (2,397) |
| **Comprehensive income** | **$110,493** | $38,056 |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

# Condensed Consolidated Statement of Changes in Equity (unaudited)

Residential Capital, LLC

| ($ in thousands) | Member's interest | Accumulated deficit | Accumulated other comprehensive income | Total equity |
|---|---|---|---|---|
| **Balance at January 1, 2011** | $11,324,371 | ($10,434,497) | ($43,710) | $846,164 |
| Net income | — | 40,453 | — | 40,453 |
| Capital contribution | — | — | — | — |
| Other comprehensive income, net of tax | — | — | (2,397) | (2,397) |
| **Balance at March 31, 2011** | $11,324,371 | ($10,394,044) | ($46,107) | $884,220 |
| **Balance at January 1, 2012** | **$11,433,776** | **($11,279,560)** | **($61,866)** | **$92,350** |
| Net income | **—** | **113,016** | **—** | **113,016** |
| Capital contribution | **196,500** | | **—** | **196,500** |
| Other comprehensive income, net of tax | **—** | **—** | **(2,523)** | **(2,523)** |
| **Balance at March 31, 2012** | **$11,630,276** | **($11,166,544)** | **($64,389)** | **$399,343** |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

Condensed Consolidated Statement of Cash Flows (unaudited)

Residential Capital, LLC

| Three months ended March 31, *($ in thousands)* | 2012 | 2011 |
|---|---:|---:|
| **Operating activities** | | |
| Net income | **$113,016** | $40,453 |
| Reconciliation of net income to net cash (used in) provided by operating activities | | |
| Depreciation and amortization | **10,449** | 7,004 |
| Accretion of deferred concession on secured notes | **(25,921)** | (24,898) |
| Provision for loan losses | **(1,302)** | 5,632 |
| Gain on mortgage loans, net | **(106,493)** | (35,200) |
| Net (gain) loss on other assets | **(1,861)** | 3,345 |
| Change in fair value of mortgage servicing rights | **(10,817)** | (36,488) |
| Originations and purchases of mortgage loans held–for–sale | **(10,908,385)** | (15,483,820) |
| Proceeds from sales and repayments of mortgage loans held–for–sale | **10,666,109** | 15,204,714 |
| Net change in | | |
| Deferred income taxes | **1,251** | (2,004) |
| Accounts receivable | **244,337** | 250,806 |
| Other assets | **1,112,423** | 1,170,188 |
| Other liabilities | **(1,336,152)** | (787,829) |
| Net cash (used in) provided by operating activities | **(243,346)** | 311,903 |
| **Investing activities** | | |
| Net (increase) decrease in commercial finance receivables and loans | **(497)** | 11,412 |
| Net decrease in consumer mortgage finance receivables and loans | **77,133** | 187,378 |
| Net decrease in investments in real estate and other | **—** | 3,085 |
| Proceeds from sales of foreclosed and owned real estate | **22,890** | 44,363 |
| Other, net | **72,016** | (9,072) |
| Net cash provided by investing activities | **171,542** | 237,166 |
| **Financing activities** | | |
| Net increase (decrease) in borrowings from parent and affiliate | **417,009** | (187,146) |
| Repayments of collateralized borrowings in securitization trusts | **(82,842)** | (140,203) |
| Proceeds from other long–term borrowings | **849,685** | 519,362 |
| Repayments of other long–term borrowings | **(923,285)** | (796,606) |
| Net (decrease) increase in other short-term borrowings | **(165,464)** | 91,776 |
| Net cash provided by (used in) financing activities | **95,103** | (512,817) |
| Effect of changes in foreign exchange rates on cash and cash equivalents | **10,706** | 10,254 |
| Net increase in cash and cash equivalents | **34,005** | 46,506 |
| Cash and cash equivalents at beginning of year | **618,699** | 672,204 |
| Cash and cash equivalents at March 31, | **$652,704** | $718,710 |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

# Condensed Consolidated Statement of Cash Flows (unaudited)
Residential Capital, LLC

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| **Supplemental disclosures** | | |
| Cash paid for | | |
|   Interest | **$38,443** | $91,379 |
|   Income taxes | **18** | 17,642 |
| Non cash items | | |
|   Mortgage loans held–for–sale transferred to consumer finance receivables and loans | **461** | 1,113 |
|   Consumer finance receivables and loans transferred to mortgage loans held–for–sale | **40,407** | 53,688 |
|   Consumer finance receivables and loans transferred to other assets | **2,571** | 3,585 |
|   Mortgage loans held–for–sale transferred to other assets | **47,073** | 15,637 |
|   Mortgage loans held–for–sale transferred to accounts receivable | **349,436** | 214,932 |
|   Mortgage servicing rights recognized upon the transfer of financial assets | **10,573** | 18,370 |
|   Capital contributions through forgiveness of borrowings from Ally Inc. | **196,500** | — |
| **Other disclosures** | | |
|   Proceeds from sales and repayments of consumer finance receivables and loans originally designated as mortgage loans held–for–sale | **$33,219** | $41,929 |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

# 1. Description of Business, Basis of Presentation and Changes in Significant Accounting Policies

Residential Capital, LLC (ResCap, we, our, or us) is a wholly owned subsidiary of GMAC Mortgage Group, LLC (GMAC Mortgage Group) which is a wholly owned subsidiary of Ally Financial Inc. (Ally Inc.). Our operations are principally conducted through our subsidiaries Residential Funding Company, LLC (RFC) and GMAC Mortgage, LLC (GMAC Mortgage). We broker, originate, purchase, sell, securitize, and service residential mortgage loans in the United States. We broker virtually all of the loan production from our origination channels to our affiliate, Ally Bank. Virtually all of our purchases are also executed with our affiliate, Ally Bank. Purchased loans are primarily agency eligible or government insured loans. Prime credit quality loans originated in conformity with the underwriting guidelines of Fannie Mae (formerly known as Federal National Mortgage Association) and Freddie Mac (formerly known as Federal Home Loan Mortgage Corporation) are generally sold to one of these government-sponsored entities in the form of agency-sponsored securitizations. Prime credit quality loans originated in conformity with the underwriting guidelines of the Federal Housing Administration (FHA) and Department of Veterans Affairs (VA) are generally sold into securitizations guaranteed by the Government National Mortgage Association (Ginnie Mae with Fannie Mae and Freddie Mac, collectively, the GSEs).

Ally Bank has recently undertaken actions that are expected to have a material adverse impact on our financial condition, results of operations and cash flows. These include the November 2011 decision to reduce its focus on its correspondent mortgage lending channel, and the decisions in April 2012 to significantly reduce its government production, including FHA and VA loans, from its correspondent mortgage lending channel, to become a direct seller of eligible loans to Fannie Mae and Freddie Mac effective May 1, 2012, and to terminate a number of its affiliate agreements with GMAC Mortgage effective April 30, 2012. We expect the level of mortgage loan purchases from Ally Bank to decline significantly in future periods. GMAC Mortgage will continue to purchase Ginnie Mae eligible loans from Ally Bank under the terms of an amended and restated master mortgage loan purchase and sale agreement executed in April 2012 effective May 1, 2012. Refer to Note 17 - Related Party Transactions for additional information.

Our legacy business included non-conforming domestic and international residential mortgage loan originations, purchases, sales, and securitization activities; our captive mortgage reinsurance portfolio; and our domestic and international commercial lending activities. The remaining legacy portfolios, which include limited international operations in Mexico, Canada and the United Kingdom, are being run-off, with periodic asset sales, workouts, or consideration and execution of other strategic disposition transactions to maximize our return.

We did not make a $20.1 million semi-annual interest payment that was due on April 17, 2012, related to $473.4 million outstanding senior unsecured notes maturing in June 2013. The indenture for the senior unsecured notes provides that a failure to pay interest on an interest payment date does not become an event of default unless such failure continues for a period of 30 days. We have projected interest payments due in May 2012 of $136.5 million, including the $20.1 interest payment due on April 17, 2012. We also have $2.0 billion of debt maturing in 2012, including our $158.0 million mortgage servicing rights secured funding facility, $131.2 million in euro-denominated notes and $1.4 billion in secured borrowings from Ally Inc. and its subsidiaries, all of which mature in May 2012.

We have been, and expect to continue to be, negatively impacted by exposure to representation and warranty obligations, adverse outcomes with respect to current or future litigation, fines, penalties or settlements related to our business activities and additional expenses to address regulatory requirements. We currently estimate that our reasonably possible losses related to litigation matters and potential repurchase obligations and related claims could be between $0.0 billion and $4.0 billion in excess of amounts recorded. See Note 16 – Contingencies and Other Risks for additional information. There can be no assurance that we will have the capital or liquidity sufficient to pay any significant portion of such estimated possible losses.

We remain heavily dependent on Ally Inc. and affiliates for funding and capital support. While Ally Inc. agreed to extend the maturity date for certain of its facilities with us until May 14, 2012, there can be no assurance that they will continue any such support or that they will choose to execute any further strategic transactions with respect to us or that any transactions undertaken will be successful. Should Ally Inc. no longer continue to support our capital or liquidity needs or should we be unable to successfully execute other initiatives, it would have a material adverse effect on our business, financial condition and results of operations. Consequently, there remains substantial doubt about our ability to continue as a going concern. If we do not receive the necessary support, we are determining whether it would be in the best interests of our creditors and other stakeholders to file for protection under the federal bankruptcy laws.

All of our credit facilities and certain other agreements contain covenants that require us to maintain consolidated tangible net worth of $250.0 million as of each month end. At December 31, 2011, we were in default of this covenant, which was subsequently cured but it is possible defaults could occur in the future due to insufficient capital or liquidity. Failure to meet this covenant is an event of default and may result in, among other things, an acceleration of the facility's maturity and/or may trigger an early amortization

event, under certain facilities. There are also cross default and cross acceleration provisions in our credit facilities, our junior secured debt and certain other agreements. A default under any one of these agreements can, through cross default and cross acceleration provisions create defaults in all of our other agreements. See Note 8 - Borrowings for additional information related to our financial covenants and counterparties remedies in an event of default.

We are also required, under master agreements with a GSE, to maintain certain servicer ratings with respect to our primary and master servicing activities. Our ability to continue to purchase, sell, securitize and service residential mortgage loans could be negatively impacted by any change in our access to programs available to us under our agreements with the GSEs.

Our consolidated tangible net worth, as defined, as of March 31, 2012 was $399.3 million in compliance with our financial covenants. Our consolidated tangible net worth, as defined, as of December 31, 2011, was $92.4 million, which constituted an event of default under our credit facilities and certain other agreements. We obtained waivers or acknowledgment letters from each of our liquidity providers in connection with our credit facilities and counterparties to agreements with financial covenants under which they agreed not to pursue their contractual remedies with respect to the default. These waivers were predicated, in part, on a January 30, 2012 capital contribution in the amount of $196.5 million that we received from Ally Inc. We are in compliance with any conditions with respect to these waivers and acknowledgment letters.

## Consolidation and Basis of Presentation

The accompanying Condensed Consolidated Financial Statements were prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Condensed Consolidated Financial Statements include our accounts and accounts of our majority–owned subsidiaries after eliminating all significant intercompany balances and transactions and include all variable interest entities (VIEs) in which we are the primary beneficiary. See Note 4 — Securitization and Variable Interest Entities for additional information.

Our accounting and reporting policies conform to accounting principles generally accepted in the United States of America (GAAP). The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and that affect income and expenses during the reporting period. In developing the estimates and assumptions, management uses all available evidence; however, actual results could differ because of uncertainties associated with estimating the amounts, timing, and likelihood of possible outcomes.

The Condensed Consolidated Financial Statements at March 31, 2012 and for the three months ended March 31, 2012 and 2011, are unaudited but reflect all adjustments that are, in management's opinion, necessary for the fair presentation of the results for the interim periods presented. All such adjustments are of a normal recurring nature. These unaudited Condensed Consolidated Financial Statements should be read in conjunction with the audited Consolidated Financial Statements (and the related notes) for the year ended December 31, 2011.

We operate our international subsidiaries in a similar manner as we operate in the United States of America (U.S. or United States), subject to local laws or other circumstances that may cause us to modify our procedures accordingly. The financial statements of subsidiaries that operate outside of the United States are measured using the local currency as the functional currency. All assets and liabilities of foreign subsidiaries are translated into U.S. dollars using the period end exchange rates. The resulting translation adjustments are recorded in accumulated other comprehensive income, a component of equity. Income and expense items are translated at average exchange rates prevailing during the reporting period.

## Recently Adopted Accounting Standards

### Fair Value Measurement - Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS (ASU 2011-04)

As of January 1, 2012, we adopted Accounting Standards Update (ASU) 2011-04, which amends ASC 820, *Fair Value Measurements*. The amendments in this ASU clarify how to measure fair value and it contains new disclosure requirements to provide more transparency into Level 3 fair value measurements. It is intended to improve the comparability of fair value measurements presented and disclosed in financial statements prepared in accordance with U.S. GAAP and IFRS. The ASU must be applied prospectively. The adoption did not have a material impact to our consolidated financial condition or results of operations.

## Recently Issued Accounting Standards

### Balance Sheet - Disclosures about Offsetting Assets and Liabilities (ASU 2011-11)

In December 2011, the Financial Asset Standards Board (FASB) issued ASU 2011-11, which amends ASC 210, *Balance Sheet*. This ASU contains new disclosure requirements regarding the nature of an entity's rights of setoff and related arrangements associated

with its financial instruments and derivative instruments. The new disclosures will give financial statement users information about both gross and net exposures. ASU 2011-11 is effective for us on January 1, 2013, and retrospective application is required. Since the guidance relates only to disclosures, adoption is not expected to have a material effect on our consolidated financial condition or results of operations.

## 2. Mortgage Loans Held–for–sale

The composition of residential mortgage loans held–for–sale reported at carrying value, were as follows.

| ($ in thousands) | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Domestic (a) (b) | Foreign | Total | Domestic (a) (b) | Foreign | Total |
| 1st Mortgage | $3,523,013 | $35,297 | $3,558,310 | $3,497,392 | $12,011 | $3,509,403 |
| Home equity | 712,516 | — | 712,516 | 740,222 | — | 740,222 |
| Total loans held–for–sale (c) | $4,235,529 | $35,297 | $4,270,826 | $4,237,614 | $12,011 | $4,249,625 |

(a)   Includes mortgage loans subject to conditional repurchase options of $2.3 billion and $2.3 billion sold to Ginnie Mae guaranteed securitizations and $99.3 million and $105.8 million sold to off-balance sheet private-label securitization trusts at March 31, 2012 and December 31, 2011, respectively. The corresponding liability is recorded in other liabilities. See Note 4 — Securitizations and Variable Interest Entities for additional information.

(b)   Includes mortgage loans for which we have elected the fair value option of $46.4 million and $57.0 million at March 31, 2012 and December 31, 2011 respectively.  See Note 13 — Fair Value for additional information.

(c)   The carrying values are net of discounts of $320.4 million and $313.1 million, fair value adjustments of $(30.8) million and $(28.0) million, lower of cost or fair value adjustments of $56.8 million and $60.2 million, and UPB write-downs of $1.4 billion and $1.5 billion at March 31, 2012 and December 31, 2011, respectively.

## 3. Finance Receivables and Loans, Net

The composition of finance receivables and loans, net reported at carrying value before allowance for loan losses, were as follows.

| ($ in thousands) | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Domestic | Foreign | Total | Domestic | Foreign | Total |
| **Consumer** | | | | | | |
| 1st Mortgage | $128,220 | $251,423 | $379,643 | $130,024 | $256,494 | $386,518 |
| Home equity | 616,916 | — | 616,916 | 636,212 | — | 636,212 |
| Total consumer (a) (b) | 745,136 | 251,423 | 996,559 | 766,236 | 256,494 | 1,022,730 |
| **Commercial** | | | | | | |
| Commercial and industrial | — | 26,232 | 26,232 | — | 23,860 | 23,860 |
| Commercial real estate | — | 14,913 | 14,913 | — | 14,157 | 14,157 |
| Total commercial | — | 41,145 | 41,145 | — | 38,017 | 38,017 |
| Total finance receivables and loans | $745,136 | $292,568 | $1,037,704 | $766,236 | $294,511 | $1,060,747 |

(a)   Consumer mortgages include $832.1 million and $835.2 million at fair value as a result of fair value option elections as of March 31, 2012 and December 31, 2011, respectively.  See Note 13 — Fair Value for additional information.

(b)   The gross carrying value is net of fair value adjustments of $1.6 billion and $1.6 billion and UPB write-downs of $8.8 million and $8.0 million at March 31, 2012 and December 31, 2011, respectively.

9

The following table presents an analysis of the activity in the allowance for loan losses on finance receivables and loans, net.

| | 2012 | | | 2011 | | |
|---|---|---|---|---|---|---|
| ($ in thousands) | Consumer | Commercial | Total | Consumer | Commercial | Total |
| Allowance at January 1, | $13,638 | $14,978 | $28,616 | $17,681 | $25,129 | $42,810 |
| Provision for loan losses | (548) | (754) | (1,302) | 447 | 5,185 | 5,632 |
| Charge-offs | | | | | | |
| Domestic | (1,123) | — | (1,123) | (2,212) | — | (2,212) |
| Foreign | 116 | 1,327 | 1,443 | (218) | (14,579) | (14,797) |
| Total charge-offs | (1,007) | 1,327 | 320 | (2,430) | (14,579) | (17,009) |
| Recoveries | | | | | | |
| Domestic | 100 | 195 | 295 | 1,263 | 937 | 2,200 |
| Foreign | — | 859 | 859 | — | 781 | 781 |
| Total recoveries | 100 | 1,054 | 1,154 | 1,263 | 1,718 | 2,981 |
| Net charge-offs | (907) | 2,381 | 1,474 | (1,167) | (12,861) | (14,028) |
| Allowance at March 31, | $12,183 | $16,605 | $28,788 | $16,961 | $17,453 | $34,414 |
| Allowance for loan losses | | | | | | |
| Individually evaluated for | $2,910 | $16,605 | $19,515 | $3,838 | $16,137 | $19,975 |
| Collectively evaluated for | $9,273 | $— | $9,273 | $13,123 | $1,316 | $14,439 |
| Finance receivables and loans | | | | | | |
| Individually evaluated for | $8,018 | $41,145 | $49,163 | $7,818 | $88,972 | $96,790 |
| Collectively evaluated for impairment | $156,447 | $— | $156,447 | $232,724 | $3,279 | $236,003 |

The following table presents an analysis of our past due finance receivables and loans at gross carrying value.

| ($ in thousands) | 30-59 days past due | 60-89 days past due | 90 days or more past due | Total past due | Current | Total |
|---|---|---|---|---|---|---|
| **March 31, 2012** | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $30,346 | $13,857 | $170,051 | $214,254 | $165,389 | $379,643 |
| Home equity | 11,122 | 5,208 | 10,813 | 27,143 | 589,773 | 616,916 |
| Total consumer | 41,468 | 19,065 | 180,864 | 241,397 | 755,162 | 996,559 |
| Commercial | | | | | | |
| Commercial and industrial | 25,881 | — | 351 | 26,232 | — | 26,232 |
| Commercial real estate | — | — | 14,913 | 14,913 | — | 14,913 |
| Total commercial | 25,881 | — | 15,264 | 41,145 | — | 41,145 |
| Total | $67,349 | $19,065 | $196,128 | $282,542 | $755,162 | $1,037,704 |
| December 31, 2011 | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $29,730 | $14,664 | $158,255 | $202,649 | $183,869 | $386,518 |
| Home equity | 13,064 | 6,488 | 11,850 | 31,402 | 604,810 | 636,212 |
| Total consumer | 42,794 | 21,152 | 170,105 | 234,051 | 788,679 | 1,022,730 |
| Commercial | | | | | | |
| Commercial and industrial | — | — | 322 | 322 | 23,538 | 23,860 |
| Commercial real estate | — | 1,736 | 12,212 | 13,948 | 209 | 14,157 |
| Total commercial | — | 1,736 | 12,534 | 14,270 | 23,747 | 38,017 |
| Total | $42,794 | $22,888 | $182,639 | $248,321 | $812,426 | $1,060,747 |

The following table presents the gross carrying value of our finance receivables and loans in nonaccrual status.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Consumer mortgage | | |
| 1st Mortgage | **$193,981** | $199,702 |
| Home equity | **30,329** | 36,651 |
| Total consumer | **224,310** | 236,353 |
| Commercial | | |
| Commercial and industrial | **26,232** | 322 |
| Commercial real estate | **14,913** | 12,212 |
| Total commercial | **41,145** | 12,534 |
| Total | **$265,455** | $248,887 |

Management performs a quarterly analysis of its consumer and commercial finance receivable and loan portfolios using a range of credit quality indicators to assess the adequacy of the allowance based on historical and current trends. Based on our allowance methodology, our credit quality indicators for consumer mortgage loans are performing and nonperforming and for commercial mortgage finance receivables and loans are pass and criticized.

The following table presents the credit quality indicators for our consumer mortgage loan portfolio at gross carrying value.

| ($ in thousands) | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Performing | Nonperforming | Total | Performing | Nonperforming | Total |
| Consumer mortgage | | | | | | |
| 1st Mortgage | **$185,662** | **$193,981** | **$379,643** | $186,816 | $199,702 | $386,518 |
| Home equity | **586,587** | **30,329** | **616,916** | 599,561 | 36,651 | 636,212 |
| Total consumer mortgage | **$772,249** | **$224,310** | **$996,559** | $786,377 | $236,353 | $1,022,730 |

The following table presents the credit quality indicators for our commercial finance receivable and loan portfolio at gross carrying value.

| ($ in thousands) | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Pass | Criticized (a) | Total | Pass | Criticized (a) | Total |
| Commercial | | | | | | |
| Commercial and industrial | **$—** | **$26,232** | **$26,232** | $— | $23,860 | $23,860 |
| Commercial real estate | **—** | **14,913** | **14,913** | 209 | 13,948 | 14,157 |
| Total commercial | **$—** | **$41,145** | **$41,145** | $209 | $37,808 | $38,017 |

(a)  Includes loans classified as special mention, substandard, or doubtful. These classifications are based on regulatory definitions and generally represent loans in our portfolio that are of higher default risk.

**Impaired Loans and Troubled Debt Restructurings**

*Impaired Loans*

Loans are considered impaired when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement or if the loan has been modified under a troubled debt restructuring.

The following table presents information about our impaired finance receivables and loans recorded at historical cost.

| ($ in thousands) | Unpaid principal balance (a) | Carrying value before allowance | Impaired with no allowance | Impaired with an allowance | Allowance for impaired loans |
|---|---|---|---|---|---|
| **March 31, 2012** | | | | | |
| Consumer mortgage | | | | | |
| 1st Mortgage | **$409** | **$409** | **$—** | **$409** | **$103** |
| Home equity | **7,609** | **7,609** | **160** | **7,450** | **2,807** |
| Total consumer | **8,018** | **8,018** | **160** | **7,859** | **2,910** |
| Commercial | | | | | |
| Commercial and industrial | **26,232** | **26,232** | **—** | **26,232** | **11,485** |
| Commercial real estate | **14,973** | **14,913** | **1,591** | **13,322** | **5,120** |
| Total commercial | **41,205** | **41,145** | **1,591** | **39,554** | **16,605** |
| Total | **$49,223** | **$49,163** | **$1,751** | **$47,413** | **$19,515** |
| December 31, 2011 | | | | | |
| Consumer mortgage | | | | | |
| 1st Mortgage | $436 | $436 | $— | $436 | $109 |
| Home equity | 7,619 | 7,619 | 173 | 7,446 | 2,926 |
| Total consumer | 8,055 | 8,055 | 173 | 7,882 | 3,035 |
| Commercial | | | | | |
| Commercial and industrial | 322 | 322 | — | 322 | 202 |
| Commercial real estate | 12,271 | 12,212 | 1,442 | 10,770 | 4,592 |
| Total commercial | 12,593 | 12,534 | 1,442 | 11,092 | 4,794 |
| Total | $20,648 | $20,589 | $1,615 | $18,974 | $7,829 |

(a)   Unpaid principal balance represents the contractual principal balance adjusted for UPB write-downs on transfers or charge offs in accordance with our policy.

The following table presents information about our impaired finance receivables and loans excluding loans carried at fair value due to fair value option elections.

| Three months ended March 31, ($ in thousands) | 2012 | | | 2011 | | |
|---|---|---|---|---|---|---|
| | Consumer | Commercial | Total | Consumer | Commercial | Total |
| Average balance of impaired loans | **$7,999** | **$21,855** | **$29,854** | $7,395 | $102,497 | $109,892 |
| Interest income recognized on impaired loans | **$95** | **$8** | **$103** | $90 | $5,574 | $5,664 |

At March 31, 2012 and December 31, 2011, there were no commercial commitments to lend additional funds to debtors owing receivables whose terms have been modified in a troubled debt restructuring.

*Troubled Debt Restructurings*

As part of our loss mitigation efforts and participation in certain governmental programs (e.g., the Making Home Affordable Program), we may offer loan modifications to borrowers experiencing financial difficulties (TDRs). Loan modifications can include any or all of the following; principal forgiveness, maturity extensions, delinquent interest capitalization, and changes to contractual interest rates. Modifications can be either temporary or permanent. Temporary loan modifications are generally used to monitor the borrower's ability to perform under the revised terms over a specified trial period; if the borrower performs, it may become a permanent loan modification. Total TDRs recorded at historical cost and reported at gross carrying value are $35.8 million and $33.6 million at March 31, 2012 and December 31, 2011, respectively.

Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The following table presents information related to finance receivables and loans recorded at historical cost modified in connection with a troubled debt restructuring during the period.

| Three months ended March 31, 2012  *($ in thousands)* | Number of Loans | Pre-modification gross carrying value | Post-modification gross carrying value |
|---|---|---|---|
| Consumer mortgage | | | |
| 1st Mortgage | — | $— | $— |
| Home equity | 11 | 507 | 504 |
| Total consumer mortgage | 11 | $507 | $504 |

The following table presents information related to finance receivables and loans recorded at gross carrying value that redefaulted (180 days or more delinquent) on or before the one year anniversary of being modified. The charge-off amount is determined in accordance with our charge-off policy.

| Three months ended March 31, 2012  *($ in thousands)* | Number of Loans | Gross carrying value | Charge-off amount |
|---|---|---|---|
| Consumer mortgage | | | |
| 1st Mortgage | — | $— | $— |
| Home equity | 1 | 10 | 10 |
| Total consumer mortgage | 1 | $10 | $10 |

## 4. Securitizations and Variable Interest Entities

## Overview

We are involved in several types of securitization and financing transactions that utilize special–purpose entities (SPEs). A SPE is an entity that is designed to fulfill a specified limited need of the sponsor. Our principal use of SPEs is to obtain liquidity by securitizing certain of our financial assets.

The SPEs involved in securitization and other financing transactions are generally considered variable interest entities (VIEs). VIEs are entities that have either a total equity investment that is insufficient to permit the entity to finance its activities without additional subordinated financial support or whose equity investors lack the ability to control the entity's activities.

## Securitizations

We provide a wide range of consumer mortgage loan products to a diverse customer base. We often securitize these loans through the use of securitization entities, which may or may not be consolidated on our Condensed Consolidated Balance Sheet. We securitize consumer mortgage loans through either the GSEs or private–label (nonagency) securitizations. For the periods presented, our consumer mortgage loans were securitized through the GSEs.

In executing a securitization transaction, we sell pools of financial assets to a wholly owned, bankruptcy–remote SPE, which then transfers the financial assets to a separate, transaction–specific securitization entity for cash, servicing rights, and in some transactions, other retained interests. The securitization entity is funded through the issuance of beneficial interests in the securitized financial assets. The beneficial interests take the form of either notes or trust certificates that are sold to investors and/or retained by us. These beneficial interests are collateralized by the transferred loans and entitle the investors to specified cash flows generated from the securitized loans. In the aggregate, these beneficial interests have the same average life as the transferred financial assets. In addition to providing a source of liquidity and cost–efficient funding, securitizing these financial assets also reduces our credit exposure to the borrowers beyond any economic interest we may retain. We securitize conforming residential mortgage loans through GSE securitizations and we historically securitized nonconforming mortgage loans through private-label securitizations.

Each securitization is governed by various legal documents that limit and specify the activities of the securitization entity. The securitization entity is generally allowed to acquire the loans, to issue beneficial interests to investors to fund the acquisition of the loans, and to enter into derivatives or other yield maintenance contracts (e.g., coverage by monoline bond insurers) to hedge or mitigate certain risks related to the financial assets or beneficial interests of the entity. A servicer, who is generally us, is appointed pursuant to the underlying legal documents to service the assets the securitization entity holds and the beneficial interests it issues. Servicing functions include, but are not limited to, making certain payments of property taxes and insurance premiums, default and property maintenance payments, as well as advancing principal and interest payments before collecting them from individual

13

Residential Capital, LLC

borrowers. Our servicing responsibilities, which constitute continued involvement in the transferred financial assets, consist of primary servicing (i.e., servicing the underlying transferred financial assets) and/or master servicing (i.e., servicing the beneficial interests that result from the securitization transactions). Certain securitization entities also require the servicer to advance scheduled principal and interest payments due on the beneficial interests issued by the entity regardless of whether cash payments are received on the underlying transferred financial assets. Accordingly, we are required to provide these servicing advances when applicable. See Note 5 — Servicing Activities for additional information regarding our servicing rights.

The GSEs provide a guarantee of the payment of principal and interest on the beneficial interests issued in securitizations. In private-label securitizations, cash flows from the assets initially transferred into the securitization entity represent the sole source for payment of distributions on the beneficial interests issued by the securitization entity and for payments to the parties that perform services for the securitization entity, such as the servicer or the trustee. In certain private-label securitization transactions, a liquidity facility may exist to provide temporary liquidity to the entity. The liquidity provider generally is reimbursed prior to other parties in subsequent distribution periods. Monoline insurance may also exist to cover certain shortfalls to certain investors in the beneficial interests issued by the securitization entity. As noted above, in certain private-label securitizations, the servicer is required to advance scheduled principal and interest payments due on the beneficial interests regardless of whether cash payments are received on the underlying transferred financial assets. The servicer is allowed to reimburse itself for these servicing advances. Additionally, certain private-label securitization transactions may allow for the acquisition of additional loans subsequent to the initial loan transfer. Principal collections on other loans and/or the issuance of new beneficial interests, such as variable funding notes, generally fund these loans; we are often contractually required to invest in these new interests.

We may retain beneficial interests in our private-label securitizations, which may represent a form of significant continuing economic interest. These retained interests include, but are not limited to, senior or subordinate mortgage– or asset–backed securities, interest–only strips, principal–only strips, and residuals. Certain of these retained interests provide credit enhancement to the trust as they may absorb credit losses or other cash shortfalls. Additionally, the securitization agreements may require cash flows to be directed away from certain of our retained interests due to specific over–collateralization requirements, which may or may not be performance–driven.

We generally hold certain conditional repurchase options that allow us to repurchase assets from the securitization entity. The majority of the securitizations provide us, as servicer, with a call option that allows us to repurchase the remaining transferred financial assets or outstanding beneficial interests at our discretion once the asset pool reaches a predefined level, which represents the point where servicing becomes burdensome (a clean–up call option). The repurchase price is typically the par amount of the loans plus accrued interest. Additionally, we may hold other conditional repurchase options that allow us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a certain prespecified delinquency level. We have discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest.

Other than our customary representation and warranty obligations, these securitizations are nonrecourse to us, thereby transferring the risk of future credit losses to the extent the beneficial interests in the securitization entities are held by third parties. Representation and warranty provisions generally require us to repurchase loans or indemnify the investor or other party for incurred losses to the extent it is determined that the loans were ineligible or were otherwise defective at the time of sale. See Note 16 — Contingencies and Other Risks for detail on representation and warranty provisions. We did not provide any noncontractual financial support to any of these entities during the three months ended March 31, 2012 and 2011.

## Other Variable Interest Entities

*Servicer Advance Funding Entity* — To assist in the financing of our servicer advance receivables, we formed a SPE that issues term notes and variable funding notes to third–party investors that are collateralized by servicer advance receivables. These servicer advance receivables are transferred to the SPE and consist of delinquent principal and interest advances we made as servicer to various investors; property taxes and insurance premiums advanced to taxing authorities and insurance companies on behalf of borrowers; and amounts advanced for mortgages in foreclosure. The SPE funds the purchase of the receivables through financing obtained from the third–party investors and subordinated loans or an equity contribution from us. This SPE is consolidated on our balance sheet at March 31, 2012 and December 31, 2011. The beneficial interest holder of this SPE does not have legal recourse to our general credit. We do not have a contractual obligation to provide any type of financial support in the future, nor have we provided noncontractual financial support to the entity during the three months ended March 31, 2012 and 2011.

*Home Equity Funding Entity* — To assist in the financing of certain of our home equity mortgage loans, we formed a SPE that issued variable funding notes to third–party investors that are collateralized by home equity loans and revolving lines of credit. This SPE is consolidated on our balance sheet at March 31, 2012 and December 31, 2011. The beneficial interest holder of this VIE does not have legal recourse to our general credit. We do not have a contractual obligation to provide any type of financial support in the future, nor have we provided noncontractual financial support to the entity during the three months ended March 31, 2012 and 2011.

*Other* — We have involvement with other immaterial on-balance sheet VIEs. Most of these VIEs are used for additional liquidity whereby we sell certain financial assets to the VIE and issue beneficial interests to third parties for cash.

## Involvement with Variable Interest Entities

The determination of whether financial assets transferred by us to VIEs (and related liabilities) are consolidated on our balance sheet (also referred to as on–balance sheet) or not consolidated on our balance sheet (also referred to as off–balance sheet) depends on the terms of the related transaction and our continuing involvement (if any) with the SPE. We are deemed the primary beneficiary and, therefore, consolidate VIEs for which we have both (a) the power through voting rights or similar rights to direct the activities that most significantly impact the VIE's economic performance, and (b) a variable interest (or variable interests) that (i) obligates us to absorb losses that could potentially be significant to the VIE and/or (ii) provides us the right to receive residual returns of the VIE that could potentially be significant to the VIE. We determine whether we hold a significant variable interest in a VIE based on a consideration of both qualitative and quantitative factors regarding the nature, size, and form of our involvement with the VIE. We assess whether we are the primary beneficiary of a VIE on an ongoing basis.

Our involvement with consolidated and nonconsolidated VIEs in which we hold a variable interest as of March 31, 2012 and December 31, 2011, is presented below.

| ($ in thousands) | Consolidated involvement with VIEs | Assets of nonconsolidated VIEs, net (a) | Maximum exposure to loss in nonconsolidated VIEs (b) |
|---|---|---|---|
| **March 31, 2012** | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | $933,317 | $— | $— |
| Servicer Advance Funding | 960,480 | — | — |
| Home Equity Funding | 150,607 | — | — |
| Other | 2,478 | — | — |
| Off–balance sheet variable interest entities | | | |
| Ginnie Mae securitizations | 2,664,512 (c) | 43,317,031 | 43,317,031 |
| Private-label securitizations | 132,455 (d) | 4,193,506 | 4,193,506 |
| Total | $4,843,849 | $47,510,537 | $47,510,537 |
| December 31, 2011 | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | $939,159 | $— | $— |
| Servicer Advance Funding | 955,823 | — | — |
| Home Equity Funding | 156,423 | — | — |
| Other | 2,541 | — | — |
| Off–balance sheet variable interest entities | | | |
| Ginnie Mae securitizations | 2,651,939 (c) | 44,126,607 | 44,126,607 |
| Private-label securitizations | 140,709 (d) | 4,408,206 | 4,408,206 |
| Total | $4,846,594 | $48,534,813 | $48,534,813 |

(a)   Asset values represent the current UPB of outstanding consumer mortgage loans within the VIEs.

(b)   Maximum exposure to loss represents the current UPB of outstanding consumer mortgage loans based on our customary representation and warranty provisions. This measure is based on the unlikely event that all of the loans have underwriting defects or other defects that trigger a representation and warranty provision and the collateral supporting the loans are worthless. This required disclosure is not an indication of our expected loss.

(c)   Includes $411.2 million and $377.8 million classified as mortgage servicing rights and $2.3 billion and $2.3 billion of mortgage loans held–for–sale that are subject to conditional repurchase options at March 31, 2012 and December 31, 2011, respectively. The corresponding liability related to conditional repurchase option loans is recorded in other liabilities.

(d)   Includes $25.3 million and $26.5 million classified as other assets, $7.8 million and $8.4 million classified as mortgage servicing rights and $99.3 million and $105.8 million of mortgage loans held–for–sale that are subject to conditional repurchase options at March 31, 2012 and December 31, 2011, respectively. The corresponding liability related to conditional repurchase option loans is recorded in other liabilities.

## On–balance Sheet Variable Interest Entities

We engage in securitization and other financing transactions that do not qualify for off–balance sheet treatment. In these situations, we hold beneficial interests or other interests in the VIE, which represents a form of significant continuing economic interest. The interests held include, but are not limited to, senior or subordinate mortgage– or asset–backed securities, interest–only strips, principal–only strips, residuals, and servicing rights. Certain of these retained interests provide credit enhancement to the securitization entity as they may absorb credit losses or other cash shortfalls. Additionally, the securitization documents may require cash flows to be directed away from certain of our retained interests due to specific over–collateralization requirements, which may or may not be performance–driven. Because these securitization entities are consolidated, these retained interests and servicing rights are not recognized as separate assets on our Condensed Consolidated Balance Sheet.

We consolidate certain of these entities because we have a controlling financial interest in the VIE, primarily due to our servicing activities, and because we hold a significant variable interest in the VIE. We are the primary beneficiary of certain private-label securitization entities for which we perform servicing activities and have retained a significant variable interest in the form of a beneficial interest. In cases where we did not meet sale accounting under previous guidance, unless we have made modifications to the overall transaction, we do not meet sale accounting under current guidance as we are not permitted to revisit sale accounting guidelines under the current guidance. In cases where substantive modifications are made, we then reassess the transaction under the amended guidance based on the new circumstances.

Consolidated VIEs represent separate entities with which we are involved. The third–party investors in the obligations of consolidated VIEs have legal recourse only to the assets of the VIEs and do not have recourse to us, except for customary representation and warranty provisions or situations where we are the counterparty to certain derivative transactions involving the VIE. Cash flows from the assets are restricted only to pay such liabilities. Thus, our economic exposure to loss from outstanding third–party financing related to consolidated VIEs is significantly less than the carrying value of the consolidated VIE assets. All assets are restricted for the benefit of the beneficial interest holders. See Note 13 — Fair Value for discussion of the assets and liabilities for which the fair value option has been elected.

## Off-balance Sheet Variable Interest Entities

The nature, purpose, and activities of nonconsolidated securitization entities are similar to those of our consolidated securitization entities with the primary difference being the nature and extent of our continuing involvement. The cash flows from the assets of nonconsolidated securitization entities generally are the sole source of payment on the securitization entities' liabilities. The creditors of these securitization entities have no recourse to us with the exception of market customary representation and warranty provisions as described in Note 16 — Contingencies and Other Risks.

Nonconsolidated VIEs include entities for which we either do not hold significant variable interests or do not provide servicing or asset management functions for the financial assets held by the securitization entity. Additionally, to qualify for off–balance sheet treatment, transfers of financial assets must meet sale accounting conditions in ASC 860. Our residential mortgage loan securitizations consist of GSE and private-label securitizations. We are not the primary beneficiary of any GSE loan securitization transaction because we do not have the power to direct the significant activities of such entities. Additionally, we do not consolidate certain private-label securitizations because we do not have a variable interest that could potentially be significant or we do not have power to direct the activities that most significantly impact the performance of the VIE.

For nonconsolidated securitization entities, the transferred financial assets are removed from our balance sheet provided the conditions for sale accounting are met. The financial assets obtained from the securitization are primarily reported as cash, servicing rights, or retained interests (if applicable). As an accounting policy election, we elected fair value treatment for our MSR portfolio. Liabilities incurred as part of these securitization transactions, such as representation and warranty provisions, are recorded at fair value at the time of sale and are reported as other liabilities on our Condensed Consolidated Balance Sheet. Upon the sale of the loans, we recognize a gain or loss on sale for the difference between the assets recognized, the assets derecognized, and the liabilities recognized as part of the transaction.

The following summarizes the pretax gains and losses recognized on financial assets sold into nonconsolidated securitization and similar asset-backed financing entities.

| Three months ended March 31, *($ in thousands)* | 2012 | 2011 |
|---|---|---|
| Consumer mortgage — GSEs | $251,693 | ($61,504) |
| Total pretax gain (loss) | $251,693 | ($61,504) |

The following table summarizes cash flows received from and paid to securitization entities that are accounted for as a sale and in which we have a continuing involvement with the transferred assets (e.g., servicing) that were outstanding during the three months ended March 31, 2012 and 2011. This table contains information regarding cash flows received from and paid to nonconsolidated securitization entities that existed during each period.

| | Consumer mortgage | |
|---|---|---|
| *Three months ended March 31, ($ in thousands)* | GSEs | Private-Label |
| **2012** | | |
| Cash proceeds from transfers completed during the period | **$10,645,441** | **$—** |
| Cash flows received on retained interests in securitization entities | **—** | **3,747** |
| Servicing fees | **117,166** | **43,182** |
| Purchases of previously transferred financial assets | | |
| Representation and warranty obligations | **(19,005)** | **(4,038)** |
| Other repurchases | **(579,948)** | **(7,517) (a)** |
| Other cash flows | **8,596** | **23,100** |
| Total net cash flows | **$10,172,250** | **$58,474** |
| **2011** | | |
| Cash proceeds from transfers completed during the period | $15,153,060 | $— |
| Cash flows received on retained interests in securitization entities | — | 5,254 |
| Servicing fees | 103,041 | 41,720 |
| Purchases of previously transferred financial assets | | |
| Representation and warranty obligations | (43,582) | (14) |
| Other repurchases | (554,409) | — |
| Other cash flows | 67,929 | 62,014 |
| Total net cash flows | $14,726,039 | $108,974 |

(a) Includes repurchases in connection with clean up call options.

The following table represents on–balance sheet mortgage loans held–for–sale and consumer finance receivable and loans, off–balance sheet securitizations, and whole–loan sales where we have continuing involvement. The table presents information about delinquencies and net credit losses. See Note 5 — Servicing Activities for further detail on total serviced assets.

| | Total UPB | | Amount 60 days or more past due | | Net credit losses (recoveries) | |
| | | | | | Three months ended March 31, | |
| ($ in thousands) | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| On–balance sheet loans | | | | | | |
| Consumer mortgage held–for–sale | $4,678,850 (a) | $4,650,917 (a) | $3,004,991 (a) | $3,049,234 (a) | $2,374 | $7,205 (b) |
| Consumer mortgage finance receivables and loans | 2,550,117 | 2,623,763 | 440,072 | 422,017 | 26,454 | 37,634 |
| Total on–balance sheet loans | 7,228,967 | 7,274,680 | 3,445,063 | 3,471,251 | 28,828 | 44,839 |
| Off–balance sheet securitization entities | | | | | | |
| Consumer mortgage — GSEs (c) | 124,446,063 | 131,751,844 | 7,155,304 | 7,675,811 | n/m (c) | n/m (c) |
| Consumer mortgage — nonagency | 58,555,428 | 60,768,935 | 11,027,854 | 11,232,126 | 749,429 | 1,288,842 |
| Total off–balance sheet securitization entities | 183,001,491 | 192,520,779 | 18,183,158 | 18,907,937 | 749,429 | 1,288,842 |
| Whole-loan transactions (d) | 16,628,200 | 17,516,446 | 2,080,368 | 2,209,088 | 133,919 | 188,971 |
| Total | $206,858,658 | $217,311,905 | $23,708,589 | $24,588,276 | $912,176 | $1,522,652 |

n/m = not meaningful

(a) Includes loans subject to conditional repurchase options of $2.3 billion and $2.3 billion guaranteed by Ginnie Mae, and $128.9 million and $131.8 million sold to certain nonagency mortgage securitization entities at March 31, 2012 and December 31, 2011, respectively. The corresponding liability is recorded in other liabilities.
(b) We determined the amount previously disclosed related to net credit losses for the three months ended March 31, 2011, were misstated. Previously disclosed net credit losses were $37.3 million for on–balance sheet mortgage loans held for sale. These amounts were corrected in the presentation above. The misstatement had no impact on our consolidated financial conditions or results of operations.
(c) Anticipated credit losses are not meaningful due to the GSEs guarantees.
(d) Whole-loan transactions are not part of a securitization transaction, but represent pools of consumer mortgage loans sold to investors.

## 5. Servicing Activities

## Mortgage Servicing Rights

The following table summarizes our activity related to MSRs. Although there are limited market transactions that are directly observable, management estimates fair value based on the price it believes would be received to sell the MSR asset in an orderly transaction under current market conditions.

| ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Estimated fair value at January 1, | $1,233,107 | $1,991,586 |
| Additions recognized on sale of mortgage loans | 10,573 | 18,370 |
| Subtractions from sales of servicing assets | — | (139) |
| Changes in fair value | | |
| Due to changes in valuation inputs or assumptions used in the valuation model | 86,900 | 120,806 |
| Other changes in fair value | (76,083) | (84,318) |
| Estimated fair value at March 31, | $1,254,497 | $2,046,305 |

Changes in fair value due to changes in valuation inputs or assumptions used in the valuation models include all changes due to a revaluation by a model or by a benchmarking exercise. Other changes in fair value primarily include the accretion of the present value of the discount related to forecasted cash flows and the economic run-off of the portfolio.

The key economic assumptions and the sensitivity of the fair value of MSRs to immediate 10% and 20% adverse changes in those assumptions were as follows.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Weighted average life *(in years)* | 4.7 | 4.3 |
| Weighted average prepayment speed | 15.1% | 18.0% |
| Impact on fair value of 10% adverse change | $(111,808) | $(71,223) |
| Impact on fair value of 20% adverse change | (211,799) | (135,292) |
| Weighted average discount rate | 10.8% | 9.5% |
| Impact on fair value of 10% adverse change | $(24,107) | $(25,396) |
| Impact on fair value of 20% adverse change | (46,384) | (48,913) |

These sensitivities are hypothetical and should be considered with caution. Changes in fair value based on a 10% and 20% variation in assumptions generally cannot be extrapolated because the relationship of the change in assumptions to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value is calculated without changing any other assumption. In reality, changes in one factor may result in changes in another (e.g., increased market interest rates may result in lower prepayments and increased credit losses) that could magnify or counteract the sensitivities. Further, these sensitivities show only the change in the asset balances and do not show any expected change in the fair value of the instruments used to manage the interest rate and prepayment risks associated with these assets. Refer to Note 1– Description of Business and Significant Accounting Policies, in our 2011 Annual Report for additional information regarding our significant assumptions and valuation techniques used in the valuation of mortgage servicing rights.

**Risk–mitigation Activities**

The primary economic risk related to our MSR is interest rate risk and the resulting impact on prepayment speeds. A significant decline in interest rates could lead to higher than expected prepayments that could reduce the value of the MSRs. We economically hedge the impact of this risk with both derivative and nonderivative financial instruments. These instruments include interest rate swaps, caps and floors, options to purchase these items, futures and forward contracts, constant monthly maturity (index trades), synthetic interest only and principal only securities and/or to–be–announced (TBAs) securities. The net fair value of derivative financial instruments used to mitigate this risk was $(339.5) million and $(199.8) million at March 31, 2012 and December 31, 2011, respectively. See Note 14 — Derivative Instruments and Hedging Activities for additional information.

The components of servicing valuation and hedge activities, net, were as follows.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Change in estimated fair value of mortgage servicing rights | $10,817 | $36,488 |
| Change in fair value of derivative financial instruments | 104,499 | 12,423 |
| Servicing valuation and hedge activities, net | $115,316 | $48,911 |

**Mortgage Servicing Fees**

The components of servicing fees were as follows.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Contractual servicing fees (net of guarantee fees and including sub-servicing) | $140,375 | $167,384 |
| Late fees | 16,806 | 18,991 |
| Ancillary fees | 31,760 | 31,289 |
| Total | $188,941 | $217,664 |

19

**Mortgage Servicer Advances**

In connection with our primary servicing activities (i.e., servicing of mortgage loans), we make certain payments for property taxes and insurance premiums, default and property maintenance payments, as well as advances of principal and interest payments before collecting them from individual borrowers. Servicer advances, including contractual interest are priority cash flows in the event of a loan principal reduction or foreclosure and ultimate liquidation of the real estate–owned property, thus making their collection reasonably assured. These servicer advances are included in accounts receivable and totaled $1.8 billion and $1.8 billion at March 31, 2012 and December 31, 2011, respectively. We maintain an allowance for uncollectible primary servicer advances, which totaled $42.5 million and $42.5 million at March 31, 2012 and December 31, 2011, respectively. Our potential advance obligation is influenced by a borrower's performance and credit quality.

We advance funds for various activities related to the foreclosure process principally related to attorney fees and costs, appraisals, escrow, insurance and property preservation, in the event we, or the investor, determine foreclosure is the most appropriate loss mitigation strategy. In the current environment, many states and local jurisdictions are requiring us to alter our processes in connection with foreclosures and in some circumstances this can result in restarting the foreclosure process entirely or repeating certain of the required steps (foreclosure restarts). To the extent we restart the process, in whole or in part, we will not be reimbursed for advances in connection with the original activities. The circumstances and extent of any foreclosure restart are specific and unique to each state and/or local jurisdiction. At March 31, 2012, we had an allowance for uncollectible advances in connection with estimated foreclosure restarts of $10.4 million.

At March 31, 2012 and December 31, 2011 we had an allowance for uncollectible primary servicer advances of $7.5 million, respectively, related to expected loan modification activities. See Note 16 — Contingencies and Other Risks for additional information. To the extent amounts had been advanced for loans that are expected to be modified in connection with our Settlement, these amounts will not be collected. The amount of this allowance is management's best estimate given the anticipated modification activity.

When we act as a subservicer of mortgage loans we perform the responsibilities of a primary servicer but do not own the corresponding primary servicing rights. We receive a fee from the primary servicer for such services. As the subservicer, we would have the same responsibilities of a primary servicer in that we would make certain payments of property taxes and insurance premiums, default and property maintenance, as well as advances of principal and interest payments before collecting them from individual borrowers. As of March 31, 2012 and December 31, 2011, outstanding servicer advances related to subserviced loans were $127.1 million and $124.9 million and we had a reserve for uncollectible subservicer advances of $1.0 million and $1.1 million, respectively.

In many cases where we act as master servicer we also act as primary servicer. In connection with our master servicing activities, we service the mortgage–backed and mortgage–related asset–backed securities and whole–loan packages sold to investors. As the master servicer, we collect mortgage loan payments from primary servicers and distribute those funds to investors in mortgage–backed and asset–backed securities and whole–loan packages. As the master servicer, we are required to advance scheduled payments to the securitization trust or whole–loan investors. To the extent the primary servicer does not advance the payments, we are responsible for advancing the payment to the trust or whole–loan investors. Master servicer advances, including contractual interest, are priority cash flows in the event of a default, thus making their collection reasonably assured. In most cases, we are required to advance these payments to the point of liquidation of the loan or reimbursement of the trust or whole–loan investors. We had outstanding master servicer advances of $189.9 million and $158.2 million as of March 31, 2012 and December 31, 2011, respectively. We had no reserve for uncollectible master servicer advances at March 31, 2012 and December 31, 2011.

**Serviced Mortgage Assets**

In many cases, we act as both the primary and master servicer. However, in certain cases, we also service loans that have been purchased and subsequently sold through a securitization trust or whole–loan sale whereby the originator retained the primary servicing rights and we retained the master servicing rights.

The unpaid principal balance of total serviced mortgage assets was as follows.

| ($ in millions) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| On–balance sheet mortgage loans (a) | | |
| Held–for–sale and investment | **$7,018** | $6,828 |
| Off–balance sheet mortgage loans | | |
| Loans held by third–party investors | | |
| Consumer mortgage private-label | **48,514** | 50,886 |
| Consumer mortgage agency | **124,339** | 131,635 |
| Consumer mortgage whole-loan portfolios | **14,484** | 15,104 |
| Purchased servicing rights (b) | **3,089** | 3,247 |
| Total primary serviced mortgage loans | **197,444** | 207,700 |
| Subserviced mortgage loans (c) | **169,223** | 169,531 |
| Master servicing only mortgage loans | **8,225** | 8,557 |
| Total serviced mortgage loans | **$374,892** | $385,788 |

(a) Includes on–balance sheet securitization consumer finance receivables and loans. See Note 3 — Finance Receivables and Loans, net, for additional information.

(b) There is no recourse to us outside of customary contractual provisions relating to the execution of the services we provide.

(c) Includes loans where we act as a subservicer under contractual agreements with the primary servicer. As subservicer, there is no recourse to us outside of customary contractual provisions relating to the execution of the services we provide, except for loans subserviced on behalf of Ally Bank. See Note 17 — Related Party Transactions for additional information.

The following table sets forth information concerning the delinquency experience in our domestic consumer mortgage loan primary servicing portfolio, including pending foreclosures.

| | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| ($ in millions) | Number of loans | Unpaid principal balance | Number of loans | Unpaid principal balance |
| Total U.S. mortgage loans primary serviced | **1,517,358** | **$197,171** | 1,587,113 | $207,380 |
| Period of delinquency | | | | |
| 30 to 59 days | **53,549** | **$7,559** | 67,239 | $9,289 |
| 60 to 89 days | **19,427** | **3,024** | 25,138 | 3,695 |
| 90 days or more | **25,521** | **4,310** | 27,570 | 4,467 |
| Foreclosures pending | **67,843** | **12,947** | 68,166 | 13,018 |
| Bankruptcies | **33,807** | **4,758** | 34,956 | 4,869 |
| Total delinquent loans | **200,147** | **$32,598** | 223,069 | $35,338 |
| Percent of U.S. mortgage loans primary serviced | **13.2%** | **16.5%** | 14.1% | 17.0% |

Certain of our subsidiaries which conduct our primary and master servicing activities are required to maintain certain servicer ratings in accordance with master agreements entered into with a GSE. At March 31, 2012, we are in compliance with the servicer rating requirements of the master agreements.

We are also required to maintain consolidated tangible net worth, as defined, of $250.0 million, under our agreements with a GSE. In the event of default, the GSE could require posting collateral in an amount based on repurchase demands outstanding plus recourse obligations; termination or suspension of our selling and servicing contract; require additional or more frequent financial and operational reporting; limit early funding programs or trading desk transactions; accelerate rebuttal time periods for outstanding repurchase demands; or take other actions permitted by law. Should we or our subsidiaries fail to remain in compliance with these requirements and as a result should our mortgage selling and servicing contract be terminated, cross default provisions within certain credit and bilateral facilities could be triggered. At March 31, 2012, we had consolidated tangible net worth of $399.3 million in compliance with our contractual covenant.

21

At March 31, 2012, domestic insured private-label securitizations with an unpaid principal balance of $5.4 billion contain provisions entitling the monoline or other provider of contractual credit support (surety providers) to declare a servicer default and terminate the servicer upon the failure of the loans to meet certain portfolio delinquency and/or cumulative loss thresholds. Securitizations with an unpaid principal balance of $4.8 billion had breached a delinquency and/or cumulative loss threshold. While we continue to service these loans and receive service fee income with respect to these securitizations, the value of the related MSR is zero at March 31, 2012. Securitizations with an unpaid principal balance of $574.0 million have not yet breached a delinquency or cumulative loss threshold. The value of the related MSR is $4.0 million at March 31, 2012.

## 6. Accounts Receivable, Net

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Servicer advances, net (a) | $2,050,651 | $2,045,446 |
| Loan insurance guarantee receivable, net (b) | 874,985 | 745,396 |
| Servicing fees receivable | 87,402 | 87,208 |
| Due from brokers for derivative trades | 54,294 | 94,024 |
| Accrued interest receivable | 36,883 | 37,962 |
| Other | 53,041 | 41,712 |
| Total accounts receivable, net | $3,157,256 | $3,051,748 |

(a)   The allowance for uncollectible servicer advances was $43.5 million and $43.7 million at March 31, 2012 and December 31, 2011, respectively.

(b)   Represents mortgage loans in foreclosure for which a guarantee from Ginnie Mae exists, net of a reserve for uncollectible guaranteed receivables of $28.0 million and $21.8 million at March 31, 2012 and December 31, 2011, respectively.

## 7. Other Assets

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Property and equipment at cost | $255,750 | $252,890 |
| Accumulated depreciation and amortization | (212,771) | (207,645) |
| Net property and equipment | 42,979 | 45,245 |
| Fair value of derivative contracts in receivable position | 3,621,448 | 4,877,197 |
| Collateral placed with derivative counterparties | 1,110,251 | 1,095,287 |
| Restricted cash | 397,494 | 448,819 |
| Foreclosed assets | 63,987 | 71,485 |
| Receivables from Ally Bank | 37,045 | — |
| Trading securities | 32,302 | 33,303 |
| Interests retained in financial asset sales | — | 23,102 |
| Income taxes receivable | — | 5,111 |
| Other | 25,866 | 28,603 |
| Total other assets | $5,331,372 | $6,628,152 |

## 8. Borrowings

Borrowings were as follows.

| ($ in thousands) | Weighted average end of period interest rates | | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | Unsecured | Secured | Total | Unsecured | Secured | Total |
| Short-term borrowings | | | | | | | | |
| Borrowings from parent | 3.0% | 3.0% | $— | $410,000 | $410,000 | $— | $183,595 | $183,595 |
| Borrowings from affiliate | 5.0% | 5.1% | — | 250,000 | 250,000 | — | 250,000 | 250,000 |
| Other short-term borrowings | 6.3% | 6.3% | — | 158,000 | 158,000 | — | 323,000 | 323,000 |
| Total short-term borrowings | 4.3% | 5.1% | — | 818,000 | 818,000 | — | 756,595 | 756,595 |
| Long-term borrowings | | | | | | | | |
| Borrowings from parent | 3.0% | 3.0% | — | 749,873 | 749,873 | — | 755,769 | 755,769 |
| Collateralized borrowings in securitization trusts (a) | 4.6% | 4.7% | — | 828,418 | 828,418 | — | 830,318 | 830,318 |
| Other long-term borrowings | 8.2% | 8.0% | 1,112,587 | 3,198,189 | 4,310,776 | 1,096,789 | 3,285,615 | 4,382,404 |
| Total long-term borrowings | 7.0% | 6.9% | 1,112,587 | 4,776,480 | 5,889,067 | 1,096,789 | 4,871,702 | 5,968,491 |
| Total borrowings | 6.7% | 6.7% | $1,112,587 | $5,594,480 | $6,707,067 | $1,096,789 | $5,628,297 | $6,725,086 |

(a)  Collateralized borrowings with an outstanding balance of $2.5 billion and $2.6 billion were recorded at fair value of $828.4 million and $829.9 million as of March 31, 2012 and December 31, 2011, respectively.  See Note 13 — Fair Value for additional information.

The following table summarizes the maturity profile of our borrowings by type.  Amounts represent the scheduled maturity of debt, assuming no early redemptions occur.  For sources of borrowings without a stated maturity date (as is the case with uncommitted agreements), the maturities are assumed to occur within 2012.

| ($ in millions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 and thereafter | Total |
|---|---|---|---|---|---|---|---|
| Secured borrowings | | | | | | | |
| Borrowings from parent | $1,159.9 | $— | $— | $— | $— | $— | $1,159.9 |
| Borrowings from affiliate | 250.0 | — | — | — | — | — | 250.0 |
| Collateralized borrowings in securitization trusts (a) | — | — | — | — | — | 828.4 | 828.4 |
| Other secured borrowings | 239.7 | 789.3 | 805.1 | 719.3 | — | 802.8 | 3,356.2 |
| Total secured borrowings | 1,649.6 | 789.3 | 805.1 | 719.3 | — | 1,631.2 | 5,594.5 |
| Unsecured borrowings | 351.6 | 537.3 | 109.5 | 114.2 | — | — | 1,112.6 |
| Total borrowings | $2,001.2 | $1,326.6 | $914.6 | $833.5 | $— | $1,631.2 | $6,707.1 |

(a)  The principal on the debt securities is paid using cash flows from underlying collateral (mortgage loans).  Accordingly, the timing of the principal payments on these debt securities is dependent on the payments received, and as such, we elected to represent the full term of the securities in the 2017 and thereafter time frame.

We did not make a $20.1 million semi-annual interest payment that was due on April 17, 2012, related to $473.4 million outstanding senior unsecured notes maturing in June 2013. The indenture provides that a failure to pay interest on an interest payment date does not become an event of default unless such failure continues for a period of 30 days.

23

The most restrictive financial covenants in our credit facilities require us to maintain consolidated tangible net worth of $250.0 million as of the end of each month, consolidated liquidity of $250.0 million daily, and unrestricted liquidity of $250.0 million daily. For these purposes, consolidated tangible net worth is defined as our consolidated equity excluding intangible assets. Unrestricted liquidity is defined as certain unrestricted and unencumbered cash balances in U.S. dollars and cash equivalents on a consolidated basis. We view unrestricted liquidity as cash readily available to cover operating demands across our business operations. These financial covenants are included in certain of our bilateral facilities. Should we fail to remain in compliance with these requirements, remedies include but are not limited to, at the option of the facility provider, termination of further funding, acceleration of outstanding obligations, rights to realize against the assets securing or otherwise supporting the facility, and other legal remedies. Our liquidity providers can waive their contractual rights in the event of a default.

We are required to maintain consolidated tangible net worth, as defined, of $250.0 million, under our agreements with a GSE. In the event of default, the GSE could require posting collateral in an amount based on repurchase demands outstanding plus recourse obligations; termination or suspension of our selling and servicing contract; require additional or more frequent financial and operational reporting; limit early funding programs or trading desk transactions; accelerate rebuttal time periods for outstanding repurchase demands; or take other actions permitted by law. We and certain of our subsidiaries are also required to maintain certain servicer ratings. Should we or our subsidiaries fail to remain in compliance with these requirements and as a result should our mortgage selling and servicing contract be terminated, cross default provisions within certain credit and bilateral facilities could be triggered.

At March 31, 2012, our consolidated tangible net worth, as defined, was $399.3 million, in compliance with all of our consolidated tangible net worth covenants. In addition we are in compliance with our consolidated and unrestricted liquidity requirements and required servicer ratings as of March 31, 2012. Refer to Note 1 – Description of Business, Basis of Presentation and Changes in Significant Accounting Policies for additional information.

The following table summarizes the outstanding, unused, and total capacity of our funding facilities at March 31, 2012. We use both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not legally obligated to advance funds under them.

| March 31, 2012   *($ in thousands)* | Outstanding | Unused capacity | Total capacity |
|---|---|---|---|
| Facilities with parent | | | |
|   Ally Inc. Senior Secured Credit Facility | $749,873 | $— | $749,873 |
|   Ally Inc. LOC | 410,000 | 1,190,000 | 1,600,000 |
| Total facilities with parent | 1,159,873 | 1,190,000 | 2,349,873 |
| Facilities with affiliate | | | |
|   Secured financing agreement - BMMZ | 250,000 | — | 250,000 |
| Secured funding facilities - committed | | | |
|   Mortgage servicing rights facility | 158,000 | — | 158,000 |
|   Servicer advance funding facilities | 727,838 | 197,162 | 925,000 |
|   Home equity funding facility | 127,294 | — | 127,294 |
|   Other funding facilities | — | 11,000 | 11,000 |
|   Total committed | 1,263,132 | 208,162 | 1,471,294 |
| Total funding facilities | $2,423,005 | $1,398,162 | $3,821,167 |

## Facilities with Parent and Affiliates

### Ally Inc. Senior Secured Credit Facility

On April 10, 2012, this facility was amended and the maturity date was extended to May 14, 2012. The borrowers, RFC and GMAC Mortgage (collectively, the Borrowers), no longer have the ability to request revolving loans under the facility. The facility is secured by certain domestic whole loans, accounts receivable, notes receivable, securities, and equity investments of the Borrowers. The facility contains limitations on the use of proceeds from sales of pledged collateral with any such proceeds required to be paid to Ally Inc. to reduce the balance outstanding.

### Ally Inc. Line of Credit (LOC)

At March 31, 2012, the maximum capacity of the LOC was $1.6 billion, comprised of $1.1 billion of secured capacity and $500.0 million of unsecured capacity. On April 10, 2012, this facility was amended, extending the maturity date to May 14, 2012 and the $500.0 million of unsecured capacity was terminated. Certain domestic whole loans, accounts receivable, notes receivable, mortgage servicing rights, securities, and equity investments of the Borrowers secure draws under the LOC, which are available to

the extent there is sufficient collateral securing the draw. Draws under the LOC are available only if certain unrestricted and unencumbered balances in U.S. dollars and cash equivalents of us and our subsidiaries are less than $300.0 million. The available amount and the borrowing base of the LOC will both be reduced by the amount of any collateral posted or delivered by Ally IM to the Borrowers or us pursuant to certain derivative transaction agreements with Ally IM. The obligations under the LOC and the Ally IM Derivative Agreements are cross-collateralized for the benefit of Ally Inc.

### BMMZ Holdings, LLC Secured Financing Agreement (BMMZ Repo)

BMMZ Holdings LLC (BMMZ) is a wholly owned subsidiary of Ally Inc. The aggregate facility amount is $250.0 million. The secured financing agreement is collateralized by domestic mortgage loan assets. The maturity date is the earlier of the maturity date of the LOC or December 19, 2012.

## Secured Funding Facilities

### Mortgage Servicing Rights Facility

On March 31, 2012, the facility was amended such that no additional draws can be made after that date, effectively reducing the maximum capacity to $158.0 million. The facility maturity date was amended to the earlier of two days prior to the maturity of the Ally Inc. LOC or May 30, 2012.

### Servicer Advance Funding Facilities

At March 30, 2012, the secured facility to fund mortgage servicer advances had total capacity of $800.0 million, consisting of an $800.0 million variable funding note which will begin amortizing on March 12, 2013 and has a stated final maturity of March 12, 2020. On March 13, 2012, the facility was amended whereby the new variable funding note was issued with the proceeds being used to pay down the then outstanding variable funding and term notes.

A second secured facility to fund mortgage servicer advances has capacity of $125.0 million. On August 1, 2012, the scheduled revolving period will end, after which date no new advances will be funded and the 18–month repayment period will begin. Termination will occur upon the earlier of the end of the repayment period or the date the outstanding loan amount is paid in full.

### Home Equity Funding Facility

The secured facility to fund home equity mortgage loans consisted of $127.3 million in variable funding notes due to mature on February 25, 2031.

## Collateralized Borrowings in Securitization Trusts

We previously sold pools of consumer mortgage loans through private-label securitization transactions. The purpose of these securitizations was to provide permanent funding and exit for these assets. Certain of these securitizations were accounted for as secured borrowings, and therefore, the debt is reflected on our Condensed Consolidated Balance Sheet.

## Other Borrowings

### Junior Secured Notes

The outstanding balance of the Junior Secured Notes at March 31, 2012, was $2.1 billion with a final maturity on May 15, 2015. The unamortized balance of deferred concession recognized as a result of our 2008 exchange offer was $220.2 million. The deferred concession is being amortized over the life of the secured notes using the effective yield method. For the three months ended March 31, 2012 and 2011, $25.9 million and $24.9 million, respectively, of deferred concession was amortized into earnings as a reduction of interest expense.

GMAC Mortgage, its immediate parent, GMAC Residential Holding Company, LLC (Res Holdings), RFC, its immediate parent, GMAC-RFC Holding Company, LLC (RFC Holdings), and Homecomings Financial, LLC (Homecomings), a wholly owned subsidiary of RFC, are all guarantors with respect to the junior secured notes.

Upon repayment in full of the Ally Inc. Senior Secured Credit Facility, net cash proceeds from sales of assets that were previously pledged as collateral to the Ally Inc. Senior Secured Credit Facility may be used to repurchase, optionally redeem or optionally prepay the junior secured notes. In the event net cash proceeds are not used to repurchase or optionally redeem or prepay the junior secured notes, or to reinvest in permissible collateral with a fair value substantially equivalent to the net cash proceeds (collectively, the Reinvested Proceeds), under certain circumstances, we may be required to make an offer to all holders of the junior secured notes to purchase notes in an amount equal to the excess of the net cash proceeds over the Reinvested Proceeds.

**Unsecured Notes**

As of March 31, 2012, unsecured notes include $673.3 million of U.S. dollar-denominated senior notes maturing between June 2012 and June 2015, $131.2 million euro-denominated notes maturing in May 2012 and $167.7 million U.K. sterling-denominated notes maturing between May 2013 and July 2014. We hedge a portion of the interest rate risk associated with our fixed-rate euro and U.K. sterling notes. As of March 31, 2012, we had interest rate swap agreements in place with notional amounts of $147.2 million and $103.9 million for our euro and U.K sterling denominated notes, respectively.

We did not make a $20.1 million semi-annual interest payment that was due on April 17, 2012, related to $473.4 million outstanding senior unsecured notes maturing in June 2013. The indenture provides that a failure to pay interest on an interest payment date does not become an event of default unless such failure continues for a period of 30 days.

**Medium-term Unsecured Notes**

Represents $140.4 million of peso-denominated notes issued by our wholly owned subsidiary GMAC Financiera S.A de C.V., SOFOM, ENR (GMAC Financiera) that mature in June 2012. ResCap, GMAC Mortgage, Res Holdings, RFC, RFC Holdings, and Homecomings are guarantors of the medium-term unsecured notes.

**Collateral for Secured Debt**

The following table summarizes the carrying value of assets that are restricted, pledged, or for which a security interest has been granted as collateral for the payment of certain debt obligations.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Cash and cash equivalents | **$85,628** | $82,389 |
| Mortgage loans held–for–sale | **1,610,350** | 1,688,037 |
| Finance receivables and loans, net | | |
| Consumer | **979,137** | 1,005,982 |
| Commercial | **4,205** | 4,226 |
| Total finance receivables and loans, net | **983,342** | 1,010,208 |
| Mortgage servicing rights | **843,299** | 855,343 |
| Accounts receivable, net | **2,481,190** | 2,404,231 |
| Other assets | **77,676** | 81,960 |
| Total assets restricted as collateral | **$6,081,485** | $6,122,168 |
| Related secured debt | **$5,594,480** | $5,628,297 |

A portion of the assets included in the table above represent assets of subsidiaries whose equity has been pledged to secure the Ally Inc. Senior Secured Credit Facility and the Ally Inc. LOC. At March 31, 2012, there were $3.0 million of equity interests of these subsidiaries pledged to the Ally Inc. Senior Secured Credit Facility. We have also provided a lien on certain of our consolidated assets, as specified in the Ally Inc. Senior Secured Credit Facility agreements, for the benefit of the Ally Inc. Senior Secured Credit Facility and the Junior Secured Notes. Included in the table above is $1.9 billion and $2.0 billion at March 31, 2012 and December 31, 2011, respectively, of collateral pledged that can be re–hypothecated or re–pledged by the secured party.

The following table summarizes the carrying value of assets pledged and the amount of related debt outstanding by our secured borrowing types.

| ($ in thousands) | March 31, 2012 | | December 31, 2011 | |
| --- | --- | --- | --- | --- |
| | Total assets restricted as collateral | Related secured debt | Total assets restricted as collateral | Related secured debt |
| Borrowings from parent and affiliate | | | | |
| Ally Inc. Senior Secured Credit facility | $1,326,032 | $749,873 | $1,340,954 | $755,769 |
| Ally Inc. LOC | 1,553,328 | 410,000 | 1,582,033 | 183,595 |
| BMMZ Repo | 377,645 | 250,000 | 401,118 | 250,000 |
| Collateralized borrowings in securitization trusts | 912,434 | 828,418 | 918,232 | 830,318 |
| Other secured borrowings | | | | |
| Junior Secured Notes (a) | — | 2,340,680 | — | 2,366,600 |
| Mortgage servicing rights facility | 675,544 | 158,000 | 634,345 | 323,000 |
| Servicer advance funding facilities | 1,083,408 | 727,838 | 1,086,011 | 780,385 |
| Home equity funding facility | 147,042 | 127,294 | 153,191 | 135,800 |
| Other secured facility | 6,052 | 2,377 | 6,284 | 2,830 |
| Total | $6,081,485 | $5,594,480 | $6,122,168 | $5,628,297 |

(a)    The Junior Secured Notes are secured by the same collateral that secures the Ally Inc. Senior Secured Credit facility.

## 9. Other Liabilities

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
| --- | --- | --- |
| Fair value of derivative instruments | $3,928,437 | $5,113,531 |
| Liability for option to repurchase assets (a) | 2,359,323 | 2,386,734 |
| Liability for representation and warranty obligations | 810,805 | 824,776 |
| Collateral received from derivative counterparties | 604,836 | 656,109 |
| Accounts payable | 317,493 | 360,726 |
| Interest payable | 126,803 | 62,225 |
| Reserve for legal proceedings | 99,646 | 94,516 |
| Mortgage foreclosure settlement | 92,061 | 204,000 |
| Reserve for insurance losses | 86,716 | 91,615 |
| Employee compensation and benefits | 67,966 | 87,542 |
| Liability for assets sold with recourse | 32,592 | 32,156 |
| Ally Inc. management fee (b) | 14,878 | 31,020 |
| Income taxes | 3,899 | — |
| Restructuring reserve | 1,901 | 4,342 |
| Payable to Ally Bank | — | 21,001 |
| Other | 21,805 | 25,733 |
| Total other liabilities | $8,569,161 | $9,996,026 |

(a)    We recognize a liability for the conditional repurchase option on certain assets held by off-balance sheet securitization trusts. The corresponding asset is recorded in mortgage loans held for sale. See Note 2 — Mortgage Loans Held–for–Sale and Note 4 — Securitizations and Variable Interest Entities for additional information.

(b)    Includes costs for personnel, information technology, communications, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to us. See Note 17 — Related Party Transactions for additional information.

## 10. Other Revenue, net

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Change due to fair value option elections | | |
|   Consumer mortgage finance receivables and loans, net | **$36,037** | $19,246 |
|   Collateralized borrowings | **(52,127)** | (36,148) |
| Loan broker fee from Ally Bank | **23,343** | 9,496 |
| Insurance income | **4,343** | 6,357 |
| Gain on interests retained in financial assets sales | **—** | 3,430 |
| Other | **8,436** | 3,650 |
| Total other revenue, net | **$20,032** | $6,031 |

## 11. Other Noninterest Expense, net

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Ally Inc. management fees (a) | **$29,053** | $16,915 |
| Legal fees | **23,473** | 10,191 |
| Loan administration fees | **22,928** | 18,244 |
| Equipment and supplies | **6,868** | 8,126 |
| Insurance losses | **4,126** | 12,577 |
| Other | **13,056** | 16,048 |
| Total other noninterest expense, net | **$99,504** | $82,101 |

(a)   Includes allocated costs for personnel, information technology, communication, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to us. See Note 17 — Related Party Transactions for additional information.

## 12. Income Tax

We are a division of Ally Inc, a corporation, for income tax purposes. We are subject to corporate U.S. Federal, state and local taxes and are included in the consolidated Ally Inc. U.S Federal and unitary and/or consolidated state income tax returns. We provide for our U.S. Federal and state taxes on a stand alone basis, which is consistent with the applicable tax sharing agreements with direct and indirect parent companies up through Ally Inc. The tax sharing agreement requires taxes to be based on the income tax liability determined as if we were a separate affiliated group of corporations filing consolidated U.S. Federal and state income tax returns. Our foreign businesses have been and continue to operate as corporations and are subject to, and provide for, U.S. Federal, state, and/or foreign income tax.

At March 31, 2012 and December 31, 2011 we have current income taxes payable of $11.1 million and $(1.7) million, respectively, to Ally Inc. pursuant to the tax sharing agreements.

We continue to be in a net deferred tax asset position, which is fully offset by a deferred tax asset valuation allowance. The net deferred tax asset includes a significant tax net operating loss carryforward. Thus, the year to date tax expense has been largely offset by the decrease of the applicable deferred tax asset valuation allowance. Tax expense from continuing operations of $5.9 million and $8.9 million for the three months ended March 31, 2012 and 2011 relates primarily to certain taxes that are not eligible for offset by U.S. net operating losses, including those on foreign income.

Gross unrecognized tax benefits totaled $7.6 million and $11.7 million at March 31, 2012 and 2011. The amount of unrecognized tax benefits that, if recognized, would affect our effective tax rate at March 31, 2012 and 2011 is approximately $5.3 million and $9.4 million, respectively. Related interest and penalties accrued for uncertain income tax positions are recorded in interest expense and other operating expenses, respectively. As of March 31, 2012 and 2011, we had approximately $2.3 million and $2.3 million, respectively, accrued for the payment of interest and penalties. We are generally no longer subject to U.S. federal, state, local, or foreign income tax examinations by tax authorities for years before 2007. A significant change in the unrecognized tax benefits is not expected within the next 12 months.

## 13. Fair Value

## Fair Value Measurements

Fair value is defined as the exchange price that would be received to sell an asset or paid to transfer a liability (exit price) in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. Fair value is based on the assumptions market participants would use when pricing an asset or liability. Additionally, entities are required to consider all aspects of nonperformance risk, including the entity's own credit standing, when measuring the fair value of a liability.

A three–level hierarchy is used when measuring and disclosing fair value. The fair value hierarchy gives the highest priority to quoted prices available in active markets (i.e., observable inputs) and the lowest priority to data lacking transparency (i.e., unobservable inputs). An instrument's categorization within the fair value hierarchy is based on the lowest level of significant input to its valuation. The following is a description of the three hierarchy levels.

| Level 1 | Inputs are quoted prices in active markets for identical assets or liabilities at the measurement date. Additionally, we must have the ability to access the active market, and the quoted prices cannot be adjusted by us. |
| --- | --- |
| Level 2 | Inputs are other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices in active markets for similar assets or liabilities; quoted prices in inactive markets for identical or similar assets or liabilities; or inputs that are observable or can be corroborated by observable market data by correlation or other means for substantially the full term of the assets or liabilities. |
| Level 3 | Unobservable inputs are supported by little or no market activity. The unobservable inputs represent management's best assumptions of how market participants would price the assets or liabilities. Generally, Level 3 assets and liabilities are valued using pricing models, discounted cash flow methodologies, or similar techniques that require significant judgment or estimation. |
| Transfers | Transfers into or out of any hierarchy level are recognized at the end of the reporting period in which the transfer occurred. There were no material transfers between any levels during the three months ended March 31, 2012. |

Following are descriptions of the valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models and significant assumptions utilized.

- *Mortgage loans held–for–sale* – We originate and purchase residential mortgage loans that we intend to sell to the GSEs. We also own nonagency eligible residential mortgage loans that were originated or purchased in prior years. Consumer mortgage loans we intend to sell to the GSEs are carried at fair value as a result of a fair value election. Our nonagency eligible residential mortgage loans are accounted for at the lower of cost or fair value. We elected to fair value nongovernment eligible mortgage loans held–for–sale subject to conditional repurchase options recognized on or after January 1, 2011. Only those non-fair value elected loans that are currently being carried at fair value are included within our nonrecurring fair value measurement tables. Mortgage loans held–for–sale account for 9.7% of all recurring and nonrecurring assets reported at fair value at March 31, 2012.

  Mortgage loans held–for–sale are typically pooled together and sold into certain exit markets, depending upon underlying attributes of the loan, such as agency eligibility, product type, interest rate, and credit quality. Two valuation methodologies are used to determine the fair value of mortgage loans held–for–sale. The methodology used depends on the exit market as described below.

  *Loans valued using observable market prices for identical or similar assets (a Level 2 fair value)* - Includes all agency–eligible mortgage loans carried at fair value due to fair value option election, which are valued predominantly using published forward agency prices. Also includes any domestic loans and foreign loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available. As of March 31, 2012, we classified 34.3% of our mortgage loans held–for–sale that are being carried at fair value on a recurring basis as Level 2.

  *Loans valued using internal models (a Level 3 fair value)* - Includes all conditional repurchase option loans carried at fair value due to the fair value option election and all nonagency eligible residential mortgage loans that are accounted for at the lower of cost or fair value. The fair value of these residential mortgage loans are determined using internally developed valuation models because observable market prices were not available. The loans are priced on a discounted cash flow basis utilizing cash flow projections from internally developed models that utilize prepayment, default, and discount rate assumptions. To the extent available, we utilize market observable inputs

29

such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates. While numerous controls exist to calibrate, corroborate, and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's fair value. As of March 31, 2012, 100.0% of our mortgage loans held–for–sale that are currently being carried at fair value on a nonrecurring basis and 65.7% of our mortgage loans held-for-sale that are carried at fair value on a recurring basis are classified as Level 3.

- **Consumer Finance receivables and loans, net** — We elected the fair value option for consumer mortgage finance receivables and loans related to our on–balance sheet securitizations. A complete description of these securitizations is provided in the *On-balance sheet securitization debt* section later in this Note. The remaining balance of our consumer finance receivables and loans are reported on the balance sheet at their principal amount outstanding, net of charge-offs, allowance for loan losses, and net premiums/discounts.

  For the securitization trusts for which we elected fair value option, the loans are measured at fair value using a portfolio approach. The values for loans held on an in-use basis may differ considerably from loans held–for–sale that can be sold in the whole-loan market. This difference arises primarily due to the liquidity of the ABS/MBS market and is evident in the fact that spreads applied to lower rated ABS/MBS are considerably wider than spreads observed on senior bond classes and in the whole-loan market. The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations. As of March 31, 2012, we classified 100.0% of our fair value elected consumer mortgage finance receivables and loans as Level 3. These loans account for 12.9% of all recurring and nonrecurring assets reported at fair value at March 31, 2012.

- **Mortgage servicing rights** — MSRs currently do not trade in an active market with observable prices, therefore we use internally developed discounted cash flow models to estimate the fair value of MSRs. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that management believes approximate yields required by investors in this asset. Cash flows primarily include servicing fees, float income, and late fees, in each case less estimated operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread derived discount rate. At March 31, 2012, 100.0% of our MSRs are classified as Level 3 and account for 19.5% of all recurring and nonrecurring assets reported at fair value.

- **Derivative instruments** — We enter into a variety of derivative financial instruments as part of our risk management strategies. Derivative assets account for 56.3% of all recurring and nonrecurring assets and derivative liabilities account for 82.1% of all recurring and nonrecurring liabilities reported at fair value at March 31, 2012.

  Certain of these derivatives are exchange traded, such as Eurodollar futures. To determine the fair value of these instruments, we utilize the exchange prices for the particular derivative contract; therefore, we classified these contracts as Level 1. We classified less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value as Level 1 at March 31, 2012.

  We also execute over–the–counter derivative contracts, such as interest rate swaps, swaptions, forwards, caps, floors and agency-to-be-announced (TBAs) securities. We utilize third–party–developed valuation models that are widely accepted in the market to value our over–the–counter derivative contracts. The specific terms of the contract and market observable inputs (such as interest rate forward curves and interpolated volatility assumptions) are used in the model. We classified 99.1% of the derivative assets and 98.8% of the derivative liabilities reported at fair value as Level 2 at March 31, 2012.

  We also hold certain derivative contracts that are structured specifically to meet a particular hedging objective. These derivative contracts often are utilized to hedge risks inherent within certain on–balance sheet securitizations. To hedge risks on particular bond classes or securitization collateral, the derivative's notional amount is often indexed to the hedged item. As a result, we typically are required to use internally developed prepayment assumptions as an input into the model to forecast future notional amounts on these structured derivative contracts. Accordingly, we classified these derivative contracts as Level 3. These derivative contracts accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at March 31, 2012.

  At March 31, 2012, we were counterparty to a forward flow agreement with Ally Bank, which effectively transfers the exposure to changes in fair value of specified pools of Ally Bank's mortgage loans held–for–sale and interest rate lock commitments to us. In addition, at March 31, 2012 we were counterparty to a total return swap agreement with Ally Bank that effectively transfers the total economic return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. The underlying reference assets that

support the value of the swap agreements are valued using internally developed valuation assumptions; therefore the swaps are classified as Level 3. These agreements accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at March 31, 2012. Both of these agreements were terminated on April 30, 2012. See Note 17 — Related Party Transactions for additional information.

We are required to consider all aspects of nonperformance risk, including our own credit standing, when measuring fair value of a liability. We reduce credit risk on the majority of our derivatives by entering into legally enforceable agreements that enable the posting and receiving of collateral associated with the fair value of our derivative positions on an ongoing basis. In the event that we do not enter into legally enforceable agreements that enable the posting and receiving of collateral, we will consider our credit risk and the credit risk of our counterparties in the valuation of derivative instruments through a credit valuation adjustment (CVA), if warranted.

- *On-balance sheet securitizations* — We elected the fair value option for certain consumer mortgage finance receivables and loans, and securitization debt for certain of our on-balance sheet securitizations. The objective in measuring these loans and related securitization debt at fair value is to approximate our economic exposure to the collateral securing the securitization debt. The remaining on-balance sheet securitization debt that was not fair value option–elected is reported on the balance sheet at cost, net of premiums or discounts and all issuance costs.

We value securitization debt that was fair value option–elected, as well as any trading securities or interests retained in financial asset sales, using market observable prices whenever possible. The securitization debt is principally in the form of asset-backed and mortgage-backed securities collateralized by the underlying consumer mortgage finance receivables and loans. Due to the attributes of the underlying collateral and current capital market conditions, observable prices for these instruments are typically not available in active markets. We base valuations on internally developed discounted cash flow models that use a market-based discount rate. In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses. As a result of the reliance on significant assumptions and estimates for model inputs, at March 31, 2012, 100.0% of fair value option–elected securitization debt is classified as Level 3. On-balance sheet securitization debt accounts for 17.3% of all recurring and nonrecurring liabilities reported at fair value at March 31, 2012.

## Recurring Fair Value

The following tables display the assets and liabilities measured at fair value on a recurring basis, including financial instruments for which we elected the fair value option. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The table below displays the hedges separately from the hedged items and, therefore, does not directly display the impact of our risk management activities.

| March 31, 2012          ($ in thousands) | Recurring fair value measurements | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Mortgage loans held–for–sale (a) | $— | $15,925 | $30,494 | $46,419 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 832,094 | 832,094 |
| Mortgage servicing rights | — | — | 1,254,497 | 1,254,497 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 3,145 | 3,588,513 | 29,790 | 3,621,448 |
| Trading securities | | | | |
| Mortgage and asset backed residential | — | 417 | 31,885 | 32,302 |
| Total assets | $3,145 | $3,604,855 | $2,178,760 | $5,786,760 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | $— | $— | ($828,418) | ($828,418) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (18,708) | (3,882,257) | (27,107) | (3,928,072) |
| Foreign currency contracts | — | (365) | — | (365) |
| Liability for option to repurchase assets (a) | — | — | (29,603) | (29,603) |
| Total liabilities | ($18,708) | ($3,882,622) | ($885,128) | ($4,786,458) |

(a)   Carried at fair value due to fair value option election.

| December 31, 2011   ($ in thousands) | Recurring fair value measurements | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Mortgage loans held–for–sale (a) | $— | $27,253 | $29,723 | $56,976 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 835,192 | 835,192 |
| Mortgage servicing rights | — | — | 1,233,107 | 1,233,107 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 61,025 | 4,780,995 | 35,038 | 4,877,058 |
| Foreign currency contracts | — | 139 | — | 139 |
| Trading securities | | | | |
| Mortgage and asset backed residential | — | 434 | 32,869 | 33,303 |
| Interests retained in financial asset sales | — | — | 23,102 | 23,102 |
| Total assets | $61,025 | $4,808,821 | $2,189,031 | $7,058,877 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | $— | $— | ($829,940) | ($829,940) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (18,445) | (5,089,201) | (24) | (5,107,670) |
| Foreign currency contracts | — | (5,861) | — | (5,861) |
| Liability for option to repurchase assets (a) | — | — | (28,504) | (28,504) |
| Total liabilities | ($18,445) | ($5,095,062) | ($28,528) | ($5,142,035) |

(a)   Carried at fair value due to fair value option election.

Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The following table presents quantitative information regarding the significant unobservable inputs used in material Level 3 assets and liabilities measured at fair value on a recurring basis.

| March 31, 2012   (*$ in thousands*) | Level 3 recurring measurements | Valuation technique | Unobservable input | Range |
|---|---|---|---|---|
| **Assets** | | | | |
| Consumer mortgage finance receivables and loans, net (a) | **$832,094** | Discounted cash flow | Prepayment rate | 2.52-12.91% |
| | | | Default rate | 1.08-34.75% |
| | | | Loss severity | 40.0-100.0% |
| Mortgage servicing rights | **1,254,497** | (b) | (b) | (b) |
| **Liabilities** | | | | |
| Collaterlized borrowings | | | | |
| On-balance sheet securitization debt (a) | **($828,418)** | (a) | (a) | (a) |

(a) A portfolio approach links the value of the consumer mortgage finance receivables and loans, net to the on-balance sheet securitization debt; therefore, the valuation technique, unobservable inputs, and related range for the debt is the same as the loans. Increases in prepayments, which would primarily be driven by any combination of lower projected mortgage rates and higher projected home values, would result in higher fair value measurement. These drivers of higher prepayments (increased ability to refinance due to lower rates and higher property values) have an opposite impact on the default rate, creating an inverse relationship between prepayments and default frequency on the fair value measurements. Generally factors that contribute to higher default frequency also contribute to higher loss severity.

(b) Refer to Note 5 – Servicing Activities for information related to the significant unobservable inputs and valuation techniques used in the mortgage servicing rights fair value measurement.

33

The following tables present the reconciliation for all Level 3 assets and liabilities measured at fair value on a recurring basis. Transfers into or out of Level 3 are recognized as of the end of the reporting period in which the transfer occurred. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The Level 3 items presented below may be hedged by derivatives and other financial instruments that are classified as Level 1 or Level 2. Thus, the following tables do not fully reflect the impact of our risk management activities.

| | | Level 3 recurring fair value measurements | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Net gains/(losses) included in earnings | | | | | | | |
| ($ in thousands) | January 1, 2012 Level 3 fair value | realized gains (losses) | unrealized gains (losses) | Other comprehensive income (loss) | Purchases | Sales | Issuances | Settlements | March 31, 2012 Level 3 fair value |
| **Assets** | | | | | | | | | |
| Mortgage loans held–for–sale | $29,723 | ($37) | $250 | $— | $8,923 (a) | $— | $— | ($8,365) | $30,494 |
| Consumer mortgage finance receivables and loans, net | 835,192 | 51,328 (b) | 35,448 (b) | — | — | — | — | (89,874) | 832,094 |
| Mortgage servicing rights | 1,233,107 | — | 10,817 (c) | — | — | — | 10,573 | — | 1,254,497 |
| Other assets | | | | | | | | | |
| Fair value of derivative contracts in receivable position, net | | | | | | | | | |
| Interest rate contracts | 35,014 | 66,983 (d) | (58,479) (d) | — | — | — | — | (40,835) | 2,683 |
| Trading securities | | | | | | | | | |
| Mortgage– and asset–backed residential | 32,869 | (1,214) (e) | 3,627 (e) | — | — | — | 103 | (3,500) | 31,885 |
| Interests retained in financial asset sales | 23,102 | (501) (f) | (5) (f) | — | — | — | — | (22,596) | — |
| Total assets | $2,189,007 | $116,559 | ($8,342) | $— | $8,923 | $— | $10,676 | ($165,170) | $2,151,653 |
| **Liabilities** | | | | | | | | | |
| Collateralized borrowings | | | | | | | | | |
| On-balance sheet securitization debt | ($829,940) $ | (43,820) (b) $ | (39,386) (b) | $— | $— | $— | $— | 84,728 | ($828,418) |
| Other liabilities | | | | | | | | | |
| Liability for option to repurchase assets | (28,504) | 37 | (250) | — | (8,923) (a) | — | — | 8,037 | (29,603) |
| Total liabilities | ($858,444) | ($43,783) | ($39,636) | $— | ($8,923) | $— | $— | $92,765 | ($858,021) |

(a)  Includes newly recognized fair value option elected conditional repurchase loans and the related liability. See Note 4 — Securitizations and Variable Interest Entities for additional information.
(b)  Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.
(c)  Fair value adjustment reported in servicing asset valuation and hedge activities, net.
(d)  See Note 14 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Condensed Consolidated Statement of Income.
(e)  Fair value adjustment reported in gain (loss) on investment securities, net. Interest accretion on these assets is reported in interest income.
(f)  Fair value adjustment reported in other revenue, net, and interest accretion on these assets is reported in interest income.

Note 20 — Condensed Consolidated Financial Statements
Residential Capital, LLC

| ($ in thousands) | Level 3 recurring fair value measurements | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | January 1, 2011 Level 3 fair value | Net gains/(losses) included in earnings | | Other comprehensive income (loss) | Purchases | Sales | Issuances | Settlements | March 31, 2011 Level 3 fair value |
| | | realized gains (losses) | unrealized gains (losses) | | | | | | |
| **Assets** | | | | | | | | | |
| Mortgage loans held–for–sale | $4,084 | ($27) | $98 | $— | $14,189 (a) | ($388) | $— | $— | $17,956 |
| Consumer mortgage finance receivables and loans, net | 1,014,703 | 57,458 (b) | 15,809 (b) | — | — | — | — | (117,313) | 970,657 |
| Mortgage servicing rights | 1,991,586 | 66 (c) | 36,489 (c) | — | — | (139) | 18,370 | (67) | 2,046,305 |
| Other assets | | | | | | | | | |
| Fair value of derivative contracts in receivable (liability) position, net | | | | | | | | | |
| Interest rate contracts | 69,353 | 212,905 (d) | 137,723 (d) | — | — | — | — | (422,563) | (2,582) |
| Trading securities | | | | | | | | | |
| Mortgage– and asset–backed residential | 44,128 | (1,362) (e) | 2,052 (e) | — | — | — | 131 | (4,871) | 40,078 |
| Available for sale securities | | | | | | | | | |
| Debt securities | | | | | | | | | |
| Mortgage-backed residential | 989 | — | — | 543 | — | — | — | (104) | 1,428 |
| Interests retained in financial asset sales | 20,588 | — | 4,353 (f) | — | — | — | — | (599) | 24,342 |
| Total assets | $3,145,431 | $269,040 | $196,524 | $543 | $14,189 | ($527) | $18,501 | ($545,517) | $3,098,184 |
| **Liabilities** | | | | | | | | | |
| Collateralized borrowings | | | | | | | | | |
| On-balance sheet securitization debt | ($972,068) | $ (71,650) (b) | $4,702 (b) | $— | $— | $— | $— | $117,413 | ($921,603) |
| Other liabilities | | | | | | | | | |
| Liability for option to repurchase assets | — | — | — | — | (14,284) (a) | — | — | — | (14,284) |
| Total liabilities | ($972,068) | ($71,650) | $4,702 | $— | ($14,284) | $— | $— | $117,413 | ($935,887) |

(a) Includes newly recognized fair value option elected conditional repurchase loans and the related liability. See Note 4 — Securitizations and Variable Interest Entities for additional information.

(b) Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.

(c) Fair value adjustment reported in servicing asset valuation and hedge activities, net.

(d) See Note 14 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Condensed Consolidated Statement of Income.

(e) Fair value adjustment reported in gain (loss) on investment securities, net. Interest accretion on these assets is reported in interest income.

(f) Fair value adjustment reported in other revenue, net, and interest accretion on these assets is reported in interest income.

**Nonrecurring Fair Value**

We may be required to measure certain assets or liabilities at fair value from time-to-time. These periodic fair value measures typically result from application of lower of cost or fair value or certain impairment measures. These items would constitute nonrecurring fair value measures. The table below presents those items which we measured at fair value on a nonrecurring basis.

| March 31, ($ in thousands) | Nonrecurring fair value measures | | | Total estimated fair value | Lower of cost or fair value or valuation allowance | Total gains included in income from continuing operations for the three months ended |
|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | | | |
| **2012** | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $579,914 | $579,914 | ($56,780) | n/m (e) |
| Commercial finance receivables and loans, net (b) | — | 1,591 | 22,949 | 24,540 | (16,605) | n/m (e) |
| Other assets | | | | | | |
| Foreclosed assets (c) | — | 30,091 | 13,830 | 43,921 | (12,050) | n/m (e) |
| Total | $— | $31,682 | $616,693 | $648,375 | ($85,435) | $— |
| **2011** | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $597,363 | $597,363 | ($50,477) | n/m (e) |
| Commercial finance receivables and loans, net (b) | — | 13,042 | 59,793 | 72,835 | (16,137) | n/m (e) |
| Other assets | | | | | | |
| Foreclosed assets (c) | — | 38,160 | 22,918 | 61,078 | (8,776) | n/m (e) |
| Real estate and other investments (d) | — | 1,579 | — | 1,579 | n/m | 16 (f) |
| Total | $— | $52,781 | $680,074 | $732,855 | ($75,390) | $16 |

n/m = not meaningful

(a) Represents loans or pools of loans held–for–sale that are required to be measured at lower of cost or fair value. Only loans or pools of loans with fair values below cost are included in the table above. The related valuation allowance represents the cumulative adjustment to fair value of those loans and pool of loans.

(b) Represents the portion of the commercial portfolio that has been specifically impaired. The related valuation allowance represents the cumulative adjustment to fair value of those specific commercial finance receivables and loans and represents the most relevant indicator of the impact on earnings caused by the fair value measurement. The carrying values are inclusive of the respective loan loss allowance.

(c) The allowance provided for foreclosed assets represents any cumulative valuation adjustments recognized to adjust the assets to fair value less costs to sell.

(d) Certain assets within the model home portfolio have been impaired and are being carried at (a) estimated fair value if the model home is under lease or (b) estimated fair value less costs to sell if the model home is being marketed for sale.

(e) We consider the applicable valuation to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation.

(f) The total loss included in earnings is the most relevant indicator of the impact on earnings caused by the fair value measurement.

The following table presents quantitative information regarding the significant unobservable inputs used in significant Level 3 assets measured at fair value on a nonrecurring basis.

| March 31, 2012    ($ in thousands) | Level 3 nonrecurring measurements | Valuation technique | Unobservable input | Range (weighted average) |
|---|---|---|---|---|
| **Assets** | | | | |
| Mortgage loans held-for-sale, net | $    579,914 | Discounted cash flow | Prepayment speeds | 0.0-13.8% |
| | | | Default rate | 2.2-17.4% |
| | | | Loss severity | 47.5-98.5% |
| | | | Discount Rate | 14.55% |

36

**Fair Value Option for Financial Assets and Financial Liabilities**

We have elected to value certain financial assets and liabilities at fair value consistent with our intent to mitigate a divergence between our accounting results and our retained economic exposure related to these assets and liabilities.

Financial assets and liabilities elected to be measured at fair value are as follows.

- **On-balance sheet securitizations** – We elected the fair value option for domestic on-balance sheet securitization trusts in which we estimated that the credit reserves pertaining to securitized assets could have exceeded or already had exceeded our economic exposure or were required to be consolidated upon the adoption of ASU 2009-17. The fair value option election was made at a securitization level and thus the election was made for both the consumer mortgage finance receivable and loans and the related securitization debt.

  The fair value elected loan balances are recorded within consumer finance receivables and loans, net, unless they are repurchased from a securitization trust in which case they are recorded in mortgage loans held–for–sale. Our policy is to separately record interest income on these fair value elected loans. The fair value adjustment recorded for consumer finance receivables and loans is classified as other revenue, net, and the fair value adjustment for mortgage loans held-for-sale is classified as gain on mortgage loans.

  The fair value elected securitization debt balances are recorded within collateralized borrowings in securitization trusts. Our policy is to separately record interest expense on the fair value elected securitization debt, which is classified as interest expense. The fair value adjustment recorded for this debt is classified as other revenue, net.

- **Government – and agency – eligible loans** – We elected the fair value option for government– and agency–eligible consumer mortgage loans held–for–sale. This election includes government– and agency–eligible loans we fund directly to borrowers and government– and agency–eligible loans we purchase from Ally Bank. The fair value option was elected to mitigate earnings volatility by better matching the accounting for the assets with the related hedges and to maintain consistency with the fair value option election by Ally Bank given the level of affiliate loan purchase and sale activity between the entities. See Note 17 — Related Party Transactions for additional information.

  We carry fair value option–elected government– and agency–eligible loans within mortgage loans held–for–sale. Our policy is to separately record interest income on these fair value elected loans. Upfront fees and costs related to the fair value elected loans are not deferred or capitalized. The fair value adjustment recorded for these fair value option–elected loans is reported in gain on mortgage loans, net. The fair value option election is irrevocable once the loan is funded even if it is subsequently determined that a particular loan cannot be sold.

- **Conditional repurchase option loans and liabilities** – As of January 1, 2011, we elected the fair value option for both nongovernment eligible mortgage loans held–for–sale subject to conditional repurchase options and the related liability. The conditional repurchase option allows us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a prespecified delinquency level. We have complete discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest. We are required to record the asset and the corresponding liability on our balance sheet when the option becomes exercisable. The fair value option election must be made at initial recording. As such, the conditional repurchase option loans and liabilities that were recorded prior to January 1, 2011, were not fair value elected.

  The fair value elected conditional repurchase option loans are recorded within mortgage loans held–for–sale. The fair value adjustment is classified as other revenue, net. We do not recognize interest income on conditional repurchase option loans until the option is exercised and the loan is repurchased.

  The corresponding fair value elected liability is recorded in other liabilities. The fair value adjustment recorded for this liability is classified as other revenue, net.

Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The following table summarizes the fair value option elections and information regarding the amounts recognized in earnings for each fair value option–elected item.

| March 31, *($ in thousands)* | Interest income (expense) (a) | Gain on mortgage loans, net | Other revenue, net | Total included in net income | Change in fair value due to credit risk | (b) |
|---|---|---|---|---|---|---|
| **2012** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (c) | **$286** | **$243,407** | **$—** | **$243,693** | **($490)** | **(d)** |
| Consumer mortgage finance receivables and loans, net | **44,139** | **—** | **42,637** | **86,776** | **(27,220)** | **(e)** |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitizations | **(25,900)** | **—** | **(57,306)** | **(83,206)** | **(7,306)** | **(f)** |
| Liability for option to repurchase assets | **—** | **—** | **(213)** | **(213)** | **490** | **(f)** |
| Total | | | | **$247,050** | | |
| **2011** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (c) | $221 | $51,498 | $98 | $51,817 | ($18) | (d) |
| Consumer mortgage finance receivables and loans, net | 54,021 | — | 19,246 | 73,267 | (17,444) | (e) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | (30,801) | — | (36,148) | (66,949) | 26,927 | (f) |
| Total | | | | $58,135 | | |

(a)  Interest income on consumer mortgage finance receivables and loans and mortgage loans held–for–sale is measured by multiplying the unpaid principal balance on the loans by the coupon rate and the number of days of interest due.  Interest expense on the on-balance sheet securitizations is measured by multiplying the bond principal by the coupon rate and days interest due to the investor.

(b)  Factors other than credit quality that impact the fair value include changes in market interest rates and the liquidity or marketability in the current marketplace.  Lower levels of observable data points in illiquid markets generally result in wide bid/offer spreads.

(c)  Includes the gain/loss recognized on fair value option–elected government– and agency–eligible assets purchased from Ally Bank.

(d)  The credit impact for mortgage loans held–for–sale that are currently agency eligible is currently zero because the fair value option–elected GSE loans are salable, and any unsalable assets are currently covered by a government guarantee.  The credit impact for non-agency eligible loans  and related liability was quantified by applying internal credit loss assumptions to cash flow models.

(e)  The credit impact for consumer mortgage finance receivables and loans was quantified by applying internal credit loss assumptions to cash flow models.

(f)  The credit impact for on-balance sheet securitization debt is assumed to be zero until our economic interests in a particular securitization is reduced to zero, at which point the losses in the underlying collateral will be expected to be passed through to third-party bondholders.  Losses allocated to third-party bondholders, including changes in the amount of losses allocated, will result in fair value changes due to credit.  We also monitor credit ratings and may make credit adjustments to the extent any bond classes are downgraded by rating agencies.

The table below provides the fair value and the unpaid principal balance for our fair value option–elected loans and related collateralized borrowings.

| | March 31, 2012 | | December 31, 2011 | |
| | Unpaid principal balance | Fair value (a) | Unpaid principal balance | Fair value (a) |
| ($ in thousands) | | | | |
|---|---|---|---|---|
| Mortgage loans held–for–sale | | | | |
| Total loans | **$76,796** | **$46,419** | $84,099 | $56,975 |
| Nonaccrual loans | **57,916** | **28,293** | 53,502 | 27,297 |
| Loans 90+ days past due (b) | **57,789** | **28,140** | 53,312 | 27,179 |
| Consumer mortgage finance receivables and loans, net | | | | |
| Total loans | **$2,385,658** | **$832,094** | $2,436,218 | $835,192 |
| Nonaccrual loans | **510,437** | **213,935 (c)** | 506,300 | 209,371 (c) |
| Loans 90+ days past due (b) | **383,837** | **172,611 (c)** | 362,002 | 162,548 (c) |
| Collateralized borrowings | | | | |
| On-balance sheet securitizations | **($2,513,734)** | **($828,418)** | ($2,559,093) | ($829,940) |
| Other liabilities | | | | |
| Liability for option to repurchase assets | **($61,490)** | **($29,603)** | ($56,568) | ($28,504) |

(a)  Excludes accrued interest receivable.

(b)  Loans 90+ days past due are also presented within the nonaccrual loans and total loans except those that are government insured and still accruing.

(c)  The fair value of consumer mortgage finance receivables and loans is calculated on a pooled basis; therefore, we allocated the fair value of nonaccrual loans and 90+ days past due to individual loans based on the unpaid principal balances.

## 14. Derivative Instruments and Hedging Activities

We transact interest rate and foreign currency swaps, futures, forwards, options, swaptions, and TBAs in connection with our risk management activities. Our primary objective for executing these financial instruments is to mitigate our economic exposure to future events that are outside our control. These financial instruments are utilized principally to manage market risk and cash flow volatility associated with mortgage loans held–for–sale and MSRs, including our total return and forward flow agreements with Ally Bank. See Note 17 — Related Party Transactions for additional information. We do not transact derivative instruments for reasons beyond risk management.

In addition to derivatives transacted as part of our risk management activities, we create derivative contracts as part of our ongoing operations. In particular, we frequently execute forward mortgage loan purchase and sale commitments with Ally Bank and financial institutions, respectively, principally to provide a future source of mortgage volume and dedicated exit channels.

Additionally, we enter into commitments with mortgage borrowers that require us to originate a mortgage at a stated amount and rate; these are derivative contracts if our intent is ultimately to hold the originated loan for sale. We refer to commitments to purchase mortgage loans from Ally Bank and commitments to originate mortgage loans held–for–sale, collectively, as interest rate lock commitments (IRLCs).

The following summarizes our significant asset and liability classes, the risk exposures for these classes, and our risk management activities utilized to mitigate certain of these risks. The discussion includes both derivative and nonderivative financial instruments utilized as part of these risk management activities.

## Interest Rate Sensitive Assets/Liabilities

- *Mortgage loan commitments and loans held–for–sale* — We are exposed to interest rate risk from the time an IRLC is made, either directly or indirectly through the forward flow agreement with Ally Bank, until the time the mortgage loan is sold. Changes in interest rates impact the market price for the mortgage loan; as market interest rates decline, the value of existing IRLCs and mortgage loans held–for–sale increase and vice versa. The primary objective of our risk management activities related to IRLCs and mortgage loans held–for–sale is to eliminate or reduce any interest rate risk associated with these assets.

    We enter into forward sale contracts of mortgage-backed securities, primarily agency TBAs, as our primary strategy to mitigate this risk. These contracts are typically entered into at the time the interest rate lock commitment is made. The value of the forward sales contracts moves in the opposite direction of the value of our IRLCs and mortgage loans held–for–sale. We may also use other derivatives, such as options, and futures, to economically hedge certain portions of the portfolio. Nonderivative instruments, such as short positions on U.S. Treasuries, may also be used to economically hedge

39

the portfolio. We monitor and actively manage our risk on a daily basis; therefore trading volume can be significant.

We do not apply hedge accounting to our derivative portfolio held to economically hedge our IRLCs and mortgage loans held–for–sale. Included in the derivatives on IRLCs and mortgage loans held–for–sale is the forward flow agreement with Ally Bank having a fair value of $(27.1) million and an outstanding notional of $6.3 billion at March 31, 2012. Under the terms of the forward flow agreement, Ally Bank transfers the exposure to changes in fair value of specified pools of assets, in this case IRLCs and mortgage loans held–for–sale, to us. This agreement was terminated on April 30, 2012. See Note 17 — Related Party Transactions for additional information.

- *Mortgage servicing rights and other retained interests* — Our MSRs and retained interests are generally subject to loss in value when mortgage rates decline. Declining mortgage rates generally result in an increase in refinancing activity, which increases prepayments and results in a decline in the value of MSRs and other retained interests. To mitigate the impact of this risk, we maintain a portfolio of financial instruments, primarily derivatives, which increase in value when interest rates decline. The primary objective is to minimize the overall risk of loss in the value of MSRs and other retained interests due to the change in fair value caused by interest rate changes and their interrelated impact to prepayments.

    We use a variety of derivative instruments to manage the interest rate risk related to MSRs and other retained interests. These include, but are not limited to, interest rate futures, call or put options on U.S. Treasuries, swaptions, mortgage-backed securities (MBS) futures, U.S. Treasury futures, interest rate swaps, interest rate floors and caps. While we do not currently utilize nonderivative instruments (i.e., U.S. Treasuries) to hedge this portfolio, we have utilized them in the past and may utilize them again in the future. We monitor and actively manage our risk on a daily basis, and therefore trading volume can be significant.

    Included in the derivatives hedging MSRs and retained interests is a total return swap with Ally Bank having a fair value of $29.4 million at March 31, 2012. Under the terms of the total return swap, Ally Bank transfers the total economic return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. This agreement was terminated on April 30, 2012. See Note 17 — Related Party Transactions for additional information.

- *Debt* — We monitor our mix of fixed and floating rate debt in relation to the rate profile of our assets. When it is cost effective to do so, we may enter into interest rate swaps to manage the interest rate composition of our debt portfolio. Typically, the significant terms of the interest rate swaps match the terms of the underlying debt resulting in an effective conversion of the rate of the related debt.

    In addition to these economic hedges, we also hold interest rate swaps that are hedging a portion of our fixed-rate senior unsecured notes. We utilize the interest rate swaps to hedge the fair value of the hedged debt balances. We elected to designate these as fair value hedges at inception. At December 31, 2011, we dedesignated our fair value swaps due to ineffectiveness.

## Foreign Currency Risk

We have operations outside the United States. Our foreign subsidiaries maintain both assets and liabilities in local currencies that are deemed to be the functional currencies of these subsidiaries for accounting purposes. Foreign currency exchange rate gains and losses arise when assets or liabilities are denominated in currencies that differ from the entities functional currency and are revalued into the functional currency. In addition, our equity is impacted by the cumulative translation adjustments recognized in other comprehensive income resulting from the translation of foreign subsidiary results to U.S. dollars. Foreign currency risk is reviewed as part of our risk management process. The principal currencies creating foreign exchange risk are the U.K. Sterling and the Euro.

Our current strategy is to economically hedge foreign currency risk related to assets and liabilities that are denominated in currencies on our U.S. dollar functional currency entities. The principal objective of the foreign currency hedges is to mitigate the earnings volatility specifically created by foreign currency exchange rate gains and losses. We hold forward currency contracts to mitigate risk against currency fluctuation in the U.K. Sterling and the Euro. We have not elected to treat any foreign currency swaps as hedges for accounting purposes, principally because the changes in the fair values of the foreign currency swaps are substantially offset by the foreign currency revaluation gains and losses of the underlying assets and liabilities.

## Credit Risk and Collateral Arrangements

Derivative financial instruments contain an element of credit risk if counterparties, including affiliates, are unable to meet the terms of their agreements. Credit risk associated with derivative financial instruments is measured as the net replacement cost should the counterparties that owe us under the contracts completely fail to perform under the terms of those contracts, assuming there are no recoveries of underlying collateral, as measured by the fair value of the derivative financial instruments. At March 31, 2012 and December 31, 2011, the fair value of derivative financial instruments in an asset, or receivable position, were $3.6 billion and $4.9 billion, including $2.2 billion and $3.2 billion with affiliates, respectively. See Note 17 — Related Party Transactions for additional information.

We minimize the credit risk exposure by limiting our counterparties to those major banks and financial institutions that meet established credit guidelines and transacting with and through affiliates. Additionally, we reduce credit risk on the majority of our derivative financial instruments by entering into legally enforceable agreements that permit the closeout and netting of transactions with the same counterparty upon occurrence of certain events. To further mitigate the risk of counterparty default, we execute collateral agreements with counterparties. The agreements require both parties to maintain cash deposits in the event the fair values of the derivative financial instruments meet established thresholds. We have received cash deposits from counterparties totaling $578.7 million and $656.1 million at March 31, 2012 and, December 31, 2011, respectively, for derivative positions in an asset position to us. We have placed cash deposits totaling $1.1 billion and $1.1 billion at March 31, 2012 and December 31, 2011, respectively, in accounts maintained by counterparties for derivative positions in a liability position to us. The cash deposits placed and received are included in accounts receivable, other assets, and other liabilities.

We are not exposed to credit risk related contingent features in any of our derivative contracts that could be triggered and potentially could expose us to future loss.

## Condensed Consolidated Balance Sheet Presentation

The following table summarizes the location and fair value amounts of derivative instruments reported on our Condensed Consolidated Balance Sheet. The fair value amounts are presented on a gross basis and are segregated between derivatives that are designated and qualifying as hedging instruments and those that are not and further segregated by type of contract within those two categories.

| | March 31, 2012 | | | December 31, 2011 | | |
| | Fair value of derivative contracts in | | | Fair value of derivative contracts in | | |
| ($ in thousands) | receivable position (a) | payable position (b) | Notional amount | receivable position (a) | payable position (b) | Notional amount |
|---|---|---|---|---|---|---|
| Economic hedges | | | | | | |
| Interest rate risk | | | | | | |
| MSRs and retained interests | $3,554,216 | ($3,893,704) | $418,931,706 | $4,811,804 | ($5,011,576) | $523,142,192 |
| Mortgage loans held–for–sale | 16,115 | (7,260) | 9,040,618 | 8,770 | (96,077) | 17,323,000 |
| Debt | 18,887 | — | 251,122 | 21,066 | — | 251,790 |
| Total interest rate risk | 3,589,218 | (3,900,964) | 428,223,446 | 4,841,640 | (5,107,653) | 540,716,982 |
| Foreign exchange risk | 2,439 | (365) | 160,748 | 520 | (5,873) | 3,157,000 |
| Non–risk management derivatives | | | | | | |
| Bank MSR swap | 29,442 | — | 1,407,351 | 17,681 | — | 1,384,835 |
| Bank forward flow agreement | — | (27,105) | 6,269,576 | 16,423 | — | 9,825,783 |
| Mortgage loan commitments | 349 | (3) | 27,542 | 933 | (5) | 77,633 |
| Total derivatives | $3,621,448 | ($3,928,437) | $436,088,663 | $4,877,197 | ($5,113,531) | $555,162,233 |

(a) Presented in other assets.
(b) Presented in other liabilities.

41

## Condensed Consolidated Statement of Income Presentation

The following table summarizes the location and amount of gains and losses from continuing operations reported in our Condensed Consolidated Statement of Income related to derivative instruments. Gains and losses are presented separately for derivative instruments designated and qualifying as hedging instruments in fair value hedges and non-designated hedging instruments. We currently do not have qualifying cash flow or foreign currency hedges.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Qualifying accounting hedges | | |
| Gain (loss) recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Interest income | $— | ($1,535) |
| Gain (loss) recognized in earnings on hedged item | | |
| Interest rate contracts | | |
| Interest expense | — | 1,813 |
| Total qualifying accounting hedges | — | 278 |
| Economic hedges | | |
| Risk management derivatives | | |
| Gain (loss) recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Interest expense | (1,633) | (1,672) |
| Gain on mortgage loans, net | (52,099) | (43,622) |
| Servicing asset valuation and hedge activities, net | 8,075 | (203,625) |
| Other revenue, net | (369) | — |
| Total interest rate contracts | (46,026) | (248,919) |
| Foreign exchange contracts | | |
| Other noninterest expense, net | 6,274 | (1,298) |
| Non-risk management derivatives | | |
| Gain on mortgage loans, net | (87,921) | 134,512 |
| Servicing asset valuation and hedge activities, net | 96,424 | 216,048 |
| Total derivatives | ($31,249) | $100,621 |

Our derivative portfolios generally are reflected in the operating activities section of our Condensed Consolidated Statement of Cash Flows. Derivative fair value adjustments are captured in our Condensed Consolidated Statement of Income line items described in the table above and, accordingly, are generally reflected within the respective line items within the reconciliation of net income (loss) to net cash provided by operating activities section of our Condensed Consolidated Statement of Cash Flows. The remaining changes in derivative portfolio values are generally reflected within the "net change in other assets" or "net change in other liabilities" line items on our Condensed Consolidated Statement of Cash Flows.

## 15. Higher Risk Mortgage Loans and Credit Quality

Historically, we originated and purchased mortgage loans that had contractual features that may increase our exposure to credit risk and thereby result in a concentration of credit risk. These mortgage loans include loans that may subject borrowers to significant payment increases in the future, have negative amortization of the principal balance or have high loan–to–value ratios.

The following table summarizes the gross carrying value of our higher-risk mortgage loans classified as held–for–sale and finance receivables and loans.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| High loan-to-value (greater than 100%) mortgage loans | $475,415 | $488,627 |
| Payment option adjustable rate mortgage loans | 13,176 | 12,140 |
| Interest-only mortgage loans | 286,740 | 293,975 |
| Below market initial rate mortgage loans | 250,517 | 259,177 |
| Total carrying value of higher-risk mortgages | $1,025,848 | $1,053,919 |

Included in the table above are $350.7 million and $362.5 million of high-risk mortgage loans held in on-balance sheet securitizations at March 31, 2012 and December 31, 2011, respectively. Our exposure on these loans is limited to the value of our retained interest.

As part of our loss mitigation efforts and participation in certain governmental programs (e.g., the Making Home Affordable program), we may offer loan restructurings to borrowers.  Due to the nature of restructurings, these loans are generally considered higher risk.  Loan modifications can include any or all of the following; principal forgiveness, maturity extensions, delinquent interest capitalization and changes to contractual interest rates.  Modifications can be either temporary or permanent.  Temporary loan modifications are generally used to monitor the borrower's ability to perform under the revised terms over a specified trial period; if the borrower performs, it may become a permanent loan modification.  We have historically performed loan modifications under our private modification program; however, more recently the majority of loan modifications are completed under government programs.  The carrying value of our on-balance sheet modified mortgage loans was $1.4 billion and $1.2 billion as of March 31, 2012 and December 31, 2011, respectively.  These modified mortgage loans are included within mortgage loans held–for–sale and consumer finance receivables and loans.

## Nonperforming Assets

Nonperforming assets include nonaccrual loans and foreclosed assets.  The classification of a loan as nonperforming does not necessarily indicate that the principal amount of the loan is ultimately uncollectible in whole or in part.  In certain cases, borrowers make payments to bring their loans contractually current and, in all cases, our mortgage loans are collateralized by residential real estate.  As a result, our experience has been that any amount of ultimate loss for mortgage loans other than home equity loans is substantially less than the unpaid principal balance of a nonperforming loan.

Delinquent loans expose us to higher levels of credit losses and therefore are considered higher risk loans.  The determination as to whether a loan falls into a particular delinquency category is made as of the close of business on the balance sheet date.  The following table sets forth information concerning the delinquency experience in our mortgage loans held–for–sale and consumer finance receivable and loans at carrying value.

| ($ in thousands) | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | Amount | % of total | Amount | % of total |
| Current | $2,065,619 | 39.2% | $2,003,928 | 38.0% |
| Past due | | | | |
| 30 to 89 days | 136,907 | 2.6% | 137,590 | 2.6% |
| 90 days or more and still accruing interest (a) | 72,727 | 1.4% | 73,661 | 1.4% |
| 90 days  or more conditional repurchase option loans (b) | 2,352,657 | 44.7% | 2,379,926 | 45.1% |
| Nonaccrual | 639,475 | 12.1% | 677,250 | 12.9% |
| Total | 5,267,385 | 100% | 5,272,355 | 100% |
| Allowance for loan losses | (12,183) | | (13,638) | |
| Total, net | $5,255,202 | | $5,258,717 | |

(a)   Loans that are 90 days or more delinquent and still accruing interest are government insured.

(b)   We do not record interest income on conditional repurchase option loans.  If these options were exercised and we acquired the loans, $2.3 billion and $2.3 billion would be classified as 90 days or more and still accruing due to government guarantees at March 31, 2012 and December 31, 2011, respectively.  The private-label conditional repurchase option loans of $99.3 million and $105.8 million would be classified as nonaccrual at March 31, 2012 and December 31, 2011, respectively.

The following table presents the net carrying value of nonperforming assets.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Nonaccrual consumer | | |
| 1st Mortgage | $440,963 | $462,275 |
| Home equity | 57,823 | 71,787 |
| Foreign | 140,689 | 143,188 |
| Total nonaccrual consumer (a) | 639,475 | 677,250 |
| Nonaccrual commercial | | |
| Domestic | — | — |
| Foreign | 41,145 | 12,534 |
| Total nonaccrual commercial | 41,145 | 12,534 |
| Foreclosed assets | 63,987 | 71,485 |
| Total nonperforming assets | $744,607 | $761,269 |

(a)   Excludes loans subject to conditional repurchase options of $2.3 billion and $2.3 billion sold to Ginnie Mae guaranteed securitizations and $99.3 million and $105.8 million sold to off-balance sheet private-label securitization trusts at March 31, 2012 and December 31, 2011, respectively. The corresponding liability is recorded in other liabilities. See Note 5 — Securitizations and Variable Interest Entities for additional information.

43

## 16. Contingencies and Other Risks

We currently estimate that it is reasonably possible losses over time related to the litigation matters and  potential repurchase obligations and related claims described herein could be between $0.0 billion and $4.0 billion over amounts already recorded.  This estimate is based on significant judgment and numerous assumptions that are subject to change, which could be material.

### Mortgage Foreclosure Matters

### Settlements with Federal Government and State Attorneys General

#### Agreement

On February 9, 2012, Ally Inc., ResCap, and certain of our subsidiaries reached an agreement in principle with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage origination and servicing activities and foreclosure home sales and evictions (the Settlement).  On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia.  In addition, we separately reached an independent settlement with Oklahoma, which did not participate in the broader settlement described below, and agreements with two other states for other releases.

In connection with the settlement we paid $109.6 million to a trustee, for distribution to federal and state governments in March 2012.  In addition, we also paid $2.3 million in connection with the separate state agreements.  We are also obligated to provide $200.0 million towards borrower relief, subject to possible upward adjustments as described below.  This obligation for borrower relief will include loan modifications, including principal reductions, rate modifications, and refinancing for borrowers that meet certain requirements, and participation in certain other programs.  Generally, if certain basic criteria are met, borrowers that are either delinquent or at imminent risk of default and owe more on their mortgages than their homes are worth could be eligible for principle reductions, and borrowers that are current on their mortgages but who owe more on their mortgage than their homes are worth could be eligible for refinancing opportunities.  Further, we have agreed to solicit borrowers that are eligible for rate and principal modifications as of March 1, 2012.  We are committed to provide loan modifications to all borrowers who accept a modification offer within three months of the solicitation.  We have also agreed to provide loan modifications to borrowers who accept a modification offer within six months of the solicitation, unless and until total borrower relief provided exceeds $250.0 million.  As of March 31, 2012, no loan modifications have been completed.  However, we are currently in the process of soliciting eligible borrowers and expect modifications to begin in the second quarter of 2012.

The Settlement provides incentives for borrower relief that is provided within the first twelve months, and all obligations must be met within three years from the date the consent judgment is filed.  In addition to the foregoing, we will be required to implement new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters.  Compliance with these obligations will be overseen by an independent monitor, who will have authority to impose additional penalties and fines if we fail to meet established timelines or fail to implement required servicing standards.

The Settlement generally resolves potential claims arising out of origination and servicing activities and foreclosure matters, subject to certain exceptions.  The Settlement does not prevent state and federal authorities from pursuing criminal enforcement actions, securities-related claims (including actions related to securitization activities and Mortgage Electronic Registration Systems, or MERS), loan origination claims, claims brought by the FDIC, and certain other matters.  The Settlement also does not prevent claims that may be brought by individual borrowers.

#### Federal Reserve Board Civil Money Penalty

On February 9, 2012, Ally Inc. and ResCap agreed with the Board of Governors of the Federal Reserve (FRB) on a civil money penalty (CMP) of $207.0 million related to the same activities that were the subject of the Settlement.  This amount will be reduced dollar-for-dollar in connection with certain aspects of our satisfaction of the required monetary payment and borrower relief obligations included within the Settlement, as well as our participation in other similar programs that may be approved by the FRB.  While additional future cash payments related to the CMP are possible if we are unable to satisfy the borrower relief requirements of the Settlement within two years, we currently expect that the full amount of the CMP will be satisfied through our commitments in connection with the Settlement.

**Other Mortgage Foreclosure Matters**

*Consent Order*

As a result of an examination conducted by the FRB and FDIC, on April 13, 2011 we entered into a Consent Order (the Consent Order) with the FRB and the FDIC. The Consent Order requires that we make improvements to various aspects of our residential mortgage loan-servicing business, including compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight by our Board of Directors.

The Consent Order further requires GMAC Mortgage to retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions. We cannot reasonably estimate the ultimate impact of any deficiencies that have been or may be identified in our historical foreclosure procedures. There are potential risks related to these matters that extend beyond potential liability on individual foreclosure actions. Specific risks could include, for example, claims and litigation related to foreclosure remediation and resubmission; claims from investors that hold securities that become adversely impacted by continued delays in the foreclosure process; the reduction in foreclosure proceeds due to delay, or by challenges to completed foreclosure sales to the extent, if any, not covered by title insurance obtained in connection with such sales; actions by courts, state attorneys general, or regulators to delay further the foreclosure process after submission of corrected affidavits, or to facilitate claims by borrowers alleging that they were harmed by our foreclosure practices (by, for example, foreclosing without offering an appropriate range of alternative home preservation options); additional regulatory fines, sanctions, and other additional costs; and reputational risks. To date we have borne all out-of-pocket costs associated with the remediation rather than passing any such costs through to investors for whom we service the related mortgages, and we expect that we will continue to do so.

**Loan Repurchases and Obligations Related to Loan Sales**

*Overview*

We sell loans that take the form of securitizations guaranteed by the GSEs, securitizations sold to private investors, and to whole–loan investors. In connection with a portion of our private-label securitizations, the monolines insured all or some of the related bonds and guaranteed timely repayment of bond principal and interest when the issuer defaults. In connection with securitizations and loan sales, the trustee for the benefit of the related security holders and, if applicable, the related monoline insurers are provided various representations and warranties related to the loans sold. The specific representations and warranties vary among different transactions and investors but typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws. In general, the representations and warranties described above may be enforced at any time unless a sunset provision is in place. Upon discovery of a breach of a representation or warranty, the breach is corrected in a manner conforming to the provisions of the sale agreement. This may require us to repurchase the loan, indemnify the investor for incurred losses, or otherwise make the investor whole. We have entered into settlement agreements with both Fannie Mae and Freddie Mac that, subject to certain exclusions, limit our remaining exposure with the GSEs. See *Government-sponsored Enterprises* below. We assume all of the customary representation and warranty obligations for loans purchased from Ally Bank and subsequently sold into the secondary market, generally through securitizations guaranteed by the GSEs.

*Originations*

The total exposure to mortgage representation and warranty claims is most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards and risk–mitigation actions implemented in 2008 and forward. Since 2009, we have focused primarily on purchasing prime conforming and government–insured mortgages. In addition, we ceased offering interest–only jumbo mortgages in 2010. Representation and warranty risk mitigation strategies include, but are not limited to, pursuing settlements with investors where economically beneficial in order to resolve a pipeline of demands in lieu of loan-by-loan assessments that could result in repurchasing loans, aggressively contesting claims we do not consider valid (rescinding claims), and seeking recourse against correspondent lenders from whom we purchased loans wherever appropriate.

*Demand/Claim Process*

After receiving a claim under representation and warranty obligations, we review the claim to determine the appropriate response (e.g. appeal, and provide or request additional information) and take appropriate action (rescind, repurchase the loan, or remit indemnification payment). Historically, repurchase demands were generally related to loans that became delinquent within the first few years following origination. As a result of market developments over the past several years, investor repurchase demand behavior has changed significantly. GSEs and investors are more likely to submit claims for loans at any point in the loans life cycle. Representation and warranty claims are generally reviewed on a loan–by–loan basis to validate if there has been a breach requiring

45

a potential repurchase or indemnification payment. We actively contest claims to the extent they are not considered valid. We are not required to repurchase a loan or provide an indemnification payment where claims are not valid.

The risk of repurchase or indemnification, and the associated credit exposure, is managed through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards. We believe that, in general, the longer a loan performs prior to default, the less likely it is that an alleged breach of representation and warranty will be found to have a material and adverse impact on the loan's performance. When loans are repurchased, we bear the related credit loss on the loans. Repurchased loans are classified as held–for–sale and initially recorded at fair value.

The following table includes amounts paid to investors and monolines with respect to representation and warranty obligations.

| *Three months ended March 31,* ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Loan repurchases (UPB) | | |
| GSEs | **$19,005** | $43,582 |
| Private–label securitizations insured (monolines) | **4,038** | 14 |
| Private–label securitizations uninsured | **—** | — |
| Whole–loan investors | **2,468** | 4,642 |
| Total | **$25,511** | $48,238 |
| Indemnifications (make wholes) by investor | | |
| GSEs | **$20,971** | $15,517 |
| Private–label securitizations insured (monolines) | **—** | 1,835 |
| Private–label securitizations uninsured | **—** | — |
| Whole–loan investors | **6,402** | 24 |
| Total | **$27,373** | $17,376 |

The following table presents the total number and original unpaid principal balance of loans related to unresolved representation and warranty demands (indemnification claims and/or repurchase demands). The table includes demands that we have requested be rescinded but which have not yet been agreed to by the investor.

| ($ in millions) | March 31, 2012 | | December 31, 2011 (a) | |
|---|---|---|---|---|
| | **Number of loans** | **Original UPB of loans** | Number of loans | Original UPB of loans |
| Unresolved repurchase demands previously received | | | | |
| GSEs | **457** | **$89** | 357 | $71 |
| Insured private-lable securitizations | | | | |
| MBIA Insurance Corporation | **7,314** | **491** | 7,314 | 490 |
| Financial Guaranty Insurance Company | **4,826** | **382** | 4,608 | 369 |
| Other | **937** | **70** | 730 | 58 |
| Uninsured private-lable securitizations | **294** | **78** | 38 | 7 |
| Whole Loan Investors | **561** | **85** | 475 | 74 |
| Total unpaid principal balance | **14,389** | **$1,195** | 13,522 | $1,069 |

(a)  Excludes $59.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.

We are currently in litigation with MBIA Insurance Corporation (MBIA) and Financial Guaranty Insurance Company (FGIC) with respect to certain representation and warranty matters related to certain of our private-label securitizations. Historically we have requested that most of the demands be rescinded, consistent with the claim/demand process described above. As the litigation process proceeds, additional loan reviews are expected and will likely result in additional repurchase demands.

### Liability for Representation and Warranty Obligations

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we do not have or have limited current or historical demand experience with an investor, it is difficult to predict and estimate the level and timing of any potential future demands. In such cases, we may not be able to reasonably estimate losses, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve,

46

as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability when additional relevant information becomes available. Changes in the estimate are recorded as representation and warranty expense, net. At March 31, 2012, the liability relates primarily to non–GSE exposure.

The following table summarizes the changes in our liability for representation and warranty obligations.

| ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Balance at January 1, | $824,776 | $830,021 |
| Provision for representation and warranty obligations | | |
| Loan sales | 4,410 | 5,895 |
| Change in estimate | 19,459 | 26,000 |
| Total additions | 23,869 | 31,895 |
| Realized losses (a) | (42,181) | (33,692) |
| Recoveries | 4,341 | 2,063 |
| Balance at March 31, | $810,805 | $830,287 |

(a)   Includes principal losses and accrued interest on repurchased loans, indemnification payments, and settlements with investors.

### Government–sponsored Entities

Between 2004 and 2012, we sold $441.0 billion of loans to the GSEs. Each GSE has specific guidelines and criteria for sellers and servicers of loans underlying their securities. In addition, the risk of credit loss of the loans sold was generally transferred to investors upon sale of the securities into the secondary market. Conventional conforming loans were sold to either Freddie Mac or Fannie Mae, and government–insured loans were securitized with Ginnie Mae. Our representation and warranty obligation liability with respect to the GSEs considers the existing unresolved claims and the best estimate of future claims that could be received. We consider our experiences with the GSEs in evaluating our liability.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our GSE exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $71 | $170 |
| New claims | 128 | 102 |
| Resolved claims (b) | (60) | (133) |
| Rescinded claims/other | (50) | (41) |
| Balance at March 31, | $89 | $98 |

(a)   Excludes $22.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b)   Includes settlements, repurchased loans and claims under which indemnification payments are made.

We have settled our repurchase obligations relating to most of the mortgage loans sold to Freddie Mac prior to January 1, 2009. This agreement does not release any of our obligations with respect to exposure for private-label MBS in which Freddie Mac had previously invested, loans where our affiliate, Ally Bank is the owner of the servicing, as well as defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Freddie Mac, including all indemnification obligations that may arise in connection with the servicing of the mortgages. These other specified categories include (i) loans subject to certain state predatory lending and similar laws; (ii) groups of 25 or more mortgage loans purchased, originated, or serviced by one of our subsidiaries, the purchase, origination, or sale of which all involve a common actor who committed fraud; (iii) "non–loan-level" representations and warranties which refer to representations and warranties that do not relate to specific mortgage loans (examples of such non-loan-level representations and warranties include the requirement that our subsidiaries meet certain standards to be eligible to sell or service loans for Freddie Mac or our subsidiaries sold or serviced loans for market participants that were not acceptable to Freddie Mac); and (iv) mortgage loans that are ineligible for purchase by Freddie Mac under its charter and other applicable documents. If, however, a mortgage loan was ineligible under Freddie Mac's charter solely because mortgage insurance was rescinded (rather than for example, because the mortgage loan is secured by a commercial property), and Freddie Mac required us or our subsidiary to repurchase that loan because of the ineligibility, Freddie Mac would pay any net loss we suffered on any later liquidation of that mortgage loan.

47

We have received subpoenas from the Federal Housing Finance Agency (FHFA), which is the conservator of Fannie Mae and Freddie Mac. The subpoenas relating to Fannie Mae investments have been withdrawn with prejudice. The FHFA indicated that documents provided in response to the remaining subpoenas will enable the FHFA to determine whether they believe issuers of private-label MBS are potentially liable to Freddie Mac for losses they might have incurred. Although Freddie Mac has not brought any representation and warranty claims against us with respect to private-label securities subsequent to the settlement, they may do so in the future. The FHFA has commenced securities and related common law fraud litigation against us and certain of our subsidiaries with respect to certain of Freddie Mac's private-label securities investments.

We have settled our repurchase obligations related to most of the mortgage loans we sold to Fannie Mae prior to June 30, 2010. The agreement also covers potential exposure for private-label MBS in which Fannie Mae had previously invested. This agreement does not release any of our obligations with respect to loans where our affiliate, Ally Bank, is the owner of the servicing, as well as for defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Fannie Mae, including all indemnification obligations that may arise in connection with the servicing of the mortgages, and we continue to be obligated to indemnify Fannie Mae for litigation or third party claims (including by borrowers) for matters that may amount to breaches of selling representations and warranties. These other specified categories include, among others, (i) those that violate anti-predatory laws or statutes or related regulations or that otherwise violate other applicable laws and regulations; (ii) those that have non-curable defects in title to the secured property, or that have curable title defects, to the extent our subsidiaries do not cure such defects at our subsidiary's expense; (iii) any mortgage loan in which title or ownership of the mortgage loan was defective; (iv) groups of 13 or more mortgage loans, the purchase, origination, sale or servicing of which all involve a common actor who committed fraud; and (v) mortgage loans not in compliance with Fannie Mae Charter Act requirements (e.g., mortgage loans on commercial properties or mortgage loans without required mortgage insurance coverage). If a mortgage loan falls out of compliance with Fannie Mae Charter Act requirements because mortgage insurance coverage has been rescinded and not reinstated or replaced, upon the borrower's default our subsidiaries would have to pay to Fannie Mae the amount of insurance proceeds that would have been paid by the mortgage insurer with respect to such mortgage loan. If the amount of the loss exceeded the amount of insurance proceeds, Fannie Mae would be responsible for such excess.

### Private-label Securitizations (PLS)

In general, representations and warranties provided as part of our private–label securitization activities are less rigorous than those provided to the GSEs and generally impose higher burdens on investors seeking repurchase. In order to successfully assert a claim, it is our position that a claimant must prove a breach of the representations and warranties that materially and adversely affects the interest of the investor in the allegedly defective loan. Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally are required to coordinate with other investors in that class comprising no less than 25% and in some cases 50% of the percentage interest constituting a class of securities of that class issued by the trust to pursue claims for breach of representations and warranties. In addition, our private-label securitizations generally require that the servicer or trustee give notice to the other parties whenever it becomes aware of facts or circumstances that reveal a breach of representation that materially and adversely affects the interest of the certificate holders.

Regarding our securitization activities, we have exposure to potential losses primarily through two avenues. First, investors, through trustees to the extent required by the applicable agreements (or monoline insurers in certain transactions), may request pursuant to applicable agreements that we repurchase loans or make the investor whole for losses incurred if it is determined that we violated representations and warranties made at the time of the sale, provided that such violations materially and adversely impacted the interest of the investor. Contractual representations and warranties are different based on the specific deal structure and investor. It is our position that litigation of these matters must proceed on a loan by loan basis. This issue is being disputed throughout the industry in various pending litigation matters. Similarly in dispute as a matter of law is the degree to which claimants will have to prove that the alleged breaches of representations and warranties actually caused the losses they claim to have suffered. Ultimate resolution by courts of these and other legal issues will impact litigation and treatment of non-litigated claims pursuant to similar contractual provisions. Second, investors in securitizations may attempt to achieve rescission of their investments or damages through litigation by claiming that the applicable offering documents were materially deficient. If an investor properly made and proved its allegations, the investor might attempt to claim that damages could include loss of market value on the investment even if there were little or no credit loss in the underlying loans.

### Insured Private-label Securitizations (Monoline)

Historically, we have securitized loans where the monolines insured all or some of the related bonds and guaranteed the timely repayment of bond principal and interest when the issuer defaults. Typically, any alleged breach requires the insurer to have both the ability to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holders or the insurer. Generally, most claims in connection with private-label securitizations come from Monoline Insurers and continue to represent the majority of outstanding repurchase demands. For the period 2004 through 2007, we sold $42.7 billion of loans into these monoline–wrapped securitizations.

We are currently in litigation with MBIA and FGIC in connection with our representation and warranty obligations, and additional litigation with other monolines is likely.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our Monoline exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $917 | $661 |
| New claims (b) | 28 | 14 |
| Resolved claims (c) | (2) | (8) |
| Rescinded claims/other | — | — |
| Balance at March 31, | $943 | $667 |

(a) Excludes $9.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b) Substantially all relate to claims associated with the 2004 through 2007 vintages.
(c) Includes settlements, repurchased loans and claims under which indemnification payments are made.

### Uninsured Private–label Securitizations

Historically, we securitized loans where all or some of the related bonds were uninsured. We are required to make customary representations and warranties about the loans to the investors and/or securitization trust. Typically, any alleged breach of representations and warranties requires the holder of the security to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holder. During the period 2004 through 2007, we sold $182.1 billion of loans into these uninsured private-label securitizations. Claims associated with uninsured PLS were historically self identified and constituted an immaterial portion of new claims. These claims were historically included within the 'Whole loan/other' category. During the three months ended March 31, 2012, we received a repurchase request from a bond trustee with respect to one of our uninsured private-label securitizations for loans originated in 2006 with an original unpaid principal balance $70.0 million. This unpaid principal balance is not representative of expected future losses.

The following table summarizes the changes in our original unpaid principal balance related to unresolved repurchase demands with respect to our uninsured PLS exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| Three months ended March 31, ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $8 | $3 |
| New claims | 75 | 3 |
| Resolved claims (b) | (4) | — |
| Rescinded claims/other | (1) | — |
| Balance at March 31, | $78 | $6 |

(a) Excludes $4.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b) Includes losses, settlements, impairments on repurchased loans, and indemnification payments.

### Whole–loan Sales

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect to our whole-loan exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $73 | $85 |
| New claims (b) | 22 | 13 |
| Resolved claims (c) | (6) | (7) |
| Rescinded claims/other | (4) | (24) |
| Balance at March 31, | $85 | $67 |

(a) Excludes $25.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b) Includes $21.9 million and $13.0 million in new claims associated with the 2004 through 2007 vintages in 2012 and 2011, respectively.
(c) Includes settlements, repurchased loans and claims under which indemnification payments are made.

*Private Mortgage Insurance*

Mortgage insurance is required for certain consumer mortgage loans sold to the GSEs and certain securitization trusts and may have been in place for consumer mortgage loans sold to whole-loan investors. Mortgage insurance is typically required for first-lien consumer mortgage loans having a loan-to-value ratio at origination of greater than 80 percent. Mortgage insurers are, in certain circumstances, permitted to rescind existing mortgage insurance that covers consumer loans if they demonstrate certain loan underwriting requirements have not been met. Upon receipt of a rescission notice, we assess the notice and if appropriate, we refute the notice, or if the notice cannot be refuted, we attempt to remedy the defect. In the event the mortgage insurance cannot be reinstated, we may be obligated to repurchase the loan or provide an indemnification payment in the event of a loss, subject to contractual limitations. While we make every effort to reinstate the mortgage insurance, we have had limited success and as a result, most of these requests result in rescission of the mortgage insurance. At March 31, 2012, we have approximately $173.4 million in original unpaid principal balance of outstanding mortgage insurance rescission notices where we have not received a repurchase demand. However, this unpaid principal amount is not representative of expected future losses.

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are occasionally involved in governmental proceedings arising in connection with our respective businesses. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the payments can be reasonably estimated. Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims. We recorded a liability for probable legal claims of $99.6 million and $94.5 million at March 31, 2012 and December 31, 2011, respectively.

*FGIC Litigation*

On November 29, 2011, FGIC filed three complaints against ResCap in New York County Supreme Court. In two of these cases, both entitled Financial Guaranty Insurance Company v. RFC et al., FGIC alleges that defendants breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured MBS offerings. FGIC further alleges that the defendants breached their contractual obligations to permit access to loan files and certain books and records.

In the third case, entitled Financial Guaranty Insurance Company v. GMAC Mortgage LLC, et al., FGIC makes similar contract allegations against GMAC Mortgage and ResCap, as well as a claim against GMAC Mortgage for fraudulent inducement. In addition, FGIC alleges aiding and abetting fraudulent inducement against Ally Bank, which originated a large portion of the loans in the disputed pool, and breach of the custodial agreement for failing to notify FGIC of the claimed breaches of representations and warranties. In each of these cases, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages.

On December 15, 2011, FGIC filed a fourth complaint in New York County Supreme Court related to insurance policies issued in connection with a RFC-sponsored transaction. This complaint, entitled Financial Guaranty Insurance Company v. Ally Financial, Inc., et al., names RFC and ResCap, and seeks various forms of declaratory and monetary relief. The complaint alleges that the defendants are alter egos of one another, fraudulently induced FGIC's agreement to provide insurance by misrepresenting the nature of RFC's business practices and the credit quality and characteristics of the underlying loans, and have now materially breached their agreement with FGIC by refusing its requests for information and documents.

On December 27, 2011, FGIC filed three additional complaints in New York County Supreme Court against ResCap and RFC. These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations. In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same.

Since January 1, 2012, FGIC has filed five new complaints in federal court naming some combination of Ally Inc., ResCap, Ally Bank, RFC, and GMAC Mortgage. The five complaints were filed on January 31, 2012, March 5, 2012, March 6, 2012, March 12, 2012 and March 13, 2012, respectively. These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations. In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same. In addition, FGIC amended its first-filed complaint to name Ally Inc. as a defendant.

All of the FGIC cases are now venued in the U.S. District Court for the Southern District of New York, and the defendants have asked the Court for leave to file motions to dismiss each such case.

### Mitchell Litigation

In this statewide class action, plaintiffs alleged that Mortgage Capital Resources, Inc. (MCR) violated the Missouri Second Mortgage Loan Act by charging Missouri borrowers fees and interest not permitted by the Act. RFC and Homecomings, among others, were named as defendants in their role as assignees of certain of the MCR loans. Following a trial concluded in January 2008, the jury returned verdicts against all defendants, including an award against RFC and Homecomings for $4.3 million in compensatory damages (plus pre- and post-judgment interest and attorneys' fees) and against RFC for $92.0 million in punitive damages. In a November 2010 decision, the Missouri Court of Appeals affirmed the compensatory damages but ordered a new trial on punitive damages. Upon remand, we paid $12.8 million in compensatory damages (including interest and attorneys' fees). At the end of February 2012, RFC entered into an agreement in principle to settle all of plaintiffs' remaining claims, including plaintiffs' already-awarded attorneys' fees on appeal, for a total of $17.3 million. The agreement was preliminarily approved on April 16, 2012. The hearing on final approval is scheduled for May 18, 2012.

### Private–label Securitizations – Other Potential Repurchase Obligations

When we sell mortgage loans through whole-loan sales or securitizations, we are required to make customary representations and warranties about the loans to the purchaser and/or securitization trust. These representations and warranties relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, ability to deliver required documentation, and compliance with applicable laws. Generally, the representations and warranties described above may be enforced at any time over the life of the loan. Breaches of these representations and warranties have resulted in a requirement that we repurchase mortgage loans. As the mortgage industry continues to experience higher repurchase requirements and additional investors begin to attempt to put back loans, a significant increase in activity beyond that experienced today could occur, resulting in additional future losses.

### Private-label Securities Litigation

We and certain of our subsidiaries have been named as defendants in several cases relating to our various roles in MBS offerings. The plaintiffs generally allege that the defendants made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to the MBS offerings. The alleged misstatements and omissions typically concern underwriting standards for residential mortgage loans. Plaintiffs generally claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud. Plaintiffs seek monetary damages and rescission. Set forth below are descriptions of the most significant of these legal proceedings.

## Regulatory

Our origination, purchase, sale, securitization and servicing business activities expose us to risks of noncompliance with extensive federal, state, local and foreign laws, rules and regulations. Our business activities are also governed by, among other contracts, primary and master servicing agreements that contain covenants and restrictions regarding the performance of our servicing activities. Our failure to comply with these laws, rules, regulations and contracts can lead to, among other things, loss of licenses and approvals, an inability to sell or securitize loans, demands for indemnification or loan repurchases from purchasers of loans, demands for indemnification or other compensation from investors in our securitizations, fines, penalties, litigation, including class action lawsuits, and governmental investigations and enforcement actions, including, in the case of some violations of law, possible criminal liability.

GMAC Financiera, our wholly-owned subsidiary operating in Mexico, incurred losses during the year which reduced its capital stock and its shareholders equity by more than two-thirds. At March 31, 2012, the amount of the deficiency is $71.4 million. Until this deficiency is cured, GMAC Financiera falls within one of the causes for dissolution under Mexican law.

## Other Contingencies

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies. We establish reserves for these contingencies when the item becomes probable and the costs can be reasonably estimated. The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item. Based on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse effect on our consolidated financial condition, results of operations, or cash flows.

## 17. Related Party Transactions

## Balance Sheet

A summary of the balance sheet effect of our transactions with Ally Inc., Ally Bank, and other affiliates were as follows.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held–for–sale — purchased from Ally Bank | **$23,624** | $13,518 |
| Mortgage loans held-for-sale — contributions from Ally Inc. (carry value) (a) | **620,611** | 645,357 |
| Other Assets | | |
| Restricted cash deposits — Ally Bank | **81,879** | 112,458 |
| Derivative collateral placed with Ally IM | **1,079,022** | 1,008,262 |
| Fair value of derivative instruments | | |
| MSR swap — Ally Bank | **29,442** | 17,681 |
| Receivable (Payable), net — Ally Bank | **20,785** | (21,001) |
| Receivable from other affiliates | **2,125** | 2,046 |
| **Liabilities** | | |
| Borrowings — Ally Inc. Senior Secured Credit Facility (b) | **$751,849** | $757,767 |
| Borrowings — Ally Inc. LOC (b) | **430,696** | 185,064 |
| Borrowings — BMMZ Repo (b) | **250,416** | 250,351 |
| Other Liabilities | | |
| Liability for loans sold with recourse — Ally Bank (c) | **5,976** | 6,773 |
| Fair value of derivative instruments | | |
| Forward flow agreement — Ally Bank | **27,105** | (16,423) |
| Ally IM (d) | **954,824** | 1,049,420 |
| Payable to Ally Inc. (e) | **4,194** | 31,019 |
| **Other activity** | | |
| Loans (UPB) sub-serviced — Ally Bank | **$140,799,853** | $143,172,634 |
| Servicing escrow/deposits for off-balance sheet loans — Ally Bank | **2,273,975** | 2,003,745 |
| Home Equity Loans (UPB) subject to indemnifications  — Ally Bank (c) | **56,571** | 58,512 |
| Income tax (receipt) payment — Ally Inc. (f) | **(4,550)** | 37,498 |

(a)  Amount represents the carrying value of the loans contributed from Ally Inc. in 2009.  The UPB of these loans is $1.5 billion and $1.6 billion at March 31, 2012 and December 31, 2011, respectively.

(b)  Includes principal balance of debt outstanding plus accrued interest.

(c)  Relates to an indemnification agreement with respect to a portfolio of second lien home equity loans with an original UPB of $166.0 million. This agreement expired in April 2012.

(d)  Includes the fair value of forwards, TBAs and swaptions executed in connection with hedging of our mortgage loans held–for–sale, retained interests and MSRs. Also includes the fair value of hedges related to our foreign currency exposure.  See Note 14 — Derivative Instruments and Hedging Activities for additional information.

(e)  Includes costs for personnel, information technology, communications, corporate marketing, procurement and services related to facilities incurred by Ally Inc. and allocated to us.

(f)  See Note 12 - Income taxes for additional information.

## Statement of Comprehensive Income

A summary of the income statement effect of our transactions with Ally Inc., Ally Bank and other affiliates were as follows.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| **Net financing revenue** | | |
| Interest income on cash deposits — Ally Bank | **$221** | $290 |
| Interest expense — Ally Inc. Senior Secured Credit Facility | **5,746** | 6,234 |
| Interest expense — Ally Inc. LOC | **2,223** | 4,177 |
| Interest expense — BMMZ Repo | **3,169** | — |
| Interest expense — Ally Bank | **385** | — |
| **Other revenue** | | |
| (Loss) gain on mortgage loans, net — derivative instruments with Ally IM | **(58,889)** | 56,980 |
| (Loss) gain on mortgage loans, net — Ally Bank | **(87,339)** | 134,468 |
| Gain on mortgage loans, net — Ally Securities, LLC (c) | **—** | 4,501 |
| Servicing fees — Ally Bank | **11,767** | 7,614 |
| Servicing assets valuation and hedge activities, net — derivative instruments with Ally IM | **(32,246)** | (174,499) |
| Servicing assets valuation and hedge activities, net — derivative instruments with Ally Bank | **96,424** | 216,048 |
| Loan brokerage fees — Ally Bank (a) | **23,343** | 9,496 |
| **Provision expense — Ally Bank (b)** | **(8)** | 860 |
| **Noninterest expense** | | |
| (Loss) on foreign currency — derivative instruments with Ally Inc. | **(7,330)** | (169) |
| Management fees — Ally Inc. | **29,558** | 16,915 |
| Custodial fees — Ally Bank | **1,985** | 1,846 |
| Allocated expenses — Ally Bank | **72** | 125 |
| **Other activity** | | |
| Loans purchased (UPB) under the MMLPSA — Ally Bank (d) | **$10,137,301** | $14,640,058 |
| Loans sold (UPB) under the MMLPSA — Ally Bank | **43,052** | 7,543 |

(a) Under the terms of a broker agreement with Ally Bank, we provide loan processing services to support Ally's loan origination and purchase activities as well as loan closing services.

(b) Relates to provision expenses associated with the indemnification agreement with respect to a portfolio of second lien home equity loans. This agreement expired in April 2012.

(c) Relates to mortgage and asset–backed securities brokered to Ally Securities, LLC for underwriting, distribution and capital markets liquidity services.

(d) Includes repurchased loans of $0.6 million and $4.2 million as of March 31, 2012 and 2011, respectively.

## Statement of Changes in Equity

A summary of the changes to the statement of equity related to our transactions with Ally Inc., Ally Bank and other affiliates were as follows.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| **Equity** | | |
| Capital contributions — Ally Inc. (a) | **$196,500** | $109,405 |

(a) Represents capital contributions from Ally Inc. through the forgiveness of Ally Inc. LOC borrowings.

## Other Significant Affiliate Agreements

We are party to an ISDA 2002 Master Agreement with Ally IM, a subsidiary of Ally Inc., whereby we enter into foreign exchange and interest rate hedging transactions (the ISDA Agreement) and a Master Securities Forward Transaction Agreement (the Forward Agreement and with the ISDA Agreement, the Derivative Agreements) whereby we agree to sell certain mortgage-backed securities to Ally IM from time to time on a forward basis. We also entered into a Guarantee and Master Netting Agreement with Ally IM whereby the parties agreed to aggregate, net, and set off the Derivative Agreements and the Ally Inc. LOC. In connection with the Derivative Agreements, we cross-collateralize the respective obligations and have granted a security interest to Ally IM in any cash or other property posted, or required to be posted, as collateral by us. We expect to transact virtually all of our hedging transactions with Ally IM in the future.

On December 5, 2011, we entered into an agreement with Ally Inc. and GMAC Mortgage Group (the Agreement), whereby we agreed to certain terms and conditions in respect of ongoing loan sales by Ally Bank to us under the terms of our Master Mortgage Loan Purchase and Sale Agreement (MMLPSA) with Ally Bank. In accordance with the Agreement, we have instructed the GSEs to deliver, free and clear of all liens and encumbrances, mortgage-backed securities received from the GSEs in connection with our loan sales to them (New MBS) directly upon issuance into an account of Ally IM for the benefit of Ally Bank and GMAC Mortgage Group. We have granted Ally Bank and GMAC Mortgage Group security interests in loans purchased from Ally Bank and all proceeds from the sale of the New MBS. All proceeds from the sale of the New MBS are paid without setoff, recoupment or other reduction by Ally IM directly to Ally Bank. Ally Bank remits to us proceeds, if any, in excess of the purchase price of loans sold to us under the MMLPSA, and we remit to Ally Bank the amount of any shortfall in such proceeds necessary to pay the purchase price of the loans. On April 25, 2012, we entered into a Pledge and Security Agreement among ResCap, GMAC Mortgage, Ally Inc., GMAC Mortgage Group, Ally Bank and Ally IM (the Pipeline Security Agreement) in connection with these conditions. See *Transactions with Ally Bank,* below, for additional information regarding the MMLPSA agreements.

## Transactions with Ally Bank

Under the terms of our Broker Agreement with Ally Bank, we act in a broker capacity and provide loan processing services to Ally Bank to support its origination and purchase of loans, as well as loan closing services. The Broker Agreement has no mandatory expiration date and can be terminated by either party with 30 days notice. Under the terms of the Broker Agreement, loans meeting the underwriting standards of Ally Bank are originated (funded) by Ally Bank, while loans not meeting those standards may be originated by us and sold directly into the secondary market. We also provide certain representations and warranties and indemnifications to Ally Bank with respect to brokered loans. The Broker Agreement was amended April 30, 2012 and is effective May 1, 2012.

Under the terms of the MMLPSA with Ally Bank, we purchase first- and second-lien mortgage loans held-for-sale from Ally Bank. We sell and deliver such mortgage loans into the secondary market primarily through Fannie Mae and Freddie Mac securitizations and Ginnie Mae insured securitizations. The MMLPSA has no mandatory expiration date and can be terminated on 30 days notice by Ally Bank or immediately if agreed by both parties. Under the MMLPSA, we purchase loans from Ally Bank and recognize gains or losses on the sale of mortgage loans as they are sold by us into the secondary market. Loans purchased by us pursuant to the MMLPSA include mortgage loans originated by third parties and purchased by Ally Bank (correspondent lending); loans originated directly by Ally Bank; and mortgage loans originated by us and sold to Ally Bank pursuant to a loan sale agreement (the Client Agreement). Effective May 1, 2012, the MMLPSA and Client Agreement were amended and restated. Under the terms of the New MMLPSA, effective May 2012, we have an obligation to purchase all FHA and VA Ginnie Mae insurable loans originated or purchased by Ally Bank. We will no longer purchase Fannie Mae and Freddie Mac eligible loans that Ally Bank originates or purchases. Loans purchased under the New MMLPSA are on a nonrecourse, service released basis. To the extent any loan purchased by us under the new MMLPSA is determined to be ineligible or uninsurable for purposes of Ginnie Mae certification, Ally Bank will cure the defect, if curable, or repurchase the loan at the current unpaid principal balance plus accrued interest.

We were counterparty to a forward flow agreement for mortgage loans held-for-sale and interest rate lock commitments held by Ally Bank that ultimately were sold to us under the MMLPSA. The forward flow agreement transferred the exposure to changes in fair value of Ally Bank's mortgage loans held-for-sale and interest rate lock commitments to us. We hedged our exposure to the forward flow agreement consistent with the hedging of our own mortgage loans held-for-sale and interest rate lock commitments. The forward flow agreement was terminated effective April 30, 2012.

We were counterparty to a MSR Total Return Swap (the MSR Swap) which transferred the total economic return of MSRs owned by Ally Bank to us in exchange for a variable payment based upon a fixed spread to LIBOR. The fixed spread to LIBOR is periodically evaluated against available market data. We hedged our exposure to the MSR Swap consistent with the hedging of our own MSRs. The MSR Swap was terminated effective April 30, 2012.

We were party to an ISDA 2002 Master Agreement with Ally Bank governing the forward flow agreement and MSR Swap. We also entered into an Agreement to Set Off Obligations (the Netting Agreement) which provided Ally Bank the right, but not the obligation, to set of any obligation that we had to Ally Bank against any obligation of Ally Bank to us. The ISDA 2002 Master Agreement and the Netting Agreement were terminated effective April 30, 2012.

Under the GSE servicer guides, the seller and servicer of mortgage loans equally share in customary representation and warranty obligations. We assume all of the representation and warranty obligations for loans we purchased from Ally Bank under the MMLPSA that we subsequently sell through an Agency securitization or otherwise sell into the secondary market. To the extent these loans were originated by third parties and purchased by Ally Bank and subsequently sold to us under the MMLPSA we pursue recovery of losses from the third parties under breach of customary representation and warranties. Pursuant to the Client Agreement, we also provide certain representations and warranties and indemnifications to Ally Bank with respect to those loan transactions. For loans that are not eligible to be sold to the GSEs that reach certain delinquency thresholds or which are otherwise in breach of sale representations and warranties contained in the Client Agreement, we repurchase loans from Ally Bank at their carrying cost.

GMAC Mortgage is designated as subservicer for loans held by Ally Bank and loans sold to us under the MMLPSA where Ally Bank retained the servicing rights (Servicing Agreement). Under the Servicing Agreement, GMAC Mortgage performs all customary mortgage loan servicing activities, including but not limited to, collection of borrower remittances, loss mitigation and foreclosure processing activities. The term of the Servicing Agreement automatically renews for a one year term on an annual basis, unless notice of termination is provided by either party with 120 days prior notice. We receive subservice fees which are generally based on the average daily balance of subserviced loans which differ by loan type and delinquency status.

In the first quarter of 2008, Ally Bank purchased a portfolio of second-lien home equity loans from us. We provided an indemnification to Ally Bank whereby we reimburse Ally Bank at such time as any of the loans covered by this agreement are charged off, typically when the loan becomes 180 days delinquent. The indemnification expired in April 2012.

In connection with our Settlement obligations Ally Bank has agreed to participate in borrower relief programs and activities with respect to their loan portfolios. We have recorded a liability of $83.5 million at March 31, 2012, in connection with losses Ally Bank is expected to incur in connection with the programs. To the extent activities under the borrower relief programs are consistent with activities currently permitted under our sub-servicing agreement, Ally Bank will not seek to be reimbursed or indemnified for any losses it incurs in connection with these borrower relief activities. See Note 16 – Contingencies and Other Risks for additional information related to the Settlement.

## 18. Regulatory Matters

Certain subsidiaries associated with our mortgage and real estate operations are required to maintain regulatory net worth requirements. See Note 8 — Borrowings for additional information. Failure to meet minimum capital requirements can initiate certain mandatory actions by federal, state, and foreign agencies that could have a material effect on our results of operations and financial condition. These entities were in compliance with these requirements as of March 31, 2012.

Certain of our foreign subsidiaries operate in local markets as either banks or regulated finance companies and are subject to regulatory restrictions. These regulatory restrictions, among other things, require that our subsidiaries meet certain minimum capital requirements and may restrict dividend distributions and ownership of certain assets. As of March 31, 2012, compliance with these various regulations has not had a material adverse effect on our financial condition, results of operations or cash flows.

## 19. Subsequent Events

Events subsequent to March 31, 2012, were evaluated through May 1, 2012, the date on which these Condensed Consolidated Financial Statements were issued.

**<u>Exhibit C-9</u>**

**<u>Deposit Accounts Not Subject to Control Agreements</u>**

**Deposit Accounts Not Subject to Control Agreements**

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S UNDERSTANDING, AS OF SEPTEMBER 24, 2012, OF THE DEBTORS' DEPOSIT ACCOUNTS THAT ARE NOT SUBJECT TO CONTROL AGREEMENTS IN FAVOR THE JUNIOR SECURED PARTIES.[1]  SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

| Bank/Institution | Debtor | Account Number | Balance at Petition Date[2] |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | Residential Capital, LLC | xxxx2599 | $8,091.32 |
| JPMorgan Chase Bank, N.A. | Residential Funding Company, LLC | xxxx7286 | $1,730,892.68 |
| JPMorgan Chase Bank, N.A. | Residential Funding Company, LLC | xxxx2763 | 0[3] |
| TD | Residential Funding Company, LLC | xxxx0593 | 0[4] |
| Wells Fargo f/k/a Wachovia | Residential Funding Company, LLC | xxxx7618 | 0[5] |
| Ally Bank | GMAC Mortgage USA Corporation | xxxx3803 | $500,000 |
| Ally Bank | GMAC Mortgage, LLC | xxxx6323 | $36,583,688 |
| Bank of New York Mellon | GMAC Mortgage, LLC | xxxx9917 | $2,000,000 |
| Bank of America | GMAC Mortgage, LLC | xxxx9454 | $892,259 |
| Citibank | GMAC Mortgage, LLC | xxxx4806 | $1,019,317 |
| JPMorgan Chase Bank, N.A. | GMAC Mortgage, LLC | xxxx2482 | $3,440,148 |
| JPMorgan Chase Bank, N.A. | GMAC Mortgage, LLC | xxxx2540 | $2,210,001 |

---

[1]  Terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates.*

[2]  As listed on each debtor's schedule of assets and liabilities on the Petition Date.

[3]  Not scheduled on schedule of assets and liabilities.

[4]  Not scheduled on schedule of assets and liabilities.

[5]  Not scheduled on schedule of assets and liabilities.

| | | | |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | GMAC Mortgage, LLC | xxxx2565 | $14,047 |
| JPMorgan Chase Bank, N.A. | GMAC Mortgage, LLC | xxxx2573 | $11,679 |
| JPMorgan Chase Bank, N.A. | GMAC Mortgage, LLC | xxxx8567 | 0[6] |
| Wells Fargo f/k/a Wachovia | GMAC Mortgage, LLC | xxxx2607 | $38,321 |
| Wells Fargo f/k/a Wachovia | GMAC Mortgage, LLC | xxxx7877 | 0[7] |
| Wells Fargo f/k/a Wachovia | GMAC Mortgage, LLC | xxxx1176 | 0[8] |
| Wells Fargo f/k/a Wachovia | GMAC Mortgage, LLC | xxxx6910 | 0[9] |
| Wells Fargo f/k/a Wachovia | Residential Consumer Services, LLC | xxxx7570 | $16,885[10] |
| JPMorgan Chase Bank, N.A. | ETS of Washington, Inc. | xxxx1781 | $7,500 |
| JPMorgan Chase Bank, N.A. | ETS of Washington, Inc. | xxxx1799 | $5,000 |
| JPMorgan Chase Bank, N.A. | Residential Funding Mortgage Exchange, LLC | xxxx1418 | $25,000 |
| **Total** | | | **$48,502,829** |

---

[6] Not scheduled on schedule of assets and liabilities.
[7] Not scheduled on schedule of assets and liabilities.
[8] Not scheduled on schedule of assets and liabilities.
[9] Not scheduled on schedule of assets and liabilities.
[10] Amount shown on "Book/Balances at Filing" (RC0075633) is zero.

**Exhibit C-10**

**Schedule of Excluded Real Property**

## Excluded Real Property

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S UNDERSTANDING, AS OF SEPTEMBER 24, 2012, OF THE DEBTORS' OWNED AND LEASED REAL ESTATE (OTHER THAN REO PROPERTIES) THAT ARE NOT SUBJECT TO MORTGAGES IN FAVOR THE JUNIOR SECURED PARTIES.[1]  SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

## Owned Real Property

| Debtor Owner | Nature of Debtor's Interest in Property | Description and Location of Property |
| --- | --- | --- |
| GMAC Mortgage, LLC | Land & Building – Servicing Center | 3451 Hammond Ave Waterloo, IA 50702 |
| EPRE LLC | Building, Land and Leasehold Improvements | Eden Prairie 6875 Shady Oak Rd Hennepin, MN 55344 |

## Leasehold Interests

| Debtor Lessee/ Sublessee | Lease and Related Documents[2] | Lease Location |
| --- | --- | --- |
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2255 N. Ontario Street #400 (Dated 10/15/1999) | 2255 N. Ontario Street #400 Burbank, CA  91504 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement, Occupancy Agreement - 17470 Pacesetter Way (Dated 11/17/2011)) | 17470 Pacesetter Way, Scottsdale, AZ  85255 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1307 Avenel Boulevard Apt. 1307 (Dated 5/21/2011) | 1307 Avenel Boulevard, Apt. 1307, North Wales, PA 19454 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 7676 Hazard Center Drive, Suite 500-33A and B (Dated 8/10/2011) | 7676 Hazard Center Drive, Suite 500-33A and B, San Diego, CA  92108 |
| ETS of Virginia, Inc. | Service Agreement between Business Suites (Texas) Ltd and Lessee (Dated 9/13/2011) | 3900 Westerre Parkway Suite 300, Office 328, 330, 332, Richmond, VA  23233 |

---

[1] Terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates*.  Due to the volume of data underlying the REO Properties, a schedule of the REO Properties is not attached, but will be made available to the Court, the Debtors, AFI, and the Junior Secured Parties upon request.

[2]  Leases referred to herein include all addenda, amendments, renewals, extensions, assignments, substitutions and subleases thereof.

| Debtor Lessee/ Sublessee | Lease and Related Documents[2] | Lease Location |
|---|---|---|
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 300 East Fall Creek (Suite 124) (Dated 7/1/2005) | 300 East Fall Creek, Suite 124, Indianapolis, IN   46205 |
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2711 North Haskell Avenue (Dated 12/17/1993) | 2711 North Haskell Avenue, Dallas, TX   75204 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1140 Virginia Drive (Dated 5/3/2012) | 1140 Virginia Drive, Fort Washington, PA 19034--3200 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2501 S State Hwy 121 Suite 300 Denton (Dated 7/30/2002)[3] | 2501 S State Hwy 121 Suite 300 Denton, Lewisville, TX 75067 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 15821 Ventura Boulevard, Suite 180 (Dated 6/26/2001)[4] | 15821 Ventura Boulevard, Suite 180, Encino, CA  91436 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 10775 Double R Boulevard (Dated 10/2/2008) | 10775 Double R Boulevard, Reno, NV  89521 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 53 Hereford Street (Dated 4/16/2012) | 53 Hereford Street, Boston, MA 02115 |
| GMAC-RFC Homecomings Financial | Memo of Understanding between Homeowners Alliance and Lessee (Dated 11/1/2006) | 24516 Harper Avenue, St. Clair Shores, MI   48081 |
| Homecomings Financial, LLC | Real Estate Lease, Sublease, Office Service Agreement- 24516 Harper Avenue (Dated 11/01/2006) | 24516 Harper Avenue, St. Clair Shores, MI   48081 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 34 Hayden Rowe Street, Suite 162 (Dated 7/20/2011) | 34 Hayden Rowe Street, Suite 162, Hopkinton, MA  01748 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- Two Ravinia, Suite 5001 (Dated 1/16/2009) | Two Ravinia, Suite 5001, Atlanta, GA  30346 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1100 Virginia Drive (Dated 1/31/2006) | 1100 Virginia Drive, Fort Washington, PA  19034-3200 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 4426 Washington Road (Dated 4/16/2012) | 4426 Washington Road, Evans, GA  30809 |
| GMAC Mortgage, LLC | Parking Lease, Sublease, Office Service Agreement-  1051 E. San Marnan Drive (Dated 2/24/2012) | Parking parcel adjacent to 1051 E. San Marnan Drive, Waterloo, IA 50702 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2504 Anderson Highway (Dated 12/11/2011) | 2504 Anderson Highway, Powhatan, VA  23139 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 9635 Granite Ridge Drive (Dated 9/16/2009) | 9635 Granite Ridge Drive, San Diego, CA  92123 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 915 East McLemore Avenue, Suite 205, Office "LOCCDC" (Dated 10/19/2010) | 915 East McLemore Avenue, Suite 205, Memphis, TN 38106 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 233 Needham Street, Office #78 (Dated 4/25/2012) | 233 Needham Street, Office #78, Newton, MA  02464 |

[3]  Pursuant to an Assignment of Leasehold Interest dated May 9, 2012, GMAC Mortgage LLC assigned a 51% leasehold interest to Ally Financial Inc. and has a right to require the re-assignment of such leasehold interest from Ally Financial Inc. as provided therein.

[4]  Property was to be surrendered to Landlord upon expiration, July 31, 2012.

| Debtor Lessee/ Sublessee | Lease and Related Documents[2] | Lease Location |
|---|---|---|
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 277 Mallory Station Road, Suite 106 (Dated 2/17/2012) | 277 Mallory Station Road, Suite 106, Franklin, TN 37067 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 111 N. Market Street Suite 300, Offices #8 and 9 (Dated 4/6/2011) | 111 N. Market Street Suite 300, Offices #8 and 9, San Jose, CA 95113 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 111 N. Market Street Suite 300, Office #10 (Dated 9/8/2011) | 111 N. Market Street Suite 300, Office #10, San Jose, CA 95113 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1990 North California Blvd., 8th Floor #830, Office 228 (Dated 4/1/2010) | 1990 North California Blvd., 8th Floor #830, Office 228, Walnut Creek, CA 94596-7261 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 990 North State Road 434 (Dated 4/16/2012) | 990 North State Road 434, Altamonte Springs, FL 32714 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 100 West 5th Avenue (Dated 4/16/2012) | 100 West 5th Avenue, Mt. Dora, FL 32757 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1977 Dundee Drive (Dated 4/16/2012) | 1977 Dundee Drive, Winter Park, FL 32792 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 9442 Capital of Texas Highway North, Plaza One, Suite 500 (Dated 2/1/2012) | 9442 Capital of Texas Highway North, Plaza One, Suite 500, Austin, TX 78759 |
| Homecomings Financial, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1650 Corporate Circle, Suites 100, 150 and 200 (Dated 12/12/2003) Sublease between Lessee and Amy's Kitchen, Inc. (Dated 1/22/2009) | 1650 Corporate Circle, Suites 100, 150 and 200, Petaluma, CA 94954 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2004 Route 17M (Dated 3/1/2012) | 2004 Route 17M, Goshen, NY 10924 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 112 W. Boulevard (Dated 10/1/2011) | 112 W. Boulevard, Laurinburg, NC 28352 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 625 N. Euclid, Suite 515 (Dated 11/1/2010, Amendment dated 10/2011) | 625 N. Euclid, Suite 515, St. Louis, MO 63108 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 60 East Rio Salado Pkwy, 9th Floor (Dated 10/6/2009) | 60 East Rio Salado Pkwy, 9th Floor, Tempe, AZ 85281 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 1224 Mill Street, Office 215 (Dated 3/31/2011) | 1224 Mill Street, Office 215, East Berlin, CT 06023 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1560 Sawgrass Corporate Parkway, Suite 401 (Dated 2/1/2011) | 1560 Sawgrass Corporate Parkway, Suite 401, Fort Lauderdale (Sunrise), FL 33323 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1560 Sawgrass Corporate Parkway, Suite 494 (Dated 2/1/2011) | 1560 Sawgrass Corporate Parkway, Suite 494, Fort Lauderdale (Sunrise), FL 33323 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1170 Peachtree Street NE, Suite 1200-1239 (Dated 12/2/2011) | 1170 Peachtree Street NE, Suite 1200-1239, Atlanta, GA |

| Debtor Lessee/ Sublessee | Lease and Related Documents[2] | Lease Location |
|---|---|---|
| | | 30309 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 33 Wood Avenue South, Office 633 (Dated 7/13/2009) | 33 Wood Avenue South, Office 633, Iselin, NJ 08830 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 4449 Easton Way 2nd Floor, Offices 2106 & 2094 (Dated 10/28/2011) | 4449 Easton Way 2nd Floor, Offices 2106 & 2094, Columbus, OH 43219 |
| ETS of Washington, Inc. | Office Service Agreement between Regus Management Group LLC and Lessee (Dated 8/1/2011) | 800 Bellevue Way, Office 420, Bellevue, WA 98004 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 800 Bellevue Way, Office 429 and 430 (Dated 2/14/2011) | 800 Bellevue Way, Office 429 and 430, Bellevue, WA 98004 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 11601 Wilshire Blvd., 5th Fl (Dated 2/8/2012) | 11601 Wilshire Blvd., 5th Fl., Los Angeles, CA 90025 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1215 K Street, 17th Floor, Offices 1720 and 1721 (Dated 1/11/2012) | 1215 K Street, 17th Floor, Offices 1720 and 1721, Sacramento , CA 95814 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 655 North Central Avenue, 17th Fl (Dated 2/22/2012) | 655 North Central Avenue, 17th Fl., Glendale, CA 91203 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 1320 Main Street Suite 300, Office 341 (Dated 7/27/2011)) | 1320 Main Street Suite 300, Office 341, Columbia, SC 29201 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 511 W Bay Street, Suite 350 (Dated 3/6/2012) | 511 W Bay Street, Suite 350, Tampa, FL 33606 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 28005 N. Smyth Drive (Dated 3/12/2012) | 28005 N. Smyth Drive, Valencia, CA 91355 |
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 8400 Normandale Lake Boulevard (Dated 7/7/2004) | 8400 Normandale Lake Boulevard, Bloomington, MN 55437 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 111 Second Avenue NE Suite 532 (Dated 5/17/2011) | 111 Second Avenue NE Suite 532, St. Petersburg, FL 33701 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2480 Route 97, Suite 7 (Dated 5/1/2012) | 2480 Route 97, Suite 7, Glenwood, MD 21738 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 105 Maxess, Office # 106 (Dated 4/26/2012) | 105 Maxess, Office #106, Melville, NY 11747 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2448 Junipero Serra Boulevard (Dated 5/1/2012) | 2448 Junipero Serra Boulevard, Daly City, CA 94015 |
| GMAC Mortgage, LLC | Lease between 1891 Professional Building Associates and Lessee (Dated 5/30/2012) | 10 Liberty Street, Office 111 & 411, Danvers MA 01923 |
| GMAC Mortgage, LLC | Lease Agreement between Bridgeton Executive Suites, Inc. and Lessee (Dated 6/29/2012) | 3466 Bridgeland Drive, Office 201, Bridgeton MO 63044 |
| GMAC Mortgage, LLC | Lease between Trotter Holdings, LLC dba Bridlewood Executive Suites and Lessee (Dated 8/6/12) | 204 Muirs Chapel Rd, Suite 100, Greensboro NC 27410 |
| GMAC Mortgage, | Lease between Kalyvas Group, LLC and Lessee (Dated 6/29/2012) | 111 Second Avenue NE Suite 910, St. Petersburg FL 33701 |

| Debtor Lessee/ Sublessee | Lease and Related Documents[2] | Lease Location |
|---|---|---|
| LLC | | |
| GMAC Mortgage, LLC | Lease between Landfall Executive Suites, LLC and Lessee (Dated 7/24/12) | 1213 Culbreth Drive, Suites 143 & 144, Wilmington NC |
| GMAC Mortgage, LLC | Office Service Agreement between Regus Management Group LLC and Lessee (Dated 7/9/2012) | 4040 Civic Center Drive, Suite 200, San Rafael CA 94903 |
| GMAC Mortgage, LLC | Office Service Agreement between Regus Management Group LLC and Lessee dated (7/12/2012) | 33 Wood Avenue South, Office 425, Iselin NJ 08830 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 725 Cool Springs, Suite 600 (Dated 6/13/2011) | 725 Cool Springs, Suite 600, Office 6001, Franklin  TN 37067 |
| GMAC Mortgage, LLC | Service Agreement between Your Office - Orlando/Lake Mary and Lessee (Dated 8/1/1012) | 1540 International Parkway, Office 203, Lake Mary FL 32746 |
| GMAC Mortgage LLC | Sublease between Steven S. Nagy, Reliant Holdings, LLC and Lessee (Dated 7/1/2012) | 256 Seaboard Lane, Suite E 105, Franklin  TN 37067 |
| GMAC Mortgage LLC | Sublease between Steven S. Nagy, Reliant Holdings, LLC and Lessee (Dated 7/1/2012) | 505 East Main Street, Hendersonville TN |
| GMAC Mortgage LLC | Sublease between Steven S. Nagy, Reliant Holdings, LLC and Lessee (Dated 7/1/2012) | 4711 Trousdale Drive, Suite 121, Nashville TN 37220 |
| GMAC Mortgage LLC | Executive Suites Lease between SW+A Pendleton West, LLC and Lessee (Dated 6/30/2012) | 607 Pendleton Street, Office #ES2, Greenville SC  29601 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 3200 Park Center Drive (Dated 8/1/2005) | 3200 Park Center Drive Suites 150 & 400, Costa Mesa CA 92626 |
| GMAC Mortgage LLC | Sublease between United Country- Columbia Realty and Lessee (Dated 7/1/2012) | 740 Nashville Hwy, Columbia TN 38401 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 10625 Ellis Avenue, Suite B (Dated 2/1/2012) | 10625 Ellis Avenue, Suite B Fountain Valley, CA 92708 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 100 Cummings Center Suite 312-G (Dated 4/25/2012) | 100 Cummings Center Suite 312-G, Beverly, MA 01915 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1076 Ocean Avenue (Dated 03/1/2012) | 1076 Ocean Avenue, Sea Bright, NJ 07760 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2027 State Highway 35 (Dated 2/1/2012) | 2027 State Highway 35, Wall, NJ 07719 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 922 Washington Street (Dated 12/1/2011) | 922 Washington Street, Hoboken, NJ 07030 |