**Hearing Date and Time: September 27, 2012 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: September 26, 2012 at 4:00 p.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip S. Kaufman
Adina C. Levine
Arielle Warshall Katz
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| Residential Capital, LLC, et al., | : Case No. 12-12020 (MG) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

------------------------------------------------------- x

### NOTICE OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE DEBTORS TO COMPEL GIBBS & BRUNS TO PRODUCE SETTLEMENT COMMUNICATIONS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On September 25, 2012 the Official Committee of Unsecured Creditors (the "**Committee**") of the above captioned debtors and debtors-in-possession filed the attached Motion of the Official Committee of Unsecured Creditors to Compel Gibbs & Bruns to Produce Settlement Communications (the "**Motion**").

2.     A hearing (the "**Hearing**") to consider the Motion shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 501 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004, on **September 27, 2012 at 10:00 a.m.** (prevailing Eastern time).

3.     Any objections to the Motion must be made in writing, filed with the Court (with a copy to Chambers) and served in accordance with the Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 and Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management and Administrative Procedures [Docket No. 141] (the "**Case Management Order**"), and served upon the Special Service List,

as that term is defined in the Case Management Order, so as to be actually received no later than **September 26, 2012 at 4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**").

4.    If no objections to the Motion are timely filed and served on or before the Objection Deadline, the Committee may submit to the Bankruptcy Court an order substantially in the form of the proposed order attached to the Motion as **Exhibit A** (the "**Proposed Order**").

5.    A Copy of the Motion can be obtained or viewed for a fee via PACER at www.pacer.gov or (without charge) on the Debtors' restructuring website at www.kccllc.net/rescap.

Dated:    September 25, 2012
New York, New York

/s/  Kenneth H. Eckstein
Kenneth H. Eckstein
Philip S. Kaufman
Adina C. Levine
Arielle Warshall Katz
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee
of Unsecured Creditors*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip S. Kaufman
Adina C. Levine
Arielle Warshall Katz
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

---------------------------------------------------------- x

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO**
**COMPEL GIBBS & BRUNS TO PRODUCE SETTLEMENT COMMUNICATIONS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 3

RELIEF REQUESTED .......................................................................................................... 3

ARGUMENT ........................................................................................................................ 3

NO PRIOR REQUEST .......................................................................................................... 7

CONCLUSION ..................................................................................................................... 7

## EXHIBITS

**Exhibit A** -- Proposed Order

**Exhibit B** -- Subpoena of the Official Committee of Unsecured Creditors, dated August 27, 2012

**Exhibit C** -- Gibbs & Bruns, LLP's Objections And Responses to The Official Committee of Unsecured Creditors' Subpoena, dated September 6, 2012

**Exhibit D** -- January 7, 2010 Transcript in *In re Lyondell Chem. Co.*, Case No. 09-10023, Doc. No. 3592 (S.D.N.Y. Jan. 7, 2010)

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby files this motion to compel Gibbs & Bruns, L.L.P. ("G&B") to produce settlement communications responsive to the Committee's August 27, 2012 Subpoena (the "Subpoena"), a copy of which is attached hereto as Exhibit B.[1]  In support of its motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    The Committee has been forced to file this motion because G&B has confirmed that it "will not produce [documents reflecting] settlement negotiations unless ordered by the Court."  September 19, 2012 Hearing Tr. at 54.  Its refusal to provide discovery concerning its communications with the Debtors and Ally Financial, Inc. ("Ally") in connection with the RMBS Settlement rests entirely on the assertion that such discovery is not relevant to the Court's determination of the Rule 9019 Motion.  But that position runs afoul of established Second Circuit authority, which makes inquiry into whether a settlement was negotiated at arm's length squarely relevant to evaluation of the proposed settlement for Rule 9019 purposes.  *See Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).  The Committee thus seeks an order overruling G&B's objection to producing the requested documents and compelling production of all such material forthwith.

## BACKGROUND

2.    As the Court is aware, the Debtors have filed a Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320] (as

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Subpoena.

amended and supplemented, the "9019 Motion"). By the 9019 Motion, the Debtors are seeking

approval of a proposed settlement resolving potential representation and warranty claims against

certain of the Debtors held by up to 392 securitization trusts for an aggregate allowed claim in

the amount of $8.7 billion. The Committee is currently examining both the merits of the RMBS

Settlement and the process through which that settlement was negotiated.

3.    On August 27, 2012, the Committee served G&B with the Subpoena

requesting, among other things, documents and communications concerning the negotiation and

execution of the RMBS Trust Settlement Agreements, the Amended RMBS Trust Settlement

Agreements, and the Plan Support Agreements. See Exh. B; Request Nos. 1-4, 6, 9, 10.

Pursuant to the discovery deadlines set forth in the Court's July 31, 2012 Scheduling Order

[Docket No. 945], G&B's response to the Subpoena was due within 10 days, i.e., on or before

September 6, 2012. On September 6, G&B served a written response that included a number of

objections. A copy of that response is attached hereto as Exhibit C.

4.    With respect to the request for settlement communications with the

Debtors and Ally, G&B objected to production of any such documents as "not discoverable and

[] irrelevant to [the] question of whether the Debtor properly exercised its business judgment in

entering into the RMBS Trust Settlement Agreement." Exh. C at 2.[2]  As support for that

position, it has argued that "the evidence of whether negotiations are at arm's length is evident

from the [settlement] agreement itself," and has further contended that discovery of settlement

communications requires a threshold showing of collusion through "extrinsic evidence." See

Sept. 19, 2019 Hearing Tr. at 53, 55. Put another way, G&B contends that the Committee may

---

[2] G&B also initially objected to production based on multiple privileges, including the "common interest" privilege,
but those objections have since been abandoned. During the September 21, 2012 telephone conference with the
Court, G&B partner Robert Madden, Esq. noted that his firm is not withholding any settlement communications
with the Debtors or Ally on privilege grounds. See September 21, 2012 Hearing Tr. at 17-18.

not conduct discovery concerning the possible lack of arm's length bargaining involved in the

RMBS Settlement unless it has already discovered the very evidence it would seek to develop

through such discovery.  As discussed below, G&B's relevance objection is without merit.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§ 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought

herein are sections 105(a) of the Bankruptcy Code, and Bankruptcy Rules 7026, 7037 and 9016.

Rule 26(b)(1) of the Federal Rules of Civil Procedure, made applicable to this matter by Rules

7026 and 9014 of the Federal Rules of Bankruptcy Procedure, provides that "[p]arties may

obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or

defense." Fed. R. Civ. P. 26(b)(1).

## RELIEF REQUESTED

6.      The Committee seeks an order in the form annexed hereto as Exhibit A

compelling G&B to produce all documents within its possession, custody or control responsive

to the Subpoena, including documents and communications concerning the negotiation and

execution of the RMBS Trust Settlement Agreements, the Amended RMBS Trust Settlement

Agreements, and the Plan Support Agreements.

## ARGUMENT

### G&B's SETTLEMENT COMMUNICATIONS
### ARE RELEVANT TO THE COURT'S DETERMINATION
### OF THE 9019 MOTION AND SHOULD BE PRODUCED

7.      In bankruptcy proceedings, courts routinely permit and even encourage

wide-ranging discovery.  *See In re GII Industries, Inc.,* 2012 Bankr. LEXIS 1936, at *7, *10

(E.D.N.Y. Apr. 30, 2012) (granting motion to compel discovery and describing discovery

standard as "liberal" and relevance as "broadly interpreted"); *In re Kelley*, 2003 Bankr. LEXIS 2159, at *4 (Bankr. D. Vt. April 24, 2003) (granting Creditor's motion to compel and explaining that Rule 7026 "promotes liberal discovery of non-privileged material relevant to the litigation so that opposing parties will be better prepared and, in some instances, more likely to come to a settlement"); *Cf. In re Molina*, 420 B.R. 825, 831 (Bankr. D. N.M. 2009) ("[A] court might well deny for bad faith confirmation of a plan of a debtor who refuses to comply with legitimate discovery requests, on the grounds that the debtor's conduct directly contravenes the overarching principles of transparency and disclosure that inhere in the bankruptcy process.").

       8.    Within the 9019 context, the Second Circuit could not have been clearer: A key factor to be considered in evaluating a proposed settlement for Rule 9019 purposes is "the extent to which the settlement is the product of arm's length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d at 462 (internal citation omitted). Courts within this Circuit have accordingly concluded that a detailed examination of the *process* by which the proposed settlement was reached is essential to evaluating the settlement. *See, e.g., In re Innkeepers USA Trust*, 442 B.R. 227, 231 (S.D.N.Y. Dec. 20, 2010) (considering evidence regarding process of negotiations in determining whether to approve Plan Settlement Agreement). In fact, Judge Gerber recently ordered the production of settlement communications on a Rule 9019 motion in order to assess whether the arm's length requirement stated in *Iridium* was satisfied. *See In re Lyondell Chem. Co.*, Case No. 09-10023, Doc. No. 3592, Tr. at 14-15 (S.D.N.Y. Jan. 7, 2010) (Gerber, J.) (copy of transcript attached hereto as Exh. D) (explaining that 9019 settlement requires "total comfort that the settlement was at arm's length and wasn't collusive," and noting that "communications between the debtors and the [other settling] party [] at any time . . . are at least potentially relevant.").

9.     The burden lies upon the proponents of the settlement — not on potential objectors — to establish that the settlement resulted from arm's length bargaining and occurred without collusion. *See In re Matco Elecs. Group, Inc.,* 287 B.R. 68, 76 (N.D.N.Y. 2002) ("The parties proposing the settlement must show that it is reasonable and that . . . [among other factors] 'the settlement was not collusive . . .'") (internal citation omitted). While the Debtors assert in the 9019 Motion that their proposed RMBS Settlement was reached at "arm's length" through "exhaustive negotiations" (*see* Docket No. 1176 at ¶ 15), neither the Committee nor this Court need accept that assertion without first testing it against a complete factual record. *Cf. In re Lyondell,* Tr. at 14-15 (Exh. D at 14-15); *see also In re Present Co., Inc.,* 141 B.R. 18, 23-24 (Bankr. W.D.N.Y. 1992) (rejecting compromise where settling parties had asked the court to "Trust us.").

10.     Disregarding the *Iridium* factors and their application here, G&B instead relies on a 22-year-old decision outside of this Circuit — *In re Lee Way Holding Co,* 120 B.R. 881, 907-09 (S.D. Ohio 1990) — for the proposition that a showing of collusion must be made before settlement communications become discoverable. *See* Exh. C, *passim.* But even if that decision had any precedential value in the face of *Iridium,* it is readily distinguishable. The Southern District of Ohio itself distinguished the situation here as one where settlement negotiations *would* be discoverable — namely, where the settlement was reached early in the case and "counsel for some of the parties were to receive a large fee for services in the case." *Id.* at 908 (distinguishing *In re Gen. Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1133 (7th Cir. 1979)). Indeed, only *one* published decision has ever cited to *In re Lee Way* for the proposition advanced by G&B – and even that court distinguished the case. *See In re Present Co., Inc.,* 141 B.R. 18, 23-24 (Bankr. W.D.N.Y. 1992) (distinguishing *In re Lee Way* and

rejecting compromise where purported "arms-length bargaining" occurred among settling parties and their counsel, and did not include the Creditors Committee).[3]

11.    G&B has also made clear that its refusal to produce any of the requested settlement communications is motivated by its parallel negotiations with other banks and its desire to maintain confidentiality in those discussions. *See* September 21, 2012 Tr. at 14. But this argument has specifically been *rejected* as a reason to protect settlement communications. Even in the class action context, it has been held that "[p]articipants in negotiations to settle. . . are or should be aware that the court will inquire into the conduct of the negotiations. To the extent such inquiry discourages settlements, it should only discourage those negotiated in circumstances so irregular as to cast substantial doubt on their fairness." *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d at 1124 n.20. The same holds true in the 9019 context. In *In re Lyondell*, Judge Gerber ordered the production of settlement communications between the debtors and the counterparties following the execution of a settlement agreement, including any joint preparation for the Rule 9019 hearing. As the Court explained:

> Frankly, I don't muchly care about any institutional concerns in protecting communications between people who were and still are legally adverse who have decided to settle a controversy if I ultimately approve it, but who once more will be in an adverse position if I don't. The debtor and the [settling] party [] should assume, if they want to caucus with each other, if they want to say anything that their communications are not protected in the event there is any further need for examining them.

---

[3] Were this Court to look for any guidance outside this Circuit, there is no reason it should look to *In re Lee Way* in any event. In *In re Grant Broadcasting of Philadelphia*, 71 B.R. 390 (Bankr. E.D. Pa. 1987), the court examined the negotiation process in a Rule 9019 context and, although noting that there was "no element of impropriety in the nature of the settlement negotiations alleged here," nevertheless held — over the debtors' objection —that evidence of the settling parties' positions at various points during the negotiations was admissible "in order to allow the parties to develop any possible evidence of collusion, naiveté, or just bad bargaining tactics on the part of the Debtors." *Id.* at 394.

Exhibit D at 78. Here, too, G&B should have no reasonable expectation of confidentiality concerning its communications with the Debtors and Ally, who were and remain legally adverse to G&B's clients.

## NO PRIOR REQUEST

12.     No prior request for the relief sought in this motion has been made to this or any other Court in connection with these chapter 11 cases.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an Order in the form annexed as Exhibit A compelling G&B to comply with the Committee's Subpoena and produce all documents and communications concerning the negotiation and execution of the RMBS Trust Settlement Agreements, the Amended RMBS Trust Settlement Agreements, and the Plan Support Agreements, and that the Court grant the Committee such other and further relief as may be deemed proper.

Dated: New York, New York
    September 25, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Philip S. Kaufman
Adina C. Levine
Arielle Warshall Katz
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee
of Unsecured Creditors*

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
Residential Capital LLC, et al.,                        :    Case No. 12-12020 (MG)
                                                        :
                        Debtors.                        :    Jointly Administered
                                                        :
------------------------------------------------------------ x

## ORDER APPROVING MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO COMPEL GIBBS & BRUNS TO PRODUCE SETTLEMENT COMMUNICATIONS

Upon consideration of the motion (the "**Motion**"),[1] of the Official Committee of Unsecured Creditors (the "**Committee**") to compel Gibbs & Bruns to produce settlement communications; and due and proper notice of the Motion having been provided; and the Court having reviewed the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and this Court having jurisdiction to order the relief provided herein in accordance with 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given, and no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND ORDERED THAT:**

A.    The Motion is hereby granted to the extent provided herein.

B.    Gibbs & Bruns shall immediately produce all documents within their

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

KL3 2896364.5

possession, custody or control responsive to the Subpoena, including documents and communications concerning the negotiation and execution of the RMBS Trust Settlement Agreements, the Amended RMBS Trust Settlement Agreements, and the Plan Support Agreements.

       C.    The Court retains jurisdiction with respect to all matters arising from or related to the interpretation and implementation of this Order.

Dated: _____, 2012
      New York, New York

 

                _____

                MARTIN GLENN
                UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**Subpoena of the Official Committee of Unsecured Creditors, dated August 27, 2012**

KL3 2896364.5

B256 (Form 256- Subpoena in a Case under the Bankruptcy Code) (12/07)

# United States Bankruptcy Court
## SOUTHERN DISTRICT OF NEW YORK

**SUBPOENA IN A CASE UNDER THE
BANKRUPTCY CODE**

In re Residential Capital, LLC, et. al.,

Case No.  12-12020 (MG)
(Jointly Administered)

**Debtors.**

Chapter 11

To:
Institutional Investors
c/o Kathy Patrick
Gibbs & Bruns LLP
1100 Louisiana Suite 5300
Houston, TX 77002

☐ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court in the place, date and time specified below to testify in the above adversary proceeding.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ **YOU ARE COMMANDED** to appear at the place, date and time specified below to testify at the taking of a deposition in the above adversary proceeding with respect to issues presented on Schedule A.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):  See attached Exhibit A.

| PLACE:   Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, NY 10036 | DATE AND TIME | September 6, 2012<br>10:00 a.m. Eastern Standard Time |
|---|---|---|

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below:

| ISSUING OFFICER SIGNATURE AND TITLE<br> /s/ Kenneth H. Eckstein<br>Attorney for the Official Committee of Unsecured Creditors of<br>Residential Capital, LLC et. al. | DATE<br>August 27, 2012 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER:
Kenneth H. Eckstein
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

KL3 2891950.1

B256 (11/91)

| PROOF OF SERVICE | | |
|---|---|---|
| | DATE | PLACE |
| SERVED | | |
| SERVED ON (PRINT NAME) | MANNER OF SERVICE | |
| SERVED BY (PRINT NAME) | TITLE | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
               (Date)

SIGNATURE OF SERVER _____

ADDRESS OF SERVER _____

Rule 45, Fed. R. Civ. P. Parts (c) & (d) made applicable in cases under the Bankruptcy Code by Rule 9016, Fed. R. Bankr. P.

(c)   PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)   A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)   A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)   Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)   On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena, if it

(i)   fails to allow reasonable time for compliance;

(ii)   requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where

that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)   requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)   subjects a person to undue burden.

(B)   If a subpoena

(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)   requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)   requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)   DUTIES IN RESPONDING TO SUBPOENA

(1)   A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)   When information subject to a subpoena is withheld or a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

KL3 2891950.1

## EXHIBIT A

## DEFINITIONS

For purposes of these requests, the following definitions shall apply:

1.    "AFI" shall mean Ally Financial Inc., f/k/a GMAC LLC, and all of its current

and former, direct and indirect affiliates, subsidiaries, employees, representatives, agents,

advisors (including without limitation Evercore), attorneys (including without limitation

Kirkland & Ellis LLP and Mayer Brown LLP), and all other persons or entities acting or

purporting to act on their behalf or under their control, and each of their predecessors and

successors, except for Debtors.

2.    "Alter Ego Claims" shall mean, without limitation, any actual, alleged or

potential alter ego claims, obligations, or liabilities, or any related claims such as veil-piercing or

substantive consolidation, that the Trusts may have against Residential Capital, LLC, including,

without limitation, the alter ego claims referred to in the Rule 9019 Supplemental Motion.

3.    "Amended RMBS Trust Settlement Agreements" shall mean all agreements

entered into as of August 15, 2012, by and between the Debtors and the Settlement Trusts

(defined in such agreement), including but not limited to the Amended and Restated RMBS Trust

Settlement Agreement with the Steering Committee Group and the Amended and Restated

RMBS Trust Settlement Agreement with the Talcott Franklin Group, attached as Exhibits 2 and

3 to the Rule 9019 Supplemental Motion.

4.    "Committee" shall mean the Official Committee of Unsecured Creditors of

Residential Capital, LLC, et al. in this Chapter 11 case.

5.    "Concerning" or "relating to" shall mean directly or indirectly concerning,

relating to, mentioning, describing, pertaining to, being connected with, or reflecting upon a stated subject matter.

6. "Debtors" shall mean, individually and collectively, Residential Capital, LLC and its direct and indirect subsidiaries that have filed voluntary petitions commencing a case under Chapter 11 of the Bankruptcy Code, and are debtors and debtors-in-possession on behalf of each such entity and its estate in this Chapter 11 case, including without limitation Residential Funding Company, LLC, and all of their current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys (including without limitation Morrison & Foerster LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

7. "Documents" shall be defined to the broadest extent permitted by Rule 34 of the Federal Rules of Civil Procedure, as made applicable to this matter by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, and shall mean and refer to any kind of tangible material, whether written, recorded, microfilmed, microfiched, photographed, computerized, reduced to any electronic or magnetic impulse, or otherwise preserved or rendered, and including but not limited to papers, agreements, contracts, notes, memoranda, electronic or computer-transmitted messages including email, correspondence, letters, telegrams, telexes, facsimile transmissions, statements, invoices, record books, reports, studies, analyses, minutes, records, accounting and financial books, transcriptions, negotiable instruments, deeds, deeds of trust, photographs, microfilm, videotapes, books, pamphlets, catalogues, working papers, charts, graphs, drawings, manuals, instructions, calendars, appointment books, agreements, minutes, diaries, indices, tapes, wires, films, data, notebooks, recordings, summaries and/or notes

2

regarding telephone conversations, personal conversations, interviews, demonstrations and

meetings and any and all other written, printed, recorded, transcribed, punched, taped, typed,

filmed, duplicated, reproduced or other tangible matter in Your possession, custody or control,

including all copies which are not identical to the originals, such as those bearing marginal

comments, alterations, notes or other notations not present on the original Document as originally

types, written, or otherwise prepared.

8. "First Day Affidavit" shall mean the Affidavit of James Whitlinger, Chief

Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions And First Day

Pleadings, dated May 14, 2012 (ECF Doc. #6).

9. "Governing Agreements" shall mean certain Pooling and Servicing

Agreements, Mortgage Loan Purchase Agreements, Indentures, Servicing Agreements and/or

Trust Agreements with certain of the Debtors, that serve as the basis for the R&W claims, as

further defined herein.

10. "HoldCo Election" shall mean the provision in the Amended Trust Settlement

Agreements allowing a Trust to assert a general unsecured claim against Residential Capital,

LLC, as that term is defined in the Rule 9019 Supplemental Motion.

11. "R&W Claims" shall mean, without limitation, any alleged and potential

representation and warranty claims, obligations, or liabilities in respect of the origination and sale

of mortgage loans to the Trusts, including, without limitation, the liability of any Debtors that are

party to the Governing Agreements with respect to representations and warranties made in

connection with such sale or with respect to the noticing and enforcement of any remedies in

respect of alleged breaches of such representations and warranties, comprising all of such

3

securities issued by the Debtors' affiliates from 2004 to 2007.

12. "Residential Capital, LLC" shall mean the corporate entity Residential

Capital, LLC and not Residential Funding Company, LLC.

13. "RMBS Plan Support Agreements" or "Plan Support Agreements" shall mean

all agreements entered into as of May 13, 2012, by and between the Debtors, AFI, and the

Consenting Claimants (defined in such agreement), which is attached as Exhibit 10-A to the First

Day Affidavit, and all amendments thereto, including but not limited to the RMBS Plan Support

Agreement with the Steering Committee Group, and the RMBS Plan Support Agreement with

the Talcott Franklin Group. (ECF Doc. # 318, 319).

14. "RMBS Trust Settlement Agreements" shall mean all agreements entered into

as of May 13, 2012, by and between the Debtors and the Institutional Investors (defined in such

agreement), which is attached as Exhibit 10-B to the First Day Affidavit, including but not

limited to the RMBS Trust Settlement Agreement with the Steering Committee Group, entered

into as of May 13, 2012, and the May 25, 2012 amendment thereto, attached as Exhibits 2 and 3

to the Rule 9019 Motion, and the RMBS Trust Settlement Agreement with the Talcott Franklin

Group entered into as of May 13, 2012, and the May 25, 2012 amendment thereto, attached as

Exhibit 4 and 5 to the Rule 9019 Motion.

15. "Rule 9019 Motion" shall mean the Debtors' Motion Pursuant to Fed.R.

Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, filed on June 11, 2012.

(ECF Doc. #320).

16. "Rule 9019 Supplemental Motion" shall mean the Debtors' Supplemental

Motion Pursuant to Fed.R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements,

4

KL3 2892218.3

filed on August 15, 2012. (ECF Doc. # 1176).

17. "Steering Committee Group" shall mean the group of seventeen institutions represented by Gibbs & Bruns LLP, as that term is defined in the Rule 9019 Motion, all of their current and former, direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys (including without limitation Gibbs & Bruns LLP and Ropes & Gray LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

18. "Talcott Franklin Group" shall mean the group of investors represented by Talcott Franklin, P.C., as that term is defined in the Rule 9019 Motion, all of their current and former, direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys (including without limitation Talcott Franklin, P.C.; Miller, Johnson, Snell & Cumminskey, P.L.C.; and Carter Ledyard & Milburn LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

19. "Trusts" shall mean the 392 Residential Mortgage Backed Securitization Trusts as that term is defined in the Rule 9019 Motion.

20. "Trustees" shall mean The Bank of New York Mellon Trust Company, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, U.S. Bank National Association and Wells Fargo Bank, N.A, solely in their capacities as trustees or indenture trustees for certain mortgage or home equity lines of credit back securities trusts, each acting as the trustee of some but not all of the Trusts.

21. "You" and "Your" shall mean the Steering Committee Group.

5

## INSTRUCTIONS

1.  Pursuant to Rule 7026-1 of the local rules of the United States Bankruptcy Court for the Southern District of New York, the uniform definitions and rules of construction set forth in Rule 26.3 of the local rules of the United States District Court for the Southern District of New York are incorporated by reference into these discovery requests.

2.  All terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Rule 9019 Motion or Rule 9019 Supplemental Motion, as applicable.

3.  Unless otherwise specified in any request, furnish Documents generated, transmitted, or received on or after January 1, 2004 or otherwise relating to the period from January 1, 2004 to the present.

4.  These requests encompass all Documents within Your custody, possession, or control, whether or not such Documents were prepared by or for You. Where Documents in Your possession, custody or control are requested or inquired of, such request or inquiry includes Documents in the possession, custody or control of Your employees, agents, accountants, attorneys, auditors, representatives and any other individuals or entities from whom You could obtain Documents.

5.  If You contend that no Documents exist relating to all or part of a request, state this contention and respond as fully as possible to all parts of the request for which Documents exist.

6.  If You claim that any privilege excuses production of any Document or part thereof, You must provide a log identifying each allegedly privileged Document by title, type,

6

date, author, recipients and subject matter, and state the privilege, and respond as fully as otherwise possible with all non-privileged Documents in whole or part.

7. Documents are to be produced in a way that identifies the request or requests to which each Document applies, including each sub-part of such requests, or as they are maintained in the usual course of business. Documents to be produced shall be the original of all Documents in the regular files as maintained, together with any Documents that were clipped or attached to them, or any originals or copies containing handwriting. A complete and legible copy may be produced in lieu of producing the Document itself.

8. The file folder or other container in which a Document is kept is deemed to be an integral part of the Document and shall be produced with the Document.

9. In the event that any Document covered hereunder has been destroyed, discarded or lost, You shall identify each such Document by stating: (a) the addressor and addressee; (b) the addresses of any indicated or blind copies; (c) the date, subject matter and number of pages of the Document; (d) a description of any attachments or appendixes to the Document; (e) the identities of all persons to whom the Document was distributed, shown or explained; (f) the date on which the Document was destroyed, discarded or lost, and the manner in which it was destroyed, discarded or lost; (g) the reasons for having the Document destroyed or discarded; and (h) the identities of the person authorizing and/or carrying out such destruction or discarding.

10. If any of the Documents cannot be produced in full, they shall be produced to the maximum extent possible and the responding party shall specify the reasons for the inability to produce the remainder.

KL3 2892218.3

11. As used herein, the singular shall include the plural and the plural shall include the singular, the past tense shall include the present and the present tense shall include the past, the words "and" and "or" shall be both conjunctive and disjunctive, the word "all" means both "any" and "all," and the word "any" means "any and all," so as to bring into the scope of definitions and document requests all matters which by any other construction would fall outside their scope.

12. These requests for documents shall be deemed continuing so as to require supplementation if You or Your attorneys or agents become aware of, receive or generate additional Documents responsive to these requests after the time of the initial response.

## REQUESTS FOR PRODUCTION

1. All documents and communications concerning the payment of legal fees to counsel for the Steering Committee Group and/or the Talcott Franklin Group in connection with the RMBS Trust Settlement Agreements or Amended RMBS Trust Settlement Agreements, including without limitation the calculation and allocation thereof.

2. All documents reflecting or concerning communications between or among the Debtors, the Steering Committee Group, the Talcott Franklin Group, the Trustees, and/or AFI, or their respective attorneys or advisors, concerning the negotiation and execution of the RMBS Trust Settlement Agreements, including but not limited to:

(a) all drafts of the RMBS Trust Settlement Agreements;

(b) all evaluations or analyses in connection with the RMBS Trust Settlement Agreements;

(c) all documents and information shared by Debtors and/or AFI with the

8

KL3 2892218.3

Steering Committee Group or the Talcott Franklin Group in connection

with such negotiations;

(d) all records of meetings, whether in-person or telephonic, and all

documents prepared for and/or exchanged at such meetings;

(e) all documents concerning any evaluations or analyses of the merits of the

R&W Claims;

(f) all documents and communications concerning any alternative settlements

or compromises contemplated, analyzed, or discussed between the Debtors

or AFI, on the one hand, and the Trusts, the Trustees, the Steering

Committee Group or the Talcott Franklin Group, on the other hand;

(g) all documents and communications concerning any advice or analysis that the

Debtors received from any expert, advisor, or consultant related to the RMBS

Trust Settlement Agreements;

(h) all documents and communications concerning the allocation of the Total

Allowed Claim among the Covered Trusts;

(i) all documents and communications concerning any of the calculations,

assumptions, or methodologies concerning the determination, calculation,

allocation and distribution of the Total Allowed Claim, including without

limitation any documents or communications concerning the Declaration

of Frank Sillman, attached as Exhibit 8 to the Rule 9019 Motion;

(j) all documents and communications concerning whether and in what

manner the determination, calculation, allocation and/or distribution of the

9

Total Allowed Claim reflects the risk profile of any of the Trusts,

including without limitation any analysis of the vintage, type and/or credit

characteristics of the loan products and/or borrowers associated with each

of the Trusts;

(k) all documents and communications concerning whether and in what

manner the determination, calculation, allocation and/or distribution of the

Total Allowed Claim reflects any actual, potential and/or claimed breaches

of contractual representations and warranties related to the collateral of

any of the Trusts, whether individually, collectively, or comparatively

among the Trusts;

(l) all documents and communications regarding the respective Committee on

Uniform Securities Identification Procedures identification number

("CUSIP") assigned to the securities issued by the Trusts and owned by

the Talcott Franklin Group, as well as the Talcott Franklin Group's

respective ownership percentage relating to each CUSIP;

(m) all documents and communications concerning whether and in what

manner the determination, calculation, allocation and/or distribution of the

Total Allowed Claim reflects any actual, potential, and/or claimed alter

ego liability on the part of any of the Debtors and/or AFI;

(n) all documents and communications concerning the basis for any actual or

potential claims by any of the members of the Steering Committee Group

against the Debtors or AFI, whether arising from state and federal

10

securities laws or otherwise, including the determination and calculation of

the amount of such claims;

(o) all documents and communications concerning the Expert referenced in

Exhibit B to the RMBS Trust Settlement Agreements;

(p) all documents and communications concerning the determination of

losses, both realized and projected, incurred by the Trusts;

(q) all documents and communications concerning the distribution of funds on

account of the Total Allowed Claim to the Trustees, to the Steering

Committee Group or the Talcott Franklin Group, or to the Trusts;

(r) all documents and communications concerning the value, or eligibility for

inclusion in the Covered Trusts, of the Mortgage Loans;

(s) all documents and communications concerning the "arm's length and

exhaustive negotiations" referred to in the Rule 9019 Motion; and

(t) documents sufficient to identify all persons and entities involved in the

negotiation and/or the approval of the RMBS Trust Settlement

Agreements, including name and job title of each of such persons.

3.  All documents and communications between or among the Debtors, the

Steering Committee Group, the Talcott Franklin Group, the Trustees, and/or AFI, or their

respective attorneys or advisors, concerning the negotiation and execution of the Amended

RMBS Trust Settlement Agreements, including but not limited to:

(a) all drafts of the Amended RMBS Trust Settlement Agreements;

(b) all valuations or analyses prepared in connection with the Amended

11

RMBS Trust Settlement Agreements;

(c) all documents and information shared by the Debtors and/or AFI with the Steering Committee Group or the Talcott Franklin Group in connection with such negotiations;

(d) all documents and communications concerning the HoldCo Election;

(e) all documents and communications concerning the Alter Ego Claims;

(f) all documents and communications concerning the claims against the Depositor Entities;

(g) all records of meetings, whether in-person or telephonic, and all documents exchanged at such meetings;

(h) All documents and communications concerning any advice or analysis that the Debtors received from any expert, advisor, or consultant related to the Amended RMBS Trust Settlement Agreements;

(i) all documents concerning the "arm's length and exhaustive negotiations" referred to in the Rule 9019 Supplemental Motion; and

(j) documents sufficient to identify all persons and entities involved in the negotiation and/or approval of the Amended RMBS Trust Settlement Agreement, including the name and job title of each of such persons.

4. All documents and communications between or among the Debtors, the Steering Committee Group, the Talcott Franklin Group, the Trustees, and/or AFI, or their respective attorneys or advisors, concerning the negotiation and execution of the Plan Support Agreements, including but not limited to:

12

KL3 2892218.3

(a) all drafts of the Plan Support Agreements;

(b) all valuations or analyses prepared in connection with the Plan Support Agreements;

(c) all documents and information shared by the Debtors and/or AFI with the Steering Committee Group or the Talcott Franklin Group in connection with such negotiations;

(d) all documents and communications concerning a connection or relationship between the RMBS Trust Settlement Agreements or the Amended RMBS Trust Settlement Agreements, on the one hand, and the Plan Support Agreements, on the other hand;

(e) all records of meetings, whether in-person or telephonic, and all documents exchanged at such meetings;

(f) All documents and communications concerning any advice or analysis that the Debtors received from any expert, advisor, or consultant related to the Plan Support Agreements;

(g) all documents and communications concerning any alternative settlements or compromises contemplated, analyzed, or discussed between the Debtors or AFI, on the one hand, and the Trusts, the Trustees, the Steering Committee Group or the Talcott Franklin Group, on the other hand; and

(h) documents sufficient to identify all persons and entities involved in the negotiation and approval of the Plan Support Agreements, including the name and job title of each of such persons.

13

5.  All documents and communications concerning the effect and operation of the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement on persons or entities that are non-parties to the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement, including but not limited to the effect and operation of the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement on any claims held by such persons or entities against the Debtors and/or AFI.

6.  All documents and communications with or relating to AFI concerning the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement, including without limitation all documents and communications concerning any claim or cause of action by or against AFI concerning the Trusts.

7.  All documents and communications concerning the ability of the Steering Committee Group and/or the Talcott Franklin Group to direct and/or bind the Trusts to participate in and accept the terms of the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement, or to take any other action.

8.  All communications with any of the Trustees concerning the RMBS Trust Settlement Agreements, the Plan Support Agreements and/or the Amended RMBS Trust Settlement Agreements.

9.  All documents and communications concerning the Debtors' approval (whether by a board of directors or otherwise) of the RMBS Trust Settlement Agreements, the Plan Support Agreements and/or the Amended RMBS Trust Settlement Agreements.

10. All documents presented to boards of directors or any officers of the Debtors or AFI concerning the RMBS Trust Settlement Agreements, the Plan Support Agreements and/or the Amended RMBS Trust Settlement Agreements, including without limitation reports, summaries,

14

KL3 2892218.3

outlines, notes, talking points, powerpoint or other presentations and slides.

11. All documents provided to any third party concerning the RMBS Trust Settlement Agreements, the Plan Support Agreements and/or the Amended RMBS Trust Settlement Agreements.

12. All documents and communications concerning any indemnification of the Trustees in connection with the RMBS Trust Settlement Agreements, the Plan Support Agreements and/or the Amended RMBS Trust Settlement Agreements.

13. All documents and communications concerning your policies (including the existence or non-existence of such policies) with respect to the retention and destruction of written and electronic documents and communications (including emails) and any change to or suspension of such policies.

14. All documents the Steering Committee Group intends to use or rely upon in connection with any hearing on the Rule 9019 Supplemental Motion, the Amended RMBS Trust Settlement Agreements, and/or the Plan Support Agreements.

KL3 2892218.3

**EXHIBIT C**

**Gibbs & Bruns, LLP's Objections and Responses to The Official Committee of Unsecured Creditors' Subpoena, dated September 6, 2012**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## GIBBS & BRUNS, LLP'S OBJECTIONS AND RESPONSES TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' SUBPOENA

To:   Kenneth H. Eckstein, Kramer, Levin, Natfalis, & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), Gibbs & Bruns, LLP ("G&B") provides the following objections and responses to the subpoena (the "Subpoena"), dated August 27, 2012, prepared by Kramer, Levin, Natfalis, & Frankel LLP as counsel for the Official Committee of Unsecured Creditors (the "Committee") and served on G&B[1] by agreement as of August 27, 2012, in connection with the Debtors' Motion Pursuant to Fed R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements and the Debtors' Supplemental Motion Pursuant to Fed R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements (collectively the "9019 Motion") in the above captioned matter.

GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas 77005
Telephone: (713) 650-8805
Facsimile: (713) 750-0903
Kathy D. Patrick
Robert J. Madden
Scott A. Humphries
David Sheeren

---

[1] Pursuant to the agreement of the Committee and G&B, the Subpoena shall be treated as being directed solely to G&B, and not the individual Steering Committee Group members.

## GENERAL OBJECTIONS

1.  G&B objects to the Subpoena on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," documents that are being withheld on the basis of a claim of privilege, by group or category.

2.  G&B objects to the Subpoena on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, the Subpoena seeks production of privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement. The Subpoena also seeks production of privileged communications and work product regarding G&B's clients' decision to enter into the Plan Support Agreement. The advice G&B provided to its clients, and G&B's clients' internal analyses, are entirely irrelevant as to whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement.

3.  G&B objects to the Subpoena on the grounds that it seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, and the Plan Support Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* On November 21, 2011, representatives of the Steering Committee Group met in Minneapolis with representatives of ResCap to discuss a possible resolution of claims held by certain RMBS Trusts. A representative of Ally Financial, Inc. attended that meeting, as well. It was agreed by all in attendance that the discussions during this meeting were confidential settlement discussions that would not be disclosed to any third parties and would be considered confidential pursuant to Federal Rule 408 and related state law rules protecting settlement communications from disclosure or use in litigation. Thereafter, on February 3, 2012, the Steering Committee Group executed a formal forbearance agreement tolling the statute of limitations for claims held by the RMBS Trusts and confirming that the ongoing discussions among the parties while the agreement remained in effect were "in the nature of compromise and settlement discussions, such that all of the protections of Rule 408 of the Federal Rules of Evidence and Section 4547 of New York's Civil Practice Law and Rules, as well as those applicable protections provided under any and all analogous evidentiary rules and/or privileges of the laws of any other applicable jurisdiction shall apply to such Discussions." This agreement remained in effect through and including the date on which the RMBS Trust Settlement Agreement was executed. Accordingly, G&B will produce non-privileged communications with the Debtors and/or Ally (not shielded by the work product doctrine or their internal common interest privilege) dated prior to November 21, 2011. All communications with ResCap and/or Ally after November 21,

2

2011 are confidential settlement communications that are neither relevant nor discoverable in this proceeding.

4. G&B objects to the Subpoena on the grounds that it is overly broad and unduly burdensome in that: (a) It seeks the production of documents that consist of publicly available information, or information that the Debtors have made available to the Committee through its Data Room, concerning the Debtors, Ally Financial, Inc. and the RMBS Trusts including, but not limited to, the following: the agreements that govern the RMBS Trusts (such as Pooling and Servicing Agreements and Indentures of Trusts); Prospectuses and Free Writing Prospectuses for offerings of securities issued by the RMBS Trusts; securities disclosures by Residential Capital LLC and/or Ally Financial, Inc.; congressional and regulatory investigation materials; the National Mortgage Settlement and related documents and consent judgments; other consent judgments; and, allegations in various pleadings and lawsuits filed against one or more of the Debtors and/or Ally Financial, Inc. (collectively "Publicly Available Information"). Because the Publicly Available Information is equally available to the Committee as it is to G&B, a demand that G&B marshal and produce this Publicly Available Information is unduly burdensome. The Committee can obtain all of this information, itself, through the Debtors' Data Room, its RMBS Trust Vision Website or public filings in the United States courts or with the Securities and Exchange Commission

5. G&B objects to each definition and instruction in the subpoena to the extent that they seek to impose duties and obligation beyond those authorized by the Bankruptcy Code and/or the Federal Rules of Civil Procedure.

**SPECIFIC RESPONSES AND OBJECTIONS**

**Request No. 1**        All documents and communications, concerning the payment of legal fees to counsel for the Steering Committee Group and/or the Talcott Franklin Group in connection with the RMBS Trust Settlement Agreements or Amended RMBS Trust Settlement Agreements, including without limitation the calculation and allocation thereof.

**Responses and Objections to Request No. 1**        In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, the payment of legal fees under the RMBS Trust Settlement Agreement is irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. In addition, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement. The advice G&B provided to its clients, G&B's work product, and G&B's clients' internal analyses, are entirely irrelevant as to whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990)*.

        Subject to, and without waiving, the foregoing objections: (i) G&B responds that the attorneys fees to be paid, and the manner in which they will be calculated and allocated, are set forth in the RMBS Trust Settlement Agreement; and (ii) G&B will produce the fee agreement with its clients regarding the payment of attorney's fees, despite the fact that it is not the agreement by which attorney's fees will be paid in connection with the RMBS Trust Settlement Agreement.

**Request No. 2**        All documents reflecting or concerning communications between or among the Debtors, the Steering Committee Group, the Talcott Franklin Group, the Trustees, and/or AFI, or their respective attorneys or advisors, concerning the negotiation and execution of the RMBS Trust Settlement Agreements, including but not limited to:

        (a) all drafts of the RMBS Trust Settlement Agreements;

4

(b) all evaluations or analyses prepared in connection with the RMBS Trust Settlement Agreements;

(c) all documents and information shared by Debtors and/or AFI with the Steering Committee Group or the Talcott Franklin Group in connection with such negotiations;

(d) all records of meetings, whether in-person or telephonic, and all documents prepared for and/or exchanged as such meetings;

(e) all documents concerning any evaluations or analyses of the merits of the R&W claims;

(f) all documents and communications concerning any alternative settlements or compromises contemplated, analyzed, or discussed between the Debtors or AFI, on the one hand, and the Trusts, the Trustees, the Steering Committee Group or the Talcott Franklin Group, on the other hand;

(g) all documents and communications concerning any advice or analysis that the Debtors received from any expert, advisor, or consultant related to the RMBS Trust Settlement Agreements;

(h) all documents and communications concerning the allocation of the Total Allowed Claim among the Covered Trusts;

(i) all documents and communications concerning any of the calculations, assumptions, or methodologies concerning the determination, calculation, allocation, and distribution of the Total Allowed Claim, including without limitation any documents or communications concerning the Declaration of Frank Sillman, attached as Exhibit 8 to the Rule 9019 Motion;

(j) all documents and communications concerning whether and in what manner the determination, calculation, allocation, and/or distribution of the Total Allowed Claim reflects the risk profile of any of the Trusts, including without limitation any analysis of the vintage, type, and/or credit characteristics of the loan products and/or borrowers associated with each of the Trusts;

(k) all documents and communications concerning whether and in what manner the determination the manner the determination, calculation, allocation, and/or distribution of the Total Allowed Claim reflects any actual, potential and/or claimed breaches of contractual representations and warranties related to the collateral of any of the Trusts, whether individually, collectively, or comparatively among the Trusts;

(l) all documents and communications regarding the respective Committee on Uniform Securities Identification Procedures identification number ("CUSIP") assigned to the securities issued by the Trusts and owned by the Talcott Franklin Group, as well as

5

the Talcott Franklin Group's respective ownership percentage relating to each CUSIP;

(m) all documents and communications concerning whether and in what manner the determination, calculation, allocation, and/or distribution of the Total Allowed Claim reflects any actual, potential and/or claimed alter ego liability on the part of the Debtors and/or AFI;

(n) all documents and communications concerning the basis for any actual or potential claims by any of the members of the Steering Committee Group against the Debtors or AFI, whether arising from state and federal securities laws or otherwise, including the determination and calculation of the amount of such claims;

(o) all documents and communications concerning the Expert reference in Exhibit B to the RMBS Trust Settlement Agreements;

(p) all documents and communications concerning the determination of losses, both realized and projected incurred by the Trusts;

(q) all documents and communications concerning the distribution of funds on account of the Total Allowed Claim to the Trustees, to the Steering Committee Group or the Talcott Franklin Group, or to the Trusts;

(r) all documents and communications concerning the value, or eligibility for inclusion in the Covered Trusts, of the Mortgage Loans;

(s) all documents and communications concerning the "arm's length and exhaustive negotiations" referred to in the Debtors 9019 Motion; and

(t) documents sufficient to identify all persons and entities involved in the negotiation and/or approval of the RMBS Trust Settlement Agreements, including the name and job title of each such persons.

**Responses and Objections to Request No. 2**    In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement, G&B's and its clients' evaluation of the claims belonging to the trusts, and G&B's clients' analyses of actual or

6

potential securities claims against the Debtors or AFI. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement.    Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections G&B will produce the documents listed in the spreadsheet attached hereto as Attachment B representing data provided to G&B and the Steering Committee Group by the Debtors in the course of the negotiations leading up to the execution of the RMBS Settlement Agreement. In addition, G&B will produce communications with the Trustees concerning negotiations regarding the July 31, 2012 Revised Joint Omnibus Scheduling Order regarding the 9019 Motion, as G&B and the Steering Committee Group do not assert the existence of a common interest privilege with respect to this narrow category of documents. In addition, for the reasons set out in General Objection 3 above, G&B will produce non-privileged communications with the Debtors and/or Ally (not shielded by the work product doctrine or their internal common interest privilege) dated prior to November 21, 2011. G&B will not re-produce the other relevant, non-privileged, discoverable documents in its possession responsive to this request, which consist of the RMBS Trust Settlement Agreement and the Amended RMBS Trust Settlement Agreement, because these documents are publicly available and already in the possession of the Committee.

**Request No. 3**        All documents and communications between or among the Debtors, the Steering Committee Group, the Talcott Franklin Group, the Trustees, and/or AFI, or their respective attorneys or advisors, concerning the negotiation and execution of the Amended RMBS Trust Settlement Agreements, including but not limited to:

(a) all drafts of the Amended RMBS Trust Settlement Agreements;

(b) all valuations or analyses in connection with the Amended RMBS Trust Settlement Agreements;

(c) all documents and information shared by Debtors and/or AFI with the Steering Committee Group or the Talcott Franklin Group in connection with such negotiations;

(d) all documents and information concerning the HoldCo Election;

7

(e) all documents and information concerning the Alter Ego Claims;

(f) all documents and information concerning the claims against the Depositor Entities;

(g) all records of meetings, whether in-person or telephonic, and all documents prepared for and/or exchanged as such meetings;

(h) all documents and communications concerning any advice or analysis that the Debtors received from any expert, advisor, or consultant related to the Amended RMBS Trust Settlement Agreements;

(i) all documents and communications concerning the "arm's length and exhaustive negotiations" referred to in the Rule 9019 Supplemental Motion; and

(j) documents sufficient to identify all persons and entities involved in the negotiation and/or approval of the Amended RMBS Trust Settlement Agreements, including the name and job title of each such persons.

**Responses and Objections to Request No. 3**    In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement, and G&B's and its clients' evaluation of the claims belonging to the trusts. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

8

Subject to, and without waiving, the foregoing objections G&B will produce the documents listed in the spreadsheet attached hereto as Attachment B representing data provided to G&B and the Steering Committee Group by the Debtors in the course of the negotiations leading up to the execution of the RMBS Settlement Agreement. In addition, G&B will produce communications with the Trustees concerning negotiations regarding the July 31, 2012 Revised Joint Omnibus Scheduling Order regarding the 9019 Motion, as G&B and the Steering Committee Group do not assert the existence of a common interest privilege with respect to this narrow category of documents. In addition, for the reasons set out in General Objection 3 above, G&B will produce non-privileged communications with the Debtors and/or Ally (not shielded by the work product doctrine or their internal common interest privilege) dated prior to November 21, 2011. G&B will not re-produce the other relevant, non-privileged, discoverable documents in its possession responsive to this request, which consist of the RMBS Trust Settlement Agreement and the Amended RMBS Trust Settlement Agreement, because these documents are publicly available and already in the possession of the Committee.

**Request No. 4**      All documents and communications between or among the Debtors, the Steering Committee Group, the Talcott Franklin Group, the Trustees, and/or AFI, or their respective attorneys or advisors, concerning the negotiation and execution of the Plan Support Agreements, including but not limited to:

   (a) all drafts of the Plan Support Agreements;

   (b) all valuations or analyses prepared in connection with the Plan Support Agreements;

   (c) all documents and information shared by Debtors and/or AFI with the Steering Committee Group or the Talcott Franklin Group in connection with such negotiations;

   (d) all documents and communications concerning a connection or relationship between the RMBS Trust Settlement Agreements, on the one hand, and the Plan Support Agreements, on the other hand;

   (e) all records of meetings, whether in-person or telephonic, and all documents prepared for and/or exchanged as such meetings;

   (f) all documents and communications concerning any advice or analysis that the Debtors received from any expert, advisor, or consultant related to the Plan Support Agreements;

   (g) all documents and communications concerning any alternative settlements or compromises contemplated, analyzed, or discussed between the Debtors or AFI, on the one hand, and the Trusts, the Trustees, the Steering Committee Group or the Talcott Franklin Group, on the other hand; and

9

(h) documents sufficient to identify all persons and entities involved in the negotiation and approval of the Plan Support Agreements, including the name and job title of each such persons.

**Responses and Objections to Request No. 4**    In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the Plan Support Agreement, and G&B's and its clients' evaluation of the claims belonging to the trusts. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the Plan Support Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections: (i) G&B responds that neither the RMBS Trust Settlement Agreement nor the Amended RMBS Trust Settlement Agreement is conditioned or contingent upon approval of the Plan Support Agreement; and (ii) G&B will produce the document identified as "update to waterfall with $8.7bb claim amount" on the spreadsheet attached hereto as Attachment B. G&B will not re-produce the other relevant, non-privileged, discoverable documents in its possession responsive to this request, which consist of the RMBS Trust Settlement Agreement, the Amended RMBS Trust Settlement Agreement, and the Plan Support Agreement, because these documents are publicly available and already in the possession of the Committee.

**Request No. 5**    All documents concerning the effect and operation of the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement on persons or entities that are non-parties to the RMBS Trust Settlement Agreement or the Amended RMBS

Trust Settlement Agreement, including but not limited to the effect and operation of the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement on any claims held by such persons or entities against the Debtors and/or AFI.

**Responses and Objections to Request No. 5**    In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement, and G&B's and its clients' evaluation of the claims belonging to the trusts. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections: (i) G&B responds that the RMBS Trust Settlement Agreement applies on its face only to Trust claims assigned to the Trustees and does not purport to affect or release claims belonging to any party other that the Trusts or the Trustee, except only to the extent that any third party should claim a right to enforce the claims at issue in the RMBS Trusts Settlement Agreement; and (ii) G&B will produce the documents listed in the spreadsheet attached hereto as Attachment B representing data provided to G&B and the Steering Committee Group by the Debtors in the course of the negotiations leading up to the execution of the RMBS Settlement Agreement. G&B will not re-produce the other relevant, non-privileged, discoverable documents in its possession responsive to this request, which consist of the RMBS Trust Settlement Agreement and the Amended RMBS Trust Settlement Agreement, because these documents are publicly available and already in the possession of the Committee.

**Request No. 6**        All documents and communications with or relating to AFI concerning the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement, including without limitation all documents and communications concerning any claim or cause of action by or against AFI concerning the Trusts.

**Responses and Objections to Request No. 6**        In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement and the Plan Support Agreement, and G&B's and its clients' evaluation of the claims belonging to the trusts. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, and their counsel regarding the RMBS Trust Settlement Agreement or the Plan Support Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections G&B will produce the documents listed in the spreadsheet attached hereto as Attachment B representing data provided to G&B and the Steering Committee Group by the Debtors in the course of the negotiations leading up to the execution of the RMBS Settlement Agreement. In addition, for the reasons set out in General Objection 3 above, G&B will produce non-privileged communications with the Debtors and/or Ally (not shielded by the work product doctrine or their internal common interest privilege) dated prior to November 21, 2011. G&B will not re-produce the other relevant, non-privileged, discoverable documents in its possession responsive to this request, which consist of the RMBS Trust Settlement Agreement, the Amended RMBS Trust Settlement Agreement, and the Plan Support Agreement because these documents are publicly available and already in the possession of the Committee.

**Request No. 7**        All documents and communications concerning the ability of the Steering Committee Group and/or the Talcott Franklin Group to direct and/or bind the Trusts to participate in and accept the terms of the RMBS Trust Settlement Agreement or the Amended RMBS Trust Settlement Agreement, or to take other action.

**Responses and Objections to Request No. 7**        In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement and the Plan Support Agreement and their analysis of their ability to direct the Trustees. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement.        Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement or the Plan Support Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections G&B responds that the documents setting out the rights of certificateholders with respect to the Covered Trusts are the relevant pooling and servicing agreements ("PSAs") and indentures governing the individual Trusts. G&B will not produce the relevant PSAs and indentures because these documents are publicly available and, therefore, equally available to the Committee as to G&B.

**Request No. 8**        All communications with any of the Trustees concerning the RMBS Trust Settlement Agreements, the Plan Support Agreements, and/or the Amended RMBS Trust Settlement Agreements.

**Responses and Objections to Request No. 8**        In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it

improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement and the Plan Support Agreement, and G&B's and its clients' evaluation of the claims belonging to the trusts. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections, G&B will produce communications with the Trustees concerning negotiations regarding the July 31, 2012 Revised Joint Omnibus Scheduling Order regarding the 9019 Motion, as G&B and the Steering Committee Group do not assert the existence of a common interest privilege with respect to this narrow category of documents.

**Request No. 9**    All documents and communications concerning the Debtors' approval, whether by a board of directors or otherwise) [sic] of the RMBS Trust Settlement Agreement and/or the Amended RMBS Trust Settlement Agreement.

**Responses and Objections to Request No. 9**    In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request, in that it seeks information from G&B regarding the Debtors internal processes, on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request

14

seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement, and G&B's and its clients' evaluation of the claims belonging to the trusts. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

**Request No. 10**    All documents presented to boards of directors or any officers of the Debtors or AFI concerning the RMBS Trust Settlement Agreements, the Plan Support Agreements, and/or the Amended RMBS Trust Settlement Agreements, including without limitation reports, summaries, outlines, notes, talking points, powerpoint or other presentations and slides.

**Responses and Objections to Request No. 10**    G&B has no knowledge of the materials provided to the boards of directors or any officers of the Debtors or AFI concerning the RMBS Trust Settlement Agreements, the Plan Support Agreements, and/or the Amended RMBS Trust Settlement Agreements. For this reason, G&B is aware of no responsive documents in its possession custody or control.

**Request No. 11**    All documents provided to any third party concerning the RMBS Trust Settlement Agreements, the Plan Support Agreements, and/or the Amended RMBS Trust Settlement Agreements.

**Responses and Objections to Request No. 11**    In addition to the general objections above, which are incorporated here by reference, G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, this request seeks production of privileged communications and work product,

15

including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement and the Plan Support Agreement, and G&B's and its clients' evaluation of the claims belonging to the trusts. The advice G&B provided to its clients, G&B's work product, the advice provided to G&B's clients by its other counsel, and G&B's clients' internal analyses, are privileged and entirely irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, and their counsel regarding the RMBS Trust Settlement Agreement or the Plan Support Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990)*. In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections: (i) G&B responds that, other than its communications with the Trustees, the Debtors, and Ally, G&B has not provided documents to any third party regarding RMBS Trust Settlement Agreements, the Plan Support Agreements, and/or the Amended RMBS Trust Settlement Agreements, other than the agreements themselves; (i) for the reasons set out in General Objection 3 above, G&B will produce non-privileged communications with the Debtors and/or Ally (not shielded by the work product doctrine or their internal common interest privilege) dated prior to November 21, 2011; and (ii) G&B will produce communications with the Trustees concerning negotiations regarding the July 31, 2012 Revised Joint Omnibus Scheduling Order regarding the 9019 Motion, as G&B and the Steering Committee Group do not assert the existence of a common interest privilege with respect to this narrow category of documents. G&B will not re-produce the other relevant, non-privileged, discoverable documents in its possession responsive to this request, which consist of the RMBS Trust Settlement Agreement, the Amended RMBS Trust Settlement Agreement, and the Plan Support Agreement because these documents are publicly available and already in the possession of the Committee.

**Request No.12**      All documents and communications concerning any indemnification of the Trustees in connection with the RMBS Trust Settlement Agreements, the Plan Support Agreements, and/or the Amended RMBS Trust Settlement Agreements.

**Responses and Objections to Request No. 12**      G&B objects to this request on the grounds that it improperly seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. In accordance with the agreement of the parties, G&B has identified, in the attached "Attachment A," groups or categories of documents that are being withheld on the basis of a claim of privilege. G&B further objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to

any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion. For example, the indemnification of the Trustees with respect to the RMBS Trust Settlement Agreement is irrelevant to the question of whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement. In addition, this request seeks production of privileged communications and work product, including without limitation privileged communications and work product regarding G&B's clients' decision to enter into the RMBS Trust Settlement Agreement. The advice G&B provided to its clients, G&B's work product, and G&B's clients' internal analyses, are entirely irrelevant as to whether the Debtor properly exercised the Debtor's business judgment in entering into the RMBS Trust Settlement Agreement and the Plan Support Agreement. Likewise, this request seeks the production of settlement communications between G&B, G&B's clients, the Debtors, Ally, the Trustees, and their counsel regarding the RMBS Trust Settlement Agreement, which information is not discoverable and is irrelevant to question of whether the Debtor properly exercised its business judgment in entering into the RMBS Trust Settlement Agreement. *See, e.g., In re Lee Way Holding Co., 120 B.R. 881, 907-909 (Bankr. S.D. Ohio 1990).* In addition, G&B objects that this request calls for the production of privileged common interest communications between the Steering Committee Group and its counsel and the Trustees and their counsel with regards to a matter in which they share a common interest of obtaining a favorable settlement of the claims of the RMBS Trusts at issue in the RMBS Trust Settlement Agreement.

Subject to, and without waiving, the foregoing objections G&B responds that the Steering Committee Group has neither provided, nor offered to provide, any indemnification to any of the Trustees in connection with the RMBS Trust Settlement Agreements, the Plan Support Agreements, or the Amended RMBS Trust Settlement Agreements.

**Request No. 13**    All documents and communications concerning your policies (including the existence or non-existence of such policies) with respect to the retention and destruction or written and electronic documents and communications (including emails) and any change to or suspension of such policies.

**Responses and Objections to Request No. 13**    G&B objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks the production of information that is not relevant, nor likely to lead to the discovery of relevant information, to any legal or factual issues that have been presented to the Bankruptcy Court in the 9019 Motion.

**Request No. 14**    All documents the Steering Committee Group intend to use or rely upon in connection with any hearing on the Rule 9019 Supplemental Motion, the Amended RMBS Trust Settlement Agreements, and/or the Plan Support Agreements.

**Responses and Objections to Request No. 14**    G&B objects to this request to the extent that it seeks discovery of attorney-client communications, protected work product, and materials protected by the common interest privilege. Notwithstanding the forgoing objections, G&B will produce documents that it intends to enter into evidence at any hearing on the Settlement Agreement of the PSA as provided in the scheduling order entered by the Bankruptcy Court.

17

**Attachment A**

In accordance with the agreement of the parties, G&B has identified below the
documents that are being withheld on the basis of a claim of privilege, by group or category:

| Category | Documents | Privilege |
|:---:|:---|:---|
| 1 | Documents reflecting communications by and between G&B, Ropes & Gray LLP, and G&B's clients regarding or relating to the RMBS Trust Settlement Agreement, the Plan Support Agreement, the actual and projected losses of the Trusts, the claims of one or more of the Trusts, or G&B's clients' holdings in the Trusts, including without limitation G&B's advice to its clients regarding or relating to the RMBS Trust Settlement Agreement, the Plan Support Agreement, or the claims of one or more of the Trusts. | Attorney/Client Privilege Attorney/Work Product Privilege Common Interest Privilege |
| 2 | Documents reflecting communications by and between G&B, Ropes & Gray LLP, G&B's clients, the Debtors, Ally, the Trustees and their counsel regarding or relating to the RMBS Trust Settlement Agreement, the Plan Support Agreement, the claims of one or more of the Trusts, or G&B's clients' holdings in the Trusts, including without limitation the negotiation and execution of the RMBS Trust Settlement Agreement and the Plan Support Agreement. | Attorney/Client Privilege Attorney/Work Product Privilege Common Interest Privilege |
| 3 | Documents reflecting communications by and between G&B, Ropes & Gray LLP, G&B's clients, the Debtors, Ally, the Trustees and their counsel regarding or relating to the RMBS Trust Settlement Agreement, the Plan Support Agreement, the claims of one or more of the Trusts, or G&B's clients' holdings in the Trusts, including without limitation the negotiation and execution of the RMBS Trust Settlement Agreement and the Plan Support Agreement. This category is limited to documents reflecting communications occurring on or after May 14, 2012. | Attorney/Client Privilege Attorney/Work Product Privilege Common Interest Privilege |

1

| 4 | Reports, memos, handwritten notes, analyses, and other work product of G&B regarding or relating to the RMBS Trust Settlement Agreement and the Plan Support Agreement. | Attorney/Work Product Privilege |
|---|---|---|
| 5 | Reports, memos, handwritten notes, analyses, and other work product of G&B regarding or relating to the actual and projected losses of the Trusts. | Attorney/Work Product Privilege |
| 6 | Reports, memos, handwritten notes, analyses, and other work product of G&B regarding or relating to claims of one or more of the Trusts, including without limitation various analyses and other work product regarding or relating to the Trusts' repurchase and servicing claims against the Debtors, corporate separateness arguments and intercompany claims between Ally Financial Inc. and the Debtors, potential rights of setoff and/or recoupment, and the meaning and effect of various provisions of the Trusts' Pooling and Servicing Agreements, Indentures, Insurance Agreements, and other related transaction documents. | Attorney/Work Product Privilege |
| 7 | Reports, memos, handwritten notes, analyses, and other work product of G&B regarding or relating to G&B's clients' holdings in the Trusts. | Attorney/Work Product Privilege |
| 8 | Documents reflecting communications by and between G&B and G&B's clients regarding or relating to the G&B clients' retention of G&B, including without limitation documents reflecting the negotiation and execution of engagement letters between G&B and G&B's clients. | Attorney/Work Product Privilege Attorney/Client Privilege |

ATTACHMENT B

| FROM | TO | CC | SENTDATE | SENTTIME | Summary of attachment |
|---|---|---|---|---|---|
| Ruckdaschel John | Kathy D. Patrick | Hamzehpour Tammy; Devine Timothy; Smith Bradley - (Dorsey & Whitney); Zellmann Patty - MN | 4/16/2012 | 10:59:11 AM | Deal performance data by product and vintage |
| Smith Bradley - (Dorsey & Whitney) | Ruckdaschel John; Kathy D. Patrick | Hamzehpour Tammy; Devine Timothy; Zellmann Patty - MN | 4/24/2012 | 3:24:30 PM | GSE repurchase data |
| Ruckdaschel John | Scott A. Humphries | Kathy D. Patrick; Hamzehpour Tammy; Devine Timothy; Thompson William - Legal Dept - PA; Smith Bradley - (Dorsey & Whitney); Lee Gary S. | 4/30/2012 | 3:49:43 PM | GSE repurchase data |
| Lee Gary S. | Lee Gary S.; Kathy D. Patrick; Devine Timothy | Rosten Linda; Cieri Richard M.; Schrock Ray C. | 5/2/2012 | 11:14:19 AM | FTI / Centerview presentation |
| Ruckdaschel John | Kathy D. Patrick; Scott A. Humphries; David Sheeren; Devine Timothy; Hamzehpour Tammy | | 5/3/2012 | 9:12:26 AM | List of ResCap's tags on '05 - '07 Trusts held by G&B group (RW / PLS / RFC / GMAC) |
| Ruckdaschel John | David Sheeren; Kathy D. Patrick; Scott A. Humphries; Gary Lee; Levitt Jamie A.; Hamzehpour Tammy; Devine Timothy; Thompson William - Legal Dept - PA; Delehey Lauren - PA | | 5/3/2012 | 11:37:56 AM | List of ResCap's tags on all Trusts (RW / PLS / RFC / GMAC) (w/out Bloomberg deal names) |
| Ruckdaschel John | Kathy D. Patrick; Scott A. Humphries; David Sheeren | Hamzehpour Tammy; Devine Timothy; Lee Gary S.; Levitt Jamie A.; Cancelliere Jeff - PA | 5/4/2012 | 2:21:15 PM | List of ResCap's tags on all Trusts (RW / PLS / RFC / GMAC) (w/ Bloomberg deal names) |
| Levitt Jamie A. | David Sheeren; Kathy D. Patrick; Robert J. Madden; Martin D. Ross | Hamzehpour Tammy; Devine Timothy; Lee Gary S.; Cancelliere Jeff - PA; Ruckdaschel John | 5/4/2012 | 9:56:39 PM | List of monoline claims (paid and unpaid) |
| Levitt Jamie A. | Ross.Martin@ropesgray.com | Timothy.Devine@ally.com; Lee Gary S.; rschrock@kirkland.com; Kathy D. Patrick | 5/7/2012 | 12:26:39 PM | Fortress and AFI bid overview |
| Lee Gary S. | Kathy D. Patrick; ross.martin@ropesgray.com | Lee Gary S. | 5/7/2012 | 5:50:47 PM | Fortress and AFI bid overview |
| Lee Gary S. | Kathy D. Patrick | | 5/9/2012 | 10:08:24 PM | Update to waterfall with $8.7bb claim amount |
| David Sheeren | Beck Melissa D. | | 6/6/2012 | 4:12:48 PM | Setoff analysis across Pooling and Servicing Agreements |

**EXHIBIT D**

**Transcript in *In re Lyondell Chem. Co.,* Case No. 09-10023, Doc. No. 3592
(S.D.N.Y. Jan. 7, 2010)**

1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF NEW YORK
2
                                    .  Chapter 11
3                                   .
     IN RE:                         .  Case No. 09-10023 (REG)
4                                   .
     LYONDELL CHEMICAL COMPANY,     .  New York, New York
5                                   .  Thursday, January 7, 2010
                        Debtors.    .  1:02 p.m.
6      .  .  .  .  .  .  .  .  .  .  .  .  .

7                 TRANSCRIPT OF TELEPHONE CONFERENCE
                BEFORE THE HONORABLE ROBERT E. GERBER
8               CHIEF UNITED STATES BANKRUPTCY JUDGE

9
     APPEARANCES:   (Via telephone)
10
     For the Debtors:              Israel Dahan, Esq.
11                                 CADWALADER, WICKERSHAM & TAFT, LLP
                                   One World Financial Center
12                                 New York, New York  10281

13   For UBS:                      Linda H. Martin, Esq.
                                   SIMPSON, THACHER & BARTLETT
14                                 425 Lexington Avenue
                                   New York, New York  10017-3954
15
     For the Official Committee
16   of Unsecured Creditors:       Sigmund Wissner-Gross, Esq.
                                   BROWN RUDNICK, LLP
17                                 7 Times Square
                                   New York, New York  10036-6536
18
     (Appearances continued)
19
     Audio Operator:               Electronically Recorded
20                                 by B. Peterson ECRO

21   Transcription Company:        Rand Reporting & Transcription, LLC
                                   80 Broad Street, Fifth Floor
22                                 New York, New York 10004
                                   (212) 504-2919
23                                 www.randreporting.com

24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

```
 1    APPEARANCES:

 2    For Apollo Investments:    David Zensky, Esq.
                                 AKIN, GUMP, STRAUSS, HAUER & FELD
 3                               One Bryant Park
                                 New York, New York  10036
 4
       For Merrill Lynch:        Michael Simes, Esq.
 5                               MAYER BROWN, LLP
                                 1675 Broadway
 6                               New York, New York  10019-5889

 7    For Citibank:              Marshall S. Huebner, Esq.
                                 DAVIS, POLK & WARDWELL
 8                               450 Lexington Avenue
                                 New York, New York  10017
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings commence at 1:02 p.m.)

2          THE COURT:  Hello.  This is Robert Gerber.  We're

3  here on the phone and in my courtroom with simply me and my

4  chambers staff being here for an on-the-record conference

5  call to address your various discovery disputes, as requested

6  by Mr. Wissner-Gross.

7          I've got a log indicating many, many people who are

8  on the call.  Rather than taking the time to have everyone

9  introducing themselves, I think I'll simply ask people to

10 identify themselves when you speak.

11         As we are keeping a transcript on this, I would ask

12 that before each of you speak, you identify yourselves so

13 that we can have a transcript that reflects who was speaking.

14         Mr. Wissner-Gross, you had requested the call if I'm

15 not mistaken.

16         MR. DAHAN:  Your Honor, it's actually Israel Dahan

17 from Cadwalader on behalf of the debtors.  I think the

18 debtors and the financing party defendants actually requested

19 the call -- the conference, but I think Mr. Wissner-Gross

20 submitted the first letter, but I think the debtors were the

21 ones who requested the conference.

22         THE COURT:  I see.  All right.  Well, I'm at your

23 pleasure, folks, as to who would like to speak first.  It

24 seems to me, subject to your rights to be heard, that we deal

25 with them issue by issue, although some may obviously bear on

1    issues that follow.

2        MR. DAHAN:  Your Honor, if I may, I'd be happy to

3    start.  Again, Israel Dahan from Cadwalader.

4        THE COURT:  All right.  Go ahead, Mr. Dahan.

5        MR. DAHAN:  Thank you.  Again, I thank Your Honor

6    for taking the time to address some of these discovery

7    issues.  I think, you know, as we've outlined in our letter,

8    you know, on December 11 Your Honor had a conference

9    regarding discovery issues and other scheduling matters

10   related to the 9019 motion.

11       And I think it's important to note that Your Honor

12   was very clear, and given the fact that it was a 9019 motion

13   and the fact that I'm going to be on a tight schedule, that

14   Your Honor expected discovery to be done in a manner that did

15   not avoid -- that actually avoided breaking the debtors'

16   backs and we'd get done in weeks as opposed to months.  I

17   mean, and we took that very seriously.

18       Despite that, you know, we waited two weeks to

19   receive the Committee's document request, which we didn't get

20   until Christmas Eve.  And even more troubling was the fact

21   that we got the request.  It dramatically was different than

22   the, quote, "giraffe request" (sic) we got from them at the

23   hearing.  Within there was only ten requests, but now we have

24   sixty document requests; and in fact, yesterday got served

25   with another fifteen document requests.

1    So I only (indiscernible) from the Committee's

2    perspective but, you know, going through those requests what

3    became even more apparent was several of those requests,

4    maybe even many of them, were on topics that Your Honor

5    specifically addressed during that lovely conference through

6    Your Honor's own initiative or whether through clarification

7    points, and still there were those requests and the Committee

8    has still not moved from making those requests and we'll

9    touch on some of those soon, but, you know, that's really

10   been the issue I think.

11   You know, we're not looking to not be cooperative.

12   I think we outlined on Page 2 of our letter the numerous

13   kinds of documents we've produced.  We've given them all the

14   consulting material.  We've given them the work product type

15   of documents or (indiscernible).

16   We've given them anything that I related to the

17   consultants from retention agreements to their reports to,

18   quote, "mapping" type of analysis, sufficient benefactor

19   retained assets and estimated claims information.  We've gone

20   through tens of thousands of emails of the internal

21   Cadwalader emails looking for communication between

22   Cadwalader and the financing party defendants and their

23   professionals.

24   I went back yesterday, made a production of about

25   11,000 pages of documents reflecting such communications that

1    touched on settlement of adversary proceedings, so the

2    debtors have been more than cooperative and trying to act in

3    good faith as Your Honor presumably directed us to do in

4    regards to the 9019 motion.  And we're continuing to look at

5    documents that may be responsive.

6         So where we come out is I think, through several

7    (indiscernible) sessions, is a couple remaining issues that

8    can be grouped, but they do relate to several requests.  And

9    I think that's where we start, so if we want to start on the

10   issue, then it would be any documents that relate to

11   communications between the debtors and the financing party

12   defendants after December 3rd, which is after the settlement

13   became public and we had the conferences that Your Honor

14   remembers on December 4th.

15        THE COURT:  Just a minute, Mr. Dahan.  You've now

16   spoken for five minutes without addressing any of the

17   particular categories in question.  With you having done

18   that, I'm going to give Mr. Wissner-Gross the same

19   opportunity to make the preliminary unfocused type of

20   discussion that you just gave me.

21        MR. WISSNER-GROSS:  Your Honor, do you want me to do

22   that now or after Mr. Dahan's --

23        THE COURT:  I was hoping and expecting that we would

24   simply go through the disputed categories and I would rule on

25   the issues that you want me to rule upon, but with Mr. Dahan

1  having spoken at the length he did talking in generalized

2  terms without any of the disputes to try to educate me as to

3  the background, I'm going to give you that same opportunity

4  if you wish to avail yourself of it.

5          MR. WISSNER-GROSS:  -- much less time.  First of

6  all, our goal remains to complete this discovery in weeks.

7  We are confident we can get it done by January 28th if we get

8  the cooperation of the other side.

9          Secondly, in terms of the number of requests, I

10 think we tried to put in context for Your Honor at summary

11 exhibit for you, Exhibit A to our papers, so I don't think

12 that really is necessary to comment on the issue of the

13 number of requests.  I think there are several basic

14 categories.

15         And we didn't get the debtors' 9019 motion until

16 late in the day on December 23.  Less than twenty-four hours

17 later we served our document requests on both the debtors and

18 the financing parties, so I don't think we should be

19 criticized for having done that within less than a day of

20 receipt of the 9019 motion.

21         And it's our view, as we get into specific requests

22 in discussion, all the things we've asked for are germane to

23 the 9019 and standing issues that are before your Court.

24         And finally I would note that I do not disagree with

25 Mr. Dahan that at least the debtors endeavored to get us some

1   of the documents.  We have received the consultant reports

2   and some other materials.  We received one thing today from a

3   financing party defendant.

4        I would, just as a factual matter, note that late

5   yesterday we received actually 1,100 pages of emails, not

6   11,000, and I'm advised by those who quickly reviewed them

7   that none of them bear on land uses or settlement

8   negotiations.

9        So with that, Your Honor, I would throw it back to

10  Mr. Dahan on the issue of the conference.

11       THE COURT:  All right.  Mr. Dahan, first category,

12  communications after December 3rd between the debtors and the

13  financing party defendants who are settling.

14       MR. DAHAN:  Yes.  Thank you, Your Honor.  And again,

15  I apologize for -- I thought that I was just going to give

16  Your Honor a little background, but that's fine, I'll address

17  that.

18       On this category of documents we have two points

19  which we outline in our letter, Your Honor.  The first has to

20  do with relevance.  You know, from our perspective we believe

21  that once the settlement agreement was announced, we don't

22  see that to the extent the parties were going through,

23  putting together pads of paper of the actual terms and

24  ultimately then became attached to the motion which Your

25  Honor has in front of them, that, you know, the back and

1    forth of people sending drafts of what the language should be

2    is relevant to Your Honor deciding whether the settlement is

3    fair and reasonable.

4           The principal terms of the settlement agreement are

5    the same, as well as presented by Mr. Davis to the Court,

6    unless he has changed them there.  So the draft settlement

7    agreement we don't think, you know, is relevant and for

8    purposes of the 9019 motion as well, you know, us drafting,

9    you know, putting together drafts of our 9019 papers, we

10   don't see why the Committee should be, you know, seeing that

11   sort of material.

12          But more fundamentally, Your Honor, we think that

13   once there became an agreement in principle between the

14   parties, and therefore there became this common goal

15   necessary between the debtors and the financing party

16   defendants to getting approval of the settlement and the 9019

17   motion, we do think that there was a common interest

18   privilege that should protect the communication regarding

19   settlement and the 9019 motion.

20          You know, by way of example, Your Honor, I mean, I'm

21   sure Your Honor could appreciate that we will likely want to

22   coordinate with the financing party defendants about the

23   hearing and about how we wanted to approach the hearing, and

24   to assume that all those types of communications are going to

25   be open to the Committee understanding our strategy or

1    coordination.

2         Again, we don't see how that's germane to Your Honor

3    deciding any of the seven factors that Your Honor needs to go

4    through post-December 3rd.  So that's really the reason for

5    withholding those documents.  We're more than happy to

6    produce any of the relevant documents prior to December 3rd,

7    it's just strictly a timing issue, Your Honor.

8         THE COURT:  All right.  Mr. Wissner-Gross.

9         MR. WISSNER-GROSS:  Your Honor, let me start by

10   briefly commenting on the last point, the common interest

11   privilege.  We cited some cases in our letter to Your Honor

12   and I think it couldn't be more crystal clear that the common

13   interest privilege, which is a very limited privilege, has

14   absolutely no application here in terms of the communications

15   between the debtors, who said they're acting on behalf of the

16   estate which was at first a financing party defendant and any

17   of those communications with the financing party defendant.

18        On December 11th Your Honor said that we should be

19   getting all communications irrespective of date relating to

20   any communications concerning the topic of settlement, at

21   minimum between the debtors and the financing party

22   defendants.  So we think that certainly a minimum up through

23   December 23, when it appears that the settlement agreement --

24   proposed settlement agreement was executed.  We're clearly

25   entitled to all those communications.

1      I would note further that in court on December 4th

2  Mr. Davis expressed among the conditions to the effectuation

3  of this settlement of the Committee's claims a resolution of

4  intercreditor disputes and made clear that he utilized that

5  as some sort of a condition precedent to the settlement that

6  was reached with the finance party defendant.

7      We haven't got any of the drafts of their settlement

8  papers, we haven't seen -- we don't know if there are term

9  sheets and so forth.  We don't know whether some of the

10  usually conceded conditions (indiscernible) was part of the

11  original draft, part of the term sheet.  We don't know what

12  happened in terms of the development of the proposed papers

13  as it went through ultimately execution.  And moreover, we

14  don't know what the debtors' 9019 drafts look like, whether

15  the finance party defendants provided input that -- before

16  they ultimately signed the settlement agreement, that

17  impacted certain terms and conditions of the settlement.

18      So from a common interest privilege perspective, we

19  don't think there is a scintilla of a legal basis for an

20  application of the common interest privilege to any of these

21  communication.

22      And then with respect to the 9019 issues more

23  generally, we think it's absolutely relevant that we be able

24  to get access to all of these communications and then work

25  through the process of attempting to document the ultimate

1    proposed settlement.

2             As to communications between them after the

3    settlement agreement was executed on December 23, we don't

4    think that any common interest privilege attaches to those

5    communications.  The case law basically says that you look to

6    invoke the common interest privilege when it's only maybe a

7    co-defendant or somebody have actually a common legal

8    interest that's much more circumscribed than as suggested by

9    the other side.

10            And to the extent there are any communications after

11   December 23, we think those are fair game as well, to the

12   extent that they relate to 9019 issues.

13            And finally, Your Honor, in our draft, 6.3 of the

14   settlement agreement, we've noted this in our papers, for

15   whatever reason, the parties have elected -- indicated that

16   the settlement agreement superceded not only all prior oral

17   agreement, but any representation to the Court, including

18   that on December 4th, as to the contents of the agreement.

19            So for these reasons, Your Honor, we think that this

20   one is something that the defendant -- excuse me, the

21   defendant as well as the debtors should be directed to

22   produce these communications.

23            THE COURT:  Mr. Dahan, I'll permit reply if it's

24   very brief.

25            MR. DAHAN:  Yes, Your Honor.  I just wanted to know

1    -- I think we have the financing party defendants' counsel on

2    the phone and they may want to weigh on the issue as well.

3           MR. SIMES:  Your Honor, it's Michael Simes from

4    Mayer Brown on behalf of Merrill Lynch and for certain of the

5    issues today on behalf of the rest of the financing party

6    defendant group.

7           As we mentioned in the --

8           THE COURT:  I'll allow you to speak now, Mr. Simes,

9    but next time if you're joining in with somebody who allied

10   in interest I want you to speak up then so that I don't have

11   to then decide whether I need your opponent still another

12   opportunity to be heard.

13          MR. SIMES:  Understood, Your Honor, and on that

14   issue, as we did in the letter, we simply join in the

15   debtors' argument and stress the point that was made with

16   respect to communication that will be held in connection with

17   preparing for the 9019 hearing.  It seems grossly unfair to

18   allow the Committee discovery into the inner workings of

19   preparing for a 9019 settlement hearing in which the legal

20   interests of both the debtors and the financing party

21   defendants are clearly aligned.

22          THE COURT:  All right.  Mr. Dahan, how is your

23   opportunity for any reply.

24          MR. DAHAN:  Thank you, Your Honor.  The only point I

25   would add, Your Honor, is I think Your Honor will find that

1    the financing party defendants are, in fact, submitting a

2    joinder motion to our 9019 motion.  I do think that that, you

3    know, that there is a joint and common interest here with --

4    between the two sides of getting the 9019 approved.

5           And I think that a lot of the different things that

6    Mr. Wissner-Gross mentioned seemed to me to be a lot of

7    speculation but the two main things went on between the 4th

8    and the 23rd, other than just the parties just putting

9    together the actual terms of the agreement, which would be

10   natural, that take place between the announcement and the

11   filing date of the motion.

12          So, you know, without reiterating my point, you

13   know, I think those are, you know, just our views with

14   respect to any relevancy and the common interest.

15          THE COURT:  All right.  Gentleman, the objection to

16   the production of the communications between the debtors and

17   the financing party defendants after December 3rd is

18   overruled and the debtors will produce any communications of

19   that character.

20          The objections fall into two essential grounds, one

21   being relevance and one being the common interest defense.

22   As I ruled previously, I need to have total comfort that the

23   settlement was at arms length and wasn't collusive.  And

24   communications between the debtors and the financing party

25   defendants at any time, especially since the -- certain of

1    the definitive terms of the agreement came into being after

2    that time, are at least potentially relevant.

3         As far as common interest goes, until and unless I

4    approve this settlement, the estate, now represented by the

5    debtors or on whose behalf the debtors propose to settle, and

6    the financing party defendants are adverse.  And if and to

7    the extent that the debtor find it in its -- to its

8    convenience to be making a settlement with the financing

9    party defendants, which will be determined to be either

10   appropriate or inappropriate after the hearing, that is not

11   in the nature of defending a common interest, but it's in

12   achieving your private commercial objectives.

13        Accordingly, I'm ruling that with the debtors and

14   the Creditors' Committee both representing the estate in

15   their various ways, in a litigation against the financing

16   party defendants I am not going to recognize a common defense

17   privilege.

18        Next issue.

19        MR. DAHAN:  Okay.  Thank you, Your Honor.  The next

20   issue relates to communication between the debtors and the

21   non-settling defendants.  Your Honor will recall at the

22   hearing Your Honor limited the Committee's discovery to

23   document production and questioning with respect to

24   communication between the debtors and the settling defendants

25   or their professionals with respect to settlement or the

1    Creditors' Committee.

2         We honestly have no issue producing such documents

3    and in fact we've already produced many such documents to the

4    extent they exist.  The problem here is that the Committee

5    has now served several requests that would require us to

6    produce documents that rebut communications between the

7    debtors and the non-settling defendants, assuming that none

8    of the financing party defendants were on those

9    communications.

10         For instance, just straight communications between

11   the debtors and Access or their counsel or any of the

12   (indiscernible) and their counsel.  We believe that that is

13   beyond what Your Honor required.  We also don't see how any

14   of that is relevant.  Your Honor knows that none of those --

15   the non-settling defendants are not parties to the settlement

16   agreement, therefore the issue of whether this was at arms

17   length with the financing party defendants is not relevant to

18   whether there were communications at any point between

19   January and December between the debtors and strictly with

20   any of the non-settling defendants.

21         And more importantly, Your Honor, at the hearing

22   itself when Your Honor made this ruling of strictly limiting

23   it to communication between debtors and settling defendants,

24   at no point did the Committee, you know, raise this as an

25   issue, raise this as a clarification, and what that's done

1   is, you know, we've been through, you know, searching, you

2   know, tens of thousands of documents and collecting them and

3   putting the search terms related to any domain name that may

4   reflect to financing party defendants.  To now have to do a

5   whole second brand new search of our files over a year period

6   over countless custodians of now another fifteen to twenty

7   domain names looking for such types of communication, again,

8   aside from just extremely burdensome, you know, it just, you

9   know, would be costly; and again, we just don't think that

10  they're relevant, especially given Your Honor's instruction

11  at the December 11th conference.

12          THE COURT:  All right.  Before I give Mr. Wissner-

13  Gross a chance to respond, do any of the financing party

14  defendant counsel need -- see a need to supplement what Mr.

15  Dahan said?

16          MR. SIMES:  Yes, Your Honor.  It's Michael Simes

17  from Mayer Brown again.

18          I just want to note before responding that we've

19  been alerted that CourtCall apparently has Mr. Huebner on

20  mute and he may wish to be heard on certain of these issues,

21  so if CourtCall could either unmute or get in touch with Mr.

22  Huebner at 212-450-4099 to remedy that, I certainly never

23  wished to have Mr. Huebner on mute.

24          THE COURT:  All right.  I'm authorizing and

25  requesting CourtCall to unmute Mr. Huebner and I'm confident

1   that I can trust him to stay quiet if he stays off mute and

2   doesn't wish to speak.

3           MR. SIMES:  With respect to this issue on

4   communications with non-settling defendants, Your Honor, we

5   echo obviously all the arguments that Mr. Dahan made with

6   respect to what we believe this Court ruled very clearly on

7   December 11th.

8           On that, with respect to communications between

9   settling defendants and non-settling defendants in this

10  matter, there is very clearly a common interest to be

11  protected.  We were all, during the course of this

12  litigation, defending against the same or very similar

13  claims.

14          As Your Honor knows, some of the defendants were put

15  together in one group as the financing party defendants, but

16  we're working in concert, at Your Honor's direction, with the

17  directors and officers; and in certain instances, with the

18  Access defendants in preparing the defense of these claims,

19  in preparing expert reports, in sharing many of the burdens.

20          The extent of their communication, especially with

21  respect to the merit of the Committee's claim, which is one-

22  half of what the Committee is requesting here, with the non-

23  settling defendants will clearly number in the thousands.  It

24  was made clear to the Committee at the outset that this was

25  not going to be part of our search because it was not what

1   the Court ordered at the December 11th hearing and we believe

2   that none of the communications between those defendants with

3   respect to defending the claims would be discoverable under

4   the common interest privilege.

5       Beyond that, to the extent that the Committee is

6   seeking communications with respect to the settlement, well,

7   I don't believe, on behalf of Merrill, that there are any and

8   I don't believe that any of the non-settling defendants were

9   part of these communications or even knew about the

10  settlement until the morning of December 4th when everybody

11  else did.

12      The fact is that going back to search these domain

13  names and, as Mr. Dahan said, review again additional

14  thousands of documents to determine whether or not that's

15  case is just burdensome in the context of the short time

16  frame we have.

17      THE COURT:  All right.  Mr. Wissner-Gross.

18      (Pause in proceedings.)

19      THE COURT:  Mr. Wissner-Gross?

20      MR. WISSNER-GROSS:  Yes, Your Honor.  I think there

21  really are two separate issues here:  one, communication that

22  the debtors had with the non-settling defendants; and

23  secondly, based on what Mr. Simes just said, I gather just

24  internal communications between and among the various

25  defendants.

1          As to the former, which is really our focus, in Mr.

2     Weisfelner's letter to you of December 10 he specifically

3     cited several instances of what we believe -- and I was

4     present at a lot of these depositions so a lot of this

5     information frankly came from me, Your Honor -- an

6     observation that the defendant -- or excuse me, the debtors

7     who are defending a number of the Lyondell party acquisitions

8     seem to have almost a collusive arrangement at the deposition

9     in the way their defense was handled.

10          And I think our real focus for purposes of this

11     topic for the 9019 is to make sure that we have all

12     communications by debtors, and it's really going to mean

13     debtors' counsel, with counsel for the non-settling

14     defendants with respect to any of the depositions that

15     occurred, whether in 2004 discovery or the adversary

16     proceeding.

17          And I think we have circumscribed the universe of

18     the focus to communications by debtors and really debtors'

19     counsel with the counsel to the D's and O's and to the Access

20     defendants tied to depositions, I think that that

21     substantially shrinks the universe of what we're focusing on.

22     It's very targeted and everybody knows what the playing field

23     is that we're talking about.  And that really -- I mean, our

24     goal here is to make sure that we develop a full record on

25     the issue of, among others, of collusion and our view of the

1    case is the way we can best establish that, Your Honor, is to

2    show a pattern that existed from the outset of Rule 2004

3    discovery, so that's really our focus.

4            We're not interested, per se, in the communications

5    that Cadwalader may have had with coverage counsel in terms

6    of insurance issues.  We're not interested in -- other than

7    the documents that are really targeted to advance record on

8    the issue of collusion on this particular point, and whatever

9    this was unlikely end.

10            As to the communications in and amongst the

11   financing party defendant, I did have a meet and confer a few

12   days with the counsel for financing party defendants and at

13   that time they actually didn't advance the argument that the

14   common interest privilege applied to all of their

15   communications with -- actually their position was that we

16   were stuck with the D's and O's and the Access defendants.

17   The only common interest privilege that applied was during

18   the period when they were comparing expert report and

19   arguably working through it together in connection with that

20   report.

21            But in the interest of expedition, Your Honor, we're

22   prepared to forego at this time questing for any

23   communications with any of the non-settling defendants other

24   than those where the debtors and debtors' counsel

25   participated, which I think should satisfy Mr. Simes's second

1    point.

2          Our focus on this is simply to make sure we have a

3    full record on the issue we think is -- that pertains to

4    questions of collusion and arms length issues.

5          THE COURT:  All right.  Mr. Dahan, I'll take brief

6    reply.

7          MR. DAHAN:  Thank you, Your Honor.  Okay.  Two quick

8    points.  One, you know, I think what Mr. Wissner-Gross fails

9    to understand is it's not like we could just, you know, find

10   a document that relates to a deposition.  We would have to go

11   and search all those documents with those domain names over

12   time, eventually maybe only produce, to the extent there were

13   any -- they reflect the communication with counsel for Access

14   about a deposition, but we're going to end up having to get

15   hits on thousands of documents to the extent there were

16   communications on D&O coverage, on anything else.

17         And again, Your Honor, we just do not see what

18   collusion, and especially since at no point during any of

19   those deposition did Mr. Wissner-Gross ever raise an issue

20   with the debtors that that's how we were behaving

21   inappropriately or any point in time during the extensive

22   adversary discovery, and I totally disagree with the way he's

23   characterizing our behavior at these depositions.

24         But therefore, Your Honor, we do think that the

25   appropriate scope here, which we have produced and which we

1  will gladly produce our communications that we may have had

2  with the settling defendants on the issue of settlement or

3  adversary proceeding, including at deposition.  So that where

4  we believe the appropriate scope is, Your Honor.

5          THE COURT:  All right.  Everybody sit for a second.

6          Okay.  With respect to this second category,

7  communications with non-settling defendants, the objection is

8  sustained except to the extent that the debtors shared with

9  any of the non-settling defendants any views the debtors had

10  as to the strengths of the claims against settling

11  defendants.

12          Putting it another way, if the debtors shared with

13  any non-settling defendants debtor views as to the strengths

14  or weaknesses of claims against the settling defendants, or

15  shared with non-settling defendants any views the debtors had

16  as to the desirability of the settlement, that's fair game.

17          Other than that, however, the objection is

18  sustained.

19          The requested discovery in this area is too remote

20  and it raises the risk, if not the certainty, that the

21  Creditors' Committee would get access to inappropriate

22  disclosure into the various defendants' views concerning the

23  strengths and weakness of claims that even as we're now

24  talking about it, the Committee is still going to be able to

25  pursue against the non-settling defendants.

1              And at the risk of stating the obvious, unlike my

2      prior ruling on common interest attorney/client privilege,

3      all defendants, at least until I've approved this settlement,

4      have a common interest in the defense of claims that are

5      being brought by the estate, whether brought by the

6      Creditors' Committee or whether they could ultimately be

7      brought in whole or in part by the debtors.

8              Issue number three, that's settlement negotiations

9      between the financing party defendants and the Creditors'

10     Committee?

11             MR. WISSNER-GROSS:  Your Honor, it's Mr. Wissner-

12     Gross.  Would you like me to start out on this one?

13             THE COURT:  It's all right with me.

14             MR. WISSNER-GROSS:  Okay.  Your Honor, this issue

15     pertains to a subject that was briefly addressed on December

16     11th and Mr. Weisfelner had began to address it in court

17     within his December 10th letter and it's something that we

18     feel quite strongly bears, among other basis in terms of

19     9019, to whether the settlement was arms length, whether the

20     debtor has properly discharged their fiduciary duty in terms

21     of finding out what actually the state of play was in terms

22     of any settlement negotiation between the Committee and the

23     bridge lenders, which were occurring; and as to other

24     relationships to the standing in 9019 issues.

25             Based on Mr. Simes's most recent letter to the Court

1    that we got just before the call, it appears that -- from the

2    bridge lenders' perspective, it appears that they are

3    prepared to explore that subject in terms of Mr. Weisfelner's

4    communications of it.  In fact, they stated probably more

5    than we have as to what they're due as to what the status of

6    the negotiations were.

7        We've been careful in our submissions to Your Honor

8    to not get into the specifics of what the offer was at the

9    time, the demand, and what the position was that was

10    communicated to us or to Mr. Weisfelner more specifically by

11    Mr. Trust and Mr. Huebner.

12        But we think that that is all quite relevant

13    ultimately to Your Honor's assessment as to whether the

14    ultimate proposed settlement is within the lowest range of

15    possible reasonableness and particularly given that as I

16    think is apparent in our papers, the view of the Committee is

17    that the Committee would have been able to essentially

18    consummate a separate settlement with the bridge lenders

19    alone that was far, far better than the proposed settlement

20    by the debtors to resolve all claims against the financing

21    party defendants.

22        And to this day, Your Honor, I really haven't gotten

23    a direct answer from the debtors or their counsel as to

24    whether they're even aware of Mr. Weisfelner's separate

25    negotiations.

1        I gather from Mr. Simes's letter there are two basic

2    fall-back arguments that they have as to why we nevertheless

3    shouldn't be able to probe further on that discovery.  First,

4    I believe that they may fill out some residual 408 argument.

5    In our letter to Your Honor that we submitted on January 6th

6    we wanted to fairly extend some discussion as to

7    (indiscernible) new application here as to our communications

8    with the bridge lenders on the subject.

9        But the other point is that it really is a privilege

10   issue, and that is that from the brief exchange you heard in

11   court on December 11th, it appears that Mr. Trust and Mr.

12   Huebner have a different recollection as to what the state of

13   play was as to the communications.  And my understanding,

14   Your Honor, is that most of those communication were done

15   verbally and that there wouldn't necessarily be a paper trail

16   or extensive paper trail reflecting Mr. Weisfelner's proposal

17   of what the position was of the Committee and what Mr. Trust

18   told him, acting on behalf of the bridge lenders, as to the

19   response of the bridge lenders.

20       Although Mr. Simes began to intimate in his letter

21   today in which he held that we've shared, it's our view that

22   this issue is really relevant to Your Honor's assessment

23   whether this is a fair and reasonable settlement on our

24   grounds and to the extent that Mr. Weisfelner's proposal was

25   conveyed, for example, by Mr. Trust to his client, or --

1    Merrill Lynch or to Bank of America, the parent of Merrill

2    Lynch, and there was a factual recitation of what -- in that

3    communication.

4         We think that that is discoverable because it seems

5    to us that what we're hearing here is a dispute as to what

6    was actually discussed between and among Mr. Weisfelner and

7    Mr. Trust and Mr. Huebner.

8         So we're not looking for any privileged

9    communications.  We recognize that there are privileged

10   communications between Mr. Trust, Mr. Huebner, and respective

11   client, but we want to make sure that we develop the record

12   on this, which we think is relevant to Your Honor's

13   consideration of the overall settlement, that at least we

14   have the benefit of an accurate factual record.

15        I noted that Mr. Simes has offered to take Mr.

16   Weisfelner's deposition.  We think that if we have at least

17   limited discovery as to the fax that were shared back and

18   forth between Mr. Weisfelner and Mr. Trust and Mr. Huebner,

19   that we'll get to the bottom of this issue fairly quickly.

20   Your Honor will have a hopefully clear record as to what the

21   actual status was of the separate bridge negotiations, which

22   were occurring, Your Honor, right on the eve of the second

23   day of meetings.

24        And given the fact that the subject of the status

25   of, assume for argument's sake, the potential assignment of

1    the (indiscernible) position ended up as part of the ultimate

2    settlement package that the debtors worked out on December 4

3    with the finance party defendant and -- surprisingly was

4    interest us, the bridge lenders ended up getting equity and

5    warrants worth about eight percent of the bridge loan.

6          We think that, for the reasons we set in our paper,

7    is that this is something that really needs to be included as

8    part of Your Honor's overall assessment as to whether the

9    settlement was arms length, whether it was fair and

10   equitable, and ultimately whether, even if there's standing

11   that's found by Your Honor, whether it meets the lowest

12   bounds of the ends of reasonableness.

13         THE COURT:  Mr. Wissner-Gross, Mr. Simes, in his

14   letter, says that if we're talking about communications

15   between the Committee and the bridge lenders' counsel, you're

16   going to know about them better than anybody, so what's the

17   point of requiring disclosure on it?

18         Is it your contention that because people have

19   different memories of that, that that's why disclosure is

20   necessary?  Because when I read the Simes letter, I said, so

21   why are people arguing about this.  You guys seem to be

22   arguing about production of documents as to which, in theory,

23   each of you should have the same documents.

24         MR. WISSNER-GROSS:  Well, I don't -- I think that's

25   probably not the case, Your Honor.  My understanding is that

1   these communications were done orally, primarily with Mr.

2   Weisfelner having a series of discussions with Mr. Trust.    In

3   fact, if I may be permitted to just explain it further, Your

4   Honor, just before Thanksgiving there was a meeting in our

5   office that Mr. Weisfelner was present with several counsel

6   for the bridge lenders, and then there was a separate meeting

7   he had with Mr. Trust and Mr. Sarnes that followed the

8   initial meeting, and then he had a series of telephone

9   discussions primarily with Mr. Trust over the period of the

10  next several days, but also to a certain extent with Mr.

11  Huebner.

12          And I'm not aware that the substance of those

13  communications reflected in emails back and forth between the

14  lawyers who had those active extensive detailed discussions

15  and my concern is that Mr. Weisfelner has a distinct

16  recollection of what happened, Mr. Trust may have a different

17  recollection, and to the extent that Mr. Trust, just using

18  Mr. Trust as an example, who had -- we saw from his time

19  record that he submitted to Court and obviously identified

20  the meeting as something that actually occurred, if he

21  communicated back to his client I had a meeting with Mr.

22  Weisfelner and here's what he said during the course of the

23  meeting, he said A, B, C, and D; and then he had a subsequent

24  phone call to Mr. Weisfelner before -- let's assume he

25  reported that to his clients, who are the other bridge

1   lenders, and said, Mr. Weisfelner has made the following

2   proposal, he said A, B, and C will settle the case against

3   the bridge lenders; and Mr. Trust says, I said no such thing

4   or Mr. Weisfelner said no such thing.

5          It seems to me that, under general rules in terms of

6   privilege, that to the extent that Mr. Trust communicated,

7   for example, to his client the facts of what Mr. Weisfelner

8   said, that that relaying of a conveyance of Mr. Weisfelner's

9   communication is not privileged.  I'm trying to avoid a big

10  dispute between the counsel who were there as to what

11  actually transpired.

12         THE COURT:  All right.

13         MR. SIMES:  This is Michael Simes from Mayer Brown.

14         I want to be quite brief on this, to cut through it

15  all.  I think our position is pretty well set out in our

16  letter.  They've asked for three different types of

17  communications here:  those with the debtors reflecting

18  communications about whatever settlement discussion occurred

19  between financing party defendants and the Committee;

20  communications with the Committee about settlement

21  discussions that occurred with the Committee; and then most

22  remarkably, communications with our clients with respect to

23  those settlement discussions.

24         And just to be clear, just because Mr. Wissner-Gross

25  says that these were negotiations does not make it so, and I

1  want to make clear for the record that we've got no problem

2  producing documents to the extent they exist, communications

3  with the debtors about such discussions with the Committee.

4  I don't know whether they exist, but I think if they do, they

5  would be told they would be captured in response to other of

6  the Committee's requests, not this one.

7         With respect to communications with the Committee, I

8  think Your Honor already applied the primary (indiscernible)

9  that they have these communications.  You know, to the extent

10 that Mr. Weisfelner has communications with me or Mr. Trust,

11 he knows better than anybody what those communications were.

12 We know what those communications were.

13        And as we said in the letter, and one of the reasons

14 why we, you know, do not really mention the 408 issue is that

15 we thought we had made some progress and Mr. Wissner-Gross's

16 letter of yesterday where they sort of admitted that the only

17 settlement offer that was ever made in connection with any

18 discussions that they had with (indiscernible) counsel was

19 made by the Committee to us.  That's it.

20        So with regard to 408, to the extent that Mr.

21 Weisfelner wants to disclose to the Court and to the world

22 what his settlement offer was, we have no objection, he's

23 more than welcome to do that.  Just as we're more than happy

24 to disclose what our response was to that offer.

25        And I want to finally make clear that the dispute,

1    such as it is, over the status of settlement negotiations or

2    discussions that Mr. Wissner-Gross mentioned is not as to

3    whether or not meetings occurred.  No one ever conceded that

4    meetings occurred.  That's what happened in disputed cases in

5    advance of trial.

6          What was disputed was the characterization that Mr.

7    Weisfelner used in his December 10th letter, that he was on

8    the verge of a settlement, that settlement was under

9    consideration, that the bridge lender counsel had put forward

10   a specific settlement structure proposal; that's what was

11   being disputed, not the fact that meetings occurred.

12         And so to the extent that Mr. Weisfelner and Mr.

13   Wissner-Gross want to ask questions about his own settlement

14   proposal, I think we're probably happy to answer them.  I

15   will note for the record that of the ten depositions that had

16   been noticed by the Committee, and actually the nineteen that

17   were initially noticed, they chose not to notice either Mr.

18   Trust or Mr. Huebner or myself, the people they say were

19   involved in these conversations, but if they want to ask

20   those questions, by all means they can ask those questions.

21         The real heart of the dispute here is whether or not

22   they get attorney/client communications with respect to their

23   settlement proposal.  And I think Mr. Wissner-Gross would

24   acknowledge that to the extent any communications went beyond

25   a mere recitation of Mr. Weisfelner's offer, there moot.  And

1    to the extent that they only include a mere recitation of Mr.

2    Weisfelner's offer, again, the committee already has that

3    information easily at its disposal.  They've already conveyed

4    the attorney/client relationship to require communications

5    between us and our client with respect to those -- that

6    settlement proposal (indiscernible).

7            THE COURT:  All right.

8            MR. WISSNER-GROSS:  Your Honor, may I be briefly

9    heard in reply?

10           THE COURT:  Yes.

11           MR. HUEBNER:  I'm sorry.  Can I just go before you

12   for a second?

13           MR. WISSNER-GROSS:  I'm sorry, Marshall.

14   Absolutely.

15           MR. HUEBNER:  Good afternoon, Your Honor.  It

16   appears that I've been taken off mute.

17           THE COURT:  Go ahead.

18           MR. HUEBNER:  Can you hear me okay?

19           THE COURT:  Uh-huh.  Fine.

20           MR. HUEBNER:  Your Honor, this is more than a little

21   bit I think of a tempest in a teacup and, frankly, we think,

22   as we said at the last hearing, this is all -- it's protected

23   by 408 and we're genuinely stunned to have received

24   references to it in the letter.

25           However, we have nothing to hide and, in fact, we're

1   very willing to tell the story.  Given that I think Mr.

2   Wissner-Gross keeps sort of saying, there aren't any

3   documents here.  There was a single meeting and clearly Mr.

4   Weisfelner has certain recollection of the nature of the

5   proffer that Mr. Wissner-Gross used the phrase about twenty

6   minutes ago about the settlement that the Committee, quote,

7   "would have been able" to do with the bridge lenders.

8          I just want to be very clear that that is just --

9   there was no bridge lender that had to do this remotely like

10  that.  I think we're going to need Mr. Weisfelner's

11  deposition here because this is really about Mr. Weisfelner's

12  perception of what he thinks the progress was, and everyone

13  else's perception on the other hand, and there really is

14  nobody but Mr. Weisfelner on the one hand and everybody else

15  on the other.

16         And Mr. Wissner-Gross is trying to get unbelievably

17  inner sanctum stuff from us, including our attorney/client

18  communications, but then say, oh, no, no, we're not going to

19  need, you know, a deposition here.  And we don't think that's

20  quite right.  If there's going to be inquiry into -- and

21  argue these highly preliminary DOAs went nowhere,

22  negotiations between the bridge lenders and Mr. Weisfelner,

23  we're going to need a deposition because it's our view that

24  those conversation were few and brief and not productive.

25  And if Mr. Weisfelner is the only holder of this information,

1   belief to the contrary, I want to hear it under oath under

2   penalty of perjury.

3            THE COURT:  All right.

4            MR. WISSNER-GROSS:  Judge, may I respond briefly

5   now?

6            THE COURT:  Yes.

7            MR. WISSNER-GROSS:  I want to say for the record,

8   and Mr. Weisfelner is here with me in the room and he

9   actually is not stepping up to comment, but I will tell you

10  that Mr. Weisfelner had a completely different understanding

11  and recollection as to the facts of negotiation.  He stands

12  by the statements on December 10th and I think the comments

13  made by Mr. Huebner, Mr. Simes has to establish those

14  negotiations, how far advanced they were, and whether there

15  were, in fact, bilateral proposals is clearly a fact in

16  dispute.

17           And I'm trying, in my approach, to avoid depositions

18  of lawyers, although it's clear that ultimately some

19  discovery of lawyers will have to take place, but, Your

20  Honor, for argument's sake, that in fact the bridge lenders

21  had said to Mr. Weisfelner through counsel, you can have all

22  the bridge loans, you can have all rights to them, the only

23  issue is whether we have to pay you something more than that,

24  and then a few days later while those discussions are still

25  going on, Mr. Weisfelner, to his amazement, hears a

1    settlement was reached with multiple financing party

2    defendants and even more to his amazement, that the bridge

3    lenders who were out of the money, who he thought were going

4    to assign at a minimum their rights to bridge loan for

5    getting eight cents on the dollar, that the bridge loan was

6    part of this global settlement.

7        Our view is that this couldn't be more relevant to

8    determining whether it was an arms length settlement, it was

9    collusive, and ultimately whether the 300-million-dollar

10   proposed settlement is far -- you know, if it's well below

11   the possible regional settlement taking into account that Mr.

12   Weisfelner thought that he was close to reaching a deal with

13   the bridge lenders that would have meant standing on a

14   separate base far better than the debtors' proposed

15   settlement with all the financing party defendants.

16       THE COURT:  All right.  Folks, for ease in

17   understanding my ruling, pull out Mr. Simes's letter, Page 4,

18   top of the page, which has three stated categories.

19       First category, communications between the bridge

20   lenders or their counsel and the debtors or their counsel,

21   with respect to settlement negotiations between the bridge

22   lenders and the Committee, that subcategory will be produced.

23       I sense from the paragraphs that immediately follows

24   the three numbered subcategories there is no objection, and

25   even if there had been an objection, it would have been

1    overruled.

2          Second category, communications between counsel for

3    certain bridge lenders and Committee counsel.  As the

4    discussion has fleshed out, it appears unlikely that there

5    are any written documents that passed between the bridge

6    lenders and Committee counsel.  What we're really talking

7    about is notes of oral communications that might have been

8    taken by the recipient or the transmitter of whatever was

9    said orally.

10          In that connection, subject to the reciprocal

11   requirement that I'm going to impose in a minute, any such

12   notes will be produced to the extent that they are what Mr.

13   Simes articulated as a mere recitation of what was said

14   between Mr. Weisfelner and the listener on the bridge lender

15   side, or by the bridge lender speaker to Mr. Weisfelner.

16          And when I say Mr. Weisfelner, I sense that it's

17   mainly Mr. Weisfelner, but if it's anybody else allied with

18   Mr. Weisfelner it's the same principle.

19          For the avoidance of doubt, I am not authorizing any

20   attorney mental impressions that were written down at the

21   same time that the substance of the proposal was made or the

22   substance of the response to that proposal was transmitted

23   back; and I am not authorizing any communication of any type

24   between the attorney and his client or her client.

25          So this is an implementation of the principle that

1   what an attorney hears from a non-privileged party is not

2   privileged, and what an attorney may -- actually, I'm getting

3   into the third category, but the principles are going to

4   remain the same.  Legal advice or mental impressions will not

5   be produced and can be redacted and should be redacted.  But

6   to the extent any notes say in words or substance the

7   specifics of what Mr. Weisfelner said to the bridge lender

8   lawyer, or what the bridge lender lawyer said to Mr.

9   Weisfelner, that will be produced vis-a-vis category number

10  two.

11        In addition, my order authorized in the production

12  of that by or on behalf of the bridge lenders is conditional

13  upon reciprocal discovery of the same character being

14  provided by Mr. Weisfelner and the Creditors' Committee to

15  the bridge lender group.

16        Category number three is going to be resolved under

17  the same principles.  Now we're talking about what counsel

18  for the bridge lenders says to its clients with respect to

19  what Mr. Weisfelner said to them in the way of a proposal on

20  behalf of the committee.

21        To the extent, if any, to which any bridge lender

22  lawyer communicated the Weisfelner proposal to a bridge

23  lender party, the bare bones of the mere recitation of what

24  the lawyer said about what Weisfelner said is fair game and

25  will be produced.  But to the extent that any attorney mental

1    impressions concerning what Mr. Weisfelner said were

2    conveyed, or any legal advice with respect to what Mr.

3    Weisfelner proposed was conveyed, including most obviously

4    whether such proposal should be accepted or rejected, or what

5    might be appropriate or inappropriate vis-a-vis any

6    counterproposal or whether any counterproposal should be made

7    shall remain fully protected.

8            And, as I said in connection with category two, the

9    duty to produce under category three will likewise be

10    conditional upon reciprocal discovery of the same nature, if

11    and to the extent Mr. Weisfelner communicated anything about

12    what he said to the bridge lender lawyer, or what the bridge

13    lender lawyer said to him, to his own folks.

14            Okay.  Next issue.  I think we're up to number four

15    on Mr. Wissner-Gross's list, communications between the first

16    lienholders and the bridge lenders.  Who wants to take the

17    lead on that?

18            MR. SIMES:  Your Honor, it's Michael Simes from

19    Mayer Brown.  I'd be happy to, on behalf of the financing

20    party defendants.

21            I think we can be pretty brief on this.  The

22    Committee acknowledges with respect to this reflects for

23    these types of communications that this goes beyond what the

24    Court authorized at the December 11th hearing in its ruling

25    after lengthy argument and deliberation, findings from the

1   Court in its December 10th letter that it was going to

2   request this type of discovery.

3          Mr. Weisfelner alluded to this type of discovery

4   during the course of his oral argument during the December

5   11th hearing and these types of discovery requests were in

6   their draft discovery request that Mr. Dahan referred to

7   earlier.  They were provided to us at the outset of the

8   December 11th hearing.

9          Your Honor after that argument came back and made a

10  specific ruling that there would not be authorization of

11  communications between the settling defendants and/or their

12  professionals.  Just to make sure it was clear, Mr.

13  Weisfelner asked again after Your Honor's ruling for

14  clarification as to whether or not he could get

15  communications between the bridge lenders and the first

16  lienholders and Your Honor once again said no.

17         Your Honor did say not at this time, which is what

18  has left the door open for the Committee to come back and

19  essentially move for reconsideration on this issue, but I

20  think it's important to note the Committee has not come back

21  with any argument that they did not raise previously as to

22  why this is relevant.  They've flagged all of these arguments

23  before and Your Honor has already ruled.

24         I think it's pretty clear that the discussions

25  between the first lien and the bridge holders with respect to

1    intercreditor disputes, which amount to discussions between

2    constituents of this debtor and to negotiation are not at all

3    relevant to determining whether or not the settlement of the

4    Committee's claims is reasonable.

5        And I know that others on the financing party

6    defendant side may have additional things to say about that,

7    so I'll stop and defer to anyone else who seeks to jump in at

8    this time.

9        THE COURT:  All right.  Anyone?

10        UNIDENTIFIED:  -- I'll just have another one or two

11    minutes at the very most.

12        Just as a reminder, which I know everybody on the

13    phone knows, a 9019 hearing is only about the debtors'

14    business judgment and is only about the party -- the

15    settlement under the last stage perspective.

16        Normally no third party discovery of any time is

17    allowed.  Here the Committee has raised, you know, kind of

18    allusions or suggestions of collusion and so Your Honor ruled

19    quite thoroughly after I think a six-hour hearing on the 11th

20    that the Committee could get basically most communications

21    relating to the settlement that were with or included the

22    debtors.  I mean, clearly the debtors had to have been

23    involved in it to show if there was any sort of collusion.

24        Your Honor was totally clear because we're,

25    remember, being very asymmetrically treated here.  The

1   Committee is being given access to all the debtors' expert

2   reports, Judge Conrad, the next, and we're not being given

3   any of it, so if this thing starts up again, you know, we're

4   in a very initial position.  But this is the one area which

5   is, you know, discussion among the defendants where I think

6   there really can't be any question at all that it, A, has no

7   relevance to the debtors' business judgment or collusion; or

8   B -- and B is clearly protected by common interest, as I

9   think Your Honor ruled about an hour ago on these issues.

10          So to say now that they can come back and ask for

11   the fourth time to get communication between and among only

12   the defendants that did not involve the debtors, certainly no

13   new evidence but rather, you know, some new theory, we think

14   would just blow fairness completely out of the water, as well

15   as grossly violated even the expectation of privilege that we

16   think are contrary to Mr. Wissner-Gross's recitation is quite

17   well in trying case law and if Your Honor should want it, I'm

18   happy to provide it, I'm not going to burden you unless asked

19   for.  I'm happy to give you citations for cases in the

20   Southern District that make it clear the common interest

21   without a question be compliant to this situation.

22          THE COURT:  All right.  Mr. Wissner-Gross, any final

23   reply?

24          MR. WISSNER-GROSS:  Yes, Your Honor.  If I could

25   briefly address this.

1        I think that, first of all, Your Honor did rule that

2    -- on December 11th that at that time you were not going to

3    permit discovery into this and I think your language on this

4    was you were willing to give it a fresh look.  Mr. Weisfelner

5    actually did not have a chance to develop on the record all

6    the points he wanted to make, so I could briefly make a

7    couple of points that I think are key here.

8        First of all, I think the real issue here, the

9    driving point here, is that there were intercreditor

10   negotiations to which they were adverse, meaning that the

11   bridge lenders were out of the money to -- if we won phase

12   one, who could benefit.  And there were negotiations with the

13   first-in lenders.

14       On the other hand, if the financing party

15   defendants, for argument sake, prevailed in phase one,

16   actually, in terms of intercreditor dispute, the bridge

17   lenders, they didn't get anything.  (Indiscernible) and their

18   position was just as bad vis-a-vis the first-in lenders.

19       So what happened here as a result of the debtors

20   injecting themselves we think inappropriately into

21   discussions of settlement at the time it did was to

22   effectively enhance or give a free ride or free pass to the

23   bridge lenders by virtue of the debtors' condition.  They've

24   stated under several points that they made as part of the

25   settlement negotiations with the finance party defendant that

1    the two groups deliver a resolution of intercreditor dispute.

2         So I think what this comes back to is the same point

3    that we addressed with respect to Mr. Weisfelner's

4    negotiations with the bridge lenders.  The thing that is

5    really driving our need to examine this issue is how did the

6    bridge lenders end up getting a settlement, which we didn't

7    participate in the negotiations with the financing -- first-

8    in lenders or the debtors, eight cents on the dollar for

9    their $8 billion out of the money, bridge loans, when we

10   thought we were very close to getting that for them and more

11   on a stand-alone basis.

12        So I think the point here is that, no, we're not

13   interested in their months of discussions between them.

14   We're not interested in most of what they had to deal with on

15   a separate basis.  But we are keenly interested in

16   understanding what happened in their intercreditor

17   negotiations where they were adverse to each other and they

18   had completely diametrically opposed positions where, as a

19   result of the debtors' intrusion into the settlement process,

20   the bridge lenders ended up taking for themselves what they

21   were prepared, from our perspective, and give to us on a

22   stand-alone basis.

23        So I appreciate, Your Honor, that -- and, Your

24   Honor, Mr. Weisfelner just reminded me that although that was

25   stated in court on December 4th that there was this

1    settlement of the intercreditor issues, we're not aware of

2    any disclosure when we were promised to get all the

3    disclosure of what those actual terms were which, according

4    to Mr. Davis on December 4, were a condition of proceeding

5    and integral to any resolution of the debtors' efforts to

6    settle with the financing party defendants.

7        So we don't want broad expanse of discovery, but we

8    have maintained that I think it's germane to the 9019 issues.

9    It will be germane to understanding whether the settlement is

10   below the bounds of reasonableness, and mindful of the fact

11   Your Honor has indicated that, you know, you want to keep

12   discovery truncated on subjects like this.  We think at least

13   some ability to probe on this content is warranted.

14       THE COURT:  All right.

15       MR. SIMES:  Michael Simes from Mayer Brown.  If I

16   could just speak for a minute, a brief reply on this.

17       Mr. Wissner-Gross says an awful lot of things in

18   there that are factually I think inaccurate.  I won't go

19   through all of them, but what sticks out is the idea that

20   bridge lenders were out of the money; two, that the

21   settlement is eight percent of the eight-million-dollar

22   bridge debt, and several other things.

23       But beyond that, cutting through everything Mr.

24   Wissner-Gross said, this comes down to whether or not these

25   communications are actually relevant to determining whether

1   the settlement of the Committee's action in the complaint

2   that the Committee filed is reasonable.  And I have not heard

3   one thing from Mr. Wissner-Gross except conclusory statements

4   of that, why they think they're relevant, as to what about

5   these communications actually relevant to Your Honor's

6   determination and to whether or not the settlement the

7   Committee claims is reasonable for purposes of Rule 9019.

8          So at this point I'd like to make those statements

9   and yield the floor to anyone else who wants to follow up.

10          MR. ZENSKY:  Your Honor, it's David Zensky of Akin,

11  Gump, Strauss, Hauer & Feld.  May I be heard for a moment on

12  this issue?

13          THE COURT:  Yes, briefly.

14          MR. ZENSKY:  Yes, thank you.  I was not going to

15  speak, Your Honor, because I of course adopted and agree with

16  the comments that Mr. Simes made earlier until I heard Mr.

17  Wissner-Gross speak.

18          All I would like to add is, Your Honor, that again,

19  the issue to be tried here is the reasonableness of the

20  personal transfer claims, not the reasonableness of whatever

21  resolution was reached of plan issues between the senior

22  lenders and the bridge lenders.  And letting one creditor

23  constituency pry into private negotiations between two other

24  creditor constituencies about how they resolve their plan

25  issues I think would be highly unusual and bad policy to set

1   for bankruptcy practice generally.

2           THE COURT:  All right.

3           MR. HUEBNER:  Your Honor, literally fifteen seconds

4   for Marshall Huebner.

5           I think it's right and I would ask Cadwalader please

6   correct me if I mis-speak, but I think they filed an amended

7   plan and I think that the amended plan contained the

8   economics which this was (indiscernible) you know, sort of

9   everybody still waiting to hear what the plan treatment yield

10  is.  It was promised very long ago and I think that's

11  reflected in the amended plan of reorganization, so I don't

12  think there is really anything relevant to the debtors'

13  restructuring on the Committee action settlement that is in

14  the category that (indiscernible) again just remembering that

15  the Court has been very mindful of not unfairly prejudicing

16  people in the future if this falls apart.

17          I think discovery entirely among defendants would be

18  truly without prejudice.

19          THE COURT:  All right.  Folks, I'm not ruling or

20  addressing the broader point Mr. Zensky made.  I am, however,

21  ruling that I see insufficient basis for change in my earlier

22  ruling and my earlier ruling on this issue stands.

23          Next issue.  Is that examiner-related issues?

24          MR. DAHAN:  Yes, Your Honor.  Israel Dahan for the

25  debtors again.

1          Your Honor, I think again at the December 11th

2    hearing was very clear by saying that I am not now

3    authorizing discovery and to any of the matters that were

4    looked into by the examiner, could be I never will.

5          You know, we tried to outline on Page 5 of our

6    letter some of the document requests that we've been asked

7    for and any concern that we believe topics that are not, as

8    Mr. Wissner-Gross they tangibly relate to exam issues, but in

9    fact, issues specifically addressed by examiner.  The one

10   that obviously sticks out to me is the one regarding reserve

11   where the examiner made it clear that he had not uncovered

12   anything unusual about the process by which the debtors will

13   address the continued inclusion or deletion of litigation and

14   reserve on the plan.

15         A lot of the sort of whether or not Mr. Cooper has

16   some sort of independence or not, and looking at visual aid

17   it shows I think the examiner touched heavily on Mr. Cooper

18   in his report.  And (indiscernible) is requesting we want all

19   documents relating to the examiner and the examiner report.

20         So we, you know, in the first instance we just

21   believe it's their requests are totally contrary to what Your

22   Honor ruled at the December 11th hearing.  You know, and more

23   importantly, I think with respect to any questions as to, you

24   know, Mr. Cooper or other members of the litigation

25   committee, all those three individuals have been submitted

1    the retention application.  We reported full disclosure to

2    the Committee and which were hopefully approved by the Court

3    and therefore we think that, you know, going into further

4    looking into their business -- past business relationships

5    and based on any time they ever did any business or any of

6    the members of the financing party defendants is just, you

7    know, totally irrelevant and a mere fishing expedition.

8            So we just think it's a topic that is not relevant

9    to this 9019 motion, Your Honor.

10           THE COURT:  All right.  Anybody else before I give

11   Mr. Wissner-Gross a chance to respond?

12           MR. ZENSKY:  Yes, Your Honor.  It's Mr. Zensky of

13   Akin, Gump, Strauss, Hauer & Feld.

14           I agree with the comments that Mr. Dahan said.  I

15   just want to expand on them.

16           With respect to the last point that he raised, while

17   this was not addressed in the text of Mr. Wissner-Gross's

18   letter, it was included on his chart, so if I could respond

19   briefly, with respect to the business relationship or the

20   fishing expedition, as Mr. Dahan called it, between any

21   financing party defendant and Mr. Cooper, the request that

22   has been made to the financing party defendants defines

23   certainly my client as leverage source and all officers,

24   directors, employees, agents, advisors, attorneys, and

25   affiliates, so that would be hundreds of investment

1    professionals and outside professionals; and ask with no time

2    limit whatsoever if there has ever been any dealings from the

3    beginning of the world to today with Mr. Cooper or anyone

4    else in the litigation subcommittee so we think it's grossly

5    overbroad and there's no basis to ask for that.

6         If they have something in mind, they should ask

7    about it.  And if not, that is inappropriate in the context

8    of the exercise we're engaged it.

9         With respect to issues that the examiner has already

10   addressed, Your Honor did rule that we were not going to go

11   down the road of doing discovery of that and Mr. Wissner-

12   Gross has asked explicitly for numerous topics from the

13   financing party defendants in that regard.  He has asked for

14   documents regarding litigation reserve that was covered by

15   the examiner.  He asked for documents about the TPG offer

16   that apparently was made to the debtors during the time that

17   equity sponsors were being considered.  He has asked

18   explicitly for documents about the examiner report itself,

19   and also listed these as deposition topics.

20        And in a related vein, although not explicitly

21   covered by the examiner report, we've been asked to provide

22   discovery about adequate protection payments and about the

23   potential proposal or a proposal by Reliance.

24        Again, this was actually something you did address

25   at the December 4th hearing and I believe you said whether

1    not redline duty (sic) applied to Luxembourg Law, some may

2    come back to me if they think the debtors are not living up

3    to their redline duties.  You didn't say let's go take

4    discovery on this issue.

5        So there are a host of issues that discovery has

6    been asked for of the financing party defendants both

7    document wise and deposition wise, which explicitly fall

8    under the examiner rubric and other topics which have utterly

9    nothing to do with the 9019 and at best have something to do

10   with the plan process.

11       THE COURT:  Okay.  Mr. Wissner-Gross.

12       MR. WISSNER-GROSS:  Yes, Your Honor.  Thank you.

13       Let me just start by saying that our goal is not to

14   redo what the examiner looked at and we're really mindful of

15   Your Honor's comment about not permitting discovery as to

16   what the examiner had done, but the examiner, just for

17   purposes of just thinking about the scope of what he did, he

18   did not conduct any depositions.  For example, with respect

19   to Mr. Cooper, who I'd like to speak to for a moment or two,

20   he did not interview Mr. Cooper with counsel for the

21   Committee present and at best it was an interview on subjects

22   that were within the scope of what he was authorized to do,

23   which was fairly circumscribed exercise with a limited budget

24   under a limited time frame.

25       In the case of Mr. Cooper, who was scheduled to be

1    deposed on Monday, who is, as Your Honor has noted, an

2    important person we should depose first among the debtor

3    witnesses, and who, based on his own affidavit or declaration

4    of support of the 9019 motion, appears to be a central player

5    for the litigation committee and appears to be the only

6    individual on the supervisory board who is reportedly

7    independent.

8           It seems to us that it's critical for us and it's

9    important for the Court to have a full and thorough

10   examination under oath with proper document discovery as to,

11   for example, whether Mr. Cooper in fact had any prior

12   business relationships with any of the financing party

13   defendants.

14          And this is not just pure speculation, Your Honor.

15   In the course of my preparing for his deposition, which I'm

16   in the process of doing, I came across a website for a

17   company named Cala Equity Partners (phonetic) of which he is

18   -- he was a defined principal and co-owner of that, and the

19   website indicated that it managed capital assets of $200

20   million with investors including Citibank.

21          Now, I don't know when he ended his relationship, if

22   he did, with Cala Equity Partners.  I don't know what, you

23   know, the extent of his relationship -- business relationship

24   was with Citibank, whether it ended before he founded his

25   company named Care Management, which at his deposition last

1   summer is that he founded that company in July of 2008, but I

2   think it's critically important and important for Your Honor

3   when you're assessing whether Mr. Cooper ultimately is

4   probably the most important member of the litigation

5   committee, you know, engaged in whatever process he engaged

6   in determine whether to settle, whether he had a prior active

7   business relationship, investment history with at least one

8   of the financing party defendants with whom he chose to

9   settle.

10          Now, I look to see, after I saw Mr. Dahan's

11   representation that Mr. Cooper was approved by the Court, his

12   retention, and I'm not aware of it, Your Honor.  He did file

13   an affidavit dated March 6th, 2009 which I have in front of

14   me, which is three pages in length, in which he advised the

15   Court that he had been unanimously selected to be a member of

16   the supervisory board, but he states at the end of his

17   declaration or affidavit that neither he nor the debtors

18   believed that approval (indiscernible).

19          To my understanding there has never been in any

20   filing with the Court -- and we looked and we haven't found

21   it, I'm happy to be proved otherwise -- any disclosure by Mr.

22   Cooper as to his existing or prior business relationships

23   that normally would ultimately be required for an estate

24   professional that they brought in and he has effectively

25   within the CRO paid $150,000 a month.

1          And so -- and I'm preparing for his deposition.  I'm

2    not doing basic sort of Google research on this and seeing,

3    well, what is his background, I was kind of was thunder

4    struck that Mr. Cooper appears to have had, at least with one

5    of the financing party defendants, a prior active business

6    relationship.

7          So my concern, Your Honor, is that what I think is

8    happening here, I think you need to step back and look at

9    what the debtors and the funding parties are trying to do.

10   What they want to do is anything that the debtor -- that the

11   examiner may have touched on in passing, and I didn't go in

12   the ambit of his assignment, they want to say, well, that's

13   off limits.  You can't explore any of the business

14   relationships of Mr. Cooper or any of the litigation

15   committee members of any of the financing party defendants

16   even though that clearly couldn't be more relevant and

17   germane to the issue of whether this group was

18   (indiscernible) collusion or whether the only supervisory

19   board member and litigation committee member was being

20   proffered as the one who is somehow disinterest, in fact, was

21   very interested.

22         And we really want to have an opportunity not to

23   redo the examiner exercise, but to be able to take

24   appropriate discovery within the limited time frame we have

25   of issues like that, then we say we'll inform the Court full

1   record as to whether this, for example, this one member of

2   the litigation committee is so important had a history with

3   one or more of the people who are going to be settled,

4   raising the substantial question of whether he should have

5   recused himself.

6          As we learned in the Enron case as we dug a little

7   deeper, we believe that he was required through his

8   appointment at Enron to recuse himself from dealing with

9   these kind of litigation issues with investors in I think

10   Cala Equity Partners that presumably included Citibank.

11          But, Your Honor, I think the point here is that we

12   have a limited time to do discovery.  I fully intend to be

13   very practical and efficient in terms of what topics we

14   explore.  But I don't think it's appropriate for the other

15   side to say, you know, pick up their hand and say the

16   examiner mentioned something in passing in the report, he

17   looked at it, you have no right to examine it.

18          On the other -- briefly, on the other topics that

19   the other side has identified, such as the PBG offer and

20   things of that nature, adequate protection payments, which

21   are not even within the ambit of the examiner's report, our

22   only goal is to take very limited discovery on those topics

23   and inquire to the extent that the financing party defendant

24   attempted to influence the debtors in any way that we think

25   was a collusive nature and inappropriate where we were not

1    privy to those discussions.

2          I have no intention, given the time we have, to

3    reopen any of that.  I think the more important point is that

4    we shouldn't be precluded from taking brief discovery on

5    topics of that nature.

6          But my fundamental point, Your Honor, is that I

7    don't think it would be appropriate or fair to the Committee

8    or the finance party defendants or the debtors to stick up a

9    stop sign and say, oh, on Page 30 the examiner made reference

10   to such-and-such a point, therefore you can't ask any

11   questions, particularly when the examiner didn't mention

12   anybody with us present and nothing was done under oath.

13         THE COURT:  All right.  Anything --

14         MR. HUEBNER:  Your Honor, can I have your ear for

15   twenty-five seconds, literally, just to respond?

16         THE COURT:  Yeah.

17         MR. HUEBNER:  Mr. Wissner-Gross keeps sounding very

18   reasonable saying things like "very limited," "very

19   targeted."  The comment that's not remotely what his document

20   requests say.  In fact, they're outrageous and they say

21   things like all documents concerning any efforts by the

22   debtors to obtain their reserve on the claim; all

23   communications with the debtors concerning adequate

24   protection payment; all -- and this is heard by every FPD --

25   all documents relating to any relationship with any FPD and

1   any of their agents, and any of Cooper, Gallagher, or McShea

2   (phonetic).

3          So if there were the highly targeted, highly narrow,

4   directly relevant, I'm-a-good-guy stuff that we were hearing

5   orally, we would have been served with a very different

6   document request. And the problem is, as Mr. Zensky laid

7   out, you know, the document request says all documents

8   relating to, and then lists topic after topic after topic

9   that have no relevance and certainly even if some conceivable

10  theory were relevant, the burden on us is crazy.

11         If Mr. Wissner-Gross thinks it's appropriate and the

12  Court agrees to ask Mr. Cooper about his relationships with

13  FPDs, the Court will rule on that, but to say that I have --

14  and I never heard about this myself until a few minutes ago.

15  To say that each FPD has to go figure out in its entire

16  institution any relationship that any FPD, let alone itself,

17  has with Mr. Cooper is insane. I don't even know how I would

18  do that.

19         So again, the issue is that, you know, when you say

20  out loud, I want to be able to ask Mr. Cooper about his

21  connections to FPDs, that doesn't sound crazy. The problem

22  is, that bears no relationship to the document request that

23  we actually requested as conference to protect ourselves

24  from.

25         MR. WISSNER-GROSS: Your Honor, if I can very

1    briefly reply to that?

2              THE COURT:  Yeah.

3              MR. WISSNER-GROSS:  I asked -- in a sense, I do

4    agree with Mr. Huebner that, you know, there are more

5    efficient ways of going about this and I have asked the

6    debtors to have Mr. Cooper provide that information, but Mr.

7    Dahan's position, at least at this point, is we don't think

8    it's relevant, we think it's sort of a redo of the examiner's

9    report, and we'll send it back but we're not sure our client

10   has agreed to provide it to you.

11             So if we can get that information from Mr. Cooper,

12   in the first instance, who his being deposed on Monday, that

13   obviously may obviate the necessity of me -- of my requesting

14   the financing party defendants for further discovery on this.

15             But having said that, I think that on other topics

16   that Mr. Huebner just identified such as the reserve-type

17   issues, we've had discussions, we tried to negotiate in good

18   faith, and the position to this point of the finance party

19   defendants is we're not giving you any of that, so we didn't

20   get to the point of trying to narrow some of those.

21             Of course I'm perfectly prepared to meet and confer

22   in good faith on some of the subsidiary issues like the

23   reserve or the rights offering, but narrow the scope of

24   things.  But for purposes of Monday, which is what I'm

25   focusing on with Mr. Cooper's deposition, the most credible

1    thing obviously is being able to fully explore with him the

2    full advent of his background and what he did.

3            MR. DAHAN:  Your Honor, Israel Dahan.  If I could

4    possibly reply.

5            First of all, I think there's two separate issues

6    here.  There's obviously the document request and there's

7    obviously the deposition.

8            We do feel that the topics in general are relevant

9    and have been addressed by this Court or the examiner.

10   Although putting that aside, it wasn't until about two hours

11   before this conference that I first got called by Mr.

12   Wissner-Gross about possibly, you know, resolving some of

13   these questions and issues through the deposition as opposed

14   to the, quote, "all documents" on this topic.  Until now

15   we've been very focused on for me to have to go to Mr. Cooper

16   and all the members of the litigation committee and have them

17   pull any documents that would reflect their relationships

18   with any financing party defendant, obviously we were very

19   disturbed by a request like that.

20           Whether or not this could be resolved because Mr.

21   Wissner-Gross could ask two questions at deposition to Mr.

22   Cooper, how was your relationship with Citibank as to Cala

23   Equity Partners, again, I didn't have a chance to reach Mr.

24   Cooper whether or not we could, you know, are allotted

25   different questions and on the new request we only got served

1   late last night.

2            But I think fundamentally, from the document

3   production perspective, we find this extremely onerous and

4   irrelevant.  Whether or not on this topic maybe there could

5   be answers through a little bit of probing at a deposition if

6   Your Honor feels it necessary, that may be a possible

7   resolution to it, but clearly from a document production

8   perspective this would be an enormous burden and on this

9   topic as well as all the other examiner-related topics.

10           MR. WISSNER-GROSS:  Your Honor, just to very briefly

11  respond, I don't want to ask Mr. Cooper at his deposition

12  these questions.  Mr. Weisfelner asked him some similar

13  questions last summer.  His answer frankly, Your Honor, they

14  told me was, I don't recall any basic relationship with a

15  financing party defendant.  Based on the investigation I've

16  conducted, just, you know, anticipation of his deposition,

17  I've identified concrete examples of direct active business

18  relationships with at least Citibank.

19           I really want documents from him.  I don't want to

20  ask him questions where he says, I don't recall, maybe, let

21  me check my records.  And we want to do this the correct way

22  and I do agree with Mr. Huebner that it's probably more

23  efficient if we got all the production from Mr. Cooper and if

24  for some reason he says, you know, I haven't been involved in

25  Cala Equity Partners for a year, I don't think I have any

1   files, well, for sure Citibank has been identified on the

2   print that I have in front of me that they're on the Cala

3   Equity Partner website identified as a prominent financial

4   invested part of the capital commitment of $200 million with

5   a company that Mr. Cooper is one of the four owners of.

6        So I'm happy to try and first get at that with Mr.

7   Cooper.  I really think the proper way of doing this, as in

8   any case, is to get the documents so that we can test Mr.

9   Cooper based on the documents.  And if he says he doesn't

10  have them, hasn't been involved in, he doesn't leave any

11  papers in his office or anything before his current

12  engagement, then maybe we need to go to Citibank, some of the

13  financing party defendants to say, well, what do you have on

14  this, so that we can at least get before Your Honor a full

15  record as to whether in fact Mr. Cooper, who was never

16  subject to any approval by the Court before he was retained,

17  is truly disinterested, because we think he isn't.

18        THE COURT:  All right.  Everybody sit in place for a

19  second.

20     (Pause in proceedings.)

21        THE COURT:  On this issue number five, items not

22  explored in the examiner's investigation, I'm not going to

23  authorize redoing the examiner inquiry.  But that's not the

24  real issue here.

25        The issue, although you folks are dancing around it,

1   and nobody to my memory has articulated it in exactly this

2   fashion, is the extent to which otherwise appropriate

3   discovery is circumscribed by the fact that it overlaps with

4   examiner areas of inquiry.  And as a general matter, I'm

5   ruling that I'm not going to authorize the Creditors'

6   Committee to do a do-over of the examiner's inquiry, but I'm

7   also ruling that otherwise appropriate discovery relevant to

8   the issues as to whether or not I should approve the 9019,

9   and whether or not it's in the best interest of the estate,

10  not by the way a decision based on business judgment but on

11  the best interests of the estate, is otherwise appropriate

12  and not circumscribed, because if it's otherwise appropriate

13  and not circumscribed, it's okay.

14         The practical issue we're faced with here and the

15  one upon which you spent the most time is, in reality, an

16  issue as to the extent to which discovery is otherwise

17  appropriate, because if Cooper has a professional or personal

18  relationship or a friendship with any of the settling

19  defendants, that is perhaps not necessarily relevant at

20  trial, but within the grounds of potential relevance that

21  makes it fair game for discovery, as applicable or arguably

22  applicable, most obviously, to collusiveness.

23         Now, for that reason, I'm going to permit oral

24  questioning of Mr. Cooper on any professional or personal

25  relationships or friendships he has with any of the financing

1   party defendants, any of the parties who's on the other side

2   of the settlement upon which he weighed in.

3           So, Mr. Wissner-Gross, if you want, you can ask

4   Cooper questions of that character when you're deposing him

5   next week.

6           The real issue, from my perspective, and where the

7   rubber is going to hit the road on this, is the desired

8   document discovery that you want to precede that deposition

9   and/or that you want to take in connection with that

10  deposition.  Now, for a guy of Cooper's age, who has been at

11  this for decades, the desired document production raises

12  extraordinary concerns on my part vis-a-vis potential breadth

13  and burden.  And I can't authorize any document discovery

14  that asks him, by way of example, to produce any documents he

15  has concerning professional relationships he or anybody he

16  was associated with had with any of the financing party

17  defendants or any bank or financial institution or any

18  variance of that.

19          In fact, while I'm not testifying, but because my

20  experience over forty years informs the exercise of my

21  discretion on matters of this character, there was a time,

22  possibly decades ago -- well, I know it was decades ago, but

23  I don't know the extent to which it's less than decades ago,

24  Mr. Cooper was associated with a company called Zolfo Cooper

25  & Company, and at least in cases on my watch, Zolfo Cooper

1   was a financial advisor to secured lenders.

2          Now, back in those days, secured lenders were

3   usually banks, and, you know, participations, while present,

4   were not as prevalent as they are now, so it's at least

5   possible that back in the seventies or eighties he was, you

6   know, had relations with banks.

7          You're going to be allowed to ask about that and

8   you're going to be allowed to ask him questions about

9   whether, in more meaningful time periods, like the last ten

10  years or something, which I say by way of example rather than

11  ruling, you know, he still has relationships with any of the

12  people who the debtors or the Committee are suing.

13         But I am not going to authorize wholesale discovery

14  document production discovery into what could be forty or

15  forty-five years of business experience without something

16  much, much more focused.  So document production from Cooper

17  vis-a-vis his relations with banks or hedge funds that may be

18  part of the financing party defendant group, or some variant

19  of that, is denied without prejudice at this time.

20         But if it turns out in the deposition that document

21  production as to something focused where Mr. Wissner-Gross

22  has some reason to believe that something is there, and Mr.

23  Cooper says, I don't remember it, and Mr. Wissner-Gross says,

24  look, I got a document that makes it seem that you did, my

25  denial without prejudice may cause me later on to rule that

1   appropriate followup is okay, even if it requires making

2   Cooper come back after that's done.

3           So the potential abuse, burden, expense, time delay

4   of the broad brush and free ranging discovery that's

5   requested on the document side is plainly inappropriate and

6   I'm not authorizing it now.

7           If after you depose Cooper and it looks like he's

8   playing rope a dope with you on this, I'm willing -- and I of

9   course have no reason to believe he will, but if that turns

10  out to be the case, then you can renew your request and I'll

11  give it a fresh look.  That's my ruling on that issue.

12          Next?

13          MS. MARTIN:  Your Honor, Linda Martin.  Just to

14  clarify as well, you're not looking for that kind of

15  discovery from the FPDs either, right?

16          THE COURT:  At this point, that's correct, but also

17  without prejudice to renewal if it turns out that there is

18  focused discovery that later turns out to be necessary and

19  appropriate.

20          MS. MARTIN:  Thank you, Your Honor.

21          MR. DAHAN:  Your Honor, Israel Dahan.

22          I take it Your Honor is working off the letter of

23  Mr. Wissner-Gross, which at this point I think we've run into

24  deposition notices.

25          THE COURT:  That's right.

1          MR. DAHAN:  And on the letter on Page 5 is one

2    additional topic that we just weren't sure, given the

3    attached exhibit of Mr. Wissner-Gross, it was not something

4    that they're still seeking or not until we put in our letter

5    that it relates to personal diaries and calendars, and that's

6    on Page 5 of our letter, Topic 4.

7          On that subject, you know, it's our understanding

8    unless Mr. Wissner-Gross corrects me if I'm wrong, that they

9    are still -- they are still seeking for us to produce the

10   personal diaries and calendars of the three members of the

11   litigation committee, two of which have businesses outside --

12   engagements outside of Lyondell, and therefore their

13   calendars over a seven-month period would have to reflect

14   numerous meetings and calls on a host of issues that they're

15   in as counsel they'd first have to delete and redact before

16   we even get to see their calendars to see what's Lyondell

17   related and then what's even settlement and adversary

18   proceeding related, and we just think that the personal

19   diaries could reflect when there was a meeting or a phone

20   call about a settlement or adversary proceeding when they're

21   going to be deposed and could be asked about such meetings is

22   simply inappropriate and extremely burdensome.

23         And we also offered that they said they want to just

24   know when there were meetings, we would be happy to provide a

25   list of meetings that took place by the litigation committee

1   about settlement or the adversary proceedings to the extent

2   they weren't able to get sufficient information at the

3   depositions.

4        But we think that those proposals would make it, you

5   know, satisfactory to avoid having the debtors go through

6   this extreme time consuming and burdensome process of looking

7   through seven months of diaries and calendars because it's

8   extremely senior executives who have many, many meetings and

9   phone calls.

10        THE COURT:  Mr. Wissner-Gross doesn't need to

11   respond on this.

12        Mr. Dahan, in forty years of doing this stuff, I've

13   never seen a party get a get-out-of-jail free card on

14   production of relevant entries in a calendar or a diary.  You

15   can redact.  For the life of me I don't understand why it

16   requires two separate people to do it.

17        If, as Mr. Wissner-Gross may find it more convenient

18   to get a list, if he's interested in getting a list, he can

19   have a list instead, but if he wants to see the diaries or

20   the calendars or whatever they are, he's entitled to the

21   relevant entries in them.  You're of course allowed to redact

22   everything else, but the fact that you're looking for

23   absolution on something like this just is incomprehensible to

24   me.  If he wants it, he gets it.

25        MR. WISSNER-GROSS:  Your Honor, Sigmund Wissner-

1   Gross.  I think the only other topic open issue is the

2   depositions and the number of depositions.

3          UNIDENTIFIED:  Can we interrupt for one second

4   though about lawyers time entry requests of the financing

5   party defendants?  Because I don't think I was --

6          MR. WISSNER-GROSS:  Before we get on that, Israel,

7   you can correct me if I'm wrong, but I believe that the

8   debtors are in the process of making available to us time

9   entries, albeit redacted, that were provided to them by

10  various of the parties that were entitled to have their fees

11  reimbursed by the estate so we, I think, were working that

12  out with the debtors and I would like to see if we can make

13  progress and resolve that before, if necessary, having to tee

14  that up for you guys, Marshall.

15         MR. HUEBNER:  Okay.  Yeah.  To be clear, we told the

16  debtors yesterday, just so the Court knows as well, that we

17  were fine with them re-forwarding to you any and all time

18  entries that were originally circulated under 17C of the DIP

19  order.  So we don't have a problem with that, just giving

20  them the document requests was a little different than that

21  and would clarify now that that's the approach we're taking,

22  at least for the present.

23         Okay.  I'm sorry.  I didn't mean to interrupt.

24         MR. WISSNER-GROSS:  Your Honor, on the issue of

25  deposition notices, here's my sort of a bit of a quandary.

1   We obviously -- we noticed more than ten deposition

2   originally and my friends for I· think both Mr. Havilas

3   (phonetic) and Mr. Dunn (phonetic) reminded me that absent

4   court approval we could only notice ten, so we scrapped the

5   nineteen and we reissued notices for ten and we were

6   beginning with Mr. Cooper, as Your Honor had recommended.

7           Once we get past Mr. Cooper -- and this is on Page

8   11 of my letter, Footnote 16 I set forth who the balance of

9   the initial depositions are.  You'll see that, with the

10  exception of Mr. Cooper and also possibly seeking to take to

11  litigation three members and possibly two of the consultants

12  to the litigation committee.  All the rest of the potential

13  witnesses are bridge lenders or ad hoc members, Weber,

14  Source, and Aries (phonetic), and I haven't gotten their -- I

15  haven't had any documents produced from the bridge lenders

16  yet.

17          But I have a sneaking suspicion that when I get to

18  the first deposition to Weber as far as Aries (sic), I am

19  going to be told by the deponent that anything he or she

20  knows came from counsel; that to the extent there are any

21  intents to communications regarding settlement of the

22  Committee's clients, that's all privileged because any

23  information came from their counsel; and that quickly see

24  that the right people to depose on this are the attorneys.

25          And I have tried to avoid keying up those

1   depositions of attorneys at the outset in the hope that the

2   document production and perhaps the beginnings of deposition

3   would indicate that it's not necessary, but my concern is

4   this.  We have ten depositions that were allocated without

5   court approval for more.  I'm damned if I do and I'm damned

6   if I don't.  If I don't at least try to take some of these

7   depositions of the bridge lenders, I won't know what I think

8   is ultimately going to be the case, which is that I should

9   really depose the lawyers who were the ones who actively

10   engaged in these discussions.

11       So for present purposes, Your Honor, all I would ask

12   for is that we are not restricted to ten depositions.  Let us

13   get the documents produced by the financing party defendants,

14   which we haven't gotten.  When we get the balance of the

15   documents that Mr. Dahan says that the debtors will be

16   producing -- they haven't produced any documents yet that

17   reflect any negotiation of the settlement that occurred, we

18   haven't received anything of that yet; and if necessary, I

19   would suggest this one is probably better off to be tabled to

20   be revisited with Your Honor.

21       What we did is we scheduled the depositions to go

22   through the 20th of January with a view that our goal is to

23   complete all depositions by January 28th, so I'm assuming

24   once I get this initial document discovery taking the

25   beginnings of deposition discovery we'll be much better

1    informed as to who else we truly need to depose to complete a

2    proper record.  But I don't think it will be fair or

3    appropriate given the size of this case and the import -- the

4    issues at play for us to be restricted to merely ten

5    depositions, take them, guess which ones you want to take and

6    if you guess wrong and it turns out you should have deposed a

7    few attorneys, that's your tough luck.

8            Further, Your Honor, I noted the other side has

9    commented that we each only have ten depositions during the

10   adversary proceeding, but there were a number of depositions

11   that were taken during Rule 2004 discovery.  Each side had

12   ten and that was forty depositions during the adversary

13   proceeding and there were nine days of expert discovery.

14           I'm not looking for anything like that.  I am

15   committed, pursuant to Your Honor's instruction we do this in

16   weeks not months, to complete all back discovery on this by

17   January 28th unless there are problems with production, but I

18   think it would only be fair to the Committee and it would

19   best serve the Court to not set up an artificial limit to day

20   to say we can only do ten depositions.

21           So my proposal is, Your Honor, I wanted to flag the

22   issue for you.  I think it's best if you reserve to revisit

23   it after I actually get the productions from the financing

24   party defendant and Mr. Dahan completes his discovery in

25   accordance with Your Honor's rulings.  We're asking after

1   we've taken the first deposition or two of the financing

2   party defendant witnesses.

3           THE COURT:  All right.  Others want to be heard on

4   this?

5           UNIDENTIFIED:  Your Honor, (indiscernible).  I mean,

6   I guess if Mr. Wissner-Gross is simply saying is for now I

7   understand I'm about for ten, I may be more, if so, will I

8   have to come back before the Court and discuss it then, I

9   guess I don't see a reason to say more except to note that,

10  you know, we may have a view not only as to how many more, if

11  any, he gets, but also what subject, a second deposition of a

12  given entity would be appropriate or not given the first one,

13  but it's hard to have a discussion in a vacuum when

14  essentially he's withdrawn or deferred his request for the

15  present, so I don't know what else I could add.

16          THE COURT:  All right.  Folks, I don't want to

17  address this in a vacuum.  On the one hand, the ten

18  deposition rule appears for a reason, because as I remember

19  from my experience before we had it, discovery would expand

20  endlessly by nature of the way lawyers, including myself when

21  I was one, have always behaved.

22          With that said, this is a matter of some fair

23  importance.  And if it turns out that people were reasonably

24  taken and it later turned out that other people need to be

25  taken, I can easily envision circumstances in which some

 1   perhaps limited but additional discovery would be

 2   appropriate.

 3           A decision of this character and what I will

 4   approve, either by nature of the person or the subject

 5   matter, is best not handled in the abstract.  Instead, I will

 6   want to know who was deposed, what he or she said, what he or

 7   she was incapable of answering, and what additional

 8   information was needed, and from whom, and on what subjects.

 9           I think that the best way to deal with it now is to

10   consider the issue tabled or request for extension being

11   denied without prejudice, with it being understood that it's

12   simply not ripe for decision.  And you guys will get to work

13   and if need be, and you can't resolve it consentually, we'll

14   have another conference call kind of like the one we're

15   having today.

16           Okay, folks?

17           MR. HUEBNER:  Your Honor, at the risk of something,

18   can I ask two housekeeping questions --

19           THE COURT:  Yeah.

20           MR. HUEBNER:  -- that I think (indiscernible) has

21   addressed.

22           MR. ZENSKY:  And I -- this is David Zensky, Your

23   Honor.  I would like one clarification of one of your

24   rulings, either now or after Mr. Huebner speaks.

25           MR. HUEBNER:  Go ahead, Dave.

1        MR. ZENSKY:  Your Honor, just to be clear so there's

2   no need to get back on the phone, in your resolution of Topic

3   3, which was the alleged settlement negotiations between Mr.

4   Weisfelner and the bridge lenders or some subset thereof, you

5   were very careful to order reciprocal discovery and in

6   category three, you said that the Committee would have to

7   produce any report that they sent -- or excuse me, Mr.

8   Weisfelner, any report that he sent on to his client, and

9   would I be correct in assuming that that means either Mr.

10  Weisfelner or other members of his firm or anyone acting on

11  his behalf who would have reported the contents of the

12  settlement dialog to the Committee members?

13       THE COURT:  Yeah, but the report is subject to

14  double entendres, and by report, as you use the expression, I

15  don't know if you meant the same kind of report I am.

16       And again, and I forgot the exact words that were

17  used, a mere recitation is what I wrote down in my notes as

18  this argument went on.  What Mr. Weisfelner or his associate

19  working for him or his partner working next to him said to

20  their committee about what the bridge lender said is okay,

21  but what any of them said about their mental impressions as

22  to that or their reactions to that, or their recommendations

23  as to that, or their advice as to that is out of bounds.

24       And the underlying concept, the legislative history

25  of this, is that what's sauce for the goose is sauce for the

1    gander.  And also I did not say then but I will say now,

2    because I don't know if this is going to be a productive

3    exercise or not, but since you guys have talked about it so

4    much I sense that some or all of you care about it a lot, is

5    that if the Creditors' Committee doesn't want to press for

6    that portion of this category that I've asked for, then I

7    will drop the requirement for reciprocal discovery.  I don't

8    want arguments being that you opened the door and that we

9    have even more discovery.  If the Creditors' Committee

10   decides it doesn't want it, then we'll just drop this

11   subject.

12         MR. ZENSKY:  Thank you, Your Honor.  I didn't mean

13   to suggest anything else by my poor choice of words.  When I

14   used the word "report," I understood it used exactly as you

15   identified during the course of your decision.

16         THE COURT:  Okay.  Fair enough.

17         MR. HUEBNER:  May I go now, Your Honor?

18         THE COURT:  Yep.

19         MR. HUEBNER:  Okay.  So just two questions.  Number

20   one, and I apologize, because as Your Honor knows, I was

21   technologically on mute for the first ten minutes and was not

22   able to speak.  I apologize.  I would have clearly asked this

23   question at the time.

24         On ruling number one, which is about communications

25   about the settlement after December 4, Mr. Wissner-Gross, in

1    his presentation, suggested as a possible middle ground

2    December 23rd when it was actually inked and filed and Your

3    Honor ruled that there was no common interest and it all had

4    to be shared.

5         The one question I have is once the settlement

6    agreement was signed on December 23rd and filed, we're now

7    turning all of our attention to preparing for a contested

8    hearing where the FPDs and the debtors are on one side and

9    the Committee is on the other side.

10        Obviously the Committee would love to be copied,

11   literally CC'ed or have discovery available of every

12   communication that goes back and forth as we prepare for this

13   hearing, and I guess I'm wondering whether -- I can't imagine

14   and am respectfully hopeful that was not intended because

15   this would be a very bizarre litigation prep if we had to

16   copy our adversary on our entire hearing preparation strategy

17   and machine and documentation; whether, in fact, that Mr.

18   Wissner-Gross at least suggested the possible middle ground,

19   that December 23rd when the agreement was signed and executed

20   and filed is not the right cutoff date because after that all

21   we're doing is preparing for a hearing where clearly we are

22   collectively totally adverse to the Committee and preparing

23   for an actual hearing before Your Honor.

24        I just don't know how we prepare if we have to CC

25   the Committee every time we have a strategy session or what

1    should we do with this witness or who is doing that

2    deposition and we have to copy our adversary.

3            THE COURT:  Mr. Wissner-Gross, you want to comment

4    on that?

5            MR. WISSNER-GROSS:  Yes, Your Honor.  I thought you

6    already ruled quite explicitly that until Your Honor approves

7    the 9019 motion, that there is no common interest and that

8    all of those communications should be discoverable by the

9    Committee so I think that was the import of your ruling and I

10   don't see any reason to revisit the subject.

11           MR. HUEBNER:  But see, we're talking now about prep

12   for the hearing, not -- so you're saying you should come to

13   every meeting we have to prepare our litigation --

14           THE COURT:  Gentleman, this is not a -- the English

15   parliament.  I don't want you arguing or asking questions of

16   each other.

17           MR. WISSNER-GROSS:  Your Honor, I'm done.

18           THE COURT:  I did not address this orally in my

19   ruling, but I thought about it when I was reading the various

20   letters.  I am not of a mind to require copying the

21   Creditors' Committee on any communication that goes back and

22   forth between the debtors and the financing party defendants,

23   but I do not believe that there is anything inherently

24   privileged under the common defense or common interest

25   privilege that would protect any such communication.

1        And frankly, I don't muchly care about any

2   institutional concerns in protecting communications between

3   people who were and still are legally adverse who have

4   decided to settle a controversy if I ultimately approve it,

5   but who will once more be in an adversarial position if I

6   don't.

7        The debtor and the financing party defendants should

8   assume, if they want to caucus with each other, if they want

9   to say anything, that their communications are not protected

10  in the event that there is any further need for examining any

11  of them.

12       With that said, I am not going to impose a duty

13  under any kind of continuing discovery obligations to copy

14  the Creditors' Committee on any such communications if they

15  take place; and if the Creditors' Committee thinks that it

16  wants to inquire into that area, while it will not be

17  proscribed from doing so on privilege grounds, it's going to

18  be at the risk of getting me, I'll try to use a more elegant

19  word, annoyed.

20       I think you guys can understand the nuances

21  associated with this ruling.  It is not privileged, but I am

22  not imposing a continuing duty of copying the Creditors'

23  Committee on any such communications or inviting the

24  Creditors' Committee to listen in on any phone calls.  Okay?

25       UNIDENTIFIED:  Yes, Your Honor.  Thank you very

1    much.  I'll actually have another housekeeping thing I wanted

2    to ask you.  I think it might be more gentlemanly to discuss

3    it with the Committee directly.

4            THE COURT:  Fair enough.  All right.  We've been on

5    the phone for a little over two hours, folks.  Is there

6    anything else?

7            MR. WISSNER-GROSS:  Not from the Committee's

8    perspective, Your Honor.

9            THE COURT:  Anyone else?

10      (No verbal response.)

11           THE COURT:  All right.  Have a good afternoon.

12    We're adjourned.

13      (Proceedings concluded at 3:01 p.m.)

14                            * * * * *

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2           I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and

5    ability.

6

7

8

9    _____   January 8, 2010

10   Lisa Luciano   AAERT Cert. No. 327

11   Certified Court Transcriptionist

12   Rand Reporting & Transcription, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25