UNITED STATES BANKRUTPCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
|  | : Case No. 12-12020 (MG) |
| Residential Capital, LLC, et al., | : |
|  | : Jointly Administered |
| Debtors. | : |

----------------------------------------------------------------x

### _BRIEF OF AMICUS CURIAE_ IN SUPPORT OF THE FORMATION OF AN OFFICIAL COMMITTEE OF HOMEOWNER-BORROWER CLAIMANTS

**I.    MY QUALIFICATION TO SUPPORT THIS AMICUS BRIEF**

I, Paula Rush, work as a Mortgage Fraud and Forensic Analyst, litigation and securitization expert.  I have six years of experience in mortgage transactional analysis, auditing, mortgage and securities fraud investigation, and extensive specific experience in lender bankruptcy matters.  I train lawyers in this subject matter and have conducted trainings in Georgia, Virginia and Florida. From 2008-2010, I served as Chairperson for the _Official Committee of Borrowers_ in the American Home Mortgage bankruptcy case in Wilmington Delaware.  My efforts in the AHM case were reported in Newsday, International Business Times, Dow Jones, Boston Times, Baltimore Sun, Bankruptcy Law Network, Forbes.com, Long Island Business News, and picked up by numerous online websites.  My CV is attached. **SEE** EXHIBIT 1 I currently work as litigation support to lawyers in Georgia, California, New York, Virginia, Florida, and have worked in many other states.  In the course of my work I find loans in securitization trusts and analyze the structure of those trusts both at inception and the current state of the trust.  My work includes both affirmative lender litigation and defensive litigation to defend and stop foreclosure sales.

**II.    STATEMENT OF AMICUS INTEREST**

The permanent subcommittee on investigations chair Senator Carl Levin said it best, "Behind every number we cite are American families who are still suffering the effects of a man-made economic catastrophe."  The committee found that originators "didn't just make loans that were

RECEIVED
SEP 2 5 2012
U.S. BANKRUPTCY COURT SDNY

likely to fail, creating hardship for borrowers and risk for the bank, but also built a conveyor belt that fed those toxic loans into the financial system like a polluter dumping poison into a river."

So contrary to the position Debtors' regularly adopt in these types of cases, that they are simply a victim of "extraordinary disruptions in the secondary markets," in truth and if fact, Debtors participated fully and for profit in the man-made economic collapse and dumped its fair share of the pollution in the system. Many American families, businesses, investors, insurers and taxpayers are suffering the effects of the conduct of the financial sector.

Recently I was interviewed by CBS Atlanta[1] on the loan modification problems. One of the problems is that homeowners do not understand the "back-story" because it is hidden from them. It is my belief that providing the homeowners a voice in these cases is of great importance, is necessary, and is fair considering the overall circumstances and posture of this case with an unprecedented 51 entities that engaged in loan origination, servicing, securitization and foreclosure of loans. The Debtor and related entities are the subject of thousands of lawsuits and have publicly stated the bankruptcy was filed to relieve them of this burden and legacy mortgage problems, and in fact, this bankruptcy has been planned for over one year. This Debtor orchestrated a plan that began more than one year ago and shed liabilities to enable them to raise capital via a public securities offering. I don't think I've ever heard of such a concept. **SEE** EXHIBIT 16

For homeowners with litigation pending, or in the process of foreclosure, the Debtor proposes a quick drive through bankruptcy and a quick deadline to close the window of time to file claims before homeowners can even figure out what is going on. I submit this brief without any compensation because of its high and urgent value to the public trust and confidence, and to inform the Court of the issues that homeowners face when their lender, servicer, securitizer, and affiliates of these entities of the loan seek bankruptcy protection to avoid claims they may have. This brief also seeks to shed light on the inherent conflicts of interest of counterparties such as

---

[1] http://paularush.me/

Trustees and Insurers representing homeowners in this venue while taking adverse actions against them simultaneously in other venues. I am not currently involved in any cases pending against the debtor entities.

My interest in offering this amicus brief is simply to shed the light of the truth based on the documentary evidence available in the public record so that this venerable Court will not be fooled by the notions that homeowners are represented in the current state of the unsecured creditors committee. I have not requested, accepted nor received any compensation for my efforts; nor do I have a stake in the outcome of the litigation except to see that justice prevails.

III.    **STATEMENT OF THE CASE AND FACTS**

Amicus Curiae Rush hereby adopts the statement of the case and facts presented by the Motion For Appointment of An Official Borrower Committee docket #1264.[2] This Amicus brief seeks to add context to the motion filed on August 24, 2012 and the replies thereto filed by the Debtors,[3] Citibank[4], and unsecured creditors committee[5]. The facts set forth in this brief are relevant and essential to this case and are critical facts that arise upon an examination of the record thus far in the case. As the unsecured creditors committee and the Debtors rely heavily on the proposition that the homeowners are represented via the nationwide settlement and consent agreement and one representative member on the seated committee, I focus on these issues directly. I reviewed all the filings to date with an eye toward finding evidence of specific homeowner protections and identify lack of homeowner protection opportunities that were missed. Next, I use my knowledge of the industry, mortgage and securitization auditing experience. Last, I draw from my experience as Chairperson in the American Home Mortgage Holdings bankruptcy case in Wilmington Delaware to identify issues which homeowners face when a lender, servicer, and securitizer files for bankruptcy and what an official committee can do to ensure their voice is heard.

IV.    **BACKGROUND OF EVENTS ONE YEAR IN THE PLANNING**

---

[2] http://www.kccllc.net/documents/1212020/1212020120824000000000016.pdf
[3] http://www.kccllc.net/documents/1212020/1212020120914000000000016.pdf
[4] http://www.kccllc.net/documents/1212020/1212020120914000000000011.pdf
[5] http://www.kccllc.net/documents/1212020/1212020120914000000000014.pdf

A Bloomberg article[6] reported that Ally is 74 percent owned by the Treasury and received a $17.2 billion government bailout. It had $19.1 billion in assets at the end of the period ResCap is involved in 22 securities lawsuits, Ally Chief Executive Officer Michael Carpenter said on the company's third-quarter conference call this month. Ally may face $2.2 billion in mortgage costs on top of the $829 million it had set aside through the end of June; CreditSights Inc. analyst Adam Steer estimated in a Sept. 13 report. The Debtors are among the largest servicers and originators of residential mortgage loans in the United States, servicing more than $370 billion of residential mortgage loans for more than 2.4 million homeowners, which makes them the fifth largest servicer in the nation. In 2011, they, along with their non-debtor affiliate Ally Bank, produced more than $56 billion in loan origination volume, making them the tenth largest residential mortgage loan originator in the nation. Debtor Residential Capital, LLC ("**ResCap**"), which is the parent company of each of the other debtors, is a subsidiary of Ally, formerly known as GMAC LLC.[7]

## V.    **INVESTIGATION OF OBJECTIONS**

I have conducted extensive research and read every docket filed in this case, as well as personally spoken to at least 100 homeowner claimants. They expressed claims ranging from illegal foreclosures to state and federal law violations against Debtor entities. Many expressed confusion about the bankruptcy and processes unfolding and somewhere in imminent danger with foreclosure sales pending. Overall, it is clear confusion, distress, and no one to reach out to for answers was the rule and not the exception.

I defined the scope of the examination by reviewing the objection filed by the unsecured creditor committee and the Debtor. The objections, as I understand them are as follows: (1) the cost of an additional committee, (2) the assertion that the current unsecured creditors committee adequately represents the homeowners and no conflict of interest exists

---

[6] [6] http://www.bloomberg.com/news/2011-11-08/ally-s-rescap-mortgage-unit-is-said-to-hire-centerview-for-restructuring.html
[7] http://www.kccllc.net/documents/1212020/1212020120611000000000038.pdf

within the current committee and the homeowners, (3) the belief that a new committee would need time to get up to

speed causing unnecessary delay, (4) and most frequently used, the assertion that the nationwide settlement somehow

protects the homeowners in this bankruptcy process, and (5) the Debtors HAMP performance.

## ISSUE 1 - THE COST OF THE COMMITTEE

The cost of the committee argument is disingenuous and unfair. The Debtor has asked for DIP financing of 1.45

billion dollars to pay for estimated cost of administration of the case so the Debtors can hire the best legal talent money

can buy to execute their agenda and argues that a committee of homeowners would cost too much. In the Debtors

Schedules [8] in answer to **Question No. 9 the Debtors reveal they have spent millions of dollars**

related to debt counseling or bankruptcy including approximately $9.5 million to professionals and

advisors on behalf of third-party creditors and Ad Hoc committees representing third party creditors

as required under relevant agreements( Trust Agreements).[9] A homeowner committee is a small fraction

of the funds the Debtor will spend to administer this bankruptcy.

## ISSUE 2 – ADEQUATE REPRESENTATION OF THE HOMEOWNER CLAIMANTS

The assertion that the homeowners are adequately represented in this case is fully briefed herein and the obvious

conflict is clear in this case. A committee dominated by four Trustees, two insurers, and an investor lawsuit

representative, all of which have adverse interest to homeowners can not represent them in this venue. All of these

parties have a vested interest in the homeowner foreclosure executed quickly and without defenses to their actions.

Under the indemnification provisions in trust agreements the debtors are required to defend litigation

actions, which will continue to incur cost to the debtor estate.

One borrower representative, Rowena Drennen, without any experience in these types of cases can be outvoted

on any issues she raises in this case.  This is to be expected. I work with lawyers all over the Country who are calling on

me to assist them to understand the complexity of how they  assist the homeowners they represent now that the party

---

[8] http://www.kccllc.net/documents/1212020/1212020120630000000000051.pdf
[9] http://www.kccllc.net/documents/1212020/1212020120630000000000020.pdf

they are suing or defending against is in bankruptcy protection. The byzantine bankruptcy code and complexity of Chapter 11, especially with 51 entities is not something an attorney practicing in another field would understand, nor do they have time to get up to speed. A homeowner seated on the committee is a disaster. With no Legal background and no bankruptcy experience it is impossible to represent thousands of diverse claimants. I found no evidence she has raised any issues in this case and calls to her phone were not returned for information. The representative case, In Re: COMMUNITY BANK OF NORTHERN VIRGINIA AND GUARANTY NATIONAL BANK OF TALLAHASSEE SECOND MORTGAGE LOAN LITIGATION (MDL 1674)(08-3621)[10] appears to have a rocky history which has unfolded since 2003 including a mutiny of class claimants appealing due to discontent with the representatives of the class and attorneys for the class. The UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT remanded the case for further consideration and specifically found that the District Court applied an incorrect legal standard, and thus abused its discretion, in determining that the named plaintiffs and class counsel are adequate representatives for the class. This case was never fully settled and is hardly a good candidate for representing all interest of homeowners. **SEE** EXHIBIT 3  It is not clear if Rowena Drennen or counsel for Rowena Drennen is participating in the committee. Counsel for Rowena Drennen have failed to even update their website to reflect the bar claims date set for Nov. 9th, still stating no bar date has been set. [11] **SEE** EXHIBIT 4

In the *ACCREDITED HOME LENDERS* Case No. 09-11516 (MFW) the "one homeowner" on the committee problem manifested in a powerful ways: (1) in the end the lone borrower, Carrie Luft, seated on the committee was found to not even have a valid claim thereby she never had standing to sit on the committee in the first place, (2) she was located in Florida and could not attend hearings, (3) she was outnumbered by large institutional creditors which actually resulted in the Citigroup attorney quitting the committee and then trying to convert the Debtor

---

[10] http://www.ca3.uscourts.gov/opinarch/083621p.pdf
[11] http://www.wbsvlaw.com/wbsv-news/cbnv-update/

to a Chapter 7 to dissolve all committees after her appointment( later to be put back on the committee after that maneuver failed). **SEE** EXHIBIT 16

In a strange twist of fate, I also was in the Court in Delaware on the day of a hearing in both Accredited and American Home Mortgage and overheard a conversation in the hall between the unsecured creditor's attorney for Accredited and an attorney for Citigroup. The conversation was really more of an argument, The Citigroup attorney repeated asked this attorney if "he was the one who told her" and threatened the creditors committee attorney over what he believed was information he had shared with Carrie Luft as to the true owner of her loan which was Citigroup. The lawyer had no idea I was standing right there and I was the one who had found out the Citigroup owned her loan. My research uncovered an action that Citigroup Global Markets brought against Accredited wherein they made claims against them for Luft's loan, and another loan that turned out to be a client ( Bouwman) of one of our seated committee members in the AHM case, Hope Del Carlo, Esquire, **Oregon Law Center**. I had alerted both of them of the fact they were named in this lawsuit. In fact, this is an excellent example of document exception reports and Trustees acting with actual knowledge of defects. The attorney for Citigroup threatened the lawyer for the creditors committee by saying his company (Citigroup) would take away all business from their firm if he found out he was the one who told her. I felt bad for the lawyer and wanted to let the Citigroup lawyer know I was the one, but instead I shared what I overheard with the U.S. Trustee.

The seated unsecured creditors committee adequately representing homeowners is absurd. The argument fails because the homeowner's interest is opposite to the creditor's committee interest in maximizing the recovery for the estate. The homeowners want to save their home, or prosecute litigation, both of which would cost the estate money. Even though the homeowners have the right to take those actions the committee will assist the Debtor in fighting those claims because it is in the interest of the estate if they fight them.

The Trustees are counterparties and the actual parties carrying out foreclosure in state courts. A direct adverse position to homeowners. The Trustees are also ISDA or Derivative Counterparties[12] which means they have actual skin in the game, side not known – short or long- interest in the performance on rooting for the non-performance in the case of a short position.    The Insurers are assigned the claims to collect deficiency judgment after foreclosure.

### FIDUCIARY DUTIES OWED BY AN AGENT TO HIS PRINCIPAL:

Prior fiduciary obligations annihilate the Trustees and Insurers ability to represent homeowners as common trust language states the trustee is acting as a fiduciary of the trust assets acting on behalf of the investors. Fiduciary duties are the highest duties known to the law.  Deutsche Bank National Trust Company, US Bank, The Bank of New York Mellon, and Wilmington Trust are all fiduciaries as Trustees of securitization trusts. Sometimes these parties are also underwriters, counterparties on ISDA swap contracts, securities administrators and document custodians, which may also create additional interest and responsibility problems.

A fiduciary is held under the law to owe certain specific duties to his principal, which in this case is investors in securitized trust.  It is not in the best interest of the Trustee to reveal exceptions that should have been identified within 90 days of the trust closing and repurchase demand should have been made. In fact, this very issue is now hotly litigated in many investor suits against the Trustees. The duties or obligations set forth in contractual agreements were breached according to these lawsuits and now the Trustee must "cover up" or at least minimize the impact on the investor to whom they owe the fiduciary duty.

With this dynamic, the Trustees can't act in the best interest of homeowner claimants in the bankruptcy venue. Clearly a conflict of duty exists.  These specific fiduciary duties the Trustee can't perform for both sides include: **Loyalty and Confidentiality,** - An agent is obligated to safeguard his

---

[12] http://www.kccllc.net/documents/1212020/1212020120630000000000051.pdf

principal's confidence and secrets. In this case one of the many secrets is that defective and missing documents exist which may render the loan obligation unenforceable. Loans will be sold via a bankruptcy sale without disclosure to homeowners of the pennies on the dollar paid or the exceptions. A fiduciary must keep confidential any information that might weaken his principal's bargaining position if it were revealed. This duty of confidentiality precludes a fiduciary from revealing information in its possession or control that may harm its principal. This conflict is clear and can't be resolved. An agent's duty of loyalty compels him to refuse to accept any position that would require him to act contrary to, or in competition with, the interests of his principal.

Here we have Trustees and unsecured creditor committee lawyers, are conflicted in their obligations to all unsecured creditors in the following ways: (1) homeowners have the right to seek relief from stay without vehement objections from the same committee who is tasked with representing them; (2) homeowners have the right to assert claims or assert the inability to enforce obligations which may hurt the Debtor estate and the Trustees so the unsecured creditors committee which is supposed to represent them will vehemently object to all proofs of claims filed by homeowners; (3) the Trustees and committee know of document defects as evident in the provisions in the purchase price of the loans, but the committee would never raise the issue as it would adverse to the estate and the Trustees interest, but would protect homeowner rights of disclosure of events taking place in the bankruptcy case.

It is the right of the homeowners to be represented by a committee that is not conflicted against them, to review all issues that affect them or their rights to assert a claim against the estate, and homeowners can't have their interest protected as constituents of the unsecured creditors committee due to the conflicts. Much like cases which involve a company who manufactured a faulty product that resulted in widespread litigation, or a massive fraud scheme which led to a bankruptcy Petition,

those who were harmed do not have their rights taken away and frequently are granted an additional

committee to represent them.

### ISSUE 3-  NEW COMMITTEE NEEDS TIME TO GET UP TO SPEED

A new committee would not take any time to get up to speed as all of the parties bringing the motion have read

every docket and are ready to hit the ground running. The purpose of the committee is not to delay actions pending, but

to participate in them for the benefit of the homeowner claimants.  The new committee is more than ready to go. The

law firm of Robert Brown has spoken to hundreds of homeowners, gathered information on their issues, and read

almost every docket.  I believe the court will find upon review of the motion for the committee, the reply to the Debtors

and creditors committee objections, and this Amicus brief, it is clear a committee will need no time at all to get up to

speed.

### ISSUE 4-  THE NATIONWIDE SETTLEMENT

The nationwide settlement and its requirements have barely gotten underway and it is yet to be seen if the

Debtors will abide by its provisions.  I believe the Debtors are already breaching the agreement by selling loans with

known defects without notice to homeowners and without remediation in court files and state registries.  The loan file

review is still clearly in process as Price Waterhouse has asked for an escalated payment for that review to determine

eligibility for settlement funds.  The settlement did not take away homeowners private right of action, or even class

actions, however closing the proof of claim deadline on Nov. 9th will accomplish that goal. So far from being a reason

for not approving the formation of a committee, the settlement and current posture of this case are an argument for the

committee formation.

The nationwide settlement argument is misleading and simply not true. (1)The settlement does not take away an

individual right of private action, (2) the proof of claim deadline will take away all homeowner rights to make a claim,

(3) if the loans and servicing rights are sold to a third party there is no guarantee they will abide by the settlement

agreement and it will be too late by then to make a claim, (4) Price Waterhouse has only begun reviewing the files and

the review results may be the first time the homeowner is informed of fraudulent conduct which will be after the proof

of claim deadline closes, (5) The timeframe for settlement to be fully executed is over a three year period and we will not know the full extent of compliance until that time, (6) it appears the debtor intends to assign this obligation to the purchaser of the assets, so how can they use it as a shield to the formation of a committee when this will be severed from them upon sale of the loans and servicing rights, (7) the debtors have included a paragraph that the homeowners will be third party beneficiaries in an apparent attempt to assert the settlement agreement will bind the purchaser, so the homeowners should have the opportunity to negotiate the language of the sale agreement when it comes to provisions specifically related to their issues.

Far from a panacea of relief that the debtors assert, the settlement agreement is a starting point to better practices and *possible* relief for homeowners. In fact, many states are grabbing the funds[13] to fill short falls in their own budgets and many homeowners who were harmed will never see any of the settlement funds. Shockingly, most states are using the funds for relief programs and not for homeowners who were foreclosed on using robo-signed documents –which was the original catalyst behind the settlement. Going forward practices compliant with the settlement will also not inure to the benefit of homeowners who were harmed and have claims. Those claims can't be erased because the debtor has now "promised" to do better. Instead of honoring the settlement agreement and continuing to service loans pursuant to those terms, the debtor appears to be passing that obligation to a third party in the proposed servicing and whole loan sales.

It is important to consider what the settlement is and what it isn't. Contrary to the Debtors assertions it is not a panacea of blanket relief for homeowners, or a blanket release for the Debtor entities of all misconduct. In fact, numerous issues are specifically reserved and most importantly a private right for individual to sue based on conduct covered and conduct not covered is specifically not covered. **SEE** EXHIBIT 5

---

[13] http://www.propublica.org/article/billion-dollar-bait-switch-states-divert-foreclosure-deal-funds

A Propublica story titled "Billion Dollar Bait & Switch: States Divert Foreclosure Deal Funds"[14] highlights the fact that many states have diverted the settlement funds completely, while other have failed to disclose what they will use the funds for.  This ensures that homeowners will litigate on their own behalf and will have claims against the Debtor entities.  "States have diverted $974 million from this year's landmark mortgage settlement to pay down budget deficits or fund programs unrelated to the foreclosure crisis, according to a ProPublica analysis. That's nearly forty percent of the $2.5 billion in penalties paid to the states under the agreement," according to the Propublica story.[15]

One protection was attempted in **Section 6.22 Mortgage Loan Modifications** sale agreement the Debtors state the purchaser will honor loan modifications and the mortgagor will be a third party beneficiary to this agreement. While this is a good start, more protection language needs to be written into this agreement and specific recourse for non compliance.

## ISSUE 5- PAST PERFORMANCE OF ASSISTANCE TO HOMEOWNERS

The Debtor has asserted that they are one of the top performers when it comes to government program participation. I reviewed the latest report from the Treasury and it appears that the Debtor is overstating the participation and in fact, appears to be trending in a downward direction. Treasury cited the Debtor as needing moderate improvement to their practices.  What will happen after the proof of claim deadline closes? If the Debtors propose to sell virtually all of the loans they hold and servicing rights, the past performance with HAMP has no effect on the formation of a committee at all as it will no longer be in their hands after the sales are complete.  The Debtors Making Home Affordable performance simply has no bearing on the appointment of a homeowner committee. Many of the statements in ISSUE 4 also apply to this argument. Past performance is not necessarily indicative of future performance,

[14] http://www.propublica.org/article/billion-dollar-bait-switch-states-divert-foreclosure-deal-funds
[15] http://www.propublica.org/special/where-are-the-foreclosure-deal-millions-going

and it appears the servicing responsibilities under relief programs and other private programs will be passed off to a yet

unknown party. It may even be a hedge fund looking to capitalize on distressed assets. Hedge funds do not have the best

reputation for helping homeowners. **SEE** EXHIBITS 7 & 8

A careful review of the latest report shows that the actual modification history taking away the other non

modification resolutions including short sales and Deed-in-Lieu, it appears the statements of the Debtors performance

may also be overstated and may include short sales and Deed-in-Lieu. The latest MHA report states that only 55,236

permanent modifications are in place with 73, 138 still in trial phase only. As of June 30, 2012 there are 24, 335

estimated eligible delinquent homeowners. The cumulative numbers reveal GMAC MORTGAGE LLC received 267,

818 request for loan modification and have only approved 88,838. This figure may be indicative of over 178,980 loans

in the pipeline for foreclosure or already foreclosed. How many of these loans are included in the loan sale proposed?

Another chart shows the percentage of homeowner eligible to the number of actual mods completed is only 20%. [16]

**SEE** EXHIBIT 9 & 10

The overall findings were the Debtors needed "moderate improvement" and in the area of resolving borrower

inquires and disputes the Debtors showed a large **spike** in bad performance from Q2 to Q3 ( current quarter). After the

Nov 9th proof of claims deadline closes, what will the performance be? **SEE** EXHIBIT 10

So contrary to assertions the Debtor has made about its stellar performance assisting homeowners in distress, the

reports tell a different story. The Debtors state they have helped over 784,000 homeowners but the report state: 25,741

GSE, 6,192 Private, and 12,818 Portfolio for a total of 44,751 active modifications.

In addition active State Exams show problems with origination, servicing and foreclosure. **SEE** EXHIBIT 14

## VI.    THE HONEST AND UNFORTUNEATE DEBTOR AND 11 U.S.C. § 523?

---

[16] http://www.treasury.gov/initiatives/financial-stability/reports/Documents/July%202012%20MHA%20Report_SERVICER%20ASSESSMENTS_Final.pdf

On Schedule B35[17] over 114 pages of foreclosure litigation is found and 241 pages of litigation on GMAC MORTGAGE LLC schedules.[18] Clearly the pending homeowner litigation is immense and this is a group similar to mass tort cases that deserves representation.

Beginning in 2007 banks, mortgage brokers, loan servicers, loan originators, and hedge funds began to drop like flies. In most cases they claimed they were the victims of extraordinary market disruptions. Fast forward to 2012 and it has been revealed that massive frauds in loan origination, inflated appraisals, and a myriad of illegal and deficient practices have shown the market disruption were the result of the conduct, not a freak occurrence without a justified explanation.

Bankruptcy law makes it clear that laws outside of bankruptcy are to be upheld in bankruptcy. These laws should not be superseded by any bankruptcy rights that Debtor might have. The question is, can the debtor effectively walk away from conduct such as forgery and fraudulent documents filed in Courts to effect foreclosures by virtue of throwing those claims into a pool of other claimants who will likely receive pennies on the dollar for claims? Should parties who participated in those acts such as Trustees receive an 8.5 billion dollar claim without requirements to even prove the claim ahead of homeowner claimants?

Non-dischargeable debts pursuant to 11 U.S.C. § 523(a)(4)(6)(2)(A) of the Bankruptcy Code preclude dischargeability for debts acquired as a result of false representations; false pretenses; misrepresentations; actual fraud; larceny; and willful and malicious injury. Indebtedness as a direct result of the false representations and actual fraud which satisfies the requirements of section 523(a)(2)(A).

**What qualifies as an honest and unfortunate debtor?** -"Although it is a fundamental goal of the Bankruptcy Code is to provide relief of debt, The United States Supreme Court, however, has

---

[17] http://www.kccllc.net/documents/1212020/1212020120630000000000020.pdf
[18] http://www.kccllc.net/documents/1212020/1212020120703000000000033.pdf

cautioned that, "in the same breath that we have invoked this fresh start policy, we have been careful
to explain that the Act limits the opportunity for a completely unencumbered new beginning to the
honest but unfortunate debtor." Grogan v. Garner, 498 U.S. 279, 286-87 (1991) (internal quotations
removed).

Many cases have taken up the issue of debtor misconduct and the right of the debtor to a fresh
start pursuant to 11 U.S.C. § 523. SEE Cohen v. de la Cruz, 523 U.S. 213, 223 (1998), Webber v.
Giarratano (In re Giarratano), 358 B.R. 106, 110 (D. Del. 2004) (quoting In re Hartman, 254 B.R.
669, 674 (Bankr. E.D. Pa. 2000)),Webber v. Giarratano (In re Giarratano), 299 B.R. 328, 338 (Bankr.
D.Del. 2003) (citing 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed. Rev. 1997)), Kaye v. Rose (In re
Rose), 934 F.2d 901, 904 (7th Cir. 1991), Starr v. Reynolds, 193 B.R. at 203, Grogan v. Garner, 498
U.S. at 286-87. Given this fundamental policy, it is clear that a debt acquired as a direct result of a
debtor's planned deceit is within the ambit of section 523(a)(2)(A), irrespective of whether the debt
was incurred by conduct that meets the technical requirements of common law fraud. To find
otherwise rewards fraudsters who carry out their misdeeds through indirect, yet equally deceptive,
means and does violence to the policy behind section 523(a)(2)(A). Moreover, §523(a)'s various
exceptions from discharge reflect Congress' conclusion that the creditors' interest in recovering full
payment of debts in these categories outweighs the debtors' interest in a complete fresh start, see
Grogan v. Garner, 498 U.S. 279, 287. Pp. 4—10.106 F.3d 52, affirmed. O'Connor, J., delivered the
opinion for a unanimous Court.

## VII.    HOMEOWNER ISSUES EVIDENT IN THE SALE AGREEMENT

As revealed in the DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), AND
(m), 365 AND 1123, AND FED R. BANKR. P. 2002, 6004, 6006, and 9014 ( APA),[19] many

---

[19] DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), AND (m), 365 AND

problems are evident which require attention and relate to homeowner issues with the Debtor entities.

The issues are in choice of language used, disclosure of defective assets, and the lack of important

provisions to protect homeowners.

### ISSUE 1 – EXCEPTION REPORTS

Perhaps the most glaring of the conflicts of interest are shown in the disclosure of exception

reports which are noted repeatedly in the sale agreement.  The Trustees have no interest in the

homeowner having knowledge of the defective documents because those are the same documents that

may hurt their primary fiduciary obligation to the investors.   In the agreement it is clear, this is to be

kept secret and confidential  and they *will not* be noticing the homeowners whose loans have been

identified to have document deficiency and other origination, servicing or foreclosure issues

including lost and defective documents and assignments. Instead the Debtor *requires* the

confidentiality of the purchaser of such issues and fails to attach the actual exception reports or

mortgage loan schedule.

The exception reports are prepared by the document custodians and trustees like Bank of New

York Mellon, US Bank, and Deutsche Bank typically within 90 days of the trust closing.  If the

debtors or the purchaser prosecute the enforcement a loan without disclosing the exceptions in state

court foreclosure proceedings and use documents that have been fabricated to hide the missing or

defective documents, they are engaging in fraud. This court should not condone the very behaviors

that landed the Debtor in hot water to begin with.  If they assert fraudulent documents  in litigation

pending they are engaging in judicial estoppels, as the Trustee parties are making claims in this court

1123, AND FED R. BANKR. P. 2002, 6004, 6006, and 9014 FOR ORDERS: (A)(I)AUTHORIZING AND APPROVING
SALE PROCEDURES, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (II) SCHEDULING BID
DEADLINE AND SALE HEARING; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV)
GRANTING RELATED RELIEF AND (B)(I) AUTHORIZING THE SALE OF CERTAIN ASSETS FREE AND CLEAR
OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING
ASSET PURCHASE AGREEMENTS THERETO; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING
RELATED RELIEF

based on the defective documents as noted in document exception reports, and in state courts taking the position that the loans are valid and enforceable when in fact the Trustee has actual knowledge of the defects. The doctrine of judicial estoppels prohibits a litigant from "blowing hot and cold," by taking one position that is accepted by one court and advocating a completely contrary position in another court, to try to gain advantage. The purpose of the doctrine is to protect the integrity of the court system. *See Berrett v. Std. Fire Ins. Co.,* 166 Md. App. 321, 888 A.2d 1189, 2005 Md. App. LEXIS 307 (2005)

### EXCEPTIONS REPORTS[20]

The Debtor has revealed that a document known as #16.8.2 is being provided to potential purchasers and that sellers may not remedy document deficiencies identified in the Collateral Exceptions Report and Mortgage files contain Mortgage Loan Documents except as specified in any applicable Collateral **Exceptions Report**. The Debtor will not cure defects because they can't cure the defects after the fact. This is exactly what led to robo-signing to create missing and defective loan documents. Exception reports exist, are being kept secret from homeowners, and the purchaser of the assets and Trustees has *actual* knowledge of these reports and *defects*. The loan assets will be sold with no notice to homeowners, and without notice of defects which could lead to claims against the debtor.

"April **Collateral Exceptions Report**" means the collateral **exceptions report prepared by Sellers' custodians** in April 2012 and most recently **updated as of May 6, 2012**, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the **Mortgage Loan Documents are not in its possession, to the extent applicable, or have document deficiencies**. **No Seller shall have any obligation to deliver any documents included in the April Collateral Exceptions Report or cure any document deficiencies** identified in the April Collateral Exceptions Report.

### PURCHASE PRICES AND EXCEPTIONS – SEE EXHIBIT 2

---

[20] http://www.kccllc.net/documents/1212020/1212020120514000000000112.pdf

The proposed purchase price and purchase price adjustments[21] -adjustments for exceptions based on defective loans and defective documents -is discussed at length in the Debtors sale agreement. All homeowners who are known to have exceptions in the loan should be notified directly of the right to file a claim.

The Debtor has revealed that the Legacy Whole Loan Portfolio value me be just 14% of loan unpaid principal balances. **SEE** EXHIBIT 12  The loans are subject to a further discount off of that for deficiency based on a formula ranging from a 6% -24% haircut. Those deficiencies are to be concealed from the homeowners in the process of this sale.  The exception schedule for adjustments fails to state what exception would grant a 6% haircut and what exceptions would go as high as 24% as is shown in the chart below. I would assert the 24% is for missing notes or documents necessary to enforce liens.  This obviously would be of interest to homeowners and if the Debtor has created false documents which are currently lodged in any state registry or court, they have committed just the kind of fraud that the settlement forbids, and if they are selling those loans with those exceptions still present in the loan file they have not remediated the problem. Homeowners have a right to know this information and it should be reported to the settlement monitor.

It is important to note the "Purchase Price Schedule" attached to the sale agreement as Schedule F, as it sets forth an example of the calculations to be made pursuant to Section 3.1 in order to calculate the Purchase Price.  **SEE** EXHIBIT 2  - DEBTORS EXHIBIT F

The Debtor describes the formula as follows: "Purchase Price Document Deficiency Multiplier" means, for each Whole Loan Bucket, the multiplier to be applied to the Whole Loan Purchase Price Percentage for such Whole Loan Bucket based on the percentage of Mortgage Files in such Whole Loan Bucket determined to contain deficiencies (as set forth in the Closing Collateral Exceptions Report) as follows:

Percentage    Purchase Price Deficient Document

---

[21] "Purchase Price" has the meaning specified in Section 3.1(a).
"Purchase Price Adjustment Statement" has the meaning specified in Section 3.2(a).

| Deficiency | Multiplier | | |
|---|---|---|---|
| <=6% | 1.033 | 15% | 1.000 |
| 8% | 1.029 | 18% | 0.979 |
| 10% | 1.021 | 20% | 0.962 |
| 12% | 1.013 | 22% | 0.948 |
| 22% | 0.948 | >=24% | 0.937 |

**Files determined to be deficient** based on the Closing Collateral Exceptions Report:
Whole Loan Bucket        Purchase Price    Percentage with respect to a Chapter 11 Plan
Purchase Price Percentage with respect to a Section 363 Sale

| | Chapter 11 Plan | Section 363 Sale |
|---|---|---|
| Performing First Lien | 49.20% | 43.05% |
| Non-Performing First Lien | 34.50% | 30.1875% |
| Performing Second Lien | 52.80% | 46.20% |
| Non-Performing Second Lien | 17.10% | 14.9625% |
| Other | 40.00% | 35.00% |
| HELOC Advances | 58.80% | 51.45% |

The calculations for loans in the Whole loan bucket[22] and sale price percentage[23] includes performing and non performing loans which will be sold for deep discounts due to exceptions – file defects. The loans will be sold without notice to the homeowners of any right to bid, although the homeowners do have an interest in the asset and may have a claim against the estate. They will not be informed the price the loan is sold for. The new owner will enforce for 100 cents on the dollar of original face value and the liabilities will be left with the Debtor entities. Insurance policies are transferred to the purchaser and that is not accounted for. The whole loans have insurance policies[24] and credit support may include undisclosed LPMI a violation of HPA 1998 and it will also be

---

[22] "Whole Loan Bucket" means each of the following categories of Whole Loans included in the Purchased Assets, calculated as set forth in the Purchase Price Schedule: Performing First Lien, Non-Performing First Lien, Performing Second Lien, Non-Performing Second Lien, Other and HELOC Advances.

[23] "Whole Loan Purchase Price Percentage" means, for the Whole Loans in each Whole Loan Bucket included in the Purchased Assets, the following percentages with respect to a Chapter 11 Plan and a Section 363 Sale, respectively, which shall be adjusted by applying the applicable Purchase Price Document Deficiency Multiplier to reflect the percentage of Mortgage/

[24] "Whole Loans" means the first and second lien Mortgage Loans, HELOCs and other Mortgage Loans owned by Sellers and intended to be purchased by Purchaser, and any collateral, **insurance, guaranty or other credit support arrangement related thereto, as identified on the Mortgage Loan Schedule**, the Cut-off Date Mortgage Loan Schedule or the Closing Date Mortgage Loan Schedule, as applicable

assigned to the purchaser, and bond wraps on securities. The value of this insurance may exceed the purchase price of the assets.

### VIII.   HOMEOWNER THROWN INTO THE HANDS OF WOLVES

Some loans Debtors are proposing to sell may have already been charged off thereby the Debtor entity has already suffered the loss, yet the purchaser will attempt to enforce at 100 cents of face value. The Debtor has revealed that the book value is only 14% of actual unpaid principal balance.

In fact many hedge funds are bragging about the returns on such asset purchases. The homeowner would have no knowledge of that fact. Is this fair and equitable to the homeowner who has claims against the Debtor? The following two articles highlight what happens when the distressed loans are sold to distressed asset buyers. For years now, vulture investor have been scooping up distressed assets – and each asset represents a home that a family is losing when the vultures only is gaining a big return after foreclosure.  Time Business ran a story titled *New REITs Pounce on Distressed Mortgage Assets*[25] *and t*he San Francisco Gate published an article titled *Vulture investors buy up distressed mortgages.*[26] **SEE** EXHIBIT 7 & 8

"Daurio refers to Kondaur's acquisition targets as "scratch-and-dent mortgages." That means home loans that are delinquent, usually by six months or more. It buys in bulk, often several hundred loans at a time. The sellers are banks, other distressed-asset investors and Wall Street firms **that prefer to quickly unload the troubled loans rather than having to foreclose or modify them.** " How it 'fixes' them- "About 80 percent of the time Kondaur takes back title to houses, usually by paying the delinquent homeowners to sign them over as a deed in lieu of foreclosure, but also by foreclosing itself if that is more expedient. If I'm right that prices will keep dropping, getting that

---

[25] http://www.time.com/time/business/article/0,8599,1916998,00.html
[26] http://www.sfgate.com/business/article/Vulture-investors-buy-up-distressed-mortgages-3262447.php#ixzz27EHDsXbh

property today (as opposed to down the road) is worth a great deal," he said. About 10 percent of the time, it will sell individual loans "as is." The remaining **10 percent of the time it will modify payments to keep the current homeowner in place.  He's not enthusiastic about that approach.**

The Debtor has revealed the classification of the loans it intends to sell. The mortgage loan schedule has not been revealed and the Debtors have proposed they will most likely sell for pennies on the dollar of actual current book value- not original face value. First lien performing only 40 cents on the dollar of actual book value, for example. The mortgage securities schedule contains only a total amount of value without any actual information on just what securities the Debtors own and are also shown as likely selling for pennies on the dollar.[27]

### IX.    SALE OF SERVICING RIGHTS - FORECLOSURES AND RESPA

In section 6.18: Transfer of Servicing, the Debtor describes a timeline that will interfere with RESPA qualified written requests timeframes. The Debtor does not address how that will occur seamlessly as this sale of servicing and delivery of the files is process. So called "hello" and "goodbye" letters will be sent after the transaction closes and (c) Delivery of Files. **Within 10 Business Days after the Closing Date (or** such later date as Purchaser shall reasonably request). The servicer must acknowledge the letter in five (5) days, answer questions about ownership of the obligation under 15 U.S.C. 1641(f)(2)[28] in ten(10) days, and fully answer in thirty (30) days. The servicing transfer of millions of loans will affect this timeframe. No protections are in place for homeowners during this time of transition. The entire purpose behind the tightening of deadlines was to ensure homeowners in foreclosure could obtain information they needed in a timely manner to save their home from foreclosure.

---

[27] "Mortgage Securities Purchase Price Percentage" means 0.8194%.
[28] 15 U.S.C. §1641(f) - Upon written request by the obligor, the servicer shall provide the obligor, to the best knowledge of the servicer, with the name, address, and telephone number of the owner of the obligation or the master servicer of the obligation.

The servicing file[29] transferred includes correspondence between the current servicer and the mortgagor, payment history, collection letters and notices, foreclosure correspondence and legal notifications. If a RESPA request is in the process who will be responsible for timely compliance, the seller or the purchaser of the servicing rights? Will it turn into a he said she said scenario where one blames the other, but neither accept responsibility. This sort of issue is of concern for misconduct during the bankruptcy. Suppose the proof of claim deadline closes on Nov 9th and the violations related to servicing or foreclosure happen after this date. Or right before this date. How will a homeowner press those claims?

In ARTICLE II. Section 2.1 Purchase and Sale of Assets the debtors assert they will sell a pool of Whole Loans to an *unknown* Purchaser:[30],.....

(d) the Purchased Servicing Rights and the related Servicing Files; (e) the causes of action, lawsuits, judgments, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims, **including those indicated by the presence of a "litigation flag" or indicated to be in bankruptcy or active foreclosure on the Mortgage Loan Schedule, including all preference or avoidance claims and actions of any of the Sellers,** in each case that are related to the Purchased Assets, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (**provided, that Sellers shall be entitled to participate in the defense of any counterclaim**);..... (g) to the extent transferable, all **rights under insurance policies and insurance proceeds directly relating to Whole Loans** serviced pursuant to any servicing agreement, .... (h) to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of any Seller or any Affiliate Seller to the extent related to any Purchased Asset.

## X.    OPPOSITION OF RELIEF FROM STAY MOTIONS[31]

---

[29] "Servicing File" means for each Mortgage Loan other than an SBO Loan, all loan documents and information (**including any servicing tapes, images and conversion reports**) received or obtained through the efforts of servicing the Mortgage Loan, which may be maintained on CD or DVD. To the extent available, each Servicing File shall contain: (a) documentation relating to any releases of collateral, (b) any correspondence between the current servicer of the mortgage and the Mortgagor, (c) payment history, (d) collection letters or form notices, and (e) foreclosure correspondence and legal notification. For the SBO Loans, the term "Servicing File" means only such copies of the foregoing documents as shall have been provided by the primary servicer and retained by the master servicing group of the applicable Seller.

It is clear in the Asset Purchase Agreement, the Debtors intend to sell the assets for pennies on the dollar, without offering the same opportunity to the homeowners to bid on their loans, and are "**promising**" the purchaser that they will vigorously oppose any stay relief motions of third parties (homeowners).  The bidders at this time are Nationstar Mortgage as the "stalking-horse" bidder for ResCap's residential servicing portfolio, and Ocwen Financial, Berkshire Hathaway and an unnamed hedge fund have also emerged.[32]

Page 61 of the Asset Purchase Agreement states as follows:

(m) With respect to any Purchased Asset, Sellers shall not, and shall use their best efforts to ensure that any Affiliates shall not: (1) **agree to allow any form of relief from the automatic stay in the Bankruptcy Case; (2) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Case**;

Considering the geographical position of most homeowners and the state specific laws and decisions, it would severely disadvantage homeowners to allow this and is completely contrary to fairness. They will protect the purchaser with estate funds and should not be allowed as a provision of the sale agreement.  **SEE** EXHIBIT 11

## XI.    **SUMMARY OF THE ARGUMENT**

Amicus Curiae Rush hereby adopts and ratifies the arguments found in the Motion for appointment of homeowners to represent their interest free and clear of conflicts of interest. This is normal in mass tort cases and the same standards applied in those cases should be applied here.  I argue that the Debtor has committed fraud acts as evident in the nationwide settlement agreement and consent orders on a massive scale. The Debtors assertions in response to the Motion for a homeowner committee are inaccurate, misleading, unreliable, self-contradictory, and make many going forward assumptions of events or conduct that is yet to be determined such as honoring the obligations under the settlement agreement.  The notice to the homeowners simply says, "keep making your payments."

---

[31] http://www.kccllc.net/documents/1212020/1212020120514000000000112.pdf
[32] http://www.americanbanker.com/issues/177_183/four-bidders-said-vying-for-rescap-1052876-1.html

Many illegal acts are ongoing as in the case of foreclosure already initiated with defective documents that have not been cured, removed, remediated. Fraudulent documents continue to be used to complete foreclosures. In fact, the Debtors propose to sell loans they know have missing and defective documents including missing notes and deeds of trust. It has been said that the note follows the mortgage. Without the note, the mortgage is unenforceable.

The sale of mortgage loans with document defects such as missing notes and mortgages, by the Debtors own calculations of discounts applicable, proves they *intend* to sell loans they know they do not possess good title to and for which the purchaser will have to resort to some sort of fabrication of documents to enforce the debt or foreclose. MERS will be used to cover up for missing and defective documents. (v**) assignments of mortgage are not being recorded in connection with the sale of the Mortgage Loans.**

It is clear that the Debtor, Trustees and the purchaser of the assets will have *actual knowledge* of the defective documents but will continue practices outlawed in the nationwide settlement agreement and obfuscate this information from the homeowners. In fact, the APA states the purchaser must keep secret this confidential information. It is not confidential information, it is a cover-up of a fraud.

## THE PLAN WILL AFFECT HOMEOWNER RECOVERY

Pursuant to 11 USC § 1102 Clearly the Court has the authority and discretion[33] to appoint additional committees if the court determines that it is necessary to ensure adequate representation of a specific group of creditors with interest that may be adverse to other creditors or members of the seated committee. There is no evidence that the seated members of the committee have provided

---

[33] **Legislative statements** - In the case of a public company there are likely to be several committees, each representing a different class of security holders and seeking authority to retain accountants, lawyers, and other experts, who will expect to be paid. If in the case of a public company creditors or stockholders wish to organize committees, they may do so, as authorized under section 1109(a). **house report no. 95–595** The creditors' and additional committees are the primary negotiating bodies for the formulation of the plan of reorganization. They represent the various classes of creditors from which they are selected when negotiating plan provisions and language in major asset sales, or various types of settlements. They may also provide a check and balance system related to the debtor in possession scenario and protect their constituents' interests.

access to information to borrower claimants not on the committee or that they have solicited any

comments from borrower claimants.

> **(3)** A committee appointed under subsection (a) shall—
> **(A)** provide access to information for creditors who—
> **(i)** hold claims of the kind represented by that committee; and
> **(ii)** are not appointed to the committee;
> **(B)** solicit and receive comments from the creditors described in subparagraph (A).[34]

The consequences to homeowners and the public at large, may be affected in ways we can't even predict at this

point in time. Will foreclosures ramp up after the closing of the proof of claim deadline on Nov.9[th]? Will the purchaser

of assets honor the APA provisions for continuing the loan modification programs in place? Will Ally Bank honor the

consent agreements and nationwide settlement? Will the unsecured creditors committee breach their fiduciary duty to

homeowners in this process? Will the loans be sold to a vulture hedge fund which will enforce defective loans for 100

cents on the dollar they bought for 40 cents on the dollar? Too many uncertainties exist to definitively discount the need

for homeowner representation in this case. All constituents and ensure all groups have a fair voice in this matter, after all,

it was the homeowners as taxpayers that supported GM, GMAC and related entities when they needed it, and still do at

this moment in time. The Debtors arguments are just not valid, and the interest to be protected is monumental. Millions

of homeowners will be affected in some way or another of events which take place in this bankruptcy. Thousands of

homeowners are in some state of distress, bankruptcy, foreclosure, or have already lost their home. I will be in New

York for the hearing and welcome the opportunity to testify to all facts and assertions I set forth in this brief.

Respectfully submitted on September 24, 2012 by:


_____ Paula Rush, Affiant, Mortgage Fraud and Forensic Analyst, Fraud

Examiner, Paula Rush .P.O. Box 1438 West Lantana Rd. Lantana FL 33462. paularush@comcast.net

---

[34] (Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2626; Pub. L. 98–353, title III, § 499,July 10, 1984, 98 Stat. 384; Pub. L. 99–554, title II, § 221,Oct. 27, 1986, 100 Stat. 3101; Pub. L. 103–394, title II, § 217(b),Oct. 22, 1994, 108 Stat. 4127; Pub. L. 109–8, title IV, §§ 405, 432(b),Apr. 20, 2005, 119 Stat. 105, 110.)

## DEFINITION REFERENCE USED IN AMICUS BRIEF

EXEPTIONS

"April Collateral Exceptions Report" means the collateral exceptions report prepared by Sellers' custodians in April 2012 and most recently updated as of May 6, 2012, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in its possession, to the extent applicable, or have document deficiencies. No Seller shall have any obligation to deliver any documents included in the April Collateral Exceptions Report or cure any document deficiencies identified in the April Collateral Exceptions Report.

"Closing Collateral Exceptions Report" means the collateral exceptions report generated by Sellers' custodians upon Sellers' request and at Purchaser's expense, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in Sellers' possession, to the extent applicable, or have document deficiencies. No Seller shall have any obligation to deliver any documents included in the Closing Collateral Exceptions Report or cure any document deficiencies identified in the Closing Collateral Exceptions Report.

"Collateral Exceptions Report" means the April Collateral Exceptions Report or the Closing Collateral Exceptions Report, as applicable.

(c) The April Collateral Exceptions Report has been delivered to Purchaser prior to the date hereof as document #16.8.2 in the data room established in connection with this Agreement. Sellers shall have the right, but not the obligation, to remedy any document deficiencies identified in the April Collateral Exceptions Report up to and including the Report Request Date.

(d) On the date that is twelve Business Days prior to the Closing Date, or such earlier date as the custodians shall require (the "Report Request Date"), Sellers shall instruct the custodians who prepared the April Collateral Exceptions Report to produce the Closing Collateral Exceptions Report and deliver it to Sellers and Purchaser as soon as reasonably practicable. Purchaser shall be responsible for all costs, expenses and fees incurred in connection with the production of the Closing Collateral Exceptions Report. Not less than five Business Days prior to the Closing Date, Sellers will provide Purchaser with a statement of Sellers' good faith calculation of the Purchase Price as of the Cut-off Date (the "Cut-off Date Purchase Price") prepared in a manner consistent with, and using the same principles, methodologies and policies as those set forth in, the Purchase Price Schedule. The Closing Collateral Exceptions Report and the calculation of the Cut-off Date Purchase Price shall be subject to approval by Purchaser, such approval not to be unreasonably withheld, conditioned or delayed.

**Section 4.9 Whole Loans**
(a) Subject to the related **Collateral Exception Reports**, the Mortgage Loan Documents include customer information and originals or copies of all material documents (either in physical or electronic form) that are required in order to service such

1

Whole Loan in accordance with Applicable Requirements.

(b) Except as set forth on the Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule, no payment of principal or interest is more than 60 days past due on any Whole Loan.

(c) Sellers are the sole owners and holders of each Whole Loan, and Sellers have full right and authority to sell and assign each Whole Loan to Purchaser pursuant to this Agreement. Except as set forth on Section 4.9(c) of the Disclosure Memorandum, the Whole Loans have not been assigned or pledged by any Seller (except for pledges or other grants of security interests which will be released on or prior to the Closing), and Sellers have good and marketable thereto.

(d) Each Whole Loan is genuine and constitutes the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms in all material respects, except as such enforcement may be limited by the Enforceability Exceptions.

(e) Except as set forth on Section 4.9(e) of the Disclosure Memorandum, for each Whole Loan that is a first lien residential mortgage loan on the applicable Mortgaged Property, including all improvements on such Mortgaged Property, such lien is subject only to (i) the Lien of current real property taxes and assessments, (ii) covenants, conditions, restrictions, rights of way, mineral right reservations, zoning and other land use restrictions, easements and other matters of public record as of the date of recording of the mortgage, (iii) any state of facts an accurate land survey of the Mortgaged Property might show, (iv) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area where the Mortgaged Property is located or specifically reflected in any appraisal obtained in connection with the origination of the Whole Loan, and (v) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.


MORTGAGE LOANS AND FILES

"Whole Loan Bucket" means each of the following categories of Whole Loans included in the Purchased Assets, calculated as set forth in the Purchase Price Schedule: Performing First Lien, Non-Performing First Lien, Performing Second Lien, Non-Performing Second Lien, Other and HELOC Advances.

"Whole Loans" means the first and second lien Mortgage Loans, HELOCs and other Mortgage Loans owned by Sellers and intended to be purchased by Purchaser, and any collateral, insurance, guaranty or other credit support arrangement related thereto, as identified on the Mortgage Loan Schedule, the Cut-off Date Mortgage Loan Schedule or the Closing Date Mortgage Loan Schedule, as applicable.

"Credit File" means with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains, if available, the documents described on Schedule B hereto, together with the credit documentation relating to the origination of such Mortgage Loan which may be maintained on microfilm, optical storage or any other comparable medium.

2

"Mortgage File" means, with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains each of the Mortgage Loan Documents except as specified in any applicable Collateral Exceptions Report.

"Mortgage Loan Schedule" has the meaning specified in Section 4.5.

**Section 4.5 Mortgage Loan Portfolio.** Sellers have delivered to Purchaser Electronic Data Files dated as of March 31, 2012 that provide loan level information with respect to the Whole Loans, with the loan level fields being those described on Schedule 4.5 (collectively, the "Mortgage Loan Schedule," which term includes, except where the context requires otherwise, updated data tapes to be prepared as of (i) the close of business on the day immediately preceding the Cut-off Date (the "Cut-off Date Mortgage Loan Schedule"), and (ii) the close of business on the day immediately preceding the Closing Date (the "Closing Date Mortgage Loan Schedule"), each to be delivered pursuant to Section 6.10). The information set forth in the Mortgage Loan Schedule is true, complete and correct in all material respects as of the date thereof and the information in each of the Cut-off Date Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule to be prepared and delivered to Purchaser in accordance with Section 6.10 will be true, complete and correct in all material respects as of their applicable Dates.

"Mortgage Loan" means any U.S. individual residential (one-to-four family) mortgage loan or other extension of credit secured by a Lien on U.S. real property of a borrower originated, purchased or serviced by a Seller or any Affiliate Seller (**which may be a charged-off Mortgage Loan or the receivable with respect to a funded HELOC advance**).

"Mortgage Note" means, with respect to a Mortgage Loan, a promissory note or notes, a loan agreement or other evidence of Indebtedness with respect to such Mortgage Loan, secured by a mortgage or mortgages or a deed or deeds of trust, together with any assignment, reinstatement, extension, endorsement or modification thereof.

SECURITIES
"Mortgage Securities" means the trading/financing securities to be included in the Purchased Assets, which are identified on Schedule E hereto.

PRICING
"Mortgage Securities Purchase Price Percentage" means 0.8194%.

"Purchase Price" has the meaning specified in Section 3.1(a).

"Purchase Price Adjustment Statement" has the meaning specified in Section 3.2(a).

"Purchase Price Document Deficiency Multiplier" means, for each Whole Loan Bucket, the multiplier to be applied to the Whole Loan Purchase Price Percentage for such Whole Loan Bucket based on the percentage of Mortgage Files in such Whole Loan Bucket determined to contain deficiencies (as set forth in the Closing Collateral Exceptions Report) as follows:

3

"Whole Loan Purchase Price Percentage" means, for the Whole Loans in each Whole Loan Bucket included in the Purchased Assets, the following percentages with respect to a Chapter 11 Plan and a Section 363 Sale, respectively, which shall be adjusted by applying the applicable Purchase Price Document Deficiency Multiplier to reflect the percentage of Mortgage

"Purchase Price Schedule" means Schedule F hereto which sets forth an example of the calculations to be made pursuant to Section 3.1 in order to calculate the Purchase Price as if calculated as of December 31, 2011.

"Purchased Assets" has the meaning specified in Section 2.1.

"Purchased Servicing Rights" means (i) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by an SBO Servicer, the Master Servicing Rights, (ii) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by a Seller, the Primary Servicing Rights and the Master Servicing Rights, and (iii) with respect to 41 Mortgage Loans as to which a Seller owns both the Primary Servicing Rights and the Master Servicing Rights, but which are indicated on the Mortgage Loan Schedule as being primary serviced by a third-party servicer on a subservicing basis, the Primary Servicing Rights and the Master Servicing Rights.

"Servicing File" means for each Mortgage Loan other than an SBO Loan, all loan documents and information (including any servicing tapes, images and conversion reports) received or obtained through the efforts of servicing the Mortgage Loan, which may be maintained on CD or DVD. To the extent available, each Servicing File shall contain: (a) documentation relating to any releases of collateral, (b) any correspondence between the current servicer of the mortgage and the Mortgagor, (c) payment history, (d) collection letters or form notices, and (e) foreclosure correspondence and legal notification. For the SBO Loans, the term "Servicing File" means only such copies of the foregoing documents as shall have been provided by the primary servicer and retained by the master servicing group of the applicable Seller.

**Valid Transfer.** The transfer of the Purchased Assets to the Purchaser pursuant to the Nationstar APA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the

Purchased Assets free and clear of all Interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

## CONSUMER RELATED PROVISIONS

**Section 2.11 Consumer Privacy Matters.** The sale, if any, of customer lists, customer data and other consumer privacy information pursuant to this Agreement is subject to and shall conform to the recommendations of any consumer privacy ombudsperson that may be appointed pursuant to section 332 of the Bankruptcy Code (the "Consumer Privacy Ombudsperson") (to the extent that appointment of a Consumer Privacy Ombudsperson is determined to be necessary) in

4

connection with the transactions contemplated in this Agreement.

## PURCHASE AND SALE OF ASSETS

**Section 2.1 Purchase and Sale of Assets.** On the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in, to and under the following assets (collectively, the "Purchased Assets"), in each case free and clear of all Claims and Liens except Permitted Liens, as approved for sale, transfer and assignment pursuant to the Sale Approval Order:

(a) the pool of Whole Loans, servicing released to the extent of the Purchased Servicing Rights (including any and all Primary Servicing Rights and Master Servicing Rights included in the Purchased Servicing Rights owned by a Seller), and the right to all payments of Accrued Interest, principal, penalties, fees, charges and other amounts received or receivable on or in respect of the Mortgage Loans after the Closing Date (except to the extent that an SBO Servicer is entitled to such amounts under an SBO Servicing Agreement), **together with the Mortgage Files and the Credit Files**, and any and all proceeds of the foregoing; provided, that HELOCs shall only be included in the Purchased Assets if the condition set forth in Section 8.3(d)(i) is satisfied or waived by Purchaser;

(b) the Mortgage Securities;

(c) the Advances as of the Closing Date;

(d) the Purchased Servicing Rights and the related Servicing Files;

**(e) the causes of action, lawsuits, judgments, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims, including those indicated by the presence of a "litigation flag" or indicated to be in bankruptcy or active foreclosure on the Mortgage Loan Schedule, including all preference or avoidance claims and actions of any of the Sellers, in each case that are related to the Purchased Assets, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (provided, that Sellers shall be entitled to participate in the defense of any counterclaim);**

(f) all rights to receive mail and other communications addressed to Sellers that pertains to the Purchased Assets, including any mail and communications from any Person who holds any Whole Loan (or any interest therein), trustees, customers, suppliers, distributors and their respective representatives;

(g) to the extent transferable, **all rights under insurance policies and insurance proceeds directly relating to Whole Loans** serviced pursuant to any servicing agreement, and all escrow accounts and any other accounts related to the Purchased Assets and all funds and property credited thereto; and

(h) to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of any Seller or any Affiliate Seller to the extent related to any Purchased Asset.

## ARTICLE II.

### Section 4.9 Whole Loans

(a) **Subject to the related Collateral Exception Reports, the Mortgage Loan Documents include customer information and originals or copies of all material documents (either in physical or electronic form)** that are required in order to service such Whole Loan in accordance with Applicable Requirements.

The Debtor makes bald assertions that they are the sole owners and holders of each Whole Loan yet exception reports may show missing or defective assignments and missing notes. (c) Sellers are the sole owners and holders of each Whole Loan, and Sellers have full right and authority to sell and assign each Whole Loan to Purchaser pursuant to this Agreement. ...Except as set forth on Section 4.9(c) of the Disclosure Memorandum, the Whole Loans have not been assigned or pledged by any Seller (except for pledges or other grants of security interests which will be released on or prior to the Closing), and Sellers have good and marketable thereto. (d) Each Whole Loan is genuine and constitutes the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms in all material respects, except as such enforcement may be limited by the Enforceability Exceptions.... (g) Except as set forth on Section 4.9(g) of the Disclosure Memorandum, no provision of any Whole Loan has been impaired, waived, altered or modified in any respect, except by written instrument that has been recorded, if required by Applicable Law or if necessary to maintain the lien priority of the Whole Loan, and that is included in the Mortgage Loan Documents relating to such Whole Loan.

**Section 6.18 Transfer of Servicing**. Without limiting the generality of this Section 6.18, Sellers or their designees shall take, or cause to be taken, the following actions with respect to the Mortgage Loans (other than SBO Loans) prior to the Closing Date (or within such time as may otherwise be specified below) in order to effect the transfer of the servicing of such Mortgage Loans to Purchaser or its designee on the Closing Date: (a) Notice to Mortgagors. Sellers (or their designees) shall inform in writing all Mortgagors of the change in servicer from any Seller (or its designee) to Purchaser (or its designee) all in accordance with Applicable Law and the terms of such "goodbye" letter (which may be combined, to the extent permitted by Applicable Law, with any "hello" letter to be sent to Mortgagors by Purchaser) shall be reasonably acceptable to Purchaser. (b) Transfer of Servicing. On the Closing Date (or such later date as Purchaser shall reasonably request), Sellers shall transfer servicing of the related Mortgage Loans to Purchaser or its designee pursuant to the terms of this Agreement and the procedures set forth in reasonable and customary servicing transfer instructions agreed to by Purchaser and Sellers. **(c) Delivery of Files. Within 10 Business Days after the Closing Date (or** such later date as Purchaser shall reasonably request), Sellers shall forward to Purchaser the Servicing Files and the Credit Files for each Mortgage Loan. (d) Payments Received Prior to the Closing Date. Sellers shall transfer all amounts received with respect to the Mortgage Loans on and after the Cut-off Date and prior to the Closing Date to Purchaser by wire transfer within three Business Days after the Closing Date to such account or accounts as may be designated by Purchaser to Sellers by prior written notice.

UNITED STATES BANKRUTPCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------x
                                               :     Chapter 11
In re:                                         :
                                               :     Case No. 12-12020 (MG)
Residential Capital, LLC, et al.,              :
                                               :     Jointly Administered
                  Debtors.                     :
-----------------------------------------------x
```

### *AFFIDAVIT OF SERVICE*

On September 24, 2012 I, Paula Rush, caused to be served a true and correct copy of the

BRIEF OF AMICUS CURIAE IN SUPPORT OF THE FORMATION OF AN OFFICIAL

COMMITTEE OF HOMEOWNER-BORROWER CLAIMANTS, Pursuant to section

1102(a)(2) of the Bankruptcy Code to the Southern District of New York Bankruptcy Court,

and the parties listed on the annexed Schedule "A" by Federal Express, Schedule "B" by first

Class Mail, postage paid thereon, and Schedule "C" by electronic mail.

I certify that the foregoing statements made by me are true under the penalty of perjury.


Paula Rush


_____    Date: 9/24/2012

.P.O. Box 1438 West Lantana Rd. Lantana FL 33462.   paularush@comcast.net

**SCHEDULE "A"**
**(By Federal Express)**

Morrison & Foerster LLP
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi
1290 Avenue of the Americas
New York, NY 10104

Kramer Levin Naftallis & Frankel LLP
Kenneth H. Eckstein
Thomas Moers Mayer
Douglas H. Mannal
1177 Avenue of the Americas
New York, NY 10036

Office of the US Trustee
Tracy Hope Davis
Linda A. Riffkin
Brian S. Masumoto
33 Whitehall Street, 21st Floor
New York, NY 10004

**SCHEDULE "B"**
**(By First Class Mail)**

**Citibank NA**
Attn Bobbie Theivakumaran
390 Greenwich St 6th Fl
New York, NY 10013

**Deutsche Bank Trust Company**
**Americas**
c/o Kelvin Vargas
25 De Forest Ave
Summit, NJ 07901

**Fannie Mae**
Attn Peter McGonigle
1835 Market St Ste 2300
Philadelphia, PA 19103

**Internal Revenue Service**
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA 19101-7346

**Internal Revenue Service**
Centralized Insolvency Operation
2970 Market St
Philadelphia, PA 19104

**Internal Revenue Service**
Insolvency Section
31 Hopkins Plz Rm 1150
Baltimore, MD 21201

**Kelley Drye & Warren LLP**
James S Carr & Eric R Wilson
101 Park Ave
New York, NY 10178

**Kirkland & Ellis**
Richard M Cieri
601 Lexington Ave
New York, NY 10022

**Kirkland & Ellis LLP**
Attn Ray C Schrock & Stephen E Hessler
601 Lexington Ave
New York, NY 10022-4611

**Kramer Levin Naftallis & Frankel**
Kenneth H Eckstein, Thomas Moers
Mayer & Douglas H Mannal
1177 Avenue of the Americas
New York, NY 10036

**Morrison & Foerster LLP**
Attn Tammy Hamzehpour
1290 Avenue of the Americas
New York, NY 10104

**Morrison & Foerster LLP**
Larren M Nashelsky, Gary S Lee &
Lorenzo Marinuzzi
1290 Avenue of the Americas
New York, NY 10104

**Nationstar Mortgage LLC**
Attn: General Counsel
350 Highland Drive
Lewisville, TX 75067

**Office of the NY State Attorney General**
Nancy Lord & Neal Mann
The Capitol
Albany, NY 12224-0341

**Office of the US Attorney for the
Southern District of NY**
United States Attorney Preet Bharara
One St Andrews Plaza
New York, NY 10007

**Securities & Exchange Commission**
Secretary of the Treasury
100 F St NE
Washington, DC 20549

**Securities & Exchange Commission**
**NY Regional Office**
George S Canellos Regional Director
3 World Financial Center Ste 400
New York, NY 10281-1022

**Sidley Austin LLP**
Larry J Nyhan & Jessica CK Boelter
One Dearborn
Chicago, IL 60603

**Skadden Arps Slate Meagher & Flom LLP**
Jonathan H. Hofer
Four Times Square
New York, NY 10036

**Skadden Arps Slate Meagher & Flom LLP**
Sarah M Ward
Four Times Square
New York, NY 10036

**Skadden Arps Slate Meagher & Flom LLP**
Ken Ziman
Four Times Square
New York, NY 10036

**Skadden Arps Slate Meagher & Flom LLP**
Suzanne D T Lovett
Four Times Square
New York, NY 10036

**The Bank of New York Mellon**
Asset-Backed Securities Group
101 Barclay St 4W
New York, NY 10286

**U.S. Bank National Association**
Attn: Irina Palchuk
60 Livingston Avenue
EP-MN-WS1D
St. Paul, MN 55107

**U.S. Department of Justice**
US Attorney General, Eric H. Holder, Jr.
950 Pennsylvania Ave NW
Washington, DC 20530-0001

**United States Attorney's Office for the**
**Southern District of New York Civil Division**
Attn Joseph Cordaro
86 Chambers St 3rd Fl
New York, NY 10007

**US Trustee for the Southern District of NY**
Tracy Hope Davis, Linda A. Riffkin and
Brian S. Masumoto
33 Whitehall St 21st Fl, Region 2
New York, NY 10004

**Wells Fargo Bank NA**
Attn Corporate Trust Services -
GMACM Home Equity Notes 2004
Variable Funding Trust
PO Box 98
Columbia, MD 21046

**Chadbourne & Parke LLP**
30 Rockefeller Plaza
New York, New York 10112

**Allstate Life Insurance Company**
Attn Peter McElvain
3075 Sanders Road, Suite G5A
Northbrook, IL 60062

**Attorney General - State of New York**
Eric T. Schneiderman
200 Old Country Road, Suite 240
Mineola, New York 11501

**SCHEDULE "C"**
**(By Electronic Mail)**

askdoj@usdoj.gov
bmyrick@sidley.com
bobbie.theivakumaran@citi.com
brian.masumoto@usdoj.gov
dmannal@kramerlevin.com
george.rayzis@usbank.com
glee@mofo.com
irina.palchuk@usbank.com
jboelter@sidley.com
jhofer@skadden.com
john.bellaver@ally.com
john_s_forlines@fanniemae.com
joseph.cordaro@usdoj.gov
kdwbankruptcydepartment@kelleydrye.com
keckstein@kramerlevin.com
kelvin.vargas@db.com
ken.ziman@skadden.com
linda.riffkin@usdoj.gov
lmarinuzzi@mofo.com
lnashelsky@mofo.com
lnyhan@sidley.com
marie.l.cerchero@irs.gov
nancy.lord@oag.state.ny.us
neal.mann@oag.state.ny.us
newyork@sec.gov
nikolay.kodes@skadden.com
projectrodeo@kirkland.com
ray.schrock@kirkland.com
richard.cieri@kirkland.com
sarah.ward@skadden.com
secbankruptcy@sec.gov
stephen.hessler@kirkland.com
suzanne.lovett@skadden.com
tammy.hamzehpour@ally.com
timothy.devine@ally.com
tmayer@kramerlevin.com
tracy.davis2@usdoj.gov
william.b.solomon@ally.com
accesslegalservices@gmail.com

adam.parkin@tdsecurities.com
aglenn@kasowitz.com
alicia.borys@barclays.com
ayala.hassell@hp.com
balaji.v@indecomm.net
bankruptcy@morrisoncohen.com
bateman@sewkis.com
bbressler@schnader.com
bdeutsch@schnader.com
bguiney@pbwt.com
bill.macurda@alston.com
brandon.johnson@pillsburylaw.com
brian.greer@dechert.com
catherine_lasher@fanniemae.com
cball@jonesday.com
ceblack@jonesday.com
christopher.stevens@tdsecurities.com
clometti@cohenmilstein.com
courtney.lowman@ally.com
cschreiber@winston.com
danbrockett@quinnemanuel.com
das@sewkis.com
dflanigan@polsinelli.com
dfliman@kasowitz.com
dloeser@kellerrohrback.com
dneier@winston.com
drehns@cohenmilstein.com
dskeens@wbsvlaw.com
dwdykhouse@pbwt.com
dwollmuth@wmd  law.com
ebcalvo@pbfcm.com
ecf@kaalaw.com
echou@coleschotz.com
eciolko@ktmc.com
esoriano@wilmingtontrust.com
frank@loanvaluegroup.com
fsosnick@shearman.com
generalcounsel@fhfa.org
gjarvis@gelaw.com
glenn.gillett@usdoj.gov
glenn.siegel@dechert.com
gregory.petrick@cwt.com
guzzi@whitecase.com
hector.gonzalez@dechert.com
heidifurlong@siegelbrill.com

ilevee@lowenstein.com
info@emortgagelogic.com
info@sgb law.com
ingrid.bagby@cwt.com
jbernstein@labaton.com
jcorneau@klestadt.com
jeff.brown@gmacfs.com
jennifer.provenzano@bnymellon.com
jgarrity@morganlewis.com
jhaake@wbsvlaw.com
jlaitman@cohenmilstein.com
jmiller@tcfbank.com
jmoldovan@morrisoncohen.com
jnagi@polsinelli.com
joe.salama@db.com
john.stern@texasattorneygeneral.gov
jpaget@hunton.com
jwilliams@wilmingtontrust.com
jzajac@proskauer.com
kapil.chopra@aegisglobal.com
kathryn.thorpe@td.com
keith.wofford@ropesgray.com
kelly.j.rentz@wellsfargo.com
kenton_hambrick@freddiemac.com
kit.weitnauer@alston.com
kpatrick@gibbsbruns.com
krehns@cohenmilstein.com
lemiller@jonesday.com
lpulford@corelogic.com
macohen@curtis.com
mageshwaran.ramasamy@bnymellon.com
malbaiady@corelogic.com
mamta.scott@usbank.com
mark.ellenberg@cwt.com
marty.bunin@alston.com
mauricio.espana@dechert.com
mcarney@mckoolsmith.com
meisenkraft@cohenmilstein.com
metkin@lowenstein.com
mgallagher@curtis.com
michael.spataro@bnymellon.com
michelle.moeller@usbank.com
mkraut@morganlewis.com
mrollin@rplaw.com

msd@dcglaw.com
mseltzer@susmangodfrey.com
mstein@kasowitz.com
mvaughan@wbsvlaw.com
mwarner@coleschotz.com
myanney@assuredguaranty.com
namamoo@kasowitz.com
nichlaus.m.ross@wellsfargo.com
patrick.kerner@barclays.com
paul_mullings@freddiemac.com
pfleming@morganlewis.com
pmoak@mckoolsmith.com
prforlenza@pbwt.com
rajan@indecomm.net
rbarkasy@schnader.com
rescapinfo@kccllc.com
rlwynne@jonesday.com
roblin@williamslaw.com
rosa.mendez@db.com
ross.martin@ropesgray.com
rzwerling@zsz.com
sarah.stout@bnymellon.com
scott.slifer@isgn.com
scottshelley@quinnemanuel.com
seth.goldman@mto.com
sfennessey@shearman.com
sharon.squillario@wellsfargo.com
sheehan@txschoollaw.com
shumphries@gibbsbruns.com
sreisman@curtis.com
srutsky@proskauer.com
stevep@rgrdlaw.com
susan.khokher@td.com
susheelkirpalani@quinnemanuel.com
tal@talcottfranklin.com
tanveer.ashraf@usbank.com
theodore.w.tozer@hud.gov
thomas.walper@mto.com
tklestadt@klestadt.com
tlallier@foleymansfield.com
tom.houghton@ally.com
westchesterlegal@aol.com
william.hao@alston.com
xrausloanops5@barclays.com

pdefilippo@wmd law.com
sfitzgerald@wmd law.com
jlawlor@wmd law.com
jglucksman@scarincihollenbeck.com
david.powlen@btlaw.com
diane.sanders@lgbs.com
lberkoff@moritthock.com
will.hoch@crowedunlevy.com
cwood@rgrdlaw.com
stevep@rgrdlaw.com
abehlmann@lowenstein.com
davids@blblaw.com
jonathanu@blbglaw.com
matthewj@blbglaw.com
jai@blbglaw.com
pferdinands@kslaw.com
ajowers@kslaw.com
thadwilson@kslaw.com
gbush@zuckerman.com
ncohen@zuckerman.com
lneish@zuckerman.com
cmomjian@attorneygeneral.gov
chris@myfaircredit.com
jglucksman@scarincihollenbeck.com
david.tillem@wilsonelser.com
tfawkes@freebornpeters.com
deggert@freebornpeters.com
rgayda@chadbourne.com
peter_mcgonigle@fanniemae.com
rajohnson@akingump.com
ccarty@akingump.com
bnkatty@aldine.k12.tx.us
ecfmail@aclawllp.com
ao@alston.com
harrisj12@michigan.gov
bbeskanos@aol.com
bankruptcy@clm.com
maofiling@cgsh.com
ra-li-ucts-bankrupt@state.pa.us
diem.home@gmail.com
gcatalanello@duanemorris.com
jvincequerra@duanemorris.com
broylesmk@rbcattys.com
dearly@fdic.gov
rnorton@hunton.com

rrich2@hunton.com
bankruptcy@ironmountain.com
Austin.bankruptcy@publicans.com
Dallas.bankruptcy@publicans.com
Houston_bankruptcy@lgbs.com
choward@lockelord.com
wcurchack@loeb.com
vrubinstein@loab.com
dminoff@loab.com
adoshi@magnozzikye.com
susan@taxcollector.com
dprather@iglou.com
sdnyecf@dor.mo.gov
paul_papas@mylegalhelpusa.com
igoldenstein@proskauer.com
romero@mromerolawfirm.com
dsasser@siwpc.com
dhall@siwpc.com
adam.harris@srz.com
howard.godnick@srz.com
marguerite.gardiner@srz.com
Michael.cutini@srz.com
taconrad@sblawfirm.com
amuller@stinson.com
whazeltine@sha-llc.com
jteitelbaum@tablawllp.com
kay.brock@co.travis.tx.us
rbrown@robertbrownlaw.com

| | |
|---|---|
| 1 | **PAULA RUSH** |
| 2 | **EXCEPTIONS – SCHEDULE F** |
| 3 | **COMMUNITY  BANK OF NORTHERN VIRGINIA AND GUARANTY NATIONAL BANK OF TALLAHASSEE SECOND MORTGAGE LOAN LITIGATION (MDL 1674)** |
| 4 | **WALTERS BENDER STROHBEHN VAUGHAN. P.C. LETTER** |
| 5 | **CONSENT JUDGMENT** |
| 6 | **NEW STANDARDS POST SETTLMENT** |
| 7 | **VULTURE INVESTORS BUY UP DISTRESSED ASSETS** |
| 8 | **NEW REITS POUNCE ON DISTRESSED MORTGAGE ASSETS** |
| 9 | **HAMP SERVICER PERFORMANCE** |
| 10 | **MAKING HOME AFFORDABLE SERVICER RESULTS** |
| 11 | **DOCUMENT 61-2  - RELIEF FROM STAY** |
| 12 | **LEGACY WHOLE LOAN PORTFOLIO BOOK VALUE – PROJECT BOUNCE** |
| 13 | **REMOVED** |
| 14 | **ACTIVE STATE EXAMS** |
| 15 | **RESCAP BOARD OF DIRECTORS APPROVES CHAPTER 11** |
| 16 | **ACCREDITED HOME LENDERS – CARRIE LUFT - EXCEPTIONS** |