# UNITED STATES BANKRUPTCY COURT

# SOURTHERN DISTRICT OF NEW YORK

**Civil Case# 12 – cv 12020**

Residential Capital, LLC, et al
Debtor

     v.

***U.S. Trustee* -United States Trustee**
33 Whitehall Street
21st Floor
New York, NY 10004
(212) 510-0500

*Claims and Noticing Agent*
**Kurtzman Carson Consultants**
2335 Alaska Ave
El Segundo, CA 90245

*FILED*
*U.S. BANKRUPTCY COURT*
*2012 SEP 25  P 1: 53*
*S.D. OF N.Y.*

*Claim(s) made by Kenneth Taggart, and others similarly situated*

**Memorandum of Law in Support of:**

**Motion to Remove Mortgage Loan alleged by Kenneth Taggart from Assets of GMAC Mortgage, LLC &Motion to Prove Ownership of Mortgage Assets (Mortgages & Notes) Kenneth Taggart Dispute Asset(s) of GMAC Mortgage, LLC. & Memorandum Law in Support of Motions**

**Memorandum of Law**

GMAC has presented to the court a list of mortgage loans in which it alleges to own, or has alleged to have an interest in ownership of said mortgage(s) listed in asset(s). Kenneth Taggart owns a property in which GMAC Mortgage, LLC alleges a mortgage, or mortgage loan interest of ownership at the present time, as well as in the

past. It also alleges that it had legal authority to collect payments as servicer of the alleged mortgage it claims to own from July 2008 until the present time. Kenneth Taggart alleges that GMAC Mortgage, LLC does not have ownership of any mortgage at the property at: 521 Cowpath Rd, Telford, Pa. 18966 ( Montgomery County, Pennsylvania) now, or at any time ever in the past. Kenneth Taggart, also alleges that GMAC Mortgage, LLC collected payments in the amount of $5,401.from September 2008 until March 2009 from Kenneth Taggart alleging that it was the owner of a mortgage loan, or had the legal right to collect payments, as a matter of law, for property it alleged ownership at: 521 Cowpath Rd, Telford, Pa. 18969 (Bucks County, Pennsylvania) . GMAC Mortgage, LLC has never proven ownership, as a matter of law, on the said property it claims ownership to, or has never proven, as a matter of law, that it had the legal right to collect payments received by Taggart from September 2008 until March 2009. Furthermore, GMAC Mortgage, LLC has not demonstrated or proven, as a matter of law, That is has the right to collect any payments whatsoever for the said mortgage in question.

**Taggart seeks Removal of Asset(s) from GMAC Mortgage' LLC's list of Assets presented to the court & Dismissal of all Claims regarding alleged Mortgage Interest at: 521 Cowpath Rd, Telford, Pa 18969 (Montgomery County, Pennsylvania)**

**HISTORY of Taggart's Mortgage Loan.**

**I. Facts**

On or about August 17, 2009, GMAC Mortgage, LLC, filed a Complaint in Mortgage Foreclosure, in The Court of Common Pleas, Montgomery County, Pennsylvania seeking a

judgment in the amount of $ 685,676.83, together with per diem interest and other costs and charges collectable under the mortgage and for the foreclosure and sale of Defendant's property at 521 Cowpath Rd, Telford, Pa 18969.  A true and correct copy of the Complaint is attached hereto, made part hereof by reference, and market as Exhibit "A"

*Kenneth Taggart now submits the following Objection and makes the following allegations and claims*: GMAC Mortgage, LLC alleges to be owner, or have an interest in the alleged mortgage, and has alleged to be servicer, or legal right to collect payments for the alleged mortgage loan since July 2008 until present. Kenneth Taggart disputes that all payments made to GMAC Mortgage, LLC from July 2008 until March 2008 were not legally collected as GMAC Mortgage, LLC had no legal ownership in the said mortgage loan or no authorization to collect payments from Kenneth Taggart. It is further alleged by Taggart that GMAC Mortgage, LLC has no authorization to collect payments now from Taggart; Furthermore, GMAC Mortgage, LLC has never had authority,  or legal right to collect payments at any time from Taggart, or any other party regarding the property located at: 521 Cowpath Rd, Telford, Pa 18969 ( Montgomery County, Pennsylvania).

# Legal Argument

***GMAC Mortgage, LLC has no ownership of mortgage, and must prove it has or had legal authority to collect payments at all times from July 2008 (the time the alleged mortgage loan was originated) until the present time.***

Kenneth Taggart is asserting to the court that, GMAC Mortgage is alleging ownership in a mortgage loan, alleging legal right to collect payments, and alleging legal right to foreclosure on alleged property for non-payment.  Taggart also alleges that even

if alleged mortgage contract exists, or if GMAC Mortgage, LLC is a legal successor to alleged mortgage contract, GMAC Mortgage, LLC has breached the mortgage contract.

## Many Reasons GMAC Mortgage, LLC does not even own the mortgage loan or have interest in mortgage loan.

**1) Mortgage Loan alleged does not even describe the property owned by Kenneth Taggart**

Kenneth Taggart owns a property at: 521 Cowpath Rd, Telford, Pa 18969, that is located in **Montgomery County Pennsylvania ( Exhibit "B").** GMAC Mortgage, LLC alleges ownership, or interest in ownership, of a property that is located **in Bucks County, Pennsylvania. It also alleges to have legal right or servicing rights to a property** in Bucks County, Pennsylvania. (see Exhibit "A")

Asset of alleged mortgage loan in Bucks County must be removed as GMAC's alleged mortgage is not valid. It is not an asset.

**2) Chain of Title, Proof of Chain of Title – GMAC has failed to provide to owner & court, proof of ownership of mortgage & failed to Provide "Wet Ink Note" & Wet Ink Mortgage"**

### No Proof of Ownership Produced by GMAC

GMAC Mortgage, LLC has failed to provide "Wet Ink Note" & "Wet Ink Mortgage" To Taggart or any court of law. Proof of ownership by Taggart has been requested by GMAC Mortgage, by which he requests GMAC Mortgage, LLC, produce the original

"Wet Ink Note" and Original "Wet Ink Mortgage" to him as well as the court. GMAC

Mortgage, LLC has failed to do so as of the effective date of this brief.

## GMAC Mortgage, LLC is not a Real Party of Interest in the mortgage loan it alleges to own and/or service

Plaintiff, GMAC Mortgage, LLC is not a Party in Interest in this complaint. GMAC

has failed to produce original Promissory Note and Mortgage and has failed to show

ownership of such (including Chain of Title). *GMAC must clearly show a recorded chain*

*of title of all owners since the origination of the loan in question. GMAC Mortgage, LLC*

*has also failed to show proof that is, or was legal servicer by way of legal agreement*

*with owner of mortgage at all times GMAC Mortgage , LLC collected or alleges it has*

*the right to collect payment on the loan in question.*

## GMAC Mortgage MUST- "Show Me the Note". An Unbroken chain of Title Must Exist To Prove it Owns the "Note" & " Mortgage". It also is evident that they have "Split the Note"

*Plaintiff has not "Shown the Original Note" or "Ownership of the Note "*RE: Agard,

U.S. Bancruptcy Court, Eastern District of New York, No. 10-77338; Castro v  Executive

Trustee Services, LLC (D. Ariz, 2009 February 23, 2009, CV -08-2156 PHX – LOA)

2009 US Dist Lexus 14134, Weingartner  v Chase Home Finance, LLC, (D Nev 2010)

702 F Supp2nd 1276, 1282 -1283.

Plaintiff must show that this Note and Mortgage were part of the res of the Trust

and that they were to be transferred to the trust within the window of time between

origination and cutoff dates that the Trust could accept assets. 2007 WL 4034554 at *1

(N.D. Ohio 2007),  In re Hayes, 393 B.R. 259 (Bankr. D Mass. 2008); In re King Jin

Hwang, 396 B.R. 757 ( Bankr, C.D. Calf, 2008),  In re: Shelter Developments Group,

Inc., 50 B.R. 588 ( Bankr S.D. Fla 1985).

**Defendant has not produced the original note or mortgage, nor shown proof of
ownership to note. The transfer of Mortgage, even if proven, does not automatically
transfer ownership of the note itself ( emphasis added ) ,  Agard, U.S. Bankruptcy Court,
Eastern District of New York, No. 10-77338.**

GMAC Mortgage *has not asserted or provided any evidence that they have ownership of*

*"The Mortgage" or "Note".* Defendant States that the plaintiff cannot produce original

Promissory Note and Mortgage upon which this alleged asset is based and therefore should be

removed.

## The Interest of the note is Split with the "MERS" concept. (emphasis added)

**Massachusetts Supreme Court has ruled that US Bank Corp & Wells Fargo
Did not have standing to foreclose on a borrower because they failed to follow
proper procedure in the mortgage transfer and securitization.  (In Ibanez Exhibit
I1 – I4) & Exhibits E1- E31)**

### The Asset should be removed as a matter of law :

1) Taggart states that the plaintiff is not the lawful assignee of the
   Promissory Note and Mortgage upon which plaintiff's claims are
   based.

2) Taggart states that plaintiff is not the holder of the Promissory Note
   and Mortgage upon which this action is based and therefore relief
   requested is barred.

3) Taggart states that the plaintiff is not in Possession Note and Mortgage

upon which this action is based.

4) Taggart states that the plaintiff is not the owner of the Promissory Note and Mortgage upon which the action is based and therefore relief requested is barred.

### The alleged Mortgage & Note has also Split.

The "Recorder of Deeds" , Nancy Becker, is on record and has published the following assertions and opinions that there is a "cloud on the title" and lack of proof of ownership on "MERS" transactions  and  quotes "MERS" transactions does not show proof of ownership  (See attached Exhibit "C"):

## 3) Fraudulent Transfer(s) - (Assignments)

### Conflict of Interest "Voids Assignments"

The "Foreclosure Mill" of Phelan, Hallinan & Schmieg, the Foreclosure Mill in which represented GMAC Mortgage, LLC in the foreclosure complaint, also signed the alleged Assignment of Mortgage" from Mortgage Electronic Registration Systems, Inc. to GMAC Mortgage, LLC; This outright knowledge and admission of a conflict of interest clearly voids the assignment as a matter of law. The same law firm cannot represent two parties in the same transaction. Phelan, GMAC & MERS, clearly did so with knowledge they were breaking the law willfully and with intent to willfully mislead and defraud Taggart and the court(s). All parties (GMAC, Phelan, MERS) continue to mislead the courts and Taggart in an attempt to defraud Taggart, and others similarly situated in illegally foreclosing on his properties and others with knowingly fraudulent assignments. Taggart has notified Counsel for GMAC, GMAC, and MERS that the assignments are Fraud due to conflict of interest, yet they proceed with arrogance and refuse to disobey the law with knowingly fraudulent documents. GMAC, counsel for

GMAC, and MERS continue to proceed with a foreclosure complaint against Taggart

and others with fraudulent affidavits and assignments on other cases as well.

(See Exhibits "A" & "D")

### *All assignments must be in writing*

**All Assignments from the origination of the loan until present have not been
recorded**.

Plaintiff has failed to show assignment is in writing  21 P.S. 623 – 1.  Plaintiff

has failed to show" Acknowledgement" of assignment; An assignment or satisfaction

must contain proper Pennsylvania Acknowledgement or other acknowledgement

approved by Statute Pennsylvania Statutes 21 P.S. – 623 Assignment and letters of

Attorney. (see Exhibits "C").


### *Certificate of Residence of mortgage or assignee*

**Certificate of Residence of Mortgage or Assignee of Each Assignee in the Chain
of Title**

Plaintiff has not shown, recorded or produced any Certificate of Residence of

Assignee and mortgage 21 P.S. – 625   (of each party owner in the chain of title).

*(See Exhibit "C")*


### *Acknowledgement   (of assignment or satisfaction)*

**NO Proof of Acknowledgement or Satisfaction of Each Assignee in the Chain of
Title**

Plaintiff has failed to provide proof of "Acknowledgement".  An assignment or

Satisfaction must contain proper Pennsylvania Acknowledgement approved by statute

<u>21 P.S. 623</u>   (Exhibit "C")

## 4) GMAC Mortgage, LLC has no right to enforce note

Even if said mortgage is proven to be valid, GMAC Mortgage, LLC must prove it

has a right to enforce the note. Taggart asserts it has no right to enforce the note.

### *GMAC Mortgage, LLC has no right to enforce the note!*

The Universal Commercial Code at 3:309(2) says *"a bank must prove it's right to*

*enforce the note"*. GMAC Mortgage, LLC has not proven it even owns the note, let alone

*"The right to enforce it"*

## 5)   Faulty Ownership and Assignments through The Mortgage Electronic Registration Systems Inc. (a/k/a/ MERS)

*GMAC Mortgage, LLC  lacks ownership in alleged Mortgage & Note, because they*

*failed to follow proper legal procedure in the mortgage transfer and securitization*

*process*  In  *Ibanez* <u>Us Bank Corp & Wells Fargo, Massachusetts Supreme Court, Jan</u>

<u>7, 2011</u>

**Testimony from Expert Witness from Georgetown Law to The United States**

**Congress, on Nov 18, 2010, that foreclosure process and Securitization process is flawed**

(See Exhibits "E" – Georgetown Law)


## "MERS",  Mortgage Electronic Registration Systems is a Flawed System

Taggart hereby challenges the truth of the factual averments by GMAC

Mortgage, LLC, as to the ownership of the mortgage & Note, chain of title, and fatal

defect in recording all transfers with the court house. GMAC Mortgage, LLC does not

have any interest in the said mortgage or note as they have not shown ownership of title

and all assignments since it's origination. (see Exhibit - Testimony from Expert Witness

from Georgetown Law to The United States Congress that foreclosure process and

Securitization process is flawed (See Exhibits  "E" Georgetown Law)


**The alleged transfer, alleged assignment, or alleged role that "MERS" participated
in During the course of the loan was "Not Disclosed" prior to settlement. It was
never mentioned prior to settlement and there were no negotiations that ever took
place as to the role or involvement of MERS.**


The role of "MERS" was not disclosed or negotiated at any time prior to

settlement; It was simply imposed on Taggart at the time of settlement without

explanation as to the purpose of the use of MERS.  The use of MERS is therefore

invalid


## MERS IS USING NON EMPLOYEE PERSONEL TO EXECUTE  LEGAL DOCUMENTS

"MERS" has been sued by New York State Attorney General for use of

nonemployee certifying officers to execute vital legal documents, misled, and deceived

owners and the courts and made it difficult to ascertain whether a party actually has the right to foreclose.

## GMAC MORTGAGE, LLC WAS SIGNING DOCUMENTS FOR "MERS"

GMAC Mortgage, LLC has admitted that employees were signing 10,000 documents a month; Some of those documents were "MERS" Documents, including Assignments & Affidavits.

### Known Conflict of Interest of Foreclosure Mill

The "Foreclosure Mill" of Phalen, Hallinan & Schmieg, the foreclosure Mill in which represented GMAC Mortgage, LLC in the foreclosure complaint, also signed the alleged Assignment of Mortgage" from Mortgage Electronic Registration Systems, Inc. to GMAC Mortgage, LLC; This outright knowledge and admission of conflict of interest clearly voids the assignment as a matter of law. The same law firm cannot represent two parties in the same transaction. Phelan, GMAC & MERS, clearly did so with knowledge they were breaking the law willfully and with intent to defraud Taggart and the court(s). All parties ( GMAC, Phelan, MERS) continue to mislead the courts and Taggart in an attempt to defraud Taggart, and others similarly situated in illegally foreclosing on his properties and others with knowingly fraudulent assignments. Taggart has notified Counsel for GMAC, GMAC, and MERS that the assignments are

Fraud due to conflict of interest, yet they proceed with arrogance and refuse to disobey the law with knowingly fraudulent documents.  (See Exhibits "A" & "D")

## GMAC Mortgage, LLC, HAS ADMITTED TO " ROBO SIGNING" THOUSANDS OF FORECLOSURE CASES FROM THE VERY OFFICE THIS FORECLOSURE COMPLAINT CAME FROM.

### *The complaint should be dismissed for this very reason alone.*

### Definition of "Robo-Signer"

An employee of a <u>mortgage</u> servicing company that signs foreclosure documents without  reviewing them. Rather than actually reviewing the individual details of each case, robo-signers assume the paperwork to be correct and sign it automatically, like robots.

### GMAC Mortgage, LLC  " Robo Signed" the  Foreclosure filed in State Court

The foreclosure filed on alleged mortgage was initiated at the Fort Washington, Pennsylvania office of GMAC Mortgage, LLC which has admitted that it signed and processes illegally by, among other things, making up/manufacturing documents, forging signatures, signing affidavits that they personally reviewed the documents, personally checked the calculations and figures in the complaint. This very complaint came from the Fort Washington, Pennsylvania office at the time it admitted flawed procedure and illegal activity as noted.  GMAC Mortgage, LLC " robo signed" this to push it through the system without any regard for Plaintiff. GMAC Mortgage, LLC " Robo

Signed" to illegally foreclose on the property and profit from the equity in the property.

(See Exhibit "F")

**"Robo Signing" a problem in the industry and proof of compliance of all applicable laws should be required.**

See attached Testimony from Expert Witness from Georgetown Law to The United States Congress that foreclosure process and Securitization process is flawed (See attached Exhibit "E")

## GMAC MORTGAGE, LLC WAS SIGNING DOCUMENTS FOR "MERS"

See attached information in Exhibits that GMAC Mortgage, LLC employees were signing 10,000 documents a month; Some of those documents were "MERS" documents. **This is not denied by GMAC Mortgage LLC. IT HAS BEEN ADMITTED BY GMAC MORTGAGE, LLC**

6)    **"Fraud", "Fraudulent Documents" & "Fraud Upon the Court"**

GMAC Mortgage, LLC, and any representative with GMAC, including counsel for GMAC with knowledge of fraudulent assignments and affidavits have committed "Fraud Upon this Court" as well as all courts in which it asserts ownership of mortgage based on knowingly fraudulent assignments and affidavits as asserted in this brief and "Adversary Complaint" against GMAC Mortgage, LLC. For reason(s) of Fraud involved

in many aspects of this case, the asset of the mortgage listed by GMAC Mortgage, LLC should be removed from the list of asset(s) in this case.

## 7) Fraudulent Affidavits, Assignments, & Documets

The only alleged sworn affidavit of such a default or ownership of said mortgage comes from known "Robo Signer", Jeffrey Stephan of GMAC Mortgage, LLC. Jeffrey Stephan signed a Sworn Affidavit, or at least Jeffrey Stephan's name appears on it, in the mortgage foreclosure complaint in Montgomery County, Pennsylvania filed against Kenneth Taggart on the property at: 521 Cowpath Rd, Telford, Pa 18966. GMAC Mortgage, LLC continues to allege a default occurred on Taggart's mortgage and rely on fraudulent affidavits of known robo-signer and the world famous , "Jeffrey Stephan". GMAC Mortgage, LLC have provided no expert witnesses of an alleged default and continue to support knowingly fraudulent documents of, *inter alia*, robo-signed affidavits and mortgage assignments. (Exhibit "A", "D", & "F")

## 8) Failed to show proof they were in fact servicer to collect payments.

GMAC Mortgage, LLC has failed to produce or propound all legal documents indicating that they had legal authority to collect mortgage payments, whether mortgage was legal, owned by them, or owned by any other party. The asset, of the alleged mortgage loan at: 521 Cowpath Rd, Telford, Pa 18969 (Bucks County, Pennsylvania),

should be removed as GMAC Mortgage, LLC has shown legal proof that they have ownership of the mortgage or even the legal right to collect or receive payments of said mortgage loan at any time. (See Exhibit "A" & "B")

## Conclusion

For the foregoing reasons, Taggart motions the court to issue an Order removing the alleged mortgage loan from GMAC Mortgage, LLC's asset list, and including it in any assets in the Chapter 11 bankruptcy proceeding. It is further ordered that all claims regarding the property located at: 521 Cowpath Rd, Telford, Pa 18969 (Montgomery County, Pennsylvania) shall be "Dismissed with Prejudice" for failure to show proof of Ownership of any claims against the property. It is further Ordered that GMAC Mortgage, LLC return all payments received by Kenneth Taggart on the above alleged loan in which it had no authorization to collect payments for. The payments collected shall be paid back in full as they were collected in the capacity as a fiduciary.

## Scheduling of Hearing

There is already a hearing date set of October 10, 2012 for the Motions to Void Pleadings & Sanctions; Kenneth Taggart requests the Motion be heard on the same date with no change in the hearing date or schedule.

Kenneth Taggart, Pro Se

September 25, 2012

# EXHIBIT "A"

GMAC/TAGGART USBC. SDNY 9.25.12

Phelan Hallinan & Schmieg, LLP
Lawrence T. Phelan, Esq., Id. No. 32227
Lawrence T. Phelan, Esq., Id. No. 32227
Francis S. Hallinan, Esq., Id. No. 62695
Daniel G. Schmieg, Esq., Id. No. 62205
Michele M. Bradford, Esq., Id. No. 69849
Judith T. Romano, Esq., Id. No. 58745
Sheetal R. Shah-Jani, Esq., Id. No. 81760
Jenine R. Davey, Esq., Id. No. 87077
Lauren R. Tabas, Esq., Id. No. 93337
Vivek Srivastava, Esq., Id. No. 202331
Jay B. Jones, Esq., Id. No. 86657
Peter J. Mulcahy, Esq., Id. No. 61791
Andrew L. Spivack, Esq., Id. No. 84439
Jaime McGuinness, Esq., Id. No. 90134
Chrisovalante P. Fliakos, Esq., Id. No. 94620
Joshua I. Goldman, Esq., Id. No. 205047
Courtenay R. Dunn, Esq., Id. No. 206779
Andrew C. Bramblett, Esq., Id. No. 208375
1617 JFK Boulevard, Suite 1400
One Penn Center Plaza
Philadelphia, PA 19103
215-563-7000

OFFICE OF THE
PROTHONOTARY
MONTGOMERY
MONTGOMERY COUNTY, PA

09 AUG 14 PM 2: 41

ATTORNEY FOR PLAINTIFF

213964

GMAC MORTGAGE, LLC
1100 VIRGINIA DRIVE
P.O. BOX 8300
FORT WASHINGTON, PA 19034

            Plaintiff

        v.

KENNETH TAGGART
521 COWPATH ROAD
TELFORD, PA 18969-7100
            Defendant

COURT OF COMMON PLEAS

CIVIL DIVISION

TERM

NO. 09-25338

MONTGOMERY COUNTY

## CIVIL ACTION - LAW
## COMPLAINT IN MORTGAGE FORECLOSURE

We hereby certify the
within to be a true and
correct copy of the
original filed of record

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:38 AM, Fee = $0.00

RECEIVED
09 AUG 17 AM 8: 45
OFFICE OF THE SHERIFF
MOT'G CO. OF PA

Filed # 213964

### NOTICE

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you, and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Services:
Montgomery Bar Association
100 West Airy Street
P.O. Box 268
Norristown, PA 19404
(610) 279-9660
(800) 560-5291

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:38 AM, Fee = $0.00





File #: 213984

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:38 AM, Fee = $0.00

1.    Plaintiff is

GMAC MORTGAGE, LLC
1100 VIRGINIA DRIVE, P.O. BOX 8300
FORT WASHINGTON, PA 19034

2.    The name(s) and last known address(es) of the Defendant(s) are:

KENNETH TAGGART
521 COWPATH ROAD
TELFORD PA 18969-7100

who is/are the mortgagor(s) and/or real owner(s) of the property hereinafter described.

3.    On 07/11/2008 mortgagor(s) made, executed and delivered a mortgage upon the premises

hereinafter described to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,

INCORPORATED AS A NOMINEE FOR LBA FINANCIAL GROUP, LLC. which

mortgage is recorded in the Office of the Recorder of MONTGOMERY County, in

Mortgage Book No. 12440, Page 01519. The PLAINTIFF is now the legal owner of the

mortgage and is in the process of formalizing an assignment of same. The mortgage and

assignment(s), if any, are matters of public record and are incorporated herein by

reference in accordance with Pa.R.C.P. 1019(g); which Rule relieves the Plaintiff from its

obligations to attach documents to pleadings if those documents are of public record.

4.    The premises subject to said mortgage is described as attached.

5.    The mortgage is in default because monthly payments of principal and interest upon said

mortgage due 04/01/2009 and each month thereafter are due and unpaid, and by the terms

of said mortgage, upon failure of mortgagor to make such payments after a date specified

by written notice sent to Mortgagor, the entire principal balance and all interest due

thereon are collectible forthwith.

File #:  213964

6.    The following amounts are due on the mortgage:

| | |
|---|---|
| Principal Balance | $655,405.27 |
| Interest | $19,526.10 |
| 03/01/2009 through 08/12/2009 | |
| (Per Diem $118.34) | |
| Attorney's Fees | $1,300.00 |
| Cumulative Late Charges | $1,762.16 |
| 07/11/2008 to 08/12/2009 | |
| Property Inspections | $16.88 |
| Cost of Suit and Title Search | $750.00 |
| Subtotal | $678,760.41 |
| Escrow | |
| Credit | $0.00 |
| Deficit | $6,916.42 |
| Subtotal | $6,916.42 |
| **TOTAL** | $685,676.83 |

7.    If the mortgage is reinstated prior to a Sheriff's Sale, the attorney's fee set forth above may be less than the amount demanded based on work actually performed. The attorney's fees requested are in conformity with the mortgage and Pennsylvania law. Plaintiff reserves its right to collect attorney's fees up to 5% of the remaining principal balance in the event the property is sold to a third party purchaser at Sheriff's Sale, or if the complexity of the action requires additional fees in excess of the amount demanded in the Action.

8.    Plaintiff is not seeking a judgment of personal liability (or an in personam judgment) against the Defendant(s) in the Action; however, Plaintiff reserves its right to bring a separate Action to establish that right, if such right exists. If Defendant(s) has/have received a discharge of personal liability in a bankruptcy proceeding, this Action of Mortgage Foreclosure is in no way an attempt to reestablish such personal liability discharged in bankruptcy, but only to foreclose the mortgage and sell the mortgaged premises pursuant to Pennsylvania Law.

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:38 AM, Fee = $0.00

File #: 213964

9.     The action does not come under Act 6 of 1974 because the original mortgage amount

exceeds the dollar amount provided in the statute.

10.     This action does not come under Act 91 of 1983 because the mortgage is FHA-insured.

WHEREFORE, PLAINTIFF demands an in rem Judgment against the Defendant(s) in the sum of

$685,676.83, together with interest from 08/12/2009 at the rate of $118.34 per diem to the date of

Judgment, and other costs and charges collectible under the mortgage and for the foreclosure and

sale of the mortgaged property.

PHELAN HALLINAN & SCHMIEG, LLP

By: *Jaime M. Guinness*
☐ Lawrence T. Phelan, Esq., Id. No. 32227
☐ Francis S. Hallinan, Esq., Id. No. 62695
☐ Daniel G. Schmieg, Esq., Id. No. 62205
☐ Michele M. Bradford, Esq., Id. No. 69849
☐ Judith T. Romano, Esq., Id. No. 58745
☐ Sheetal R. Shah-Jani, Esq., Id. No. 81760
☐ Jenine R. Davey, Esq., Id. No. 87077
☐ Lauren R. Tabas, Esq., Id. No. 93337
☐ Vivek Srivastava, Esq., Id. No. 202331
☐ Jay B. Jones, Esq., Id. No. 86657
☐ Peter J. Mulcahy, Esq., Id. No. 61791
☐ Andrew L. Spivack, Esq., Id. No. 84439
☑ Jaime McGuinness, Esq., Id. No. 90134
☐ Chrisovalante P. Fliakos, Esq., Id. No. 94620
☐ Joshua I. Goldman, Esq., Id. No. 205047
☐ Courtenay R. Dunn, Esq., Id. No. 206779
☐ Andrew C. Bramblett, Esq., Id. No. 208375
Attorneys for Plaintiff

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:38 AM, Fee = $0.00

File #:  213964

## VERIFICATION

The undersigned attorney hereby states that I am the attorney for the Plaintiff in this matter, that Plaintiff is outside the jurisdiction of the Court and/or the verification could not be obtained within the time allowed for the filing of the pleading, that I am authorized to make this verification pursuant to Pa.R.C.P. 1024 (c), and that the statements made in the foregoing Civil Action in Mortgage Foreclosure are based upon information supplied by Plaintiff and are true and correct to the best of my knowledge, information and belief.  Furthermore, counsel intends to substitute a verification from Plaintiff upon receipt.

The undersigned understands that this statement is made subject to the penalties of 18 Pa.C.S. Sec. 4904 relating to unsworn falsifications to authorities.

_____
Attorney for Plaintiff

DATE: __8-12-09__

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:38 AM, Fee = $0.00

File #: 213964

# EXHIBIT "B"

GMAC/TAGGART USBC. SDNY 9.25.12

# RECORDER OF DEEDS
## MONTGOMERY COUNTY
*Nancy J. Becker*

One Montgomery Plaza
Swede and Airy Streets ~ Suite 303
P.O. Box 311 ~ Norristown, PA 19404
Office: (610) 278-3289 ~ Fax: (610) 278-3869

**I hereby certify that the following is a true and correct
copy of the original document
recorded in Montgomery County, PA**



Certification signature by Montgomery County Recorder of Deeds
<montcoecertify@recordfusion.com> Validity Unknown



UNITED STATES
POSTAL SERVICE®
Electronic Postmark
Validation may require Adobe 'Windows Integration'

Receipt ID
10000kddtcj

eCertified copy of recorded # 2004164038 (page cover of 4)
Montgomery County Recorder of Deeds
Only valid with epm-signature on cover page



DE BK05521-2204                          DT-DEED
2004164038    08/12/2004 10 47 47 AM 1
RCD FEE $46 50 LCL TAX $5 297 47 ST TAX $5 297 47

                                    MONTGOMERY
                                    COUNTY ROD

34-FRANCONIA TOWNSHIP $5 297 47NANCY BECKER ROD

---

# DEED :

### Virginia R. Lattig, Trustee and John H. Van Dyke, Jr. Trustee under Revocable Trust Agreement for Margaret B. Van Dyke dated 5/10/2002

## TO:

### Kenneth Taggart

---

## PREMISES:

### 521 Cowpath Road
### Township of Franconia
### Montgomery COUNTY, PENNSYLVANIA
### CP #34-00-01078-00-4

---

AFTER RECORDING INSTRUMENT, PLEASE RETURN TO

### Suburban Abstract Affiliates, L.P.
### 7606 Castor Avenue
### Philadelphia, PA. 19152

### STA-55492-V

---

*The address of the above named Grantee is*

## 709 Schwab Rd
## Hatfield PA 19440
## aen

*On behalf of the Grantee*

2

eCertified copy of recorded # 2004164038 (page 1 of 4)
Montgomery County Recorder of Deeds
Only valid with epm-signature on cover page

STA-55492-V

**THIS INDENTURE MADE** the ___27___ day of ___July___
in the year of our Lord Two Thousand and Four   (2004)

**BETWEEN**

*Virginia R. Lattig, Trustee and John H. Van Dyke, Jr. Trustee under Revocable Trust
Agreement for Margaret B. Van Dyke dated 5/10/2002*

(hereinafter called the Grantor(s)), of the one part and

*Kenneth Taggart*

```
MONTGOMERY COUNTY COMMISSIONERS REGISTRY
34-00-01078-00-4  FRANCONIA
521 COWPATH RD
VAN DYKE MARGARET B TRUST
B 009  U 038 L  ____  I108  DATE. 08/12/04
```

(hereinafter called the Grantee(s)), of the other part,

**WITNESSETH,** That the said Grantor(s) for and in consideration of the sum of
_Five Hundred Twenty Nine Thousand Seven Hundred Forty Seven —_
Dollars,
($ _529747_ 00  ) lawful money of the United States of America, unto him, her, them
well and truly paid by the Grantee(s), at or before the sealing and delivery hereof, the receipt whereof is
hereby acknowledged, has/have granted, bargained and sold, released and confirmed and by these
presents do/does grant, bargain and sell, release and confirm unto the said Grantee(s), his, her, their heirs
and assigns, , in fee

ALL THAT CERTAIN messuage or tract of land with the improvements thereon erected, situate in the
Township of Franconia, County of Montgomery , and State of Pennsylvania, bounded and described
according to a recent plan and survey dated August 16, 1947 with revisions of October 3, 1951 as
prepared by Stanley F  Moyer, Registered Engineer and Land Surveyor, Souderton, PA, as follows, to
wit'-

BEGINNING at a spike in the center line of the Cowpath Road extending from the Harleysville-Telford
Pike to Earlington said spike being four hundred seventy-four and forty-three one-hundredths feet North
of the center line of Harleysville-Telford Pike, thence along the Cowpath Road North one degree thirty-
one minutes East the distance of two hundred eighty-one and sixty-five one-hundredths feet to an angle
point of the road, thence still along the same North thirty-nine degrees thirteen minutes West the distance
of six hundred forty-seven and two one-hundredths feet to a corner, thence along Tract #1A on said plan
intended to be conveyed to John R  Souder North seventy-nine degrees eleven minutes East the distance
of four hundred nineteen and nineteen one-hundredths feet to a corner in the center line of the creek
channel in line of lands of Preston Souder, thence along the same the next three courses and distances (1)

3


eCertified copy of recorded # 2004164038 (page 2 of 4)
Montgomery County Recorder of Deeds
Only valid with epm-signature on cover page

South thirty-eight degrees two minutes East the distance of one hundred ninety-one and eighty-eight one-hundredths feet to an iron pin, thence (2) North seventy-two degrees forty-seven minutes East the distance of three hundred two and forty-seven one-hundredths feet to an iron pin, thence (3) South twenty-five degrees seven minutes East the distance of six hundred forty-seven and thirty-nine one-hundredths feet to a corner of Telford Borough lands, thence along land now or late of Charles B Mininger South twenty-nine degrees fifty-two minutes East the distance of one hundred seven and fifty-eight one-hundredths feet to a corner, thence along Tract #1B on said plan other lands of grantor of which this was a part, South sixty-four degrees forty-seven minutes West the distance of five hundred nine and thirty-three one-hundredths feet to an iron pin a corner of lands of Wellington N Cassel thence along the same North seventy-five degrees sixteen minutes West the distance of three hundred seventeen and forty-seven one-hundredths feet to the place of BEGINNING

BEING Tract #1 on said Plan

BEING CP #34-00-01078-00-4

BEING THE SAME Premises, which Margaret B Van Dyke by Deed dated 10/17/2003 and recorded at Norristown by Recorder of Deeds, in and for the County of Montgomery on 6/3/2004 in Deed Book 5510 page 825, granted and conveyed unto Margaret B. Van Dyke, Trustee under Revocable Trust Agreement for Margaret B Van Dyke, Trust dated 5/10/2002, in fee.

**TOGETHER** with all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances whatsoever unto the hereby granted premises belonging, or in any wise appertaining and the reversions and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, claim and demand whatsoever of him, her, them the Grantor(s), as well at law as in equity, of, in, and to the same

**TO HAVE AND TO HOLD** the said lot or piece of ground described with the buildings and improvements thereon erected, hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances, unto the said Grantee(s), his, her, their heirs and assigns, to and for the only proper use and behoof of the said Grantee(s), his, her, their heirs and assigns, forever,

## UNDER AND SUBJECT TO RESTRICTIONS AS OF RECORD.

**AND** the said Grantor(s), for his, her their heirs, executors and administrators, do/does covenant, promise and agree to and with the Grantee(s), his, her, their heirs and assigns, by these presents, that the said Grantor(s) and his, her, their heirs, all and singular the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances, unto the Grantee(s), his, her, their heirs and assigns, against the said Grantor(s) and his, her, their heirs and against all and every person and persons whomsoever lawfully claiming or to claim the same or any part thereof, by, from or under him, her, them or any of them, shall and will Subject as aforesaid.

### WARRANT AND FOREVER DEFEND.

**In Witness Whereof,** the party/ies of the first part hereunto set his, her, their hand(s) and seal(s). Dated the day and year first above written

4

eCertified copy of recorded # 2004164038 (page 3 of 4)
Montgomery County Recorder of Deeds
Only valid with epm-signature on cover page


*Sealed and Delivered*
*in the presence of us:*

Virginia R. Lattig, Trustee

John H. Van Dyke, Jr. Trustee

**Commonwealth** Virginia
**County of** Franklin        **ss:**

On this, the 27 day of July, 2004, before me, a Notary Public for the Commonwealth of Pennsylvania, residing in the Virginia the undersigned Officer, personally appeared,
**Virginia R. Lattig, Trustee, under Revocable Trust Agreement for Margaret B. Van Dyke dated 5/10/2002**
known to me (satisfactorily proven) to be the person(s) whose name(s) is are subscribed to the within instrument, and acknowledged that he, she, they executed the same for the purposes therein contained.

*I hereunto set my hand and official seal.*



SUSAN W MOWERY
Notary Public
Commonwealth of Virginia
My Commission Exps July 31, 2007

*Notary Public*

**Commonwealth of Pennsylvania**
**County of** Montgomery        **ss:**

On this, the 28th day of July, 2004, before me, a Notary Public for the Commonwealth of Pennsylvania, residing in the the undersigned Officer, personally appeared,
**H. Van Dyke, Jr. Trustee under Revocable Trust Agreement for Margaret B. Van Dyke dated 5/10/2002**
known to me (satisfactorily proven) to be the person(s) whose name(s) is are subscribed to the within instrument, and acknowledged that he, she, they executed the same for the purposes therein contained.

*I hereunto set my hand and official seal*

*Notary Public*

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Debra L. Jakielaszek, Notary Public
Lower Salford Twp., Montgomery County
My Commission Expires Mar 27, 2008
Member, Pennsylvania Association of Notaries

eCertified copy of recorded # 2004164038 (page 4 of 4)
Montgomery County Recorder of Deeds
Only valid with epm-signature on cover page

# EXHIBIT "C"

GMAC/TAGGART USBC. SDNY 9.25.12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MONTGOMERY COUNTY, PENNSYLVANIA, RECORDER OF DEEDS, by and through NANCY J. BECKER, in her official capacity as the Recorder of Deeds of Montgomery County, Pennsylvania, on its own behalf and on behalf of all others similarly situated, | Civil Action<br><br>NO._____ |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| vs. | |
| MERSCORP, INC., and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC, | |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff, The Montgomery County, Pennsylvania, Recorder of Deeds Office, by and through Nancy J. Becker in her official capacity as the Recorder of Deeds of Montgomery County, Pennsylvania, on behalf of itself and all other similarly situated Pennsylvania County Recorder of Deeds Offices ("Plaintiff"), submits this Complaint (the "Complaint") against MERSCORP, Inc., and Mortgage Electronic Registration Systems, Inc. The allegations are asserted on information and belief after due investigation, except as to those matters which relate to Plaintiff and its own acts, which are asserted on personal knowledge.

1

## I.   <u>NATURE OF THE ACTION</u>

The Montgomery County, Pennsylvania, Recorder of Deeds office, by and through

Nancy J. Becker, the Montgomery County Recorder of Deeds, brings this action on its own

behalf and on behalf of a class of all other similarly situated Pennsylvania County Recorder of

Deeds Offices (collectively, the "Counties" or the "Class") against MERSCORP, Inc. and

Mortgage Electronic Registration Systems, Inc. ("Defendants" or "MERS") to remedy the

Defendants' illegal scheme to avoid paying fees associated with properly recording mortgages

and mortgage assignments in violation of Pennsylvania law.

Defendants, together with the major financial institutions which created the MERS

Defendants and benefit from their operation, created and maintain a private system designed to

avoid recording mortgage assignments and paying the associated fees.  MERS allows the

mortgage industry to "register" property transfers on its website.  Members, who are part of the

mortgage industry, pay membership dues and per-transaction fees to MERS.  In exchange,

MERS members are allowed to "record" property transfers and avoid the county recording

system in Pennsylvania and throughout the country.  Through the Defendants' electronic

recording system MERS engaged and continues to engage in deceptive practices that create

confusion amongst property owners, damage the integrity of Pennsylvania's land records, and

deny Plaintiff and the Class millions of dollars in uncollected fees.

By creating and maintaining a system that lacks corporate controls, oversight, and

reliability, Defendants systematically circumvented Pennsylvania recording law for which

Plaintiff and the Class seek damages and injunctive relief.

2

## II.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action under and pursuant to the Court's diversity jurisdiction.  28 U.S.C. § 1332(a)(1).  Defendants are citizens of Delaware and Virginia.  Plaintiff is a citizen of Pennsylvania.

2.     Venue in this Judicial District is proper under 28 U.S.C. § 1391(a)(2).  Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claims occurred within this District.

## III.   PARTIES

3.     Plaintiff is The Montgomery County, Pennsylvania, Recorder of Deeds Office, by and through Nancy J. Becker in her official capacity as the Recorder of Deeds of Montgomery County.  Plaintiff brings this action on its own behalf and on behalf of a class of all other similarly situated Pennsylvania County Recorder of Deeds Offices.

4.     Defendant MERSCORP, Inc. ("MERSCORP") is a Delaware corporation that maintains it principal place of business at 1818 Library Street, Suite 300, Reston, Virginia 20190.

5.     Defendant Mortgage Electronic Registration Systems, Inc. ("MERS"), a wholly-owned subsidiary of Defendant MERSCORP, is a Delaware corporation and maintains its principal place of business at 1818 Library Street, Suite 300, Reston, Virginia 20190.

6.     Defendants have at all times relevant to this litigation conducted business in the Commonwealth of Pennsylvania including in this Judicial District.

7.     Plaintiff reserves the right to join Defendants predecessors in interest after Plaintiff conducts sufficient discovery.  Moreover, Defendants may acquire other entities or may

divest itself of some operation and form new entities. Therefore, Plaintiff reserves the right to join new or different entities after sufficient discovery has been undertaken.

## IV.   FACTUAL BACKGROUND

### A.   Local Recording Laws

8.      As early as the 17th Century, American Colonies passed property recordation statutes, requiring a mortgagee (the party who makes the loan) to record mortgages or assignments or risk losing its ability to enforce the contract against a subsequent purchaser for value.

9.      The purpose of these recording statutes are, in the words of one commentator, "to prevent disputes over property rights and to facilitate the use of land as collateral by creating a transparent public record that provides certainty in private bargains." Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U. Cin. L. Rev. 1359, 1364-65 (2010). Specifically, mortgage lenders, when contemplating offering a loan secured by land, use recording indexes compiled by county recorders to ensure that debtors have not already sold the land, granted a mortgage to someone else, and that there are no liens on the property.

10.      All fifty states and the District of Columbia retain recording statutes similar to their colonial predecessors. Pennsylvania adopted its first recording act in 1717, which remains in force today.

11.      Pennsylvania law requires that "all deeds, conveyances, contracts, and other instruments of writing . . . shall be recorded in the office for the recording of deeds in the county where such lands . . ." are located. 21 Pa. Stat. § 351 (2011) (emphasis added). Unrecorded mortgages and mortgage assignments "shall be adjudged fraudulent and void as to any

4

subsequent bona fide purchaser or mortgagee or holder of any judgment, duly entered in the

prothonotary's office . . ." 21 Pa. Stat. § 351 (2011).

12.    The Pennsylvania Supreme Court has confirmed that Pennsylvania law

"recognizes mortgages as acting . . . as <u>conveyances.</u>" *Pines v Farrell*, 577 Pa. 564, 848 A.2d

94, 100 (2004)(emphasis added).

13.    From this conclusion, the Court stated that "it logically follows that an assignment

of the mortgagee's rights likewise effects a conditional transfer of the subject property to the

assignee." *Id.*

14.    Therefore, under Pennsylvania law a <u>conveyance</u> or property transfer includes

"mortgage assignments" which are subject to the recordation statute. *Id.* at 101.

### B.    The Mortgage Electronic Registration Systems, Inc.

15.    MERS was created in the mid-1990s by the mortgage industry to facilitate the

growing industry practice of selling residential mortgages for securitization in complex

investment vehicles known as mortgage backed securities ("MBS"). MERS also was formed for

the express purpose of avoiding fees traditionally due to county recorders of deeds when sales or

assignments of mortgages were made. In 1997, MERS' former CEO said that "MERS is owned

and operated by and for the mortgage industry" and stressed that its express purpose was to

circumvent recording assignments and paying fees to recorders of deeds in connection with such

recording. In filings from this year, MERS has affirmed that it exists to "eliminate the need for

frequent, recorded assignments of subsequent transfers." As a result, MERS, and the mortgage

industry it serves, have failed to pay tens of millions of dollars in fees to the county offices and

vitiated the time honored public recording system.

16.    Although MERS has no employees it has 5,000 member institutions and 20,302

certifying officers. Approximately 65 million mortgage loans in the United States name MERS

as original mortgagee and nominee of a lender. There are over 130,000 mortgages recorded in

Montgomery County, Pennsylvania naming MERS as the mortgagee since 2004 alone. There

are currently over 31 million active loans registered on the MERS system. To become a

member, a mortgage company can purchase the Defendants' corporate seal for their signing

officers at a cost of $25 each. Thereafter, member companies can have their employees interact

with other MERS members and transfer mortgages.

17.     MERS purports to maintain a computer database designed to track servicing and

ownership rights of mortgage loans throughout the United States. MERS certifying officers are

permitted to record changes in ownership of notes with an "electronic handshake." Certifying

officers are officials from MERS member institutions that can enter transactions in MERS'

system. The electronic handshake occurs on the MERS' system after a certifying officer of one

party enters the transaction and a certifying officer of the other party confirms the transaction.

MERS members are not required to update the database. In deposition testimony, MERS'

former CEO said that the system "is capable of being used to track [beneficial ownership

interests] if the members utilize it for that reason." When pressed on whether MERS expects

financial institutions to update the MERS database regarding changes in loan ownership, the

former CEO replied, "not so much . . ."

18.     One observer explained how individuals become MERS certifying officers:

> "MERS invites financial companies to enter names of their own
> employees into a MERS webpage that then automatically regurgitates
> boilerplate corporate resolutions that purport to name the employees of
> other companies as certifying officers of MERS. These certifying officers
> also take job titles from MERS and stylize themselves as either assistant
> secretaries or vice presidents of MERS . . . These employees of the
> servicers, debt collectors, and law firms sign documents pretending to be
> vice presidents or assistant secretaries of MERS, Inc. even though neither
> MERSCORP, Inc. nor MERS, Inc. pays any compensation or provides
> benefits to them. Astonishingly, MERS "vice presidents" are simply

6

paralegals, customer service representatives, and foreclosure attorneys employed by other companies. MERS even sells its corporate seal to nonemployees on its internet web page for $25.00 each. Ironically, MERS, Inc. — a company that nominally owns 60% of the nation's residential mortgages — does not have any of its own employees but still purports to have over twenty thousand assistant secretaries and vice presidents."

Christopher Peterson, *Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory* (Sept. 19, 2010),

http://papers.ssrn.com/sol13/papers.cfm?abstract_id=1684729; then follow "One-Click Download."

19.    In deposition testimony, Jeffrey Stephan, who is a MERS' certifying officer revealed that he executed roughly 10,000 affidavits a month. Mr. Stephan held two MERS job titles, received no training from MERS, received no compensation from MERS, did not attend board meetings of MERS, and did not report to anyone at MERS.

20.    Recently, in response to MERS' poor practices, several federal agencies entered a consent decree with MERSCORP, Inc., which stated that MERS and MERSCORP:

(a)    have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; and

(b)    have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services to Examined Members.

Because of this conduct, the consent order states, "MERS and MERSCORP engaged in unsafe or unsound practices that expose them and Examined Members to unacceptable operational, compliance, legal, and reputational risks." *MERSCORP. Inc., and the Mortgage Elec. Sys., Inc., Reston, Va.,* OCC No. AA-EC-11-20, p. 5 (April 12, 2011), available at:

http://www.scribd.com/doc/61286937/OCC-Consent-Order-MERS

21.    MERS' avoidance of filing mortgage assignments resulted in the loss of millions of dollars to county governments. In the Commonwealth of Pennsylvania alone, Plaintiff estimates that over $100 million was lost in recording fees. Recording fees are allocated to maintain the county recorders' records as well as fund other county services such as children and youth services, veterans affairs, health centers, and housing assistance.

22.    State and local entities across the nation are bringing suit to rein in Defendants' deceptive conduct. Recently, The Delaware Attorney General's Office brought suit against MERS for deceiving the public, stating that Defendants designed a company with few internal controls, foreclosing on mortgages in which they do not have authority to act, and assigning mortgages without the authorization to do so. Del. comp. in *State of Delaware v. MERS et al. in the Court of Chancery of the State of Delaware,* Case No. 6987 (Oct. 27, 2011) at para. 71, 73,75, 83. Delaware experiences the same deceptive trade practices that plague Pennsylvania. As noted in the Delaware Complaint, MERS engaged and continues to engage in deceptive practices that "sow confusion among consumers, investors, and other stakeholders in the mortgage finance system, damage the integrity of Delaware's law records, and lead to unlawful foreclosure practices." *Id.* at para. 3. In addition, lawsuits have been filed against MERS on behalf of county recording offices in Kentucky, Ohio, California, and Tennessee.

8

### C.   Securitization

23.     Beginning in the 1990s, securitization of mortgages became more common. Mortgage lenders would originate as many residential mortgage loans as possible and then sell them to various banks and financial institutions. Those banks and financial institutions would pool the mortgages into trusts for sale to investors as mortgage-backed securities.

24.     To securitize a mortgage several assignments must be made: (A) The mortgage lenders as the originating lender sell mortgages (promissory note and mortgage documents) to a sponsor. The sponsor is a special purpose entity affiliated with a bank or financial institution. (B) The sponsor initiates the securitization by transferring (i.e. assigning) the mortgage to a depositor. (C) The depositor then transfers the mortgage to a "special purpose vehicle" (usually a trust) where the mortgages are then sold to investors.

25.     The securitization process requires three assignments. Under Pennsylvania law, these assignments are conveyances and must be recorded.

26.     In reality, members of MERS might record the initial mortgage but as their practice, fail to record all subsequent assignments. Many such mortgages have been sold and assigned on multiple occasions, but there is no recording of these conveyances in the public record.

27.     MERS members often only record a mortgage assignment in county recording offices when they are attempting to assign the mortgage from MERS to another entity in connection with initiating foreclosure proceedings. Before this final assignment takes place there might be two, three, or a dozen assignments that are not recorded. The final assignment from MERS to a member of the mortgage industry typically occurs prior to a terminating event-foreclosure or satisfaction of the mortgage.

28.     When this final assignment takes place, Defendants have already allowed MERS'
members to circumvent recording multiple assignments. This creates gaps in the record of
ownership. While the foreclosing entity claims to hold title to the property their rights to the
property are in question.

29.     Gaps in title cloud ownership, increase questions about foreclosure procedures,
and raise doubts on the accurate satisfaction of mortgages, all of which undermine the time
honored recording requirements in Pennsylvania and throughout the country.

## V.     CLASS ACTION ALLEGATIONS

30.     Plaintiff requests that the Court certify this case as a Class Action pursuant to Fed.
R. Civ. P. 23.

31.     Plaintiff seeks to certify a Class of "All Pennsylvania counties where Defendants
from 1995 to the present, have failed to record mortgage assignments and pay all associated
recording fees for such recording of mortgages."

32.     The Plaintiff Class meets the prerequisites for the maintenance of a Class Action
in that:

> (a)  The Plaintiff Class is so numerous that joinder of all Class Members
>       is impracticable. The practices complained of caused damage to most
>       if not all of Pennsylvania's 67 counties;
>
> (b)  The claims of the named party are common of the claims or of the
>       class, including whether Defendants can lawfully create an alternative
>       mortgage recording system that prevents the recording of mortgage
>       assignments;

(c)   The claims of the named party are typical of the claims of the class.
Whether Defendants violated Pennsylvania law requiring the proper
recording of mortgage assignments is typical of all class members and
ensures that the interests of absent class members will be fairly
represented;

(d)   The representative parties will fairly and adequately assert and protect
the interests of the class under the criteria set forth in Fed. R. Civ. P.
23. The attorneys for the representative parties are skilled in class
action matters. There is no conflict of interest between the parties
who are uniform in their pursuit of damages for Defendants alleged
violations of Pennsylvania law. Through the course of this action,
Plaintiff has adequate financial resources to ensure that the interests
of the class will not be harmed.

(e)   A class action provides a fair and efficient method for adjudication of
the controversy under the criteria set forth in Fed. R. Civ. P. 23. The
class consists of common questions of law or fact which predominate
over any questions affecting only individual members: (1) whether
Defendants violated 21 P.S. § 351; (2) whether Defendants conspired
to violate 21 P.S. § 351; (3) whether Defendants were unjustly
enriched by their conduct; (4) whether the Plaintiff is entitled to an
order declaring that these practices, as described above, are in
violation of 21 P.S. § 351; and (5) the appropriate amount of damages
and other relief to be granted to Plaintiffs. Due to the size of the

11

class, a class action is superior to other available methods for the fair

and efficient adjudication of this controversy. The prosecution of

separate actions by or against individual members of the class would

create a risk of inconsistent or varying adjudications with respect to

individual members of the class. Individual adjudications would

confront the Defendants with incompatible standards of conduct. This

class action will adjudicate claims of individual members of the class,

which as a practical matter would be dispositive of the interests of

other members of the class not a party to the suit. Individual litigation

magnifies the delay and expense to all parties and drains judicial

resources. Finally, the equitable and declaratory relief sought asking

Defendants to refuse to act on certain grounds is applicable to the

entire class.

33.     The Plaintiff contemplates the eventual issuance to the proposed Class Members

of a notice setting forth the subject and nature of the instant action.

## CAUSES OF ACTION

## COUNT I - NEGLIGENT AND/OR WILLFUL VIOLATION OF 21 P.S. § 351

34.     The Plaintiff hereby realleges and incorporates the allegations contained in

paragraphs 1-33 above as if fully set forth herein.

35.     The Defendants knew or showed reckless disregard for duties they had under the

law. The intent of the recording statute was to protect the residents of Pennsylvania from the

execution of fraudulent deeds and to maintain a public and accurate record of real property

ownership and encumbrances. Defendants' disregarded the statute, deliberately failing to

12

properly record mortgages and to pay the associated recording fees. Due to Defendants direct

actions the intent of the statute was substantially frustrated, causing Plaintiff and the Class a loss

of millions of dollars in recording fees and rendering the public recording system inaccurate and

incomplete.

36.     As a proximate result of the Defendants' negligent and willful violations

of 21 P.S. § 351, Plaintiff and the Class were damaged in an amount to be ascertained at trial.

## COUNT II - CIVIL CONSPIRACY TO VIOLATE 21 P.S. § 351

37.     The Plaintiff hereby realleges and incorporates the allegations contained in

paragraphs 1-36 above as if fully set forth herein

38.     Defendants in this action have conspired with other unnamed co-conspirators to

violate the provisions of 21 P.S. § 351.

39.     Defendants acted in combination to create an alternative mortgage recording

system, outside of public view, with the specific purpose of unlawfully failing to record

assignments of mortgages and paying the associated fees.

40.     As a proximate result of the Defendants' Conduct, Plaintiff and the Class were

damaged in an amount to be ascertained at trial.

## COUNT III - UNJUST ENRICHMENT

41.     The Plaintiff hereby realleges and incorporates the allegations contained in

paragraphs 1-40 as if fully set forth herein.

42.     Based upon Defendants' wrongful conduct, Plaintiff and the Class seek to recover

in equity monies held by Defendants that belong to Plaintiff and the Class.

43.     Plaintiff conferred benefits on the Defendants. The Defendants appreciated those

benefits. Defendants retention of those benefits without payment will produce an inequitable

result.  Defendants enjoyed the benefit of avoiding the payment of recording fees.  These benefits amounted to millions of dollars in money due to the counties.  The plaintiff, under Pennsylvania law, has the authority to collect these overdue fees.  In addition, when Defendants circumvented the county recording system they were able to benefit from the appearance of holding good title on thousands of properties.  Without recording these assignments Plaintiff is denied an accurate accounting of property transfers throughout Pennsylvania.  Defendants' acceptance of these benefits and failure to compensate Plaintiff resulted in an unconscionable bargain.

44.    Prior to Defendants' actions, the recording indexes of the counties provided a transparent public record that promoted open and vibrant commercial activity by enabling potential mortgage purchasers to know with certainty whether they could obtain clear title to land.  Recording the assignments will assist in clearing title to the relevant properties.  The Plaintiff and the Class is entitled to all such monies based on the general principles of equity and good conscience.

45.    Plaintiff and the Class seek equitable remedies to prevent the unjust enrichment of Defendants by causing payment to Plaintiff and the Class of all mortgage assignment fees wrongfully avoided by the Defendants in addition to interest, attorneys' costs and fees, and, exemplary damages as allowed by law and equity.

## COUNT IV- DECLARATORY JUDGMENT AND PERMANENT INJUNCTION FOR DEFENDANTS FAILURE TO RECORD MORTGAGE ASSIGNMENT WAS A VIOLATION OF 21 P.S. § 351

46.    The Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1-45 as if fully set forth herein

47.    This is an action against Defendants for a declaratory judgment pursuant to 28 U.S.C. § 2201 (2010) and for a permanent injunction.

48.    As a result of Defendants' actions, the Plaintiff and the Class are uncertain about the true holders of title to property because of unrecorded mortgage assignments.

49.    Plaintiff seeks clarification about the assignment of mortgages to restore order to the property records in recorders' offices throughout the Commonwealth.

50.    The Plaintiff and the Class have a bona fide, actual, imminent, present and practical need for a declaration that deeds without properly recorded assignments are fraudulent, and that, if Defendants want to claim the benefits of the recording process and hold good title to properties, they must record all mortgage assignment and pay the accompanying fees.

51.    Defendants acted inequitably toward the Plaintiff and the Class by representing that all mortgages were properly recorded. On the contrary, Defendants did not record the necessary mortgage assignments nor pay the counties for the services they provide, which are preconditions for enjoying the benefits offered by the county recording system.

52.    Defendants inequitable actions have, among other things, allowed them to save millions of dollars.

53.    The Plaintiff and the Class seek a declaratory judgment and a permanent injunction requiring Defendants to properly record in the public record, any and all assignments of mortgages known to MERS.

## JURY DEMAND

Plaintiff hereby requests, on behalf of itself and the Plaintiff Class, a trial by jury on all issues so triable in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following on behalf of itself and the Plaintiff Class:

    (a)  For certification of the plaintiff class pursuant to Fed. R. Civ. P. 23;

    (b)  For judgment against Defendants and in favor of Plaintiff and the Plaintiff Class on all causes of action asserted in this Complaint;

    (c)  Compensatory damages;

    (d)  Restitution and disgorgement of all monies due and owing to the Plaintiff and Plaintiff Class;

    (e)  A declaration and determination by the Court of the rights, duties and remedies for the failure to record mortgage assignments and pay the accompanying fees;

    (f)  A mandatory injunction requiring Defendants to record all prior assignments that Defendants failed to record in county record's offices throughout Pennsylvania;

    (g)  For costs of suit incurred herein;

    (h)  For pre-judgment interest to the extent allowed by law;

    (i)  For penalties as alleged in this Complaint;

    (j)  For reasonable and necessary attorneys' fees; and,

(k)  For such other and further relief as this Court may deem just and proper.


DATED:  November 7, 2011

_____
Joseph C. Kohn, Esquire (PA. Bar No. 36565)
Robert J. LaRocca, Esquire
Jared G. Solomon, Esquire
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107-3304
Phone:  (215) 238-1700
Facsimile:  (215) 238-1968

Jeffrey D. Schaffer, Esquire
COOPER & SCHAFFER, LLC
815 Greenwood Avenue, Suite 22
Jenkintown, PA. 19046-2800
Phone:  (215) 887-6850

*Attorneys for Plaintiff and the Class*

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

*MERS COMPLAINT*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
See Attached Sheet

## DEFENDANTS
Merscorp, Inc., and Mortgage Electronic Registration Systems, Inc.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Reston, Virginia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
See Attached Sheet

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332 (a)(1)
Brief description of cause:
Violations related to 21 Pa. STat. §351 (2011) and Pennsylvania Common law

## VII. REQUESTED IN COMPLAINT:
☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____   DOCKET NUMBER _____

DATE  11/7/11

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

MONTGOMERY COUNTY, PENNSYLVANIA, RECORDER OF DEEDS, by and through NANCY J. BECKER, in her official capacity as the Recorder of Deeds of Montgomery County, Pennsylvania, on its own behalf and on behalf of all others similarly situated,

        Plaintiff,

MERSCORP, INC., and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC,

        Defendants.

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Office of Recorder of Deeds, One Montgomery Plaza 3rd fl., Swede and Airy Stre

Address of Plaintiff: P.O. Box 311, Norristown, PA 19404-0311

Address of Defendant: 1818 Library Street, Suite 300, Reston, Virginia 20190

Place of Accident, Incident or Transaction: _____
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☐  No ☒

Does this case involve multidistrict litigation possibilities?    Yes ☒  No ☐

*RELATED CASE, IF ANY:*

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐  No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?    Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐  No ☒

**CIVIL:** (Place ✔ in ONE CATEGORY ONLY)

**A.** *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify)

**B.** *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify)

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, **Joseph C. Kohn, Esquire**, counsel of record do hereby certify:
☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: November 7, 2011    _____    36565
Attorney-at-Law    Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: November 7, 2011    _____    36565
Attorney-at-Law    Attorney I.D.#

CIV. 609 (6/08)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

CIVIL ACTION

SEE ATTACHED SHEET                                :

                          v.                       :

                                                   :                    NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                           ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                       (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.           ( )


| November 7, 2011 | _Jonne W.___ | Plaintiff and the Plaintiff Class |
|---|---|---|
| Date | Attorney-at-law | Attorney for |
| (215) 238 1700 | (215) 238 1968 | jkohn@kohnswift.com |
| Telephone | FAX Number | E-Mail Address |

(Civ. 660) 10/02

MONTGOMERY COUNTY, PENNSYLVANIA, RECORDER OF DEEDS, by and through NANCY J. BECKER, in her official capacity as the Recorder of Deeds of Montgomery County, Pennsylvania, on its own behalf and on behalf of all others similarly situated,

                Plaintiff,

    vs.

MERSCORP, INC., and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC,

                Defendants.

# EXHIBIT "D"

GMAC/TAGGART USBC. SDNY 9.25.12

(Page 5 of 45)

Case# 2009-25336-173 Received at Montgomery County Prothonotary on 01/04/2012 11:50 AM, Fee = $0.00

MTG BK 12714 PG 00482 to 00485

MTG BK 12714 PG 00482 to 00485
INSTRUMENT # : 2009106497
RECORDED DATE: 10/06/2009 09:48:49 AM



8895951-0845X



**RECORDER OF DEEDS**
MONTGOMERY COUNTY
*Nancy J. Becker*

One Montgomery Plaza
Swede and Airy Streets ~ Suite 303
P.O. Box 311 ~ Norristown, PA 19404
Office: (610) 278-3289 ~ Fax: (610) 278-3869

**MONTGOMERY COUNTY ROD**

**OFFICIAL RECORDING COVER PAGE**                Page 1 of 4

| | |
|---|---|
| Document Type:  Mortgage Assignment | Transaction #: 758956 - 1 Doc(s) |
| Document Date:  08/17/2009 | Document Page Count: 3 |
| Reference Info: | Operator Id: cbrown |
| RETURN TO:  (Mail) | SUBMITTED BY: |
| PHELAN, HALLINAN & SCHMIEG | J A M TRANSFERS, INC |
| ONE PENN CENTER | 106 S CEDAR HOLLOW RD |
| SUITE 1400 | PAOLI, PA 19301 |
| PHILADELPHIA, PA 19103-1814 | |

**\* PROPERTY DATA:**

Parcel ID #:        34-00-01078-00-4
Address:              521 COWPATH RD

                          PA

Municipality:
School District:

**\* ASSOCIATED DOCUMENT(S):**

MTG BK 12440 PG 0151S

| FEES / TAXES: | | MTG BK 12714 PG 00482 to 00485 |
|---|---|---|
| Recording Fee:Mortgage Assignment | $40.50 | Recorded Date: 10/06/2009 09:48:49 AM |
| Rejected Document Fee | $5.00 | |
| Total: | $45.50 | |

I hereby CERTIFY that
this document is
recorded in the
Recorder of Deeds
Office in Montgomery
County, Pennsylvania.



*Nancy J Becker*
Nancy J. Becker
Recorder of Deeds

# PLEASE DO NOT DETACH

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always supersedes.
\*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION.

Prepared By:    Phelan Hallinan & Schmieg, LLP
Prepared By:    Phelan Hallinan & Schmieg, LLP
                1617 JFK Boulevard, Suite 1400, One Penn Center Plaza
                Philadelphia, PA 19103

Return To:      Phelan Hallinan & Schmieg, LLP
                1617 JFK Boulevard, Suite 1400, One Penn Center Plaza
                Philadelphia, PA 19103
                ryan.galvin@fedphe.com

                            MONTGOMERY COUNTY COMMISSIONERS REGISTRY
                            34-00-01078-00-4  FRANCONIA
                            521 COWPATH RD
                            TAGGERT KENNETH                         $10.00
CPN:            34-00-01078-00-4    B 009  U 038 L  1134  DATE: 09/02/2009    JO

## ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS that "Mortgage Electronic Registration Systems, Inc." hereinafter "Assignor" the holder of the Mortgage hereinafter mentioned, for and in consideration of the sum of ONE DOLLAR ($1.00) lawful money unto it in hand paid by GMAC MORTGAGE, LLC, "Assignee," the receipt whereof is acknowledged, has granted, bargained, sold, assigned, transferred and set over unto the said Assignee, its successors and assigns, ALL THAT CERTAIN Indenture of Mortgage given and executed by KENNETH TAGGART to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED AS A NOMINEE FOR LBA FINANCIAL GROUP, LLC., bearing the date 07/11/2008, in the amount of $659,648.00, together with the Note and indebtedness therein mentioned, said Mortgage being recorded on 07/23/2008 in the County of MONTGOMERY, Commonwealth of Pennsylvania, in Mortgage Book 12440 Page 01519, MIN: 100590400050026018.

Being Known as Premises: 521 COWPATH ROAD, TELFORD, PA 18969-7100
Parcel No: 34-00-01078-00-4

The transfer of the mortgage and accompanying rights was effective at the time the loan was sold and consideration passed to the Assignee. This assignment is solely intended to describe the instrument sold in a manner sufficient to put third parties on public notice of what has been sold.

Also the Bond or Obligation in the said Indenture of Mortgage recited, and all Moneys, Principal and Interest, due and to grow due thereon, with the Warrant of Attorney to the said Obligation annexed. Together with all Rights, Remedies and incidents thereunto belonging. And all its Right, Title, Interest, Property, Claim and Demand, in and to the same:

TO HAVE, HOLD, RECEIVE AND TAKE, all and singular the hereditaments and premises granted and assigned, or mentioned and intended so to be, with the appurtenances unto Assignee, its successors and assigns, to and for its only proper use, benefit and behoof forever; subject, nevertheless, to the equity of redemption of said Mortgagor in the said Indenture of Mortgage named, and his/her/their heirs and assigns therein.

IN WITNESS WHEREOF, the said "Assignor" has caused its Corporate Seal to be herein affixed and these presents to be duly executed by its proper officers this 17th day of _____August_____, 20 09

Mortgage Electronic Registration Systems, Inc.

Sealed and Delivered
in the presence of us;                      By: _____Michele M_____

                                            Michele M. Bradford, Assistant Secretary and Vice President
State of Pennsylvania
                              : ss.
County of Philadelphia        :

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:58 AM, Fee...

2009 OCT -5 AM 11:18
RECORDER OF DEEDS
MONTGOMERY COUNTY

2009 SEP -2 AM 10: 06
RECORDER OF DEEDS
MONTGOMERY COUNTY

On this 17th day of August, 2009 before me, the subscriber, personally appeared
Michele M. Bradford, who acknowledged herself to be the Assistant Secretary and Vice President of Mortgage
Electronic Registration Systems, Inc., and that she, as such Assistant Secretary and Vice President, being authorized to
do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Stamp/Seal:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANGELA M. McFADDEN, Notary Public
City of Philadelphia, Phila. County
My Commission Expires March 18, 2013

_Angela McFadden_
Notary Public

The precise address of the within named
Assignee is:
1100 VIRGINIA DRIVE, P.O. BOX 8300
FORT WASHINGTON, PA 19034
By:_____
(For Assignee)

After recording return to:
Phelan Hallinan & Schmieg, LLP
1617 JFK Boulevard, Suite 1400
One Penn Center Plaza
Philadelphia, PA 19103

August 15, 2009
Document Execution
0602083957
PHS # 213964

Case# 2009-25338-173 Received at Montgomery County Prothonotary on 01/04/2012 11:38 AM, Fee = $0.00

ALL THAT CERTAIN messuage or tract of land with the improvements thereon erected, situate in the Township of Franconia, County of Montgomery, and State of Pennsylvania, bounded and described according to a recent plan and survey dated August 16, 1947 with revisions of October 3, 1951 as prepared by Stanley F Moyer, Registered Engineer and Land Surveyor, Souderton, PA, as follows, to wit -

BEGINNING at a spike in the center line of the Cowpath Road extending from the Harleysville-Telford Pike to Barlington said spike being four hundred seventy-four and forty-three one-hundredths feet North of the center line of Harleysville-Telford Pike, thence along the Cowpath Road North one degree thirty-one minutes East the distance of two hundred eighty-one and sixty-five one-hundredths feet to an angle point of the road, thence still along the same North thirty-nine degrees thirteen minutes West the distance of six hundred forty-seven and two one-hundredths feet to a corner, thence along Tract #1A on said plan intended to be conveyed to John R Souder North seventy-nine degrees eleven minutes East the distance of four hundred nineteen and nineteen one-hundredths feet to a corner in the center line of the creek channel in line of lands of Preston Souder, thence along the same the next three courses and distances (1) South thirty-eight degrees two minutes East the distance of one hundred ninety-one and eighty-eight one-hundredths feet to an iron pin, thence (2) North seventy-two degrees forty-seven minutes East the distance of three hundred two and forty-seven one-hundredths feet to an iron pin, thence (3) South twenty-five degrees seven minutes East the distance of six hundred forty-seven and thirty-nine one-hundredths feet to a corner of Telford Borough lands, thence along land now or late of Charles B Mininger South twenty-nine degrees fifty-two minutes East the distance of one hundred seven and fifty-eight one-hundredths feet to a corner, thence along Tract #1B on said plan other lands of grantor of which this was a part, South sixty-four degrees forty-seven minutes West the distance of five hundred nine and thirty-three one-hundredths feet to an iron pin a corner of lands of Wellington N Cassel thence along the same North seventy-five degrees sixteen minutes West the distance of three hundred seventeen and forty-seven one-hundredths feet to the place of BEGINNING

BEING Tract #1 on said Plan

BEING CP #34-00-01078-00-4

BEING THE SAME Premises, which Margaret B Van Dyke by Deed dated 10/17/2003 and recorded at Norristown by Recorder of Deeds, in and for the County of Montgomery on 6/3/2004 in Deed Book 5510 page 825, granted and conveyed unto Margaret B. Van Dyke, Trustee under Revocable Trust Agreement for Margaret B Van Dyke, Trust dated 5/10/2002, in fee.

# EXHIBIT "E"

GMAC/TAGGART USBC. SDNY 9.25.12



**GEORGETOWN LAW**
**The Scholarly Commons**

2010

# Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcomm. on Hous. and Cmty. Opportunity of the H. Fin. Serv. Comm., 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Geo. U. L. Center)

Adam J. Levitin
*Georgetown University Law Center, ajl53@law.georgetown.edu*

This paper can be downloaded free of charge from:
http://scholarship.law.georgetown.edu/cong/111

This open-access article is brought to you by the Georgetown Law Library. Posted with permission of the author.



GEORGETOWN UNIVERSITY LAW CENTER

*Adam J. Levitin*
*Associate Professor of Law*

**Written Testimony of**

**Adam J. Levitin**
**Associate Professor of Law**
**Georgetown University Law Center**

Before the
House Financial Services Committee
Subcommittee on Housing and Community Opportunity

"Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing"

November 18, 2010
10:00 am

### Witness Background Statement

**Adam J. Levitin** in an Associate Professor of Law at the Georgetown University Law Center, in Washington, D.C., and Robert Zinman Scholar in Residence at the American Bankruptcy Institute. He also serves as Special Counsel to the Congressional Oversight Panel and has been the Robert Zinman Scholar in Residence at the American Bankruptcy Institute.

Before joining the Georgetown faculty, Professor Levitin practiced in the Business Finance & Restructuring Department of Weil, Gotshal & Manges, LLP in New York, and served as law clerk to the Honorable Jane R. Roth on the United States Court of Appeals for the Third Circuit.

Professor Levitin holds a J.D. from Harvard Law School, an M.Phil and an A.M. from Columbia University, and an A.B. from Harvard College.

Professor Levitin has not received any Federal grants nor has he received any compensation in connection with his testimony. The views expressed in Professor Levitin's testimony are his own and do not represent the positions of the Congressional Oversight Panel.

## EXECUTIVE SUMMARY

The US is now in its forth year of a mortgage crisis in which over 3 million families have lost their homes and another 2.5 million are currently scheduled to lose theirs. Repeated government loan modification or refinancing initiatives have failed miserably. To this sad state of affairs, there now come a variety of additional problems: faulty foreclosures due to irregularities ranging from procedural defects (including, but not limited to robosigning) to outright counterfeiting of documents; predatory servicing practices that precipitate borrower defaults and then overcharge for foreclosure services that are ultimately paid for by investors; and questions about the validity of transfers in private-label mortgage securitizations. While the extent of these problems is unknown at present, the evidence is mounting that they are not limited to one-off cases, but that there may be pervasive defects throughout the mortgage servicing and securitization processes.

The servicing problems stem from servicers' failed business model. Servicers are primarily in the transaction processing business and are failing miserably at trying to adapt themselves to the loan modification business. Servicers' business model also encourages them to cut costs wherever possible, even if this involves cutting corners on legal requirements, and to lard on junk fees and in-sourced expenses at inflated prices. The financial incentives of mortgage servicers also encourage them to foreclose, rather than modify loans in many cases, even when modification would maximize the net present value of the loan for investors.

The chain of title problems are highly technical, but they pose a potential systemic risk to the US economy. If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever. The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law. If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts, which would cloud title to nearly every property in the United States and would create contract rescission/putback liabilities in the trillions of dollars, greatly exceeding the capital of the US's major financial institutions.

These problems are very serious. At best they present problems of fraud on the court, clouded title to properties coming out of foreclosure, and delay in foreclosures that will increase the shadow housing inventory and drive down home prices. At worst, they represent a systemic risk that would bring the US financial system back to the dark days of the fall of 2008.

Congress would do well to ensure that federal regulators are undertaking a thorough investigation of foreclosure problems and to consider the possibilities for a global settlement of foreclosure problems, loan modifications, and the housing debt overhang on consumers and financial institutions that stagnate the economy and pose potential systemic risk.

Madam Chairwoman, Members of the Committee:

Good morning. My name is Adam Levitin. I am an Associate Professor of Law at the Georgetown University Law Center in Washington, D.C., where I teach courses in bankruptcy, commercial law, contracts, and structured finance. I also serve as Special Counsel to the Congressional Oversight Panel for the Troubled Asset Relief Program. The views I express today are my own, however.

We are now well into the fourth year of the foreclosure crisis, and there is no end in sight. Since mid-2007 around eight million homes entered foreclosure,[1] and over three million borrowers lost their homes in foreclosure.[2] As of June 30, 2010, the Mortgage Bankers Association reported that 4.57% of 1-4 family residential mortgage loans (roughly 2.5 million loans) were currently in the foreclosure, process a rate more than quadruple historical averages. (See Figure 1.) Additionally, 9.85% of mortgages (roughly 5 million loans) were at least a month delinquent.[3]

**Chart 1:  Percentage of 1-4 Family Residential Mortgages in Foreclosure[4]**



— All Delinquent Loans — In Foreclosure

Private lenders, industry associations, and two successive administrations have made a variety of efforts to mitigate the crisis and encourage loan modifications and refinancings. A series of much hyped initiatives, such as the FHASecure refinancing program and the Hope4Homeowners have all met what can charitably be described as limited success. FHASecure, predicted to help 240,000 homeowners,[5] assisted only a few thousand borrowers

---

[1] HOPE Now Data Reports.
[2] Id.
[3] Mortgage Bankers Association, National Delinquency Survey.
[4] Mortgage Bankers Association, National Delinquency Surveys.
[5] See, e.g., Press Release, US Dep't of Housing and Urban Development, Bush Administration to Help Nearly One-Quarter of a Million Homeowners Refinance, Keep Their Homes; FHA to implement new "FHASecure" refinancing product (Aug. 31, 2007), available at http://www.hud.gov/news/release.cfm?content=pr07-123.cfm; Press Release, US Dep't of Housing and Urban Development, FHA Helps 400,000 Families Find Mortgage Relief; Refinancing on pace to help half-million homeowners by year's end (Oct. 24, 2008), available at http://www.hud.gov/news/release.cfm?content=pr08- 167.cfm.

before it wound down,[6] while Hope4 Homeowners, originally predicted to help 400,000 homeowners,[7] had closed only 130 refinancings as of September 30, 2010.[8]   The Home Affordable Modification (HAMP) has also failed, producing 495,898 permanent modifications through September 2010.  This number is likely to be a high water mark for HAMP, as new permanent modifications are decreasing rapidly while defaults on permanent modifications rise; if current trends continue, by year's end the number of active permanent HAMP modifications will actually decline.

A number of events over the past several months have roiled the mortgage world, raising questions about:

(1) Whether there is widespread fraud in the foreclosure process;

(2) Securitization chain of title, namely whether the transfer of mortgages in the securitization process was defective, rendering mortgage-backed securities into *non*-mortgage-backed securities;

(3) Whether the use of the Mortgage Electronic Registration System (MERS) creates legal defects in either the secured status of a mortgage loan or in mortgage assignments;

(4) Whether mortgage servicers' have defaulted on their servicing contracts by charging predatory fees to borrowers that are ultimately paid by investors;

(5) Whether investors will be able to "putback" to banks securitized mortgages on the basis of breaches of representations and warranties about the quality of the mortgages.

These issues are seemingly disparate and unconnected, other than that they all involve mortgages.  They are, however, connected by two common threads:  the necessity of proving standing in order to maintain a foreclosure action and the severe conflicts of interests between mortgage servicers and MBS investors.

It is axiomatic that in order to bring a suit, like a foreclosure action, the plaintiff must have legal standing, meaning it must have a direct interest in the outcome of the litigation.  In the case of a mortgage foreclosure, only the mortgagee has such an interest and thus standing.  Many of the issues relating to foreclosure fraud by mortgage servicers, ranging from more minor procedural defects up to outright counterfeiting relate to the need to show standing.  Thus problems like false affidavits of indebtedness, false lost note affidavits, and false lost summons affidavits, as well as backdated mortgage assignments, and wholly counterfeited notes, mortgages, and assignments all relate to the evidentiary need to show that the entity bringing the foreclosure action has standing to foreclose.

Concerns about securitization chain of title also go to the standing question; if the mortgages were not properly transferred in the securitization process (including through the use of MERS to record the mortgages), then the party bringing the foreclosure does not in fact own the mortgage and therefore lacks standing to foreclose.  If the mortgage was not properly transferred, there are profound implications too for investors, as the mortgage-backed securities they believed they had purchased would, in fact be non-mortgage-backed securities, which

---

[6] Michael Corkery, *Mortgage 'Cram-Downs' Loom as Foreclosures Mount*, WALL ST. J., Dec. 31, 2008.
[7] Dina ElBoghdady, *HUD Chief Calls Aid on Mortgages a Failure*, WASH. POST. Dec. 17, 2008, at A1.
[8] *See* FHA Single Family Outlook, Sept. 2010, *at* http://www.hud.gov/offices/hsg/rmra/oe/rpts/ooe/olcurr.xls - 2010-11-02, Row 263 (note that FHA fiscal years begin in October, so that Fiscal Year 2009 began in October 2008).

would almost assuredly lead investors [to] demand that their investment contracts be rescinded, thereby exacerbating the scale of mortga[ge] putback claims.

Putback claims underscore the [my]riad conflicts of interest between mortgage servicers and investors. Mortgage servicers are [res]ponsible for prosecuting on behalf of MBS investors, violations of representations and warr[ant]ies in securitization deals. Mortgage servicers are loathe to bring such actions, however, [at least because they would often be bringing them] against their own affiliates. Servicers' f[iduciary] [a]re to honor their contractual duty to protect investors' interest is but one of numerous problems [w]ith servicer conflicts of interest, including the levying of junk fees in foreclosures that are ult[im]ately paid by investors and servicing first lien loans while directly owning junior liens.

Many of the problems in the mo[rtg]age securitization market (and thus this testimony) are highly technical, but they are extremely [ser]ious.[9]  At best they present problems of fraud on the court and questionable title to property. [At worst], they represent a systemic risk of liabilities in the trillions of dollars, greatly exceedi[ng] the capital of the US's major financial institutions. While understanding the securitization [m]arket's problems involves following a good deal of technical issues, it is critical to under[stand] from the get-go that securitization is all about technicalities.

Securitization is the legal apothe[osis] of form over substance, and if securitization is to work it must adhere to its proper, pres[crib]ed form punctiliously. The rules of the game with securitization, as with real property la[w] and secured credit are, and always have been, that dotting "i's" and crossing "t's" matter, [in] part to ensure the fairness of the system and avoid confusions about conflicting claims to p[rop]erty. Close enough doesn't do it in securitization; if you don't do it right, you cannot ensure [th]at securitized assets are bankruptcy remote and thus [oth]ers necessary for securitization to work. Thus, it is important not to dismiss securitization p[rob]lems as merely "technical;" these issues are no more technicalities than the borrower's sign[atu]re on a mortgage. Cutting corners may improve securitization's economic efficiency, but [it] undermines its legal viability.

Finally, as an initial matter, let m[e] also emphasize that the problems in the securitization world do not affect the whether homeow[ne]rs owe valid debts or have defaulted on those debts. Those are separate issues about which th[ere] is no general controversy, even if debts are disputed in individual cases.[10]

This written testimony proceeds [as f]ollows: Part I presents an overview of the struc[t]ure of the mortgage market, the role of mo[rtg]age servicers, the mortgage contract and foreclo[s]ure process. Part II presents the procedura[l] [p]roblems and fraud issues that have emerged in the mortgage market relating to foreclosur[e.]  Part III addresses chain of title issues. Part IV considers the argument that the problem[s] [in] foreclosures are mere technicalities being used by deadbeats to delay foreclosure. Part V co[nc]ludes.

---

[9] I emphasize, however, that this testimony does n[ot] [pur]port to be a complete and exhaustive treatment of the issues involved and that many of the legal issues discussed are not settled law, w[hile] [it] is itself part of the problem; trillions of dollars of mortgage securitization transactions have been done without a certain legal basis.

[10] A notable exception, however, is for cases w[here] the default is caused by a servicer improperly force-placing insurance or misapplying a payment, resulting in an inflated loan balance t[hat] [tr]iggers a homeowner default.

## I. BACKGROUND ON SECURITIZATION, RVICING, AND THE FORECLOSURE PROCESS

### A. MORTGAGE SECURITIZATION

Most residential mortgages in e United States are financed through securitization. Securitization is a financing method involving the issuance of securities against a dedicated cashflow stream, such as mortgage paments, that are isolated from other creditors' claims. Securitization links consumer borrower with capital market financing, potentially lowering the cost of mortgage capital. It also allows nancing institutions to avoid the credit risk, interest rate risk, and liquidity risk associated with holding the mortgages on their own books.

Currently, about 60% of all outstanding residential mortgages by dollar amount are securitized.[11] The share of securitized ortgages by number of mortgages outstanding is much higher because the securitization rate is lower for larger "jumbo" mortgages.[12] Credit Suisse estimates that 75% of outstanding first en residential mortgages are securitized.[13] In recent years, over 90% of mortgages originated have been securitized.[14] Most second-lien loans, however, are not securitized.[15]

Although mortgage securitization transactions are extremely complex and vary somewhat depending on the type of entity underlying the securitization, the core of the transaction is relatively simple.[16]

First, a financial institution (the 'sponsor" or "seller") assembles a pool of mortgage loans. The loans were either made ("originated") by an affiliate of the financial institution or purchased from unaffiliated third-party riginators. Second, the pool of loans is sold by the sponsor to a special-purpose subsidiary he "depositor") that has no other assets or liabilities This is done to segregate the loans from the sponsor's assets and liabilities.[17] Third, the depositor sells the loans to a passive, spially created, single-purpose vehicle (SPV), typically a trust in the case of residential mortgage.[18] The SPV issues certificated securities to raise the funds to pay the depositor for the loans. Most of the securities are debt securities—bonds—but there will also be a security representing the rights to the residual value of the trust or the "equity."

---

[11] Inside Mortgage Finance, 2010 Mortgage Mark Statistical Annual.

[12] Id.

[13] Ivy L. Zelman et al., *Mortgage Liquidity du J* *Underestimated No More* 28 exhibit 21 (Credit Suisse, Equity Research Report, Mar. 12, 2007).

[14] Inside Mortgage Finance, 2010 Mortgage Mark Statistical Annual.

[15] Inside Mortgage Finance, 2010 Mortgage M Statistical Annual. From 2001-2007, only 14% of second lien mortgage originated were securitized. *Id.* Second lien mortgages crea conflict of interest beyond the scope of this paper. In many cases, second lien loans are owned by financial institutions that are servicing ( o not own) the first lien loan. *See* Hearing Before the House Financial Service Committee, Apr. 13, 2009 "Second Liens and Other Barriers Principal Reduction as an Effective Foreclosure Mitigation Program" (testimony of Barbara DeSoer, President, Bank of America Home Loan 6 (noting that Bank of America owns the second lien mortgage on 5% of the first lien mortgages it services); Hearing Before the House ancial Services Committee, Apr. 13, 2009 "Second Liens and Other Barriers t Principal Reduction as an Effective Foreclosure Mitigation ram" (testimony of David Lowman, CEO for Home Lending, JPMorgan Chase at 5 (noting that Chase owns the second lien mortgage on an 10% of the first lien mortgages it services). The ownership of the second while servicing the first creates a direct financial conflict between servicer qua servicer and the servicer qua owner of the second lien mortgage, a the servicer has an incentive to modify the first lien mortgage rder to free up borrower cashflow for payments on the second lien mortgage

[16] The structure illustrated is for private-label gage-backed securities. Ginnie Mae and GSE securitizations are structured somewhat differently. The private-label structure can, of cse, be used to securitize any asset, from oil tankers to credit card debt t song catalogues, not just mortgages.

[17] This intermediate entity is not essential to secization, but since 2002, Statement of Financial Accountings Standards 140 ha required this additional step for off-balance-sheet treatmenecause of the remote possibility that if the originator went bankrupt or into receivership, the securitization would be treated as a securtan, rather than a sale, and the originator would exercise its equitable right of redemption and reclaim the securitized assets. Deloitte & To, *Learning the Norwalk Two-Step*, HEADS UP, Apr. 25, 2001, at 1

[18] The trustee will then typically convey the tgage notes and security instruments to a "master document custodian," who manages the loan documentation, while the servicer handles t collection of the loans.

The securities can be sold direct[ly] to investors by the SPV or, as is more common, they are issued directly to the depositor as [pa]yment for the loans. The depositor then resells th[e] [...]g affiliate that then places them on the market. (See Figure 2, below.) The depositor uses th[e] [pr]oceeds of the securities sale (to the underwriter or th[e] market) to pay the sponsor for the loans. Because the certificated securities are collateralized b[y] the residential mortgage loans owned b[y] the trust, they are called residential mortgage backed securities (RMBS).

A variety of reasons—credit risk treatment, and pass-through tax status ( [...] bankruptcy remoteness), off-balance sheet accounting [...] pically as a REMIC[19] or grantor trust)—mandate that the SPV be passive; it is little more than [a] shell to hold the loans and put them beyond the reach of the creditors of the financial institutio[n] [...] Loans, however, need to be managed. Bills must be sent out and payments collected. Thus, [a] third-party must be brought in to manage the loans.[21] This third party is the servicer. The ser[vi]cer is supposed to manage the loans for the benefit of the RMBS holders.

Every loan, irrespective of whe[th]er it is securitized, has a servicer. Sometimes that servicer is a first-party servicer, such as [w]hen a portfolio lender services its own loans. Other times it is a third-party servicer that ser[vi]ces loans it does not own. All securitizations involve third-party servicers, but many portfolio [lo]ans also have third-party servicers, particularly if they go into default. Third-party servicing [co]ntracts for portfolio loans are not publicly available, making it hard to say much about them, [in]cluding the precise nature of servicing compensation, arrangements in these cases or the degre[e] of oversight portfolio lenders exercise over their third-party servicers. Thus, it cannot always [be] assumed that if a loan is not securitized it is being serviced by the financial institution that [ow]ns the loan, but if the loan is securitized, it [ha]s third-party servicing.

Securitization divides the benefi[ci]al ownership of the mortgage loan from leg[a]l title to the loan and from the management of th[e] loans. The SPV (or more precisely its truste[e]) holds legal title to the loans, and the trust is t[he] nominal beneficial owner of the loans. The RMBS investors are formally creditors of the tru[st], not owners of the loans held by the trust.

The economic reality, however, [is] that the investors are the true beneficial own[er]s. The trust is just a pass-through holding entit[y] rather than an operating company. Moreov[er], while the trustee has nominal title to the loans [fo]r the trust, it is the third-party servicer that [ty]pically exercises legal title in the name of the [tr]ustee. The economic realities of securitization do not track with its legal formalities; securitiz[ati]on is the apotheosis of legal form over substance, but punctilious respect for formalities is criti[ca]l for securitization to work.

Mortgage servicers provide the [cr]itical link between mortgage borrowers and the SPV and RMBS investors, and servicing arra[n]gements are an indispensable part of securitization.[22] Mortgage servicing has become particu[la]rly important with the growth of the securitization market.

---

[19] A REMIC is a real estate mortgage investment c[ondu]it, as defined under I.R.C. §§ 860A-860G.

[20] See Anna Gelpern & Adam J. Levitin, Rewriti[ng] [...] Frankenstein Contracts: Workout Prohibitions in Residential Mo[rtga]ge Backed Securities, 82 S. CAL. L. REV. 1075, 1093-98. (2009).

[21] See Kurt Eggert, Limiting Abuse and Opportuni[sm] by Mortgage Servicers, 15 HOUSING POL'Y DEBATE 753, 754 (200[4]).

[22] The servicing of nonsecuritized loans may als[o] [b]e outsourced. There is little information about this market becau[se it] [doe]s not involve publicly available contracts and does not show up in s[tand]ard data.

**Figure 2. Private-Label Mortgage Securitization Structure**[23]



## B. THE MORTGAGE SERVICING BUSINESS[24]

The nature of the servicing business in general militates toward economies of scale and automation. Servicing combines three distinct lines of business: transaction processing, default management, and loss mitigation. Transaction processing is a highly automatable business, characterized by large economies of scale. Default management involves collections and activities related to taking defaulted loans through foreclosure. Like transaction processing,

---

[23] *See* ACE Sec. Corp. Home Equity Loan Trust, Series 2006-NC3, Prospectus Supplement (Form 424B5) S-11 (Nov. 21, 2006), *available at* http://www.sec.gov/Archives/edgar/data/1380884/000114420406049985/v058926_424b5.htm.
[24] This section of my testimony comes from Adam J. Levitin & Larry Cordell, *What RMBS Servicing Can Learn from CMBS Servicing*, working paper, November 2010.

default management can be automated,[25] as it does not require any negotiation with the homeowner, insurers, or junior lienholders.[26]

Loss mitigation is considered an *alternative to foreclosure*, and includes activities such as repayment plans, loan modifications, short sales and deeds in lieu of foreclosure. Loss mitigation is always a negotiated process and is therefore labor-intensive and expensive. Not only must the homeowner be agreeable to any loss mitigation solution, but so too must mortgage insurers and junior lienholders if they are parties on the loan. Because each negotiation is separate and requires a trained employee, there are very few opportunities for automation or economies of scale. Labor expenses are also considered overhead, which are all non-reimbursable expenses to servicers. And, to the extent that loss mitigation is in the form of a loan modification, redefault and self-cure risk always lurk in the background. Moreover, loss mitigation must generally be conducted in addition to default management; the servicer must proceed with foreclosure even if attempting to find an alternative, so the cost of loss mitigation is additive. Yet, while taking a loan through foreclosure is likely to involve lower costs than pursuing loss mitigation, it may not ultimately maximize value for RMBS investors because loss severities in foreclosure can easily surpass those on a re-performing restructured loan.

The balance between these different parts of a servicer's business changes over the course of the housing cycle. When the housing market is strong, the transaction processing dominates the servicing business, but when the housing market is weak, default management and loss mitigation become more important.

The very short weighted average life (WAL) of RMBS trusts combined with very low defaults in most economic environments encouraged servicers to place disproportionate weight on performing loan servicing, which historically has been characterized by small servicing fees and enormous economies of scale. Thus, on a typical loan balance of $200,000 today, a servicer might earn between $500 and $1,000 per year.[27] Given the low-level of annual income per loan, the short WAL of each loan, and low default rates in most economic environments before 2006, servicers had few incentives to devote resources to loss mitigation, but large incentives to invest in performing loan automation to capture the large economies of scale. This left servicers wholly unprepared for the elevated level of defaults that began in 2007.

## C. RMBS SERVICER COMPENSATION

RMBS servicers' duties and compensation are set forth in a document called a "Pooling and Servicing" agreement (PSA) also governs the rights of the RMBS certificate holders. RMBS servicers are compensated in four ways. First, they receive a "servicing fee," which is a flat fee of 25—50 basis points (bps) and is a first priority payment in the RMBS trust.[28] This is by far the greatest portion of servicer income. This fee is paid out proportionately across all loans regardless of servicer costs through the economic cycle.

---

[25] *See In re Taylor*, 407 B.R. 618 (Bankr. E.D. Pa. 2009), *rev'd* 2010 WL 624909 (E.D. Pa. 2010).
[26] Arguably servicers have a fourth line of business—the management of real estate owned (REO). REO are foreclosed properties that were not purchased by third-parties at the foreclosure sale. REO management involves caring for and marketing the REO. It does not require negotiations with the homeowner (who is evicted) or junior lienholders (whose liens are generally extinguished by the foreclosure).
[27] Servicing fees are generally 25—50 bps, which translates into $500—$1000 per year in servicing fees.
[28] Generally the servicing fee is 25 bps for conventional fixed rate mortgages, 37.5 bps for conventional ARM loans, 44 bps for government loans and 50 bps for subprime.

Second, servicers earn "float" income. Servicers generally collect mortgage payments at the beginning of the month, but are not required to remit the payments to the trust until the 25th of the month. In the interim, servicers invest the funds they have collected from the mortgagors, and they retain all investment income. Servicers can also obtain float income from escrow balances collected monthly from borrowers to pay taxes and insurance during the course of the year.

Third, servicers are generally permitted to retain all ancillary fees they can collect from mortgagors. This includes things like late fees and fees for balance checks or telephone payments. It also includes fees for expenses involved in handling defaulted mortgages, such as inspecting the property. Finally, servicers can hold securities themselves directly as investors, and often hold the junior-most, residual tranche in the securitization.

Servicers face several costs. In addition to the operational expenses of sending out billing statements, processing payments, maintaining account balances and histories, and restructuring or liquidating defaulted loans, private label RMBS servicers face the expense of "servicing advances."[29] When a loan defaults, the servicer is responsible for advancing the missed payments of principal and interest to the trust as well as paying taxes and insurance on the property. They continue to pay clear through liquidation of the property, unless these advances are not deemed recoverable.

The servicer is able to recover advances it has made either from liquidation proceeds or from collections on other loans in the pool, but the RMBS servicer does not receive interest on its advances. Therefore, advances can be quite costly to servicers in terms of the time value of money and can also place major strains on servicers' liquidity, as the obligation to make advances continues until the loan is liquidated or the servicer believes that it is unlikely to be able to recover the advances. In some cases, servicers have to advance years' worth of mortgage payments to the trust.

While RMBS servicers do not receive interest on servicing advances, they are compensated for their "out-of-pocket" expenses. This includes any expenses spent on preserving the collateral property, including force-placed insurance, legal fees, and other foreclosure-related expenses. Large servicers frequently "in-source" default management expenses to their affiliates.


## D. MONITORING OF RMBS SERVICERS

RMBS servicing arrangements present a classic principal-agent problem wherein the agent's incentives are not aligned with the principal and the principal has limited ability to monitor or discipline the agent.

### 1. Investors

Investors are poorly situated to monitor servicer behavior because they do not have direct dealings with the servicer. RMBS investors lack information about servicer loss mitigation

---

[29] In Agency securities, servicers generally stop advancing after borrowers owe their fifth payment, at 120 days past due. For GSE loans, they are then removed from the securities and taken on balance sheet. Servicer advances for the four payments are typically not reimbursed until termination.

activity. Investors do not have access to detailed servicer expense reports or the ability to examine loss mitigation decisions. Investors are able to see only the ultimate outcome. This means that investors are limited in their ability to evaluate servicers' performance on an ongoing basis. And even if investors were able to detect unfaithful agents, they have little ability to discipline them short of litigation.

## 2. Trustees

RMBS feature a trustee, but the name is deceptive. The trustee is not a common law trustee with general fiduciary duties. Instead, it is a limited purpose corporate trustee whose duties depend on whether there has been a default as defined UN the PSA. A failure to pay all tranches their regularly scheduled principal and interest payments is *not* an event of default. Instead, default relates to the financial condition of the servicer, whether the servicer has made required advances to the trust, whether the servicer has submitted its monthly report, and whether the servicer has failed to meet any of its covenants under the PSA.

Generally, before there is an event of default, the trustee has a few specifically assigned ministerial duties and no others.[30] These duties are typically transmitting funds from the trust to the RMBS investors and providing investors performance statements based on figures provided by the servicer. The trustee's pre-default duties do *not* include active monitoring of the servicer.

Trustees are generally entitled to rely on servicers' data reporting, and have little obligation to analyze it.[31] Indeed, as Moody's has noted, trustees lack the ability to verify most data reported by servicers; at best they can ensure that the reported data complies with any applicable covenant ratios:

> The trustee is not in a position to verify certain of the numbers reported by the servicer. For example, the amount of delinquent receivables and the amount of receivables charged off in a given month are figures that are taken from the servicer's own computer systems. While these numbers could be verified by an auditor, they are not verifiable by the trustee.[32]

Likewise, as attorney Susan Macaulay has observed, "In most cases, even if the servicer reports are incorrect, or even fraudulent, absent manifest error, the trustee simply has no way of knowing that there is a problem, and must allocate the funds into the appropriate accounts, and make the mandated distributions, in accordance with the servicer reports."[33]

---

[30] *See, e.g.*, Wells Fargo Mortgage Backed Securities 2006-AR10 Trust § 8.01 ("Prior to the occurrence of an Event of Default of which a Responsible Officer of the Trustee shall have actual knowledge and after the curing of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee, and conforming to the requirements of this Agreement."). *See also* Moody's Investor Service, Structured Finance Ratings Methodology: Moody's Re-examines Trustees' Role in ABS and RMBS, Feb. 4, 2003, at 4. (noting "Some trustees have argued that their responsibilities are limited to strictly administrative functions as detailed in the transaction documents and that they have no "fiduciary" duty prior to an event of default.").

[31] MBIA Ins. Corp. v. Royal Indem. Co., 519 F. Supp. 2d 455 (2007), *aff'd* 321 Fed. Appx. 146 (3d Cir. 2009) ("Royal argues that Wells Fargo [the trustee] had the contractual obligation to analyze data using certain financial accounting principles and to detect any anomalies that analysis might have uncovered. As Royal suggests, this analysis may not have been very labor-intensive. Yet, the contract did not call for any analysis at all. It simply required Wells Fargo to perform note comparisons between that data and data contained in various other sources, and to report any numerical inconsistencies. Wells Fargo did just that.").

[32] Moody's Investor Service, *supra* note 30, at 4.

[33] Susan J. Macaulay, *US: The Role of the Securitisation Trustee*, GLOBAL SECURITISATION AND STRUCTURED FINANCE 2004. Macaulay further notes that:

Similarly, trustees usually wait for servicers to notify them of defaults,[34] and Moody's has noted that trustees are often unresponsive to information from third parties indicating that an unreported default might have occurred.[35] Thus, trustees enforce servicer representations and warranties largely on the honor system of servicer self-reporting.

For private-label securities, trustees also lack the incentive to engage in more vigorous monitoring of servicer loss mitigation decisions. The trustee does not get paid more for more vigorous monitoring. The trustee generally has little ability to discipline the servicer except for litigation. Private-label RMBS trustees have almost no ability to fire or discipline a servicer. Servicers can only be dismissed for specified acts, and these acts are typically limited to the servicer's insolvency or failure to remit funds to the trust. Occasionally servicers may be dismissed if default levels exceed particular thresholds.

Trustees also have no interest in seeing a servicer dismissed because they often are required to step in as back-up servicer.[36] In the event of a servicer default, the trustee takes over as servicer (which includes the option of subcontracting the duties), and assumes the duty of making servicing advances to the trust. The back-up servicer role is essentially an insurance policy for investors, and activation of that role is equivalent to payment on a claim; a trustee that has to act as a back-up servicer is likely to lose money in the process, especially when some of the trustees do not themselves own servicing operations.

Trustees also often have close relationships with particular servicers. For example, Professor Tara Twomey and I have shown that Bank of America/Countrywide accounts for nearly two-thirds of Deutsche Bank's RMBS trustee business.[37] In such circumstances, trustees are unlikely to engage in meaningful monitoring and disciplining of servicers.[38] Amherst Securities points out that early payment default provisions are not effectively enforced by trustees, to the point where in cases where borrowers did not make a single payment on the mortgage, only 37 percent were purchased out of the trust, much smaller amounts for loans making only one to six payments.[39] Thus, for private-label RMBS, there is virtually no supervision of servicers.[40]

GSE and Ginnie Mae securitization have greater oversight of servicers. The GSEs serve as master servicers on most of their RMBS; they therefore have a greater ability to monitor servicer compliance. The GSEs require servicers to foreclose according to detailed timelines, and

It is almost always an event of default under the indenture if the trustee does not receive a servicer report within a specified period of time, and the trustee must typically report such a failure to the investors, any credit enhancement provider, the rating agencies and others. However, the trustee generally has no duties beyond that with respect to the contents of the report, although under the TIA, the trustee must review any reports furnished to it to determine whether there is any violation of the terms of the indenture. Presumably this would include verifying that any ratios represented in any reports conform to financial covenants contained in the indenture, etc. It would not however, require the trustee to go beyond the face of the report, i.e. to conduct further investigation to determine whether the data underlying the information on the reports presented to it were, in fact, true. Virtually all indentures, whether or not governed by the TIA, explicitly permit the trustee to rely on statements made to the trustee in officers' certificates, opinions of counsel and documents delivered to the trustee in the manner specified within the indenture.

*Id.*
[34] Moody's Investor Service, *supra* note 30, at 4.
[35] *Id.*
[36] Eric Gross, *Portfolio Management: The Evolution of Backup Servicing*, Portfolio Financial Servicing Company (PFSC) (July 11, 2002) *at* http://www.securitization.net/knowledge/article.asp?id=147&aid=2047.
[37] Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, 28 YALE J. ON REG. (forthcoming 2011).
[38] *See* Ellington Credit Fund, Ltd. v. Select Portfolio, Inc., No. 1:07-cv-00421-LY, W.D. Tex., Plaintiffs' First Amended Complaint, July 10, 2007 (RMBS residual tranche holder alleging that trustee was aware that servicer was in violation of PSA and failed to act).
[39] *See* Amherst Mortgage Insight, "The Elephant in the Room—Conflicts of Interest in Residential Mortgage Securitizations", 15, May 20, 2010.
[40] For MBS with separate master and primary servicers, the master servicer may monitor the primary servicer(s), but often the master and primary servicers are the same entity.

servicers that fail to comply face monetary penalties. Recognizing the benefits inherent in effective loss mitigation, Fannie Mae places staff directly in all of the largest servicer shops to work alongside loss mitigation staff at their servicers.[41]   Freddie Mac constructed servicer performance profiles to directly monitor servicers, sharing results directly with servicers and rating agencies. Since each GSE insures against credit losses on the loans, their ongoing monitoring provides consistent rules and a single point of contact to approve workout packages and grant exceptions, something absent in private label RMBS.

### 3. Ratings and Reputation

Like any repeat transaction business, servicers are concerned about their reputations. But reputational sanctions have only very weak discipline on servicer behavior.

While Regulation AB requires servicers to disclose information about their experience and practices,[42] they are not required to disclose information about performance of past pools they have serviced. In any event, reputational sanctions are ineffective because loss severities are more likely to be attributed to underwriting quality than to servicing decisions.

Rating agencies also produce servicer ratings, but these ratings are a compilation of the evaluation of servicers on a multitude of characteristics. Rating agencies have been known to incorporate features of Freddie Mac's servicer performance profiles in their servicer assessments and to incorporate loss mitigation performance into their ratings. But details of their methodology used to measure these assessments are not disclosed. They give no indication of whether a servicer is likely to make loss mitigation decisions based solely on the interests of the securitization trust. Ratings are also combined with other criteria, such as the servicer's own financial strength and operational capacity. In other words, servicer ratings go to the question of whether a servicer will have to be replaced because it is insolvent or lacks the ability to service the loans, with much less weight given to whether the servicer acts in the investors' interests.

### C. THE MORTGAGE CONTRACT AND FORECLOSURE PROCESS

The mortgage contract consists of two documents, a promissory note (the "note" or the "mortgage loan") and a security instrument (the "mortgage" or the "deed of trust").[43] The note is the IOU that contains the borrower's promise to repay the money loaned. If the note is a negotiable instrument, meaning that it complies with the requirements for negotiability in Article 3 of the Uniform Commercial Code,[44] then the *original physical note* is itself the right to payment.[45]

The mortgage is the document that connects the IOU with the house. The mortgage gives the lender a contingent right to the house; it provides that *if* the borrower does not pay according to the terms of the note, then the lender can foreclose and have the property sold *according to the*

---

[41] PMI insurers have recently started to embed staff in servicer shops to monitor loss mitigation efforts. Harry Terris & Kate Berry, *In the Trenches*, AM. BANKER, Aug. 27, 2009.

[42] 17 C.F.R. § 229.1108.

[43] The note and the mortgage can be combined in a single document, but that is not common practice, both because the mortgage can be granted subsequent to the creation of the debt and because of borrower privacy concerns about the terms of the note, which would become public if the note and mortgage were combined and recorded in local property records.

[44] *See* UCC 3-104.

[45] UCC 3-203, Cmt. 1 ("An instrument is a reified right to payment. The right is represented by the instrument itself.").

*terms of the mortgage and applicable state and federal law.* The applicable law governing foreclosures is state law.[46]

State real estate law, including foreclosure law, is non-uniform, making it difficult to state what the law is as a generic matter; there is always the possibility that some jurisdictions may deviate from the majority rule. That said, no state requires a borrower's note to be recorded in local land records for the note to be valid, and, as a general matter, state law does not require the mortgage to be recorded either in order for the mortgage to be enforceable against the borrower. Recording of the mortgage is necessary, however, to establish the mortgage's priority relative to the claims of other parties, including other mortgagees, judgment lien creditors and tax and workmen's' liens against the property. The basic rule of priority is first in time, first in right; the first mortgage to be recorded has senior priority. An unrecorded mortgage will thus, generally have junior priority to a subsequently issued, but recorded mortgage. The difference between enforceability and priority is an important one, discussed in more detail below, in the section of this testimony dealing with MERS.

State law on foreclosures is also non-uniform. Roughly, however, states can be divided into two groups: those where foreclosure actions are conducted through the courts ("judicial foreclosure") and those where foreclosure actions are conducted by private sales ("nonjudicial foreclosure"). This division maps, imperfectly, with whether the preferred security instrument is a mortgage or a deed of trust.[47]

Mortgage loans cost more in states that have judicial foreclosure; what this means is that borrowers in judicial foreclosure states are paying more for additional procedural rights and legal protections; those procedural rights are part of the mortgage contract; failure to honor them is a breach of the mortgage contract. Note, that a default on the mortgage note is not a breach of the contract per se; instead it merely triggers the lender's right to foreclose per the applicable procedure.

In a typical judicial foreclosure proceeding, the homeowner receives a notice of default and if that default is not cured within the required period, the mortgagee then files a foreclosure action in court. The action is commenced by the filing of a written complaint that sets forth the mortgagee's allegations that the homeowner owes a debt that is secured by a mortgage and that the homeowner has defaulted on the debt. Rules of civil procedure generally require that legal actions based upon a writing include a copy of the writing as an attachment to the complaint, although there is sometimes an exception for writings that are available in the public records. While the mortgage is generally filed in the public records, assignments of the mortgage are often not (an issue complicated by MERS, discussed below), and the note is almost never a matter of public record.

It is important to understand that most judicial foreclosures do not function like the sort of judicial proceeding that is dramatized on television, in which all parties to the case appear in court, represented by attorneys and judgment only follows a lengthy trial. Instead, the norm in foreclosure cases is a default judgment. Most borrowers do not appear in court or contest their

---

[46] There is a federal foreclosure statute that can be utilized by the federal government. *See* 12 U.S.C. §§ 3701-3711 (multi-family property foreclosures); §§3751-3768 (single-family property foreclosures).

[47] Mortgages sometimes also include a power of sale, permitting nonjudicial foreclosure. In a deed of trust, the deed to the property is transferred in trust for the noteholder to a deed of trust trustee, often a local attorney. The note remains the property of the lender (the deed of trust beneficiary). When there is a default on the note, the lender notifies the deed of trust trustee and the lender or its agent is typically appointed as substitute deed of trust trustee to run the foreclosure sale.

foreclosures, and not all of those who do are represented by competent counsel, not least because of the difficulties in paying for counsel. Most borrowers that the borrower does not contest the foreclosure or appear in court. In most cases, only the lender's attorney appears, and judges routinely dispatch dozens or hundreds of foreclosure cases in a sitting. Homeowners in foreclosure actions are among the most vulnerable of defendants, the least able to insist up on and vindicate their rights, and accordingly the ones most susceptible to abuse of legal process.

## II. PROCEDURAL PROBLEMS AND FRAUD

The first type of problems in the mortgage market are what might generously be termed "procedural defects" or "procedural irregularities." There are numerous such problems that have come to light in foreclosure cases. The extent and distribution of these irregularities is not yet known. No one has compiled a complete typology of procedural defects in foreclosures; there are, to use Donald Rumsfeld's phrase, certainly "known unknowns" and well as "unknown unknowns."

### A. AFFIDAVITS FILED WITHOUT PERSONAL KNOWLEDGE (ROBOSIGNING)

Affidavits need to be based on personal knowledge to have any evidentiary effect; absent personal knowledge an affidavit is hearsay and therefore generally inadmissible as evidence. Accordingly, affidavits attest to personal knowledge of the facts alleged therein.

The most common type of affidavit is an attestation about the existence and status of the loan, namely that the homeowner owes a debt, how much is currently owed, and that the homeowner has defaulted on the loan. (Other types of affidavits are discussed in sections II.B. and II.C., *infra*). Such an affidavit is typically sworn out by an employee of a servicer (or sometimes by a law firm working for a servicer). Personal knowledge for such an affidavit would involve, at the very least, examining the payment history for a loan in the servicer's computer system and checking it against the facts alleged in a complaint.

The problem with affidavits filed in many foreclosure cases is that the affiant lacks any personal knowledge of the facts alleged whatsoever. Many servicers, including Bank of America, Citibank, JPMorgan Chase, Wells Fargo, and GMAC, employ professional affiants, some of whom appear to have no other duties than to sign affidavits. These employees cannot possibly have personal knowledge of the facts in their affidavits. One GMAC employee, Jeffrey Stephan, stated in a deposition that he signed perhaps 10,000 affidavits in a month, or approximately 1 a minute for a 40-hour work week.[48] For a servicer's employee to ascertain payment histories in a high volume of individual cases is simply impossible.

When a servicer files an affidavit that claims to be based on personal knowledge, but is not in fact based on personal knowledge, the servicer is committing a fraud on the court, and quite possibly perjury. The existence of foreclosures based on fraudulent pleadings raises the

---

[48] *See* Deposition of Jeffrey Stephan, GMAC Mortgage LLC v. Ann M. Neu a/k/a Ann Michelle Perez, No. 50 2008 CA 040805XXXX MB, (15th Judicial Circuit, Florida, Dec. 10, 2009) at 7, available at http://api.ning.com/files/s4SMvwlZXvPu4A7kq7XQUsGW9xEcYtqNMPCm0a2hISJu88PoY6ZNqanX7XK41Fvf9gV8JIHDme7K;dK,2cvJk SE McpU8vwnDT/091210gmacmortgagevsannmneu1.pdf (stating that Jeffrey Stephan, a GMAC employee, signed approximately 10,000 affidavits a month for foreclosure cases).

question of the validity of foreclosure judgments and therefore title on properties, particularly if they are still in real estate owned (REO).

## B. LOST NOTE AFFIDAVITS FOR NOTES THAT ARE NOT LOST

The plaintiff in a foreclosure action is generally required to produce the note as evidence that it has standing to foreclose. Moreover, under the Uniform Commercial Code, if the note is a negotiable instrument, only a holder of the note (or a subrogee)—that is a party in possession of the note— may enforce the note, as the note is the reified right to payment.[49]

There is an exception, however, for lost, destroyed, or stolen notes, which permits a party that has lost possession of a note to enforce it.[50] If a plaintiff seeks to enforce a lost note, it is necessary "to prove the terms of the instrument" as well as the "right to enforce the instrument."[51] This proof is typically offered in the form of a lost note affidavit that attests to the prior existence of the note, the terms of the note, and that the note has been lost.

It appears that a surprisingly large number of lost note affidavits are filed in foreclosure cases. In Broward County, Florida alone, over 2000 such affidavits were filed in 2008-2009.[52] Relative to the national population, that translates to roughly 116,000 lost note affidavits nationally over the same period.[53]

There are two problems with the filing of many lost note affidavits. First, is a lack of personal knowledge. Mortgage servicers are rarely in possession of the original note. Instead, the original note is maintained in the fireproof vault of the securitization trustee's document custodian. This means that the servicer lacks personal knowledge about whether a note has or has not been lost.[54] Merely reporting a communication from the document custodian would be hearsay and likely inadmissible as evidence.

The second problem is that the original note is frequently not in fact lost. Instead, it is in the document custodian's vault. Servicers do not want to pay the document custodian a fee (of perhaps $30) to release the original mortgage, and servicers are also wary of entrusting the original note to the law firms they hire. Substitution of counsel is not infrequent on defaulted mortgages, and servicers are worried that the original note will get lost in the paperwork shuffle if there is a change in counsel. When pressed, however, servicers will often produce the original note, months after filing lost note affidavits. The Uniform Commercial Code (UCC) requires that a party seeking to enforce a note be a holder (or subrogee to a holder) or produce evidence that a note has been lost, destroyed, or stolen; the UCC never contemplates an "inconvenience affidavit" that states that it is too much trouble for a servicer to bother obtaining the original note. But that is precisely what many lost note affidavits are effectively claiming.

Thus, many lost note affidavits are doubly defective: they are sworn out by a party that does not and cannot have personal knowledge of the alleged facts and the facts being alleged are

---

[49] UCC 3-301; 1-201(b)(21) (defining "holder").

[50] UCC 3-309. Note that UCC 3-309 was amended in the 2001 revision of Article 3. The revision made it easier to enforce a lost note. Not every state has adopted the 2001 revisions. Therefore, UCC 3-309 is non-uniform law.

[51] UCC 3-309(b).

[52] Gretchen Morgenson & Andrew Martin, *Battle Lines Forming in Clash Over Foreclosures*, N.Y. TIMES, Oct. 20, 2010, at A1.

[53] According to the US Census Bureau, Broward County's population is approximately 1.76 million, making it .57% of the total US population of 307 million. Broward does have a significantly higher than average foreclosure rate, roughly 12% over the past two years, according to Core Logic Loan Performance data, making it approximately 3 times the national average.

[54] The 2001 version of UCC 3-309 permits not only a party that has lost a note but a buyer from such a party to enforce a lost note

often false as the note is not in fact lost, but the servicer simply does not want to bother obtaining it.

## C. JUNK FEES

The costs of foreclosure actions are initially incurred by servicers, but servicers recover these fees off the top from foreclosure sale proceeds before MBS investors are paid. This reimbursement structure limits servicers' incentive to rein in costs and actually incentives them to pad the costs of foreclosure. This is done in two ways. First, servicers charge so-called "junk fees" either for unnecessary work or for work that was simply never done. Thus, Professor Kurt Eggert has noted a variety of abusive servicing practices, including "improper foreclosures or attempted foreclosures; imposition of improper fees, especially late fees; forced-placed insurance that is not required or called for; and misuse of escrow funds."[55] Servicers' ability to retain foreclosure-related fees has even led them to attempt to foreclose on properties when the homeowners are current on the mortgage or without attempting any sort of repayment plan.[56] Consistently, Professor Katherine Porter has documented that when mortgage creditors file claims in bankruptcy, they generally list amounts owed that are much higher than those scheduled by debtors.[57]

There is also growing evidence of servicers requesting payment for services not performed or for which there was no contractual right to payment. For example, in one particularly egregious case from 2008, Wells Fargo filed a claim in the borrower's bankruptcy case that included the costs of two brokers' price opinions allegedly obtained in September 2005, on a property in Jefferson Parish, Louisiana when the entire Parish was under an evacuation order due to Hurricane Katrina.[58]

Similarly, there is a frequent problem of so-called "sewer summons" issued (or actually not issued) to homeowners in foreclosures. Among the costs of foreclosure actions is serving notice of the foreclosure (a court summons) on the homeowner. There is disturbing evidence that homeowners are being charged for summons that were never issued. These non-delivered summons are known as "sewer summons" after their actual delivery destination.

One way in which these non-existent summons are documented is through the filing of "affidavits of lost summons" by process servers working for the foreclosure attorneys hired by mortgage servicers. A recent article reports that in Duval County, Florida (Jacksonville) the number of affidavits of lost summons has ballooned from 1,031 from 2000-2006 to over 4,000 in the last two years, a suspiciously large increase that corresponds with a sharp uptick in foreclosures.[59]

Because of concerns about illega' ‹es, the United States Trustee's Office has undertaken several investigations of servicers' fa : claims in bankruptcy[60] and brought suit against

---

[55] Kurt Eggert, *Comment on Michael A. Stegman* ...L's *"Preventive Servicing Is Good for Business and Affordable Homeownership*
*Policy": What Prevents Loan Modifications?*, 18 HOUSING P ·′ DEBATE 279 (2007).
[56] Eggert, *Limiting Abuse, supra* note 21, at 757.
[57] Katherine M. Porter, *Mortgage Misbehavior*, 8 IX. L. REV. 121, 162 (2008).
[58] *In re Stewart*, 391 B.R. 327, 355 (Bankr. E.D. I :008).
[59] Matt Taibi, *Courts Helping Banks Screw Over Homeowners*, ROLLING STONE, Nov. 25, 2010, *at*
http://www.rollingstone.com/politics/news/17390/232611?R : ow_page=7.
[60] Ashby Jones, *U.S. Trustee Program Playin iugh With Countrywide, Others*, LAW BLOG (Dec. 3, 2007, 10:01 AM), *at*
http://blogs.wsj.com/law/2007/12/03/us-trustee-program-play : tough-with-countrywide-others.

Countrywide,[61] while the Texas Attorne[y] [G]eneral has sued American Home Mortgage Servicing for illegal debt collection practices.[62]

The other way in which servic[ers] [p]ad the costs of foreclosure is by in-sourcing their expenses to affiliates at above-market [r]ates. For example, Countrywide, the largest RMBS servicer, force places insurance on d[efaulted] properties with its captive insurance affiliate Balboa.[63] Countrywide has been accu[sed] of deliberately extending the time to foreclosure [in] order to increase the insurance premium [p]aid to its affiliate, all of which are reimbursable by the trust, before the RMBS investors' clai[ms] are paid.[64] Similarly, Countrywide in-sources trustee services in deed of trust foreclosures to [its] subsidiary Recon Trust.[65]

Thus, in Countrywide's 2007 th[ird] quarter earnings call, Countrywide's President David Sambol emphasized that increased reve[nue] from in-sourced default management functions could offset losses from mortgage defaults.

> Now, we are frequently asked w[hat] the impact on our servicing costs and earnings will be from increased delinq[ue]ncies and loss mitigation efforts, and wha[t] happens to costs. And what w[e] [p]oint out is, as I will now, is that *increased operating expenses in times li[ke] this tend to be fully offset by increases in* ancillary income in our servicin[g] [o]peration, greater fee income from items like late charges, and importantly fr[om] in-sourced vendor functions that represent part of our diversification strategy, a[nd] [c]ounter-cyclical diversification strategy such as our businesses involved in for[ec]losure trustee and default title services and property inspection services.[66]

In June, 2010, Countrywide settled with [th]e FTC for $108 million on charges that it overcharged delinquent homeowners for default man[age]ment services. According to the FTC,

> Countrywide ordered property [in]spections, lawn mowing, and other services meant to protect the lender's inte[rest] [i]n the property… But rather than simply hire third-party vendors to perform t[hese] services, Countrywide created subsidiaries to hire the vendors. The subsidiarie[s] [m]arked up the price of the services charged by the vendors – often by 100% [or] more – and Countrywide then charged the homeowners the marked-up fees.

Among the accusations brought against [Co]untrywide in a recent investor notice of default filed by the Federal Reserve Bank of Ne[w] York along with BlackRock and PIMCO, is that Countrywide has been padding expenses [vi]a in-sourcing on the 115 trusts covered by the letter.[68]

---

[61] Complaint, Walton v. Countrywide Home Loan[s] [In]c. (*In re Atchely*), No. 05-79232 (Bankr. N.D. Ga. filed Feb. 28, 2008).

[62] Complaint, State v. Am. Home Mtg. Servicing, [.] No. 2010-3307 (Tex. Dist. Ct. 448th Jud. Dist. filed Aug. 30, 2010).

[63] Amherst Mortgage Insight, 2010, "The Elepha[nt i]n the Room—Conflicts of Interest in Residential Mortgage Securitizations," 23. May 20, 2010.

[64] *Id.*

[65] Center for Responsible Lending, *Unfair and [uns]afe: How Countrywide's irresponsible practices have harmed borrowers and* shareholders, CRL Issue Paper, Feb. 7, 2008, at 6-7.

[66] Transcript, "Countrywide Financial Corporatio[n 1]3 2007 Earnings Call," Oct. 26, 2007 (emphasis added) (also mentioning "Our vertical diversification businesses, some of which I mention[ ] [a]re counter-cyclical to credit cycles, like the lender-placed property business in Balboa and like the in-source vendor businesses in our loan a[d][m]inistration unit.").

[67] FTC, Press Release, June 7, 2010, *Countrywi[de wi]ll Pay $108 Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled Loans of Borrowers in Bankruptcy[.]*

[68] Kathy D. Patrick, Letter to Countrywide Hom[e Lo]an Servicing LP and the Bank of New York, dated Oct. 18, 2010, *available at* http://www.scribd.com/Bondholders-Letter-to-BofA-Over-C[ountr]ywide-Loans-inc-NY-Fed/d/39686107.

Countrywide is hardly the only s ...vicer accused of acting in its interests at the expense of investors. Carrington, another major s ...vicer, also owns the residual tranche on many of the deals it services. Amherst Mortgage Se ...ities has shown that Carrington has been much slower than other servicers to liquidate default ... loans.[69] Delay benefits Carrington both as a servicer and as the residual tranche investor. ... a servicer, delay helps Carrington by increasing the number of monthly late fees that it c ... levy on the loans. These late fees are paid from liquidation proceeds before any of the M ... S investors.

As an investor in the residual tr ...che, Carrington has also been accused of engaging in excessive modifications to both capture ...te fees and to keep up the excess spread in the deals, as it is paid directly to the residual hol ...rs.[70] When loans were mass modified, Carrington benefited as the servicer by capitalizing ...te fees and advances into the principal balance of the modified loans, which increased the ...lance on which the servicing fee was calculated. Carrington also benefited as the residu ...holder by keeping up excess spread in the deals and delaying delinquency deal triggers that ...strict payments to residual holders when delinquencies exceed specified levels. Assuming that ...e residual tranche would be out of the money upon a timely foreclosure, delay means that C ...rrington, as the residual holder, receives many more months of additional payments on the M ...S it holds than it otherwise would.[71]

It is important to emphasize tha ... junk fees on homeowners ultimately come out of the pocket of MBS investors. If the homec ...ner lacks sufficient equity in the property to cover the amount owed on the loan, including ju ...e fees, then there is a deficiency from the foreclosure sale. As many mortgages are legally or ...nctionally non-recourse, this means that the deficiency cannot be collected from the homeov ...r's other assets. Mortgage servicers recover their expenses off the top in foreclosure sal ... before MBS investors are paid. Therefore, when a servicer lards on illegal fees in a foreclc ...re, it is stealing from investors such as pension plans and the US government.

## D. COMPLAINTS THAT FAIL TO INCLUDE ...E NOTE

Rule of civil procedure generally ...equire that a compliant based on a writing include, as an attachment, a copy of a writing. In a ...reclosure action, this means that both the note and the mortgage and any assignments of either ...ust be attached. Beyond the rules of civil procedure requirement, these documents are also ...cessary as an evidentiary matter to establish that the plaintiff has standing to bring the forecl ...are. Some states have exceptions for public records, which may be incorporated by reference ...nt it is not always clear whether this exception applies in foreclosure actions. If it does, then or ... the note, which is not a public record, would need to be attached.

---

[69] Amherst Mortgage Insight, 2010, "The Elephar ...t the Room—Conflicts of Interest in Residential Mortgage Securitizations", pp. 22-24, May 20, 2010.

[70] See Amherst Mortgage Insight, "Why Investc ...should Oppose Servicer Safe Harbors", April 28, 2009. Exces: spread is the difference between the income of the SPV in a given period a ...ts payment obligations on the MBS in that period, essentially the SPV's periodic profit. Excess spread is accumulated to supplement future ...tfalls in the SPV's cashflow, but is either periodically released to the residual tranche holder. Generally, as a further protection for senior M ... holders, excess spread cannot be released if certain triggers occur, like a decline in the amount of excess spread trapped in a period beneath a j ...icular threshold.

[71] Carrington would still have to make servicing a ...nces on any delinquent loans if it stretched out the time before foreclosure, but these advances would be reimbursable, and the reimburseme ...ould come from senior MBS holders, rather than from Carrington, if it were out of the money in the residual.

Many foreclosure complaints are facially defective and should be dismissed because they fail to attach the note. I have recently examined a small sample of foreclosure cases filed in Allegheny County, Pennsylvania (Pittsburgh and environs) in May 2010. In over 60% of those foreclosure filings, the complaint failed to include a copy of the note. Failure to attach the note appears to be routine practice for some of the foreclosure mill law firms, including two that handle all of Bank of America's foreclosures.

I would urge the Committee to ask Bank of America whether this was an issue it examined in its internal review of its foreclosure practices.

### E. COUNTERFEIT AND ALTERED DOCUMENTS AND NOTARY FRAUD

Perhaps the most disturbing problem that has appeared in foreclosure cases is evidence of counterfeit or altered documents and false notarizations. To give some examples, there are cases in which multiple copies of the "true original note" are filed in the same case, with variations in the "true original note;"[72] signatures on note allonges that have clearly been affixed to documents via Photoshop;[73] "blue ink" notarizations that appear in blank ink; counterfeit notary seals;[74] backdated notarizations of documents issued before the notary had his or her commission;[75] and assignments that include the words "bogus assignee for intervening asmts, whose address is XXXXXXXXXXXXXXXX."[76]

Most worrisome is evidence that these frauds might not be one-off problems, but an integral part of the foreclosure business. A price sheet from a company called DocEx that was affiliated with LPS, one of the largest servicer support firms, lists prices for various services including the "creation" of notes and mortgages. While I cannot confirm the authenticity of this price sheet or date it, it suggests that document counterfeiting is hardly exceptional in foreclosure cases.

While the fraud in these cases is not always by servicers themselves, but sometimes by servicer support firms or attorneys, its existence should raise serious concerns about the integrity of the foreclosure process. I would urge the Committee to ask the servicer witnesses what steps they have taken to ascertain that they do not have such problems with loans in their servicing portfolios.

### G. THE EXTENT OF THE PROBLEM

The critical question for gauging the risk presented by procedural defects is the extent of the defects. While Federal Reserve Chairman Bernanke has announced that federal bank regulators are looking into the issue and will issue a report this month, I do not believe that it is

---

[72] Brief of Antonio Ibanez, Defendant-Appellee, US Bank Nat'l Assn, as Trustee for the Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-Z v. Ibanez; Wells Fargo Bank, N.A. as Trustee for ABFC 2005-Opt 1 Trust, ABFC Asset Backed Certificates Series 2005-OPT 1, No 10694, (Mass. Sept. 20, 2010), at 10 (detailing 3 different "certified true copies" of a note allonge and of an assignment of a mortgage); http://4closurefraud.org/2010/04/27/foreclosure-fraud-of-the-week-two-original-wet-ink-notes-submitted-in-the-same-case-by-the-florida-default-law-group-and-jpmorgan-chase/ (detailing a foreclosure file with two different "original" wet ink notes for the same loan).

[72] http://4closurefraud.org/2010/04/08/foreclosure-fraud-of-the-week-poor-photoshop-skills/.

[74] See WSTB.com, at http://www.wsbtv.com/video/25764145/index.html.

[75] Deposition of Cheryl Samons, Deutsche Bank Nat'l Trust Co., as Trustee for Morgan Stanley ABS Capital 1 Inc. Trust 2006-HE4 v. Pierre, No. 50-2008-CA-028558-XXXX-MB (15th Judicial Circuit, Florida, May 20, 2009, available at http://mattweidnerlaw.com/blog/wp-content/uploads/2010/03/depositionsammons.pdf.

[76] http://www.nassauclerk.com/clerk/publicrecords/oncoreweb/showdetails.aspx?id=809395&m=0&pi=0&ref=search.

within the ability of federal bank regulators to gauge the extent of procedural defects in foreclosure cases. To do so would require, at the very least, an extensive sampling of actual foreclosure filings and their examination by appropriately trained personnel. I am unaware of federal bank regulators undertaking an examination of actual foreclosure filings, much less having a sufficient cadre of appropriately trained personnel. Bank examiners lack the experience or training to evaluate legal documents like foreclosure filings. Therefore, any statement put forth by federal regulators on the scope of procedural defects is at best a guess and at worse a parroting of the "nothing to see here folks" line that has come from mortgage servicers.

I would urge the Committee to inquire with federal regulators as to exactly what steps they are taking to examine foreclosure irregularities and how they can be sure that those steps will uncover the extent of the problem. Similarly, I would urge the Committee to ask the servicer witnesses what specific irregularities they examined during their self-imposed moratoria and by what process. It defies credulity that a thorough investigation of all the potential problems in foreclosure paperwork could be completed in a month or two, much less by servicers that have taken so long to do a small number of loan modifications.

### III. CHAIN OF TITLE PROBLEMS

A second problem and potentially more serious problem relating to standing to foreclose is the issue of chain of title in mortgage securitizations.[77] As explained above, securitization involves a series of transfers of both the note and the mortgage from originator to sponsor to depositor to trust. This particular chain of transfers is necessary to ensure that the loans are "bankruptcy remote" once they have been placed in the trust, meaning that if any of the upstream transferors were to file for bankruptcy, the bankruptcy estate could not lay claim to the loans in the trust by arguing that the transaction was not a true sale, but actually a secured loan.[78] Bankruptcy remoteness is an essential component of private-label mortgage securitization deals, as investors want to assume the credit risk solely of the mortgages, not of the mortgages' originators or securitization sponsors. Absent bankruptcy remoteness, the economics of mortgage securitization do not work in most cases.

Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose. There are several different theories about the defects in the transfer process; I do not attempt to do justice to any of them in this testimony.

---

[77] Chain of title problems appear to be primarily a problem for private-label securitization, not for agency securitization because even if title were not properly transferred for Agency securities, it would have little consequence. Investors would not have incurred a loss as the result of an ineffective transfer, as their MBS are guaranteed by the GSEs or Ginnie Mae, and when a loan in an Agency pool defaults, it is removed from the pool and the owned by the GSE or Ginnie Mae, which is then has standing to foreclose.

[78] Bankruptcy remote has a second meaning, namely that the trust cannot or will not file of bankruptcy. This testimony uses bankruptcy remote solely in the sense of whether the trust's assets could be clawed back into a bankruptcy estate via an equity of redemption. The Uniform Commercial Code permits a debtor to redeem collateral at face value of the debt owed. If a pool of loans bore a now-above-market interest rate, the pool's value could be above the face value of the debt owed, making redemption economically attractive.

It can be very difficult to distinguish true sales from secured loans. For example, a sale and repurchase agreement (a repo) is economically identical to a secured loan from the repo buyer to the repo seller, secured by the assets being sold.

While the chain of title issue has arisen first in foreclosure defense cases, it also has profound implications for MBS investors. If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors' purchased were in fact *non-mortgage-backed securities*. In such a case, investors would have a claim for the rescission of the MBS,[79] meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate). Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors, and that the securitization sponsor would have to have risk-weighted capital for the mortgages. If this problem exists on a wide-scale, there is not the capital in the financial system to pay for the rescission claims; the rescission claims would be in the trillions of dollars, making the major banking institutions in the United States would be insolvent.

The key questions for evaluating chain of title are what method of transferring notes and mortgages is actually supposed to be used in securitization and whether that method is legally sufficient both as a generic matter and as applied in securitization deals. There is a surprising lack of consensus on both counts. Scholars and attorneys cannot agree either on what methods would work generically, much less determine which were used in securitization transactions. This means there is a great deal of legal uncertainty over these issues. Even among banks' attorneys, different arguments appear in different litigation. For example, one possible method of transfer—a sale under Article 9 of the Uniform Commercial Code—has never, to my knowledge, been made by banks' attorneys in foreclosure litigation when chain of title has been questioned, even though it is one of the two methods that a recent American Securitization Forum (ASF) white paper argues is proper.[80] Even among the banks' lawyers, then, there is lack of consensus on what law governs transfers.

The following section outlines the potential methods of transfer and some of the issues that arise regarding specific methods. It is critical to emphasize that the law is not settled on most of the issues regarding securitization transfers; instead, these issues are just starting to be litigated.

## A. TRANSFERS OF NOTES GENERALLY

As a generic matter, a note can be transferred in one of four methods:

(1) The note can be sold via a contract of sale, which would be governed by the common law of contracts.

(2) If the note is a negotiable instrument,[81] it could be negotiated, meaning that it would be transferred via endorsement and delivery, with the process governed by Article 3 of the Uniform Commercial Code (UCC).[82] The endorsement can either be a specific

---

[79] This claim would not be a putback claim necessarily, but could be brought as a general contract claim. It could not be brought as a securities law claim under section 11 of the Securities Act of 1933 because the statute of limitations for rescission has expired on all MBS.

[80] American Securitization Forum, *Transfer and Assignment of Residential Mortgage Loans in the Secondary Mortgage Market*, ASF White Paper Series, Nov. 16, 2010, *at* http://www.americansecuritization.com/uploadedFiles/ASF_White_Paper_11_16_10.pdf. The ASF white paper notes that it has been reviewed and approved by 13 major (but unnamed) law firms. The ASF white paper does not report whether any of these firms have outstanding opinion letter liability on securitization transactions.

[81] It is not clear whether mortgage notes are necessarily negotiable instruments.

[82] The note endorsement process works just like endorsements on checks and is governed by the same law.

endorsement to a named endorsee or an endorsement in blank that converts the note into bearer paper.

(3) The note could be converted into an electronic note and transferred according to the provisions of the federal E-SIGN Act.[83]

(4) The note could be sold pursuant to UCC Article 9, if it was sold after 2001.[84] In 49 states (South Carolina being the exception), Article 9 provides a method for selling a promissory note, which requires that there be an authenticated (signed) agreement, value given, and that the seller have rights in the property being transferred.[85] This process is very similar to a common law sale.

## B. TRANSFERS OF MORTGAGES GENERALLY

There is general agreement that as a generic method, any of these methods of transfer would work to effectuate a transfer of the note. No method is mandatory. Whether or not the chosen process was observed in practice, is another matter, however.[86] Concerns about non-compliance is discussed below.

There are also several conceivable ways to transfer mortgages, but there are serious doubts about the validity of some of the methods:

(1) The mortgage could be assigned through the traditional common law process, which would require a document of assignment. There is general consensus that this process works.

(2) The mortgage could be negotiated. This method of transfer is of questionable effectiveness. A mortgage is not a negotiable instrument, and concepts of negotiability do not fit well with mortgages. For example, if a mortgage were negotiated in blank, it should become a "bearer mortgage," but this concept is utterly foreign to the law, not least as the thief of a bearer mortgage would have the ability to enforce the mortgage (absent equitable considerations). Similarly, with a bearer mortgage, a homeowner could never figure out who would be required to grant a release of the mortgage upon payoff. And, in many states (so-called title theory states), a mortgage is considered actual ownership of real property, and real property must have a definite owner (not least for taxation purposes).

(3) The mortgage could "follow the note" per common law. While there is a good deal of case law using this mellifluous phrase, common law is not wholly settled on the principle,

_____

[83] 15 U.S.C. § 7021. E-SIGN imposes a number of requirements on electronic note transfers and also requires consent of the issuer (maker) of the note.

[84] The revisions of UCC Articles 1 and 9 went into effect nationally in 2001.

[85] UCC 9-203. The language of Article 9 is abstruse, but UCC Revised Article 1 defines "security interest" to include the interest of a buyer of a promissory note. UCC 1-201(b)(35). Article 9's definition of "debtor" includes a seller of a promissory note, UCC 9-102(a)(28)(B ), and "secured party" includes a buyer of a promissory note, UCC 9-102(a)(72)(D). Therefore UCC 9-203, which would initially appear to address the attachment (enforceability) of a security interest also covers the sale of a promissory note. South Carolina has not adopted the revised Article 1 definition of security interest necessary to make Article 9 apply to sales of promissory notes.

[86] Note that common law sales and Article 9 sales do not affect the enforceability of the note against the obligor on the note. UCC 9-308, Cmt.6, Ex. 3 ("Under this Article, attachment and perfection of a security interest in a secured right to payment do not of themselves affect the obligation to pay. For example, if the obligation is evidenced by a negotiable note, then Article 3 dictates the person to whom the maker must pay to discharge the note and any lien security it."). UCC Article 3 negotiation and E-SIGN do affect enforceability as they enable a buyer for value in good faith to be a holder in due course and thereby cut off some of the obligor's defenses that could be raised against the seller. UCC 3-305, 3-306; 15 U.S.C. § 7021(d).

and its meaning is not entirely clear (e.g., does it mean that a transfer of the note effectuates a transfer of the mortgage or that the mortgage and the note cannot be separated and both must be transferred—by their own processes— in order for either transfer to work). There are also several instances where the mortgage clearly does not follow the note. For example, the basic concept of a deed of trust is that the security instrument and the note are separated; the deed of trust trustee holds the security, while the beneficiary holds the note. Likewise, the mortgage follows the note concept would imply that the theft of a note also constitutes theft of a mortgage, thereby giving to a thief more than the thief was able to actually steal. Another situation would be where a mortgage is given to a guarantor of a debt. The mortgage would not follow the debt, but would (at best) follow the guarantee. And finally, the use of MERS, a recording utility, as original mortgage (a/k/a MOM) splits the note and the mortgage. MERS has no claim to the note, but MERS is the mortgagee. If taken seriously, MOM means that the mortgage does not follow the note. While MERS might claim that MOM just means that the beneficial interest in the mortgage follows the note, a transfer of the legal title would violate a bankruptcy stay and would constitute a voidable preference if done before bankruptcy.

(4) the mortgage could "follow the note" if it is an Article 9 transfer.[87] There is consensus that this process would work *if* Article 9 governs the transfer of the note.

## C. TRANSFERS IN RESIDENTIAL MORTGAGE SECURITIZATION TRANSACTIONS

All the methods described above for transferring notes and mortgages are simply generic methods. There may be additional requirements for a valid transfer, either as a function of trust law or as agreed upon by the parties themselves by contract. Notably, the American Securitization Forum's white paper considers neither of these possibilities.[88]

### 1. Trust Law

Trust law creates additional requirements for transfers. RMBS typically involve a transfer of the assets to a New York common law trust. Transfers to New York common law trusts are governed by the common law of gifts. In New York, such a transfer requires actual delivery of the transferred assets in a manner such that no one else could possibly claim ownership.[89] This is done to avoid fraudulent transfer concerns. For a transfer to a New York common law trust, the mere recital of a transfer, is insufficient to effectuate a transfer;[90] there must be delivery in as perfect a manner as possible.[91] Similarly, an endorsement in blank might not be sufficient to effectuate a transfer *to a trust* because endorsement in blank turns a note into bearer paper to which others could easily lay claim.

---

[87] UCC 9-203(g). If the transfer is not an Article 9 transfer, then the Article 9 provision providing that the mortgage follows the note would not apply.

[88] *See supra*, note 80.

[89] *See* Vincent v. Putnam, 248 N.Y. 76, 83 (N.Y. 1928) ("The delivery must be such as to vest the donee with the control and dominion over the property and to absolutely divest the donor of his dominion and control, and the delivery must be made with the intent to vest the title of the property in the donee....Equity will not help out an incomplete delivery.").

[90] *Id.* at 84 ("Mere words never constitute a delivery.").

[91] *In re* Van Alstyne, 207 N.Y. 298, 309 (N.Y. 1913).

## 2. Private Contract

The UCC is simply a set of default rules.[92] Parties are free to contract around it, and need not do so explicitly.[93] Parties can thus impose by contract additional requirements for transfers to those in Articles 3 and 9 or, alternatively, ease the requirements. PSAs appear to be precisely this type of variation by agreement from the UCC. If so, then they would govern the transfers as a simple matter of contract law. Deviation from the PSA requirements would be allowed, but only by the extent permitted by contract law, and even if there were a deviation that constituted a material breach of the contract, it would not void the transfer on a self-executing basis.

## 3. Private Contract + Trust Law

Trust law and private contract law combine to make a much more rigid set of transfer requirements that contract law would by itself. New York law provides that a trustee's authority is limited to that provided in the trust documents.[94] New York law also provides that any transfer in contravention of the trust documents is void.[95] Therefore, if the PSA—the trust document—says that the transfer must be done in a certain way and the transfer did not comply, the transfer is void, irrespective of whether it would comply with the Uniform Commercial Code or other law. The trust document creates a higher level of conduct to which the transfer must comply.

PSAs require a specific form of transfer. First, the PSA contains a recital of the transfer.[96] But per New York trust law, that recital alone is insufficient to effectuate a transfer to a common law trust.[97] Second, PSAs contain a provision that calls for delivery to the trustee for every mortgage loan in the deal of

> the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer.[98]

The reason for requiring this complete chain of endorsement from originator up through the Depositor before a final endorsement to the trust is to provide a clear evidentiary basis for all of the transfers in the chain of title in order to remove any doubts about the bankruptcy remoteness of the assets transferred to the trust. Absent a complete chain of endorsements, it

---

[92] A few provisions of the UCC are mandatory, but these do not affect the chain of title issue.

[93] UCC 1-203; 1-201(b)(3) (defining "agreement").

[94] 14-140 Warren's Weed New York Real Property § 140.58 ("It is a fundamental principle of trust law that the instrument under which the trustee acts is the charter of his rights. Therefore, in administering the trust, he must act in accordance with its terms. This rule applies to every kind of trustee, regardless of whether the trustee is to hold, invest or pay over income, or to sell or liquidate for the benefit of creditors.").

[95] N.Y. E.P.T.L. § 7.2-4.

[96] Pooling and Servicing Agreement, Securities Asset Backed Receivables LLC Trust 2005-FR3, § 2.01(b), July 1, 2005, *available at* http://www.secinfo.com/dRSm6.z1Fa.d.htm ("The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the [mortgage notes].")

[97] Vincent v. Putnam, 248 N.Y. 76, 84 (N.Y. 1928) ("Mere words never constitute a delivery.").

[98] Pooling and Servicing Agreement, Securities Asset Backed Receivables LLC Trust 2005-FR3, § 2.01(b), July 1, 2005, *available at* http://www.secinfo.com/dRSm6.z1Fa.d.htm. Deal language may vary, and some PSAs merely require endorsement in blank, not the chain of endorsements on the note. *See, e.g.*, Pooling and Servicing Agreement, Asset Backed Finance Corp. 2006-OPT- 1 Trust, July 1, 2006, *available at* http://www.secinfo.com/dRSm6.v2K1.c.htm#8mq6 (requiring delivery to the trustee of "the original Mortgage Note, endorsed in blank or with respect to any lost Mortgage Note, an original Lost Note Affidavit, together with a copy of the related Mortgage Note" but not of intervening endorsements.).

23

could be argued that the trust assets were transferred directly from the originator to the trust, raising the concern that if the originator filed for bankruptcy, the trust assets could be pulled back into the originator's bankruptcy estate.

### D. COMPLIANCE

Regardless of the legal method that applies for transferring notes and mortgages, there is a question of whether there was compliance with that method in actual securitization deals. The American Securitization Forum white paper says nothing on this count, nor can it; evaluating compliance would involve examining actual loan files. This is something that federal bank regulators should be doing, and I would urge the Committee to underscore that point in conversations with the regulators.

There are, of course, a multitude of potential non-compliance problems, including the premature shredding of notes[99] or the signing of assignments by purported agents of now-defunct companies. The scope of these problems is unclear; they may plague individual deals or just individual loans within those deals. On the other hand, if the PSAs set forth the transfer requirements, there may well be widespread non-compliance with the endorsement requirements of the PSAs. Most notes contain only a single endorsement in blank, not "all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee" before a final endorsement in blank. This would appear to mean that such transfers are void under New York law and that the mortgages were never actually transferred to the trusts issuing the MBS and this could not be corrected because of various timeliness requirements in PSAs.

It bears emphasis that the validity of transfers to the trusts is an unsettled legal issue. It is not as clear as either the American Securitization Forum or any law firm with outstanding securitization opinion letter liability would have one believe. There are questions both about what law actually governs the transfers and about whether there was compliance with the law. If there is a widespread chain of title problem, however, it would create a systemic crisis, as title on most properties in the US would be clouded and the contract rescission/putback liability because of the failed transfers would greatly surpass the market capitalization of the country's major banks.

## IV. YES, BUT WHO CARES? THESE ARE ALL DEADBEATS

### A. DOES BANKS' CONVENIENCE TRUMP RULE OF LAW?

A common response from banks about the problems in the securitization and foreclosure process is that it doesn't matter as the borrower still owes on the loan and has defaulted. This "No Harm, No Foul" argument is that homeowners being foreclosed on are all a bunch of deadbeats, so who really cares about due process? As JPMorganChase's CEO Jamie Dimon put it "for the most part by the time you get to the end of the process we're not evicting people who

---

[99] See Florida Bankers' Ass'n Comment to the Florida Supreme Court on the Emergency Rule and Form Proposals of the Supreme Court Task Force on Residential Mortgage Foreclosure Cases, at 4, at http://www.scribd.com/doc/38213950/Notes-Are-Destroyed ("The reason 'many firms file lost note counts as a standard alternative pleading in the complaint' is because the physical document was deliberately eliminated to avoid confusion immediately upon its conversion to an electronic file.").

deserve to stay in their house."[100]

Mr. Dimon's logic condones vigilante foreclosures: so long as the debtor is delinquent, it does not matter who evicts him or how. (And it doesn't matter if there are some innocents who lose their homes in wrongful foreclosures as long as "for the most part" the borrowers are in default.) But that is not how the legal system works. A homeowner who defaults on a mortgage doesn't have a right to stay in the home if the proper mortgagee forecloses, but any old stranger cannot take the law into his own hands and kick a family out of its home. That right is reserved solely for the proven mortgagee.

Irrespective of whether a debt is owed, there are rules about who can collect that debt and how. The rules of real estate transfers and foreclosures have some of the oldest pedigrees of any laws. They are the product of centuries of common law wisdom, balancing equities between borrowers and lenders, ensuring procedural fairness and protecting against fraud.

The most basic rule of real estate law is that only the mortgagee may foreclosure. Evidence and process in foreclosures are not mere technicalities nor are they just symbols of rule of law. They are a paid-for part of the bargain between banks and homeowners. Mortgages in states with judicial foreclosures cost more than mortgages in states without judicial oversight of the foreclosure process.[101] This means that homeowners in judicial foreclosure states are buying procedural protection along with their homes, and the banks are being compensated for it with higher interest rates. Banks and homeowners bargained for legal process, and rule of law, which is the bedrock upon which markets are built function, demands that the deal be honored.

Ultimately the "No Harm, No Foul," argument is a claim that rule of law should yield to banks' convenience. To argue that problems in the foreclosure process are irrelevant because the homeowner owes *someone* a debt is to declare that the banks are above the law.

### B. ARE THEY ALL DEADBEATS?

Not every homeowner in foreclosure is a deadbeat. There are some homeowners who are in foreclosure while current on their mortgages, others who are in foreclosure after having been told by their servicers that they have received loan modifications, and others who are in foreclosure because of warehouse lending fraud problems whereby their original lender sold their same mortgage multiple times. There are also homeowners who are in foreclosure because of predatory servicing practices such as charges for forced-placed insurance at way-above-market rates and misapplication of payments (such as illegally applying payments first to late fees and then the principal and interest owed so as to make the payment only qualify as a partial payment, thus incurring another late fee). These homeowners are hardly deadbeats; they are in foreclosure not because of their own behavior, but because of their servicer's behavior.

Ultimately, we don't know how many homeowners in foreclosure are truly in default on their mortgages. To actually determine that would require a detailed examination of homeowners' payment history, an examination that would take several hours in most cases, and homeowners currently lack the right to receive servicing statements showing how their payments

---

[100] Tamara Keith & Renee Montaigne, *Sorting Out the Banks' Foreclosure Mess*, NPR, Oct. 15, 2010.
[101] *See* Karen Pence, *Foreclosing on Opportunity: State Laws and Mortgage Credit*, 88 REV. ECON. & STAT. 177 (2006) (noting that the availability—and hence the cost—of mortgages in states with judicial foreclosure proceedings is greater than in states with non-judicial foreclosures).

are applied. A servicer's assertion that the homeowner is delinquent is not conclusive evidence, especially if the assertion is in a robosigned affidavit. Most homeowners in foreclosure are likely in default, but given that most homeowners lack legal representation, we should be cautious in assuming too much. Sometimes a default judgment is an admission that the plaintiff is correct, and sometimes it is just a sign of lack of resources to litigate.

## V. CONCLUSION

The foreclosure process is beset with problems ranging from procedural defects that can be readily cured to outright fraud to the potential failure of the entire private label mortgage securitization system.

In the best case scenario, the problems in the mortgage market are procedural defects and they will be remedied within reasonably quickly (perhaps taking around a year). Remedying them will extend the time that properties are in foreclosure and increase the shadow housing inventory, thereby driving down home prices. The costs of remedying these procedural defects will also likely be passed along to future mortgage borrowers, thereby frustrating attempts to revive the housing market and the economy through easy monetary policy.

In the worst case scenario, there is systemic risk, as there could be a complete failure of loan transfers in private-label securitization deals in recent years, resulting in trillions of dollars of rescission claims against major financial institutions. This would trigger a wholesale financial crisis.

Perhaps the most important lesson from 2008 is the need to be ahead of the ball of systemic risk. This means (1) ensuring that federal regulators do a serious investigation as discussed in this testimony above and (2) considering the possible legislative response to a crisis. The sensible course of action here is to avoid gambling on unsettled legal issues that could have systemic consequences. Instead, we should recognize that stabilizing the housing market is the key toward economic recovery, and that it is impossible to fix the housing market unless the number of foreclosures is drastically reduced, thereby reducing the excess inventory that drives down housing prices and begets more foreclosures. Unless we fix the housing market, consumer spending will remain depressed, and as long as consumer spending remains depressed, high unemployment will remain and the US economy will continue in a doldrums that it can ill-afford given the impending demographics of retirement.

This suggests that the best course of action is a global settlement on mortgage issues, the key elements of which must be (1) a triage between homeowners who can and cannot pay with principal reduction and meaningful modifications for homeowners with an ability to pay and speedier foreclosures for those who cannot, (2) a quieting of title on securitized properties, and (3) a restructuring of bank balance sheets in accordance with loss recognition.

A critical point in any global settlement, however, must be removing mortgage servicers from the loan modification process. Servicers were historically never in the loan modification business on any scale, and four years of hoping that something would change have demonstrated that servicers never will manage to successfully modify many loans on their own. They lack the capacity, they lack the incentives, and the lack the will.

26

If we want to see more loan modifications—and I would submit that this is important not just as a type disaster relief for deserving homeowners, but as an indispensable measure for stabilizing the housing market and the economy—then we need to take servicers out of the loan modification process and have modifications done either by a government agency or by the courts or by outcome-neutral third parties.

A global settlement would also be an allocation of the losses from the implosion of the housing bubble. Those losses are not avoidable. The Treasury Department's unspoken hope that the economy will grow its way out of those losses and that they can be recognized against future retained earnings was optimistic to begin with and given the performance of the economy of the past two years, it is Pollyannaism to continue in such a belief. Instead, if the economy is to move forward without losing a decade or more in a long-shot bet on sudden resurrection, we must face the losses from the financial crisis and allocate them sensibly. There are only a limited number of places where we can put those losses: homeowners, banks, MBS investors (including many pension funds), or the government. There are political choices to be made in any allocation, but failure to make an explicit allocation is also a choice—that the losses will be borne by homeowners and MBS investors. We should be cognizant of these choices.

I recognize that for many, the preferred course of action is not to deal with a problem until it materializes and certainly to avoid any loss allocation that might threaten US financial institutions. But if we pursue that route, we may well be confronted with an unmanageable crisis. We cannot rebuild the US housing finance system until we deal with the legacy problems from our old system, and these are problems that are best addressed sooner, before an acute crisis, then when it is too late.

27

# EXHIBIT "F"

GMAC/TAGGART USBC. SDNY 9.25.12

(Page 1 of 3)

Phelan Hallinan & Schmieg, LLP
Lawrence T. Phelan, Esq., Id. No. 32227
Francis S. Hallinan, Esq., Id. No. 62695
Daniel G. Schmieg, Esq., Id. No. 62205
Michele M. Bradford, Esq., Id. No. 69849
Judith T. Romano, Esq., Id. No. 58745
Sheetal R. Shah-Jani, Esq., Id. No. 81760
Jenine R. Davey, Esq., Id. No. 87077
Lauren R. Tabas, Esq., Id. No. 93337
Vivek Srivastava, Esq., Id. No. 202331
Jay B. Jones, Esq., Id. No. 86657
Peter J. Mulcahy, Esq., Id. No. 61791
Andrew L. Spivack, Esq., Id. No. 84439
Jaime McGuinness, Esq., Id. No. 90134
Chrisovalante P. Fliakos, Esq., Id. No. 94620
Joshua I. Goldman, Esq., Id. No. 205047
Courtenay R. Dunn, Esq., Id. No. 206779
Andrew C. Bramblett, Esq., Id. No. 208375
1617 JFK Boulevard, Suite 1400
One Penn Center Plaza
Philadelphia, PA 19103
215-563-7000



2009-25338-0003
9/8/2009 10:27:34 AM
Praecipe for Substitution of
Receipt# Z740284
Mark Levy - Montgomery County Prothonotary

ATTORNEY FOR PLAINTIFF

| | | |
|---|---|---|
| **GMAC MORTGAGE, LLC** | : | **COURT OF COMMON PLEAS** |
| | : | |
| **Plaintiff** | : | **CIVIL DIVISION** |
| | : | |
| **vs.** | : | **NO. 09-25338** |
| | : | |
| **KENNETH TAGGART** | : | **MONTGOMERY COUNTY** |
| | : | |
| **Defendant(s)** | : | |
| | : | |
| | : | |

PHS #: 213964

## PRAECIPE TO SUBSTITUTE VERIFICATION
## TO CIVIL ACTION COMPLAINT
## IN MORTGAGE FORECLOSURE

TO THE PROTHONOTARY:

Kindly substitute the attached verification for the verification originally filed with the complaint in the instant matter.

Phelan Hallinan & Schmieg, LLP
Attorney for Plaintiff

By: _____

- [ ] Lawrence T. Phelan, Esq., Id. No. 32227
- [ ] Francis S. Hallinan, Esq., Id. No. 62695
- [ ] Daniel G. Schmieg, Esq., Id. No. 62205
- [ ] Michele M. Bradford, Esq., Id. No. 69849
- [ ] Judith T. Romano, Esq., Id. No. 58745
- [ ] Sheetal R. Shah-Jani, Esq., Id. No. 81760
- [✓] Jenine R. Davey, Esq., Id. No. 87077
- [ ] Lauren R. Tabas, Esq., Id. No. 93337
- [ ] Vivek Srivastava, Esq., Id. No. 202331
- [ ] Jay B. Jones, Esq., Id. No. 86657
- [ ] Peter J. Mulcahy, Esq., Id. No. 61791
- [ ] Andrew L. Spivack, Esq., Id. No. 84439
- [ ] Jaime McGuinness, Esq., Id. No. 90134
- [ ] Chrisovalante P. Fliakos, Esq., Id. No. 94620
- [ ] Joshua I. Goldman, Esq., Id. No. 205047
- [ ] Courtenay R. Dunn, Esq., Id. No. 206779
- [ ] Andrew C. Bramblett, Esq., Id. No. 208375

Date: 9-4-09

PHS #: 213964

(Page 3 of 3)

## VERIFICATION

Jeffrey Stephan
Limited Signing Officer    hereby states that he/she is

_____CSO_____ of GMAC MORTGAGE, LLC, servicing agent for Plaintiff in

this matter, that he/she is authorized to take this Verification, and that the statements made in the

foregoing Civil Action in Mortgage Foreclosure are true and correct to the best of his/her

knowledge, information and belief. The undersigned understands that this statement is made

subject to the penalties of 18 Pa. C.S. Sec. 4904 relating to unsworn falsification to authorities.

Name:

DATE: _August 19, 2009_    Title:    Jeffrey Stephan
Limited Signing Officer

Company: GMAC MORTGAGE, LLC

File #: 213964 Taggart

**SUMMARY OF KEY PORTIONS OF TESTIMONY OF JEFFERY STEPHAN AT HIS DEPOSTION TAKEN ON JUNE 7, 2010**

P. 33, line 24

Q. Do you have any knowledge of how summary judgment affidavits are used in judicial foreclosure case?

A. No.

Q. Are you aware that they are given to a judge?

A. Yes.

Q. And do you understand that a judge relies upon them?

A. Yes

P. 34, line16

Q. Has the manner in which you perform your duties as team lead for the document execution team changed in any way over the period from August 5, 2009 to the present date?

A. No.

P. 54

Q. When you sign a summary judgment affidavit, do you check to see if all of the exhibits are attached to it?

A. No.

Q. When you sign a summary judgment affidavit, do you inspect any of the exhibits attached to it.

A. No.

Q. Does anybody in your department check to see if all of the exhibits are attached to it?

A. No.

Q. When you sign a summary judgment affidavit, do you inspect any exhibits attached to it?

A. No.

**EXHIBIT 1**

1

P. 56, line 56

Q. My question to you is where does a summary judgment affidavit go after you sign it?

A. After I sign it, it is handed back to my staff. My staff hands it to a notary for notarization. They send it back to the attorney network requesting any type of affidavit.

Q. So you do not appear before the notary; is that correct.

A. I do not.

P. 58, line 13

Q. Your department does not do an independent check of the accuracy of the information on summary judgment affidavits coming to you; isn't that correct?

A. I review, quickly, the figures. Other than that, that's about it.

P. 61, line 14

Q. And you just testified that you look at principal, interest, late charges and escrow, is that correct?

A. That is correct.

Q. Is there anything else that you look at in your computer system when your signing a summary judgment affidavit?

A. The only thing I review other than that is who the borrower is.

Q. When you receive a summary judgment affidavit to sign, do you read every paragraph of it?

A. No.

Q. What do you read?

A. I look at the figures.

Q. That's all that you look at when you sign a summary judgment affidavit?

A. Yes, to ensure that the figures are accurate.

2

P. 62, line 11

Q.  Is it fair to say that when you sign a summary judgment affidavit, you do not know what information it contains other than the figures that are set forth within it?

A. Other than the borrower's name and if I have signing authority for that entity.  That is correct.

P. 67, line 21

Q.  So other than the due date and the balances due, is it correct that you do not know whether any other part of the affidavit that you sign is true.

A.  That could be correct.

Q.  Is it correct?

A. That is correct.

3