**EXHIBIT 1**

## CONSULTING AND DEVELOPMENT MASTER AGREEMENT

This Consulting and Development Master Agreement (the "Agreement") is made and entered into as of the 21 day of FEBRUARY , 2002 by and between GMAC Mortgage Corporation, a Pennsylvania corporation with offices at 100 Witmer Road, Horsham, PA 19044-0963 (the "Company"), and Palisades Technology Partners, a New Jersey limited liability company with offices at 440 Sylvan Avenue, Englewood Cliffs, NJ 07632 (the "Supplier"). The Effective Date ("Effective Date") of this Agreement shall be October 29, 2000, the first date Supplier commenced performance of consulting and/or development services for Company.

## BACKGROUND

**WHEREAS**, Company owns and/or wishes to develop certain proprietary computer software applications for its businesses and for the benefit of Company and/or its parent, affiliates and subsidiaries (collectively referred to as "Company").

**WHEREAS**, Supplier is skilled in the development, integration, testing and certification of computer software.

**WHEREAS**, the Company wishes to engage Supplier, and Supplier desires to perform various consulting and development services for Company. In performing such consulting and development services, Supplier will be involved with and have access to Company information and materials of a highly sensitive nature that must be carefully protected including, without limitation, certain confidential and proprietary information including, but not limited to, trade secrets of Company.

WHEREAS, Supplier began to perform such services for Company prior to its execution of this Agreement, but did so in accordance with the understandings reflected in this Agreement, including but not limited to Supplier's representations, warranties, covenants and undertakings herein with respect to confidentiality and intellectual property rights.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement, and intending to be legally bound by this Agreement, Company and Supplier agree as follows:

1.   Scope of Work.

     1.1   Projects. During the Term (as defined herein), Company or Supplier may identify services that Supplier can provide to the Company ("Project(s)"). Each Project may include provisions of services ("Services") and/or delivery of certain products or other items ("Deliverables"). Services and Deliverables include services performed and items delivered at any time on or after the Effective Date, whether before or after Supplier's execution of this Agreement. Each Project will be described, along with any terms and conditions that are additional to the terms and conditions of this Agreement, in Statement(s) of Work each to be incorporated herein, which may contain specifications, schedules, milestones, payments, or any other terms and conditions mutually agreed upon by the parties. Statements of Work shall be effective only if accompanied by the dated signature of an authorized representative of each party. The terms and conditions of this Agreement shall be applicable to each Project and are

incorporated by reference into each Statement of Work, unless specifically excluded by a Statement of Work. Incorporation of third-party products or services into a specific Project must be approved in advance and in writing by Company. If Company agrees that any third-party products or services are necessary for integration into a specific Project, Company will provide Supplier with access to the vendor of such third-party products or services, when Company, in its sole discretion, agrees that it is necessary and appropriate. During the Term of each Project under this Agreement and until the expiration of the Warranty Period, Supplier will respond diligently and within a commercially reasonable period of time to all inquiries and requests for assistance by the Company.

1.2    Change Orders. Both parties acknowledge that the scope of work for the Services and Deliverables to be provided by Supplier under a Statement of Work may change over the course of a Project, and agree that no additional fees shall be due for any changes that do not materially alter the obligations of Supplier relating to such Statement of Work. Supplier will not charge additional fees until such changes are greater than a five percent (5%) increase of the time and materials specified in the Statement of Work. If the Company requests Supplier to provide additional services resulting in fees of greater than five percent (5%) for such increased time and materials, then Supplier may, as mutually agreed upon by the Parties, respond to such requests from the Company as a change in order ("Change Order"), provided however, that all Change Orders must be agreed upon in writing and executed by authorized representatives of the Parties prior to commencing such additional services. Such Change Orders shall be amendments to the current Project and Statement of Work and will be paid as mutually agreed upon by the parties but in no event less than thirty (30) days following receipt of an undisputed invoice. All material and significant deviations beyond the agreed upon Project and Statement of Work may constitute an additional and separate Project ("Additional Project") that must be mutually agreed upon in writing by the Company and Supplier as provided in Section 1.1. Supplier will advise Company in writing upon receipt of a request by Company to go beyond the scope of any Project and/or Statement of Work if such work will constitute a Change Order and/or an Additional Project. Notwithstanding the foregoing, Supplier will not begin to provide services beyond the agreed upon Project and Statement of Work until the parties have mutually agreed in writing to a Change Order or Additional Project.

1.3    Relationship Managers. The parties will designate and maintain relationship managers ("Relationship Managers") for purposes of all work and business between them concerning this Agreement, any Statement(s) of Work and all notice required or permitted by this Agreement. The Relationship Manager for Company will be the Chief Information Officer, or his designee. The Relationship Manager for Supplier will be Carmine Cacciavillani . The signature of the Relationship Manager on this Agreement, any Statement of Work or any Change Order will be deemed the authorized signature of the respective party. If either party decides, at any time, to replace the Relationship Manager, or his designee, it may do so by written notice to the other party pursuant to the Notices Section in this Agreement.

1.4    Project Contacts. The parties will designate and maintain contact persons ("Project Contacts") for purposes of all day to day work and business between them concerning a Statement(s) of Work . The Project Contact for each party will be set forth on each Statement of Work. In performing its obligations under this Agreement, Supplier will be entitled to rely upon

any routine instructions, authorizations, approvals or other information provided to Supplier by Company's Project Contact, or as to areas of competency specifically identified by such Project Contact, by any other Company personnel identified by Company's Project Contact, from time to time, as having authority to provide the same on behalf of Company in such person's area of competency. Company will be entitled to rely upon any routine instructions, authorizations, approvals, or other information provided to Company by Supplier's Project Contact, or as to areas of competency specifically identified by such Project Contact, by any other Supplier personnel identified by Supplier Project Contact, from time to time, as having authority to provide the same on behalf of Supplier in such person's area of competency. Notwithstanding the foregoing, the Project Contacts are not authorized signatories under this Agreement, any Statement(s) of Work or any Change Orders, unless the Project Contacts are also Relationship Managers. If there is a conflict between the information provided by a Project Contacts and a Statement of Work and/or Change Order , the Statement of Work and/or Change Order shall control. If either party decides, at any time, to replace the Project Contact, it may do so by written notice to the other party pursuant to the Notices Section in this Agreement.

1.5    Delivery. The Services and Deliverables for each Project shall be delivered to the Company by Supplier in accordance with the delivery and payment schedules and in conformity with the specifications of the applicable Statement of Work. Deliverables must be accompanied by proper documentation and source code, scripts, parameter settings and other such items necessary for Company to independently operate and maintain the Deliverable. Absence of such requirements in a Statement of Work or acceptance of a Deliverable without these requirements being fulfilled does not waive the Supplier's obligations to provide them. If the Statement of Work or Change Order specifies that Deliverables will be produced and delivered according to specific milestones ("Milestone Deliverables"), then delivery of each Milestone Deliverable shall be submitted to Company for review pursuant to the procedures set forth in the Statement of Work or Change Order. Milestones may, for example, require Supplier to deliver detailed functional or design specifications, or interim beta test code, as set forth in the Statement of Work. Each Milestone Deliverable shall be delivered or transmitted by Supplier to Company in accordance with the delivery method and schedules specified in the Statement of Work. Supplier shall give Company written notice certifying the delivery of the completed Deliverables, and delivery shall not be considered complete until Company has received such notice.

1.6    Evaluation and Acceptance. Company shall evaluate each Deliverable submitted by Supplier and shall provide to Supplier either (i) notice of Company acceptance upon successful completion of Company's evaluation (the "Acceptance Date"), or (ii) notice of deviations in the event the Deliverables do not conform to the specifications of the Statement of Work. Company shall be deemed to have accepted a Deliverable if (x) Company fails to provide Supplier with notice of acceptance or notice of deviations within thirty (30) days of receipt of the Deliverable, and (y) Company uses such Deliverable in a production environment for at least ten (10) business days ("Deemed Acceptance"). No payment made by Company shall be construed as acceptance of substandard or careless Deliverables or as relieving Supplier from its full responsibility under this Agreement.

1.7    Warranty and Warranty Period. The Supplier represents and warrants that it will perform all Services in a professional and workmanlike manner and that the Services will conform to the specifications contained in any Statement of Work. For a period of ninety (90)

days following the Acceptance Date or Deemed Acceptance of each Deliverable (the "Warranty Period"), Supplier warrants that the Deliverable shall be free from any and all deficiencies that cause the Deliverable to not function in conformity with the functional specifications set forth in the Statement of Work(the "Defect(s)"). Supplier acknowledges that time is of the essence in curing any Defect and thus agrees that upon receipt of Company's notice of a Defect, Supplier shall use its best efforts to cure such Defect immediately but in no event longer than fifteen (15) days from the date of notice, unless otherwise reasonably agreed to by the parties. Any failure by Supplier to cure any Defect within such time period shall constitute a material breach of this Agreement and/or the Statement of Work. Any and all source and/or object code developed by Supplier for a Project, whether or not included in the final Deliverable, shall be subject to Section 3 below and a copy of such source code shall be provided along with the Deliverable. Supplier shall also archive any such code for the duration of the warranty period.

1.8    Limitation on Warranty. Except as set forth in this Agreement, Supplier does not make any additional warranty, express or implied, including warranties of merchantability and fitness for a particular purpose pertaining to the performance of this Agreement.

2.    Compensation.

2.1    Payment Schedule. Supplier shall provide Project invoices, in accordance with this Agreement and any applicable Statement of Work, setting forth charges for Services and Deliverables in such detail as may be appropriate to reflect the specific amounts due for each Project. Company shall pay Supplier in accordance with the delivery and payment schedules set forth for each Project in the Statement of Work, as may be adjusted by mutual written agreement of the parties, but in no event less than thirty (30) days following receipt of an undisputed invoice. Unless otherwise stated in the Statement of Work, installment payments are due and payable thirty (30) days following the Acceptance Date or Deemed Acceptance of the Deliverable and following receipt of an undisputed invoice from Supplier, and expense reimbursements, if applicable, are due within thirty (30) days after the Company's receipt of an undisputed invoice from Supplier. Company will reimburse Supplier in accordance with Company's policies and guidelines for all necessary, reasonable and actual expenses provided such expenses are authorized in advance by Company in writing and incurred solely in connection with the Services contemplated under this Agreement or a Statement of Work. Supplier and its employees will exercise reasonable cost effectiveness when incurring reimbursable expenses and comply with Company's policies and guidelines, as shall be provided by Supplier in writing from time to time, for such expense. Notwithstanding the preceding paragraph, unless specifically agreed in writing, each party will be responsible for its own expense incurred in rendering performance, including the cost of facilities, work space, computers and computer time, development tools and platforms, utilities management, personnel, and the like.

(b)    If there is a dispute as to any invoice or portion thereof, Company shall pay all items not disputed as set forth in Section 2.1(a) and the Relationship Managers agree to engage in good faith efforts to resolve the dispute within ten (10) days of the due date of the invoice.

3.    Ownership of the Work and/or All Derivative Works.

3.1    Work for Hire.  Supplier assigns to Company all right, title, and interest in and to the Services, Deliverables, Projects, Statements of Work, and Change Orders.  Supplier further acknowledges and agrees that the Company shall be the sole owner of all patents, patent rights, copyrights, trade secret rights, trademark rights and all other intellectual property or other rights, whether or not registered or to be registered in the United States or elsewhere, in connection with this Agreement, any Service, Deliverable , Project, Statement of Work, and/or Change Order (the "Assigned Properties").    Supplier further acknowledges and agrees that such Services, Deliverables, Projects, Statements of Work, Change Orders and/or Assigned Properties, including, without limitation, any computer programs, programming documentation, other works of authorship, written materials, notes, designs, drawings, documentation, technology, algorithms, code, source code, ideas, concepts, know-how, techniques, processes, methods, inventions, discoveries, developments, innovations, and improvements, tangible or intangible, that are discovered, invented, created, conceived, made or reduced to practice in connection with any Services performed by Supplier pursuant to this Agreement, Projects and/or Change Orders, whether alone by Supplier or with others, which shall include the object and source code to the Deliverables and any and all "Derivative Work" as defined in Section 101 of the U.S. Copyright Act are "works made for hire" for purposes of the Company's rights under copyright laws.  To the extent such Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders are not "works made for hire", Supplier hereby assigns to Company any and all rights, title and interest it may have or acquire in such Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders.  Supplier acknowledges and agrees that this Section 3 applies to any and all services and deliverables provided to Company prior to or after execution of this Agreement and that (a) all such services are hereby deemed to be "Services" under this Agreement, and (b) all such deliverables are hereby deemed to be "Deliverables" under this Agreement.  Within thirty (30) days of execution of this Agreement, Supplier will provide Company with a detailed listing of all such Services and Deliverables and will deliver the source and object code for all such Services and Deliverables.

3.1.1    Limited License.  For the limited purpose of performing the Services under this Agreement or any Project and to the extent Company believes such access is necessary and appropriate, Supplier may utilize Company's confidential and proprietary information, including but not limited to, software programs, program code, information, methodologies, business methods, competitive strategies, and other trade secrets or proprietary information, and all derivative works thereof (the "Company Property"), and may incorporate them into the Deliverables.  Company shall retain all ownership rights, including without limitation, all mask work act registrations, mask work act applications, copyrights, copyright applications, copyright extensions, copyright renewals, patents, and patent applications (whether or not registered or to be registered in the United States or elsewhere), all other intellectual property rights, and all know-how, trade secrets and proprietary information associated with the Company Property or its development or use in and to Company Property, and no right, title or license in the Company Property is granted to Supplier.

3.1.2    Excluded Property.  Notwithstanding Section 3.1, excluded from Assigned Properties shall be the following:   concepts, know-how, techniques, processes, methods, inventions, discoveries, developments, and innovations that are discovered, invented, created, conceived, made or reduced to practice by Supplier (a) prior to the Effective Date , or (b) that are not a part of the Deliverables or necessary to the Deliverables or the function of the Deliverables.

but (i) were developed by Supplier in support of the build effort as a tool, test, platform or development method and not as a specific function or feature of the actual application or the Services or Deliverables; and (ii) are not based on or derived from Company Property in part or in whole (collectively the "Supplier Property"). Supplier Property is listed in Attachment A to this Agreement.

3.1.3   As part of the consideration tendered by the Company to Supplier for any Project, Supplier grants to Company a fully-paid, royalty-free, irrevocable, perpetual, unlimited, sublicensable, worldwide, non-exclusive license to the Supplier Property to use, execute, perform, display, reproduce, transfer, modify, and create derivative work of such Supplier Property as part of or in connection with the Company Property. Title and all rights of Supplier's Property remains with Supplier.

3.1.4   Company may not disclose Supplier Property source code to third parties except as set forth herein, provided that the obligations set forth in this Section 3.1.4 shall not apply in the event this Agreement is terminated pursuant to a No Cause Termination as set forth in Section 7.1, and in such event, Supplier hereby acknowledges and agrees that Company may disclose Supplier Property source code to third parties designated by Company in Company's discretion, subject to the requirements of Section 3.1.5. In the event Company desires third party services that require Company to disclose Supplier Property source code to a third party for such third party to use, execute, perform, display, reproduce, transfer, modify and create derivative work of such Supplier Property for the benefit of Company ("Additional Work"), then Company must first notify Supplier of Company's desire for such Additional Work ("Notice") and offer Supplier an opportunity to submit a proposal for the Additional Work. In this event, Supplier will have the right of first refusal for such Additional Work, provided that Supplier submits its offer ("Offer") for such Additional Work within five (5) calendar days after Supplier's receipt of the Notice, and provided further that Company's failure to receive an Offer within five (5) calendar days shall be deemed to mean Supplier has refused to provide such Additional Work ("Refusal"). In the event of a Refusal, Supplier will notify Company in writing within three (3) business days ("Module Notice") of the specific modules of Supplier Property source code that would be required to perform the Additional Work ("Modules"), and Supplier hereby agrees that Company may disclose such Modules to third parties selected by Company to perform the Additional Work, provided that Company's failure to receive a Module Notice within three (3) business days shall be deemed to mean that Supplier agrees to Company's disclosure of any and all Supplier Property source code to third parties selected by Company to perform such Additional Work. Notwithstanding the foregoing, Company will not disclose Supplier Property source code and Supplier Property object code to the following entities: Ceira Technologies, Inc., Mortgagehub.com, Harland Financial Solutions, and Mindbox, Inc., without the prior written consent of Supplier.

3.1.5   Company agrees that any disclosure of Supplier Property source code to third parties shall be only to third parties who have agreed in writing to be bound by confidentiality terms consistent with those in this Agreement.

3.2     Disclosure.  Upon commencement of a Project, and as necessary during a Project in Company's discretion, Supplier agrees to promptly disclose to Company all Assigned Properties and any Supplier Property and establish a third-party escrow account for any such

Supplier Property source code determined by Company to be required. The terms of any third-party escrow account shall be as mutually agreed between the Parties.

3.3    Assistance in Enforcement. Supplier agrees to provide all assistance reasonably requested by Company in the establishment, preservation and enforcement of Company's copyright, trade secret, and other proprietary interests in the Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders, including executing documents, testifying, and all similar activity, such assistance to be provided at Company's expense. Supplier shall be reasonably compensated for such assistance and in connection with any efforts to perfect copyrights and other intellectual property right, at a rate mutually agreed upon by the parties. Supplier shall at the expense of Company, assist Company or its designated agents to register copyrights and obtain patents for the Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders, in any country throughout the world. Supplier hereby irrevocably appoints Company, and its duly authorized officers and agents, as Supplier's agent and attorney-in-fact to act for and in behalf of Supplier in filing all patent applications, applications for copyright or trademark registration or amendments, renewals, and all other appropriate documents in any way related to the Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders.

3.4    Assignment or Waiver of Moral Rights. Any assignment of copyright under this Agreement or a Project (and any ownership of a copyright as a "work made for hire") includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights"). To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, Supplier waives such Moral Rights and consents to any action of the Company that would violate such Moral Rights in the absence of such consent.

3.5    Supplier's Employees. Supplier shall, at its own expense, cause any and all of its employees, independent consultants, and all other parties it engages for the Projects to undertake all actions and execute all appropriate documents necessary to carry out the intent of the paragraphs of this Section 3, including but not limited to, waivers, releases of liens and assignments, and shall provide copies of such documents to the Company upon written request. Supplier agrees to indemnify, waive and release the Company against any third-party liens on the Deliverables or Assigned Properties.

4.    Confidential Information.

4.1    The parties agree that any information and documents that are furnished by each party for the purposes of performing the Services, Deliverables, Projects, Statements of Work, and/or Change Orders or which are produced or are otherwise furnished to or come to the attention of a party are proprietary to the disclosing party and shall be used only for the purposes of this Agreement. This information may include, without limitation: the terms of this Agreement, technical specifications and operating manuals, services and information concerning current, future, or proposed products and services and combinations of products and services; product and services descriptions; financial information; information related to mergers or acquisitions; passwords and security procedures; computer programs, software, and software

documentation; customer and/or prospective client lists, mortgage loan files, and all other information relating in any way to the customer and/or prospective client and printouts; records; policies, practices and procedures; and any or all other information, data or materials relating to the business, trade secrets and technology, its customers, clients, employees, business affairs, affiliates, subsidiaries and the affiliates of its parent organization; and, any and all information and materials in the disclosing party's possession or under its control from any other person or entity that the disclosing party is obligated to treat as confidential or proprietary (all of the foregoing collectively referred to as "Information").

4.2    Each party shall maintain the Information in confidence and maintain a secure system for its storage and handling. The parties further agree to (a) restrict disclosure of the Information solely to persons who need to know the Information to perform under this Agreement, (b) not to disclose the Information to any third-party or copy Information without written approval of the disclosing party, and (c) inform those authorized third parties and other persons who receive such Information of the confidential nature of the Information and obtain their written agreement to abide by the obligations set forth herein.

4.3    The obligations imposed under this Agreement shall not apply to Information that (a) is made public by the disclosing party, (b) rightfully becomes generally available to the public, or (c) is rightfully received from a third person having the legal right to disclose the Information free of any obligation of confidence. In the event that the receiving party, or any of its partners or employees, becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil or criminal investigative demand or similar process) to disclose any Information, the receiving party shall provide the disclosing party with prompt prior notice so that the disclosing party may seek a protective order or other appropriate remedy.

4.4    Each party acknowledges and agrees that any breach or threatened breach of any of the provisions of this Section by the receiving party will result in immediate and irreparable harm and that any remedies at law in such event will be inadequate. The receiving party agrees that such breaches, whether threatened or actual, will give the disclosing party the right to terminate this Agreement immediately and obtain injunctive relief to restrain such disclosure or use. This right shall, however, be in addition to and not in lieu of any other remedies at law or in equity.

4.5    Upon termination of the Agreement, all copies of the Information (including all electronic imaging of the Information) will either be destroyed or returned to the disclosing party immediately upon the disclosing party's request. The receiving party agrees that it will not retain any copy, summary or extract of the Information or any related work papers on any storage medium whatsoever. Upon request, the receiving party will provide a certification from an appropriate officer that the requirements of this paragraph have been satisfied in full. Notwithstanding anything to the contrary contained herein, Company shall in no event have any obligation hereunder to destroy mortgage loan files or any documents related thereto.

4.6    The provisions of the Section shall survive the termination or expiration of this Agreement.

5.    Supplier Additional Warranties.

In addition to those warranties provided in Section 1.6, Supplier represents and warrants that: (i) it has experience and is qualified to provide the Services contemplated by this Agreement and such Services will be performed in a professional and workmanlike manner in accordance with applicable professional standards, (ii) it is duly organized and validly existing in good standing under the laws of the jurisdiction in which it is organized, is duly qualified and in good standing as a foreign limited liability company in every state in which the character of its business requires such qualifications, and has the full power to own its property and to carry on its business as now being conducted; (iii) the execution and delivery of this Agreement and compliance by it with all provisions of this Agreement (a) are within the power and authority of it, and (b) have been duly authorized by all requisite proceedings; (iv) the Agreement has been duly executed and delivered by it and, assuming due and authorized execution by the other party, constitutes a valid and binding agreement between the parties, enforceable in accordance with its terms; and, (v) the execution and delivery of this Agreement shall not conflict with or result in a breach of the terms, conditions or provisions of, give rise to a right of termination under, constitute a default under, or result in any violation of, the organizational documents of it or any agreement, contract, instrument, order, judgment, decree, statute, law, rule or regulation to which it or any of its respective properties is subject; (v) no authorizations or other consents, approvals or notices of or to any person or entity are required in connection with (a) the performance by it of its obligations under this Agreement, (b) the development and implementation of the systems necessary to perform the Services and provide the Deliverables and facilities required by, and otherwise comply with, this Agreement in accordance with the applicable provisions of this Agreement and in compliance with all applicable law, (c) the validity and enforceability of this Agreement; or (d) the execution, delivery and performance by it of this Agreement.

Without limiting the foregoing, Supplier specifically represents and warrants to Company that Supplier's performance of all of the terms of this Agreement and the performance of consulting and development services does not and will not breach any agreement or obligation to keep in confidence proprietary information or trade secrets acquired by Supplier in confidence or in trust, whether before or after the Effective Date, and Supplier will not disclose to Company, or induce Company to use, any confidential or proprietary information or materials belonging to others. Supplier agrees not to enter into any agreement either written or oral, in conflict with this Agreement; provided, however, that nothing herein shall prohibit the Supplier from providing services to other companies or entities. Supplier further represents and warrants that is has complied with this subparagraph, and with the confidentiality obligations imposed on it under Section 4 hereof, at all times since commencing services for Company, including but not limited to the period prior to its execution of this Agreement.

6.    Indemnification.

6.1    Infringement Indemnification by Supplier. Supplier shall, at its own expense, defend, indemnify and hold harmless Company and its employees, officers, directors, licensees, representatives, attorneys, parents, subsidiaries, successors, assigns and agents from and against any and all liabilities, claims, actions, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) relating to or arising out of any third-party claim(s) that the Services, Deliverables, Projects, and/or Change Orders, source code or object

code provided pursuant to this Agreement by Supplier or any of its employees, agents, representatives, or contractors, subcontractors, and/or consultants infringe any United States patent, or any license, trademark, copyright, trade secret or any other intellectual property right. Supplier will defend Company against such claims at Supplier's sole expense and pay all court awarded damages relating to such claims, provided that, Company notifies Supplier in a timely manner in writing of the claim, and allows Supplier to control, and cooperates with Supplier in the defense or any related settlement negotiations, to the extent such settlement does not cause the Company to incur any liability and does not admit any liability on the part of Company. If an infringement claim is made or appears possible, Supplier will, at Company's sole option: (i) secure for Company the right to continue to use the Services, Deliverables, Projects, and/or Change Orders; (ii) modify or replace the information, Services, Deliverables, Projects, and/or Change Orders so that they are non-infringing but functionally equivalent; or (iii) accept the return of the Services, and/or Deliverables from the Company and provide a pro rata refund of fees paid by the Company. However, Supplier has no obligation (i) to the extent any claim is based in whole on modification of the Services, information, Deliverables, Projects and/or Change Orders by Company which is not authorized or supported by Supplier; and (ii) for Company provided specifications except to the extent Supplier should reasonably know such specifications are infringing.

6.2    Indemnification. Each party (each an "Indemnitor") shall, at its own expense, defend, indemnify and hold harmless the other party and its employees, officers, directors, licensees, representatives, attorneys, parents, subsidiaries, successors, assigns and agents ("Indemnitee") from and against any and all liabilities, claims, actions, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) relating to or arising out of any third-party claim(s) for bodily injury to, or death of, any person or for damage, loss or destruction of tangible real property or tangible personal property caused by Indemnitor or its agents, subcontractors, employees, consultants or representatives. The Indemnitor will defend Indemnitee against such claims at Indemnitor's sole expense and pay all court awarded damages relating to such claims, provided that Indemnitee notifies Indemnitor in writing in a timely manner of the claim, and allows Indemnitor to control, and cooperates with Indemnitor in, the defense or any related settlement negotiations, provided, however, that any settlement of a claim requires the Indemnitee's consent. In addition, each party shall, at its own expense, defend, indemnify and hold harmless the other party, and its employees, officers, directors, licensees, representatives, parents, subsidiaries, successors, assigns and agents ("Indemnitee") from and against any and all liabilities, claims, actions, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) relating to or arising out of any breach of this Agreement or any warranty or representation contained in this Agreement. Indemnitor will defend Indemnitee against such claims at Indemnitor's sole expense and pay all court awarded damages relating to such claims, provided that Indemnitee notifies Indemnitor in a timely manner of the claim, and allows Indemnitor to control the defense or any related settlement negotiations, provided, however, that any settlement of a claim requires the Indemnitee's consent.

6.3    Independent Participation. Notwithstanding Sections 6.1 and 6.2, the party that is the beneficiary of the indemnity is entitled to participate in any defense of it by the Indemnitor or conduct its own defense at its own costs.

6.4    Failure to Indemnify.  If the Indemnitor refuses to accept defense of the Indemnitee or fails to accept such defense within ten (10) days of receiving notice of any claim, then the Indemnitee shall be free to conduct its own defense, including settlement upon any terms, and the Indemnitor shall be liable to the Indemnitee for: (i) all costs and fees of defense; (ii) any judgment, verdict, settlement or other determination against the Indemnitee; and (iii) if necessary, any fees and costs (including attorneys' fees) incurred by the Indemnitee in enforcing its indemnification rights.

6.5    Disclaimer of Consequential Damages.  Except for claims arising out of Sections 3, 4, 6 or the gross negligence or willful misconduct of a party, each party agrees that in no event shall either party be liable to the other for special, incidental, consequential, or indirect damages under this Agreement, even if the party has been advised of the possibility of such damages.

7.    Term and Termination.

7.1    Term.  This Agreement shall be effective as of the Effective Date and shall remain in effect until terminated by either party pursuant to this Section 7 (the "Term"). Notwithstanding the foregoing, this Agreement or any Project may be terminated at any time upon one hundred twenty (120) days written notice to Supplier by Company (a "No Cause Termination").  Furthermore, either party may terminate this Agreement:  (a) upon the other party's dissolution, liquidation, insolvency, the filing of a bankruptcy proceeding or the filing of a bankruptcy proceeding against it by any of its creditors or any other party, or (b) upon the appointment of a receiver or trustee for benefit of creditors or when the other party enters into an arrangement with its creditors.

7.2    Termination by Company.  This Agreement or any Project and/or Change Order may be terminated by Company immediately if Supplier has breached a material provision of this Agreement and, after Company has provided written notice of such breach and a reasonable opportunity, not to exceed thirty (30) business days, for Supplier to cure such breach (a "Company For Cause Termination").  No cure period shall apply to a breach of confidentiality or intellectual property rights under Sections 3 and 4 and this Agreement or any Project and/or Change Order may be terminated by Company immediately upon written notice.

7.3    Termination by Supplier.  This Agreement or a Project may be terminated by Supplier immediately if the Company has breached a material provision of this Agreement with respect to such Project and, after Supplier has provided written notice of such breach and a reasonable opportunity, not to exceed thirty (30) business days (a "Supplier For Cause Termination").   Supplier may not terminate a Project except as a Supplier For Cause Termination. Notwithstanding the foregoing, Supplier may refuse to accept a new Project offered to Supplier by Company within the time frame indicated in the applicable Statement of Work or other such offering document.

7.4    Remedies upon Company's For Cause Termination.  If Company terminates this Agreement, a Project and/or a Change Order pursuant to a Company For Cause Termination, Company shall be entitled, at its option, and upon written notice to Supplier, to:

(a)     Return all Deliverables to Supplier, and Supplier shall immediately forfeit any entitlement to fees not yet earned and shall refund to Company any payment made to Supplier for unsatisfactory Services; or

(b)     Retain any or all Deliverables, including but not limited to all Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders previously developed and delivered to Company, and receive such additional Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders as may have been developed by Supplier to the date of such termination but not yet delivered to the Company. If the Project is incomplete or not according to specifications, and Company opts to retain the Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders "as is," Company shall either: (i) pay a pro rata portion of total fees based on the percentage of completion pursuant to the applicable Statement of Work; or (ii) correct or complete the Project and deduct an amount equal to the sum of Company's costs for completing the Project (including royalties, if any, paid to others) from any payments paid to or due Supplier under this Agreement, which in no event shall exceed the amount of cash compensation paid to or due to Supplier for the Project. If the amount paid by Company to Supplier prior to termination exceeds the amount payable by Company, Supplier agrees to refund the amount of Supplier overpayment to Company. Any refunds will be made by Supplier to Company within thirty (30) days of termination.

7.5    Remedies upon Company's No Cause Termination or Supplier's For Cause Termination. Company shall be entitled to retain all Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders previously developed, delivered and assigned to Company and receive an assignment of such additional Assigned Properties, Services, Deliverables, Projects, Statements of Work, and/or Change Orders as may have been developed by Supplier to the date of such termination but not yet delivered, provided that Company shall be obligated to pay a pro-rata portion of total fees based on the percentage of completion pursuant to the Statement of Work. If the amount paid by Company to Supplier prior to termination exceeds the amount payable by Company, Supplier agrees to refund the amount of overpayment to Company. Any refunds will be made by Supplier to Company within thirty (30) days of termination.

8.    Publicity. Supplier shall not use the Company's name, trademarks and/or logos for advertising or any other similar purpose including, but not limited to, brochures, advertisements, press releases, testimonials, websites, customer reference lists or other implied or expressed endorsements, or for demonstrating, marketing or selling a similar and/or competitive product without the prior written approval of Company. However, Supplier may include Company in any written or verbal list of its customers without obtaining prior approval as long as the list is portrayed as a list of "representative clients," and does not imply endorsement. Supplier acknowledges that this is a material provision to Company and further acknowledges that remedies at law may be inadequate to protect Company against breach of this provision. Supplier hereby agrees in advance that Company will be entitled to the granting of injunctive relief in its favor without proof of actual damages in the event of breach of this provision by Supplier. Such remedy shall not be deemed to be the exclusive remedy for any breach of this Agreement, but shall be in addition to all other remedies at law or in equity available to Company.

9.    Audits.  At Supplier's cost, Supplier agrees to provide Company with a report prepared
by an independent certified public accountant (or other financial statements acceptable to
Company) within one hundred and twenty (120) days after the close of each Supplier fiscal year
occurring after the Effective Date.  Further, Supplier agrees to provide Company with any and all
such other information relating to the financial condition of Supplier, as Company may
reasonably request from time to time.  At Company's request, but not more than once per year,
Supplier will allow Company or its designated representatives to have access to its accounting
books and records to the extent necessary to verify Supplier's billings to Company for the
preceding 12-month period.  Supplier will cooperate with and comply with all reasonable
requests from Company or its designated representatives in connection with such requests.  If
any such review discloses overpayments that in the aggregate equal seven percent or more of the
amounts that were actually due, then, in addition to refunding such overpayments to Company,
Supplier will reimburse Company for the costs of the review.

10.    Miscellaneous Provisions.

    10.1    Assignment and Delegation.  Supplier's rights under this Agreement shall not be
assignable nor shall Supplier's duties be delegated, including by operation of law, without prior
written consent of Company.

    10.2    Subcontractors.  Supplier shall not subcontract any portion of its performance
obligations under this Agreement without Company's prior written approval. In the case of any
subcontract for which Company has issued its written consent, each subcontract entered into by
Supplier shall be in such form and substance as will not create any relationship, contractual or
otherwise, between the subcontractor and Company, and will not permit subcontract to pass
through to Company, as agent for subcontractor or otherwise, any claims of subcontractor.
Supplier shall be solely responsible for the job performance, actions, and omissions of the
subcontractor's employees through completion of the subcontractor 's performance of any such
services. Supplier shall include in each subcontract agreement terms and conditions consistent
with the intent of the Agreement, including all special performance requirements hereunder.
Additionally, Supplier shall include in each such subcontract agreement, a provision giving
Company the right to audit the subcontractor in accordance with the audit requirements of the
Agreement.

    10.3    Rights and Remedies.  Nothing contained in this Agreement, expressed or
implied, is intended to confer upon any person or entity other than the Parties and their
successors in interest and permitted assignees, any rights or remedies resulting from this
Agreement unless expressly stated to the contrary.

    10.4    Prior Disclosures.  The parties agree that this Agreement shall apply to any
Information that may have been provided to Supplier by Company prior to the Effective Date.

    10.5    Severability.  This Agreement is intended to be valid and enforceable in
accordance with its terms, to the fullest extent permitted by law. In the event that one or more
provisions of this Agreement are held to be invalid, illegal or unenforceable in any respect, by

any court of competent jurisdiction, such event shall not affect the validity or enforceability of any and all other provisions of this Agreement, which shall continue and remain in full force and effect as though such void, invalid, unenforceable or inoperative provision had not been a part of this Agreement.

      10.6   Cumulative Remedies.  No remedy conferred on either party by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given or now or later existing at law or in equity or by statute or otherwise.  The election of one or more remedies by Company or Supplier shall not constitute a waiver of the right to pursue other available remedies, unless expressly waived in a signed writing.

      10.7   Neutral Construction.  The determination of the terms of, and the drafting of this Agreement has been by mutual agreement after negotiation, with consideration by and participation of all parties hereto.  Any presumption that uncertainties in a contract are interpreted against the party causing such uncertainty to exist is hereby waived by all parties.

      10.8   Binding Effect.  This Agreement, and its terms and conditions, shall be binding upon and inure to the benefit of the parties and their respective heirs, successors and assigns.

      10.9   Successors and Assigns.  All covenants, representations, warranties and agreements of the parties contained herein shall be binding upon and inure to the benefit of their respective successors and permitted assigns.

      10.10  Notices.  All notices, requests, demands and other communications pursuant to this Agreement shall be in writing and may be delivered by hand delivery or by first class registered or certified mail, postage prepaid, return receipt requested, or any other form of delivery which requires a signature upon receipt, to the following address or to such other address as any party may have furnished to the others in writing in accordance with this Agreement, except that notices of change of address shall only be effective upon receipt as follows:

If to Company:      GMAC Mortgage Corporation
100 Witmer Road
Horsham, PA 19044
Att:  General Counsel
Facsimile No.: (215) 682-1467

GMAC Mortgage Corporation
4 Walnut Grove Drive
Horsham, PA 19044
Att:  Chief Information Officer

GMAC Mortgage Corporation
3200 Park Center Drive, Suite 150
Costa Mesa, CA 92626
Att:  Divisional Chief Information Officer, GMAC Direct Lending

If to Supplier:

Palisades Technology Partners, LLC
440 Sylvan Avenue
Englewood Cliffs, NJ 07632
Att: Carmine Cacciavillani

Daniel E Horgan, Esq
Waters, McPherson, McNeill, P.C
300 Lighting Way
Secaucus, New Jersey 07096

All notices shall be deemed received on the date of delivery or, if mailed, on the date appearing on the return receipt. Provided, however, that any hand delivery shall only be valid with a signed confirmation of receipt by the receiving party at the time of delivery.

10.11 Captions and Section Headings. Captions and Section headings are for convenience only and are not a part of this Agreement and shall not be used in construing it.

10.12 Amendments. This Agreement shall not be modified, amended, changed, supplemented or in any way altered, nor may any obligations hereunder be waived or extensions of time for performance granted, except by an instrument in writing signed by duly authorized agents of Supplier and Company.

10.13 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.14 Entire and Sole Agreement. This Agreement, its Statement(s) of Work and its Change Order(s) constitute the entire understanding and final expression of the agreement between the parties regarding the subject matter of this Agreement , its Statement(s) of Work and its Change Order(s) and supersedes any and all prior or contemporaneous oral or written communications regarding it, all of which are merged herein and may not be contradicted by evidence of any prior or contemporaneous agreement. If there is a conflict between or among any Statement of Work and this Agreement, the Statement of Work shall control.

10.15 Governing Law; Venue. This Agreement shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania excluding the choice-of-law provisions of such laws.

10.16 Independent Contractor. In accordance with the mutual intentions of Company and Supplier, this Agreement establishes between them an independent contractor relationship, and all of the terms and conditions of the Agreement shall be interpreted in light of that relationship. Supplier shall have the sole and exclusive control over the labor and employee relations policies and policies relating to wages, worker's compensation, hours, working conditions or other conditions of its employees, agents or independent contractors. Supplier shall have the sole and exclusive right to hire, transfer, suspend, layoff, recall, promote, assign,

discipline, adjust grievances and discharge said employees, agents or independent contractors. However, any employee, agent or independent contractor used by Supplier in connection with the Services must enter into or be subject to a confidentiality agreement substantially identical to the terms of Sections 3 and 4 of this Agreement, and abide by all Company rules and procedures while performing services at Company premises or on behalf of the Company.

10.17  Waivers and Extensions.  Waivers or extensions may be given or withheld in the sole and absolute discretion of the party who is requested to grant the waiver or extension, but to make such a waiver effective it must be made in writing.  No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement, or provision herein contained.  No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

10.18  Force Majeure.  Subject to the limitations of this Agreement and except as specifically provided in this Agreement to the contrary, neither of the parties hereto shall be liable for defaults, delays or non-performance of any covenant, agreement, work, service, or other act required under this Agreement to be performed by such party, or for any damages, including, without limitation, any incidental or consequential damages, arising out of the failure to perform any of its obligations, by reason of any circumstance or condition beyond its reasonable control, including, without limitation, default of third-party vendors, suppliers or service providers, failure of power or other utilities, or other industrial disturbances, unavoidable accidents, acts of terrorism, sabotage, embargoes, blockades, injunction or other administrative order, governmental law or regulations which prevent or substantially interfere with the required performance, condemnations, riots, insurrections, martial law, conflicts (declared or undeclared), civil commotion or disorders and any adverse change in political, economic or social conditions, fire, explosion, flood, earthquakes and other casualty, acts of God, or any other cause beyond the control of such party (each, a "Force Majeure Event").  In the event of any such Force Majeure Event, the performance of any covenant, agreement, obligation, work or service, or other act of the party affected by such Force Majeure Event under this Agreement shall be excused for the period of delay and the period for the performance of the same shall be extended by such period; provided that, in order to be excused from delay or failure to perform, such party must act promptly and diligently to take all reasonable steps to resume performance hereunder with the least possible delay.  Nothing herein shall prevent the Company from terminating this Agreement pursuant to Section 7.

10.19  Compliance with Laws.  Each party agrees to comply with all applicable laws, regulations and ordinances relating to its performance hereunder.

10.20  Insurance and Bonds.  For and during the term of this Agreement, Supplier shall secure and maintain at its own expense insurance of the type and in the amounts set forth below.

(1)  Workers' Compensation in accordance with all federal and state statutory requirements and Employer's Liability Insurance in an amount of not less than $500,000 per accident for bodily injury and $500,000 per employee/aggregate for disease.  Supplier and its underwriter shall waive subrogation against the Company.

(2)    Commercial General Liability Insurance in an amount of not less than $1,000,000 per occurrence, subject to a $2,000,000 aggregate covering bodily injury (including death), personal injury, property damage including, and without limitation, all contractual liability for such injury or damage assumed by Supplier under this Agreement.  This policy shall include products/completed operations coverage.

(3)    Commercial Automobile Liability Insurance in an amount of not less than $1,000,000 combined single limit covering bodily injury (including death) and property damage for all owned, hired and non-owned vehicles used by Supplier.

(4)    Umbrella Liability Insurance with respect to Workers' Compensation, Commercial General Liability, and Commercial Automobile Liability in an amount of not less than $5,000,000 combined single limit.

(5)    Blanket Fidelity Bond (with third-party liability endorsement, if applicable) in an amount of not less than $1,000,000 covering the dishonest acts of all Supplier employees performing Services under this Agreement.  The Company shall be named loss payee as respects the Blanket Fidelity Bond.

(6)    Errors and Omissions Liability Insurance in an amount not less than $2,000,000.

(7)    Contractual Liability Bond (with third-party liability endorsement, if applicable) in an amount of not less than $1,000,000 covering the acts of all Supplier employees performing Services under this Agreement.  The Company shall be named loss payee as respects the Contractual Liability Bond.

(8)    The Company, its directors, officers, employees, agents, subsidiaries and affiliates shall be named as additional insured on the Commercial General Liability and Commercial Automobile Liability policies.  All of the foregoing policies shall be issued by insurance companies having an "A" rating by A.M. Best Company.  These insurance provisions set forth the minimum amounts and scopes of coverage to be maintained by Supplier and are not to be construed in any way as a limitation on Supplier's liability under this Agreement. Supplier shall not self-insure any of its obligations under this Agreement without full disclosure to the Company of its intention to self-insure and without obtaining the Company's prior written consent.   Any and all deductibles specified in the above-referenced insurance policies shall be assumed by, for the account of, and at the sole risk of Supplier.  The insurance coverages shall be primary and will not participate with nor will be excess over any valid and collectable insurance or program of self-insurance carried or maintained by the Company.

(9)    Supplier shall furnish Certificates of Insurance evidencing all of the forgoing insurance coverages prior to or upon execution of this Agreement.  All of the above-described policies shall provide that no less than thirty (30) days prior written notice of cancellation, material modification, reduction in coverage or non-renewal shall be given to the Company.  In the event that any Services under this Agreement are to be rendered by persons other than Supplier's own employees, Supplier shall arrange for such persons to forward to the Company prior to commencement of Services by them, Certificates of

Insurance evidencing such amounts, in such form, and with such insurance companies as are satisfactory to the Company.

       10.21  <u>No Third-Party Beneficiaries</u>.  This Agreement is not intended, and shall not be construed to create or convey any benefits to or rights on any persons or entities other than the Company and the Supplier.

       10.22  Non-Solicitation. During the Term of this Agreement, neither party will knowingly and intentionally solicit the other party's employees involved in the provision of the Services hereunder for employment or engagement as a consultant or independent contractor. Provided, however, that it shall not be deemed a violation of this Section 10.22 for either party to hire an employee of the other party, if the initial solicitation to which an employee responds is a general advertisement not specifically targeted to the other party's employees, such as a newspaper or web site job listing.  Provided further, however, that (i) the parties may choose to waive this provision by mutual written agreement, (ii) this provision does not apply to employees who are terminated by Supplier. and (iii) this Section 10.22 shall have no force or effect as to solicitation of Supplier employees upon termination of this Agreement by GMACM pursuant to Section 7.2 of this Agreement.

       10.23  <u>Surviving Clauses</u>.  Sections 1.7, 3, 4, 6, 7, 8, 9, and 10 shall survive termination or expiration of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Consulting and Development Master Agreement to be duly executed as of the date first above written.

Supplier:

**Palisades Technology Partners**

By: _____

Title: _President_____

Date: _2/22/2002_____

Company:

**GMAC Mortgage Corporation**

By: _____
    Michael Amble

Title: Chief Information Officer

Date: _2/25/2002_____

By: _____
   ~~Dennis Geer~~ (RALPH HALL)

Title: ~~EVP/ Chief Administrative Officer~~
    CHIEF OPERATING OFFICER

Date: _____

## ATTACHMENT A

Pursuant to Section 3.1.2 of the Agreement, the following is the list of Supplier Property.
This list is intended to be exclusive.

Contact Management
1003 - Application Taking
Automated Property Interface Evaluation
Credit Bureau Interface
Pricing Engine
FNMA Desktop Underwriter Interface