1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                September 19, 2012

                10:10 AM




B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2  Doc# 1429 Conference on the Status of Discovery and Other

3  Matters Related to Debtors' Motion Pursuant to Fed. R. Bankr.

4  P. 9019 for Approval of the RMBS Settlement Agreements (related

5  document(s)320)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Zipporah Geralnik

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

A P P E A R A N C E S :

MORRISON & FOERSTER LLP

      Attorneys for Debtors

      1290 Avenue of the Americas

      New York, NY 10104


BY:   JAMIE A. LEVITT, ESQ.

      ANTHONY PRINCI, ESQ.

      DANIEL E. CLARK, ESQ.




KRAMER LEVIN NAFTALIS & FRANKEL LLP

      Attorneys for Official Creditors' Committee

      1177 Avenue of the Americas

      New York, NY 10036


BY:   KENNETH ECKSTEIN, ESQ.

4

1

2  CADWALADER, WICKERSHAM & TAFT LLP

3       Attorneys for MBIA

4       One World Financial Center

5       New York, NY 10281

6

7  BY:   JONATHAN M. HOFF, ESQ.

8

9

10  CADWALADER, WICKERSHAM & TAFT LLP

11       Attorneys for MBIA

12       700 Sixth Street, N.W.

13       Washington, DC 20001

14

15  BY:   MARK C. ELLENBERG, ESQ.

16

17

18  CARTER LEDYARD & MILBURN LLP

19       Attorneys for Talcott Franklin Group Investors

20       2 Wall Street

21       New York, NY 10005

22

23  BY:   LEONARDO TRIVIGNO, ESQ.

24

25

5

CHADBOURNE & PARKE LLP

     30 Rockefeller Plaza

     New York, NY 10112


BY:   SEVEN RIVERA, ESQ.




CLEARY GOTTLIEB STEEN & HAMILTON LLP

     Attorneys for Wilmington Trust as Indenture Trustee

     One Liberty Plaza

     New York, NY 10006


BY:   MARK A. LIGHTNER, ESQ.

     THOMAS MOLONEY, ESQ.

     MATT DOLAN, ESQ.




DECHERT LLP

     Attorneys for Bank of New York Mellon

     1095 Avenue of the Americas

     New York, NY 10036


BY:   GLENN E. SIEGEL, ESQ.

6

GIBBS & BRUNS LLP

    Attorneys for RMBS Steering Committee

    1100 Louisiana

    Suite 5300

    Houston, TX 77002


BY:   KATHY D. PATRICK, ESQ.



JACKSON WALKER LLP

    Attorneys for Frost Bank National

    100 Congress Avenue

    Suite 1100

    Austin, Texas 78701


BY:   PATRICIA B. TOMASCO, ESQ. (TELEPHONICALLY)

7

1

2    JONES DAY

3            Attorneys for Financial Guaranty Insurance Company

4            555 South Flower Street

5            Fiftieth Floor

6            Los Angeles, CA 90071

7

8    BY:   RICHARD L. WYNNE, ESQ. (TELEPHONICALLY)

9

10

11    KIRKLAND & ELLIS LLP

12            Attorneys for Ally Financial Inc. and Ally Bank

13            655 Fifteenth Street, N.W.

14            Washington, D.C. 20005

15

16    BY:   PATRICK M. BRYAN, ESQ.

17            DANIEL T. DONOVAN, ESQ.

18

19

20    KIRKLAND & ELLIS LLP

21            Attorneys for Ally Financial Inc. and Ally Bank

22            601 Lexington Avenue

23            New York, NY 10022

24

25    BY:   RAY C. SCHROCK, ESQ.

8

1

2   LOEB & LOEB LLP

3       Attorneys for Trustee, Wilmington Trust N.A.

4       345 Park Avenue

5       New York, NY 10154

6

7   BY:   WALTER H. CURCHACK, ESQ.

8

9

10  MILBANK TWEED HADLEY & MCCLOY LLP

11      One Chase Manhattan Plaza

12      New York, NY 10005

13

14  BY:   GERARD UZZI, ESQ.

15

16

17  PROSKAUER ROSE LLP

18      Attorneys for Assured Guaranty

19      Eleven Times Square

20      New York, NY 10036

21

22  BY:   IRENA M. GOLDSTEIN, ESQ.

23

24

25

9

1

2  ROPES & GRAY LLP

3        Attorneys for RMBS Steering Committee

4        1211 Avenue of the Americas

5        New York, NY 10036

6

7  BY:   KEITH H. WOFFORD, ESQ.

8

9

10  SEWARD & KISSEL LLP

11        Attorneys for U.S. Bank NA as Securitization Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15  BY:   MARK D. KOTWICK, ESQ.

16        ARLENE R. ALVES, ESQ.

17

18

19  SIDLEY AUSTIN LLP

20        Attorneys for Nationstar Mortgage

21        One South Dearborn

22        Chicago, IL 60603

23

24  BY:   JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)

25        LARRY J. NYHAN, ESQ. (TELEPHONICALLY)

10

WHITE & CASE LLP

     Attorneys for Ad Hoc Group of Junior Secured Noteholders

     1155 Avenue of the Americas

     New York, NY 10036


BY:   J. CHRISTOPHER SHORE, ESQ.

     HARRISON DENMAN, ESQ.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    11

1                      P R O C E E D I N G S

2            THE COURT:  All right.  Please be seated.  We're here

3    in Residential Capital LLC, number 12-12020.

4            Mr. Princi?

5            MR. PRINCI:  Good morning, Your Honor.  Anthony Princi

6    of Morrison & Foerster on behalf of the debtors.  Your Honor,

7    just to make sure that we're starting off on the same page, I

8    just want to confirm that the Court has received the documents

9    which were filed yesterday afternoon into last evening from

10   various parties, so as the Court is -- by my account, Your

11   Honor, the debtors filed, initially, a status report.  That was

12   followed by a response of the creditors' committee --

13           THE COURT:  Mr. Princi, let me assure you, despite the

14   fact that I spent two days observing the New Year and,

15   therefore, didn't see anything until very early this morning, I

16   have reviewed everything.

17           MR. PRINCI:  Okay.  Then I'll commence.  Judge, I

18   think there are three main disputes for the Court to decide.

19   One is the question of whether the debtors fail to

20   substantially comply with the scheduling order.  And to narrow

21   that, I think the -- putting aside the nits and gnats, I think

22   the fundamental allegation is that the loan files that we

23   produced were produced after the ten-day period called for by

24   the scheduling order.

25           Number 2, I believe, is the question of whether now

1    that a second amended settlement agreement has been executed,

2    been circulated to the parties, and that second amended

3    settlement agreement removes the HoldCo election, whether at

4    this junction in the case alter ego discovery is necessary in

5    connection with the Court's adjudication of the 9019 motion.

6         And number 3, whether depositions of the principal

7    people on behalf of the debtors, which consist mostly of the

8    in-house lawyers at the debtor and myself and a couple of my

9    colleagues at Morrison & Foerster, whether depositions of those

10    people should be taken forthwith, in connection with the

11    adjudication of the 9019 motion.

12         I believe those are, fundamentally, Your Honor, the

13    open issues for the Court.  Let me --

14         THE COURT:  When I read the papers, the responses to

15    your status report have focused heavily on the production of --

16    search for and production of e-mails, not only for Morrison &

17    Foerster lawyers, which has either been done or is in the

18    process of being done; several other Morrison & Foerster

19    lawyers were specifically identified.  But additionally, the

20    issue of whether there has been a search for e-mails of --

21         MR. PRINCI:  Other people at ResCap.

22         THE COURT:  -- people from the debtors but also from

23    AFI.

24         MR. PRINCI:  Okay.

25         THE COURT:  That seemed to me -- I mean, I'll tell you

1  quite honestly, Mr. Princi, it seemed to me that the issue

2  about the production of the loan files -- yes, it was

3  important, but it didn't seem to me to be the big issue today.

4          MR. PRINCI:  Okay.  Let me address, Judge, that point

5  and then I think that'll dovetail into the question of

6  depositions as well.  So contextually, Judge, what we have is a

7  situation where the question that will be before the Court when

8  the hearing is held is whether an 8.7 billion dollar allowed

9  claim for the 392 trusts that are involved in that settlement

10 is reasonable.  And the analysis of that issue is one that has

11 been ongoing for quite some time and that, we believe, is

12 independent from the collateral questions of who said what to

13 whom in the negotiations.

14          We have asked the parties for a while to reconsider

15 their position with respect to that with a view that, first,

16 presumably, it would inform their judgment as to whether to

17 pursue that line of discovery if they first consider whether

18 the 8.7 billion dollars is reasonable.  For example, if one

19 were to conclude, on their part, that the 8.7 billion dollar

20 proposed claim is outrageously high -- outrageously high --

21 they can then presumably allege that the possible reason for

22 why that's outrageously high has to do with their theory of

23 collusion which, simply stated, is:  Ally is the parent company

24 of ResCap.  ResCap, at the time of the petition, entered into

25 not only the RMBS settlement agreement but also the plan

1  support agreement.  Therefore, ipso facto, Ally was pulling the

2  strings of its puppet, ResCap, to get ResCap to settle for the

3  amount in question.

4          But presumably, what people on the other side would

5  want to do is first figure out whether 8.7 is within the realm

6  of reasonableness.  So we have taken the position, Judge, for a

7  while, that not only does --

8          THE COURT:  Let me ask you this --

9          MR. PRINCI:  Yes?

10         THE COURT:  -- Mr. Princi.  When I read your status

11 report, you seemed quite offended that the committee and others

12 have embarked, late in your view, on an effort to depose the

13 negotiators of the settlement.  When I read Mr. Bentley's

14 response, he set out that for a very considerable period of

15 time, in discussions with debtors' counsel, they agreed to

16 defer, in the first instance, the issue of discovery from the

17 negotiators.  But they say it's hardly a surprise or news to

18 your colleagues that the potential for that discovery has been

19 on the table virtually from the start of these proceedings

20 regarding approval of the RMBS settlement.

21         MR. PRINCI:  Well, Judge, it was a surprise in two

22 ways.  Number 1, we never would expect a constituency that's

23 looking out for the interest of the estate to want to

24 potentially jeopardize --

25         THE COURT:  They're looking out for the constituency

1  as their creditors.  That's their primary responsibility, is to

2  look out for the unsecured creditors.  And you're supposed to

3  be looking after the debtors.  And you're obviously at

4  loggerheads with a whole group of constituents.

5          MR. PRINCI:  I stand corrected and you're absolutely

6  right.  We look -- it is our obligation to look at the

7  interests of all the estates.  It is their obligation to look

8  into the interest, solely, of the unsecured creditors.  My

9  point, Judge, is this.  The sale that we have teed up

10 unquestionably is advantageous to the creditors -- the

11 unsecured creditors.  So we did not anticipate having

12 understood -- we thought they understood us in saying, look,

13 make your assessment first of whether this is reasonable or not

14 before you launch into something that'll get us so

15 sidetracked --

16         THE COURT:  Look, you agreed on a discovery schedule

17 that requires that all fact discovery be completed by September

18 24th.  We're on September 19th.  When do you expect them -- if

19 they believe that the arm's-length nature of the

20 negotiations -- a factor identified in In re: Iridium

21 Operating, the Second Circuit's decision -- on what are the --

22 they set out seven nonexclusive factors for court's to consider

23 in deciding whether to approve the settlement.  When is it

24 supposed to do that discovery if September 24th is the current

25 cutoff date for fact discovery?

RESIDENTIAL CAPITAL, LLC, ET AL.                          16

1            MR. PRINCI:  Judge, let me make clear.  We do not

2    believe that they should be permitted to take that kind of --

3    those depositions.  But if they are, Judge, this case is going

4    to change dramatically.  We will have to put off -- and we

5    simply -- you're talking about taking the depositions of the

6    people who run these cases.  I was going to use the word brain

7    trust but since I'm involved in there, I didn't want to be

8    presumptuous.  But the people who run these cases, Judge, are

9    the in-house lawyers at ResCap and the financial -- the

10   principal people at FTI and the principal people at Morrison &

11   Foerster.  And those are the depositions that people want to

12   take.

13           THE COURT:  Well, look, I am very wary of ever

14   authorizing the depositions of lawyers in a case.  And I'm

15   mindful of how the Second Circuit, quite properly, has dealt

16   with the issue.  But your own submission indicates that the

17   principal negotiators of the RMBS settlement were the lawyers.

18   It's -- was there one senior executive from the debtors who was

19   present or heavily involved throughout the negotiations and the

20   completion of the RMBS settlement, which I guess takes us -- I

21   still haven't seen this amendment that you've now advised me

22   about.  As of the status reports, at least, it was still

23   anticipated but -- even in your status report, once again it

24   was anticipated but had not happened.

25           Okay.  Is there a senior executive from any of the

1  debtors, is there a senior executive from AFI who participated

2  substantially in the negotiations of the RMBS settlement?  What

3  you've -- your own papers say the principal negotiators were

4  the lawyers and you say lawyers shouldn't be deposed.  But you

5  haven't said that X, Y or Z were principal negotiators from the

6  debtors.  So you have not really provided an alternative.  If

7  there's to be discovery of -- regarding the settlement

8  negotiations, that there is one or more people who are not

9  acting as lawyers, who were acting -- they may be lawyers but

10 they were acting in a business capacity, who were substantially

11 involved in the settlement negotiations.  Can you answer that?

12         MR. PRINCI:  Yes.  Your Honor, I believe that the

13 businesspeople are lawyers, okay?

14         THE COURT:  That's okay.  I mean --

15         MR. PRINCI:  And I think what the issue comes down to,

16 Judge, is that we don't believe that the law that Your Honor

17 referenced -- in other words, the -- one of the seven factors

18 in Iridium is eclipsed by the other law in this circuit with

19 respect to requests to depose the lawyers of --

20         THE COURT:  Your view; not necessarily my view.  But

21 let's get back --

22         MR. PRINCI:  Okay.

23         THE COURT:  Was there -- was there a senior executive,

24 acting in a business capacity, for any of the debtors that was

25 substantially involved in the settlement negotiations?  It's

1    fine that they're a lawyer.  If they're acting in a business

2    capacity, they shouldn't be exempt from discovery.  Is there

3    someone?

4              MR. PRINCI:  There is someone.

5              THE COURT:  Who is it?

6              MR. PRINCI:  That's Mr. Cancelliere.

7              THE COURT:  How do you spell that?

8              MR. PRINCI:  C-O-N-C-I-L-L-I-E-R-E, (sic) if I'm not

9    mistaken.

10             THE COURT:  And what is his -- what was his title?

11             MR. PRINCI:  His title -- excuse me one second, Your

12   Honor.  Pardon me, Judge.  That's C-A-N --

13             THE COURT:  Okay.

14             MR. PRINCI:  -- C-I-L-L-I (sic) --

15             THE COURT:  Yes.  And what is --

16             MR. PRINCI:  -- E-R-E.

17             THE COURT:  What is his position?

18             MR. PRINCI:  He's a mortgage risk officer.

19             THE COURT:  That doesn't sound like a legal capacity

20   to me.

21             MR. PRINCI:  No, no.  I'm saying he is -- I'm saying I

22   tried to come up with somebody who wasn't a lawyer.

23             THE COURT:  And he -- and Mr. Cancelliere was

24   substantially involved in the negotiations of the settlement,

25   the RMBS settlement?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    19

1           MR. PRINCI:  Can I confer with my client just for a

2   moment, judge?

3           THE COURT:  Yeah, go ahead.

4           MR. PRINCI:  Yes, Your Honor.

5           THE COURT:  And had you provided Mr. Cancelliere's

6   name in the role and a description of the role he played in the

7   RMBS settlement to the committee and the other parties-in-

8   interest who were seeking such discovery?

9           MR. PRINCI:  I don't want to speak off the top of my

10  head.  But now I can.  Yes.

11          THE COURT:  Go ahead, Mr. Princi.

12          MR. PRINCI:  All right, Your Honor.  I don't -- I

13  understand where Your Honor may well be going but I do want

14  to --

15          THE COURT:  I don't know where I'm coming out of this,

16  you know?  I spent a lot of hours starting very early this

17  morning reading a lot of stuff, okay?

18          MR. PRINCI:  I'm sorry, I just -- did you say you --

19          THE COURT:  I have not decided where I'm coming out.

20          MR. PRINCI:  Thank you, Your Honor.  Okay.  Then let

21  me, Your Honor, try to suggest what we think would be a

22  balanced approach here and --

23          THE COURT:  Let's -- before we get to the balanced

24  approach.  What's -- your view, obviously, is that -- first

25  off, tell me when the amended RMBS settlement was signed?

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1          MR. PRINCI:  You're talking about the one we just --

2    the second amended?

3          THE COURT:  Whatever it is you think the settlement is

4    today --

5          MR. PRINCI:  Oh, excuse me, yesterday.

6          THE COURT:  -- when was it signed?

7          MR. PRINCI:  Yesterday.  Pardon me, Your Honor.

8          THE COURT:  And it takes the HoldCo election out.

9          MR. PRINCI:  It does, Your Honor.

10         THE COURT:  What other substantive changes does it

11   make?

12         MR. PRINCI:  It makes clear that the HoldCo is not the

13   subject of the releases that are provided in the agreement.

14   And further, the way it operates is that, to the extent that

15   there is an adjudication by this Court after the filing of a

16   proof of claim and overruling any objections thereto, to the

17   extent there's an adjudication by this Court that any claimant

18   does have a derivative claim against the HoldCo, based on

19   whatever derivative theory, alter ego or otherwise, and it

20   further provides that such claim shall be in the amount of the

21   total allowed claim as that is set forth in the agreement.  So

22   it's 8.7, Judge, for your purposes.

23         The last thing it provides for is that 8.7 billion

24   number, in that event, will be ratcheted down to -- in the

25   event that there are any payments from either the RFC estate or

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              21

1  the GMAC-M estate on account of the 8.7 allowed claim against

2  those estates.  So it provides that there won't be duplication,

3  if you will, with respect to that claim.  Those are the

4  principal terms.

5          THE COURT:  I think the last thing I read in -- it's

6  in Cleary's -- Mr. Moloney's report is -- and he refers to it

7  in paragraph 5 on page 4.  "The trustee has learned of an

8  undisclosed allocation of AFI's cash contribution as between

9  Residential Capital and the other debtors as part of the

10 concurrently executed plan support agreement with certain RMBS

11 investors.  (The debtors have discussed this as integral to the

12 RMBS settlement and the case more generally.)  This secret deal

13 which should have been fully disclosed affects the RMBS

14 settlement, including potential alter ego claims and the

15 release of Residential Capital contained in the original RMBS

16 settlement."  I'll end my quote there.  The paragraph goes on.

17          Is there such an agreement?

18          MR. PRINCI:  There's an agreement, Your Honor, but

19 there's no undisclosed agreement.  We don't know where that

20 came from, Judge.  So the plan support agreement which was

21 filed -- it's a public record; it's been a public record since,

22 I believe, day one of this case -- you know, makes clear in it

23 and references expressly that one of the conditions of the

24 parties is that the recovery to the institutional investors has

25 to be kept in accordance with a certain waterfall that is part

RESIDENTIAL CAPITAL, LLC, ET AL.                                           22

1   and parcel of a presentation that was given to them by the

2   debtors' financial advisor, FTI.  That's no surprise to

3   anybody.  The committee's known that for a long -- everybody's

4   known it.  I don't know why the unsecured creditors' counsel is

5   claiming that that's either undisclosed or that it's secret but

6   it's neither.

7          THE COURT:  Are there any other substantive changes in

8   the RMBS settlement?

9          MR. PRINCI:  No, Your Honor.  So Judge --

10         THE COURT:  Let me ask you some more questions.

11         MR. PRINCI:  Please.  Please.

12         THE COURT:  I understand your position that in light

13  of the amendment you don't believe that the discovery regarding

14  alter ego or the HoldCo election is relevant.  I'll hear from

15  the other side and give you a chance to respond to that.  Let

16  me ask you this; this seems to me a fundamental question.  Why

17  does the RMBS settlement have to be resolved before the sale of

18  the loan platform and the legacy loan portfolio?

19         MR. PRINCI:  Okay.  That's a critical question, Judge,

20  and I have to make sure the Court understands this.  Because

21  there's been some obfuscation here that's really not helpful to

22  the Court.  In the scheduling order --

23         THE COURT:  You know, you would do yourself a real

24  service if you didn't accuse other parties of obfuscation.  If

25  you would just directly respond to questions that I ask, okay?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    23

1  I'll tell you, you're not the only one who's done it in this

2  case.  I don't find it helpful.  I don't appreciate when

3  comments are made by filings about other -- that other counsel

4  had made.

5          MR. PRINCI:  Understood, Your Honor.

6          THE COURT:  So restrict yourself to addressing

7  specifically why this needs to be resolved before -- I mean,

8  the auction is August -- October 23 and this hearing is

9  supposed to be November 5th.  So the auction is going forward

10  without a resolution of the RMBS settlement and that's why I

11  begin to ask myself, why does the settlement have to be

12  resolved before the sale of the loan platform and the legacy

13  loan portfolio --

14          MR. PRINCI:  Okay.

15          THE COURT:  -- are completed?

16          MR. PRINCI:  So, Judge, the auction is going forward

17  with the comfort and understanding that whoever's the

18  successful bidder, that the proceeds from that sale will not be

19  subject to an enormous potential cure claim, to a cure claim

20  which would effectively cannibalize the -- potentially, the

21  entirety of the proceeds.  And that's --

22          THE COURT:  So it's the cap on the cure claim?

23          MR. PRINCI:  That's the key, Judge.  That is -- that

24  is an absolutely critical concession that these estates have

25  gotten from the institutional investors with the consent of the

1  trustees.  That cap, I believe, was estimated by the creditors'

2  committee as being -- that the maximum, as I understood the

3  creditors' committee's calculations on this when they proposed

4  the specifics of it, I believe they informed me that they

5  thought that that amount would be mo more, ever, than 200

6  million dollars.  Around that number.  And I'm not trying to

7  pin it at that; it could have been a little more but around

8  that number, okay?

9           As against -- as against, in the absence of a

10 provision like that, the position of the trustees that you

11 cannot, as we contend, sever the legacy claims from the claims

12 that we're looking to have assumed and assigned.  And if that

13 issue is decided against us, I mean, these estates don't -- the

14 trustees for the trusts will, effectively, either kill the sale

15 or kill the net proceeds that go to the estates.  So that's the

16 critical element, Judge.

17          THE COURT:  And the cap was agreed to in the

18 scheduling -- the revised joint scheduling order?

19          MR. PRINCI:  Yes, Your Honor.

20          THE COURT:  And what is it that says that if the

21 hearing doesn't happen by November 5th, their agreement to cap

22 is gone?

23          MR. PRINCI:  Oh, it doesn't say that in the order,

24 Judge.

25          THE COURT:  I didn't -- that's what I was looking for

1    and I didn't see it.

2              MR. PRINCI:  No.  It doesn't say that in the order,

3    Judge.  It just -- and, you know, it's Your Honor's order.  I

4    will just say that, you know, having --

5              THE COURT:  So what do you base -- have you received a

6    threat from the RMBS trustees that they will terminate any

7    agreement to cap the cure claim if the hearing doesn't go

8    forward on November 5th?

9              MR. PRINCI:  I'll let Ms. Patrick, when she addresses

10   the Court, speak for herself but --

11             THE COURT:  Well, you can answer for yourself.

12             MR. PRINCI:  Yes, Your Honor, but I understand --

13             THE COURT:  Have you received a threat from the RMBS

14   trustees that unless the hearing goes forward on November 5th

15   they will withdraw their agreement to the cap?

16             MR. PRINCI:  Not from the trustees; from the

17   institutional investors who have said they will direct the

18   trustees to do that.

19             THE COURT:  Okay.  Go ahead.

20             MR. PRINCI:  So that, Your Honor, is the --

21             THE COURT:  How many -- you have -- the institutional

22   investors, these are the ones who agreed to the plan support

23   agreement?

24             MR. PRINCI:  Yes, Your Honor.

25             THE COURT:  And -- all or some?  How many of the

1  institutional investors have said that if the hearing doesn't

2  go forward on November 5th, they will withdraw -- they will

3  instruct the RMBS trustees not to go forward with the

4  settlement?

5          MR. PRINCI:  There are two agreements that we have but

6  let me just say, the vast majority are contained in one

7  agreement and the counsel for all of those institutional

8  investors is the one who informed me of that.

9          THE COURT:  Who's that?

10         MR. PRINCI:  Ms. Patrick.

11         THE COURT:  Go ahead.

12         MR. PRINCI:  So Judge, I just -- I want to say this at

13 the outset.  If there's evidence that there's collusion --

14 you've --

15         THE COURT:  Evidence is usually derived from

16 discovery.

17         MR. PRINCI:  Understood.  And that's why, Judge, when

18 we produced the documents which are -- by the way, there's a

19 continuing reference about the fact that we've only produced

20 the e-mails regarding settlement discussions for the attorneys.

21 Well, we wanted to get them the ninety-plus percent of them or

22 the ninety-eight percent of them.  That's where you start.

23 There's going to be a de minimis amount, we understand, if any,

24 of any further documentation coming from the individual.  This

25 would be because they -- any of their communications were

1  either with us, so they're privileged -- but those people

2  weren't the ones negotiating and having the communications with

3  the other parties.  But --

4          THE COURT:  Have you produced e-mails from Mr.

5  Cancelliere?

6          MR. PRINCI:  I understand that we're collecting them.

7  But so that Your Honor understands my point, take Mr.

8  Cancelliere; it is our understanding that any communications

9  that he had regarding this was with either the general counsel

10 of ResCap or us.  He wasn't the one who was interfacing --

11 except, you know, in meetings.  But he wasn't interfacing in

12 written form with the other parties.  But in any event, we're

13 going to get people that and then I don't think --

14         THE COURT:  Are the debtors' directors relying on

15 advice of counsel supporting their approval of the RMBS

16 settlement?

17         MR. PRINCI:  Yes, Your Honor.

18         THE COURT:  Doesn't that waive privilege?

19         MR. PRINCI:  We don't believe so and, you know, I

20 would say this.  These are very important and not simple issues

21 to address and if this is --

22         THE COURT:  I'm not going to rule on the issue now.

23         MR. PRINCI:  Okay.

24         THE COURT:  But it did -- that was a point raised in

25 one of the responses and it did seem to resonate with me that

1  if -- you need to show that this settlement is fair, reasonable

2  and in the best interests of the debtors' estates.  And to the

3  extent that it involves business judgment, there needs to be

4  evidence to support that this was an appropriate exercise of

5  business judgment.

6          If the lawyers were the principal negotiators but the

7  people making the decisions were the directors, that's why I

8  think it's a fair question to ask whether they're relying on

9  advice of counsel in support of their decision to approve the

10 settlement.  If that's so, then without deciding, you know,

11 specific communications, you're going to have a real problem if

12 you're going to assert privilege with respect to communications

13 from counsel that form any part of the basis for directors

14 approving the settlement.

15         MR. PRINCI:  Your Honor, I do not want to suggest to

16 the Court that the debtors exclusively relied on the advice of

17 counsel.

18         THE COURT:  Whether they exclusively or in part.  Once

19 you acknowledge that the directors relied, in whole or in part,

20 on advice of counsel, how is it that you propose to shield that

21 advice from discovery?

22         MR. PRINCI:  Well, maybe this is semantics and maybe

23 this is substance.  There are fundamental business issues that

24 were the basis of the directors' conclusions to do the deals

25 that are in front of the Court.  I think there's, necessarily

1  at times, counsel that provides information, but I don't think

2  their decision, Judge, was based on anything other than

3  business information and that will all come out.

4       THE COURT:  Well, look, if they weren't sitting in the

5  negotiations, then they have to be relying on what the

6  negotiators informed them, in writing or orally.

7       MR. PRINCI:  Well, management, Judge -- I mean,

8  management does provide to the directors business information

9  upon which the directors exercise their business judgment --

10      THE COURT:  Well, you already answered my question --

11      MR. PRINCI:  Okay.

12      THE COURT:  -- by saying acknowledging that they

13  relied, in part, on advice of counsel and -- are you retracting

14  that?

15      MR. PRINCI:  Judge, what I'm concerned about is what

16  Your Honor's really looking for.  I believe that the

17  fundamental decision is a business decision based on business

18  information.  I can't exclude the possibility that there is

19  advice you get from attorneys.  I just don't -- that's my

20  issue, Judge.

21      THE COURT:  Here's what's bothering me, Mr. Princi.

22  The discovery cutoff is next week, okay?  And none of these

23  issues have been sorted out.  You haven't completed document

24  production; you haven't produced a privilege log.  There may

25  well be communications -- written communications that are

1  properly protected by privilege.  They don't have a basis --

2  when I say "they", the people who are objecting don't have a

3  basis to know that because you haven't completed the discovery,

4  you haven't produced e-mails from management, you haven't

5  identified on a privilege log which of the e-mails you contend

6  is or isn't privileged.  How is that all going to happen by

7  September 24th?

8              MR. PRINCI:  Okay.  Judge, the one thing --

9              THE COURT:  And --

10             MR. PRINCI:  Yes?

11             THE COURT:  -- they're taking depositions.

12             MR. PRINCI:  Okay.  So I want to -- for a moment

13 because I want to answer Your Honor's present question.  I want

14 to separate depositions for a second because we do believe we

15 have a sound proposal.  Indeed, Your Honor, fundamentally, the

16 committee has indicated that, conceptually, it agrees with

17 this, and I'll explain that in a moment.  We do believe we have

18 a balanced proposal that will not prejudice any of the rights

19 of the parties here, okay, and that will not put the debtors in

20 a position where we have a sideshow to a sideshow becoming the

21 main event, okay?

22             But let me just -- the narrow point, Judge, we are

23 getting them the privilege logs but if the September 24th date

24 is a problem, that can be moved back and the fact discovery

25 date, Judge, can be made -- obviously, if has to be subject to

RESIDENTIAL CAPITAL, LLC, ET AL.                                    31

1   Your Honor's approval, but the fact discovery date can be made

2   coterminous with the expert discovery.  It had always been our

3   preference -- and we pushed this; this was something in the

4   negotiations we pushed.  We want it stagnated (sic) because

5   it's just easier on our brain cells.  But under the

6   circumstances, Your Honor, we would be prepared to move back

7   the September 24th date to the end date for expert discovery.

8           The reason, Judge, on this point, that I don't think

9   people are prejudiced is if people, Judge, believe when they

10  review the information -- and they haven't done it yet so

11  there's a fundamental prejudgment that eclipses all this.  And

12  I'm not trying to cast dispersions.  It just happens to be the

13  facts.  But if after they actually review the information, they

14  review the privilege log, they have issues, I think we can all

15  accept, given how proactive people have been, they'll come back

16  to the Court.  And Your Honor always, if you believe that this

17  no longer works at any time, you always can move back the

18  hearing date.

19          THE COURT:  Let me ask you three -- when will the

20  debtors complete production of e-mails?

21          MR. PRINCI:  Your Honor, may I confer?

22          THE COURT:  Yes.

23          MR. PRINCI:  Thank you.

24      (Pause)

25          THE COURT:  Ms. Lovett, if you want to address it

RESIDENTIAL CAPITAL, LLC, ET AL.                                    32

1  directly --

2           MS. LOVETT:  No, that's okay.

3           THE COURT:  -- you can do that, okay?

4           MR. PRINCI:  So Your Honor, information -- there'll be

5  some information on this coming this week.  The information

6  that people are looking for, the documentation to the extent it

7  exists with respect to --

8           THE COURT:  The reason -- I really -- I ask this

9  question -- yes, I -- to the extent it's a rolling production,

10 that's fine.  But I really --

11          MR. PRINCI:  That's what I was trying to --

12          THE COURT:  -- I'm very -- I want to be very specific

13 and I want a specific answer, one that you have to live with.

14 I want to know when -- the date when e-mail discovery -- e-mail

15 production will be complete.

16          MR. PRINCI:  Excuse me, Your Honor.

17          THE COURT:  Go ahead.

18          MR. PRINCI:  I need to confer with my client.

19          I've been informed September 28th.

20          THE COURT:  Okay.  The reason -- look, assuming that

21 I'm prepared to move some of these dates, okay, this isn't

22 going to be a death by a thousand slices, okay?  When I ask you

23 for dates, you better be able to live with them, okay?  And

24 that's why -- and I fully expect, assuming that the schedule is

25 adjusted, that there'll be rolling production.  But I want to

RESIDENTIAL CAPITAL, LLC, ET AL.                                    33

1  know -- it's a hard stop date when -- look, there's always a

2  few pieces of paper that turn up.  I mean, that's the reality

3  of litigation.  I don't -- I'm not -- that's not what I'm

4  talking about, okay?  They find a reference in an e-mail to

5  some document that hadn't turned up and then you go look for

6  it; that's produced after.

7         So you believe that e-mail production will be -- now,

8  we're talking about the debtors, but I'm going to have the same

9  question for AFI.  E-mail production by the debtors will be

10  substantially complete -- very substantially -- will be

11  complete by September 28th?

12         MR. PRINCI:  I want to double-check, Judge.

13         THE COURT:  Yeah.

14         MR. PRINCI:  Excuse me.

15         THE COURT:  The last thing you want to do is, when we

16  get to September 28th, I find out that there's some server that

17  hasn't even been touched yet.

18         MR. PRINCI:  So you'll understand by my answer that

19  people are clearly listening to you this morning, Judge.

20  October --

21         THE COURT:  Well, maybe they were listening last week,

22  too, but yet everybody seems to think something happened after

23  September 11th.

24         MR. PRINCI:  October 3, Your Honor.

25         THE COURT:  All right.  I'm crossing out September

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                                                34

1   28th.   October 3.   When will all other requested document

2   production be complete?   Again -- I don't want to -- I'm not

3   talking about a handful of loan files that you can't find and

4   you've asked them to designate some others in their sample.

5   I'm talking about in reading all of the status reports, it

6   certainly appears to me that there is additional document

7   production, besides e-mails, that have not been -- for example,

8   there was a reference in one of the responses to an e-mail that

9   referred to attached spreadsheets and those haven't been

10  produced yet.

11          MR. PRINCI:   Okay.

12          THE COURT:   When -- what's the hard stop date for the

13  debtors' completion of document production?

14          MR. PRINCI:   So, Judge, it's October 3.   But just

15  understand, what you referenced is how the problems come up.

16  So if people are working with us -- and I'm not casting

17  aspersions at all -- if we're working together towards a common

18  goal, there will be things that will come up and it could be

19  that they come up on October 1.   So therein lies issue -- the

20  loan files, for example --

21          THE COURT:   I'm used to dealing with those issues.

22          MR. PRINCI:   Okay.

23          THE COURT:   Okay?   I experienced those issues as a

24  practicing lawyer.   I understand that there're always things

25  that come up, okay?   But I don't want to hear, if the schedule

RESIDENTIAL CAPITAL, LLC, ET AL.                                35

1  gets moved, on October 4th that I suddenly hear there are large

2  swathes of documents that nobody has -- you know, haven't been

3  produced, they're being reviewed, it'll be another week or ten

4  days.  That's not acceptable, okay?

5          MR. PRINCI:  Judge, I hear you.  We believe it's

6  October 3.  Obviously --

7          THE COURT:  When's the privilege log?

8          MR. PRINCI:  -- we're not talking about alter ego

9  documents.

10          THE COURT:  When's the privilege log?  Same question.

11  When will the debtor complete a privilege log?

12          MR. PRINCI:  Not next week, the following week, which

13  is the week of whatever that is.

14          THE COURT:  What's the date?  Let's -- I want real

15  dates.

16          MR. PRINCI:  By the way, that's not -- we're going

17  to -- we're not going -- we'll do this in rolling fashion, but

18  you're looking for a dead -- a hard stop deadline, when will we

19  be completed.

20          THE COURT:  Well, have you given them any privilege

21  log so far?

22          MR. PRINCI:  I do not believe so, Your Honor.

23          So on a rolling basis, Judge, to October 10.  But

24  again, on a rolling basis, Judge.

25          THE COURT:  Okay.  I understand -- I'm switching

RESIDENTIAL CAPITAL, LLC, ET AL.                                36

1   issues now --

2           MR. PRINCI:  Please.

3           THE COURT:  -- that initially, at least, and it may

4   still be a problem -- parties have raised an issue that

5   documents that were produced initially weren't searchable.  And

6   you at least represented in your papers that that problem has

7   been substantially cured?  I mean, it doesn't -- look, to

8   produce 500 -- you say you've produced 500 or the equivalent of

9   500,000 pages.  If you produce 500,000 pages in a form that

10  can't be searched, that's like throwing the needle in the

11  haystack and saying oh, we got a trial November 5th, good luck,

12  I hope you get through them.  Oh, discovery cutoff is next week

13  so you can't take any more depositions.

14          MR. PRINCI:  Agreed, of course.  I'm going to ask Mr.

15  Clark, my associate, who's in the trenches on this --

16          THE COURT:  Okay.

17          MR. PRINCI:  -- and who understands the technology

18  light years better than I do, to address that, Your Honor.

19          MR. CLARK:  Good afternoon, Your Honor.  Dan Clark

20  from Morrison & Foerster on behalf of the debtors.  We produced

21  e-mails on Friday in PDF format.  Those can be downloaded,

22  printed, and they would obviously need to be loaded in to

23  anyone's own search platform.  That's --

24          THE COURT:  PDF documents, if they were -- were they

25  converted from text files or where they scanned images?

1  Scanned images aren't searchable, converted from text files,

2  PDFs are searchable.

3          MR. CLARK:  I believe they were converted from text

4  files.  And we provided searchable OCR, optical character

5  recognition, documents on Monday at the request of one of the

6  parties.

7          THE COURT:  Okay.  That's of all the documents you've

8  produced now have been -- everything has been --

9          MR. CLARK:  That is of all the e-mails.

10          THE COURT:  -- produced in searchable form?  Either

11  OCR or PDFs that are searchable because they were converted

12  from a text file and not an image.

13          MR. CLARK:  I would say everything in the 9019 data

14  room is either a native file that can be downloaded, an Excel

15  file, or will be a searchable PDF.  That does not apply to the

16  loan files we produced to the UCC and to the trustees because

17  those are handwriting documents that are not --

18          THE COURT:  Right.  I understand that.

19          MR. CLARK:  -- usually produced in that form.  Your

20  Honor, any further questions?

21          THE COURT:  Okay.  Thank you very much, Mr. Clark.

22          MR. CLARK:  Thank you, Dan.  Your Honor, should I

23  address further specific questions, obviously, if you have

24  them?

25          THE COURT:  I'm looking through my notes.

1      MR. PRINCI:  All righty.

2      THE COURT:  I'll ask Mr. Schrock or one of his

3  colleagues this question, but let me ask it of you.  What was

4  the role of AFI and Kirkland & Ellis in the RMBS settlement

5  negotiations?

6      MR. PRINCI:  We discussed with Kirkland & Ellis the

7  terms that were being negotiated of the RMBS settlement

8  agreement.

9      THE COURT:  Did either Kirkland --

10      MR. PRINCI:  In a real-time basis.

11      THE COURT:  Did either Kirkland or AFI have anyone

12  present during negotiations?

13      MR. PRINCI:  I'm sorry; say again, please?

14      THE COURT:  Did either Kirkland or AFI have anyone

15  present during negotiations?

16      MR. PRINCI:  I believe -- I believe --

17      THE COURT:  I don't know that -- whether these -- go

18  ahead.

19      MR. PRINCI:  I believe the answer to that, Judge, I --

20  from firsthand knowledge, I know the answer to that, like,

21  right before the petition was filed is yes, because there was

22  an associate at Kirkland & Ellis who we asked to be there just

23  so that we get the document done, so he came to our offices,

24  Morrison & Foerster's offices.  And then prior to -- okay.  And

25  then prior to that, Your Honor, I wasn't involved, and so I'd

RESIDENTIAL CAPITAL, LLC, ET AL.                                    39

1   have to consult, but I'm being told, yes.

2          THE COURT:  You identified Mr. Cancelliere, a mortgage

3   risk officer, as being substantially involved in the settlement

4   negotiations on behalf of the debtors.  Was there any other

5   person employed by any of the debtors who was substantially

6   involved in the settlement negotiations of the RMBS settlement?

7          MR. PRINCI:  Yes, Your Honor.

8          THE COURT:  Who else?

9          MR. PRINCI:  Ms. Hamzehpour.

10         THE COURT:  Give me -- hang on; let me find -- I'm

11  switching between the notes I prepared before and -- what is

12  the name?

13         MR. PRINCI:  It's Hamzehpour.

14         THE COURT:  Could you spell it for me?

15         MR. PRINCI:  I will in just one second, Judge.  H-A-M-

16  Z-E-H-P-O-U-R, H-A-M-Z, as in zebra, E-H-P, as in Peter, O-U-R.

17         THE COURT:  And what is Ms. Hamzehpour's position with

18  the debtors?

19         MR. PRINCI:  She's general counsel.

20         THE COURT:  And what was her role in the negotiations?

21         MR. PRINCI:  She was one of our principal contacts,

22  directives.

23         THE COURT:  All right.  Was there anyone else employed

24  by any of the debtors that was substantially involved in the

25  settlement negotiations?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    40

1          MR. PRINCI:  Mr. Ruckdaschel.

2          THE COURT:  D-A-S-H-E-L-L or --

3          MR. PRINCI:  R-U-C-H (sic) --

4          THE COURT:  Yes.

5          MR. PRINCI:  -- D, as in David --

6          THE COURT:  Yes.

7          MR. PRINCI:  -- A-S-C-H-E-L.

8          THE COURT:  And what is his position?

9          MR. PRINCI:  I don't know -- he's a lawyer.  I don't

10   know the exact title, Judge, but he is an in-house expert on

11   securitizations.  I can find out his title in just one moment,

12   if I confer with the client.

13         THE COURT:  Go ahead.

14         MR. PRINCI:  Excuse me, Your Honor.  I've been

15   informed his title is counsel.

16         THE COURT:  Somebody just added something to that or

17   not?

18         MR. PRINCI:  Capital markets counsel.

19         THE COURT:  Anyone else?

20         MR. PRINCI:  I'm sure -- excuse me one second, Your

21   Honor.  You're talking now about people who work for ResCap as

22   opposed to outside advisors, correct?

23         THE COURT:  Correct.

24         MR. PRINCI:  Okay.

25         THE COURT:  Well, you say "outside advisors".  If

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    41

1   there are financial advisors who were substantially involved in

2   the negotiations of the RMBS settlement on behalf of the

3   debtors, I do want to know who they are, as well.

4            MR. PRINCI:  Okay.  That would be Mr. Nolan and Mr.

5   Renzi, R-E-N-Z, as in zebra, I, from FTI Consulting.

6            THE COURT:  Okay.

7            MR. PRINCI:  Mr. Puntus, P-U-N-T-U-S, and Mr. Chopra,

8   C-H-O-P-R-A, from Centerview Partners.

9            THE COURT:  Anyone else?

10           MR. PRINCI:  Those -- and I'm sure there are other

11  people, Judge, but those are the principal people.

12           THE COURT:  Okay.  All right.  Anything else you want

13  to add now?

14           MR. PRINCI:  Yes, Your Honor.  So, I just do want to

15  speak to the Court about a proposal we have, and why we think

16  it's important for some sort of balance to be entertained by

17  the Court, and it is as follows.

18           We believe that the thesis for the request for all

19  this information is not well founded.  The fact that we, prior

20  to the petition date, took parties who were involved in the

21  various agreements that we were executing and discussed these

22  matters with them, is not per se evidence that there is

23  collusion.  You'd have sort of a double supposition:  A, Ally

24  owns you and therefore dominates you.  You're exercising no

25  independent judgment; your board is not exercising any

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                42

1   independent judgment.

2        And B, off the heels of that, when you negotiated with

3   people you've been litigating with for -- indirectly -- for

4   quite some time, or that you're adverse to, you purposely

5   inflated the amount of the allowed claim.  Now, while we don't

6   believe that's evidence, but that's supposition, we've given

7   people a lot of documentation to see if, upon their review,

8   they can identify anything beyond supposition, something to

9   corroborate that this was collusive in its nature.

10        And what we're asking the Court is this:  let these

11  people, who obviously have -- I mean, some of these people have

12  already made a decision not to accept the settlement agreement.

13  For example, MBIA has decided -- MBIA has told the trustees --

14        THE COURT:  They had a different explanation for their

15  letter, but go ahead.

16        MR. PRINCI:  Yes, I saw that explanation; I'm just

17  having some difficulty with it, and I know you're -- you don't

18  want to hear my views when it's -- with respect to inferences

19  that can be drawn.  I don't understand how they were addressing

20  duplication of efforts.  That's not what the letter says.  And

21  the other thing is they told the trustees in that letter do not

22  accept the settlement.  They just flatly say it.  They don't

23  qualify it; they say don't accept the settlement.

24        By the way, FGIC also sent a letter to the trustees

25  and FGIC instructed the trustees don't accept the settlement.

1  Now, I just don't know what all the rest of the information is

2  going to do to change somebody's view --

3          THE COURT:  But Mr. Princi --

4          MR. PRINCI:  -- that they shouldn't accept the

5  settlement.  But --

6          THE COURT:  -- whether this hearing goes forward on

7  November 5th or on some other date, I have prejudged none of

8  the issues.  The only thing I'm determined to do is make sure

9  that anyone opposing this settlement has a full and fair

10  opportunity to present whatever facts that are relevant to the

11  issues before the Court that requires in the first instance

12  that they be given discovery of them.

13          I said early on, that I thought this was an aggressive

14  schedule.  You negotiated a schedule.  The hearing going

15  forward on the date that it's scheduled requires that there be

16  substantial compliance.  If dates are adjusted, either by

17  agreement or by order of the Court, they'll be adjusted, but

18  you don't get to decide -- with all due respect, or even less

19  than that though, okay -- you're not the one who gets to decide

20  what issues the objectors can present.  They may go to present

21  an argument, and I may rule that's not relevant.  I may find

22  some other basis; I may sustain your objection to the evidence.

23  That's fine, but the objectors are going to have a full and

24  fair opportunity to present their arguments.  In an appropriate

25  time; I'm going to set time limits for everybody on this

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      44

1  hearing, so no one should be expecting that they're going to

2  filibuster a hearing.  It isn't going to happen, okay.  When I

3  set timed trials, I set the timed trials, and everybody lives

4  with it.  It's still premature for me to do that, but no one

5  should think that they're simply going to filibuster, okay.

6          MR. PRINCI:  So --

7          THE COURT:  So you're not going to be the one who's

8  going to decide, okay.  You may disagree with the Iridium

9  factors.  They may not be able to offer, at a hearing,

10 evidence.  You described it as their collusion theory.  I'm not

11 sure it has to rise to the level of collusion, but if that's

12 the theory of their defense, they'll have an opportunity to

13 try.  And if they have evidence to support it, if it's relevant

14 to one of the factors the Court has taken into account, the

15 Court will hear it and consider it, okay.

16         But when I said at the last hearing, everybody's

17 picked up and quoted, that I said your November 5th date is

18 hanging by a thread, it still is, okay, because you file a

19 piece of paper, your status report, saying, oh, here's all the

20 things we've done.  But when I start reading your chart, you

21 know, I had question marks in lots of places down, because you

22 didn't represent that all of that discovery was done.  You come

23 back to the 1,500 sample loan files, but until I asked you

24 questions, you didn't deal with the e-mails, okay.  E-mails,

25 for better or worse, have become a major topic of discovery and

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1  expense and burden on everybody.

2          Let me hear from the other parties.

3          MR. DONOVAN:  Good morning, Your Honor.  Daniel

4  Donovan from Kirkland & Ellis for Ally Financial.  Your Honor,

5  you asked Mr. Princi five questions, and I want to answer those

6  for you.

7          First you asked, who from AFI, if anyone, should be

8  deposed?  It would be Mr. Timothy Devine, chief counsel of

9  litigation for Ally; that's one.

10         Two, you asked Mr. Princi when he would, and I assume

11 you'd asked me, when would Ally complete their e-mail

12 production.  On or before September 24th of 2012.

13         Third, you asked when a privilege log would be

14 produced.  We're going to produce our initial privilege log

15 September 28th, and plan to supplement that October 5th, and be

16 done on that date, October 5th, 2012.

17         Fourth, you asked Mr. Princi, whether ResCap's

18 production is searchable.  Ally's is searchable.  We produced

19 as TIFFs with load files; we've heard nothing from the

20 committee.  They've been unable to search it.  And I'm going to

21 come back -- I hope they have searched the settlement

22 negotiation documents we produced in July of 2012, but I'll

23 come back to that.

24         Fifth, you asked what was Ally's role related to the

25 RMBS trust settlement agreement.  And I think Mr. Princi had it

RESIDENTIAL CAPITAL, LLC, ET AL.                          46

1  right.  We were kept up to date, primarily Mr. Devine, also, my

2  colleague Noah Ornstein, from Kirkland & Ellis.  We were kept

3  up to date; we were interested, and we were kept up to date,

4  primarily by Morrison & Foerster and others.

5          So I believe those were five questions you asked, but

6  I wanted to give you Ally's response at the outset.

7          THE COURT:  You gave me the date by which e-mail

8  production will be completed.  What about any other document

9  production other than e-mails, electronic or paper?

10         MR. DONOVAN:  And I'm putting those together, Your

11 Honor.  So I believe both --

12         THE COURT:  Okay.  All production.

13         MR. DONOVAN:  All of our discovery, and just for the

14 record, we have searched and are searching thirteen custodians,

15 four of which are from Kirkland.  The four Kirkland custodians

16 were searched and produced back in July 2012, July 26th to be

17 precise.  And those documents were e-mails of which MOFO was

18 on, Ms. Patrick was on, and others if we were CCed, if any of

19 those four Kirkland custodians were CCed.

20         So when the committee's report last night said

21 settlement negotiations that we were at least copied on -- I

22 know they happened without us -- those have been produced.

23 There's going to be some more, but they've been produced.  And

24 that's because, Your Honor, since June, the committee served

25 2004 requests, as you know, and at least three of them, if not

1   more, committee request 18 to 20, asked for the same

2   information, not surprisingly.  So --

3          THE COURT:  And you say that was substantially done

4   when?

5          MR. DONOVAN:  From the Kirkland --

6          THE COURT:  Yes.

7          MR. DONOVAN:  July 26th is when we produced it.  And

8   later this week -- I hope to be done by Friday, but I gave

9   myself till Monday under your question -- is we're going to get

10  the rest of the business folks.

11         THE COURT:  Okay.

12         MR. DONOVAN:  And that's where we come out, Your

13  Honor.  We have no objection to the committee asking for

14  discovery from Ally.  We've produced it; we intend to.  We

15  don't think we particularly should be the focus, but that's

16  fine.  And that's why in our report last night, when we've been

17  working with the committee, we asked, knowing we're going to

18  come before Your Honor, for confirmation that there are no

19  issues.  And we got confirmation.  And then in the status

20  report, there were the two issues raised last night that I

21  think I've given you the dates now.

22         THE COURT:  Okay.

23         MR. DONOVAN:  Your Honor, I don't know if you want to

24  go through -- we can -- I know some other parties -- FGIC had

25  some objections to our discovery.  I'm happy to save that,

RESIDENTIAL CAPITAL, LLC, ET AL.                                    48

1   since you seem to be focused --

2            THE COURT:  No, go ahead.

3            MR. DONOVAN:  Okay.  FGIC, Your Honor, as you know, if

4   the co-chair of the creditors' committee.  They're also a

5   plaintiff against us in ten cases that are stayed by agreement

6   extending the stay, okay.  So we obviously have some different

7   issues than with the committee.  We told FGIC, just recently,

8   we wanted to meet and confer; it didn't happen, but I believe

9   it was passing between status reports and letters yesterday,

10  that we would give them access to the material we're producing

11  to the committee that's confidential.

12           Your Honor, under the protective order there's also a

13  category called "professional eyes only", and that was

14  negotiated obviously for a reason.  FGIC is an adversary.  We

15  have serious concerns about giving them that, but we told them

16  if we can get to an agreed order -- I think it would basically

17  need to be a lawyer who's not going to be involved in any of

18  the other litigation -- we're willing to give them that

19  information.  But that's a serious issue to us, Judge, because

20  we are adversaries, and we don't believe we should have to

21  produce such information, especially when we view some of their

22  requests to basically get around the stay.

23           THE COURT:  So Jones Day in paragraph 12 of their

24  status report says "FGIC continues to be stonewalled in its

25  efforts to receive discovery from another key party to the

1  settlement process, namely the debtors' parent, Ally Financial.

2  AFI, remarkably, claims that it is not a relevant party to the

3  settlement for discovery purposes," et cetera.  So your

4  response is you've -- you don't know what they're talking

5  about.

6          MR. DONOVAN:  Right.  What we told them was, look, we

7  think it's duplicative, Judge, but understanding we're coming

8  before Your Honor, we said, fine, we're not going to fight

9  this.  We will give you what we're giving the committee, and

10  this was either contemporaneous, or after they filed the status

11  report, we had letters going -- and e-mails last night.  We're

12  going to give them that information.

13          THE COURT:  Hearing dates tend to focus the mind; it

14  does, you know.

15          MR. DONOVAN:  It does, doesn't it?  Yes.  A hanging in

16  the square.  But what did happen, though, Judge, and this is --

17          THE COURT:  So wait, let me ask you this.

18          MR. DONOVAN:  Yes.

19          THE COURT:  Have you reached an agreement with Jones

20  Day as to what you will give and under what conditions you will

21  give it?

22          MR. DONOVAN:  We have, although the second part -- the

23  first part is confidential.  We're giving the committee --

24  we're giving that, so there's no need.  The second part, we

25  agree we're going to talk after the hearing.  We tried to match

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1   up before; we couldn't reach.

2           THE COURT:  Okay.

3           MR. DONOVAN:  And that is this category.  And I don't

4   think it's much for RMBS, but there is some, the "professional

5   eyes only" material, and frankly, as my client has told me,

6   they don't want material that shouldn't be produced or is

7   somehow not producible on the FGIC cases that are being

8   requested to be produced, but if we can reach an agreement

9   where it's a separate lawyer looking at it, we're fine with

10  that.  So I think that will resolve most, if not all; they'll

11  tell you.

12          THE COURT:  What judge is the FGIC cases pending

13  before?

14          MR. DONOVAN:  Don't know, Your Honor.  I'd have to

15  check.

16          THE COURT:  All right.  Thank you.

17          MR. DONOVAN:  So Your Honor, I believe that brings you

18  up to date.  So bottom line, Ally has no objection to the

19  discovery from the committee that we believe remains; there may

20  be some leftovers.  And we will cooperate and proceed.

21          THE COURT:  Okay.  Thank you.  Ms. Patrick?

22          MS. PATRICK:  Yes, Your Honor.  May it please the

23  Court, Kathy Patrick for the steering committee investors who

24  have -- are parties to the settlement agreement.  Let me answer

25  your questions that you put to Mr. Princi.  Has there been a

1    threat?  No, there has not been a threat, but the --

2              THE COURT:  A promise, or what?  I mean, Mr. --

3              MS. PATRICK:  There has been a key observation that

4    there were substantive concessions made by our trustees in

5    consideration of a good faith effort on the part of everyone to

6    meet the schedule for the hearing.  We want this motion heard.

7    As the Court observed at the very first hearing I attended, if

8    these repurchase claims languish, the case can go into a

9    meltdown.  It's in nobody's interest for that to happen.

10             And having negotiated that settlement -- that

11   scheduling order -- it's important that the Court know that

12   when that order was negotiated, there was no mention of loan

13   files, there was no mention of settlement communications or

14   depositions of lawyers or anything else.  And when that order

15   was negotiated, the very day it was negotiated, the creditors'

16   committee stood up in this courtroom and tried to walk it back

17   and suggest that they were not going to meet it.

18             And so part of what our clients have to evaluate is

19   whether the creditors' committee's continued effort to run this

20   case the way they prefer by waiting for the examiner, by having

21   all of this in a plan -- I know that --

22             THE COURT:  I think I made it clear --

23             MS. PATRICK:  I know that.

24             THE COURT:  -- last week on the issue of plan

25   negotiations that we're not waiting for the examiner report.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    52

1          MS. PATRICK:  Yes, Your Honor, you did.

2          THE COURT:  On that or on this, okay.  So to the

3    extent that -- and I didn't really read that as -- that seems

4    to have gotten dropped from what they're pressing.

5          MS. PATRICK:  It --

6          THE COURT:  But Ms. Patrick, there's an enormous

7    amount of discovery and expert work and preparation that goes

8    into having a hearing on the RMBS settlement.  I don't

9    underestimate the importance of the settlement to this case.

10         MS. PATRICK:  Yes, sir.

11         THE COURT:  Okay.  My concern before last week,

12   expressed last week, the reason I scheduled this hearing is,

13   I'm not sure it's realistic to really think that this case is

14   going to be ready for hearing on November 5th.  I'm not

15   prepared to say today that it's not, but --

16         MS. PATRICK:  Yes, Your Honor.  I --

17         THE COURT:  -- from the standpoint of your clients

18   who've entered into an agreement, and I understand the

19   importance to them, having committed to this, that it go

20   forward expeditiously and not languish --

21         MS. PATRICK:  Um-hum.

22         THE COURT:  -- if they want the agreement approved,

23   it's in their interest to assure that there aren't these

24   unnecessary diversions from dealing with it on the merits.

25         MS. PATRICK:  Indeed, Your Honor.  And to be clear, it

RESIDENTIAL CAPITAL, LLC, ET AL.                                    53

1    isn't as though the settlement agreement itself was entered in

2    July.  The settlement was announced in May on the first day

3    hearing.  The plan support agreement specifically referenced

4    the allocation of -- pursuant to the waterfall, there is a

5    precise provision in it that refers to two presentations of the

6    waterfall concerning the allocation that was not a surprise to

7    anyone.  Creditors' committee was appointed soon after that.

8    The scheduling order was entered in July, at the end of July.

9    And we got our first request for settlement communications from

10   the committee on August 27th.

11           THE COURT:  Well, but here we are; we're in the middle

12   of September.

13           MS. PATRICK:  Here we are, exactly.  But my point,

14   Your Honor, is, having gotten that request on August 27th, we

15   have not yet had an opportunity to talk to you about our

16   position on settlement communications, and I want to be clear

17   about it.

18           The debtors have agreed to produce the settlement

19   communications.  Ally produced all of the settlement

20   communications on July 26th.  The Court, in the hearing on the

21   exclusivity point last week, made the point that settlement

22   negotiations are not ordinarily discoverable in the ordinary

23   course.  Why is that?  Because the evidence of whether

24   negotiations are at arm's length is evident from the agreement

25   itself.  It is.  And for our clients, this is a significant

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                           54

1    issue.

2         We, unlike everybody else here, are trying to remedy

3    this broadly across the market.  We have two settlements

4    pending:  one here, one in Bank of America.  We are negotiating

5    with other banks.  This morning we sent notices of default to

6    Wells Fargo and Morgan Stanley.  It is not insignificant to our

7    ability to try to get relief for bondholders that have suffered

8    billions of dollars of losses to be able to conduct settlement

9    negotiations with the presumption of confidentiality that

10   everyone expects.  And so we have been clear with the

11   creditors' committee and with everybody else that has requested

12   them that we will not produce our settlement negotiations

13   unless ordered by the Court.

14        We had conversations about that with the creditors'

15   committee in August.  We met with them on September 4th and

16   told them that was their position.  As recently as last week,

17   we sent another letter to them asking them to tell us if they

18   intended to raise this issue so that we could brief it to the

19   Court.  They acknowledged that we were entitled to notice so

20   that we could brief the issue for ourselves, and we learned

21   that they intended to raise it in an e-mail yesterday.

22        Now, that may be how they believe this is fair to

23   raise this issue, but this is not insignificant to our clients.

24   Uniquely among everybody here, we are prejudiced if our

25   settlement communications are disclosed.  Uniquely among

1  everybody here, we have other interests at stake, and uniquely,

2  those interests are compelling, given that both Ally and the

3  debtors have agreed to produce these settlement negotiations,

4  and --

5          THE COURT:  Isn't the cat out of the bag, once --

6          MS. PATRICK:  Well, the cat is out of the bag, but the

7  issue for them is, well, they might have overlooked something

8  in their production, but we are in a circumstance where, for

9  the sake of what we are trying to accomplish elsewhere, we

10  think the holding of In re Lee Way (ph.) and the many other

11  cases requiring that collusion be established by extrinsic

12  evidence before settlement negotiations are made discoverable,

13  is apposite here.  It's entirely relevant.  They now have

14  documents, that in our view, they were not entitled to receive,

15  settlement negotiations, and they've had them for over a month

16  from Ally.  They're in the process of getting them from the

17  debtor, and yet on the basis of our refusal to produce the same

18  universe of documents, they now want to kick the hearing date

19  that we negotiated.

20          To be clear, our privilege log will be done on

21  Thursday for all of the pre-settlement communications.  All of

22  our other production that was not settlement negotiations was

23  completed on July 31st.  But there is, Your Honor, a

24  significant group of people who for their own reasons,

25  including the creditors' committee, would prefer this hearing

RESIDENTIAL CAPITAL, LLC, ET AL.                          56

1   to happen on the 12th of Never, because they have other

2   interests.  Everybody has their interests.  I certainly have

3   mine; I acknowledge that.  But let's take MBIA as an example.

4           MBIA issued a subpoena, including a request for

5   settlement negotiations, on June 15th.  The Court will remember

6   that hearing; we were here arguing.  On July 6th, in

7   correspondence with us, they agreed to defer that issue.  On

8   July 23rd, they sent a letter to the trustees instructing them,

9   not only not to accept the settlement, but not to consider it.

10  Now, we didn't find out about that letter until recently.  But

11  on September 13th, we sent a letter to MBIA saying, haven't

12  heard from you; assume that you have no other issues.  And they

13  filed a response yesterday raising these issues.

14          THE COURT:  Let me ask you --

15          MS. PATRICK:  It is not question of not being

16  proactive, Your Honor.  We have produced -- in response to

17  every request we have gotten, we have produced within the ten-

18  day period.

19          THE COURT:  Wait, let me ask you something.

20          MS. PATRICK:  Um-hum.

21          THE COURT:  Can you identify the person or persons on

22  behalf of the investors who was substantially involved in the

23  negotiations?  Was there anyone other than their outside

24  counsel?

25          MS. PATRICK:  You're talking to her.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    57

1       THE COURT:  Okay.

2           MS. PATRICK:  And so for our purposes, the question of

3   deposing lawyers is particularly acute.  Now, we have addressed

4   this issue before.  We've addressed the question of settlement

5   communications before, and it initially came up while the Bank

6   of America settlement was pending in federal court and then

7   made its way back to state court.  And in that context, we

8   cited a number of cases that are familiar to the Court, as

9   you've said, the Second Circuit law, which requires parties

10  which want to depose lawyers to identify, not only that the

11  evidence is highly material, but that there is no other source

12  from which it can be obtained.

13          THE COURT:  What are the other sources -- if the

14  lawyers were the negotiators, what are the other sources from

15  which the information can be obtained?

16          MS. PATRICK:  Well, they have all of the written

17  documents and e-mails that went back and forth; they have the

18  drafts of the agreement; they have the agreements themselves;

19  they have data on which the settlement was premised, the GSE

20  repurchased data that the debtors produced.  They have an

21  abundance of evidence from which to assess the reasonableness

22  of the debtors' conclusion that 8.7 billion dollars was a

23  reasonable settlement to enter into with trusts that have

24  already suffered 47 billion dollars of losses.  So there is an

25  abundance of evidence.

1          Importantly, Your Honor, there's a clear distinction

2    in the case law.  Every settlement does not make the

3    negotiation of that settlement relevant.  The back and forth of

4    who said what to whom, is not presumptively relevant.  Indeed,

5    it's only rarely relevant.  It's only relevant if there is

6    extrinsic evidence of collusion.  And notably -- notably, there

7    is no suggestion by anyone that our clients or the separately

8    represented Tal-Franklin Group, which has a different

9    agreement, right -- their terms of their agreement preserve

10   certain servicing claims that our clients did not -- engaged in

11   any collusion with the debtors or Ally Financial with regard to

12   this settlement.  There is no evidence of that.  There is no

13   suggestion of it at all.

14          And as a consequence of that, from our perspective,

15   the prospect of deposing litigation counsel to discover

16   settlement negotiations -- recall, Your Honor, this is not the

17   only place where we face MBIA and FGIC.  It's not the only

18   place where we face other noteholders who have interests that

19   are --

20          THE COURT:  See, the issues you raise seem to me to be

21   quite different from depositions of employees of the debtors --

22          MS. PATRICK:  Yes.

23          THE COURT:  -- who happen to be lawyers, whether they

24   were acting -- put aside there may be a relevant issue as to

25   whether they were acting as lawyers or acting as

RESIDENTIAL CAPITAL, LLC, ET AL.                                         59

 1  businesspeople --

 2              MS. PATRICK:  Um-hum.

 3              THE COURT:  -- where the debtor -- where the debtors'

 4  board, in making a decision to enter into a settlement has

 5  relied, in part, on advice of counsel.

 6              MS. PATRICK:  Um-hum.

 7              THE COURT:  That's a different issue than you raise as

 8  litigation counsel for the investors who negotiated the

 9  settlement.

10              MS. PATRICK:  Yes, Your Honor.

11              THE COURT:  So the fact that some lawyers may get

12  deposed doesn't mean all lawyers get deposed.

13              MS. PATRICK:  Although -- exactly, Your Honor.  I

14  agree with that.  But even in the context of typical derivative

15  litigation, special litigation committee, litigation, all of

16  that, it's not customary to depose lawyers.

17              THE COURT:  Look, I am -- I said this at the start.

18  I'm not a fan of having lawyers --

19              MS. PATRICK:  Um-hum.

20              THE COURT:  -- deposed.

21              MS. PATRICK:  Yes.

22              THE COURT:  There are cases and there are issues where

23  that necessarily is appropriate.  When I'm told -- and that's

24  been modified slightly -- that the only people who were

25  involved in these negotiations were the lawyers, and you can't

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1  depose any of them, that doesn't ring quite true to me.  Okay?

2          MS. PATRICK:  Sure.  I understand that, Your Honor.

3  And I completely get where you're coming from in that regard.

4  But for --

5          THE COURT:  Because even the cases that have been

6  cited; is there another alternative?  Yes.  And I would look to

7  is there some alternative other than deposing the lawyers if

8  there's -- where the information can be obtained.

9          MS. PATRICK:  Um-hum.  Yes.  That's right.

10          THE COURT:  Okay.  I understand your argument, Ms.

11  Patrick.

12          MS. PATRICK:  And then the --

13          THE COURT:  Trust me, if -- you'll have -- if

14  necessary, I will give you a chance to brief the issue.

15          MS. PATRICK:  Thank you, Your Honor.

16          THE COURT:  I'm not deciding it on the basis of status

17  reports.  Okay?

18          MS. PATRICK:  Thank you, Your Honor.  And, Your Honor,

19  we are prepared to move forward.  We have moved forward.  We've

20  met our deadlines.  People -- this is, as you said, this

21  happens often in cases where production gets a little off

22  track.  But ours is on track.

23          THE COURT:  Well, yours is on track, but the cutoff of

24  fact discovery is September 24th.  And what I'm being told --

25  that was a cutoff of all fact discovery.  And now I'm being

RESIDENTIAL CAPITAL, LLC, ET AL.                    61

1    told that the debtor will complete its production by October

2    3rd and have a privilege log by October 10th.  You can't have a

3    cutoff of fact discovery when not all stuff has been produced.

4    Okay?  So the situation is going to require an adjustment to

5    the schedule; which parts of it remain to be seen.

6              MS. PATRICK:  Yes, Your Honor.  And the only other

7    points that I will make with re --

8              THE COURT:  Mr. Princi seemed to be saying that you

9    threatened to pull the plug on the proposed settlement if the

10   hearing doesn't go forward on November 5th.  And your answer to

11   that was, no threat.

12             MS. PATRICK:  No, Your Honor.  My answer to that was,

13   actually, the concession that our trustees made with regard to

14   capping their cure claims and limiting their servicing

15   objections was premised on the notion that the creditors'

16   committee and others would work in good faith to try to achieve

17   that schedule, would work hard, would put us in a position

18   where we would have a hearing.  And what has happened, Your

19   Honor, from the moment that hearing was announced, is that the

20   creditors' committee has been clear that it does not prefer

21   this settlement to be resolved outside of a plan.

22             THE COURT:  Well, I've already told you, that part is

23   a nonstarter, okay?

24             MS. PATRICK:  But the point I was trying to make, Your

25   Honor, is that in that context, if you look at the timing and

RESIDENTIAL CAPITAL, LLC, ET AL.                                      62

1   scope of when they have served discovery, they have not used

2   their time efficiently.  For example, the settlement was

3   announced in May.  The scheduling order was entered at the end

4   of July.  We had informal conversations with them about the

5   production of documents.  They did not subpoena settlement

6   communications until August 27th.  We responded to them, and

7   they notified us for the first time yesterday that they

8   intended to raise it.

9         And so all I'm saying is, we are all trying to work

10  very hard to try to get this hearing held on the calendar so

11  that it can be resolved.  But our position is very clear --

12         THE COURT:  Let me make one or -- I'm going to stop

13  you there.

14         MS. PATRICK:  Um-hum.

15         THE COURT:  Earlier in this case --

16         MS. PATRICK:  Um-hum.

17         THE COURT:  -- there was another issue about

18  scheduling of hearings, and I basically told counsel for one of

19  the other parties-in-interest that I was not going to allow

20  their threats to hold this case hostage; that the schedule

21  would be set appropriately.  The Court is certainly prepared to

22  move forward expeditiously.

23         But you haven't -- and I want to make clear -- I

24  haven't heard a statement -- call it a threat or call it

25  something else --

RESIDENTIAL CAPITAL, LLC, ET AL.                                63

1          MS. PATRICK:  No.

2          THE COURT:  -- that if the November 5 hearing gets

3  moved because there just is not sufficient time, I don't have a

4  reason to question the good faith of all the parties who are

5  seeking discovery.  Okay?

6          There's a lot that has to be done to prepare for this

7  hearing.  There are experts who have to have access to all the

8  documents before they can complete reports.  There's a lot of

9  things -- there are a lot of moving targets.  Okay?

10          The one thing that I recoil at --

11          MS. PATRICK:  Um-hum.

12          THE COURT:  -- is anyone who takes the position that

13  well, if this date doesn't hold or that date doesn't hold, I

14  don't care what the problems are, we're going to take our cards

15  and go home.  Well, we'll see what happens if that happens,

16  okay?  We'll see what --

17          MS. PATRICK:  Your Honor --

18          THE COURT:  -- happens.

19          MS. PATRICK:  -- we have not said that.

20          THE COURT:  Okay.  I --

21          MS. PATRICK:  What we have said is if the creditors --

22  here's all we're saying; because it's not a one-sided

23  conversation between us and the creditors' committee.  If the

24  creditors' committee, as they suggest in their pleading,

25  believes they can take the benefit of the agreement our

RESIDENTIAL CAPITAL, LLC, ET AL.                                                64

1   trustees made without working hard to adhere to the schedule,

2   that they can, having agreed to that benefit, stick their feet

3   in concrete and say no, no, no, we just don't want to, that's

4   not fair.

5             THE COURT:  Well, that's not what's going to happen.

6   But let me -- I want to make -- I want to get your position on

7   a question that I asked Mr. Princi.

8             MS. PATRICK:  You bet.

9             THE COURT:  Because this was what seems to me to be

10  the key question; and I think I know the answer to this, but if

11  you have a different view, go ahead and tell me.  The question

12  I asked him was why does the RMBS settlement have to be

13  resolved before the sale of the loan platform and the legacy

14  loan portfolio?  And I think the answer is, it doesn't.

15            MS. PATRICK:  Oh, Your Honor, we believe absolutely

16  that it does.

17            THE COURT:  How is that going to happen?  The auction

18  is scheduled for October 23rd.

19            MS. PATRICK:  The auction, right now, is going forward

20  with the prospect that there is a settlement agreement in place

21  that is subject to approval, that allows for the settlement to

22  be made free and clear of the repurchase and servicing claims.

23  The trustees are currently operating under an agreement that

24  caps the cure claim at 600 million dollars.  So we're in a

25  universe where prospective buyers, just as they were at the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    65

1   beginning of the case, are operating under the assumption that

2   the RMBS claims are in a box and will stay there and will not

3   present significant risk to them going forward.

4        It is our position -- it has been our position that in

5   the absence of these agreements, it is not possible to sever

6   the servicing going forward from the obligation of the seller,

7   because they are one and the same entity.  In each of these

8   instances, they are one and the same.  And so that's why it was

9   very important to get these lined up in a row so that the

10  settlement could proceed free and clear.

11       Our clients have an interest in that servicing sale,

12  probably an interest overwhelmingly different than everyone

13  else's, because we actually care about mortgage servicing over

14  the long term.  We also care about proceeds, because proceeds

15  are what are going to compensate us.

16       THE COURT:  And what is -- if the RMBS settlement is

17  resolved in November versus resolved in January, what

18  consequences flow from that?

19       MS. PATRICK:  Your Honor, we believe that if it's a

20  circumstance where all of the schedule is going to move back,

21  the issue that we understand will be at play at that point is

22  this:  our clients have cure claims -- our clients -- the

23  trusts have cure claims that our clients have concurred with

24  the trustees, can be cured.  That was a substantive concession

25  that the estates wanted, needed, and that benefits other

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              66

1  creditors.

2          There was a quid pro quo for that.  It's not a threat,

3  but we're going to have to think about what rights we have to

4  preserve for the trusts.  Because if we're not going to get a

5  circumstance where -- if we're going to be operating in a

6  circumstance where the RMBS trusts' claims are treated as

7  inchoate and subject to dispute, where other constituencies'

8  claims are treated as concrete, we get less consideration.  And

9  I'll give you a perfect example of how that happens.

10         It is our understanding that although our trustees

11 have not made a decision at all about this settlement, they are

12 routinely excluded from creditors' committee deliberations

13 about it, whereas, MBIA, which has already directed the

14 trustees not to accept it, participates in those discussions.

15 And so I understand that bankruptcy is a collision of

16 interests, it's a fascinating collision of interests, but our

17 clients cannot unilaterally disarm themselves, leaving

18 themselves in a circumstance where cure claims that might have

19 substantial value for the trusts, if the settlement doesn't get

20 resolved, are compromised, but they don't get a hearing on the

21 rest.  That's not a threat.  That's just a practical

22 recognition of the reality of the circumstance.

23         THE COURT:  Okay.  Thank you.

24         MS. PATRICK:  Thank you, Your Honor.

25         THE COURT:  Mr. Eckstein?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    67

1           MR. ECKSTEIN:  Happy New Year, Judge.

2           THE COURT:  Thank you, you too.

3           MR. ECKSTEIN:  I'm trying to sort out where I think it

4    makes the most sense to go.  I think I'd like to first deal

5    with Ms. Patrick's comments, because I view those, in some

6    respects, as threshold issues.

7           I am -- the committee respects the goal that Ms.

8    Patrick has in moving this forward swiftly; and the committee

9    understands the Court's intention to move this hearing forward

10   as quickly as possible.  And this is not an attempt to delay or

11   derail the consideration of the settlement.  That said --

12          THE COURT:  Well, that's a theme that's been echoed

13   for quite some time, including in some of the status reports.

14          MR. ECKSTEIN:  Your Honor, that doesn't change our

15   view that this is such a pervasive settlement, and it has such

16   overwhelming implications for the outcome of the case and a

17   plan, that it would be preferable if this was dealt with in a

18   plan.

19          I understand Your Honor's observations that that's not

20   going to be the way this is going to be considered, and so be

21   it.  But it's correct that our view is that this should ideally

22   be folded into a plan.  And in fact, if you go back to the way

23   this was structured by the debtor initially, they contemplated

24   that this would be done in conjunction with a plan.  And I

25   think there's a lot of merit to that.  But if that's not the

1  way the case is going to proceed now, we understand that.

2          The question -- the threshold question, however, that

3  I think Your Honor raised and discussed with Ms. Patrick is, is

4  there an absolute requirement that this proceed on November

5  5th.  I believe that there's no question on all sides of this

6  case, parties have been working very diligently to deal with

7  these issues.

8          As Mr. Princi knows, as Ms. Levitt knows, and as Ms.

9  Patrick knows, we have been talking about, for example,

10  discovery going back prior to the entry of the scheduling

11  order.  And each of those individuals have personally requested

12  me and my partners that we defer the filing of formal discovery

13  with respect to the settlement process until we could:

14  A, consider the substance of the settlement; B, deal with it

15  informally.  And we accommodated those requests.

16          And the reason that the discovery was served at the

17  end of August was in response to requests by the debtors'

18  counsel and by Ms. Patrick that we not proceed precipitously

19  with those discovery requests.  I was personally implored on

20  multiple occasions to do that.  I discussed this issue with the

21  parties going back in July, whether or not this was or was not

22  proper discovery.  So to now suggest that we delayed --

23          THE COURT:  Let me just stop you for a second.  Okay?

24  Let's assume that I conclude it's proper discovery.  Okay?  But

25  so where does that take us now?

RESIDENTIAL CAPITAL, LLC, ET AL.                    69

1            MR. ECKSTEIN:  I'm getting to that, Your Honor.  But I

2   was just responding to the fact that somehow we sat on our

3   hands.  We didn't sit on our hands.  This issue was --

4            THE COURT:  Do I take it from the fact that you're

5   pressing for discovery about the negotiations that you've

6   concluded that the amount of the proposed settlement is not

7   fair, reasonable, and in the best interests of the debtors'

8   estate?

9            MR. ECKSTEIN:  No.  At this point, we have not made

10  that conclusion, Your Honor.  We are pressing with the

11  discovery at this point in time, because we concluded that time

12  was running out.  The September 24th cutoff for discovery is in

13  place, and we concluded, at the end of October (sic) that we

14  could not wait any longer, and we had to serve the discovery

15  requests so that there was ample --

16           THE COURT:  You concluded at the end of August that --

17           MR. ECKSTEIN:  End of August that we needed to serve

18  formal discovery requests so that we can conclude this by the

19  end of September.  I thought that was the responsible thing to

20  do.

21           THE COURT:  Have you taken any depositions at all?

22           MR. ECKSTEIN:  No, we have not.  We have not -- Your

23  Honor let's -- to cut through a lot of discussions today.  The

24  reality is, we have minimal -- right now, notwithstanding all

25  the documents, all the comments, we have minimal substantive

RESIDENTIAL CAPITAL, LLC, ET AL.                70

1    production, as of today, with respect to the settlement

2    process.

3            I heard we're going to be getting some.  We're hearing

4    names for the first time.  The debtor has conceded, they

5    haven't even searched -- they haven't even searched the

6    businesspeople who participated in the negotiations.  Even

7    Ally, they suggest that they may have produced some documents

8    in July from Kirkland, but they haven't produced any

9    businesspeople e-mails to date.

10            THE COURT:  Well, let me ask you this.  The names that

11    were specifically identified as having been substantially

12    involved in the negotiations for employees of the debtors were

13    Daschel (sic), Hamzehpour, Cancelliere, and then from FTI,

14    Nolan and Renzi, and from Centerview, Puntus and -- I can't

15    read my own --

16            MR. ECKSTEIN:  Chopra.

17            THE COURT:  -- Chopra.  Those names haven't been

18    identified?

19            MR. ECKSTEIN:  We have not received e-mails from any

20    of those individuals to date.  And I don't believe --

21            THE COURT:  Any of them?

22            MR. ECKSTEIN:  Any of them.  And, Your Honor,

23    respectfully, for the debtor to stand and suggest that Mr.

24    Cancelliere is the principal negotiator -- to the extent -- we

25    just searched what we've received to date.  We have found two

1   e-mails that has Mr. Cancelliere's name.  I have not heard his

2   name in this case to date.  It's the first time I've heard his

3   name in the case.

4          So he may be the principal person who negotiated the

5   single most important settlement in this Chapter 11 case, but I

6   haven't heard his name to date.  And I haven't heard the CEO, I

7   haven't heard the CFO, I haven't heard a board member's name,

8   mentioned as having any involvement with this settlement.

9          Your Honor, it would be my experience that a

10  settlement of 8.7 billion dollars that was the sine qua non for

11  this case being filed, you would have expected that we would

12  get -- that the debtor would have affirmatively produced

13  documents from the files of the principal -- the leading

14  principals of the debtor.  That's not an unreasonable request.

15  We don't have to articulate the individuals.  The debtor should

16  be coming forth with those.  So --

17          THE COURT:  I don't disagree with that.  But I -- you

18  know, I asked the question.  Look, I made clear, I'm not a fan

19  of taking depositions of lawyers.  And so I pressed to find out

20  whether there are employees of the debtors who were

21  substantially involved in the negotiations, because it seems to

22  me, in the first instance, those are the people who ought to be

23  deposed, okay, about the negotiations, before you're deposing

24  outside counsel.

25          That doesn't mean you don't get depositions of outside

1  counsel.  But in the first instance, the issue of whether there

2  is some other source for discovery other than the lawyers is --

3  that's a relevant inquiry by the case law.  Okay?  And that's

4  why I asked the question.  I'm distressed if, in fact, those

5  people hadn't been identified to you before.

6          MR. ECKSTEIN:  Your Honor, I concur with the view that

7  we would prefer not to be taking depositions of outside

8  counsel.  That's not anybody's first choice.

9          THE COURT:  And I think -- and I said this in response

10 to Ms. Patrick's comments -- I think -- I agree with Ms.

11 Patrick.  I think she stands in a different position than the

12 debtors.  Ultimately the decision is was this an appropriate

13 exercise of business judgment by the debtors in entering into

14 the settlement.  That may make other third-party discovery

15 relevant.  But the key -- the crucial inquiry is the decision

16 by the debtors to enter into the settlement.

17         MR. ECKSTEIN:  And we agree with that, Your Honor.

18 And we have, I think, been as accommodating as possible in not

19 precipitating these disputes prematurely.  And --

20         THE COURT:  Well, you waited until a week before the

21 discovery cutoff to raise these issues.  And then I don't have

22 a lot of sympathy --

23         MR. ECKSTEIN:  No, Your Honor.  No, this was raised as

24 early as July.  The discussions with the debtor -- the debtor

25 asked us to defer.

RESIDENTIAL CAPITAL, LLC, ET AL.                                        73

1       THE COURT:  Yes, but nobody called my chambers.  I

2  made clear at the start of the case, if there's a discovery

3  dispute, you call chambers if you can't resolve it.  That

4  hasn't happened.  At the last hearing, when it was clear there

5  were all these issues floating around, I scheduled this hearing

6  for today.  Okay?

7       MR. ECKSTEIN:  Your Honor, as I said, we served the

8  discovery requests in August.

9       THE COURT:  Fine.

10      MR. ECKSTEIN:  And there was no surprise.  Everybody

11  knows exactly what the issues have been.  And there are no

12  unknown issues in this case.  There's a lot of communication

13  and the issues have been on the table.

14       So the question right now is, when will discovery be

15  complete?  We understand -- I guess today we're told discovery

16  will be complete sometime in the first week of October.  And

17  then the question is, who needs to be deposed.  And we've

18  gotten a variety of names.  The one name at least to date that

19  seems most substantive is Ms. Hamzehpour.  Ms. Hamzehpour is

20  the general counsel of the debtor.  I don't know sitting here

21  today, whether or not Mr. Marano or Mr. Whitlinger, for

22  example, were involved in the negotiations.  We have no

23  reason -- we don't know.  We haven't seen the documents one way

24  or the other and nobody has told us.  We have been told that

25  Ms. Hamzehpour is the most senior person at the debtor who was

1 responsible for the negotiation of this settlement.  And it

2 would seem logical that notwithstanding the fact that Ms.

3 Hamzehpour is an attorney, that if Ms. Hamzehpour was acting as

4 the businessperson -- most senior businessperson responsible

5 for the negotiation of the settlement -- it would be logical

6 that we would want to take her deposition.  There may be other

7 depositions that are needed in connection with this settlement,

8 and once we've --

9          THE COURT:  Let me ask you this, Mr. Eckstein; have

10 you given other counsel a list of the names of the individuals

11 whom you wish to depose?  It may change as you get more

12 documents, but have you provided them with a list of names at

13 this point?

14          MR. ECKSTEIN:  Your Honor, unfortunately because we

15 have not yet seen the documents, we have not been able to give

16 them a reliable list.  We could only give them the list after

17 we --

18          THE COURT:  Well you just told me with great

19 confidence that Ms. Hamzehpour is -- that you want to depose

20 her.

21          MR. ECKSTEIN:  We've been told by the debtor that she

22 was the most senior person involved in the negotiations.  So

23 that seems fairly obvious to me; if I've been told by the

24 debtor that she's the person, that would be a logical person to

25 depose.  We have not heard -- we heard a couple of other names.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                            75

1   We've now heard Mr. Nolan and Mr. Renzi from FTI.  Mr. Nolan

2   and Mr. Renzi of FTI are not lawyers; to the extent they were

3   involved in making analyses, they would be individuals I expect

4   we would want to depose.

5           THE COURT:  And I assume that Puntus and the name I

6   can't read --

7           MR. ECKSTEIN:  Puntus and Chopra --

8           THE COURT:  -- Chopra.

9           MR. ECKSTEIN:  -- I would imagine if they were

10  involved in the negotiations -- and I'm learning that today --

11  if they were involved in negotiations, they're individuals we

12  would expect to depose.

13          THE COURT:  Well, you got a list coming out of the

14  hearing today of people who I guess you want to depose.

15          MR. ECKSTEIN:  Your Honor, I think that's one thing

16  that we've accomplished, but the fact is, this is a long time

17  in coming to just get to this.  And without the documents, I

18  think Your Honor knows better than I, that those depositions

19  are not official.

20          THE COURT:  Look, I don't know what documents you have

21  and what documents you don't have.  There --

22          MR. ECKSTEIN:  Well --

23          THE COURT:  -- obviously have been a lot of documents

24  that are produced -- I don't know what hasn't been produced

25  yet.  So --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    76

1    MR. ECKSTEIN:  Your Honor, I'm told that we will be

2   getting -- you heard what I heard -- we're told that we're

3   going to be getting the documents by October 3.

4        THE COURT:  Well, you're told that you're going to get

5   a rolling production and that production will be completed no

6   later than October 3.  That was what I understood.

7        MR. ECKSTEIN:  So I would imagine that several days

8   after October 3, we will have been able to review the documents

9   and we'll then be able to take depositions.  There's no great

10  mystery to how this proceeds.  In terms of this discovery, I

11  don't think it's any more complicated that we'll get the

12  documents -- we probably need I would think a week to finish

13  reviewing the documents -- and we can then begin taking

14  depositions.  And the depositions -- it depends on how many

15  we'll take -- but I'm assuming that there'll be six, seven,

16  eight depositions that'll be necessary in connection with the

17  fact discovery.

18        So from that standpoint, Your Honor, depending upon

19  how Your Honor wants to handle the hearing --

20        THE COURT:  Let me ask briefly -- let me ask some

21  other questions.

22        A subject of discussion at prior hearings has been the

23  1,500 loan file sample.  And I understand -- I don't remember;

24  the number escapes me -- other than some relatively small

25  number that they say they can't produce the files for whatever

RESIDENTIAL CAPITAL, LLC, ET AL.                                77

1  reason -- is it your intent to ask for additional files in

2  place of the ones they haven't been able to provide you with?

3          MR. ECKSTEIN:  If I may Your Honor, just one moment?

4          THE COURT:  Yes.

5          MR. ECKSTEIN:  Mr. Bentley tells me Your Honor, that

6  we're going to rely on what we've received.

7          THE COURT:  Okay.  Let me ask you this; does your

8  expert have the information he needs from the debtor to proceed

9  with his or her analysis -- let me stop with a question mark.

10         MR. ECKSTEIN:  Your Honor, the experts just received,

11 in the last few days, the documents which were not in

12 particularly great form.

13         THE COURT:  I understand that.

14         MR. ECKSTEIN:  And --

15         THE COURT:  Do you know yet whether -- does your

16 expert --

17         MR. ECKSTEIN:  -- we --

18         THE COURT:  -- have you talked to -- you or one of

19 your colleagues discussed with your expert whether he or she

20 has the information believed to be necessary to complete the

21 analysis?

22         MR. ECKSTEIN:  If I may just one moment, Your Honor?

23         Your Honor, we have a call tomorrow afternoon with the

24 experts to get a download from the experts on the status.  We

25 believe that the materials that we're requesting from the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    78

1  debtor are substantially complete.

2          THE COURT:  Okay.

3          MR. ECKSTEIN:  I will know after we consult with them

4  tomorrow when they will be in a position to present a useful

5  report to the Court.  I don't know today whether or not it's

6  realistic to have that done by the 8th of October; my sense is

7  that would be extremely aggressive and it certainly doesn't

8  provide sufficient opportunity to discuss it, and to discuss it

9  with the clients --

10         THE COURT:  Um-hum.

11         MR. ECKSTEIN:  -- and to be thoughtful about it the

12  way we would like to be.  Obviously, people deal with

13  deadlines, but the materials just came in last week, and so

14  we're dealing with it as quickly as we can.

15         THE COURT:  Remind me who your expert is.  Have you

16  disclosed the name of the expert or --

17         MR. ECKSTEIN:  I don't think we've actually

18  disclosed --

19         THE COURT:  Then I'm not forcing you to do it now.

20         MR. ECKSTEIN:  Actually, I think, Your Honor, I think

21  we have; we filed the application.

22         THE COURT:  You put a retention application in.

23         MR. ECKSTEIN:  Yeah; Brad Cornell -- Brad Cornell and

24  Moelis are the --

25         THE COURT:  I know who he is; is he from UCLA?

1          MR. ECKSTEIN:  He's from California, Your Honor; yes.

2          THE COURT:  Yeah, right.

3          MR. ECKSTEIN:  Your Honor, if I may make a couple of

4    more other observations?

5          THE COURT:  Yeah, go ahead; yeah.

6          MR. ECKSTEIN:  So in terms of the expert and loan file

7    analysis, I think that we are working extremely quickly right

8    now to try to meet an aggressive deadline, which I think I

9    could tell you that from our perspective, is not optimal --

10   regardless of when this hearing is, you know, when it's

11   ultimately held in the context of the case -- I don't think

12   that an October 8th deadline to submit an expert report from

13   the committee is what we would like to do in light of when the

14   materials came in.  In terms of fact discovery Your Honor, I

15   think it's pretty clear that September 24th, there will not be

16   completion of production, and I think some accommodation is, by

17   definition, going to be required in order to complete fact

18   discovery.

19          The third item that I think we have to deal with is,

20   we now have a new second amended RMBS settlement that deals

21   with the HoldCo election.  I think you'll hear from Wilmington,

22   but the fact of the matter is, that each of these modifications

23   are in fact significant.  What we understand has happened is

24   the original settlement -- and it's important to understand --

25   the original settlement provided that there was going to be an

1  allowed claim against the two OpCos.  And HoldCo was going to

2  get a release.  And so in some respects the HoldCo creditors

3  were not concerned about the amount of the claim; the only

4  concern was really by the creditors at the OpCo levels.  What

5  we now understand is --

6           THE COURT:  HoldCo is ResCap, LLC?

7           MR. ECKSTEIN:  Yes; HoldCo -- it's the parent company

8  of the OpCos that issued the senior unsecured bonds.

9           What now is occurring in the settlement is the HoldCo

10  is no longer receiving release; that's material modification.

11  And I'm told this settlement will provide that to the extent

12  it's determined that the certificate holders or the trustees

13  can assert a claim against the HoldCo entity based upon alter

14  ego or substantive consolidation or the like, that the claim

15  against HoldCo will be fixed at 8.7 billion dollars.  So they

16  now -- there's now an interest in the amount of the claim and

17  there's also the uncertainty about whether or not there's going

18  to have to be a subsequent litigation in the case about the

19  amount of the claim, based upon assertions against HoldCo.

20           THE COURT:  In light of Mr. Princi's description of

21  the amended agreement, which you now have, correct?

22           MR. ECKSTEIN:  We've seen a draft of it, I believe.

23           THE COURT:  Well, he said he sent you the --

24           MR. ECKSTEIN:  Well, we saw something last night; I

25  don't believe it was --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    81

1          THE COURT:  Okay.

2          MR. ECKSTEIN:  I don't think it's filed, but --

3          MR. PRINCI:  It's filed, Judge.

4          MR. ECKSTEIN:  It's final?

5          THE COURT:  Did you give him a signed copy, Mr.

6    Princi?

7          MR. PRINCI:  He does have a signed copy.

8          THE COURT:  Okay.

9          So what's the relevance of alter ego discovery and

10   discovery with regard to the HoldCo election, in light of the

11   amendment to the settlement?

12         MR. ECKSTEIN:  Your Honor, I personally do not think

13   that anybody wants to inject alter ego issues with the

14   reasonableness of the settlement.

15         THE COURT:  Do --

16         MR. ECKSTEIN:  The problem is from the standpoint now

17   of the HoldCo creditors, they may have to be contending with an

18   8.7 billion dollar claim --

19         THE COURT:  And we may have a litigation at some point

20   that deals with it.  But in terms of the approval of the

21   settlements, since it doesn't affect a release --

22         MR. ECKSTEIN:  Well, no, the --

23         THE COURT:  Mr. Moloney's getting excited here.

24         MR. ECKSTEIN:  The problem -- and he'll speak -- the

25   problem is, Your Honor, that if ultimately there is a

1  determination that there is alter ego liability, the HoldCo

2  creditors might well want to assert that the liability is not

3  8.7; it should be 2 or 1 or 3.

4          THE COURT:  They might.

5          MR. ECKSTEIN:  They have a substantive interest in the

6  amount of the claim.

7          THE COURT:  I mean, just to cut through this; are you

8  seeking discovery regarding to alter ego or the HoldCo election

9  in light of the amendment to the agreement?

10         MR. ECKSTEIN:  Your Honor, we asked for alter ego

11  discovery and it's still pending.  We obviously need to look at

12  where this comes to rest.  As I said, we saw this last night,

13  Your Honor, and in fairness, I'm responding at 10 a.m. this

14  morning.

15         THE COURT:  Well wait, wait; time out, time out, time

16  out.

17         You saw it last night but the check was in the mail

18  but Mr. Princi or Mr. Lee previously told the Court that -- in

19  writing and from the lectern -- that further amendment of the

20  RMBS settlement was in the works that would remove the HoldCo

21  election from the agreement.  I questioned when, and it was a

22  work in progress.  But the fact that it was being negotiated,

23  it was represented that there was -- I won't put the words -- I

24  was told that it was being removed, so you've known that.

25         MR. ECKSTEIN:  Your Honor, there were a lot of

RESIDENTIAL CAPITAL, LLC, ET AL.                                    83

 1  different permutations --

 2          THE COURT:  I understand.

 3          MR. ECKSTEIN:  -- that were being explored --

 4          THE COURT:  All right; let me hear from other counsel.

 5          MR. ECKSTEIN:  -- and until we saw this, we didn't

 6  understand how this was going to come to rest.

 7          THE COURT:  Okay.

 8          MR. ECKSTEIN:  So the HoldCo election issue does

 9  change the dynamic in terms of how this affects the HoldCo --

10          THE COURT:  It wasn't in there originally.

11          MR. ECKSTEIN:  It was not in there originally.

12          THE COURT:  So when the schedule was originally set

13  there was no HoldCo election.  They then amended it to include

14  it.  It created quite a storm; and they negotiated to take it

15  out.  So we're back where we started from.

16          MR. ECKSTEIN:  We're not back where we started from,

17  we're in a different place, but -- we don't have the HoldCo

18  election, but we're not where we started from; there is no

19  longer a release of HoldCo.

20          THE COURT:  Okay.

21          MR. ECKSTEIN:  Which is different from what the

22  original agreement provided.

23          THE COURT:  All right; let me hear from other counsel.

24  Thank you, Mr. Eckstein.

25          Mr. Moloney, you were becoming quite agitated.

RESIDENTIAL CAPITAL, LLC, ET AL.                              84

1    MR. MOLONEY:  Well I didn't mean to be agitated, Your

2    Honor; and happy New Year.

3         And I did read this agreement last night -- the signed

4    agreement, and I'd like -- for the record, it's Tom Moloney on

5    behalf of Wilmington Trust -- and they're representing a

6    billion dollars of note holders at the Residential Capital, LLC

7    level, which we sometimes refer to as the "HoldCo".

8         And Your Honor, I think it's important to note -- at

9    the last hearing we had I didn't stand up because I thought

10   we'd have a chance today -- I know deals change all the time in

11   bankruptcy.  But this deal materially changed in a way uniquely

12   adverse to our clients, and in a way that makes the schedule,

13   unless it's changed, uniquely unfair to our clients in the

14   sense that --

15        THE COURT:  How does the agreement as it stands

16   today -- which I haven't seen yet -- differ from what it was at

17   the start of the case?

18        MR. MOLONEY:  It differs in two material respects,

19   Your Honor.  First, at the start of the case, there was a

20   release to the ResCap level.  So that -- in some ways, whether

21   the claim was four billion or eight billion dollars, at the

22   subsidiary level was a matter of a difference, because it's not

23   going to be paid hundred cents to the dollar at either level.

24   So at the HoldCo level, just representing the bondholders, that

25   issue is not really germane as the agreement was originally

1   structured.   And then it gets changed, and the way it gets

2   changed, Your Honor, is a way that should give pause to the

3   Court and to everyone regarding the original deal as well.

4   Because this is the thirteenth chime that puts doubt on every

5   single ticking of this clock.   Because when the original deal

6   was approved by the board -- and we just got these board

7   resolutions within the last few days -- the original deal was

8   approved by the board and said the board would have to approve

9   if there's material change.   The board did not approve the

10   HoldCo election according to the interrogatories which we got

11   on Friday; the board did not approve this change.   So if you're

12   looking for collusion --

13           THE COURT:   Did they approve taking it back out?

14           MR. MOLONEY:   I don't know if they approved taking it

15   back out because the interrogatories were addressed at the

16   state of play when it was in place.   Immediately, when they

17   changed this deal, we served them interrogatories; immediately

18   when they changed this deal, we served our document request;

19   immediately when they changed this deal, we served a motion to

20   change the schedule because now these issues are in play.

21           The second material change is that -- and I don't know

22   what their theory is -- best as I know, the teaching in the

23   Second Circuit in the St. Paul fire case is that alter ego is

24   in an estate claim, not a claim by an individual creditor.   And

25   an individual creditor can't settle -- and a debtor can't

RESIDENTIAL CAPITAL, LLC, ET AL.                    86

1  settle an estate claim by giving alter ego claim to one

2  creditor and not to all other creditors.  So if actually

3  they're creditors at our level, we're creditors at their level

4  if there's really a resolution of an alter ego issue.

5        More materially, the arguments regarding alter ego

6  really do not rely -- do not take you to the ResCap level.  The

7  arguments if there are any alter ego theory, take you exactly

8  to AFI which is why this hidden waterfall deal -- when I said

9  that the deal was a secret deal they didn't tell people about,

10 was that they have two PSAs, and they seem fairly innocuous,

11 and so we have a deal more or less consistent with this

12 presentation, and they have two dates for presentation.  And we

13 looked through -- they're not public; these waterfalls are not

14 public.  Even though they want approval of these agreements,

15 they have not made these waterfalls public.  We look to find

16 the two documents that were referenced in the PSAs; we discover

17 they don't exist but their other two documents at different

18 dates -- apparently everyone involved just made a mistake in

19 the dates or they got re-dated, but there's not documents that

20 actually relate to the dates in these two agreements.  And in

21 talking to the debtor and in talking to the representative of

22 the RMBS, they both have a different understanding of what

23 these documents mean, materially different understanding of

24 what these documents mean, and both of them have a reading that

25 is totally different than what I would read or what I think an

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                  87

1   objective person would read --

2          THE COURT:  Since we're talking about documents -- I

3   don't know whether they exist, I don't know what they provide

4   if they do exist -- how -- referring to them as "the waterfall

5   documents" -- how do they bear on the approval of the RMBS

6   settlement?

7          MR. MOLONEY:  The reason they made the change and

8   eliminated the release, which was material benefit to our

9   debtor --

10         THE COURT:  The release was a material benefit to your

11  debtor.

12         MR. MOLONEY:  To our debtor.

13         THE COURT:  Yes.

14         MR. MOLONEY:  The reason it made that change --

15  according to them in a cryptic footnote -- footnote 13 to the

16  response, which I don't know how anybody who wasn't involved at

17  inside baseball would understand -- but apparently a bond

18  holder called up the lawyer for the RMBS creditors and said

19  that don't think you're going to get the full 750 million

20  dollars given by AFI; we're going to ask for a lot of it.  At

21  that point, she calls up the debtor and says we've got a

22  problem here; I need you to improve my deal in order to improve

23  my position vis-a-vis the bondholders.  That's what that

24  footnote says.  And in fact, we asked the --

25         THE COURT:  That's in the document that they filed

1  here?  Thirteen --

2          MR. MOLONEY:  Well, the last document they filed,

3  footnote 13.

4          MR. PRINCI:  The earlier status report, Your Honor, of

5  last week.

6          MR. MOLONEY:  Footnote 13.  But in the -- we said, in

7  our interrogatories, we said when did you start negotiating

8  this change?  The answer is they started negotiating a change

9  on July 30, 2012.  That date may resonate with Your Honor; that

10 was the date they were in court setting the schedule.  They

11 apparently left this Court and then materially changed the

12 deal.  So how could they now complain that someone's -- why

13 didn't people come up earlier; why didn't people object

14 earlier?  Well, they changed the playing field in a materially.

15         And the third way they changed the deal materially,

16 Your Honor, is this fixed claim of 8.7 billion dollars, under

17 various theories, it could be irrational for them to have an

18 8.7 billion dollar claim.  If their fear of recovery is that

19 it's RMBS that has the alter ego theory but not GMAC that has

20 the alter ego theory, it should be, maybe, 3.7 or 2.7 or 1.7.

21 If their fear of recovery is something else it could be some

22 different number.  They fixed an amount of a claim without any

23 description what the theory of the claim is.

24         So we need discovery as to theory of the claim,

25 whatever it is; HoldCo, whatever the theory of claim is they're

1  preserving, we need discovery as to how they changed the claim

2  and why -- why is it less advantageous to our clients, and also

3  Your Honor, our interrogatories ask them to identify all the

4  businesspeople and all the lawyers who are involved in this

5  negotiation and authorization.  We now have a document which

6  includes the names you were told and other names.  They should

7  all be custodians; it's less than half a dozen names.

8          THE COURT:  They should all be custodians?  I don't

9  understand.

10          MR. MOLONEY:  Custodians who have to produce e-mail

11  discovery.

12          THE COURT:  Well --

13          MR. MOLONEY:  None of the businesspeople are

14  custodians --

15          THE COURT:  -- it doesn't make a difference who the

16  custodian is; they need to produce the documents.  Documents

17  can be in possession of nineteen different people, it doesn't

18  make them all custodians.

19          MR. MOLONEY:  Well, Your Honor, as a pri --

20          THE COURT:  They have an obligation to search the

21  records of any of the debtors for documents responsive to the

22  request, unless there's a privilege that's being asserted.  You

23  don't designate everybody as a custodian.

24          MR. MOLONEY:  I agree; but in terms of e-mail

25  searches, Your Honor, in terms of trying to make it less

1   burdensome to them, in terms of saying they have to have a

2   targeted search of e-mails of a limited universe of people,

3   they identified responsively, Kirkland & Ellis, thirteen

4   people.  I think if they looked at the list of people at the

5   debtors they also get about thirteen people.  Of those thirteen

6   people, nine of them -- all of them -- all the businesspeople,

7   everyone other than a few MoFo lawyers -- they have not

8   searched for a single e-mail yet.

9            THE COURT:  All right; is it --

10           MR. MOLONEY:  Now, maybe they're going to search for

11   all those e-mails and produce them by October 3rd.  If that's

12   their undertaking, terrific, we'll work real hard.  We don't

13   waste time.  We have substantive problems with this.

14           THE COURT:  Since I didn't pick up on the significance

15   of footnote 13 in a document I don't have a copy of sitting in

16   front of me, just tell me again, Mr. Moloney, what is the gist

17   of that?  What did you take away from the footnote?

18           MR. MOLONEY:  What I took away from the footnote is

19   that the RMBS creditors were concerned that their PSA waterfall

20   might be upset as a result of the examiner's reports, as a

21   result of claims that we might argue against AFI on behalf of

22   the note holders and that either some of that 750 which they

23   had hoped to go to them, or money beyond that 750, would go to

24   us and not to them.  And so they asked the debtor to change the

25   deal.

1    I think the debtor was concerned that they had a PSA

2    agreement with Kathy and not with our group, and that,

3    therefore, if they accommodated that request, they would create

4    a voting block at the parent-company level that would support

5    their plan.  So I think, putting it another way, it's

6    collusion; putting it another way, we want to put some sunshine

7    on something that doesn't look good, doesn't smell right, and

8    it's hard to explain.

9            THE COURT:  Okay.  Make it really simple for me.  What

10   is it that you're seeking in discovery that you believe you

11   have not received so far?

12           MR. MOLONEY:  We would like them to produce discovery

13   related to the HoldCo election, how it was arrived at and why

14   it was changed, and why it's changed again, including the names

15   of the people who were involved in the most recent change, who

16   approved it and who negotiated it.  We would like discovery as

17   to the basis for the claim which they are now preserving and

18   which they have now set an amount of at 8.7 billion dollars.

19   And we would like to be sure that the e-mail productions they

20   produce include the e-mails of all the people who they've

21   identified in these interrogatories as having been involved in

22   negotiation or approval of this deal, which is about thirteen.

23           THE COURT:  Okay; thank you, Mr. Moloney.

24           MR. MOLONEY:  Thank you.

25           THE COURT:  Who else wants to be heard?

RESIDENTIAL CAPITAL, LLC, ET AL.                                92

1      MR. SHORE:  Good afternoon, Your Honor; Chris Shore

2  from White & Case on behalf of the junior secured notes.

3      Let me kind of answer a question that Your Honor asked

4  on footnote 13 and how we perceived it.

5      As secured parties in this case, we are nonetheless

6  still focused on some key debtor boxes within the capital

7  structure.  When this deal was originally proposed, our view of

8  the settlement, which is shared by many people --

9      THE COURT:  Let me just stop you for a second.

10      Mr. Princi, I got this giant binder in front of me.

11  Is the status report from the last hearing that has this

12  footnote 13, is it in the binder?

13      Somebody have a copy of it?

14      THE CLERK:  Sir.

15      UNIDENTIFIED SPEAKER:  Your Honor, may I approach?

16      THE COURT:  Yeah, please.  I'll give it back to you.

17  Want to make sure there are no secret notes?  It's all in

18  invisible ink, so it's okay.

19      MR. SHORE:  Let me -- we don't -- we can do it

20  without.  It's all right.

21      THE COURT:  Okay, go ahead, Mr. Shore.

22      MR. SHORE:  We can do it without.

23      THE COURT:  No, I mean, I -- Mr. Moloney talks about

24  it as well, so I -- but go ahead.

25      MR. SHORE:  We looked at the deal as follows:  8.7

1  billion is a huge number.

2          THE COURT:  It's a lot of money.

3          MR. SHORE:  It's a huge number in the context of what

4  anybody was expecting RMBS settlements would be on putback

5  litigation and the like.

6          From creditors' perspective at the main box, is it

7  really didn't matter.  It kind of worked for everybody.  8.7

8  billion dollar headline number is great for somebody who is

9  trying to negotiate deals in other cases as they said they're

10  doing.  8.7 billion dollar claim against small boxes is kind of

11  ice in winter for debtors to agree to.  The problem all began

12  when they started applying an 8.7 billion dollar number at

13  places where they could actually get a recovery.  From our

14  perspective, this settlement motion began on August 15th when

15  the HoldCo election was put in.

16          Now, they have said no blood, no foul, we've removed

17  the HoldCo election; but as has been pointed out to you, it's

18  not a removal.  ResCap, LLC is one of your fifty-one debtors.

19  They are now proceeding with a motion that says we'd like you

20  to allow an amount of a claim against us in the amount of 8.7

21  billion dollars; we just want to reserve for a later date the

22  issue of whether we actually owe any of that money.  That is a

23  significant problem for us and one which we believe that the

24  fiduciaries of ResCap --

25          THE COURT:  Hang on a second.  We've had this

1  continuing problem of the construction in JSA is impossible to

2  deal with; I'm sorry.

3          Go ahead, Mr. Shore.

4          MR. SHORE:  That is one which we believe a fiduciary

5  of ResCap, LLC should respond to.  To that end, we sent out

6  last week very minimal document requests saying we want the

7  board minutes of the debtors talking about the HoldCo election

8  and the removal of the HoldCo election --

9          THE COURT:  If they took out the HoldCo election but

10 left the release of HoldCo, that would take us back to the way

11 this started out.

12         MR. SHORE:  That would take us back.

13         THE COURT:  And then you wouldn't have a problem.

14         MR. SHORE:  Correct.  But we don't have that.

15         THE COURT:  Yeah.

16         MR. SHORE:  And I don't believe that anybody's going

17 to go for, right.  When someone starts -- I think footnote

18 13 -- I know I said I wouldn't refer to it -- means we got a

19 lot of criticism -- someone got a lot of criticism -- for

20 agreeing to a great headline number against some empty boxes,

21 and they wanted to protect themselves from criticism by saying

22 no, no, no, I've got an ability to get some of my claim against

23 a real box.

24         THE COURT:  Bear with me a second.

25         MR. SHORE:  So I don't think -- maybe they will go

1   back to a situation in which ResCap, LLC and the other debtors

2   get a release and the claims exist against the seller entities

3   and the depositor entities.  But that's not where we are.  What

4   we got was the agreement signed last night which leaves that in

5   place.  We've asked for board minutes and we've asked for

6   communications with people regarding the HoldCo election and

7   the HoldCo removal and these claims of alter ego.  I don't want

8   to get into the substance of the alter ego, I just want to know

9   what people were talking about that they thought this was a

10  good idea, we're going to allow a claim in amount, but just

11  reserve the right to argue liability later, if the theory that

12  people want to press is that the 8.7 number was an irrational

13  number when one looked at recoveries in the case.

14          We've been deferred by the debtors on that, they've

15  taken the position that we should just talk about this at some

16  later date because again, they're taking the position no blood,

17  no foul.  We're expecting to get documents from them.  We've

18  asked for a 30(b)(6) deposition for somebody to talk about that

19  because, of course, we don't know who, if anybody, was involved

20  in the decision first to do a HoldCo election and then to

21  remove it without getting a release.

22          THE COURT:  Mr. Princi, can you answer that question

23  right now?

24          MR. PRINCI:  As to who gave the release?

25          THE COURT:  Who made the decision to grant the HoldCo

RESIDENTIAL CAPITAL, LLC, ET AL.                          96

1  election; who made the decision to take it out and remove the

2  release?

3          MR. PRINCI:  Your Honor, ResCap, LLC --

4          THE COURT:  I -- a person.

5          MR. PRINCI:  Off the top of my head, no, Your Honor.

6          THE COURT:  Any of your many colleagues able to answer

7  this question?

8          MR. PRINCI:  Not instantly; but Your Honor, this

9  whole --

10         THE COURT:  No, I just wanted -- if you can't answer

11 it --

12         MR. PRINCI:  I don't.  I can't answer it.

13         THE COURT:  And none of your colleagues who are here

14 can answer the question of who at ResCap, using -- who at the

15 debtors -- made the decision to first amend it to add the

16 HoldCo election, then to take it out, but also to take out the

17 release?

18         MR. PRINCI:  What I don't want to do Your Honor, is

19 without double-checking, state an incomplete record for Your

20 Honor.  Certainly Ms. Hamzehpour was involved; it was taken out

21 with board approval.  But I can get you that information.

22         THE COURT:  See, look, Mr. Princi, the one thing I

23 have to say from Mr. Moloney and Mr. Shore, that didn't come

24 across to me before -- and I guess it's because I'm dealing

25 with a revised settlement agreement I don't have, I couldn't

1  compare it to one that existed before that I did see -- is that

2  it does seem to me to be a material change in the business

3  terms when you take the HoldCo election out but also take out

4  the release.  That, you agree, is a substantive change from

5  what was initially presented to the Court?

6        MR. PRINCI:  No, Your Honor, they misstated what the

7  agreement says.  So this entire thing is flawed, entirely; I

8  want to clear it up.

9        THE COURT:  Well, let me hear the rest of Mr. Shore;

10  go ahead, Mr. Shore.

11        MR. SHORE:  Let me address that, and I think they'll

12  say well the original application was to allow an 8.7 billion

13  dollar claim and it didn't specify against which debtor.  I

14  think that's what they're going to say.

15        Do they mean they came in with an application to this

16  Court to allow an 8.7 billion dollar claim against every debtor

17  in this case, regardless of whether they were involved at all

18  in any RMBS activity?  The rational reading of the agreement,

19  and something that would have had to have been cleared up

20  before Your Honor would have agreed, is exactly which debtors

21  are getting claims of 8.7 billion dollars against them.

22        And I want to make this clear, because we have growing

23  concerns about this issues; there are fifty-one debtor estates

24  here.  Your Honor had written on the issue of problems in the

25  thorny situations that arise when one set of professionals and

1  management is trying to manage through these interdebtor

2  conflicts.  But when they file a status report -- this is from

3  yesterday, paragraph 30:  "The debtors and the parties can

4  continue to focus on the primary task at hand, namely whether

5  the 8.7 billion total allowed claim is in the best interest of

6  the estate."

7        We're not here talking about the best interest of a

8  fifty-one debtor, nonconsolidated estate.  We're talking about

9  whether it's in the best interest of each of the estates that

10  are affected by this settlement agreement.  The agreement that

11  just came up is a settlement by a debtor box that we care

12  about, ResCap, LLC.  It is coming to this Court at this point

13  saying please allow against me an 8.7 billion dollar claim;

14  just reserve everybody's rights later to figure out whether

15  that claim is going to be cut down or allowed in the sense that

16  alter ego liability or some other basis for alleging that this

17  debtor is liable for other debtors' debts exists.  So that's

18  what we're focused on.

19        THE COURT:  But why isn't it appropriate for that

20  issue to be deferred?

21        MR. SHORE:  It is appropriate for that issued to be

22  heard, but in the context --

23        THE COURT:  No; deferred.

24        MR. SHORE:  Oh, deferred?

25        THE COURT:  Yeah.  Why isn't it appropriate for that

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    99

1   issue to be deferred?   The issue isn't being decided.

2          MR. SHORE:  I'm not -- I want to talk to a fiduciary

3   of ResCap, LLC, the person who made the decision as to why

4   they're doing it.  If in fact the explanation is because this

5   benefits the other estates, it allows sales to go on in other

6   estates, it allows other estates to cordon off their liability

7   and reduce litigation, that is an inappropriate answer.  Under

8   Augie/Restivo, this Court has to look at each debtor action on

9   the basis of the effect on that debtor estate.  I suspect --

10  notwithstanding having said this and they're being able to

11  prepare their witness ad nauseum with respect to this -- that

12  the real answer as to why ResCap, LLC did this -- and kind of

13  what you've heard today -- is to allow sales to go on at other

14  debtor estates or to cordon off liability and litigation at

15  other debtor estates that really doesn't provide a direct

16  benefit to ResCap, LLC.

17         THE COURT:  But why isn't this like any other

18  reservation of rights?  The issue hasn't been resolved as to

19  whether there is an alter ego claim; if there is, against what

20  entities, does it pass all the way up to AFI?  I don't know.

21  It's not deciding those issues.

22         MR. SHORE:  I think about it this way.  Assume the

23  proof of claim is the complaint.  What's going on here is the

24  proof of claim, the complaint is I'm suing you for 8.7 billion

25  dollars on these following theories.  And the answer that's

1    coming to the complaint right now is I agree, that there is an

2    8.7 billion dollars of damages you've suffered; I just dispute

3    all these other things.

4          THE COURT:  Well, let me ask you this; if the language

5    in the agreement were modified such that it's not only whether

6    the claim exists against HoldCo, but the amount of the claim,

7    do you agree that that would satisfactorily resolve your issue?

8          MR. SHORE:  If people, and obviously Your Honor, is

9    going to -- if that's the order that goes in, Your Honor's

10   keeping an open mind about it and people want to have a trial

11   about 8.7 billion dollars and a bunch of little boxes within

12   the capital structure, okay; that's fine.

13         THE COURT:  Look, I understand -- your point, if I

14   understand it correctly, is that this agreement would fix any

15   future -- in the event of an alter ego determination, this

16   agreement would fix the amount of the claim against HoldCo at

17   8.7 billion dollars.

18         MR. SHORE:  Yes.

19         THE COURT:  Okay.  And I understand the concern you're

20   raising.  If the agreement were further amended to make clear

21   that the fact -- the existence of a claim and the amount of a

22   claim are all reserved --

23         MR. SHORE:  No collateral estoppel effect, no res

24   judicata effect.

25         THE COURT:  -- then you would be satisfied.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    101

1          MR. SHORE:  We'd be satisfied, but I'd still want the

2     answer to why there --

3          THE COURT:  Well, but you might get the answer but not

4     right now.  I mean, there is -- look, I want to make sure

5     everybody gets their full and fair opportunity at this hearing,

6     but it ought to be confined to the issues that have to be

7     decided, okay?  I understand the issue you're -- and Mr.

8     Moloney's raising his finger because he's getting concerned

9     again.  I don't want anything sort of backdooring an issue; I

10    don't want to be told later in the case when you approve the

11    settlement -- if I approve the settlement -- the result of that

12    is in the event of an alter ego determination, you don't get to

13    decide how much the claim against HoldCo should be; it's 8.7

14    billion dollars by virtue of the agreement you approve.  It may

15    be that if there's an alter ego determination it should be 8.7

16    billion dollars.

17         MR. SHORE:  It may be.

18         THE COURT:  And nothing that I would determine now

19    would decide that one way or the other.  But I understand your

20    concern about is this agreement trying to fix the amount of a

21    claim just leaving the only issue as to whether alter ego

22    applies.

23         MR. SHORE:  That would be it --

24         THE COURT:  Okay.

25         MR. SHORE:  -- and it would spill over into numerous

1  potential issues in the case -- estimation for voting purposes,

2  anything else like that where we're really talking about an 8.7

3  billion dollar number.  If Your Honor is saying I can sit and I

4  can have a trial, and I can hear 8.7 as an appropriate number

5  against these other debtors but when it comes to that 8.7

6  translating itself into actual votes in a case or actual

7  dollars of distribution, that it's going to be a fair game;

8  then we're going to --

9        THE COURT:  I understand your point, Mr. Shore; any

10 other points you want to make?

11       MR. SHORE:  No, Your Honor.

12       THE COURT:  Okay.

13       Hold on Mr. Princi, there's a lot of people who want

14 to speak before you.

15       MR. WOFFORD:  Your Honor, Keith Wofford from Ropes &

16 Gray on behalf of the institutional investors.

17       Just a bit of clarification about the statements about

18 change to the agreement.  The original agreement itself, Your

19 Honor -- and everyone here is represented by sophisticated

20 counsel -- provided that the settlement was between ResCap --

21 which is Residential Capital, the parent and its indirect

22 subsidiaries, and that was defined as ResCap, and the entity

23 giving the claim in the original agreement that was filed just

24 after the outset of the cases was that ResCap, meaning the

25 debtors, will provide a general unsecured claim of 8.7 billion

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              103

1  dollars.

2        So Your Honor, obviously everyone here has been

3  concerned about notice and about accurately portraying what the

4  debtor is doing.  We endeavored, with the debtors, with the

5  HoldCo election to clarify -- because clearly the only debtor

6  mentioned in the original agreement as giving a claim was

7  HoldCo, ResCap itself.  We knew, in fact, that there would be

8  questions that would come up about which debtors would and

9  which debtors were not giving a claim.  So rather than have

10  that be a mess, when the settlement actually got litigated, we

11  chose, after discussion with the debtors, to clarify that

12  issue.  The method of the clarification was in fact this HoldCo

13  election.  After discussion, frankly, about potential

14  possibilities about how to make that clarification, the debtors

15  proposed that, we negotiated it, and it was put into the

16  agreement.  As a result of the objections of many -- oh, by the

17  way, when the HoldCo election was put in the agreement, it was

18  made severable, as you may recall.  That is --

19        THE COURT:  I don't recall.

20        MR. WOFFORD:  Okay.

21        THE COURT:  Go ahead.

22        MR. WOFFORD:  Well, it was made severable so that if

23  people -- perhaps Mr. Moloney's clients or others -- objected

24  to the HoldCo election, that it could be, if the debtors could

25  not satisfy their burden with respect to that proposed claim,

RESIDENTIAL CAPITAL, LLC, ET AL.                                    104

1   it could be turned down by the Court without vitiating or

2   throwing out the rest of the settlement.  Because it was

3   severable and because there was such a tumult that arose around

4   it, when the debtors asked us would you consider removing it,

5   we agreed to remove it.  But we would not agree to the

6   following, which is since the original settlement provided that

7   there was the possibility and in fact a claim at HoldCo, in

8   exchange for a HoldCo release, if the possibility of a claim or

9   a claim being allowed was removed from the settlement, we said

10  no claim, there's no consideration for that debtor, it is in

11  fact as the Wilmington folks would call a preferred subcon, for

12  other debtors to pay with their claim being granted for a

13  HoldCo release, and we said fine, remove it; remove the claim,

14  remove the release.

15          The creditor's committee requested, among others,

16  perhaps with the debtors, that so as to avoid the possibility

17  of having to re-litigate the size of the claim if alter ego

18  liability was established, that we put in the provision that

19  you will see shortly, that says in fact that if there is a

20  HoldCo alter ego claim allowed, that that would be fixed at the

21  already-settled 8.7 number.

22          THE COURT:  So let me -- if there is a claim against

23  HoldCo, what's the theory of liability of HoldCo?

24          MR. WOFFORD:  Alter -- direct alter ego liability.

25          THE COURT:  Okay.  So does that necessarily -- if the

1  amount -- if this agreement provides that the amount of the

2  claim against HoldCo is 8.7 billion, then don't I

3  necessarily -- doesn't -- don't you all necessarily have to try

4  alter ego now, because why -- are -- those parties-in-interest

5  who would be very substantially adversely affected by an 8.7

6  billion dollar claim against HoldCo, aren't they entitled to

7  challenge the alter ego theory before the Court determines that

8  okay, it's 8.7 billion and we'll later hear -- I mean, isn't

9  that so?

10         MR. WOFFORD:  Our view is no, Your Honor, because --

11         THE COURT:  Why?

12         MR. WOFFORD:  -- you are trying whether the settlement

13  amount of 8.7 billion dollars is reasonable.  It does not

14  establish whether or not there's any alter ego liability of the

15  parent at all.

16         THE COURT:  Well, I'd have to look at --

17         MR. WOFFORD:  If they are in fact an alter ego --

18         THE COURT:  Mr. Wofford, let me stop you.

19         MR. WOFFORD:  Yes.  Sure.

20         THE COURT:  No, I disagree, because I have to look at

21  whether -- what the basis -- I can't decide that a -- 8.7

22  billion is a reasonable settlement amount for HoldCo unless I

23  examine, not decide the issue, but look at what -- the

24  arguments and some evidence in support of and in opposition to

25  the claim.  I just can't take a flier on it and say because the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                  106

1   debtors say I ought to approve 8.7 billion against HoldCo, I'm

2   supposed to do that.  That's just not what the standard for

3   approving a settlement is.

4           MR. WOFFORD:  Well, Your Honor --

5           THE COURT:  How can I decide that --

6           MR. WOFFORD:  -- again --

7           THE COURT:  -- it's above the minimum amount to

8   determine it's reasonable if I don't at least examine the basis

9   for the claim against HoldCo.

10          MR. WOFFORD:  The reason, Your Honor, is because --

11  the formal reason is the order is not establishing the

12  allowance of the claim.  It's merely --

13          THE COURT:  Well --

14          MR. WOFFORD:  -- fixing the amount --

15          THE COURT:  -- come on.

16          MR. WOFFORD:  -- if it is allowed.

17          THE COURT:  All right.  So do you agree that if the

18  release is removed that the agreement can make clear that the

19  amount of any claim against HoldCo is reserved?

20          MR. WOFFORD:  We were always comfortable with that

21  position, Your Honor.  Again, the fixing was at the best of the

22  creditors' committee that reques -- and I believe the debtors

23  also.

24          THE COURT:  Mr. Eckstein's getting all excited now.

25          MR. WOFFORD:  If they in fact take the position today

1  -- if everyone's taking the position today --

2          THE COURT:  Let me --

3          MR. WOFFORD:  -- in fact --

4          THE COURT:  -- stop -- hold on.

5          MR. WOFFORD:  Yeah.

6          THE COURT:  Stop.  Is there anybody here who wants to

7  stand in opposition to clarifying this agreement to make clear

8  that the amount of any claim against HoldCo would be reserved,

9  as well as the alt -- the underlying alter ego issue?

10         MR. PRINCI:  Your Honor, the debtors have a business

11  judgment, and that business judgment goes to the fairness and

12  reasonableness of 8.7 being the appropriate --

13         THE COURT:  Could you answer my question?

14         MR. PRINCI:  Yes, I'm trying to explain, Judge,

15  because --

16         THE COURT:  No, give me the bottom line and then I'll

17  let you explain.

18         MR. PRINCI:  The bottom line, Judge, is we think it

19  would be bad for the ResCap LLC --

20         THE COURT:  Okay.

21         MR. PRINCI:  -- estate.

22         THE COURT:  Alter ego is open for discovery.  I can't

23  go ahead -- if -- unless the debtors agree that the issue of

24  the amount of any claim against HoldCo is reserved for later

25  determination, then necessarily I have to be able to evaluate

RESIDENTIAL CAPITAL, LLC, ET AL.                                  108

1   the alter ego claim.  You want to take that position, that's

2   fine.  Alter ego discovery is fair game for everybody.

3              MR. PRINCI:  Your Honor, may I be heard, please?

4              THE COURT:  Go ahead.

5              MR. PRINCI:  Thank you.  Judge, we think it's -- we

6   want to make clear for the record -- because we are

7   fiduciaries -- we want to make clear for the record what we

8   think the impact of this is, okay?  So we think it's not good

9   for the ResCap LLC estate because, and this is why we did what

10  we did in the second amended agreement --

11             THE COURT:  Which I haven't seen and --

12             MR. PRINCI:  -- I --

13             THE COURT:  -- therefore -- I keep getting surprises,

14  Mr. Princi, when you describe what it does, and then Mr.

15  Moloney, and Mr. Shore.  I hear very different things about

16  what this amended agreement does.  It really supports the

17  committee's view that none of this should be happening right

18  now.

19             MS. PATRICK:  Your Honor --

20             MR. PRINCI:  Your Honor --

21             THE COURT:  No.

22             MR. PRINCI:  -- I'd like to --

23             THE COURT:  Sit down, Ms. Patrick.

24             MR. PRINCI:  -- be heard.  Okay.  Your Honor, I have

25  to respect people's ability to come to the podium and make the

1  allegations they do, but I need an opportunity to clarify the

2  mistakes that have been made by people.  And I'm going to try

3  to do that.

4        We don't believe it's in the best interest of ResCap

5  LLC's estate.  That's the estate that Mr. Shore's clients have

6  an interest in.  Now, Mr. Shore's clients also have an interest

7  in the operating company estates, okay, because they're

8  secured.  Their collateral is also at the opco level, all

9  right, but that's the only estate that Mr. Moloney's clients

10 have an interest in.

11        Now, independent of how they look at it, on behalf of

12 ResCap LLC, we don't think it's in ResCap LLC's interest to

13 leave it open.  Why?  Because we have done a lot of work as to

14 what the appropriate amount, what would be fair, what would be

15 reasonable to settle the underlying rep and warranty claims.

16 So we look at this way.  The rep and warranty claims arise

17 because two parties are in privity of contact -- contract; the

18 trusts and then the operating companies.  We think 8.7 is a

19 fair number for the rep and warranty claims there.

20        That -- our view on that won't change whether there is

21 an alter ego basis or not.

22        THE COURT:  Yes, but you capped the amount of the

23 liability at 8.7 billion whether there's a claim against HoldCo

24 or not.  What -- if Mr. Moloney or Mr. Shore subsequently wants

25 to argue a legal and factual basis why the amount of the claim

1  against HoldCo should be less than 8.7 billion, that's what

2  they want the opportunity to do.

3        MR. PRINCI:  Then, we will do that.  If the

4  institutional investors will agree, we will have no problem,

5  Judge, entering into a further amendment and doing that, but I

6  want to state for the record why we believe this is not in the

7  estate's interests.

8        THE COURT:  Okay.  I'm -- what I'm telling you is if

9  you don't want to agree --

10       MR. PRINCI:  No --

11       THE COURT:  -- that's fine, but the result of that is

12 all discovery about alter ego is relevant to the issue of

13 whether the settlement is going to be approved.

14       MR. PRINCI:  I --

15       THE COURT:  Okay?

16       MR. PRINCI:  Your Honor, I hear you --

17       THE COURT:  It's as simple --

18       MR. PRINCI:  -- loud and --

19       THE COURT:  -- as that.

20       MR. PRINCI:  And I hear you loud and clear.  And so if

21 the institutional investors are willing to further amend the

22 agreement, we will do that.  But I don't think it's fair to the

23 debtors, Your Honor.

24       THE COURT:  Why -- okay.  That's fine.  If they don't

25 want to, that's okay.  That's their decision, and your -- and

1   the debtors' decision, okay?

2        MR. PRINCI:  No, we're prepared to do that --

3        THE COURT:  But --

4        MR. PRINCI:  -- Judge.

5        THE COURT:  -- what I don't understand, Mr. Princi, is

6   if you or Ms. Patrick says -- or Mr. Wofford says no, we're not

7   willing to change the agreement.  We believe part of the

8   consideration for this agreement is fixing the claim against

9   the -- against HoldCo at 8.7 billion in the event of an

10  ultimate alter ego determination.  That's fine, but it makes

11  the alter ego issue relevant to approval of the settlement.

12       MR. PRINCI:  I --

13       THE COURT:  It's not -- I'm not forcing you to do

14  anything.

15       MR. PRINCI:  -- I don't --

16       THE COURT:  I'm just telling you what the price is if

17  you don't agree.

18       MR. PRINCI:  Your Honor, quite candidly, all I'm

19  trying to do is just state for the record why we think the

20  position that the -- that these parties who have an interest in

21  ResCap LLC and what they want to do by undoing the deal, which

22  we're happy to do, they're the -- it's, if you will, their

23  money, but that doesn't change our fiduciary obligation.  I

24  want to state on the record why we did this and why we think is

25  a mistake.

RESIDENTIAL CAPITAL, LLC, ET AL.                    112

1    But that having been said, it's simple.  To leave that

2    open means you -- this -- that estate will face a plenary trial

3    on the issue of whether the forty-five-billion-dollar potential

4    claim that they will potentially assert --

5            THE COURT:  Why forty-five -- isn't it capped at 8.7

6    billion?

7            MR. PRINCI:  No, no.  Judge, when you uncap it, I

8    think you're talking about a --

9            THE COURT:  No, time out.  I -- what I understood, and

10   you're saying the cap is gone, then you're probably better off

11   going ahead and dealing with the alter ego issue now.  I mean,

12   if the maximum amount of the claim against any of the debtor

13   entities is capped at 8.7 billion dollars, the issue then

14   becomes which debtor entities will the claim lie against.  What

15   I've heard from Mr. Moloney and Mr. Shore is they don't believe

16   the claim should lie against HoldCo, okay?

17           If the settlement purports to resolve the issue by

18   fixing the amount, if -- assuming alter ego liability is

19   established, that's one thing, in which case alter ego is a

20   relevant issue for the settlement approval hearing.  I

21   didn't -- so that's why when you say it's forty-five billion, I

22   didn't understand that unless -- if Ms. Patrick says --

23           MR. PRINCI:  No.

24           THE COURT:  -- no, it's either this or nothing, okay.

25           MR. PRINCI:  I'm saying that's what --

RESIDENTIAL CAPITAL, LLC, ET AL.                    113

1   THE COURT:  Then go ahead and take your discovery --

2   everybody take their discovery about --

3           MR. PRINCI:  Your Honor --

4           THE COURT:  -- alter ego.

5           MR. PRINCI:  -- that's what -- that was my -- that

6   will be the risk that the LLC estate, by removing it -- but you

7   know what, we're going to try to remove it --

8           THE COURT:  Well --

9           MR. PRINCI:  -- period.  That's what they want us to

10  do.  The Court sees that also as sensible, so we're going to

11  try to do that, and we'll know very shortly, I suspect, whether

12  we'll have the agreement, because I suspect they're going to

13  stand up and take a position.

14          THE COURT:  If you don't --

15          MR. PRINCI:  If they say that they'll undo it, we'll

16  undo it.  And there will be no -- there will be absolutely no

17  agreement whatsoever by ResCap LLC in any way, shape, or form

18  with the institutional investors, be completely --

19          THE COURT:  There can be an agreement that makes it

20  clear that the claim is capped at 8.7 billion dollars.  I mean,

21  otherwise go ahead with alter ego.  I'm not telling you not to.

22          MR. PRINCI:  No, no, no.  I understand.

23          THE COURT:  But you're telling me it's -- you were

24  telling me that the HoldCo election and alter ego is not

25  relevant to anything that I have to decide as part of approval

RESIDENTIAL CAPITAL, LLC, ET AL.                    114

1   of the settlement.  And what I'm hearing from Mr. Moloney and

2   Mr. Shore is exactly this is why it's relevant.

3            MR. PRINCI:  Judge --

4            THE COURT:  Okay.  Why don't you go confer with Mr.

5   Wofford and Ms. Patrick?

6            MR. PRINCI:  Okay, Judge.  I'm sorry, but I need to be

7   able to address to the Court the underlying fact --

8            THE COURT:  No, you need to --

9            MR. PRINCI:  -- that you accept --

10           THE COURT:  -- go talk to them.  I'm taking a ten-

11   minute recess.

12       (Recess from 12:31 p.m. until 12:44 p.m.)

13           THE COURT:  Please be seated.

14           Mr. Princi?

15           MR. PRINCI:  Your Honor, what a difference a recess

16   can make.

17           So we have some good news.  And first, I do want to

18   clarify, Judge.  I was misunderstanding you, as my colleagues

19   immediately yelled at me when we took the recess.  So what I do

20   understand and what Ms. Patrick understands the Court was

21   asking to consider, we do think is in the best interests of the

22   ResCap LLC estate.  And so -- but I don't get -- what we've now

23   agreed to -- what we're going to further amend the agreement to

24   reflect, so I don't get that potentially wrong, I'm going to

25   let Ms. Patrick put that on the record.

RESIDENTIAL CAPITAL, LLC, ET AL.                    115

1          MS. PATRICK:  Mr. Wofford walked away with my notepad,

2    so I'll do it from memory.

3          THE COURT:  You want to wait for Mr. Wofford to come

4    back?

5          MS. PATRICK:  Well, yeah.  I have it.

6          THE COURT:  We can wait for him to come back.

7          MS. PATRICK:  Thank you, because I wrote it down very

8    carefully --

9          THE COURT:  Let's make sure we get it --

10          MS. PATRICK:  -- to address the Court's concerns.

11    Thank you, sir.

12          THE COURT:  -- make sure we get it right.

13          MS. PATRICK:  Thank you.

14          THE COURT:  Go ahead --

15          MS. PATRICK:  All right.

16          THE COURT:  -- Ms. Patrick.

17          MS. PATRICK:  On behalf of the steering committee

18    investors, we will agree to take out the fixed amount of the

19    claim against the holding company.  All parties will reserve

20    all rights with regard to the amount and substance of the RMBS

21    trust's claims against the holding company.  They file their

22    proofs of claim.  People can object to them on that basis.

23          But we will also agree that while we must prove the

24    amount of the claim, any liability proved will be capped

25    regardless of the evidence at 8.7 billion dollars, which I

RESIDENTIAL CAPITAL, LLC, ET AL.                    116

1  believe was what the Court suggested.  We think it was fine.

2  It was always fine with us, so --

3          THE COURT:  That's what I was trying to suggest.

4          MS. PATRICK:  Yes.  Well, we heard you, And I hope we

5  got it right.  I think that, in that event, Your Honor, should

6  take the issue of needing to prove alter ego or anything off

7  the table, because it reserves everything for another day, but

8  gives the senior unsecured holders the benefit knowing that

9  the --

10          THE COURT:  All right.

11          MS. PATRICK:  -- claim is capped at not more than.

12          THE COURT:  Thank you, Ms. Patrick.

13          MR. MOLONEY:  Your Honor, can I respond?

14          THE COURT:  Come on, Mr. Moloney.  What can you object

15  to?

16          MR. MOLONEY:  I don't.  I think --

17          THE COURT:  Oh, how about that?

18          MR. MOLONEY:  Your Honor, I think this --

19          THE COURT:  I'm sorry, I don't mean to tease.  This is

20  an important issue.

21          MR. MOLONEY:  No, it is important, and I think Your

22  Honor got us to the right place to take --

23          THE COURT:  Just identify yourself for the record.

24          MR. MOLONEY:  Tom Moloney for the record, for

25  Wilmington Trust.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    117

1    I think you got us to the right place on one of the

2    three issues I raised, which is I think we don't need to pursue

3    alter ego discovery at this time with the new agreement on the

4    table.

5         However, we did have a release, and that did get

6    changed.  And it did get changed, we believe, for planned

7    reasons, which does suggest collusion, which does go to the

8    standard which the -- the Court -- Your Honor is going to have

9    to follow and look at the overall agreement.  And so we still

10   need process discovery.  And still, as a matter of public

11   record, they should publicize what this waterfall is.  Since

12   they filed applications to assume these agreements, people

13   should understand what it is they've assumed, otherwise you're

14   going to have a replay of this whole store about I thought the

15   deal was this; I thought the deal was that.  Publicize it.

16        And Your Honor, I -- in terms of what the deal was --

17        THE COURT:  I kept looking for footnote 13.  I can't

18   find whatever document --

19        MR. MOLONEY:  It was their exclusivity filing, Your

20   Honor.  And -- you know, it was their exclusivity filing, where

21   they --

22        THE COURT:  Somebody have a copy I can look at?  No?

23        MR. MOLONEY:  I've asked for someone from the office

24   to bring it here.

25        THE COURT:  I can --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                 118

1           MR. PRINCI:  Your Honor, can I approach with a --

2           THE COURT:  Do you know what the ECF number is?

3           MR. PRINCI:  The ECF number?  It's docket 1371, Your

4    Honor.

5           THE COURT:  Okay.  Well, that -- can I see the 13

6    footnote?  What page is it on?  I've had --

7           MR. MOLONEY:  Your Honor, I have a paper copy.  If I

8    may approach the bench, Your Honor?

9           THE COURT:  I got it on the screen.  If you can tell

10   me what page it's on.

11          MR. MOLONEY:  I'll find it.

12          MR. PRINCI:  Page 13.

13          THE COURT:  Page 13.

14          MR. MOLONEY:  It says it was a phone call from one of

15   the holders who --

16          THE COURT:  I'm going to read it.  I have it on here.

17          MR. MOLONEY:  Okay.

18          THE COURT:  All right, Mr. Moloney.

19          MR. MOLONEY:  Your Honor, if -- either this is the

20   explanation in the pleading with the Court, or what someone

21   stood up and test -- and told you a minute ago was the

22   clarification of the original deal was the explanation, or

23   there's another explanation which we still haven't heard.

24   They're not consistent.  And in terms of what the original deal

25   was, I went back and looked at the motion filed on June 11th.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    119

1          And in the first paragraph of the 919 motion filed on

2   June 11th, says they're going to resolve this with an allowed

3   claim of 8.7 against debtors' Residential Funding Capital, LLC

4   and GM -- which is defined as RFC -- and GMAC Mortgage, G-M-A-C

5   Mortgage.  The first paragraph tells you how they're resolving

6   this, then in paragraph 22, they tell the carve-out.  There's

7   no carve-out for this claim against ResCap.  They changed the

8   deal, and they're standing here today lying about it, and

9   that's very disturbing, Your Honor.

10          THE COURT:  You can tell me the deal's changed.  You

11   can't tell me they're lying about it.

12          MR. MOLONEY:  Your Honor, their explanations that

13   they've --

14          THE COURT:  No --

15          MR. MOLONEY:  -- given today are --

16          THE COURT:  That, I don't want.

17          MR. MOLONEY:  Your Honor, I won't do that.

18          THE COURT:  I tried to make that clear earlier.

19          MR. MOLONEY:  And I apologize, Your Honor, but I can

20   say that the explanation that they gave you today, that this

21   was -- that the deal didn't change is inconsistent with this

22   motion.  I can tell you the reason they gave you for the change

23   is not consistent with footnote 13, which suggests that it

24   was -- that footnote suggests this was part of a planned

25   discussion.  That conversation was with persons in this

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      120

1    courtroom now, who called up and said you're not going to get

2    the 750 million dollars, or I think we're going to get some of

3    it.

4              No one encouraged him to have this conversation.  But

5    that deal should just PSA, and this separate allocation

6    agreement, which is a secret agreement, and which needs to be

7    public, and we need to understand what it is.

8              THE COURT:  Mr. Moloney, what I -- what is missing --

9    what I'm missing is why that's relevant to approval of the RMBS

10   settlement.  Any agreement regarding allocation or waterfall or

11   any of that, there'll be --

12             MR. MOLONEY:  Okay.  I think -- Your Honor --

13             THE COURT:  -- appropriate time.

14             MR. MOLONEY:  -- if I can just take you back to the

15   introductory remarks, the thesis that you heard from the

16   debtors' counsel, who said the thesis for collusion -- as to

17   which there's no evidence -- the thesis for collusion is that

18   there was a linkage between the RMBS settlement and the plan

19   support agreement.  He said that was the thesis.  He said there

20   was no evidence of that, but the thesis was that there was a

21   linkage.

22             We now have that the first time that the RMBS

23   creditors think they're not getting the full benefit of the PSA

24   agreement, they change the settlement agreement.  That shows

25   that there is a linkage now.  Now, does that show that there

1  was a linkage in the very beginning as well?  Maybe yes, maybe

2  no.  But that's why we need a discovery into the process of how

3  the sausage was made, how the settlement was done, what -- who

4  was present, and who -- and the fact that they approved this

5  amendment with no board representation, the fact that there

6  were no business people involved; that you have just a -- you

7  have an ability for the lawyers for AFI to speak to the lawyers

8  for ResCap and for AFI to pull strings in this -- in the way

9  this deal is being done, without any kind of business person in

10 the middle or any record, that's the inference I'm drawing from

11 this record.

12        Now, it may not be -- I may not be able to show that,

13 but if I do show, then when you go to approve this settlement,

14 you're going to look at not where it meets the lower standard

15 of fairness, which is the very deferential WT grant standard.

16 You're going to look to wherever it's intrinsically fair.  That

17 will be the -- and that's how it will bear directly on that

18 hearing.  The standard you apply is if there was business

19 judgment and if there was an arms length agreement, then

20 there's a very, very generous standard long established in this

21 circuit to approve settlements.

22        If in fact you do not have business judgment, and if

23 in fact it's not an independent process, then you apply a

24 different standard.

25        THE COURT:  Who do you believe this so-called secret

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      122

1  agreement is between?

2          MR. MOLONEY:  Your Honor, I think the thesis was

3  fairly --

4          THE COURT:  Just tell me.  You're being specific.  You

5  think there's a secret agreement.  Who do you believe it's

6  between?

7          MR. MOLONEY:  I believe that the -- AFI has reached a

8  deal here, essentially, with the -- with the debtors to give a

9  large claim at the operating company level, which doesn't cost

10 them any money, in return for their release under this PSA

11 agreement.  And that agree -- I think they're paying 750

12 million dollars for that, and I believe there's a secret

13 allocation of that 750 million dollars, which we've never been

14 told about and which, if they're forced to become public about,

15 there's going to be a disagreement about.  That's what I

16 believe.

17         THE COURT:  Thank you, Mr. Moloney.

18         Before Mr. Princi speaks, Mr. Shore, do you want to be

19 heard again?  Let me ask you, are you satisfied with the --

20 what Ms. Patrick described?

21         MR. SHORE:  I think there's going to be -- have to be

22 some work around the language when we see it.  I'll ask them to

23 put some things into the agreement, because, obviously, we're

24 going to need to have a third amended agreement to be brought

25 to the Court.

1    Let me just amplify two things.  I've got maybe a

2  little different theory, and not involving secret agreements or

3  anything else.  8.7's a very big number.  I think it had as

4  much to do with the debtors' stated concerns all the time.

5  We've done a lot of work, and we think 8.7's a reasonable

6  number, as much as it had to do with it was a number that they

7  could have attached, get some empty boxes that would satisfy

8  people for distribution purposes, but would have other benefits

9  for different people in different cases.  It was a number that

10  was workable, not necessarily the number --

11          THE COURT:  But, we'll ultimately find out --

12          MR. SHORE:  -- that they predict --

13          THE COURT:  -- whether the number is --

14          MR. SHORE:  Right.

15          THE COURT:  -- appropriate or not.

16          MR. SHORE:  Right.

17          THE COURT:  Okay?

18          MR. SHORE:  So that's the discovery.  From testing the

19  theory -- and getting back to what we're here to for today --

20  with respect to discovery, we think we're entitled to discovery

21  at the ResCap LLC board level of the original deal, the putting

22  the HoldCo election in, taking the HoldCo election out and

23  whether the board has been consulted with respect to some of

24  this stuff today.  I don't know.

25          I think we're entitled to do that.  We've asked for

RESIDENTIAL CAPITAL, LLC, ET AL.                    124

1   the minutes.  We've asked for communications between ResCap LLC

2   and a host of people regarding those issues.  We think we're

3   entitled to that.  We think after we get those documents, we're

4   entitled to either a 30(b)(6) witness or to the extent we find

5   that somebody's fingerprints are at the board level, we'll ask

6   for a specific person.  But for the purposes of testing the

7   theory about what's going on at ResCap LLC and the interface

8   between the number, plan support agreement, AFI release,

9   that -- in order to test that theory, we're going to need that

10  discovery.

11          To date, the debtors have said we're just going to

12  defer it.  We think it's totally irrelevant.  We don't want to

13  give it to you now.  We're at the end of the discovery.  It's

14  not a lot.  They should have produced the board minutes in any

15  event with respect to things --

16          THE COURT:  That --

17          MR. SHORE:  -- that have gone on at --

18          THE COURT:  Let me just stop there.  Producing the

19  board minutes.  Should, must be done.  That's got nothing to do

20  with anything else.

21          UNIDENTIFIED SPEAKER:  It's done.

22          THE COURT:  Okay.  That -- okay.

23          MR. SHORE:  And then communications between ResCap LLC

24  and different parties, and this gets again to that issue that

25  the -- we're apparently not resolving today, which is if

1  there's a communication between a ResCap attorney and the

2  institutional investors' lawyer with respect to what we are

3  doing about the HoldCo election, whether that's privileged or

4  not.  I don't think it is.  I think if the lawyers are

5  negotiating it, it should be produced.  They're going to do

6  what they're going to do with respect to that.

7          They're going to schedule it in a privileged log, and

8  I guess we're going to come back to Your Honor later to say

9  that -- for Your Honor to determine if the -- if there was a

10  statement yeah, but without the HoldCo election, we're pulling

11  our PSA, whether that's a privileged communication or not.

12  Okay, I get we're not going to do it today, but what we need to

13  establish today is that we're not going to be told none of that

14  discovery is relevant for the purposes of this motion.

15          THE COURT:  All right.  Anybody else want to be heard?

16  Let -- hold on a second.  Go ahead.

17          MR. ELLENBERG:  If the Court please, Mark Ellenberg,

18  Cadwalader, Wickersham & Taft, on behalf of MBIA.

19          Your Honor, I rise just to make two points.  First,

20  MBIA has not --

21          THE COURT:  You didn't really mean it when you said

22  never, under no circumstances should you ever approve this

23  settlement?

24          MR. ELLENBERG:  It's not what we said, Your Honor.

25          THE COURT:  It's pretty close.

RESIDENTIAL CAPITAL, LLC, ET AL.                    126

1          MR. ELLENBERG:  It's not, Your Honor.  And you were

2  provided with the entire letter.

3          THE COURT:  Okay.

4          MR. ELLENBERG:  What we said was --

5          THE COURT:  Looked like the entire letter.

6          MR. ELLENBERG:  -- what we said was -- and we've

7  clarified with the trustee since, what we said was do not

8  charge our trusts expenses for your consideration of the

9  settlement.  And the reason that's what we said, Your Honor,

10  was because we are the real party-in-interest in those trusts.

11          Ms. Patrick's clients and Mr. Talcott's clients have

12  not absorbed a single penny of damage --

13          THE COURT:  Tell me, Mr. Ellenberg, the letter that

14  the debtors attached to their status report, which is a one-

15  page letter; you're saying that's not a complete letter?

16          MR. ELLENBERG:  I'm sorry.  It -- I didn't realize

17  they attached the letter --

18          THE COURT:  Well, they did.

19          MR. ELLENBERG:  -- Your Honor.  I read it on my iPad.

20  I only saw the --

21          THE COURT:  They did.  They --

22          MR. ELLENBERG:  -- quote.

23          THE COURT:  -- attached --

24          MR. ELLENBERG:  Okay.

25          THE COURT:  It's a one-page letter.  It bears a

RESIDENTIAL CAPITAL, LLC, ET AL.                                    127

1   signature of -- for David --

2           MR. ELLENBERG:  David Glehan --

3           THE COURT:  -- Glehan.

4           MR. ELLENBERG:  -- Your Honor.  Yes.  And the --

5           THE COURT:  And you're saying that's not a complete

6   document?

7           MR. ELLENBERG:  It is a complete document, Your Honor.

8   And read in its entirety, what it says is --

9           THE COURT:  I did it read it.  It's only two

10  paragraphs long.

11             MR. ELLENBERG:  Okay.  It doesn't say we're

12  opting out.  It says we will make the decision, not you.  And

13  that's because we have the right to make that decision --

14          THE COURT:  When it says "We hereby instruct you not

15  to consider or accept any settlement or compromise offers

16  relating to any claims that may belong to the above referenced

17  trust" and it goes on from there.

18          MR. ELLENBERG:  It does go on, Your Honor.

19          THE COURT:  That looks like pretty clear language.

20          MR. ELLENBERG:  But, Your Honor, it goes on.  All

21  right, the point is we will give them an instruction at the

22  appropriate time.

23          Your Honor, if I may?

24          THE COURT:  Go ahead.

25          MR. ELLENBERG:  No investor has suffered a penny of

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                128

1   loss in the trust that we've insured.  There have been lots of

2   losses; over one and a half billion dollars worth, and we've

3   absorbed every penny of those losses in our trusts, okay,

4   because we are paying those claims pursuant to our insurance

5   policies.  Under the indentures and the insurance agreements,

6   okay,  that A, subrogates us to the claims of the investors.

7   And so when Ms. Patrick talks about the claims she could bring

8   in connection with the sale, for example, in our trust those

9   are our claims.  And under the indentures, as we read them, we

10  have the ability to direct the trustees to take action with

11  respect to litigation and, we believe, with respect to the

12  settlement.

13          We have not yet directed them.  We will at some point.

14  And we have genuinely not decided what position --

15          THE COURT:  What does that have to do with --

16          MR. ELLENBERG:  -- we're going to take on this

17  subject.

18          THE COURT:  What does that have to do with

19  scheduling -- with discovery --

20          MR. ELLENBERG:  Your Honor, I just assert -- I didn't

21  bring up the subject, Your Honor.  I just want to make the

22  record very clear.

23          THE COURT:  It's late.  I've got a 2 o'clock calendar.

24  What does that have to do with setting a --

25          MR. ELLENBERG:  Okay.  The --

RESIDENTIAL CAPITAL, LLC, ET AL.                               129

1    THE COURT:  -- discovery and trial schedule?

2        MR. ELLENBERG:  So let's talk about that, Your Honor.

3    I think the key question was your question of why does this

4    have to be done before the 5th.  Why does this have to be done

5    before the sale?  There is no reason.  There is an agreement

6    that the trustees entered into that capped the claims, and that

7    permits these sales to go forward.

8        Now, either there's a threat that if the schedule

9    changes somehow they'll get out of that agreement that's

10   embodied in an order, and they're trying to hold the sale

11   hostage, or they're not.  So let's get that clear.  But if the

12   sales are not being held hostage, I don't know why we are

13   trying to turn ourselves into pretzels to deal with the

14   schedule.

15       The settlement is still moving around.  And if the

16   debtors made every single commitment they promised to make

17   today -- which would be astonishingly good performance on their

18   part -- we would still be trying to squeeze ourselves into a

19   straw when we really need a fire hose.

20       THE COURT:  Okay.  Anything else?

21       MR. ELLENBERG:  I mean, why are we doing this?

22       THE COURT:  Okay.  Any other substantive points you

23   want to make, Mr. Ellenberg?

24       MR. ELLENBERG:  Your Honor, you read our points, and I

25   won't repeat them.  Thank you.

1      THE COURT:  Thank you very much.  Anybody else who

2  hasn't spoken yet want to be heard?

3      MR. WYNNE:  Your Honor, it's Richard Wynne from Jones

4  Day on the phone for FGIC.  If everyone in the courtroom's

5  done, I just wanted to speak for a minute.

6      THE COURT:  Go ahead.

7      MR. WYNNE:  Thank you, Your Honor.  I apologize for

8  not being there.

9      I'd really just like to make a few very short points.

10  First, with respect to AFI, that's fairly easy.  Effectively,

11  only after our status report did we get the letter, or I think

12  they crossed right at the same time.  So I think with AFI we

13  should be able to work out an agreement and get a production

14  from them, so I don't think there's any issue there.  But the

15  fundamental issue that we tried to address in our status report

16  was that we did very timely serve discovery on July 13th, I

17  think, was the first date.  We tried hard to work with the

18  debtors.  We had very serious delays.  We've been aiming to a

19  November 5th hearing date.  We hired our own experts, we worked

20  through their database, we told them in a timely way what the

21  issues were with the database -- and they were considerable, as

22  shown in our report.  The production was very deficient.

23      With respect to Ms. Patrick's harped point about good

24  faith, at least (indiscernible) and what we've observed from

25  other people, we've exerted an incredible amount of effort to

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    131

1  try to make those deadlines, and it's simply proven impossible

2  for all the reasons that you've heard.  You know, just today

3  Mr. Princi just said that the debtors spent a considerable

4  amount of time analyzing and dealing with the rep and warranty

5  claims.  Well, that's the essence of what we wanted to see.

6  This is a monumental claim that's going to very, very seriously

7  impact this case.  And the only thing that we saw with respect

8  to internal memos, or e-mails, or analysis was on Monday, I

9  think it was, they uploaded into the database a couple of pages

10  of a board presentation, and it's sometime in May before they

11  signed the agreement that dealt with that.  We wanted to see

12  those internal e-mails and analysis; they just haven't come and

13  we don't know when they're going to come.

14          The last point I'd like to make with respect to that

15  is on the sales linkage.  As far as we can tell there's no

16  provision in the scheduling order that gives the RMBS trustees

17  the right to now change that agreement.  And Your Honor made

18  clear in that July 31st order it wasn't really just scheduling;

19  in fact, they had to change the title because it was a

20  substantive provision that people agreed to.  But there was

21  nothing in that order that required that the Court rule on the

22  RMBS settlement motion before the November 19th sale hearing.

23  There was nothing that said that Your Honor had to approve it

24  or the sales couldn't go forward.

25          THE COURT:  November 5th.

1           MR. WYNNE:  Nothing -- excuse me, Your Honor.  Well,

2    the sale is November 19th --

3           THE COURT:  Yes.

4           MR. WYNNE:  -- the hearing.  But there was nothing

5    that said that the RMBS hearing couldn't be continued from

6    November 5th if Your Honor needed more time.  There was nothing

7    that said that Your Honor was going to rule on November 5th or

8    before the November 19th sales.  So I think that there's no

9    provision that we're aware of that would allow them to now back

10   out of that.  And in fact, the RMBS trustees have stood up in

11   court I think the first time this was raised, and said that the

12   institutional investors in fact cannot direct them to take

13   action.  They can direct them to consider the settlement, and

14   under the schedule we have the RMBS trustees are going to first

15   consider what to do and exercise their own fiduciary judgment

16   after this Court approves of settlement, if it does.  So I

17   think the sale is really a red herring.

18          Your Honor, that's it.  Unless Your Honor had any

19   questions.

20          THE COURT:  Thank you very much.

21          All right.  Anybody else on the phone or in court wish

22   to be heard?  Mr. Eckstein, and then I'll give you the --

23          MR. ECKSTEIN:  Your Honor, if I may before Mr.

24   Princi --

25          THE COURT:  Go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.** 133

1     MR. ECKSTEIN:  I just wanted to, if I can, try to

2  return very briefly to the scheduling issues, which I think

3  were the initial subject.  I think the HoldCo election

4  discussion really just indicates an example of the documents

5  and the discovery that are needed.  Your Honor, as we look at

6  this process where we are today, the documents regarding the

7  settlement and the negotiations and items pertaining to the

8  reasonableness of the settlement are approximately one month

9  late.  As we see it, Your Honor, there's a need to push the

10  9/24 fact discovery deadline by approximately thirty days.

11     The scheduling order gave the committee and other

12  parties approximately three weeks from the conclusion of the

13  discovery deadline to file an objection.  I think that's a

14  relevant date for the Court's consideration.  As we see it,

15  that date right now as we're looking at it needs to be pushed

16  ahead.

17     THE COURT:  I'm sorry.  Which date?

18     MR. ECKSTEIN:  That the date to file the objection.

19  Right now the committee --

20     THE COURT:  Right now it's October 15th.

21     MR. ECKSTEIN:  October 15th.  As we see it, Your

22  Honor, that date needs to be moved out.  And I'm not dealing

23  with the impact of the sale right now; I think that's been

24  discussed.  We're simply looking at the schedule, Your Honor.

25  We believe that this schedule requires approximately a thirty-

RESIDENTIAL CAPITAL, LLC, ET AL.                    134

1  day extension of the discovery deadline.  And we think that the

2  deadline for filing the objection of October 15th needs to be

3  moved out to the middle of November.

4          And, obviously, Your Honor, that has impacts on the

5  schedule.  As we're looking at the loan file production, that

6  was approximately two weeks late, and we would expect that that

7  deadline for the filing of the expert report should also

8  benefit from an extension of that period by approximately two

9  weeks, which would take it out to around October 24th or 25th.

10         THE COURT:  Well -- all right.

11         Mr. Princi, you wanted to be heard?

12         MR. PRINCI:  I think, Your Honor, the particulars on

13 moving the timeline and the schedule have to be discussed.  I

14 mean, so let me just real quick --

15         THE COURT:  They don't have to be.  I mean, I can just

16 order.

17         MR. PRINCI:  Or you could do that.

18         THE COURT:  But that's, you know --

19         MR. PRINCI:  Or you could do that.

20         I'm just trying to say in terms of anything

21 constructive, Judge, I mean, I think we --

22         THE COURT:  You don't think it would be constructive

23 if I just rule.

24         MR. PRINCI:  Okay.  So, Judge, real quickly.  With

25 respect to the points made by Mr. Moloney, number one I think

1  he said July 30 was the date when we began -- when we made the

2  HoldCo amendment; that's  nottrue.

3          THE COURT:  Well, he read for me the original -- the

4  initial motion, and I don't have it open in front of me so --

5  he read from -- that talked about fixing the claim against the

6  two operating entities, not against HoldCo.

7          MR. PRINCI:  Right.  And that's what caused, Judge --

8  and that's what caused the need to have to do the second

9  amended agreement.  So this is the flow.  The first agreement

10 says in the first line that "the agreements entered into

11 between Residential Capital LLC" -- that's the HoldCo -- "and

12 its direct and indirect subsidiaries, collectively ResCap,

13 defined as ResCap to the debtors".  And then in Article 5,

14 Section 5.1 it says "ResCap, the defined term, hereby makes in

15 irrevocable offer to settle and ResCap will provide the general

16 unsecured claim of 8.7".

17         We explained in the motion where we thought those

18 monies would come from.  Now, that gets to the so-called --

19 what did he call it? -- the secret document.  So secret that A,

20 it's referenced in the plan support agreement that was filed

21 the first day.  B, it was put in the data room on July 9th --

22         THE COURT:  What does the document show?

23         MR. PRINCI:  It shows what the debtors anticipated --

24 what the debtors anticipate the waterfall will be, under the

25 present Ally settlement agreement, into the various estates and

RESIDENTIAL CAPITAL, LLC, ET AL.                    136

1   out to the various creditors.

2          THE COURT:  Has it changed since the beginning of the

3   case?

4          MR. PRINCI:  No.  So that was filed -- the secret

5   document was put into the data room --

6          THE COURT:  But is the document in the data room?  Has

7   it changed -- has the proposed waterfall or allocation changed

8   since it was put into the data room?

9          MR. PRINCI:  No.  Footnote 13 refers to the following.

10  One of the noteholders called Ms. Patrick -- as I was told.  As

11  I was told -- and basically construed this agreement

12  differently than as it's worded.  And I think based on that,

13  that gave the institutional investors concern, as Mr. Wofford

14  was saying:  that there was a need to make a clarification

15  about this, and that's what led to the second amended

16  settlement agreement and the HoldCo election.  The secret

17  document was also sent to Mr. Moloney's partners -- one of the

18  other -- one of his partners, either Mr. Lightner or Mr. O'Neal

19  on August 22nd.  So I don't know why Mr. Moloney refers to

20  it --

21         THE COURT:  Okay.  I don't need to hear any more

22  about --

23         MR. PRINCI:  -- as a secret.

24         THE COURT:  -- about that.

25         MR. PRINCI:  Okay.  Fair enough.  And so let me get to

1   a couple of points, Judge, that I think are more relevant, and

2   that relates to the schedule.

3           I think Mr. Eckstein said that he just heard today who

4   the people were that knew -- that were involved in the

5   negotiations; that's incorrect.  We served them with

6   interrogatory responses on September 14th and on the second

7   page -- excuse me, in the answer to the first interrogatory

8   response to the first interrogatory it explains that "the

9   people who played the greatest role and had the most

10  responsibility in the negotiation of the RMBS trust settlement

11  agreement on behalf of the debtors are" and then it lists

12  myself, Mr. Lee, Ms. Levitt, Mr. Newton and Mr. Clark from my

13  firm; Ms. Hamzehpour, Mr. Thompson, Mr. Ruckdaschel and Mr.

14  Cancelliere from the debtors.  It lists Mr. Nolan and Mr. Renzi

15  from FTI Consulting.  It lists Mr. Puntus and Mr. Chopra from

16  Centerview Partners.  So it is not the case that we had not

17  made that information available to people.

18          THE COURT:  Okay.  I've heard enough.

19          MR. PRINCI:  With respect --

20          THE COURT:  Mr. Princi, I've heard enough.

21          MR. PRINCI:  Okay.  Your Honor, may I just make a

22  request for the depositions?  The depositions are going to go

23  to the topic that the examiner is covering.  The depositions

24  are not intended to really find out what we said to Ms.

25  Patrick; that's not what people are alleging.  The collusion

RESIDENTIAL CAPITAL, LLC, ET AL.                                    138

1    they're alleging isn't really that we colluded with Ms.

2    Patrick.  The collusion they're alleging is that ResCap and

3    Ally were colluding.  And I don't know, Judge, how it is and

4    why it is that that should be undertaken now when we're

5    dealing -- when the people who are going to otherwise be

6    deposed are the very people, Judge, on a day in and day out

7    basis, full-time -- example of full-time.

8           Ms. Hamzehpour lives in Minnesota, or she used to,

9    because what she does now is she comes to our offices, and we

10   have an office for her at Morrison & Foerster.  And she works

11   out of that office because we need her input literally every

12   day for twelve hours.  Literally.  So people want -- while

13   we're dealing with an auction, while we're dealing with all the

14   lift stay motions we get, while we're dealing with plan

15   considerations people want to take these people and depose them

16   because of the allegation concerning our relationship with Ally

17   that's presently being looked into by the examiner.  It's just

18   another way of dealing with that allegation.  Nobody really

19   contends that the institutional investors and ResCap were in

20   collusion.

21          THE COURT:  Okay.  Let me stop you.  Mr. Princi, when

22   will your expert be completed with their work?

23          UNIDENTIFIED SPEAKER:  Your Honor, are you asking

24   about a supplemental declaration?

25          THE COURT:  No.  I'm asking for whatever you intend to

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    139

1   offer at the trial in this matter.  When will your expert --

2   when will your expert's report be completed so that anybody who

3   wishes to can take your expert's deposition?

4           MR. PRINCI:  The final expert -- okay, Judge.  The way

5   the scheduling order was set up, it's --

6           THE COURT:  I know what the scheduling order said.

7           MR. PRINCI:  Okay.  Understood.

8           THE COURT:  But a lot of the dates haven't happened

9   already, and so I'm asking you a question.  If you're sticking

10  to what the schedule said, fine.

11          MR. PRINCI:  Judge, I'm not -- I misunderstood you.  I

12  needed clarification.  Thank you.  Just let me find it, Judge,

13  sorry.  I just -- Your Honor, I just --

14          THE COURT:  All expert -- all discovery, everything

15  was supposed to be over by October 12th.  Everything, okay.

16  That's in paragraph 9.  Any expert report was supposed to be

17  filed by October 8th.  That's paragraph 8.

18          MR. PRINCI:  Oh, here it is, Judge.  Okay.  I'm just

19  trying to see when we --

20          THE COURT:  It's not a trick question.

21          MR. PRINCI:  No.  No.  No.  I understand, Judge.  I'm

22  literally on my feet just trying to make sure I answer

23  correctly.  I think it was October -- in paragraph 11 it says

24  "any reply to objections, including any rebuttal expert

25  reports, shall be filed and served by October 29".

**RESIDENTIAL CAPITAL, LLC, ET AL.**                          140

1      THE COURT:  Mr. Bentley?

2          MR. BENTLEY:  Your Honor, if it helps, I think the

3   operative condition is in paragraph 6 of the scheduling order,

4   the last saying says the debtors will file a supplemental

5   expert report not later than September 24th.

6          THE COURT:  Okay.

7          MR. PRINCI:  That's correct, Judge.

8          THE COURT:  And now you're sticking to that date?

9          MR. PRINCI:  We have no problem with that, Your Honor.

10         THE COURT:  All right.  I'm going to provide you with

11  several dates that are fixed and unchangeable, and what I

12  expect is that you will promptly meet and confer and fill in

13  the rest of the schedule based on the dates I'm giving you now.

14  The November 5th hearing is being moved, and it will occur on

15  November 13, 14 and 16.  The other date I'm going to give you

16  is November 6th, one week before the hearing.  Everything needs

17  to be filed with the Court one week before.  And by

18  everything -- I mean, things can -- the last of the filings

19  with the Court has to be one week before, November 6th.  Dates

20  can and should be staggered before that, but this is a

21  complicated matter.  This is not the only thing I have between

22  November 6th and November 13th.  You need to agree on the date

23  for the cutoff of all fact discovery, all expert discovery, and

24  it seems to me listening to you that that could be the same

25  date.  But it ordinarily wouldn't be, but it sounds like the

RESIDENTIAL CAPITAL, LLC, ET AL.                                 141

1   materials on which the experts are relying is substantially

2   produced already.

3          MR. PRINCI:  That's correct, Your Honor.

4          THE COURT:  And so this is not -- this doesn't strike

5   me as the usual case; we have to wait for the conclusion of

6   fact discovery before experts can do their reports.

7          All of this is premised on Mr. Princi's representation

8   to the Court that all discovery by the debtors will be

9   completed by October 3rd.  Rolling production until then, but

10  completed no later than October 3rd, and that the privilege log

11  will be provided no later than October 10th.  I didn't hear

12  anyone really -- with respect to Ally, it sounds like those

13  discovery issues have been resolved.

14         MR. PRINCI:  I just wanted to clarify that's not with

15  respect to the so-called alter ego discovery.

16         THE COURT:  Well, with respect to alter ego, in light

17  of the agreement to amend the RMBS settlement to make clear

18  that the amount is reserved -- alter ego is off the table for

19  purposes of this hearing.

20         MR. PRINCI:  Okay.

21         THE COURT:  It's off the table for discovery, and in

22  taking alter ego off I'm also taking the HoldCo election off.

23  What is relevant to the Court is the agreement -- I think the

24  only change that's being made to what was circulated yesterday

25  is this agreement with respect to -- there's no -- the amount

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    142

1  of any allowed claim against HoldCo is left open.

2             MR. PRINCI:  Other than the cap.

3             THE COURT:  Yeah.

4             MR. PRINCI:  Yes.

5             THE COURT:  Other than the cap.

6             MR. PRINCI:  Yes.

7             THE COURT:  Correct.

8             MR. PRINCI:  That's correct, Your Honor.

9             THE COURT:  So I'm persuaded that the history of the

10 HoldCo election -- how it got in, how it came out, the

11 release -- in my view is not relevant or material to the issues

12 that the Court will have to decide at this hearing.  What is

13 relevant and material to it is the decision process by which

14 the settlement is approved.  And so if amendments were never

15 approved by the board, that's relevant.

16             As part of your agreement with respect to a discovery

17 schedule -- now, if you can't work it out contact chambers

18 promptly.  I mean, this should be worked out within the next

19 day or so.  If you can't, arrange a telephone conference and

20 I'll just set the dates.  You ought to be able to do it.  Just

21 set this -- I'm not questioning the good faith of everybody in

22 agreeing on this schedule.  I'm not questioning the good faith

23 of parties in going forward with discovery.  You are where you

24 are.  It's complicated, there's a lot of discovery.

25             I think it's important -- and maybe it's already

1  happened.   There seems to be some disagreement about it -- as

2  to identification of individuals with knowledge about the

3  settlement negotiations and the settlement.   Disclosure of the

4  identities of those individuals should happen --

5           MR. PRINCI:  That's been complete already.

6           THE COURT:  I don't want to get into a disagreement

7  about whether it has or it hasn't happened, okay?  If it has,

8  that's great.

9           MR. PRINCI:  It has.

10          THE COURT:  If not, I mean, like within the next two

11  days there better be just accurate disclosure of anyone who is

12  involved.  With respect to the depositions of lawyers, I will

13  not permit depositions of outside counsel at this time.

14  Depositions of in-house counsel of those individuals who were

15  substantially involved in negotiations of a settlement in the

16  Court's view are proper and should go forward.

17          If there's an assertion of privilege with respect to

18  specific questions, I'm not ruling on that.  I'm not ruling

19  that there's no privilege that attaches, but what I am ruling

20  is that the settlement -- everybody has indicated it was

21  substantially negotiated by counsel.  Ms. Hamzehpour, the

22  general counsel was substantially involved, Mr. Cancelliere,

23  Mr. Nolan, Mr. Renzi, Mr. Puntus, Mr. Chopra, all identified

24  today as having been involved.  They clearly should be deposed.

25  No depositions of outside counsel without further order of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                144

1   Court.   And I hope that will be unnecessary.   If there's a

2   further dispute about it, promptly arrange for a telephone

3   conference with the Court and I'll endeavor to resolve it

4   promptly.

5            It's too late in the day to put issues off in the

6   hopes that they'll go away.   That's well and good, but not with

7   the schedule.   So meet and confer properly; if you can't

8   resolve it arrange a call and I will resolve it.   These dates

9   that I'm giving you, November 13th, 14th and 16th, if the

10  hearing doesn't happen on those days it won't happen until next

11  year.   I want it to happen on those days.   It depends on

12  everybody moving forward and cooperating.   But just to make it

13  clear, I don't think November 5th is a realistic date in light

14  of where we are in the discovery schedule today.   And I think

15  good cause has been established to move the hearing date, and

16  that's what I've done, and those are the only days that I have

17  that I can do this.   The hearing will be limited to three days.

18           The court's closed on the 12th, otherwise we would

19  have the hearing on the 12th.   So the 13th, right now ResCap is

20  on the calendar for the 13th.   Borders is on the calendar as

21  well.   I will move the Borders' hearing date.   On the 14th

22  Grubb & Ellis is on the calendar and we will move that date.

23  The 15th is MF Global and I can't change -- I'm not changing

24  that.   I guess you're on and General Maritime in the afternoon,

25  is that -- I can't change the 14th.   The 13th and 14th, you

1    need -- it's important now -- this is going to be a timed

2    trial.  You need to try and agree on the allocation of time.

3    If you can't -- if the parties-in-interest can't agree I will

4    make the allocation.  I don't mind on the 13th and 14th running

5    late into the evening on both of those days.  On the 16th, on

6    Friday, I will not run court past 5 o'clock, so the 16th we

7    have to end by 5.  On the 13th and 14th I will listen to

8    what -- the good faith estimates of the amount of time

9    required.

10           Typically, what I do with a timed trial -- here there

11   are many more parties opposing or objecting at this stage;

12   maybe some of those will be resolved, and some of those were

13   limited objections, but there are a number of major contestants

14   to this settlement.  They obviously need to confer; I'm not

15   going to allow any duplication of effort.  All direct

16   examination should be in written narrative form with the

17   declarants available for cross-examination in court.  That's

18   why I want the papers a week in advance, because I will have

19   read everything before the hearing.  All exhibits need to be

20   pre-marked, moving party numbering, objectors lettering

21   exhibits.  Everything has to be -- you need to coordinate

22   because everything has to have a unique identifier.

23           I would like to have a telephone conference to discuss

24   what will hopefully be a finalized schedule this Friday,

25   September 21 at 2 p.m.  So you have until to work out any of

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    146

1    these dates.  You ought to be able to do that.

2              Any other issues?

3              MR. PRINCI:  No, Your Honor.

4              THE COURT:  Anybody else have -- anybody want to be

5    heard?

6              All right.  We're adjourned.

7              MR. PRINCI:  Thank you, Judge.

8          (Whereupon these proceedings were concluded at 1:29 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

147

# C E R T I F I C A T I O N

I, Zipporah Geralnik, certify that the foregoing transcript is

a true and accurate record of the proceedings.

_____

ZIPPORAH GERALNIK

AAERT Certified Electronic Transcriber CET**D 489


eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  September 20, 2012

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 148 of 170

September 19, 2012

## A

**ability (5)**
54:7;94:22;108:25;
121:7;128:10
**able (15)**
32:23;44:9;54:8;
74:15;76:8,9;77:2;
96:6;99:10;107:25;
114:7;121:12;
130:13;142:20;146:1
**above (2)**
106:7;127:16
**absence (2)**
24:9;65:5
**absolute (1)**
68:4
**absolutely (4)**
15:5;23:24;64:15;
113:16
**absorbed (2)**
126:12;128:3
**abundance (2)**
57:21,25
**accept (10)**
31:15;42:12,22,23,
25;43:4;56:9;66:14;
114:9;127:15
**acceptable (1)**
35:4
**access (2)**
48:10;63:7
**accommodated (2)**
68:15;91:3
**accommodating (1)**
72:18
**accommodation (1)**
79:16
**accomplish (1)**
55:9
**accomplished (1)**
75:16
**accordance (1)**
21:25
**according (2)**
85:10;87:15
**account (3)**
11:10;21:1;44:14
**accurate (1)**
143:11
**accurately (1)**
103:3
**accuse (1)**
22:24
**achieve (1)**
61:16
**acknowledge (2)**
28:19;56:3
**acknowledged (1)**
54:19
**acknowledging (1)**
29:12

**across (2)**
54:3;96:24
**acting (9)**
17:9,9,10,24;18:1;
58:24,25,25;74:3
**action (3)**
99:8;128:10;
132:13
**activity (1)**
97:18
**actual (2)**
102:6,6
**actually (10)**
31:13;61:13;65:13;
78:17,20;86:2,20;
93:13,22;103:10
**acute (1)**
57:3
**Ad (2)**
10:3;99:11
**add (2)**
41:13;96:15
**added (1)**
40:16
**additional (2)**
34:6;77:1
**additionally (1)**
12:19
**address (9)**
13:4;27:21;31:25;
36:18;37:23;97:11;
114:7;115:10;130:15
**addressed (3)**
57:3,4;85:15
**addresses (1)**
25:9
**addressing (2)**
23:6;42:19
**adhere (1)**
64:1
**adjourned (1)**
146:6
**adjudication (4)**
12:5,11;20:15,17
**adjusted (3)**
32:25;43:16,17
**adjustment (1)**
61:4
**advance (1)**
145:18
**advantageous (2)**
15:10;89:2
**adversaries (1)**
48:20
**adversary (1)**
48:14
**adverse (2)**
42:4;84:12
**adversely (1)**
105:5
**advice (8)**
27:15;28:9,16,20,
21;29:13,19;59:5

**advised (1)**
16:21
**advisor (1)**
22:2
**advisors (3)**
40:22,25;41:1
**affect (1)**
81:21
**affected (2)**
98:10;105:5
**affects (2)**
21:13;83:9
**affirmatively (1)**
71:12
**AFI (18)**
12:23;17:1;33:9;
38:4,11,14;45:7;
49:2;86:8;87:20;
90:21;99:20;121:7,8;
122:7;124:8;130:10,
12
**AFI's (1)**
21:8
**afternoon (5)**
11:9;36:19;77:23;
92:1;144:24
**again (12)**
16:23;34:2;35:24;
38:13;90:16;91:14;
95:16;101:9;106:6,
21;122:19;124:24
**against (47)**
20:18;21:1;24:9,9,
13;48:5;80:1,13,15,
19;90:21;93:10,20;
94:20,22;95:2;97:13,
16,21;98:13;99:19;
100:6,16;101:13;
102:5;104:22;105:2,
6;106:1,9,19;107:8,
24;109:23;110:1;
111:8,9;112:12,14,
16;115:19,21;119:3,
7;135:5,6;142:1
**aggressive (3)**
43:13;78:7;79:8
**agitated (2)**
83:25;84:1
**ago (1)**
118:21
**agree (21)**
49:25;59:14;72:10,
17;89:24;93:11;97:4;
100:1,7;104:5;
106:17;107:23;
110:4,9;111:17;
115:18,23;122:11;
140:22;145:2,3
**agreed (14)**
14:15;15:16;24:17;
25:22;36:14;48:16;
53:18;55:3;56:7;
64:2;97:20;104:5;

**114:23;131:20**
**agreeing (2)**
94:20;142:22
**agreement (105)**
12:1,3;13:25;14:1;
20:13,21;21:10,17,
18,19,20;24:21;25:7,
15,23;26:7;38:8;
42:12;43:17;45:25;
48:5;49:19;50:8,24;
52:18,22;53:1,3,24;
57:18;58:9,9;63:25;
64:20,23;80:21;82:9,
21;83:22;84:3,4,15,
25;91:2;95:4;96:25;
97:7,18;98:10,10;
100:5,14,16,20;
101:14,20;102:18,18,
23;103:6,16,17;
105:1;106:18;107:7;
108:10,16;110:22;
111:7,8;113:12,17,
19;114:23;117:3,9;
120:6,6,10,19,24,24;
121:19;122:1,5,11,
23,24;124:8;129:5,9;
130:13;131:11,17;
135:9,9,20,25;
136:11,16;137:11;
141:17,23,25;142:16
**agreements (10)**
26:5;41:21;57:18;
65:5;86:14,20;
117:12;123:2;128:5;
135:10
**agrees (1)**
30:16
**ahead (27)**
19:3,11;25:19;
26:11;32:17;38:18;
40:13;42:15;48:2;
64:11;79:5;92:21,24;
94:3;97:10;103:21;
107:23;108:4;
112:11;113:1,21;
115:14;125:16;
127:24;130:6;
132:25;133:16
**aiming (1)**
130:18
**allegation (3)**
11:22;138:16,18
**allegations (1)**
109:1
**allege (1)**
13:21
**alleging (4)**
98:16;137:25;
138:1,2
**allocation (9)**
21:8;53:4,6;120:5,
10;122:13;136:7;
145:2,4

**allow (9)**
62:19;93:20;95:10;
97:12,16;98:13;
99:13;132:9;145:15
**allowance (1)**
106:12
**allowed (12)**
13:8;20:21;21:1;
42:5;80:1;98:5,15;
104:9,20;106:16;
119:2;142:1
**allows (3)**
64:21;99:5,6
**Ally (22)**
7:12,12,21,21;
13:23;14:1;41:23;
45:4,9,11;47:14;
49:1;50:18;53:19;
55:2,16;58:11;70:7;
135:25;138:3,16;
141:12
**Ally's (3)**
45:18,24;46:6
**already-settled (1)**
104:21
**alt (1)**
107:9
**alter (54)**
12:4;20:19;21:14;
22:14;35:8;80:13;
81:9,13;82:1,8,10;
85:23;86:1,4,5,7;
88:19,20;95:7,8;
98:16;99:19;100:15;
101:12,15,21;104:17,
20,24,24;105:4,7,14,
17;107:9,22;108:1,2;
109:21;110:12;
110:11;112:11,18,
19;113:4,21,24;
116:6;117:3;141:15,
16,18,22
**alternative (3)**
17:6;60:6,7
**although (3)**
49:22;59:13;66:10
**ALVES (1)**
9:16
**always (7)**
31:2,16,17;33:1;
34:24;106:20;116:2
**amend (4)**
96:15;110:21;
114:23;141:17
**amended (13)**
12:1,2;19:25;20:2;
79:20;80:21;83:13;
100:20;108:10,16;
122:24;135:9;136:15
**amendment (8)**
16:21;22:13;81:11;
82:9;91:10;5;121:5;
135:2

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 149 of 170

September 19, 2012

**amendments (1)**
142:14
**America (2)**
54:4;57:6
**Americas (3)**
5:21;9:4;10:4
**among (3)**
54:24,25;104:15
**amount (42)**
14:3;20:20;24:5;
26:23;42:5;52:7;
69:6;80:3,16,19;
82:6;88:22;91:18;
93:20,20;95:10;
100:6,16,21;101:20;
105:1,1,13,22;106:7,
14,19;107:8,24;
109:14,22,25;112:12,
18;115:18,20,24;
130:25;131:4;
141:18,25;145:8
**ample (1)**
69:15
**amplify (1)**
123:1
**analyses (1)**
75:3
**analysis (6)**
13:10;77:9,21;
79:7;131:8,12
**analyzing (1)**
131:4
**Angeles (1)**
7:6
**announced (3)**
53:2;61:19;62:3
**answered (1)**
29:10
**Anthony (1)**
11:5
**anticipate (2)**
15:11;135:24
**anticipated (3)**
16:23,24;135:23
**apologize (2)**
119:19;130:7
**apparently (4)**
86:18;87:17;88:11;
124:25
**appears (1)**
34:6
**application (4)**
78:21,22;97:12,15
**applications (1)**
117:12
**applies (1)**
101:22
**apply (3)**
37:15;121:18,23
**applying (1)**
93:12
**appointed (1)**
53:7

**apposite (1)**
55:13
**appreciate (1)**
23:2
**approach (5)**
19:22,24;92:15;
118:1,8
**appropriate (13)**
28:4;43:24;59:23;
72:12;98:19,21,25;
102:4;107:12;
109:14;120:13;
123:15;127:22
**appropriately (1)**
62:21
**approval (13)**
14:20;27:15;31:1;
64:21;81:20;86:14;
87:5;91:22;96:21;
111:11;112:20;
113:25;120:9
**approve (14)**
15:23;28:9;85:8,9,
11,13;101:10,11,14;
106:1;121:13,21;
125:22;131:23
**approved (9)**
52:22;85:6,8,14;
91:16;110:13;121:4;
142:14,15
**approves (1)**
132:16
**approving (3)**
28:14;106:3
**approximately (6)**
133:8,10,12,25;
134:6,8
**argue (3)**
90:21;95:11;
109:25
**arguing (1)**
56:6
**argument (2)**
43:21;60:10
**arguments (4)**
43:24;86:5,7;
105:24
**arise (2)**
97:25;109:16
**ARLENE (1)**
9:16
**arms (1)**
121:19
**arm's (1)**
53:24
**arm's-length (1)**
15:19
**arose (1)**
104:3
**Around (8)**
24:6,7;48:22;73:5;
104:3;122:22;
129:15;134:9

**arrange (3)**
142:19;144:2,8
**arrived (1)**
91:13
**Article (1)**
135:13
**articulate (1)**
71:15
**A-S-C-H-E-L (1)**
40:7
**aside (2)**
11:21;58:24
**aspersions (1)**
34:17
**assert (5)**
28:12;80:13;82:2;
112:4;128:20
**asserted (1)**
89:22
**assertion (1)**
143:17
**assertions (1)**
80:19
**assess (1)**
57:21
**assessment (1)**
15:13
**assigned (1)**
24:12
**associate (2)**
36:15;38:22
**assume (6)**
45:10;56:12;68:24;
75:5;99:22;117:12
**assumed (2)**
24:12;117:13
**assuming (4)**
32:20,24;76:15;
112:18
**assumption (1)**
65:1
**assure (2)**
11:13;52:23
**Assured (1)**
8:18
**astonishingly (1)**
129:17
**attached (5)**
34:9;123:7;126:14,
17,23
**attaches (1)**
143:19
**attempt (1)**
67:10
**attended (1)**
51:7
**attorney (2)**
74:3;125:1
**Attorneys (18)**
4:3,11,19;5:10,20;
6:3,12;7:3,12,21;8:3,
18;9:3,11,20;10:3;
26:20;29:19

**auction (6)**
23:8,9,16;64:17,
19;138:13
**Augie/Restivo (1)**
99:8
**August (11)**
23:8;53:10,14;
54:15;62:6;68:17;
69:16,17;73:8;93:14;
136:19
**Austin (2)**
6:15;9:19
**authorization (1)**
89:5
**authorizing (1)**
16:14
**available (2)**
137:17;145:17
**Avenue (6)**
5:21;6:13;7:22;
8:4;9:4;10:4
**avoid (1)**
104:16
**aware (1)**
132:9
**away (4)**
90:17,18;115:1;
144:6

**B**

**back (32)**
17:21;30:24;31:6,
15,17;44:23;45:21,
23;46:16;51:16;57:7,
17;58:3;65:20;67:22;
68:10,21;83:15,16;
85:13,15;92:16;
94:10,12;95:1;115:4,
6;118:25;120:14;
123:19;125:8;132:9
**backdooring (1)**
101:9
**bad (1)**
107:19
**bag (2)**
55:5,6
**balance (1)**
41:16
**balanced (3)**
19:22,23;30:18
**Bank (7)**
5:20;6:12;7:12,21;
9:11;54:4;57:5
**bankruptcy (2)**
66:15;84:11
**banks (1)**
54:5
**base (1)**
25:5
**baseball (1)**
87:17
**based (7)**

20:18;29:2,17;
80:13,19;136:12;
140:13
**basically (4)**
48:16,22;62:18;
136:11
**basis (19)**
28:13,24;30:1,3;
35:23,24;38:10;
43:22;55:17;60:16;
91:17;98:16;99:9;
105:21;106:8;
109:21,25;115:22;
138:7
**Battery (1)**
9:12
**bear (3)**
87:5;94:24;121:17
**bears (1)**
126:25
**become (2)**
44:25;122:14
**becomes (1)**
112:14
**becoming (2)**
30:20;83:25
**began (3)**
93:11,14;135:1
**begin (2)**
23:11;76:13
**beginning (3)**
65:1;121:1;136:2
**behalf (14)**
11:6;12:7;36:20;
39:4;41:2;56:22;
84:5;90:21;92:2;
102:16;109:11;
115:17;125:18;
137:11
**believes (1)**
63:25
**belong (1)**
127:16
**bench (1)**
118:8
**benefit (8)**
63:25;64:2;87:8,
10;99:16;116:8;
120:23;134:8
**benefits (3)**
65:25;99:5;123:8
**Bentley (3)**
77:5;140:1,2
**Bentley's (1)**
14:13
**besides (1)**
34:7
**best (9)**
28:2;69:7;85:22;
98:5,7,9;106:21;
109:4;114:21
**bet (1)**
64:8

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 150 of 170

September 19, 2012

**better (6)**
32:23;36:18;44:25;
75:18;112:10;143:11
**beyond (2)**
42:8;90:23
**bidder (1)**
23:18
**big (2)**
13:3;123:3
**billion (48)**
13:8,18,19;20:23;
57:22,24;71:10;
80:15;81:18;84:6,21,
21;88:16,18;91:18;
93:1,8,10,12,21;
97:12,16,21;98:5,13;
99:24;100:2,11,17;
101:14,16;102:3,25;
105:2,6,8,13,22;
106:1;109:23;110:1;
111:9;112:6,13,21;
113:20;115:25;128:2
**billions (1)**
54:8
**binder (2)**
92:10,12
**bit (1)**
102:17
**block (1)**
91:4
**blood (2)**
93:16;95:16
**board (20)**
41:25;59:4;71:7;
85:6,6,8,8,9,11;94:7;
95:5;96:21;121:5;
123:21,23;124:5,14,
19;131:10;142:15
**BOELTER (1)**
9:24
**bond (1)**
87:17
**bondholders (3)**
54:7;84:24;87:23
**bonds (1)**
80:8
**Borders (1)**
144:20
**Borders' (1)**
144:21
**both (5)**
46:11;55:2;86:22,
24;145:5
**bothering (1)**
29:21
**bottom (3)**
50:18;107:16,18
**box (4)**
65:2;93:6;94:23;
98:11
**boxes (5)**
92:6;93:10;94:20;
100:11;123:7

**Brad (2)**
78:23,23
**brain (2)**
16:6;31:5
**brief (3)**
54:18,20;60:14
**briefly (2)**
76:20;133:2
**bring (3)**
117:24;128:7,21
**brings (1)**
50:17
**broadly (1)**
54:3
**brought (1)**
122:24
**BRUNS (1)**
6:2
**BRYAN (1)**
7:16
**bunch (1)**
100:11
**burden (2)**
45:1;103:25
**burdensome (1)**
90:1
**business (20)**
17:10,24;18:1;
28:3,5,23;29:3,8,9,
17,17;47:10;72:13;
97:2;107:10,11;
121:6,9,18,22
**businesspeople (7)**
17:13;59:1;70:6,9;
89:4,13;90:6
**businessperson (2)**
74:4,4
**buyers (1)**
64:25

**C**

**CA (1)**
7:6
**CADWALADER (3)**
4:2,10;125:18
**calculations (1)**
24:3
**calendar (5)**
62:10;128:23;
144:20,20,22
**California (1)**
79:1
**call (8)**
62:24,24;73:3;
77:23;104:11;
118:14;135:19;144:8
**called (6)**
11:23;48:13;73:1;
87:18;120:1;136:10
**calls (1)**
87:21
**came (8)**

21:20;38:23;57:5;
78:13;79:14;97:15;
98:11;142:10
**can (70)**
13:21;17:11;19:1,
10;25:11;30:24,25;
31:1,14,17;32:3;
36:21;37:14;40:11;
42:8,19;43:20;47:24;
48:16;50:8;51:8;
56:21;57:12,15;60:8;
62:11;63:8,25;64:2;
65:24;69:18;76:13;
78:14;80:13;89:17;
92:19,22;95:22;
96:14,21;98:3;102:3,
4,4;106:5,18;113:19;
114:16;115:6,22;
116:13,14;117:22,25;
118:1,5,9;119:10,19,
22;120:14;131:15;
132:13;133:1;
134:15;139:3;
140:18,20;141:6;
144:17
**C-A-N (1)**
18:12
**Cancelliere (9)**
18:6,23;27:5,8;
39:2;70:13,24;
137:14;143:22
**Cancelliere's (2)**
19:5;71:1
**candidly (1)**
111:18
**cannibalize (1)**
23:20
**cap (9)**
23:22;24:1,17,21;
25:7,15;112:10;
142:2,5
**capacity (4)**
17:10,24;18:2,19
**Capital (10)**
11:3;21:9,15;
40:18;84:6;92:6;
100:12;102:21;
119:3;135:11
**capped (7)**
109:22;112:5,13;
113:20;115:24;
116:11;129:6
**capping (1)**
61:14
**caps (1)**
64:24
**cards (1)**
63:14
**care (4)**
63:14;65:13,14;
98:11
**carefully (1)**
115:8

**CARTER (1)**
4:18
**carve-out (2)**
119:6,7
**CASE (42)**
10:2;12:4;16:3,14;
21:12,22;23:2;51:8,
20;52:9,13;58:2;
62:15,20;65:1;67:16;
68:1,6;71:2,3,5,11;
72:3;73:2,12;79:11;
80:18;84:17,19;
85:23;92:2,5;95:13;
97:17;101:10;102:1,
6;112:19;131:7;
136:3;137:16;141:5
**cases (13)**
16:6,8;48:5;50:7,
12;55:11;57:8;59:22;
60:5,21;93:9;102:24;
123:9
**cash (1)**
21:8
**cast (1)**
31:12
**casting (1)**
34:16
**cat (2)**
55:5,6
**category (2)**
48:13;50:3
**cause (1)**
144:15
**caused (2)**
135:7,8
**CCed (2)**
46:18,19
**cells (1)**
31:5
**Center (1)**
4:4
**Centerview (3)**
41:8;70:14;137:16
**cents (1)**
84:23
**CEO (1)**
71:6
**certain (3)**
21:10,25;58:10
**certainly (5)**
34:6;56:2;62:21;
78:7;96:20
**certificate (1)**
80:12
**cetera (1)**
49:3
**CFO (1)**
71:7
**CHADBOURNE (1)**
5:2
**challenge (1)**
105:7
**chambers (3)**

73:1,3;142:17
**chance (3)**
22:15;60:14;84:10
**change (30)**
16:4;43:2;67:14;
74:11;83:9;84:10;
85:9,11,20,21;87:7,
14;88:8,8;90:24;
91:15;97:2,4;102:18;
109:20;111:7,23;
119:21,22;120:24;
131:17,19;141:24;
144:23,25
**changed (20)**
84:11,13;85:1,2,17,
18,19;88:11,14,15;
89:1;91:14,14;117:6,
6;119:7,10;136:2,7,7
**changes (3)**
20:10;22:7;129:9
**changing (1)**
144:23
**Chapter (1)**
71:5
**character (1)**
37:4
**charge (1)**
126:8
**chart (1)**
44:20
**Chase (1)**
8:11
**check (2)**
50:15;82:17
**Chicago (1)**
9:22
**chief (1)**
45:8
**chime (1)**
85:4
**choice (1)**
72:8
**Chopra (7)**
41:7;70:16,17;
75:7,8;137:15;
143:23
**C-H-O-P-R-A (1)**
41:8
**chose (1)**
103:11
**Chris (1)**
92:1
**CHRISTOPHER (1)**
10:7
**C-I-L-L-I (1)**
18:14
**Circuit (5)**
16:15;17:18;57:9;
85:23;121:21
**Circuit's (1)**
15:21
**circulated (2)**
12:2;141:24

**circumstance (6)**
55:8;65:20;66:5,6,
18,22
**circumstances (2)**
31:6;125:22
**cited (2)**
57:8;60:6
**CK (1)**
9:24
**claim (96)**
13:9,20;20:16,18,
20,21;21:1,3;23:19,
19,22;25:7;42:5;
64:24;80:1,3,13,14,
16,19;81:18;82:6;
84:21;85:24,24;86:1,
1;88:16,18,22,23,24,
25;89:1;91:17;93:10,
20;94:22;95:10;
97:13,16;98:5,13,15;
99:19,23,24;100:6,6,
16,21,22;101:13,21;
102:23,25;103:6,9,
25;104:7,8,9,10,12,
13,17,20,22;105:2,6,
25;106:9,12,19;
107:8,24;108:1;
109:23,25;111:8;
112:4,12,14,16;
113:20;115:19,22,24;
116:11;119:3,7;
122:9;131:6;135:5,
16;142:1
**claimant (1)**
20:17
**claiming (1)**
22:5
**claims (29)**
21:14;24:11,11;
49:2;51:8;58:10;
61:14;64:22;65:2,22,
23;66:6,8,18;90:21;
95:2,7;97:21;109:15,
16,19;115:21;
127:16;128:4,6,7,9;
129:6;131:5
**clarification (6)**
102:17;103:12,14;
118:22;136:14;
139:12
**clarified (1)**
126:7
**clarify (5)**
103:5,11;109:1;
114:18;141:14
**clarifying (1)**
107:7
**Clark (10)**
36:15,19,19;37:3,9,
13,19,21,22;137:12
**clear (34)**
16:1;20:12;21:22;
51:22;52:25;53:16;

54:10;55:20;58:1;
61:20;62:11,23;
64:22;65:10;71:18;
73:2,4;79:15;97:8,
22;100:20;106:18;
107:7;108:6,7;
110:20;113:20;
119:18;127:19;
128:22;129:11;
131:18;141:17;
144:13
**cleared (1)**
97:19
**clearly (3)**
33:19;103:5;
143:24
**CLEARY (1)**
5:9
**Cleary's (1)**
21:6
**CLERK (1)**
92:14
**client (4)**
19:1;32:18;40:12;
50:5
**clients (21)**
51:18;52:17;53:25;
54:23;58:7,10;65:11,
22,22,23;66:17;78:9;
84:12,13;89:2;
103:23;109:5,6,9;
126:11,11
**clock (1)**
85:5
**close (1)**
125:25
**closed (1)**
144:18
**co-chair (1)**
48:4
**collateral (3)**
13:12;100:23;
109:8
**colleague (1)**
46:2
**colleagues (7)**
12:9;14:18;38:3;
77:19;96:6,13;
114:18
**collecting (1)**
27:6
**collectively (1)**
135:12
**collision (2)**
66:15,16
**colluded (1)**
138:1
**colluding (1)**
138:3
**collusion (16)**
13:23;26:13;41:23;
44:10,11;55:11;58:6,
11;85:12;91:6;117:7;

120:16,17;137:25;
138:2,20
**collusive (1)**
42:9
**comfort (1)**
23:17
**comfortable (1)**
106:20
**coming (11)**
19:15,19;26:24;
32:5;49:7;60:3;
71:16;75:13,17;
98:12;100:1
**commence (1)**
11:17
**comments (4)**
23:3;67:5;69:25;
72:10
**commitment (1)**
129:16
**committed (1)**
52:19
**Committee (39)**
6:3;9:3;11:12;
14:11;19:7;24:2;
30:16;45:20;46:24;
47:1,13,17;48:4,7,11;
49:9,23;50:19,23;
51:16;53:7,10;54:11,
15;55:25;59:15;
61:16,20,63:23,24;
66:12;67:7,8;79:13;
104:15;106:22;
115:17;133:11,19
**committee's (5)**
22:3;24:3;46:20;
51:19;108:17
**common (1)**
34:17
**communication (3)**
73:12;125:1,11
**communications (19)**
26:25;27:2,8;
28:11,12;29:25,25;
51:13;53:9,16,19,20;
54:25;55:21;57:5;
62:6;95:6;124:1,23
**companies (1)**
109:18
**Company (7)**
7:3;13:23;80:7;
109:7;115:19,21;
122:9
**compare (1)**
97:1
**compelling (1)**
55:2
**compensate (1)**
65:15
**complain (1)**
88:12
**complaint (3)**
99:23,24;100:1

**complete (18)**
31:20;32:15;33:10,
11;34:2;35:11;45:11;
61:1;63:8;73:15,16;
77:20;78:1;79:17;
126:15;127:5,7;
143:5
**completed (12)**
15:17;23:15;29:23;
30:3;35:19;46:8;
55:23;76:5;138:22;
139:2;141:9,10
**completely (2)**
60:3;113:18
**completion (3)**
16:20;34:13;79:16
**compliance (1)**
43:16
**complicated (3)**
76:11;140:21;
142:24
**comply (1)**
11:20
**compromise (1)**
127:15
**compromised (1)**
66:20
**conceded (1)**
70:4
**conceptually (1)**
30:16
**concern (5)**
52:11;80:4;100:19;
101:20;136:13
**concerned (6)**
29:15;80:3;90:19;
91:1;101:8;103:3
**concerning (2)**
53:6;138:16
**concerns (4)**
48:15;97:23;
115:10;123:4
**concession (3)**
23:24;61:13;65:24
**concessions (1)**
51:4
**C-O-N-C-I-L-L-I-E-R-E (1)**
18:8
**conclude (3)**
13:19;68:24;69:18
**concluded (5)**
69:6,11,13,16;
146:8
**conclusion (4)**
57:22;69:10;
133:12;141:5
**conclusions (1)**
28:24
**concrete (2)**
64:3;66:8
**concur (1)**
72:6
**concurred (1)**

65:23
**concurrently (1)**
21:10
**condition (1)**
140:3
**conditions (2)**
21:23;49:20
**conduct (1)**
54:8
**confer (9)**
19:1;31:21;32:18;
40:12;48:8;114:4;
140:12;144:7;145:14
**conference (3)**
142:19;144:3;
145:23
**confidence (1)**
74:19
**confidential (2)**
48:11;49:23
**confidentiality (1)**
54:9
**confined (1)**
101:6
**confirm (1)**
11:8
**confirmation (2)**
47:18,19
**conflicts (1)**
98:2
**Congress (1)**
6:13
**conjunction (1)**
67:24
**connection (5)**
12:5,10;74:7;
76:16;128:8
**consent (1)**
23:25
**consequence (1)**
58:14
**consequences (1)**
65:18
**consider (10)**
13:17;15:22;44:15;
56:9;68:14;104:4;
114:21;127:15;
132:13,15
**considerable (3)**
14:14;130:21;
131:3
**consideration (7)**
51:5;66:8;67:11;
104:10;111:8;126:8;
133:14
**considerations (1)**
138:15
**considered (1)**
67:20
**consist (1)**
12:7
**consistent (3)**
86:11;118:24;

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Pg 152 of 170

September 19, 2012

119:23
**consolidation (1)**
80:14
**constituencies' (1)**
66:7
**constituency (2)**
14:22,25
**constituents (1)**
15:4
**construction (1)**
94:1
**constructive (2)**
134:21,22
**construed (1)**
136:11
**consult (2)**
39:1;78:3
**consulted (1)**
123:23
**Consulting (2)**
41:5;137:15
**contact (2)**
109:17;142:17
**contacts (1)**
39:21
**contained (2)**
21:15;26:6
**contemplated (1)**
67:23
**contemporaneous (1)**
49:10
**contend (2)**
24:11;30:5
**contending (1)**
81:17
**contends (1)**
138:19
**contestants (1)**
145:13
**context (6)**
57:7;59:14;61:25;
79:11;93:3;98:22
**contextually (1)**
13:6
**continue (1)**
98:4
**continued (2)**
51:19;132:5
**continues (1)**
48:24
**continuing (1)**
26:19;94:1
**contract (1)**
109:17
**contribution (1)**
21:8
**conversation (3)**
63:23;119:25;
120:4
**conversations (2)**
54:14;62:4
**converted (4)**
36:25;37:1,3,11

**cooperate (1)**
50:20
**cooperating (1)**
144:12
**coordinate (1)**
145:21
**copied (1)**
46:21
**copy (6)**
81:5,7;90:15;
92:13;117:22;118:7
**cordon (2)**
99:6,14
**Cornell (2)**
78:23,23
**corrected (1)**
15:5
**correctly (1)**
100:14;139:23
**correspondence (1)**
56:7
**corroborate (1)**
42:9
**cost (1)**
122:9
**coterminous (1)**
31:2
**counsel (36)**
14:15;22:4;23:3;
26:7;27:9,15;28:9,13,
17,20;29:1,13;39:19;
40:15,18;45:8;56:24;
58:15;59:5,8;62:18;
68:18;71:24;72:1,8;
73:20;74:10;83:4,23;
102:20;120:16;
143:13,14,21,22,25
**couple (5)**
12:8;74:25;79:3;
131:9;137:1
**course (3)**
36:14;53:23;95:19
**COURT (491)**
11:2,8,10,13,18;
12:13,14,22,25;13:7;
14:8,10,25;15:16;
16:13;17:14,20,23;
18:5,7,10,13,15,17,
19,23;19:3,5,11,15,
19,23;20:3,6,8,10,15,
17;21:5;22:7,10,12,
20,22,23;23:6,15,22;
24:17,20,25;25:5,10,
11,13,19,21,25;26:9,
11,15;27:4,14,18,22,
24;28:16,18,25;29:4,
10,12,21;30:9,11;
31:16,19,22,25;32:3,
8,12,17,20;33:13,15,
21,25;34:12,21,23;
35:7,10,14,20,25;
36:3,16,24;37:7,10,
18,21,25;38:2,9,11,

14,17;39:2,8,10,14,
17,20,23;40:2,4,6,8,
13,16,19,23,25;41:6,
9,12,15,17;42:10,14;
43:3,6,11,17;44:7,14,
15;46:7,12;47:3,6,11,
22;48:2,23;49:13,17,
19;50:2,12,16,21,23;
51:2,7,11,22,24;52:2,
6,11,17,22;53:11,20;
54:13,19;55:5;56:5,
14,19,21;57:1,6,7,8,
13;58:20,23;59:3,7,
11,17,20,22;60:5,10,
13,16,23;61:8,22;
62:12,15,17,21;63:2,
12,18,20;64:5,9,17;
65:16;66:23,25;67:2,
12;68:23;69:4,16,21;
70:10,17,21;71:17;
72:9,20;73:1,9;74:9,
18;75:5,8,13,20,23;
76:4,20;77:4,7,13,15,
18;78:2,5,10,15,19,
22,25;79:2,5;80:6,20,
23;81:1,5,8,15,19,23;
82:4,7,15,18;83:2,4,
7,10,12,20,23;84:15;
85:3,13;87:2,10,13,
25;88:10,11;89:8,12,
15,20;90:9,14;91:9,
23,25;92:9,16,21,23;
93:2,25;94:9,13,15,
24;95:22,25;96:4,6,
10,13,22;97:5,9,16;
98:12,19,23,25;99:8,
17;100:4,13,19,25;
101:3,18,24;102:9,
12;103:19,21;104:1,
22,25;105:7,11,16,
18,20;106:5,7,13,15,
17,24;107:2,4,6,13,
16,20,22;108:4,11,
13,21,23;109:22;
110:8,11,15,17,19,
24;111:3,5,13,16;
112:5,9,24;113:1,4,8,
10,14,19,23;114:4,7,
8,10,13,20;115:3,6,9,
12,14,16;116:1,3,10,
12,14,19,23;
117:8,17,22,25;
118:2,5,9,13,16,18,
20;119:10,14,16,18;
120:8,13;121:25;
122:4,17,25;123:11,
13,15,17;124:16,18,
22;125:15,17,21,25;
126:3,5,13,18,21,23,
25;127:3,5,9,14,19,
24;128:15,18,23;
129:1,20,22;130:1,6;
131:21,25;132:3,11,

14,17;39:2,8,10,14,
16,20,21,25;133:17,
20;134:10,15,18,22;
135:3,22;136:2,6,21,
24;137:18,20;138:21,
25;139:6,8,14,20;
140:1,6,8,10,17,19;
141:4,8,16,21,23;
142:3,5,7,9,12;143:6,
10;144:1,3;145:6,17;
146:4
**courtroom (2)**
51:16;120:1
**courtroom's (1)**
130:4
**Court's (7)**
12:5;15:22;67:9;
115:10;133:14;
143:16;144:18
**covering (1)**
137:23
**create (1)**
91:3
**created (1)**
83:14
**creditor (3)**
85:24,25;86:2
**creditors (18)**
15:1,2,8,10,11;
63:21;66:1;80:2,4;
81:17;82:2;86:2,3,3;
87:18;90:19;120:23;
136:1
**creditors' (18)**
11:12;22:4;24:1,3;
48:4;51:15,19;53:7;
54:11,14;55:25;
61:15,20;63:23,24;
66:12;93:6;106:22
**creditor's (1)**
104:15
**critical (3)**
22:19;23:24;24:16
**criticism (3)**
94:19,19,21
**crossed (1)**
130:12
**cross-examination (1)**
145:17
**crossing (1)**
33:25
**crucial (1)**
72:15
**cryptic (1)**
87:15
**CURCHACK (1)**
8:7
**cure (9)**
23:19,19,22;25:7;
61:14;64:24;65:22,
23;66:18
**cured (2)**
36:7;65:24
**current (1)**

16,20,21,25;133:17,
20;134:10,15,18,22;
135:3,22;136:2,6,21,
24;137:18,20;138:21,
25;139:6,8,14,20;
140:1,6,8,10,17,19;
141:4,8,16,21,23;
142:3,5,7,9,12;143:6,
10;144:1,3;145:6,17;
146:4

15:24
**currently (1)**
64:23
**custodian (2)**
89:16,23
**custodians (8)**
46:14,15,19;89:7,8,
10,14,18
**customary (1)**
59:16
**cut (1)**
69:23;82:7;98:15
**cutoff (9)**
15:25;29:22;36:12;
60:23,25;61:3;69:12;
72:21;140:23

**D**

**damage (1)**
126:12
**damages (1)**
100:2
**Dan (2)**
36:19;37:22
**DANIEL (2)**
7:17;45:3
**Daschel (1)**
70:13
**D-A-S-H-E-L-L (1)**
40:2
**data (3)**
37:13;57:19,20;
135:21;136:5,6,8
**database (3)**
130:20,21;131:9
**date (51)**
15:25;30:23,25;
31:1,7,7,18;32:14;
33:1;34:12;35:14;
41:20;43:7,15;44:17;
45:16;46:1,3,3,7;
50:18;55:18;63:13,
13;70:9,20,25;71:2,6;
73:18;88:9,10;93:21;
95:16;124:11;
130:17,19;133:14,15,
17,18,22;135:1;
140:8,15,22,25;
144:13,15,21,22
**dates (17)**
32:21,23;35:15;
43:16;47:21;49:13;
86:12,18,19,20;
139:8;140:11,13,19;
142:20;144:8;146:1
**David (3)**
40:5;127:1,2
**DAY (16)**
7:2;21:22;48:23;
49:20;51:15;53:2;
56:18;116:7;130:4;
134:1;135:21;138:6,

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 153 of 170

September 19, 2012

6,12;142:19;144:5
**days (12)**
11:14;35:4;76:7;
77:11;85:7;133:10;
143:11;144:10,11,16,
17;145:5
**DC (2)**
4:13;7:14
**de (1)**
26:23
**dead (1)**
35:18
**deadline (8)**
35:18;79:8,12;
133:10,13;134:1,2,7
**deadlines (3)**
60:20;78:13;131:1
**deal (39)**
21:12;44:24;67:4;
68:6,14;78:12;79:19;
84:11;85:3,5,7,17,18,
19;86:8,9,9,11;87:22;
88:12,15;90:25;
91:22;92:7,25;94:2;
111:21;117:15,15,16;
118:22,24;119:8,21;
120:5;121:9;122:8;
123:21;129:13
**dealing (12)**
34:21;52:24;78:14;
96:24;112:11;131:4;
133:22;138:5,13,13,
14,18
**deals (5)**
28:24;79:20;81:20;
84:10;93:9
**deal's (1)**
119:10
**dealt (3)**
16:15;67:17;
131:11
**Dearborn (1)**
9:21
**death (1)**
32:22
**debtor (43)**
12:8;35:11;55:17;
59:3;61:1;67:23;
70:4,23;71:12,14,15;
72:24,24;73:20,25;
74:21,24;77:8;78:1;
85:25;86:21;87:9,11,
12,21;90:24;91:1;
92:6;97:13,16,23;
98:8,11,17;99:8,9,14,
15;103:4,5;104:10;
112:12,14
**debtors (72)**
11:6,11,19;12:7,
22;15:3;16:18;17:1,
6,24;21:9,11;28:16;
30:19;31:20;33:8,9;
36:20;39:4,5,18,24;

41:3;53:18;55:3;
57:20;58:11,21;
70:12;71:20;72:12,
13,16;89:21;90:5;
93:11,18;94:7;95:1,
14;96:15;97:20;98:3;
102:5,25;103:4,8,9,
11,14,24;104:4,12,
16;106:1,22;107:10,
23;110:23;122:8;
124:11;126:14;
129:16;130:18;
131:3;135:13,23,24;
137:11,14;140:4;
141:8
**debtors' (15)**
14:15;22:2;27:14;
28:2;34:13;49:1;
57:22;59:3;68:17;
69:7;98:17;111:1;
119:3;120:16;123:4
**debts (1)**
98:17
**DECHERT (1)**
5:19
**decide (11)**
11:18;43:18,19;
44:8;101:13,19;
105:21,23;106:5;
113:25;142:12
**decided (6)**
19:19;24:13;42:13;
99:1;101:7;128:14
**deciding (4)**
15:23;28:10;60:16;
99:21
**decision (20)**
15:21;28:9;29:2,
17,17;42:12;59:4;
66:11;72:12,15;
95:20,25;96:1,15;
99:3;110:25;111:1;
127:12,13;142:13
**decisions (1)**
28:7
**declarants (1)**
145:17
**declaration (1)**
138:24
**default (1)**
54:5
**defense (1)**
44:12
**defer (5)**
14:16;56:7;68:12;
72:25;124:12
**deferential (1)**
121:15
**deferred (5)**
95:14;98:20,23,24;
99:1
**deficient (1)**
130:22

**defined (4)**
102:22;119:4;
135:13,14
**definition (1)**
79:17
**delay (1)**
67:10
**delayed (1)**
68:22
**delays (1)**
130:18
**deliberations (1)**
66:12
**DENMAN (1)**
10:8
**depending (1)**
76:18
**depends (2)**
76:14;144:11
**depose (12)**
14:12;17:19;57:10;
59:16;60:1;74:11,19,
25;75:4,12,14;138:15
**deposed (9)**
17:4;45:8;59:12,
12,20;71:23;73:17;
138:6;143:24
**deposing (4)**
57:3;58:15;60:7;
71:23
**deposition (3)**
74:6;95:18;139:3
**depositions (29)**
12:6,9;13:6;16:3,5,
11,14;30:11,14;
36:13;51:14;58:21;
69:21;71:19,25;72:7;
74:7;75:18;76:9,14,
14,16;137:22,22,23;
143:12,13,14,25
**depositor (1)**
95:3
**derail (1)**
67:11
**derivative (3)**
20:18,19;59:14
**derived (1)**
26:15
**describe (1)**
108:14
**described (2)**
44:10;122:20
**description (3)**
19:6;80:20;88:23
**designate (2)**
34:4;89:23
**despite (1)**
11:13
**determination (6)**
82:1;100:15;
101:12,15;107:25;
111:10
**determine (3)**

101:18;106:8;
125:9
**determined (2)**
43:8;80:12
**determines (1)**
105:7
**Devine (2)**
45:8;46:1
**differ (1)**
84:16
**difference (3)**
84:22;89:15;
114:15
**different (23)**
42:14;48:6;58:8,
21;59:7;64:11;65:12;
72:11;83:1,17,21;
86:17,22,23,25;
88:22;89:17;108:15;
121:24;123:2,9,9;
124:24
**differently (1)**
136:12
**differs (1)**
84:18
**difficulty (1)**
42:17
**diligently (1)**
68:6
**direct (8)**
25:17;99:15;
104:24;128:10;
132:12,13;135:12;
145:15
**directed (2)**
66:13;128:13
**directives (1)**
39:22
**directly (3)**
22:25;32:1;121:17
**directors (6)**
27:14;28:7,13,19;
29:8,9
**directors' (1)**
28:24
**disagree (3)**
44:8;71:17;105:20
**disagreement (3)**
122:15;143:1,6
**disarm (1)**
66:17
**disclosed (4)**
21:13;54:25;78:16,
18
**Disclosure (2)**
143:3,11
**discover (2)**
58:15;86:16
**discoverable (2)**
53:22;55:12
**discovery (102)**
12:4;13:17;14:16,
18;15:16,17,24,25;

17:7;18:2;19:8;
22:13;26:16;28:21;
29:22;30:3,24;31:1,2,
7;32:14;36:12;43:12;
44:22,25;46:13;
47:14,25;48:25;49:3;
50:19;52:7;60:24,25;
61:3;62:1;63:5;
68:10,12,16,19,22,
24;69:5,11,12,14,18;
72:2,14,21;73:2,8,14,
15;76:10,17;79:14,
18;81:9,10;82:8,11;
88:24;89:1,11;91:10,
12,16;107:22;108:2;
110:12;113:1,2;
117:3,10;121:2;
123:18,20,20;124:10,
13;125:14;128:19;
129:1;130:16;133:5,
10,13;134:1;139:14;
140:23,23;141:6,8,
13,15,21;142:16,23,
24;144:14
**discuss (3)**
78:8;83;145:23
**discussed (8)**
21:11;38:6;41:21;
68:3,20;77:19;
133:24;134:13
**discussion (5)**
76:22;103:11,13;
119:25;133:4
**discussions (5)**
14:15;26:20;66:14;
69:23;72:24
**dispersions (1)**
31:12
**dispute (4)**
66:7;73:3;100:2;
144:2
**disputes (2)**
11:18;72:19
**distinction (1)**
58:1
**distressed (1)**
72:4
**distribution (2)**
102:7;123:8
**disturbing (1)**
119:9
**diversions (1)**
52:24
**docket (1)**
118:3
**document (21)**
29:23;33:5;34:1,6,
13;38:23;46:8;85:18;
87:25;88:2;89:5;
90:15;94:6;117:18;
127:6,7;135:19,22;
136:5,6,17
**documentation (3)**

26:24;32:6;42:7
**documents (45)**
11:8;26:18;35:2,9;
36:5,24;37:5,7,17;
45:22;46:17;55:14,
18;57:17;62:5;63:8;
69:25;70:7;71:13;
73:23;74:12,15;
75:17,20,21,23;76:3,
8,12,13;77:11;86:16,
17,19,23,24;87:2,5;
89:16,16,21;95:17;
124:3;133:4,6
**DOLAN (1)**
5:16
**dollar (13)**
13:8,19;81:18;
84:23;88:18;93:8,10,
12;97:13,16;98:13;
102:3;105:6
**dollars (31)**
13:18;24:6;54:8;
57:22,24;64:24;
71:10;80:15;84:6,21;
87:20;88:16;91:18;
93:21;97:21;99:25;
100:2,11,17;101:14,
16;102:7;103:1;
105:13;112:13;
113:20;115:25;
120:2;122:12,13;
128:2
**dominates (1)**
41:24
**done (24)**
12:17,18;23:1;
31:10;38:23;44:20,
22;45:16;47:3,8;
55:20;63:6;67:24;
78:6;109:13;121:3,9;
123:5;124:19,21;
129:4,4;130:5;
144:16
**DONOVAN (17)**
7:17;45:3,4;46:10,
13;47:5,7,12,23;48:3;
49:6,15,18,22;50:3,
14,17
**double (1)**
41:23
**double-check (1)**
33:12
**double-checking (1)**
96:19
**doubt (1)**
85:4
**dovetail (1)**
13:5
**down (7)**
17:15;20:24;44:21;
98:15;104:1;108:23;
115:7
**download (1)**

77:24
**downloaded (2)**
36:21;37:14
**dozen (1)**
89:7
**draft (1)**
80:22
**drafts (1)**
57:18
**dramatically (1)**
16:4
**drawing (1)**
121:10
**drawn (1)**
42:19
**dropped (1)**
52:4
**due (1)**
43:18
**duplication (3)**
21:2;42:20;145:15
**duplicative (1)**
49:7
**during (2)**
38:12,15
**dynamic (1)**
83:9

**E**

**Earlier (5)**
62:15;88:4,13,14;
119:18
**early (4)**
11:15;19:16;43:13;
72:24
**easier (1)**
31:5
**easy (1)**
130:10
**ECF (2)**
118:2,3
**echoed (1)**
67:12
**Eckstein (64)**
66:25;67:1,3,14;
69:1,9,17,22;70:16,
19,22;72:6,17,23;
73:7,10;74:9,14,21;
75:7,9,15,22;76:1,7;
77:3,5,10,14,17,22;
78:3,11,17,20,23;
79:1,3,6;80:7,22,24;
81:2,4,12,16,22,24;
82:5,10,25;83:3,5,8,
11,16,21,24;132:22,
23;133:1,18,21;137:3
**Eckstein's (1)**
106:24
**eclipsed (1)**
17:18
**eclipses (1)**
31:11

**effect (3)**
99:9;100:23,24
**effectively (3)**
23:20;24:14;
130:10
**efficiently (1)**
62:2
**effort (5)**
14:12;51:5,19;
130:25;145:15
**efforts (2)**
42:20;48:25
**ego (53)**
12:4;20:19;21:14;
22:14;35:8;80:14;
81:9,13;82:1,8,10;
85:23;86:1,4,5,7;
88:19,20;95:7,8;
98:16;99:19;100:15;
101:12,15,21;104:17,
20,24;105:4,7,14,17;
107:9,22;108:1,2;
109:21;110:12;
111:10,11;112:11,18,
19;113:4,21,24;
116:6;117:3;141:15,
16,18,22
**E-H-P (1)**
39:16
**eight (2)**
76:16;84:21
**either (20)**
12:17;20:25;22:5;
24:14;27:1,9;37:10,
14;38:9,11,14;43:16;
49:10;84:23;90:22;
112:24;118:19;
124:4;129:8;136:18
**election (35)**
12:3;20:8;22:14;
79:21;81:10;82:8,21;
83:8,13,18;85:10;
91:13;93:15,17;94:7,
8,9;95:6,20;96:1,16;
97:3;103:5,13,17,24;
113:24;123:22,22;
125:3,10;133:3;
136:16;141:22;
142:10
**electronic (1)**
46:9
**element (1)**
24:16
**Eleven (1)**
8:19
**eliminated (1)**
87:8
**ELLENBERG (26)**
4:15;125:17,17,24;
126:1,4,6,13,16,19,
22,24;127:2,4,7,11,
18,20,25;128:16,20,
25;129:2,21,23,24

**ELLIS (9)**
7:11,20;38:4,6,22;
45:4;46:2;90:3;
144:22
**else (19)**
39:8,23;40:19;
41:9,12;51:14;54:2,
11;62:25;88:21;
91:25;102:2;123:3;
124:20;125:15;
129:20;130:1;
132:21;146:4
**else's (1)**
65:13
**elsewhere (1)**
55:9
**e-mail (13)**
32:14,14;33:4,7,9;
34:8;45:11;46:7;
54:21;89:10,24;90:8;
91:19
**e-mails (24)**
12:16,20;26:20;
27:4;30:4,5;31:20;
34:7;36:21;37:9;
44:24,24;46:9,17;
49:11;57:17;70:9,19;
71:1;90:2,11;91:20;
131:8,12
**embarked (1)**
14:12
**embodied (1)**
129:10
**employed (2)**
39:5,23
**employees (3)**
58:21;70:12;71:20
**empty (2)**
94:20;123:7
**encouraged (1)**
120:4
**end (12)**
21:16;31:7;53:8;
62:3;68:17;69:13,16,
17,19;94:5;124:13;
145:7
**endeavor (1)**
144:3
**endeavored (1)**
103:4
**engaged (1)**
58:10
**enormous (2)**
23:19;52:6
**enough (3)**
136:25;137:18,20
**enter (3)**
57:23;59:4;72:16
**entered (7)**
13:24;52:18;53:1,
8;62:3;129:6;135:10
**entering (2)**
72:13;110:5

**entertained (1)**
41:16
**entire (3)**
97:7;126:2,5
**entirely (2)**
55:13;97:7
**entirety (2)**
23:21;127:8
**entities (6)**
95:2,3;99:20;
112:13,14;135:6
**entitled (7)**
54:19;55:14;105:6;
123:20,25;124:3,4
**entity (3)**
65:7;80:13;102:22
**entry (1)**
68:10
**equivalent (1)**
36:8
**E-R-E (1)**
18:16
**escapes (1)**
76:24
**especially (1)**
48:21
**ESQ (24)**
4:7,15,23;5:6,14,
15,16,24;6:8,17;7:8,
16,17,25;8:7,14,22;
9:7,15,16,24,25;10:7,
8
**essence (1)**
131:5
**essentially (1)**
122:8
**establish (2)**
105:14;125:13
**established (5)**
55:11;104:18;
112:19;121:20;
144:15
**establishing (1)**
106:11
**estate (17)**
14:23;20:25;21:1;
69:8;85:24;86:1;
98:6,8;99:9;107:21;
108:9;109:5,5,9;
112:2;113:6;114:22
**estates (16)**
15:7;21:2;23:24;
24:13,15;28:2;65:25;
97:23;98:9;99:5,6,6,
14,15;109:7;135:25
**estate's (1)**
110:7
**estimated (1)**
24:1
**estimates (1)**
145:8
**estimation (1)**
102:1

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 155 of 170

September 19, 2012

**estoppel (1)**
100:23
**et (1)**
49:3
**evaluate (2)**
51:18;107:25
**even (9)**
16:23;33:17;43:18;
59:14;60:5;70:5,5,6;
86:14
**evening (2)**
11:9;145:5
**event (9)**
20:24,25;27:12;
30:21;100:15;
101:12;111:9;116:5;
124:15
**everybody (18)**
33:22;43:25;44:3;
45:1;54:2,11,24;
55:1;56:2;73:10;
89:23;93:7;101:5;
108:2;113:2;142:21;
143:20;144:12
**everybody's (3)**
22:3;44:16;98:14
**everyone (9)**
51:5;54:10;65:12;
85:3;86:18;90:7;
102:19;103:2;130:4
**everyone's (1)**
107:1
**evidence (19)**
26:13,15;28:4;
41:22;42:6;43:22;
44:10,13;53:23;
55:12;57:11,21,25;
58:6,12;105:24;
115:25;120:17,20
**evident (1)**
53:24
**exact (1)**
40:10
**exactly (6)**
53:13;59:13;73:11;
86:7;97:20;114:2
**examination (1)**
145:16
**examine (2)**
105:23;106:8
**examiner (4)**
51:20,25;137:23;
138:17
**examiner's (1)**
90:20
**example (12)**
13:18;34:7,20;
42:13;56:3;62:2;
66:9;68:9;73:22;
128:8;133:4;138:7
**Excel (1)**
37:14
**except (1)**

**27:11**
**exchange (1)**
104:8
**excited (1)**
81:23;106:24
**exclude (1)**
29:18
**excluded (1)**
66:12
**exclusively (2)**
28:16,18
**exclusivity (3)**
53:21;117:19,20
**excuse (8)**
18:11;20:5;32:16;
33:14;40:14,20;
132:1;137:7
**executed (2)**
12:1;21:10
**executing (1)**
41:21
**executive (4)**
16:18,25;17:1,23
**exempt (1)**
18:2
**exercise (4)**
28:4;29:9;72:13;
132:15
**exercising (2)**
41:24,25
**exerted (1)**
130:25
**exhibits (2)**
145:19,21
**exist (4)**
86:17;87:3,4;95:2
**existed (1)**
97:1
**existence (1)**
100:21
**exists (3)**
32:7;98:17;100:6
**expect (7)**
14:22;15:18;32:24;
75:3,12;134:6;
140:12
**expected (1)**
71:11
**expecting (3)**
44:1;93:4;95:17
**expects (1)**
54:10
**expeditiously (2)**
52:20;62:22
**expense (1)**
45:1
**expenses (1)**
126:8
**experience (1)**
71:9
**experienced (1)**
34:23
**expert (20)**

**31:2,7;40:10;52:7;**
77:8,16,19;78:15,16;
79:6,12;134:7;
138:22;139:1,4,14,
16,24;140:5,23
**experts (7)**
63:7;77:10,24,24;
130:19;141:1,6
**expert's (2)**
139:2,3
**explain (4)**
30:17;91:8;107:14,
17
**explained (1)**
135:17
**explains (1)**
137:8
**explanation (7)**
42:14,16;99:4;
118:20,22,23;119:20
**explanations (1)**
119:12
**explored (1)**
83:3
**expressed (1)**
52:12
**expressly (1)**
21:23
**extending (1)**
48:6
**extension (2)**
134:1,8
**extent (10)**
20:14,17;28:3;
32:6,9;52:3;70:24;
75:2;80:11;124:4
**extremely (2)**
78:7;79:7
**extrinsic (2)**
55:11;58:6
**eyes (2)**
48:13;50:5

**F**

**face (3)**
58:17,18;112:2
**fact (45)**
11:14;15:17,25;
26:19;30:24;31:1;
41:19;59:11;60:24,
25;61:3;67:22;69:2,
4;72:4;74:2;75:16;
76:17;79:14,17,22,
23;82:22;87:24;99:4;
100:21;103:7,12;
104:7,11,19;105:17;
106:25;107:3;114:7;
121:4,5,22,23;
131:19;132:10,12;
133:10;140:23;141:6
**facto (1)**
14:1

**factor (1)**
15:20
**factors (4)**
15:22;17:17;44:9,
14
**facts (2)**
31:13;43:10
**factual (1)**
109:25
**fail (1)**
11:19
**fair (15)**
28:1,8;43:9,24;
54:22;64:4;69:7;
101:5;102:7;108:2;
109:14,19;110:22;
121:16;136:25
**fairly (4)**
74:23;86:10;122:3;
130:10
**fairness (3)**
82:13;107:11;
121:15
**faith (7)**
51:5;61:16;63:4;
130:24;142:21,22;
145:8
**familiar (1)**
57:8
**fan (1)**
59:18;71:18
**far (3)**
35:21;91:11;
131:15
**Fargo (1)**
54:6
**fascinating (1)**
66:16
**fashion (1)**
35:17
**fear (2)**
88:18,21
**federal (1)**
57:6
**feet (2)**
64:2;139:22
**few (5)**
33:2;77:11;85:7;
90:7;130:9
**FGIC (11)**
42:24,25;47:24;
48:3,7,14,24;50:7,12;
58:17;130:4
**fiduciaries (2)**
93:24;108:7
**fiduciary (4)**
94:4;99:2;111:23;
132:15
**field (1)**
88:14
**Fifteenth (1)**
7:13
**Fifth (1)**

**45:24**
**Fiftieth (1)**
7:5
**fifty-one (3)**
93:18;97:23;98:8
**fight (1)**
49:8
**figure (2)**
14:5;98:14
**file (12)**
37:12,14,15;44:18;
76:23;79:6;98:2;
115:21;133:13,18;
134:5;140:4
**filed (21)**
11:9,11;21:21;
38:21;49:10;56:13;
71:11;78:21;81:2,3;
87:25;88:2;102:23;
117:12;118:25;
119:1;135:20;136:4;
139:17,25;140:17
**files (14)**
11:22;13:2;34:3,
20;36:25;37:1,4,16;
44:23;45:19;51:13;
71:13;76:25;77:1
**filibuster (2)**
44:2,5
**filing (6)**
20:15;68:12;
117:19,20;134:2,7
**filings (2)**
23:3;140:18
**fill (1)**
140:12
**final (2)**
81:4;139:4
**finalized (1)**
145:24
**Financial (10)**
4:4;7:3,12,21;16:9;
22:2;41:1;45:4;49:1;
58:11
**find (16)**
23:2;33:4,16;34:3;
39:10;40:11;43:21;
56:10;71:19;86:15;
117:18;118:11;
123:11;124:4;
137:24;139:12
**fine (16)**
18:1;32:10;43:23;
47:16;49:8;50:9;
73:9;100:12;104:13;
108:2;110:11,24;
111:10;116:1,2;
139:10
**finger (1)**
101:8
**fingerprints (1)**
124:5
**finish (1)**

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 156 of 170

September 19, 2012

**76:**12
**fire (2)**
  85:23;129:19
**firm (1)**
  137:13
**first (37)**
  13:15,17;14:5,16;
  15:13;19:24;43:11;
  45:7;49:23;51:7;
  53:2,9;62:7;67:4;
  70:4;71:2,22;72:1,8;
  73:16;84:19;95:20;
  96:15;114:17;119:1,
  5;120:22;125:19;
  130:10,17;132:11,14;
  135:9,10,21;137:7,8
**firsthand (1)**
  38:20
**five (2)**
  45:5;46:5
**fix (3)**
  100:14,16;101:20
**fixed (6)**
  80:15;88:16,22;
  104:20;115:18;
  140:11
**fixing (5)**
  106:14,21;111:8;
  112:18;135:5
**flatly (1)**
  42:22
**flawed (1)**
  97:7
**flier (1)**
  105:25
**floating (1)**
  73:5
**Floor (1)**
  7:5
**flow (2)**
  65:18;135:9
**Flower (1)**
  7:4
**focus (3)**
  47:15;49:13;98:4
**focused (4)**
  12:15;48:1;92:6;
  98:18
**Foerster (8)**
  11:6;12:9,17,18;
  16:11;36:20;46:4;
  138:10
**Foerster's (1)**
  38:24
**folded (1)**
  67:22
**folks (2)**
  47:10;104:11
**follow (1)**
  117:9
**followed (1)**
  11:12
**following (4)**

**35:**12;99:25;104:6;
  136:9
**follows (2)**
  41:17;92:25
**footnote (16)**
  87:15,15,24;88:3,
  6;90:15,17,18;92:4,
  12;94:17;117:17;
  118:6;119:23,24;
  136:9
**forced (1)**
  122:14
**forcing (2)**
  78:19;111:13
**form (8)**
  27:12;28:13;36:9;
  37:10,19;77:12;
  113:17;145:16
**formal (3)**
  68:12;69:18;
  106:11
**format (1)**
  36:21
**forth (4)**
  20:21;57:17;58:3;
  71:16
**forthwith (1)**
  12:10
**forty-five (2)**
  112:5,21
**forty-five-billion-dollar (1)**
  112:3
**forward (23)**
  23:9,16;25:8,14;
  26:2,3;43:6,15;
  52:20;60:19,19;
  61:10;62:22;64:19;
  65:3,6;67:8,9;129:7;
  131:24;142:23;
  143:16;144:12
**foul (2)**
  93:16;95:17
**found (1)**
  70:25
**founded (1)**
  41:19
**four (4)**
  46:15,15,19;84:21
**Fourth (1)**
  45:17
**Franklin (1)**
  4:19
**frankly (2)**
  50:5;103:13
**free (2)**
  64:22;65:10
**Friday (5)**
  36:21;47:8;85:11;
  145:6,24
**front (4)**
  28:25;90:16;92:10;
  135:4
**Frost (1)**

**6:**12
**FTI (7)**
  16:10;22:2;41:5;
  70:13;75:1,2;137:15
**full (5)**
  43:9,23;87:19;
  101:5;120:23
**full-time (2)**
  138:7,7
**fully (2)**
  21:13;32:24
**fundamental (6)**
  11:22;22:16;28:23;
  29:17;31:11;130:15
**fundamentally (2)**
  12:12;30:15
**Funding (1)**
  119:3
**further (12)**
  20:14,20;26:24;
  37:20,23;82:19;
  100:20;110:5,21;
  114:23;143:25;144:2
**future (1)**
  100:15

**G**

**game (2)**
  102:7;108:2
**gave (7)**
  46:7;47:8;95:24;
  119:20,22;133:11;
  136:13
**general (7)**
  27:9;39:19;73:20;
  102:25;135:15;
  143:22;144:24
**generally (1)**
  21:12
**generous (1)**
  121:20
**genuinely (1)**
  128:14
**GERARD (1)**
  8:14
**germane (1)**
  84:25
**gets (5)**
  35:1;43:19;60:21;
  63:2;85:1,1;101:5;
  124:24;135:18
**giant (1)**
  92:10
**GIBBS (1)**
  6:2
**gist (1)**
  90:16
**given (10)**
  22:1;31:15;35:20;
  42:6;43:12;47:21;
  55:2;74:10;87:20;
  119:15

**gives (2)**
  116:8;131:16
**giving (10)**
  48:15;49:9,23,24;
  86:1;102:23;103:6,9;
  140:13;144:9
**Glehan (2)**
  127:2,3
**GLENN (1)**
  5:24
**Global (1)**
  144:23
**GM (1)**
  119:4
**GMAC (2)**
  88:19;119:4
**G-M-A-C (1)**
  119:4
**GMAC-M (1)**
  21:1
**gnats (1)**
  11:21
**goal (2)**
  34:18;67:7
**goes (8)**
  21:16;25:14;43:6;
  52:7;100:9;107:11;
  127:17,20
**GOLDSTEIN (1)**
  8:22
**Good (19)**
  11:5;36:11,19;
  45:3;51:5;61:16;
  63:4;91:7;92:1;
  95:10;108:8;114:17;
  129:17;130:23;
  142:21,22;144:6,15;
  145:8
**GOTTLIEB (1)**
  5:9
**grant (2)**
  95:25;121:15
**granted (1)**
  104:12
**GRAY (2)**
  9:2;102:16
**great (6)**
  74:18;76:9;77:12;
  93:8;94:20;143:8
**greatest (1)**
  137:9
**Group (6)**
  4:19;10:3;15:4;
  55:24;58:8;91:2
**growing (1)**
  97:22
**Grubb (1)**
  144:22
**GSE (1)**
  57:19
**Guaranty (2)**
  7:3;8:18
**guess (6)**

**16:**20;73:15;75:14;
  96:24;125:8;144:24

**H**

**HADLEY (1)**
  8:10
**half (2)**
  89:7;128:2
**H-A-M- (1)**
  39:15
**HAMILTON (1)**
  5:9
**H-A-M-Z (1)**
  39:16
**Hamzehpour (13)**
  39:9,13;70:13;
  73:19,19,25;74:3,3,
  19;96:20;137:13;
  138:8;143:21
**Hamzehpour's (1)**
  39:17
**hand (1)**
  98:4
**handful (1)**
  34:3
**handle (1)**
  76:19
**hands (2)**
  69:3,3
**handwriting (1)**
  37:17
**hang (2)**
  39:10;93:25
**hanging (2)**
  44:18;49:15
**happen (14)**
  24:21;30:6;44:2;
  48:8;49:16;51:9;
  56:1;58:23;64:5,17;
  143:4;144:10,10,11
**happened (9)**
  16:24;33:22;46:2;
  61:18;73:4;79:23;
  139:8;143:1,7
**happening (1)**
  108:17
**happens (6)**
  31:12;60:21;63:15,
  15,18;66:9
**happy (4)**
  47:25;67:1;84:2;
  111:22
**hard (9)**
  33:1;34:12;35:18;
  61:17;62:10;64:1;
  90:12;91:8;130:17
**hardly (1)**
  14:17
**harped (1)**
  130:23
**HARRISON (1)**
  10:8

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 157 of 170

September 19, 2012

**haystack (1)**
36:11
**head (2)**
19:10;96:5
**headline (2)**
93:8;94:20
**hear (18)**
22:14;34:25;35:1,
5;42:18;44:15;45:2;
79:21;83:4,23;97:9;
102:4;105:8;108:15;
110:16,20;136:21;
141:11
**heard (35)**
45:19;51:6;56:12;
62:24;70:3;71:1,2,6,
6,7,7;74:25,25;75:1;
76:2,2;91:25;98:22;
99:13;108:3,24;
112:15;116:4;
118:23;120:15;
122:19;125:15;
130:2;131:2;132:22;
134:11;137:3,18,20;
146:5
**hearing (59)**
13:8;23:8;24:21;
25:7,14;26:1;31:18;
43:6,14;44:1,2,9,16;
49:13,25;51:6,7;52:8,
12,14;53:3,20;55:18,
25;56:6;61:10,18,19;
62:10;63:2,7;66:20;
67:9;70:3;73:4,5;
75:14;76:19;79:10;
84:9;92:11;101:5;
112:20;114:1;
121:18;130:19;
131:22;132:4,5;
140:14,16;141:19;
142:12;144:10,15,17,
19,21;145:19
**hearings (2)**
62:18;76:22
**heavily (2)**
12:15;16:19
**heels (1)**
42:2
**held (4)**
13:8;62:10;79:11;
129:12
**helpful (2)**
22:21;23:2
**helps (1)**
140:2
**hereby (2)**
127:14;135:14
**Here's (3)**
29:21;44:19;63:22
**herring (1)**
132:17
**herself (1)**
25:10

**hidden (1)**
86:8
**high (3)**
13:20,20,22
**highly (1)**
57:11
**hired (1)**
130:19
**history (1)**
142:9
**Hoc (1)**
10:3
**HOFF (1)**
4:7
**hold (7)**
62:20;63:13,13;
102:13;107:4;
125:16;129:10
**HoldCo (80)**
12:3;20:8,12,18;
22:14;79:21;80:1,2,6,
7,9,13,15,19;81:10,
17;82:1,8,20;83:8,9,
13,17,19;84:7,24;
85:10;88:25;91:13;
93:15,17;94:7,8,9,10;
95:6,7,20,25;96:16;
97:3;100:6,16;
101:13;103:5,7,12,
17,24;104:7,8,13,20,
23,23;105:2,6,22;
106:1,9,19;107:8,24;
109:23;110:1;111:9;
112:16;113:24;
123:22,22;125:3,10;
133:3;135:2,6,11;
136:16;141:22;
142:1,10
**holder (1)**
87:18
**holders (5)**
80:12;84:6;90:22;
116:8;118:15
**holding (3)**
55:10;115:19,21
**home (1)**
63:15
**honestly (1)**
13:1
**Honor (206)**
11:5,6,11;12:12;
17:12,16;18:12;19:4,
12,13,20,21;20:7,9;
21:18;22:9;23:5;
24:19;25:12,20,24;
27:7,17;28:15;30:15;
31:6,16,21;32:4,16;
33:24;35:22;36:18,
19;37:20,22;38:25;
39:7;40:14,21;41:14;
45:3,4;46:11,24;
47:13,18,23;48:3,12;
49:8;50:14,17,22;

52:1,16,25;53:14;
55:23;56:16;58:1,16;
59:10,13;60:2,15,18,
18;61:6,12,19,25;
63:17;64:15;65:19;
66:24;67:14;68:3;
69:1,10,23;70:22;
71:9;72:6,17,23;
73:7;74:14;75:15,18;
76:1,18,19;77:3,5,10,
22,23;78:20;79:1,3,
14;81:12,25;82:10,
13,25;84:2,8,19;85:2;
88:4,9,16;89:3,19,25;
92:1,3,15;96:3,5,8,
18,20;97:6,20,24;
100:8;102:3,11,15,
19;103:2;105:10;
106:4,10,21;107:10;
108:3,19,20,24;
110:16,23;111:18;
113:3;114:15;116:5,
13,18,22;117:8,16,
20;118:1,4,7,8,19;
119:9,12,17,19;
120:12;122:2;125:8,
9,19,24;126:1,9,19;
127:4,7,18,20,23;
128:20,21;129:2,24;
130:3,7;131:17,23;
132:1,6,7,18,18,23;
133:5,9,22,24;134:4,
12;137:21;138:23;
139:13;140:2,9;
141:3;142:8;146:3
**Honor's (6)**
25:3;29:16;30:13;
31:1;67:19;100:9
**hope (5)**
36:12;45:21;47:8;
116:4;144:1
**hoped (1)**
90:23
**hopefully (1)**
145:24
**hopes (1)**
144:6
**hose (1)**
129:19
**host (1)**
124:2
**hostage (3)**
62:20;129:11,12
**hours (2)**
19:16;138:12
**Houston (1)**
6:6
**huge (2)**
93:1,3
**hundred (1)**
84:23

**I**

**ice (1)**
93:11
**idea (1)**
95:10
**ideally (1)**
67:21
**identification (1)**
143:2
**identified (10)**
12:19;15:20;30:5;
39:2;70:11,18;72:5;
90:3;91:21;143:23
**identifier (1)**
145:22
**identify (5)**
42:8;56:21;57:10;
89:3;116:23
**identities (1)**
143:4
**IL (1)**
9:22
**image (1)**
37:12
**images (2)**
36:25;37:1
**imagine (2)**
75:9;76:7
**Immediately (4)**
85:16,17,19;
114:19
**impact (2)**
108:8;131:7;
133:23
**impacts (1)**
134:4
**implications (1)**
67:16
**implored (1)**
68:19
**importance (2)**
52:9,19
**important (12)**
13:3;27:20;41:16;
51:11;65:9;71:5;
79:24;84:8;116:20,
21;142:25;145:1
**Importantly (1)**
58:1
**impossible (2)**
94:1;131:1
**improve (2)**
87:22,22
**inappropriate (1)**
99:7
**Inc (2)**
7:12,21
**inchoate (1)**
66:7
**include (2)**
83:13;91:20

**includes (1)**
89:6
**including (6)**
21:14;55:25;56:4;
67:13;91:14;139:24
**incomplete (1)**
96:19
**inconsistent (1)**
119:21
**incorrect (1)**
137:5
**incredible (1)**
130:25
**Indeed (3)**
30:15;52:25;58:4
**Indenture (1)**
5:10
**indentures (2)**
128:5,9
**independent (5)**
13:12;41:25;42:1;
109:11;121:23
**indicated (2)**
30:16;143:20
**indicates (2)**
16:16;133:4
**indirect (2)**
102:21;135:12
**indirectly (1)**
42:3
**indiscernible (1)**
130:24
**individual (3)**
26:24;85:24,25
**individuals (9)**
68:11;70:20;71:15;
74:10;75:3,11;143:2,
4,14
**inference (1)**
121:10
**inferences (1)**
42:18
**inflated (1)**
42:5
**inform (1)**
13:16
**informal (1)**
62:4
**informally (1)**
68:15
**information (21)**
29:1,3,8,18;31:10,
13;32:4,5,5;41:19;
43:1;47:2;48:19,21;
49:12;57:15;60:8;
77:8,20;96:21;
137:17
**informed (5)**
24:4;26:8;29:6;
32:19;40:15
**in-house (4)**
12:8;16:9;40:10;
143:14

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 158 of 170

September 19, 2012

**initial (3)**
45:14;133:3;135:4
**initially (6)**
11:11;36:3,5;57:5;
67:23;97:5
**inject (1)**
81:13
**ink (1)**
92:18
**innocuous (1)**
86:10
**input (1)**
138:11
**inquiry (2)**
72:3,15
**inside (1)**
87:17
**insignificant (2)**
54:6,23
**instance (4)**
14:16;43:11;71:22;
72:1
**instances (1)**
65:8
**instantly (1)**
96:8
**institutional (14)**
21:24;23:25;25:17,
21;26:1,7;102:16;
110:4,21;113:18;
125:2;132:12;
136:13;138:19
**instruct (2)**
26:3;127:14
**instructed (1)**
42:25
**instructing (1)**
56:8
**instruction (1)**
127:21
**Insurance (3)**
7:3;128:4,5
**insured (1)**
128:1
**integral (1)**
21:11
**intend (2)**
47:14;138:25
**intended (4)**
54:18,21;62:8;
137:24
**intent (1)**
77:1
**intention (1)**
67:9
**interdebtor (1)**
98:1
**interest (18)**
14:23;15:8;19:8;
51:9;52:23;65:11,12;
80:16;82:5;98:5,7,9;
109:4,6,6,10,12;
111:20

**interested (1)**
46:3
**interests (12)**
15:7;28:2;55:1,2;
56:2,2;58:18;66:16,
16;69:7;110:7;
114:21
**interface (1)**
124:7
**interfacing (2)**
27:10,11
**internal (2)**
131:8,12
**interrogatories (6)**
85:10,15,17;88:7;
89:3;91:21
**interrogatory (3)**
137:6,7,8
**into (32)**
11:9;13:5,24;15:8,
14;44:14;51:8;52:8,
18;57:23;59:4;67:22;
72:13,16;95:8;
101:25;102:6;
103:15;110:5;121:2;
122:23;129:6,13,18;
131:9;135:10,25;
136:5,8;138:17;
143:6;145:5
**intrinsically (1)**
121:16
**introductory (1)**
120:15
**investor (1)**
127:25
**Investors (20)**
4:19;21:11,24;
23:25;25:17,22;26:1,
8;50:23;56:22;59:8;
102:16;110:4,21;
113:18;115:18;
128:6;132:12;
136:13;138:19
**investors' (1)**
125:2
**invisible (1)**
92:18
**involved (36)**
13:9;16:7,19;
17:11,25;18:24;
38:25;39:3,6,24;41:1,
20;48:17;56:22;
59:25;70:12;71:21;
73:22;74:22;75:3,10,
11;86:18;87:16;89:4;
91:15,21;95:19;
96:20;97:17;121:6;
137:4;143:12,15,22,
24
**involvement (1)**
71:8
**involves (1)**
28:3

**involving (1)**
123:2
**iPad (1)**
126:19
**ipso (1)**
14:1
**IRENA (1)**
8:22
**Iridium (3)**
15:20;17:18;44:8
**irrational (2)**
88:17;95:12
**irrelevant (1)**
124:12
**irrevocable (1)**
135:15
**issue (58)**
12:20;13:1,3,10;
14:16;16:16;17:15;
24:13;27:22;29:20;
34:19;36:4;48:19;
51:24;54:1,18,20,23;
55:7;56:7;57:4;
58:24;59:7;60:14;
62:17;65:21;68:20;
69:3;72:1;83:8;
84:25;86:4;93:22;
97:24;98:20;99:1,1,
18;100:7;101:7,9,21;
103:12;105:23;
107:9,23;110:12;
111:11;112:3,11,13,
17,20;116:6,20;
124:24;130:14,15
**issued (3)**
56:4;80:8;98:21
**issues (39)**
12:13;27:20;28:23;
29:23;31:14;34:21,
23;36:1;43:8,11,20;
47:19,20;48:7;56:12,
13;58:20;59:22;67:6;
68:7;72:21;73:5,11,
12,13;81:13;85:20;
97:23;99:21;101:6;
102:1;117:2;124:2;
130:21;133:2;
141:13;142:11;
144:5;146:2
**item (1)**
79:19
**items (1)**
133:7

**J**

**JACKSON (1)**
6:11
**January (1)**
65:17
**jeopardize (1)**
14:24
**JESSICA (1)**

9:24
**joint (1)**
24:18
**JONATHAN (1)**
4:7
**JONES (4)**
7:2;48:23;49:19;
130:3
**JSA (1)**
94:1
**Judge (70)**
11:17;13:4,6;14:6,
21;15:9;16:1,3,8;
17:16;18:12;19:2;
20:22;21:20;22:9,19;
23:16,23;24:16,24;
25:3;26:12,17;29:2,7,
15,20;30:8,22,25;
31:8,9;33:12,19;
34:14;35:5,23,24;
38:19;39:15;40:10;
41:11;48:19;49:7,16;
50:12;67:1;81:3;
107:14,18;108:5;
110:5;111:4;112:7;
114:3,6,18;134:21,
24;135:7;137:1;
138:3,6;139:4,11,12,
18,21;140:7;146:7
**judgment (12)**
13:16;23:8,5;29:9;
41:25;42:1;72:13;
107:11,11;121:19,22;
132:15
**judicata (1)**
100:24
**July (20)**
45:22;46:16,16;
47:7;53:2,8,8,20;
55:23;56:6,8;62:4;
68:21;70:8;72:24;
88:9;130:16;131:18;
135:1,21
**junction (1)**
12:4
**June (4)**
46:24;56:5;118:25;
119:2
**Junior (2)**
10:3;92:2

**K**

**KATHY (3)**
6:8;50:23;91:2
**keep (1)**
108:13
**keeping (1)**
100:10
**KEITH (2)**
9:7;102:15
**kept (5)**
21:25;46:1,2,3;

117:17
**key (7)**
23:23;48:25;51:3;
64:10;72:15;92:6;
129:3
**kick (1)**
55:18
**kill (2)**
24:14,15
**kind (6)**
16:2;92:3;93:7,10;
99:12;121:9
**KIRKLAND (16)**
7:11,20;38:4,6,9,
11,14,22;45:4;46:2,
15,15,19;47:5;70:8;
90:3
**KISSEL (1)**
9:10
**knew (2)**
103:7;137:4
**knowing (2)**
47:17;116:8
**knowledge (2)**
38:20;143:2
**known (3)**
22:3,4;82:24
**knows (5)**
68:8,8,9;73:11;
75:18
**KOTWICK (1)**
9:15

**L**

**language (3)**
100:4;122:22;
127:19
**languish (2)**
51:8;52:20
**large (2)**
35:1;122:9
**LARRY (1)**
9:25
**last (32)**
11:9;20:23;21:5;
33:15,21;44:16;
46:20;47:16,20;
49:11;51:24;52:11,
12;53:21;54:16;73:4;
77:11;78:13;80:24;
82:12,17;84:3,9;
85:7;88:2,5;92:11;
94:6;95:4;131:14;
140:4,18
**late (6)**
14:12;128:23;
133:9;134:6;144:5;
145:5
**later (13)**
47:8;76:6;93:21;
95:11,16;98:14;
101:10;105:8;

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.            Pg 159 of 170

September 19, 2012

107:24;125:8;140:5;
141:10,11
**launch (1)**
15:14
**law (5)**
17:16,18;57:9;
58:2;72:3
**lawyer (8)**
18:1,22;34:24;
40:9;48:17;50:9;
87:18;125:2
**lawyers (34)**
12:8,17,19;16:9,14,
17;17:4,4,9,9,13,19;
28:6;51:14;57:3,10,
14;58:23,25;59:11,
12,16,18,25;60:7;
71:19;72:2;75:2;
89:4;90:7;121:7,7;
125:4;143:12
**leading (1)**
71:13
**learned (2)**
21:7;54:20
**learning (1)**
75:10
**least (8)**
16:22;36:3,6;
46:21,25;73:18;
106:8;130:24
**leave (2)**
109:13;112:1
**leaves (1)**
95:4
**leaving (2)**
66:17;101:21
**lectern (1)**
82:19
**led (1)**
136:15
**LEDYARD (1)**
4:18
**Lee (3)**
55:10;82:18;
137:12
**left (3)**
88:11;94:10;142:1
**leftovers (1)**
50:20
**legacy (4)**
22:18;23:12;24:11;
64:13
**legal (2)**
18:19;109:25
**length (2)**
53:24;121:19
**LEONARDO (1)**
4:23
**less (7)**
43:18;66:8;86:11;
89:2,7,25;110:1
**letter (16)**
42:15,20,21,24;

54:17;56:8,10,11;
126:2,5,13,15,15,17,
25;130:11
**lettering (1)**
145:20
**letters (2)**
48:9;49:11
**level (14)**
44:11;84:7,20,22,
23,24;86:3,3,6;91:4;
109:8;122:9;123:21;
124:5
**levels (1)**
80:4
**Levitt (2)**
68:8;137:12
**Lexington (1)**
7:22
**liability (13)**
82:1,2;95:11;
98:16;99:6,14;
104:18,23,24;105:14;
109:23;112:18;
115:24
**liable (1)**
98:17
**Liberty (1)**
5:11
**lie (2)**
112:14,16
**lies (1)**
34:19
**lift (1)**
138:14
**light (8)**
22:12;36:18;79:13;
80:20;81:10;82:9;
141:16;144:13
**LIGHTNER (2)**
5:14;136:18
**limited (3)**
90:2;144:17;
145:13
**limiting (1)**
61:14
**limits (1)**
43:25
**line (5)**
13:17;50:18;
107:16,18;135:10
**lined (1)**
65:9
**linkage (5)**
120:18,21,25;
121:1;131:15
**list (6)**
74:10,12,16,16;
75:13;90:4
**listen (1)**
145:7
**listening (3)**
33:19,21;140:24
**lists (3)**

137:11,14,15
**literally (3)**
138:11,12;139:22
**litigated (1)**
103:10
**litigating (1)**
42:3
**litigation (14)**
33:3;45:9;48:18;
58:15;59:8,15,15,15;
80:18;81:19;93:5;
99:7,14;128:11
**little (4)**
24:7;60:21;100:11;
123:2
**live (2)**
32:13,23
**lives (2)**
44:3;138:8
**LLC (24)**
11:3;80:6;84:6;
93:18;94:5;95:1;
96:3;98:12;99:3,12,
16;107:19;108:9;
109:12;111:21;
113:6,17;114:22;
119:3;123:21;124:1,
7,23;135:11
**LLC's (2)**
109:5,12
**LLP (17)**
4:2,10,18;5:2,9,19;
6:2,11;7:11,20;8:2,
10,17;9:2,10,19;10:2
**load (1)**
45:19
**loaded (1)**
36:22
**loan (16)**
11:22;13:2;22:18,
18;23:12,13;34:3,20;
37:16;44:23;51:12;
64:13,14;76:23;79:6;
134:5
**LOEB (2)**
8:2,2
**log (13)**
29:24;30:5;31:14;
35:7,10,11,21;45:13,
14;55:20;61:2;125:7;
141:10
**loggerheads (1)**
15:4
**logical (3)**
74:2,5,24
**logs (1)**
30:23
**long (5)**
22:3;65:14;75:16;
121:20;127:10
**longer (4)**
31:17;69:14;80:10;
83:19

**look (35)**
15:2,6,6,7,12,16;
16:13;29:4;32:20;
33:1,5;36:7;49:6;
59:17;60:6;61:25;
71:18;75:20;82:11;
86:15;91:7;96:22;
99:8;100:13;101:4;
105:16,20,23;109:11,
16;117:9,22;121:14,
16;133:5
**looked (7)**
86:13;90:4;92:25;
95:13;118:25;126:5;
138:17
**looking (15)**
14:23,25;15:3;
24:12,25;29:16;32:6;
35:18;37:25;50:9;
85:12;117:17;
133:15,24;134:5
**looks (1)**
127:19
**Los (1)**
7:6
**loss (1)**
128:1
**losses (4)**
54:8;57:24;128:2,3
**lot (22)**
19:16,17;42:7;
63:6,8,9;67:25;
69:23;72:22;73:12;
75:23;82:25;87:20;
93:2;94:19,19;
102:13;109:13;
123:5;124:14;139:8;
142:24
**lots (2)**
44:21;128:1
**loud (2)**
110:18,20
**Louisiana (1)**
6:4
**Lovett (2)**
31:25;32:2
**lower (1)**
121:14
**luck (1)**
36:11
**lying (2)**
119:8,11

## M

**mail (1)**
82:17
**main (3)**
11:18;30:21;93:6
**major (2)**
44:25;145:13
**majority (1)**
26:6

**makes (7)**
20:12;21:22;67:4;
84:12;111:10;
113:19;135:14
**making (3)**
28:7;59:4;75:3
**manage (1)**
98:1
**management (4)**
29:7,8;30:4;98:1
**Manhattan (1)**
8:11
**many (8)**
25:21,25;55:10;
76:14;92:8;96:6;
103:16;145:11
**Marano (1)**
73:21
**Maritime (1)**
144:24
**MARK (5)**
4:15;5:14;9:15;
77:9;125:17
**market (1)**
54:3
**markets (1)**
40:18
**marks (1)**
44:21
**match (1)**
49:25
**material (13)**
48:10;50:5,6;
57:11;80:10;84:18;
85:9,21;87:8,10;
97:2;142:11,13
**materially (6)**
84:11;86:5,23;
88:11,14,15
**materials (4)**
77:25;78:13;79:14;
141:1
**MATT (1)**
5:16
**matter (6)**
79:22;84:22;93:7;
117:10;139:1;140:21
**matters (1)**
41:22
**maximum (2)**
24:2;112:12
**may (42)**
17:9;19:13;29:24;
31:21;36:3;43:20,21,
21,22;44:8,9;50:19,
22;53:2;54:22;58:24;
59:11;62:3;70:7;
71:4;72:14;74:6,11;
77:3,22;79:3;81:17,
19;88:9;92:15;
101:14,17;103:18;
108:3;118:8;121:12,
12;127:16,23;

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 160 of 170

September 19, 2012

131:10;132:23;
137:21
**maybe (11)**
28:22,22;33:21;
88:20;90:10;94:25;
121:1,1;123:1;
142:25;145:12
**MBIA (11)**
4:3,11;42:13,13;
56:3,4,11;58:17;
66:13;125:18,20
**MCCLOY (1)**
8:10
**mean (30)**
12:25;17:14;23:7;
24:13;29:7;33:2;
36:7;42:11;51:2;
59:12;71:25;82:7;
84:1;86:23,24;92:23;
97:15;101:4;105:8;
112:11;113:20;
116:19;125:21;
129:21;134:14,15,21;
140:18;142:18;
143:10
**meaning (1)**
102:24
**means (2)**
94:18;112:2
**meet (6)**
48:8;51:6,17;79:8;
140:12;144:7
**meetings (1)**
27:11
**meets (1)**
121:14
**Mellon (1)**
5:20
**meltdown (1)**
51:9
**member's (1)**
71:7
**memory (1)**
115:2
**memos (1)**
131:8
**mention (2)**
51:12,13
**mentioned (2)**
71:8;103:6
**merely (1)**
106:12
**merit (1)**
67:25
**merits (1)**
52:24
**mess (1)**
103:10
**met (2)**
54:15;60:20
**method (1)**
103:12
**MF (1)**

144:23
**middle (3)**
53:11;121:10;
134:3
**might (7)**
55:7;66:18;82:2,4;
90:20,21;101:3
**MILBANK (1)**
8:10
**MILBURN (1)**
4:18
**million (6)**
24:6;64:24;87:19;
120:2;122:12,13
**mind (3)**
49:13;100:10;
145:4
**mindful (1)**
16:15
**mine (1)**
56:3
**minimal (3)**
69:24,25;94:6
**minimis (1)**
26:23
**minimum (1)**
106:7
**Minnesota (1)**
138:8
**minute (3)**
114:11;118:21;
130:5
**minutes (5)**
94:7;95:5;124:1,
14,19
**missing (2)**
120:8,9
**misstated (1)**
97:6
**mistake (2)**
86:18;111:25
**mistaken (1)**
18:9
**mistakes (1)**
109:2
**misunderstanding (1)**
114:18
**misunderstood (1)**
139:11
**mo (1)**
24:5
**modification (1)**
80:10
**modifications (1)**
79:22
**modified (2)**
59:24;100:5
**Moelis (1)**
78:24
**MOFO (2)**
46:17;90:7
**MOLONEY (54)**
5:15;83:25;84:1,4,

18;85:14;87:7,12,14;
88:2,6;89:10,13,19,
24;90:10,16,18;
91:12,23,24;92:23;
96:23;108:15;
109:24;112:15;
114:1;116:13,14,16,
18,21,24,24;117:19,
23;118:7,11,14,17,
18,19;119:12,15,17,
19;120:8,12,14;
122:2,7,17;134:25;
136:19
**Moloney's (6)**
21:6;81:23;101:8;
103:23;109:9;136:17
**moment (7)**
19:2;30:12,17;
40:11;61:19;77:3,22
**Monday (3)**
37:5;47:9;131:8
**money (5)**
90:23;93:2,22;
111:23;122:10
**monies (1)**
135:18
**month (2)**
55:15;133:8
**monumental (1)**
131:6
**more (18)**
17:8;21:12;22:10;
24:5,7;36:13;46:23;
47:1;74:11;76:11;
79:4;86:5,11;116:11;
132:6;136:21;137:1;
145:11
**Morgan (1)**
54:6
**morning (7)**
11:5,15;19:17;
33:19;45:3;54:5;
82:14
**Morrison (9)**
11:6;12:9,16,18;
16:10;36:20;38:24;
46:4;138:10
**Mortgage (6)**
9:20;18:18;39:2;
65:13;119:4,5
**most (9)**
50:10;67:4;71:5;
73:19,25;74:4,22;
91:15;137:9
**mostly (1)**
12:7
**motion (13)**
12:5,11;51:6;
85:19;93:14,19;
118:25;119:1,22;
125:14;131:22;
135:4,17
**motions (1)**

138:14
**move (10)**
31:6,17;32:21;
60:19;62:22;65:20;
67:9;144:15,21,22
**moved (7)**
30:24;35:1;60:19;
63:3;133:22;134:3;
140:14
**moving (6)**
63:9;67:8;129:15;
134:13;144:12;
145:20
**much (7)**
37:21;50:4;101:13;
123:4,6;130:1;
132:20
**multiple (1)**
68:20
**must (2)**
115:23;124:19
**myself (4)**
12:8;23:11;47:9;
137:12
**mystery (1)**
76:10

## N

**NA (2)**
8:3;9:11
**name (10)**
19:6;39:12;71:1,2,
3,6,7;73:18;75:5;
78:16
**namely (2)**
49:1;98:4
**names (11)**
70:4,10,17;73:18;
74:10,12,25;89:6,6,7;
91:14
**narrative (1)**
145:16
**narrow (2)**
11:20;30:22
**National (1)**
6:12
**Nationstar (1)**
9:20
**native (1)**
37:14
**nature (2)**
15:19;42:9
**nauseum (1)**
99:11
**necessarily (8)**
17:20;28:25;59:23;
104:25;105:3,3;
107:25;123:10
**necessary (4)**
12:4;60:14;76:16;
77:20
**need (33)**

28:1;32:18;36:22;
48:17;49:24;76:12;
82:11;87:22;88:24;
89:1,16;109:1;114:6,
8;117:2,10;120:7;
121:2;122:24;124:9;
125:12;129:19;
133:9;135:8;136:14,
21;138:11;140:22;
145:1,2,14,19,21
**needed (6)**
65:25;69:17;74:7;
132:6;133:5;139:12
**needing (1)**
116:6
**needle (1)**
36:10
**needs (9)**
23:7;28:3;73:17;
77:8;120:6;133:15,
22;134:2;140:16
**negotiate (1)**
93:9
**negotiated (16)**
38:7;42:2;43:14;
48:14;51:10,12,15,
15;55:19;59:8;71:4;
82:22;83:14;91:16;
103:15;143:21
**negotiating (5)**
27:2;54:4;88:7,8;
125:5
**negotiation (7)**
45:22;58:3;74:1,5;
89:5;91:22;137:10
**negotiations (45)**
13:13;15:20;16:19;
17:2,8,11,25;18:24;
29:5;31:4;38:5,12,
15;39:4,6,20,25;41:2;
46:21;51:25;53:22,
24;54:9,12;55:3,12,
15,22;56:5,23;58:16;
59:25;69:5;70:6,12;
71:21,23;73:22;
74:22;75:10,11;
133:7;137:5;143:3,
15
**negotiator (1)**
70:24
**negotiators (8)**
14:13,17;16:17;
17:3,5;28:6;29:6;
57:14
**neither (1)**
22:6
**net (1)**
24:15
**New (18)**
4:5,21;5:4,12,20,
22;7:23;8:5,12,20;
9:5,13,10:5;11:14;
67:1;79:20;84:2;

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                    Pg 161 of 170

September 19, 2012

117:3
**news (2)**
14:17;114:17
**Newton (1)**
137:12
**next (6)**
29:22;35:12;36:12;
142:18;143:10;
144:10
**night (9)**
46:20;47:16,20;
49:11;80:24;82:12,
17;84:3;95:4
**nine (1)**
90:6
**nineteen (1)**
89:17
**ninety-eight (1)**
26:22
**ninety-plus (1)**
26:21
**nits (1)**
11:21
**Noah (1)**
46:2
**nobody (4)**
35:2;73:1,24;
138:18
**nobody's (1)**
51:9
**Nolan (6)**
41:4;70:14;75:1,1;
137:14;143:23
**non (1)**
71:10
**nonconsolidated (1)**
98:8
**none (6)**
29:22;43:7;89:13;
96:13;108:17;125:13
**nonetheless (1)**
92:5
**nonexclusive (1)**
15:22
**nonstarter (1)**
61:23
**notably (2)**
58:6,6
**note (3)**
84:6,8;90:22
**Noteholders (3)**
10:3;58:18;136:10
**notepad (1)**
115:1
**notes (4)**
37:25;39:11;92:2,
17
**notice (2)**
54:19;103:3
**notices (1)**
54:5
**notified (1)**
62:7

**notion (1)**
61:15
**nottrue (1)**
135:2
**notwithstanding (3)**
69:24;74:2;99:10
**November (29)**
23:9;24:21;25:8,
14;26:2;36:11;43:7;
44:17;52:14;61:10;
63:2;65:17;68:4;
130:19;131:22,25;
132:2,6,7,8;134:3;
140:14,15,16,19,22,
22;144:9,13
**number (33)**
11:3,25;12:6;
14:22;20:24;24:6,8;
57:8;76:24,25;88:22;
93:1,3,8,12;94:20;
95:12,13;102:3,4;
104:21;109:19;
118:2,3;123:3,6,6,9,
10,13;124:8;134:25;
145:13
**numbering (1)**
145:20
**numerous (1)**
101:25
**NW (2)**
4:12;7:13
**NY (12)**
4:5,21;5:4,12,22;
7:23;8:5,12,20;9:5,
13;10:5
**NYHAN (1)**
9:25

### O

**obfuscation (2)**
22:21,24
**object (3)**
88:13;115:22;
116:14
**objected (1)**
103:23
**objecting (2)**
30:2;145:11
**objection (6)**
43:22;47:13;50:18;
133:13,18;134:2
**objections (6)**
20:16;47:25;61:15;
103:16;139:24;
145:13
**objective (1)**
87:1
**objectors (3)**
43:20,23;145:20
**obligation (5)**
15:6,7;65:6;89:20;
111:23

**observation (1)**
51:3
**observations (2)**
67:19;79:4
**observed (2)**
51:7;130:24
**observing (1)**
11:14
**obtained (3)**
57:12,15;60:8
**obvious (1)**
74:23
**obviously (17)**
15:3;19:24;30:25;
35:6;36:22;37:23;
42:11;48:6,14;75:23;
78:12;82:11;100:8;
103:2;122:23;134:4;
145:14
**occasions (1)**
68:20
**occur (1)**
140:14
**occurring (1)**
80:9
**o'clock (2)**
128:23;145:6
**OCR (2)**
37:4,11
**October (33)**
23:8;33:20,24;
34:1,14,19;35:1,6,23;
45:15,16;61:1,2;
64:18;69:13;73:16;
76:3,6,8;78:6;79:12;
90:11;133:20,21;
134:2,9;139:15,17,
23,25;141:9,10,11
**off (16)**
11:7;16:4;19:9,25;
42:2;60:21;96:5;
99:6,14;112:10;
116:6;141:18,21,22,
22;144:5
**offended (1)**
14:11
**offer (3)**
44:9;135:15;139:1
**offers (1)**
127:15
**office (3)**
117:23;138:10,11
**officer (2)**
18:18;39:3
**offices (3)**
38:23,24;138:9
**official (1)**
75:19
**often (1)**
60:21
**once (4)**
16:23;28:18;55:5;
74:8

**One (70)**
4:4;5:11;8:11;9:12,
21;11:19;13:10,18;
16:18;17:8,17;18:11;
20:1;21:22,23;23:1;
26:6,8;27:10,25;
30:8;32:13;34:8;
37:5;38:2;39:15,21;
40:11,20;43:19;44:1,
4,7,14;45:9;54:4,4;
62:12,18;63:10;65:7,
8;73:18,23;75:15;
77:3,18,22;86:1;
93:18,23;94:4;95:13;
96:22;97:1,25;
101:19;112:19;
117:1;118:14;120:4;
128:2;133:8;134:25;
136:10,17,18;140:16,
17,19
**one- (1)**
126:14
**O'Neal (1)**
136:18
**one-page (1)**
126:25
**ones (3)**
25:22;27:2;77:2
**one-sided (1)**
63:22
**ongoing (1)**
13:11
**only (29)**
12:16;13:25;14:7;
23:1;26:19;43:8;
48:13;50:5;56:9;
57:10;58:5,5,17,17;
59:24;61:6;74:16;
80:3;100:5;101:21;
103:5;109:9;126:20;
127:9;130:11;131:7;
140:21;141:24;
144:16
**OpCo (2)**
80:4;109:8
**OpCos (2)**
80:1,8
**open (7)**
12:13;100:10;
107:22;109:13;
112:2;135:4;142:1
**operates (1)**
20:14
**Operating (8)**
15:21;64:23;65:1;
66:5;109:7,18;122:9;
135:6
**operative (1)**
140:3
**opportunity (8)**
43:10,24;44:12;
53:15;78:8;101:5;
109:1;110:2

**opposed (1)**
40:22
**opposing (2)**
43:9;145:11
**opposition (2)**
105:24;107:7
**optical (1)**
37:4
**optimal (1)**
79:9
**opting (1)**
127:12
**orally (1)**
29:6
**order (31)**
11:20,24;22:22;
24:18,23;25:2,3;
43:17;48:12,16;
51:11,12,14;53:8;
62:3;68:11;79:17;
87:22;100:9;106:11;
124:9;129:10;
131:16,18,21;133:11;
134:16;139:5,6;
140:3;143:25
**ordered (1)**
54:13
**ordinarily (2)**
53:22;140:25
**ordinary (1)**
53:22
**original (16)**
21:15;79:24,25;
83:22;85:3,5,7;
97:12;102:18,23;
103:6;104:6;118:22,
24;123:21;135:3
**originally (5)**
83:10,11,12;84:25;
92:7
**Ornstein (1)**
46:2
**others (7)**
14:11;34:4;46:4,
18;61:16;103:23;
104:15
**otherwise (5)**
20:19;113:21;
117:13;138:5;144:18
**ought (5)**
71:22;101:6;106:1;
142:20;146:1
**O-U-R (1)**
39:16
**ours (1)**
60:22
**ourselves (3)**
54:20;129:13,18
**out (59)**
14:5,14,23,25;15:2,
22;19:15,19;20:8;
29:3,23;33:16,25;
40:11;47:12;55:5,6;

56:10;67:3;69:12;
71:19;75:13;82:15,
15,16;83:15;85:13,
15;93:17;94:5,9,11;
96:1,16,16,20;97:3,3;
98:14;104:2;112:9;
115:18;123:11,22;
127:12;129:9;
130:13;132:10;
133:22;134:3,9;
136:1;137:24;138:6,
11;142:10,17,18;
145:25

**outcome (1)**
67:16
**outrageously (3)**
13:20,20,22
**outset (3)**
26:13;46:6;102:24
**outside (9)**
40:22,25;56:23;
61:21;71:24,25;72:7;
143:13,25
**over (5)**
55:15;65:13;
101:25;128:2;139:15
**overall (1)**
117:9
**overlooked (1)**
55:7
**overruling (1)**
20:16
**overwhelming (1)**
67:16
**overwhelmingly (1)**
65:12
**owe (1)**
93:22
**own (7)**
16:16;17:3;36:23;
55:24;70:15;130:19;
132:15
**owns (1)**
41:24

## P

**page (8)**
11:7;21:7;118:6,
10,12,13;126:15;
137:7
**pages (3)**
36:9;9;131:9
**paid (1)**
84:23
**paper (4)**
33:2;44:19;46:9;
118:7
**papers (4)**
12:14;17:3;36:6;
145:18
**paragraph (11)**
21:7,16;48:23;

98:3;119:1,5,6;
139:16,17,23;140:3
**paragraphs (1)**
127:10
**parcel (1)**
22:1
**Pardon (2)**
18:12;20:7
**parent (5)**
13:23;49:1;80:7;
102:21;105:15
**parent-company (1)**
91:4
**Park (2)**
8:4;9:12
**PARKE (1)**
5:2
**part (19)**
13:19;21:9,25;
28:13,18,19;29:13;
49:22,23,24;51:5,18;
59:5;61:22;111:7;
113:25;119:24;
129:18;142:16
**participated (2)**
17:1;70:6
**participates (1)**
66:14
**particularly (3)**
47:15;57:3;77:12
**particulars (1)**
134:12
**parties (27)**
11:10;12:2;13:14;
21:24;22:24;27:3,12;
30:19;36:4;37:6;
41:20;45:2;47:24;
50:24;57:9;63:4;
68:6,21;92:5;98:3;
109:17;111:20;
115:19;124:24;
133:12;142:23;
145:11
**parties-in- (1)**
19:7
**parties-in-interest (3)**
62:19;105:4;145:3
**Partners (5)**
41:8;68:12;136:17,
18;137:16
**parts (1)**
61:5
**party (3)**
48:25;49:2;145:20
**party-in-interest (1)**
126:10
**pass (1)**
99:20
**passing (1)**
48:9
**past (1)**
145:6
**PATRICIA (1)**

6:17
**PATRICK (80)**
6:8;7:16;25:9;
26:10;46:18;50:21,
22,23;51:3,23;52:1,5,
6,10,16,21,25;53:13;
55:6;56:15,20,25;
57:2,16;58:22;59:2,6,
10,13,19,21;60:2,9,
11,12,15,18;61:6,12,
24;62:14,16;63:1,11,
17,19,21;64:8,15,19;
65:19;66:24;67:8;
68:3,9,18;72:11;
108:19,23;111:6;
112:22;114:5,20,25;
115:1,5,7,10,13,15,
16,17;116:4,11,12;
122:20;128:7;
136:10;137:25;138:2
**Patrick's (4)**
67:5;72:10;126:11;
130:23
**Paul (1)**
85:23
**Pause (2)**
31:24;85:2
**pay (1)**
104:12
**paying (2)**
122:11;128:4
**payments (1)**
20:25
**PDF (3)**
36:21,24;37:15
**PDFs (2)**
37:2,11
**pending (4)**
50:12;54:4;57:6;
82:11
**penny (3)**
126:12;127:25;
128:3
**people (72)**
12:7,10,21,22;
14:4;16:6,8,10,10,11;
17:8;27:1,13;28:7;
30:2;31:9,9,15;32:6;
33:19;34:16;40:21;
41:11,11;42:3,7,11,
11;55:24;59:24;
60:20;71:22;72:5;
75:14;78:12;86:9;
88:13,13;89:17;90:2,
4,4,5,6;91:15,20;
92:8;95:6,9,12;100:8,
10;102:13;103:23;
109:2;115:22;
117:12;121:6;123:8,
9;124:2;130:25;
131:20;137:4,9,17,
25;138:5,6,12,15,15
**people's (1)**

108:25
**per (1)**
41:22
**perceived (1)**
92:4
**percent (2)**
26:21,22
**perfect (1)**
66:9
**performance (1)**
129:17
**perhaps (2)**
103:23;104:16
**period (5)**
11:23;14:14;56:18;
113:9;134:8
**permit (1)**
143:13
**permits (1)**
129:7
**permitted (1)**
16:2
**permutations (1)**
83:1
**person (12)**
39:5;56:21;71:4;
73:25;74:22,24,24;
87:1;96:4;99:3;
121:9;124:6
**personally (3)**
68:11,19;81:12
**persons (2)**
56:21;119:25
**perspective (4)**
58:14;79:9;93:6,14
**persuaded (1)**
142:9
**pertaining (1)**
133:7
**pervasive (1)**
67:15
**Peter (1)**
39:16
**petition (3)**
13:24;38:21;41:20
**ph (1)**
55:10
**phone (3)**
118:14;130:4;
132:21
**pick (1)**
90:14
**picked (1)**
44:17
**piece (1)**
44:19
**pieces (1)**
33:2
**pin (1)**
24:7
**place (10)**
58:17,18;64:20;
69:13;77:2;83:17;

85:16;95:5;116:22;
117:1
**places (2)**
44:21;93:13
**plaintiff (1)**
48:5
**plan (18)**
13:25;21:10,20;
25:22;45:15;51:21,
24;53:3;61:21;67:17,
18,22,24;91:5;
120:18;124:8;
135:20;138:14
**planned (2)**
117:6;119:24
**platform (4)**
22:18;23:12;36:23;
64:13
**play (3)**
65:21;85:16,20
**played (2)**
19:6;137:9
**playing (1)**
88:14
**Plaza (4)**
5:3,11;8:11;9:12
**pleading (2)**
63:24;118:20
**Please (11)**
11:2;22:11,11;
36:2;38:13;50:22;
92:16;98:13;108:3;
114:13;125:17
**plenary (1)**
112:2
**plug (1)**
61:9
**pm (4)**
114:12,12;145:25;
146:8
**podium (1)**
108:25
**point (23)**
13:4;15:9;27:7,24;
30:22;31:8;53:13,21,
21;61:24;65:21;69:9,
11;74:13;81:19;
87:21;98:12;100:13;
102:9;127:21;
128:13;130:23;
131:14
**pointed (1)**
93:17
**points (8)**
61:7;102:10;
125:19;129:22,24;
130:9;134:25;137:1
**policies (1)**
128:5
**portfolio (3)**
22:18;23:13;64:14
**portraying (1)**
103:3

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 163 of 170

September 19, 2012

**position (28)**
13:15;14:6;18:17;
22:12;24:10;30:20;
39:17;40:8;53:16;
54:16;61:17;62:11;
63:12;64:6;65:4,4;
72:11;78:4;87:23;
95:15,16;106:21,25;
107:1;108:1;111:20;
113:13;128:14
**possession (1)**
89:17
**possibilities (1)**
103:14
**possibility (4)**
29:18;104:7,8,16
**possible (4)**
13:21;65:5;67:10;
72:18
**potential (6)**
14:18;21:14;23:19;
102:1;103:13;112:3
**potentially (4)**
14:24;23:20;112:4;
114:24
**practical (1)**
66:21
**practicing (1)**
34:24
**precipitating (1)**
72:19
**precipitously (1)**
68:18
**precise (2)**
46:17;53:5
**predict (1)**
123:12
**prefer (4)**
51:20;55:25;61:20;
72:7
**preferable (1)**
67:17
**preference (1)**
31:3
**preferred (1)**
104:11
**prejudged (1)**
43:7
**prejudgment (1)**
31:11
**prejudice (1)**
30:18
**prejudiced (2)**
31:9;54:24
**pre-marked (1)**
145:20
**premature (1)**
44:4
**prematurely (1)**
72:19
**premised (3)**
57:19;61:15;141:7
**preparation (1)**

52:7
**prepare (2)**
63:6;99:11
**prepared (7)**
31:6;32:21;39:11;
52:15;60:19;62:21;
111:2
**present (12)**
16:19;30:13;38:12,
15;43:10,20,20,24;
65:3;78:4;121:4;
135:25
**presentation (4)**
22:1;86:12,12;
131:10
**presentations (1)**
53:5
**presented (1)**
97:5
**presently (1)**
138:17
**preserve (2)**
58:9;66:4
**preserving (2)**
89:1;91:17
**pre-settlement (1)**
55:21
**press (1)**
95:12
**pressed (1)**
71:19
**pressing (3)**
52:4;69:5,10
**presumably (3)**
13:16,21;14:4
**presumption (1)**
54:9
**presumptively (1)**
58:4
**presumptuous (1)**
16:8
**pretty (3)**
79:15;125:25;
127:19
**pretzels (1)**
129:13
**previously (1)**
82:18
**pri (1)**
89:19
**price (1)**
111:16
**primarily (2)**
46:1,4
**primary (2)**
15:1;98:4
**Princi (219)**
11:4,5,5,13,17;
12:21,24;13:1,4;14:9,
10,21;15:5;16:1;
17:12,15,22;18:4,6,8,
11,14,16,18,21;19:1,
4,9,11,12,18,20;20:1,

5,7,9,12;21:18;22:9,
11,19;23:5,14,16,23;
24:19,23;25:2,9,12,
16,20,24;26:5,10,12,
17;27:6,17,19,23;
28:15,22;29:7,11,15,
21;30:8,10,12;31:21,
23;32:4,11,16,18;
33:12,14,18,24;
34:11,14,22;35:5,8,
12,16,22;36:2,14,17;
38:1,6,10,13,16,19;
39:7,9,13,15,19,21;
40:1,3,5,7,9,14,18,20,
24;41:4,7,10,14;
42:16;43:3,4;44:6;
45:5,10,17,25;50:25;
61:8;64:7;68:8;81:3,
6,7;82:18;88:4;
92:10;95:22,24;96:3,
5,8,12,18,22;97:6;
102:13;107:10,14,18,
21;108:3,5,12,14,20,
22,24;110:3,10,14,
16,18,20;111:2,4,5,
12,15,18;112:7,23,
25;113:3,5,9,15,22;
114:3,6,9,14,15;
118:1,3,12;122:18;
131:3;132:24;
134:11,12,17,19,24;
135:7,23;136:4,9,23,
25;137:19,20,21;
138:21;139:4,7,11,
18,21;140:7,9;141:3,
14,20;142:2,4,6,8;
143:5,9;146:3,7
**principal (13)**
12:6;16:10,10,17;
17:3,5;21:4;28:6;
39:21;41:11;70:24;
71:4,13
**principals (1)**
71:14
**Princi's (2)**
80:20;141:7
**printed (1)**
36:22
**prior (5)**
38:24,25;41:19;
68:10;76:22
**privilege (19)**
27:18;28:12;29:24;
30:1,5,23;31:14;35:7,
10,11,20;45:13,14;
55:20;61:2;89:22;
141:10;143:17,19
**privileged (5)**
27:1;30:6;125:3,7,
11
**privity (1)**
109:17
**pro (1)**

66:2
**proactive (2)**
31:15;56:16
**probably (3)**
65:12;76:12;
112:10
**problem (14)**
28:11;30:24;36:4,
6;81:16,24,25;87:22;
93:11,23;94:1,13;
110:4;140:9
**problems (4)**
34:15;63:14;90:13;
97:24
**proceed (6)**
50:20;65:10;68:1,
4,18;77:8
**proceeding (1)**
93:19
**proceedings (2)**
14:19;146:8
**proceeds (6)**
23:18,21;24:15;
65:14,14;76:10
**process (10)**
12:18;49:1;55:16;
68:13;70:2;117:10;
121:2,23;133:6;
142:13
**produce (14)**
36:8,9;45:14;
48:21;53:18;54:12;
55:3,17;76:25;89:10,
16;90:11;91:12,20
**produced (40)**
11:23,23;26:18,19;
27:4;29:24;30:4;
33:6;34:10;35:3;
36:5,8,20;37:8,10,16,
19;45:14,18,22;
46:16,22,23;47:7,14;
50:6,8;53:19;56:16,
17;57:20;61:3;70:7,
8;71:12;75:24,24;
124:14;125:5;141:2
**producible (1)**
50:7
**producing (2)**
48:10;124:18
**production (31)**
12:15,16;13:2;
29:24;31:20;32:9,15,
25;33:7,9;34:2,7,13;
45:12,18;46:8,9,12;
55:8,22;60:21;61:1;
62:5;70:1;76:5,5;
79:16;130:13,22;
134:5;141:9
**productions (1)**
91:19
**professional (2)**
48:13;50:4
**professionals (1)**

97:25
**progress (1)**
82:22
**promise (1)**
51:2
**promised (1)**
129:16
**promptly (4)**
140:12;142:18;
144:2,4
**proof (3)**
20:16;99:23,24
**proofs (1)**
115:22
**proper (3)**
68:22,24;143:16
**properly (3)**
16:15;30:1;144:7
**proposal (3)**
30:15,18;41:15
**propose (1)**
28:20
**proposed (8)**
13:20;24:3;61:9;
69:6;92:7;103:15,25;
136:7
**PROSKAUER (1)**
8:17
**prospect (2)**
58:15;64:20
**prospective (1)**
64:25
**protect (1)**
94:21
**protected (1)**
30:1
**protective (1)**
48:12
**prove (2)**
115:23;116:6
**proved (1)**
115:24
**proven (1)**
131:1
**provide (9)**
29:8;77:2;78:8;
80:11;87:3;99:15;
102:25;135:15;
140:10
**provided (11)**
17:6;19:5;20:13;
37:4;74:12;79:25;
83:22;102:20;104:6;
126:2;141:11
**provides (5)**
20:20,23;21:2;
29:1;105:1
**provision (6)**
24:10;53:5;104:18;
131:16,20;132:9
**PSA (19)**
90:19;91:1;120:5,
23;122:10;125:11

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.         Pg 164 of 170

September 19, 2012

**PSAs (2)**
86:10,16
**public (8)**
21:21,21;86:13,14,
15;117:10;120:7;
122:14
**publicize (2)**
117:11,15
**pull (2)**
61:9;121:8
**pulling (2)**
14:1;125:10
**Puntus (6)**
41:7;70:14;75:5,7;
137:15;143:23
**P-U-N-T-U-S (1)**
41:7
**puppet (1)**
14:2
**purports (1)**
112:17
**purposely (1)**
42:4
**purposes (8)**
20:22;49:3;57:2;
102:1;123:8;124:6;
125:14;141:19
**pursuant (2)**
53:4;128:4
**pursue (2)**
13:17;117:2
**push (1)**
133:9
**pushed (3)**
31:3,4;133:15
**put (18)**
16:4;30:19;50:25;
58:24;61:17;78:22;
82:23;91:6;93:15;
103:15,17;104:18;
114:25;122:23;
135:21;136:5,8;
144:5
**putback (1)**
93:4
**puts (1)**
85:4
**putting (5)**
11:21;46:10;91:5,
6;123:21

**Q**

**qua (1)**
71:10
**qualify (1)**
42:23
**quick (1)**
134:14
**quickly (4)**
67:10;78:14;79:7;
134:24
**quid (1)**

66:2
**quite (11)**
13:1,11;14:11;
16:15;42:4;58:21;
60:1;67:13;83:14,25;
111:18
**quo (1)**
66:2
**quote (2)**
21:16;126:22
**quoted (1)**
44:17

**R**

**raise (7)**
54:18,21,23;58:20;
59:7;62:8;72:21
**raised (7)**
27:24;36:4;47:20;
68:3;72:23;117:2;
132:11
**raising (3)**
56:13;100:20;
101:8
**rarely (1)**
58:5
**ratcheted (1)**
20:24
**rather (1)**
103:9
**rational (1)**
97:18
**RAY (1)**
7:25
**re (3)**
15:20;55:10;61:7
**reach (2)**
50:1,8
**reached (2)**
49:19;122:7
**read (19)**
12:14;14:10,13;
21:5;52:3;70:15;
75:6;84:3;86:25;
87:1;118:16;126:19;
127:8,9;128:9;
129:24;135:3,5;
145:19
**reading (5)**
19:17;34:5;44:20;
86:24;97:18
**ready (1)**
52:14
**real (9)**
22:23;28:11;35:14;
90:12;94:23;99:12;
126:10;134:14,24
**realistic (3)**
52:13;78:6;144:13
**reality (3)**
33:2;66:22;69:24
**realize (1)**

126:16
**really (26)**
17:6;22:21;29:16;
32:8,10;52:3,13;
80:4;84:25;86:4,6;
91:9;93:7;99:15;
102:2;108:16;
125:21;129:19;
130:9;131:18;
132:17;133:4;
137:24;138:1,18;
141:12
**realm (1)**
14:5
**real-time (1)**
38:10
**reason (17)**
13:21;31:8;32:8,
20;48:14;52:12;63:4;
68:16;73:23;77:1;
87:7,14;106:10,11;
119:22;126:9;129:5
**reasonable (11)**
13:10,18;15:13;
28:1;57:23;69:7;
105:13,22;106:8;
109:15;123:5
**reasonableness (5)**
14:6;57:21;81:14;
107:12;133:8
**reasons (3)**
55:24;117:7;131:2
**rebuttal (1)**
139:24
**recall (3)**
58:16;103:18,19
**receive (2)**
48:25;55:14
**received (8)**
11:8;25:5,13;
70:19,25;77:6,10;
91:11
**receiving (1)**
80:10
**recent (1)**
91:15
**recently (3)**
48:7;54:16;56:10
**recess (3)**
114:11,12,15,19
**recognition (2)**
37:5;66:22
**recoil (1)**
63:10
**reconsider (1)**
13:14
**record (17)**
21:21,21;46:14;
84:4;96:19;108:6,7;
110:6;111:19,24;
114:25;116:23,24;
117:11;121:10,11;
128:22

**records (1)**
89:21
**recoveries (1)**
95:13
**recovery (4)**
21:24;88:18,21;
93:13
**red (1)**
132:17
**re-dated (1)**
86:19
**reduce (1)**
99:7
**refer (2)**
84:7;94:18
**reference (3)**
26:19;33:4;34:8
**referenced (6)**
17:17;34:15;53:3;
86:16;127:16;135:20
**references (1)**
21:23
**referred (1)**
34:9
**referring (1)**
87:4
**refers (4)**
21:6;53:5;136:9,19
**reflect (1)**
114:24
**refusal (1)**
55:17
**regard (5)**
58:11;60:3;61:13;
81:10;115:20
**regarding (12)**
14:20;17:7;22:13;
26:20;27:9;82:8;
85:3;86:5;95:6;
120:10;124:2;133:6
**regardless (3)**
79:10;97:17;
115:25
**relate (1)**
86:20
**related (2)**
45:24;91:13
**relates (1)**
137:2
**relating (1)**
127:16
**relationship (1)**
138:16
**relatively (1)**
76:24
**release (23)**
21:15;80:2,10;
81:21;83:19;84:20;
87:8,10;94:10;95:2,
21,24;96:2,17;97:4;
104:8,13,14;106:18;
117:5;122:10;124:8;
142:11

**releases (1)**
20:13
**relevance (1)**
81:9
**relevant (26)**
22:14;43:10,21;
44:13;49:2;55:13;
58:3,4,5,5,24;72:3,
15;110:12;111:11;
112:20;113:25;
114:2;120:9;125:14;
133:14;137:1;
141:23;142:11,13,15
**reliable (1)**
74:16
**relied (4)**
28:16,19;29:13;
59:5
**relief (1)**
54:7
**re-litigate (1)**
104:17
**rely (2)**
77:6;86:6
**relying (4)**
27:14;28:8;29:5;
141:1
**remain (1)**
61:5
**remains (1)**
50:19
**remarkably (1)**
49:2
**remarks (1)**
120:15
**remedy (1)**
54:2
**remember (2)**
56:5;76:23
**Remind (1)**
78:15
**removal (3)**
93:18;94:8;95:7
**remove (5)**
82:20;95:21;96:1;
104:5,13,13,14;113:7
**removed (4)**
82:24;93:16;104:9;
106:18
**removes (1)**
12:3
**removing (2)**
104:4;113:6
**R-E-N-Z (1)**
41:5
**Renzi (6)**
41:5;70:14;75:1,2;
137:14;143:23
**rep (4)**
109:15,16,19;
131:4
**repeat (1)**
129:25

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 165 of 170

September 19, 2012

**replay (1)**
117:14
**reply (1)**
139:24
**report (25)**
11:11;12:15;14:11;
16:23;21:6;44:19;
46:20;47:16,20;
48:24;49:11;51:25;
78:5;79:12;88:4;
92:11;98:2;126:14;
130:11,15,22;134:7;
139:2,16;140:5
**reports (9)**
16:22;34:5;48:9;
60:17;63:8;67:13;
90:20;139:25;141:6
**represent (1)**
44:22
**representation (2)**
121:5;141:7
**representative (1)**
86:21
**represented (4)**
36:6;58:8;82:23;
102:19
**representing (2)**
84:5,24
**repurchase (2)**
51:8;64:22
**repurchased (1)**
57:20
**reques (1)**
106:22
**request (12)**
37:5;41:18;47:1;
53:9,14;56:4,17;
71:14;85:18;89:22;
91:3;137:22
**requested (5)**
34:1;50:8;54:11;
68:11;104:15
**requesting (1)**
77:25
**requests (10)**
17:19;46:25;48:22;
68:15,17,19;69:15,
18;73:8;94:6
**require (1)**
61:4
**required (3)**
79:17;131:21;
145:9
**requirement (1)**
68:4
**requires (5)**
15:17;43:11,15;
57:9;133:25
**requiring (1)**
55:11
**res (1)**
100:23
**ResCap (47)**

12:21;13:24,24;
14:2,2;16:9;27:10;
40:21;80:6;84:20;
86:6;93:18,24;94:5;
95:1;96:3,14;98:12;
99:3,12,16;102:20,
22,24;103:7;107:19;
108:9;109:4,12,12;
111:21;113:17;
114:22;119:7;121:8;
123:21;124:1,7,23;
125:1;135:12,13,14,
15;138:2,19;144:19
**ResCap's (1)**
45:17
**reservation (1)**
99:18
**reserve (4)**
93:21;95:11;98:14;
115:19
**reserved (5)**
100:22;106:19;
107:8,24;141:18
**reserves (1)**
116:7
**Residential (7)**
11:3;21:9,15;84:6;
102:21;119:3;135:11
**resolution (2)**
23:10;86:4
**resolutions (1)**
85:7
**resolve (8)**
50:10;73:3;100:7;
112:17;119:2;144:3,
8,8
**resolved (12)**
22:17;23:7,12;
61:21;62:11;64:13;
65:17,17;66:20;
99:18;141:13;145:12
**resolving (2)**
119:5;124:25
**resonate (2)**
27:25;88:9
**respect (32)**
13:15;17:19;21:3;
28:12;32:7;42:18;
43:18;68:13;70:1;
99:11;103:25;
108:25;123:20,23;
124:15;125:2,6;
128:11,11;130:10,23;
131:7,14;134:25;
137:19;141:12,15,16,
25;142:16;143:12,17
**respectfully (1)**
70:23
**respects (4)**
67:6,7;80:2;84:18
**respond (4)**
22:15,25;94:5;
116:13

**responded (1)**
62:6
**responding (2)**
69:2;82:13
**response (10)**
11:12;14:14;46:6;
49:4;56:13,16;68:17;
72:9;87:16;137:8
**responses (4)**
12:14;27:25;34:8;
137:6
**responsibility (2)**
15:1;137:10
**responsible (3)**
69:19;74:1,4
**responsive (1)**
89:21
**responsively (1)**
90:3
**rest (8)**
43:1;47:10;66:21;
82:12;83:6;97:9;
104:2;140:13
**restrict (1)**
23:6
**result (5)**
90:20,21;101:11;
103:16;110:11
**retention (1)**
78:22
**retracting (1)**
29:13
**return (2)**
122:10;133:2
**review (5)**
31:10,13,14;42:7;
76:8
**reviewed (2)**
11:16;35:3
**reviewing (1)**
76:13
**revised (2)**
24:18;96:25
**RFC (2)**
20:25;119:4
**RICHARD (2)**
7:8;130:3
**right (55)**
11:2;15:6;19:12;
33:25;37:18;38:21;
39:23;41:12;46:1;
49:6;50:16;58:9;
60:9;64:19;69:24;
73:14;79:2,7;83:4,
23;90:9;91:7;92:20;
94:17;95:11,23;
100:1;101:4;106:17;
108:17;109:9;
115:12,15;116:5,10,
22;117:1;118:18;
123:14,16;125:15;
127:13,21;130:12;
131:17;132:21;

133:15,19,20,23;
134:10;135:7;
140:10;144:19;146:6
**rights (5)**
30:18;66:3;98:14;
99:18;115:20
**righty (1)**
38:1
**ring (1)**
60:1
**rise (2)**
44:11;125:19
**risk (4)**
18:18;39:3;65:3;
113:6
**RIVERA (1)**
5:6
**RMBS (52)**
6:3;9:3;13:25;
14:20;16:17,20;17:2;
18:25;19:7,25;21:10,
12,13,15;22:8,17;
23:10;25:6,13;26:3;
27:15;38:4,7;39:6;
41:2;45:25;50:4;
52:8;64:12;65:2,16;
66:6;79:20;82:20;
86:22;87:5,18;88:19;
90:19;93:4;97:18;
115:20;120:9,18,22;
131:16,22;132:5,10,
14;137:10;141:17
**Rockefeller (1)**
5:3
**role (6)**
19:6,6;38:4;39:20;
45:24;137:9
**rolling (7)**
32:9,25;35:17,23,
24;76:5;141:9
**room (5)**
37:14;135:21;
136:5,6,8
**ROPES (2)**
9:2;102:15
**ROSE (1)**
8:17
**routinely (1)**
66:12
**row (1)**
65:9
**R-U-C-H (1)**
40:3
**Ruckdaschel (2)**
40:1;137:13
**rule (5)**
27:22;43:21;
131:21;132:7;134:23
**ruling (3)**
143:18,18,19
**run (4)**
16:6,8;51:19;145:6
**running (2)**

69:12;145:4

**S**

**sake (1)**
55:9
**sale (14)**
15:9;22:17;23:12,
18;24:14;64:13;
65:11;128:8;129:5,
10;131:22;132:2,17;
133:23
**sales (7)**
99:5,13;129:7,12;
131:15,24;132:8
**same (9)**
11:7;33:8;35:10;
47:1;55:17;65:7,8;
130:12;140:24
**sample (3)**
34:4;44:23;76:23
**sat (1)**
69:2
**satisfactorily (1)**
100:7
**satisfied (3)**
100:25;101:1;
122:19
**satisfy (2)**
103:25;123:7
**sausage (1)**
121:3
**save (1)**
47:25
**saw (7)**
42:16;80:24;82:12,
17;83:5;126:20;
131:7
**saying (21)**
15:12;18:21,21;
29:12;36:11;44:19;
56:11;61:8;62:9;
63:22;90:1;94:6,21;
98:13;102:3;112:10,
25;126:15;127:5;
136:14;140:4
**scanned (2)**
36:25;37:1
**schedule (32)**
15:16;32:24;34:25;
43:14,14;51:6;61:5,
17;62:20;64:1;65:20;
83:12;84:12;85:20;
88:10;125:7;129:1,8,
14;132:14;133:24,
25;134:5,13;137:2;
139:10;140:13;
142:17,22;144:7,14;
145:24
**scheduled (4)**
43:15;52:12;64:18;
73:5
**scheduling (18)**

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 166 of 170

September 19, 2012

11:20,24;22:22;
24:18,18;51:11;53:8;
62:3,18;68:10;
128:19;131:16,18;
133:2,11;139:5,6;
140:3
**SCHROCK (2)**
7:25;38:2
**scope (1)**
62:1
**screen (1)**
118:9
**se (1)**
41:22
**search (7)**
12:16,20;36:23;
45:20;89:20;90:2,10
**searchable (9)**
36:5;37:1,2,4,10,
11,15;45:18,18
**searched (8)**
36:10;45:21;46:14,
16;70:5,5,25;90:8
**searches (1)**
89:25
**searching (1)**
46:14
**seated (2)**
11:2;114:13
**second (24)**
12:1,2;15:21;
16:15;18:11;20:2;
30:14;39:15;40:20;
49:22,24;57:9;68:23;
79:20;85:21,23;92:9;
93:25;94:24;108:10;
125:16;135:8;
136:15;137:6
**secret (14)**
21:12;22:5;86:9;
92:17;120:6;121:25;
122:5,12;123:2;
135:19,19;136:4,16,
23
**Section (1)**
135:14
**Secured (4)**
10:3;92:2,5;109:8
**Securitization (1)**
9:11
**securitizations (1)**
40:11
**seeking (4)**
19:8;63:5;82:8;
91:10
**seem (7)**
13:3;27:25;48:1;
58:20;74:2;86:10;
97:2
**seemed (4)**
12:25;13:1;14:11;
61:8
**seems (9)**

22:16;33:22;52:3;
64:9;71:21;73:19;
74:23;140:24;143:1
**sees (1)**
113:10
**seller (2)**
65:6;95:2
**semantics (1)**
28:22
**senior (9)**
16:18,25;17:1,23;
73:25;74:4,22;80:8;
116:8
**sense (4)**
67:4;78:6;84:14;
98:15
**sensible (1)**
113:10
**sent (8)**
42:24;54:5,17;
56:8,11;80:23;94:5;
136:17
**separate (3)**
30:14;50:9;120:5
**separately (1)**
58:7
**September (23)**
15:17,18,24;30:7,
23;31:7;32:19;33:11,
16,23,25;45:12,15;
53:12;54:15;56:11;
60:24;69:12,19;
79:15;137:6;140:5;
145:25
**serious (3)**
48:15,19;130:18
**seriously (1)**
131:6
**serve (3)**
69:14,17;130:16
**served (9)**
46:24;62:1;68:16;
73:7;85:17,18,19;
137:5;139:25
**server (1)**
33:16
**service (1)**
22:24
**servicing (6)**
58:10;61:14;64:22;
65:6,11,13
**set (13)**
14:14;15:22;20:21;
43:25;44:3,3;62:21;
83:12;91:18;97:25;
139:5;142:20,21
**setting (2)**
88:10;128:24
**settle (5)**
14:2;85:25;86:1;
109:15;135:15
**settlement (159)**
12:1,3;13:9,25;

14:13,20;15:23;
16:17,20;17:2,7,11,
25;18:24,25;19:7,25;
20:3;21:12,14,16;
22:8,17;23:10,11;
26:4,20;27:16;28:1,
10,14;38:4,7;39:3,6,
6,25;41:2;42:12,22,
23,25;43:5,9;45:21,
25;46:21;49:1,3;
50:24;51:10,13;52:8,
9;53:1,2,9,16,18,19,
21;54:8,12,25;55:3,
12,15,22;56:5,9;57:4,
6,19,23;58:2,3,12,16;
59:4,9;61:9,21;62:2,
5;64:12,20,21;65:10,
16;66:11,19;67:11,
15;68:13,14;69:6;
70:1;71:5,8,10;72:14,
16;74:1,5,7;79:20,24,
25;80:9,11;81:11,14;
82:20;87:6;92:8;
93:14;96:25;98:10,
11;101:11,11;
102:20;103:10;
104:2,6,9;105:12,22;
106:3;110:13;
111:11;112:17,20;
114:1;120:10,18,24;
121:3,13;125:23;
126:9;127:15;
128:12;129:15;
131:22;132:13,16;
133:7,8;135:25;
136:16;137:10;
141:17;142:14;
143:3,3,15,20;145:14
**settlements (4)**
54:3;81:21;93:4;
121:21
**SEVEN (4)**
5:6;15:22;17:17;
76:15
**sever (2)**
24:11;65:5
**severable (3)**
103:18,22;104:3
**several (3)**
12:18;76:7;140:11
**SEWARD (1)**
9:10
**shall (2)**
20:20;139:25
**shape (1)**
113:17
**shared (1)**
92:8
**shield (1)**
28:20
**SHORE (43)**
10:7;92:1,1,19,21,
22,25;93:3;94:3,4,12,

14,16,25;96:23;97:9,
10,11;98:21,24;99:2,
22;100:8,18,23;
101:1,17,23,25;
102:9,11;108:15;
109:24;112:15;
114:2;122:18,21;
123:12,14,16,18;
124:17,23
**Shore's (2)**
109:5,6
**short (1)**
130:9
**shortly (2)**
104:19;113:11
**show (5)**
28:1;120:25;
121:12,13;135:22
**shown (1)**
130:22
**shows (2)**
120:24;135:23
**sic (6)**
18:8,14;31:4;40:3;
69:13;70:13
**side (2)**
14:4;22:15
**sides (1)**
68:5
**sideshow (2)**
30:20,20
**sidetracked (1)**
15:15
**SIDLEY (1)**
9:19
**SIEGEL (1)**
5:24
**signature (1)**
127:1
**signed (7)**
19:25;20:6;81:5,7;
84:3;95:4;131:11
**significance (1)**
90:14
**significant (5)**
53:25;55:24;65:3;
79:23;93:23
**simple (4)**
27:20;91:9;110:17;
112:1
**simply (5)**
13:23;16:5;44:5;
131:1;133:24
**sine (1)**
71:10
**single (5)**
71:5;85:5;90:8;
126:12;129:16
**sit (3)**
69:3;102:3;108:23
**sitting (3)**
29:4;73:20;90:15
**situation (3)**

14,16,25;96:23;97:9,
10,11;98:21,24;99:2,
22;100:8,18,23;
101:1,17,23,25;
102:9,11;108:15;
109:24;114:2;122:18,21;
123:12,14,16,18;
124:17,23
**situations (1)**
97:25
**six (1)**
76:15
**Sixth (1)**
4:12
**size (1)**
104:17
**slices (1)**
32:22
**slightly (1)**
59:24
**small (2)**
76:24;93:10
**smell (1)**
91:7
**so-called (3)**
121:25;135:18;
141:15
**solely (1)**
15:8
**somebody (6)**
18:22;40:16;92:13;
93:8;95:18;117:22
**somebody's (2)**
43:2;124:5
**somehow (5)**
50:7;69:2;129:9
**someone (6)**
18:3,4;94:17,19;
117:23;118:20
**someone's (1)**
88:12
**sometime (2)**
73:16;131:10
**sometimes (1)**
84:7
**soon (1)**
53:7
**sophisticated (1)**
102:19
**sorry (8)**
19:18;38:13;94:2;
114:6;116:19;
126:16;133:17;
139:13
**sort (4)**
41:16,23;67:3;
101:9
**sorted (1)**
29:23
**sound (2)**
18:19;30:15
**sounds (2)**
140:25;141:12
**source (2)**
57:11;72:2
**sources (2)**
57:13,14
**South (2)**
7:4;9:21
**speak (7)**

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 167 of 170

September 19, 2012

19:9;25:10;41:15;
81:24;102:14;121:7;
130:5
**SPEAKER (3)**
92:15;124:21;
138:23
**speaks (1)**
122:18
**special (1)**
59:15
**specific (7)**
28:11;32:12,13;
37:23;122:4;124:6;
143:18
**specifically (4)**
12:19;23:7;53:3;
70:11
**specifics (1)**
24:4
**specify (1)**
97:13
**spell (2)**
18:7;39:14
**spent (3)**
11:14;19:16;131:3
**spill (1)**
101:25
**spoken (1)**
130:2
**spreadsheets (1)**
34:9
**Square (2)**
8:19;49:16
**squeeze (1)**
129:18
**St (1)**
85:23
**stage (1)**
145:11
**staggered (1)**
140:20
**stagnated (1)**
31:4
**stake (1)**
55:1
**stand (5)**
15:5;70:23;84:9;
107:7;113:13
**standard (7)**
106:2;117:8;
121:14,15,18,20,24
**standing (1)**
119:8
**standpoint (3)**
52:17;76:18;81:16
**stands (2)**
72:11;84:15
**Stanley (1)**
54:6
**start (8)**
14:19;26:22;44:20;
59:17;73:2;84:17,19;
88:7

**started (6)**
83:15,16,18;88:8;
93:12;94:11
**starting (2)**
11:7;19:16
**starts (1)**
94:17
**state (6)**
57:7;85:16;96:19;
110:6;111:19,24
**stated (2)**
13:23;123:4
**statement (2)**
62:24;125:10
**statements (1)**
102:17
**status (20)**
11:11;12:15;14:10;
16:22,23;34:5;44:19;
47:19;48:9,24;49:10;
60:16;67:13;77:24;
88:4;92:11;98:2;
126:14;130:11,15
**stay (4)**
48:6,22;65:2;
138:14
**stayed (1)**
48:5
**STEEN (1)**
5:9
**Steering (4)**
6:3;9:3;50:23;
115:17
**stick (1)**
64:2
**sticking (2)**
139:9;140:8
**still (13)**
16:21,22;36:4;
44:4,18;82:11;92:6;
101:1;117:9,10;
118:23;129:15,18
**stonewalled (1)**
48:24
**stood (3)**
51:16;118:21;
132:10
**stop (12)**
33:1;34:12;35:18;
62:12;68:23;77:9;
92:9;105:18;107:4,6;
124:18;138:21
**store (1)**
117:14
**storm (1)**
83:14
**straw (1)**
129:19
**Street (4)**
4:12,20;7:4,13
**strike (1)**
141:4
**strings (2)**

14:2;121:8
**structure (2)**
92:7;100:12
**structured (1)**
67:23;85:1
**stuff (3)**
19:17;61:3;123:24
**subcon (1)**
104:11
**subject (9)**
20:13;23:19;30:25;
64:21;66:7;76:22;
128:17,21;133:3
**submission (1)**
16:16
**submit (1)**
79:12
**subpoena (2)**
56:4;62:5
**subrogates (1)**
128:6
**subsequent (1)**
80:18
**subsequently (1)**
109:24
**subsidiaries (2)**
102:22;135:12
**subsidiary (1)**
84:22
**substance (4)**
28:23;68:14;95:8;
115:20
**substantial (2)**
43:16;66:19
**substantially (22)**
11:20;17:2,10,25;
18:24;33:10,10;36:7;
39:3,5,24;41:1;47:3;
56:22;70:11;71:21;
78:1;105:5;141:1;
143:15,21,22
**substantive (12)**
20:10;22:7;51:4;
65:24;69:25;73:19;
80:14;82:5;90:13;
97:4;129:22;131:20
**successful (1)**
23:18
**suddenly (1)**
35:1
**suffered (4)**
54:7;57:24;100:2;
127:25
**sufficient (2)**
63:3;78:8
**suggest (9)**
19:21;28:15;51:17;
63:24;68:22;70:7,23;
116:3;117:7
**suggested (1)**
116:1
**suggestion (2)**
58:7,13

**suggests (2)**
119:23,24
**suing (1)**
99:24
**Suite (2)**
6:5,14
**sunshine (1)**
91:6
**supplement (1)**
45:15
**supplemental (2)**
138:24;140:4
**support (13)**
14:1;21:10,20;
25:22;28:4,9;44:13;
53:3;91:4;105:24;
120:19;124:8;135:20
**supporting (1)**
27:15
**supports (1)**
108:16
**supposed (6)**
15:2,24;23:9;
106:2;139:15,16
**supposition (3)**
41:23;42:6,8
**sure (15)**
11:7;22:20;40:20;
41:10;43:8;44:11;
52:13;60:2;91:19;
92:17;101:4;105:19;
115:9,12;139:22
**surprise (5)**
14:17,21;22:2;
53:6;73:10
**surprises (1)**
108:13
**surprisingly (1)**
47:2
**suspect (3)**
99:9;113:11,12
**sustain (1)**
43:22
**swathes (1)**
35:2
**swiftly (1)**
67:8
**switching (2)**
35:25;39:11
**sympathy (1)**
72:22

---

**T**

---

**table (6)**
14:19;73:13;116:7;
117:4;141:18,21
**TAFT (3)**
4:2,10;125:18
**Talcott (1)**
4:19
**Talcott's (1)**
126:11

**Tal-Franklin (1)**
58:8
**talk (7)**
49:25;53:15;95:15,
18;99:2;114:10;
129:2
**talked (2)**
77:18;135:5
**talking (20)**
16:5;20:1;33:4,8;
34:3,5;35:8;40:21;
49:4;56:25;68:9;
86:21,21;87:2;94:7;
95:9;98:7,8;102:2;
112:8
**talks (2)**
92:23;128:7
**targeted (1)**
90:2
**targets (1)**
63:9
**task (1)**
98:4
**teaching (1)**
85:22
**tease (1)**
116:19
**technology (1)**
36:17
**teed (1)**
15:9
**telephone (3)**
142:19;144:2;
145:23
**TELEPHONICALLY (4)**
6:17;7:8;9:24,25
**telling (5)**
110:8;111:16;
113:21,23,24
**tells (2)**
77:5;119:5
**ten (2)**
35:3;48:5
**ten- (2)**
56:17;114:10
**tend (1)**
49:13
**ten-day (1)**
11:23
**term (2)**
65:14;135:14
**terminate (1)**
25:6
**terms (15)**
21:4;38:7;58:9;
76:10;79:6,14;81:20;
83:9;89:24,25;90:1;
97:3;117:16;118:24;
134:20
**terrific (1)**
90:12
**test (2)**
118:21;124:9

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 168 of 170

September 19, 2012

**testing (2)**
123:18;124:6
**Texas (1)**
6:15
**that'll (3)**
13:5;15:14;76:16
**theme (1)**
67:12
**theories (2)**
88:17;99:25
**theory (18)**
13:22;20:19;44:10,
12;85:22;86:7;88:19,
20,23,24,25;95:11;
104:23;105:7;123:2,
19;124:7,9
**therefore (5)**
11:15;14:1;41:24;
91:3;108:13
**therein (1)**
34:19
**there'll (4)**
32:4,25;76:15;
120:11
**there're (1)**
34:24
**thereto (1)**
20:16
**thesis (7)**
41:18;120:15,16,
17,19,20;122:2
**Third (4)**
45:13;79:19;88:15;
122:24
**third-party (1)**
72:14
**thirteen (6)**
46:14;88:1;90:3,5,
5;91:22
**thirteenth (1)**
85:4
**thirty (1)**
133:10
**thirty- (1)**
133:25
**THOMAS (1)**
5:15
**Thompson (1)**
137:13
**thorny (1)**
97:25
**though (4)**
43:19;49:16;53:1;
86:14
**thought (9)**
15:12;24:5;43:13;
69:19;84:9;95:9;
117:14,15;135:17
**thoughtful (1)**
78:11
**thousand (1)**
32:22
**thread (1)**

44:18
**threat (9)**
25:6,13;51:1,1;
61:11;62:24;66:2,21;
129:8
**threatened (1)**
61:9
**threats (1)**
62:20
**three (6)**
11:18;31:19;46:25;
117:2;133:12;144:17
**threshold (2)**
67:6;68:2
**throughout (1)**
16:19
**throwing (2)**
36:10;104:2
**Thursday (1)**
55:21
**ticking (1)**
85:5
**TIFFs (1)**
45:19
**till (1)**
47:9
**timed (4)**
44:3,3;145:1,10
**timeline (1)**
134:13
**timely (2)**
130:16,20
**Times (2)**
8:19;29:1
**timing (1)**
61:25
**Timothy (1)**
45:8
**title (6)**
18:10,11;40:10,11,
15;131:19
**today (30)**
13:3;20:4;52:15;
69:23;70:1;73:6,15,
21;75:10,14;78:5;
84:10,16;99:13;
106:25;107:1;119:8,
15,20;123:19,24;
124:25;125:12,13;
129:17;131:2;133:6;
137:3;143:24;144:14
**together (2)**
34:17;46:10
**told (33)**
39:1;42:13,21;
48:7,15;49:6;50:5;
54:16;59:23;60:24;
61:1,22;62:18;73:15,
24,24;74:18,21,23;
76:1,2,4;80:11;82:18,
24;89:6;101:10;
118:21;122:14;
125:13;130:20;

136:10,11
**Tom (2)**
84:4;116:24
**TOMASCO (1)**
6:17
**tomorrow (2)**
77:23;78:4
**took (4)**
41:20;90:18;94:9;
114:19
**top (2)**
19:9;96:5
**topic (2)**
44:25;137:23
**total (2)**
20:21;98:5
**totally (2)**
86:25;124:12
**touched (1)**
33:17
**towards (1)**
34:17
**track (3)**
60:22,22,23
**translating (1)**
102:6
**treated (2)**
66:6,8
**trenches (1)**
36:15
**trial (8)**
36:11;100:10;
102:4;112:2;129:1;
139:1;145:2,10
**trials (2)**
44:3,3
**trick (1)**
139:20
**tried (6)**
18:22;49:25;51:16;
119:18;130:15,17
**TRIVIGNO (1)**
4:23
**true (1)**
60:1
**Trust (11)**
5:10;8:3;16:7;
45:25;60:13;84:5;
116:25;127:17;
128:1,8;137:10
**Trustee (5)**
5:10;8:3;9:11;
21:7;126:7
**trustees (27)**
24:1,10,14;25:6,14,
16,18;26:3;37:16;
42:13,21,24,25;51:4;
56:8;61:13;64:1,23;
65:24;66:10,14;
80:12;128:10;129:6;
131:16;132:10,14
**trusts (10)**
13:9;24:14;57:23;

65:23;66:4,19;
109:18;126:8,10;
128:3
**trusts' (1)**
66:6
**trust's (1)**
115:21
**try (3)**
19:21;44:13;54:7;
61:16;62:10;79:8;
105:3;109:2;113:7,
11;131:1;133:1;
145:2
**trying (22)**
24:6;31:12;32:11;
54:2;55:9;61:24;
62:9;67:3;89:25;
93:9;98:1;101:20;
105:12;107:14;
111:19;116:3;
129:10,13,18;134:20;
139:19,22
**tumult (1)**
104:3
**turn (2)**
33:2;129:13
**turned (2)**
33:5;104:1
**TWEED (1)**
8:10
**twelve (1)**
138:12
**two (23)**
11:14;14:21;26:5;
45:10;47:20;53:5;
54:3;70:25;80:1;
84:18;86:10,12,16,
17,20;109:17;123:1;
125:19;127:9;134:6,
8;135:6;143:10
**TX (1)**
6:6
**typical (1)**
59:14
**Typically (1)**
145:10

**U**

**UCC (1)**
37:16
**UCLA (1)**
78:25
**ultimate (1)**
111:10
**Ultimately (4)**
72:12;79:11;81:25;
123:11
**Um-hum (10)**
52:21;56:20;59:2,
6,19;60:9;62:14,16;
63:11;78:10
**unable (1)**

45:20
**uncap (1)**
112:7
**uncertainty (1)**
80:17
**unchangeable (1)**
140:11
**under (14)**
31:5;47:9;48:12;
49:20;64:23;65:1;
88:16;99:7;122:10;
125:22;128:5,9;
132:14;135:24
**underestimate (1)**
52:9
**underlying (3)**
107:9;109:15;
114:7
**understands (5)**
22:20;27:7;36:17;
67:9;114:20
**understood (8)**
15:12,12;23:5;
24:2;26:17;76:6;
112:9;139:7
**undertaken (1)**
138:4
**undertaking (1)**
90:12
**undisclosed (3)**
21:8,19;22:5
**undo (1)**
113:15,16
**undoing (1)**
111:21
**unfair (1)**
84:13
**unfortunately (1)**
74:14
**UNIDENTIFIED (3)**
92:15;124:21;
138:23
**unilaterally (1)**
66:17
**unique (1)**
145:22
**Uniquely (5)**
54:24,25;55:1;
84:11,13
**universe (3)**
55:18;64:25;90:2
**unknown (1)**
73:12
**unless (8)**
25:14;54:13;84:13;
89:22;105:22;
107:23;112:22;
132:18
**unlike (1)**
54:2
**unnecessary (2)**
52:24;144:1
**unquestionably (1)**

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 169 of 170

September 19, 2012

15:10
**unreasonable (1)**
71:14
**unsecured (8)**
15:2,8,11;22:4;
80:8;102:25;116:8;
135:16
**up (33)**
15:9;18:22;33:2,5;
34:15,18,19,25;
44:17;46:1,3,3;50:1,
18;51:16;57:5;65:9;
84:9;87:18,21;88:13;
90:14;97:8,19;98:11;
99:20;103:8;113:13;
118:21;120:1;
128:21;132:10;139:5
**uploaded (1)**
131:9
**upon (5)**
29:9;42:7;76:18;
80:13,19
**upset (1)**
90:20
**use (1)**
16:6
**used (3)**
34:21;62:1;138:8
**useful (1)**
78:4
**using (1)**
96:14
**usual (1)**
141:5
**usually (2)**
26:15;37:19
**UZZI (1)**
8:14

**V**

**value (1)**
66:19
**variety (1)**
73:18
**various (5)**
11:10;41:21;88:17;
135:25;136:1
**vast (1)**
26:6
**versus (1)**
65:17
**view (19)**
13:15;14:12;17:20,
20;19:24;43:2;48:21;
55:14;64:11;67:5,15,
21;72:6;92:7;105:10;
108:17;109:20;
142:11;143:16
**views (1)**
42:18
**virtually (1)**
14:19

**virtue (1)**
101:14
**vis-a-vis (1)**
87:23
**vitiating (1)**
104:1
**votes (1)**
102:6
**voting (2)**
91:4;102:1

**W**

**wait (8)**
49:17;56:19;69:14;
82:15,15;115:3,6;
141:5
**waited (1)**
72:20
**waiting (2)**
51:20,25
**waive (1)**
27:18
**walk (1)**
51:16
**walked (1)**
115:1
**WALKER (1)**
6:11
**Wall (1)**
4:20
**WALTER (1)**
8:7
**wants (5)**
76:19;81:13;91:25;
107:6;109:24
**warranty (4)**
109:15,16,19;
131:4
**wary (1)**
16:13
**Washington (2)**
4:13;7:14
**waste (1)**
90:13
**waterfall (10)**
21:25;53:4,6;86:8;
87:4;90:19;117:11;
120:10;135:24;136:7
**waterfalls (2)**
86:13,15
**way (30)**
20:14;26:18;35:16;
42:24;51:20;55:10;
57:7;67:20,22;68:1;
73:23;78:12;84:11,
12;85:1,2;88:15;
91:5,6;94:10;99:20,
22;101:19;103:17;
109:16;113:17;
121:8;130:20;
138:18;139:4
**ways (2)**

14:22;84:20
**week (24)**
29:22;32:5;33:21;
35:3,12,12,13;36:12;
47:8;51:24;52:11,12;
53:21;54:16;72:20;
73:16;76:12;78:13;
88:5;94:6;140:16,17,
19;145:18
**weeks (3)**
133:12;134:6,9
**Wells (1)**
54:6
**weren't (3)**
27:2;29:4;36:5
**What's (9)**
19:24;29:21;34:12;
35:14;64:5;81:9;
99:23;104:23;124:7
**whatsoever (1)**
113:17
**When's (2)**
35:7,10
**whereas (1)**
66:13
**Whereupon (1)**
146:8
**wherever (1)**
121:16
**WHITE (2)**
10:2;92:2
**Whitlinger (1)**
73:21
**whoever's (1)**
23:17
**whole (4)**
15:4;28:19;96:9;
117:14
**who's (3)**
23:1;26:9;36:15;
44:7;48:17
**who've (1)**
52:18
**WICKERSHAM (3)**
4:2,10;125:18
**willing (3)**
48:18;110:21;
111:7
**Wilmington (6)**
5:10;8:3;79:21;
84:5;104:11;116:25
**winter (1)**
93:11
**wish (2)**
74:11;132:21
**wishes (1)**
139:3
**withdraw (2)**
25:15;26:2
**within (7)**
14:5;56:17;85:7;
92:6;100:11;142:18;
143:10

**without (14)**
23:10;28:10;46:22;
64:1;75:17;88:22;
92:20,22;95:21;
96:19;104:1;121:9;
125:10;143:25
**witness (2)**
99:11;124:4
**WOFFORD (25)**
9:7;102:15,15;
103:20,22;104:24;
105:10,12,17,18,19;
106:4,6,10,14,16,20,
25;107:3,5;111:6;
114:5;115:1,3;
136:13
**word (1)**
16:6
**worded (1)**
136:12
**words (2)**
17:17;82:23
**work (15)**
40:21;52:7;61:16,
17;62:9;82:22;90:12;
109:13;122:22;
123:5;130:13,17;
138:22;142:17;
145:25
**workable (1)**
123:10
**worked (3)**
93:7;130:19;
142:18
**working (6)**
34:16,17;47:17;
64:1;68:6;79:7
**works (3)**
31:17;82:20;
138:10
**World (1)**
4:4
**worse (1)**
44:25
**worth (1)**
128:2
**writing (2)**
29:6;82:19
**written (5)**
27:12;29:25;57:16;
97:24;145:16
**wrong (1)**
114:24
**wrote (1)**
115:7
**WT (1)**
121:15
**WYNNE (6)**
7:8;130:3,3,7;
132:1,4

**Y**

**Year (4)**
11:14;67:1;84:2;
144:11
**years (1)**
36:18
**yelled (1)**
114:19
**yesterday (9)**
11:9;20:5,7;48:9;
54:21;56:13;62:7;
87:3;141:24
**York (13)**
4:5,21;5:4,12,20,
22;7:23;8:5,12,20;
9:5,13;10:5

**Z**

**zebra (2)**
39:16;41:5
**Z-E-H-P-O-U-R (1)**
39:16

**1**

**1 (3)**
14:22;34:19;82:3
**1,500 (2)**
44:23;76:23
**1.7 (1)**
88:20
**1:29 (1)**
146:8
**10 (2)**
35:23;82:13
**100 (1)**
6:13
**10004 (1)**
9:13
**10005 (2)**
4:21;8:12
**10006 (1)**
5:12
**10022 (1)**
7:23
**10036 (4)**
5:22;8:20;9:5;10:5
**10112 (1)**
5:4
**10154 (1)**
8:5
**10281 (1)**
4:5
**1095 (1)**
5:21
**10th (2)**
61:2;141:11
**11 (2)**
71:5;139:23
**1100 (2)**
6:4,14
**1155 (1)**
10:4

12-12020-mg    Doc 1616    Filed 09/20/12    Entered 09/28/12 09:52:59    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 170 of 170

September 19, 2012

**11th (3)**
33:23;118:25;
119:2
**12 (1)**
48:23
**12:31 (1)**
114:12
**12:44 (1)**
114:12
**1211 (1)**
9:4
**12-12020 (1)**
11:3
**12th (4)**
56:1;139:15;
144:18,19
**13 (14)**
87:15;88:3,6;
90:15;92:4,12;94:18;
117:17;118:5,12,13;
119:23;136:9;140:15
**1371 (1)**
118:3
**13th (9)**
56:11;130:16;
140:22;144:9,19,20,
25;145:4,7
**14 (1)**
140:15
**14th (7)**
137:6;144:9,21,25,
25;145:4,7
**15th (6)**
56:5;93:14;133:20,
21;134:2;144:23
**16 (1)**
140:15
**16th (3)**
144:9;145:5,6
**18 (1)**
47:1
**19th (4)**
15:18;131:22;
132:2,8

**2**

**2 (5)**
4:20;11:25;82:3;
128:23;145:25
**2.7 (1)**
88:20
**20 (1)**
47:1
**200 (1)**
24:5
**20001 (1)**
4:13
**20005 (1)**
7:14
**2004 (1)**
46:25
**2012 (5)**

**45:12,16,22;46:16;**
88:9
**21 (1)**
145:25
**22 (1)**
119:6
**22nd (1)**
136:19
**23 (1)**
23:8
**23rd (2)**
56:8;64:18
**24th (11)**
15:18,24;30:7,23;
31:7;45:12;60:24;
69:12;79:15;134:9;
140:5
**25th (1)**
134:9
**26th (3)**
46:16;47:7;53:20
**27th (3)**
53:10,14;62:6
**28th (5)**
32:19;33:11,16;
34:1;45:15
**29 (1)**
139:25

**3**

**3 (9)**
12:6;33:24;34:1,
14;35:6;76:3,6,8;
82:3
**3.7 (1)**
88:20
**30 (4)**
5:3;88:9;98:3;
135:1
**30b6 (2)**
95:18;124:4
**31st (2)**
55:23;131:18
**345 (1)**
8:4
**392 (1)**
13:9
**3rd (4)**
61:2;90:11;141:9,
10

**4**

**4 (1)**
21:7
**47 (1)**
57:24
**4th (2)**
35:1;54:15

**5**

**5 (5)**
21:7;63:2;135:13;
145:6,7
**5.1 (1)**
135:14
**500 (2)**
36:8,8
**500,000 (2)**
36:9,9
**5300 (1)**
6:5
**555 (1)**
7:4
**5th (20)**
23:9;24:21;25:8,
14;26:2;36:11;43:7;
44:17;45:15,16;
52:14;61:10;68:5;
129:4;130:19;
131:25;132:6,7;
140:14;144:13

**6**

**6 (1)**
140:3
**600 (1)**
64:24
**601 (1)**
7:22
**60603 (1)**
9:22
**655 (1)**
7:13
**6th (4)**
56:6;140:16,19,22

**7**

**700 (1)**
4:12
**750 (6)**
87:19;90:22,23;
120:2;122:11,13
**77002 (1)**
6:6
**78701 (1)**
6:15

**8**

**8 (1)**
139:17
**8.7 (54)**
13:8,18,19;14:5;
20:22,23;21:1;57:22;
71:10;80:15;81:18;
82:3;88:16,18;91:18;
92:25;93:7,10,12,20;
95:12;97:12,16,21;
98:5,13;99:24;100:2,
11,17;101:13,15;
102:2,4,5,25;104:21;

105:2,5,8,13,21;
106:1;107:12;
109:18,23;110:1;
111:9;112:5,13;
113:20;115:25;
119:3;135:16
**8.7's (2)**
123:3,5
**8th (3)**
78:6;79:12;139:17

**9**

**9 (1)**
139:16
**9/24 (1)**
133:10
**90071 (1)**
7:6
**9019 (3)**
12:5,11;37:13
**919 (1)**
119:1
**9th (1)**
135:21