# EXHIBIT 13

DECLARATION OF BRIDGET M. LEE
(FOE) IN CASE FOE vs. U.S. EPA IN
CASE NO. 12-CV-363 IN THE U.S.
DISTRICT COURT, DISTRICT OF COLUMBIA
FILED SEPT. 14, 2012

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE EARTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civ. No. 1: 12-cv-00363-ABJ |
| | ) |
| UNITED STATES ENVIRONMENTAL | ) |
| PROTECTION AGENCY, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

### CERTIFICATE OF SERVICE

I, Marianne Engelman Lado, do hereby certify that on this 14th day of September, 2012, I

filed the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment and Declaration of Bridget M. Lee, with Exhibit A, using the Court's

CM/ECF system, which caused a copy to be served on counsel of record. I further certify that I

caused a copy of the foregoing to be served this day by First-Class U.S. Mail on:

> Yvonne D. Webb-Lewis
> Sidney T. Lewis
> 1875 Alvason Avenue
> Columbus, Ohio 43219

> /s/ Marianne L. Engelman Lado
> Marianne L. Engelman Lado
> Earthjustice
> 156 William Street, Suite 800
> New York, NY 10038-5326
> Phone: (212) 791-1881
> Fax: (212) 918-1556
> mengelmanlado@earthjustice.org
>
> *Counsel for Friends of the Earth*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE EARTH, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES ENVIRONMENTAL )<br>PROTECTION AGENCY and )<br>LISA JACKSON, Administrator, )<br><br>Defendants. )<br>_____ ) | Civ. No. 1: 12-cv-00363-ABJ |

### DECLARATION OF BRIDGET M. LEE

I, Bridget M. Lee, declare and state as follows:

1.      I submit this declaration in support of Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary, filed September 14, 2012.

2.      Attached hereto as Exhibit A is a true and correct copy of "Aircraft Emissions: Impact on Air Quality and Feasibility of Control," a report prepared by the United Stets Environmental Protection Agency.

I declare, under penalty of perjury, that the foregoing information is true, accurate, and correct. Executed on September 14, 2012, in New York, New York.

_____
Bridget M. Lee

# Exhibit A

TD
886.7
.U52

TD
886.7
.U52



# AIRCRAFT EMISSIONS:

# IMPACT ON AIR QUALITY

# AND FEASIBILITY OF CONTROL



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

TD
886.7
.452

# PREFACE

This report presents the available information on the
present and predicted nature and extent of air pollution
related to aircraft operations in the United States.  In
addition, it presents an investigation of the present and
future technological feasibility of controlling such
emissions.  This report is published in accordance with
Section 231 (a) of the Clean Air Act as amended, which
states:

"(1)  Within 90 days after the date of enactment of
the Clean Air Amendments of 1970, the Administrator shall
commence a study and investigation of emissions of air
pollutants from aircraft in order to determine-

"A.  the extent to which such emissions affect
air quality in air quality control regions throughout the
United States, and

"B.  the technological feasibility of controlling
such emissions

"(2)  Within 180 days after commencing such study
and investimation, the Administrator shall publish a report
of such study and investigation . . ."

618747

i

# TABLE OF CONTENTS

Page

LIST OF FIGURES ......................................................... v

LIST OF TABLES ......................................................... vii

INTRODUCTION ........................................................... 1

CONCLUSIONS ............................................................ 5

METHODOLOGY FOR ASSESSMENT OF AIR QUALITY IMPACT ....................... 7

    NATIONAL AMBIENT AIR QUALITY STANDARDS ............................. 7

    BASIC REQUIREMENTS FOR IMPACT EVALUATION .......................... 10

        EMISSION FACTORS ............................................. 10

        SELECTION OF CRITICAL AREAS AND AIRPORTS ..................... 12

        EMISSION PROJECTIONS ......................................... 13

RESULTS OF IMPACT EVALUATION .......................................... 19

    REGIONAL IMPACT OF AIRCRAFT EMISSIONS ............................. 19

    SUBREGIONAL AND LOCALIZED IMPACT .................................. 29

        GENERAL INDICATIONS OF LOCALIZED AIR QUALITY IMPACT .......... 29

            PASSENGER USAGE DENSITY AND AIR POLLUTION POTENTIAL ..... 29

            EMISSION DENSITY COMPARISON ............................. 30

        DETAILED INVESTIGATION OF LOCALIZED POLLUTANT CONCENTRATION .. 33

            8-HOUR CARBON MONOXIDE CONCENTRATIONS ................... 33

            1-HOUR CARBON MONOXIDE CONCENTRATIONS AT LOS ANGELES AIRPORT ...... 39

            CARBON MONOXIDE CONCENTRATIONS AT OTHER AIRPORTS ........ 39

            HYDROCARBONS AND POTENTIAL OXIDANT CONCENTRATIONS ....... 43

            OXIDES OF NITROGEN ...................................... 47

            SMOKE AND PARTICULATES .................................. 49

TECHNOLOGICAL FEASIBILITY OF CONTROLLING AIRCRAFT EMISSIONS ........... 53

                                                                          Page

        EMISSION CONTROL BY ENGINE MODIFICATION ......................... 54

            ENGINE CLASSIFICATION ...................................... 54

            EMISSION CONTROL METHODS AND EFFECTIVENESS ................. 56

                TURBINE ENGINES ....................................... 56

                PISTON ENGINES......................................... 62

            COST AND TIME REQUIREMENTS FOR CONTROL METHOD

            DEVELOPMENT AND IMPLEMENTATION ............................. 66

                EXISTING ENGINES ...................................... 66

                FUTURE ENGINES......................................... 70

    EMISSION CONTROL BY MODIFICATION OF GROUND OPERATIONS ........... 71

        DEFINITION OF GROUND OPERATIONS ............................ 71

        EMISSION CONTROL METHODS ................................... 71

        IMPLEMENTATION COST AND TIME REQUIREMENTS .................. 72

    COMPARATIVE EVALUATION OF EMISSION CONTROL METHODS............... 76

    EMISSION MEASUREMENT TECHNOLOGY ................................. 79

        SAMPLING AND TEST PROCEDURES .............................. 80

        EMISSION MEASUREMENT INSTRUMENTATION ...................... 81

APPENDIX A ........................................................ 83

APPENDIX B ........................................................ 91

APPENDIX C ........................................................ 95

REFERENCES ........................................................ 97

# LIST OF FIGURES

Page

1. AIR SAMPLING LOCATIONS AT LOS ANGELES INTERNATIONAL AIRPORT.......... 34

2. EXPECTED CO CONCENTRATIONS, 8-HOUR AVERAGING TIME, WINTER
   1970, STATION 209, LAX............................................... 35

3. VICINITY OF LOS ANGELES INTERNATIONAL: PERCENT OF CONTRIBUTION
   BY AIRCRAFT TO CARBON MONOXIDE LEVELS............................... 37

4. FREQUENCY DISTRIBUTIONS FOR CARBON MONOXIDE FOR VARIOUS
   AIRCRAFT EMISSION CONTRIBUTIONS AT STATION 209, WINTER 1980.......... 38

5. HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTER-
   NATIONAL:  AIRCRAFT SOURCES (3-Hr. Average for 1970)................ 44

6. HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTER-
   NATIONAL:  AIRCRAFT SOURCES (3-Hr. Average for 1980)................ 45

7. CALCULATED NON-METHANE HYDROCARBON CONCENTRATIONS DOWNWIND
   OF LOS ANGELES AIRPORT FOR 1980 WITH NON-AIRCRAFT SOURCES
   CONTROLLED......................................................... 46

8. $NO_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:
   AIRCRAFT SOURCES (Annual Average for 1970)......................... 48

9. $NO_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:
   AIRCRAFT SOURCES (Annual Average for 1980)......................... 50

10. $NO_x$ ISOPLETHS IN THE VICINITY OF CHICAGO-O'HARE INTER-
    NATIONAL:  AIRCRAFT SOURCES (Annual Average for 1980)............. 51

11. PISTON ENGINE EMISSION CHARACTERISTICS............................ 64

12. HYDROCARBON AND CARBON MONOXIDE EMISSIONS FROM A TYPICAL
    AIRCRAFT TURBINE ENGINE (JT3D).................................... 73

A-1. MAXIMUM 8-HOUR AVERAGE CO CONCENTRATIONS IN LOS ANGELES AREA........85

A-2. BASELINE DATA, DAILY MAXIMUM 8-HOUR AVERAGE CO CONCENTRATIONS,
     STATION 209, LAX, 1970..........................................86

A-3. FREQUENCY DISTRIBUTION FOR 8-HOUR CO DATA, STATION 209, LAX,
     SEPTEMBER 1970..................................................87

A-4. EXPECTED CO CONCENTRATION DISTRIBUTION, WINTER, STATION 209,
     LAX FOR 80 PERCENT AIRCRAFT CONTRIBUTION........................88

A-5. EXPECTED CO DISTRIBUTION, WINTER, STATION 209, LAX FOR 20
     PERCENT AIRCRAFT CONTRIBUTION...................................89

# LIST OF TABLES

Page

TABLE

1. NATIONAL AMBIENT AIR QUALITY STANDARDS................................. 9

2. AIRCRAFT CLASSIFICATION SYSTEM........................................ 11

3. PRESENT AND PROJECTED LTO CYCLES FOR 1970, 1975, and 1980............ 14

4. CURRENT AND PROJECTED EMISSIONS FOR AIRCRAFT AND AIRPORTS............ 16

5. ABILITY OR NON-ABILITY TO MEET THE NATIONAL AMBIENT AIR QUALITY
   STANDARDS IN 1975................................................... 20

6. METROPOLITAN LOS ANGELES INTRASTATE AQCR EMISSIONS.................. 21

7. NEW YORK PORTION OF THE N.J. - N.Y. - CONN. INTERSTATE AQCR
   EMISSIONS.......................................................... 22

8. NATIONAL CAPITAL INTERSTATE AQCR EMISSIONS......................... 23

9. ILLINOIS PORTION OF THE METROPOLITAN CHICAGO INTERSTATE AQCR
   EMISSIONS.......................................................... 24

10. METROPOLITAN DENVER INTRASTATE AQCR EMISSIONS...................... 25

11. SAN FRANCISCO BAY AREA INTRASTATE AQCR EMISSIONS................... 26

12. METROPOLITAN DALLAS - FORT WORTH INTRASTATE AQCR EMISSIONS......... 27

13. METROPOLITAN BOSTON INTRASTATE AQCR EMISSIONS...................... 28

14. INDICATIONS OF LOCALIZED AIRPORT IMPACT OF 20 LARGEST AIR
    CARRIER AIRPORTS.................................................. 31

15. COMPARISON OF EMISSION DENSITIES FOR AIRPORTS VERSUS URBAN
    AREAS FOR 1970, 1975, and 1980................................... 32

16. EXPECTED RANGE OF DAYS THAT 8-HR STANDARD WILL BE EXCEEDED
    IN VICINITY OF LAX FOR VARIOUS LEVELS OF AIRCRAFT IMPACT......... 40

17. LOS ANGELES AIRPORT - NUMBER OF TIMES THE 1-HOUR CO STANDARD
    WAS EXCEEDED - MAY 10 THROUGH NOVEMBER 9, 1970................... 41

18. DISPERSION MODEL ESTIMATES OF 1-HOUR CO CONCENTRATIONS............ 42

19. AIRCRAFT ENGINE CLASSIFICATION................................... 55

20. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND
    FUTURE TURBINE ENGINES........................................... 57

Page

21. EFFECTIVENESS OF t1 - MINOR COMBUSITON CHAMBER REDESIGN -
    ON REDUCTION OF EMISSIONS FROM TURBINE ENGINES.....................59

22. EFFECTIVENESS OF ENGINE MODIFICATION IN CONTROL OF EMISSIONS
    FROM TURBINE ENGINES, BY OPERATING MODE............................60

23. BASES FOR CONTROL METHOD EFFECTIVENESS ESTIMATES FOR TURBINE
    ENGINES............................................................61

24. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND
    FUTURE PISTON ENGINES..............................................63

25. CURRENT UNCONTROLLED EMISSION RATES FOR PISTON ENGINES.............65

26. EFFECTIVENESS OF ENGINE MODIFICATIONS IN CONTROL OF
    EMISSIONS FROM PISTON ENGINES BY POLLUTANT.........................65

27. TIME AND COSTS FOR MODIFICATION OF CURRENT CIVIL AVIATION
    ENGINES............................................................68

28. COST RESULTS FOR TURBINE ENGINE POPULATION BY SEPARATE USE
    CATEGORIES.........................................................69

29. COMPARATIVE REDUCTIONS RESULTING FROM CONTROL METHODS APPLIED
    AT LOS ANGELES INTERNATIONAL AIRPORT...............................74

30. COSTS AND TIME FOR OPERATIONS CHANGES AT LOS ANGELES INTER-
    NATIONAL AIRPORT...................................................75

31. COMPARISON OF EMISSION CONTROL METHODS.............................77

32. INSTRUMENTATION FOR MEASUREMENT OF TURBINE ENGINE EMISSIONS.........82

B-1. SHORT-TERM METEOROLOGICAL AND ACTIVITY CONDITIONS..................94

# INTRODUCTION

Public awareness that aircraft were a source of air
pollution developed in the late 1950's with the introduction
of turbine-engine aircraft.  Visible exhaust plumes from the
engines and increased levels of exhaust odors at airports
caused complaints to be lodged.  The complaints, in turn,
stimulated investigations into the nature and extent of
aircraft emissions.  The Air Quality Act of 1967
specifically identified aircraft emissions as a subject of
concern and required an investigation by the Department of
Health, Education, and Welfare.  The study[1], submitted to
Congress on January 17, 1969, concluded that:

"1. Reduction of particulate emissions from jet
aircraft is both desirable and feasible.  Engine
manufacturers and airlines have indicated that improvements
in turbine engine combustor design can be built into new
engines and retrofitted on engines already in use.  Testing
programs are already underway.  Furthermore, they have
indicated that application of this technology will be
underway by the early 1970's.  While there are no laws or
regulations to compel the industry to follow through on this
work, it appears that public pressures resulting primarily
from the adverse effects of odors and visibility obscuration
will lead industry to initiate the application of this
technology as soon as possible and to complete it within the
shortest possible time.  Accordingly, it is the intention of
this Department to encourage such action by engine
manufacturers and airline operators and to keep close watch
on their progress.  If, at any time, it appears that
progress is inadequate or that completion of the work will
be unduly prolonged, or that the concern of the industry
lags, the Department will recommend regulatory action to the
Congress that statutory authority for such action be
provided.

"2. Further research is needed to define more
precisely the present and probable future nature and
magnitude of all other air pollution problems associated
with aircraft activity in the United States and to identify
needs for control measures.  Emphasis must be placed
particularly on assessment of air pollutant levels in the

air terminal environment and their effects on health and
safety and on evaluation of possible long-term effects of
upper atmospheric pollution resulting from aircraft flight
activity.  The Department will undertake research
appropriate to the solution of this problem.

"3. As further research results in identification of
needs for additional measures to control air pollution from
any type of aircraft, and as measures to achieve such
control become available through research and development,
it is the Department's expectation that engine
manufacturers, airline operators, and other segments of the
aviation community will take the initiative in the
development and application of such control measures.  If
the private sector fails to provide adequate controls, the
Department will not hesitate to recommend to the Congress
that Federal regulatory action be authorized.

"4. In light of the relatively small contribution of
aircraft to community air pollution in all places for which
adequate data are available, and in view of the practical
problems that would result from State and local regulatory
action in this field, it is the Department's conclusion that
adoption and enforcement of State or local emission control
regulations pertaining to aircraft cannot be adequately
justified at this time.  The Department recommends that, if
and when regulations become necessary, the rationale used to
develop Federal rather than local emission standards for
motor vehicles be applied to aircraft.

"5. The Department recognizes that State and local
agencies, in cooperation with the Federal Aviation
Administration and other cognizant agencies, are the most
appropriate groups to insure that control of airport
pollution hazards will be given adequate consideration in
the selection of airport sites, planning for expansion and
reconstruction of airports, design of airports, and planning
and conduct of ground operations.

"6. The Department will include information on
progress in the control of air pollution from aircraft in
the annual report which must be submitted under section 306
of the Air Quality Act."

As a result of conclusion (1) above, in March 1970, at a
meeting held by the Secretaries of Health, Education, and
Welfare and of Transportation, representatives of 31
airlines agreed to a schedule for retrofitting JT8D engines
with reduced smoke combustors, to be substantially completed
by the end of 1972.  This agreement sought to significantly

abate visible (smoke) emissions from aircraft powered by
this widely used engine.  This retrofit program is 85%
complete (July 1972).  Conclusion (2) pointed to the need
for studying air terminal environments, a need which led to
an EPA-sponsored study of Los Angeles International Airport
by the Los Angeles Air Pollution Control District.  This
study was completed in April 1971.[2]

Passage of the 1970 Clean Air Act Amendments essentially
required that we reassess the aircraft emissions problem and
update our knowledge concerning the air quality impact and
feasibility of control of such emissions.

The data base for this report includes information
developed by Northern Research and Engineering[3][4], Cornell
Research Laboratories[5], the previously cited LAPCD study,
and information compiled separately by EPA personnel.

3

# CONCLUSIONS

The various approaches taken in this study to assess the
impact of aircraft on air quality indicate, both
individually and collectively, that aircraft operations
"cause or contribute to or are likely to cause or contribute
to air pollution which endangers the public health or
welfare" (Sec. 231(a), Clean Air Act Amendments of 1970).
Based on this general conclusion a realistic program of
emissions control should be instituted. Though such a
control program cannot be quantitatively related to the air
quality considerations discussed herein, pollutant emissions
from aircraft and aircraft engines should be reduced through
the application of the present and prospective technology
described in this study. A control program should have
inherent flexibility so that as more extensive impact data
become available the required controls can be modified
accordingly.

The results of EPA's current study of aircraft emissions
and their control have led to the following specific
conclusions:

1. Aircraft emissions are significant contributors to
the regional burden of pollution in comparison to other
sources which will have to be controlled to meet National
Ambient Air Quality Standards.

2. When airports are viewed as concentrated area sources
of pollution emissions, either in isolation or in concert
with their surrounding pollution sources, it can be
demonstrated that airports will probably exert localized
impact on air quality, in excess of the standards, even
though relief is provided elsewhere in the region by
controls relating to automobiles and stationary sources.
That is, unless aircraft emissions are reduced, airports
will still remain intense area emitters of pollutants when
the emission densities in the surrounding region have been
greatly reduced.

3. Aircraft emissions have impact on air quality in
residential and business areas adjacent to major U. S.
airports. The control of non-aircraft sources in and around
such airports will not be adequate to insure compliance with

5

the National Ambient Air Quality Standards indicating the need for controlling aircraft emissions.

4. There exists a variety of control techniques for effecting aircraft emissions reductions which appear both feasible and economically attractive during the next two decades. Emissions may be reduced by means of the following general approaches:

(a) Modification of ground operational procedures.

(b) Improvement in maintenance and quality control procedures to minimize emissions from existing families of turbine engines.

(c) Development and demonstration of new combustion technology for major reductions in emissions from second-generation turbine and piston aircraft engines.

(d) Retrofit of turbine engine fleets with existing technology for near-term reduction of emissions.

6

# METHODOLOGY FOR IMPACT ASSESSMENT

Assessment of air quality impact involves investigation at several different levels: (a) global, (b) regional (sub-global), (c) urban, and (d) local. In this report the urban level is defined as an air quality control region. The ability to conduct investigations or assessment at these levels depends entirely on the analytical tools and data bases available. Until quite recently most assessments were source oriented and presented data in terms of national or air quality control region inventories. With the development of models and more refined monitoring systems, we can now explore the more localized "hot spots" within an urban area. The earlier report[1] on the impact of aircraft emissions dealt only with national and regional inventories and projections of aircraft emissions and pointed to the need for a closer look at local airports and their immediate environments. Hence, this study concentrates on assessing local effects through a combination of approaches involving monitoring, statistical analysis, and modeling. Additionally, aircraft emissions are compared with those from other sources of the same pollutants in terms of relative importance and relative cost of control.

The potential impact of aircraft emissions on the global and sub-global environments is not being ignored. Studies of pollution at these levels involve an integrated assessment of all contributors to the global pollution inventory, and hence are beyond the scope of this report. The Clean Air Act mandates that EPA study the geophysical effects of air pollution. Research and monitoring components of EPA are now engaged in preliminary phases of such studies.

To provide continuity, we have updated pertinent data prepared by Northern Research and Engineering which was contained in the previous report[1]. Discrepancies between similar data presentations in the two reports result from the better data base obtained in this study.

## NATIONAL AMBIENT AIR QUALITY STANDARDS

In order to assess the significance of aircraft emissions, one must evaluate their contribution to pollutant concentrations in the atmosphere and relate the resulting concentrations to the national ambient air quality standards.

7

In accordance with the Clean Air Act Amendments of 1970, the EPA established primary and secondary ambient air quality standards[6] for six major pollutants: carbon monoxide, nitrogen dioxide, hydrocarbons, photochemical oxidants, sulfur dioxide, and particulates. The primary standards provide for protection of public health and the secondary standards for prevention of all other undesirable effects of air pollution. Table 1 shows the national standards for these six pollutants.

It should be noted that nonmethane hydrocarbons at concentrations observed in the atmosphere have not been associated with health effects. The relationship between nonmethane hydrocarbons and photochemical oxidants indicates, however, that peak photochemical oxidant concentrations are associated with hydrocarbon concentrations averaged over the time period from 6 to 9 a.m.[7] The peak oxidant levels normally appear some three hours later. The nonmethane hydrocarbon standard is based on this relationship.

As a basis for implementation of the standards, the entire United States has been divided into some 240 Air Quality Control Regions[8]. Regional boundaries are based on considerations of urban-industrial concentration, existing jurisdictional boundaries, and other factors including topography and meteorology, which would affect levels of air quality in an area.

In accordance with the provisions of Section 110 of the Clean Air Act, the States have submitted plans that provide for the implementation, maintenance, and enforcement of the national air quality standards on a regional (air quality region) basis. The State implementation plan for each region must provide for attainment of the primary standards in 3-5 years depending on whether an extension has been granted. The State plan is required to set forth the procedure for attaining the secondary standards within a reasonable amount of time.

Strategies which States are proposing to meet the standards and the possible impact aircraft emissions and their control may have on the strategies are discussed in the section on regional impact.

8

Table 1   NATIONAL AMBIENT AIR QUALITY STANDARDS

| Pollutant | Standard Description |
|---|---|
| Carbon monoxide (Primary and secondary standards are the same) | - 10 milligrams per cubic meter (9 ppm), maximum 8-hour concentration not to be exceeded more than once per year.<br>- 40 milligrams per cubic meter (35 ppm), maximum 1-hour concentration not to be exceeded more than once per year. |
| Nitrogen dioxide (Primary and secondary standards are the same) | - 100 micrograms per cubic meter (0.05 ppm), annual arithmetic mean. |
| Hydrocarbons (non-methane) (Primary and secondary standards are the same) | - 160 micrograms per cubic meter (0.24 ppm), maximum 3-hour concentration (6-9 a.m.) not to be exceeded more than once per year.  For use as a guide in devising implementation plans to meet the oxidant standards. |
| Particulate matter Primary standard | - 75 micrograms per cubic meter, annual geometric mean.<br>- 260 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
| Secondary standard | - 60 micrograms per cubic meter, annual geometric mean, as a guide to be used in assessing implementation plans to achieve the 24-hour standard.<br>- 150 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
| Sulfur dioxide Primary standard | - 80 micrograms per cubic meter, annual arithmetic mean.<br>- 365 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
| Secondary standard | - 60 micrograms per cubic meter, annual arithmetic mean.<br>- 260 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year.<br>- 1300 micrograms per cubic meter, maximum 3-hour concentration not to be exceeded more than once per year. |
| Oxidant (Primary and secondary standards are the same) | - 160 micrograms per cubic meter, maximum 1-hour concentration not to be exceeded more than once per year. |

9

BASIC REQUIREMENT FOR IMPACT EVALUATION

EMISSION FACTORS

Pollutants emitted by aircraft engines include gaseous
hydrocarbons, carbon monoxide, oxides of nitrogen,
particulate matter, and sulfur oxides. In order to evaluate
the impact of aircraft emissions on the ambient air levels
of these pollutants, the logical first step is an estimate
of the total emissions due to aircraft. Because emission
rates vary according to engine type, number of engines and
operating mode, we have classified aircraft by type, defined
the typical operating modes for each class throughout their
landing and takeoff (LTO) cycles, and determined emission
factors for each class operating in each mode.

The aircraft classification system groups aircraft into 12
separate types that include the currently used commercial
air carriers, and general aviation, and military aircraft.
(Classes 8-11 are exclusively military aircraft and are
excluded from further consideration in this report.)
Provision was also made in the classification system for the
possible introduction of supersonic commercial aircraft in
the future. The basis for classification of civilian and
commercial aircraft is presented in Table 2.

The aircraft modes of operation for which emission rates
were categorized are:

      (1) Start-up and idle
      (2) Taxi
      (3) Idle at runway
      (4) Takeoff
      (5) Climb-out to 3,000 foot elevation
      (6) Fuel dumping
      (7) Approach from 3,000 foot elevation
      (8) Landing
      (9) Idle and shutdown
     (10) Maintenance

Emission factors were developed for the civil aviation
aircraft classes. A representative listing of emission
factors for piston and turbine engines is presented in
subsequent discussions of control feasibility.

The aircraft emission data, obtained through various
research programs funded by EPA, are summarized in the
report prepared for EPA by Cornell University.[5]

Emissions from non-aircraft sources on and around the
airport are also accounted for in the air quality analyses.
These sources of emissions include airport heating plants,

10

TABLE 2

AIRCRAFT CLASSIFICATION SYSTEM

| Category | Class | Ref. 14 class-fication | Type | Examples | Engine Model | Type | Thrust or power[a] | Engines per aircraft |
|---|---|---|---|---|---|---|---|---|
| Air Carrier | 1 | – | Supersonic transport | Concorde Tupolev TU-144 | R-R/Snecma Olympus 593 | Turbojet | 39,000 lb. | 4 |
| | 2 | | Jumbo jet transport | Boeing 747 Douglas DC-10 | P&WA JT9D | Turbofan | 43,000 lb. | 4 |
| | 3 | 1 | Long-range jet transport | Boeing 707 Douglas DC-8 | P&WA JT3D | Turbofan | 18,000 lb. | 4 |
| | 4 | 2 | Medium range jet transport | Boeing 727 Douglas DC-9 | P&WA JT8D | Turbofan | 13,900 lb. | 2.6 |
| | 5 | 4 | Turboprop transport | Lockheed Electra Fairchild Hiller FH-227 | Allison 501-D13 | Turbo-prop | 3,750 hp. | 2.5 |
| General Aviation | 6 | 3 | Business jet | Lockheed Jetstar North American Sabreliner | P&WA JT12 | Turbojet | 2,900 lb. | 2.1 |
| | 7 | 6 | Piston-engine utility | Cessna 210 Centurion Piper 32-300 Cherokee Six | Continental 10-520-A | Opposed piston | 292 hp. | 1[b] |
| V/Stol | 12 | 7 | Helicopters and V/STOL | Silorsky S-61 Vertol 107 | General Electric CT58 | Turbo-shaft | 1,390 hp. | 2 |

[a]Equivalent shaft power.

[b]Representative of Van Nuys and Tamiami.

11

fuel storage losses, automobiles, service vehicles, and areas neighboring the airport. To estimate the impact of aircraft emissions on air quality near the ground, one must take into account emissions from the time an aircraft enters the atmospheric mixing layer during approach until it leaves this layer during climb-out. In defining an LTO cycle representative of this consideration, a height of 3,000 feet above the runway was selected as a reasonable approximation of atmospheric mixing depth over major U. S. metropolitan areas.[1] The number of LTO cycles performed, and the relative lengths of time spent in each operational mode of an LTO cycle, combined with the appropriate emission factors, determine the quantities of pollutants emitted by aircraft.

SELECTION OF CRITICAL AREAS AND AIRPORTS

Once the general emission characteristics of aircraft were determined, specific regions and airports having high aircraft activity and air pollution potential were selected for impact evaluation.

As a part of the Northern study[3], several airports were selected to represent, as nearly as possible, those at which the impact of emissions from aircraft and related activities would probably be greatest. The factors considered in evaluating the potential impact of individual airports included: (1) aircraft activity levels, (2) airport area, (3) mean wind speed, and (4) relative activity of different types of aircraft (commercial air carrier and general aviation). On the basis of these considerations and the availability of airport and aircraft activity data, these airports were selected for study:

    (1) Commercial Air Carrier

       Los Angeles International

       Washington National

       J. F. Kennedy International

       O'Hare International

    (2) General Aviation

       Van Nuys, California

       Tamiami, Florida

Less elaborate evaluations of four additional airports and their impact in their respective air quality control regions were developed as the regional impact analysis was expanded to include an examination of State implementation plans for the attainment of the air quality standards.

The four additional airports, located in San Francisco, Dallas-Ft. Worth, Denver, and Boston, were selected on the basis of high levels of aircraft activity and severity of the regional pollutant levels.

## EMISSION PROJECTIONS

The basic emission factors for any particular engine type are not expected to change substantially with time unless changes are required by emission standards. In addition, the number and type of engines representative of one particular class of aircraft are not expected to change substantially in the next 10-20 years. The important and determining factors affecting the projected controlled or uncontrolled emissions are: (1) changes in the level of airport activity, and (2) changes in the mix of the various classes of aircraft.

As a part of the Northern Research Study, records of aircraft activity by class were obtained for the selected airports. Prospective growth in activity at each airport was estimated by projecting past and current activity data to 1975 and 1980. The general trend at the selected airports is towards more aircraft operations in classes 1, 2, 4, 6 and 7; and less in classes 3 and 5. The total yearly activity data and projections are summarized in Table 3.

The air carrier airports are so-called because of the preponderance of commercial air carrier activity, which, in 1970, ranged from 66 percent of total activity at Washington National to 92 percent at Chicago O'Hare. Activity at Tamiami and Van Nuys Airports is approximately 99 percent general aviation aircraft.

Additionally, data were obtained on the uses and locations of taxiways, runways, terminals, hangars, heating plants, fuel storage areas, and roadways at each airport in order to locate and quantify the various sources of emissions during the operation of aircraft.

Based on projections from Reference 3, revised to incorporate more accurate emission factors, total projected emissions of pollutants from aircraft and from all sources

Table 3

Present and Projected LTO Cycles for 1970, 1975, and 1980

| Airport | Type of aircraft | | | | Total LTO cycles | | |
|---|---|---|---|---|---|---|---|
| | Air carrier | General aviation | Military | Helicopters | 1970[a] | 1975 | 1980 |
| All FAA operated airports | - | - | - | - | $28 \times 10^6$ | $39 \times 10^6$ | $59 \times 10^6$ |
| Air carrier airports | | | | | | | |
| Los Angeles International | 203,900 | 59,900 | 4,200 | 4,050 | 272,000 | 305,200 | 358,100 |
| Washington National | 109,800 | 55,500 | 1,500 | - | 166,700 | 169,800 | 173,500 |
| J. F. Kennedy International | 188,800 | 27,800 | - | - | 219,200 | 208,500 | 241,300 |
| Chicago | 314,300 | 21,200 | - | - | 339,900 | 357,000 | 410,800 |
| General aviation airports | | | | | | | |
| Van Nuys, California | 20 | 279,400 | 2,700 | - | 281,600 | - | 700,000 |
| Tamiami,[b] Florida | - | 200,800 | - | - | 200,800 | - | - |

[a] Where parts do not add up to total, LTO cycles not classified by type were included in total
[b] 1971 estimated activity

14

were calculated for the years 1975 and 1980 at each of the
selected airports except New Tamiami (which lacked reliable
activity projections).  These projections are presented in
Table 4 for total hydrocarbons, carbon monoxide, nitrogen
oxides, sulfur dioxide, particulate matter (including lead),
and lead.  For a more complete assessment of proposed
control strategies, emission projections for three of the
pollutants (hydrocarbons, carbon monoxide, and nitrogen
oxides) were also developed for 1990.  The projected values
for 1990 are presented in the discussion of control
feasibility and impact.  The emission projections are based
on present emission rates for each aircraft engine class and
do not incorporate potential future reductions in emissions
as a result of aircraft emission standards.  The projected
aircraft emissions reflect increased activity and changes in
the mix of existing engines.

At the four air carrier airports during the 1970's, as a
result of continued introduction of jet engines found in
present-day new jet aircraft, total emissions of carbon
monoxide from aircraft are not projected to change greatly.
Hydrocarbon emissions, however, although predicted to
increase by 18 percent at Washington National Airport, are
expected to decrease by about 60 to 70 percent at Los
Angeles, John F. Kennedy, and O'Hare Airport.  The estimated
average increase in aircraft operations is 20 percent at
these airports during the 1970's, indicating in general,
lower hydrocarbon and carbon monoxide emissions from the
newer and, in many cases, larger engines.  As shown in Table
4 there will be substantial increases in aircraft NOx
emissions of 275 percent at Los Angeles, 146 percent at John
F. Kennedy, 98 percent at O'Hare, and 33 percent at
Washington National Airport between 1970 and 1980.  These
increases reflect the greater amounts of NOx emitted during
an entire LTO cycle from the newer engines.  Some increases
in SO2 and particulate emissions from aircraft are
projected, since such increases usually follow increases in
aircraft operations.

At Van Nuys Airport, the projected increases in all
pollutants parallel the large projected increases in
activity at this airport.  During the 1970's, emissions of
hydrocarbons, carbon monoxide, NOx, and lead from aircraft
are projected to increase by about 140 percent.

As Table 4 indicates, we estimate that in 1975 CO emissions
from aircraft at Van Nuys Airport will exceed CO emissions
from aircraft at a major commercial airport, Washington
National.  This estimation indicates the increasing
importance of general aviation aircraft emissions, and

15

Table 4. CURRENT AND PROJECTED EMISSIONS[a] FROM AIRCRAFT AND AIRPORTS

(tons/year)

| Airport and year | Particulates[b] | | NOx | | SO2 | | Lead | | Carbon monoxide | | Total hydrocarbons | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total |
| **Los Angeles** | | | | | | | | | | | | |
| 1970 | 570 | 616 | 3,050 | 4,369 | 431 | 434 | 0.3 | 35.2 | 16,030 | 29,230 | 12,570 | 14,660 |
| 1975 | 610 | 627 | 6,790 | 8,110 | 490 | 561 | 0.9 | 22.0 | 16,630 | 28,730 | 8,660 | 10,530 |
| 1980 | 680 | 693 | 11,490 | 12,480 | 623 | 726 | 1.0 | 7.8 | 18,480 | 27,280 | 4,770 | 5,760 |
| **Washington National** | | | | | | | | | | | | |
| 1970 | 231 | 253 | 820 | 1,074 | 105 | 319 | 0.5 | 4.8 | 2,410 | 3,731 | 610 | 864 |
| 1975 | 242 | 253 | 980 | 1,211 | 121 | 330 | 0.5 | 2.1 | 2,700 | 3,691 | 680 | 823 |
| 1980 | 286 | 297 | 1,090 | 1,277 | 143 | 352 | 0.5 | 0.9 | 3,030 | 3,470 | 720 | 775 |
| **John F. Kennedy** | | | | | | | | | | | | |
| 1970 | 570 | 660 | 2,580 | 4,846 | 418 | 902 | 0.3 | 53.9 | 12,590 | 32,390 | 9,490 | 12,680 |
| 975 | 550 | 605 | 4,660 | 6,640 | 415 | 913 | 0.4 | 27.5 | 11,280 | 26,680 | 8,010 | 8,010 |
| 980 | 550 | 583 | 6,370 | 7,580 | 442 | 957 | 0.9 | 7.8 | 10,680 | 18,380 | 2,830 | 3,930 |
| **O'Hare** | | | | | | | | | | | | |
| 1970 | 900 | 1,001 | 3,760 | 6,290 | 562 | 605 | 0.2 | 63.8 | 14,740 | 34,540 | 9,580 | 13,210 |
| 1975 | 970 | 1,023 | 5,760 | 7,520 | 600 | 660 | 0.4 | 28.6 | 13,840 | 31,440 | 6,300 | 8,830 |
| 1980 | 1,100 | 1,100 | 7,440 | 8,540 | 718 | 803 | 0.6 | 7.7 | 13,530 | 22,330 | 3,710 | 4,920 |
| **Van Nuys** | | | | | | | | | | | | |
| 1970 | 3.2 | 3.7 | 12.1 | 27.5 | 0.033 | 0.33 | 3.2 | 3.6 | 1,650 | 1,870 | 100 | 132 |
| 1975 | 5.4 | 5.7 | 19.8 | 34.1 | 0.066 | 0.55 | 5.3 | 5.5 | 2,750 | 2,860 | 165 | 198 |
| 1980 | 7.7 | 7.8 | 28.6 | 36.3 | 0.099 | 0.88 | 7.6 | 7.6 | 3,960 | 4,070 | 242 | 264 |

[a]Based on aircraft emissions below 3000 feet altitude.

[b]Includes lead.

16

emphasizes that during an LTO cycle, CO emissions from a small general aviation piston engine can, in many cases, be expected to approach CO emissions from a commercial air carrier turbine engine.

The existing and potential air quality impact of sulfur oxides and lead is considered to be negligible in comparison to other sources of these two pollutants. Therefore, no further analysis was performed on these pollutants in this study. The particulate problem associated with aircraft operations has already been shown to be confined to the smoke problem and hence the air quality impact discussion is very brief in this report.

Emission projections for the additional airports at Dallas-Ft. Worth, San Francisco, Denver, and Boston were based on the similarity of the particular airport to one or more of those in Table 4.

# RESULTS OF IMPACT EVALUATION

### REGIONAL IMPACT

The implementation plans of eight air quality control
regions were reviewed in detail.  These regions have
critical problems in terms of their ability to meet the
National Ambient Air Quality Standards and also have
airports with high air passenger activity.  Four of the
regions considered are those in which the four major air
carrier facilities considered in the Northern Research Study
are located.  The analysis of regional implementation
strategies was extended to include San Francisco, Boston,
Denver, and Dallas-Fort Worth.  Table 5 reflects the present
status of implementation plans relating to the control
strategies (by pollutant) for these regions and their
ability to meet the air quality standards by 1975.

As an aid in assessing aircraft emissions and their regional
impact Tables 6 through 13 present the 1970 emission
inventories and emission projections for 1975 and 1980, for
the eight regions cited, along with reductions expected as a
result of Federal standards for emissions from light-duty
motor vehicles.* In addition, one or more of the proposed
strategies representing control of smaller sources or
additional controls on motor vehicle sources are cited so
that the spectrum of control demands is evident.  Present
and projected estimates of aircraft emissions are also
tabulated, along with the reductions to be expected if the
proposed standards are met.  The reductions for 1975
represent application of the only feasible control strategy
available by that date, ground operation control.  Two
values are shown for 1980 potential reduction: the first
represents the actual reductions achievalbe by 1980; the
second, mass reductions achievable in the 1980-1990 time
frame as a result of the proposed 1979 design standards.
Note that in 9 of the 17 possible region/pollutant
combinations (an 8-region by 2-pollutant matrix plus Los
Angeles NOx) the potential reductions in aircraft emissions
are comparable to (at least half of) or greater than the
reductions due to minimum strategies proposed for 1980 by
the various regional or State agencies.

More importantly, in 4 of these 9 cases, the air quality
standard will not be met or will be only marginally met in
the 1975-1980 time frame.  In these cases aircraft emission
reductions before and after 1980 would represent effective
control strategies.  In all regions facing difficulties in

19

TABLE 5

ABILITY TO MEET
NATIONAL AMBIENT AIR QUALITY STANDARDS
IN 1975

(yes = able, no = unable)

Based on Current State Implementation Plan Information

| Region | Pollutant | | |
|---|---|---|---|
| | CO | HC | $NO_2$* |
| 1. Los Angeles | Yes | No | No |
| 2. New York | No | No | -- |
| 3. Washington, D.C. | No | Yes | -- |
| 4. Chicago | Yes | Yes | -- |
| 5. Denver | No | No | -- |
| 6. San Francisco | Yes | No | -- |
| 7. Dallas/Fort Worth | Yes | Yes | -- |
| 8. Boston | No | No | -- |

*$NO_2$ air quality data is currently being reevaluated. Results of this reassessment may require additional or accelerated control of aircraft $NO_x$ emissions to those herein proposed.

TABLE 6

METROPOLITAN LOS ANGELES INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[c] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC[a] | NOx | CO | HC[a] | NOx | CO | HC[a] | NOx |
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 4,130 | 651 | 573 | 4,400 | 693 | 611 | 4,800 | 756 | 668 |
| Aircraft (for entire region) | 41.1 | 6.8 | 4.2 | 51.4 | 4.9 | 9.3 | 70.0 | 3.2 | 15.6 |
| **REGION WITH PROPOSED CONTROLS** (Aircraft control not included) | | | | 880 | 178 | 335 | 515 | 130 | 275 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| Present motor vehicle program | | | | 2,200 | | 164 | 3,720 | | 350 |
| Petroleum industry | | | | | 365 | | | 548 | |
| Organic solvents | | | | | 23.7 | | | 25.5 | |
| Incineration | | | | 14.6 | 1.8 | 1.1 | 16.4 | 2.2 | 1.1 |
| Combustion of fuels | | | | | | 9.1 | | | 9.1 |
| Agriculture | | | | 1.8 | | | 2.2 | | |
| Periodic vehicle inspection | | | | 584 | 25.6 | +16.4[b] | 230 | 7.3 | +14.6[b] |
| Retrofit evaporative control | | | | | 34.7 | | | 9.1 | |
| 1/3 conversion to gaseous fuels | | | | 485 | 27.4 | 73 | 175 | 7.3 | 25.6 |
| 20% traffic reduction | | | | 200.7 | 30.8 | 47.5 | 109.5 | 18.3 | 27.4 |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Turbine ground operation | | | | 10.4 | 2.5 | | 10.9 | 1.3 | |
| Turbine emission standard | | | | | 0.3 | | 1.9 | 0.4 | 1.0 |
| Piston emission standard | | | | | | | (25.8) | (2.7) | (13.4) |
| | | | | | | | 2.3 | 0.0 | |
| | | | | | | | (30.9) | (0.3) | |
| Sum of aircraft control strategies | | | | 10.4 | 2.8 | 0 | 15.1 | 1.7 | 1.0 |
| | | | | | | | 56.7 | 3.0 | 13.4 |

[a] Reactive HC based on California SIP

[b] Increase rather than decrease due to engine operation tradeoff

[c] Values shown in parenthesis are projected 1990 emission reductions.

21

TABLE 7

NEW YORK PORTION OF THE N.J. - N.Y. - CONN. INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980d | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 4,207 | 832 | 741 | 4,840 | 955 | 851 | 5,260 | 1,040 | 926 |
| Aircraft (JFK only) | 12.6 | 9.5 | 2.6 | 11.3 | 5.7 | 4.7 | 10.7 | 2.8 | 6.4 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 2,630 | 485 | 727 | 1,136 | 268 | 622 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 2,139 | 431 | 101 | 4,066 | 702 | 269 |
| (Other Strategies) | | | | 41[a] | 20.8[b] | 23.6[c] | 44.6[a] | 21[b] | 25.6[c] |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 5.7 | 3.6 | | 5.1 | 1.6 | |
| Emission Standards | | | | | .4 | | 0.8 (9.6) | 0.6 (3.0) | 0.5 (6.1) |

Note: La Guardia ≅ 60-70% of JFK.
[a] Downtown truck control.
[b] Process evaporation.
[c] Gas space heat downtown.
[d] Values shown in parenthesis are projected 1990 emission reductions.

22

TABLE 8

NATIONAL CAPITAL INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[c] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 1,389 | 267 | 184 | 1,554 | 299 | 206 | 1,735 | 335 | 230 |
| Aircraft (National) | 2.4 | 0.6 | 0.8 | 2.7 | 0.7 | 0.9 | 3.0 | 0.7 | 1.1 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 1,025 | 155 | 188 | 460 | 117 | 150 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 470 | 97 | 20 | 1,215 | 190 | 78 |
| Minimum Strategies | | | | 25.2[a] | 2.2[a] | 0.5[b] | 11.3[a] | 1.3[a] | 0.3[b] |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 1.1 | .3 | | 1.2 | .4 | |
| Emission Standards | | | | | 0.1 | | 0.2 (2.9) | 0.2 0.7 | 0.1 (1.0) |

[a]Use of liquified petroleum gas for fleet vehicles.
[b]Motor vehicle maintenance and inspection.
[c]Values shown in parenthesis are projected 1990 emission reductions.

23

TABLE 9

ILLINOIS PORTION OF THE METROPOLITAN CHICAGO INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980e | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 2,730 | 606 | 383 | 3,064 | 688 | 435 | 3,496 | 796 | 504 |
| Aircraft (O'Hare) | 14.7 | 9.6 | 3.8 | 13.8 | 6.3 | 5.8 | 13.3 | 3.7 | 7.4 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| Region | | | | 1,480 | 235.5 | 306 | 506 | 96 | 196 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| National Motor Vehicle Standards | | | | 1,383 | 262 | 94.5 | 2,748 | 465 | 265 |
| Aggregate Stationary Source Controls[a] | | | | 4.4[b] | 1.1[c] | 6.0[d] | 5.3[b] | 1.3[c] | 7.4[d] |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 6.5 | 3.6 | | 6.2 | 2.0 | |
| Emission Standards | | | | | 0.6 | | 1.1 | 0.8 | 0.6 |
| | | | | | | | 12.2 | 3.9 | (6.5) |

Note: Midway emissions ≅ 20% O'Hare.
[a] Minimum source strategy assumed to be 10% of aggregate.
[b] Incinerators.
[c] Refinery solvents.
[d] Values shown in parenthesis are projected 1990 emission reductions.

24

TABLE 10

METROPOLITAN DENVER INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[a] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | NO$_x$ | CO | HC | NO$_x$ | CO | HC | NO$_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 873 | 174 | 139 | 965 | 192 | 154 | 1,065 | 212 | 170 |
| Aircraft (Stapleton) | 4.5 | 2.6 | 1.0 | 4.6 | 1.7 | 1.6 | 4.8 | 1.0 | 2.0 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 516 | 98 | | 252 | 65 | |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 280 | 70 | | 757 | 140 | |
| Retrofit Pre '67 Cars | | | | 66 | 14.5 | | 12 | 2.6 | |
| Tune-ups | | | | 103 | 9 | | 44 | 4 | |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 1.8 | 1.0 | | 1.7 | 0.5 | |
| Emission Standards | | | | | 0.2 | | 0.3 (3.5) | 0.2 (1.1) | 0.2 (1.8) |

[a]Values shown in parenthesis are projected 1990 emission reductions.

TABLE 11

SAN FRANCISCO BAY AREA INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC[b] | NO$_x$ | CO | HC[b] | NO$_x$ | CO | HC[b] | NO$_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
|   Region | 1,980 | 315 | 266 | 2,150 | 340 | 287 | 2,350 | 371 | 313 |
|   Aircraft (S.F. Int'l.) | 11.0 | 3.2 | 2.1 | 11.5 | 2.2 | 4.7 | 12.7 | 1.2 | 7.9 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
|   Region | | | | 451 | 89 | 156 | 291 | 69 | 125 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
|   National Motor Vehicle Standards | | | | 1,030 | 172 | 77 | 1,730 | 252 | 164 |
|   Minimum Strategies | | | | 16[c] | .7[e] | 21.8[d] | 18[c] | .7[c] | 10.8[e] |
|   Vehicle Inspection | | | | 266 | 10.9 | +7.3[f] | 106 | 2.9 | +7.3[f] |
| AIRCRAFT CONTROL | | | | | | | | | |
|   Ground Operation | | | | 5.3 | 1.3 | | 5.6 | 0.7 | |
|   Emission Standards | | | | 0 | 0.1 | | 1.0 | 0.2 | 0.5 |
| | | | | | | | 13.3 | 1.4 | 6.8 |

Note:  Oakland and San Jose ≅ 20% of S.F. Int'l.
[a] Values shown in parenthesis are projected 1990 emission reductions.
[b] Defined highly reactive.
[c] Agricultural burning.
[d] 20% traffic reduction.
[e] 1/3 conversion to gaseous fuels.
[f] Increase rather than reduction.

26

TABLE 12

METROPOLITAN DALLAS – FORT WORTH INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980 [a] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 2,340 | 454 | 280 | 2,620 | 509 | 314 | 2,920 | 567 | 350 |
| Aircraft (Love Field) | 7.2 | 4.5 | 1.8 | 6.9 | 3.0 | 2.7 | 6.7 | 1.8 | 3.5 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | | 256 | 270 | | 149 | 178 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | | 199 | 44 | | 393 | 172 |
| Minimum, Control Stationary Source and Gases | | | | | 6.4 | | | 6.4 | |
| Maintenance and Inspection | | | | | 48 | | | 19 | |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 3.1 | 1.7 | | 2.9 | 0.9 | |
| Emission Standards | | | | | 0.3 | | 0.5 (5.9) | 0.4 1.8 | 0.3 (3.2) |

[a] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 13

METROPOLITAN BOSTON INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[a] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
|    Region | 1,352 | 263 | 206 | 1,555 | 302 | 237 | 1,690 | 329 | 258 |
|    Aircraft (Logan) | 7.9 | 5.8 | 1.6 | 7.0 | 3.5 | 2.8 | 6.5 | 1.7 | 3.9 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
|    Region | | | | 1,034 | 141.5 | 211.7 | 490 | 82 | 183 |
| REDUCTION FOR SPECIFIC    STRATEGIES | | | | | | | | | |
|    National Motor Vehicle     Standards | | | | 502 | 95 | 25 | 1,200 | 178 | 75 |
|    Gasoline Handling    Evaporative Losses | | | | | 12 | | | 13 | |
|    Solvent Control | | | | | 52 | | | 56 | |
|    Other Strategies Sited    None Actually Proposed | | | | | | | | | |
| AIRCRAFT CONTROL | | | | | | | | | |
|    Ground Operation | | | | 3.5 | 2.2 | | 3.1 | 1.0 | |
|    Emission Standards | | | | | 0.2 | | 0.5 (5.9) | 0.4 (1.8) | 0.3 (3.7) |

[a]Values shown in parenthesis are projected 1990 emission reductions.

meeting the air quality standards, every viable control
strategy will have to be applied to meet requirements of the
Clean Air Act.

Table 6, which relates to the implementation plan for
metropolitan Los Angeles, lists all proposed strategies and
gives aircraft emission figures representative of all
aircraft activity, including LAX, in the region.  For a
specific region, total aircraft emissions can be
substantially higher than those attributed to the area's
major air carrier airport.  The region encompassing
metropolitan Los Angeles, for example, includes, besides
LAX, several smaller commercial air carrier airports and
numerous general aviation facilities.  It is not surprising
then that LAX accounts for only 40%, 70%, and 73%,
respectively of the total regional aircraft emissions of
CO, HC, and NOx in 1970.  This general relationship of
emissions attributable to major airports and total regional
aircraft emissions could be expected in similar highly
populated air quality control regions.

In the Los Angeles region, uncontrolled emissions from
aircraft are expected to account for 14% of the CO, 2.5% of
the reactive HC, and 5.5% of the NOx total emissions by
1980.

Emissions from piston aircraft have a particularly
significant impact on regional CO levels.  Although piston
aircraft were responsible for about 0.5% of the total CO
emissions in 1970, their contribution to CO emissions, if
uncontrolled, is expected to reach 10% by 1980.

## SUB REGIONAL AND LOCALIZED IMPACT

This section deals with the effect of aircraft emissions on
air quality at major airports and downwind of these
airports.  Emission densities and other parameters of
emission intensity and air quality impact are first
presented to provide indications of the contribution of
aircraft to air pollutant concentration around a number of
major U. S. airports.  Then detailed results of sampling and
dispersion modeling are presented to give deeper insight
into the localized impact of aircraft at airports where
aircraft contributions to air pollutant concentration are
expected to be particularly important.

## GENERAL INDICATORS OF LOCALIZED AIR QUALITY IMPACT

**Passenger Usage Density and Air Pollution Potential.**  An
indication of localized impact of aircraft on air quality is

presented in Table 14 for the 20 largest U. S. air carrier
airports, as determined by passenger enplanement.  On the
basis of concentration of passenger activity, proximity of
the airport to built-up areas, and meteorological pollution
potential[10] (a function of atmospheric mixing height and
wind speed), seven airports, designated by asterisks in
Table 14, could be expected to be particularly important
contributors to localized air pollutant concentrations.  The
results of Table 14 indicate most directly the airport
contributions to localized carbon monoxide concentrations;
the airport contributions to oxidant and nitrogen dioxide
concentrations are indicated less directly because
intermediate atmospheric reactions are involved in their
production.

Emission Density Comparison.  Emission densities have been
calculated for four of the airports that show a major air
quality impact potential.  Table 15 indicates that emission
densities due to aircraft alone in 1970 were in most cases
comparable to those of densely populated metropolitan areas
served by the corresponding airports.

This emission density comparison suggests that, in these
four airport areas, the contribution by aircraft to ambient
air concentrations of hydrocarbon, CO, and NOx is
substantial.  Such contributions are particularly important
where major airports lie in or near metropolitan areas in
which national ambient air quality standards are currently
exceeded.  As shown in Table 5, this is the case for the
four areas considered.

The comparison of emission densities (airport versus
metropolitan area) for 1975 and 1980 demonstrates that the
ratio of the airport emisison densities to those of the
metropolitan areas will increase in most cases, sometimes
dramatically.  The trends can be identified in Table 15,
which indicates that aircraft are expected to become
increasingly significant contributors to air pollutant
concentrations at airports and in their vicinities.

It should be kept in mind that the emissions densities
presented in Table 15 are averaged for the given areas and
that variation in actual emission rates within the defined
areas exist.

The majority of the HC, CO, and NOx emissions in
metropolitan areas are due to area rather than point
sources.  This tends to minimize variation in emission
densities throughout a metropolitan area.  However, one
would expect to observe higher emission densities where

TABLE 14

INDICATIONS OF LOCALIZED AIRPORT IMPACT OF 20 LARGEST AIR CARRIER AIRPORTS

| Airport | Enplaned Passengers Millions (FY 1970) | Aircraft Activity Percent Commercial Aviation | Percent General Aviation | Airport Area, Miles$^2$ | Passengers $\overline{\sqrt{area}}$ X $10^5$ | Airport Proximity to Built-up Areas[a] | Morning Meteorological Air Pollution Potential $(\bar{\chi}/\bar{Q})$[b] |
|---|---|---|---|---|---|---|---|
| * O'Hare | 13.5 | 95 | 5 | 14.1 | 36 | 2 | 50 |
| * Los Angeles | 8.5 | 76 | 22 | 4.8 | 40 | 2 | 50 |
| * Atlanta | 8.2 | 86 | 14 | 6.6 | 33 | 2 | 50 |
| * J.F. Kennedy | 7.0 | 86 | 14 | 8.1 | 25 | 2 | 30 |
| * La Guardia | 5.9 | 80 | 20 | 0.9 | 65 | 2 | 30 |
| San Francisco | 5.5 | 78 | 21 | 8.1 | 20 | 1 | 50 |
| * Dallas (Love) | 5.3 | 70 | 30 | 2.0 | 38 | 2 | 30 |
| * Washington (Nat.) | 4.9 | 66 | 33 | 1.0 | 49 | 2 | 70 |
| Boston | 4.5 | 66 | 34 | 3.7 | 24 | 1 | 20 |
| Miami | 4.4 | 66 | 31 | 4.2 | 22 | 2 | 20 |
| Detroit | 3.7 | 71 | 27 | 7.5 | 14 | | 40 |
| Denver | 3.5 | 48 | 52 | 7.2 | 13 | 2 | 30 |
| Newark | 3.4 | 76 | 24 | 3.4 | 19 | 2 | 30 |
| Philadelphia | 3.2 | 70 | 30 | 3.9 | 17 | 2 | 40 |
| St. Louis | 3.1 | 58 | 38 | 2.9 | 18 | | 80 |
| Pittsburgh | 3.0 | 64 | 29 | 4.8 | 14 | 2 | 60 |
| Minneapolis | 2.6 | 55 | 37 | 4.6 | 13 | | 50 |
| Cleveland | 2.5 | 45 | 55 | 2.3 | 17 | 2 | 40 |
| Seattle | 2.5 | 68 | 32 | 2.8 | 16 | 1 | 30 |
| Houston | 2.2 | 73 | 27 | 11.4 | 6 | | 30 |

a  1 = Residential and business areas adjacent to airport boundaries.
  2 = Residential and business areas adjacent to airport boundaries, and a significant frequency of wind from airport toward these areas.

b  This parameter is based on a simple model of dispersion over urban areas, in which an average area-wide pollutant concentration, $\bar{\chi}$, is normalized for an average emission rate, $\bar{Q}$. High $\chi/Q$ values indicate high potential pollutant concentrations. The values listed above are morning upper decile levels for a 10-kilometer along-wind distance. More detailed information on this parameter is presented in Ref. 10.

Table 15.  COMPARISON OF EMISSION DENSITIES FOR AIRPORTS VERSUS URBAN AREAS FOR 1970, 1975, and 1980

| | Area,[a] mi² | Emission densities,[b] tons/mi²-day | | | | | | | | |
| | | 1970 | | | 1975 | | | 1980 | | |
| | | Carbon monoxide | Hydro-carbons | Nitrogen oxides | Carbon monoxide | Hydro-carbons | Nitrogen oxides | Carbon monoxide | Hydro-carbons | Nitrogen oxides |
|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles metropolitan area | 1250.0 | 7.2 | 2.0 | 1.0 | 4.8 | 1.1 | 0.9 | 2.8 | 0.9 | 0.8 |
| Los Angeles Airport - all emission sources | 3.9 | 20.6 | 10.3 | 2.0 | 20.2 | 7.4 | 3.5 | 19.1 | 4.0 | 5.6 |
| Los Angeles Airport - aircraft alone | 3.9 | 11.2 | 8.8 | 1.1 | 11.7 | 6.1 | 2.6 | 13.0 | 3.4 | 4.9 |
| New York metropolitan area | 320.0 | 14.5 | 3.4 | 3.6 | 11.4 | 2.4 | 3.6 | 5.5 | 1.3 | 3.2 |
| Airport - all emission sources | 4.5 | 19.6 | 7.7 | 2.1 | 16.2 | 4.9 | 2.7 | 11.2 | 2.4 | 3.0 |
| Airport - aircraft alone | 4.5 | 7.7 | 5.8 | 0.8 | 6.9 | 3.5 | 1.5 | 6.5 | 1.7 | 2.3 |
| Washington D.C. metropolitan area | 61.0 | 12.5 | 1.7 | 1.7 | 7.9 | 1.1 | 1.5 | 3.3 | 0.4 | 1.3 |
| National Airport - all emission sources | 1.0 | 10.2 | 2.4 | 1.7 | 10.1 | 2.3 | 1.8 | 9.5 | 2.1 | 1.9 |
| National Airport - aircraft alone | 1.0 | 6.6 | 1.7 | 1.0 | 7.4 | 1.9 | 1.2 | 8.3 | 2.0 | 1.4 |
| Chicago metropolitan area | 227.0 | 8.1 | 2.5 | 1.4 | 6.3 | 1.7 | 1.4 | 1.4 | 0.9 | 1.2 |
| O'Hare Airport - all emission sources | 6.7 | 14.1 | 5.4 | 1.9 | 12.9 | 3.6 | 2.0 | 9.1 | 2.0 | 2.3 |
| O'Hare Airport - aircraft alone | 6.7 | 6.0 | 3.9 | 0.8 | 5.7 | 2.6 | 1.3 | 5.5 | 1.5 | 1.8 |

[a]Airport areas represent those areas devoted to the operation of the airport, but not necessarily the total area owned by the airport.

[b]Emissions used to calculate airport emission densities are based on all aircraft emissions within each airport area.

there is high population activity such as in downtown and
industrial areas as opposed to residential areas within the
region.

## Detailed Investigation of Localized Pollutant Concentrations

The emissions density data previously discussed pointed to
the fact that major airports are and will continue to be
significant area sources of air pollution emissions. If the
health and welfare of the exposed population is to be
protected, the conclusion may be drawn that the emissions
must be reduced equally for all such sources, e.g., whether
they be airport or non-airport area sources of pollution.

### 8-Hour Carbon Monoxide Concentrations. Carbon monoxide
concentrations at the Los Angeles International Airport and
in its vicinity were measured from May to November, 1970[2].
The sampling was done by the Los Angeles County Air
Pollution Control District under EPA contract. Carbon
monoxide concentrations were continuously monitored at
several sampling sites, including 4 sites in the airport
terminal area, and 2 sites located upwind and downwind of
the airport complex. At all of these, ambient
concentrations of CO were measured. The monitoring sites
were located as shown in Figure 1. Data from site 209 were
analyzed extensively to determine as quantitatively as
possible the air quality impact of aircraft CO emissions on
8-hour ambient CO concentrations in residential and business
areas downwind of the airport.

Site 209 is located directly downwind of the L. A. airport
when the wind blows from its most frequent direction, as
indicated by the wind rose in Figure 1. Until recently this
area was a residential neighborhood, but now it is almost
completely owned by the Los Angeles Airport. Other
residential areas, however, are located only a few blocks
west and north of this area; and it was concluded that
concentrations measured at site 209 are indicative of
concentrations in such residential areas.

Figure 2 presents an estimated frequency distribution of
carbon monoxide concentrations at site 209 during the winter
months, the time of highest CO concentrations in the Los
Angeles area. This frequency distribution is based on
sampling data collected at site 209 during August and is
adjusted to represent wintertime concentrations using a
seasonal conversion based on air quality data for the entire
Los Angeles basin. Derivation of the results shown in
Figure 2 is detailed in Appendix A. It can be seen, in
Figure A-3 of that section, that site 209 is exposed to the



Figure 1
AIR SAMPLING LOCATIONS
AT LOS ANGELES INTERNATIONAL AIRPORT

FREQUENCY OF WIND DIRECTION AT L.A.
AIRPORT, IN PERCENTAGES OF TOTAL,
1951-1960

Calm - 14%

FIGURE 2

EXPECTED CO CONCENTRATIONS, 8-HOUR AVERAGING TIME, WINTER 1970, STATION 209, LAX



Probability (%) of exceeding the given pollutant level.

same levels of carbon monoxide whether it be influenced by
pollution from other than the airport (easterly winds) or
from the airport alone (westerly winds). Figure 2 shows
that the 8-hour CO standard, which is not to be exceeded
more than once per year, is estimated to have been exceeded
at site 209 13 times per month, or 39 times in the winter 3-
month period.

Part of the carbon monoxide concentrations shown in Figure 2
is due to aircraft. To estimate the portion of the
concentration that is due to aircraft, dispersion modeling
was applied. The dispersion modeling methodology is
discussed in Appendix B. The model's resulting estimate of
the current contribution by aircraft to total CO
concentrations, shown in Figure 3, indicates that aircraft
are highly significant contributors to local CO
concentrations downwind of the airport. Figure 3 indicates
that expected aircraft contributions constitute 60-70% of
the total CO concentrations in the area of site 209.

Between 1970 and 1980, CO emissions from aircraft are
estimated to increase by fifteen percent (Table 4) while CO
emissions from all other sources in the Los Angeles area are
expected to decrease to 20% of their 1970 levels.[12] Using
the estimated changes in emissions from these two source
categories, and assuming that the emission changes yield
proportional changes in pollutant concentrations due to each
source category, CO concentration frequency distributions
for various aircraft contributions can be derived from
Figure 2. The result is presented in Figure 4 for various
1970 aircraft contributions to pollutant concentrations.

Figure 4 indicates that without controls of CO emissions
from aircraft the 8-hour CO standard will be exceeded more
than once during the 1980 winter months at site 209 if the
aircraft contribution to the total CO concentration in 1970
is as little as 20%. As shown in Figure 3, the 1970
contribution by aircraft exceeds this percentage over a
large area downwind of the airport. If the reasonable
assumption is made that Figure 2 approximates the 1970
winter CO concentration frequency distribution in this area,
it is evident that in 1980 the 8-hour CO concentrations will
continue to exceed the standard in this same area downwind
of the Los Angeles Airport if aircraft CO emissions are not
controlled.

As noted in Appendix A, the analysis resulting in Figures 2
and 4 can be repeated using data from September, rather than
from August, as a basis. The September data will yield
higher concentrations than will the August data for similar



FIGURE 3
VICINITY OF LOS ANGELES INTERNATIONAL:
Percent Contribution by Aircraft to
Carbon Monoxide Levels

(Based on 1970 emissions data)

FIGURE 4
FREQUENCY DISTRIBUTIONS FOR CARBON MONOXIDE FOR VARIOUS
AIRCRAFT EMISSION CONTRIBUTIONS AT STATION 209 – WINTER 1980



Probability (%) of exceeding the given pollutant level

frequencies of occurrence.  Consequently, the results from
the September data analysis can be used to indicate an upper
value of a range of frequencies at which the 8-hour CO
standard is exceeded; the results from the August data can
be used to indicate a lower value of the range.  The ranges
for 1970, and for 1980 with various aircraft contributions,
is presented in Table 16.

1-Hour CO Concentrations at the Los Angeles Airport.  The 1-
hour CO air quality standard of 35 ppm (40 ug/m3) was
exceeded at only one of the outdoor continuous sampling
locations at the Los Angeles Airport.  A summary of the 1-
hour sampling data at these receptors is presented in Table
17, which indicates that only at site 205 was the 1-hour CO
standard frequently exceeded.  Site 205 was located next to
heavy automobile traffic cn World Way Boulevard at an
automobile passenger unloading area.  The 1-hour CO standard
was exceeded 12 times during the approximately 4-week period
of sampler operation.  Expected reductions in CO emissions
from automobiles probably would reduce concentrations at
sites such as 205 to levels below the 1-hour standard.
Generally the 8-hour CO standard of 10 ug/m3 is the most
difficult of the two standards to reach, and statistically
if the 8-hour standard is met, the 1-hour CO standard will
also be met.[13]

Carbon Monoxide Concentrations at Other Airports.
Dispersion modeling was used to provide estimates of 1-hour
CO concetnrations both from aircraft alone and from all
airport and adjacent sources within 10 kilometers of the
center of each airport.  This modeling was done for Los
Angeles, J. F. Kennedy, Chicago-O'Hare, and Washington
National Airports.  The results, presented in Table 18, are
predicted concentrations at airport area points where: (1)
the general public could have access for 1-hour periods, and
(2) the total concentrations, as estimated by dispersion
modeling, exceed the standards.

Although minimal reliance should be placed on the precise
numerical values predicted by the model, these values are of
the same order of magnitude as the values from actual
measurements presented in Table 17.  These results indicate
that localized carbon monoxide effects are not limited to
Los Angeles Airport.

The potential of high 8-hour CO concentrations downwind of
other airports, with large aircraft contributions, exists
near airports besides Los Angeles Airport.  As previously
discussed, Table 14 indicates the potential of such
concentrations at six additional airports.

TABLE 16

EXPECTED RANGE OF DAYS THAT 8-HR STANDARD WILL BE EXCEEDED IN
VICINITY OF L.A. AIRPORT, 1970 and 1980[a]

|  | Based on August Data[b] | | Based on September Data |
|---|---|---|---|
| Days Standard Exceeded in 1970 | 39 | to | 65 |
| Days Standard Exceeded in 1980, With Following % Contributions by Aircraft (at 1970 emission levels) to Total CO Concentrations | | | |
| 80% | 36 | to | 61 |
| 60% | 22 | to | 49 |
| 40% | 9 | to | 32 |
| 20% | 1 | to | 14 |
| 0% | 0 | to | 1 |

[a] Because the highest CO concentrations occur during winter months, it is assumed that the frequency of exceeding the standard during the winter quarter gives the frequency of exceeding the standard the entire year.
[b] From Figures 2 and 4.

40

TABLE 17

LOS ANGELES AIRPORT

NUMBER OF TIMES THE 1-HOUR CO STANDARD WAS EXCEEDED
MAY 10 THROUGH NOVEMBER 9, 1970, CONTINUOUS SAMPLING SITES

| Site* | Total Hours of Sampling | Number of Hourly Values When Standard Exceeded | Highest Two Hourly Values |
|-------|-------------------------|-----------------------------------------------|---------------------------|
| 201 | 3710 | 0 | 27, 26 |
| 203 | 4256 | 2 | 46, 40 |
| 204 | 4258 | 0 | 23, 19 |
| 205 | 637 | 12 | 51, 49 |
| 208 | 4326 | 1 | 37, 28 |
| 209 | 4279 | 0 | 31, 27 |
| Downtown LA | 4965 | 3 | 37, 35 |

*Refer to Figure 1 for Location.

Table 18

Dispersion Model Estimates of 1-Hour
Carbon Monoxide Concentrations

| Site Location* | CO Concentration, $mg/m^3$ | |
|---|---|---|
| | Aircraft Sources Only | Total |
| JFK (T) | 85 | 100 |
| JFK (T) | 4 | 45 |
| JFK (T) | 3 | 44 |
| LAX (P) | 55 | 62 |
| LAX (P) | 32 | 45 |
| ORD (T) | 21 | 41 |
| ORD (S) | 9 | 41 |
| DCA (P) | 110 | 120 |
| DCA (P) | 45 | 59 |

*DCA = Washington National Airport, LAX = Los Angeles International
Airport, JFK = John F. Kennedy International Airport, and ORD =
O'Hare Airport, Chicago

(T) = Terminal area

(P) = Peripheral area--away from terminals, but within airport
      boundary

(S) = Outside of airport boundary, in airport surroundings

42

<u>Hydrocarbon and Potential Oxidant Concentrations</u>.  Isopleths
of 1970 hydrocarbon concentrations due to aircraft alone at
the Los Angeles Airport are presented in Figure 5.  These
isopleths are based on the dispersion modeling methodology
presented in Appendix B, and are a result of meteorological
conditions that are particularly conducive to high
hydrocarbon concentrations.  Such conditions would be
expected to occur at least once per year.

The results indicate that there are large areas surrounding
the airport where the hydrocarbon concentrations due to
aircraft are well in excess of the standard.

Between 1970 and 1980, Table 4 indicates that at the Los
Angeles Airport, hydrocarbon emissions from aircraft will
decline to about 40% of their 1970 values.  These reductions
are reflected in Figure 6 which presents isopleths of 1980
hydrocarbon concentrations due to aircraft alone, at Los
Angeles Airport, based on meteorological conditions
equivalent to those used for the isopleths in Figure 5.
Even with the reduction in aircraft hydrocarbon emissions,
it is likely that in 1980 the hydrocarbon standard will
continue to be exceeded over a large area due to aircraft
emissions alone.

As indicated earlier, hydrocarbon concentrations at levels
typically found in the atmosphere are not harmful to health.
However, if airport hydrocarbon concentrations were followed
downwind for several hours under conditions conducive to the
accumulation of high oxidant concentrations,[7] aircraft-
generated hydrocarbons could be expected to be large
contributors to downwind oxidant concentrations over the Los
Angeles area.

A modeling analysis was performed to estimate hydrocarbon
concentrations downwind of Los Angeles Airport in 1980.  The
meteorological conditions used were similar to those used
for Figures 5 and 6.  The methodology of this analysis is
presented in Appendix C, and results are presented in Figure
7.  The three curves in Figure 7 show nonmethane hydrocarbon
concentrations downwind of Los Angeles Airport resulting
from the surroundings plus total airport emissions, total
airport emissions alone, and aircraft emissions alone.  The
initial concentration at the western airport boundary (0 km
in Figure 7) is shown to be zero, which is a result of the
proximity of the western boundary to the ocean, wind
direction from the west, and the assumption of negligible
hydrocarbon concentrations in wind coming off at the ocean.
At a point 3 hours downwind (16 km from the eastern airport
boundary) the overall hydrocarbon concentration will have



(numbers in $\mu g/m^3$)

FIGURE 5    HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:   AIRCRAFT SOURCES
3-Hr Average for 1970 (6 - 9 AM)

44



(numbers in $\mu g/m^3$)

FIGURE 6    HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:  AIRCRAFT SOURCES

3-Hr Average for 1980 (6 - 9 AM)



FIGURE 7

CALCULATED NON-METHANE HYDROCARBON CONCENTRATIONS
DOWNWIND OF LOS ANGELES AIRPORT FOR 1980
WITH NON-AIRCRAFT SOURCES CONTROLLED

been in excess of the standard for 3 hours, enough time for
possible formation of oxidant in concentrations exceeding
the standard.

It is important to emphasize that this analysis was
performed for 1980. If it were repeated for 1970, the
concentrations for each of the curves would be at least
double the 1980 values.

The emissions densities presented in Table 15 indicate that
among the four airports studied, emission densities from
aircraft alone are highest at Los Angeles Airport. However,
the range among these emission density values is still less
than a factor of 2.3 in 1980, indicating that conclusions
concerning future aircraft-generated hydrocarbon and oxidant
concentrations at the Los Angeles Airport and vicinity apply
generally to the other airports studied, and that additional
reductions in aircraft-generated hydrocarbon concentrations
are necessary.

Oxides of Nitrogen. Although the ambient air quality
standard is for $NO_2$ (100 ug/m3, annual concentration), the
result of the dispersion modeling is presented as oxides of
nitrogen ($NOx$). This is done because there exists no well-
defined relationship for the conversion of NO to $NO_2$. In
the presence of hydrocarbons; the NO to $NO_2$ conversion is
accelerated; best estimates indicate that 90 percent of the
NO is converted to $NO_2$ within a 2-hour period in the
presence of sunlight. The reaction is essentially
negligible at night. Considering all $NOx$ as $NO_2$ could
result in an overestimation of annual average
concentrations.

Oxides of nitrogen concentrations due to aircraft alone are
presented in Figure 8 for Los Angeles Airport area for 1970.
These modeling approximations indicate that LAX is
responsible for $NOx$ impact over a large area surrounding the
airport. With growth of overall aircraft activity, and the
changeover to bigger and higher pressure ratio turbine
engines, aircraft emissions of $NOx$ will increase greatly
between 1970 and 1980. Present and expected future $NOx$
emissions from aircraft at the four major airports studied
are given in Table 15, which indicates that between 1970 and
1980 aircraft emissions of $NOx$ will increase by factors of
2.2 at O'Hare Airport, 1.4 at Washington National Airport,
4.5 at Los Angeles International Airport, and 2.9 at John F.
Kennedy Airport.

The general affect of increased $NOx$ emissions from aircraft
at LAX is reflected in Figure 9, which presents isopleths of



(numbers in $\mu g/m^3$)

**FIGURE 8** NO$_X$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL: AIRCRAFT SOURCES
Annual Average for 1970

48

1980 NOx concentrations due to aircraft.  Figure 9 indicates
that NOx concentrations due to aircraft alone could be
widespread in residential areas around LAX, and that in some
areas, the NO2 concentrations due to aircraft are comparable
to the standard.  It should be emphasized that these NOx
concentrations are due to aircraft alone, and NOx emissions
from other sources would be expected to significantly
increase the concentrations plotted in Figures 8 and 9.

NOx concentrations of similar magnitude to those in Figures
8 and 9 can be expected in the vicinity of other airports.
For example, isopleths showing expected 1980 NOx emissions
densities due to aircraft alone for O'Hare Airport are
presented in Figure 10.  Without emission controls, aircraft
using O'Hare Airport can be expected to be large future
contributors to localized NOx concentrations, as was the
case for Los Angeles Airport.

Smoke and Particulates.  Smoke generated by aircraft causes
significant reductions in visibility and is a cause of
widespread complaint by affected citizens.

The 1-year air quality monitoring program conducted at Los
Angeles International Airport indicated increased soiling
effects in the airport vicinity due to aircraft activity.
Atmospheric measurements of particulates using a tape
sampler technique gave higher readings (indicative of
soiling) for the airport area than for locations several
miles removed, such as downtown Los Angeles.  Additionally,
sampling at sites surrounding and adjacent to the Los
Angeles Airport area showed increasing soiling values from
upwind of the airport to a maximum immediately downwind of
the airport.

Measurement of total weight of particulate material, based
on Hi-Vol sampling, showed little variation between airport
and downtown areas.

Results of the dispersion modeling analysis for all four
airports indicated that particulate concentrations due to
aircraft in some parts of the airports could exceed the
secondary particulate air quality standards.



(numbers in $\mu g/m^3$)

ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:   AIRCRAFT SOURCES
Annual Average For 1980

FIGURE 9



FIGURE 10    (numbers in μg/m³)

NO_X ISOPLETHS IN THE VICINITY OF CHICAGO-O'HARE INTERNATIONAL:  AIRCRAFT SOURCES

Annual Average for 1980

51

# TECHNOLOGICAL FEASIBILITY OF CONTROLLING

# AIRCRAFT EMISSIONS |

Information on emission control methods is necessary to determine the levels to which aircraft emissions can feasibly be reduced. An earlier Federal study,[1][14] identified potential control approaches including modification of aircraft engines, fuels, and ground operational procedures. This study indicated that modification of aircraft engines and ground operational procedures appear to be the most feasible and effective control procedures. More recently, the Aerospace Industries Association (AIA) has issued a report[15] summarizing results of investigations conducted by industry on: (1) emission characteristics of aircraft gas turbine engines; and (2) potential methods for reducing aircraft turbine engine emissions. The AIA report also identifies the possibility of reducing emissions through modifications of engines (especially combustor design) and of ground operational procedures.

The current reassessment of control methods must consider each of the aforementioned approaches. In assessing the feasibility of a control method, four factors must be explored: (1) effect of the method on the functioning or capacity of the aircraft system; (2) effectiveness of the method in reducing emissions; (3) cost of utilizing the method; and (4) time required for implementing the method. Information on emission-measurement instrumentation is also necessary to ensure that aircraft emissions can be measured with the accuracy and sensitivity required for enforcing the desired standards.

The Environmental Protection Agency has conducted several studies (references 16-27) to obtain information for assessment of aircraft emission control methods. This report summarizes the information obtained in these investigations. The specific objectives of this analysis of aircraft emission control technology are:

(1) To identify methods of controlling aircraft emissions through modification of engines, fuels, and ground operations.

53

(2) To estimate their effectiveness in reducing aircraft emissions.

(3) To estimate the time required for and cost of implementation.

(4) To assess the technology of measuring emissions from aircraft engines and to identify areas requiring advancements in instrumentation or test procedures.

Emission control by fuel modifications was reassessed to evaluate developments in aircraft fuel technology. This investigation was discontinued after preliminary analysis indicated that no significant reductions in emissions could be achieved by modifying fuels, except for reductions in sulfur or lead content that result in proportionate reductions of SO and lead emissions.

A list of specific emission control methods involving engine modifications was formulated on the basis of preliminary analyses, which indicated that each method was feasible and offered a significant reduction in one or more emission classes. Feasibility was assessed on the basis of the following factors:

(1) No reduction in engine reliability (safety).

(2) Little or no reduction in engine performance (power-weight ratio).

(3) Reasonable cost of implementation.

The preliminary list of control methods was then subjected to more detailed analysis of control effectiveness and implementation costs. Control methods involving changes in ground operations were evaluated in a similar manner.

Evaluation of the emission control methods involving engine modifications gave primary consideration to the following emission classes: carbon monoxide (CO), nitrogen oxides (NOx), total hydrocarbons (including drained fuel) (THC), dry particulates (DP), and smoke.

## EMISSION CONTROL BY ENGINE MODIFICATION

### Engine Classification

To facilitate analyses of engine modifications, aircraft engines are categorized according to their thrust or power level. The classification system is indicated in Table 19.

54

TABLE 19

AIRCRAFT ENGINE CLASSIFICATION

| Engine class | Engine Type | Power Range, lb thrust or eshp |
|---|---|---|
| T1 | Turbine | Less than 6,000 |
| T2 | Turbine | 6,000 to 29,000 |
| T3 | Turbine | Greater than 29,000 |
| P1 | Piston | All piston engines |

Although this classification system is based simply upon
power level it effectively groups engines of similar
emission potential (when the emission rates are normalized
according to an appropriate engine-size parameter). Also,
since effectiveness factors and costs of the control methods
are similar for engine models within each class, the system
is particularly useful for this analysis.

Three classes of turbine engines are defined, and all
piston engines are included in a single class. This system
thus categorizes engines according to their principal
applications and according to certain design characteristics
that affect emission rates.

The small turbine engine class (T1) includes most of the
turboshaft and small turbojet and turbofan engines used in
business and small commercial aircraft. It also includes
auxiliary power units (APU) used on large commercial
aircraft. These engines are considered as one class because
the relatively small size of the combustor components (or
large surface-volume ratio) makes control of certain
emissions more difficult than with larger engines.

The next turbine engine class (T2) includes most of the
turbojet and turbofan engines used in medium-to-large
commercial aircraft. The design characteristics of most of
these engines are basically similar.

The third turbine engine class (T3) includes large
turbofan engines for "jumbo" transport aircraft and the SST
engines currently in use or under development.

Emission Control Methods and Effectiveness

Technology for controlling emissions from aircraft
engines by means of engine modifications has been analyzed.
The purpose of this analysis was to identify specific
methods of reducing pollutant emissions from aircraft
engines and to indicate the reductions in rates of emission
attainable by these methods. Various engine modifications
appear to be feasible in that they can be applied to
aircraft without degrading engine reliability or seriously
reducing aircraft performance. Costs of implementing these
control methods also appear to be within reasonable limits,
at least in preliminary analysis.

Turbine Engines - The engine modification control methods
considered feasible for turbine engines are listed and
described briefly in Table 20. Six methods are, at least in

56

Table 20. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND FUTURE
TURBINE ENGINES

| Control method | Modification |
|---|---|
| **Existing engines** | |
| t1 – Minor combustion chamber redesign | Minor modification of combustion chamber and fuel nozzle to achieve best state-of-art emission performance. |
| t2 – Major combustion chamber redesign | Major modification of combustion chamber and fuel nozzle incorporating advanced fuel injection concepts (carburetion or prevaporization). |
| t3 – Fuel drainage control | Modify fuel supply system or fuel drainage system to eliminate release of drained fuel to environment. |
| t4 – Divided fuel supply system | Provide independent fuel supplies to subsets of fuel nozzles to allow shutdown of one or more subsets during low-power operation. |
| t5 – Water injection | Install water injection system for short duration use during maximum power (takeoff and climb-out) operation. |
| t6 – Modify compressor air bleed rate | Increase air bleed rate from compressor at low-power operation to increase combustor fuel-air ratio. |
| **Future engines** | |
| t7 – Variable-geometry combustion chamber | Use of variable airflow distribution to provide independent control of combustion zone fuel-air ratio. |
| t8 – Staged injection combustor | Use of advanced combustor design concept involving a series of combustion zones with independently controlled fuel injection in each zone. |

principle, applicable to existing engines by retrofitting of new or modified parts, and to engines currently in production. Two methods are considered to be applicable only to future engines of new design, since the modifications required are too extensive to be applied to engines for which development has been completed.

The first control method consists of simple modifications of the combustor and fuel nozzles to reduce all emission rates to the best levels currently attainable within each engine class. The degree of control attainable depends upon the performance of specific engines compared with those engines in the same class demonstrating the lowest emission rates. In general, this control method requires emission quality control (emission reduction to levels demonstrated by other engines of that model). Additionally, for certain high-emission engine models, it means emission reduction to the level of other engines of the same class. Each of the other control methods is more specifically directed at one or two pollutant classes.

Reductions in emissions achievable through the use of a control method vary with the pollutant considered, the engine class, and the engine operating mode. Estimates of the effectiveness of each control method have been made for all combinations of these factors and are presented in Tables 21 and 22. The estimation of emission control effectiveness for turbine engines is based upon reductions attainable from "lowest current emission rates." These rates are defined as those attainable through control method t1 (table 19), minor combustion chamber redesign.

It is predicted that all engines in each class could be modified to achieve these "best rates." The values of these rates are listed in Table 21. These "best rates" are not the lowest rates indicated for each engine class, but are rates near the low end of those emission rates that appear to be realistically attainable. The use of the "best rate" basis is necessary to allow effectiveness estimates for each engine class. Because of the wide variations in actual emission rates of turbine engines, an effectiveness analysis based on average rates would be less significant. Table 22 indicates the effectiveness of control methods t2 through t8. Some estimates are based upon demonstrated performance. Most, however, are not based on direct experience with these control methods on aircraft engines. Therefore, estimates of effectiveness are based largely on theoretical analyses of engine performance under the operating conditions associated with the control methods. The bases for these estimates are summarized in Table 23.

Table 21.  EFFECTIVENESS OF t1 - MINOR COMBUSTION CHAMBER
REDESIGN[a] - ON REDUCTION OF EMISSIONS FROM TURBINE ENGINES
(Emission rates in lb/1000 lb of fuel)

| Engine class | Pollutant | Mode | | |
|---|---|---|---|---|
| | | Idle/taxi | Approach | Takeoff |
| T1 | CO | 25 | 5 | 2 |
| T1 | THC | 10 | 1 | 0.2 |
| T1 | NO$_x$ | 3 | 7 | 11 |
| T1 | DP | 0.2 | 0.5 | 0.5 |
| T2 | CO | 45 | 6 | 1 |
| T2 | THC | 10 | 1 | 0.1 |
| T2 | NO$_x$ | 2 | 6 | 12 |
| T2 | DP | 0.2 | 0.5 | 0.5 |
| T3 | CO | 50 | 3 | 0.5 |
| T3 | THC | 10 | 1 | 0.1 |
| T3 | NO$_x$ | 3 | 10 | 40 |
| T3 | DP | 0.1 | 0.1 | 0.1 |

[a]Minor combustor redesign is assumed to reduce the smoke to
invisible or "smokeless" levels for all engine classes.

Table 22

Effectiveness of Engine Modification in Control
of Emissions from Turbine Engines, by Operating Mode[a]

| Control method | Engine class | Pollutant | Mode | | |
|---|---|---|---|---|---|
| | | | Idle/taxi | Approach | Takeoff |
| t2[b] | T1 | DP | 0.5 | 0.5 | 0.5 |
| t2 | T1 | $NO_x$ | NC[c] | NC | 0.5 |
| t2 | T2 | DP | 0.5 | 0.5 | 0.5 |
| t2 | T3 | $NO_x$ | NC | NC | 0.5 |
| t3 | T1 | THC | NC | NC | 0[d] |
| t3 | T2 | THC | NC | NC | 0[d] |
| t3 | T3 | THC | NC | NC | 0[d] |
| t4 | T1 | CO | 0.25 | NC | NC |
| t4 | T1 | THC | 0.25 | NC | NC |
| t4 | T2 | CO | 0.25 | NC | NC |
| t4 | T2 | THC | 0.25 | NC | NC |
| t4 | T3 | CO | 0.25 | NC | NC |
| t4 | T3 | THC | 0.25 | NC | NC |
| t5 | T1 | $NO_x$ | NC | NC | 0.1 |
| t5 | T2 | $NO_x$ | NC | NC | 0.1 |
| t5 | T3 | $NO_x$ | NC | NC | 0.1 |
| t6 | T1 | CO | 0.5 | NC | NC |
| t6 | T1 | THC | 0.5 | NC | NC |
| t6 | T2 | CO | 0.5 | NC | NC |
| t6 | T2 | THC | 0.5 | NC | NC |
| t6 | T3 | CO | 0.5 | NC | NC |
| t6 | T3 | THC | 0.5 | NC | NC |
| t7 or t8 | T1 | CO | 0.1 | NC | NC |
| t7 or t8 | T1 | THC | 0.1 | NC | NC |
| t7 or t8 | T1 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T1 | DP | 0.5 | 0.5 | 0.5 |
| t7 or t8 | T2 | CO | 0.1 | NC | NC |
| t7 or t8 | T2 | THC | 0.1 | NC | NC |
| t7 or t8 | T2 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T2 | DP | 0.5 | 0.5 | 0.5 |
| t7 or t8 | T3 | CO | 0.1 | NC | NC |
| t7 or t8 | T3 | THC | 0.1 | NC | NC |
| t7 or t8 | T3 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T3 | DP | 0.5 | 0.5 | 0.5 |

[a]Emission rate is fraction of best current rate assumed to be attainable
through minor combustion chamber redesign and with control method cited

[b]t2 = Major combustion chamber redesign
t3 = Fuel drainage control
t4 = Divided fuel supply system
t5 = Water injection
t6 = Modify compressor air bleed rate
t7 = Variable-geometry combustion chamber
t8 = Staged injection combustor

[c]NC indicates no change

[d]Refers to raw fuel drainage only

Table 23

Bases for Control Method Effectiveness Estimates for Turbine Engines

| Control method | Rationale |
|---|---|
| t1 - Minor combustion chamber redesign | The assumption is made that emission rates for all engines within a given class can be reduced to common, optimum levels (on a lb/1000 lb fuel basis) by minor combustor modifications. These optimum emission rates are based on the best performance reported for each engine class, excluding extreme data points. |
| t2 - Major combustion chamber redesign | Estimates are based on reports of carbureting fuel injector performance and reduction of smoke emission. Concept is incorporated in some Class T3 engines. Estimates are based on assumption that best emission rate for Class T1 and T2 engines is at an exhaust visibility threshold at maximum power. Carburetion appears to reduce smoke level, and presumably particulate emissions, to approximately half that level. Additionally, premixing of air and fuel can be used to give substantial $NO_x$ reduction by decreasing residence time in the combustor. |
| t3 - Fuel drainage control | Estimate is based on the assumption that fuel drainage can be completely eliminated by collecting drained fuel and returning to fuel tank. |
| t4 - Divided fuel supply system | Control method results in combustion zone fuel-air ratio similar to that at approach condition. Reduction in CO and THC from idle to approach is approximately 90 percent in Class T1 and T2 engines and 90 percent in Class T3 engines. Effectiveness is reduced by one order because combustor is not operating at "well-designed" condition. |
| t5 - Water injection | Water injection is assumed only at takeoff at a rate up to twice the fuel rate. Water injection into compressor or diffuser is assumed to be by system similar to those in current use. Effectiveness based upon published results with steam injection.[28] Water injection assumed to be of equal effectiveness when injected upstream of combustor. |
| t6 - Modify compressor air | Assumptions are (1) fraction of air that can be bled is small so that engine operating point is nearly unchanged, (2) combustor f/a varies inversely with air bleed rate, and (3) CO and THC emissions at idle vary as the (air mass flow rate)$^3$ and inversely as $(f/a)^3$. This relationship is based upon data from Reference 14. If maximum air bleed rate is 20 percent, CO and THC emission rates are reduced by 50 percent. |
| t7 - Variable-geometry combustion chamber<br><br>t8 - Staged injection combustor | Combustor primary zone is assumed to operate at a constant f/a equal to normal f/a at approach power condition (primary equivalence ratio = 0.6). CO and THC emissions at idle are reduced to levels corresponding to approach power, or by 90 percent for Classes T1, T2, and T3. This incorporates design characteristics that provide a good mixture in the combustion zone. This feature and constant f/a operation combine to reduce $NO_x$ emissions at full power by 75 percent[26] and particulate emissions by 50 percent at all power levels as in t2. |

Emission-control effectiveness is indicated in Tables
21, 22, and 23 for each control method and for each
pollutant for which a significant degree of control
expected.  Pollutants for which little or no control
expected are not listed.  Effectiveness is indicated
separately for each engine class.  No specific estimates
have been made for control of reactive hydrocarbons, odor,
or aldehydes because control methods applicable to these
emissions are not yet identified.  Reductions in these
emissions are expected along with reductions in THC
emissions.  Any of the modifications defined for existing
turbine engines (t1 through t6) could be combined to achieve
increased emission control effectiveness; exceptions are
modifications t4 and t6, which are mutually exclusive.

**Piston Engines** - The control methods considered feasible for
aircraft piston engines are listed with brief descriptions
in Table 24.  These methods include most of the approaches
that have been developed for automotive engines for control
of carbon monoxide and total hydrocarbon.  Methods for
controlling nitrogen oxide (NOx) emissions are not included
because the fuel-rich operating conditions of aircraft
piston engines result in low NOx emission rates.  Piston
engine emission characteristics are included in Figure 11.
As this figure indicates, fuel-air ratio has a significant
effect on aircraft piston engine emissions.  Plans for
changes in engine operating conditions to reduce CO and THC
emissions must also consider NOx to prevent significant
increases in emissions of this pollutant.

Table 24 lists nine piston-engine control methods,
including the use of direct-flame afterburners and water
injection, methods that are not being considered currently
for automotive engines.  Afterburners might be used to
advantage in this application because they can utilize the
high-velocity airflow around the aircraft.  Although
aircraft piston engines and automobile engines are
fundamentally similar, their applications are significantly
different, with different requirements.  Reliability is of
primary importance in aircraft piston engine applications
and therefore is given paramount consideration in
identifying applicable control methods.  The piston-engine
emission-control methods were identified and evaluated
through reviews of published investigations.  Of the methods
identified, all are considered applicable to existing
engines except those that would require redesign of the
basic engine or its control systems.

Effectiveness estimates for piston engines are based on
reductions of current uncontrolled rates listed in Table 25.

62

Table 24

Engine Modifications for Emission Control
for Existing and Future Piston Engines

| Control method | Modification |
|---|---|
| **Existing engines** | |
| p1 - Fuel-air ratio control | Limiting rich fuel-air ratios to only those necessary for operational reliability. |
| p2 - Simple air injection | Air injected at controlled rate into each engine exhaust port. |
| p3 - Thermal reactors | Air injection thermal reactor installed in place of, or downstream of, exhaust manifold. |
| p4 - Catalytic reactors for HC and CO control | Air injection catalytic reactor installed in exhaust system. Operation with lead-free or low-lead fuel required. |
| p5 - Direct-flame afterburner | Thermal reactor with injection of air and additional fuel installed in exhaust system. |
| p6 - Water injection | Water injected into intake manifold with simultaneous reduction in fuel rate to provide for cooler engine operation at leaner fuel-air ratios. |
| p7 - Positive crankcase ventilation | Current PCV system used with automotive engines applied to aircraft engines. Effective only in combination with one of preceding control methods. |
| p8 - Evaporative emission controls | A group of control methods used singly or in combination to reduce evaporative losses from the fuel system. Control methods commonly include charcoal absorbers and vapor traps in combination with relatively complex valving and fuel flow systems. |
| **Future engines** | |
| p9 - Engine redesign | Coordinated redesign of combustion chamber geometry, compression ratio, fuel distribution system, spark and valve timing, fuel-air ratio, and cylinder wall temperature to minimize emissions while maintaining operational reliability. |

FIGURE 11

PISTON ENGINE EMISSION CHARACTERISTICS



TABLE 25

CURRENT UNCONTROLLED EMISSION RATES
FOR PISTON ENGINES[29]
(lb/1000 lb of fuel)

| Pollutant | Idle | Taxi | Approach | Takeoff |
|-----------|------|------|----------|---------|
| CO | 896 | 882 | 918 | 849 |
| THC[a] | 48 | 76 | 80 | 18 |
| $NO_x$ (as $NO_2$) | 7 | 4 | 4 | 6 |

[a] Total hydrocarbon (THC) emission rates have been increased by 50% to
account for crankcase blow-by emissions. Evaporative emissions are
not included in these rates.

TABLE 26

EFFECTIVENESS OF ENGINE MODIFICATIONS IN
CONTROL OF EMISSIONS FROM PISTON ENGINES
BY POLLUTANT[a]

| Control Method | Controlled Emission Rate | |
|----------------|------|------|
| | CO | THC[b] |
| P1 Fuel-air ratio control | 0.5 | 0.5 |
| P2 - Simple air injection | 0.1 | 0.5 |
| P3 - Thermal reactor | 0.1 | 0.25 |
| P4 - Catalytic reactor (requires lead-free fuel) | 0.1 | 0.25 |
| P5 - Direct-flame afterburner | 0.1 | 0.1 |
| P6 - Water injection | 0.1 | 0.25 |
| P7 - Positive crankcase ventilation (PCV) | NC | d |
| P8 - Evaporative emission control | NC | e |
| P9 - Engine redesign | 0.1 | 0.5 |

[a] Emission rate is fraction of uncontrolled emission rate after installation
of control method and applies to all operating modes.
[b] Exhaust HC only.
[c] NC indicates no change.
[d] PCV would eliminate blow-by emissions when used in combination with p1,
p2, p3, p4, p5, or p8. Blow-by THC emission estimated to be equal to
30% of uncontrolled exhaust emission.
[e] Evaporative controls would reduce THC emissions due to evaporation from
fuel supply. Magnutude of uncontrolled emissions is inknown.

Since emission rates from piston engines do not vary as
widely as those from turbine engines, control effectiveness
can be based on average rates for existing engines. The
effectiveness estimates shown in Table 26 are based in most
cases on the application of individual control methods
without other engine changes. Method p7 (PCV) is an
exception; it is considered to be most effective in
combination with method p1, p2, p3, p4, p5, p6, or p9.

Piston-engine modifications p2 through p6 are designed
to serve the same function and, thus, are mutually
exclusive. All of the others could be combined with any of
the modifications p2 through p6 to achieve increased
emission-control effectiveness.

Cost and Time Requirements for Control-Method Development
and Implementation

<u>Existing Engines</u> - Estimates of the cost and time
requirements of applying each control method applicable to
existing engines are preliminary and are intended to
indicate the magnitude of costs and time involved in
controlling emissions from all civil aircraft. Cost and
time requirements are estimated separately for control-
method development and implementation. Development includes
all effort required from initial stages through
certification of the control method for a specific engine
class and tooling for production. Implementation includes
initial installation of the control method on all engines of
a given class and costs associated with additional effort or
materials required for the control method throughout the
remaining service life of the engines. These estimates are
based on a turbine engine life of 10 years with engine
overhauls every 5,000 hours or 2 1/2 years and a piston
engine life of 10 years with engine overhauls every 5,000
hours or 5 years. Operating costs for water injection are
based upon experience with the water injection system on the
Boeing 747 aircraft.

Because few of the control methods have been developed
for or applied to aircraft engines, and because many factors
affect total implementation costs, many uncertainties are
involved in the estimates. Estimates of development costs
and time requirements are based on the previous experience
of aircraft engine manufacturers in similar modifications.
Estimates of implementation costs are considered to be less
certain than development costs. The cost and service life
of a modified engine component is difficult to predict
accurately. Yet these factors strongly affect the
cumulative costs of operating and maintaining the modified

engine. Because implementation costs could be far greater
than development costs for some control methods, the
estimates of implementation costs are only indicative of
cost penalties that might be involved with control-method
implementation.

Three potential levels of aircraft emission control
entail three distinct associated cost levels: (1)
retrofitting in-use engines, (2) modifying present
production designs to incorporate emission control
technology in new engines of models presently being
produced, and (3) incorporating emission control technology
into new engine designs during the design phases of a new
engine model.

Costs are highest for retrofitting in-use engines, are
significantly lower for modifying existing designs in new
production engines and are lowest for incorporating emission
technology during engine design. Table 27 presents
estimates of the development time, development costs, and
implementation costs for application of the control methods
that could be retrofitted on the current population of all
civil engines.

The development time requirements listed in Table 27 are
the periods required to reach the point where installation
of the control methods in existing engines could begin. The
application of controls in all existing engines would
require an additional time period that depends primarily on
the availability of engine maintenance facilities. The time
for implementation is estimated to be 2 1/2 years for
turbine engines and 5 years for piston engines. These time
estimates allow implementation of the emission control
method during normal maintenance procedures, minimizing
cost. Table 28 presents costs by category: air carrier,
general aviation, and civil aviation. These tables
represent cost to retrofit the various control methods to
the current population of aircraft.

From another perspective, implementation costs may be
expressed as fractions of total engine costs. For a typical
class T2 (turbine) engine, the cost of installing and
maintaining control systems ranges from $300 to $69,900,
assuming a 10-year engine life. Based on a total engine
cost of $250,000, these control-method implementation costs
represent 0.1 to 25 percent of the total engine cost. For a
typical piston engine, estimated control-method
implementation costs range from $100 to $4,000, also based
upon a 10-year engine life. For a total engine cost of

67

Table 27

Time and Costs for Modification of Current
Civil Aviation[a] Engines

| Control method | Development time, years | Development cost, $10^6$ dollars | Implementation cost, $10^6$ dollars |
|---|---|---|---|
| Turbine engines | | | |
| Minor combustion chamber redesign | 2.5 to 5 | 37 | 383 |
| Major combustion chamber redesign | 2.5 to 7.5 | 74 | 665 |
| Fuel drainage control | 1 to 2.5 | 1.5 | 5.4 |
| Divided fuel supply | 5 to 7.5 | 84 | 102 |
| Water injection | 2.5 to 4 | 25 | 175 |
| Compressor air bleed | 4 to 6.5 | 90 | 58 |
| Piston engines | | | |
| Simple air injection | 1.5 to 3 | 9 | 165 |
| Thermal reactor | 3 to 6 | 25 | 424 |
| Catalytic reactor | 2.5 to 5 | 22 | 535 |
| Direct-flame afterburner | 3 to 6 | 25 | 424 |
| Water injection | 1.5 to 3 | 9 | 400 |
| Positive crankcase ventilation | 2 to 4 | 4 | 94 |
| Evaporative emission control | 1.5 to 2.5 | 4 | 269 |

[a]"Civil aviation" includes air carrier and general aviation engines

68

Table 28

Cost Results for Turbine Engine Population
by Separate Use Categories

| Engine class | Control method | Cost scaling factor | Development cost per engine family, $10^6$ dollars | Implementation cost per engine, $10^3$ dollars | Total cost, $10^6$ dollars | | |
|---|---|---|---|---|---|---|---|
| | | | | | Air carrier | General aviation | Civil aviation[a] |
| T1 | t1 | 0.35 | 0.90 | 12.4 | 19.2 | 90.5 | 109.7 |
| T1 | t2 | 0.35 | 1.80 | 21.3 | 34.5 | 159.3 | 193.8 |
| T1 | t3 | -- | 0.05 | 0.1 | 0.4 | 1.0 | 1.4 |
| T1 | t4 | 0.35 | 1.80 | 3.7 | 14.9 | 51.5 | 66.4 |
| T1 | t5 | 0.35 | 0.62 | 5.5 | 9.8 | 43.6 | 53.4 |
| T1 | t6 | 0.35 | 2.20 | 2.1 | 15.5 | 48.1 | 63.6 |
| T2 | t1 | 1.00 | 0.90 | 35.5 | 243.0 | 17.8 | 259.8 |
| T2 | t2 | 1.00 | 1.80 | 69.9 | 418.0 | 31.0 | 449.6 |
| T2 | t3 | -- | 0.05 | 0.3 | 2.0 | -- | 2.0 |
| T2 | t4 | 1.00 | 1.80 | 10.5 | 87.0 | 8.3 | 95.3 |
| T2 | t5 | 1.00 | 0.62 | 15.6 | 108.7 | 8.2 | 116.9 |
| T2 | t6 | 1.00 | 2.20 | 6.0 | 61.5 | 7.1 | 68.6 |
| T3 | t1 | 1.64 | 0.90 | 58.3 | 50.0 | -- | 50.0 |
| T3 | t2 | 1.64 | 1.80 | 100.0 | 95.0 | -- | 95.0 |
| T3 | t3 | 1.64 | 0.05 | 0.6 | 2.0 | -- | 2.0 |
| T3 | t4 | 1.64 | 1.80 | 17.2 | 13.7 | -- | 13.7 |
| T3 | t5 | 1.64 | 0.62 | 25.6 | 29.5 | -- | 29.5 |
| T3 | t6 | 1.64 | 2.20 | 9.9 | 16.0 | -- | 16.0 |

[a]"Civil aviation" includes air carrier and general aviation engines

69

$6,000, these implementation costs represent 2 to 65 percent of the total.

Retrofit cost and time estimates for turbine engines were developed by using the application of low-smoke combustors to the JT8D engine class as a reference for cases in which no direct experience was available. Cost and time requirements for this modification, which is considered a minor combustor redesign for a class T2 engine, were estimated in detail in 1969.[27] Requirements for other control methods were determined essentially by proportioning the cost and time expenditures according to the complexity of the method, with respect to the reference case. Requirements for other engine classes were determined by using appropriate scaling factors and by again using the JT8D modifications as reference. Time and cost estimates for piston engines are based largely on experience to date with emission controls for automobile engines. Significant differences, such as certification and safety requirements and production levels, were considered in scaling the costs from the experience with automobiles.

Costs of emission control technology are substantially lower when applied to new engines only. These costs are less than one-half the retrofit costs on a per-engine basis. These estimates cannot be totalled as were the retrofit estimates because of uncertainty concerning the number of engines that would be affected.

Future Engines - Cost estimates have been developed also for incorporation of emission controls in future engines, that is, engines that have not yet been developed. These estimates are defined only as fractions of total engine cost, since no reasonable basis is available for estimating the numbers of engines that would be affected.

Emission control in turbine engines that is attained through the use of advanced combustor-design concepts is estimated to represent an increase in total engine cost of 3 to 4 percent. Emission control in piston engines that is achieved by engine-design modifications would not necessarily result in any significant increase in engine cost. If greater control of emissions is required than can be achieved by engine design modifications, however, one or more of the control methods applicable to existing engines will be necessary. The costs of these control methods, which involve the addition of auxiliary devices such as thermal reactors, will be significant, probably in the range of 5 to 10 percent of total engine cost.

70

These estimates represent the increased costs of new
engines with emission controls installed. Additional
continuing costs may accrue for maintenance of the controls.
These maintenance costs will be considerably less than those
entailed in modifications of existing engines.

## EMISSION CONTROL BY MODIFICATION OF GROUND OPERATIONS

### Definition of Ground Operations

The cycle of operations performed by an aircraft during
its arrival at and departure from an airport can be defined
quite precisely because most of these operations are
prescribed by airport or aircraft operating procedures.
Characteristic operating or LTO (landing-takeoff) cycles
have been defined for various classes of aircraft for
purposes of estimating pollutant emissions.

The LTO cycle can be separated logically into flight and
ground operations. Flight operations include the approach
and climb-out modes as well as landing and takeoff, even
though the latter occur partially on the ground. Ground
operations include the taxi and idle modes of the cycle.
This separation is logical for two reasons. First, flight
operations as defined here are those that cannot readily be
modified to reduce pollutant emissions. Second, flight
operations are conducted almost entirely with aircraft
engines at full or part power; under these conditions,
pollutant emission rates are quite different from those at
the low power levels characteristic of ground operations.
Aircraft ground operations contribute substantially to the
concentrations of CO and THC at air carrier airports because
of the relatively high emission rates of these pollutants at
low engine power levels, and because ground operations are
largely confined to limited areas within the airport
boundaries.

### Emission Control Methods

Six methods offer some degree of control of CO and THC
emissions at air carrier airports by modification of
turbine-aircraft ground-operation procedures.

(1) Increase engine speed during idle and taxi
operations.

(2) Increase engine speed and reduce number of
engines operating during idle and taxi.

71

(3) Reduce idle operating time by controlling departure times from gates.

(4) Reduce taxi operating time by transporting passengers to aircraft.

(5) Reduce taxi operating time by towing aircraft between runway and gate.

(6) Reduce operating time of aircraft auxiliary power supply by providing ground-based power supply.

The first two methods reduce emissions by requiring that engines be operated at more efficient power settings than those in current practice (Figure 12); the next four methods reduce emissions by reducing operating time of either main or auxiliary engines. The effectiveness of these methods in reducing emissions varies considerably. Table 29 summarizes the reductions in CO and THC emissions that would result at Los Angeles International Airport from the six suggested ground-operation changes. Tables developed for other major air carrier airports show emission reductions of the same magnitude.

The control methods listed, with the possible exception of number 3, are not applicable to small, piston-engine aircraft, and, therefore, do not seem to offer means for controlling emissions at general aviation airports. Periods of delay at take-off are significant at some general aviation airports; however, aircraft ground traffic at general aviation airports may not be sufficiently controlled to allow an effective system of controlled gate departures or engine start-ups to reduce periods of delay.

Implementation Cost and Time Requirements

The cost and time requirements of the control methods involving ground operation modifications have been estimated for Los Angeles International. Table 30 presents summary of the estimates. Implementation of these methods at other airports would involve costs of the same magnitude. Specific costs, however, would vary with airport activity level and the present availability of auxiliary equipment. FAA and the airlines have estimated savings for control method 2, and their estimates are within 20% of the estimate in Table 30.

Tables 29 and 30 indicate that alternative 2 is the most attractive means of reducing turbine aircraft emissions



FIGURE 12

HYDROCARBON AND CARBON MONOXIDE EMISSIONS
FROM A TYPICAL AIRCRAFT TURBINE ENGINE (JT3D)

73

Table 29

Comparative Reductions Resulting from Control
Methods Applied at Los Angeles International Airport

| Control method | Resultant emissions, % of uncontrolled emissions | |
|---|---|---|
| | CO | Hydrocarbons |
| 1. Increase engine idle speed | 71 | 93 |
| 2. Increase idle speed and use minimal engines for taxi | | |
|     Two engines | 53 | 66 |
|     Single engine | 39 | 51 |
| 3. Eliminate delays at gate and runway | 90 | 91 |
| 4. Transport passengers between terminal and aircraft | 98 | 97 |
| 5. Tow aircraft to avoid taxi emissions | 34 | 42 |
| 6. Avoid use of aircraft auxiliary power units (APU) | 96 | 98.5 |

74

Table 30

Costs and Time for Operations Changes
at Los Angeles International Airport

| Control method | Time, years | Initial cost, $10^6$ dollars | Annual operating cost change,[a] $10^6$ dollars |
|---|---|---|---|
| 1. Increase engine speed | 0 | 0 | 8.5 |
| 2. Increase speed, reduce number | 0.3 | 0 | -0.7 |
| 3. Control gate departure | 5 | 15 | -0.4 |
| 4. Transport passengers | 2.5 | 65 | 5.0 |
| 5. Tow aircraft | 1 | 1.2 | 0.4 |
| 6. Reduce APU operation | 0.5 | 1.3 | 1.5 |

[a]Minus sign indicates an estimated savings

providing that operational and safety requirements can be met.

## COMPARATIVE EVALUATION OF EMISSION CONTROL METHODS

The engine and ground operation modifications just discussed can be compared in terms of effectiveness, cost, and implementation time. A "potential benefit factor" has been defined to allow comparison of cost/benefit of the emission control methods. The potential benefit factor (PBF) is the net emission reduction resulting from a particular control strategy, averaged over the next 20 years, divided by the cost.

$$PBF = \frac{FYE \times CE \times ECF}{CP}$$

where FYE is the fraction of the next 20 years that the control method is effective; CE is the control method effectiveness (the percentage reduction of a particulate pollutant); ECF is the emission contribution fraction (percentage of total aircraft emissions at relevant airports contributed by engines affected by this control strategy); and CP is the cost of the control strategy for the pollutant considered. Emissions at major carrier airports were used to determine effectiveness of turbine engine control methods and those at general aviation airports to determine effectiveness of piston engine emission control methods.

The potential benefit factor is a measure of the cost-effectiveness of each control strategy. Potential benefit factors (Table 31) have been calculated for the control strategies previously described as applied to (1) retrofitting in-use aircraft, (2) modifying new engines of present models, and (3) incorporating control methods in new engine designs. The higher numbers represent the most cost-effective strategies for emission reduction.

The potential benefit factors in Table 31 are a composite for all turbine and piston engines. Although these factors indicate the relative merits of the control methods, the factor for an individual engine classification may be significantly different. For example, retrofit of water injection for class T3 shows a potential benefit factor of 4.2, whereas the average for all turbine engines is only 1.4. Additionally, while some control strategies show a high potential benefit number, other strategies must also be used to achieve significant emission reductions. For example, fuel venting represents from 4 to 20% of total hydrocarbon emissions, dependent upon airport considered.

Table 31

Comparison of Emission Control Methods

| Control Method | Potential Benefit Factor | | |
|---|---|---|---|
| | HC & CO | $NO_x$ | Smoke |
| **Turbine Engines** | | | |
| A. Retrofit-Engine Modifications | | | |
|   1. Minor combustion chamber redesign | 0.37 | 0.37 | 0.37 |
|     (APU) | (2.5) | | |
|   2. Major combustion chamber redesign | 0.3 | 1.1 | 1.1 |
|     (T3 and APU) | | (6.6) | |
|     (T2 only) | | | (5.0) |
|   3. Fuel drainage control | 10 | -- | -- |
|     (T2 and T3 only) | (20) | | |
|   4. Divided fuel supply | 1.5 | -- | -- |
|   5. Water injection | -- | 1.4 | -- |
|     (T3 only) | | (4.2) | |
|   6. Compressor air bleed | 1.3 | -- | -- |
| B. New Production Engine Modification | | | |
|   1. Minor combustion chamber redesign | 5.0 | 5.0 | 5.0 |
|   2. Major combustion chamber redesign | 4.6 | 4.6 | 4.6 |
|   3. Fuel drainage control | 30 | -- | -- |
|   4. Divided fuel supply | 5.0 | -- | -- |
|   5. Water injection | -- | 1.4 | -- |
|     (T3 only) | | (4.2) | |
|   6. Compressor air bleed | 4.0 | -- | -- |
| C. Future Engine Emission Control | | | |
|   1. Fuel drainage control | 30 | -- | -- |
|   2. Divided fuel supply | 15 | -- | -- |
|   3. Water injection | -- | 2.0 | -- |
|     (T3 only) | | (5.6) | |
|   4. Compressor air bleed | 15 | -- | -- |
|   5. Variable geometry combustion chamber | 25 | 25 | 25 |
|   6. Staged injection combustor | 25 | 25 | 25 |
| D. Ground Operations Modification | | | |
|   1. Increase engine idle speed | 2.4 | -- | -- |
|   2. Increase speed, reduce number | $10^5$ | -- | -- |
|   3. Eliminate delays | 10 | -- | -- |
|   4. Transport passengers | 0.1 | -- | -- |
|   5. Tow aircraft | 75 | -- | -- |
|   6. Reduce APU operation | 1.0 | -- | -- |
| **Piston Engine** | | | |
| A. Retrofit-Engine Modification | | | |
|   1. Fuel-air ratio control | 50 | -- | -- |
|   2. Air injection | 5 | -- | -- |
|   3. Thermal reactor | 2 | -- | -- |

Table 31 (Cont.)

Comparison of Emission Control Methods

| Control Method | Potential Benefit Factor | | |
|---|---|---|---|
| | HC & CO | NO$_x$ | Smoke |
| 4. Catalytic reactor | 1.5 | -- | -- |
| 5. Direct-flame afterburner | 1 | -- | -- |
| 6. Water injection | 2 | -- | -- |
| 7. Positive crankcase ventilation | 3 | -- | -- |
| 8. Evaporative emission control | 1.5 | -- | -- |
| B. New Production Engine Modifications | | | |
| 1. Fuel-air ratio control | 500 | -- | -- |
| 2. Air injection | 30 | -- | -- |
| 3. Thermal reactor | 6.6 | -- | -- |
| 4. Catalytic reactor | 5.0 | -- | -- |
| 5. Direct-flame afterburner | 3.3 | -- | -- |
| 6. Water injection | 15 | -- | -- |
| 7. Positive crankcase ventilation | 50 | -- | -- |
| 8. Evaporative emission control | 3.0 | -- | -- |
| C. Future Engines | | | |
| 1. Fuel-air ratio control | 500 | -- | -- |
| 2. Air injection | 30 | -- | -- |
| 3. Thermal reactor | 6.6 | -- | -- |
| 4. Catalytic reactor | 5.0 | -- | -- |
| 5. Direct-flame afterburner | 3.3 | -- | -- |
| 6. Water injection | 15 | -- | -- |
| 7. Positive crankcase ventilation | 50 | -- | -- |
| 8. Evaporative emission control | 6.0 | -- | -- |
| 9. Engine redesign | 25 | -- | -- |
| D. Ground Operations Modifications | | | |
| 1. Eliminate delays | 10 | -- | -- |

78

Consequently, to achieve substantial reduction cf hydrocarbon emissions a less attractive control method is necessary in addition to eliminating fuel venting.

A review of the PBF values in Table 31 supports the following conclusions providing that all operational and safety requirements can be met:

(1) Modification 2 for ground operation procedures is the most cost-effective method of reducing hydrocarbon and carbon monoxide emissions from turbine engines,

(2) Incorporating emission control methods into design of new engines is the most cost-effective method of over-all aircraft emission control.

(3) Control of fuel-air ratio is the most cost-effective method of reducing hydrocarbon and carbon monoxide emissions from piston engines.

(4) Retrofits of class T3 turbines is a more cost-effective method for NOx control compared to retrofit of other turbine engine classes.

(5) Fuel drainage control has high PBF because of extremely low cost of implementation (CP) rather than high control effectiveness (CE).

Because cost-effectiveness varies significantly among engine classes and control strategies, several factors in addition to cost and effectiveness must be considered in developing emission control strategies for aircraft engines.

## EMISSION MEASUREMENT TECHNOLOGY

Reliable methods for measuring the rates at which pollutants are emitted from aircraft engines are required for the support of an emission-control program. Emission measurements are required for evaluating the effectiveness of control methods, and specific measurement methods must be incorporated in emission-control standards.

The state of emission-measurement technology has been assessed to determine whether measurement techniques are sufficiently well advanced to support the development of emission-control methods and the implementation of emission standards for aircraft engines. The conclusion drawn from this assessment is that current measurement technology will meet the requirements of an emission-control program. Although measurement techniques for particulate emissions

are inadequate at present, improved techniques are being developed through cooperative government-industry action.

Measurement of emission rates from an aircraft engine involves three major requirements:

(1) A test procedure specifying engine operating conditions.

(2) A sampling technique for obtaining a representative sample of exhaust gas.

(3) Analytical instrumentation for determining pollutant concentrations in the exhaust-gas sample.

Aircraft engine manufacturers, FAA, and EPA are devoting substantial effort toward meeting these requirements for measuring emissions from turbine engines.

Sampling and Test Procedures

Obtaining a representative sample of exhaust gas from an aircraft engine for analysis of emission rates is a complex and difficult procedure. Sampling emissions from turbine engines is difficult at the outset because of the jet-blast environment in which the sampling equipment must be installed. Beyond this problem, the following factors all significantly affect the composition of the exhaust sample:

(1) Engine power level.

(2) Temporal and spatial variations in exhaust composition.

(3) Sampling-line diameter, length, material, and temperature.

(4) Ambient temperature and humidity.

(5) Ambient pollutant levels.

Procedures for sampling and analyzing turbine-engine exhaust gases have been under development for several years by engine manufacturers, FAA, and EPA. More recently, the Society of Automotive Engineers Aircraft Exhaust Emission Measurement (E-31) Committee has been formed to standardize these procedures. Standardization of measurement techniques will minimize variations resulting from the factors listed above; however, the several sources of error in collecting exhaust samples and the variability of samples among

80

different engines must be considered in the establishment of a standard emission measurement procedure.

Sampling requirements for aircraft piston engines are similar to those for automobile engines.  The exhaust gases are well mixed by the time they reach the exhaust stack exit.  Consequently, no factors are apparent, beyond those already recognized as affecting automobile exhaust emissions, that would cause variability in exhaust samples from aircraft piston engines.  Differences in engine operation, however, must be considered in the establishment of a standard emission measurement procedure.

Emissions Measurement Instrumentation

Measuring the concentrations of most gaseous pollutants in exhaust samples from aircraft engines is generally within the capabilities of existing instruments and should remain so, even when engines are modified to reduce emission rates.

The various types of instruments that are available and in current use for aircraft emission measurement have been reviewed.  Instruments that appear to be most suitable for measuring turbine-engine emissions at the present time are presented in Table 32.

81

Table 32

Instrumentation for Measurement
of Turbine Engine Emissions

| Measurement method | Pollutant class |
|---|---|
| Non-dispersive infrared (NDIR) | CO and $CO_2$ |
| Heated flame ionization | THC |
| Chemiluminescence | NO |
| Chemiluminescence[a] | $NO_2$ |
| SAE smokemeter (ARP1179) | Smoke |
| None | Particulates |
| Determined from fuel analysis | $SO_2$ |
| 3-MBTH | Aldehydes |
| Human odor panel | Odor |

[a]The non-dispersive ultraviolet instrument (NDUV)
may also prove acceptable for $NO_2$ measurement

82

# APPENDIX A:
# ANALYSIS OF CARBON MONOXIDE CONCENTRATION
# AT LOS ANGELES INTERNATIONAL AIRPORT

When continuous air quality monitoring data is available,
statistical analysis may be applied to determine frequencies
of occurrence of any concentration for any averaging time
either by interpolation of the data or by extrapolation if
the available data is limited.  It has been observed that
all air quality data regardless of averaging time follows a
log normal distribution.[13]

The continuous carbon monoxide data taken at LAX during six
months in 1970 were analyzed statistically for 1-hour and 8-
hour averaging times at several sites to determine the
expected frequencies when the NAAQS would be exceeded.  With
the use of the simple rollback technique, adjusted
frequencies could be determined for changes in emissions and
various control strategies for aircraft and non-aircraft
emission sources.  Dispersion modeling results were used to
predict the degree of influence aircraft emissions have in
locations beyond the boundaries of Los Angeles Airport.

The analysis focused on the 8-hour exposure case in areas
adjacent to the airport where it would be expected that
people would meet the exposure time criteria either as
residents or business employees.  The 1-hour exposure case
would apply to the terminal area itself as well as the areas
considered in the 8-hour averaging time case.

Corrections were made to the available ambient data because
of the recognized seasonal variation of carbon monoxide
levels in the Los Angeles basin.  A recent report published
by the LAAPCD contained sufficient data to calculate the
summer-winter correction factors for the hourly and 8-hour
averaging times.  The average correction factors for the
basin to convert August-September data to December-January
data were found to be 1.5 for the 1-hour data and 1.9 for
the 8-hour case.

Data and statistical information on carbon monoxide analysis
presented in a paper by Larsen[31] were also utilized in this
phase of the analysis.  The L. A. basin CO data in the
Larsen paper were used to check the LAX data for consistency

83

in terms of the frequency and range of observed carbon
monoxide levels.  Tabulated and plotted data in this
reference indicate the air pollution hot spot represented by
the Los Angeles Airport and its environs.  Figure A-1, taken
from the reference shows this point quite clearly.  Figure 1
in the main text of this report indicates the location of
the continuous ambient carbon monoxide stations.  Station
209 was chosen as representative of an off airport site for
the 8 and 1-hour analysis.  Figure A-2 shows the plot of the
raw station 209 data for the months of August and September.

It is obvious that station 209 is directly influenced by the
airport only when the wind is blowing from a westerly
direction.  The September data were categorized into East or
West influences and the results are plotted on Figure A-3.
It can be seen that the composite plot is representative of
both these subcategories and therefore was used for all
subsequent analysis.  It further demonstrates that the
airport exerts the same impact on the air quality at station
209 as the non-airport area sources surrounding it.  Figure
2, in the text of the report, shows the August station 209
frequency distributions for maximum 8-hour daily averages
adjusted for the summer-winter correction factor.  The
frequency of occurrence relating to one day per quarter is
assumed to be equivalent to the one day per year frequency
associated with the 8-hour NAAQS because it can be assumed
that the worst exposure case would occur during the winter
quarter of the year.  This plot has then been adjusted
(Figures A-4 and A-5) for expected rollback emission
reductions of non-aircraft sources in combination with
various percent contributions due to due to aircraft sources
and assumed levels of aircraft emission controls.  Similar
methodology was used in estimating expected 1980 CO
concentrations with various aircraft contributions.  These
are given in the main text.  Modeling results were used to
determine the relating distribution and magnitude of
aircraft emissions around LAX.  It can be seen that the
station 209 analysis is quite representative of other areas
adjacent to LAX where adverse influences of aircraft
operations can be expected to occur.

The same procedures were followed in plotting the adjusted
September data to determine the frequency with which the
standard would be expected to be exceeded for various
percent aircraft contributions.  This data would represent
the upper limits of the analysis.

Similar frequency analysis can be performed for the 1-hour
exposure case.  However, unless there is extreme variation
between the slopes (or standard geometric deviations) of the

84

FIGURE A-1.

MAXIMUM ANNUAL 8-HOUR-AVERAGING-TIME CONCENTRATION OF
CARBON MONOXIDE EXPECTED AT VARIOUS SITES IN THE LOS ANGELES AREA.



FIGURE A-2

BASELINE DATA, DAILY MAXIMUM 8-HR. AVERAGE
CO CONCENTRATIONS, STATION 209, LAX, 1970



FIGURE A-3
FREQUENCY DISTRIBUTION FOR 8-HR. CO DATA, STATION 209, LAX, SEPTEMBER 1970



Probability (%) of exceeding the given pollutant level.

FIGURE A-4

EXPECTED CO CONCENTRATION DISTRIBUTION, WINTER, STATION 209, LAX
FOR 80 PERCENT AIRCRAFT CONTRIBUTION



Probability (%) of exceeding given pollutant level

88

FIGURE A-5

EXPECTED CO DISTRIBUTION, WINTER, STATION 209, LAX
FOR 20 PERCENT AIRCRAFT CONTRIBUTION



Probability (%) of exceeding the given pollutant level

1-hour data and the 8-hour averaging time data, the 1-hour
standard will be met if the strategies are imposed to meet
the 8-hour standard. This would appear to be the case in
those areas at LAX where the 1-hour CO levels are higher
than the standard at the present time.

# APPENDIX B:

# DISPERSION MODELING METHODOLOGY AND

# ISOPLETH DERIVATION

The primary and most direct method of estimating aircraft contributions to air pollutant concentrations involved the application of frequently used dispersion modeling procedures to estimate air pollutant concentrations caused by aircraft alone and by all sources located in the airport vicinity (within a 10-kilometer radius of the airport center). Dispersion models similar to the one used in this study are specified by EPA as one means of showing that implementation plans for certain regions will be adequate to meet the ambient air quality standards. Much of the analysis of aircraft air quality impact presented in this report is based on modeling work performed, under EPA contract, by Northern Research and Engineering Corporation. A general description of the modeling procedure is presented here; a more detailed account of the modeling work and results is available in the contract report.[3]

The procedure in the modeling study involved: (1) approximating emission sources as continuous, stationary point sources of constant strength over the time period being considered, (2) modeling the dispersion of pollutants from these sources using an empirical mathematical model, and (3) estimating concentrations at specified receptor points by summing the pollutant contributions from each point source, and (4) constructing isopleths of estimated pollutant concentrations based on the estimated receptor point concentrations.

The point sources used in the modeling approximated the location and strength of emission sources at each of the four airports studied. Lines along which automobile or aircraft movement occur were represented by series of point sources. Area sources, representing airport surroundings out to a 10-kilometer radius from the airport center, were represented by circular arrangements of point sources around the airports. Altogether, 149 to 276 point sources were used for each air carrier airport, depending on the size and complexity of the airport. The number of sources was chosen to provide a reasonable approximation of emissions at the

airport and in the vicinity without need for excessive
computer time or computer program complexity.

The basis of the atmospheric dispersion modeling is an
empirical, mathematical approximation of pollutant
dispersion after emission from a point source.  This
approximation yields a plume whose concentration
distribution is Gaussian in the vertical and crosswind
direction.  The distribution is dependent upon downwind
distance from the source and on atmospheric stability.
Eventually the upper boundary of the atmospheric mixing
layer restricts vertical spread of the plume and modifies
the distribution of pollutants in the vertical direction.
This dispersion model should be considered as a general
approximation of airport dispersion patterns; considerable
model development would be required to include more detailed
small-scale dispersion patterns, such as those around large
buildings or near jet blasts.

In calculation of long-term concentrations, the fact
that there is a distribution of meteorological conditions is
used to simplify the basic dispersion model.  The result,
known as the Martin-Tikvart model, approximates plume spread
in the crosswind direction and sums the contributions of all
combinations of wind speeds and atmospheric stabilities.

The concentration at any receptor point is obtained as
the sum of the contributions from each point source of
emissions.  The accuracy of the concentration value for this
type of model is dependent upon the proximity of the
receptor point and the emission sources.  Because the
sources of emission are actually a collection of points,
lines areas, and volumes, rather than merely a collection of
points, as assumed in the model, greater accuracy general`
results when the receptor point is not close proximity to
any sources.  To limit inaccuracies attributable to the
point source, receptor locations within 100 meters of a
point source were not considered in the results.

The model provided estimates of air pollutant
concentrations both from aircraft alone and from all sources
at a number of sites located in and around the selected
airports.  Receptors considered in this study were located
according to the following overall scheme at air carrier
airports: (1) one receptor at the center of each major
terminal, (2) one receptor 100 meters from the head of each
runaway, (3) sixteen receptors on the airport boundary,
spaced equally on a compass rose located at the designated
center of the airport, and (4) sixteen more receptors
located in the airport surroundings, 5 kilometers from the

center of the airport and spaced equally on the compass
rose.  Not more than 50 receptors were used, the actual
number depending on the number of terminals and runways at
each airport.

The resulting concentrations at the various receptor points
were used in constructing isopleths of pollutant
concentration.  Isopleths were constructed for 6-9 a.m.
hydrocarbon and annual NOx concentrations due to aircraft
alone, and for aircraft contributions to total CO
concentrations.

The model input data used in calculating annual
concentrations of NOx were based on yearly distributions of
wind direction, stability class and wind speed class, and
annual average values of mixing height and emission rates.
The short-term meteorological and activity conditions used
to calculate the 8-hour and 1-hour CO conditions and the 6-9
a.m. hydrocarbon concentration were chosen to be
representative of conditions that would be expected to yield
high concentrations of these pollutants, i.e., low wind
speed, high atmospheric stability, and low mixing height,
and moderate to high aircraft activity.  The conditions for
calculation of short-term concentrations are presented in
Table B-1.

Because the results of the model have not been
extensively validated or verified, the concentrations
generated by the model should be considered to te very
approximate.  They are useful, however, in indicating
general pollutant concentration levels of the extent of
aircraft contributions to localized pollutant concentration.

TABLE B-1

SHORT-TERM METEOROLOGICAL AND ACTIVITY CONDITIONS

| | 6-9 A.M. HC at L.A. Airport | 8-Hour CO at L.A. Airport[a] | LAX | 1-Hour CO ORD | JFK | DCA |
|---|---|---|---|---|---|---|
| Wind speed class | 1 | 1 | 1 | 1 | 1 | 1 |
| Stability class (Turner) | C | E | E | F | E | E |
| Wind direction, deg. | 255 | 255 | 90 | 215 | 200 | 320 |
| Wind variability, deg. | 20 | 20 | 40 | 30 | 10 | 20 |
| Mixing height, m. | 200 | 200 | 535 | 700 | 960 | 980 |
| Aircraft activity, LTO cycles. | 60 (1970) 79 (1980) | 260 | 54 | 49 | 30 | 34 |
| Direction of movement | West | West | E | SW | S | N |
| Idle time at runway, sec. | 60 | 150 | 240 | 260 | 540 | 300 |
| Estimated annual frequency of occurrence of meteorological conditions | | at least once | 81 | 29[b] | 10 | 67 |

[a] These conditions are used in estimating ratios between aircraft generated and total 8-hour CO concentrations; the ratios are not sensitive to the conditions assumed.
[b] Based on 5 months of data.

# APPENDIX C:

# AREA – SOURCE DISPERSION MODELING TO ESTIMATE

# DOWNWIND POLLUTANT CONCENTRATIONS

The modeling method used in this analysis involved approximating emissions both at airports and in surrounding areas as area sources, and relating these emissions to downwind pollutant concentrations by assuming Gaussian pollutant distribution in the vertical and crosswind directions. For each receptor point, the concentration caused by small-area elements was determined by integrating in the crosswind and upwind directions over each source region. The airport and surroundings were considered as separate source regions. The concentrations due to these two source regions were calculated separately then added together to obtain the total concentration at each receptor. Near the airport source, concentrations are the same as those from an area source of infinite extent.[32] At greater distances, edge effects caused by the finite width of the airport are considered by including the integration in the cross-wind direction. Also included is the limit to vertical mixing imposed by a more stable layer aloft.

For the purpose of this modeling, the airport was assumed to cover an area of 3.2 by 3.2 kilometers. The time period for the analysis, 8 a.m. to 11 a.m., was selected on the basis of recurring meteorological conditions conducive to high air pollutant concentrations. A diurnal correction factor was applied to the resulting concentrations to correct for the disproportionately greater amount of activity that occurred during this 3-hour period than occurred during other 3-hour periods during the day. The specific meteorological conditions used for the time period considered were: wind from west; stability class = 3, wind speed = 1.5 m/second mixing height = 200 m. These conditions are representative of severe conditions, from an air pollution standpoint, that are expected to occur at least once a year in the Los Angeles area.

95

# REFERENCES

1. Nature and Control of Aircraft Engine Exhaust Emissions. Report of the Secretary of Health, Education, and Welfare to the United States Congress. December 1968.

2. Jet Aircraft Emissions and Air Quality in the Vicinity of the Los Angeles International Airport. Air Pollution Control District, County of Los Angeles, California. April 1971.

3. The Potential Impact of Aircraft Emissions Upon Air Quality. Northern Research and Engineering Corporation. Final Report to the U. S. Environmental Protection Agency. Research Triangle Park, North Carolina. Contract Number 68-02-0085. December 1971.

4. Assessment of Aircraft Emission Control Technology. Northern Research and Engineering Corporation. Final Report to the U. S. Environmental Protection Agency. Research Triangle Park, North Carolina. Contract Number 68-04-0011. September 1971.

5. Analysis of Aircraft Exhaust Emission Measurements. Cornell Aeronautical Laboratory. Available from NTIS--PB 204-879. Contract Number 68-04-0040. October 1971.

6. National Primary and Secondary Ambient Air Quality Standards. Environmental Protection Agency. Federal Register 36(84):8187, April 30, 1971.

7. Air Quality Criteria for Hydrocarbons. U. S. DHEW, PHS, EHS, National Air Pollution Control Administration. Publication Number AP-64. Washington, D. C. March 1970.

8. Federal Air Quality Control Regions. Environmental Protection Agency, Office of Air Programs, Research Triangle Park, North Carolina. Publication Number AP-102. January 1972.

9. Requirements for Preparation, Adoption, and Submittal of Implementation Plans. Environmental Protection Agency. Federal Register 36(158):15486, August 14, 1971.

10. Mixing Heights, Wind Speeds, and Potential for Urban Air Pollution Throughout the Contiguous United States. Environmental Protection Agency, Office of Air Programs, Research Triangle Park, North Carolina. Publication Number AP-101. January 1972.

11. Climatography of U. S., Summary of Observations for Los Angeles International Airport, 1951-1960. U. S. Department of Commerce, Weather Bureau. Washington, D. C. 1962.

12. The State of California Implementation Plan for Achieving and
    Maintaining the National Ambient Air Quality Standards. California
    Air Resources Board. Sacramento, California. January 1972.

13. A Mathematical Model for Relating Air Quality Measurements to Air
    Quality Standards. Environmental Protection Agency, Office of Air
    Programs, Research Triangle Park, North Carolina. Publication
    Number AP-89. November 1971.

14. Nature and Control of Aircraft Engine Exhaust Emissions. Northern
    Research and Engineering Corporation. Final Report to the National
    Air Pollution Control Administration. Durham, North Carolina.
    Contract Number CPA 222-68-27. November 1968.

15. A Study of Aircraft Gas Turbine Engine Exhaust Emissions. Aerospace
    Industries Association. Washington, D. C. August 1971.

16. Collection and Assessment of Aircraft Emissions Baseline Data -
    Turbo-prop Engines. Detroit Diesel Allison Division (GMC). Avail-
    able from NTIS--PB 202-961. Contract Number 68-04-0029. September
    1971.

17. Exhaust Emissions Test: AiResearch Aircraft Propulsion and Auxiliary
    Power Gas Turbine Engines. AiResearch Division Garrett Corporation.
    Available from NTIS--PB 204-920. Contract Number 68-04-0022.
    September 1971.

18. Assessment of Aircraft Emission Control Technology. Northern
    Research and Engineering Corporation. Available from NTIS--PB 204-878.
    Contract Number 68-04-0011. September 1971.

19. Collection and Assessment of Aircraft Emissions - Piston Engines.
    Teledyne Continental Motors. Available from NTIS--PB 204-196.
    Contract Number 68-04-0035. October 1971.

20. Analysis of Aircraft Exhaust Emission Measurements: Statistics.
    Cornell Aeronautical Laboratory. Available from NTIS--PB 204-869.
    Contract Number 68-04-0040. November 1971.

21. A Study of Aircraft Powerplant Emissions (Piston and Turbine).
    Scott Research Laboratories, Inc. Available from NTIS--PB 207-107.
    Contract Number 68-04-0037. January 1971.

22. Collection and Assessment of Aircraft Emissions Baseline Data -
    Turbine Engines. Pratt and Whitney Aircraft. Available from NTIS--
    PB 207-321. Contract Number 68-04-0027. February 1972.

23.  A Field Survey of Emissions from Aircraft Turbine Engines. U. S.
     Bureau of Mines, RI 7634. Bartlesville Energy Research Center,
     Bartlesville, Oklahoma.

24.  Gaseous Emissions from a Limited Sample of Military and Commercial
     Aircraft Turbine Engines. Southwest Research Institute. Available
     from NTIS--PB 204-177. Interim Report, Contract Number EHS 70-108.

25.  A Study of Exhaust Emissions from Reciprocating Aircraft Power
     Plants. Scott Research Laboratories. Available from NTIS--PB 197-627.
     Contract Number CPA 22-69-129. December 1970.

26.  Design Criteria for Control of Nitrogen Oxide Emissions from Air-
     craft Turbine Engines. Ronald S. Fletcher, Richard D. Siegel, and
     E. Karl Bastress. Northern Research and Engineering Corporation.
     Report Number 1162-1.

27.  Time Requirements for Retrofitting Jet Aircraft with Improved
     Combustor Design. Northern Research and Engineering Corporation.
     Final Report to National Air Pollution Control Administration,
     Durham, North Carolina. Contract Number CPA 22-69-90. July 1969.

28.  Reduction of Nitrogen Oxides from Gas Turbines by Steam Injection.
     N. R. Dibelius, M. B. Hilt, and R. H. Johnson. ASME Paper 71-67-58,
     American Society of Mechanical Engineers.

29.  A Study of Exhaust Emissions from Reciprocating Aircraft Power
     Plants. Scott Research Laboratories, Inc. Scott Project Number 1136.
     Final Report to the U. S. Environmental Protection Agency. Research
     Triangle Park, North Carolina. Contract Number CPA 22-69-129.
     December 1970.

30.  Profile of Air Pollution Control. County of Los Angeles, Air Pollution
     Control District. 1971.

31.  Ambient Carbon Monoxide Exposures. R. I. Larsen and H. W. Burke.
     APCA 69-167, Air Pollution Control Association. June 1969.

32.  A Simple Method of Calculating Dispersion for Urban Areas. Steven R.
     Hanna. Journal of the Air Pollution Control Association, $\underline{21}$(12):774-
     777. December 1971.

⚹U.S. GOVERNMENT PRINTING OFFICE: 1973 514-151/133 1-3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRIENDS OF THE EARTH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ No. 1: 12-cv-00363(ABJ) |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARIANNE L. ENGELMAN LADO
BRIDGET M. LEE
Admitted *pro hac vice*
Earthjustice
156 William Street, Suite 800
New York, NY 10038
(212) 791-1881
(212) 918-1556 [*FAX*]
mengelmanlado@earthjustice.org
blee@earthjustice.org

TIMOTHY D. BALLO
D.C. Bar No. 977077
Earthjustice
1625 Massachusetts
Avenue NW, Suite 702
Washington, DC 20036
(202) 667-4500
(202) 667-2356 [*FAX*]
tballo@earthjustice.org

HELEN KANG
DEBORAH BEHLES
Golden Gate University
School of Law
Environmental Law and
Justice Clinic
536 Mission Street
San Francisco, CA 94105
(415) 442-6647
(415) 896-2450 [*FAX*]
hkang@ggu.edu
dbehles@ggu.edu

*Counsel for Friends of the Earth*

Dated: September 14, 2012

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

   I.     FACTUAL AND REGULATORY BACKGROUND ........................................... 2

        A.    EPA Has Long Known that Lead Air Pollution Endangers Human Health and Has Repeatedly Regulated Lead Emissions. ......................................... 2

        B.    EPA Has Recognized the Contribution to Overall Lead Air Pollution Made by Lead Emissions from Aircraft Engines. ........................................ 5

   II.    LEGAL STANDARD ......................................................................................... 7

   III.   ARGUMENT ...................................................................................................... 7

        A.    EPA Has a Mandatory Duty to Determine Whether Emissions from Aircraft Cause or Contribute to Air Pollution that May Endanger Public Health or Welfare. ............................................................................ 7

            1.    The Plain Meaning and Structure of Section 231 Establishes a Mandatory Duty that EPA Undertake an Endangerment Determination ............................................................................................ 8

            2.    EPA's Ability to Exercise Discretion in Making an Endangerment Determination Does Not Diminish Its Mandatory Duty to Conduct Such Determination. ........................................................................... 13

            3.    The Legislative History of the Clean Air Act Supports the Plain Meaning of Section 231, Which Imposes a Mandatory Duty to Conduct an Endangerment Determination. ........................................ 16

        B.    EPA Has a Mandatory Duty to Make an Endangerment Determination Specifically for Lead. ............................................................................... 19

        C.    Sovereign Immunity Does Not Apply When EPA Has a Mandatory Duty. ................................................................................................24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Department of Environmental Conservation v. EPA,*
    540 U.S. 461 (2004)........................................................................................................13

*Allied Pilots Association v. Pension Benefit Guarantee Corporation,*
    334 F.3d 93 (D.C. Cir. 2003)........................................................................................9, 12

*America's Community Bankers v. F.D.I.C.,*
    200 F.3d 822 (D.C. Cir. 2000)...........................................................................................12

*American Lung Association v. Reilly,*
    962 F.2d 258 (2d Cir. 1992)..........................................................................................15, 17

*American Trucking Associations v. EPA,*
    175 F.3d 1027 (D.C. Cir. 1999).........................................................................................15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................................................7

*Beaty v. Food & Drug Administration,*
    --- F. Supp. 2d --, 2012 WL 1021048 (D.D.C. Mar. 27, 2012) .........................................11

*Bennett v. Spear,*
    520 U.S. 154 (1997).........................................................................................................9, 14

*Bloomgarden v. Coyer,*
    479 F.2d 201 (D.C. Cir. 1973)............................................................................................7

*Burnett v. Al Baraka Investment & Development Corporation,*
    274 F. Supp. 2d 86 (D.D.C. 2003) .....................................................................................12

*Center for Biological Diversity v. EPA,*
    794 F. Supp. 2d 151 (D.D.C. 2011) ............................................................................ passim

*Center for Biological Diversity v. U.S. Fish & Wildlife Service,*
    450 F.3d 930 (9th Cir. 2006) ..............................................................................................11

*Chamber of Commerce v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996)...........................................................................................24

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 ......................................................................................................................16

*Coalition for Responsible Regulation v. EPA,*
    684 F.3d 102 (D.C. Cir. 2012)..............................................................................21

*Environmental Defense Fund v. Thomas,*
    870 F.2d 892 (2d Cir. 1989)............................................................................14, 15

*Ethyl Corporation v. EPA,*
    541 F.2d 1 (D.C. Cir. 1976)....................................................................8, 18, 20, 23

*Harrison v. PPG Industries,*
    446 U.S. 578 (1980)...............................................................................................16

*Lane v. Pena,*
    518 U.S. 187 (1996)...............................................................................................25

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998).................................................................................................12

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)..........................................................................................14, 21

*Montgomery v. Chao,*
    546 F.3d 703 (D.C. Cir. 2008)................................................................................7

*National Association of Clean Air Agencies v. EPA,*
    489 F.3d 1221 (D.C. Cir. 2007).................................................................11, 14, 17

*Natural Resources Defense Council, Inc. v. Train,*
    545 F.2d 320 (2d Cir. 1976)...................................................................................20

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
    483 U.S. 711 (1987)...............................................................................................16

*Porto Rico Railway, Light & Power Co. v. Mor,*
    253 U.S. 345 (1920)..................................................................................................9

*Ruckelshaus v. Sierra Club,*
    463 U.S. 680 (1983)...............................................................................................16

*Sea-Land Service, Inc. v. Alaska Railroad,*
    659 F.2d 243 (D.C. Cir. 1981)...............................................................................24

*Sierra Club v. EPA,*
    850 F. Supp. 2d 300 (D.D.C. 2012) .......................................................................24

*Sierra Club v. Leavitt,*
    355 F. Supp. 2d 544 (D.D.C. 2005) ..................................................................15, 24

*Trudeau v. Federal Trade Commission,*
    456 F.3d 178 (D.C. Cir. 2006) ........................................................................................24

*United States ex rel. Totten v. Bombardier Corporation,*
    380 F.3d 488 (D.C. Cir. 2004) ....................................................................................12, 13

**STATUTES**

5 U.S.C. § 702 ......................................................................................................................24

42 U.S.C. §§ 7401–7671(q) ..................................................................................................8

42 U.S.C. § 7408(1)(A) ..........................................................................................................2

42 U.S.C. § 7412(b)(1) .........................................................................................................23

42 U.S.C. § 7571(a) ..............................................................................................9, 11, 17, 22

42 U.S.C. § 7571(a)(1) .........................................................................................................10

42 U.S.C. § 7571(a)(2)(A) ..........................................................................................8, 19, 21

42 U.S.C. § 7571(a)(3) .....................................................................................................10, 11

42 U.S.C. § 7602(g) ..............................................................................................................21

Fed. R. Civ. P. 56(a) ...............................................................................................................7

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 95-564 (Aug. 3, 1977) ....................................................................18, 23

H.R. Rep. No. 91-1146 (Dec. 31, 1970) ..............................................................................17

H.R. Rep. No. 95-294 (May 12, 1977) .....................................................................14, 18, 19, 23

Pub. L. No. 91-604, § 231(a)(1)–(2); 84 Stat. 1676, 1703–04 (Dec. 31, 1970) ...................17, 23

Pub. L. No. 95-95, § 401(f); 91 Stat. 685, 791 (Aug. 7, 1977) .........................................17, 22, 23

**REGULATIONS AND FEDERAL REGISTER ENTRIES**

14 C.F.R. § 34.61 ..................................................................................................................20

40 C.F.R. § 87.21 .............................................................................................................20, 21

40 C.F.R. § 471.13 .................................................................................................................23

38 Fed. Reg. 19,088 (July 17, 1973) .................................................................................21, 22

EPA, 1977 Clean Air Act Amendments to Prevent Significant Deterioration, 43 Fed. Reg. 26,388 (June 19, 1978)............................................................................................................21

EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg. 14,921 (Apr. 8, 1976) .............2, 23

EPA, Advance Notice of Proposed Rulemaking on Lead Emission from Piston-Engine Aircraft Using Leaded Aviation Gasoline, 75 Fed. Reg. 22,440 (Apr. 28, 2010) .................5, 6

EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality Standards, 75 Fed. Reg. 71,033 (Nov. 22, 2010).........................................................................6

EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality Standards, 76 Fed. Reg. 72,097 (Nov. 22, 2011).........................................................................6

EPA, Control of Air Pollution from New Motor Vehicles and New Motor Vehicle Engines; Certification and Test Procedures; Gasoline Lead Content, 53 Fed. Reg. 470 (Jan. 7, 1988)...................................................................................................................................24

EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009) ("GHG Endangerment Finding").....................................................................................................8

EPA, Lead; Identification of Dangerous Lead Levels, 66 Fed. Reg. 1206 (Jan. 5, 2001)...............3

EPA, National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964 (Nov. 12, 2008) ............................................................................................................................3, 4, 5

EPA, National Primary and Secondary Ambient Air Quality Standards for Lead, 43 Fed. Reg. 46,246 (Oct. 5, 1978)...................................................................................................2, 3

EPA, Petition Requesting Rulemaking to Limit Lead Emissions from General Aviation Aircraft; Request for Comments, 72 Fed. Reg. 64,570 (Nov. 16, 2007).....................................5

EPA, Prohibition on Gasoline Containing Lead or Lead Additives for Highway Use, 61 Fed. Reg. 3832 (Feb. 2, 1996) ....................................................................................................3

EPA, Regulation of Fuel and Fuel Additives, 47 Fed. Reg. 38,070 (Aug. 27, 1982).......................3

EPA, Regulation of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (Feb. 23, 1972)................20, 23

EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg. 1254 (Jan. 10, 1973).............2, 20, 23

**OTHER AUTHORITIES**

EPA, Air Quality Criteria for Lead (June 1986), Docket ID No. EPA-HQ-OAR-2007-0294-0178 (filed Apr. 28, 2010) ...............................................................................................3

EPA, Integrated Science Assessment for Lead (Second External Review Draft) (Feb. 2012), *available at* http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=235331#Download ................................4

EPA, Lead Emissions from the Use of Leaded Aviation Gasoline in the United States, Technical Support Document (Oct. 2008), Docket ID No. EPA-HQ-OAR-2006-0735-5917 (filed Dec. 18, 2009) .........................................................................................7

EPA, Lead Emissions from Use of Leaded Aviation Gasoline, Technical Support Document, Docket ID No. EPA-HQ-OAR-2007-0294-0163 (Oct. 2008) (filed Apr. 28, 2010) ..........................................................................................................6

EPA, PBT National Action Plan for Alkyl-lead (June 2002), Docket ID No. EPA-HQ-OAR-2007-0294-0158 (filed Apr. 28, 2010) .........................................................5

EPA, Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft Equipped with Turbofan, Turbojet, and Turboprop Engines (May 2009), http://www.epa.gov/nonroad/aviation/420r09901.pdf ................................22

EPA, Table of EPA Initial Nonattainment Designations, http://www.epa.gov/leaddesignations/2008standards/documents/2010-11-16/tableI.html (last visited Sept. 14, 2012) ...............................................................7

Friends of the Earth, Supplemental Comment on EPA's ANPR (Feb. 16, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0498 (filed Feb. 23, 2011) ................................6

Friends of the Earth, Supplemental Comments on EPA's ANPR (Aug. 31, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0501 (filed Sept. 1, 2011) ................................4

Friends of the Earth, Supplemental Comments on EPA's ANPR (Nov. 28, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0503 (filed Nov. 30, 2011) ................................6

Marie Lynn Miranda et al., *A Geospatial Analysis of the Effects of Aviation Gasoline on Childhood Blood Lead Levels*, Envtl. Health Perspectives 119 (Oct. 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3230438/ ................................4

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Pursuant to this Court's Order of August 20, 2012, Plaintiff Friends of the Earth ("FoE")

files this memorandum in opposition to the portion of Defendants' Motion for Summary

Judgment that concerns the threshold issue whether Section 231(a)(2)(A) of the Clean Air Act

imposes a non-discretionary duty to determine whether lead emissions from lead-fueled general

aviation aircraft engines cause or contribute to lead air pollution which may reasonably be

anticipated to endanger public health or welfare.  FoE seeks to compel the United States

Environmental Protection Agency and Lisa Jackson, the Agency's Administrator (collectively,

"EPA"), to carry out this duty, which EPA has avoided for decades despite its long recognition

that there is no safe exposure level for lead and that use of aviation gasoline is the largest source

of lead emissions in the United States.  Given overwhelming evidence of the grave health effects

caused by human lead exposure and the contribution of aircraft lead emissions to air pollution, it

is unconscionable that EPA has failed to carry out its duty to make an endangerment

determination.

The existence of an enforceable mandatory duty is manifest by the plain meaning and

structure of Section 231(a) and is supported by the legislative history of the Act.  An

endangerment determination is a compulsory step within EPA's duty to regulate aircraft

emissions.  *Ctr. for Biological Diversity v. EPA*, 794 F. Supp. 2d 151, 158–62 (D.D.C. 2011)

("*CBD*").  Moreover, Section 231(a) specifically requires that EPA study "emissions of air

pollutants from aircraft" and, following such study, that EPA propose emissions standards for

those pollutants.  Lead, uncontrovertibly, fits under the definition of "air pollutant," and, indeed,

EPA identified lead as an air pollutant from aircraft when it conducted its Section 231(a)(1)

1

study forty years ago. The plain language, structure, and legislative history of the Act compel

EPA to undertake the endangerment determination as to aircraft lead emissions. For these

reasons, FoE requests that this Court find that EPA has a mandatory duty under Clean Air Act

Section 231(a)(2) and deny EPA's Motion for Summary Judgment.

## I.    FACTUAL AND REGULATORY BACKGROUND

### A.   EPA Has Long Known that Lead Air Pollution Endangers Human Health and Has Repeatedly Regulated Lead Emissions.

EPA has repeatedly regulated lead with the growing understanding of lead's toxicity,

particularly its serious adverse impacts on children. In 1973, in recognition of the risks posed by

lead exposure, EPA began to phase out the use of lead in motor vehicle gasoline, noting that the

resulting lead air pollution presented "a significant risk of harm to the health of urban population

groups, especially in children." EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg. 1254

(Jan. 10, 1973).

In 1976, under Section 108 of the Clean Air Act, EPA listed lead as a criteria pollutant—

*i.e.*, a pollutant from numerous or diverse sources that endangers public health or welfare. *See*

EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg. 14,921 (Apr. 8, 1976); 42 U.S.C.

§ 7408(1)(A). In 1978, EPA promulgated National Ambient Air Quality Standards ("NAAQS")

for airborne lead emissions, concluding that "it remains the Agency's belief that airborne lead

directly and indirectly contributes to the risk of adverse health consequences and that sufficient

clinical and epidemiological evidence is available to form a judgment as to the extent of this

contribution." EPA, National Primary and Secondary Ambient Air Quality Standards for Lead,

43 Fed. Reg. 46,246, 46,250 (Oct. 5, 1978). EPA based its decision on its finding that increases

in airborne lead leads to increases in blood lead levels and that adverse health effects from

2

increased blood lead levels include the "risk of permanent, severe, neurological damage or death." *Id.* at 46,247.

In 1982, EPA reiterated its "concern over the impact of total environmental loadings of lead, including exposures that may result from contaminated soil, dust, water, or foodstuffs . . . [and, thus,] increases in exposure resulting from increased use of lead in gasoline should be avoided." EPA, Regulation of Fuel and Fuel Additives, 47 Fed. Reg. 38,070, 38,076 (Aug. 27, 1982).

In 1986, EPA revised its "Air Quality Criteria" for lead, recognizing that lead is more dangerous than EPA had previously found and concluding that reducing lead air pollution would "result in significant widespread reductions in levels of lead in human blood." EPA, Air Quality Criteria for Lead 1-159 (June 1986), Docket ID No. EPA-HQ-OAR-2007-0294-0178 (filed Apr. 28, 2010). EPA recognized that "young children are at greatest risk for experiencing lead-induced health effects." *Id.*[1]

In 1996, EPA completed its phaseout of the last one percent of lead from automobile gasoline. *See* EPA, Prohibition on Gasoline Containing Lead or Lead Additives for Highway Use, 61 Fed. Reg. 3832 (Feb. 2, 1996).

In 2001, EPA acknowledged that "there is no known threshold for lead." EPA, Lead; Identification of Dangerous Lead Levels, 66 Fed. Reg. 1206, 1215 (Jan. 5, 2001); *see also* 73 Fed. Reg. at 66,984 (acknowledging that "there is now no recognized safe level of [lead] in children's blood").

---

[1] Indeed, in 1991, the Secretary of Health and Human Services characterized lead poisoning as the "number one environmental threat to the health of children in the United States." EPA, National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964, 66,968 (Nov. 12, 2008).

3

In 2008, EPA tightened the air quality standards for lead due to increased evidence of adverse health effects at lower levels than previously thought. *See* 73 Fed. Reg. 66,964. In particular, the Administrator found that "the current evidence indicates the need for a standard level that is substantially lower than the current level to provide increased public health protection, especially for at-risk groups, including most notably children."[2] *Id.* at 66,985. EPA recognized that airborne lead emissions can continue to harm human health for years: "[o]nce deposited out of the air, [lead] can subsequently be resuspended into the ambient air and, because of the persistence of [lead], [lead] emissions contribute to media concentrations for some years into the future." *Id.* at 66,971.

As part of its most recent review of the NAAQS for lead, EPA acknowledged that "[w]ith each successive assessment to-date, the epidemiologic and toxicological study findings show that progressively lower blood [lead] levels or [lead] exposures are associated with cognitive deficits and behavioral impairments." EPA, Integrated Science Assessment for Lead (Second External Review Draft) 2-63 (Feb. 2012), *available at* http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=235331#Download (last visited Sept. 13, 2012).

As EPA has acknowledged, there is no safe exposure level for lead; even small, discrete doses of emissions can cause adverse health impacts. 73 Fed. Reg. at 66,972 (recognizing that no "safe" threshold exists). The adverse health effects from lead exposure include "neurological,

---

[2] Children who live near sources of airborne lead, such as airports that use leaded aviation gasoline, have increased blood lead levels and, thus, a higher risk of adverse impacts from lead air pollution. *See* Marie Lynn Miranda et al., *A Geospatial Analysis of the Effects of Aviation Gasoline on Childhood Blood Lead Levels*, Envtl. Health Perspectives 119(10) (Oct. 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3230438/ (last visited Sept. 12, 2012) (submitted to EPA on August 31, 2011, *see* Friends of the Earth, Supplemental Comments on EPA's ANPR (Aug. 31, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0501 (filed Sept. 1, 2011).

4

hematological and immune effects for children and hematological, cardiovascular and renal

effects for adults." *Id.* at 66,987. Indeed, EPA has documented both the risk and severity of the

effects of lead air pollution on human health. EPA, Advance Notice of Proposed Rulemaking on

Lead Emission from Piston-Engine Aircraft Using Leaded Aviation Gasoline, 75 Fed. Reg.

22,440, 22,449 (Apr. 28, 2010) ("Lead has been demonstrated to exert 'a broad array of

deleterious effects on multiple organ systems via widely diverse mechanisms of action'" and

"has been classified as a probable human carcinogen.").

### B. EPA Has Recognized the Contribution to Overall Lead Air Pollution Made by Lead Emissions from Aircraft Engines.

EPA has recognized that lead is an air pollutant emitted by aircraft since 1972. *See* EPA,

Aircraft Emissions: Impact on Air Quality and Feasibility of Control 5 (1972) (attached as Ex. A

to the Decl. of Bridget M. Lee (Sept. 14, 2012) and submitted herewith). Ten years ago, EPA

also identified aviation gasoline as the largest lead pollution source category in the nation. *See*

EPA, Petition Requesting Rulemaking to Limit Lead Emissions from General Aviation Aircraft;

Request for Comments, 72 Fed. Reg. 64,570, 64,571 (Nov. 16, 2007) (discussing the results of

the 2002 emissions inventory); EPA, PBT National Action Plan for Alkyl-lead (June 2002),

Docket ID No. EPA-HQ-OAR-2007-0294-0158 (filed Apr. 28, 2010). In 2010, EPA issued an

Advance Notice of Proposed Rulemaking ("ANPR") for lead emissions from aircraft that

described information upon which EPA would rely in conducting an eventual endangerment

determination. *See* 75 Fed. Reg. at 22,440. The ANPR documents EPA's recognition that lead

emissions from aircraft contribute to increased concentrations of lead in the air. *See id.* at

22,457–58 (citing Bill Piazza, Los Angeles Unified School District, Envtl. Health & Safety

Board, Santa Monica Municipal Airport: A Report on the Generation and Downwind Extent of

Emissions Generated from Aircraft and Ground Support Operations (June 1999), Docket ID No.

EPA-HQ-OAR-2007-0294-0123 (filed Apr. 28, 2010)). Lead from general aviation aircraft

engines is released at approximately 20,000 airports throughout the country and represent "the

largest single source category for emissions of lead to air, comprising approximately half of the

national inventory." *Id.* at 22,440, 22,442. In the ANPR, EPA reported that 779 tons of lead

were estimated to have been emitted from aircraft in just one year. *Id.* at 22,453.

Studies confirm the contribution of aircraft emissions to airborne lead pollution, as EPA

has acknowledged. For example, in 2006 and 2007, EPA conducted a study at the Santa Monica

Airport of lead emissions from piston-engine aircraft. *Id.* at 22,458. EPA reported that "ambient

lead increased with increasing proximity to the airport" and that the data from the Santa Monica

Airport study "suggest that piston-engine activity can increase ambient lead concentrations in

downwind neighborhood sites, resulting in levels that are four to five times higher than

background levels and maximum impact site concentrations that are up to 25 times higher than

background lead levels." *Id.*

Significantly, airports at which leaded aviation gasoline is used are located in or near

each of the twenty areas identified by EPA as failing to meet federal Clean Air Act standards for

lead air pollution. *Compare* EPA, Air Quality Designations for the 2008 Lead (Pb) National

Ambient Air Quality Standards, 75 Fed. Reg. 71,033 (Nov. 22, 2010), *and* EPA, Air Quality

Designations for the 2008 Lead (Pb) National Ambient Air Quality Standards, 76 Fed. Reg.

72,097 (Nov. 22, 2011), *with* EPA, Lead Emissions from Use of Leaded Aviation Gasoline,

Technical Support Document, Docket ID No. EPA-HQ-OAR-2007-0294-0163 (Oct. 2008) (filed

Apr. 28, 2010); *see also* Friends of the Earth, Supplemental Comment on EPA's ANPR (Feb. 16,

2011), Docket ID No. EPA-HQ-OAR-2007-0294-0498 (filed Feb. 23, 2011); Friends of the

Earth, Supplemental Comments on EPA's ANPR (Nov. 28, 2011), Docket ID No. EPA-HQ-

6

OAR-2007-0294-0503 (filed Nov. 30, 2011). In fact, three of the highest lead-emitting airports

are located in Los Angeles County, a non-attainment area. *See* EPA, Lead Emissions from the

Use of Leaded Aviation Gasoline in the United States, Technical Support Document 11–12 (Oct.

2008), Docket ID No. EPA-HQ-OAR-2006-0735-5917 (filed Dec. 18, 2009) (Van Nuys; Long

Beach/Daugherty F; Brackett Field); EPA, Table of EPA Initial Nonattainment Designations,

http://www.epa.gov/leaddesignations/2008standards/documents/2010-11-16/tableI.html (last

visited Sept. 14, 2012).

## II.     LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A summary

judgment motion "must withstand scrutiny on both its factual and legal foundations."

*Bloomgarden v. Coyer*, 479 F.2d 201, 207 (D.C. Cir. 1973). In assessing a summary judgment

motion, a court "must view the evidence in the light most favorable to the nonmoving party [and]

draw all reasonable inferences in his favor." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir.

2008). As set forth below, Defendants have not demonstrated that they are entitled to judgment

as a matter of law based on material facts that are not genuinely disputed and, thus, the Court

should deny EPA's motion.

## III.    ARGUMENT

### A. EPA Has a Mandatory Duty to Determine Whether Emissions from Aircraft Cause or Contribute to Air Pollution that May Endanger Public Health or Welfare.

Section 231(a)(2)(A) imposes on EPA a mandatory duty to determine whether lead

emissions from aircraft engines cause or contribute to lead air pollution which may reasonably be

7

anticipated to endanger public health or welfare. 42 U.S.C. § 7571(a)(2)(A).[3] The existence of

such duty is manifest by the plain meaning of Section 231(a) and is supported by the overall

structure of the section and of the statute as a whole as well as by the legislative history of the

Clean Air Act.

> **1. The Plain Meaning and Structure of Section 231 Establishes a Mandatory Duty that EPA Undertake an Endangerment Determination.**

The Clean Air Act, 42 U.S.C. §§ 7401–7671(q), grants the Administrator of the EPA

exclusive authority to regulate aircraft emissions. Specifically, Section 231(a) of the Act—

originally enacted in 1970 and amended to its present form in 1977—sets forth the following

scheme for the regulation of such pollutants:

Study; proposed standards; hearings; issuance of regulations

(1) Within 90 days after December 31, 1970, the Administrator *shall* commence a study and investigation of emissions of air pollutants from aircraft in order to determine--
(A) the extent to which such emissions affect air quality in air quality control regions throughout the United States, and
(B) the technological feasibility of controlling such emissions.

(2)(A) The Administrator *shall*, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare.

---

[3] Under Section 231(a)(2)(A), EPA must determine (1) whether lead air pollution, considered cumulatively, may reasonably be anticipated to endanger public health or welfare, and (2) whether lead emissions from general aviation aircraft engines cause or contribute to overall lead air pollution. *See* EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,506 (Dec. 15, 2009) ("GHG Endangerment Finding") (interpreting the parallel endangerment finding standard for motor vehicles, the EPA stated that "the Administrator is to consider the cumulative impact of sources of a pollutant in assessing the risks from air pollution, and is not to look only at the risks attributable to a single source or class of sources" and that the Administrator "need not find that emissions from any one sector or group of sources are the sole or even the major part of an air pollution problem"). EPA need not possess proof of actual harm in order to make an endangerment finding. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 13–20 (D.C. Cir. 1976).

(B)(i) The Administrator *shall* consult with the Administrator of the Federal
Aviation Administration on aircraft engine emission standards.
(ii) The Administrator *shall* not change the aircraft engine emission standards if
such change would significantly increase noise and adversely affect safety.

(3) The Administrator *shall* hold public hearings with respect to such proposed
standards. Such hearings *shall*, to the extent practicable, be held in air quality
control regions which are most seriously affected by aircraft emissions. Within 90
days after the issuance of such proposed regulations, he *shall* issue such
regulations with such modifications as he deems appropriate. Such regulations
*may* be revised from time to time.

42 U.S.C. § 7571(a) (emphasis added).

By its plain meaning, Section 231(a)(2)(A)'s instruction creates a mandatory duty with its

imperative language: the Administrator "*shall*, from time to time, issue proposed emission

standards applicable to the emission of any air pollutant from any class or classes of aircraft

engines which in his judgment causes, or contributes to, air pollution which may reasonably be

anticipated to endanger public health or welfare." *Id.* (emphasis added); *see Bennett v. Spear*,

520 U.S. 154, 175 (1997) (finding the use of "the imperative shall" means a mandatory duty);

*Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*, 334 F.3d 93, 98 (D.C. Cir. 2003) (noting the

"well-recognized principle that the word 'shall' is ordinarily the language of a command")

(internal quotation marks and citation omitted). Here, "shall" imposes on EPA a mandatory duty

to propose standards for air pollutants that cause or contribute to air pollution which may

reasonably be anticipated to endanger public health or welfare. "Shall" applies to the entire

provision since there is no punctuation or words that suggest otherwise; "[w]hen several words

are followed by a clause which is applicable as much to the first and other words as to the last,

the natural construction of the language demands that the clause be read as applicable to all."

*Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920). EPA cannot follow

Congress's command that it issue emission standards for air pollutants unless and until EPA

9

makes an endangerment finding for such emissions. Determining endangerment is a compulsory

first step within EPA's duty to regulate aircraft emissions; thus, EPA has a mandatory duty to

undertake these determinations. *See CBD*, 794 F. Supp. 2d at 160.

The mandatory nature of the endangerment finding is further demonstrated by the plain

language of other provisions in Section 231(a). The first clause of Section 231(a) places a

mandatory duty on EPA to study aircraft emissions, their effect on air quality, and the feasibility

of control measures. *See* 42 U.S.C. § 7571(a)(1). The statutory provision at issue here

immediately follows the command to study the effect of aircraft emissions on air quality, thus

indicating Congress's understanding that EPA would have completed a study of emissions to

base its judgment regarding whether a particular pollutant endangers public health or welfare on

the results of such study. Indeed, EPA did complete such study in 1972, and issued a report that

identified six pollutants from aircraft, including lead. EPA, Aircraft Emissions: Impact on Air

Quality and Feasibility of Control 5, 14–16 (1972) (listing "total hydrocarbons, carbon

monoxide, nitrogen oxides, sulfur dioxide, particulate matter (including lead), and lead" as

pollutants from aircraft).[4]

The third subsection of Section 231(a) mandates that EPA hold public hearings on its

proposed standards and issue final regulations within 90 days of the issuance of proposed

standards. 42 U.S.C. § 7571(a)(3). Each subsection places an unqualified mandatory duty on

EPA, each designed to result in the imposition of enforceable standards for aircraft emissions.

Under the most plain reading of Section 231(a), Congress has mandated that EPA conduct a

---

[4] In the 1972 study, EPA did not fully evaluate the impact of lead or sulfur oxides finding that it
"is considered to be negligible in comparison to other sources of these two pollutants." EPA,
Aircraft Emissions: Impact on Air Quality and Feasibility of Control 17 (1972). This statement
was made before the phase-out of lead in automobile fuel. Since 2002, EPA has identified

10

study, propose standards, engage the public, and issue final regulations. *See Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1230 (D.C. Cir. 2007) (Congress "require[ed] the administrator to study and investigate emissions of air pollutants from aircraft and adopt regulations to control them."). Indeed, the first line of Section 231(a) reads: "Study; proposed standards; hearings; issuance of regulations." 42 U.S.C. § 7571(a).

Significantly, in contrast with the mandate of Section 231(a)(2) that EPA *"shall,* from time to time," propose regulations, Section 231(a)(3) provides that "[s]uch regulations *may* be revised from time to time." 42 U.S.C. § 7571(a)(3) (emphasis added). When a statute uses both "may" and "shall," the normal inference is that each is being used in its ordinary sense—the one being permissive, the other mandatory." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006); *see also Beaty v. Food & Drug Admin.*, --- F. Supp. 2d --, 2012 WL 1021048, *5 (D.D.C. Mar. 27, 2012) ("Given the structure of the statute, it is clear that Congress intended for the word 'shall' to have a different meaning than 'may'— specifically, to be mandatory rather than permissive."). The use of the word "may" in Section 231(a)(3) reinforces, by contrast, Congress's intent to establish a mandatory duty to conduct endangerment determinations under Section 231(a)(2)(A).

The D.C. District Court recently held that EPA's duty to regulate aircraft pollution under Section 231(a) includes a nondiscretionary duty to conduct endangerment findings. *CBD*, 794 F. Supp. 2d at 158–62 (holding that EPA has an enforceable duty under Section 231(a)(2)(A) independent of a petition for agency action to make an endangerment finding for greenhouse gases emitted by aircraft engines). The *CBD* court reasoned: "Congress's use of mandatory language, and paragraph 231(a)(2)(A)'s role in the aircraft-emissions-regulation regime created by section 231, strongly suggest that Congress intended the predicate

endangerment finding to be a compulsory step." *Id.* at 162.  A conclusion that EPA is under no

obligation to conduct endangerment determinations would undermine Congress's clear command

that limits be placed on the harmful pollutants emitted from aircraft and render nugatory the

mandate to regulate. *See id.* at 160.

The *CBD* court's ruling is grounded in sound reasoning that is aligned with the canons of

statutory construction.  The court examined the role of Section 231(a)(2)(A) in the context of the

surrounding provisions and of the statute as a whole. *Id.* ("EPA reads paragraph 231(a)(2)(A) in

a vacuum, but it cannot be understood without reference to the provisions around it.").  The court

determined that "Congress's use of 'shall' throughout subsection 231(a) suggests that it intended

to mandate a certain outcome—the regulation of harmful aircraft emissions." *Id.* (citing *Allied

Pilots Ass'n v. Pension Ben. Guar. Corp.*, 334 F.3d at 99).  Such examination is consistent with

the most basic tenets of statutory interpretation.  "Consistency of interpretation of one portion of

a statute with the apparent meaning of another portion is a traditional tool of statutory

interpretation." *Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 836 (D.C. Cir. 2000) (citing

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)).  "It is the

entire statute that must be reviewed, however, and not specific clauses or provisions in

isolation." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 93 (D.D.C. 2003) (citing

*Lexecon Inc. v. Milberg*, 523 U.S. at 36)).  The *CBD* court undertook precisely this type of

analysis of Section 231(a)(2)(A)'s place within the overall scheme of the Clean Air Act.

Critically, the *CBD* court concluded that the duty to issue regulations under Section 231

"would be defeated by allowing EPA to avoid triggering its obligation to regulate in the first

place." 794 F. Supp. 2d at 160.  Again, this conclusion is well grounded in the traditional canons

of statutory interpretation. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488,

499 (D.C. Cir. 2004) (recognizing the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 518 n.13 (2004)). An interpretation of Section 231(a)(2)(A) that allows EPA never to determine endangerment would render superfluous Congress's command that the Agency regulate such emissions.

Defendants' attempts to discredit the court's ruling in *CBD* amount to mere disagreement with the court's reading of the relevant statutory provisions. Defendants read Section 231(a)(2)(A) in isolation, ignoring EPA's duty to conduct a study of aircraft emissions, the Agency's 1972 study, and the identification of lead as an air pollutant emitted by aircraft contained therein. Defendants' interpretation of Section 231(a)(2)(A) as allowing for the perpetual non-regulation of potentially harmful pollutants—in the case of lead, non-regulation dating back to the 1970s—ignores the plain language and overarching structure of Section 231(a) and, if accepted, would fly in the face of the purpose of the statute. Thus, consistent with *CBD*, this Court should determine that EPA has a mandatory duty under Section 231 to undertake an endangerment determination.[5]

### 2. EPA's Ability to Exercise Discretion in Making an Endangerment Determination Does Not Diminish Its Mandatory Duty to Conduct Such Determination.

As this court concluded in *CBD*, the conclusion that Congress intended the predicate endangerment determination to be a compulsory step "does not rob EPA of regulatory discretion; on the contrary, . . . section 231 'confer[s] broad discretion to the Administrator to weigh various

---

[5] Indeed, Defendants mischaracterize the language of the statute, eliminating the word "shall" from Section 231(a)(2)(A). Defs.' Summ. J. Br. at 3 ("[U]nder Section 231, EPA *may* regulate a pollutant emitted by aircraft engines.") (emphasis added).

13

factors in arriving at appropriate standards' for aircraft emissions." *CBD*, 794 F. Supp. 2d at 162

(quoting *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d at 1230).[6]  The fact that Section

231(a)(2)(A) allows for the exercise of the Administrator's discretion related to the substance of

the endangerment finding does not diminish the underlying duty to undertake an endangerment

determination and, in the event endangerment is found, to issue emission standards.

The ability of EPA to use its judgment when making an endangerment determination

does not relieve EPA of its nondiscretionary duty to make *some* judgment and issue proposed

regulations accordingly.  *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) ("[T]he use of the

word 'judgment' is not a roving license to ignore the statutory text.  It is but a direction to

exercise discretion within defined statutory limits."); *Envtl. Def. Fund v. Thomas*, 870 F.2d 892,

898–99 (2d Cir. 1989) (finding that a section of the Clean Air Act with a parallel structure

imposed a mandatory duty on EPA to revise air quality standards while leaving the content of the

regulatory decision within the Agency's discretion).  Indeed, as the Supreme Court held in

*Bennett v. Spear*—"[i]t is rudimentary administrative law that discretion as to the substance of

the ultimate decision does not confer discretion to ignore the required procedures of

decisionmaking."  520 U.S. at 172.

In addition to the *CBD* decision, other cases interpreting sections of the Clean Air Act

with structures similar to that of Section 231 support the *CBD* court's conclusion that the

existence of language affording an agency some discretion over its regulatory decisions does not

render discretionary a clear mandatory duty to conduct rulemaking.  In *Environmental Defense

Fund v. Thomas*, for example, plaintiffs sought to compel EPA to revise the NAAQS for sulfur

---

[6] As discussed below, *see infra* at Section III.B, the legislative history of the 1977 Clean Air Act
Amendments reinforces the conclusion that the language was intended to provide EPA discretion
to use its judgment in how it undertakes the endangerment determination, not whether.

oxides under Section 109(d) of the Clean Air Act. 870 F.2d 892. That section provided that "the

Administrator *shall* complete a thorough review of the criteria published under Section 108

. . . and promulgate such new standards *as may be appropriate*." *Id.* at 895 (emphasis added).

Like Section 231(a), Section 109(d) commands EPA to take certain action by using the word

"shall," but affords the Agency some discretion with respect to the specifics of such action. In

that case—much as it does here—EPA argued that the phrase "as may be appropriate" gave it

discretion "simply not to address the issue with a formal public opinion." *Id.* at 898. The Court

of Appeals for the Second Circuit rejected that argument, holding that "[t]he words 'as may be

appropriate' clearly suggest that the Administrator must exercise judgment and the presence of

'shall' in the section implies only that the district court has jurisdiction to order the

Administrator to make *some* formal decision whether to revise the NAAQS, the content of that

decision being within the Administrator's discretion." *Id.* at 898–99; *see also Am. Trucking

Ass'ns v. EPA*, 175 F.3d 1027, 1047 (D.C. Cir. 1999) (adopting the Second Circuit's reasoning

regarding mandatory duty from *Am. Lung Ass'n v. Reilly*, 962 F.2d 258, 262–63 (2d Cir. 1992),

which cited *Envtl. Def. Fund v. Thomas* with approval); *Sierra Club v. Leavitt*, 355 F. Supp. 2d

544, 549 (D.D.C. 2005) (holding that a statutory clause that provides an agency flexibility in

determining the substance of a regulation does not nullify a clear mandatory duty).

     Both the Second Circuit and the D.C. Circuit subsequently have reconfirmed the

*Environmental Defense Fund* court's finding that a nondiscretionary duty exists even where a

statute affords the agency some discretion with respect to the substance of its ultimate regulatory

decision. *See Am. Trucking Ass'ns v. EPA*, 175 F.3d at 1047; *Am. Lung Ass'n v. Reilly*, 962 F.2d

at 263. Similarly, here, contrary to EPA's argument, the "in his judgment language" does not

grant EPA the discretion to decline to conduct the requisite endangerment determinations.

15

    **3. The Legislative History of the Clean Air Act Supports the Plain Meaning of Section 231, Which Imposes a Mandatory Duty to Conduct an Endangerment Determination.**

The amendments to the Clean Air Act directly support Plaintiff's plain meaning interpretation of Section 231(a).[7]  In 1977, Congress amended various provisions of the Clean Air Act, among them, Section 231(a)(1) and (a)(2).  The amendments of 1977 included changes to subsections (a)(1) and (a)(2) of Section 231, shown here:

> (1) Within 90 days after ~~the date of the enactment of the Clean Air Act Amendments of 1970~~**December 31, 1970,** the Administrator shall commence a study and investigation of emissions of air pollutants from aircraft in order to determine--
> (A) the extent to which such emissions affect air quality in air quality control regions throughout the United States, and
> (B) the technological feasibility of controlling such emissions.
>
> (2) ~~Within 180 days after commencing such study and investigation, t~~(A) **T**he Administrator ~~shall publish a report of such study and investigation and~~ shall, **from time to time,** issue proposed emission standards applicable to **the** emission~~s~~ of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, ~~or are likely to cause or contribute to~~ air pollution which ~~endangers the~~ **may reasonably be anticipated to endanger** public health or welfare.

*Compare* Pub. L. No. 91-604, § 231(a)(1)–(2); 84 Stat. 1676, 1703–04 (Dec. 31, 1970) *with* Pub. L. No. 95-95, § 401(f); 91 Stat. 685, 791 (Aug. 7, 1977) (amending 42 U.S.C. § 7571(a)).

The original language of Section 231(a)(2) provided: "[w]ithin 180 days after commencing such study and investigation, the Administrator shall publish a report of such study and investigation and shall issue proposed emissions standards . . . ."  Pub. L. No. 91-604, §

---

[7] The use of legislative history to discern Congressional intent is particular appropriate in the case of the complex Clean Air Act.  *See, e.g., Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 723 (1987) (considering factors endorsed by Congress); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 851 (looking to the legislative history to determine Congressional intent); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683 (1983) (using legislative history to establish Congress's designation of discretionary authority); *Harrison v. PPG Indus.*, 446 U.S. 578, 589–90 (1980) (declining to adopt a statutory interpretation based on lack of support in the legislative history).

16

231(a)(2). In 1977, the report had been published, but EPA had yet to propose emissions standards for all of the pollutants identified in that study. Accordingly, the command to publish the report was removed and "from time to time" was substituted for "[w]ithin 180 days"—a deadline that had long passed. *Compare* Pub. L. No. 91-604, § 231(a)(2), *with* Pub. L. No. 95-95, § 401(f). The legislative history includes no indication that this change was meant to remove any mandatory duty.[8] *See CBD*, 794 F. Supp. 2d at 161 (EPA has a mandatory duty to act "from time to time" under Section 231). Indeed, the legislative history that accompanied the original enactment of Section 231 states that "Section 231 directs the Secretary to prescribe, *as soon as practicable*, giving appropriate consideration to technological feasibility and economic cost, emission standards for any class of aircraft or aircraft engines which cause or contribute to air pollution endangering the health or welfare of any persons." H.R. Rep. No. 91-1146 (Dec. 31, 1970). The mandatory regulatory sequence envisioned by Congress was not dismantled by Congress's recognition that EPA needed more time to execute the latter step.

In addition to altering the time frame during which EPA must carry out its mandatory duties under Section 231, the 1977 amendments standardized a number of other provisions of the Clean Air Act by allowing for regulation of emissions of air pollutants "which in [the Administrator's] judgment cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." H.R. Conf. Rep. No. 95-564, at 183 (Aug. 3,

---

[8] The "from time to time" language sets no specific date for the fulfillment of the duty, but does not negate the duty. "[W]hen a statute requires agency action at indefinite intervals, such as 'from time to time' . . . 'unreasonable delay' [can] be a meaningful standard for judicial review. *Am. Lung Ass'n v. Reilly*, 962 F.2d at 263 (interpreting unreasonable delay provision in Section 304 of the Clean Air Act, 42 U.S.C. § 7604(a), which was added by the 1990 Clean Air Amendments); *see also Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d at 1229 (D.C. Cir. 2007) (relying on "from time to time" language in support of statement that Congress required EPA to study and adopt regulations to control aircraft emissions). By its terms, the mandate to act "from time to time" indicates a periodic and continuing duty.

1977) (uniform standard applies to Sections 108, 111, 202, 211, and 231, and to hazardous

stationary source emissions). The legislative history indicates that Congress made such changes,

including the language affording the Administrator discretion in weighing the risks associated

with air pollution, to incorporate the reasoning of Court of Appeals for the D.C. Circuit in *Ethyl*

*Corp. v. EPA*, 541 F.2d 1, which upheld EPA's regulation of lead additives to automobile

gasoline given the precautionary nature and purpose of the Act's mandate to protect public

health. *See* H.R. Rep. No. 95-294, at 46–47 (May 12, 1977) (citing *Ethyl*, 541 F.2d at 12–18).

In *Ethyl,* the court reasoned that: "[a] statute allowing for regulation in the face of danger

is, necessarily, a precautionary statute. Regulatory action may be taken before the threatened

harm occurs; indeed, the very existence of such precautionary legislation would seem to demand

that regulatory action precede, and, optimally, prevent, the perceived threat." 541 F.2d at 13.

Indeed, "[a]waiting certainty will often allow for only reactive, not preventive, regulation." *Id.* at

25. The 1977 amendments recognize the *Ethyl* court's reasoning that "[d]anger . . . is not set by

a fixed probability of harm, but rather is composed of reciprocal elements of risk and harm, or

probability and severity," 541 F.2d at 18, and allow the Agency to exercise its discretion when

evaluating potential dangers to public health and welfare.

The House Report for the Clean Air Act Amendments of 1977 confirms that Congress

had not intended the "in his judgment" language to exercise judgment in weighing and predicting

future health risks. H.R. Rep. No. 95-294, at 51. The House Report states, "the committee

language is intended to emphasize the necessarily judgmental element in the task of predicting

future health risks of present action and to confer upon the Administrator the requisite authority

to exercise such judgment." *Id.* The House Report continues:

> In upholding the majority opinion in the en banc rehearing in Ethyl, the
> committee is moving in a direction which is consistent with most judicial

18

> interpretations of the act. Most other courts have held that a substantial element
> of judgment, including making comparative assessment of risks, projections of
> future possibilities, establishing margins of safety and margins of error,
> extrapolating from limited data, etc., are necessary and permissible under the act
> in order to protect public health and encourage development of new technology.

*Id.* at 50–51. There is no indication that the "in his judgment" language in the original text, and unchanged by the 1977 amendments, was meant to diminish EPA's mandatory duty to regulate aircraft emissions. In fact, the opposite is true; the language is meant to remove the barrier of needing definitive proof that such emissions cause harm before regulating. *Id.*

The plain reading of Section 231(a)(2)(A) as imposing a mandatory duty on EPA to conduct endangerment findings is supported by the structure of the section and the overall purpose of the Act as well as the legislative history of the 1977 amendments.

### B.  EPA Has a Mandatory Duty to Make an Endangerment Determination Specifically for Lead.

In addition to the reasons discussed above, EPA's own interpretations and the legislative history of Section 231 demonstrate that the Agency has a mandatory duty to make an endangerment finding specifically for lead.

Section 231(a)(2)(A) requires the Administrator to "issue proposed emission standards applicable to the emission of *any air pollutant* . . . ." 42 U.S.C. § 7571(a)(2)(A) (emphasis added). Lead emissions fit within the definition of "air pollutant" under Section 231. Indeed, EPA's 1972 report on its study of emissions of air pollutants from aircraft, which was required by Section 231(a)(1), identified six pollutants from aircraft, including lead. EPA, Aircraft Emissions: Impact on Air Quality and Feasibility of Control 10, 15 (1972). Except for lead, EPA has regulated all the other air pollutants identified in its 1972 study. *See* 40 C.F.R. § 87.21 (regulating hydrocarbons, carbon monoxide, nitrogen dioxide and particulate matter, as a smoke number); 14 C.F.R. § 34.61 (regulating sulfur level in fuel). As discussed above, *see supra*

Section III.A.1, the statute links EPA's mandatory duty to study air pollutants from aircraft and the duty to conduct endangerment findings. Given that lead has long been identified as an air pollutant under Section 231 and EPA conducted the study as required by Section 231(a)(1), EPA has a mandatory duty to undertake the endangerment determination.

EPA also has identified lead as an air pollutant, and found endangerment from lead, under other sections of the Clean Air Act. *See, e.g.*, EPA, Regulation of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (proposed Feb. 23, 1972) (finding endangerment from lead in gasoline under Section 212); 38 Fed. Reg. 1254 (regulating the use of lead in gasoline under Section 212); *Natural Res. Def. Council, Inc. v. Train*, 545 F.2d 320 (2d Cir. 1976) (finding EPA had a duty to list lead as an air pollutant under Section 108).[9]

Ignoring that Plaintiff's claim is limited to EPA's unreasonable delay in making an endangerment finding for lead, Defendants suggest that finding that a mandatory duty exists under Section 231(a)(2)(A) would require EPA to conduct endangerment determinations for "each and every chemical compound emitted by aircraft engines." Defs.' Summ. J. Br. at 25. This attempt to distract the Court from the plain meaning of the statutory provision in question should be rejected. Indeed, the plain language of the statute specifically requires endangerment determinations for "any air pollutant," 42 U.S.C. § 7571(a)(2)(A), not, as Defendants would have it, for "each and every chemical compound emitted by aircraft engines," Defs.' Summ. J. Br. at 25. The Clean Air act defines "air pollutant" as an "air pollution agent or combination of such

---

[9] As with other sources of airborne lead, lead emissions from aircraft contribute to overall lead pollution, which has an impact on health. As the D.C. Circuit in *Ethyl* explained:

> Once the lead is in the body, however, its source becomes irrelevant; all lead in the bloodstream, from whatever source, is essentially fungible. Thus so long as there are multiple sources of lead exposure it is virtually impossible to isolate one source and determine its particular effect on the body. The effect of any one source is meaningful only in cumulative terms.

*Ethyl*, 541 F.2d at 9.

agents." 42 U.S.C. § 7602(g). "Air pollutant" is thus limited to substances that are harmful

"agents" of pollution, which is narrower than each and every chemical compound emitted. *See,*

*e.g., Massachusetts v. EPA*, 549 U.S. at 529 n. 26 (finding that greenhouse gases are air

pollutants because they "both 'ente[r] the ambient air' *and* tend to warm the atmosphere"). In

addition, EPA has more narrowly interpreted "any air pollutant" under the requirements related

to visibility and prevention of significant deterioration demonstrating that "any air pollutant"

does not necessarily mean every substance emitted. *See Coal. for Responsible Regulation v.*

*EPA*, 684 F.3d 102, 133 (D.C. Cir. 2012) (citing EPA, 1977 Clean Air Act Amendments to

Prevent Significant Deterioration, 43 Fed. Reg. 26,388 (June 19, 1978)); *see also Coal. for*

*Responsible Regulation*, 684 F.3d at 134–35 (upholding EPA's interpretation of "any air

pollutant" as "any regulated air pollutant" under the Prevention of Significant Deterioration

provisions).

Moreover, contrary to Defendants' suggestion that EPA would have to conduct

endangerment determinations for as many as eighty organic compounds emitted by aircraft, *see*

Defs.' Summ. J. Br. at 25, EPA has already found endangerment, *see* 38 Fed. Reg. 19,088,

19,089 (July 17, 1973), and regulates all organic compounds in exhaust as the general category

"hydrocarbons," 40 C.F.R. § 87.21 (regulating total hydrocarbons from airplane exhaust); EPA,

Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft

Equipped with Turbofan, Turbojet, and Turboprop Engines 9 (May 2009),

http://www.epa.gov/nonroad/aviation/420r09901.pdf (defining hydrocarbon emissions as all

organic compounds in exhaust). Thus, EPA's assertion that it would have to conduct

endangerment determinations for organic compounds is factually wrong because it has already

found endangerment for organic compounds as a category of air pollutants.

21

The history of the Clean Air Act amendments also supports the conclusion that Congress intended to impose a mandatory duty on EPA to undertake an endangerment determination under Section 231 specifically for lead. As discussed above, Congress's 1977 amendments to Section 231 replaced the 180-day deadline (which had passed) with the duty to propose emissions standards "from time to time," thus providing EPA flexibility to conduct endangerment determinations and propose emissions standards for lead and other pollutants not yet regulated.[10] *See supra* at Section III.A.3. Moreover, though the 1977 amendments also eliminated language that required EPA to issue a report on its Section 231(a)(1) study—presumably in light of the fact that such report had been issued five years earlier, Congress preserved the provision—Section 231(a)(1)—that required a study and investigation of "emissions of air pollutants from aircraft," Pub. L. 95-95, § 401(f), thereby retaining the structure of Section 231(a) that links "the study and investigation of emissions of air pollutants for aircraft" with the endangerment determination and the proposal of emissions standards, 42 U.S.C. § 7571(a).

The 1977 amendments also changed the language of Section 231 by lowering the threshold of the proof of harm from air pollutants that "*are likely to* cause or contribute to air pollution which endangers human health" to air pollutants "which *may reasonably be anticipated* to endanger public health or welfare." *Compare* Pub. L. 91-604; 84 Stat. 1676, 1704 (Dec. 31, 1970) *with* Pub. L. 95-95, § 401(f) (emphasis added); *see also* H.R. Rep. No. 95-294, at 49–51. Congress made clear that such change was intended to incorporate the reasoning of the *Ethyl* decision, which had upheld EPA's endangerment finding for lead that assessed risks from lead

---

[10] At the time of the 1977 amendments, EPA already had regulated four of the six pollutants identified in its 1972 report. *See* 38 Fed. Reg. 19,088 (promulgating emissions standards for carbon monoxide, hydrocarbons, nitrogen oxides and smoke (particulate matter) from aircraft).

instead of waiting for proof of harm. *See* H.R. Rep. No. 95-294, at 47–48. In *Ethyl*, the Court

described Congress's knowledge of the harm from all lead emissions:

> Congress understood that the body lead burden is caused by multiple sources. It
> understood that determining the effect of lead automobile emissions, by
> themselves, on human health is of no more practical value than finding the
> incremental effect on health of the fifteenth sleeping pill swallowed by a would-
> be suicide. It did not mean for "endanger" to be measured only in incremental
> terms.

541 F.2d at 30–31.

Notably, when Congress amended the endangerment language in Section 231, it also

amended the parallel provisions of five other sections of the Act to provide a "uniform standard

of proof" for EPA's regulation of sources under those sections. H.R. Conf. Rep. No. 95-564, at

183 (describing amendment of endangerment language in Sections 108, 111, 112, 202, 211, and

231 of the Clean Air Act). Pursuant to this standard, EPA has found endangerment for, and

regulated, lead emissions from other sources such as motor vehicles. *See, e.g.*, EPA, Regulation

of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (proposed Feb. 23, 1972) (finding endangerment

from lead from motor vehicle fuel); EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg.

1254 (Jan. 10, 1973); *see also* EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg.

14,921 (Apr. 8, 1976) (listing lead as a criteria pollutant under Section 108); 42 U.S.C.

§ 7412(b)(1) (listing lead compounds as hazardous air pollutants under Section 112); 40 C.F.R. §

471.13 (regulating lead under New Source Performance Standards pursuant to Section 111);

EPA, Control of Air Pollution from New Motor Vehicles and New Motor Vehicle Engines;

Certification and Test Procedures; Gasoline Lead Content, 53 Fed. Reg. 470 (Jan. 7, 1988)

(regulating lead pursuant to Section 202).

23

## C. Sovereign Immunity Does Not Apply When EPA Has a Mandatory Duty.

If the Court agrees that Section 231(a)(2)(A) imposes on EPA a mandatory duty to

conduct an endangerment finding, the sovereign immunity defense raised by Defendants does

not apply. *See Sierra Club v. EPA*, 850 F. Supp. 2d 300, 303 (D.D.C. 2012); *Sierra Club v.

Leavitt*, 355 F. Supp. 2d at 557 (holding that EPA's sovereign immunity was waived in suit

alleging unreasonable delay of nondiscretionary duty).

Moreover, in the attempt to invoke the sovereign immunity bar, Defendants fail to inform

the Court of the long-standing exception to the sovereign immunity defense in all actions for

specific, nonmonetary relief against a United States agency or officer acting in an official

capacity. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("[T]here is

no doubt that § 702 [of the Administrative Procedure Act ("APA")] waives the Government's

immunity from actions seeking relief other than money damages.") (internal quotation marks and

citation omitted); *Sea-Land Serv., Inc. v. Alaska R. R.*, 659 F.2d 243, 244 (D.C. Cir. 1981)

("Insofar as appellants seek equitable relief, we conclude that sovereign immunity does not bar

the way.") (citing 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other

than money damages and stating a claim that an agency or an officer or employee thereof acted

or failed to act in an official capacity or under color of legal authority shall not be dismissed nor

relief therein be denied on the ground that it is against the United States or that the United States

is an indispensable party.")). The Court of Appeals for the D.C. Circuit has held that this

exception extends to cases where plaintiffs seek nonmonetary relief against the United States,

even if plaintiffs' claims are not brought under the APA. *See, e.g., Chamber of Commerce v.

Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies

to any suit whether under the APA or not."). Indeed, even the case cited by Defendants notes the

24

APA's broad waiver of sovereign immunity for cases not seeking monetary damages. *Lane v.*

*Pena*, 518 U.S. 187, 196 (1996) (a case seeking monetary damages).

## CONCLUSION

For the foregoing reasons, FoE respectfully requests that this Court find that EPA has a

mandatory duty under the Clean Air Act Section 231(a)(2) and deny EPA's Motion for Summary

on this threshold issue.

Respectfully submitted on September 14, 2012.

/s/ Marianne L. Engelman Lado
MARIANNE L. ENGELMAN LADO
BRIDGET M. LEE
Admitted *pro hac vice*
Earthjustice
156 William Street, Suite 800
New York, NY 10038-5326
Phone: (212) 791-1881
mengelmanlado@earthjustice.org
blee@earthjustice.org

/s/ Timothy D. Ballo
TIMOTHY D. BALLO
D.C. Bar No. 977077
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036-2212
Phone: (202) 667-4500
tballo@earthjustice.org

HELEN KANG
DEBORAH BEHLES
Golden Gate University School of Law
Environmental Law and Justice Clinic
536 Mission Street
San Francisco, CA 94105-2968
Phone: (415) 442-6647
hkang@ggu.edu
dbehles@ggu.edu

*Counsel for Friends of the Earth*