Objection Deadline:  September 28, 2012 at 5:00 p.m.
Hearing Date:  November 5, 2012 at 11:00 a.m.

FEATHERSTONE PETRIE DESISTO LLP
600 Seventeenth Street
Suite 2400-S
Denver, Colorado 80202-5424
Andrew J. Petrie (*pro hac vice*)
Phone: 303-626-7100
Fax: 303-626-7101
apetrie@featherstonelaw.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
|  |  |
| --- | --- |
| In re | : |
|  | : Case No. 12-12020 (MG) |
| **RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,** | : |
|  | : Chapter 11 |
|  | : |
| Debtors. | : Jointly Administered |

-----------------------------------------------------------------------x

## CITIMORTGAGE, INC.'S OBJECTION TO THE DEBTORS' PROPOSALS:  (I) TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS; AND (II) TO ASSIGN CURE AMOUNTS RELATED THERETO

Pursuant to paragraphs 9, 10, 17 and 25 of the *First Amended and Restated Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto* [Dkt. no. 1484] (the "**Cure Notice**")[1], counterparty CitiMortgage, Inc. ("CMI") objects both to the Debtors' proposal to assume and assign its servicing agreements (therefore, making an "Assignment Objection"), and to the Debtors' proposed cure amount of -0-

---

[1] By which the debtors' amended and restated Exhibits 3a and 3b to their July 26, 2012 *Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Property and (II) Cure Amounts Related Thereto* [Dkt. no. 924].

for each of those CMI executory contracts the Debtors propose to assume and assign (therefore, making a "Cure Objection").

## Preliminary Statement

1.      CMI is the counterparty to certain executory contracts that the Debtors propose to assume and assign.  The Debtors propose to assume and then to assign to the Purchaser some, but not all, of the servicing duties and obligations the Debtors owe CMI under those contracts. As result, the Debtors' do not comply with the all-or-nothing requirement that Section 365 of the Bankruptcy Code requires before permitting any assumption and assignment.

2.      Further, while industry custom, practice and experience dictates that there may or may likely be various servicing defaults and unresolved obligations, currently existing but at this time unrealized and/or undiscovered, for both the prepetition period and for the period between the Debtors' filing of their petitions and the Closing Date on which the Purchaser will accept the assignment of the CMI servicing contracts, the Debtors propose that they will not be responsible for those liabilities and the Purchaser will not be responsible for those liabilities.  As a result, the Debtors do not offer at the time of the proposed assumption, and with respect to the resulting defaults and losses to CMI from these defaults, either:  (a) a cure of the defaults; (b) the adequate assurance of a prompt cure of the defaults; or (c) the adequate assurance of prompt compensation for CMI's losses.  Thus, the Debtors violate Section 365(b)(1) of the Bankruptcy Code.

## Background

**A.    CMI's Business Relationship with the Debtors.**

3.    CMI is the master servicer for over 3,500 mortgage loans with an unpaid principal balance (as of the petition date) of over $547 million, for which loans the Debtors (specifically, Residential Funding Company and GMAC Mortgage, LLC) are the subservicer.[2]

4.    The Debtors' obligations to CMI that they propose to assume and assign arise under several different contracts CMI has with Residential Funding Company and seven different contracts it has with GMAC Mortgage, LLC, all of which the Debtors' list on the exhibits to the **Cure Notice**.  [Dkt. no. 1484, Exh. 1, page 39 of 180 (contract nos. 1985-MS-ASL-1038, 1985-MS-ASL-1039), page 62 of 180 (contract no. 2005-EMX3); Exh. 2 pages 112-13 of 160 (contract nos. 1082, 1082 [sic], 1083, 1084, 1085, 1792, 2115].[3]

5.    As master servicer, CMI is as a general matter responsible under the governing agreements for supervising, overseeing and monitoring the Debtors' performance under the relevant servicing agreements.  Among other involvements, CMI as master servicer receives cash collections and mortgage loan data from the Debtors, reviews and evaluates that data, and responds to the Debtors' requests for consent or approval of actions the Debtors contemplate (for example, a proposed transfer of servicing to another party) under the relevant servicing

---

[2]    For the purposes of this motion, CMI will generally refer to the servicer entities with which it has contracted (Residential Funding Company and GMAC Mortgage, LLC) as the "Debtors;" recognizing, of course, that not every one of the Debtor entities was in fact a servicer/subservicer for the CMI mortgage loans.

[3]    Although the Debtors' refer in that Exhibit 2 only to the original contracts, and do not include the various Assumption, Assignment and Recognition Agreements, and the other contracts by which the Debtors obtained their servicing rights and assumed their servicing obligations.

agreement. If the Debtors default under the servicing agreement, CMI as the master servicer must pursue appropriate remedies against the Debtors.[4]

6.      As subservicer, the Debtors contractually agreed with CMI to provide and/or perform the following services (which list is illustrative and not exclusive):

(a)      To follow their good faith business judgment in servicing the mortgage loans consistent with the parties' agreement, the applicable program guide, and normal and usual mortgage servicing practices (where these practices are consistent with the parties' agreement).

(b)      To collect payments, waive late payment charges or penalty interest, and extend payment due dates (provided, however, that any such extension is consistent with the program guide and does not result in the loss of coverage under any related mortgage insurance policy).

(c)      To make the necessary adjustments on adjustable rate mortgages on the related Adjustment Date, and to adjust the mortgagor's monthly payments accordingly.

(d)      To establish and maintain principal and interest accounts in accord with the applicable program guide, to deposit all amounts received from mortgagors in the appropriate account, and to remit those amounts (less only the appropriate servicing fees).

(e)      To establish and maintain escrow accounts, and to deposit and retain in the appropriate account all collections for taxes, assessments, hazard insurance premiums, mortgage insurance policy premiums, if any, and any and all comparable items.

(f)      To establish and maintain custodial accounts into which they will deposit certain payments for principal reductions, liquidation proceeds, insurance proceeds, and

---

[4]      CMI does not intend by this general overview in any way to limit or modify the terms and conditions of those contracts. Those contracts contain the complete and accurate description of the parties' rights and duties.

similar amounts received, as well as to make payments and provide statements re

distributions from those accounts.

(g)     To take no actions that would result in the loss of coverage under any

applicable mortgage insurance policy.

(h)     To enforce due-on-sale clauses contained in the underlying mortgages, or

other debt or security instruments.

(i)     To conduct foreclosures when and as appropriate, and to use their best

efforts to maximize the return of principal and interest to the owner (including structuring

the timing of foreclosures to achieve that end).

(j)     To manage REO properties (or, "real estate owned" properties that the

owner has acquired through foreclosure or deed-in-lieu of foreclosure) as per the

applicable program guide.

(k)     To release files upon the mortgagor's payment in full (or to escrow

payment in full in a manner that is customary for such purpose).

(l)     To maintain appropriate records concerning funds received and disbursed,

and to provide monthly and annual reporting.

[See generally *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital,*

*LLC, In Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. no. 6] ¶¶ 26-30, 34

("**Whitlinger Affdvt.**")].

7.     As servicer, the Debtors indemnify the owner and the master servicer against any

and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs,

judgments, and any other cost, fees and expenses the Owner sustains related to the servicer's

failure to perform its duties and service the mortgage loans as the servicing agreements require.

8.       As servicer, the Debtors do not have an unfettered right to assign their contracts.[5]

In addition, it is important to note that it is <u>not</u> exclusively CMI decision to determine whether

the Debtors can assign their servicing obligations.  The contracts under which CMI is the master

servicer provide that the owner of the mortgage loans has the right to approve any change in

subservicers, and CMI is required to obtain that owner's approval before changing subservicers.

As a result, there are potential issues under Section 365(c)(1)(A) of the Bankruptcy Code with

that which the Debtors propose.

9.       Thus, CMI has several different types of claims against the Debtors under the

contracts that arise from the Debtors' actions and omissions as servicer.  CMI has claims relating

to:  (a) the Debtors' breaches of their mortgage loan administration obligations as servicers of

various mortgage loans; (b) the Debtors' payment of servicing transfer costs and expenses;

(c) the servicer's mortgage loan administration obligations, which obligations may include

repurchase claims with respect to defective mortgage loans where the Debtors' have the

obligation to enforce loan sellers' repurchase obligations; and (d) the Debtors' liabilities for

---

[5]       By way of example only, Section 8.03 of the Sale and Servicing Agreement, dated and effective
as of September 1, 1995, between California Federal Bank, F.S.B., as owner, and GMAC Mortgage
Corporation of PA, as seller and servicer, provides in pertinent part:
> [GMAC] shall not assign this Agreement (except to GMAC Mortgage Corporation or
> GMAC-Residential Funding Corporation) . . . except by mutual consent of [GMAC] and the
> Owner or upon the determination that its duties hereunder are no longer permissible under
> applicable law and such incapacity cannot be cured by [GMAC]. . . .

[Contract no. 1085 § 8.03 at 38-39, listed on Dkt. No. 1484, Exh. 2, page 113 of 160].
      And, to the same general effect, Section 5.02(a) of the Participation Agreement, dated as of
February 3, 1997, among California Public Employees Retirement System, as owner, First Nationwide
Mortgage Corporation, as manager, and GMAC Mortgage Corporation, as seller and servicer, provides in
pertinent part:
> [GMACM] may not assign any of its rights or privileges hereunder or make or enter into
> any delegation, subcontract, authorization or appointment with respect to any of its duties,
> liabilities or obligations hereunder unless (i) [GMACM] shall have received the prior written
> consent of [FNMC] and (ii) any agreement to assign such rights and obligations provides that the
> assignee must assume the servicing obligations of his Agreement with respect to the applicable
> Mortgage Loans. . . .

[Contract no. 1085 § 5.02(a) at 32, listed on Dkt. No. 1484, Exh. 2, page 112 of 160].

indemnification amounts arising from the Debtors' actions as servicers (the payment of the fees,

penalties and indemnification amounts arising from losses, liabilities, costs and expenses of

administering the loans, including, but not limited to, costs relating to third-party claims relating

to mortgage loans the Debtors' servicing activities with respect to those loans).

**B.       Proceedings in the Debtors' Chapter 11 Relevant to CMI's Executory Contracts.**

10.     On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.

11.     The Debtors, together with their non-debtor subsidiaries, engaged prepetition in

two lines of business:  (a) originating and servicing mortgages; and (b) what the Debtors call

their "legacy portfolio operations" consisting of mortgage loans and other residual financial

assets.  [Whitlinger Affdvt. [Dkt. No. 6] ¶ 16].  Only the first of those lines has any bearing on

CMI's executory contracts.

12.     The Debtors acknowledge their primary and most valuable operations consist of

servicing mortgage loans for various investors, including loans the Debtors, Ally Bank (f/k/a

GMAC Bank), a non-debtor affiliate of the Debtors, and third parties originated, and that these

operations include the subservicing of loans for various master servicers such as CMI.  [See id.

¶¶ 6, 31].

13.     As part of their preparatory work for a proposed plan of reorganization, or, in the

alternative, for a proposed sale free and clear of certain assets under Section 363(b) of the

Bankruptcy Code, the Debtors included as "part and parcel" of the proposed sale "the

assumption and assignment of the Assumed Contracts."  *Debtors' Motion Pursuant to 11 U.S.C.*

*§§ 105, 363(b), (f), and (m), 365 and 1123, and Fed R. Bankr. P. 2002, 6004, 6006, and 9014 for*

*Orders: (I)(A) Authorizing and Approving Sale Procedures, Including Break-Up Fee and*

*Expenses Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form*

*and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale*

*of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests;*

*(II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the*

*Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related*

*Thereto; and (IV) Granting Related Relief* [Dkt. no. 61] ¶ 31 (the "**Sale Motion**").  The Debtors'

Sale Procedures included specific provisions with respect to the proposed assumption and

assignment of the Assumed Contracts.  In particular, the Sale Procedures provided that the

Debtors would serve a Notice of Assumption and Assignment on each counterparty to one or

more Assumed Contracts apprising that counterparty of:

(i)    the Debtors' estimate of the Cure Amount associated with each such contract;

(ii)   [the fact, as the Debtors propose the transaction] that Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract, whether such claims or obligations are known, unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing, including, without limitation, any claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date.  Any parties holding such claims or obligations will be required to respond to the Debtors' cure notice if they disagree with the amounts set forth therein;

(iii)  the deadline for objecting to approval of any Cure Amounts, the severing of any multi-agreement document (as described below) and/or the assumption by the Debtors and assignment to Nationstar of an Assumed Contract, shall be September 28, 2012, at 5:00 p.m. (Eastern Time); and

(iv)   the Nationstar Sale Approval Order will generally provide that, in cases where a Servicing Agreement is contained within the same writing as an agreement related to origination or loan sales, that the Debtors intend to assume and assign to Nationstar only the Servicing Agreement and that the origination agreements and/or loan sale documents will be severed from the multi-agreement document pursuant to the Sale Order.  Further,

> the Sale Order will generally require that no delay or failure of
> performance by the Debtors under or in respect to any origination
> agreement will (i) affect any right of Nationstar under any Servicing
> Agreement or (ii) permit, result in or give rise to any setoff, delay,
> deferral, defense, recoupment, claim, counterclaim, default or other
> impairment of the rights of Nationstar under any Servicing Agreement.

[Id. ¶ 60, as amended; see also Exh. F (*Proposed Notice of Assumption and Assignment*).

14.    On June 28, 2012, the Court entered its *Order Under 11 U.S.C. §§ 105, 363(b)
and 365 (I) Authorizing and Approving Sale Procedures, Including Payment of Break-Up Fees;
(II) Scheduling Bid Deadline, Auction (If Necessary) and Sale Hearing; (III) Establishing
Assumption and Assignment Procedures, Including Procedures for Fixing Cure Amounts, etc.*
[Dkt. no. 538], in which it authorized and approved the Debtors' proposed Sale Procedures and
related notices substantially in the form attached to that motion (the "**Sale Procedures Order**").
This included Exhibit 3 to the Sale Procedures Order, which exhibit contained the proposed form
of the Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts,
Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property
and (II) Cure Amounts Related Thereto, which notice the Debtors subsequently amended with
their July 25, 2012 *Statement / Notice of Filing Amended Assumption and Assignment Notice in
Connection with Sale Procedures Order* [Dkt. no. 913].

15.    The Debtors characterize or include as "cure" amounts obligations that have not
yet matured.  Specifically, the Cure Notice reads:

> Nationstar is not assuming and parties will be enjoined from asserting against
> Nationstar any claims or obligations relating to the pre-closing period under any
> Assumed Contract (including any Servicing Agreement), whether such claims or
> obligations are known, unknown, fixed, contingent, unliquidated or liquidated at
> the time of the Closing, including, without limitation, any claims or liabilities
> relating to any act or omission of any originator, holder or servicer of mortgage
> loans prior to the Closing Date, and any indemnification claims or liabilities
> relating to any act or omission of the Sellers or any other person prior to the
> Closing Date.  Any parties holding such claims or obligations will be required to

file a Contract Objection if they disagree with the Cure Amount set forth on the
Schedule.

[Cure Notice ¶ 21].  Thus, there are "gaps" for both:  (a) prepetition defaults that have not yet

manifested themselves (whether characterized as "unknown," "contingent" and/or

"unliquidated"); and (b) events that take place after the Debtors filed their petitions and before

the Closing Date.

## CMI's Objection

16.     Preliminarily, CMI objects to the Debtors' proposals because the Debtors have, at

least in some instances, not provided sufficient information for CMI to identify the specific

agreements they propose to assume and assign.  The list of agreement titles the Debtors provide

in the Exhibits 1 and 2 to their Cure Notice seems to provide only summaries of titles, not the

full titles of the contracts with complete dates.  In the face of that lack of specificity, CMI

reserves its right to supplement this objection as and when the Debtors provide complete

information.

17.     CMI objects to the proposed assignment and assumption, and the accompanying

proposal to pay nothing as cure amounts and the absence of the required adequate assurances,

because these proposals do not account for the defaults and gaps that exist as a necessary part of

these types of transactions into which the Debtors entered with CMI.

18.     As but one acknowledgement of the fact that there are existing, but as-of-yet

unasserted, claims for breaches of representations and warranties, the Debtors state that they

have reserved over $800 million against the eventuality of those claims. [See generally

Whitlinger Affdvt. [Dkt. no. 6] ¶ 100 ("At March 31, 2012, the Debtors' aggregate reserve in

respect of representation and warranty liabilities was $810.8 million.")].

**A.      The Debtors' Proposal Does Not Provide for the Assumption and Assignment of All of Their Servicing Duties and Obligations Owed to CMI.**

19.      The Debtors propose to rewrite their servicing agreements with CMI by narrowing the servicing obligations the Purchaser proposes to assume.  The asset purchase agreement into which the Debtors have entered with Nationstar (the "**Nationstar APA**") [Dkt. no. 61-2] includes the Purchaser's  assumption of "Servicing Agreements," but the Sales Order does not provide for Nationstar to assume all of the Debtors' duties and obligations under the Servicing Agreements.  Rather, Nationstar's duties and obligations under the Servicing Agreements are limited to duties, obligations and agreements related to:

> (a) collections with respect to, or the administration or servicing or subservicing or master servicing of, or reporting in respect of, Mortgage Loans, (b) servicing fees or ancillary income, (c) the disbursement of collections with respect to Mortgage Loans, (d) the making of delinquency advances and servicing advances in connection with the servicing or subservicing or master servicing of Mortgage Loans, (e) payment of expenses associated with the administration, servicing or subservicing or master servicing of Mortgage Loans, (f) the limitation on liability of, and indemnification in favor of, the servicer, subservicer or master servicer thereunder, or (g) representations, warranties and covenants running in favor of the servicer, subservicer or master servicer thereunder. . . .

20.      The Debtor's list of servicing obligations does not include all of the servicer's duties and obligations under the contracts the Debtors propose to assume and assign.  In fact, the servicer's duties and obligations are far broader than what the Debtors' list.  The CMI contracts provide that the Debtors, as servicer, are responsible for all tasks relating to the administration of the mortgage loan assets for which CMI is master servicer (to include billing, collecting, foreclosing, maintaining and selling REO properties, the investment of mortgage loan cash flows pending distribution to owners/securities holders, and the compilation, computation and reporting of mortgage loan performance data).  Puzzlingly, the Debtors and Purchaser's list of servicing obligations the Purchaser proposes to assume focuses on the day-to-day servicing of mortgage loans, and does not make any mention of dealing with foreclosures or the maintenance

or liquidation of foreclosed properties or properties the borrowers have surrendered via deeds-in-lieu (both of which are then REO properties).  [See generally Whitlinger Affdvt. [Dkt. no. 6] ¶ 45 ("In the ordinary course of the Debtors' loan servicing business, the Debtors institute foreclosure procedures when mortgagors fail to honor their loan commitments.")].  In fact, the Nationstar APA specifically defines Mortgage Loans as something separate from REO Property, which definitional exercise has the effective of carving REO Property out of Nationstar's responsibilities.

21.    Section 365 of the Bankruptcy Code does not permit a debtor to assume only what it considers the beneficial portions of an executory contract and to leave behind those liabilities it now considers undesirable.  See, e.g., In re MF Global Holdings Ltd., 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012) ("The trustee must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits."); The Leslie Fay Cos., Inc. v. Corporate Property Assocs. 3 *(In re The Leslie Fay Cos., Inc.)*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) ("If an executory contract is assumed, it is said to be assumed *cum onere*, with all of its benefits and burdens.") (citing NLRB v. Bildisco & Bildisco, 465 U.S. 413, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984)).

22.    Accordingly, the Court should require the Debtors to assume each contract in its entirety, and to pay all amounts necessary to cure all existing defaults arising under each contract.

23.    This assumption mechanism also means that if the purchaser/assignee later reports or discovers pre-assignment defaults, it is liable for those defaults.  (Any adjustment for the purchaser/assignee assuming that contractual liability being one the assignor and assignee need to make in accounting for the pricing of that transfer.)  That is particularly the case where the

Debtors currently propose to insulate both themselves and the Purchaser from any carryover liabilities that arose pre-transfer, but manifest post-transfer – where, in the non-bankruptcy context, a purchaser would be responsible for those post-transfer liabilities and the "risk" of them would be something for which the purchaser/assignee accounted in the price it paid the seller/assignor.

**B.      The Procedures Relating to Assumption and Payment of Cure Amounts Are Neither Fair Nor Workable, and Do Not Comply With the Bankruptcy Code.**

24.      The Debtors' proposed schedule does not provide enough time for the counterparties to determine and resolve their cure claims.  There are breaches the Debtors are required to cure in connection with the assumption and assignment of the CMI contracts, or for which the Debtors must provide adequate assurances of a prompt cure.  The identification of the extent of these breaches, and calculation of the resulting claim amounts, is highly complex, and may vary from agreement to agreement.

25.      The Sale Motion attempts erroneously to include in "cure" amounts obligations that have not yet matured.  Cure Notice ¶¶ 17, 25.

26.      A "cure" payment relates specifically to a prior default under an executory contract or unexpired lease.  <u>See</u> 11 U.S.C. § 365(b).  Neither that provision of the Bankruptcy Code nor any case authority would permit a debtor to use a cure payment to absolve the assignee of the risk of future claims that might arise under the agreement the debtor proposes to assign.  Rather, the risk of future performance obligations necessarily lies with the party assuming the obligations (or its assignee).

27.      Section 365 of the Bankruptcy Code is not the same and does not provide the same relief as Section 363(f) of the Bankruptcy Code.  As a result, Section 365 does not allow the assumption of an executory contract free and clear of the obligations that contract expressly

- 13 -

sets forth. See Cinicola v. Sharffenberger, 248 F.3d 110, 124 (3d Cir. 2001) ("[T]he sale of an

executory contract triggers the protections afforded sales of bankruptcy estate property but also

requires satisfaction of the requirements for assuming and/or assigning the same executory

contract."); In re Access Beyond Technologies, Inc., 237 B.R. 32, 48 (Bankr. D. Del. 1999)

(holding an executory contract does not become part of a debtor's estate until it is assumed, and

"[a] debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or

executory contract, rather than assuming and assigning it.").

28.    A debtor's assumption of an executory contract makes the estate liable to perform

all of the obligations under that contract. The debtor's assignment of a contract it has assumed

obligates the assignee to those same terms. See, e.g., Am. Flint Glass Workers Union vs. Anchor

Resolution Corp., 197 F.3d 76, 81 (3d Cir. 1999) ("[A]n assignment of a contract as such

involves a commitment by the assignee to perform all obligations under the contract, as well as

to acquire all rights created by the contract.").

29.    There is nothing in the Bankruptcy Code that would permit a debtor to assume

and assign any executory contract "free and clear" of the existing and ongoing duty to perform

all obligations, and honor all liabilities, arising under that contract. If the Debtors' obligation has

not yet matured at the time it assumes the contract, then there can be no corresponding default

that the debtor must cure at the time of assignment. Accordingly, a proposed purchaser of the

Debtors' assets that also seeks to takeover executory contracts by assignment cannot do so

without accepting all of the liabilities arising under the contracts, including those obligations that

have not yet matured.

30.    If and to the extent the CMI may in the future have claims, some based on events

occurring prepetition and some not, those claims have not yet matured or been liquidated (and in

some instances or neither known nor capable of being known).  As a result, even if the Debtors

were to have correctly characterized those claims as cure claims – CMI could not assert them in

connection with its cure claims, and any assignment of the CMI contracts cannot now extinguish

those claims.

**C.      The Debtors Propose to Create a Catch-22 Situation in Which Neither They Nor the
Purchaser Will Be Responsible for Breaches of Representations and Warranties
Under the Executory Contracts the Debtors Propose to Assume and Assign.**

31.      The Debtors' assumption, assignment and cure proposals:  (a) presume the

absence of any existing, but undiscovered or unrealized, defaults when the Debtors posit a cure

amount of -0-; and (b) absolve the Purchaser from any responsibility for those defaults when and

as they may be discovered or realized in the future (specifically eliminating any liability of the

Debtors with respect to representations and warranties made in connection with the sale, or with

respect to the noticing and enforcement of any remedies against a Debtor in respect of alleged

breaches of such representations and warranties).

32.      The Debtors provide both that they will have no liability, and that the Purchaser

will have no liability, for anything relating to the pre-closing period.  Specifically, in paragraph

12 of their Cure Notice, the Debtors state:

> The respective Assumption Notice Parties shall be forever barred from . . .
> (ii) asserting at any time any condition to assignment, default, claims, obligations
> or breach and/or any additional cure, damage or other amount with respect to the
> respective Assumed Contract on the basis of events of any kind or nature
> occurring or arising prior to the Closing Date (as defined in the Nationstar APA),
> whether such events constituted acts or omissions by the Debtors or other person
> and regardless of whether such events are known or unknown, including, without
> limitation, claims or liabilities relating to any act or omission of any originator,
> holder or servicer of mortgage loans prior to the Closing Date, and any
> indemnification obligations, claims or liabilities relating to any act or omission of
> the Sellers or any other person prior to the Closing Date.

Cure Notice ¶ 12.

33.     Likewise, in paragraph 13 of the Cure Notice, the Debtors state: "The Debtors

will request that Cure Objections to the proposed Cure Amounts based upon unquantifiable or

unknown pre-closing liability be overruled; provided, however, that no such liabilities may

asserted against the Purchaser or the Purchased Assets, as further described in the Sale Approval

Order." Id. ¶13.

34.     Confirming that Nationstar will not be responsible, the Debtors further state:

> Nationstar is not assuming and parties will be enjoined from asserting
> against Nationstar any claims or obligations relating to the pre-closing period
> under any Assumed Contract (including any Servicing Agreement), whether such
> claims or obligations are known, unknown, fixed, contingent, unliquidated or
> liquidated at the time of the Closing, including, without limitation, any claims or
> liabilities relating to any act or omission of any originator, holder or servicer of
> mortgage loans prior to the Closing Date, and any indemnification claims or
> liabilities relating to any act or omission of the Sellers or any other person prior to
> the Closing Date.  <u>Any parties holding such claims or obligations will be required
> to file a Cure Objection if they disagree with the Cure Amount set forth on the
> Schedule.</u>

Id. ¶ 25 (emphasis added); accord Sale Motion ¶ 9.

35.     As a result, then, the Debtors propose that these future breaches of the contract –

based as they are in the Debtors' pre-assumption acts or omissions – are ones from which

Nationstar or the ultimate purchaser will be relieved, and ones for which the Debtors will have

no responsibility after the proposed assumption and assignment.  Thus, the Debtors propose that

no one on the subservicer side of the equation will be responsible.  This then puts the

counterparty in a Catch-22 position where it would be left with no claim against either the

servicer or its successor.

36.     This limitation on the Purchaser's performance is not consistent with the statutory

requirement that a debtor can assign an executory contract only if "adequate assurance of future

performance by the assignee . . . is provided . . . ."  11 U.S.C. § 365(f)(2)(B).  In fact, this

proposed limitation on the purchaser's future performance demonstrates that the Debtors cannot

- 16 -

(or will not) comply with Section 365(f)(2)(B) because the Debtors' proposal would authorize Nationstar or the ultimate purchaser to walk away from any claim arising from any servicing "act or omission" occurring prior to the Closing and from any "claims or obligations relating to the pre-closing period under any Assumed Contract."

37.    The entire purpose of the adequate assurance of future performance is to backstop the relief the debtor receives from any other or further liability or obligation to perform after the assignment.  "The statutory requirement of 'adequate assurance of future performance by the assignee' affords 'needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment.'"  In re Fleming Cos., 499 F.3d 300, 305 (3d Cir. 2007) (quoting Cinicola v. Sharffenberger, 248 F.3d at 120) (emphasis added).

38.    These are burdens the Purchaser properly assumes when it accepts the assignment *cum onere*.  As the Unsecured Creditors' Committee noted in addressing the Debtor's proposal to continue to pay certain prepetition repurchase claims in the ordinary course post-petition and outside of a plan of reorganization:

> [T]he "doctrine of necessity" does not apply [to justify the proposed payments], because if, as the Committee understands, such liabilities are to be assumed, they can be paid when the servicing agreements are assumed in connection with a sale.

*Limited Objection and Reservation of Rights of the Official Committee of Unsecured Creditors to the Debtors' (I) Origination Motion and (II) Ally Servicing Motion* [Dkt. no. 202] ¶ 23 at 16-17]. The Committee then objected and suggested that the Debtors' proposal be limited to only GA Loans and would not extend to Non-GA Loans (meaning non-government sponsored entity loans).  Id. ¶ 24 at 17.

39.    The fact that the Debtors propose to pay certain prepetition repurchase claims when asserted by their non-debtor affiliate, by branding those claims as being in the ordinary

course post-petition and handling them outside of a plan of reorganization, serves to illustrate the
unfairness of the Debtors' proposals.  Proposing to preserve the protected status of the GA Loans
transactions, while excluding non-GA transactions, see id., is no better.  That is because it would
still elevate one insider creditor's group of transactions over the other creditors and over the
other similarly-situated creditors' transactions (where those creditors would be in the same class
for plan purposes under 11 U.S.C. § 1122(a)).

40.    Here, the Court's assessment of whether the Purchaser can provide adequate
assurances of future performance will require, at the very least a determination of its ability to
provide all of the servicing services for which the agreements provide, and not just the pared
down list the Debtors propose.  "What constitutes adequate assurance is a factual question to be
determined on a case by case basis with due regard to the nature of the parties, their past dealings
and present commercial realities."  In re Gen. Oil Distribs., Inc., 18 B.R. 654, 658 (Bankr.
E.D.N.Y. 1982); see also Androse Assocs. of Allaire, LLC v. A&P (In re A&P), 2012 U.S. Dist.
LEXIS 65193 (S.D.N.Y. May 8, 2012) ("[C]ourts have determined that whether 'adequate
assurance of future performance' has been provided is determined by the facts and circumstances
of each case.") (internal quotation omitted).  Factors that courts have considered in determining
whether a debtor has provided (or assured the counterparty that the proposed assignee will
provide) adequate assurance of future performance include "financial data submitted by the
debtor or movant, . . . industry outlooks, the nature and relationship of the parties, past dealings
of the parties, and the willingness of the parties to fund payments."  In re Res. Tech., Corp.,
2008 U.S. Dist. LEXIS 91148 (N.D. Ill. Nov. 7, 2008).

**D.    There Are Significant Issues With The Procedural Posture In Which The Debtors Now Couch The Request To Assume And Assign.**

41.    As certain trustees have observed in challenging the procedures for cure, see

*Limited Objection  of Certain Trustees for Residential Mortgage Backed Securities Trusts to*

*Debtors Motion Pursuant to 11 U.S.C. Sections 105, 363(b), (f) and (m), 365 and 1123, and Fed.*

*R. Bankr. P. 2002, 6004, 6006 and 9014, etc.* [Dkt. no. 291] ¶¶ 29-31, at pages 21-22 of 27

("**RMBS Objection**"), the Debtors propose to resolve cure disputes prior to the conclusion of the

Sale Hearing, but offer no assurance that the Debtors will be able to satisfy all cure claims prior

to the assumption of the contracts as Section 365 requires.  See also Cure Notice ¶¶ 11-12.  CMI

joins in that objection.

42.    Similarly, the Debtors have requested that the Court overrule any objections

"based upon unquantifiable or unknown pre-closing liability," but have not proposed a structure

that requires an escrow or otherwise provides for the possible later satisfaction of these claims.

Id. ¶ 13.[6]  Moreover, even if this Court were to require an escrow of the entire proposed purchase

---

[6]    And this lack of protection stands in sharp contrast to the provisions of the *Stipulation and Proposed Order Reserving Rights With Respect to Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business* [Dkt. no. 1275], into which the Debtors entered in connection with their obligations to service mortgage loans their non-debtor affiliate Ally Bank owns.  This stipulation addresses disputes over compliance with the provisions of the servicing agreement with Ally Bank and the DOJ/AG settlement.

In that stipulation, among other things, Ally Financial, Inc. ("AFI") agreed to escrow, where and as the Debtors pay Ally Bank in accord with the Indemnification Obligation – defined to be GMAC Mortgage LLC's ("GMACM") obligations to pay Ally Bank in connection with loan modifications the Debtors' assert are part of their obligations under the DOJ/AG Settlement – amounts equal to the reasonable estimate of future liabilities incurred after the Closing Date for the sale of the Debtors' servicing platform and on account of unperformed loan modifications.  Id. ¶ 6 (requiring a monthly adjustment of the escrowed amount, which adjustment could result in additional payments into that escrow).

These indemnification obligations include the Debtors' $19.9 million post-petition indemnification payment to Ally Bank, which payment included a payment on account of $13 million relating to prepetition loan modifications.  *Statement of the Official Committee of Unsecured Creditors Regarding the Debtors' Motion for an Order Authorizing the Debtors to Continue to Perform Under the*

price, it is not clear that the proposed sales will yield sufficient proceeds to satisfy the

counterparties' claims.  Accordingly, there is a very real possibility that the Debtors will not be

able to satisfy the key condition precedent to their proposals to assume and assign the servicing

contracts; in other words, they will not be able to cure the breaches of those agreements.  CMI

joins in the trusts' objection [RMBS Objection ¶¶ 31, 33] and asks that this Court require a

process for the orderly assertion and calculation of cure claims, by which the Court may be able

to avoid undue waste and delay attendant with a failure to cure at the point of sale.

43.    CMI objects to the Debtors' request that the Court waive the 14-day stay in

connection with the closing of the sale because it also is not appropriate.  The issues in question

likely will lead to controversial decisions and the corresponding possibility of appeal.  The assets

in question are not of the "rotting on the vine" variety.  The Debtors propose to avoid Federal

Bankruptcy Rule 6006(d), which was specifically designed to give aggrieved parties the chance

to appeal and to seek a more lengthy stay in order to avoid mootness.  The Debtors have come

forward with no reason why this Court should take away that important right, and CMI therefore

also joins in the trust's objection to this extent.  [See RMBS Objection ¶ 32].

---

*Ally Bank Servicing Agreement in the Ordinary Course of Business* [Dkt. no. 1290] ¶ 8.  The Committee
describes the indemnification payments as follows:

> Unlike modifications to the Debtors' own loans, which simply recognize a loss in value
> that has already occurred, indemnification payments to Ally Bank are hard costs that turn
> the Debtors into guarantors of the full amount of Ally Bank's loss of original loan value.
> Far from "compensating" Ally Bank for some benefit provided to the Debtors, these
> payments extract value from the Debtors to remedy flaws in Ally Bank's own loan
> portfolio *that may have been caused by Ally Bank's own originating activities.*

Id. ¶ 9.  And, this payment creates a resolution of prepetition obligations outside any plan.
The Stipulation and Proposed Order further provides "nothing in this paragraph 6 shall relieve
GMACM or the purchaser of the Debtors' Platform, as applicable, from remitting payment on account of
the Indemnification Obligation in the first instance . . . ."  *Stipulation and Proposed Order . . .*
[Dkt. no. 1275] ¶ 6.  Thus, the Debtors recognize in this instance that the Purchaser can and should
assume future liabilities incurred pursuant to the Debtors' prepetition obligations under the GMACM
servicing agreement and/or DOJ/AG Settlement.

- 20 -

44.     CMI further objects to the procedure by which the Debtors purport to reserve the right to remove executory contracts from the list of those contracts they propose to assume and assign, and to do so at any time up to two business days before the Closing Date.  [Dkt. No. 1484 ¶¶ 5, 18, 21].  This unilateral ability to amend the motion serves only to create undue negotiating leverage and prevents parties from meaningfully considering exactly what the Debtors propose.

### Notice

45.     CMI has provided notice of this objection within the time and in the manner that paragraphs 9 and 11 of the *First Amended and Restated Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto* [Dkt. No. 1484] provides.

### Conclusion

For all of the reasons stated above, CMI requests that the Court:

A.      Require the Debtors to cure defaults that all of the parties know exist, but that have not yet manifested or are contingent and/or unliquidated; or

B.      Provide adequate assurances that they will cure those defaults by either:

(i) requiring the Purchaser to retain responsibility for those obligations; or

(ii) retaining the liability for those obligations as part of the "cost" of the transaction; or

C.      Not include future or unknown defaults as part of a cure, but direct that they remain the Purchaser's responsibility; and

D.      Deny the Debtors' request to assume and assign CMI's executory contracts until such time as the Debtors provide for an appropriate cure and/or adequate

- 21 -

assurances of a prompt cure, compensate CMI or provide adequate assurances that

they will promptly compensate CMI for its actual pecuniary losses, and provide

adequate assurances of future performance under CNI's contracts; and

E.      Grant such other and further relief as the Court determines is just and proper.

Dated: September 28, 2012
       Denver, Colorado

                                        Respectfully submitted,

                                        FEATHERSTONE PETRIE DESISTO LLP


                                        /s/ Andrew J. Petrie
                                        Andrew J. Petrie (*pro hac vice*)
                                        600 Seventeenth Street, Suite 2400-S
                                        Denver, Colorado  80202-5424
                                        Telephone:  303-626-7100
                                        Facsimile:  303-626-7101
                                        apetrie@featherstonelaw.com
                                        *Attorneys for CitiMortgage, Inc.*