# EXHIBIT "1"

## BASIC LEASE INFORMATION

**LEASE EXECUTION DATE:**    July **30**, 2002

**TENANT:**    GMAC Mortgage Corporation

**ADDRESS OF TENANT:**    Attention: Corporate Real Estate
4 Walnut Grove
Horsham, PA  19044

**CONTACT:**    Mr. Warren Braverman
Telephone: (215) 682-1257
Fax: (215) 682-1890

With a copy to:

Colleen Price, Esq.
GMAC Mortgage Corporation
Corporate Counsel
100 Witmer Road
Horsham, PA  19004
Telephone: (215) 682-3989
Fax: (214) 682-1467

**LANDLORD:**    Lewisville LSF, L.P., a Texas limited partnership

**ADDRESS OF LANDLORD:**    c/o Hudson Advisors, L.L.C.
717 North Harwood Street, Suite 2100
Dallas, Texas  75201
Attention: Mr. Andrew B. Qualls
Telephone:  214-754-8400
Fax: 214-754-8402

With a copy to:

Champion Partners
15601 Dallas Parkway, Suite 100
Addison, Texas 75001
Attention: Mr. Robert Poynor
Telephone: 972-490-5600
Fax: 972-490-5599

**CONTACT:**    Property Manager Telephone:  (972) 393-4521 (Ed Adams of Price Edwards & Co.)

**PREMISES:**    Suite No. 300 in the office building (the "**Building**") located on the land commonly referred to as Convergence Office Center, City of Lewisville, Denton County, Texas 75067 and known as Building 3, as more particularly described on Exhibit "A" (the "**Land**"). The Premises are outlined on the plan attached to the Lease as Exhibit "B" and are deemed to contain approximately 19,112 square feet of Rentable Space. The calculation of square feet contained within the Premises shall be subject to measurement and verification by Landlord's and Tenant's architects according to the ANSI/BOMA265.1-1996 BOMA Standards prior to the expiration of ninety (90) days after the Commencement Date, and in the event of a variation, Landlord and Tenant agree to amend this Lease accordingly.

**LEASE TERM:**    One hundred one (101) months, commencing on the date which is the earlier to occur of (i) the date the Premises are "ready for occupancy" as defined in Paragraph 8 below, or (ii) November 25, 2002 (the "**Commencement Date**") and ending at 5:00 p.m., the last day of the 101ˢᵗ full calendar month following the Commencement Date, subject to adjustment and earlier termination as provided in the Lease.

**BASE RENTAL:**    See Rider 105 attached to and made a part of the Lease for all purposes, which amounts Tenant agrees to pay to Landlord at c/o Champion Partners, 15601 Dallas Parkway, Suite 100, Addison, Texas 75001 (or at such other place as Landlord from time to time may designate in writing) in advance and without demand on the first day of each calendar month during and throughout the Lease Term.

**BASE EXPENSE AMOUNT:**    The amount of Operating Expenses (including those Operating Expenses which Landlord "grosses-up" to 95% occupancy as provided in Paragraph 4(d) of the Lease) for the Building and the Project, as applicable, during the calendar year 2003 on a per square foot of Rentable Space in the Building and/or the Project basis, as applicable.

PROJECT:  Convergence Office Center, Lewisville, Texas, including the Land, the Building and any other buildings constructed upon the Land from time to time. The Project is currently depicted on the site plan attached hereto as Exhibit "A-1"; provided, however, Landlord may add or remove any land and any buildings thereon from the Project at Landlord's sole discretion and at Landlord's sole cost, and such costs shall not be included in the Operating Expenses. The Project includes all areas and facilities within the exterior boundaries of the Project that are provided by Landlord for the general use and convenience of Tenant and the other tenants of the Project, including corridors, stairways, elevator shafts, janitor rooms, driveways, parking areas and landscaped areas as same may exist from time to time (the "Common Areas").

SOLE PERMITTED USE:  General business offices and data center and for no other purpose.

TENANT'S PROPORTIONATE
SHARE:  In the case of Operating Expenses that are incurred on a Building-wide basis, 25.048%, which is the percentage obtained by dividing (i) the 19,112 rentable square feet in the Premises by (ii) the 76,302 rentable square feet in the Building. In the case of Operating Expenses that are incurred on a Project-wide basis, initially 2.053% which is the percentage obtained by dividing (i) the 19,112 rentable square feet in the Premises by (ii) the 931,048 rentable square feet currently located within the Project. Tenant's Proportionate Share will be recalculated as required effective at the commencement of any period to which the calculation is applicable in this Lease. Landlord, in Landlord's reasonable discretion, shall determine which Operating Expenses are allocated on a Building-wide basis, and which Operating Expenses are allocated on a Project-wide basis. Notwithstanding the foregoing, Tenant's Proportionate Share as to certain expenses may be calculated differently to yield a higher percentage share to Tenant as to certain expenses in the event that Landlord permits other tenants in the Building or the Project to directly incur such expenses rather than have Landlord incur the expense in common for the Building or the Project.

The foregoing Basic Lease Information is incorporated into and made a part of the Lease identified above. If any conflict exists between any Basic Lease Information and the Lease, then the Lease shall control.

LANDLORD:                                          TENANT:

LEWISVILLE LSF, L.P.,                              GMAC MORTGAGE CORPORATION,
a Texas limited partnership                         a Pennsylvania corporation

By:   Lewisville GenPar, LLC,
      general partner                              By:  _____
                                                   Its:  _____
                                                         Ralph Hall
      By:  _____                      Chief Operating Officer
      Its:  Benjamin D. Velvin
            Vice President

## TABLE OF CONTENTS

| Paragraph | Page No. |
|---|---|
| 1. Definitions and Basic Provisions | 1 |
| 2. Lease of Premises | 1 |
| 3. Services by Landlord | 1 |
| 4. Additional Rental | 2 |
| 5. Electricity | 4 |
| 6. Payments and Performance | 5 |
| 7. Tenant Plans and Specifications - Installation of Improvements | 5 |
| 8. Completion of Improvements and Commencement of Rent | 5 |
| 9. Intentionally Deleted | 6 |
| 10. Repairs and Reentry | 6 |
| 11. Assignment and Subletting | 6 |
| 12. Alterations and Additions by Tenant | 7 |
| 13. Legal Use; Violations of Insurance Coverage; Nuisance | 7 |
| 14. Laws and Regulations | 8 |
| 15. Mutual Indemnity | 8 |
| 16. Rules of the Building | 8 |
| 17. Entry for Repairs and Inspection | 8 |
| 18. Condemnation | 8 |
| 19. Intentionally deleted | 8 |
| 20. Abandoned Property | 8 |
| 21. Holding Over | 9 |
| 22. Fire and Casualty | 9 |
| 23. Entire Agreement and Amendment; No Implied Representations or Warranties; No Memorandum of Lease | 9 |
| 24. Transfer of Landlord's Rights | 9 |
| 25. Default | 10 |
| 26. Waiver; Attorney's Fees | 12 |
| 27. Quiet Possession | 12 |
| 28. Severability | 12 |
| 29. Intentionally deleted | 13 |
| 30. No Subrogation; Insurance | 13 |
| 31. Binding Effect | 13 |
| 32. Notices | 13 |
| 33. Brokerage | 13 |
| 34. Subordination | 13 |
| 35. Joint and Several Liability | 14 |
| 36. Building Name and Address | 14 |
| 38. Mechanic's Liens | 14 |
| 39. Taxes and Tenant's Property; Waiver | 15 |
| 40. Constructive Eviction | 15 |
| 41. Landlord's Liability | 15 |
| 42. Execution by Landlord | 15 |
| 43. No Waiver | 15 |
| 44. No Third Party Beneficiary | 15 |
| 45. Number and Gender | 15 |
| 46. Force Majeure | 15 |
| 47. Telecommunications; Telecommunications Allowance | 15 |
| 48. Landlord's Fees | 16 |
| 49. APPLICABLE LAW; CONSENT TO JURISDICTION | 16 |
| 50. WAIVER OF JURY TRIAL | 16 |
| 51. Confidentiality | 16 |
| 52. Signage | 16 |
| 53. Tenant's Termination Right | 16 |
| 54. Landlord's Authority | 16 |
| 55. Environmental | 16 |
| 56. Satellite | 17 |
| 57. Backup Generator | 17 |
| 58. Time of Essence | 17 |

| | |
|---|---|
| Exhibit "A" | Legal Description |
| Exhibit "A-1" | Site Plan |
| Exhibit "B" | Floor Plan |
| Exhibit "C" | Holidays |
| Exhibit "D" | Leasehold Improvements Agreement |
| Exhibit "E" | Acceptance of Premises Memorandum |
| Exhibit "F" | Building Rules and Regulations |
| Exhibit "G" | Registration and Commission Agreement |

| | |
|---|---|
| Rider No. 101 | Parking Facilities |

Rider No. 102    Tenant's Option to Renew
Rider No. 103    Option to Expand
Rider No 103     Conditional Option to Expand
Rider No. 104    Right of First Refusal
Rider No. 105    Schedule of Base Rental

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "**Lease**") is made and entered into as of the _30_ day of July, 2002, by and between Lewisville LSF, L.P., a Texas limited partnership ("**Landlord**"), and GMAC Mortgage Corporation, a Pennsylvania corporation ("**Tenant**").

1.    **Definitions and Basic Provisions.** The definitions and basic provisions set forth in the Basic Lease Information (the "**Basic Lease Information**") executed by Landlord and Tenant contemporaneously herewith are incorporated herein by reference for all purposes. The additional terms defined below shall have the respective meanings stated when used elsewhere in this Lease, and such terms and the following basic provisions constitute an integral part of this Lease:

(a)    "**Normal Business Hours**": From 7:00 a.m. until 6:00 p.m. on weekdays (except Holidays, as defined on **Exhibit** "C" attached hereto and made a part hereof for all purposes) and 8:00 a.m. until 1:00 p.m. on Saturday (except Holidays).

(b)    "**Rentable Space**": The Rentable Space for the Premises, the Building and the Project is stipulated for all purposes to be the rentable square feet for such areas as set forth in the Basic Lease Information; provided, however, that Landlord, in Landlord's reasonable discretion, may adjust the Rentable Space as to the Project in the event any buildings are added to or removed from the Project by Landlord. The calculation of square feet contained within the Building and the Project shall be subject to measurement and verification by Landlord's and Tenant's architects according to the ANSI/BOMA265.1-1996 BOMA Standards prior to the expiration of ninety (90) days after the Commencement Date, and in the event of a variation, Landlord and Tenant agree to amend this Lease accordingly.

(c)    "**Rider**": Collectively, Rider No(s). 101, 102, 103, 104 and 105, which are attached hereto, contain additional provisions of this Lease, and are hereby incorporated in, and made a part of, this Lease.

(d)    "**Exhibits**": The following Exhibits are attached to and made a part of this Lease for all purposes:

A - Land
B - Premises
C - Holidays
D - Leasehold Improvements Agreement
E - Acceptance of Premises Memorandum
F - Building Rules and Regulations
G - Registration and Commission Agreement

2.    **Lease of Premises.** In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord hereby demises and leases to Tenant, and Tenant, in consideration of Landlord's obligations hereunder, hereby leases and takes from Landlord, the Premises, together with the right to use and enjoy in common with others the Common Areas, for the Lease Term specified herein, all upon and subject to the terms and conditions set forth herein. Landlord covenants to use reasonable efforts to minimize any interference with Tenant's enjoyment and use of the Common Areas, entrances, exits, approaches and means of entrance and approach in favor of the Premises. Tenant agrees and acknowledges that there is excluded from Tenant's use of the Premises (whether the Premises are or include one or more full floors within the Building) and Landlord hereby expressly reserves for its sole and exclusive use, any and all mechanical, electrical, telephone and similar rooms, janitor closets, elevator, pipe and other vertical shafts and ducts, flues, stairwells, any area above the acoustical ceiling, and any other areas not specifically shown on Exhibit "B" as being part of the Premises. Tenant shall have no duty hereunder to occupy the Premises; however, the lack of such duty to occupy the Premises shall not permit Tenant to fail to otherwise comply with all of the terms and provisions of this Lease.

3.    **Services by Landlord.** Landlord agrees to furnish the following services to the Premises at a first class building standard comparable to other first class buildings in the greater Lewisville area, all of such services to be at Landlord's cost and expense except as specifically provided to the contrary elsewhere in this Lease:

(a)    Cold water (at the normal temperature of the supply of water to the Building) for lavatory, water fountain and toilet purposes, and hot water (from the regular Building supply at prevailing temperatures) for lavatory purposes, all of such water service to be supplied from the regular supply of water to the Building at points of supply provided for general use of tenants of the Building through fixtures installed by Landlord or by Tenant with Landlord's consent; provided, however, nothing contained herein shall require Landlord to furnish hot water to any kitchen, bar or other such lavatory facility in the Premises.

(b)    Heated and refrigerated air conditioning in season, and at such temperature and in such amounts as are reasonably considered by Landlord to be standard. It is understood that Tenant will operate its business twenty (24) hours per day, seven (7) days per week and will require heated and refrigerated air conditioning at all times. For avoidance of doubt, Landlord and Tenant acknowledge and agree that Tenant's data processing and other machines and equipment proposed to be installed in the Premises will generate an abnormal amount of heat; accordingly, Landlord, in the initial build-out, at Tenant's sole cost and expense, shall separately meter and charge to Tenant from time to time the cost of the chilled water necessary to maintain the

temperature of the Premises at levels reasonably required for comfortable use and occupancy under normal business operations as reasonably determined by Landlord.

      (c)      In the event passenger elevators are located in the Building, operatorless passenger elevator service in common with other tenants for ingress and egress from the Premises twenty-four (24) hours a day, seven (7) days a week, provided that Landlord may reasonably limit the number of elevators to be in operation at times other than Normal Business Hours, and service elevator(s) in common with other tenants but only when scheduled through the management of the Building.

      (d)      Such janitorial cleaning services as may, in the reasonable judgment of Landlord, be standard for office and data center use.

      (e)      Electric current in the manner and to the extent reasonably deemed by Landlord to be standard for office and data center use, twenty four (24) hours per day, seven (7) days per week.

Failure to any extent to furnish or any stoppage of these defined utilities and services resulting from any cause whatsoever shall not render Landlord liable in any respect for damages to either person, property or business, nor be construed as an eviction of Tenant, nor entitle Tenant to any abatement of rent, nor relieve Tenant from fulfillment of any covenant or agreement contained herein. Should any malfunction of the Building improvements or facilities (which by definition do not include any improvements or facilities of Tenant beside Building standard improvements) occur for any reason, Landlord shall use reasonable diligence to repair same promptly, but Tenant shall have no claim for rebate or abatement of rent or damages on account of such malfunction or of any interruptions in service occasioned thereby or resulting therefrom. Notwithstanding the foregoing, in the event Landlord fails to provide any of these defined utilities or services required by this Paragraph 3 and such failure results in an interruption of Tenant's business and/or use of all or any part of the Premises ("Interruption of Services"), then Tenant shall have the right to pursue the following rights and remedies, which are its sole and exclusive rights and remedies: (i) in the event the Interruption of Services is the result of Landlord's negligence or willful misconduct or that of its employees or agents, then after the expiration of five (5) business days written notice and opportunity to cure provided by Tenant to Landlord, Base Rental and Tenant's Additional Rental shall abate (equitably in the event Tenant is permitted to use only a part of the Premises) for the period commencing on the expiration of such five (5) business days until the Interruption of Services is remedied; provided, however, in the event the Interruption of Services extends for ninety (90) days, then Tenant shall have the right to terminate this Lease (other than any provisions which expressly survive the expiration or earlier termination of this Lease) by providing Landlord written notice thereof within ten (10) days of the expiration of such ninety (90) day period, which termination shall be effective from the date of Landlord's receipt of such notice; and (ii) in the event the Interruption of Services is the result of any cause other than Landlord's negligence or willful misconduct or that of its employees or agents (or is the result of a casualty or condemnation, which shall be governed by the terms and provisions of Paragraphs 18 and 22 below), then after the expiration of thirty (30) days written notice and opportunity to cure provided by Tenant to Landlord, Base Rental and Tenant's Additional Rental shall abate (equitably in the event Tenant is permitted to use only a part of the Premises) for the period commencing on the expiration of such thirty (30) days until the Interruption of Services is remedied; provided, however, in the event the Interruption of Services extends for one hundred twenty (120) days, then Tenant shall have the right to terminate this Lease (other than any provisions which expressly survive the expiration or earlier termination of this Lease) by providing Landlord written notice thereof within ten (10) days of the expiration of such one hundred twenty (120) day period, which termination shall be effective from the date of Landlord's receipt of such notice. Notwithstanding the foregoing, in the event the Interruption of Services is the result of the negligence or willful misconduct of Tenant, its agents or employees, then Tenant shall have no abatement or termination rights in connection with any such Interruption of Services.

    4.    **Additional Rental.**

      (a)      Tenant's Base Rental is based, in part, upon the fact that Landlord is contributing as its share of the annual Operating Expenses (as defined in Paragraph 4(e) hereof) of the Project and/or Building, as applicable, an amount equal to (i) the Base Expense Amount for the Project and/or Building, as applicable, multiplied by (ii) the Rentable Space in the Premises. Tenant shall during the Lease Term, pay an amount per square foot of Rentable Space within the Premises ("Tenant's Additional Rental") equal to the excess from time to time of the Operating Expenses per square foot of Rentable Space in the Building and/or the Project, as applicable, over the Base Expense Amount. Landlord, in Landlord's reasonable discretion, shall determine which Operating Expenses are allocated on a Building-wide Basis, and which Operating Expenses are allocated on a Project-wide Basis. Notwithstanding the foregoing, Tenant's Proportionate Share as to certain expenses maybe calculated differently to yield a higher percentage of share to Tenant as to certain expenses in the event that Landlord permits other Tenants in the Building or the Project to directly incur such expenses rather than have Landlord incur the expense in common for the Building or the Project. Prior to the commencement of each calendar year of Tenant's occupancy, Landlord shall make a good faith estimate of the anticipated amount of Tenant's Additional Rental ("Tenant's Forecast Additional Rental") and Tenant agrees to pay Tenant's Forecast Additional Rental in equal monthly installments in advance and without demand on the first day of each calendar month during and throughout the Lease Term and any renewal or extension thereof, subject to adjustment of Tenant's Forecast Additional Rental pursuant to any audit conducted pursuant to Paragraph 4(c) hereof. Landlord estimates that Operating Expenses for the calendar year 2003 will be approximately $4.50 per square foot of Rentable Space within the Project.

      (b)      Within one hundred twenty (120) days after the end of each calendar year during the Lease Term and any renewal or extension thereof, or as soon as reasonably possible thereafter, but no later than twelve (12) months following the end of each calendar year, Landlord shall provide Tenant a statement showing the Operating Expenses for said calendar year and a statement prepared by Landlord comparing Tenant's

2

Forecast Additional Rental theretofore paid by Tenant with Tenant's Additional Rental. In the event that Tenant's Forecast Additional Rental paid by Tenant exceeds Tenant's Additional Rental for said calendar year, Landlord shall pay Tenant an amount equal to such excess by direct payment to Tenant within thirty (30) days of the date of such statement, provided that if Tenant's Forecast Additional Rental paid by Tenant exceeds Tenant's Additional Rental for said calendar year by a sum which is less than $5,000, then at Landlord's option, Landlord may credit such excess payment against the next accruing installment(s) of Tenant's Forecast Additional Rental. In the event that Tenant's Additional Rental exceeds Tenant's Forecast Additional Rental for said calendar year, Tenant shall pay Landlord, within thirty (30) days of receipt of the statement, an amount equal to such difference. Such obligation of Landlord to refund and of Tenant to pay shall survive expiration or termination of this Lease. All statements must be reasonable detailed and itemized and shall use generally accepted accounting principles ("GAAP") consistently applied. Upon written request, Landlord shall deliver to Tenant reasonably detailed documentation to support such statements.

(c)     Tenant at its sole expense shall have the right during the Lease Term, but no more frequently than once per calendar year following prior written notice to Landlord, to audit Landlord's books and records relating to Operating Expenses, provided that Tenant's audit is performed by a reputable independent certified public accountant reasonably acceptable to Landlord and such accountant and Tenant deliver a confidentiality agreement to Landlord, in form and substance reasonably satisfactory to Landlord, and further provided that any such audit must be conducted and completed and the results thereof delivered to Landlord as provided below, no later than twelve (12) months after Landlord has provided to Tenant the end of the calendar year statement comparing Tenant's Forecast Additional Rental thereto paid by Tenant with Tenant's Additional Rental. In the event Tenant fails to deliver to Landlord any such audit prior to the expiration of such twelve (12) month period, Landlord's statement comparing Tenant's Forecast Additional Rental thereto paid by Tenant with Tenant's Additional Rental shall be conclusive and binding for all purposes on Tenant as to any and all items contained therein. Upon the completion of Tenant's audit, Tenant shall deliver to Landlord the results thereof, certified by Tenant's accountant as true, correct and complete. In the event Tenant's audit reveals that Landlord undercharged Tenant for Tenant's Proportionate Share of the Operating Expenses, Tenant shall immediately pay Landlord the amount that Landlord undercharged Tenant, and in the event Tenant's audit reveals that Landlord overcharged Tenant for Tenant's Proportionate Share of Operating Expenses, Tenant shall receive a credit against its next installment(s) of Base Rental due. In the event Tenant's audit reveals that Landlord overcharged Tenant more than five percent (5%) of Tenant's Proportionate Share of the Operating Expenses for the calendar year in question and Landlord's verification of such audit confirms such overcharge, then Landlord agrees to pay to Tenant the reasonable cost of such audit.

(d)     Notwithstanding anything to the contrary contained herein, if the Building or the Project, as applicable, is not fully occupied during any calendar year of the Lease Term, Operating Expenses, Tenant's Forecast Additional Rental and Tenant's Additional Rental for purposes of this Paragraph 4 shall be determined as if the Building and/or the Project had been fully occupied during such year and Operating Expenses had been in an amount which would be normal if the Building and/or the Project were fully occupied. For the purposes of this Lease, "fully occupied" shall mean occupancy of ninety-five (95%) of the total Rentable Space in the Building or the Project, as applicable. The items which are to be adjusted pursuant to this subsection (d) shall be limited to costs which are affected by occupancy levels, such as by way of example and not limitation, janitorial services (if based on occupied space), and water and sewer use charges, and not those which are unaffected by occupancy levels, such as ad valorem real estate taxes, landscape maintenance costs, and service contracts for building systems.

(e)     The term "Operating Expenses" shall mean all costs of management, operation (specifically excluding the cost of electricity to the Premises ), and maintenance of the Land, the Building, the Project, and all other improvements on the Land and any and all appurtenances thereto (the "Common Facilities"), all accrued and based on an annual period consisting of a calendar year. By way of illustration but not limitation, Operating Expenses shall include expenditures for maintenance and repairs; amortization of any capital expenditures in accordance with generally accepted accounting practices and principles which are incurred by Landlord to (i) effect a reduction in the Operating Expenses of the Project, or (ii) keep the Project in compliance with all applicable governmental rules and regulations from time to time enacted after the date of this Lease; assessments and governmental charges (including taxes on rents or services, but not Landlord's income taxes) (excluding special assessments and water or sewer tap in charges arising in connection with the initial development of the Project or any penalties incurred for late payment); ad valorem property taxes with respect to the Land and/or the Project or any part of either thereof; charges for water, sewerage, and gas; maintenance of the central utility plant; charges for electricity for the Common Facilities, including electricity and chilled water for heating and cooling of the Common Facilities; cleaning, including supplies, janitorial services and pest control; licenses, permits and inspection fees; refuse collection; insurance; administrative expenses, including salaries, benefits, taxes and other expenses for labor and management, office equipment, telephone, and supplies; management fees payable by Landlord with respect to the Land, Project and Common Facilities not to exceed the fair market rate for such services as reasonably determined by Landlord; fire protection; snow and ice removal; landscape maintenance; and security services. The following shall be excluded from Operating Expenses: depreciation; capital expenditures other than those referenced in the previous sentence; cost of Building alterations or renovations for other tenants in the Project; advertising; commissions or fees paid for leasing; cost of repairs occasioned by fire, windstorm, or other casualty (but only to the extent reimbursed by insurance proceeds) or condemnation; and wages, salaries, or other compensation paid to any executive above the grade of facility manager. In addition, Operating Expenses shall not include the following:

1)     legal fees and other costs incurred in enforcing the terms of any lease or other occupancy agreement;

2)    increases in insurance premiums caused by any portion of the Project being used for any purpose other than general office purposes and not caused by Tenant; insurance deductibles or self-insurance costs  in excess of those which are commercially reasonable;

3)    any reimbursed items; expenses paid directly by Tenant; repairs and general maintenance paid by Tenant or by other third parties or the cost of any work or service to be supplied by Landlord to Tenant hereunder if Tenant relieves Landlord of the obligation to provide such work or service to Tenant or any expenses paid directly by the Tenant;

4)    interest or amortization payments on any debt, mortgage or mortgages or other financing charges, including origination fees, points or prepayment charges and any rent or other sums payable by Landlord under any ground or underlying lease;

5)    the cost of installing, operating or maintaining a specialty improvement including, without limitation, an observatory, broadcasting, cafeteria, conference center, parking or dining facility, or lunchroom and any wages, salaries or any compensation paid to clerks and attendants in concessions or newsstands operated by Landlord; or costs to replace the roof or structural components of the Project;

6)    any cost or expense representing an amount paid to a related person or entity which is in excess of the amount which would be paid in the absence of such relationship and any costs exceeding those available from competitive bidding;

7)    the cost of surveying, testing, containing, removing or otherwise addressing, cleaning-up or disposing of any materials or waste classified as hazardous materials under any governmental statute, regulation or order;

8)    expenses resulting from the negligent or tortious act of  Landlord, its agents, employees or contractors;

9)    the cost of any work or service (including after-hours services) not generally provided to all tenants in the Project, and the difference between (i) the cost of any service generally provided to tenants in the Project and (ii) the cost of a higher level of that service if such higher level of service is not generally provided to tenants in the Project;

10)    costs specifically attributable to (or otherwise pro-rated to) the operation of the business of Landlord generally and the operation, maintenance and repair of any other real property owned or operated by Landlord or Landlord's managing agent, as opposed to costs specifically attributable to (or otherwise pro-rated to) the operation, maintenance and repair of the Project;

11)    costs of any fines or penalties or any interest thereon, costs incurred as a result of a lease default by Landlord or any tenant or Landlord's legal fees;

12)    any inheritance, estate, succession, mortgage, transfer, gift, gross receipts, franchise, corporation, partnership, income or profit tax or capital levy that is or may be imposed directly or indirectly upon Landlord or any real estate tax increase triggered by the sale of property; or

13)    costs of acquisition of new land or construction of new buildings; and costs to correct original construction or to demolish any buildings.

(f)    Landlord will use its reasonable efforts to control Operating Expenses in order to keep them commensurate with then current market rates and agrees to use the reimbursement of Operating Expenses only as a pass-through of expenses incurred by Landlord and not as a profit-making device. Notwithstanding anything to the contrary contained in this Lease, Tenant's share of Operating Expenses shall not increase by more than seven percent (7%) per year (determined cumulatively for the entire term for this Lease) to the extent attributable to any and all controllable expenses, i.e., with the limitation expressed in this subsection (f) not being applicable to the extent that increases in expenses such as utilities, taxes and insurance caused the Operating Expenses to increase by more than seven percent (7%) per year.

5.    **Electricity.**

(a)    Notwithstanding anything contained in this Lease to the contrary, Operating Expenses shall not include the cost of electricity to the Premises, but the Base Rental hereunder shall be increased by an amount equal to the cost of electricity to the Premises (including the cost of electricity for heated and refrigerated air conditioning), as measured by the submeter (collectively, the "**Electricity Charge**"). The Electricity Charge shall not include the cost of any electrical use for the benefit of another tenant of the Project. Landlord may from time to time (including during any periods for which Base Rentals is $0.00) deliver to Tenant an invoice and Tenant shall make payment of the Electricity Charge to Landlord within thirty (30) days of

delivery of the invoice. Electricity Charges shall be calculated only to reimburse Landlord for costs actually paid and not used as a profit-making device. Upon request, Landlord shall give Tenant reasonably detailed documentation to support its invoices. Landlord from time to time (including during any periods for which Base Rental is $0.00) shall also have the option to make a good faith estimate of the annual Electricity Charge for each upcoming year and, upon thirty (30) days' written notice to Tenant, may require the monthly payment of Base Rental to be adjusted in accordance with such estimated annual Electricity Charge. Any amounts paid based on such an estimate shall be subject to adjustment as hereafter provided when the actual cost of electricity to the Project and Common Areas is available for such year. Within ninety (90) days of the end of each calendar year, Landlord shall furnish to Tenant a statement of the actual cost of electricity to the Project and Common Areas for the period since the last such statement. If the Electricity Charge collected for the prior year, as a result of Landlord's estimate of the cost of electricity, is in excess of the Electricity Charge actually due during such prior year, then Landlord shall refund to Tenant any overpayment within thirty (30) days following the delivery of such statement to Tenant, provided that if the estimated Electricity Charge paid by Tenant exceeds the actual Electricity Charge for such prior year by a sum which is less than $5,000, then at Landlord's option, Landlord may credit such excess payment against the next accruing installment(s) of Tenant's Electricity Charge. Likewise, Tenant shall pay to Landlord, within thirty (30) days after demand, any underpayment with respect to the prior year. Tenant shall be responsible for the payment of all of the Electricity Charge up to and including the date of expiration or termination of this Lease, when such costs have been billed to Tenant within three (3) months after the time of the termination of this Lease. Landlord shall, within forty-five (45) days after the expiration or termination of this Lease or as soon thereafter as practical, deliver to Tenant an invoice for all such Electricity Charge up to and including the date of expiration or termination of this Lease. Landlord shall not make a profit on bulk utility rates.

        (b)     Intentionally deleted.

        (c)     Landlord and Tenant acknowledge and agree that as a part of the finish-out of the Premises, the Premises will be separately metered.

        (d)     Without Landlord's prior written consent, Tenant shall not install any equipment (such as, without limitation, tabulating or computing equipment) in the Premises that will require any electrical current or equipment for its use other than that supplied by Landlord for normal office usage, and the cost of special electrical installations approved by Landlord shall be paid by Tenant to Landlord on demand. Tenant shall not be charged for electricity applicable to other rentable areas of the Project.

       6.    **Payments and Performance.** Tenant agrees to pay all rents and sums provided to be paid by Tenant hereunder at the times and in the manner herein provided, without any setoff, deduction or counterclaim whatsoever. Should this Lease commence on a day other than the first day of a calendar month or terminate on a day other than the last day of a calendar month, the Base Rental and Tenant's Additional Rental for such partial month shall be proportionately reduced. The Base Rental for the first partial month, if any, shall be payable at the beginning of said period. The obligation of Tenant to pay such rent is an independent covenant, and no act or circumstance whatsoever, whether such act or circumstance constitutes a breach of covenant by Landlord or not, shall release Tenant from the obligation to pay rent. Time is of the essence in the performance of all of Tenant's obligations hereunder. Any amount which becomes owing by Tenant to Landlord hereunder shall bear interest at the highest lawful rate per annum from the due date until paid, unless there is no highest lawful rate of interest provided by law with respect to such amount, in which event such amount shall bear interest at the rate of one and one-half percent (1-1/2%) per month from the due date until paid. In addition, at Landlord's option, but only to the extent allowed by applicable law and not in excess of the amount allowed by applicable law, Tenant shall pay a late charge in the amount (as solely determined by Landlord) of up to five percent (5%) of any installment of rental hereunder which is not paid within five (5) days of the date on which it is due in order to compensate Landlord for the additional expense involved in handling delinquent payments.

       7.    **Tenant Plans and Specifications - Installation of Improvements.** Landlord will install or cause to be installed in the Premises all improvements shown on the Approved Working Drawings (as defined in **Exhibit "D"** attached hereto) upon the terms and conditions set forth in the Leasehold Improvements Agreement attached hereto as **Exhibit "D"** and made a part hereof.

       8.    **Completion of Improvements and Commencement of Rent.** Subject to any Tenant's Delay or force majeure delays, Landlord covenants and agrees that the Premises will be Rack Ready (as defined below) on or before October 28, 2002. The term **"Rack Ready"** shall mean that Tenant will have the ability to securely begin installing computer equipment in the data center with basic electrical, cooling, security system, data cabling, and fire protection necessary to support limited occupation by computer equipment. Landlord agrees that Tenant's early entry into the Premises pursuant to the preceding sentence shall not constitute occupancy of the Premises for the purposes of this Section. If the Premises are not ready for occupancy by Tenant on the Commencement Date pursuant to the terms of **Exhibit "D"**, the obligations of Landlord and Tenant shall nevertheless continue in full force and effect, including the obligation of Tenant to commence paying rent on the Commencement Date, provided that if the Premises are not ready for occupancy on the Commencement Date for any reason other than Tenant's Delay (as defined in **Exhibit "D"**), then (i) the rent shall abate and not commence until the date the Premises is ready for occupancy or until the date Tenant commences occupancy of any portion of the Premises for purposes of conducting business operations, whichever first occurs (such first occurring date being herein referred to as the "**Actual Commencement Date**"), and (ii) Tenant shall receive a day for day credit of Base Rental (based on a rate of $17.00 per rentable square foot of the Premises) for the first seven (7) days and a two (2) day for one (1) day credit of Base Rental (based on a rate of $17.00 per rental per square foot of the Premises) thereafter, to be applied to the first installment(s) of Base Rental hereunder equal to the number of days between the Commencement Date and the Actual Commencement Date not caused by Tenant's Delay; provided further, however, in the event the Actual Commencement Date has not occurred within seventy (70) days following the

Commencement Date for any reason other than Tenant's Delay, then Tenant shall have the right to either (y) terminate this Lease (other than any provisions which expressly survive the expiration or earlier termination of this Lease) by written notice to Landlord within five (5) days of such date, or (z) complete the Work in accordance with the terms of Exhibit "D" in which event Landlord shall reimburse Tenant for the reasonable costs incurred by Tenant in completing the Work up to but not to exceed the Allowance, together with an administrative fee in an amount equal to 3% of the reasonable costs incurred by Tenant in completing the Work up to but not to exceed the Allowance, within fifteen (15) days following receipt by Landlord of reasonably satisfactory evidence of such costs. In the event Landlord fails to timely reimburse Tenant for any amounts payable to Tenant pursuant to the preceding sentence, then Tenant shall have the right to offset such amounts against the rentals next coming due under this Lease. In the event, Tenant terminates this Lease as provided above, all monies paid by Tenant to Landlord shall be refunded. For purposes hereof, "ready for occupancy" means that (a) the Work (as defined in Exhibit "D") is substantially completed in accordance with the terms of Exhibit "D", and (b) Landlord has obtained a certificate of occupancy or such other governmental approval, if required by applicable law, with respect to permitting Tenant to occupy the Premises as intended. Any such abatement of rent or termination, however, shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of the Premises not being ready for occupancy by Tenant on the Commencement Date. If the Premises are not ready for occupancy by Tenant on the Commencement Date, the number of months of the Lease Term will remain as stated in the Basic Lease Information, and the Lease Term will commence on the Actual Commencement Date. Notwithstanding the foregoing, if Tenant, with Landlord's consent, occupies the Premises after substantial completion of Tenant's leasehold improvements but prior to the beginning of the Lease Term set forth herein, all of the terms and provisions of this Lease shall be in full force and effect from the commencement of such occupancy and the Lease Term shall commence on the earlier date on which Tenant first occupies the Premises and shall expire the same number of months thereafter as shown in the Basic Lease Information and no change shall occur in the length of the Lease Term.

After the Premises are ready for occupancy, by moving into the Premises or taking possession thereof, Tenant accepts the Premises as suitable for the purposes for which the same are leased (subject to Landlord's Warranty, as defined in Exhibit "D", and to any punch lists items as provided in Exhibit "D") and accepts the Building and every appurtenance thereof, and waives any and all defects therein and on request from Landlord, Tenant shall promptly execute and deliver to Landlord an Acceptance of Premises Memorandum in the form attached hereto as Exhibit "E" and made a part hereof for all purposes; provided, however, Landlord agrees to cause Tenant to be named a third party beneficiary of any warranties that Landlord receives with respect to the construction of the Premises. Notwithstanding anything to the contrary set forth above, Landlord agrees to delay the Commencement Date for up to but not to exceed seven (7) days for any Tenant's Delay; provided, however, in the event any delays in excess of seven (7) days resulting from any Tenant's Delay, then the Commencement Date will be deemed to have occurred on the eighth (8th) day following the date that the Commencement Date would have occurred but for such Tenant's Delay. In addition, Landlord and Tenant hereby agree that the occurrence of any Tenant's Delay which results in excess of seventy (70) days of delay in completion of the Work, shall constitute an immediate event of default under this Lease. Notwithstanding anything to the contrary set forth above, the Commencement Date and the Actual Commencement Date shall be extended by any force majeure delays pursuant to Paragraph 46 of this Lease.

9.    **Intentionally Deleted**

10.    **Repairs and Reentry.** Except for (i) the items which Landlord is obligated to maintain pursuant to this Paragraph 10, and (ii) repairs required pursuant to Landlord's Warranty, as defined in Exhibit D, Tenant will, at Tenant's own cost and expense, maintain and keep the Premises and any alterations and additions thereto in sound condition and good repair, and shall pay for the repair of any damage or injury done to the Building or any part thereof by Tenant or Tenant's agents and employees; provided, however, that Tenant shall make no repairs to the Premises without the prior written consent of Landlord.  The performance by Tenant of its obligation to maintain and make repairs shall be conducted only by contractors approved by Landlord after plans and specifications therefor have been approved by Landlord.  Tenant will not commit or allow any waste or damage to be committed on any portion of the Premises, and upon the termination of this Lease by lapse of time or otherwise, Tenant shall deliver up the Premises to Landlord in as good condition as at date of possession, ordinary wear and tear and damage from all casualty excepted and all trade fixtures and equipment removed; provided, however, Tenant shall not be required to spend more than $2.00 per rentable square foot of the Premises to cause the Premises to be in such condition. Upon such termination of this Lease, Landlord shall have the right to reenter and resume possession of the Premises. Notwithstanding the foregoing provisions of this Paragraph 10, any repairs to the Premises or the Building that are necessitated because of any damage caused by fire or other casualty shall be governed by the provisions of Paragraph 22 below. Landlord shall be responsible for maintenance to and repair of the exterior, structural and Common Areas of the Building as well as all building systems. In the event Landlord fails to maintain or repair the exterior, structural and Common Areas of the Building as well as all building systems after reasonable written notice from Tenant, Tenant may pursue any and all of its rights and remedies available at law or in equity, including, without limitation, a suit for specific performance; provided, however, Tenant shall have no right to maintain or repair the exterior, structural and Common Areas of the Building or the building systems.

11.    **Assignment and Subletting.** In the event that Tenant desires to encumber this Lease, assign this Lease or sublet all or any part of the Premises or grant any license, concession or other right of occupancy of any portion of the Premises, Tenant shall notify Landlord in writing and shall state the name of the proposed assignee, sublessee or other transferee and the terms of the proposed assignment, sublease or transfer. Tenant shall also provide financial information and state and provide information requested by Landlord as to the nature and character of the business of the proposed assignee, sublessee or transferee. Landlord shall have the option to retake possession of the Premises and terminate this Lease as of the date on which the proposed assignment, sublease or other transfer was to become effective. Landlord must exercise such option to retake the Premises by giving written notice to Tenant within fifteen (15) days after receipt of Tenant's notice or Landlord will be deemed to have rejected its option to retake the Premises. If Landlord fails to exercise its option to retake the Premises, Tenant shall not assign or mortgage this Lease or any right hereunder or interest herein, and Tenant shall not sublet the Premises in whole or in part or grant any license, concession or other right of occupancy of any portion of the Premises, without the prior written consent of Landlord, which consent may be

granted or withheld at the reasonable discretion of Landlord. Any such assignment, mortgage or subletting without such consent shall be void and shall, at the sole option of the Landlord, be deemed an event of default by Tenant under this Lease. Landlord's consent shall not be required in the event Tenant assigns this Lease or sublets the Premises to an entity that is, directly or indirectly, controlled or owned by, General Motors Corporation or to any corporation or other entity resulting from a merger, acquisition, sale of stock, sale of assets, consolidation or reorganization of or with General Motors Corporation (an "Affiliate"). Furthermore, Landlord agrees that Tenant can permit independent contractors that service Tenant to occupy the Premises from time to time in order to service Tenant's operational requirements, and Tenant agrees to indemnify, defend and hold harmless Landlord from any claims, suits or damages that Landlord suffers or incurs as a result thereof. Notwithstanding any assignment or subletting consented to by Landlord, Tenant and any guarantor of Tenant's obligations under this Lease and each assignee shall at all times remain fully responsible and liable for the payment of the rent herein specified and for compliance with all of Tenant's other covenants and obligations under this Lease. No consent to any assignment or mortgage of this Lease or any subletting of the Premises shall constitute a waiver of the provisions of this Paragraph except as to the specific instance covered thereby. In the event that the monthly rental per square foot of space subleased which is payable by any sublessee to Tenant shall exceed the monthly rental per square foot for the same space payable for the same month by Tenant to Landlord (including any bonuses or any other consideration paid directly or indirectly by the sublessee to Tenant), Tenant shall pay fifty percent (50%) of the profit to Landlord. "Profit" shall mean all minimum and additional rent in excess of the minimum and additional rent due under this Lease less any reasonable costs incurred by Tenant in connection with the execution and performance of such assignment or sublease, including leasing commissions, costs of renovation or construction and costs required under such assignment or sublease. Tenant is entitled to recover such costs and expenses before Tenant is obligated to pay Landlord its share of the Profit. In the case of a sublease for less than all of the Premises, the rent allocable to the subleased space shall be as a percentage on a square footage basis. In the event Tenant shall receive any consideration from an assignee other than the assumption by the assignee of Tenant's obligations hereunder, Tenant shall be obligated to pay the full amount of such consideration to Landlord as additional rent hereunder on the same date it is received by Tenant, less any reasonable expenses. Landlord, at Landlord's option, may elect to require that rental payable by any sublessee be paid directly to Landlord and offset Tenant's rent obligations accordingly. At no time during the Lease Term shall Tenant be entitled to (i) advertise the Premises for sublease without the prior written consent of Landlord, such consent not to be unreasonably withheld and (ii) market the Premises for sublease at a rate less than the fair market value of the Premises. If Tenant is a corporation or partnership, an assignment prohibited by this Paragraph 11 shall be deemed to include one or more sales or transfers, by operation of law or otherwise, or creation of new stock or partnership interests, by which a majority of the voting shares of the corporation or interests in the partnership shall be vested in a party or parties who are not owners of a majority of the voting shares or partnership interests of Tenant as of the date hereof; provided, however, that the foregoing provisions of this sentence shall not be applicable if (i) Tenant's stock is listed on a recognized securities exchange or (ii) at least eighty percent (80%) of Tenant's stock is owned by a corporation whose stock is listed on a recognized securities exchange. For the purposes hereof, stock ownership shall be determined in accordance with the principles set forth in section 544 of the Internal Revenue Code of 1986, as amended to the date hereof. Any transfer by operation of law shall also constitute an assignment prohibited by this Paragraph 11. Tenant shall reimburse Landlord, on demand, for its reasonable attorneys' fees and other reasonable expenses incurred in connection with considering any request for Landlord's consent to an assignment or sublease of the Premises.

12.    **Alterations and Additions by Tenant**. Tenant shall make no alterations in or additions to the Premises without the prior written consent of Landlord which shall not be unreasonably withheld or delayed; provided, however, with regard to alterations or additions that would affect the Building's structure or its HVAC, plumbing, electrical or mechanical systems, Landlord's consent shall be in its sole and absolute discretion. All alterations, additions, and improvements made to or fixtures or improvements placed in or upon the Premises by either party (except only moveable trade fixtures of Tenant) shall be deemed a part of the Building and the property of the Landlord at the time they are placed in or upon the Premises, and they shall remain upon and be surrendered with the Premises as a part thereof, subject to Paragraph 10 above, at the termination of this Lease, whether such termination shall occur by the lapse of time or otherwise. Alterations and additions to the Premises will be performed by Landlord at Tenant's cost and expense. Tenant acknowledges that Landlord's approval of any alterations or additions shall not be a representation by Landlord that such alterations, additions or improvements comply with applicable laws.

13.    **Legal Use; Violations of Insurance Coverage; Nuisance**. Tenant will not occupy or use any portion of the Premises for any purpose other than the Sole Permitted Use or for any purpose which is unlawful or which, in the reasonable judgment of Landlord, is disreputable or which is hazardous due to risk of fire, explosion or other casualty, nor permit anything to be done which will in any way (i) increase the rate of fire and casualty insurance on the Building or its contents, or (ii) tend to lower the first-class character and reputation of the Building, or (iii) create unreasonable elevator loads or otherwise interfere with standard Building operations, or (iv) affect the structural integrity or design capabilities of the Building or (v) result in the storage of any hazardous materials or substances at the Building (other than reasonable amounts of normal office supplies). In the event that, by reason of any act or conduct of business of Tenant, there shall be any increase in the rate of insurance on the Building or its contents created by Tenant's acts or conduct of business, then Tenant hereby agrees to pay Landlord the amount of such increase on demand. Tenant shall not erect, place, or allow to be placed any sign, advertising matter, stand, booth or showcase in, upon or visible from the vestibules, halls, corridors, doors, outside walls, outside windows or pavement of the Building or the Land without the prior written consent of Landlord. Tenant will conduct its business, and control its agents, employees, and invitees in such a manner as not to create any nuisance or interfere with, annoy or disturb other tenants or Landlord in the management of the Building.

14.    **Laws and Regulations**. Tenant at its sole expense will maintain the Premises in a clean, safe and healthful condition and will comply with all applicable laws, ordinances, orders, rules and regulations of any governmental authority having jurisdiction over the use, conditions or occupancy of the Premises. Landlord will maintain the Project (other than the Premises), including all building systems, in a clean, safe and healthful condition and will comply with all laws, ordinances, rules and regulations of any governmental authority having jurisdiction over the use, conditions or

occupancy of the Project. Landlord covenants and agrees that on the Commencement Date, the Premises will be in compliance with the Americans With Disabilities Act of 1990, as amended, and any OSHA requirements applicable to the finish-out of the Premises. Tenant shall not be required to perform any work, make any repairs, or comply with any legal requirements that require changes to the Premises unless the work, repairs or legally required changes relate to the interior, non-structural components of the Premises for which Tenant is required to maintain pursuant to Paragraph 10 above. Except with respect to any repairs or alterations for which Tenant is responsible pursuant to Paragraphs 10, 12 and 14 of this Lease, nothing contained herein shall require Tenant to perform any work, or to make any repairs or changes past the entry to the Premises, and Tenant shall not be required to make any changes to the Building or Common Areas or otherwise make permanent improvements to the Project or to make any repairs which are the responsibility of Landlord hereunder.

15.     **Mutual Indemnity.** Tenant shall indemnify Landlord and save it harmless from all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of any occurrence in, upon, at or from the Premises or the occupancy or use by Tenant of the Premises or any part thereof, or occasioned wholly or in part by any action or omission of Tenant, its agents, contractors, employees, or licensees. Tenant shall indemnify Landlord and save it harmless from, all suits, actions, damages, liability and expense in connection with the negligence or wrongful misconduct of Tenant, its agents, contractors, employees, or licensees. Landlord shall indemnify Tenant and save it harmless from all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of any occurrence in, upon, at or from the Project (other than the Premises). Landlord shall indemnify Tenant and save it harmless from, all suits, actions, damages, liability and expense in connection with the negligence or wrongful misconduct of Landlord, its agents, contractors, employees, or licensees.

16.     **Rules of the Building.** Tenant will comply fully, and will cause Tenant's agents, employees, and invitees to comply fully with all Rules and Regulations of the Building which are attached hereto as Exhibit "E" and made a part hereof as though fully set out herein. As more particularly provided therein, Landlord shall at all times have the right to change such Rules and Regulations or to amend them in such reasonable manner as Landlord may deem advisable for the safety, protection, care and cleanliness of the Building and appurtenances and for preservation of good order therein, all of which Rules and Regulations, changes and amendments will be forwarded to Tenant in writing and shall be complied with and observed by Tenant and Tenant's agents, employees and invitees. Landlord will reasonably endeavor to apply the Rules and Regulations without discrimination to all tenants.

17.     **Entry for Repairs and Inspection.** Landlord and its agents and representatives shall have the right to enter into and upon any and all parts of the Premises at all reasonable hours upon reasonable notice (or, in an emergency, at any hour) to inspect same or clean or make repairs or alterations or additions to the Building and the Premises (whether structural or otherwise) as Landlord may deem necessary, and during the continuance of any such work, Landlord may temporarily close doors, entryways, public spaces and corridors and interrupt or temporarily suspend Building services and facilities, and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof. During the Lease Term, Landlord may exhibit the Premises to prospective purchasers and lenders at reasonable hours and upon twenty-four (24) hours prior notice to Tenant. Furthermore, during the nine (9) month period prior to the expiration date of this Lease, Landlord and Landlord's agents may exhibit the Premises to prospective tenants during Normal Business Hours and upon prior notice to Tenant.

18.     **Condemnation.** If all of the Premises or Tenant's access to the Premises, or so much thereof as would materially interfere with Tenant's use of or access to the remainder, shall be taken or condemned for any public use or purpose by right of eminent domain, with or without litigation, or be transferred by agreement in connection with or in lieu of or under threat of condemnation, then the Lease Term and the leasehold estate created hereby shall terminate as of the date title shall vest in the condemnor or transferee. If all or any portion of the Building is taken or condemned or transferred as aforesaid, Landlord or Tenant shall have the option to terminate this Lease effective as of the date title shall vest in the condemnor or transferee. Landlord shall receive the entire award from any taking or condemnation (or the entire compensation paid because of any transfer by agreement), and Tenant shall have no claim thereto, except that Tenant may make a separate claim for the loss of any personal property owned by Tenant, relocation expenses and the unamortized cost of any improvements made by or on behalf of Tenant to the Premises.

19.     **Intentionally deleted.**

20.     **Abandoned Property.** After three (3) days written notice, all personal property of Tenant remaining in the Premises after the termination or expiration of the Lease Term or after the abandonment of the Premises by Tenant may be treated by Landlord as having been abandoned by Tenant and Landlord may, at its option and election, thereafter take possession of such property and either (i) declare same to be the property of Landlord, or (ii) at the cost and expense of Tenant, store and/or dispose of such property in any manner and for whatever consideration, Landlord, in its reasonable discretion, shall deem advisable. Tenant shall be presumed conclusively to have abandoned the Premises if the amount of Tenant's property removed by Tenant from the Premises is substantial enough to indicate a probable intent to abandon the Premises and such removal is not in the normal course of Tenant's business, or if Tenant removes any material amount of Tenant's personal property from the Premises, at a time when Tenant is in default in the payment of rental due hereunder or in the performance of any other obligation of Tenant hereunder and such removal is not in the normal course of Tenant's business. Nothing contained in this Paragraph shall prejudice or impair Landlord's rights as a lienholder and secured party under Paragraph 19 hereof, and the rights granted to Landlord under this Paragraph shall be cumulative of its rights as a lienholder and secured party.

21.     **Holding Over.** Should Tenant continue to hold the Premises after this Lease terminates, whether by lapse of time or otherwise, such holding over shall, unless otherwise agreed by Landlord in writing, constitute and be construed as a tenancy at will at a daily rental equal to one-thirtieth (1/30) of an amount equal to 150% of the amount of

the monthly rental payable during the last month prior to the termination of this Lease, and upon and subject to all of the other terms and provisions set forth herein except any right to renew this Lease, expand the Premises or lease additional space. This provision shall not be construed, however, as permission by Landlord for Tenant to holdover. No payments of money by Tenant to Landlord after the termination of this Lease shall reinstate, continue, or extend the Lease Term and no extension of this Lease after the termination hereof shall be valid unless and until the same shall be reduced to writing and signed by both Landlord and Tenant. Tenant shall be liable to Landlord for all damage which Landlord shall suffer by reason of any holding over by Tenant, and Tenant shall indemnify Landlord against all claims made by any other tenant or prospective tenant against Landlord resulting from delay by Landlord in delivering possession of the Premises (or any portion thereof) to such other tenant or prospective tenant.

22.    **Fire and Casualty.**

(a)    If the Premises are damaged by fire or other casualty and if such damage is not susceptible of repair within one hundred fifty (150) days (as estimated, as soon as reasonably practicable after the occurrence of such damage, by an architect of recognized good reputation selected by Landlord), then in such event this Lease, at the option of Landlord, exercised by giving written notice thereof to Tenant within thirty (30) days after receipt of such written estimate of the architect so selected, shall terminate as of the date of such loss, and Tenant shall pay the rent hereunder apportioned to the time of such loss and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

(b)    If the damage described above is susceptible of repair within one hundred fifty (150) days, or if the damage is not susceptible of repair within one hundred fifty (150) days but Landlord fails to exercise its option to terminate this Lease, and so long as Landlord does not elect to terminate the Lease pursuant to Subparagraph (c) below, Landlord shall enter and make the necessary repairs without affecting this Lease, but the rent hereunder shall be reduced or abated as shall be equitable, in the good faith judgment of Landlord, until such repairs are made, unless such damage has been so slight that Tenant's occupancy of the Premises is not materially interfered with, in which case the rent hereunder shall not be abated or reduced. Notwithstanding the foregoing, Landlord shall have the option to terminate this Lease and shall not be obligated to repair the Premises or the Building if the damage is not covered by insurance or if Landlord's mortgagee applies any portion of the insurance proceeds to the unpaid balance of its loan.

(c)    In the event the Building is so badly damaged or injured by fire or other casualty, even though the Premises may not be affected, that Landlord decides, within ninety (90) days after such destruction, not to rebuild or repair the Building (such decision being vested exclusively in the discretion of Landlord), then in such event Landlord shall so notify Tenant in writing and this Lease shall terminate as of the date specified for termination in the notice from Landlord to Tenant, and the Tenant shall pay rent hereunder apportioned to the date of such termination (unless rent is abated pursuant to subparagraph (b) above) and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

23.    **Entire Agreement and Amendment; No Implied Representations or Warranties; No Memorandum of Lease.** This Lease contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements, understandings, promises, and representations made by either party to the other concerning the subject matter hereof and the terms applicable hereto. It is expressly agreed by Tenant, as a material consideration to Landlord for the execution of this Lease, that there have been no representations, understandings, stipulations, agreements or promises pertaining to the Premises, the Building or this Lease not incorporated in writing herein. This Lease shall not be altered, waived, amended or extended, except by a written agreement signed by the parties hereto, unless otherwise expressly provided herein. LANDLORD'S DUTIES AND WARRANTIES ARE LIMITED TO THOSE SET FORTH IN THIS LEASE, AND SHALL NOT INCLUDE ANY IMPLIED DUTIES OR WARRANTIES, ALL OF WHICH ARE HEREBY DISCLAIMED BY LANDLORD AND WAIVED BY TENANT. LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSE, AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED. Neither this Lease nor a memorandum of this Lease shall be recorded in the public records of the county in which the Building is located without the prior written consent of Landlord.

24.    **Transfer of Landlord's Rights.** In the event Landlord transfers its interest in the Building, Landlord shall thereby automatically be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations, provided such transferee assumes all of Landlord's obligations hereunder arising from and after the date of transfer.

25.    **Default.**

(a)    The following events shall be deemed to be events of default (herein so called) by Tenant under this Lease:

(i)    Tenant shall fail to pay any rental or other sum payable by Tenant hereunder as and when such rental or other sum becomes due and payable; provided, however, that Tenant shall be entitled to receive, two (2) times each calendar year, a written notice of such failure from Landlord and a five (5) day period thereafter to cure such payment default;

(ii)    Tenant shall fail to comply with any other provision, condition or covenant of this Lease and any such failure is not cured within fifteen (15) days after Landlord gives written notice of such failure to Tenant; provided, however, in the event any such failure is not susceptible to being cured within such fifteen (15) day period and provided that Tenant has commenced to cure any such failure within such fifteen (15) day period, then such fifteen (15) day period shall be reasonably extended, not to exceed sixty (60) days, provided Tenant is diligently pursuing such cure;

(iii)    Intentionally deleted;

(iv)    Tenant shall assign this Lease or sublet all or any part of the Premises or grant any license, concession or other right of occupancy of any portion of the Premises, without the prior written consent of Landlord;

(v)    Any petition shall be filed by or against Tenant or any guarantor of Tenant's obligations under this Lease pursuant to any section or chapter of the present federal Bankruptcy Act or under any future federal Bankruptcy Act or under any similar law or statute of the United States or any state thereof (which as to any involuntary petition shall not be and remain discharged or stayed within a period of thirty (30) days after its entry), or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed under any section or chapter of the present federal Bankruptcy Act or under any future federal bankruptcy act or under any similar law or statute of the United States or any state thereof;

(vi)    Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent or make a transfer in fraud of creditors;

(vii)    Tenant or any guarantor of this Lease shall make an assignment for the benefit of creditors; or

(viii)    A receiver or trustee shall be appointed for Tenant or any guarantor of this Lease or for any of the assets of Tenant or any guarantor of this Lease.

(b)    Upon the occurrence of any event of default, Landlord shall have the option to do any one or more of the following without any further notice or demand, in addition to and not in limitation of any other remedy permitted by law or by this Lease:

(i)    Enforce, by all legal suits and other means, its rights hereunder, including the collection of Base Rental, Tenant's Additional Rental and other sums payable by Tenant hereunder and the reimbursement for all unamortized tenant allowances and concessions, without reentering or resuming possession of the Premises and without terminating this Lease.

(ii)    Terminate this Lease by issuing written notice of termination to Tenant, in which event Tenant shall immediately surrender the Premises to Landlord, but if Tenant shall fail to do so, Landlord may without notice and without prejudice to any other remedy Landlord may have, enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor, and upon any such termination, Tenant agrees that in addition to its liability for the payment of arrearages of Base Rental, Tenant's Additional Rental and other sums due and owing by Tenant to Landlord under this Lease upon such termination, Tenant shall be liable to Landlord for damages. Tenant shall pay to Landlord as damages on the same days as Base Rental, Tenant's Additional Rental and other payments which are expressed to be due under the provisions of this Lease, the total amount of such Base Rental, Tenant's Additional Rental and other payments plus a reimbursement for all unamortized tenant allowances and concessions, less such part, if any, of such payments that Landlord shall have been able to collect from a new tenant upon reletting; provided, however, that Landlord shall have no obligation to relet the Premises so as to mitigate the amount for which Tenant is liable. Landlord shall have the right at any time to demand final settlement. Upon demand for a final settlement, Landlord shall have the right to receive, and Tenant hereby agrees to pay, as damages for Tenant's breach, the difference between the total rental provided for in this Lease for the remainder of the Lease Term and the reasonable rental value of the Premises for such period, such difference to be discounted to present value at a rate equal to the rate of interest allowed by law (at the time the demand for final settlement is made) when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of 6% per annum).

(iii)    Enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and its effects therefrom without being liable to prosecution or any claim for damages therefor, and Landlord may relet the Premises for the account of Tenant. Tenant shall pay to Landlord all arrearages of Base Rental, Tenant's Additional Rental and other sums due and owing by Tenant to Landlord, and Tenant shall also pay to Landlord during each month of the unexpired Lease Term the installments of Base Rental, Tenant's Additional Rental and other sums due hereunder, less such part, if any, that Landlord shall have been able to collect from a new tenant upon reletting; provided, however, that Landlord shall have no obligation to relet the Premises so as to mitigate the amount for which Tenant is liable. In the event Landlord exercises the rights and remedies afforded to it under this Paragraph 25(b)(iii) and then subsequently elects to terminate this Lease, Tenant shall

be liable to Landlord for damages as set forth in Paragraph 25(b)(ii) above and Landlord shall have the right at any time to demand final settlement as provided therein.

(iv)    Landlord may do whatever Tenant is obligated to do by the provisions of this Lease and may enter the Premises in order to accomplish this purpose; provided, however, that except in the event of an emergency, Landlord must provide Tenant with ten (10) days prior written notice before exercising its right of self help. Tenant agrees to reimburse Landlord immediately upon demand for any expenses which Landlord may incur in its actions pursuant to this Subparagraph, and Tenant further agrees that Landlord shall not be liable for damages resulting to Tenant from such action, whether caused by the negligence of Landlord or otherwise.

(v)    Landlord may enter upon the Premises and change, alter, or modify the door locks on all entry doors of the Premises, and permanently or temporarily exclude Tenant, and its agents, employees, representatives and invitees, from the Premises. In the event that Landlord either permanently excludes Tenant from the Premises or terminates this Lease on account of Tenant's default, Landlord shall not be obligated thereafter to provide Tenant with a key to the Premises at any time, regardless of any amounts subsequently paid by Tenant. If Landlord elects to exclude Tenant from the Premises temporarily without permanently repossessing the Premises or terminating this Lease, then Landlord shall not be obligated to provide Tenant with a key to reenter the Premises until such time as all delinquent rent and other amounts due under this Lease have been paid in full and all other defaults, if any, have been cured and Tenant shall have given Landlord evidence reasonably satisfactory to Landlord that Tenant has the ability to comply with its remaining obligations under this Lease; and if Landlord temporarily excludes Tenant from the Premises, Landlord shall have the right thereafter to permanently exclude Tenant from the Premises or terminate this Lease at any time before Tenant pays all delinquent rent, cures all other defaults and furnishes such evidence to Landlord. A key to the Premises will be furnished to Tenant only during Landlord's Normal Business Hours. Landlord's exclusion of Tenant from the Premises shall not constitute a permanent exclusion of Tenant from the Premises or a termination of this Lease unless Landlord so notifies Tenant in writing. Landlord shall not be obligated to place a written notice on the Premises on the front door thereof explaining Landlord's action or stating the name, address or telephone number of any individual or company from which a new key may be obtained. In the event Landlord permanently or temporarily excludes Tenant from the Premises or terminates this Lease, and Tenant owns property that has been left in the Premises but which is not subject to any statutory or contractual lien or security interest held by Landlord as security for Tenant's obligations, Tenant shall have the right to promptly so notify Landlord in writing, specifying the items of property not covered by any such lien or security interest and which Tenant desires to retrieve from the Premises. Landlord shall have the right to either (i) escort Tenant to the Premises to allow Tenant to retrieve Tenant's property not covered by any such lien or security interest, or (ii) remove such property itself and make it available to Tenant at a time and place designated by Landlord. In the event Landlord elects to remove such property itself as provided in the immediately preceding clause (ii), Landlord shall not be obligated to remove such property or deliver it to Tenant unless Tenant shall pay to Landlord, in advance, an amount of cash equal to the amount that Landlord estimates Landlord will be required to expend in order to remove such property and make it available to Tenant, including all moving or storage charges theretofore or thereafter incurred by Landlord with respect to such property. If Tenant pays such estimated amount to Landlord and the actual amount incurred by Landlord differs from the estimated amount, Tenant shall pay any additional amounts to Landlord on demand or Landlord shall refund any excess amounts paid by Tenant to Tenant on demand.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or equity. Any entry by Landlord upon the Premises may be by use of a master or duplicate key or electronic pass card or any locksmith's entry procedure or other means. Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect. Any reletting shall be for such term or terms (which may be greater or less than the period which, in the absence of a termination of this Lease, would otherwise constitute the balance of the Lease Term) and on such terms and conditions (which may include free rent, rental concessions or tenant inducements of any nature) as Landlord in its absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting. In the event of any reletting, Tenant shall pay to Landlord on demand the cost of renovating, repairing and altering the Premises for a new tenant or tenants, and the cost of advertisements, brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting. In the event any rentals actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of rental payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord and Tenant shall have no right with respect thereto. In the event it is necessary for Landlord to institute suit against Tenant in order to collect the rental due hereunder or any deficiency between the rental provided for by this Lease for a calendar month and the rental actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rental deficiencies at one time. No suit shall prejudice in any way the right of Landlord to bring a similar action for any subsequent rental deficiency or deficiencies.

(c)    Except to the extent that Landlord has a duty under applicable law to mitigate the damages suffered by Landlord for which Tenant is liable and a waiver of such duty by Tenant is not enforceable by Landlord under applicable law, Tenant hereby waives any duty that Landlord might otherwise have under applicable law to mitigate the damages for which Tenant is liable, and agrees that Landlord shall have no

obligation to relet the Premises so as to mitigate the amount of damages for which Tenant is liable hereunder. Landlord agrees, however, that in any instance in which Landlord has a duty to mitigate damages and the foregoing waiver by Tenant of Landlord's duty to mitigate is not enforceable under applicable law, Landlord shall attempt to mitigate damages by making a reasonable effort to relet the Premises after the Premises have been vacated by Tenant; but Tenant acknowledges and agrees that in attempting to relet the Premises, Landlord shall not be obligated to (i) solicit or entertain negotiations with any other prospective tenants for the Premises until Landlord obtains full and complete possession of the Premises free of any claim by Tenant that it continues to have a right of occupancy of the Premises, (ii) offer the Premises to a prospective tenant when other premises in the Building suitable for that prospective tenant's use are (or soon will be) available for lease to the prospective tenant, (iii) lease the Premises to a prospective tenant for a rental less than the current fair market rental then prevailing for comparable space and similar office uses in comparable buildings in the same market area as the Building, (iv) enter into a new lease upon terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Building, (v) enter into a lease with any prospective tenant whose use would violate any restriction, covenant or requirement contained in the lease of another tenant of the Building, adversely affect the reputation of the Building, or be incompatible with the operation of the Building as a first class building, (vi) enter into a lease with any prospective tenant which does not have, in Landlord's reasonable opinion, sufficient financial resources or operating experience to operate the Premises in a first class manner, (vii) enter into a lease with any prospective tenant that is not suitable under the circumstances, (viii) travel outside a radius of 30 miles from the Building in order to meet with a prospective tenant, (ix) accept a prospective tenant for the Premises or any portion thereof which is an existing or prospective tenant elsewhere in the Building, (x) expend monies for the installation of additional leasehold improvements to the Premises requested by a prospective tenant unless Landlord reasonably approves both the lease terms and credit of the prospective tenant, or (xi) give priority to the Premises over other premises owned or managed by Landlord or its affiliates.

26.    **Waiver; Attorney's Fees.**  No act or thing done by Landlord or its agents during the Lease Term shall be deemed an acceptance of an attempted surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord. No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a written notice of such intention, signed by Landlord, is given by Landlord to Tenant. Notwithstanding any such reletting or reentry or taking possession, Landlord may at any time thereafter elect to terminate this Lease for a previous event of default. Landlord's acceptance of rent following an event of default hereunder shall not be construed as Landlord's waiver of such event of default. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default. The failure of Landlord to enforce any of the Rules and Regulations described in Paragraph 16 against Tenant or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and is signed by Landlord. The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies. If either party (the "**Enforcing Party**") brings any action under this Lease, or places this Lease or any amount payable by the other party (the "**Defaulting Party**") hereunder with an attorney for the enforcement of any of the Enforcing Party's rights hereunder, then the Defaulting Party agrees to pay to the Enforcing Party on demand the reasonable attorney's fees and other costs and expenses incurred by the Enforcing Party in connection therewith, unless the Defaulting Party, in good faith, disputes whether the Defaulting Party is in default under this Lease. In any arbitration or litigation between the parties with respect to this Lease, the non-prevailing party shall pay the prevailing party's reasonable attorneys' fees and expenses.

27.    **Quiet Possession.**  Landlord hereby covenants that Tenant, upon paying rent as herein reserved, and performing all covenants and agreements herein contained on the part of Tenant, shall and may peacefully and quietly have, hold and enjoy the Premises without any disturbance from Landlord or from any other person claiming by, through or under Landlord, subject to the terms, provisions, covenants, agreements and conditions of this Lease, specifically including, but without limitation, the matters described in Paragraph 34 hereof.

28.    **Severability.**  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the Lease Term, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

29.    **Intentionally Deleted.**

30.    **No Subrogation; Insurance.**

(a)    Tenant hereby waives any cause of action it might have against Landlord on account of any loss or damage that is insured against under any insurance policy that covers the Premises, Tenant's fixtures, personal property, leasehold improvements or business and which names Tenant as a party insured. Landlord hereby waives any cause of action it might have against Tenant because of any loss or damage that is insured against under any insurance policy that covers the Premises, the Building, the Project or any property of Landlord used in connection with the Building or the Project and which names Landlord as a party insured, provided that if the cost of restoring the loss or damage exceeds the amount of property damage insurance proceeds paid to Landlord on account of the loss or damage, Tenant shall remain liable to Landlord for the amount of such excess. This provision is cumulative of Paragraph 15.

(b)    Tenant shall procure and maintain throughout the Lease Term from an insurance company reasonably acceptable to Landlord a policy or policies of insurance, at its sole cost and expense, insuring Tenant and Landlord against any and all liability for injury to or death of a person or persons, occasioned by or arising out of or in connection with the use or occupancy of the Premises, the limits of such policy or policies to be in an amount not less than $1,000,000.00 with respect to injuries to or death of any one person and in an amount of not less than $1,000,000.00 with respect to any one accident or disaster, and shall furnish evidence satisfactory to Landlord of the maintenance of such insurance. This insurance coverage shall include blanket contractual liability and broad form property damage liability and shall contain an exception to any pollution exclusion which insures damage or injury arising out of heat, smoke or fumes from a hostile fire. Tenant may self-insure the fire and casualty insurance required hereby, provided it provides evidence, satisfactory to Landlord, that Tenant has a net worth in excess of $50,000,000.00 as determined by GAAP, consistently applied. Landlord's agent, Landlord's mortgagee, and any other parties which Landlord shall deem necessary shall be named as an additional insured therein as their respective interests may appear. This insurance shall be written on an occurrence basis and shall be primary and noncontributory to any other insurance carried by Landlord. Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least thirty (30) days prior to cancellation, expiration or material alteration of such insurance. It is recommended that Tenant carry fire and extended coverage insurance on its personal property, as Landlord shall in no event be required to rebuild, repair or replace any part of the furniture, equipment, personal property, fixtures and other improvements which may have been placed by Tenant on or within the Premises, and Tenant hereby waives any cause of action it might have against Landlord on account of the loss of any such property.

(c)    Landlord shall obtain and maintain during the Lease Term all risk property insurance for the Project on a full replacement cost basis, with no co-insurance requirement; commercial general liability insurance and such other insurance of such types and in such amounts as are commercially reasonable. However, Landlord may self-insure any coverages other than the all risk property insurance for the Project. Landlord may provide any such coverages by means of a blanket policy. Landlord shall deliver to Tenant upon request a certificate evidencing the coverages carried by Landlord.

31.    **Binding Effect**. The provisions of this Lease shall be binding upon and inure to the benefit of Landlord and Tenant, respectively, and to their respective heirs, personal representatives, successors and assigns, subject to the provisions of Paragraphs 11, 24 and 41 hereof.

32.    **Notices**. Any notice required or permitted to be given hereunder by one party to the other shall be deemed to be given when deposited in the United States mail, certified or registered, return receipt requested, with sufficient postage prepaid, or hand delivered, or couried for one business day delivery by a nationally recognized overnite courier service, addressed to the respective party to whom notice is intended to be given at the address of such party set forth on the Basic Lease Information. Either party hereto may at any time by giving written notice to the other party in the aforesaid manner designate any other address, which, in regard to notices to be given to Tenant, must be within the continental United States, in substitution of the foregoing address to which any such notice shall be given. Any notice from Tenant to Landlord regarding a material default by Landlord hereunder shall also be sent concurrently to Landlord's lender.

33.    **Brokerage**. Tenant warrants that it has not had any dealings with any broker or agent in connection with the negotiation or execution of this Lease other than Grubb & Ellis Company and USI Real Estate Brokerage Services, Inc., and Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any and all cost, expense or liability for commissions or other compensation or charges claimed by any broker or agent with respect to this Lease. In accordance with applicable law, attached to this Lease as Exhibit "G" and incorporated herein for all purposes is Landlord's Registration and Commission Agreement with Grubb & Ellis Company. Landlord and Tenant acknowledge and agree that Landlord shall have no liability or responsibility to pay any commission, finder's fee or other compensation to USI Real Estate Brokerage Services, Inc., with respect to this Lease, and Tenant shall indemnify Landlord and hold Landlord harmless from and against any such amounts.

34.    **Subordination**. This Lease and all rights of Tenant hereunder are subject and subordinate to any deed of trust, mortgage or other instrument of security which does now or may hereafter cover the Building and the Land or any interest of Landlord therein, and to any and all advances made on the security thereof, and to any and all increases, renewals, modifications, consolidations, replacements and extensions of any of such deed of trust, mortgage or instrument of security; provided, however, that the rights of Tenant shall remain in full force and effect during the Lease Term so long as Tenant shall continue to recognize and perform all covenants and conditions of this Lease. This provision is hereby declared by Landlord and Tenant to be self-operative and no further instrument shall be required to effect such subordination of this Lease. Tenant shall, however, upon demand at any time or times execute, acknowledge and deliver to Landlord any and all instruments and certificates that, in the judgment of Landlord, may be necessary or

proper to confirm or evidence such subordination. However, notwithstanding the generality of the foregoing provisions of this Paragraph 34, Tenant agrees that any such mortgagee shall have the right at any time to subordinate any such deed of trust, mortgage or other instrument of security to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Tenant further covenants and agrees upon demand by Landlord's mortgagee at any time, before or after the institution of any proceedings for the foreclosure of any such deed of trust, mortgage or other instrument of security, or sale of the Building pursuant to any such deed of trust, mortgage or other instrument of security or voluntary sale, to attorn to the purchaser upon any such sale and to recognize and attorn to such purchaser as Landlord under this Lease. The agreement of Tenant to attorn upon demand of Landlord's mortgagee contained in the immediately preceding sentence shall survive any such foreclosure sale or trustee's sale. Tenant hereby agrees to execute, acknowledge and deliver to Landlord's mortgagee any and all instruments and certificates that Landlord's mortgagee may request in order to confirm or evidence such attornment. In addition, Tenant acknowledges that following any foreclosure by Landlord's lender, such lender shall not be: (1) liable for any previous act or omission of the Landlord under such Lease; (2) subject to any credit, demand, claim, counterclaim, offset or defense which theretofore accrued to such tenant against Landlord, (3) bound by any covenant or obligation of Landlord to perform, undertake or complete any work in the Premises or to prepare it for occupancy; (4) required to account for any security deposit of Tenant other than any security deposit actually delivered to such lender by Landlord; (5) bound by any obligation to make any payment to Tenant or grant any credits, except for services, repairs, maintenance and restoration provided for under this Lease to be performed by Landlord after the date of such attornment; and (6) responsible for any monies owing by Landlord to Tenant unless such monies are actually delivered to any such lender.

35.    **Joint and Several Liability.** If there is more than one Tenant, the obligations hereunder imposed upon Tenant shall be joint and several. If there is a guarantor(s) of Tenant's obligations hereunder, the obligations of Tenant shall be joint and several obligations of Tenant and each such guarantor, and Landlord need not first proceed against Tenant hereunder before proceeding against each such guarantor, nor shall any such guarantor be released from its guarantee for any reason whatsoever, including, without limitation, any amendment of this Lease, any forbearance by Landlord or waiver of any of Landlord's rights, the failure to give Tenant or any such guarantor any notices, or the release of any party liable for the payment or performance of any of Tenant's obligations hereunder.

36.    **Building Name and Address.** Landlord reserves the right at any time to change the name by which the Building is designated and its address, and Landlord shall have no obligation or liability whatsoever for costs or expenses incurred by Tenant as a result of such name change or address change of the Building.

37.    **Estoppel Certificates; Financial Statements.**

(a)    Tenant agrees to furnish from time to time, within fifteen (15) days following the request by Landlord or any successor to Landlord or by the holder of any deed of trust or mortgage covering the Land and Building or any interest of Landlord therein, an estoppel certificate signed by Tenant to the effect that this Lease is then presently in full force and effect and specifying any modifications; that the Lease Term has commenced and the full rental is then accruing hereunder; that Tenant has accepted possession of the Premises and that any improvements required by the terms of this Lease to be made by Landlord have been completed to the satisfaction of Tenant; that no rent under this Lease has been paid more than thirty (30) days in advance of its due date; that the address for notices to be sent to Tenant is as set forth in this Lease; that Tenant, as of the date of such certificate, has no charge, lien or claim of offset under this Lease or otherwise against rents or other charges due or to become due hereunder; and that to the knowledge of Tenant, Landlord is not then in default under this Lease. To the extent that Tenant believes any of the foregoing to be inaccurate, Tenant shall specifically enumerate in the certificate the alleged inaccuracy and Tenant's basis for refusing to certify to such facts. At Landlord's option, any such certificate may also contain an acknowledgment by Tenant of receipt of notice of the assignment of this Lease to such holder and the agreement by Tenant with such holder that from and after the date of such certificate, Tenant will not pay any rent under this Lease more than thirty (30) days in advance of its due date, and will not seek to terminate this Lease by reason of any act or omission of Landlord until Tenant shall have given written notice of such act or omission to the holder of such deed of trust or mortgage (at such holder's last address furnished to Tenant) and until a reasonable period of time shall have elapsed following the giving of such notice, during which period such holder shall have the right, but shall not be obligated, to remedy such act or omission; provided, however, that (i) the agreement of Tenant described in this sentence will be of no effect under such certificate unless Tenant is furnished by such holder with a copy of any assignment to such holder of Landlord's interest in this Lease within ninety (90) days after the date of such certificate, and (ii) the agreement of Tenant with such holder that is embodied in such certificate shall terminate upon the subsequent termination of any such assignment.

(b)    Tenant shall also furnish to Landlord within fifteen (15) days following a written request by Landlord, but no more often than one time per calendar year, a statement of the financial condition of Tenant prepared by an independent certified public accountant in a form reasonably satisfactory to Landlord.

38.    **Mechanic's Liens.** Nothing contained in this Lease shall authorize Tenant to do any act which shall in any way encumber the title of Landlord in and to the Premises or the Building or any part thereof; and if any mechanic's or materialman's lien is filed or claimed against the Premises or Building or any part thereof in connection with any work performed, materials furnished or obligation incurred by or at the request of Tenant, Tenant will promptly pay same or cause it to be released of record. If the lien is not released of record within, or default in payment thereof shall continue for, twenty (20) days after written notice thereof from Landlord to Tenant, without limiting or otherwise affecting any of Landlord's other rights or remedies and without waiving any event of default by Tenant, Landlord shall have the right and privilege at Landlord's option of paying the same or any portion thereof without inquiry as to the validity thereof, and any amounts so paid, including expenses and interest, shall be so much additional rent hereunder from Tenant to Landlord and shall be repaid to Landlord immediately on demand therefor.

DALLAS4 577816v7 32970-00288                14

39.    **Taxes and Tenant's Property; Waiver**. Tenant shall be liable for all taxes levied or assessed against personal property, furniture or fixtures placed by Tenant in the Premises. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, and Landlord elects to pay the taxes based on such increase, Tenant shall pay Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder. Tenant hereby waives any rights of Tenant to contest reappraisals of the Project (but not ad valorem taxes on Tenant's personal property in the Premises) under Sections 41.413 and 42.015 of the Texas Tax Code (as amended).

40.    **Constructive Eviction**. Tenant shall not be entitled to claim a constructive eviction from the Premises unless Tenant shall have first notified Landlord in writing of the condition or conditions giving rise thereto, and, if the complaints be justified, unless Landlord shall have failed to remedy such conditions within a reasonable time after receipt of said notice.

41.    **Landlord's Liability**. The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Building and the Land, and Landlord shall not be personally liable for any deficiency. This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder which do not involve the personal liability of Landlord. Notwithstanding anything to the contrary contained in this Lease, in the event Landlord sells, assigns, transfers or conveys its interest in the Building and the Land, Landlord shall have no liability for any acts or omissions that occur after the date of said sale, assignment, transfer or conveyance.

42.    **Execution by Landlord**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights with respect hereto unless and until Landlord shall, or shall cause its managing agent to, execute a copy of this Lease already executed and delivered by Tenant to Landlord, and deliver the same to Tenant.

43.    **No Waiver**. No waiver by Landlord of any of its rights or remedies hereunder, or otherwise, shall be considered a waiver of any other or subsequent right or remedy of Landlord; no delay or omission in the exercise or enforcement by Landlord of any rights or remedies shall ever by construed as a waiver of any right or remedy of Landlord; and no exercise or enforcement of any such rights or remedies shall ever be held to exhaust any right or remedy of Landlord.

44.    **No Third Party Beneficiary**. This Lease is for the sole benefit of Landlord, its successors and assigns, and Tenant, its permitted successors and assigns, and it is not for the benefit of any third party.

45.    **Number and Gender**. Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

46.    **Force Majeure**. Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant, Landlord and Tenant shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any delays due to strikes, riots, acts of God, shortages and/or unavailability of labor or materials, war, governmental laws, regulations or restrictions, or any other cause of any kind whatsoever which are beyond the reasonable control of Landlord or Tenant.

47.    **Telecommunications; Telecommunications Allowance**.

(a)    Tenant and its telecommunications companies, including but not limited to local exchange telecommunications companies and alternative access vendor services companies shall have no right of access to and within the Building, for the installation and operation of telecommunications systems including but not limited to voice, video, data, and any other telecommunications services provided over wire, fiber optic, microwave, wireless, and any other transmission systems, for part or all of Tenant's telecommunications within the Building and from the Building to any other location without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed. Tenant expressly understands and agrees that Landlord reserves the right to grant or deny access (to the Building or any portion thereof, including, without limitation, the Premises) to any telecommunications service provider whatsoever, and that Tenant shall have no right to demand or attempt to require Landlord to grant any access to any such telecommunications service provider. Moreover, Tenant acknowledges and agrees that, in the event any such telecommunications service provider desires access to the Building to serve any or all tenants thereof, such access shall be prescribed and governed by the terms and provisions of Landlord's standard Telecommunications License Agreement, which must be executed and delivered to Landlord by such telecommunications service provider before it is allowed any access whatsoever to the Building.

(b)    Landlord hereby agrees to provide Tenant an allowance of up to $50,000 (the "Telecommunications Allowance") to apply against the actual costs incurred by Tenant with third parties in connection with the installation of fiber optic and other telecommunications wiring to the Building and the Premises during the initial construction of the finish-out work contemplated by Exhibit "D". Provided Tenant is not in default hereunder (beyond any applicable notice and cure periods), Landlord shall pay to Tenant an amount up to the Telecommunications Allowance upon receipt by Landlord of paid receipts or other reasonably satisfactory evidence of the actual costs incurred by Tenant in connection with the installation of fiber optic and other telecommunications wiring. The installation of fiber optic and other telecommunications wiring by

Tenant shall be subject to the prior written approval of Landlord to plans, specifications, location and use of existing conduit, which approval may not be unreasonably withheld. Any unused portion of the Telecommunications Allowance may be applied to the Agreed Cost in the same manner as the Allowance, as those terms are defined in Exhibit "D".

48.     **Landlord's Fees.** Whenever Tenant requests Landlord to take any action or give any consent required or permitted under this Lease, Tenant will reimburse Landlord for Landlord's reasonable costs incurred in reviewing the proposed action or consent, including without limitation reasonable attorneys', engineers' or architects' fees, within ten days after Landlord's delivery to Tenant of a statement of such costs. Tenant will be obligated to make such reimbursement without regard to whether Landlord consents to any such proposed action.

49.     **APPLICABLE LAW; CONSENT TO JURISDICTION.** THIS LEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS IN THE STATE OF TEXAS. TENANT HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT WITH RESPECT TO THIS LEASE MAY BE MAINTAINED IN THE COURTS OF DALLAS COUNTY, TEXAS OR IN THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, AND TENANT HEREBY CONSENTS TO THE JURISDICTION AND VENUE OF SUCH COURTS.

50.     **WAIVER OF JURY TRIAL.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, LANDLORD AND TENANT EACH WAIVE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR WITH RESPECT TO THIS LEASE.

51.     **Confidentiality.** Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent. The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure.

52.     **Signage.** During the Lease Term, Tenant, at its sole cost and expense, shall be permitted to place its name on the multi-tenant signage for the Project designated by Landlord. Any such signage shall be subject to Landlord's prior written approval. The location of Tenant's signage on the multi-tenant signage for the Project shall be at Landlord's sole discretion and may be moved from time to time. Tenant shall have no right to place any signage on the outside of the Building.

53.     **Tenant's Termination Right.** Provided Tenant is not either (A) in monetary default hereunder (beyond any applicable notice and cure periods) or (B) in material non-monetary default hereunder (beyond any applicable cure periods), at the time of delivery of the Termination Notice (as defined below) or at the time of termination, Tenant shall have a one-time right to terminate this Lease (other than any terms and provisions hereof which expressly survive the expiration or earlier termination of this Lease) effective at the end of the sixty-fifth (65th) full calendar month of the Lease Term, on the following terms and conditions: (i) Tenant shall deliver its irrevocable written notice ("**Termination Notice**") to Landlord of Tenant's election to terminate this Lease pursuant to this Paragraph 53 at least six (6) calendar months prior to the end of the sixty-fifth (65th) full calendar month of the Lease Term, and (ii) with such Termination Notice, Tenant shall deliver to Landlord the following sums of money: (1) an amount equal to $326,756.00 representing the unamortized Allowance (as defined on Exhibit "D"), Telecommunications Allowance (as defined in Paragraph 47), costs for generator and HVAC slab installation pursuant to Paragraph 57, commissions and reasonable attorneys' fees and expenses incurred by Landlord in connection herewith (amortized at an interest rate of 9% per annum), and (2) an amount equal to the Base Rental and Tenant's Additional Rental for the previous six (6) months. Tenant acknowledges and agrees that from and after the delivery of the Termination Notice, Tenant shall continue to comply with all of the terms and provisions of this Lease, including the payment of the Base Rental and Tenant's Additional Rental. The phrase "material non-monetary default," as used in this Section, shall include, without limitation, any (a) default which adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which adversely affects other tenants of the Project, and (c) any default relating to violations of applicable laws.

54.     **Landlord's Authority.** Landlord represents that it is the fee owner of the Land, has full authority to enter into this Lease and all necessary partnership and limited liability company action has been taken in order for this Lease to be duly executed and delivered by Landlord.

55.     **Environmental.** Landlord hereby represents and warrants that to Landlord's current, actual knowledge, as of the Commencement Date of this Lease, there is no asbestos, ACM, petroleum distillates, radon gas or other hazardous substances located within the Premises requiring abatement pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et al. seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 at et. seq., the Texas Water Code, the Texas Solid Waste Disposal Act, or any other applicable state or local environmental laws and the regulations adopted under those acts ("**Existing Hazardous Substances**"). Landlord agrees to remediate any Existing Hazardous Substances to the extent required by applicable environmental laws. Landlord and Tenant hereby acknowledge and agree that Landlord has previously delivered to Tenant an Environmental Survey in connection with the Project. Landlord hereby represents and warrants that the Environmental Survey previously delivered to Tenant does not indicate that there are any hazardous substances located within the Project requiring abatement pursuant to applicable environmental laws, nor does Landlord have current actual knowledge of any hazardous materials located within the Project requiring abatement pursuant to applicable environmental laws. Landlord agrees to indemnify and hold Tenant harmless from any claim resulting from Landlord's breach of the representations and warranties set forth above in this Paragraph 55, or which may arise in connection with the existence of hazardous substances at the Project which require abatement or remediation pursuant

to applicable environmental laws and which are not introduced by Tenant, its employees, agents, contractors, licensees, subtenants or assignees.

56.    **Satellite**  Tenant shall have the right, at its sole cost and expense, to install a satellite or other antenna communications system on the roof of the Building for use in connection with the conduct of Tenant's business in the Premises, together with the right to have access thereto for service and repair, and the right to install communications cabling between such communications system in the Premises, subject to the following terms and conditions:

(a)    The location and specifications of the system and any cabling shall be subject to the prior reasonable approval of Landlord.

(b)    The construction and installation of the system and any cabling shall be performed in strict compliance with the terms and provisions of Paragraph 12 of this Lease.

(c)    The construction and installation of the system shall be performed in strict compliance with the terms and provisions of any applicable federal, state or local laws, codes or regulations.

(d)    Tenant shall, at its sole cost and expense, maintain the system in good condition and repair throughout the term of this Lease.

(e)    Tenant shall indemnify and hold Landlord harmless from and against any and all loss, cost, expense, damage, claims and liabilities (including attorney's fees) arising in connection with the installation used and maintenance of the satellite system.

57.    **Backup Generator**.  Tenant shall have the right, at its sole cost and expense, to locate certain backup generators and HVAC units, together with the right of access thereto for service and repair, subject to the following terms and conditions:

(a)    The location and specifications of the generators and HVAC units shall be subject to the prior reasonable approval of Landlord.

(b)    The generators and HVAC units shall be designed solely for the use of Tenant to provide backup electrical and HVAC service to the Premises.

(c)    The installation of the generators and HVAC units, as well as the construction of a screening wall around such generators and HVAC units, shall be performed by Landlord, at Tenant's sole cost and expense (subject to the Allowance), as part of the Work in accordance with Exhibit D attached hereto. The parties acknowledge and agree that the screening wall around the generators and HVAC units must be architecturally compatible with the balance of the project.

(d)    Landlord, at its sole cost and expense, shall be responsible for installing the slab upon which the generators and HVAC units will be located up to but not to exceed the cost of $15,000, and Tenant shall be responsible for any costs relating to the installation of such slab in excess of $15,000. Any sums payable by Tenant pursuant to the preceding sentence shall be paid to Landlord within fifteen (15) days following receipt by Tenant of written invoices evidencing such costs.

(e)    Tenant shall, at its sole cost and expense, maintain the generators and HVAC units in good condition and repair. Tenant agrees that any testing and/or preventative maintenance procedures with respect to the generators and the HVAC units will be performed after normal business hours and will be coordinated with Landlord.

·   (f)    Tenant shall indemnify and hold Landlord harmless from and against any and all loss, cost, expense, damage, claims and liabilities (including attorney's fees) arising in connection with the use and maintenance of the generators and HVAC units.

58.    **Time of Essence**.  Time is of the essence in the performance of all of the covenants and obligations of the parties under this Lease.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, this Lease Agreement is entered into by the parties hereto on the day and year first set forth above.

**LANDLORD:**

LEWISVILLE LSF, L.P.,
a Texas limited partnership

By:    Lewisville GenPar, LLC,
       general partner

       By:    _____
       Its:    Benjamin D. Velvin
                 Vice President

**TENANT:**

GMAC MORTGAGE CORPORATION,
a Pennsylvania corporation

By:    _____
Title:    Cathy Hoff
       Chief Operating Officer

## EXHIBIT A

### LEGAL DESCRIPTION OF THE LAND

Situated in the City of Lewisville, Denton County, Texas and being in the B. Hunter Survey, Abstract No. 554, P. Harmonson Survey, Abstract No. 604, B. Smith Survey, Abstract No. 1576 and the R. Thompson Survey, Abstract No. 1274 and being the remainder and resurvey of Texas Instruments Addition, Lot 1, Block A as recorded in Cabinet F. Page 374, of the Plat Records of Denton County, Texas, said tract being more particularly described by metes and bounds as follows:

Beginning at a ½ inch iron rod found for the interior corner of said Texas Instruments Addition, Lot 1, Block A, said point being the Northeast corner of a called 62.037 acre tract owned by Valley Parkway Association and recorded in Volume 1383, Page 818 of the Deed Records of Denton County, Texas;

THENCE North 89 Degrees 16 minutes 13 seconds West, a distance of 212.96 feet along the North line of said 62.037 acre tract and along the most Westerly South line of said Texas Instruments Addition to a ½ inch iron rod found for corner;

THENCE North 88 degrees 21 minutes 16 seconds West, a distance of 237.44 feet along the North line of said 62.037 acre tract and along the most Westerly South line of said Texas Instruments Addition to a ½ inch iron rod found for the most Northerly Southwest corner of said Texas Instruments Addition, said point also being in the East right-of-way line of Edmonds Lane (variable width right-of-way) and being in a curve to the right, having a radius of 237.50 feet, a delta angle of 09 degrees 02 minutes 27 seconds and an arc length of 37.48 feet;

THENCE with the East right-of-way line of said Edmonds Lane as follows:

THENCE in a Northerly direction with said curve to the right, having a chord that bears North 07 degrees 52 minutes 44 seconds East 37.44 feet, to a ½ inch iron rod found for corner at the beginning of a curve to the left, having a radius of 262.50 feet, a delta angle of 12 degrees 34 minutes 44 seconds and an arc length of 57.63 feet;

THENCE with said curve to the left, having a chord that bears North 06 degrees 06 minutes 35 seconds East 57.51 feet, to a ½ inch iron rod found for corner;

THENCE North 00 degrees 10 minutes 47 seconds West, a distance of 144.99 feet to a ½ inch iron rod found for corner;

THENCE North 45 degrees 10 minutes 47 seconds West, a distance of 16.97 feet to a ½ inch iron rod found for corner;

THENCE North 87 degrees 43 minutes 55 seconds West, a distance of 20.00 feet to a ½ inch iron rod found for corner;

THENCE South 27 degrees 47 minutes 25 seconds West, a distance of 179.50 feet to a ½ inch iron rod found for corner, said point being in a curve to the left, having a radius of 5794.58 feet, a delta angle of 02 degrees 03 minutes 39 seconds and an arc length of 208.42 feet;

THENCE with said curve to the left, having a chord that bears South 52 degrees 24 minutes 53 seconds West 208.41 feet to a ½ inch iron rod found for corner;

THENCE South 38 degrees 36 minutes 56 seconds East, a distance of 15.00 feet to a ½ inch iron rod found for corner, said point being in a curve to the left, having a radius of 5779.58 feet, a delta angle of 01 degree 00 minutes 20 seconds and an arc length 101.43 feet;

THENCE with said curve to the left, having a chord that bears South 50 degrees 52 minutes 54 seconds West 101.43 feet to a ½ inch iron rod found for corner;

THENCE South 58 degrees 19 minutes 36 seconds West, a distance of 102.10 feet to a ½ inch iron rod found for corner, said point being in a curve to the left, having a radius of 5794.58 feet, a delta angle of 02 degrees 35 minutes 08 seconds and an arc length of 261.49 feet;

THENCE with said curve to the left, having a chord that bears South 48 degrees 05 minutes 10 seconds West 261.47 feet to a ½ inch iron rod found for corner, said point being in the Northeast right-of-way line of the above-mentioned Edmonds Lane;

THENCE South 86 degrees 00 minutes 00 seconds West, a distance of 39.20 feet along the Northeast right-of-way line of said Edmonds Lane to an "X" found in concrete sidewalk for corner;

THENCE North 58 degrees 57 minutes 49 seconds West, a distance of 46.66 feet along the Northeast right-of-way line said Edmonds Lane to a ½ inch iron rod found for corner at the beginning of a curve to the right, having a radius of 1339.00 feet, a delta angle of 11 degrees 12 minutes 52 seconds and an arc length of 262.08 feet;

THENCE with said curve to the right, having a chord that bears North 53 degrees 19 minutes 20 seconds West 261.66 feet along the Northeast right-of-way line of said Edmonds Lane to a ½ inch iron rod found for corner, said point being in the East line of the above-mentioned 62.037 acre tract;

THENCE North 00 degrees 50 minutes 41 seconds East, a distance of 1066.11 feet along the most Southerly West line of said Texas Instruments Addition and the East line of said 62.037 acre tract to the POINT OF BEGINNING and containing 185.345 acres of land.

THENCE North 89 degrees 02 minutes 36 seconds East, a distance of 280.73 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE South 53 degrees 52 minutes 51 seconds East, a distance of 125.78 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE North 89 degrees 24 minutes 00 seconds East, a distance of 99.60 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner, said point being in the West right-of-way line of State Highway 121 (variable width right-of-way);

THENCE in a Southerly direction, with said West right-of-way line of said State Highway 121 as follows;

THENCE South 03 degrees 33 minutes 33 seconds East, a distance of 55.24 feet to a 5/8 inch iron rod found for corner;

THENCE South 03 degrees 08 minutes 09 seconds East, a distance of 201.39 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE South 04 degrees 41 minutes 17 seconds West, a distance of 529.08 feet to a ½ inch iron rod set for corner from which a STHD&PT concrete right-of-way monument found with brass disk, bears South 08 degrees 48 minutes 44 seconds West 11.45 feet and said iron rod also being the beginning of a curve to the right, having a radius of 521.93 feet, a delta angle of 43 degrees 45 minutes 54 seconds and an arc length of 398.67 feet;

THENCE with said curve to the right, having a chord that bears South 26 degrees 34 minutes 14 seconds West 389.05 feet to a ½ inch iron rod set for corner at the end of said curve from which a STHD&PT concrete right-of-way monument found with brass disk, bears North 45 degrees 11 minutes 01 seconds East 17.16 feet;

THENCE South 48 degrees 27 minutes 11 seconds West, a distance of 453.61 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE South 56 degrees 17 minutes 21 seconds West, a distance of 1071.81 feet to a ½ inch iron rod found for corner;

THENCE South 57 degrees 39 minutes 18 seconds West, a distance of 472.79 feet to a concrete STHD&PT right-of-way monument found for corner at the beginning of a curve to the left, having a radius of 5779.58 feet, a delta angle of 02 degrees 20 minutes 41 seconds and an arc length of 236.52 feet;

THENCE with said curve to the left, having a chord that bears South 56 degrees 44 minutes 42 seconds West 236.50 feet to a ½ inch iron rod found for corner;

THENCE North 60 degrees 22 minutes 49 seconds West, a distance of 92.00 feet to a ½ inch iron rod found for corner;

Dallas# 456667 v 7, 32970.00151

concrete right-of-way monument with brass disk found for corner;

THENCE North 87 degrees 36 minutes 16 seconds East, a distance of 20.76 feet to a new STHD&PT concrete right-of-way monument with aluminum disk found for corner;

THENCE North 85 degrees 20 minutes 11 seconds East, a distance of 280.22 feet to a ½ inch iron rod found for corner;

THENCE North 88 degrees 33 minutes 50 seconds East, a distance of 298.76 feet to a 2 inch iron rod found for corner;

THENCE South 58 degrees 43 minutes 42 seconds East, a distance of 82.42 feet to a ½ inch iron rod found for corner;

THENCE North 54 degrees 53 minutes 28 seconds East, a distance of 95.67 feet to a ½ inch iron rod found for corner, said point being in a curve to the right, having a radius of 1087.22 feet, a delta angle of 29 degrees 01 minutes 44 seconds and an arc length of 550.84 feet;

THENCE with said curve to the right, having a chord that bears South 71 degrees 24 minutes 54 seconds East 544.97 feet, to a ½ inch iron rod found for corner;

THENCE South 56 degrees 54 minutes 02 seconds East, a distance of 295.98 feet to a ½ inch iron rod found for corner at the beginning of a curve to the left, having a radius of 1062.90 feet, a delta angle of 03 degrees 48 minutes 55 seconds and an arc length of 70.78 feet;

THENCE with said curve to the left, having a chord that bears South 58 degrees 48 minutes 30 seconds East 70.77 feet to a ½ inch iron rod found for corner;

THENCE South 00 degrees 28 minutes 58 seconds West, a distance of 107.46 feet to a ½ inch iron rod found for corner;

THENCE North 89 degrees 33 minutes 21 seconds East, a distance of 243.82 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE South 74 degrees 57 minutes 32 seconds East, a distance of 121.24 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE South 82 degrees 47 minutes 46 seconds East; a distance of 179.23 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE North 89 degrees 00 minutes 21 seconds East, a distance of 430.45 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE South 49 degrees 04 minutes 42 seconds East, a distance of 14.59 feet to a ½ inch iron rod found for corner from which a STHD&PT concrete right-of-way monument found with brass disk, bears North 85 degrees 23 minutes 16 seconds East 9.67 feet;

Dallas 456697 v 7, 33970.00151

THENCE North 00 degrees 10 minutes 47 seconds West, a distance of 1421.54 feet to a ½ inch iron rod found for corner at the beginning of a curve to the right, having a radius of 237.50 feet, a delta angle of 12 degrees 34 minutes 43 seconds and an arc length of 52.14 feet;

THENCE with said curve to the right, having a chord that bears North 06 degrees 06 minutes 36 seconds East 52.04 feet, to a ½ inch iron rod found for corner at the beginning of a curve to the left, having a radius of 262.50 feet, a delta angle of 12 degrees 34 minutes 44 seconds, and an arc length of 57.63 feet;

THENCE with said curve to the left, having a chord that bears North 06 degrees 06 minutes 36 seconds East 57.51 feet, to a ½ inch iron rod found for corner;

THENCE North 00 degrees 10 minutes 47 seconds West, a distance of 157.50 feet to a ½ inch iron rod found for corner;

THENCE North 44 degrees 00 minutes 38 seconds West, a distance of 17.33 feet to a ½ inch iron rod found for corner;

THENCE North 00 degrees 10 minutes 47 seconds West, a distance of 63.28 feet to a ½ inch iron rod found for corner at the beginning of a curve to the right, having a radius of 162.50 feet, a delta angle of 15 degrees 02 minutes 42 seconds and an arc length of 42.67 feet;

THENCE with said curve to the right, having a chord that bears North 07 degrees 20 minutes 39 seconds East 42.55 feet, to a ½ inch iron rod found for corner at the beginning of a curve to the left, having a radius of 187.50 feet, a delta angle of 15 degrees 02 minutes 48 seconds and an arc length of 49.24 feet;

THENCE with said curve to the left, having a chord that bears North 07 degrees 20 minutes 36 seconds East 49.10 feet, to a ½ inch iron rod found for corner;

THENCE North 00 degrees 10 minutes 47 seconds West, a distance of 100.00 feet to a ½ inch iron rod found for corner;

THENCE North 43 degrees 20 minutes 47 seconds East, a distance of 54.45 feet to a ½ inch iron rod found for corner in the South right-of-way line of FM HWY 3040 (variable width right-of-way);

THENCE with the South right-of-way line of said FM HWY 3040 as follows;

THENCE South 89 degrees 43 minutes 07 seconds East, a distance of 127.35 feet to a State of Texas Highway Department & Public Transportation (STHD&PT) concrete right -of-way monument with brass disk found for corner;

THENCE North 87 degrees 43 minutes 55 seconds East, a distance of 122.32 feet to a STHD&PT concrete right-of-way monument with brass disk found for corner;

THENCE North 85 degrees 52 minutes 31 seconds East, a distance of 129.40 feet to a STHD&PT

## EXHIBIT "A-1" TO LEASE AGREEMENT

### Site Plan

Landlord and Tenant acknowledge that this Site Plan does not show certain buildings which will likely be
demolished in connection with Landlord's proposed re-development of the Project and which are not included for
purposes of the calculation of rentable square feet within the Project. Landlord and Tenant further acknowledge that
this Site Plan is presented solely for the purpose of identifying the approximate location and size of the buildings
presently contemplated by Landlord. Building sizes, site dimensions, access and parking areas, existing tenant
locations and identities are subject to change at Landlord's discretion, except as otherwise expressly restricted in the
Lease.



CONVERGENCE
office
center

2501 SOUTH STATE HIGHWAY 121
LEWISVILLE, TEXAS

SITE PLAN



**GMAC MORTGAGE CORP.**
**EXHIBIT B**
**19,112 RSF**
**BUILDING III**



**GMAC MORTGAGE CORP.**
**EXHIBIT B-1**
**EXPANSION SPACE**
**21,754 RSF**
**BUILDING III**



**GMAC MORTGAGE CORP.**
**EXHIBIT B-2**
**RIGHT OF FIRST REFUSAL**
**6,481 RSF**
**BUILDING III**

## EXHIBIT "C" TO LEASE AGREEMENT

### Holidays

| | |
|---|---|
| January 1st | New Years Day |
| Last Monday in May | Memorial Day |
| July 4th* | Independence Day |
| First Monday in September | Labor Day |
| Fourth Thursday in November plus Friday following | Thanksgiving Holidays |
| December 25th | Christmas Day |

*or date legally celebrated

EXHIBIT "C" - PAGE 1 OF 1

INITIALED:
LANDLORD:_____
TENANT:_____

EXHIBIT "D" TO LEASE AGREEMENT

Leasehold Improvements Agreement

This Leasehold Improvements Agreement (this "Agreement") is made and entered into this **30** day of July, 2002, in connection with that certain Lease Agreement (the "Lease"), executed concurrently herewith by and between Lowisville LSF, L.P. ("Landlord") and GMAC Mortgage Corporation ("Tenant"), and constitutes the entire agreement of Landlord and Tenant with respect to the construction and completion of the Premises described in the Lease. In the event of a conflict between the provisions of this Agreement and other provisions of the Lease, the provisions of this Agreement will control. Terms defined in the Lease, when used herein, shall have the same meanings as are ascribed to them in the Lease.

1.    **Premises Condition.** Tenant hereby agrees to accept the Premises in its "as is" condition, subject to the installation of any improvements identified below and to Landlord's Warranty.

2.    **Scope of Work.** Tenant has delivered to Landlord a Scope of Work briefly outlining the expected data center improvements. Landlord has engaged Interprise Design to prepare all necessary and desirable architectural, electrical, mechanical, plumbing, structural and communication/security drawings with written specifications and space plans through construction documents. Design and documentation services are to include the following drawings, but are not limited to this listing only.

A- Architectural set
>    Space Plan
>    Electrical/Data/Telephone Plan
>    Construction/Demolition Plan
>    Reflected Ceiling Plan
>    Carpet/Finish Plan
>    Workstation Plan
>    Furniture/Personal Plan
>    Elevations & Detail/Schedules

B-Engineering Set
1. Plumbing & Fire Protection
   - Preaction Sprinkler System
   - FM 200 Fire Suppression System

2. Mechanical
   - Leibert Water and Air cooled units
   - VAV System within office area
   - Pumps to provide constant water flow volume
   - Panning above ceiling where water lines exist above computer equipment
   - 480/208/120 V Equipment

3. Electrical Set
   - Uninterrupted Power Supply Units
   - Power Distribution Units
   - Electrical Power Generator –diesel fuel
   - Automatic Transfer Switch
   - 480/208/120 V Equipment

4. Raised Floor
   - 24 inch pedestals w/ 24 x 24-inch steel tiles & anti-static laminate tile face

5. Specifications and Schedules
   - Place on drawings within each discipline not to be in booklet or pamphlet form

The architectural drawing sets Reflected Ceiling Plan and Telephone/Data Electrical Plans are to be used for product placement and description only. All circuiting is to be coordinated and designated on the electrical engineering set. The ceiling grid is to be 2 x 4 exposed and 2 x 4 lay in tiles with a tegular edge. Documents are to be prepared to meet or exceed local and state ordinances for building and fire codes. The data center is to meet N plus 1 requirements with an electrical design load of 50 watt/SF.

3.    **Space Plan.** Landlord and Tenant have heretofore approved the final space plan, attached hereto as Schedule D-1, showing the configuration of the leasehold improvements that Tenant desires to have constructed in the Premises. If Tenant employs a consultant, such as an architect, engineer, interior designer or decorator, whether in connection with the working drawings referred to below or otherwise, Tenant shall be responsible for coordinating the

EXHIBIT "D" - PAGE 1 of 4

INITIALED:
LANDLORD:_____
TENANT:_____

DALLAS4 577816v7 32970-00286

consultant's work with Landlord and shall also be responsible for any delays resulting from any lack of coordination or the consultant's lack of responsiveness, and any other delays caused by the consultant.

    4.    **Working Drawings.** Landlord and Tenant hereby approve the working drawings for the fixed leasehold improvements to be constructed in the Premises described in Schedule D-4 attached hereto (hereinafter referred to as the "Approved Working Drawings").

    5.    **Delays.** Tenant agrees that the Commencement Date shall not be extended for more than seven (7) days on account of a delay in the substantial completion of the leasehold improvements and the Premises being "ready for occupancy" (as defined in the Lease) if the delay is due to any of the following (referred to herein and in the Lease, individually or collectively as "Tenant's Delay"):

        (a)    Any delay caused by any of Tenant's consultants;

        (b)    Any delay due to revisions of Tenant's space plan, proposed working drawings, the Approved Working Drawings, the Bid or any delay due to a change reflected in a Change Order; or

        (c)    Any other delay that is the responsibility of Tenant under this Agreement or otherwise, including without limitation, any delay resulting from the failure of tenant's specialty equipment described in Paragraph 15 below to be delivered on the scheduled dates set forth on Schedule D-3.

Tenant's delay must be unwarranted and shall not include any delay resulting from corrections or revisions to deficiencies in the proposed working drawings or the Approved Working Drawings or due to changes requested by Landlord. In addition, the act or omission of Tenant must actually cause Landlord to be delayed in prosecuting the Work. Finally, Landlord agrees that in order to benefit from any Tenant's Delay, Landlord must notify Tenant of such delay in writing within forty-eight (48) hours following the occurrence of the event causing such delay. Any notices pursuant to the preceding sentence may be sent by either facsimile transmission or e-mail.

    6.    **Cost Estimate.** Landlord shall provide Tenant with a written, itemized bid to perform all of the Work (as defined below) noted on the Approved Working Drawings (the "Bid"), based on the construction bid process at a guaranteed maximum price. The construction bid process is to consist of a Construction Management Firm, bidding to a minimum of three (3) independent, qualified and experienced subcontractors or materialmen for each discipline (unless less than three are required by Tenant) with a set fee to manage the project. The construction management fees shall not include any items paid for directly by Tenant, except for the costs of installation of such items. The bids are to be based upon value, thoroughness, and adherence to schedule. The contractor will report to Landlord. Along with the bid price, Landlord shall give to Tenant a copy of each subcontractor or materialman's bid letter, term sheet or cut-sheet.

    The Bid shall include and itemize: a) all labor, material, services, tools and equipment required by the Approved Working Drawings or which could be reasonably inferred by the Approved Working Drawings; b) all architectural, engineering or other professional fees; c) all permit, license and inspection fees; d) any expected or projected overtime costs; e) any overnight, rush, delivery or freight charges; and f) an itemization for the tax applicable to each item or service. Landlord shall furnish all labor, material and equipment for, and perform all services necessary to complete the Work.

    Landlord acknowledges that it has completely reviewed all drawings, specifications and addenda with regard to the Work and is satisfied that it can complete the Work in accordance with this Agreement. Any work not specifically referred to in this Agreement but which may be reasonably inferred from this Agreement shall also be performed and completed when and as required by Landlord at no additional cost to Tenant. As a material inducement to enter into this Lease, Tenant is relying on Landlord and/or the contractors skill, expertise and knowledge to establish firm bid prices. Any failure of Landlord to include appropriate cost will not relieve Landlord of its duty to properly estimate and to take into account the difficulty and cost of successfully performing the Work.

    Landlord and Tenant hereby acknowledge and agree that Tenant has approved the Bid and the Agreed Cost (as defined below) in writing concurrent with the execution of this Lease, and the parties further acknowledge and agree that the amount of the Agreed Cost is $1,634,114.00. The Bid and the Approved Working Drawings cannot be changed, modified or altered without Tenant's prior written approval, other than de minimis changes. Tenant's approval shall constitute an authorization by Tenant for Landlord to proceed with construction of the leasehold improvements contemplated by the Approved Working Drawings. All of the work required by the Approved Working Drawings (the "Work") will be performed by one or more contractors approved and engaged by Landlord. After Landlord receives Tenant's written approval of the Bid, Landlord shall proceed to construct the leasehold improvements for the Agreed Cost (as defined below). The cost of the Work agreed upon by Landlord and Tenant pursuant to this Paragraph 5, as affected by any Change Order accepted by Tenant as provided below, is hereinafter referred to as the "Agreed Cost". The Agreed Cost shall also include, without limitation, all costs associated with the space plan, the proposed working drawings, the Approved Working Drawings and permitting.

    7.    **Change Orders.** In the event Tenant desires any changes to the Approved Working Drawings, Tenant shall submit the proposed changes to Landlord for Landlord's approval. If any proposed change is acceptable to Landlord, Landlord shall prepare and submit to Tenant a change order (a "Change Order") setting forth, among other things, any increase or decrease in the Agreed Cost as a result of the change sought by Tenant, specifically including,

EXHIBIT "D" - PAGE 2 of 4

INITIALED:
LANDLORD:_____
TENANT:_____

without limitation, any change in the cost of the Work, changes in the contractor's fees, architectural and engineering fees, Landlord's construction coordination fee, and any increased cost due to delays in construction of any aspect of the Work on account of the change sought by Tenant. The Change Order shall also set forth the anticipated delay, if any, in the substantial completion of the leasehold improvements on account of the change sought by Tenant. If Tenant fails to execute and approve the Change Order within two (2) business days following delivery of the Change Order by Landlord to Tenant, Tenant shall be deemed to have withdrawn the proposed change and it shall not be implemented by Landlord. If Tenant executes the Change Order within the two (2) business-day period, Landlord shall implement the change and the Agreed Cost shall be adjusted as set forth in the Change Order. Tenant shall not be responsible to pay for any additional Work performed by Landlord unless Tenant approved of the Work and the attendant costs, in writing, prior to the commencement of the Work.

8.    **Tenant Payments: Construction Coordination Fee.** Tenant shall pay the Agreed Cost for construction of the leasehold improvements in three (3) installments as the Work progresses. The first and second installments shall each equal thirty percent (30%) of the difference between the Agreed Cost and the Allowance and shall be due and payable on the date which is twenty-eight (28) days following the Lease Execution Date and the date which is fifty-six (56) days following the Lease Execution Date, respectively. The third installment shall equal forty percent (40%) of the difference between the Agreed Cost and the Allowance and shall be due and payable on the Commencement Date. However, to the extent provided in Paragraph 10 below, Tenant shall have the right to use the Allowance (hereinafter defined) as a credit against the installments of the Agreed Cost payable by Tenant. In addition, Tenant shall pay to Landlord in monthly installments as the Work progresses, a construction coordination fee equal to three percent (3%) of the Agreed Cost (other than that portion of the Agreed Cost associated with the cost of certain of Tenant's equipment designated by Landlord and Tenant prior to being ordered).

9.    **Completion of the Work; Occupancy of the Premises.** The Lease Term and Tenant's rental obligations under the Lease will commence upon the Commencement Date set forth in the Lease except as otherwise expressly provided herein or in the Lease. Subject to any delays that are the responsibility of Tenant, Landlord shall cause all of the Work to be completed on or before the Commencement Date set forth in the Lease, subject to Tenant's Delays, delays caused by force majeure and subject to the provisions of Paragraph 8 of the Lease. Tenant agrees that upon substantial completion of the Work and when the Premises are "ready for occupancy" (as defined in the Lease), Tenant will occupy and accept the Premises, subject to any incomplete or defective work described on a punch list prepared by Landlord and approved by Tenant prior to occupancy. Only one punch list will be prepared prior to Tenant's occupancy of the Premises. Latent defects or other items mutually agreed upon between Landlord and Tenant not listed in the original punch list may be added to such original punch list for a period of thirty (30) days after Tenant's occupancy of the Premises. Tenant shall not enter into possession of the Premises until the Premises are "ready for occupancy" without Landlord's written consent, which consent may be granted or withheld at the sole discretion of Landlord. In the event Tenant takes possession of all or any portion of the Premises with Landlord's consent prior to the Premises being "ready for occupancy", without limitation, of Landlord's other rights and remedies, Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any and all loss, cost, expense, damage, claim, action and liability that Landlord may ever suffer or incur or have asserted against it on account of any loss of or damage to property (whether owned by Landlord, Tenant or any third party) or injury or death of any person that occurs prior to the date of substantial completion, whether due to the negligence of Landlord or Tenant, or their respective employees, agents or contractors. Notwithstanding the foregoing, Tenant may enter the Premises early, with Landlord's prior written consent not to be unreasonably withheld, to prepare it for Tenant's use, such as for the purposes of installing its furniture, equipment, security system, telephone and computer cabling and the like. Tenant agrees to coordinate such installation so as to not interrupt or delay Landlord's Work, and Tenant agrees to indemnify, defend and hold harmless Landlord from any injury, damage or interruption caused by Tenant's early access to the Premises.

Landlord warrants that all improvements and equipment other than Specialty Equipment unless repairs are necessitated by faulty installation) shall be free from material defects in materials and workmanship or latent defects and the mechanical, electrical and HVAC systems serving the Premises shall be in good working order for a period of one (1) year after the Commencement Date, and Landlord, shall at its sole cost and expense, make any required repairs ("Landlord's Warranty").

10.    **Defaults.** The Agreed Cost and any other sums payable by Tenant to Landlord under this Agreement shall constitute additional rental under the Lease. In the event Tenant shall fail to pay any amount of such additional rental when due, and any such failure continues for a period of five (5) days after written notice of such failure is issued by Landlord to Tenant, then such failure shall constitute an event of default under the Lease and hereunder and Landlord shall have the right to exercise all of its rights and remedies under the Lease and under applicable law. In no event shall any termination of the Lease by Landlord relieve Tenant of Tenant's obligation to pay to Landlord the Agreed Cost and any other sums payable by Tenant hereunder.

11.    **Allowance.** Tenant shall receive an allowance (the "Allowance") to apply against Tenant's obligation to pay for the Agreed Cost equal to the product of $25.00 times the number of square feet of Rentable Space in the Premises, which shall be used first to pay for any portion of the Agreed Cost. The Allowance may not be used for any purpose other than payment of the Agreed Cost of construction of Tenant's leasehold improvements, and any portion of the Allowance not used for such purpose shall not be paid or refunded to Tenant. In no event shall Tenant be entitled to any substitution or credits for improvements in place in the Premises. Tenant shall pay for all actual, reasonable and necessary improvement costs in excess of the Allowance except to the extent such costs should have been reasonably inferred from the Approved Working Drawings but were not included in the Agreed Cost.

EXHIBIT "D" - PAGE 3 of 4

INITIALED:
LANDLORD:_____
TENANT:_____

DALLAS4 577816v7 32970-00288

The cost to complete the Work shall be established by waivers of lien and a sworn statement itemizing the Work done, the contractor performing each item of Work, the cost to complete each item, and the total cost, certified by Landlord and its general contractor and architect (if any), and supported by evidence that the Work and all applicable taxes have been paid for in full. Upon Tenant's written request and at reasonable times, Tenant shall have the right to examine and audit Landlord's books and records covering the cost to complete the Work, in order to substantiate the information contained in the sworn statement and waivers of lien.

12.    **Time of the Essence**. Time is of the essence hereunder.

13.    **Compliance with Plans and Laws**. Landlord agrees to perform or cause to be performed all Work in a lien-free, good and workmanlike manner in substantial conformance with the Approved Working Drawings and to hire only reputable contractors and ensure that the contractors maintain adequate commercially reasonable insurance coverages. Landlord will obtain and supply copies of all permits, licenses and inspections, including a certificate of occupancy or such other governmental approval, if required by applicable law, with respect to permitting Tenant to occupy the Premises, and will correct any defects in Landlord's work. Landlord agrees that the Work shall be performed in compliance with all applicable laws, rules, and regulations (including all building, zoning, fire, police or sanitary codes) and any other governmental requirement, such as environmental rules, ADA or OSHA requirements, or underwriter requirements with respect to the Work. Landlord shall allow Tenant's representatives to visit the Premises on a regular basis during construction. Tenant may inspect the Work and provide its input without incurring any liability as to how the Work is done.

14.    **Warranty Agreements**. Landlord shall provide Tenant with copies of all warranties and other documents that warrant, certify or guarantee the workmanship and the quality of materials and, after the expiration of the Landlord Warranty, shall assign same to Tenant to the fullest extent possible to the extent such warranties relate to items for which Tenant is responsible to maintain.

15.    **Specialty Equipment**. Attached hereto as **Schedule D-3** is a list of certain specialty equipment that Tenant requires (the "**Specialty Equipment**"), that Tenant shall order and pay for directly, and that is scheduled to be delivered to the Premises on the dates noted thereon. The parties hereby acknowledge and agree that the Agreed Cost includes the cost to install such equipment, but not the purchase of the Specialty Equipment. In addition, Tenant, at its sole cost and expense, shall be solely responsible for any furniture, security systems, phone systems, computer systems, data lines, office equipment, or any other systems and equipment required in connection with Tenant's operations within the Premises, as well as all moving and relocation expenses.

16.    **Expense Reimbursement Letter**. The parties hereby acknowledge and agree that the letter agreement dated May 21, 2002 made and entered into by and between Landlord and Tenant, a true and correct copy of which is attached hereto as **Schedule D-2**, is hereby terminated and of no further force or effect.

**EXECUTED** as of the day and year first above written.

**LANDLORD**:

LEWISVILLE LSF, L.P., a Texas limited partnership

By:    Lewisville GenPar, LLC, general partner

By: _____

Its: _Benjamin O. Velvin_
      _Vice President_

**TENANT**:

GMAC MORTGAGE CORPORATION,
a Pennsylvania corporation

By: _____

Title: _Ralph Hall_
       _Chief Operating Officer_

EXHIBIT "D" - PAGE 4 of 4

INITIALED:
LANDLORD:_____
TENANT:_____



**GMAC MORTGAGE CORP.**
**EXHIBIT D-1**
**SPACE PLAN**
**19,112 RSF**
**BUILDING III**

SCHEDULE D-2

## REIMBURSEMENT LETTER

# LEWISVILLE LSF, L.P.
600 North Pearl Street
Suite 1550
Dallas, Texas 75201

May 21, 2002

GMAC Mortgage Corporation
Attn: Corporate Real Estate
4 Walnut Grove
Horsham, Pennsylvania 19044

> Re:  Reimbursement Letter Concerning Proposed Lease Transaction to be made and
> entered into by and between Lewisville LSF, L.P., a Texas limited partnership
> ("Landlord"), and GMAC Mortgage Corporation ("Tenant") relating to certain
> premises located at Convergence Office Center, Lewisville, Denton County,
> Texas (the "Project")

Ladies and Gentlemen:

This letter is to express, among other things, Landlord's and Tenant's intentions to enter
into future negotiations for the leasing of office space located at the Project to Tenant. This letter
does not obligate either party to negotiate or proceed to the completion of an agreement. The
parties shall not be contractually bound with respect to such a lease unless and until they execute
a formal written lease, which must be in form and content satisfactory to each party and its
counsel in their sole discretion.

Notwithstanding that Landlord and Tenant have not yet finalized a letter of intent or
begun to negotiate a lease agreement, Tenant has requested Landlord to:
1) prepare architectural, design and engineering drawings through construction
documents (including completion of the bidding process), and
2) apply for permits for the premises proposed to be leased by Tenant at the Project.

DALLAS4 579598v5 12970-00288

May 21, 2002
Page 2

Landlord is willing to commence such process and begin to incur such costs and expenses provided that Tenant agrees to reimburse Landlord for any such costs and expenses up to a maximum amount of $60,000 for the costs to prepare the architectural, design and engineering drawings through construction documents (including the bidding process) and up to a maximum of $10,000 for permit fees incurred by Landlord in the event Landlord and Tenant do not enter into a written lease agreement. Tenant covenants and agrees that if for any reason Landlord and Tenant do not make and enter into a written lease agreement, Tenant shall reimburse Landlord upon demand for any and all costs and expenses incurred by Landlord related to the proposed architectural, design, engineering, permitting and bidding process up to a maximum of $70,000. Landlord shall have no obligation hereunder or otherwise to incur any costs or expenses in excess of such amounts, but if Landlord does incur any such additional costs and expenses with Tenant's prior written approval, Tenant agrees to reimburse Landlord hereunder for such additional costs and expenses.

Based upon the information provided by Landlord and after a review of the Tenant's Scope of Work appended hereto as Exhibit "A", Landlord represents that, but for Tenant delays (including any delay beyond 7 days for Tenant's approval of the final drawings) and force majeure delays, Landlord will use commercially reasonable efforts to meet the following construction timeline:

| ITEM | COMPLETION DATE |
|---|---|
| Completion of architectural, design and engineering drawings through construction documents | 3 weeks from the date Tenant executes this Letter |
| Completion of Bidding Process | 1 week thereafter |
| Completion of entire construction project | 16 weeks after Tenant executes this Letter (to be extended on a day for day basis for each day after 7 days that Tenant fails to approve the final drawings) |

Time is of the essence. To ensure that the parties are aware of all of the costs and potential costs involved, Landlord will advise Tenant, in writing, on a weekly basis of all of the costs it has incurred or expects to incur. If, at any time, Landlord believes that it cannot adhere to this schedule or complete the construction on or before the date which is 16 weeks after execution of this letter by Tenant (to be extended on a day for day basis for each day after 7 days that Tenant fails to approve the final drawings), Landlord agrees to promptly advise Tenant. In the event Tenant thereafter notifies Landlord in writing to stop all work and to cancel all orders

DALLAS4 579598v5 32070-00288

May 21, 2002
Page 3

(as agreed to by Tenant) as quickly as possible, Landlord agrees to do so in order to minimize
Tenant's exposure. Tenant agrees that it shall have no recourse against Landlord in the event
Landlord fails to meet the schedule set forth herein, but Tenant shall have no obligation to
reimburse Landlord if Landlord fails to meet the schedule due to its bad faith or willful
misconduct.

If the parties do enter into a written lease agreement, such agreement shall provide that (a)
Landlord shall be fully responsible to pay for all costs involved up to Tenant's allowance of
$25/rsf and (b)Tenant shall remain liable for all costs and expenses associated with the above-
referenced process over and above $25/rsf. This letter will be superceded by any such written
lease agreement. If the parties do not enter into a written lease agreement, Tenant shall upon
demand reimburse Landlord for all such costs and expenses incurred by Landlord on Tenant's
behalf hereunder. Any amounts remaining unpaid after twenty (20) days shall accrue interest at
the highest lawful rate until paid in full. Tenant shall own any drawing, plan or design plan
prepared for and paid by Tenant, subject to the terms of the relevant architect, engineer or
construction contract, and Landlord shall assign all rights, if any, thereto to Tenant.

Tenant's obligations hereunder shall be binding and remain in full force and effect
regardless of whether or not Tenant and Landlord are able to enter into a mutually satisfactory
written lease agreement for the premises contemplated to be leased by Tenant for any reason
whatsoever unless due to Landlord's bad faith. Landlord and Tenant both acknowledge and
agree that the execution, delivery and performance of this letter does not obligate either party to
enter into a letter of intent or a lease agreement for the premises contemplated to be leased by
Tenant, and any such letter of intent or lease agreement shall be evidenced solely by written
instruments which have been fully executed by and between Landlord and Tenant. This letter is
not assignable by Tenant. This letter does not create any duty of good faith or fair dealing
between the parties with respect to negotiating a letter of intent or a lease agreement.

For a period of thirty (30) days after the date hereof, Landlord agrees not to lease to any
third party any space at the Project designated on the space plan proposed by both Tenant and
Landlord.

This letter may be executed in separate counterparts, each of which shall be an original
and all of which when taken together shall constitute one and the same instrument. Further, this
letter may be executed by both Landlord and Tenant by facsimile signature, such that execution
of this letter by facsimile signature shall be deemed effective for all purposes as though this letter
was executed as a "blue ink" original.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

DALLAS4 579598v5 32970-00188

May 21, 2002
Page 4

    Please acknowledge your acceptance of the terms of this letter by executing this letter in the space provided below and returning it to Landlord.

                        Sincerely,
                        LEWISVILLE LSF, L.P.,
                        a Texas limited partnership

                        By:    Lewisville GenPar, LLC,
                               its general partner
                               By: _____
                               Name: Andrew B. Quelle
                               Title: VP / Asset Mgmt
                               Date: _____

AGREED AND ACCEPTED:
GMAC MORTGAGE CORPORATION
By: _____
Name: _____
Title: _____
Date: _____
            Warren J. Braverman
       Vice President - Corporate Real Estate
            GMAC Mortgage Corporation

DALLAS4 579598v5 32970-00288

May 21, 2002
Page 5

EXHIBIT "A"

**SCOPE OF WORK
DALLAS (LEWISVILLE) DATA CENTER**

Landlord or landlord's representative is to provide the following services for a perspective tenant, GMAC Mortgage Company, Horsham, PA for the construction of a data center and office space at the Convergence Office Center, Lewisville, TX. Tenant reserves the right to supplement this Scope of Work Exhibit (provided such supplements are consistent with the initial Scope of Work) and to further describe the Work in the Lease Agreement and accompanying Work Letter. The project is to comprise of four phases:

    I.     Design & construction of 15,000+/- S.F. of office /Data Center Space;
    II.   Construction Permit and Subcontractor Bid Process;
    III.  Purchase of equipment and materials; and,
    IV.  Construction/Tenant fit-out of office

The tenant requires that Landlord proceed with phases I and II of this Scope of Work, as well as a project schedule indicating required weeks for completion of project tasks. The tenant is also requiring a list of project participants indicating roles of involvement for the entire project.

Design and documentation services are to include the following drawings, but are not limited to this listing only. Documents are to be prepared to meet or exceed local and state ordinances for building and fire codes. The data center is to meet N plus 1 requirements with an electrical design load of 50 watt/SF.

A- Architectural set
1. Space Plan (based upon plan from GMAC)
2. Electrical/Data/Telephone Plan
3. Construction/Demolition Plan
4. Reflected Ceiling Plan
5. Carpet/Finish Plan
6. Workstation Plan (layout of workstations only, based upon info. from GMAC, does not include design and purchasing)
7. Furniture/Personal Plan (layout of standard office furniture only, based upon info. from GMAC, does not include design and purchasing)
8. Elevations & Detail/Schedules

B-Engineering Set
    1. Plumbing & Fire Protection
       - Preaction Sprinkler System
       - FM 200 Fire Suppression System

    2. Mechanical

DALLAS4 579598v3 32470-002RK

May 21, 2002
Page 6

- Downflow Leibert Water cooled units
- VAV System within office area
- Pumps to provide constant water flow volume
- Panning above ceiling where water lines exist above computer equipment
- 480/208/120 V Equipment

3. Electrical Set
   - Uninterrupted Power Supply Units
   - Power Distribution Units
   - Electrical Power Generator –diesel fuel
   - Automatic Transfer Switch
   - 480/208/120 V Equipment

4. Raised Floor
   - 24 inch pedestals w/ 24 x 24-inch steel tiles & anti-static laminate tile face

5. Specifications and Schedules
   - Place on drawings within each discipline not to be in booklet or pamphlet form

The architectural drawing sets Reflected Ceiling Plan and Telephone/Data Electrical Plans are to be used for product placement and description only. All circuiting is to be coordinated and designated on the electrical engineering set. The ceiling grid is to be 2-0"x 2-0 x 9/16" exposed and 2 x 2 lay in tiles with a tegular edge.

All construction documents are to be prepared and formatted for bidding. Landlord intends to utilize a general contractor who will competitively bid each trade to three (3) subcontractors. The design professionals are to be present for walk throughs if required by contractor or subcontractors, available to respond to contractor phone inquiries and evaluate thoroughness of each bid proposal. The contractor will report to the landlord. GMAC Mortgage's representative, which is to be established by GMAC's Vice President of Corporate Real Estate, will approve cost estimates, working drawings, final drawings and final price before landlord proceeds with permitting and construction, which approval shall be deemed after the expiration of 2 business days unless GMAC Mortgage delivers to Landlord its written disapproval (and a reasonable explanation therefor) prior to the expiration of such 2 business days for cost estimates, working drawings and final price and after the expiration of seven (7) calendar days for final drawings and final price unless GMAC Mortgage delivers to Landlord its written disapproval (and a reasonable explanation therefor) prior to the expiration of such 7 days.

# SCHEDULE D-3 TO LEASE AGREEMENT

## CONVERGENCE OFFICE CENTER
## GMAC DATA CENTER

### GMAC Supplied Equipment

| Model Number | Description | Capacity | Volts | Type | Size (Width x Depth x Height) | Delivery Date on or About |
|---|---|---|---|---|---|---|
| UPS #1 | | | | | | |
| UDA63751A36A890 | UPS Liebert | 750kVA | 480/480 | Single Module | 108 x 39 x 78 | Sept. 6, 2002 |
| Maintenance Bypass | Customs Controls | 1200 Amp | 480 | Free standing | 60 x 30 x 90 | Sept. 6, 2002 |
| Battery System | IEB Battery Cabinet 7 Min | 4 Cabinets | 360 VDC | | 48 x 32 x 56 | Sept. 6, 2002 |
| UPS #2 | | | | | | |
| UDA63751A36A890 | UPS Liebert | 750kVA | 480/480 | Single Module | 108 x 39 x 78 | Sept. 6, 2002 |
| Maintenance Bypass | Sq D | 1200 Amp | 480 | Wall Mount | 42 x 10 x 86 | Sept. 6, 2002 |
| Battery System | IEB Battery Cabinet 7 Min | 4 Cabinets | 360 VDC | | 48 x 32 x 56 | Sept. 6, 2002 |
| PDU # 1 PPA150C | PDU Liebert | 150kVA 3 Panel | 480/208 | Single input | 44 x 32 x 68 | Sept. 6, 2002 |
| PDU # 2 PPA150C | PDU Liebert | 150kVA 3 Panel | 480/208 | Single input | 44 x 32 x 68 | Sept. 6, 2002 |
| PDU # 3 PPA150C | PDU Liebert | 150kVA 3 Panel | 480/208 | Single input | 44 x 32 x 68 | Sept. 6, 2002 |
| PDU # 4 PPA150C | PDU Liebert | 150kVA 3 Panel | 480/208 | Single input | 44 x 32 x 68 | Sept. 6, 2002 |
| PDU # 5 PPA150C | PDU Liebert | 150kVA 3 Panel | 480/208 | Single input | 44 x 32 x 68 | Sept. 6, 2002 |
| PDU # 6 PPA150C | PDU Liebert | 150kVA 3 Panel | 480/208 | Single input | 44 x 32 x 68 | Sept. 6, 2002 |
| Cat 3516B-TIDA | 2000kW Cat Diesel Generator | 2000kW | 480 | 3000 Gallon Tank | 248 x 101 x 135 | Sept. 20, 2002 |
| 3000A Frame, 2-1600A | Output Switch gear SQ-D | 3000A | 480 | 2-1600A Bkr | 60 x 36 x 90 | Sept. 6, 2002 |
| 300-3800N1XC480V60HZ | Qty 4 800A Transfer Switch ASCO | 800A | 480 | Wall mount | 34 x 20 x 72 | Sept. 6, 2002 |
| AC # 1 DE383GUAASM | 30 Ton Air Conditioner | 30T | 480 | Air Cooled | 120 x 33 x 72 | Sept. 6, 2002 |
| AC # 2 DE383GUAASM | 30 Ton Air Conditioner | 30T | 480 | Air Cooled | 120 x 33 x 72 | Sept. 6, 2002 |
| AC # 3 DE383GUAASM | 30 Ton Air Conditioner | 30T | 480 | Air Cooled | 120 x 33 x 72 | Sept. 6, 2002 |
| AC # 4 DE383GUAASM | 30 Ton Air Conditioner | 30T | 480 | Air Cooled | 120 x 33 x 72 | Sept. 6, 2002 |
| AC # 5 VE192GUAASM | 15 Ton Air Conditioner | 15T | 480 | Air Cooled | 99 x 33 x 72 | Sept. 6, 2002 |
| AC # 6 VB192GUAASM | 15 Ton Air Conditioner | 15T | 480 | Air Cooled | 99 x 33 x 72 | Sept. 6, 2002 |
| Qty 4 30T CDF510C | 4 Fan Condenser | 30T | 480 | Fan Speed Control | 171 x 44 x 54 | Sept. 6, 2002 |
| Qty 2 15T CDF308L | 4 Fan Condenser | 30T | 480 | Fan Speed Control | 132 x 44 x 54 | Sept. 6, 2002 |
| Instal Raised floor Ground | #8 bare copper wire every 4th Pedistal | | | | | Sept. 20, 2002 |
| 960 | Tate Raised Flooring | 7800sf | Grey Swirl | Concrete Filled | 24" bolted Grid | Sept. 20, 2002 |
| Freight on Floor | | | | | | |
| Install raised flooring | Labor to Install floor Included 2 ramps | 7800sf | Grey Swirl | Concrete Filled | 24" bolted Grid | Sept. 20, 2002 |
| Hand Rails F/I | AIA Hand Rail | 126 feet | Alum | | | Sept. 20, 2002 |

NOTE: Once construction has commenced, exact delivery dates will be coordinated between Turner Construction and Sherraton ( equipment supplier) in order to meet the construction schedule.

## SCHEDULE D-4 TO LEASE AGREEMENT

### CONVERGENCE OFFICE CENTER
### GMAC DATA CENTER

### APPROVED WORKING DRAWINGS

| Mark | Title | Latest Issue |
|------|-------|--------------|
| | Cover Sheet, Issued | Not Dated |
| L-1 | General Requirements, Issued | 18-Jun-02 |
| L-2 | Specifications and Legends, Revision 3 | 17-Jul-02 |
| A1.01 | Construction Plan, Revision 3 | 17-Jul-02 |
| A2.01 | Telephone/Electrical Plan, Revision 3 | 17-Jul-02 |
| A3.01 | Reflected Ceiling Plan, Revision 3 | 17-Jul-02 |
| A4.01 | Finish Plan, Revision 3 | 17-Jul-02 |
| A5.01 | Server Rack Plan, Issued | 18-Jun-02 |
| A7.01 | Elevations, Revision 1 | 21-Jun-02 |
| A7.02 | Elevations, Revision 3 | 17-Jul-02 |
| A8.01 | Details, Revision 3 | 17-Jul-02 |
| A8.02 | Details, Revision 1 | 21-Jun-02 |
| EN.01 | Energy Code Plan, Issued | 18-Jun-02 |
| EN.02 | Energy Code Plan, Issued | 18-Jun-02 |
| M0.01 | Legends and Symbols, Issued | 11-Jun-02 |
| M2.01 | First Floor Plan, Revision 3 | 17-Jul-02 |
| M3.01 | Schedules and Details, Revision 3 | 17-Jul-02 |
| E0.01 | Legends and Symbols, Issued | 11-Jun-02 |
| E2.01 | First Floor Plan, Revision 3 | 17-Jul-02 |
| E2.02 | Cable Tray Layout and Elevations, Revision 1 | 20-Jun-02 |
| E3.01 | First Floor Plan, Revision 3 | 17-Jul-02 |
| E4.01 | One Line Diagram, Revision 3 | 17-Jul-02 |
| E5.01 | Schedules, Revision 3 | 17-Jul-02 |
| E5.02 | Schedules, Revision 3 | 17-Jul-02 |
| E6.01 | Details, Revision 1 | 20-Jun-02 |
| P0.01 | Legends and Symbols, Issued | 11-Jun-02 |
| P2.01 | First Floor Plan, Revision 1 | 20-Jun-02 |
| P3.01 | Risers and Schedules, Revision 1 | 20-Jun-02 |

CONVERGENCE OFFICE
GMAC DATA CENTER
PAGE 2

## SPECIFICATIONS

<u>Division 15 - Mechanical</u>

| | | |
|---|---|---|
| 15325 | Standpipe and Fire Sprinkler Systems | 18-Jun-02 |
| 15390 | Total Flooding Fire Suppression System | 18-Jun-02 |

<u>Division 16 – Electrical</u>

| | | |
|---|---|---|
| 16000 | Supplementary General Conditions for Electrical Work | 18-Jun-02 |
| 16050 | Basic Electrical Materials and Methods | 18-Jun-02 |
| 16060 | Grounding | 18-Jun-02 |
| 16120 | Conductors and Cables | 18-Jun-02 |
| 16130 | Raceways and Boxes | 18-Jun-02 |
| 16139 | Cable Trays | 18-Jun-02 |
| 16140 | Wiring Devices | 18-Jun-02 |
| 16425 | Switchboards | 18-Jun-02 |
| 16470 | Panelboards | 18-Jun-02 |
| 16476 | Disconnect Switches and Circuit Breakers | 18-Jun-02 |

## ADDENDA

| | |
|---|---|
| Addendum No. 1 | 21-Jun-02 |
| Addendum No. 2 | 25-Jun-02 |
| Addendum No. 3 | 17-Jul-02 |
| Addendum No. 4 | 22-Jul-02 |

doc #25793

Acceptance of Premises Memorandum

THIS ACCEPTANCE OF PREMISES MEMORANDUM (this "Memorandum") is entered into on this 4th day of __November__, 200_2_ by and between Lewisville LSF, L.P., as Landlord ("Landlord"), and GMAC Mortgage Corporation, as Tenant ("Tenant"). Unless otherwise defined herein, all capitalized terms used herein shall have the same meaning ascribed to such terms in the Lease (as hereinafter defined).

## RECITALS:

WHEREAS, on __July 30,__ 200_2_, Landlord and Tenant entered into that certain Lease Agreement (the "Lease") whereby Landlord leased certain Premises located in the Building to Tenant pursuant to certain terms and provisions more particularly described therein;

WHEREAS, certain leasehold improvements on the Premises have been constructed and installed for the benefit of Tenant in accordance with the Approved Working Drawings and upon the terms and conditions set forth in the Leasehold Improvements Agreement attached as Exhibit "D" to the Lease; and

WHEREAS, as provided in Paragraph 8 of the Lease, Tenant desires to take possession of and accept the Premises subject to the terms and provisions hereof.

NOW, THEREFORE, for and in consideration of the premises, and the mutual covenants and agreements contained herein and in the Lease, Landlord and Tenant hereby expressly covenant, acknowledge and agree as follows:

1.    Except for the specific items described in the "punch list" attached hereto as Exhibit "E-1" and incorporated herein by reference for all purposes, and subject to Landlord's Warranty, which Landlord shall endeavor to remedy within __twenty (20)__ business days hereof, Landlord has fully completed the leasehold improvements, alterations or modifications to the Premises in accordance with the Approved Working Drawings and approved Change Orders, if any, and pursuant to the Leasehold Improvements Agreement. The Premises are substantially complete as that term is defined in Paragraph 8 of the Leasehold Improvements Agreement attached as Exhibit "D" to the Lease.

2.    The Premises are tenantable and ready for immediate occupancy by Tenant, Landlord has no further obligation to install or construct any leasehold improvements, modifications or alterations to the Premises (except as described in Exhibit "E-1" attached hereto), and, except as described in Exhibit "E-1" attached hereto, the Premises are satisfactory to Tenant in all respects.

3.    The Commencement Date shall be November 4, 2002 Pursuant to the provisions of the Lease, the first monthly installment of Base Rental shall become due and payable on April 4, 2003.

4.    The expiration date of the Lease shall be __April 30, 2011__.

5.    The Premises contain approximately 19,112 square feet of Rentable Space and 17,172 square feet of usable space.

6.    To effectuate Tenant's termination right as described in Section 53 of the Lease, Tenant must give Landlord written notice of its election to terminate the Lease as well as make the payments required thereby on or before 10/31/07, thereby effectively terminating the Lease as of 4/30/08.

7.    Except as specifically set forth herein, as of the date of this Memorandum the Lease has not been modified, altered, supplemented, superseded or amended in any respect.

8.    All terms, provisions and conditions of the Lease are and remain in full force and effect, and are hereby expressly ratified, confirmed, restated and reaffirmed in each and every respect.

IN WITNESS WHEREOF, this Memorandum is entered into by Landlord and Tenant on the date first set forth above.

LANDLORD:

LEWISVILLE LSF, L.P.,
a Texas limited partnership

By:    Lewisville GenPar, LLC,
       general partner

       By:    _____
       Its:   Vice President

TENANT:

GMAC MORTGAGE CORPORATION,
a Pennsylvania corporation

By:    _____
Its:   Vice President - Corporate Real Estate
       GMAC Mortgage

EXHIBIT "E" - PAGE 1 OF 1

INITIALED:
LANDLORD:_____
TENANT:_____

DALLAS4 577816v7 32370-00288

EXHIBIT "F" TO LEASE AGREEMENT

Building Rules and Regulations

1.      Sidewalks, doorways, vestibules, corridors, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises and for going from or to another part of the Building.

2.      Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable materials shall be thrown or placed therein. Damage resulting to any such fixtures or appliances or surrounding areas from misuse by Tenant shall be repaired at the sole cost and expense of Tenant, and Landlord shall not in any case be responsible therefor.

3.      No signs, advertisements or notices shall be painted or affixed on or to any windows or doors or other parts of the Building except of such color, size and style and in such places as shall be first approved in writing by Landlord. No nails, hooks or screws shall be driven or inserted in any part of the Building except by the Building maintenance personnel nor shall any part of the Building be defaced by Tenant.

4.      Landlord will provide and maintain an alphabetical directory of each Tenant's firm name on the first floor (main lobby) of the Building and no other directory shall be permitted unless previously consented to by Landlord in writing.

5.      Tenant shall not place any additional lock or locks on any doors in or to the Premises without Landlord's prior written consent. Two keys to the locks on the doors which access the Premises from the Common Areas shall be furnished by Landlord to Tenant, and Tenant shall not have any duplicate keys made. Additional keys required by Tenant shall be made by Landlord at Tenant's sole expense. Upon termination of the Lease, Tenant shall return all keys to Landlord and shall provide to Landlord a means of opening all safes, cabinets and vaults being left with the Premises.

6.      With respect to work being performed by Tenant in the Premises with the approval of Landlord, Tenant will refer all contractors, contractor's representatives and installation technicians rendering any service to them to Landlord for Landlord's supervision, approval and control before the performance of any contractual services. This provision shall apply to work performed in the Building including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and any and all installation of every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment and any other physical portion of the Building. Tenant must have Landlord's written approval prior to employing any contractor. Any and all such contractors shall comply with these Rules and Regulations for such services including, but not limited to, insurance requirements. All work in or on the Building shall comply with any and all codes. Tenant shall take no action which would disturb the ceiling tiles or cause any work to be performed above the acoustical ceiling in the Building.

7.      Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of any bulky materials, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be restricted to such hours as Landlord shall reasonably designate. All such movement shall be under the supervision of Landlord and in the manner agreed between Tenant and Landlord by prearrangement before performance. Such prearrangement initiated by Tenant will include determination by Landlord, and subject to its decision and control, as to the time, method and routing of movement and as to limitations for safety or other concerns which may prohibit any article, equipment or any other item from being brought into the Building. Tenant is to assume all risk as to damage to articles moved and injury to person or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord and other tenants if damaged or injured as a result of acts in connection with carrying out this service for Tenant from the time of entering the property to completion of work; and Landlord shall not be liable for acts of any person engaged in, or any damage or loss to any of said property or persons resulting from any act in connection with such service performed for Tenant.

8.      Landlord shall have the power to prescribe the weight and position of safes and other heavy equipment, which shall, in all cases, be positioned to distribute the weight and stand on supporting devices approved by Landlord. All damage done to the Building by taking in or putting out any property of Tenant, or done by Tenant's property while in the Building, shall be repaired at the expense of Tenant.

9.      Corridor doors, when not in use, shall be kept closed.

10.     Tenant shall cooperate with Landlord's employees in keeping its Premises neat and clean. Tenant shall not employ any person for the purpose of such cleaning other than the Building's cleaning and maintenance personnel. Landlord shall be in no way responsible to Tenant, its agents, employees or invitees for any loss of property from the Premises or public areas or for any damage to any property thereon from any cause whatsoever.

11.     To insure orderly operation of the Building, no ice, mineral or other water, towels, newspapers, etc. shall be delivered to the Premises except by persons approved by Landlord in writing.

EXHIBIT "F" - PAGE 2 OF 2

INITIALED:
LANDLORD:_____
TENANT:_____

# EXHIBIT G

## REGISTRATION AND COMMISSION AGREEMENT

April 16, 2002

Mr. Jeff Price                                          Mr. Steven Schneider
Office Services Group                                   Office Services Group
Grubb & Ellis Company                                   Grubb & Ellis Company
1000 Signature Place II                                 1000 Signature Place II
14785 Preston Rd.                                       14785 Preston Rd.
Dallas, TX. 75254                                       Dallas, TX. 75254

**RE:    *Commission Registration Agreement for GMAC Mortgage Group; Convergence
Office Center; Lewisville, Texas***

Dear Jeff and Steven:

Thank you for your inquiry regarding your registration at Convergence Office Center. Lewisville
LSF, L.P. ("Landlord") accepts your registration, subject to GMAC Mortgage Group ("Prospect")
designating Grubb & Ellis Company ("Broker") to act exclusively in its behalf and that no other
similar exclusive arrangements have or will be executed between Prospect and other real estate
brokers. If a lease is executed, a commission will be earned and paid in accordance with this
agreement ("Agreement") to duly licensed Texas Real Estate Broker as follows:

### COMMISSION

In the event that a lease agreement ("Lease") is executed by Landlord and Prospect, then the
Broker will earn a commission equal to four and one-half percent (4½%) of the Annual Base
Rent provided for in the Lease during the Primary Term. The Primary Term of the Lease is
defined as the portion of the Lease term in which both the Landlord and the Tenant (formerly
defined as Prospect) have agreed that neither party will have a right to terminate or cancel the
Lease and shall not include an extension or renewal option(s) or early renewal period within the
previous lease term. However, if a termination penalty is outlined in the Lease and this penalty
includes unamortized commissions, tenant improvements, and other applicable penalties, then
Landlord will pay a total commission, per the terms of this Agreement, as if no Termination
Option existed.

Annual Base Rent, as defined in the Lease, shall be the minimum rental to be paid by Tenant
and shall exclude or deduct, without limitation, the following items:

1.  Annual Base Rent abated;
2.  Additional rent to be paid by Tenant for escalation of operating expenses and taxes above
    the operating expense and tax stop;
3.  Additional rent to be paid by Tenant for cost of living increases and other escalations, as
    provided for in the Lease;
4.  Payments made by Tenant for utilities/electricity above Base Rent;
5.  Rental credited to Tenant by reason of lease "pick-up" or take-overs;

6.  Parking rent to be paid by Tenant as it relates to this initial transaction, parking rent is outside the base rent number;

7.  Amortization of or lump sum payments for leasehold improvements above the allowance, as per the Lease;

8.  Cancellation or penalty payments for Lease termination rights;

9.  Cash credits;

10. Any other sums designated as "additional rent" under the Lease Agreement;

11. Late payment charges;

12. Security deposits (including any amounts necessary to restore any security deposit after application of same pursuant to the Lease Agreement) or available funds under any letter of credit;

13. Any amounts paid to Landlord for fees, repairs, reimbursements, late charges or interest, whether or not characterized as rentals under the Lease;

14. Rent for services or facilities available to Tenant at locations other than the Premises covered by the Lease Agreement;

15. Other concessions such as moving allowance, club memberships, above-standard space planning/architectural allowance and the like;

16. Any amounts paid to Landlord for the rental of storage space; and

17. Rentals payable as a result of a holdover, or upon continuation of a tenancy on a day-to-day, week-to-week, or month-to-month basis. (Note: Base Rent paid and the associated commissions in connection with a renewal, extension, or expansion will be addressed in Exhibit A.)

### PAYMENT OF COMMISSION

Fifty percent (50%) of the commission shall be paid to Broker within 30 days of the unconditional delivery of the following:

1.  Commission statement and invoice;

2.  Fully executed commission registration agreement;

3.  Full execution of any applicable Subordination, Non-Disturbance, and Attornment Agreement, if required as a condition of the Lease by Tenant or lender;

4.  Payment of first month's rent and any other amounts due to Landlord at Lease execution; and

5.  Fully executed Lease.

The balance of said commission shall be paid within 30 days of: (i) Tenant's acceptance and occupancy of the leased Premises as described in the Lease Agreement, unless Tenant is in default of the Lease, in which case the balance of said commission shall not be paid until such breach is fully and completely cured.

12-12020-mg  Mr. Jeff Price and Mr. Steve Schneider  Filed 09/28/12  Entered 09/28/12 16:31:02  Exhibit 1
Commission Registration Agreement for GMAC Mortgage Group  Pg 52 of 120
April 16, 2002
Page 3

### REGISTRATION

To register a Prospect the Broker must introduce an authorized representative of the Prospect to the Leasing Agent/Agent (CAPSTAR Commercial Real Estate Services, Ltd.) of Convergence Office Center and deliver written authorization from the Prospect naming the Broker as its exclusive leasing representative. As of the date of this Agreement, Landlord confirms Broker has performed the required introduction described above, thus naming Broker as its exclusive leasing representative.

Registration will remain in effect for 180 days or as long as it is requested in writing by the Broker and the Prospect and there is active progress toward negotiating a lease as evidenced by meetings between the project leasing agent, Broker, and Prospect.

If the commission claim is made by more than one broker, the Broker shall be responsible for resolving the dispute. Under no circumstance will more than one commission be paid to brokers. Broker agrees to defend, indemnify, and hold Landlord, Landlord's Agent, and Landlord's and Agent's officers and employees, harmless from and against any and all loss, cost, liability and expense, including, but not limited to, reasonable attorney fees arising out of any claims for finder's fees, brokerage, or other commissions which may be asserted against Landlord or Landlord's Agent arising out of Broker's activities in connection with this Agreement or a breach of Broker's representation.

### SUCCESSORS AND ASSIGNS

In the event Landlord shall sell, convey, or assign the Property which includes Tenant's demised premises, all liabilities and obligations under this Agreement shall terminate as of the date of such sale, conveyance, or assignment, and Landlord and its Leasing Agent shall thereafter be released from any and all liabilities and obligations under this Agreement.

### CONFIDENTIALITY

Except as required by law or legal process, Broker shall keep strictly confidential all information, whether oral or written form, furnished by Landlord or Landlord's Leasing Agent, or otherwise acquired by Broker, including without limitation, lease terms; however, Broker may disclose such information to Tenant and Tenant's respective attorneys, accountants, employees. Broker shall not publish or cause to be published any marketing materials, announcements, logos, Building renderings, or other communications which connect Broker or its logo to Landlord, Landlord's Leasing Agent or Convergence Office Center unless such materials or communication have been approved in writing by Landlord, in Landlord's sole discretion, in advance of publication. The obligations of Broker under this clause shall survive the expiration or earlier termination of this Agreement.

Thank you for your interest in Convergence Office Center. We look forward to working with you to complete this transaction. Please indicate your acceptance to the above terms and conditions by executing and supplying all of the information requested, and promptly return the original of this agreement for our execution.

Mr. Jeff Price and Mr. Steven Schneider
Commission Registration Agreement for GMAC Mortgage Group
April 16, 2002
Page 4

**REDACTED**

*LANDLORD:*

LEWISVILLE LSF, L.P.

    By: HUDSON ADVISORS, L.L.C., Asset Manager

    Signature: _Andrew B. Ruelle_

    Name: _Andrew B. Ruelle_      Date: _4/30/02_

*ACKNOWLEDGED & ACCEPTED:*

Grubb & Ellis Company

Signature: _____      Date: _4/16/02_

Name: _JEFF DEWEESE_

Title: _EX. V.P._

Federal ID: _____      Broker ID: _____

## EXHIBIT A

This Exhibit A is attached to, made a part of, and supplements the Commission Registration Agreement (the "Agreement") dated December 3, 2001, between Lewisville LSF, L.P., and Grubb & Ellis Company as Broker.

Section 1.    **Payment of Commissions on Renewals or Expansions.**

Additional commissions shall be payable to Broker in connection with a renewal of the lease term or leasing of additional space (expansion) in accordance with the terms hereof. If an additional commission is earned as herein provided the commission structure shall be as follows:

(a)    **Renewals.**

A four and one-half percent (4½%) commission based on the Base Rent payable to Owner during the renewal term; payable consistent with the terms of the PAYMENT OF COMMISSION provision of the Agreement.

(b)    **Expansions.**

A four and one-half percent (4½%) commission based on the Base Rent payable to Owner during the term with respect to the additional space leased; payable consistent with the terms of the PAYMENT OF COMMISSION provision of the Agreement.

Section 2.    **Conditions Precedent to Payment of Additional Commissions.**

If the term of the Lease is renewed or extended (or if the Premises are expanded) generally in accordance with the terms of the Lease, Landlord agrees to pay Broker a commission in accordance with Section 1 above; however, such commission shall be due and payable only if all the following conditions are met:    (i) Broker, acting as Tenant's exclusive agent, materially participates in the effort to accomplish the renewal, extension, new lease, or expansion; (ii) Tenant has not appointed another broker as its representative; and (iii) Tenant certifies in writing to landlord that Broker is acting as Tenant's exclusive representative in connection therewith.

Section 3.    **Limitation on Total Commission.**

Notwithstanding anything herein or in the Agreement to the contrary, no commission shall be due as to the portion of any lease term (i.e., Primary Term, Renewal Term, or Expansion Term) that exceeds fifteen years from the commencement of any such lease term.

*[signature blocks are continued on next page]*

Mr. Jeff Price and Mr. Steven Schneider
Commission Registrati... Agreement for GMAC Mortgage Group
April 16, 2002
Page 6

REDACTED

LANDLORD:

LEWISVILLE LSF, L.P.

By: HUTSON ADVISORS, L.b.C., Asst Manager

Signature: _Andrew B. Quille_

Name: _Andrew B. Quille_          Date: _4/3/02_

ACKNOWLEDGED & ACCEPTED:
Grubb & Ellis Company

Signature: _____          Date: _4/16/02_

Name: _JEFF DEWEESE_

Title: _EX. V. P._

Federal ID: _____          Broker ID: _____

Rider No. 101

## PARKING FACILITIES

So long as this Lease remains in effect, Landlord hereby agrees to make available to Tenant, one (1) parking space for each two hundred fifty (250) square feet of Rentable Space of the Premises in surface parking lots designated on Schedule 101 attached hereto, of which ten (10) spaces will be designated by Landlord as reserved for Tenant. The parking spaces described in the preceding sentence may be re-located, at Landlord's reasonable discretion, in any of the surface parking areas located within the Project.

A condition of any parking rights set forth above shall be compliance by the parker with any rules and regulations established by Landlord, including any sticker or other identification system established by Landlord. Landlord reserves the right to modify and/or adopt such other reasonable and generally applicable rules and regulations for the applicable parking areas as it deems reasonably necessary for the operation of such areas. The following rules and regulations are in effect until notice is given to Tenant of any change:

(1)     Cars must be parked entirely within the stall lines painted on the floor.

(2)     All directional signs and arrows must be observed.

(3)     The speed limit shall be five (5) miles per hour.

(4)     Parking is prohibited in areas not striped for parking, aisles, areas where "no parking" signs are posted, in cross hatched areas and in such other areas as may be designated by Landlord or Landlord's agent(s) including, but not limited to, areas designated as "Visitor Parking" or reserved spaces not rented under this Lease.

(5)     Every parker is required to park and lock his own car.  All responsibility for damage to cars or persons or loss of personal possessions is assumed by the parker.

(6)     Spaces which are designated for small, intermediate or full-sized cars shall be so used.  No intermediate or full-size cars shall be parked in parking spaces limited to compact cars.

Note: Landlord and tenant mutually agree to designate ten (10) reserved parking spaces for exclusive use of GMAC immediately adjacent to the primary entrance of Building Three (3).  The primary entrance is located on the Highway 121 side of the breezeway connecting Buildings Three (3) and Four (4).  In lieu of Schedule 101 Landlord and Tenant will identify the location of the designated spaces within thirty (30) days of lease execution.

RIDER NO. 101 - PAGE 1 OF 1

INITIALED:
LANDLORD:_____
TENANT:_____

DALLAS4 5778164v7 32970-00288

Rider No. 104

### RIGHT OF FIRST REFUSAL

1.    **Right of First Refusal.** Provided this Lease is then in full force and effect and no monetary event of default (beyond any applicable notice and cure periods) and no material non-monetary event of default (beyond any applicable cure period) exists, and subject to the terms hereof, Tenant shall have the right of first refusal during the first eighty-four (84) months of the Lease Term as hereinafter described to lease all (but not less than all) of the additional space consisting of the areas designated and referred to on **Exhibit "B-2"** attached to this Lease as the "Right of First Refusal Space", for a term beginning on the Effective Date (as hereinafter defined) and ending contemporaneously with the expiration of the Lease Term (unless sooner terminated pursuant to the terms of this Lease, and subject to any rights of extension contained in this Lease). The phrase "material non-monetary default," as used herein, shall include, without limitation, (a) any default which adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which adversely affects other tenants of the Project, and (c) any default relating to violations of applicable laws. The right of first refusal contained herein shall automatically terminate following the expiration of such eighty-four (84) month period (unless sooner terminated pursuant to the terms of this Lease).

2.    **Notice by Landlord.** If Landlord enters into negotiations with an existing tenant in the Building or a prospective tenant to lease all or any part of the Right of First Refusal Space (or if an existing tenant of the Right of First Refusal Space desires to extend the term of its lease thereof), upon terms which Landlord desires to accept (the "**Offer Terms**") Landlord shall notify Tenant of such fact and shall include in such notice the Offer Terms. Tenant shall have a period of seven (7) business days from the date of delivery of such notice to notify Landlord whether Tenant elects to exercise the right granted hereby to lease the entire Right of First Refusal Space. If Tenant fails to give any notice to Landlord within the required seven (7) business day period, Tenant shall be deemed to have refused its right to lease the Right of First Refusal Space.

3.    **Refusal by Tenant.** If Tenant so refuses its right to lease the Right of First Refusal Space (either by giving written notice thereof or by failing to give any notice), Landlord shall have the right to lease all or any portion of the Right of First Refusal Space to an existing tenant in the Building or a prospective tenant (or to extend the term of the lease of an existing tenant) on such terms and provisions as may be acceptable to Landlord. If Tenant so refuses its right to lease the Right of First Refusal Space, then if Landlord shall enter into a lease with a prospective tenant (or extend the term of the lease of an existing tenant) for all or any part of the Right of First Refusal Space, Tenant's right of first refusal contained herein shall terminate and be of no further force and effect; provided, however, that in the event (i) Landlord shall enter into a Lease with a prospective tenant for less than all of the Right of First Refusal Space, and (ii) the remaining unleased portion of the Right of First Refusal Space is located immediately adjacent to the Premises, then Tenant's Right of First Refusal contained herein shall continue as to the unleased portion of the Right of First Refusal Space which is located immediately adjacent to the Premises.

4.    **Acceptance by Tenant.** Upon the exercise by Tenant of its right of first refusal as provided in Paragraph 2, Landlord and Tenant shall, within ten (10) days after Tenant delivers to Landlord notice of its election, enter into a written amendment modifying and supplementing this Lease and containing other appropriate terms and provisions relating to the addition of the Right of First Refusal Space to the Premises (including specifically any increase, adjustment, or augmentation of rent as a result of such addition). The annual Base Rental to be paid under this Lease for the Right of First Refusal Space so leased shall be at the Offer Terms, except that in no event will the Base Rental be less than the Base Rental then in effect under the Lease. The payment of the new Base Rental for the Right of First Refusal Space shall commence on the date specified in the Offer Terms. Rent for a partial month shall be prorated. Possession of the Right of First Refusal Space shall be delivered to Tenant in accordance with the Offer Terms.

5.    **Termination of Right.** Any termination of this Lease during the original Lease Term (or any extension thereof) or any permitted assignment or subleasing by Tenant pursuant to this Lease (except for any assignment of sublease to an Affiliate, as defined in Paragraph 11 of the Lease) shall terminate the right of first refusal of Tenant contained herein.

RIDER NO. 104 - PAGE 1 OF 1

INITIALED:
LANDLORD:_____
TENANT:_____

DALLAS4 577616v7 32970-00288

Rider No. 102

### TENANT'S OPTION TO RENEW

Tenant may, at its option and subject to the terms hereof, renew the Lease Term for two (2) additional term(s) of sixty (60) months each, provided that this Lease must be in full force and effect and no monetary event of default (beyond any applicable notice and cure period) and no material non-monetary default (beyond any applicable notice and cure period) exists under this Lease at the time of exercise of such option or at the time the renewal term would begin. The phrase "material non-monetary default," as used herein, shall include, without limitation, (a) any default which adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which adversely affects other tenants of the Project, and (c) any default relating to violations of applicable laws. Such renewal shall be upon the same terms and conditions as provided elsewhere in this Lease, except that (i) this Lease may not be renewed more often than as set forth above, (ii) Landlord shall have no obligation to install improvements in the Premises, and (iii) the annual Base Rental for such renewal period(s), and each monthly installment thereof, shall be determined as provided below. Each such option shall be exercised by Tenant giving notice to Landlord by certified mail, return receipt requested, at least nine (9) but not more than twelve (12) months prior to the end of the then-existing term, and, if not so exercised, such option not so exercised and any subsequent option to renew shall automatically expire and terminate. If Tenant so elects to renew the Lease Term, following Tenant's exercise of such renewal option, upon request from Landlord, Tenant and Landlord will enter into a renewal agreement by which this Lease will be renewed in accordance with the terms set forth in this Rider.

The annual Base Rental for each renewal period shall be the Prevailing Rental Rate, which shall mean the current fair market rent for comparable office space located within similar buildings within the Lewisville/Denton submarket, as reasonably determined by Landlord, taking into consideration use, location and floor level within the Building, rental concessions then being granted by Landlord under similar circumstances, base year and/or expense calculations, the date the particular rate under consideration is to become effective, and the term of the lease under consideration. However, it is specifically agreed that for the purposes of Tenant's renewal option only, no concession or allowance for installation of Tenant improvements or moving expenses will be included in determining the Prevailing Rental Rate, inasmuch as Tenant will already be in possession and leasehold improvements will already have been installed in Tenant's Premises. Landlord shall promptly notify Tenant of the Prevailing Rental Rate as determined by Landlord in accordance with this Paragraph no more than 30 days following Landlord's receipt of notice from Tenant of the election to renew.

Within thirty (30) days after Landlord shall have given notice to Tenant of the Prevailing Rental Rate as determined by Landlord for either the first renewal term or the second renewal term, Landlord and Tenant shall attempt to agree upon the Prevailing Rental Rate for the extended term. If the parties agree on Prevailing Rental Rate for the extended term during that period, they shall immediately execute an amendment to the Lease stating the Prevailing Rental Rate and the amount of the fixed rent for such renewal term in question.

If the parties are unable to agree on the Prevailing Rental Rate for the applicable renewal term within the 30 day period, then, within 15 days after the expiration of that period, each party, at its cost, and by giving notice to the other party, shall appoint a real estate appraiser with MAI designation and at least five years' full time commercial appraisal experience in the area in which the Building is located to appraise the Premises and determine the fair rental value for the Premises, taking into consideration the factors described in the second Paragraph of this Rider No. 102. If one party does not appoint an appraiser within ten days after the other party has given notice of the name of its appraiser, the single appraiser appointed shall be the sole appraiser, and fair rental value so determined by that appraiser shall be the Prevailing Rental Rate for purposes of this subparagraph.

If two appraisers are appointed by the parties as stated above, they shall independently establish fair rental value for the Premises. If the appraisers agree, the Prevailing Rental Rate shall be the fair rental value of the property as agreed by the two appraisers. If they are unable to agree within 30 days after the second appraiser has been appointed, the Prevailing Rental Rate shall be the fair rental value for the Premises as determined by the average of the two appraisals if the higher of the two appraisals is no greater than 110% of the lower of the two appraisals. If, however, the higher of the two appraisals is more than 110% higher than the lower appraisal, the two appraisers shall promptly appoint a third appraiser who shall appraise the Premises and independently determine fair rental value for the Premises, taking into consideration the factors described in the second paragraph of this Rider No. 102. Each of the parties shall bear one half of the cost of appointing the third appraiser and of paying the third appraiser's fee. The third appraiser shall have the qualifications stated above and shall further be a person who has not previously acted in any capacity for either party.

Within 30 days after the selection of the third appraiser, the Prevailing Rental Rate shall be established as the fair rental value of the Premises as determined by an average of the three appraisers; provided, however, that if the low appraisal and/or the high appraisal are/is more than ten percent lower and/or higher than the middle appraisal, the low appraisal and/or the high appraisal shall be disregarded. If only one appraisal is disregarded, the remaining two appraisals shall be added together and their total divided by two to establish the Prevailing Rental Rate. If both the low appraisal and the high appraisal are disregarded as stated in this Paragraph, the middle appraisal shall establish the Prevailing Rental Rate for the Premises during the renewal term in question.

RIDER NO. 102 - PAGE 1 OF 1

INITIALED:
LANDLORD:_____
TENANT:_____

Rider No. 103

## OPTION TO EXPAND

1.    **Option to Expand.** Tenant shall, subject to the terms hereof, have the option to Lease additional space consisting of the area designated and referred to on Exhibit "B-1" attached to this Lease as the "Expansion Space", for a term beginning prior to the expiration of twelve (12) months after the Commencement Date (the commencement date of any such term being referred to as the "Effective Date") and ending on the expiration of the Lease Term (unless sooner terminated pursuant to the terms of this Lease, and subject to any rights of extension contained in this Lease) by delivering written notice to Landlord no later than nine (9) months after the Commencement Date, provided that at the time of such notice and on the Effective Date, no monetary event of default (beyond any applicable cure period) and no material non-monetary event of default (beyond any applicable cure period) exists. The phrase "material non-monetary default," as used herein, shall include, without limitation, (a) any default which adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which adversely affects other tenants of the Project, and (c) any default relating to violations of applicable laws. Once Tenant shall exercise an expansion option, Tenant may not thereafter revoke such exercise. Tenant's failure to timely exercise an expansion option for any reason whatsoever shall conclusively be deemed a waiver of such expansion option. Tenant may not thereafter revoke such exercise. Tenant's failure whatsoever shall conclusively be deemed a waiver of such expansion option.

2.    **Expansion of Premises.** Upon the exercise of such expansion option, Landlord and Tenant shall enter into a written agreement modifying and supplementing this Lease and specifying that the Expansion Space is part of the Premises and is subject to all of the terms and provisions of this Lease, including the Leasehold Improvements Agreement, and containing other appropriate terms and provisions relating to the addition of the Expansion Space to this Lease; provided, however, any periods that are free of Base Rental shall be prorated based on the ratio that the period free of Base Rental bears to the Lease Term, and provided, however, any improvement allowance shall be prorated based on the ratio that the remaining length of the Lease Term bears to the Lease Term.

3.    **Termination of Option.** Any termination of this Lease during the initial Lease Term (or any extension hereof) or any permitted assignment or subleasing by Tenant pursuant to this Lease (except for any assignment or sublease to an Affiliate, as defined in Paragraph 11 of the Lease) shall terminate the option of Tenant contained herein.

RIDER NO. 103 - PAGE 1 OF 1

INITIALED:
LANDLORD:_____
TENANT:_____

DALLAS4 377816v7 32970-00288

### RIGHT OF FIRST OPPORTUNITY

1.    **Right of First Opportunity**. Tenant shall, subject to the terms hereof, have the option to Lease additional space within the Building to be identified by Tenant in the Opportunity Notice (the "**Opportunity Space**"), for a term beginning prior to the expiration of twenty four (24) months after the Commencement Date (the commencement date of any such term being referred to as the "**Effective Date**") and ending on the expiration of the Lease Term (unless sooner terminated pursuant to the terms of this Lease, and subject to any rights of extension contained in this Lease) by delivering written notice (the "**Opportunity Notice**") to Landlord either (i) no later than ten (10) days following the delivery of written notice to Tenant that Landlord desires to lease any Opportunity Space to an existing or prospective tenant of the Building, or (ii) no later than 540 days following the Commencement Date, provided that at the time of such notice and on the Effective Date, no monetary event of default (beyond any applicable notice and cure period) and no material non-monetary default (beyond any applicable notice and cure period). Once Tenant shall exercise an option pursuant to this Rider 103A, , Tenant may not thereafter revoke such exercise. Tenant's failure to timely exercise an option pursuant to this Rider 103A, for any reason whatsoever shall conclusively be deemed a waiver of such option. Tenant may not thereafter revoke such exercise. Tenant's failure whatsoever shall conclusively be deemed a waiver of such option.

2.    **Expansion of Premises**. Upon the exercise of such option, Landlord and Tenant shall enter into a written agreement modifying and supplementing this Lease and specifying that the Opportunity Space is part of the Premises and is subject to all of the terms and provisions of this Lease, including the Leasehold Improvements Agreement, and containing other appropriate terms and provisions relating to the addition of the Opportunity Space to this Lease; provided, however, any periods that are free of Base Rental shall be prorated based on the ratio that the period free of Base Rental bears to the Lease Term, and provided, however, any improvement allowance shall be prorated based on the ratio that the remaining length of the Lease Term bears to the Lease Term.

3.    **Termination of Option**. The rights contained in this Rider No. 103A shall automatically terminate on the second anniversary of the Commencement Date. In addition, any termination of this Lease during the initial Lease Term (or any extension hereof) or any permitted assignment or subleasing by Tenant pursuant to this Lease (except for any assignment of sublease to an Affiliate, as defined in Paragraph 11 of the Lease) shall terminate the option of Tenant contained herein.

INITIALED:
LANDLORD:_____
TENANT:_____

Rider No. 105

## SCHEDULE OF BASE RENTAL

Base Rental shall be payable as follows, prorated for any partial month of occupancy:

| Months | Cost Per Rentable Square Foot Per Annum | Monthly Installment |
|---|---|---|
| 1 through 5 | $0.00 | $0.00 |
| 6 through 65 | $17.00 | $27,075.33 |
| 66 through 101 | $18.50 | $29,464.33 |

RIDER NO. 105 - PAGE 1 OF 1

INITIALED:
LANDLORD:_____
TENANT:_____

# FIRST AMENDMENT TO LEASE AGREEMENT

This FIRST AMENDMENT TO LEASE AGREEMENT (this "Amendment") is entered into as of the latest date accompanying the signatures below, by and between LEWISVILLE LSF, L.P., a Texas limited partnership ("Landlord"), and GMAC MORTGAGE CORPORATION, a Pennsylvania corporation ("Tenant").

## RECITALS

A.    Landlord and Tenant have previously entered into that certain Lease Agreement dated July _30_, 2002 (the "Lease"), covering approximately 19,112 square feet of Rentable Space designated as Suite 300 in the project commonly referred to as Convergence Office Center, Lewisville, Texas (the "Premises").

B.    Landlord and Tenant desire to modify the Lease pursuant to the terms and provisions outlined below in this Amendment.

## AGREEMENTS

NOW THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by each party hereto to the other, the receipt and sufficiency of which is hereby mutually acknowledged, Landlord and Tenant hereby agree as follows:

1.    Premises. On the Expansion Commencement Date (as defined below), the Premises shall be expanded to include that certain space covering approximately 15,314 square feet of Rentable Space (13,760 usable square feet) (designated as the GMAC Expansion (the "Expansion Premises"), as shown on the floor plan attached hereto as Exhibit A and made a part hereof for all purposes. Accordingly, all references to "Premises" (i) hereafter in this Amendment, and (ii) effective as of Expansion Commencement Date, in the Lease, shall be deemed to refer to a total of approximately 34,426 square feet of Rentable Space and is amended to include the Expansion Premises.

2.    Term. Landlord and Tenant hereby acknowledge and agree that the Lease Term for the Expansion Premises (as defined below) shall commence on the earlier of (i) the date of substantial completion of the Tenant Finish Work pursuant to Exhibit C attached hereto and made a part hereof and the issuance to Tenant of a Certificate of Occupancy or its equivalent covering the Expansion Premises, or (ii) June 1, 2004 (which date shall be postponed by one day for each day of delay resulting from a Landlord Delay (defined in Exhibit C)) (the "Expansion Commencement Date") and expire on April 30, 2011 (the "Expiration Date"). The Expiration Date or Termination Date for the Expansion Premises and the Original Premises shall, under all circumstances, be coterminous. Any options or rights to terminate, cancel, extend, expand or renew, or any rights of first refusal or first opportunity are automatically extended to the Expansion Space. Commencing on the date of this Amendment, Tenant shall be permitted access to the Expansion Premises for purposes of constructing Tenant Finish Work (defined in Exhibit B hereto), subject to all provisions

1

of the Lease and this Amendment, except that Tenant shall have no obligation to pay rent of any kind with regard to the Expansion Space until the Expansion Commencement Date.

3.    Base Rental. Commencing on the Expansion Commencement Date, and continuing until the termination of the Lease on the Expiration Date (unless sooner terminated as provided in the Lease), the Base Rental payable by Tenant with respect to the Expansion Premises shall be as follows:

| Period | Cost Per Rentable Square Foot Per Annum | Monthly Installment |
|---|---|---|
| Expansion Commencement Date through the 123rd day thereafter | $0.00 | $0.00 |
| 124th Day following the Expansion Commencement Date through April 30, 2008 | $17.00 | $21,695.00 |
| May 1, 2008 through end of term | $18.50 | $23,609.00 |

4.    Base Expense Amount; Tenant's Proportionate Share.    The calendar year for determining the "Base Expense Amount" for the Expansion Premises shall be calendar year 2004. Effective as of the Expansion Commencement Date, in addition to Tenant's Proportionate Share of the Operating Expenses in excess of the Base Expense Amount (based on calendar year 2003) attributable to the original Premises, Tenant shall pay Tenant's Proportionate Share of Operating Expenses in excess of the Base Expense Amount (based on calendar year 2004) attributable to the Expansion Premises, determined as follows:

In the case of Operating Expenses that are incurred on a Building-wide Basis, 20.07%, which is the percentage obtained by dividing (i) the 15,314 rentable square feet in the Expansion Premises by (ii) the 76,302 rentable square feet in the Building. In the case of Operating Expenses that are incurred on a Project-wide Basis, 1.64% which is the percentage obtained by dividing (i) the 15,314 rentable square feet in the Expansion Premises by (ii) the 931,048 rentable square feet currently located within the Project. Tenant's Proportionate Share will be recalculated as required effective at the commencement of any period to which the calculation is applicable in this Lease. Landlord, in Landlord's reasonable discretion, shall determine which Operating Expenses are allocated on a Building-wide Basis, and which Operating Expenses are allocated on a Project-wide Basis. Notwithstanding the foregoing, Tenant's Proportionate Share as to certain expenses may be calculated differently to yield a higher percentage to Tenant as to certain expenses in the event Landlord permits other

2

tenants in the Building or the Project to directly incur such expenses rather than have Landlord incur the expense in common for the Building or the Project.

Landlord will cooperate, at no expense to Landlord, in efforts by Tenant to obtain tax credits, rebates, abatements, or similar benefits that may be available to Tenant with respect to the Lease.

5.    Acceptance of Leased Premises; Work Allowance. Tenant acknowledges and agrees that as of the date of this Amendment, Tenant is currently occupying the Premises, shall continue to lease the Premises, and commencing on the Expansion Commencement Date shall occupy and lease the entire Premises (i.e., including the Expansion Premises), except as otherwise expressly provided herein, in its "AS IS, WHERE IS" condition, WITH ALL FAULTS (except to the extent of any items which Landlord is specifically obligated to repair or maintain pursuant to the terms of the Lease) and subject to latent defects with respect to any items which Landlord is specifically obligated to repair or maintain pursuant to the terms of the Lease. All of Landlord's representations and warranties provided under the Lease concerning environmental compliance as described in Paragraph 55 are hereby expressly extended to apply to the Expansion Premises. Tenant further acknowledges that Landlord nor any of Landlord's affiliates has made, and Tenant waives, any representation or warranty with respect to the Premises or any other portion of the Project including, without limitation, any representation or warranty with respect to the suitability or fitness of the Premises or any other portion of the Project for the conduct of Tenant's business. Notwithstanding the foregoing, Landlord hereby acknowledges and agrees that Landlord will provide Tenant a Work Allowance (as defined in Exhibit C attached hereto and made a part hereof for all purposes) for the Expansion Premises for the purpose of construction of Tenant Finish Work (as defined in Exhibit C attached hereto and made a part hereof for all purposes) for the Expansion Premises, to be performed in accordance with the terms, conditions, and provisions set forth on Exhibit C attached hereto and made a part hereof for all purposes. Notwithstanding anything in this Amendment to the contrary, Landlord warrants that on the Expansion Premises Commencement Date all base building systems (as opposed to systems to be designed for the interior of the Expansion Premises) for HVAC, plumbing, electrical, and mechanical systems serving the Expansion Premises shall be in good working order. Further, Landlord acknowledges and agrees that nothing in this Amendment will require Tenant to make or perform any work or make any repairs or changes outside the entry to the Premises, including, but not limited to, changes to the Building or Common areas or otherwise make permanent improvements to the Project, other than any alterations or improvements to be made by Tenant to Tenant's mechanical and electrical equipment located in the mechanical rooms and Tenant's generators located outside of the Premises.

6.    Address of Landlord. Landlord's address for notices due under the Lease, as provided in the Basic Lease Information is hereby deleted and replaced with the following:

Lewisville LSF, L.P.
c/o Hudson Advisors, L.L.C.
717 North Harwood Street, Suite 2100
Dallas, Texas 75201
Attention: Mr. Joe Jernigan
Telephone: (214) 754-8476
Fax: (214) 754-8402

3

with a copy to:

Champion Partners
15601 Dallas Parkway, Suite 100
Addison, Texas 75001
Attention: Mr. Robert Poynor
Telephone (972) 490-5600
Fax: (972) 490-5599

7.    Brokerage; Indemnity. Each of Tenant and Landlord warrant to the other that it has had no dealings with any broker or agent in connection with this Amendment other than USI, Grubb & Ellis and Capstar Commercial (collectively, "Brokers"), and each shall indemnify the other against all costs, expenses, attorneys' fees, or other liability for commissions or other compensation or charges claimed by any other broker or agent, other than Brokers, claiming the same by, through, or under Tenant or Landlord, as applicable.

8.    Option to Expand. Landlord and Tenant hereby confirm and agree that Tenant shall have no further right to expand the Premises pursuant to Rider No. 103 attached to the Lease.

9.    Right of First Refusal Space. Exhibit "B-2" attached to the Lease is hereby deleted and replaced with Exhibit "B-2" attached to this Amendment.

10.    Right of First Opportunity. Effective on the date of the expiration of Tenant's right of first opportunity currently provided for in Rider No. 103A of the original Lease (i.e., on November 4, 2004), Rider No. 103A is hereby deleted and replaced with Rider No. 103A attached to this Amendment. In addition, Exhibit "B-3" attached to this Amendment is hereby incorporated into the Lease for the purpose set forth in Rider 103A attached to this Amendment.

11.    Miscellaneous.

(a)    Tenant, based on its present, actual knowledge hereby acknowledges, that Landlord is not in default under the Lease and no event or condition exists which, with the giving of notice or the passing of time or both, would constitute a default or event of default by Landlord under the Lease, and that Tenant has no charge, lien, defense or claim of offset under the Lease against rent or other charges due or to become due thereunder.

(b)    This Amendment may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Amendment.

(c)    Any capitalized term or phrase used in this Amendment shall have the same meaning as the meaning ascribed to such term or phrase in the Lease unless expressly otherwise defined in this Amendment.

4

DALLAS4 618758v12 32970-00288

(d)    Except as amended by this Amendment, the terms of the Lease remain in full force and effect. All obligations of Tenant under the Lease are hereby ratified and reaffirmed.

(e)    In the event that the terms of the Lease conflict or are inconsistent with those of this Amendment, the terms of this Amendment shall govern.

(f)    This Amendment shall become effective only upon execution and delivery by both Landlord and Tenant.

(g)    Time is of the essence in the performance of all covenants and obligations set forth in this Amendment.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the latest date accompanying signatures below.

**LANDLORD:**

**LEWISVILLE LSF, L.P.,**
a Texas limited partnership

By:    Lewisville GenPar LLC, its general partner

By: _____
Name: ~~J.S. Bell~~
Title: ~~Vice President~~

Date: _____

**TENANT:**

**GMAC MORTGAGE CORPORATION,**
a Pennsylvania corporation

By: _____
Name: _Jim Hillshop_    _Lisa Gess_
Title: _CFO_    _CAO_

Date: _March 23, 2009_

5

## <u>EXHIBIT A</u>

### FLOOR PLAN OF EXPANSION PREMISES

GMAC Proposed as "Expansion Premises"



GMAC
PROPOSED
13,760 USF.
15,314 RSF
12-05-03

# BUILDING 3

6

## EXHIBIT B-2

### RIGHT-OF FIRST REFUSAL SPACE



7

## EXHIBIT B-3

### RIGHT OF FIRST OPPORTUNITY SPACE



8

## EXHIBIT C

## TENANT FINISH CONSTRUCTION

1.    **PLANS AND SPECIFICATIONS**: Tenant shall submit to Landlord within thirty (30) days after the date of this Amendment space plan(s) and other information (collectively the "Space Plan") necessary or required to complete the initial plans and specifications (the "Initial Construction Documents") for the construction of the Tenant Finish Work (as defined below) in the Expansion Premises. Any disapproval by Landlord of the Space Plan or any revisions must specify in reasonable detail the reasons therefore. Landlord and Tenant shall work to resolve their differences and produce an approved Space Plan (the "Approved Space Plan"). Landlord will reasonably cooperate with Tenant, at no cost or expense to Landlord, to assist Tenant in obtaining all permits. Based on the Approved Space Plan, Tenant shall cause the Initial Construction Documents to be completed and delivered to Landlord for approval.

The Initial Construction Documents shall consist of any and all architectural, electrical, mechanical, plumbing, structural and communication/security drawings and written specifications necessary to construct the leasehold improvements. The Initial Construction Documents shall be subject to the written approval of Landlord, which approval shall not be unreasonably withheld. Any disapproval of the Initial Construction Documents must specify in reasonable detail the reasons for the disapproval. The approved Initial Construction Documents are referred to as the "Construction Documents" and all work to be performed by Tenant pursuant to the Construction Documents is referred to as the "Tenant Finish Work". Landlord shall not be deemed to represent and warrant that the Construction Documents comply with applicable laws and Tenant, at its sole cost and expense, is responsible for the Construction Documents complying with applicable laws.

Within 7-business days after receipt of any one or more of Tenant's Space Plan, Initial Construction Documents, Approved Space Plan, Construction Documents, and any revisions thereto (collectively referred to as the "Plans"), Landlord must approve or reject such one or more of Tenant's Plans. Landlord's failure to respond in writing within the 7-business-day period will be a deemed approval. If Tenant revises the Plans, Landlord shall approve or reject of revisions within 7-business days after receipt of the revision. Landlord's failure to respond in writing within the 7-business-day period will be a deemed approval. Minor revisions not involving exterior, structural utility or mechanical and electrical systems will not require the Landlord's review or consent.

2.    **TENANT FINISH WORK**. Tenant shall construct or cause to be constructed, at its sole cost and risk (subject to payment by Landlord as provided below), the Tenant Finish Work in substantial accordance with the Construction Documents. Tenant shall permit Landlord access to the Expansion Premises at all reasonable times to inspect the Tenant Finish Work; provided, however, that Landlord has no obligation to inspect the Tenant Finish Work. No inspection of the Tenant Finish Work by Landlord shall be deemed a warranty that the Tenant Finish Work complies with the Construction Documents, or any applicable laws.

9

Tenant shall pay the Actual Cost (defined below) of the Tenant Finish Work. Within thirty (30) days following the last to occur of the following: (i) the completion of the Tenant Finish Work to Landlord's reasonable satisfaction in substantial accordance with the Construction Documents, (ii) the delivery to Landlord of reasonable evidence (i.e., invoices) of the Actual Costs of the Tenant Finish Work, (iii) the delivery to Landlord of unconditional lien waivers and bills paid affidavits from all contractors, subcontractors or other parties who performed work in connection with the Tenant Finish Work, (iv) the delivery to Landlord of copies of Tenant's final certificate of occupancy and final TAS (Texas Accessibility Standards) approval issued by the appropriate governmental and/or municipal authorities, (v) the delivery to Landlord of two (2) reproducible copies of "as built" plans and specifications (1/8 inch scale) for the Tenant Finish Work, together with copies of all warranties issued in connection with the completion of Tenant's Finish Work, Landlord shall reimburse Tenant the lesser of (a) the Actual Cost (as defined below) of the Tenant Finish Work, but not more ~~$315,393.50~~ than the aggregate of ~~$314,549.56~~ (the "Work Allowance") (based on an June 1, 2004 Commencement Date). The term "Actual Cost" means the cost of all labor, services, supplies, materials, equipment and tools (including rental fees) and all hard costs incurred by Tenant in performing the Tenant Finish Work, excluding the cost of preparing the Construction Documents (i.e., the Work Allowance shall not include the cost of preparing the Construction Documents), together with a construction review fee payable to Landlord not to exceed $1,000 based on Landlord's actual costs. In addition, Landlord will pay Tenant an additional $19,142.50, which figure represents $1.25/rentable square foot related to certain VAV units and ductwork, which amount shall be payable to Tenant in the same manner as the Work Allowance. ~~Notwithstanding anything to the contrary set forth above, in the event that the Expansion Commencement Date occurs prior to June 1, 2004, then the Work Allowance shall be increased by an amount equal to the following: (1) the product of (A) the rentable square footage of the Expansion Premises multiplied by (B) the product of $25.00 multiplied by a fraction, the numerator of which is the remaining Lease Term as of the Expansion Commencement Date and the denominator of which is the original Lease Term (i.e., one hundred one (101) months), as prorated on a per diem basis for a partial month(s) minus (2) $314,549.56.~~

3.    **PROJECT ENGINEER; TENANT'S GENERAL CONTRACTOR:** Tenant must use the fire alarm contractor and the roof contractor of record for the Project in connection with any Tenant Finish Work or any other work affecting the Building's fire alarm or roof, as applicable, so as not to negatively impact any warranties applicable to the fire alarm system and/or roof. The contact information for the fire alarm contractor and roof contractor for the Project is set forth on Schedule B to this Exhibit C. The general contractor selected by Tenant to construct the Tenant Finish Work shall be subject to Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed.

4.    **GENERAL:**

(a)    Any material changes to the Construction Documents must first be submitted to Landlord for review and approval prior to the work reflected in such amended Construction Documents being undertaken by Tenant.

10

(b)  Workmanship and materials reflected in proposed changes to the Construction Documents shall be of a quality which is equal to or better than the quality of the improvements contained in the prior Construction Documents.

(c)  Tenant shall perform the Tenant Finish Work in a manner so as to minimize noise and other interference with tenants of the Project and shall remove all trash and other debris from the Expansion Premises and all other areas of the Project on a daily basis.

(d)  Upon completion of the construction of the Tenant Finish Work, Tenant shall promptly restore any landscaping, sidewalks and other exterior or interior portions of the Project damaged as a result of Tenant's construction of the Tenant Finish Work to the condition existing prior to the commencement of such construction.

(e)  Any entry upon the Expansion Premises by Tenant and its agents and contractors shall be deemed to be under all of the terms, covenants, provisions and conditions of the Lease, excepting only (as to Tenant's agents and contractors) the covenant to pay Rent. All of Tenant's materials, work, installations and decorations of any nature brought upon or installed in the Expansion Premises shall be at Tenant's sole risk, and neither Landlord nor any party acting on Landlord's behalf shall be responsible for any damage thereto or loss or destruction thereof.

(f)  Prior to the commencement of construction of the Tenant Finish Work, Tenant must provide to Landlord a copy of the building permit for the Tenant Finish Work, along with evidence of the insurance coverages required pursuant to Schedule A to this Exhibit C.

5.  **CONTRACTOR INSURANCE REQUIREMENTS**: All contractors, subcontractors, suppliers, service providers, moving companies, and others performing work of any type for Tenant in the Building shall comply with the terms of Schedule A attached to this Exhibit C.

6.  **LANDLORD DELAY**. "Landlord Delay" shall mean any delay in the construction of the Tenant Finish Work resulting from (a) Landlord's failure to respond within the time frames contained herein; (b) Landlord's unreasonable withholding of consent, adding of unreasonable conditions, or subjecting its consent to unreasonable delay, but only to the extent that the Lease or this Amendment expressly prohibits Landlord from unreasonably withholding, conditioning, or delaying consent to the item in question; (c) any negligent or intentional act of Landlord or its employees, agents, or contractors that directly and materially impacts the timely completion of the Tenant Finish Work. Tenant shall have no right to claim a Landlord Delay unless Tenant shall have specified the nature of the delay in a written notice to Landlord within forty-eight (48) hours following the occurrence of the event causing the delay.

DALLAS4 61875M2 32970-00288

<u>Schedule A</u>
<u>to</u>
<u>EXHIBIT C</u>

## CONTRACTOR INSURANCE REQUIREMENTS

All contractors, subcontractors, suppliers, service providers, moving companies, and others performing work of any type for Tenant in the Project shall:

- carry the insurance listed below with companies acceptable to Landlord; and

- furnish Certificates of Insurance in form acceptable to Landlord, together with a copy of the endorsements to such policies of insurance evidencing the Landlord and Landlord's property manager, agents, mortgagees, any ground, primary or master lessor, and their respective officers, directors, employees, agents, partners and assignees, have been included as additional insureds, evidencing required coverages at least ten (10) days prior to entry in the Project and annually thereafter.

Certificates of Insurance must provide for thirty (30) days' prior written notice of cancellation, non-renewal or material change in coverage to Landlord.

1. <u>Workers Compensation</u>: Statutory coverage in compliance with Workers Compensation Laws of the state in which the Project is located.

2. <u>Employers' Liability</u>: With the following minimum limits of liability:

   | | |
   |---|---|
   | $100,000 | Each Accident |
   | $500,000 | Disease-Policy Limit |
   | $100,000 | Disease-Each Employee |

3. <u>Commercial General Liability</u>: (1986 ISO Form or its equivalent): This Insurance must provide contractual liability and a general aggregate limit on a per location or per project basis. The minimum limits must be $1,000,000 combined single limit on a per occurrence basis.

4. <u>Automobile Liability</u>: Insurance for claims arising out of ownership, maintenance, or use of owned, non-owned, loading and unloading, and hired motor vehicles at, upon, or away from the Project with the following minimum limits:

   | | |
   |---|---|
   | $1,000,000 | Combined Single Limit Bodily Injury and Property Damage combined on a per occurrence basis |

5. <u>Umbrella</u>: At least Following Form liability insurance, in excess of the Commercial General Liability, Employers Liability, and Automobile Insurance above, with the following minimum limits:

12

$3,000,000    Each Occurrence
$3,000,000    Aggregate – Where Applicable

6.    **General Requirements**: All policies must be:

- written on an occurrence basis and not on a claims-made basis;

- except for the workers compensation insurance, commercial general liability insurance shall be endorsed to name as additional insureds Landlord, Landlord's property manager, Landlord's mortgagees, any ground, primary, or master lessor, and their respective officers, directors, employees, agents, partners, and assigns;

- all policies shall be endorsed to cause each insurance carrier to waive any and every claim for recovery from any and all loss or damage to the Project or Leased Premises or to the contents thereof, whether such loss or damage is due to the negligence of Landlord, its officers, partners, directors, agents or servants, such waiver shall also include Landlord's property manager, mortgagees, any ground, primary or master lessor and their respective officers, directors, employees, agents, partners and assignees;

- any self-insured retention shall be the responsibility of the Tenant under its umbrella coverage;

- there shall be commercially reasonable deductibles applicable to the commercial general liability insurance; and
- all insurance companies shall have an A.M. Best's Rating of A-IX or better.

13

<u>Schedule B</u>
<u>to</u>
<u>EXHIBIT C</u>

<u>List of Fire Alarm and Roof Contractors</u>

<u>Fire Alarm</u>
General Sound – Phone No. (972) 231-2541

<u>Roof Contractor</u>
Texas Roof Management – Phone No. (972) 272-7663

DALLAS4 618758v12 32970-00288

Rider No. 103A

## RIGHT OF FIRST OPPORTUNITY

1.    **Right of First Opportunity**. Tenant shall, subject to the terms hereof, have the option to lease additional space in excess of 2,000 sq. ft located anywhere within the Building to be identified by Landlord in the Opportunity Notice (the "Opportunity Space"), for a term beginning on the earlier to occur of (i) the issuance of a Certificate of Occupancy or its equivalent covering the Opportunity Space, (ii) one hundred twenty (120) days following the delivery of an Opportunity Notice to Landlord, or (iii) November 4, 2009 (the commencement date of any such term being referred to as the "Effective Date") and ending on the expiration of the Lease Term (unless sooner terminated pursuant to the terms of this Lease, and subject to any rights of extension contained in this Lease) by delivering written notice (the "Opportunity Notice") to Landlord either (i) no later than thirty (30) days following the delivery of written notice to Tenant ("Landlord's Prospect Notice") that Landlord desires to lease any Opportunity Space to an existing or prospective tenant of the Building (the "Landlord's Prospect"), or (ii) no later than May 4, 2009, provided that (A) at the time of such notice and on the Effective Date, no monetary event of default (beyond any applicable notice and cure period) and no material non-monetary default (beyond any applicable notice and cure period) exists, and (B) in the event Tenant elects to lease Opportunity Space which is not the subject of a Prospect Notice, such Opportunity Space must be contiguous to the Premises. Once Tenant shall exercise an option pursuant to this Rider 103A, Tenant may not thereafter revoke such exercise. Tenant's failure to timely exercise an option pursuant to this Rider 103A, for any reason whatsoever shall conclusively be deemed a waiver of such option. Tenant may not thereafter revoke such exercise. If Tenant exercises the Right of First Opportunity for only part of the Building, then any residual space subject to this Right of First Opportunity shall remain available for Tenant's future right of expansion pursuant to this Rider. If the Landlord does not lease the space referenced in the Landlord's Prospect Notice to the Landlord Prospect within one hundred eighty (180) days following Tenant's rejection or deemed rejection of the right to lease the Opportunity Space, then such space shall be deemed available and again subject to this Right of First Opportunity.

2.    **Expansion of Premises**. Upon Tenant's exercise of such rights set forth in Paragraph 1 above, Landlord and Tenant shall enter into a written agreement specifying the portion of the Opportunity Space that is part of the Premises and that such space is subject to all of the terms and provisions of this Lease, except that Base Rent (including concessions) and tenant improvement allowance shall be the Prevailing Rates as determined in accordance in with the provisions set forth below. The Expiration Date or Termination Date for the Opportunity Space and the Original Premises shall, under all circumstances, be coterminous. Any options or rights to terminate, cancel, extend, expand or renew, or any rights of first refusal are automatically extended to the Opportunity Space.

The Rental and tenant improvement allowance ("TIA") for the Opportunity Space shall be the "Prevailing Rate," which shall mean the current fair market rate of rent and of tenant improvement allowance for comparable office space located within similar buildings within the Lewisville/Denton submarket as reasonably determined by Landlord, taking into consideration use, location and floor

11

DALLAS4 618758v12 32970-00288

level within the Building, rental concessions, free rent periods and improvement allowances then being granted by Landlords under similar circumstances, base year and/or expense calculations, the date the particular rate under consideration is to become effective, and the term of the lease under consideration. Landlord shall promptly notify Tenant of the Prevailing Rate as determined by Landlord in accordance with this Section 2 no more than thirty (30) days following Landlord's receipt of notice from Tenant of the Opportunity Notice.

Within thirty (30) days after Landlord shall have given notice to Tenant of the Prevailing Rate as determined by Landlord, Landlord and Tenant shall attempt to agree upon the Prevailing Rate for the Opportunity Space. If the parties agree on Prevailing Rate for the Opportunity Space during that period, they shall immediately execute an amendment to the Lease stating the Prevailing Rate and the amount of the fixed rent for such Opportunity Space.

If the parties are unable to agree on the Prevailing Rate for the Opportunity Space within the thirty (30) day period, then, within fifteen (15) days after the expiration of that period, each party, at its cost, and by giving notice to the other party, shall appoint a real estate appraiser with MAI designation and at least five years' full time commercial appraisal experience in the area in which the Building is located to appraise the Premises and determine the fair rental value for the Opportunity Space, taking into consideration the factors described in the second paragraph of this Section 2. If one party does not appoint an appraiser within ten days after the other party has given notice of the name of its appraiser, the single appraiser appointed shall be the sole appraiser, and fair rental value so determined by that appraiser shall be the Prevailing Rate for purposes of this subparagraph.

If two appraisers are appointed by the parties as stated above, they shall independently establish fair rental value for the Opportunity Space. If the appraisers agree, the Prevailing Rate shall be the fair rental value of the property as agreed by the two appraisers. If they are unable to agree within thirty (30) days after the second appraiser has been appointed, the Prevailing Rate shall be the fair rental value for the Opportunity Space as determined by the average of the two appraisals if the higher of the two appraisals is no greater than 110% of the lower of the two appraisals. If, however, the higher of the two appraisals is more than 110% higher than the lower appraisal, the two appraisers shall promptly appoint a third appraiser who shall appraise the Opportunity Space and independently determine fair rental value for the Opportunity Space, taking into consideration the factors described in the second paragraph of this Section 2. Each of the parties shall bear one half of the cost of appointing the third appraiser and of paying the third appraiser's fee. The third appraiser shall have the qualifications stated above and shall further be a person who has not previously acted in any capacity for either party.

Within fifteen (15) days after the selection of the third appraiser, the Prevailing Rate shall be established as the fair rental value of the Opportunity Space as determined by an average of the three appraisers; provided, however, that if the low appraisal and/or the high appraisal are/is more than ten percent lower and/or higher than the middle appraisal, the low appraisal and/or the high appraisal shall be disregarded. If only one appraisal is disregarded, the remaining two appraisals shall be added together and their total divided by two to establish the Prevailing Rate. If both the low appraisal and the high appraisal are disregarded as stated in this Paragraph, the middle appraisal shall establish the Prevailing Rate for the Opportunity Space.

12

3.    **Termination of Option**. The rights contained in this Rider No. 103A shall automatically terminate on November 4, 2009. In addition, any termination of this Lease during the initial Lease Term (or any extension hereof) or any permitted assignment or subleasing by Tenant pursuant to this Lease (except for any assignment or sublease to an Affiliate, as defined in Paragraph 11 of the Lease) shall terminate the option of Tenant contained herein.

4.    **New Tenant**.

a.    Landlord is currently in negotiations with a prospective tenant ("New Tenant") for certain space within the Project. In connection with the proposed lease to New Tenant, Landlord intends to grant certain rights to New Tenant to lease space within the Building.

b.    Landlord confirms and agrees that any rights granted to New Tenant to lease the Designated Space shall be subordinate to Tenant's current right of first opportunity set forth in Rider No. 103A attached to the original Lease.

c.    Notwithstanding anything to the contrary set forth herein, in the event Landlord enters into a lease with New Tenant for at least 200,000 square feet of space within the Project on or before November 4, 2004, then commencing on November 4, 2004, the terms and provisions of this Rider 103A shall automatically terminate and be of no further force and affect, and Tenant shall have no rights with respect to the Opportunity Space.

13

Rider No. 104

## RIGHT OF FIRST REFUSAL

1.    **Right of First Refusal**.  Provided this Lease is then in full force and effect and on the date Tenant elects to exercise its right to lease any Right of First Refusal Space (defined below) and on the Effective Date (as hereinafter defined), no monetary event of default (beyond any applicable cure period) and no material non-monetary event of default (beyond any applicable cure period) exists, Tenant shall have the right of first refusal during the first eighty-four (84) months of the Lease Term as hereinafter described to lease all (but not less than all) of the additional space consisting of the area designated and referred to on **Exhibit "B-2"** attached to this Rider No. 104 as the "Right of First Refusal Space", for a term beginning on the Effective Date and ending contemporaneously with the expiration of the Lease Term (unless sooner terminated pursuant to the terms of this Lease, and subject to any rights of extension contained in this Lease).  The phrase "material non-monetary default", as used herein, shall include, without limitation, (a) any default which adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which adversely affects other tenants of the Project, and (c) any default relating to Tenant's violations of applicable laws in contravention of the terms of the Lease.  The right of first refusal contained herein shall automatically terminate following the expiration of such eighty-four (84) month period (unless sooner terminated pursuant to the terms of this Lease).

2.    **Notice by Landlord**.  If Landlord makes or receives a written offer to any non-affiliated third party which is either an existing tenant in the Building or a prospective tenant to lease all or any part of the Right of First Refusal Space (or if an existing tenant of the Right of First Refusal Space desires to extend the term of its lease thereof), upon terms which Landlord desires to accept (the "Offer Terms") Landlord shall notify Tenant of such fact and shall include in such notice the Offer Terms.  The "Effective Date" will be the lease commencement date set forth in the Offer Terms.  Tenant shall have a period of ten (10) business days from the date of delivery of such notice to notify Landlord whether Tenant elects to exercise the right granted hereby to lease the entire Right of First Refusal Space.  If Tenant fails to give any notice to Landlord within the required ten (10) business day period, Tenant shall be deemed to have refused its right to lease the Right of First Refusal Space.

3.    **Refusal by Tenant**.  If Tenant so refuses its right to lease the Right of First Refusal Space (either by giving written notice thereof or by failing to give any notice), Landlord shall have the right to lease all or any portion of the Right of First Refusal Space to an existing tenant in the Building or a prospective tenant (or to extend the term of the lease of an existing tenant) on such terms and provisions as may be acceptable to Landlord.  If Tenant so refuses its right to lease the Right of First Refusal Space, then if Landlord shall enter into a lease with a prospective tenant (or extend the term of the lease of an existing tenant) for all or any part of the Right of First Refusal Space, Tenant's right of first refusal contained herein shall terminate and be of no further force and effect; provided, however, (A) that in the event (i) Landlord shall enter into a lease with a prospective tenant for less than all of the Right of First Refusal Space, and (ii) the remaining unleased portion of the Right of First Refusal Space is located immediately adjacent to the Premises, then Tenant's right of first refusal contained herein shall continue as to the unleased portion of the

14

Right of First Refusal Space which is located immediately adjacent to the Premises or (B) that in the event Landlord and such prospective tenant fail to enter into a lease within one hundred eighty (180) days following the rejection by Tenant of the Offer Terms, then Tenant's right of first refusal contained herein shall continue as to the entire Right of First Refusal Space.

4.    **Acceptance by Tenant.** Upon the exercise by Tenant of its right of first refusal as provided in Paragraph 2, Landlord and Tenant shall, within ten (10) days after Tenant delivers to Landlord notice of its election, enter into a written amendment modifying and supplementing this Lease and containing other appropriate terms and provisions relating to the addition of the Right of First Refusal Space to the Premises (including specifically any increase, adjustment, or augmentation of rent as a result of such addition). The Annual Base Rental (including concessions) to be paid under this Lease for the Right of First Refusal Space so leased, and the tenant improvement allowance provided by Landlord, shall be at the Offer Terms, except that the amount of tenant improvement allowance will be decreased or increased in proportion to the ratio that the term of Tenant's lease of such Right of First Refusal Space (the numerator) bears to the term set forth in the Offer Terms (the denominator).

The payment of the new Base Rental for the Right of First Refusal Space shall commence on the date specified in the Offer Terms. Rent for a partial month shall be prorated. Possession of the Right of First Refusal Space shall be delivered to Tenant in accordance with the Offer Terms.

5.    **Termination of Right.** The rights contained in this Rider No. 104 shall automatically terminate on November 4, 2009. In addition, any termination of this Lease during the original Lease Term (or any extension thereof) or any permitted assignment or subleasing by Tenant pursuant to this Lease (except for any assignment or sublease to an Affiliate, as defined in Paragraph 11 of the Lease) shall terminate the right of first refusal of Tenant contained herein.

DALLAS4 618758v12 32970-00288

## SECOND AMENDMENT TO LEASE AGREEMENT

This SECOND AMENDMENT TO LEASE AGREEMENT (this "Amendment") is entered into as of the latest date accompanying the signatures below, by and between LEWISVILLE LSF, L.P., a Texas limited partnership ("Landlord"), and GMAC MORTGAGE CORPORATION, a Pennsylvania corporation ("Tenant").

## RECITALS

A.   Landlord and Tenant have previously entered into that certain Lease Agreement dated July 30, 2002 (the "Original Lease"), covering approximately 19,112 square feet of Rentable Space designated as Suite 300 in the project commonly referred to as Convergence Office Center, Lewisville, Texas (the "Original Premises").

B.   Landlord and Tenant have previously entered into that certain First Amendment to Lease Agreement (the "First Amendment") dated March 23, 2004, providing for, among other things, the expansion of the Original Premises to include approximately 15,314 square feet of additional Rentable Space (the "First Expansion Premises"). The Original Lease, as amended by the First Amendment, is referred to herein as the "Lease."

C.   Landlord and Tenant desire to modify the Lease to (i) further expand the Premises to include that certain space covering approximately 18,875 square feet of Rentable Space (the "Second Expansion Premises"), shown as GMAC Proposed Expansion #2 on the floor plan attached hereto as Exhibit A and made a part hereof for all purposes, and (ii) extend the Lease Term, subject to the terms and provisions set forth below.

## AGREEMENTS

NOW THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by each party hereto to the other, the receipt and sufficiency of which is hereby mutually acknowledged, Landlord and Tenant hereby agree as follows:

1.   Premises. On the Second Expansion Commencement Date (as defined below), the Premises shall be expanded to include the Second Expansion Premises. Accordingly, all references to "Premises" (i) hereafter in this Amendment, and (ii) effective as of Second Expansion Commencement Date, in the Lease, shall be deemed to refer to a total of approximately 53,301 square feet of Rentable Space and is amended to include the Second Expansion Premises.

2.   Term. Landlord and Tenant hereby acknowledge and agree that the Lease Term for the Second Expansion Premises (as defined below) shall commence on March 1, 2006 (which date shall be postponed by one day for each day of delay resulting from a Landlord Delay (defined in Exhibit B)) (the "Second Expansion Commencement Date"). Landlord and Tenant hereby further agree that Lease Term is hereby extended so as to expire on February 29, 2016. The Lease Term for the Second Expansion Premises, the First Expansion Premises and the Original Premises shall, under all circumstances, be coterminous. Any options or rights to terminate, cancel, extend, expand or renew, or any rights of first refusal or first opportunity (all as modified in this Amendment) are

1

automatically extended to the Second Expansion Premises. Commencing on the date of this Amendment, Tenant shall be permitted access to the Second Expansion Premises for purposes of constructing the Tenant Finish Work (defined in Exhibit B hereto), subject to all provisions of the Lease and this Amendment, except that Tenant shall have no obligation to pay rent of any kind with regard to the Second Expansion Space until the Second Expansion Commencement Date. From and after the Second Expansion Commencement Date, the Original Premises, First Expansion Premises and Second Expansion Premises shall be together defined (unless the context clearly indicates otherwise) as the "Premises".

3.   Base Rental. Commencing on the Second Expansion Commencement Date, and continuing throughout the Lease Term (unless sooner terminated as provided in the Lease), the Base Rental payable by Tenant with respect to the Second Expansion Premises shall be as follows:

| Period | Cost Per Rentable Square Foot Per Annum | Monthly Installment |
|---|---|---|
| Expansion Commencement Date through May 31, 2006 | $0.00 | $0.00 |
| June 1, 2006 through April 30, 2008 | $17.00 | $26,740.00 |
| May 1, 2008 through end of term | $18.50 | $29,099.00 |

The Base Rental payable by Tenant with respect to the Original Premises and the First Expansion Premises shall continue to be as follows: (i) $17.00 per square foot of Rentable Space within the Original Premises and the First Expansion Premises per annum through April 30, 2008, and (ii) $18.50 per square foot of Rentable Space within the Original Premises and the First Expansion Premises per annum from May 1, 2008 through the end of the Lease Term.

4.   Base Expense Amount; Tenant's Proportionate Share. The calendar year for determining the "Base Expense Amount" for the Second Expansion Premises shall be calendar year 2006. Effective as of the Second Expansion Commencement Date, in addition to Tenant's Proportionate Share of the Operating Expenses in excess of the Base Expense Amount (based on calendar year 2003) attributable to the Original Premises, and Tenant's Proportionate Share of the Operating Expenses in excess of the Base Expense Amount (based on calendar year 2004) attributable to the First Expansion Premises, Tenant shall pay Tenant's Proportionate Share of Operating Expenses in excess of the Base Expense Amount (based on calendar year 2006) attributable to the Second Expansion Premises, determined as follows:

In the case of Operating Expenses that are incurred on a Building–wide Basis, 24.74%, which is the percentage obtained by dividing (i) the 18,875 rentable square feet in the

2

Expansion Premises by (ii) the 76,302 rentable square feet in the Building. In the case of Operating Expenses that are incurred on a Project-wide Basis, 2.03% which is the percentage obtained by dividing (i) the 18,875 rentable square feet in the Expansion Premises by (ii) the 931,048 rentable square feet currently located within the Project. Tenant's Proportionate Share will be recalculated as required effective at the commencement of any period to which the calculation is applicable in this Lease. Landlord, in Landlord's reasonable discretion, shall determine which Operating Expenses are allocated on a Building-wide Basis, and which Operating Expenses are allocated on a Project-wide Basis. Notwithstanding the foregoing, Tenant's Proportionate Share as to certain expenses may be calculated differently to yield a higher percentage to Tenant as to certain expenses in the event Landlord permits other tenants in the Building or the Project to directly incur such expenses rather than have Landlord incur the expense in common for the Building or the Project. As with the Original Premises and First Expansion Premises, there will be a seven percent (7%) cap per annum on Controllable Operating Expenses in regards to the Second Expansion Premises.

Landlord will cooperate, at no expense to Landlord, in efforts by Tenant to obtain tax credits, rebates, abatements, or similar benefits that may be available to Tenant with respect to the Lease.

   5.   Acceptance of Leased Premises; Work Allowance.  Tenant acknowledges and agrees that as of the date of this Amendment, Tenant is currently occupying the Premises, shall continue to lease the Premises, and commencing on the Second Expansion Commencement Date shall occupy and lease the entire Premises (i.e., including the Second Expansion Premises), except as otherwise expressly provided herein, in its "AS IS, WHERE IS" condition, WITH ALL FAULTS (except to the extent of any items which Landlord is specifically obligated to repair or maintain pursuant to the terms of the Lease) and subject to latent defects with respect to any items which Landlord is specifically obligated to repair or maintain pursuant to the terms of the Lease. All of Landlord's representations and warranties provided under the Lease concerning environmental compliance as described in Paragraph 55 are hereby expressly extended to apply to the Second Expansion Premises. Tenant further acknowledges that neither Landlord nor any of Landlord's affiliates has made, and Tenant waives, any representation or warranty with respect to the Premises or any other portion of the Project including, without limitation, any representation or warranty with respect to the suitability or fitness of the Premises or any other portion of the Project for the conduct of Tenant's business.

   Notwithstanding the foregoing, Landlord hereby acknowledges and agrees that Landlord will provide Tenant a Work Allowance (as defined in Exhibit B attached hereto and made a part hereof for all purposes) for the Second Expansion Premises for the purpose of construction of the Tenant Finish Work (as defined in Exhibit B attached hereto and made a part hereof for all purposes) for the Second Expansion Premises, to be performed in accordance with the terms, conditions, and provisions set forth on Exhibit B attached hereto and made a part hereof for all purposes. Notwithstanding anything in this Amendment to the contrary, Landlord warrants that on the Second Expansion Commencement Date all base building systems (as opposed to systems to be designed for the interior of the Second Expansion Premises) for HVAC, plumbing, electrical, and mechanical systems serving the Second Expansion Premises shall be in good working order. Further, Landlord acknowledges and agrees that nothing in this Amendment will require Tenant to make or perform any work or make any repairs or changes outside the entry to the Premises, including, but not limited to, changes to the Building or Common areas or otherwise make permanent improvements to the

3

Project, other than any alterations or improvements to be made by Tenant to Tenant's mechanical and electrical equipment located in the mechanical rooms and Tenant's generators located outside of the Premises.

      6.    <u>Address of Landlord and Tenant</u>. Landlord's address for notices due under the Lease, as provided in the Basic Lease Information is hereby deleted and replaced with the following:

> Lewisville LSF, L.P.
> c/o Hudson Advisors, L.L.C.
> 717 North Harwood Street, Suite 2100
> Dallas, Texas 75201
> Attention: David Stahl
> Telephone: (214) 754-8329
> Fax: (214) 459-1329

> <u>with a copy to</u>:

> Capstar Commercial Real Estate Services, Inc.
> 14185 Dallas Parkway, Suite 660
> Dallas, TX 75240
> Attention: Mr. Johnny Johnson
> Telephone: (972) 692-1753
> Fax: (972) 692-1740

> Tenant's address for notices due under the Lease, as provided in the Basic Lease Information is hereby deleted and replaced with the following:

> GMAC Mortgage Corporation
> Attn: Director – Corporate Real Estate
> 500 Enterprise Road
> Mail Code: 190-500-182
> Horsham, PA 19044
> Contact: Director-Corporate Real Estate
> Telephone: 215-682-1000
> Fax: 215-682-1895

> No copy requirement

      7.    <u>Tenant's Termination Right</u>. Section 53 of the Lease is hereby deleted from the Lease. Landlord hereby agrees that provided Tenant is not either (A) in monetary default hereunder (beyond any applicable notice and cure periods) or (B) in material non-monetary default hereunder (beyond any applicable cure periods), at the time of delivery of the Termination Notice (as defined below) or at the time of termination, Tenant shall have a one-time right to terminate this Lease (other than any terms and provisions hereof which expressly survive the expiration or earlier termination of this Lease) effective on February 28, 2014, on the following terms and conditions: (i) Tenant shall deliver its irrevocable written notice ("<u>Termination Notice</u>") to Landlord of Tenant's election to

DALLAS4 739250v3 32970-00408

terminate this Lease pursuant to this Section 7 on or before March 1, 2013, and (ii) with such Termination Notice, Tenant shall deliver to Landlord the following sums of money: (1) an amount equal to the unamortized transaction costs incurred by Landlord in connection with this Amendment, including, without limitation, the Work Allowance (as defined in Exhibit B attached to this Amendment), commissions and reasonable attorneys' fees and expenses incurred by Landlord in connection with the Lease and this Amendment (with all such amortized costs to include an interest component at the rate of 9% per annum), and (2) an amount equal to the Base Rental and Tenant's Additional Rental for the previous six (6) months. Tenant acknowledges and agrees that from and after the delivery of the Termination Notice, Tenant shall continue to comply with all of the terms and provisions of this Lease, including the payment of the Base Rental and Tenant's Additional Rental. The phrase "material non-monetary default," as used in this Section, shall include, without limitation, any (a) default which adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which adversely affects other tenants of the Project, and (c) any default relating to violations of applicable laws.

8.  Brokerage; Indemnity. Each of Tenant and Landlord warrant to the other that it has had no dealings with any broker or agent in connection with this Amendment other than Grubb & Ellis and Capstar Commercial (collectively, "Brokers"), and each shall indemnify the other against all costs, expenses, attorneys' fees, or other liability for commissions or other compensation or charges claimed by any other broker or agent, other than Brokers, claiming the same by, through, or under Tenant or Landlord, as applicable.

9.  Renewal Option. Rider No. 102 is hereby deleted from the Lease and replaced with Rider No. 102 attached hereto and incorporated herein for all purposes.

10.  Right of First Refusal/Right of First Opportunity. Landlord and Tenant hereby agree that Tenant shall have no further right of first refusal pursuant to Rider No. 104 attached to the Lease. Landlord and Tenant further agree that Rider No. 103A (as reflected in the First Amendment) is hereby deleted from the Lease and replaced with Rider No. 103A attached to this Amendment.

11.  Miscellaneous.

(a)  Tenant, based on its present, actual knowledge and without further investigation, hereby acknowledges, that Landlord is not in default under the Lease and no event or condition exists which, with the giving of notice or the passing of time or both, would constitute a default or event of default by Landlord under the Lease, and that Tenant has no charge, lien, defense or claim of offset under the Lease against rent or other charges due or to become due thereunder.

(b)  This Amendment may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Amendment.

(c)  Any capitalized term or phrase used in this Amendment shall have the same meaning as the meaning ascribed to such term or phrase in the Lease unless expressly otherwise defined in this Amendment.

5

(d)     Except as amended by this Amendment, the terms of the Lease remain in full force and effect. All obligations of Tenant under the Lease are hereby ratified and reaffirmed.

(e)     In the event that the terms of the Lease conflict or are inconsistent with those of this Amendment, the terms of this Amendment shall govern.

(f)     This Amendment shall become effective only upon execution and delivery by both Landlord and Tenant.

(g)     Time is of the essence in the performance of all covenants and obligations set forth in this Amendment.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the latest date accompanying signatures below.

**LANDLORD**:

**LEWISVILLE LSF, L.P.,**
a Texas limited partnership

By:     Lewisville GenPar LLC, its general partner

By:     _Marc L. Lipshy_
Name:   _____ Marc L. Lipshy _____
Title:  _____ Vice President _____

Date:   _11 - 4 - 05_

**TENANT**:

**GMAC MORTGAGE CORPORATION,**
a Pennsylvania corporation

By:     _Dal M Appleget_
Name:   _David Appleget_
Title:  _President / CEO_

Date:   _November 1, 2005_

# EXHIBIT A

## FLOOR PLAN OF EXPANSION PREMISES



7

## EXHIBIT B

### TENANT FINISH CONSTRUCTION

1.    **PLANS AND SPECIFICATIONS**: Tenant shall submit to Landlord within forty-five (45) days after the date of this Amendment space plan(s) and other information (collectively the "Space Plan") necessary or required to complete the initial plans and specifications (the "Initial Construction Documents") for the construction of the Tenant Finish Work (as defined below) in the Second Expansion Premises. Any disapproval by Landlord of the Space Plan or any revisions must specify in reasonable detail the reasons therefore. Landlord and Tenant shall work to resolve their differences and produce an approved Space Plan (the "Approved Space Plan"). Landlord will reasonably cooperate with Tenant, at no cost or expense to Landlord, to assist Tenant in obtaining all permits. Based on the Approved Space Plan, Tenant shall cause the Initial Construction Documents to be completed and delivered to Landlord for approval.

The Initial Construction Documents shall consist of any and all architectural, electrical, mechanical, plumbing, structural and communication/security drawings and written specifications necessary to construct the leasehold improvements. The Initial Construction Documents shall be subject to the written approval of Landlord, which approval shall not be unreasonably withheld. Any disapproval of the Initial Construction Documents must specify in writing and in reasonable detail the reasons for the disapproval. The approved Initial Construction Documents are referred to as the "Construction Documents" and all work to be performed by Tenant pursuant to the Construction Documents is referred to as the "Tenant Finish Work". Landlord shall not be deemed to represent and warrant that the Construction Documents comply with applicable laws and Tenant, at its sole cost and expense, is responsible for the Construction Documents complying with applicable laws.

Within 7-business days after receipt of any one or more of Tenant's Space Plan, Initial Construction Documents, Approved Space Plan, Construction Documents, and any revisions thereto (collectively referred to as the "Plans"), Landlord must approve or reject such one or more of Tenant's Plans. Landlord's failure to respond in writing within the 7-business-day period will be a deemed approval. If Tenant revises the Plans, Landlord shall approve or reject of revisions within 7-business days after receipt of the revision. Landlord's failure to respond in writing within the 7-business-day period will be a deemed approval. Minor revisions not involving exterior, structural utility or mechanical and electrical systems will not require the Landlord's review or consent.

2.    **TENANT FINISH WORK**. Tenant shall construct or cause to be constructed, at its sole cost and risk (subject to payment by Landlord as provided below), the Tenant Finish Work in substantial accordance with the Construction Documents. Tenant shall permit Landlord access to the Second Expansion Premises at all reasonable times to inspect the Tenant Finish Work; provided, however, that Landlord has no obligation to inspect the Tenant Finish Work. No inspection of the Tenant Finish Work by Landlord shall be deemed a warranty

8

that the Tenant Finish Work complies with the Construction Documents, or any applicable laws.

Tenant shall pay the Actual Cost (defined below) of the Tenant Finish Work. Within thirty (30) days following the last to occur of the following: (i) the completion of the Tenant Finish Work to Landlord's reasonable satisfaction in substantial accordance with the Construction Documents, (ii) the delivery to Landlord of reasonable evidence (i.e., invoices) of the Actual Costs of the Tenant Finish Work, (iii) the delivery to Landlord of unconditional lien waivers and bills paid affidavits from all contractors, subcontractors or other parties who performed work in connection with the Tenant Finish Work, (iv) the delivery to Landlord of copies of Tenant's final certificate of occupancy and final TAS (Texas Accessibility Standards) approval issued by the appropriate governmental and/or municipal authorities, (v) the delivery to Landlord of two (2) reproducible copies of "as built" plans and specifications (1/8 inch scale) for the Tenant Finish Work, together with copies of all warranties issued in connection with the completion of Tenant's Finish Work, Landlord shall reimburse Tenant $750,000.00 (the "<u>Work Allowance</u>"). The term "<u>Actual Cost</u>" means the cost of all labor, services, supplies, materials, equipment, data center equipment, cabling, furniture, condenser units, generators and tools (including rental fees) and all hard costs incurred by Tenant in performing the Tenant Finish Work, including the cost of preparing the Construction Documents (i.e., the Work Allowance shall include the cost of preparing the Construction Documents). In addition, the term Actual Costs shall include (y) the costs and expenses incurred by Landlord in constructing the Loading Dock pursuant to Section 7(a) below, and (z) the costs and expenses incurred by Tenant in constructing the generator and condenser units pursuant to Section 7(b) below.

3.  **PROJECT ENGINEER; TENANT'S GENERAL CONTRACTOR**: Tenant must use the fire alarm contractor and the roof contractor of record for the Project in connection with any Tenant Finish Work or any other work affecting the Building's fire alarm or roof, as applicable, so as not to negatively impact any warranties applicable to the fire alarm system and/or roof. The contact information for the fire alarm contractor and roof contractor for the Project is set forth on <u>Schedule B</u> to this <u>Exhibit B</u>. The general contractor selected by Tenant to construct the Tenant Finish Work shall be subject to Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed.

4.  **GENERAL**:

    (a)   Any material changes to the Construction Documents must first be submitted to Landlord for review and approval prior to the work reflected in such amended Construction Documents being undertaken by Tenant.

    (b)   Workmanship and materials reflected in proposed changes to the Construction Documents shall be of a quality which is equal to or better than the quality of the improvements contained in the prior Construction Documents.

(c)     Tenant shall perform the Tenant Finish Work in a manner so as to minimize noise and other interference with tenants of the Project and shall remove all trash and other debris from the Expansion Premises and all other areas of the Project on a daily basis.

(d)     Upon completion of the construction of the Tenant Finish Work, Tenant shall promptly restore any landscaping, sidewalks and other exterior or interior portions of the Project damaged as a result of Tenant's construction of the Tenant Finish Work to the condition existing prior to the commencement of such construction.

(e)     Any entry upon the Second Expansion Premises by Tenant and its agents and contractors shall be deemed to be under all of the terms, covenants, provisions and conditions of the Lease, excepting only (as to Tenant's agents and contractors) the covenant to pay Rent. All of Tenant's materials, work, installations and decorations of any nature brought upon or installed in the Second Expansion Premises shall be at Tenant's sole risk, and neither Landlord nor any party acting on Landlord's behalf shall be responsible for any damage thereto or loss or destruction thereof.

(f)     Prior to the commencement of construction of the Tenant Finish Work, Tenant must provide to Landlord a copy of the building permit for the Tenant Finish Work, along with evidence of the insurance coverages required pursuant to <u>Schedule A</u> to this <u>Exhibit B</u>.

5.    **<u>CONTRACTOR INSURANCE REQUIREMENTS</u>**: All contractors, subcontractors, suppliers, service providers, moving companies, and others performing work of any type for Tenant in the Building shall comply with the terms of <u>Schedule A</u> attached to this <u>Exhibit B</u>.

6.    **<u>LANDLORD DELAY</u>**. "Landlord Delay" shall mean any delay in the construction of the Tenant Finish Work resulting from (a) Landlord's failure to respond within the time frames contained herein; (b) Landlord's unreasonable withholding of consent, adding of unreasonable conditions, or subjecting its consent to unreasonable delay, but only to the extent that the Lease or this Amendment expressly prohibits Landlord from unreasonably withholding, conditioning, or delaying consent to the item in question; (c) any negligent or intentional act of Landlord or its employees, agents, or contractors that directly and materially impacts the timely completion of the Tenant Finish Work. Tenant shall have no right to claim a Landlord Delay unless Tenant shall have specified the nature of the delay in a written notice to Landlord within forty-eight (48) hours following the occurrence of the event causing the delay.

7.    **<u>SPECIAL CONSTRUCTION PROVISIONS</u>**.

(a)     Landlord shall construct a loading dock (the "Loading Dock") for the use by Tenant and any other tenants of the Building in the general location shown in <u>Exhibit A</u> attached to this Amendment pursuant to plans and specifications approved by Tenant which approval may not be unreasonably withheld, conditioned or delayed. The costs and expenses incurred by Landlord and approved by Tenant, which approval may not be unreasonably withheld, conditioned or delayed, in designing and

10

constructing the Loading Dock shall be deducted from the Work Allowance. Landlord agrees that it will not construct a corridor connecting the Premises to the Loading Dock along the southern wall of the Building until such time as Landlord has leased any remaining portion of the Building to a tenant other than Tenant.

(b)  As part of the Tenant Finish Work, Tenant shall have the right to construct new generator and condenser units within the general location shown as "condenser units" and "generator" in Exhibit A subject to the following terms and conditions:

   (i)    The location and specifications of the generator and condenser units shall be subject to the prior reasonable approval of Landlord.

   (ii)   The generator and condenser units shall be designed solely for the use of Tenant to provide backup electrical and HVAC service to the Premises.

   (iii)  The installation of the generator and condenser units, as well as the construction of a screening wall around such generator and condenser units, shall be performed at Tenant's sole cost and expense (subject to the Work Allowance). The parties acknowledge and agree that the screening wall around the generator and condenser units must be architecturally compatible with the balance of the project.

   (iv)   Tenant shall, at its sole cost and expense, maintain the generator and condenser units in good condition and repair. Tenant agrees that any testing and/or preventative maintenance procedures with respect to the generator and the condenser units will be performed after normal business hours and will be coordinated with Landlord.

   (v)    Tenant shall indemnify and hold Landlord harmless from and against any and all loss, cost, expense, damage, claims and liabilities (including attorney's fees) arising in connection with the use and maintenance of the generator and condenser units.

   (vi)   Landlord, at Landlord's sole cost and expense, shall be responsible for Landscaping around the proposed generator and condenser units.

DALLAS4 739250v0 32970-00408

**Schedule A**
**to**
**EXHIBIT B**

## CONTRACTOR INSURANCE REQUIREMENTS

All contractors, subcontractors, suppliers, service providers, moving companies, and others performing work of any type for Tenant in the Project shall:

- carry the insurance listed below with companies acceptable to Landlord; and

- furnish Certificates of Insurance in form acceptable to Landlord, together with a copy of the endorsements to such policies of insurance evidencing the Landlord and Landlord's property manager, agents, mortgagees, any ground, primary or master lessor, and their respective officers, directors, employees, agents, partners and assignees, have been included as additional insureds, evidencing required coverages at least ten (10) days prior to entry in the Project and annually thereafter.

Certificates of Insurance must provide for thirty (30) days' prior written notice of cancellation, non-renewal or material change in coverage to Landlord.

1. **Workers Compensation**: Statutory coverage in compliance with Workers Compensation Laws of the state in which the Project is located.

2. **Employers' Liability**: With the following minimum limits of liability:

    $100,000      Each Accident
    $500,000      Disease-Policy Limit
    $100,000      Disease-Each Employee

3. **Commercial General Liability**: (1986 ISO Form or its equivalent): This Insurance must provide contractual liability and a general aggregate limit on a per location or per project basis. The minimum limits must be $1,000,000 combined single limit on a per occurrence basis.

4. **Automobile Liability**: Insurance for claims arising out of ownership, maintenance, or use of owned, non-owned, loading and unloading, and hired motor vehicles at, upon, or away from the Project with the following minimum limits:

    $1,000,000      Combined Single Limit Bodily Injury and Property Damage combined on a per occurrence basis

5. **Umbrella**: At least Following Form liability insurance, in excess of the Commercial General Liability, Employers Liability, and Automobile Insurance above, with the following minimum limits:

DALLAS4 739250v6 32970-00408

$3,000,000    Each Occurrence
$3,000,000    Aggregate - Where Applicable

6.    **General Requirements**: All policies must be:

- written on an occurrence basis and not on a claims-made basis;

- except for the workers compensation insurance, commercial general liability insurance shall be endorsed to name as additional insureds Landlord, Landlord's property manager, Landlord's mortgagees, any ground, primary, or master lessor, and their respective officers, directors, employees, agents, partners, and assigns;

- all policies shall be endorsed to cause each insurance carrier to waive any and every claim for recovery from any and all loss or damage to the Project or Leased Premises or to the contents thereof, whether such loss or damage is due to the negligence of Landlord, its officers, partners, directors, agents or servants, such waiver shall also include Landlord's property manager, mortgagees, any ground, primary or master lessor and their respective officers, directors, employees, agents, partners and assignees;

- any self-insured retention shall be the responsibility of the Tenant under its umbrella coverage;

- there shall be commercially reasonable deductibles applicable to the commercial general liability insurance; and

- all insurance companies shall have an A.M. Best's Rating of A-IX or better.

DALLAS4 739250v3 32970-00408

## Schedule B
### to
## EXHIBIT B

### List of Fire Alarm and Roof Contractors

**Fire Alarm**
MiTec Net

**Roof Contractor**
Texas Roof Management – Phone No. (972) 272-7663

**14**

Rider No. 102

## TENANT'S OPTION TO RENEW

Tenant may, at its option and subject to the terms hereof, renew the Lease Term for either (1) two (2) additional terms of sixty (60) months each or (2) one (1) additional term of one hundred twenty (120) months, provided that this Lease must be in full force and effect and no monetary event of default (beyond any applicable notice and cure period) and no material non-monetary default (beyond any applicable notice and cure period) exists under this Lease at the time of exercise of such option or at the time the renewal term would begin. The phrase "material non-monetary default," as used herein, shall include, without limitation, (a) any default which adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which adversely affects other tenants of the Project, and (c) any default relating to violations of applicable laws. Such renewal shall be upon the same terms and conditions as provided elsewhere in this Lease, except that (i) this Lease may not be renewed more often than as set forth above, and (iii) the annual Base Rental for such renewal period(s), and each monthly installment thereof, shall be determined as provided below. Each such option shall be exercised by Tenant giving notice to Landlord by certified mail, return receipt requested, at least nine (9) but not more than twelve (12) months prior to the end of the then-existing term, and, if not so exercised, such option not so exercised and any subsequent option to renew shall automatically expire and terminate. In Tenant's initial renewal notice described in the preceding sentence, Tenant shall specify as to whether Tenant elects to exercise the initial 60-month renewal term or the single 120-month renewal term. If Tenant so elects to renew the Lease Term, following Tenant's exercise of such renewal option, upon request from Landlord, Tenant and Landlord will enter into a renewal agreement by which this Lease will be renewed in accordance with the terms set forth in this Rider.

The annual Base Rental for each renewal period shall be the Prevailing Rental Rate, which shall mean the current fair market rent for comparable office space located within similar buildings within the Lewisville/Denton submarket, as reasonably determined by Landlord, taking into consideration use, location and floor level within the Building, rental concessions then being granted by Landlord under similar circumstances, base year and/or expense calculations, the date the particular rate under consideration is to become effective, and the term of the lease under consideration. Landlord shall promptly notify Tenant of the Prevailing Rental Rate as determined by Landlord in accordance with this Paragraph no more than 30 days following Landlord's receipt of notice from Tenant of the election to renew.

Within thirty (30) days after Landlord shall have given notice to Tenant of the Prevailing Rental Rate as determined by Landlord for either the first renewal term or the second renewal term, Landlord and Tenant shall attempt to agree upon the Prevailing Rental Rate for the extended term. If the parties agree on Prevailing Rental Rate for the extended term during that period, they shall immediately execute an amendment to the Lease stating the Prevailing Rental Rate and the amount of the fixed rent for such renewal term in question.

If the parties are unable to agree on the Prevailing Rental Rate for the applicable renewal

15

term within the 30 day period, then, within 15 days after the expiration of that period, each party, at its cost, and by giving notice to the other party, shall appoint a real estate appraiser with MAI designation and at least five years' full time commercial appraisal experience in the area in which the Building is located to appraise the Premises and determine the fair rental value for the Premises, taking into consideration the factors described in the second Paragraph of this Rider No. 102. If one party does not appoint an appraiser within ten days after the other party has given notice of the name of its appraiser, the single appraiser appointed shall be the sole appraiser, and fair rental value so determined by that appraiser shall be the Prevailing Rental Rate for purposes of this subparagraph.

If two appraisers are appointed by the parties as stated above, they shall independently establish fair rental value for the Premises. If the appraisers agree, the Prevailing Rental Rate shall be the fair rental value of the property as agreed by the two appraisers. If they are unable to agree within 30 days after the second appraiser has been appointed, the Prevailing Rental Rate shall be the fair rental value for the Premises as determined by the average of the two appraisals if the higher of the two appraisals is no greater than 110% of the lower of the two appraisals. If, however, the higher of the two appraisals is more than 110% higher than the lower appraisal, the two appraisers shall promptly appoint a third appraiser who shall appraise the Premises and independently determine fair rental value for the Premises, taking into consideration the factors described in the second paragraph of this Rider No. 102. Each of the parties shall bear one half of the cost of appointing the third appraiser and of paying the third appraiser's fee. The third appraiser shall have the qualifications stated above and shall further be a person who has not previously acted in any capacity for either party.

Within 30 days after the selection of the third appraiser, the Prevailing Rental Rate shall be established as the fair rental value of the Premises as determined by an average of the three appraisers; provided, however, that if the low appraisal and/or the high appraisal are/is more than ten percent lower and/or higher than the middle appraisal, the low appraisal and/or the high appraisal shall be disregarded. If only one appraisal is disregarded, the remaining two appraisals shall be added together and their total divided by two to establish the Prevailing Rental Rate. If both the low appraisal and the high appraisal are disregarded as stated in this Paragraph, the middle appraisal shall establish the Prevailing Rental Rate for the Premises during the renewal term in question.

16

Rider No. 103A

## RIGHT OF FIRST OPPORTUNITY

1.    **Right of First Opportunity**. Tenant shall, subject to the terms hereof, have the option to lease additional space (the "Opportunity Space") located anywhere within the Building to be identified by Tenant in its Opportunity Notice, as hereinafter defined, for a term beginning on the earlier to occur of (i) the issuance of a Certificate of Occupancy or its equivalent covering the Opportunity Space, (ii) one hundred fifty (150) days following the delivery of an executed Lease Amendment to Landlord (the commencement date of any such term being referred to as the "Effective Date") and ending on the expiration of the Lease Term (unless sooner terminated pursuant to the terms of this Lease, and subject to any rights of extension contained in this Lease) by delivering written notice (the "Opportunity Notice") to Landlord either (i) no later than ten (10) business days following the delivery of written notice to Tenant (a "Prospect Notice") that Landlord desires to lease any Opportunity Space to an existing or prospective tenant of the Building (the "Landlord's Prospect") provided that (A) at the time of such notice and on the Effective Date, no monetary event of default (beyond any applicable notice and cure period) and no material non-monetary default (beyond any applicable notice and cure period) exists, (B) in the event Tenant elects to lease Opportunity Space which is not the subject of a Prospect Notice, such Opportunity Space must be contiguous to the Premises, and (C) if Tenant elects to lease Opportunity Space which is the subject of a Prospect Notice, Tenant must lease the entire space covered by such Prospect Notice. Once Tenant shall exercise an option pursuant to this Rider 103A, Tenant may not thereafter revoke such exercise. Tenant's failure to timely exercise an option pursuant to this Rider 103A, for any reason whatsoever shall conclusively be deemed a waiver of such option. If Tenant exercises the Right of First Opportunity for only part of the Building, then any residual space subject to this Right of First Opportunity shall remain available for Tenant's future right of expansion pursuant to this Rider. If the Landlord does not lease the space referenced in the Landlord's Prospect Notice to the Prospect within one hundred eighty (180) days following Tenant's rejection or deemed rejection of the right to lease the Opportunity Space, then such space shall be deemed available and again subject to this Right of First Opportunity.

2.    **Expansion of Premises**. Upon Tenant's exercise of such rights set forth in Paragraph 1 above, Landlord and Tenant shall enter into a written agreement specifying the portion of the Opportunity Space that will become part of the Premises and that such space shall be subject to all of the terms and provisions of this Lease, except that Base Rental (including concessions) and tenant improvement allowance shall be determined in accordance in with the provisions set forth below. The Expiration Date or Termination Date for the Opportunity Space and the Premises shall be coterminous except as set forth in subsection (b) below. Any options or rights to terminate, cancel, extend, expand or renew, or any rights of first refusal shall be automatically extended to the Opportunity Space. The Base Rental and tenant improvement allowance for any Opportunity Space shall be determined as follows:

(a)    In the event Tenant initiates an expansion of the Premises pursuant to this Rider 103A (i.e., if Tenant delivers an Opportunity Notice to Landlord with respect to Opportunity Space which

is not the subject of a Prospect Notice) prior to March 1, 2011, then the Base Rental for such Opportunity Space shall be at the same rate applicable to the balance of the Premises, and the Lease Term for such Opportunity Space shall be coterminous with the primary Lease Term.

(b)    In the event that Tenant initiates an expansion of the Premises pursuant to this Rider 103A (i.e., if Tenant delivers an Opportunity Notice to Landlord with respect to Opportunity Space which is not the subject of a Prospect Notice) subsequent to March 1, 2011, then the Base Rental and tenant improvement allowance ("TIA") for the Opportunity Space shall be the "Prevailing Rate," which shall mean the current fair market rate of rent and of tenant improvement allowance for comparable office space located within similar buildings within the Lewisville/Denton submarket as reasonably determined by Landlord, taking into consideration use, location and floor level within the Building, rental concessions, free rent periods and improvement allowances then being granted by Landlords under similar circumstances, base year and/or expense calculations, the date the particular rate under consideration is to become effective, and the term of the lease under consideration. Landlord shall promptly notify Tenant of the Prevailing Rate as determined by Landlord in accordance with this Section 2 no more than thirty (30) days following Landlord's receipt of notice from Tenant of the Opportunity Notice.

Within thirty (30) days after Landlord shall have given notice to Tenant of the Prevailing Rate as determined by Landlord, Landlord and Tenant shall attempt to agree upon the Prevailing Rate for the Opportunity Space. If the parties agree on Prevailing Rate for the Opportunity Space during that period, they shall immediately execute an amendment to the Lease stating the Prevailing Rate and the amount of the fixed rent for such Opportunity Space.

If the parties are unable to agree on the Prevailing Rate for the Opportunity Space within the thirty (30) day period, then, within fifteen (15) days after the expiration of that period, each party, at its cost, and by giving notice to the other party, shall appoint a real estate appraiser with MAI designation and at least five years' full time commercial appraisal experience in the area in which the Building is located to appraise the Premises and determine the fair rental value for the Opportunity Space, taking into consideration the factors described in the second paragraph of this Section 2. If one party does not appoint an appraiser within ten days after the other party has given notice of the name of its appraiser, the single appraiser appointed shall be the sole appraiser, and fair rental value so determined by that appraiser shall be the Prevailing Rate for purposes of this subparagraph.

If two appraisers are appointed by the parties as stated above, they shall independently establish fair rental value for the Opportunity Space. If the appraisers agree, the Prevailing Rate shall be the fair rental value of the property as agreed by the two appraisers. If they are unable to agree within thirty (30) days after the second appraiser has been appointed, the Prevailing Rate shall be the fair rental value for the Opportunity Space as determined by the average of the two appraisals if the higher of the two appraisals is no greater than 110% of the lower of the two appraisals. If, however, the higher of the two appraisals is more than 110% higher than the lower appraisal, the two appraisers shall promptly appoint a third appraiser who shall appraise the Opportunity Space and independently determine fair rental value for the Opportunity Space, taking into consideration the factors described in the second paragraph of this Section 2. Each of the parties shall bear one half of the cost of appointing the third appraiser and of paying the third appraiser's fee. The third appraiser

18

shall have the qualifications stated above and shall further be a person who has not previously acted in any capacity for either party.

Within fifteen (15) days after the selection of the third appraiser, the Prevailing Rate shall be established as the fair rental value of the Opportunity Space as determined by an average of the three appraisers; provided, however, that if the low appraisal and/or the high appraisal are/is more than ten percent lower and/or higher than the middle appraisal, the low appraisal and/or the high appraisal shall be disregarded. If only one appraisal is disregarded, the remaining two appraisals shall be added together and their total divided by two to establish the Prevailing Rate. If both the low appraisal and the high appraisal are disregarded as stated in this Paragraph, the middle appraisal shall establish the Prevailing Rate for the Opportunity Space.

(c)    In the event Tenant exercises an expansion option with respect to Opportunity Space which is the subject of a Prospect Notice, then the Base Rental, tenant improvement allowance lease term, and other terms and provisions and provisions for such Opportunity Space shall be on the same terms set forth in the Prospect Notice. Notwithstanding the foregoing, if Landlord provides a Prospect Notice on a bona fide third-party offer on the Opportunity Space prior to September 1, 2008, Tenant may exercise its right to that space and the Base Rental for such Opportunity Space shall be at the same rate applicable to the balance of the Premises, and the Lease Term for such Opportunity Space shall be coterminous with the primary Lease Term. If the Prospect Notice is provided after September 1, 2008, Tenant may exercise its right to that space and shall match the terms of the bona fide third-party offer reflected in such Prospect Notice.

DALLAS4 739250v3 32970-00408

## THIRD AMENDMENT TO LEASE AGREEMENT

THIS THIRD AMENDMENT TO LEASE AGREEMENT (this "Amendment") is entered into as of the latest date accompanying the signatures below, by and between BREOF CONVERGENCE LP, a Delaware limited partnership, as successor-in-interest to LEWISVILLE LSF, L.P., a Texas limited partnership ("Landlord"), and GMAC MORTGAGE, LLC, a Delaware limited liability company, f/k/a GMAC Mortgage Corporation.

## RECITALS

A.    Landlord and Tenant have previously entered into that certain Lease Agreement dated July 30, 2002 (the "Original Lease"), covering approximately 19,112 square feet of Rentable Space designated as Suite 300 within Building 3 of the project commonly referred to as Convergence Office Center, Lewisville, Texas (the "Original Premises").

B.    Landlord and Tenant have previously entered into (i) that certain First Amendment to Lease Agreement (the "First Amendment") dated March 23, 2004, providing for, among other things, the expansion of the Original Premises to include approximately 15,314 square feet of additional Rentable Space (the "First Expansion Premises"), and (ii) that certain Second Amendment to Lease Agreement (the "Second Amendment") dated November 4, 2005, providing for, among other things, the expansion of the Original Premises and the First Expansion Premises to include approximately 18,875 square feet of additional Rentable Space (the "Second Expansion Premises"). The Original Lease, as amended by the First Amendment and the Second Amendment, is referred to herein as the "Lease."

C.    Landlord and Tenant desire to modify the Lease to (i) further expand the Premises to include that certain space covering approximately 25,112 square feet of Rentable Space (the "Third Expansion Premises"), consisting of the balance of Building 3, and (ii) extend the Lease Term, subject to the terms and provisions set forth below.

## AGREEMENTS

NOW THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by each party hereto to the other, the receipt and sufficiency of which is hereby mutually acknowledged, Landlord and Tenant hereby agree as follows:

1.    Premises. On the Third Expansion Commencement Date (as defined below), the Premises shall be expanded to include the Third Expansion Premises. Accordingly, all references to "Premises" (i) hereafter in this Amendment, and (ii) effective as of Third Expansion Commencement Date, in the Lease, shall be deemed to refer to a total of approximately 78,413 square feet of Rentable Space and is amended to include the Third Expansion Premises.

2.    Term. Landlord and Tenant hereby acknowledge and agree that the lease term for the Third Expansion Premises shall commence on November 1, 2011 (which date shall be postponed by one day for each day of delay resulting from a Landlord Delay (defined in Exhibit A)) (the "Third Expansion Commencement Date"). Landlord and Tenant hereby further agree that the Lease Term is

I

hereby extended so as to expire on December 31, 2017. The Lease Term for the Third Expansion Premises, the Second Expansion Premises, the First Expansion Premises and the Original Premises shall, under all circumstances, be coterminous. Commencing on the date of this Amendment, Tenant shall be permitted access to the Third Expansion Premises for purposes of constructing the Tenant Finish Work (defined in Exhibit A hereto), subject to all provisions of the Lease and this Amendment, except that Tenant shall have no obligation to pay rent of any kind with regard to the Third Expansion Premises until the Third Expansion Commencement Date. From and after the Third Expansion Commencement Date, the Original Premises, the First Expansion Premises, the Second Expansion Premises and the Third Expansion Premises shall be together defined (unless the context clearly indicates otherwise) as the "Premises".

3.      Base Rental. Commencing on the Third Expansion Commencement Date, and continuing throughout the Lease Term (unless sooner terminated as provided in the Lease), the Base Rental payable by Tenant with respect to the Third Expansion Premises shall be as follows:

| Period | Cost Per Rentable Square Foot Per Annum | Monthly Installment |
|---|---|---|
| Expansion Commencement Date through April 30, 2012, extended by one day for each day of delay resulting from a Landlord Delay | $0.00 | $0.00 + E |
| May 1, 2012, postponed by one day for each day of delay resulting from a Landlord Delay through end of term | $18.50 | $38,714.33 + E |

The Base Rental payable by Tenant with respect to the Original Premises, the First Expansion Premises and the Second Expansion Premises shall continue at the rate of $18.50 per square foot of Rentable Space within the Original Premises, the First Expansion Premises and the Second Expansion Premises per annum through the end of the Lease Term.

4.      Base Expense Amount; Tenant's Proportionate Share.  The calendar year for determining the "Base Expense Amount" for the Third Expansion Premises shall be calendar year 2012. In addition to Tenant's Proportionate Share of the Operating Expenses in excess of the Base Expense Amount attributable to the Original Premises, the First Expansion Premises, and the Second Expansion Premises (which shall continue to be payable by Tenant in accordance with the terms and provisions of the Lease), Tenant shall, beginning on January 1, 2013, pay Tenant's Proportionate Share of Operating Expenses in excess of the Base Expense Amount (based on calendar year 2012) attributable to the Third Expansion Premises, determined as follows:

In the case of Operating Expenses that are incurred on a Building–wide Basis, 32.03%, which is the percentage obtained by dividing (i) the 25,112 rentable square feet in the Third Expansion Premises by (ii) the 78,413 rentable square feet in the Building. In the case of

2

Operating Expenses that are incurred on a Project-wide Basis, 3.07% which is the percentage obtained by dividing (i) the 25,112 rentable square feet in the Third Expansion Premises by (ii) the 819,243 rentable square feet currently located within the Project. Tenant's Proportionate Share will be recalculated as required effective at the commencement of any period to which the calculation is applicable in this Lease. Landlord, in Landlord's reasonable discretion, shall determine which Operating Expenses are allocated on a Building-wide Basis, and which Operating Expenses are allocated on a Project-wide Basis. Notwithstanding the foregoing, Tenant's Proportionate Share as to certain expenses may be calculated differently to yield a higher percentage to Tenant as to certain expenses in the event Landlord permits other tenants in the Building or the Project to directly incur such expenses rather than have Landlord incur the expense in common for the Building or the Project. There will be a five percent (5%) cumulative cap on the per annum increase in Controllable Operating Expenses in regard to the Third Expansion Premises.

5.    Acceptance of Leased Premises; Work Allowance. Tenant acknowledges and agrees that as of the date of this Amendment, Tenant is currently occupying the Original Premises, the First Expansion Premises and the Second Expansion Premises, shall continue to lease the Original Premises, the First Expansion Premises and the Second Expansion Premises, and commencing on the Third Expansion Commencement Date shall occupy and lease the entire Premises (i.e., including the Third Expansion Premises), except as otherwise expressly provided herein, in its "AS IS, WHERE IS" condition, WITH ALL FAULTS (except to the extent of any items which Landlord is specifically obligated to repair or maintain pursuant to the terms of the Lease) and subject to latent defects with respect to any items which Landlord is specifically obligated to repair or maintain pursuant to the terms of the Lease. All of Landlord's representations and warranties provided under the Lease concerning environmental compliance as described in Paragraph 55 are hereby expressly extended to apply to the Third Expansion Premises. Tenant further acknowledges that neither Landlord nor any of Landlord's affiliates has made, and Tenant waives, any representation or warranty with respect to the Premises or any other portion of the Project including, without limitation, any representation or warranty with respect to the suitability or fitness of the Premises or any other portion of the Project for the conduct of Tenant's business.

Notwithstanding the foregoing, Landlord hereby acknowledges and agrees that Landlord will provide Tenant a Work Allowance (as defined in Exhibit A attached hereto and made a part hereof for all purposes) for the Third Expansion Premises for the purpose of construction of the Tenant Finish Work (as defined in Exhibit A attached hereto and made a part hereof for all purposes) for the Third Expansion Premises, to be performed in accordance with the terms, conditions, and provisions set forth on Exhibit A attached hereto and made a part hereof for all purposes. Notwithstanding anything in this Amendment to the contrary, Landlord warrants that on the Third Expansion Commencement Date all base building systems (as opposed to systems to be designed for the interior of the Third Expansion Premises) for HVAC, plumbing, electrical, and mechanical systems serving the Third Expansion Premises shall be in good working order. Further, Landlord acknowledges and agrees that nothing in this Amendment will require Tenant to make or perform any work or make any repairs or changes outside the entry to the Premises, including, but not limited to, changes to the Building or Common areas or otherwise make permanent improvements to the Project, other than any alterations or improvements to be made by Tenant to Tenant's mechanical and electrical

3

equipment located in the mechanical rooms and Tenant's generators and HVAC equipment located outside of the Premises.

6.    Restroom Upgrades.  On or before the Third Expansion Commencement Date, Landlord shall perform certain cosmetic upgrades to the restrooms located within Building 3, specifically the removal and replacement of the circular trough sinks, along with the installation of new tile and sinks of a type and quality consistent with the restrooms located in Building 2 of the Project.

7.    Parking.  Notwithstanding anything to the contrary in the Lease, so long as the Lease remains in effect and only with respect to the Third Expansion Premises, Landlord hereby agrees to make available to Tenant a total of three (3) unreserved parking spaces for each one thousand (1,000) square feet of Rentable Space within the Third Expansion Premises in the surface parking lots of the Project to be utilized free of charge on a first-come, first-serve basis.  Landlord agrees to allocate such unreserved parking spaces both on the north and south sides of Building 3.  The term "Premises" as used in the first sentence of Rider No. 101 to the Lease is hereby deleted and replaced with the following: "the Original Premises, the First Expansion Premises and the Second Expansion Premises".

8.    Electricity Charge.  Commencing on the date Landlord delivers possession of the Third Expansion Premises to Tenant, Tenant shall be responsible for the cost of electricity with respect to the Third Expansion Premises in accordance with the terms and provisions of Section 5(a) of the Lease. In addition, prior to the Third Expansion Commencement Date, Tenant shall, at its sole cost and expense, install a submeter to measure electricity usage for the Premises pursuant to plans and specifications to be approved in advance by Landlord.

9.    Electrical Requirements.

(a)    On or before June 1, 2012, Landlord will increase the power supply available at any time for use by Tenant within the Premises to seven (7) megawatts of power which may be determined and confirmed through Tenant's existing breakers for the Premises. In addition to the seven (7) megawatts of power described in the preceding sentence, and to the extent available without adversely affecting the electrical service to other tenants or other areas of the Project, Landlord and Tenant will negotiate in good faith the terms upon which Landlord would make available to Tenant additional power. Any additional power provided to Tenant pursuant to the preceding sentence shall be included within the Electricity Charge payable by Tenant in accordance with the terms and provisions of Section 5 of the Lease.

(b)    If the additional power described in subsection (a) above is not available through the central utilities plant for the Project (the "CUP"), then Tenant shall have the right to negotiate directly with Texas New Mexico Power (TNMP) for a direct electrical connection from the Premises to the on-site substation and to install conduit from the Premises to the on-site substation to provide a secondary source of additional power to Tenant (an "Alternative Feed"), subject to obtaining Landlord's prior written approval, which approval may not be unreasonably withheld, delayed or conditioned. Tenant hereby agrees that the installation of any Alternative Feed shall be performed in consultation and cooperation with Landlord. In connection with Tenant's installation

4

of any Alternative Feed to the Premises pursuant to this Section 9(b), Landlord hereby agrees to provide necessary and reasonable easements at no cost to Tenant except that Tenant shall be responsible for any actual costs incurred by Landlord in granting such easements, including by way of example and not limitation, legal fees, recording fees and costs of relocating any existing utilities to the extent required. Unless otherwise agreed in writing by Landlord and Tenant, any Alternative Feed shall be for Tenant's sole and exclusive benefit and at Tenant's sole cost and expense. Such costs shall include restoration of any easement lands to their condition prior to the installation of the Alternative Feed. The installation of conduit pursuant to this Section 9(b) shall be subject to Paragraph 12 of the Original Lease, including Landlord's reasonable requirements as to the location, size and specifications. Notwithstanding anything to the contrary herein, should Tenant install a direct connection to the on-site substation, upon such time as the construction of the direct connection is complete and operational, Tenant shall disconnect the existing electrical feeds from the CUP to the Premises.

      10.    <u>Address of Landlord and Tenant</u>. Landlord's address for notices due under the Lease, as provided in the Basic Lease Information is hereby deleted and replaced with the following:

ADDRESS OF
LANDLORD:    BREOF Convergence LP
                c/o Brookfield Real Estate Opportunity Fund
                181 Bay Street, Suite 300
                Toronto, Ontario
                Canada M5J 2T3
                Attention: Asset Manager
                Fax No.: (416) 359-8650

                and

                BREOF Convergence LP
                c/o Brookfield Real Estate Opportunity Fund
                Three World Financial Center, 11th Floor
                New York, New York 10281-1021
                United State of America
                Attention: Asset Manager
                Fax No.: (212) 417-7292

MANAGEMENT
CONTACT:    BREOF Asset Management LLC
                c/o Cassidy Turley
                  3500 Maple Avenue, Suite 220
                Dallas, Texas 75219
                United States of America
                Attention: Asset Manager
                Fax No.: (972) 393-4522

and

> BREOF Asset Management LLC
> c/o Brookfield Real Estate Opportunity Fund
> Three World Financial Center, 11th Floor
> New York, New York 10281-1021
> United States of America
> Attention: Asset Manager
> Fax No.: (212) 417-7292

Tenant's address for notices due under the Lease, as provided in the Basic Lease Information is hereby deleted and replaced with the following:

> GMAC Mortgage LLC
> c/o Jones Lang LaSalle Americas, Inc.
> 525 William Penn Place, 20th Floor
> Pittsburgh, Pennsylvania 15259

> With a copy to:

> GMAC Mortgage LLC
> c/o Ally Corporate Workplace
> 1100 Virginia Drive, MC: 190-FTW-M98
> Fort Washington, Pennsylvania 19034

11.    Tenant's Termination Right. Section 53 of the Original Lease and Section 7 of the Second Amendment are hereby deleted from the Lease. Accordingly, Tenant shall have no further right to terminate the Lease pursuant to Section 53 of the Original Lease or Section 7 of the Second Amendment.

12.    Brokerage; Indemnity. Each of Tenant and Landlord warrant to the other that it has had no dealings with any broker or agent in connection with this Amendment other than Grubb & Ellis, Jones Lang LaSalle Americas, Inc. and Cassidy Turley (collectively, "Brokers"), and each shall indemnify the other against all costs, expenses, attorneys' fees, or other liability for commissions or other compensation or charges claimed by any other broker or agent, other than Brokers, claiming the same by, through, or under Tenant or Landlord, as applicable.

13.    Renewal Option. Rider No. 102 is hereby deleted from the Lease and replaced with Rider No. 102 attached hereto and incorporated herein for all purposes.

14.    Right of First Refusal. Landlord and Tenant hereby agree that Tenant shall have no further right of first refusal pursuant to Rider No. 104 attached to the Lease. Landlord and Tenant further agree that Rider No. 103A (as reflected in the Second Amendment) is hereby deleted from the Lease and replaced with Rider No. 103A attached to this Amendment.

6

15.    _Assignment and Subletting_. In the event that Tenant assigns, subleases or transfers all or any portion of the Third Expansion Premises, and provided that such assignment, sublease or transfer does not include any portion of the Premises other than the Third Expansion Premises, Landlord waives its right to terminate this Lease and retake the Premises under Section 11 of the Lease. Furthermore, lines 16, 17 and 18 of Section 11 of the Lease shall be amended so that all references to "General Motors Corporation" are replaced with "Ally Financial Inc." To the extent that they do not conflict with the provisions of this Section, all provisions of Section 11 of the Lease shall remain in full force and effect.

16.    _Miscellaneous_.

(a)    Tenant, based on its present, actual knowledge and without further investigation, hereby acknowledges, that Landlord is not in default under the Lease and no event or condition exists which, with the giving of notice or the passing of time or both, would constitute a default or event of default by Landlord under the Lease, and that Tenant has no charge, lien, defense or claim of offset under the Lease against rent or other charges due or to become due thereunder.

(b)    This Amendment may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Amendment.

(c)    Any capitalized term or phrase used in this Amendment shall have the same meaning as the meaning ascribed to such term or phrase in the Lease unless expressly otherwise defined in this Amendment.

(d)    Except as amended by this Amendment, the terms of the Lease remain in full force and effect. All obligations of Tenant under the Lease are hereby ratified and reaffirmed.

(e)    In the event that the terms of the Lease conflict or are inconsistent with those of this Amendment, the terms of this Amendment shall govern.

(f)    This Amendment shall become effective only upon execution and delivery by both Landlord and Tenant.

(g)    Time is of the essence in the performance of all covenants and obligations set forth in this Amendment.

7

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the latest date accompanying signatures below.

**LANDLORD**:

**BREOF CONVERGENCE LP,**
a Delaware limited partnership
By:     BREOF Convergence GP LLC, a Delaware limited
        liability company, its general partner
        By:     BREOF CONVERGENCE LLC, a Delaware
                limited liability company, its sole member

By: _____
Name:   ASHLEY LAWRENCE
Title:   VP

Date:   August 25, 2011

**TENANT**:

**GMAC MORTGAGE, LLC,**
a Delaware limited liability company

By: _____
Name:  Charles A. Kraft
Title:  Service Delivery Leader
Date:  August 25, 2011

72326.000014 EMF_US 35557010v9

## EXHIBIT A

### TENANT FINISH CONSTRUCTION

1.  **PLANS AND SPECIFICATIONS**: Tenant shall submit to Landlord space plan(s) and other information (collectively the "Space Plan") necessary or required to complete the initial plans, specifications and construction schedule (the "Initial Construction Documents") for the construction of the Tenant Finish Work (as defined below) in the Third Expansion Premises prior to the start of construction of the Tenant Finish Work. Landlord shall not unreasonably withhold, condition or delay its approval of the Space Plan. Any disapproval by Landlord of the Space Plan or any revisions proposed by Landlord must specify in reasonable detail the reasons therefor. Landlord and Tenant shall, with reasonable diligence and in good faith, work to resolve their differences and produce an approved Space Plan (the "Approved Space Plan"). Landlord will reasonably cooperate with Tenant, at no cost or expense to Landlord, to assist Tenant in obtaining all permits and licenses required for construction of the Tenant Finish Work. Based on the Approved Space Plan, Tenant shall cause the Initial Construction Documents to be completed and delivered to Landlord for approval, which approval shall not be unreasonably withheld, conditioned or delayed.

    The Initial Construction Documents shall consist of (i) any and all architectural, electrical, mechanical, plumbing, structural and communication/security drawings and written specifications necessary to construct the leasehold improvements and (ii) a schedule for construction of the leasehold improvements. The Initial Construction Documents shall be subject to the written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Any disapproval of the Initial Construction Documents must specify in writing and in reasonable detail the reasons for the disapproval. The approved Initial Construction Documents are referred to as the "Construction Documents" and all work to be performed by Tenant pursuant to the Construction Documents is referred to as the "Tenant Finish Work". Landlord shall not be deemed to represent and warrant that the Construction Documents comply with applicable laws and Tenant, at its sole cost and expense, is responsible for the Construction Documents complying with applicable laws.

    Within 7-business days after receipt of any one or more of Tenant's Space Plan, Initial Construction Documents, Approved Space Plan, Construction Documents, and any revisions thereto (collectively referred to as the "Plans"), Landlord must approve or reject such one or more of Tenant's Plans. Landlord's failure to respond in writing within the 7-business-day period will be a deemed approval. If Tenant revises the Plans, Landlord shall approve or reject of revisions within 7-business days after receipt of the revision. Landlord's failure to respond in writing within the 7-business-day period will be a deemed approval. Minor revisions not involving exterior, structural utility or mechanical and electrical systems will not require the Landlord's review or consent.

2.  **TENANT FINISH WORK**. Tenant shall construct or cause to be constructed, at its sole cost and risk (subject to payment by Landlord as provided below), the Tenant Finish Work in substantial accordance with the Construction Documents. Tenant shall permit Landlord

72326.000014 EMF_US 35557010v9

access to the Third Expansion Premises at all reasonable times to inspect the Tenant Finish Work; provided, however, that Landlord has no obligation to inspect the Tenant Finish Work. No inspection of the Tenant Finish Work by Landlord shall be deemed a warranty that the Tenant Finish Work complies with the Construction Documents, or any applicable laws.

Tenant shall pay the Actual Cost (defined below) of the Tenant Finish Work. Within thirty (30) days following the last to occur of the following: (i) the completion of the Tenant Finish Work to Landlord's reasonable satisfaction in substantial accordance with the Construction Documents, (ii) the delivery to Landlord of reasonable evidence (i.e., invoices) of the Actual Costs of the completed Tenant Finish Work, (iii) the delivery to Landlord of unconditional lien waivers and bills paid affidavits from all contractors, subcontractors or other parties who performed work in connection with the completed Tenant Finish Work, (iv) the delivery to Landlord of copies of Tenant's final certificate of occupancy and final TAS (Texas Accessibility Standards) approval issued by the appropriate governmental and/or municipal authorities, if applicable, (v) the delivery to Landlord of two (2) reproducible copies of "as built" plans and specifications (1/8 inch scale) for the Tenant Finish Work, together with copies of all warranties issued in connection with the completion of Tenant's Finish Work, Landlord shall reimburse Tenant for Actual Costs in conjunction with completing the Tenant Finish Work. Landlord's reimbursement shall not exceed $400,000.00 (the "Work Allowance") in the aggregate for the Tenant Finish Work. In the event Tenant assigns or sublets the Third Expansion Premises in accordance with the terms and provisions of the Lease, then (a) as to any such assignment, such assignee shall have the right to use any unused portion of the Work Allowance as of the date of the assignment in accordance with the terms of this Exhibit A, and (b) as to any such sublet, Tenant shall continue to have the right to use any unused portion of the Work Allowance as of the date of the sublease for the benefit of the subtenant, in accordance with the terms of this Exhibit A. The term "Actual Cost" means the cost of all labor, services, supplies, materials, equipment, data center equipment, cabling, furniture, condenser units, generators and tools (including rental fees) and all hard costs incurred by Tenant in performing the Tenant Finish Work, including the cost of preparing the Construction Documents (i.e., the Work Allowance shall include the cost of preparing the Construction Documents). In addition, the term Actual Costs shall include the costs and expenses incurred by Tenant in constructing the generator and condenser units pursuant to Section 7 below.

In the event there are funds remaining from the Work Allowance that are not disbursed to Tenant following the final completion of the initial Tenant Finish Work project and the disbursement of funds in connection therewith, Tenant may utilize such remaining Work Allowance for subsequent Tenant Finish Work projects in accordance with the following terms and provisions;

(a)     Each such subsequent Tenant Finish Work project shall result in the complete finish-out of all or a portion of the Premises. Such finish-out shall (i) be fully functional for its intended use; (ii) shall not be dependent on subsequent Tenant Finish Work for any of its functional requirements, including but not limited to demising walls,

10

utilities and access; and (iii) shall include separation from any unfinished portions of the Premises.

(b)  Each such subsequent Tenant Finish Work project shall be performed in accordance with the terms and provisions of this Exhibit A, and the disbursement of the remaining Work Allowance shall be subject to the terms and provisions of this Exhibit A.

(c)  During the continuance of any Event of Default, Tenant shall have no right to utilize any remaining Work Allowance.

3.  **PROJECT ENGINEER; TENANT'S GENERAL CONTRACTOR**: Tenant must use the fire alarm contractor and the roof contractor of record for the Project in connection with any Tenant Finish Work or any other work affecting the Building's fire alarm or roof, as applicable, so as not to negatively impact any warranties applicable to the fire alarm system and/or roof. The contact information for the fire alarm contractor and roof contractor for the Project is set forth on Schedule B to this Exhibit A. The general contractor selected by Tenant to construct the Tenant Finish Work shall be subject to Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed.

4.  **GENERAL**:

(a)  Any material changes to the Construction Documents must first be submitted to Landlord for review and approval prior to the work reflected in such amended Construction Documents being undertaken by Tenant.

(b)  Workmanship and materials reflected in proposed changes to the Construction Documents shall be of a quality which is equal to or better than the quality of the improvements contained in the prior Construction Documents.

(c)  Tenant shall perform the Tenant Finish Work in a manner so as to minimize noise and other interference with tenants of the Project and shall remove all trash and other debris from the Expansion Premises and all other areas of the Project on a daily basis.

(d)  Upon completion of the construction of the Tenant Finish Work, Tenant shall promptly restore any landscaping, sidewalks and other exterior or interior portions of the Project damaged as a result of Tenant's construction of the Tenant Finish Work to the condition existing prior to the commencement of such construction.

(e)  Any entry upon the Third Expansion Premises by Tenant and its agents and contractors shall be deemed to be under all of the terms, covenants, provisions and conditions of the Lease, excepting only (as to Tenant's agents and contractors) the covenant to pay Rent. All of Tenant's materials, work, installations and decorations of any nature brought upon or installed in the Third Expansion Premises shall be at Tenant's sole risk, and neither Landlord nor any party acting on Landlord's behalf shall be responsible for any damage thereto or loss or destruction thereof.

11

(f)     Prior to the commencement of construction of the Tenant Finish Work, Tenant must
provide to Landlord a copy of the building permit for the Tenant Finish Work, along
with evidence of the insurance coverages required pursuant to Schedule A to this
Exhibit A.

5.   **CONTRACTOR INSURANCE REQUIREMENTS**: All contractors, subcontractors,
suppliers, service providers, moving companies, and others performing work of any type for
Tenant in the Building shall comply with the terms of Schedule A attached to this Exhibit A.

6.   **LANDLORD DELAY**. "Landlord Delay" shall mean any delay in the construction of the
Tenant Finish Work resulting from (a) Landlord's failure to respond within the time frames
contained herein; (b) Landlord's unreasonable withholding of consent, adding of
unreasonable conditions, or subjecting its consent to unreasonable delay, but only to the
extent that the Lease or this Amendment expressly prohibits Landlord from unreasonably
withholding, conditioning, or delaying consent to the item in question; (c) any negligent or
intentional act of Landlord or its employees, agents, or contractors that directly and
materially impacts the timely completion of the Tenant Finish Work. Tenant shall have no
right to claim a Landlord Delay unless Tenant shall have specified the nature of the delay in a
written notice to Landlord within five (5) business days following the occurrence of the event
causing the delay.

7.   **SPECIAL CONSTRUCTION PROVISIONS**. As part of the Tenant Finish Work, Tenant
shall have the right to construct new generator and condenser units within the location
designated by Landlord to the east of Building 3 subject to the following terms and
conditions:

(a)     The location and specifications of the generator and condenser units shall be
subject to the prior reasonable approval of Landlord and generally consistent
with Schedule C attached to this Exhibit A.

(b)     The generator and condenser units shall be designed solely for the use of
Tenant to provide backup electrical and HVAC service to the Premises.

(c)     The installation of the generator and condenser units, as well as the
construction of a split face CMU block enclosure around such generator and
condenser units, shall be performed at Tenant's sole cost and expense
(subject to the Work Allowance). The parties acknowledge and agree that the
split face CMU block enclosure around the generator and condenser units
must be architecturally compatible with the balance of the project.

(d)     Tenant shall, at its sole cost and expense, maintain the generator and
condenser units in good condition and repair. Tenant agrees that any testing
and/or preventative maintenance procedures with respect to the generator and
the condenser units will be performed after normal business hours and will be
coordinated with Landlord.

12

(e) Tenant shall indemnify and hold Landlord harmless from and against any and all loss, cost, expense, damage, claims and liabilities (including attorney's fees) arising in connection with the use and maintenance of the generator and condenser units. Landlord shall indemnify and hold Tenant harmless from and against any and all loss, cost, expense, damage, claims and liabilities (including attorney's fees) arising in connection with damage to the generator or condenser units caused by the negligence or willful misconduct of Landlord or its agents or contractors.

(f) Landlord, at Landlord's sole cost and expense, shall be responsible for Landscaping around the proposed generator and condenser units.

13

## Schedule A
## to
## EXHIBIT A

### CONTRACTOR INSURANCE REQUIREMENTS

All contractors, subcontractors, suppliers, service providers, moving companies, and others performing work of any type for Tenant in the Project shall:

- carry the insurance listed below with companies acceptable to Landlord; and

- furnish Certificates of Insurance in form acceptable to Landlord, together with a copy of the endorsements to such policies of insurance evidencing the Landlord and Landlord's property manager, agents, mortgagees, any ground, primary or master lessor, and their respective officers, directors, employees, agents, partners and assignees, have been included as additional insureds, evidencing required coverages at least ten (10) days prior to entry in the Project and annually thereafter.

Certificates of Insurance must provide for thirty (30) days' prior written notice of cancellation, non-renewal or material change in coverage to Landlord.

1. **Workers Compensation**: Statutory coverage in compliance with Workers Compensation Laws of the state in which the Project is located.

2. **Employers' Liability**: With the following minimum limits of liability:

   | | |
   |---|---|
   | $100,000 | Each Accident |
   | $500,000 | Disease-Policy Limit |
   | $100,000 | Disease-Each Employee |

3. **Commercial General Liability**: (1986 ISO Form or its equivalent): This Insurance must provide contractual liability and a general aggregate limit on a per location or per project basis. The minimum limits must be $1,000,000 combined single limit on a per occurrence basis.

4. **Automobile Liability**: Insurance for claims arising out of ownership, maintenance, or use of owned, non-owned, loading and unloading, and hired motor vehicles at, upon, or away from the Project with the following minimum limits:

   $1,000,000    Combined Single Limit Bodily Injury and Property Damage combined on a per occurrence basis

5. **Umbrella**: At least Following Form liability insurance, in excess of the Commercial General Liability, Employers Liability, and Automobile Insurance above, with the following minimum limits:

14

$3,000,000    Each Occurrence
$3,000,000    Aggregate - Where Applicable

6.    **General Requirements**: All policies must be:

- written on an occurrence basis and not on a claims-made basis;

- except for the workers compensation insurance, commercial general liability insurance shall be endorsed to name as additional insureds Landlord, Landlord's property manager, Landlord's mortgagees, any ground, primary, or master lessor, and their respective officers, directors, employees, agents, partners, and assigns;

- all policies shall be endorsed to cause each insurance carrier to waive any and every claim for recovery from any and all loss or damage to the Project or Leased Premises or to the contents thereof, whether such loss or damage is due to the negligence of Landlord, its officers, partners, directors, agents or servants, such waiver shall also include Landlord's property manager, mortgagees, any ground, primary or master lessor and their respective officers, directors, employees, agents, partners and assignees;

- any self-insured retention shall be the responsibility of the Tenant under its umbrella coverage;

- there shall be commercially reasonable deductibles applicable to the commercial general liability insurance; and

- all insurance companies shall have an A.M. Best's Rating of A-IX or better.

## Schedule B
## to
## EXHIBIT A

### List of Fire Alarm and Roof Contractors

Fire Alarm
MiTec Net

Roof Contractor
Texas Roof Management – Phone No. (972) 272-7663

## Schedule C
### to
### EXHIBIT A



17

Rider No. 102

## TENANT'S OPTION TO RENEW

Tenant may, at its option and subject to the terms hereof, renew the Lease Term for either (1) two (2) additional terms of sixty (60) months each or (2) one (1) additional term of one hundred twenty (120) months, provided that this Lease must be in full force and effect and no monetary event of default (beyond any applicable notice and cure period) and no material non-monetary default (beyond any applicable notice and cure period) exists under this Lease at the time of exercise of such option or at the time the renewal term would begin. The phrase "material non-monetary default," as used herein, shall include, without limitation, (a) any default which materially adversely affects the operation of the Building, the Building systems, or the Common Area, (b) any default which materially adversely affects other tenants of the Project, and (c) any default relating to violations of applicable laws. Such renewal shall be upon the same terms and conditions as provided elsewhere in this Lease, except that (i) this Lease may not be renewed more often than as set forth above, and (ii) the annual Base Rental for such renewal period(s), and each monthly installment thereof, shall be determined as provided below. Each such option shall be exercised by Tenant giving notice to Landlord by certified mail, return receipt requested, at least twelve (12) but not more than twenty six (26) months prior to the end of the then-existing term, and, if not so exercised, such option not so exercised and any subsequent option to renew shall automatically expire and terminate. In Tenant's initial renewal notice described in the preceding sentence, Tenant shall specify as to whether Tenant elects to exercise the initial 60-month renewal term or the single 120-month renewal term. If Tenant so elects to renew the Lease Term, following Tenant's exercise of such renewal option, upon request from Landlord, Tenant and Landlord will enter into a renewal agreement by which this Lease will be renewed in accordance with the terms set forth in this Rider.

The annual Base Rental for each renewal period shall be the Prevailing Rental Rate, which shall mean the current fair market rent for comparable office space located within similar buildings within the Lewisville/Denton submarket, taking into consideration use, location and floor level within the Building, rental concessions then being granted by landlords of such comparable space under similar circumstances, base year and/or expense calculations, the date the particular rate under consideration is to become effective, and the term of the lease under consideration. Landlord shall promptly notify Tenant of the Prevailing Rental Rate as determined by Landlord in accordance with this Paragraph no more than 30 days following Landlord's receipt of notice from Tenant of the election to renew.

Within thirty (30) days after Landlord shall have given notice to Tenant of the Prevailing Rental Rate as determined by Landlord for either the first renewal term or the second renewal term, Landlord and Tenant shall attempt to agree upon the Prevailing Rental Rate for the extended term. If the parties agree on Prevailing Rental Rate for the extended term during that period, they shall immediately execute an amendment to the Lease stating the Prevailing Rental Rate and the amount of the annual Base Rental for such renewal term in question.

18

If the parties are unable to agree on the Prevailing Rental Rate for the applicable renewal term within the 30-day period, then, within fifteen (15) days after the expiration of that period, each party, at its cost, and by giving notice to the other party, shall appoint a real estate appraiser with MAI designation and at least five years' full time commercial appraisal experience in the area in which the Building is located to appraise the Premises and determine the fair rental value for the Premises, taking into consideration the factors described in the second Paragraph of this Rider No. 102. If one party does not appoint an appraiser within twenty (20) days after the other party has given notice of the name of its appraiser, the single appraiser appointed shall be the sole appraiser, and fair rental value so determined by that appraiser shall be the Prevailing Rental Rate for purposes of this subparagraph.

If two appraisers are appointed by the parties as stated above, they shall independently establish fair rental value for the Premises. If the appraisers agree, the Prevailing Rental Rate shall be the fair rental value of the property as agreed by the two appraisers. If they are unable to agree within thirty (30) days after the second appraiser has been appointed, the Prevailing Rental Rate shall be the fair rental value for the Premises as determined by the average of the two appraisals if the higher of the two appraisals is no greater than 110% of the lower of the two appraisals. If, however, the higher of the two appraisals is more than 110% higher than the lower appraisal, the two appraisers shall promptly appoint a third appraiser who shall appraise the Premises and independently determine fair rental value for the Premises, taking into consideration the factors described in the second paragraph of this Rider No. 102. Each of the parties shall bear one half of the cost of appointing the third appraiser and of paying the third appraiser's fee. The third appraiser shall have the qualifications stated above and shall further be a person who has not previously acted in any capacity for either party.

Within thirty (30) days after the selection of the third appraiser, the Prevailing Rental Rate shall be established as the fair rental value of the Premises as determined by an average of the three appraisers; provided, however, that if the low appraisal and/or the high appraisal are/is more than ten percent lower and/or higher than the middle appraisal, the low appraisal and/or the high appraisal shall be disregarded. If only one appraisal is disregarded, the remaining two appraisals shall be added together and their total divided by two to establish the Prevailing Rental Rate. If both the low appraisal and the high appraisal are disregarded as stated in this Paragraph, the middle appraisal shall establish the Prevailing Rental Rate for the Premises during the renewal term in question.

Rider No. <u>103A</u>

## <u>RIGHT OF FIRST REFUSAL</u>

<u>Right of First Refusal</u>.

      Landlord and Tenant hereby agree that provided that the Lease continues in full force and effect without any uncured default by Tenant, Tenant shall have a continuing right of first refusal (subject to the provisions set out below and to any pre-existing rights of other tenants), throughout the Lease Term and any extension thereof, to lease any vacant space in Building 2 which is adjacent and contiguous to the Premises (such space being hereinafter referred to as the "<u>Designated Area</u>"), which Landlord intends to market for lease to a party or parties other than Tenant. If a proposed tenant gives Landlord a bona fide expression of interest in leasing then vacant space (evidenced by a signed LOI) within the Designated Area (either as a separate leased premises or together with space outside the Designated Area), and if Landlord intends to enter into a lease with the proposed tenant for such space, Landlord shall deliver to Tenant a written notice which (i) specifies the portion or portions of the Designated Area and, if applicable, any other space in the Project which the proposed tenant wishes to lease and Landlord intends to allow to be leased along with the portion or portions of the Designated Area (all such space being referred to collectively as the "<u>Refusal Space</u>"), (ii) identifies the proposed tenant, (iii) summarizes what Landlord in good faith considers to be the most significant business terms of the proposed lease (which must, without limitation, include the identity of the proposed leased premises, the rental(s), the expense calculations, the finish-out obligations and allowance, any right of termination that the proposed tenant has the right to exercise prior to the end of the lease term, and any right of first refusal granted to the proposed tenant for additional space), and (iv) offers to lease the Refusal Space to Tenant on the same terms and conditions as Landlord intends to offer to the proposed tenant, except that in the event such offer is accepted by Tenant prior to December 31, 2012, (A) the annual Base Rental for the Refusal Space shall be at the same rate applicable for the Premises for the same time period, (B) the lease term for the Refusal Space shall be coterminous with the Lease Term, including any extensions thereof occurring pursuant to Rider No. 102 to this Amendment, and (C) Tenant shall receive a free rent period and tenant improvement allowance (on a per square foot basis) consistent with the terms of this Amendment as to the Third Expansion Premises prorated based on a fraction, the numerator of which is the number of months remaining in the Lease Term on the rent commencement date for such Refusal Space, and the denominator of which is seventy-four (74) months. Tenant shall then have a period of ten (10) business days from the delivery of such notice (the "<u>Delivery Date</u>") to accept the lease offered by Landlord. If within the 10-business-day period Tenant does not give Landlord written notice of its acceptance of the lease offered by Landlord (time being of the essence), then Landlord shall be entitled to execute with the proposed tenant identified in Landlord's notice to Tenant (or with an "affiliated entity," i.e., an entity affiliated to such identified proposed tenant by common ownership), a lease of the Refusal Space for the same or better (for Landlord) terms as stated in the notice to Tenant. If within one hundred eighty (180) days after the Delivery Date Landlord does so execute such a lease of the Refusal Space, this right of first refusal shall terminate (i.e., as to the entirety of the Refusal Space), subject to the next sentence. If the space is so leased and again becomes vacant

20

and not subject to a lease, or if Landlord does not execute a lease of the entirety of the Refusal Space with the proposed tenant or an affiliated entity within one hundred eighty (180) days after the Delivery Date, or if the economic terms of the proposed lease are modified in any material manner to the benefit of Tenant, then Landlord shall again comply with the terms of this Paragraph in marketing the Refusal Space which is in the Designated Area.

21