1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 12-12020-mg

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6

7  RESIDENTIAL CAPITAL, LLC, et al.,

8

9           Debtors.

10

11  - - - - - - - - - - - - - - - - - - - -x

12

13           United States Bankruptcy Court

14           One Bowling Green

15           New York, New York

16

17           September 27, 2012

18           10:02 AM

19

20  B E F O R E:

21  HON. MARTIN GLENN

22  U.S. BANKRUPTCY JUDGE

23

24

25

2

1    (Doc no. 1419) Application of the Official Committee of

2    Unsecured Creditors for Entry of an Order Authorizing the

3    Employment and Retention of J F. Morrow, as Consultant to the

4    Committee Nunc Pro Tunc to September 5, 2012 filed by Stephen

5    Zide on behalf of Official Committee Of Unsecured Creditors.

6

7    (CC: Doc no. 1228, 1321, 1341, 1326, 1228, 1077) Motion of

8    Patrick Hopper for Reconsideration of Order Authorizing

9    Employment and Retention of Bradley Arant Boult Cummings LLP as

10   Special Litigation and Compliance Counsel to the Debtors.

11

12   (CC: Doc no. 1356) Debtors' Motion for Entry of an Order Under

13   Sections 105 and 363 of the Bankruptcy Code Authorizing the

14   Reimbursement of Expenses Including Counsel Fees Incurred by

15   the Independent Directors filed by Gary S. Lee on behalf of

16   Residential Capital, LLC.

17

18   Status Conference RE: GMAC Mortgage, LLC. v. Silmon (Circuit

19   Court of Jefferson County, Alabama (Birmingham Division), Case

20   No.: CV-2009-902322)

21

22

23

24

25

1   (Doc no. 1418) Application of the Official Committee of

2   Unsecured Creditors for Entry of an Order Authorizing the

3   Employment and Retention of Analytic Focus, LLC as Consultant

4   to the Committee, Nunc Pro Tunc to August 28, 2012 filed by

5   Stephen Zide on behalf of Official Committee Of Unsecured

6   Creditors.

7

8   Status Conference RE: Plan Developments

9

10   Adversary proceeding: 12-01731-mg United States of America, Ex

11   Rel. et al. v. GMAC, Mortgage Co., LLC

12   Pre-trial Conference.

13

14   (CC: Doc# 14) Motion to Dismiss Adversary Proceeding / Debtors

15   Motion for Judgment on the Pleadings in Response to Yvonne D.

16   Lewis, et al. Adversary Complaint by Surplus Creditor s for

17   False Claims and RICO, 31 U.S.C.A. 3729 to 3733; 18 U.S.C. 666,

18   1962; BR Rule 7008

19

20   CC: Doc# 12 Motion for Summary Judgment By Plaintiffs; Grounded

21   On (1) Federal Preemptions For Federal Programs Under HUD (42

22   U.S.C. 3535 (i) (1)) And US DOT (49 U.S.C. 47502); And

23   "Separation Of Powers" Of Federal Agencies On 09/08/2012 In

24   State Court Case No. 05-CV-4555, FR. CNTY., Ohio.

25

4

1   (CC: Doc no. 1242, 945, 61) Status Conference RE: Pre-Auction

2   Objections of the RMBS Trustees and Related Joinders to the

3   Debtors' Sale Motion.

4

5   (CC: Doc no. 1426) Status Conference RE: Debtors' Application

6   for an Order Under Section 327(e) of the Bankruptcy Code,

7   Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the

8   Debtors to Employ and Retain Pepper Hamilton LLP as Special

9   Foreclosure Review Counsel for Bankruptcy Issues to the

10  Debtors, Nunc Pro Tunc to May 14, 2012 filed by Gary S. Lee on

11  behalf of Residential Capital, LLC.

12

13  (CC: Doc no. 1427) Status Conference RE: Debtors' Application

14  Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule

15  2014(a) and Local Rule 2014-1 for Authorization to Employ and

16  Retain Hudson Cook, LLP as Special Counsel to the Debtors, Nunc

17  Pro Tunc to May 14, 2012 filed by Gary S. Lee on behalf of

18  Residential Capital, LLC.

19

20  (CC: Doc# 1416) Debtors Motion Under Bankruptcy Code Sections

21  105(a) and 362(d) for Entry of an Order Approving Procedures by

22  Which Third Parties May Request and Obtain Stipulated Relief

23  from the Automatic Stay to Commence or Continue Actions to

24  Foreclose Senior Liens.

25  (CC: Doc# 1415, 1229) Hearing in Reference to Motion in

5

1   Reference to Stay Order Violations by GMAC - GMAC Mortgage

2   Violated/Stay Order Violation Re: GMAC Mortgage Fabricated

3   Documents and Sold Jackson Home Illegally filed by Corla

4   Jackson. (related document(s)1229)

5

6   (CC: Doc# 1357) Status Conference RE: Debtors Motion for Entry

7   of an Order Under Bankruptcy Code Section 363 and Bankruptcy

8   Rule 6004 (I) Authorizing the Debtors to Compensate

9   PricewaterhouseCoopers, LLP for Foreclosure Review Services in

10  Furtherance of the Debtors Compliance Obligations Under Federal

11  Reserve Board Consent Order and (II) Reaffirming Relief

12  Granting in the GA Servicing Order.

13

14  (CC: Doc# 1264, 1494) Motion to Appoint Committee and Motion to

15  Join in Motion to Appoint Committee.

16

17  Doc# 1591 Motion to Join Additional Homeowners to the Motion

18  for an Order Appointing an Official Committee of Borrowers.

19  (related document(s)1264)

20

21  Transcribed by:  Penina Wolicki

22  eScribers, LLC

23  700 West 192nd Street, Suite #607

24  New York, NY 10040

25  (973)406-2250; operations@escribers.net

6

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8   BY:    GARY LEE, ESQ.

9          SAMANTHA MARTIN, ESQ.

10         LORENZO MARINUZZI, ESQ.

11         AARON M. KLEIN, ESQ.

12         NORMAN S. ROSENBAUM, ESQ.

13

14

15  MORRISON & FOERSTER

16       Attorneys for Debtors

17       2000 Pennsylvania Avenue NW

18       Suite 5500

19       Washington, DC 20006

20

21  BY:    ALEXANDRA STEINBERG BARRAGE, ESQ.

22

23

24

25

7

```
 1
 2   ORRICK, HERRINGTON & SUTCLIFFE LLP
 3         Special Counsel to Debtors
 4         777 South Figueroa Street
 5         Suite 3200
 6         Los Angeles, CA 90017
 7
 8   BY:   DUANE K. BEASLEY, ESQ. (TELEPHONICALLY)
 9
10
11   ORRICK, HERRINGTON & SUTCLIFFE LLP
12         Special Counsel to Debtors
13         51 West 52nd Street
14         New York, NY 10019
15
16   BY:   SCOTT M PEARSALL, ESQ. (TELEPHONICALLY)
17
18
19   UNITED STATES DEPARTMENT OF JUSTICE
20         Office of the United States Trustee
21         33 Whitehall Street
22         21st Floor
23         New York, NY 10004
24
25   BY:   BRIAN S. MASUMOTO, ESQ.
```

8

1

2    KRAMER, LEVIN, NAFTALIS & FRANKEL LLP

3          Attorneys for Official Creditors' Committee

4          1177 Avenue of the Americas

5          New York, NY 10036

6

7    BY:   DOUGLAS H. MANNAL, ESQ.

8          ELISE S. FREJKA, ESQ.

9          GREGORY A. HOROWITZ, ESQ.

10          KENNETH H. ECKSTEIN, ESQ.

11          STEPHEN D. ZIDE, ESQ.

12

13    KIRKLAND & ELLIS LLP

14          Attorneys for Ally Financial, Inc. & Ally Bank

15          601 Lexington Avenue

16          New York, NY 10022

17

18    BY:   RAY C. SCHROCK, ESQ.

19

20    MORGAN, LEWIS & BOCKIUS LLP

21          Attorneys for Deutsche Bank

22          1701 Market Street

23          Philadelphia, PA 19103

24

25    BY:   JOHN C. GOODCHILD, III, ESQ.

9

SEWARD & KISSEL LLP

 Attorneys for US Bank N.A. as Securitization Trustee

 One Battery Park Plaza

 New York, NY 10004


BY: ARLENE R. ALVES, ESQ.

 LAURIE R. BINDER, ESQ.



SHEARMAN & STERLING LLP

 Attorneys for Citibank, NA

 599 Lexington Avenue

 New York, NY 10022


BY: EDMUND EMRICH, ESQ.



AKIN GUMP STRAUSS HAUER & FELD LLP

 Attorneys for Aurelius Capital Management LP

 One Bryant Park

 New York, NY 10036


BY: DANIEL H. GOLDEN, ESQ.

10

1

2  WHITE & CASE LLP

3       Attorneys for Ad Hoc Group of Junior Secured Noteholders

4       1155 Avenue of the Americas

5       New York, NY 10036

6

7  BY:   J. CHRISTOPHER SHORE, ESQ.

8        HARRISON DENMAN, ESQ.

9

10

11  CLEARY GOTTLIEB STEEN & HAMILTON

12       Attorneys for Wilmington Trust

13       One Liberty Plaza

14       New York, NY 10006

15

16  BY:   MARK A. LIGHTNER, ESQ.

17

18

19  ALLEN & OVERY

20       Attorneys for HSBC

21       1221 Avenue of the Americas

22       New York, NY 10020

23

24  BY:   JOHN KIBLER, ESQ.

25

11

1

2  MORRISON COHEN LLP

3       Attorneys for Independent Directors

4       909 Third Avenue

5       New York, NY 10022

6

7  BY:   JOSEPH T. MOLDOVAN, ESQ.

8

9

10  DECHERT LLP

11       Attorneys for Bank of New York Mellon

12       1095 Avenue of the Americas

13       New York, NY 10036

14

15  BY:   GLENN E. SIEGEL, ESQ.

16

17

18  TEITELBAUM & BASKIN, LLP

19       Attorneys for JPMorgan Chase Bank NA

20       1 Barker Avenue

21       Third Floor

22       White Plains, NY 10601

23

24  BY:   JAY TEITELBAUM, ESQ.

25

12

ROBERT E. BROWN ATTORNEY AT LAW

         Attorneys for Homeowners Claimants

         44 Wall Street

         12th Floor

         New York, NY 10005


BY:   ROBERT E. BROWN, ESQ.



SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

         Attorneys for Barclays Bank PLC

         Four Times Square

         New York, NY 10036


BY:   JONATHAN H. HOFER, ESQ.



SCHLAM STONE & DOLAN LLP

         Attorneys for Homeowners Claimants

         26 Broadway

         19th Floor

         New York, NY 10004


BY:   BENNETTE D. KRAMER, ESQ.

13

1

2  WEIL, GOTSHAL & MANGES LLP

3        Attorneys for Syncora Guarantee Inc.

4        767 Fifth Avenue

5        New York, NY 10153

6

7  BY:   SARA COELHO, ESQ.

8

9

10 SIDLEY AUSTIN LLP

11        Attorneys for Nationstar

12        One South Dearborn

13        Chicago, IL 60603

14

15 BY:   LARRY J. NYHAN, ESQ. (TELEPHONICALLY)

16        JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)

17

18

19 BRADLEY ARANT BOULT CUMMINGS LLP

20        Attorneys for GMAC Mortgage

21        1819 Fifth Avenue North

22        Birmingham, AL 35203

23

24 BY:   CHRISTY W. HANCOCK, ESQ. (TELEPHONICALLY)

25        JON H. PATTERSON, ESQ. (TELEPHONICALLY)

14

JACKSON WALKER, L.L.P.

    Attorneys for Frost Bank

    100 Congress Avenue

    Suite 1100

    Austin, TX 78701

BY:   PATRICIA TOMASCO, ESQ. (TELEPHONICALLY)


ROPES & GRAY LLP

    Attorneys for RMBS Noteholders

    1211 Avenue of the Americas

    New York, NY 10036

BY:   KEITH H. WOFFORD, ESQ. (TELEPHONICALLY)


JONES DAY

    Attorneys for FGIC

    555 South Flower Street

    Fiftieth Floor

    Los Angeles, CA 90071

BY:   RICHARD L. WYNNE, ESQ. (TELEPHONICALLY)

15

1

2  POLSINELLI SHUGHART PC.

3       Attorneys for Plaintiffs

4       700 W. 47th Street

5       Suite 1000

6       Kansas City, MO 64112

7

8  BY:   DANIEL J. FLANIGAN, ESQ. (TELEPHONICALLY)

9

10  ACCESS LEGAL SERVICES

11       Attorney for Wendy Alison Nora and others

12       similarly situated

13       4675 West 80th Street Circle

14       Minneapolis, MN 55437

15

16  BY:   WENDY ALISON NORA, ESQ. (TELEPHONICALLY)

17

18

19  HOOD & LAY, LLC

20       Attorneys for Derrius Silmon

21       1117 22nd Street South

22       Birmingham, AL 35205

23

24  BY:   RHONDA S. HOOD, ESQ. (TELEPHONICALLY)

25

16

1

2    THE LAW OFFICES OF MATTHEW WEIDNER, P.A.

3          1229 Central Avenue

4          St. Petersburg, FL 33705

5

6    BY:    MATTHEW D. WEIDNER, ESQ.

7

8

9    KENNETH TAGGART

10          Pro Se

11

12

13    ALSO PRESENT:

14          ADRIAN COWAN, Analytic Focus (TELEPHONICALLY)

15          PATRICK J. HOPPER, Pro Se (TELEPHONICALLY)

16          CORLA JACKSON, Pro Se (TELEPHONICALLY)

17          J.F. MORROW, Analytic Focus (TELEPHONICALLY)

18          PAULA RUSH, Mortgage Analyst.

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, et al.**                    17
P R O C E E D I N G S

1

2          THE COURT:  Please be seated.  All right, we're here n

3  Residential Capital, number 12-12020.  There are also some

4  adversary proceedings, but I'll deal with that when the time

5  comes.

6          Mr. Lee?

7          MR. LEE:  Good morning, Your Honor.  Gary Lee from

8  Morrison & Foerster for the debtors.  Your Honor, the first

9  item on the agenda today is on page 6 of the amended agenda,

10 which is the status report on the plan negotiation process.

11         THE COURT:  Can I ask you something?  I looked over

12 the agenda, and there are two matters that are listed on the

13 electronic docket that I don't see on the agenda.  Maybe I just

14 missed it when I went over.  It's the creditors' committee has

15 two applications to retain experts.  Are they still on here?

16         UNIDENTIFIED SPEAKER:  At the end of the agenda.

17         THE COURT:  I'm sor -- the end of the agenda?  Okay,

18 that's fine.

19         All right, go ahead, Mr. Lee.

20         MR. LEE:  Your Honor, at the September 11th hearing,

21 you asked us to work with Mr. Eckstein and with the committee

22 professionals to identify what we thought were the plan

23 negotiation issues and also to come up with an active process

24 for negotiations with and among the creditors, and to report

25 back to you today.

RESIDENTIAL CAPITAL, LLC, et al.                                    18

1        I'm pleased to report that with the very active

2   cooperation of the committee professionals, we've made progress

3   on both fronts.

4        THE COURT:  I did read the status report that you

5   filed.

6        MR. LEE:  Okay.  Well, then Your Honor, other than to

7   note that there's general consensus on what the plan issues

8   are, and without attempting to understate the difficulty of

9   resolving them, there is, Your Honor, in place, a process now

10  to begin active discussions with the different constituents.

11       I think Your Honor directed at the last hearing that

12  we begin with meetings with AFI and the committee.

13       THE COURT:  Yes.  Have any of the --

14       MR. LEE:  And that's been set.

15       THE COURT:  -- meetings been scheduled?

16       MR. LEE:  Yes, Your Honor.  And also a meeting's been

17  scheduled with the junior secured bond groups and with the

18  committee as well, Your Honor.

19       THE COURT:  All right.

20       MR. LEE:  And e-mails have gone out to the committee

21  and to AFI to set a further series of meetings with the

22  different constituencies, including the senior notes, the

23  monolines, the securities claimants, and also with the

24  borrowers as well, Your Honor.

25       THE COURT:  When are the first meetings scheduled for?

RESIDENTIAL CAPITAL, LLC, et al.                                    19

1      MR. LEE:  I believe, Your Honor, the first meeting is

2  on October the 10th.  Okay, the 9th, Your Honor.

3      THE COURT:  All right.  Mr. Eckstein, do you want to

4  be heard on this?

5      MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

6  Eckstein of Kramer Levin.  Mr. Lee correctly characterizes the

7  efforts that the debtor and the committee have been making to

8  try to organize plan discussions.  I don't want to minimize the

9  substance that has to be dealt with here.

10      THE COURT:  Well, that was my reaction when I read the

11  status report, which I was glad to see and I think -- until the

12  parties, the constituencies, begin speaking with each other,

13  the difficult issues aren't going to move forward.  There are a

14  lot of difficult issues.

15      MR. ECKSTEIN:  There are.  I think it is very useful

16  for these meetings to be set up.  And as Mr. Lee indicated, all

17  the parties are, I think, being contacted.  In addition, I've

18  been having discussions among the various constituencies within

19  my committee about plan-related issues and how that ultimately

20  can be incorporated into what hopefully will be productive

21  discussions.

22      I think this process takes some time, Your Honor.  But

23  I think that there is a good structure in place.  And I would

24  encourage that we spend the next couple of weeks trying to lay

25  a foundation and see what the key issues are on which I'll come

RESIDENTIAL CAPITAL, LLC, et al.                                    20

1   back.

2          THE COURT:  Yes.  I mean, I don't -- other than

3   attempting to jump start the process, I think that I don't see

4   any reason for further status reports to me on it at this

5   stage.  The process will work best if it can occur

6   confidentially between the parties.  Unless somebody comes to

7   me with a specific problem that would ordinarily require the

8   Court to intervene, I think you just ought to carry on.

9          The only thing I want to be sure of is, is that there

10  is a regular dialog going on with the constituencies.  If

11  that's happening, then it should happen without my involvement.

12  Okay?

13         MR. ECKSTEIN:  The only other point I think we want

14  to -- we want to just emphasize that from our perspective,

15  we're expecting that all parties are going to come to the table

16  without any preconceived either commitments or limitations.

17  And we're expecting that that's the only way there's going to

18  be real progress.  And I think we'll have to see how that plays

19  out.

20         THE COURT:  Okay.  I think, you know, in -- obviously

21  exclusivity is going to be back on the table before the end of

22  the year.  And I'm not prejudging anything, but I think I made

23  clear when I only granted the extension into December that I

24  fully contemplate extending exclusivity further.  I just wanted

25  to get this process underway.  So in any -- I don't want

1  anything further in writing about it.  I think when we get into

2  November, the briefest reports:  Yes, we've continued to have

3  meetings with the various constituencies.  That's the -- unless

4  there are specific problems that somebody's going to raise with

5  me, I don't want to know more than that.  I just want to be

6  sure that the process is moving forward.  Okay?

7          MR. LEE:  Yes, Your Honor.

8          THE COURT:  Thank you very much, Mr. Lee.  All right,

9  we can go on to the next agenda item.

10          MR. LEE:  Okay.

11          MR. SHORE:  Your Honor?

12          THE COURT:  Sure, Mr. Shore.  Come on up.

13          MR. SHORE:  Sorry.  Just in the context of --

14          THE COURT:  Just --

15          MR. SHORE:  -- a status report to the Court --

16          THE COURT:  -- make your appearance.

17          MR. SHORE:  Sure.  Chris Shore from White & Case on

18  behalf of the ad hoc group of senior secured notes.  And I just

19  rise briefly to talk about preconceived commitments.  I just

20  wanted to let Your Honor know, we walked into this case with

21  plan support agreements in our group, based on a very quick

22  exit from an 11.  For various reasons, that's not happening

23  now.  So we either already terminated or in the --

24          THE COURT:  Am I supposed to be surprised at that?

25          MR. SHORE:  No.  We're in the process of terminating

**RESIDENTIAL CAPITAL, LLC, et al.**                                22

1    the PSAs.  So we'll be coming to the settlement agreements with

2    an open mind about a new plan.

3               THE COURT:  Okay.  We've got somebody else.  This

4    really shouldn't take much time here.  We've got a lot to

5    cover.  Mr. Golden?

6               MR. GOLDEN:  This won't take long, Your Honor, thank

7    you.  Daniel Golden, Akin Gump, counsel for Aurelius Capital.

8               Your Honor, we read the status report, and we are

9    ready, willing, and able, when the debtors get to us, to begin

10   in negotiations.  One troubling aspect, however, Your Honor,

11   that I did want to bring to your attention.  Aurelius has had a

12   series of correspondence with the debtors to get requested

13   documentation, information that's readily available to the

14   debtors, that would be a necessary component to any --

15               THE COURT:  Look if --

16               MR. GOLDEN:   -- legitimate --

17               THE COURT:  -- you have a discovery dispute, I have a

18   process for bringing discovery disputes to my attention.  This

19   is not the time or the place or the manner to do that.  So take

20   it up with the debtor.  If you can't resolve the issue

21   satisfactorily, arrange a conference call with the Court and I

22   will deal with discovery in that context, not in today's

23   context without any papers.  Thank you.

24               MR. GOLDEN:  Thank you, Your Honor.

25               THE COURT:  Mr. Lee?

RESIDENTIAL CAPITAL, LLC, et al.                                    23

1        MR. LEE:  Your Honor, just one brief update.  I think

2   you asked at the last conference for a status report in the

3   KEIP as well, which I did not put into the schedule.

4        THE COURT:  Well, I'm not sure I asked for a status

5   conference.  I sort of -- I think you weren't here --

6        MR. LEE:  Just an update --

7        THE COURT:  -- Mr. Marinuzzi was here.  And what I

8   indicated was if the parties were going to -- you know, I

9   obviously issued my opinion and if the debtor was going to go

10  ahead -- I understood that time may be important.  And the

11  Court was certainly prepared to entertain the renewed motion if

12  it was made.

13       MR. LEE:  Thank you.  Just briefly, Your Honor.  We

14  sent around a revised plan to both the committee and the U.S.

15  Trustee on September the 6th, with revised metrics that were

16  intended to be consistent with Your Honor's order in relation

17  to the KEIP.  My understanding is the committee has signed off

18  on that.  The U.S. Trustee has had some supplemental requests

19  that they made to us including, effectively, a legal brief

20  demonstrating why the revised KEIP was consistent with Your

21  Honor's order.  And I understand from Mr. Masumoto that they're

22  continuing to ask questions and discuss it internally, but that

23  we should be a position to come back to you, hopefully next

24  week.

25       THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    24

1      MR. LEE:  Thank you, Your Honor.

2          THE COURT:  Mr. Masumoto, is there anything you want

3  to say on that subject?

4          MR. MASUMOTO:  No, Your Honor.  Mr. Lee summarized the

5  current status of the process.

6          THE COURT:  Okay.  I mean, I understand that time is

7  important, particularly when -- if the metrics or some of the

8  metrics are tied to the auctions, the auction is not that far

9  in the distant future, and therefore it's important to try and

10  get this resolved.

11          Certainly, if there's agreement, I can hear it on

12  quite short notice.  If there's still disputes, we'll -- I want

13  to allow the U.S. Trustee time to respond.  But --

14          MR. MASUMOTO:  Thank you, Your Honor.

15          THE COURT:  Okay.  All right.  Next, Mr. Lee?

16          MS. BARRAGE:  Good morning, Your Honor.  Alexandra

17  Barrage of Morrison & Foerster on behalf of the debtors.  I'm

18  here to report on our progress in seeking to resolve the RMBS

19  trustees' pre-auction objections which were filed on August

20  23rd in conjunction with this Court's previously entered

21  revised joint omnibus scheduling order on July 31st.

22          Your Honor, will recall that this scheduling order,

23  negotiated by the debtors, the committee, the trustees, and

24  various institutional investors, after the marathon of day-one

25  negotiations, involved two topics.  The first topic covered the

1   9019 settlement and discovery with respect to that issue.  And

2   the second topic covered the issue -- the topic that we are

3   speaking about this morning with respect to a discovery and

4   briefing schedule in connection with the trustees' earlier

5   filed limited objection to the debtors' sale motion.  Our

6   update, this morning, Your Honor, only focuses on that second

7   matter, which is currently scheduled to be heard before Your

8   Honor on October 17th.

9          Since the filing of the pre-auction objections,

10  Morrison & Foerster, counsel for the trustees -- and there are

11  four trustees -- in their capacity as trustees, as well as in

12  their capacity as master servicers, and Nationstar, have been

13  in regular discussions in an effort to try to resolve these

14  issues prior to the commencement of the auction of the

15  servicing platform, which is scheduled to commence on October

16  23rd.  Morrison & Foerster has also been in regular contact

17  with counsel for the creditors' committee on these issues.

18         Although there has been significant progress made on

19  one front -- and I'll get to that in a minute, Your Honor --

20  there still remain several issues outstanding between the

21  parties on the substance of the trustees' pre-auction

22  objections.  After this morning's status conference, counsel

23  are convening in person in an attempt to resolve these

24  outstanding issues.

25         To the extent an agreement is reached, the debtors

**RESIDENTIAL CAPITAL, LLC, et al.**                                    26

1    would propose filing an agreed-upon stipulation and order

2    before this Court, on or before October 3rd.  If, however, the

3    parties do not resolve their remaining issues, the debtors

4    propose filing their response to the pre-auction objections on

5    October 10th, which is seven days prior to the hearing date,

6    and which hopefully would give Your Honor ample opportunity to

7    review the responses and respond.

8          I think all parties are in agreement that resolution

9    of these pre-auction objections prior to the auction remains

10   critical, particularly to the extent it could affect bidding.

11   And so the debtors are certainly working hard to try and

12   resolve these issues with the parties.

13         But before I continue, I wanted to ask the Court

14   whether that proposed scheduling would work?

15         THE COURT:  When I see -- if you reach an agreement --

16         MS. BARRAGE:  Right.

17         THE COURT:  -- with respect to the October 3rd date,

18   if you reach a stipulation, I think you need to bring it before

19   the Court on presentment --

20         MS. BARRAGE:  Um-hum.

21         THE COURT:  -- so that any other parties-in-interest

22   who have an objection can assert it.  I won't simply enter an

23   order on a stipulation.  Hopefully that will resolve things,

24   but there have been lots of parties who've been objecting to a

25   whole variety of things in the case.  So October 3rd is next

1   Wednesday?

2          MS. BARRAGE:  I think so, Your Honor.

3          THE COURT:  You should indicate in the notice of

4   presentment that any objections to the proposed stipulation

5   shall be filed by noon, Tuesday October 9th.

6          MS. BARRAGE:  Was that October 9th, Your Honor?

7          THE COURT:  Yes.

8          MS. BARRAGE:  Okay.

9          THE COURT:  You're on the calendar for the next day at

10  10.  And so if possible, I'll endeavor to resolve -- hopefully

11  there won't be -- if you can work out the agreement, hopefully

12  there won't objections.  If there are, I'll either take them up

13  on the 10th or indicate then when -- if I need more time to

14  review it, when I will.  Okay?

15         MS. BARRAGE:  Your Honor, I believe the scheduled

16  hearing date is actually for the 17th.

17         THE COURT:  I know.  But I have -- there is a ResCap

18  hearing on October 10th.

19         MS. BARRAGE:  Okay.

20         THE COURT:  What I'm saying is, if you're able to

21  reach an agreement with the trustees, and you present it in a

22  stipulation on October 3rd, I'm setting an objection deadline

23  of October 9th -- the court's closed on the 8th.  I'm setting

24  an objection deadline on the 9th.  And if possible, I will --

25  you can add it to the agenda for the 10th.  If I feel I can

**RESIDENTIAL CAPITAL, LLC, et al.**                                  28

1  resolve the matter on the 10th, I will, so as not to wait until

2  the 17th.

3          MS. BARRAGE:  I appreciate that, Your Honor.

4          THE COURT:  If you're filing objections on the 10th,

5  it'll be on the calendar for the 17th.  Okay?

6          MS. BARRAGE:  Yes.  Thank you very much, Your Honor.

7          The good news, Your Honor, is that on an important

8  matter involving the debtors, Nationstar, and the trustees,

9  negotiations over the past several months have been actually

10  very fruitful.  Although this matter technically falls outside

11  the scope of the pre-auction objections, it is related to the

12  debtors' sale of the servicing platform, and I think

13  demonstrates the ability of the parties to work together on

14  issues directly affecting the estate.  With Your Honor's

15  permission, I'd like to briefly --

16          THE COURT:  Go ahead.

17          MS. BARRAGE:  -- discuss this before highlighting some

18  of the open issues.

19          Your Honor, as of last Tuesday, the debtors,

20  Nationstar, and the RMBS trustees agreed on a form of omnibus

21  pooling and servicing agreement amendment.  And essentially

22  what this omnibus amendment does, is it allows GMAC Mortgage,

23  in its capacity as servicer, for certain securitizations

24  sponsored by ResCap, to enter into financing facilities which

25  require an assignment or a pledge to a lender or a trustee on

1  such lender's behalf, of GMAC Mortgage's rights to be

2  reimbursed for advances that it made under servicing agreements

3  relating to these securitizations.

4          So with this form of omnibus amendment in hand,

5  bidders now have greater certainty about their ability to

6  finance these reimbursement amounts, which, in turn, should

7  allow bidders to pay a higher value for these advance --

8          THE COURT:  Let me just -- I want to be clear on this.

9          MS. BARRAGE:  Sure.

10          THE COURT:  This is something that's already been

11  executed?

12          MS. BARRAGE:  It's been agreed to by the parties, Your

13  Honor.  There is a condition -- there are various conditions

14  built into the amendment, one of which is bankruptcy court

15  approval of the omnibus form of amendment.  And we would seek

16  to incorporate the terms of that amendment in a revised form of

17  sale approval order, which would inure to the benefit of either

18  our stalking horse or any other --

19          THE COURT:  Here's what I'm -- I want to be sure --

20          MS. BARRAGE:  Um-hum.

21          THE COURT:  -- that all bidders in the auction for the

22  servicing platform -- that it's a level playing field; that as

23  soon as possible the form of the agreement be filed -- I

24  understand it's got conditions, including approval of the

25  Court.  Obviously, Nationstar has to ultimately -- the ultimate

RESIDENTIAL CAPITAL, LLC, et al.                                30

1   approval is Nationstar has to be the successful bidder.  But I

2   want to be sure that there's nothing about this amendment that

3   unfairly tilts the auction toward Nationstar and chills any

4   other bidders.  I've no reason to believe it does, but I want

5   to be sure that any and all bidders have ample time to review

6   the agreement.

7          So what I don't want to happen is two days before the

8   auction, for the first time, to have the omnibus PSA amendment

9   filed with the Court.  Because my reaction to that would be --

10  is if I hear objections then, is that bidders have not had an

11  adequate opportunity to review that agreement and take it into

12  account in their bids.

13         So the sooner you're able to document and file the

14  proposed amendment, the better I think it will be.  I want to

15  be sure that there is a level playing field for all bidders in

16  an auction.

17         MS. BARRAGE:  We appreciate that, Your Honor.  In

18  fact, to your point, the form of omnibus amendment has already

19  been circulated to our financial advisor, Centerview.  I don't

20  know for sure whether that's, in fact, been transmitted to

21  potential bidders, but it certainly will be done.

22         THE COURT:  I'm not -- I don't want to get -- I'm not

23  micromanaging it.  I --

24         MS. BARRAGE:  I understand.

25         THE COURT:  -- just want to be sure that I suddenly

**RESIDENTIAL CAPITAL, LLC, et al.**                                  31

1    don't have a lot of complaints that it chilled the bidding.

2    Okay?

3            MS. BARRAGE:  I understand, Your Honor.

4            So the remaining issues, really, in terms of the pre-

5    auction objections, and I think that they're points that are

6    raised specifically in the trustees' papers, really relate to

7    the scope of Nationstar's obligations going forward, post-

8    closing.  And in addition, one of those issues touches on the

9    indemnification of the trustees for any losses incurred by

10   those trustees under the provisions of those documents.  And

11   basically, Your Honor --

12           THE COURT:  Which doc -- under the provisions of which

13   documents?

14           MS. BARRAGE:  The pooling and servicing agreements.

15   And as a preliminary matter, Nationstar has told us that they

16   would agree to pick up those indemnification obligations of the

17   trustees, including costs and expenses, with several

18   conditions, if you will.  One --

19           THE COURT:  Just wait, Mr. Siegel.

20           MR. SIEGEL:  These are settlement discussions.  I

21   don't think she should be --

22           THE COURT:  Okay.

23           MR. SIEGEL:  -- putting it on the record.

24           THE COURT:  Are these settlement --

25           MS. BARRAGE:  Your Honor --

RESIDENTIAL CAPITAL, LLC, et al.                    32

1    THE COURT:  -- discussions?

2    MS. BARRAGE:  -- these are topics for discussion later

3  this afternoon.

4    THE COURT:  Well, then take them up with Mr. Siegel

5  and his colleagues.  Don't -- I don't want to -- and I

6  understand, these are important issues, and hopefully they'll

7  be resolved consensually.  They are in the nature -- it does

8  seem to me, they are in the nature of settlement discussions,

9  and I don't want to do anything to impact on that by having

10  somebody prematurely sort of lay out what their position is.

11  Okay?

12    MS. BARRAGE:  I understand, Your Honor.  Well, with

13  that, I mean, I don't have anything further --

14    THE COURT:  Okay.  That's fine.  Thank you.

15    MS. BARRAGE:  -- on the pre-auction objections.

16    THE COURT:  All right.  Mr. Siegel, is there anything

17  you wanted to add?

18    MR. SIEGEL:  Your Honor, I know --

19    THE COURT:  Just make your appearance, Mr. Siegel.

20    MR. SIEGEL:  Glenn Siegel, on behalf of Bank of New

21  York Mellon.  We are one of the RMBS trustees.  I'm with

22  Dechert.

23    Your Honor, I know better than to object to -- make an

24  objection -- I'll start again.  I know better than to interrupt

25  proceedings, unless is pertinent.

RESIDENTIAL CAPITAL, LLC, et al.                                      33

1    THE COURT:  That's -- if you have a point you want to

2    make, Mr. Siegel, go ahead.

3    MR. SIEGEL:  I'm sorry, very briefly.  We have had

4    numerous discussions with the debtor.  We are diligently trying

5    to resolve our objections.  We are hopeful of resolving them.

6    We meet -- we're meeting fairly frequently, including today, on

7    this.  I'm not sure we have the same level of optimism as the

8    debtor does about reaching as successful a conclusion, but we

9    certainly have the same desire they do to reach a conclusion.

10    THE COURT:  Thank you, Mr. Siegel.

11    MR. SIEGEL:  Thank you, Your Honor.

12    THE COURT:  All right.  Mr. Lee, what's next on --

13    MR. GOODCHILD:  Excuse me, Your Honor.  May I be

14    heard?

15    THE COURT:  Quickly.

16    MR. GOODCHILD:  Good morning, Your Honor.  John

17    Goodchild; Morgan, Lewis & Bockius.  I represent Deutsche Bank,

18    one of the RMBS trustees.

19    Your Honor, with respect to the proposal that was made

20    by the debtors to file their response to the pre-auction

21    objection on the 10th --

22    THE COURT:  That's been the case all along.

23    MR. GOODCHILD:  Yes, Your Honor.  We would ask leave

24    to file a short reply.

25    THE COURT:  Noon on the 12th.

RESIDENTIAL CAPITAL, LLC, et al.                                      34

1          MR. GOODCHILD:   Thank you, Your Honor.  And --

2          THE COURT:  Limited to ten pages.

3          MR. GOODCHILD:  And, Your Honor, with respect to the

4    submission of the record in the event that the matter cannot be

5    resolved, we would propose the 3rd for an exchange of

6    information between the parties.

7          THE COURT:  I'm sorry, I don't understand what you're

8    saying.

9          MR. GOODCHILD:  Your Honor, it is our anticipation

10   that if the matter is to be litigated, there will have to be a

11   record.  The precise provisions of the PSAs --

12         THE COURT:  This is not going to be an evidentiary

13   hearing as it is scheduled currently.  If, after I see all of

14   these papers, I conclude an evidentiary hearing is required, I

15   will enter appropriate orders thereafter.

16         MR. GOODCHILD:  Thank you, Your Honor.  Your Honor,

17   with the Court's permission, the group of lawyers representing

18   the RMBS trustees would like to be excused from the courtroom.

19         THE COURT:  You certainly can.

20         MR. GOODCHILD:  Thank you, Your Honor.

21         THE COURT:  All right, Mr. Lee?

22         MS. COELHO:  Your Honor, I'd just like to be heard on

23   the --

24         THE COURT:  Could you --

25         MS. COELHO:  -- status conference, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                                    35

1      THE COURT:  -- identify yourself, please?

2          MS. COELHO:  Sara Coelho; Weil, Gotshal & Manges.  We

3  represent Syncora Guarantee Inc.  Syncora is an insurer, and it

4  has insured some of the trusts that are subject to the sale.

5  We have some of the same objections that have been raised in

6  the trustees' objection.  But because we're not part of the

7  settlement process, we were not part of the earlier objection

8  process.  And I just wanted to stand up so that the Court and

9  the parties are not surprised that there are similar objections

10 out there that are not being addressed through these

11 discussions.

12         THE COURT:  I'll deal with the objections when they

13 come in.  This is not the hearing on it.

14         MS. COELHO:  Okay, thank you.

15         THE COURT:  Thank you.

16         Mr. Marinuzzi?

17         MR. MARINUZZI:  Good morning.  Lorenzo Marinuzzi,

18 Morrison & Foerster, on behalf of the debtors.  I'm going to

19 cover the status conference on items 3, 4, and 5, dealing with

20 the consent order.

21         THE COURT:  Yes, go ahead.

22         MR. MARINUZZI:  Your Honor, the consent order, as the

23 Court is aware, is an order issued by the Federal Reserve Board

24 and the FDIC, dating back to April of 2011.  It's a public

25 document.  It's been referenced in every single order submitted

**RESIDENTIAL CAPITAL, LLC, et al.**                                    36

1  by the debtors since this case began, at the insistence of the

2  Department of Justice.

3          THE COURT:  I know I've read all or parts of it, but I

4  would appreciate it if you could send a copy of it to chambers

5  to I can have it as a standalone, and not search for it online.

6  Okay?

7          MR. MARINUZZI:  We'll do that, Your Honor.  We'll do

8  that.  It's actually an exhibit to the motion to pay PWC.

9          Now, the consent order was signed by Ally Bank, AFI,

10 ResCap, and GMAC Mortgage.  What it does is it establishes a

11 time frame and a framework for ResCap, GMAC Mortgage, AFI, and

12 Ally to address the alleged mortgage servicing and foreclosure

13 deficiencies that arose out of the mortgage crisis in

14 2008/2009.

15         THE COURT:  May I ask this?  Does the consent order

16 deal with issues arising to loan underwriting by Ally Bank, for

17 example?  In other words, I -- look, I read all these papers.

18 Okay?  And Mr. Schrock or his colleagues, in the last paper

19 that he filed on it, emphasizes a point I knew before, that the

20 consent order required the debtors to have his review process,

21 not AFI -- required the debtors.

22         The committee focuses on the fact that -- whether

23 these are the exact terms in the engagements or not --

24 essentially joint and several liability for payment of the

25 obligations to PricewaterhouseCoopers, Pepper Hamilton -- I

**RESIDENTIAL CAPITAL, LLC, et al.**                          37

1  can't remember the name of the other firm.

2          MR. MARINUZZI:  Hudson Cook, Your Honor.

3          THE COURT:  Hudson, right.  Okay.  What my question

4  focuses on is, the conduct that's being reviewed, is it solely

5  the conduct of the debtors, or does it include the conduct of

6  AFI and Ally Bank or any other nondebtor affiliates?

7          MR. MARINUZZI:  Your Honor, it is mostly focused on

8  the debtors' servicing and foreclosure conduct.  It does

9  include aspects of the review that pertain to oversight by the

10 parent.  And I have a bunch of heads nodding behind me, so I've

11 accurately described it.  But the focus is mostly on the

12 foreclosure and servicing activities of GMAC mortgage.

13         And, Your Honor, I don't know if you have any other

14 questions.

15         THE COURT:  Well, to the extent that any review is

16 required with respect to AFI or Ally Bank or any other

17 nondebtor affiliates, has there been any effort to allocate the

18 costs of the review process among those entities, debtor or

19 nondebtor, for which review is to be conducted?

20         MR. MARINUZZI:  Your Honor, prior to filing the

21 motion, I don't know the answer to that with respect to PWC.

22 It's been communicated to me by counsel for the parent, that

23 this is an obligation that belongs to GMAC Mortgage.  We've

24 asked for contribution towards the amounts payable to PWC.

25         I can tell you that there are negotiations between the

RESIDENTIAL CAPITAL, LLC, et al.                                      38

 1  debtors and --

 2          THE COURT:  You can tell me that there are or are not?

 3          MR. MARINUZZI:  Are -- are -- regarding the costs to

 4  be paid to a validation agent, which is another entity that

 5  needs to be retained under the consent order.  And it's -- I

 6  don't want to get into discussions too deeply -- but it's based

 7  on the allocated percentage of things that need to be validated

 8  for the benefit of GMAC Mortgage versus things that need to be

 9  validated by the validation agent for purposes of the parent.

10          THE COURT:  So but is PWC, for example, is it supposed

11  to -- has it, in the past, will it -- is it currently, will it

12  in the future, undertake a review -- I'll use that term; it may

13  encompass more than review -- of activities of AFI and Ally

14  Bank and any other nondebtor affiliates in connection with the

15  work it's supposed to undertake?

16          MR. MARINUZZI:  Your Honor, the expression --

17          THE COURT:  I saw the an expression of exasperation --

18          MR. MARINUZZI:  -- from counsel it's very complicated,

19  Your Honor.  The focus of what PWC is supposed to be evaluating

20  and the various streams of review outlined in the consent order

21  are focused on servicing and foreclosure practices, what fees

22  were charged.  They just are.

23          THE COURT:  Well, let me ask you this.  To the extent

24  that any of the work of PWC or any of the counsel assisting

25  focuses on nondebtor affiliates, why should the debtor be

RESIDENTIAL CAPITAL, LLC, et al.                                    39

1   paying the freight?

2           MR. MARINUZZI:  Your Honor --

3           THE COURT:  I mean, first, I assume -- again, I am --

4   next question -- a question, whether it's next question is, I

5   can understand a certain amount of sticker shock when the

6   estimated cost rose from 180 million to 250 million.  A lot of

7   money.

8           MR. MARINUZZI:  Unquestionably.

9           THE COURT:  But what's the basis for charging the

10  debtors for any review required by the consent order, review of

11  the nondebtor affiliates?

12          MR. MARINUZZI:  Your Honor, I guess when you look at

13  the consent order, the consent order -- there's two different

14  things.  There's the consent order and the obligations that are

15  imposed on the debtors by the Board of Governors of the Federal

16  Reserve.  And then there is the obligation to pay PWC set forth

17  in the engagement letter.  And I think we need to separate the

18  two.  Because each presents different issues, although it

19  relates to the foreclosure review.

20          And the issue, as we see it, when we look at the

21  consent order, it says GMAC Mortgage must do the following.

22  And so we looked at the PWC engagement letter, and it says that

23  Ally and GMAC Mortgage are jointly and severally liable for all

24  obligations under the engagement letter.

25          THE COURT:  Well, you know, if there's a 180 million

RESIDENTIAL CAPITAL, LLC, et al.                                      40

1   or a 250 million dollar cost to what PWC is going to do, it

2   surprises me not in the least that PWC would want joint and

3   several liability among the parent and the debtors.  No

4   surprise about that.  Okay?  It wouldn't matter whether it was

5   a bankruptcy or not.  I mean, if they were going to do this

6   work, they want to be satisfied they're being paid.

7           So the fact of the joint and several liability for the

8   costs doesn't -- that part of the committee's argument doesn't

9   persuade me, just the fact that there is this joint and several

10  liability.  My focus -- maybe it's wrong -- this is a status

11  conference, not the ultimate hearing on it -- but when I

12  reviewed the materials, which I've done, my reaction is that

13  here's a -- this is a consent order.  The committee may think

14  it's -- I'm not sure what the committee thinks; whether -- they

15  say it -- I don't know whether it could be rejected.  But they

16  seem to think this is a bad deal and the debtor shouldn't be

17  required to comply with the requirements of it.

18          How they do that, I don't know.  But, okay, that's

19  what the co -- but there's a consent order.  And let's assume

20  for the sake of discussion that it's enforceable and that the

21  committee can't just decide, I don't like it.  Okay?  That's

22  different, in my view, than saying who should pay for the

23  review.  And if a portion of the review focuses on nondebtor

24  affiliates, why should the debtor be paying for it?

25          MR. MARINUZZI:  Your Honor, I was handed two separate

RESIDENTIAL CAPITAL, LLC, et al.                                    41

1   notes that say the same thing, so I think at least one of them

2   is correct.  And the answer I got is that the PWC review is

3   only with respect to GMAC's and Residential Capital's

4   foreclosure and servicing process, not that of Ally.  So that's

5   what PWC is doing.  Whether it's the answer we all like or not,

6   that's the answer I was given by the client.

7            So we take Your Honor's comments to heart.  And the

8   problem we have, and the reason we filed the motion is we have

9   a consent order that says we must do this.  And we know that

10  not complying with the consent order is a bad thing, not just

11  according to the Fed and regulations, but also with respect to

12  our post-petition financing facilities and our asset purchase

13  agreement.

14           Now, what we did want to do -- and Your Honor granted,

15  we believed, authority in the GA servicing order, for us to

16  comply with our obligations under the consent order.  This open

17  and notorious, a public document.  We said it was expensive

18  from day one.  It was in the Whitlinger declaration.  It's not

19  a secret.  And in the context of the dispute regarding the Ally

20  subservicing, which I'm sure Your Honor fondly remembers, we

21  said wait a second --

22           THE COURT:  Or not so fondly.

23           MR. MARINUZZI:  Not so fondly.  We said wait a second.

24  If we pay eight, ten million dollars PricewaterhouseCoopers on

25  account of the post-petition services that they've invoiced,

RESIDENTIAL CAPITAL, LLC, et al.                                    42

1    it's going to show up in a monthly operating report.  We'll

2    tell the committee that we've done it.  And then we're afraid

3    of allegations that we shouldn't have made the payment, should

4    have done more disclosure.  And we said rather than face that

5    because it's a lose-lose situation; let's file a motion --

6              THE COURT:  How much is in the DIP budget for this

7    expense?

8              MR. MARINUZZI:  I don't remember specifically.  But

9    I'm told it's sufficient for the projected expenses through the

10   closing of the sale.

11             THE COURT:  Is there a line item in the DIP budget?

12             MR. MARINUZZI:  Yes.  There is.  And our thought

13   process, Your Honor --

14             THE COURT:  And what happens upon the closing of a

15   sale of the servicing platform?

16             MR. MARINUZZI:  Our obligations under the consent

17   order to permit for the continuation of the foreclosure review

18   stand.  We'll have access to the files to permit the review.

19   We would hope between now and the closing of the transaction

20   that given the costs of the foreclosure review versus the

21   projected remediation payments, that perhaps there'll be some

22   changes with respect to the consent order to allow for some

23   different solution to this.

24             But right now we're living in the world of what the

25   consent order requires us to do.  And we filed the motion.  And

**RESIDENTIAL CAPITAL, LLC, et al.**                                    43

1    our thought process was pretty straightforward.  We've got a

2    consent order that says we have to do this; if we don't, bad

3    things could happen.  We have an engagement letter that says

4    joint and several liability.  It doesn't say in accordance with

5    whatever PWC is doing for Ally, which may be nothing.  It's

6    just joint and several.

7            So we said rather than risk noncompliance and

8    violating the terms of our other agreements, we are not

9    talking, in the short term, about a lot of money.  We'll pay --

10           THE COURT:  How much is PWC burning a month?  I say

11   "burning", what's the burn rate?

12           MR. MARINUZZI:  Your Honor, I understand the amount

13   that they're currently owed is eighteen million dollars.  The

14   estimated monthly rate is about six or seven million dollars

15   per month.  The law firms are significantly less than that.

16           And we said let's pay.  Let's avoid trouble with the

17   Fed.  Let's not put any risk on the sale or the DIP financing.

18   And you go through the thought process, and you say well,

19   they're not going to call a default with the sale happening.

20   And people want the sale to go forward, so they'll look the

21   other way if the Fed says we're going to issue a cease and

22   desist and require you to respond in thirty days as to why

23   you're not complying.  But that puts a tremendous risk on the

24   process, if for example, the GSEs say well, we hear you're not

25   comporting with the requirement of the consent order, I want to

RESIDENTIAL CAPITAL, LLC, et al.                                    44

1    look at this a little bit more closely.

2            Rather than risk that, we said we have contribution

3    rights; at least the right to make a contribution claim against

4    the parent for the cost, that we're preserving for everybody's

5    benefit.  And so we can get through the sale.  Whatever the

6    costs are under the consent order, they will be paid; the Fed

7    will be happy; the governmental agencies will be happy.  And to

8    the extent that there is a contribution claim that we, the

9    committee on behalf of the estates, or any other third party

10   wants to assert against the parent, those rights are not

11   affected by our payment.  We wanted to preserve those rights,

12   and that's what the proposed order would do.

13           And so we provided -- we told the committee since last

14   month, well before we filed the motion, that this is what we

15   intended to do.  And we provided them with a draft or a

16   substantially final draft of the PWC papers on August 31st or

17   29th -- the last Friday in August.  We filed it the following

18   Wednesday.  And ten days later we get an extensive document

19   demand, basically asking for any and all communications and

20   documents concerning the consent order.

21           We had a meet-and-confer the following week.  And it

22   is our intention -- and we understand that Ally was also served

23   with an extensive document demand mirroring ours -- our

24   intention to comply and try to provide them with documents

25   regarding the foreclosure proceeding.

RESIDENTIAL CAPITAL, LLC, et al.                                    45

1          But, Your Honor, I want to be very clear on something,

2    and I conveyed this to committee counsel yesterday, I'm not a

3    regulatory attorney.  I'm just a bankruptcy lawyer.  But I

4    spoke with my regulatory team, and they have told me that there

5    are significant restrictions in the ability of a regulated

6    entity to provide to a third party that requests information,

7    information the board considers -- the board of the Federal

8    Reserve -- confidential and dealing with the regulatory

9    authority of the board.

10         And so what does that mean?  Our regulators are

11   looking at that.  But we were obligated under the CFR to advise

12   the board, which we did, of the document demand.  We sent a

13   copy of document demand.  Because ultimately, at the end of the

14   day, whatever documents we or the parent produce, the Fed is

15   going to have to agree that we can produce them.  We'll ask the

16   Fed, recommend to the Fed, try to negotiate the best

17   confidentiality agreement we can with committee counsel, to

18   allow the process to go forward.  But there are restrictions.

19   And everybody needs to understand them.  And they're not

20   created by the debtors.

21         And, Your Honor, if I could approach with, just as an

22   example -- because I've never seen anything like this, Your

23   Honor, until my regulatory team told me about it.  If I could

24   approach?

25              THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    46

1      MR. MARINUZZI:  Your Honor, what I've copied --

2      THE COURT:  You've given Mr. Eckstein a copy?

3      MR. MARINUZZI:  Yes, I'm handing them out.  Your

4  Honor, what I've copied are the relevant provisions of

5  12 CFR 261.20 and -.23  And the provision that I just want to

6  focus on, just as an example, is found on the last page of the

7  attachment.  It is on page 252.  And it's 261.23 subpart (b).

8  and it says, "Unless the Board," which is the board of the

9  Federal Reserve, "has authorized disclosure of the information

10 requested, any person who has Board information that may not be

11 disclosed, and who is required to respond to a subpoena or

12 other legal process, shall attend at the time and place

13 required and decline to disclose or to give any testimony with

14 respect to the information, basing such refusal upon the

15 provisions of this regulation. If the court or other body

16 orders the disclosure of the information or the giving of

17 testimony, the person having the information shall continue to

18 decline to disclose the information and shall promptly report

19 the facts to the Board for such action as the Board may deem

20 appropriate."

21     THE COURT:  What's the information?

22     MR. MARINUZZI:  The information is the information

23 shared between the regulated entities and the Board of

24 Governors concerning the consent order.  We've had preliminary

25 discussions with the General Counsel's Office of the Board of

**RESIDENTIAL CAPITAL, LLC, et al.**                    47

1  Governors, to try to understand how broadly that can be

2  interpreted.  But that's a process.  And our regulatory team is

3  working on it.

4          But I want to reiterate, Your Honor, we will do what

5  we can to provide documents to the committee in response to

6  their requests on the foreclosure review, but it's not

7  completely within our control.  And I think that's what the

8  committee and the Court needs to understand.

9          THE COURT:  Okay.

10         MR. MARINUZZI:  Now, there were two objections to the

11  motion, Your Honor.  Unless Your Honor has any questions on the

12  CFR; that's about the extent of my knowledge on it.

13         THE COURT:  No, I don't have any other questions on

14  it.

15         MR. MARINUZZI:  Your Honor, so there were two

16  objections filed, and they both point out the imbalance in the

17  cost.  This is not a secret.  We understand, it's expensive to

18  have the foreclosure review done by professionals that are

19  receiving a lot of money for remediation that seems to be much,

20  much smaller.

21         THE COURT:  Let me ask this.  I should say I read -- I

22  guess the better word would be -- I skimmed the publicly

23  released report of -- I don't know, what is it -- a monitor;

24  I'm not sure -- the monitor of the settlements.  And I guess

25  what the five largest servicers -- your being the fifth --

RESIDENTIAL CAPITAL, LLC, et al.                                      48

1  entered into a settlement with the Department of Justice, and

2  in your case with the Federal Reserve Board -- it's the same

3  settlement, isn't it?

4          MR. MARINUZZI:  There's two different settlements.

5  There's the DOJ-AG settlement --

6          THE COURT:  Okay.

7          MR. MARINUZZI:  -- and then there's the consent order.

8  The DOJ-AG settlement is a separate document, and it requires a

9  different review.

10         THE COURT:  All right.  And this just relates to the

11  Federal Reserve Board --

12         MR. MARINUZZI:  Correct.

13         THE COURT:  -- consent?

14         MR. MARINUZZI:  And the FDIC.

15         THE COURT:  And are any of the other servicers a party

16  to a settlement with the Federal Reserve Board?

17         MR. MARINUZZI:  Yes, Your Honor.  There are, I think

18  thirteen or fourteen -- I'm sorry, three with the Fed and ten

19  with the OCC.

20         THE COURT:  Okay.  And with respect to the three other

21  consents with the Federal Reserve Board, do you know whether

22  they impose similar review requirements?

23         MR. MARINUZZI:  They do, Your Honor.  They do.

24         THE COURT:  I mean, I'm not surprised, but I --

25         MR. MARINUZZI:  They do, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                                                49

1    Your Honor, so here we are.  And we've got an

2    outstanding document demand.  We're going to do what we can to

3    comply.  But the committee's proposal, which I read to say just

4    ignore the consent order, because the parent, since you're

5    jointly and severally liable, they'll wind up writing a check;

6    we've asked, they've said no -- to us, doesn't sound, as a

7    fiduciary, like the approach that we can take with respect to

8    these matters; because the Fed had been patient, but they are

9    losing their patience.

10    I have an e-mail from last night wanting a call today

11    after this hearing to see where we are.  Not surprisingly.

12    They've been pushing us to pay PWC now for several weeks.

13    THE COURT:  Well, let me ask you this.  Shift the

14    subject a little.  You referred to contribution arguments.

15    First, do you know whether -- is this also going to be a

16    subject of the examiner's review?

17    MR. MARINUZZI:  Yes, it is, Your Honor.

18    THE COURT:  I assume -- is the examiner's counsel

19    here?  Somebody here for the examiner?  Yes.

20    MR. MARINUZZI:  And, Your Honor, they've requested

21    copies of whatever documents are produced.  They'll get them as

22    well.

23    THE COURT:  Okay.  So just so the record notes, there

24    is someone who stood and identify them -- not by name, but

25    identified themselves as here for the examiner.  So they're

RESIDENTIAL CAPITAL, LLC, et al.                                    50

1   certainly cognizant of the discussion.

2            Okay, but go ahead.  The examiner has requested what?

3            MR. MARINUZZI:  Copies of whatever documents we

4   produce to the committee in response to their document demand.

5   And we've agreed to do that.  To the extent the Fed says it's

6   fine for one, we imagine they'll say it's fine for both.

7            THE COURT:  You know, I mean -- and I'll hear from the

8   committee in a minute, and I do want them to address this

9   issue.  Because it does seem to me that let's assume that the

10  examiner concludes that -- I'm not using this as a term of

11  art -- let's assume the examiner concludes that it was

12  inappropriate for AFI and the debtors to enter into a consent

13  order that would appear to impose the full costs of the review

14  on the debtors, and let's assume the examiner concluded that

15  that potentially gives rise to a cause of action by the debtors

16  against, I don't know, AFI or others, for doing that.

17           There's nothing in what's proposed now that would

18  relieve AFI or anyone else from any claims that might exist

19  based on having entered into the consent.  Is that correct?

20           MR. MARINUZZI:  Not to my knowledge, Your Honor.

21           THE COURT:  Have you asked AFI to acknowledge in

22  writing that in the event that the debtors make the payments

23  for the professionals who are going to do the review, that it's

24  without prejudice to any rights the debtors or creditors may

25  have to assert any claims or seek any contribution or recovery

1  from AFI, in light of the payments that are made?

2       MR. MARINUZZI:  Your Honor, we haven't asked them for

3  an acknowledgement, but the proposed form of order does, in

4  fact, do just that.

5       THE COURT:  Well, it wouldn't be the first time that

6  an order a bankruptcy court had entered, that other parties

7  take a view that well, that's too bad.  We're not debtors, and

8  therefore we're not bound by it.

9       Mr. Schrock, come on up.

10      MR. SCHROCK:  Yes, Your Honor.  Ray Schrock of

11  Kirkland & Ellis on behalf of AFI and Ally Bank.  We don't have

12  an objection to that provision in the order.

13      THE COURT:  So in other words, you'd be -- on behalf

14  of AFI and Ally Bank, you would be prepared to include a

15  provision that made clear that if the debtors make payments,

16  it's without prejudice to any rights or claims they may have

17  for contribution or otherwise against the nondebtor affiliates?

18      MR. SCHROCK:  Yes, Your Honor.  We think, frankly,

19  that's appropriate.  We know that this is the subject of an

20  examination.  We also know that making these payments has

21  always been contemplated.

22      THE COURT:  Thank you, Mr. Schrock.  Anything else,

23  Mr. Marinuzzi?

24      MR. MARINUZZI:  No, Your Honor.  Just the last point I

25  want to make is, as I mentioned, the Fed has been exceedingly

**RESIDENTIAL CAPITAL, LLC, et al.**                                52

1    patient with us in requesting that we make these payments.  And

2    while we requested their consent to an adjournment, we never

3    got a formal reply.

4            THE COURT:  Okay.

5            MR. MARINUZZI:  I don't know what's going to happen

6    during our call today, what message is going to be conveyed by

7    in-house counsel for the Fed.  Our intention is to have Your

8    Honor enter an order after providing discovery to the committee

9    and providing the same documents to the examiner.

10           But just to be clear.  We may be forced by the Fed to

11   decide whether we're going to be held in contempt of the order

12   which triggers defaults under agreements, or start making

13   payments to PWC and reserving our rights.  We'll do the best we

14   can to get in front of the judge if we get in that situation.

15   But it could happen without a lot of notice.

16           THE COURT:  All right, thank you.  Let me hear from

17   the committee.

18           MR. HOROWITZ:  Good morning, Your Honor.  Gregory

19   Horowitz from Kramer Levin on behalf of the creditors'

20   committee.

21           Your Honor, the committee has a number of issues with

22   the debtors' motion to pay PWC.  And that's what this is a

23   motion to do.  This is a motion to pay PWC.  This is not a

24   motion to continue complying with the consent decree.  I think

25   it's very important to make that distinction.  We don't --

RESIDENTIAL CAPITAL, LLC, et al.                    53

1    THE COURT:  PWC was retained before the bankruptcy or

2    not?

3        MR. HOROWITZ:  They were retained before the

4    bankruptcy.  The retention letter was a joint retention letter

5    by both the debtors and Ally.  Yes, it did have the language

6    "joint and several".  I heard Your Honor saying it doesn't

7    surprise you.

8        THE COURT:  Are you surprised by that?

9        MR. HOROWITZ:  No, it doesn't surprise me that PWC,

10   before entering into an engagement that would involve a very

11   significant -- I'd say enormous devotion of resources would

12   want --

13       THE COURT:  So you believe that the joint and several

14   liability provision in the engagement letter is a separate

15   source of authority for you to argue that the debtor shouldn't

16   pay?

17       MR. HOROWITZ:  Well, Your Honor, actually I think much

18   more important is the supplement to the consent decree that the

19   FDIC and the Fed entered into with Ally -- I'm sorry, the Fed

20   entered into -- the Federal Reserve entered into with Ally on

21   the eve of the bankruptcy.

22       Obviously -- first of all, Your Honor, it's important

23   to understand why it is that the Federal Reserve and the FDIC

24   were engaged in this investigation.  They were engaged in this

25   investigation because Ally is a bank under --

RESIDENTIAL CAPITAL, LLC, et al.                                    54

1        THE COURT:  Look --

2        MR. HOROWITZ:  -- their jurisdiction.

3        THE COURT:  -- you agree that because of the

4    relationship of the debtors to AFI and Ally, that the Federal

5    Reserve Board had jurisdiction or has jurisdiction over the

6    debtors for this purpose?

7        MR. HOROWITZ:  Absolutely.  That was what I was

8    emphasizing.  That the reason that the debtors were subject --

9        THE COURT:  So when I read your papers, you say oh,

10   it's only because an affiliate is a regulated entity, they were

11   in this position.  Well, you're in the position, because you're

12   in the position, okay?

13       MR. HOROWITZ:  And --

14       THE COURT:  The Federal Reserve Board has

15   jurisdiction.

16       MR. HOROWITZ:  It does.  And it is because it is

17   within the jurisdiction of the Federal Reserve Bank that Ally

18   is very concerned that the consent decree continue to be

19   complied with.

20       THE COURT:  Well --

21       MR. HOROWITZ:  The Federal --

22       THE COURT:  -- I'm concerned about -- you know, when

23   the debtors enter into a consent decree with a federal

24   regulator, I'm concerned about compliance with it.

25       MR. HOROWITZ:  I understand, Your Honor.  On the eve

RESIDENTIAL CAPITAL, LLC, et al.                                55

1   of the bankruptcy, with the concern that the Federal Reserve

2   obviously had, that upon entering into the bankruptcy, the

3   debtors would not be able to continue to pay for PWC and the

4   other professionals to do the independent review, they clearly

5   approached Ally, because there's a supplemental agreement

6   that's entered into where Ally says, in the event that our

7   debtor affiliates are unable to pay and do not pay, we will

8   pay.  There are dates set forth in there which can be waived at

9   the sole discretion of the Federal Reserve.  Clearly they have

10  been waived to some degree, because it's 120 days, and that's

11  already been passed.

12          But at the moment that the Federal Reserve wants, they

13  can indicate to Ally this supplemental obligation is incurred.

14  You have to start paying PWC.  The review will continue, as it

15  has been.

16          THE COURT:  Okay, Mr. Horowitz --

17          MR. HOROWITZ:  The debtors will continue to be --

18          THE COURT:  -- tell me why, if the consent obligated

19  the debtors to conduct the review -- you agree it does,

20  correct?

21          MR. HOROWITZ:  Yes, I do.

22          THE COURT:  All right.  If operating funds and the DIP

23  budget provide sufficient funds to do so, why should the debtor

24  be relieved of the obligation by this Court?

25          MR. HOROWITZ:  Well, first of all, Your Honor, there

1    was a small caveat in there.  They did provide sufficient funds

2    up through the closing.  It's a very small subset of the now

3    estimated 250 million plus that will be involved in this

4    process.

5            THE COURT:  Okay.  So let's assume up to that point at

6    least -- when is a closing likely to occur?  Do you know?

7            MR. HOROWITZ:  End of the year, Your Honor.

8            THE COURT:  Okay.  And --

9            MR. HOROWITZ:  Or January.  Sorry, I'm hearing

10   January --

11           THE COURT:  Okay.

12           MR. HOROWITZ:  -- in my other ear.

13           THE COURT:  If there are sufficient funds available to

14   pay costs, at least through the closing, why shouldn't the

15   debtor have to do that?

16           MR. HOROWITZ:  Well, I think, Your Honor, the question

17   is, is it an appropriate exercise of the debtors' business

18   judgment to make these payments when it is clear that the

19   consequences of not making these payments are that Ally will

20   make these payments and Ally --

21           THE COURT:  Doesn't --

22           MR. HOROWITZ:  -- will then --

23           THE COURT:  -- the debtor have to comply with all

24   police and regulatory actions or orders?  It has to -- what is

25   it, 28 U.S.C. 959, is that the section?  I mean, it has to

**RESIDENTIAL CAPITAL, LLC, et al.**                                          57

1   comply with law.  It has to operate its business in compliance

2   with law.  Compliance with law requires it to comply with the

3   consent order, isn't that true?  Is that the -- it's 959; I

4   think it's 28 U.S.C.

5            MR. HOROWITZ:  Your Honor, this does emphasize that

6   there are lots of factual issues.  In fact, nothing in the

7   consent order obligates the debtors to pay PwC.  It obligates

8   the debtors to do the review.  It obligates the debtors to

9   retain --

10           THE COURT:  They're required that they retain

11  professionals to do the review?

12           MR. HOROWITZ:  -- independent professionals, but it

13  does not say anything about what the financial allocation of

14  obligations is as between the debtors and Ally Financial and

15  Ally Bank, which were also signatories to the consent decree

16  for complying with the consent decree.  Your Honor asked --

17           THE COURT:  That's why I asked the question earlier

18  whether the review that the professionals are conducting is of

19  the debtors or does it include a review of the nondebtor

20  affiliates, because I must say, if it includes work concerning

21  the nondebtor affiliates, I agree with you the debtor shouldn't

22  pay for that.  But if it's -- I mean, the debtors were the loan

23  servicers.

24           MR. HOROWITZ:  Well, there are two answers to that,

25  Your Honor.  The first is it directly addresses the debtors'

**RESIDENTIAL CAPITAL, LLC, et al.**                    58

1   activity as loan servicers, and the reason it does so is

2   because those were activities that were done under the

3   supervision and control of their parent who was within the

4   jurisdiction of the Federal Reserve and FDIC.

5          The second answer is, Your Honor, it is my

6   understanding that at least a significant portion of the work

7   being done by PwC is reviewing work done on Ally loans, loans

8   in the Ally portfolio that were serviced by the debtors as

9   agent --

10          THE COURT:  Does the --

11          MR. HOROWITZ:  -- for Ally.

12          THE COURT:  Does the work that's being done with

13  respect to Ally loans that are in the portfolio relate to the

14  servicing and foreclosure activity carried out by the debtors

15  with respect to Ally loans?

16          MR. HOROWITZ:  It's my understanding that it does.

17          THE COURT:  Okay.  I mean, it doesn't -- Mr. Horowitz,

18  I'm not sure what's discoverable.  I mean, it may be -- as I

19  say, it may be that the examiner will determine -- and that's

20  not the last word on it, but the examiner will determine that

21  there are potential causes of action that can be asserted

22  against the nondebtor affiliates based on agreements that

23  imposed the financial obligation on the debtors to retain

24  professionals to conduct the review.  And if those causes of

25  actions exist or are identified they'll be prosecuted or

RESIDENTIAL CAPITAL, LLC, et al.                                           59

1  resolved in some fashion.

2          But look, maybe it reflected an incomplete

3  understanding with respect to the servicing dispute that came

4  before me.  There the issue was an agreement entered into --

5  part of the issue was an agreement entered into shortly before

6  the bankruptcy that imposed the indemnification obligation on

7  the debtors.  We'll see how that shakes out at the end of the

8  day.

9          This seems to me to be different.  Yes, the PwC and

10 the other professionals, not surprising to anybody, insisted on

11 joint and several liability for the costs.  And it may be -- I

12 didn't look at the supplement to the consent decree; it may say

13 in the event the debtors can't pay, AFI will.  But I've seen

14 nothing to suggest that AFI -- that, excuse me, that the

15 debtors can't pay, at least at this stage.  And what I don't

16 want to see happen is every issue that comes up in this case,

17 as between the committee and AFI as to who bears a cost,

18 results in extensive discovery and therefore delay in resolving

19 issues that, at least on the face of the papers I read, didn't

20 seem all that difficult to me.

21         So what are the disputed issues of fact that you

22 see?  And don't tell me that's what you want discovery for.

23 You don't get to go on a fishing expedition to look for

24 something.

25         MR. HOROWITZ:  Okay.  Thank you, Your Honor.  I do

**RESIDENTIAL CAPITAL, LLC, et al.**                    60

1   want to suggest what the areas are that we need discovery on.

2   First, we need discovery on the negotiation of the consent

3   decree which was in our -- we believe was controlled entirely

4   by Ally.  We have questions about the defensibility of the

5   consent decree.  We have reasons to believe that it --

6           THE COURT:  I'm sorry, the what?

7           MR. HOROWITZ:  The defensibility of the consent decree

8   for the reasons that we were talking about.

9           THE COURT:  What do you mean by that?

10          MR. HOROWITZ:  Well, defensibility of entering into an

11  agreement that provides for payment; now it looks to be

12  approaching a third of a trillion dollars to professionals for

13  a benefit that --

14          THE COURT:  And that's why I asked the question

15  whether the FRB's settlements with the other servicers for whom

16  they have exercised jurisdiction included similar obligations.

17          MR. HOROWITZ:  I'm sorry, what's this?

18          Yes, I'm advised that each of the other agreements

19  that we have seen in the public record have imposed these

20  obligations on the parent company.  The --

21          THE COURT:  Well, when you say "impose the obligation

22  on the parent company" --

23          MR. HOROWITZ:  The --

24          THE COURT:  -- impose joint liability on the parent

25  company?

**RESIDENTIAL CAPITAL, LLC, et al.**                                   61

1      MR. HOROWITZ:  No, imposed in the first instance the

2  financial -- the burden of complying with the consent decree on

3  the parent bank company.

4      We also -- this leads to the second big issue which is

5  that we believe that there was an effort by the parent to

6  explicitly, in the consent decree, build in allocation of the

7  cost burdens, and in fact the regulators refused to go along

8  with that.

9      This supplemental agreement that was entered into on

10  the eve of bankruptcy, really, the significance of this is the

11  regulators coming in and saying:  Bank, who is under our

12  jurisdiction, you need to assure us you're going to continue to

13  be in compliance with this consent decree, so you need to give

14  us explicit assurance that if you fail in your effort to get

15  the payments made out of this bankrupt subsidiary of yours,

16  you're going to continue to pay these professionals and

17  continue to comply with the consent decree, which is why, Your

18  Honor, I think I understand your concerns about getting

19  involved in every expenditure out of the estate.  This is a

20  very large dollar --

21      THE COURT:  Oh, it is.

22      MR. HOROWITZ:  -- expenditure.

23      THE COURT:  There was sticker shock when I saw

24  particularly the initial estimate and now the revised estimate

25  of what the cost is.

**RESIDENTIAL CAPITAL, LLC, et al.**                    62

1    MR. HOROWITZ:  As has the committee.  And on the other

2    side, we think especially by virtue of the supplemental

3    agreement, the sort of Cassandra warnings about being in

4    default under the consent decree are misplaced.  It's clear

5    that there cannot be a situation where by virtue of taking our

6    time, appropriately investigating and litigating this, the

7    debtors will enter into default under the consent decree and

8    suffer adverse consequences.

9         So our factual issues are does the consent decree

10   indeed seek to place the financial burden on the debtors and

11   does it accomplish that, or to the contrary, did the parent

12   seek to accomplish that and fail to do so?  The regulators are

13   indifferent as to who pays.

14        THE COURT:  Well, let me ask you this.  Do you agree

15   that all or substantially all of the review that is going to be

16   conducted by the professionals is of the activities or conduct

17   of the debtors in servicing loans --

18        MR. HOROWITZ:  I think that's ab --

19        THE COURT:  -- and foreclosure --

20        MR. HOROWITZ:  -- absolutely essentially has to be the

21   fact,  Your Honor.  It is the debtors that performed the work.

22   The reason that they were subject to this inquiry and the

23   reason why the parent has obligations --

24        THE COURT:  So why isn't --

25        MR. HOROWITZ:  -- substantial ones --

**RESIDENTIAL CAPITAL, LLC, et al.**                                    63

1    THE COURT:  But --

2        MR. HOROWITZ:  -- is because it was done under their

3    supervision and control.

4        THE COURT:  Why isn't it appropriate for the debtors

5    to bear the costs of the review of its own -- of their own

6    activities?

7        MR. HOROWITZ:  Because the reason that they were

8    forced to enter into this consent decree, the reason they were

9    the subject of the investigation by these entities is because

10   that work was done under the monitoring and control of their

11   bank parent.

12       THE COURT:  No, it isn't.  It may be that they had --

13   the Fed had jurisdiction over them because of it.  You're

14   blaming the foreclosure crisis on AFI?  You're saying that the

15   conduct of the debtors has nothing to do with all of the

16   pleadings I get about alleged robo-signing or whatever, none of

17   it established.  You're saying that's all AFI --

18       MR. HOROWITZ:  I --

19       THE COURT:  -- because it didn't supervise the

20   activities closely enough and that the officers and directors

21   of the debtors aren't responsible for that?

22       MR. HOROWITZ:  I'm sorry, Your Honor, I am not saying

23   that.  As Mr. Marinuzzi pointed out, there were separate

24   investigations and obligations that the debtors were exposed

25   to --

**RESIDENTIAL CAPITAL, LLC, et al.**                                64

1          THE COURT:  How much?

2          MR. HOROWITZ:  -- from the --

3          THE COURT:  What --

4          MR. HOROWITZ:  -- the Justice Department.

5          THE COURT:  So --

6          MR. HOROWITZ:  And those are obligations --

7          THE COURT:  Have you seen these CFRs that Mr.

8   Marinuzzi has pointed to?

9          MR. HOROWITZ:  I have, Your Honor.  I think that --

10         THE COURT:  And what's your view?

11         MR. HOROWITZ:  My view is that we do have to go

12  through the hoops.  Actually, if you look at page 251 of the

13  handout --

14         THE COURT:  Yes.

15         MR. HOROWITZ:  -- it makes it clear that there is an

16  express provision -- this is under 262.22(a), the word "policy"

17  that "While the board" -- I'm starting five lines down, "While

18  the board will not normally disclose this information to the

19  public", going on, it makes it clear the board will consider

20  requests for disclosure.  And while it's written in the

21  negative, it makes it clear they will authorize disclosure if

22  the person requesting the disclosure is able to show a

23  substantial need for the information --

24         THE COURT:  And have you --

25         MR. HOROWITZ:  -- and that that need outweighs the

1  confidentiality.

2          THE COURT:  Have you applied to --

3          MR. HOROWITZ:  Here I --

4          THE COURT:  -- the Fed?

5          MR. HOROWITZ:  I'm sorry?

6          THE COURT:  Have you made an application to the Fed?

7          MR. HOROWITZ:  No, Your Honor.  The debtors actually

8  only discussed -- raised this issue with us in writing

9  yesterday.  They've given us the contact information and we're

10 going to take that up promptly.

11         THE COURT:  Well, certainly, the Fed will make its own

12 decisions as to what it's going to do, but just so that it's

13 clear, this Court, assuming the Fed is prepared to permit the

14 release of information, the Court is prepared to limit

15 disclosure, attorney's eyes only, highly confidential,

16 additional bells and whistles, as appropriate.

17         MR. HOROWITZ:  That's helpful, Your Honor, and we'll

18 make that point clear when we raise the -- when we make the

19 request.

20         I think for the purposes of today, Your Honor, the

21 main report I wanted to make is that we've made substantial

22 progress in discussions with the debtors and Ally over the

23 scope of discovery.  We're not there yet, but we think we will

24 be.  Ally, in a letter yesterday, advised us that they expect

25 to make substantially complete document production of what

RESIDENTIAL CAPITAL, LLC, et al.                                          66

1  they're agreeing to produce -- we still have some disputes --

2  by October 8th.  And we think that the appropriate thing to do

3  is to take up Ally's suggestion in their position statement

4  that the Court schedule a telephonic status conference by which

5  point, hopefully, the parties will have agreed on a scheduling

6  order to have this matter heard.

7           I believe that the committee is still likely to be

8  asking for an evidentiary hearing on this issue, but it's

9  possible after doing the discovery that this will be something

10  that would be taken up on papers and legal argument.

11          THE COURT:  Mr. Marinuzzi, what's the status of the

12  professionals' work?  Is it stopped?  Are they --

13          MR. MARINUZZI:  No, fortunately, the last information

14  we got is that PwC is continuing to work asking for payment.

15  They're putting pressure on the Fed, which is putting pressure

16  on us to release money to pay PwC.  We didn't want to pay PwC

17  anything in the context of this hearing without being in front

18  of Your Honor first.

19          And like I said, we have a call scheduled tentatively

20  for 1 o'clock today with the Fed.  I don't know what their

21  position is going to be.  I don't know if anybody from the Fed

22  is listening in on this hearing.  They've been very cooperative

23  with us thus far.  I don't know how long we'll have their

24  cooperation.

25          But Your Honor, I did want to respond to just one or

**RESIDENTIAL CAPITAL, LLC, et al.**                                    67

1  two points.  We submitted, as Exhibit 10 to the motion on

2  Friday, the supplemental agreement that counsel for the

3  committee places a high degree of reliance on.  And what I'd

4  want to point out from this is that it, again, ratifies that

5  paragraphs 3 and 4 of the consent order require GMAC Mortgage

6  to conduct an independent review, again, so there's no

7  misunderstanding about whose obligation it is.

8          THE COURT:  Oh, it's just a question of who's paying

9  for it.

10          MR. MARINUZZI:  Correct.

11          Second, it says that if ResCap commences bankruptcy

12  cases, which we've done, Ally will be secondarily liable for

13  the obligations to timely pay.  And so to say that there could

14  never be a default under the consent order ignores the fact

15  that paragraph 3 says GMAC Mortgage.  And to rely on that kind

16  of an argument when the Federal Reserve Board can assess, for

17  intentional violation of their order, fines of one million

18  dollars per day, and to assume that that provision will be

19  interpreted the same way by our DIP financing providers, by

20  Nationstar is, I think, asking a little too much.

21          That's all I have, Your Honor.

22          THE COURT:  Look, let's just define who's going to

23  pay; whether you're going to pay or whether AFI's going to pay.

24  I don't want to hear -- NationStar shouldn't be particularly

25  worried about it.  AFI can pay if you can't or if the Court

RESIDENTIAL CAPITAL, LLC, et al.                                    68

1   somehow found that you shouldn't -- the debtors shouldn't be

2   paying the entire amount, that it should be split or whatever.

3          We've got a long agenda already on October 10th.  This

4   is going to be added to the agenda.  The committee hopefully

5   will come away from this hearing understanding I'm not

6   particularly moved by the position they've asserted in their

7   papers.  I will entertain at the October 10th hearing; I'll see

8   what the schedule is that the parties have endeavored to reach.

9          I'll tell you, I'm tempted today, but I'm not going to

10  do it -- I'm tempted today to enter an order saying the debtors

11  are directed to make the payments to PwC and the other

12  professionals pending further order of the Court.  This review

13  has got to go forward.  In my view, the debtors need to comply

14  with the consent order.  Nothing that I read in the committee's

15  papers convinces me otherwise.  Maybe they think they could

16  have negotiated a better deal, but it's the deal that was

17  negotiated.  It's a regulatory -- or a police and regulatory

18  enforcement matter.

19         MR. MARINUZZI:  Your Honor, my understanding is there

20  wasn't a lot of negotiation anyway.  The consent orders look

21  very much alike.

22         THE COURT:  Well, look, it wouldn't be beyond AFI to

23  have endeavored to shift the entire financial burden of doing

24  this to the debtors.  That, at least, is the allegation with

25  respect to the servicing agreement.  So don't take my comments

**RESIDENTIAL CAPITAL, LLC, et al.**                                    69

1  to suggest that there wasn't something inappropriate in AFI's

2  approach to the issue.  It is a review of the debtors, though,

3  principally.  Okay?

4          We'll take this up on the 10th and --

5          MR. MARINUZZI:  And Your Honor, if the Fed runs out of

6  patience --

7          THE COURT:  -- this needs to get resolved.

8          MR. MARINUZZI:  -- we'll call chambers --

9          THE COURT:  Okay.

10         MR. MARINUZZI:  -- and request an emergency hearing.

11         THE COURT:  Okay.

12         MR. MARINUZZI:  Thank you.

13         THE COURT:  All right.  Who else wants to be heard?

14         MR. LIGHTNER:  Good morning, Your Honor.  Mark

15  Lightner from Cleary Gottlieb Steen & Hamilton on behalf of

16  Wilmington Trust, the trustee and the senior unsecured notes.

17         We hear you loud and clear, Your Honor.  We filed a

18  limited objection, which I know that you've read.  We raised

19  the two issues, and the one that we think that is still

20  outstanding is which debtor is obligated to perform under the

21  consent order and which debtor is obligated to pay for it.  And

22  there's, we think, some conflation going on about who's

23  obligated.  We use the term "debtors" generically to refer to

24  all of the debtors, but we would like to make it clear that it

25  is GMAC Mortgage, and GMAC Mortgage alone, that has committed

RESIDENTIAL CAPITAL, LLC, et al.                    70

1    itself under paragraph 3 of the consent order as well as the

2    engagement letter.

3              THE COURT:  We'll take that up --

4              MR. LIGHTNER:  Thank you.

5              THE COURT:  -- when this is heard.

6              Okay, Mr. Marinuzzi?

7              MR. MARINUZZI:  Your Honor, unless you have any other

8    questions --

9              THE COURT:  I don't.

10             MR. MARINUZZI:  -- on those matters, I'm going to cede

11   the podium to my partner, Norman Rosenbaum, for the status

12   conference on the Silmon litigation.

13             THE COURT:  Okay.  Mr. Rosenbaum, let me ask you --

14             MR. MARINUZZI:  Your Honor, I'm sorry --

15             THE COURT:  I'm sorry --

16             MR. MARINUZZI:  -- Your Honor --

17             THE COURT:  Mr. Mari --

18             MR. MARINUZZI:  -- just I have to run to something

19   else.  May I be excused?

20             THE COURT:  You're excused, absolutely.

21             MR. MARINUZZI:  Thank you.

22             THE COURT:  Mr. Rosenbaum, I don't know whether you

23   saw this morning -- I had it posted to ECF.  You may not have

24   seen it yet.  I received a letter from Judge Nicole Still on

25   September 25th, 2012, relating to the Silmon matter.  I was out

**RESIDENTIAL CAPITAL, LLC, et al.**                    71

1   yesterday so it didn't get posted until this morning.  I had it

2   posted to ECF.  Did you get  chance to see it?

3           MR. ROSENBAUM:  I have, Your Honor.

4           THE COURT:  Okay.  All right.  Go ahead, Mr.

5   Rosenbaum.

6           MR. ROSENBAUM:  Well, Your Honor, as --

7           THE COURT:  Let me ask, is counsel for Ms. Sil -- I

8   don't know whether it's Ms. or Mr. Silmon on the phone?

9           MS. HOOD:  This is Rhonda Hood.  I'm appearing for Mr.

10  Silmon.

11          THE COURT:  All right.  Thank you very much.

12          Go ahead, Mr. Rosenbaum.

13          MR. ROSENBAUM:  And just to confirm, Mr. Patterson is

14  also on the line.

15          THE COURT:  Okay.  All right.  Thank you.

16          MR. ROSENBAUM:  Your Honor, as you directed at the

17  prior status conference, we did -- parties did meet and confer

18  on a process forward and subsequently appeared before Judge

19  Still on a status conference.  And I believe all parties under

20  the auspices of Judge Still did agree to a way forward which

21  would allow for summary judgment on GMAC's motion to go forward

22  on all counts.  The Silmons could defend on all counts.  If the

23  judge granted summary judgment, that would conclude the matter.

24  If the judge found against GMAC and summary judgment but did

25  not permit for additional discovery, the matter would go to

RESIDENTIAL CAPITAL, LLC, et al.                                    72

1  trial.  And GMAC is prepared to stipulate --

2            THE COURT:  Okay.

3            MR. ROSENBAUM:  -- to relief from the automatic stay

4  on that basis.

5            The only issue that remains is if Judge Still finds

6  that additional discovery is permitted as a basis to deny the

7  summary judgment motion, then the Silmons would be entitled to

8  take discovery.  But we're not prepared at this point to

9  stipulate to that relief from the automatic stay.  We believe

10 that'd be a fairly expensive process.  That's what was

11 presented before Judge Still and it's an acceptable way forward

12 for the debtors.

13           The parties are here to answer any other questions you

14 might have about the status of the litigation.

15           THE COURT:  Well, let me hear from Mr. Silmon's

16 counsel on this issue.

17           MS. HOOD:  Your Honor, on the summary judgment,

18 there's an affidavit that was filed, but the discovery itself

19 for the case is closed.  So I wanted to make sure that the

20 Court wasn't misled in any way.  But because the affidavit is

21 filed we will be filing a 56(f) motion to ask for relief from

22 the Court to take the deposition of the deponent -- I mean, of

23 the affiant that filed the affidavit on behalf of GMAC.  And of

24 course Judge Still brought to your attention that part of the

25 issue is the ownership of this note.

RESIDENTIAL CAPITAL, LLC, et al.                                    73

1   So the problem is, is we were trying to stipulate to

2   that, but we can't -- we don't really know how far that

3   discovery's going to have to go if Judge Still allows us to do

4   that.  And so I need some guidance from the Court.  The

5   stipulation asks -- the stipulation that they provided to us

6   says that if she grants that relief to us, pursuant to Rule

7   56(f), that we would then seek -- then we wouldn't have to come

8   back to the Court and file a motion for relief from the

9   automatic stay.  And I'm not sure that I understood that from

10  the Court's direction or if we could just come back and seek

11  your guidance, or do we actually have to file --

12          THE COURT:  Well, let --

13          MS. HOOD -- for relief?

14          THE COURT:  Let me ask you this.  Is all you're asking

15  for, in the event that Judge Still denies the motion because

16  she thinks that you should be allow to take the deposition, is

17  the only thing you're asking for is to take the deposition of

18  the affiant?

19          MS. HOOD:  The problem -- I can't answer that

20  question.  It depends on what we get from the affiant.  If they

21  say, well, I can't answer that and you've got to get that

22  information from here; I'm not exactly sure where that's going

23  to lead.

24          THE COURT:  Well, let me stop you there.

25          MS. HOOD:  Yes, sir.

RESIDENTIAL CAPITAL, LLC, et al.                                    74

1    THE COURT:  Judge Still will have to decide.  I don't

2    want to do anything to affect how Judge Still proceeds.  The

3    question that she asks in the letter, and I appreciated her

4    raising it, was if she denies the motion and thinks that there

5    needs to be more discovery, how we proceed.

6           And let me -- I'm going to truncate this to this

7    extent.  I'm not inviting the deposition of the affiant, but I

8    am indicating on the record that I'm lifting the stay to permit

9    Mr. Silmon's counsel to take the deposition of the affiant if

10   Judge Still believes that's required or appropriate.

11          With respect to any discovery beyond the affiant, Mr.

12   Silmon's counsel is going to have to raise with this Court,

13   either get an agreement from the debtors' counsel -- because

14   look, this matter was -- it's your summary judgment motion, the

15   debtors'.  Judge Still -- and I reported this in the last

16   hearing -- Judge Still had discussed with me not what she was

17   going to -- she didn't indicate in the slightest how she was

18   going to rule on the summary judgment motion, but she just laid

19   out for me her concern with the counterclaims and the

20   affirmative defenses raising essentially the same issues.

21   Given that the trial hasn't occurred yet, but it is close to

22   being trial-ready, and I think that Judge Still should be

23   permitted, to the extent it doesn't seriously interfere with

24   what's going on in this case, to do her job, and that's what

25   she's trying to do.  It's on your motion -- it's on the

RESIDENTIAL CAPITAL, LLC, et al.                                    75

1   debtors' motion to recover possession of the property.

2              This is not something that Mr. Silmon invited.  It

3   arises because you've brought -- you, GMAC, has brought an

4   action to recover possession.  That's fine.  I have no

5   questions about that.  So, you know, counsel in the case can

6   certainly report back to Judge Still that she ought to go ahead

7   and sign the motion if she concludes that a deposition of the

8   affiant is appropriate.  I'm lifting the stay on the record,

9   I'm indicating that the Court has lifted the stay to permit

10  that to go forward.

11             You ought to -- if that doesn't resolve all the

12  discovery issues, the debtors' counsel who's handling the case,

13  in conjunction with you Mr. Rosenbaum, ought to see whether you

14  can resolve by stipulation.  I mean, it sounded to me that

15  substantially all the discovery is done.  If there are a couple

16  odds and ends see if you can resolve it, okay, by stipulation.

17  Present the stipulation -- if the stay has to be lifted beyond

18  just the one deposition, see if you can resolve it by

19  stipulation.  If not, you'll have to bring it back to me.

20  Okay?

21             MR. ROSENBAUM:  That's fine, Your Honor.

22             Just to clarify, the one thing that we do need to do

23  is just present the stipulation and we'll make the necessary

24  modifications to the order --

25             THE COURT:  That's fine.

RESIDENTIAL CAPITAL, LLC, et al.                      76

1        MR. ROSENBAUM:  -- just to allow everything to go

2   forward.

3        THE COURT:  I appreciate that.

4        MR. ROSENBAUM:  Thank you, Your Honor.

5        THE COURT:  Are you satisfied with that as well,

6   counsel for Mr. Silmon?

7        MS. HOOD:  Yes, sir.

8        THE COURT:  Okay.  All right.  Thank you very much.

9        UNIDENTIFIED SPEAKER:  Thank you, Judge.

10        MR. MARINUZZI:  For the record, Lorenzo Marinuzzi,

11   Morrison & Foerster.

12        Your Honor, that brings us to our contested matters,

13   the first of which, I think, is relatively short and won't take

14   much time.  Then, I think, the remaining ones will take some

15   time.

16        THE COURT:  Well, let me just -- to -- this isn't

17   going to cut much time off, but with respect to number 5 on

18   your agenda, Mr. Hopper's motion to reconsider, earlier this

19   morning I entered an order, it's ECF docket 1600 denying the

20   motion.

21        MR. MARINUZZI:  Thank you.

22        THE COURT:  Our local rules do not -- the only

23   circumstance in which a hearing is required is if -- on a

24   motion for reconsideration is when the Court requests it.  I

25   concluded it was unnecessary, and I entered a written order.

**RESIDENTIAL CAPITAL, LLC, et al.**                    77

1   Okay.  Let's start with the contested matters.

2              MR. MARINUZZI:  Sorry.  Okay.  Your Honor, Mr.

3   Eckstein asked if we could go out of order and address the two

4   committee retention applications that are --

5              THE COURT:  Sure.

6              MR. MARINUZZI:  -- at the end of the agenda, since the

7   professionals are on the phone.

8              THE COURT:  Okay.  We can do that.

9              MR. MARINUZZI:  That's fine.

10             THE COURT:  Go ahead, Mr. Eckstein.  Are you going to

11  have one of your colleagues do it?  Go ahead.

12             MR. ECKSTEIN:  Mr. Zide's going to handle it.

13             THE COURT:  Okay.

14             MR. ZIDE:  Good morning, Your Honor.  Stephen Zide

15  from Kramer Levin --

16             THE COURT:  Thank you, Mr. Zide.

17             MR. ZIDE:  -- on behalf of the committee.

18             THE COURT:  Okay.

19             MR. ZIDE:  The last two matters on the uncontested

20  part of the agenda are the retention applications by the

21  creditors' committee for --

22             THE COURT:  Well, it's on the contested part of the

23  calendar but --

24             MR. ZIDE:  I thought it was the --

25             THE COURT:  You're right, it is on -- it is shown as

1  uncontested.  I'm sorry.

2        MR. ZIDE:  Yeah, there were no objections.

3        THE COURT:  It was moved to the end.  Okay.  I thought

4  there was a limited objection that had been filed.

5        MR. ZIDE:  There had been nothing.

6        THE COURT:  Okay.

7        MR. ZIDE:  We had previewed both of them with the

8  debtors --

9        THE COURT:  That's fine.

10       MR. ZIDE:  -- and the U.S. Trustee.  And if Your Honor

11  has any questions?

12       THE COURT:  No.  Just bear with me just a second,

13  okay?  This is the committee's application to retain Analytic

14  Focus LLC and J.F. Morrow as consultants to the committee.

15       MR. ZIDE:  Yes.

16       THE COURT:  And potentially expert witnesses, correct?

17       MR. ZIDE:  Yes.

18       THE COURT:  Mr. Masumoto, does the U.S. Trustee have

19  anything it wants?

20       MR. MASUMOTO:  No objection, Your Honor.

21       THE COURT:  All right.  Anybody else have anything

22  they want to raise?

23       All right.  Those motions are granted.

24       MR. ZIDE:  Thank you, Your Honor.

25       THE COURT:  Thank you very much, Mr. Zide.

**RESIDENTIAL CAPITAL, LLC, et al.**                    79

1          MR. ZIDE:  Thank you.

2          THE COURT:  Mr. Marinuzzi?

3          MR. MARINUZZI:  Thank you, Your Honor.

4          That brings us to item 1 under contested matters, on

5     page 9, which is the debtors' application, under Section 363

6     authorizing reimbursement of expenses incurred by independent

7     members of the debtors' board.

8          THE COURT:  This is where the committee did file a

9     limited objection.

10         MR. MARINUZZI:  They did file a limited reservation of

11    rights.

12         THE COURT:  A reservation of rights.

13         MR. MARINUZZI:  And just a very brief history.  The

14    boards established special committees to look at affiliated

15    transactions and also to evaluate the pre-petition settlement.

16    Those agreements are the subject of the examiner's review.  The

17    independent board members are being interviewed.  We think it's

18    appropriate for them, as it was the case in the past, that they

19    have their attorneys' fees reimbursed.

20         In addition, as we get to the sale transaction I'm

21    sure there are going to be issues that we're going to want an

22    independent -- the independent board members to evaluate, and

23    they'll do so with counsel, and we would like to be able to

24    continue to pay counsel.

25         THE COURT:  It's a single counsel, Morrison Cohen firm

RESIDENTIAL CAPITAL, LLC, et al.                                          80

1    representing the independent directors, is that correct?

2              MR. MARINUZZI:  They're representing the current

3    independent directors, but what we've built into the motion is

4    a little bit of a 327 procedure, they're going to be subject to

5    the fee order.

6              THE COURT:  Even though they're not representing the

7    debtor --

8              MR. MARINUZZI:  Correct.

9              THE COURT:  -- you've built in the review procedure?

10             MR. MARINUZZI:  Correct.  That's right.  And to the

11   extent any former independent member or even current

12   independent board member decides they want different counsel,

13   we'd expect them to comply with the procedures as well.  Their

14   fees would be subject to review by the committee, the U.S.

15   Trustee, and the Court.

16             THE COURT:  All right.  Does somebody from the

17   committee want to be heard?  Mr. Mannal?

18             MR. MANNAL:  Your Honor, Doug Mannal from Kramer Levin

19   on behalf of the committee.

20             Your Honor, we had asked for certain information

21   regarding historical payments made to Morrison Cohen.  We've

22   received that information and have no objection based on the

23   review that we're going to receive regarding Morrison Cohen's

24   fee applications.

25             THE COURT:  All right.  Mr. Masumoto?

**RESIDENTIAL CAPITAL, LLC, et al.**                    81

1          MR. MASUMOTO:  No objection, Your Honor.

2          THE COURT:  All right.  The motion to retain Morrison

3  Cohen or to approve the -- authorizing the reimbursement, it's

4  not retaining, because it's authorizing reimbursement of fees

5  and expenses for Morrison Cohen as counsel to the independent

6  directors is granted.

7          MR. MARINUZZI:  Thank you, Your Honor.

8          That brings us to the motion for the appointment of a

9  borrowers' committee.  I don't know if Your Honor wants to take

10  a break or wants to go straight into it.

11          THE COURT:  Let's take a ten minute recess.  But

12  here's -- I'm going to ask -- let me put this question out to

13  you right away, the whole much longer than I anticipated

14  discussion about paying the costs of the review to comply with

15  the consent order, why doesn't that really say that's why there

16  needs to be a homeowners committee?  I mean, the committee,

17  which is strenuously fighting the expenses of conducting the

18  loan servicing and foreclosure review, how can they adequately

19  represent the interests of all of the homeowners?  I'm using

20  the term homeowners, but a lot of them don't own homes anymore

21  because they were foreclosed.  Many of them have wrongful

22  foreclosure actions, we have a whole variety of things.  Every

23  -- virtually every one of our omnibus hearings has had a large

24  number of lift stay motions, other things relating specifically

25  to issues relating to foreclosure, et cetera.

**RESIDENTIAL CAPITAL, LLC, et al.**                               82

1    So let's take a ten minute break.  And I must say when

2    I prepared for today my initial reaction was no committee.  And

3    then, the more I thought about it, and particularly took --

4    thought about it in relation to the arguments -- I understand

5    your view on it, they'll pay the consultants, but I -- you

6    know, there's no one really looking out for -- no committee

7    that really has the interests of the homeowners.

8         And one of the things I asked Mr. Masumoto when we

9    addressed this is, what I don't want to do is have an unlimited

10   budget for a committee and its professionals, but I'm concerned

11   that there is no organized voice for them.  We'll take a ten

12   minute recess.

13        (Recess from 11:30 a.m. until 11:42 a.m.)

14        UNIDENTIFIED SPEAKER:  Your Honor, just one moment.

15   Mr. Eckstein and I need to leave for another meeting, so we're

16   going to hand it over to Mr. Marinuzzi.

17        THE COURT:  Okay.  You're excused.

18        All right.  Mr. Rosenbaum, you're going to pick up?

19        MR. ROSENBAUM:  Your Honor, just one matter out of

20   order, number 3 on the contested matter agenda.  We'll just

21   deal with it very quickly.  This was the debtors' motion for

22   approval of procedures for holders --

23        THE COURT:  Yes.

24        MR. ROSENBAUM:  -- of senior liens.

25        THE COURT:  Okay.  You were trying to work this out

RESIDENTIAL CAPITAL, LLC, et al.                               83

1  with Mr. Teitelbaum?

2          MR. ROSENBAUM:  Yes, that's the only objection we

3  received.  We've been in discussions.  We're hopeful we can

4  resolve the objection, if not we would notice it for a hearing

5  and we would respond, but we're hopeful we'll get there.

6          THE COURT:  Okay.

7          MR. ROSENBAUM:  I just wanted to report that to the

8  Court.

9          THE COURT:  All right.  So we'll adjourn the matter,

10  and it can get reset.

11          MR. ROSENBAUM:  Thank you.

12          THE COURT:  Okay.  Thank you.

13          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

14          THE COURT:  Mr. Marinuzzi, let's take up the Corla

15  Jackson matter.  Is Ms. Jackson on the phone or in the court?

16          MR. MARINUZZI:  That's fine, Your Honor.

17          THE COURT:  I thought I had heard some indication that

18  she was here or on the phone?  No?

19          MR. MARINUZZI:  I'll let Aaron Klein, from my office;

20  address the motion, Your Honor.

21          THE COURT:  Okay.

22          MR. KLEIN:  Thank you, Your Honor.  Aaron Klein from

23  Morrison & Foerster for the debtors.

24          Since Ms. Jackson is not here and it is her motion, if

25  you'd like me to address the debtors' position or do some

1 explaining about what our thoughts are on it, or if you just

2 have questions.

3        THE COURT:  Well, I understand from my chambers that

4 Ms. Jackson called rather irate, because the Court entered an

5 order denying her motion to adjourn everything, not just her

6 motion but, at least as I read she filed two motions, the one

7 that's ECF docket 1229, which -- to address stay violations,

8 but she filed a separate motion to adjourn everything scheduled

9 for today, and I promptly entered an order denying that motion.

10 She was, apparently, irate that she didn't know about it.  I

11 think at some point she seems to have learned about it, but in

12 any event --

13        MR. KLEIN:  I can empathize with Your Honor and your

14 chambers.

15        THE COURT:  Well, I think, you know -- but no, in all

16 seriousness Ms. Jackson is pro se.

17        MR. KLEIN:  Right.

18        THE COURT:  And she doesn't have access to ECF.  The

19 order was filed on ECF.  I guess what I would ask, if this

20 issue arises in the future, that if I enter an order involving

21 a pro se litigant, if the motion was addressed to the debtors

22 as opposed to other third parties, the debtors should endeavor

23 to provide a pro se litigant, Ms. Jackson or anyone else, with

24 notice if I enter an order before a hearing.  It was just -- I

25 mean, I -- enough said on that.  Go ahead.

**RESIDENTIAL CAPITAL, LLC, et al.**                                                    85

1      MR. KLEIN:  Your Honor, we're happy to do that.

2           Our view of, and we're talking about the order that

3   you did not deny, the docket number 1229, we put in papers and

4   the debtors' position is that these papers that she put in,

5   that Ms. Jackson put in, are procedurally deficient.

6           We were having difficulty in reading it, discerning

7   what relief she was seeking, what legal claims and what facts

8   would entitle her to any relief.  We didn't know if she was

9   seeking injunctive relief, equitable relief, monetary damages.

10  Whatever type of relief she was seeking, number one, we think

11  that given the fact that she is pro se and that we may provide

12  wide latitude to pro se litigants, these court's rules and the

13  Bankruptcy Rules require pleading with particularity so that

14  the Court, and the opposing counsel, and the party who's on the

15  other end of that motion would understand what the allegations

16  are, what the facts are, and what legal theories support

17  awarding some relief.

18          So we think that, as a preliminary matter, that the

19  motion should be denied based upon procedural deficiencies

20  based on Bankruptcy Rule 9013 and the local rules of this

21  court, 9013-1.

22          THE COURT:  Let me just, for the purposes of the

23  record, in addition to the motion we're talking about, which is

24  ECF 1229, I indicated Ms. Jackson filed a motion seeking to

25  adjourn all hearings scheduled for September 27th, that was ECF

**RESIDENTIAL CAPITAL, LLC, et al.**                                      86

1    1517, and the motion was denied, and the written order is ECF

2    docket number 1549.

3          Ms. Jackson previously filed a motion pursuant to

4    Section 362(d), Bankruptcy Rule 4001 and Local Bankruptcy Rule

5    4001-1 to lift the stay in order to pursue an action she filed

6    and is pending in Alabama State Court.  Her -- that prior

7    motion was ECF docket number 856.  That motion was denied in a

8    written opinion and that's at ECF number 1184.

9          The Court obviously has reviewed this latest motion,

10   ECF 1229, and I'm not -- I don't know what she's really

11   seeking, but I do have some questions for you, Mr. Klein.

12          MR. KLEIN:  Absolutely.

13          THE COURT:  In the pile of papers she filed --

14          MR. KLEIN:  Uh-huh.

15          THE COURT:  -- it indicates she had, what, at least

16   two Chapter 13 proceedings in Alabama?

17          MR. KLEIN:  Actually three, Your Honor.

18          THE COURT:  Three.  Are all disposed of?

19          MR. KLEIN:  Yes, Your Honor.  All are disposed of.

20   The first one was filed in 2005, and it was -- it was closed

21   about 2010.  The second one she filed a few months afterwards

22   and that was -- that was closed -- that was dismissed, because

23   she didn't comply with the Chapter 13 plan in the previous

24   bankruptcy, which provided for, among other things, payment on

25   the loan to GMAC.

RESIDENTIAL CAPITAL, LLC, et al.                    87

1        THE COURT:  Let me ask you this.

2        MR. KLEIN:  Yes.

3        THE COURT:  GMAC completed a non-judicial foreclosure

4  of Ms. Jackson's home, is that correct?

5        MR. KLEIN:  That's correct, Your Honor.

6        THE COURT:  And did the non-judicial foreclosure of

7  her home occur when there was a pending Chapter 13 case?

8        MR. KLEIN:  No, Your Honor.

9        THE COURT:  Because she seems -- you know, she's

10  complaining about stay violations, there's no stay violation

11  from any order in this case, but she seems to be suggesting

12  that the foreclosure took place while she had a pending Chapter

13  13 case.  Can you give me the chronology?

14        MR. KLEIN:  Yes I can, Your Honor, and let me clarify

15  that -- let me give you the chronology first.  So she filed her

16  first Chapter 13 case --

17        THE COURT:  Thirteen.

18        THE COURT:  -- in 2005.  She also filed a Chapter 13

19  plan which provided for payment for continued post-petition

20  payments and payment of arrearages for secured lenders.  GMAC

21  was a secured lender.  GMAC was a servicer, actually, under her

22  loan, it was owned by Option One.  In 2008, Option One assigned

23  the loan to GMAC Mortgage.

24        In 2010 that first Chapter 13 case was closed.  She

25  received a discharge except with respect to certain items like

RESIDENTIAL CAPITAL, LLC, et al.                                          88

1  the GMAC loan.  She filed the second case in October -- so that

2  was January 2010 when it closed.  She filed a second case in

3  October of 2010, and then that was dismissed in December of

4  2010, just a few months later, for failure to abide by the

5  requirements that she continue to make payments pursuant to the

6  Chapter 13 plan.

7          So this brings us, now, to October of -- or, I'm

8  sorry; in April 2011 she filed her third Chapter 13 case.  GMAC

9  moved for relief from the stay based on missed payments and her

10 loan was in -- Ms. Jackson's loan was in default.  In October

11 of 2011 -- and the way the court disposed of that, by the way,

12 that motion for relief from stay was to say we're going to

13 conditionally deny it based upon you, the debtor, Ms. Jackson,

14 meeting certain requirements, one of which is to pay the

15 arrearages and bring the loan current; and two, that she would

16 continue to make timely payments on the rest of the balance of

17 the loan.

18         It also specifically provided for GMAC to be able to

19 send her notices of default and upon -- for which she could

20 cure within ten days.  But if she didn't cure those loans --

21 those defaults, then the order specifically said that the

22 automatic stay with respect to the property and the interest

23 that GMAC had in the property was lifted so that GMAC could

24 exercise any remedies against that, including foreclosure.

25         THE COURT:  Without further order of the court?

RESIDENTIAL CAPITAL, LLC, et al.                                        89

1    MR. KLEIN:  Without further order of the court, that's

2  a very important part.  Thank you.

3          So after continued missed payments and notices of

4  default, in October of 2011, GMAC filed a motion -- a notice of

5  the termination of the stay based upon that conditional order

6  and notified everyone, including the debtor, of its intent to

7  foreclose.  Subsequent to that Ms. Jackson moved to reimpose

8  the stay as to GMAC, but the bankruptcy court -- the Alabama

9  Bankruptcy Court denied that motion.

10         THE COURT:  Do you know who the judge was?  Was it

11 Judge Bennett?

12         MR. KLEIN:  I have that in my -- I'm actually not

13 sure --

14         THE COURT:  Okay.

15         MR. KLEIN:  -- who the judge was.  If you could give

16 me one second?

17         THE COURT:  Sure.

18         MR. KLEIN:  Judge Mahoney was the --

19         THE COURT:  Okay.

20         MR. KLEIN:  -- was the first one, but I don't have

21 that judge's name.

22         THE COURT:  All right.  Okay.  Go ahead.

23         MR. KLEIN:  So --

24         THE COURT:  When did she file the motion to reinstate

25 the stay?

1          MR. KLEIN:  In December of 2011.

2          THE COURT:  Okay.

3          MR. KLEIN:  And then the court subsequently denied

4    that motion.

5          THE COURT:  When was that?

6          MR. KLEIN:  That was in January of 2012.

7          THE COURT:  Okay.

8          MR. KLEIN:  And that's the same month where she filed

9    a lawsuit in Alabama State Court, which was then subsequently

10   removed to Alabama Federal Court alleging fraud and a myriad

11   number of other allegations against the debtors.

12         THE COURT:  So the motion to reinstate the stay was --

13   well, arguably there was no stay since October 2011.

14         MR. KLEIN:  That's correct, Your Honor.  So --

15         THE COURT:  When did the foreclosure occur?

16         MR. KLEIN:  In June of this year.

17         THE COURT:  June 2012?

18         MR. KLEIN:  Yes, sir.  And she is still in the

19   premises.  Eviction proceedings have not been initiated.

20         THE COURT:  All right.

21         MR. KLEIN:  So when I said earlier, let me clarify,

22   that the Chapter 13 case may still be going on, but the

23   automatic stay has been lifted --

24         THE COURT:  Okay.

25         MR. KLEIN:  -- with respect to GMAC.

RESIDENTIAL CAPITAL, LLC, et al.                              91

1    THE COURT:  So I think we've seen the October 2011

2    notice to terminate the stay, but do I have the order?

3    MR. KLEIN:  There is no order that was entered on the

4    court -- the court's docket.  There was an order stating that

5    the stay would be -- I'm sorry; let me ask you, you're asking

6    specifically about the order denying her motion to reimpose the

7    stay?

8    THE COURT:  No, really the order that conditionally

9    denied the motion but included these cure -- you know, had the

10   notice -- the provisions for automatically lifting the stay in

11   the event, you know, she didn't remain timely, and you filed a

12   notice?

13   MR. KLEIN:  I think we included that as an exhibit --

14   THE COURT:  Okay.

15   MR. KLEIN:  -- the motion.  If you'd like I can point

16   it out to you.

17   THE COURT:  We'll go back and look -- I'll go back and

18   look at it.

19   MR. KLEIN:  Okay.

20   THE COURT:  Okay.  All right.  The Court is going to

21   deny Corla Jackson's latest motion, I'm not quite sure how to

22   denominate it.  She's seeking to have this Court, apparently,

23   determine that GMAC violated a stay in her Chapter 13 case,

24   which is not pending before me and thereafter sold her home

25   through fraudulent and illegal means.  Her motion is at ECF

RESIDENTIAL CAPITAL, LLC, et al.                                      92

1   docket number 1229.

2        I already recited the prior motion activity and the

3   Court's prior opinion with respect to denying her motion to

4   lift the stay.

5        This motion, the current motion, does not clearly set

6   forth the relief that Ms. Jackson is seeking from this Court or

7   any basis for the Court to grant any relief to her in any

8   event, and it appears that the non-judicial foreclosure of her

9   home took place at a time when no stay was in effect in any

10  then pending Chapter 13 case.

11       Additionally, what was true at the time that I issued

12  the last opinion, Ms. Jackson remains in possession.  Even when

13  GMAC commences a proceeding to evict her she can assert

14  whatever defenses are available to her under Alabama law.  Just

15  a brief written order will be entered by the Court denying her

16  motion for the reasons stated on the record.

17       Thank you, Mr. Klein.

18       MR. KLEIN:  Thank you, Your Honor.  I'm going to turn

19  the podium --

20       THE COURT:  And when that order is entered --

21       MR. KLEIN:  I will --

22       THE COURT:  -- please send it to her.

23       MR. KLEIN:  We will absolutely, and I'll make sure it

24  happens.

25       THE COURT:  Thank you.

**RESIDENTIAL CAPITAL, LLC, et al.**                    93

1        MR. KLEIN:  I'm going to turn the podium back over to

2   my colleague --

3        THE COURT:  Thank you.

4        MR. KLEIN:  -- Mr. Marinuzzi.

5        MR. MARINUZZI:  Thank you, Your Honor.  That brings us

6   back to the motion to appoint a borrower's committee.

7        When we broke Your Honor asked the question about why

8   there shouldn't be a borrower's committee, and it's obviously

9   not our motion, and I'm sure the movant will explain to the

10  Court the rationale.  But where I continue to scratch my head

11  is to understand what the borrower's committee would be doing.

12       There are allegations about the foreclosure process

13  and not having the information they would like to have readily

14  available to them.  Also, I believe I read in the motion some

15  endeavor to investigate claims that borrowers might have

16  against certain financial institutions on the committee.  I'm

17  not sure that that's something a borrower's committee should be

18  doing or we should be paying for.  So I would just ask the

19  movant to express --

20       THE COURT:  Let me hear the moving party.

21       MR. MARINUZZI:  All right.  Thank you.

22       THE COURT:  Who's going to speak for the moving party?

23       MR. BROWN:  Robert Brown from Robert E. Brown, P.C.

24  for the homeowner movants.

25       Your Honor, I'd like to introduce my co-counsel in

**RESIDENTIAL CAPITAL, LLC, et al.**                                    94

1  this matter, which is Bennett Kramer from Schlam Stone who

2  joins in the application, but I'm going to be making the

3  presentation to the Court.

4          THE COURT:  Go ahead.

5          MR. BROWN:  Your Honor, if not now, when?

6          THE COURT:  Well, the real question to me is what's

7  the committee supposed to do?

8          MR. BROWN:  You know, to address the latest comments,

9  our intention is not to be involved in every aspect of this

10  bankruptcy.  It's to provide as much protection for homeowners

11  as we can reasonably.  And maybe in negotiating, you know, in

12  the papers, in the objections there's a supplemental servicing

13  order and had we been involved in the negotiation of the

14  supplemental servicing order we would have tried to add

15  language in there that would lift the stay for people moving to

16  vacate default judgments.  In state court it's extremely common

17  for homeowners to find out they're in foreclosure with a

18  default judgment already entered against them.

19          But as it is right now, under the supplemental

20  servicing order, those homeowners would have to hire separate

21  counsel and move individually to lift the stay, whereas that

22  would be something on a general basis, across the board, we

23  would try and put in protections like that.  There may be

24  things in the plan that need the eye of somebody whose sole

25  loyalty is to the homeowners in the United States and not to

**RESIDENTIAL CAPITAL, LLC, et al.**                                    95

1   any particular other entity.

2          As it is now, the one homeowner that's on -- or the

3   borrower claimant that's on the committee, on the creditors'

4   committee, it's my understanding that she does not view herself

5   as a representative of all homeowners, but only as a

6   representative of the plaintiffs in her class action and many

7   homeowners have tried to contact her using the Website and the

8   phone number that's on there, and she hasn't returned any phone

9   calls.  And I believe there's even -- Ms. Wendy Alison Nora on

10  the line, and I've had discussions with her that she's made

11  several calls to Rowena Drennan and received no calls back.

12          There are -- one of the key issues, immediate issues,

13  is you have the bar date of November 9th, and I think it's

14  extremely important to make sure that the notice gets out there

15  and homeowners know that if they don't put in a proof of claim

16  by November 9th, they're going to be forever barred.  And I

17  don't think -- I know that the plan right now is to notify all

18  people whose loans are being serviced by GMAC, and this

19  isn't -- the one thing about this bankruptcy that makes it

20  unusual is that you have fifty-one debtors that were involved

21  in all aspects of the foreclosure process, from origination to

22  securitization to servicing to actually foreclosing.  So by

23  just narrowing that notice to people that are currently being

24  serviced by GMAC, you're missing quite a few people that could

25  potentially have claims.

**RESIDENTIAL CAPITAL, LLC, et al.**                                        96

1          One of the things, in my papers, I describe the

2     committee as a borrower's committee, and I guess that was

3     inartful.  It should be a homeowners committee, because some

4     people with claims may have never borrowed money from a debtor;

5     they may just be serviced by a debtor.

6          THE COURT:  Well, a lot of people don't own their

7     homes anymore, they were foreclosed.

8          MR. BROWN:  Right, or they're no longer homeowners.

9     Right.  So --

10         THE COURT:  So calling it a homeowners committee is a

11    misnomer as well.

12         MR. BROWN:  I mean, I'm sure that we could come up

13    with a title if the Court were to approve the motion.  But the

14    point is 1102 gives you discretion in order to appoint

15    additional committees.  And if not this case then what case?

16    Then why have that statute?  This is such an unusual case.

17    It's such a large case.  There are so many homeowners affected

18    by it.  There are so many things going on between the FDIC

19    consent decree, the multiple forty-nine state decree.

20         THE COURT:  It's not the FDIC.

21         MR. BROWN:  Well, it's the --

22         THE COURT:  The Federal Reserve Board.

23         MR. BROWN:  The Federal Reserve, the consent decree.

24         THE COURT:  And the justice department.

25         MR. BROWN:  In addition to that, we also have one of

**RESIDENTIAL CAPITAL, LLC, et al.**                                          97

1   the concerns that's expressed throughout the papers is the

2   cost.  And the Court expressed its sticker shock to the cost of

3   Pricewaterhouse in order to do a foreclosure review.  The cost

4   that would be involved in a borrowers' committee would be a

5   fraction of a percent of what Pricewaterhouse would be getting

6   just to do the foreclosure review.

7              I have a small firm, my co-counsel, Ms. Kramer, is

8   from a small firm.  Our billable hour rates are probably in the

9   vicinity of half the hourly rates of most of the attorneys in

10  this room.  So --

11             THE COURT:  Even if a committee was formed, doesn't

12  mean you're going to represent them.

13             MR. BROWN:  Understood, and I don't want to jump ahead

14  to that point, right, but in the event that a committee is

15  formed and in the event that that committee would select us,

16  our rates are nowhere near what the rates are --

17             THE COURT:  I don't know how the U.S. Trustee is

18  supposed to -- if the Court granted a motion for the

19  appointment of, call it borrower/home owner -- question mark --

20  committee, how is the U.S. Trustee supposed to appoint members

21  to it?

22             MR. BROWN:  Well --

23             THE COURT:  I'll give you a chance, Mr. Masumoto.

24             MR. MASUMOTO:  Okay.

25             MR. BROWN:  One of the ways that they appointed

RESIDENTIAL CAPITAL, LLC, et al.                                                      98

1    members in the American Home case was they looked first to the

2    movants -- to the original group of movants.  And we have

3    thirty-four original movants and twenty additional homeowners.

4    Then you could -- there are other people that have filed --

5    I've been following the docket in this case -- that have filed

6    on behalf of second mortgage HELOC clients.  And there are

7    various constituencies that we can look at and say that they

8    would probably make sense.

9            I mean I would hope that if the Court were to appoint

10   a committee Rowena Drennan would rather be on the

11   borrowers/home owner -- question mark -- committee than the

12   creditors' committee.  And I think that we would be able to put

13   in a --

14           THE COURT:  For somebody who hasn't carried their role

15   on the creditors' committee it doesn't seem to me to be a

16   particularly likely selection for another committee.  But --

17           MR. BROWN:  I mean, obviously -- and I don't want to

18   overstep my boundaries, it's up to the Court and the trustee to

19   do it, but certainly we could help in analyzing the potential

20   classes of people that are out there.

21           THE COURT:  What is that you think -- I mean I start

22   with -- and I said this before -- I mean I started with a view

23   that the last thing this case needs is another committee with

24   another expense, and I still have a lot of concerns in that

25   regard.  I will tell you, because I've said this from the

RESIDENTIAL CAPITAL, LLC, et al.                                          99

1  bench, some of the pleadings I've gotten from counsel, forget

2  the pro ses, from counsel have been fair -- for homeowners --

3  have been fairly outrageous, and it doesn't suggest to me that

4  this is an area for appropriate exercise of discretion.  But,

5  yes, I am very concerned about whether the interests of people

6  whose loans are or were serviced by the debtors, whose homes

7  are currently or property is currently in a foreclosure

8  proceeding, or nondebtor foreclosure, or who have claims for

9  wrongful foreclosure, or other statutory or common law claims

10 against the debtors in denying lift stay motions in this case,

11 and in some of my opinions I've indicated that if people have

12 monetary claims against the debtors they need to be raised in

13 the claims allowance process and not through a proliferation of

14 lawsuits all around the country.  So I'm not sure what the

15 appropriate role for a committee would be.

16          MR. BROWN:  May I, Your Honor?

17          THE COURT:  Go ahead.

18          MR. BROWN:  The goal, I think, would be to make the

19 Court's life easier and to streamline all that and rather than

20 addressing it one at a time --

21          THE COURT:  Well, I'm going to still -- I mean the

22 committee doesn't prevent people from filing motions to lift

23 the stay, they need to.  The committee doesn't do that.

24          MR. BROWN:  Correct.  But if the committee can get

25 categories that we can negotiate with the debtor and the

**RESIDENTIAL CAPITAL, LLC, et al.**                              100

1  creditors' committee to include automatic categories like you

2  did in the supplemental servicing order that would --

3          THE COURT:  Well, in the supplemental servicing order

4  there was someone from NACBA who appeared --

5          MR. BROWN:  Yes.

6          THE COURT:  -- in court, and I believe consulted with

7  the debtors' counsel before -- with some changes that were made

8  in the order.  That seemed to me an appropriate role.  I was

9  glad to have -- I respect NACBA.  I was glad to see that they

10  had taken a position.

11          And if there were a provision in the Bankruptcy Code

12  similar to the provision on appointment of a consumer privacy

13  ombudsman, I'd be more inclined to say yes that's the role

14  that's needed not a committee and the havoc that it may well

15  work.

16          MR. BROWN:  Well, certainly -- you know, hopefully you

17  got the tone from my papers that I'm not looking to create

18  havoc in any way, shape, or form.  The fact that the National

19  Association of Consumer Bankruptcy Attorneys were involved was

20  very helpful, but if you look at the end result, people in

21  bankruptcy got more protection than people who weren't in

22  bankruptcy.  And I think that comes from the fact that the

23  NACBA was involved.

24          If you look at the provisions, there's a difference

25  between the relief that's given automatically to consumers that

RESIDENTIAL CAPITAL, LLC, et al.                                    101

1  are in bankruptcy, homeowners that are in bankruptcy, as

2  opposed to homeowners that aren't in bankruptcy and there are

3  things that -- one of the things is that it doesn't apply to

4  final judgments.  And that's something that we would want to

5  try and negotiate.

6          As far --

7          THE COURT:  Let me hear -- I know your position -- let

8  me hear from other -- let me hear -- can anybody --

9          MR. BROWN:  Just one quick thing.

10         THE COURT:  Quickly.

11         MR. BROWN:  As far as the fishing expedition for

12 discovery, that's certainly not our intent and if it was in the

13 papers then I misstated it.  But certainly, our intent is not

14 to start getting beyond what we're trying to do and that is

15 protect homeowners as much as we possibly can.  Thank you.

16         THE COURT:  Mr. Masumoto, let me hear from you now and

17 then I'll hear from those who filed oppositions.

18         MR. MASUMOTO:  Good morning, Your Honor.  Brian

19 Masumoto for the Office of the United States Trustee.

20         Your Honor, the U.S. Trustee's program takes a neutral

21 position regarding the motion for the borrowers' committee.  We

22 stand ready to follow any of the Court's direction, but at this

23 point we don't -- we don't take a position.

24         THE COURT:  Let's assume that I granted the motion,

25 how would you go about appointing a committee?

**RESIDENTIAL CAPITAL, LLC, et al.**                                    102

1          MR. MASUMOTO:  Well, as indicated, I did make some

2    inquiry and my understanding is that in the American Homes case

3    they did solicit the movants -- the movants for the motion for

4    a committee.  We could do that.  In addition, Your Honor, the

5    top fifty largest list of unsecured creditors that was

6    originally filed by the debtors' --

7          THE COURT:  Well, if somebody files a fifty-three

8    trillion dollar claim, because they think that somebody's

9    threatened to foreclose on their house is -- if you look at a

10   fifty-three trillion dollar claim, and I think we had one of

11   those, is not a pretty good basis for deciding that somebody

12   ought to be on a committee.

13         MR. MASUMOTO:  I agree, Your Honor.  And, in fact, I

14   think we would hopefully be able to target it a little bit more

15   carefully.  As I mentioned, the debtor apparently has some

16   records, they included some borrowers on the docket, the list

17   of unsecured creditors who, in fact, were solicited for the

18   original organizational meeting resulting in a, as Your Honor

19   is aware, the appointment of one borrower to that committee.

20   There weren't a large number of responses from borrowers to the

21   organizational meeting.  So --

22         THE COURT:  What's your view about whether the Court

23   can impose limits on the role of the committee or the budget

24   that a committee would have.  And I'm not looking to unfairly

25   restrict what a committee does.  Let's assume that I conclude

**RESIDENTIAL CAPITAL, LLC, et al.**                                            103

1    that it would -- some representation is appropriate but it

2    clearly doesn't involve representation of specific homeowners

3    who bring lift stay motions or other -- or have actions pending

4    around the country.

5              MR. MASUMOTO:  Your Honor, that's correct.  And

6    typically for most committees, usually the -- it's rare to see

7    a cap placed on the budget, but I believe in some cases it has

8    been done.

9              As to the scope of the committee, I think the --

10   that's also within the Court's discretion to limit the scope.

11   I think frequently, the courts have taken the position that the

12   issue as to scope is also addressed at the time of the fee

13   application.  Should they exceed the scope of their authority,

14   they will be challenged at the time of the fee application.  I

15   understand that under the current circumstances that perhaps

16   certain prophylactic standards might be -- might avoid any

17   future disputes down the road.  So I think that might be

18   helpful both for the committee as well as the other parties-in-

19   interest in the case.

20             THE COURT:  Thank you, Mr. Masumoto.

21             MR. MASUMOTO:  Thank you.

22             All right.  All right.  Let me hear from the

23   opposition.  Mr. Mannal.

24             MR. MANNAL:  Doug Mannal from Kramer Levin on behalf

25   of the creditors' committee.

RESIDENTIAL CAPITAL, LLC, et al.                               104

1    Your Honor, before we broke, you had a couple of

2    questions.  I want to make clear what the committees' position

3    is, if it's not with respect to the PwC motion.  The

4    committees' not objecting to the review of their own files.

5    The committees' objecting --

6        THE COURT:  Well, we'll deal with the review of the

7    loan files at another time.  Okay?

8        MR. MANNAL:  But --

9        THE COURT:  I just -- that's a separate part.

10       MR. MANNAL:  -- your question was that the 250 million

11   in going to PwC, but not going to the borrowers.  The -- a net

12   result of that review is going to be between -- estimated

13   between thirty and sixty million dollars going to borrower.

14       THE COURT:  How are you protecting the interest of

15   borrowers and homeowners?

16       MR. MANNAL:  Well, contrary to what Your Honor said

17   about Rowena Drennan, Rowena Drennan's counsel has participated

18   in almost all committee meetings, and they're are weekly

19   committee meetings, and they're lengthy committee meetings, and

20   the committee is comprised, as Your Honor knows, of Rowena

21   Drennan, the borrower, an indenture trustee, three RMBS

22   trustees, two security claimants, and two monolines.  The

23   committee room discussions are often informative of various

24   parties' views as to what the committee should be taking in

25   this case.

RESIDENTIAL CAPITAL, LLC, et al.                          105

1   Rowena Drennan is no exception to voicing her views in

2   the committee room, Your Honor.  They do, in fact, have a

3   voice, and that voice is heard.  Any my colleague, Elise

4   Frejka, has spent numerous hours, both with the debtors and

5   with various homeowners, in negotiating, among other things,

6   the supplemental servicing order that provided specific relief

7   to homeowners.

8        What the committee's concern is with the borrowers'

9   committee motion is they don't -- the committee does not

10  understand what the borrowers' committee would do.  The movants

11  say that they would not pursue any individual claims on behalf

12  of borrowers.  We agree.  That's not the role of a committee.

13  But we're not sure what their role would be in this case.

14       Mr. Brown had suggested that the borrowers' committee

15  be comprised of three different lawyers; a former attorney

16  general from Ohio, a consumer's right attorney from St.

17  Petersburg, and a plaintiff's lawyer from South Carolina.  I'm

18  not certain that they all represent homeowners or that they're

19  knowledgeable in this space and that's why they should be

20  appointed to a committee in this bankruptcy case.  But that was

21  certainly not made clear to me, Your Honor.  And in Mr. Brown's

22  presentation I still don't understand --

23       THE COURT:  But they're not -- they're probably not

24  creditors either.

25       MR. MANNAL:  Creditors or equity holders, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    106

1            THE COURT:  Well, they may do a good job, but they

2    don't sound like creditors.  I don't know how -- Mr. Masumoto,

3    do they get appointed to a committee?

4            MR. MASUMOTO:  No, Your Honor, and the precedent is

5    typically the asbestos or the -- I'm sorry.  It's usually found

6    in the asbestos cases.  Frequently all asbestos claimants are

7    represented by individual representatives, and the case law is

8    pretty specific, and the practice in the program is specific.

9    We do not appoint representatives.  We look for the underlying

10   creditor, and they can choose to have someone represent them on

11   the committee.

12           THE COURT:  Thanks, Mr. Masumoto.

13           MR. MANNAL:  Your Honor, the statute, 1102(a)(2), and

14   if I could read it, Your Honor, it's says --

15           THE COURT:  I have it.  I'm looking at it.

16           MR. MANNAL:  Okay.

17           THE COURT:  I'm staring at it.

18           MR. MANNAL:  It says "The Court may order appointment

19   of additional committees of creditors or of equity security

20   holders if necessary".  Now, that's why we were surprised to

21   see who he was recommending serve on this committee, again, not

22   knowing what the committee would do, but what I think is lost,

23   and we tried to make clear, that the difference between this

24   case and American Home is that the debtors and this committee

25   learned from American Home, and the U.S. Trustee, different

RESIDENTIAL CAPITAL, LLC, et al.                                    107

1  than what was in American Home, appointed a borrower to the

2  creditors' committee.

3         In this case a bar date notice was sent to all

4  borrowers, unlike American Home where it was only sent to those

5  borrowers that had a pending claim against the debtor.  In this

6  case we have the supplemental servicing order that, as Your

7  Honor pointed out, was negotiated between the committee --

8         THE COURT:  When you say notice was sent to all

9  borrowers is that current borrowers only?

10        MR. MANNAL:  I believe that was sent to all current

11  borrowers, Your Honor.

12        MR. MARINUZZI:  That's correct, Your Honor.  All

13  borrowers whose mortgages were serviced as of the petition

14  date, any other creditor that was the subject of a proceeding,

15  a foreclosure proceeding, that had a claim against us, would

16  get it.  And for borrowers we also included a letter advising

17  them of the bar date notice, and its purpose so that if they

18  had questions they could at least start with the letter.

19        MR. MANNAL:  Your Honor, individual borrowers have

20  been --

21        THE COURT:  Let me just -- Mr. Marinuzzi, does that

22  mean that anybody who had an action pending against any of the

23  debtors in a state or federal court around the country relating

24  to servicing or foreclosure would have received such a notice?

25        MR. MARINUZZI:  They would have received the notice,

RESIDENTIAL CAPITAL, LLC, et al.                                    108

1    Your Honor, yes.

2              THE COURT:  Thank you.  Go ahead, Mr. Mannal.

3              MR. MANNAL:  We think the supplemental servicing order

4    was unique in cases such as these and provided a more level

5    playing field for the borrowers.  As Your Honor is familiar,

6    there is no need to lift the stay to continue to make

7    counterclaims in foreclosure proceedings.

8              THE COURT:  Well, counterclaims, yes; affirmative

9    defenses, no.  Counterclaims seeking monetary relief were not

10   permitted under the supplemental servicing order.  And that's

11   why we're fussing with the Silmon case in Alabama, because the

12   same affirmative defenses and counterclaims are being asserted,

13   so the supplemental servicing order does not deal clearly with

14   that issue.

15             MR. MANNAL:  Understood, Your Honor.  We don't see --

16   unfortunately, nothing's perfect.  We don't see how a

17   borrowers' committee would change that.  I think,

18   unfortunately, certain circumstances need to come before Your

19   Honor to make determinations on it.

20             The debtors have provided the borrowers with court

21   access.  Yes?

22             THE COURT:  Who's Ms. Drennan's counsel you say

23   participates in the committee meetings?

24             MR. MANNAL:  Dan Flanigan is the bankruptcy expert.

25   He's with the firm Polsinelli Shughart, and David Skeens is at

**RESIDENTIAL CAPITAL, LLC, et al.**                                          109

1   the firm of Walters Bender Strohbehn & Vaughan.

2          Now, with respect to, you know, they are not taking an

3   active role with respect to this particular motion, Your Honor,

4   but I can assure you that they have been participating actively

5   in all committee meetings and communications.

6          In addition, Your Honor, unlike the other cases, or

7   the American Home case, rather, both the committee and the

8   debtors have set up websites that are intended to assist the

9   borrowers and answer any questions they have regarding the

10  bankruptcy.

11         THE COURT:  What information does the committee

12  provide on its website to assist borrowers?

13         MR. MANNAL:  It has a list of frequently asked

14  questions, Your Honor, and it has telephone numbers of where

15  folks can go for additional information, and it explains the

16  basics of a bankruptcy proceeding.

17         THE COURT:  Okay.

18         MR. MANNAL:  Your Honor, we suggest that the

19  creditors' committee that is comprised of several different

20  creditor constituencies is the best way to facilitate a

21  negotiation.  When Judge Gonzalez was faced with this issue in

22  the Enron case a special committee of energy traders sought the

23  appointment of a special energy trader committee.  He found

24  that having certain committees representing individual creditor

25  specific claims would simply balkanize the various creditor

**RESIDENTIAL CAPITAL, LLC, et al.**                    110

1  constituents into several committees and only lead to an

2  increase in the costs and the delays that will hamper the plan

3  process.

4          THE COURT:  What's the cite on that?

5          MR. MANNAL:  Your Honor, I apologize.  It was cited in

6  our papers.  Just give me a moment.

7          THE COURT:  Okay.  That's all right.  No, I'll find

8  it.  That's okay.

9          MR. MANNAL:  I'm sorry, Your Honor.  It's Mirant

10  Americas Energy Marketing LP v. The Official Committee of

11  Unsecured Creditors of Enron Corp.  I have it at 02 --

12          THE COURT:  I'll find it in your brief.

13          MR. MANNAL:  Okay.

14          THE COURT:  That's okay, Mr. Mannal.  Okay.  Anything

15  else?

16          MR. MANNAL:  Your Honor, unless you have any further

17  questions?

18          THE COURT:  I don't.  Okay.  Mr. Marinuzzi, do you

19  want to be heard?

20          MR. MARINUZZI:  Your Honor, I'll be very brief.  I had

21  a question initially.  I'm not sure what they're going to do.

22  Your Honor has the same question.  And in response to that

23  question what I heard is we might have added things to orders

24  that were entered by the Court to make them more favorable.

25  They're free to pick up the telephone.  Mr. Brown's been

1    following the case, not just this week, but since we negotiated

2    that order.  To the extent there was an issue that he wanted to

3    address in the order he could have contacted us.  We're always

4    available if somebody needs to talk to us about a specific

5    borrower issue.  Borrower issues are important to us, and

6    that's why we've done those things that weren't done in

7    American Home that Mr. Mannal just mentioned to the Court.

8            The issue Your Honor raised about the budget, I sat

9    there and I watched my colleague, Aaron Klein, spend a lot of

10   time describing to the Court the history of Ms. Jackson's

11   Chapter 13 proceedings.  It didn't cost Ms. Jackson much money

12   to file what she filed.  Maybe just postage and some personal

13   time, but it cost Mr. Klein a lot of time to get that

14   chronology right and go through the history of the filing.  So

15   the fact that you might be able to budget a small amount of

16   money, relatively speaking, for a borrowers' committee, if they

17   file something that requires the debtors, the committee, and

18   any other third party to spend an awful lot of time responding

19   to what may or may not be baseless allegations, it's not that

20   cost that concerns us.  It's the cost that gets extrapolated to

21   all the professionals that have to respond.

22           Your Honor, I think Your Honor hit the nail on the

23   head.  It's a committee of creditors, and, so, people that want

24   to volunteer to serve on a committee, and the U.S. Trustee,

25   would have to trust that office to police this.  They just

**RESIDENTIAL CAPITAL, LLC, et al.**                                        112

1   can't be volunteers who decide that they want to make this a

2   personal crusade.  And even just looking at the movants, as

3   they existed before last night's filing, there are a number of

4   movants, and the company went back and checked their records,

5   they don't even have any record of ever servicing a loan for

6   those movants.  For some of them the loans have been discharged

7   and paid in full.  We're not quite sure what claims they might

8   have as borrowers.  And, yes, for some there are foreclosures

9   that are pending and foreclosures that have concluded.  But I

10  don't know what a borrowers' committee is going to do to

11  enhance the rights of borrowers more than can be accomplished

12  by somebody picking up the phone, calling us.

13          If Mr. Brown thinks we missed serving the bar date

14  notice on a particular class of creditors that may have claims

15  that we didn't consider we didn't hear about it until today,

16  but we'll talk about it after the hearing.  If we have to

17  extend the bar date or send out additional bar date notices to

18  people that may have claims that we didn't consider, we'll

19  talk.  We'll talk.

20          THE COURT:  All right.  Anybody else want to be heard?

21          MS. NORA:  Yes, Your Honor.  Wendy Alison Nora,

22  partial joinder for the purposes of explaining to the Court the

23  necessity of the appointments of a committee to address the

24  issues of assets being claimed by these debtors to which the

25  debtors are not entitled.

RESIDENTIAL CAPITAL, LLC, et al.                    113

1       THE COURT:  I'm sorry.  You need to say that again.  I

2   didn't understand you.

3       MS. NORA:  Your Honor, in my partial joinder I've

4   explained to the Court that there is a problem with this

5   estate.  The estate is claiming assets which it has taken by

6   robo-signed documents for which there is still relief available

7   in all states.  If this case goes forward without examination

8   of the rights of the people whose property has been confiscated

9   by robo-signed documents this Court will be engaging in

10  inadvertent laundering of real estate titles by allowing those

11  properties to be liquidated on the procedures that the debtors

12  have obtained to liquidate assets which are not lawfully theirs

13  because they were procured by fraud.

14      THE COURT:  How will the committee effect that, Ms.

15  Nora?

16      MS. NORA:  I believe that it's necessary in the

17  negotiation of a plan in this case, Your Honor, for the debtors

18  to consider where it is claiming to get its liquidation funds

19  in order to pay the creditors.  There's a strong conflict

20  between the securitization trustees, the insureds of the

21  securitization trusts, and the homeowners whose assets are

22  being confiscated or have been confiscated.

23      This is virtually unresolvable.  I had thought that

24  maybe the committee would come up with a way that it could

25  address theses issues.  No one is addressing the issue of the

**RESIDENTIAL CAPITAL, LLC, et al.**                                    114

1  plan negotiations where the assets of persons who have been

2  defrauded through Court proceedings and nonjudicial foreclosure

3  proceedings will be liquidated in favor of the overwhelming

4  majority of the constituency of the unsecured creditors'

5  committee.

6          What I'm calling upon the Court to do is to sua sponte

7  create a committee of -- for robo-signing fraud claimants, and

8  this needs to examine the assets being claimed by the debtors

9  as to whether they can properly be liquidated and used to pay

10 other constituencies of creditors.

11         Also, just on a side note, I want to correct the

12 record.  I only called Rowena Drennan once, discovered that she

13 was not someone who seemed able to deal with the kinds of

14 issues I was trying to bring to her attention, and I proceeded

15 on my own behalf to try to raise some of these issues for the

16 Court's consideration.

17         THE COURT:  Thank you, Ms. Nora.  Anybody else wish to

18 be heard?  Come on up.  There's somebody in the back.

19         MR. TAGGART:  Good afternoon, Your Honor.  I was

20 before the Court --

21         THE COURT:  Your name?

22         MR. TAGGART:  Oh, I'm sorry.  Kenneth Taggart.

23         THE COURT:  You're not a lawyer, Mr. Taggart.  Is

24 that --

25         MR. TAGGART:  I'm not a lawyer.  I'm a pro se litigant

**RESIDENTIAL CAPITAL, LLC, et al.**                              115

1  in --

2          THE COURT:  Okay.  Yes.  You've been here before.

3          MR. TAGGART:  -- GMAC v. --

4          THE COURT:  Correct.

5          MR. TAGGART:  -- Taggart.

6          THE COURT:  Right.

7          MR. TAGGART:  Actually, I have a hearing October 10th,

8  and I came to voice my support for a borrowers' committee.  I

9  saw the pleading.  I Didn't get a chance to write up a brief.

10 In the October 10th hearing I had a few issues at that hearing,

11 and they're issues that are showing willful violations of GMAC,

12 especially when it's pro se litigants.  They're, kind of, just

13 moving right along.  They're ignoring many of the Court orders,

14 including the consent orders by the Feds, which were the two

15 consent orders which was the Federal Reserve.

16         My case itself is they're continuing to foreclose with

17 a sworn affidavit of Jeffrey Stephan to this day.  And counsel

18 is aware of it.  They've had certified letters.  They're

19 continuing in court to do that.  There's assignments of fraud

20 on the assignment of mortgage, so there's a question whether

21 it's even an asset.

22         It continues to go on.  I filed a complaint with HUD

23 in the Philadelphia office approximately -- probably mid to

24 late May, I'm going to estimate, as well as the U.S. Attorney's

25 Office in Philadelphia, letting them know that they're

RESIDENTIAL CAPITAL, LLC, et al.                                116

1  continuing to violate their orders.  And it's four months

2  later, and there's nothing done.

3        On my case -- my case is still pending -- they've

4  refused to withdraw that case on the Jeffrey Stephan case

5  alone.  So there's a lot of borrowers out there that they don't

6  even know that they've been -- there's been fraud, or it may

7  take a while to discover, and if they're going to close the

8  door November 4th on all claims there's people that are going

9  to be disenfranchised, a lot of homeowners in the country.

10        There's people that can't come here in court.  They

11  don't -- can't afford a lawyer.  They've lost their homes or

12  are going to lose their homes, all based on fraud.  There's a

13  lot of assets that they're claiming that GMAC does not even own

14  because of fraudulent affidavits.  They're foreclosing -- how

15  can they claim an asset when it's based on fraudulent

16  affidavits of, you know, of the mortgage?  So, there's several

17  issues in support.  There's got to be some committee for

18  homeowners to be heard.

19        THE COURT:  Thank you, Mr. Taggart.

20        MR. TAGGART:  An independent committee.

21        THE COURT:  Thank you, Mr. Taggart.  Anybody else wish

22  to be heard?

23        MR. HOPPER:  Your Honor, Patrick Hopper, pro se.

24        THE COURT:  Go ahead, Mr. Hopper.

25        MR. HOPPER:  Your Honor, really, as a movant and a pro

**RESIDENTIAL CAPITAL, LLC, et al.**                    117

1   se movant I don't -- I'd like to say I don't think that there's

2   a need to have a special committee, but there needs to be some

3   forum that we can go through and bring up issues.  I would not

4   have gone through this process if there was an opportunity to

5   go through and present it to somebody else to bring up the

6   issues.

7           For instance, some of the issues shouldn't be case

8   specific.  And I'm not trying to tie it back to my case.  It's

9   more final orders.  The final order that you did with BABC

10  expanded the scope versus what the original intent was of the

11  scope.  It now gives them the ability to represent more

12  parties.

13          THE COURT:  I'm sorry.  I didn't understand your last

14  point.

15          MR. HOPPER:  The final order that you signed, the

16  initial order basically said that BABC was going to represent

17  the debtor and/or investors, but now the final order says that

18  they will represent the debtor or other parties and/or parties

19  whom the debtors are obligated to defend and indemnify related

20  to servicing agreements.

21          THE COURT:  All right.  You're raising issues

22  regarding the retention of Bradley Arant, and that's not

23  appropriate for this discussion.  I've already denied your

24  motion for reconsideration earlier today.  But anything else

25  you want to speak to with respect to the motion for appointment

**RESIDENTIAL CAPITAL, LLC, et al.**                    118

1    of a committee?

2              MR. HOPPER:  No, Your Honor.  The only thing I would

3    say is if you'd give us an opportunity to go through and bring

4    up issues so we don't have to come to you and waste the Court's

5    time, and I do apologize for wasting the Court's time.

6              THE COURT:  That's okay.  All right.  Thank you, Mr.

7    Hopper.  Yes?

8              MR. HOPPER:  Thank you.

9              THE COURT:  Go ahead.

10             MR. WEIDNER:  Please the Court, Your Honor, my name is

11   Matt Weidner.  I'm a foreclosure defense attorney in St.

12   Petersburg, Florida.  I think what you're seeing here in this

13   courtroom is a good example of why we need a borrowers'

14   committee.  I hear all of the good lawyers here in this room

15   talking about important issues affecting this extraordinarily

16   complex case, but I don't hear many attorneys talking about

17   what happens on the ground down in Florida, in circuit

18   courtrooms.

19             What's currently pending -- and there are two very

20   specific issues I want to talk about -- in our Circuit Court

21   cases we expect to win a foreclosure case as a defense

22   attorney, and we are getting awards of attorneys' fees.  But

23   what's happening down on the ground right now is those award of

24   attorneys' fees which are being assessed against GMAC, they are

25   then coming into court waiving the bankruptcy and saying you

**RESIDENTIAL CAPITAL, LLC, et al.**                                    119

1   can't proceed on those.  That's one example of claims that a

2   borrowers' committee might be able to address.

3          Second is I am litigant as a plaintiff in several

4   cases where other banks have broken down doors, entered into

5   people's homes, and we are getting awards in those cases as

6   well.  I won't say we're getting awards, but we're getting

7   treatment of those cases.  But the issue is down in the sticks,

8   if you will, or down there in the Circuit Courts, borrowers are

9   not represented.  We are not provided --

10         THE COURT:  But a committee does not take a position

11  in specific individual homeowner litigations.

12         MR. WEIDNER:  Again, I'm just talking about two cases

13  or two classes there.  That would be when borrowers are being

14  given affirmative relief and awards down in Circuit Court, and

15  then they're being barred, and then other affirmative relief

16  that might be sought.

17         You're hearing these other claims, that, frankly, may

18  not be relevant, but I think the purpose would be to have a

19  focus for those and to have the borrowers and have the people

20  that are raising these claims be able to speak to that

21  borrowers' committee and treat those claims there.

22         THE COURT:  Thank you.

23         MR. WEIDNER:  Yes, sir.

24         THE COURT:  Anyone else wish to be heard?

25         MS. RUSH:  Good afternoon.

**RESIDENTIAL CAPITAL, LLC, et al.**                    120

1    MS. NORA:  Your Honor, Wendy Alison Nora again.  Just

2  to reiterate --

3    THE COURT:  No, Ms. Nora.  Ms. Nora?  Ms. Nora?  There

4  are other people in the courtroom who wish to be heard.  I've

5  already allowed you to speak.  Go ahead in the courtroom.

6    MS. NORA:  Thank you.  With the negotiation of the

7  plan, Your Honor --

8    THE COURT:  No, Ms. Nora, not you.  I heard you.  I

9  gave you a chance to address the Court.  There are other people

10  in the courtroom waiting to be heard.  I'm not recognizing --

11    MS. NORA:  I understand, Your Honor.

12    THE COURT:  Ms. Nora, I am not recognizing you to

13  speak again.  At the podium.

14    MS. NORA:  Okay.

15    THE COURT:  Go ahead.

16    MS. RUSH:  Good afternoon, Your Honor.  My name is

17  Paula Rush.  I filed the amicus brief in this case.  I was --

18    THE COURT:  Which, you know, Ms. Rush, I ought to just

19  strike the brief.  You called to try to get an extension of the

20  page limits, and my chambers advised you no, so you filed this

21  monstrosity that purports to comply with the page limits,

22  attaches a separate document with the definitions of what you

23  try to put in of the terms you use in the document.  So what do

24  you want to say?

25    MS. RUSH:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**                    121

1    THE COURT:  So it quickly.  Don't you ever dare do

2    something like that again, okay?

3    MS. RUSH:  I -- I apologize, Your Honor.  I do.  I

4    apologize.  I had trouble cutting it down, and I apologize.

5    THE COURT:  Well, you know, everybody has a problem,

6    but twenty-five pages is an appropriate limit unless someone

7    establishes good cause to file a longer brief.  You didn't.  I

8    refused.  And you just did it anyway.

9    MS. RUSH:  I apologize.  I do.

10    THE COURT:  What are the points you want to make on

11    the motion?

12    MS. RUSH:  Okay.  The points that I want to make is

13    I'd actually like to be a voice of reason in all of this.  I

14    was the chairperson in the American Home Mortgage case, and I

15    think that what you hear from pro se homeowners is there is a

16    lot of confusion.  They don't understand the process.  They

17    don't understand that proof of claim filing is the way to

18    prosecute your claim.  And I do think that having someplace

19    that they can go, even if it's just a phone call that says I

20    don't understand this, and we say, you know, file a proof of

21    claim.  That's the process.  There's all kinds of things we did

22    in the American Home case that assisted borrowers in writing

23    language into the plan, writing an ombudsman into the plan.

24    There was a lot of issues that came up that affected

25    homeowners.

RESIDENTIAL CAPITAL, LLC, et al.                                    122

1          This is an extraordinary bankruptcy that covers

2   origination, servicing, securitization, as well as foreclosure

3   actions, and I do think that, you know, I don't want you to

4   throw all people under the bus.  There's always going to be

5   crazy homeowners out there.  And believe me, I deal with them.

6   I've been an auditor for six years working with lawyers all

7   over the country.  There are the crazies out there.

8          There's also the elderly couple who can't advocate on

9   their own behalf.  They're not even equipped to do that.

10  There's people that have valid claims.  There's people that

11  don't have valid claims.  And, you know, I do feel that if

12  homeowners have a voice in this matter, a place to go, some

13  touch point from somebody that can give them the right

14  direction, the right information, and, again, help with notices

15  and things.  They talked about their notices.  Their notices

16  primarily say keep making your payments.  This doesn't affect

17  you.  And the questions that they posed, which the generic

18  answers specifically say that.

19         So, I do think that homeowners need some experienced

20  counsel like Mr. Brown and Ms. Bennette to have that person

21  that they can go to that will hopefully bring them into reason

22  and not file crazy things into this court thinking that that's

23  okay.  Because it is.  It's an extreme amount of resources for

24  the Court and the committee and the debtors to deal with things

25  that sometimes aren't even valid.  They're crazy.  And the

**RESIDENTIAL CAPITAL, LLC, et al.**                                    123

1   committee does not represent anyone individually.  They look

2   for issues that affect all homeowners and see where they can

3   maybe insert a paragraph in something or negotiate a little bit

4   of the language in something so that they do have that

5   representative voice and they feel that they have that

6   representative voice.  I think the homeowners in this case

7   have, you know, somewhat earned that right.

8          Again, you may have seen nothing but the crazies so

9   far.

10          THE COURT:  No, that's not true, okay?  And it's far

11  from it.  And the Court has attempted in every instance to

12  examine every lift stay motion that's come before the Court.

13  Where something really appropriately should be raised as a

14  proof of claim I've so indicated.  In the Silmon case, which I

15  heard earlier today, the reason we've had several hearings

16  already is because the Court has carefully looked at the facts

17  and circumstances and the issues in that case, and I do that in

18  every one of them.

19          MS. RUSH:  I -- I --

20          THE COURT:  I'm mindful of the problems that

21  homeowners have in dealing with -- when they don't have

22  lawyers, or even if they do -- with dealing with the complexity

23  of the bankruptcy proceeding.  I'm very mindful of that.  But

24  the issue, really, from my standpoint is the unsecured

25  creditors' committee the appropriate body in existence today to

**RESIDENTIAL CAPITAL, LLC, et al.**                          124

1   deal with those issues or should a separate committee, with the

2   additional cost and burdens that it can create, should it be

3   formed.  Okay?  Any last points you want to make?

4        MS. RUSH:  Just the point that I had made in my brief,

5   and, again, I apologize for that, was that I do feel that

6   there's inherent conflicts of the parties that are seated on

7   the committee against the homeowners, and I think that's the

8   reason why, and that's the reason why Judge Sontchi, in the

9   American Home case, came to the conclusion that it was better

10  to have the separate committee and not a committee of people

11  that were against --

12       THE COURT:  All right.  Let me hear anybody else.

13  Does somebody else in the courtroom want to be heard?  Thank

14  you, Ms. Rush.

15       MR. EMRICH:  Good morning, Your Honor.  Edmund Emrich

16  with Shearman & Sterling representing Citibank N.A.  Your

17  Honor, our papers set forth our position.  We're not objecting

18  to the merits of the motion.  We're not taking a position on

19  that.  Rather, our sole concern is making sure that the sale

20  process that's currently scheduled goes forward as scheduled,

21  because it would be prejudicial to all creditors, including

22  Citibank, if that process were to be delayed because of the

23  appointment of a new committee.

24       THE COURT:  Okay.  Thank you.

25       MR. EMRICH:  Thanks.

RESIDENTIAL CAPITAL, LLC, et al.                                    125

1        THE COURT:  Anybody else in the courtroom wish to be

2   heard?  Mr. Brown, you wanted to be heard in reply?

3        MR. BROWN:  Yes, Your Honor.  Briefly.  With respect

4   to the information on the websites I attached to my reply a

5   letter that was on the website that's sent to homeowners that,

6   in essence, tells them that they don't have to do anything in

7   this case.

8        With respect to the hotline, we've had some of our

9   movants call the hotline and keep track of what's going on,

10  and, to make a long story short, they didn't get answers.  When

11  they called the hotline the hotline referred them to their

12  lender, to their servicer.  When they called their servicer

13  their service referred them back to the hotline.  Then they

14  referred them back and so on, and they got disconnected over

15  and over again, and they didn't have answers.  And on the

16  hotline itself there's a message that says we can't provide

17  legal or financial advice.  If you think that you're owed

18  money, then you can file a proof of claim.  And I think that if

19  the Court were to approve the committee you certainly could put

20  any limits --

21       THE COURT:  I have your arguments.  I'm going to take

22  the --

23       MR. BROWN:  Okay.

24       THE COURT:  -- the matter under submission.

25       MR. BROWN:  Thank you.

**RESIDENTIAL CAPITAL, LLC, et al.**                    126

1    THE COURT:  Thank you very much, Mr. Brown.  Mr.

2  Marinuzzi?

3    MR. MARINUZZI:  Your Honor, maybe we have a suggestion

4  that the Court might entertain, and I'll let --

5    THE COURT:  Mr. Mannal?

6    MR. MARINUZZI:  -- committee counsel present it.

7    MR. MANNAL:  Doug Mannal on behalf of the creditors'

8  committee.  Your Honor, it may make sense, in light of the

9  concerns that the Court has expressed, to have a borrower be

10  appointed to the creditors' committee.  In speaking with the

11  United States Trustee earlier today he had suggested that he

12  did not have an objection to doing so.

13    THE COURT:  In other words, appoint an additional

14  member to the creditors' committee?

15    MR. MANNAL:  Additional member to the creditors'

16  committee.

17    THE COURT:  Mr. Masumoto, you want to address that?

18    MR. MASUMOTO:  Your Honor, just to make the record

19  clear.  We're not endorsing that procedure or not.

20    THE COURT:  I understand.

21    MR. MASUMOTO:  Pursuant to the statute, if a party-in-

22  interest petitions the Court for that relief the Court can

23  direct the U.S. Trustee to change the composition of the

24  committee, but that decision we'll leave up to the Court.

25    THE COURT:  Thank you, Mr. Masumoto.  All right.  The

**RESIDENTIAL CAPITAL, LLC, et al.**                    127

1    Court's taking the matter under submission.

2          MR. MARINUZZI:  Thank you, Your Honor.  I believe that

3    brings us to page 12 of the agenda, the adversary proceeding

4    matters Lewis v. GMAC Mortgage.  I don't see Mr. Lewis in

5    court.

6          THE COURT:  Anybody in court or on the phone for Mr.

7    Lewis?  Mr. Marinuzzi, my understanding is that Mr. Lewis has

8    been the subject of more than one order identifying him as a

9    vexatious litigator --

10          MR. MARINUZZI:  That is correct, Your Honor.

11          THE COURT:  -- in Ohio.  Could somebody provide me

12    with those orders?

13          MR. MARINUZZI:  Your Honor, we can.

14          THE COURT:  Do I have them?

15          MR. MARINUZZI:  They were submitted in connection with

16    another pleading that we filed.  We'll get them to Your Honor.

17          THE COURT:  Okay.

18          MR. MARINUZZI:  Your Honor, actually, my colleague,

19    Samantha Martin, just presented me with one of the orders.  Can

20    I approach?

21          THE COURT:  Yes, please.  All right.  What I've been

22    handed is the four-page order in a case -- first off, it's in

23    the Court of Common Pleas of Franklin County, Ohio, in the case

24    Huntington National Bank v. Sidney T. Lewis, case number 05

25    CVH-07-7346, and it's an order dated July 24, 2007.

**RESIDENTIAL CAPITAL, LLC, et al.**                                              128

1          All right.  My understanding, is that Mr. Lewis has

2   had at least one bankruptcy proceeding in the Bankruptcy Court

3   in Ohio.

4          MR. MARINUZZI:  Your Honor, I am not the expert on Mr.

5   and Mrs. Lewis.

6          THE COURT:  Mr. Martin, can you --

7          MR. MARINUZZI:  Samantha Martin is, so I'll cede the

8   podium to her.

9          THE COURT:  Can you help me here?

10         MS. MARTIN:  Yes, Your Honor.  There were two

11  foreclosure proceedings and three bankruptcy proceedings in

12  Ohio.

13         THE COURT:  And was there an order precluding -- in

14  one or more of the bankruptcy proceedings precluding Mr. Lewis

15  from filing any additional papers?

16         MS. MARTIN:  I believe there was a reference in one of

17  the documents that was filed to a bankruptcy order, but I'm not

18  entirely sure.

19         THE COURT:  Okay.  I mean, look, what I have before me

20  are two motions.  I have the debtors' motion to dismiss the

21  complaint on the pleadings.  Debtor answered -- attempted to

22  answer the complaint.

23         Mr. Lewis has moved for summary judgment.  If I had

24  any idea in the world what it is he's seeking it might make

25  life easier.  Yes, he is a pro se litigant, but I'm mindful of

RESIDENTIAL CAPITAL, LLC, et al.                                              129

1   the fact that I will have to look to confirm.

2            I would ask you to do this.  If you would research the

3   issue further as to any additional orders entered by any

4   federal or state court with respect to Mr. Lewis determining

5   that he is a vexatious litigator or the equivalent of that, but

6   some courts don't use that term, but -- I may be mistaken, but

7   I was under the impression that in at least one of his

8   bankruptcy proceedings the judge had entered an order

9   precluding Mr. Lewis from doing any further court filings.

10           MS. MARTIN:  I have in my own notes here that he was

11  noted to be an adjudicated vexatious litigator by the Ohio

12  Court of Appeals, but I don't have that document in front of

13  me.

14           THE COURT:  Okay.  I'm going to take the matter under

15  advisement.  I would ask if you would gather together whatever

16  you can, file it so that -- and, you know, that Mr. Lewis will

17  have copies of it as well, and I'm going to await receiving

18  either further papers or a notice that you can't find any

19  before acting on the cross motions.  Okay?

20           MS. MARTIN:  Yes, Your Honor.

21           THE COURT:  Thank you very much.  Mr. Masumoto?

22           MR. MASUMOTO:  Brian Masumoto for the Office of the

23  United States Trustee.  Your Honor, I just wanted to seek

24  clarification and also to clarify the record.  I wanted to make

25  it clear that the U.S. Trustee has, on many occasions, with

RESIDENTIAL CAPITAL, LLC, et al.                    130

1  respect to companies added members to a committee for any

2  number of reasons.  Sometimes when interested parties appear.

3  Sometimes when there are resignations.  In this circumstance we

4  have not had a prior request to add to the creditors'

5  committee.  The first indication was when Mr. Mannal stood up

6  to say it.

7          I wanted to make it clear that the U.S. Trustee

8  certainly has that authority, but what I was alluding to was

9  1102(a)(4), under which the Court has the authority to direct

10 the U.S. Trustee to add.  If Your Honor wants us, the U.S.

11 Trustee, to consider membership additions at this time we're --

12 as I said, we normally do that, but I don't want to interfere

13 with the Court's determination at this point.

14         THE COURT:  Mr. Masumoto, let me think about it.

15 Okay.  I'll take it under advisement and I'll decide.

16         Does it take an actual court order from -- if the

17 Court indicated that it would be beneficial if there was at

18 least one additional homeowner/borrower representative on the

19 committee, do you need an order?

20         MR. MASUMOTO:  Not necessarily, Your Honor.  For

21 example, if this had been a chambers conference and there was

22 an open discussion about the committee certainly the U.S.

23 Trustee would take those into consideration.

24         THE COURT:  Okay.  Look, I don't know what I'm going

25 to do on this motion.  I do believe it's important that

**RESIDENTIAL CAPITAL, LLC, et al.**                                131

1   homeowners/borrowers have an easy voice in this process who

2   they can contact.  Not to deal with their specific problems.

3   That's for them.  If somebody has a -- if there's a foreclosure

4   pending or they want to file a proof of claim that's for them

5   to do it, but it's important that, you know, because many of

6   the people who are facing foreclosure, they're facing

7   foreclosure because they don't have the money to pay a mortgage

8   payment.  They don't have money to retain counsel.  They have

9   all sorts of problems.  It's very important that they feel they

10  have a voice and that they have a voice in the process, and not

11  necessarily through a separate committee.

12          I'm going to cogitate on this.  Thank you, Mr.

13  Masumoto.

14          MR. MASUMOTO:  Thank you, Your Honor.

15          THE COURT:  I appreciate it.

16          MR. MARINUZZI:  Your Honor, I only rise to add in

17  response to Your Honor's question regarding process that in the

18  case of the Los Angeles Dodgers, which was before Judge Gross,

19  we represented the committee.  In that case there was a motion

20  to appoint a committee of season-ticket holders.

21          THE COURT:  I remember reading about that.

22          MR. MARINUZZI:  And the resolution, which didn't get

23  to the Court, was, after a discussion with the U.S. Trustee's

24  Office, the debtors, and the committee, to appoint two

25  additional members to the committee representing the interests

RESIDENTIAL CAPITAL, LLC, et al.                                    132

1   of season-ticket holders.  There was no order, to my

2   recollection, from the judge directing the U.S. Trustee to make

3   that change.

4              MR. MARINUZZI:  Well, I'm also mindful of the -- I

5   mean, committees vote on things, and the votes ought to be

6   reflective, to some extent, of the interests in the case, the

7   creditors' interests in the case, so it's not as simple as just

8   saying that additional people should be appointed to the

9   committee.

10             MR. MARINUZZI:  I'm only addressing the procedural

11  point, Your Honor --

12             THE COURT:  All right.  Okay.  All right.  Okay.

13             MR. MARINUZZI:  -- because I went through it already.

14             THE COURT:  Let's try and finish up here.  What's

15  next?

16             MR. MARINUZZI:  Your Honor, the last items on the

17  agenda appear to be items that were resolved.  They were lift

18  stay motions where stipulations were presented to the Court for

19  consideration.

20             THE COURT:  These are the issues of, what, HELOC

21  mortgages where the first mortgagee is moving to lift the stay

22  because it needs to deal with junior interests if the property

23  is foreclosed?

24             MR. MARINUZZI:  That's correct, Your Honor.

25             THE COURT:  Okay.  And this is also the subject of the

**RESIDENTIAL CAPITAL, LLC, et al.**                                    133

1  order that you're -- proposed order that you're continuing to

2  negotiate with Chase, I take it?

3          MR. MARINUZZI:  That's correct, Your Honor.

4          THE COURT:  All right.  Does anybody wish to be heard

5  with respect to -- these are listed as uncontested settled

6  matters on the agenda, to be resolved in accordance with

7  stipulations.  Does anybody wish to be heard with respect to

8  those?

9          MS. FREJKA:  Your Honor, Elise Frejka, Kramer, Levin,

10  for the committee.

11          THE COURT:  Yes, Ms. Frejka.

12          MS. FREJKA:  The committee has reviewed in detail the

13  documentation that was submitted to the debtor, has inquired,

14  had answers, and supports the relief on these stipulations.

15          THE COURT:  Okay.  All right.  I'm going to go ahead

16  and -- anybody else wish to be heard?  All right.  I'm going to

17  go ahead and approve  each of those stipulations.  I obviously

18  have to see the final form of them, but I understand the issues

19  on this and hopefully you'll be able to come to an agreement

20  with Chase to resolve any of the remaining objections that come

21  up with a procedure that'll apply across the board rather than

22  requiring these individual motions in each of the cases.

23          MR. MARINUZZI:  Your Honor, I hate to do this, but

24  let's go back to the Sydney Lewis motions.

25          THE COURT:  Yes.

**RESIDENTIAL CAPITAL, LLC, et al.**                      134

1          MR. MARINUZZI:  We've recovered two orders, one from

2    the Bankruptcy Court.  Your Honor has a great recollection of

3    the facts.

4          THE COURT:  All right.  I would still -- I will take

5    these, but I would like them added to -- do a filing on ECF so

6    that Mr. Lewis can see these since he's not participating in

7    the hearing.  What I've been handed are two orders, one dated

8    April 27, 2009.  It is in Mr. Lewis's Chapter 7 bankruptcy in

9    the Southern District of Ohio, Eastern Division, before Judge

10   Hoffman, and it's ECF docket number 326.  It's case number 07-

11   57237.  And the second order, also by Judge Hoffman in the same

12   Chapter 7 bankruptcy case.  So I will add -- so now I have

13   three orders, which I will review carefully, but if you would

14   go ahead and -- if there are any others find them.  I don't

15   know that there are any others.  I think I was aware that in a

16   Chapter 7 case --

17         MR. MARINUZZI:  We'll search for them, Your Honor.

18         THE COURT:  -- and it's obviously the one before Judge

19   Hoffman.  Okay.

20         MR. MARINUZZI:  That concludes the agenda, Your Honor.

21   Thank you very much for your time.

22         THE COURT:  We're adjourned.

23         MR. MARINUZZI:  Thank you.

24      (Whereupon these proceedings were concluded at 12:55 PM)

25

135

## I N D E X

### RULINGS

|  | Page | Line |
|---|---|---|
| Stay is Lifted to Allow Deposition of Affiant | 76 | 20 |
| Mr. Hopper's Motion for Reconsideration of | 76 | 20 |
|   Order Authorizing Employment and Retention |  |  |
|   of Bradley Arent Boult, Cummings LLP, Denied |  |  |
| Motion of the Committee of Unsecured | 78 | 23 |
|   Creditors Authorizing Employment and |  |  |
| Retention of Analytic Focus, LLC and J.F. |  |  |
|   Morrow, Granted |  |  |
| Motion Authorizing Reimbursement of Fees and | 81 | 6 |
|   Expenses for Morrison Cohen as Counsel to |  |  |
|   Independent Directors, Granted |  |  |
| Debtors' Motion for Approval of Procedures | 83 | 10 |
|   for Holders of Senior Liens, Adjourned |  |  |
| Corla Jackson's Motion Regarding Violation of | 91 | 121 |
|   Lift Stay Motion in Her Chapter 13 Case, |  |  |
|   Denied |  |  |
| Motion of HSBC Bank USA, N.A. Seeking | 133 | 22 |
| Relief from the Automatic Stay granted |  |  |

136

1                                    RULINGS

2                                                      Page       Line

3    Motion of PNC Bank, N.A. Seeking             133        22

4    an Order Granting Relief from the Automatic

5    Stay Pursuant to 11 U.S.C. Section 362(a) and

6    Federal Bankruptcy Rule 4001 granted

7    Motion of Residential Credit                 133        22

8    Solutions, Inc. Seeking an Order Granting

9    Relief from the Automatic Stay Pursuant to

10   11 U.S.C. § 362(a) and Federal Bankruptcy

11   Rule 4001 granted

12   Motion of PHH Mortgage Corporation           133        22

13   Seeking an Order Granting Relief

14   from the Automatic Stay Pursuant to 11

15   U.S.C. Section 362(a) and Federal Bankruptcy Rule

16   4001 granted

17   Motion of PNC Mortgage for                   133        22

18   Termination of the Automatic Stay granted

19   Motion of PNC Mortgage for

20   Termination of Automatic Stay granted

21   Motion of Capital One, N.A. for              133        22

22   Termination of Automatic Stay granted

23   Motion [of Union Savings Bank]

24   for Termination of Automatic Stay granted

25

137

C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a

true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569


eScribers

700 West 192nd Street, Suite #607

New York, NY 10040


Date:  September 28, 2012

## #

**#607 (1)**
5:23

## A

**Aaron (3)**
83:19,22;111:9
**ab (1)**
62:18
**abide (1)**
88:4
**ability (4)**
28:13;29:5;45:5;
117:11
**able (14)**
22:9;27:20;30:13;
55:3;64:22;79:23;
88:18;98:12;102:14;
111:15;114:13;
119:2,20;133:19
**Absolutely (5)**
54:7;62:20;70:20;
86:12;92:23
**acceptable (1)**
72:11
**ACCESS (4)**
15:10;42:18;84:18;
108:21
**accomplish (2)**
62:11,12
**accomplished (1)**
112:11
**accordance (2)**
43:4;133:6
**according (1)**
41:11
**account (2)**
30:12;41:25
**accurately (1)**
37:11
**acknowledge (1)**
50:21
**acknowledgement (1)**
51:3
**across (2)**
94:22;133:21
**acting (1)**
129:19
**action (7)**
46:19;50:15;58:21;
75:4;86:5;95:6;
107:22
**Actions (6)**
4:23;56:24;58:25;
81:22;103:3;122:3
**active (4)**
17:23;18:1,10;
109:3
**actively (1)**
109:4

**activities (6)**
37:12;38:13;58:2;
62:16;63:6,20
**activity (3)**
58:1,14;92:2
**actual (1)**
130:16
**actually (14)**
27:16;28:9;36:8;
53:17;64:12;65:7;
73:11;86:17;87:21;
89:12;95:22;115:7;
121:13;127:18
**Ad (2)**
10:3;21:18
**add (7)**
27:25;32:17;94:14;
130:4,10;131:16;
134:12
**added (4)**
68:4;110:23;130:1;
134:5
**addition (7)**
19:17;31:8;79:20;
85:23;96:25;102:4;
109:6
**Additional (17)**
5:17;65:16;71:25;
72:6;96:15;98:3;
106:19;109:15;
112:17;124:2;
126:13,15;128:15;
129:3;130:18;
131:25;132:8
**Additionally (1)**
92:11
**additions (1)**
130:11
**address (13)**
36:12;50:8;77:3;
83:20,25;84:7;94:8;
111:3;112:23;
113:25;119:2;120:9;
126:17
**addressed (4)**
35:10;82:9;84:21;
103:12
**addresses (1)**
57:25
**addressing (3)**
99:20;113:25;
132:10
**adequate (1)**
30:11
**adequately (1)**
81:18
**adjourn (4)**
83:9;84:5,8;85:25
**adjourned (1)**
134:22
**adjournment (1)**
52:2
**adjudicated (1)**

**129:11**
**ADRIAN (1)**
16:14
**advance (1)**
29:7
**advances (1)**
29:2
**Adversary (5)**
3:10,14,16;17:4;
127:3
**adverse (1)**
62:8
**advice (1)**
125:17
**advise (1)**
45:11
**advised (3)**
60:18;65:24;
120:20
**advisement (2)**
129:15;130:15
**advising (1)**
107:16
**advisor (1)**
30:19
**advocate (1)**
122:8
**affect (4)**
26:10;74:2;122:16;
123:2
**affected (3)**
44:11;96:17;
121:24
**affecting (2)**
28:14;118:15
**affiant (7)**
72:23;73:18,20;
74:7,9,11;75:8
**affidavit (4)**
72:18,20,23;
115:17
**affidavits (2)**
116:14,16
**affiliate (1)**
54:10
**affiliated (1)**
79:14
**affiliates (11)**
37:6,17;38:14,25;
39:11;40:24;51:17;
55:7;57:20,21;58:22
**affirmative (5)**
74:20;108:8,12;
119:14,15
**afford (1)**
116:11
**AFI (23)**
18:12,21;36:9,11,
21;37:6,16;38:13;
50:12,16,18,21;51:1,
11,14;54:4;59:13,14,
17;63:14,17;67:25;
68:22

**AFI's (2)**
67:23;69:1
**afraid (1)**
42:2
**afternoon (4)**
32:3;114:19;
119:25;120:16
**afterwards (1)**
86:21
**again (14)**
32:24;39:3;67:4,6;
106:21;113:1;
119:12;120:1,13;
121:2;122:14;123:8;
124:5;125:15
**against (11)**
44:3,10;50:16;
51:17;58:22;71:24;
88:24;90:11;93:16;
94:18;99:10,12;
107:5,15,22;118:24;
124:7,11
**Agencies (2)**
3:23;44:7
**agenda (18)**
17:9,9,12,13,16,17;
21:9;27:25;68:3,4;
76:18;77:6,20;82:20;
127:3;132:17;133:6;
134:20
**agent (3)**
38:4,9;58:9
**agree (9)**
31:16;45:15;54:3;
55:19;57:21;62:14;
71:20;102:13;105:12
**agreed (4)**
28:20;29:12;50:5;
66:5
**agreed-upon (1)**
26:1
**agreeing (1)**
66:1
**agreement (22)**
24:11;25:25;26:8,
15;27:11,21;28:21;
29:23;30:6,11;41:13;
45:17;55:5;59:4,5;
60:11;61:9;62:3;
67:2;68:25;74:13;
133:19
**agreements (10)**
21:21;22:1;29:2;
31:14;43:8;52:12;
58:22;60:18;79:16;
117:20
**ahead (24)**
17:19;23:10;28:16;
33:2;35:21;50:2;
71:4,12;75:6;77:10,
11;84:25;89:22;94:4;
97:13;99:17;108:2;
116:24;118:9;120:5,

**15;133:15,17;134:14**
**AKIN (2)**
9:19;22:7
**al (4)**
3:11,16;13:22;
15:22
**Alabama (8)**
2:19;86:6,16;89:8;
90:9;10;92:14;
108:11
**Alexandra (1)**
24:16
**alike (1)**
68:21
**Alison (5)**
15:11,16;95:9;
112:21;120:1
**allegation (1)**
68:24
**allegations (5)**
42:3;85:15;90:11;
93:12;111:19
**alleged (2)**
36:12;63:16
**alleging (1)**
90:10
**ALLEN (1)**
10:19
**allocate (1)**
37:17
**allocated (1)**
38:7
**allocation (2)**
57:13;61:6
**allow (7)**
24:13;29:7;42:22;
45:18;71:21;73:16;
76:1
**allowance (1)**
99:13
**allowed (1)**
120:5
**allowing (1)**
113:10
**allows (2)**
28:22;73:3
**alluding (1)**
130:8
**Ally (37)**
8:14,14;36:9,12,
16;37:6,16;38:13;
39:23;41:4,19;43:5;
44:22;51:11,14;53:5,
19,20,25;54:4,17;
55:5,6,13;56:19,20;
57:14,15;58:7,8,11,
13,15;60:4;65:22,24;
67:12
**Ally's (1)**
66:3
**almost (1)**
104:18
**alone (2)**

69:25;116:5

**along (3)**
33:22;61:7;115:13

**Although (3)**
25:18;28:10;39:18

**ALVES (1)**
9:7

**always (3)**
51:21;111:3;122:4

**amended (1)**
17:9

**amendment (10)**
28:21,22;29:4,14,
15,16;30:2,8,14,18

**America (1)**
3:10

**American (11)**
98:1;102:2;106:24,
25;107:1,4;109:7;
111:7;121:14,22;
124:9

**Americas (6)**
8:4;10:4,21;11:12;
14:13;110:10

**amicus (1)**
120:17

**among (6)**
17:24;19:18;37:18;
40:3;86:24;105:5

**amount (5)**
39:5;43:12;68:2;
111:15;122:23

**amounts (2)**
29:6;37:24

**ample (2)**
26:6;30:5

**Analyst (1)**
16:18

**Analytic (4)**
3:3;16:14,17;78:13

**analyzing (1)**
98:19

**and/or (2)**
117:17,18

**Angeles (3)**
7:6;14:23;131:18

**answered (1)**
128:21

**anticipated (1)**
81:13

**anticipation (1)**
34:9

**anymore (2)**
81:20;96:7

**apologize (7)**
110:5;118:5;121:3,
4,4,9;124:5

**apparently (3)**
84:10;91:22;
102:15

**Appeals (1)**
129:12

**appear (3)**

50:13;130:2;
132:17

**appearance (2)**
21:16;32:19

**appeared (2)**
71:18;100:4

**appearing (1)**
71:9

**appears (1)**
92:8

**Application (10)**
2:1;3:1;4:5,13;
65:6;78:13;79:5;
94:2;103:13,14

**applications (4)**
17:15;77:4,20;
80:24

**applied (1)**
65:2

**apply (2)**
101:3;133:21

**Appoint (10)**
5:14,15;93:6;
96:14;97:20;98:9;
106:9;126:13;
131:20,24

**appointed (6)**
97:25;105:20;
106:3;107:1;126:10;
132:8

**Appointing (2)**
5:18;101:25

**appointment (8)**
81:8;97:19;100:12;
102:19;106:18;
109:23;117:25;
124:23

**appointments (1)**
112:23

**appreciate (5)**
28:3;30:17;36:4;
76:3;131:15

**appreciated (1)**
74:3

**approach (5)**
45:21,24;49:7;
69:2;127:20

**approached (1)**
55:5

**approaching (1)**
60:12

**appropriate (17)**
34:15;46:20;51:19;
56:17;63:4;65:16;
66:2;74:10;75:8;
79:18;99:4,15;100:8;
103:1;117:23;121:6;
123:25

**appropriately (2)**
62:6;123:13

**approval (5)**
29:15,17,24;30:1;
82:22

**approve (4)**
81:3;96:13;125:19;
133:17

**Approving (1)**
4:21

**approximately (1)**
115:23

**April (3)**
35:24;88:8;134:8

**Arant (3)**
2:9;13:19;117:22

**area (1)**
99:4

**areas (1)**
60:1

**arguably (1)**
90:13

**argue (1)**
53:15

**argument (3)**
40:8;66:10;67:16

**arguments (3)**
49:14;82:4;125:21

**arises (2)**
75:3;84:20

**arising (1)**
36:16

**ARLENE (1)**
9:7

**arose (1)**
36:13

**around (4)**
23:14;99:14;103:4;
107:23

**ARPS (1)**
12:11

**arrange (1)**
22:21

**arrearages (2)**
87:20;88:15

**art (1)**
50:11

**asbestos (3)**
106:5,6,6

**aspect (2)**
22:10;94:9

**aspects (1)**
37:9;95:21

**assert (4)**
26:22;44:10;50:25;
92:13

**asserted (3)**
58:21;68:6;108:12

**assess (1)**
67:16

**assessed (1)**
118:24

**asset (3)**
41:12;115:21;
116:15

**assets (5)**
112:24;113:5,12,
21;114:1,8;116:13

**assigned (1)**
87:22

**assignment (2)**
28:25;115:20

**assignments (1)**
115:19

**assist (2)**
109:8,12

**assisted (1)**
121:22

**assisting (1)**
38:24

**Association (1)**
100:19

**assume (10)**
39:3;40:19;49:18;
50:9,11,14;56:5;
67:18;101:24;102:25

**assuming (1)**
65:13

**assurance (1)**
61:14

**assure (2)**
61:12;109:4

**attached (1)**
125:4

**attaches (1)**
120:22

**attachment (1)**
46:7

**attempt (1)**
25:23

**attempted (2)**
123:11;128:21

**attempting (2)**
18:8;20:3

**attend (1)**
46:12

**attention (4)**
22:11,18;72:24;
114:14

**ATTORNEY (7)**
12:2;15:11;45:3;
105:15,16;118:11,22

**Attorneys (26)**
8:3,14,21;9:3,12,
20;10:3,12,20;11:3,
11,19;12:3,13,20;
13:3,11,20;14:3,12,
20;15:3,20;97:9;
100:19;118:16

**attorneys' (3)**
79:19;118:22,24

**attorney's (2)**
65:15;115:24

**auction (8)**
24:8;25:14;26:9;
29:21;30:3,8,16;31:5

**auctions (1)**
24:8

**auditor (1)**
122:6

**August (4)**

3:4;24:19;44:16,17

**Aurelius (3)**
9:20;22:7,11

**auspices (1)**
71:20

**AUSTIN (2)**
13:10;14:6

**authority (6)**
41:15;45:9;53:15;
103:13;130:8,9

**Authorization (1)**
4:15

**authorize (1)**
64:21

**authorized (1)**
46:9

**Authorizing (9)**
2:2,8,13;3:2;4:7;
5:8;79:6;81:3,4

**Automatic (7)**
4:23;72:3,9;73:9;
88:22;90:23;100:1

**automatically (2)**
91:10;100:25

**available (6)**
22:13;56:13;92:14;
93:14;111:4;113:6

**Avenue (13)**
8:4,15;9:13;10:4,
21;11:4,12,20;13:4,
21;14:4,13;16:3

**avoid (2)**
43:16;103:16

**await (1)**
129:17

**award (1)**
118:23

**awarding (1)**
85:17

**awards (4)**
118:22;119:5,6,14

**aware (4)**
35:23;102:19;
115:18;134:15

**away (2)**
68:5;81:13

**awful (1)**
111:18

---

**B**

**BABC (2)**
117:9,16

**back (20)**
17:25;20:1,21;
23:23;35:24;73:8,10;
75:6,19;91:17,17;
93:1,6;95:11;112:4;
114:18;117:8;
125:13,14;133:24

**bad (20)**
40:16;41:10;43:2;
51:7

**balance (1)**
88:16
**balkanize (1)**
109:25
**Bank (23)**
8:14,21;9:3;11:11,
19;12:12;14:3;32:20;
33:17;36:9,16;37:6,
16;38:14;51:11,14;
53:25;54:17;57:15;
61:3,11;63:11;
127:24
**bankrupt (1)**
61:15
**Bankruptcy (53)**
2:13;4:6,7,9,14,14,
20;5:7,7;29:14;40:5;
45:3;51:6;53:1,4,21;
55:1,2;59:6;61:10;
67:11;85:13,20;86:4,
4,24;89:8,9;94:10;
95:19;100:11,19,21,
22;101:1,1,2;105:20;
108:24;109:10,16;
118:25;122:1;
123:23;128:2,2,11,
14,17;129:8;134:2,8,
12
**banks (1)**
119:4
**bar (6)**
95:13;107:3,17;
112:13,17,17
**Barclays (1)**
12:12
**Barker (1)**
11:20
**BARRAGE (23)**
24:16,17;26:16,20;
27:2,6,8,15,19;28:3,
6,17;29:9,12,20;
30:17,24;31:3,14,25;
32:2,12,15
**barred (2)**
95:16;119:15
**based (12)**
21:21;38:6;50:19;
58:22;80:22;85:19,
20;88:9,13;89:5;
116:12,15
**baseless (1)**
111:19
**basically (3)**
31:11;44:19;
117:16
**basics (1)**
109:16
**basing (1)**
46:14
**basis (6)**
39:9;72:4,6;92:7;
94:22;102:11
**BASKIN (1)**

11:18
**Battery (1)**
9:4
**bear (2)**
63:5;78:12
**bears (1)**
59:17
**BEASLEY (1)**
7:8
**began (1)**
36:1
**begin (4)**
18:10,12;19:12;
22:9
**behalf (24)**
2:5,15;3:5;4:11,17;
21:18;24:17;29:1;
32:20;35:18;44:9;
51:11,13;52:19;
69:15;72:23;77:17;
80:19;98:6;103:24;
105:11;114:15;
122:9;126:7
**behind (1)**
37:10
**believes (1)**
74:10
**bells (1)**
65:16
**belongs (1)**
37:23
**bench (1)**
99:1
**Bender (1)**
109:1
**beneficial (1)**
130:17
**benefit (4)**
29:17;38:8;44:5;
60:13
**Bennett (2)**
89:11;94:1
**BENNETTE (2)**
12:25;122:20
**best (4)**
20:5;45:16;52:13;
109:20
**better (6)**
30:14;32:23,24;
47:22;68:16;124:9
**beyond (4)**
68:22;74:11;75:17;
101:14
**bidder (1)**
30:1
**bidders (8)**
29:5,7,21;30:4,5,
10,15,21
**bidding (2)**
26:10;31:1
**bids (1)**
30:12
**big (1)**

61:4
**billable (1)**
97:8
**BINDER (1)**
9:8
**Birmingham (3)**
2:19;13:22;15:22
**bit (4)**
44:1;80:4;102:14;
123:3
**blaming (1)**
63:14
**Board (31)**
5:11;35:23;39:15;
45:7,7,9,12;46:8,8,
10,19,19,23,25;48:2,
11,16,21;54:5,14;
64:17,18,19;67:16;
79:7,17,22;80:12;
94:22;96:22;133:21
**boards (1)**
79:14
**BOCKIUS (2)**
8:20;33:17
**body (2)**
46:15;123:25
**BOELTER (1)**
13:16
**bond (1)**
18:17
**borrowed (1)**
96:4
**borrower (8)**
95:3;102:19;
104:13,21;107:1;
111:5,5;126:9
**borrower/home (1)**
97:19
**Borrowers (27)**
5:18;18:24;93:15;
102:16,20;104:11,15;
105:12;107:4,5,9,9,
11,13,16,19;108:5,
20;109:9,12;112:8,
11;116:5;119:8,13,
19;121:22
**borrowers' (13)**
81:9;97:4;101:21;
105:8,10,14;108:17;
111:16;112:10;
115:8;118:13;119:2,
21
**borrower's (5)**
93:6,8,11,17;96:2
**borrowers/home (1)**
98:11
**both (9)**
18:3;23:14;47:16;
50:6;53:5;78:7;
103:18;105:4;109:7
**Boult (2)**
2:9;13:19
**bound (1)**

51:8
**boundaries (1)**
98:18
**BR (1)**
3:18
**Bradley (3)**
2:9;13:19;117:22
**break (2)**
81:10;82:1
**BRIAN (3)**
7:25;101:18;
129:22
**brief (11)**
23:1,19;79:13;
92:15;110:12,20;
115:9;120:17,19;
121:7;124:4
**briefest (1)**
21:2
**briefing (1)**
25:4
**briefly (5)**
21:19;23:13;28:15;
33:3;125:3
**bring (10)**
22:11;26:18;75:19;
88:15;103:3;114:14;
117:3,5;118:3;
122:21
**bringing (1)**
22:18
**brings (6)**
76:12;79:4;81:8;
88:7;93:5;127:3
**broadly (1)**
47:1
**Broadway (1)**
12:21
**broke (2)**
93:7;104:1
**broken (1)**
119:4
**brought (3)**
72:24;75:3,3
**BROWN (31)**
12:2,8;93:23,23,
23;94:5,8;96:8,12,21,
23,25;97:13,22,25;
98:17;99:16,18,24;
100:5,16;101:9,11;
105:14;112:13;
122:20;125:2,3,23,
25;126:1
**Brown's (2)**
105:21;110:25
**Bryant (1)**
9:21
**budget (8)**
42:6,11;55:23;
82:10;102:23;103:7;
111:8,15
**build (1)**
61:6

**built (3)**
29:14;80:3,9
**bunch (1)**
37:10
**burden (3)**
61:2;62:10;68:23
**burdens (2)**
61:7;124:2
**burn (1)**
43:11
**burning (2)**
43:10,11
**bus (1)**
122:4
**business (2)**
56:17;57:1

---

**C**

**CA (2)**
7:6;14:23
**calendar (3)**
27:9;28:5;77:23
**call (9)**
22:21;43:19;49:10;
52:6;66:19;69:8;
97:19;121:19;125:9
**called (3)**
84:4;114:12;
120:19;125:11,12
**calling (3)**
96:10;112:12;
114:6
**calls (3)**
95:9,11,11
**came (4)**
59:3;115:8;121:24;
124:9
**Can (68)**
17:11;19:20;20:5;
21:9;24:11;26:22;
27:11,25,25;34:19;
36:5;37:25;38:2;
39:5;44:5;45:15,17;
47:1,5;49:2,7;52:14;
55:8,13;58:21;67:16,
25;75:5,14,16,18;
77:8;81:18;83:3,10;
84:13;87:13,14;
91:15;92:13;94:11;
98:7;99:24,25;101:8,
15;102:23;106:10;
109:4,15;112:11;
114:9;116:15;117:3;
121:19;122:13,21;
123:2;124:2;125:18;
126:22;127:13,19;
128:6,9;129:16;
131:2;134:6
**cap (1)**
103:7
**capacity (3)**
25:11,12;28:23

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**Capital (6)**
2:16;4:11,18;9:20;
17:3;22:7
**Capital's (1)**
41:3
**carefully (3)**
102:15;123:16;
134:13
**Carolina (1)**
105:17
**carried (2)**
58:14;98:14
**carry (1)**
20:8
**Case (76)**
2:19;3:24;10:2;
21:17,20;26:25;
33:22;36:1;48:2;
59:16;72:19;74:24;
75:5,12;79:18;87:7,
11,13,16,24;88:1,2,8;
90:22;91:23;92:10;
96:15,15,16,17;98:1,
5,23;99:10;102:2;
103:19;104:25;
105:13,20;106:7,24;
107:3,6;108:11;
109:7,22;111:1;
113:7,17;115:16;
116:3,3,4,4;117:7,8;
118:16,21;120:17;
121:14,22;123:6,14,
17;124:9;125:7;
127:22,23,24;131:18,
19;132:6,7;134:10,
12,16
**cases (11)**
67:12;103:7;106:6;
108:4;109:6;118:21;
119:4,5,7,12;133:22
**Cassandra (1)**
62:3
**categories (2)**
99:25;100:1
**cause (2)**
50:15;121:7
**causes (2)**
58:21,24
**caveat (1)**
56:1
**CC (11)**
2:7,12;3:14,20;4:1,
5,13,20,25;5:6,14
**cease (1)**
43:21
**cede (2)**
70:10;128:7
**Centerview (1)**
30:19
**Central (1)**
16:3
**certain (10)**
28:23;39:5;80:20;

87:25;88:14;93:16;
103:16;105:18;
108:18;109:24
**certainly (17)**
23:11;24:11;26:11;
30:21;33:9;34:19;
50:1;65:11;75:6;
98:19;100:16;
101:12,13;105:21;
125:19;130:8,22
**certainty (1)**
29:5
**certified (1)**
115:18
**cetera (1)**
81:25
**CFR (3)**
45:11;46:5;47:12
**CFRs (1)**
64:7
**chairperson (1)**
121:14
**challenged (1)**
103:14
**chambers (6)**
36:4;69:8;84:3,14;
120:20;130:21
**chance (4)**
71:2;97:23;115:9;
120:9
**change (3)**
108:17;126:23;
132:3
**changes (2)**
42:22;100:7
**Chapter (16)**
86:16,23;87:7,12,
16,18,24;88:6,8;
90:22;91:23;92:10;
111:11;134:8,12,16
**characterizes (1)**
19:6
**charged (1)**
38:22
**charging (1)**
39:9
**Chase (3)**
11:19;133:2,20
**check (1)**
49:5
**checked (1)**
112:4
**Chicago (1)**
13:13
**chilled (1)**
31:1
**chills (1)**
30:3
**choose (1)**
106:10
**Chris (1)**
21:17
**CHRISTOPHER (1)**

10:7
**CHRISTY (1)**
13:24
**chronology (3)**
87:13,15;111:14
**Circle (1)**
15:13
**Circuit (5)**
2:18;118:17,20;
119:8,14
**circulated (1)**
30:19
**circumstance (2)**
76:23;130:3
**circumstances (3)**
103:15;108:18;
123:17
**cite (1)**
110:4
**cited (1)**
110:5
**Citibank (3)**
9:12;124:16,22
**City (1)**
15:6
**CK (1)**
13:16
**claim (14)**
44:3,8;95:15;
102:8,10;107:5,15;
116:15;121:17,18,21;
123:14;125:18;131:4
**claimant (1)**
95:3
**Claimants (6)**
12:3,20;18:23;
104:22;106:6;114:7
**claimed (2)**
112:24;114:8
**claiming (3)**
113:5,18;116:13
**Claims (24)**
3:17;50:18,25;
51:16;85:7;93:15;
95:25;96:4;99:8,9,12,
13;105:11;109:25;
112:7,14,18;116:8;
119:1,17,20,21;
122:10,11
**clarification (1)**
129:24
**clarify (4)**
75:22;87:14;90:21;
129:24
**class (2)**
95:6;112:14
**classes (2)**
98:20;119:13
**clear (20)**
20:23;29:8;45:1;
51:15;52:10;56:18;
62:4;64:15,19,21;
65:13,18;69:17,24;

104:2;105:21;
106:23;126:19;
129:25;130:7
**clearly (5)**
55:4,9;92:5;103:2;
108:13
**CLEARY (2)**
10:11;69:15
**client (1)**
41:6
**clients (1)**
98:6
**close (2)**
74:21;116:7
**closed (6)**
27:23;72:19;86:20,
22;87:24;88:2
**closely (2)**
44:1;63:20
**closing (7)**
31:8;42:10,14,19;
56:2,6,14
**CNTY (1)**
3:24
**Co (2)**
3:11;40:19
**co-counsel (2)**
93:25;97:7
**Code (6)**
2:13;4:6,14,20;5:7;
100:11
**COELHO (6)**
13:7;34:22,25;
35:2,2,14
**cogitate (1)**
131:12
**cognizant (1)**
50:1
**COHEN (5)**
11:2;79:25;80:21;
81:3,5
**Cohen's (1)**
80:23
**colleague (4)**
93:2;105:3;111:9;
127:18
**colleagues (3)**
32:5;36:18;77:11
**coming (3)**
22:1;61:11;118:25
**Commence (2)**
4:23;25:15
**commencement (1)**
25:14
**commences (2)**
67:11;92:13
**comments (3)**
41:7;68:25;94:8
**commitments (2)**
20:16;21:19
**committed (1)**
69:25
**Committee (173)**

2:1,4,5;3:1,4,5;
5:14,15,18;8:3;17:14,
21;18:2,12,18,20;
19:7,19;23:14,17;
24:23;25:17;36:22;
40:13,14,21;42:2;
44:9,13;45:2,17;47:5,
8;50:4,8;52:8,17,20,
21;59:17;62:1;66:7;
67:3;68:4;77:4,17,
21;78:14;79:8;80:14,
17,19;81:9,16,16;
82:2,6,10;93:6,8,11,
16,17;94:7;95:3,4;
96:2,2,3,10;97:4,11,
14,15,20;98:10,11,
12,15,16,23;99:15,
22,23,24;100:1,14;
101:21,25;102:4,12,
19,23,24,25;103:9,
18,25;104:18,19,19,
20,23,24;105:2,9,9,
10,12,14,20;106:3,
11,21,22,24;107:2,7;
108:17,23;109:5,7,
11,19,22,23;110:10;
111:16,17,23,24;
112:10,23;113:14,24;
114:5,7;115:8;
116:17,20;117:2;
118:1,14;119:2,10,
21;122:24;123:1,25;
124:1,7,10,10,23;
125:19;126:6,8,10,
14,16,24;130:1,5,19,
22;131:11,19,20,24,
25;132:9;133:10,12
**committees (7)**
79:14;96:15;103:6;
106:19;109:24;
110:1;132:5
**committees' (3)**
104:2,4,5
**committee's (5)**
40:8;49:3;68:14;
78:13;105:8
**common (3)**
94:16;99:9;127:23
**communicated (1)**
37:22
**communications (2)**
44:19;109:5
**companies (1)**
130:1
**company (5)**
60:20,22,25;61:3;
112:4
**Compensate (1)**
5:8
**complaining (1)**
87:10
**Complaint (4)**
3:16;115:22;

128:21,22
**complaints (1)**
  31:1
**complete (1)**
  65:25
**completed (1)**
  87:3
**completely (1)**
  47:7
**complex (1)**
  118:16
**complexity (1)**
  123:22
**Compliance (6)**
  2:10;5:10;54:24;
  57:1,2;61:13
**complicated (1)**
  38:18
**complied (1)**
  54:19
**comply (13)**
  40:17;41:16;44:24;
  49:3;56:23;57:1,2;
  61:17;68:13;80:13;
  81:14;86:23;120:21
**complying (5)**
  41:10;43:23;52:24;
  57:16;61:2
**component (1)**
  22:14
**comporting (1)**
  43:25
**composition (1)**
  126:23
**comprised (3)**
  104:20;105:15;
  109:19
**concern (4)**
  55:1;74:19;105:8;
  124:19
**concerned (5)**
  54:18,22,24;82:10;
  99:5
**concerning (3)**
  44:20;46:24;57:20
**concerns (5)**
  61:18;97:1;98:24;
  111:20;126:9
**conclude (3)**
  34:14;71:23;
  102:25
**concluded (4)**
  50:14;76:25;112:9;
  134:24
**concludes (4)**
  50:10,11;75:7;
  134:20
**conclusion (3)**
  33:8;9;124:9
**condition (1)**
  29:13
**conditional (1)**
  89:5

**conditionally (2)**
  88:13;91:8
**conditions (3)**
  29:13,24;31:18
**conduct (9)**
  37:4,5,5,8;55:19;
  58:24;62:16;63:15;
  67:6
**conducted (2)**
  37:19;62:16
**conducting (2)**
  57:18;81:17
**confer (1)**
  71:17
**Conference (19)**
  2:18;3:8,12;4:1,5,
  13;5:6,22,21;23:2,5;
  25:22;34:25;35:19;
  40:11;66:4;70:12;
  71:17,19;130:21
**confidential (2)**
  45:8;65:15
**confidentiality (2)**
  45:17;65:1
**confidentially (1)**
  20:6
**confirm (2)**
  71:13;129:1
**confiscated (3)**
  113:8,22,22
**conflation (1)**
  69:22
**conflict (1)**
  113:19
**conflicts (1)**
  124:6
**confusion (1)**
  121:16
**Congress (1)**
  14:4
**conjunction (2)**
  24:20;75:13
**connection (3)**
  25:4;38:14;127:15
**consensually (1)**
  32:7
**consensus (1)**
  18:7
**Consent (64)**
  5:11;35:20,22;
  36:9,15,20;38:5,20;
  39:10,13,13,14,21;
  40:13,19;41:9,10,16;
  42:16,22,25;43:2,25;
  44:6,20;46:24;48:7,
  13;49:4;50:12,19;
  52:2,24;53:18;54:18,
  23;55:18;57:3,7,15,
  16;59:12;60:2,5,7;
  61:2,6,13,17;62:4,7,
  9;63:8;67:5,14;
  68:14,20;69:21;70:1;
  81:15;96:19,23;

115:14,15
**consents (1)**
  48:21
**consequences (2)**
  56:19;62:8
**consider (5)**
  64:19;112:15,18;
  113:18;130:11
**consideration (3)**
  114:16;130:23;
  132:19
**considers (1)**
  45:7
**consistent (2)**
  23:16,20
**constituencies (8)**
  18:22;19:12,18;
  20:10;21:3;98:7;
  109:20;114:10
**constituency (1)**
  114:4
**constituents (2)**
  18:10;110:1
**Consultant (2)**
  2:3;3:3
**consultants (2)**
  78:14;82:5
**consulted (1)**
  100:6
**consumer (2)**
  100:12,19
**consumers (1)**
  100:25
**consumer's (1)**
  105:16
**contact (4)**
  25:16;65:9;95:7;
  131:2
**contacted (2)**
  19:17;111:3
**contemplate (1)**
  20:24
**contemplated (1)**
  51:21
**contempt (1)**
  52:11
**contested (5)**
  76:12;77:1,22;
  79:4;82:20
**context (5)**
  21:13;22:22,23;
  41:19;66:17
**continuation (1)**
  42:17
**Continue (16)**
  4:23;26:13;46:17;
  52:24;54:18;55:3,14,
  17;61:12,16,17;
  79:24;88:5,16;93:10;
  108:6
**continued (3)**
  21:2;87:19;89:3
**continues (1)**

115:22
**continuing (6)**
  23:22;66:14;
  115:16,19;116:1;
  133:1
**contrary (2)**
  62:11;104:16
**contribution (7)**
  37:24;44:2,3,8;
  49:14;50:25;51:17
**control (4)**
  47:7;58:3;63:3,10
**controlled (1)**
  60:3
**convening (1)**
  25:23
**conveyed (2)**
  45:2;52:6
**convinces (1)**
  68:15
**Cook (2)**
  4:16;37:2
**cooperation (2)**
  18:2;66:24
**cooperative (1)**
  66:22
**copied (2)**
  46:1,4
**copies (3)**
  49:21;50:3;129:17
**copy (3)**
  36:4;45:13;46:2
**Corla (4)**
  5:3;16:16;83:14;
  91:21
**Corp (1)**
  110:11
**correctly (1)**
  19:6
**correspondence (1)**
  22:12
**cost (15)**
  39:6;40:1;44:4;
  47:17;59:17;61:7,25;
  97:2,2,3;111:11,13,
  20,20;124:2
**costs (12)**
  31:17;37:18;38:3;
  40:8;42:20;44:6;
  50:13;56:14;59:11;
  63:5;81:14;110:2
**Counsel (42)**
  2:10,14;4:9,16;7:3,
  12;22:7;25:10,17,22;
  37:22;38:18,24;45:2,
  17;49:18;52:7;67:2;
  71:7;72:16;74:9,12,
  13;75:5,12;76:6;
  79:23,24,25;80:12;
  81:5;85:14;94:21;
  99:1,2;100:7;104:17;
  108:22;115:17;
  122:20;126:6;131:8

**Counsel's (1)**
  46:25
**counterclaims (5)**
  74:19;108:7,8,9,12
**country (5)**
  99:14;103:4;
  107:23;116:9;122:7
**counts (2)**
  71:22,22
**County (2)**
  2:19;127:23
**couple (4)**
  19:24;75:15;104:1;
  122:8
**course (2)**
  72:24
**Court (475)**
  2:19;3:24;17:2,11,
  17;18:4,13,15,19,25;
  19:3,10;20:2,8,20;
  21:8,12,14,15,16,24;
  22:3,15,17,21,25;
  23:4,7,11,25;24:2,6,
  15;26:2,13,15,17,19,
  21;27:3,7,9,17,20;
  28:4,16;29:8,10,14,
  19,21,25;30:9,22,25;
  31:12,19,22,24;32:1,
  14,4,16,19;33:1,10,
  12,15,22,25;34:2,7,
  12,19,21,24;35:1,8,
  12,15,21,23;36:3,15;
  37:3,15;38:2,10,17,
  23;39:3,9,25;41:22;
  42:6,11,14;43:10;
  45:25;46:2,15,21;
  47:8,9,13,21;48:6,10,
  13,15,20,24;49:13,
  18,23;50:7,21;51:5,6,
  13,22;52:4,16;53:1,8,
  13;54:1,3,9,14,20,22;
  55:16,18,22,24;56:5,
  8,11,13,21,23;57:10,
  17;58:10,12,17;60:6,
  9,14,21,24;61:21,23;
  62:14,19,24;63:1,4,
  12,19;64:1,3,5,7,10,
  14,24;65:2,4,6,11,13,
  14;66:4,11;67:8,22,
  25;68:12,22;69:7,9,
  11,13;70:3,5,9,13,15,
  17,20,22;71:4,7,11,
  15;72:2,15,20,22;
  73:4,8,12,14,24;74:1,
  12;75:9,25;76:3,5,8,
  16,22,24;77:5,8,10,
  13,16,18,22,25;78:3,
  6,9,12,16,18,21,25;
  79:2,8,12,25;80:6,9,
  15,16,25;81:2,11;
  82:17,23,25;83:6,8,9,
  12,14,15,17,21;84:3,
  4,15,18;85:14,21,22;

86:6,9,13,15,18;87:1,
3,6,9,17,18;88:11,25,
25;89:1,8,9,10,14,17,
19,22,24;90:2,3,5,7,9,
10,12,15,17,20,24;
91:1,4,8,14,17,20,20,
22;92:6,7,15,20,22,
25;93:3,10,20,22;
94:3,4,6,16;96:6,10,
13,20,22,24;97:2,11,
17,18,23;98:9,14,18,
21;99:17,21;100:3,6,
6;101:7,10,16,24;
102:7,22,22;103:20;
104:6,9,14;105:23;
106:1,12,15,17,18;
107:8,21,23;108:2,8,
20,22;109:11,17;
110:4,7,12,14,18,24;
111:7,10;112:20,22;
113:1,4,9,14;114:2,6,
17,20,21,23;115:2,4,
6,13,19;116:10,19,
21,24;117:13,21;
118:6,9,10,20,25;
119:10,14,22,24;
120:3,8,9,12,15,18;
121:1,5,10;122:22,
24;123:10,11,12,16,
20;124:12,24;125:1,
19,21,24;126:1,4,5,9,
13,17,20,22,22,24,25;
127:5,6,6,11,14,17,
21,23;128:2,6,9,13,
19;129:4,9,12,14,21;
130:9,14,16,17,24;
131:15,21,23;132:12,
14,18,20,25;133:4,
11,15,25;134:2,4,18,
22

**courtroom (7)**
34:18;118:13;
120:4,5,10;124:13;
125:1
**courtrooms (1)**
118:18
**courts (3)**
103:11;119:8;
129:6
**Court's (15)**
24:20;27:23;34:17;
73:10;85:12;91:4;
92:3;99:19;101:22;
103:10;114:16;
118:4,5;127:1;
130:13
**cover (2)**
22:5;35:19
**covered (2)**
24:25;25:2
**covers (1)**
122:1
**COWAN (1)**

16:14
**crazies (2)**
122:7;123:8
**crazy (3)**
122:5,22,25
**create (3)**
100:17;114:7;
124:2
**created (1)**
45:20
**Creditor (6)**
3:16;106:10;
107:14;109:20,24,25
**Creditors (18)**
2:2,5;3:2,6;17:24;
50:24;102:5,17;
105:24,25;106:2,19;
110:11;111:23;
112:14;113:19;
114:10;124:21
**Creditors' (20)**
8:3;17:14;25:17;
52:19;77:21;95:3;
98:12,15;100:1;
103:25;107:2;
109:19;114:4;
123:25;126:7,10,14,
15;130:4;132:7
**crisis (2)**
36:13;63:14
**critical (1)**
26:10
**cross (1)**
129:19
**crusade (1)**
112:2
**Cummings (2)**
2:9;13:19
**cure (3)**
88:20,20;91:9
**current (8)**
24:5;80:2,11;
88:15;92:5;103:15;
107:9,10
**currently (9)**
25:7;34:13;38:11;
43:13;95:23;99:7,7;
118:19;124:20
**cut (1)**
76:17
**cutting (1)**
121:4
**CV-2009-902322 (1)**
2:20
**CVH-07-7346 (1)**
127:25

## D

**damages (1)**
85:9
**Dan (1)**
108:24

**DANIEL (3)**
9:24;15:8;22:7
**dare (1)**
121:1
**date (10)**
26:5,17;27:16;
95:13;107:3,14,17;
112:13,17,17
**dated (2)**
127:25;134:7
**dates (1)**
55:8
**dating (1)**
35:24
**David (1)**
108:25
**DAY (7)**
14:19;27:9;41:18;
45:14;59:8;67:18;
115:17
**day-one (1)**
24:24
**days (6)**
26:5;30:7;43:22;
44:18;55:10;88:20
**deadline (2)**
27:22,24
**deal (16)**
17:4;22:22;35:12;
36:16;40:16;68:16,
16;82:21;104:6;
108:13;114:13;
122:5,24;124:1;
131:2;132:22
**dealing (4)**
35:19;45:8;123:21,
22
**dealt (1)**
19:9
**Dearborn (1)**
13:12
**debtor (29)**
19:7;22:20;23:9;
33:4,8;37:18;38:25;
40:16,24;53:15;55:7,
23;56:15,23;57:21;
69:20,21;80:7;88:13;
89:6;96:4,5;99:25;
102:15;107:5;
117:17,18;128:21;
133:13
**Debtors (101)**
2:10;3:14;4:8,10,
16,20;5:6,8,10;7:3,
12;17:8;22:9,12,14;
24:17,23;25:25;26:3,
11;28:8,19;33:20;
35:18;36:1,20,21;
37:5;38:1;39:10,15;
40:3;45:20;50:12,14,
15,22,24;51:7,15;
53:5;54:4,6,8,23;
55:3,17,19;57:7,8,8,

14,19,22;58:8,14,23;
59:7,13,15;62:7,10,
17,21;63:4,15,21,24;
65:7,22;68:1,10,13,
24;69:2,23,24;72:12;
78:8;83:23;84:21,22;
90:11;95:20;99:6,10,
12;105:4;106:24;
107:23;108:20;
109:8;111:17;
112:24,25;113:11,17;
114:8;117:19;
122:24;131:24
**Debtors' (22)**
2:12;4:3,5,13;25:5;
28:12;37:8;52:22;
56:17;57:25;74:13,
15;75:1,12;79:5,7;
82:21;83:25;85:4;
100:7;102:6;128:20
**December (3)**
20:23;88:3;90:1
**DECHERT (2)**
11:10;32:22
**decide (5)**
40:21;52:11;74:1;
112:1;130:15
**decides (1)**
80:12
**deciding (1)**
102:11
**decision (1)**
126:24
**decisions (1)**
65:12
**declaration (1)**
41:18
**decline (2)**
46:13,18
**decree (21)**
52:24;53:18;54:18,
23;57:15,16;59:12;
60:3,5,7;61:2,6,13,
17;62:4,7,9;63:8;
96:19,19,23
**deem (1)**
46:19
**deeply (1)**
38:6
**default (9)**
43:19;62:4,7;
67:14;88:10,19;89:4;
94:16,18
**defaults (2)**
52:12;88:21
**defend (2)**
71:22;117:19
**defense (2)**
118:11,21
**defenses (4)**
74:20;92:14;108:9,
12
**defensibility (3)**

60:4,7,10
**deficiencies (2)**
36:13;85:19
**deficient (1)**
85:5
**define (1)**
67:22
**definitions (1)**
120:22
**defrauded (1)**
114:2
**degree (2)**
55:10;67:3
**delay (1)**
59:18
**delayed (1)**
124:22
**delays (1)**
110:2
**demand (6)**
44:19,23;45:12,13;
49:2;50:4
**demonstrates (1)**
28:13
**demonstrating (1)**
23:20
**denied (7)**
85:19;86:1,7;89:9;
90:3;91:9;117:23
**denies (2)**
73:15;74:4
**DENMAN (1)**
10:8
**denominate (1)**
91:22
**deny (4)**
72:6;85:3;88:13;
91:21
**denying (7)**
76:19;84:5,9;91:6;
92:3,15;99:10
**DEPARTMENT (5)**
7:19;36:2;48:1;
64:4;96:24
**depends (1)**
73:20
**deponent (1)**
72:22
**deposition (7)**
72:22;73:16,17;
74:7,9;75:7,18
**Derrius (1)**
15:20
**describe (1)**
96:1
**described (1)**
37:11
**describing (1)**
111:10
**desire (1)**
33:9
**desist (1)**
43:22

**detail (1)**
133:12
**determination (1)**
130:13
**determinations (1)**
108:19
**determine (3)**
58:19,20;91:23
**determining (1)**
129:4
**Deutsche (2)**
8:21;33:17
**Developments (1)**
3:8
**devotion (1)**
53:11
**dialog (1)**
20:10
**difference (2)**
100:24;106:23
**different (13)**
18:10,22;39:13,18;
40:22;42:23;48:4,9;
59:9;80:12;105:15;
106:25;109:19
**difficult (3)**
19:13,14;59:20
**difficulty (2)**
18:8;85:6
**diligently (1)**
33:4
**DIP (5)**
42:6,11;43:17;
55:22;67:19
**direct (2)**
126:23;130:9
**directed (3)**
18:11;68:11;71:16
**directing (1)**
132:2
**direction (3)**
73:10;101:22;
122:14
**directly (2)**
28:14;57:25
**Directors (6)**
2:15;11:3;63:20;
80:1,3;81:6
**discerning (1)**
85:6
**discharge (1)**
87:25
**discharged (1)**
112:6
**disclose (3)**
46:13,18;64:18
**disclosed (1)**
46:11
**disclosure (7)**
42:4;46:9,16;
64:20,21,22;65:15
**disconnected (1)**
125:14

**discover (1)**
116:7
**discoverable (1)**
58:18
**discovered (1)**
114:12
**discovery (21)**
22:17,18,22;25:1,
3;52:8;59:18,22;
60:1,2;65:23;66:9;
71:25;72:6,8,18;74:5,
11;75:12,15;101:12
**discovery's (1)**
73:3
**discretion (4)**
55:9;96:14;99:4;
103:10
**discuss (2)**
23:22;28:17
**discussed (2)**
65:8;74:16
**discussion (7)**
32:2;40:20;50:1;
81:14;117:23;
130:22;131:23
**discussions (16)**
18:10;19:8,18,21;
25:13;31:20;32:1,8;
33:4;35:11;38:6;
46:25;65:22;83:3;
95:10;104:23
**disenfranchised (1)**
116:9
**Dismiss (2)**
3:14;128:20
**dismissed (2)**
86:22;88:3
**disposed (3)**
86:18,19;88:11
**dispute (3)**
22:17;41:19;59:3
**disputed (1)**
59:21
**disputes (4)**
22:18;24:12;66:1;
103:17
**distant (1)**
24:9
**distinction (1)**
52:25
**District (1)**
134:9
**Division (2)**
2:19;134:9
**Doc (8)**
2:1,7,12;3:1;4:1,5,
13;31:12
**Doc# (7)**
3:14,20;4:20,25;
5:6,14,17
**docket (11)**
17:13;76:19;84:7;
85:3;86:2,7;91:4;

92:1;98:5;102:16;
134:10
**document (14)**
30:13;35:25;41:17;
44:18,23;45:12,13;
48:8;49:2;50:4;
65:25;120:22,23;
129:12
**documentation (2)**
22:13;133:13
**Documents (13)**
5:3;31:10,13;
44:20,24;45:14;47:5;
49:21;50:3;52:9;
113:6,9;128:17
**documents1229 (1)**
5:4
**documents1264 (1)**
5:19
**Dodgers (1)**
131:18
**DOJ-AG (2)**
48:5,8
**DOLAN (1)**
12:19
**dollar (4)**
40:1;61:20;102:8,
10
**dollars (6)**
41:24;43:13,14;
60:12;67:18;104:13
**done (17)**
30:21;40:12;42:2,
4;47:18;58:2,7,7,12;
63:2,10;67:12;75:15;
103:8;111:6,6;116:2
**door (1)**
116:8
**doors (1)**
119:4
**DOT (1)**
3:22
**Doug (3)**
80:18;103:24;
126:7
**DOUGLAS (1)**
8:7
**down (9)**
64:17;103:17;
118:17,23;119:4,7,8,
14;121:4
**draft (2)**
44:15,16
**Drennan (6)**
95:11;98:10;
104:17,21;105:1;
114:12
**Drennan's (2)**
104:17;108:22
**DUANE (1)**
7:8
**during (1)**
52:6

**E**

**ear (1)**
56:12
**earlier (8)**
25:4;35:7;57:17;
76:18;90:21;117:24;
123:15;126:11
**earned (1)**
123:7
**easier (2)**
99:19;128:25
**Eastern (1)**
134:9
**easy (1)**
131:1
**ECF (15)**
70:23;71:2;76:19;
84:7,18,19;85:24,25;
86:1,7,8,10;91:25;
134:5,10
**ECKSTEIN (12)**
8:10;17:21;19:3,5,
6,15;20:13;46:2;
77:3,10,12;82:15
**EDMUND (2)**
9:16;124:15
**effect (2)**
92:9;113:14
**effectively (1)**
23:19
**effort (4)**
25:13;37:17;61:5,
14
**efforts (1)**
19:7
**eight (1)**
41:24
**eighteen (1)**
43:13
**either (7)**
20:16;21:23;27:12;
29:17;74:13;105:24;
129:18
**elderly (1)**
122:8
**electronic (1)**
17:13
**ELISE (3)**
8:8;105:3;133:9
**ELLIS (2)**
8:13;51:11
**else (18)**
22:3;50:18;51:22;
69:13;70:19;78:21;
84:23;110:15;
112:20;114:17;
116:21;117:5,24;
119:24;124:12,13;
125:1;133:16
**e-mail (1)**
49:10

**e-mails (1)**
18:20
**emergency (1)**
69:10
**empathize (1)**
84:13
**emphasize (2)**
20:14;57:5
**emphasizes (1)**
36:19
**emphasizing (1)**
54:8
**Employ (2)**
4:8,15
**Employment (3)**
2:3,9;3:3
**EMRICH (4)**
9:16;124:15,15,25
**encompass (1)**
38:13
**encourage (1)**
19:24
**end (10)**
17:16,17;20:21;
45:13;56:7;59:7;
77:6;78:3;85:15;
100:20
**endeavor (3)**
27:10;84:22;93:15
**endeavored (2)**
68:8,23
**endorsing (1)**
126:19
**ends (1)**
75:16
**energy (3)**
109:22,23;110:10
**enforceable (1)**
40:20
**enforcement (1)**
68:18
**engaged (2)**
53:24,24
**engagement (7)**
39:17,22,24;43:3;
53:10,14;70:2
**engagements (1)**
36:23
**engaging (1)**
113:9
**enhance (1)**
112:11
**enormous (1)**
53:11
**enough (2)**
63:20;84:25
**Enron (2)**
109:22;110:11
**enter (11)**
26:22;28:24;34:15;
50:12;52:8;54:23;
62:7;63:8;68:10;
84:20,24

**entered (23)**
24:20;48:1;50:19;
51:6;53:19,20,20;
55:6;59:4,5;61:9;
76:19,25;84:4,9;
91:3;92:15,20;94:18;
110:24;119:4;129:3,
8
**entering (3)**
53:10;55:2;60:10
**entertain (3)**
23:11;68:7;126:4
**entire (2)**
68:2,23
**entirely (2)**
60:3;128:18
**entities (3)**
37:18;46:23;63:9
**entitle (1)**
85:8
**entitled (2)**
72:7;112:25
**entity (4)**
38:4;45:6;54:10;
95:1
**Entry (5)**
2:2,12;3:2;4:21;5:6
**equipped (1)**
122:9
**equitable (1)**
85:9
**equity (2)**
105:25;106:19
**equivalent (1)**
129:5
**eScribers (1)**
5:22
**especially (2)**
62:2;115:12
**ESQ (36)**
7:8,16,25;8:7,8,9,
10,11,18,25;9:7,8,16,
24;10:7,8,16,24;11:7,
15,24;12:8,16,25;
13:7,15,16,24,25;
14:8,16,25;15:8,16,
24;16:6
**essence (1)**
125:6
**essentially (4)**
28:21;36:24;62:20;
74:20
**established (2)**
63:17;79:14
**establishes (2)**
36:10;121:7
**estate (5)**
28:14;61:19;113:5,
5,10
**estates (1)**
44:9
**estimate (3)**
61:24,24;115:24

**estimated (4)**
39:6;43:14;56:3;
104:12
**et (3)**
3:11,16;81:25
**evaluate (2)**
79:15,22
**evaluating (1)**
38:19
**eve (3)**
53:21;54:25;61:10
**Even (14)**
80:6,11;92:12;
95:9;97:11;112:2,5;
115:21;116:6,13;
121:19;122:9,25;
123:22
**event (10)**
34:4;50:22;55:6;
59:13;73:15;84:12;
91:11;92:8;97:14,15
**everybody (2)**
45:19;121:5
**everybody's (1)**
44:4
**everyone (1)**
89:6
**evict (1)**
92:13
**Eviction (1)**
90:19
**evidentiary (3)**
34:12,14;66:8
**Ex (1)**
3:10
**exact (1)**
36:23
**exactly (1)**
73:22
**examination (2)**
51:20;113:7
**examine (2)**
114:8;123:12
**examiner (9)**
49:19,25;50:2,10,
11,14;52:9;58:19,20
**examiner's (3)**
49:16,18;79:16
**example (8)**
36:17;38:10;43:24;
45:22;46:6;118:13;
119:1;130:21
**exasperation (1)**
38:17
**exceed (1)**
103:13
**exceedingly (1)**
51:25
**except (1)**
87:25
**exception (1)**
105:1
**exchange (1)**

34:5
**exclusivity (2)**
20:21,24
**Excuse (2)**
33:13;59:14
**excused (4)**
34:18;70:19,20;
82:17
**executed (1)**
29:11
**exercise (3)**
56:17;88:24;99:4
**exercised (1)**
60:16
**exhibit (3)**
36:8;67:1;91:13
**exist (2)**
50:18;58:25
**existed (1)**
112:3
**existence (1)**
123:25
**exit (1)**
21:22
**expanded (1)**
117:10
**expect (3)**
65:24;80:13;
118:21
**expecting (2)**
20:15,17
**expedition (2)**
59:23;101:11
**expenditure (2)**
61:19,22
**expense (2)**
42:7;98:24
**Expenses (6)**
2:14;31:17;42:9;
79:6;81:5,17
**expensive (3)**
41:17;47:17;72:10
**experienced (1)**
122:19
**expert (3)**
78:16;108:24;
128:4
**experts (1)**
17:15
**explain (1)**
93:9
**explained (1)**
113:4
**explaining (2)**
84:1;112:22
**explains (1)**
109:15
**explicit (1)**
61:14
**explicitly (1)**
61:6
**exposed (1)**
63:24

**express (2)**
64:16;93:19
**expressed (3)**
97:1,2;126:9
**expression (2)**
38:16,17
**extend (1)**
112:17
**extending (1)**
20:24
**extension (2)**
20:23;120:19
**extensive (1)**
44:18,23;59:18
**extent (12)**
25:25;26:10;37:15;
38:23;44:8;47:12;
50:5;74:7,23;80:11;
111:2;132:6
**extraordinarily (1)**
118:15
**extraordinary (1)**
122:1
**extrapolated (1)**
111:20
**extreme (1)**
122:23
**extremely (2)**
94:16;95:14
**eye (1)**
94:24
**eyes (1)**
65:15

**F**

**Fabricated (1)**
5:2
**face (2)**
42:4;59:19
**faced (1)**
109:21
**facilitate (1)**
109:20
**facilities (2)**
28:24;41:12
**facing (2)**
131:6,6
**fact (19)**
30:18,20;36:22;
40:7,9;51:4;57:6;
59:21;61:7;62:21;
67:14;85:11;100:18,
22;102:13,17;105:2;
111:15;129:1
**facts (5)**
46:19;85:7,16;
123:16;134:3
**factual (2)**
57:6;62:9
**fail (2)**
61:14;62:12
**failure (1)**

88:4
**fair (1)**
99:2
**fairly (3)**
33:6;72:10;99:3
**falls (1)**
28:10
**False (1)**
3:17
**familiar (1)**
108:5
**far (7)**
24:8;66:23;73:2;
101:6,11;123:9,10
**fashion (1)**
59:1
**favor (1)**
114:3
**favorable (1)**
110:24
**FDIC (7)**
35:24;48:14;53:19,
23;58:4;96:18,20
**Fed (24)**
41:11;43:17,21;
44:6;45:14,16,16;
48:18;49:8;50:5;
51:25;52:7,10;53:19,
19;63:13;65:4,6,11,
13;66:15,20,21;69:5
**Federal (30)**
3:21,21,23;5:10;
35:23;39:15;45:7;
46:9;48:2,11,16,21;
53:20,23;54:4,14,17,
21,23;55:1,9,12;58:4;
67:16;90:10;96:22,
23;107:23;115:15;
129:4
**Feds (1)**
115:14
**fee (4)**
80:5,24;103:12,14
**feel (5)**
27:25;122:11;
123:5;124:5;131:9
**Fees (7)**
2:14;38:21;79:19;
80:14;81:4;118:22,
24
**FELD (1)**
9:19
**few (4)**
86:21;88:4;95:24;
115:10
**FGIC (1)**
14:20
**fiduciary (1)**
49:7
**field (3)**
29:22;30:15;108:5
**Fifth (3)**
13:4,21;47:25

**Fiftieth (1)**
14:22
**fifty (1)**
102:5
**fifty-one (1)**
95:20
**fifty-three (2)**
102:7,10
**fighting (1)**
81:17
**Figueroa (1)**
7:4
**file (17)**
30:13;33:20,24;
42:5;73:8,11;79:8,
10;89:24;111:12,17;
121:7,20;122:22;
125:18;129:16;131:4
**filed (50)**
2:4,15;3:4;4:10,17;
5:3;18:5;24:19;25:5;
27:5;29:23;30:9;
36:19;41:8;42:25;
44:14,17;47:16;
69:17;72:18,21,23;
78:4;84:6,8,19;
85:24;86:3,5,13,20,
21;87:15,18;88:1,2,8;
89:4;90:8;91:11;
98:4,5;101:17;102:6;
111:12;115:22;
120:17,20;127:16;
128:17
**files (4)**
42:18;102:7;104:4,
7
**filing (12)**
25:9;26:1,4;28:4;
37:20;72:21;99:22;
111:14;112:3;
121:17;128:15;134:5
**filings (1)**
129:9
**final (7)**
44:16;101:4;117:9,
9,15,17;133:18
**finance (1)**
29:6
**Financial (10)**
8:14;30:19;57:13,
14;58:23;61:2;62:10;
68:23;93:16;125:17
**financing (4)**
28:24;41:12;43:17;
67:19
**find (5)**
94:17;110:7,12;
129:18;134:14
**finds (1)**
72:5
**fine (5)**
17:18;32:14;50:6,
6;75:4,21,25;77:9;

78:9;83:16
**fines (1)**
67:17
**finish (1)**
132:14
**firm (6)**
37:1;79:25;97:7,8;
108:25;109:1
**firms (1)**
43:15
**first (24)**
17:8;18:25;19:1;
24:25;30:8;39:3;
49:15;51:5;53:22;
55:25;57:25;60:2;
61:1;66:18;76:13;
86:20;87:15,16,24;
89:20;98:1;127:22;
130:5;132:21
**fishing (2)**
59:23;101:11
**five (2)**
47:25;64:17
**FL (1)**
16:4
**FLANIGAN (2)**
15:8;108:24
**FLOM (1)**
12:11
**Floor (5)**
7:22;11:21;12:5,
22;14:22
**Florida (2)**
118:12,17
**Flower (1)**
14:21
**Focus (9)**
3:3;16:14,17;
37:11;38:19;40:10;
46:6;78:14;119:19
**focused (2)**
37:7;38:21
**focuses (5)**
25:6;36:22;37:4;
38:25;40:23
**Foerster (7)**
17:8;24:17;25:10,
16;35:18;76:11;
83:23
**folks (1)**
109:15
**follow (1)**
101:22
**following (5)**
39:21;44:17,21;
98:5;111:1
**fondly (3)**
41:20,22,23
**forced (2)**
52:10;63:8
**Foreclose (4)**
4:24;89:7;102:9;
115:16

**foreclosed (3)**
81:21;96:7;132:23
**foreclosing (2)**
95:22;116:14
**Foreclosure (44)**
4:9;5:9;36:12;37:8,
12;38:21;39:19;41:4;
42:17,20;44:25;47:6,
18;58:14;62:19;
63:14;81:18,22,25;
87:3,6,12;88:24;
90:15;92:8;93:12;
94:17;95:21;97:3,6;
99:7,8,9;107:15,24;
108:7;114:2;118:11,
21;122:2;128:11;
131:3,6,7
**foreclosures (2)**
112:8,9
**forever (1)**
95:16
**forget (1)**
99:1
**form (9)**
28:20;29:4,15,16,
23;30:18;51:3;
100:18;133:18
**formal (1)**
52:3
**formed (3)**
97:11,15;124:3
**former (2)**
80:11;105:15
**forth (4)**
39:16;55:8;92:6;
124:17
**fortunately (1)**
66:13
**forty-nine (1)**
96:19
**forum (1)**
117:3
**forward (14)**
19:13;21:6;31:7;
43:20;45:18;68:13;
71:18,20,21;72:11;
75:10;76:2;113:7;
124:20
**found (5)**
46:6;68:1;71:24;
106:5;109:23
**foundation (1)**
19:25
**Four (3)**
12:13;25:11;116:1
**four-page (1)**
127:22
**fourteen (1)**
48:18
**FR (1)**
3:24
**fraction (1)**
97:5

**frame (1)**
36:11
**framework (1)**
36:11
**FRANKEL (1)**
8:2
**Franklin (1)**
127:23
**frankly (2)**
51:18;119:17
**fraud (6)**
90:10;113:13;
114:7;115:19;116:6,
12
**fraudulent (3)**
91:25;116:14,15
**FRB's (1)**
60:15
**free (1)**
110:25
**freight (1)**
39:1
**FREJKA (6)**
8:8;105:4;133:9,9,
11,12
**frequently (4)**
33:6;103:11;106:6;
109:13
**Friday (2)**
44:17;67:2
**front (4)**
25:19;52:14;66:17;
129:12
**fronts (1)**
18:3
**Frost (1)**
14:3
**fruitful (1)**
28:10
**full (2)**
50:13;112:7
**fully (1)**
20:24
**funds (5)**
55:22,23;56:1,13;
113:18
**further (12)**
18:21;20:4,24;
21:1;32:13;68:12;
88:25;89:1;110:16;
129:3,9,18
**Furtherance (1)**
5:10
**fussing (1)**
108:11
**future (4)**
24:9;38:12;84:20;
103:17

---

**G**

**GA (2)**
5:12;41:15

**Gary (4)**
2:15;4:10,17;17:7
**gather (1)**
129:15
**gave (1)**
120:9
**general (4)**
18:7;46:25;94:22;
105:16
**generic (1)**
122:17
**generically (1)**
69:23
**gets (2)**
95:14;111:20
**given (8)**
41:6;42:20;46:2;
65:9;74:21;85:11;
100:25;119:14
**gives (3)**
50:15;96:14;
117:11
**giving (1)**
46:16
**glad (3)**
19:11;100:9,9
**GLENN (2)**
11:15;32:20
**GMAC (45)**
2:18;3:11;5:1,1,2;
13:20;28:22;29:1;
36:10,11;37:12,23;
38:8;39:21,23;67:5,
15;69:25,25;71:24;
72:1,23;75:3;86:25;
87:3,20,21,23;88:1,8,
18,23,23;89:4,8;
90:25;91:23;92:13;
95:18,24;115:3,11;
116:13;118:24;127:4
**GMAC's (2)**
41:3;71:21
**goal (1)**
99:18
**goes (2)**
113:7;124:20
**GOLDEN (6)**
9:24;22:5,6,7,16,24
**Gonzalez (1)**
109:21
**Good (20)**
17:7;19:5,23;
24:16;28:7;33:16;
35:17;52:18;69:14;
77:14;101:18;
102:11;106:1;
114:19;118:13,14;
119:25;120:16;
121:7;124:15
**GOODCHILD (10)**
8:25;33:13,16,17,
23;34:1,3,9,16,20
**GOTSHAL (2)**

13:2;35:2
**GOTTLIEB (2)**
  10:11;69:15
**governmental (1)**
  44:7
**Governors (3)**
  39:15;46:24;47:1
**grant (1)**
  92:7
**granted (7)**
  20:23;41:14;71:23;
  78:23;81:6;97:18;
  101:24
**Granting (1)**
  5:12
**grants (1)**
  73:6
**GRAY (1)**
  14:11
**great (1)**
  134:2
**greater (1)**
  29:5
**GREGORY (2)**
  8:9;52:18
**Gross (1)**
  131:18
**ground (2)**
  118:17,23
**Grounded (1)**
  3:20
**Group (5)**
  10:3;21:18,21;
  34:17;98:2
**groups (1)**
  18:17
**GSEs (1)**
  43:24
**Guarantee (2)**
  13:3;35:3
**guess (5)**
  39:12;47:22,24;
  84:19;96:2
**guidance (2)**
  73:4,11
**GUMP (2)**
  9:19;22:7

**H**

**half (1)**
  97:9
**Hamilton (4)**
  4:8;10:11;36:25;
  69:15
**hamper (1)**
  110:2
**HANCOCK (1)**
  13:24
**hand (2)**
  29:4;82:16
**handed (3)**
  40:25;127:22;

134:7
**handing (1)**
  46:3
**handle (1)**
  77:12
**handling (1)**
  75:12
**handout (1)**
  64:13
**happen (6)**
  20:11;30:7;43:3;
  52:5,15;59:16
**happening (4)**
  20:11;21:22;43:19;
  118:23
**happens (3)**
  42:14;92:24;
  118:17
**happy (3)**
  44:7,7;85:1
**hard (1)**
  26:11
**HARRISON (1)**
  10:8
**hate (1)**
  133:23
**HAUER (1)**
  9:19
**havoc (2)**
  100:14,18
**head (2)**
  93:10;111:23
**heads (1)**
  37:10
**hear (20)**
  24:11;30:10;43:24;
  50:7;52:16;67:24;
  69:17;72:15;93:20;
  101:7,8,8,16,17;
  103:22;112:15;
  118:14,16;121:15;
  124:12
**heard (28)**
  19:4;25:7;33:14;
  34:22;53:6;66:6;
  69:13;70:5;80:17;
  83:17;105:3;110:19,
  23;112:20;114:18;
  116:18,22;119:24;
  120:4,8,10;123:15;
  124:13;125:2,2;
  133:4,7,16
**Hearing (28)**
  4:25;17:20;18:11;
  26:5;27:16,18;34:13,
  14;35:13;40:11;
  49:11;56:9;66:8,17,
  22;68:5,7;69:10;
  74:16;76:23;83:4;
  84:24;112:16;115:7,
  10,10;119:17;134:7
**hearings (3)**
  81:23;85:25;

123:15
**heart (1)**
  41:7
**held (1)**
  52:11
**HELOC (2)**
  98:6;132:20
**help (3)**
  98:19;122:14;
  128:9
**helpful (3)**
  65:17;100:20;
  103:18
**Here's (3)**
  29:19;40:13;81:12
**HERRINGTON (2)**
  7:2,11
**herself (1)**
  95:4
**high (1)**
  67:3
**higher (1)**
  29:7
**highlighting (1)**
  28:17
**highly (1)**
  65:15
**hire (1)**
  94:20
**historical (1)**
  80:21
**history (3)**
  79:13;111:10,14
**hit (1)**
  111:22
**Hoc (2)**
  10:3;21:18
**HOFER (1)**
  12:16
**Hoffman (3)**
  134:10,11,19
**holders (5)**
  82:22;105:25;
  106:20;131:20;132:1
**Home (15)**
  5:3;87:4,7;91:24;
  92:9;98:1;106:24,25;
  107:1,4;109:7;111:7;
  121:14,22;124:9
**homeowner (3)**
  93:24;95:2;119:11
**homeowner/borrower (1)**
  130:18
**Homeowners (41)**
  5:17;12:3,20;
  81:16,19,20;82:7;
  94:10,17,20,25;95:5,
  7,15;96:3,8,10,17;
  98:3;99:2;101:1,2,
  15;103:2;104:15;
  105:5,7,18;113:21;
  116:9,18;121:15,25;
  122:5,12,19;123:2,6,

21;124:7;125:5
**homeowners/borrowers (1)**
  131:1
**homes (7)**
  81:20;96:7;99:6;
  102:2;116:11,12;
  119:5
**Honor (240)**
  17:7,8,20;18:6,9,
  11,16,18,24;19:1,2,5,
  22;21:7,11,20;22:6,8,
  10,24;23:1,13;24:1,4,
  14,16,22;25:6,8,19;
  26:6;27:2,6,15;28:3,
  6,7,19;29:13;30:17;
  31:3,11,25;32:12,18,
  23;33:11,13,16,19,
  23;34:1,3,9,16,16,20,
  22,25;35:22;36:7;
  37:2,7,13,20;38:16,
  19;39:2,12;40:25;
  41:14,20;42:13;
  43:12;45:1,21,23;
  46:1,4;47:4,11,11,15;
  48:17,23,25;49:1,17,
  20;50:20;51:2,10,18,
  24;52:8,18,21;53:6,
  17,22;54:25;55:25;
  56:7,16;57:5,16,25;
  58:5;59:25;61:18;
  62:21;63:22;64:9;
  65:7,17,20;66:18,25;
  67:21;68:19;69:5,14,
  17;70:7,14,16;71:3,6,
  16;72:17;75:21;76:4,
  12;77:2,14;78:10,20,
  24;79:3;80:18,20;
  81:1,7,9;82:14,19;
  83:13,16,20,22;
  84:13;85:1;86:17,19;
  87:5,8,14;90:14;
  92:18;93:5,7,25;
  94:5;99:16;101:18,
  20;102:4,13,18;
  103:5;104:1,16,20;
  105:2,21,25;106:4,
  13,14;107:7,11,12,
  19;108:1,5,15,19;
  109:3,6,14,18;110:5,
  9,16,20,22;111:8,22,
  22;112:21;113:3,17;
  114:19;116:23,25;
  118:2,10;120:1,7,11,
  16;121:3;124:15,17;
  125:3;126:3,8,18;
  127:2,10,13,16,18;
  128:4,10;129:20,23;
  130:10,20;131:14,16;
  132:11,16,24;133:3,
  9,23;134:2,17,20
**Honor's (5)**
  23:16,21;28:14;
  41:7;131:17

**HOOD (9)**
  15:19,24;71:9,9;
  72:17;73:13,19,25;
  76:7
**hoops (1)**
  64:12
**hope (2)**
  42:19;98:9
**hopeful (3)**
  33:5;83:3,5
**hopefully (13)**
  19:20;23:23;26:6,
  23;27:10,11;32:6;
  66:5;68:4;100:16;
  102:14;122:21;
  133:19
**Hopper (10)**
  2:8;16:15;116:23,
  23,24,25;117:15;
  118:2,7,8
**Hopper's (1)**
  76:18
**HOROWITZ (53)**
  8:9;52:18,19;53:3,
  9,17;54:2,7,13,16,21,
  25;55:16,17,21,25;
  56:7,9,12,16,22;57:5,
  12,24;58:11,16,17;
  59:25;60:7,10,17,23;
  61:1,22;62:1,18,20,
  25;63:2,7,18,22;64:2,
  4,6,9,11,15,25;65:3,5,
  7,17
**horse (1)**
  29:18
**hotline (6)**
  125:8,9,11,11,13,
  16
**hour (1)**
  97:8
**hourly (1)**
  97:9
**hours (1)**
  105:4
**house (1)**
  102:9
**HSBC (1)**
  10:20
**HUD (2)**
  3:21;115:22
**Hudson (3)**
  4:16;37:2,3
**Huntington (1)**
  127:24

**I**

**idea (1)**
  128:24
**identified (2)**
  49:25;58:25
**identify (3)**
  17:22;35:1;49:24

**identifying (1)**
127:8
**ignore (1)**
49:4
**ignores (1)**
67:14
**ignoring (1)**
115:13
**II (1)**
5:11
**III (1)**
8:25
**IL (1)**
13:13
**illegal (1)**
91:25
**Illegally (1)**
5:3
**imagine (1)**
50:6
**imbalance (1)**
47:16
**immediate (1)**
95:12
**impact (1)**
32:9
**important (15)**
23:10;24:7,9;28:7;
32:6;52:25;53:18,22;
89:2;95:14;111:5;
118:15;130:25;
131:5,9
**impose (5)**
48:22;50:13;60:21,
24;102:23
**imposed (5)**
39:15;58:23;59:6;
60:19;61:1
**impression (1)**
129:7
**inadvertent (1)**
113:10
**inappropriate (2)**
50:12;69:1
**inartful (1)**
96:3
**Inc (3)**
8:14;13:3;35:3
**inclined (1)**
100:13
**include (5)**
37:5;9;51:14;
57:19;100:1
**included (5)**
60:16;91:9,13;
102:16;107:16
**includes (1)**
57:20
**Including (10)**
2:14;18:22;23:19;
29:24;31:17;33:6;
88:24;89:6;115:14;
124:21

**incomplete (1)**
59:2
**incorporate (1)**
29:16
**incorporated (1)**
19:20
**increase (1)**
110:2
**Incurred (4)**
2:14;31:9;55:13;
79:6
**indeed (1)**
62:10
**indemnification (3)**
31:9,16;59:6
**indemnify (1)**
117:19
**indenture (1)**
104:21
**Independent (15)**
2:15;11:3;55:4;
57:12;67:6;79:6,17,
22,22;80:1,3,11,12;
81:5;116:20
**indicate (4)**
27:3,13;55:13;
74:17
**indicated (7)**
19:16;23:8;85:24;
99:11;102:1;123:14;
130:17
**indicates (1)**
86:15
**indicating (2)**
74:8;75:9
**indication (2)**
83:17;130:5
**indifferent (1)**
62:13
**individual (6)**
105:11;106:7;
107:19;109:24;
119:11;133:22
**individually (2)**
94:21;123:1
**information (26)**
22:13;34:6;45:6,7;
46:9,10,14,16,17,18,
21,22,22;64:18,23;
65:9,14;66:13;73:22;
80:20,22;93:13;
109:11,15;122:14;
125:4
**informative (1)**
104:23
**inherent (1)**
124:6
**in-house (1)**
52:7
**initial (3)**
61:24;82:2;117:16
**initially (1)**
110:21

**initiated (1)**
90:19
**injunctive (1)**
85:9
**inquired (1)**
133:13
**inquiry (2)**
62:22;102:2
**insert (1)**
123:3
**insisted (1)**
59:10
**insistence (1)**
36:1
**instance (3)**
61:1;117:7;123:11
**institutional (1)**
24:24
**institutions (1)**
93:16
**insured (1)**
35:4
**insureds (1)**
113:20
**insurer (1)**
35:3
**intended (3)**
23:16;44:15;109:8
**intent (4)**
89:6;101:12,13;
117:10
**intention (4)**
44:22,24;52:7;94:9
**intentional (1)**
67:17
**interest (4)**
88:22;103:19;
104:14;126:22
**interested (1)**
130:2
**interests (7)**
81:19;82:7;99:5;
131:25;132:6,7,22
**interfere (2)**
74:23;130:12
**internally (1)**
23:22
**interpreted (2)**
47:2;67:19
**interrupt (1)**
32:24
**intervene (1)**
20:8
**interviewed (1)**
79:17
**into (35)**
19:20;20:23;21:1,
20;23:3;28:24;29:14;
30:11;38:6;48:1;
50:12,19;53:10,19,
20,20;54:23;55:2,6;
59:4,5;60:10;61:9;
62:7;63:8;80:3;

81:10;110:1;118:25;
119:4;121:23,23;
122:21,22;130:23
**introduce (1)**
93:25
**inure (1)**
29:17
**investigate (1)**
93:15
**investigating (1)**
62:6
**investigation (3)**
53:24,25;63:9
**investigations (1)**
63:24
**investors (2)**
24:24;117:17
**invited (1)**
75:2
**inviting (1)**
74:7
**invoiced (1)**
41:25
**involve (2)**
53:10;103:2
**involved (9)**
24:25;56:3;61:19;
94:9,13;95:20;97:4;
100:19,23
**involvement (1)**
20:11
**involving (2)**
28:8;84:20
**irate (2)**
84:4,10
**issue (27)**
22:20;25:1,2;
39:20;43:21;50:9;
59:4,5,16;61:4;65:8;
66:8;69:2;72:5,16,
25;84:20;103:12;
108:14;109:21;
111:2,5,8;113:25;
119:7;123:24;129:3
**issued (3)**
23:9;35:23;92:11
**Issues (53)**
4:9;17:23;18:7;
19:13,14,19,25;
25:14,17,20,24;26:3,
12;28:14,18;31:4,8;
32:6;36:16;39:18;
52:21;57:6;59:19,21;
62:9;69:19;74:20;
75:12;79:21;81:25;
95:12,12;111:5;
112:24;113:25;
114:14,15;115:10,11;
116:17;117:3,6,7,21;
118:4,15,20;121:24;
123:2,17;124:1;
132:20;133:18
**It's (1)**

68:17
**item (4)**
17:9;21:9;42:11;
79:4
**items (4)**
35:19;87:25;
132:16,17

## J

**Jackson (18)**
5:3,4;14:2;16:16;
83:15,15,24;84:4,16,
23;85:5,24;86:3;
88:13;89:7;92:6,12;
111:11
**Jackson's (4)**
87:4;88:10;91:21;
111:10
**January (4)**
56:9,10;88:2;90:6
**JAY (1)**
11:24
**Jefferson (1)**
2:19
**Jeffrey (2)**
115:17;116:4
**JESSICA (1)**
13:16
**JF (2)**
16:17;78:14
**job (2)**
74:24;106:1
**JOHN (3)**
8:25;10:24;33:16
**Join (2)**
5:15,17
**joinder (2)**
112:22;113:3
**Joinders (1)**
4:2
**joins (1)**
94:2
**joint (12)**
24:21;36:24;40:2,
7,9;43:4,6;53:4,6,13;
59:11;60:24
**jointly (2)**
39:23;49:5
**JON (1)**
13:25
**JONATHAN (1)**
12:16
**JONES (1)**
14:19
**JOSEPH (1)**
11:7
**JPMorgan (1)**
11:19
**judge (31)**
52:14;70:24;71:18,
20,23,24;72:5,11,24;
73:3,15;74:1,2,10,15,

16,22;75:6;76:9;
89:10,11,15,18;
109:21;124:8;129:8;
131:18;132:2;134:9,
11,18
**judge's (1)**
89:21
**Judgment (12)**
3:15,20;56:18;
71:21,23,24;72:7,17;
74:14,18;94:18;
128:23
**judgments (1)**
94:16;101:4
**July (2)**
24:21;127:25
**jump (2)**
20:3;97:13
**June (2)**
90:16,17
**Junior (3)**
10:3;18:17;132:22
**jurisdiction (9)**
54:2,5,5,15,17;
58:4;60:16;61:12;
63:13
**JUSTICE (5)**
7:19;36:2;48:1;
64:4;96:24

**K**

**Kansas (1)**
15:6
**keep (2)**
122:16;125:9
**KEIP (3)**
23:3,17,20
**KEITH (1)**
14:16
**KENNETH (4)**
8:10;16:9;19:5;
114:22
**key (2)**
19:25;95:12
**KIBLER (1)**
10:24
**kind (2)**
67:15;115:12
**kinds (2)**
114:13;121:21
**KIRKLAND (2)**
8:13;51:11
**KISSEL (1)**
9:2
**Klein (42)**
83:19,22,22;84:13,
17;85:1;86:11,12,14,
17,19;87:2,5,8,14;
89:1,12,15,18,20,23;
90:1,3,6,8,14,16,18,
21,25;91:3,13,15,19;
92:17,18,21,23;93:1,

4;111:9,13
**knew (1)**
36:19
**knowing (1)**
106:22
**knowledge (2)**
47:12;50:20
**knowledgeable (1)**
105:19
**knows (1)**
104:20
**KRAMER (10)**
8:2;12:25;19:6;
52:19;77:15;80:18;
94:1;97:7;103:24;
133:9

**L**

**laid (1)**
74:18
**language (4)**
53:5;94:15;121:23;
123:4
**large (4)**
61:20;81:23;96:17;
102:20
**largest (2)**
47:25;102:5
**LARRY (1)**
13:15
**last (19)**
18:11;23:2;28:19;
36:18;44:13,17;46:6;
49:10;51:24;58:20;
66:13;74:15;77:19;
92:12;98:23;112:3;
117:13;124:3;132:16
**late (1)**
115:24
**later (4)**
32:2;44:18;88:4;
116:2
**latest (3)**
86:9;91:21;94:8
**latitude (1)**
85:12
**laundering (1)**
113:10
**LAURIE (1)**
9:8
**LAW (9)**
12:2;16:2;43:15;
57:1,2,2;92:14;99:9;
106:7
**lawfully (1)**
113:12
**lawsuit (1)**
90:9
**lawsuits (1)**
99:14
**lawyer (5)**
45:3;105:17;

114:23,25;116:11
**lawyers (5)**
34:17;105:15;
118:14;122:6;123:22
**LAY (3)**
15:19;19:24;32:10
**lead (2)**
73:23;110:1
**leads (1)**
61:4
**learned (2)**
84:11;106:25
**least (15)**
40:2;41:1;44:3;
56:6,14;58:6;59:15,
19;68:24;84:6;86:15;
107:18;128:2;129:7;
130:18
**leave (3)**
33:23;82:15;
126:24
**Lee (27)**
2:15;4:10,17;17:6,
7,7,19,20;18:6,14,16,
20;19:1,6,16;21:7,8,
10;22:25;23:1,6,13;
24:1,4,15;33:12;
34:21
**LEGAL (7)**
15:10;23:19;46:12;
66:10;85:7,16;
125:17
**legitimate (1)**
22:16
**lender (3)**
28:25;87:21;
125:12
**lenders (1)**
87:20
**lender's (1)**
29:1
**lengthy (1)**
104:19
**less (1)**
43:15
**letter (14)**
39:17,22,24;43:3;
53:4,4,14;65:24;70:2,
24;74:3;107:16,18;
125:5
**letters (1)**
115:18
**letting (1)**
115:25
**level (4)**
29:22;30:15;33:7;
108:4
**LEVIN (7)**
8:2;19:6;52:19;
77:15;80:18;103:24;
133:9
**Lewis (17)**
3:16;8:20;33:17;

127:4,4,7,7,24;128:1,
5,14,23;129:4,9,16;
133:24;134:6
**Lewis's (1)**
134:8
**Lexington (2)**
8:15;9:13
**liability (8)**
36:24;40:3,7,10;
43:4;53:14;59:11;
60:24
**liable (3)**
39:23;49:5;67:12
**Liberty (1)**
10:13
**Liens (2)**
4:24;82:24
**life (2)**
99:19;128:25
**lift (12)**
81:24;86:5;92:4;
94:15,21;99:10,22;
103:3;108:6;123:12;
132:17,21
**lifted (4)**
75:9,17;88:23;
90:23
**lifting (2)**
74:8;75:8;91:10
**light (2)**
51:1;126:8
**LIGHTNER (4)**
10:16;69:14,15;
70:4
**likely (3)**
56:6;66:7;98:16
**limit (3)**
65:14;103:10;
121:6
**limitations (1)**
20:16
**limited (6)**
25:5;34:2;69:18;
78:4;79:9,10
**limits (4)**
102:23;120:20,21;
125:20
**line (3)**
42:11;71:14;95:10
**lines (1)**
64:17
**liquidate (1)**
113:12
**liquidated (3)**
113:11;114:3,9
**liquidation (1)**
113:18
**list (3)**
102:5,16;109:13
**listed (2)**
17:12;133:5
**listening (1)**
66:22

**litigant (5)**
84:21,23;114:25;
119:3;128:25
**litigants (2)**
85:12;115:12
**litigated (1)**
34:10
**litigating (1)**
62:6
**Litigation (3)**
2:10;70:12;72:14
**litigations (1)**
119:11
**litigator (3)**
127:9;129:5,11
**little (6)**
44:1;49:14;67:20;
80:4;102:14;123:3
**living (1)**
42:24
**LLC (9)**
2:16,18;3:3,11;
4:11,18;5:22;15:19;
78:14
**LLP (23)**
2:9;4:8,16;5:9;7:2,
11;8:2,13,20;9:2,11,
19;10:2;11:2,10,18;
12:11,19;13:2,10,19;
14:2,11
**loan (14)**
36:16;57:22;58:1;
81:18;86:25;87:22,
23;88:1,10,10,15,17;
104:7;112:5
**loans (9)**
58:7,7,13,15;
62:17;88:20;95:18;
99:6;112:6
**Local (5)**
4:7,15;76:22;
85:20;86:4
**long (4)**
22:6;66:23;68:3;
125:10
**longer (3)**
81:13;96:8;121:7
**Look (27)**
22:15;36:17;39:12,
20;43:20;44:1;54:1;
59:2,12,23;64:12;
67:22;68:20,22;
74:14;79:14;91:17,
18;98:7;100:20,24;
102:9;106:9;123:1;
128:19;129:1;130:24
**looked (4)**
17:11;39:22;98:1;
123:16
**looking (6)**
45:11;82:6;100:17;
102:24;106:15;112:2
**looks (1)**

Min-U-Script®                   eScribers, LLC | (973) 406-2250
                      operations@escribers.net | www.escribers.net
                                                        (12) judge's - looks

60:11
**Lorenzo (2)**
35:17;76:10
**Los (3)**
7:6;14:23;131:18
**lose (1)**
116:12
**lose-lose (1)**
42:5
**losing (1)**
49:9
**losses (1)**
31:9
**lost (2)**
106:22;116:11
**lot (19)**
19:14;22:4;31:1;
39:6;43:9;47:19;
52:15;68:20;81:20;
96:6;98:24;111:9,13,
18;116:5,9,13;
121:16,24
**lots (2)**
26:24;57:6
**loud (1)**
69:17
**loyalty (1)**
94:25
**LP (2)**
9:20;110:10

## M

**Mahoney (1)**
89:18
**main (1)**
65:21
**majority (1)**
114:4
**makes (4)**
64:15,19,21;95:19
**making (7)**
19:7;51:20;52:12;
56:19;94:2;122:16;
124:19
**Management (1)**
9:20
**MANGES (2)**
13:2;35:2
**MANNAL (33)**
8:7;80:17,18,18;
103:23,24,24;104:8,
10,16;105:25;106:13,
16,18;107:10,19;
108:2,3,15,24;
109:13,18;110:5,9,
13,14,16;111:7;
126:5,7,7,15;130:5
**manner (1)**
22:19
**Many (8)**
81:21;95:6;96:17,
18;115:13;118:16;

129:25;131:5
**marathon (1)**
24:24
**Mari (1)**
70:17
**Marinuzzi (108)**
23:7;35:16,17,17,
22;36:7;37:2,7,20;
38:3,16,18;39:2,8,12;
40:25;41:23;42:8,12,
16;43:12;46:1,3,22;
47:10,15;48:4,7,12,
14,17,23,25;49:17,
20;50:3,20;51:2,23,
24;52:5;63:23;64:8;
66:11,13;67:10;
68:19;69:5,8,10,12;
70:6,7,10,14,16,18,
21;76:10,10,21;77:2,
6,9;79:2,3,10,13;
80:2,8,10;81:7;
82:16;83:14,16,19;
93:4,5,21;107:12,21,
25;110:18,20;126:2,
3,6;127:2,7,10,13,15,
18;128:4,7;131:16,
22;132:4,10,13,16,
24;133:3,23;134:1,
17,20,23
**MARK (4)**
10:16;69:14;97:19;
98:11
**Market (1)**
8:22
**Marketing (1)**
110:10
**Martin (7)**
127:19;128:6,7,10,
16;129:10,20
**master (1)**
25:12
**MASUMOTO (34)**
7:25;23:21;24:2,4,
14;78:18,20;80:25;
81:1;82:8;97:23,24;
101:16,18,19;102:1,
13;103:5,20,21;
106:2,4,12;126:17,
18,21,25;129:21,22,
22;130:14,20;131:13,
14
**materials (1)**
40:12
**Matt (1)**
118:11
**matter (24)**
25:7;28:1,8,10;
31:15;34:4,10;40:4;
66:6;68:18;70:25;
71:23,25;74:14;
82:19,20;83:9,15;
85:18;94:1;122:12;
125:24;127:1;129:14

**matters (9)**
17:12;49:8;70:10;
76:12;77:1,19;79:4;
127:4;133:6
**MATTHEW (2)**
16:2,6
**May (40)**
4:10,17,22;23:10;
33:13;36:15;38:12;
40:13;43:5;46:10,19;
50:24;51:16;52:10;
58:18,19;59:11,12;
63:12;70:19,23;
85:11;90:22;94:23;
96:4,5;99:16;100:14;
106:1,18;111:19,19;
112:14,18;115:24;
116:6;119:17;123:8;
126:8;129:6
**Maybe (9)**
17:13;40:10;59:2;
68:15;94:11;111:12;
113:24;123:3;126:3
**MEAGHER (1)**
12:11
**mean (27)**
20:2;24:6;32:13;
39:3;40:5;45:10;
48:24;50:7;56:25;
57:22;58:17,18;60:9;
72:22;75:14;81:16;
84:25;96:12;97:12;
98:9,17,21,22;99:21;
107:22;128:19;132:5
**means (1)**
91:25
**meet (2)**
33:6;71:17
**meet-and-confer (1)**
44:21
**meeting (6)**
19:1;33:6;82:15;
88:14;102:18,21
**meetings (11)**
18:12,15,21,25;
19:16;21:3;104:18,
19,19;108:23;109:5
**meeting's (1)**
18:16
**Mellon (2)**
11:11;32:21
**member (4)**
80:11,12;126:14,
15
**members (7)**
79:7,17,22;97:20;
98:1;130:1;131:25
**membership (1)**
130:11
**mentioned (3)**
51:25;102:15;
111:7
**merits (1)**

124:18
**message (2)**
52:6;125:16
**metrics (3)**
23:15;24:7,8
**micromanaging (1)**
30:23
**mid (1)**
115:23
**might (13)**
50:18;72:14;93:15;
103:16,16,17;110:23;
111:15;112:7;119:2,
16;126:4;128:24
**million (11)**
39:6,6,25;40:1;
41:24;43:13,14;56:3;
67:17;104:10,13
**mind (1)**
22:2
**mindful (4)**
123:20,23;128:25;
132:4
**minimize (1)**
19:8
**Minneapolis (1)**
15:14
**minute (5)**
25:19;50:8;81:11;
82:1,12
**Mirant (1)**
110:9
**mirroring (1)**
44:23
**misled (1)**
72:20
**misnomer (1)**
96:11
**misplaced (1)**
62:4
**missed (4)**
17:14;88:9;89:3;
112:13
**missing (1)**
95:24
**misstated (1)**
101:13
**mistaken (1)**
129:6
**misunderstanding (1)**
67:7
**MN (1)**
15:14
**MO (1)**
15:6
**modifications (1)**
75:24
**MOLDOVAN (1)**
11:7
**moment (3)**
55:12;82:14;110:6
**monetary (3)**
85:9;99:12;108:9

**money (10)**
39:7;43:9;47:19;
66:16;96:4;111:11,
16;125:18;131:7,8
**monitor (2)**
47:23,24
**monitoring (1)**
63:10
**monolines (2)**
18:23;104:22
**monstrosity (1)**
120:21
**month (4)**
43:10,15;44:14;
90:8
**monthly (2)**
42:1;43:14
**months (4)**
28:9;86:21;88:4;
116:1
**more (18)**
21:5;27:13;38:13;
42:4;44:1;53:18;
74:5;82:3;100:13,21;
102:14;108:4;
110:24;112:11;
117:9,11;127:8;
128:14
**MORGAN (2)**
8:20;33:17
**morning (15)**
17:7;19:5;24:16;
25:3,6;33:16;35:17;
52:18;69:14;70:23;
71:1;76:19;77:14;
101:18;124:15
**morning's (1)**
25:22
**MORRISON (13)**
11:2;17:8;24:17;
25:10,16;35:18;
76:11;79:25;80:21,
23;81:2,5;83:23
**Morrow (3)**
2:3;16:17;78:14
**Mortgage (27)**
2:18;3:11;5:1,2;
13:20;16:18;28:22;
36:10,11,12,13;
37:12,23;38:8;39:21,
23;67:5,15;69:25,25;
87:23;98:6;115:20;
116:16;121:14;
127:4;131:7
**mortgagee (1)**
132:21
**mortgages (2)**
107:13;132:21
**Mortgage's (1)**
29:1
**most (2)**
97:9;103:6
**mostly (2)**

37:7,11
**Motion (97)**
2:7,12;3:14,15,20;
4:3,20,25;5:6,14,14,
15,17,17;23:11;25:5;
36:8;37:21;41:8;
42:5,25;44:14;47:11;
52:22,23,23,24;67:1;
71:21;72:7,21;73:8,
15;74:4,14,18,25;
75:1,7;76:18,20,24;
80:3;81:2,8;82:21;
83:20,24;84:5,6,8,9,
21;85:15,19,23,24;
86:1,3,7,7,9;88:12;
89:4,9,24;90:4,12;
91:6,9,15,21,25;92:2,
3,5,5,16;93:6,9,14;
96:13;97:18;101:21,
24;102:3;104:3;
105:9;109:3;117:24,
25;121:11;123:12;
124:18;128:20;
130:25;131:19
**motions (11)**
78:23;81:24;84:6;
99:10,22;103:3;
128:20;129:19;
132:18;133:22,24
**movant (4)**
93:9,19;116:25;
117:1
**movants (11)**
93:24;98:2,2,3;
102:3,3;105:10;
112:2,4,6;125:9
**move (2)**
19:13;94:21
**moved (5)**
68:6;78:3;88:9;
89:7;128:23
**moving (6)**
21:6;93:20,22;
94:15;115:13;132:21
**Mrs (1)**
128:5
**much (23)**
21:8;22:4;28:6;
42:6;43:10;47:19,20;
53:17;64:1;67:20;
68:21;71:11;76:8,14,
17;78:25;81:13;
94:10;101:15;
111:11;126:1;
129:21;134:21
**multiple (1)**
96:19
**must (4)**
39:21;41:9;57:20;
82:1
**myriad (1)**
90:10

## N

**NA (4)**
9:3,12;11:19;
124:16
**NACBA (3)**
100:4,9,23
**NAFTALIS (1)**
8:2
**nail (1)**
111:22
**name (6)**
37:1;49:24;89:21;
114:21;118:10;
120:16
**narrowing (1)**
95:23
**National (2)**
100:18;127:24
**Nationstar (10)**
13:11;25:12;28:8,
20;29:25;30:1,3;
31:15;67:20,24
**Nationstar's (1)**
31:7
**nature (2)**
32:7,8
**near (1)**
97:16
**necessarily (2)**
130:20;131:11
**necessary (4)**
22:14;75:23;
106:20;113:16
**necessity (1)**
112:23
**need (25)**
26:18;27:13;38:7,
8;39:17;60:1,2;
61:12,13;64:23,25;
68:13;73:4;75:22;
82:15;94:24;99:12,
23;108:6,18;113:1;
117:2;118:13;
122:19;130:19
**needed (1)**
100:14
**needs (11)**
38:5;45:19;47:8;
69:7;74:5;81:16;
98:23;111:4;114:8;
117:2;132:22
**negative (1)**
64:21
**negotiate (5)**
45:16;99:25;101:5;
123:3;133:2
**negotiated (5)**
24:23;68:16,17;
107:7;111:1
**negotiating (2)**
94:11;105:5

**negotiation (8)**
17:10,23;60:2;
68:20;94:13;109:21;
113:17;120:6
**negotiations (6)**
17:24;22:10;24:25;
28:9;37:25;114:1
**net (1)**
104:11
**neutral (1)**
101:20
**New (22)**
5:24;7:14,23;8:5,
16;9:5,14,22;10:5,14,
22;11:5,11,13;12:6,
14,23;13:5;14:14;
22:2;32:20;124:23
**news (1)**
28:7
**next (10)**
19:24;21:9;23:23;
24:15;26:25;27:9;
33:12;39:4,4;132:15
**Nicole (1)**
70:24
**night (1)**
49:10
**night's (1)**
112:3
**nodding (1)**
37:10
**noncompliance (1)**
43:7
**nondebtor (12)**
37:6,17,19;38:14,
25;39:11;40:23;
51:17;57:19,21;
58:22;99:8
**none (1)**
63:16
**nonjudicial (1)**
114:2
**non-judicial (3)**
87:3,6;92:8
**noon (2)**
27:5;33:25
**Nora (19)**
15:11,16;95:9;
112:21,21;113:3,15,
16;114:17;120:1,1,3,
3,3,6,8,11,12,14
**normally (2)**
64:18;130:12
**Norman (1)**
70:11
**North (1)**
13:21
**note (3)**
18:7;72:25;114:11
**noted (1)**
129:11
**Noteholders (2)**
10:3;14:12

**notes (6)**
18:22;21:18;41:1;
49:23;69:16;129:10
**nothing's (1)**
108:16
**notice (18)**
24:12;27:3;52:15;
83:4;84:24;89:4;
91:2,10,12;95:14,23;
107:3,8,17,24,25;
112:14;129:18
**notices (6)**
88:19;89:3;112:17;
122:14,15,15
**notified (1)**
89:6
**notify (1)**
95:17
**notorious (1)**
41:17
**November (4)**
21:2;95:13,16;
116:8
**nowhere (1)**
97:16
**number (19)**
17:3;52:21;76:17;
81:24;82:20;85:3,10;
86:2,7,8;90:11;92:1;
95:8;102:20;112:3;
127:24;130:2;
134:10,10
**numbers (1)**
109:14
**numerous (2)**
34:3;105:4
**Nunc (4)**
2:4;3:4;4:10,16
**NY (19)**
5:24;7:14,23;8:5,
16;9:5,14,22;10:5,14,
22;11:5,13,22;12:6,
14,23;13:5;14:14
**NYHAN (1)**
13:15

## O

**object (1)**
32:23
**objecting (4)**
26:24;104:4,5;
124:17
**objection (18)**
25:5;26:22;27:22,
24;32:24;33:21;35:6,
7;51:12;69:18;78:4,
20;79:9;80:22;81:1;
83:2,4;126:12
**Objections (22)**
4:2;24:19;25:9,22;
26:4,9;27:4,12;28:4,
11;30:10;31:5;32:15;

33:5;35:5,9,12;47:10,
16;78:2;94:12;
133:20
**obligated (6)**
45:11;55:18;69:20,
21,23;117:19
**obligates (3)**
57:7,7,8
**obligation (8)**
37:23;39:16;55:13,
24;58:23;59:6;60:21;
67:7
**Obligations (15)**
5:10;31:7,16;
36:25;39:14,24;
41:16;42:16;57:14;
60:16,20;62:23;
63:24;64:6;67:13
**Obtain (1)**
4:22
**obtained (1)**
113:12
**obviously (10)**
20:20;23:9;29:25;
53:22;55:2;86:9;
93:8;98:17;133:17;
134:18
**OCC (1)**
48:19
**occasions (1)**
129:25
**occur (4)**
20:5;56:6;87:7;
90:15
**occurred (1)**
74:21
**o'clock (1)**
66:20
**October (24)**
19:2;25:8,15;26:2,
5,17,25;27:5,6,18,22,
23;66:2;68:3,7;88:1,
3,7,10;89:4;90:13;
91:1;115:7,10
**odds (1)**
75:16
**off (3)**
23:17;76:17;
127:22
**Office (9)**
7:20;46:25;83:19;
101:19;111:25;
115:23,25;129:22;
131:24
**officers (1)**
63:20
**OFFICES (1)**
16:2
**Official (7)**
2:1,5;3:1,5;5:18;
8:3;110:10
**often (1)**
104:23

**Ohio (8)**
3:24;105:16;
127:11,23;128:3,12;
129:11;134:9
**ombudsman (2)**
100:13;121:23
**omnibus (8)**
24:21;28:20,22;
29:4,15;30:8,18;
81:23
**once (1)**
114:12
**One (59)**
9:4,21;10:13;
13:12;22:10;23:1;
25:19;29:14;31:8,18;
32:21;33:18;41:1,18;
50:6;66:25;67:17;
69:19;75:18,22;
77:11;81:23;82:6,8,
14,19;84:6;85:10;
86:20,21;87:22,22;
88:14;89:16,20;95:2,
12,19;96:1,25;97:25;
99:20;101:3,9;
102:10,19;113:25;
119:1;123:18;127:8,
19;128:2,14,16;
129:7;130:18;134:1,
7,18
**ones (2)**
62:25;76:14
**online (1)**
36:5
**only (21)**
20:9,13,17,23;
25:6;41:3;54:10;
65:8,15;72:5;73:17;
76:22;83:2;95:5;
107:4,9;110:1;
114:12;118:2;
131:16;132:10
**open (4)**
22:2;28:18;41:16;
130:22
**operate (1)**
57:1
**operating (2)**
42:1;55:22
**operations@escribersnet (1)**
5:25
**opinion (4)**
23:9;86:8;92:3,12
**opinions (1)**
99:11
**opportunity (4)**
26:6;30:11;117:4;
118:3
**opposed (2)**
84:22;101:2
**opposing (1)**
85:14
**opposition (1)**

103:23
**oppositions (1)**
101:17
**optimism (1)**
33:7
**Option (2)**
87:22,22
**Order (127)**
2:2,8,12;3:2;4:6,
21;5:1,2,7,11,12,18;
23:16,21;24:21,22;
26:1,23;29:17;35:20,
22,23,25;36:9,15,20;
38:5,20;39:10,13,13,
14,21;40:13,19;41:9,
10,15,16;42:17,12,
25;43:2,25;44:6,12,
20;46:24;48:7;49:4;
50:13;51:3,6,12;52:8,
11;57:3,7;66:6;67:5,
14,17;68:10,12,14;
69:21;70:1;75:24;
76:19,25;77:3;80:5;
81:15;82:20;84:5,9,
19,20,24;85:2;86:1,5;
87:11;88:21,25;89:1,
5;91:2,3,4,6,8;92:15,
20;94:13,14,20;
96:14;97:3;100:2,3,
8;105:6;106:18;
107:6;108:3,10,13;
111:2,3;113:19;
117:9,15,16,17;
127:8,22,25;128:13,
17;129:8;130:16,19;
132:1;133:1,1;
134:11
**orders (16)**
34:15;46:16;56:24;
68:20;110:23;
115:13,14,15;116:1;
117:9;127:12,19;
129:3;134:1,7,13
**ordinarily (1)**
20:7
**organizational (2)**
102:18,21
**organize (1)**
19:8
**organized (1)**
82:11
**original (4)**
98:2,3;102:18;
117:10
**originally (1)**
102:6
**origination (2)**
95:21;122:2
**ORRICK (2)**
7:2,11
**others (4)**
15:11;50:16;
134:14,15

**otherwise (2)**
51:17;68:15
**ought (7)**
20:8;75:6,11,13;
102:12;120:18;132:5
**ours (1)**
44:23
**out (31)**
18:20;20:19;27:11;
32:10;35:10;36:13;
46:3;47:16;58:14;
59:7;61:15,19;63:23;
67:4;69:5;70:25;
74:19;77:3;81:12;
82:6,19,25;91:16;
94:17;95:14;98:20;
107:7;112:17;116:5;
122:5,7
**outlined (1)**
38:20
**outrageous (1)**
99:3
**outside (1)**
28:10
**outstanding (4)**
25:20,24;49:2;
69:20
**outweighs (1)**
64:25
**over (11)**
17:11,14;28:9;
54:5;63:13;65:22;
82:16;93:1;122:7;
125:14,15
**oversight (1)**
37:9
**overstep (1)**
98:18
**overwhelming (1)**
114:3
**OVERY (1)**
10:19
**owed (2)**
43:13;125:17
**own (10)**
63:5,5;65:11;
81:20;96:6;104:4;
114:15;116:13;
122:9;129:10
**owned (1)**
87:22
**owner (2)**
97:19;98:11
**ownership (1)**
72:25

**P**

**PA (2)**
8:23;16:2
**page (8)**
17:9;46:6,7;64:12;
79:5;120:20,21;

127:3
**pages (2)**
34:2;121:6
**paid (4)**
38:4;40:6;44:6;
112:7
**paper (1)**
36:18
**papers (22)**
22:23;31:6;34:14;
36:17;44:16;54:9;
59:19;66:10;68:7,15;
85:3,4;86:13;94:12;
96:1;97:1;100:17;
101:13;110:6;
124:17;128:15;
129:18
**paragraph (3)**
67:15;70:1;123:3
**paragraphs (1)**
67:5
**parent (17)**
37:10,22;38:9;
40:3;44:4,10;45:14;
49:4;58:3;60:20,22,
24;61:3,5;62:11,23;
63:11
**Park (2)**
9:4,21
**part (9)**
35:6,7;40:8;59:5;
72:24;77:20,22;89:2;
104:9
**partial (2)**
112:22;113:3
**participated (1)**
104:17
**participates (1)**
108:23
**participating (2)**
109:4;134:6
**particular (3)**
95:1;109:3;112:14
**particularity (1)**
85:13
**particularly (7)**
24:7;26:10;61:24;
67:24;68:6;82:3;
98:16
**Parties (27)**
4:22;19:12,17;
20:6,15;23:8;25:21;
26:3,8,12,24;28:13;
29:12;34:6;35:9;
51:6;66:5;68:8;
71:17,19;72:13;
84:22;117:12,18,18;
124:6;130:2
**parties' (1)**
104:24
**parties-in- (1)**
103:18
**parties-in-interest (1)**

26:21
**partner (1)**
70:11
**parts (1)**
36:3
**party (7)**
44:9;45:6;48:15;
85:14;93:20,22;
111:18
**party-in- (1)**
126:21
**passed (1)**
55:11
**past (3)**
28:9;38:11;79:18
**patience (2)**
49:9;69:6
**patient (2)**
49:8;52:1
**PATRICIA (1)**
14:8
**Patrick (3)**
2:8;16:15;116:23
**PATTERSON (2)**
13:25;71:13
**PAULA (2)**
16:18;120:17
**pay (35)**
29:7;36:8;39:16;
40:22;41:24;43:9,16;
49:12;52:22,23;
53:16;55:3,7,7,8;
56:14;57:7,22;59:13,
15;61:16;66:16,16;
67:13,23,23,23,25;
69:21;79:24;82:5;
88:14;113:19;114:9;
131:7
**payable (1)**
37:24
**paying (7)**
39:1;40:24;55:14;
67:8;68:2;81:14;
93:18
**payment (9)**
36:24;42:3;44:11;
60:11;66:14;86:24;
87:19,20;131:8
**payments (19)**
42:21;50:22;51:1,
15,20;52:1,13;56:18,
19,20;61:15;68:11;
80:21;87:20;88:5,9,
16;89:3;122:16
**pays (1)**
62:13
**PC (2)**
15:2;93:23
**PEARSALL (1)**
7:16
**pending (13)**
68:12;86:6;87:7,
12;91:24;92:10;

103:3;107:5,22;
112:9;116:3;118:19;
131:4
**Penina (1)**
5:21
**people (28)**
43:20;94:15;95:18,
23,24;96:4,6;98:4,20;
99:5,11,22;100:20,
21;111:23;112:18;
113:8;116:8,10;
119:19;120:4,9;
122:4,10,10;124:10;
131:6;132:8
**people's (1)**
119:5
**Pepper (2)**
4:8;36:25
**per (2)**
43:15;67:18
**percent (1)**
97:5
**percentage (1)**
38:7
**perfect (1)**
108:16
**perform (1)**
69:20
**performed (1)**
62:21
**perhaps (2)**
42:21;103:15
**permission (2)**
28:15;34:17
**permit (6)**
42:17,18;65:13;
71:25;74:8;75:9
**permitted (3)**
72:6;74:23;108:10
**person (5)**
25:23;46:10,17;
64:22;122:20
**personal (2)**
111:12;112:2
**persons (1)**
114:1
**perspective (1)**
20:14
**persuade (1)**
40:9
**pertain (1)**
37:9
**pertinent (1)**
32:25
**Petersburg (3)**
16:4;105:17;
118:12
**petition (1)**
107:13
**petitions (1)**
126:22
**Philadelphia (3)**
8:23;115:23,25

**phone (9)**
71:8;77:7;83:15,
18;95:8,8;112:12;
121:19;127:6
**pick (3)**
31:16;82:18;
110:25
**picking (1)**
112:12
**pile (1)**
86:13
**place (8)**
18:9;19:23;22:19;
46:12;62:10;87:12;
92:9;122:12
**placed (1)**
103:7
**places (1)**
67:3
**Plains (1)**
11:22
**plaintiff (1)**
119:3
**Plaintiffs (3)**
3:20;15:3;95:6
**plaintiff's (1)**
105:17
**Plan (19)**
3:8;17:10,22;18:7;
19:8;21:21;22:2;
23:14;86:23;87:19;
88:6;94:24;95:17;
110:2;113:17;114:1;
120:7;121:23,23
**plan-related (1)**
19:19
**platform (4)**
25:15;28:12;29:22;
42:15
**playing (3)**
29:22;30:15;108:5
**plays (1)**
20:18
**Plaza (2)**
9:4;10:13
**PLC (1)**
12:12
**pleading (3)**
85:13;115:9;
127:16
**Pleadings (4)**
3:15;63:16;99:1;
128:21
**Pleas (1)**
127:23
**Please (5)**
17:2;35:1;92:22;
118:10;127:21
**pleased (1)**
18:1
**pledge (1)**
28:25
**plus (1)**

56:3
**PM (1)**
134:24
**podium (5)**
70:11;92:19;93:1;
120:13;128:8
**point (21)**
20:13;30:18;33:1;
36:19;47:16;51:24;
56:5;65:18;66:5;
67:4;72:8;84:11;
91:15;96:14;97:14;
101:23;117:14;
122:13;124:4;
130:13;132:11
**pointed (3)**
63:23;64:8;107:7
**points (5)**
31:5;67:1;121:10,
12;124:3
**police (3)**
56:24;68:17;
111:25
**policy (1)**
64:16
**POLSINELLI (2)**
15:2;108:25
**pooling (2)**
28:21;31:14
**portfolio (2)**
58:8,13
**portion (2)**
40:23;58:6
**posed (1)**
122:17
**position (19)**
23:23;32:10;54:11,
11,12;66:3,21;68:6;
83:25;85:4;100:10;
101:7,21,23;103:11;
104:2;119:10;
124:17,18
**possession (3)**
75:1,4;92:12
**possible (4)**
27:10,24;29:23;
66:9
**possibly (1)**
101:15
**post- (1)**
31:7
**postage (1)**
111:12
**posted (3)**
70:23;71:1,2
**post-petition (3)**
41:12,25;87:19
**potential (3)**
30:21;58:21;98:19
**potentially (3)**
50:15;78:16;95:25
**Powers (1)**
3:23

**practice (1)**
106:8
**practices (1)**
38:21
**pre- (1)**
31:4
**Pre-Auction (9)**
4:1;24:19;25:9,21;
26:4,9;28:11;32:15;
33:20
**precedent (1)**
106:4
**precise (1)**
34:11
**precluding (3)**
128:13,14;129:9
**preconceived (2)**
20:16;21:19
**Preemptions (1)**
3:21
**prejudging (1)**
20:22
**prejudice (2)**
50:24;51:16
**prejudicial (1)**
124:21
**preliminary (3)**
31:15;46:24;85:18
**prematurely (1)**
32:10
**premises (1)**
90:19
**prepared (7)**
23:11;51:14;65:13,
14;72:1,8;82:2
**pre-petition (1)**
79:15
**PRESENT (6)**
16:13;27:21;75:17,
23;117:5;126:6
**presentation (2)**
94:3;105:22
**presented (3)**
72:11;127:19;
132:18
**presentment (2)**
26:19;27:4
**presents (1)**
39:18
**preserve (1)**
44:11
**preserving (1)**
44:4
**pressure (2)**
66:15,15
**Pre-trial (1)**
3:12
**pretty (3)**
43:1;102:11;106:8
**prevent (1)**
99:22
**previewed (1)**
78:7

**previous (1)**
86:23
**previously (2)**
24:20;86:3
**Pricewaterhouse (2)**
97:3,5
**PricewaterhouseCoopers (3)**
5:9;36:25;41:24
**primarily (1)**
122:16
**principally (1)**
69:3
**prior (9)**
25:14;26:5,9;
37:20;71:17;86:6;
92:2,3;130:4
**privacy (1)**
100:12
**Pro (19)**
2:4;3:4;4:10,17;
16:10,15,16;84:16,
21,23;85:11,12;99:2;
114:25;115:12;
116:23,25;121:15;
128:25
**probably (4)**
97:8;98:8;105:23;
115:23
**problem (6)**
20:7;41:8;73:1,19;
113:4;121:5
**problems (4)**
21:4;123:20;131:2,
9
**procedural (2)**
85:19;132:10
**procedurally (1)**
85:5
**procedure (4)**
80:4,9;126:19;
133:21
**Procedures (4)**
4:21;80:13;82:22;
113:11
**proceed (2)**
74:5;119:1
**proceeded (1)**
114:14
**proceeding (11)**
3:10,14;44:25;
92:13;99:8;107:14,
15;109:16;123:23;
127:3;128:2
**proceedings (13)**
17:4;32:25;86:16;
90:19;108:7;111:11;
114:2,3;128:11,11,
14;129:8;134:24
**proceeds (1)**
74:2
**process (38)**
17:10,23;18:9;
19:22;20:3,5,25;21:6,

25;22:18;24:5;35:7,
8;36:20;37:18;41:4;
42:13;43:1,18,24;
45:18;46:12;47:2;
56:4;71:18;72:10;
93:12;95:21;99:13;
110:3;117:4;121:16,
21;124:20,22;131:1,
10,17
**procured (1)**
113:13
**produce (4)**
45:14,15;50:4;66:1
**produced (1)**
49:21
**production (1)**
65:25
**productive (1)**
19:20
**professionals (17)**
17:22;18:2;47:18;
50:23;55:4;57:11,12,
18;58:24;59:10;
60:12;61:16;62:16;
68:12;77:7;82:10;
111:21
**professionals' (1)**
66:12
**program (2)**
101:20;106:8
**Programs (1)**
3:21
**progress (5)**
18:2;20:18;24:18;
25:18;65:22
**projected (2)**
42:9,21
**proliferation (1)**
99:13
**promptly (3)**
46:18;65:10;84:9
**proof (6)**
95:15;121:17,20;
123:14;125:18;131:4
**properly (1)**
114:9
**properties (1)**
113:11
**property (6)**
75:1;88:22,23;
99:7;113:8;132:22
**prophylactic (1)**
103:16
**proposal (2)**
33:19;49:3
**propose (3)**
26:1,4;34:5
**proposed (7)**
26:14;27:4;30:14;
44:12;50:17;51:3;
133:1
**prosecute (1)**
121:18

**prosecuted (1)**
58:25
**protect (1)**
101:15
**protecting (1)**
104:14
**protection (2)**
94:10;100:21
**protections (1)**
94:23
**provide (11)**
44:24;45:6;47:5;
55:23;56:1;84:23;
85:11;94:10;109:12;
125:16;127:11
**provided (10)**
44:13,15;73:5;
86:24;87:19;88:18;
105:6;108:4,20;
119:9
**providers (1)**
67:19
**provides (1)**
60:11
**providing (2)**
52:8,9
**provision (8)**
46:5;51:12,15;
53:14;64:16;67:18;
100:11,12
**provisions (7)**
31:10,12;34:11;
46:4,15;91:10;
100:24
**PSA (1)**
30:8
**PSAs (2)**
22:1;34:11
**public (4)**
35:24;41:17;60:19;
64:19
**publicly (1)**
47:22
**purchase (1)**
41:12
**purports (1)**
120:21
**purpose (3)**
54:6;107:17;
119:18
**purposes (4)**
38:9;65:20;85:22;
112:22
**pursuant (4)**
73:6;86:3;88:5;
126:21
**pursue (2)**
86:5;105:11
**pushing (1)**
49:12
**put (11)**
23:3;43:17;81:12;
85:3,4,5;94:23;

95:15;98:12;120:23;
125:19
**puts (1)**
43:23
**putting (3)**
31:23;66:15,15
**PWC (32)**
36:8;37:21,24;
38:10,19,24;39:16,
22;40:1,2;41:2,5;
43:5,10;44:16;49:12;
52:13,22,23;53:1,9;
55:3,14;57:7;58:7;
59:9;66:14,16,16;
68:11;104:3,11

## Q

**quick (2)**
21:21;101:9
**Quickly (4)**
33:15;82:21;
101:10;121:1
**quite (4)**
24:12;91:21;95:24;
112:7

## R

**raise (5)**
21:4;65:18;74:12;
78:22;114:15
**raised (7)**
31:6;35:5;65:8;
69:18;99:12;111:8;
123:13
**raising (4)**
74:4,20;117:21;
119:20
**rare (1)**
103:6
**rate (2)**
43:11,14
**rates (4)**
97:8,9,16,16
**rather (9)**
42:4;43:7;44:2;
84:4;98:10;99:19;
109:7;124:19;133:21
**ratifies (1)**
67:4
**rationale (1)**
93:10
**RAY (2)**
8:18;51:10
**RE (7)**
2:18;3:8;4:1,5,13;
5:2,6
**reach (3)**
26:15,18;27:21;
33:9;68:8
**reached (1)**
25:25

**reaching (1)**
33:8
**reaction (4)**
19:10;30:9;40:12;
82:2
**read (3)**
18:4;19:10;22:8;
36:3,17;47:21;49:3;
54:9;59:19;68:14;
69:18;84:6;93:14;
106:14
**readily (2)**
22:13;93:13
**reading (2)**
85:6;131:21
**ready (2)**
22:9;101:22
**Reaffirming (1)**
5:11
**real (3)**
20:18;94:6;113:10
**really (13)**
22:4;31:4,6;61:10;
73:2;81:15;82:6,7;
86:10;91:8;116:25;
123:13,24
**reason (14)**
20:4;30:4;41:8;
54:8;58:1;62:22,23;
63:7,8;121:13;
122:21;123:15;
124:8,8
**reasonably (1)**
94:11
**reasons (5)**
21:22;60:5,8;
92:16;130:2
**recall (1)**
24:22
**receive (1)**
80:23
**received (7)**
70:24;80:22;83:3;
87:25;95:11;107:24,
25
**receiving (2)**
47:19;129:17
**recess (3)**
81:11;82:12,13
**recited (1)**
92:2
**recognizing (2)**
120:10,12
**recollection (2)**
132:2;134:2
**recommend (1)**
45:16
**recommending (1)**
106:21
**reconsider (1)**
76:18
**Reconsideration (3)**
2:8;76:24;117:24

**record (14)**
31:23;34:4,11;
49:23;60:19;74:8;
75:8;76:10;85:23;
92:16;112:5;114:12;
126:18;129:24
**records (2)**
102:16;112:4
**recover (2)**
75:1,4
**recovered (1)**
134:1
**recovery (1)**
50:25
**refer (1)**
69:23
**Reference (3)**
4:25;5:1;128:16
**referenced (1)**
35:25
**referred (2)**
49:14;125:11,13,
14
**reflected (1)**
59:2
**reflective (1)**
132:6
**refusal (1)**
46:14
**refused (3)**
61:7;116:4;121:8
**regard (1)**
98:25
**regarding (9)**
38:3;41:19;44:25;
80:21,23;101:21;
109:9;117:22;131:17
**regular (3)**
20:10;25:13,16
**regulated (3)**
45:5;46:23;54:10
**regulation (1)**
46:15
**regulations (1)**
41:11
**regulator (1)**
54:24
**regulators (4)**
45:10;61:7,11;
62:12
**regulatory (8)**
45:3,4,8,23;47:2;
56:24;68:17,17
**reimbursed (2)**
29:2;79:19
**Reimbursement (5)**
2:14;29:6;79:6;
81:3,4
**reimpose (2)**
89:7;91:6
**reinstate (2)**
89:24;90:12
**reiterate (2)**

47:4;120:2
**rejected (1)**
    40:15
**Rel (1)**
    3:11
**relate (2)**
    31:6;58:13
**Related (5)**
    4:2;5:4,19;28:11;
    117:19
**relates (2)**
    39:19;48:10
**relating (5)**
    29:3;70:25;81:24,
    25;107:23
**relation (2)**
    23:16;82:4
**relationship (1)**
    54:4
**relatively (2)**
    76:13;111:16
**release (2)**
    65:14;66:16
**released (1)**
    47:23
**relevant (2)**
    46:4;119:18
**reliance (1)**
    67:3
**Relief (26)**
    4:22;5:11;72:3,9,
    21;73:6,8,13;85:7,8,
    9,9,10,17;88:9,12;
    92:6,7;100:25;105:6;
    108:9;113:6;119:14,
    15;126:22;133:14
**relieve (1)**
    50:18
**relieved (1)**
    55:24
**rely (1)**
    67:15
**remain (2)**
    25:20;91:11
**remaining (4)**
    26:3;31:4;76:14;
    133:20
**remains (3)**
    26:9;72:5;92:12
**remediation (2)**
    42:21;47:19
**remedies (1)**
    88:24
**remember (3)**
    37:1;42:8;131:21
**remembers (1)**
    41:20
**removed (1)**
    90:10
**renewed (1)**
    23:11
**reply (4)**
    33:24;52:3;125:2,4

**report (15)**
    17:10,24;18:1,4;
    19:11;21:15;22:8;
    23:2;24:18;42:1;
    46:18;47:23;65:21;
    75:6;83:7
**reported (1)**
    74:15
**reports (2)**
    20:4;21:2
**represent (10)**
    33:17;35:3;81:19;
    97:12;105:18;
    106:10;117:11,16,18;
    123:1
**representation (2)**
    103:1,2
**representative (5)**
    95:5,6;123:5,6;
    130:18
**representatives (2)**
    106:7,9
**represented (3)**
    106:7;119:9;
    131:19
**representing (7)**
    34:17;80:1,2,6;
    109:24;124:16;
    131:25
**Request (4)**
    4:22;65:19;69:10;
    130:4
**requested (5)**
    22:12;46:10;49:20;
    50:2;52:2
**requesting (2)**
    52:1;64:22
**requests (5)**
    23:18;45:6;47:6;
    64:20;76:24
**require (5)**
    20:7;28:25;43:22;
    67:5;85:13
**required (11)**
    34:14;36:20,21;
    37:16;39:10;40:17;
    46:11,13;57:10;
    74:10;76:23
**requirement (1)**
    43:25
**requirements (4)**
    40:17;48:22;88:5,
    14
**requires (4)**
    42:25;48:8;57:2;
    111:17
**requiring (1)**
    133:22
**ResCap (5)**
    27:17;28:24;36:10,
    11;67:11
**research (1)**
    129:2

**reservation (2)**
    79:10,12
**Reserve (22)**
    5:11;35:23;39:16;
    45:8;46:9;48:2,11,16,
    21;53:20,23;54:5,14,
    17;55:1,9,12;58:4;
    67:16;96:22,23;
    115:15
**reserving (1)**
    52:13
**reset (1)**
    83:10
**Residential (5)**
    2:16;4:11,18;17:3;
    41:3
**resignations (1)**
    130:3
**resolution (2)**
    26:8;131:22
**resolve (16)**
    22:20;24:18;25:13,
    23;26:3,12,23;27:10;
    28:1;33:5;75:11,14,
    16,18;83:4;133:20
**resolved (7)**
    24:10;32:7;34:5;
    59:1;69:7;132:17;
    133:6
**resolving (3)**
    18:9;33:5;59:18
**resources (2)**
    53:11;122:23
**respect (34)**
    25:1,3;26:17;
    33:19;34:3;37:16,21;
    41:3,11;42:22;46:14;
    48:20;49:7;58:13,15;
    59:3;68:25;74:11;
    76:17;87:25;88:22;
    90:25;92:3;100:9;
    104:3;109:2,3;
    117:25;125:3,8;
    129:4;130:1;133:5,7
**respond (7)**
    24:13;26:7;43:22;
    46:11;66:25;83:5;
    111:21
**responding (1)**
    111:18
**Response (7)**
    3:15;26:4;33:20;
    47:5;50:4;110:22;
    131:17
**responses (2)**
    26:7;102:20
**responsible (1)**
    63:21
**rest (1)**
    88:16
**restrict (1)**
    102:25
**restrictions (2)**

45:5,18
**result (2)**
    100:20;104:12
**resulting (1)**
    102:18
**results (1)**
    59:18
**Retain (9)**
    4:8,16;17:15;57:9,
    10;58:23;78:13;81:2;
    131:8
**retained (3)**
    38:5;53:1,3
**retaining (1)**
    81:4
**Retention (8)**
    2:3,9;3:3;53:4,4;
    77:4,20;117:22
**returned (1)**
    95:8
**Review (55)**
    4:9;5:9;26:7;
    27:14;30:5,11;36:20;
    37:9,15,18,19;38:12,
    13,20;39:10,10,19;
    40:23,23;41:2;42:17,
    18,20;47:6,18;48:9,
    22;49:16;50:13,23;
    55:4,14,19;57:8,11,
    18,19;58:24;62:15;
    63:5;67:6;68:12;
    69:2;79:16;80:9,14,
    23;81:14,18;97:3,6;
    104:4,6,12;134:13
**reviewed (4)**
    37:4;40:12;86:9;
    133:12
**reviewing (1)**
    58:7
**revised (6)**
    23:14,15,20;24:21;
    29:16;61:24
**RHONDA (2)**
    15:24;71:9
**RICHARD (1)**
    14:25
**RICO (1)**
    3:17
**right (65)**
    17:2,19;18:19;
    19:3;21:8;24:15;
    26:16;32:16;33:12;
    34:21;37:3;42:24;
    44:3;48:10;52:16;
    55:22;69:13;71:4,11,
    15;76:8;77:25;78:21,
    23;80:10,16,25;81:2,
    13;82:18;83:9;84:17;
    89:22;90:20;91:20;
    93:21;94:19;95:17;
    96:8,9;97:14;103:22,
    22;105:16;110:7;
    111:14;112:20;

115:6,13;117:21;
    118:6,23;122:13,14;
    123:7;124:12;
    126:25;127:21;
    128:1;132:12,12;
    133:4,15,16;134:4
**rights (11)**
    29:1;44:3,10,11;
    50:24;51:16;52:13;
    79:11,12;112:11;
    113:8
**rise (3)**
    21:19;50:15;
    131:16
**risk (4)**
    43:7,17,23;44:2
**RMBS (8)**
    4:2;14:12;24:18;
    28:20;32:21;33:18;
    34:18;104:21
**road (1)**
    103:17
**ROBERT (4)**
    12:2,8;93:23,23
**robo-signed (2)**
    113:6,9
**robo-signing (2)**
    63:16;114:7
**role (8)**
    98:14;99:15;100:8,
    13;102:23;105:12,
    13;109:3
**room (4)**
    97:10;104:23;
    105:2;118:14
**ROPES (1)**
    14:11
**rose (1)**
    39:6
**Rosenbaum (20)**
    70:11,13,22;71:3,5,
    6,12,13,16;72:3,5;
    75:13,21;76:1,4;
    82:18,19,24;83:2,7,
    11
**Rowena (7)**
    95:11;98:10;
    104:17,17,20;105:1;
    114:12
**Rule (11)**
    3:18;4:7,7,14,15;
    5:8;73:6;74:18;
    85:20;86:4,4
**rules (4)**
    76:22;85:12,13,20
**run (1)**
    70:18
**runs (1)**
    69:5
**RUSH (12)**
    16:18;119:25;
    120:16,17,18,25;
    121:3,9,12;123:19;

124:4,14

## S

**sake (1)**
40:20
**Sale (13)**
4:3;25:5;28:12;
29:17;35:4;42:10,15;
43:17,19,20;44:5;
79:20;124:19
**Samantha (2)**
127:19;128:7
**same (12)**
33:7,9;35:5;41:1;
48:2;52:9;67:19;
74:20;90:8;108:12;
110:22;134:11
**SARA (2)**
13:7;35:2
**sat (1)**
111:8
**satisfactorily (1)**
22:21
**satisfied (2)**
40:6;76:5
**saw (4)**
38:17;61:23;70:23;
115:9
**saying (11)**
27:20;34:8;40:22;
53:6;61:11;63:14,17,
22;68:10;118:25;
132:8
**schedule (4)**
23:3;25:4;66:4;
68:8
**scheduled (12)**
18:15,17,25;25:7,
15;27:15;34:13;
66:19;84:8;85:25;
124:20,20
**scheduling (4)**
24:21,22;26:14;
66:5
**SCHLAM (2)**
12:19;94:1
**SCHROCK (7)**
8:18;36:18;51:9,
10,10,18,22
**scope (9)**
28:11;31:7;65:23;
103:9,10,12,13;
117:10,11
**SCOTT (1)**
7:16
**scratch (1)**
93:10
**Se (14)**
16:10,15,16;84:16,
21,23;85:11,12;
114:25;115:12;
116:23;117:1;

121:15;128:25
**search (2)**
36:5;134:17
**season-ticket (2)**
131:20;132:1
**seated (2)**
17:2;124:6
**second (15)**
25:2,6;41:21,23;
58:5;61:4;67:11;
78:12;86:21;88:1,2;
89:16;98:6;119:3;
134:11
**secondarily (1)**
67:12
**secret (2)**
41:19;47:17
**Section (6)**
4:6,14;5:7;56:25;
79:5;86:4
**Sections (2)**
2:13;4:20
**Secured (5)**
10:3;18:17;21:18;
87:20,21
**securities (1)**
18:23
**Securitization (5)**
9:3;95:22;113:20,
21;122:2
**securitizations (2)**
28:23;29:3
**security (2)**
104:22;106:19
**seeing (1)**
118:12
**seek (7)**
29:15;50:25;62:10,
12;73:7,10;129:23
**seeking (10)**
24:18;85:7,9,10,
24;86:11;91:22;92:6;
108:9;128:24
**seem (5)**
32:8;40:16;50:9;
59:20;98:15
**seemed (2)**
100:8;114:13
**seems (5)**
47:19;59:9;84:11;
87:9,11
**select (1)**
97:15
**selection (1)**
98:16
**send (4)**
36:4;88:19;92:22;
112:17
**Senior (5)**
4:24;18:22;21:18;
69:16;82:24
**sense (2)**
98:8;126:8

**sent (7)**
23:14;45:12;107:3,
4,8,10;125:5
**separate (12)**
39:17;40:25;48:8;
53:14;63:23;84:8;
94:20;104:9;120:22;
124:1,10;131:11
**Separation (1)**
3:23
**September (5)**
2:4;17:20;23:15;
70:25;85:25
**series (2)**
18:21;22:12
**seriously (1)**
74:23
**seriousness (1)**
84:16
**serve (2)**
106:21;111:24
**served (1)**
44:22
**service (1)**
125:13
**serviced (6)**
58:8;95:18,24;
96:5;99:6;107:13
**servicer (4)**
28:23;87:21;
125:12,12
**servicers (6)**
25:12;47:25;48:15;
57:23;58:1;60:15
**Services (3)**
5:9;15:10;41:25
**Servicing (34)**
5:12;25:15;28:12,
21;29:2,22;31:14;
36:12;37:8,12;38:21;
41:4,15;42:15;58:14;
59:3;62:17;68:25;
81:18;94:12,14,20;
95:22;100:2,3;105:6;
107:6,24;108:3,10,
13;112:5;117:20;
122:2
**serving (1)**
112:13
**ses (1)**
99:2
**set (8)**
18:14,21;19:16;
39:16;55:8;92:5;
109:8;124:17
**setting (2)**
27:22,23
**settled (1)**
133:5
**settlement (12)**
22:1;25:1;31:20,
24;32:8;35:7;48:1,3,
5,8,16;79:15

**settlements (3)**
47:24;48:4;60:15
**seven (2)**
26:5;43:14
**several (19)**
25:20;28:9;31:17;
36:24;40:3,7,9;43:4,
6;49:12;53:6,13;
59:11;95:11;109:19;
110:1;116:16;119:3;
123:15
**severally (2)**
39:23;49:5
**SEWARD (1)**
9:2
**shakes (1)**
59:7
**shall (4)**
27:5;46:12,17,18
**shape (1)**
100:18
**shared (1)**
46:23
**SHEARMAN (2)**
9:11;124:16
**Shift (2)**
49:13;68:23
**shock (3)**
39:5;61:23;97:2
**SHORE (8)**
10:7;21:11,12,13,
15,17,17,25
**short (5)**
24:12;33:24;43:9;
76:13;125:10
**shortly (1)**
59:5
**show (2)**
42:1;64:22
**showing (1)**
115:11
**shown (1)**
77:25
**SHUGHART (2)**
15:2;108:25
**side (2)**
62:2;114:11
**SIDLEY (1)**
13:10
**Sidney (1)**
127:24
**SIEGEL (14)**
11:15;31:19,20,23;
32:4,16,18,19,20,20;
33:2,3,10,11
**sign (1)**
75:7
**signatories (1)**
57:15
**signed (3)**
23:17;36:9;117:15
**significance (1)**
61:10

**significant (4)**
25:18;45:5;53:11;
58:6
**significantly (1)**
43:15
**Sil (1)**
71:7
**Silmon (10)**
2:18;15:20;70:12,
25;71:8,10;75:2;
76:6;108:11;123:14
**Silmons (2)**
71:22;72:7
**Silmon's (1)**
72:15;74:9,12
**similar (4)**
35:9;48:22;60:16;
100:12
**similarly (1)**
15:12
**simple (1)**
132:7
**simply (2)**
26:22;109:25
**single (2)**
35:25;79:25
**situated (1)**
15:12
**situation (3)**
42:5;52:14;62:5
**six (2)**
43:14;122:6
**sixty (1)**
104:13
**SKADDEN (1)**
12:11
**Skeens (1)**
108:25
**skimmed (1)**
47:22
**SLATE (1)**
12:11
**slightest (1)**
74:17
**small (5)**
56:1,2;97:7,8;
111:15
**smaller (1)**
47:20
**Sold (2)**
5:3;91:24
**sole (3)**
55:9;94:24;124:19
**solely (1)**
37:4
**solicit (1)**
102:3
**solicited (1)**
102:17
**solution (1)**
42:23
**somebody (17)**
20:6;22:3;32:10;

49:19;80:16;94:24;
98:14;102:7,11;
111:4;112:12;
114:18;117:5;
122:13;124:13;
127:11;131:3
**somebody's (2)**
21:4;102:8
**somehow (1)**
68:1
**someone (5)**
49:24;100:4;
106:10;114:13;121:6
**someplace (1)**
121:18
**sometimes (3)**
122:25;130:2,3
**somewhat (1)**
123:7
**Sontchi (1)**
124:8
**soon (1)**
29:23
**sooner (1)**
30:13
**sor (1)**
17:17
**Sorry (21)**
21:13;33:3;34:7;
48:18;53:19;56:9;
60:6,17;63:22;65:5;
70:14,15;77:2;78:1;
88:8;91:5;106:5;
110:9;113:1;114:22;
117:13
**sort (3)**
23:5;32:10;62:3
**sorts (1)**
131:9
**sought (2)**
109:22;119:16
**sound (2)**
49:6;106:2
**sounded (1)**
75:14
**source (1)**
53:15
**South (5)**
7:4;13:12;14:21;
15:21;105:17
**Southern (1)**
134:9
**space (1)**
105:19
**speak (5)**
93:22;117:25;
119:20;120:5,13
**SPEAKER (4)**
17:16;76:9;82:14;
83:13
**speaking (4)**
19:12;25:3;111:16;
126:10

**Special (9)**
2:10;4:8,16;7:3,12;
79:14;109:22,23;
117:2
**specific (12)**
20:7;21:4;103:2;
105:6;106:8,8;
109:25;111:4;117:8;
118:20;119:11;131:2
**specifically (7)**
31:6;42:8;81:24;
88:18,21;91:6;
122:18
**spend (3)**
19:24;111:9,18
**spent (1)**
105:4
**split (1)**
68:2
**spoke (1)**
45:4
**sponsored (1)**
28:24
**sponte (1)**
114:6
**Square (1)**
12:13
**St (3)**
16:4;105:16;
118:11
**stage (2)**
20:5;59:15
**stalking (1)**
29:18
**stand (3)**
35:8;42:18;101:22
**standalone (1)**
36:5
**standards (1)**
103:16
**standpoint (1)**
123:24
**staring (1)**
106:17
**start (8)**
20:3;32:24;52:12;
55:14;77:1;98:21;
101:14;107:18
**started (1)**
98:22
**starting (1)**
64:17
**State (7)**
3:24;86:6;90:9;
94:16;96:19;107:23;
129:4
**stated (1)**
92:16
**statement (1)**
66:3
**States (8)**
3:10;7:19,20;
94:25;101:19;113:7;

126:11;129:23
**stating (1)**
91:4
**Status (25)**
2:18;3:8;4:1,5,13;
5:6;17:10;18:4;
19:11;20:4;21:15;
22:8;23:2,4;24:5;
25:22;34:25;35:19;
40:10;66:4,11;70:11;
71:17;19;72:14
**statute (3)**
96:16;106:13;
126:21
**statutory (1)**
99:9
**Stay (39)**
4:23;5:1;72:3,9;
73:9;74:8;75:8,9,17;
81:24;84:7;86:5;
87:10,10;88:9,12,22;
89:5,8,25;90:12,13,
23;91:2,5,7,10,23;
92:4,9;94:15,21;
99:10,23;103:3;
108:6;123:12;
132:18,21
**STEEN (2)**
10:11;69:15
**Stephan (2)**
115:17;116:4
**Stephen (4)**
2:4;3:5;8:11;77:14
**STERLING (2)**
9:11;124:16
**sticker (3)**
39:5;61:23;97:2
**sticks (1)**
119:7
**still (29)**
17:15;24:12;25:20;
66:1,7;69:19;70:24;
71:19,20;72:5,11,24;
73:3,15;74:1,2,10,15,
16,22;75:6;90:18,22;
98:24;99:21;105:22;
113:6;116:3;134:4
**stipulate (3)**
72:1,9;73:1
**Stipulated (1)**
4:22
**stipulation (12)**
26:1,18,23;27:4,
22;73:5,5;75:14,16,
17,19,23
**stipulations (4)**
132:18;133:7,14,
17
**STONE (2)**
12:19;94:1
**stood (2)**
49:24;130:5
**stop (1)**

73:24
**stopped (1)**
66:12
**story (1)**
125:10
**straight (1)**
81:10
**straightforward (1)**
43:1
**STRAUSS (1)**
9:19
**streamline (1)**
99:19
**streams (1)**
38:20
**Street (10)**
5:23;7:4,13,21;
8:22;12:4;14:21;
15:4,13,21
**strenuously (1)**
81:17
**strike (1)**
120:19
**Strohbehn (1)**
109:1
**strong (1)**
113:19
**structure (1)**
19:23
**sua (1)**
114:6
**subject (14)**
24:3;35:4;49:14,
16;51:19;54:8;62:22;
63:9;79:16;80:4,14;
107:14;127:8;132:25
**submission (3)**
34:4;125:24;127:1
**submitted (4)**
35:25;67:1;127:15;
133:13
**subpart (1)**
46:7
**subpoena (1)**
46:11
**Subsequent (1)**
89:7
**subsequently (3)**
71:18;90:3,9
**subservicing (1)**
41:20
**subset (1)**
56:2
**subsidiary (1)**
61:15
**substance (2)**
19:9;25:21
**substantial (3)**
62:25;64:23;65:21
**substantially (4)**
44:16;62:15;65:25;
75:15
**successful (2)**

30:1;33:8
**suddenly (1)**
30:25
**suffer (1)**
62:8
**sufficient (4)**
42:9;55:23;56:1,13
**suggest (5)**
59:14;60:1;69:1;
99:3;109:18
**suggested (2)**
105:14;126:11
**suggesting (1)**
87:11
**suggestion (2)**
66:3;126:3
**Suite (4)**
5:23;7:5;14:5;15:5
**summarized (1)**
24:4
**Summary (9)**
3:20;71:21,23,24;
72:7,17;74:14,18;
128:23
**supervise (1)**
63:19
**supervision (2)**
58:3;63:3
**supplement (2)**
53:18;59:12
**supplemental (16)**
23:18;55:5,13;
61:9;62:2;67:2;
94:12,14,19;100:2,3;
105:6;107:6;108:3,
10,13
**support (4)**
21:21;85:16;115:8;
116:17
**supports (1)**
133:14
**supposed (7)**
21:24;38:10,15,19;
94:7;97:18,20
**sure (36)**
20:9;21:6,12,17;
23:4;29:9,19;30:2,5,
15,20,25;33:7;40:14;
41:20;47:24;58:18;
72:19;73:9,22;77:5;
79:21;89:13,17;
91:21;92:23;93:9,17;
95:14;96:12;99:14;
105:13;110:21;
112:7;124:19;128:18
**Surplus (1)**
3:16
**surprise (3)**
40:4;53:7,9
**surprised (5)**
21:24;35:9;48:24;
53:8;106:20
**surprises (1)**

Min-U-Script® eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(20) somebody's - surprises

40:2
**surprising (1)**
59:10
**surprisingly (1)**
49:11
**SUTCLIFFE (2)**
7:2,11
**sworn (1)**
115:17
**Sydney (1)**
133:24
**Syncora (3)**
13:3;35:3,3

**T**

**table (2)**
20:15,21
**TAGGART (13)**
16:9;114:19,22,22,
23,25;115:3,5,5,7;
116:19,20,21
**talk (6)**
21:19;111:4;
112:16,19,19;118:20
**talked (1)**
122:15
**talking (7)**
43:9;60:8;85:2,23;
118:15,16;119:12
**target (1)**
102:14
**team (3)**
45:4,23;47:2
**technically (1)**
28:10
**TEITELBAUM (3)**
11:18,24;83:1
**telephone (2)**
109:14;110:25
**telephonic (1)**
66:4
**TELEPHONICALLY (16)**
7:8,16;13:15,16,24,
25;14:8,16,25;15:8,
16,24;16:14,15,16,17
**tells (1)**
125:6
**tempted (2)**
68:9,10
**ten (8)**
34:2;41:24;44:18;
48:18;81:11;82:1,11;
88:20
**tentatively (1)**
66:19
**term (6)**
38:12;43:9;50:10;
69:23;81:20;129:6
**terminate (1)**
91:2
**terminated (1)**
21:23

**terminating (1)**
21:25
**termination (1)**
89:5
**terms (5)**
29:16;31:4;36:23;
43:8;120:23
**testimony (2)**
46:13,17
**Thanks (2)**
106:12;124:25
**that'd (1)**
72:10
**that'll (1)**
133:21
**theirs (1)**
113:12
**theories (1)**
85:16
**thereafter (2)**
34:15;91:24
**therefore (3)**
24:9;51:8;59:18
**there'll (1)**
42:21
**theses (1)**
113:25
**thinking (1)**
122:22
**Third (9)**
4:22;11:4,21;44:9;
45:6;60:12;84:22;
88:8;111:18
**thirteen (2)**
48:18;87:17
**thirty (2)**
43:22;104:13
**thirty-four (1)**
98:3
**though (2)**
69:2;80:6
**thought (10)**
17:22;42:12;43:1,
18;77:24;78:3;82:3,
4;83:17;113:23
**thoughts (1)**
84:1
**threatened (1)**
102:9
**three (8)**
48:18,20;86:17,18;
104:21;105:15;
128:11;134:13
**throughout (1)**
97:1
**throw (1)**
122:4
**thus (1)**
66:23
**tie (1)**
117:8
**tied (1)**
24:8

**tilts (1)**
30:3
**timely (3)**
67:13;88:16;91:11
**Times (1)**
12:13
**title (1)**
96:13
**titles (1)**
113:10
**today (16)**
17:9,25;33:6;
49:10;52:6;65:20;
66:20;68:9,10;82:2;
84:9;112:15;117:24;
123:15,25;126:11
**today's (1)**
22:22
**together (2)**
28:13;129:15
**told (5)**
31:15;42:9;44:13;
45:4,23
**TOMASCO (1)**
14:8
**tone (1)**
100:17
**took (3)**
82:3;87:12;92:9
**top (1)**
102:5
**topic (3)**
24:25;25:2,2
**topics (2)**
24:25;32:2
**touch (1)**
122:13
**touches (1)**
31:8
**toward (1)**
30:3
**towards (1)**
37:24
**track (1)**
125:9
**trader (1)**
109:23
**traders (1)**
109:22
**transaction (2)**
42:19;79:20
**transactions (1)**
79:15
**Transcribed (1)**
5:21
**transmitted (1)**
30:20
**treat (1)**
119:21
**treatment (1)**
119:7
**tremendous (1)**
43:23

**trial (2)**
72:1;74:21
**trial-ready (1)**
74:22
**tried (3)**
94:14;95:7;106:23
**triggers (1)**
52:12
**trillion (3)**
60:12;102:8,10
**trouble (2)**
43:16;121:4
**troubling (1)**
22:10
**true (3)**
57:3;92:11;123:10
**truncate (1)**
74:6
**Trust (3)**
10:12;69:16;
111:25
**Trustee (26)**
7:20;9:3;23:15,18;
24:13;28:25;69:16;
78:10,18;80:15;
97:17,20;98:18;
101:19;104:21;
106:25;111:24;
126:11,23;129:23,25;
130:7,10,11,23;132:2
**Trustees (16)**
4:2;24:23;25:10,
11,11;27:21;28:8,20;
31:9,10,17;32:21;
33:18;34:18;104:22;
113:20
**trustees' (5)**
24:19;25:4,21;
31:6;35:6
**Trustee's (2)**
101:20;131:23
**trusts (1)**
35:4;113:21
**try (13)**
19:8;24:9;25:13;
26:11;44:24;45:16;
47:1;94:23;101:5;
114:15;120:19,23;
132:14
**trying (8)**
19:24;33:4;73:1;
74:25;82:25;101:14;
114:14;117:8
**Tuesday (2)**
27:5;28:19
**Tunc (4)**
2:4;3:4;4:10,17
**turn (3)**
29:6;92:18;93:1
**twenty (1)**
98:3
**twenty-five (1)**
121:6

**two (29)**
17:12,15;24:25;
30:7;39:13,18;40:25;
47:10,15;48:4;57:24;
67:1;69:19;77:3,19;
84:6;86:16;88:15;
104:22,22;115:14;
118:19;119:12,13;
128:10,20;131:24;
134:1,7
**TX (1)**
14:6
**type (1)**
85:10
**typically (2)**
103:6;106:5

**U**

**ultimate (2)**
29:25;40:11
**ultimately (3)**
19:19;29:25;45:13
**Um-hum (2)**
26:20;29:20
**unable (1)**
55:7
**uncontested (3)**
77:19;78:1;133:5
**Under (43)**
2:12;3:21;4:6,14,
20;5:7,10;29:2;
31:10,12;38:5;39:24;
41:16;42:16;44:6;
45:11;52:12;53:25;
58:2;61:11;62:4,7;
63:2,10;64:16;67:14;
69:20;70:1;71:19;
79:4,5;87:21;92:14;
94:19;103:15;
108:10;122:4;
125:24;127:1;129:7,
14;130:9,15
**underlying (1)**
106:9
**understate (1)**
18:8
**understood (4)**
23:10;73:9;97:13;
108:15
**undertake (2)**
38:12,15
**underway (1)**
20:25
**underwriting (1)**
36:16
**unfairly (2)**
30:3;102:24
**unfortunately (2)**
108:16,18
**UNIDENTIFIED (4)**
17:16;76:9;82:14;
83:13

**unique (1)**
  108:4
**United (7)**
  3:10;7:19,20;
  94:25;101:19;
  126:11;129:23
**Unless (8)**
  20:6;21:3;32:25;
  46:8;47:11;70:7;
  110:16;121:6
**unlike (2)**
  107:4;109:6
**unlimited (1)**
  82:9
**unnecessary (1)**
  76:25
**Unquestionably (1)**
  39:8
**unresolvable (1)**
  113:23
**Unsecured (10)**
  2:2,5;3:2,5;69:16;
  102:5,17;110:11;
  114:4;123:24
**unusual (2)**
  95:20;96:16
**up (37)**
  17:23;19:16;21:12;
  22:20;27:12;31:16;
  32:4;35:8;42:1;49:5;
  51:9;56:2,5;59:16;
  65:10;66:3,10;69:4;
  70:3;82:18;83:14;
  96:12;98:18;109:8;
  110:25;112:12;
  113:24;114:18;
  115:9;117:3,5;118:4;
  121:24;126:24;
  130:5;132:14;133:21
**update (3)**
  23:1,6;25:6
**upon (8)**
  42:14;46:14;55:2;
  85:19;88:13,19;89:5;
  114:6
**USC (5)**
  3:17,22,22;56:25;
  57:4
**USCA (1)**
  3:17
**use (4)**
  38:12;69:23;
  120:23;129:6
**used (1)**
  114:9
**useful (1)**
  19:15
**using (3)**
  50:10;81:19;95:7
**usually (2)**
  103:6;106:5

**V**

**vacate (1)**
  94:16
**valid (3)**
  122:10,11,25
**validated (2)**
  38:7,9
**validation (2)**
  38:4,9
**value (1)**
  29:7
**variety (2)**
  26:25;81:22
**various (10)**
  19:18;21:3,22;
  24:24;29:13;38:20;
  98:7;104:23;105:5;
  109:25
**Vaughan (1)**
  109:1
**versus (3)**
  38:8;42:20;117:10
**vexatious (3)**
  127:9;129:5,11
**vicinity (1)**
  97:9
**view (10)**
  40:22;51:7;64:10,
  11;68:13;82:5;85:2;
  95:4;98:22;102:22
**views (2)**
  104:24;105:1
**violate (1)**
  116:1
**violated (1)**
  91:23
**Violated/Stay (1)**
  5:2
**violating (1)**
  43:8
**Violation (3)**
  5:2;67:17;87:10
**Violations (4)**
  5:1;84:7;87:10;
  115:11
**virtually (2)**
  81:23;113:23
**virtue (2)**
  62:2,5
**voice (11)**
  82:11;105:3,3;
  115:8;121:13;
  122:12;123:5,6;
  131:1,10,10
**voicing (1)**
  105:1
**volunteer (1)**
  111:24
**volunteers (1)**
  112:1
**vote (1)**

**132:5
votes (1)**
  132:5

**W**

**wait (4)**
  28:1;31:19;41:21,
  23
**waiting (1)**
  120:10
**waived (2)**
  55:8,10
**waiving (1)**
  118:25
**walked (1)**
  21:20
**WALKER (1)**
  14:2
**Wall (1)**
  12:4
**Walters (1)**
  109:1
**wants (7)**
  44:10;55:12;69:13;
  78:19;81:9,10;
  130:10
**warnings (1)**
  62:3
**waste (1)**
  118:4
**wasting (1)**
  118:5
**watched (1)**
  111:9
**way (12)**
  20:17;43:21;67:19;
  71:20;72:11,20;
  88:11,11;100:18;
  109:20;113:24;
  121:17
**ways (1)**
  97:25
**Website (3)**
  95:7;109:12;125:5
**websites (2)**
  109:8;125:4
**Wednesday (2)**
  27:1;44:18
**week (3)**
  23:24;44:21;111:1
**weekly (1)**
  104:18
**weeks (2)**
  19:24;49:12
**WEIDNER (6)**
  16:2,6;118:10,11;
  119:12,23
**WEIL (2)**
  13:2;35:2
**Wendy (5)**
  15:11,16;95:9;
  112:21;120:1

**weren't (4)**
  23:5;100:21;
  102:20;111:6
**West (3)**
  5:23;7:13;15:13
**what's (18)**
  33:12;39:9;43:11;
  46:21;50:17;52:5;
  58:18;60:17;64:10;
  66:11;74:24;94:6;
  102:22;110:4;
  118:19,23;125:9;
  132:14
**whereas (1)**
  94:21
**Whereupon (1)**
  134:24
**whistles (1)**
  65:16
**WHITE (3)**
  10:2;11:22;21:17
**Whitehall (1)**
  7:21
**Whitlinger (1)**
  41:18
**whole (3)**
  26:25;81:13,22
**who's (7)**
  67:8,22;69:22;
  75:12;85:14;93:22;
  108:22
**whose (8)**
  67:7;94:24;95:18;
  99:6,6;107:13;113:8,
  21
**who've (1)**
  26:24
**wide (1)**
  85:12
**willful (1)**
  115:11
**willing (1)**
  22:9
**Wilmington (2)**
  10:12;69:16
**win (1)**
  118:21
**wind (1)**
  49:5
**wish (8)**
  114:17;116:21;
  119:24;120:4;125:1;
  133:4,7,16
**withdraw (1)**
  116:4
**within (11)**
  19:18;47:7;54:17;
  58:3;88:20;103:10
**without (11)**
  18:8;20:11,16;
  22:23;50:24;51:16;
  52:15;66:17;88:25;
  89:1;113:7

**witnesses (1)**
  78:16
**WOFFORD (1)**
  14:16
**Wolicki (1)**
  5:21
**word (3)**
  47:22;58:20;64:16
**words (3)**
  36:17;51:13;
  126:13
**work (18)**
  17:21;20:5;26:14;
  27:11;28:13;38:15,
  24;40:6;57:20;58:6,
  7,12;62:21;63:10;
  66:12,14;82:25;
  100:15
**working (3)**
  26:11;47:3;122:6
**world (2)**
  42:24;128:24
**worried (1)**
  67:25
**write (1)**
  115:9
**writing (6)**
  21:1;49:5;50:22;
  65:8;121:22,23
**written (5)**
  64:20;76:25;86:1,
  8;92:15
**wrong (1)**
  40:10
**wrongful (2)**
  81:21;99:9
**WYNNE (1)**
  14:25

**Y**

**year (3)**
  20:22;56:7;90:16
**years (1)**
  122:6
**yesterday (4)**
  45:2;65:9,24;71:1
**York (20)**
  5:24;7:14,23;8:5,
  16;9:5,14,22;10:5,14,
  22;11:5,11,13;12:6,
  14,23;13:5;14:14;
  32:21
**Yvonne (1)**
  3:15

**Z**

**Zide (18)**
  2:5;3:5;8:11;77:14,
  14,16,17,19,24;78:2,
  5,7,10,15,17,24,25;
  79:1

**Zide's (1)**
77:12

**0**

**02 (1)**
110:11
**05 (1)**
127:24
**05-CV-4555 (1)**
3:24
**07- (1)**
134:10
**09/08/2012 (1)**
3:23

**1**

**1 (5)**
3:21,22;11:20;
66:20;79:4
**10 (2)**
27:10;67:1
**100 (1)**
14:4
**1000 (1)**
15:5
**10004 (3)**
7:23;9:5;12:23
**10005 (1)**
12:6
**10006 (1)**
10:14
**10019 (1)**
7:14
**10020 (1)**
10:22
**10022 (3)**
8:16;9:14;11:5
**10036 (6)**
8:5;9:22;10:5;
11:13;12:14;14:14
**10040 (1)**
5:24
**10153 (1)**
13:5
**105 (1)**
2:13
**105a (1)**
4:21
**10601 (1)**
11:22
**1077 (1)**
2:7
**1095 (1)**
11:12
**10th (13)**
19:2;26:5;27:13,
18,25;28:1,4;33:21;
68:3,7;69:4;115:7,10
**11 (1)**
21:22
**11:30 (1)**

82:13
**11:42 (1)**
82:13
**1100 (1)**
14:5
**1102 (1)**
96:14
**1102a2 (1)**
106:13
**1102a4 (1)**
130:9
**1117 (1)**
15:21
**1155 (1)**
10:4
**1177 (1)**
8:4
**1184 (1)**
86:8
**11th (1)**
17:20
**12 (3)**
3:20;46:5;127:3
**12:55 (1)**
134:24
**120 (1)**
55:10
**12-01731-mg (1)**
3:10
**1211 (1)**
14:13
**12-12020 (1)**
17:3
**1221 (1)**
10:21
**1228 (2)**
2:7,7
**1229 (7)**
4:25;16:3;84:7;
85:3,24;86:10;92:1
**1242 (1)**
4:1
**1264 (1)**
5:14
**12th (2)**
12:5;33:25
**13 (13)**
86:16,23;87:7,13,
16,18,24;88:6,8;
90:22;91:23;92:10;
111:11
**1321 (1)**
2:7
**1326 (1)**
2:7
**1341 (1)**
2:7
**1356 (1)**
2:12
**1357 (1)**
5:6
**14 (3)**
3:14;4:10,17

**1415 (1)**
4:25
**1416 (1)**
4:20
**1418 (1)**
3:1
**1419 (1)**
2:1
**1426 (1)**
4:5
**1427 (1)**
4:13
**1494 (1)**
5:14
**1517 (1)**
86:1
**1549 (1)**
86:2
**1591 (1)**
5:17
**1600 (1)**
76:19
**1701 (1)**
8:22
**17th (4)**
25:8;27:16;28:2,5
**18 (1)**
3:17
**180 (1)**
39:6,25
**1819 (1)**
13:21
**19103 (1)**
8:23
**192nd (1)**
5:23
**1962 (1)**
3:18
**19th (1)**
12:22

**2**

**2005 (2)**
86:20;87:18
**2007 (1)**
127:25
**2008 (1)**
87:22
**2008/2009 (1)**
36:14
**2009 (1)**
134:8
**2010 (5)**
86:21;87:24;88:2,
3,4
**2011 (7)**
35:24;88:8,11;
89:4;90:1,13;91:1
**2012 (7)**
2:4;3:4;4:10,17;
70:25;90:6,17
**2014-1 (2)**

4:7,15
**2014a (2)**
4:7,15
**21st (1)**
7:22
**22nd (1)**
15:21
**23 (1)**
46:5
**23rd (2)**
24:20;25:16
**24 (1)**
127:25
**250 (4)**
39:6;40:1;56:3;
104:10
**251 (1)**
64:12
**252 (1)**
46:7
**25th (1)**
70:25
**26 (1)**
12:21
**261.20 (1)**
46:5
**261.23 (1)**
46:7
**262.22a (1)**
64:16
**27 (1)**
134:8
**27th (1)**
85:25
**28 (3)**
3:4;56:25;57:4
**29th (1)**
44:17

**3**

**3 (5)**
35:19;67:5,15;
70:1;82:20
**31 (1)**
3:17
**31st (2)**
24:21;44:16
**3200 (1)**
7:5
**326 (1)**
134:10
**327 (1)**
80:4
**327e (2)**
4:6,14
**33 (1)**
7:1
**33705 (1)**
16:4
**35203 (1)**
13:22
**35205 (1)**

15:22
**3535 (1)**
3:22
**362d (2)**
4:21;86:4
**363 (3)**
2:13;5:7;79:5
**3729 (1)**
3:17
**3733 (1)**
3:17
**3rd (5)**
26:2,17,25;27:22;
34:5

**4**

**4 (2)**
35:19;67:5
**4001 (1)**
86:4
**4001-1 (1)**
86:5
**42 (1)**
3:21
**44 (1)**
12:4
**4675 (1)**
15:13
**47502 (1)**
3:22
**47th (1)**
15:4
**49 (1)**
3:22
**4th (1)**
116:8

**5**

**5 (3)**
2:4;35:19;76:17
**51 (1)**
7:13
**52nd (1)**
7:13
**55437 (1)**
15:14
**555 (1)**
14:21
**56f (2)**
72:21;73:7
**57237 (1)**
134:11
**599 (1)**
9:13

**6**

**6 (1)**
17:9
**6004 (1)**
5:8

**601 (1)**
  8:15
**60603 (1)**
  13:13
**61 (1)**
  4:1
**64112 (1)**
  15:6
**666 (1)**
  3:17
**6th (1)**
  23:15

### 7

**7 (3)**
  134:8,12,16
**700 (2)**
  5:23;15:4
**7008 (1)**
  3:18
**767 (1)**
  13:4
**777 (1)**
  7:4
**78701 (1)**
  14:6

### 8

**80th (1)**
  15:13
**856 (1)**
  86:7
**8th (2)**
  27:23;66:2

### 9

**9 (1)**
  79:5
**90017 (1)**
  7:6
**90071 (1)**
  14:23
**9013 (1)**
  85:20
**9013-1 (1)**
  85:21
**9019 (1)**
  25:1
**909 (1)**
  11:4
**945 (1)**
  4:1
**959 (2)**
  56:25;57:3
**973406-2250 (1)**
  5:25
**9th (7)**
  19:2;27:5,6,23,24;
  95:13,16