JACKSON WALKER LLP
Patricia B. Tomasco
SDNY PT0899
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2076 (direct line)
(512) 691-4138 (direct fax)
ptomasco@jw.com

*Counsel for The Frost National Bank*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | (Chapter 11) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE FROST NATIONAL BANK TO THE
FIRST SUPPLEMENTAL NOTICE OF (I) DEBTORS' INTENT TO ASSUME
AND ASSIGN CERTAIN EXECUTORY CONTRACTS, UNEXPIRED LEASES OF
PERSONAL PROPERTY, AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL
PROPERTY AND (II) CURE AMOUNTS RELATED THERETO**

TO THE HONORABLE MARTIN GLENN, U.S. BANKRUPTCY JUDGE:

The Frost National Bank ("Frost"), a counterparty to a Servicing Agreement, creditor and party-in-interest in the above captioned bankruptcy case, files this Objection to the First Supplemental Notice of the Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpir3ed Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property, and (ii) Cure Amounts Related Thereto (the "Notice") [Dckt. No. 924]. In support, Frost respectfully shows the Court as follows:

### I. SUMMARY OF FROST'S OBJECTION

1.  The Debtors purport to assume and assign the Assumed Contracts without complying with the *cum onere* principles of 11 U.S.C. 365. Specifically, the Debtors propose

that the Purchaser will have no liability for any default that arose prior to the Closing Date at the same time that Debtors propose that Cure Amounts cannot include any "unknown" amounts that arose at anytime prior to the Closing Date.

2.     The Frost Servicing Agreement contains indemnification language typical to all servicing contracts that recognizes that the servicer holds the mortgages in trust and is required to indemnify the owner for any liabilities arising out of the servicer's negligence or willful conduct.  There is very little transparency between the owner and the servicer with respect to the servicer's day-to-day conduct.  Whether there has been a servicer default is frequently not known to the owner until there is a mortgagor lawsuit alleging wrongdoing by the servicer or a loss to a tax sale or other competing lien holder.  As the Court is well aware, the Debtors are subject to multiple lawsuits for servicer conduct that would give rise to an indemnification obligation under the Frost Servicing Agreement.  If a lawsuit is asserted or a loss incurred after the Closing Date relating to any conduct of the Debtors (a "Latent Default"), Frost will have no recourse against either the Debtors or the Purchaser under the Debtors' scheme as proposed.

3.     Frost attempted to conduct discovery to discern whether there were Latent Defaults that could or should be asserted as part of this Objection.  Frost propounded discovery on August 24, 2012, and pursuant to this Court's Scheduling Order indicated that the discovery was due on September 4, 2012.  The Debtors requested an extension to September 11, 2012, which Frost acquiesced provided that there were not any wholesale objections to the discovery.  The Debtors did not respond until September 23, 2012.  Even then, the responses blithely invited Frost to "conduct an audit" as permitted by the Frost Servicing Agreement and did not compile or provide the requested answers.  Document production did not occur until September 27, 2012, one day before the deadline to Object to the Contract Notice.  According to the Debtors, Frost

cannot get the information it needs to discern whether a Latent Default exists but is nonetheless barred from asserting one when it occurs after the Closing Date.

4.  In sum, the Debtors propose that the Purchaser have no liability for Latent Defaults, that the Debtors have no liability for Latent Defaults, and that the Debtors have no responsibility to provide discovery to Frost to determine whether or if there are Latent Defaults.

## II. BACKGROUND FACTS

### A. The Debtors' Sale Motion and Related Pleadings

5.  On May 14, 2012 (the "Petition Date"), the Debtors filed voluntary petitions commencing the above-referenced cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

6.  On the Petition Date, the Debtors also filed their Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m) and 1123, and Fed. R. Bankr. P. 2002, 6004 and 9014 for Orders: (a)(i) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (ii) Scheduling Bid Deadline and Sale Hearing; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief and (b)(i) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; (ii) Authorizing and Approving Asset Purchase Agreements Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Sale Motion") [Dckt. No. 61]. The Sale Motion provides for the sale of the Debtor's Servicing Platform to Nationstar or a Successful Bidder (hereinafter the "Purchaser" or "Nationstar").[1]

---

[1] Capitalized Terms not otherwise defined herein shall have the meanings ascribed in the Sale Motion and the Nationstar APA.

8504105v.1

7. On June 28, 2012, the Bankruptcy Court entered the Sale Procedures Order [Dckt. No. 538]. On July 26, 2012, the Debtors filed a Notice of (i) Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property and Unexpired Leases of Nonresidential Real Property and (ii) Cure Amounts Related thereto [Dckt. No. 924](the "Contract Notice,").

8. The Contract Notice contains a proposed Cure Amount (the "Cure Amount") for each agreement included in the schedule, but expressly states that the Cure Amounts "do not include any (i) existing post-petition obligations that the Debtors anticipate paying before the date the Designated Agreement is to be assumed and assigned…; (ii) post-Petition Date obligations that may be incurred but unknown as of July 25, 2012, which obligations may remain outstanding against the Debtors as of the Assumption Date; [or] (iii) unknown pre-Petition Date obligations." The Contract Notice lists the Frost Servicing Agreement (described below) with a Cure Amount of zero.

9. As previously detailed in Frost Bank's Limited Objection ("Frost's Limited Objection") to Debtors' Motion Pursuant to 11 U.S.C. §363, (b)(f), and (m), 365 and 1123 [Dckt. No. 61], the Debtors purport to assume and assign Contracts subject to the Contract Notice free and clear of any liability that is based on the pre-Closing Date conduct of the Debtors whether or not the basis for that liability is known or unknown as of the Closing Date. (Such pre-Closing Default not known at the time of the Closing Date is hereinafter referred to as a "Latent Default").

10. Latent Defaults are not theoretical but are certain to occur in a typical servicing relationship. For example, if the Debtors failed to insure that taxes were paid for 2012 on a Mortgaged Property and the relevant taxing authority conducts a tax sale in January 2013, the

8504105v.1

loss of that property could not be asserted either against the Debtors or the proposed Purchaser. If the Debtors issued forced place insurance that was duplicative of mortgagor insurance and the mortgagor requests a refund of the premium, that refund would not be payable by either the Debtors or the Purchaser under the Debtors' scheme even though all of the Custodial Accounts and Escrow Accounts are purportedly transferred to the Purchaser under the Nationstar APA. This scheme finds no support in the law or the Bankruptcy Code, yet the Debtors persist in advancing it to the detriment of their contract counterparties such as Frost.

11. The Debtors' scheme to circumvent the *cum onere* principles of section 365 with respect to Latent Defaults has three steps. First, the Purchaser is absolved of any liability arising after the Closing Date based on any act or omission arising prior to the Closing Date. Second, the Debtors propose to exclude any Latent Default from the Cure Amount (and refuse to provide discovery to allow the counterparty to ascertain whether a default exists). Third, the Debtors purport to absolve themselves or their estates from any liability for any Latent Default. The result is that contract counterparties will be left holding the bag for any Latent Default despite the Bankruptcy Code's requirement that they be made whole as a result of assumption of their contracts.

12. Step one of the Debtors' scheme is to absolve the Purchaser of any liability for a Latent Default. The Sale Motion, the Nationstar APA, the Contract Notice and the proposed Sale Order all indicate that Nationstar as the Purchaser is expected to be responsible only for claims or obligations under an Assumed Contract that arise on or after the Closing of the Sale of the Servicing Platform. For example, section 2.2 of the Nationstar APA states that Nationstar assumes the Servicing Contracts. In turn, Assumed Liabilities is defined as including only "the Liabilities arising under any Assumed Contract to the extent such Liabilities arise ***on or after the***

***Closing***." Correspondingly, "Retained Liabilities" is defined as including the "Cure Amount" and "any act or omission of any … servicer of Mortgage Loans occurring prior to the Closing Date." *See* Nationstar APA.

13. Step two of the Debtors' scheme the Debtors' proposal that the Debtors will not cure contingent, unknown liabilities such as Latent Defaults. The Contract Notice recites that it does not include "unquantifiable or unknown pre-closing liability" of a Debtor, and to the extent that contract counterparties request that latent defaults be cured, the Debtors have indicated in the Contract Notice that they will request that such objections "be overruled."

14. If the Debtors proposed a mechanism whereby Latent Defaults could be asserted against the Debtors' estates as and when they become known, the APA might not be that onerous. However, step three of the Debtors' scheme is that the Debtors propose that a contract counterparty be bound to the proposed terms of such assumption and assignment "for all purposes in [the] Chapter 11 cases," and be barred from:.

> …asserting at any time any condition to assignment, default, claims, obligations or breach and/or any additional cure, damage or other amount with response to the respective Assumed Contract on the basis of events of any kind or nature occurring or arising prior to the Closing Date. . ., whether such events constituted acts or omissions by the Debtors or other person and regardless of whether such events are known or unknown, including, without limitation, claims or liabilities related to any act or omission of any originator, holder or servicer of mortgage loans prior the Closing Date, and any indemnification obligations, claims or liabilities relating to a any act or mission of the Sellers or any other person prior to the Closing Date.

Contract Notice, p.4. Thus the Debtors purport to transfer the Custodial Accounts and Escrow Accounts even though, in the case of Frost, the Debtors do not own the proceeds of the Mortgage Loans.

**B.**     **Breaches and Cure Amounts Due under the Frost Servicing Agreement**

15.     On June 30, 2000, Frost and GMAC Mortgage Corporation, joint-debtor and subsidiary of ResCap ("GMAC") executed that certain servicing agreement for residential mortgage loans (the "Frost Servicing Agreement").  The Frost Servicing Agreement is relatively small, covering only 547 mortgages totaling $22.1 million, with an average outstanding principal of $39,000.

16.     Section 2.04 of the Frost Servicing Agreement provides for broad indemnification for " any and all claims, losses, damages, penalties fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs, fees and expenses … that result directly from a breach of any … covenant.  Section 8.01 further provides that "[t]he Servicer shall indemnify the Owner and hold the Owner harmless against any and all claims, losses, penalties, fines forfeitures, legal fees and related costs, judgments and any other costs, fees and expenses that the Owner may sustain in any way related to the failure of Servicer to perform its duties and service the Mortgage Loans in material compliance with the terms of this Agreement."  Section 7.01 requires that the "Servicer shall provide to the Owner … access to any documentation regarding the Mortgage Loans which may be required by applicable law."  Events of Default include, without limitation: (i) failure to remit required payments to Frost, (ii) failure to observe any of the obligations, agreements or covenants of the Servicing Agreement, (iii) the Servicer is suspended or terminated by FNMA, FHLMC, HUD, or the VA.

17.     The proposed Sale Motion and the Contract Notice violate the terms of the Frost Servicing Agreement and purport to modify the Frost Servicing Agreement without Frost's consent.  Further, the proposed Sale Motion and the Contract Notice are a repudiation of the Debtors' obligations under the Frost Servicing Agreement and are a breach thereof. The Debtors' refusal to provide timely information about the servicing and the Mortgage Loans

as requested by Frost is a breach and repudiation of the Frost Servicing Agreement. As a result of these breaches Frost has been required to employ counsel to enforce its rights under the Frost Servicing Agreement. In addition, Frost estimates that Latent Defaults under the Frost Servicing Agreement will be 1.5% of the outstanding principal balance of the Mortgage Loans. Thus Frost's total cure claim is $331,500 plus attorneys' fees and costs of $50,000 (subject to future costs and fees).

18. Frost is continuing to review documents provided by the Debtors and may supplement this cure claim analysis as additional information is gleaned from the Debtors' late and paltry responses to Frost's discovery requests or from other information that Frost may learn. Further, as explained below, Frost does not waive its rights of recoupment and setoff with respect to any amounts that may be owed to the Debtors or the Purchaser under the Frost Servicing Agreement.

### III. ARGUMENT AND AUTHORITIES

A. **The Contract Notice and the Sale Motion Violate the *Cum Onere* Maxim**

19. Section 365 of the Bankruptcy Code provides that the debtor cannot assume an executory contract unless it: (i) cures the default; (ii) compensates the nondebtor party for any actual pecuniary losses resulting from the default; and (iii) provides adequate assurance of future performance under the contract. 11 U.S.C. § 365(b). As made clear by the amendments effected by the Bankruptcy Abuse Prevention and Consumer Protection Act of 3005 ("BAPCPA"), with the limited exceptions of penalty rates and penalty provisions, the debtor is required to cure all nonmonetary defaults as well. *Id.* By excluding "unquantifiable or unknown pre-closing liability" from its proposed Cure Claims, the Debtors attempt to rewrite section 365 to exclude non-monetary defaults.

20. Paragraph 6 of the proposed Sale Order and the "Assumed Liability" and "Excluded Liability" definitions of the APA purport to cut off Frost's ability to recover for any pre-Closing Date default while simultaneously absolving the Debtors of responsibility. This coupled with an inadequate mechanism for asserting or identifying non-monetary defaults or otherwise discerning what defaults need to be cured puts the Sale Motion on illegal footing. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere* and the exposés and liability incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate") *citing In re Italian Cook Oil Co.*, 190 F.2d 994, 996 (3rd Cir. 1951) ("The trustee, however, may not blow hot or cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits, he must adopt the burdens. He cannot accept one and reject the other."). The Sale Motion purports to assume and assign the Frost Servicing Agreement without any mechanism for addressing non-monetary defaults and Latent Defaults. Any purchaser should be required to assume liability for non-monetary defaults and Latent Defaults regardless of their temporal origins.

21. Further, adequate assurance of future performance includes showing that the assignee of the contract is capable of continued performance in every material respect. *See In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 693, 712-13 (Bankr. M.D. La. 1999) (otherwise permissible assignment resulted in an impermissible modification of electric supply contract by changing essential structure of arrangement). Here, the Debtors purport to assign the Frost Servicing Agreement without requiring the Purchaser or the Debtors to satisfy its broad and ongoing indemnification provisions. The Debtors' scheme is thus an impermissible modification of the Frost Servicing Agreement because the Purchaser will be absolved of complying with the

8504105v.1

indemnification provisions of the Contract with respect to any Latent Default. *See also, In re 1945 Route 23 Assocs., Inc.*, 2008 WL 2386296 at *7 (Bankr. D. N.J. 2008) (rejecting assignee's argument that it was not responsible for amount accrued under a lease prior to the sale closing date").

22. Frost further hereby incorporates by reference paragraphs 16 through 21 of the *Pre-Auction Objections of the RMBS Trustees to the Debtors' Sale Motion* filed on August 23, 2012 [Dckt. No. 1242] (hereinafter the "RMBST Objection").

B. **The Contract Notice and Sale Motion Violate Frost's Vested Property Rights**

23. Under the terms of the Nationstar APA, the Debtors will transfer as "assets" certain funds and escrow rights to the Purchaser free and clear of all liens claims and encumbrances. However, the Debtors cannot sell under section 363 property that is not property of the estate or provide the Purchaser any greater title than that possessed by the Debtors. If the bankruptcy estate holds only bare legal title, it would follow that all of the value of the property must be retained to the beneficial owner and the bankruptcy estate would receive nothing from the sale. *See In re Combustion Engineering, Inc.,* 292 B.R. 515, 519 (Bankr.D.Del.2003) (§ 541(d) mandates that debtor administer trust property in accordance with terms of the trust for benefit of the beneficial owner of the property); *In re W.L. Bradley, Inc.,* 75 B.R. 505, 513 (Bankr.E.D.Pa.1987) (corpus of a trust in favor of a non-debtor beneficiary is not property of the estate).

24. Pursuant to 3.01(c) the Frost Servicing Agreement, "[a]ll funds received on or in connection with a Mortgage Loan shall be received and held by Servicer in trust for the benefit of the Owner … ." As such, any funds received by the Debtors from the mortgaged covered by Frost Servicing Agreement are not property of the estate such that any provision of the Sale Order that purports to limit or cut off Frost's setoff, recoupment or other rights with respect to

those proceeds before or after the Closing Date are unenforceable. *E.g.* 11 U.S.C. § 541(d); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) ("Congress plainly excluded [from the bankruptcy estate] property of others held by the debtor in trust at the time of the filing of the petition."). Therefore, the "bankrupt estate ... obtains no greater ownership right ... than [the debtor] ... would have ... prior to the bankruptcy filing." *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.,* 960 F.2d 366, 372 (3d Cir.1992).

25. Because the Debtors cannot sell property that they do not own, it follows that that the proposed Sale Order cannot cutoff Frost's beneficial title to the proceeds of the Mortgage Loans under the Frost Servicing Agreement.

> [i]f the Debtor's interest in the Property is a bare legal interest and if one conceptualizes the possibility of a sale of that interest, it is difficult to see how the Trustee could meet the requirements of § 363(h)(3) in this case. Generally, when a trustee sells both the estate's interest and the co-owner's interest in property pursuant to 11 U.S.C. § 363(h), the trustee must account to the co-owner for the co-owner's rightful share of the net proceeds. If the bankruptcy estate holds only bare legal title, it would follow that all of the value of the property must be attributed to the beneficial owner and the bankruptcy estate would receive nothing from the sale. In these circumstances ... it is difficult to see how the benefit to the bankruptcy estate would outweigh the detriment to the co-owner, as is required by § 363(h).

*In re Stewart*, 368 B.R. 445, 449 n. 8 (citations omitted), aff'd, 325 F. App'x 82 (3d Cir.2009). *Stewart* involved property held in a resulting trust under Pennsylvania law. Here, the Nationstar APA purports to transfer beneficial ownership of funds the Custodial Accounts, Escrow Accounts and other funds held in trust by the Debtors, free and clear of those interests including the right of setoff and recoupment. This is demonstrated by the Debtors' purported attempts to cutoff any counterparty's right to setoff or recoupment for any Latent Default pursuant to

11 U.S.C. § 363(f). The Debtors seek a result antithetical to the Bankruptcy Code and property rights of Frost.

26. Further, recoupment rights cannot be abridged even with respect to funds that property of the estate. *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252 (3rd Cir. 2000) (entitlement to recoupment may not be extinguished in "free and clear" sale under 11 U.S.C. §363(f)); *Hispanic Independent Television Sales LLC v. Kaza Azteca America Inc.*, 10 Civ. 932 (SHS), 2012 WL 1079959 (S.D.N.Y. Mar. 30, 2012) (claimant's affirmative defense of recoupment held not to have been extinguished by sale pursuant to 11 U.S.C. §363(b) and (f))

## IV. RESERVATION OF RIGHTS

27. Frost specifically reserves its right to (a) amend, supplement or otherwise modify this Objection, and (b) assert or raise such other and further objections or responses to a possible assumption by the Debtors and assignment to the Purchaser of the Frost Servicing Agreement based on information received from the Debtors, Nationstar or other sources, or compiled by Frost, and with respect to any supplemental or revised notices or pleadings filed by the Debtors or any other party.

WHEREFORE, PREMISES CONSIDERED The Frost National Bank respectfully requests that any order granting the Sale Motion be modified to require that potential purchasers assume all Latent Defaults under the Frost Servicing Agreement, that Frost's estimated Cure Claim and attorneys' fees be paid as required in the Frost Servicing Agreement, that Frost's property interests in the Mortgage Loans and their proceeds be preserved, and that Frost have such other and further relief to which it is entitled.

8504105v.1

Dated: September 28, 2012.

        Respectfully submitted,

        JACKSON WALKER L.L.P.
        100 Congress Ave., Suite 1100
        Austin, Texas 78701
        (512) 236-2000
        (512) 236-2002 - FAX

        By: */s/Patricia B. Tomasco*
            Patricia B. Tomasco
            SDNY PT0899
            (512) 236-2076 – Direct Phone
            (512) 691-4438 – Direct Fax
            Email address:  ptomasco@jw.com

        **COUNSEL FOR THE FROST NATIONAL BANK**

8504105v.1

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 28th day of September 2012, a true and correct copy of the foregoing was served via the Court's CM/ECF electronic notification system on the parties listed below:

Larren M. Nashelsky,
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104

OFFICE OF THE US TRUSTEE
Tracy Hope Davis
Linda A. Rifking
Brian S. Masumoto
33 Whitehall Street, 21st Floor
New York, NY 10004

Richard A. Cieri
KIRKLAND & ELLIS, LLP
153 East 53rd Street
New York, NY 10022

Ken Ziman
Jonathan H. Hofer
SKADDEN ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

Kenneth Eckstein
George Horowitz
KRAMER LEVIN NAFTALIS & FRANKEL
1177 Avenue of the Americas
New York, NY 10036

Jessica C. K. Boelter
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

                                                /s/ *Patricia B. Tomasco*
                                                Patricia B. Tomasco