WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Ronit J. Berkovich

*Attorneys for Syncora Guarantee Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
 ---------------------------------------------------------------- x
                                                                  :
In re:                                                            :   Chapter 11
                                                                  :
Residential Capital, LLC, et al.                                  :   Case No. 12-12020 (MG)
                                                                  :
                          Debtors.                                :   (Jointly Administered)
                                                                  :
 ---------------------------------------------------------------- x
```

**SYNCORA GUARANTEE INC.'S LIMITED**
**OBJECTION TO DEBTORS' SALE MOTION**

## <u>TABLE OF CONTENTS</u>

I.  Preliminary Statement.............................................................................................1

II.  Background and Agreements..................................................................................5

III.  Objection.................................................................................................................6

A.  Section 365(c) Prohibits the Debtors From Assigning the Syncora-Related Servicing Agreements Without Providing Adequate Assurance of Future Performance.................................................................................................6

B.  The Debtors Should Not Be Permitted to Reform the Syncora-Related Servicing Agreements Through the Assumption and Assignment Process........................................................................................................8

i.  The Debtors' Improper Cherry-Picking..........................................12

ii.  Failure to Assume Integral Agreements ........................................16

iii.  Sale Free and Clear of Certain Rights and Obligations.................19

C.  Certain Provisions in the Proposed Order Should Be Removed, Modified or Added.....................................................................................................20

V.  Conclusion ..........................................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AGV Productions, Inc. v. Metro-Goldwyn-Mayer, Inc.*,
    115 F.Supp.2d 378 (S.D.N.Y. 2000) .........................................................................10

*Carvel Corp. v. Diversified Mgmt Group, Inc.*,
    930 F.2d 228 (2d Cir. 1991) ..............................................................................13, 20

*DB Structured Products, Inc. v. American Home Mortgage Holdings, Inc. (In re
    American Home Mortgage Holdings, Inc.)*,
    402 B.R. 87 (Bankr. D. Del. 2009) .........................................................................14

*Empire State Bldg. Co. L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*,
    432 B.R. 66 (Bankr. S.D.N.Y. 2010) ..........................................................11, 12, 21

*In re Gardinier, Inc.*
    831 F.2d 974 (11th Cir. 1987) ................................................................................11

*In re GlycoGenesis*,
    352 B.R. 568 (Bankr. D. Mass. 2006) ......................................................................8

*In re Plitt Amusement Co. of Washington, Inc.*,
    233 B.R. 837 (Bankr. C.D. Cal. 1999) ....................................................................11

*In re S.E. Nichols Inc.*,
    120 B.R. 745 (Bankr. S.D.N.Y. 1990) ....................................................................11

*In re Teligent, Inc.*,
    268 B.R. 723 (Bankr. S.D.N.Y. 2001) ................................................12, 13, 20, 21

*Matter of Easthampton Sand & Gravel Co., Inc.*
    25 B.R. 193 (Bankr. E.D.N.Y. 1982) ...............................................................12, 16

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*,
    892 F.2d 199 (2d Cir. 1989) ..............................................................................13, 21

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (U.S. 1984) ....................................................................................4, 10

*Pieco, Inc. v. Atlantic Computer Sys. (In re Atlantic Computer Sys.)*,
    173 B.R. 844 (S.D.N.Y. 1994) ..........................................................10, 13, 15, 17

*Rudman v. Cowles Commc'ns*,
    30 N.Y.2d 1 (N.Y. 1972) ........................................................................................12

*The Leslie Fay Cos., Inc. v. Corp. Prop. Assocs. 3 (In re Leslie Fay Cos., Inc.)*,
     166 B.R. 802 (S.D.N.Y. 1994)................................................................................................10

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Syncora Guarantee Inc. ("***Syncora***") respectfully submits this limited objection to

the above-captioned debtors' (the "***Debtors***") sale motion [Docket No. 61] (the "***Motion***"), and

respectfully represents as follows:

## I.    <u>Preliminary Statement</u>

1.    The Debtors' request to sell their servicing-related business, if permitted

as outlined in the Motion, violates title 11 of the United States Code (the "***Bankruptcy Code***")

and the rights provided thereunder to counterparties of contracts.  Syncora objects to (i) the

Debtors' gross failure to demonstrate that the proposed assignee can and will provide "adequate

assurance of future performance" as required by section 365(f) of the Bankruptcy Code, (ii) the

Debtors' attempt, through language in the proposed sale order (the "***Proposed Order***") [Docket

No. 113-2], to reform, or rewrite, the executory contracts they propose to assume and assign to a

successful bidder by cherry-picking only certain of the rights and obligations under such

agreements, and (iii) additional improper provisions of the Proposed Sale Order.

2.    The Debtors seek to assign certain mortgage servicing and related

agreements to the successful bidder at an auction scheduled for October 23, 2012, including the

agreements, listed on Exhibit "A" hereto, relating to three trusts where Syncora has issued

insurance policies (the "***Syncora-Related Servicing Agreements***").  Under the Syncora-Related

Servicing Agreements, the Debtors administer thousands of mortgages on behalf of trusts that

own those mortgages.  To service the mortgages, the Debtors are actively:

- providing consents and waivers with respect to serviced loans and the
  property that secures them;

- maintaining information and providing periodic, detailed reports on the status of the loans in the trusts and related financial information;

- executing instruments of satisfaction or cancellation with respect to the loans and collateral; and

- prosecuting and defending actions relating to the loans and collateral, including initiating foreclosure actions.

3.       Syncora, formerly known as XL Capital Assurance, Inc., insured payment of principal and interest for the benefit of the holders of certain securities in the three trusts that own loans the Debtors service.  Accordingly, Syncora has a strong economic interest in ensuring that the mortgage loans in those trusts are properly serviced and that the trusts recover the maximum amount possible from the loans and collateral serviced by the Debtors or their successor.

4.       Syncora objects to the Debtors' assumption and assignment of servicing rights to any bidder absent evidence that the proposed assignee has the personnel, expertise, operations, experience and financial wherewithal to service portfolios of loans on a scale commensurate with the size of the Debtors' portfolio.  Each loan pool in the trusts subject to the Syncora-Related Servicing Agreements is comprised of second-lien loans.  Two trusts are highly distressed with significant loans in default and subject to remedial action, and the third trust is at risk of suffering significant defaults.

5.       As a result, these loan pools require a servicer with established expertise in servicing distressed second lien loans to maximize the value of the loan pools.  The Debtors have not provided satisfactory information to evaluate the ability of their stalking horse, Nationstar Mortgage LLC ("***Nationstar***"), to perform the large-scale and complex duties required of a servicer under the Syncora-Related Servicing Agreements.  Syncora has contacted Nationstar to perform its own diligence and ultimately may conclude that Nationstar will capably

2

service the loans.  Although Nationstar has provided Syncora with some information and access

to personnel, Syncora has outstanding inquiries to Nationstar, which have not yet been satisfied,

as a result, Syncora has not completed its diligence.

      6.      In addition to Nationstar's financial wherewithal and capabilities to

perform the obligations it proposes to assume under the Syncora-Related Servicing Agreements,

it must demonstrate that it is willing to fully perform ***all*** obligations under those agreements –

Nationstar has done the opposite here.  The Debtors seek to exempt Nationstar from its adequate

assurance obligations by agreeing that Nationstar will have to perform only certain of the

obligations under the servicing agreements post-closing.  The assignment of the Syncora-Related

Servicing Agreements must be denied until Nationstar agrees to perform all obligations under

assigned agreements post-closing as required by section 365(f) of the Bankruptcy Code.

      7.      As woeful as the Debtors' adequate assurance failure is, the Debtors'

attempts to reform the Syncora-Related Servicing Agreements pursuant to the Proposed Order is

beyond the pale.  The Proposed Order would reform the Syncora-Related Servicing Agreements

by (i) improperly severing portions of those agreements, cherry-picking only certain rights and

obligations for assumption and/or assignment and (ii) failing to assume and assign together all

agreements that are an integral part of a single transaction.  By doing so, the Debtors are

violating a fundamental principle of bankruptcy law:  a debtor only may assume an executory

contract *cum onere* and may not modify the contract through the assumption process.  *See NLRB*

*v. Bildisco & Bildisco*, 465 U.S. 513, 531 (U.S. 1984).

      8.      The exception to this principle demonstrates its inviolability.  In the

limited circumstances where courts allow a debtor to sever a contract, it is only after the debtor

has proven that the intent of the parties was to assent to separate contracts.  A corollary principle

also demonstrates the sanctity of the *cum onere* contract: where a single assent is reflected in

multiple agreements, those agreements must be treated as one in the assumption process. Courts

do not allow a debtor to assume parts of an integrated agreement, while disclaiming obligations

in that agreement or related agreements, as the Debtors propose to do here, because such a

practice would vitiate private bargains and severely prejudice non-debtor parties. This case

exemplifies why a debtor cannot assume and assign less than all of the benefits and burdens of

an agreement. Permitting partial assumption and assignment avoids performance of the related

obligations the Debtors agreed to undertake (including in related agreements) and on which

counterparties relied as part of their bargain.

9.      Although the deadline for filing certain of its objections to the Proposed

Order is not until October 29, 2012 (Sale Procedures Order [Docket No. 538] ¶ 25), out of an

abundance of caution, and to apprise the Court, the Debtors, all bidders and parties in interest of

its objections – particularly in light of the announcement at the September 27, 2012 status

conference that the Debtors are attempting to resolve certain objections prior to the auction –

Syncora is asserting objections to the sale now. Although Syncora has reached out to the

Debtors to share its views, Syncora has not been included in these discussions, and its objections

are not resolved. Importantly, in the event that the Debtors and the Trustees (as defined below)

resolve any of their issues as they relate to the Syncora-Related Servicing Agreements (*e.g.,* if

the Trustees agree not to object to the severing of certain obligations under those agreements),

such resolution *will not be binding on Syncora*. Syncora will continue to have a right to

prosecute its objections to the treatment of the Syncora-Related Servicing Agreements.

10.     While Syncora does not object to the sale or assumption and assignment of

the Syncora-Related Servicing Agreements *per se*, it objects to unilateral reformation of the

4

Syncora-Related Servicing Agreements.  If the Court approves a transaction, Syncora

respectfully requests that the Court revise the Proposed Order to approve assumption and

assignment of the Syncora-Related Servicing Agreements and their related agreements *cum*

*onere*.[1]

## II.   Background and Agreements

11.   The three Syncora-Related Servicing Agreements do not stand on their

own.  Each one is a part of an integrated transaction for the creation and servicing of trusts that

hold mortgage loans: the ***"SunTrust Transaction***," the "***GreenPoint Transaction***" and the "***Bear***

***Stearns Transaction***" (collectively, the "***Syncora Insured Transactions***").[2]  Each Syncora

Insured Transaction involves certain "***Additional Transaction Documents***," which are listed and

described in Exhibit "B" hereto.[3]  Each Additional Transaction Document comprises a part of the

same transaction as, and works together with, the Syncora-Related Servicing Agreement to

which it relates and contains important rights and responsibilities of parties to those agreements,

including Syncora and the Debtors.  The parties' bargain for any given transaction is only

reflected when such documents are read together.[4]

---

[1] In the event that the Court approves modification of the Syncora-Related Servicing Agreements through the assumption and assignment process in a manner that triggers consequences under those agreements and/or other agreements, (i) Syncora reserves all rights against parties other than the Debtors and the assignee under the Syncora-Related Servicing Agreements that are assumed and assigned and (ii) Syncora reserves all rights against all parties under agreements that are not assumed.

[2] Each of the Syncora Insured Transactions is a separate transaction with a separate set of related agreements and each such set of related agreements may be assumed and assigned independent of the others.

[3] The Syncora-Related Servicing Agreements and the Additional Transaction Documents are voluminous and are therefore not attached here.

[4] Syncora has certain third-party beneficiary rights with respect to each of the Syncora-Related Servicing Agreements and is also a third-party beneficiary under or party to certain of the Additional Transaction Documents.  For the Bear Stearns Transaction, Syncora's third party beneficiary rights appear in the Assumption and Recognition Agreement, among GMAC Mortgage, LLC, EMC Mortgage Corporation

5

### III.    Objection

#### A.    Section 365(c) Prohibits the Debtors From Assigning the Syncora-Related Servicing Agreements Without Providing Adequate Assurance of Future Performance

12.    A debtor's right to assume and assign an executory contract is not absolute.  It is the Debtors' burden to demonstrate adequate protection of future performance. *See In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 674-75 (S.D.N.Y. 2012). Debtors are prohibited from assuming and assigning executory contracts pursuant to section 365(f) of the Bankruptcy Code unless "adequate assurance of future performance by the assignee . . . is provided . . . ."

13.    As the Motion acknowledges, adequate assurance is a flexible concept and is applied in light of the facts and circumstances.  *See* Motion at ¶ 84, citing *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Here, where performance under the assumed contracts will require a large, sophisticated operation and special expertise, parties should receive more than a simple demonstration of financial wherewithal.  *See* Motion at ¶ 84, (citing *In re Bygaph Inc.*, 56 B.R. 596 605-06 (Bankr. S.D.N.Y. 1986) (experience in managing the type of enterprise or property assigned may be part of the adequate assurance inquiry); *In re GlycoGenesis*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (considering "business plan, financing and scientific expertise" in deciding whether adequate assurance was present).  A party's financial wherewithal is only one important factor when assuming obligations as complex as those under a servicing agreement.  An assignee's operational

---

and Sovereign Bank (the "***AAR Agreement***"), which contains certain of the terms of the servicing agreement for the Bear Stearns Transaction.   Under section 5.20 of the indenture for the Greenpoint Transaction (as defined herein) it has certain rights to direct the trustee for the Greenpoint Transaction, in connection with any insolvency proceeding of the servicer, including any settlement or agreement to the terms of the Proposed Order.

capabilities – logistically and experience-wise – to perform adequately all such obligations is equally critical.

14.    Nationstar has provided Syncora with information related to its ability to perform under the Syncora-Related Servicing Agreements.    However, Syncora has not obtained sufficient information on Nationstar's experience managing portfolios of distressed second-lien loans and its success generating recoveries, including performance data for management of pools of second-lien collateral.  Syncora has requested information on the number of loans and the balances and recovery rates over specific time periods in representative distressed portfolios Nationstar manages.  Syncora is also seeking information from Nationstar regarding how it proposes to absorb the Debtors' large servicing platform without disruption to Nationstar's ability to perform under the Syncora-Related Servicing Agreements.  Absent complete information on Nationstar's operational capabilities, and in particular its ability to service large portfolios of distressed second-lien loans, the Debtors fail to demonstrate adequate assurance of future performance because they fail to show that Nationstar will be able to perform the servicing duties under the Syncora-Related Servicing Agreements.

15.    In addition, as argued by the RMBS Trustees (the "*Trustees*") in The Pre-Auction Objections of the RMBS Trustees to the Debtors' Sale Motion (the "*Trustees' Objection*") [Docket No. 1242], Syncora objects that the Debtors cannot demonstrate adequate assurance where they have failed to assume all parts of a contract.  The Motion asserts that "Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations *relating to* the pre-closing period under any Assumed Contract. . ."  Motion at ¶ 60 (emphasis added).  The Debtors cannot adequately assure future performance by Nationstar of the Syncora-Related Servicing Agreements because they explicitly excuse

Nationstar from assuming, and thus performing, any obligations of the Syncora-Related

Servicing Agreements that arose pre-closing or in any way relate to the pre-closing period. *See*

Trustees' Objection at ¶ 11. As the Trustees further point out, the Debtors must be required to

honor minimum rating requirements and rights of consent to an assignment under the transaction

documents because such provisions are forms of adequate assurance. *See id.* at ¶ 25. Syncora

agrees, as such provisions provide parties with very important rights pertaining to the credit

quality of the deal and adequacy of the servicer. Syncora also adds that, to the extent certain of

the Additional Transaction Documents are not assumed and assigned with each Syncora-Related

Servicing Agreement, the Debtors fail to show that the entire agreement will be performed.

## B.  The Debtors Should Not Be Permitted to Reform the Syncora-Related Servicing Agreements Through the Assumption and Assignment Process

16.     The Debtors propose to modify and reform the Syncora-Related Servicing

Agreements in at least three ways:

- by severing obligations from the servicing agreements and separating them from the contract to be assumed and assigned, including by carving out pre-closing and other liabilities from the assumption and either leaving them behind or declaring them unenforceable;

- by failing to provide for the assumption and assignment, as a single unit, of all documents that are part of the same servicing bargain; and

- through ambiguity in the Proposed Order suggesting that the Debtors will be selling the contracts free and clear of a range of claims and interests, including those that arise under contracts proposed to be assumed and assigned.

Each of these aspects of the Debtors' proposed treatment of the Syncora-Related Servicing

Agreements is a request for an impermissible reformation of the Syncora-Related Servicing

Agreements and should be rejected.

17.    Reformation or modification of contracts through the assumption process is strictly prohibited.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (superseded in part on other grounds by statute) ("If an executory contract is assumed, it is said to be assumed *cum onere*, with all of its benefits and burdens."); *The Leslie Fay Cos., Inc. v. Corp. Prop. Assocs. 3 (In re Leslie Fay Cos., Inc.)*, 166 B.R. 802, 808 (S.D.N.Y. 1994) ("An executory contract cannot be assumed in part and rejected in part."); *AGV Productions, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 115 F.Supp.2d 378, 391 (S.D.N.Y. 2000) ("[The debtor] could not have assumed some of the provisions of an agreement and rejected others, because under the law of bankruptcy a contract cannot be assumed in part or rejected in part."); *Pieco, Inc. v. Atlantic Computer Sys. (In re Atlantic Computer Sys.)*, 173 B.R. 844, 849 (S.D.N.Y. 1994) ("[U]nder Section 365 of the [Bankruptcy] Code, a debtor may not 'cherry pick' pieces of contracts it wishes to assume.").

18.    In the exceptional circumstances where courts allow certain obligations in a single written agreement to be treated as separate contracts, or single agreements in a larger transaction to be treated differently from other agreements in the same transaction, they do so under a severance doctrine that applies only when the debtor has established that the parties' intent was to allow the separation of the rights and obligations.  *See In re Gardinier, Inc*. 831 F.2d 974, 976-978 (11th Cir. 1987) (debtor permitted to assume a contract for the sale of property and reject a specific, identified provision in such contract that provided for the payment of a broker's fee after the court analyzed party intent by considering whether (i) the parties' obligations under each of the agreements were interrelated, (ii) the nature and purpose of the agreements were different and (iii) there was separate and distinct consideration for each agreement).  *See also In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 845 (Bankr.

C.D. Cal. 1999) ("Severability is determined by the intent and the actions of the contracting

parties.  Severability is a question whether parts of a contract or lease, or part performance

thereunder, can be separated and treated as independent legal obligations.") (citations omitted).

In other words, severance is not a license to cherry-pick; it is a remedy available when there has

been a specific showing of intent.  Moreover when applied, it divides certain specific provisions

in a contract from others, rather than loosely carving out (or in) certain amorphous obligations.

State law governs whether agreements "are separate or indivisible for purposes of § 365."

*Empire State Bldg. Co. L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R.

66, 77 (Bankr. S.D.N.Y. 2010) (citations omitted); *In re S.E. Nichols Inc.*, 120 B.R. 745, 748

(Bankr. S.D.N.Y. 1990); *In re Teligent, Inc.*, 268 B.R. 723, 728 (Bankr. S.D.N.Y. 2001).

   19.  Whether nominally separate contracts that constitute a single transaction

are divisible is considered under the same standard for determining whether provisions in a

single written document may be severed.  In each case, the inquiry is to discern what rights

comprise the parties' agreement and ensure that the entire agreement is assumed.  *See Rudman v.*

*Cowles Commc'ns*, 30 N.Y.2d 1, 13 (N.Y. 1972) ("In determining whether contracts are

separable or entire, the primary standard is the intent manifested, viewed in the surrounding

circumstances.").  Related contracts that are not divisible must be treated together for purposes of

assumption or rejection.  *See Empire State Bldg. Co. L.L.C.*, 432 B.R. at 77 (holding that a lease

and licensing agreement and a subsequent related agreement were one contract because each of

the documents cannot "stand or fall by itself," after noting that "[s]ometimes, the debtor will

seek to assume or reject one or more of several related agreements.  The question in those

circumstances is whether the agreement to be assumed or rejected is separate from the other

agreements, or alternatively, whether all of the agreements are one indivisible agreement that

must be assumed or rejected *in toto*.") (citations omitted); *Matter of Easthampton Sand & Gravel Co., Inc*. 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982) (finding that severance of a note obligation from a lease obligation would "deny the creditor the benefit of his bargain and would result in an unjust windfall for the debtor").

20.     Courts have examined the circumstances of the original assent and the structure of the contract to assess whether parties intended to form one contract or multiple contracts.  For example, in *Teligent*, the court determined that two agreements comprised one contract, in part, because "neither side would have signed one unless the other side signed the second."  268 B.R. 723, 729 (Bankr. S.D.N.Y. 2001).  Similarly, in *Atlantic Computer Systems*, the court found that certain equipment schedules and "flexleases" were a single contract "by reason of the lack of consideration to [debtor] in the Flexleases [proposed to be] considered as separate agreements"  *See Pieco*, 173 B.R. at 851.[5]

21.     Whether the parties intended separate agreements or obligations comprise a single contract is a question of fact.  *Nat'l Union Fire Ins. Co. of Pittsburgh,* 892 F.2d at 204 (internal citations omitted).  Accordingly, the Debtors cannot cherry-pick rights and obligations out the Syncora-Related Servicing Agreements, or sever the Syncora-Related Servicing Agreements from the Additional Transaction Documents, without evidence and a factual finding

---

[5] *See also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 204 (2d Cir. 1989) (quoting 6 WILLISTON ON CONTRACTS § 863, 279-80 (3d ed. W. Jaeger 1962) ("It can be nothing else than the answer to an inquiry whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.")); *Carvel Corp. v. Diversified Mgmt Group, Inc.*, 930 F.2d 228, 233 (2d Cir. 1991) (when determining that two contemporaneously executed documents constitutes a single contract, the Circuit Court stated, "Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together.").

by the Court that the parties to these contracts intended the rights and obligations under these contracts to be divisible in the manner proposed by the Debtors.[6]

### i. The Debtors' Improper Cherry-Picking

22.    Here, the Debtors have provided *no* evidence that the provisions of Syncora-Related Servicing Agreements constitute multiple contracts subject to severance. In fact, they have not even identified precisely which provisions in the agreements they intend to sever as separate and distinct contracts. Instead, the Debtors provide a generalized list of obligations that they will assume and arbitrarily carve out as "***Other Agreements***" any obligations that are not on the list. Proposed Order ¶ P. The Proposed Order mandates severance of certain rights and obligations from all other rights and obligations in the same contract, holding "[a]ny Servicing Agreement memorialized in the same writing as an Other Agreement . . . is hereby severed and deemed reformed to become a separate, independently enforceable agreement." Proposed Order ¶ 15. The Proposed Order arbitrarily voids "[a]ny provision of a Multi-Agreement Document that would allow any person to terminate, recapture, impose any penalty, or modify any term or condition upon such reformation," seemingly voiding provisions in documents that the Debtors are asserting are severed and not subject to assumption, or documents between third parties. *Id.* The Debtors also specify that they will not assume

---

[6] In their long motion and memorandum of law, the Debtors cite only a single case to support this extraordinary relief they are seeking, and that case is inapposite. The Debtors provide no explanation for what they are trying to achieve through the severance provisions in the Proposed Order, and provide no analysis of their single case, except to say that it approved severing agreements in the same manner and in the same circumstances as this case. Memorandum of Law at ¶ 53. The single case that the Debtors cite, however, contains a traditional analysis of the intent of the parties, and finds that certain loan sale obligations may be severed from certain loan servicing rights and obligations after analyzing the particular terms of the contract and finding that the loan sale and servicing functions were not interrelated. *See DB Structured Products, Inc. v. American Home Mortgage Holdings, Inc. (In re American Home Mortgage Holdings, Inc.)*, 402 B.R. 87 (Bankr. D. Del. 2009). It does not stand for the proposition that a debtor may cherry-pick portions of contracts it wishes to assume by defining the assumed contract according to a list of the types of rights and obligations that the Debtors wish to assume.

liabilities that "relate[] to mortgage loan origination or the sale of mortgage loans," which are also treated as Other Agreements. *Id.*

23.     The Syncora-Related Servicing Agreements are long, intricate, complex documents, with numerous rights and obligations on the part of multiple parties, and the Debtors must assume each of them in full or not at all.  There is no authority for a debtor being able to arbitrarily define the rights and obligations it wishes to assume without regard to the constitution of the contract.  Moreover, there is no authority for the Debtors to assume and assign certain agreements while voiding provisions in agreements that they are not assuming.

24.     It is especially notable that the Debtors have drawn their list to deliberately assume indemnification rights, limitations on liability, representations, warranties and covenants running *in favor of the servicer parties only,* while seeking to disclaim such rights insofar as they run in favor of other parties.  Proposed Order ¶ P(f).  Such a blatant cherry-picking of rights in favor of the Debtors and rejection of similar categories of rights in favor of contract counterparties demonstrates that the Debtors have not proposed to sever these provisions based on a belief that multiple, distinct contracts are contained in the same writing.  Rather, they are impermissibly seeking to alter the bargain struck by the parties when they entered into these agreements by, in this instance, assuming only the rights favoring the Debtors, contrary to established law against cherry-picking.  *See Pieco, Inc*, 173 B.R. at 849.

25.     The Debtors' attempt to rewrite their contracts through the assumption process would prejudice contract counterparties, including Syncora.  For example, the documents governing each Syncora Insured Transaction contain indemnification, limitation on liability, representations, warranties and covenants in favor of or beneficial to Syncora that are fundamental to the bargain struck by Syncora with the servicer, and are designed to protect

13

Syncora's interests.  These protections would be excised from the contracts governing the
Syncora Insured Transactions under the Proposed Order.[7]

26.    Similarly, as the Trustees have already pointed out, it appears that the
Debtors do not propose to assume and assign the servicing obligations in respect of defaulted
loans and foreclosed properties, which are servicing obligations that Syncora relied on at the
time it agreed with the Debtors to insure timely payment of principal and interest for the benefit
of the holders of certain securities in the trusts and relies on now to mitigate losses to the trusts
and its own liability.  Trustees' Objection ¶ 20.  To alter these or any of the other rights set forth
in the Syncora-Related Servicing Agreement for a given Syncora Insured Transaction and its
Additional Transaction Documents alters the parties' bargain, prejudices the Debtors'
counterparties, provides a windfall to the Debtors and is not permissible under the vast case law
described above.  *See, e.g., Easthampton Sand & Gravel Co.* 25 B.R. at 199.

27.    In addition, the Debtors disclaim assumption of any liabilities that "relate"
to mortgage origination and the sale of mortgage loans.  Proposed Order ¶ P(ii).  The word
"relate" has a broad meaning and many servicing obligations that are not properly severable
could "relate" to the origination or sale of loans.[8]  Just as the Debtors should not be permitted to

---

[7] For example, in each Insurance and Indemnity Agreement, the servicer indemnifies Syncora for losses
arising as a result of breaches of covenants under the related Syncora-Related Servicing Agreement.
This indemnity protects Syncora from losses caused by the servicer failing to carry out its duties under the
applicable servicing agreement and incentivizes the servicer to perform those duties properly, but
indemnity obligations in favor of non-servicer parties are carved out of assumed liabilities under the
Proposed Order.  Proposed Order ¶ P(f).

[8] For example, under the AAR Agreement associated with the Bear Stearns Transaction (one of the
Additional Transaction Documents set forth on Exhibit "B"), an assignment of loans was made from one
non-debtor entity to another.  As part of this agreement, the parties entered into a servicing contract,
which they defined by reference to the terms of an existing servicing contract, and amended that existing
servicing contract in the assignment document.  Do those altered servicing obligations "relate" to the sale
of loans because they were instituted and possibly negotiated as part of the sale transaction?

define narrowly the categories of rights and obligations they wish to assume, they ought not be able to disclaim broadly rights and obligations under a contract with such a broad, poorly defined category.  If a limited exception to the severance doctrine is applied to allow the Debtors to sever obligations specifically arising from the origination of the loans, the Debtors should be required to be much more specific in describing the specific obligations being severed (*e.g.,* by reference to particular representations and warranties) rather than using the very broad and ambiguous "related to" descriptor.

28.    Finally, the Debtors seek to eliminate, rather than assume and assign, any liabilities based on events that arose before the closing of the sale to Nationstar, even those liabilities that are ordinary course performance obligations and not monetary defaults subject to cure.[9]  Such obligations are also not retained by the Debtors.  *See* Proposed Order at ¶ 20. Indeed, the Debtors are seeking to assume and assign contracts even though neither the Debtors nor the assignee would remain liable for ordinary performance obligations arising pre-closing. The Trustees' Objection aptly describes how the Proposed Order attempts to effectuate this incomplete assumption and why it is impermissible.  *See* Trustees Objection, at ¶¶ 9-15. Assumption of the Syncora-Related Servicing Agreements should not be approved where the assignee does not demonstrate that it will perform *all* obligations arising under the contract in the ordinary course, whether those obligations arise before or after closing, other than monetary defaults subject to cure.  *See Pieco, Inc.* 173 B.R. at 849.

---

[9] These are the provisions referred to in the Trustee's Objection as "Limitation on Future Performance." Trustees' Objection ¶ 9.  The Proposed Order states "All . . . other obligations or Liabilities under any Assumed Contract occurring, arising or accruing prior to the date of the assignment or transfer to the Purchaser . . . shall be deemed cured or satisfied upon payment by the Sellers of the cure amount."  *See, e.g.*, Proposed Order at ¶ 19.

29.     Finally, the Proposed Order purports to eliminate any waivers that may have been given under any contract.  Proposed Order ¶ 21.  The provision of the Sale Order should be deleted, as the Debtors may only assume and assign a contract as it exists at the time of assumption.

30.     What the Debtors are seeking to do here is truly extraordinary.  While even the simple removal of a specific provision or section of a contract is prohibited absent a showing of intent and satisfaction of the standards set forth above, the Debtors have provided no support for a debtor to pick and choose certain *types* of obligations in a contract that are favorable to it while rejecting related unfavorable provisions and without even identifying which specific provisions of the contract are being assumed versus those being left behind.  Permitting the Debtors to do so in this case would create a precedent that would turn bankruptcy law on its head.  Wouldn't every debtor and every purchaser of assets want to assume only those provisions of a contract that are beneficial to them?  Of course they would, but the Bankruptcy Code and decades of case law interpreting it have consistently, and for good reason, prohibited just that.

**ii.  Failure to Assume Integral Agreements**

31.     As described above, servicing agreements, including the Syncora-Related Servicing Agreements, are each one part of a larger transaction with multiple, inter-related agreements and obligations that together form a single integrated transaction.  The Debtors may acknowledge this, as their proposed list of assumable executory contracts and unexpired leases, filed September 18, 2012 [Docket No. 1484] contains many of the types of documents that are integrated with the servicing agreements for non-Syncora trusts, including Insurance and Indemnity Agreements (*see, e.g.,* page 7), AAR Agreements (*see, e.g.,* page 54), Credit Risk Management Agreements (*see, e.g.,* page 70), and Custodial Agreements (*see, e.g.,* page 75).

16

32.    The Syncora-Related Agreements and Additional Transaction Documents

were entered into at substantially the same time as Syncora agreed to issue its policies.[10]  Entry

into each of the Syncora-Related Servicing Agreements and its related Additional Transaction

Documents was a condition precedent under each Insurance and Indemnity Agreement to

Syncora issuing its policies, because each is necessary to ensure that the portfolios of loans

underlying the securities that Syncora insured are properly serviced and Syncora's risk is

controlled.[11]  The recitals for the Insurance and Indemnity Agreement for the Bear Stearns and

---

[10] For example, in the Bear Stearns Transaction, entry into the Insurance and Indemnity Agreements and
AAR Agreement (which establishes the servicing agreement for the transaction) and issuance of the
insurance policy occurred at the same time as one transaction.  In the Greenpoint and SunTrust
Transactions, the Insurance and Indemnity Agreements were entered at the same time the policy was
issued, and both became effective soon after the applicable servicing agreement was entered into.

[11] For example, the obligations under the Syncora-Related Servicing Agreements together with the
Insurance and Indemnity Agreements reflected on Exhibit "B," provide an important incentive for the
servicer to perform based upon the form of an indemnity granted in favor of Syncora for, among other
things, losses relating to breaches by the servicer of covenants, representations and warranties contained
in the Operative Documents to which the servicer is a party (including the applicable Syncora-Related
Servicing Agreement), losses relating to an event of default in respect of the servicer under any of the
Operative Documents, as well as losses arising from misfeasance, malfeasance, negligence, bad faith,
willful misconduct or theft by the servicer.  Failure of the servicer to perform under the Syncora-Related
Servicing Agreements trigger events of default under the Insurance and Indemnity Agreements and give
Syncora the right to take remedial action, including, without limitation, declaring all amounts payable to
Syncora by other parties to the Insurance and Indemnity Agreement immediately due and taking legal
action to collect to enforce its rights.

Each of the Insurance and Indemnity Agreements also contains promises by the servicer that it will
service the loans in accordance with the applicable servicing agreement and provides that the parties
agree Syncora will not be liable for any acts or omissions of the servicer, providing protections for
Syncora in exchange for issuance of the policies for each transaction.  The Insurance and Indemnity
Agreement for the SunTrust Transaction also contains covenants requiring the servicer to, among other
things, comply with the Operative Documents (including the servicing agreement), refrain from denying
that any Operative Document (including a servicing agreement) is a binding obligation, and provide
notice of material events, and prohibits, among other things, actions that interfere with Syncora's
enforcement rights under any of the Operative Documents, modification of any Operative Document
(including the servicing agreement) without Syncora's consent and certain corporate transactions not
otherwise permitted under the Operative Documents.

The other Additional Transaction Documents on Exhibit "B" also contain obligations on the part of the
servicer that protect Syncora.  The Credit Risk Management Agreement for the SunTrust Transaction
requires the servicer to cooperate with an entity that monitors its performance.  The side letter for the

SunTrust transactions specifically state that the servicing arrangement was part of the consideration for Syncora's issuance of its policy. In each case, when Syncora issued its policy, it was able to establish that a servicer with specific duties would be in place and have indemnity obligations to Syncora for failures of performance. Syncora's assent to issue the policy was conditioned on a viable servicing arrangement for the life of the transaction and the rights and protections afforded by all of these documents.

33.    ***Syncora would not have issued its policy under any Syncora Insured Transaction without the servicers' agreement to all of the documents to which they are a party for such Syncora Insured Transaction, in particular the Additional Transaction Documents associated with each such transaction.*** If these agreements and the Syncora-Related Servicing Agreements were anticipated to be separated, or if any part was anticipated to cease to be in effect, Syncora would have viewed the risk it was underwriting differently, and would have either negotiated new terms, or not have issued its policies. Similarly, the Debtors would not have been able to enter into the Syncora-Related Servicing Agreements and received the benefits they received thereunder if they and Syncora had not entered into the Insurance and Indemnity Agreements and other related documents.

34.    As discussed above, the design and nature of the transaction, the consideration provided for the transaction, as well as formation of the contract when all the obligations under all the documents came into effect demonstrates that the Syncora-Related

---

Bear Stearns Transaction provides inspection rights for Syncora after certain trigger events. The Custodial Agreements require the servicer to cooperate with the custodian so that it can properly keep records regarding the collateral. The Premium Letter is an acknowledgement by the servicer of certain of the insurer's payment rights. Each of these documents is an "Operative Document," and was therefore required, under the Insurance and Indemnity Agreement, to be executed as a condition precedent to Syncora's obligation to issue its policies, and breaches of these documents resulting in losses to Syncora are subject to indemnity under the Insurance and Indemnity Agreements.

Servicing Agreements are part of a larger contract. *See Carvel Corp.* 930 F.2d at 233; *Teligent*, 268 B.R. at 729. The indemnity relationships and other protections the Debtors are trying to sever from servicing benefits it is selling to Nationstar made it possible for Syncora to agree to insure the transactions and Syncora would only have assented to such agreements "as a single whole." *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* 892 F.2d at 204; *see also Teligent*, 268 B.R. at 729. None of the agreements comprising the Syncora Insured Transactions can "stand or fall by itself." *See Empire State Bldg.*, 432 B.R. at 77. Because the parties' bargain with respect to a Syncora Insured Transaction is only reflected when the applicable Syncora-Related Servicing Agreement and the related Additional Transaction Documents are considered as a whole, the Debtors should be required to assume or reject all of these agreements pertaining to their servicing role for a particular Syncora Insured Transaction as a group.

### iii.  Sale Free and Clear of Certain Rights and Obligations

35.    In addition, Syncora objects to the extent the Proposed Order does not make clear in all cases that the "Claims" and "Interests" of which the assets, including the mortgage servicing rights, are being sold free and clear do not include Claims and Interests under the contracts being assumed.[12] Typically, these provisions in a sale order would provide that "the assets are being sold free and clear of all Claims and Interests *except for Assumed Contracts and Assumed Liabilities*" and Syncora requests that, for the sake of clarity, such language be included in the relevant provisions of the Proposed Order in this case. *See e.g.*, Proposed Order

---

[12]  For example, the Proposed Order defines "Claims" to include all rights to payment (which could include rights to payments under servicing agreements), "Liens" to include certain kinds of agreements that may be part of servicing contracts, including, without limitation, rights of first refusal, options, transfer restrictions and agreements to provide security, and "Interests" to include "other interests." *See* Proposed Order at preamble, n. 2-3

at preamble, ¶¶ O, R, 7, 9, 10, 11, 17, 22.[13]  Simply put, the Debtors cannot assume and assign

contracts free and clear of Claims and Interests arising under such contracts – section 363(f) does

not trump sections 365(b) and (f), which specifically relate to the requirements for assuming and

assigning contracts.

**C.    Certain Provisions in the Proposed Order
Should Be Removed, Modified or Added**

36.    In addition to the foregoing, Syncora objects to the following provisions

included or omitted from the Proposed Order and/or the Nationstar asset purchase agreement for

the following reasons, and respectfully requests that the Court revise them as suggested below:

- Any schedules to the Proposed Order and Nationstar asset purchase agreement should include the full agreement names (full names are listed on Exhibits "A" and "B") and include all amendments.

- Paragraph 11 of the Proposed Order directs "each of the Sellers' creditors and any other holder of an Interest" to execute releases of their Interests, which, as noted above, includes the category "other interests."  As drafted the provision provides a direction to parties to execute documents releasing unspecified rights and it should be removed.  Provisions in the same paragraph authorizing the Debtors and Nationstar to release interests should be confined to specific, non-contractual interests.

- At paragraph 18, the Proposed Order declares that provisions in the assumed contract that are triggered by assignment are void and of no force and effect. If the court finds that such provisions are not enforceable, the Proposed Order should make clear that they are unenforceable with respect to the Debtors only, as such provisions should be enforceable against any purchaser that attempts to assign the contract.

- Paragraph 29 of the Proposed Order allows modification of the Nationstar asset purchase agreement without notice to any party affected, as long as the modification is not adverse to the Debtors' estates, and paragraph 4 makes the Nationstar asset purchase agreement binding on a host of parties.  As drafted,

---

[13] Some additional examples of rights terminated without regard to whether they should be assumed contractual obligations are rights "relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the closing" and any "indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Persons prior to the Closing Date."  *See* Proposed Order at ¶¶ O, 9.

20

the Proposed Order allows modifications that will be binding on parties in interest without notice to parties or oversight by the Court, and it should be removed.  In the alternative, it should be changed to provide that notice and Court approval are only not needed if the modification does not adversely affect the Debtors' estates *or any other party that has not agreed in writing to such modification.*

- Paragraph 30 of the Proposed Order waives the fourteen day stay pending appeal imposed by section 6004(h) of the Bankruptcy Code.  Given the novel and radical treatment of contract rights proposed by the Debtors, the provision should be removed so that parties have an opportunity to appeal any order approving such treatment.

- Paragraph 31 of the Proposed Order makes the Proposed Order applicable to debtors with cases that are jointly administered with the Debtors' cases in the future.  This provision could allow relief in the Proposed Order to be imposed with respect to additional contracts that have not been identified or reviewed and should be removed.

- Section 6.2 of the Nationstar asset purchase agreement provides that if any ratings agency "no downgrade" letter is required under a servicing agreement and by any Order of the Bankruptcy Court, and such a letter is not obtained by closing, the relevant servicing agreement will not be transferred.  A similar provision should be incorporated into any Order approving the sale.

### V.  Conclusion

37.    Until the Debtors can demonstrate that Nationstar can and will (through a commitment to perform in full under all of the Syncora-Related Servicing Agreements and their related Additional Transaction Documents) provide adequate assurance of future performance under the contracts being assumed and assigned in the Proposed Order, the request in the Motion to assume and assign the Syncora-Related Servicing Agreements should be denied.  Moreover, the Proposed Order and the schedule of assumed and assigned contracts should be modified to provide that the Debtors may only assume and assign whole contracts, including related agreements, without modification of existing contractual rights.

WHEREFORE, Syncora respectfully requests that the Court modify the Proposed

Order consistent with the foregoing and grant Syncora such other and further relief as is just and

proper.

Dated:  September 28, 2012
        New York, New York

                                    /s/ Ronit J. Berkovich
                                    Gary T. Holtzer
                                    Ronit J. Berkovich
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York  10153-0119
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Syncora Guarantee Inc.

## Exhibit A

## Syncora-Related Servicing Agreements

Servicing Agreement, dated as of May 1, 2001, as amended by Amendment No. 1, dated as of October 1, 2001, Amendment No. 2, dated as of July 31, 2002 and Amendment No. 3, dated as of December 20, 2005, between EMC Mortgage Corporation and GMAC Mortgage, LLC (Bear Stearns Transaction)

Transfer and Servicing Agreement, dated as of August 1, 2006, among GreenPoint Mortgage Funding Trust 2006-HE1, as issuer, Structured Asset Securities Corporation, as depositor, GMAC Mortgage Corporation, as servicer and U.S. Bank National Association, as indenture trustee (GreenPoint Transaction)

Pooling and Servicing Agreement, dated as of April 1, 2007, among ACE Securities Corp., as depositor, GMAC Mortgage, LLC, as servicer, Wells Fargo Bank, National Association, as master servicer and securities administrator and HSBC Bank USA, National Association, as trustee (SunTrust Transaction)

**Exhibit B**

**Additional Transaction Documents**

Bear Stearns Transaction

- Insurance and Indemnity Agreement, dated as of March 30, 2007, among XL Capital Assurance Inc., EMC Mortgage Corporation, SACO I Inc., GMAC Mortgage, LLC and Citibank, N.A.

- Side Letter Agreement, dated as of March 30, 2007, between GMAC Mortgage, LLC and XL Capital Assurance Inc.[14]

- Assignment, Assumption and Recognition Agreement, dated as of March 20, 2007, among GMAC Mortgage, LLC, EMC Mortgage Corporation and Sovereign Bank

GreenPoint Transaction

- Insurance and Indemnity Agreement, dated as of August 28, 2006, among XL Capital Assurance Inc., Lehman Brothers Holdings Inc., Structured Asset Securities Corporation, Greenpoint Mortgage Funding Trust 2006-HE1, GMAC Mortgage Corporation and U.S. Bank National Association

- Side Letter Agreement, dated as of September 12, 2006, between GMAC Mortgage Corporation and XL Capital Assurance Inc.

- Custodial Agreement, dated as of August 1, 2006, among Deutsche Bank National Trust Company, as custodian, U.S. Bank National Association, as indenture trustee and GreenPoint Mortgage Funding Trust 2006-HE1, as issuer[15]

- Custodial Agreement, dated as of August 1, 2006, among U.S. Bank National Association, as custodian and as trustee and GreenPoint Mortgage Funding Trust 2006-HE1, as issuer

---

[14] Under this side letter certain of the Debtors, as servicer, provide Syncora with certain diligence rights after certain trigger events. The Debtor in the Insurance and Indemnity Agreement for the Bear Stearns transaction agreed to honor the side letter.

[15] These agreements relate to the custody of the mortgage loan-related documents and files and provide for servicer obligations, such as informing the applicable custodians of payments in full of mortgage loans and requesting related documentation. While no Debtor is a party to the GreenPoint Transaction custodial agreements, such agreements were acknowledged by a Debtor. A Debtor is a party to the SunTrust Transaction Custodial Agreement.

SunTrust Transaction

- Insurance and Indemnity Agreement, dated as of May 15, 2007, among XL Capital Assurance Inc., Suntrust Asset Funding, LLC, Suntrust Bank, ACE Securities Corp., GMAC Mortgage, LLC and Wells Fargo Bank, National Association

- GMACM Side Letter Agreement, dated as of May 15, 2007, between GMAC Mortgage, LLC and XL Capital Assurance Inc.

- Credit Risk Management Agreement, dated as of May 14, 2007, between GMAC Mortgage, LLC and Clayton Fixed Income Services Inc.[16]

- Premium Letter, dated as of May 15, 2007, among XL Capital Assurance Inc., HSBC Bank USA, National Association, Wells Fargo Bank, National Association, Suntrust Asset Funding, LLC, GMAC Mortgage, LLC and ACE Securities Corp.[17]

- Custodial Agreement, dated as of April 1, 2007, among HSBC Bank USA, National Association, as trustee, GMAC Mortgage, LLC, as servicer and Deutsche Bank National Trust Company, as custodian

---

[16] Under the Credit Risk Management Agreement, a Debtor agreed to, among other things, facilitate Clayton Fixed Income Servicers Inc., as credit risk manager, monitoring of the portfolio and making certain recommendations to the Debtor regarding defaulted mortgage loans. These provisions are important from the deal performance standpoint and therefore benefit Syncora.

[17] This agreement sets forth the specifics of the premium payable to Syncora in connection with the SunTrust Transaction.  A Debtor is a party to this agreement and agrees that the premium will be payable in accordance the Premium Letter and in consideration of the issuance of the insurance policy by Syncora.