**Exhibit B**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Gary S. Lee
Anthony Princi
Jamie Levitt

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF FRANK SILLMAN IN SUPPORT OF DEBTORS'**
**MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL**
**OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

I, Frank Sillman, being duly sworn, depose and say:

1.     I serve as Managing Partner for Fortace, LLC ("Fortace"),[1] an

advisory and consulting firm to banks, mortgage companies, insurance companies,

trustees and other investors.  I am authorized to submit this declaration (the

"Declaration") on behalf of the Debtors in connection with their motion pursuant to Rule

9019 of the Federal Rules of Bankruptcy Procedure for approval of RMBS Trust

Settlement Agreements.  This Declaration reflects the work performed to date, and I

reserve the right to augment and refine the analysis as my work is ongoing.

---

[1] Capitalized terms not otherwise defined herein are as defined in the RMBS Trust Settlement Agreement, or in the
Governing Agreements for each of the Debtors' securitizations, or in the defined terms incorporated by reference
therein.

2.       A key area of my work with Fortace relates to reviewing and opining on the reasonableness of repurchase demands.  I have performed repurchase demand work for insurers and lenders who have issued repurchase demands to Sellers, as defined below, based on alleged breaches of representations and warranties.  As part of this work I helped develop the loan audit selection criteria, reviewed contractual obligations, performed loan-level audits, made recommendations as to whether or not a repurchase demand should be issued and participated in the negotiations with the Sellers on discussions to repurchase loans.  I have also performed work for Sellers who have received repurchase demands from Trustees, insurers and lenders for alleged breaches of representations and warranties.  As part of this work I have reviewed contractual obligations, reviewed the repurchase demands and the related findings and supporting evidence, performed loan level audits, made recommendations to Sellers as to whether or not the alleged breaches were contractual breaches, and participated in the negotiations with Trustees on discussions to repurchase loans.

3.       I have approximately 25 years of experience in the mortgage banking industry.  I have held senior executive positions at a federally insured bank, at a Wall Street investment bank, and at privately held mortgage banking companies.  During those 25 years, I have managed residential mortgage origination and loan operations, secondary marketing, capital markets, treasury and warehouse lending.  In particular, I have extensive experience in the residential mortgage market, including origination, securitization, loss reserves, and repurchase-related activities related to Fannie Mae, Freddie Mac, FHA, Prime Jumbo, Alt A, Subprime, Home Equity Line of Credit ("HELOC"), and Closed End Second Lien residential mortgage loans.

4.    I am familiar and have experience with the variety of methods used to estimate potential repurchase liabilities or requirements.  I employed a methodology based on frequency and severity rates to forecast the potential Trust lifetime loss ranges and developed my repurchase-related assumptions utilizing the Debtors' historical loan loss data, current payment statuses, Shelf, mortgage loan product and the Debtors prior repurchase experience.  Frequency and severity rate-based loss forecasting and historically-based assumption development are two of the accepted methods for deriving an estimate of potential repurchase exposure.  These two methodologies are regularly used by market participants, financial institutions and experts to estimate repurchase exposures, including estimates provided by financial institutions in their regulatory filings, and independent third-party expert reports.  Accordingly, the methodology that I used in this Declaration is generally accepted in the industry as a sound means of estimating repurchase exposure.

5.    The RMBS Trust Settlement seeks to resolve a large number of breach of representation and warranty claims.  I was asked to provide an independent assessment of the Total Allowed Claim as defined in the RMBS Trust Settlement Agreements and opine as to its reasonableness.  However, I take no position on the ability of any party to prove a breach of representations and warranties under the Governing Agreements, and I assume for the purposes of this Declaration that such a showing can be made against Debtors.  To that end, and in conjunction with selected Fortace personnel under my supervision, I have therefore performed a review of the following data and agreements related to the securitization trusts identified in Exhibit A to the RMBS Trust

Settlement Agreement (the "<u>Trusts</u>"): (1) the Actual Liquidated Losses,[2] (2) the actual Severity Rates for the Trusts based on the Liquidated Loans, (3) Frequency Rates from one Trust for each of the representative Shelves (as defined below), (4) the payment status and delinquency data for the Trusts as of March 31, 2012, (5) the Debtors' repurchase experience with Freddie Mac and Fannie Mae's repurchase demand data, and (6) Governing Agreements from one Trust from each of the Shelves.  Additionally, in those areas where actual data for the Trusts is not available, such as Audit Rates, Demand Rates, Breach Rates and Agree Rates as defined and detailed below, I utilized assumptions and developed my own models based on my own experience and industry data, where available, which takes into consideration the Payment Status, Shelf and loan product types, including Prime Jumbo, Alt A, Subprime, HELOC and Second Lien (collectively, "<u>Mortgage Loan Products</u>").

        6.       The first step in estimating the range of potential repurchase liability for the Debtors ("<u>Potential Repurchase Requirements</u>") is developing the potential cumulative lifetime loss ranges for the Trusts ("<u>Estimated Lifetime Losses</u>"). The next step necessary to understand the Potential Repurchase Requirements is to determine the percentage of Estimated Lifetime Losses that the Debtors might agree to share with the Trusts ("<u>Loss Share Rate</u>") as a result of potential breaches of representations and warranties.

        7.       For purposes of this Declaration, I developed Estimated Lifetime Loss assumptions in the aggregate based on the Payment Status, Shelf, and Mortgage

---

[2] In this Declaration, all references to percentages are rounded to the nearest whole percentage (*e.g.*, 98.5% is rounded up to 99%, and 98.4% is rounded down to 98%).  Therefore, some percentage totals will not equal 100% due to this rounding convention.

Loan Product, instead of utilizing more detailed cash flow and loss assumptions for each individual Trust.

8.     For purposes of this Declaration, I developed my Demand Rate, Breach Rate and Agree Rate assumptions utilizing the Debtors' actual GSE repurchase demand data, industry repurchase demand data and my own repurchase demand experience. Those assumptions were then applied at the Payment Status, Shelf and Mortgage Loan Product levels as defined and detailed below. The Audit Rate, Demand Rate and Breach Rate for the Trusts were not available publicly or from the Debtors. Additionally, the vast majority of the Trusts' private label securities ("PLS") repurchase demands received by the Debtors to date are unresolved, so I could not ascertain a meaningful PLS Agree Rate or Loss Share Rate assumption for use in this Declaration. Instead I focused on the more robust, complete and reliable information available regarding the Debtors' actual GSE repurchase demand data.

9.     If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## OVERVIEW OF THE MORTGAGE SECURITIZATION PROCESS

10.     The creation, sale and servicing of a Residential Mortgage-Backed Security ("RMBS") is a multi-stage process comprising numerous steps and utilizing various entities to discharge the required duties.[3] The RMBS securitization process detailed below is consistent with the process utilized by the Debtors in the creation, sale and servicing of the Trusts.

---

[3] A mortgage-related Asset-Backed Security ("ABS") transaction is similar in nature and is comparable for purposes of this discussion.

11.     First, the "Seller" of the RMBS, also known as the Sponsor, Issuer and/or Depositor, accumulates or pools the mortgage loans it originated and/or purchased from other Lenders.  Various of the Debtors acted as Sellers to the Trusts.  The Seller arranges to sell those mortgage loans into a "Special Purpose Entity" created exclusively for the purpose of issuing an RMBS, often referred to as an "RMBS Trust."  If the Seller planned to offer a large quantity of a similar type of securities, the Seller would file a registration statement with the SEC to allow it to offer Trusts without SEC review of each supplement ("Shelf" or "Shelves").  The Debtors offered RMBS Trusts under eight different Shelves,[4] covering a wide range of different mortgage products.  In connection with the securitization, an Underwriter(s), Trustee, Servicer, Master Servicer, REMIC Administrator and Custodian are selected to handle various duties on behalf of the RMBS Trust.  In addition to being the Seller of Trusts, the Debtors, at times, acted as the Servicer and/or Master Servicer of the Trusts.

12.     Second, prior to the closing of the sale of loans to the RMBS Trust, the parties negotiate all the applicable RMBS Trust agreements ("Governing Agreements") involved in the creation, sale and loan servicing of the RMBS Trust. Generally, the key Governing Agreements are the Mortgage Loan Purchase Agreement ("MLPA"), the Pooling and Servicing Agreement ("PSA"), and the Assignment, Assumption and/or Indenture Agreements, as applicable.  Under the Governing Agreements, Sellers typically provide certain representations and warranties, which may vary from RMBS Trust to RMBS Trust, but can include requirements that the Sellers

---

[4] These Shelves and their corresponding products are: "RALI" (Alt-A); "RFSMI" (Jumbo A); "RASC" (subprime); "RFMSII" (second lien); "RAAC" (seasoned loans); "RAAC-RP" (subprime), "RAMP" (non-conforming products), and "GMACM" (various products).

comply with some or all of the following: a) accuracy of the loan-level data provided on the securitization data tape, b) Seller's underwriting guidelines, c) origination and loan servicing policy and procedures, d) documents required to be contained in the mortgage file, e) accuracy of the valuation of collateral, f) federal, state and local regulations, and g) various degrees of fraud provisions.  The Trusts utilized the standard Governing Agreements, which typically, but not always, contained similar representations and warranties to those detailed above.

13.    As a way to further enhance the credit rating of the Certificates, a Seller may choose to obtain bond insurance ("Bond Wrap"), from a monoline bond insurance company ("Monoline").  The Bond Wrap is a non-cancelable, irrevocable, and binding obligation of the Monoline to guarantee full, complete and timely principal and interest payments to the RMBS Trust.  For this guarantee, the Monoline charges the Seller a premium or fee for the issuance of the Bond Wrap.  The presence of the Bond Wrap is an added third-party guarantee to the Certificate Holders in addition to the underlying credit structure of the RMBS Trust, which reduces the overall risk to the Certificate Holders and allows the credit rating agencies to increase the credit ratings of the Certificates.  The Debtors utilized Bond Wraps on 61 of the 392 Trusts.

14.    One or more credit rating agencies, such as Standard & Poor's and Moody's, review the data about the underlying mortgage loans, the Seller, the Servicer, the Master Servicer, the Trustees, and Governing Agreements, and Monoline Bond Wraps, if applicable, and assign credit ratings to each of the tranches of mortgage-backed pass-through certificates ("Certificates").  The Trusts were all rated by one of more of the credit rating agencies.

15.    The Certificates are then created and sold to investors through the Underwriter(s), who are typically Wall Street investment banks but also may be an affiliate of the Seller.  With respect to the Trusts at issue here, the Sponsors/Issuers may have utilized a Wall Street investment banks and/or the Debtors' affiliate GMAC RFC Securities as such Underwriters.

16.    Finally, the Servicer administers the mortgage loans in accordance with the Governing Agreements, and the Trustee distributes the remittances to the Certificate Holders in accordance with the Governing Agreements and Certificates. Certain of the Debtors did act as Servicer, at times, for the Trusts.

## ALLEGED BREACHES OF REPRESENTATIONS AND WARRANTIES

17.    The Governing Agreements authorize certain parties, such as the Trustees, to notify the Seller of any alleged breaches of representations and warranties.  If any such party notifies the Seller of an alleged breach of one or more of the representations and warranties, the following analysis is required in order to assess the Seller's repurchase or loss reimbursement obligation under the Governing Agreements.

18.    Generally, the standard for analyzing a breach of representations and warranties requires an assessment of: (a) whether the alleged loan defect or alleged breach is an actual and material breach of representations and warranties, and (b) whether such breach was material and adverse to the interests of the Certificate Holders in the mortgage loans (cumulatively the "R&W Repurchase Standard").  If the R&W Repurchase Standard is met, the Seller is required to repurchase non-liquidated loans at the purchase price, as defined in the applicable Governing Agreements, or to reimburse the RMBS Trust for any losses incurred in the liquidation of the loan, as defined in the applicable Governing Agreements.  If the R&W Repurchase Standard is not met, the

Seller does not have an obligation to repurchase the loan or reimburse the RMBS Trust

for liquidated losses.  I offer no opinion on whether the Trusts would be able to prove

liability and/or meet the R&W Repurchase Standard.  Rather, for purposes of this

Declaration, I have assumed that the Trusts would be capable of meeting the R&W

Repurchase Standard in certain cases in order to predict the Debtors' Potential

Repurchase Requirements.

### LOAN REPURCHASE TRENDS

19.    Beginning in late 2007, the U.S. economy entered the worst

recession since the Great Depression.  This recession has inflicted tremendous damage on

all sectors of the economy including employment, credit, gross domestic product, and the

housing market.  As the recession worsened, growing unemployment and the resulting

loss of income have had a devastating effect on the housing market, loan performance

and housing prices.  Rising delinquencies and plummeting housing prices have had and

continue to have a profoundly negative impact on the performance of and resulting losses

on all mortgage securitizations.

20.    As a result, the government-sponsored entities, including Fannie

Mae and Freddie Mac ("GSEs"), Monolines, and investors with various holdings have

begun to pursue claims for alleged breach of representations and warranties at elevated

rates to help offset their RMBS losses.  The GSEs have requested sellers to repurchase

approximately $66 billion in loans as noted in their recent SEC filings as summarized in

Inside Mortgage Finance's Special Report ("IMF Special Report"),[5] while industry

---

[5]  As reported in Inside Mortgage Finance's Special Report Analyzing GSE Mortgage Buyback Demands
regarding Fannie Mae and Freddie Mac's Regulation AB 15-G repurchase-related SEC filings dated 2012.
In this Special Report, the Debtor is referred to as "GMAC Mortgage / Ally."  An excerpt of this report is
attached hereto as Exhibit A.

estimates forecast that sellers of non-GSE securities, known as PLS, will repurchase

hundreds of billions in loans, resulting in seller losses of approximately $133 billion

according to Compass Point Research.[6]

## RECENT INDUSTRY SETTLEMENTS

21.    As a way to more efficiently resolve the billions of dollars in

repurchase demands, Fannie Mae, Freddie Mac and some investors with various holdings

have reached global repurchase settlements with certain Sellers.

22.    In preparation for this Declaration, I reviewed the publicly-

available settlement information relating to the following settlements:

| Seller/Originator | Securitization Type | Settlement Amount | Date |
|---|---|---|---|
| Bank of America | PLS | $8,500,000,000 | June 2011[7] |
| Lehman | PLS | $40,000,000 | November 2011 |
| Bank of America | Fannie Mae | $1,520,000,000 | January 2012 |
| Bank of America | Freddie Mac | $1,280,000,000 | January 2012 |

23.    Both the Bank of America ("BofA") and Lehman PLS settlements

and the corresponding RMBS Trusts are similar in terms of the securitization structure,

issuance years, Mortgage Loan Product mix, Governing Agreements and R&W

Repurchase Standards.

## THE DEBTORS' REPURCHASE HISTORY

24.    I reviewed the Debtors' 2006-2008 GSE historical repurchase data,

based on both Fannie Mae and Freddie Mac's Regulation AB 15-G SEC filings, as

summarized in the IMF Special Report.[8]  The repurchase data was as follows:

---

[6]  *See* Exhibit B hereto: Compass Point Research on Mortgage Repurchases Part II: Private Label RMBS
Investors Take Aim, dated August 17, 2010.

[7]  Bank of America settlement for 530 trusts is pending court approval.

| Seller/Originators | Repurchase Demands (millions) | Repurchased ("Agree Rate") | Pending | Disputed |
|---|---|---|---|---|
| GMAC Mortgage / Ally (the Debtors) | $1,537.81 | 67.56% | 2.60% | .50% |
| All Seller / Originators | $65,836.91 | 49.54% | 12.58% | 4.15% |

## **DETERMINATION OF THE TRUSTS' ESTIMATED LIFETIME LOSSES**

25.     The "Estimated Lifetime Losses" for the Trusts are determined by adding (a) the actual losses that are incurred when a loan is foreclosed and sold through a short sale, REO or other final disposition and the losses are allocated to the trust ("Actual Liquidated Losses"), and (b) the losses forecasted on the remaining outstanding unpaid principal balance ("Outstanding UPB") for the remaining life of the Trusts ("Forecasted Remaining Lifetime Losses").  The analysis below is based on data obtained from the Debtors, from Intex,[9] from the Debtors' Vision website[10] ("Vision"), and from other industry sources including SEC filings.  From these sources, I have estimated the Trusts' Estimated Lifetime Losses and the Potential Repurchase Requirements ranges based on Actual Liquidated Losses plus Forecasted Remaining Lifetime Losses by Payment Status, by Shelf, and by Mortgage Loan Product utilizing "Frequency Rate" and "Severity Rate" assumptions as described below.

26.     The Actual Liquidated Losses for the Trusts is $30.3 billion.  This figure was obtained from Intex, and the unpaid principal balance ("UPB") of the

---

[8] As noted above, the Debtors' PLS repurchase data is incomplete due to the large number of PLS repurchase demands that have not completed the repurchase process, largely due to pending litigation. Accordingly, I focused on the GSE repurchase experience instead.

[9]  Intex is a subscription-based provider of RMBS loan-level data and cash flow models.  Intex data was provided by the Debtors.

[10] The Debtors' Vision website contains RMBS Trust information, monthly servicing certificate statements, prospectus supplements, and operating documents in addition to loan-level data files.

liquidated loans at the time of liquidation ("Trusts' Liquidated Loans") was obtained

from the Debtors.

27.    The Forecasted Remaining Lifetime Losses for the Trusts are

determined by multiplying (i) the Outstanding UPB, (ii) the Frequency Rate assumptions,

and (iii) the Severity Rate assumptions.

## A.  OUTSTANDING UPB FOR THE TRUSTS

28.    For purposes of this Declaration, the data for the Outstanding UPB

of the Trust was as of March 31, 2012 ("Cut-Off Date").

29.     Fortace obtained and stratified the Trusts' Outstanding UPB data

by Payment Status obtained from Intex and by Shelf and by Mortgage Loan Product

group obtained from both Vision and the Debtors.  The "Payment Status" buckets used

for this analysis were as follows: (a) "Current", the mortgage payments are paid up to

date, (b) "30-59 Days Delinquent": the mortgage payments are 30-59 days past due, (c)

"60-89 Days Delinquent": the mortgage payments are 60-89 days past due, (d) "90+ Days

Delinquent & REO": the mortgage payments are 90 or more days past due or the property

has been acquired through foreclosure, often referred to as real estate owned ("REO"),

and (e) "Foreclosure": the Servicer is in the legal process of acquiring the property from

the defaulted borrower.

30.    The Trusts' Outstanding UPB as of the Cut-Off Date is $62.4

billion.

## B.  FREQUENCY RATE ASSUMPTIONS

31.    The "Frequency Rate" is defined as the percentage of loans in a

mortgage portfolio that are projected to be liquidated with a loss through foreclosure sale,

REO sale, short sale or charge-off.  The Frequency Rate, also known in the industry as

the "Roll Rate", represents the projected likelihood that a group of loans will "roll" from current or delinquent status to defaulted and liquidated. The Frequency Rate and the Severity Rate are industry standards utilized to forecast future losses for an RMBS Trust and are two key assumptions utilized by credit rating agencies when rating RMBS Certificates, by mortgage investors when evaluating RMBS Certificates and by Banks when evaluating loan loss reserves.

32.     I reviewed the May 2012 Frequency Rates for one Trust from each of the eight Debtors' Shelves. I then compared the Trusts' Frequency Rates to Frequency Rates provided by other industry sources, such as the BofA Expert Report[11] and the Lehman Expert Declaration,[12] to develop our Frequency Rate assumptions. The Frequency Rate assumptions utilized in this Declaration are similar to those used in the BofA Expert Report and the Lehman Expert Declaration.

33.     These Frequency Rates were then applied first by Payment Status, then by Shelf, then by Mortgage Loan Product for both the lower and higher ranges. These Frequency Rates were then assumed to have a flat Roll Rate to liquidation, which means the Frequency Rates were not varied with the passage of time or other variables.

34.     The average Frequency Rates for the Trusts assumed in this analysis are 36% at the lower range and 41% at the higher range.

---

[11]  *See* Exhibit C hereto: The RRMS Advisors Opinion Concerning Contemplated Settlement Amount for 530 Trusts, dated June 7, 2011.

[12]  See Exhibit D hereto: The Lehman Brothers Holdings Inc. Declaration of Zachary Trumpp filed January 12, 2012.

## C.  SEVERITY RATE ASSUMPTIONS

35.     The "Severity Rate", also known as the "Default Rate", represents the percentage of losses associated with a loan or group of loans which default and are liquidated though foreclosure sale, REO sale, short sale or charge-off.

36.     I reviewed the actual Severity Rates to date, based on the Actual Liquidated Losses for the Trusts by Shelf and by Mortgage Loan Product, and adjusted them to current market conditions based on the latest three-month actual Severity Rates obtained from Intex, by Shelf and by Mortgage Loan Product.

37.     Once we determined our Severity Rates they were then applied by Shelf and by Mortgage Loan Product on a flat severity basis.

38.     The average Severity Rates for the Trusts assumed in this analysis are 68% at the lower range and 78% at the higher range.

## D.  FORECASTED REMAINING LIFETIME LOSSES

39.     Applying the Frequency Rate and Severity Rate assumptions to the Outstanding UPB, I determined a potential range for such Forecasted Remaining Lifetime Losses for the Trusts.  Assuming that this liability can be demonstrated, the lower end of the possible range for such losses, calculated using the metrics and assumptions shown in the following chart, was $15.4 billion.

| LOWER RANGE (in billions) | | | | |
|---|---|---|---|---|
| Payment Status As of March 31, 2012 | Trusts Outstanding UPB | Frequency Rate | Severity Rate | Forecasted Remaining Lifetime Loss |
| Current (Non-Modified) | $34.1 | 11% | 72% | $2.8 |
| Current (Modified) | $11.3 | 36% | 68% | $2.8 |
| 30-59 Days Delinquent | $2.2 | 15% | 68% | $0.2 |
| 60 – 89 Days Delinquent | $1.0 | 84% | 66% | $0.6 |
| 90+ Days Delinquent & REO | $6.3 | 96% | 67% | $4.0 |
| Foreclosure | $7.5 | 99% | 67% | $5.0 |
| **Total** | **$62.4** | **36%** | **68%** | **$15.3** |

40.    Assuming that this liability can be demonstrated, the higher end of possible range for such losses for the Trusts, calculated using the metrics and assumptions shown in the following chart, was $19.5 billion.

| HIGHER RANGE (in billions) | | | | |
|---|---|---|---|---|
| Payment Status As of March 31, 2012 | Trusts' Outstanding UPB | Frequency Rate | Severity Rate | Forecasted Remaining Lifetime Loss |
| Current (Non-Modified) | $34.1 | 17% | 80% | $4.6 |
| Current (Modified) | $11.3 | 41% | 78% | $3.6 |
| 30-59 Days Delinquent | $2.2 | 20% | 77% | $0.3 |
| 60-89 Days Delinquent | $1.0 | 87% | 75% | $0.7 |
| 90+ Days Delinquent & REO | $6.3 | 97% | 75% | $4.6 |
| Foreclosure | $7.5 | 99% | 77% | $5.7 |
| **Total** | **$62.4** | **41%** | **78%** | **$19.5** |

41.    The following chart shows a comparison of the assumptions made for the Frequency Rate and Severity Rate to those used in the BofA Expert Report and Lehman Expert Declaration.

| Description | Frequency Rate Assumptions | | Severity Rate Assumptions | |
|---|---|---|---|---|
| | Lower Range | Higher Range | Lower Range | Higher Range |
| Trusts | 36% | 41% | 68% | 78% |
| BofA Expert Report | 44% | 47% | 45% | 60% |
| Lehman Expert Declaration | 25% | 45% | 45% | 55% |

42.    The Frequency Rate assumptions for the lower range are similar in this Declaration and the BofA Expert Report, with lower range assumption in the Lehman Expert Declaration again representing a more aggressive assumption based on my experience.  The Frequency Rate assumptions for the higher range are all similar.  The Severity Rate assumptions utilized in this Declaration are primarily driven by the actual Severity Rates for the Trusts' Liquidated Loans which are meaningfully higher in both the lower ranges and the higher ranges than those used in the BofA Expert Report and the

Lehman Expert Declaration.  I assumed that the actual Severity Rates for the BofA loans

and Lehman loans must be meaningfully lower than the Trusts' actual Severity Rates,

thus justifying BofA's and Lehman's lower Severity Rate assumptions.  Based on the

actual historical Trust Frequency Rates and Severity Rates, these Frequency Rate

assumptions and Severity Rate assumptions are, in my professional opinion, reasonable

for the Trusts.

## E.  ESTIMATED LIFETIME LOSSES

43.    By adding the Actual Liquidated Losses to the range of Forecasted

Remaining Lifetime Losses, I determined that the Estimated Lifetime Losses for the

Trusts range between $45.6 billion on the lower end, and $49.8 billion on the higher end.

The calculation of these numbers is expressed in the following chart:

| (in billions) | Lower Range | Higher Range |
|---|---|---|
| Actual Liquidated Losses | $30.3 | $30.3 |
| Forecasted Remaining Lifetime Loss | $15.3 | $19.5 |
| **Trusts Estimated Lifetime Losses** | **$45.6** | **$49.8** |

## LOSS SHARE RATE

44.    As defined above, the Loss Share Rate is the percentage of

Estimated Lifetime Losses that the Debtors might agree to share with the Trusts as a

result of potential breaches of representations and warranties.

45.    For the purposes of this Declaration, the Loss Share Rate is defined

as the product of (a) the "Breach Rate," and (b) the "Agree Rate."

46.    The  Breach Rate is defined as the product of (a) the "Audit Rate"

and (b) the "Demand Rate."

## A.  AUDIT RATE

47.    The  Audit Rate is defined as the percentage of loans in a given mortgage portfolio that are audited by the Trustee or other parties authorized under the Governing Agreements for the purpose of finding alleged representation and warranty breaches.  To make this calculation, one must first determine the Audit Rate on a group of loans or the Trustee loan audit selection criteria designed to identify loans with a high likelihood of representation and warranty breaches.

48.    Since a Trustee's audit selection methodology is proprietary to the Trustee and not shared with the Seller, there is very little publicly available information regarding GSE or PLS Trustee Audit Rates or loan audit selection criteria.  I did find one recent report from September 2011 from the FHFA OIG[13] that provides some unique insight into both Fannie Mae's and Freddie Mac's Audit Rate and loan audit selection criteria.

49.    The FHFA OIG reported that Freddie Mac reviews for repurchase claims only those loans that go into foreclosure or experience payment problems during the first two years following origination.  Loans that default after the first two years are reviewed at dramatically lower rates.  The report goes on to note that a Freddie Mac senior examiner believed that this narrower selection criterion resulted in a lower population of loans with defects than would have been discovered if all loans that go into foreclosure or liquidation were considered.

50.    Additionally, the FHFA OIG report contained an FHFA Memorandum, written by Jeffrey Spohn, which stated that the longstanding business

---

[13]  *See* Exhibit E hereto: The FHFA OIG Evaluation of the Federal Housing Finance Agency's Oversight of Freddie Mac's Repurchase Settlement with Bank of America, dated September 27, 2011.

practice for both Fannie Mae and Freddie Mac has been to review non-performing loans

principally but not exclusively on mortgages that default in the first few years.  This

business practice stems from the belief that defaults that occur in the first few years

provide the best opportunity to learn why loans go into default, while most later defaults

are unlikely to be related to manufacturing defects (they more typically reflect life events

such as unemployment, divorce or health issues), and that manufacturing defects become

harder to prove with the passage of time.

      51.    In his memo, Mr. Spohn agreed with the FHFA OIG report that

Freddie Mac and FHFA needed to reassess their loan audit selection criteria with the

potential to broaden their selection criteria to include a larger population of loans that go

into foreclosure or liquidation.

      52.    It has been my experience working with mortgage insurance

companies and for banks issuing repurchase demands to their wholesale and

correspondent sellers, that it is a standard industry practice to select more than just loans

that go to foreclosure or liquidation in the first two years for loan audits.  A more

prevalent industry practice is to first evaluate all loans that go to foreclosure or

liquidation and then exclude a portion of the loans that defaulted due to a documented

hardship (or life event as noted in the FHFA Memorandum) such as loss of a job,

reduction of income, major illness, or those loans that defaulted after 24-36 months of

perfect pay history.  The reasoning behind this reduction or discount is that these

excluded loans likely defaulted because of the borrower hardship or some reason other

than a loan defect.  This is consistent with the reasoning utilized by FHFA, Fannie Mae

and Freddie Mac in their Audit Rate selection criteria.  Even the mortgage insurance

companies, who have been among the most aggressive pursuers of insurance rescissions, have often excluded loans with perfect pay histories from their Audit Rate selection criteria. I have observed with my clients Audit Rates ranging from approximately 65% to 90% of Forecasted Liquidated Loans with reductions in the Audit Rates for perfect loan payment histories and borrower hardships.

53.      Based on my Audit Rate experience and the FHFA OIG findings and recommendations, I have assumed for purposes of this Declaration the following Audit Rate assumptions:

| Description | Audit Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts Liquidated Loans | 70% | 75% |
| Current (Non-Modified) | 15% | 30% |
| Current (Modified) | 45% | 50% |
| 30-59 Days Delinquent | 70% | 75% |
| 60-89 Days Delinquent | 70% | 75% |
| 90+ Days Delinquent & REO | 70% | 75% |
| Foreclosure | 70% | 75% |
| **Total Average** | **65%** | **69%** |

54.      I note that neither the BofA Expert Report nor the Lehman Expert Declaration discussed its Audit Rate assumptions but simply provided the Breach Rate which, as defined above, is the product of (a) the Audit Rate and (b) the Demand Rate.

## B. DEMAND RATE AND DEMAND PROCESS

55.      As part of the Trustee's loan-level audit and repurchase demand decision process, the Trustee requires the loan auditor to perform the following review as part of the loan-level audit: (1) identify any potential contractual breaches (such as failure to comply with the seller's underwriting guidelines), (2) document the alleged breach facts, (3) opine as to whether or not such alleged breach is material and (4) opine as to whether or not such alleged breach was adverse to the interests of the Certificate Holders.

As we discussed above, the alleged breach must meet the R&W Repurchase Standard in order to contractually require the Seller to repurchase the loan.

56.    The Demand Rates for the GSEs are not publicly available.  There are Demand Rates that have been alleged in some PLS repurchase-related litigation against various Sellers, including the Debtors.  These PLS litigation Demand Rates are unsubstantiated, appear to be inflated and are vigorously disputed by the Sellers.  Lastly, neither the BofA Expert Report nor the Lehman Expert Declaration discussed its Demand Rate assumptions.  Therefore, I based my Demand Rate assumptions on my repurchase demand experience.  I have assumed for purposes of this Declaration the following Demand Rate assumptions:

| Description | Demand Rate assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts' Liquidated Loans | 55% | 65% |
| Current (Non-Modified) | 30% | 40% |
| Current (Modified) | 50% | 60% |
| 30-59 Days Delinquent | 55% | 65% |
| 60-89 Days Delinquent | 55% | 65% |
| 90+ Days Delinquent & REO | 55% | 65% |
| Foreclosure | 55% | 65% |
| **Total Average** | **54%** | **64%** |

## C.  BREACH RATE

57.    The Breach Rate was determined by multiplying the Audit Rate assumptions by the Demand Rate assumptions.  Based on this calculation, I determined that the Breach Rate assumptions for the Trusts range between 36% and 44%.  The following chart shows a comparison of this Breach Rate to that used in the BofA Expert Report and Lehman Expert Declaration:

| Description | Breach Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts | 36% | 44% |
| BofA Expert Report | 36% | 36% |
| Lehman Expert Declaration | 30% | 35% |

58.     The Breach Rate assumptions for the lower range are the same in this Declaration and the BofA Expert Report, while the Lehman Expert Declaration lower range is a more aggressive assumption than in this Declaration or the BofA Expert Report, based on the Alt-A and Subprime mortgage loan products securitized by Lehman, which in my experience have historically yielded higher alleged representation and warranty breaches.  The Breach Rate assumptions for the higher range utilized in this Declaration are higher than those used in both the BofA Expert Report and the Lehman Expert Declaration.  I concluded that higher Breach Rate assumptions used in this Declaration are the result of my more conservative view of potential Breach Rates.  Given the above, these Breach Rate assumptions are in my professional opinion reasonable for the Trusts.

**D.  AGREE RATE**

59.     The Agree Rate is the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole.  While the Trustee may issue a Demand alleging one or more representation and warranty breaches, the Seller may not agree with the alleged breach facts.  Then, even if the Seller does agree with the alleged breach facts, the Seller will not always agree that the breach meets the R&W Repurchase Standard as described above.

60.     Prior to March 2012, there was not much in terms of public disclosures with any insight into Agree Rates for alleged breaches of representations and

warranties.  However, beginning in March of 2012, Fannie Mae, Freddie Mac and over a

dozen Private Label Sellers have filed Regulation AB 15-G repurchase demand data with

the SEC, including Agree Rates.

61.    Based on the IMF Special Report, the average GSE Agree Rates

for all Sellers was 49.54% and 67.56% for the Debtors. In our assumptions, we discount

the GSE Agree Rates based on the less stringent representations and warranties found in

the Trusts' Governing Agreements when compared to the stronger representations and

warranties found in the Fannie Mae and Freddie Mac agreements.  For example, in many

of Trusts' Governing Agreements there is little to no fraud representation or warranty

language, and the requirements to conform to the Underwriting Guidelines are often

qualified with "generally" or "substantially" in compliance with the Underwriting

Guidelines, which are both lower standards than are found in Fannie Mae or Freddie Mac

agreements.

62.    Based on the above and in consideration of the costs, risks and

uncertainties if the parties do not mutually agree on the repurchase population and have

to resort to litigation to resolve their differences, we have discounted the Debtors' GSE

Agree Rates and have assumed the Trusts' Agree Rate ranges between a low of 41% and

a high of 47%.  The following chart shows a comparison of this Agree Rate to that used

in the BofA Expert Report and Lehman Expert Declaration:

| Description | Agree Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts | 41% | 47% |
| BofA Expert Report | 40% | 40% |
| Lehman Expert Declaration | 30% | 40% |

63.     The Agree Rate assumptions for the lower range are similar in this Declaration and the BofA Expert Report, while the Lehman Expert Declaration lower range assumption is a more aggressive assumption than in my Declaration or the BofA Expert Report.  The Agree Rate assumptions for the higher range utilized in this Declaration are higher than those used in both the BofA Expert Report and the Lehman Expert Declaration.  I concluded that higher Agree Rate assumptions in this Declaration are correlated to the Debtors' substantially higher actual Agree Rates with the GSEs when compared to the industry as a whole, 67.56% versus 49.54%.  Given the above, these Agree Rate assumptions are in my professional opinion reasonable for the Trusts.

## E.  LOSS SHARE RATE AND POTENTIAL LIABILITY

64.     The Loss Share Rate was determined by multiplying the Breach Rate times the Agree Rate.  Based on this calculation, I determined that the Loss Share Rate for the Trusts ranges between 15% and 21%.

65.     The following chart shows a comparison with the calculated Loss Share Rates used in the BofA Expert Report and Lehman Expert Declaration.

| Description | Loss Share Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts | 15% | 21% |
| BofA Expert Report | 14% | 14% |
| Lehman Expert Declaration | 9% | 14% |

66.     The higher Loss Share Rate assumptions in this Declaration, when compared to the Loss Share Rate assumptions in both the BofA Expert Report and the Lehman Expert Declaration, are the result of the higher assumed Trust Agree Rates, which results in the higher Debtors' Loss Share Rates.

## POTENTIAL REPURCHASE REQUIREMENTS

67.     For purposes of this Declaration, I was asked to calculated the Debtors' Potential Repurchase Requirements and assume that the Trusts were capable of proving a breach of representations and warranties under the Governing Agreements in certain claims against the Debtors.  This calculation is the product of (a) the Trusts' Estimated Lifetime Losses and (b) the Loss Share Rate.

68.     Utilizing the figures stated above in this Declaration, the range of Potential Repurchase Requirements is $6.7 billion to $10.3 billion.  The following chart shows the metrics for determining the low end of the range for the Debtors' Loss Share Rate and corresponding Potential Repurchase Requirements:

| Description | Current Outstanding Trusts' UPB | Frequency Rate | Severity Rate | Trusts' Estimated Lifetime Losses | Breach Rate | Agree Rate | Loss Share Rate | Potential Repurchase Requirements |
|---|---|---|---|---|---|---|---|---|
| **LOWER RANGE** (in billions) | | | | | | | | |
| Trusts' Liquidated Loans | | | | $30.3 | 39% | 42% | 16% | $4.9 |
| Current (Non-Modified) | $34.1 | 11% | 72% | $2.8 | 5% | 13% | .6% | $0.02 |
| Current (Modified) | $11.3 | 36% | 68% | $2.8 | 23% | 32% | 7% | $0.2 |
| 30-59 Days Delinquent | $2.2 | 15% | 68% | $0.2 | 39% | 42% | 16% | $0.04 |
| 60-89 Days Delinquent | $1.0 | 84% | 66% | $0.6 | 39% | 42% | 16% | $0.09 |
| 90+ Days Delinquent | $6.3 | 96% | 67% | $4.0 | 39% | 42% | 16% | $0.6 |
| Foreclosure | $7.5 | 99% | 67% | $5.0 | 39% | 42% | 16% | $0.8 |
| | | | | | | | **15%** | **$6.7** |

69.     The following chart shows the metrics for determining the high end of the range for the Debtors' Loss Share Rate and corresponding Potential Repurchase Requirements:

| | | | | **HIGHER RANGE** (in billions) | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current Outstanding Trusts' UPB | Frequency Rate | Severity Rate | Trusts' Estimated Lifetime Losses | Breach Rate | Agree Rate | Loss Share Rate | Potential Repurchase Requirements |
| Trusts' Liquidated Loans | | | | $30.3 | 49% | 48% | 23% | $7.1 |
| Current (Non-Modified) | $34.1 | 17% | 80% | $4.6 | 12% | 23% | 3% | $0.1 |
| Current (Modified) | $11.3 | 41% | 78% | $3.6 | 30% | 43% | 13% | $0.4 |
| 30-59 Days Delinquent | $2.2 | 20% | 77% | $0.3 | 49% | 48% | 23% | $0.08 |
| 60-89 Days Delinquent | $1.0 | 87% | 75% | $0.7 | 49% | 48% | 23% | $0.2 |
| 90+ Days Delinquent | $6.3 | 97% | 75% | $4.6 | 49% | 48% | 23% | $1.1 |
| Foreclosure | $7.5 | 99% | 77% | $5.7 | 49% | 48% | 23% | $1.2 |
| | | | | | | | **21%** | **$10.3** |

[The remainder of this page intentionally left blank]

## CONCLUSION

70.     In summary, I utilized two generally accepted methodologies for forecasting Trust lifetime loss ranges and developing repurchase-related assumptions based on the Debtors' historical loan loss data, including frequency and severity rates, current payment statuses, Shelf, mortgage loan product, and the Debtors' prior repurchase experience.  These two methodologies are regularly used by market participants, financial institutions and experts to estimate repurchase exposures, including estimates provided by financial institutions in their regulatory filings, and independent third-party expert reports.  Accordingly, the methodologies that I used in this Declaration are generally accepted in the industry as a sound means of estimating repurchase exposure.  Based on my analysis described above, it is my opinion to a reasonable degree of certainty that the proposed Allowed Claim of $8.7 billion appears to be in the range of reasonableness.  I swear under penalty of perjury that the foregoing is true and correct.

Dated:  June 11, 2012

Frank Sillman