## Exhibit F

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------- | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ----------------------------------------------- | ) | |

## SUPPLEMENTAL DECLARATION OF JEFFREY A. LIPPS

I, Jeffrey A. Lipps, declare:

1.     I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215 (the "Firm").

2.     I have over thirty years' experience as a trial lawyer representing and counseling clients in complex commercial litigation matters, including commercial disputes, class action litigation, securities litigation, procurement matters, and bankruptcy litigation. I have handled cases in state and federal courts in over a dozen states. I was a partner at Jones Day before becoming a founding partner in my current firm, which is a litigation boutique with a national practice.

3.     I currently represent or have represented over the past several years a number of the debtor entities, four non-debtor affiliated entities, and several individual former directors and officers of debtor entities in over a dozen separate lawsuits involving the debtor entities' issuance of residential mortgage-backed securities. I have been representing various defendants in these matters since the spring of 2010.

4.     In addition to the cases in which the Firm is involved, I am also aware that there are additional lawsuits regarding the debtor entities' issuance of residential mortgage-backed securities that also name several debtor entities, non-debtor affiliates, and/or former directors and

officers. Although the Firm does not represent the defendants in those actions, I am aware of the cases, the plaintiffs' allegations, and the causes of action asserted against the defendants.

5.      A number of the lawsuits in which I represented the Debtors before the filing of the bankruptcy petition asserted various claims for breaches of representations and warranties made by various Debtor entities relating to the loans that form that collateral for the residential mortgage-backed securities, as well as claims for failure to repurchase any such breaching loans.

6.      These claims arise out of the same or substantially similar contract language to that giving rise to the claims at issue in the Third Amended and Restated RMBS Trust Settlement Agreements, dated as of September 21, 2012 between Residential Capital LLC and its direct and indirect subsidiaries, on the one hand, and two separate groups of institutional investors (the "RMBS Trust Settlements"). In fact, the securities at issue in the cases I handled are included in the RMBS Trust Settlements.

7.      Specifically, *MBIA Insurance Co. v. Residential Funding Company, LLC*, No. 603552/2008 (N.Y. Sup. Ct.) (involving five securitizations), *MBIA Insurance Co. v. GMAC Mortgage, LLC*, No. 600837/2010 (N.Y. Sup. Ct.) (involving three securitizations), *Assured Guaranty Mutual Corp. f/k/a Financial Securities Assurance Inc. v. GMAC Mortgage LLC et al.* No. 12-cv-03776-JPO (involving two securitizations), and the 12 cases brought by FGIC against various Debtor and affiliated entities (involving 20 securitizations, and coordinated before Judge Crotty under the lead case *FGIC v. GMAC Mortgage, LLC*, No. 11-CV-09729-PAC (S.D.N.Y.)) all involved claims of breaches of representations and warranties, and related claims of alleged failure to repurchase loans pursuant to the terms of the applicable contracts. Our Firm was counsel of record in all but the *Assured Guaranty* case, which was filed on the eve of the filing of the Debtors' bankruptcy petitions and not served until after those filings.

2

8.    In addition, the Debtors frequently called upon me and my Firm to evaluate various issues relating to repurchase demands or alleged breaches of representations and warranties that were not yet in litigation.

9.    As part of our Firm's representation of the Debtors in these matters, I have conducted extensive factual and legal analysis of the claims and defenses in these types of "representation and warranty" cases, monitored the development of the law around the country in this area of the law, and assessed the Debtors' exposure in these types of cases.  This analysis has included close review of the publicly available papers relating to similar RMBS representation and warranty settlements, including the Bank of America and Lehman Brothers settlements.

10.    I am also deeply familiar with the Debtors' history and practices with respect to RMBS securitizations.  As detailed in my May 24, 2012 Declaration, the parties in the two MBIA cases engaged in extensive fact discovery involving the exchange and analysis of millions of pages of discovery material and the completion of dozens of depositions as of the petition date, and had begun exchanging initial expert reports in the *MBIA v. Residential Funding Company* case.  In addition, we had evaluated and made initial letter submissions in the *FGIC* group of cases relating to motion to dismiss arguments, and FGIC, likewise, had submitted a letter outlining a proposed early summary judgment motion.

11.    Because of my experience with these types of representation and warranty claims – and, specifically, those asserted against the Debtors – I was asked by Morrison & Foerster to evaluate the reasonableness of the Debtors' settlement of such claims relating to 392 mortgage-backed securitization trusts upon the terms set forth in the RMBS Trust Settlements.  Based on my review of the settlement terms, my extensive knowledge of the types of claims and defenses at issue and the strengths and weaknesses in the applicable law, and my familiarity with the

strengths and potential weaknesses in the Debtors' defense of the claims, it is my opinion that the

RMBS Trust Settlement resolves the potential claims against the Debtors in a reasonable and fair

range.

12.    The bases for my conclusion are outlined below.

## I.    **OVERVIEW OF POTENTIAL CLAIMS**

13.    Claims for breaches of loan-level representations and warranties, such as those to

be resolved by the RMBS Trust Settlements, generally arise out of the applicable Pooling and

Servicing Agreement, Assignment and Assumption Agreement, or another applicable sale

agreement (for purposes of this Declaration, "Sale Agreements") between the appropriate Debtor

entity and the Trust to whom the Debtor is selling the loans.

14.    These Sale Agreements typically contain or incorporate by reference a list of

fairly standard representations and warranties about the loans in the collateral pool underlying

the securitization.  These may be representations about the pool of loans generally – for example,

"97.5% of the loans in this securitization are actuarial mortgage loans, on which 30 days of

interest is owed each month irrespective of the day on which the payment is received" or "no

more than 25.0% of the loans are secured by Mortgaged Properties located in California", or they

may be representations that apply to each and every loan in the pool, such as "All of the loans in

the pool were originated in compliance with applicable state and federal law."

15.    As discussed in greater detail below, additional insight regarding the

interpretation of certain representations and warranties may be found in other, related transaction

documents, such as the Prospectus and Prospectus Supplement.

16.    The representations and warranties most commonly claimed to have been breached in the various lawsuits that have been filed, both against the Debtors and against others, include:

a.   Representations relating to compliance with Underwriting Guidelines;

b.   Representations relating to compliance with state and federal law;

c.   Representations relating to the accuracy of Loan-to-Value (LTV) or Combined Loan-to-Value (CLTV) information;

d.   Representations relating to appraisals or the qualifications of appraisers;

e.   Representations relating to the accuracy of Owner/Occupancy information;

f.   Representations relating to the completeness of Loan Files; and

g.   Representations relating to the accuracy of loan information on the Mortgage Loan Schedule or loan tapes provided in connection with the securitization.

17.    In addition to these claims for breach of the applicable representations and warranties, plaintiffs in representation and warranty litigation have often engaged in a pre-litigation negotiation process, pursuant to the repurchase process outlined in the applicable contract documents.

18.    Specifically, the transaction documents provide that, "upon discovery" of a breach of a representation or warranty, the Seller (here, the Debtor entity selling the loans to the Trust for each securitization) is obligated to repurchase or substitute Mortgage Loans sold to a Trust that breach the stated representations and warranties and "materially and adversely" affect the Certificateholders' interest in those Loans.  The substitution and cure remedies are limited, leaving repurchase of the loan as the primary remedy once the securitization has been in the market for some period of time.

19.    Under the contract documents, the Trustee for each Trust is the party authorized to pursue claims for breaches of representations and warranties.  In the case of pools wrapped by

insurance from a monoline insurer, the insurer will also have certain contractual rights to enforce breaches of representations and warranties regarding the mortgage loans.

20.    Although the right to request repurchase belongs in the first instance to the Trustees, the contract documents provide that investors with substantial holdings in a given class of certificates – typically, 25% – have the ability to direct the Trustees to take action with respect to such repurchase demands, including, if necessary, pursuing litigation against the Debtors for alleged breaches of either the representations and warranties themselves, or the obligation to repurchase a loan "upon discovery" that it does not comply with the representations and warranties.[1]

## II.    ELEMENTS OF THE CAUSE OF ACTION

21.    The claims to be asserted by the Trustees, at the direction of the Institutional Investors who are parties to the RMBS Trust Settlements, are primarily breach of contract claims.[2] There are two basic contract causes of action that may be asserted:  one for breaches of

---

[1]    The Institutional Investors themselves are likely barred from pursuing a direct action against the Debtors themselves by contractual "no action" clauses that require them to work through the Trustees, at least in the first instance. *See, e.g., Walnut Place LLC v. Countrywide Home Loans, Inc.*, 35 Misc. 3d 1207A (N.Y. Sup. Ct. 2012), *aff'd* 96 A.D.3d 684, 948 N.Y.S.2d 580, 581 (N.Y. App. Div. 1st Dept. 2012).

[2]    It is possible the Institutional Investors and/or Trustees would attempt to assert related tort claims, such as negligent misrepresentation or fraud. As to negligent misrepresentation, however, New York requires a showing of a "special relationship of trust" between the parties that would warrant the Trustees relying on the Debtors' statements without question. Courts have regularly rejected such claims as to the monoline insurers, which are similarly situated to the Trustees in terms of the arm's length contractual relationship to the Debtors and the information provided to them by the Debtors. *See, e.g., MBIA Insurance Corp. v. Countrywide Home Loans, Inc.,* 87 A.D.3d 287, 928 N.Y.S.2d 229, 235-36 (N.Y. App. Div. 1st Dep't 2011) (upholding dismissal of negligent misrepresentation claim because no special relationship of trust or uniquely superior knowledge was established); *MBIA Insurance Corp. v. Residential Funding Company, LLC,* 26 Misc. 3d 1204A, 906 N.Y.S.2d 781, 781 (N.Y. Sup. Ct. 2009) (same). As to fraud, similarly, the Trustees would need to establish the additional elements of scienter and justifiable reliance. *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 941 N.Y.S.2d

the representations and warranties made in the Sale Agreements themselves, and one for breach

of the obligation to repurchase defective loans that is triggered by the discovery of a breach of

representation or warranty.  Although distinct causes of action, both types of claims turn on the

question of whether a given loan breached one or more contractual representations or warranties.

22.     If the Institutional Investors or Trustees were to pursue litigation of the claims, the

elements they would need to prove include that (1) an agreement existed, (2) the agreement was

breached, (3) the breach was material, (4) the breach caused harm to the plaintiff, and (5) the

Institutional Investors suffered damages as a result.

23.     Because of the complex structure of the RMBS offerings, each of these elements

poses unique legal and evidentiary challenges, many of which have not fully developed in a

definitive way in the case law to date, and none of which have been litigated to resolution with

respect to the Debtors specifically.  I evaluate each element in more detail below, and explain

why I have concluded that there is sufficient uncertainty and risk in the outcome of these claims

to support the conclusion that the proposed settlement is reasonable.

A.     **Scope of Representations and Warranties**

24.     Although the representations and warranties for each securitization are spelled out

in a clearly identifiable section of the Sale Agreements, there remains ambiguity and dispute

about the scope of some of the representations.  Accordingly, the fundamental question of

---

59, 65 (N.Y. App. Div. 1st Dep't 2012) (collecting cases holding no justifiable reliance as to
fraud claims arising from sale or agreement to provide insurance for securities where plaintiff
was sophisticated, understood and accepted the risks, and could conduct its own independent
investigation into the accuracy of defendant's representations before agreeing to purchase or
provide insurance); *see also CIFG Assur. N.A., Inc. v. Goldman Sachs Mortg. Co.*, 2012 N.Y.
Misc. LEXIS 3986, at *29-33 (N.Y. Sup. Ct. May 1, 2012) (same).  In either case, the Trustees'
and Institutional Investors' burden of proof would be greater than it is for breach of contract
claims.  Moreover, the Debtors would argue that any tort claims relating to the representations
and warranties are duplicative of breach of contract claims.  Accordingly, I have focused my
analysis on the riskiest claims for the Debtors, which are the breach of contract claims.

whether the Debtor had even made an actionable representation may be disputed, and subject to uncertainty as to how a court might rule.

25.    Some of the representations and warranties that pose potential interpretive issues with respect to the Debtors' Sale Agreements include (for example):

a.    "The appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in the Program Guide." 2005-EMX3 Assignment and Assumption Agreement, Sec. 4(xi)

b.    "The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects as of the date or dates which such information is furnished." *Id.* at 4(xv);

c.    "The weighted average Loan-to-Value Ratio with respect to the Mortgage Loans, by outstanding principal balance at origination, is 83.80%." *Id.* at 4(xviii);

d.    "Approximately 93.87% of the Mortgaged Properties (by outstanding principal balance as of the Cut-off Date) are secured by the owner's primary residence. Approximately 3.69% . . . of the Mortgaged Properties . . . are secured by the owner's second or vacation residence. Approximately 2.44% of the Mortgaged Properties . . . are secured by a non-owner occupied residence." *Id.* at 4(xxiii)

e.    "[T]here is no default, breach, violation or event of acceleration existing under any Mortgage Note or Mortgage and no event which, with notice and expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration . . . ." *Id.* at 4(xxviii)

f.    "Each Mortgage Loan as of the time of its origination complied in all material respects with all applicable local, state and federal laws, including, but not limited to, all applicable predatory lending laws." *Id.* at 4(xlvii)

g.    "The originator of [the relevant Loans] offered the related borrower mortgage loan products for which the borrower qualified and we are not aware that the originator encouraged or required the borrower to select a mortgage loan product that is a higher cost product designed for less creditworthy borrowers." 2007-KS3 Assignment and Assumption Agreement at 4(liv)

h.    "The originator of [the relevant Loans] adequately considered the borrower's ability to make payments by employing underwriting techniques that considered a variety of factors, such as: the borrower's income, assets and liabilities, and not solely the collateral value, in deciding to extend the credit at the time of origination." *Id.* at 4(lv)

i. "With respect to each Mortgage Loan originated under a 'streamlined' Mortgage Loan program (through which no new or updated appraisals of Mortgaged Properties are obtained in connection with the refinancing thereof), the related Seller has represented that either (a) the value of the related Mortgaged Property as of the date the Mortgage Loan was originated was not less than the appraised value of such property at the time of origination of the refinanced Mortgage Loan or (b) the Loan-to-Value Ratio of the Mortgage Loan as of the date of origination of the Mortgage Loan generally meets the Company's underwriting guidelines." 2006-QS5 Series Supplement to Standard Terms of Pooling & Servicing Agreement, at 2.03(b)(xv)

j. "No borrower . . . was charged 'points and fees' in an amount greater than (a) $1,000 or (b) 5% of the principal amount of such Mortgage Loan, whichever is greater." 2007-EMX1 Assignment and Assumption Agreement, at 4(liv)

k. "No fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan." *Id.* at 4(lx).

l. "There is no right of rescission, valid offset, defense, claim or counterclaim of any obligor under any Mortgage Note or Mortgage . . . ." 2006-HSA2 Home Equity Loan Purchase Agreement at 3.1(b)(iii)

m. "For each [relevant] Loan, the related Mortgage File contains or will contain each of the documents and instruments specified to be included therein" *Id.* at 3.1(b)(vi)

n. "All of the [relevant] Loans have been underwritten in substantial compliance with the criteria set forth in the Program Guide," *Id.* at 3.1(b)(xxxvii)

o. "Each Subservicer meets all applicable requirements under the Servicing Agreement, is properly qualified to service the [Loans] and has been servicing the [Loans] . . . in accordance with the terms of the respective Subservicing Agreement." *Id.* at 3.1(b)(xxiii)

26.    The representations and warranties cited above are just a sampling of the variety of loan-level representations and warranties that may be at issue, and they vary from Trust to Trust, requiring that any issues as to their scope be litigated differently for different Trusts. But the examples above all present interpretive (not to mention evidentiary) issues: How will the qualifications of an appraiser be evaluated? If some number of the appraisals are deemed flawed because of unqualified appraisers (or for other reasons), how does that impact the weighted average Loan-to-Value Ratio for the collateral pool? Did the Debtors warrant the accuracy of

the underlying appraisal, or merely the accuracy of the loan-to-value calculation based on it? What constitutes "awareness" as to whether an originator may be "encourag[ing]" a borrower to choose one loan product over another? What does it mean for an originator to "adequately consider" a borrower's ability to pay, and what are the Debtors actually warranting in that regard? What does "substantial compliance" with the underwriting guidelines mean? If granting exceptions to the requirements of published underwriting guidelines is common across the industry, should loans with exceptions be considered in "substantial compliance"? Will those originators be considered to have "adequately considered" the borrower's ability to pay? Is there a threshold number of exceptions that renders the loan not substantially compliant, or demonstrates a failure to adequately consider the borrower's ability to pay? Or could a single exception, if the variance is large enough (say, 40 or more points on a FICO score, or 10 or more percentage points for a DTI or LTV), be sufficient to render a given loan out of substantial compliance? Do such deviations constitute *prima facie* evidence that an originator has not adequately considered a borrower's ability to pay?

27.    Further complicating the issues, other materials in the package of transaction documents relating to each Trust shed additional light on how potentially ambiguous representations and warranties should be interpreted, including the extensive risk disclosures included in the Prospectus and Prospectus Supplement for each securitization. For example, the risk disclosures explain:

> a. "Generally, the [Loans] have been originated using underwriting standards that are less stringent than the underwriting standards applied by certain other [similar] loan purchase programs." 2006-HSA4 Pro. Supp. at S-13. *See also* 2007-EMX1 Pro. Supp. at S-19 ("The mortgage loans have been originated using underwriting standards that are less restrictive than the underwriting requirements used as standards for other first lien and junior lien mortgage loan purchase programs, including other programs of Residential Funding Company, LLC and the programs of Fannie Mae and Freddie Mac.")

b. "Applying less stringent underwriting standards creates additional risks that losses on the [loans] will be allocated to noteholders. For example, the . . . loan pool includes . . . loans made to borrowers whose income is not required to be disclosed or verified." 2006-HSA4 Pro. Supp. at S-13. *See also* 2007-EMX1 Pro. Supp. at S-19 ("Applying less restrictive underwriting standards creates additional risks that losses on the mortgage loans will be allocated to certificateholders.")

c. "[M]ortgage loans made to borrowers whose income is not verified, including borrowers who may not be required to state their income . . . may increase the risk that the borrowers' income is less than that represented." 2007-EMX1 Pro. Supp. at S-19.

d. "The basis for any statement that a given percentage of the mortgage loans is secured by mortgaged properties that are owner-occupied will be one or more of the following:

- the making of a representation by the mortgagor at the origination of a mortgage loan that the mortgagor intends to use the mortgaged property as a primary residence;

- a representation by the originator of the mortgage loan, which may be based solely on the above clause; or

- the fact that the mailing address for the mortgagor is the same as the address of the mortgaged property.

"Any representation and warranty in the related pooling and servicing agreement regarding owner-occupancy may be based solely on that information." 2007-EMX1 Prospectus at 9.

e. "In some cases, in lieu of an appraisal, a valuation of the mortgaged property will be obtained from a service that provides an automated valuation." 2007-EMX1 Prospectus at 10.

f. "Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator." 2007-EMX1 Prospectus at 11.

g. "Appraised values may be determined by either:

- a statistical analysis;

- a broker's price opinion; or

- an automated valuation, drive-by appraisal, or other certification of value." 2007-EMX1 Prospectus at 10.

11

h. "If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program. Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated." 2007-EMX1 Prospectus at 11.

i. "[S]ome mortgage loans may have been originated under 'limited documentation,' 'stated documentation,' or 'no documentation' programs that require less documentation and verification than do traiditional 'full documentation' programs.  Under [these programs], minimal investigation into the mortgagor's credit history and income profile is undertaken by the originator . . . ." 2007-EMX1 Prospectus at 11.

j. "The level of review by Residential Funding Company, LLC, if any, will vary . . . [RFC] typically will review a sample of the mortgage loans purchased . . . for conformity with the applicable underwriting standards." 2007-EMX1 Prospectus at 12.

k. "[A] mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards." 2007-EMX1 Prospectus at 12.

l. "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." 2007-EMX1 Prospectus at 12.

m. "In the case of a Designated Seller Transaction" – such as the EMX transactions – "the applicable underwriting standards will be those of the seller or of the originator of the mortgage loans . . . ." 2007-EMX1 Prospectus at 12.

n. "In addition, the depositor purchases loans that do not conform to the underwriting standards contained in the Guide." 2006-HSA4 Prospectus at 13.

o. "The underwriting standards used in negotiated transactions and master commitments and the underwriting standards applicable to loans underlying private securities may vary substantially from the underwriting standards contained in the Guide." 2006-HSA4 Prospectus at 14.

p. "Due to the variety of underwriting standards and review procedures that may be applicable to the loans included in any pool, the accompanying prospectus supplement, in most cases, will not distinguish among the various underwriting standards applicable to the loans nor describe any review for

compliance with applicable underwriting standards performed by the depositor or Residential Funding Corporation." 2006-HSA4 Prospectus at 14.

q. "Because an automated underwriting system will only consider the information that it is programmed to review, which may be more limited than the information that could be considered in the course of a manual review, some mortgage loans may be approved by an automated system that would have been rejected through a manual review." 2006-HSA4 Prospectus at 14.

r. "[T]here could be programming inconsistencies between an automated underwriting system and the underwriting criteria set forth in Residential Funding Corporation's Seller Guide, which could in turn be applied to numerous mortgage loans that the system reviews." 2006-HSA4 Prospectus at 14.

s. "We cannot assure you that an automated underwriting review will in all cases result in the same determination as a manual review with respect to whether a mortgage loan satisfied Residential Funding Corporation's underwriting criteria." 2006-HSA4 Prospectus at 14.

28.    The Debtors would argue that these risk disclosures must be considered when evaluating the scope and/or interpretation of the applicable representations and warranties, and that where the disclosure clearly state the data provided elsewhere in the transaction documents is less than 100% reliable, the scope and/or interpretation of the corresponding warranties is therefore more limited. *See, e.g., Assured Guar. Mun. Corp. v. Flagstar Bank*, 2011 U.S. Dist. LEXIS 102722, at *13 (S.D.N.Y. Sept. 8, 2011), amended Oct. 27, 2011 (Rakoff, J.) ("[I]t is black letter law that the provisions of a contract or a related set of contracts should be read as a whole and every effort should be made to give them consistent meaning in their overall context") (citing *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (it is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other," and, accordingly, "all provisions of a contract [should] be read together as a harmonious whole, if possible.")). Thus, for example, the Debtors would argue that because the risk disclosures make clear that owner-occupancy data is frequently self-reported by borrowers, and that self-reported data is the basis for the calculations provided by Debtors, it

cannot be a breach of the owner occupancy representations if it turns out some of the self-reporting was inaccurate.

29.    The Institutional Investors, however, would likely argue that regardless of their skepticism as to the quality of the underwriting or accuracy of the data supplied, the very purpose of a warranty is that it obviates the need to do additional investigating, including by probing the discrepancies between the warranties and the risk disclosures. *See CBS, Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 997, 1001-02 (N.Y. 1990); *see also Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.) ("A warranty . . . is intended precisely to relieve the promise of any duty to ascertain the fact for himself."); *Credit Suisse Secs. (USA) LLC*, 2011 N.Y. Misc. LEXIS 4787, at *17 ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or warranty] that certain facts are true, it will often be justified in accepting that representation [or warranty] rather than making its own inquiry") (citation and emphasis omitted)).

30.    To illustrate the complexity of the issue, just one of the many key potential disputes likely to be litigated for a large number of Trusts arises with respect to alleged borrower fraud. Some transactions contain an express representation that "[n]o fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan." *See, e.g.,* 2006-QS5 Assignment and Assumption Agreement at 8, § 4(hh); 2006-S12 Assignment and Assumption Agreement at 9, § 4(xxxvii). Those representations pose their own challenges in terms of determining what constitutes "fraud or misrepresentation."

31.    Many of the Debtors' securitizations, however, do not contain an express "fraud representation," but contain language in the representations and warranties that plaintiffs have argued is the equivalent of a fraud representation.

14

32.    For example, a number of the Debtors' Sale Agreements include warranties as to the accuracy of the Mortgage Loan Schedules accompanying the Trust documents. *See, e.g.,* 2005-EMX3 Assignment and Assumption Agreement, Sec. 4(xxviii) ("The information set forth in the Mortgage Loan Schedule with respect to each Mortgage Loan or the Mortgage Loans is true and correct in all material respects as of the date or dates respecting which such information is initially furnished."); 2006-HSA2 Home Equity Loan Purchase Agreement, Sec. 3.1(b)(ii) (similar language).

33.    The Mortgage Loan Schedules vary in complexity from one securitization to the next, but the Schedules frequently include information about debt-to-income ratios, loan-to-value ratios, and owner-occupancy status.

34.    In many cases, particularly for securitizations on the RALI and RFMSII shelves, the "income" data from which the "debt to income" ratio is derived is based on a borrower's stated income, and not on W-2s or pay stubs collected as part of the loan application process.

35.    Stated income loans were clearly permitted under various of the Debtors' loan programs and did not require verification of the borrower's actual income.  The consequence of not requiring income documentation meant that the incomes stated by borrowers could be inaccurate, inflated, or even fraudulent, and the Debtors may not have any express obligation to investigate them for accuracy.    As described above, these facts were disclosed in the Prospectuses for securitizations containing stated income loans.

36.    Plaintiffs in representation and warranty litigation have alleged that, by representing that the Mortgage Loan Schedules were accurate, the Debtors indirectly represented that the underlying income data were truthful and not fraudulent. *See, e.g.,* Complaint, *Fin. Ins. Guar. Corp. v. Residential Funding Co., LLC* (No. 1:11-cv-09736-PAC) (S.D.N.Y.), Complaint

at ¶ 81, Doc. 1 ("RFC provided information to FGIC concerning Mortgage Loans . . . . This information included schedules that set forth statistics about the loan pool. The schedules purported to describe key characteristics relevant to the assessment of risk, including weighted averages of FICO scores and DTI and CLTV ratios. . . . In turn, . . . RFC represented that all the information in those schedules 'is true and correct in all material respects as of the date or dates respecting which such information is furnished.'"); First Amended Complaint, *MBIA Ins. Corp. v. Residential Funding Co., LLC*,  (No. 603552/2008) (N.Y. Sup. Ct. March 19, 2010), at ¶ 57 ("RFC's breaches of its representations and warranties establish that the information conveyed to MBIA, including the schedules in the Offering Documents containing DTI and CLTV statistics for the mortgage loan pools . . . was materially false. Notably, the DTI and CLTV statistics for the mortgage loan pools contained in the Offering Documents are based on 'stated incomes' and appraisals that are grossly inflated and unreasonable.").

37.    For such securitizations, the Debtors would vigorously dispute plaintiffs' interpretation. On the contrary, the Debtors' position is that they only warranted that the data in the Schedules was consistent with the data in their records, not that it was actually true; and that if the other transaction documents disclosed a potential reason for inaccuracy in the data, such as the use of stated income underwriting, then there is no basis for interpreting the representation otherwise.

38.    Although I have been unable to locate any case law squarely addressing the correct interpretation of this representation, there is at least some risk that a Court will accept plaintiffs' arguments that, by representing the Schedules are "accurate," the Debtors could be found to have warranted the *truth* of the information contained in them. Such a conclusion could find support in general contract principles applying the "plain meaning" of contractual language,

or in extrinsic evidence if the court deems the contractual language ambiguous. *See, e.g.,* *LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.,* 2007 U.S. Dist. LEXIS 59303, at *21-*25 (S.D.N.Y. Aug. 13, 2007).

39.    Likewise, as the various Prospectuses and Prospectus Supplements clearly disclose, the property value data underlying the calculation of a loan's loan-to-value ratio (as included on a Mortgage Loan Schedule) may be derived from drive-by appraisals, automated valuation models, or stated values, depending on the applicable underwriting guidelines for that loan; and owner-occupancy data is typically based on what the borrower's stated intention is at the time of loan closing, not what actually occurs (or even what the borrower actually intends). These other aspects of the Mortgage Loan Schedules may also be subject to attack by the Institutional Investors for alleged breach of the "accuracy" representation, depending on what re-underwriting of the individual loan files reveals.[3]   Other data on certain Schedules may be subject to a similar argument.   These issues are starting to be litigated in different types of RMBS cases around the country, but no consensus has yet emerged from the courts to review these issues. *See, e.g., Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, 2012 U.S. Dist. LEXIS 121702, at *9-10 (C.D. Cal. Aug. 17, 2012) (Pfaelzer, J.) (holding issuer cannot be liable in investor litigation for misrepresentations of owner occupancy data where information was furnished by borrowers); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* 843 F. Supp. 2d 191, 204-05 (D. Mass. 2012) (same).

40.    As another example, for a number of Trusts, the relevant agreements included a representation that:

---

[3]    The Debtors did not re-underwrite substantial numbers of loans in connection with defending the pre-petition litigation matters because the bankruptcy petition was filed on the eve of that work beginning in earnest in the first case to reach the expert phase.

> [T]here is no material default, breach, violation or event of
> acceleration existing under the terms of any Mortgage Note or
> Mortgage and no event which . . . would constitute a material
> default, breach, violation or event of acceleration under the terms
> of any Mortgage Note or Mortgage.

2005-EMX3 Assignment and Assumption Agreement, at 4(xxviii); *see also* 2006-HSA2 Home

Equity Loan Purchase Agreement, at 3.1(b)(xix).

41.    Plaintiffs in representation and warranty litigation have argued that certain

commonly-used Notes and Loan Application forms contain a promise by the borrower that the

information provided by the borrower in obtaining the loan is true.  Where borrowers make those

representations, breach of them is typically described in the loan documents as a "material event

of default."  Thus, plaintiffs argue, if a borrower lied in his or her loan application, that is a

"material event of default" and a breach of the related representation by the issuer (here, one of

the Debtors) for which the issuer should be strictly liable, regardless of whether applicable

underwriting guidelines required it to investigate the truthfulness of the statements in the loan

application and regardless of whether it knew of the borrower's fraud.

42.    There are a number of counter-arguments the Debtors could mount (and have

mounted) to such an argument, including testimony and expert opinions that such an

interpretation is contrary to the parties' intent and the industry standard interpretation of the

"material event of default" language.  However, at least some courts have agreed with the

plaintiffs' view as to this representation. *Trust for the Certificate Holders of the Merrill Lynch

Mortg. Pass-Through Certificates Series 1991-C1 v. Love Funding Corp.*, 2005 U.S. Dist.

LEXIS 23522, at *26-30 (S.D.N.Y. Oct. 7, 2005), *reversed and remanded on other grounds*, 591

F.3d 116 (2d Cir. 2010), *judgment entered on remand*, 736 F. Supp. 2d 716 (S.D.N.Y. 2010).

43.    In *Love Funding*, the Southern District of New York granted summary judgment to the Trust/plaintiff in a commercial mortgage-backed securities case for breach of a virtually identical "material event of default" representation, concluding that the seller of the loans was "strictly liable" for an event of acceleration caused by the borrower's fraud, even if the seller lacked knowledge of the fraud.  *Id.* at *29-*30.  *See also Citimortgage v. OCM Bancorp, Inc.,* 2011 U.S. Dist. LEXIS 45437, at *19 (E.D. Mo. Apr. 27, 2011) (holding that, regardless of whether applicable guidelines require it, underwriters must evaluate the "reasonableness" of a borrower's income in a stated income transaction).

44.    Indeed, when MBIA, in its case against RFC, sought to issue subpoenas to thousands of borrowers' employers to try to determine whether the borrowers had committed fraud, it successfully relied on this argument to obtain the discovery, notwithstanding the absence of an express fraud representation in the applicable Sale Agreements. *MBIA Ins. Corp. v. Residential Funding Co., LLC* (603552/2008), MBIA Letter To Court, Doc. 83:6-8 (N.Y. Sup. Ct. Feb. 17, 2011); *id.*, Hr'g Tr., Doc. 118 at 34:21-26, 35-38 (N.Y. Sup. Ct. Mar. 3, 2011).

45.    There are some distinguishing features to the *Love Funding* opinion that render it not directly applicable to the claims here: the defendant in that case did not dispute either (1) whether the "material event of default" representation was intended to be limited to non-payment defaults, or (2) the correctness of a prior Louisiana state court determination that the borrower's fraud at origination constituted an "event of default" under the terms of the mortgage.  Thus, the arguments Debtors might advance were not specifically tested in *Love Funding*.  However, the court in *Love Funding* did find that "the meaning [of the representation at issue] was unambiguous," despite the fact that the parties "urge[d] different interpretations." *Id.* at *27-28.

46.    Accordingly, there is uncertainty in the developing case law – and certainly with respect to the Debtors' specific transaction documents – as to the correct interpretation of the scope of the representations and warranties at issue in the RMBS Trust Settlement.

### B.    Existence of a Breach

47.    The only reliable way to determine whether a loan in fact complies with an underwriting-related representation or warranty – such as those relating to loan-to-value ratios, debt-to-income ratios, borrower misrepresentations, or compliance with federal or state law, all of which are commonly alleged to have been breached – is to review and re-underwrite the actual loan files.  This task is time-consuming, expensive, and fraught with differences in judgment and opinion, as predicting or assessing a borrower's likely ability to pay in the future is not an empirical exercise.

48.    In addition to the mortgage and the note, loan files typically contain the borrower's loan application, supporting income documentation (if required), credit report, appraisals (if required), Truth In Lending Act disclosure forms, and other documents relating to the evaluation of the borrower's creditworthiness.

49.    Debtors RFC and GMAC Mortgage, who originated and/or acquired the loans prior to securitization, each published underwriting guidelines generally governing the process of evaluating whether a loan met the respective Debtor's standards.  In addition, RFC sometimes negotiated specific contracts with third party loan sellers, or negotiated purchase terms for a specific portfolio of loans, that included additional underwriting parameters.  For individual loans, Debtors RFC or GMAC Mortgage might also grant an exception to the published guidelines, depending on the circumstances of the particular loan or borrower.  These underwriting standards, including the use of exceptions and other variances from the published guidelines, are described in the Prospectus and Prospectus Supplement for each Trust.  *See*

Paragraph 26, *infra* (quoting underwriting disclosures from various Prospectuses and Prospectus Supplements).

50.    There are frequently ambiguities in how to determine when there has been a breach of an underwriting-related representation or warranty, and loan underwriting and the evaluation of a borrower's creditworthiness are often judgment calls.

51.    Thus, litigating the fundamental issue of whether a representation or warranty has even been breached poses evidentiary challenges and injects a high level of uncertainty into the outcome.

52.    By way of example, some of the typical underwriting-related disputes that arise in attempting to prove a breach include the following (some of which have already arisen in pre-petition litigation against the Debtors):

     a.    **Is the granting of exceptions to underwriting guidelines consistent with representations that the underwriting "substantially complies" with the published guidelines?** *See, e.g.,* First Amended Complaint, *MBIA Insurance Corp. v. Residential Funding Company, LLC* (603552/2008) Doc. 28 at ¶¶ 58, 61, 63, 68-69, 78 (N.Y. Sup. Ct. Mar. 19, 2010); Amended Complaint, *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.* (602825/2008), Doc. 9 at ¶¶ 78-79 (N.Y. Sup. Ct. Aug. 24, 2009).

     b.    **Is the purchase of loans in bulk (a practice that is common in the industry) pursuant to a negotiated set of underwriting criteria consistent with representations that the underwriting "substantially complies" with the published guidelines?** *See, e.g.,* First Amended Complaint, *MBIA Insurance Corp. v. Residential Funding Company, LLC* (603552/2008), Doc. 28 at ¶¶ 62-63, 69, 78 (N.Y. Sup. Ct. Mar. 19, 2010); Amended Complaint, *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.* (602825/2008), Doc. 9 at ¶¶ 1-4 (N.Y. Sup. Ct. Aug. 24, 2009).

     c.    **Can defects in appraisals be accurately demonstrated through the use of retroactive automated valuation tools (essentially, retroactive appraisal models)?** *See, e.g.*, Amended Complaint, *Fed. Home Loan Bank of Boston v. Ally Fin. Inc.* (1:11-cv-10952-GAO), Doc. 180 at ¶¶ 877-90 (D. Mass. June 29, 2012); Amended Complaint at ¶¶ 628-35, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Secs. Inc.*, 49D05 10 10 PL 045071 (Marion, Indiana Sup. Ct. July 14, 2011); Corrected Amended Complaint at ¶¶