619-26, *Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*, 10 CH 45033 (Circuit Court of Cook County, Illinois Apr. 8, 2011).

d. **Do issuers who acquire and then sell stated income loans into securitizations have a duty to evaluate whether the borrower committed fraud in stating an inflated income, even where there is no fraud representation in the securitization documents?** *Compare Citimortgage v. OCM Bancorp, Inc.,* 2011 U.S. Dist. LEXIS 45437, at \*19 (E.D. Mo. Apr. 27, 2011) (holding that, regardless of whether applicable guidelines require it, underwriters must evaluate the "reasonableness" of a borrower's income in a stated income transaction) *with New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.,* 2012 U.S. Dist. LEXIS 56010, at \*18-21 (S.D.N.Y. Mar. 29, 2012) (finding it unreasonable for an investor to rely on statements about the underwriting of stated income loans when the same set of transaction documents contained extensive disclosures about the risks of such loans).

e. **Have issuers who conducted "due diligence" on only a sample of loans coming through the process breached their representation that loans were underwritten according to "generally accepted" standards?** *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 580-581 (E.D. Pa. 2009) (in assessing sufficiency of complaint alleging securities fraud arising from sale of RMBS, stating that the "quality of the issuer's due diligence examination was a material characteristic of all the Certificates" and that, "[a]s part of its due diligence, Defendant [] reviewed a large sample of the loan documentation and conducted a detailed statistical analysis to ensure that the quality of the loans was consistent with the expected yields").

f. **Where issuers have warned that owner-occupancy data is self-reported, can they nonetheless be held liable for owner-occupancy data that turns out to be inaccurate?** *Massachusetts Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, 2012 U.S. Dist. LEXIS 121702, at \*6-10 (C.D. Cal. Aug. 17, 2012) (Pfaelzer, J.) (holding issuer cannot be liable in investor litigation for misrepresentations of owner occupancy data where information was furnished by borrowers); *MassMutual v. Residential Funding Co., LLC,* 843 F. Supp. 2d 191, 204-05 (D. Mass. 2012) (same).

g. **Were points and fees correctly calculated and disclosed to borrowers (in order to comply with state and federal requirements)?**

h. **Does the absence of certain documents in a loan file – such as a written underwriting approval, exception request form, or Patriot Act disclosure form – constitute a breach of a representation that the loan "substantially complied" with applicable underwriting guidelines, even if irrelevant to the borrower's actual creditworthiness?**

53.    From my experience representing the Debtors in RMBS cases over the past several years, I am aware that the Debtors face a number of factual hurdles in answering these questions, and there is great uncertainty in the outcome of any one of these issues.

54.    By way of example, the parties in the pre-petition RMBS cases involving the debtors have largely disagreed as to which were the applicable underwriting guidelines and whether the use of "exceptions" as disclosed in the Prospectus was permissible.

55.    On the one hand, RFC developed evidence, including the deposition testimony of a number of witnesses and the language of the Prospectuses, showing that RFC considered loans with exceptions, loans processed through automated underwriting systems, or loans acquired pursuant to negotiated criteria agreements all to be in "substantial compliance" with the applicable guidelines.  The evidence showed that the Debtors' underwriters, quality audit staff, and those managing the securitization process followed consistent processes, gave considerable time and attention to individual underwriting decisions, never intended or knowingly allowed "bad" loans to be securitized, often voluntarily undertook to weed out weak collateral, and made extensive efforts to fully disclose to counterparties and investors any risks present in the collateral pool, including through the creation and expansion of the "Vision" website, a "best in class" tool for tracking historical collateral performance at a loan level for each securitization and shelf.

56.    On the other hand, the Institutional Investors and/or Trustees may attempt to point to the plain language of the published RFC Client Guide to suggest that deviations from it (including exceptions and negotiated criteria) were not authorized.  They may try to develop evidence that there were either certain controls lacking in the Debtors' underwriting and securitization processes, or failures to document underwriting decision-making, that (they will

likely argue) demonstrate the process was flawed.  Underwriting decisions are frequently a judgment call, so it is likely the Institutional Investors and/or Trustees will be able to find examples where reasonable underwriters may disagree, and point to those as examples of breaches.

57.    For example, the Institutional Investors and/or Trustees may look to stated income loan underwriting practices and try to advance the theory that the Debtors had an affirmative obligation routinely to evaluate the reasonableness of every stated income loan, notwithstanding the clear language of the Client Guide and the risk disclosures to the contrary.  They may likewise attempt to mount an attack on the Debtors' use of automated decisioning tools, (which was externally available to loan sellers and allowed for a preliminary assessment of whether the loan was acceptable to the Debtors), arguing that because the Debtors knew that automated programs might evaluate a loan application differently than a human underwriter would (despite that this is clearly disclosed in the Prospectus and Prospectus Supplement), their use of such tools was problematic.  And, as with any document-intensive complex litigation matter— particularly where the events in question are several years in the past—the Institutional Investors and/or Trustees are likely to attempt to point to the absence of documentation as evidence that proper processes were allegedly not followed.

58.    Finally, it is typical for plaintiffs to focus on the small handful of self-critical memos or emails that inevitably exist in any business process of this size and complexity, and attempt to present those out of context.  I considered the potential impact of these types of random documents on a judge or jury, regardless of the weight of the evidence otherwise suggesting a generally robust and disciplined underwriting process.

59. Thus, the Debtors' ability to meet the various representations and warranties relating to loan underwriting is an issue for which both the law and the facts are likely to be disputed. While the Debtors would hotly contest any allegation that underwriting representations were breached, there is potential risk for the Debtors of an adverse outcome on each of these issues if a representation and warranty case were to go to trial.

### C.    **Materiality of Breach**

60. Under black-letter contract law, a breach must be "material" to be actionable.

61. In addition, the applicable contract language for breaches of representations and warranties in these Trusts adds an express materiality component, requiring that the breach be one that "materially and adversely affects the interests of any Securityholders or the Credit Enhancer . . . in such [Loan]". *See, e.g.,* 2006-HSA2 Home Equity Loan Purchase Agreement at 3.1; 2006-QO8 Pooling and Servicing Agreement at 2.03 (actionable breach is one that "materially and adversely affects the interests of the Certificateholders in any Mortgage Loan").

62. Under general contract principles, whether a "material" breach has occurred is typically a question of fact. 23 Williston on Contracts (4th ed.) § 63.3 (quoted in *Metro. Nat'l Bank v. Adelphi Acad.*, 886 N.Y.S.2d 68, 68 (N.Y. Sup. Ct. 2009)). To be "material," a breach must "go to the root of the agreement" and be "so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform . . . ." *Id.*

63. To date, I am aware of no significant opinions relating to materiality issued specifically in cases brought by Trustees for breaches arising out of residential mortgage-backed securities. However, the issue of whether a breach is material or causes a material and adverse effect has been addressed a handful of times in cases involving contracts for the purchase of

loans, commercial mortgage-backed securities cases, and in residential mortgage-backed securities cases brought by monoline insurers.

64.    Generally, the most significant materiality disputes arise because the plaintiff (whether Trustee or insurer) seeks to restrict the materiality analysis to the closing date of the securitization. Under plaintiffs' analysis, the breach of the representation or warranty has occurred as of the closing date, so, plaintiffs argue, subsequent events are irrelevant to the evaluation of whether the breach was material.

65.    Defendants argue, in contrast, that certain breaches are not material because they do not ultimately have a "material and adverse effect" on the plaintiff, and facts subsequent to the closing date are relevant to that analysis.

66.    For example, some loans may breach a representation or warranty, but if the borrower continues to pay his or her loan timely, there is no "effect" on the investor. Similarly, if the loan is found to breach an underwriting representation related to stated income, undisclosed debts, property value, etc., but the reason the borrower ultimately stopped paying is because he passed away, then the breach itself has no "effect" on the investor.

67.    These issues overlap with causation issues, discussed further below.

68.    In two commercial mortgage-backed cases to address the issue, the dispute arose in the context of motions *in limine* to preclude evidence relating to post-closing performance of the loans. *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n,* 2011 U.S. Dist. LEXIS 35343 (W.D. Okla. Apr. 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n,* 2011 U.S Dist. LEXIS 145026 (D. Nev. Dec. 15, 2011). Both cases were brought by trustees seeking to enforce loan repurchase provisions for breaches of representations and warranties.

69.    The Oklahoma court addressed Wells Fargo's motion *in limine* to exclude
evidence regarding the decline of the economy and mortgage and real estate markets because "as
of the closing date of the securities, the value of the certificateholders' interests and the
underlying mortgages were materially and adversely affected by Defendant's alleged breaches of
warranties." *Wells Fargo,* 2011 U.S. Dist. LEXIS 35343, at *24.    The court held that
"[e]vidence regarding the post-securitization market meltdown is relevant only if Plaintiff asserts
material and adverse effects occurred after the securitization closing date." *Id.* at *24.  Similarly,
the Nevada court held that "[i]f plaintiff limits its material and adverse effects claim to evidence
available as of the closing date, evidence or testimony of general post-closing economic
conditions is irrelevant" and must be excluded. *Wells Fargo Bank,* 2011 U.S Dist. LEXIS
145026, at *4.

70.    Likewise, courts interpreting loan sale agreements have found evidence that a
buyer would not have purchased the loan "had they known about the negative information" that
was the basis for an alleged breach of representation and warranty sufficient to defeat summary
judgment.  *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs.,* 2007 U.S. Dist. LEXIS
76940, at *36-37 (S.D. Ind. Sept. 28, 2007).  This again suggests a risk that a court may find it is
the falsity of the information available to the buyer at the time of closing that gives rise to the
"material and adverse effect," and not the subsequent performance of the loan in question.  *See
also* Material and Adverse Opinion of Professor Barry E. Adler (relating to the action *In the
Matter of the Application of The Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct.
filed    June    29,    2011)    (pending    before    Kapnick,    J.)),    *available    at*
http://www.cwrmbssettlement.com/docs/Opinion%20Regarding%20Material%20and%20Advers
e%20Affect.pdf, at 12 (last visited September 24, 2012) (discussing interpretation of similar

language in light of *Laureate* and *Wells Fargo* decisions and concluding it "is not possible to conclude with any confidence how a court would interpret" such language).

71.    Most recently, in the monoline insurance context, Judge Rakoff issued an opinion denying summary judgment in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,* No. 11 Civ. 2375 (JSR) (S.D.N.Y. Sept. 25, 2012), in which he relied on the "dictionary definitions" of "material" and "adverse" to conclude that plaintiffs in breach of representation and warranty cases need not prove that the breach "causes . . . actual loss" in order to satisfy the "material and adverse breach" element. *Id.* at 9-10.

72.    Courts interpreting this type of language in the commercial mortgage-backed securities context have also split on the question of whether plaintiffs can be required to meet a "double materiality" standard; that is, whether plaintiff must prove both that the breach was a material breach *and*, as a separate element, that the breach had a "material and adverse" effect on the Institutional Investor. *Compare Wells Fargo Bank NA v. LaSalle Bank Nat'l Ass'n,* 3:07-cv-00449-MRM, Hr'g Tr., Doc. 366 at 5:11-15 (S.D. Ohio Nov. 13, 2009) ("I agree with Defendant's interpretation of the relevant case law, that Plaintiff must prove as required by New York law that there is a material breach of a representation and warranty . . . .") *with Wells Fargo Bank NA v. LaSalle Nat'l Ass'n,* 2011 U.S. Dist. LEXIS 145026, at *11 (D. Nev. Dec. 15, 2011) ("[T]he court does not endorse defendant's contention that the double materiality requirement is well-supported by the relevant case law") and Wells Fargo Bank, N.A. v. LaSalle Nat'l Ass'n, No. CIV-08-1125-C, Mem. Op. & Order Doc. 323:41 (W.D. Okla. Dec. 10, 2010) (declining to follow *Wells Fargo* S.D. Ohio decision). Thus, it is unclear what burden of proof a court in a case between Debtors and the Trustees or Institutional Investors might place on the plaintiffs regarding materiality.

73.    In addition to the issues discussed above, other, more mundane disputes as to "materiality" are bound to arise in any litigation concerning residential mortgage-backed securities.  For example, as noted above, it was industry standard during the relevant time period to grant "exceptions" to underwriting guidelines from time to time, based on an overall assessment of the borrower's creditworthiness.  Thus, while published guidelines might require a minimum FICO score of 680 for certain types of loans, an underwriter could approve a borrower with a lower FICO score (say, 640) based on an evaluation of other features of that borrower or loan, such as reserves in excess of the minimum required amount, or a lower debt-to-income ratio than required.  Disputes are bound to arise as to whether a 40-point FICO deviation, in the overall context of that loan, is or is not "material."  With dozens of underwriting parameters to evaluate for thousands of individual loans, any litigation over such issues is certain to be extremely costly and fraught with risk.

**D.    Causation**

74.    As noted above, a hotly contested issue in representation and warranty litigation is proximate cause.  This has most recently arisen in the context of RMBS cases pursued by monoline insurers, but has also been addressed by commercial mortgage-backed cases.

75.    The primary legal dispute, which is intertwined with the materiality issues discussed above, is whether the actual cause of the loan's failure is a defect in the underwriting.

76.    Courts have confirmed that the market collapse can serve as a defense to securities claims under the federal securities laws, as well as common law claims for fraud and negligent misrepresentation.  *See, e.g., In re Washington Mut. Mortg. Backed Secs. Litig.*, 2012 U.S. Dist. LEXIS 102064, at *41-42 (W.D. Wash. July 23, 2012) (denying summary judgment on Securities Act claim where factual issues existed regarding, among other things, whether

market collapse caused plaintiffs' losses); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 2012 U.S. Dist. LEXIS 119671, at *101-103 (S.D.N.Y. Aug. 17, 2012) (same as to fraud and negligent misrepresentation claims). *But see MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296 (1st Dep't 2011) (declining to rule at motion to dismiss stage that MBIA's losses were caused by the housing and credit crisis).

77.    Furthermore, as a general matter, causation is an element of a contract claim under New York law. A plaintiff, for example, must show that the alleged breach of contract was the "direct and proximate" cause of the plaintiff's injuries. *See Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 379 (1974). Accordingly, general contract law allows defendants to present evidence of the market collapse as the cause of a plaintiff's losses in RMBS cases.

78.    Only a handful of cases, however, have examined this causation issue in the specific context of contractual breach of representation and warranty claims (or repurchase claims). While some of these cases touch on the market collapse as a defense to plaintiffs' claims, no court has issued a definitive ruling on the issue.

79.    The only two cases involving trustee repurchase demands I am aware of are the two *Wells Fargo* evidentiary decisions discussed above, in which the courts excluded *in limine* any evidence of the market collapse so long as the plaintiff trustee limited its evidence to "material and adverse effects as of the closing date." *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 35343, at *23-24 (W.D. Okla. April 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 145026, at *3-4 (D. Nev. Dec. 15, 2011). In both cases, however, the courts did not provide any legal analysis supporting

this conclusion. Accordingly, these decisions appear to have limited persuasive or precedential value.

80.    In another case, *LaSalle Bank Nat'l Assn. v. Citicorp Real Estate, Inc.,* 2002 U.S. Dist. LEXIS 1730 (S.D.N.Y. Feb. 5, 2002), which is a non-trustee case involving the sale of a loan, the court stated that plaintiffs had properly pleaded a "material and adverse effect" because the alleged breaches could constitute a "partial cause" or may have "contributed" to the loan's eventual default. *Id.* at *13. Under this analysis, even a court looking to the eventual outcome of the loan may accept a minimal showing of partial causation by plaintiff as sufficient for plaintiff to meet its burden.

81.    Courts in the monoline insurance context have addressed the causation issue – most notably Justice Bransten in the *MBIA Insurance Co. v. Countrywide Financial Corp.* case. There, Justice Bransten held that MBIA was "not required to establish a direct causal connection between proven warranty breaches by [defendant] and MBIA's claims payments made pursuant to the insurance policies at issue" in order to prove that a breach was material. 936 N.Y.S.2d 513, 527 (2012). In the same opinion, Justice Bransten nonetheless held that MBIA must still "prove that it was damaged as a direct result of the material misrepresentations," and denied MBIA's motion to strike Countrywide's defenses based on the intervening or superseding cause of the economic crisis. *Id.* at 522, 527. However, the court's ruling—in addition to providing mixed guidance—was based in substantial part on applicable insurance statutes, which are not relevant to the Investor- or Trustee-initiated claims at issue in the RMBS Trust Settlements. *See also Syncora Guar. Inc. v. EMC Mortg. Corp.,* 2012 U.S. Dist. LEXIS 84937, at *32 (S.D.N.Y. June 19, 2012); *Assured Guaranty v. Flagstar,* No. 11 Civ. 2375 (JSR) (S.D.N.Y. Sept. 25, 2012)*,* at 10-12 (also noting that the contractual repurchase language does not tie the repurchase

obligation to default of the loan). It is unclear whether any portion of these rulings can be imported into the Institutional Investor / Trustee litigation context, or to what extent courts will look to the monoline insurance litigation for guidance.

82.    No court has yet addressed the issue in an Institutional Investor-initiated RMBS representation and warranty case, so the outcome of the causation issues remains highly uncertain.

E.    **Harm and Damages**

83.    Defendants in representation and warranty litigation, including the Debtors, have consistently maintained that the sole remedy for breaches of representations and warranties is repurchase of the defective loan. That conclusion is supported by the plain language of the Sale Agreements. *See, e.g.,* 2006-HSA2 Home Equity Loan Purchase Agreement at 3.1 ("Upon discovery . . . of a breach of any representation and warranty . . . which materially and adversely affects the interests of any Securityholders or the Credit Enhancer . . . the Seller shall, within 90 days of its discovery or receipt of notice of such breach, . . . either (i) cure such breach in all material respects or (ii) . . . either (A) repurchase such [Loan] . . . or (B) substitute one or more Eligible Substitute Loans . . . ; provided that the seller shall have the option to substitute . . . only if such substitution occurs within two years following the Closing Date."); 2006-QO8 Pooling and Servicing Agreement at 2.03 (similar language).

84.    The issue of damages has not come up in Trustee litigation involving RMBS, except as to the Bank of New York Mellon and Lehman Brothers settlements. Meanwhile, Plaintiffs in the monoline context have argued with some success – based in large part on applicable insurance statutes that have no bearing on the Institutional Investors' claims – that

they are instead entitled to the monetary equivalent of rescission of their insurance agreements. *See, e.g., MBIA Ins. Co. v. Countrywide,* 936 N.Y.S.2d 513, 522-24 (N.Y. Sup. Ct. 2012).

85.    In considering the risk to the Debtors of litigating the RMBS Trust Settlement claims, I had to take into account the possibility—however remote—that the Institutional Investors would attempt to import concepts of rescission into their claims here, in order to maximize or increase their potential recovery.  Such a theory could inflate the Institutional Investors' claimed damages by attempting to hold the Debtors responsible for all losses suffered by the Trusts, regardless of whether they are attributable to breaches of representations and warranties, based on the argument that the Institutional Investors would never have purchased the certificates had they known of the alleged breaches.

86.    Even if the Institutional Investors do not attempt to pursue a rescission-like theory, the parties will undoubtedly dispute the extent to which any losses suffered by the Trusts are actually attributable to breaches of representations and warranties.

87.    In addition, the parties will almost certainly dispute whether the Institutional Investors can recover for loans that breach representations and warranties, but have not defaulted.  This dispute flows directly from the proximate cause issues discussed above.  If the Institutional Investors can recover for loans that have not defaulted—and perhaps even loans that have been fully paid off, as MBIA's counsel suggested in arguing the issue before Justice Bransten in the *Countrywide* case—then their damages could theoretically exceed even the actual and estimated losses to the Trusts.

88.    Finally, as noted in footnote 1, it is possible the Institutional Investors will pursue some tort claims, which could expose the Debtors to a different potential damages calculation and the prospect of having to litigate punitive damages issues.

89.     These risks and uncertainties as to the basic methodology for calculating damages relating to the Institutional Investors' claims are an important factor I considered in reaching my conclusion.

## III.    ADDITIONAL DEFENSES

90.     In addition to the elements of a proposed plaintiff's cause of action for breaches of representations and warranties or breaches of the repurchase obligation, I reviewed various potential affirmative defenses available to Debtors.    The strengths and weaknesses of these affirmative defenses also were factors in my conclusion.    The three primary affirmative defenses I evaluated were (1) statute of limitations, (2) plaintiff's knowledge of the risk and/or failure to conduct appropriate due diligence, and (3) the intervening cause of the housing crisis.

### Statute of Limitations

91.     The Trusts included in the RMBS Trust Settlement were issued between 2004 and 2007.

92.     The statute of limitations for contract claims in New York is six years, and no discovery rule that would extend the time period is available for contract claims.  NY CPLR § 213(2); *Hernandez v. Bank of Nova Scotia,* 908 N.Y.S.2d 45, 46 (N.Y. App. Div. 1st Dep't 2010).[4]

---

[4]     As noted at the outset of this Declaration, my analysis focuses on the breach of contract claims because they pose the greatest risk to Debtors.    However, I note that the statute of limitations for fraud in New York is either six years, or two years from the time the plaintiff discovered or should have discovered the fraud.  N.Y. CPLR § 213.  The analysis as to when the statute was triggered on fraud claims is likely highly factual; however courts have considered the fact of widely-publicized allegations of underwriting problems as evidence that the plaintiff "should have discovered" the fraud at that point.  *See, e.g., Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,* 802 F. Supp.2d 1125, 1134-39 (C.D. Cal. 2011).  The analysis above with respect to the timing of repurchase demands as a trigger will likely apply to tort claims as well.

93.    Accordingly, one argument we likely would have considered making if the claims were litigated is that claims for breach of representation and warranty arising from securitizations issued prior to May 14, 2006 are time-barred.

94.    This argument is supported by a number of courts in a variety of breach of warranty contexts. *See, e.g., Structured Mortg. Trust 1997-2 v. Daiwa Fin. Corp.,* 2003 U.S. Dist. LEXIS 2677, *5 (S.D.N.Y. Feb. 25, 2003) (breach occurs at the moment of sale because "the facts warranted in the . . . Agreement were not true when made"); *Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.,* 793 F. Supp. 2d 1189, 1194 (W.D. Wash. 2011); *see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,* 2012 Del. Ch. LEXIS 171, at *56 (Del. Ch. Aug. 7, 2012).

95.    However, at least one court has held that the breach of the contractual repurchase obligation is a separate claim from that for breach of a representation or warranty. *Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas,* 2012 U.S. Dist. LEXIS 87265, at *12-13 (E.D. Ark. June 25, 2012).    Thus, the cause of action for breach of the repurchase obligation is only complete – and the statute of limitations only begins running – once the Debtors fail to repurchase non-conforming loans upon demand.

96.    Here, the Institutional Investors have yet to direct the Trustees to make a formal repurchase demand and thus trigger the obligation to repurchase.    The applicable contract documents contain no limitation on the time for the Trustees to make such a demand, and indeed, although the Debtors would dispute this in litigation, there is a facially logical argument that none should apply: if a defect is discovered, whenever or however that may be, a remedy should exist to remove that defective loan and make the investors whole.

97.    In addition, the Institutional Investors' position – and that articulated by the court in *Bank of Arkansas* – finds some support in the concept of the condition precedent.  The Debtors today typically treat the repurchase obligation as only arising when there is a demand for repurchase.  Thus, the Institutional Investors may argue, "where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete."  NY CPLR § 206; *see also Kunstsammlungen Zu Weimar v. Elicofon,* 536 F. Supp. 829, 848-49 (E.D.N.Y. 1981).

98.    Thus, while Debtors would have argued that many of the Institutional Investors' claims are time-barred if this dispute were litigated, I must consider as part of my analysis the risk that a court hearing the issues would agree with the *Bank of Arkansas* court and allow a separate claim for breach of the repurchase obligation to proceed.

**Plaintiffs' Due Diligence**

99.    A common inquiry in the monoline insurer litigation context, and under federal securities law in the investor litigation context, is whether the plaintiff undertook any diligence before entering the transaction.  For claims arising under the 1933 Securities Act, the relevant inquiry is whether the investor had knowledge of the risks prior to purchasing the securities.  For the monoline litigation matters, the question is whether the insurer justifiably relied on the seller's assurances.

100.    Accordingly, we considered whether any similar analysis might provide a defense in the context of the kinds of claims resolved by the RMBS Trust Settlements.  We found only limited support for importing these concepts into a breach of contract setting such as this one.  On the contrary, the bulk of the case law has supported the general rule that because a warranty "is intended precisely to relieve the promise of any duty to ascertain the fact for himself," it

relieves the recipient of any obligation to investigate further. *Metro. Coal Co. v. Howard*, 155
F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.); *see also CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75
N.Y.2d 496, 503-06 (N.Y. 1990); *Credit Suisse Secs. (USA) LLC*, 2011 N.Y. Misc. LEXIS 4787,
at *17 ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or
warranty] that certain facts are true, it will often be justified in accepting that representation [or
warranty] rather than making its own inquiry") (citation omitted).

101.    The general rule has a critical exception directly applicable here: "where the
seller has disclosed at the outset facts that would constitute a breach of warranty, that is to say,
the inaccuracy of certain warranties, and the buyer closes with full knowledge and acceptance of
those inaccuracies, the buyer cannot later be said to believe he was purchasing the seller's
promise respecting the truth of the warranties." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
500 F.3d 171, 186 (2d Cir. 2007). In other words, if the counterparty to the contract "candidly
disclosed" that the information supplied (and warranted in the contract to be accurate) was
actually inaccurate, the allegedly "relying" party cannot assert a claim for breach of warranty.
*Id*. *See also Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992) ("Where a buyer closes on a
contract in the full knowledge and acceptance of facts *disclosed by the seller* which would
constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed
from later asserting the breach. In that situation, unless the buyer expressly preserves his rights
under the warranties . . . , we think the buyer has waived the breach.").

102.    However, this exception has been narrowly construed. Indeed, the court in
*Assured Guaranty v. Flagstar* recently rejected a diligence-based argument made by Flagstar on
summary judgment, holding that *Ziff-Davis* applied and the *Galli* exception did not, because
even though Assured received diligence reports identifying actual examples of problematic loans

in the securitization, and had run its own loss models predicting certain losses would occur, that information did not come from the seller/issuer (*i.e.*, Flagstar). *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,* No. 11 Civ. 2375 (JSR) (S.D.N.Y. Sept. 25, 2012), at 15-19. Thus, the court reasoned, "[i]f the buyer 'has been informed of the falsity of the facts by some third party,' he has not waived the representations and warranties." *Id.* at 16 (quoting *Rogath v. Siebenmann,* 129 F.3d 261, 265 (2d Cir. 1997)).

103.    Debtors would argue that their own risk disclosures are so substantial, and so directly warn against reliance on the corresponding statements in the representations and warranties, that the *Galli* exception applies. However, there is no clear indication that the Debtors would be successful in making such an argument.

### "Housing Crisis" Defense

104.    There is ample evidence that the true cause of the losses to these Trusts was the massive economic downturn beginning in late 2007 and escalating through 2008 and into 2009.

105.    As discussed above, Debtors had developed extensive factual and expert support for this argument.

106.    However, in light of some of the court rulings discussed above with respect to materiality and causation, it is possible a court evaluating such claims against the Debtors would preclude the evidence entirely, require the Debtors to prove these facts as an affirmative defense, rather than considering them part of plaintiff's burden to address as part of the "causation" element its claims, or consider the evidence only as a "partial" cause of the loss.

107.    Moreover, some of the Institutional Investors may attempt to argue that the housing crisis itself was propelled in part by the business practices of RMBS issuers like the Debtors.

108.    Finally, although I believe based on my analysis of the facts that the housing crisis is the greatest single cause for the poor performance of the Trusts, it is not likely the *only* cause of loan failures.

109.    Accordingly, a key factor to be considered in weighing the potential outcome of the RMBS Trust Settlement claims is the possibility that the housing crisis defense may not be permitted or may not be entirely persuasive.

### Other Intervening Causes

110.    Debtors also would argue that a number of issues relating to loan attributes and/or non-underwriting events contributed to the Institutional Investors' losses.

111.    For example, a number of the Trusts involve loans with underwriting characteristics that increase the risk of losses.  These risks are disclosed in the Prospectuses and Prospectus Supplements, and likely contributed to some of the losses experienced by the Trusts, reinforcing that breaches of representations and warranties were not the sole cause of losses.  For example, some Trusts are comprised of loans that are "payment option" loans or otherwise negatively amortize, so that the amounts owed by the borrower could increase over time.  Other trusts contain loans with adjustable interest rates or "teaser" rate, such that a borrower may be able to afford an introductory or lower interest rate early in the term of the loan, but later encounters difficulty timely paying when the interest rate increases.

112.    In addition, there are a number of causes of delinquencies or defaults that cannot be effectively prevented or controlled through stringent underwriting:  borrowers may become disabled or die; they may unexpectedly lose their jobs; the property may be destroyed due to a fire or natural disaster and they may be unable to refinance or sell the home as a result.  Some

amount of the losses to the Trusts occur as a result of these everyday, non-underwriting-related events.

113.    This type of "causation" evidence is likely to face similar challenges to the causation factors described above, because it relates to events occurring after the closing of the transaction.    I considered the likelihood that these alternative causes actually impacted the Trusts' losses, as well as the possibility that a court might not permit such evidence to be introduced (either as to causation or damages), in my analysis of the reasonableness of the RMBS Trust Settlements.

## V.    **EVIDENTIARY ISSUES**

114.    In reaching my conclusions regarding the reasonableness of the RMBS Trust Settlements, I also had to consider potential evidentiary issues and, as a trial lawyer, make an assessment of whether and how the proof on either side of the case would be admitted.

115.    In general, based on my evaluation of the factual record developed so far, I believe the Debtors have very strong factual defenses and solid witnesses.    None of the 60+ witnesses deposed in the *MBIA v. RFC* case, for example, testified to anything resembling fraud or knowing misrepresentation in any of the Debtors' practices.    Many described good attention to internal controls, and a meaningful effort and genuine desire to be transparent with investors about the risks of the investments.

116.    However, there are some practical challenges to the presentation of evidence, separate from the legal and factual merits discussed above.

117.    For one, there has been tremendous attrition among the Debtors' employees since the key events occurring from 2004 through about 2008.    For example, of the 76 witnesses deposed in the two MBIA cases as of the petition date, 80% were former employees.    Some who were current employees at the time of their deposition have since left the company.    Most reside

in Minnesota and Pennsylvania, beyond the reach of a New York state court trial subpoena. A few reside as far away as California and Texas. Almost none left the company with any ongoing contractual obligation to cooperate with future litigation.

118.    Moreover, most of the former employee witnesses were involuntarily terminated as part of a series of mass layoffs beginning in 2007. Thus, many have a limited sense of loyalty to the Debtors, and while they may have been willing to appear voluntarily once for a deposition to avoid being served with a deposition subpoena, garnering their cooperation for future depositions, let alone trial testimony in another state, would undoubtedly be challenging. Thus, presenting evidence live at trial – which, from my perspective as a trial lawyer, is almost always more meaningful than reading a dry transcript or even replaying videotaped testimony – would be a challenge.

119.    Another challenge is posed by the nature of these securitizations, each of which contains thousands of individual loans. As noted above, it has always been the Debtors' position that a repurchase claim requires a loan-by-loan evaluation of *which* loans to repurchase. Plaintiffs in both securitization and representation and warranty cases have argued, with some limited success to date, that a statistical sampling approach is acceptable. *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 2010 N.Y. Misc. LEXIS 6182, at *8-18 (N.Y. Sup. Ct. Dec. 22, 2010) (permitting statistical sampling); Order, Doc. 90, *Fed. Housing Fin. Agency v. UBS Americas, Inc.*, 1:11-cv-07010 (S.D.N.Y. May 8, 2012) (same). Regardless of whether statistical sampling can reliably be used to assess breaches and calculate damages, however, it is clear most judges would not permit the presentation of evidence on thousands of individual loans one by one.

120.    Thus, the evidentiary challenge for trial becomes *which* loans to present.  While it is my belief based on the available evidence to date that the overwhelming majority of the loans in each collateral pool did not breach any representations and warranties, it is easy for a plaintiff's lawyer to focus in on the relatively few loans that present egregious examples of underwriting problems – what I call the "low hanging fruit."

121.    Those examples present a risk to the Debtors that a judge or jury will form an adverse impression based on a small slice of the available evidence, placing the Debtors in the position of attempting to prove a negative.  It is often impractical and difficult to shake those kinds of initial impressions effectively.

122.    Finally, a trial of this magnitude would be lengthy and expensive, involving weeks of evidence and numerous experts on either side, including experts on the underwriting of the loans, statistical sampling, the impact of the housing crisis, and damages, to name a few.  The details of the discovery burdens and cost just to get to that point are more fully described in my prior Declaration; I estimate the burden and cost of pre-trial motion practice and trial itself in this case would easily run into the millions of dollars.

## V.    CONCLUSION

123.    Based on all of the factors described above, as well as my general professional experience, my experience working with the Debtors as my clients, and my experience defending representation and warranty and other RMBS lawsuits, I conclude that the RMBS Trust Settlements represent a fair and reasonable settlement within an appropriate range under the circumstances.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true to the best of my knowledge, information, and belief.  Executed on September 28, 2012, at Columbus, Ohio.

_____
Jeffrey A. Lipps