**Hearing Date: November 19, 2012, 10:00 a.m. E.T.**
**Objection Deadline: October 1, 2012, 5:00 p.m. E.T.**
**(extended pursuant to agreement with the Debtors)**

**WINSTON & STRAWN LLP**
David Neier (dneier@winston.com)
Carey D. Schreiber (cschreiber@winston.com)
Corina I. Bogaciu (cbogaciu@winston.com)
200 Park Avenue
New York, NY  10166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700

*Attorneys for Fannie Mae*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x
                                                          :
In re:                                                    :    Case No. 12-12020 (MG)
                                                          :
RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,                  :    Chapter 11
                                                          :
                                         Debtors.         :    Jointly Administered
                                                          :
--------------------------------------------------------- x

**OBJECTION OF FANNIE MAE TO THE DEBTORS' MOTION AND**
**NOTICE OF (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN**
**EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL**
**PROPERTY, AND UNEXPIRED LEASES OF NON-RESIDENTIAL**
<u>**REAL PROPERTY, AND (II) CURE AMOUNTS RELATED THERETO**</u>

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Fannie Mae hereby submits this Objection (the "<u>Objection</u>") to (i) the *Debtors' Motion*

*Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002,*

*6004, 6006, and 9014 For Orders: (A)(I) Authorizing and Approving Sale Procedures, Including*

*Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing;*

*(III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and*

*(B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances,*

*and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III)*
*Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired*
*Leases Related Thereto; and (IV) Granting Related Relief* [Docket. No. 61] (the "Sale Motion")
solely as it relates to assumption and assignment of Fannie Mae's executory contracts with the
Debtors; (ii) the *Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts,*
*Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property*
*and (II) Cure Amounts Related Thereto* [Docket No. 924] (the "Notice"); (iii) the *First*
*Supplemental Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts,*
*Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property*
*and (II) Cure Amounts Related Thereto* [Docket No. 1459]; (iv) the *First Amended and Restated*
*Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired*
*Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II)*
*Cure Amounts Related Thereto* [Docket No. 1484]; and (v) any other notice or other pleading
filed to assume and assign the Debtors' executory contracts with Fannie Mae.[1]  In support of its
Objection, Fannie Mae respectfully states as follows:[2]

## INTRODUCTION

1.        Fannie Mae is, by far, the largest owner of mortgage loans originated and serviced
by the Debtors.  It is therefore surprising that the Debtors are pursuing a non-consensual transfer
of servicing rights in connection with Fannie Mae's mortgage loans.  Indeed, it is difficult to
discern the logic of requiring both Fannie and Freddie Mac, the next largest owner of mortgages

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to those terms in the Sale
Motion and the notices issued in connection with the Sale Motion.
[2] This Objection addresses only Fannie Mae's objections to the proposed assumption and assignment of
contracts and related cure amounts.  Fannie Mae reserves all of its rights with respect to the sale of
substantially all of the Debtors' assets.  In addition, this Objection does not constitute submission to this
Court's jurisdiction by Fannie Mae's Conservator, the Federal Housing Finance Agency ("FHFA") under
the Housing and Economic Recovery Act of 2008 ("HERA").

serviced by the Debtors, to file objections to assumption and assignment of their master selling and servicing contracts. Fannie Mae has always indicated that it is supportive of the Debtors' efforts to transfer servicing to someone capable of servicing such a large loan portfolio. Since the Debtors are liquidating and Fannie Mae is desirous of good servicing, that should be all that is required to serve as the impetus for the Debtors and Fannie Mae to reach a comprehensive agreement on a transfer of servicing. However, for whatever reason, the Debtors have chosen to pursue a non-consensual assumption and assignment of their largest contract, which, standing alone, constitutes 40% of the Debtors' servicing assets.

2. With respect to assumption and assignment of Fannie Mae's contracts, the Sale Motion and the various notices issued in connection with the Sale Motion should be denied for the following reasons:

a. The Debtors have provided limited, incomplete, misleading and contradictory information as to which agreements of Fannie Mae the Debtors seek to assume and assign;

b. The blanket use of zero cure amounts provided for each of Fannie Mae's agreements is inappropriate and incorrect, and, in fact, Fannie Mae's cure claim is not less than $178,665,000;

c. In addition to zero cure amounts, the Debtors incorrectly provide notice with respect to cure amounts through May 2012, when the sale is not expected to consummate until the end of December 2012;

d. The Debtors fail to provide any evidence of adequate assurance of future performance;

e. The Debtors are seeking to impermissibly sever Fannie Mae's mortgage servicing and selling contract to leave behind liabilities and have a purchaser assume only profitable servicing rights;

f. The Debtors' master mortgage selling and servicing contract with Fannie Mae contains specific, detailed, non-boilerplate nonseverability provisions that expressly prohibit the severing of Fannie Mae's contract, which nonseverability clauses cannot be abrogated under applicable law;

g.    The Sale Motion impermissibly seeks an injunction against Fannie Mae's enforcement of its contractual rights against any purchaser even though those rights exist in a separate contract that Fannie Mae has with prospective purchasers such as Nationstar, and that separate contract between two non-debtors is not before this Court and is not subject to the Court's jurisdiction;

h.    The Debtors may not assume and assign Fannie Mae's intellectual property agreement absent Fannie Mae's consent; and

i.    The Debtors may not assume, assign, convey or otherwise affect any of the assets of Fannie Mae without the consent of Fannie Mae's Conservator.

## BACKGROUND

**A.    General**

1.    On May 14, 2012 (the "Petition Date"), the Debtors commenced these bankruptcy cases by filing voluntary petitions for reorganization relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)"). The Debtors are managing and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    On May 16, 2012, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors. On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Hon. Arthur J. Gonzalez as the Examiner [Docket No. 674]. No trustee has been appointed.

**B.    The Debtors' Agreements with Fannie Mae**

3.    As noted in the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, filed in support of the Debtors' Chapter 11 petitions and first day pleadings [Docket No. 6] (the "Whitlinger Affidavit"), the Debtors service over 2.4 million

4

mortgage loans with an aggregate unpaid principal balance of approximately $374.9 billion, approximately 68% of which loans are owned, insured or guaranteed by Fannie Mae, Freddie Mac and Ginnie Mae. (Whitlinger Affidavit ¶14).

4.    According to the Debtors, the Debtors service approximately 950,000 loans owned by Fannie Mae, with an aggregate unpaid principal balance of $153.2 billion. (*Declaration of Joseph A. Pensabene Filed in support of Debtors' GA Servicing Motion, Non-GA Servicing Motion and Supplemental Servicing Motion* [Docket No. 256] (the "Pensabene Declaration") ¶13).

5.    Fannie Mae is by far the largest owner of the loans being serviced by the Debtors, with approximately 99% of the mortgage loans originated or purchased by the Debtors having been sold to Fannie Mae or Freddie Mac or guaranteed by Ginnie Mae, and with approximately 60% of the Debtors' Loan servicing portfolio for Fannie Mae, Freddie Mac and Ginnie Mae being owned by Fannie Mae.  (Whitlinger Affidavit ¶14; Pensabene Declaration ¶13).

6.    In connection with the Fannie Mae loan portfolio, GMAC Mortgage, LLC, one of the Debtors in the Chapter 11 Cases ("GMAC"), is party to a number of executory contracts with Fannie Mae.  Neither Fannie Mae nor its Conservator has consented to the assumption or assignment of any such agreements, and neither Fannie Mae nor its Conservator has waived any portion of the amounts owing from the Debtors to Fannie Mae under the terms of any such agreements, including the amounts discussed herein.

7.    Servicing of the Fannie Mae loan portfolio is performed in accordance with the requirements of that certain Mortgage Selling and Servicing Contract dated as of August 9, 2006, as subsequently may be amended, which incorporates the provisions of the Fannie Mae Selling and Servicing Guides and any Master Contracts or pool purchase contracts that Fannie Mae and

GMAC Mortgage have entered into (collectively, each as amended from time to time, the "MSSC").

8.    In addition, GMAC and Fannie Mae are party to that certain Desktop Underwriter Software Subscription License Agreement dated August 2, 2001 (as amended, supplemented or otherwise modified from time to time, including the Master Agreement and schedules (including schedule of Terms and Conditions), collectively, the "Fannie Mae IP Agreement").  Under the terms of the Fannie Mae IP Agreement, GMAC agreed, *inter alia*, to pay to Fannie Mae various fees and other charges, in exchange for which Fannie Mae agreed to grant to GMAC a non-exclusive, non-transferable license to Fannie Mae's software product know as Desktop Underwriter (the "Fannie Mae IP").   (Fannie Mae IP Agreement, Schedule of Terms and Conditions, Part I ¶¶1, 4, 5, 10).

9.    The Fannie Mae IP is protected under various intellectual property laws, including those governing copyrighted works and trade secrets.  In addition, the Fannie Mae IP Agreement contains numerous provisions designed to further protect and preserve Fannie Mae's intellectual property rights, including protecting confidential or proprietary information disclosed in connection therewith.  Among other things, the Fannie Mae IP Agreement prohibits GMAC from assigning their license (including to anyone other than an affiliate or subsidiary who are permitted usage in a limited fashion) without Fannie Mae's consent.  (Fannie Mae IP Agreement ¶¶4, 5, 6, 10).

C.    **The Sale Motion and Sale Procedures Order**

10.    On May 14, 2012, the Debtors filed the Sale Motion and an accompanying Memorandum of Law [Docket No. 62] ("Debtors' Sale Br.").

6

11.    On June 11, 2012, Fannie Mae filed that certain *Statement of Fannie Mae Concerning Debtors' Motion to Approve Sale Procedures and Related Relief* [Docket No. 302] pursuant to which Fannie Mae apprised the Debtors and prospective bidders of Fannie Mae's position with respect to the proposed sale, including without limitation, cure and adequate assurance issues with respect to the Debtors' agreements with Fannie Mae.

12.    On June 28, 2012, the Court entered the *Order Under 11 U.S.C. §§ 105, 363(b) and 365 (I) Authorizing and Approving Sale Procedures, Including Payment of Break-Up Fees; (II) Scheduling Bid Deadline, Auction (If Necessary) and Sale Hearing; (III) Establishing Assumption and Assignment Procedures, Including Procedures for Fixing Cure Amounts; and (IV) Establishing Notice Procedures and Approving Forms of Notice* [Docket No. 538] approving the Sales Procedures Motion (the "Sale Procedures Order"), which includes procedures regarding the assumption and assignment of executory contracts, including procedures for fixing cure amounts.

**D.    The Notice and Schedule**

13.    Pursuant to the Sale Procedures Order, commencing on July 26, 2012, the Debtors filed several notices of intent to assume and assign certain of their executory contracts with Fannie Mae. Proposed Cure Amounts (as defined in the Notice) through May 14, 2012 were also provided by the Debtors. Among the Designated Contracts on the Schedule are various agreements among GMAC (and conceivably any other Debtor) and Fannie Mae (the "Fannie Mae Designated Contracts"). With respect to Fannie Mae, the Debtors have identified dozens of Fannie Mae Designated Contracts that they propose to assume and assign to the Purchaser, and the Debtors summarily provide that the proposed cure amount is zero.

7

## ARGUMENT

**The Debtors have failed to adequately identify the
Fannie Mae Agreements that the Debtors propose to Assume and Assign.**

14.    It is entirely unclear from the descriptions provided exactly what agreements the Debtors are referring to with respect to what constitutes each of the proposed Fannie Mae Designated Contracts.  The Sale Motion and the various notices issued in connection with the Sale Motion refer to dozens of supposed agreements between the Debtors and Fannie Mae that the Debtors purportedly intend to assume and assign.  The descriptions of these agreements are limited, incomplete and misleading; indeed, many of the agreements listed appear to be duplicates.  Moreover, the Debtors have either mistakenly failed to include the MSSC as a contract the Debtors are seeking to assume or have listed the MSSC with an incorrect date, since the Notice refers to an agreement dated July 1, 2005. (Notice, Ex. 3a at 18-21).  As noted earlier, the MSSC is dated August 9, 2006.  Accordingly, Fannie Mae objects to the ambiguity with which the Debtors have identified the proposed Fannie Mae Designated Contracts.  For the avoidance of doubt, Fannie Mae objects to the assumption of any and all agreements listed in the Sale Motion, any notice filed thereunder, or any other pleading or notice filed that purports to designate a Fannie Mae contract for assumption and assignment.

15.    Bankruptcy Rule 6004(c) requires that notice of a motion to reject be given to the other party to the contract or lease.  Section 102(1) of the Bankruptcy Code, in turn, provides that "notice" is such notice "as is appropriate in the particular circumstances."  11 U.S.C. §102(1)(A).

16.    With respect to the Sale Motion and the various notices issued thereunder, the Debtors' form of "notice" falls well below the appropriate notice required by the Bankruptcy Rules.  The Sale Motion and the various notices issued in connection with the Sale Motion fail to adequately identify the Fannie Mae agreements the Debtors are seeking to have assumed and

8

assigned. Such inadequate notice violates Fannie Mae's constitutional rights of due process. The Bankruptcy Rules are governed by due process considerations. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV,* 209 F.3d 252, 265 (3d Cir. 2000). Due process "requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950)); *Texaco Capital Inc. v. Bd. of Cmm'rs for the LaFourche Basin Levee Dist. (In re Texaco, Inc.),* 254 B.R. 536, 561 (Bankr. S.D.N.Y. 2000).

17. The Sale Motion and the notices issued in connection with the Sale Motion, interpreted in accordance with the facts and circumstances, fall well below the level of notice required by due process. Although the Sale Motion and the notices issued thereunder provide that certain agreements will be assumed and assigned, the vague identifications with respect to the Fannie Mae agreements purportedly being designated for assumption and assignment renders the Sale Motion and the notices issued in connection with the Sale Motion meaningless.

18. In addition, without clear identification of the agreements at issue, there can be no determination that the proposed transfer satisfies the statutory requirements for disposition of assets under HERA. HERA generally requires that any disposition shall (1) maximize the net present value return from the sale of such assets, (2) minimize the amount of any loss to Fannie Mae and Freddie Mac, and (3) ensure adequate competition and fair and consistent treatment of purchasers. *See* 12 U.S.C. § 4617 (b)(11)(E).

**The Proposed Fannie Mae Cure Amount is incorrect.**

19. Section 365 of the Bankruptcy Code provides, in relevant part, as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such

contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A)  cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property . . . ;

(B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)  provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

20.    In addition, section 365(f) of the Bankruptcy Code provides, in relevant part, as follows:

(f)(2) The Trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

21.    Further, under section 365(b)(1) of the Bankruptcy Code, all defaults must be cured as of the time of assumption, or adequate assurance of prompt cure must be provided.  The defaults that must be cured include both pre-petition and post-petition defaults.  *See Stoltz v. Brattleboro Hous. Auth. (In re Stoltz)*, 315 F.3d 80, 86, 94 (2d Cir. 2002); *South St. Seaport Ltd. P'ship. v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 763 (2d Cir. 1996); *In re Bradlees Stores, Inc.*, 2001 WL 36143034, at * 2 (Bankr. S.D.N.Y. 2001).

22.     It is undisputed that under section 365(b) of the Bankruptcy Code, the non-debtor

party to a contract bears the initial burden of establishing a debtor's default under an executory

contract or unexpired lease. *In re F.W Restaurant Associates, Inc.,* 190 B.R. 143, 147 (Bankr. D.

Conn. 1995).   If defaults are established, the burden shifts back to the Debtors to provide

evidence that defaults have been cured or will be promptly cured and there is adequate assurance

of future performance. *Id.* The Debtors have the ultimate burden to demonstrate that agreements

are subject to assumption and that all requirements for such assumption have been met. *See, e.g.,*

*In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. S.D. Tex. 1999).

23.     The actual amounts required to cure existing payment defaults under GMAC's

agreements with Fannie Mae substantially exceed the zero cure amounts proposed by the

Debtors.  As of the date hereof, the estimated total correct cure amount with respect to the MSSC

alone is not less than $177,141,000, which amount is subject to amendment and adjustment.  The

Debtors' proposed zero cure amounts thus fail to satisfy the requirements of section 363(b) of the

Bankruptcy Code.[3]  Moreover, the Debtors' actions are not in good faith when they simply deny

the existence of legitimate claims by blanket listing zero cure amounts. *See In re Crown Books*

*Corp.*, 269 B.R. 12, 19-20 (Bankr. D. Del. 2001) ("Debtor knew that it was responsible for real

---

[3] Fannie Mae objects to the Debtors' requirement that supporting documentation and evidence be submitted at this stage with respect to its proposed cure amount.  Such evidence is massive and will require extensive discovery and a protracted evidentiary hearing to present.  The deadline for filing of proofs of claim has not yet occurred and even then the presumption is that such claims should be deemed allowed.  Under section 502(a) of the Bankruptcy Code, a proof of claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  In addition, Bankruptcy Rule 3001(f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and the amount of the claim." Fed. R. Bankr. P. 3001(f).  Indeed, it is the Debtors and not Fannie Mae that have failed to list proper cure amounts.  Burden shifting is inappropriate. *In re Truffles of Sarasota, Inc.*, 30 B.R. 666, 668 (Bankr. M.D. Fla. 1983) ("[B]efore a Debtor can assume an executory contract, the Debtor must establish by competent proof that all conditions precedent to the right to assume an executory contract under the Code are met," which requirements are listed in section 365(b)(1)(A), (B) and (C)).  The Debtors carry the burden of proof to meet their obligations under section 365 of the Bankruptcy Code, not Fannie Mae. *See, e.g., In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. S.D. Tex. 1999).

estate taxes under the terms of the Lease. Although it may not have known the exact amount, it could have estimated the claim. Instead, the Debtor included nothing for real estate taxes in its cure schedule . . . . This evidences a lack of good faith.").

24. With respect to the Fannie Mae IP Agreement, the Debtors owe approximately $304,000 for the month of August 2012, which amount is due October 5, 2012. In addition, the Debtors will owe approximately $305,000 for each month through the date of assumption, which, assuming continued usage by the Debtors through a closing date of December 31, 2012 and including the amount due for August 2102, is an estimated total of $1,524,000 cure amount for the Fannie Mae IP Agreement.[4]

25. The components for Fannie Mae's cure amounts are as follows (in millions):

| Cure Amount Component | Est. Amts. Accrued and Owed Through Est. Closing of 12/31/12 | Est. Amts. Accruing Post-Closing due to Pre-Closing Defaults |
|---|---|---|
| Rep & warranty previously claimed | 13.224 | TBD |
| Rep & warranty not yet claimed | 52.9 | TBD |
| MI insurance coverage claims previously billed | 3.5 | TBD |
| MI insurance coverage claims not yet billed | 27.83 | TBD |
| Compensatory fees billed | 2.997 | TBD |
| Est. compensatory fees not yet billed | 73.257 | TBD |
| Loan delivery fees | 0.343 | TBD |
| Misc. servicing fees and penalties | 1.94 | TBD |
| Reimbursement for improper withholding of funds due Fannie Mae under Short Sale Online Offer Generation Initiative | 1.15 | TBD |
| TOTAL cure amt. for MSSC Agreement. | 177.141 | TBD |
| TOTAL cure amt. for MSSC and IP Agrmts. | $178.665 | TBD |

**The Debtors fail to provide a Proposed Cure Amount through the Date of Assumption.**

26. In addition, although the Debtors acknowledge that the date of assumption is "anticipated to occur no earlier than November 5, 2012," the Notice only provides that the

---

[4] Fannie Mae reserves its rights to supplement, amend or otherwise modify its cure claim amounts.

Proposed Cure Amount is the amount due and owing as of May 14, 2012. (Notice ¶5). Nor do the Debtors propose a process for establishing cure amounts as of the date of assumption. Including amounts outstanding as of the date hereof of $178,665,000, amounts owing by GMAC to Fannie Mae that will be required to be cured in any assignment will continue to accrue through the date of assumption. Accordingly, Fannie Mae objects to the proposed cure amounts to the extent they do not provide for payment of the correct cure costs, in full, whatever such amount may be through the date of assumption and beyond that date with respect to damages resulting from the Debtors' actions that will not accrue until after the consummation of the sale. *See In re Washington Capital Aviation & Leasing,* 156 B.R. 167, 173 (Bankr. E.D.Va. 1993) (Bankruptcy Code Section 365 measures defaults as of the time of assumption).

**The Debtors fail to provide for adequate
assurance of payment of the Proposed Cure Amount.**

27.    Although the Debtors acknowledge in the Notice that section 365(b)(1) of the Bankruptcy Code "requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure any defaults under executory contracts and unexpired leases at the time of assumption," the Notice provides only for *payment* of proposed cure amounts allegedly due and owing as of May 14, 2012 set forth on the Schedule thereto. (Notice ¶5). There is no discussion regarding adequate assurance of cure of any other defaults under the proposed Fannie Mae Designated Contracts. Accordingly, Fannie Mae objects to the assumption of GMAC's agreements with Fannie Mae unless and until Fannie Mae has been provided with both correct cure payments and adequate assurance of future performance.

13

**In order to Assume the MSSC, Adequate Assurance
of Future Performance by the Purchaser Must Be Provided.**

28.    Bankruptcy Code Sections 365(b)(1)(c) and (f)(2) provide that a debtor may
assign an executory contract or unexpired lease of the debtor only if adequate assurance of future
performance by the assignee of such contract or lease is provided, whether or not there has been
a default in such contract or lease.  11 U.S.C. § 365(b)(1)(c), (f)(2).  Accordingly, the Debtors
bear the burden of proof that any prospective purchaser can provide Fannie Mae with adequate
assurance that it will be capable of meeting all of the obligations owing to Fannie Mae under the
MSSC.  *See, e.g., In re PRK Enters., Inc.*, 235 B.R. at 603 (debtors carry the burden of proof to
meet their obligations under section 365 of the Bankruptcy Code); *In re Gant*, 201 B.R. 216, 220
(Bankr. N.D. Ill. 1996).

29.    The Sale Motion and notices issued in connection with the Sale Motion offer no
discussion regarding adequate assurance of future performance by the Purchaser of the MSSC.
As set forth above, according to the Debtors, the Debtors service approximately 950,000 loans
owned by Fannie Mae, with an aggregate unpaid principal balance of $153.2 billion.  (Pensabene
Declaration ¶13).  Fannie Mae does not object to a transfer of servicing of the Fannie Mae loan
portfolio to a servicer approved by Fannie Mae, on terms acceptable to Fannie Mae and its
Conservator.  However, due to the size of the loan portfolio at issue, it is imperative that any
replacement servicer have the operational expertise and capability (as well as the financial
wherewithal) to service the loans in accordance with the requirements of the MSSC.  To date, the
Debtors have failed to meet their burden by failing to demonstrate that the Purchaser can provide
Fannie Mae with adequate assurance that it will be capable of meeting all of the obligations
owing to Fannie Mae under the MSSC.  Accordingly, Fannie Mae objects to the assumption of
the MSSC.

14

**Each of the Debtors' Agreements with Fannie Mae Must Be Assumed In Its Entirety.**

30.    Among other things, the Sale Motion states that:

> The Nationstar Sale Approval Order will generally provide that, in
> cases where a Servicing Agreement is contained within the same
> writing as an agreement related to origination or loan sales, that the
> Debtors intend to assume and assign to Nationstar only the
> Servicing Agreement and that the originations and/or loan sale
> documents will be severed from the multi-agreement document
> pursuant to the Sale Order.

Sale Motion ¶60.

31.    The Debtors have indicated they intend to pursue, over the strong objections of

Fannie Mae, a severing of MSSC, thus taking the benefits and leaving behind the burdens and

defaults, including burdens and defaults associated with both origination and servicing of Fannie

Mae's loan portfolio.  The Debtors have cited only a single case as support for this extraordinary

relief, *DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg.*

*Holdings, Inc.)*, 402 B.R. 87 (Bankr. D. Del. 2009) (hereafter, "*American Home*").  (Debtors'

Sale Br. ¶53).

32.    The attempt to sever Fannie Mae's contract with GMAC and only assume and

assign part of that contract violates one of the most fundamental tenets of bankruptcy law,

namely that "[s]hould the debtor-in-possession elect to assume [or reject] the executory contract .

. . it assumes [or rejects] the contract *cum onere*, and the expenses and liabilities incurred may be

treated as administrative expenses, which are afforded the highest priority on the debtor's estate,

11 U.S.C. §365(b)(1)(A)." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531-532 (1984) (citations

omitted); *see Cinicola v. Scharffenberger*, 248 F.3d 110, 119-20 (3d Cir. 2000) ("If the trustee

meets the assumption requirements under §365, it must assume the executory contract

entirely."); *Folger Adam Security, Inc., JV*, 209 F.3d at 264 ("Bankruptcy law generally does not

permit a debtor . . . to assume the benefits of a contract and reject the unfavorable aspects of the

15

same contract."); *Three Sisters Partners, Inc. v. Harden* (*In re Shangri-La, Inc.*), 167 F.3d 843, 849 (4th Cir. 1999) ("When the debtor assumes its unexpired lease, however, it assumes it *cum onere* - the debtor must accept obligations of the executory contract along with the benefits."); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) ("It is well established that as a general proposition an executory contract must be assumed or rejected in its entirety . . . . Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others.") (citations omitted); *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012) ("The trustee must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits."); *In re Adelphia Business Solutions, Inc.*, 322 B.R. 51, 54 (Bankr. S.D.N.Y. 2005) ("Generally, in order for an unexpired lease to be assumed or rejected, the lease must be assumed or rejected in its entirety.") (citing *NLRB*, 465 U.S. at 531); *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 183 (Bankr. E.D. Pa. 2010) (debtor "must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits"); *AGV Prods., Inc. v. Metro-Goldwyn-Mayer, Inc.*, 115 F. Supp.2d 378, 390-91 (S.D.N.Y. 2000) (observing that debtor "could not have assumed some of the provisions of an agreement and rejected others, because under the law of bankruptcy a contract cannot be assumed in part or rejected in part"), *aff'd*, 37 Fed.Appx. 555 (2d Cir. 2002); *In re Texaco, Inc.*, 254 B.R. at 550 (Bankr. S.D.N.Y. 2000) ("The law is clear that a debtor who assumes a lease or other executory contract assumes the contract *cum onere*, without any diminution in its obligations or impairment of the rights of the lessor in the present or the future."); *Kopel v. Campanile* (*In re Kopel*), 232 B.R. 57, 65 n.4 (Bankr. E.D.N.Y. 1999) ("Where several documents are construed as one contract, the debtor must assume or reject them together."); *In re*

16

*Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996) ("Except as otherwise provided in the

Bankruptcy Code, an executory contract or unexpired lease is assumed *cum onere*."); *The Leslie*

*Fay Companies, Inc. v. Corp. Prop. Assocs.* (*In re Leslie Fay Cos., Inc.*), 166 B.R. 802, 808

(Bankr. S.D.N.Y. 1994) ("An executory contract cannot be assumed in part and rejected in

part."); *Pieco, Inc. v. Atlantic Computer Sys., Inc.* (*In re Atlantic Computer Sys., Inc.*), 173 B.R.

844, 849 (S.D.N.Y. 1994) (noting that debtor may not "cherry-pick" pieces of a contract it

wishes to assume or reject).[5]

33.      In the face of universal precedent for the general proposition that contracts must

be assumed or rejected in their entirety, the Debtors have cited a single case from the Bankruptcy

Court in Delaware, *American Home*, where that Bankruptcy Court found that a mortgage

servicing and selling contract could be severed, with the servicing portion of that agreement

assumed and the selling portion of that agreement rejected, but only because (i) the parties of that

particular contract agreed that it was a non-executory contract and (ii) incorrectly used a test

developed under Florida law to determine New York law.

34.      In *American Home*, the Bankruptcy Court, citing to *Folger Adams*, *supra*, noted

that contracts generally must be assumed or rejected in their entirety. *American Home*, 402 B.R.

at 94.   However, the Bankruptcy Court noted that the parties "stipulated that the Master

[Servicing and Selling] Agreement is nonexecutory . . . . In other words, the parties agree that

[Debtor] has no material, unperformed obligations under the Master Agreement the non-

performance of which would constitute a material breach excusing [counterparty's] further

performance." *Id.* at 93. Here, there is no such stipulation, and it is indisputable that the MSSC

is executory.   In addition, the Bankruptcy Court in *American Home* determined that under New

---

[5] Moreover, the Debtors ignore HERA, which mandates the manner in which Fannie Mae's assets must be
transferred. *See* 12 U.S.C. §4617 (b)(11)(E).

York law, which governed the MSSC, that "as with all contract interpretation, *severability is a question of the parties' intent*, to be determined from the language employed by the parties, viewed in light of the circumstances surrounding them at the time they contracted." *Id.* at 94 (emphasis added) (internal quotation marks and citation to earlier decision by the same court in the same case omitted). The *American Home* Court then adopted a three-part test of severability under Florida law from the Eleventh Circuit in the case of *Byrd v. Gardinier* (*In re Gardinier, Inc.*), 831 F.2d 974 (11th Cir. 1987):

- First, whether the nature and purpose of the agreements are different;

- Second, whether the consideration for each agreement is separate and distinct; and

- Third, the obligations of each party to the instrument are not interrelated.

*American Home,* 402 B.R. at 95.[6]

35.    The *American Home* Court quickly concluded that the parties' agreement contained different functions and that the consideration for those functions was separate and distinct. *Id.* at 95-96. The *American Home* court spent the most time analyzing the third part of the *Gardinier* test, whether the obligations were interrelated. *Id.* at 96-104. The *American Home* Court concluded that the obligations of the parties were not interrelated, notwithstanding an indemnity provision, a cross-default provision and an anti-assignment provision, all of which provisions have been held not to prevent assumption and assignment under various provisions of the Bankruptcy Code and prevailing precedent. *Id.*

---

[6] The parties in *American Home* erroneously agreed that this three part test of severability from the 11th Circuit when applied to New York law was the appropriate test to apply. *American Home,* 402 B.R. at 95 ("The parties agree that the *Gardinier* analysis, viewed against the backdrop of New York state contract law, is appropriate in determining whether the Master Agreement is severable into a distinct Loan Servicing Agreement and Loan Sale Agreement."). As discussed below, *Gardinier* is not the appropriate test under New York law as it does not appropriately credit the single most important factor, namely, the parties' intent with respect to nonseverability.

36.     In sharp contrast to *American Home*, here, **the parties have specifically and expressly agreed that the selling and servicing functions are interrelated and non-severable**. As the Debtors themselves have acknowledged, the Fannie Mae MSSC "incorporate[s] by reference the applicable Governmental Association servicing guides, as may be updated or supplemented from time to time." (GA Servicing Motion ¶20).[7]  With respect to Fannie Mae, the Debtors acknowledge that the Servicing Guide that is incorporated into the Debtors' MSSC is the Fannie Mae Single Family Servicing Guide (the "Fannie Mae Servicing Guide"). (Sale Motion ¶20 n.11).

37.     The Fannie Mae Servicing Guide, which, as noted above, the Debtors acknowledge is incorporated into the MSSC, **specifically and expressly provides in detailed non-boilerplate language that servicing and selling functions are nonseverable**. The Fannie Mae Servicing Guide provides as follows:

> All types of agreements between a servicer and Fannie Mae are incorporated into the Lender Contract (the lender's and servicer's obligations under all of these agreements are referred to in the Guides in their entirety as the "Lender Contract") and form a single integrated MSSC and not a separate contract or agreement.
>
> Notwithstanding any other provisions in the Guides, or any assignment or transfer of servicing by a lender to another entity:
>
> • A lender/servicer's benefits and obligations with respect to its contractual rights to service mortgage loans are, and were at the time of execution of the Lender Contract, fully integrated and non-divisible from the lender's benefits

---

[7] *See Debtors' Motion for Interim and Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief* dated May 14, 2012 [Docket  No. 57] (the "GA Servicing Motion").

and obligations with respect to its contractual rights and obligations to sell mortgage loans under the Lender Contract.

- Absent such integration, Fannie Mae would not have entered into, or continued to be bound by, the Lender Contract and would not have entered into, or continued to be bound by, separate agreements with a lender/servicer providing for the contractual right to sell or to service mortgage loans for Fannie Mae.

- When Fannie Mae consents to a transfer of servicing by a lender or servicer, it relies on the integration and non-divisibility of the Lender Contract. Fannie Mae requires that the transferor or lender remain obligated for all selling and servicing representations and warranties and recourse obligations upon the transfer of servicing, and requires that the transferee servicer, whether the original seller or a transferee servicer, undertake and assume joint and several liability for all selling and servicing representations and warranties and recourse obligations related to the mortgage loans it services unless explicitly agreed to the contrary in writing by Fannie Mae.

Fannie Mae Servicing Guide (https://www.efanniemae.com/sf/guides/ssg/svcg/svc031412.pdf) §201 at pp. 102-1 to 102-2 (emphasis added).

38.     In addition, the Debtors' MSSC with Fannie Mae specifically incorporates the Fannie Mae Selling Guide, which also **specifically and expressly provides in detailed non-boilerplate language that servicing and selling functions are nonseverable**:

All Master Agreements, cash commitments, pool purchase contracts, collateral agreements, or other applicable agreements and contractual documents in which the lender agrees to undertake special lender obligations in connection with Fannie Mae's purchase or securitization of mortgages or participation interests in mortgages—whether they relate to a transaction that already has been entered into or one that will be entered into in the future—are incorporated into the Lender Contract and form a single, integrated MSSC and not a separate contract or agreement.

Notwithstanding any other provisions in the Guides, or any assignment or transfer of servicing by a lender to another entity

- A lender's benefits and obligations with respect to its contractual rights to service loans are, and were at the time of execution of the Contract, fully integrated and non-divisible from the lender's benefits and obligations with respect to its contractual rights and obligations to sell loans under the Contract,

- Absent such integration, Fannie Mae would not have entered into, or continued to be bound by, the Contract and would not have entered into, or continued to be bound by, separate agreements with a lender providing for the contractual right to sell or to service loans for Fannie Mae,

- When Fannie Mae consents to a transfer of servicing by a lender, it relies on the integration and non-divisibility of the Contract. Fannie Mae requires that the transfer or lender remain obligated for all selling representations and warranties and recourse obligations upon the transfer of servicing, and requires that the transferee servicer, whether the original seller or a transferee servicer, undertake and assume joint and several liability for all selling representations and warranties and recourse obligations related to the loans it services unless explicitly agreed to the contrary in writing by Fannie Mae.

Fannie Mae Selling Guide (https://www.efanniemae.com/sf/guides/ssg/sg/pdf/sel082112.pdf)
§A2-1-01 at pp. 11-12 (emphasis added).

39.    The Bankruptcy Court in *American Home*, and numerous other bankruptcy court decisions in Delaware and elsewhere all stand for the unremarkable proposition that where the parties' various agreements are contained in a single agreement and are interrelated, bankruptcy courts should not allow the agreements to be severed.  *See, e.g. American Home,* 402 B.R. at 100 (interdependent contracts not severable and "contracts are economically interdependent when the consideration underlying each contract supports *the other* contract, such that nonperformance under one contract would constitute a failure of the consideration underlying *the other* contract") (citations omitted); *In re CB Holding Corp.,* 448 B.R. 684, 688 (Bankr. Del. 2011) ("Because the Lease is one integrated agreement, it cannot be assumed in part and rejected in part."); *In re Beatriz Ready Mix, Inc.*, No. 08-04457(SEK), 2009 WL 255890, at * 3-5 (Bankr. D.P.R. Feb. 3, 2009) (lease for manufacturing premises and transportation agreement for hauling raw materials used in manufacturing were economically interdependent where they were part of sale of entire business); *In re Buffets Holdings, Inc.,* 387 B.R. 115, 128 (Bankr. D. Del. 2008) (master leases that were part of a single sale/leaseback transaction, constituted one indivisible contract precluding debtor from rejecting one part while assuming others); *In re Kopel,* 232 B.R. at 69

(Bankr. E.D.N.Y. 1999) (lease and consulting agreement were interdependent relating to sale of

a veterinary business, and "Debtors must therefore cure (or provide adequate assurances of the

prompt cure of) the default under the Consulting Agreement as a condition to the assumption of

the Lease").

40.     Here, unlike in *American Home*, the parties have specifically agreed that the

contracts are interdependent and non-divisible, and neither the Debtors, nor, respectfully, this

Bankruptcy Court, should rewrite Fannie Mae's agreements with the Debtors to say otherwise.

Courts may not modify the terms of a fair, arms-length, negotiated, clear and unambiguous

agreement. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889-90 (2d Cir. 1990)

("Where the parties have expressly agreed that the availability of a cure period shall be

temporally limited, the court does not give effect to the parties' intention by removing the time

limitation."); *Diversified Mortg. Investors v. U.S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir.

1976) (court order "[s]hould not be used as a device for creating a new contract between the

parties"); *Addison Terry Co. v. N.F.L. Films, Inc.,* 390 F. Supp. 621, 623 (S.D.N.Y. 1974) ("[i]t

is a cardinal rule of construction that a court should not 'adopt an interpretation' which will

operate to leave a 'provision of a contract . . . without force and effect'") (citation omitted);

*Breed v. Ins. Co. of N. Amer.,* 46 N.Y.2d 351, 355 (1978) (court may not vary unambiguous

terms of contract to "accomplish its notions of abstract justice or moral obligation"); *Liberty

Mut. Ins. Co. v. Aetna Casualty & Surety Co.*, 168 A.D.2d 121 131-32 (2d Dep't 1991) (lower

court's determination that negated part of contract reversed).  Thus, "[i]n adjudicating the rights

of parties to a contract, courts may not fashion a new contract under the guise of contract

construction."  *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985); *see Brainard v. New York Central

Railroad Co.*, 242 N.Y. 125, 133 (1926) (court "may not change the terms of the contract").

**The Proper Test for Determining Whether the MSSC is Severable Under Applicable Law**.

41.    Even though the parties in *American Home* agreed to its application, as noted above,[8] the three part test used by the 11th Circuit in *Gardinier* with respect to Florida law should not have been used by the Delaware Court in *American Home* with respect to severability under New York law.

42.    Preliminarily, it is important to determine which state law should be used to determine whether the MSSC should be severed.  The MSSC does not contain a choice of law provision.  However, generally "bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state." *Bianco v. Erkins  (In re Gaston & Snow)*, 243 F.3d 599, 601–02 (2d Cir. 2001); *see also In re Coudert Bros. LLP*, 673 F.3d 180, 186-194 (2d Cir. 2012) (bankruptcy courts should apply choice of law rules of the forum state except where the claim before the bankruptcy court is wholly derived from another claim already pending in a parallel out-of-state, non-bankruptcy proceeding, and the pending original claim was filed in a court prior to commencement of bankruptcy case,  bankruptcy courts should follow the choice of law rules of the state where the underlying prepetition complaint was filed).

43.    In addition, under New York choice of law rules, a court "first examines whether an actual conflict exists between the laws of the jurisdiction involved."  *Geron v. Robinson & Cole LLP*, Nos. 11 Civ. 8967, 12 Civ. 1364, 2012 WL 3800766, at * 3 (S.D.N.Y. Sep. 4, 2012). "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Intl. Business Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).   As discussed below, analysis of law in the other potentially relevant jurisdictions,

---

[8] *See* note 6.

Delaware (where GMAC is incorporated) and Pennsylvania (where GMAC's principle place of business is located) does not indicate any substantive difference between the laws of the three states.

44.     As set forth above, the MSSC contains two detailed nonseverability provisions, each one indicating that the parties' agreement with respect to selling and servicing functions are integrated and non-divisible. *See* ¶¶37-38, *supra*.

45.     Many contracts routinely contain severability clauses, which generally provide that if one part of a contract is invalid that portion shall be severed and the remaining portion of the contract shall be enforced. *Christian v Christian*, 42 N.Y.2d 63, 73 (N.Y. 1977) ("parties had a right to and did, by expressly stipulating that if any provision of the separation agreement be held invalid or unenforceable all other shall nevertheless continue in full force, make the agreement within reasonable limits divisible, and there is little room for construction"). However, under New York law, where, as is the case here with the MSSC, there is no severability clause, that "militates against a finding of severability." *Mun. Capital Appreciation Partners v. Page,* 181 F. Supp.2d 379, 395 (S.D.N.Y. 2002) (citing *F & K Supply, Inc. v. Willowbrook Dev. Co.,* 288 A.D.2d 713, 716 (3d Dep't 2001)).

46.     In addition, some contracts contain nonseverability clauses. Significant users of nonseverability provisions include bankruptcy attorneys, who often seek to declare plan releases granted to a debtor's management to be nonseverable from the other provisions contained in a plan of reorganization. As discussed in the recent case of $R^2$ *Invs., LDC v. Charter Commc'ns, Inc.* (*In re Charter Commc'ns, Inc.*), Bankruptcy Case Nos. 11-1710, 11-1726, 2012 WL 3764706, at * 7 (2d Cir. Aug. 31, 2012), "the top ten prenegotiated bankruptcies filed in 2010 by

value of the debtor's assets, each contained a nonseverability clause in either the confirmation order or in the reorganization plan."[9]

47.    Notwithstanding the somewhat suspect use of nonseverability clauses to tie a court's hands with respect to plan releases, such nonseverability clauses are routinely enforced by bankruptcy courts. *See Kenton Cnty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 523 (S.D.N.Y. 2007) (severance of settlement agreement incorporated into reorganization plan "would treat a non-severable provision . . . as dispensable"); *see also Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43, 61 (S.D.N.Y. 2010); *Compania Internacional Financiera S.A. v. Calpine Corp. (In re Calpine Corp.)*, 390 B.R. 508, 519 (S.D.N.Y. 2008), *aff'd*, 354 F. App'x 479 (2d Cir. 2009) (request for a rehearing on valuation denied given nonseverability provision in plan); *Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 550 (S.D.N.Y. 2008) ("courts have found it difficult to sever one piece of a Plan, and have noted that such a severance might 'ignore the tradeoff that allowed the parties to settle in the first instance and would treat a non-severable provision of [their agreement] as dispensable'") (citations omitted) (quoting *Delta*, 374 B.R. at 523); *Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 92 B.R. 38, 46 (S.D.N.Y. 1988) (enforcing nonseverability because "'piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions' is, in practical terms if nothing else, a virtually impossible task") (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1149 (D.C. Cir. 1986)).

---

[9] In the bankruptcy case of *In re Charter Communications*, the Second Circuit held that a nonseverability clause in a plan would be enforced, but a boilerplate nonseverability clause would not, standing alone, be sufficient grounds for a court to declare equitably moot an appeal with respect to releases in a plan that had been substantially consummated. *In re Charter Commc'ns*, 2012 WL 3764706 at * 7-8.

48.    Here, as acknowledged by the Debtors, the parties contracted to incorporate the

Fannie Mae Selling and Servicing Guides into the MSSC. Because both of those Guides contain

detailed non-boilerplate nonseverability provisions that specifically provide that the selling and

servicing functions of Fannie are integrated and non-divisible, the MSSC cannot, under New

York law, be severed. In New York, as is the case generally, whether a contract is entire or

severable generally is a question of intention, to be determined from the language employed by

the parties, viewed in the light of the circumstances surrounding them at the time they

contracted. *Christian*, 42 N.Y.2d at 73 (citing 5 Samuel Williston, *Williston on Contracts* § 767

(3d ed. 1961)). Moreover, where a contract, such as the MSSC here, specifically provides that

certain functions are non-severable, that provision should be enforced. *Barden & Robeson Corp.*

*v Timmerman,* 116 A.D.2d 814, 815-816 (3d Dep't 1986) ("Where the parties contemplate

fulfillment of the entire contract, the contract is treated as indivisible.") (citations omitted).

49.    Indeed, the very same bankruptcy judge (Sontchi, J.) that decided *American Home*

recently held that where parties specifically and unambiguously intended for a contract to be

nonseverable, that provision should be respected. Thus, in *Foothills Texas, Inc. v. MTGLQ*

*Investors, L.P. (In re Foothills Texas, Inc.),* 476 B.R. 143 (Bankr. D. Del. 2012), the Delaware

Bankruptcy Court held, under Texas law (which is not in conflict with New York law), as

follows:

> As a general rule, the decision to reject a contract "is an all-or-nothing
> proposition." But, in limited circumstances, some courts have been willing to
> treat an agreement as severable and subject to rejection if the contract would
> receive the same treatment under applicable law. Thus, if a purported agreement
> actually consists of multiple distinct, agreements, and at least one of those
> portions is an "executory contract," then the severed portion may be rejected
> pursuant to §365.
>
> As with all things, there are limits. One important limit is the court will only
> sever a contract if it can be severed under applicable law. In the current instance,

applicable law means the laws of Texas.

Under Texas law, determining whether a contract is severable is ordinarily a question of law. A "divisible contract" is said to exist when performance by one party consists of several distinct and separate items and the price paid by either party is apportioned to each item. <u>No single test or rule of law can be used to ascertain whether a contract is divisible or indivisible. But the inquiry is primarily determined by intent of the parties, as evidenced by the language of the Contract, the subject matter of the agreement and the conduct of the parties.</u>

<u>The intent of the parties is the principal determinant of divisibility.</u> The case *Johnson v. Walker*, for instance, turned on a question of intent. In that case, the court found that an agreement involving periodic payments was indivisible, since the parties intended to agree to the whole. The court explained: "The contract in question is an agency contract whereby Johnson was to market Walker's insurance policies. It is similar in nature to an employment contract where an employee receives commissions for each sale . . . . <u>Since the agent's contract in the present case contemplated agreement to the entire bundle of rights and duties included therein, it is not divisible, and Johnson's claim fails.</u>"

*Id.* at 153-54 (emphasis added, footnotes omitted, citations omitted).

50.     Under New York law, while there is no formulaic test, severability is determined by (i) whether the parties intended for the contract to be severable, and (ii) assuming the parties did not intend for the contract to be nonseverable, the nature and terms of the contract determine whether a contract is divisible.

51.     In the case of *In re Prakope,* 317 B.R. 593 (Bankr. E.D.N.Y. 2004), a debtor entered into a contract to sell the residence he jointly owned with his wife three days before filing a Chapter 7 petition. The trustee rejected the agreement and moved for authority to sell the residence free and clear. The prepetition purchasers moved to intervene and claim that they still had the authority to enforce the prepetition purchase contract against the debtor's wife. The Bankruptcy Court held the contract to be nonseverable and summarized the law concerning severability under New York law as follows:

A severable contract includes two or more promises which can be acted on separately such that the failure to perform one does not necessarily put the

> promisor in breach of the entire agreement. There is no formulaic test for determining whether a contract is severable or entire. In making such a determination, the primary factor to consider is the intent of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances existing at the time of contracting. A contract is entire when, by its terms and purposes, it contemplates that all of its parts are interdependent and common to one another. A contract is severable when its nature and purpose are susceptible to division and apportionment. Under New York law, a contract will not be regarded as severable unless (1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents.

*Id.* at 598-599 (emphasis added, citations omitted, internal quotation marks omitted).

52.    In the case of *Instead v. ReProtect, Inc.,* Case No. 08 Civ. 5236 (DLC), 2009 WL 274154 (S.D.N.Y. February 5, 2009), two companies in the business of women's reproductive health products entered into an agreement that had several components, including a research and development component, two product licensing components and a non-competition component. One of the companies filed for bankruptcy and sold its assets to a purchaser. The purchaser did not designate the agreement for assumption and assignment. The other party to the contract, Instead, claimed that the purchaser was violating the license and non-competition components of the agreement. The purchaser claimed that because the agreement was not assumed and assigned, it had no obligations under the agreement. Instead claimed the agreement was severable into separate components and the only part of the agreement that was excluded from the 363 sale was the research and development component and that the product licensing and non-competition components were assumed by the debtor and assigned to the purchaser. The Court held that the agreement was not severable and had been entirely excluded from the 363 sale, and stated that:

> Under New York law, the severability of a contract is a question of the parties' intent, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted. Where

the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may thus be determined by summary judgment or by dismissal.

*Id.* at * 4 (citations omitted, internal quotation marks omitted). *See also Ginett v. Computer Task Group, Inc.,* 962 F.2d 1085, 1098-99 (2d Cir. 1992) ("While form is not conclusive, the fact that the parties entered into only one agreement encompassing numerous terms rather than two agreements is 'influential.'") (citation omitted); *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 13 (1972) ("In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances.") (citations omitted).

53.    In the case of *In re Teligent, Inc.,* 268 B.R. 723 (Bankr. S.D.N.Y. 2001), the court held a trial to determine in part whether a merger and non-disclosure/non-compete agreement constituted a single agreement or multiple agreements where one could be rejected and the other assumed.    The court determined that the parties agreements constituted a single agreement, noting that under New York, Delaware and Texas law, and "[u]nder general contract law, the parties' intentions determine whether two separately executed agreements are in reality one." *Id.* at 728 (citations omitted).

54.    The Second Circuit recently addressed the issue of severability under New York law in *Novick v. AXA Network, LLC,* 642 F.3d 304 (2d Cir. 2011).    In that case, a stockbroker brought a claim for breach of an employment agreement and the brokerage firm counterclaimed for breach of a promissory note.    Common industry practice would indicate that these two separate agreements were integrated, but, nevertheless, the lower court granted summary judgment on the brokerage firm's counterclaim for breach of the promissory note, finding that the promissory note was independent from the broker's employment claim.    The Second Circuit reversed.    With respect to the two agreements, the Second Circuit held that "[b]y a long series of

decisions, the rule has been established that the question whether covenants are to be held

dependent or independent of each other is to be determined by the intention and meaning of the

parties, as expressed by them, and by the application of common sense to each case submitted for

adjudication." *Id.* at 312.

55.     Here, as in the cases of *Prakope, Instead, Teligent* and *Novick*, the parties' intent

to make the MSSC nonseverable is clear and unambiguous.  This Bankruptcy Court should not

countenance the Debtors' attempt to use the bankruptcy process to rewrite the parties' contract.

56.     Delaware law is not in conflict with New York law with respect to severability of

a contract.  In the seminal Delaware case, *Orenstein v. Kahn*, 119 A. 444 (Del. Ch. 1922), the

court held that a contract for the sale of real estate occupied by a store and for the fixtures and

stock of merchandise, was an entire, nonseverable contract, even though consideration was

apportioned between the three kinds of property.  *Id.* at 447.  The court essentially held that even

though the contract seemed to be divisible, the intent of the parties indicated that they bargained

for the whole, and it is the intent of the parties that is controlling.  *Id.* at 446.  The Supreme Court

of Delaware then set down the following standard with respect to the severability of a contract:

> In determining whether a contract is divisible or entire, the essential
> question, therefore, is: 'Did the parties give a single assent to the whole
> transaction, or did they assent separately to several things?' 2 *Williston on
> Contracts*, § 863. If there be a single assent to a whole transaction
> involving several things or several kinds of property, a contract is *always*
> entire . . . . And although consideration is apportioned on the face of the
> contract, 'yet if there be a special agreement to take the whole or nothing,
> or if the evidence clearly shows that such was the purpose of the parties,
> the contract would be entire.'

*Id.* (emphasis added).  *See also R.S.M. Inc. v. Alliance Capital Mgmt. Holdings L.P.,* 790 A.2d

478, 494 n.20 (Del. 2001); *Equitable Trust Co. v. Delaware Trust Co.,* 54 A.2d 733, 738 (Del.

1947).

57.    In Pennsylvania, similar to New York and Delaware, the "primary inquiry in resolving this question is whether the language employed in the contract clearly indicates the intention of the parties that the contract of the parties be entire or severable." *In re Karfakis*, 162 B.R. 719, 725 (Bankr. E.D. Pa. 1993) (quoting *Heilwood Fuel Co., Inc. v. Manor Real Estate Co.,* 175 A.2d 880, 884 (Pa. 1961)).  Where a contract expressly provides that it is entire, there is no need to consider extraneous evidence.  *In re Grede Foundries, Inc.*, 440 B.R. 497, 499-500 (Bankr. W.D. Wis. 2010) (applying Pennsylvania law and holding that software license agreement, maintenance schedule, and appendices constituted one integrated nonseverable agreement).  It is only where a contract does not contain such express language that a court "may look to the contract as a whole, including the character of the consideration, to determine the intent of the parties as to severability." *Jacobs v. CNG Transmission Corp.,* 772 A.2d 445, 452 (Pa. 2001).

58.    Other state law is not to the contrary.  For example, in the case of *In re Adelphia Bus. Solutions, Inc.,* 322 B.R. at 54-55, the Bankruptcy Court determined that a single lease for two separate spaces was severable and one space could be assumed and the other could be rejected, finding that "[u]nder Missouri law, several instruments made at the same time, and relating to the same subject matter *may* be read together as one contract . . . but it does not necessarily follow that those instruments are one contract.  <u>As a minimum prerequisite, there must be some reasonable basis for finding that the parties so intended</u>." (emphasis added, citations omitted, internal quotation marks omitted).

59.    In addition, importantly, the Debtors' proposed assumption and assignment of the Fannie Mae Designated Contracts is subject to the requirements for disposition of conservatorship estate assets, as mandated by 12 U.S.C. §4617.

**The Sale Motion Impermissibly Seeks an Injunction
against Fannie Mae's Enforcement of its Contractual Rights against any Assignee.**

60.    The Sale Motion additionally seeks to enjoin contract parties from enforcing

certain servicing obligations against Nationstar:

> Nationstar is not assuming and parties will be enjoined from
> asserting against Nationstar any claims or obligations relating to
> the pre-closing period under any Assumed Contract, whether such
> claims or obligations are known, unknown, fixed, contingent,
> unliquidated or liquidated at the time of the Closing, including,
> without limitation, any claims or liabilities relating to any act or
> omission of any originator, holder or servicer of mortgage loans
> prior to the Closing Date, and any indemnification claims or
> liabilities relating to any act or omission of the Sellers or any other
> person prior to the Closing Date.  Any parties holding any such
> claims or obligations will be required to respond to the Debtors'
> cure notice if they disagree with the amounts set forth therein.

Sale Motion ¶60.

61.    The Debtors' proposed injunction would directly affect the conservatorship of

Fannie Mae, and pursuant to HERA the Conservator controls Fannie Mae's operations and

assets. *See* 12 U.S.C. § 4617(b)(2)(A),(B) (providing that Conservator succeeds to all assets and

rights of Fannie Mae as a regulated entity).  Issuance of this requested injunction as to Fannie

Mae and its Conservator would be in violation of 12 U.S.C. § 4617(f). Fannie Mae is under the

conservatorship of FHFA.  Pursuant to HERA, "no court may take any action to restrain or affect

the exercise of powers or functions of the [FHFA] as a conservator or receiver." 12 U.S.C. §

4617(f).  As Judge Cote recently held in dismissing for lack of jurisdiction the Debtors' action to

enjoin FHFA from seeking discovery of non-debtor parties:

> I am persuaded that the anti-injunction provision of HERA
> deprives this Court of jurisdiction to grant the relief that ResCap
> seeks . . . . HERA's anti-injunction provision must be construed
> broadly to preclude judicial action of any kind that could impair
> the FHFA's ability to carry out its statutorily mandated function.

Transcript of Hearing at 6-9 *Residential Capital, LLC v. FHFA*, No. 12-5116, slip op. (S.D.N.Y. July 17, 2012) (No. 34).[10] Other courts interpreting section 4617(f) have similarly recognized its expansive reach, concluding that "[t]he court lacks jurisdiction to adjudicate matters which may restrict the FHFA's ability to exercise [its] powers"[11] and that "[t]his ban [on judicial interference] is an essential part of HERA's comprehensive scheme for conservatorships and receiverships."[12] Section 4617(f) bars courts from taking action that restrains or affects the exercise of the powers or functions of the Conservator, even if that action is directed at a third party and not at the Conservator directly. *See In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp.2d at 799 ("A court action can 'affect' a conservator even if . . . the litigation is not directly aimed at the conservator itself.").

62.    Because the Debtors' proposed injunction would impermissibly restrain or affect the Conservator's ability to preserve and conserve the property and assets of Fannie Mae, as well as FHFA's authority to collect obligations and money due to Fannie Mae, any such relief requested in the Sale Motion should be denied.

63.    An additional issue with the proposed injunction is that it would seek to enjoin Fannie Mae from exercising remedies under Fannie Mae's existing origination and servicing contract with Nationstar. Similar to the Debtors' MSSC (and every other Fannie Mae approved mortgage seller and servicer), Nationstar's contract with Fannie Mae incorporates the Fannie Mae Servicing Guide. The Servicing Guide provides that a transferee servicer such as Nationstar

---

[10] The transcript of this hearing is attached as Exhibit A to the *Supplement to July 17, 2012 Motion of the Federal Housing Finance Agency Pursuant to the July 11, 2012 Order of the Honorable Denise L. Cote Seeking Limited Discovery from the Debtors and, if Necessary to that Purpose, Relief from the Automatic Stay* [Docket No. 859].

[11] *Kuriakose v. Federal Home Loan Mortgage Corp.*, 674 F. Supp. 2d 483, 493 (S.D.N.Y. 2009); *see also In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp.2d 790, 799 (E.D. Va. 2009) ("HERA provides that "no court may take any action to restrain or affect the exercise of power or functions of the [FHFA] as a conservator or a receiver." (alteration in original) (quoting 12 U.S.C. § 4617(f)).

[12] *See Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp.2d 347, 351 (S.D.N.Y. 2009).

is responsible for the selling warranties on any portfolio of Fannie Mae loans it assumes.

Specifically, Part I, section 205.03 provides:

> The transferee servicer must assume all of the responsibilities, duties, and selling warranties that were agreed to whether made when the mortgage loan was originally sold to Fannie Mae or subsequent to that date . . . . The two servicers will be jointly and severally liable to Fannie Mae for all warranties and for repurchase, all special obligations under agreements previously made by the transferor servicer or any previous seller or servicer (including actions that arose prior to the transfer).

Fannie Mae Servicing Guide, p. 89
(https://www.efanniemae.com/sf/guides/ssg/svcg/svc031412.pdf).

64.    Thus, even if the Debtors, over Fannie Mae's objections, sever the MSSC and transfer servicing to Nationstar, Fannie Mae can demand that Nationstar assume all origination liabilities based not on the MSSC, but Fannie Mae's existing mortgage servicing and selling contract with Nationstar, which, as a contract between two non-debtors, is neither subject to this Court's jurisdiction nor the Debtors' proposed injunction.

**The Debtor May Not Assume and/or Assign the Fannie Mae IP Agreement
or Otherwise Transfer Fannie Mae Intellectual Property Absent Fannie Mae's Consent**

65.    Section 365(c)(2) of the Bankruptcy Code governs GMAC's ability to assume and assign the Fannie Mae IP Agreement.  Section 365(c) of the Bankruptcy Code states, in relevant part:

> The trustee may not assume or assign an executory contract . . . of the debtor . . . , if (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor . . . , whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c).

66.    Under well-established federal law, non-exclusive software licenses protected under copyright law are non-assignable absent the licensor's consent. *See In re Patient Educ.*

*Media, Inc.*, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997) ("[T]he nonexclusive license is personal

to the transferee . . . and the licensee cannot assign it to a third party without the consent of the

copyright owner.") (citation omitted); *TAP Publications Inc. v. Chinese Yellow Pages*, 925 F.

Supp. 212, 218 (S.D.N.Y. 1996); *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*,

165 F.3d 747, 750 (9th Cir. 1999), *cert. dismissed*, 528 U.S. 924 (1999); *In re Valley Media, Inc.*,

279 B.R. 105, 135-36 (Bankr. D. Del. 2002); *In re Golden Books Family Entm't, Inc.*, 269 B.R.

300, 309 (Bankr. D. Del. 2001) ("Under copyright law, a nonexclusive licensee . . . has only a

personal and not a property interest in the [intellectual property], which cannot be assigned

unless the [intellectual property] owner authorizes the assignment.") (alteration in original,

citation omitted, internal quotation marks omitted); *In re Access Beyond Techs., Inc.*, 237 B.R.

32, 47-49 (Bankr. D. Del 1999) (citing *In re West Elec., Inc.*, 852 F.2d 79 (3d Cir. 1988)); *see

also* 17 U.S.C. § 101, *et seq.* (copyright protection conferred automatically).

67. The Fannie Mae IP Agreement provides only a non-exclusive license to GMAC.

Neither Fannie Mae nor the Conservator has consented to an assignment of the Fannie Mae IP

Agreement. As such, under applicable law, including HERA, and the terms of the software

license, GMAC cannot unilaterally assume and assign the Fannie Mae IP Agreement.

## RESERVATION OF RIGHTS

68. Fannie Mae reserves all of its rights under the Bankruptcy Code and applicable

non-bankruptcy law. In addition, Fannie Mae reserves the right to amend or supplement this

Objection, including with respect to cure amounts.

69. Fannie Mae accordingly reserves all of its rights with respect to the proposed

assumption and assignment of GMAC's agreements with Fannie Mae and approval of the sale.

## CONCLUSION

For the foregoing reasons, Fannie Mae respectfully requests that the Court deny the Sale

Motion with respect to the assumption and assignment of Fannie Mae's contracts with the

Debtors and grant such other and further relief as is just and necessary.

Dated: New York, New York
      October 1, 2012

**WINSTON & STRAWN LLP**

By:   /s/David Neier
David Neier (dneier@winston.com)
Carey D. Schreiber (cschreiber@winston.com)
Corina I. Bogaciu (cbogaciu@winston.com)
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Attorneys for Fannie Mae*