Hearing Date:  October 10, 2012 at 10:00 a.m. (ET)
Objection Deadline:  October 3, 2012 at 4:00 p.m. (ET)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Erica J. Richards

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                                    )
In re:                                              )        Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )        Chapter 11
                                                    )
                        Debtors.                    )        Jointly Administered
                                                    )
---------------------------------------------------------------  )

**DEBTORS' OBJECTION TO MOTION OF DEBORAH BOLLINGER AND**
**BRYAN BUBNICK FOR RELIEF FROM AUTOMATIC STAY AS TO**
**GMAC MORTGAGE, LLC AND RESIDENTIAL CAPITAL, LLC**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................4

    A.    General Chapter 11 Case Background.................................................................4

    B.    Critical Case Milestones......................................................................................5

    C.    Washington Action ..............................................................................................5

OBJECTION ..........................................................................................................................7

    A.    Relief From the Automatic Stay is Not Warranted at this Time ...........................7

    B.    Movants Have Failed To Satisfy Their Burden Under Sonnax............................9

        i.    The Second Sonnax Factor: Lack of any connection with or
            interference with the bankruptcy case ......................................................9

        ii.    The Tenth Sonnax Factor: The interests of judicial economy and
            the expeditious and economical resolution of litigation..........................14

        iii.    The Eleventh Sonnax Factor: Readiness For Trial.................................15

        iv.    The Twelfth Sonnax Factor: Impact of the stay on the parties and
            balance of harms....................................................................................16

    C.    ..........................................................................................................................19

    D.    Additional Sonnax Factors Support Continuation of the Stay ..........................19

        i.    The First Sonnax Factor: Whether relief would result in a partial
            or complete resolution of the issues ......................................................19

        ii.    The Fourth Sonnax Factor: Whether a specialized tribunal with the
            necessary expertise has been established to hear the cause of action.......20

        iii.    The Fifth Sonnax Factor: whether the debtor's insurer has
            assumed full responsibility for defending the action................................20

        iv.    The Sixth Sonnax Factor: Whether the action primarily involves
            third parties ............................................................................................21

        v.    The Seventh Sonnax Factor: Whether litigation in another forum
            would prejudice the interests of other creditors .....................................21

CONCLUSION ....................................................................................................................22

ny-1051541

<u>Exhibits:</u>

Exhibit 1 – Scoliard Declaration
        Exhibit A – Plaintiffs' Expert Report
        Exhibit B – Plaintiffs' Motion for Status Conference
        Exhibit C – Scheduling Order

Exhibit 2 – Excerpts from Transcript of Hearing, <u>In re Motors Liquidation Company f/k/a
        General Motors Corp</u>., No. 09-50026 (REG), (Bankr. S.D.N.Y. Nov. 5, 2009)

ii

## TABLE OF AUTHORITIES

**Page(s)**

CASES

In re Am. Reserve Corp.,
  840 F.2d 487 (7th Cir. 1988) ................................................................... 19

In re Bally Total Fitness of Greater N.Y., Inc.,
  402 B.R. 616 (Bankr. S.D.N.Y. 2009), aff'd sub nom., Carrera v. Bally
  Total Fitness of Greater N.Y., Inc. (In re Bally Total Fitness of Greater
  N.Y., Inc.), 411 B.R. 142 (S.D.N.Y. 2009) ........................................... passim

Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow),
  126 F.3d 43 (2d Cir. 1997) ...................................................................... 9

Carrera v. Bally Total Fitness of Greater N.Y., Inc. (In re Bally Total Fitness
  of Greater N.Y., Inc.),
  411 B.R. 142 (S.D.N.Y. 2009) ............................................................... 11

In re The Celotex Corp.,
  140 B.R. 912 (Bankr. M.D. Fla. 1992) ................................................... 17

City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l, Inc.),
  28 B.R. 324 (Bankr. S.D.N.Y. 1983) ..................................................... 21

In re Ephedra Prods. Liab. Litig.,
  329 B.R. 1 (S.D.N.Y. 2005) ................................................................. 15,19

In re Johns-Manville Corp.,
  26 B.R. 420 (Bankr. S.D.N.Y. 1983), aff'd in relevant part, Johns-Manville
  Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.), 40 B.R. 219 (S.D.N.Y.
  984), rev'd and remanded on other grounds, Johns-Manville Corp. v. Asbesto
  Litig. Grp. (In re Johns-Manville Corp.), 41 B.R. 926 (S.D.N.Y. 1984) .............. 11

In re Leibowitz,
  147 B.R. 341 (Bankr. S.D.N.Y. 1992) .................................................... 9

Mazzeo v. Lenhart (In re Mazzeo),
  167 F.3d 139 (2d Cir. 1999) ............................................................... 8, 9

Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection,
  474 U.S. 494 (1986) ........................................................................... 7

In re Motors Liquidation Co.,
  Case. No. 10 Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 17, 2010) ........... 9

iii

In re Musicland Holding Corp.,
    362 B.R. 644 (Bankr. S.D.N.Y. 2007) .................................................................................. 15

In re Northwest Airlines Corp.,
    No. 05-17930 (ALG), 2006 WL 687163 (Bankr. S.D.N.Y. Mar. 10, 2006)........................ 13

In re Northwest Airlines Corp.,
    No. 05-17930 (ALG), 2006 Bankr. LEXIS 477 (Bankr. S.D.N.Y. Mar. 13, 2006)............... 17

In re Pioneer Commercial Funding Corp.,
    114 B.R. 45 (Bankr. S.D.N.Y. 1990) .................................................................................. 13

Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),
    922 F.2d 984 (2d Cir. 1990) ........................................................................................... 8, 17

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),
    907 F.2d 1280 (2d Cir. 1990) ........................................................................................... 8, 9

Teachers Ins. & Annuity Ass'n of Am. v. Butler,
    803 F.2d 61 (2d Cir. 1986) ..................................................................................................... 7

In re Woodward & Lothrop Holdings, Inc.,
    205 BR 365 (Bankr. S.D.N.Y. 1997) .............................................................................. 15, 19

Zenith Labs., Inc. v. Sinay (In re Zenith Labs., Inc.),
    104 B.R. 659 (D.N.J. 1989) ................................................................................................... 16


STATUTES

11 U.S.C. § 362(a)(1) .............................................................................................................. 7

11 U.S.C. § 362(d)(1) .............................................................................................................. 8


OTHER AUTHORITIES

Transcript of Hearing, In re Motors Liquidation Company f/k/a General Motors Corp.,
    No. 09-50026 (REG), (Bankr. S.D.N.Y. Nov. 5, 2009) ................................................. 15, 18

ny-1051541

Residential Capital, LLC ("**ResCap**")and its affiliated debtors and debtors in possession

in the above-captioned Chapter 11 cases (collectively, the "**Debtors**") hereby submit this

objection (the "**Objection**") to the *Motion of Deborah Bollinger and Bryan Bubnick for Relief*

*from Automatic Stay as to GMAC Mortgage, LLC and Residential Capital, LLC*, dated July 3,

2012 [Docket No. 677] (the "**Motion**").[1]  In support of hereof, the Debtors submit the

Declaration of Jennifer Scoliard, dated October 3, 2012 (the "**Scoliard Decl.**"), attached hereto

as Exhibit 1, and respectfully represent:

## PRELIMINARY STATEMENT

1.      Deborah Bollinger and Bryan Bubnick ("**Movants**") seek relief from the

automatic stay to proceed with prepetition claims for damages pending against Debtors ResCap

and GMAC Mortgage, LLC ("**GMACM**" and, together with GMACM, the "**Debtor**

**Defendants**") and non-Debtor Ally Financial, Inc. ("**AFI**" and, together with the Debtor

Defendants, the "**Defendants**") in an action (the "**Washington Action**") pending in the United

States District Court for the Western District of Washington (the "**Washington Court**").

Movants bring their claims on their own behalf and on behalf of 89 other claimants.  The Motion

should be denied because Movants cannot satisfy their burden of establishing sufficient cause as

to why their significant and complex class action lawsuit should be permitted to proceed

notwithstanding the statutorily imposed breathing spell to which the Debtors are entitled under

section 362 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.      First, the Motion ignores the vast burden that relief from the stay would

place upon the Debtors and greatly overestimates the benefits that might flow from a grant of

such relief.  Litigating the Washington Action, which is not scheduled for trial until January of

---

[1]    The Motion was originally scheduled to be heard on July 24, 2012.  The Motion was adjourned several times
until October 10, 2012.

next year and would require significant preparation before the trial commences, would impose a

substantial financial burden on the Debtors (as they bear their own legal defense expenses and

costs) and would distract the Debtors' management and Legal Department (as defined below)

and divert the Debtors' resources at a critical juncture in the reorganization process. Moreover,

Movants present no evidence to suggest that they would be prejudiced by maintenance of the

stay where (i) the Debtors' management and professionals are fully engaged in a highly complex

process in an effort to meet several critical milestones over the course of the next few months,

which will, to a large degree, dictate the outcome of these cases, and (ii) time is not of the

essence with respect to the Washington Action.[2]

        3.        Moreover, the Washington Action is just one of a substantial number of

lawsuits, including putative class actions, and proceedings for prepetition claims currently

pending against the Debtors that are being managed by the Legal Department across the country.

(Scoliard Decl. ¶ 5.) The Debtors submit that their highly complex bankruptcy cases (the

"**Chapter 11 Cases**") have in just a few short months reached a critical phase, and that it is

essential for the Debtors to continue to enjoy the protection afforded by the stay, and particularly

with respect to an action as inherently complex as the Washington Action. Granting relief at this

juncture would undoubtedly invite countless other lift stay motions from the Debtors' myriad

other prepetition claimants, opening the "floodgates" to litigation which would impose a burden

on the Debtors and their estates at a time when their remaining resources must be devoted to

maximizing the value of their assets through the contemplated asset sales (discussed further

---

[2]    As described in this Objection, the Debtors will fact substantial prejudice if the Washington Action goes
       forward. In addition, even if the Motion is denied and the Washington Action proceeds solely against AFI, the
       Debtors are likely to face similar harm because it is the Debtors' conduct at issue. A trial against AFI would, in
       many respects, be tantamount to a proceeding against the Debtors given the nature of the claims against AFI,
       the fact that the Debtors' employees and documents are the key witnesses and evidence, and the Debtors'
       potential indemnification obligations to AFI. For these reasons, the Debtors reserve the right, and may seek, to
       extend the automatic stay so that the Washington Action is also stayed as to AFI.

below), consummating various settlements, complying in full with the Examiner's investigation,

proposing and confirming a Chapter 11 plan, and proceeding with the Chapter 11 claims

resolution process.  Forcing the Debtors to address motions for relief from stay arising from, and

potentially litigate, even a fraction of the suits in which they are named as defendants (including

as a consequence of counterclaims) would deprive them of the "breathing spell" the automatic

stay provides and distract them from addressing the critical tasks necessary to achieve a

successful resolution of the Chapter 11 Cases.  (Scoliard Decl. ¶ 5.)  The Bankruptcy Code

provides an orderly and centralized claims process meant to prevent a debtor from being forced

to litigate claims in a piecemeal, ad hoc manner.  Granting relief from the stay at this relatively

early stage would in effect require the Debtors to conduct the claims resolution process in

hundreds of forums across the country.

4.       As this Court is aware, given the volume of litigation to which the Debtors

are party around the country and the many motions for relief from the automatic stay that have

been filed in the Chapter 11 Cases, the Debtors have carefully considered the merits of

stipulating to stay relief where in their judgment, taking into consideration all relevant factors

and with Creditor Committee review, it has been appropriate to do so.  The Debtors have entered

into several such stipulations.[3]  The instant Motion does not present such an opportunity.

5.       The burden imposed on the Debtors in terms of the time, financial

resources, and attention necessary to defend themselves in the Washington Action far outweighs

any prejudice to the Movants in preserving the automatic stay as to the Debtors.  The Debtors

---

[3]    See, e.g., *Stipulation and Order Modifying Automatic Stay with Respect to Action of Hedeya Haroutunian*
[Docket No. 1205]; *Stipulation and Consent Order Resolving the Motion of Hitoshi and Wakana Inoue for
Relief from the Automatic Stay* [Docket No. 1206]; *Stipulation and Order Regarding Application of the
Automatic Stay with Respect to Action of State of New York v. Empire Property Solutions, LLC, et. al.* [Docket
No. 1207]; *Stipulation and Order Modifying Automatic Stay to Provide Declarations to Wells Fargo and to
Allow Wells Fargo to Issue Trial Subpoenas Directed at Debtors* [Docket No. 1220].

therefore must oppose the Motion so that their estates—and thousands of other creditors—are

not burdened and prejudiced by prepetition litigation proceeding against the Debtors.

6.      For the above reasons, and as more fully set forth below, the Debtors

respectfully request that this Court deny the Motion.

## BACKGROUND

### A.      General Chapter 11 Case Background

7.      On the Petition Date, each of the Debtors filed a voluntary petition in this

Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and

operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a)

and 1108.  These cases are being jointly administered pursuant to Rule 1015(b) of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  No trustee has been appointed in the

Chapter 11 Cases.

8.      On May 16, 2012, the United States Trustee for the Southern District of

New York (the "**U.S. Trustee**") appointed a nine member official committee of unsecured

creditors (the "**Creditors' Committee**").

9.      On July 3, 2012, the U.S. Trustee appointed the Honorable Arthur T.

Gonzalez, former Chief Judge of this Court, as examiner (the "**Examiner**").  The Examiner is

currently conducting an investigation of, among other things, the Debtors' prepetition

transactions with their non-Debtor affiliates Ally Financial Inc. and Ally Bank.  The Court has

advised that the Debtors will be permitted to solicit votes in support of a Chapter 11 plan only

after the Examiner has completed his investigation, which is currently anticipated to conclude in

early February 2013.

4

### B.    Critical Case Milestones

10.    Over the course of the next several months, the Debtors face a number of critical case milestones, the satisfaction of which will require the full efforts and attention of the Debtors' management and the support of the Debtors' Legal Department.  These milestones include, but are not limited to, the following:

- October 23, 2012 – Auction of the Debtors' servicing and origination platforms (the "**Platform Sale**");

- October 24, 2012 – Auction of the Debtors' "legacy" assets (the "**Whole Loan Sale**" and, together with the Platform Sale, the "**Asset Sales**");

- October 29, 2012 – deadline to file objections to the Asset Sales;

- November 7, 2012 – deadline to file Debtors' replies to any objections to the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* (the "**9019 Motion**"), along with Debtors' reply expert reports;

- November 13, 14, and 16, 2012 – hearing on the 9019 Motion;

- November 19 and 20, 2012 – hearing to approve the Asset Sales;

- December 20, 2012 – termination of the Debtors' exclusive period in which to file a Chapter 11 plan.

11.    In addition to these upcoming deadlines, the Debtors are continuing to cooperate with the Examiner and facilitate the Examiner's investigation (including complying with discovery demands, as discussed in further detail below), to work with parties in interest to formulate a Chapter 11 plan, and to operate their businesses on a day-to-day basis.

### C.    Washington Action

12.    As of the Petition Date, the Washington Action was pending in United States District Court for the Western District of Washington (the "**Washington Court**").  (See Mot. ¶1, 2; Schug Decl. ¶ 2.)  Movants are seeking money damages claims against the Defendants for unpaid overtime under the Fair Labor Standards Act ("**FLSA**"), 29 U.S.C. §

ny-1051541

216(b), and for unpaid overtime and failure to provide meal and rest periods under Washington

state law, which claims Movants assert stem from the Debtor Defendants' alleged willful

misclassification of their underwriting workforce as "exempt" from the protections of state and

federal wage and hours laws.  (See Mot. 1-2.)

       13.     Movants' claims consist almost entirely of claims for monetary relief.

(See Complaint at 13-14.)  According to the expert report filed by Movants in the Washington

Action, Movants have estimated the value of their claims at between $71,758.00 and $5.83

million.  (See Scoliard Decl., Ex. A.)

       14.     On August 17, 2010, the Defendants filed a motion to dismiss the

Complaint in its entirety.  (Mot. 2; Schug Decl. ¶ 4.)  On November 5, 2010, Movants filed a

motion for conditional certification and judicial notice pursuant to 29 U.S.C. § 216(b). (Mot. 2;

Schug Decl. ¶ 4.)

       15.     On January 5, 2011, the Washington Court denied Defendants' motion to

dismiss, and granted Movants' motion for conditional class certification. (Schug Decl. ¶ 5.)

Notice of the lawsuit was sent to the members of the putative FLSA collective, and

approximately 91 current and former mortgage underwriters have joined the case.

       16.     On June 21, 2011, after the close of the FLSA opt-in period, the parties

submitted a Joint Status Report and Discovery Plan.  (Schug Decl. ¶ 6.)  On August 16, 2011, the

district court issued an Order Setting Trial Date & Related Dates.  (See Scoliard Decl., Ex. C

(Scheduling Order).)  Discovery is now complete, although notwithstanding the imposition of the

automatic stay, Movants filed a motion on June 22, 2012 requesting a status conference

regarding, among other things, a potential extension of the discovery deadline to allow Movants

to conduct additional discovery regarding which Defendant was the plaintiffs' employer.  (See

Scoliard Decl., Ex. B.)  The trial is scheduled to begin on January 21, 2013.  (Id.)

        17.     The Washington Action is now stayed pursuant to the automatic stay as to

GMAC Mortgage and ResCap only, although no further proceedings have occurred in the

Washington Action since the commencement of the Chapter 11 Cases.  As Movants note, despite

the imposition of the automatic stay, the Washington Court did issue a decision on the parties'

pending motions for summary judgment on May 30, 2012.[4]

        18.     On July 3, 2012, Movants filed the Motion.

## OBJECTION

### A.    Relief From the Automatic Stay is Not Warranted at this Time

        19.     The automatic stay imposed by section 362(a) of the Bankruptcy Code is a

core provision of bankruptcy law that promotes the reorganization process by providing the

debtor with "a breathing spell from [its] creditors."[5]  Teachers Ins. & Annuity Ass'n of Am. v.

Butler, 803 F.2d 61, 65 (2d Cir. 1986) (holding that the automatic stay applied to an appeal that

otherwise would "distract . . . debtor's attention from its primary goal of reorganizing").  It

affords "one of the fundamental debtor protections provided by the bankruptcy laws."  Midlantic

Nat'l Bank v. New Jersey Dep't of Evntl. Protection, 474 U.S. 494, 503 (1986) (citation and

internal quotation marks omitted).  Likewise, it allows the debtor to manage and, where

---

[4]    The notice of bankruptcy was filed in the Washington Action on June 1, 2012.

[5]    Section 362(a)(1) of the Bankruptcy Code provides, in pertinent part, that the filing of a bankruptcy petition:
operates as a stay, applicable to all entities, of –

        (1) the commencement or continuation, including the issuance or employment of process, of a
        judicial, administrative, or other action or proceeding against the debtor that was or could have
        been commenced before the commencement of the case under this title, or to recover a claim
        against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

appropriate, centralize all creditor actions against property of the estate, "so that

reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other

arenas." Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984,

989 (2d Cir. 1990).

20.    Section 362(d)(1) of the Bankruptcy Code provides that a court may

grant relief from the automatic stay for "cause." See 11 U.S.C. § 362(d)(1). In the context of

stayed prepetition litigation, the Second Circuit has outlined the following 12-factor test to

determine whether good cause exists to lift the stay to allow the litigation to proceed:

> (1) whether relief would result in a partial or complete resolution
> of the issues, (2) the lack of any connection with or interference
> with the bankruptcy case, (3) whether the other proceeding
> involves the debtor as a fiduciary, (4) whether a specialized
> tribunal with the necessary expertise has been established to hear
> the cause of action, (5) whether the debtor's insurer has assumed
> full responsibility for defending the action, (6) whether the action
> primarily involves third parties, (7) whether litigation in another
> forum would prejudice the interests of other creditors, (8) whether
> the judgment claim arising from the other action is subject to
> equitable subordination, (9) whether movant's success in the other
> proceeding would result in a judicial lien avoidable by the debtor,
> (10) the interests of judicial economy and the expeditious and
> economical resolution of litigation, (11) whether the parties are
> ready for trial in the other proceeding and (12) the impact of the
> stay on the parties and the balance of harms.

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280,

1286 (2d Cir. 1990); see also Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir.

1999) (vacating a district court order granting stay relief where the bankruptcy court had not

applied the Sonnax Factors, made only sparse factual findings and ultimately did not provide the

appellate court "with sufficient information to determine what facts and circumstances specific to

the present case the court believed made relief from the automatic stay appropriate…."). In a

given case, however, not all of the factors will be relevant, and the court may disregard

irrelevant factors. See Mazzeo, 167 F.3d at 143.

21.    The moving party bears the initial burden to demonstrate, using the

relevant Sonnax factors, that good cause exists for lifting the stay.[6]  The movant's burden is

especially heavy if it is an unsecured creditor.  "[T]he general rule is that claims that are not

viewed as secured in the context of § 362(d)(1) should not be granted relief from the stay unless

extraordinary circumstances are established to justify such relief."[7]

**B.    Movants Have Failed To Satisfy Their Burden Under Sonnax**

22.    Movants rely on four of the twelve Sonnax factors (factor numbers 2, 10,

11, and 12) as cause to lift the stay.  Movants misconstrue the facts, or the law, or both with

respect to each such factor.  Additionally, consideration of the remaining relevant Sonnax factors

demonstrates that the stay should not be lifted.[8]

**i.    The Second Sonnax Factor: Lack of any connection with
or interference with the bankruptcy case**

23.    Movants could not be more mistaken when they assert that lifting the stay

will not interfere with the Chapter 11 Cases.  (See Memorandum in support of the Motion, dated

July 3, 2012 (the "**MOL**"), at 6.)  Significant attention must be devoted to address the

extraordinary operational difficulties that arise in the early stages of complex Chapter 11 cases

such as these.  In addition to addressing day-to-day challenges, it is of the utmost importance that

the Debtors devote their complete efforts on the critical tasks necessary to achieve a successful

---

[6]    See Sonnax, 907 F.2d at 1285. See Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow), 126
F.3d 43, 48 (2d Cir. 1997) ("We have emphasized that a bankruptcy court should deny relief from the stay if the
movant fails to make an initial showing of cause.") (quotation omitted).

[7]    In re Leibowitz, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992); see also In re Motors Liquidation Co., Case. No. 10
Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 17, 2010).

[8]    Sonnax factors numbers 3 and 9 are not applicable to the facts here.  The Debtors do not address Sonnax Factor
8 in their objection, but reserve all right with regard thereto.

resolution of these cases, namely the preservation of the Debtors' going concern value through

the sale of their servicing platform and legacy assets through which the Debtors hope to

maximize creditor recoveries and the resolution of significant potential liabilities.

24.    As outlined above, the proceedings scheduled to occur over the next

several months are absolutely critical to the Debtors' Chapter 11 cases.  The Debtors face an

extremely ambitious schedule in order to meet several case milestones.  Among other things, the

Debtors will seek Court approval of the Asset Sales and the 9019 Motion, will be working with

various constituents regarding the formulation of their Chapter 11 plan, and will continue to

work to facilitate investigations conducted by both the Creditors' Committee and the Examiner.

Performing just these tasks in isolation is in and of itself an enormous burden.  At the same time,

while operating their businesses in the ordinary course and meeting their ongoing obligations as

debtors in possession attendant to the prosecution of the Chapter 11 Case, the Debtors must

address the concerns of multiple constituencies, including United States government entities and

governmental associations in the context of a Chapter 11 case (e.g., FNMA; Federal Home Loan

Mortgage Corporation; Governmental National Mortgage Association; Department of Housing

and Urban Development; and the U.S. Department of Justice).  Overall, given the objectives of

these Chapter 11 Cases, including the unprecedented the sale of a mortgage loan servicing and

origination platform as a going concern, the full protection of the automatic stay is essential.

Maintenance of this breathing spell permits the Debtors' management, employees, including the

Debtors' in-house legal department (the "**Legal Department**") and the Debtors' retained

professionals to focus their full time, effort and energy on achieving the Debtors' objectives to

the benefit of all parties in interest.

25.     Lifting the automatic stay to permit the Washington Action to proceed
would distract the Debtors' management, the Legal Department and the retained professionals
from handling the important reorganization matters described above, as well as others, and
would unnecessarily increase their burdens.[9]  The Legal Department is tasked with managing
litigation in which the Debtors are defendants or respondents in state and federal court, including
bankruptcy courts, as well as managing litigation for third parties for which the Debtors have a
contractual obligation to defend.  The Legal Department plays a very active role in analyzing and
strategizing on active litigation matters, working with various departments within the Debtors'
various regional offices, collecting all documents and information necessary to analyze each
case.[10]  (Scoliard Decl. at ¶ 8.)

26.     By virtue of the Supplemental Servicing Order[11] and their contractual
obligations to defend certain non-debtor third parties, the Legal Department is actively managing
in excess of two-thirds of ResCap's pending litigation (over 1,100 cases) that are not subject to

---

[9]    Carrera v. Bally Total Fitness of Greater N.Y., Inc. (In re Bally Total Fitness of Greater N.Y., Inc.), 411 B.R.
       142, 148 (S.D.N.Y. 2009) (finding that allowing an action to proceed distracts the debtor's management, thus
       hindering its performance of its fiduciary duty to maximize the value of the bankruptcy estate); In re Johns-
       Manville Corp., 26 B.R. 420, 426 (Bankr. S.D.N.Y. 1983), aff'd in relevant part, Johns-Manville Corp. v.
       Asbestos Litig. Grp. (In re Johns-Manville Corp.), 40 B.R. 219 (S.D.N.Y. 984), rev'd and remanded on other
       grounds, Johns-Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.), 41 B.R. 926, 928
       (S.D.N.Y. 1984)) (finding that the extensive discovery process associated with class actions would irreparably
       injure the bankruptcy estate by distracting management).

[10]   The Legal Department specific tasks include, but are not limited to, the following: (i) reviewing documents and
       information related to discovery, (ii) reviewing all draft pleadings and discovery responses, (iii) preparation of
       deposition and trial witnesses, (iv) directing settlement negotiations, (v) coordinating discussion with internal
       business personnel, (vi) maintaining the Legal Staff database, (vii) coordinating with local litigation counsel and
       ResCap bankruptcy counsel, (viii) attending mediations and settlement conferences and (ix) preparing for trial.
       (Scoliard Decl. at ¶ 8.)

[11]   On July 13, 2012, the Court entered the *Final Supplemental Order Under Bankruptcy Code Sections 105(a),
       362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue
       Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain
       Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction
       Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing
       the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774] (the "**Supplemental Servicing
       Order**").

the automatic stay and continue to proceed in various jurisdictions across the country.  The

overwhelming task of managing hundreds of outside counsel in these cases and assisting them

with automatic stay and application of the Supplemental Servicing Order will continue to

consume the time and resources of the Legal Department.  (Scoliard Decl. at ¶ 9.)

27.    As a result of the Debtors' bankruptcy filings and the entry of the

Supplemental Servicing Order, the Legal Department's responsibilities have expanded to include

(i) the review and analysis of individual claims as they arise in conjunction with internal business

personnel, local litigation counsel and ResCap bankruptcy counsel to determine the applicability

of the Supplemental Servicing Order; (ii) fielding inquiries daily from both its outside litigation

counsel and its mortgage default counsel regarding the application of the Supplemental Servicing

Order (and will continue to do so as new legal actions arise); (iii) assisting Chapter 11 counsel

with the preparation of various motions, responses to motions for relief from stay and other

Court filings,[12] as well as various bankruptcy related tasks; (iv) assisting Chapter 11 counsel and

internal business personnel with Chapter 11 reporting requirements; (v) assisting with pending

and anticipated discovery with respect to the 9019 Motion, (vi) assisting with matters pertaining

to the pending Asset Sales; and (vii) complying with the Examiner's investigation.[13]  These

responsibilities are ongoing and will continue and will no doubt increase as these Chapter 11

---

[12]    By way of example, the Legal Department had a significant role in the drafting of the motion to approve the
Supplemental Servicing Order and the interim Supplemental Servicing Order [Docket No. 181] and participated
in the negotiation of the final Supplemental Servicing Order.  The Legal Department also, *inter alia*, assisted in
the preparation of the Debtors' schedules and statement of financial affairs, their motion to approve ordinary
course professionals, and all of the responses to the motions for relief from the automatic stay filed to date.

[13]    For example, over the next few months, the Debtors' personnel are scheduled to participate in four interviews
with the Examiner, one of which has already taken place.  Additionally, the Examiner's initial document
requests have required the production of a wide range of corporate records of various kinds as well as the
production of emails for six custodians dating back to 2006.  Complying with the current production timeframes
requested by the Examiner has required the full-time services of twenty contract document reviewers plus
additional time from attorneys at the Debtors' outside counsel.  The Debtors anticipate that the Examiner will
likely request more documents and interviews as the investigation proceeds.

cases progress.  (Scoliard Decl. at ¶ 9.)  Imposing such distractions by granting the relief

requested would run counter to the policies behind the automatic stay.[14]

28.      Moreover, a number of the Debtors' key personnel are likely to be called

as witnesses in the trial, including Anne Janiczek (Chief Human Resources Officer), Ed

Muscovitch (Director Underwriting/Credit Policy), Jillese Cobb (Human Resources Consultant),

Bridgit Appel (Human Resources Manager), and Cathy Williams (Senior Vice President, Credit,

Compliance and Regulatory Risk).  The assistance of other human resources personnel will be

required to prepare for the trial, even though they are unlikely to be called as witnesses.  These

individuals will be critical in facilitating the transition of the Debtors' business to the new owner

of their servicing and origination platforms, which is expected to occur early next year, the same

period the trial is scheduled to be held.  Their participation in what could be as long as a three

week trial in Washington state would impose a particular hardship on the Debtors' operations

and their effort to close the Asset Sales during a critical period.  Because most of these

individuals are located in Pennsylvania, that hardship would be compounded by the physical

absence of those personnel a trial in Washington would require.  (Scoliard Decl. at ¶ 11.)

29.      Moreover, contrary to Movant's assertions, waiting to resolve the

Washington Action and liquidating Movants' claims and potentially the claims of the other

conditional class members) pose no obstacle to the Debtors' ability to confirm a chapter 11 plan.

Even if the Movants' claims are meritorious, they will only be accorded a general unsecured

claim.[15]

---

[14]    See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990) (noting that the automatic stay is intended to provide the Debtors with a "breathing spell" to address the immediate concerns related to the restructuring of the Debtors' businesses).

[15]    See, e.g., In re Northwest Airlines Corp., No. 05-17930 (ALG), 2006 WL 687163, at *2 (Bankr. S.D.N.Y. Mar. 10, 2006) (denying motion for relief from stay under the Sonnax factors where movant gave "no indication that the Movant's claims must be resolved before the Debtors can file a feasible plan.").

30.    Due to its size and complexity and the timing, the Washington Action threatens to interfere with the administration of the Chapter 11 Cases on a much higher magnitude than any single general liability claim. (Scoliard Decl. at ¶ 12.) The result, then, is clear: this <u>Sonnax</u> factor weighs heavily against lifting the automatic stay.

### ii.    The Tenth <u>Sonnax</u> Factor: The interests of judicial economy and <br> the expeditious and economical resolution of litigation

31.    Movants attempt to portray this <u>Sonnax</u> factor as weighing in favor of lifting the automatic stay by arguing that the Washington Court is best equipped to adjudicate this litigation because of its familiarity with the Washington Action. (MOL, at 8.) The salient question under this factor, however, is whether (i) maintaining the automatic stay will lead to a waste of judicial resources or undermine the economical resolution of the underlying litigation, and (ii) whether relief from the stay would hinder or delay the Debtors' efforts for a speedy and effective reorganization process. <u>See</u> <u>In re Bally Total Fitness of Greater N.Y., Inc.</u>, 402 B.R. 616, 624 (Bankr. S.D.N.Y. 2009), <u>aff'd</u> <u>sub</u> <u>nom.</u>, <u>Carrera</u>, 411 B.R. 142. Although judicial resources have been expended by the Washington Court, the proceedings were stayed with respect to the Debtor Defendants shortly after entry by the Washington Court of judgments as to the parties' respective motions for summary judgment that did nothing more than hold that the claimants fall within the scope of the FLSA and deny certain of Defendants' defenses. (Scoliard Decl. ¶ 13.) The most significant judicial expenditure—a trial during which (in addition to ruling on the liability, if any, of the Defendants) the Washington Court would be required to assess the availability to the Defendants of a good faith defense, whether the alleged violations were willful, and the amount of any corresponding damages—has not yet been incurred. (Scoliard Decl. ¶ 13.) Furthermore, both sides may wish to appeal one or more issues upon entry of a judgment by the Washington Court, which would involve additional judicial expenditure.

Maintaining the automatic stay, therefore, will not lead to a waste of judicial resources, nor

will maintenance of the stay undermine an economical resolution of the litigation.  See Bally,

402 B.R. at 624.

        32.     Moreover, the Debtors' priority at this time is in ensuring a speedy and

effective reorganization process, which may be hindered if they are forced to litigate this or any

other class action suit during the pendency of the Chapter 11 Cases, and particularly at this

juncture in the Chapter 11 Cases.[16]  The interests of judicial economy and the economical

resolution of litigation would best be served by resolving Movants' claims against the Debtors

through the uniform bankruptcy claims process, which will be utilized to address the thousands

of claims filed against these estates, including claims asserted in the hundreds of legal actions

pending against the Debtors.[17]

### iii.    The Eleventh Sonnax Factor: Readiness For Trial

        33.     Movants mischaracterize the Washington Action as "ready for trial."

(MOL at 7.)  Discovery is now complete, although Movants have filed a motion with the

Washington Court indicating that they want to reopen discovery in order to identify which

Debtor Defendant was the plaintiffs' employer.  (Scoliard Decl. ¶ 16.)  Putting aside the potential

that discovery may be reopened, under the initial scheduling order entered in the Washington

---

[16]    Bally, 402 B.R. at 624 (finding that lifting the stay to permit a class action would hinder debtor's efforts for a speedy and effective reorganization process); In re Woodward & Lothrop Holdings, Inc., 205 BR 365, 376 (Bankr. S.D.N.Y. 1997) ("[A] class action may 'gum up the works' because until complete, the bankruptcy court cannot determine the entitlement of the other creditors."); In re Ephedra Prods. Liab. Litig., 329 B.R. 1, 4 (S.D.N.Y. 2005) ("[G]ranting of class action claims at this late juncture would wholly disrupt and undercut the expeditious execution of the Plan of Reorganization."); In re Musicland Holding Corp., 362 B.R. 644, 656 (Bankr. S.D.N.Y. 2007) (refusing to lift automatic stay because allowing putative class members to lodge a "class claim would seriously delay the administration of the case ….").

[17]    Judge Gerber noted in In re General Motors Corp., "[b]ankruptcy litigation is typically as efficient or more efficient than litigation in the district courts in connection with plenary litigation."  Transcript of Hearing at 41:18-20, In re Motors Liquidation Company f/k/a General Motors Corp., No. 09-50026 (REG) , (Bankr. S.D.N.Y. Nov. 5, 2009) (relevant excerpts attached as Exhibit 2 hereto).

ny-1051541

Action, the trial is not scheduled to begin until January 21, 2013, and actual trial preparations, including witness preparation, exhibit designations, motions in limine, and general trial preparations, have yet to be undertaken.  (Scoliard Decl. ¶ 16.)

   iv.    **The Twelfth Sonnax Factor: Impact of the stay
          on the parties and balance of harms**

   34.    Movants asserts that the balance of the harms weighs in their favor. (MOL, at 6.)  However, they have not demonstrated how the continued suspension of the Washington Action results in any material prejudice to Movants.

   35.    On the other hand, the cost to the Debtors of lifting the automatic stay at this relatively early stage of the Chapter 11 Cases, particularly in light of the critical hearings and deadlines facing the Debtors before the end of this year, is substantial in terms of the time, financial resources, and attention necessary to defend itself in the Washington Action.  (See Scoliard Decl. ¶¶ 17-18.)  At this critical phase in the Chapter 11 Cases, the estates' limited resources are better spent on meeting the case milestones outlined above and the overall reorganization process, rather than litigating complex and expensive class action lawsuits. Forcing a debtor to defend against suits and proceedings brought in other venues distracts and hinders a debtor from focusing on its own reorganization efforts.[18]  As described above, the Debtors are working diligently towards achieving the proposed asset sales, obtaining approval of the RMBS settlement, complying with the Examiner investigation, and participating in the chapter 11 plan process.  In the meantime, the Debtors need the protection of the automatic stay

---

[18]    See Bally, 402 B.R. at 624 (finding that class actions distract the debtor from the central tasks of stabilizing operations and cash flows and hence harms all creditors); Zenith Labs., Inc. v. Sinay (In re Zenith Labs., Inc.), 104 B.R. 659, 666 (D.N.J. 1989) (finding that allowing debtors a sufficient window to reorganize their estates serves the public interest more than allowing class actions to be resolved sooner).

to afford themselves the "breathing space" necessary to allow them to restructure and preserve the value of their assets for the benefit of their creditors.

36.    In addition to the Washington Action, the Debtors are defendants in approximately thirty-eight (38) other putative or certified class actions pending in various forums across the United States.  (Scoliard Decl. ¶ 6.)  The likelihood that motions for relief from stay would be filed by other putative class action litigants in the event that the Motion is granted, and the attendant costs associated with defending such motions and litigation if relief were to be granted, would impose an untold burden on the Debtors' estates.[19]  Litigating such lift stay motions and any single class action suit will result in a drain on the Debtors' resources and an untimely distraction from the reorganization process.[20]  The Debtors should not have to divert their resources to respond to a multitude of "lift stay" requests or defend against the underlying class claims at the same time as they are attempting to sell their businesses as a going concern, consummate settlements, and formulate, propose and confirm a plan.[21]  During the pendency of the Chapter 11 Cases, the limited resources of the Debtors' estates are much better spent on the

---

[19]    See Bally, 402 B.R. at 623 (finding that allowing the stay to be lifted for one class can open the floodgates to many similar actions, which would further interfere with the resolution of the bankruptcy case); In re Northwest Airlines Corp., No. 05-17930 (ALG), 2006 Bankr. LEXIS 477, at *5-6 (Bankr. S.D.N.Y. Mar. 13, 2006) (when there are many potential claims being held back by a stay, the court should consider the interference with the bankruptcy proceeding if all of those matters were allowed to continue, not just the individual case at bar); In re The Celotex Corp., 140 B.R. 912, 916 (Bankr. M.D. Fla. 1992) (declining to release a stay for fear of unleashing "an avalanche of litigation").

[20]    With the Debtors' named as defendants or respondents in over 1,900 prepetition actions and in addition, party to several thousand foreclosure, eviction and borrower bankruptcy proceedings nationwide, relief from stay motions filed by plaintiffs in even a relatively small percentage of the Debtors' outstanding litigation would unnecessarily distract the Debtors' management, professionals and the Legal Department from the primary task at hand of a successful rehabilitation of the Debtors' estates.

[21]    See, e.g., In re Northwest Airlines Corp., 2006 Bankr. LEXIS 477, at *6 (stating that "[t]o allow the automatic stay to be lifted with respect to this action at this time would prompt similar motions and . . . [t]he distraction and expense of defending such litigation would interfere with judicial economy and the Debtors' process of reorganization.") (citing Ionosphere Clubs, 922 F.2d at 989); Bally, 402 B.R. at 623 ("allowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding . . . thereby affecting the interests of other creditors.").

17

Debtors' restructuring efforts, rather than litigating lawsuits spread throughout the country.

Judge Gerber succinctly framed this concern in General Motors:

> [I]f I were ever to allow relief from the stay on a garden variety
> claim of this type there would indeed be the risk, if not the
> certainty, that every other party who thinks he or she has a good
> claim against the estate pending in another jurisdiction would be
> asking me to defend -- to provide relief from the stay and require
> the debtors to be litigating claims of this character all over the
> country. The floodgates concern that the estate articulated is indeed
> a very serious one.[22]

37.    This concern is also real in the Chapter 11 Cases; since the first motion

seeking relief from stay was filed, dozens of additional motions seeking relief from the automatic

stay to proceed with litigation have been filed and the Debtors and their counsel have received

several additional informal requests for such relief.  The balance of the harms clearly favors

maintaining the automatic stay with respect to the Washington Action.

38.    Meanwhile, Movants suffer virtually no hardship on account of the

continued imposition of the automatic stay.  Each of the Movants waited approximately two

years or more before commencing the Washington Action, and no evidence has been presented

to suggest that time is of the essence with respect to resolution of the Movants' claims.  Even if

the Movants' claims are meritorious, they will be accorded general unsecured claims against the

Debtors' estates.  They will experience no great benefit if awarded such claims sooner rather

than later, and are similarly situated to each other potential creditor of the Debtors' estates.

Indeed, the Debtors' objective remains to proceed with the plan confirmation process in an

expedited fashion.  This remains true, notwithstanding the conditional class certification.

Though class treatment may be beneficial with respect to other civil actions in consolidating the

---

[22]    Transcript of Hearing at 45:2–45:10 (Nov. 5, 2009) (denying motion to lift stay because <u>Sonnax</u> Factors weigh
against lifting the stay).

adjudication of common issues, this advantage disappears in the context of a bankruptcy. The centralized bankruptcy claims resolution process provides the same procedural advantages as a class action because it concentrates all disputes in one forum.[23]

**C.**

**D.    Additional <u>Sonnax</u> Factors Support Continuation of the Stay**

39.    Although the Debtors are under no affirmative obligation to demonstrate that relief from stay is inappropriate where a plaintiff has failed in her burden to show "cause" (as is the case here), the Debtors nevertheless submit that additional <u>Sonnax</u> factors not identified by Movants as relevant to this matter in fact weigh in favor of preserving the stay.

**i.    <u>The First Sonnax Factor: Whether relief would result
in a partial or complete resolution of the issues</u>**

40.    Lifting the stay will <u>**not**</u> allow for the complete resolution of the issues. Permitting the Washington Action to go forward at this time would push the Debtors into a morass of issues that would need to be resolved with respect to Movants' claims and nearly one hundred other claimants and an exceedingly complex trial. The Debtors estimate that preparations for the trial in the Washington Action will result in out-of-pocket costs of approximately $100,000 to $175,000. (Scoliard Decl. ¶ 18.) The trial itself could take up to three weeks, and cost an additional $400,000 to $550,000 in outside attorneys' fees and costs. (Scoliard Decl. ¶ 18.) These amounts exclude the costs of any potential appeals that might be brought.

---

[23]    <u>Woodward</u>, 205 B.R. at 376 (citing <u>In re Am. Reserve Corp.</u>, 840 F.2d 487, 490 (7th Cir. 1988)) ("A bankruptcy proceeding offers the same procedural advantages as the class action because it concentrates all the disputes in one forum."); <u>see also</u> <u>Ephedra Prods.</u>, 329 B.R. at 9 ("[S]uperiority of the class action vanishes when the 'other available method' is bankruptcy, which consolidates all claims in one forum and allows claimants to file proofs of claim without counsel and at virtually no cost. In efficiency, bankruptcy is superior to a class action….").

41.    Although discovery is now complete, litigating the Washington Action to completion would still require the Debtor Defendants to prepare for and conduct a trial.  (See Scoliard Decl. ¶¶ 13, 16.)  As noted above, even if judgments were ultimately rendered against the Debtor Defendants in the Washington Action, such judgments would merely entitle Movants to general unsecured claims to be paid proportionally with thousands of other similar claims in accordance with the terms of a confirmed chapter 11 plan.  There is no reason Movants must liquidate their general unsecured claims ahead of the thousands of similarly-situated creditors.

ii.    **The Fourth *Sonnax* Factor: Whether a specialized tribunal with the necessary expertise has been established to hear the cause of action**

42.    The fourth Sonnax factor does not support relief from the stay because no specialized tribunal has been created to hear the claims brought in the Washington Action.  The Bankruptcy Code specifically contemplates resolving prepetition claims against the Debtors via a centralized claims resolution process shepherded by the bankruptcy courts.  This Court has recognized that it can interpret and apply state law in resolving claims through the bankruptcy process.[24]  Movants' claims are no exception.  Accordingly, the fourth Sonnax Factor weighs in favor of denying relief from the automatic stay.

iii.    **The Fifth *Sonnax* Factor: whether the debtor's insurer has assumed full responsibility for defending the action**

43.    While the Debtors have customary errors and omissions insurance coverage, that insurance does not provide coverage for the types of claims Movants assert against the Debtors. (Scoliard Decl. ¶ 20.)  Moreover, the Debtors pay their legal defense fees and costs out-of-pocket for this action (and many others).  As a result, requiring the Debtors to defend the Washington Action will result in out-of-pocket defense costs in a total estimated

---

[24]    See, e.g., Bally, 402 B.R. at 624 ("[t]his Court has significant experience in applying state law ….").

ny-1051541

amount estimated of up to $725,000 for outside counsel fees and expenses alone.[25]  (Scoliard

Decl. ¶ 18.)  This factor weighs heavily against granting relief from the automatic stay.

    **iv.**    **The Sixth *Sonnax* Factor:**
                  **Whether the action primarily involves third parties**

        44.    The only named defendants in the Washington Action are the Debtor

Defendants and AFI, with whom the Debtor Defendants are party to a joint defense agreement in

connection with the Washington Action.  (See Compl. ¶ 1.)  As a result, the Debtors are required

to actively participate in the Washington Action to avoid facing an adverse judgment and,

accordingly, this Sonnax factor weighs against granting relief from the automatic stay.[26]

    **v.**    **The Seventh *Sonnax* Factor: Whether litigation in another**
                  **forum would prejudice the interests of other creditors**

        45.    The interests of the Debtors' other creditors will be severely prejudiced if

the automatic stay is lifted to allow the Washington Action to proceed against the Debtors at this

juncture in the Chapter 11 Cases.  Having to defend such actions would deplete estate resources,

thereby prejudicing other creditors.  Additionally, lifting the stay would also expose the Debtors

to have to defend countless other lift stay motions, including likely lift stay motions from other

class action claimants.  This would impose a heavy burden on the valuable time and efforts of the

Debtors' employees and retained professionals, tax the Debtors' financial resources, and result in

a wholly unnecessary distraction to the Debtors' focus on achieving the objectives of the Chapter

11 Cases—the maximization of value for creditors.

---

[25]    For context, based upon the Debtors' records for the year prior to the Petition Date, their legal costs averaged
approximately $5.7 million per month.  (Scoliard Decl. ¶ 20.)

[26]    See City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l, Inc.), 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying
motion to lift the automatic stay where the debtor was more than a mere conduit for the flow of proceeds and
the action impacted the "property and administration of [the debtor's] estate, suggesting that continuance of the
stay [was] proper.").

46.     Requiring the Debtors to defend the Washington Action in the Washington Court would upend the "strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court."  A successful case is in the interests of all of the Debtors' creditors and, as demonstrated above, permitting the Washington Action to proceed would impose a significant burden on the Debtors' estates both in terms of out-of-pocket legal costs and the demands upon their personnel.  As a result, the seventh <u>Sonnax</u> Factor also weighs in favor of denying relief from the automatic stay.

### CONCLUSION

47.     Based on the weight of settled authority and its application to the Motion as described above, the Debtors respectfully submit that the Movants have failed to meet their burden.  Substantially all of the applicable <u>Sonnax</u> Factors weigh heavily in favor of maintaining the automatic stay.  As such, the Court should deny the Motion.

WHEREFORE, for the foregoing reasons, the Debtors request that the Court enter an Order denying the Motion and grant such other relief as the Court deems proper.

New York, New York
Dated: October 3, 2012

/s/ Norman S. Rosenbaum
Gary S. Lee
Norman S. Rosenbaum
Erica J. Richards
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
Debtors in Possession*

22