**<u>Exhibit E</u>**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Gary S. Lee
Anthony Princi
Jamie A. Levitt

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | ) | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF WILLIAM J. NOLAN IN SUPPORT OF DEBTORS'
MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL
OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

I, William J. Nolan, being duly sworn, depose and say:

    1.  I am a Senior Managing Director in the Corporate Finance practice of FTI Consulting, Inc. ("<u>FTI</u>"). FTI's Corporate Finance practice is one of the largest restructuring and reorganization advisory practices in the country. FTI's Corporate Finance practice is successor to PricewaterhouseCoopers's ("<u>PWC</u>") Business Recovery Services practice. Prior to joining FTI, I was a Partner at PWC. I am a member of my firm's Real Estate and Structured Finance practice group and I have over 20 years of experience providing financial advisory services to debtors and creditors. FTI currently

ny-1045165        1

is serving as financial advisor to Residential Capital, LLC ("ResCap") and the other above-captioned debtors and debtors-in-possession (collectively the "Debtors").

2. I submit this declaration (the "Declaration") on behalf of the Debtors in connection with their motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for approval of the RMBS Trust Settlement Agreements. This Declaration reflects the work performed to date, and I reserve the right to augment and refine the analysis.

## QUALIFICATIONS

3. FTI was first engaged by ResCap in March 2007 to provide financial advisory services and has been periodically reengaged by the Debtors since that time. Since March 2007, FTI has developed a great deal of institutional knowledge regarding the Debtors' operations and finances. Since August 2011, Gina Gutzeit, an FTI Senior Managing Director, and I have been the primary contacts at FTI responsible for providing ResCap with financial advisory services, including, but not limited to, the evaluation of strategic alternatives, bankruptcy planning, bankruptcy operational readiness, cash flow analysis, and planning and general restructuring advice.

4. As a member of FTI's and PWC's practices over the course of the last 20 years, I have developed extensive experience in advising troubled and bankrupt companies and their creditors. My experience includes a wide range of assignments including out-of-court restructurings, turnarounds, workouts and corporate bankruptcies. In addition, I have considerable experience in restructurings and bankruptcies in the financial services industry, including, but are not limited to, the bankruptcies and restructurings of: MF Global Holdings Ltd, Advanta Corp, The Education Resources

ny-1045165                              2

Institute, Inc., Refco, Inc., People's Choice Home Loan, Inc., Mortgage Lenders Network USA Inc., ResMae Mortgage Corporation, First NLC Financial Services LLC, Alliance Bancorp, Mortgage Corporation of America, American Business Financial Services, Inc., ContiFinancial Corporation, The Thaxton Group Inc., Criimi Mae Inc., and Fidelity Bond and Mortgage.

5.   In addition, I have been engaged in other large workouts and bankruptcies on behalf of the Debtors or their creditors, including: Orleans Homebuilders, Inc., M. Fabrikant & Sons, Inc., Oakwood Homes, Inc., Cone Mills Corp., Delta Mills, Inc., US Aggregates, Inc., and Heilig-Meyers Company.  I have also been engaged in many out-of-court restructurings, including Credit-Based Asset Servicing and Securitization LLC, LNR Corporation, and other, nonpublic matters.

6.   Furthermore, FTI and I have provided financial advisory services to parties involved in mortgage-related litigation, all of which are confidential in nature.

7.   I hold a bachelor of science from the University of Delaware and a Masters Degree in Business Administration in Finance from The Wharton School of the University of Pennsylvania.  I have been a speaker at various industry conferences, covering topics such as the recent financial crisis, tranche warfare in structured finance, and other real estate issues.

8.   In preparing this Declaration and in addition to the information referenced herein, I, and others from my firm under my direction, reviewed and considered other materials and documents, the internal nonpublic financial and operating data concerning the Debtors furnished to me by the management of the Debtors and information publicly available about the Debtors.  Based on my review of numerous

bankruptcy cases and the relevant materials, and based on my 20 years of experience in this industry, I concluded that, if the RMBS Trust Settlement is not approved, the Debtors' Chapter 11 cases will be more protracted and more expensive — to the likely detriment of recoveries for creditors in these cases — than if the RMBS Trust Settlement is approved.

## BACKGROUND

9.      The RMBS Trust Settlement resolves, in exchange for an allowed claim of up to $8.7 billion against the debtors Residential Funding Company, LLC ("RFC") and GMAC Mortgage LLC ("GMAC Mortgage") (the "Allowed Claim"), alleged and potential representation and warranty claims and servicing claims (collectively, the "R&W Claims") held by up to 392 securitization trusts (the "Trusts") in connection with approximately 1.6 million mortgage loans backing approximately $221 billion in original issue balance ("OIB") of associated residential mortgage-backed securities ("RMBS") issued by the Debtors' affiliates between 2004 and 2007. In aggregate, the R&W Claims represent a potential for tens of billions of dollars in contingent claims against the Debtors' estates. It is my understanding that the R&W Claims allegedly arise under Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and other documents governing the Trusts (collectively, the "Governing Agreements"). These Governing Agreements require mortgage Sellers,[1] in certain circumstances, to repurchase securitized Mortgage Loans that materially breach applicable representations and warranties. It is my understanding the Debtors have repurchased approximately $1.16

---

[1] In descriptions of the terms of the Governing Agreements, capitalized terms have the meaning ascribed to them in the Governing Agreements.

ny-1045165                                      4

billion in loans since 2005, in part, to resolve similar contractual representation and warranty claims. Furthermore, I understand that the Debtors dispute the R&W Claims and intend to vigorously defend future contractual representation and warranty claims brought against them.

10.     Due to the complex nature of the disputes around the R&W Claims, absent the RMBS Trust Settlement the Debtors' estates face substantial litigation costs and risks in connection with the R&W Claims. Based on my review of the costs and delays of numerous Chapter 11 cases, my professional experience, and the Declaration of Jeffrey Lipps ("Lipps Declaration"),[2] I conclude that the costs and delays associated with litigating rather than settling the R&W Claims are likely substantial and not in the best interests of the Debtors or their creditors. Furthermore, I conclude that the RMBS Trust Settlement could prevent delays in the Debtors' restructuring which in turn could negatively impact the confirmation of a Chapter 11 plan.

## COMPLEX NATURE OF THE R&W CLAIMS

11.     Litigation regarding alleged breaches of representations and warranties under multiple securitizations is extremely complex and time consuming. As an initial matter, the factual analyses required to determine whether a breach occurred are vast. For instance, the relevant documents and information differs from case to case, as the securitization structures and Governing Agreements vary from one securitization to another. The claims potentially covered by the RMBS Trust Settlement involve up to 392 different securitizations. It is my understanding that these securitizations were the results of efforts of both RFC and GMAC Mortgage, each of which employed different

---

[2] The Lipps Declaration is referenced and cited in the Debtors' motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for approval of the RMBS Trust Settlement Agreements.

personnel and procedures during this time frame.  In addition, each Trust involved a unique set of mortgage loans which included different loan products, such as first liens, second liens, prime, Alt-A, and subprime.  The underwriting of the various loans would have involved different employees, with different automated processes and underwriting guidelines, diligence standards, and quality audit practices.  Furthermore, the representations and warranties in the securitizations will often differ between securitizations; for example, key representations and warranties may or may not include: underwriting standards, underwriting methodologies, borrower income, loan-to-value, appraisal methodologies, and occupancy, among others.  Analyzing each of the above elements requires detailed and specific analyses often viewed through the prevailing underwriting environment that existed when each loan was created.

12.    Accordingly, the discovery process for the resolution of these claims alone is a significant undertaking.  As an example, the Debtors' litigation with MBIA Insurance Corporation ("MBIA") demonstrates the enormity of the discovery required in litigating alleged breaches of representations and warranties. Based on my review of the Lipps Declaration, MBIA's lawsuit against RFC involved just five trusts securitizing approximately 63,000 home equity lines of credit or closed-end second mortgages — just two of the many loan types involved in the 392 Trusts — issued by RFC in less than a year.  Fact discovery in this case has not been completed over three and a half years after MBIA first sued RFC.  RFC has produced more than a million pages of documents, including loan files for more than 63,000 mortgage loans.  RFC has produced nearly one terabyte of data including a variety of source code, other application

data, and back-end loan-level data relating to automated systems used in connection with underwriting, pricing, acquisition of, pooling, auditing, and servicing the mortgage loans.

13. My understanding is that the claims litigated in the MBIA litigation are substantially similar to those that could be brought by the Trusts. Accordingly, if the RMBS Trust Settlement is not approved, the same types of litigation could occur for the remaining non-MBIA trusts.

## THE EXPENSE OF LITIGATING THE R&W CLAIMS

14. Due to their complexity and size, the litigation of the R&W Claims held by the Trusts would burden the estate with significant professional fees and other litigation-related expenses. The professional fees and other burdens of litigation, including the reserves that would be required if such litigation commenced, could harm the Debtors' estates and likely reduce and delay recoveries for the Debtors' creditors.

15. In order to analyze the potential impact of the litigation of the R&W Claims on the Debtors' estates, I analyzed the professional fees of various Chapter 11 cases over the past four years. The cases chosen for the analysis included financial services-related enterprises with assets greater than $1 billion and nonfinancial companies with assets greater than $5 billion and less than $30 billion.[3] I analyzed the professional fees in 16 large bankruptcy cases.[4]

---

[3] The sample sized was limited to the Southern District of New York and Delaware jurisdictions and to cases that filed between 2008 and June of 2011. The sample did not include cases that converted to Chapter 7. Capital IQ was used as the primary database.

[4] The cases included: Tribune Company, WMI Holdings Corp., Lehman Brothers Holdings, Inc., Ambac Financial Group, Inc., Lyondell Chemical Company, Innkeepers USA Trust, Nortel Networks, Inc., Capmark Financial Group, Inc., Abitibi Bowater, Inc., General Growth Properties, Inc., Smurfit-Stone Container Corp., Fairfield Residential LLC, CIT Group Inc., Lear Corp., Charter Communications, Inc., and R.H. Donnelley Corp.

ny-1045165                                    7

16. As part of this analysis, I reviewed the publicly available professional fee applications for the debtors' lead counsels and financial advisors, and the lead counsels and financial advisors for the official committees for unsecured creditors to evaluate the level of fees associated with litigation.[5] I calculated the fees and expenses incurred and categorized under task codes on fee applications that related to litigation activities, such as fees designated as litigation, discovery, contested matters, and others.[6] It should be noted that to the extent professionals categorized litigation activities as another task — for instance, work on a plan of reorganization or disclosure statement hearing — my analysis would not include those as litigation-related costs. I then compared the total litigation related fees to the non-litigation fees on a percentage basis, as shown in Exhibit A hereto.

17. The vast majority of matters had some level of designated litigation-related professional fees while in bankruptcy. Of the matters with some litigation activities disclosed, the litigation fees ranged from 1% to 73% of non-litigation related fees. From the reading of the case histories, it is apparent that bankruptcy matters which involve disputes that result in litigation had significantly increased fees. Tribune Company, WMI Holdings Corp., Lehman Brothers Holdings, Inc., Lyondell Chemical Company, Innkeepers USA Trust, Ambac Financial Group, Smurfit-Stone Container Corp. and Charter Communications, Inc. involved significant dispute issues and therefore had on average 33% (with a range of 17% to 73%) additional fees associated with

---

[5] We also considered special litigation counsel and expert witnesses to the extent the total case fees requested by such firms were in excess of $2 million. Also note that only professional firms retained through bankruptcy court and compensated through fee application process were included in the analysis.

[6] In addition, there were differences in the manner in which professionals categorized and summarized time entries; therefore, inconsistencies in the total time reported related to litigation may exist if a comparison is made between professionals.

litigation. Cases which did not have significant litigation activity had litigation costs which ranged from 0%-8% of all other fees with an average of 3%. Since the analysis relies on the descriptions included in the various fee applications analyzed and it appears that not all litigation is specifically identifiable, the difference between fees in cases with significant litigation and those without may be understated.

### LITIGATING THE R&W CLAIMS COULD DELAY THE DEBTORS' RESTRUCTURING PROCESS

18.    In addition to the costs and risks of litigation, my review of bankruptcy cases demonstrated that cases with disputes that result in litigation also have longer durations. If the RMBS Trust Settlement is not approved, the litigation of the R&W Claims could cause significant delay in resolving the bankruptcy estate and, therefore, increased costs. Longer case durations generally increase overall fees associated with a case. Based on my assessment, cases that become litigious could be delayed by approximately 10 months. Thus, it is reasonable to conclude that the Debtors' case could face a similar delay if the case becomes litigious.

19.    In order to analyze the impact of settlements on the duration of bankruptcies, I reviewed all bankruptcy case filings from January 2007 through June 2011.[7] Of those, I, and others from my firm at my direction, selected 155 to analyze based on cases with assets greater than $250 million.[8] This sample was analyzed to identify whether the matter was prepackaged, prearranged or otherwise. Of the 155

---

[7] June 2011 was chosen as a cutoff date in order to capture completed cases as represented in the Capital IQ database.

[8] This sample includes chapter 11 cases with assets greater $250 million and excludes cases filed within the past year, cases that were dismissed or converted to Chapter 7.

ny-1045165                                    9

cases, 24 bankruptcies were identified as being prepackaged, 11 were identified as being prearranged and 120 were otherwise.

20.     Based on this sample of 155 bankruptcy filings, there is a significant time savings to consensual resolution of cases.  Prepackaged bankruptcies had an average duration of 2 months versus prearranged bankruptcies which had an average duration of 8 months, while all others had an average duration of 19 months.  <u>Exhibit B</u> hereto illustrates the duration of delay between prepackaged, prearranged, and the remaining bankruptcies in this sample.

21.     The Debtors' bankruptcy as planned is a prearranged bankruptcy in large part due to the three plan support agreements.  If the Debtors did not have this support, the Debtors' bankruptcy would likely be extended.  These three plan support agreements allow the Debtors to focus on preserving assets, consummating a timely sale of a majority of their assets, and effectuating a plan of reorganization.

22.     I have prepared a hypothetical analysis using the time savings between prepackaged/prearranged bankruptcies versus the remaining cases in my sample. To calculate the cost of delay, I used the average length of time between the three types of bankruptcies and assumed an average run rate of professional fees of $19 million per month,[9] which is the line item for fees in the budget for the Debtors' postpetition financing facility (the "<u>DIP Facility</u>") from the petition date until December 2012.  If the current bankruptcy proceedings were extended by a mere six months, the range of professional fees increase could be $28 million to $114 million more than is currently anticipated.  If the delay was twelve months and assuming 50% of the DIP Facility

---

[9] As shown in the DIP projections filed on May 14, 2012 and excluding the Servicing Foreclosure File Review costs.

projections "run rate," the professional fees could increase by as much as $114 million based on the assumptions in Exhibit C. An increased duration would also lead to other increased costs, such as additional months of interest on the DIP Facility, additional adequate protection payments and increased United States Trustee fees. If these professional fees and other incremental costs are incurred, there could be a meaningful reduction in recoveries to unsecured creditors.

## BENEFITS OF SETTLEMENT

23. After the substantial downturn in the real estate and financial markets beginning in 2007, investors in securitization trusts and other interested parties have brought claims regarding alleged breaches of representations and warranties contained in the agreements governing those trusts. The Debtors have been involved in repurchase requests in connection with such alleged breaches and, as a consequence, have repurchased approximately $1.16 billion in loans since 2005 partially due to such alleged breaches.

24. The Debtors face considerable uncertainty, litigation costs and risk associated with the R&W Claims. In similar RMBS litigation cases, the plaintiffs have asserted claims in the tens of billions of dollars. In the case of Countrywide and Bank of America, the matter has been proceeding for over two years and the parties are still in the discovery phase.

25. In many instances, the Debtors have disputed repurchase demands and allegations of breaches of representations and warranties as the calculation and estimation of repurchase exposure depends on a number of factors that parties value and measure differently. For example, the Debtors dispute the accuracy and methodology of

MBIA's allegations and breach rates associated with the R&W Claims. An exhaustive analysis of the MBIA claims and other claims will require extensive research which would require time and professional fees, and many such investigations would be necessary if the RMBS Trust Settlement is not approved and the R&W Claims are litigated.

26. Additionally, the RMBS Trust Settlement is an integral part of the Debtors' Plan. In connection with the RMBS Trust Settlement, and subject to Bankruptcy Court approval, the Debtors, following extensive negotiations, have entered into substantially the same Chapter 11 Plan Support Agreements with each of the Steering Committee Group and the Talcott Franklin Group and Ally Financial Inc. ("AFI"). These settlements provide a construct for a global settlement of RMBS claims and will likely prevent a protracted litigation to settle claims. Without the RMBS Trust Settlement, the institutional investors and the Trustees could hold up the implementation of the Debtors' Plan, and such litigation could significantly delay the Debtors' restructuring efforts. As indicated in the sample of 155 bankruptcies, if a bankruptcy was non-prepackaged or non-prearranged, the proceedings of such bankruptcy were delayed and extended by upwards of a year — with the potential of tens of millions in extra professional fees — which delay could apply to the Debtors' if the prearranged bankruptcy does not occur. Without the RMBS Trust Settlement, the Debtors' Chapter 11 cases could be similar to the 120 cases that are not prepackaged or prearranged.

27. Furthermore, the proposed RMBS Trust Settlement Agreement provides substantial benefits to the Debtors, as litigating these issues would distract the

Debtors from focusing on critical aspects of their restructuring, including potentially interfering with the multibillion dollar sale of mortgage servicing rights and other assets.

28.     Additionally, lengthy claims litigation would likely reduce recoveries to other unsecured creditors.  The claims of the other unsecured creditors are largely fixed in nature, and are dwarfed by the size of the R&W Claims.  Increasing the size of the R&W Claims (or instituting an estimation procedure that risks increasing their potential size) could dramatically lower recoveries for the other creditors whose claims will be paid from the same, limited pool of funds.

29.     The RMBS Trust Settlement provides certainty to the Debtors with respect to the single largest set of disputed claims against the Debtors' estates and removes impediments to a successful restructuring of the Debtors.  The RMBS Trust Settlement was a necessary precursor to the Institutional Investors' commitment to the Plan Support Agreements.  Additionally, if the RMBS Trust Settlement is not approved and the R&W Claims are increased, the recovery by the holders of the Debtors' Junior Secured Bonds will be diluted and could compromise the Debtors' plan support agreement with such bondholders and impede the Debtors' Chapter 11 proceedings.

## CONCLUSION

30.     In conclusion, the RMBS Trust Settlement will reduce the probability of protracted litigation and reduce the probability of a longer Chapter 11 proceeding, both of which would otherwise substantially increase professional fees that would be incurred by the estate, likely to the detriment of recoveries for creditors in these cases.  Approval of the RMBS Trust Settlement will allow the Debtors to focus on other

critical aspects of their restructuring, including maximizing the multibillion dollar sale of mortgage servicing rights and other assets.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 11, 2012

/s/ William Nolan
William J. Nolan

# Exhibit A

**Litigation Fees Versus Non Litigation Fees**

|  | **Advisor Fee Analysis** | |
|---|---|---|
|  | Lit Fees as % of Non-Lit Fees | Duration Years |
| **Higher Range** | | |
| Charter Communications, Inc. | 73% | 0.7 |
| Tribune Company | 49% | 3.5 |
| WMI Holdings Corp. | 46% | 3.5 |
| Lyondell Chemical Company | 27% | 1.3 |
| Innkeepers USA Trust | 19% | 1.3 |
| Lehman Brothers Holdings, Inc. | 19% | 3.5 |
| Smurfit-Stone Container Corp. | 17% | 1.4 |
| Ambac Financial Group, Inc. | 17% | 1.6 |
| **Lower Range** | | |
| Capmark Financial Group Inc. | 8% | 1.9 |
| General Growth Properties Inc. | 7% | 1.6 |
| Nortel Networks, Inc. | 4% | 3.4 |
| AbitibiBowater, Inc. | 2% | 1.6 |
| Fairfield Residential LLC | 1% | 0.6 |
| Lear Corp. | 1% | 0.3 |
| R.H. Donnelley Corporation | 0% | 0.7 |
| CIT Group, Inc. | 0% | 0.1 |
| **Average:** | | |
| Higher | 33% | 2.1 |
| Lower | 3% | 1.3 |
| Total Sample Size | 18% | 1.7 |

**Notes and Assumptions:**

(1) There were differences in the manner in which professionals categorized and summarized time entries; therefore, inconsistencies in the total time reported related to litigation may exist if a comparison is made between

(2) Sample population includes financial related enterprises with assets greater than $1 billion and non-financial companies with assets between $5 billion and $30 billion, which filed for bankruptcy between January 2008 and June 2011 in New York and Delaware jurisdictions.

(3) Reflects fees requested by lead counsels and lead financial advisors for the debtors and for the official committees for unsecured creditors. This analysis does not consider professional firms retained by other constituents, such as chapter 11 examiner and equity committee. This analysis includes special litigation counsel and expert witness, if any, to the extent requested fees over the course of the case were greater than $2 million.

(4) Fixed fees related to litigation submitted by financial advisors are estimated based on hours billed to the task code related to litigation procedures.

(5) Includes travel time discount. All other fees are gross.

(6) Publicly available information only. Does not consider fees and expenses funded by the estate to the extent such fees were not filed publicly.

(7) Reflects fees and expenses incurred and categorized under task codes on fee applications related to litigation activities, such as fees designated as litigation, discovery, contested matters, and others. To the extent professionals categorized litigation activities as another task — for instance, work on a plan of reorganization or disclosure statement hearing — this analysis does not reflect such fees as litigation fees.

(8) Billing codes are generally inconsistent between fee applications.

(9) Certain professionals involved in the Lehman bankruptcy have not disclosed their involvement in the litigation procedures, however, certain narrative indicates that the litigation amount could be a material part of the final application for their professional compensation.

*Source: Capital IQ, court docket*

# Exhibit B

## Duration of Pre-Packaged, Prearranged and Other Chapter 11 Cases

|  | Total | | Chapter 11 Classification[1] | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | | | Pre-Packaged | | Pre-Arranged | | Other[2] | |
|  | Count | Avg. Length[1] | Count | Avg. Length[3] | Count | Avg. Length[3] | Count | Avg. Length[3] |
| By Case Length | | | | | | | | |
| On-going Cases[4] | 17 | 3.3 | - | - | - | - | 17 | 3.3 |
| 3-4 years | 4 | 3.4 | - | - | - | - | 4 | 3.4 |
| 2-3 years | 13 | 2.4 | - | - | - | - | 13 | 2.4 |
| 1- 2 years | 46 | 1.5 | - | - | 1 | 1.9 | 45 | 1.5 |
| Less than 1 year | 75 | 0.5 | 24 | 0.2 | 10 | 0.6 | 41 | 0.6 |
| **Total/Blended** | **155** | **1.3** | **24** | **0.2** | **11** | **0.7** | **120** | **1.6** |

[1] Classification of the type of Chapter 11 cases is generally based on Capital IQ's designation.

[2] Other case durations may be due to litigation and other issues. For these cases, the reason for the extended duration has not been analyzed on a case by case basis.

[3] In number of years.

[4] Case length reflects time lapsed since filing through the date of this analysis

*Source: Capital IQ*

## Exhibit C

### Range of Potential Outcomes

*($ in millions)*
Monthly Run Rate    $  19 *

|  | Percent of Run Rate of Professional Fees | | | |
|---|---|---|---|---|
|  | 25% | 50% | 75% | 100% |
| 18 | $ 85 | $ 171 | $ 256 | $ 342 |
| 12 | $ 57 | $ 114 | $ 171 | $ 228 |
| 6 | $ 28 | $ 57 | $ 85 | $ 114 |

(Months)

*Source: DIP projections dated 5/14/2012; this figure excludes Servicing Foreclosure File Review costs and covers the period