## Exhibit F

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, et al.,<br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |

| | |
|---|---|
| RESIDENTIAL CAPITAL, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALLSTATE INS. CO., THE OTHER PARTIES<br>LISTED ON EXHIBIT A TO THE COMPLAINT,<br>JOHN DOES 1-1000,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 12-ap-1671 (MG)<br><br>Bankruptcy Case No. 12-12020 (MG)<br><br>Jointly Administered |

## DECLARATION OF JEFFREY A. LIPPS

I, Jeffrey A. Lipps, declare:

1.      I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215 (the "Firm").

2.      The Firm currently represents or has represented over the past several years a number of the debtor entities, four non-debtor affiliated entities, and several individual former directors and officers of debtor entities in over a dozen separate lawsuits involving the debtor entities' issuance of residential mortgage-backed securities. The Firm has been representing various defendants in these matters since the spring of 2010.

3.      In addition to the cases in which the Firm is involved, I am also aware that there are additional lawsuits regarding the debtor entities' issuance of residential mortgage-backed

securities that also name several debtor entities, non-debtor affiliates, and/or former directors and officers. Although the Firm does not represent the defendants in those actions, I am aware of the cases, the plaintiffs' allegations, and the causes of action asserted against the defendants.

4.      This Declaration provides an overview of the pending residential mortgage-backed securities lawsuits that name both the debtor entities and certain of their non-debtor affiliates and/or individual directors and officers.[1]  It also discusses why, based on my experience in these lawsuits, it is highly likely that very substantial discovery burdens will be imposed on the debtor entities and their employees if any of the lawsuits proceed against the non-debtor affiliate defendants or the individual defendants.

5.      The Appendix to this Declaration, in turn, provides a more detailed description of the allegations, claims, anticipated defenses, and procedural status of each of the lawsuits.

## I.      <u>Overview Of The Lawsuits.</u>

6.      Collectively, the debtor entities originated residential mortgage loans, securitized those loans through both government-sponsored entities (including Fannie Mae, Freddie Mac, and Ginnie Mae) and private-label securitization trusts, and sold the securitizations to investors. Some of the debtor entities' private-label securitizations were insured by financial guaranty or "monoline" insurers which guaranteed the repayment of certain payments to the security certificate holders.

7.      The debtor entities have been named in 42 lawsuits across the country arising from their issuance of the mortgage-backed securities.   Those lawsuits concern 392 securitizations and more than 1.6 million mortgage loans with an original principal balance in excess of $226 billion.  The debtor entities named as defendants in these lawsuits are as follows:

---

[1]      In addition, there are other residential mortgage-backed securities-related lawsuits filed solely against the debtor entities, which this declaration does not address because they are subject to the automatic stay.

2

a. Residential Capital, LLC ("ResCap"), the holding company for the mortgage lending and securitization businesses of GMAC, LLC (now known as Ally Financial, Inc.);

b. Residential Funding Company, LLC ("RFC"), one of ResCap's two primary operating subsidiaries that acquired and sold mortgage loans in "private-label" securitizations and whole loan sales;

c. GMAC Mortgage, LLC ("GMACM"), ResCap's other primary operating subsidiary that originated and sold loans to and through Fannie Mae, Freddie Mac, and other government agencies, and also originated and sold mortgage loans into private-label securitizations;

d. Residential Accredit Loans, Inc. ("RALI"), the separate entity (known as a "shelf") that filed registration statements with the SEC through which RFC securitized Alt-A first lien mortgage loans;

e. Residential Funding Mortgage Securities I, Inc. ("RFMSI"), the shelf through which RFC registered with the SEC to issue securitizations of prime first lien mortgage loans;

f. Residential Funding Mortgage Securities II, Inc. ("RFMSII"), the shelf through which RFC registered with the SEC to issue securitizations of second lien loans;

g. Residential Asset Securities Corporation ("RASC"), the shelf through which RFC registered with the SEC to issue securitizations of subprime loans;

h. Residential Asset Mortgage Products, Inc. ("RAMP"), the shelf through which GMACM issued securitizations of second lien loans, and a "catch-all" shelf from which RFC and GMACM registered with the SEC to issue securitizations of other non-standard or non-conforming mortgage loans;

i. GMAC-RFC Holding Co., a holding company for RFC and the RFC shelf companies (RALI, RAMP, RASC, RFMSI & RFMSII); and

j. Homecomings Financial, LLC, a wholly owned subsidiary of RFC that underwrote and funded mortgage loans originated through brokers for sale or securitization by RFC.

8. Twenty-seven lawsuits have named certain non-debtor affiliated entities and/or former directors and officers of debtor entities as defendants. Those 27 lawsuits involve 116 securitizations and more than 660,000 mortgage loans with an original principal balance of more than $83 billion. The individual former director and officer defendants are Bruce J. Paradis,

Davee L. Olson, David C. Walker, Kenneth M. Duncan, Ralph T. Flees, James G. Jones, David M. Bricker, Lisa R. Lundsten, and James N. Young. The non-debtor affiliated entities named as defendants in these lawsuits are as follows:

    a.  Ally Financial, Inc., the ultimate indirect parent of the debtor and non-debtor entities;

    b.  Ally Bank, which purchased, funded, and sold mortgage loans to and through GMACM, some of which were securitized by GMACM;

    c.  Ally Securities, LLC (f/k/a Residential Funding Securities, LLC or Residential Funding Securities Corporation d/b/a GMAC RFC Securities), which underwrote some of the securities offered by RFC and GMACM; and

    d.  GMAC Mortgage Group, LLC, the holding company that was ResCap's parent.

    9.    The 27 pending lawsuits filed against the debtor entities and their non-debtor affiliates and the individuals fall into three general categories: (1) 11 lawsuits filed by monoline insurers, 10 of which were filed by Financial Guaranty Insurance Company ("FGIC") and one of which was filed by Assured Guaranty Municipal Corp; (2) 15 lawsuits filed by institutional investors who purchased certificates in the debtor entities' private-label mortgage-backed securitizations; and (3) a lawsuit filed by the Federal Housing Finance Agency ("FHFA"), acting in its capacity as the conservator for Freddie Mac.

    10.    All 27 lawsuits are premised on the central allegation that the debtor entities misrepresented the characteristics of the mortgage loans underlying the subject securitizations. The private-label plaintiffs and the FHFA bring claims primarily for alleged violations of state and/or federal securities laws and common law fraud and negligent misrepresentation, based on the debtor entities' statements in the offering documents that accompanied the securitizations. The monoline insurers primarily bring contract and fraud claims pursuant to the representations

and warranties that the debtor entities provided in conjunction with obtaining insurance on the securities.

11.     The 27 lawsuits bring claims against the non-debtor affiliates and/or individual defendants that are derivative of, and inextricably intertwined with, the claims against the debtor entities.  It is the debtor entities—not the non-debtor affiliates or the individual defendants—that issued the mortgage-backed securities, prepared and filed the accompanying offering documents, and provided the representations and warranties to the monoline insurers.  This conduct of the debtor entities is the indispensable foundation for the plaintiffs' causes of action against the non-debtor affiliates and the individual defendants.

12.     In particular, the plaintiffs allege that the non-debtor affiliates Ally Financial, Inc. and GMAC Mortgage Group, LLC are liable for the debtor entities' alleged wrongdoing as "control persons" of the debtor entities, given the organizational fact that these non-debtor entities were direct or indirect parent companies of the debtor entities.  The plaintiffs' claims against the individual defendants are similarly based on "control person" liability stemming from the individuals' conduct in their capacities as directors and officers of debtor entities.  As such, an essential element of the plaintiffs' claims against these non-debtor entities and individual defendants is proof of the underlying liability of the debtor entities—specifically, a non-debtor parent such as Ally Financial, Inc. cannot be liable for the fraud of subsidiaries/debtors RFC and GMACM under a "control person" theory unless RFC or GMACM is first found liable for fraud.

13.     Likewise, the plaintiffs' claims against the non-debtor affiliates Ally Securities and Ally Bank overlap with the allegations and claims against the debtor entities.  The plaintiffs sue Ally Securities as an underwriter for some of the securitizations, and Ally Bank as a contributor of mortgage loans and custodian for some of the securitizations.  Those claims arise

out of the mortgage loan origination, acquisition, and securitization activities of debtors RFC and GMACM.  Thus, establishing the liability of Ally Securities and Ally Bank will necessarily require resolution of a number of issues and allegations as to debtors RFC and GMACM: for example, whether in fact misrepresentations were made to plaintiffs in the offering materials prepared by the debtor entities, and whether proper underwriting standards were in fact followed by debtors RFC and GMACM in acquiring, originating, and/or pooling the mortgage loans.

14.     In short, to pursue claims against the non-debtors, the plaintiffs must establish that either the debtor entities' offering materials for the subject securitizations (*i.e.,* the prospectus and prospectus supplements) contained various misrepresentations and omissions regarding the underlying mortgage loans, or the debtor entities' contractual representations and warranties similarly misrepresented the characteristics of those loans.  Disproving these allegations is also central to the defense of the plaintiffs' claims.

15.     The essential information necessary to prosecute and defend these claims is virtually all in the possession of the debtor entities.  The debtor entities have possession and control of the loan files, underwriting guidelines and memos, due diligence materials, relevant emails, quality audit documents, and other loan-level or securitization-related information that are necessary for these cases to go forward.  Those documents are central to determining whether there *was* a contractual misrepresentation or any securities fraud—and those documents are in the debtor entities' possession.

16.     Meanwhile, the non-debtor entities have virtually no relevant documents: non-debtors Ally Financial, Inc. and GMAC Mortgage Group have no information specific to any securitizations or the mortgage loan underwriting process; non-debtor Ally Securities at most would have a small amount of diligence- or sale-related information relating to its role as

securitization underwriter; and Ally Bank at most would have its own underwriting guidelines—but not RFC's or GMACM's guidelines, which are the ones at issue in the litigation—and a small amount of very basic loan-level information relating to loans it contributed to the securitizations or for which it served as custodian.  None of these materials are sufficient to prosecute or defend against the claims in the cases, because none relate to the underwriting or securitization practices of the offerors of the securitizations.

17.     Further complicating discovery, the relevant documents and information differ from case to case.  Each case involves different securitizations.  Each securitization involves a unique set of mortgage loans, and was separately negotiated and structured.  Each securitization shelf (that is, RALI, RAMP, RFMSI, RFMSII, and RASC) involves unique documents, processes, and personnel, which varied over time.  For example, RALI was the shelf through which Alt-A first lien securitizations were offered; RASC was the shelf through which subprime first lien securitizations were offered; RFMSI was the shelf through which prime and jumbo first liens were offered; and RFMSII was the shelf through which second lien securitizations were offered.  Different loan products—second liens, first liens, prime, Alt-A, subprime—likewise involved different teams of employees, different automated processes, different underwriting guidelines, different diligence standards, and different audit practices.  The processes and personnel changed over time.  As a result, each lawsuit essentially poses a new discovery challenge and unique discovery burdens from every other lawsuit.  For example, a lawsuit involving 2005 RALI securitizations of Alt-A first liens will involve entirely different documents and testimony from a lawsuit involving 2006 RFMSII home equity securitizations, which would be different again from a lawsuit involving RASC subprime securitizations of any vintage.

18.    To compound matters, the loan origination, acquisition, and securitization processes of RFC and GMACM were entirely distinct when the securitizations at issue were offered.  RFC was a Minneapolis-based company that focused on non-agency, private label loans and securitizations.  GMACM, on the other hand, was a Pennsylvania-based company whose primary business was originating "agency" or "conforming" loans for sale or securitization to and through the GSEs (Fannie Mae, Freddie Mac, and Ginnie Mae).  Thus, discovery into the processes at RFC cannot be used in cases questioning the securitizations of GMACM.  And cases that involve securitizations offered by both RFC and GMACM require discovery into the processes of each entity—essentially double the discovery effort.  Moreover, the cases are pending in a variety of different courts, both state and federal, in New York, Minnesota, Ohio, Massachusetts, Indiana, and Illinois, and are proceeding on different discovery schedules.

19.    Accordingly, permitting the lawsuits to proceed against the non-debtor affiliates and individual defendants would impose a substantial burden on the debtor entities.  The debtor entities would be forced to devote significant time and resources in responding to discovery requests in 27 different lawsuits.  And the anticipated scope of discovery is massive—likely to involve tens of millions of pages of documents, hundreds (if not thousands) of hours of time from dozens of debtor entity employees, hundreds of days of deposition testimony from current and former employees of the debtor entities, and cost millions of dollars.

20.    The following discussion of the investor securities fraud lawsuits (such as *Western & Southern*, *New Jersey Carpenters*, and *Allstate*), the *FHFA* lawsuit, and the *FGIC* lawsuits illustrates these points and demonstrates the anticipated discovery burden on the debtor entities if any of the 27 lawsuits is permitted to proceed against the non-debtor affiliates or the

individual defendants. Further detail as to the other cases facing a similar situation is contained in the Appendix.

## II. Monoline Litigation: The Financial Guaranty Insurance Company ("FGIC") Lawsuits.

21.     FGIC is a monoline insurer that issued insurance policies guaranteeing payments to investors in over 30 of the debtor entities' securitizations.  As such, FGIC entered into various contracts with the debtor entities.  FGIC now alleges that the debtor entities fraudulently induced it to enter those contracts; that the debtor entities breached various provisions of those contracts relating to their handling of the underlying mortgage loans; and that the debtor entities breached their contractual obligations to permit access to loan files and certain books and records.

22.     FGIC has filed ten lawsuits that name non-debtor affiliate Ally Financial, Inc., and four of those also name non-debtor affiliate Ally Bank.  These lawsuits are all currently pending in the Southern District of New York before Judge Paul Crotty.[2]

23.     With regard to Ally Financial, FGIC alleges that Ally Financial is the alter ego of debtor entities ResCap and RFC, and therefore Ally Financial is liable for the actions of its subsidiaries.  FGIC also alleges that Ally Financial aided and abetted its subsidiaries in fraudulently inducing FGIC to enter the contracts.  Thus, all of FGIC's claims against Ally Financial will require FGIC first to establish the debtor entities' underlying wrongdoing.

---

[2]  The twelve cases are:
    *FGIC v. GMAC Mortgage, LLC et al.,*  Case No. 11-CV-09729 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-00338 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-00339 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-00340 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-00341 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-00780 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-01601 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-01658 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-01818 (PAC)
    *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-01860 (PAC)

24.     The four cases that name Ally Bank allege that it breached obligations arising from securitization agreements with FGIC and certain debtor entities based on its role as custodian of the underlying mortgage notes.  To prove its claims against Ally Bank, FGIC will have to obtain extensive discovery from the debtors relating to the securitization agreements, the mortgage loan origination and acquisition process, and the handling and appropriate transfer of the mortgage notes.

25.     As with the other complaints described above and in the Appendix, the plaintiff cannot prove its claims without extensive discovery from the debtor entities.  The scope of that discovery in the FGIC litigation, however, will be substantial—and it will be focused on the debtor entities because FGIC's claims fundamentally arise from contractual dealings **with the debtors**.

26.     Discovery in the FGIC lawsuits has not yet commenced and the parties have just begun to outline potential motion to dismiss arguments in letters to the Court.  However, one of the best indicators of the likely discovery burden in these cases is the scope of discovery in two other similar monoline insurer lawsuits, involving different transactions, brought against debtor entities: *MBIA Insurance Corp. v. Residential Funding Company, LLC* and *MBIA Insurance Corp. v. GMAC Mortgage, LLC*.  The Firm represents debtors RFC and GMACM in both of these lawsuits, which are subject to the automatic stay.

27.     Both lawsuits involve claims relating to the origination, acquisition, securitization, and servicing of loans in securitization transactions for transactions sponsored by debtor entities for which MBIA provided insurance.  The MBIA cases, like the FGIC litigation, allege that the debtor entities fraudulently induced MBIA to enter the insurance contracts, and that the debtor entities breached their contractual representations and warranties to MBIA

10

regarding the origination, underwriting, and pooling of the mortgage loans underlying the securitizations.  Like the FGIC litigation, the MBIA cases also involve the plaintiff's invocation of contractual remedies, which permit certain participants in the securitization, such as monoline insurers, to request that the debtor entities repurchase defective loans from the trusts, thereby reducing the monoline insurer's potential losses.  MBIA and FGIC both pursued those contractual remedies with the debtor entities for a period of time before filing suit.  Thus, the MBIA cases raise many similar issues to the FGIC litigation described above, and the extensive fact discovery sought in the MBIA litigation to date is illustrative of the future burdens likely to fall to the debtor entities should any portion of the FGIC litigation proceed.

28.     Fact discovery in MBIA's lawsuit against RFC was lengthy and enormous, although the case involved just five securitizations of either home equity lines of credit or closed-end second mortgages issued by RFC in less than a year.  The case was filed in 2008, but fact discovery is only winding down now and certain discovery matters are still ongoing.  RFC has produced more than 1,000,000 pages of documents, including loan files for over 63,000 mortgage loans.  In addition, RFC has produced nearly one terabyte of data including a variety of source code, other application data, and back-end loan-level data relating to automated systems used in connection with underwriting, pricing, acquiring, pooling, auditing, and servicing the mortgage loans.

29.     MBIA has taken over 80 days worth of depositions of current or former RFC, GMACM, or ResCap personnel over the course of more than a year.  RFC has taken 50 days of depositions of current or former MBIA personnel.   A number of additional third party depositions have been taken and several third party depositions remain to be taken.  The initial

exchange of expert reports in that case saw the parties exchange 10 expert reports and it is anticipated that rebuttal expert reports will be exchanged in the future.

30.     Fact discovery in MBIA's lawsuit against GMACM has not yet completed.  That case involves just three securitizations of home equity lines of credit or closed-end second mortgages issued by GMACM.  GMACM has already produced in excess of 1,000,000 pages of documents plus additional electronic records—and production is continuing.  To date, and despite an arrangement to use previous transcripts from the RFC case to try and reduce the number and length of depositions for the overlapping witnesses, MBIA has taken nine depositions and has scheduled or is in the process of scheduling at least that many more depositions.  For its part, GMACM has taken 14 depositions and has requested dates for several more witnesses.

31.     As the MBIA lawsuits demonstrate, FGIC cannot prosecute its claims against the non-debtor affiliate entities without pursuing extensive and burdensome discovery from the debtor entities.

## III.     <u>Investor Litigation – *Western and Southern, New Jersey Carpenters, Allstate,* And Others.</u>

32.     Investors who purchased certificates in the debtor entities' mortgage-backed securitizations have brought 15 lawsuits against debtor entities, non-debtor affiliates, and individual directors and officers.  These lawsuits assert claims for state or federal securities violations, fraud, and negligent misrepresentation.  Below are three illustrative examples of the discovery burdens involved with defending these claims on behalf of all defendants.

A. **The Western And Southern Life Insurance Company, et al. v. Residential Funding Company, LLC, et al.**, **Case No. A1105042, Court of Common Pleas, Hamilton County, Ohio ("*Western & Southern*").**

33.     The plaintiffs in *Western & Southern* are institutional investors who purchased certificates in seven securitizations by debtor entities spanning three years and three different securitization shelves.  The seven securitizations involve more than 48,000 mortgage loans with a face value in excess of $5.6 billion.

34.     The plaintiffs name as defendants debtor entities RFC, GMACM, RALI, RAMP, and RFMSI; non-debtor affiliate Ally Securities; and individual former directors and officers Bruce J. Paradis, Davee L. Olson, David C. Walker, Kenneth M. Duncan, Ralph T. Flees, James G. Jones, and David M. Bricker.  The case is pending in state court in Ohio.  Motions to dismiss are pending, but discovery is beginning.  Defendants have been ordered to produce readily available information, plaintiffs have already served voluminous document requests, the bulk of which would fall on the debtor entities, and, at the time ResCap and its subsidiaries filed for bankruptcy, the ResCap defendants were preparing to produce transaction documents and underwriting guidelines relevant to the transactions at issue.

35.     The plaintiffs allege that the prospectus supplements for the seven securitizations contained numerous material misstatements and omissions.  More specifically, the plaintiffs allege that the debtor entities "abandoned" the underwriting standards disclosed in the prospectus supplements; falsely represented that the underlying mortgages would be assigned to the applicable trust; provided false information regarding the characteristics of the mortgage loans to the rating agencies; improperly manipulated the appraisal process and misrepresented the loan-to-value ratios for the underlying mortgages; and misrepresented the "owner occupancy" status of the underlying mortgages.

36.     Based on these allegations, the amended complaint asserts claims for fraud, civil conspiracy, negligent misrepresentation, and violation of the Ohio Securities Act.  The plaintiffs allegedly purchased approximately $215.4 million of certificates and seek rescission, compensatory damages, punitive damages, and costs.

37.     The plaintiffs' claims against the non-debtor affiliate, Ally Securities, and the individual defendants are entirely derivative of their claims against the debtor entities.  The plaintiffs' allege that the debtor entities made the misrepresentations at issue.  The individual defendants are only alleged to have signed the registration statements for the subject offerings.  *See* Amended Complaint ¶¶ 28-34, 218.  Non-debtor affiliate Ally Securities was only an underwriter for the securitizations at issue, but the plaintiffs fail to allege that it made any specific affirmative misrepresentations.

38.     To prove their claims against the non-debtor affiliate and the individual defendants, then, the plaintiffs must first establish the conduct and liability of the debtor entities.  The plaintiffs could not prosecute their claims without discovery from the debtor entities—and likewise the non-debtor affiliate and individual defendants could not defend the claims without discovery from the debtors.

39.     The plaintiffs have requested the loan files for each of the seven subject offerings.  Given that typical loan files can contain several hundred pages of documents, production of all 48,000 loan files could easily involve at least 5,000,000—and as many as 10,000,000—pages of documents.  The loan files are in the possession of the debtor entities, not the individual defendants or the non-debtor affiliate entities.  Moreover, the loan files are a mixture of imaged and paper documents stored in numerous locations around the country.

14

40.    The plaintiffs have also demanded production of all internal communications and communications between and among the debtor defendants and various other entities such as rating agencies, underwriters, due diligence firms, and government agencies, relating not just to the loans underlying the seven offerings, but also any and all related business activities.  In essence, the plaintiffs seek all internal and external email and other electronic communications in any way related to the seven subject offerings.  These requested emails and electronic communications are in the possession of the debtor defendants and require debtor defendants' employees to retrieve.

41.    Given that the case involves seven unique securitizations involving three different shelves, and with a relevant time period spanning at least six years, the number of individuals' emails and other electronic communications that would have to be searched would be enormous. As noted above, each securitization involves its own transaction documents, a unique group of mortgage loans, and underwriting guidelines that may have varied over time.  Where, as in this case, multiple securitization shelves and loan products are involved, different witnesses (and so different email boxes and other sources of information) must be searched for each shelf and product.

42.    Based on past experience, such searching is likely to produce millions of pages of results, both paper and electronic, all of which must be processed and then reviewed for relevance, responsiveness, and privilege.  In addition, relevant loan-level data for these 48,000 mortgage loans—such as information about loan-level performance data, loan originators, underwriting parameters, due diligence, quality audit results, payment history and other relevant metrics—is housed in or was processed through a number of electronic systems.  Some of these electronic systems are no longer operational and require extensive involvement of IT

15

professionals to access.  Furthermore, producing such information requires the export of large volumes of loan-level data, as well as grappling with complex issues surrounding "structured data" such as source code, underwriting rules programmed into automated loan evaluation systems, automated loan pricing tools, automated loan pooling tools, and others.

43.     The anticipated cost of searching, reviewing and producing such documents will inevitably run into the hundreds of thousands, if not millions, of dollars.  To make matters worse, the emails for the time period of the seven securitizations, for both debtor and non-debtor email custodians, are only available on literally thousands of backup tapes.  Those tapes would need to be restored (a manual and time-consuming process), processed, and searched before a typical document review could even begin.  That effort, too, would fall on the debtor entities and their in-house IT resources in the first instance.

44.     In sum, if this lawsuit were permitted to proceed against the non-debtor affiliates or the individual defendants, the plaintiffs and defendants would have to pursue extensive, burdensome discovery from the debtor entities.

**B.  New Jersey Carpenters Health Fund, et al. v. RALI Series 2006-QO1 Trust, et al., Case No. 08-CV-08781-HB, United States District Court, Southern District of New York ("New Jersey Carpenters").**

45.     The plaintiffs in this case represent a proposed class of institutional investors who purchased certificates in four securitizations by debtor entities spanning two years.  The four securitizations involve more than 12,000 mortgage loans with a face value of approximately $3.8 billion.  Furthermore, four additional institutional investors have intervened, and, after motions to dismiss, their remaining claims relate to an additional six securitizations with a face value of approximately $5.7 billion.

46.     The plaintiffs name as defendants debtor entities ResCap, RFC, and RALI; non-debtor affiliate Ally Securities; and individual former directors and officers Bruce J. Paradis, Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, James G. Jones, David M. Bricker, and James N. Young.  The case is pending in federal court in the Southern District of New York.

47.     The plaintiffs allege that the debtors' offering materials (e.g., the prospectus and prospectus supplements) for the four securitizations failed to disclose that the defendants had "systematically disregarded" the applicable underwriting guidelines; that the credit rating models were outdated and the credit enhancements for the offerings were inadequate; and that defendants had conflicts of interest with the rating agencies. *See, e.g.,* FAC ¶¶ 66-254.

48.     Based on these allegations, the plaintiffs assert securities claims under Sections 11, 12, and 15 of the Securities Act of 1933.  *Id.* at ¶¶ 262-294.  Generally, these statutes prohibit untrue and misleading statements and omissions of material facts in offering documents.  15 U.S.C. §§ 77k, 77o & 77l.  The original plaintiffs' class certification motion was denied and the denial was affirmed by the Second Circuit Court of Appeals; however, the trial judge has allowed plaintiffs a 60-day period of additional discovery and an opportunity to file a renewed class certification motion.

49.     The plaintiffs' claims against the non-debtor affiliate and individual defendants are derivative of their claims against the debtor entities.  The only specific allegations as to the individual defendants are that they signed the registration statements, conspired with the debtor defendants, or were in a position to control the activities of the debtor defendants.  FAC ¶¶ 35-48, 266, 288.  The plaintiffs' claims against the non-debtor affiliate Ally Securities, which served as the underwriter for two of the offerings, are similarly based on the allegations against the

debtor defendants. In particular, the plaintiffs allege that Ally Securities did not exercise proper control over the debtor defendants and did not conduct proper due diligence or necessary oversight in the underwriting, securitization, and preparation of the debtor entities' offering documents—all allegations that are premised on the debtor defendants' alleged wrongdoing in underwriting, securitizing, and preparing the relevant offering documents. FAC ¶136; SAC ¶¶ 2, 45, 128, 135, 225-57.

50.     With respect to defenses, the defendants generally intended to demonstrate that there were no misrepresentations or omissions in the offering materials; that plaintiffs' losses were not caused by any purported misrepresentations or omissions; that plaintiffs' claims were barred by the one year statute of limitations; and that plaintiffs knew of the purported untruths or omissions.

51.     More specifically, Sections 11, 12 and 15 provide "due diligence" or "due care" defenses for the individual defendants and/or non-debtor affiliate defendant. For example, under Section 11, a defendant can avoid liability by showing that "after reasonable investigation," he or she had "reasonable ground to believe and did believe" that the subject offering materials did not contain material misstatements or omissions. *See* 15 U.S.C. § 77k(b)(3)(A). Similarly, Section 12 provides a "due care" defense to a defendant that "did not know, and in the exercise of reasonable care could not have known" that the offering materials contained material misstatements or omissions. 15 U.S.C. § 77l(a)(2). Section 15, in turn, provides an affirmative defense for a defendant who "had no knowledge of or reasonable ground to believe in the existence of facts" that allegedly gave rise to the section 11 and 12 claims. 15 U.S.C. § 77o(a). In connection with their efforts to establish each of these affirmative defenses, the individual

defendants and/or non-debtor affiliate will need to obtain information and evidence, including testimony, from the debtor entities.

52.    Each of the individual defendants will also defend against the Section 15 claims by showing that he or she was not a "control" person as defined under federal securities law. Again, the individual defendants will need to obtain information and evidence, including testimony, from the debtor entities in order to establish this defense.  Indeed, the plaintiffs themselves are likely to seek information and evidence, including testimony, from the debtor entities in order to prosecute their claims in the action.

53.    As noted above, the plaintiffs are seeking class action status for their claims, and are embarking on a 60-day period of renewed discovery related to an effort to revise their proposed class definition.  Merits discovery as to these offerings also remains to be completed. In addition, the court permitted four other plaintiffs to intervene based on investments in other securitizations also issued by the debtors, and their class and merits discovery efforts have not yet commenced.

54.    To date, discovery has been focused on class certification issues.  Nonetheless, the debtor entities have already produced more than 175,000 pages of documents, including underwriting guidelines, transaction documents, contract files reflecting agreements between debtor RFC and various loan originators, emails for over 20 custodians, and selected loan files. The plaintiffs also have already indicated that they intend to take 80 depositions on the merits.

55.    Given the discovery efforts and communications to date, it is anticipated that ongoing discovery will be extensive, burdensome, and costly—and as in *Western & Southern*, that discovery can only be obtained from the debtor entities.

### C.  Allstate Insurance Company, et al. v. GMAC Mortgage, LLC, et al., No. 27-CV-11-3480, Hennepin County District Ct., Minnesota ("Allstate")

56.     The plaintiffs in *Allstate* are a variety of affiliated investors who purchased certificates with a face value of over $553 million in 25 securitizations involving more than 190,000 mortgage loans issued by debtor entities RFC and GMACM between 2005 and 2007. The plaintiffs name debtors RFC, GMACM, RALI, RAMP, RFMSI, RFMSII, and RASC as defendants, along with non-debtor affiliate Ally Securities.  The case is pending in state court in Minnesota.

57.     The plaintiffs' claims and allegations are substantially similar to those asserted in the *Western and Southern* and *New Jersey Carpenters* cases, including common law fraud and negligent misrepresentation based on alleged misstatements regarding the underwriting of the loans forming the collateral for the securitizations.  Fact discovery is underway and the Court has set a discovery deadline of September 2012.

58.     The plaintiffs have served over 90 document requests covering virtually every aspect of the debtor entities' loan origination, acquisition, underwriting, auditing, and securitization businesses.  To date, the debtor entities have produced transaction documents, underwriting guidelines, and organizational charts, and were just concluding extensive negotiations with plaintiffs' counsel regarding the enormous volume of email data to be collected and produced when the ResCap debtors filed for bankruptcy.

59.     Because the *Allstate* litigation involves all five of RFC's securitization shelves, the number of witnesses, email custodians, and documents involved is massive.  Each securitization shelf involved different key personnel: the deal managers, traders, asset specialists and others who worked on second-lien securitizations from the RFMSII shelf are almost completely distinct from those who worked on subprime first-lien securitizations from the RASC

shelf, and distinct again from those who worked on Alt-A first lien securitizations from the RALI

shelf.  Likewise, the individuals involved in loan acquisition decisions differed by product type:

one team focused on standards for acquiring prime and Alt-A first liens; another team focused on

subprime; another on second liens.  Moreover, debtors Homecomings, GMACM, and RFC each

had their own underwriting guidelines, underwriting staff, and automated systems and processes

relating to underwriting decisions.

60.     Accordingly, the plaintiffs have preliminarily sought email production from over

50 custodians, the vast majority of whom were employees of the debtors working in Structured

Finance, Trading, Product Management, Quality Audit, and other departments directly relevant

to the origination, acquisition, and securitization of residential mortgage loans.

61.     The plaintiffs have also served four subpoenas on both debtor and non-debtor

non-party affiliates (non-debtors Ally Bank and Ally Financial, and debtors ResCap and

Homecomings Financial), and have threatened motion practice against both debtor and non-

debtor defendants and non-parties over objections to the various document requests and

subpoenas that the debtor and non-debtor parties have asserted.

62.     For all of these reasons, discovery will be burdensome in many of the same ways

described above for the other investor litigation matters.  If litigation proceeds only against the

non-debtor defendant, as plaintiffs' subpoenas have already demonstrated, discovery will

nonetheless require significant attention and resources from a number of debtor entities, since the

vast majority of the relevant documents and materials are in the debtor entities' possession and

control.  By way of example, a recent subpoena on non-debtor and nonparty affiliate Ally Bank

required the debtors to determine what Bank-related documents are now in the debtor entities'

21

custody and control, and what Bank-related email data now resides on the debtor entities' servers.

## IV.  **The FHFA Litigation.**

63.  Although ultimately an investor case similar to the cases set forth above, the FHFA litigation warrants separate consideration because of the size and coordinated nature of the overall FHFA litigation.

64.  The FHFA filed the lawsuit against debtor entities ResCap, RFC, RAMP, RASC, and RALI; and against non-debtor affiliates Ally Financial, Inc., GMAC Mortgage Group, LLC, and Ally Securities.  The FHFA simultaneously filed 16 other similar actions against other groups of issuers and underwriters.  The lawsuit against the debtors and non-debtors at issue here involves 21 securitizations across the RASC, RAMP, and RALI shelves, and concerns more than 100,000 loans.  FHFA's initial investment in these securitizations exceeds $6 billion.

65.  Sixteen of the FHFA's 17 cases are assigned to Judge Denise Cote of the Southern District of New York, where they are proceeding on a coordinated track.[3]  Common issues are being briefed across all cases where possible, and the Court has indicated an intention to explore common methodologies of using sampling of loan files and other discovery management tools across all of the cases.

66.  For example, Judge Cote has ordered that witnesses—including FHFA's witnesses—will each only be deposed once.  She has selected the *FHFA v. UBS* case, which served as a test case for motion to dismiss briefing, as the first to be set for trial (although discovery is beginning in all of the cases).  In addition to being a defendant as an issuer of

---

[3]  The seventeenth, against Countrywide, originally was also coordinated with the other 16, but was transferred to the pending MDL against Countrywide in California.  However, Judge Cote has expressed an intention to be mindful of possible coordination of discovery in that case as well, to the extent possible.

mortgage-backed securities in the *FHFA v. UBS* case, UBS is also a defendant in the *FHFA v. Ally* case because it served as a securitization underwriter on certain of the Ally securitizations. Thus, when FHFA and UBS personnel are deposed in the *FHFA v. UBS* case, the non-debtor affiliated defendants will have to actively participate in those depositions as to any issues relevant in the *FHFA v. Ally* case, as they will not have another opportunity to do so. The same is true for any other depositions that occur across the cases, including depositions of personnel from JP Morgan, RBS, Citigroup, and others that are underwriter defendants in the *FHFA v. Ally*.

67. Judge Cote's most recent Order relating to discovery, which requires defendants to produce information about loan originators and loan data provided in connection with the closing of the securitizations within a matter of weeks, perfectly illustrates the problem with allowing piecemeal litigation to proceed against the non-debtor affiliated defendants. Judge Cote ordered the production of data so that the FHFA can better assess the possibility of using a statistical sample of loan files to prove liability. Only the debtor entities have the ready access to information responsive to Judge Cote's Order: it is debtor ResCap that maintains the loan-level data, and debtor ResCap personnel that must research and query debtor ResCap systems to pull together that type of information. Here, it would have to do so as to 21 separate securitizations. Moreover, should discovery proceed to the logical next step, only the debtor entities have possession of the mortgage loan files, underwriting parameters, and other information necessary to evaluate any collection of loan files that may ultimately be at issue in the litigation.

68. Thus, as with the other investor cases, the discovery process will prove to be excessively burdensome on the debtor entities should the litigation against the non-debtor entities be permitted to proceed.

## V.    <u>Remaining Lawsuits</u>

69.    As described in more detail in the Appendix to this Declaration, the remaining lawsuits have similar allegations and claims as those discussed in the *Western & Southern*, *New Jersey Carpenters*, and/or *FGIC* lawsuits.  While the facts, documents, and witnesses will differ from case to case, the basic issues are substantially similar.  Accordingly, it is anticipated that the likely scope of discovery and burden to the debtor entities in those matters will be the same or similar if the claims against the non-debtor affiliate entities and individual defendants are permitted to proceed: each of the cases will involve extensive document and deposition discovery relating to the particular securitizations at issue in that particular case, including the origination, acquisition, underwriting and pooling of the loans for each securitization, the preparation of the transaction documents for each securitization, the diligence performed on loans contained within the collateral pools for each securitization, and the performance of the loans underlying each securitization.

## VI.    **Permitting The Court Actions To Proceed Against The Individual Defendants And The Non-Debtor Affiliates Will Likely Impose Substantial Discovery Burdens On The Debtor Entities And Their Employees**

70.    As set forth above, the plaintiffs' claims in all of these cases hinge on the allegations that either the debtor entities' offering materials contained various misrepresentations and omissions regarding the mortgage loans underlying the subject securitizations, or the debtor entities' contractual representations and warranties similarly misrepresented the characteristics of those loans.  Thus, the key factual areas for discovery and dispute include:

      a.    The mortgage loan underwriting and diligence standards applied **<u>by the debtor defendants</u>**;

      b.    The loan origination and acquisition practices followed **<u>by the debtor defendants</u>**;

      c.    The pooling of mortgage loans for securitization **<u>by the debtor defendants</u>**;

d.  The preparation of securitization-related documents and risk disclosures **by the debtor defendants**; and

e.  The monitoring of loan performance and quality audit practices **of the debtor defendants**.

71.     Virtually all of the information necessary to prosecute and defend these claims is in the possession of the debtor entities, including loan files, loan-level performance data, quality audit data for the loans, underwriting guidelines applicable to the loans, documents related to negotiated agreements with external loan originators who sold loans to the debtor defendants, transaction documents for each securitization, documents relating to the preparation of and negotiation of the various securitization-related agreements and disclosures, and historical emails for those involved in every aspect of the business.

72.     In contrast, the individual defendants and Ally Financial have *none* of those materials in their possession, custody, or control.  And while Ally Securities and Ally Bank may have some modicum of relevant information in their possession, they do not possess any of the other crucial information described above.  Thus, the information necessary for the plaintiffs to prosecute their claims and for the defendants to defend against those claims must be obtained from the debtor entities.

73.     That discovery burden is compounded because the debtor entities have downsized substantially since the events in 2005, 2006, and 2007.  For example, the debtor entities' work force today is just one-third of what it was in 2007.  Numerous automated systems and databases used in the processing of mortgage loans and creation of securitizations have been retired, making the gathering and production of responsive material a challenge.  As well, material stored on shared drives has been moved or archived, making it difficult to locate and identify necessary materials, particularly in the absence of personnel who are able to describe or explain the information.  As a result, the debtor entities have limited resources to assist with the collection of

25

responsive materials, prepare for and provide deposition testimony on behalf of the company, and provide strategic advice to guide the defense of the claims on behalf of both debtor and non-debtor entities and individuals.

74.    The few remaining employees with personal knowledge of the facts relevant to the ongoing litigation, and with personal knowledge of documents, systems and historical processes, include the individuals and function areas described below.  We have consulted with each of them regularly regarding discovery and fact development issues, and would need to continue to do so were these cases to proceed.  Thus, these individuals will continue to be called upon to provide extensive time and resources to the defense if discovery in the litigation is permitted to go forward against the non-debtor affiliate entities or the individual defendants:

     a.    Heather Anderson was a deal manager in the Structured Finance group and is now in the debtors' Treasury function.  Ms. Anderson is one of the only remaining current employees of any ResCap entity with personal knowledge of the first-lien structured finance operations at debtor RFC, and thus she is a critical witness in all of the pending litigation.  She has signed verifications for discovery responses on behalf of RFC, has spent many hours assisting our Firm with understanding the facts underlying the loan acquisition and securitization process, and had begun preparation to testify as both a corporate designee and an individual fact witness in numerous of the cases described above.  I would anticipate that Ms. Anderson would play a similar role with respect to all of the RFC-related Jumbo or Alt-A first lien residential mortgage-backed securities litigation.

b. Jeffrey Blaschko was a deal manager in the Structured Finance group and he
is currently the head of the Capital Markets Investor Relations team that
manages the Vision investor website and other loan-level performance data
and reporting. During his time in Structured Finance, Mr. Blaschko worked
on second-lien securitizations. He is therefore a key resource in all the
pending cases. In fact, he is the only remaining ResCap employee with
personal knowledge of debtor RFC's second-lien securitization practices, and
was deposed for two lengthy days in the *MBIA v. RFC* litigation. In his
current role, Mr. Blaschko and his group have repeatedly been called upon by
our Firm to provide loan-level data, both current and historical, relating to the
individual loans in the collateral pools for the securitizations.

c. Tim Witten, another key resource, is responsible for the Master Servicing
function at debtor RFC, which manages all the cash flows to and through each
securitization trust out to investors. He has been deposed and has provided
regular advice and information to our Firm. Others in his group—including
Jeb Robinson, Bob Horn and Marcia Neira—had unique involvement in
various aspects of the Master Servicing function for the various RFC
securitizations, and each has also been deposed and invested many hours
providing data, documents, and information to our Firm on an ongoing basis.
I anticipate that Mr. Witten and his team would play a similar role with
respect to all the pending residential mortgage-backed securities litigation.

75. In addition, the debtor entities have limited resources to assist with the
identification and collection of responsive material for production in the various cases.

27

76.     Our Firm works hand-in-hand on a daily basis with the individuals and groups described above (Treasury, Investor Relations, Credit Policy, Capital Markets, Repurchase Management, Compliance and Master Servicing), as well as the Legal Department, the E-discovery Group, and the Information Technology Department to gather material responsive to the plaintiffs' discovery requests and to build the defense of the cases. This effort is challenging given the attrition and reorganization at the companies since 2007. To date, it has required many hours of time and effort, including frequent conferences with a large number of current employees across departments to marshal facts and locate relevant material. Much of the documents and data are stored on old shared drives that have been moved around or reorganized, and are difficult to locate and navigate. Historical policies and practices must be pieced together in light of the lack of institutional memory. Substantial effort is required by the debtors' IT and E-discovery groups to restore and access responsive data from old proprietary electronic systems. Restoring and accessing historical email traffic responsive to discovery requires time and dedicated personnel.

77.     In addition, we are frequently in contact with Human Resources requesting information about the dozens of former employees who are being sought as witnesses in the litigation; the Accounting department, relating to loan-level and securitization-level funding, pricing, and accounting information relevant to the underlying litigation; and Master Servicing and Investor Relations in connection with gathering loan level data. The individuals involved in these various efforts include a wide variety of employees across departments and at virtually all levels of the debtor entities.

78.     The defense of these lawsuits is a time-consuming and burdensome process for the entirety of the limited staff at the debtor entities. If discovery is permitted to proceed, even

12-01677-mg   Doc 6   Filed 05/25/12   Entered 05/25/12 21:03:53   Main Document
Pg 30 of 42

against the non-debtor affiliate entities and individual defendants, the burden and distraction on the debtor entities will continue—and if anything that burden will only increase given the increasing number of cases entering the discovery phase across a wider variety of loan types and securitization shelves.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true to the best of my knowledge, information, and belief.  Executed on May 24, 2012, at Columbus, Ohio.

_____
Jeffrey A. Lipps

12-01674-mg    Doc 61    Filed 05/23/12    Entered 05/23/12 11:55:00    Appendix Pg
3 of 42

**APPENDIX TO DECLARATION OF JEFFREY A. LIPPS**

**REPRESENTATION AND WARRANTY CASES**

(Cases Listed in Alphabetical Order)

**Assured Guaranty Municipal Corp. v. GMAC Mortgage, LLC, et al., No. 12-civ-3776,
United States District Court, Southern District of New York (May 11, 2012) ("*Assured
Guaranty*").**

      1.     Assured Guaranty is a monoline insurer who insured payments to investors on

several of the debtor entities' securitizations.  At issue in this action are two securitizations

involving more than 23,000 mortgage loans with a face value in excess of $1.1 billion.

      2.     The complaint was filed on May 11, 2012.  Named as defendants are debtors

ResCap, GMACM, RFC, RAMP and RFMSII.  Also named as defendants are non-debtor

affiliates Ally Financial and Ally Bank.

      3.     Generally, Assured Guaranty alleges the debtor defendants misrepresented the

quality and characteristics of the underlying mortgage loans; failed to comply with contractual

repurchase obligations; failed to comply with notice and disclosure obligations regarding the sale

of "subsequent mortgage loans" into the applicable trusts; breached various servicing

obligations; and breached contractual obligations regarding transfer of certain loan documents to

the applicable trustees.   Complaint ¶¶ 50, 55, 57, 62, 69.  Based on these allegations, Assured

Guaranty asserts claims for breach of contract, reimbursement, and indemnification.

      4.     The Complaint does not contain any specific allegations against non-debtor

affiliate Ally Financial other than its purported "control" of the debtor defendants' actions.  See

e.g., Complaint ¶¶ 112, 130, 136, 142, 148, 155, 160, 169, 173.  As for non-debtor Ally Bank,

the Complaint alleges that it failed to notify Assured Guaranty of the debtor defendants' breach

of representations and warranties.  Complaint ¶ 141.  While the Complaint also alleges that Ally Bank failed to provide Assured Guaranty with documents relating to subsequent mortgage loan transfers, it is debtor GMACM who allegedly was responsible for making these subsequent transfers.  Complaint ¶¶ 56-57.  In short, Assured Guaranty's claims against the non-debtor affiliates are entirely derivative of, and premised on, the underlying alleged misconduct of the debtor defendants.

5.     The complaint was only filed days ago and discovery has not yet commenced. However, the scope of discovery in other monoline insurer cases against the debtor defendants provides a good indicator of the likely scope of discovery in this matter.  See Lipps Declaration ¶¶ 26-30.  In those other matters, discovery has included the production of millions of pages of documents, more than a terabyte of data, and more than 100 days of deposition testimony.  Id.  It is anticipated that the likely scope of discovery would be similar in this matter.

**Financial Guaranty Insurance Company ("FGIC") Lawsuits.**

6.     These 10 lawsuits are discussed in the Lipps Declaration at ¶¶ 21-31.

## INVESTOR CASES

(Cases Listed in Alphabetical Order)

**Allstate Insurance Company, et al. v. GMAC Mortgage, LLC, et al., Civil File No. 27-CV-11-3480, Fourth Judicial District, Hennepin County, Minnesota ("*Allstate*").**

7.      This lawsuit is discussed in the Lipps Declaration at ¶¶ 56-62.

**Cambridge Place Investment Management Inc. v. Citigroup Global Markets Inc., et al. ("*CPIM I*"), No. 10-2741 (Mass. Sup. Ct. July 9, 2010).**

**Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., et al., ("*CPIM II*"), No. 11-00555 (Mass. Sup. Ct. February 11, 2011).**

8.      Cambridge Place Investment Management ("CPIM") has sued debtors RALI, RASC, and RAMP; non-debtor affiliate Ally Securities; and a wide range of other mortgage securitization sponsors in two separate actions in the Superior Court for Suffolk County, Trial Division in Massachusetts, although plaintiffs voluntarily dismissed RALI, RASC and RAMP without prejudice after the bankruptcy petition was filed.  The debtors are involved with 10 out of the more than 200 securitizations at issue in this litigation.  The plaintiff alleges it purchased more than $51 million of the subject securities.  The 10 securitizations involve more than 36,000 loans with a face value in excess of $5.8 billion.

9.      The complaints are premised on the allegation that the registration statements and the prospectuses for the securities contained numerous material misstatements.  Specifically, CPIM alleges that misstatements were made regarding:  (a) the mortgage underwriting standards used to underwrite the loans by the third parties from which the loans were purchased, (b) the appraisal standards for the loans, (c) the loan-to-value ratios, debt-to-income ratios, and occupancy status of the properties, (d) the due diligence and underwriting procedures of the defendants, (e) the forms of credit enhancement applicable to certain tranches of securities, and (f) whether the issuing trusts had obtained good title for the mortgage loans comprising the

borrowing. <u>See</u> Amended Complaint at ¶ 658. Based on these allegations, CPIM asserts violations under the Massachusetts Uniform Securities Act.

10.    Motions to dismiss are pending and discovery has not yet commenced. The first request for documents was served May 22, 2012. Nonetheless, given the extensive scope of the allegations, the derivative nature of the plaintiff's claims against non-debtor affiliate Ally Securities, the number of securitizations involved, and the size of the plaintiff's investment, it is anticipated that discovery needed from the debtors will be extensive, costly, and burdensome.

**Federal Deposit Insurance Corporation, As Receiver for Citizens National Bank, et al. v. Bear Stearns Asset Backes Securities I LLC, et al., No. 12-CV-4000, United States District Court, Southern District of New York (May 18, 2012).**

11.    The Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for Citizens National Bank ("CNB") and Strategic Capital Bank ("SCB"), filed a complaint on May 18, 2012, in the United States District Court for the Southern District of New York. Named as defendants are non-debtor affiliate Ally Securities and numerous issuers and underwriters of mortgage-backed securities.

12.    At issue are 12 securitizations, involving 28,700 mortgage loans, with a face value in excess of $6.9 billion. Although not named as defendants in the complaint, non-party debtors RFC and GMACM originated loans included in 5 of the securitizations, allegedly involving approximately 18,000 mortgage loans, with a face value in excess of $3.9 billion.

13.    The complaint alleges violations of Sections 11 and 15 of the Securities Act of 1933 based on alleged misrepresentations concerning the credit quality and loan-to-value ratios of the underlying mortgage loans, compliance with appraisal standards, occupancy status of the properties securing the underlying mortgage loans, and the underwriting standards used to

originate the loans.  Accordingly, extensive discovery requests directed at non-party debtors RFC and GMACM are inevitable.

14.     The complaint was only filed days ago and discovery has not yet commenced. Nonetheless, given the extensive scope of the litigation, the number of securitizations involving the non-party debtors, and the size of plaintiffs' alleged investment (in excess of $140 million), it is anticipated that discovery needed from the non-party debtors as to the underlying mortgage loans securitized and sold will be extensive, costly, and burdensome.

**Huntington Bancshares, Inc. v. Ally Financial Inc., et al., Case No. 27-CV-11-20276 (Minnesota District Court, 4th Judicial District Oct. 11, 2011).**

**Stichting Pensioenfonds ABP v. Ally Financial Inc., et. al., Case No. 27-CV-11-20426 (Minnesota District Court, 4th Judicial District Oct. 11, 2011).**

15.     On October 11, 2011, Huntington Bancshares, Inc. ("Huntington") filed a complaint with the Minnesota District Court, 4th Judicial District, asserting claims against several debtor entities, non-debtor affiliates Ally Financial, Inc. and Ally Securities, LLC, and former officers and/or directors Bruce Paradis, Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, David C. Walker, Jack R. Katzmark and Julie Steinhagen with respect to five securitizations where the debtors acted as sponsor and depositor.

16.     Also on October 11, 2011, Stichting Pensioenfonds ABP ("Stichting") filed a complaint with the Minnesota District Court, 4th Judicial District asserting claims against several debtor entities, non-debtor affiliates Ally Financial, Inc. and Ally Securities, LLC, and former officers and/or directors James G. Jones, David M. Bricker, Diane Wold, James G. Young, Bruce Paradis, Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, David C. Walker, Jack R. Katzmark Julie Steinhagen, Deutsche Bank Securities, Inc., JP Morgan Securities LLC, Banc of America Securities, LLC, Barclays Capital Inc., and Merrill Lynch

Pierce Fenner & Smith Inc. with respect to six securitizations where the debtors acted as sponsor and depositor.

17.     Huntington and Stichting are represented by the same counsel and the two complaints assert that the offering materials for the subject securitizations contained material misrepresentations and omissions regarding the underwriting standards used for the loans, the owner-occupancy status of the mortgaged properties, the loan-to-value ratios for the loans, the credit risk of the securitizations, the credit enhancement for the securitizations and the legal validity of the assignment of the loans to the trusts.  In both cases, the claims asserted against Ally Financial, Inc. and Ally Securities, LLC are common law fraud, aiding and abetting fraud, negligent misrepresentation and violation of the Minnesota Securities Act.  In the case brought by Huntington each of these claims is also brought against the individual defendants, while in the case brought by Stichting all of the claims other than common law fraud are brought against individual defendants.

18.     The plaintiffs' claims against the individual defendants are based solely on alleged acts or omissions they took while employees of the debtors.  Huntington Complaint ¶¶ 202-216;  Stichting Complaint ¶¶ 249-267.    In the Huntington action, the complaint generically lumps together non-debtor defendants Ally Financial, Inc. and Ally Securities, LLC with the debtors as a common group of corporate defendants when discussing the conduct giving rise to the action.  In the Stichting action, claims are asserted against Ally Financial, Inc. based on its alleged control of the debtors.  Stichting Complaint ¶¶ 238-247.

19.     The cases brought by Huntington and Stichting are pending before the same judge.  While the cases have not been formally consolidated, the judge has been conducting the pretrial proceedings for the two actions together.  Ally Financial, Inc. and Ally Securities, LLC

have filed motions to dismiss in both actions.  Argument was heard on these motions on March

19.  The other defendants have also filed motions to dismiss, which are scheduled to be heard on

June 12.  The court has also scheduled a Rule 16 scheduling conference on discovery for that

same day.  Once the court has ruled on the motions to dismiss, it is anticipated that discovery

will commence in both actions.

**Massachusetts Mutual Life Insurance Company v. Residential Funding Company, LLC, et al.**, Case No. 3:11-cv-30035-KPN (D. Mass. Feb. 9, 2011).

20.     The plaintiffs are institutional investors who purchased $300 million of

certificates in 18 securitizations involving the debtor entities.  The 18 securitizations involve

more than 39,000 mortgage loans with a face value in excess of $8 billion.

21.     Named as defendants are debtors RFC, RALI, RAMP, and RASC; non-debtor

affiliate Ally Securities LLC; and former officers and/or directors Bruce J. Paradis, Davee L.

Olson, David C. Walker, Kenneth M. Duncan, Ralph T. Flees, James G. Jones, and David M.

Bricker.

22.     Generally, the plaintiffs allege that the debtor defendants misrepresented that the

underlying mortgage loans were underwritten in accordance with prudent underwriting

standards, and misrepresented that borrowers would be able to repay loans, misrepresented the

characteristics of the loans (e.g., loan-to-value ratios and owner-occupancy rates).  Complaint

¶ 4.  Based on these allegations, the plaintiffs assert claims for violation of the Massachusetts

Uniform Securities Act.

23.     The plaintiffs' claims against the individual officer defendants are derivative of,

and premised on, their claims against the debtor defendants.  The plaintiffs' sole basis for

asserting liability against the individual officer defendants is that they purportedly "controlled"

the debtor defendants operations and therefore allegedly are "jointly and severally liable" with

the debtor defendants.  Complaint ¶¶ 225-234.  The plaintiffs' claims against non-debtor affiliate

Ally Securities are based solely on the allegation that it participated in the sale of the securities,

and along with the debtor defendants was allegedly responsible for conducting "due diligence"

regarding the loans involved in the securitizations.  Complaint ¶ 41.  In other words, the

plaintiffs' claims against the non-debtor affiliate are ultimately premised on, and require proof

of, the alleged underlying misrepresentations of the debtor defendants.

24.     Discovery has not yet commenced. However, the allegations and claims asserted

in this action are similar to those contained in other matters discussed in the Lipps Declaration

and herein.  Accordingly, it is anticipated that the scope, burden, and cost of discovery would be

similar if this matter were to proceed.

**New Jersey Carpenters Health Fund, et al. v. RALI Series 2006-QO1 Trust, et al., Case No.
08-CV-08781-HB, United States District Court, Southern District of New York ("*New
Jersey Carpenters*").**

25.     This lawsuit is discussed in the Lipps Declaration at ¶¶ 45-55.

**Sealink Funding Ltd. v. Royal Bank of Scotland et al., No. 650484/2012 (New York
Supreme Court February 21, 2012).**

26.     On February 21, 2012, Sealink Funding Limited filed a summons and notice with

the Supreme Court for the State of New York, New York County Branch, asserting claims

against debtors ResCap, RFC, RAMP, and GMAC-RFC Holding Company and non-debtor

affiliates Ally Financial, Inc. and GMAC Mortgage Group, LLC.   Sealink alleges that it

purchased more than $135 million of certificates in two securitizations sponsored by the debtor

defendants.

27.     In the notice, the plaintiff asserts that the offering materials for the subject

securitizations contained material misrepresentations and omissions regarding the underwriting

standards used for the loans, the legal validity of the assignment of the loans to the trusts, the

statistical characteristics for the loans and the securities credit ratings.  The claims being asserted

against non-debtor affiliates Ally Financial, Inc. and GMAC Mortgage Group, LLC and the

debtors are common law fraud, fraudulent inducement, and negligent misrepresentation.  A

complaint has not yet been filed or served in this matter.

28.    The allegations and claims asserted in the notice and summons are similar to

those contained in other matters discussed in the Lipps Declaration and herein.  Accordingly, it is

anticipated that the scope, burden, and cost of discovery would be similar if this matter were to

proceed.

### **Thrivent Financial For Lutherans, et al. v. Residential Funding Company, LLC, et al., File No. 27-CV-11-5830, Fourth Judicial District, County Of Hennepin, Minnesota (_"Thrivent"_).**

29.    The plaintiffs in _Thrivent_ are institutional investors who purchased certificates in

seven securitizations involving the debtor entities.  The seven securitizations involve more than

53,890 mortgage loans with a face value in excess of $4.6 billion.  Plaintiffs allege they

purchased more than $115 million of the subject securities.

30.    The complaint was filed on March 28, 2011.  Named as defendants are debtor

entities RFC, GMACM, RALI, RAMP, and Homecomings Financial, LLC; and non-debtor

affiliates Ally Bank and Ally Securities, LLC (f/k/a Residential Funding Securities, LLC).

31.    Generally, the plaintiffs' claims are similar to those of other investor plaintiffs.

The parties have reached a preliminary settlement agreement that is in the process of being

finalized; however, if the settlement does not go forward for any reason, discovery will be of

comparable scope of and burden to the other investor cases discussed in the Lipps Declaration

and this Appendix.

32.      Discovery had only just begun at the time of the settlement, yet the defendants' initial production of documents already totals almost 30,000 pages and the plaintiffs had begun noticing a number of both corporate designee and individual depositions.

**Union Central Life Ins. Co. et al. v. Credit Suisse First Boston Mortgage Securities Corp. et al., Case No. 11-cv-02890 (S.D.N.Y. Apr. 28, 2011).**

33.      The plaintiffs are institutional investors who allegedly purchased $31 million of securities in 8 securitizations involving the debtor defendants.  Named as defendants in the complaint are debtors ResCap, RFC, and RALI.  Also named as defendants are nondebtor affiliates Ally Financial, Inc., Ally Securities LLC and Bruce J. Paradis.

34.      In the amended complaint, the plaintiffs assert that the offering materials for the subject securitizations contained false and misleading statements regarding the underlying mortgage loans' compliance with underwriting standards.  See Amended Complaint ¶¶ 622-33. The plaintiffs also allege that the debtor defendants made false or misleading statements in the prospectuses regarding the appraisals used to value the collateral in the securitizations and the loan-to-value ratio for the loans in the securitizations.  See id. ¶¶ 634-40.  The plaintiffs further allege that the prospectuses made misleading statements about borrowers' ability to repay the loans, see id. ¶¶ 641-43, the owner occupancy status of the loans underlying certificates, see id. ¶¶ 644-45, and whether the debtor defendants removed loans with defective mortgage notes from the trusts, see id. ¶ 646.  The plaintiffs allege that the defendants made similar misstatements to the ratings agencies in order to obtain inflated ratings to entice investors to purchase the certificates.  See id. ¶¶ 647-51.

35.      The allegations against individual defendant Bruce Paradis are based solely on the allegation that, as an officer and/or director, he was a "controlling person" and is therefore purportedly liable under Section 20(a) of the Securities Exchange Act of 1934.  Similarly, the

plaintiffs' claims against non-debtor Ally Financial are based solely on the allegation that it "controlled and had the authority to control" the contents of the offering materials. Amended Complaint ¶ 849. With respect to non-debtor affiliate Ally Securities, the plaintiffs allege that it was an underwriter that conducted due diligence and participated in preparation of the offering materials. See id. ¶ 703. In sum, the plaintiffs' claims against the non-debtor affiliates and the individual defendants are derivative of, and premised on, the alleged underlying misconduct of the debtor defendants.

36. Based on these alleged misstatements, the plaintiffs assert claims for common law fraud, unjust enrichment, aiding and abetting, violations of section 10(b) of the 1934 Act and Rule 10b-5, violation of section 20(a) of the 1934 act, and violation of section 20(b) of the 1934 Act.

37. Discovery has not yet commenced. However, the allegations and claims asserted in this action are similar to those contained in other matters discussed in the Lipps Declaration and herein. Accordingly, it is anticipated that the scope, burden and cost of discovery would be similar if this matter were to proceed.

**The Western And Southern Life Insurance Company, et al. v. Residential Funding Company, LLC, et al., Case No. A1105042, Court of Common Pleas, Hamilton County, Ohio ("_Western & Southern_").**

38. This lawsuit is discussed in the Lipps Declaration at ¶¶ 33-44.

## GSE CASE

**Federal Housing Finance Agency v. Ally Financial Inc, et al., Case No. 11-CV-07010-DLC, United States District Court, Southern District of New York (September 4, 2011)**

39.     This lawsuit is discussed in the Lipps Declaration at ¶¶ 63-68.


## OTHER CASES INVOLVING INDIVIDUAL
## DEFENDANTS AND/OR NON-DEBTOR AFFILIATES

40.     There are also several additional lawsuits involving non-debtor affiliates and/or individual former directors and officers, in which the Firm has not been retained or has not taken a lead role.  Generally, these additional lawsuits include allegations similar to the investor lawsuits discussed above, _i.e.,_ that the offering materials for the subject securitizations allegedly contained material misstatements and/or omissions, and it is anticipated that discovery would be of similar burden and breadth.  These additional lawsuits are:

> Federal Home Loan Bank of Boston v. Ally Financial, Inc., et al., (Suffolk Superior Court April 20, 2011);

> Federal Home Loan Bank of Chicago v. Banc of America Funding Corp., et al., (Chancery Division of the Circuit Court of Cook County, IL Oct. 15, 2010); and

> Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc., et al., (Marion Superior Court for the State of IN, October 15, 2010).