GIBBS & BRUNS LLP
Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Residential Capital, LLC, *et al.* | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**STEERING COMMITTEE INVESTORS' STATEMENT IN SUPPORT OF**
**SETTLEMENT AND RESPONSE TO SETTLEMENT OBJECTIONS**

## Table of Contents

Page

I.      Standard of Review .................................................................................................. 1

II.     Summary of Argument ........................................................................................... 2

III.    The Settlement Is Within the Range of Reasonableness and Is Fair, Equitable, and
        in the Best Interests of the Estates ...................................................................... 6

        A.      The Amount of the Settlement ................................................................. 7

                1.      Evidence from Other Cases ........................................................ 7

                        a.      FHFA and MassMutual ................................................... 8

                        b.      Monoline Litigation ....................................................... 9

                2.      Debtors' Expert Report Understates the Likely Exposure .................... 10

        B.      The Risks of Litigating the RMBS Claims ........................................ 12

                1.      Debtors' Defenses Are Exposed to Adverse Changes in the Law ......... 12

                        a.      Adversity Does Not Require Proof of Causation ..................... 12

                        b.      Debtors' Dual Role Bars a Statute of Limitations Defense ....... 14

        C.      The Settlement Benefits Creditors ...................................................... 15

                1.      Litigation Would Be Enormously Expensive Yet Yield Little
                        Improvement for the Creditors ................................................ 16

                        a.      Lehman Brothers ......................................................... 16

                        b.      Washington Mutual ..................................................... 17

                2.      Interest of Other Creditor Constituencies ............................... 18

                3.      Creditor Objections Do Not Preclude Settlement Approval .............. 19

                4.      The Settlement Has Provided Significant Benefits to the Estates ........ 21

        D.      The Settlement Is the Product of Arms' Length Negotiation ........................ 22

        E.      The Settlement Is Also Fair to the RMBS Trusts and Their Investors ............. 22

                1.      The Settlement Eliminates Uncertainty and Saves Costs ..................... 22

i

2.      The Allocation Formula Is Fair.............................................................. 22

3.      Defining Distributions As Subsequent Recoveries Is Required by
the PSA Waterfall ................................................................................. 24

IV.    Conclusion ......................................................................................................... 25

Table of Authorities

## Cases

*ASR Leveensverzekering v. Swiss Re Fin. Prods. Corp.*, Index No. 650557/09, slip op. (N.Y. Sup. Ct. Oct. 11, 2011).................................................................................................................. 24

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, --- F. Supp. 2d ---, 2012 WL 4373327 (S.D.N.Y. 2012)....................................................................................................... 13, 14

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, --- F. Supp. 2d ---, 2012 WL 4373327, at *4 (S.D.N.Y. 2012) .................................................................................... 14, 22

*Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302 (S.D.N.Y. 1989)........... 15

*Beck v. Mfrs. Hanover Trust Co.*, 218 A.D.2d 1 (N.Y. App. Div. 1995) ..................................... 10

*Cerbone v. Int'l Ladies' Garment Workers Union*, 768 F.2d 45 (2d Cir. 1985) ......................... 15

*Croce v. Kurnit*, 565 F. Supp. 884 (S.D.N.Y. 1982)................................................................... 15

*Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 09-1656 (D.D.C.).................................................. 17

*Fed. Hous. Fin. Agency v. Ally Fin. Inc.* (N.Y. Sup. Ct.) ............................................................. 8

*Fin. Guar. Ins. Co. v. Ally Fin., Inc.*, No. 12-cv-1818 (S.D.N.Y.) ............................................. 10

*Greenwich Fin. Servs. Distressed Mtg. Fund 3, LLC v. Countrywide Fin. Corp.*, Index No. 650474/08 slip op. (N.Y. Sup. Ct. Oct. 7, 2010) ...................................................................... 24

*IIT v. Cornfeld*, 619 F.2d 909 (2d Cir. 1980)............................................................................. 15

*In re Adelphia Comm'cns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................... 20

*In re AOL Time Warner, Inc.*, 2006 WL 903236 (S.D.N.Y. 2006) ............................................. 23

*In re Atlas Computers, Inc.*, 2012 WL 3018256 (Bankr. N.D. Okla. 2012)................................ 20

*In re Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct.) ........................................... 22

*In re Capmark Fin. Grp., Inc.*, 438 B.R. 471 (Bankr. D. Del. 2010) ................................... 20, 25

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)........................................................... 23

*In re Chemtura Corp.*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010).................................................. 1, 7

*In re Drexel Burnham Lambert Grp.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991) ....................... 1, 20

*In re Enron Corp. Secs., Derivative & Erisa Litig.*, 2008 WL 4178151 (S.D. Tex. 2008).......... 23

*In re Fed.-Mogul Global Inc.*, 330 B.R. 133 (Bankr. D. Del. 2005) ............................................ 16

*In re G-I Holdings, Inc.*, 323 B.R. 583 (Bankr. D.N.J. 2005) ...................................................... 16

*In re Holocaust Victim Assets Litig.*, 413 F.3d 183 (2d Cir. 2005) ............................................. 23

*In re Idearc Inc.*, 423 B.R. 138 (Bankr. N.D. Tex. 2009)............................................................. 7

*In re Innkeepers USA Trust*, 448 B.R. 131 (Bankr. S.D.N.Y. 2011)........................................... 24

*In re Iridium Operating Co. LLC*, 478 F.3d 452 (2d Cir. 2007)........................................ 1, 18, 20

*In re Lee Way Holding Co.*, 120 B.R. 881 (Bankr. S.D. Ohio 1990) ........................................... 20

*In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.) ......................................... 17

*In re Martin*, 91 F.3d 389 (3d Cir. 1996)................................................................................... 20

*In re MF Global, Inc.*, 2012 WL 3242533 (Bankr. S.D.N.Y. 2012) ............................. 1, 7, 15, 16

*In re Rosenberg*, 419 B.R. 532 (Bankr. E.D.N.Y. 2009)............................................................... 1

*In re Sea Containers Ltd.*, 2008 WL 4296562 (Bankr. D. Del. 2008)......................................... 20

*In re Thomson McKinnon Secs., Inc.*, 191 B.R. 976 (Bankr. S.D.N.Y. 1996) .............................. 7

*In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983) .................................................................... 20

*In re Worldcom, Inc. ERISA Litig.*, 2004 WL 2338151 (S.D.N.Y. 2004) ..................................... 7

*Kranzdorf v. Green*, 76 B.R. 974 (Bankr. E.D. Pa. 1987) .......................................................... 20

*LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, 2006 WL 6916430 (N.Y. Sup. Ct. 2006).... 13

*Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................. 22

*Mass. Mut. Life Ins. Co. v. Res. Funding Co., LLC*, 3:11-cv-30035 (D. Mass. Feb. 9, 2011) ....... 8

*MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 10600837/2010 (N.Y. Sup. Ct.) ............................ 9

*MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 08603552/2008 (N.Y. Sup. Ct.) ............. 9

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439 (S.D.N.Y. 1998) ........................................................................................................................... 15

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972)............................................................................ 5

*Pet, Inc. v. Lustig*, 77 A.D.2d 455 (N.Y. App. Div. 1980) ......................................................... 15

*Reiss v. Fin. Performance Corp.*, 738 N.Y.S.2d 658 (2001) ...................................................... 13

*Syncora Guarantee, Inc. v. EMC Mortg. Corp.*, --- F. Supp. 2d ---, 2012 WL 2326068 (S.D.N.Y.
  2012) ............................................................................................................ 12, 14, 22

**Statutes**

11 U.S.C. § 502(c) ........................................................................................ 16, 25

11 U.S.C. § 510(a) ........................................................................................ 24, 25

**Rules**

Fed. R. Bankr. P. 9019 ...................................................................................... 1

**Websites**

http://www.fdic.gov/bank/individual/failed/wamu_settlement.html ........................................... 18

TO THE HONORABLE MARTIN GLENN:

This brief in support of the settlement, and in response to settlement objections, is filed by the Steering Committee investors[1] in support of Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, Dkt. No. 320 ("9019 Motion").[2]

## I.    Standard of Review

1.    "Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re MF Global, Inc.*, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. 2012) (Glenn, J.).  A settlement should be approved if it is "fair, equitable and in the best interest of the estate." *Id.* (citing FED. R. BANKR. P. 9019 and *In re Drexel Burnham Lambert Grp.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991)).  A court must "'canvass the issues and see whether the settlement falls below the lowest point of the range of reasonableness,'" but is not required to conduct "a trial on the terms to approve a settlement." *Id.* (quoting *In re Chemtura Corp.*, 439 B.R. 561, 593-94 (Bankr. S.D.N.Y. 2010)).  The business judgment of the debtor is a factor to be considered in the settlement, as are the "opinions of the trustee, the parties and their attorneys." *Id.* (citing *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009)).

2.    *In re Iridium Operating Co. LLC* sets out the factors relevant to determining the fairness of a proposed 9019 settlement.  *See* 478 F.3d 452, 462 (2d Cir. 2007).  Factors 1 and 2

---

[1]  The Steering Committee Group consists of AEGON USA Investment Management, LLC; Angelo, Gordon & Co., L.P.; Cascade Investment, LLC; Federal Home Loan Bank of Atlanta; Goldman Sachs Asset Management, L.P.; ING Investment Management Co. LLC; ING Investment Management, LLC; Bayerische Landesbank; BlackRock Financial Management Inc.; Kore Advisors, L.P.; Pacific Investment Management Company LLC; Metropolitan Life Insurance Company; Neuberger Berman Europe Limited; SNB StabFund; The TCW Group, Inc.; Teachers Insurance and Annuity Association of America; Thrivent Financial for Lutherans; Western Asset Management Company; and certain of their affiliates, either in their own capacities or as advisors or investment managers.

[2]  This brief is support of the settlement is being filed in reliance on the existing Scheduling Order regarding Debtor's 9019 Motion for approval of the RMBS Settlements.  The Steering Committee investors reserve the right to modify, amend or supplement this brief in light of any modifications to that Scheduling Order.

evaluate the claims being settled, the relative risks of litigating them, and the likelihood of

complex and protracted litigation if they are not settled. *Id.* Factors 3 and 4 consider the

settlement's impact on other creditors and whether other parties in interest support the

settlement. *Id.* Factors 5 and 7 focus on the competence and experience of counsel who support

the settlement and the extent to which the settlement is the result of arms'-length bargaining. *Id.*

Factor 6 assesses the nature and breadth of the releases to be granted to officers and directors.

*Id.* The Proposed Order also asks this Court to find that the settlement is "fair and reasonable to,

and in the best interest of, all interested parties, including but not limited to . . . the Institutional

Investors, the Investors for each Trust that executes a joinder and each such Trust, [and] the

Trustees."[3]

## II.    Summary of Argument

3.    The settlement clearly falls within the range of reasonableness. *See infra* Part

III.A. Debtors have offered to settle mortgage repurchase claims held by 392 RMBS Trusts for a

maximum Total Allowed Claim[4] of $8.7 billion. These Trusts have already suffered more than

$30 billion in mortgage losses and are projected to suffer an additional $15 to $20 billion in

losses over their lifetimes. Considering these losses, and other relevant data, Debtors' expert

calculated the Trusts' repurchase claims at between $6.7 billion and $10.3 billion. *See* Decl. of

Frank Sillman, attached as Ex. 8 to the 9019 Motion ("Sillman Decl.") ¶¶ 68-69. The $8.7

billion proposed settlement is near the mid-point of that range and is unquestionably fair and

equitable under the circumstances. Debtors' settlement judgment has also been vindicated by

subsequent developments. Since the agreement was signed, two published decisions by courts in

the Southern District of New York have significantly limited Debtors' "material and

---

[3] *See* Proposed Form of Order ¶ 5, attached as Ex. 1 to the 9019 Motion.
[4] Capitalized terms have the meaning ascribed to them in the RMBS Trust Settlement Agreement with the Steering Committee Group ("Settlement Agmt."), attached as Ex. 2 to the 9019 Motion.

adverse/causation" defense to the settled claims.  Although any settlement must necessarily be evaluated on the state of the law at the time of the settlement, these cases have increased the risk and complexity of Debtors' ability to defend the RMBS Trusts' claims if the settlement is not approved.  Calculations by Debtors' expert, for example, demonstrate that if Debtors lost on that defense, their repurchase liability could balloon to more than **$14 billion**.  *See infra* ¶ 21.  Finally, if the Court were to estimate Debtors' repurchase exposure using the same data set that creditors MBIA and FGIC have used to support their own repurchase claims on mortgages held by the same trusts, Debtors' repurchase exposure would be even higher, ranging from **$31 to $44 billion**, or even more.  *See infra* Part III(A)(1).

4.      The Creditors, even those that may oppose the settlement for one reason or another, are *objectively* benefitted by the settlement.  First, the RMBS Trusts' mortgage repurchase claims are unquestionably the largest creditor constituency in the case.  A plan cannot be negotiated or implemented until those claims are liquidated and valued.  The Lehman Brothers bankruptcy and Washington Mutual receivership demonstrate the hazards of "waiting until later" to try to resolve mortgage repurchase claims.  *See infra* Part III(C)(1).  Second, litigation of the Trusts' repurchase claims would be enormously expensive and tax the already limited funds Debtors have available to make distributions to creditors.  Debtors' four-year experience in forty-two separate lawsuits arising from their issuance of mortgage-backed securities, *see* Decl. of Jeffrey A. Lipps, attached as Ex. 9 to the 9019 Motion ("Lipps Decl.") ¶ 7, confirms that litigation of such claims can be intractably hard, immensely contentious, and incredibly expensive.  Third, the mere existence of the proposed settlement has already facilitated the sale of Debtors' servicing platform, to the benefit of all creditors:  The RMBS Trustees agreed, as a result of the proposed settlement, to cap the RMBS Trusts' potential cure claims at a maximum of $600 million.  Left uncapped, the RMBS Trusts' cure claims would

have complicated the sale of the servicing platform and could have swamped (or eliminated) a recovery by other creditors.

5.    The settlement also binds the investors to use commercially reasonable efforts to authorize an amendment to the Pooling and Servicing Agreements (PSAs)[5] to permit the eventual purchaser of the servicing platform to finance servicing advances. *See* RMBS Trust Settlement Agreement with the Steering Committee Group, attached as Ex. 2 to the 9019 Motion (Settlement Agmt.) § 4.03. The PSAs currently prohibit the financing of servicing advances. Debtors could not otherwise have obtained a change to this prohibition because the PSAs can be amended only by the consent of the RMBS Trusts and their Certificateholders. *See* PSA § 11.01(b). This agreement will help maximize value for all creditors and is a benefit all creditors will obtain, independently, as a result of the settlement's approval.

6.    The settlement has garnered significant support from parties in interest. The settlement was negotiated separately with two very disparate groups of RMBS holders. One, the Steering Committee group, consists of eighteen institutions that hold 25% or more in one or more classes of 298 Trusts; the other, represented by Talcott Franklin, holds 25% or more in one or more classes of 35 additional Trusts. The agreements reflect the shared conviction of a very large constituency that settlement of the RMBS Trusts' claims is in the best interests of the estates, their creditors, and the RMBS Trusts and their investors. New holders have also come forward to support the settlement after it was announced. Although the settlement has been a matter of public record for nearly five months, only one investor (Triaxx) has thus far lodged any objection to it—an objection that is limited solely to the allocation formula, not to the fairness of the amount. As a result of the proposed settlement, four different RMBS Trustees have joined

---

[5] The Trusts are governed by Pooling and Servicing Agreements or Indentures of Trusts. For ease of reference, they will be referred to throughout as "PSAs."

4

forces to file joint pleadings and share a single expert (at a significant cost savings to the estate) to assist them in evaluating the settlement. Although not released by the settlement, Ally Financial supports its approval because the settlement is an important step toward the overall resolution of Debtors' cases. *See* Plan Support Agreement, Dkt. No. 318, Ex. 4.

7.      The settlement unquestionably was negotiated as a result of hard, arms'-length bargaining. The Steering Committee investors are large institutions that formed a group several years ago to pursue industry-wide resolutions of mortgage repurchase claims. No one has suggested Debtors colluded with these investors in negotiating the settlement, nor could they: the settlement communications produced by Debtors and Ally refute it categorically. Counsel who negotiated the settlement are also, obviously, "competent and experienced" in evaluating similar claims. Debtors' counsel have been defending mortgage repurchase claims for many years. Counsel for the Steering Committee investors included both a firm that has achieved an $8.5 billion settlement with Bank of America and Countrywide and continues to pursue multi-billion dollar repurchase claims against other institutions and a firm nationally recognized for its bankruptcy and restructuring practice. Talcott Franklin, counsel to the other investor group, "wrote the book" on securitization litigation. *See* TALCOTT J. FRANKLIN, MORTGAGE AND ASSET BACKED SECURITIES LITIGATION HANDBOOK (2008). Finally, the releases comprehensively address all repurchase and servicing liability that could be asserted against Debtors, their officers, and their directors, so that factor is also satisfied. Debtors' settlement is therefore within the range of their reasonable business discretion, considering the uncertainties of law and fact and the risks and costs of taking the Trusts' repurchase claims to trial. *See Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

8.      The settlement is also fair and reasonable to the RMBS Trusts and their investors. Given the disputed nature of the Trusts' repurchase claims, and the potential difficulties and

expense associated with proving them, litigating to try to obtain a "better" result than a fair settlement would be a speculative enterprise.  It could take years and yield little or nothing more, due to the intervening depletion of Debtors' estates.  The Lehman bankruptcy and the Washington Mutual receivership are object lessons of the severe harms caused to all creditors—including RMBS Trusts—when mortgage repurchase obligations become mired in contentious litigation that diminishes and delays recovery by all creditors.

9.       The Total Allowed Claim is fair not only in size but in its treatment of each Trust.  Each Trust (through its trustee) is free to decide whether it wishes to accept Debtors' settlement offer.  Each Trust that accepts the settlement will pay the attorneys' fees used to procure the settlement out of its share of the Allowed Claim, ensuring that all of the Trusts that benefit from the settlement bear the burden associated with achieving it and that all certificateholders in the Accepting Trusts share that burden in accordance with their interests in the Trusts.  Payment in the form of an Allowed Claim does not require other creditors to pay the RMBS Trusts' attorneys' fees, despite the benefits the settlement has already conferred on the estate.

10.       The formula by which the Total Allowed Claim is allocated among the Accepting Trusts is also reasonable.  Each Accepting Trust will share in the Total Allowed Claim on a basis that conforms to the likely prevalence of ineligible mortgages in the pools.  Given that there is no evidence that losses associated with defective mortgages are distributed differently by collateral type, distributing the claim based on mortgage losses is eminently fair.  The formula also conforms to the PSAs, as it requires that recoveries within each Trust flow down the mandatory payment waterfalls.

**III.    The Settlement Is Within the Range of Reasonableness and Is Fair, Equitable, and in the Best Interests of the Estates**

11.    Debtors reasonably decided to settle the Trusts' repurchase claims because the data available to them (and their long and expensive experience in litigating these claims) confirmed that settlement is fair and equitable to all creditors.  It is fair because the amount is reasonable, particularly when measured against the risk that litigation could ultimately prove Debtors' liability was catastrophically higher than the settlement.  Settlement is also in the best interests of the estates and all creditors because litigation would force the Court to address many thorny and difficult questions to determine the validity and amount of the claims.  *Cf. In re Thomson McKinnon Secs., Inc.*, 191 B.R. 976, 979, 982–89 (Bankr. S.D.N.Y. 1996) (undertaking a detailed analysis of applicable law in estimating securities-fraud claim because a "bankruptcy judge [ ] is bound by the legal rules which may govern the ultimate value of the claim").  That undertaking would not only be "time-consuming and expensive," it would provide "no clear likelihood of success," *MF Global*, 2012 WL 3242533, at *6, due to the nature of the PSAs.

### A.    The Amount of the Settlement

12.    Debtors' expert estimated Debtors' repurchase liability to the RMBS Trusts is between $6.7 billion and $10.3 billion.   The proposed Total Allowed Claim of $8.7 billion is near the mid-point of that range.[6]  Although the evidence underlying this calculation is more than sufficient to establish the settlement is reasonable, the decision to settle is also reasonable because Debtors' face the risk of far greater liability if they choose to litigate.

### 1.    Evidence from Other Cases

13.    Debtors did not settle the RMBS Trusts' mortgage repurchase claims in a vacuum.  For many years, Debtors have defended claims by a variety of litigants alleging the

---

[6] *Cf. In re Chemtura*, 439 B.R. at 597 (approving $20 million settlement where, among other things, claim that a "No Call Provision" was breached could have yielded $50 billion); *In re Worldcom, Inc. ERISA Litig.*, 2004 WL 2338151 (S.D.N.Y. 2004) (approving 9019 and class action settlement where $46 million settlement amount was near the $42 million midpoint of the range of likely recovery estimated by Lead Counsel); *In re Idearc Inc.*, 423 B.R. 138, 176-77 (Bankr. N.D. Tex. 2009) (approving settlement where amount was "well within the range of potential outcomes of the Adversary Proceeding").

loans Debtors sold to the RMBS Trusts were defective. In many cases, the RMBS Trusts'
repurchase claims arise from the very same loans. Debtors knew about this data from other
proceedings, so the Court can fairly consider it in evaluating the settlement.

### a.     FHFA and MassMutual

14.     Although data from securities complaints cannot be extrapolated with precision to
estimate Debtors' mortgage repurchase liability to the RMBS Trusts, allegations from such
claims provide strong indications that the RMBS Trusts' loans are plagued with pervasive,
actionable defects. Among the most troubling allegations are those from the Federal Housing
Finance Administration (FHFA), the conservator of Freddie Mac and Fannie Mae. FHFA
reviewed 21 ResCap securitizations. *See* Compl., *Fed. Hous. Fin. Agency v. Ally Fin. Inc.* (N.Y.
Sup. Ct.) ¶ 2. The review was extensive, typically involving 1,000 loans from each
securitization. *Id.* ¶ 94. From that population of loans, FHFA determined that, on average:

- 25.67% of the loans were misstated as having a Loan-to-Value (LTV) ratio of
  80% or less[7];

- 18.38% of the loans were misstated as having an LTV of 100% or less;

- 10.73% of the loans were misstated as to occupancy status.[8]

15.     Allegations by MassMutual in its securities complaint suggest similarly pervasive
violations. According to MassMutual's securities complaint, its review of 18 RAMP and/or
RALI securitizations showed that 29.96%[9] of the loans exceeded the 90% LTV representation.
*See* Compl., *Mass. Mut. Life Ins. Co. v. Res. Funding Co., LLC*, 3:11-cv-30035 (D. Mass. Feb. 9,
2011).

---

[7] The LTV representation assures the Trusts that the value of the mortgaged property is high enough to retire the
debt without a loss in the event of foreclosure. Excessive LTV ratios are also excellent predictors of which loans
will eventually fall into default. *See* Amherst Securities Group LP, Amherst Analysis: The Bank of America
Settlement (June 30, 2011), attached as Ex. 1 to the Decl. of Kathy D. Patrick, dated Oct. 5, 2012 ("Patrick Decl."),
at 5.
[8] These figures reflect the average of the breach rates alleged for each of the 21 securitizations in the complaint.
[9] This figure reflects the average of the breach rates alleged for each of the 18 securitizations in the complaint.

### b.      Monoline Litigation

16.      MBIA and FGIC have been litigating repurchase claims on the RMBS Trusts'
loans for many years.  This litigation is highly material to MBIA.  It has taken the unusual step
of recognizing "litigation accounts receivable assets" for its repurchase claims against GMAC
and ResCap on its balance sheet,[10] a practice that MBIA's CEO and CFO acknowledge creates
volatility and liquidity risks for MBIA.[11]  In its complaint against Debtor GMAC, MBIA pleaded
it had reviewed 4,104 delinquent loans that had been charged off and on which MBIA had made
payments.  *See* Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 10600837/2010 (N.Y. Sup.
Ct.) ¶ 14.  It found that 89% of the loans reviewed did not conform to GMAC's underwriting
guidelines or representations and warranties.  *Id.  If they are true*,[12] applying MBIA's findings to
all 392 RMBS Trusts would suggest Debtors' repurchase liability is markedly higher than that
calculated by Debtors' expert.  Using the $43.5 billion to $49.8 billion range of realized and
estimated projected losses in the Trusts, *see* Supplemental Decl. of Frank Sillman, Dkt. No.
1664, Ex. 3 ("Sillman Suppl. Decl.) ¶ 15, MBIA's allegation would balloon the exposure to
**$38.7 billion to $44.3 billion**.  The number would be larger still if the Court used data from a
similar complaint MBIA filed against ResCap.  There, MBIA reviewed 1,847 loans and found
that *fewer than 7%* were originated in compliance with representations and warranties.  *See*
Compl., *MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 08603552/2008 (N.Y. Sup. Ct.) ¶
46.  Using that data predicts a claim size of **$40.4 billion to $46.3 billion**.  Although skepticism

---

[10] *See* Tr., Q1 2012 MBIA Earnings Call, Comments of C. Edward Chaplin, President, CAO, and CFO (May 11, 2012), attached as Patrick Decl., Ex. 2 (reporting liquidity risks arising from this recognition practice and stating that MBIA would be "monitoring events at ResCap, and as we get more information, to assess their impacts on ***the carrying value of our expected recoveries from RFC and GMAC Mortgage***" (emphasis added)).

[11] *Id.*, Comments of Joseph Brown, CEO (acknowledging that a bankruptcy of ResCap could cause MBIA to have to "consider it in future evaluations of those recoverables").

[12] The Steering Committee investors do not necessarily endorse the methodologies employed by MBIA (or others) in reaching such breach rate allegations, but the prevalence of such allegations across various litigations creates serious risks concerning the magnitude of the RMBS Trusts' repurchase claims against Debtors.

concerning MBIA's numbers is warranted, MBIA cannot credibly contend Debtors' settlement is *too high*, given its own breach rate allegations across the RMBS Trusts' pools.

17.    FGIC[13] filed suit on five RFSMII Trusts and two GMAC Trusts, all issued in 2006 and all involving loans held by the RMBS Trusts.    FGIC alleges that 72% of the nonperforming loans it reviewed in GMACM 2006-HE2 had serious breaches of representations and warranties, including missing appraisals, missing statements of borrower income, or excessive loan-to-value ratios.    *See* Compl., *Fin. Guar. Ins. Co. v. Ally Fin., Inc.*, No. 12-cv-1818 (S.D.N.Y.) ¶ 154.    Although caution is warranted regarding FGIC's allegations, applying its "breach rate" across the range of realized and projected losses estimated by Debtors' expert would yield a repurchase claim of **$31.3 billion to $35.9 billion**.    FGIC, like MBIA, cannot credibly contend Debtors' settlement is *too high*.

## 2.    Debtors' Expert Report Understates the Likely Exposure

18.    Although Debtors' expert report is thorough and comprehensive, and uses and accepted methodology to assess repurchase exposure, it makes two key assumptions that have the effect of *understating* Debtors' estimated repurchase liability.    One such assumption is that not all loans will be "Audited" to determine whether they are defective.    That assumption should not be applied in bankruptcy.    Absent a settlement, the Trustees *must* quantify[14] *all* of the Trusts' repurchase claims to ensure they receive fair value before they are discharged.    A second assumption is that Debtors' Government Sponsored Enterprises' (GSEs) repurchase data should be "discounted" to account for the RMBS Trusts' allegedly "weaker representations and

---

[13] FGIC, like MBIA, is in financial straits due to insurance it wrote on RMBS pools.  *See* Statutory Basis Financial Statements, Financial Guaranty Insurance Company, Mar. 31, 2012, at n. 2 (reporting order from New York State Department of Financial Services issued an order that FGIC "suspend paying any and all claims")

[14] After a default, trustees "*must*, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation."  *Beck v. Mfrs. Hanover Trust Co.*, 218 A.D.2d 1, 13 (N.Y. App. Div. 1995) (emphasis added).

warranties."[15]  Sillman Decl. ¶ 61.  This purported "weakness" likely arises largely from the Trusts' obligation to prove defects are "material and adverse," an obligation the GSEs do not have.  Although there are other differences between Debtors' two loan sales programs, the propriety, size, and scope of any GSE "discount" is subject to reasonable debate, particularly in light of new developments in the law.  *See infra* Part III(B)(1).

19.    The table below reflects the effect of reversing *both* of Debtors' understating assumptions (the Audit and GSE Agree Rate) on Sillman's Higher Range Model.[16]

| Table 1: Sillman's Higher Range Model Adjusted to Remove Audit Rate Discount and GSE Agree Rate Discount ($bb) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | *WITHOUT DISCOUNTS TO AUDIT OR AGREE RATES* | | | | |
| Description | Current Outstanding Trusts' UPB | Trusts' Estimated Lifetime Losses | Demand Rate | Audit Rate | Breach Rate | Agree Rate | Loss Share Rate | Potential Repurchase Requirements |
| Liquidated Loans | | $30.3 | 65% | 100% | 65% | 68% | 44% | $13.3 |
| Current (Non-Modified) | $34.10 | $4.6 | 40% | 100% | 40% | 23% | 9% | $0.4 |
| Current (Modified) | $11.30 | $3.6 | 60% | 100% | 60% | 43% | 26% | $0.9 |
| 30-59 Days Delinquent | $2.20 | $0.3 | 65% | 100% | 65% | 68% | 44% | $0.1 |
| 60-89 Days Delinquent | $1.00 | $0.7 | 65% | 100% | 65% | 68% | 44% | $0.3 |
| 90+ Days Delinquent | $6.30 | $4.6 | 65% | 100% | 65% | 68% | 44% | $2.0 |
| Foreclosure | $7.50 | $5.7 | 65% | 100% | 65% | 68% | 44% | $2.5 |
| Total Exposure Using Sillman's Shelf Level Estimate of Lifetime Losses | | $49.80 | | | | | 39% | $19.6 |
| Total Exposure Using Sillman's Trust Level Estimate of Lifetime Losses | | $46.80 | | | | | 39% | $18.4 |

Although the settlement is demonstrably fair based on Debtors' existing analysis, the adjusted table confirms the settlement likely removes an even *greater* risk of potential liability, with the potential repurchase requirements jumping to **$18.4 billion to $19.6 billion**, depending on the estimate of the Trusts' lifetime losses.  Even if the Lower Range Model were used, the exposure would jump to **$14.7 billion to $15.5 billion**, *see* Patrick Decl., Ex. 3, Table 2.

---

[15] The GSE "guaranty" program guaranteed principal on loans originated by Debtors, so long as they conformed to the GSEs' underwriting guidelines and requirements.  The GSE repurchase data was compiled from actual loan repurchases completed under the GSE guaranty program.  Sillman Decl. ¶¶ 60-61.

[16] Table 2 in Patrick Decl., Ex. 3 reflects the deletion of each of these assumptions on Sillman's Lower Range model.  Tables 3 through 6 in Patrick Decl., Ex. 3 reflect the deletion of each of these assumptions, individually, in both the Higher Range model and Lower Range model.  These tables adopt Debtors' expert's assumptions as set out in paragraphs 56 and 69 of his Declaration and paragraph 15 of his Supplemental Declaration.  *See* Sillman Decl. ¶¶ 56, 69; Sillman Suppl. Decl. ¶ 15.

### B.    The Risks of Litigating the RMBS Claims

#### 1.    Debtors' Defenses Are Exposed to Adverse Changes in the Law

20.    The settlement should be evaluated in the context of "the uncertainties of law and fact," *Newman*, 464 F.2d at 693, relating to Debtors' repurchase liabilities.    At the time of the original settlement, a central area of uncertainty concerned the meaning of two key terms in the repurchase obligation: namely, the requirement that the Trusts prove that the breach of a representation or warranty was one that "materially and adversely affects the interests of the certificateholders in any mortgage loan."    PSA § 2.03(b).    Debtors and others have argued that this phrase imposes on the RMBS Trusts the obligation to prove that a particular defect "caused" the Trusts to sustain a loss.    *See, e.g.*, Sillman Decl. ¶ 52.    Post-settlement developments cast significant doubt on Debtors' ability to defend repurchase claims on this basis.

#### a.    Adversity Does Not Require Proof of Causation

21.    Two cases, decided after the settlement was agreed, significantly undercut the strength of an argument that the "adversity" requirement mandates proof of "causation."    If this law were applied to the repurchase exposure calculated by Debtors' expert (without correcting other understating assumptions) Debtors' exposure would balloon to **$10.2 billion to $14.3 billion**, depending on the model used.    *See* Patrick Decl., Ex. 3, Tables 5 & 6.

22.    The first case of these cases is *Syncora Guarantee, Inc. v. EMC Mortg. Corp.*, --- F. Supp. 2d ---, 2012 WL 2326068 (S.D.N.Y. 2012).    In *Syncora*,   Judge Crotty rejected the argument that a monoline insurer had to "show actual pecuniary loss resulting from a breach" to support a finding of damages based upon repurchase liability.    *Id.* at *4.    Although the *Syncora* decision turned in part on an interpretation of "the nature and scope of an insurer's 'interests' under New York law," *id.*, it rests squarely on the terms of the repurchase obligation:

12

> In essence, EMC argues, the repurchase provision contemplated a remedy only
> where breached representations and warranties caused actual adverse effect, and
> not simply an increase in risk. But nothing in the language of the parties'
> agreements provides for this result . . . . . [T]he parties' written agreements do not
> provide that breaches of representations or warranties must cause any HELOC
> loan to default, before the Note Insurer can enforce its remedies under the
> repurchase provision. Had the parties intended this requirement, they could have
> included such language. They did not, and the Court will not do so now "under
> the guise of interpreting the writing."

*Id.* at \*5 (quoting *Reiss v. Fin. Performance Corp.*, 738 N.Y.S.2d 658 (2001)); *see also LaSalle*

*Bank N.A. v. Nomura Asset Capital Corp.*, 2006 WL 6916430 (N.Y. Sup. Ct. 2006) ("[N]othing

in the [Mortgage Loan Pooling and Servicing Agreement] . . . requires the plaintiff to show a

causal link between the breach and the requirement that the defendants (the Sellers of the

Mortgage Loans) either repurchase the loans . . . [or] cure the breach in all material respects."),

*aff'd in part*, 846 N.Y.S.2d 95 (N.Y. App. Div. 2007).

      23.    In *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, Judge Rakoff

likewise rejected the claim that the phrase "material and adverse" requires proof of pecuniary

loss caused by the alleged defect to establish repurchase liability. --- F. Supp. 2d ---, 2012 WL

4373327, at \*4 (S.D.N.Y. 2012) Instead, the court held it would give the term "'adverse' its

ordinary meaning of 'opposed to one's interests.'" *Id.* "In this context, a breach of contract that

materially increased Assured's risk of loss would be adverse, because it was opposed to the

insurer's interest." *Id.* Judge Rakoff also rejected the argument that the Sale and Servicing

Agreements required proof of actual loss causation: "It should also be noted that the Transaction

Documents [which include the SSAs] do not mention 'cause,' 'loss' or 'default' with respect to

defendants' repurchase obligations. If the sophisticated parties had intended that the plaintiff be

required to show direct loss causation, they could have included that in the contract, but they did

not do so, and the Court will not include that language now 'under the guise of interpreting the

writing.'" *Id.* at \*5.

24.    As in *Syncora* and *Flagstar Bank*, the PSAs contain no language that requires the RMBS Trusts to prove a "cause," "loss," or a "default" to obtain repurchase of a defective loan. *Compare* PSA §§ 2.03 & 2.04, *with Syncora*, 2012 WL 2326068, at *9-10 (SSA required proof only that the breach "materially and adversely affects the value of the interest . . . in any of the HELOCs"), *and Flagstar Bank*, 2012 WL 4373327, at *4 (SSA required repurchase "when a breach 'materially and adversely affects the interest of the Issuer, the Noteholders or the Note Issuer in the related Mortgage Loan'"). Accordingly, were the settlement to be disapproved, Debtors are unlikely to be able to assert any effective "causation defense" to reduce their repurchase liability. The settlement should be evaluated with that risk in mind.

25.    *Syncora* and *Flagstar* also vindicate Debtors' decision to eliminate the risk that their repurchase liabilities might be magnified by adverse judicial interpretations of the PSAs. Debtors are sophisticated in the area of repurchase litigation; they surely understand their repurchase liability could suffer an enormous upward swing if they were to lose their causation defense. Debtors' expert applied a substantial discount to Debtors' GSE data in his estimate of the RMBS Trusts' repurchase claims, Sillman Decl. ¶ 61, but Debtors were right to be concerned that any such discount would not hold if the law on causation developed adversely to them. Now that this adverse law *has* developed, Debtors face a *magnified* risk if the settlement is disapproved.

### b.    Debtors' Dual Role Bars a Statute of Limitations Defense

26.    The peculiar fact that Debtors here are *both* the Mortgage Seller, obligated to repurchase defective loans, *and* the Mortgage Servicer, obligated to pursue repurchase claims, means there is little likelihood Debtors could prevail on any statute of limitations defense.[17] The

---

[17] Because the claims for repurchase of a defective mortgage do not accrue until one is "discovered" and repurchase is refused, claims accrue and expire on a rolling 6-year basis as each defective mortgage loan is discovered. *See* Tr.,

reason is simple: Equitable tolling "will not permit the statute of limitations to run where," as here, "the one claiming the benefit of the statute is the one charged in law with the duty of asserting and enforcing the claim before the statute runs." *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1310 (S.D.N.Y. 1989) (quoting *Pet, Inc. v. Lustig*, 77 A.D.2d 455 (N.Y. App. Div. 1980)).  In their dual roles, Debtors "certainly could not be expected to bring an action . . . when such an action would simply focus attention on [their] own wrongdoing." *Id.* (citing *IIT v. Cornfeld*, 619 F.2d 909, 930 (2d Cir. 1980)); *see also Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 448 (S.D.N.Y. 1998) ("It cannot be expected that [the parties with designated responsibility for bringing suit], who were involved in the alleged corrupt behavior, would bring this behavior to the attention of the courts."); *Croce v. Kurnit*, 565 F. Supp. 884, 892 (S.D.N.Y. 1982) ("Although it is understandable that Kurnit did not investigate or pursue claims against his own interest, he may not now claim the benefit of the statute of limitations.").  Accordingly, equitable tolling precludes the Master Servicers, who were obligated to pursue the repurchase claims, from raising their own failure to pursue those claims as a limitations *defense* to the Trusts' demand that *they*—as Mortgage Sellers—are obliged to repurchase the defective mortgage loans.[18]

### C.    The Settlement Benefits Creditors

27.    Settlement is strongly favored in bankruptcy because it reduces litigation costs and provides certainty to the parties. *MF Global*, 2012 WL 3242533, at *5.  The Code permits

---

Bank of America Q3 2010 Earnings Call, Remarks of Brian T. Moynihan, CEO, attached as Patrick Decl., Ex. 4, at 22.

[18] The case for equitable tolling is even stronger when one considers that the Master Servicers had all of the loan files in their custody. *See* PSA § 2.01.  Limitations begin to run when the plaintiff "acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence [after notice]." *Cerbone v. Int'l Ladies' Garment Workers Union*, 768 F.2d 45, 48 (2d Cir. 1985).

Debtors to *estimate* the Trusts' repurchase exposure for the purpose of resolving their claims.[19]

Debtors have performed a sound estimate that establishes their exposure to the Trusts'

repurchase claims. *See generally* Sillman Decl. It serves little purpose to reject a fair settlement,

based on a reasonable estimate of exposure, when the only result will be a duplicative and

expensive estimation proceeding that would provide "no clear likelihood of success" in reducing

the size of the RMBS Trusts' claims. *MF Global*, 2012 WL 3242533, at *6.

### 1.    Litigation Would Be Enormously Expensive Yet Yield Little Improvement for the Creditors

28.    The desire of some constituents to swing for the fences and force Debtors into a

multi-year "Herculean and contentious loan-file-by-loan-file review," 9019 Mot. at 22, is neither

fair to all creditors nor in the best interests of the Estates. Debtors have a very limited pool of

assets. Litigating these claims could cost the creditors millions and millions of dollars, Lipps

Decl. ¶¶ 8, 43, without any certainty it would materially reduce Debtors' liability or increase

creditors' recoveries. The experience of creditors in the Lehman bankruptcy and the Washington

Mutual receivership illustrate the peril of plunging the estates into the "meltdown" that would

surely arise from litigation of the Trusts' repurchase claims.

### a.    Lehman Brothers

29.    Lehman filed for bankruptcy protection in September 2008. By the following

year, various RMBS Trustees had filed over 300 proofs of claim, alleging breaches of

representations and warranties as to more than 1.5 million loans originated by Lehman

subsidiaries. *See In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.), Dkt. No.

---

[19] *See* 11 U.S.C. § 502(c) (providing that "any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case," including litigation claims, "shall be estimated"); *see also In re Fed.-Mogul Global Inc.*, 330 B.R. 133, 158–62 (Bankr. D. Del. 2005) (estimating asbestos-related personal injury claims based largely on expert testimony regarding historical settlement amounts); *In re G-I Holdings, Inc.*, 323 B.R. 583, 600, 626 (Bankr. D.N.J. 2005) ("some form of estimation proceeding is required" to estimate 150,000 asbestos-related personal injury claims because litigating the claims individually would delay the bankruptcy).

24254, at 4, 6.  As is true here, the RMBS Trusts' claims, which the Lehman debtors estimated

at $1.1 to $2.4 billion and the trustees at estimated $15 billion, *id.*, Dkt. No. 24254, at 4, 12,

"represent the single largest group, by amount, of disputed claims remaining in Debtors' chapter

11 cases," *id.*, Dkt. No. 24254, at 4-5.

30.    Despite their significance to the overall estate, the parties have been unable for

four years to resolve their disputes.  Initially, Debtors argued that the claims should be

disallowed and expunged.  *Id.*, Dkt. No. 18088, at 8-11.  The dispute more recently has centered

on valuation.  In February 2012, the court set an unsecured claims reserve of $5 billion for

RMBS repurchase claims, but emphasized this ruling "not determine or affect in any respect the

allowed amount, validity or priority of the Indenture Trustees' Claims for any purpose other than

estimating the reserve" and was "without prejudice to the rights of the Indenture Trustees to

assert that the allowed amount" should be greater.  *Id.*, Dkt. No. 25643, at 3.  Although the

parties were ordered to mediate the dispute, there is no evidence from the docket—eight months

after the court's order, three years after the deadline for filing proofs of claim, and more than

four years after Lehman first sought Chapter 11 protection—that Debtors and trustees are any

closer to resolving or paying out these disputed claims.

### b.    Washington Mutual

31.    The failure to settle repurchase claims has similarly stalled the resolution of the

FDIC receivership proceedings for Washington Mutual (WaMu).  In December 2008, Deutsche

Bank filed a proof of claim as trustee of 159 RMBS trusts, seeking repurchase of loans

originated and sold by WaMu.  *See Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 09-1656

(D.D.C.), Dkt. No.1, Ex. A.  In August 2009, after the FDIC failed to act to resolve that claim,

Deutsche Bank sued the FDIC.  Despite receiving several billion in funds from the WaMu

bankruptcy estate, the FDIC has yet to make any distribution, due in no small part to the

17

uncertainty engendered by Deutsche Bank's pending mortgage repurchase claims.[20]  Thus, the unresolved repurchase claims have delayed distributions not only to the RMBS investors, but also to WaMu debtholders.

32.     Litigation of the RMBS Trusts' repurchase claims would be protracted and highly contentious were the settlement disapproved.  By *any* measure, the RMBS Trusts' repurchase claims are multi-billion dollar liabilities of Debtors' estates.  The large and motivated group of RMBS investors that supports the settlement will not "go quietly into the night" if it is disapproved; they will vigorously contest these claims to ensure the RMBS Trusts receive every dollar of recovery to which they are entitled.  The certainty of intense and time-consuming litigation if the settlement is disapproved is itself a factor that weighs strongly in favor of Debtors' settlement judgment.  *See Iridium*, 478 F.3d at 462 (noting that the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience and delay," is relevant to whether 9019 settlement should be approved).  Although the Steering Committee investors can and will litigate these claims if they are forced to do so, they do not prefer litigation over a reasonable and fair settlement.  The reason is obvious:  a legal war of attrition—although it might eventually prove a higher total claim than the $8.7 billion Total Allowed Claim proposed by the settlement—would deplete Debtors' limited assets.  That factor strongly favors settlement.

### 2.     Interest of Other Creditor Constituencies

33.     The settlement has broad support among the investors in the RMBS Trusts. *Cf. Iridium*, 478 F.3d at 462 (court may consider "whether other parties in interest support the settlement").  That this diverse and sophisticated group of investors favors the settlement is strong evidence that the Trusts' certificateholders believe it is fair not only to all creditors, but

---

[20] *See* FDIC, Status of Washington Mutual Bank Receivership, <u>available at</u>
 http://www.fdic.gov/bank/individual/failed/wamu_settlement.html (last visited Oct. 4, 2012).

also to the Trusts and their investors.[21]   Only one investor (Triaxx) has thus far lodged any

objection to the settlement.   That objection, however, does not challenge the fairness of the

settlement amount; it is a misplaced objection to the allocation formula.  *See infra* Part III(E)(2).

34.     The settlement is supported not only by a large and diverse group of RMBS

investors, it is also supported by Debtors' indirect parent company, Ally Financial, Inc.  This

support is notable for many reasons.  First, Ally's cooperation is essential to a consensual plan

process.  Ally is itself a major creditor of Debtors' estates; indeed, it is the single largest creditor

*other than* the RMBS Trusts.  Second, Ally agreed to contribute $750 million in value to support

Debtors' Plan, much of which will flow to Debtors' unsecured creditors (including the RMBS

Trusts), even though the RMBS Trusts' claims against Ally are *not released* in this settlement.[22]

Ally is thus supporting the early resolution of a major group of creditor claims with no assurance

that those claims will be limited or resolved against Ally.[23]

### 3.    Creditor Objections Do Not Preclude Settlement Approval

35.     Some creditors may object to the settlement.  Others may attack the settlement to

serve their own litigation interests.  Neither precludes approval of the settlement.  Courts have

been clear that the views of dissident creditors are not dispositive:

> There is no *per se* rule that the views of a committee or other creditors are
> dispositive on the reasonableness of a settlement.  A *per se* rule would unduly
> expose Debtors to the demands of creditors preferring to risk estate assets in a
> litigation lottery or litigate under blackmail or strong-arm strategies.  Instead, a
> debtor may seek approval of a settlement over major creditor objections as long as

---

[21] The investors who have appeared to support the settlement will receive the *same* benefit under the settlement that
will flow to every other, similarly situated investor in an RMBS Trust.  None of the Steering Committee investors
has offered to trade approval of this settlement for their own, individual advantage.  It remains to be seen whether
the same is true of those who appear to challenge the settlement.
[22] The Steering Committee investors and the Tal Franklin investors have signed separate Plan Support Agreements
binding them to support a plan release of claims against Ally *if* certain conditions are met.  Importantly, however,
approval of the RMBS Settlement is *not* one of those conditions.
[23] In addition, until the Unsecured Creditors Committee chose to attack their liens, a significant percentage of the
junior secured bondholders were parties to a Plan Support Agreement that contemplated approval of the RMBS
Trust Settlement.

it carries its burden of establishing that the balance of the *Martin* factors,[24] including the paramount interests of creditors, weighs in favor of the settlement.

*In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010).[25]

36.    Certain creditors in this case have idiosyncratic needs that may lead them to prefer that Debtors litigate the Trusts' claims rather than settle them, despite the fact that settlement is in the best interests of *all* creditors.  For example, MBIA has already purported to instruct its Trustee not to consider the settlement at all.  *See* Patrick Decl., Ex. 5.  Other creditors, including some of the Senior Unsecured Noteholders, chose to invest in ResCap debt *after* Debtors filed for bankruptcy.  They knowingly exposed themselves to the *unsecured* (and asset-less) balance sheet of Residential Capital LLC as a form of "litigation lottery," to try to redirect value away from the RMBS Trusts and to their otherwise asset-less Debtor.  These creditors' desire to speculate on litigation does not mean other creditors should be forced to do so.[26]

37.    The RMBS Trusts are *not* creditors by choice:  they are creditors by force of circumstance.  They found themselves in this bankruptcy case because their primary obligors collapsed and could no longer perform their contracts.  The repurchase claims owned by the

---

[24] The *Martin* factors are the articulation, in the Third Circuit, of a set of factors similar to the *Iridium* factors that guide courts in their evaluation of proposed Rule 9019 Settlements.  *Compare In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996), *with Iridium*, 478 F.3d at 462.

[25] *See also In re Drexel Burnham Lambert Gr., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (approving settlement under Rule 9019 over creditors' committee objection, stating that "although we may consider a creditor's objection to the proposed compromise, the objection is not controlling, and will not bar approval . . . when a review of the settlement shows it does not 'fall below the lowest point in the range of reasonableness.'" (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983))); *In re Sea Containers Ltd.*, 2008 WL 4296562, at *11 (Bankr. D. Del. 2008) (approving settlement over objection of creditors most impacted by it when they failed to convince the court "the settlement so affects their position as to be unfair"); *In re Adelphia Comm'cns Corp.*, 368 B.R. 140, 283 (Bankr. S.D.N.Y. 2007) (fact that some creditors were dissatisfied because they were unable to obtain modest incremental recoveries or could not "advance other investment strategies unrelated to the recoveries for creditors" was not a basis upon which settlement would be disapproved); *In re Lee Way Holding Co.*, 120 B.R. 881, 904 (Bankr. S.D. Ohio 1990) (individual litigation agenda of a creditor was not a sufficient basis on which to disapprove 9019 Settlement); *In re Atlas Computers, Inc.*, 2012 WL 3018256, at *11 (Bankr. N.D. Okla. 2012) (where "Trustee has met his burden regarding the reasonableness of a settlement, a single objection based upon a flawed premise is insufficient to upset the apple cart").

[26] *Cf. Kranzdorf v. Green*, 76 B.R. 974, 979 (Bankr. E.D. Pa. 1987) ("Not approving the settlement could benefit creditors *only if* the net recovery eventually received would be greater than offered by the settlement, an *entirely speculative and uncertain prospect. . . .*  Disapproval will force the Trustee to proceed with litigation that not inconceivably *might prove to be totally unsuccessful.*" (emphasis added)).

Trusts are highly complex and will likely require years to resolve if they are not settled. The

Trusts might recover more eventually; Debtors might pay slightly less (or a whole lot more)

eventually; but the Trusts, Debtors, and all creditors now have a "bird in the hand." Given

Debtors' depleted financial capacity and the massive costs and uncertainties associated with

litigating the repurchase claims, the Court can readily conclude that this bird in the hand is to be

preferred over the uncertain "bird in the bush" some creditors seek force Debtors to pursue.

### 4.        The Settlement Has Provided Significant Benefits to the Estates

38.      Debtors' proposed settlement has already conferred significant benefits on

Debtors' estates. As a result of the proposed settlement, the multi-billion dollar cure claims the

RMBS Trusts could have asserted have been capped at $600 million. This agreement was

essential to permit Debtors to proceed with the sale of their servicing platform, the proceeds of

which will benefit all creditors. Debtors have obtained the agreement that a large group of

investors will support PSA amendments that are vital to the sale of their servicing platform. *See*

Settlement Agmt. § 4.03. The settlement has enforced a level of cooperation and coordination

among the four RMBS Trustees. Rather than speaking dissonantly, they have retained a joint

expert to evaluate the proposed settlement (saving significant costs in the process) and have

negotiated jointly orders for relief beneficial to Debtors. Separate from these benefits are the

other obvious benefits of this settlement: certainty; cost-savings; avoidance of litigation risks;

and the obvious fact that, if successful, the early resolution of these claims will stand in marked

contrast to the tortuous process in which similar claims have been resolved in Lehman and

WaMu.[27] Finally, the releases to be provided in the settlement comport with the scope of the

claims to be released and encompass claims against current and former officers and directors of

---

[27] Some may argue that those claims were "not RMBS cases," but the RMBS Trusts' claims were in each instance the *largest* creditor constituency, and the failure to resolve their claims has precluded an ultimate resolution.

the settling Debtors. *See* Settlement Agmt. § 7.01. This eliminates any prospect of following claims against officers and directors that may trigger indemnity obligations.

### D.    The Settlement Is the Product of Arms' Length Negotiation

39.    The 9019 Settlement is the result of hard-fought, arms'-length negotiations. All parties were represented by skilled counsel who negotiated (and have continued to negotiate) vigorously for their clients' interests. There is no credible basis to contend otherwise. [28]

### E.    The Settlement Is Also Fair to the RMBS Trusts and Their Investors

#### 1.    The Settlement Eliminates Uncertainty and Saves Costs

40.    Debtors' decision to eliminate uncertainty by settling their exposure does not undercut the fairness of the settlement to the RMBS Trusts. The discussion above demonstrates that many areas of the law governing the RMBS Trusts' claims are plagued by uncertainty. To cite just one example, before *Syncora* and *Flagstar Bank*, the published case law concerning "causation" had arisen largely in the context of demands for the repurchase of defaulted loans. A ruling by another court could reach a different conclusion.[29] This uncertainty justifies settlement because it avoids the risk of thorny, potentially adverse rulings on the Trusts' claims.

#### 2.    The Allocation Formula Is Fair

41.    The settlement allocation formula independently demonstrates that the settlement is fair to the RMBS Trusts and their investors. The formula allocates the Total Allowed Claim based upon each Accepting Trust's ratable share of the losses suffered by all of the Accepting Trusts. *See* Settlement Agmt., Ex. B. "An allocation formula need only have a reasonable, rational basis" to be found "fair and adequate." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002); *see also In re AOL Time Warner, Inc.*, 2006 WL 903236, at *17

---

[28] The Steering Committee has refuted Triaxx's claim in an earlier brief. *See* Dkt. No. 1254.

[29] *See also* Material and Adverse Opinion of Professor Barry E. Adler, *In re Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct.), Dkt. No. 126-1, attached as Patrick Decl., Ex. 6.

(S.D.N.Y. 2006) ("A plan of allocation is evaluated by the same standards applied to the settlement as a whole: fairness, reasonableness, and adequacy.").[30]  Allocating the settlement based on losses is reasonable and rational because it conforms to the precise method by which the Total Allowed Claim was determined.  *Cf. generally* Sillman Decl. (using common breach and agree rates for all collateral types, but applying loss estimates to calculate total claim size).

42.    There is also no evidence to support a finding that losses associated with defective mortgages are higher in any particular collateral type held by the RMBS Trusts.  Although it is true that the allocation plan for a limited settlement fund may include adjustments based on equitable principles such as the strength of competing claims, *see In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005), there is no evidence here that any of the RMBS Trusts has a "better" or "stronger" repurchase claim than any other Trust.[31]  Plunging the Trusts into a lengthy "battle of the damage experts" for the purpose of achieving a greater punctilio of precision than that provided by the existing formula is not warranted where the results would be "a speculative enterprise at best."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 249-50 (3d Cir. 2001).  The allocation proposed here is the same that BNY Mellon adopted in its repurchase settlement of Bank of America.  It is supported by two large and diverse groups of investors, represented by skilled counsel.  For all of these reasons, there is abundant evidence that the settlement allocation formula is fair and reasonable and should be approved.

43.    The Triaxx objection does not establish the formula is unfair.  Triaxx argues the allocation formula should be rejected because it ostensibly favors subprime trusts at the expense of prime trusts.  *See* Dkt. No. 481.  Triaxx, however, did not analyze the loans in *all* of the

---

[30] Cases evaluating allocation formulas arise largely in class action settlements, but are useful analogies.  *See also In re Enron Corp. Secs., Derivative & Erisa Litig.*, 2008 WL 4178151, at *12 (S.D. Tex. 2008) (approving allocation where there was "no way to allocate [settlement] proceeds that would not in some way favor or disfavor to some degree some of the class members").

[31] If such evidence comes to light, the Court can consider it, but the information available to Debtors at the time of the settlement confirmed that the allocation formula was fair to the Trusts and their investors.

23

Trusts; instead, it focused only on its own Trusts. This is not evidence from which the Court

could determine the allocation formula is unfair, because it does not demonstrate defective loans

are more (or less) prevalent in any particular loan type.

### 3.    Defining Distributions As Subsequent Recoveries Is Required by the PSA Waterfall

44.    The settlement requires that distributions from the Allowed Claim flow down the

PSA distribution waterfalls, in accordance with the contract terms. Every investor and every

bond insurer who claims under the PSAs is bound by the PSA payment waterfalls.[32]    The

Bankruptcy Code likewise requires that these subordination and waterfall provisions be enforced.

11 U.S.C. § 510(a). The PSAs define "Subsequent Recoveries" to include "recoveries *in respect*

*of* the representations and warranties made by the related Seller and assigned to the Trustee

pursuant to Section 2.04."[33] (Emphasis added.)   The term "Available Distribution Amount"

includes Subsequent Recoveries.[34]    The Available Distribution Amount is then distributed

according to varying waterfalls, but in general the PSAs provide that the Available Distribution

Amount is paid first to interest, in descending order of priority, then to principal.[35]   The fact that

the pool is insured by a Credit Enhancer, such as MBIA or FGIC, does not alter this basic

structure. Indeed, the Settlement Agreement allocates the Allowed Claim across the Accepting

Trusts according to the Trusts' collateral losses, not their certificate losses. Therefore, claims

paid by a Credit Enhancer of a particular Accepting Trust would not affect that Trust's share of

---

[32] *Greenwich Fin. Servs. Distressed Mtg. Fund 3, LLC v. Countrywide Fin. Corp.*, Index No. 650474/08 slip op., at 7 (N.Y. Sup. Ct. Oct. 7, 2010) (RMBS investors are bound by the terms of the PSAs "which they . . . agreed to when they purchased the certificates."); *see also ASR Leveensverzekering v. Swiss Re Fin. Prods. Corp.*, Index No. 650557/09, slip op., at 7 (N.Y. Sup. Ct. Oct. 11, 2011); *In re Innkeepers USA Trust*, 448 B.R. 131, 144 (Bankr. S.D.N.Y. 2011) (all certificateholders are bound to the terms of the PSAs' no action clause).

[33] Excerpts from sample PSAs in each of the Debtors' shelves are attached as Patrick Decl., Ex. 7. A table summarizing the definitions of "Subsequent Recoveries" across these PSAs is attached as Patrick Decl., Ex. 8. Even where "Subsequent Recoveries" is not a defined term, the definition of "Available Distribution Amount" generally includes repurchase recoveries for representation and warranty violations. *See, e.g.*, Patrick Decl., Ex. 9 (showing definition of "Available Distribution Amount" in § 1.01 of the PSA for RFMSII 2006-HSA1).

[34] *See* Patrick Decl., Ex. 9 (definitions of Available Distribution Amount across sample PSAs).

[35] *See* Patrick Decl., Ex. 7. The section of the PSAs describing this waterfall is typically found in Section 4.02.

the Allowed Claim. Whether the Credit Enhancer would receive a distribution, however, would depend entirely on the waterfall, which the Court cannot rewrite.[36]

45.     Finally, any Credit Enhancer that is unhappy with the settlement can simply direct its Trustee to reject it (as MBIA has already apparently done, *see* Patrick Decl., Ex. 5). Generally, under the PSAs, if a bond insurer is currently paying insurance claims as they come due,[37] the insurer controls the voting rights for that Trust and can direct the Trustee to act. The monolines' parochial litigation strategies, however, should not be permitted to become a roadblock to the right of hundreds of other RMBS Trusts to accept Debtors' offer to settle with them. *Cf. In re Capmark Fin. Grp., Inc.*, 438 B.R. at 519.

## IV.   Conclusion

For these reasons, the Steering Committee group of investors supports the Debtors' Supplemental Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of RMBS Trust Settlement Agreements and urges the Court to approve the Motion.

---

[36] The Credit Enhancers may contend the allocation formula must be revised because they are somehow "subrogated" to the senior certificates and have a right to all of the Trusts' repurchase recoveries, even if the waterfalls would require otherwise. Section 510 negates this argument: it requires that the contractual subordination provisions be enforced. 11 U.S.C. § 510(a). Section 509 mandates the same result. *See id.* § 509(b)(1)(C) (denying subrogation rights where creditor is "subordinated under section 510 of this title"). The insurers may have *other* claims against Debtors, for indemnity, fraud, or the like, but those claims do not permit deviation from the mandated waterfall in the PSAs. In any event, all such claims remain unproved and outside the settlement, so the insurers cannot demand that the allocation formula be revised to account (or pay) for them.

[37] FGIC is in default of many of its payment obligations.

Dated:  October 5, 2012
        New York, New York

                                */s/ Kathy D. Patrick*        

                                Kathy D. Patrick, Esq. (*pro hac vice*)
                                Robert J. Madden, Esq. (*pro hac vice*)
                                GIBBS & BRUNS LLP
                                1100 Louisiana, Suite 5300
                                Houston, TX 77002
                                Telephone: (713) 650-8805
                                Facsimile:  (713) 750-0903

                                     -AND-

                                ROPES & GRAY LLP
                                Keith H. Wofford, Esq. (KW-2225)
                                D. Ross Martin, Esq. (DM-2947)
                                1211 Avenue of the Americas
                                New York, NY 10036-8704
                                Telephone:  (212) 596-9000
                                Facsimile:  (212) 596-9090

                                *Attorneys for the Steering Committee Group of
                                RMBS Holders*