# EXHIBIT 5

# Seward & Kissel llp

ONE BATTERY PARK PLAZA
NEW YORK, NEW YORK 10004

M. WILLIAM MUNNO
PARTNER
(212) 574-1587
munno@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

901 K STREET, NW
WASHINGTON, DC 20001
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

September 14, 2012

**VIA FEDEX & EMAIL**

Kathy D. Patrick, Esq.
Gibbs & Bruns LLP
1100 Louisiana Street, Suite 5300
Houston, Texas 77002

Talcott J. Franklin, Esq.
Talcott Franklin P.C.
208 North Market Street
Suite 200
Dallas, Texas 75202

**RMBS Trust Settlement Agreement with Residential Capital, LLC**

Dear Ms. Patrick and Mr. Franklin:

We represent U.S. Bank National Association, solely in its capacity as Trustee ("U.S. Bank") under various Pooling and Servicing Agreements and Indentures (together, the "Governing Agreements") for approximately 300 RMBS securitization trusts (the "Trusts") in connection with the Chapter 11 cases of Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap").

U.S. Bank has received correspondence regarding the proposed RMBS Settlement Agreement with ResCap (the "Settlement Agreement") from three different Credit Enhancers[1] for fifteen of the Trusts. You have advised that your clients (the "Clients") hold 25% or more of the face value of one or more classes of notes in at least ten of these fifteen Trusts. Specifically, U.S. Bank has the received the following letters (the "Letters," and each a "Letter"):

1.    Letters dated May 25 and August 9, 2012 from Financial Guaranty Insurance Company ("FGIC") with respect to eight Trusts (it appears your Clients are investors in at least four of those Trusts) in which FGIC, among other things, provides notice that it "does not authorize U.S. Bank, as Trustee, to vote in favor of, or opt in

---

[1]    Capitalized terms used herein and not otherwise defined have the meanings specified in the relevant Governing Agreements.

Kathy D. Patrick, Esq.
Talcott J. Franklin, Esq.
September 14, 2012
Page 2

to, the Settlement Agreement or the Plan Support Agreement and
direct[s] U.S. Bank, as Trustee, not to vote in favor or, or opt in to,
such agreements, to the extent any of the [Trusts for which it is a
Credit Enhancer] are subject to such agreements;"

2.    Three Letters, dated July 23, 2012, from MBIA Insurance
Corporation ("MBIA") with respect to six Trusts (it appears that
your Clients are investors in each at least five of those Trusts)
which purport to "instruct [U.S. Bank, as trustee] to not consider or
accept any settlement or compromise offers relating to any claims
that may belong to [its insured] trusts, including, but not limited to
the RMBS Settlement Agreement…;" and

3.    A Letter, dated August 23, 2012, from Proskauer Rose LLP on
behalf of Assured Guaranty Municipal Corp. ("Assured") with
respect to one Trust (in which it appears your Clients are investors)
which states, in relevant part, that "notwithstanding any direction
the Indenture Trustee may have received from noteholders,
Assured does not consent at this time to the Indenture Trustee's
entering into the Joinder [of the RMBS Settlement Agreement]."

Copies of the Letters, as well as our responses, are enclosed. To assure full
disclosure, we have also provided to the Credit Enhancers copies of the relevant Gibbs & Bruns
letters, dated May 24 and July 9, 2012, and Talcott Franklin's two letters, dated August 22, 2012.

Each of the Letters (to the extent they identify Trusts in which your Clients are
investors) conflict with your previous correspondence to U.S. Bank that "urge and direct" U.S.
Bank to exercise its prudent, independent judgment to accept the Settlement Agreement on the
Trusts' behalf or "request that [U.S. Bank] accept [the Settlement Agreement]." We encourage
you to reach out to the Credit Enhancers and attempt to resolve the conflicting "directions" in
advance of the date by which U.S. Bank must accept or reject the Settlement Agreement under
the July 31, 2012 scheduling order in the ResCap bankruptcy proceeding.

Please call me if you have any questions or we can help facilitate your contacting
the Credit Enhancers. Thank you.

Sincerely,

M. William Munno

M. William Munno

caw
Enclosures

SK 03687 0119 1317986



WISDOM IN ACTION℠

July 23, 2012

**URGENT MATERIAL ENCLOSED**
BY E-MAIL AND CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, Minnesota 55107
Attention:    Home Equity Loan Trusts 2007-HSA2 and 2007-HSA3

Re:    Home Equity Loan Trust 2007-HSA2, Home Equity Loan Pass-Through Certificates, Series 2007-HSA2; and

Home Equity Loan Trust 2007-HSA3, Home Equity Loan-Backed Term Notes, Series 2007-HSA3

Ladies and Gentlemen:

Reference is made to the agreements (each an "Agreement") described on Exhibit A, each of which you are party to, relating to the series of securities described above (the "Securities"). With respect to each series of Securities, MBIA Insurance Corporation (the "Credit Enhancer") issued the Policy or Policies referred to in the applicable Agreement.

Pursuant to each Agreement, the Credit Enhancer has the right to direct remedial actions relating to the Securities, including, but not limited to, the acceptance of any settlement or compromise offers. We hereby instruct you to not consider or accept any settlement or compromise offers relating to any claims that may belong to the above-referenced Trusts, including, but not limited to the RMBS Trust Settlement Agreement, dated as of May 13, 2012 (the "Settlement Agreement"), by and between Residential Capital, LLC and its direct and indirect subsidiaries and the Institutional Investors (as defined in the Settlement Agreement). As such, it is the Credit Enhancer's position that it would not be reasonable for you to incur any costs or expenses in evaluating any such settlement or compromise offers and, therefore, the Credit Enhancer will not reimburse you for any such costs or expenses.

Sincerely,

MBIA Insurance Corporation

By: _David_____
    Name: David Glehan
    Title:  Managing Director

**MBIA Insurance Corporation**  ·  113 King Street  ·  Armonk, NY 10504  ·  +1 914 273 4545  ·  _www.mbia.com_

## EXHIBIT A

1.  Pooling and Servicing Agreement, dated as of April 1, 2007, among Residential Funding Mortgage Securities II, Inc., Residential Funding Company, LLC and U.S. Bank National Association, successor trustee to Bank of America, N.A., successor by merger to LaSalle Bank National Association

2.  Indenture, dated as of May 30, 2007, among Home Equity Loan Trust 2007-HSA3 and U.S. Bank National Association, successor trustee to Bank of America, N.A., successor by merger to LaSalle Bank National Association


**WISDOM IN ACTION**℠

July 23, 2012

**URGENT MATERIAL ENCLOSED**
**BY E-MAIL AND CERTIFIED MAIL (RETURN RECEIPT REQUESTED)**

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, Minnesota 55107
Attention:    GMACM Home Equity Loan Trust 2004-HE4
            GMACM Home Equity Loan Trust 2006-HE4
            GMACM Home Equity Loan Trust 2007-HE1


    Re:    GMACM Home Equity Loan Trust 2004-HE4, GMACM Home Equity
        Loan-Backed Term Notes, Series 2004-HE4;

        GMACM Home Equity Loan Trust 2006-HE4, GMACM Home Equity
        Loan-Backed Term Notes, Series 2006-HE4; and

        GMACM Home Equity Loan Trust 2007-HE1, GMACM Home Equity
        Loan-Backed Term Notes, Series 2007-HE1

Ladies and Gentlemen:

        Reference is made to the Indentures (each an "Indenture") described on
Exhibit A, each of which you are party to, relating to the series of notes described above (the
"Notes"). With respect to each series of Notes, MBIA Insurance Corporation (the "Enhancer")
issued the Policy referred to in the applicable Indenture.

        Pursuant to each Indenture, the Enhancer has the right to direct remedial actions
relating to the Notes, including, but not limited to, the acceptance of any settlement or
compromise offers. We hereby instruct you to not consider or accept any settlement or
compromise offers relating to any claims that may belong to the above-referenced Trusts,
including, but not limited to the RMBS Trust Settlement Agreement, dated as of May 13, 2012
(the "Settlement Agreement"), by and between Residential Capital, LLC and its direct and
indirect subsidiaries and the Institutional Investors (as defined in the Settlement Agreement). As
such, it is the Enhancer's position that it would not be reasonable for you to incur any costs or
expenses in evaluating any such settlement or compromise offers and, therefore, the Enhancer
will not reimburse you for any such costs or expenses.

**MBIA Insurance Corporation** • 113 King Street • Armonk, NY 10504 • +1 914 273 4545 • *www.mbia.com*



Sincerely,

MBIA Insurance Corporation

By: _____
    Name: David Glehan
    Title:  Managing Director

## EXHIBIT A

1.  Indenture, dated as of October 28, 2004, among GMACM Home Equity Loan Trust 2004-HE4 and U.S. Bank National Association, successor indenture trustee to Wells Fargo Bank, N.A.

2.  Indenture, dated as of September 27, 2006, among GMACM Home Equity Loan Trust 2006-HE4 and U.S. Bank National Association, successor indenture trustee to The Bank of New York Mellon Trust Company, N.A., successor indenture trustee to JPMorgan Chase Bank, National Association

3.  Indenture, dated as of March 29, 2007, among GMACM Home Equity Loan Trust 2007-HE1 and U.S. Bank National Association, successor indenture trustee to The Bank of New York Mellon Trust Company, N.A., successor indenture trustee to JPMorgan Chase Bank, National Association



WISDOM IN ACTION℠

July 23, 2012

**URGENT MATERIAL ENCLOSED**
BY E-MAIL AND CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, Minnesota 55107
Attention:      Global Securities Solutions, RFMSII 2007-HSA1

Re:      Home Equity Loan Trust 2007-HSA1, Home Equity Loan-Backed Term
Notes, Series 2007-HSA1

Ladies and Gentlemen:

Reference is made to the Indenture, dated as of February 27, 2007 (the "Indenture"), by and between Home Equity Loan Trust 2007-HSA1 and Bank of America, N.A., successor by merger to LaSalle Bank National Association, relating to the series of notes described above (the "Notes"). With respect to the Notes, MBIA Insurance Corporation (the "Credit Enhancer") issued the Policy referred to in the Indenture.

Pursuant to the Indenture, the Credit Enhancer has the right to direct remedial actions relating to the Notes, including, but not limited to, the acceptance of any settlement or compromise offers. We hereby instruct you to not consider or accept any settlement or compromise offers relating to any claims that may belong to the above-referenced Trusts, including, but not limited to the RMBS Trust Settlement Agreement, dated as of May 13, 2012 (the "Settlement Agreement"), by and between Residential Capital, LLC and its direct and indirect subsidiaries and the Institutional Investors (as defined in the Settlement Agreement). As such, it is the Credit Enhancer's position that it would not be reasonable for you to incur any costs or expenses in evaluating any such settlement or compromise offers and, therefore, the Credit Enhancer will not reimburse you for any such costs or expenses.

Sincerely,

MBIA Insurance Corporation

By: _____
Name: David Glehan
Title:   Managing Director

**MBIA Insurance Corporation**   ·   113 King Street   ·   Armonk, NY 10504   ·   +1 914 273 4545   ·   *www.mbia.com*



Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

August 23, 2012

*By Email*
Ronald L. Cohen, Esq.
M. William Munno, Esq.
Seward & Kissell LLP
One Battery Park Plaza
New York, New York 10004

Irena M. Goldstein
Member of the Firm
d 212 969 4053
f 212.969.2900
igoldstein@proskauer.com
www.proskauer.com

Re: RMBS Settlement

Dear Messrs. Cohen and Munno:

This firm represents Assured Guaranty Municipal Corp. ("Assured") (formerly known as Financial Security Assurance Inc.) in connection with the bankruptcy proceedings of Residential Capital LLC and its related debtors (collectively, "ResCap"). Assured is the "Enhancer" under the Indenture (the "Indenture"), dated as of June 30, 2004, between GMACM Home Equity Loan Trust 2004-HE3, as issuer, and Wells Fargo Bank, N.A., as indenture trustee. It is my understanding that your client, U.S. Bank National Association, is the successor indenture trustee under the Indenture (the "Indenture Trustee").

Pursuant to section 5.11 of the Indenture, "the Enhancer shall have the right to exercise all rights of the Owners of the Notes as specified under this Indenture without any further consent of the Owners of the Term Notes and that the Owners of the Term Notes may not exercise such rights except with the written consent of the Enhancer." Among the rights granted to the Enhancer, is "the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee." *Id.*

As you are aware, ResCap is seeking approval of certain RMBS settlement agreements, and is requesting the Indenture Trustee to enter into a Joinder and Acceptance of the RMBS Settlement Agreement (the "Joinder"). I am writing to advise you that, notwithstanding any direction the Indenture Trustee may have received from noteholders, Assured does not consent at this time to the Indenture Trustee's entering into the Joinder. Accordingly, the Indenture Trustee cannot enter into the Joinder and must await further instructions from Assured.

Please do not hesitate to contact me if you have any questions or comments.

Regards,

Irena M. Goldstein

cc: Margaret Yanney, Esq.

Beijing | Boca Raton | Boston | Chicago | Hong Kong | London | Los Angeles | New Orleans | New York | Newark | Paris | São Paulo | Washington, DC



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212-312-3000
F 212-312-3093

August 9, 2012

**VIA OVERNIGHT MAIL**

U.S. Bank National Association
190 South LaSalle Street
MK-IL-SL8T
Chicago, IL 60603
Attention: Mamta K. Scott, Vice President

Re: RMBS Trust Settlement Agreement with Residential Capital, LLC

Dear Ms. Scott:

We write in response to the letter from your counsel, Seward & Kissel, dated June 26, 2012 (the "Response Letter") to Financial Guaranty Insurance Company ("FGIC"). Reference is hereby made to (i) the RMBS Trust Settlement Agreement dated as of May 13, 2012 (the "Settlement Agreement") by and between Residential Capital, LLC ("ResCap") and its direct and indirect subsidiaries and certain institutional investors identified in such agreement (the "Institutional Investors"), (ii) the Plan Support Agreement between ResCap and the Institutional Investors as described in the Settlement Agreement (the "Plan Support Agreement"), (iii) each of the transactions listed on Exhibit A hereto (each a "Transaction") for which U.S. Bank National Association ("U.S. Bank") currently serves as a Trustee or Indenture Trustee, as applicable (each a "Trustee"), and (iv) the direction letter from FGIC to you dated May 25, 2012 (the "Direction Letter").

**I.      FGIC's Rights Under the Governing Agreements**

We are writing to you today so that you are clearly aware of FGIC's rights under the Pooling and Servicing Agreements, Indentures and other documents governing the Transactions (the "Governing Agreements") and your obligations to FGIC in respect thereof. As you are aware, FGIC has issued policies (each a "Policy") insuring certain payments on securities (the "Transaction Securities") in connection with each of the Transactions and has extensive control and direction rights with respect thereto, including the rights to consent to amendments and waivers of the Governing Agreements and the

Page 1 of 8

NYI-4465868v2



institution of legal proceedings thereunder, the exclusive right to vote on behalf of the insured securityholders ("Insured Holders"), and, with respect to certain transactions, the express right to direct the Trustee with respect to the exercise of any trust or power conferred upon it. FGIC also has rights and obligations independent of the rights and obligations of the Institutional Investors, the Trustees and the trusts relating to the Transactions, and pursuant to Section 8.02 of the Settlement Agreement, the releases and waivers described in Article VII of the Settlement Agreement are not intended to and shall not release these rights.

The Direction Letter provided notice to you that FGIC does not authorize U.S. Bank, as Trustee, to vote in favor of, or opt in to, the Settlement Agreement or the Plan Support Agreement and directed U.S. Bank, as Trustee, not to vote in favor of, or opt in to, such agreements, to the extent any of the Transactions are subject to such agreements. Moreover, by this letter, FGIC hereby informs the Trustee that the Trustee should not enter into *any* settlement that would impair or otherwise impact FGIC's rights with respect to the Transactions without FGIC's express consent. FGIC has the right to withhold such authorization and to direct the Trustee for the following reasons.

Pursuant to Section 5.11 of each indenture (each an "Indenture") for the Transactions listed in Schedule I hereto (the "Note Transactions"), FGIC has the right to direct the Trustee with respect to the exercise of any trust or power conferred on it under such Indenture. Consequently, the Trustee is prohibited from taking any action contrary to the direction of FGIC.

We also note that, pursuant to Section 4.12 of each Indenture, the Trustee is required to cooperate in all respects with any reasonable requests by FGIC for actions to preserve FGIC's interests under the Indentures. As stated in the Direction Letter, FGIC believes that the Settlement Agreement and the Plan Support Agreement may be materially adverse to FGIC's interests under the Indentures. Therefore, to the extent any Note Transaction is subject to the Settlement Agreement or the Plan Support Agreement, pursuant to the terms of Section 5.11 of the related Indenture, FGIC hereby repeats its direction to you, as Trustee, not to vote in favor of, or opt into, the Settlement Agreement or Plan Support Agreement. Moreover, FGIC hereby directs the Trustee to not enter into any settlement that is materially adverse to FGIC without FGIC's express consent.

Pursuant to the terms of the Pooling and Servicing Agreements (each a "Pooling and Servicing Agreement") for the Transactions listed on Schedule II hereto (the "Certificate Transactions"), FGIC may exercise all rights of the Insured Holders without the consent of such holders, and such holders may exercise such rights only with FGIC's prior written consent. Accordingly, to the extent any Certificate Transaction is subject to the Settlement Agreement and Plan Support Agreement, we note that any actions instituted by the Institutional Investors directing the Trustee with respect thereto are not valid because FGIC's consent to such direction was not obtained. FGIC hereby repeats its direction to you, as Trustee, not to vote in favor of, or opt into, the Settlement Agreement or Plan Support Agreement with respect to such Certificate Transaction.

NYI-4465868v2



## II.    The 1310 Order and Rehabilitation Order

In connection with the order of the New York Superintendent of Insurance pursuant to Section 1310 of the New York Law Insurance Law, dated November 24, 2009 and Supplemental Order Pursuant to Insurance Law §1310 March 25, 2010 (the "1310 Order"), which can be viewed at www.fgic.com, FGIC retains full rights under the operative documents relating to each of the Transactions, including the related indenture, pooling and servicing agreement, sale and servicing agreement, servicing agreement, mortgage loan purchase agreement and/or other operative documents, as the case may be (the "Transaction Documents"), including its direction and consent rights under the Indentures and the Pooling and Servicing Agreements described above.

In addition, pursuant to Section 14 of the Rehabilitation Order, attached hereto as Exhibit B (the "Rehabilitation Order"), all persons and entities (other than FGIC and FGIC Credit Products, LLC ("FGIC CP")) are enjoined and restrained from, among other things, exercising or taking any action to exercise any approval, consent, direction, determination, voting, or other right or remedy that FGIC or FGIC CP would or may have directly or indirectly but for the commencement or continuation of the Rehabilitation Proceeding (as defined in the Rehabilitation Order) or the occurrence or the existence of any Rehabilitation Circumstances (as defined in the Rehabilitation Order). Therefore, any rights of FGIC, the suspension of which was asserted due to any purported default under the Transaction Documents that is a direct result of the 1310 Order and/or a Rehabilitation Circumstance are reinstated and other parties, including the Institutional Investors, are enjoined and restrained from exercising FGIC's rights under the Transaction Documents, which include FGIC's right to direct the Indenture Trustee for each Note Transaction and its right to consent to actions by the holders of the Certificate Transactions.

Because there is very little information publicly available concerning the Settlement Agreement or the Plan Support Agreement, we again request that the Trustee provide to FGIC copies of any non-public information that it may receive concerning the Settlement Agreement or Plan Support Agreement.

As stated in the Direction Letter, the terms of the Settlement Agreement and the Plan Support Agreement, which may increase FGIC's potential claims and losses under the Transactions, may be materially adverse to FGIC's interests with respect to the Transactions. FGIC does not waive any of its rights, under the Indentures and Pooling and Servicing Agreements or in any way relating to the Transactions, all of which are expressly reserved.

This letter shall constitute a "Direction" within the definition of Section 14 of the Rehabilitation Order at such time as the Settlement Agreement or the Plan Support Agreement are submitted to the Trustee for approval, support, or opt-in. Should the Trustee fail to comply with the Direction Letter or the Rehabilitation Order at that time, FGIC will pursue any rights and remedies it may have under the Transaction Documents or the Rehabilitation Order.

NYI-4465868v2



In addition, if the Trustee intends to take any action to support, including indicating support for, the Settlement Agreement or the Plan Support Agreement prior to the time the Settlement Agreement or Plan Support Agreement are formally submitted to it, the Trustee must provide FGIC prior notice of such action, as required by the Rehabilitation Order.

If you have any questions or wish to discuss our concerns, the Settlement Agreement or the Plan Support Agreement in more detail, please contact me at 212-312-2784.

Sincerely,

Timothy S. Travers
Executive Vice President

cc:    Seward & Kissel LLP
       One Battery Park Plaza
       New York, NY 10004
       Attention: M. William Munno, Partner

       U.S. Bank National Association
       EP-MN-WS3D
       60 Livingstion Avenue
       St. Paul, MN 55107
       Attn: Client Services Manager:
       RFMSII 2007-HI1, RFMSII 2006-HI5,
       RFMSI 2005-S7, RFMSI 2005-S2,
       RASC 2007-EMX1, RASC 2005-EMX5,
       RAMP 2005-NC1, RAMP 2005-EFC7

## <u>EXHIBIT A</u>

## <u>TRANSACTIONS</u>

RFMSII 2007-HI1
RFMSII 2006-HI5
RFMSI 2005-S7
RFMSI 2005-S2
RASC 2007-EMX1
RASC 2005-EMX5
RAMP 2005-NC1
RAMP 2005-EFC7

NYI-4465868v2

## **EXHIBIT B**

Attach Rehabilitation Order

NYI-4465868v2

AT IAS PART 36 OF THE SUPREME COURT
OF THE STATE OF NEW YORK. COUNTY OF
NEW  YORK.  AT  THE  COURTHOUSE,
60 CENTRE STREET, IN THE COUNTY, CITY
AND STATE OF NEW YORK. ON THE 28TH
DAY OF JUNE, 2012

PRESENT:
HON. DORIS LING-COHAN, J.S.C.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                   :

In the Matter of                :

the Application of            :    Index No. 401265/2012

Benjamin M. Lawsky, Superintendent of Financial  :   **ORDER OF REHABILITATION**
Services of the State of New York. for an order to  :
take possession of the property of and rehabilitate  :

FINANCIAL GUARANTY INSURANCE       :
COMPANY.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Petitioner, Benjamin M. Lawsky, Superintendent of Financial Services of the

State of New York (the "**Superintendent**"), having moved this Court for an order placing

Financial Guaranty Insurance Company ("**FGIC**") into rehabilitation, and upon reading and

filing the Order to Show Cause dated June 11, 2012, the verified petition of the Superintendent,

duly verified the 11th day of June, 2012 (the "**Rehabilitation Petition**"),[1] the exhibits attached

to the Rehabilitation Petition, and the Memorandum of Law in Support of the Rehabilitation

Petition, and the Court having held a full hearing to consider the requested relief, this Court finds

that:

        a.     FGIC is a New York State stock insurance company that issued financial
               guaranty insurance;

        b.     FGIC's statutory home office is located at 125 Park Avenue, New York,
               New York 10017;

---

[1] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Rehabilitation
Petition.

c.    FGIC is subject to the New York Insurance Law ("**NYIL**") and, in particular, to Article 74 thereof;

d.    FGIC has consented to entry of an order of rehabilitation pursuant to Article 74 of the NYIL by a resolution of FGIC's board of directors;

e.    FGIC is insolvent within the meaning of Section 1309 of the NYIL;

f.    FGIC has been unable to comply, within the time designated by the Superintendent, with an order of the Superintendent pursuant to Section 1310 of the NYIL, to make good an impairment of its capital or minimum surplus to policyholders;

g.    It is in the best interest of FGIC's policyholders, creditors, and the general public that the Superintendent be directed to take possession of FGIC's property and to rehabilitate its business and affairs;

h.    FGIC is the sole member of FGIC Credit Products, LLC ("**FGIC CP**"), a Delaware limited liability company that issued credit default swaps ("**CDS**") to certain buyers of credit protection. FGIC wrote financial guaranty insurance policies for the benefit of counterparties to CDS with FGIC CP (collectively, "**Counterparties**"), which policies insure FGIC CP's obligations under such CDS. The financial obligations of FGIC and FGIC CP, with respect to such CDS, are sufficiently interconnected to warrant a grant of the relief requested herein with respect to FGIC CP; and

i.    Judicial immunity applies to the Rehabilitator, the New York Liquidation Bureau (the "**NYLB**"), and their respective employees, attorneys, representatives, and agents for any action taken by them when acting in good faith, in accordance with the orders of this Court, and/or, in the case of the Rehabilitator and the NYLB, in the performance of their duties pursuant to Article 74 of the NYIL.

NOW, on motion of Eric T. Schneiderman, Attorney General of the State of New York, it is ORDERED as follows:

1.    The relief requested in the Rehabilitation Petition is granted;

2.    The Superintendent, and his successors in office, is appointed rehabilitator (the "**Rehabilitator**") of FGIC and is vested with all powers and authority expressed or implied under Article 74 of NYIL and this Order;

3.    The Rehabilitator is authorized and directed to take possession and/or control of FGIC's property and assets and to conduct FGIC's business;

4.    The Rehabilitator may deal with the property and business of FGIC in FGIC's name or in the name of the Rehabilitator including, without

2

limitation, continue, commence, advance, defend, or prosecute any action, claim, lawsuit, arbitration, alternative dispute resolution proceeding, or other formal legal or administrative proceedings in any municipal, state, federal, or foreign court, administrative body, or other tribunal;

5.  The Rehabilitator is directed to take such steps toward the removal of the causes and conditions that make this rehabilitation proceeding (the "**Rehabilitation Proceeding**") necessary as the Rehabilitator may deem prudent and advisable;

6.  All persons and entities, other than the Rehabilitator, are permanently enjoined and restrained, except as authorized by the Rehabilitator or his designee in writing, from: (i) transacting FGIC's business, (ii) disposing of FGIC's property; (iii) interfering with the Rehabilitator's possession, control, or management of FGIC's property or the discharge of the Rehabilitator's duties with regard to FGIC or the Rehabilitation Proceeding; and (iv) disclosing the name, address, or contact information of FGIC's policyholders, or any other information that is proprietary to FGIC or not in the public domain;

7.  All persons and entities are permanently enjoined and restrained from wasting or permitting to be done any act or thing that might waste FGIC's property;

8.  All persons and entities are enjoined and restrained from commencing, continuing, advancing, or otherwise prosecuting any actions, claims, lawsuits, arbitrations, alternative dispute resolution proceedings, or other formal legal or administrative proceedings in any municipal, state, federal, or foreign court, administrative body, or other tribunal, against (i) the Rehabilitator, the New York State Department of Financial Services ("**NYSDFS**"), the Superintendent, the NYLB, any of their respective officers, employees, attorneys, representatives, or agents, or any directors, officers, employees, attorneys, representatives, or agents of FGIC or FGIC CP, in each case as related to FGIC, FGIC CP, the Rehabilitation Circumstances (as defined below), or the Rehabilitation Proceeding; or (ii) FGIC or FGIC CP.

9.  All persons and entities are enjoined and restrained from taking any steps to transfer, foreclose, sell, assign, garnish, levy, encumber, attach, dispose of, exercise, or enforce purported rights in or against any claimed interest in any property or assets of FGIC or FGIC CP or any part thereof;

10. All directors, trustees, officers, employees, agents, or representatives, if any, of FGIC and FGIC CP are hereby enjoined and restrained from paying any claims or performing any other obligations of FGIC or FGIC CP under any policy, contract, or other instrument to which FGIC or FGIC CP is a party or by which FGIC or FGIC CP is bound (a "**FGIC**

3

Policy/Contract") except as authorized by the Rehabilitator or his designee in writing;

11.    All persons and entities are enjoined and restrained from seeking to acquire, acquiring, or exercising voting or other corporate governance rights pursuant to or under FGIC's outstanding preferred stock;

12.    All persons and entities are enjoined and restrained from withholding or continuing to withhold, subordinating, failing to pay, setting-off, or taking similar action with respect to payments (including, without limitation, recoveries or reimbursements) owed (or that would have been or would be owed but for the commencement or continuation of the Rehabilitation Proceeding or the occurrence or existence of any of the Rehabilitation Circumstances) to FGIC or FGIC CP under any FGIC Policy/Contract, or any Transaction Document (as defined below) executed in connection with the issuance of or entry into such FGIC Policy/Contract or related to such FGIC Policy/Contract or any obligations insured or covered thereby, regardless of the existence of any provisions in such FGIC Policy/Contract or Transaction Document that would or may otherwise permit such withholding, subordination, failure to pay, setting-off, or similar action; *provided, however,* that if this Court enters an order that becomes final and non-appealable holding that a particular person or entity or group of persons or entities should have been able to set-off or recoup any given payment during the pendency of the Rehabilitation Proceeding, the Rehabilitator shall refund as an administrative expense any such payment that was made to FGIC or FGIC CP during the pendency of the Rehabilitation Proceeding. As used herein, the term "**Rehabilitation Circumstances**" means the circumstances and events, whenever arising, giving rise to the Rehabilitation Proceeding or in existence from and after, or giving rise to or at any time resulting from, issuance of the 1310 Order, including (i) the financial condition of FGIC or FGIC CP, (ii) the grounds for the Rehabilitation Proceeding described in the Rehabilitation Petition, (iii) actions taken or statements made by FGIC, FGIC CP, the NYSDFS, the Superintendent, the NYLB or any other person or entity in connection with or in contemplation of the 1310 Order or the Rehabilitation Proceeding, (iv) any ratings downgrade of FGIC or any affiliate thereof, (v) any failure by FGIC or FGIC CP to pay any amount (whether due to the 1310 Order, the injunctive relief in the Order to Show Cause, this Order, or otherwise), and (vi) the issuance and existence of the 1310 Order;

13.    All persons and entities (other than the Rehabilitator or as authorized in writing by the Rehabilitator or his designee) are enjoined and restrained from (i) terminating, accelerating, liquidating, closing out, collecting on, claiming against, making any demand or delivering any notice under, or otherwise exercising or enforcing rights or remedies or taking any action under or with respect to, or attempting to terminate, accelerate, liquidate,

close out, collect on, claim against, make any demand or deliver any notice under, or otherwise exercise or enforce rights or remedies or take action under or with respect to any FGIC Policy/Contract or any Transaction Document (as defined below) executed in connection with the issuance of or entry into such FGIC Policy/Contract or related to such FGIC Policy/Contract or any obligations insured or covered thereby, on the basis of the commencement or continuation of the Rehabilitation Proceeding or the occurrence or existence of any of the Rehabilitation Circumstances, regardless of the existence of any provisions in such FGIC Policy/Contract or Transaction Document (as defined below) that would or may otherwise permit or require such termination, acceleration, liquidation, closing out, collection, claim, demand, notice, exercise, enforcement, or action, and/or (ii) asserting claims as a result of any actual or attempted early termination of any FGIC Policy/Contract including without limitation Termination Payments (whether calculated on the basis of "Market Quotation", "Loss", "Close-out Amount," or other methodologies) under or in relation to such FGIC Policy/Contract;

14.   All persons and entities (other than the Rehabilitator or as authorized in writing by the Rehabilitator or his designee) are enjoined and restrained from:  (i) exercising or taking any action to exercise any approval, consent, direction, determination, appointment, request, voting, veto, waiver, or other right or remedy that FGIC or FGIC CP has (through the right to direct or grant or withhold consent with respect to such exercise or otherwise) (or that FGIC or FGIC CP would have but for the commencement or continuation of the Rehabilitation Proceeding or the occurrence or existence of any of the Rehabilitation Circumstances) under or with respect to any policies, contracts, or other instruments or documents relating to any FGIC Policy/Contract or any obligations insured or covered thereby, including without limitation any financial guaranty policies, fee letters or premium agreements, insurance and indemnification agreements, credit default swaps or other credit derivative transaction agreements, interest rate or currency rate swap agreements, basis swap agreements, total return swap agreements, indentures, trust deeds, pooling and servicing agreements, pooling agreements, sale and servicing agreements, sale agreements, collateral management or administration agreements, servicing agreements, credit or loan agreements, residential mortgage-backed securities transaction documents, guarantee investment certificates, custodial account agreements, note purchase agreements, or other financing or transaction documents of any kind (collectively, "**Transaction Documents**" and each a "**Transaction Document**") ~~or under applicable law~~ (~~collectively,~~ the "**FGIC Rights**"); or (ii) failing to take, or taking any action inconsistent with, any action (or inaction) directed (whether actively or passively) to be taken pursuant to the exercise by FGIC, FGIC CP, or the Rehabilitator of any FGIC Rights; or (iii) failing to provide, or causing to be provided, to FGIC or FGIC CP any notice, request, or other communication or document that FGIC or

*all rights and remedies described in this clause (i)*

5

FGIC CP may have the right to receive (or that FGIC or FGIC CP would or may have the right to receive but for the commencement or continuation of the Rehabilitation Proceeding or the occurrence or the existence of any of the Rehabilitation Circumstances). For the avoidance of doubt, this paragraph does not enjoin or restrain any servicer (including any master servicer, sub-servicer or special servicer) from servicing underlying collateral to the extent it would be permitted to do so under the applicable Transaction Documents (without regard to the commencement or continuation of the Rehabilitation Proceeding or the occurrence or existence of any Rehabilitation Circumstances). In addition, notwithstanding anything to the contrary in this Paragraph 14, (i) if the Rehabilitator (or his designee) directs an indenture trustee or another type of corporate trustee (collectively, an "**Indenture Trustee**") or servicer to take an action or refrain from taking an action (collectively, the "**Direction**") that the Indenture Trustee or servicer believes it is not obligated to take or refrain from taking, the Indenture Trustee or servicer may seek a ruling from this Court (on an expedited basis if necessary) as to whether it is required to comply with the Direction, and the Indenture Trustee or servicer shall not be in contempt of Court for not complying with the Direction prior to this Court's ruling so long as the Indenture Trustee or servicer (a) seeks a ruling no later than five (5) business days after the Rehabilitator (or his designee) gives it the Direction and (b) provides prompt notice to the Rehabilitator of its request for a ruling; *provided, however*, that nothing herein shall prohibit the Rehabilitator from seeking a ruling (on an expedited basis if necessary) with respect to the Direction at any time; and (ii) if an Indenture Trustee or servicer intends to exercise any FGIC Right, (x) the Indenture Trustee or servicer shall provide the Rehabilitator with prompt notice of its intent to exercise such FGIC Right, and (y) if the Rehabilitator believes that the Indenture Trustee or servicer is not permitted to exercise such FGIC Right, the Rehabilitator may seek a ruling from this Court as to whether to preclude such exercise (on an expedited basis if necessary) within five (5) business days after receiving notification of the intended exercise of a FGIC Right;

> *[handwritten margin note:]* and the Rehabilitator shall provide prompt notice to the Indenture Trustee or servicer of its request for a ruling

15.    FGIC and all persons and entities having any property belonging to or relating to FGIC, as applicable, including but not limited to, business records, insurance policies, claims files (electronic or paper), software programs, bank records, or any tangible or intangible items of value, shall preserve such property and are directed, immediately upon the Rehabilitator's request, to assign, transfer, turn over and deliver such property to the Rehabilitator or his designees;

16.    Any person or entity providing claims processing services, data processing services, electronic records retention services, or other information technology services to or on behalf of FGIC shall maintain and preserve all information in its possession ("**Information**") relating in any way to FGIC and its rights and obligations, wherever located, including but not

limited to all documents, data, electronic files and records, computer equipment (e.g., servers and printers), software programs and software licenses owned or leased by FGIC and are directed, upon the Rehabilitator's request, to promptly submit all such Information to the Rehabilitator or his designees;

17. Any bank, savings and loan association, other financial institution or any other entity or person, which has on deposit or in its possession, custody, or control any of FGIC's funds, accounts or assets, shall immediately upon the Rehabilitator's request and direction: (i) turn over custody and control of such funds, accounts, or assets to the Rehabilitator or his designees; (ii) transfer title of such funds, accounts, or assets to the Rehabilitator or his designees; (iii) change the name of such accounts to the name of the Rehabilitator; (iv) transfer funds from such bank, savings and loan association or other financial institution; or (v) take any other action necessary for the proper conduct of the Rehabilitation Proceeding;

18. Without limiting the ability of the Rehabilitator to reject, modify, or renegotiate any contract, lease, or arrangement concerning FGIC, all persons and entities that provide goods or services to FGIC shall continue to provide such goods or services to the Rehabilitator pursuant to the terms of any contract, lease, or other arrangement with FGIC, regardless of the existence of any provisions in any contract or lease that would otherwise excuse performance on the basis of the commencement or continuation of the Rehabilitation Proceeding or the occurrence or existence of any of the Rehabilitation Circumstances;

19. All persons and entities are enjoined and restrained from seeking to impose liability upon the Rehabilitator, the NYLB, or any of their respective employees, attorneys, representatives, or agents relating to or arising out of the Rehabilitation Proceeding or the Rehabilitation Circumstances;

20. The injunctive relief granted by this Order shall issue without the furnishing of an undertaking by the Superintendent. CPLR § 2512(a);

21. Notwithstanding anything to the contrary in this Order, nothing herein prevents any person or entity from asserting a claim in the Rehabilitation Proceeding; *provided, however*, that no person or entity may trigger or submit claims for Termination Payments (or take any action in furtherance thereof) or otherwise take any action prohibited by the provisions of this Order. Pending further Court order, policyholders and other claimants should submit their notices of claim or similar demands pursuant to the deadlines, procedures, and service requirements specified in their policies or contracts. Without extending the deadlines for filing claims that may be set forth in any FGIC Policy/Contract, the deadline set forth in Section 7432(b) of the NYIL for all persons and entities having claims against

7

FGIC to file or present their claims to the Rehabilitator is deferred until further order of this Court;

22. Any person seeking modification of, or relief from, the injunctive relief set forth in this Order (an "**Objecting Party**") shall submit a written request to the Rehabilitator setting forth good cause for such modification or relief. If the Objecting Party and the Rehabilitator reach a settlement regarding such modification or relief, the Rehabilitator shall submit a request to this Court seeking approval of such settlement. If the Objecting Party and the Rehabilitator fail to reach a settlement within 30 days of the Rehabilitator's receipt of such request, or such longer time as both the Rehabilitator and the Objecting Party agree, the Objecting Party may seek relief with this Court;

23. The failure by any person or entity to have objected to the injunctive relief set forth in this Order by June 22, 2012, any delay in seeking modification of, or relief from, the injunctive relief set forth in this Order through the procedures set forth in Paragraph 22 of this Order, and any delay in seeking a ruling from this Court pursuant to Paragraph 14 of this Order shall not waive, bar, or otherwise impair the right of such person or entity to challenge the validity of or seek to set aside all or any portion of the injunctive relief set forth in this Order or be deemed a waiver of any right to take any action that has been stayed by this Order if the injunctive relief applicable to such action is modified or lifted. Any person or entity that intends to challenge or seek to set aside all or any portion of the injunctive relief set forth in this Order shall follow the procedures set forth in Paragraph 22 hereof. Nothing in this Order shall be deemed to constitute a determination of any person's or entity's rights under any Transaction Documents or applicable law so long as the procedures in Paragraphs 14 and 22 are complied with;

24. The Rehabilitator may at any time make further application to this Court for such further and different relief as he sees fit;

25. A copy of this Order shall be served forthwith by certified and regular mail upon: John S. Dubel, Chief Executive Officer of FGIC, at the statutory home office of FGIC, located at 125 Park Avenue, New York, New York 10017, and Stroock & Stroock & Lavan LLP attn. William D. Latza, counsel for FGIC, located at 180 Maiden Lane, New York, NY 10038;

26. The Rehabilitator shall provide notice of this Order to all creditors and policyholders by (i) mailing such notice to all known creditors and policyholders by first class mail; (ii) publishing such notice in the Wall Street Journal and The Bond Buyer; and (iii) posting such notice on the internet website maintained by the NYLB for the Rehabilitation Proceeding at http://www.fgicrehabilitation.com (which shall be

8

accessible from http://www.nylb.org and http://www.fgic.com) within 30 days after the entry of this Order;

27.  This Court shall have exclusive jurisdiction to interpret, implement, and enforce the provisions of this Order and to hear any and all matters relating to the Rehabilitation Proceeding; and

28.  All further papers with respect to FGIC in this proceeding shall bear the caption:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                               :      Index No. 401265/2012
                                               :
In the Matter of the Rehabilitation of        :
FINANCIAL GUARANTY INSURANCE                   :
COMPANY.                                        :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

E N T E R

_____
               J.S.C.
DORIS LING-COHAN

9

## Schedule I

**RFMSII 2007-HI1**
**RFMSII 2006-HI5**

NYI-4465868v2

## Schedule II

RFMSI 2005-S7
RFMSI 2005-S2
RASC 2007-EMX1
RASC 2005-EMX5
RAMP 2005-NC1
RAMP 2005-EFC7

NYI-4465868v2

# SEWARD & KISSEL LLP

ONE BATTERY PARK PLAZA
NEW YORK, NEW YORK 10004

M. WILLIAM MUNNO
PARTNER
(212) 574-1587
munno@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

901 K STREET, NW
WASHINGTON, DC 20001
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

June 26, 2012

**VIA FEDERAL EXPRESS**

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017

Attention of Walter Wohr
        Managing Director

Re:     RMBS Trust Settlement Agreement with Residential
        Capital, LLC

Dear Mr. Wohr:

        We represent U.S. Bank National Association, solely in its capacity as Trustee
under the Pooling and Servicing Agreements (the "PSAs") for approximately 300 RMBS
Securitization Trusts (in such capacity, "U.S. Bank"), in connection with the Chapter 11 cases of
Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap").

        We have your letter dated May 25, 2012 (the "Letter") stating that FGIC does not
authorize U.S. Bank to vote in favor of, or opt into, the RMBS Trust Settlement Agreement with
ResCap with respect to the 8 Trusts identified on Exhibit B to the Letter.

        FGIC notes in its letter that it has not made payments under its policies relating to
the 8 Trusts in accordance with an order issued by the New York Superintendent of Insurance
(the "1310 Order").

        Please provide us with a copy of the 1310 Order. Please explain how the 1310
Order, in your view, preserves FGIC's rights under the applicable PSAs to provide any
instruction to U.S. Bank.

Financial Guaranty Insurance Company
June 26, 2012
Page 2

We look forward to your response.

Thank you.

Sincerely,

M. William Munno

caw



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212-312-3000
F 212-312-3093

May 25, 2012

<u>**VIA OVERNIGHT MAIL**</u>

U.S. Bank National Association
EP-MN-WS3D
60 Livingston Avenue
St. Paul, Minnesota 55107
Attention: Client Services Manager:
RFMSII 2007-HI1, RFMSII 2006-HI5,
RFMSI 2005-S7, RFMSI 2005-S2,
RASC 2007-EMX1, RASC 2005-
EMX5, RAMP 2005-NC1, RAMP
2005-EFC7

Re:  RMBS Trust Settlement Agreement with Residential Capital, LLC

Ladies and Gentlemen:

Reference is hereby made to (i) the RMBS Trust Settlement Agreement dated as of May 13, 2012 by and between Residential Capital, LLC ("<u>ResCap</u>") and its direct and indirect subsidiaries and certain institutional investors as defined in such agreement ("<u>Institutional Investors</u>") (attached hereto as <u>Exhibit A</u>, the "<u>Settlement Agreement</u>"), (ii) the Plan Support Agreement between ResCap and the Institutional Investors as described in the Settlement Agreement (the "<u>Plan Support Agreement</u>") and (iii) each of the transactions listed on <u>Exhibit B</u> hereto whereby U.S. Bank National Association currently serves as a Trustee or Indenture Trustee, as applicable (each a "<u>Transaction</u>"). Financial Guaranty Insurance Company ("<u>FGIC</u>") has issued policies insuring the repayment of certain of the securities (the "Transaction Securities") issued in connection with each of the Transactions.

FGIC is not only the financial guaranty insurer of the Transaction Securities issued in each of the Transactions, but it is also an express third party beneficiary of the operative documents relating to each of the Transactions, including the related indenture, pooling and servicing agreement, sale and servicing agreement, servicing agreement, mortgage loan purchase agreement and/or other operative documents, as the case may be. FGIC has rights and obligations independent of the rights and obligations of the Institutional Investors, the trustees and the trusts relating to the Transactions. In addition, to the extent FGIC has paid claims with respect to any of the Transactions, it is subrogated to the rights of the holders of the Transaction Securities, including but not limited to the right to receive payment of the Transaction Securities.



The terms of the Settlement Agreement and the Plan Support Agreement, which will increase FGIC's potential claims and losses under the Transactions, are materially adverse to FGIC's interest with respect to the Transactions. As you are aware, FGIC was ordered to suspend payment of all claims effective November 24, 2009 pursuant to an order by the New York Superintendent of Insurance (the "1310 Order"). However, FGIC retains its obligation to make payments under the policies relating to each Transaction and will resume making claims payments if and when allowed pursuant to the 1310 Order.

The Plan Support Agreement purports to release all claims against Ally Financial Inc. and its non-debtor affiliates, including Residential Funding Company, LLC, an indirect wholly owned subsidiary of ResCap ("RFC"), which is a seller in each of the Transactions. FGIC has filed complaints, however, against RFC alleging, *inter alia*, that RFC made material misrepresentations and omissions about the quality of the mortgage loans relating to certain of the Transactions. In addition, FGIC has claims against Ally Bank that could also be affected by the Plan Support Agreement. It would not be appropriate for the Trustee to consent to the proposed Settlement Agreement and Plan Support Agreement while certain Transactions are subject to separate litigation.

Finally, we note that there is very little information publicly available concerning the Settlement Agreement or the Plan Support Agreement. The Trustee should not in any event make any decisions with respect to the Settlement Agreement or Plan Support Agreement before it has obtained complete information concerning the terms and conditions of the Settlement Agreement or Plan Support Agreement and all other information necessary to make a fully informed decision. The Trustee should also provide to FGIC and the holders of the Transaction Securities copies of any non-public information that it may receive concerning the Settlement Agreement or Plan Support Agreement, in order for us to provide direction to the Trustee on a fully informed basis.

Accordingly, to the extent any of the Transactions are subject to the Settlement Agreement or the Plan Support Agreement, FGIC hereby provides notice that it does not authorize the Trustee to vote in favor of, or opt in to, such Settlement Agreement or Plan Support Agreement and hereby directs the Trustee not to vote in favor of, or opt in to, the Settlement Agreement or Plan Support Agreement.

If you have any questions or wish to discuss our concerns, the Settlement Agreement, the Plan Support Agreement and the filed complaints in more detail, please contact me at 212-312-3423.

Sincerely,

Winston Wohr
Managing Director

## EXHIBIT A

**Attach Settlement Agreement**

# EXHIBIT B

## TRANSACTIONS

RFMSII 2007-HI1
RFMSII 2006-HI5
RFMSI 2005-S7
RFMSI 2005-S2
RASC 2007-EMX1
RASC 2005-EMX5
RAMP 2005-NC1
RAMP 2005-EFC7

*EXECUTION VERSION*

*TO BE SIGNED BY THE PARTIES*
*IMMEDIATELY FOLLOWING THE PETITION DATE*

## SETTLEMENT AND PLAN SPONSOR AGREEMENT

THIS SETTLEMENT AND PLAN SPONSOR AGREEMENT (the "Agreement"), dated as of May 14, 2012 (the "Execution Date"), is made and entered into by and among Residential Capital, LLC and certain of its direct and indirect subsidiaries, as debtors and debtors-in-possession on behalf of each such entity and its estate (collectively, the "Debtors"),[1] and Ally Financial Inc. ("AFI"), on behalf of its direct and indirect subsidiaries and affiliates other than the Debtors and the Debtors' direct and indirect subsidiaries (collectively, "Ally") (each of the Debtors and Ally is a "Party," and collectively, the "Parties").

## RECITALS

WHEREAS, on the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") commencing cases (the "Chapter 11 Cases"), which are proposed to be jointly administered for procedural purposes;

WHEREAS, the Debtors believe certain claims exist against Ally related to the corporate relationship between the Debtors and Ally, including with respect to certain transactions between the Debtors and Ally, including equitable subordination, debt recharacterization, fraudulent conveyance, avoidance liability under federal or state laws, and other causes of action under theories of veil piercing and alter ego liability;

WHEREAS, Ally denies each allegation of the Debtors and has substantial claims against the Debtors;

---

[1]    The Debtors are: Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

*EXECUTION VERSION*

WHEREAS, certain entities, including AFI, GMAC Mortgage Group LLC, Ally Securities LLC, and Ally Bank have been named as defendants in lawsuits brought by third parties in connection with, or arising from, the Debtors' business activities, including with respect to residential mortgage backed securities issued and/or sold by the Debtors; and

WHEREAS, the Debtors and Ally have resolved all issues and disputes between and among the Parties, and have agreed upon a term sheet for a chapter 11 plan of reorganization for the Debtors' restructuring and to implement the terms of the settlement contained herein.

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

### Definitions

Section 1.1    *Terms Defined in the Preamble and Recitals.*  The following terms shall have the meaning ascribed thereto in the preamble and recitals of this Agreement: Ally; AFI; Bankruptcy Code; Bankruptcy Court; Chapter 11 Cases; Debtors; Execution Date; Parties and Party; and Petition Date.

Section 1.2    ₁*Other Defined Terms.*  The following definitions shall apply and constitute a part of this Agreement and all annexes and exhibits hereto:

"Ally Bank MSR" means the mortgage servicing rights held by Ally Bank.

"Allowed Claims" means the claims to be allowed under the Plan pursuant to Section 3.1(e).

"Ally Claims" means the Claims of Ally against the Debtors as described in Section 3.1(e) of this Agreement.

"Ally Contribution" means such term as defined in Section 2.1.

"Ally DIP Financing Facility" means the debtor-in-possession financing facility to be provided to the Debtors, attached to the Plan Term Sheet as Exhibit 3.

"Ally LOC" means such term as defined in Section 3.1(e).

"Ally Revolver" means such term as defined in Section 3.1(e).

"Bankruptcy Court Order" means an order of the Bankruptcy Court entered after notice and a hearing.

"Barclays DIP Financing Facility" means the debtor-in-possession financing facility to be provided to the Debtors, attached to the Plan Term Sheet as Exhibit 6.

2

*EXECUTION VERSION*

"Cash" means legal tender of the United States of America.

"Cash Collateral Order" means the order attached hereto as Exhibit 1.

"Cash Contribution" means such term as defined in Section 2.1(a).

"Causes of Action" means any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending on the Effective Date or instituted after the Effective Date against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

"Claim" means a claim, as such term is defined in section 101(5) of the Bankruptcy Code.

"Confirmation Order" means an order, in form and substance satisfactory to both Parties, confirming the Plan.

"Consent Materials" means (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, and (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012.

"Consumer Lending Origination Support" means Ally's support of ResCap's consumer origination channel through Ally Bank's continued (a) origination of conforming loans brokered by ResCap to Ally Bank pursuant to the Client Agreement governing broker activity, (b) performance under the GNMA Origination Agreement, and (c) offering of such other products, such as the origination of jumbo loans and the Purchase Power lending program, consistent with current practices.

"Current Program" means such term as defined in Section 2.2(b).

"Data Center Transaction" means that certain sale and buy-back transaction between AFI and the Debtors of the Debtors' real estate interests in the data center property known as "Shady Oak" (MN) and the data center in Lewisville, TX as set forth in Exhibit 2.

"Debtors' Obligations" means such term as defined in Section 3.1.

3

*EXECUTION VERSION*

"Disclosure Statement" means the disclosure statement for the Plan, as amended, supplemented or modified from time to time, in form and substance reasonably acceptable to both Parties, including all exhibits and schedules thereto, and as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"Effective Date" means the date of substantial consummation of the Plan, which shall be the first business day upon which all conditions precedent to the effectiveness of the Plan are satisfied or waived in accordance with the Plan.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction), which has not been modified, amended, reversed, vacated, or stayed, is in full force and effect, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"GNMA Origination Agreement" means the Amended and Restated Master Mortgage Loan Purchase and Sale Agreement with respect to the FHA, USDA, and VA Residential Mortgage Loans (as such terms are defined therein) between Ally Bank, as Seller, and GMAC Mortgage, LLC, as Purchaser.

"GNMA Origination Order" means the Bankruptcy Court Order approving the GNMA Origination Agreement.

"Governing Documents" means articles or certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of entity).

"HFS APA" means such term as defined in Section 2.1(b).

"HFS Portfolio" means ResCap's held-for-sale portfolio of mortgage loans, which are the subject of the HFS APA.

"HFS Sale Price" means such term as defined in Section 2.1(b).

"Interest" means any "Equity Security," as defined in section 101(16) of the Bankruptcy Code, of a Debtor existing immediately prior to the Effective Date.

"Milestones" means the deadlines and conditions set forth in Exhibit A attached hereto.

4

*EXECUTION VERSION*

"Person" means such term as defined in section 101(41) of the Bankruptcy Code.

"Plan" means the Debtors' chapter 11 plan, together will all addenda, exhibits, schedules, or other attachments, if any, including the Plan Supplement, and as may be amended, modified, or supplemented from time to time, in form and substance satisfactory to the Debtors and Ally, as set forth in more detail in the Plan Term Sheet.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed with the Bankruptcy Court on notice to parties-in-interest, and additional documents to be filed before the Effective Date as supplements or amendments to the Plan Supplement.

"Plan Term Sheet" means the chapter 11 plan term sheet, dated May 14, 2012, which is Exhibit 4 to this Agreement.

"Purchaser" means the buyer of certain of the Debtors' assets in the ResCap Asset Sale.

"Released Parties" means Ally, and each of theirs and the Debtors' respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives.

"Reorganized Debtors" means the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

"ResCap Asset Sale" means the sale of certain of the Debtors' assets pursuant to an Asset Purchase Agreement between the Debtors and Nationstar Mortgage LLC, or such other higher or better offer as may be selected by the Debtors pursuant to the bidding procedures established pursuant to such agreement.

"Restructuring" means the Plan and the transactions contemplated in relation thereto.

"Run Off Period" means such term as defined in Section 2.2(b).

"Section 363 Sale" means a sale under section 363 of the Bankruptcy Code prior to, and outside of, the Plan.

"Shared Services Agreement" means the shared services agreement, dated May 13, 2012, by and between AFI and the Debtors, to be approved by the Bankruptcy Court.

"Solicitation Procedures" means the procedures for soliciting acceptance or rejection of the Plan from each holder of an impaired Claim or Interest that is entitled to vote to accept or reject the Plan.

"Subservicing Agreement" means the Amended and Restated Servicing Agreement, dated May 13, 2012, by and between Ally Bank, as owner, and GMAC Mortgage, LLC, as Servicer.

5

*EXECUTION VERSION*

"Subservicing Agreement Order" means a Bankruptcy Court Order approving the Subservicing Agreement.

"Stalking Horse Bidder" means Nationstar Mortgage LLC, as the initially designated bidder for the assets to be purchased in connection with the ResCap Asset Sale.

"Third Party Release" means such term as defined in the section entitled Third Party Releases.

"Transition Services Agreement" means the transition services agreement to be negotiated with the Purchaser in connection with the ResCap Asset Sale.

## ARTICLE II

## Ally Obligations

Section 2.1     *Ally Contribution.*  Ally hereby agrees to make the following contributions to the Debtors:

(a)   **Cash Contribution.**   Upon satisfaction of the conditions set forth in Section 5.2 hereof, AFI will make a Cash contribution to the Debtors in the amount of $750,000,000 (the "Cash Contribution"); paid to fund the settlement of pending and future claims and to secure the releases in favor of the Released Parties set forth in Section 3.1(d), including third party releases under Section 3.1(d)(ii); provided that if AFI, in its sole discretion, agrees upon an acceptable purchase price for the Ally Bank MSR to be sold in conjunction with the Plan (via a contribution of the Ally Bank MSR by Ally to the Debtors immediately before the Effective Date), Ally shall negotiate with the Debtors in good faith to provide the Debtors with additional consideration from the sale of the Ally Bank MSR.

(b)   **HFS Stalking Horse Bid.**

   (i)     Subject to the conditions set forth in Section 5.2 hereof, AFI will serve as a stalking horse bidder for the HFS Portfolio in the amount (the "HFS Sale Price") set forth in the asset purchase agreement attached as Exhibit 5 hereto (the "HFS APA").   Ally shall not receive any break-up fee or other bid protections in the event ResCap receives a higher or better offer for the HFS Portfolio.

   (ii)    Notwithstanding the foregoing, if the conditions set forth in Section 5.2 hereof are not satisfied and the ResCap Asset Sale is consummated pursuant to the Section 363 Sale, AFI shall purchase the HFS Portfolio for 87.5% of the HFS Sale Price, subject to higher or better offers, all as set forth in the HFS APA.

*EXECUTION VERSION*

(c)     **Shared Services Agreement.** Subject to Bankruptcy Court approval, AFI will enter into and perform under the Shared Services Agreement with the Debtors during the Chapter 11 Cases attached hereto as Exhibit 7.

(d)     .**Cash Collateral Order.** Subject to Bankruptcy Court approval, Ally shall provide ResCap with use of Cash Collateral pursuant to the terms of the Cash Collateral Order.

(e)     **Transition Services Agreement.** Subject to Bankruptcy Court approval, AFI will negotiate and, upon agreement of the parties, enter into a Transition Services Agreement with the Purchaser in connection with the ResCap Asset Sale.

(f)     **Debtor-in-Possession Financing.** Subject to Bankruptcy Court approval, AFI will provide up to $220,000,000 of debtor-in-possession financing to the Debtors in accordance with the terms and conditions set forth in the Ally DIP Term Sheet attached hereto as Exhibit 3.

(g)     **Support of Pension.** AFI will honor in the ordinary course of business, obligations under the Employees' Retirement Plan sponsored by GMAC Mortgage Group LLC.

(h)     - -**Continued Consumer Lending Origination Support.** Subject to Bankruptcy Court approval, Ally Bank will provide Consumer Lending Origination Support to the Debtors during the Chapter 11 Cases through and until the closing of the ResCap Asset Sale.

Section 2.2     *ResCap Director and Officer Issues.*

(a)     **Indemnification.** AFI stands by and re-affirms its indemnification obligations under its Amended and Restated Certificate of Incorporation regarding ResCap's current and former Directors and Officers to the full extent of Delaware law.

(b)     **Insurance.** Ally will use commercially reasonable efforts to continue to renew its current blended directors and officers liability and fiduciary liability insurance program (the "Current Program"), for a period of six years following the Effective Date (the "Run Off Period"), on substantially the same terms and conditions as the Current Program and including prior acts coverage with respect to claims arising from acts or omissions that occurred prior to the Effective Date; provided that if Ally is unable to continue the Current Program for the entire Run Off Period despite its commercially reasonable efforts it shall promptly notify the Debtors and use best efforts to obtain run off coverage for the balance of the Run Off Period.

Section 2.3     *Ally Release.* Subject to the Debtors' satisfaction of their obligations set forth in Section 3.1, on the Effective Date of the Plan, Ally shall release the Debtors and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to the Debtors, including

7

*EXECUTION VERSION*

those that any Ally entity would have been legally entitled to assert against any of the parties above in their own right (whether individually or collectively), other than the Allowed Claims.

Section 2.4    *Ally Plan Sponsor Obligations.*

(a)    **Support of Restructuring.**  As long as this Agreement has not been terminated in accordance with Article VII, AFI agrees to:

(i)    support the relief requested in each of the Debtors' first day pleadings (including interim and final relief thereof, as applicable);

(ii)    support the Debtors' efforts to pursue the Restructuring contemplated by the Plan Term Sheet;

(iii)    support the Debtors' prosecution of their Chapter 11 Cases consistent with this Agreement and the Plan Term Sheet;

(iv)    support entry of an order approving the Disclosure Statement to permit solicitation of the Plan;

(v)    vote to accept the Plan, provided that (i) the Bankruptcy Court has entered an order approving the Disclosure Statement, (ii) the Consenting Claimants have been properly solicited pursuant to section 1125 of the Bankruptcy Code, (iii) the material terms of the Plan and the Disclosure Statement are consistent with the terms of the Plan Term Sheet and incorporate the terms of the AFI Settlement Agreement, and (iv) the Plan and the Disclosure Statement are satisfactory to the Consenting Claimants; and

(vi)    support confirmation of the Plan and approval of this Agreement incorporated therein.

(b)    **Transfer of Claims.**  AFI hereby agrees, for so long as this Agreement shall remain in effect, not to sell, assign, transfer, pledge, hypothecate or otherwise dispose of, directly or indirectly, any of the Ally Claims or any right related thereto and including any voting rights associated with such Ally Claims.

(c)    **Further Acquisition of Claims.**  This Agreement shall in no way be construed to preclude AFI or any of its affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional claims following its execution of this Agreement; provided, that any such additional claims acquired by AFI shall automatically be deemed to be subject to the terms of this Agreement unless AFI does not have the authority to make any such additional claim subject to the Agreement.  AFI further agrees that it will not create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any of the Debtors without causing such affiliate to become a Party hereto prior to such acquisition.

(d)    **Representations of AFI's Holdings.**  AFI represents that, as of the date hereof (i) it is the legal owner of the Ally Claims; and (ii) it has full power to vote, dispose of, and compromise the Ally Claims.

*EXECUTION VERSION*

## ARTICLE III

### Debtors' Obligations

Section 3.1  *Debtors' Obligations.*  The Debtors hereby agree to do the following and to use good faith efforts to do the following:

(a)  **Agreement.**  The Debtors shall file this Agreement on the Petition Date and shall use commercially reasonable efforts to obtain approval of the Debtors' obligations under this Agreement contemporaneously with approval of the Disclosure Statement.

(b)  **Plan.**  The Debtors shall use good faith efforts to file and prosecute the Plan as set forth in the Plan Term Sheet.

(c)  **Regulatory Obligations.**  The Debtors shall perform all of the obligations required under the Consent Materials, and fund any and all costs related to such performance during the Chapter 11 Cases through and until the closing of the ResCap Asset Sale.  The Debtors shall (i) escrow proceeds from the ResCap Asset Sale in an amount to be agreed upon between Ally and Debtors (or determined by the Bankruptcy Court to the extent no agreement can be reached) for the purpose of funding any and all remaining obligations under the Consent Materials following the ResCap Asset Sale, or (ii) the Purchaser shall assume such obligations as part of the ResCap Asset Sale on terms reasonably acceptable to Ally.

(d)  **Plan Releases.**  The Confirmation Order and Plan shall include the following provisions in the Plan and the Confirmation Order or such other release provisions as are acceptable to Ally.

(i)  Debtor Releases.  On and as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including: (a) the discharge of debt and all other good and valuable consideration provided pursuant to the Plan; (b) pursuant to the terms of this Agreement; and (c) the services of the Debtors' present officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to the Released Parties (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any holder of a Claim or Interest or other entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Bankruptcy Cases or the Plan to the fullest extent of the law; provided that Ally shall reaffirm its obligations under Section 2.2 in conjunction with the Plan; provided, further, that the Debtors' rights to any insurance shall not be adversely affected.

9

*EXECUTION VERSION*

       (ii)    <u>Third Party Releases</u>.  On and as of the Effective Date, the holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or sold by Debtors and/or the Chapter 11 Cases or the Plan; provided that claims of the Debtors' directors and officers against Ally pursuant to Ally's indemnification obligations and Section 2.2 hereof (as well as any applicable insurance related thereto) shall not be released.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Section 3.1(d)(ii) (the "<u>Third Party Releases</u>"), and further, shall constitute its finding that the Third Party Releases are: (a) in exchange for the good, valuable, and substantial consideration provided by the Released Parties; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; (e) justified by truly unusual circumstances; (f) an essential component and important to the success of the Plan; (g) resulted in increased distributions to the creditors that would otherwise have been unavailable; (h) the result of an identity of interest between the Debtors and the Released Parties regarding the restructuring; and (i) a bar to any party asserting any claim released by the Third Party Release against any of the Released Parties.  The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, damages, demands, debts, rights, suits, Causes of Action, judgments, or liabilities released pursuant to the Plan.

       (e)    **Allowed Claims.**  The Confirmation Order shall allow all Claims in full that arise (i) under the Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), among the GMAC Mortgage, LLC and Residential Funding Company, LLC, as borrowers, Residential Capital, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, and Homecomings Financial, LLC, as guarantors, AFI as initial lender and agent, and Wells Fargo Bank, N.A., as first priority collateral agent  (the "<u>Ally Revolver</u>"), (ii) under the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), by and among GMAC Mortgage, LLC and Residential Funding Company, LLC, as borrowers, Residential Capital, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, and Equity Investment I, LLC, as guarantors, and AFI as lender and agent (the "<u>Ally LOC</u>"), and (iii) claims from and after the Petition Date, which are held by Ally against the Debtors and arise in the ordinary course of business or otherwise agreed to by the Debtors and Ally.

    Section 3.2    *Debtors Plan Support Obligations.*

       (a)    **Implementation of the Restructuring.**  As long as this Agreement has not been terminated in accordance with Article VII, the Debtors agree to:

*EXECUTION VERSION*

(i)      effectuate and consummate the Restructuring contemplated by the Plan Term Sheet in accordance with the Milestones;

(ii)      obtain any and all required regulatory approvals and material third-party approvals for the Restructuring; and

(iii)      take any and all reasonably necessary actions in furtherance of the Restructuring.

(b)    **Representation of the Debtors.**  None of the materials and information provided by or on behalf of the Debtors to AFI in connection with the Restructuring, when read or considered together, contains any untrue statement of a material fact or omits to state a known material fact necessary in order to prevent the statements made therein from being materially misleading.

(c)    **Alternative Restructuring.**  Notwithstanding anything contained in this Agreement to the contrary, following the good faith determination by the Debtors and their respective Boards of Directors that a proposal or offer for a chapter 11 plan or other restructuring transaction that is not consistent with the Plan Term Sheet (an "Alternative Restructuring") constitutes a proposal that is reasonably likely to be more favorable to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties than the Restructuring, and receipt of approval by the Boards of Directors to pursue such Alternative Restructuring, the Debtors may immediately terminate their obligations under this Agreement (and Ally shall have similar termination rights as set forth in section 7.3) by written notice to Ally.

## ARTICLE IV

### Mutual Plan Support Obligations

Section 4.1   *Mutual Plan Support Obligations.*  As long as this Agreement has not been terminated in accordance with Article VII, each of the Parties agrees that it:

(a)    shall negotiate in good faith the Definitive Documents (as defined in the Plan Term Sheet), including the Plan and Disclosure Statement, both of which shall contain the same terms set forth in, and be consistent with, the Plan Term Sheet and this Agreement;

(b)    shall not directly or indirectly seek, solicit, support, or vote in favor of any alternative restructuring that could reasonably be expected to prevent, delay, or impede the Restructuring contemplated by the Plan Term Sheet or that is inconsistent with this Agreement, unless the Debtors and AFI have agreed, in writing, to pursue an alternative restructuring;

(c)    shall not directly nor indirectly (i) engage in, continue, or otherwise participate in any negotiations regarding any alternative restructuring, (ii) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any alternative restructuring or (iii) withhold, withdraw, qualify, or

*EXECUTION VERSION*

modify its approval or recommendation of this Agreement, the Plan Term Sheet, the Plan, or the Restructuring;

(d)    shall not encourage any other entity to object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with the Restructuring; and

(e)    shall not take any action that is inconsistent with this Agreement, the Plan Term Sheet, or the Plan, or that would obstruct or delay approval of the Disclosure Statement or confirmation and consummation of the Plan.

## ARTICLE V

### Conditions to Effectiveness of the Agreement

Section 5.1    *Conditions to Effectiveness*.  This Agreement is effective immediately upon satisfaction of the following conditions precedent:

(a)    **Bankruptcy Filing.**  The Debtors shall have filed cases under chapter 11 of the Bankruptcy Code on or before May 15, 2012.

(b)    **Data Center Transaction.**  The Data Center Transaction shall have been executed on or before the date that the Debtors file their cases under chapter 11 of the Bankruptcy Code.

Section 5.2    *Additional Conditions to Effectiveness*.  Ally's obligations pursuant to Section 2.1(a), Section 2.2(b)(i) and Section 2.3 shall only apply upon the satisfaction of the following conditions precedent:

(a)    **Plan and Confirmation Order.**  The Plan and the Confirmation Order shall incorporate the terms and conditions of this Agreement and shall include the Third Party and Debtor Releases.

(b)    **Bankruptcy Court Approval.**  The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order.

(c)    **Plan Effective Date.**  The Effective Date shall have occurred.

## ARTICLE VI

### Representations And Warranties Of The Parties

The Parties, solely on behalf of themselves and their respective subsidiaries, represent and warrant as of the Effective Date:

Section 6.1    *Due Organization, Standing, and Authority*.  Such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation.  Subject to entry of the Bankruptcy Court Orders set forth herein, such Party has all necessary power and

**EXECUTION VERSION**

authority to execute, deliver, and perform its obligations under this Agreement as contemplated by its Governing Documents.

Section 6.2    *Authorization and Validity of the Agreement.* Subject to entry of the Bankruptcy Court Orders set forth herein, the execution, delivery, and performance of this Agreement (a) are within such Party's powers, (b) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals have been obtained and are in full force and effect, and (c) do not violate any of the terms and conditions of (i) such Party's Governing Documents, (ii) any applicable law, or (iii) any contract to which it is a party.

Section 6.3    *Enforceability.* This Agreement has been duly executed and delivered on behalf of such Party and constitutes a legal, valid, and binding obligation of such Party enforceable against it in accordance with its terms and the terms of the Plan and Confirmation Order.

Section 6.4    *Acknowledgment of Party.* Each Party acknowledges that, except with respect to the representations and warranties made in this Agreement: (a) it has relied on its own independent investigation, and has not relied on any information or representations furnished by any Party or any representative or agent thereof in determining whether or not to enter into this Agreement; (b) it has conducted its own due diligence as well as undertaken the opportunity to review information, ask questions, and receive satisfactory answers concerning the terms and conditions of this Agreement; and (c) it possesses the knowledge, experience, and sophistication to allow it to fully evaluate and accept the merits and risks of entering into the transactions contemplated by this Agreement.

## ARTICLE VII

### Termination of the Agreement

Section 7.1    *Termination of the Agreement by Ally.* This Agreement shall automatically terminate upon failure to satisfy any of the conditions set forth in Article III, Article IV or Article V hereof, any breach of the Debtors of their obligations under this Agreement, or in the event satisfaction of such conditions becomes a legal impossibility; provided that Ally may waive conditions or a breach by the Debtors in its sole discretion.

Section 7.2    *Termination of the Agreement by the Debtors.* This Agreement may be terminated by the Debtors upon failure to satisfy any of the conditions set forth in Article V or the breach of any of Ally's obligations under Article II hereof; provided that Ally shall have 15 days to cure any such alleged breach of Article II or the Debtors' exercise of their rights pursuant to Section 3.2(c).

Section 7.3    *Additional Termination Events.* Unless waived in writing by Ally, this Agreement shall terminate automatically if:

      (a)    any material modification is made to the Plan Term Sheet or the Plan that is not in form and substance satisfactory to AFI and the Debtors;

13

*EXECUTION VERSION*

(b)    any of the Definitive Documents (as defined in the Plan Term Sheet), including the Plan, is filed with the Bankruptcy Court by the Debtors and is inconsistent with the Plan Term Sheet in any material respects, unless otherwise acceptable to AFI;

(c)    the Bankruptcy Court has entered an order in any of the Debtors' chapter 11 cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in sub-clauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(d)    the obligations of the Debtors under any debtor-in-possession credit facility are accelerated;

(e)    any of the Debtors' chapter 11 cases is dismissed;

(f)    the Debtors publicly announce their intention not to support the Restructuring or provide written notice to AFI of their intention to do so;

(g)    the Debtors' Boards of Directors approve an Alternative Restructuring or the Debtors execute a letter of intent (or similar document) indicating their intention to pursue an Alternative Restructuring;

(h)    any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable; and

(i)    the Debtors fail to achieve any of the Milestones.

Section 7.4    *Automatic Termination.* Unless extended in writing by the Debtors, Ally and Purchaser, this Settlement Agreement shall terminate automatically if (i) the Confirmation Order has not been entered on or before October 31, 2012, or (ii) any of the conditions set forth in Article V have not been satisfied on or before December 15, 2012.

Section 7.5    *Termination Event Procedure.* The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder solely in connection with giving any termination notice (and agree not to object to any non-breaching Party seeking to lift the automatic stay solely in connection with giving any such notice, if necessary), subject to all rights of the Party to contest any such alleged Termination.

Section 7.6    *Survival.* Notwithstanding termination of this Agreement pursuant to this Article VII, Ally's obligations in Section 2.1(b)(ii)-(h), and Section 2.2 shall survive; provided that Ally shall have no remaining obligations under this Agreement to the extent of a breach by the Debtors of Section 3.1(a) or 3.1(b) hereof unless such breach was as a result of the Debtors' determination to pursue an Alternative Restructuring in accordance with the terms hereof, in which case Ally's only remaining obligations shall be those set forth in Section 2.1(c) and (d); provided further that, notwithstanding anything in this Agreement to the contrary, in the event of any Alternative Restructuring or any termination of this Agreement on account thereof, Ally's only remaining obligations shall be those set forth in Section 2.1(c) and (d) hereof.

14

*EXECUTION VERSION*

# ARTICLE VIII

## Miscellaneous

Section 8.1    *Notices.*    All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given: (a) when personally delivered; (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter, if transmitted by facsimile, e-mail, or telecopier with confirmation of receipt; (c) five business days after being mailed by certified mail, return receipt requested, first class postage prepaid; or (d) one business day after being sent by nationally recognized overnight courier; in each case, to the following addresses, or to such other addresses as a Party may from time to time specify by notice to the other Parties given pursuant hereto.

If to the Debtors, to:

> Tammy Hamzehpour
> Residential Capital LLC
> 1100 Virginia Drive
> Fort Washington, PA  19034

And with a copy to (which copy shall not constitute notice):

> Mr. Larren M. Nashelsky
> Mr. Gary S. Lee
> Morrison & Foerster
> 1290 Avenue of the Americas
> New York, NY 10100

If to Ally, to:

> Mr. William B. Solomon Jr.
> Ally Financial Inc.
> 200 Renaissance Center
> Mail Code 482-B09-B11
> Detroit, Michigan 48265

And with a copy to (which copy shall not constitute notice):

> Mr. Richard M. Cieri
> Mr. Ray C. Schrock
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022

Section 8.2    *Specific Performance.*    Each Party acknowledges that the other Party would be irreparably damaged if this Agreement were not performed in accordance with its

15

*EXECUTION VERSION*

specific terms or were otherwise breached. Accordingly, each Party's sole remedy shall be to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms of this Agreement.

Section 8.3    *Governing Law/Jurisdiction.* This Agreement, the rights and duties of the Parties and all other matters arising out of or relating to this Agreement (whether in contract, tort, or otherwise) will be governed by and construed, enforced, and performed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of laws that would require the application of laws of another jurisdiction. The Parties acknowledge and agree that the Bankruptcy Court shall have the exclusive jurisdiction over this Agreement and that any claims arising out of or related to the interpretation and enforcement of this Agreement shall be properly brought only before the Bankruptcy Court. If and to the extent that the Chapter 11 Cases are closed or dismissed, the United States District Court located in the borough of Manhattan in New York City shall have exclusive jurisdiction over this Agreement and any such claims. This provision shall not constitute a consent by any Party to personal jurisdiction over it for any purpose, other than with respect to the enforcement of this Agreement.

Section 8.4    *Entire Agreement.* This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, representations, or warranties between the Parties other than those set forth or referred to herein.

Section 8.5    *Acknowledgement.* THIS AGREEMENT, THE PLAN TERM SHEET, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES.    EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.    THE DEBTORS WILL NOT SOLICIT ACCEPTANCES OF THE PLAN FROM AFI UNTIL AFI HAS BEEN PROVIDED WITH COPIES OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR.

Section 8.6    *Amendment and Waiver.* This Agreement may not be amended, and no right or obligation under this Agreement may be waived, except by written instrument signed by the Parties.

Section 8.7    *Severability.* Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties. Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a

16

*EXECUTION VERSION*

mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 8.8    *Reliance on Representations.* All representations, warranties, agreements, covenants, and obligations herein are material, and shall be deemed to have been relied upon by the other Parties.

Section 8.9    *Successors and Assigns.* This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, and is intended to be binding upon any chapter 11 or chapter 7 trustee, any successor trustee, and the estates of any or all of the Debtors. Without in any manner limiting the scope, extent, or effect of the foregoing, no Party hereto shall transfer, assign, or otherwise dispose of their right, title, and interests in and to any claims or causes of action of such Party that are the subject of this Agreement, and any such transfer shall be void and of no force and effect unless and until such transferee or assignee agrees in writing at the time of such transfer or assignment to be bound by this Agreement in its entirety without revision.

Section 8.10    *No Admission of Liability.* This Agreement is not an admission of any liability, but is a compromise and settlement and this Agreement shall not be treated as an admission of liability. All communications (whether oral or in writing) between and/or among the Parties, their counsel, and/or their respective representatives relating to, concerning, or in connection with this Agreement, or the matters covered hereby and thereby, shall be governed and protected in accordance with the Federal Rule of Evidence 408 and New York Civil Practice Law and Rules Section 4547 to the fullest extent permitted by law.

Section 8.11    *Interpretation.* This Agreement has been jointly drafted by the Parties at arm's-length and each Party has had ample opportunity to consult with independent legal counsel. No provision or ambiguity in this Agreement shall be resolved against any Party solely by virtue of its participation in the drafting of this Agreement.

Section 8.12    *Expenses.* Except as specifically provided otherwise, the Parties shall be responsible for the payment of their own respective costs and expenses (including reasonable attorneys' fees) in connection with the negotiation, participation, execution, and delivery of, and the observance or performance of their obligations under, this Agreement. Nevertheless, in any action or proceeding to enforce this Agreement, the prevailing Party shall be entitled to payment of its reasonable costs and expenses (including reasonable attorneys' fees). The Parties agree that claims for enforcement of this Agreement shall not be released by any of the provisions contained herein.

Section 8.13    *Captions.* The captions of this Agreement are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions of this Agreement and shall have no effect on its interpretation.

Section 8.14    *Counterparts.* This Agreement may be executed in counterparts, by either an original signature or signature transmitted by facsimile transmission, other electronic copy, or other similar process and each copy so executed shall be deemed to be an original and all copies so executed shall constitute one and the same agreement.

17

*EXECUTION VERSION*

Section 8.15 *Further Assurances.* From time to time, upon request, the Parties shall, without further consideration, promptly execute, deliver, acknowledge, and file all such further documents, agreements, certificates, and instruments and do such further acts as the persons or entities entitled to the benefit of this Agreement may reasonably require to effectuate the transactions contemplated by this Agreement.

Section 8.16 *Taxes.* It is acknowledged and agreed to by each of the Parties hereto that each such Party shall be responsible for paying all taxes, if any, arising out of any payments or transfers made to it pursuant hereto and that it shall pay all such taxes in accordance with applicable law.

Section 8.17 *Construction of Agreement.* Each of the functional words "each", "every", "any", and "all" shall be deemed to include each of the other functional words. This Agreement or any uncertainty or ambiguity herein shall not be construed against any one party but shall be construed as if all parties to this Agreement jointly prepared all aspects of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**EXECUTION COPY**

**RESIDENTIAL CAPITAL, LLC for itself and its debtor subsidiaries**

By: _____
     Name: Jonathan Ilany
     Title: Independent Director

By: _____
     Name: John E. Mack
     Title: Independent Director

**ALLY FINANCIAL INC. on behalf of itself and its subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries)**

By: _____
     Name:
     Title:

*EXECUTION VERSION*

**ALLY FINANCIAL INC.** on behalf of itself and its subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries)

By: _____
    Name: Michael A. Carpenter
    Title: Chief Executive Officer

*EXECUTION VERSION*

### Exhibit A

**MILESTONES**

*EXECUTION VERSION*

### MILESTONES

The Debtors' failure to comply with the following milestones (the "Milestones") will result in a termination under Section 7.3 of this Agreement, unless waived pursuant to the terms of this Agreement:

1)   The Debtors shall have commenced the Chapter 11 Cases on or before May 15, 2012;

2)   On or before the Petition Date, the Debtors shall have:

   a)   executed the Asset Purchase Agreement with the Stalking Horse Bidder that is in form, scope, and substance satisfactory to AFI;

   b)   executed the Held-For-Sale Asset Purchase Agreement with AFI that is in form, scope, and substance satisfactory to AFI;

   c)   executed the Barclays DIP Financing Facility that is substantially consistent with the term sheet attached as Exhibit 6 to this Agreement; and

   d)   agreed upon the term sheet for the Ally DIP Financing Facility that is substantially consistent with the form as Exhibit 3 attached to this Agreement.

3)   On or before May 18, 2012, the Debtors shall have obtained entry of orders of the Bankruptcy Court on an interim basis approving the Barclays DIP Financing Facility and the Ally DIP Financing Facility that are in form, scope, and substance satisfactory to AFI;

4)   On or before May 18, 2012, the Debtors shall have obtained entry of the Cash Collateral Order, on an interim basis, in form, scope, and substance satisfactory to AFI;

5)   On or before May 18, 2012, the Debtors shall have filed with the Bankruptcy Court a motion to approve their proposed bidding procedures with respect to the ResCap Asset Sale, which bidding procedures will propose a timeline for the asset sale consistent with the terms of the Plan Term Sheet and provide for the ResCap Asset Sale to be approved in conjunction with the Plan;

6)   On or before May 18, 2012, the Debtors shall have entered into the following agreements and have obtained entry of the following Bankruptcy Court Orders on an interim basis, in each case in form, scope and substance satisfactory to the Debtors and AFI:

   a)   the Subservicing Agreement and the Subservicing Agreement Order;

   b)   the Shared Services Agreement and the Shared Services Agreement Order; and

   c)   the GNMA Origination Agreement and the GNMA Origination Order.

7)   On or before May 25, 2012, the Debtors shall have filed a motion, in form and substance satisfactory to AFI, to extend the automatic stay of section 362(a) of the Bankruptcy Code to AFI and certain of its affiliates;

8)   On or before June 15, 2012, the Debtors shall have filed a motion seeking the Bankruptcy Court's approval of this Agreement;

9)   On or before June 15, 2012, the Debtors shall have filed with the Bankruptcy Court the Plan, Disclosure Statement, a motion to approve the Disclosure Statement, and a motion to approve solicitation procedures in relation to the Plan and Disclosure Statement, all of which shall be in form and substance satisfactory to AFI;

*EXECUTION VERSION*

10)     On or before 50 days following the Petition Date, the Debtors shall have obtained entry of the Bankruptcy Court of Final Orders approving the Barclays DIP Financing Facility, Ally DIP Financing Facility, the Shared Servicing Agreement, the GNMA Origination Agreement and the Subservicing Agreement, in each case in form, scope and substance satisfactory to AFI;

11)     On or before ninety (90) days following the Petition Date], the Bankruptcy Court shall have entered (a) an order approving the Disclosure Statement, which shall be in form and substance satisfactory to AFI, (b) an order approving the Debtors' proposed bidding procedures related to the ResCap Asset Sale, in each case in form and substance satisfactory to the Debtors and AFI, and (c) an order approving this Agreement;

12)     On or before October 31, 2012, the Bankruptcy Court shall have entered the Confirmation Order, which such order will grant final approval of the Plan, the ResCap Asset Sale and the Agreement, in the form and substance satisfactory to AFI; and

13)     On or before December 15, 2012, the effective date of the Plan shall have occurred.

# SEWARD & KISSEL LLP

ONE BATTERY PARK PLAZA
NEW YORK, NEW YORK 10004

M. WILLIAM MUNNO
PARTNER
(212) 574-1587
munno@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

901 K STREET, NW
WASHINGTON, DC 20001
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

September 14, 2012

**VIA FEDEX & EMAIL**

Mr. David Glehan
Managing Director
MBIA Insurance Corporation
113 King Street
Armonk, New York  10504

## RMBS Trust Settlement Agreement with Residential Capital, LLC

Dear Mr. Glehan:

We represent U.S. Bank National Association, solely in its capacity as Trustee ("U.S. Bank") under various Pooling and Servicing Agreements and Indentures (together, the "Governing Agreements") for approximately 300 RMBS securitization trusts in connection with the Chapter 11 cases of Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap"), including the six trusts (the "Trusts") identified in your three July 23, 2012 letters to U.S. Bank (collectively, the "MBIA Letters") and write in response to those letters.[1]

The MBIA Letters state that MBIA Insurance Corporation ("MBIA"), "directs" or "instructs" U.S. Bank "to not consider or accept any settlement or compromise offers relating to any claims that may belong to the [] Trusts, including, but not limited to the RMBS Trust Settlement Agreement, dated as May 13, 2012 (the "Settlement Agreement"), by and between [ResCap] and the Institutional Investors (as defined in the Settlement Agreement)."

While the MBIA Letters describe MBIA's purported right to "direct" U.S. Bank as trustee under certain circumstances, no reference is made to Section 8.02(iii) of the relevant Pooling and Servicing Agreement.  That section, in relevant part, provides that:

The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at

---

[1]    Capitalized terms used herein and not otherwise defined have the meanings specified in the MBIA Letters or in the Governing Agreements for the Trusts.

Mr. David Glehan
September 14, 2012
Page 2

> the request, order or direction of [MBIA], pursuant to the
> provisions of this Agreement, unless [MBIA] shall have offered to
> the Trustee reasonable security or indemnity against the costs,
> expenses and liabilities which may be incurred therein or thereby...

The Indentures governing the relevant Trusts impose similar indemnification
obligations on a party seeking to "direct" the trustee in the manner MBIA seeks to direct U.S.
Bank. Section 6.01(f) of those Indentures, in relevant part, states:

> No provision of this Indenture shall require the Indenture Trustee
> to expend or risk its own funds or otherwise incur financial
> liability in the performance of any of its duties hereunder or in the
> exercise of any of its rights or powers, if it shall have reasonable
> grounds to believe that repayment of such funds or adequate
> indemnity against such risk or liability is not reasonably assured to
> it.

Section 5.11 of the relevant Indentures, in pertinent part, further provides:

> [S]ubject to Section 6.01, the Indenture Trustee need not take any
> action that it determines (in its sole discretion)[2] might involve it in
> liability or might materially adversely affect the rights of any
> Noteholders not consenting to such action, unless the Trustee has
> received satisfactory indemnity from [MBIA].

Finally, three of the relevant Indentures provide additional indemnification
obligations on MBIA, stating in Section 6.02(h) that:

> The Indenture Trustee shall be under no obligation to exercise any
> of the trusts and powers vested in it by this Indenture or to
> institute, conduct or defend any litigation hereunder or in relation
> hereto at the request, order or direction of [MBIA], pursuant to the
> provisions of this Indenture, unless [MBIA] shall have offered to
> the Indenture Trustee reasonable security or indemnity against the
> costs, expenses and liabilities which may be incurred therein or
> thereby...

The relevant Governing Agreements, in sum, make clear that U.S. Bank is not
obligated to comply with MBIA's purported "direction" unless MBIA first provides U.S. Bank
with adequate security or indemnity. If MBIA believes that adequate indemnity or security is not

---

[2]    Two of the five relevant Indentures do not contain the parenthetical "(in its sole discretion)."

Mr. David Glehan
September 14, 2012
Page 3

necessary, or that not consenting to the Settlement Agreement will not "materially adversely affect the rights of any noteholders" in the Trusts, U.S. Bank requests that MBIA explain why proceeding with its purported "direction" (i) will not expose U.S. Bank to certain costs, expenses and liabilities, and (ii) will not materially adversely affect the interest of noteholders in the Trusts.

Regardless of whether the MBIA Letters would constitute a valid, binding direction or instruction, U.S. Bank will, of course, consider MBIA's request that it not accept the Settlement Agreement on behalf of the Trusts, along with any other Noteholder or Certificateholder requests and any other relevant information that U.S. Bank receives. In that regard, as MBIA may be aware, U.S. Bank has received correspondence from Institutional Investors who hold 25% in one or more classes of numerous RMBS trusts that "urge and direct" U.S. Bank to accept the Settlement Agreement on behalf of those trusts, including at least five of the Trusts identified in the MBIA Letters. Enclosed is a copy of the relevant correspondence from the Institutional Investors. To assure full disclosure, we are providing to the Institutional Investors copies of the MBIA Letters, as well as our response.

On July 31, 2012, the Court entered a scheduling order (the "Order") in the ResCap bankruptcy proceeding concerning the Debtors' efforts to seek approval of the Settlement Agreement. To the extent MBIA has any objections to the Settlement Agreement, the Order provides that those objections should be filed by October 5, 2012. The Order also provides that U.S. Bank must accept or reject the Settlement Agreement by "the later of November 12, 2012 or five business days after the entry of an order approving the [Settlement Agreement]." U.S. Bank will consider any objections that are filed prior to deciding whether to accept or reject the terms of the Settlement Agreement. We encourage you to reach out to the Institutional Investors to resolve the conflicting "directions" regarding the Settlement Agreement in advance of the date by which U.S. Bank must accept or reject the Settlement Agreement.

U.S. Bank reserves its right to contest whether the MBIA Letters would constitute a "Direction" under the relevant Governing Agreements, or whether U.S. Bank has any other obligations thereunder.

Mr. David Glehan
September 14, 2012
Page 4

        Please call me if you have any questions or we can help facilitate your contacting
the Institutional Investors.  Thank you.

                                Sincerely,

                                M. William Munno

Enclosures

SK 03687 0119 1319148

# Seward & Kissel LLP

ONE BATTERY PARK PLAZA

NEW YORK, NEW YORK 10004

M. WILLIAM MUNNO
PARTNER
(212) 574-1587
munno@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

901 K STREET, NW
WASHINGTON, DC 20001
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

September 14, 2012

**VIA FEDEX & EMAIL**

Irena M. Goldstein, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036-8299

## RMBS Trust Settlement Agreement with Residential Capital, LLC

Dear Ms. Goldstein:

We represent U.S. Bank National Association, solely in its capacity as Trustee ("U.S. Bank") under various Pooling and Servicing Agreements and Indentures for approximately 300 RMBS securitization trusts in connection with the Chapter 11 cases of Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap"), including the trust (the "Trust") governed by the Indenture, dated as of June 30, 2004 between GMACM Home Equity Loan Trust 2004-HE3 and Wells Fargo Bank, N.A. (the "Indenture"). We respond to your August 23, 2012 letter regarding the "direction" of your client, Assured Guaranty Municipal Corp. ("Assured"), with respect to the Trust and the RMBS Settlement.[1]

Your letter states that "notwithstanding any direction [U.S. Bank] may have received from noteholders, Assured does not consent at this time to [U.S. Bank] entering into the Joinder. Accordingly, [U.S. Bank] cannot enter the Joinder and must await further instructions from Assured."

While your letter relies on Section 5.11 of the Indenture with regard to Assured's purported right to "direct" U.S. Bank as trustee under certain circumstances, no reference is made to the penultimate paragraph of that section, which, in relevant part, provides:

[S]ubject to Section 6.01, the Indenture Trustee need not take any action that it determines (in its sole discretion) might involve it in liability or might materially adversely affect the rights of any

---

[1]    Capitalized terms used herein and not otherwise defined have the meanings specified in your August 23 Letter or in the Indenture.

Irena M. Goldstein, Esq.
September 14, 2012
Page 2

Noteholders not consenting to such action unless the Indenture
Trustee has received satisfactory indemnity from [Assured].

Section 6.01(f) of the Indenture, in relevant part, further states:

No provision of this Indenture shall require the Indenture Trustee
to expend or risk its own funds or otherwise incur financial
liability in the performance of its duties hereunder or in the
exercise of any of its rights or powers, if it shall have reasonable
grounds to believe that repayment of such funds or adequate
indemnity against such risk or liability is not reasonably assured to
it.

Finally, Section 6.02(h) of the Indenture provides, in relevant part, that:

The Indenture Trustee shall be under no obligation to exercise any
of the trusts and powers vested in it by this Indenture or to
institute, conduct or defend any litigation hereunder or in relation
hereto at the request, order or direction of [Assured], pursuant to
the provisions of this Indenture, unless [Assured] shall have
offered to the Indenture Trustee reasonable security or indemnity
against the costs, expenses and liabilities which may be incurred
therein or thereby...

The Indenture, in sum, makes clear that U.S. Bank is not obligated to comply with
Assured's purported "direction" unless Assured first provides U.S. Bank with adequate
indemnity or reasonable security. If Assured believes that adequate indemnity is not necessary,
or that not joining the RMBS Settlement will not "materially adversely affect the rights of any
noteholders" in the Trust, U.S. Bank requests that Assured explain why proceeding with its
purported "direction" (i) will not expose U.S. Bank to potential financial liability, and (ii) will
not materially adversely affect the interest of noteholders in the Trust.

Regardless of whether your letter would constitute a valid, binding direction or
instruction on behalf of Assured, U.S. Bank will, of course, consider Assured's request that it not
join the RMBS Settlement on behalf of the Trust, along with any other Noteholder or
Certificateholder requests and any other relevant information that U.S. Bank receives. In that
regard, as Assured may be aware, U.S. Bank has received correspondence from Institutional
Investors who hold 25% in one or more classes of numerous RMBS trusts, including the Trust,
that "urge and direct" U.S. Bank to accept the RMBS Settlement. Enclosed is a copy of the
relevant correspondence from the Institutional Investors. To assure full disclosure, we are
providing to the Institutional Investors copies of your letter, as well as this response.

Irena M. Goldstein, Esq.
September 14, 2012
Page 3

On July 31, 2012, the Court entered a scheduling order (the "Order") in the ResCap bankruptcy proceeding concerning the Debtors' efforts to seek approval of the RMBS Settlement. To the extent Assured has any objections to the RMBS Settlement, the Order provides that those objections should be filed by October 5, 2012. The Order also provides that U.S. Bank must accept or reject the RMBS Settlement by "the later of November 12, 2012 or five business days after the entry of an order approving the [RMBS Settlement]." U.S. Bank will consider any objections that are filed prior to deciding whether to accept or reject the terms of the RMBS Settlement. We encourage you to reach out to the Institutional Investors to resolve the conflicting "directions" regarding the RMBS Settlement in advance of the date by which U.S. Bank must accept or reject the RMBS Settlement.

U.S. Bank reserves its right to contest whether your letter would constitute a "Direction" on behalf of Assured under the Indenture, or whether U.S. Bank has any other obligations thereunder.

Please call me if you have any questions or we can help facilitate your contacting the Institutional Investors. Thank you.

Sincerely,

M. William Munno

M. William Munno

Enclosures

SK 03687 0119 1318949

# SEWARD & KISSEL LLP

ONE BATTERY PARK PLAZA

NEW YORK, NEW YORK 10004

M. WILLIAM MUNNO
PARTNER
(212) 574-1587
munno@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

901 K STREET, NW
WASHINGTON, DC 20001
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

September 14, 2012

**VIA FEDEX & EMAIL**

Mr. Timothy S. Travers
Executive Vice President
Financial Guaranty Insurance Company
125 Park Avenue
New York, New York  10017

## RMBS Trust Settlement Agreement with Residential Capital, LLC

Dear Mr. Travers:

We represent U.S. Bank National Association, solely in its capacity as Trustee ("U.S. Bank") under various Pooling and Servicing Agreements and Indentures (together, the "Governing Agreements") for approximately 300 RMBS securitization trusts in connection with the Chapter 11 cases of Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap"). We respond to your August 9, 2012 letter to U.S. Bank (the "August 9 Letter") and further respond to Winston Wohr's May 25, 2012 letter to U.S. Bank (the "May 25 Letter," together with the August 9 Letter, the "FGIC Letters").[1]

The May 25 Letter stated that "to the extent any of the Transactions are subject to the Settlement Agreement or the Plan Support Agreement, FGIC hereby provides notice that it does not authorize [U.S. Bank] to vote in favor of, or opt in to, such Settlement Agreement or Plan Support Agreement and hereby directs [U.S. Bank] not to vote in favor of, or to opt in to, the Settlement Agreement or Plan Support Agreement." The August 9 Letter further informs U.S. Bank that "it should not enter into *any* settlement that would impair or otherwise impact FGIC's rights with respect to the Transactions without FGIC's express consent." (Emphasis in the original). The August 9 Letter states that the FGIC Letters shall constitute a "Direction" for purposes of Section 14 of the Rehabilitation Order at the time the Settlement Agreement or Plan Support Agreement are submitted to U.S. Bank for approval, support or opt-in.

---

[1] Capitalized terms used herein and not otherwise defined have the meanings specified in the August 9 Letter or in the Transactions' Governing Agreements.

Mr. Timothy S. Travers
September 14, 2012
Page 2

        While the August 9 Letter describes the basis for FGIC's "right to withhold such
authorization and to direct" U.S. Bank under the Governing Agreements for the Transactions, it
makes no reference to Section 8.02(a)(iii) of the relevant Pooling and Servicing Agreements.
The language of those agreements vary slightly, however, in substance, each provides that the
Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by those
agreements, to institute, conduct or defend any litigation, or to follow the request, order or
direction of FGIC pursuant to the provisions of the agreements, unless FGIC "shall have offered
to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which
may be incurred therein or thereby."

        The Indentures governing the Transactions identified in the FGIC Letters impose
similar indemnification obligations on a party seeking to "direct" the trustee in the manner FGIC
seeks to direct U.S. Bank. Section 6.01(f) of those Indentures, in relevant part, states:

        No provision of this Indenture shall require the Indenture Trustee
        to expend or risk its own funds or otherwise incur financial
        liability in the performance of any of its duties hereunder or in the
        exercise of any of its rights or powers, if it shall have reasonable
        grounds to believe that repayment of such funds or adequate
        indemnity against such risk or liability is not reasonably assured to
        it.

        Section 5.11 of the relevant Indentures, in pertinent part, further provides:

        [S]ubject to Section 6.01, the Indenture Trustee need not take any
        action that it determines might involve it in liability or might
        materially adversely affect the rights of any Noteholders not
        consenting to such action unless the Indenture Trustee has received
        satisfactory indemnity from [FGIC].

        The Transactions' Governing Agreements, in sum, make clear that U.S. Bank is
not obligated to comply with FGIC's purported "direction" unless FGIC first provides U.S. Bank
with adequate security or indemnity. If FGIC believes that adequate indemnity or security is not
necessary, or that not consenting to the Settlement Agreement or Plan Support Agreement will
not "materially adversely affect the rights of any noteholders" in the Transactions, U.S. Bank
requests that FGIC explain why proceeding with its purported "direction" (i) will not expose
U.S. Bank to certain costs, expenses and liabilities, and (ii) will not materially adversely affect
the interest of noteholders in the Transactions.

        Regardless of whether the FGIC Letters would constitute a valid, binding
direction or instruction, U.S. Bank will, of course, consider FGIC's request that it not accept the

Mr. Timothy S. Travers
September 14, 2012
Page 3

Settlement Agreement on behalf of the Transactions, along with any other Noteholder or Certificateholder requests and any other relevant information that U.S. Bank receives. In that regard, as FGIC may be aware, U.S. Bank has received correspondence from Institutional Investors who hold 25% in one or more classes of numerous RMBS trusts that "urge and direct" U.S. Bank to accept the Settlement Agreement on behalf of those trusts, including at least four of the Transactions identified in the FGIC Letters. Enclosed are copies of the relevant correspondence from the Institutional Investors. To assure full disclosure, we are providing to the Institutional Investors copies of the FGIC Letters, as well as our responses.

On July 31, 2012, the Court entered a scheduling order (the "Order") in the ResCap bankruptcy proceeding concerning the Debtors' efforts to seek approval of the Settlement Agreement. To the extent FGIC has any objections to the Settlement Agreement, the Order provides that those objections should be filed by October 5, 2012. The Order also provides that U.S. Bank must accept or reject the Settlement Agreement by "the later of November 12, 2012 or five business days after the entry of an order approving the [Settlement Agreement]." U.S. Bank will consider any objections that are filed prior to deciding whether to accept or reject the terms of the Settlement Agreement. We encourage you to reach out to the Institutional Investors to resolve the conflicting "directions" regarding the Settlement Agreement in advance of the date by which U.S. Bank must accept or reject the Settlement Agreement.

The Order further provides that any party that has an interest in the Settlement Agreement may seek discovery immediately. If FGIC wants additional information regarding the Settlement Agreement, FGIC may seek such information from the Debtors under the terms of the Order.

U.S. Bank reserves its right to contest whether the FGIC Letters would constitute a "Direction" under the Rehabilitation Order or the relevant Governing Agreements, or whether U.S. Bank has any other obligations thereunder.

Please call me if you have any questions or we can help facilitate your contacting the Institutional Investors. Thank you.

Sincerely,

M. William Munno

M. William Munno

Enclosures

SK 03687 0119 1315895 v3