# EXHIBIT 6

## MATERIAL AND ADVERSE OPINION
## OF PROFESSOR BARRY E. ADLER

I have been retained by Mayer Brown LLP ("Mayer Brown") to provide an expert opinion on issues of contract interpretation in connection with a potential settlement (the "Potential Settlement") involving securitization trusts for which Mayer Brown's client, The Bank of New York Mellon ("BNY Mellon") is trustee. I have not been retained as a lawyer in connection with this matter, nor do I owe any duty to Mayer Brown or BNY Mellon in connection with this matter. In this opinion, I make no recommendation to Mayer Brown or BNY Mellon. My compensation is based on hours worked and does not depend on the content of my opinion.

### 1.      Qualifications

I am the Bernard Petrie Professor of Law and Business, New York University ("NYU"). I have taught at NYU since 1996. I have also held permanent or visiting appointments at Columbia University School of Law, Emory University School of Law, George Mason University School of Law, University of Virginia School of Law, and Yale Law School. I am the director of the annual NYU Workshop on Bankruptcy and Business Reorganizations and have been a director of the American Law and Economics Association. I teach or have taught Contracts, Bankruptcy, and Corporations, and have been the convener of the Contracts and Commercial Law Area Group at NYU School of Law. I have written a casebook and an edited reader in bankruptcy law, and have written numerous articles in the fields of bankruptcy, commercial, and corporate law.

Case 1:11-cv-06988-WHP   Document 126-5   Filed 10/31/11   Page 15 of 85

## 2.       Question Presented

For the purposes of this report, I have reviewed §2.03(c) of a document identified to me by Mayer Brown as an agreement (the "Pooling and Servicing Agreement") that governs mortgage loans (each a "Mortgage Loan") sold by, among others, Countrywide Home Loans, Inc. ("Countrywide") to a Depositor, which in turn deposited the Mortgage Loans with BNY Mellon as trustee or indenture trustee for holders of certificates or notes that comprise the beneficial ownership of the mortgages (the owners of or investors in such certificates or notes "Certificateholders"). This provision addresses specified breaches of certain representations and warranties in connection with specified Mortgage Loans. Under the provision, in the event such a breach is discovered in connection with such a loan, if such breach "materially and adversely affects the interests of the Certificateholders in that Mortgage Loan," the seller is obligated to cure the breach or replace or repurchase the Mortgage Loan.

In a document identified to me by Mayer Brown as the most recent Form 10-Q filed with the Securities and Exchange Commission by Countrywide's parent, Bank of America Corp. ("Bank of America"), Bank of America takes what I assume to be the position that in order for a breach of a representation or warranty to materially and adversely affect the interests of Certificateholders and thus trigger a repurchase obligation it is not sufficient that the breach may have been instrumental to a purchaser in its decision to accept a Mortgage Loan. Rather I assume it to be Bank of America's position that there is no repurchase obligation unless a breach causes the Certificateholders to suffer a significant loss.

-2-

Case 1:11-cv-06988-WHP    Document 126    Filed 10/31/11    Page 16 of 55

Below are my general views on the above-quoted language from §2.03(c) of the Pooling and Servicing Agreement and on the above-referenced Bank of America position. My opinion here is based solely on general principles of contract law as supported by references provided below. I have not broadly reviewed documents relevant to the Potential Settlement. I do not have knowledge of relevant events or of customary documents or practice in the commercial lending industry.

## 3.    Opinion

An interpretive issue is presented by the phrase "materially and adversely affects the interests of the Certificateholders in that Mortgage Loan" as used in §2.03(c) of the Pooling and Servicing Agreement between Countrywide and BNY Mellon. Because the phrase applies to a breach of a representation or warranty used by the seller to induce a sale of a mortgage loan under the agreement, one might say that "material and adverse" refers to the mortgage buyer's purchase decision. Under this interpretation, if at the time of the sale a purchaser would not have accepted the mortgage had it been aware of facts inconsistent with a representation or warranty, then the breach is "material and adverse" to the interests of the purchaser (or owner), which could then demand that the seller buy back a mortgage subject to a repurchase obligation in the event of such breach.[*] (For simplicity here and hereafter, I ignore the possibility that a seller might satisfy its obligations under the Pooling

---

[*] Functionally, a warranty is a promise to make a promisee whole in the event that a factual assertion is false. So one might prefer to think of a warranty breach as a failure to cure or to provide compensation in the event of such falsity rather than as the falsity itself. That said, it is common for a breach of warranty to mean merely that a factual assertion is false and this the sense in which I use the term here.

and Servicing Agreement through cure or replacement.) The significance of any loss caused by the breach would be irrelevant.

This interpretation was apparently approved at least in part by the court in *Lehman Brothers Holdings, Inc. v. Laureate Realty Services, Inc.*, 2007 WL 2904591 (S.D. Ind. Sept. 28, 2007) [hereinafter *Laureate*]. *Laureate* addressed a dispute over a mortgage loan purchase and sale agreement between Laureate as seller and Lehman as purchaser of mortgage loans. Under the agreement, in the event that a party discovered a breach of specified seller's representation or warranty with respect to a mortgage loan, the purchaser could demand cure or repurchase of the mortgage loan provided that the breach "materially and adversely affects the interest of the owner of such" loan. *Id.* at *12. An issue in the case was whether Laureate's alleged failure to disclose relevant information about a loan sold under the agreement constituted a breach of representation or warranty sufficient to trigger the repurchase obligation. In Laureate' view, Lehman designated no evidence to suggest that the alleged breach would materially and adversely affect the owner of the loan and so Laureate moved for summary judgment against Lehman's repurchase demand. The court denied Laureate's motion for summary judgment in part because Lehman had proffered evidence that Lehman would not have purchased the loan in question "had they known about the negative information" that was the basis of the alleged breach. *Id.* at *13; *Cf., e.g., Resolution Trust Corp. v. Key Fin. Servs.*, 280 F.3d 12, 16 (1st Cir. 2002) [hereinafter *Resolution Trust*] (affirming that breach of a representation or warranty in connection with the sale of a mortgage loan is material if the breach "concerns a fact likely to influence the decision-

-4-

making process," quoting, *U.S. ex rel. Roman v. Schlesinger*, 404 F.Supp 77, 85 (E.D.N.Y. 1975)).

The court's opinion in *Laureate* is not entirely clear on the question of how one is to interpret "material and adversely affects." The court observed that Lehman had designated evidence that the alleged breach "had an adverse effect on Lehman as it remains undisputed that Lehman lost $13 million on the transaction." *Laureate*, 2007 WL 2904591, at *13. This observation raises the possibility that the court believed "material" goes to the loan purchase decision while "adverse" goes to the loan outcome. Such a reading is awkward and may not have been intended. Still, *Laureate* suggests that a court might determine that there is a repurchase obligation at least in part by reference to how a breach could have affected the initial purchase decision.

The contractual language at issue in *Laureate* is similar to that in §2.03(c) of the Pooling and Servicing agreement between Countrywide and BNY Mellon and so the court's interpretation of the repurchase obligation in *Laureate* may suggest a similar interpretation of the Pooling and Servicing Agreement. But the *Laureate* approach, or one like it, is not the only word on how to interpret such language. For example, in *Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n*, 643 F. Supp. 2d 1014 (S.D. Ohio 2009), as in *Laureate*, a court was asked to address alleged breaches of representations and warranties in connection with the sale of mortgage loans placed in a trust on behalf of certificateholders. Although the reported opinion is somewhat opaque on the point, apparently the related pooling and servicing agreement provided that the seller could be subject to a repurchase obligation if

there were "a breach of any representation or warranty with respect to a [m]ortgage [l]oan …

which … materially and adversely affects the value of such [m]ortgage [l]oan, the related

[m]ortgaged [p]roperty or the interests of the [t]rustee or any [c]ertificateholder in the

[m]ortgage [l]oan or the related [m]ortgaged [p]roperty". First Amended Complaint at ¶35,

*Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n,* 3:07-cv-0049-MRM (Apr., 22, 2009) (Doc.

# 17) (ellipses in the original). In a motion, Wells Fargo, as trustee for certificateholders,

asked that the court clarify how it might demonstrate a material and adverse effect. The

court responded, in part, as follows:

> Wells Fargo appears to be arguing here that it can prove a material and
>
> adverse effect on the loans or the mortgaged property by showing that this
>
> loan would have been rejected by the investors had they known what Wells
>
> Fargo claims should have been [disclosed]. In the Court's opinion, that
>
> position begs the question. To put it another way, the fact that an investor
>
> might have made a different decision had he or she different information may
>
> make that information material to the investor's decision, but it does not make
>
> the omission of that information cause a material and adverse effect on the
>
> loan. "Material information" and "material effect" are not the same thing.

*Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n*, Case No. 3:07-cv-0049-MRM, Doc. # 299,

slip op. at 2 (S.D. Ohio Oct. 27, 2009) (Decision and Order Granting In Part and Denying in

Part Plaintiff's Motion for Clarification) [hereinafter *Wells Fargo*].

The rejection by *Wells Fargo* of a purchase-decision approach to "material and adverse" suggests that whether a breach of a representation or warranty materially and adversely affects the interests of a purchaser (or owner) turns on whether the breach caused a significant loss to the purchaser (or owner). And this is presumably what the court intended in a related jury instruction, which provided that the plaintiff must "prove by a preponderance of the evidence" that a breach of a representation or warranty "caused a material and adverse effect on the value of the loan, the value of the property, or the interests of the investors." General Jury Charge at 22, *Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n,* Case No. 3:07-cv-0049-MRM (Nov. 24, 2009) (Doc. # 351).

It is possible to distinguish *Laureate* from *Wells Fargo* based on the contractual language applicable in each case. As noted, the language in *Laureate* refers to a breach that materially and adversely affects the interest of the owner of a mortgage loan. In contrast, the comparable language in *Wells Fargo* refers to a breach that materially and adversely affects "the value of" a mortgage loan, the related mortgaged property or the interests of the trustee or any certificateholder in the mortgage loan or the related mortgaged property. *Cf., e.g., LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.,* 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002) (addressing similar language). The difference between the two provisions and between the respective interpretations may suggest that unless a repurchase obligation is expressly conditioned on a material and adverse effect on "value" such obligation may be triggered by a mere determination that the purchaser would not have accepted the loan but for the breach. This would mean that §2.03(c) of Pooling and Servicing agreement between

Case 1:11-cv-06969-WHP    Document 126    Filed 10/31/11    Page 21 of 33

Countrywide and BNY Mellon, which does not expressly condition the seller's repurchase obligation on a breach that materially and adversely affects "value," could be triggered if the breach merely affects the buyer's purchase decision, and this interpretation could be bolstered by the observation that the parties *elsewhere*, in another portion of §2.03(c) addressed to a particular set of representations and warranties, expressly conditioned a contractual outcome on a change in value.[**]

Such interpretation is not necessary, however. The omission of an express reference to "value" need not imply that "material and adverse" refers to something other than a loss in value of an owner's interest caused by a breach, as a material and adverse effect on an owner's interest in a mortgage loan can be read as a reference to a significant loss caused by the breach and suffered by the owner in any manner—whether through a reduction in the value of a mortgage loan or through some other means—rather than as a reference to a purchase decision.[***] Indeed, it might seem more natural for the parties to have expressly

---

[**] According to §2.03(c), for specified representations and warranties made to the best of a seller's knowledge, if it is discovered "that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders therein, notwithstanding that Seller's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable representation or warranty."

[***] Under this approach, §2.03(c) of the Pooling and Servicing agreement between Countrywide and BNY Mellon could be interpreted such that a breach could not trigger a repurchase obligation if it caused a Mortgage Loan but not the Certificateholders' interests in that Loan to lose value, while an inaccuracy in a best-of-seller's-knowledge representation or warranty could be deemed a breach regardless of the seller's knowledge even if only the Mortgage Loan, but not the Certificateholders' interests, lost value. Such an interpretation would give meaning to "value of the related Mortgage Loan" as that language appears in the section even while "materially and adversely affects the interests of the Certificateholders in that Mortgage Loan" is interpreted as a reference to a loss of value in those interests caused by a breach. In any case, and regardless whether there is a plausible argument that there can be a loss of value in a Mortgage Loan without a loss of value in the interests of Certificateholders in that Loan, the law will

(. . . Continued)

Case 1:11-cv-06938-WHP    Document 126    Filed 10/31/11    Page 22 of 65

addressed the buyer's purchase decision if they meant for an influence on that decision to be

the basis for a determination that a breach materially and adversely affects the interests of a

mortgage owner. Thus, the *Wells Fargo* approach may, but need not, depend on a reference

to "value" in the applicable contractual language.

Turning now to the merits of the alternative approaches, an advantage of the *Wells

Fargo* approach is that it can limit purchaser opportunism. This point may be illustrated by

the following hypothetical case.

Assume that a seller of mortgage loans represents that the origination practices used

by the seller have in all material respects met customary industry standards. Imagine that a

seller substantially disregards such standards in the origination of a loan sold to a purchaser

on behalf of certificateholders but that the breach does not significantly diminish the value

of the loan. Imagine further that subsequent to this transaction, the real estate market

crashes and as a consequence of this external event the loan declines precipitously in value.

Now consider the question of how to interpret a provision in the contract between the seller

and the buyer that gives the latter an option to insist on a repurchase if a breach in a

representation or warranty with respect to a mortgage loan materially and adversely affects

the interests of the certificateholders.

---

(Continued . . .)

not necessarily interpret a contract to give every term meaning. As explained by a leading treatise, although the law "prefers an interpretation which gives effect to all parts of the contract rather than one which leaves a portion of the contract ineffective or meaningless … sometimes particular words or provisions of a contract will be disregarded in order to give effect to the general meaning of a contract." 11 Williston on Contracts §32:9 (4th ed.) (database updated 2011).

-9-

Under the *Laureate* approach, or one like it, the purchaser might prevail and force the seller to repurchase the loan because, at the time of purchase, the seller might have rejected the loan had it known of the seller's poor origination practices. If, however, events subsequent to the sale, but prior to the real estate market collapse, revealed the loan to be of then acceptable value notwithstanding the seller's breach, the buyer might never have asked the seller to repurchase the loan but for the market collapse. It is not clear why the parties would have desired a contractual provision that permitted what they might, at the time of contract, have agreed would be buyer opportunism in a case such as this. That is, one might doubt that the permissibility of such strategic behavior by the buyer constitutes an accurate interpretation of the parties' agreement.

While the *Laureate* interpretation of "material and adverse" invites the sort of opportunism just described, the *Wells Fargo* interpretation is consistent with what may well have been the parties' contractual intent to combat such opportunism. This is so because, under the *Wells Fargo* approach, not any breach triggers the repurchase obligation, only one that significantly injures the buyer. Such a result is a seemingly reasonable outcome for this illustration.

This illustration is hypothetical, but it is not fanciful. In another case, based on events in Nevada, to which Wells Fargo (as well as LaSalle Bank) was a party, *Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n*, 2011 WL 743929 (D. Nev. Feb. 23, 2011), Wells Fargo, again as trustee for certificateholders' interests in mortgage loans, sought a capacious definition of "material and adverse." In this pursuit, Wells Fargo unsuccessfully sought to exclude the

Case 1:11-cv-06969-WHP    Document 126    Filed 10/31/11    Page 24 of 55

testimony of the seller's expert, who concluded, in the court's words, "that the decline in the housing and real estate markets in Las Vegas in 2007-2009 caused material and adverse affects, not a breach of any representation." *Id.* at *4. This expert's conclusion, while perhaps not a legal opinion, does put forward the merit in an interpretation of "material and adverse" that precludes a repurchase obligation when the buyer's motivation to invoke the clause is not a loss caused by the seller's breach.

Although not directly on point here, the interpretive approach adopted in *Wells Fargo* also parallels aspects of the common law material breach doctrine. That doctrine addresses the situation where a party breaches a contract but nevertheless seeks to hold her counterparty to the agreement. In general terms (and at the risk of oversimplification), if the party's breach is material and uncured, she may not insist on her counterparty's performance. If the party's breach is not material, however, although the party is liable in damages for her breach, her counterparty is not released from the contract and the breaching party can thus enjoy the benefit of her bargain despite her breach. *See, e.g.*, Restatement (Second) Contracts §§ 237; 241; 242; 243; 250 (1981). A virtue of this common law rule is that the counterparty is unable to use a trivial breach as an excuse to free himself from what turns out to be—for reasons unrelated to the breach—a burdensome bargain. Similarly, the *Wells Fargo* interpretation of a provision such as §2.03(c) of the Pooling and Servicing Agreement could

Case 1:11-cv-06988-WHP    Document 126-1    Filed 10/31/11    Page 25 of 55

prevent purchaser abrogation of a transaction that has—for reasons other than the seller's breach—become burdensome.[****]

None of the foregoing suggests that the *Wells Fargo* approach is ideal. It is not. Notably, to say that a material adverse effect on an interest in a loan is one that reduces the value of that interest does not help determine how much of a reduction in value constitutes a "material" reduction. The few cases cited here as examples suggest that an inquiry into the consequences of a breach of a representation or warranty may require case-by-case analysis regardless of how one interprets "material and adverse" (though I offer no view as to whether this is in fact the case). Such an inquiry would be difficult under any circumstances but would be further complicated, and subject to inconsistent results across cases, where the standard provides no principled guidance, and a court might be reluctant to embark on such a course.

In sum, then, it is not possible to conclude with any confidence how a court would interpret a provision such as §2.03(c) of the Pooling and Servicing Agreement. And I make no such prediction. Notably, in addition to the competing considerations discussed here, there may be cases or circumstances of which I am unaware, including but not limited to industry standards or practices, that would lead a court—through the admission of extrinsic

---

[****] *Resolution Trust Corp*, cited earlier in the text, opined that the standard for material breach is different, and may include a higher threshold, when the victim of breach attempts to "walk away from" an agreement rather than merely enforce a contractual repurchase obligation that is expressly triggered by a material breach in a representation or warranty. 280 F.3d at 17. The court was not, however, interpreting the language that appears in §2.03(c) of the Pooling and Servicing Agreement between Countrywide and BNY Mellon and, in any case, for the reasons given, the argument made above about the possible intention of the parties to avoid opportunism applies even to a repurchase obligation provided for as part of a contract.

evidence or otherwise—to reach one conclusion or another.***** But, for the reasons described here, based solely on general contract principles, and taking the language of the provision at face value, it appears to be a reasonable position that a determination of whether a breach materially and adversely affects the interests of Certificateholders should turn on the harm caused by the breach.

Dated: May 27, 2011

_____

Professor Barry E. Adler

---

***** Different jurisdictions have different rules and standards regarding contract interpretation and the admissibility of evidence. I offer no opinion on such differences or on the particular rules or standards that would apply to this case.