Hearing Date:  November 19, 2012, 10:00 a.m. E.T.
Objection Deadline: October 5, 2012
(extended pursuant to agreement with the Debtors)

Richard L. Wynne (N.Y. Bar No. 1861426)
Howard F. Sidman (N.Y. Bar No. 3970985)
**JONES DAY**
222 East 41st Street
New York, New York  10017.6702
Phone: (212) 326-3418
Fax: (212) 755-7306

Attorneys for Creditor
*Financial Guaranty Insurance Company*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- x
In the matter of:                                  )
                                                   )   Case No. 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC,                           )
                                                   )   Chapter 11
        Debtors.                                   )
                                                   )
                                                   )
                                                   )
-------------------------------------------------- x
```

**LIMITED OBJECTION OF FINANCIAL GUARANTY INSURANCE COMPANY
TO THE DEBTORS' SALE MOTION AND ASSUMPTION NOTICE**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................................... 1

II.   BACKGROUND .................................................................................................................. 2

    A.   General ...................................................................................................................... 2

    B.   The Debtors' Agreements with FGIC ..................................................................... 3
        (a)  GMAC 2005-HE1 Servicing Agreement Provisions ...............................................4
        (b)  GMAC 2005-HE1 I&I Agreement Provisions........................................................5

    C.   Various Servicing Breaches in the Securitization Transactions ........................... 6
        (a)  Claims for Due and Unpaid Premiums. ...................................................................8
        (b)  Claims for Reimbursement of Expenses. .................................................................8
        (c)  Claims for Debtors' Excessive Loan Modifications without FGIC's Consent which violated the Servicing Agreements. ............................................................................................................9
        (d)  Claims for Debtors' Nonrecoverable Advances Breach. ........................................10
        (e)  Claims for Debtors' Failure to Service and Deficiency of Mitigation Process. .............................11
        (f)  Claims for Debtors' Improper Addition of Loans into the Mortgage Loan Pool. .........................12

    D.   Amendment and Transfer of Certain Servicing Agreements ........................................14

    E.   The Contemplated Sale and Assumption and Assignment of Contracts ....................................14

III.  OBJECTION ......................................................................................................................15

    A.   The Debtors' proposed cure amount is incorrect..........................................................15

    B.   The Debtors fail to provide a proposed cure amount through the date of assumption. ...............16

    C.   The Debtors must provide adequate assurance that Nationstar or any other purchaser will be able to perform under the assigned agreements. .............................................................16

    D.   The Debtors may not absolve the assignee of the obligation to perform future servicing duties under the agreements. ......................................................................................................19

    E.   The Debtors may not assume the Servicing Agreements without also assuming the Related Agreements......................................................................................................................21

IV.   RESERVATION OF RIGHTS ..........................................................................................25

V.    CONCLUSION ..................................................................................................................25

## TABLE OF AUTHORITIES

**Page**

CASES

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,
    197 F.3d 76 (3d Cir. 1999)..................................................................................20

*Carvel Corp. v. Diversified Mgmt. Grp., Inc.*,
    930 F.2d 228 (2d Cir. 1991)................................................................................22

*In re Atlantic Computer Sys., Inc.*,
    173 B.R. 844 (S.D.N.Y. 1994)........................................................................22, 23

*In re Burger Boys, Inc.*,
    94 F.3d 755 (2d Cir. 1996).................................................................................15

*In re Bygaph, Inc.*,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986)................................................................16, 17

*In re Gen. Oil Distribs., Inc.*,
    18 B.R. 654 (Bankr. E.D.N.Y. 1982)..................................................................17

*In re GlycoGenesis*,
    352 B.R. 568 (Bankr. D. Mass. 2006) .................................................................17

*In re Great Atlantic & Pacific Tea Co., Inc.*,
    472 B.R. 666 (S.D.N.Y. 2012)............................................................................16

*In re Kopel*,
    232 B.R. 57 (Bankr. E.D.N.Y. 1999)................................................................22, 23

*In re MF Global Holdings, Ltd.*,
    466 B.R. 239 (Bankr. S.D.N.Y. 2012)..................................................................22

*In re Progressive Rest. Sys., Inc.*,
    1997 WL 251508 (W.D.N.Y. May 8, 1997).........................................................23

*In re Res. Tech. Corp.*,
    624 F.3d 376 (7th Cir. 2010) .............................................................................17

*In re Stoltz*,
    315 F.3d 80 (2d Cir. 2002).................................................................................15

*In re Teligent, Inc.*,
    268 B.R. 723 (Bankr. S.D.N.Y. 2001)..............................................................22, 23

*In re TSW Stores of Nanuet, Inc.*,
    34 B.R. 299 (Bankr. S.D.N.Y. 1983)....................................................................17

*In re Washington Capital Aviation & Leasing*,
    156 B.R. 167 (Bankr. E.D. Va. 1993) ...................................................................16

*Nat'l Union Fire Ins. Co. v. Turtur*,
    892 F.2d 199 (2d Cir. 1989) .........................................................................22, 23

*Rudman v. Cowles Commc'ns, Inc.*,
    280 N.E.2d 867 (N.Y. 1972) ..........................................................................22

*Williams v. Mobil Oil Corp.*,
    445 N.Y.S.2d 172 (N.Y. App. Div. 1981) ...........................................................22

### STATUTES

11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123 ...................................................1

11 U.S.C. § 365(f)(2)(B) ...............................................................................16, 17, 19, 21

Bankruptcy Code § 365 ...................................................................................... passim

§ 365(a) of the Bankruptcy Code .........................................................................21

§ 365(b)(1) of the Bankruptcy Code .....................................................................15

§ 502(a) of the Bankruptcy Code .........................................................................6

Memorandum of Law ¶ 52 ....................................................................................19

### OTHER AUTHORITIES

Assumption Notice. Exhibit 1 ................................................................................14

Bankruptcy Rule 3001(f) ....................................................................................6

Depositor, the Enhancer ....................................................................................5

Depositor with a copy to the Enhancer .................................................................5

Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 .........................................................1

Operative Documents . . . without the prior written consent of the Insurer ......................9

www.fgicrehabilitation.com .................................................................................3

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

Financial Guaranty Insurance Company ("FGIC") files this Limited Objection to: (i) the

Debtors' Sale Motion[1] and (ii) the Debtors' Assumption Notice,[2] solely as it relates to assumption

and assignment of FGIC's executory contracts with the Debtors.  In support of this Limited

Objection, FGIC respectfully states as follows:

## I.      PRELIMINARY STATEMENT

1.        FGIC, as the largest monoline insurer in terms of exposure to Debtors by balance of

securities issued, has a vested interest in a successful sale process and transfer of the servicing

obligation to a strong and capable servicer.  However, in its current form, the Sale Motion, and

related Assumption Notice, should be denied for the following reasons:

- The Debtors blanket use of zero cure amount provided for each of FGIC's
  agreements is inappropriate and incorrect, and, in fact, FGIC's cure claim is not less
  than $193,735,218;

- In addition to the incorrect cure amounts, the Debtors improperly seek to cure
  amounts only through May 2012 instead of the date of consummation of the sale;

- Debtors and Nationstar have failed in their responsibility to provide sufficient
  evidence of adequate assurance of future performance; and

- Debtors seeks to impermissibly sever various obligations and have impermissibly
  reserved the right to sever interrelated contracts.

---

[1] Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (A) (i) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (ii) Scheduling Bid Deadline and Sale Hearing; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief and (B) (i) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Asset Purchase Agreements Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related Relief [Docket No. 61] (the "Sale Motion").  The Debtors also filed a Memorandum of Law in support of the Sale Motion [Docket No. 62] (the "Memorandum of Law").

[2] First Amended and Restated Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto [Docket No. 1484] (the "Assumption Notice").

## II.    BACKGROUND

### A.    General

2.    GMAC Mortgage Corporation ("GMACM") and Residential Funding Corporation, LLC ("RFC," and together with GMACM, the "Debtors") originated, acquired, sold and serviced residential mortgage loans.  The Debtors, from time to time, arranged for the securitization of those mortgage loans and the sale of securities collateralized by those mortgage loans to investors, in the form of residential mortgage-backed securities ("RMBS").

3.    In addition to being the sponsor and the seller, the Debtors also act as servicer for many of these transactions.  As servicer, the Debtors are responsible for collecting borrower payments, modifying delinquent mortgage loans and performing other loss mitigation tasks, preserving the mortgaged property with respect to defaulted mortgage loans, liquidating defaulted mortgage loans, and performing other servicing duties set forth in the applicable securitization servicing agreements.

4.    FGIC, a monoline financial guaranty insurance company, was in the business of writing financial guaranty insurance policies with respect to asset-backed securities, including RMBS.  FGIC's financial guaranty insurance policies for certain of the Debtors' RMBS guaranteed the payment of principal and interest due on the insured securities.  At the times FGIC issued financial guaranty insurance policies with respect to Debtors' RMBS, FGIC's financial strength was rated triple-A by rating agencies, which enabled securities insured by FGIC to be highly rated as well.  Accordingly, FGIC's financial guaranty insurance policies enhanced the ratings and marketability of the Debtors' RMBS which, in turn, made the Debtors' securitization transactions viable, and enabled the Debtors to strengthen their balance sheets, grow their mortgage origination businesses through such off-balance sheet financing vehicles, and earn substantial fees, including ongoing servicing fees.

5.    With respect to any RMBS insured by FGIC, FGIC is exposed to any unpaid losses on such securities.  FGIC's risk in any such securitization transaction is dependent on, among other things, (i) the credit quality of the underlying mortgage loans and (ii) the servicing of such

mortgage loans.  FGIC is obligated to make payments on any of its insured RMBS if the cash flow

from the underlying mortgage loans is insufficient to satisfy the payments due to certificateholders

in a timely manner, including if the servicer of such mortgage loans is not properly collecting

borrower payments or otherwise is not servicing in accordance with industry standards.

Accordingly, FGIC has a significant economic interest in the proper servicing of the underlying

mortgage loans and the maximization of collections.[3]

### B.    The Debtors' Agreements with FGIC

6.    Currently, FGIC insures securities in 43 of the Debtors' securitization transactions.

FGIC is the largest monoline insurer in terms of exposure to Debtors by balance of securities

issued.  FGIC currently insurers approximately 10% of the Debtors' current outstanding

securitization balance.  Each securitization transaction consists of either a Pooling & Servicing

Agreement or Sale and Servicing Agreement (each referred to as a "Servicing Agreement" herein),

which anticipates that there be a companion Insurance & Indemnity Agreement ("I&I

Agreement"), and a Custodial Agreement.  In each case, these agreements were executed and

delivered simultaneously as part of the closing of the related securitization transactions.  The

obligations of the servicers in these agreements are indivisible.  Thus, although FGIC is not a

direct party to the Servicing Agreements, by virtue of the integrated agreements and the express

third party beneficiary rights granted FGIC under the Servicing Agreements and other principal

transaction documents, including the I&I Agreements, FGIC's rights and interests are preserved

and protected.

7.    The Servicing Agreements associated with the 43 securitization transactions that

FGIC insures are listed on the Assumption Notice.  Certain of these Servicing Agreements were

amended.  FGIC has no objection to the extent that the Servicing Agreements are to be assumed

and assigned as previously amended.  In addition, only 37 of each I&I Agreements and Custodial

Agreements are listed on the Assumption Notice.  Accordingly, six I&I Agreements and six

---

[3] FGIC is subject to an Article 74 Rehabilitation Proceeding (Index Number 401265-2012) under New York law.
A court hearing is scheduled for December 18, 2012 to consider approval of FGIC's proposed Plan of
Rehabilitation.  *See* www.fgicrehabilitation.com for more details regarding FGIC's Rehabilitation Proceeding.

Custodial Agreements should be added to the schedule of contracts to be assumed and assigned to Nationstar.[4]

8.    The terms of each Servicing Agreement and corresponding I&I Agreement are substantially similar with respect to the provisions governing the relationship between the servicer and FGIC as insurer.  What follows is a description of the agreements that comprise the GMAC 2005-HE1 transaction, which is a representative example of the other transactions involving FGIC and the Debtors.

    **(a)    GMAC 2005-HE1 Servicing Agreement Provisions**[5]

9.    The GMAC 2005-HE1 Servicing Agreement contains a number of provisions for the benefit of FGIC, including the following:

- The GMAC 2005-HE1 Servicing Agreement requires FGIC's consent for the appointment of a successor servicer,[6] and any such successor becomes bound to the terms and conditions of not only the GMAC 2005-HE1 Servicing Agreement, but also the terms of the GMAC 2005-HE1 I&I Agreement.[7]

- FGIC is provided with the right to enforce breaches of representations and warranties under the GMAC 2005-HE1 Servicing Agreement.[8]

---

[4] The six I&I Agreements to be added are for the GMACM 2002-HE4, RFMSI 2005-S7, RFMSI 2005-S2, AHM 2005-1, AHM 2005-2 and AHM 2005-4 securitization transactions.  FGIC's counsel has exchanged emails with Debtors' counsel and been assured that these six agreements will be added to the assumption list.  To the extent they are not, FGIC reserves its rights to supplement this limited objection on that issue.

[5] The GMAC 2005-HE1 Servicing Agreement is attached as Exhibit 1 to the Declaration of Lori Sinanyan in support of the Limited Objection, filed concurrently herewith (the "Sinanyan Declaration").

[6] See GMAC 2005-HE1 Servicing Agreement § 6.02 ("The Servicer may assign its rights and delegate its duties and obligations under this Agreement; provided, that the Person accepting such assignment or delegation shall be a Person qualified to service mortgage loans, is reasonably satisfactory to the Enhancer. . . .").

[7] See GMAC 2005-HE1 Servicing Agreement § 7.02(b) ("Any successor, including the Indenture Trustee, to the Servicer as servicer shall during its term as Servicer (i) continue to service and administer the Mortgage Loans for the benefit of the Securityholders, (ii) maintain in force a policy or policies of insurance covering errors and omissions in the performance of its obligations as Servicer hereunder and a fidelity bond in respect of its officers employees and agents to the same extent as the Servicer is so required pursuant to Section 3. 13 and (iii) be bound by the terms of the Insurance Agreement.") (emphasis added).

[8] See GMAC 2005-HE1 Servicing Agreement § 2.03 ("Upon the discovery by the Sellers, the Depositor, the Servicer, the Indenture Trustee, the Enhancer, the Issuer, or the Custodian of a breach of any of the representations and warranties made by a Seller in the Purchase Agreement, in respect of any Mortgage Loan which materially and adversely affects the interests of the Securityholders or the Enhancer, the party discovering such breach shall give

- Multiple references are included in the GMAC 2005-HE1 Servicing Agreement that prohibit the servicer from taking an action if it would adversely affect the interests of the Enhancer (FGIC), including, for example, loan modifications in excess of the contractual cap.[9]

- FGIC must be provided with copies of annual statements[10] and annual servicing reports.[11] FGIC is also included as a notice party in the GMAC 2005-HE1 Servicing Agreement.[12]

- Perhaps most importantly, FGIC may terminate all the rights and obligations of GMACM as servicer under the GMAC 2005-HE1 Servicing Agreement upon the occurrence of a Servicing Default.[13]

### (b)   GMAC 2005-HE1 I&I Agreement Provisions[14]

10.   In addition, the GMAC 2005-HE1 I&I Agreement contains numerous provisions reflecting the intent of the parties to have one integrated transaction, including the following:

- The issuance of the related insurance policies by FGIC was expressly conditioned upon the delivery of fully executed Servicing Agreements in form and substance satisfactory to FGIC.[15]

---

(continued…)

prompt written notice to the other parties (the Custodian being so obligated under the Custodial Agreement).").  The "Enhancer" is FGIC.  *See id.* § 1.01.

[9] *See* GMAC 2005-HE1 Servicing Agreement § 3.02(a)

[10] *See* GMAC 2005-HE1 Servicing Agreement § 3.10 ("The Servicer shall deliver to the Issuer, the Indenture Trustee and the Depositor <u>with a copy to the Enhancer</u>, beginning March 31 , 2006, and on or before March 31 of each year thereafter, an Officer s Certificate . . .") (emphasis added).

[11] *See* GMAC 2005-HE1 Servicing Agreement § 3.11 ("the Servicer at its expense shall cause a firm of nationally recognized independent public accountants (which firm may also render other services to the Servicer) to furnish a report to the Issuer, the Indenture Trustee, the Depositor, <u>the Enhancer</u> and each Rating Agency stating its opinion that . . .") (emphasis added).

[12] *See* GMAC 2005-HE1 Servicing Agreement § 8.03 ("All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by certified mail, return receipt requested, to … (b) in the case of the Enhancer, Financial Guaranty Insurance Company. . . .").

[13] *See* GMAC 2005-HE1 Servicing Agreement § 7.01("If a Servicing Default shall occur and be continuing, then, . . . <u>the Enhancer . . . may terminate all of the rights and obligations of the Servicer</u> as servicer under this Agreement.") (emphasis added).

[14] The GMAC 2005-HE1 I&I Agreement is attached as Exhibit 2 to the Sinanyan Declaration.

[15] *See* GMAC 2005-HE1 I&I Agreement § 3.01.

- "Operative Documents" is defined in the I&I Agreement to include, among others, the I&I Agreement, the Servicing Agreement, and any Subsequent Transfer Agreement.[16]

- The servicer is required to service the mortgage loans in accordance with applicable market standards and in accordance with the terms of the applicable Servicing Agreement.[17]

- There is a cross-default provision whereby a default by the servicer under the Servicing Agreement triggers an event of default under the I&I Agreement. The occurrence of an event of default under the I&I Agreement gives FGIC the power to exercise rights and remedies in addition to those available to it in the Servicing Agreement.[18]

- An express negative covenant provides that GMACM cannot consent to the designation of a successor servicer without the prior written approval of FGIC as insurer.[19]

**C.    Various Servicing Breaches in the Securitization Transactions**

11.    As described in detail below, there are a variety of defaults under the I&I Agreements and Custodial Agreements that are included in (or will be added to) the Assumption Notice. Such defaults must be cured before such agreements can be assumed and assigned to Nationstar or any other successful bidder.[20]

12.    FGIC has determined to date that servicing breaches under the 43 securitization transactions to which FGIC is a party total at least $193,735,218.[21] These servicing breaches can

---

[16] *Id.* § 1.01.

[17] *Id.* § 2.02(l).

[18] *Id.* § 5.02(a)(iv). Note that an event of default under the I&I Agreement has already occurred as a result of the bankruptcy and the "additional" rights and remedies available to FGIC are against GMACM.

[19] *Id.* § 2.03(d).

[20] A more detailed description of the claims related to the 2005-HE1 Transaction and 2006-HE2 Transaction is contained in Exhibit 3 (2005-HE1 Complaint) and Exhibit 6 (2006-HE1 Complaint) attached to the Sinanyan Declaration.

[21] All amounts included in this Limited Objection are *preliminary* estimates of FGIC's claims *only*. FGIC only had two weeks to prepare this calculation in light of the fact that the relevant agreements were only recently added to the Assumption Schedule. FGIC is in the process of analyzing and developing its claims. FGIC reserves the right to revise or supplement its claim in any manner it deems necessary to protect its interests. Further, FGIC objects to the requirement in the Assignment and Cure Notice that supporting documentation and evidence be submitted at this stage with respect to its Proposed Cure Amount. Such evidence will require extensive discovery and a protracted evidentiary hearing to present. Further, the deadline for filing of proofs of claim has not yet occurred, and even then the presumption is that such claims should be deemed allowed. Under section 502(a) of the Bankruptcy Code, a proof of claim "is deemed allowed, unless a party in interest objects." 11 U.S.C. § 502(a). In addition, Bankruptcy

be broken down into six specific types: (a) due and unpaid premiums, (b) reimbursement of expenses, (c) unauthorized loan modification losses,  (d) nonrecoverable advances breach, (e) failure to service and deficiency of mitigation, and (f) the improper addition of loans into the mortgage loan pool.[22]

13.     The breaches described in paragraphs (b) – (f) below occurred in a number of different transactions and were the subject of the complaints filed by FGIC against the Debtors and certain affiliates.  As such, these servicing breach claims are nothing new to the Debtors.  For simplicity, in discussing the breaches in sections (b) – (e), FGIC uses the 2007-EMX1 transaction for purposes of illustration, refers back to the 2007-EMX1 Complaint for fuller explanation, and references the other complaints in which the same servicing breach was also asserted.[23]  In discussing the breach in paragraph (f), FGIC uses the 2005-HE1 transaction for purposes of illustration, refers back to the 2005-HE1 Complaint for fuller explanation and notes the other complaint in which the same servicing breach was also asserted.[24]

14.     Again, in each case, FGIC reserves its rights to amend the damage claim figures included herein and to assert additional causes of action relating to the Debtors' servicing obligations as may be uncovered after an evidentiary process.  FGIC further states that the complaints referenced herein have multiple causes of action, including for various origination and servicing breaches, that are only summarized herein.  FGIC therefore reserves all rights to claims it has against the Debtors and its affiliates, including but not limited to, the claims discussed in the complaints and discussed herein.

---

(continued…)

Rule 3001(f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and the amount of the claim."

[22] Copies of the 2006-HE1 Servicing Agreement, I&I Agreement, and Complaint are attached to the Sinanyan Declaration as Exhibits 4, 5, and 6.

[23] Copies of the 2007-EMX1 Servicing Agreement, I&I Agreement, and Complaint are attached to the Sinanyan Declaration as Exhibits 7, 8, and 9.

[24] Copies of the 2005-HE1 Servicing Agreement, I&I Agreement, and Complaint are attached to the Sinanyan Declaration as Exhibits 1, 2, and 3.

(a)    **Claims for Due and Unpaid Premiums.**

15.    Under the terms of each of the I&I Agreements for the transactions noted below, FGIC is entitled to receive an annual premium based on a small, fixed percentage of the aggregate principal balance of the certificates insured and remain outstanding.

16.    As of September 2012, FGIC has not been paid these premiums as noted below.

| Transaction | Periods Covered | Unpaid Premiums |
|---|---|---|
| GMACM 2005-HE2 | Since at least Nov. 2009 | $98,393.6 |
| RFMSII 2004-HS3 | Since Feb. 2012 with certain adjustments | $92,823.5 |
| | | **$191,217.1** |

(b)    **Claims for Reimbursement of Expenses.**

17.    Under the terms of the 2007-EMX1 I&I Agreement, RFC agreed to reimburse FGIC for (a) any and all costs or expenses including attorneys' fees and expenses in connection with the enforcement, defense or preservation of any rights in respect of any of the 2007-EMX1 operative documents, and (b) all costs or expenses including reasonable fees and expenses of attorneys arising out of or relating to the breach by RFC of any of the representations or warranties contained in the I&I Agreement or arising out of or relating to the 2007-EMX1 Transaction.[25] This includes, but is not limited to, RFC's obligation to pay for expenses associated with non-performing loan files that were re-underwritten by FGIC and subsequently repurchased by RFC.

---

[25] See 2007-EMX1 I&I Agreement §§ 3.03(c), 3.04(a). (Section 3.03(c) provides "RFC agrees to pay to the Insurer any and all reasonable charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents … or (ii) any amendment, waiver or other action with respect to, or related to, any Operative Document, whether or not executed or completed.") (Section 3.04(a) In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, RFC and the Depositor agree to pay, and to protect, indemnify and save harmless, the Insurer … from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or relating to the breach by RFC or the Depositor of any of the representations or warranties contained in Section 2.01 or arising out of or relating to the transactions contemplated by the Operative Documents.")

18.    FGIC has not been reimbursed for at least $1.7 million in such expenses calculated as of September 2012.

19.    A more detailed discussion of certain expense reimbursement servicing breach claims is provided for in the 2007-EMX1 Complaint at ¶¶ 266-273 and reference should be made thereto for additional detail.

(c)    **Claims for Debtors' Excessive Loan Modifications without FGIC's Consent which violated the Servicing Agreements.**

20.    Under the terms of the relevant transaction documents constituting the 2007-EMX1 Transaction,[26] RFC, as master servicer, agreed that it would not modify, waive or amend its Servicing Agreement without the prior written consent of FGIC.[27]

21.    RFC requested FGIC consent to an amendment to allow RFC to modify 100% of the 2007-EMX1 mortgage loans (which are otherwise subject to a 5% loan modification cap).[28] FGIC requested that RFC provide it with certain information before it would consent to the requested amendment, which RFC never provided. Despite the lack of required FGIC consent and in contravention of FGIC's contractual rights, RFC nonetheless proceeded as if it received FGIC's consent and modified the loans in excess of the allowed 5% cap.[29]

22.    As of January 25, 2012 a total of approximately 25% of the original pool had been modified. A significant portion of the cumulative losses incurred to date were the result of the servicing modifications improperly performed to date.

---

[26] 2007-EMX1 Transaction refers to the transactions contemplated by the 2007-EMX1 Pooling & Servicing Agreement dated as of February 1, 2007, the 2007-EMX1 I&I Agreement dated as of March 12, 2007, and all related documents.

[27] *See* 2007-EMX1 I&I Agreement § 2.03(b) ("Except as provided in and in accordance with the Operative Documents, neither RFC or the Depositor will modify, waive or amend, or consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of the Operative Documents . . . without the prior written consent of the Insurer thereto...") (emphasis added).

[28] *See* 2007-EMX1 PSA § 3.07(a) ("…the aggregate principal balance of all Reportable Modified Mortgage Loans subject to Servicing Modifications . . . can be no more than five percent of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date. . . .") (emphasis added).

[29] *See* 2007-EMX1 I&I Agreement § 2.03(b).

23.     A more detailed discussion of the loan modification related servicing breach is provided in the 2007-EMX1 Complaint at ¶¶ 212-17 and reference should be made thereto for additional detail.  Similar breach claims are included in the following complaints: 2005-RS9 Complaint at ¶ 125, 2005-EMX5 Complaint at ¶¶ 156-159, 2005-NC1 Complaint at ¶¶ 177-180, and 2005-EFC7 Complaint at ¶¶ 187-190.

**(d)     Claims for Debtors' Nonrecoverable Advances Breach.**

24.     RFC, as master servicer, is permitted under the 2007-EMX1 Transaction to withdraw funds from the 2007-EMXl Transaction's custodial account (the "Custodial Account") to reimburse itself for advance of funds made that are deemed to be "nonrecoverable."[30]   An advance is nonrecoverable when the master servicer determines, in its good faith judgment, that the advance will not be ultimately recoverable by the master servicer and the master servicer determines that no other source of payment or reimbursement for such advances is available to it.[31]

25.     RFC has been improperly declaring advances "nonrecoverable" in order to seek reimbursement of monies that RFC has been advancing as master servicer. Such declaration has improperly allowed RFC to remove funds from the Custodial Account by improperly reimbursing itself for advances that should not be deemed nonrecoverable.

26.     Even if RFC were to prove successfully that its reimbursements were made in good faith, RFC is still in breach of its servicing obligations because it has failed to comply with the provisions in the PSA regarding the process of declaring an advance nonrecoverable.  The PSA requires RFC to transmit an officers' certificate to FGIC that evidences RFC's decision to declare an advance nonrecoverable, and that includes relevant information or reports used to make such

---

[30] *See* PSA § 3.10(a)(vii) ("The Master Servicer may, from time to time as provided herein, make withdrawals from the Custodial Account … for the following purposes:  … (vii) to reimburse itself or the related Subservicer for any Nonrecoverable Advance or Advances in the manner and to the extent provided in subsection (c) below, and any Advance or Servicing Advance made in connection with a modified Mortgage Loan that is in default or, in the judgment of the Master Servicer, default is reasonably foreseeable pursuant to Section 3.07(a)...").

[31] *See* PSA § 1.01 (definition of "Nonrecoverable Advance: Any Advance previously made or proposed to be made by the Master Servicer or Subservicer in respect of a Mortgage Loan (other than a Deleted Mortgage Loan) which, in the good faith judgment of the Master Servicer, will not, or, in the case of a proposed Advance, would not, be ultimately recoverable by the Master Servicer from related Late Collections, Insurance Proceeds, Liquidation Proceeds or REO Proceeds….").

determination.[32] The so-called "Officer's Certificates" sent by RFC to FGIC as of the date of the 2007-EMX1 Complaint were not executed by an officer nor did they include any supporting information or reports, as required, that would allow FGIC to determine that RFC is in fact using its good faith judgment.

27.    Accordingly, RFC has breached its servicing obligations and FGIC has been harmed in an amount of at least $2 million to date.

28.    A more detailed discussion of the nonrecoverable advances servicing breach is provided in the 2007-EMX1 Complaint at ¶¶ 218-220 and reference should be made thereto for additional detail.

### (e)    Claims for Debtors' Failure to Service and Deficiency of Mitigation Process.

29.    Under the terms of the I&I Agreements and the Servicing Agreements, both RFC and GMACM covenanted that all mortgage loans would be serviced in all material respects in compliance with the Servicing Agreement.[33]  RFC and GMACM are required to follow such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities.[34]

30.    The Debtors, however, have been deficient in their borrower contact, collections, and loss mitigation standards.  Furthermore, in March 2009, Debtors disclosed to FGIC that it classified loans into one of three categories or "Risk Tiers" under a "Risk Protocol."  However, under the Risk Protocol, the Mortgage Loans were knowingly miscategorized and neglected, and

---

[32] *See* for example 2007-EMX1 PSA § 1.01 (definition of "Nonrecoverable Advance: …The determination by the Master Servicer that it has made a Nonrecoverable Advance shall be evidenced by a certificate of a Servicing Officer, Responsible Officer or Vice President or its equivalent or senior officer of the Master Servicer, delivered to the … the Certificate Insurer … setting forth such determination, which shall include any other information or reports obtained by the Master Servicer such as property operating statements, rent rolls, property inspection reports and engineering reports, which may support such determinations.").

[33] *See* for example 2007-EMX1 I&I Agreement § 2.02(1) ("All Mortgage Loans will be serviced in all material respects in compliance with the Pooling and Servicing Agreement.")

[34] *See* for example 2007-EMX1 PSA §§ 3.0l(a) ("The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans, following such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities…")

received much less care than if they had been properly categorized and appropriately serviced. Accordingly, RFC breached its obligations as master servicer under the Servicing Agreement and the I&I Agreement. FGIC is currently working on the claim amount for such breach.

31.     A more detailed discussion of the failure to service mortgage loans in conformity with generally accepted servicing practices and deficiency of mitigation process is provided in the 2007-EMX1 Complaint at ¶¶ 201-210 and reference should be made thereto for additional detail. Similar breach claims are included in the following complaints: the 2005-RS9 Complaint at ¶¶ 123-124, the 2005-HS1 and HS2 Complaint at ¶¶ 128-129, the 2005-NC1 Complaint at ¶¶ 170-175, the 2005-EFC7 Complaint at ¶¶ 180-185, the HSA Transactions Complaint at ¶¶ 166-171, the HI Transactions Complaint at ¶¶ 206-211, the 2005-HE1 Complaint at ¶¶ 135-140, the 2006-HE1 Complaint at ¶¶ 215-220, the 2006-HE3 Complaint at ¶¶ 215-220, and the 2006 and 2007-HE2 Complaint at ¶¶ 221-226.

**(f)     Claims for Debtors' Improper Addition of Loans into the Mortgage Loan Pool.**

32.     FGIC has determined that servicing breaches under the 2005-HE1 Transaction, as detailed below, have resulted in a claim of at least $71,784,077 and under the 2006-HE1 Transaction in a claim for at least $118,217,917.

33.     At GMACM's request, FGIC agreed pursuant to the I&I Agreement, dated as of March 29, 2005 (the "2005-HE1 I&I Agreement"), between FGIC, GMACM and the GMACM Home Equity Loan Trust 2005-HE1 (the "2005-HE1 Trust") (among others), to issue an insurance policy (the "2005-HE1 Policy") in relation to a GMACM-sponsored transaction (the "2005-HE1 Transaction").

34.     GMACM procured the 2005-HE1 Policy from FGIC in order to enhance the ratings and marketability of the 2005-HE1 Notes. In its role as sponsor, seller and servicer of the 2005-HE1 Transaction, GMACM provided FGIC with certain material representations, warranties and affirmative covenants. In reliance on those representations, warranties and affirmative covenants, FGIC issued the 2005-HE1 Policy.

35.     The 2005-HE1 Trust was permitted to execute subsequent transfers of new collateral (in the form of additional mortgage loans) into the mortgage loan pool, provided that certain conditions precedent had been met, including, among other things, GMACM providing FGIC with proper notice, and an "Early Amortization Event" not having occurred.

36.     Following the closing of the 2005-HE1 Transaction, GMACM, in its role as Servicer, failed to recognize and give effect to the occurrence of an Early Amortization Event as defined in the plain language of the transaction documents.

37.     As detailed in the 2005-HE1 Complaint, GMACM added approximately $851 million in additional mortgage loans to the 2005-HE1 Trust through subsequent transfers that it was not permitted to make.  GMACM also failed to give notice to FGIC of the occurrence of an Early Amortization Event or of the many occasions on which it executed subsequent transfers.

38.     Accordingly, GMACM committed multiple breaches of the contractual provisions governing transfers of Subsequent Mortgage Loans to the 2005-HE1 Trust.  The breaches and causes of action are further described in the prepetition complaint filed by FGIC in the United States District Court, Southern District of New York, on January 31, 2012.

39.     A more detailed discussion of this servicing breach is provided in the 2005-HE1 Complaint at ¶¶ 82-112 and reference should be made thereto for additional detail.

40.     Similar to the 2005-HE1 Trust, in the 2006-HE1 Transaction, the GMACM Home Equity Loan Trust 2006-HE1 (the "2006-HE1 Trust") was also permitted to execute subsequent transfers of new collateral (in the form of additional mortgage loans) into the mortgage loan pool, provided that certain conditions precedent had been met, including, among other things, (i) GMACM providing FGIC with proper notice; and (ii) certain events, such as a "Managed Amortization Event," had not occurred.

41.     Following the closing of the 2006-HE1 Transaction, GMACM, in its role as servicer, failed to recognize and give effect to the occurrence of a Managed Amortization Event as defined in the plain language of the transaction documents.  As detailed in the 2006-HE1

Complaint, GMACM added approximately $580 million in additional mortgage loans to the 2006-HE1 Trust through subsequent transfers that it was not permitted to make.

42.    A more detailed discussion of this servicing breach is provided in the 2006-HE1 Complaint at ¶¶ 194-214 and reference should be made thereto for additional detail.

### D.    Transfer of Certain Servicing Agreements

43.    Upon the occurrence of a servicer default, under the terms of the Servicing Agreements, FGIC as certificate insurer is entitled to terminate all of the rights and obligations of the servicer under the transaction documents.

44.    Between October 1, 2009, and March 1, 2012, prior to the Petition Date, FGIC caused the servicing of seven transactions[35] to be transferred to GreenTree.  Agreements related to four of the seven transactions are on the Assumption Notice.  Accordingly, FGIC has notified Debtors' counsel that such agreements cannot be assumed and assigned to Nationstar.  Although Debtors' counsel has acknowledged the termination and previous transfer of these servicing agreements in email correspondence with FGIC's counsel, Debtors have not filed an amended assumption notice.  FGIC therefore objects to the extent these four servicing agreements are not removed from the Assumption Notice.  *See* Sinanyan Declaration ¶ 12.

### E.    The Contemplated Sale and Assumption and Assignment of Contracts

45.    The Debtors filed their original notice on July 26, 2012 [Docket 924].  It was not until almost two months later, on September 18, only 10 days before the objection deadline that the Debtors amended the Assumption Schedule to include FGIC's I&I Agreements.[36]

46.    FGIC's I&I Agreements are listed on Exhibit 1 to the Assumption Notice.  Exhibit 1 does not even have a column for relevant cure amount.  Therefore, FGIC assumes that the Debtors contemplate that there is to be no cure payment with respect to the I&I Agreements.

---

[35] GMACM 2006-HLTV1, GMACM 2007-HE2, RFC RFMSII 2006-HI4, and RFC RFMSII 2006-HI3.

[36] FGIC's counsel obtained an extension of the objection deadline to Friday, October 5, to provide time to address adequate assurance issues with Nationstar and prepare a cure calculation.

III.    **OBJECTION**

A.    **The Debtors' proposed cure amount is incorrect.**

47.    As detailed above, the Debtors are in default of their servicing obligations[37] under

multiple Servicing Agreements and I&I Agreements listed on the Assumption Notice.  Thus,

before the I&I Agreements can be assumed and assigned to Nationstar or any other purchaser, the

Debtors must comply with § 365(b)(1) of the Bankruptcy Code.

48.    Section 365(b)(1) of the Bankruptcy Code provides that in the event of a default

under an executory contract, a debtor may not assume that contract unless, at the time of

assumption, the debtor "(A) cures, or provides adequate assurance that the debtor will promptly

cure, such default; (B) compensates, or provides adequate assurance that the debtor will promptly

compensate, the non-debtor party to the contract for any actual pecuniary loss to such party

resulting from such default; and (C) provides adequate assurance of future performance under such

contract." 11 U.S.C. § 365(b)(1).

49.    All defaults must be cured as of the time of assumption, or adequate assurance of

prompt cure must be provided, and the defaults that must be cured include both pre-petition and

post-petition defaults.  *See In re Stoltz*, 315 F.3d 80, 86, 94 (2d Cir. 2002); *In re Burger Boys, Inc.*,

94 F.3d 755, 763 (2d Cir. 1996).

50.    FGIC objects to the Debtors' proposed $0 cure amount.  All defaults under the

Servicing Agreements and their related agreements must be cured in order to assume and assign

any such agreements.  At this time, FGIC estimates that, as of September, 2012, it is owed not less

than $193,735,218 in cure payments as detailed above.  FGIC is continuing to calculate the

amounts owed to it for servicing breaches related to the agreements listed on the Assumption

Notice.  FGIC reserves the right to supplement this Limited Objection to seek additional cure

amounts, including those arising after the filing of this Limited Objection.

---

[37] These defaults arise under the Servicing Agreements at issue and are separate and apart from the numerous
breaches related to the Debtors' origination activities, which will be separately asserted in FGIC's proof of claim.

**B.** **The Debtors fail to provide a proposed cure amount through the date of assumption.**

51.     Although the Debtors acknowledge that the date of assumption is "anticipated to occur no earlier than November 5, 2012," the Notice only provides that the Proposed Cure Amount is the amount due and owing as of May 14, 2012.  *See* Assumption Notice ¶ 6.  The Debtors do not propose a process for establishing cure amounts as of the date of assumption.  Including the cure amount of approximately $194 million through September 2012, amounts owing by the Debtors to FGIC will continue to accrue through the date of assumption.  Accordingly, FGIC objects to the proposed cure amounts to the extent they do not provide for payment of the correct cure costs, in full, whatever such amount may be through the date of assumption and beyond that date with respect to damages resulting from the Debtors' actions that will not accrue until after the consummation of the sale.  *See In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 173 (Bankr. E.D. Va. 1993) (stating that Bankruptcy Code section 365 measures defaults as of the time of assumption).

**C.** **The Debtors must provide adequate assurance that Nationstar or any other purchaser will be able to perform under the assigned agreements.**

52.     A debtor's right to assume and assign an executory contract is not absolute.  Rather, before the Court can approve the Debtors' proposed assumption and assignment of the relevant agreements, the Debtors must provide "adequate assurance" that the assignee will be able to perform the obligations under the assumed contracts.  *See* 11 U.S.C. § 365(f)(2)(B) ("The trustee may assign an executory contract . . . only if (B) adequate assurance of future performance by the assignee of such contract . . . is provided, whether or not there has been a default in such contract . . . .").  The Debtors bear the burden of proof that the adequate assurance requirement has been met.  *See In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 674-75 (S.D.N.Y. 2012).

53.     The adequate assurance requirement is designed to protect contract counterparties; without such a requirement, a debtor could freely assign its contracts to assignees that are unable to perform, leaving the counterparty with the burden of pursuing the assignee for damages.  *See In re*

*Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ("[T]he [counterparty] must be given adequate assurance of future performance so that it will be protected from having to take on the burden of an [assignee] who may be likely to default . . . after the assumption and assignment have occurred. . . . The emphasis is on protection.").

54.    "What constitutes adequate assurance is a factual question to be determined on a case by case basis with due regard to the nature of the parties, their past dealings and present commercial realities." *In re Gen. Oil Distribs., Inc.*, 18 B.R. 654, 658 (Bankr. E.D.N.Y. 1982). If the debtor cannot establish that the assignee is more likely than not to perform the obligations of the contract, assignment is not permitted. *See In re Res. Tech. Corp.*, 624 F.3d 376, 383 (7th Cir. 2010). In *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299 (Bankr. S.D.N.Y. 1983), for example, the proposed assignee sought to alter the nature of the contract in question by changing the debtor's former business model. *Id.* at 306. The assignee acknowledged that it would not be able to operate its business in accordance with the terms of the agreement in question. *Id.* at 306 ("Odd Lot concedes that it cannot and will not operate its business under the current restrictive use clause in the debtor's lease."). Thus, because the debtor was unable to show that the assignee could perform under the contract, the debtor failed to satisfy the adequate assurance requirement under section 365(f)(2)(B). *Id.* (rejecting debtor's attempt to effect a "substantial rewriting" of the contract in order to have it assumed and assigned).

55.    Here, where performance under the assumed contracts will require a large, sophisticated operation and special expertise, the Debtors must provide more than a simple demonstration of the assignee's financial wherewithal. *See In re Bygaph Inc.*, 56 B.R. 596 605-06 (Bankr. S.D.N.Y. 1986) (experience in managing the type of enterprise or property assigned may be part of the adequate assurance inquiry); *In re GlycoGenesis*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (considering "business plan, financing and scientific expertise" in deciding whether adequate assurance was present). A party's financial wherewithal is only one factor when assuming obligations as complex as those under the Servicing Agreements. An assignee's

operational capabilities – logistically and experience-wise – to perform adequately all such obligations is equally critical.

56.     At this point, the Debtors have failed to provide adequate information regarding Nationstar's ability to perform under the Servicing Agreements.  Though FGIC began the process of attempting to obtain information directly from Nationstar on September 24th, FGIC was not put in contact with the appropriate person at Nationstar until October 3rd, and the first conference call was not scheduled until late in the day on October 4, a mere day before this objection was due.[38]

57.     While FGIC has received some limited information from Nationstar, neither the Debtors nor Nationstar has provided FGIC with sufficient information on Nationstar's experience managing portfolios of distressed second-lien loans and its success generating recoveries, including performance data for management of pools of second-lien collateral.  FGIC has requested information on the number of loans and the balances and recovery rates over specific time periods in representative distressed portfolios Nationstar manages.  FGIC is also seeking information from Nationstar regarding how it proposes to absorb the Debtors' large servicing platform without disruption to Nationstar's ability to perform under the Servicing Agreements.  Absent complete information on Nationstar's operational capabilities, and in particular its ability to service large portfolios of distressed second-lien loans, the Debtors fail to demonstrate adequate assurance of future performance because they fail to show that Nationstar will be able to perform the servicing duties under the relevant agreements.

58.     Finally, as argued by the RMBS Trustees (the "Trustees") in The Pre-Auction Objections of the RMBS Trustees to the Debtors' Sale Motion (the "Trustees' Objection") [Docket No. 1242] and Syncora [Docket No. 1657], FGIC objects on the grounds that the Debtors cannot demonstrate adequate assurance where they have failed to assume all parts of a contract.  The Sale

---

[38] FGIC's counsel reached out to Nationstar's counsel on September 24, 2012 who suggested that FGIC directly contact someone that they already have a pre-existing relationship with at Nationstar as she was not sure who to direct FGIC to.  FGIC complied but to no avail, going back to counsel on September 28 to inform her that FGIC's efforts did not bear fruit.  Counsel for Nationstar responded on September 28 that she would follow-up immediately.  After a further prompting from FGIC's counsel on October 2, FGIC received the name of appropriate person to contact at Nationstar on October 3.  Nationstar sent FGIC a brief presentation and directed FGIC to visit Nationstar's website for more information on October 4.  *See* Sinanyan Declaration ¶ 13.

Motion asserts that "Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations <u>relating to</u> the pre-closing period under any Assumed Contract. . ." *See* Sale Motion at ¶ 60 (emphasis added). The Debtors cannot adequately assure future performance of the relevant Agreements by Nationstar because the Debtors explicitly excuse Nationstar from assuming, and thus performing, any obligations of the relevant agreements that arose pre-closing or in any way relate to the pre-closing period. *See* Trustees' Objection ¶ 11. As the Trustees further point out, the Debtors must be required to honor minimum rating requirements and rights of consent to an assignment under the transaction documents because such provisions are forms of adequate assurance. *See id.* ¶ 25. FGIC agrees, as such provisions provide parties with important rights pertaining to the credit quality of the deal and adequacy of the servicer. FGIC also adds that, to the extent any of the I&I Agreements are not assumed and assigned with each relevant Servicing Agreement, the Debtors fail to show that the entire agreement will be performed.

59.     Since the Debtors have failed to make a substantial showing that Nationstar or any other potential assignee has the experience, knowledge, and infrastructure to perform the numerous and complex obligations that will be assigned under the Servicing Agreements, section 365(f)(2)(B) compels the conclusion that the Debtors cannot assume and assign the Servicing Agreements.[39]

**D.     The Debtors may not absolve the assignee of the obligation to perform future servicing duties under the agreements.**

60.     In the Sale Motion, the Debtors state that "Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract, whether such claims or obligations are known,

---

[39] FGIC also objects to the Debtors' attempt to defer entirely the issue of adequate protection to the Sale Hearing. In the Sale Motion and Memorandum of Law, the Debtors merely state that they "will present facts at the Sale Hearing that demonstrate the financial credibility, willingness, and ability of Nationstar or any other Successful Bidder to perform under the Assumed Contracts." *See* Memorandum of Law ¶ 52. Postponing all adequate protection issues to the Sale Hearing deprives FGIC and other parties in interest of a meaningful opportunity to evaluate whether Nationstar or some other assignee will be able to perform under the assigned Agreements.

unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing . . . ." *See* Sale

Motion ¶ 32.  As no fewer than eleven other parties in interest have already pointed out in their

objections to the Sale Motion, this attempt to limit Nationstar's liabilities violates the rule that "an

assignment of a contract . . . involves a commitment by the assignee to perform <u>all obligations</u>

under the contract, as well as to acquire all rights created by the contract." *Am. Flint Glass*

*Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 81 (3d Cir. 1999) (emphasis added).  *See*

Objections at Docket Nos. 1242, 1628, 1633, 1638, 1646, 1649, 1657, 1658, 1659, 1689, and 1690

(collectively, the "<u>Other Severance Sale Objections</u>").[40]

61.    Rather than burden the Court by repeating the arguments made in the Other

Severance Sale Objections, FGIC hereby adopts these arguments as its own and incorporates them

by reference:[41]

> • The Debtors must assume and assign the Servicing Agreements in their
> entirety.  The Debtors' attempt to cut off all obligations that "relate to" the
> pre-closing period is not permitted because certain post-closing obligations
> will inevitably relate to the pre-closing period.  Thus, the Debtors would be
> assigning only a portion of the Servicing Agreements, which is not
> permitted.[42]

---

[40] Limited Objection and Reservation Of Rights By Roosevelt Mortgage Acquisition Company and Roosevelt
Depositor LLC to Debtors' Proposed Sale Approval Order and Proposed Assumption and Assignment of Agreements
[Docket No. 1628]; Objection of Wells Fargo Bank, N,A., as Custodian for Residential Mortgage Backed Securities
Trusts, to Proposed Cure Amounts and Assumption and Assignment of Executory Contracts [Docket No. 1633];
Limited Objection to Notice of (I) Debtor's Intent to Assume and Assign Certain Executory Contracts, Unexpired
Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related
Thereto [Docket No. 1638]; Objection to Motion Debtors' Proposals: (I) To Assume And Assign Certain Executory
Contracts; and (II) To Assign Cure Amounts Related Thereto [Docket No. 1646]; Objection to Motion Objection to
Debtors' Motion for Orders [Docket No. 1649]; Syncora Guarantee Inc.'s Limited Objection to Debtors' Sale Motion
[Docket No. 1657]; Objection to Motion First Supplemental Notice of Intent to Assume and Assign [Docket No.
1658]; Limited Objection and Reservation of Rights of Ally Financial Inc. and Ally Bank Regarding Assumption and
Assignment of Certain Executory Contracts to Nationstar Mortgage LLC [Docket No. 1659]; Objection to Debtors'
Motion and Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases or
Personal Property, and Unexpired Leases of Non-Residential Real Property, and (II) Cure Amounts Related Thereto
[Docket No. 1689]; Federal Home Loan Mortgage Corporation's Objection to Debtors' Proposed Assumption and
Assignment of Certain Executory Contracts and Related Cure Amount [Docket No. 1690].

[41] To the extent any of the Sale Objections is withdrawn, resolved consensually, or otherwise denied, FGIC
reserves the right to supplement or amend this limited objection in order to directly raise the arguments made therein
in support of this Limited Objection.

[42] *See* Docket No. 1242 ¶¶ 13-15; Docket No. 1646 ¶¶ 26, 29-30; Docket No. 1649 ¶¶ 24-26; Docket No. 1657
¶ 28; Docket No. 1659 ¶¶ 18-22; Docket No. 1689 ¶¶ 60-64]; Docket No. 1690 ¶¶ 24-33.

- By cutting off obligations that relate to the pre-closing period, the Debtors fail the adequate assurance of performance requirement under Bankruptcy Code § 365(f)(2)(B).[43]

- The Debtors' attempt to eliminate Nationstar's liability for obligations that relate to the pre-closing period is an improper attempt to graft the benefits of a "free and clear" sale under section 363 onto the assignment of an executory contract under section 365.[44]

- The Debtors cannot simply "cure" all defaults that are related to the pre-closing period. "Cure" refers only to defaults that have actually accrued as of the time of assumption and assignment. Because certain obligations that "relate to" the pre-closing period will be post-closing obligations, they cannot be resolved through the cure process.[45]

62.    In short, the Debtors may not assign the Servicing Agreements to Nationstar or any other party while absolving such assignee of the obligation to perform all post-closing obligations.

**E.    The Debtors may not assume the Servicing Agreements without also assuming the Related Agreements.**

63.    Because each Servicing Agreement, I&I Agreement and Custodial Agreement are part of a single integrated transaction, the Debtors may not assume one without assuming the others. Currently, most of the agreements to which FGIC is a counterparty are listed on the Assumption Notice. FGIC informed Debtors' counsel that there are twelve additional agreements[46] that were not listed on the schedule and should be added. By email confirmation, the Debtors have agreed to add these agreements, but at this time, they have not yet filed an amended schedule. To the extent these six agreements are not added, FGIC objects to the assumption and assignment of the related Servicing Agreements.[47]

64.    It is blackletter law that when a debtor seeks to assume an executory contract under section 365(a) of the Bankruptcy Code, it must assume the entire contract; the debtor may not

---

[43] *See* Docket No. 1242 ¶¶ 9-11; Docket No. 1649 ¶¶ 34-37.

[44] *See* Docket No. 1242 ¶¶ 14-15; Docket No. 1646 ¶¶ 27-29.

[45] *See* Docket No. 1242 ¶ 12.

[46] *See supra* note 4.

[47] The Debtors have reserved the right to amend at any time the schedule of contracts to be assumed. *See* Assumption Notice ¶ 18. In the event that the Debtors exercise such right and remove any or all of the I&I Agreements and/or Custodial Agreements from the list of contracts to be assumed and assigned, FGIC objects.

cherry-pick the provisions it likes and assume only those. *In re MF Global Holdings, Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012). Likewise, where a complex transaction is memorialized by a series of related agreements, courts will look past the form of the agreements to the substance of the transaction and conclude that the entire transaction is a single executory contract. *See In re Atlantic Computer Sys., Inc.*, 173 B.R. 844, 849 (S.D.N.Y. 1994) (stating that "it is elemental that if the various instruments at issue are deemed a single contract, then [the debtor] may not assume only the benefits . . . while rejecting the obligations of the bargain," and concluding that the agreements in question were a single contract); *In re Kopel*, 232 B.R. 57, 66-69 (Bankr. E.D.N.Y. 1999) (concluding that a lease, note, and consulting agreement were part of a single transaction).

65.    Whether multiple agreements are part of a single transaction is a question of fact that depends on the circumstances of the case. *Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 204 (2d Cir. 1989). In analyzing the issue, courts apply state law,[48] which focuses on the parties' intent as evidenced by the language of the relevant agreements. *See Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 873 (N.Y. 1972) ("In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances."). If the parties intended the agreements to be part of a single transaction, then the entire transaction should be treated as a single agreement for purposes of section 365. *See In re Teligent, Inc.*, 268 B.R. 723, 728 (Bankr. S.D.N.Y. 2001) ("[T]he parties' intentions determine whether two separately executed agreements are in reality one.").

66.    Various factors may guide a court's analysis. For example, if agreements are signed at approximately the same time, it is more likely that they are part of a single transaction and must be assumed collectively. *See Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 233 (2d Cir. 1991); *Williams v. Mobil Oil Corp.*, 445 N.Y.S.2d 172, 175 (N.Y. App. Div. 1981). Where agreements share similar subject matter, are negotiated collectively, cross-reference each other, or include cross-default provisions, they may be considered a single agreement. *See*

---

[48] Here, the Servicing Agreements and I&I Agreements are governed by New York law. *See, e.g.,* GMAC 2005-HE1 Servicing Agreement § 8.02; *See* GMAC 2005-HE1 I&I Agreement § 6.04.

*Kopel*, 232 B.R. at 66-69; *Atlantic Computer*, 173 B.R. at 846-55.  If more than one agreement is

supported by the same consideration, the agreements are more likely to be considered part of a

single transaction.  *See Atlantic Computer*, 173 B.R. at 851 (bankruptcy court was clearly

erroneous in concluding that agreements were separate where there was no separate consideration);

*but see Kopel*, 232 B.R. at 69 (multiple agreements were part of a single transaction, even where

supported by separate consideration).  Furthermore, the fact that the counterparties to various

agreements are different does not preclude a finding that the agreements are part of a single

integrated transaction.  *See Kopel*, 232 B.R. at 66-69 (three of the debtors' contracts, each with a

different counterparty, were all part of a single transaction); *Turtur*, 892 F.2d at 204-05 (finding

"no basis in New York law" for concluding that two agreements with different parties could not be

considered part of the same transaction).

       67.     Often, the most telling fact is whether or not the parties would have entered into the

individual agreements without entering into all of them.  If entry into one agreement was

contingent upon entry into other agreements, the court should treat them as a single agreement for

purposes of assumption.  *See, e.g., Kopel*, 232 B.R. at 66-69 (multiple agreements were part of a

single transaction where party would not have entered into one without the others); *In re

Progressive Rest. Sys., Inc.*, 1997 WL 251508, at *3 (W.D.N.Y. May 8, 1997) (multiple

agreements were part of a single transaction because there was "no doubt" that the agreements

would not have been consummated individually); *Teligent*, 268 B.R. at 729 (agreements were part

of a single transaction where "neither side would have signed one unless the other side signed the

second"); *Atlantic*, 173 B.R. at 845-52 (multiple agreements were part of a single transaction for

purposes of section 365 where the agreements were entered into simultaneously, the agreements

cross-referenced each other, and there was no separate consideration for the individual

agreements).

       68.     Here, the plain language of the Servicing Agreements and I&I Agreements makes it

clear that the parties did not intend for the agreements to be separable.  Each set of transaction

documents was entered into contemporaneously.[49]  The agreements cross-reference each other repeatedly, and though FGIC is not a direct party to the Servicing Agreements, FGIC is an express third-party beneficiary under such agreements, FGIC obtains substantial rights, including the right to terminate the servicer (which right has been exercised in certain instances), and the Servicing Agreements require certain actions to be taken for the benefit of FGIC.  *See, e.g.,* GMAC 2005-HE1 Servicing Agreement § 6.02 (requiring FGIC's consent before an assignment of servicing duties under the Servicing Agreement); *Id.* § 7.02(b) (stating that any successor to the servicer shall be bound by the corresponding I&I Agreement); *Id.* §§ 3.10, 3.11 (requiring the servicer to deliver certain statements and reports to FGIC); GMAC 2005-HE1 I&I Agreement § 1.01 (defining "Transaction" to include the obligations under both the Servicing Agreement and I&I Agreement); *Id.* § 2.02(l) (stating that all obligations under the I&I Agreement shall be binding on any successor to the Servicing Agreement).

69.    Furthermore, the basic structure of each transaction makes it clear that the agreements are co-dependent.  Because the servicing function is essential to any insurer involved in a securitization, FGIC would not have issued the insurance policies without a corresponding Servicing Agreement that, together with the I&I Agreement, set forth the servicer's rights and obligations with respect to the servicing of the mortgage loans.  As discussed above, FGIC's risk in any of the transactions is dependent upon (i) the credit quality of the underlying mortgage loans and (ii) the servicing of such mortgage loans.  Because FGIC is the first party exposed to losses if the mortgage loans are not serviced properly, FGIC bargained for certain rights and protections from the servicer in the transaction documents at the time of closing.  The failure to include <u>all</u> interrelated transaction documents in the Assumed Contracts would deny FGIC the benefits that it bargained for at the time the transactions were consummated.

70.    In short, the parties contemplated, at the time they negotiated the terms of each Servicing Agreement and its related transaction documents, that the agreements were to be treated

---

[49] For example, the GMAC 2005-HE1 Servicing Agreement and GMAC 2005-HE1 I&I Agreement were both entered into on March 29, 2005.

as a single transaction.  This intent governs the interpretation of such agreements under section 365 of the Bankruptcy Code, and thus, the Debtors may not assume a Servicing Agreement without also assuming its corresponding I&I Agreement and Custodial Agreement.

## IV.    RESERVATION OF RIGHTS

71.    FGIC reserves its rights to: (a) amend, supplement or otherwise modify this Limited Objection, (b) assert additional cure amounts or additional defaults under the applicable agreements, (c) raise additional objections to the assumption and assignment of any contract to which FGIC is a counterparty or beneficiary, and (d) make such other and further objections as may be appropriate based upon any new information provided by the Debtors or upon any different relief requested by Debtors, including amendment to the Assumption Notice, or as may be developed through formal or informal discovery.  FGIC also reserves all objections and rights related to the sale of the Debtors' assets.

## V.    CONCLUSION

72.    For the foregoing reasons, FGIC respectfully requests that the Court deny the Sale Motion with respect to the assumption and assignment of FGIC's contracts with the Debtors and grant such other and further relief as is just and necessary.

Dated: October 5, 2012
      New York, New York

/s/ Richard L. Wynne
Richard L. Wynne (1861426)
rlwynne@JonesDay.com
Howard F. Sidman (3970985)
hfsidman@JonesDay.com
JONES DAY
222 East 41st Street
New York, New York  10017.6702
Phone: (212) 326-3418
Fax: (212) 755-7306

Attorneys for Creditor
*Financial Guaranty Insurance Company*