UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

FINANCIAL GUARANTY INSURANCE  )
COMPANY,                      )
                             )
          Plaintiff,          )
                             )
         -against-            )
                             )
ALLY FINANCIAL, INC. F/K/A GMAC, )
LLC; RESIDENTIAL CAPITAL, LLC )
F/K/A RESIDENTIAL CAPITAL     )
CORPORATION; ALLY BANK F/K/A  )
GMAC BANK; GMAC MORTGAGE,     )
LLC F/K/A GMAC MORTGAGE       )
CORPORATION                   )
                             )
          Defendants.

-------------------------------------------------------- x

No.____ **12 CIV 0780**

**COMPLAINT**

Plaintiff Financial Guaranty Insurance Company ("FGIC"), by and through its attorneys,

Jones Day, for its Complaint against defendants, Ally Financial, Inc., formerly known as GMAC,

LLC ("Ally Financial"), Residential Capital, LLC, formerly known as Residential Capital

Corporation ("ResCap"), Ally Bank, formerly known as GMAC Bank ("Ally Bank"), and

GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation ("GMACM"),

alleges as follows:

## NATURE OF THE ACTION

1.        This breach of contract action arises in connection with a financial guaranty

insurance policy (the "Policy") issued by FGIC in relation to a GMACM-sponsored transaction

(the "2005-HE1 Transaction" or the "Transaction"), in which GMACM Home Equity Loan Trust

2005-HE1 (the "2005-HE1 Trust" or the "Trust") issued and sold to investors over $991 million

aggregate principal amount of insured residential mortgage-backed securities (the "2005-HE1

Notes"). As the sponsor of the 2005-HE1 Transaction, GMACM procured the Policy from FGIC

in order to enhance the ratings and marketability of the 2005-HE1 Notes by, among other things,

providing FGIC with certain material representations, warranties and affirmative covenants. In

reliance on those representations, warranties and affirmative covenants FGIC issued the Policy,

thereby enabling the 2005-HE1 Notes to receive a triple-A rating from the rating agencies. This,

in turn, made the 2005-HE1 Transaction viable and enabled GMACM and its affiliates to earn

millions of dollars in transaction fees. GMACM, however, has failed to honor its contractual

obligations by materially breaching the essential terms of its agreement with FGIC and the

essential terms of the other operative documents incorporated therein.

   2.    The breaches committed by GMACM, as detailed more fully below, were

directed by Ally Financial, acting directly or indirectly through its wholly-owned subsidiary,

ResCap. Ally Financial is the ultimate parent of ResCap, which owns GMACM. Ally Financial,

as the ultimate parent of ResCap and GMACM, has the practical ability, which it has repeatedly

exercised, to direct and control the activities of these (and other) subsidiaries. In many

instances—including in this Transaction—Ally Financial's direction and control was effected by

using ResCap as an intermediary instrument to achieve its goals.

   3.    The 2005-HE1 Transaction is a mortgage loan securitization: a complex

arrangement comprising multiple interdependent agreements among GMACM and several other

parties, pursuant to which the Trust acquired a pool of home equity lines of credit ("HELOCs" or

"Mortgage Loans") and issued securities, including the 2005-HE1 Notes, which were intended to

be repaid out of the cash flow from those HELOCs. The Transaction was sponsored by

GMACM. To facilitate the Transaction, GMACM pooled together over eighteen thousand

Mortgage Loans to provide collateral for the 2005-HE1 Notes. All of the Mortgage Loans were either originated or acquired by GMACM or Ally Bank, another Ally Financial subsidiary.

4.    After pooling the Mortgage Loans originated or acquired by GMACM and Ally Bank, GMACM transferred the Mortgage Loans directly or indirectly to another Ally Financial subsidiary, Residential Asset Mortgage Products, Inc. ("RAMP"). RAMP then deposited the Mortgage Loans it received from GMACM into the 2005-HE1 Trust. The 2005-HE1 Trust, in turn, issued the 2005-HE1 Notes to investors. Thereafter, the 2005-HE1 Trust used the periodic payments made by the borrowers under the Mortgage Loans to pay, among other things, principal and interest due on the 2005-HE1 Notes and the fees and expenses of GMACM and other participants in the Transaction.

5.    The 2005-HE1 Trust was a legal entity created by GMACM solely for the purposes of the 2005-HE1 Transaction to hold the Mortgage Loans and to issue the 2005-HE1 Notes to investors in a registered public offering. Wells Fargo Bank, N.A. ("Wells Fargo") agreed to act as indenture trustee of the 2005-HE1 Trust (the "Indenture Trustee").

6.    As well as being the Sponsor, GMACM also acts as servicer of the 2005-HE1 Transaction (the "Servicer"). As Servicer, GMACM supervises the collection of borrower payments and performs other servicing duties related to the Mortgage Loans. As discussed in more detail below, all of GMACM's servicing operations have since been integrated into ResCap.

7.    GMACM, directed and controlled by Ally Financial, is, therefore, the hub of the 2005-HE1 Transaction: it is the sponsor of the securitization, the originator of most of the Mortgage Loans, the seller of the Mortgage Loans directly or indirectly to the 2005-HE1 Trust, and the servicer of the Mortgage Loans. The primary victim of the 2005-HE1 Transaction is

FGIC, which has already paid out tens of millions of dollars in losses under the Policy, with further material losses still to come.

8.      In addition to originating some of the Mortgage Loans used in the 2005-HE1 Transaction, Ally Bank also entered into its own separate contractual agreement with FGIC regarding its duties as custodian of the Transaction. As custodian, Ally Bank (then doing business as GMAC Bank) was one of the critical parties to the Transaction, charged with certain oversight and maintenance duties with respect to the 2005-HE1 Trust for which it collected substantial fees. Like GMACM, however, Ally Bank has materially breached the terms of its agreements with FGIC, in particular by failing to ensure that essential documents were included in the loan file, such as the loan agreements.

9.      Yet another Ally Financial subsidiary, Ally Securities, LLC ("Ally Securities" f/k/a GMAC RFC Securities), was an underwriter for the 2005-HE1 Transaction.

10.     FGIC, a monoline financial guaranty insurance company, was in the business of writing financial guaranty insurance policies with respect to asset-backed and debt securities, including residential mortgage-backed notes ("RMBS Notes"). At the time of the 2005-HE1 Transaction, FGIC's financial strength was rated triple-A by Moody's Investors Services, Inc. ("Moody's"), Standard and Poor's Ratings Services (a division of The McGraw-Hill Companies, Inc.) ("S&P"), and Fitch, Inc., which enabled securities that were insured by FGIC to be rated triple-A as well. FGIC's financial guaranty insurance policies for RMBS Notes typically guaranteed the timely payment of the principal and interest due on the insured securities, including the amount, if any, of principal losses allocated to the RMBS Notes. FGIC's insurance policies thus enhanced the credit quality, and marketability, of the insured securities.

11.    At GMACM's request, FGIC agreed pursuant to the Insurance and Indemnity

Agreement, dated as of March 29, 2005 (the "I&I Agreement"), among FGIC, GMACM and the

Trust (among others), to issue an insurance policy to insure the repayment of the 2005-HE1

Notes.  On March 29, 2005, FGIC issued the Policy to Wells Fargo, as Indenture Trustee under

the Indenture, dated as of March 29, 2005 (the "Indenture"), between the Trust and the Indenture

Trustee, with respect to the insured securities.  The Policy thus enhanced the credit quality, and

marketability, of the 2005-HE1 Notes.

12.    As explained more fully in this Complaint, the 2005-HE1 Trust was permitted to

execute subsequent transfers of new collateral (in the form of additional Mortgage Loans) into

the loan pool, in exchange for a portion of the payments made by borrowers under the Mortgage

Loans, provided, however, that certain conditions precedent had been met—including, among

other things, GMACM providing FGIC with proper notice, and an "Early Amortization Event"

not having occurred (as this would close the period during which new mortgage loans could be

added (the "Revolving Period")).

13.    Following the closing of the 2005-HE1 Transaction, GMACM failed to recognize

and give effect to the occurrence of an Early Amortization Event as defined by the plain

language of the transaction documents.  Such failure was a breach of its contractual obligations

under the transaction documents.

14.    In all, GMACM added approximately $851 million in additional Mortgage Loans

(the "Subsequent Mortgage Loans") to the 2005-HE1 Trust through subsequent transfers that it

was not permitted to make because, among other reasons, the Revolving Period had closed.  As a

result, FGIC is being asked to pay significant losses incurred on a substantial number of loans

that should never have been added to the 2005-HE1 Trust under the express terms of the

transaction documents. GMACM also failed to give notice to FGIC of the occurrence of an Early Amortization Event or of the many occasions on which it executed subsequent transfers. This also resulted in the improper funding of certain 2005-HE1 Notes, which also increased FGIC's exposure under the Policy.

15.     Accordingly, GMACM has committed multiple breaches of the contractual provisions governing transfers of Subsequent Mortgage Loans to the 2005-HE1 Trust.

16.     Faced with substantial claims under the Policy, FGIC requested copies of the Mortgage Loan files and servicing notes for the Mortgage Loans. GMACM is obligated under its agreements with FGIC to provide these documents to FGIC. Notwithstanding its contractual obligations, GMACM has refused to provide FGIC with all of the requested documentation, which, on information and belief, will provide further evidence of GMACM's material breaches of representations and warranties. This refusal to provide information is itself a material breach of GMACM's contractual obligations to FGIC.

17.     Through this Complaint, FGIC seeks relief against GMACM, Ally Bank, ResCap, and Ally Financial for GMACM's material breaches of the I&I Agreement and other contractual obligations owed to FGIC in connection with the 2005-HE1 Transaction.

18.     Further, FGIC seeks relief against Ally Bank for its material breaches of its contractual obligations to FGIC.

19.     FGIC also seeks a declaration from the Court that Ally Financial, ResCap, and GMACM were, and continue to be, alter egos of one another.

## THE PARTIES

20.     Plaintiff FGIC is a New York stock insurance corporation with its principal place of business at 125 Park Avenue, New York, New York 10017.

21.    Defendant Ally Financial is a Delaware corporation with its principal place of business in Detroit, Michigan. Ally Financial is the parent company of ResCap, GMACM, and all GMACM-affiliated entities relevant to this action.

22.    Defendant GMACM is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania. In the period relevant to this action, GMACM originated, acquired, and serviced residential mortgage loans, and sponsored securitizations of mortgage loans.

23.    Since 2005, GMACM has been an indirect wholly-owned subsidiary of ResCap; prior to that time, GMACM was an indirect, wholly-owned subsidiary of Ally Financial.

24.    Defendant ResCap is a Delaware limited liability corporation and an indirect wholly owned subsidiary of Ally Financial. ResCap is the indirect corporate parent of GMACM and its business includes originating, acquiring, selling, and servicing mortgage loans.

25.    Ally Bank (f/k/a GMAC Bank) is an indirect, wholly-owned subsidiary of Ally Financial, and was at all times relevant to this Complaint a loan originator. To facilitate the 2005-HE1 Transaction, Ally Bank sold to GMACM many of the Mortgage Loans, which it had originated or acquired to be securitized in the Transaction. GMAC Bank was renamed Ally Bank in May 2009. Ally Bank is an online bank chartered under Utah law.

### JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred within this judicial district. Moreover, GMACM,

a party to this action, has agreed to submit to the jurisdiction of this Court, and has agreed not to

challenge venue in this Court.

## RELEVANT NON-PARTIES

28.    RAMP, a special purpose vehicle, is an indirect, wholly owned subsidiary of Ally

Financial and a Delaware corporation with its principal place of business in Minnesota.  To

facilitate the 2005-HE1 Transaction, RAMP purchased mortgage loans from GMACM and

Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove") and deposited those loans into

the 2005-HE1 Trust.  The Trust then issued the 2005-HE1 Notes to the underwriters, including

Ally Securities (then doing business as GMAC RFC Securities), to be sold to investors.

29.    Ally Securities, an entity incorporated in Delaware, is an affiliate of GMACM and

RAMP and a registered broker-dealer under the Securities Exchange Act of 1934, and is

registered to do business in New York.  Prior to 2007, Ally Securities was known as Residential

Funding Securities Corporation, and was doing business as GMAC RFC Securities.  Ally

Securities served as an underwriter of the 2005-HE1 Notes and, on information and belief,

participated in the preparation of certain of the key offering documents for the 2005-HE1

Transaction.

30.    Walnut Grove is a Delaware statutory trust established by an affiliate of GMACM.

Beginning in 2003, GMACM sold to Walnut Grove second-lien mortgage loans that it had

originated or acquired.  To facilitate the 2005-HE1 Transaction, Walnut Grove sold certain of the

Mortgage Loans to RAMP.

## FACTUAL ALLEGATIONS

### A.    Ally Financial and its Subsidiaries

31.    In the period relevant to this action, GMACM originated, acquired, sold, and

serviced residential mortgage loans and, from time to time, arranged for the securitization of

those mortgage loans and the sale of securities collateralized by those mortgage loans to investors, often in the form of RMBS Notes.

32.    The mortgage loans included in securitizations sponsored by GMACM have suffered extremely high rates of delinquencies, defaults and losses, and it is a matter of public knowledge that the business practices of Ally Financial's subsidiaries, including in large part GMACM, Ally Bank, and ResCap, led Ally Financial to seek a bailout by the federal government in 2008.

### (1)    GMACM, GMAC-RFC, and RFC

33.    GMACM is a subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC") which in turn is a subsidiary of ResCap, which in turn is a subsidiary of the ultimate parent, Ally Financial.

34.    Residential Funding Corporation, LLC ("RFC") is also a subsidiary of GMAC-RFC and ResCap. Like its affiliate GMACM, RFC engaged in the business of originating, acquiring, servicing, and securitizing mortgage loans during the period relevant to this action.

35.    GMAC-RFC companies issued $42.34 billion of non-agency mortgage-backed securities in 2004, $56.93 billion in 2005, $66.19 billion in 2006, and $32.43 billion in 2007, according to Inside Mortgage Finance Publications, Inc. *See 2011 Mortgage Market Statistical Annual: Volume II* at 38-41. GMAC-RFC was the fifth largest issuer of non-agency mortgage-backed securities in 2005, the fourth largest in 2006, and the eighth largest in 2007. *Id.*

36.    GMAC-RFC was the largest issuer of private mortgage-backed securities in 2002, when it issued $11.5 billion of private mortgage-backed securities, according to the *Financial Crisis Inquiry Report, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (the "FCIC Report"), published in January 2011. *See*

FCIC Report at 462. GMAC-RFC was also the fourth largest subprime mortgage lender in 2004, when it loaned $26 billion to subprime borrowers. *See id.* at 504.

37.    The FCIC Report pointedly notes the widespread failure among the mortgage-backed security industry generally to adhere to basic standards in loan origination, selection, and evaluation—a truth FGIC would come to learn specifically in its dealings with GMACM. The FCIC Report concludes that:

> [F]irms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.  Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities.  These problems appear to have been significant.

*Id.* at 187.

38.    The FCIC Report further notes that, in light of Ally Financial and its subsidiaries' systemic failure to ensure the credit quality of the mortgage loans backing its securitizations, repurchase demands against GMAC/Ally Financial have mounted. From 2007 to 2010, the Federal National Mortgage Association ("Fannie Mae") has forced Ally Financial to buy back approximately $838 million worth of mortgage loans. *Id.* at 225. And in 2009 and 2010, the Federal Home Loan Mortgage Corporation ("Freddie Mac") forced Ally Financial to buy back approximately $453 million worth of mortgage loans. *Id.*

### (2)    Ally Financial's Securitization Business

39.    Ally Financial's business model depended on securitizations, which were conducted by its business units, including GMACM. Pooling mortgage loans and selling them into securitizations enabled GMACM to fund its ongoing mortgage loan originations and acquisitions, earned it significant fees from the resulting transactions, and reduced the credit risk it retained with respect to those loans.

40.     GMACM, in addition to securitizing mortgage loans originated by itself or other Ally Financial subsidiaries, also earned fees by securitizing mortgage loans it acquired from third parties. GMACM would acquire such mortgage loans and then deposit them (usually through an affiliate), along with mortgage loans it had originated, into a securitization trust. In many instances, GMACM profited from the difference between the cost GMACM incurred to originate or acquire mortgage loans, and the price at which it sold them for deposit into the securitizations.

41.     In order to gain additional fees for performing certain administrative duties under the various transaction agreements, including collecting mortgage payments and determining whether a mortgage loan is in default based on the transaction documents, GMACM generally acted as servicer of its own securitizations. GMACM thereby earned servicing fees that normally amounted to—as it did in the 2005-HE1 Transaction—0.50% per annum of the aggregate principal balance of the mortgage loans, and also collected substantial fees amounting to a large percentage of any subsequent recoveries from charged-off or liquidated loans.

42.     GMACM also enriched Ally Financial and its other subsidiaries through its sponsorship of securitizations. Ally Financial entities typically participated in each of the key steps in the securitization process, and recorded gains and earned fees at each of those steps. For example, in the 2005-HE1 Transaction:

- Ally Bank gained fees for originating many of the loans initially comprising the 2005-HE1 Trust, and proceeds from selling those loans to GMACM; Ally Bank also gained fees as custodian of the 2005-HE1 Trust for holding certain documents;

- Walnut Grove received the proceeds from selling certain of the Mortgage Loans to RAMP;

- RAMP received payments for serving as the depositor of the Mortgage Loans to the 2005-HE1 Trust; and

- Ally Securities received fees for underwriting the 2005-HE1 Notes.

**(3)    Ally Financial, GMACM, and RFC Face Numerous Investigations
and Lawsuits Relating to Their RMBS Securitizations**

43.    GMACM is currently being investigated by the U.S. Department of Justice (the

"DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29,

2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011,

which "includes a broad request for documentation and other information in connection with its

investigation of potential fraud related to the origination and/or underwriting of mortgage loans."

Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of

1933 (Form S-1/A), at 23 (June 29, 2011) (emphasis added).

44.    Additionally, on September 2, 2011, the Federal Housing Finance Authority

("FHFA"), as conservator for Freddie Mac, filed suit in the Supreme Court of the State of New

York, New York County against Ally Financial and several of its subsidiaries for claims arising

in connection with its role in the public filing of offering documents containing false and

misleading statements.  These claims arise from Freddie Mac's purchase of over $6 billion in

certificates issued through twenty-one transactions similar to the transactions at issue here.

Among other claims, FHFA brought suit for common law fraud against various Ally Financial

subsidiaries and aiding and abetting fraud against Ally Financial for its intentional and

substantial assistance in rendering material misrepresentations to Freddie Mac in connection with

the sale of the subject certificates.  The FHFA also alleges violations of state and federal

securities laws by Ally Financial and several of its subsidiaries stemming from false and

misleading statements contained in publicly filed prospectuses, prospectus supplements,

registration statements, and other offering documents.  Additionally, FHFA also alleges aiding

and abetting fraud against Ally Financial and certain of its affiliates for their intentional and

substantial assistance in rendering material misrepresentations to Freddie Mac in connection with

the sale of the certificates. The FHFA action seeks relief in the form of rescission and recovery

of the $6 billion purchase price of the certificates, including lost principal and interest, as well as

punitive damages and attorneys' fees and costs.

45.    Ally Financial also disclosed that the U.S. Securities and Exchange Commission

(the "SEC") served a subpoena on Ally Financial, requesting documentation regarding certain

"bulk settlements" relating to securitized mortgage loans as well as a request for materials

provided to investors and prospective investors in mortgage securitization transactions. *Id.*

46.    GMACM and RFC face numerous pending lawsuits brought by RMBS investors

and insurers. For example, GMACM is currently facing a lawsuit brought by MBIA Insurance

Corporation ("MBIA") in New York Supreme Court in which MBIA alleges that in connection

with three transactions similar to the one at issue here, GMACM affirmatively misrepresented

the credit quality of tens of thousands of mortgage loans, with a total original principal balance

of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that

GMACM should have borne itself. On December 15, 2010, the New York Supreme Court

issued a ruling on GMACM's motion to dismiss which allowed both the breach of

representations and warranties and fraud claims, among others, to proceed to trial.

47.    Additionally, according to Ally Financial's quarterly report for the third quarter of

2011, as of November 4, 2011, there were twenty-two pending suits against Ally Financial's

mortgage-related subsidiaries. The plaintiffs in those suits have alleged, among other things, that

Ally Financial's various subsidiaries made misstatements and omissions in registration

statements, prospectuses, prospectus supplements, and other documents related to RMBS

offerings. The alleged misstatements typically concern underwriting standards. Ally Fin. Inc.,

Quarterly Report (Form 10-Q), at 159 (Nov. 4, 2011).

48.    Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits from monoline insurers like FGIC given that Ally Financial and its subsidiaries sold $42.7 billion of loans into monoline-wrapped securitizations from 2004 to 2007.  In the first nine months of 2011 alone, Ally Financial and its subsidiaries have received repurchase claims from monoline insurers for $254 million worth of mortgages related to securitizations it consummated between 2004 and 2007.  It clearly recognizes its exposure because, according to Ally Financial's CEO, Michael Carpenter, ResCap has already reserved $829 million for representations and warranties claims and, according to its own SEC filings, Ally Financial confirms that "litigation with . . . monolines is likely."  Ally Fin. Inc., Quarterly Report (Form 10-Q), at 88, 159 (Nov. 4, 2011).

49.    According to its most recent quarterly report, Ally Financial believes its "exposure to mortgage representation and warranty claims is most significant for loans originated and sold between 2004 through 2008 . . . ."  Ally Fin. Inc., Quarterly Report (Form 10-Q), at 146 (Nov. 4, 2011).  The 2005-HE1 Transaction is, as its name implies, of the 2005 vintage.

### (4)    The Mortgage Loan Servicing Practices of Ally Financial and GMACM Have Come Under Scrutiny for Deficiencies

50.    The Board of Governors of the Federal Reserve System (the "Federal Reserve Board") and the Federal Deposit Insurance Corporation (the "FDIC") has ordered Ally Financial, GMACM, and several other Ally Financial subsidiaries to adopt new procedures and practices in relation to mortgage loan servicing.  *See* Consent Order, FRB Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").

51.    The Consent Order notes that Ally Financial's mortgage servicing subsidiaries, including GMACM, have been accused, *inter alia*, of (1) failing to properly increase financial,

staffing, and managerial resources in order to meet an increasing number of foreclosures; (2)

failing to properly put in place "adequate internal controls, policies and procedures, compliance

risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing

false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without

"confirming that the promissory note and mortgage document were properly endorsed or

assigned." *Id.* at 3-4.

52.    Furthermore, under the Consent Order, Ally Financial must direct GMACM and

its other mortgage servicing subsidiaries to take certain remedial action to ensure that they

operate in a "safe and sound manner" in the future. *Id.* at 4. Specifically, among other things,

the Consent Order requires Ally Financial to take "steps to improve the information and reports

that will be regularly reviewed by [Ally Financial's] board of directors. . . [to assess the

performance of] residential mortgage loan servicing, Loss Mitigation, and foreclosure activities

and operations . . . ." *Id.* at 8.

53.    In connection with the enforcement of the Consent Order, as of November 2011,

the Federal Reserve Board is permitting mortgage borrowers who were financially harmed by the

foreclosure processes of GMACM to request an independent review of their files. *See* Press

Release, Federal Reserve Board (November 1, 2011). This independent review will determine

whether errors and misrepresentations in GMACM's foreclosure processes indeed caused

financial harm to the borrower. *See id.* If the foreclosure process is found to have caused

financial injury to the borrower, GMACM will then be required to provide full compensation.

*See id.*

54.    Moreover, according to the sworn testimony of an Ally Financial/GMACM

employee, Ally Financial's mortgage servicing subsidiaries have routinely filed false affidavits

in thousands of foreclosure actions across the country. *See* Jeffrey Stephan Dep. *Federal National Mortgage Association v. Bradbury*, BRI-RE-09-65 (Me. Dist. Ct., Div Nine, No. Cumb.) (June 7, 2010). Indeed, according to the FCIC Report:

> [L]enders have relied on "robo-signers" who substituted speed for accuracy by signing, and sometimes backdating, hundreds of affidavits claiming personal knowledge of facts about mortgages that they did not actually know to be true. One such "robosigner," Jeffrey Stephan of GMAC, said that he signed 10,000 affidavits in a month—roughly 1 per minute, in a 40-hour workweek—making it highly unlikely that he verified payment histories in each individual case of foreclosure.

FCIC Report at 407.

55.    Stephan also testified that, when executing summary judgment affidavits to be used in judicial foreclosure actions, he was acting in accordance with policies and procedures, and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits were attached, despite swearing that he had done so in the affidavits themselves. Stephan Dep. Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among other things, the mortgage note and documents relating to the assignment of the mortgage. *See id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the foreclosure was proper, all he knew was the borrower's name and whether he had signing authority for the GMAC entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan testified that the process he followed in signing summary judgment affidavits was in accordance with the policies and procedures required by GMACM. *Id.* at 64:8-14.

56.    The Ohio Attorney General, in October 2010, filed suit against GMACM and Ally Financial, alleging, *inter alia*, that employees of GMACM had executed thousands of false affidavits in connection with foreclosures on properties in that state. *See State of Ohio v. GMAC Mortgage LLC*, CI0201006984, Court of Common Pleas, Lucas County, Ohio (Toledo). And in December 2011, the Massachusetts Attorney General filed a similar suit against GMACM for,

among other things, engaging in unfair and deceptive foreclosure practices. *See Commonwealth of Massachusetts v. Bank of America NA*, 11-4363, Suffolk County Superior Court (Boston).

57.     Indeed, as recently as January 31, 2012, Ally Financial reported that it was forced to record a charge of approximately $270 million in the fourth quarter of 2011, as a result of penalties expected to be imposed against ResCap by regulators and governmental agencies in connection with ResCap's improper foreclosure processes. *See* Ally Fin. Inc., Form 8-K, at 2 (Jan. 31, 2012).

58.     Days after filing suit, the Massachusetts Attorney General sent a letter to the United States Senate Committee on Banking, Housing and Urban Affairs, and the United States House Committee on Financial Services asking that the federal government investigate Ally Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false documents related to property seizures. *See* Attorney General Martha Coakley Urges Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices, Boston Globe, Dec. 6, 2011. Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions against homeowners in Massachusetts and across the country, I respectfully request that your committees investigate Ally [Financial]'s serious misconduct and consider what actions the federal government can take to ensure that Ally [Financial] adheres to the law.

### (5)     Significant Possibility of Ally Financial Seeking Bankruptcy Protection for ResCap, GMAC-RFC, and GMACM

59.     Ally Financial is considering filing for bankruptcy protection for ResCap, its wholly-owned, indirect subsidiary, which has reportedly lost $555 million since 2009, according to multiple published reports, as of November 9, 2011. GMACM is a wholly-owned, indirect subsidiary of ResCap.

60.     Bloomberg News reported that "[d]erivatives traders are betting that Ally [Financial] will place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of supporting the business as the bank prepares for an initial public offering," in an article entitled "*Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance,*" dated November 14, 2011. According to the article, Ally Financial has the power to decide whether its "mortgage unit," ResCap, should file for bankruptcy.

61.     Indeed, Ally Financial warned in its 2010 annual report that "[t]here is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near term." Ally Fin. Inc., Annual Report (Form 10-K), at 21 (Feb. 25, 2011). Additionally, on January 31, 2012, Ally Financial disclosed that it "will record a charge of approximately $270 million in the fourth quarter of 2011 for penalties expected to be imposed by certain of [its] regulators and other governmental agencies in connection with foreclosure related Matters . . . [t]he majority of [which] was recorded at Residential Capital, LLC ('ResCap') . . . . [This] resulted in a covenant breach in certain of ResCap's credit facilities." Ally Financial, Current Report (Form 8-K) (January 31, 2012).

**B.      GMACM's Securitizations and Financial Guaranty Insurance Generally**

62.     To improve the marketability and ratings of the RMBS Notes issued as part of its securitizations, GMACM from time to time sought credit enhancement for the RMBS Notes from FGIC, a financial guaranty insurer, in the form of financial guaranty insurance policies. Under the terms of a financial guaranty insurance policy like the one FGIC issued here, the insurer unconditionally and irrevocably guarantees to the trustee for the benefit of the holders of the insured RMBS Notes that, if there is a shortfall in cash available to make required payments on the insured securities, the financial guaranty insurer will pay the amount of the shortfall to the trustee for the benefit of the holders of the insured securities.

63.    For a trust that issues RMBS Notes, the primary source of funds is the remittance of payments on the underlying residential mortgage loans. Delinquencies by borrowers in making their mortgage loan payments will, by definition, reduce cash flows to the trust, which will directly impair the ability of the trust to make required payments on the RMBS Certificates. Delinquencies, if not cured, will eventually result in losses on the mortgage loans, which reduce the aggregate principal amount of the loan pool held by the trust. In this manner, high levels of mortgage loan delinquencies and defaults can lead to shortfalls in cash available to pay RMBS investors. Such shortfalls result in claims on FGIC's policies.

### C.    The GMACM 2005-HE1 Transaction

64.    On March 29, 2005, GMACM pooled together and deposited many thousands of HELOCs into the GMACM Home Equity Loan Trust 2005-HE1. The 2005-HE1 Trust served as the Issuer of $991,087,000 in aggregate principal amount of 2005-HE1 Notes. HELOCs are typically adjustable rate revolving credit line loans collateralized by second-lien mortgages, which can be drawn on at any time during an extended period, and repaid at any time, subject to a maximum repayment period.

65.    The initial conveyance to the 2005-HE1 Trust by RAMP (acting as Depositor) contained over 18,100 Mortgage Loans (*i.e.*, HELOCs) with an aggregate outstanding principal balance of approximately $732 million. Investors in the GMACM-sponsored 2005-HE1 Transaction were issued six classes of securities—Class A-1 Notes, Class A-2 Notes, and Class A-3 Notes, Class A-1 Variable Pay Revolving Notes ("VPRNs"), Class A-2 VPRNs, and Class A-3 VPRNs (collectively, the "2005-HE1 Notes")—which were collateralized by the Mortgage Loans transferred to and held by the 2005-HE1 Trust. In addition, approximately $243 million was deposited into a pre-funding account at closing, which was used to acquire additional Mortgage Loans in the 90 days following closing (the "Prefunding Period").

66.    To enhance the ratings and marketability of the 2005-HE1 Notes, GMACM sought a financial guaranty insurance policy from FGIC for the purpose of insuring the transaction for the benefit of the certificate holders. On March 29, 2005, GMACM and FGIC executed the I&I Agreement, under which FGIC agreed to and did issue the Policy (number 05030011) to insure the 2005-HE1 Notes. The I&I Agreement was signed by FGIC (as the Insurer), GMACM (as a Seller and Servicer), RAMP (as the Depositor), Walnut Grove (as a Seller), and Wells Fargo (as the Indenture Trustee).

67.    Also on March 29, 2005, Ally Bank (using its then-current name, GMAC Bank) entered into the 2005-HE1 Custodial Agreement (the "Custodial Agreement") whereby it agreed, among other things, to serve as Custodian of the underlying mortgage loan notes on behalf of the 2005-HE1 Trust. FGIC is an express third party beneficiary of that agreement. *See* Custodial Agreement § 4.6.

68.    The I&I Agreement provides, in part, that FGIC is a third-party beneficiary of, and shall have all of the rights provided for in, the "Operative Documents." I&I Agreement § 2.02(k). "Operative Documents" are defined to include, among other documents: (i) the 2005 HE-1 Notes; (ii) the Mortgage Loan Purchase Agreement dated as of March 29, 2005 among GMACM, RAMP, Walnut Grove, the 2005-HE1 Trust, and Wells Fargo (the "MLPA"); (iii) the Servicing Agreement dated as of March 29, 2005 among GMACM, the 2005-HE1 Trust and Wells Fargo; (iv) the Indenture dated as of March 29, 2005 between the 2005-HE1 Trust and Wells Fargo; (v) the Custodial Agreement dated as of March 29, 2005 among GMACM, Wells Fargo, and Ally Bank; and (vi) any Subsequent Transfer Agreement in respect of Subsequent Mortgage Loans entered between GMACM and the 2005-HE1 Trust. *See* I&I Agreement § 1.01.

69.     Pursuant to the I&I Agreement, FGIC—termed the "Enhancer" under certain of the Operative Documents—insured the 2005-HE1 Notes. The Policy improved the marketability of the 2005-HE1 Notes by mitigating risk for potential investors and making the 2005-HE1 Notes eligible to receive a credit rating of triple-A by the rating agencies at closing.

70.     GMACM and the Depositor offered the 2005-HE1 Notes for sale pursuant to a prospectus, dated December 22, 2004 (the "2005-HE1 Prospectus"), a prospectus supplement, dated March 23, 2005 (the "2005-HE1 Prospectus Supplement"), and a Private Placement Memorandum for the VPRNs, dated March 29, 2005 (the "2005-HE1 PPM"), which touted the Policy and the "triple-A" initial rating of the 2005-HE1 Notes made possible by the Policy. The 2005-HE1 Prospectus, 2005-HE1 Prospectus Supplement, and 2005-HE1 PPM, together with certain preliminary offering documents, each as further supplemented by any subsequent amendment or supplement thereto and any other offering document that makes reference to the Policy, are referred to collectively as the "2005-HE1 Offering Documents."

71.     On March 29, 2005, an Ally Financial subsidiary, Ally Securities, sold the 2005-HE1 Notes to investors, and FGIC issued the Policy in accordance with the terms of the I&I Agreement.

72.     The 2005-HE1 Transaction was structured in such a way as to permit GMACM to add additional collateral in the form of Subsequent Mortgage Loans to the 2005-HE1 Trust during a specifically defined Revolving Period, which enabled GMACM to continue to shift the credit risk of such loans to investors and to FGIC for a defined period after closing, and to realize immediate gains on the loans it sold to the Trust. GMACM represented and warranted to FGIC that the Subsequent Mortgage Loans would conform to the same contractual representations and

warranties GMACM made about the characteristics and the underwriting procedures of the
Mortgage Loans that were in the pool at closing. *See* MLPA § 3.1(b).

73.    Nevertheless, by express contractual provisions, Subsequent Mortgage Loans
were not permitted to be added to the pool following the occurrence of an Early Amortization
Event. An Early Amortization Event was deemed to occur whenever, for three consecutive
months, the average amount in the Funding Account which has not been used during a month to
purchase Additional Balances or Subsequent Mortgage Loans is greater than 30% of such
amount plus the amount which had been used during that month to purchase Additional Balances
and Subsequent Mortgage Loans. Indenture, Appendix A. The "Funding Account" is an
account held by the 2005-HE1 Trust and used, among other things, to purchase Additional
Balances (*i.e.*, subsequent draws on the Mortgage Loans) and Subsequent Mortgage Loans
during the Revolving Period. *See* Servicing Agreement § 3.16.

**D.    GMACM's Representations, Warranties and Affirmative Covenants**

74.    In connection with the 2005-HE1 Transaction, GMACM, at the direction of Ally
Financial, either directly or indirectly through ResCap, made numerous representations,
warranties and affirmative covenants to FGIC. Among other things, GMACM covenanted that it
would comply with and perform its obligations under the Operative Documents. Moreover,
GMACM promised to service the Mortgage Loans in accordance with the terms of the Operative
Documents, provide timely Mortgage Loan file information, and provide FGIC with a variety of
information, including access to GMACM's books and records and to GMACM's Servicing
Officer and its independent accountants.

75.    Based on the information received by FGIC and the representations and
warranties given by GMACM, FGIC entered into the I&I Agreement and agreed to issue the
Policy to the Indenture Trustee for the benefit of the holders of the 2005-HE1 Notes. In return

for doing so, FGIC received a modest annual premium, based on a small, fixed percentage of the

aggregate principal balance of the 2005-HE1 Notes.  Specifically, FGIC received 0.125% per

annum of the aggregate balance of the 2005-HE1 Notes for serving as insurer, a figure

commensurate with the risk that FGIC believed it was accepting, based on the representations,

warranties and affirmative covenants provided by GMACM.

**(1)    Representations, Warranties and Affirmative Covenants Relating to
the Operative and Offering Documents**

76.    Under Article II of the I&I Agreement, GMACM made the following

representations, warranties, and covenants, among others.  *First*, in the I&I Agreement—which

expressly identifies FGIC as a third-party beneficiary with respect to the related Operative

Documents—GMACM specifically covenants that it will "comply in all material respects with

the terms and conditions of and perform its obligations under the Operative Documents to which

it is a party . . . ."  I&I Agreement § 2.02(a).

77.    *Second*, in the I&I Agreement, GMACM represented and warranted to FGIC that

"[n]either the Operative Documents to which it is a party nor other information relating to the

Mortgage Loans. . . including the Offering Documents . . . contains any statement of a material

fact which was untrue or misleading in any material respect when made."  I&I Agreement §

2.01(j).  GMACM further represented and warranted that "[t]he Offering Document does not

contain any untrue statement of a material fact and does not omit to state [any] material fact

necessary to make the statements made therein, in light of the circumstances under which they

were made, not misleading[.]"  § 2.01(k).

78.    *Third*, the I&I Agreement incorporated by reference, for the benefit of FGIC, the

representations and warranties contained in the "Operative Documents," as that term was defined

in the I&I Agreement: "[e]ach of the representations and warranties . . . contained in the

applicable Operative Documents . . . is true and correct in all material respects[.]" *See* I&I

Agreement § 2.01(l); *see also id.* § 1.01. The incorporation by reference of the Operative

Documents into the I&I Agreement was intended to allow FGIC to rely on any representation

and warranty that GMACM made to other entities, such as investors or the Indenture Trustee, in

connection with the 2005-HE1 Transaction. Indeed, the I&I Agreement expressly identifies

FGIC as a third-party beneficiary with respect to the related Operative Documents. I&I

Agreement § 2.02(k).

(2)    **Representations, Warranties, and Affirmative Covenants Regarding
Access to Information and Servicing**

79.    The I&I Agreement also provides that "[a]ll the Mortgage Loans will be serviced

in all material respects in compliance with the Servicing Agreement and the Indenture[.]" *See*

I&I Agreement § 2.02(l). In the Servicing Agreement, GMACM covenanted, represented, and

warranted that it would service and administer the Mortgage Loans in the 2005-HE1 Transaction

in a manner consistent with its own servicing guidelines. *See* Servicing Agreement § 3.01(a).

80.    The I&I Agreement requires, among other things, that GMACM furnish or cause

to be furnished to FGIC "promptly upon receipt thereof, copies of all schedules, financial

statements or other similar reports delivered to or by GMACM . . . [as well as] [p]romptly upon

request such other data as [FGIC] may reasonably request." I&I Agreement § 2.02(c)(v).

81.    The I&I Agreement further affords FGIC the express right "to conduct an ongoing

review of GMACM's practices as Servicer through reviews of the Mortgage Loans, reappraisals

of Mortgaged Properties and reviews of servicing practices." I&I Agreement § 2.02(p). FGIC

also has the express right to "inspect the books and records of GMACM . . . [and to] discuss the

affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and

with GMACM's consent, which consent shall not be unreasonably withheld or delayed, to

- 24 -

discuss the affairs, finances and accounts of GMACM with GMACM's independent

accountants[.]" I&I Agreement § 2.02(e).

**E.    GMACM's Breaches of Its Representations, Warranties and Affirmative Covenants**

**(1)    GMACM Improperly Transferred Over $850 Million in Subsequent Mortgage Loans**

82.    As discussed below, GMACM improperly and repeatedly transferred Subsequent

Mortgage Loans into the 2005-HE1 Trust long after the Operative Documents forbade it from

doing so.  Moreover, GMACM failed to give FGIC required information and data concerning the

Subsequent Mortgage Loans, and/or to obtain FGIC's consent prior to transferring the

Subsequent Mortgage Loans into the 2005-HE1 Trust.  GMACM transferred loans with an

aggregate principal amount of $851,740,479 to the 2005-HE1 Trust through these improper

subsequent transfers (the "Subsequent Transfers").

**a.    "Revolving Period," "Subsequent Mortgage Loans" And An "Early Amortization Event"**

83.    Under the Operative Documents, GMACM, as Servicer of the 2005-HE1 Trust, is

required to establish a Custodial Account in which it must deposit any payments made by

borrowers on the Mortgage Loans (*i.e.*, the principal and interest payments made by mortgagors).

Servicing Agreement § 3.02(b).  Additionally, under the Operative Documents, the Indenture

Trustee is required to establish a segregated trust account known as the Funding Account.

Servicing Agreement § 3.16(a).

84.    As Servicer of the 2005-HE1 Trust, GMACM is required, "[o]n each Payment

Date during the Revolving Period, . . . to withdraw from the Custodial Account and deposit into

the Funding Account . . . the aggregate amount of Principal Collections remaining after the

purchase of all Additional Balances or Subsequent Mortgage Loans on or prior to such Payment

Date." Servicing Agreement § 3.16(a).

85.    A revolving period, in the context of a securitization, is generally the time during

which cash available to the trust may properly be reinvested in new collateral for the pool rather

than being used to pay down the principal balance of the securities. Under the Operative

Documents, the Revolving Period is defined in pertinent part as: "The period beginning on the

Closing Date and ending on the earlier of (i) the Payment Date occurring in September 2006,

[and] (ii) the occurrence of an event described in clause (iv) of the definition of Early

Amortization Event[.]" Indenture, Appendix A.

86.    During the Revolving Period and subject to certain conditions, GMACM, as

Seller, could purchase Subsequent Mortgage Loans and transfer them into the 2005-HE1 Trust.

MLPA § 2.2(a).  GMACM could then be reimbursed with funds from the Custodial Account

and/or the Funding Account.  *See* MLPA § 2.2(a); Servicing Agreement § 3.16(c)(i)(B).

87.    Even during the period in which GMACM is authorized under the Operative

Documents to execute the purchase and transfer of Subsequent Mortgage Loans, it is required to

seek and obtain FGIC's permission to do so prior to transferring those loans into the 2005-HE1

Trust.  *See* MLPA § 2.2(b)(vi); 2005-HE1 Prospectus Supplement at S-43.  In addition, the

MLPA also requires GMACM to deliver to FGIC, within five days after the transfer, a copy of

the Mortgage Loan Schedule reflecting the Subsequent Mortgage Loans in electronic format.

*See* MLPA § 2.2(c).

88.    Moreover, GMACM may only transfer Subsequent Mortgage Loans if "the

Revolving Period shall not have terminated." MLPA § 2.2(b)(v).  As detailed above, the

Revolving Period ends, *inter alia*, upon "the occurrence of an event described in clause (iv) of the definition of Early Amortization Event." Indenture, Appendix A.

89.    An Early Amortization Event, as defined, is "[t]he occurrence of one of the following events: . . . (iv) if beginning in June 2005 (a) for three consecutive months, the average amount in the Funding Account which has not been used during a month to purchase Additional Balances or Subsequent Mortgage Loans is greater than 30% of such amount plus the amount which had been used during that month to purchase Additional Balances and Subsequent Mortgage Loans. . . ." Indenture, Appendix A.

> **b.    An Early Amortization Event Occurs no later than January 2006**

90.    Under the Operative Documents, an Early Amortization Event occurred no later than January 2006. By that date, at the latest, for three consecutive months the average amount in the Funding Account which had not been used during a month to purchase Additional Balances or Subsequent Mortgage Loans was greater than 30% of such amount plus the amount which had been used during that month to purchase Additional Balances and Subsequent Mortgage Loans.

91.    Because the condition specified in clause (iv) of the definition of "Early Amortization Event" was satisfied, at the latest, on one or more occasions by January 2006, an Early Amortization Event occurred by operation of the express terms of the Operative Documents in January 2006, or earlier.

> **c.    GMACM Failed to Notify FGIC of the Occurrence of the Early Amortization Event and the Resulting "Material Adverse Change"**

92.    Under the Operative Documents, "[u]pon [GMACM's] becoming aware of any Early Amortization Event, [GMACM] shall forward to the Indenture Trustee a statement to such

effect, including the nature of such Early Amortization Event." Servicing Agreement § 4.01(a).
In turn, the Indenture Trustee must then deliver by mail such notice to other parties to the
Transaction, including FGIC. *Id.*

93.     GMACM has failed to notify the Indenture Trustee of the occurrence of an Early
Amortization Event, which occurred no later than January 2006, in breach of its obligations
under the Servicing Agreement. Consequently, the Indenture Trustee failed to notify FGIC of
the occurrence of the Early Amortization Event. Accordingly, GMACM has breached, and
continues to breach, its obligations under the Servicing Agreement to provide notice of the
occurrence of the Early Amortization Event.

94.     Moreover, pursuant to the I&I Agreement, GMACM must promptly inform FGIC
of the occurrence of any "Material Adverse Change." I&I Agreement § 2.02(f). A "Material
Adverse Change" is defined in the I&I Agreement as "a material adverse change in the ability of
such Person [*i.e.*, any individual or entity] to perform its obligations under any of the Operative
Documents including any material adverse change in the business, financial condition, results of
operations or properties of such Person on a consolidated basis with its subsidiaries which might
have such effect." *Id.* § 1.01.

95.     The occurrence of the Early Amortization Event resulted in an Event of Default
under the Indenture, which is a Material Adverse Change under the I&I Agreement. *See*
Indenture, Appendix A; I&I Agreement § 1.01. Therefore, GMACM had an obligation to
promptly notify FGIC of this Material Adverse Change.

96.     GMACM has failed to notify FGIC of the occurrence of this Material Adverse
Change. Accordingly, GMACM has breached, and continues to breach, its obligations under the

I&I Agreement to provide prompt notice to FGIC of the occurrence of this Material Adverse
Change.

### d.    Subsequent Transfers in Contravention of the Operative Documents

97.    GMACM was permitted to transfer new loans to the 2005-HE1 Trust only during
the Revolving Period.  Accordingly, under the express provisions in the Operative Documents,
the Revolving Period automatically (and without the need for any action by any party) ended
when the Early Amortization Event occurred no later than January 2006.  As of that point in time,
the Revolving Period ended and GMACM was prohibited from transferring any new loans to the
2005-HE1 Trust.

98.    Notwithstanding the fact that the Revolving Period had ended no later than
January 2006, GMACM continued to improperly transfer Subsequent Mortgage Loans into the
2005-HE1 Trust after that date.  In total, GMACM improperly added to the 2005-HE1 Trust,
through at least nine (9) Subsequent Transfers starting on or after the January 2006 Payment
Date, an aggregate principal amount of $397,444,259 in improper Subsequent Mortgage Loans.

99.    The table below sets forth the aggregate outstanding principal balance of the
Subsequent Mortgage Loans in each of the at least nine (9) improper Subsequent Transfers that
GMACM effected:

| Month | Subsequent Transfer Amount ($) |
|---|---|
| February 2006 | 83,499,906 |
| March 2006 | 35,799,998 |
| April 2006 | 34,799,950 |
| May 2006 | 45,499,830 |
| June 2006 | 40,299,989 |
| July 2006 | 41,299,967 |
| August 2006 | 39,000,000 |
| September 2006 | 35,999,999 |
| October 2006 | 41,244,620 |
| **Total** | 397,444,259 |

100.    In short, Subsequent Mortgage Loans improperly transferred to the 2005-HE1

Trust despite the fact that an Early Amortization Event had already triggered the termination of

the Revolving Period.  GMACM had no authority to execute such transfers.  As such, under the

express terms of the Operative Documents, the subsequently transferred loans were not properly

transferred to the 2005-HE1 Trust in accordance with the terms of the 2005-HE1 Transaction.

Accordingly, GMACM breached the I&I Agreement by failing to comply with the Operative

Documents.

> **e.    Improper Transfer Following Natural Expiration of Revolving
> Period**

101.    As described above, the Revolving Period terminated, at the latest, on the

Payment Date occurring in September 2006, even if there had been no Early Amortization Event.

Nevertheless, GMACM improperly transferred approximately $41,244,620 in Subsequent

Mortgage Loans into the 2005-HE1 Trust in October 2006.  Therefore, in the alternative, even if

an Early Amortization Event had not occurred no later than January 2006 and the Revolving

Period had not then ended (which it did), GMACM improperly transferred Subsequent Mortgage

Loans beyond the scheduled close of the Revolving Period in September 2006, which is a separate breach of the I&I Agreement. *See* I&I Agreement § 2.02(a).

**f.    GMACM Failed to Obtain FGIC's Consent or Furnish Required Data and Documents In Transferring Subsequent Mortgage Loans**

102.    Separately and independently from its obligation to refrain from transferring Subsequent Mortgage Loans following an Early Amortization Event, GMACM must execute a Subsequent Transfer Agreement on or prior to each Subsequent Transfer of Subsequent Mortgage Loans. *See* MLPA § 2.2(b)(ii); MLPA Exhibit 2.  In each Subsequent Transfer Agreement, GMACM must restate therein all applicable representations and warranties regarding the Mortgage Loans and certify that it is complying with the requirements of the Operative Documents, including that its actions are not in contravention of any of those agreements. *See* MLPA §§ 2.2(b)(ii), (iv); MLPA Exhibit 2.  GMACM must also certify that it had satisfied each condition precedent to effecting a Subsequent Transfer. *See* MLPA § 2.2(b)(ii); MLPA Exhibit 2.  As explained further below, GMACM has failed to provide either FGIC or the Indenture Trustee with any Subsequent Transfer Agreement in respect of the Subsequent Transfers.

103.    In addition, pursuant to the MLPA, before it can transfer any Subsequent Mortgage Loan into the 2005-HE1 Trust, GMACM must:  (i) deliver to FGIC a timely "Addition Notice" no later than seven Business Days prior to the Subsequent Transfer Date, (ii) deliver to FGIC an executed copy of the related Subsequent Transfer Agreement together with a Mortgage Loan Schedule listing the related Subsequent Mortgage Loans, and (iii) obtain the approval of FGIC for the sale of the related Subsequent Mortgage Loans within five Business Days of FGIC's receipt of an updated loan tape containing information on the Subsequent Mortgage

- 31 -

Loans. *See* MLPA § 2.2(b). GMACM failed to deliver such Addition Notices, Subsequent Transfer Agreements, and Mortgage Loan Schedules, or to obtain such approvals.

104.     On November 2, 2011, FGIC sent a notice to GMACM stating that it may have transferred approximately $851,740,479 in Subsequent Mortgage Loans to the 2005-HE1 Trust without satisfying all of the conditions described above. FGIC advised it had no evidence that GMACM provided FGIC with the required notices, electronic tapes and other information, or had obtained FGIC's consent prior to the transfer. Specifically, FGIC had no record of receiving any Addition Notice, Subsequent Transfer Agreement, related Mortgage Loan Schedule, or electronic tape with respect to any Subsequent Mortgage Loan transferred. Nor did FGIC have any record of its approval for the sale of any Subsequent Mortgage Loan. Further, FGIC advised that it had made inquiries with the Indenture Trustee, and determined that the Indenture Trustee did not have any record of receiving any Addition Notice or copies of Subsequent Transfer Agreements in respect of the Subsequent Mortgage Loans.

105.     To date, GMACM has failed to respond to this notice. FGIC has no records of the required notices, tapes, information, or approvals in respect of the Subsequent Mortgage Loans.

> **g.      GMACM Selected Subsequent Mortgage Loans in a Manner Adverse to the Interests of FGIC by Reselling Loans to the Trust that GMACM Had Been Required to Repurchase**

106.     Separately and independently from its obligation to refrain from transferring Subsequent Mortgage Loans following an Early Amortization Event, or to provide the required notices, tapes, information, and approvals prior to the Subsequent Transfers, GMACM may not adversely select Subsequent Mortgage Loans to transfer into the 2005-HE1 Trust.

107.     As discussed above, during the Revolving Period and subject to certain conditions, GMACM, as Seller, may purchase Subsequent Mortgage Loans and transfer them into the 2005-HE1 Trust. MLPA § 2.2(a). Among the conditions GMACM must satisfy in order to transfer

Subsequent Mortgage Loans to the 2005-HE1 Trust, GMACM must not "select[] such

Subsequent Mortgage Loans in a manner that it reasonably believes is adverse to the interests of

[FGIC] . . . ." MLPA § 2.2(b).

108.    In its role as Servicer, GMACM also has the discretion to increase the credit limit

on a given Mortgage Loan, subject to certain limitations, if such an increase is requested by the

mortgagor.  In order to maintain the integrity of the overall loan pool, however, GMACM is also

required to repurchase, and thereby remove, any such Mortgage Loan from the 2005-HE1 Trust

if GMACM agrees to such an increase.  Specifically, pursuant to the Servicing Agreement,

"[GMACM] shall repurchase any Mortgage Loan . . . [if] at the request of the Mortgagor,

[GMACM] at its option and in its sole discretion agrees to an increase in the Credit Limit above

the Credit Limit of such Mortgage Loan as of the related Cut-Off Date . . . ." Servicing

Agreement § 3.15(b).

109.    During the Revolving Period, GMACM increased the credit limits on certain

Mortgage Loans held by the 2005-HE1 Trust.  As a result, GMACM repurchased and removed

some or all of these Mortgage Loans from the 2005-HE1 Trust (the "Repurchased Mortgage

Loans").

110.    Nevertheless, GMACM then resold those very same Repurchased Mortgage

Loans back into the 2005-HE1 Trust, even though it knew that it had been required to remove

(and had previously removed) the Repurchased Mortgage Loans from the 2005-HE1 Trust

pursuant to the Servicing Agreement.  In fact, in a June 9, 2008 e-mail to FGIC, GMACM

conceded that it had resold the Repurchased Mortgage Loans back to the 2005-HE1 Trust.  By

selecting the Repurchased Mortgage Loans for resale back to the 2005-HE1 Trust—Mortgage

Loans that GMACM knew it was required to remove from the Trust—GMACM not only

circumvented the intended operation of the Servicing Agreement, but also breached the MLPA

by selecting "such Mortgage Loans in a manner . . . adverse to the interests of [FGIC]." MLPA

§ 2.2(b).

111.    Accordingly, because it has failed to comply with conditions precedent before

transferring the Subsequent Mortgage Loans, GMACM has breached and continues to breach

Section 2.2(b) of the MLPA and Section 2.02(a) of the I&I Agreement.

### h.    Subsequent Transfers Damaged FGIC

112.    Further, the Subsequent Mortgage Loans transferred into the 2005-HE1 Trust

have performed much worse than the initial Mortgage Loans. As of January 1, 2012,

approximately 16% of the balance of the over $397 million in improperly transferred Subsequent

Mortgage Loans added in or after January 2006 has been charged-off, defaulted, or was severely

delinquent, as compared to approximately 3% of the balance of the initial Mortgage Loans and

other loans added during the Prefunding Period.

### (2)    GMACM Caused Funding of Variable Pay Revolving Notes Following the Early Amortization Event in Contravention of the Contracts

113.    The 2005-HE1 Transaction was structured using what is known as a "soft-bullet"

structure, whereby the principal balances of the Class A-1 Notes, Class A-2 Notes, and Class A-3

Notes (collectively, the "Term Notes") were to be satisfied and retired sequentially with a single,

"bullet" payment to each class on a specified payment date (the "Targeted Final Payment Date").

In order to fund this bullet payment, the Indenture Trustee was to request advances from existing

holders of associated VPRNs and/or the Issuer was to issue and sell additional associated VPRNs

in the amount of the principal balance of the Term Note that was scheduled to be retired (*i.e.*,

Class A-1 VPRNs were to be funded to retire Class A-1 Notes, Class A-2 VPRNs were to be

funded to retire the Class A-2 Notes, Class A-3 VPRNs were to be funded to retire the Class A-3

Notes). The associated class of VPRNs would then be amortized over a specified term.

114.    The Targeted Final Payment Date for the Term Notes was September 25, 2006 for

the Class A-1 Notes. *See* Indenture, Appendix A. On or about this date, the Class A-1 VPRNs

were funded and the Class A-1 Notes were retired.

115.    Under the Operative Documents, "[u]pon [GMACM's] becoming aware of any

Early Amortization Event, [GMACM] shall forward to the Indenture Trustee a statement to such

effect, including the nature of such Early Amortization Event." Servicing Agreement § 4.01(a).

Furthermore, "if an Early Amortization Event has occurred . . . the Indenture Trustee will not

request an Advance and the Issuer will not issue any additional Variable Pay Revolving Notes."

Indenture § 2.03.

116.    An Early Amortization Event occurred no later than January 2006. As such,

under the express terms of the Operative Documents, GMACM should have notified the

Indenture Trustee of the Early Amortization Event. Notwithstanding this obligation, GMACM

failed to notify the Indenture Trustee that the Early Amortization Event had occurred, thereby

causing the Indenture Trustee to fund the Class A-1 VPRNs—with an aggregate principal

amount of $423,800,000—on or about the Targeted Final Payment Date of September 25, 2006.

The issuance of such Class A-1 VPRNs after the Early Amortization Event occurred constituted

a breach of the Operative Documents.

117.    The funding of Class A-1 VPRNs caused an improper outflow of funds from the

2005-HE1 Trust to the holders of the VPRNs, because the interest rate on the improperly issued

Class A-1 VPRNs was higher than the interest rate of the Class A-1 Notes that were improperly

retired. The funds applied to cover the higher interest rate on the Class A-1 VPRNs would have

otherwise been used to cover other liabilities of the Trust, including payment shortfalls on the remaining 2005-HE1 Notes. The failure to cover these shortfalls because of the higher interest rate of the Class A-1 VPRNs has resulted in additional claims on the Policy to the detriment of FGIC.

118.    Accordingly, because it failed to notify the Trustee of the occurrence of an Early Amortization Event, and caused the Trust to issue Class A-1 VPRNs after the occurrence of such Early Amortization Event, GMACM has breached and continues to breach Section 4.01(a) of the Servicing Agreement and Section 2.02(a) of the I&I Agreement.

### (3)    GMACM's Denial of Loan File Requests

119.    As the 2005-HE1 Transaction continued to perform poorly, on December 9, 2010, FGIC wrote to GMACM via e-mail demanding that GMACM provide additional Mortgage Loan files to FGIC, including origination files, servicing notes, and custodian files, for a random sample of 350 2005-HE1 loans. Having received no response from GMACM to its earlier requests, FGIC sent a follow-up e-mail on February 3, 2011, regarding the status of its December 9, 2010 request for files. FGIC's demands for information were received by ResCap, which informed FGIC that ResCap could not respond to the requests until the matter was discussed internally at ResCap and a response was authorized by those with decision-making authority. On information and belief, ResCap's response required authorization from officers at Ally Financial, and GMACM/ResCap's response was directed by officers at Ally Financial.

120.    On February 14, 2011, and again on April 26, 2011, FGIC sent further follow-up letters requesting loan files.

121.    In finally responding to FGIC's request for information, GMACM refused to provide any loan files or other information relating to current or pre-paid loans ("Performing

Loans"). Instead, it only provided FGIC with only some of the requested loan files, consisting largely of non-performing loans, and chose to conceal the Performing Loan files from FGIC.

122.    Pursuant to the Servicing Agreement and the I&I Agreement, FGIC is entitled to reasonable access to the documentation regarding all of the Mortgage Loans. Section 2.02(p) of the I&I Agreement provides that "FGIC shall have the right, so long as any of the [2005-HE1] Notes remains outstanding, to conduct an ongoing review of GMACM's practices as Servicer through reviews of the Mortgage Loans . . . ." Notably, there is no limitation in the I&I Agreement as to the nature of the Mortgage Loans files that are subject to review. Further, Section 2.02(c)(v) of the I&I Agreement states that "[p]romptly upon request," GMACM must provide to FGIC "such other data as [FGIC] may reasonably request. . . ."

123.    On April 26, 2011, having still received none of the remaining performing Mortgage Loan files it requested, FGIC sent a further letter requesting the remaining loan files. To date, GMACM has not responded.

124.    By producing only non-performing Mortgage Loan files, in contravention of the I&I Agreement, GMACM has arbitrarily and unreasonably imposed limitations on FGIC's contractual right to reasonable access to Mortgage Loan files in contravention of the Operative Documents.

125.    As a result of the failure of GMACM to fulfill this contractually-sanctioned request, despite its obligation to do so, FGIC is unable to evaluate the full extent of potential breaches of the representations and warranties of GMACM, and in that regard reserves its rights to bring further claims. Moreover, on information and belief, GMACM is and has been aware that a substantial number of the Mortgage Loans, whether acquired at the closing or thereafter, were nonconforming and, thus, in breach of its own representations and warranties. Despite this

knowledge, GMACM has failed to repurchase the nonconforming loans or replace them with conforming loans, as is required under the Operative Documents.

### (4)    GMACM's Denial of Servicing Notes

126.    On December 9, 2010, FGIC demanded, pursuant to Section 2.02(c)(v) of the I&I Agreement, that GMACM furnish the servicing notes for the Mortgage Loans.

127.    GMACM, without justification or explanation, and in breach of its obligations in the I&I Agreement, has failed to respond to requests for servicing notes.

### (5)    GMACM's Denial of FGIC's Access To Books and Records, Servicing Officer, and GMACM's Independent Accountants

128.    On January 20, 2012, in accordance with its express rights under Sections 2.02(e)(i),(ii), (iii) of the I&I Agreement, FGIC requested (i) to inspect the books and records of GMACM; (ii) to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and (iii) to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants.

129.    To date, GMACM has failed to respond to this request, in violation of the I&I Agreement.

### F.    Ally Bank's Breaches of The Custodial Agreement

130.    Under the Custodial Agreement, to which FGIC is an express third party beneficiary, *see* Custodial Agreement § 4.6, and through which Ally Bank received substantial fees, Ally Bank undertook several obligations to FGIC concerning the manner in which Ally Bank would ensure that the Mortgage Loans contained complete and accurate information and that GMACM was in compliance with its representations and warranties regarding the origination, selection, and characteristics of those loans.

131.    Ally Bank agreed that it would "hold the Loan Agreements [for the initial

Mortgage Loans] and any Loan Agreement relating to any Subsequent Mortgage Loan," and that

it would review the Loan Agreements and deliver to FGIC a certification of "the completeness of

the receipt of the Loan Agreements." Custodial Agreement §§ 2.1, 2.2(b).

132.    Ally Bank further agreed to notify FGIC of breaches of the MLPA by GMACM,

by providing that: "Upon discovery by the Custodian of a breach of any representation or

warranty made by [GMACM] in the Purchase Agreement . . . with respect to a Mortgage

Loan . . . the Custodian shall give prompt written notice to [FGIC]." Custodial Agreement § 2.3.

133.    An initial review of a small percentage of defective Mortgage Loans has revealed

that in some instances the Mortgage Note or Second Lien Note (*i.e.*, the Loan Agreement) was

not included in the loan file. The lack of a Loan Agreement within a particular file constitutes a

breach of the representations and warranties given by GMACM in the MLPA. Ally Bank should

have been aware of the fact that Loan Agreements were missing from certain Mortgage Loan

files, and that this was a breach of the MLPA's representations and warranties. Consequently, it

should have notified FGIC of such breaches pursuant to its own obligations under the Custodial

Agreement. *See* Custodial Agreement §§ 2.1-2.3. Ally Bank has, however, failed to provide

FGIC with any notices regarding defects in any Mortgage Loan file, and has further provided

inaccurate and/or incomplete certifications regarding the Mortgage Loans, thereby breaching the

Custodial Agreement to which FGIC is an express third party beneficiary.

134.    Moreover, Ally Bank had an obligation to notify FGIC of any breach by

GMACM of the MLPA representations and warranties that it discovered, not just those

pertaining to the Loan Agreement, and its failure to so notify FGIC was a further breach of the

Custodial Agreement.

### G.    GMACM's Breach of Obligations as Servicer

135.    GMACM, as Servicer, failed in numerous material respects to properly perform
its duties to service and administer the Mortgage Loans in accordance with the provisions of the
relevant Operative Documents for the 2005-HE1 Transaction, including, but not limited to, its
obligations to follow proper servicing procedures.

136.    GMACM took responsibility for the servicing of the Mortgage Loans and had
certain related contractual obligations under the I&I Agreement and the Servicing Agreement
with respect to the 2005-HE1 Transaction.  Under the I&I Agreement, GMACM covenanted that
"[a]ll Mortgage Loans will be serviced in all material respects in compliance with the Servicing
Agreement and the Indenture." I&I Agreement § 2.02(l).  Under the Servicing Agreement,
GMACM is liable to FGIC for the servicing and administration of the Mortgage Loans, and in
doing so is required to "follow such collection procedures as shall be normal and usual in its
general mortgage servicing activities and consistent with the procedures the Servicer employs in
servicing all other Mortgage Loans in the servicing portfolio with characteristics similar to those
of the Mortgage Loans." Servicing Agreement §§ 3.02(a), 6.01.

137.    During 2007, the servicing operations of GMACM were integrated into ResCap.
Since the time of the integration, on information and belief, GMACM breached these obligations
by, among other things, being deficient in its borrower contact, collections, and loss mitigation
standards, and by failing to honor FGIC's contractual rights to information.  In particular, an
onsite review of the Ally Financial servicing arm's practices, including those of GMACM, on
March 25, 2009 by FGIC and a third party firm, and subsequent analysis, revealed *inter alia*: (i)
inadequate call center staffing—staffing unable to handle increased incoming and outgoing call
volumes; (ii) call center staffing turnovers as high as 40% in a single year; (iii) a calling
campaign that does not attempt to contact borrowers through other means when GMACM does

not have a viable number or the borrower is continuously unresponsive to messages left; (iv) a lack of effort to hire personnel to visit the mortgaged property to discuss loss mitigation strategies with borrowers in default; and (v) severely infrequent use of alternative loss mitigation strategies as compared to the industry. GMACM, as servicer, also had an obligation to notify FGIC of any material breaches of representations and warranties, and to cause GMACM, as seller, to repurchase the affected Mortgage Loans.

138.    On information and belief, GMACM has failed to remedy any of its deficient servicing practices.

139.    In addition, GMACM disclosed to FGIC for the first time in March 2009 that it classified loans into one of three categories or "Risk Tiers" under a servicing protocol ("Risk Protocol"). Such an approach was, upon information and belief, part of the further cost-cutting measures implemented under the direction of Ally Financial when all of the servicing operations were integrated.

140.    FGIC was damaged by the use of the Risk Protocol following the Ally-directed integration. Under the Risk Protocol, the timing and frequency of calls made with respect to a loan are determined in accordance with the loan's assigned category or Risk Tier. GMACM disclosed to FGIC that all of the mortgage loans in FGIC-insured, GMACM-serviced transactions (over 90,000 mortgage loans), including all of the Mortgage Loans in the 2005-HE1 Transaction, were placed in the lowest category of risk. For such mortgage loans, regardless whether they were (i) first- or second- lien, (ii) underwritten under less stringent guidelines, or (iii) originated by non-GMAC entities—all of which are factors that require more attentive servicing—delinquent borrowers were called at a later stage of delinquency and less frequently than loans in higher risk categories. As the purchaser of the Mortgage Loans, however,

GMACM clearly knew that such Mortgage Loans, by their very nature, required particularized servicing before the implementation of the Risk Protocol. The Mortgage Loans were therefore knowingly miscategorized and neglected, and intentionally received much less care than if they had been properly categorized and appropriately serviced. Consequently, the failure by GMACM to ensure that the Mortgage Loans were serviced and administered in accordance with "procedures as shall be normal and usual in its general mortgage servicing activities" constitutes a breach of the Servicing Agreement and the I&I Agreement. *See* Servicing Agreement § 3.02(a); I&I Agreement § 2.02(l).

141.    On July 8, 2009, FGIC requested: (1) additional information concerning the various Risk Tiers generally, and (2) documentation in order to assess whether or not FGIC was being harmed as a result of being placed in the lower risk tier. To date, GMACM has failed to provide such information in breach of Section 2.02(c)(v) of the I&I Agreement.

### H.    Ally Financial's Domination and Control of its Subsidiaries Results in an Integrated, Single Corporate Enterprise

142.    As discussed in greater detail below, Ally Financial is the ultimate parent of all of the other Defendants to this action. Ally Financial owns ResCap, which owns GMACM and RFC. Ally Financial—as the ultimate parent of ResCap, GMACM, Ally Bank, and RFC—has the practical ability, which it has repeatedly and admittedly exercised, to direct and control the actions of its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC.

143.    As also discussed below, Ally Financial has exercised such domination and control over its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC. Ally Financial exercised its direction and control in connection with the 2005-HE1 Transaction. At times, Ally Financial performed such direction and control by using ResCap as an instrument to effect its goals.

144.    As mentioned above, Ally Financial has recently admitted to the Federal Reserve Board and FDIC that it "indirectly owns and controls . . . numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC . . . ('ResCap'), and its direct and indirect subsidiaries[.]" *See* Consent Order, *In the Matter of Ally Financial Inc., et al.*, FRB Docket No. 11020-B-HC (Apr. 13, 2011) (emphasis added).

145.    As further discussed below, Ally Financial's public statements and actions at or around the time of the Transaction's close until present, also demonstrate that Ally Financial: (i) owns a majority of its subsidiaries' stock; (ii) shares resources, management and employees with its subsidiaries; (iii) considers its mortgage businesses to be "units" of its business; and (iv) has a business relationship with its subsidiaries designed to benefit itself at the expense of its subsidiaries.

> **(1)    Evidence of Ally Financial's Domination of GMACM Directly and Indirectly Through its Control of ResCap**

146.    From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap as an extension of itself, rather than a subsidiary whose dealings were at arm's length.

147.    ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly-owned subsidiaries—were transferred to it in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

148.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

149.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would

agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap]

suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."

Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005

Operating Agreement").

150.    On information and belief, Ally Financial's restructuring and financial support of

its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to

improve and maintain the investment grade rating and profitability of Ally Financial's mortgage

securitization business. This restructuring then enabled Ally Financial to present itself to its

subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent

supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries

more attractive as counterparties to market participants, such as FGIC.

151.    On December 1, 2006, Ally Financial, had its inaugural conference call with

investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations,

"welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global

financial services company." On the same investor call, Eric Feldstein, Ally Financial's then

CEO, demonstrated how Ally Financial was going to take initial steps to actively control its

subsidiaries. For instance, Feldstein declared that one of Ally Financial's first acts as controlling

parent was "to integrate certain of GMAC mortgage operations . . . with RFC operations . . . to

drive some cost efficiencies." *Id.*

152.    At all times since Ally Financial caused ResCap to be incorporated, it has owned

100% of ResCap.[1] Since incorporation, the ownership of ResCap has not changed—Ally

---

[1] GM had created a shell company, GMAC Mortgage Group Inc., which was the direct parent of ResCap.
However, there is no indication that this company conducted any business independent from Ally Financial. In fact,
Ally Financial's first Annual Report as an independent entity, which was filed with the Securities and Exchange

Financial still "owns 100% of ResCap . . . ." Ally Financial Earnings Call dated Nov. 2011,

statement by Michael Carpenter, Ally Financial's CEO.

153.    Ally Financial has continued to exert its domination and control over ResCap via

shared resources, management and employees.  For example, Ally Financial and ResCap shared

at least three common board members, including two individuals who were active participants

with respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's

chairman and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director

of ResCap, Sanjiv Khattri.  In fact, the proposed 2005 operating agreement, between ResCap and

Ally Financial, which Ally Financial filed with the SEC, and which upon information and belief

is still currently in effect, "*require[s] that [ResCap's] board of directors include at least two*

*independent directors, to be selected by GMAC.*"  2005 Operating Agreement (emphasis added).

154.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release

of Ally Financial's 2007 first quarter financial results to investors in an email bearing the

ResCap logo.  That announcement stated that Ally Financial's financial results were found on

both Ally Financial's and ResCap's websites.

155.    Another example of the many employees who had overlapping responsibilities at

Ally Financial and its subsidiaries, including GMACM and RAMP, is David C. Walker.  Walker

joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of

GMAC Mortgage Group.  In September 2005, around the closing of the 2005-HE1 Transaction,

---

(continued...)

Commission (the "SEC") on March 3, 2007, included a corporate hierarchy chart that evidenced Ally Financial's
corporate structure. There was a direct line from Ally Financial to ResCap. *See* Ally Fin. Form 10-K, at 2 (March 3,
2007).  In addition, there is no indication that Ally Financial ever discusses ResCap as an "indirect subsidiary." To
the contrary, as discussed, below, Ally has publicly stated on numerous occasions that it is the owner of ResCap.

Walker was a director at ResCap, GMACM, RFC, and RAMP, among other ResCap
subsidiaries.

156.    Similarly, William F. Muir, Ally Financial's President, has served in that capacity
since at least 2004 (first at GMAC and then at Ally Financial) while also serving as President
and Chairman of the Board of IB Finance Holding Company, LLC—the direct parent of Ally
Bank—and as a director of Ally Bank.

157.    The 2005 Operating Agreement also indicates that Ally Financial has expressly
"restrict[ed] ResCap's ability to declare dividends or prepay subordinated indebtedness owed to
[Ally Financial] or its other affiliates." *See id.*

158.    Conversely, Ally Financial has also agreed to directly pay the losses or expenses
of ResCap. In the same 2005 Operating Agreement, Ally Financial stated that it would stand
behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any losses
[ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its
subsidiaries." *Id.*

159.    Ally Financial has continued to make additional public statements that further
demonstrate its willingness to support and fund ResCap. For instance, in May 2007, during an
investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer
of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take
whatever reasonable efforts that need to be done to maintain [ResCap's] earnings." Ally
Financial's Q1 2007 Earnings Call at 24 (May 2, 2007). Khattri pointed to the fact that "the
[Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of
equity when it was appropriate . . . ." Ally Financial's Q2 2007 Earnings Call at 9 (July 30,
2007). Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the

strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part

of our plan and a key part of our value creation." *Id.* (emphasis added). Thus, Ally Financial's

senior management assured the market that Ally Financial was supporting ResCap for the

purposes of Ally Financial's own "value creation."

160.    The financial support Ally Financial gave to ResCap began as far back as May

2005 and has persisted over many years. Upon information and belief, Ally Financial continued

to prop up ResCap, an undercapitalized entity, by channeling capital and liquidity into ResCap

even as its condition continued to deteriorate as the housing market crashed. In addition to the

direct financial support Ally Financial contributed to ResCap, it was also instrumental in

obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally

Financial announced to the market that it renewed a funding facility with Citi, which provided

"funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such

funding was specifically earmarked for "mortgage assets across the [Ally Financial] and

[ResCap] businesses." *Id.*

161.    Moreover, there is substantial evidence that billions of dollars of TARP funds

meant to stabilize Ally Financial were given to ResCap by Ally Financial. *See* TARP Report

dated March 10, 2010, at 41, 44 (hereinafter "TARP Report"). Upon information and belief, the

TARP funds were commingled among a variety of entities within Ally Financial's mortgage

family, including ResCap.

162.    Additionally, as discussed above, Ally Financial recorded a $270 million charge

in the fourth quarter of 2011, the majority of which was recorded at its controlled subsidiary,

ResCap. In the wake of anticipated penalties to be assessed against ResCap by government

regulators, and the fact that ResCap failed to maintain sufficient tangible net worth to comply

with the requirements of the terms of certain credit facilities, Ally Financial propped up its

subsidiary ResCap with a $196.5 million capital contribution in the form of intercompany debt

forgiveness. *See* Ally Fin. Inc., Form 8-K, at 2 (Jan. 31, 2012).

**(2)    Ally Financial Has Disregarded Corporate Formalities and Treated
Its Businesses as a Single Enterprise**

163.    Ally Financial describes its subsidiaries as its own business units rather than

separate and distinct entities. For example, Ally Financial declares, in a section of its website

specifically intended to inform investors, that GMACM is a "business unit" of Ally Financial,

rather than an indirect subsidiary owned by ResCap. *See* Ally Financial Website, Ally Home >

About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last visited

Jan. 26, 2012).

164.    In line with Ally Financial's current classification of its mortgage businesses as

"units" of Ally Financial, it has consistently been involved in the day-to-day operations of its

subsidiaries. For example, at least one individual, who was identified at various times as being a

GM and/or Ally Financial employee, was on the working group list for transactions involving

ResCap subsidiaries that FGIC insured, including this Transaction. He was included on

communications surrounding the deal document drafting processes from commencement to

close. Such communications sent to him concerned both the negotiation of the various Operative

and Offering Documents, as well as the final executed versions of the Operative and Offering

Documents, including the fraudulent representations, warranties, and affirmative covenants that

are at issue in this action.

165.    In addition to the dominance and control Ally Financial exerted over its mortgage

units, ResCap also viewed GMACM and RFC as part of its own business. For example, in its

investor presentation from 2007, ResCap declares that GMACM and RFC "are owned and

*operated* by GMAC Residential Capital Company, LLC [ResCap]." It further states that ResCap "is part of the [Ally Financial] family of companies."

166.    Ally Financial exerted its dominance and control over ResCap. Upon information and belief, when Ally Financial was not directly controlling GMACM and RFC, it was using ResCap as an instrument to do so.

167.    Ally Financial is currently using its subsidiaries' resources as its own in order to earn favorable ratings by credit rating agencies. For instance, a report put out by Moody's in November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is evident from that report that Ally Financial obtained such a rating by providing information related to its mortgage units, including GMACM and Ally Bank. Ally Financial itself is not engaged in the origination business. Instead, it is using its mortgage units as instruments to obtain favorable ratings.

168.    Such disregard for the corporate form has persisted over time. For instance, Fitch Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage servicing businesses—which include [GMACM, RFC], and HomeComings Financial Network— have been integrated into" ResCap. Moreover, Moody's reported that in 2007, "ResCap combined all servicing operations under one servicing entity . . . under common management [and] common systems . . . ." There is no indication that either RFC or GMACM has ceased operations or been sold to other entities or investors. Thus, upon information and belief, ResCap has conflated various businesses that currently have extensive third-party contractual relationships, such as the one GMACM has with respect to the 2005-HE1 Transaction as Servicer.

169.    Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference. For example, Thomas F. Marano, served as an officer of Ally Financial as well as Chairman and CEO of ResCap.  His responsibilities include overseeing the mortgage lending and servicing in ResCap.  In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage."  Upon information and belief, Marano—in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap—directed and controlled the actions of GMACM and RFC.

170.    In another example, Larry Hipp, a member of ResCap's Risk Analyst/Investor Repurchase Department, communicated with FGIC regarding rescission requests using an Ally Financial email address, but in those very same emails, lists his ResCap contact information, including a ResCap email address.  In addition, Ally Financial/ResCap used to send FGIC secure communications bearing a "GMAC ResCap" header, but those secure communications now have an Ally Financial header.

171.    A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans.  He was asked the following questions at his deposition:

> Q:    Could you please state your name for the record.
> A:    My name is Jeffrey Stephan.
> Q:    Okay.  And who do you work for?
> A:    GMAC, LLC [Ally Financial].
> Q:    And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?
> A:    GMAC, LLC – I'm trying to think of the word to use – the most recent name.
> Q:    Okay.
> A:    It's GMCA [sic] Mortgage Corporation.

Q:      Okay.
A:      I'm not sure how you would word that.
Q.      Okay.  So are they -- does GMAC, LLC -- now has that basically
taken over these other entities --
A.      Yes.
Q.      -- that formerly existed?
A.      Yes.
Q.      So these entities no longer currently exist?
A.      Right.
Q.      Okay.  And how long then have you been employed by GMAC,
LLC?
A.      Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, 4:25-5:22, Dec. 10, 2009, Case No.

50 2008 CA 040805, (15th Cir. Ct., Palm Beach, Fl.).

### I.      FGIC's Contractual Remedies Under The I&I Agreement

172.    The I&I Agreement provides FGIC with broad remedies for GMACM's breaches

of its representations and warranties.  The breadth of these remedies provided further material

inducement for FGIC to issue the Policy.  Specifically, Section 5.02(b) of the I&I Agreement

provides:

> Unless otherwise expressly provided, no remedy herein conferred
> or reserved is intended to be exclusive of any other available
> remedy, but each remedy shall be cumulative and shall be in
> addition to other remedies given under this Insurance Agreement,
> the Indenture or existing at law or in equity.

173.    Moreover, the I&I Agreement provides that, upon an "Event of Default" – which

is defined to include when "[a]ny representation or warranty" by GMACM in the I&I Agreement

or the Operative Documents is materially untrue or incomplete – FGIC can "take whatever action

at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if

any, then due under [the I&I Agreement] or any other Operative Document or to enforce

performance and observance of any obligation, agreement or covenant of GMACM."  I&I

Agreement §§ 5.01(a), 5.02(a).

174.    In addition, GMACM agreed in Section 3.04(a) of the I&I Agreement:

> to pay, and to protect, indemnify and save harmless
> [FGIC] . . . from and against, any and all claims, losses, liabilities
> (including penalties), actions, suits, judgments, demands, damages,
> costs or expenses (including reasonable fees and expenses of
> attorneys . . . ) . . . of any nature arising out of or relating to the
> breach by GMACM of any of the representations or warranties
> contained in Section 2.01 [of the I&I Agreement] or arising out of
> or relating to the Transaction contemplated by the Operative
> Documents . . . .

I&I Agreement § 3.04(a).

175.    Moreover, consistent with its obligation to select Mortgage Loans that met its
published criteria, GMACM agreed to repurchase or substitute Mortgage Loans that did not
conform to GMACM's representations and warranties, and to indemnify FGIC for claims and
losses arising from GMACM's breach of any representation or warranty. *See* I&I Agreement §§
3.03(b), 3.04(a).

## FIRST CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Material Breach of the I&I Agreement – Declaratory Relief Regarding GMACM's Indemnification Obligation)

176.    FGIC re-alleges and incorporates by reference paragraphs 1 through 175 of this
Complaint.

177.    The I&I Agreement is a valid and binding agreement between the parties.

178.    FGIC has performed its obligations under the I&I Agreement.

179.    GMACM's representations and warranties were material to FGIC's decision to
insure the Notes and to issue the Policy.

180.    GMACM's pervasive and material breaches of its representations and warranties,
from the very inception of the Transaction and in the years since, constitute a material breach of
the I&I Agreement that has deprived FGIC of the purpose of the parties' bargain.

181.    Pursuant to Section 3.04(a) of the I&I Agreement, GMACM must indemnify

FGIC for any and all claims, losses, liabilities, demands, damages, costs or expenses of any

nature arising out of or relating to the breach by GMACM of any of the representations or

warranties contained in Section 2.01 of the I&I Agreement or arising out of or related to the

transactions contemplated by the related Operative Documents by reason of, among other things,

the breach by GMACM of any representation, warranty, or covenant under any of the related

Operative Documents.

182.    As explained above, GMACM has breached numerous representations, warranties,

and covenants in the Offering and Operative Documents, for example, those contained in Section

2.01 of the I&I Agreement.  These breaches have caused FGIC to pay claims and to incur losses,

costs, and expenses; and it will continue to do so.

183.    Ally Financial, acting directly and/or indirectly through ResCap, directed

GMACM's actions as set forth in this cause of action.

184.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM

must jointly and severally indemnify and reimburse FGIC for all sums arising out of the 2005-

HE1 Transaction for which FGIC has or will become liable, or, alternatively, for all loss

resulting from any breaches of the representations, warranties, and covenants of the I&I

Agreement or any of the related Operative Documents, or, alternatively, in an amount to be

determined at trial, and an order giving effect to such indemnification.

185.    In addition, FGIC seeks a declaration that GMACM must indemnify and

reimburse FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or

will become liable, or, alternatively, for all loss resulting from any breaches of the

representations, warranties, and covenants of the I&I Agreement or any of the related Operative

Documents, or, alternatively, in an amount to be determined at trial, and an order giving effect to such indemnification.

## SECOND CAUSE OF ACTION

**(As Against Ally Financial, ResCap, GMACM: Material Breach of the Operative Documents — Indemnification for Improper Subsequent Transfers, or, Alternatively, Repurchase of Improper Subsequent Transfers, or, Alternatively, Damages for all Losses Sustained from Improper Subsequent Transfers)**

186.    FGIC re-alleges and incorporates by reference paragraphs 1 through 185 of this Complaint.

187.    The I&I Agreement is a valid and binding agreement between the parties.

188.    FGIC has performed its obligations under the I&I Agreement.

189.    GMACM has breached the I&I Agreement, and the provisions of the MLPA and the Operative Documents incorporated therein, by executing improper Subsequent Transfers to the 2005-HE1 Trust despite the occurrence of an Early Amortization Event having terminated the Revolving Period no later than January 2006, and—independently—after the stated date for the termination of the Revolving Period on the September 2006 Payment Date.

190.    Moreover, GMACM has breached the MLPA by failing to provide FGIC with the required agreements, notices, information, and data, and failing to obtain from FGIC the required approvals, prior to transferring the Subsequent Mortgage Loans into the 2005-HE1 Trust.

191.    In addition, GMACM has breached and continues to breach the Servicing Agreement by failing to notify the Indenture Trustee of the occurrence of the Early Amortization Event no later than January 2006. Further, GMACM has breached and continues to breach the I&I Agreement by failing to promptly notify FGIC of the same, which constitutes a Material Adverse Change.

192.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

193.    FGIC has been damaged in an amount to be proven at trial as a result of the improper transfer of Mortgage Loans to the 2005-HE1 Trust.

194.    FGIC is entitled to indemnification for any claim it has paid or which it may be required to pay arising from a Subsequent Mortgage Loan that was improperly transferred to the 2005-HE1 Trust.

195.    FGIC therefore seeks a declaration that GMACM must reimburse and indemnify FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or will become liable and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented, as a result of the improper transfer of Subsequent Mortgage Loans to the 2005-HE1 Trust.

196.    Further, FGIC seeks an order that GMACM must repurchase the Mortgage Loans that were improperly transferred to the 2005-HE1 Trust.

197.    In the alternative, FGIC has been damaged in an amount to be proven at trial because it has paid or remains liable for certain claims arising from Subsequent Mortgage Loans that GMACM was obligated to repurchase as a result of their improper transfer to the 2005-HE1 Trust.

198.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

199.    Alternatively, GMACM is liable for such damages.

## THIRD CAUSE OF ACTION

**(As Against Ally Financial, ResCap, GMACM: Material Breach of the Operative
Documents — Indemnification for Improper Funding of Variable Pay Revolving Notes
Following Early Amortization Event, or, Alternatively, Damages for such Improper
Funding)**

200.    FGIC re-alleges and incorporates by reference paragraphs 1 through 199 of this
Complaint.

201.    The I&I Agreement is a valid and binding agreement between the parties.

202.    FGIC has performed its obligations under the I&I Agreement.

203.    GMACM has breached the I&I Agreement, and the provisions of the Indenture
and the Operative Documents incorporated therein, by failing to notify the Indenture Trustee that
the Early Amortization Event had occurred, thereby causing the Indenture Trustee and Issuer to
improperly fund the Class A-I VPRNs following the Early Amortization Event.

204.    FGIC therefore seeks a declaration that GMACM must reimburse and indemnify
FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or will become
liable and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under
the Policy and to the payment of all future amounts due or claims that may be presented for
payment by FGIC under the Policy as and when such sums fall due or such claims are presented,
as a result of the improper funding of the VPRNs following the Early Amortization Event.

205.    In the alternative, FGIC has been damaged in an amount to be proven at trial
because it has paid or remains liable for certain claims as a result of the improper funding of the
VPRNs following the Early Amortization Event.

206.    GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

207.    Alternatively, GMACM is liable for such damages.

## FOURTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and GMACM: Breach of Contract – Declaratory
Relief Regarding Access to Information)**

208.    FGIC re-alleges and incorporates by reference paragraphs 1 through 207 of this
Complaint.

209.    The I&I Agreement is a valid and binding agreement between the parties.

210.    FGIC has performed its obligations under the I&I Agreement.

211.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to
furnish or cause to be furnished to FGIC financial statements, accountants' reports, and other
information.  Such other information includes, but is not limited to, data relating to the Mortgage
Loans, the servicing of the Mortgage Loans, and the 2005-HE1 Transaction.  FGIC further has
the right to conduct reviews of GMACM's practices as Servicer through reviews of the Mortgage
Loans pursuant to Section 2.02(p) of the I&I Agreement.

212.    As discussed above, pursuant to the I&I Agreement, FGIC made numerous
reasonable written requests that GMACM furnish or cause to be furnished data relating to the
Mortgage Loans, and the servicing of those loans, in order for FGIC to determine the veracity of
representations and warranties made by GMACM, and others, concerning the Mortgage Loans.

213.    GMACM has refused to provide more than a fraction of the data concerning the
Mortgage Loans sought by FGIC.

214.    GMACM has failed to comply with its contractual obligations and breached the
I&I Agreement by failing to provide data relating to the Mortgage Loans after receiving
reasonable requests for such data from FGIC.

215.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to
permit FGIC, upon its reasonable request, to (i) inspect the books and records of GMACM; (ii)

discuss the affairs, finances and accounts of GMACM with GMACM's Servicing Officer; and
(iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent
accountants.

216.    On January 20, 2012, FGIC made a reasonable written request that GMACM
permit FGIC or its authorized agent to conduct an inspection of the books and records of
GMACM, as well as permit FGIC to (i) discuss the affairs, finances and accounts of GMACM
with the Chief Financial Officer of GMACM, and (ii) with GMACM's consent, which consent
shall not be unreasonably withheld or delayed, discuss the affairs, finances, and accounts of
GMACM with GMACM's independent accountants.

217.    GMACM has failed to make available such persons or to produce such
information.

218.    GMACM has failed to comply with its contractual obligations and breached the
I&I Agreement by failing to make available the persons requested or to provide the information
requested pursuant to the I&I Agreement, Section 2.02(e)(i)-(iii).

219.    Pursuant to Section 2.02(c)(v) of the I&I Agreement, GMACM agreed to furnish
or cause to furnish to FGIC "all reports provided . . . pursuant to the [Servicing Agreement]."

220.    FGIC made a reasonable request for servicing notes on December 9, 2010.

221.    GMACM has failed to comply with its contractual obligations and breached the
I&I Agreement by failing to cause the Servicing Reports to be delivered to FGIC after receiving
reasonable requests from FGIC.

222.    Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

223.    Accordingly, FGIC seeks a declaration that GMACM has failed to comply with Sections 2.02(c)(v), 2.02(e)(i)-(iii), and 2.02(p) of the I&I Agreement, and an order requiring GMACM to promptly remedy those breaches and therefore comply with FGIC's requests and notices to GMACM pursuant to the relevant provisions, as detailed above.

## FIFTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Servicer Obligations)

224.    FGIC re-alleges and incorporates by reference paragraphs 1 through 223 of this Complaint.

225.    The I&I Agreement is a valid and binding agreement between the parties.

226.    FGIC has performed its obligations under the I&I Agreement.

227.    As explained above, GMACM has breached its affirmative covenant under the I&I Agreement to service all Mortgage Loans in all material respects in compliance with the Servicing Agreement.

228.    GMACM's breaches of the I&I Agreement have caused substantial harm and damages to FGIC, in an amount to be proved at trial, but at a minimum including substantially higher claims on the Policy and other losses and expenses.

229.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

230.    As a result of this breach of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

231.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

232.    Alternatively, GMACM is liable for such damages.

## SIXTH CAUSE OF ACTION

### (As Against Ally Bank:  Breach of the Custodial Agreement

233.    FGIC re-alleges and incorporates by reference paragraphs 1 through 232 of this Complaint.

234.    The Custodial Agreement is a valid and binding agreement between the parties thereto.

235.    FGIC is an express third party beneficiary of the Custodial Agreement.

236.    As explained above, Ally Bank has materially breached its obligations under Sections 2.1, 2.2, and 2.3 of the Custodial Agreement.

237.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

238.    Ally Bank is liable for such damages.

## SEVENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Declaratory Relief)

239.    FGIC re-alleges and incorporates by reference paragraphs 1 through 238 of this Complaint.

240.    As discussed above, Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this complaint.

241.    For the reasons set forth in paragraphs 142 through 171, among others, Ally Financial, ResCap, and GMACM were and continue to be alter egos of each other.

242.    FGIC has been damaged as a result of the actions Ally Financial, ResCap, and GMACM.

243.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM were and continue to be alter egos of each other, and therefore are jointly and severely liable for each other's liabilities.

## EIGHTH CAUSE OF ACTION

### (As Against GMACM: Attorneys' Fees and Costs)

244.    FGIC re-alleges and incorporates by reference paragraphs 1 through 243 of this Complaint.

245.    The I&I Agreement is a valid and binding agreement between the parties.

246.    FGIC has performed its obligations under the I&I Agreement.

247.    Pursuant to Section 3.03(c) of the I&I Agreement, GMACM agreed to reimburse FGIC for any and all costs or expenses "including reasonable attorneys' . . . fees and expenses" in connection with the enforcement, defense or preservation of any rights in respect of any of the Operative Documents. Further, pursuant to Section 3.04(a) of the I&I Agreement, GMACM agreed to pay FGIC any and all costs or expenses "including reasonable fees and expenses of attorneys" arising out of or relating to the breach by GMACM of any of the representations or warranties contained in Section 2.01 of the I&I Agreement or arising out of or relating to the 2005-HE1 Transaction.

248.    FGIC has incurred and will continue to incur substantial costs and expenses, including but not limited to attorneys' fees in filing and prosecuting this lawsuit, arising out of GMACM's failure to provide Mortgage Loan files, Servicing Reports, and financial information and its breach of the representations and warranties contained in Section 2.01 of the I&I Agreement and other representations, warranties, and its covenants within the Operative Documents, such as Section 2.02 of the I&I Agreement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Financial Guaranty Insurance Company demands judgment in

its favor and against defendant GMAC Mortgage Company, LLC, with respect to (1) through (3)

and (5) through (14) below, and in its favor and against Residential Capital, LLC, with respect to

(1) through (3), (5) through (11), (13), and (14), below, and in its favor and against Ally Bank,

with respect to (4), (13), and (14) below, and in its favor and against Ally Financial, Inc., with

respect to (1) through (3), (5) through (11), (13), and (14) below and the following relief:

    **(1)**    A declaration that, pursuant to GMACM's obligations under the I&I Agreements, GMACM must solely and/or Ally Financial, ResCap, and GMACM must jointly and severally reimburse and indemnify FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or will become liable, or, alternatively, for all loss resulting from any breaches of the representations, warranties, and covenants of the I&I Agreement or any of the related Operative Documents, or, alternatively, in an amount to be determined at trial, and an order giving effect to that declaration;

    **(2)**    Further or alternatively, an award of all legal, rescissory, and equitable damages, to be proven at trial for GMACM's material breaches of the I&I Agreement and the Operative Documents incorporated therein;

    **(3)**    Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's pervasive and material breaches of its representations, warranties, and affirmative covenants, which constitute material breaches of the I&I Agreement and frustration of the parties' bargain;

    **(4)**    Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for Ally Bank's material breaches of its obligations under the Custodial Agreement;

    **(5)**    Further or alternatively, a declaration that GMACM reimburse and indemnify FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented, as a result of Subsequent Mortgage Loans that were improperly transferred to the 2005-HE1 Trust, and the

improper funding of the VPRNs, and an order giving effect to that declaration;

**(6)**     Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's improper transfer of Subsequent Mortgage Loans to the 2005-HE1 Trust and improper funding of the VPRNs;

**(7)**     Further or alternatively, a declaration that GMACM must repurchase the Mortgage Loans that were improperly transferred to the 2005-HE1 Trust, and/or must reimburse the 2005-HE1 Trust for monies improperly distributed to the VPRNs, and order giving effect to that declaration;

**(8)**     Further or alternatively, a declaration that GMACM must provide full access to all Mortgage Loan files requested or that will be requested by FGIC in the 2005-HE1 Transaction, and an order giving effect to that declaration;

**(9)**     Further or alternatively, a declaration that GMACM must allow FGIC to inspect the books and records of GMACM, to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, and to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants, and an order giving effect to that declaration;

**(10)**    Further or alternatively, a declaration that GMACM must cause servicing notes to be provided for the 2005-HE1 Transaction when requested by FGIC, and an order giving effect to that declaration;

**(11)**    Further or alternatively, a declaration that Ally Financial, ResCap, and GMACM are alter egos of each other and are jointly and severally liable for each other's liabilities;

**(12)**    An award of FGIC's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the I&I Agreement and other Operative Documents, as defined in the I&I Agreement;

**(13)**    An award of prejudgment interest at the statutory rate; and

**(14)**    Any other and further relief that the Court deems just and proper.

## JURY DEMAND

FGIC demands a trial by jury for all issues so triable as a matter of right.

Dated: January 31, 2012

JONES DAY

Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
Alex P. McBride
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*