FILED: NEW YORK COUNTY CLERK 11/29/2011
NYSCEF DOC. NO. 1
INDEX NO. 653302/2011
RECEIVED NYSCEF: 11/29/2011

12-12020-mg   Doc 1748-6   Filed 10/06/12   Entered 10/06/12 00:41:03   Exhibit 6
Pg 1 of 67

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- x

FINANCIAL GUARANTY INSURANCE )
COMPANY, )
                       )
        **Plaintiff,**  )
                       )
        **-against-**  )
                       )
**GMAC MORTGAGE, LLC F/K/A** )
**GMAC MORTGAGE CORPORATION;** )
**ALLY BANK F/K/A GMAC BANK;** )
**RESIDENTIAL CAPITAL, LLC F/K/A** )
**RESIDENTIAL CAPITAL** )
**CORPORATION,** )
                       )
        **Defendants.**  )

Index No. _____

<u>**SUMMONS**</u>

<u>**Date Index No. Purchased:**</u>

November 29, 2011

-------------------------------------------------------- x

**TO THE ABOVE-NAMED DEFENDANTS**:

    **YOU ARE HEREBY SUMMONED** to answer the Complaint of the Plaintiff herein and to serve a copy of your answer on the Plaintiff at the address indicated below within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

    **YOU ARE HEREBY NOTIFIED THAT** should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

    **VENUE**: Plaintiff designates New York County as the place of trial. The basis of this designation is Plaintiff's residence in New York County at 125 Park Avenue, New York, New York 10017. A further basis of this designation is Defendant GMAC MORTGAGE, LLC's residence in New York County and agreed submission to this venue.

Dated: November 29, 2011

JONES DAY

_/s/ Howard F. Sidman_____
Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- x

**FINANCIAL GUARANTY INSURANCE**    )       **Index No. _____**
**COMPANY,**                                              )
                                                          )
                    **Plaintiff,**                        )
                                                          )       <u>**COMPLAINT**</u>
                    **-against-**                         )
                                                          )
**GMAC MORTGAGE, LLC F/K/A GMAC**   )
**MORTGAGE CORPORATION; ALLY**       )
**BANK F/K/A GMAC BANK;**            )
**RESIDENTIAL CAPITAL, LLC F/K/A**   )
**RESIDENTIAL CAPITAL**              )
**CORPORATION,**                     )
                                     )
                    **Defendants.**  )

-------------------------------------------------------- x

Plaintiff Financial Guaranty Insurance Company ("FGIC"), by and through its attorneys,

Jones Day, for its Complaint against defendants GMAC Mortgage, LLC, formerly known as

GMAC Mortgage Corporation ("GMACM"), Ally Bank, formerly known as GMAC Bank

("Ally Bank"), and Residential Capital, LLC, formerly known as Residential Capital Corporation

("ResCap"), alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.        This action arises in connection with a financial guaranty insurance policy (the

"Policy") issued by FGIC in relation to a GMACM-sponsored transaction (the "2006-HE1

Transaction" or "Transaction"), in which GMACM Home Equity Loan Trust 2006-HE1 (the

"2006-HE1 Trust") issued and sold to investors over $1.2 billion aggregate principal amount of

residential mortgage-backed securities (the "2006-HE1 Notes").  As the sponsor of the 2006-

HE1 Transaction, GMACM procured the Policy from FGIC in order to enhance the ratings and

marketability of the 2006-HE1 Notes.  GMACM fraudulently induced FGIC's agreement to
provide this insurance through willful and material misrepresentations and omissions concerning
the nature of its business practices and the credit quality of the tens of thousands of mortgage
loans that provided the collateral for the 2006-HE1 Notes.  GMACM knew those mortgage loans
to be far different—and demonstrably worse—than GMACM had represented them to be.
FGIC's issuance of the Policy enabled the 2006-HE1 Notes to receive a triple-A rating from the
rating agencies, which in turn made the 2006-HE1 Transaction viable, and enabled GMACM and
GMACM's affiliates to earn millions of dollars in transaction fees.

2.      Since the closing of the 2006-HE1 Transaction, GMACM has compounded its
misconduct by repeatedly and materially breaching its contractual agreements.  From the very
inception of the 2006-HE1 Transaction, GMACM has violated the essential terms of its
agreement with FGIC.  GMACM has also breached the essential terms of the other operative
documents incorporated therein.

3.      GMACM was substantially assisted in fraudulently inducing FGIC to issue the
Policy by its affiliate Ally Bank, then doing business as GMAC Bank.  Ally Bank and GMACM
were the two principal originators of loans that became the collateral for the 2006-HE1
Transaction, and as such had intimate knowledge of the quality of the loan pool.  In total, Ally
Bank sold over $500 million in loans that it had originated or acquired to GMACM to be
securitized in the 2006-HE1 Transaction.  Further, Ally Bank agreed to serve as custodian of the
2006-HE1 Transaction—one of the critical parties charged with certain oversight and
maintenance duties with respect to the 2006-HE1 Trust.  With knowledge of GMACM's material
misrepresentations and omissions regarding the mortgage loans that collateralized the 2006-HE1
Transaction, Ally Bank separately made representations and warranties regarding those loans for

the purpose of aiding GMACM's inducement of FGIC to issue the Policy.  By assisting

GMACM in inducing FGIC to issue the Policy, Ally Bank was able to collect substantial fees as

custodian and perpetuate its lucrative loan origination business.

4.      Like GMACM, Ally Bank has materially breached its own separate contractual

agreement with FGIC regarding Ally Bank's duties as custodian of the 2006-HE1 Transaction.

5.      Moreover, many of the material contractual breaches committed by GMACM,

concerning, primarily, FGIC's right to access information in GMACM's possession and

GMACM's failure to repurchase or cure certain of the mortgage loans backing the 2006-HE1

Notes that FGIC sought to have repurchased, were directed by ResCap—GMACM's indirect

parent company.

6.      The 2006-HE1 Transaction is a mortgage loan securitization: a complex

arrangement comprising multiple interdependent agreements among GMACM and several

parties whereby tens of thousands of home equity loans and home equity revolving lines of credit

were pooled together and transferred to the 2006-HE1 Trust, which then issued to investors

securities (i.e., the 2006-HE1 Notes) collateralized by those loans.  The 2006-HE1 Trust uses the

periodic payments made by the borrowers under the thousands of mortgage loans held by the

trust to pay, among other things, principal and interest due on the 2006-HE1 Notes, and the fees

and expenses of GMACM and other participants.

7.      At the hub of the 2006-HE1 Transaction lies GMACM:  the sponsor of the

securitization, and the originator/transferor and the servicer of the loans that collateralize the

2006-HE1 Notes.  The primary victim of the 2006-HE1 Transaction—which turned out to be

backed by inferior loans that did not meet the underwriting standards or credit characteristics

warranted by GMACM—is FGIC, which has already paid out tens of millions of dollars in losses under the Policy, with further material losses still to come.

8.      FGIC, a monoline financial guaranty insurance company, was in the business of writing financial guaranty insurance policies with respect to asset-backed and debt securities, including residential mortgage-backed securities ("RMBS").  At the time of the 2006-HE1 Transaction, FGIC's financial strength was rated triple-A by Moody's Investors Services, Inc. ("Moody's"), Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), and Fitch, Inc., which enabled securities that were insured by FGIC to be rated triple-A as well.  FGIC's policies for RMBS typically guaranteed the timely payment of the principal and interest due on the insured securities, including the shortfall, if any, in the principal balance of the mortgage pool as compared to the principal balance of the insured securities. FGIC's insurance policies thus enhanced the credit quality, and therefore the marketability, of the insured securities.

9.      In March 2006, FGIC and several other parties entered into the 2006-HE1 Transaction.  The 2006-HE1 Transaction was sponsored by GMACM.  As the sponsor of the 2006-HE1 Transaction, GMACM pooled together over twenty-one thousand residential mortgage loans (the "Mortgage Loans") to provide collateral for the 2006-HE1 Notes.  All of the Mortgage Loans were either originated or acquired by GMACM or Ally Bank.

10.     After pooling the Mortgage Loans originated by GMACM and Ally Bank, GMACM transferred the loans directly or indirectly to another one of its affiliates (Residential Asset Mortgage Products, Inc. ("RAMP")).  RAMP then deposited the Mortgage Loans received into the 2006-HE1 Trust.  The 2006-HE1 Trust, in turn, issued the 2006-HE1 Notes to investors.

11.      To enhance the ratings and marketability of the 2006-HE1 Notes, and to increase
the profit that GMACM would derive from the 2006-HE1 Transaction, GMACM sought to have
FGIC issue the Policy to JPMorgan Chase Bank, N.A., as indenture trustee for the 2006-HE1
Notes for the benefit of the holders of the 2006-HE1 Notes.

12.      GMACM made material representations and warranties and affirmative covenants
to FGIC to induce FGIC to enter into the 2006-HE1 Transaction, on which FGIC relied, about
the manner in which GMACM conducted its loan origination, selection, and evaluation processes,
as well as the characteristics of the Mortgage Loans.  Those representations and warranties were
false when stated.  Additionally, those representations and warranties were false on the many
occasions when they were restated by GMACM (for example, when GMACM added new loans
to the mortgage pool).  Consequently, the credit risk inherent in the Mortgage Loans turned out
to be far greater than it should have been had GMACM's representations and warranties been
true.

13.      GMACM received substantial assistance in fraudulently inducing FGIC to issue
the Policy from Ally Bank.  Ally Bank was aware of the material misrepresentations GMACM
had made to FGIC, and further represented to FGIC that it would undertake duties to monitor
and certify the accuracy and completeness of certain material aspects of the Mortgage Loan files,
as well as inform FGIC of certain failures by GMACM to comply with its obligations under the
2006-HE1 Transaction documents.   Ally Bank made these representations to FGIC despite its
knowledge that GMACM had not complied—and would not comply—with its representations
and warranties to FGIC.  As such, Ally Bank actively aided and abetted GMACM's fraudulent
inducement of FGIC to issue the Policy.

14.     The increased credit risk of the Mortgage Loans has resulted in extremely high levels of delinquencies, defaults, and losses on the Mortgage Loans, and the resultant claims FGIC has been required to pay have been far in excess of what FGIC reasonably expected when it decided to issue the Policy in reliance on the (presumed) accuracy and truthfulness of GMACM's representations and warranties and affirmative covenants.  In fact, the levels of defaults and losses and the amount of claims presented to FGIC have been overwhelming.  Had FGIC been told the truth about the nature of GMACM's underwriting and business practices and/or the true characteristics of the Mortgage Loans, it would never have agreed to issue the Policy, and would thereby have avoided the significant losses and liabilities it has incurred, and will incur, as a result of GMACM's misconduct.

15.     Further, as explained more fully *infra*, following the closing of the 2006-HE1 Transaction, GMACM failed to properly give effect to a "Managed Amortization Event," as defined by the plain language of the transaction documents.  GMACM subsequently improperly added approximately $580 million in additional mortgage loans (the "Subsequent Mortgage Loans") to the 2006-HE1 Trust through subsequent transfers that it was not authorized to make. As a result, FGIC is being asked to pay significant losses incurred on a substantial number of loans that were added to the 2006-HE1 Trust after closing, in circumstances where the express terms of the operative documents for the 2006-HE1 Transaction (the "Operative Documents") precluded those loans from being added to the 2006-HE1 Trust.

16.     Through this Complaint, FGIC seeks relief against GMACM for its fraudulent inducement, and for its material breaches of its insurance agreement with FGIC and breaches of its obligations under the Operative Documents for the 2006-HE1 Transaction.

17.      FGIC further seeks relief against Ally Bank for aiding and abetting GMACM's fraudulent inducement, as well as for Ally Bank's material breaches of its contractual obligations to FGIC.

18.      FGIC further seeks relief against ResCap for tortious interference with the contract between FGIC and GMACM.

## THE PARTIES

19.      FGIC is a New York stock insurance corporation with its principal place of business at 125 Park Avenue, New York, New York 10017.

20.      Defendant GMACM is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania.  In the period relevant to this action, GMACM originated, acquired, and serviced residential mortgage loans, and sponsored securitizations of mortgage loans.

21.      GMACM is an indirect wholly owned subsidiary of ResCap.

22.      ResCap is a Delaware limited liability corporation and an indirect wholly owned subsidiary of Ally Financial, Inc. (f/k/a GMAC, LLC).  ResCap is the indirect corporate parent of GMACM and is a leading real estate finance company, the business of which includes originating, acquiring, and servicing mortgage loans.

23.      In September 2008, ResCap announced that it was closing much of its mortgage loan acquisition business.  At or about this time, GMACM closed all of its retail locations, at which home buyers or owners had previously been able to obtain mortgages.  GMACM remains one of the largest residential mortgage loan servicers in the nation.

24.      Ally Bank (f/k/a GMAC Bank), formerly an indirect, wholly owned subsidiary of Ally Financial, Inc., was at all times relevant to this Complaint a loan originator.  To facilitate the 2006-HE1 Transaction, Ally Bank sold to GMACM over $500 million in mortgage loans that

it had originated or acquired to be securitized in the Transaction. These loans comprised more than 55% of the initial Mortgage Loans. GMAC Bank was renamed Ally Bank in May 2009. Ally Bank is an online bank chartered under Utah law.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this suit pursuant to CPLR §§ 301, 302, and 311-a. GMACM is a registered limited liability company within the State of New York, has appointed an agent for service of process in this State, and transacts business within this State. Also, in an agreement at issue in this case, GMACM irrevocably submitted to the jurisdiction of this Court. Ally Bank also regularly transacts business in this State, and the acts and underlying transactions giving rise to the claims in this case occurred in this State. ResCap likewise regularly transacts business in this State, and the acts giving rise to the claims in this case occurred in this State.

26.     Venue is proper in New York County pursuant to CPLR § 503. FGIC, as plaintiff, has designated New York County as the place of trial. GMACM, a party to this action, has designated New York County as its county of residence in the State of New York, and has agreed not to challenge venue in this Court. Furthermore, substantial activity giving rise to the claims in this case occurred within New York County.

## RELEVANT NON-PARTIES

27.     Ally Financial, Inc. ("Ally Financial," f/k/a GMAC, LLC)—the ultimate parent company of GMACM, Ally Bank, and ResCap—is a Delaware corporation with its principal place of business in Detroit, Michigan. Ally Financial specializes in automotive financings, residential mortgage financings and services, and insurance services. Ally Financial is the indirect parent company of GMACM and all GMACM-affiliated entities relevant to this action.

28.     Ally Securities, LLC ("Ally Securities"), an entity incorporated in Delaware, is an affiliate of GMACM and RAMP and a registered broker-dealer under the Securities Exchange Act of 1934, and is registered to do business in New York.  Prior to 2007, Ally Securities was known as Residential Funding Securities Corporation, and was doing business as GMAC RFC Securities. Ally Securities served as an underwriter of the 2006-HE1 Notes and, on information and belief, participated in the preparation of certain of the key offering documents for the 2006-HE1 Transaction.

29.     Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove") is a Delaware statutory trust established by an affiliate of GMACM.  Beginning in 2003, GMACM sold to Walnut Grove second-lien mortgage loans that it had originated or acquired.  To facilitate the 2006-HE1 Transaction, Walnut Grove sold certain of the Mortgage Loans to RAMP.

30.     RAMP, a special purpose vehicle, is an indirect, wholly owned subsidiary of Ally Financial and a Delaware corporation with its principal place of business in Minnesota.  To facilitate the 2006-HE1 Transaction, RAMP purchased mortgage loans from GMACM and Walnut Grove and deposited those loans into the 2006-HE1 Trust.  The trust then issued the 2006-HE1 Notes to the underwriters, including Ally Securities (then doing business as GMAC RFC Securities), to be sold to investors.

## FACTUAL ALLEGATIONS

### A.    GMACM

31.     In the period relevant to this action, GMACM originated, acquired, and serviced residential mortgage loans and, from time to time, arranged for the securitization of those mortgage loans and the sale of securities collateralized by those mortgage loans to investors, in the form of RMBS.

32.    GMACM-originated loans have suffered extremely high rates of delinquencies, defaults and charge-offs (i.e., loans for which the servicer has recognized a loss), and it is a matter of public knowledge that the mortgage lending practices of Ally Financial's subsidiaries, including in large part GMACM, led Ally Financial to seek a bail-out by the federal government in 2008.

33.    GMACM is currently the servicer for the 2006-HE1 Transaction.

### (1)    GMACM, GMAC-RFC, and RFC

34.    GMACM is a subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC") which in turn is a subsidiary of ResCap.

35.    Residential Funding Corporation, LLC ("RFC") is also a subsidiary of GMAC-RFC and ResCap.  Like its affiliate GMACM, RFC engaged in the business of originating, acquiring, servicing, and securitizing mortgage loans during the period relevant to this action.

36.    According to Inside Mortgage Finance Publications, Inc., GMAC-RFC issued $42.34 billion of non-agency mortgage-backed securities in 2004, $56.93 billion in 2005, $66.19 billion in 2006, and $32.43 billion in 2007.  *See 2011 Mortgage Market Statistical Annual: Volume II* at 38-41.  GMAC-RFC was the fifth largest issuer of non-agency mortgage-backed securities in 2005, the fourth largest in 2006, and the eighth largest in 2007.  *See id.*

37.    According to the *Financial Crisis Inquiry Report, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (the "FCIC Report"), published in January 2011, GMAC-RFC was the largest issuer of private mortgage-backed securities in 2002, when it issued $11.5 billion of private mortgage-backed securities.  *See* FCIC Report at 462.  GMAC-RFC was also the fourth largest subprime mortgage lender in 2004, when it loaned $26 billion to subprime borrowers.  *See id.* at 504.

38.     The FCIC Report pointedly notes the widespread failure among the mortgage-
backed security industry generally to adhere to basic standards in loan origination, selection, and
evaluation—a truth FGIC would come to learn specifically in its dealings with GMACM.  The
FCIC Report concludes that:

> [F]irms securitizing mortgages failed to perform adequate due
> diligence on the mortgages they purchased and at times knowingly
> waived compliance with underwriting standards.   Potential
> investors were not fully informed or were misled about the poor
> quality of the mortgages contained in some mortgage-related
> securities.  These problems appear to have been significant.

*Id.* at 187.

### (2)     GMACM's Business of Securitization

39.     GMACM's business model depended on securitization.  Pooling mortgage loans
and selling them into securitizations enabled GMACM to fund its ongoing mortgage loan
origination business, earned it significant fees from the resulting transactions, and reduced  the
credit risk it retained with respect to those loans.

40.     GMACM also gained loan origination fees, as well as proceeds from selling the
loans.  GMACM in many instances profited from the difference between the cost GMACM
incurred to originate or acquire the loans, and the price at which it sold them to RAMP for
deposit into the securitizations.

41.     In order to handle all of the administrative duties under the various transaction
agreements, including *inter alia* collecting mortgage payments and determining whether a
mortgage loan is in default based on the transaction documents, GMACM generally acted as
servicer of its own securitizations.  GMACM thereby earned servicing fees that normally
amounted to 0.50% per annum of the aggregate principal balance of the mortgage loans, as well
as collected fees in the range of 20%-36% of any subsequent recoveries from charged-off loans.

42.     GMACM also enriched other Ally Financial affiliates by sponsoring securitizations.  Ally Financial entities participated in each of the key steps in the securitization process, and recorded gains and earned fees at each of those steps.  For example, in the 2006-HE1 Transaction at issue here:

- Ally Bank gained fees for originating nearly 60% of the loans initially comprising the 2006-HE1 Trust, and proceeds from selling those loans to GMACM; Ally Bank also gained fees as custodian of the 2006-HE1 Trust for holding certain documents;

- Walnut Grove received the proceeds from selling certain of the Mortgage Loans to RAMP (after purchasing over 40% of the loans from GMACM);

- RAMP received payments for serving as the depositor of the Mortgage Loans to the 2006-HE1 Trust; and

- Ally Securities gained fees for underwriting the 2006-HE1 Notes.

### (3)     GMACM, RFC and Ally Financial Inc. Face Numerous Investigations and Lawsuits Relating to its RMBS Securitizations

43.     GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011) (emphasis added).

44.     Ally Financial also disclosed that the U.S. Securities and Exchange Commission (the "SEC") served a subpoena on Ally Financial, requesting documentation regarding certain "bulk settlements" relating to securitized mortgage loans as well as a request for materials provided to investors and prospective investors in mortgage securitization transactions.  *Id.*

45.    GMACM and RFC face numerous pending lawsuits brought by RMBS investors

and insurers.  For example, GMACM is currently facing a lawsuit brought by MBIA Insurance

Corporation ("MBIA") in New York Supreme Court in which MBIA alleges that in connection

with three transactions similar to the one at issue here, GMACM affirmatively misrepresented

the credit quality of tens of thousands of mortgage loans, with a total original principal balance

of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that

GMACM should have borne itself.  On December 15, 2010, the New York Supreme Court

issued a ruling on GMACM's motion to dismiss which allowed both the breach of

representations and warranties and fraud claims, among others, to proceed to trial.

46.    According to Ally Financial's quarterly report for the third quarter of 2011, dated

November 4, 2011, there were at that time twenty-two pending suits against Ally Financial's

mortgage-related subsidiaries.  The plaintiffs in those suits have alleged, among other things, that

Ally Financial's various subsidiaries made misstatements and omissions in registration

statements, prospectuses, prospectus supplements, and other documents related to RMBS

offerings.  The alleged misstatements typically concern underwriting standards.  Ally Fin. Inc.,

Quarterly Report (Form 10-Q), at 159 (Nov. 4, 2011).

47.    Additionally, on September 2, 2011, the Federal Housing Finance Authority

("FHFA"), as conservator for the Federal Home Loan Mortgage Corporation ("Freddie Mac"),

filed suit in the Supreme Court of the State of New York, New York County against Ally

Financial and several of its subsidiaries for claims arising in connection with Freddie Mac's

purchase of over $6 billion in certificates issued through twenty-one transactions similar to the

transaction at issue here.  Among other claims, FHFA brought suit for common law fraud against

various Ally Financial subsidiaries and aiding and abetting fraud against Ally Financial for its

intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in

connection with the sale of the subject certificates.  The complaint also alleges numerous

violations of state and federal securities laws by Ally Financial and several of its subsidiaries

stemming from false and misleading statements contained in publicly filed prospectuses,

prospectus supplements, registration statements, and other offering documents.  The FHFA seeks

relief in the form of rescission and recovery of the $6 billion purchase price of the certificates,

including lost principal and interest, as well as punitive damages and attorneys' fees and costs.

48.    Moreover, Ally Financial disclosed that it expects additional RMBS lawsuits from

monoline insurers like FGIC given that Ally Financial and its subsidiaries sold $42.7 billion of

loans into monoline-wrapped securitizations from 2004 through 2007.  In the first nine months of

2011 alone, Ally Financial and its subsidiaries have received repurchase claims from monoline

insurers for $254 million worth of mortgages related to securitizations it consummated between

2004 and 2007.  They clearly recognize their exposure because, according to Michael Carpenter,

CEO of Ally Financial, ResCap has already reserved $829 million for representations and

warranties claims and, according to its own SEC filings, Ally Financial confirms that "litigation

with . . . monolines is likely."  Ally Fin. Inc., Quarterly Report (Form 10-Q), at 88 (Nov. 4,

2011).

49.    Indeed, according to its most recent quarterly report, Ally Financial, GMACM's

parent, also believes its "exposure to mortgage representation and warranty claims is most

significant for loans originated and sold between 2004 through 2008, specifically the 2006 and

2007 vintages that were originated and sold prior to enhanced underwriting standards and risk-

mitigation actions implemented in 2008 and forward." Ally Fin. Inc., Quarterly Report (Form

10-Q), at 146 (Nov. 4, 2011).  The 2006-HE1 Transaction is, as its name implies, of the 2006

vintage, but also includes Mortgage Loans originated in 2007.

**(4)    Significant Possibility of Ally Financial Seeking Bankruptcy
Protection for ResCap, GMAC-RFC and GMACM**

50.    According to multiple published reports, as of November 9, 2011, Ally Financial

is considering filing for bankruptcy protection for ResCap, which has reportedly lost $555

million since 2009.  GMACM is a subsidiary of ResCap.

51.    In a Bloomberg News article dated November 14, 2011, entitled "*Ally May Put*

*ResCap in Bankruptcy to Ease IPO: Corporate Finance*," it was reported that "Derivatives

traders are betting that Ally Financial Inc. will place its Residential Capital LLC [ResCap]

mortgage unit into bankruptcy instead of supporting the business as the bank prepares for an

initial public offering."

52.    Indeed, Ally itself warned in its 2010 annual report that "[t]here is significant risk

that ResCap will not be able to meet its debt service obligations and other funding obligations in

the near term."  Ally Fin. Inc., Annual Report (Form 10-K), at 21 (Feb. 25, 2011).

**B.    GMACM's Securitizations and Financial Guaranty Insurance Generally**

**(1)    Financial Guaranty Insurance Policies**

53.    To increase the marketability of its RMBS, GMACM from time to time sought

credit enhancement for its securitizations from FGIC, a financial guaranty insurer, in the form of

financial guaranty insurance policies.  Such financial guaranty insurance policies were generally

issued to the indenture trustee for the insured securities, for the benefit of the holders of the

insured RMBS, to insure the risk of shortfalls in cash available to the trust to repay the insured

securities.

54.     In a typical GMACM-sponsored securitization, including the 2006-HE1 Transaction, GMACM, as servicer, remits proceeds from the mortgage loans backing the securitization to the indenture trustee, along with a servicer's certificate that details the distributions to be made.  Then, in accordance with the servicer's certificate, the indenture trustee allocates those funds to the payment of principal and interest due on the RMBS, as well as the payment of fees to GMACM and other participants, and in some cases to reserve funds and other uses.

55.     The primary source of the funds administered by the indenture trustee is the remittance of payments on the underlying loans.  Delinquencies by borrowers in making their mortgage loan payments, by definition, will reduce cash flows to the trust, which will directly impair the ability of the trust to meet its obligations.  Delinquencies, if not cured, will eventually result in mortgage loan charge-offs, which reduce the aggregate principal amount of the loan pool supporting the RMBS.   In this manner, high levels of mortgage loan delinquencies and defaults can lead to shortfalls in cash available to pay RMBS investors.  Such shortfalls result in claims on FGIC's policies.

56.     Under the terms of a financial guaranty insurance policy, like the one FGIC issued here, the insurer unconditionally and irrevocably guarantees to the indenture trustee for the benefit of the holders of the insured RMBS that, if there is a shortfall in cash available to it to make required payments on the insured securities, the financial guaranty insurer will pay the amount of the shortfall to the indenture trustee for the benefit of the holders of the insured securities.

**(2)    Securitization Sponsor's Disclosures and Representations and Warranties**

57.    The risk FGIC assumed when it agreed to issue a policy for RMBS depended upon the credit quality of the underlying mortgage loans, which in turn depended on the underwriting practices of the loan originators and the characteristics of the loans.  If, for instance, GMACM and other loan originators employed substandard underwriting practices, the underlying mortgage loans would be of inferior credit quality. Consequently, the credit risk— i.e., the risk of delinquency or default—of the underlying mortgages, and of the mortgage portfolio as a whole, would be materially increased.

58.    Accordingly,  FGIC generally required securitization sponsors, like GMACM, to provide substantial disclosures and representations and warranties about the characteristics of the underlying mortgage loans, including representations about the standards and procedures used to underwrite the loans.  Although a securitization may include mortgage loans that the sponsor did not originate itself, the sponsor is nonetheless typically required to make representations about those loans as well, thereby assuming the risk that those representations might not be accurate.

59.    Although the characteristics of the mortgage loans and the loan underwriting standards used were critical issues for FGIC, FGIC was not under a contractual duty, nor in a position, to evaluate those issues directly by re-underwriting the loans, due to the massive volume of paperwork involved and the time frame allocated to FGIC to complete the transaction. GMACM's disclosures, however, together with its representations and warranties, were intended to allow FGIC to assess the credit risk inherent in the mortgage loan pool before deciding to commit to the transaction.

60.    GMACM's representations and warranties in its RMBS transactions regarding the characteristics of the loans included in the mortgage loan portfolios, and the underwriting

standards used to evaluate those mortgage loans, are particularly vital because each loan pool

comprised thousands of mortgage loans, each of which was in itself a complex legal transaction.

Each loan file typically contains (or at least is supposed to contain) a mortgage application, a

credit report, income and employment verifications, an appraisal, the lender's internal

documentation and a wide variety of other documentation necessary to support proper loan

underwriting decisions.  Moreover, in seeking financial guaranty insurance from FGIC for the

2006-HE1 Transaction, GMACM demanded that FGIC commit to the pricing and other material

terms within a very limited time frame.  Both GMACM and FGIC understood and intended that

FGIC would rely on the information supplied by GMACM as sponsor, as well as GMACM's

representations and warranties concerning that information, in assessing the credit risk of the

mortgage loan pool.

61.    Further, on information and belief, for each of its securitizations, GMACM as

sponsor supplied the same data it provided to FGIC to one or several rating agencies in order for

those agencies to create expected loan level default and loss estimates.  The loan level default

and loss estimates were then used by the rating agencies to create cash flow projections and

potential loss estimates for the entire transaction.  Finally, the rating agencies delivered to the

sponsor and to FGIC a private credit assessment for the transaction (sometimes referred to as a

"shadow rating") without considering the effect of FGIC's policy.  The shadow rating provided

an overall evaluation of the likelihood of default on the securities FGIC would be insuring in the

securitization.  As sponsor, GMACM arranged for the shadow rating to be provided to FGIC

knowing that it was an essential condition to FGIC's willingness to issue a financial guaranty

insurance policy.

C.      **The GMACM 2006-HE1 Transaction**

62.      On March 30, 2006, GMACM pooled together and deposited many thousands of
fixed and adjustable rate Home Equity (Revolving) Lines of Credit ("HELOCs") and Home
Equity Loans ("HELs") into the GMACM Home Equity Loan Trust 2006-HE1.  The 2006-HE1
Trust served as the Issuer of $1,274,156,000 in aggregate principal amount of 2006-HE1 Notes.
Home equity loans are essentially second-lien mortgage loans, which are generally funded
entirely at the closing of the loan.  Home equity lines of credit are typically revolving credit lines
collateralized by second-lien mortgage loans, which can be drawn on at any time during an
extended period, and repaid at any time, subject to a maximum repayment period.

63.      The initial conveyance to the 2006-HE1 Trust by RAMP (acting as Depositor)
contained over 12,500 HELOCs with an aggregate outstanding principal balance of
approximately $593 million, and over 8,800 HELs with an aggregate principal balance of
approximately $368 million.  In all, the 2006-HE1 Trust contained at closing roughly 21,300
initial Mortgage Loans with an aggregate principal balance of approximately $961 million.
Investors in the GMACM-sponsored 2006-HE1 Transaction were issued a single class of
securities—the 2006-HE1 Notes (formally termed the GMACM Home Equity Loan-Backed
Term Notes, Series 2006-HE1)—which were collateralized by the mortgage loans transferred to
and held by the 2006-HE1 Trust.  In addition, approximately $320 million was deposited into a
pre-funding account at the closing, which was used to acquire additional mortgage loans in the
90 days following the closing.

64.      On March 30, 2006, GMACM entered into an Insurance and Indemnity
Agreement ("I&I Agreement") with FGIC.  The I&I Agreement was executed by FGIC (the
Insurer of the 2006-HE1 Transaction); GMACM (the Sponsor, a Seller and the Servicer of the
2006-HE1 Transaction); RAMP (the Depositor for the 2006-HE1 Transaction); Walnut Grove (a

Seller); and JPMorgan Chase Bank, N.A. ("JPMorgan") (the Indenture Trustee).  The Bank of

New York Trust Company, N.A., later became the successor in interest to JPMorgan as

Indenture Trustee.

65.     Also on March 30, 2006, Ally Bank (using its then-current name, GMAC Bank)

entered into a Custodial Agreement whereby it agreed to serve as Custodian of the underlying

mortgage loan notes on behalf of the 2006-HE1 Trust.  FGIC is an express third party

beneficiary of that agreement.  Custodial Agreement § 5.6.

66.     The I&I Agreement provides that FGIC (the Insurer) is a third-party beneficiary

of, and shall have all of the rights provided for in, the "Operative Documents."  I&I Agreement §

2.02(k).  The I&I Agreement defines "Operative Documents" to include, among other

documents:  the 2006 HE-1 Notes; the Mortgage Loan Purchase Agreement (the "MLPA") dated

as of March 30, 2006 among GMACM, RAMP, Walnut Grove and JPMorgan; the Servicing

Agreement dated as of March 30, 2006 among GMACM, the 2006-HE1 Trust and JPMorgan;

the Indenture dated as of March 30, 2006 between the 2006-HE1 Trust and JPMorgan; and the

Custodial Agreement dated as of March 30, 2006 among GMACM, JPMorgan, and Ally Bank.

I&I Agreement § 1.01.   Pursuant to the I&I Agreement FGIC—termed the "Enhancer" under

certain of the Operative Documents—insured $1,274,156,000 aggregate principal amount of the

2006-HE1 Notes.

67.     FGIC issued financial guaranty insurance policy number 06030037 for the 2006-

HE1 Notes.  The Policy increased the marketability of the 2006-HE1 Notes by mitigating risk for

potential investors and making the 2006-HE1 Notes eligible to be rated triple-A by the rating

agencies as of their date of issue.

68.     GMACM and the Depositor offered the 2006-HE1 Notes for sale pursuant to a prospectus, dated February 16, 2006 (the "Prospectus"), and a prospectus supplement (the "Prospectus Supplement"), dated March 29, 2006 (the Prospectus and the Prospectus Supplement, together with certain preliminary offering documents, each as further supplemented by any subsequent amendment or supplement thereto, and any other offering document that makes reference to the Policy, are referred to collectively as the "Offering Documents").  The Offering Documents touted the Policy and the "triple-A" initial rating of the 2006-HE1 Notes, which was made possible by the Policy.

69.     The 2006-HE1 Transaction was structured in such a way as to permit GMACM to add Subsequent Mortgage Loans to the pool during a specifically defined Revolving Period, which enabled GMACM to continue to shift the credit risk of such loans to investors and to FGIC for a defined period after the closing, and to realize immediate gains on the loans it sold to the trust.  GMACM represented and warranted to FGIC that the Subsequent Mortgage Loans would conform to the same contractual representations and warranties GMACM made about the loans and the underwriting of the loans that were in the pool at closing.  *See* MLPA § 3.1(b). Those representations and warranties were critical to FGIC's acceptance of this feature of the 2006-HE1 Transaction.

70.     As discussed more fully *infra*, Subsequent Mortgage Loans were also expressly not permitted to be added to the pool following the occurrence of a Managed Amortization Event, which, as defined, was deemed to occur whenever the Funding Account carried an average daily balance of greater than $10 million in any three-consecutive-month period.

**D.    GMACM Fraudulently Induces FGIC to Insure the 2006-HE1 Notes With Substantial Assistance from Ally Bank**

**(1)    GMACM's Fraudulent Inducement of FGIC**

71.     FGIC's participation in the 2006-HE1 Transaction was an essential component of the 2006-HE1 Transaction and enhanced GMACM's ability to market the securitization effectively.  The Policy allowed GMACM to sell the 2006-HE1 Notes with an initial triple-A credit rating, making them more attractive to a broader pool of potential investors.

72.     In order to induce FGIC to write financial guaranty insurance for the 2006-HE1 Transaction, GMACM provided to FGIC, directly or indirectly, a variety of information.  First, it provided a document (generally referred to as a "loan tape" ) detailing material characteristics of individual borrowers and loans expected to be included in the 2006-HE1 Transaction, together with representations regarding material statistics about the loan pool as a whole.  Second, it provided shadow ratings that it procured from the credit rating agencies.  Third, it provided registered initial and final Prospectus Supplements summarizing, among other material information, GMACM's loan underwriting guidelines and loan origination criteria.  Fourth, as discussed *infra*, it provided representations, warranties and affirmative covenants in the Operative Documents and the I&I Agreement regarding the mortgage loans specifically and the loan pool generally.

73.     ***Loan Tapes.***  The loan tapes provided by GMACM set forth, for each loan in the pool, key characteristics such as the borrower's FICO score and debt-to-income ("DTI") ratio and the loan-to-value ("LTV") ratio for the loan.  GMACM also disclosed in the Prospectus Supplement—with respect to the pool as a whole—aggregate characteristics also relevant to the assessment of the credit risk of the pool, including weighted averages of FICO scores and DTI and LTV ratios.

74.    ***Shadow Rating Letters***.  GMACM, on information and belief, provided Moody's and S&P with, at a minimum, the same mortgage loan tape that it also provided to FGIC.  Based on the information supplied by GMACM, Moody's assessed the credit quality of the loan pool and assigned a shadow rating of Baa2 to the 2006-HE1 Notes, while S&P assigned the 2006-HE1 Notes a shadow rating of BBB.  These shadow ratings met FGIC's minimum requirements. FGIC required these shadow ratings as an essential condition to its willingness to insure the 2006-HE1 Transaction.

75.    ***Prospectus Supplement Summarizing Underwriting Guidelines.***  In determining whether to insure the 2006-HE1 Notes, FGIC relied in part upon representations and warranties regarding GMACM's loan underwriting standards made by GMACM in the Prospectus and Prospectus Supplement. The Prospectus, as supplemented by the Prospectus Supplement, was filed with the SEC and became effective on March 29, 2006.  A Preliminary Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about March 28, 2006, in an email sent by Daniel Deaton, on behalf of GMACM.  The Final Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about March 29, 2006, in an email sent by Jeffrey Wittenberg on GMACM's behalf.

76.    In the Offering Documents, GMACM represented that, based on the data provided in the borrower's application and certain other applicable verifications, "a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property."  Prospectus at 29.  Further, in the Prospectus Supplement, GMACM also represented to FGIC that:

> The mortgage loans were selected for inclusion in the mortgage
> pool from among mortgage loans originated or purchased in
> connection with [GMACM's] Underwriting Standards . . . based
> on [GMACM's] assessment of investor preferences and rating
> agency criteria.

Prospectus Supplement at S-33.

77.    The Prospectus Supplement expressly states that GMACM's "underwriting

standards with respect to the [mortgage loans, including the Home Equity Lines of Credit and

Home Equity Loans] will generally conform to those published in the GMAC Mortgage

Corporation underwriting guidelines, including the provisions of the GMAC Mortgage

Corporation underwriting guidelines applicable to the GMAC Mortgage Home Equity Program."

Prospectus Supplement at S-38, S-42.

78.    GMACM publishes its loan underwriting standards in a document referred to in

the Prospectus Supplement as "the GMAC Mortgage Corporation underwriting guidelines" (and

referred to herein as the "Underwriting Guidelines").  Prospectus Supplement at S-38, S-39, S-42.

In general, the Underwriting Guidelines specify documentation requirements, and substantive

criteria for key credit-related characteristics, that borrowers must satisfy in order to qualify for a

particular mortgage loan or line of credit.  Depending upon the particular type of loan or line of

credit, these requirements and criteria may include asset verification, income verification,

employment verification, bank statements, payment histories and/or evidence of closing funds,

among other things.  The substantive criteria for eligibility address material characteristics of the

proposed loan, such as DTI and LTV ratios.

79.    GMACM represented in the Offering Documents that the loans had generally

been originated with a maximum DTI ratio of 45% and a maximum LTV ratio of 100%.  *See*

Prospectus Supplement at S-40, S-43.  GMACM also represented that for each mortgage loan it

had made a determination based upon all applicable employment, credit and property

information regarding whether the prospective borrower had sufficient monthly income available to meet the borrower's monthly obligations.  *See* Prospectus Supplement at S-41, S-45.

80.    ***GMACM's Contractual Representations and Warranties.***  As discussed *infra*, GMACM made numerous representations and warranties to FGIC in the I&I Agreement. GMACM's representations and warranties, and particularly GMACM's representation that the information supplied to FGIC was not materially inaccurate or misleading, materially induced FGIC to enter into the 2006-HE1 Transaction and to issue the Policy.  Further, the I&I Agreement's incorporation and restatement of the representations and warranties in the Operative Documents was intended to allow FGIC to rely upon each and every one of the representations and warranties that GMACM made in connection with the 2006-HE1 Transaction.

81.    FGIC, for its part, reasonably relied on the information available to it regarding the underlying mortgage loans and the representations and warranties provided by GMACM. Since FGIC had neither the right under the Operative Documents, nor the practical ability, to review the tens of thousands of underlying Mortgage Loan files prior to the closing of the 2006-HE1 Transaction, GMACM knew that FGIC had no choice but to rely on GMACM's representations regarding the underlying loans in determining whether to insure the 2006-HE1 Transaction.  Further, FGIC had no reason to believe that these representations were not true and accurate.

82.    Indeed, GMACM included more than 21,000 individual Mortgage Loans in the 2006-HE1 Transaction at closing.  Typically, each Mortgage Loan has its own voluminous file containing, among other items, a mortgage application, a credit report, income and employment verifications, the lender's internal documentation and other types of documentation necessary to

support each underwriting decision.  Unlike GMACM, FGIC was under no contractual duty whatsoever to review the more than 21,000 Mortgage Loans.  Instead, FGIC, as contemplated by the many representations, warranties, and affirmative covenants by GMACM regarding its loan origination, selection, and evaluation practices, and the credit quality of the Mortgage Loans, reasonably relied on GMACM to conduct its underwriting processes according to the promised standards and FGIC had no basis to conclude that GMAMC's representations and warranties were false.  Thus, FGIC reasonably believed that truthful and accurate information had been provided and that it would not face additional, hidden risk by virtue of key omissions or positive misrepresentations having been made.

83.    Based on the information received by FGIC and the representations and warranties given by GMACM, FGIC entered into the I&I Agreement and agreed to issue the Policy to the indenture trustee for the benefit of the holders of the 2006-HE1 Notes.  In return for doing so, FGIC received a modest annual premium, based on a small, fixed percentage of the aggregate principal balance of the 2006-HE1 Notes.  Specifically, FGIC received 0.12% per annum of the aggregate balance of the 2006-HE1 Notes for serving as insurer, a figure calculated to be commensurate with the risk that FGIC believed it was accepting, based on the representations, warranties and affirmative covenants provided by GMACM.

84.    As discussed *infra*, GMACM's information and representations and warranties, which are described above, were materially false when disclosed and/or provided by GMACM. GMACM knew that this information, and its representations and warranties, were materially false when made and that this information and the representations and warranties were essential to FGIC's decision to issue the Policy.  Indeed, GMACM intentionally made these material misrepresentations to induce FGIC to enter into the I&I Agreement and issue the Policy.  The

issuance by FGIC of the Policy—provided unwittingly by FGIC as a result of GMACM's fraudulent misrepresentations and breaches of warranty—made the 2006-HE1 Notes eligible to receive an initial triple-A credit rating, thus greatly increasing their marketability to potential investors.

**(2)      GMACM's Fraudulent Inducement of FGIC is Carried Out with Substantial Assistance from Ally Bank**

85.      Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently procuring the Policy from FGIC.  As it originated or acquired nearly 60% of the Mortgage Loans, Ally Bank was well aware of the true characteristics of the majority of the loan pool. Moreover, as a result of its affiliate status with GMACM, and its role as Custodian for the 2006-HE1 Transaction—for which it received substantial fees—Ally Bank was aware of the representations and warranties GMACM made to FGIC regarding the nature of GMACM's business practices and the characteristics of the Mortgage Loans (including the many thousands of Mortgages Loans that were originated by Ally Bank).

86.      With full knowledge that GMACM had not complied—and would not comply— with the representations and warranties it made to FGIC, and direct knowledge of the many thousands of loans it had originated and sold to GMACM, which formed a substantial part of the collateral for the 2006-HE1 Transaction, Ally Bank represented to FGIC that, as Custodian, it would inform FGIC if it discovered any non-compliant Mortgage Loans or non-compliance with GMACM's obligations under the Operative Documents.  By offering FGIC this false comfort, despite knowing that GMACM was fraudulently inducing FGIC to provide financial guaranty insurance for the 2006-HE1 Transaction, Ally Bank provided material assistance to GMACM's fraud.

### E.    GMACM's Representations, Warranties and Affirmative Covenants

87.    In connection with the 2006-HE1 Transaction, GMACM made numerous

representations, warranties and affirmative covenants to FGIC.    The representations and

warranties concerned, among other things, the way GMACM conducted its loan origination,

selection, and evaluation process, the characteristics of the Mortgage Loans, and the accuracy

and completeness of the information supplied to FGIC.    The characteristics of the Mortgage

Loans were detailed with respect to the initial Mortgage Loans in a schedule attached to the

Servicing Agreement, and, as to Subsequent Mortgage Loans, in similar schedules at the time of

their transfer to the 2006-HE1 Trust (such schedules collectively, the "Mortgage Loan

Schedule").

88.    Notably, under Section 2.01 of the I&I Agreement, GMACM made the following

representations and warranties, among others (emphasis added in each case):

♦    *Accuracy of Information.* **Neither the Operative Documents to which it is a**
**party nor other information relating to the Mortgage Loans**, the operations of
GMACM. . . or the financial condition of GMACM . . . furnished to [FGIC] . . .
by GMACM . . . including the Offering Documents . . . **contains any statement**
**of a material fact which was untrue or misleading in any material respect**
**when made** . . . GMACM  . . . has no knowledge of any circumstances that could
reasonably be expected to cause a Material Adverse Change with respect to
GMACM . . . Since the furnishing of the Documents, there has been no change
nor any development or event involving a prospective change known to
GMACM . . . that would render any of the Documents untrue or misleading in any
material respect.

♦    *Compliance with Securities Laws.*    The offering and sale of the Securities
complies in all material respects with all requirements of law, including the
registration requirements of the Securities Act and any other applicable securities
laws.    **The Offering Documents do not contain any untrue statement of a**
**material fact and do not omit to state material fact necessary to make the**
**statements made therein, in light of the circumstances under which they were**
**made, not misleading** . . . .

♦    *Operative Documents.*    **Each of the representations and warranties of**
**GMACM . . . contained in the applicable Operative Documents and the**

- 28 -

**Underwriting Agreement is true and correct in all material respects** [and] GMACM . . . hereby makes each such representation and warranty to, and for the benefit of, [FGIC] as if the same were set forth in full herein.

♦   *Solvency; Fraudulent Conveyance.*   GMACM . . . is solvent and will not be rendered insolvent by the Transaction and . . . **GMACM . . . shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business**, and . . . GMACM . . . does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. . . . GMACM  . . . is not transferring the Mortgage Loans . . . with any intent to hinder, delay or defraud . . . creditors.

89.     *First*, in the I&I Agreement, GMACM represented and warranted to FGIC that "[n]either the Operative Documents to which it is a party nor other information relating to the Mortgage Loans. . . including the Offering Documents . . . contains any statement of a material fact which was untrue or misleading in any material respect when made."  I&I Agreement § 2.01(j).  Through these Operative and Offering Documents, GMACM communicated several material facts about the characteristics of the mortgage loans sold to the 2006-HE1 Trust.

90.     *Second*, as discussed *supra*, in the Prospectus Supplement, GMACM represented that all of the mortgage loans sold to the 2006-HE1 Trust had been underwritten generally in accordance with GMACM's underwriting standards, including the GMAC Mortgage Home Equity Program.  Prospectus Supplement at S-38, S-42.

91.     *Third*, the I&I Agreement incorporated by reference, for the direct benefit of FGIC, the representations and warranties contained in the "Operative Documents," as that term was defined in the I&I Agreement.  *See* I&I Agreement §§ 1.01, 2.01(l).  The incorporation by reference of the Operative Documents into the I&I Agreement was intended to allow FGIC itself to rely upon any representation and warranty that GMACM made to any other entities, such as investors or the Indenture Trustee, in connection with the 2006-HE1 Transaction.

92.     *Fourth*, GMACM also separately represented and warranted in the I&I

Agreement that "[t]he Offering Documents do not contain any untrue statement of a material fact

and do not omit to state material fact necessary to make the statements made therein, in light of

the circumstances under which they were made, not misleading."  § 2.01(k).

93.     Among the representations and warranties incorporated and restated in the I&I

Agreement from the Operative Documents are certain representations and warranties regarding

the underwriting of the Mortgage Loans.  These representations and warranties set forth the

standards governing each Mortgage Loan, including, significantly, the representation that each

Mortgage Loan had been underwritten in compliance with GMACM's underwriting guidelines.

*See* MLPA § 3.1(xxxvii).

94.     In particular, in the MLPA, GMACM represents and warrants, as to each

Mortgage Loan:

♦  The information set forth in the Mortgage Loan Schedule with respect to each
Mortgage Loan or the Mortgage Loans is true and correct in all material respects
as of the date or dates respecting which such information is initially furnished;

♦  As of the Cut-Off Date or related Subsequent Cut-Off Date, no Mortgage
Loan was 30 days or more delinquent in payment of principal or interest;

♦  With respect to the GMACM Initial Mortgage Loans or, as applicable, any
Subsequent Mortgage Loans sold by GMACM, the related Mortgage File contains
or will contain, in accordance with the definition of "Mortgage File" in Appendix
A to the Indenture, each of the documents and instruments specified to be
included therein;

♦  As of the Cut-Off Date or Subsequent Cut-Off Date, the Combined Loan-to-
Value Ratio [("CLTV")] for each Mortgage Loan was not in excess of 100.00%;

♦  GMACM used no selection procedures that identified the Mortgage Loans as
being less desirable or valuable than other comparable mortgage loans originated
or acquired by GMACM under the GMACM Home Equity Program.

95.     Moreover, in the I&I Agreement GMACM specifically covenanted that it "shall

comply in all material respects with the terms and conditions of and perform its obligations

under the Operative Documents to which it is a party . . . ." I&I Agreement § 2.02(a).  The I&I

Agreement also expressly identifies FGIC as a third-party beneficiary with respect to the

Operative Documents.  *See* I&I Agreement § 2.02(k).

96.     GMACM made these extensive representations and warranties to FGIC in order

to induce FGIC to issue the Policy, and thereby assumed and allocated to itself all risk associated

with the Mortgage Loans failing to comply with GMACM's representations and warranties.

97.     The I&I Agreement also incorporates the representations and warranties that

GMACM made in the Servicing Agreement in its capacity as Servicer.  *See* I&I Agreement §

2.01(l).  In the Servicing Agreement, for example, GMACM covenanted, represented, and

warranted that it would service the Mortgage Loans in the 2006-HE1 Transaction in a manner

consistent with its own servicing guidelines.  *See* Servicing Agreement § 3.01(a).

98.     The I&I Agreement requires *inter alia* that GMACM furnish or cause to be

furnished to FGIC "promptly upon receipt thereof, copies of all schedules, financial statements

or other similar reports delivered to or by GMACM . . . [as well as] promptly on request such

other data as [FGIC] may reasonably request."  I&I Agreement § 2.02(c)(v),(A),(B).

99.     The I&I Agreement further affords FGIC the express right "to conduct an ongoing

review of GMACM's practices as Servicer through reviews of the Mortgage Loans, reappraisals

of Mortgaged Properties and reviews of servicing practices."  I&I Agreement § 2.02(p).  FGIC

also has the express right to "inspect the books and records of GMACM . . . [and  to] discuss the

affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and

with GMACM's consent, which consent shall not be unreasonably, withheld or delayed, to

discuss the affairs, finances and accounts of GMACM with GMACM's independent

accountants." I&I Agreement § 2.02(e)(i)-(iii).

100.    FGIC had no reason to believe that any of the representations and warranties

made by GMACM were not true and accurate.

F.    **GMACM's Pervasive and Material Breaches of Its Representations, Warranties and Affirmative Covenants**

101.    As discussed above, FGIC relied on material representations and warranties made

by GMACM regarding the manner in which GMACM or others originated, selected, and

evaluated Mortgage Loans, the characteristics of those loans, and the accuracy and completeness

of information it supplied to FGIC.  Based on those representations and warranties, FGIC

reasonably believed that it understood the risk it would assume upon issuing the Policy.  In fact,

as demonstrated by the extreme levels of delinquencies and losses detailed below, the risk that

FGIC assumed when it issued the Policy was many times greater than the risk disclosed by

GMACM's representations and warranties.   GMACM materially breached its representations

and warranties to FGIC, and FGIC has been damaged as a result of those breaches.

102.    The 2006-HE1 Transaction has performed extremely poorly; delinquencies and

defaults for Mortgage Loans in the 2006-HE1 Transaction have been substantial, thus

diminishing cash flow to the 2006-HE1 Trust, which has caused, and will continue to cause,

substantial claims to be presented to FGIC under the Policy to cover these shortfalls.  As of

October, 2011, a staggering total of 4,763 mortgage loans had been charged-off or were

delinquent. The total balance of these charged-off or delinquent loans accounts for nearly 15% of

the balance of the entire loan pool.

103.    As of November 2011, more than $91 million in claims had been presented to

FGIC in connection with the 2006-HE1 Transaction. FGIC expects tens of millions of dollars

more in claims to be presented with respect to the 2006-HE1 Transaction in the future.

104.    As an increasingly high percentage of the 2006-HE1 mortgage loans enter

delinquency and default, FGIC has uncovered a wealth of material breaches of GMACM's

representations and warranties regarding the characteristics of the loans and the standards to

which they were underwritten.

### (1)    Breaches Identified Through Initial Review

105.    When FGIC became concerned about the high delinquencies and default rates in

the 2006-HE1 Transaction, FGIC requested that GMACM provide it with certain Mortgage Loan

files underlying the 2006-HE1 Transaction.

106.    FGIC selected for review 121 non-performing (i.e., non-current or charged-off)

loans that had resulted in a loss to the 2006-HE1 Trust.  To perform this review, FGIC hired an

independent outside consultant with particular skill, experience, and expertise in the review,

evaluation, and re-underwriting of mortgage loans.

107.    That review revealed that GMACM had breached one or more material

representations and warranties on 103 of the 121 loans, or approximately 85% of the loans

reviewed.

108.    A small sample of these material breaches and underwriting violations are listed

below:

- Loan Number 8253418290: due to an undisclosed second mortgage, the loan closed
  with a CLTV of 148.77%.  In order for this mortgage loan to have been eligible for
  inclusion in the 2006-HE1 pool, the relevant guidelines for the particular type of loan
  underwritten permit a maximum CLTV ratio of 100%.

- Loan Number 8255068044: due to an income misrepresentation, the loan closed with a DTI of 106.49%. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE1 pool, the relevant guidelines for the particular type of loan underwritten permit a maximum DTI ratio of 50%.

- Loan Number 8259971235: the borrower had a payment history evidencing multiple delinquencies on a prior loan within the prior year and the loan closed with a DTI of 58.83%. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE1 pool, the relevant guidelines for the particular type of loan underwritten require that the borrower have made no late payments on any prior loans within the twelve month period preceding the date of the mortgage loan. Further, the relevant guidelines permit a maximum DTI ratio of 50%.

- Loan Number 8601459619: the borrower never made a single payment on the loan and it was therefore delinquent at the time it was transferred to the 2006-HE1 Trust. GMACM represented and warranted to FGIC that no mortgage loan was 30 days or more delinquent in payment of principle or interest at the time of payment.

- Loan Number 8655697712: the loan closed with a DTI of 69.30% and a CLTV of 88.84%. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE1 pool, the relevant guidelines for the particular type of loan underwritten permit a maximum DTI of 45% and a maximum CLTV of 85%.

109.    These examples of underwriting violations—but a small smattering of the extensive defects among the Mortgage Loans—evidence significant breaches of the MLPA, under which GMACM represented and warranted that (i) the information set forth in the Mortgage Loan Schedule is true and correct in all material respects; (ii) no Mortgage Loan was 30 days or more delinquent as of March 1, 2006; (iii) each Mortgage File contains all required documents and instruments; (iv) the CLTV of each Mortgage Loan did not exceed 100%; and (v) GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (i.e. the Home Equity Loan Program). *See* MLPA § 3.1. It is reasonable to conclude—based on what is now known by FGIC and as a result of what is being wrongly withheld from FGIC—that a substantial majority of the 27,400 initial and pre-funded Mortgage Loans (amounting to over $1.2 billion) held by the 2006-HE1 Trust, and the approximately 13,300 Subsequent Mortgage

Loans (amounting to over $600 million), evidence similar breaches of GMACM's

representations and warranties.

110.    Moreover, on information and belief, GMACM is and has been aware that many

of the Mortgage Loans, whether acquired at the closing or thereafter, were nonconforming and,

thus, in breach of its own representations and warranties.  Despite this knowledge, GMACM has

failed to repurchase the nonconforming loans with conforming loans, as is required under the

Operative Documents.

### (2)    Breaches Identified Through Additional Review

111.    In 2010, as the 2006-HE1 Transaction continued to perform poorly, FGIC again

retained a professional mortgage loan review team to identify, review, and evaluate a statistically

significant sample of mortgage loans in the 2006-HE1 Transaction.

112.    On December 9, 2010, FGIC wrote GMACM via e-mail demanding that

GMACM provide additional Mortgage Loan files to FGIC, including origination files, servicing

notes, and custodian files, for a random sample of 431 2006-HE1 loans.  Having received no

response from GMACM, FGIC sent a follow-up e-mail on February 3, 2011, concerning the

status of its December 9 request for files.

113.    On February 14, 2011, and again on April 26, 2011, FGIC sent a further follow-

up letter requesting loan files.

114.    In finally responding to FGIC's fourth request for information, GMACM refused

to provide any loan files or other information relating to current or pre-paid loans ("Performing

Loans").   Instead, it only provided FGIC with a small sampling (257 of 431) of the requested

loan files, consisting largely of non-performing loans, and chose to conceal the Performing Loan

files from FGIC.

115.    Pursuant to the Servicing Agreement and the I&I Agreement, FGIC is entitled to reasonable access to the documentation regarding all of the Mortgage Loans.  Section 2.02(p) of the I&I Agreement provides that "FGIC shall have the right, so long as any of the 2006-HE1 Notes remains outstanding, to conduct an ongoing review of GMACM's practices as Servicer through reviews of the Mortgage Loans . . . ."  Notably, there is no limitation in the I&I Agreement as to the nature of the Mortgage Loans files that are subject to review.

116.    By only producing non-performing Mortgage Loan files, GMACM has refused to comply with FGIC's reasonable and permissible requests for information, and has arbitrarily and unreasonably imposed limitations on FGIC's contractual right to reasonable access to Mortgage Loan files in contravention of the Operative Documents.

117.    On April 26, 2011, having still received none of the remaining performing 2006-HE1 Mortgage Loan files it requested, FGIC sent a further letter requesting the remaining loan files.  To date, GMACM has not responded.

118.    FGIC's independent loan consultant reviewed the 257 loan files FGIC did receive from GMACM.  That review revealed that GMACM had breached one or more material representations with respect to 245, or an astounding 95%, of these loans.

119.    Based on the information gathered from this random sample review, FGIC estimates a Transaction-wide defect rate as high as 88%.

### (3)    GMACM's Pervasive and Material Breaches of Its Representations and Warranties and Affirmative Covenants

120.    As indicated above, FGIC ultimately obtained access to 378 mortgage loan files (the 121 files FGIC initially reviewed, as well as the 257 files it belatedly received from GMACM) which FGIC's independent consultant reviewed to evaluate and re-underwrite the

mortgage loans. These reviews revealed that GMACM breached one or more material representations with respect to 348—approximately 92%—of the Mortgage Loans reviewed.

121.    Moreover, despite its express obligations under the MLPA and the I&I Agreement, GMACM continues to refuse to repurchase or cure over 300 of the 348 non-compliant and defective loans that FGIC has asked GMACM to repurchase.

122.    The pervasive and blatant defects in the Mortgage Loan files reviewed to date indicate the clear breach of GMACM's contractual representations, warranties and covenants relating to, among other things, the characteristics of the Mortgage Loans, including the guidelines under which the Mortgage Loans were underwritten. Specifically, GMACM has breached representation and warranties stating that:

- neither the Operative Documents nor any information related to the Mortgage Loans contain any untrue or misleading statement of material fact;

- the Offering Documents (i.e. the Prospectus and Prospectus Supplement) contain no untrue or misleading statement of material fact;

- each representation and warranty of GMACM in the Operative Documents (including each representation and warranty in the MLPA) is true and correct in all material respects;

- the information set forth in the Mortgage Loan Schedule is true and correct in all material respects;

- no Mortgage Loan was 30 days or more delinquent as of March 1, 2006 (or the date the loan was transferred to the 2006-HE1 Trust);

- each Mortgage File contains all required documents and instruments;

- the CLTV of each Mortgage Loan did not exceed 100%; and

- GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (i.e. the Home Equity Loan Program).

123.    Moreover, the true scope of GMACM's many material underwriting failures is unknown given GMACM's refusal to provide FGIC with pertinent—and contractually

required—information.  This refusal in itself constitutes a breach of GMACM's affirmative

covenant to comply with FGIC's reasonable requests regarding access to information regarding

the Mortgage Loans.

### G.    Ally Bank's Breaches of The Custodial Agreement

124.    Under the Custodial Agreement, to which FGIC is an express third party

beneficiary, *see* Custodial Agreement § 5.6, and through which Ally Bank received substantial

fees, Ally Bank undertook several obligations to FGIC concerning the manner in which Ally

Bank would ensure that the Mortgage Loans contained complete and accurate information and

that GMACM was in compliance with its representations and warranties regarding the

origination, selection, and characteristics of those loans.

125.    Ally Bank agreed that it would "hold the Mortgage Notes and any Loan

Agreement relating to any Subsequent Mortgage Loan," and that it would review the Mortgage

Notes and deliver to FGIC a certification of "the completeness of the receipt of the Mortgage

Notes."  Custodial Agreement §§ 2.1, 2.2.

126.    Ally Bank further agreed to notify FGIC of breaches of the MLPA by GMACM,

by providing that: "Upon discovery by the Custodian of a breach of any representation or

warranty made by [GMACM] in the Purchase Agreement . . .with respect to a Mortgage Loan . . .

the Custodian shall give prompt written notice to [FGIC]."  Custodial Agreement §  2.3.

127.    An initial review of a small percentage of defective Mortgage Loans has revealed

that in many instances the Mortgage Note was not included in the loan file.  The lack of a

Mortgage Note within a particular file constitutes a breach of the representations and warranties

given by GMACM in the MLPA.  Ally Bank should have been aware of the fact that Mortgage

Notes were missing from certain Mortgage Loan files, and that this was a breach of the MLPA

representations and warranties.  Consequently, it should have notified FGIC pursuant to its own

obligations under the Custodial Agreement. *See* Custodial Agreement §§ 2.1-2.3. Ally Bank has, however, failed to provide FGIC with any notices regarding defects in any Mortgage Loan file, and has further provided inaccurate and/or incomplete certifications regarding the Mortgage Loans, thereby breaching the Custodial Agreement to which FGIC is an express third party beneficiary.

128.    Moreover, Ally Bank had an obligation to notify FGIC of any breach by GMACM of the MLPA representations and warranties that it discovered, not just those pertaining to the Mortgage Note. Since Ally Bank originated nearly 60% of the Mortgage Loans in the 2006-HE1 Transaction—which have suffered astounding defect rates—it must have been keenly aware of the breadth and scope of the underwriting failures with respect to those loans. Ally Bank, thus, must have known that GMACM was in breach of the representations and warranties in the MLPA, and its failure to so notify FGIC was a further breach of the Custodial Agreement.

### H.    GMACM's Fraud

129.    The massive and blatant material breaches of GMACM's representations and warranties, including the extensive underwriting failures by GMACM, and the poor credit quality of almost all of the Mortgage Loans, demonstrate the knowing and wanton disregard of the  material representations and warranties and affirmative covenants GMACM made to FGIC. The extraordinarily high defect and default rate among the Mortgage Loans demonstrates not merely that GMACM breached its representations and warranties as a contractual matter, but that it did not—and never intended to—comply with them, despite representing to FGIC that, if FGIC issued the Policy, it (GMACM) would comply with all of its representations and warranties. Because GMACM refuses to provide all of the requested Mortgage Loan files in violation of its

contractual obligation to do so, however, the full extent and scope of the fraud has yet to be revealed.

130.    All of the Mortgage Loans underlying the securitizations were originated or acquired by GMACM.  As such, GMACM had unique access and ability to evaluate the Mortgage Loan files.

131.    To induce FGIC to enter into the 2006-HE1 Transaction, GMACM provided FGIC with loan tapes, which contained false and misleading information regarding, among other things, the LTV and DTI ratios and FICO scores of borrowers.

132.    In addition, GMACM made critical misrepresentations to FGIC with respect to the credit rating agencies' assessment of the loans that were to comprise the 2006-HE1 Trust. GMACM was well aware that FGIC would not agree to insure the 2006-HE1 Notes unless GMACM obtained shadow ratings from the rating agencies that satisfied FGIC's minimum requirements.  To this end, upon information and belief, GMACM provided Moody's and S&P with the same false information regarding the credit quality of the underlying mortgage loans that it also provided to FGIC.  Based on this faulty information, Moody's and S&P assigned shadow ratings regarding the credit quality of the 2006-HE1 Notes that met FGIC's minimum requirements—Baa2 and BBB, respectively.  In this way, GMACM made both direct and indirect misrepresentations to FGIC—first, by providing faulty information to the rating agencies to provide a risk assessment that GMACM would pass on to FGIC, and second, by causing shadow ratings of the 2006-HE1 Notes to be delivered to FGIC without disclosing to FGIC that those ratings were based on incomplete and inaccurate loan-level data.

133.    GMACM also made material representations and warranties and affirmative covenants to FGIC, on which FGIC relied, about the manner in which it conducted its loan

origination, selection, and evaluation process, and the characteristics of the Mortgage Loans,

including the guidelines under which the Mortgage Loans were underwritten.

134.    For example, in the Prospectus Supplement (and in the I&I Agreement by

incorporation) GMACM assured FGIC that the loans it sold into securitizations "were originated

generally in accordance with the underwriting standards of GMAC Mortgage Corporation."

Prospectus Supplement at S-33, S-36.  GMACM represented to FGIC that, in the case of each

loan within the pool, an underwriter had made an assessment that the borrower had the ability to

repay his or her loan, after receiving and reviewing all applicable employment, credit, and

property information.  In fact, GMACM was not verifying the ability of borrowers to repay their

loans in compliance with its own underwriting guidelines accurately or at all.  As a result,

GMACM misrepresented facts that were uniquely within its knowledge.

135.    Moreover, the MLPA (and the I&I Agreement by incorporation) also contained

false and misleading representations about the Mortgage Loans.  In particular, GMACM

misrepresented that: (i) the information set forth in the Mortgage Loan Schedule is true and

correct in all material respects; (ii) no Mortgage Loan was 30 days or more delinquent as of

March 1, 2006; (iii) each Mortgage File contains all required documents and instruments; (iv) the

CLTV of each Mortgage Loan did not exceed 100%; and (v) GMACM selected the Mortgage

Loans in accordance with its underwriting guidelines (i.e. the Home Equity Loan Program).  The

true information regarding these loans—as known by GMACM—simply could not substantiate

GMACM's assurances.  In short, no amount of GMACM promising that the loans met certain

standards, despite knowing otherwise, actually made those promises true.

136.    GMACM knew that its representations were materially false and that these false

representations were essential to FGIC's decision to issue the Policy.  Those representations and

warranties were false when stated.  GMACM intentionally made these material

misrepresentations to induce FGIC to enter into the I&I Agreement and to issue the Policy.

137.    GMACM knew when making the representations and warranties regarding the

Mortgage Loans to FGIC prior to FGIC agreeing to issue the Policy that GMACM never

intended to honor those representations and warranties, as is evidenced, *inter alia*, by the

extraordinary breadth and depth of the problems FGIC has uncovered with respect to the

underwriting and characteristics of those loans, and the poor performance of the 2006-HE1

Trust.  In short, in order to induce FGIC to issue the Policy, GMACM represented to FGIC that,

if FGIC issued the Policy, GMACM would comply with its contractual representations and

warranties, despite knowing that it had not complied—and would not comply—with those very

same obligations.

138.    GMACM's repeated fraudulent acts have exposed it to investigations by the DOJ

and the SEC, including the receipt of a subpoena served in connection with GMACM's

suspected fraudulent origination and underwriting practices, as well as to a multitude of suits and

the potential for more litigation to come.

139.    Consistent with this pattern of behavior, GMACM defrauded FGIC into issuing

the Policy, through its knowing misrepresentations.

## I.    Ally Bank Aids and Abets GMACM's Fraud

140.    Ally Bank provided substantial assistance to GMACM in fraudulently inducing

FGIC to issue the Policy.  In its role as Custodian—for which it received substantial fees—Ally

Bank undertook to provide "prompt written notice" to FGIC of any breaches of the

representations and warranties in the MLPA that it discovered.  The MLPA, *see supra* at ¶ 94,

contained several representations and warranties regarding the characteristics of the underlying

mortgage loans as well as loans subsequently transferred to the 2006-HE1 Trust.

141.    As an originator of nearly 60% of the Mortgage Loans, Ally Bank was well aware of the true nature of the loan pool.  Moreover, as a result of being a key part of the 2006-HE1 Transaction and its affiliate status with GMACM, Ally Bank must have been aware of the representations and warranties GMACM routinely made to financial guaranty insurers—and did make here to FGIC—regarding the nature of GMACM's business practices and the quality of the mortgage loans that collateralized its many RMBS transactions, including the 2006-HE1 Transaction.

142.    Against this backdrop, Ally Bank represented to FGIC that, if the 2006-HE1 Transaction was consummated, it (Ally Bank) would hold and monitor certain key information and documentation regarding the Mortgage Loans, and would provide notice to FGIC of any breaches by GMACM of which it was aware with respect to GMACM's representations and warranties to FGIC.  As must have been known to Ally Bank, those representations and warranties made by GMACM directly concerned the Mortgage Loans, including the 60% of them that Ally Bank itself had originated.  Ally Bank made these representations to FGIC with full knowledge that GMACM had not complied—and would not comply—with its relevant representations and warranties, and, accordingly, that they were false.  By representing to FGIC that it would (a) hold and certify the accuracy of certain key information and documentation regarding the Mortgage Loans, the majority of which it had originated itself, and (b)  inform FGIC of any failure by GMACM to comply with its obligations, Ally Bank materially aided GMACM's fraudulent inducement of FGIC to issue the Policy.  The issuance of the Policy, which made the 2006-HE1 Transaction possible, inured to the significant financial benefit of Ally Bank, given that it collected substantial fees as Custodian and also perpetuated the market for its loan origination and sales business.

### J.      The Managed Amortization Event

143.      As discussed below, under the plain language of the 2006-HE1 Transaction

documents, GMACM failed to properly give effect to the existence of a "Managed Amortization

Event."  Accordingly, GMACM improperly added 12,712 new loans, having an aggregate

principal amount of approximately $580 million, to the 2006-HE1 Trust through subsequent

transfers.

### (1)      The Operative Documents Control the Occurrence of a Managed Amortization Event

144.      Under the Operative Documents, GMACM, as Servicer of the 2006-HE1 Trust, is

required to establish a Custodial Account in which it must deposit any payments made by

borrowers on the Mortgage Loans (i.e., the principal and interest payments made by mortgagors).

Servicing Agreement § 3.02(b).

145.      Additionally, under the Operative Documents, the Indenture Trustee is required to

establish a segregated trust account known as the Funding Account.  Servicing Agreement §

3.16(a).  As Servicer of the 2006-HE1 Trust, GMACM is required, "on each Payment Date

during the Revolving Period, . . . to withdraw from the Custodial Account and deposit into the

Funding Account the aggregate amount of Principal Collections remaining after the purchase of

all Additional Balances or Subsequent Mortgage Loans on or prior to such Payment Date."

Servicing Agreement § 3.16(a).

146.      A revolving period, in the context of a securitization, is generally the time during

which cash available to the trust may properly be reinvested in new collateral for the pool rather

than being used to repay the securities.  Under the Operative Documents for the 2006-HE1

Transaction, the Revolving Period was defined as: "the period beginning on the Closing Date

and ending on the earliest of (i) the Payment Date occurring in September 2007, (ii) the

occurrence of a Managed Amortization Event or (iii) the occurrence of a Rapid Amortization

Event." Indenture, Appendix A. As further described below, a "Managed Amortization Event"

was defined as a period beginning on the first date when the balance of the particular account

from which cash available to the trust may properly be reinvested in new loans for the pool, for

any reason, exceeds a specified amount. *See id.*

147.   In the 2006-HE1 Transaction, during the Revolving Period, GMACM could use

the funds in the Funding Account, subject to certain conditions, to purchase:

> Subsequent Mortgage Loans that are HELOCs, if any, in an
> amount equal to (1) the aggregate Principal Balance of all such
> Subsequent Mortgage Loans purchased from such Seller during the
> related Collection Period or (2) if the Servicer has applied amounts
> on deposit in the Custodial Account representing Principal
> Collections for such Collection Period toward the purchase of
> Subsequent Mortgage Loans that are HELOCs, the excess if any,
> of the aggregate Principal Balance of all such Subsequent
> Mortgage Loans purchased from such Seller over such Principal
> Collections.

Servicing Agreement § 3.16(c)(i)(B). In consideration for the payment of funds from the

Funding Account, the Operative Documents require that the seller from whom the new loans are

purchased transfer the new loans into the 2006-HE1 Trust. *See* MLPA § 2.2(a). The MLPA also

requires GMACM to deliver to FGIC, within five days after the transfer, a copy of the Mortgage

Loan Schedule reflecting the Subsequent Mortgage Loans in electronic format. *See* MLPA §

2.2(c). Further, if a Subsequent Mortgage Loan is outside certain criteria, GMACM is required

to seek and obtain FGIC's agreement to the transfer of the mortgage loan to the 2006-HE1 Trust

as a Subsequent Mortgage Loan, subject to certain conditions, including that GMACM must

increase the over-collateralization amount for 2006-HE1 Trust in order to reduce FGIC's

potential exposure. *See* MLPA 2.2(d).

148.    Significantly, GMACM may transfer Subsequent Mortgage Loans only if "the Revolving Period shall not have terminated."  MLPA § 2.2(b)(v).  The Revolving Period ends, *inter alia*, upon "the occurrence of a Managed Amortization Event."  Indenture, Appendix A.

149.    A Managed Amortization Event, as defined in the current version of the Indenture, is "deemed to occur if . . . for any three month consecutive period, the average of the daily balances on deposit in the Funding Account for such three consecutive months is greater than $10,000,000."  Indenture, Appendix A.

### (2)    The Initial Managed Amortization Event Definition

150.    The currently operative version of the Managed Amortization Event definition was included in the Indenture in or around May 2006—approximately six weeks after the initial closing date of the 2006-HE1 Transaction.

151.    At the closing of the 2006-HE1 Transaction on March 30, 2006, the Prospectus Supplement issued by GMACM in conjunction with the offering of the 2006-HE1 Notes and dated March 29, 2006, defined a Managed Amortization Event as "the event deemed to occur on any date on which the amount on deposit in the Funding Account equals or exceeds $10,000,000."  Prospectus Supplement at S-64.  As relevant here, then, the Operative Documents strictly limited the transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust by creating an iron-clad requirement, namely: that the Revolving Period shall not have terminated due to a Managed Amortization Event having been triggered by the Funding Account having a balance of greater than $10,000,000.

152.    In April 2006, the Funding Account held an ending balance of nearly $15,000,000. As such, under the then-operative definition, a Managed Amortization Event would have been triggered almost as soon as the 2006-HE1 Transaction closed.  FGIC was not aware, and

GMACM did not provide notice, of the fact that the Managed Amortization Event had been triggered.

> **(3)      GMACM Changes the Managed Amortization Event Definition After a Managed Amortization Event Has Already Occurred**

153.    Sometime in or around late April to early May 2006, GMACM approached FGIC in an effort to change the definition of Managed Amortization Event under the Operative Documents.  Ultimately, FGIC agreed to GMACM's proposed change, as reflected in Appendix A to the Indenture, such that the Managed Amortization Event was deemed triggered "if, beginning in June 2006, for any three month consecutive period, the average of the daily balances on deposit in the Funding Account for such three consecutive months is greater than $10,000,000."  Although GMACM never executed a formal amendment to the Operative Documents, and did not obtain the consent of either the relevant credit rating agencies or the Indenture Trustee, the altered Indenture, together with its Appendix A containing the governing definitions, was filed with the SEC on or about May 17, 2006, and is dated "as of March 30, 2006 [i.e., the closing date]."

154.    Assuming that the revised definition was operative on or about May 17, 2006, the Operative Documents still strictly limit the transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust, although the altered—but still inflexible—requirement is that the Revolving Period shall not have terminated due to a Managed Amortization Event having been triggered by the existence of a three-consecutive-month period in which the Funding Account held an average daily balance of greater than $10,000,000.

   **(4)  A Managed Amortization Event Occurs Under GMACM's Modified Definition**

155. In the three-consecutive-month period from May 2006 to July 2006, the Funding Account held an average daily balance of greater than $10,000,000, such that a Managed Amortization Event was deemed to have occurred as of July 2006.

156. Accordingly, by operation of clear and express provisions in the Operative Documents, the Revolving Period automatically (and without the need for any action by any party) ended at the time that such Managed Amortization Event occurred.  Once the Revolving Period ended, GMACM was prohibited from transferring any new loans to the 2006-HE1 Trust.

157. Notwithstanding this fact, GMACM failed to calculate and give effect to the fact that a Managed Amortization Event had occurred in July 2006, ending the Revolving Period, and continued to improperly transfer Subsequent Mortgage Loans into the 2006-HE1 Trust.  *See* MLPA § 2.2(b)(v); Indenture, Appendix A.

158. Notwithstanding the termination of the Revolving Period, GMACM improperly sold and added to the 2006-HE1 Trust, through fifteen (15) Subsequent Transfers, an aggregate principal amount of $578,445,325.61 in improper Subsequent Mortgage Loans.

159. The below table sets forth the amount of principal balance in each of the fifteen (15) improper Subsequent Transfers that GMACM effected:

| Month | Subsequent Transfer Amount ($) |
|---|---|
| Jul-06 | 32,099,929.96 |
| Aug-06 | 37,199,985.80 |
| Sep-06 | 38,299,997.82 |
| Oct-06 | 42,999,999.71 |
| Nov-06 | 37,499,997.95 |
| Dec-06 | 27,101,022.31 |
| Jan-07 | 53,937,029.04 |
| Mar-07 | 67,749,920.19 |
| Apr-07 | 44,924,807.40 |
| May-07 | 36,359,900.58 |
| Jun-07 | 34,560,875.41 |

| | |
|---|---|
| Jul-07 | 36,821,863.84 |
| Aug-07 | 33,499,999.50 |
| Sep-07 | 29,099,337.99 |
| Oct-07 | 26,290,658.11 |
| **Total** | **578,445,325.61** |

160.    Further, the Subsequent Mortgage Loans transferred into the 2006-HE1 Trust have performed much worse than the initial and pre-funded Mortgage Loans.  As of October 1, 2011, approximately 20% of the balance of the over $578 million in improperly transferred Subsequent Mortgage Loans has been charged-off, defaulted, or was severely delinquent, as compared to approximately 12.7% of the balance of the earlier Mortgage Loans as of the same time period.

161.    With respect to each Subsequent Transfer for which FGIC received the required Subsequent Transfer Agreement, GMACM restated therein all applicable representations and warranties regarding the mortgage loans and that it was complying with the requirements of the Operative Documents, including that its actions were not in contravention of any of those agreements.  GMACM further certified that it had satisfied each condition precedent to effecting a Subsequent Transfer even though this was untrue as the occurrence of a Managed Amortization Event in July 2006 had ended the Revolving Period and precluded any Subsequent Transfers.

162.    In short, Subsequent Mortgage Loans were improperly transferred to the 2006-HE1 Trust despite the fact that a Managed Amortization Event had already triggered the termination of the Revolving Period.  GMACM had no authority to execute such transfers.  As such, under the express terms of the Operative Documents, the subsequently transferred loans were not properly transferred to the 2006-HE1 Trust in accordance with the terms of the 2006-HE1 Transaction.

**K.    GMACM's Denial of FGIC's Access to Books and Records, Chief Financial Officer and GMACM's Independent Accountants**

163.    On November 21, 2011, consistent with its rights under Sections 2.02(e)(i),(ii), (iii) of the I&I Agreement, FGIC requested to (i) inspect the books and records of GMACM; (ii) discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and (iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants.

164.    To date, GMACM has refused to respond to this request, in violation of the I&I Agreement.

**L.    ResCap's Tortious Interference with Contract**

165.    As discussed *supra* at ¶ 112, on December 9, 2010, FGIC made a written demand that GMACM provide FGIC with Mortgage Loan files regarding the 2006-HE1 Transaction. Having received no response to its December 9, 2010 demand, FGIC sent a follow-up e-mail on February 3, 2011, concerning the status of that request.  FGIC's demands for information were received by ResCap, which informed FGIC that ResCap could not respond to the requests until the matter was discussed internally at ResCap and a response was authorized by those with decision-making authority at ResCap.

166.    After having received no response to its earlier requests, FGIC made another written demand for the Mortgage Loan files on February 14, 2011 (as it would again on April 26, 2011), and noted GMACM's obligation to provide such information under the Operative Documents. That request was also received by ResCap.

167.    FGIC's request for Mortgage Loan files only began to be addressed and processed once ResCap authorized the retrieval and provision of that information.

168.     As further discussed *supra* at ¶ 114, GMACM eventually did respond to FGIC's demand for access to information.  However, in contravention of its obligations under the Operative Documents, the information GMACM provided was incomplete and failed to fully respond to FGIC's requests.

169.     On information and belief, ResCap directed the manner in which GMACM responded to FGIC's request, specifically instructing GMACM to withhold from FGIC information relating to performing Mortgage Loans.

170.     GMACM breached its obligations to FGIC under the Operative Documents by first denying and/or ignoring FGIC's requests for information, and second by then providing FGIC with incomplete information.

171.     Additionally, with respect to the Mortgage Loan files that GMACM did produce, FGIC received invoices from ResCap—not GMACM—for the retrieval and processing of the files, and ResCap refused to release the requested information to FGIC until FGIC paid ResCap pursuant to those invoices.

172.     As also discussed *supra* at ¶ 121, GMACM further breached its obligation to repurchase or cure non-compliant and defective Mortgage Loans that FGIC has asked GMACM to repurchase.  In its course of dealing with FGIC in similar transactions, and on information and belief with respect to the 2006-HE1 Transaction, ResCap corresponded with FGIC regarding mortgage loans that FGIC had sought to have repurchased.  In those communications, received by FGIC from ResCap, it was ResCap—and not one of its indirect subsidiaries (such as GMACM)—that was instrumental in determining whether a specific mortgage loan should be repurchased.

173.    Consequently, it is reasonable to conclude that GMACM's handling of FGIC's demands for information and its failure to repurchase or cure certain of the Mortgage Loans that FGIC submitted for repurchase were directed by ResCap—GMACM's indirect parent company. Moreover, due to the relationship between GMACM and ResCap, as well as FGIC's communications with GMACM and ResCap noting GMACM's contractual duties to FGIC, ResCap, on information and belief, was aware of the contractual agreements between the parties and GMACM's obligations thereunder. By directing and/or influencing GMACM's handling of FGIC's requests for information and the decision-making regarding FGIC's repurchase requests, ResCap improperly interfered with, and procured the breach by GMACM of, GMACM's contractual obligations to FGIC under the I&I Agreement.

174.    Additionally, because FGIC has received only incomplete information regarding the 2006-HE1 Transaction, and therefore cannot currently ascertain the extent to which ResCap has directed the actions and omissions of GMACM in connection with GMACM's obligation under the Operative Documents, FGIC reserves its rights with respect to asserting additional causes of action relating to ResCap's tortious interference with the I&I Agreement, and any other potential claims that may arise as a result of ResCap's direction of GMACM.

### M.    GMACM's Servicing Obligations

175.    GMACM, as servicer, has certain contractual obligations under the I&I Agreement and the Servicing Agreement with respect to the HE1 Transaction. On information and belief, GMACM may have breached these obligations by, *inter alia*, being deficient in its borrower contact, collections, and loss mitigation standards, and by failing to honor FGIC's contractual rights to information.

176.    In particular, an onsite review of GMACM's servicing headquarters in 2009 by FGIC and an independent consultant, and subsequent analysis revealed, *inter alia*,: (i) call center

staffing levels inadequate to handle increased incoming and outgoing call volume; (ii)

unreasonably high call center staffing turnovers; (iii) a borrower calling system that makes no

attempt to contact borrowers who have failed to provide GMACM with a viable telephone

number or who have been continuously unresponsive to messages left by GMACM; (iv) the

failure to hire personnel to visit the mortgaged properties to discuss loss mitigation strategies

with borrowers in default; and (v) severely infrequent use of alternative loss mitigation strategies

as compared to the industry.  GMACM, as servicer, also had an obligation to notify FGIC of any

material breaches of representations and warranties, and to cause GMACM, as seller, to

repurchase the affected Mortgage Loans.

177.    FGIC has requested additional information in order to determine whether

GMACM is in breach of its servicing obligations.  In contravention of FGIC's contractual rights,

GMACM has failed to provide such information to FGIC.  Accordingly, FGIC reserves its rights

with respect to asserting additional causes of action relating to GMACM's servicing obligations.

On information and belief, GMACM, as servicer, also knew of material breaches of

representations and warranties and did not notify FGIC thereof, or cause the repurchase of the

affected Mortgage Loans.

### N.    FGIC's Contractual Remedies Under the I&I Agreement

178.    The I&I Agreement provides FGIC with broad remedies for GMACM's breaches

of its representations and warranties.  These remedies provided further material inducement for

FGIC to issue the Policy.  Specifically, Section 5.02(b) of the I&I Agreement provides:

> Unless otherwise expressly provided, no remedy herein conferred
> or reserved is intended to be exclusive of any other available
> remedy, but each remedy shall be cumulative and shall be in
> addition to other remedies given under this Insurance Agreement,
> the Indenture or the other Operative Documents, or existing at law
> or in equity.

179.    Moreover, the I&I Agreement provides that, upon an "Event of Default" – which is defined to include when "any representation or warranty" by GMACM in the I&I Agreements or the Operative Documents is materially untrue or incomplete – FGIC can "take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under the Operative Documents or to enforce performances and observances of any obligation, agreement or covenant of [GMACM]."  I&I Agreement §§ 5.01(a), 5.02(a).

180.    In addition, GMACM agreed in Section 3.04(a) of the I&I Agreement:

> to pay, and to protect, indemnify and save harmless [FGIC] . . . from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages costs or expenses (including reasonable fees and expenses of attorneys . . . ) of any nature arising out of or relating to the breach by GMACM of any of the representations or warranties contained in Section 2.01 [of the I&I Agreement] or arising out of or relating to the Transaction contemplated by the Operative Documents . . . .

I&I Agreement § 3.04(a).

181.    Moreover, consistent with its obligation to select Mortgage Loans that met its published  criteria, GMACM agreed to repurchase or substitute certain Mortgage Loans that did not conform to GMACM's representations and warranties, and to indemnify FGIC for certain claims and losses arising from GMACM's breach of any representation or warranty.  *See* I&I Agreement § 3.03(b).

## FIRST CAUSE OF ACTION

### (As Against GMACM: Material Breach of the I&I Agreement – Declaratory Relief Regarding GMACM's Indemnification Obligation)

182.    FGIC realleges and incorporates by reference paragraphs 1 through 181 of this Complaint.

183.    GMACM's representations and warranties were material to FGIC's decision to insure the 2006-HE1 Notes and induced FGIC to sign the I&I Agreement and  issue the Policy.

184.     The I&I Agreement is a valid and binding agreement between the parties.

185.     FGIC has performed its obligations under the I&I Agreement.

186.     GMACM's pervasive and material breaches of its representations and warranties

constitute a material breach of the I&I Agreement that has deprived FGIC of the purpose of the

parties' bargain.

187.     Pursuant to Section 3.04(a) of the I&I Agreement, GMACM agreed to indemnify

FGIC for any and all claims, losses, liabilities, demands, damages, costs or expenses of any

nature arising out of or relating to the breach by GMACM of any of the representations or

warranties contained in Section 2.01 of the I&I Agreement or arising out of or related to the

transactions contemplated by the Operative Documents by reason of, among other things:  (i) the

breach by GMACM of any representation, warranty, or covenant under any of the Operative

Documents; or (ii) any untrue statement or alleged untrue statement of a material fact contained

in the Offering Documents or any omission or alleged omission to state therein a material fact

required to be stated therein or necessary to make the statements therein, in light of the

circumstances under which they were made, not misleading.

188.     As explained above, GMACM has breached numerous representations and

warranties and made material misstatements and/or omissions in the Offering and Operative

Documents.  These breaches have caused FGIC to pay claims and to incur losses, costs, and

expenses and will continue to do so.

189.     FGIC therefore seeks a declaration that GMACM must reimburse and indemnify

FGIC for all sums arising out of the 2006-HE Transaction for which FGIC has or will become

liable, and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under

the Policy and to the payment of all future amounts that may fall due or claims that may be

presented for payment by FGIC under the Policy as and when such sums fall due or such claims

are presented.

## SECOND CAUSE OF ACTION

### (As Against GMACM: Fraudulent Inducement — I&I Agreement)

190.    FGIC re-alleges and incorporates by reference paragraphs 1 through 189 of this

Complaint.

191.    GMACM induced FGIC to enter into the I&I Agreement and to issue the Policy

by making false representations and warranties about its business practices and the Mortgage

Loans, and by agreeing to broad remedies (including indemnification) for any breach of those

representations and warranties.

192.    As explained above, GMACM knowingly made materially false statements to,

and/or omitted material facts from, FGIC with the intent to induce detrimental reliance by FGIC.

193.    GMACM intended for FGIC to rely on GMACM's material false statements

and/or omissions.  FGIC had no reason to believe that GMACM's representations were false, and

reasonably and justifiably relied on GMACM's material false statements and/or omissions

regarding information uniquely in the possession of GMACM when it decided to enter into the

I&I Agreement and to issue the Policy for the 2006-HE1 Notes.

194.    As a result of GMACM's material false statements and omissions, FGIC entered

into the I&I Agreement, issued the Policy, and thereby agreed to insure a pool of Mortgage

Loans that was, in actuality, materially different from the mortgage loan pool that GMACM

represented would collateralize the 2006-HE1 Transaction.

195.    As a result of GMACM's material false statements and omissions, FGIC has been

damaged and will continue to be damaged in an amount to be determined at trial.

## **THIRD CAUSE OF ACTION**

### **(As Against Ally Bank: Aiding and Abetting Fraudulent Inducement — I&I Agreement)**

196.    FGIC re-alleges and incorporates by reference paragraphs 1 through 195 of this Complaint.

197.    As explained above, Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently inducing FGIC to issue the Policy.

198.    Ally Bank originated nearly 60% of the Mortgage Loans (amounting to over $500 million in loans), which form a substantial part of the collateral for the 2006-HE1 Transaction. Ally Bank was therefore aware of the characteristics of the loan pool. Ally Bank was also an affiliate of GMACM and served as Custodian of the 2006-HE1 Transaction, for which it received substantial fees. As such, Ally Bank was aware of the material misrepresentations GMACM had made to FGIC to fraudulently induce FGIC to issue the Policy. Ally Bank further represented to FGIC that it would undertake duties to monitor and certify the accuracy and completeness of the Mortgage Loan files, as well as inform FGIC of failures by GMACM to comply with its obligations under the Operative Documents. Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would not comply—with its representations and warranties.

199.    Ally Bank's representations to FGIC materially aided GMACM's fraudulent inducement of FGIC to issue the Policy.

200.    As a result of Ally Bank's aiding and abetting of GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (As Against GMACM: Breach of Representations, Warranties, and Affirmative Covenants)

201.    FGIC re-alleges and incorporates by reference paragraphs 1 through 200 of this Complaint.

202.    The I&I Agreement is a valid and binding agreement between the parties.

203.    FGIC has performed its obligations under the I&I Agreement.

204.    As explained above, GMACM has materially breached its representations and warranties under Section 2.01 of the I&I Agreement.

205.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (As Against Ally Bank: Breach of Custodial Agreement)

206.    FGIC re-alleges and incorporates by reference paragraphs 1 through 205 of this Complaint.

207.    The Custodial Agreement is a valid and binding agreement between the parties thereto.

208.    FGIC is an express third party beneficiary of the Custodial Agreement.

209.    As explained above, Ally Bank has materially breached its obligations under Sections 2.1, 2.2, and 2.3 of the Custodial Agreement.

210.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (As Against GMACM: Breach of Repurchase Obligation)

211.    FGIC re-alleges and incorporates by reference paragraphs 1 through 210 of this Complaint.

212.    The I&I Agreement is a valid and binding agreement between the parties.

213.    FGIC has performed its obligations under the I&I Agreement.

214.    Pursuant to the terms of the I&I Agreement, and the provisions of the MLPA incorporated therein, FGIC has demanded that GMACM repurchase non-complying Mortgage Loans. GMACM has refused to repurchase numerous such Mortgage Loans.

215.    GMACM has breached the I&I Agreement, and the provisions of the MLPA incorporated therein, by failing to repurchase those Mortgage Loans that violated GMACM's representations and warranties that FGIC has noticed to GMACM.

## SEVENTH CAUSE OF ACTION

### (As Against GMACM: Material Breach of the Operative Documents — Indemnification for Improper Subsequent Transfers or, Alternatively, Declaration of Repurchase Obligation)

216.    FGIC re-alleges and incorporates by reference paragraphs 1 through 215 of this Complaint.

217.    The I&I Agreement is a valid and binding agreement between the parties.

218.    FGIC has performed its obligations under the I&I Agreement.

219.    GMACM has breached the I&I Agreement, and the provisions of the MLPA and the Operative Documents incorporated therein, by executing improper Subsequent Transfers to the 2006-HE1 Trust despite the occurrence of a Managed Amortization Event having triggered the termination of the Revolving Period.

220.    FGIC has been damaged in an amount to be proven at trial as a result of the improper transfer of Mortgage Loans to the 2006-HE1 Trust.

221.    FGIC is entitled to indemnification for any claim it has paid or which it may be required to pay arising from a Subsequent Mortgage Loan that was improperly transferred to the 2006-HE1 Trust after the occurrence of a Managed Amortization Event triggered the termination of the Revolving Period.

222.    FGIC therefore seeks a declaration that GMACM must reimburse and indemnify FGIC for all sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented, as a result of the improper transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust.

223.    In the alternative, FGIC has been damaged in an amount to be proven at trial because it has paid or remains liable for certain claims arising from Subsequent Mortgage Loans that GMACM was obligated to repurchase as a result of their improper transfer to the 2006-HE1 Trust after the occurrence of a Managed Amortization Event triggered the termination of the Revolving Period.

## EIGHTH CAUSE OF ACTION

### (As Against GMACM: Breach of Contract – Declaratory Relief)

224.    FGIC re-alleges and incorporates by reference paragraphs 1 through 223 of this Complaint.

225.    The I&I Agreement is a valid and binding agreement between the parties.

226.    FGIC has performed its obligations under the I&I Agreement.

227.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to allow FGIC to (i) inspect the books and records of GMACM; (ii) discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and (iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants.

228.    As discussed above, pursuant to Sections 2.02(c)(v), 2.02(e)(i)-(iii), and 2.02(p) of the I&I Agreement, FGIC made numerous reasonable written requests that GMACM furnish or cause to be furnished data relating to the Mortgage Loans in order for FGIC to determine the veracity of the representations and warranties made by GMACM, and others, concerning the 2006-HE1 Notes.

229.    On November 21, 2011, FGIC made a reasonable written request that GMACM permit FGIC or its authorized agent to conduct an inspection of the books and records of GMACM, as well as permit FGIC to (i) discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, and (ii) with GMACM's consent, which consent shall not be unreasonably withheld or delayed, discuss the affairs, finances, and accounts of GMACM with GMACM's independent accountants.

230.    GMACM has breached the I&I Agreement by failing to respond to these requests.

231.    GMACM's refusal to provide this information violates FGIC's contractual rights pursuant to the I&I Agreement.

232.    FGIC therefore seeks a declaration that GMACM must comply with Sections 2.02(c)(v), 2.02(e)(i)-(iii), and 2.02(p) of the I&I Agreement.

## NINTH CAUSE OF ACTION

### (As Against ResCap: Tortious Interference with Contract)

233.    FGIC re-alleges and incorporates by reference paragraphs 1 through 232 of this Complaint.

234.    As explained above, GMACM has materially breached the I&I Agreement.

235.    As a result of these breaches of contract, FGIC has been damaged and will

continue to be damaged in an amount to be determined at trial.

236.    As further explained above, ResCap was aware of the I&I Agreement between

FGIC and GMACM, as well as the obligations of GMACM thereunder, and improperly

interfered with, and procured the breach by GMACM of, GMACM's contractual obligations to

FGIC under the I&I Agreement.

237.    As a result of this tortious interference with contract by ResCap, FGIC has been

damaged and will continue to be damaged in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (As Against GMACM: Attorneys' Fees and Costs)

238.    FGIC re-alleges and incorporates by reference paragraphs 1 through 237 of this

Complaint.

239.    Pursuant to Section 3.03(c) of the I&I Agreement, GMACM agreed to reimburse

FGIC for any and all costs or expenses "including reasonable attorneys' . . . fees and expenses"

in connection with the enforcement, defense or preservation of any rights in respect of any of the

Operative Documents. Further, pursuant to Section 3.04(a) of the I&I Agreement, GMACM

agreed to pay FGIC, and to indemnify FGIC against, any and all costs or expenses "including

reasonable fees and expenses of attorneys" arising out of or relating to the breach by GMACM of

any of the representations or warranties contained in Section 2.01 of the I&I Agreement or

arising out of or relating to the 2006-HE1 Transaction..

240.    FGIC has incurred and will continue to incur substantial costs and expenses,

including but not limited to attorneys' fees in filing and prosecuting this lawsuit, arising out of

GMACM's breach of the representations and warranties contained in Section 2.01 of the I&I

Agreement and/or arising out of or relating to the 2006-HE1 Transaction.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Financial Guaranty Insurance Company demands judgment in

its favor and against defendant GMAC Mortgage Company, LLC, with respect to (1), (2), (4), (5),

(7) through (11), and (13) through (15) below, and in its favor and against defendant Ally Bank,

with respect to (3) and (6) below, and in its favor and against ResCap, with respect to (12) below,

and the following relief:

**(1)**    A declaration that, pursuant to GMACM's obligations under the I&I Agreement, GMACM must reimburse and indemnify FGIC for all sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented, and an order giving effect to that declaration;

**(2)**    Further or alternatively, an award of all legal, rescissory, equitable and punitive damages, to be proven at trial, for GMACM's fraudulent inducement of FGIC to enter into the 2006-HE1 Transaction and to issue the Policy;

**(3)**    Further or alternatively, an award of all legal, equitable, rescissory, and punitive damages, to be proven at trial, for Ally Bank's aiding and abetting of GMACM's fraudulent inducement of FGIC to enter into the 2006-HE1 Transaction and to issue the Policy;

**(4)**    Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's pervasive and material breaches of its representations, warranties, and affirmative covenants, and its repurchase obligation, both of which constitute material breaches of the I&I Agreement and frustration of the parties' bargain;

**(5)**    Further or alternatively, an order compelling GMACM to repurchase the Mortgage Loans that FGIC has presented for repurchase or substitution that are in breach of GMACM's representations,  warranties, and affirmative covenants, and to repurchase any and all other Mortgage

Loans that are in breach of GMACM's representations, warranties, and affirmative covenants;

**(6)**     Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for Ally Bank's material breaches of its obligations under the Custodial Agreement;

**(7)**     Further or alternatively, a declaration that GMACM reimburse and indemnify FGIC for all sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented, as a result of Subsequent Mortgage Loans that were improperly transferred to the 2006-HE1 Trust, and an order giving effect to that declaration;

**(8)**     Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's improper transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust;

**(9)**     Further or alternatively, an order compelling GMACM to repurchase the Mortgage Loans that were improperly transferred to the 2006-HE1 Trust;

**(10)**     Further or alternatively, a declaration that GMACM must furnish or cause to be furnished the data requested by FGIC pursuant to Sections 2.02(c)(v), 2.02(e)(i)-(iii), and 2.02(p) of the I&I Agreement, and an order giving an effect to that declaration;

**(11)**     Further or alternatively, a declaration that GMACM must allow FGIC to inspect the books and records of GMACM, to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, and to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants, and an order giving effect to that declaration;

**(12)**     Further or alternatively, an award of all legal, equitable, and punitive damages, to be proven at trial, for ResCap's tortious interference with the I&I Agreement;

**(13)**     An award of FGIC's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the I&I Agreement and other Operative Documents, as defined in the I&I Agreement;

**(14)**     An award of prejudgment interest at the statutory rate; and

(15)     Any other and further relief that the Court deems just and proper.

## **JURY DEMAND**

FGIC demands a trial by jury for all issues so triable as a matter of right.


Dated: November 29, 2011

JONES DAY

  /s/ Howard F. Sidman
Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
Patrick J. Smith
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*