EXHIBIT E

## FORM OF CUSTODIAL AGREEMENT

THIS CUSTODIAL AGREEMENT (as amended and supplemented from time to time, the "Agreement"), dated as of February 1, 2007, by and among U.S. BANK NATIONAL ASSOCIATION, as Trustee (including its successors under the Pooling Agreement defined below, the "Trustee"), RESIDENTIAL ASSET SECURITIES CORPORATION (together with any successor in interest, the "Company"), RESIDENTIAL FUNDING COMPANY, LLC, as master servicer (together with any successor in interest or successor under the Pooling Agreement referred to below, the "Master Servicer"), and WELLS FARGO BANK, NATIONAL ASSOCIATION (together with any successor in interest or any successor appointed hereunder, the "Custodian").

## W I T N E S S E T H   T H A T :

WHEREAS, the Company, the Master Servicer, and the Trustee have entered into a Pooling and Servicing Agreement, dated as of February 1, 2007, relating to the issuance of Residential Asset Securities Corporation, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1 (as in effect on the date of this Agreement, the "Original Pooling Agreement," and as amended and supplemented from time to time, the "Pooling Agreement"); and

WHEREAS, the Custodian has agreed to act as agent for the Trustee for the purposes of receiving and holding certain documents and other instruments delivered by the Company and the Master Servicer under the Pooling Agreement, all upon the terms and conditions and subject to the limitations hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the Trustee, the Company, the Master Servicer and the Custodian hereby agree as follows:

## ARTICLE I

### Definitions

Capitalized terms used in this Agreement and not defined herein shall have the meanings assigned in the Original Pooling Agreement, unless otherwise required by the context herein.

## ARTICLE II

### Custody of Mortgage Documents

Section 2.1.  Custodian to Act as Agent; Acceptance of Custodial Files.  The
Company and the Master Servicer hereby direct the Trustee to appoint Wells Fargo Bank National
Association as the Custodian hereunder.  The Custodian, as the duly appointed agent of the Trustee
for these purposes, acknowledges receipt of the Custodial Files relating to the Mortgage Loans
identified on the schedule attached hereto (the "Custodial Files") and declares that it holds and will
hold the Custodial Files as agent for the Trustee, in trust, for the use and benefit of all present and
future Certificateholders.

Section 2.2.  Recordation of Assignments.  If any Custodial File includes one or
more assignments of the related Mortgages to the Trustee that have not been recorded, each such
assignment shall be delivered by the Custodian to the Company for the purpose of recording it in the
appropriate public office for real property records, and the Company, at no expense to the
Custodian, shall promptly cause to be recorded in the appropriate public office for real property
records each such assignment and, upon receipt thereof from such public office, shall return each
such assignment to the Custodian.

Section 2.3.  Review of Custodial Files.

(a)  On or prior to the Closing Date, the Custodian shall deliver to the Trustee and
the Certificate Insurer an Initial Certification in the form annexed hereto as Exhibit One evidencing
receipt of a Custodial File for each Mortgage Loan listed on the Schedule attached hereto (the
"Mortgage Loan Schedule").  The parties hereto acknowledge that certain documents referred to in
Subsection 2.01(b)(i) of the Pooling Agreement may be missing on or prior to the Closing Date and
such missing documents shall be listed as a Schedule to Exhibit One.

(b)  Within 45 days after the Closing Date, the Custodian agrees, for the benefit of
Certificateholders and the Certificate Insurer, to review each Custodial File and to deliver to the
Trustee and the Certificate Insurer an Interim Certification in the form annexed hereto as Exhibit
Two to the effect that all documents required to be delivered pursuant to Section 2.01(b) of the
Pooling Agreement have been executed and received and that such documents relate to the
Mortgage Loans identified on the Mortgage Loan Schedule, except for any exceptions listed on
Schedule A attached to such Interim Certification. For purposes of such review, the Custodian shall
compare the following information in each Custodial File to the corresponding information in the
Mortgage Loan Schedule: (i) the loan number, (ii) the borrower name and (iii) the original principal
balance.  In the event that any Mortgage Note or Assignment of Mortgage has been delivered to the
Custodian by the Company in blank, the Custodian, upon the direction of the Company, shall cause
each such Mortgage Note to be endorsed to the Trustee and each such Assignment of Mortgage to
be completed in the name of the Trustee prior to the date on which such Interim Certification is
delivered to the Trustee.  Within 45 days of receipt of the documents required to be delivered
pursuant to Section 2.01(c) of the Pooling Agreement, the Custodian agrees, for the benefit of the
Certificateholders and the Certificate Insurer, to review each such document, and upon the written
request of the Trustee to deliver to the Trustee and the Certificate Insurer an updated Schedule A to

the Interim Certification. The Custodian shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that the same are genuine, enforceable, or appropriate for the represented purpose or that they have actually been recorded or that they are other than what they purport to be on their face, or that the MIN is accurate. If in performing the review required by this Section 2.3 the Custodian finds any document or documents constituting a part of a Custodial File to be missing or defective in respect of the items reviewed as described in this Section 2.3(b), the Custodian shall promptly so notify the Company, the Master Servicer, Certificate Insurer and the Trustee.

(c)    Upon receipt of all documents required to be in the Custodial Files the Custodian shall deliver to the Trustee a Final Certification in the form annexed hereto as Exhibit Three evidencing the completeness of the Custodial Files.

Upon receipt of written request from the Trustee, the Company or the Master Servicer, the Custodian shall as soon as practicable supply the Trustee with a list of all of the documents relating to the Mortgage Loans required to be delivered pursuant to Section 2.01(b) of the Pooling Agreement not then contained in the Custodial Files.

Section 2.4.    Notification of Breaches of Representations and Warranties.    If the Custodian discovers, in the course of performing its custodial functions, a breach of a representation or warranty made by the Master Servicer or the Company as set forth in the Pooling Agreement with respect to a Mortgage Loan relating to a Custodial File, the Custodian shall give prompt written notice to the Company, the Master Servicer and the Trustee.

Section 2.5.    Custodian to Cooperate; Release of Custodial Files.    Upon the repurchase or substitution of any Mortgage Loan pursuant to Article II of the Pooling Agreement or payment in full of any Mortgage Loan, or the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Master Servicer shall immediately notify the Custodian by delivering to the Custodian a Request for Release (in the form of Exhibit Four attached hereto or a mutually acceptable electronic form) and shall request delivery to it of the Custodial File. The Custodian agrees, upon receipt of such Request for Release, promptly to release to the Master Servicer the related Custodial File.

Upon receipt of a Request for Release from the Master Servicer, signed by a Servicing Officer, that (i) the Master Servicer or a Subservicer, as the case may be, has made a deposit into the Certificate Account in payment for the purchase of the related Mortgage Loan in an amount equal to the Purchase Price for such Mortgage Loan or (ii) the Company has chosen to substitute a Qualified Substitute Mortgage Loan for such Mortgage Loan, the Custodian shall release to the Master Servicer the related Custodial File.

Upon written notification of a substitution, the Master Servicer shall deliver to the Custodian and the Custodian agrees to accept the Mortgage Note and other documents constituting the Custodial File with respect to any Qualified Substitute Mortgage Loan, upon receiving written notification from the Master Servicer of such substitution.

From time to time as is appropriate for the servicing or foreclosures of any Mortgage Loan, including, for this purpose, collection under any Primary Insurance Policy or any Mortgage

Pool Insurance Policy, the Master Servicer shall deliver to the Custodian a Request for Release certifying as to the reason for such release. Upon receipt of the foregoing, the Custodian shall deliver the Custodial File or such document to the Master Servicer. All Custodial Files so released to the Master Servicer shall be held by it in trust for the Trustee for the use and benefit of all present and future Certificateholders. The Master Servicer shall cause each Custodial File or any document therein so released to be returned to the Custodian when the need therefor by the Master Servicer no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or (ii) the Custodial File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered to the Custodian an updated Request for Release signed by a Servicing Officer certifying as to the name and address of the Person to which such Custodial File or such document was delivered and the purpose or purposes of such delivery. Immediately upon receipt of any Custodial File returned to the Custodian by the Master Servicer, the Custodian shall deliver a signed acknowledgement to the Master Servicer, confirming receipt of such Custodial File.

Upon the written request of the Master Servicer, the Custodian will send to the Master Servicer copies of any documents contained in the Custodial File.

Section 2.6. <u>Assumption Agreements</u>. In the event that any assumption agreement or substitution of liability agreement is entered into with respect to any Mortgage Loan subject to this Agreement in accordance with the terms and provisions of the Pooling Agreement, the Master Servicer shall notify the Custodian that such assumption or substitution agreement has been completed by forwarding to the Custodian the original of such assumption or substitution agreement, which shall be added to the related Custodial File and, for all purposes, shall be considered a part of such Custodial File to the same extent as all other documents and instruments constituting parts thereof.

## ARTICLE III

### Concerning the Custodian

Section 3.1. <u>Custodian a Bailee and Agent of the Trustee</u>. With respect to each Mortgage Note, Mortgage and other documents constituting each Custodial File which are delivered to the Custodian, the Custodian is exclusively the bailee and agent of the Trustee and has no instructions to hold any Mortgage Note or Mortgage for the benefit of any person other than the Trustee, holds such documents for the benefit of Certificateholders and undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. Except upon compliance with the provisions of Section 2.5 of this Agreement, no Mortgage Note, Mortgage or other document constituting a part of a Custodial File shall be delivered by the Custodian to the Company or the Master Servicer or otherwise released from the possession of the Custodian.

The Master Servicer shall promptly notify the Custodian in writing if it shall no longer be a member of MERS, or if it otherwise shall no longer be capable of registering and recording Mortgage Loans using MERS. In addition, the Master Servicer shall (i) promptly notify

the Custodian in writing when a MERS Mortgage Loan is no longer registered with and recorded under MERS and (ii) concurrently with any such deregistration of a MERS Mortgage Loan, prepare, execute and record an original assignment from MERS to the Trustee and deliver such assignment to the Custodian.

Section 3.2. Indemnification. The Company hereby agrees to indemnify and hold the Custodian harmless from and against all claims, liabilities, losses, actions, suits or proceedings at law or in equity, or any other expenses, fees or charges of any character or nature, which the Custodian may incur or with which the Custodian may be threatened by reason of its acting as custodian under this Agreement, including indemnification of the Custodian against any and all expenses, including attorney's fees if counsel for the Custodian has been approved by the Company, and the cost of defending any action, suit or proceedings or resisting any claim. Notwithstanding the foregoing, it is specifically understood and agreed that in the event any such claim, liability, loss, action, suit or proceeding or other expense, fee or charge shall have been caused by reason of any negligent act, negligent failure to act or willful misconduct on the part of the Custodian, or which shall constitute a willful breach of its duties hereunder, the indemnification provisions of this Agreement shall not apply.

Section 3.3. Custodian May Own Certificates. The Custodian in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Custodian.

Section 3.4. Master Servicer to Pay Custodian's Fees and Expenses. The Master Servicer covenants and agrees to pay to the Custodian from time to time, and the Custodian shall be entitled to, reasonable compensation for all services rendered by it in the exercise and performance of any of the powers and duties hereunder of the Custodian, and the Master Servicer shall pay or reimburse the Custodian upon its request for all reasonable expenses, disbursements and advances incurred or made by the Custodian in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ), except any such expense, disbursement or advance as may arise from its negligence or bad faith.

Section 3.5. Custodian May Resign; Trustee May Remove Custodian. The Custodian may resign from the obligations and duties hereby imposed upon it as such obligations and duties relate to its acting as Custodian of the Mortgage Loans. Upon receiving such notice of resignation, the Trustee shall either take custody of the Custodial Files itself and give prompt notice thereof to the Company, the Master Servicer and the Custodian, or promptly appoint a successor Custodian by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Custodian and one copy to the successor Custodian. If the Trustee shall not have taken custody of the Custodial Files and no successor Custodian shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Custodian may petition any court of competent jurisdiction for the appointment of a successor Custodian.

The Trustee, at the direction of the Master Servicer and the Company, may remove the Custodian at any time. In such event, the Trustee shall appoint, or petition a court of competent jurisdiction to appoint, a successor Custodian hereunder. Any successor Custodian shall be a

depository institution subject to supervision or examination by federal or state authority and shall be able to satisfy the other requirements contained in Section 3.7 and shall be unaffiliated with the Master Servicer or the Company.

Any resignation or removal of the Custodian and appointment of a successor Custodian pursuant to any of the provisions of this Section 3.5 shall become effective upon acceptance of appointment by the successor Custodian. The Trustee shall give prompt notice to the Company and the Master Servicer of the appointment of any successor Custodian. No successor Custodian shall be appointed by the Trustee without the prior approval of the Company and the Master Servicer.

Section 3.6.  Merger or Consolidation of Custodian.  Any Person into which the Custodian may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Custodian shall be a party, or any Person succeeding to the business of the Custodian, shall be the successor of the Custodian hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided that such successor is a depository institution subject to supervision or examination by federal or state authority and is able to satisfy the other requirements contained in Section 3.7 and is unaffiliated with the Master Servicer or the Company.

Section 3.7.  Representations of the Custodian.  The Custodian hereby represents that it is a depository institution subject to supervision or examination by a federal or state authority, has a combined capital and surplus of at least $15,000,000 and is qualified to do business in the jurisdictions in which it will hold any Custodial File.

ARTICLE IV

Compliance with Regulation AB

Section 4.1.  Intent of the Parties; Reasonableness.  The parties hereto acknowledge and agree that the purpose of this Article IV is to facilitate compliance by the Company with the provisions of Regulation AB and related rules and regulations of the Commission. The Company shall not exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission under the Securities Act and the Exchange Act. Each of the parties hereto acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the mortgage-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Company in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. The Custodian shall cooperate reasonably with the Company to deliver to the Company (including any of its assignees or designees), any and all disclosure, statements, reports, certifications, records and any other information necessary in the reasonable, good faith determination of the Company to permit the Company to comply with the provisions of Regulation AB.

.

Section 4.2.    Additional Representations and Warranties of the Custodian.

(a)    The Custodian hereby represents and warrants that the information set forth under the caption "Pooling and Servicing Agreement – Custodial Arrangements" (the "Custodian Disclosure") does not contain any untrue statement of a material fact or omit to state a material required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(b)    The Custodian shall be deemed to represent to the Company as of the date hereof and on each date on which information is provided to the Company under Section 4.3 that, except as disclosed in writing to the Company prior to such date: (i) there are no aspects of its financial condition that could have a material adverse effect on the performance by it of its Custodian obligations under this Agreement or any other Securitization Transaction as to which it is the custodian; (ii) there are no material legal or governmental proceedings pending (or known to be contemplated) against it; and (iii) there are no affiliations, relationships or transactions relating to the Custodian with respect to the Company or any sponsor, issuing entity, servicer, trustee, originator, significant obligor, enhancement or support provider or other material transaction party (as such terms are used in Regulation AB) relating to the Securitization Transaction contemplated by the Agreement, as identified by the Company to the Custodian in writing as of the Closing Date (each, a "Transaction Party").

(c)    If so requested by the Company on any date following the Closing Date, the Custodian shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such confirmation, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party. Any such request from the Company shall not be given more than once each calendar quarter, unless the Company shall have a reasonable basis for a determination that any of the representations and warranties may not be accurate.

Section 4.3.    Additional Information to Be Provided by the Custodian.    For so long as the Certificates are outstanding, for the purpose of satisfying the Company's reporting obligation under the Exchange Act with respect to any class of Certificates, the Custodian shall (a) notify the Company in writing of any material litigation or governmental proceedings pending against the Custodian that would be material to Certificateholders, and (b) provide to the Company a written description of such proceedings. Any notices and descriptions required under this Section 4.3 shall be given no later than five Business Days prior to the Determination Date following the month in which the Custodian has knowledge of the occurrence of the relevant event. As of the date the Company or Master Servicer files each Report on Form 10-D or Form 10-K with respect to the Certificates, the Custodian will be deemed to represent that any information previously provided under this Section 4.3, if any, is materially correct and does not have any material omissions unless the Custodian has provided an update to such information.

Section 4.4.    <u>Report on Assessment of Compliance and Attestation</u>.  On or before March 15 of each calendar year, the Custodian shall:

(a)    deliver to the Company a report (in form and substance reasonably satisfactory to the Company) regarding the Custodian's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB.  Such report shall be addressed to the Company and signed by an authorized officer of the Custodian, and shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit Five hereto; and

(b)    deliver to the Company a report of a registered public accounting firm reasonably acceptable to the Company that attests to, and reports on, the assessment of compliance made by the Custodian and delivered pursuant to the preceding paragraph.  Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act.

Section 4.5.    <u>Indemnification; Remedies</u>.

(a)    The Custodian shall indemnify the Company, each affiliate of the Company, the Master Servicer and each broker dealer acting as underwriter, placement agent or initial purchaser of the Certificates or each Person who controls any of such parties (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)(A)  any untrue statement of a material fact contained or alleged to be contained in the Custodian Disclosure and any information, report, certification, accountants' attestation or other material provided under this Article IV by or on behalf of the Custodian (collectively, the "Custodian Information"), or (B) the omission or alleged omission to state in the Custodian Information a material fact required to be stated in the Custodian Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

(ii)    any failure by the Custodian to deliver any information, report, certification, accountants' attestation or other material when and as required under this Article IV.

(b)    In the case of any failure of performance described in clause (ii) of Section 4.5(a), the Custodian shall promptly reimburse the Company for all costs reasonably incurred by the Company in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by the Custodian.

## ARTICLE V

### Miscellaneous Provisions

Section 5.1. <u>Notices</u>. All notices, requests, consents and demands and other communications required under this Agreement or pursuant to any other instrument or document delivered hereunder shall be in writing and, unless otherwise specifically provided, may be delivered personally, by telegram or telex, or by registered or certified mail, postage prepaid, return receipt requested, at the addresses specified on the signature page hereof (unless changed by the particular party whose address is stated herein by similar notice in writing), in each case the notice will be deemed delivered when received.

Section 5.2. <u>Amendments</u>. No modification or amendment of or supplement to this Agreement shall be valid or effective unless the same is in writing and signed by all parties hereto, and none of the Company, the Master Servicer or the Trustee shall enter into any amendment of or supplement to this Agreement except as permitted by the Pooling Agreement. The Trustee shall give prompt notice to the Custodian of any amendment or supplement to the Pooling Agreement and furnish the Custodian with written copies thereof.

Section 5.3. <u>Governing Law</u>. This Agreement shall be deemed a contract made under the laws of the State of New York and shall be construed and enforced in accordance with and governed by the laws of the State of New York.

Section 5.4. <u>Recordation of Agreement</u>. To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer and at its expense on direction by the Trustee (pursuant to the request of holders of Certificates evidencing undivided interests in the aggregate of not less than 25% of the Trust Fund), but only upon direction accompanied by an Opinion of Counsel reasonably satisfactory to the Master Servicer to the effect that the failure to effect such recordation is likely to materially and adversely affect the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 5.5. <u>Severability of Provisions</u>. If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the holders thereof.

[SIGNATURE PAGE FOLLOWS]

E-9

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

Address:

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, MN  55107
Attention:  Structured Finance,
          RASC 2007-EMX1

U.S. BANK NATIONAL ASSOCIATION, as
Trustee

By:  _____
Name:
Title:

Address:

8400 Normandale Lake Boulevard
Minneapolis, Minnesota  55437

RESIDENTIAL ASSET SECURITIES
CORPORATION

By:  _____
Name:
Title:

Address:

8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

RESIDENTIAL FUNDING COMPANY, LLC,
as Master Servicer

By:  _____
Name:
Title:

Address:

Mortgage Document Custody
One Meridian Crossings, Lower Level
Richfield, Minnesota  55423

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By: _____
Name:
Title:

STATE OF MINNESOTA          )
                           ) ss.:
COUNTY OF RAMSEY           )

On the _____ day of March 2007, before me, a notary public in and for said State, personally appeared _____, known to me to be a(n) _____ of U.S. Bank National Association, a national banking association that executed the within instrument, and also known to me to be the person who executed it on behalf of said national banking association and acknowledged to me that such national banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[Notarial Seal]

STATE OF MINNESOTA          )
                           ) ss.:
COUNTY OF HENNEPIN          )


       On the _____ day of March 2007, before me, a notary public in and for said State, personally appeared _____, known to me to be a(n) Assistant Vice President of Wells Fargo Bank, National Association, a national banking association that executed the within instrument, and also known to me to be the person who executed it on behalf of said national banking association, and acknowledged to me that such national banking association executed the within instrument.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


                                             _____
                                                  Notary Public


[Notarial Seal]

STATE OF MINNESOTA            )
                             ) ss:
COUNTY OF HENNEPIN           )


   On the _____ day of March 2007, before me, a notary public in and for said State, personally appeared [_____], known to me to be a(n) Vice President of Residential Asset Securities Corporation, one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


            _____
                Notary Public


[Notarial Seal]

STATE OF MINNESOTA            )
                             ) ss:
COUNTY OF HENNEPIN           )


   On the_____ day of March 2007, before me, a notary public in and for said State, personally appeared [_____], known to me to be a(n) Associate of Residential Funding Company, LLC, one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


            _____
                Notary Public


[Notarial Seal]

EXHIBIT ONE

FORM OF CUSTODIAN INITIAL CERTIFICATION

March _____, 2007

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, MN 55107
Attention: Structured Finance, RASC 2007-EMX1

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017

Re:   Custodial Agreement, dated as of February 1, 2007, by and among U.S. Bank National Association, Residential Asset Securities Corporation, Residential Funding Company, LLC and Wells Fargo Bank, National Association, relating to Home Equity Mortgage Asset-Backed Pass-Through Certificates Series 2007-EMX1

Ladies and Gentlemen:

In accordance with Section 2.3 of the above-captioned Custodial Agreement, and subject to Section 2.02 of the Pooling Agreement, the undersigned, as Custodian, hereby certifies that it has received a Custodial File (which contains an original Mortgage Note or an original Lost Note Affidavit with a copy of the related Mortgage Note) to the extent required in Section 2.01(b) of the Pooling Agreement with respect to each Mortgage Loan listed in the Mortgage Loan Schedule, with any exceptions listed on Schedule A attached hereto.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Custodial Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION

By:      _____
Name:
Title:

E-1-1

EXHIBIT TWO

FORM OF CUSTODIAN INTERIM CERTIFICATION

March _____, 2007

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, MN 55107
Attention: Structured Finance, RASC 2007-EMX1

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017

Re:    Custodial Agreement, dated as of February 1, 2007, by and among U.S. Bank
National Association, Residential Asset Securities Corporation, Residential Funding
Company, LLC and Wells Fargo Bank, National Association, relating to Home
Equity Mortgage Asset-Backed Pass-Through Certificates Series 2007-EMX1

Ladies and Gentlemen:

In accordance with Section 2.3 of the above-captioned Custodial Agreement, the
undersigned, as Custodian, hereby certifies that it has received a Custodial File to the extent
required pursuant to Section 2.01(b) of the Pooling Agreement with respect to each Mortgage Loan
listed in the Mortgage Loan Schedule, and it has reviewed the Custodial File and the Mortgage
Loan Schedule and has determined that: all required documents have been executed and received
and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule,
with any exceptions listed on Schedule A attached hereto.

Capitalized words and phrases used herein shall have the respective meanings
assigned to them in the above-captioned Custodial Agreement.

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By:    _____
Name:
Title:

E-2-1

EXHIBIT THREE

FORM OF CUSTODIAN FINAL CERTIFICATION

March _____, 2007

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, MN 55107
Attention: Structured Finance, RASC 2007-EMX1

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017

Re:     Custodial Agreement, dated as of February 1, 2007, by and among U.S. Bank National Association, Residential Asset Securities Corporation, Residential Funding Company, LLC and Wells Fargo Bank, National Association, relating to Home Equity Mortgage Asset-Backed Pass-Through Certificates Series 2007-EMX1

Ladies and Gentlemen:

In accordance with Section 2.3 of the above-captioned Custodial Agreement, the undersigned, as Custodian, hereby certifies that it has received a Custodial File with respect to each Mortgage Loan listed in the Mortgage Loan Schedule and it has reviewed the Custodial File and the Mortgage Loan Schedule and has determined that: all required documents referred to in Section 2.01(b) of the Pooling Agreement have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Custodial Agreement.

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By: _____
Name:
Title:

E-3-1

## EXHIBIT FOUR
## FORM OF REQUEST FOR RELEASE

DATE:

TO:

RE:          REQUEST FOR RELEASE OF DOCUMENTS

In connection with the administration of the pool of Mortgage Loans held by you for the
referenced pool, we request the release of the Mortgage Loan File described below.

Pooling and Servicing Agreement Dated:
Series#:
Account#:
Pool#:
Loan#:
MIN#:
Borrower Name(s):
Reason for Document Request:     (circle one)

        Mortgage Loan Prepaid in Full          Mortgage Loan Repurchased

"We hereby certify that all amounts received or to be received in connection with such payments
which are required to be deposited have been or will be so deposited as provided in the Pooling
and Servicing Agreement."

_____
Residential Funding Company, LLC
Authorized Signature

*************************************************************************************

TO CUSTODIAN/TRUSTEE:  Please acknowledge this request, and check off documents being
enclosed with a copy of this form.  You should retain this form for your files in accordance with
the terms of the Pooling and Servicing Agreement.

Enclosed Documents:        [ ]    Promissory Note
                           [ ]    Primary Insurance Policy
                           [ ]    Mortgage or Deed of Trust
                           [ ]    Assignment(s) of Mortgage or Deed of Trust
                           [ ]    Title Insurance Policy
                           [ ]    Other:

Name:_____
Title:_____
Date:_____

E-4-1

## EXHIBIT FIVE

## SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by the Custodian shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| | **General Servicing Considerations** | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| | **Investor Remittances and Reporting** | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of pool assets serviced by the servicer. | |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the servicer's investor records, or such other number of days specified in the transaction agreements. | |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | |
| | **Pool Asset Administration** | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related asset pool documents. | ✓ |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | ✓ |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | |
| 1122(d)(4)(v) | The servicer's records regarding the pool assets agree with the servicer's records with respect to an obligor's unpaid principal balance. | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool asset (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | |

E-5-2

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| **Reference** | **Criteria** | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool asset, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | |
| | | |

E-5-3

EXHIBIT F-1

## GROUP I LOAN SCHEDULE

[FILED WITH THE SECURITIES AND EXCHANGE COMMISSION BY FORM 8-K]

EXHIBIT F-2

## GROUP II LOAN SCHEDULE

**[FILED WITH THE SECURITIES AND EXCHANGE COMMISSION BY FORM 8-K]**

EXHIBIT G

## FORM OF REQUEST FOR RELEASE

DATE:
TO:
RE:    REQUEST FOR RELEASE OF DOCUMENTS

In connection with the administration of the pool of Mortgage Loans held by you for the referenced pool, we request the release of the Mortgage Loan File described below.

Pooling and Servicing Agreement, Dated:
Series#:
Account#:
Pool#:
Loan#:
MIN#:
Borrower Name(s):
Reason for Document Request: (circle one)    Mortgage Loan Prepaid in Full
                                             Mortgage Loan Repurchased

"We hereby certify that all amounts received or to be received in connection with such payments which are required to be deposited have been or will be so deposited as provided in the Pooling and Servicing Agreement."

_____
Residential Funding Company, LLC
Authorized Signature

**************************************************************

TO CUSTODIAN/TRUSTEE:  Please acknowledge this request, and check off documents being enclosed with a copy of this form. You should retain this form for your files in accordance with the terms of the Pooling and Servicing Agreement.

         Enclosed Documents:          [ ] Promissory Note
                                      [ ] Primary Insurance Policy
                                      [ ] Mortgage or Deed of Trust
                                      [ ] Assignment(s) of Mortgage or Deed of Trust
                                      [ ] Title Insurance Policy
                                      [ ] Other: _____

_____
Name

_____
Title

_____
Date

EXHIBIT H-1

## FORM OF TRANSFER AFFIDAVIT AND AGREEMENT

STATE OF           )
                      )ss.:
COUNTY OF       )

[NAME OF OFFICER], being first duly sworn, deposes and says:

1.      That he is [Title of Officer] of [Name of Owner] (record or beneficial owner of the Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1, Class R (the "Owner")), a [savings institution] [corporation] duly organized and existing under the laws of [the State of _____] [the United States], on behalf of which he makes this affidavit and agreement.

2.      That the Owner (i) is not and will not be a "disqualified organization" or an electing large partnership as of [date of transfer] within the meaning of Section 860E(e)(5) and 775, respectively, of the Internal Revenue Code of 1986, as amended (the "Code") or an electing large partnership under Section 775(a) of the Code, (ii) will endeavor to remain other than a disqualified organization for so long as it retains its ownership interest in the Class R Certificates, and (iii) is acquiring the Class R Certificates for its own account or for the account of another Owner from which it has received an affidavit and agreement in substantially the same form as this affidavit and agreement. (For this purpose, a "disqualified organization" means an electing large partnership under Section 775 of the Code, the United States, any state or political subdivision thereof, any agency or instrumentality of any of the foregoing (other than an instrumentality all of the activities of which are subject to tax and, except for the Federal Home Loan Mortgage Corporation, a majority of whose board of directors is not selected by any such governmental entity) or any foreign government, international organization or any agency or instrumentality of such foreign government or organization, any rural electric or telephone cooperative, or any organization (other than certain farmers' cooperatives) that is generally exempt from federal income tax unless such organization is subject to the tax on unrelated business taxable income).

3.      That the Owner is aware (i) of the tax that would be imposed on transfers of Class R Certificates to disqualified organizations or an electing large partnership under the Code, that applies to all transfers of Class R Certificates after March 31, 1988; (ii) that such tax would be on the transferor (or, with respect to transfers to electing large partnerships, on each such partnership), or, if such transfer is through an agent (which person includes a broker, nominee or middleman) for a disqualified organization, on the agent; (iii) that the person (other than with respect to transfers to electing large partnerships) otherwise liable for the tax shall be relieved of liability for the tax if the transferee furnishes to such person an affidavit that the transferee is not a disqualified organization and, at the time of transfer, such person does not have actual knowledge that the affidavit is false; and (iv) that the Class R Certificates may be "noneconomic residual interests" within the meaning of Treasury regulations promulgated pursuant to the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due

H-1-1

with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax.

4.      That the Owner is aware of the tax imposed on a "pass-through entity" holding Class R Certificates if either the pass-through entity is an electing large partnership under Section 775 of the Code or if at any time during the taxable year of the pass-through entity a disqualified organization is the record holder of an interest in such entity. (For this purpose, a "pass through entity" includes a regulated investment company, a real estate investment trust or common trust fund, a partnership, trust or estate, and certain cooperatives.)

5.      That the Owner is aware that the Trustee will not register the transfer of any Class R Certificates unless the transferee, or the transferee's agent, delivers to it an affidavit and agreement, among other things, in substantially the same form as this affidavit and agreement. The Owner expressly agrees that it will not consummate any such transfer if it knows or believes that any of the representations contained in such affidavit and agreement are false.

6.      That the Owner has reviewed the restrictions set forth on the face of the Class R Certificates and the provisions of Section 5.02(f) of the Pooling and Servicing Agreement under which the Class R Certificates were issued (in particular, clause (iii)(A) and (iii)(B) of Section 5.02(f) which authorize the Trustee to deliver payments to a person other than the Owner and negotiate a mandatory sale by the Trustee in the event the Owner holds such Certificates in violation of Section 5.02(f)). The Owner expressly agrees to be bound by and to comply with such restrictions and provisions.

7.      That the Owner consents to any additional restrictions or arrangements that shall be deemed necessary upon advice of counsel to constitute a reasonable arrangement to ensure that the Class R Certificates will only be owned, directly or indirectly, by an Owner that is not a disqualified organization.

8.      The Owner's Taxpayer Identification Number is _____.

9.      This affidavit and agreement relates only to the Class R Certificates held by the Owner and not to any other holder of the Class R Certificates. The Owner understands that the liabilities described herein relate only to the Class R Certificates.

10.     That no purpose of the Owner relating to the transfer of any of the Class R Certificates by the Owner is or will be to impede the assessment or collection of any tax; in making this representation, the Owner warrants that the Owner is familiar with (i) Treasury Regulation 1.860E-1(c) and recent amendments thereto, effective as of July 19, 2002, and (ii) the preamble describing the adoption of the amendments to such regulation, which is attached hereto as Annex I.

11.     That the Owner has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding. In this regard, the Owner hereby represents to and for the benefit of the person from whom it acquired the Class R Certificate that the Owner intends to pay taxes associated with holding such Class R Certificate as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificate.

H-1-2

12.    That the Owner has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Class R Certificates remain outstanding.

13.    The Owner is either (i) a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or a partnership for U.S. federal income tax purposes and created or organized in, or under the laws of, the United States, any state thereof or the District of Columbia (other than a partnership that is not treated as a United States person under any applicable Treasury regulations), (iii) an estate that is described in Section 7701(a)(30)(D) of the Code, or (iv) a trust that is described in Section 7701(a)(30)(E) of the Code.

14.    The Owner hereby agrees that it will not cause income from the Class R Certificates to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the Owner or another United States taxpayer.

15.    The Owner hereby certifies, represents and warrants to, and covenants with the Depositor, the Trustee and the Master Servicer that the following statements in (a) or (b) are accurate:

(a)    The Certificates are not being acquired by, and will not be transferred to, any employee benefit plan or other plan or arrangement subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or any person (including an insurance company investing its general account, an investment manager, a named fiduciary or a trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition (each of the foregoing, a "Plan Investor"); or

(b)    The Owner has provided the Trustee, the Depositor, the Certificate Insurer and the Master Servicer with an Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee, the Depositor, the Certificate Insurer and the Master Servicer to the effect that the purchase or holding of Certificates is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Depositor, the Certificate Insurer or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Pooling and Servicing Agreement, which Opinion of Counsel shall not be at the expense of the Trustee, the Depositor, the Certificate Insurer, the Trust Fund or the Master Servicer.

In addition, the Owner hereby certifies, represents and warrants to, and covenants with, the Depositor, the Trustee, the Certificate Insurer and the Master Servicer that the Owner will not transfer such Certificates to any Plan Investor or person unless either such Plan Investor or person meets the requirements set forth in either (a) or (b) above.

Capitalized terms used but not defined herein shall have the meanings assigned in the Pooling and Servicing Agreement.

OHS West:260191802.4

IN WITNESS WHEREOF, the Owner has caused this instrument to be executed on its behalf, pursuant to the authority of its Board of Directors, by its [Title of Officer] and its corporate seal to be hereunto attached, attested by its [Assistant] Secretary, this _____ day of _____ 200__.

[NAME OF OWNER]

By: _____
[Name of Officer]
[Title of Officer]

[Corporate Seal]

ATTEST:

_____
[Assistant] Secretary

Personally appeared before me the above-named [Name of Officer], known or proved to me to be the same person who executed the foregoing instrument and to be the [Title of Officer] of the Owner, and acknowledged to me that he executed the same as his free act and deed and the free act and deed of the Owner.

Subscribed and sworn before me this _____ day of _____ , 200_.

_____
NOTARY PUBLIC

COUNTY OF _____
STATE OF _____.
My Commission expires the ___ day of _____, 20__

H-1-4

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Parts 1 and 602

[TD 9004]

RIN 1545-AW98


Real Estate Mortgage Investment Conduits

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

-----------------------------------------------------------------------

SUMMARY: This document contains final regulations relating to safe harbor transfers of noneconomic residual interests in real estate mortgage investment conduits (REMICs). The final regulations provide additional limitations on the circumstances under which transferors may claim safe harbor treatment.

DATES: Effective Date: These regulations are effective July 19, 2002.

Applicability Date: For dates of applicability, see Sec. 1.860E-(1)(c)(10).

FOR FURTHER INFORMATION CONTACT: Courtney Shepardson at (202) 622-3940 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

Paperwork Reduction Act

The collection of information in this final rule has been reviewed and, pending receipt and evaluation of public comments, approved by the Office of Management and Budget (OMB) under 44 U.S.C. 3507 and assigned control number 1545-1675.

The collection of information in this regulation is in Sec. 1.860E-1(c)(5)(ii). This information is required to enable the IRS to verify that a taxpayer is complying with the conditions of this regulation. The collection of information is mandatory and is required. Otherwise, the taxpayer will not receive the benefit of safe harbor treatment as provided in the regulation. The likely respondents are businesses and other for-profit institutions.

Comments on the collection of information should be sent to the Office of Management and Budget, Attn: Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, DC, 20503, with copies to the Internal Revenue Service, Attn: IRS Reports Clearance Officer, W:CAR:MP:FP:S, Washington, DC 20224. Comments on the collection of information should be received by September 17, 2002. Comments are specifically requested concerning:

- Whether the collection of information is necessary for the proper performance of the functions of the Internal Revenue Service, including whether the information will have practical utility;

- The accuracy of the estimated burden associated with the collection of information (see below);

- How the quality, utility, and clarity of the information to be collected may be enhanced;

- How the burden of complying with the collection of information may be minimized, including through the application of automated collection techniques or other forms of information technology; and

- Estimates of capital or start-up costs and costs of operation, maintenance, and purchase of service to provide information.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by the Office of Management and Budget.

The estimated total annual reporting burden is 470 hours, based on an estimated number of respondents of 470 and an estimated average annual burden hours per respondent of one hour.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

Background

This document contains final regulations regarding the proposed amendments to 26 CFR part 1 under section 860E of the Internal Revenue Code (Code). The regulations provide the circumstances under which a transferor of a noneconomic REMIC residual interest meeting the investigation and representation requirements may avail itself of the safe harbor by satisfying either the formula test or the asset test.

Final regulations governing REMICs, issued in 1992, contain rules governing the transfer of noneconomic REMIC residual interests. In general, a transfer of a noneconomic residual interest is disregarded for all tax purposes if a significant purpose of the transfer is to enable the transferor to impede the assessment or collection of tax. A purpose to impede the assessment or collection of tax (a wrongful purpose) exists if the transferor, at the time of the transfer, either knew or should have known that the transferee would be unwilling or unable to pay taxes due on its share of the REMIC's taxable income.  Under a safe harbor, the transferor of a REMIC

OHS West:260191802.4

noneconomic residual interest is presumed not to have a wrongful purpose if two requirements are satisfied: (1) the transferor conducts a reasonable investigation of the transferee's financial condition (the investigation requirement); and (2) the transferor secures a representation from the transferee to the effect that the transferee understands the tax obligations associated with holding a residual interest and intends to pay those taxes (the representation requirement).

The IRS and Treasury have been concerned that some transferors of noneconomic residual interests claim they satisfy the safe harbor even in situations where the economics of the transfer clearly indicate the transferee is unwilling or unable to pay the tax associated with holding the interest. For this reason, on February 7, 2000, the IRS published in the Federal Register (65 FR 5807) a notice of proposed rulemaking (REG-100276-97; REG-122450-98) designed to clarify the safe harbor by adding the "formula test," an economic test. The proposed regulation provides that the safe harbor is unavailable unless the present value of the anticipated tax liabilities associated with holding the residual interest does not exceed the sum of: (1) The present value of any consideration given to the transferee to acquire the interest; (2) the present value of the expected future distributions on the interest; and (3) the present value of the anticipated tax savings associated with holding the interest as the REMIC generates losses.

The notice of proposed rulemaking also contained rules for FASITs. Section 1.860H-6(g) of the proposed regulations provides requirements for transfers of FASIT ownership interests and adopts a safe harbor by reference to the safe harbor provisions of the REMIC regulations. In January 2001, the IRS published Rev. Proc. 2001-12 (2001-3 I.R.B. 335) to set forth an alternative safe harbor that taxpayers could use while the IRS and the Treasury considered comments on the proposed regulations. Under the alternative safe harbor, if a transferor meets the investigation requirement and the representation requirement but the transfer fails to meet the formula test, the transferor may invoke the safe harbor if the transferee meets a two-prong test (the asset test). A transferee generally meets the first prong of this test if, at the time of the transfer, and in each of the two years preceding the year of transfer, the transferee's gross assets exceed $100 million and its net assets exceed $10 million. A transferee generally meets the second prong of this test if it is a domestic, taxable corporation and agrees in writing not to transfer the interest to any person other than another domestic, taxable corporation that also satisfies the requirements of the asset test. A transferor cannot rely on the asset test if the transferor knows, or has reason to know, that the transferee will not comply with its written agreement to limit the restrictions on subsequent transfers of the residual interest.

Rev. Proc. 2001-12 provides that the asset test fails to be satisfied in the case of a transfer or assignment of a noneconomic residual interest to a foreign branch of an otherwise eligible transferee. If such a transfer or assignment were permitted, a corporate taxpayer might seek to claim that the provisions of an applicable income tax treaty would resource excess inclusion income as foreign source income, and that, as a consequence, any U.S. tax liability attributable to the excess inclusion income could be offset by foreign tax credits. Such a claim would impede the assessment or collection of U.S. tax on excess inclusion income, contrary to the congressional purpose of assuring that such income will be taxable in all events. See, e.g., sections 860E(a)(1), (b), (e) and 860G(b) of the Code.

The Treasury and the IRS have learned that certain taxpayers transferring noneconomic residual interests to foreign branches have attempted to rely on the formula test to obtain safe

H-1-I-3

harbor treatment in an effort to impede the assessment or collection of U.S. tax on excess inclusion income. Accordingly, the final regulations provide that if a noneconomic residual interest is transferred to a foreign permanent establishment or fixed base of a U.S. taxpayer, the transfer is not eligible for safe harbor treatment under either the asset test or the formula test. The final regulations also require a transferee to represent that it will not cause income from the noneconomic residual interest to be attributable to a foreign permanent establishment or fixed base.

Section 1.860E-1(c)(8) provides computational rules that a taxpayer may use to qualify for safe harbor status under the formula test. Section 1.860E-1(c)(8)(i) provides that the transferee is presumed to pay tax at a rate equal to the highest rate of tax specified in section 11(b). Some commentators were concerned that this presumed rate of taxation was too high because it does not take into consideration taxpayers subject to the alternative minimum tax rate. In light of the comments received, this provision has been amended in the final regulations to allow certain transferees that compute their taxable income using the alternative minimum tax rate to use the alternative minimum tax rate applicable to corporations.

Additionally, Sec. 1.860E-1(c)(8)(iii) provides that the present values in the formula test are to be computed using a discount rate equal to the applicable Federal short-term rate prescribed by section 1274(d). This is a change from the proposed regulation and Rev. Proc. 2001-12. In those publications the provision stated that "present values are computed using a discount rate equal to the applicable Federal rate prescribed in section 1274(d) compounded semiannually" and that "[a] lower discount rate may be used if the transferee can demonstrate that it regularly borrows, in the course of its trade or business, substantial funds at such lower rate from an unrelated third party." The IRS and the Treasury Department have learned that, based on this provision, certain taxpayers have been attempting to use unrealistically low or zero interest rates to satisfy the formula test, frustrating the intent of the test. Furthermore, the Treasury Department and the IRS believe that a rule allowing for a rate other than a rate based on an objective index would add unnecessary complexity to the safe harbor. As a result, the rule in the proposed regulations that permits a transferee to use a lower discount rate, if the transferee can demonstrate that it regularly borrows substantial funds at such lower rate, is not included in the final regulations; and the Federal short-term rate has been substituted for the applicable Federal rate. To simplify taxpayers' computations, the final regulations allow use of any of the published short-term rates, provided that the present values are computed with a corresponding period of compounding. With the exception of the provisions relating to transfers to foreign branches, these changes generally have the proposed applicability date of February 4, 2000, but taxpayers may choose to apply the interest rate formula set forth in the proposed regulation and Rev. Proc. 2001-12 for transfers occurring before August 19, 2002.

It is anticipated that when final regulations are adopted with respect to FASITs, Sec. 1.860H-6(g) of the proposed regulations will be adopted in substantially its present form, with the result that the final regulations contained in this document will also govern transfers of FASIT ownership interests with substantially the same applicability date as is contained in this document.

OHS West:260191802.4

.

Effect on Other Documents

Rev. Proc. 2001-12 (2001-3 I.R.B. 335) is obsolete for transfers of noneconomic residual interests in REMICs occurring on or after August 19, 2002.

Special Analyses

It is hereby certified that these regulations will not have a significant economic impact on a substantial number of small entities. This certification is based on the fact that it is unlikely that a substantial number of small entities will hold REMIC residual interests. Therefore, a Regulatory Flexibility Analysis under the Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required. It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It also has been determined that sections 553(b) and 553(d) of the Administrative Procedure Act (5 U.S.C. chapter 5) do not apply to these regulations.

Drafting Information

The principal author of these regulations is Courtney Shepardson. However, other personnel from the IRS and Treasury Department participated in their development.

List of Subjects

26 CFR Part 1

Income taxes, Reporting and record keeping requirements.

26 CFR Part 602

Reporting and record keeping requirements.

Adoption of Amendments to the Regulations

Accordingly, 26 CFR parts 1 and 602 are amended as follows:

PART 1--INCOME TAXES

Paragraph 1. The authority citation for part 1 continues to read in

part as follows:

Authority: 26 U.S.C. 7805 * * *

.

H-1-I-5

EXHIBIT H-2

FORM OF TRANSFEROR CERTIFICATE

_____, 20__

U.S. Bank National Association
EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107

Attention: Structured Finance/RASC, Series 2007-EMX1

Re:   Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1

Ladies and Gentlemen:

This letter is delivered to you in connection with the transfer by _____ (the "Seller") to _____ (the "Purchaser") of $_____ Initial Certificate Principal Balance of Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1, Class R (the "Certificates"), pursuant to Section 5.02 of the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of February 1, 2007 among Residential Asset Securities Corporation, as depositor (the "Depositor"), Residential Funding Company, LLC, as master servicer, and U.S. Bank National Association, as trustee (the "Trustee"). All terms used herein and not otherwise defined shall have the meanings set forth in the Pooling and Servicing Agreement. The Seller hereby certifies, represents and warrants to, and covenants with, the Depositor and the Trustee that:

1.     No purpose of the Seller relating to the transfer of the Certificate by the Seller to the Purchaser is or will be to impede the assessment or collection of any tax.

2.     The Seller understands that the Purchaser has delivered to the Trustee and the Master Servicer a transfer affidavit and agreement in the form attached to the Pooling and Servicing Agreement as Exhibit H-1.  The Seller does not know or believe that any representation contained therein is false.

3.     The Seller has at the time of the transfer conducted a reasonable investigation of the financial condition of the Purchaser as contemplated by Treasury Regulations Section 1.860E-1(c)(4)(i) and, as a result of that investigation, the Seller has determined that the Purchaser has historically paid its debts as they become due and has found no significant evidence to indicate that the Purchaser will not continue to pay its debts as they become due in the future. The Seller understands that the transfer of a Class R Certificate may not be respected for United States income tax purposes (and the Seller may continue to be liable for United States income taxes associated therewith) unless the Seller has conducted such an investigation.

H-2-1

4.    The Seller has no actual knowledge that the proposed Transferee is not both a United States Person and a Permitted Transferee.

Very truly yours,

_____
(Seller)

By: _____
Name: _____
Title: _____

H-2-2

EXHIBIT I

### FORM OF INVESTOR REPRESENTATION LETTER

_____, 20__

Residential Asset Securities Corporation
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN  55437

U.S. Bank National Association
EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107
Attn: Structured Finance/RASC 2007-EMX1

Residential Funding Company, LLC
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN  55437

Attention:  Residential Funding Company, LLC Series 2007-EMX1

Re: Home Equity Mortgage Asset-Backed Pass-Through Certificates,
Series 2007-EMX1, Class [SB] [R] _____

Ladies and Gentlemen:



_____ (the "Purchaser") intends to purchase from _____ (the "Seller") $_____ Initial Certificate Principal Balance of Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1, Class [SB] [R-[__]] (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of February 1, 2007 among Residential Asset Securities Corporation, as depositor (the "Depositor"), Residential Funding Company, LLC, as master servicer (the "Master Servicer"), and U.S. Bank National Association, as trustee (the "Trustee").  All terms used herein and not otherwise defined shall have the meanings set forth in the Pooling and Servicing Agreement.  The Purchaser hereby certifies, represents and warrants to, and covenants with, the Depositor, the Trustee and the Master Servicer that:

1. The Purchaser understands that (a) the Certificates have not been and will not be registered or qualified under the Securities Act of 1933, as amended (the "Act") or any state securities law, (b) the Depositor is not required

I-1

to so register or qualify the Certificates, (c) the Certificates may be resold only if registered and qualified pursuant to the provisions of the Act or any state securities law, or if an exemption from such registration and qualification is available, (d) the Pooling and Servicing Agreement contains restrictions regarding the transfer of the Certificates and (e) the Certificates will bear a legend to the foregoing effect.

2.      The Purchaser is acquiring the Certificates for its own account for investment only and not with a view to or for sale in connection with any distribution thereof in any manner that would violate the Act or any applicable state securities laws.

3.      The Purchaser is (a) a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters, and, in particular, in such matters related to securities similar to the Certificates, such that it is capable of evaluating the merits and risks of investment in the Certificates, (b) able to bear the economic risks of such an investment and (c) an "accredited investor" within the meaning of Rule 501(a) promulgated pursuant to the Act.

4.      The Purchaser has been furnished with, and has had an opportunity to review (a) [a copy of the Private Placement Memorandum, dated _____, 20__, relating to the Certificates (b)] a copy of the Pooling and Servicing Agreement and [b] [c] such other information concerning the Certificates, the Mortgage Loans and the Depositor as has been requested by the Purchaser from the Depositor or the Seller and is relevant to the Purchaser's decision to purchase the Certificates. The Purchaser has had any questions arising from such review answered by the Depositor or the Seller to the satisfaction of the Purchaser. [If the Purchaser did not purchase the Certificates from the Seller in connection with the initial distribution of the Certificates and was provided with a copy of the Private Placement Memorandum (the "Memorandum") relating to the original sale (the "Original Sale") of the Certificates by the Depositor, the Purchaser acknowledges that such Memorandum was provided to it by the Seller, that the Memorandum was prepared by the Depositor solely for use in connection with the Original Sale and the Depositor did not participate in or facilitate in any way the purchase of the Certificates by the Purchaser from the Seller, and the Purchaser agrees that it will look solely to the Seller and not to the Depositor with respect to any damage, liability, claim or expense arising out of, resulting from or in connection with (a) error or omission, or alleged error or omission, contained in the Memorandum, or (b) any information, development or event arising after the date of the Memorandum.]

5.      The Purchaser has not and will not nor has it authorized or will it authorize any person to (a) offer, pledge, sell, dispose of or otherwise transfer any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) solicit any offer to buy or to accept a pledge, disposition of other transfer of any Certificate, any interest in any Certificate or

I-2

any other similar security from any person in any manner, (c) otherwise approach or negotiate with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) make any general solicitation by means of general advertising or in any other manner or (e) take any other action, that (as to any of (a) through (e) above) would constitute a distribution of any Certificate under the Act, that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Purchaser will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

6.    The Purchaser hereby certifies, represents and warrants to, and covenants with the Depositor, the Trustee and the Master Servicer that the following statements in (a) or (b) are correct:

(a)    The Purchaser is not an employee benefit plan or other plan or arrangement subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or any person (including an insurance company investing its general account, an investment manager, a named fiduciary or a trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition (each of the foregoing, a "Plan Investor"); or

(b)    the Purchaser has provided the Trustee, the Depositor, the Certificate Insurer and the Master Servicer with an Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee, the Depositor, the Certificate Insurer and the Master Servicer to the effect that the purchase or holding of Certificates is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Depositor, the Certificate Insurer or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Pooling and Servicing Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Certificate Insurer the Depositor or the Master Servicer.

In addition, the Purchaser hereby certifies, represents and warrants to, and covenants with, the Depositor, the Trustee and the Master Servicer that the Purchaser will not transfer such Certificates to any Plan Investor or person unless either such Plan Investor or person meets the requirements set forth in either (a) or (b) above.

Very truly yours,

_____

(Purchaser)

By:_____

Name: _____

Title: _____

EXHIBIT J

## FORM OF TRANSFEROR REPRESENTATION LETTER

_____, 20__

Residential Asset Securities Corporation
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

U.S. Bank National Association
EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107
Attn: Structured Finance/RASC 2007-EMX1

Attention: Residential Funding Company, LLC Series 2007-EMX1

    Re:    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1, Class [SB] [R]

Ladies and Gentlemen:

        In connection with the sale by _____ (the "Seller") to _____ (the "Purchaser") of $_____ Initial Certificate Principal Balance of Home Equity Mortgage Asset- Backed Pass-Through Certificates, Series 2007-EMX1, Class [SB] [R] (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of February 1, 2007 among Residential Asset Securities Corporation, as depositor (the "Depositor"), Residential Funding Company, LLC, as master servicer, and U.S. Bank National Association, as trustee (the "Trustee"). The Seller hereby certifies, represents and warrants to, and covenants with, the Depositor and the Trustee that:

        Neither the Seller nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933 (the "Act"), that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The

J-1

Seller will not act, in any manner set forth in the foregoing sentence with respect to any Certificate.  The Seller has not and will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

Very truly yours,

_____

(Purchaser)

By:_____

Name: _____

Title: _____

EXHIBIT K

TEXT OF AMENDMENT TO POOLING AND SERVICING
AGREEMENT PURSUANT TO SECTION 11.01(e) FOR A
LIMITED GUARANTY

ARTICLE XIII

Subordinate Certificate Loss Coverage; Limited Guaranty

Section 13.01. <u>Subordinate Certificate Loss Coverage; Limited Guaranty</u>. (a) Subject to subsection (c) below, prior to the later of the third Business Day prior to each Distribution Date or the related Determination Date, the Master Servicer shall determine whether it or any Subservicer will be entitled to any reimbursement pursuant to Section 3.10 on such Distribution Date for Advances or Subservicer Advances previously made, (which will not be Advances or Subservicer Advances that were made with respect to delinquencies which were subsequently determined to be Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses) and, if so, the Master Servicer shall demand payment from Residential Funding of an amount equal to the amount of any Advances or Subservicer Advances reimbursed pursuant to Section 3.10, to the extent such Advances or Subservicer Advances have not been included in the amount of the Realized Loss in the related Mortgage Loan, and shall distribute the same to the Class SB Certificateholders in the same manner as if such amount were to be distributed pursuant to Section 4.02.

(b)    Subject to subsection (c) below, prior to the later of the third Business Day prior to each Distribution Date or the related Determination Date, the Master Servicer shall determine whether any Realized Losses (other than Excess Special Hazard Losses, Excess Bankruptcy Losses, Excess Fraud Losses and Extraordinary Losses) will be allocated to the Class SB Certificates on such Distribution Date pursuant to Section 4.05, and, if so, the Master Servicer shall demand payment from Residential Funding of the amount of such Realized Loss and shall distribute the same to the Class SB Certificateholders in the same manner as if such amount were to be distributed pursuant to Section 4.02; provided, however, that the amount of such demand in respect of any Distribution Date shall in no event be greater than the sum of (i) the additional amount of Accrued Certificate Interest that would have been paid for the Class SB Certificateholders on such Distribution Date had such Realized Loss or Losses not occurred plus (ii) the amount of the reduction in the Certificate Principal Balances of the Class SB Certificates on such Distribution Date due to such Realized Loss or Losses. Notwithstanding such payment, such Realized Losses shall be deemed to have been borne by the Certificateholders for purposes of Section 4.05. Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses and Extraordinary Losses allocated to the Class SB Certificates will not be covered by the Subordinate Certificate Loss Obligation.

(c)    Demands for payments pursuant to this Section shall be made prior to the later of the third Business Day prior to each Distribution Date or the related Determination Date by the Master Servicer with written notice thereof to the Trustee. The maximum amount that

Residential Funding shall be required to pay pursuant to this Section on any Distribution Date
(the "Amount Available") shall be equal to the lesser of (X) _____ minus the sum of (i) all
previous payments made under subsections (a) and (b) hereof and (ii) all draws under the
Limited Guaranty made in lieu of such payments as described below in subsection (d) and
(Y) the then outstanding Certificate Principal Balances of the Class SB Certificates, or such
lower amount as may be established pursuant to Section 13.02. Residential Funding's
obligations as described in this Section are referred to herein as the "Subordinate Certificate Loss
Obligation."

(d)    The Trustee will promptly notify GMAC LLC of any failure of
Residential Funding to make any payments hereunder and shall demand payment pursuant to the
limited guaranty (the "Limited Guaranty"), executed by GMAC LLC, of Residential Funding's
obligation to make payments pursuant to this Section, in an amount equal to the lesser of (i) the
Amount Available and (ii) such required payments, by delivering to GMAC LLC a written
demand for payment by wire transfer, not later than the second Business Day prior to the
Distribution Date for such month, with a copy to the Master Servicer.

(e)    All payments made by Residential Funding pursuant to this Section or
amounts paid under the Limited Guaranty shall be deposited directly in the Certificate Account,
for distribution on the Distribution Date for such month to the Class SB Certificateholders.

(f)    The Depositor shall have the option, in its sole discretion, to substitute for
either or both of the Limited Guaranty or the Subordinate Certificate Loss Obligation another
instrument in the form of a corporate guaranty, an irrevocable letter of credit, a surety bond,
insurance policy or similar instrument or a reserve fund; provided that (i) the Depositor obtains
(subject to the provisions of Section 10.01(f) as if the Depositor was substituted for the Master
Servicer solely for the purposes of such provision) an Opinion of Counsel (which need not be an
opinion of independent counsel) to the effect that obtaining such substitute corporate guaranty,
irrevocable letter of credit, surety bond, insurance policy or similar instrument or reserve fund
will not cause either (a) any federal tax to be imposed on the Trust Fund, including without
limitation, any federal tax imposed on "prohibited transactions" under Section 860(F)(a)(1) of
the Code or on "contributions after the startup date" under Section 860(G)(d)(1) of the Code or
(b) the Trust Fund to fail to qualify as a REMIC at any time that any Certificate is outstanding,
and (ii) no such substitution shall be made unless (A) the substitute Limited Guaranty or
Subordinate Certificate Loss Obligation is for an initial amount not less than the then current
Amount Available and contains provisions that are in all material respects equivalent to the
original Limited Guaranty or Subordinate Certificate Loss Obligation (including that no portion
of the fees, reimbursements or other obligations under any such instrument will be borne by the
Trust Fund), (B) the long term debt obligations of any obligor of any substitute Limited Guaranty
or Subordinate Certificate Loss Obligation (if not supported by the Limited Guaranty) shall be
rated at least the lesser of (a) the rating of the long term debt obligations of GMAC LLC as of the
date of issuance of the Limited Guaranty and (b) the rating of the long term debt obligations of
GMAC LLC at the date of such substitution and (C) if the Class SB Certificates have been rated,
the Depositor obtains written confirmation from each Rating Agency that rated the Class SB
Certificates at the request of the Depositor that such substitution shall not lower the rating on the
Class SB Certificates below the lesser of (a) the then-current rating assigned to the Class SB
Certificates by such Rating Agency and (b) the original rating assigned to the Class SB

K-2

Certificates by such Rating Agency. Any replacement of the Limited Guaranty or Subordinate Certificate Loss Obligation pursuant to this Section shall be accompanied by a written Opinion of Counsel to the substitute guarantor or obligor, addressed to the Master Servicer and the Trustee, that such substitute instrument constitutes a legal, valid and binding obligation of the substitute guarantor or obligor, enforceable in accordance with its terms, and concerning such other matters as the Master Servicer and the Trustee shall reasonably request. Neither the Depositor, the Master Servicer nor the Trustee shall be obligated to substitute for or replace the Limited Guaranty or Subordinate Certificate Loss Obligation under any circumstance.

Section 13.02. Amendments Relating to the Limited Guaranty. Notwithstanding Sections 11.01 or 13.01: (i) the provisions of this Article XIII may be amended, superseded or deleted, (ii) the Limited Guaranty or Subordinate Certificate Loss Obligation may be amended, reduced or canceled, and (iii) any other provision of this Agreement which is related or incidental to the matters described in this Article XIII may be amended in any manner; in each case by written instrument executed or consented to by the Depositor and Residential Funding but without the consent of any Certificateholder and without the consent of the Master Servicer or the Trustee being required unless any such amendment would impose any additional obligation on, or otherwise adversely affect the interests of, the Master Servicer or the Trustee, as applicable; provided that the Depositor shall also obtain a letter from each Rating Agency that rated the Class SB Certificates at the request of the Depositor to the effect that such amendment, reduction, deletion or cancellation will not lower the rating on the Class SB Certificates below the lesser of (a) the then-current rating assigned to the Class SB Certificates by such Rating Agency and (b) the original rating assigned to the Class SB Certificates by such Rating Agency, unless (A) the Holder of 100% of the Class SB Certificates is Residential Funding or an Affiliate of Residential Funding, or (B) such amendment, reduction, deletion or cancellation is made in accordance with Section 11.01(e) and, provided further that the Depositor obtains (subject to the provisions of Section 10.01(f) as if the Depositor was substituted for the Master Servicer solely for the purposes of such provision), in the case of a material amendment or supersession (but not a reduction, cancellation or deletion of the Limited Guaranty or the Subordinate Certificate Loss Obligation), an Opinion of Counsel (which need not be an opinion of independent counsel) to the effect that any such amendment or supersession will not cause either (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code or (b) the Trust Fund to fail to qualify as a REMIC at any time that any Certificate is outstanding. A copy of any such instrument shall be provided to the Trustee and the Master Servicer together with an Opinion of Counsel that such amendment complies with this Section 13.02.

EXHIBIT L

## FORM OF LIMITED GUARANTY
### RESIDENTIAL ASSET SECURITIES CORPORATION

Home Equity Mortgage Asset-Backed Pass-Through Certificates
Series 2007-EMX1

_____, 20__

U.S. Bank National Association
EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107
Attn: Structured Finance/RASC 2007-EMX1

Ladies and Gentlemen:

WHEREAS, Residential Funding Company, LLC, a Delaware limited liability company ("Residential Funding"), an indirect wholly-owned subsidiary of GMAC LLC, a Delaware limited liability company ("GMAC"), plans to incur certain obligations as described under Section 13.01 of the Pooling and Servicing Agreement dated as of February 1, 2007 (the "Servicing Agreement"), among Residential Asset Securities Corporation (the "Depositor"), Residential Funding and U.S. Bank National Association (the "Trustee") as amended by Amendment No. ___ thereto, dated as of _____, with respect to the Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1 (the "Certificates"); and

WHEREAS, pursuant to Section 13.01 of the Servicing Agreement, Residential Funding agrees to make payments to the Holders of the Class SB Certificates with respect to certain losses on the Mortgage Loans as described in the Servicing Agreement; and

WHEREAS, GMAC desires to provide certain assurances with respect to the ability of Residential Funding to secure sufficient funds and faithfully to perform its Subordinate Certificate Loss Obligation;

NOW THEREFORE, in consideration of the premises herein contained and certain other good and valuable consideration, the receipt of which is hereby acknowledged, GMAC agrees as follows:

1.    <u>Provision of Funds</u>. (a) GMAC agrees to contribute and deposit in the Certificate Account on behalf of Residential Funding (or otherwise provide to Residential

Funding, or to cause to be made available to Residential Funding), either directly or through a subsidiary, in any case prior to the related Distribution Date, such moneys as may be required by Residential Funding to perform its Subordinate Certificate Loss Obligation when and as the same arises from time to time upon the demand of the Trustee in accordance with Section 13.01 of the Servicing Agreement.

(b)    The agreement set forth in the preceding clause (a) shall be absolute, irrevocable and unconditional and shall not be affected by the transfer by GMAC or any other person of all or any part of its or their interest in Residential Funding, by any insolvency, bankruptcy, dissolution or other proceeding affecting Residential Funding or any other person, by any defense or right of counterclaim, set-off or recoupment that GMAC may have against Residential Funding or any other person or by any other fact or circumstance. Notwithstanding the foregoing, GMAC's obligations under clause (a) shall terminate upon the earlier of (x) substitution for this Limited Guaranty pursuant to Section 13.01(f) of the Servicing Agreement, or (y) the termination of the Trust Fund pursuant to the Servicing Agreement.

2.    Waiver.  GMAC hereby waives any failure or delay on the part of Residential Funding, the Trustee or any other person in asserting or enforcing any rights or in making any claims or demands hereunder. Any defective or partial exercise of any such rights shall not preclude any other or further exercise of that or any other such right. GMAC further waives demand, presentment, notice of default, protest, notice of acceptance and any other notices with respect to this Limited Guaranty, including, without limitation, those of action or non-action on the part of Residential Funding or the Trustee.

3.    Modification, Amendment and Termination.  This Limited Guaranty may be modified, amended or terminated only by the written agreement of GMAC and the Trustee and only if such modification, amendment or termination is permitted under Section 13.02 of the Servicing Agreement. The obligations of GMAC under this Limited Guaranty shall continue and remain in effect so long as the Servicing Agreement is not modified or amended in any way that might affect the obligations of GMAC under this Limited Guaranty without the prior written consent of GMAC.

4.    Successor.  Except as otherwise expressly provided herein, the guarantee herein set forth shall be binding upon GMAC and its respective successors.

5.    Governing Law.  This Limited Guaranty shall be governed by the laws of the State of New York.

6.    Authorization and Reliance.  GMAC understands that a copy of this Limited Guaranty shall be delivered to the Trustee in connection with the execution of Amendment No. __ to the Servicing Agreement and GMAC hereby authorizes the Depositor and the Trustee to rely on the covenants and agreements set forth herein.

7.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meaning given them in the Servicing Agreement.

        8.     Counterparts. This Limited Guaranty may be executed in any number of counterparts, each of which shall be deemed to be an original and such counterparts shall constitute but one and the same instrument.

IN WITNESS WHEREOF, GMAC has caused this Limited Guaranty to be executed and delivered by its respective officers thereunto duly authorized as of the day and year first above written.

GMAC LLC

By:_____

Name: _____

Title: _____

Acknowledged by:

U.S. BANK NATIONAL ASSOCIATION,
  as Trustee

By:_____

Name: _____

Title: _____

RESIDENTIAL ASSET SECURITIES
CORPORATION

By:_____

Name: _____

Title: _____

EXHIBIT M

FORM OF LENDER CERTIFICATION FOR ASSIGNMENT OF MORTGAGE LOAN

_____, 20\_\_

Residential Asset Securities Corporation
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

U.S. Bank National Association
EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107
Attn: Structured Finance/RASC 2007-EMX1

> Re:    Home Equity Mortgage Asset-Backed Pass-Through Certificates,
> Series 2007-EMX1 Assignment of Mortgage Loan _____

Ladies and Gentlemen:

This letter is delivered to you in connection with the assignment by U.S Bank National Association (the "Trustee") to _____ (the "Lender") of _____ (the "Mortgage Loan") pursuant to Section 3.13(d) of the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of February 1, 2007 among Residential Asset Securities Corporation, as depositor (the "Depositor"), Residential Funding Company, LLC, as master servicer, and the Trustee. All terms used herein and not otherwise defined shall have the meanings set forth in the Pooling and Servicing Agreement. The Lender hereby certifies, represents and warrants to, and covenants with, the Master Servicer and the Trustee that:

(ii)    the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction;

(iii)    the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws;

(iv)    the Mortgage Loan following the proposed assignment will be modified to have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and

(v)    such assignment is at the request of the borrower under the related Mortgage Loan.

Very truly yours,

_____

(Lender)

By:_____
Name: _____
Title: _____

EXHIBIT N

FORM OF RULE 144A INVESTMENT REPRESENTATION

Description of Rule 144A Securities, including numbers:

The undersigned seller, as registered holder (the "Seller"), intends to transfer the Rule 144A Securities described above to the undersigned buyer (the "Buyer").

1.    In connection with such transfer and in accordance with the agreements pursuant to which the Rule 144A Securities were issued, the Seller hereby certifies the following facts:  Neither the Seller nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the Securities Act of 1933, as amended (the "1933 Act"), or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, and that the Seller has not offered the Rule 144A Securities to any person other than the Buyer or another "qualified institutional buyer" as defined in Rule 144A under the 1933 Act.

2.    The Buyer, pursuant to Section 5.02 of the Pooling and Servicing Agreement (the "Agreement"), dated as of February 1, 2007 among Residential Funding Company, LLC, as master servicer (the "Master Servicer"), Residential Asset Securities Corporation, as depositor (the "Depositor"), and U.S. Bank National Association, as trustee (the "Trustee") warrants and represents to, and covenants with, the Seller, the Trustee and the Master Servicer as follows:

a.    The Buyer understands that the Rule 144A Securities have not been registered under the 1933 Act or the securities laws of any state.

b.    The Buyer considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Rule 144A Securities.

c.    The Buyer has been furnished with all information regarding the Rule 144A Securities that it has requested from the Seller, the Trustee or the Servicer.

N-1

d.      Neither the Buyer nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the 1933 Act or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Rule 144A Securities.

e.      The Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the 1933 Act and has completed either of the forms of certification to that effect attached hereto as Annex I or Annex II. The Buyer is aware that the sale to it is being made in reliance on Rule 144A. The Buyer is acquiring the Rule 144A Securities for its own account or the accounts of other qualified institutional buyers, understands that such Rule 144A Securities may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the 1933 Act.

3.      The Buyer of Class SB Certificates or Class R Certificates

a.      is not an employee benefit plan or other plan or arrangement subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code, or any person (including an insurance company investing its general account, an investment manager, a named fiduciary or a trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition; or

b.      has provided the Trustee, the Depositor, the Certificate Insurer and the Master Servicer with the Opinion of Counsel described in Section 5.02(e)(i) of the Agreement, which shall be acceptable to and in form and substance satisfactory to the Trustee, the Depositor, the Certificate Insurer and the Master Servicer to the effect that the purchase or holding of this Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Depositor, the Certificate Insurer, the Trust Fund or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Depositor, the Certificate Insurer, the Trust Fund or the Master Servicer.

4.     This document may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same document.

IN WITNESS WHEREOF, each of the parties has executed this document as of the date set forth below.

| | |
|---|---|
| _____ | _____ |
| Print Name of Seller | Print Name of Purchaser |

By:_____    By:_____

    Name:                            Name:

    Title:                              Title:

Taxpayer Identification:                  Taxpayer Identification:

No._____    No._____

Date: _____    Date: _____

ANNEX I TO EXHIBIT N

## QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers Other Than Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

1.    As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

2.    In connection with purchases by the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis $_____ in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Buyer satisfies the criteria in the category marked below.

____    Corporation, etc. The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code.

____    Bank. The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

____    Savings and Loan. The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements.

____    Broker-Dealer. The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

____    Insurance Company. The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State or territory or the District of Columbia.

N-I-1

\_\_\_\_    **State or Local Plan.** The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

\_\_\_\_    **Investment Adviser.** The Buyer is an investment adviser registered under the Investment Advisers Act of 1940.

\_\_\_\_    **SBIC.** The Buyer is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

\_\_\_\_    **Business Development Company.** The Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

\_\_\_\_    **Trust Fund.** The Buyer is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees, or (b) employee benefit plans within the meaning of Title I of the Employee Retirement Income Security Act of 1974, but is not a trust fund that includes as participants individual retirement accounts or H.R. 10 plans.

3.    The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

4.    For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph. Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction. However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934.

5.    The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties related to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

| \_\_\_\_ | \_\_\_\_ | Will the Buyer be purchasing the Rule 144A |
|------|------|--------------------------------------------|
| Yes  | No   | Securities for the Buyer's own account?    |

N-I-2

6.      If the answer to the foregoing question is "no", the Buyer agrees that, in connection with any purchase of securities sold to the Buyer for the account of a third party (including any separate account) in reliance on Rule 144A, the Buyer will only purchase for the account of a third party that at the time is a "qualified institutional buyer" within the meaning of Rule 144A.  In addition, the Buyer agrees that the Buyer will not purchase securities for a third party unless the Buyer has obtained a current representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to conclude that such third party independently meets the definition of "qualified institutional buyer" set forth in Rule 144A.

7.      The Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein.  Until such notice is given, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification as of the date of such purchase.

_____
Print Name of Buyer

By:     _____
            Name:
            Title:

Date:   _____

N-I-3

ANNEX II TO EXHIBIT N

## QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers That Are Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

8.    As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

9.    In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year.  For purposes of determining the amount of securities owned by the  Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used.

_____    The Buyer owned $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

_____    The Buyer is part of a Family of Investment Companies which owned in the aggregate $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

10.    The term "Family of Investment Companies" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

11.    The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer or are part of the Buyer's Family of Investment Companies, (ii) bank deposit notes and certificates of deposit, (iii) loan participations, (iv) repurchase agreements, (v) securities owned but subject to a repurchase agreement and (vi) currency, interest rate and commodity swaps.

12.    The Buyer is familiar with Rule 144A and understands that each of the parties to which this certification is made are relying and will continue to rely on the statements made herein because one or more sales to the Buyer will be in reliance on Rule 144A.  In addition, the Buyer will only purchase for the Buyer's own account.

13.    The undersigned will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification by the undersigned as of the date of such purchase.

_____

Print Name of Buyer


By:    _____

      Name:

      Title:


IF AN ADVISER:


_____

Print Name of Buyer

Date:    _____

N-II-2

EXHIBIT O

[RESERVED]

EXHIBIT P

FORM OF ERISA REPRESENTATION LETTER

_____, 20__

Residential Asset Securities Corporation
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

U.S. Bank National Association
EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107
Attn: Structured Finance/RASC 2007-EMX1

Residential Funding Company, LLC
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

Re:    Home Equity Mortgage Asset-Backed Pass-Through Certificates,
       Series 2007-EMX1, Class SB

Ladies and Gentlemen:

        [_____] (the "Purchaser") intends to purchase
from [_____] (the "Seller") $[_____] Initial Certificate
Principal Balance of Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series
2007-EMX1, Class _____ (the "Certificates"), issued pursuant to the Pooling and Servicing
Agreement (the "Pooling and Servicing Agreement"), dated as of February 1, 2007 among
Residential Asset Securities Corporation, as the depositor (the "Depositor"), Residential Funding
Company, LLC, as master servicer (the "Master Servicer") and U.S. Bank National Association,
as trustee (the "Trustee"). All terms used herein and not otherwise defined shall have the
meanings set forth in the Pooling and Servicing Agreement. The Purchaser hereby certifies,
represents and warrants to, and covenants with, the Depositor, the Trustee, the Certificate Insurer
and the Master Servicer that:

        (a)    The Purchaser is not an employee benefit plan or other plan or
arrangement subject to the prohibited transaction provisions of the Employee Retirement
Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal
Revenue Code of 1986, as amended (the "Code"), or any person (including an insurance
company investing its general account, an investment manager, a named fiduciary or a

trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition (each of the foregoing, a "Plan Investor"); or

(b)    The Purchaser has provided the Trustee, the Depositor, the Certificate Insurer and the Master Servicer with the Opinion of Counsel described in Section 5.02(e)(i) of the Agreement, which shall be acceptable to and in form and substance satisfactory to the Trustee, the Depositor, the Certificate Insurer and the Master Servicer to the effect that the purchase or holding of Certificates is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Depositor, the Certificate Insurer or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Pooling and Servicing Agreement, which Opinion of Counsel shall not be at the expense of the Trustee, the Depositor, the Certificate Insurer, the Trust Fund or the Master Servicer.

In addition, the Purchaser hereby certifies, represents and warrants to, and covenants with, the Depositor, the Trustee, the Certificate Insurer and the Master Servicer that the Purchaser will not transfer such Certificates to any Plan Investor or person unless such Plan Investor or person meets the requirements set forth in either (a) or (b) above.

Very truly yours,

_____
(Purchaser)

By: _____
Name: _____
Title: _____

EXHIBIT Q

## FORM OF SB-A SWAP AGREEMENT

.                                    .

EXHIBIT Q

## FORM OF SB-A SWAP AGREEMENT

**DATE:**       March 12, 2007

**TO:**        U.S. Bank National Association, not in its individual capacity but solely as supplemental interest trust trustee for the benefit of RASC Series 2007-EMX1 Supplemental Interest Trust, acting on behalf of the Class A Certificateholders under the Pooling and Servicing Agreement identified below ("**Party A**")

**ATTENTION:**    RASC Series 2007-EMX1

**FROM:**      U.S. Bank National Association, not in its individual capacity but solely as supplemental interest trust trustee for the benefit of RASC Series 2007-EMX1 Supplemental Interest Trust, acting on behalf of the Class SB Certificateholders under the Pooling and Servicing Agreement identified below ("**Party B**")

**SUBJECT:**     Payment Swap Confirmation and Agreement

**REFERENCE NUMBER**

The purpose of this letter agreement (the "Agreement") is to confirm the terms and conditions of the Transaction entered into on the Trade Date specified below (the "Transaction") between Party A and Party B. This Agreement, which evidences a complete and binding agreement between you and us to enter into the Transaction on the terms set forth below, constitutes a "Confirmation" as referred to in the ISDA Form Master Agreement (as defined below), as well as a "Schedule" as referred to in the ISDA Form Master Agreement.

1.  This Agreement is subject to and incorporates the 2000 ISDA Definitions (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA"). You and we have agreed to enter into this Agreement in lieu of negotiating a Schedule to the 1992 ISDA Master Agreement (Multicurrency-Cross Border) form (the "ISDA Form Master Agreement") but, rather, an ISDA Form Master Agreement shall be deemed to have been executed by you and us on the date we entered into the Transaction. In the event of any

inconsistency between the provisions of this Agreement and the Definitions or the ISDA Form
Master Agreement, this Agreement shall prevail for purposes of the Transaction. Terms used and
not otherwise defined herein, in the ISDA Form Master Agreement or the Definitions shall have
the meanings assigned to them in the Pooling and Servicing Agreement, dated as of February 1,
2007, among Residential Asset Securities Corporation, as depositor, Residential Funding
Company, LLC, as master servicer, and U.S. Bank National Association, as trustee and
supplemental interest trust trustee (the "Pooling and Servicing Agreement"). Each reference to a
"Section" or to a "Section" "of this Agreement" will be construed as a reference to a Section of
the 1992 ISDA Form Master Agreement. Each capitalized term used herein that is not defined
herein or in the 1992 ISDA Form Master Agreement shall have the meaning defined in the
Pooling and Servicing Agreement. Notwithstanding anything herein to the contrary, should any
provision of this Agreement conflict with any provision of the Pooling and Servicing Agreement,
the provision of the Pooling and Servicing Agreement shall apply.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:

Trade Date:

Effective Date:

Termination Date:              March 25, 2037 subject to adjustment in accordance
                               with the Business Day Convention.

Business Days:                 California, Minnesota, Texas, New York, Illinois.

Business Day Convention:       Following.

**Party A Payments:**

Party A Payment Dates:         Each Distribution Date under the Pooling and
                               Servicing Agreement.

Party A Payment Amounts:       On each Party A Payment Date, the amount, if any,
                               equal to the aggregate amount of Net Swap
                               Payments and Swap Termination Payments owed to
                               the Swap Counterparty remaining unpaid after
                               application of the sum of (A) from the Adjusted
                               Available Distribution Amount that would have
                               remained had the Adjusted Available Distribution
                               Amount been applied on such Distribution Date to
                               make the distributions for such Distribution Date
                               under Section 4.02(c) clauses (i) through (x) of the
                               Pooling and Servicing Agreement, the sum of (I)
                               Accrued Certificate Interest on the Class SB
                               Certificates,    (II) the    amount    of    any
                               Overcollateralization Reduction Amount and (III)
                               for each Distribution Date after the Certificate
                               Principal Balance of each Class of Class A

Certificates has been reduced to zero, the Overcollateralization Amount, (B) from prepayment charges on deposit in the Certificate Amount, any prepayment charges received on the Mortgage Loans during the related Prepayment Period and (C) the amount distributable with respect to REMIC IV Regular Interest IO.

**Party B Payments:**

Party B Payment Dates:   Each Distribution Date under the Pooling and Servicing Agreement

Party B Payment Amounts:   On each Party B Payment Date, an amount equal to the lesser of (a) the Available Distribution Amount remaining on such Distribution Date after the distributions on such Distribution Date under Section 4.02(c) clauses (i) through (vi) of the Pooling and Servicing Agreement and (b) the aggregate unpaid Basis Risk Shortfalls allocated to the Class A Certificateholders for such Distribution Date.

3.     Additional Provisions: Each party hereto is hereby advised and acknowledges that the other party has engaged in (or refrained from engaging in) substantial financial transactions and has taken (or refrained from taking) other material actions in reliance upon the entry by the parties into the Transaction being entered into on the terms and conditions set forth herein and in the ISDA Form Master Agreement relating to such Transaction, as applicable.

4.     Provisions Deemed Incorporated in a Schedule to the ISDA Form Master Agreement:

1)     *Termination Provisions.* For purposes of the ISDA Form Master Agreement:

(a)     "Specified Entity" is not applicable to Party A or Party B for any purpose.

(b)     "Specified Transaction" is not applicable to Party A or Party B for any purpose, and, accordingly, Section 5(a)(v) shall not apply to Party A or Party B.

(c)     The "Cross Default" provisions of Section 5(a)(vi) shall not apply to Party A or Party B.

(d)     The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will not apply to Party A or Party B.

(e)     With respect to Party A and Party B, the "Bankruptcy" provision of Section 5(a)(vii)(2) of the ISDA Form Master Agreement will be deleted in its entirety.

(f)     The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A or to Party B.

(g)     Payments on Early Termination. For the purpose of Section 6(e) of the ISDA Form Master Agreement:

(i)     Market Quotation will apply.

(ii)     The Second Method will apply.

(h)     "Termination Currency" means United States Dollars.

(i)     The provisions of Sections 5(a)(ii), 5(a)(iii) and 5(a)(iv) shall not apply to Party A or Party B.

(j)     Tax Event. The provisions of Section 2(d)(i)(4) and 2(d)(ii) of the ISDA Form Master Agreement shall not apply to Party A and Party A shall not be required to pay any additional amounts referred to therein.

2)     Tax Representations.

(a)     Payer Representations. For the purpose of Section 3(e) of the ISDA Form Master Agreement, each of Party A and Party B will make the following representations:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of the ISDA Form Master Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

(i)     the accuracy of any representations made by the other party pursuant to Section 3(f) of the ISDA Form Master Agreement;

(ii)     the satisfaction of the agreement contained in Sections 4(a)(i) or 4(a)(iii) of the ISDA Form Master Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Sections 4(a)(i) or 4(a)(iii) of the ISDA Form Master Agreement; and

(iii)     the satisfaction of the agreement of the other party contained in Section 4(d) of the ISDA Form Master Agreement, provided

that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)      Payee Representations. For the purpose of Section 3(f) of the ISDA Form Master Agreement, Party A and Party B make the following representations: None

3)      *Documents to be Delivered.* For the purpose of Section 4(a) (i) and 4(a) (iii):

(1)      Tax forms, documents, or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to Be delivered |
|---|---|---|
| Party A and Party B | Any documents required or reasonably requested to allow the other party to make payments under this Agreement without any deduction or withholding for or on the account of any Tax or with such deduction or withholding at a reduced rate | Promptly after the earlier of (i) reasonable demand by either party or (ii) learning that such form or document is required |

(2)      Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Any documents required by the receiving party to evidence the authority of the delivering party for it to execute and deliver this Agreement, any Confirmation to which it is a party, and to evidence the authority of the delivering party to perform its | Upon execution and delivery of this Agreement and such Confirmation | Yes |

March 12, 2007
Page 6 of 11

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | obligations under this Agreement and such Confirmation. | | |
| Party A and Party B | A certificate of an authorized officer of the party, as to the incumbency and authority of the respective officers of the party signing this Agreement | Upon the execution and delivery of this Agreement and such Confirmation | Yes |

4)   *Miscellaneous.* Miscellaneous

(a)   Address for Notices: For the purposes of Section 12(a) of this Agreement:

Address for notices or communications to Party A:

Address:   RASC Series 2007-EMX1 Supplemental Interest Trust
c/o U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, Minnesota 55107

with a copy to:   Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 600
Minneapolis, Minnesota 55437

Attention:   Tim Jacobson
Facsimile:   (952) 921-9087

(For all purposes)

Address for notices or communications to Party B:

Address:   RASC Series 2007-EMX1 Supplemental Interest Trust
c/o U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3D
St. Paul, Minnesota 55107

with a copy to:   Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 600

March 12, 2007
Page 7 of 11

Minneapolis, Minnesota 55437

Attention:     Tim Jacobson
Facsimile No.:  (952) 921-9087

(For all purposes)

    (b)    Process Agent. For the purpose of Section 13(c):

Party A:                    Not Applicable
Party B:                    Not Applicable

    (c)    Offices. The provisions of Section 10(a) will not apply to this Agreement; neither Party A nor Party B have any Offices other than as set forth in the Notices Section.

    (d)    Multibranch Party. For the purpose of Section 10(c) of the ISDA Form Master Agreement, neither Party A nor Party B is a Multibranch. Party.

    (e)    Calculation Agent. The Calculation Agent is Residential Funding Company, LLC.

    (f)    Credit Support Document.

    Not Applicable

    (g)    Credit Support Provider.

    Not Applicable

    (h)    Governing Law. The parties to this ISDA Agreement hereby agree that the law of the State of New York shall govern their rights and duties in whole, without regard to the conflict of law provision thereof, other than New York General Obligations Law Sections 5-1401 and 5-1402.

    (i)    Non-Petition. Party A and Party B each hereby irrevocably and unconditionally agrees that it will not institute against, or join any other person in instituting against or cause any other person to institute against RASC Series 2007-EMX1 Supplemental Interest Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1, or the other party any bankruptcy, reorganization, arrangement, insolvency, or similar proceeding under the laws of the United States, or any other jurisdiction for the non-payment of any amount due hereunder or any other reason until the payment in full of the Certificates and the expiration of a period of one year plus ten days (or, if longer, the applicable preference period) following such payment.

(j)      Severability. If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants, and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties.

The parties shall endeavor to engage in good faith negotiations to replace any invalid or unenforceable term, provision, covenant or condition with a valid or enforceable term, provision, covenant or condition, the economic effect of which comes as close as possible to that of the invalid or unenforceable term, provision, covenant or condition.

(k)      [Intentionally Omitted].

(l)      Waiver of Jury Trial. Each party to this Agreement respectively waives any right it may have to a trial by jury in respect of any Proceedings relating to this Agreement or any Credit Support Document.

(m)      Set-Off. Notwithstanding any provision of this Agreement or any other existing or future agreement, each party irrevocably waives any and all rights it may have to set off, net, recoup or otherwise withhold or suspend or condition payment or performance of any obligation between it and the other party hereunder against any obligation between it and the other party under any other agreements. The provisions for Set-off set forth in Section 6(e) of the ISDA Form Master Agreement shall not apply for purposes of this Transaction.

(n)      This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(o)      Supplemental Interest Trustee Liability Limitations. It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank National Association, not individually or personally but solely as Supplemental Interest Trustee of Party A and Party B, in the exercise of the powers and authority conferred and vested in it and that U.S. Bank National Association shall perform its duties and obligations hereunder in accordance with the standard of care set forth in Article VIII of the Pooling and Servicing Agreement, (b) each of the representations, undertakings and agreements herein made on the part of Party A and Party B is made and intended not as personal representations, undertakings and agreements by U.S. Bank National Association but is made and intended for the purpose of binding only Party A and Party B, (c) nothing herein contained shall be construed as creating any liability on U.S. Bank

National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto; provided that nothing in this paragraph shall relieve U.S. Bank National Association from performing its duties and obligations hereunder and under the Pooling and Servicing Agreement in accordance with the standard of care set forth therein, and (d) under no circumstances shall U.S. Bank National Association be personally liable for the payment of any indebtedness or expenses of Party A or Party B or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by Party A or Party B under this Agreement or any other related documents; provided, that nothing in this paragraph shall relieve U.S. Bank National Association from performing its duties and obligations hereunder and under the Pooling and Servicing Agreement in accordance with the standard of care set forth herein and therein.

5)      "Affiliate". Party A and Party B shall be deemed to not have any Affiliates for purposes of this Agreement, including for purposes of Section 6(b)(ii).

6)      Section 3 of the ISDA Form Master Agreement is hereby amended by adding at the end thereof the following subsection (g):

"(g)      Relationship Between Parties.

Each party represents to the other party on each date when it enters into a Transaction that:--

(1)      Nonreliance. (i) It is not relying on any statement or representation of the other party regarding the Transaction (whether written or oral), other than the representations expressly made in this Agreement or the Confirmation in respect of that Transaction and (ii) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party.

(2)      Evaluation and Understanding.

(i)      It has the capacity to evaluate (internally or through independent professional advice) the Transaction and has made its own decision to enter into the Transaction and has been directed by the Pooling and Servicing Agreement to enter into this Transaction; and

(ii)      It understands the terms, conditions and risks of the Transaction and is willing and able to accept those terms and conditions and to assume those risks, financially and otherwise.

          (3)     <u>Purpose.</u> It is entering into the Transaction for the purposes of managing its borrowings or investments, hedging its underlying assets or liabilities or in connection with a line of business.

          (4)     <u>Status of Parties.</u> The other party is not acting as agent, fiduciary or advisor for it in respect of the Transaction.

          (5)     <u>Eligible Contract Participant.</u> It is an "eligible swap participant" as such term is defined in Section 35.1(b)(2) of the regulations (17 C.F.R 35) promulgated under, and it constitutes an "eligible contract participant" as such term is defined in Section 1(a)12 of the Commodity Exchange Act, as amended."

      7)     Account Details and Settlement Information:

**Payments to Party A:**
Payments to Party A shall be made in the same manner as provided for in the Pooling and Servicing Agreement with respect to the Class A Certificateholders.

**Payments to Party B:**
Payments to Party B shall be made in the same manner as provided for in the Pooling and Servicing Agreement with respect to the Class SB Certificateholders.

Please sign and return to us a copy of this Agreement.

Very truly yours,

U.S. BANK NATIONAL ASSOCIATION, not in
its individual capacity but solely as supplemental
interest trust trustee for the benefit of RASC Series
2007-EMX1 Supplemental Interest Trust, acting on
behalf of the Class SB Certificateholders

By: _____
        Name:
        Title:

**AGREED AND ACCEPTED AS OF THE
TRADE DATE**
U.S. BANK NATIONAL ASSOCIATION, not in
its individual capacity but solely as supplemental
interest trust trustee for the benefit of RASC Series
2007-EMX1 Supplemental Interest Trust, acting on
behalf of the Class A Certificateholders

By: _____
        Name:
        Title:

EXHIBIT R

## ASSIGNMENT AGREEMENT

## [ON FILE WITH THE TRUSTEE]

EXHIBIT S

## SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by the Trustee shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| | **General Servicing Considerations** | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | ✓ (as to accounts held by Trustee) |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | ✓ (as to investors only) |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | ✓ (as to accounts held by Trustee) |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| **Reference** | **Criteria** | |
| | **Investor Remittances and Reporting** | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of pool assets serviced by the servicer. | |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | ✓ |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the servicer's investor records, or such other number of days specified in the transaction agreements. | ✓ |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | ✓ |
| | **Pool Asset Administration** | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related asset pool documents. | |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | |
| 1122(d)(4)(v) | The servicer's records regarding the pool assets agree with the servicer's records with respect to an obligor's unpaid principal balance. | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool asset (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| **Reference** | **Criteria** | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool asset, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | ✓ |
| | | |

EXHIBIT T-1

## FORM OF FORM 10-K CERTIFICATION

I, [identify the certifying individual], certify that:

1.    I have reviewed the annual report on Form 10-K for the fiscal year [_____], and all reports on Form 8-K containing distribution or servicing reports filed in respect of periods included in the year covered by that annual report, of the trust (the "Trust") created pursuant to the Pooling and Servicing Agreement dated as of February 1, 2007 (the "P&S Agreement") among Residential Asset Securities Corporation (the "Depositor"), Residential Funding Company, LLC (the "Master Servicer") and U.S. Bank National Association (the "Trustee");

2.    Based on my knowledge, the information in these reports, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading as of the last day of the period covered by this annual report;

3.    Based on my knowledge, the servicing information required to be provided to the Trustee by the Master Servicer under the P&S Agreement for inclusion in these reports is included in these reports;

4.    I am responsible for reviewing the activities performed by the Master Servicer under the P&S Agreement and based upon my knowledge and the annual compliance review required under the P&S Agreement, and, except as disclosed in the reports, the Master Servicer has fulfilled its obligations under the P&S Agreement; and

5.    The reports disclose all significant deficiencies relating to the Master Servicer's compliance with the minimum servicing standards based upon the report provided by an independent public accountant, after conducting a review in compliance with the Uniform Single Attestation Program for Mortgage Bankers as set forth in the P&S Agreement, that is included in these reports.

In giving the certifications above, I have reasonably relied on the information provided to me by the following unaffiliated parties: [the Trustee].

IN WITNESS WHEREOF, I have duly executed this certificate as of _____, 20__.


_____
Name:
Title:


* to be signed by the senior officer in charge of the servicing functions of the Master Servicer


T-1-1

EXHIBIT T-2

## FORM OF BACK-UP CERTIFICATE TO FORM 10-K CERTIFICATION

The undersigned, a Responsible Officer of [_____] (the "Trustee") certifies that:

1. The Trustee has performed all of the duties specifically required to be performed by it pursuant to the provisions of the Pooling and Servicing Agreement dated as of February 1, 2007 (the "Agreement") by and among Residential Asset Securities Corporation, as depositor, Residential Funding Company, LLC, as master servicer, and the Trustee in accordance with the standards set forth therein.

2. Based on my knowledge, the list of Certificateholders as shown on the Certificate Register as of the end of each calendar year that is provided by the Trustee pursuant to Section 4.03(e)(I) of the Agreement is accurate as of the last day of the 20[  ] calendar year.

Capitalized terms used and not defined herein shall have the meanings given such terms in the Agreement.

IN WITNESS WHEREOF, I have duly executed this certificate as of _____, 20__.

_____
Name:
Title:

T-2-1

EXHIBIT U

## INFORMATION TO BE PROVIDED BY THE MASTER SERVICER TO THE RATING AGENCIES RELATING TO REPORTABLE MODIFIED MORTGAGE LOANS

Account number
Transaction Identifier
Unpaid Principal Balance prior to Modification
Next Due Date
Monthly Principal and Interest Payment
Total Servicing Advances
Current Interest Rate
Original Maturity Date
Original Term to Maturity (Months)
Remaining Term to Maturity (Months)
Trial Modification Indicator
Mortgagor Equity Contribution
Total Servicer Advances
Trial Modification Term (Months)
Trial Modification Start Date
Trial Modification End Date
Trial Modification Period Principal and Interest Payment
Trial Modification Interest Rate
Trial Modification Term
Rate Reduction Indicator
Interest Rate Post Modification
Rate Reduction Start Date
Rate Reduction End Date
Rate Reduction Term
Term Modified Indicator
Modified Amortization Period
Modified Final Maturity Date
Total Advances Written Off
Unpaid Principal Balance Written Off
Other Past Due Amounts Written Off
Write Off Date
Unpaid Principal Balance Post Write Off
Capitalization Indicator
Mortgagor Contribution
Total Capitalized Amount
Modification Close Date
Unpaid Principal Balance Post Capitalization Modification
Next Payment Due Date per Modification Plan
Principal and Interest Payment Post Modification
Interest Rate Post Modification
Payment Made Post Capitalization
Delinquency Status to Modification Plan

EXHIBIT V

## CERTIFICATE OF GUARANTY INSURANCE POLICY

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
(800) 352-0001

**Financial Guaranty Insurance Policy**

Policy Number:  07030010
Control Number:  0010001

Issuing Entity: RASC Series 2007-EMX1 Trust

Insured Obligations:
$692,852,000 in aggregate certificate principal balance of Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1, Class A-I-1, Class A-I-2, Class A-I-3 and Class A-I-4 Certificates (collectively, the "Class A-I Certificates") and Class A-II Certificates (the "Class A-II Certificates," and together with the Class A-I Certificates, the "Class A Certificates")

Trustee: U.S. Bank National Association

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the right of Financial Guaranty to receive monthly premiums as provided in the Insurance Agreement (as defined below) and subject to the terms of this Financial Guaranty Insurance Policy (this "Policy"), hereby unconditionally and irrevocably agrees to pay each Insured Payment (as defined below) to the Trustee named above or its successor, as trustee for the Holders of the Class A Certificates, to the extent set forth in the Pooling and Servicing Agreement (as defined below). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Pooling and Servicing Agreement as in effect and executed on the date hereof, without giving effect to any subsequent amendment or modification to the Pooling and Servicing Agreement unless such amendment or modification has been approved in writing by Financial Guaranty.

The following terms used herein shall have the meanings assigned to them below:

"Deficiency Amount" shall mean (a) with respect to any Distribution Date and each class of Class A-I Certificates, an amount, if any, equal to the sum of (1) the excess, if any, of the Accrued Certificate Interest (without taking into account any reductions in the Accrued Certificate Interest in respect of Realized Losses) on such class of Class A-I Certificates for that Distribution Date over the amounts on deposit in the Certificate Account on that Distribution Date available for distribution to such class of Class A-I Certificates in accordance with the Class A Interest Distribution Priority on that Distribution Date (other than any portion thereof consisting of an Insured Payment payable as interest on such class of Class A-I Certificates), and (2) (i) with respect to any Distribution Date that is not the Distribution Date in January 2037, the principal portion of any Realized Losses allocated to each class of Class A-I Certificates, if any,

Form 9133
Page 1 of 4

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
(800) 352-0001

**Financial Guaranty Insurance Policy**

for that Distribution Date and (ii) on the Distribution Date in January 2037, the aggregate
Certificate Principal Balance of each class of Class A-I Certificates on that Distribution Date
after giving effect to all distributions to be made thereon on that Distribution Date other than any
portion thereof consisting of an Insured Payment payable as principal on the Class A-I
Certificates, and (b) with respect to any Distribution Date and the Class A-II Certificates, an
amount, if any, equal to the sum of (1) the excess, if any, of the Accrued Certificate Interest
(without taking into account any reductions in the Accrued Certificate Interest in respect of
Realized Losses) on the Class A-II Certificates for that Distribution Date over the amounts on
deposit in the Certificate Account on that Distribution Date available for distribution to the Class
A-II Certificates in accordance with the Class A Interest Distribution Priority on that Distribution
Date (other than any portion thereof consisting of an Insured Payment payable as interest on the
Class A-II Certificates), and (2) (i) with respect to any Distribution Date that is not the
Distribution Date in January 2037, the principal portion of any Realized Losses allocated to the
Class A-II Certificates, if any, for that Distribution Date and (ii) on the Distribution Date in
January 2037, the aggregate Certificate Principal Balance of the Class A-II Certificates on that
Distribution Date after giving effect to all distributions to be made thereon on that Distribution
Date other than any portion thereof consisting of an Insured Payment payable as principal on the
Class A Certificates.

"Insured Payment" means with respect to (a) any Distribution Date, (i) any Deficiency Amount
and (ii) any Preference Amount (as defined in this Policy) and (b) any other date, any Preference
Amount.

Financial Guaranty will pay a Deficiency Amount with respect to the Class A Certificates by
12:00 noon New York City time in immediately available funds to the Trustee on the later of (i)
the second Business Day following receipt in New York, New York on a Business Day by
Financial Guaranty of a Notice from the Trustee specifying the Deficiency Amount which is due
in respect of the Class A Certificates and (ii) the Distribution Date on which the related
Deficiency Amount is payable to the Holders of the Class A Certificates pursuant to the Pooling
and Servicing Agreement, for disbursement to the Holders of the Class A Certificates in the same
manner as other payments with respect to the Class A Certificates are required to be made. Any
Notice received by Financial Guaranty after 12:00 noon New York City time on a given
Business Day or on any day that is not a Business Day shall be deemed to have been received by
Financial Guaranty on the next succeeding Business Day. In addition, if any Notice received by
Financial Guaranty is not in proper form or is otherwise insufficient for the purpose of making a
claim under this Policy, it will be deemed not to have been received by Financial Guaranty, and
Financial Guaranty will promptly so advise the Trustee, and the Trustee may submit an amended
Notice.

If any portion or all of any amount that is insured hereunder that was previously distributed to a
Holder of Class A Certificates is recoverable and sought to be recovered from such Holder as a

Form 9133
Page 2 of 4

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
(800) 352-0001

**Financial Guaranty Insurance Policy**

voidable preference by a trustee in bankruptcy pursuant to the U.S. Bankruptcy Code, pursuant to a final non-appealable order of a court exercising proper jurisdiction in an insolvency proceeding (a "Final Order") (such recovered amount, a "Preference Amount"), Financial Guaranty will pay on the guarantee described in the first paragraph hereof, an amount equal to each such Preference Amount by 12:00 noon New York City time on the second Business Day following receipt by Financial Guaranty on a Business Day of (w) a certified copy of the Final Order, (x) an opinion of counsel satisfactory to Financial Guaranty that the Final Order is final and not subject to appeal, (y) an assignment, in form reasonably satisfactory to Financial Guaranty, irrevocably assigning to Financial Guaranty all rights and claims of the Trustee and/or such Holder of the Class A Certificates relating to or arising under such Preference Amount and constituting an appropriate instrument, in form reasonably satisfactory to Financial Guaranty, appointing Financial Guaranty as the agent of the Trustee and/or such Holder in respect of such Preference Amount, including without limitation in any legal proceeding related to the Preference Amount, and (z) a Notice appropriately completed and executed by the Trustee or such Holder, as the case may be. Such payment shall be made to the receiver, conservator, debtor-in-possession or trustee in bankruptcy named in the Final Order and not to the Trustee or Holder of the Class A Certificates directly (unless the Holder has previously paid such amount to such receiver, conservator, debtor-in-possession or trustee in bankruptcy named in such Final Order in which case payment shall be made to the Trustee for distribution to the Holder upon delivery of proof of such payment reasonably satisfactory to Financial Guaranty). Notwithstanding the foregoing, in no event shall Financial Guaranty be (i) required to make any payment under this Policy in respect of any Preference Amount to the extent such Preference Amount is comprised of amounts previously paid by Financial Guaranty hereunder, or (ii) obligated to make any payment in respect of any Preference Amount, which payment represents a payment of the principal amount of any Class A Certificates, prior to the time Financial Guaranty otherwise would have been required to make a payment in respect of such principal, in which case Financial Guaranty shall pay the balance of the Preference Amount when such amount otherwise would have been required.

Any of the documents required under clauses (w) through (z) of the preceding paragraph that are received by Financial Guaranty after 12:00 noon New York City time on a given Business Day or on any day that is not a Business Day shall be deemed to have been received by Financial Guaranty on the next succeeding Business Day. If any notice received by Financial Guaranty is not in proper form or is otherwise insufficient for the purpose of making a claim under this Policy with respect to a Deficiency Amount or a Preference Amount, as applicable, it will be deemed not to have been received by Financial Guaranty, and Financial Guaranty will promptly so advise the Trustee, and the Trustee may submit an amended Notice. All payments made by Financial Guaranty hereunder in respect of Preference Amounts will be made with Financial Guaranty's own funds.

Form 9133
Page 3 of 4

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
(800) 352-0001

**Financial Guaranty Insurance Policy**

Upon payment of any Insured Payment hereunder, Financial Guaranty shall be fully subrogated to the rights of the Holders of the Class A Certificates to receive the amount so paid. Financial Guaranty's obligations with respect to the Class A Certificates hereunder with respect to each Distribution Date shall be discharged to the extent funds consisting of the related Deficiency Amount are received by the Trustee on behalf of the Holders of the Class A Certificates for payment to such Holders, as provided in the Pooling and Servicing Agreement and herein, whether or not such funds are properly applied by the Trustee.

This Policy is non-cancelable for any reason, including nonpayment of any premium. The premium on this Policy is not refundable for any reason, including the payment of any Class A Certificates prior to their respective maturities. This Policy shall expire and terminate without any action on the part of Financial Guaranty or any other Person on the date that is the later of (i) the date that is one year and one day following the date on which the Class A Certificates shall have been paid in full and (ii) if any insolvency proceeding referenced in the third preceding paragraph with respect to which the Depositor is the debtor has been commenced on or prior to the date specified in clause (i) above, the 30th day after the entry of a final, non-appealable order in resolution or settlement of such proceeding.

This Policy does not cover payments under the Swap Agreement, Basis Risk Shortfalls, Prepayment Interest Shortfalls or Relief Act Shortfalls, as applicable, with respect to the Class A Certificates, nor does the Policy cover any reductions in the Pass-Through Rates resulting from application of the Net WAC Cap Rate or Swap Termination Payments. The Policy does not guarantee to the holders of the Class A Certificates any particular rate of principal payment. In addition, this Policy does not cover shortfalls, if any, attributable to the liability of the Depositor, the Issuing Entity, any REMIC, the Trustee or any Holder for withholding taxes, if any (including interest and penalties in respect of any liability for withholding taxes). This Policy also does not cover the failure of the Trustee to make any payment required under the Pooling and Servicing Agreement to any Holder of a Class A Certificate.

To the fullest extent permitted by applicable law, Financial Guaranty hereby waives, solely for the benefit of Holders of the Class A Certificates, all defenses of any kind (including, without limitation, the defense of fraud in inducement or fact, any defense based on any duty claimed to arise from the doctrine of "utmost good faith" or any similar or related doctrine or any other circumstances that would have the effect of discharging a surety, guarantor or any other person in law or in equity) that Financial Guaranty otherwise might have asserted as a defense to its obligation to pay in full any amounts that have become due and payable in accordance with the terms and conditions of this Policy. Nothing in this paragraph, however, shall be deemed to constitute a waiver of any rights, remedies, claims or counterclaims that Financial Guaranty may have with respect to Residential Funding Corporation, the Issuing Entity, or any of their affiliates, whether acquired by subrogation, assignment or otherwise.

Form 9133
Page 4 of 4

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
(800) 352-0001

**Financial Guaranty Insurance Policy**

A monthly Premium shall be due and payable in arrears as provided in the Pooling and Servicing Agreement and the Insurance Agreement.

This Policy is subject to and shall be governed by the laws of the State of New York. The proper venue for any action or proceeding on this Policy shall be the County of New York, State of New York.

THE INSURANCE PROVIDED BY THIS POLICY IS NOT COVERED BY THE NEW YORK PROPERTY/CASUALTY INSURANCE SECURITY FUND (NEW YORK INSURANCE CODE, ARTICLE 76).

"Notice" means a written notice in the form of Exhibit A to this Policy by registered or certified mail or telephonic or telegraphic notice, subsequently confirmed by written notice delivered via telecopy, telex or hand delivery from the Trustee to Financial Guaranty specifying the information set forth therein. "Holder" means, as to a particular Class A Certificate, the person, other than Residential Asset Securities Corporation (the "Depositor"), Residential Funding Company, LLC (the "Sponsor" and the "Master Servicer"), any subservicer retained by the Master Servicer or the Trustee and, in each case, any of their respective affiliates, who, on the applicable Distribution Date, is entitled under the terms of such Class A Certificate to a payment thereon. "Pooling and Servicing Agreement" means the Pooling and Servicing Agreement relating to the Class A Certificates by and among, the Depositor, the Sponsor, the Master Servicer and the Trustee, dated as of February 1, 2007. "Insurance Agreement" means the Insurance and Indemnity Agreement, among Financial Guaranty, the Depositor, the Sponsor, the Master Servicer and the Trustee, dated as of March 12, 2007.

In the event that payments under any Class A Certificate are accelerated, nothing herein contained shall obligate Financial Guaranty to make any payment of principal or interest on such Class A Certificate on an accelerated basis, unless such acceleration of payment by Financial Guaranty is at the sole option of Financial Guaranty; it being understood that a payment shortfall in respect of the retirement of any Class A Certificate by reason of the optional termination of any group of Mortgage Loans pursuant to Section 9.01 of the Pooling and Servicing Agreement does not constitute acceleration for the purposes hereof.

IN WITNESS WHEREOF, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.


President                                                        Authorized Representative


Form 9133
Page 5 of 4

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
(800) 352-0001

**Financial Guaranty Insurance Policy**

IN WITNESS WHEREOF, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

Name: Howard C. Pfeffer
Title:   President

Name: Jeffrey Kert
Title:   Authorized Representative

Effective Date:  March 12, 2007

Form 9133
Page 6 of 6

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
(800) 352-0001

**Financial Guaranty Insurance Policy**

Effective Date:  March 12, 2007

EXHIBIT A

NOTICE OF NONPAYMENT AND DEMAND FOR
INSURED PAYMENT

To:      Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
(212) 312-3000
Attention:    Structured Finance Surveillance - RASC - 2007-EMX1

Telephone: (212) 312-3000
Telecopier: (212) 312-3220

Re:

$692,852,000 in aggregate certificate principal balance of
Home Equity Mortgage Asset-Backed Pass-Through
Certificates, Series 2007-EMX1, Class A-I-1, Class A-I-2,
Class A-I-3 and Class A-I-4 Certificates (collectively, the
"Class A-I Certificates") and Class A-II Certificates (the
"Class A-II Certificates," and together with the Class A-I
Certificates, the "Class A Certificates")

Policy No: 07030010 (the "Policy")

Distribution Date:     _____

We refer to that certain Pooling and Servicing Agreement, dated as of February 1, 2007, by and
among Residential Asset Securities Corporation, as Depositor, Residential Funding Company,
LLC, as Master Servicer and U.S. Bank National Association. as Trustee (the "Pooling and
Servicing Agreement"), relating to the above referenced Class A Certificates. All capitalized
terms not otherwise defined herein or in the Policy shall have the same respective meanings
assigned to such terms in the Pooling and Servicing Agreement.

(a)    The Trustee has determined under the Pooling and Servicing Agreement that in respect of
the Distribution Date:

    (1)    The Deficiency Amount on the Class A-I Certificates in respect of the
Distribution Date that is due to be received on the Distribution Date specified
above under the Pooling and Servicing Agreement, is equal to $_____,
consisting of

        (A)    $_____ in respect of interest on the Class A-I Certificates, which
is calculated as the amount by which:

            (i)    $_____, constituting the Accrued Certificate Interest on
the Class A-I Certificates for the Distribution Date (without taking



into account any reductions in the Accrued Certificate Interest in respect of Realized Losses); exceeds

(ii)    $_____, constituting the amounts on deposit in the Certificate Account on the Distribution Date available for distribution to the Class A-I Certificates in accordance with the Class A Interest Distribution Priority (other than any portion thereof consisting of an Insured Payment payable as interest on the Class A-I Certificates); plus

(B)    $_____ in respect of principal of the Class A-I Certificates which with respect to (i) any Distribution Date that is not the Distribution Date in January 2037, constitutes the principal portion of any Realized Losses allocated to the Class A-I Certificates, if any, for that Distribution Date and (ii) on the Distribution Date in January 2037, constitutes the aggregate Certificate Principal Balance of the Class A-I Certificates on such Distribution Date after giving effect to all distributions to be made thereon on that Distribution Date other than any portion thereof consisting of an Insured Payment payable as principal on the Class A-I Certificates.

(2)    The Deficiency Amount on the Class A-II Certificates in respect of the Distribution Date that is due to be received on the Distribution Date specified above under the Pooling and Servicing Agreement, is equal to $_____, consisting of

(A)    $ _____ in respect of interest on the Class A-II Certificates, which is calculated as the amount by which:

(i)    $_____, constituting the Accrued Certificate Interest on the Class A-II Certificates for the Distribution Date (without taking into account any reductions in the Accrued Certificate Interest in respect of Realized Losses); exceeds

(ii)    $_____, constituting the amounts on deposit in the Certificate Account on the Distribution Date available for distribution to the Class A-II Certificates in accordance with the Class A Interest Distribution Priority (other than any portion thereof consisting of an Insured Payment payable as interest on the Class A-II Certificates); plus

(B)    $_____ in respect of principal of the Class A-II Certificates which with respect to (i) any Distribution Date that is not the Distribution Date in January 2037, constitutes the principal portion of any Realized Losses allocated to the Class A-II Certificates, if any, for that Distribution Date and (ii) the Distribution Date in January 2037, constitutes the aggregate Certificate Principal Balance of the Class A-II Certificates on such Distribution Date after giving effect to all distributions to be made

A-2

thereon on that Distribution Date other than any portion thereof consisting of an Insured Payment payable as principal on the Class A-II Certificates.

Please be advised that, accordingly, a Deficiency Amount exists for the Distribution Date identified above for the Class A Certificates in the amount of $_____. This Deficiency Amount constitutes an Insured Payment payable by Financial Guaranty under the Policy.

[In addition, attached hereto is a copy of the Final Order in connection with a Preference Amount in the amount set forth therein, together with an assignment of rights and appointment of agent and other documents required by the Policy in respect of the Preference Amounts. The amount of the Preference Amount is $_____. This Preference Amount constitutes an Insured Payment payable by Financial Guaranty under the Policy.]

Accordingly, pursuant to the Pooling and Servicing Agreement, this statement constitutes a notice for payment of an Insured Payment by the Insurer in the amount of $_____ under the Policy.

(b)    No payment claimed hereunder is in excess of the amount payable under the Policy.

The amount requested in this Notice should be paid to: [Payment Instructions]

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed Five Thousand Dollars ($5,000.00) and the stated value of the claim for each such violation.

IN WITNESS WHEREOF, the Trustee has executed and delivered this Notice of Nonpayment and Demand for Insured Payments this _____ day of _____.

_____,
as Trustee

By:    _____

Title:    _____

A-3