**JUDGE BAER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

**FINANCIAL GUARANTY INSURANCE COMPANY,**

      **Plaintiff,**

      -against-

**ALLY FINANCIAL, INC. F/K/A GMAC, LLC; RESIDENTIAL CAPITAL, LLC; RESIDENTIAL FUNDING COMPANY, LLC,**

      **Defendants.**

------------------------------------------------ x

**12 CV 1601**

**COMPLAINT**

**Civil Action No. _____**

**ECF Filed**

RECEIVED
MAR 0 5 2012
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Financial Guaranty Insurance Company ("FGIC"), by and through its attorneys, Jones Day, for its Complaint against defendants, Ally Financial, Inc., formerly known as GMAC, LLC ("Ally Financial"); Residential Capital, LLC ("ResCap"); and Residential Funding Company, LLC ("RFC"), alleges as follows:

**NATURE OF THE ACTION**

1.     This action arises in connection with a financial guaranty insurance policy (the "Policy") issued by FGIC in relation to an RFC-sponsored transaction (the "2007-EMX1 Transaction" or the "Transaction") in which the RASC Series 2007-EMX1 Trust (the "2007-EMX1 Trust") issued and sold to investors $692,852,000 aggregate principal amount of insured residential mortgage-backed securities (the "2007-EMX1 Certificates"). As the sponsor of the 2007-EMX1 Transaction, RFC procured the Policy from FGIC in order to enhance the ratings

and marketability of the 2007-EMX1 Certificates. RFC fraudulently induced FGIC's agreement to provide this insurance through willful and material misrepresentations and omissions concerning, among other things, the nature of its business practices, and the credit quality and characteristics of the thousands of mortgage loans that provided the collateral for the 2007-EMX1 Certificates (individually the "Mortgage Loans" and collectively the "Loan Pool"). In short, the Mortgage Loans were different—and demonstrably worse—than RFC had represented them to be. Indeed, RFC's misrepresentations with respect to the 2007-EMX1 Transaction have been so egregious that a federal government agency has alleged fraud and state and federal securities law violations against RFC, ResCap and Ally Financial relating to the 2007-EMX1 Transaction.

2.      FGIC's issuance of the Policy enabled the 2007-EMX1 Certificates to receive an initial triple-A rating from the rating agencies, which in turn made the 2007-EMX1 Transaction viable, and enabled RFC and its affiliates to earn millions of dollars in transaction fees.

3.      Since the closing of the 2007-EMX1 Transaction, RFC has compounded its misconduct by repeatedly and materially breaching its contractual obligations to FGIC. From the very inception of the 2007-EMX1 Transaction, RFC has violated the essential terms of its agreement with FGIC. RFC has also breached the essential terms of the other operative documents incorporated therein.

4.      The wrongdoing committed by RFC, as detailed more fully below, was directed by Ally Financial, acting directly or indirectly through ResCap. Ally Financial is the ultimate parent of ResCap, which owns RFC. Ally Financial, as the ultimate parent of ResCap and RFC, has the practical ability, which it has repeatedly exercised, to direct and control the activities of

its subsidiaries, including ResCap and RFC. At times, Ally Financial's direction and control was effected by using ResCap as an instrument to achieve its goals.

5.    The 2007-EMX1 Transaction is a mortgage loan securitization: a complex arrangement comprising multiple interdependent agreements among RFC and several other parties whereby the Mortgage Loans were pooled together and transferred to the 2007-EMX1 Trust, which then issued to investors securities (*i.e.*, the 2007-EMX1 Certificates) collateralized by those loans.

6.    To facilitate the Transaction, RFC pooled together the Mortgage Loans, which RFC had previously purchased from an affiliate of the originator, Mortgage Lenders Network USA, Inc. ("MLN"), a nationwide mortgage lender at that time. The Mortgage Loans consisted of 4,051 first-lien and junior-lien mortgage loans originated by MLN. After origination, the Mortgage Loans were sold to Emax Financial Group, LLC ("Emax"), an MLN affiliate. RFC acquired the Mortgage Loans from Emax prior to the closing of the 2007-EMX1 Transaction.

7.    Following its acquisition of the Mortgage Loans, RFC transferred the Mortgage Loans to another Ally Financial subsidiary, Residential Asset Securities Corporation ("RASC"). RASC then deposited the Mortgage Loans it received from RFC into the 2007-EMX1 Trust. The trust, in turn, issued certificates representing the beneficial interest in the 2007-EMX1 Trust. The 2007-EMX1 Trust was a legal entity created by RFC solely for the purpose of the 2007-EMX1 Transaction: to hold the Mortgage Loans and to issue the 2007-EMX1 Certificates to investors in a registered public offering.

8.    RFC also acts as master servicer of the 2007-EMX1 Transaction (the "Master Servicer"), and two other Ally Financial subsidiaries—HomeComings Financial, LLC ("HomeComings") and GMAC Mortgage, LLC ("GMACM")—act as subservicers of the 2007-

EMX1 Transaction (the "Subservicers"). As Master Servicer, RFC supervises the activities of the Subservicers, including the collection of borrower payments, and performs other servicing duties related to the Mortgage Loans. As discussed in more detail below, all of HomeComings' and GMACM's servicing operations have since been integrated into ResCap. Yet another Ally Financial subsidiary, Ally Securities, LLC ("Ally Securities" f/k/a GMAC RFC Securities), was a joint lead manager of the underwriters of the 2007-EMX1 Transaction. U.S. Bank National Association ("U.S. Bank") agreed to act as trustee of the 2007-EMX1 Trust (the "Trustee").

9.      The periodic mortgage payments made by the borrowers under the Mortgage Loans held by the Trust are used to pay, among other things, principal and interest due on the 2007-EMX1 Certificates, and the fees and expenses of RFC, GMACM and HomeComings, as well as other participants in the Transaction.

10.     RFC, directed and controlled by Ally Financial, is, therefore, the hub of the 2007-EMX1 Transaction: it is the sponsor of the securitization, an acquirer and seller of the Mortgage Loans, and the Master Servicer of the Transaction. The primary victim of the 2007-EMX1 Transaction—which turned out to be backed by inferior loans that did not meet the underwriting standards or loan characteristics warranted by RFC—is FGIC, which has already been presented with over $26.9 million in claims under the Policy, with further material losses still to come.

11.     FGIC, a monoline financial guaranty insurance company, was in the business of writing financial guaranty insurance policies with respect to asset-backed and debt securities, including residential mortgage-backed certificates ("RMBS Certificates"). At the time of the 2007-EMX1 Transaction, FGIC's financial strength was rated triple-A by Moody's Investors Services, Inc. ("Moody's"), Standard and Poor's Ratings Services (a division of The McGraw-Hill Companies, Inc.) ("S&P"), and Fitch, Inc., which enabled securities that were insured by

FGIC to be rated triple-A as well. FGIC's financial guaranty insurance policies for RMBS Certificates typically guaranteed the timely payment of the principal and interest due on the insured securities, including the amount, if any, of realized losses on the Mortgage Loans collateralizing the insured securities. FGIC's insurance policies thus enhanced the credit quality and marketability of the insured securities.

12.     To enhance the ratings and marketability of the 2007-EMX1 Certificates, and to increase the profit that RFC would derive from the 2007-EMX1 Transaction, RFC sought to have FGIC issue the Policy to U.S. Bank, as Trustee, for the benefit of the holders of the 2007-EMX1 Certificates.

13.     As an essential element of the 2007-EMX1 Transaction, RFC made material representations and warranties to FGIC about the manner in which the Mortgage Loans were selected and evaluated and their characteristics to induce FGIC to enter into the Transaction. RFC represented, among other things, that the Mortgage Loans "were in substantial conformity with the standards set forth in [RFC's] AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement." Prospectus Supplement at S-57; *see also* Prospectus Supplement at S-60. Those representations and warranties were false when stated, and FGIC reasonably relied on such warranties, among others, when deciding to enter into the 2007-EMX1 Transaction. As a result, FGIC was fraudulently induced to enter into the Transaction, and the credit risk assumed by FGIC in connection with the Transaction was far greater than it would have been had RFC's representations and warranties been true, as demonstrated by the overwhelming number of claims that have been subsequently presented to FGIC.

14.    RFC received substantial assistance from Ally Financial in fraudulently inducing FGIC to issue the Policy. Ally Financial took actions and made statements to finance, support, and boost investor confidence in its mortgage securitization business, which was carried out by its subsidiaries. Ally Financial was aware of the material misrepresentations RFC had made to FGIC. As a result of its dominance over ResCap and RFC, Ally Financial knew that the representations and warranties RFC made to FGIC, prior to and at the closing, upon which FGIC reasonably relied, were false. As such, Ally Financial actively aided and abetted RFC's fraudulent inducement of FGIC to issue the Policy.

15.    The increased credit risk inherent in the Mortgage Loans has resulted in extremely high levels of delinquencies, defaults, and losses on the Mortgage Loans, and the resultant claims presented to FGIC have been far in excess of what FGIC reasonably expected when it decided to issue the Policy in reliance on the (presumed) accuracy and truthfulness of RFC's representations and warranties and affirmative covenants. In fact, the levels of defaults and losses, and therefore the amount of claims presented to FGIC, have been overwhelming. Had FGIC been told the truth about the nature of RFC's underwriting and business practices and/or the true characteristics of the Mortgage Loans, it would never have agreed to issue the Policy, and would thereby have avoided the significant losses and liabilities it has incurred, and will incur, as a result of RFC's misconduct.

16.    In order to evaluate the extent of RFC's breaches, FGIC has requested copies of the mortgage loan files and servicing notes for the Mortgage Loans. RFC is obligated, under its agreements with FGIC, to provide those documents to FGIC. RFC has refused to provide FGIC with the requested documentation, which, on information and belief, will further evidence

material breaches by RFC. This refusal to provide information in itself constitutes a material breach of RFC's insurance agreement with FGIC.

17.    Certain of the material contractual breaches committed by RFC—including, but not limited to, FGIC's right to access information in RFC's possession—were directed by Ally Financial, acting directly or indirectly through ResCap.

18.    Through this Complaint, FGIC seeks relief against RFC, ResCap, and Ally Financial for RFC's fraudulent inducement, and for RFC's material breaches of its insurance agreement with FGIC and other contractual obligations owed to FGIC in connection with the 2007-EMX1 Transaction.

19.    FGIC seeks a declaration from the Court that Ally Financial, ResCap, and RFC were and continue to be alter egos of each other. Further and alternatively, FGIC seeks relief against Ally Financial for aiding and abetting RFC's fraudulent inducement.

## THE PARTIES

20.    Plaintiff FGIC is a New York stock insurance corporation with its principal place of business at 125 Park Avenue, New York, New York 10017.

21.    Defendant Ally Financial is a Delaware corporation with its principal place of business in Detroit, Michigan. Ally Financial specializes in automotive financings, residential mortgage financings and services, and insurance services. Ally Financial is the parent company of ResCap, RFC, and all RFC-affiliated entities relevant to this action.

22.    Defendant ResCap is a Delaware limited liability corporation and an indirect wholly owned subsidiary of Ally Financial. ResCap is the indirect corporate parent of RFC and is a leading real estate finance company, the business of which includes acquiring, selling and servicing mortgage loans.

23.     In September 2008, ResCap announced that it was closing much of its mortgage loan acquisition business.

24.     Defendant RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. In the period relevant to this action, RFC acquired, and serviced residential mortgage loans, and sponsored securitizations of mortgage loans.

25.     Since 2005, RFC has been an indirect wholly owned subsidiary of ResCap; prior to that time, RFC was an indirect, wholly owned subsidiary of Ally Financial.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred within this judicial district. Moreover, at least one of the defendants in this action, RFC, has agreed to submit to the jurisdiction of this Court, and has agreed not to challenge venue in this Court.

## RELEVANT NON-PARTIES

28.     GMACM is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania. GMACM is an indirect wholly owned subsidiary of ResCap, which in turn is a wholly owned subsidiary of Ally Financial. GMACM has served as one of the two Subservicers.

29.     HomeComings, formerly known as HomeComings Financial Network, Inc., is a limited liability company with its principal place of business in Minneapolis, Minnesota. It,

along with GMACM, has served as a Subservicer of the Mortgage Loans. HomeComings is a wholly owned subsidiary of RFC.

30.     RASC, a special purpose vehicle, is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. To facilitate the 2007-EMX1 Transaction, RASC purchased the Mortgage Loans from RFC and deposited them into the 2007-EMX1 Trust, which then issued the 2007-EMX1 Certificates to underwriters to be sold to investors.

31.     Ally Securities, an entity incorporated in Delaware, is an affiliate of RFC and a registered broker-dealer under the Securities Exchange Act of 1934, and is registered to do business in New York. Prior to 2011, Ally Securities was known as Residential Funding Securities LLC, and was doing business as GMAC RFC Securities. Ally Securities served as an underwriter of the 2007-EMX1 Certificates and, on information and belief, participated in the preparation of the Prospectus and Prospectus Supplement.

32.     MLN was the originator of the Mortgage Loans, which were bought by Emax, and then sold to RFC. MLN filed for bankruptcy on February 5, 2007.

33.     Emax was the seller of the Mortgage Loans to RFC. Emax made a written request to the State of Illinois Department of Financial and Professional Regulation on February 27, 2007, to surrender its residential mortgage license. That request was ultimately approved and Emax's residential mortgage license was revoked on June 11, 2008.

<u>**FACTUAL ALLEGATIONS**</u>

**A.    Ally Financial and its Subsidiaries**

34.     In the period relevant to this action, RFC acquired, sold, and serviced residential mortgage loans and, from time to time, arranged for the securitization of those mortgage loans

and the sale of securities collateralized by those mortgage loans to investors, often in the form of RMBS Certificates.

35.     The Mortgage Loans have suffered extremely high rates of delinquencies, defaults, and losses; and it is a matter of public knowledge that the business practices of Ally Financial's subsidiaries, including ResCap and RFC, led Ally Financial to seek a bailout by the federal government in 2008.

### (1)     RFC, GMACM, and GMAC-RFC

36.     RFC is a subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC") which in turn is a subsidiary of ResCap, which in turn is a subsidiary of the ultimate parent, Ally Financial.

37.     GMACM is also a subsidiary of GMAC-RFC and ResCap. Like its affiliate RFC, GMACM engaged in the business of originating, acquiring, servicing, and securitizing mortgage loans during the period relevant to this action.

38.     GMAC-RFC companies issued $42.34 billion of non-agency mortgage-backed securities in 2004, $56.93 billion in 2005, $66.19 billion in 2006, and $32.43 billion in 2007, according to Inside Mortgage Finance Publications, Inc. *See 2011 Mortgage Market Statistical Annual: Volume II* at 38-41. GMAC-RFC was the fifth largest issuer of non-agency mortgage-backed securities in 2005, the fourth largest in 2006, and the eighth largest in 2007. *Id.*

39.     GMAC-RFC was the largest issuer of private mortgage-backed securities in 2002, when it issued $11.5 billion of private mortgage-backed securities, according to the *Financial Crisis Inquiry Report, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (the "FCIC Report"), published in January 2011. *See*

FCIC Report at 462. GMAC-RFC was also the fourth largest subprime mortgage lender in 2004, when it loaned $26 billion to subprime borrowers. *See id.* at 504.

40. The FCIC Report pointedly notes the widespread failure among the mortgage-backed security industry generally to adhere to basic standards in loan origination, selection, and evaluation—a truth FGIC would come to learn specifically in its dealings with RFC. The FCIC Report concludes that:

> [F]irms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

*Id.* at 187.

41. The FCIC Report further notes that, in light of Ally Financial and its subsidiaries' systemic failure to ensure the credit quality of the mortgage loans backing its securitizations, repurchase demands against GMAC/Ally Financial have mounted. From 2007 to 2010, the Federal National Mortgage Association ("Fannie Mae") has forced Ally Financial to buy back approximately $838 million worth of mortgage loans. *Id.* at 225. And in 2009 and 2010, the Federal Home Loan Mortgage Corporation ("Freddie Mac") forced Ally Financial to buy back approximately $453 million worth of mortgage loans. *Id.*

### (2)    Ally Financial's Securitization Business

42. Ally Financial's business model depended on securitizations, which were conducted by its business units, including RFC. Pooling mortgage loans and selling them into securitizations enabled RFC to fund its ongoing mortgage loan originations and acquisitions, earned it significant fees from the resulting transactions, and reduced the credit risk it retained with respect to those loans.

43.    RFC, in addition to securitizing mortgage loans originated by itself or other Ally
Financial subsidiaries, also earned fees by securitizing mortgage loans it acquired from third
parties through its warehouse lending business. In fact, as of 2006, "ResCap's warehouse
lending business [was] the largest provider of warehouse lending services for mortgage loans in
the US, with more than $17 billion in commitments." ResCap, *Residential Capital
Corporation's CFO to Lead Company's Warehouse Lending Business*, (May 4, 2006) *available
at* http://www.businesswire.com/news/home/20060504006138/en/Residential-Capital-
Corporations-CFO-Lead-Companys-Warehouse.

44.    When securitizing mortgage loans originated by other parties, RFC would
typically acquire such mortgage loans and then deposit them into a securitization trust (usually
through an affiliate). RFC would then procure underwriters, trustees, and (in the case of insured
securities) financial guaranty insurers, and cause the securitization trust to sell securities
collateralized by the relevant mortgage loans. RFC would also (i) make representations and
warranties with respect to the origination and characteristics of the individual mortgage loans
and the mortgage loan pool as a whole, and (ii) arrange to provide mortgage loan servicing,
typically through one of its affiliates. By this means, RFC presented securitizations of loans
originated by other lenders as the equivalent of securitizations of RFC-originated loans. Since
these other lenders typically had lesser reputations in the market— and in the case of MLN, were
in fact in bankruptcy and out of business entirely— the presentation of transactions collateralized
by such loan pools as the equivalent of transactions collateralized by RFC-originated loan pools
substantially improved the marketability of such loan pools.

45.    In many instances, when RFC arranged for the securitization of mortgage loans originated by other lenders, RFC profited from the difference between the cost it incurred to acquire mortgage loans and the price at which it sold them for deposit into the securitizations.

46.    In order to gain additional fees for performing certain administrative duties under the various transaction agreements, including collecting mortgage payments and determining whether a mortgage loan is in default based on the transaction documents, RFC typically also sought (as it did here) to be appointed as the Master Servicer for the 2007-EMX1 Transaction. Moreover, RFC appointed its affiliate, GMACM, and its subsidiary, HomeComings, to act as Subservicers. For acting as Master Servicer to the 2007-EMX1 Transaction, RFC gained substantial additional compensation.

47.    RFC also enriched Ally Financial and its subsidiaries through its sponsorship of securitizations. Ally Financial entities typically participated in each of the key steps in the securitization process, and recorded gains and earned fees at each of those steps. For example, in the 2007-EMX1 Transaction: (i) HomeComings and GMACM gained fees servicing the Mortgage Loans; (ii) RASC, which established the 2007-EMX1 Trust and acted as depositor of the Mortgage Loans, charged fees to cover its operating expenses; and (iii) Ally Securities received fees for underwriting the 2007-EMX1 Certificates.

48.    In 2000, GMAC-RFC entered into a strategic alliance with MLN under which it provided MLN with a warehouse lending facility and a revolving line of credit, whereby GMACM could make funds available to MLN in exchange for MLN's future volume of subprime mortgage originations. At the time of the alliance, GMACM's Director of Strategic Alliances and Acquisitions for GMAC-RFC, Marty McCormack, announced that "[b]y pairing

GMAC-RFC's access to capital markets with MLN's quality products, we can leverage both companies' strengths into a strong financing relationship."

49.    In addition to the lending relationship, as further evidence of this strategic alliance, GMAC-RFC also received convertible debt of MLN, which created a further incentive to make MLN as profitable as possible regardless of the consequences to third parties, such as FGIC.

### (3)    Ally Financial, RFC, and GMACM Face Numerous Investigations and Lawsuits Relating to Their RMBS Securitizations

50.    On September 2, 2011, the Federal Housing Finance Authority (the "FHFA"), as conservator for Freddie Mac, alleged fraud and state and federal securities laws violations against Ally Financial, ResCap, GMACM and RFC relating to the 2007-EMX1 Transaction, among others.    On September 2, 2011, the FHFA filed suit in the Supreme Court of the State of New York, New York County ("New York Supreme Court") against various Ally Financial entities, for fraud, aiding and abetting fraud, and violating state and federal securities laws in connection with their roles in the public filing of offering documents containing false and misleading statements.    These claims arise from Freddie Mac's purchase of over $6 billion in RMBS issued through twenty-one RFC-sponsored transactions, including the 2007-EMX1 Transaction.

51.    The FHFA also alleges violations of state and federal securities laws by RFC, its parent, Ally Financial, and their affiliates.    The violations stem from false and misleading statements contained in publicly filed prospectuses, prospectus supplements, registration statements, and other offering documents.    Additionally, FHFA also alleges aiding and abetting fraud against Ally Financial and certain of its affiliates for their intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the certificates.    The FHFA action seeks relief in the form of rescission and recovery of the $6

- 14 -

billion purchase price of the certificates, including lost principal and interest, as well as punitive damages and attorneys' fees and costs.    In October 2011, Ally Financial and its co-defendants removed the FHFA action to the United States District Court for the Southern District of New York.

52.    In addition, RFC is currently facing a lawsuit brought by MBIA Insurance Corporation ("MBIA") in New York Supreme Court in which MBIA alleges that in various RMBS transactions, similar to the 2007-EMX1 Transaction, RFC affirmatively misrepresented the credit quality of tens of thousands of mortgage loans with an aggregate principal balance worth billions of dollars, as a means of unfairly shifting to investors and MBIA risks that RFC should have borne itself.  On December 22, 2009, that court issued a ruling on RFC's motion to dismiss, which allowed both the breach of contract and the fraud claims, among others, to proceed to trial.

53.    RFC's sister company, GMACM, is also currently facing a lawsuit brought by MBIA in New York Supreme Court for, among other things, fraud and breach of representations and warranties in connection with RMBS transactions.  In December 2010, the New York Supreme Court rejected GMACM's motion to dismiss certain of the claims brought against it, allowing both the breach of contract and fraud claims, among others, to proceed.

54.    DZ Bank AG also filed a summons with notice in New York Supreme Court on December 13, 2011, against Ally Financial, ResCap, RFC, RASC, and other Ally Financial subsidiaries for common-law fraud, fraudulent inducement, negligent misrepresentation, and aiding and abetting fraud, in connection with various RMBS transactions, including the 2007-EMX1 Transaction. The summons with notice alleges material misrepresentations and omissions regarding the standards used to underwrite, and key statistical characteristics of, the

- 15 -

Mortgage Loans in the 2007-EMX1 Transaction. The claims arise from DZ Bank AG's

purchase of $289.8 million in securities issued by Ally Financial subsidiaries, including a portion

of the 2007-EMX1 Certificates.

55.    IKB Deutsche Industriebank AG also filed two summonses with notices in New

York Supreme Court on December 16, 2011 and January 17, 2012, against Ally Financial,

ResCap, RFC, and other Ally Financial subsidiaries for securities law violations, common law

fraud, fraudulent inducement, and aiding and abetting fraud among others. The claims arise

from the purchase of $14 million in securities underwritten and issued by Ally Financial

subsidiaries in similar RMBS transactions.

56.    Additionally, according to Ally Financial's quarterly report for the third quarter of

2011, as of November 4, 2011, there were twenty-two suits in various jurisdictions pending

against Ally Financial's mortgage-related business units and subsidiaries arising from numerous

mortgage-backed securities offerings. The plaintiffs in those suits have alleged, among other

things, that Ally Financial's various mortgage subsidiaries made misstatements and omissions in

registration statements, prospectuses, prospectus supplements, and other documents related to

RMBS offerings. The alleged misstatements typically concern underwriting standards. *See* Ally

Fin. Inc., Quarterly Report (Form 10-Q), at 159 (Nov. 4, 2011). Further, in its 2011 annual

report, Ally Financial stated that it expects additional similar claims to be brought against Ally

Financial and/or its subsidiaries in the future. *See* Ally Fin. Inc., Annual Report (Form 10-K), at

20 (Feb. 28, 2011).

57.    Since the filing of its November 2011 quarterly report, moreover, Ally Financial

and its subsidiaries have been sued by additional plaintiffs, including HSH Nordbank AG, which

have alleged, among other things, material misrepresentations and omissions about the loans

backing RMBS securities issued by Ally Financial's affiliates.

58.    Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits

from monoline insurers like FGIC given that Ally Financial and its subsidiaries sold $42.7

billion of loans into monoline-wrapped securitizations from 2004 to 2007. During 2011, Ally

Financial and its subsidiaries have received repurchase claims from monoline insurers for $265

million worth of mortgages related to securitizations it consummated between 2004 and 2007.

Ally Financial evidently recognizes its exposure because, according to Ally Financial's CEO,

Michael Carpenter, ResCap has already reserved $829 million for representations and warranties

claims, and, according to its own Securities and Exchange Commission ("SEC") filings, Ally

Financial confirms that "litigation with . . . monolines is likely." Ally Fin. Inc., Annual Report

(Form 10-K), at 98 (Feb. 28, 2012).

59.    Indeed, according to Ally Financial's 2011 annual report, Ally Financial, RFC's

parent, also believes that "[t]he total exposure. . . to mortgage representation and warranty claims

is most significant for loans originated and sold between 2004 through 2008, specifically the

2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards

and risk-mitigation actions implemented in 2008 and forward." Ally Fin. Inc., Annual Report

(Form 10-K), at 224 (Feb. 28, 2012). The 2007-EMX1 Transaction is comprised of mostly

Mortgage Loans originated in 2006.

60.    Additionally, Ally Financial also disclosed that the SEC served a subpoena on

Ally Financial in June 2011, requesting documentation regarding certain "bulk settlements"

relating to securitized mortgage loans as well as a request for materials provided to investors and

prospective investors in mortgage securitization transactions. Ally Fin. Inc., Amendment No. 3

- 17 -

to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

61.     Furthermore, RFC's sister company GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." *Id.* (emphasis added).

**(4)     The Mortgage Loan Servicing Misconduct of Ally Financial and its Subsidiaries Has Come Under  Scrutiny and Resulted in Severe Sanctions**

62.   On February 9, 2012, the Federal Reserve Board announced that Ally Financial, its subsidiaries, and several other mortgage loan servicers would be required to pay $766.5 million in monetary sanctions for "unsafe and unsound processes and practices in residential mortgage loans servicing and foreclosure processing."  Press Release, Federal Reserve Board (February 9, 2011).  On February 12, 2012, the Federal Reserve Board imposed well over $200 million of this fine against Ally Financial, ResCap, and GMACM pursuant to an Assessment Order, which requires that the sanctions be paid into various borrower assistance programs and nonprofit programs established to help victims of improper servicing and foreclosure practices.  *See* Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, FRB Docket No. 12-006-CMP-HC (February 12, 2012) (the "Assessment Order").  According to the Federal Reserve Board, the sanction "takes into account the maximum amount prescribed for unsafe and unsound practices under the applicable statutory limits, the comparative severity of the institutions' misconduct, and the comparative sizes of the

institutions' foreclosure activities." *See* Press Release, Federal Reserve Board (February 9, 2011).

63.    Furthermore, also on February 9, 2012, the U.S. Attorney General announced that Ally Financial will take part in a $25 billion settlement to resolve claims brought by the government in response to the "reckless and abusive mortgage practices" of Ally Financial and four similarly situated bank holding companies. *See* Eric Holder, U.S. Attorney General, Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the settlement releases Ally Financial from certain civil claims brought by the DOJ and multiple state attorneys general, *see id.*; National Mortgage Settlement Website, Settlement Documents > Servicing Standard Highlights, available at http://www.nationalmortgagesettlement.com/ (last visited Feb. 12, 2012), the settlement was not designed to resolve any other liabilities that Ally Financial has incurred through its improper origination, securitization, and servicing practices, *see id.*, About the Settlement, *available at* http://www.nationalmortgagesettlement.com/about (last visited Feb. 12, 2012).

64.    According to the U.S. Attorney General, the $25 billion settlement and $766.5 million sanction are just "the latest step forward" in holding Ally Financial and others accountable for "egregious mortgage loan servicing abuses." *See* Attorney General Holder, Remarks at the Mortgage Servicers Settlement Press Conference.

65.    Indeed, the New York Attorney General recently announced that his office will lead the new Residential Mortgage-Backed Securities Working Group, a component of the interagency Financial Fraud Enforcement Task Force, which is led by the DOJ. *See* Office of the New York Attorney General Website, *available at* http://www.ag.ny.gov/media_center/2012 /feb/feb9b_12.html; *see also* http://www.stopfraud.gov/docs/FFETF-Report-LR.pdf. According

to a statement by the New York Attorney General's Office, the Working Group's joint investigation "brings together the Department of Justice, several state law enforcement officials, and other federal agencies to investigate those responsible for misconduct contributing to the financial crisis through the pooling and sale of residential mortgage-backed securities [and builds] upon ongoing state and federal investigations, while also launching new ones." *See id.*

66.    In addition to the recent $25 billion settlement and Assessment Order, the Federal Reserve Board and the Federal Deposit Insurance Corporation (the "FDIC") have previously ordered Ally Financial and several of its subsidiaries to adopt new procedures and practices in relation to mortgage loan servicing. *See* Consent Order, FRB Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").

67.    The Consent Order notes that Ally Financial's mortgage servicing subsidiaries have been accused, *inter alia*, of (1) failing to properly increase financial, staffing, and managerial resources in order to meet an increasing number of foreclosures; (2) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

68.    Furthermore, under the Consent Order, Ally Financial must direct its mortgage servicing subsidiaries to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id.* at 4. Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors. . . [and to assess the performance of]

residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and

operations . . . ." *Id.* at 8.

69.    In connection with the enforcement of the Consent Order, as of November 2011,

the Federal Reserve Board is permitting mortgage borrowers who were financially harmed by the

foreclosure processes of GMACM, one of the Subservicers of the 2007-EMX1 Transaction, to

request an independent review of their files. *See* Press Release, Federal Reserve Board

(November 1, 2011).  This independent review will determine whether errors and

misrepresentations in GMACM's foreclosure processes indeed caused financial harm to the

borrower. *See id.* If the foreclosure process is found to have caused financial injury to the

borrower, GMACM will then be required to provide full compensation. *See id.*

70.    Pursuant to the Consent Order, Ally Financial and other bank holding companies

will also now be required to adhere to new, heightened servicing standards. *See* Press Release,

Federal Reserve Board (February 9, 2011).  The Federal Reserve Board will require Ally

Financial to remedy its servicing practices by, among other things, "strengthen[ing] the

coordination of communications with borrowers by providing borrowers the name of the person

at the service who is their primary point of contact, establish[ing] limits on foreclosures where

loan modifications have been approved, establish[ing] robust third party vendor controls,

strengthen[ing] compliance programs, and provid[ing] appropriate remediation to borrowers who

suffered financial injury as a result of errors by the servicers." *See id.*

71.    Moreover, the servicing and foreclosure improprieties of Ally Financial and its

subsidiaries are a matter of public account.  According to the sworn testimony of an Ally

Financial/GMACM employee, Ally Financial's mortgage servicing subsidiaries have routinely

filed false affidavits in thousands of foreclosure actions across the country. *See* Jeffrey Stephan

Dep. *Federal National Mortgage Association v. Bradbury*, BRI-RE-09-65 (Me. Dist. Ct., Div

Nine, No. Cumb.) (June 7, 2010). Indeed, according to the FCIC Report:

> [L]enders have relied on "robo-signers" who substituted speed for accuracy
> by signing, and sometimes backdating, hundreds of affidavits claiming
> personal knowledge of facts about mortgages that they did not actually
> know to be true. One such "robosigner," Jeffrey Stephan of GMAC, said
> that he signed 10,000 affidavits in a month—roughly 1 per minute, in a 40-
> hour workweek—making it highly unlikely that he verified payment
> histories in each individual case of foreclosure.

FCIC Report at 407.

72.    Stephan also testified that, when executing summary judgment affidavits to be

used in judicial foreclosure actions, he was acting in accordance with policies and procedures,

and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits

were attached, despite swearing that he had done so in the affidavits themselves. Stephan Dep.

Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among

other things, the mortgage note and documents relating to the assignment of the mortgage. *See*

*id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the

foreclosure was proper, all he knew was the borrower's name and whether he had signing

authority for the GMAC entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan

testified that the process he followed in signing summary judgment affidavits was in accordance

with the policies and procedures required by GMACM. *Id.* at 64:8-14.

73.    Additionally, in October 2010, the Ohio Attorney General filed suit against Ally

Financial and its subsidiaries, alleging, among other things, that employees of Ally Financial

subsidiaries had executed thousands of false affidavits in connection with foreclosures on

properties in that state. *See  State of Ohio v. GMAC Mortgage LLC*, CI0201006984, Court of

Common Pleas, Lucas County, Ohio (Toledo). Although some of the claims brought by this suit

may ultimately be resolved by the $25 billion multi-party settlement, other claims not

encompassed by the settlement, including those relating to the improper assignment of mortgage

notes, will likely survive. As of March 2012, the action remains pending.

74.    Similarly, in December 2011, the Massachusetts Attorney General filed suit

against GMACM for, among other things, engaging in unfair and deceptive foreclosure practices.

*See Commonwealth of Massachusetts v. Bank of America NA*, 11-4363, Suffolk County Superior

Court (Boston). Days after filing suit, the Massachusetts Attorney General sent a letter to the

United States Senate Committee on Banking, Housing and Urban Affairs, and the United States

House Committee on Financial Services asking that the federal government investigate Ally

Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false

documents related to property seizures. *See* Boston Globe, <u>Attorney General Martha Coakley</u>

<u>Urges Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices</u>, Dec. 6, 2011.

Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees

stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions against
> homeowners in Massachusetts and across the country, I respectfully request
> that your committees investigate Ally [Financial]'s serious misconduct and
> consider what actions the federal government can take to ensure that Ally
> [Financial] adheres to the law.

Letter from Martha Coakley, Massachusetts Attorney General, to the Hon. Tim
Johnson, Chairman, U.S. Senate Committee on Banking, Housing, and Urban Affairs,
and the Hon. Spencer Bachus, Chairman, U.S. House Committee on Financial
Services (Dec. 6, 2011).

75.    While the $25 billion settlement ultimately resolved certain claims brought by the

Massachusetts Attorney General in this action, several claims relating to improper foreclosure

practices and abuse of certain state recordation systems have survived and will continue to be

prosecuted. *See* Press Release, Office of the Attorney General of Massachusetts, *Massachusetts*

*Homeowners to Receive $318 Million in Relief as Part of State-Federal Agreement Over*

*Unlawful Foreclosures and Loan Servicing,* Feb. 9, 2012.

> **(5)    Significant Possibility of Ally Financial Seeking Bankruptcy Protection for ResCap, GMAC-RFC, and RFC**

76.    Since at least as far back as November 2011, Ally Financial has been considering

filing for bankruptcy protection for ResCap, its wholly owned subsidiary, which has reportedly

lost $555 million since 2009, according to multiple published reports, as of November 9, 2011.

RFC is a wholly owned, indirect subsidiary of ResCap.

77.    Around that time, the financial industry was "betting that Ally [Financial] will

place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of supporting

the business as the bank prepares for an initial public offering." Bloomberg News, *Ally May Put*

*ResCap in Bankruptcy to Ease IPO: Corporate Finance,* Nov. 14, 2011.

78.    As the article notes, Ally Financial has the power to decide whether its "mortgage

unit," ResCap, should file for bankruptcy. *See id.*

79.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a

significant risk that ResCap will not be able to meet its debt service obligations and other

funding obligations in the near term." Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb. 29,

2012).

80.    That risk ultimately came to pass as Ally Financial recently disclosed that the

penalties assessed by  the federal government and numerous state attorneys general regarding the

foreclosure practices of Ally Financial and its subsidiaries "resulted in our Mortgage operations

recording a $230 million charge in the fourth quarter of 2011." *Id.* at 31. As Ally Financial

detailed in its previous public filing, the "[t]he majority of [the charge] was recorded at

Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in certain of

- 24 -

ResCap's credit facilities." Ally Financial, Current Report (Form 8-K) (January 31, 2012).

Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated

net worth . . . of $250 million at the end of each month under the terms of certain of its credit

facilities. . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was

$92 million at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb.

28, 2012). ResCap's substantial shortfall, however, was "immediately remediated by Ally

through a capital contribution of $197 million, which was provided through forgiveness of

intercompany debt during January 2012." *Id.*

81.    Moreover, in February 2012, it was reported that Ally Financial had contacted

buyout firms such as Fortress Investment Group LLC and Cerberus Capital Management LP

regarding a potential sale of ResCap through a pre-packaged bankruptcy to be effectuated by the

end of March as ResCap faces financing and liquidity deadlines. *See* Bloomberg Businessweek,

*Ally's ResCap Said to Seek Buyers for Prearranged Bankruptcy*, Feb. 8, 2012.

82.    According to the report, "[p]otential bidders are being told that a pre-packaged

bankruptcy filing would allow the buyer to leave behind liabilities such as [RMBS]

securitizations that have been the subject of litigation." *Id.* To that end, Ally Financial's CEO,

Michael Carpenter, has stated that he will not pursue the aforementioned initial public offering

for Ally Financial "until [these] legacy mortgage issues are resolved." *Id.* Nevertheless, a

bondholder group representing holders of approximately $800 million in ResCap debt has

expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the bankruptcy, in part on

the belief that "Ally [Financial] can't legally separate itself from ResCap because it has stripped

assets from the unit." Bloomberg News, *Paulson, Tepper Said Among Investors Urging Ally to

Back ResCap*, Jan. 10, 2012.

83.     Indeed, as Ally Financial has pointedly noted in its most recent annual report; "In light of ResCap's liquidity and capital needs combined with volatile conditions in the marketplace, there is substantial doubt about ResCap's ability to continue as a going concern." Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

**B.      RFC's Securitizations and Financial Guaranty Insurance Generally**

**(1)      Financial Guaranty Insurance Policies**

84.     To improve the marketability and ratings of the RMBS Certificates issued as part of its securitizations, RFC from time to time sought credit enhancement for the RMBS Certificates from FGIC, a financial guaranty insurer, in the form of financial guaranty insurance policies.  In some cases, such as the 2007-EMX1 Transaction, RFC sought FGIC's participation in transactions that were collateralized by mortgage loans originated by other lenders, such as MLN.  RFC's sponsorship of such transactions, and the inducements provided by RFC in connection with such transactions, were critical to FGIC's willingness to issue its insurance policies with respect to the resulting RMBS Certificates.

85.     Under the terms of a financial guaranty insurance policy like the one FGIC issued here, the insurer unconditionally and irrevocably guarantees to the trustee for the benefit of the holders of the insured RMBS Certificates that, if there is a shortfall in cash available to it to make required payments on the insured securities, the financial guaranty insurer will pay the amount of the shortfall to the trustee for the benefit of the holders of the insured securities.

86.     For a trust that issues RMBS Certificates, the primary source of funds is the remittance of payments on the underlying residential mortgage loans.  Delinquencies by borrowers in making their mortgage loan payments will, by definition, reduce cash flows to the trust, which will directly impair the ability of the trust to make required payments on the RMBS

Certificates. Delinquencies, if not cured, will eventually result in losses on the mortgage loans, which reduce the aggregate principal amount of the loan pool held by the trust. In this manner, high levels of mortgage loan delinquencies and defaults can lead to shortfalls in cash available to pay RMBS Certificate investors. Such shortfalls result in claims on FGIC's policy.

### (2)    Securitization Sponsor's Representations and Warranties

87.    The risk FGIC assumes when it agrees to issue a policy for RMBS Certificates depends upon the credit quality of the underlying mortgage loans, which in turn depends on the underwriting practices of the loan originator and the characteristics of the loans. If, for instance, a loan originator employs substandard underwriting practices, the underlying mortgage loans would be of inferior credit quality. Consequently, the credit risk—the risk of delinquency or default—of the underlying mortgages, and of the mortgage portfolio as a whole, would be materially increased.

88.    Accordingly, FGIC generally required securitization sponsors like RFC to provide substantial representations and warranties about the underlying mortgage loans, including representations about the standards and procedures used to underwrite the loans and the characteristics of the underlying mortgage loans, such as the ratio of the borrower's monthly debt payments to monthly income ("DTI ratio"), the ratio of the mortgage loan principal balance to the value of the mortgaged property at origination—plus, in the case of a junior lien Mortgage Loan, the principal balance of the senior Mortgage Loan on the related mortgaged property ("LTV ratio"), the borrower's credit score ("FICO score"), and the credit grade of the loan according to RFC's grading system ("Credit Grade"). Even where, as here, RFC did not originate the loans at issue, it nonetheless is typically required to make representations about those loans, thereby assuming the risk that those representations might not be accurate. RFC's

representations and warranties were intended to allow FGIC to assess the credit risk inherent in the mortgage Loan Pool before deciding to commit to the transaction.

### C.   The RASC 2007-EMX1 Transaction

89.   In late 2006, RFC began to put together the 2007-EMX1 Transaction. RFC had, at that time, a long-standing relationship with MLN, having sponsored prior transactions collateralized by MLN-originated mortgage loans. As part of that relationship RFC maintained a warehouse lending facility for the purpose of financing MLN's mortgage loan originations in anticipation of securitization by RFC of such loans.

90.   On information and belief, at the time of MLN's bankruptcy RFC held tens of millions of dollars in aggregate principal amount of MLN-originated mortgage loans pursuant to such warehouse lending facility. RFC was unable to sell the mortgage loans on the open market without taking an unacceptable loss on the sale. RFC was able to dispose of such loans, however, by arranging an RFC-sponsored securitization collateralized by those loans—the 2007-EMX1 Transaction.

91.   MLN sold the Mortgage Loans that comprised the 2007-EMX1 Transaction to Emax, which in turn sold the Mortgage Loans to RFC. In the securitization, RFC pooled those Mortgage Loans, and deposited them in the 2007-EMX1 Trust (via RASC). The trust then issued $692,852,000 aggregate principal amount of Class A Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1. The 2007-EMX1 Certificates consisted of five classes of senior certificates, all of which were insured by FGIC.

92.   The 2007-EMX1 Trust contains two groups of Mortgage Loans (respectively, the "2007-EMX1 Group I Loans" and the "2007-EMX1 Group II Loans"). The 2007-EMX1 Group I Loans consist of 2,084 fixed-rate and adjustable-rate first-lien and junior-lien mortgage loans

having an outstanding principal balance of more than $395 million. The 2007-EMX1 Group II

Loans are comprised of 1,967 fixed-rate and adjustable-rate first-lien and junior-lien mortgage

loans having an outstanding aggregate principal balance of more than $353 million. The

Mortgage Loans were purportedly acquired and evaluated by RFC under its "AlterNet" program

(the "AlterNet Program") or the credit grades as described in the Prospectus Supplement.

93.    To enhance the ratings and marketability of the 2007-EMX1 Certificates, RFC

sought a financial guaranty insurance policy from FGIC for the purpose of insuring the

Transaction for the benefit of the certificate holders. On March 12, 2007, FGIC and RFC

executed an Insurance and Indemnity Agreement (the "I&I Agreement"), under which FGIC

agreed to issue a financial guaranty insurance policy to insure the 2007-EMX1 Certificates, and

FGIC accordingly issued its policy number 07030010. The I&I Agreement was signed by FGIC

(the "Insurer" for the Transaction); RFC (the "Seller" and Master Servicer for the Transaction);

RASC (the "Depositor" for the Transaction); and U.S. Bank (the "Trustee" for the Transaction).

94.    The I&I Agreement provides that FGIC is a third-party beneficiary of, and shall

have all of the rights provided for in, the "Operative Documents." The "Operative Documents"

are defined to include, among other documents: (i) the 2007-EMX1 Certificates; (ii) the Pooling

and Servicing Agreement, dated as of February 1, 2007, among RFC, RASC, and U.S. Bank (the

"PSA"); and (iii) the Assignment and Assumption Agreement, dated as of March 12, 2007,

between RFC and RASC (the "A&A Agreement"). The PSA also provides that FGIC (the

Certificate Insurer) "is an express third-party beneficiary of [the PSA]."

95.    The Policy improved the marketability of the 2007-EMX1 Certificates by

mitigating risk for potential investors and making the 2007-EMX1 Certificates eligible to receive

an initial credit rating of triple-A by the rating agencies at closing.

- 29 -

96.    RFC and the Depositor offered the 2007-EMX1 Certificates for sale pursuant to a prospectus, dated December 6, 2006 (the "Prospectus"), and a prospectus supplement, dated March 8, 2007 (the "Prospectus Supplement"), touting the Policy and the triple-A initial rating of the 2007-EMX1 Certificates made possible by the Policy. The Prospectus and the Prospectus Supplement, together with certain preliminary Offering Documents, each as further supplemented by any subsequent amendment or supplement thereto, and any other Offering Documents that makes reference to the Policy, are referred to collectively as the "Offering Documents."

97.    On March 12, 2007, an Ally Financial subsidiary, Ally Securities, and Credit Suisse (the other underwriter for the 2007-EMX1 Transaction), purchased from the 2007-EMX1 Trust and sold to investors the 2007-EMX1 Certificates, and FGIC issued the Policy in accordance with the terms of the I&I Agreement.

### D.    RFC Fraudulently Induces FGIC to Insure the 2007-EMX1 Certificates with Substantial Assistance from Ally Financial

### (1)    RFC's Fraudulent Inducement of FGIC

98.    FGIC's participation in the 2007-EMX1 Transaction was an essential component of the 2007-EMX1 Transaction and enhanced RFC's ability to market the securitization effectively. On information and belief, RFC had been unable to execute a securitization of the Mortgage Loans on an unwrapped basis, due to the provenance of the Mortgage Loans. The Policy allowed RFC to sell the 2007-EMX1 Certificates with an initial triple-A credit rating, making them more attractive to a broader pool of potential investors.

99.    In order to induce FGIC to write financial guaranty insurance for the 2007-EMX1 Transaction, RFC provided to FGIC, directly or indirectly, a variety of information and covenants, which comprised several features that were specifically required by FGIC in order to

induce it to enter into a transaction based on loans originated by MLN, which at that time had already filed for bankruptcy.

100.     First and foremost, RFC provided to FGIC the initial and final Prospectus Supplements, which summarized, among other material information, the credit quality and characteristics of the Mortgage Loans, and RFC's loan underwriting guidelines.

101.     Second, RFC provided a document (generally referred to as a "loan tape" or "magnetic tape") detailing material characteristics of individual borrowers and loans expected to be included in the 2007-EMX1 Transaction, together with representations regarding material statistics about the Loan Pool.

102.     Third, RFC provided to FGIC credit ratings for the 2007-EMX1 Certificates determined without considering the effect of the Policy. These ratings, which RFC procured from the credit rating agencies, are known as "shadow ratings."

103.     Fourth, RFC provided FGIC with an express representation that there was no fraud in the origination of the Mortgage Loans.

104.     Fifth, as discussed in detail in Section E, RFC provided representations, warranties, and affirmative covenants in the Operative Documents and the I&I Agreement regarding the Mortgage Loans specifically and the Loan Pool generally. These covenants included, among other things, representations that the Mortgage Loans would be "seasoned" (*i.e.*, that they were originated at least four months before the closing date), and that RFC would itself service the Mortgage Loans, through its HomeComings and GMACM affiliates as Subservicers.

105.     *Prospectus Supplement and Other Operative Documents.*  In determining whether to insure the 2007-EMX1 Certificates, FGIC relied in part upon representations and warranties regarding RFC's loan underwriting standards made by RFC in the Prospectus and

- 31 -

Prospectus Supplement. A Preliminary Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about March 8, 2007, in an email sent by Jeffrey Wittenberg on behalf of RFC. The Prospectus, as supplemented by the Prospectus Supplement, was filed with the SEC on March 9, 2007. The Final Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about March 9, 2007, in an email sent by John Farmer on RFC's behalf.

106.    The Prospectus Supplement set forth, among other information, the following important characteristics of the Loan Pool: the ranges of and weighted average FICO scores and Credit Grades, the ranges of and weighted average LTV ratios, the ranges of and weighted average outstanding principal balances of the loans, the DTI ratios of the borrowers, the geographic distribution of the loans, and the occupancy status of the borrowers (i.e., whether the property securing a mortgage is: (i) the borrower's primary residence; (ii) a second home; or (iii) an investment property). Prospectus Supplement at II-25 – II-37.

107.    RFC publishes its loan underwriting standards in a document the Prospectus refers to as "Residential Funding Company, LLC's Client Guide" as modified from time to time (the "Client Guide"). In general, the Client Guide specifies documentation requirements, and substantive criteria for key credit-related characteristics, that borrowers must satisfy in order to qualify for a particular mortgage loan or line of credit. Depending upon the particular type of loan or line of credit, these requirements and criteria may include asset verification, income verification, employment verification, bank statements, payment histories, and/or evidence of closing funds, among other things. RFC disclosed additional data relevant to the AlterNet Program to FGIC. In particular, RFC provided FGIC with the AlterNet Program.

- 32 -

108.    The Prospectus Supplement and Prospectus Supplement also include substantive criteria for eligibility addressing material characteristics of a proposed loan, such as DTI ratios, LTV ratios, occupancy status, and Credit Grades.

109.    In particular, RFC represented in the Offering Documents that only one of the Mortgage Loans had been originated with a maximum monthly DTI ratio of greater than 55% (0.02% of the Loan Pool); furthermore, RFC represented that the Mortgage Loans had a maximum LTV ratio of 100%. *See* Prospectus Supplement at II-28, II-37. Moreover, with respect to at least 80.55% of the Mortgage Loans, RFC represented that the maximum DTI ratio was 50%, and the maximum LTV ratio for 82.02% of the Mortgage Loans was 95%. *See id.*

110.    RFC also represented in the Prospectus Supplement that 92.72% of the Mortgage Loans would be owner-occupied. Prospectus Supplement at II-6. The A&A Agreement further indicated that "[a]pproximately 91.8% and 93.8% of the Mortgage Properties related to the Group I Loans and the Group II Loans, respectively, are secured by the owner's primary residence." A&A Agreement § 4(xxiii); *see also* Prospectus Supplement at II-7, II-19.

111.    ***Loan Tape.*** RFC sent via email a final loan tape to FGIC on February 21, 2007. The loan tape provided by RFC set forth, for each Mortgage Loan, key characteristics such as the borrower's FICO score, Credit Grade, DTI ratio, the LTV ratio and for each Mortgage Loan. RFC also disclosed in the Prospectus Supplement, with respect to the pool as a whole, aggregate characteristics relevant to the assessment of the credit risk of the Loan Pool, including FICO scores, Credit Grades, DTI ratios and LTV ratios.

112.    ***Shadow Rating Letters.*** RFC, on information and belief, provided Moody's and S&P with, at a minimum, the same mortgage loan tape that it also provided to FGIC. Based on the information supplied by RFC, Moody's assessed the credit quality of the loan pool and

assigned a shadow rating of A2 to the 2007-EMX1 Certificates, while S&P assigned the 2007-EMX1 Certificates a shadow rating of BBB. These shadow ratings met FGIC's minimum requirements. FGIC required these shadow ratings as an essential condition to its willingness to insure the 2007-EMX1 Transaction.

113. *No Fraud in the Origination of the Mortgage Loans.* MLN had filed for bankruptcy on February 5, 2007. Accordingly, as an additional inducement to FGIC, and in order to persuade FGIC to enter into a transaction based on MLN-originated mortgage loans, RFC offered to provide a representation that there was no fraud in the origination of the Mortgage Loans. Although RFC indicated its strong preference to not give a fraud representation or put a fraud representation in public agreements, it ultimately agreed to do so. RFC represented in the A&A Agreement that "[n]o fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan." § 4(lx).

### (2) RFC's Fraudulent Inducement of FGIC is Carried Out with Substantial Assistance from Ally Financial

114. Ally Financial provided substantial assistance to its subsidiary RFC in fraudulently inducing FGIC to participate in the 2007-EMX1 Transaction and, ultimately, issue the Policy. Ally Financial knew that the Mortgage Loans underlying the 2007-EMX1 Transaction were of a substantially poorer quality than was represented to FGIC and other participants in the Transaction, including investors. Ally Financial further knew that the Mortgage Loans were not underwritten to the standards represented in the Offering Documents and warranted in the Operative Documents. Moreover, on information and belief, as a result of its dominance over ResCap and its other subsidiaries, Ally Financial knew that the representations and warranties RFC made to FGIC prior to and at the closing, upon which FGIC reasonably relied, were false.

- 34 -

115.    Ally Financial, at the direction of its board of directors, took a number of actions in 2005 to finance, support, and engender investor confidence in its mortgage securitization business, which was carried out by its subsidiaries. Ally Financial substantially restructured its subsidiaries in 2005. ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly owned subsidiaries—were transferred to it in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

116.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

117.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." Exhibit 99.1.

118.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business. This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants, such as FGIC.

119.    Ally Financial's corporate restructuring also allowed RFC to explicitly represent and warrant to FGIC in the I&I Agreement that RFC "is solvent, and will not be rendered

insolvent by the Transaction. . . . [RFC] will not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business." I&I Agreement § 2.01(xiii). This statement—on which FGIC materially relied—could not have been made absent Ally Financial's decision to prop up its subsidiary RFC.

120.    Additionally, Ally Financial was aware that the true characteristics of the Mortgage Loans in the 2007-EMX1 Transactions—and other securitization transactions—were far worse than was represented to FGIC and were not underwritten to the standards that were represented and warranted to FGIC. This is true in that Ally Financial's subsidiaries were, in many cases, the acquirers, sellers, and servicers of those very loans. Indeed, the driving factor in the separation of Ally Financial from General Motors Corporation ("GM") and the creation, in particular, of ResCap, was to create an entity, the sole focus of which was the home mortgage business.

121.    Moreover, as a result of its domination and control over ResCap and RFC, as well as the shared officers and directors among and between Ally Financial and its subsidiaries, Ally Financial was aware of RFC's representations and warranties to FGIC—and that they were untrue when stated. For example, Eric A. Feldstein was Ally Financial's CEO and Chairman of its board of directors and also served as Chairman of ResCap's board of directors. Furthermore, Sanjiv Khattri has served as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO of ResCap. Numerous other individuals served as Directors and Officers of both Ally Financial and ResCap, with many serving in roles directly related to the mortgage operations of both companies. ResCap and its own subsidiaries, including RFC, shared numerous directors and senior management as well.

122.    As a result of the overlapping personnel, intertwined business operations, and the free flow of information among Ally Financial, ResCap, and RFC, it is more than reasonable to conclude that information regarding the representations and warranties being made to FGIC by RFC was shared among and between RFC and its parent ResCap, as well as ResCap and its parent Ally Financial. Indeed, at least one Ally Financial employee who was involved in the 2007-EMX1 Transaction appeared on the Transaction's working group list and received all distributions that were sent to the group, including all drafts, final versions, and communications concerning the Operative and Offering Documents.

123.    Another example of the many employees who had overlapping responsibilities at Ally Financial and its subsidiaries, including RFC and RASC, is David C. Walker. Walker joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group. In September 2005, shortly before the closing of the 2007-EMX1 Transaction, Walker was a director at ResCap, GMACM, RFC, and RASC, among other ResCap subsidiaries. In the 2007-EMX1 Transaction, acting as a director of RASC, Walker was a signatory to both RASC's and RFC's "Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors." Both documents were dated December 20, 2005. Both of these documents were included in the closing documents of the 2007-EMX1 Transaction.

124.    Ally Financial, by (1) representing that its mortgage loan practices were sound and that its securitization transactions were supported by mortgage loans that met the criteria to which they were purportedly underwritten, (2) providing financial, managerial, and strategic assistance to its subsidiaries, and (3) modifying its corporate structure to control and direct its subsidiaries, provided substantial assistance to RFC in fraudulently inducing FGIC to participate in the Transaction and issue the Policy. Further, the issuance of the Policy, which made the

- 37 -

2007-EMX1 Transaction possible, inured to the significant financial benefit of Ally Financial and its subsidiaries.

### E.    RFC's Representations, Warranties, and Affirmative Covenants

125.    In connection with the 2007-EMX1 Transaction, RFC, at the direction of Ally Financial, either directly or indirectly through ResCap, made numerous representations, warranties, and affirmative covenants to FGIC. These representations and warranties were material and concerned, among other things, the way the loans were selected and evaluated, the characteristics of the Mortgage Loans, and the accuracy of the information supplied to FGIC. RFC also promised to provide timely Mortgage Loan file information and to provide FGIC with a variety of information, including access to RFC's books and records and to RFC's Servicing Officer and its independent accountants.

126.    RFC's representation, among others, that the information supplied to FGIC was not materially inaccurate or misleading, induced FGIC to enter into the 2007-EMX1 Transaction and to issue the Policy. Further, the I&I Agreement's incorporation and restatement of the representations and warranties in the Operative Documents was intended to allow FGIC to rely upon each and every one of the representations and warranties that RFC made in connection with the 2007-EMX1 Transaction.

127.    FGIC, for its part, reasonably relied on the information available to it regarding the underlying Mortgage Loans and the representations and warranties provided by RFC. Since FGIC had neither the right nor duty under the Operative Documents, nor the practical ability, to review the thousands of underlying Mortgage Loan files in the days available to it prior to the closing of the 2007-EMX1 Transaction, RFC knew that FGIC had no choice but to rely on RFC's representations regarding the underlying Mortgage Loans in determining whether to issue

the Policy. Further, FGIC had no reason to believe that these representations were not true and accurate.

128.    RFC included 4,051 individual Mortgage Loans in the 2007-EMX1 Trust. Typically, each Mortgage Loan has its own voluminous file containing, among other items, mortgage applications, credit reports, income and employment verifications, the lender's internal documentation, and other forms of documentation necessary to support underwriting decisions. Unlike RFC, FGIC was under no contractual duty whatsoever to review the Mortgage Loans. Instead, FGIC, as contemplated by the many representations, warranties, and affirmative covenants by RFC regarding its evaluation practices, and the credit quality of the Mortgage Loans, reasonably relied on the fact that truthful and accurate information had been provided and that it would not face additional, hidden risk by virtue of material omissions or positive misrepresentations having been made.

129.    Based on the information received by FGIC and the representations and warranties given by RFC, FGIC entered into the I&I Agreement and agreed to issue the Policy to the Trustee for the benefit of the holders of the 2007-EMX1 Certificates. In return for doing so, FGIC received a modest annual premium, based on a small, fixed percentage of the aggregate principal balance of the 2007-EMX1 Certificates, commensurate with the risk FGIC thought it was taking. Specifically, FGIC received 0.20% per annum of the aggregate balance of the 2007-EMX1 Certificates for serving as insurer, a figure commensurate with the risk that FGIC believed it was accepting, based on the representations, warranties, and affirmative covenants provided by RFC.

130.    RFC's information, representations, and warranties were materially false when disclosed and/or provided by RFC. RFC knew that this information, and its representations and

warranties, were materially false when made. RFC also knew that this information and the

representations and warranties were essential to FGIC's decision to issue the Policy. Indeed,

RFC intentionally made these material misrepresentations to induce FGIC to enter into the I&I

Agreement and issue the Policy. The issuance by FGIC of the Policy—induced by RFC's

fraudulent misrepresentations and substantial assistance of Ally Financial—made the 2007-

EMX1 Certificates eligible to receive an initial triple-A credit rating, thus greatly improving their

marketability to potential investors.

> **(1)    Representations, Warranties, and Affirmative Covenants Relating to the Operative and Offering Documents**

131.    Under Section 2.01(a) of the I&I Agreement, RFC made the following

representations and warranties, among others (emphasis added in each case):

- *Accuracy of Information.* **None of the Operative Documents nor any other material information relating to the Mortgage Loans**, the operations of RFC . . . or the financial condition of RFC . . . furnished to [FGIC] . . . by RFC . . . including the Offering Documents . . . **contains any statement of a material fact which was untrue or misleading in any material respect when made.** [RFC] has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change. . . Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to RFC . . . that would render any of the Documents untrue or misleading in any material respect. § (x).

- *Compliance with Securities Laws.* The offering and sale of the [2007-EMX1] Certificates complies in all material respects with all requirements of law, including the registration requirements of the Securities Act and any other applicable securities laws. **The Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading** . . . . § (xi).

- *Operative Documents.* **Each of the representations and warranties of RFC . . . contained in the applicable Operative Documents and the Underwriting Agreement is true and correct in all material respects** . . . . § (xii).

- *Solvency; Fraudulent Conveyance.* [RFC] is solvent, and will not be rendered insolvent by the Transaction. . . . **[RFC] shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business.** [RFC] does not intend to incur, and does not believe that it has incurred, debts beyond its ability to pay as

they mature. . . . [RFC] is not entering into the Operative Documents, or transferring any of its assets in connection with the Transaction, with any intent to hinder, delay or defraud any of its creditors.  § (xiii).

132.    *First*, in the I&I Agreement, RFC represented and warranted that "[n]one of the Operative Documents nor any other material information relating to the Mortgage Loans, the operations of RFC . . . or the financial condition of RFC . . . including the Offering Documents . . . contains any statement of a material fact which was untrue or misleading in any material respect when made." I&I Agreement § 2.01(a)(x).  Through these Operative and Offering Documents, as detailed above, RFC communicated several material facts about the characteristics of the mortgage loans sold to the 2007-EMX1 Trust.

133.    *Second*, in the I&I Agreement, RFC also represented and warranted that the "[t]he Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading." I&I Agreement § 2.01(a)(xi). As discussed above, in the Prospectus Supplement, RFC represented that the Mortgage Loans sold to the 2007-EMX1 Trust had been evaluated in conformity with RFC's underwriting standards.

134.    *Third*, the I&I Agreement incorporated by reference, for the benefit of FGIC, the representations and warranties contained in the respective related Operative Documents: "Each of the representations and warranties of RFC . . . contained in the applicable Operative Documents and the Underwriting Agreement is true and correct in all material respects . . . ." I&I Agreement § 2.01(a)(xii). The incorporation by reference of the Operative Documents into the I&I Agreement was intended to allow FGIC to rely on any representation and warranty that RFC made to other entities, such as investors or the Trustee, in connection with the 2007-EMX1

- 41 -

Transaction. Indeed, the I&I Agreement expressly identifies FGIC as a third-party beneficiary with respect to the related Operative Documents. I&I Agreement § 2.02(k).

135.    Such representations and warranties included the representation that there was no fraud or misrepresentation in connection with the origination of the Mortgage Loans.

136.    *Fourth*, RFC also provided information to FGIC concerning the Mortgage Loans in the 2007-EMX1 Transaction. *See* I&I Agreement § 2.02(c)(iii). This information included a schedule (or "loan tape") that set forth statistics about the Loan Pool. The loan tape purported to describe key characteristics relevant to the assessment of risk, including DTI ratios, LTV ratios, occupancy status, Credit Grades, and FICO scores. *See* PSA § 1.01. On information and belief, the loan tape FGIC received at closing contains the same information as is contained in the Mortgage Loan Schedule, referred to in Section 4(xv) of the A&A Agreement. In turn, in the A&A Agreement, RFC represented that all the information in that schedule "is true and correct in all material respects as of the date or dates which such information is furnished." § 4(xv).

137.    As a result of incorporating into the I&I Agreement the representations and warranties in the related Operative Documents, RFC incorporated representations and warranties regarding the underwriting of the Mortgage Loans included in the 2007-EMX1 Transaction. These representations and warranties set forth the standards governing each Mortgage Loan, including, significantly, the representation that each Mortgage Loan had been underwritten in compliance with RFC's own underwriting guidelines.

138.    In particular, in the A&A Agreement, RFC represented and warranted as the Mortgage Loans:

- **No Fraud in the Origination**: "No fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan." § 4(lx).

- **Information in Mortgage Loan Schedule**: "The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects as of the date or dates which such information is furnished." § 4(xv).

- **No Material Breach Or Default**: "[T]here is no default, breach, violation or event of acceleration existing under any Mortgage Note or Mortgage and no event which, with notice and expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by RFC or by any other entity involved in originating or servicing a Mortgage Loan." § 4(xxviii).

- **LTV Ratio**: "The weighted average [LTV] Ratios with respect to the Group I Loans, and the Group II Loans, in each case by outstanding principal balance at origination, are 84.1% and 83.8%, respectively." § 4(xviii).

- **Delinquent Loans**: "None of the Group I Loans are 30 [or more] days Delinquent in payment of principal and interest. . . . None of the Group II Loans have been a maximum of 30 or more days Delinquent in payment of principal or interest in the last 12 months." § 4(xvi).

- **Credit Grades**: "No more than 49.5% of the Group I Loans [and 51.4% of the Group II Loans] have been classified by RFC as Credit Grade A4 Mortgage Loans, no more than 33.6% of the Group I Loans [and 31.7% of the Group II Loans] have been classified by RFC as Credit Grade A5 Mortgage Loans, no more than 8.1% of the Group I Loans [and 8.8% of the Group II Loans] have been classified by RFC as Credit Grade AX Mortgage Loans, no more than 5.4% of the Group I Loans [and 4.3% of the Group II Loans] have been classified by RFC as Credit Grade AM Mortgage Loans, no more than 1.6% of the Group I Loans [and 2.0% of the Group II Loans] have been classified by RFC as Credit Grade B Mortgage Loans and no more than 2.1% of the Group I Loans [and 2.2% of the Group II Loans] have been classified by RFC as Credit Grade C Mortgage Loans, in each case as described generally in the Prospectus Supplement." §§ 4(xxx), 4(xxxi).

- **Occupancy Status**: "Approximately 91.8% and 93.8% of the Mortgaged Properties related to the Group I Loans and the Group II Loans, respectively, are secured by the owner's primary residence." § 4(xxiii).

- **The Originator Considered the Borrower's Ability to Repay**: "The originator of the Group II Loans adequately considered the borrower's ability to make payments by employing underwriting techniques that considered a variety of factors, such as: the borrower's income, assets and liabilities, and not solely the collateral value, in deciding to extend the credit at the time of origination." § 4(liii).

- **Residence is Borrower's Principal Residence**: "With respect to any Group II Loan that is a subordinate lien mortgage loan: (i) such lien is a one- to four-family residence that is the principal residence of the borrower. . . ." § 4(lvii).

139.    Moreover, in the I&I Agreement—which expressly identifies FGIC as a third-party beneficiary with respect to the related Operative Documents—RFC specifically covenants that it "shall comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party . . . ." I&I Agreement §§ 2.02(a), 2.02(k).

140.    RFC also agreed that it had to receive FGIC's consent before modifying or amending any of the Operative Documents. The I&I Agreement provides, that RFC will not "modify, waive or amend, or consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of the Operative Documents to which it is a party . . . without the prior written consent of [FGIC], which consent shall not be unreasonably withheld, conditioned or delayed." § 2.03(b).

### (2)    Representations, Warranties and Affirmative Covenants Regarding Servicing and Access to Information

141.    In addition to the representations and warranties referenced above, the I&I Agreement provides that RFC has the contractual obligation, as Master Servicer, to service the Mortgage Loans in compliance with the PSA and to provide FGIC with access to the underlying Mortgage Loans and servicing notes, and as Seller, to procure custodial interim certifications stating that all mortgage files were complete and properly transferred into the appropriate trust ("Interim Certification"). Specifically, the I&I Agreement provides:

- *Other Information.* (A) Promptly upon request, such other data as [FGIC] may reasonably request relating to the Mortgage Loans, the servicing of the Mortgage Loans . . . the Transaction or the ability of any of RFC. . . to perform its obligations under the Operative Documents, and (B) all information required to be furnished to the Trustee or the Holders, as the case may be. § 2.02(c)(v).

- *Access to Records; Discussions with Officers and Accountants.* On an annual basis, or at any time when a Material Adverse Change shall have occurred and be continuing, *upon the reasonable request of [FGIC], [RFC] will permit [FGIC] or its authorized agents, or cause [FGIC] or its authorized agents to be permitted . . .* to inspect the books and records of RFC . . . . to discuss the affairs, finances and accounts of RFC . . . as they relate to the Mortgage Loans, the Transaction or the ability to perform [its] obligations under the Operative Documents with a Servicing Officer . . . [and] if [FGIC] reasonably believes that a Material Adverse Change may have occurred and with RFC's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of RFC . . . with the independent accountants of such Person; provided, however, that officers of RFC shall have the right to be present during such discussions. In addition, if requested by [FGIC], on an annual basis, or otherwise when reasonably requested by [FGIC], RFC will . . . cause the Custodian to deliver to [FGIC] an updated certification, in the form of the "Interim Certification" required under the Custody Agreement, with an exceptions list attached thereto, to enable [FGIC] to track the progress of recording of Mortgages and Assignments with respect to the Mortgage Loans. § 2.02(e) (emphasis added).

- *Servicing of Mortgage Loans.* All Mortgage Loans will be serviced in all material respects in compliance with the [PSA]. § 2.02(l).

- *Due Diligence.* If in [FGIC's] reasonable judgment circumstances so warrant, based on the performance of the Transaction, [FGIC] shall have the right, so long as the [2007-EMX1] Certificates remain outstanding, to conduct reviews of RFC's practices as Master Servicer through reviews of the Mortgage Loans, reappraisals of Mortgaged Properties and reviews of servicing practices, at [FGIC]'s expense and in reasonable manner convenient to both RFC and [FGIC]. This due diligence right is in addition to the access provided and the other rights provided for in Section 2.02(e) of this Insurance Agreement. § 2.02(m).

## F.    RFC's Breaches of Its Representations, Warranties, and Affirmative Covenants

142.    As discussed above, FGIC relied on material representations and warranties made by RFC regarding the manner in which the Mortgage Loans were selected and evaluated, the characteristics of those loans, and the accuracy and completeness of information RFC supplied to FGIC. Based on those representations and warranties, FGIC agreed to issue the Policy. In fact, as demonstrated by the extreme levels of delinquencies and losses detailed above, the risk that FGIC assumed when it issued the Policy was many times greater than the risk disclosed by

RFC's representations and warranties. RFC breached its representations and warranties to FGIC, and FGIC has been damaged as a result of those breaches.

143.    The 2007-EMX1 Transaction has performed poorly; delinquencies and defaults for Mortgage Loans in the 2007-EMX1 Transaction have been substantial. As of January 2012, a total of 2,828 Mortgage Loans, representing 73.4% of the Mortgage Loans underlying the 2007-EMX1 Transaction, had posted a loss or were severely delinquent. As discussed above, by making these extensive representations and warranties to FGIC, and thereby inducing FGIC to issue the Policy, RFC assumed and allocated to itself all risk associated with the Mortgage Loans failing to comply with RFC's representations and warranties.

144.    The poor performance of the Mortgage Loans has reduced the cash flow to the 2007-EMX1 Trust, which has caused and will continue to cause claims to be presented to FGIC under the Policy to cover these shortfalls. Indeed, as of February 2012, more than $26.9 million in claims had been presented to FGIC in connection with the 2007-EMX1 Transaction. FGIC expects tens of millions of dollars more in claims to be presented to it under the 2007-EMX1 Transaction in the future.

### (1)    RFC's Denial of Loan File Requests

145.    As the 2007-EMX1 Transaction continued to perform poorly, on December 9, 2010, FGIC wrote to Jeff Blaschko, an RFC/ResCap employee, via e-mail demanding that RFC provide 367 of the Mortgage Loan files. Having received no response from RFC to its earlier requests, FGIC sent a follow-up e-mail on February 3, 2011 regarding the status of its December 9, 2010 request for files. FGIC's demands for information were received by ResCap, which informed FGIC that ResCap could not respond to the requests until the matter was discussed internally at ResCap and a response was authorized by those with decision-making authority. On

- 46 -

information and belief, the request required authorization from officers at Ally Financial, and RFC/ResCap's response was directed by officers at Ally Financial.

146.    On February 14, 2011, and again on April 26, 2011, FGIC sent further follow-up letters requesting loan files.

147.    In finally responding to FGIC's request for information, RFC refused to provide any loan files or other information relating to current or pre-paid loans ("Performing Loans"). Instead, it only provided FGIC with a portion of the requested loan files, consisting solely of non-performing loans, and chose to conceal the Performing Loan files from FGIC.

148.    Pursuant to the PSA and the I&I Agreement, FGIC is entitled to reasonable access to the documentation regarding all of the Mortgage Loans. Section 2.02(m) of the I&I Agreement provides that FGIC "shall have the right, so long as the [2007-EMX1] Certificates remain outstanding, to conduct reviews of RFC's practices as Master Servicer through reviews of the Mortgage Loans, [and] to conduct reviews of RFC's practices as Master Servicer through reviews of the Mortgage Loans . . . ." Notably, there is no limitation in the I&I Agreement as to the nature of the Mortgage Loan files that are subject to review. Further, Section 2.02(c)(v) of the I&I Agreement states that "[p]romptly upon request," RFC must provide to FGIC "such other data as [FGIC] may reasonably request relating to the Mortgage Loans . . . ."

149.    By producing only non-performing Mortgage Loan files, in contravention of the I&I Agreement, RFC has arbitrarily and unreasonably imposed limitations on FGIC's contractual right to reasonable access to Mortgage Loan files.

(2)    **RFC's Denial of Interim Certification Requests**

150.    On February 24, 2011, FGIC demanded, pursuant to Section 2.02(e) of the I&I Agreement, that RFC promptly cause the Custodian of the 2007-EMX1 Transaction to deliver to

- 47 -

FGIC an updated certification, in the form of the "Interim Certification" required under the Custodial Agreement for the Transaction, with an exceptions list attached thereto. An Interim Certification would enable FGIC to track the progress of the recording of mortgages and assignments with respect to the related Mortgage Loans.

151.    Again on May 24, 2011, FGIC wrote RFC demanding the Interim Certification, noting that its prior request dated February 24, 2011—three months earlier—had gone unanswered.

152.    RFC, without justification or explanation, and in breach of its obligations in the I&I Agreement, has failed to respond to these requests.

### (3)    RFC's Denial of Servicing Notes

153.    On December 9, 2010, FGIC demanded, pursuant to Section 2.02(c)(iv) of the I&I Agreement, that RFC furnish or cause to furnish the servicing notes for the Mortgage Loans.

154.    RFC, without justification or explanation, and in breach of its obligations in the I&I Agreement, has failed to respond to requests for servicing notes.

### (4)    RFC's Denial of FGIC's Access To Books and Records, Servicing Officer, and RFC's Independent Accountants

155.    On December 8, 2011, in accordance with its express rights under Sections 2.02(e)(i)-(ii) of the I&I Agreement, FGIC requested to (i) inspect the books and records of RFC; (ii) discuss the affairs, finances, and accounts of RFC with the Servicing Officer of RFC; and (iii) discuss the affairs, finances, and accounts of RFC with RFC's independent accountants.

156.    To date, RFC has failed to respond to this request, in violation of the I&I Agreement.

### (5)    Breaches Uncovered In Loan File Reviews

157.    When FGIC became concerned about the high delinquencies and default rates in the 2007-EMX1 Transaction, FGIC requested that RFC provide it with certain Mortgage Loan files in the Loan Pool. FGIC selected for review 1,188 non-performing (i.e., non-current or charged-off) loans that had resulted in a loss to the 2007-EMX1 Trust. To perform this review, FGIC hired an independent outside consultant with particular skill, experience, and expertise in the review, evaluation, and re-underwriting of mortgage loans.

158.    That review revealed that RFC had breached one or more material representations and warranties in 795 of the 1,062 loans, or approximately 75% of the Mortgage Loans initially reviewed. As a result, FGIC requested that RFC repurchase those Mortgage Loans because they were non-conforming. RFC agreed with FGIC's identification of various breaches with regard to approximately 40% of those Mortgage Loans.

159.    As discussed above, in 2010 FGIC randomly selected 500 Mortgage Loans. Of those Mortgage Loans, FGIC found that it already possessed loan files for 133 of them so FGIC requested the additional 367 Mortgage Loan files from RFC. When RFC finally responded to FGIC's multiple requests, RFC improperly refused to provide FGIC with any Mortgage Loan files for loans RFC deemed to be Performing Loans. Thus, of the 367 Mortgage Loan files FGIC requested, FGIC received only 140 Mortgage Loan files to review.

160.    After receiving the additional Mortgage Loan files, FGIC evaluated them to determine whether they contained material breaches of the 2007-EMX1 Operative Documents necessitating repurchase under the related Operative Documents. To perform this review, FGIC once again engaged an independent outside consultant, having particular skill, experience, and expertise in the review, evaluation, and re-underwriting of mortgage loans.

161.    The independent consultant's review revealed that over 86% of the Mortgage

Loans that were reviewed contained breaches of the representations and warranties in the

Operative Documents, including the I&I Agreement.

162.    A small sample of these material breaches and underwriting violations are listed

below:

- Loan Number 10755392: The borrower provided a stated monthly income of
$9,200 a head chef for a diner, but information provided by the borrower for loan
modification in 2009 indicated that the borrower was working 30 hours per week
as a cook for the same diner for $7.50 per hour (approximately $975 per month).
It is unlikely that the borrower earned a tenth as much income in 2009 as he did in
2006, when the loan was originated. Based on the 2009 income, the DTI ratio for
the loan is 399.44%, well in excess of the maximum allowable DTI ratio of 55%.

- Loan Number 10754554: Among other defects, the borrower did not disclose two
additional mortgages that were closed prior to the subject loan, in the amounts of
$217,520 and $54,380, respectively. As a result, the loan had a significantly
higher DTI ratio than what was disclosed to FGIC. The borrower's self-
employment also was not verified and therefore was not eligible for financing.

- Loan Number 10776558: Among other defects, the borrower did not disclose a
prior mortgage in the amount of $222,300 secured by the same property.
Therefore the DTI ratio was 67.46% instead of 39.42% as represented in the
Mortgage Loan Schedule. Additionally, salary data and business earning
information indicate that the borrower vastly overstated his monthly income.
Using a more reliable income figure, and combined with the undisclosed
mortgage, further increased the DTI ratio to 143.66%. The AlterNet [Program]
indicated the maximum allowable DTI ratio was 50% and up to 55% with two
months reserves or $1,500 residual income.

These examples of underwriting violations—but a small smattering of the extensive defects

among the Mortgage Loans—evidence significant breaches of the Operative Documents for the

2007-EMX1 Transaction.

163.    Following the discovery of these high defect rates, and pursuant to the I&I

Agreement and the A&A Agreement, FGIC demanded that RFC repurchase the non-compliant

Mortgage Loans discovered during its repurchase review. RFC has expressly refused to

repurchase a significant number of non-conforming Mortgage Loans or replace them with

conforming Mortgage Loans. This failure constitutes a material breach of the I&I Agreement

and Operative Documents incorporated therein.

164.    Moreover, RFC's responses in connection with FGIC's loan file review indicate

that RFC was aware that the representations and warranties it provided FGIC were not truthful.

For example, RFC has admitted to FGIC that the information RFC provided to FGIC via the loan

tape was not accurate. In response to FGIC's repurchase requests, RFC stated that repurchase

was not required because under the Prospectus, only "substantial compliance" with underwriting

standards was required. RFC's response is an admission that the loan tape, which indicated the

borrower's assets had been verified, was not accurate—a breach of Section 2.01(x) of the I&I

Agreement.

### (6)    Breaches Uncovered Using Loan Pool Data

165.    In addition to the loan-level review discussed above, FGIC commissioned an

independent consultant—a leading provider of financial, property, and consumer information,

such as property valuation services using automated property valuation tools—to test the

accuracy of RFC's representations and warranties relating to the Mortgage Loans regarding

occupancy status and LTV ratios. The consultant extracted information and data relating to

3,558 Mortgage Loans.

### a.    Breaches of Owner-Occupancy Representation and Warranty

166.    RFC represented in the A&A Agreement and the Prospectus Supplement that

approximately 91.8% of the Group I Loans and 93.8% of the Group II Loans—92.7% of all

Mortgage Loans—would be secured by the borrower's primary residence. A&A Agreement §

4(xxiii); Prospectus Supplement at II-7, II-19, II-31.

167.    Based on the information provided by RFC, FGIC determined that only 78% of the Mortgage Loans were owner-occupied properties.

168.    The A&A Agreement and the Prospectus Supplement therefore materially overstated the percentage of Mortgage Loans in their respective pools that were owner-occupied as a primary residence.  As such, RFC breached its representation and warranty that the information in the Prospectus Supplement did not contain any untrue statements of material fact.

169.    FGIC has determined that the rate of Mortgage Loan non-performance (i.e., loans that, as of January 2012 were delinquent for more than 60 days, in foreclosure, liquidated, or have posted a loss) in the 2007-EMX1 Transaction for loans that were determined after review to be non owner-occupied was approximately 74.7%.

### b.    Breaches of LTV Ratio Representation and Warranty

170.    The Prospectus Supplement also provided information relating to the LTV ratios of the underlying Mortgage Loans.

171.    LTV information provided in the Prospectus Supplement provided that the loans had generally been originated with a maximum LTV ratio of 100%.  *See* Prospectus Supplement at II-28.  LTV information provided in the Prospectus Supplement included (1) the average weighted LTV ratio for the Mortgage Loans, and (2) the number and aggregate value of the Mortgage Loans with LTV ratios in a given percentage band (e.g., the number of Mortgage Loans with LTV ratios of between 80% and 85%, between 85% and 90%, and so on).  Prospectus Supplement at II-28.  The Prospectus Supplement reported that *none* of Mortgage Loans had a LTV ratio over 100 percent.  *See* Prospectus Supplement at II-28.

172.    Using an industry standard automated valuation model to calculate the value of the underlying property at the time the Mortgage Loan was originated, FGIC determined that

approximately 19% of the aggregate principal balance of the Mortgage Loans—as opposed to *none* of the loans, as reported in the Prospectus Supplement—had an original LTV ratio above 100%. FGIC also determined that approximately 30% of the aggregate principal balance of the Mortgage Loans—as opposed to fewer than 18%, as reported in the Prospectus Supplement— had an original LTV ratio above 95%. In addition, RFC represented in the A&A Agreement that the weighted average LTV ratio of the Group I Loans and Group II Loans at origination were 84.1% and 83.8%, respectively. *See* A&A Agreement § 2.02(xviii). However, FGIC determined that the actual weighted average LTV ratio of the aggregate principal balance of the Mortgage Loans at origination was approximately 91.1% for Group I Loans and 90.3% for Group II Loans. Thus, RFC breached its representation and warranty that the information in the Prospectus Supplement did not contain any untrue statements of material fact, as well as its representations regarding weighted average LTV in the A&A Agreement.

173.    Moreover, FGIC has determined that the rate of Mortgage Loan non-performance (i.e., Mortgage Loans that, as of January 2012 were delinquent for more than 60 days, in foreclosure, liquidated, or have posted a loss) in the 2007-EMX1 Transaction for Mortgage Loans where the automated valuation model indicated a LTV greater than 100% was over 77.5%. This non-performance rate was over 15.4% greater than the non-performance rate of those Mortgage Loans whose automated valuation model indicated a LTV below 100%.

174.    The pervasive and overwhelming defects in the Mortgage Loan files reviewed to date indicates the clear breach of RFC's contractual representations, warranties, and affirmative covenants relating to, among other things, the characteristics of the Mortgage Loans, including the guidelines to which the Mortgage Loans were underwritten. Specifically, RFC has breached representations and warranties stating, for the 2007-EMX1 Transaction, that:

- neither the Operative Documents nor any information related to the Mortgage Loans contain any untrue or misleading statement of material fact;

- the Offering Documents (i.e. the Prospectus and Prospectus Supplement) contain no untrue or misleading statement of material fact;

- each representation and warranty of RFC in the Operative Documents (including each representation and warranty in the A&A Agreement) is true and correct in all material respects;

- the information set forth in the Mortgage Loan Schedule is true and correct in all material respects;

- each Mortgage File contains all required documents and instruments; and

- the Mortgage Loans were in substantial conformity with the standards in RFC's AlterNet Program or in the description of the Credit Grades.

175.    It is reasonable to conclude—based on what is known by FGIC and as a result of what is being wrongly withheld from FGIC—that many of the 4,051 Mortgage Loans held by the 2007-EMX1 Trust at closing evidenced similar breaches of RFC's representations and warranties.

176.    Indeed, based on the information gathered from FGIC's loan file review and the information extracted by FGIC's consultant relating to LTV ratios and owner-occupancy rates discussed above, FGIC believes that the Transaction-wide defect rate for the Mortgage Loans is likely to be at least 66%.

177.    Moreover, the true scope of RFC's underwriting failures is unknown given RFC's refusal to provide FGIC with pertinent—and contractually required—information. This refusal in itself constitutes a breach of RFC's affirmative covenant to comply with FGIC's reasonable requests regarding access to information concerning the Mortgage Loans.

**G.    RFC's Fraud**

178.    The material breaches of RFC's representations and warranties, and the poor credit quality of almost all of the Mortgage Loans, demonstrate the knowing and wanton disregard of material representations and warranties and affirmative covenants RFC made to FGIC to induce its participation in the Transaction. The extraordinarily high defect and default rate among the Mortgage Loans, among other things, demonstrates not merely that RFC breached its representations and warranties as a contractual matter, but that it did not—and never intended to—comply with them, despite representing to FGIC that, if FGIC issued the Policy, RFC would make the representations and warranties set forth in the Operative Documents, and that those representations and warranties would be true. Because RFC refuses to provide all of the requested Mortgage Loan files in violation of its contractual obligation to do so, however, the full extent and scope of the fraud has yet to be revealed.

179.    All of the Mortgage Loans underlying the 2007-EMX1 Transaction were acquired by RFC. In addition, as of early 2007 RFC employees were working in MLN's servicing department in order to ensure the continuing servicing of the loans and to prevent the deterioration of the quality of the MLN portfolio. As such, even before acquiring the loans from MLN's affiliate, RFC had the access and ability to evaluate the Mortgage Loan files and to determine if the loans were in substantial compliance with RFC's AlterNet Program.

180.    On information and belief, RFC did in fact examine the Mortgage Loans when it assisted with servicing, and thereby became (if it had not been already) aware that many of the Mortgage Loans actually did breach one or more of the representations and warranties that were to be made by RFC in connection with the 2007-EMX1 Transaction.

181.    To induce FGIC to enter into the 2007-EMX1 Transaction, RFC provided FGIC with a loan tape, which contained false and misleading information regarding, among other

things, the LTV and DTI ratios, occupancy status, Credit Grades, and FICO scores of the

borrowers.

182.    In addition, RFC made critical misrepresentations to FGIC with respect to the

credit rating agencies' assessment of the loans that were to comprise the 2007-EMX1 Trust.

RFC was well aware that FGIC would not agree to insure the 2007-EMX1 Certificates unless

RFC obtained shadow ratings from the rating agencies that satisfied FGIC's minimum

requirements.  To this end, upon information and belief, RFC provided Moody's and S&P with

the same false information regarding the credit quality of the underlying mortgage loans that it

also provided to FGIC.  Based on this faulty information, Moody's and S&P assigned shadow

ratings regarding the credit quality of the 2007-EMX1 Certificates that met FGIC's minimum

requirements.  In this way, RFC made both direct and indirect misrepresentations to FGIC—first,

by providing faulty information to the rating agencies to provide a risk assessment that RFC

would pass on to FGIC, and second, by causing shadow ratings of the 2007-EMX1 Certificates

to be delivered to FGIC without disclosing to FGIC that those ratings were based on incomplete

and inaccurate loan-level data.

183.    In connection with MLN's bankruptcy proceeding, on January 29, 2008, RFC

filed a proof of claim in the aggregate amount of $495,766,952.77 against MLN.  As MLN's

largest unsecured and one of its largest secured creditors, RFC was able to wield great influence

over MLN.  For example, shortly after MLN filed for bankruptcy the press reported that Mitchell

Heffernan, former CEO and president of MLN, made allegations that during the approximately

45-day period preceding MLN's bankruptcy RFC and others took over the cash management of

MLN.  *See* Bloomberg News, *Mortgage Lenders Judge Can't Block Arrest, State Says*, Apr. 5,

2007.  As a result, all of MLN's financial transactions and payments to creditors had to be

approved by RFC.

184.    Moreover, as discussed above, RFC extended warehouse lending facilities to

MLN.  On information and belief, these lending arrangements gave RFC access to the underlying

Mortgage Loan file information, thus providing RFC the opportunity to assess the characteristics

and performance of the loans, including increases in early payment defaults of the Mortgage

Loans that occurred shortly after origination.  In light of the increased defaults and RFC's access

to the Mortgage Loan files, RFC was (or should have been) aware that MLN's underwriting

practices did not conform to the requirements of the applicable underwriting standards.

185.    RFC also made material misrepresentations to FGIC, on which FGIC relied, about

the characteristics of the Mortgage Loans, including the standards to which the Mortgage Loans

were underwritten.

186.    For example, RFC knowingly misrepresented to FGIC that the Mortgage Loans

were evaluated by RFC at several critical junctures and determined by RFC to comply with

RFC's own underwriting guidelines .  In the Prospectus Supplement (and in the I&I Agreement

by incorporation), RFC represented to FGIC that, prior to assigning the Mortgage Loans to its

affiliate RASC, RFC "reviewed the underwriting standards for the mortgage loans" and

determined that "all of the [M]ortgage [L]oans were in substantial conformity with the standards

set forth in [RFC's] AlterNet Program or are otherwise in conformity with the standards set forth

in the description of credit grades set forth in this prospectus supplement."  Prospectus

Supplement at S-56.  In addition, in the section of the Prospectus Supplement titled "AlterNet

Program," RFC represented that each and every Mortgage Loan purchased from the Seller was

determined to be acceptable by RFC for inclusion in the 2007-EMX1 Transaction due to having

been originated in accordance with or generally consistent with the underwriting program

applicable to this Transaction—namely, the AlterNet Program. *See* Prospectus Supplement at

S-60. RFC also provided FGIC with the AlterNet Program's guidelines, which detailed the

program's extensive underwriting standards and requirements. Moreover, the loan tape provided

by RFC indicated that the Mortgage Loans were acquired and evaluated under those same

guidelines.

187.    Despite all of RFC's above-referenced representations to FGIC, among others,

RFC was well aware at the closing of the 2007-EMX1 Transaction that those representations

were false. It was not until years after the Transaction closed that RFC admitted that the

Mortgage Loans were not underwritten to RFC's AlterNet Program. In 2009, FGIC sent RFC

numerous repurchase requests after reviewing certain Mortgage Loans in the 2007-EMX1

Transaction. In those requests, FGIC cited material breaches of the I&I Agreement and the

Operative Documents, including non-conformity to RFC underwriting guidelines, which

rendered certain Mortgage Loans ineligible or non-conforming and required RFC to repurchase

those loans. RFC responded to many of FGIC's repurchase requests by claiming that the

Mortgage Loans *were* conforming because they were underwritten to MLN's guidelines and not

RFC's AlterNet Program.

188.    For example, in 2009, FGIC sent RFC repurchase requests for loan numbers

11213763 and 10687886 because those loans were non-conforming under the applicable

AlterNet Program. In response to FGIC's repurchase request for loan number 11213763, RFC

asserted that the loan *was* conforming because it was underwritten "using a Lite Documentation

Program with a Negotiated Commitment between RFC and EMAX/MLN." RFC attached a

chart purporting to represent the requirements of the program and admitted that such a program

- 58 -

required less documentation than the AlterNet Program. In response to FGIC's repurchase

request for loan number 10687886, RFC asserted that the loan *did* qualify because "[t]he subject

transaction was underwritten according to the EMAX Financial Group Wholesale Loan Program

Guide for Stated Income Documentation Program." RFC asserted that this program allowed

such a loan because, unlike the AlterNet Program, this other program "do[es] not have a

minimum credit depth requirement."

189. RFC's responses noted above further indicate that the Loan Pool was not

compliant with RFC's representation in the Prospectus Supplement that the Mortgage Loans

were underwritten to AlterNet Program.

190. These admissions demonstrate that RFC did not review the underwriting

standards for the Mortgage Loans and determine that all of the Mortgage Loans were in

substantial conformity with RFC's AlterNet Program or the credit grades listed in the Prospectus

Supplement. Instead, as RFC implicitly conceded in the rescission letters, these loans were

evaluated and acquired under Emax and/or MLN's less demanding underwriting guidelines.

Accordingly, RFC knew that its representations were materially false at the time of the closing or

should have known that its representations were materially false.

191. Moreover, the A&A Agreement (and Prospectus Supplement as incorporated by

reference in the I&I Agreement) also contained false and misleading representations about the

Mortgage Loans. In particular, RFC misrepresented that, as of the closing: (i) the information set

forth in the Mortgage Loan Schedule was true and correct in all material respects; (ii) the

Mortgage Loans met certain credit grades; (iii) there was no default breach, violation or event of

acceleration existing under any Mortgage Note or Mortgage; and (iv) the weighted average LTV

Ratio with respect to the Group I Loans, and the Group II Loans were 84.1% and 83.8%, respectively.

192.    Therefore, at the time of the closing of the 2007-EMX1 Transaction, RFC either (1) knew or should have known that its representations were materially false because RFC had not, among other things, determined if the Mortgage Loans were in fact in "substantial conformity" with the AlterNet Program, or (2) had reviewed whether the Mortgage Loans were in "substantial conformity" with the AlterNet Program, had determined that they did not meet the standards of this program, but nonetheless materially misrepresented to FGIC that the Mortgage Loans were in "substantial conformity" with the AlterNet Program.

193.    These representations were essential to FGIC's decision to issue the Policy. These representations and warranties were false when stated. RFC intentionally made these material misrepresentations to induce FGIC to enter into the I&I Agreement and to issue the Policy. The true information regarding these loans, as detailed above, simply could not substantiate RFC's assurances. In short, no amount of RFC promising that the loans met certain standards actually made those promises true.

194.    RFC's repeated fraudulent acts have exposed it to investigations by the DOJ and the SEC as well as to a multitude of suits and the potential for more litigation to come.

195.    Consistent with this pattern of behavior, RFC defrauded FGIC into issuing the Policy, through its knowing misrepresentations.

**H.    Ally Financial Aids and Abets RFC's Fraud**

196.    Ally Financial provided substantial assistance to RFC in fraudulently inducing FGIC to issue the Policy. As the ultimate parent of an intertwined corporate enterprise, the subsidiaries of which were substantially involved in every aspect of Ally Financial's

securitization business, Ally Financial was well aware of the true nature of the Mortgage Loans.

Moreover, as discussed above, Ally Financial was aware of the representations and warranties

RFC made regarding the nature of RFC's business practices and the quality of the Mortgage

Loans and that such representations and warranties were false.

I.    **The Federal Government Alleges Fraud Against Ally Financial and Its
      Subsidiaries Relating to the 2007-EMX1 Transaction**

197.    As discussed above, the FHFA recently filed suit in the Supreme Court of New

York against RFC for fraud, aiding and abetting fraud, and violating state and federal securities

laws in connection with its role in the public filing of offering documents which allegedly

contained false and misleading statements.

198.    In support of its claims, the FHFA performed a review of loan-level data for

randomly-selected 2007-EMX1 Group II Loans to assess whether the information provided in

the Prospectus Supplement for the 2007-EMX1 Transaction was true and accurate. *See* FHFA

Complaint at ¶ 94; Table 6. For each of the sampled loans, the FHFA used an industry standard

automated valuation model ("AVM")—on information and belief, similar to the approach used

by FGIC—to calculate the value of the underlying property at the time the mortgage loan was

originated. (Id. ¶ 99).

199.    Similar to FGIC's findings with respect to 2007-EMX1, the FHFA's review of the

sample data confirmed, on a statistically-significant basis, that the information provided in the

2007-EMX1 Prospectus Supplement concerning owner-occupancy and LTV ratios was

materially false.

200.    The FHFA's analysis determined that RFC overstated the true percentage of non-

owner-occupied properties within the 2007-EMX1 underlying Group II Loan Pool, overstated

the true percentage of 2007-EMX1 underlying Group II Loans with a LTV ratio at or below 80

percent, and falsely represented that none of the loans had a LTV ratio above 100%. FHFA

Complaint ¶ 98 & Table 6; ¶ 102 & Table 7.

### J. RFC's Breach of Obligations as Master Servicer

#### (1) Failure to Remedy Subservicing Deficiencies and to Provide Information

201.    RFC, as Master Servicer, failed in numerous material respects to properly perform

its duties to service and administer the Mortgage Loans in accordance with the provisions of the

relevant Operative Documents for the 2007-EMX1 Transaction, including, but not limited to, its

obligations to follow proper servicing procedures, and to sufficiently monitor and manage the

performance of the Subservicers with respect to their duties under the Transaction.

202.    RFC took responsibility for the servicing of the Mortgage Loans through its

wholly owned subsidiary HomeComings and affiliate GMACM. RFC had certain related

contractual obligations under the I&I Agreement and the PSA with respect to the 2007-EMX1

Transaction. Under the I&I Agreement, RFC covenanted that "[a]ll Mortgage Loans will be

serviced in all material respects in compliance with the [PSA]." I&I Agreement § 2.02(l).

Under the PSA, RFC is "obligated and liable to . . . [FGIC] for the servicing and administering of

the Mortgage Loans," and in doing so is required to "follow[] such procedures as it would

employ in its good faith business judgment and which are normal and usual in its general

mortgage servicing activities. . . ." PSA §§ 3.01(a), 3.04. As such, on each occasion that

HomeComings and/or GMACM failed to service and administer the Mortgage Loans in

conformity with generally accepted servicing practices (including RFC's own servicing

guidelines), RFC was liable "to the same extent and under the same terms and conditions as if

the Master Servicer alone were servicing and administering the Mortgage Loans." PSA §§

3.01(a), 3.04.

- 62 -

203.    During 2007, the servicing operations of RFC, GMACM and HomeComings were integrated into ResCap. Since the time of the integration, on information and belief, the Subservicers have been deficient in their borrower contact, collections and loss mitigation standards. An onsite review of the Ally Financial servicing arm's headquarters, including those of GMACM, HomeComings and RFC, on March 25, 2009 by FGIC and a third party firm, and subsequent analysis, revealed among other issues: (i) inadequate call center staffing—staffing unable to handle increased incoming and outgoing call volumes; (ii) call center staffing turnovers as high as 40% in a single year; (iii) a calling campaign that does not attempt to contact borrowers through other means when GMACM or HomeComings does not have a viable number or the borrower is continuously unresponsive to messages left; (iv) a lack of effort to hire personnel to visit the mortgaged property to discuss loss mitigation strategies with borrowers in default; and (v) severely infrequent use of alternative loss mitigation strategies as compared to the industry, including forbearance plans and workout programs.

204.    As performance of this transaction quickly began to deteriorate, FGIC hired a consultant to conduct an onsite servicing review focusing specifically on the servicing of loans in the 2007-EMX1 transaction. The onsite review revealed numerous deviations from industry standards specific to the servicing procedures used with respect to the mortgage loans backing the 2007-EMX1 Certificates. For example, borrowers of the 2007-EMX1 Mortgage Loans who were at risk of defaulting were offered forbearance plans more infrequently than the industry norm, and where forbearance plans were offered to such borrowers, the terms did not comport to, and were generally less generous than, typical industry standards. For instance, at-risk borrowers of the Mortgage Loans were offered only six-month forbearance plans, while the industry norm is to extend borrowers a twelve-month plan.

- 63 -

205.  Beyond these forbearance deficiencies, the Subservicers of the Transaction committed other loss mitigation failures.  For example, according to industry standards at that time, approximately 85% to 90% of the delinquent mortgage loans in a particular RMBS transaction are involved in some stage of the workout solution process that is designed to mitigate loss.  Yet, with respect to the 2007-EMX1 Transaction, FGIC's March 25, 2009 onsite review revealed that only 73% of delinquencies for the preceding month had a workout solution in process, while 27% of the delinquent mortgage loans were not involved in any loss mitigation process whatsoever.

206.  The failure by the Subservicers to follow appropriate standards likely resulted from, and was compounded by,  the fact that, as of February 2009, the average loss mitigation associate employed by the Subservicers was handling approximately 250 accounts—a workload that was more than double the industry norm at that time.

207.  The onsite review further revealed that the Subservicers had employed inadequate and improper practices concerning charged off loans and short sales, which, as of February 2009, had contributed to a pool-wide deficiency rate for the 2007-EMX1 Transaction of over 52%.

208.  On information and belief, RFC has failed to remedy any of the deficient servicing practices of the Subservicers.

209.   In addition, RFC disclosed to FGIC for the first time in March 2009 that it classified loans into one of three categories or "Risk Tiers" under a protocol ("Risk Protocol"). Such an approach was, upon information and belief, part of the further cost-cutting measures implemented under the direction of Ally Financial when all of the servicing operations were integrated.

210.    FGIC was damaged by the use of the Risk Protocol following the Ally-directed integration.  Under the Risk Protocol, the timing and frequency of calls made with respect to a loan are determined in accordance with the loan's assigned category or Risk Tier.  RFC disclosed to FGIC that all of the mortgage loans in FGIC-insured, RFC-serviced transactions (over 90,000 mortgage loans), including all of the Mortgage Loans in the 2007-EMX1 Transaction, were placed in the lowest category of risk.  ·For such mortgage loans, regardless whether they were (i) first- or second- lien, (ii) underwritten under less stringent guidelines, or (iii) originated by non-GMAC entities—all of which are factors that require more attentive servicing—delinquent borrowers were called at a later stage of delinquency and less frequently than loans in higher risk categories.  As the purchaser of the Mortgage Loans, however, RFC clearly knew that such Mortgage Loans, by their very nature, required particularized servicing such as that provided by HomeComings before the implementation of the Risk Protocol.  The Mortgage Loans were therefore knowingly miscategorized and neglected, and intentionally received much less care than if they had been properly categorized and appropriately serviced.  Consequently, the failure by RFC to ensure that the Mortgage Loans were serviced and administered in accordance with "good faith" business practices constitutes a breach of the PSA and the I&I Agreement.  *See* PSA §§ 3.01(a), 3.04; I&I Agreement § 2.02(l).

211.    On July 8, 2009, FGIC requested: (1) additional information concerning the various Risk Tiers generally, and (2) documentation in order to assess whether or not FGIC was being harmed as a result of being placed in the lower risk tier.  To date, RFC has still failed to provide such information.

    **(2)**    **RFC allowed Excessive Loan Modifications And Amended the PSA without FGIC's Consent**

212.    RFC, as Master Servicer, agreed that it would "not modify, waive or amend, or consent to any modification, waiver or amendment of" the PSA without the prior written consent of FGIC. I&I Agreement § 2.03(b).

213.    On August 12, 2009, RFC, through its counsel, requested FGIC's consent in order to execute an amendment (the "Purported Amendment") to allow RFC to modify 100% of the Mortgage Loans rather than what would otherwise be allowed under the PSA. On information and belief, as of December 2008 RFC had already far exceeded the 5% cap on allowable modifications in the 2007-EMX1 Transaction. FGIC requested that RFC provide FGIC with sufficient information, including RFC's policies and procedures used for underwriting and processing prospective mortgagors for the Home Affordable Modification Program, to respond to RFC's request for FGIC's consent. RFC never provided that information. Despite the fact that FGIC never consented to the additional loan modifications, it appears that RFC nonetheless proceeded as if its Purported Amendment had been adopted in contravention of FGIC's contractual rights. *See* I&I Agreement § 2.03(b).

214.    Thus, to amend the PSA, RFC had to receive FGIC's consent. FGIC never gave its consent. Therefore, RFC breached section 2.03(b) of the I&I Agreement.

215.    As of January 25, 2012 a total of approximately 25% of the original pool had been modified. Of the cumulative losses incurred to date, approximately $27 million or 13% of the loss is a result of the servicing modifications improperly performed to date.

216.    On information and belief, RFC has collected significantly higher servicing fees as a result of adopting the Amendment and modifying particular Mortgage Loans.

217.    FGIC has requested additional information in order to determine whether RFC is in breach of its servicing obligations.  In contravention of FGIC's contractual rights, RFC has failed to provide such information, including servicing notes, to FGIC.  On information and belief, RFC, as Master Servicer, also knew of material breaches of representations and warranties and did not notify FGIC thereof, or cause the repurchase of the Mortgage Loans affected thereby. Accordingly, FGIC reserves its rights to assert additional causes of action relating to RFC's servicing obligations.

(3)    **RFC has been Improperly Removing Funds from the 2007-EMX1 Trust's Custodial Account**

218.    The Master Servicer is permitted under the 2007-EMX1 Transaction to withdraw funds from the 2007-EMX1 Transaction's custodial account ("Custodial Account"), into "which the Master Servicer shall deposit or cause to be deposited on a daily basis. . . payments and collections remitted by Subservicers or received by it in respect of the Mortgage Loans," including all principal and interest payments made by the borrowers, among other funds. PSA § 3.07(b).  Such withdrawals are meant "to reimburse [RFC] or the related Subservicer for" an advance of funds that RFC, GMACM or HomeComings makes that is deemed to be "nonrecoverable." *See* PSA § 3.10(a)(vii).  An advance is nonrecoverable when the Master Servicer determines, in its "good faith judgment," that the advance will not "be ultimately recoverable by the Master Servicer from related Late Collections, Insurance Proceeds, Liquidation Proceeds or REO Proceeds. . . and the Master Servicer determines that no other source of payment or reimbursement for such advances is available to it. . . ." PSA § 1.01.

219.    Upon information and belief, RFC has been improperly declaring advances nonrecoverable in order to seek reimbursement of monies that RFC has been advancing as Master Servicer.  Such declaration has improperly allowed RFC to remove funds from the

Custodial Account by improperly reimbursing itself for advances that should not be deemed nonrecoverable.

220.    Even if RFC were to prove successfully that its reimbursements were made in good faith, RFC is still in breach of its servicing obligations because it has failed to comply with the provisions in the PSA regarding the process of declaring an advance nonrecoverable. The PSA requires RFC to transmit "a certificate of a Servicing Officer, Responsible Officer or Vice President or its equivalent" to FGIC that evidences RFC's decision to declare an advance nonrecoverable. However, the certificate must "include any other information or reports obtained by [RFC]. . . , which may support such determinations." PSA § 1.01. The so-called "Officer's Certificates" sent by RFC to FGIC to date have been executed by an employee identified as a "Manager," not a Servicing Officer, Responsible Officer, Vice President or its equivalent. Furthermore, RFC has also failed to include any supporting information or reports with its Officer's Certificates that would allow FGIC to determine that RFC is in fact using its good faith judgment.

### K.    Ally Financial's Domination and Control of its Subsidiaries Results in an Integrated, Single Corporate Enterprise

221.    As discussed in greater detail below, Ally Financial is the ultimate parent of all of the other Defendants to this action. Ally Financial owns ResCap, which owns RFC and GMACM. Ally Financial—as the ultimate parent of ResCap, RFC and GMACM—has the practical ability, which it has repeatedly and admittedly exercised, to direct and control the actions of its subsidiaries, including ResCap, RFC and GMACM.

222.    As also discussed below, Ally Financial has exercised such domination and control over its subsidiaries, including ResCap, RFC and GMACM. Ally Financial exercised its

direction and control in connection with the 2007-EMX1 Transaction. At times, Ally Financial performed such direction and control by using ResCap as an instrument to effect its goals.

223.    As mentioned above, Ally Financial has recently admitted to the Federal Reserve Board and the FDIC that it "indirectly owns and controls . . . numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC . . . ('ResCap'), and its direct and indirect subsidiaries[.]" *See* Consent Order, *In the Matter of Ally Financial Inc., et al.*, FRB Docket No. 11020-B-HC (Apr. 13, 2011) (emphasis added).

224.    As further discussed below, Ally Financial's public statements and actions at or around the time of the Transaction's close until present, also demonstrate that Ally Financial: (i) owns a majority of its subsidiaries' stock; (ii) shares resources, management and employees with its subsidiaries; (iii) considers its mortgage businesses to be "units" of its business; and (iv) has a business relationship with its subsidiaries designed to benefit itself at the expense of its subsidiaries.

### (1)    Evidence of Ally Financial's Domination of RFC Directly and Indirectly Through its Control of ResCap

225.    From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap as an extension of itself, rather than a subsidiary whose dealings were at arm's length.

226.    ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly owned subsidiaries—were transferred to it in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

227.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

228.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap

would enter into an operating agreement with Ally Financial, under which Ally Financial would

agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap]

suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."

Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005

Operating Agreement").

229.    On information and belief, Ally Financial's restructuring and financial support of

its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to

improve and maintain the investment grade rating and profitability of Ally Financial's mortgage

securitization business.  This restructuring then enabled Ally Financial to present itself to its

subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent

supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries

more attractive as counterparties to market participants, such as FGIC.

230.    On December 1, 2006, Ally Financial had its inaugural conference call with

investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations,

"welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global

financial services company."  GMAC LLC – Sale of Controlling Interest in GMAC Investor

Conference Call (Dec. 1, 2006).  On the same investor call, Eric Feldstein, Ally Financial's then

CEO, demonstrated how Ally Financial was going to take initial steps to actively control its

subsidiaries.  For instance, Feldstein declared that one of Ally Financial's first acts as controlling

parent was "to integrate certain of GMAC mortgage operations . . . with RFC operations . . . to

drive some cost efficiencies."  *Id.*

- 70 -

231.    At all times since Ally Financial caused ResCap to be incorporated, it has owned

100% of ResCap.[1]  Since incorporation, the ownership of ResCap has not changed—Ally

Financial still "owns 100% of ResCap . . . ." Ally Financial Earnings Call dated Nov. 2011,

statement by Michael Carpenter, Ally Financial's CEO.

232.    Ally Financial has continued to exert its domination and control over ResCap via

shared resources, management and employees.  For example, Ally Financial and ResCap shared

at least three common board members, including two individuals who were active participants

with respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's

chairman and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director

of ResCap, Sanjiv Khattri.  In fact, the proposed 2005 operating agreement, between ResCap and

Ally Financial, which Ally Financial filed with the SEC, and which upon information and belief

is still currently in effect, "*require[s] that [ResCap's] board of directors include at least two*

*independent directors, to be selected by GMAC.*" 2005 Operating Agreement (emphasis added).

233.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release

of Ally Financial's 2007 first quarter financial results to investors in an email bearing the

ResCap logo.  That announcement stated that Ally Financial's financial results were found on

both Ally Financial's and ResCap's websites.

234.    Additionally, David C. Walker, as discussed above, has served as Vice President

of GMAC Group and CFO of GMAC Mortgage Group, and as of September 29, 2005, was a

---

[1] GM had created a shell company, GMAC Mortgage Group Inc., which was the direct parent of ResCap.
However, there is no indication that this company conducted any business independent from Ally Financial.  In fact,
Ally Financial's first Annual Report as an independent entity, which was filed with the SEC Con March 3, 2007,
included a corporate hierarchy chart that evidenced Ally Financial's corporate structure.  There was a direct line
from Ally Financial to ResCap. *See* Ally Fin. Form 10-K, at 2 (March 3, 2007).  In addition, there is no indication
that Ally Financial ever discusses ResCap as an "indirect subsidiary."  To the contrary, as discussed below, Ally has
publicly stated on numerous occasions that it is the owner of ResCap.

director at ResCap, GMACM, RFC, and RASC, among other Ally Financial subsidiaries. In the
2007-EMX1 Transaction, acting as a director of both RASC and RFC, Walker was a signatory to
the "Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors." Both
documents are dated December 20, 2005.

235.    Ally Financial's domination and control of its subsidiaries, and in particular its
use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who,
according to publicly available information, has served as in-house counsel at Ally Financial
since October 2006. According to an e-mail sent from ResCap to FGIC, Ruckdaschel has
served as "internal legal counsel for all [] securitizations" since at least May 2008. Although
purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using a
ResCap e-mail address. Furthermore, an employee of ResCap specifically instructed FGIC that
all "official letters" regarding several Ally Financial subsidiaries—including GMACM, RFC,
RASC, and others—should be sent not to the relevant (and supposedly independent) subsidiary,
but rather to Ruckdaschel, Ally Financial's internal counsel.

236.    Additionally, as discussed above, on May 24, 2011, FGIC sent RFC a demand for
an Interim Certification for the 2007-EMX1 Transaction that has been unanswered to date. That
same day, FGIC's demand was forwarded from Jeffrey Blaschko at RFC directly to Ruckdaschel
at Ally Financial with "high importance." Blaschko included a note to Ruckdaschel that this
was FGIC's "[s]econd request" for the Interim Certification.

237.    Upon information and belief, that (1) FGIC was directed to address official
correspondence that would otherwise go to ResCap and/or RFC to Ally Financial's in-house
counsel, and (2) FGIC's demand letter was sent by RFC to Ruckdaschel, were done at Ally
Financial's direction in order for Ally Financial to provide its subsidiaries with its controlling

- 72 -

input and approval before acting on FGIC's requests. As such, the ultimate decision by RFC not

to respond to FGIC's request for the Interim Certification, and any other demands for

information and remedies to which FGIC has a clear contractual right, was made by Ally

Financial, which continues to direct the activities of its subsidiaries in their dealings with FGIC

and others.

238.    As further evidence of Ally Financial's domination over ResCap, the 2005

Operating Agreement also indicates that Ally Financial has expressly "restrict[ed] ResCap's

ability to declare dividends or prepay subordinated indebtedness owed to [Ally Financial] or its

other affiliates." *See* 2005 Operating Agreement.

239.    Conversely, Ally Financial has also agreed to directly pay the losses or expenses

of ResCap. In the same 2005 Operating Agreement, Ally Financial stated that it would stand

behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any losses

[ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."

*Id.*

240.    Ally Financial has continued to make additional public statements that further

demonstrate its willingness to support and fund ResCap. For instance, in May 2007, during an

investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer

of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take

whatever reasonable efforts that need to be done to maintain [ResCap's] earnings." Ally

Financial's Q1 2007 Earnings Call at 24 (May 2, 2007). Khattri pointed to the fact that "the

[Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of

equity when it was appropriate . . . ." Ally Financial's Q2 2007 Earnings Call at 9 (July 30,

2007). Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the

strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part

of our plan and a key part of our value creation." *Id.* (emphasis added). Thus, Ally Financial's

senior management assured the market that Ally Financial was supporting ResCap for the

purposes of Ally Financial's own "value creation."

241.    The financial support Ally Financial gave to ResCap began as far back as May

2005 and has persisted over many years. Upon information and belief, Ally Financial continued

to prop up ResCap, an undercapitalized entity, by channeling capital and liquidity into ResCap

even as its condition continued to deteriorate as the housing market crashed. In addition to the

direct financial support Ally Financial contributed to ResCap, it was also instrumental in

obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally

Financial announced to the market that it renewed a funding facility with Citi, which provided

"funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such

funding was specifically earmarked for "mortgage assets across the [Ally Financial] and [ResCap]

businesses." *Id.*

242.    Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily

dependent on [Ally Financial] and its affiliates for funding and capital support." Ally. Fin. Inc.,

Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

243.    Additionally, Annual Reports prepared by Ally Financial further note its pursuit

of strategic alternatives with ResCap, and highlight the extent to which Ally Financial

manipulated its control over its subsidiaries to enhance its own financial health. According to

Ally Financial: "On December 31, 2009, we announced that due to our ongoing strategic review

of how to best deploy GMAC's current and future liquidity, we decided to pursue strategic

alternatives with respect to ResCap and committed to a plan . . . related to management's intent

to sell certain ResCap related assets and businesses. . . .  In order to maximize value, we will

consider a variety of options including one or more sales, spin-offs, or other potential

transactions . . . [that we believe] should minimize the impact of any significant future losses

related to ResCap's legacy mortgage business . . . ." Ally Fin. Inc., Annual Report (Form 10-K),

at 3-4 (Feb. 26, 2010).

244.    There is also substantial evidence that billions of dollars of TARP funds meant to

stabilize Ally Financial were given to ResCap by Ally Financial. *See* TARP Report dated March

10, 2010, at 41, 44 (hereinafter "TARP Report"). Upon information and belief, the TARP funds

were commingled among a variety of entities within Ally Financial's mortgage family, including

ResCap.

245.    Further, Ally Financial has established a "Mortgage Repurchase Reserve" to

account for the potentially significant liabilities stemming from repurchase demands made on its

mortgage-related subsidiary business units. The balance of the Mortgage Repurchase Reserve

was $825 million as of the fourth quarter of 2011. See Ally Financial's 4Q 2011 Earnings

Presentation at 16. Although these repurchase demands are generally made on Ally Financial's

subsidiaries—such as GMACM—in discussing the reserve on an earnings call, Ally Financial

CFO Jim Mackey made clear that it was Ally Financial that was recording "repurchase

expense[s]" related to mortgages, as he stated that Ally Financial "had lower mortgage

repurchase expense of $44 million." Ally Financial's Q4 2011 Earnings Call at 4 (Feb. 2, 2012).

246.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on Ally

Financial's third quarter 2011 earnings call, Mackey further described losses attributable

mortgage loan repurchases as belonging to Ally Financial, when he stated: "Our mortgage

repurchase reserve is [as it then stood] $829 million . . . . Our loss experience improved during

the quarter due to the fact that we had fewer mortgage insurance rescission payments that we experienced last quarter and that did not repeat this quarter." Ally Financial's Q3 2011 Earnings Call at 6 (Nov. 2, 2011) (emphases added). Making this point even more explicitly, on the same call, Ally Financial CEO Carpenter explained that "we have routinely repurchased problem loans voluntarily and by contract . . . ." *Id.* at 8 (emphasis added).

247.    Additionally, as discussed above, Ally Financial recorded a $230 million charge in the fourth quarter of 2011, $212 million of which was recorded at its controlled subsidiary, ResCap. As a result of the penalties assessed against ResCap by government regulators, and the fact that ResCap failed to maintain sufficient tangible net worth to comply with the requirements of the terms of certain credit facilities, Ally Financial propped up its subsidiary ResCap with a $197 million capital contribution in the form of intercompany debt forgiveness. *See* Ally Fin. Inc., Form 10-K, at 31-32 (Feb. 28, 2012).

### (2)    Ally Financial Has Disregarded Corporate Formalities and Treated Its Businesses as a Single Enterprise

248.    Ally Financial describes its subsidiaries as its own business units rather than separate and distinct entities. For example, Ally Financial declares, in a section of its website specifically intended to inform investors, that GMACM is a "business unit" of Ally Financial, rather than an indirect subsidiary owned by ResCap. *See* Ally Financial Website, Ally Home > About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last visited Dec. 9, 2011).

249.    In line with Ally Financial's current classification of its mortgage businesses as "units" of Ally Financial, it has consistently been involved in the day-to-day operations of its subsidiaries. For example, at least one individual, who was identified at various times as being a GM and/or Ally Financial employee, was on the working group list for transactions involving

ResCap subsidiaries that FGIC insured, including the 2007-EMX1 Transaction. He was included

on communications surrounding the deal document drafting processes from commencement to

close. Such communications sent to him concerned both the negotiation of the various Operative

and Offering Documents, as well as the final executed versions of the Operative and Offering

Documents, including the fraudulent representations, warranties, and affirmative covenants that

are at issue in this action.

250.    The origination and securitization of mortgage loans by ResCap and its

subsidiaries have long been an integral part of Ally Financial's core business. In its 2006 Annual

Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading real estate

finance company focused primarily on the residential real estate market. Our business activities

include the origination, purchase, servicing, sale and securitization of residential mortgage loans."

GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007) (emphasis added). Ally

Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical

component of our diversified funding strategy." *Id.* at 5 (emphasis added).

251.    Ally Financial continued to publicly report on its own business and that of its

subsidiaries in later filings on an integrated basis: "We engage in the origination, purchase,

servicing, sale, and securitization of consumer (i.e., residential) mortgage loans and mortgage-

related products. Mortgage operations include the Residential Capital, LLC (ResCap) legal

entity, [and] the mortgage operations of Ally Bank . . . ." Ally Fin. Inc., Annual Report (Form

10-K), at 3 (Feb. 26, 2010). More recently, continuing to discuss its various mortgage operations

as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is

one of the leading originators of conforming and government-insured residential mortgage loans

in the United States. We are one of the largest residential mortgage loan servicers in the United

States and we provide collateralized lines of credit to other mortgage originators." Ally Fin. Inc.,

Annual Report (Form 10-K), at 4 (Feb. 28, 2012).

252.    Moreover, as discussed above, Ally Financial—at least in the view of certain of

ResCap's bondholders—is believed to have stripped assets from its subsidiary.

253.    In addition to the dominance and control Ally Financial exerted over its mortgage

units, ResCap also viewed RFC and GMACM as part of its own business. For example, in its

investor presentation from 2007, ResCap declares that RFC and GMACM "are owned *and*

*operated* by GMAC Residential Capital Company, LLC [ResCap]." It further states that ResCap

"is part of the [Ally Financial] family of companies." As discussed above, Ally Financial

exerted its dominance and control over ResCap. Upon information and belief, when Ally

Financial was not directly controlling RFC and GMACM, it was using ResCap as an instrument

to do so.

254.    Ally Financial is currently using its subsidiaries' resources as its own in order to

earn favorable ratings by credit rating agencies. For instance, a report put out by Moody's in

November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is

evident from that report that Ally Financial obtained such a rating by providing information

related to its mortgage units, including GMACM and Ally Bank. Ally Financial itself is not

engaged in the origination business. Instead, it is using its mortgage units as instruments to

obtain favorable ratings.

255.    Such disregard for the corporate form has persisted over time. For instance, Fitch

Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage

servicing businesses—which include [GMACM, RFC], and HomeComings Financial Network—

have been integrated into" ResCap. Moreover, Moody's reported that in 2007, "ResCap

- 78 -

combined all servicing operations under one servicing entity . . . under common management [and] common systems . . . ." There is no indication that either RFC or GMACM has ceased operations or been sold to other entities or investors. Thus, upon information and belief, ResCap has conflated various businesses that currently have extensive third-party contractual relationships, such as the one RFC has with respect to the 2007-EMX1 Transaction as Master Servicer.

256.    Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference. For example, Thomas F. Marano served as an officer of Ally Financial as well as Chairman and CEO of ResCap. His responsibilities include overseeing the mortgage lending and servicing in ResCap. In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage." Upon information and belief, Marano—in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap—directed and controlled the actions of GMACM and RFC.

257.    In another example, Larry Hipp, a member of ResCap's Risk Analyst/Investor Repurchase Department, communicated with FGIC regarding rescission requests using an Ally Financial email address, but in those very same emails, lists his ResCap contact information, including a ResCap email address. In addition, Ally Financial/ResCap used to send FGIC secure communications bearing the "GMAC ResCap" logo, but those same secure communications now have an "Ally Financial" logo.

258.    A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans.  He was asked the following questions at his deposition:

Q:    Could you please state your name for the record.
A:    My name is Jeffrey Stephan.
Q:    Okay.  And who do you work for?
A:    GMAC, LLC [Ally Financial].
Q:    And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?
A:    GMAC, LLC – I'm trying to think of the word to use – the most recent name.
Q:    Okay.
A:    It's GMCA [sic] Mortgage Corporation.
Q:    Okay.
A:    I'm not sure how you would word that.
Q.    Okay.  So are they -- does GMAC, LLC -- now has that basically taken over these other entities --
A.    Yes.
Q.    -- that formerly existed?
A.    Yes.
Q.    So these entities no longer currently exist?
A.    Right.
Q.    Okay.  And how long then have you been employed by GMAC, LLC?
A.    Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, 4:25-5:22, Dec. 10, 2009, Case No. 50 2008 CA 040805, (15th Cir. Ct., Palm Beach, Fl.).

**L.    FGIC's Contractual Remedies Under The I&I Agreement**

259.    The I&I Agreement provides FGIC with broad remedies for RFC's breaches of its representations and warranties.  The breadth of these remedies provided further material inducement for FGIC to issue the Policy.  Specifically, Section 5.02(b) of the I&I Agreement provides:

> Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this [I&I] Agreement, the [PSA] or the other Operative Documents, or existing at law or in equity.

260.    RFC also agreed in Sections 3.03(b) and 3.03(c) of the I&I Agreement:

Anything in Sections 2.01(a)(xii) and 3.03(a) hereof or in any Operative Document to the contrary notwithstanding, [FGIC] shall be entitled to full reimbursement from RFC for (i) any payment made under the Policy arising as a result of RFC's failure to substitute for or deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section 4 and Section 5 of the [A&A] Agreement, together with interest on any and all such amounts remaining unreimbursed . . . from the date such amounts became due until paid in full. . . .

I&I Agreement § 3.03(b); and

RFC agrees to pay to [FGIC] any and all reasonable charges, fees, costs and expenses that [FGIC] may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring or participating in any litigation or proceeding . . . relating to any of the Operative Documents . . . .

I&I Agreement § 3.03(c).

261.    In addition, RFC agreed in Section 3.04(a) of the I&I Agreement:

to pay, and to protect, indemnify and save harmless, [FGIC] . . . from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs and expenses (including reasonable fees and expenses of attorneys . . . ) of any nature arising out of or relating to the breach by RFC. . . of any of the representations or warranties contained in Section 2.01 [of the I&I Agreement] or arising out of or relating to the transactions contemplated by the Operative Documents by reason of . . . . the breach by RFC. . . of any representation, warranty . . . or covenant under any of the Operative Documents or the occurrence, in respect of RFC. . . , under any of the Operative Documents of any "event of default" . . . .

I&I Agreement §§ 3.04(a), 3.04(a)(iv).

262.    Moreover, consistent with its obligation to select Mortgage Loans that met its

published criteria, RFC agreed to repurchase or substitute Mortgage Loans that did not conform

to RFC's representations and warranties, and to indemnify FGIC for claims and losses arising

from RFC's breach of any representation or warranty.

## FIRST CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and RFC: Material Breach of the I&I Agreement—
Declaratory Relief Regarding RFC's Indemnification Obligation)**

263.    FGIC re-alleges and incorporates by reference paragraphs 1 through 262 of this

Complaint.

264.    The I&I Agreement is a valid and binding agreement between the parties.

265.    FGIC has performed its obligations under the I&I Agreement.

266.    RFC's representations and warranties were material to FGIC's decision to insure

the 2007-EMX1 Certificates and to issue the Policy.

267.    RFC's pervasive and material breaches of its representations and warranties, from

the very inception of the Transaction and in the years since, constitute a material breach of the

I&I Agreement that has deprived FGIC of the purpose of the parties' bargain.

268.    Pursuant to Section 3.04(a) of the I&I Agreement, RFC must indemnify FGIC for

any and all claims, losses, liabilities, demands, damages, costs or expenses of any nature arising

out of or relating to the breach by RFC of any of the representations or warranties contained in

Section 2.01 of the I&I Agreement or arising out of or related to the transactions contemplated

by the related Operative Documents by reason of, among other things, the breach by RFC of any

representation, warranty, or covenant under any of the respective Operative Documents.

269.    As explained above, RFC has breached numerous representations and warranties

in the 2007-EMX1 Offering and Operative Documents, for example, those contained in Section

2.01 of the I&I Agreement.  These breaches have caused FGIC to pay claims and to incur losses,

costs, and expenses; and it will continue to do so.

270.    On April 13, 2011, FGIC sent RFC a request for reimbursement in the amount of $197,990 for fees FGIC incurred in connection with the repurchases by RFC of the Mortgage Loans RFC admitted did not qualify for inclusion in the 2007-EMX1 Transaction.  RFC never responded to FGIC's request and has not tendered payment.

271.    Ally Financial, acting directly and/or indirectly through ResCap, directed RFC's actions as set forth in this cause of action.

272.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and RFC must jointly and severally indemnify and reimburse FGIC for all sums arising out of the 2007-EMX1 Transaction for which FGIC has or will become liable, or, alternatively, for all loss resulting from any breaches of the representations, warranties and covenants of the I&I Agreement or any of the respective Operative Documents, or alternatively, in an amount to be determined at trial, and an order giving effect to such indemnification.

273.    In addition, FGIC seeks a declaration that  RFC must indemnify and reimburse FGIC for all sums arising out of the 2007-EMX1 Transaction for which FGIC has or will become liable, or, alternatively, for all loss resulting from any breaches of the representations, warranties and covenants of the I&I Agreement or any of the respective Operative Documents, or alternatively, in an amount to be determined at trial, and an order giving effect to such indemnification.

## SECOND CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and RFC: Fraudulent Inducement—I&I Agreement)

274.    FGIC re-alleges and incorporates by reference paragraphs 1 through 273 of this Complaint.

275.    RFC induced FGIC to enter into the I&I Agreement and to issue the Policy by making false representations and warranties about its business practices and the Mortgage Loans, and by agreeing to broad remedies (including indemnification) for any breach of those representations and warranties.

276.    As explained above, RFC knowingly made materially false statements to, and/or omitted material facts from, FGIC with the intent to induce detrimental reliance by FGIC.

277.    RFC intended for FGIC to rely on RFC's material false statements and/or omissions. FGIC had no reason to believe that RFC's representations were false, and reasonably and justifiably relied on RFC's material false statements and/or omissions regarding information uniquely in the possession of RFC when it decided to enter into the I&I Agreement and to issue the Policy for the 2007-EMX1 Certificates.

278.    As a result of RFC's material false statements and omissions, FGIC entered into the I&I Agreement, issued the Policy, and thereby agreed to insure certificates backed by a pool of Mortgage Loans that was, in actuality, materially different from the Loan Pool that RFC represented would collateralize the 2007-EMX1 Transaction.

279.    Ally Financial, acting directly and/or indirectly through ResCap, directed RFC's actions as set forth in this cause of action.

280.    As a result of RFC's material false statements and omissions, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

281.    RFC, ResCap and Ally Financial are jointly and severally liable for such damages.

282.    In addition, RFC is separately liable for such damages.

## THIRD CAUSE OF ACTION

**(Alternatively Against Ally Financial: Aiding and Abetting Fraudulent Inducement—I&I Agreement)**

283.    FGIC re-alleges and incorporates by reference paragraphs 1 through 282 of this Complaint.

284.    As explained above, Ally Financial provided substantial assistance to its subsidiary RFC in fraudulently inducing FGIC to issue the Policy.

285.    RFC could not have perpetrated its fraudulent scheme against FGIC without the substantial assistance of Ally Financial.

286.    Ally Financial knew that RFC fraudulently induced FGIC to issue the Policy for the 2007-EMX1 Transaction.

287.    Ally Financial's statements materially aided RFC's fraudulent inducement.

288.    As a result of Ally Financial's aiding and abetting RFC's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and RFC: Breach of Contract—Representations, Warranties, and Affirmative Covenants)**

289.    FGIC re-alleges and incorporates by reference paragraphs 1 through 288 of this Complaint.

290.    The I&I Agreement is a valid and binding agreement between FGIC and RFC.

291.    FGIC has performed its obligations under the I&I Agreement.

292.    As explained above, RFC has materially breached its representations, warranties and affirmative covenants under the I&I Agreement.

293.    Ally Financial, acting directly and/or indirectly through ResCap, directed RFC's actions as set forth in this cause of action.

294.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

295.    RFC, ResCap and Ally Financial are jointly and severally liable for such damages.

296.    In addition, RFC is separately liable for such damages.

### FIFTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and RFC: Breach of Repurchase Obligations)**

297.    FGIC re-alleges and incorporates by reference paragraphs 1 through 296 in this Complaint.

298.    The I&I Agreement is a valid and binding agreement between the parties.

299.    FGIC has performed its obligations under the I&I Agreement.

300.    Pursuant to the terms of the I&I Agreement, and the provisions of the Operative Documents incorporated therein, FGIC has demanded that RFC repurchase non-complying Mortgage Loans. RFC has refused to repurchase numerous such Mortgage Loans.

301.    RFC has breached the I&I Agreement, and the provisions of the Operative Documents incorporated therein, by failing to repurchase those Mortgage Loans that violated RFC's representations and warranties that FGIC has noticed to RFC.

302.    Ally Financial, acting directly and/or indirectly through ResCap, directed RFC's actions as set forth in this cause of action.

303.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

304.    RFC, ResCap and Ally Financial are jointly and severally liable for such damages.

305.    In addition, RFC is separately liable for such damages.

## SIXTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and RFC:  Breach of Contract—Declaratory Relief
Regarding Access to Information)**

306.    FGIC re-alleges and incorporates by reference paragraphs 1 through 305 of this
Complaint.

307.    The I&I Agreement is a valid and binding agreement between FGIC and RFC.

308.    FGIC has performed its obligations under the I&I Agreement.

309.    Pursuant to Section 2.02(c) of the I&I Agreement, RFC agreed to furnish or cause
to be furnished to FGIC financial statements, accountants' reports, and other information.  Such
other information includes, but is not limited to, data relating to the Mortgage Loans, the
servicing of the Mortgage Loans, and the 2007-EMX1 Transaction.  FGIC further has the right to
conduct reviews of RFC's practices as Master Servicer through reviews of the Mortgage Loans
pursuant to Section 2.02(m) of the I&I Agreement.

310.    As discussed above, pursuant to the I&I Agreement, FGIC made numerous
reasonable written requests that RFC furnish or cause to be furnished data relating to the
Mortgage Loans, and the servicing of those loans, in order for FGIC to determine the veracity of
representations and warranties made by RFC, and others, concerning the Mortgage Loans.

311.    RFC has refused to provide more than a fraction of the data concerning the
Mortgage Loans sought by FGIC.

312.    RFC has failed to comply with its contractual obligations and breached the I&I
Agreement by failing to provide data relating to the Mortgage Loans after receiving reasonable
requests for such data from FGIC.

313.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, RFC agreed to permit FGIC, upon its reasonable request, to (i) inspect the books and records of RFC; (ii) discuss the affairs, finances and accounts of RFC with RFC's Servicing Officer; and (iii) discuss the affairs, finances and accounts of RFC with RFC's independent accountants.

314.    On December 8, 2011, FGIC made a reasonable, written request that RFC permit FGIC or its authorized agent to conduct an inspection of the books and records of RFC, as well as permit FGIC to (i) discuss the affairs, finances and accounts of RFC with (i) RFC's Servicing Officer, and (ii) RFC's independent accountants with RFC's consent, which consent shall not be unreasonably withheld or delayed.

315.    RFC has failed to make available such persons or to produce such information.

316.    RFC has failed to comply with its contractual obligations and breached the I&I Agreement by failing to make available the persons requested or to provide the information requested pursuant to the I&I Agreement, Section 2.02(e)(i)-(iii).

317.    Pursuant to Section 2.02(e) of the I&I Agreement, RFC agreed, on an annual basis or when reasonably requested by FGIC, to cause the Custodian to deliver to FGIC an updated certification, in the form of the Interim Certification required under the 2007-EMX1 Custodial Agreement to enable FGIC to track the progress of the recording of Mortgages and Assignments with respect to the Mortgage Loans.

318.    FGIC made a reasonable request for the Interim Certification on June 21, 2011.

319.    RFC has failed to cause the Interim Certification to be delivered to FGIC as requested. On December 8, 2011, FGIC again notified RFC of its failure to perform under the I&I Agreement, but RFC continued to fail to cause the Interim Certification to be delivered to FGIC.

320.    RFC has failed to comply with its contractual obligations and breached the I&I Agreement by failing to cause the Interim Certification to be delivered to FGIC after receiving reasonable requests from FGIC.

321.    Pursuant to Section 2.02(c)(iv) of the I&I Agreement, RFC agreed to furnish or cause to furnish to FGIC "all reports provided . . . pursuant to the [PSA]."

322.    FGIC made a reasonable request for servicing notes on December 9, 2010.

323.    RFC has failed to comply with its contractual obligations and breached the I&I Agreement, Section 2.02(e), by failing to cause the Servicing Notes to be delivered to FGIC after receiving reasonable requests from FGIC.

324.    Ally Financial, acting directly and/or indirectly through ResCap, directed RFC's actions as set forth in this cause of action, as evidenced by Ally Financial's involvement as described more fully in paragraphs 235-237 above.

325.    Accordingly, FGIC therefore seeks a declaration that Ally Financial, ResCap, and RFC must comply with Sections 2.02(c), 2.02(e) and 2.02(m) of the I&I Agreement, and an order requiring RFC to promptly remedy those breaches and therefore comply with FGIC's requests and notices to RFC pursuant to  relevant provisions, as detailed above.

## SEVENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and RFC:  Breach of Master Servicer Obligations)

326.    FGIC re-alleges and incorporates by reference paragraphs 1 through 325 of this Complaint.

327.    The I&I Agreement is a valid and binding agreement between FGIC and RFC.

328.    FGIC has performed its obligations under the I&I Agreement.

- 89 -

329.    As explained above, RFC has materially breached its representations and warranties under section 2.03(b) of the I&I Agreement by purporting to amend the Operative Documents without FGIC's prior and necessary consent.

330.    Moreover, as explained above, RFC has breached its affirmative covenant under the I&I Agreement to service all Mortgage Loans in all material respects in compliance with the PSA.

331.    RFC's breaches of the I&I Agreement have caused substantial harm and damages to FGIC, in an amount to be proved at trial, but at a minimum including substantially higher claims on the Policy and other losses and expenses.

332.    Ally Financial, acting directly and/or indirectly through ResCap, directed RFC's actions as set forth in this cause of action.

333.    As a result of this breach of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

334.    RFC, ResCap and Ally Financial are jointly and severally liable for such damages.

335.    In addition, RFC is separately liable for such damages.

## EIGHTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and RFC:  Declaratory Relief)

336.    FGIC re-alleges and incorporates by reference paragraphs 1 through 335 of this Complaint.

337.    As discussed above, Ally Financial, acting directly and/or indirectly through ResCap, directed RFC's actions as set forth in this complaint.

338.    For  the reasons set forth in paragraphs 221 through 258, among others, Ally Financial, ResCap, and RFC were and continue to be alter egos of each other.

339.    FGIC has been damaged as a result of the actions of Ally Financial, ResCap and

RFC.

340.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and RFC were

and continue to be alter egos of each other, and therefore are jointly and severally liable for each

other's liabilities.

## NINTH CAUSE OF ACTION

### (As Against RFC:  Attorneys' Fees and Costs)

341.    FGIC re-alleges and incorporates by reference paragraphs 1 through 340 of this

Complaint.

342.    The I&I Agreement is a valid and binding agreement between the parties.

343.    FGIC has performed its obligations under the I&I Agreement.

344.    Pursuant to Section 3.03(c) of the I&I Agreement, RFC agreed to reimburse FGIC

for any and all costs or expenses "including reasonable attorneys'. . . fees and expenses" in

connection with the enforcement, defense or preservation of any rights in respect of any of the

Operative Documents. Further, pursuant to Section 3.04(a) of the I&I Agreement, RFC agreed to

pay FGIC any and all costs or expenses "including reasonable fees and expenses of attorneys"

arising out of or relating to the breach by RFC of any of the representations or warranties

contained in Section 2.01 of the I&I Agreement or arising out of or relating to the 2007-EMX1

Transaction.

345.    FGIC has incurred and will continue to incur substantial costs and expenses,

including but not limited to attorneys' fees in filing and prosecuting this lawsuit, arising out of

RFC's failure to provide Mortgage Loan files, the Interim Certification, Servicing Notes, and

financial information and its breach of the representations and warranties contained in Section

2.01 of the I&I Agreement and other representations, warranties, and its covenants within the

Operative Documents, such as Section 2.02 of the I&I Agreement.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Financial Guaranty Insurance Company demands

judgment in its favor and against defendant Residential Funding Company, LLC, with respect to

(1), (2), and (4) through (15) below, and in its favor and against Residential Capital, LLC, with

respect to (1), (2), (4) through (12), (14), and (15) below, and in its favor and against Ally

Financial, Inc., with respect to (1) through (12), (14), and (15) below and the following relief:

(1)    A declaration that, pursuant to RFC's obligations under the I&I Agreement, RFC solely and/or Ally Financial, ResCap, and RFC must jointly and severally reimburse and indemnify FGIC for all sums arising out of the 2007-EMX1 Transaction for which FGIC has or will become liable, or, alternatively, for all losses resulting from any breaches of the representations, warranties, and covenants of the I&I Agreement or any of the respective Operative Documents, or alternatively, in an amount to be determined at trial, and an order giving effect to that declaration;

(2)    Further or alternatively, an award of all legal rescissory, equitable, and punitive damages, to be proven at trial, for RFC's fraudulent inducement of FGIC to enter into the 2007-EMX1 Transaction and to issue the Policy;

(3)    Further or alternatively, an award of all legal, rescissory, equitable, and punitive damages, to be proven at trial, for Ally Financial's aiding and abetting of RFC's fraudulent inducement of FGIC to enter into the 2007-EMX1 Transaction and to issue the Policy;

(4)    Further or alternatively, an award of all legal, rescissory, and equitable damages, to be proven at trial for RFC's material breaches of the 2007-EMX1 Transaction;

(5)    Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for RFC's pervasive and material breaches of its representations, warranties, and affirmative covenants, which constitute material breaches of the I&I Agreement and frustration of the parties' bargain;

(6)    Further or alternatively, a declaration that RFC must repurchase all Mortgage Loans that are in breach of RFC's representations and warranties in the 2007-EMX1 Transaction, and an order giving effect to that declaration;

(7)    Further or alternatively, a declaration that RFC must provide full access to all Mortgage Loan files requested or that will be requested by FGIC in the 2007-EMX1 Transaction, and an order giving effect to that declaration;

(8)    Further or alternatively, a declaration that RFC must allow FGIC to inspect the books and records of RFC, to discuss the affairs, finances and accounts of RFC with RFC's Servicing Officer, and to discuss the affairs, finances and accounts of RFC with RFC's independent accountants, and an order giving effect to that declaration;

(9)    Further or alternatively, a declaration that RFC must cause servicing notes to be provided for the 2007-EMX1 Transaction when requested by FGIC, and an order giving effect to that declaration;

(10)    Further or alternatively, a declaration that RFC must cause to be provided the custodial Interim Certification when requested by FGIC for the 2007-EMX1 Transaction stating that all mortgage files were complete and were properly transferred into the trusts, or noting any exceptions, and an order giving effect to that declaration;

(11)    Further or alternatively, an award of legal and equitable damages, to be proven at trial, for RFC's purported amendment of the PSA without FGIC's consent;

(12)    Further or alternatively, a declaration that Ally Financial, ResCap, and RFC are alter egos of each other and are jointly and severally liable for each other's liabilities;

(13)    An award of FGIC's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the I&I Agreement and other Operative Documents, as defined in the I&I Agreement;

(14)    An award of prejudgment interest at the statutory rate; and

(15)    Any other and further relief that the Court deems just and proper.

## **JURY DEMAND**

FGIC demands a trial by jury for all issues so triable as a matter of right.

Dated: March 5, 2012

JONES DAY

Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
Michael J. Dailey
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*