1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


               United States Bankruptcy Court

               One Bowling Green

               New York, New York


               October 4, 2012

               11:12 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2 Debtors' application to the Court with respect to certain

3 discovery disputes

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20 Transcribed by:  Esther Accardi

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   ANTHONY PRINCI, ESQ.

9

10

11  MORRISON & FOERSTER LLP

12        Attorneys for Debtors

13        755 Page Mill Road

14        Palo Alto, CA 94304

15

16  BY:   DARRYL RAINS, ESQ. (Telephonically)

17

18

19  GIBBS & BRUNS LLP

20        Attorneys for Institutional Investor Steering Group

21        1100 Louisiana Street

22        Houston TX 77002

23

24  BY:  ROBERT J. MADDEN, ESQ.

25

4

1

2  KRAMER, LEVIN, NAFTALIS & FRANKEL LLP

3          Attorneys for Official Creditors' Committee

4          1177 Avenue of the Americas

5          New York, NY 10036

6

7  BY:   PHILIP BENTLEY, ESQ.

8          PHILIP S. KAUFMAN, ESQ.

9          BRENDAN M. SCHULMAN, ESQ.

10

11

12  JONES DAY

13          Attorney for FGIC

14          555 South Flower Street

15          Los Angeles, CA 90071

16

17  BY:   RICHARD L. WYNNE, ESQ. (Telephonically)

18

19

20

21

22

23

24

25

5

1

2  CADWALADER, WICKERSHAM & TAFT LLP

3        Attorneys for MBIA

4        One World Financial Center

5        New York, NY 10281

6

7  BY:   INGRID BAGBY, ESQ.

8

9

10  ALSO PRESENT TELEPHONICALLY:

11        JAMES GARRITY, ESQ., MORGAN, LEWIS & BOCKIUS

12        KENNETH ECKSTEIN, ESQ. KRAMER, LEVIN, NAFTALIS & FRANKEL

13

14

15

16

17

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, et al.**                                      6

1            P R O C E E D I N G S

2            THE COURT:  Residential Capital.  Let me have the

3    appearances of counsel.  Mr. Princi, are you going to make an

4    appearance?

5            MR. PRINCI:  Yes, Your Honor.

6            THE COURT:  Just do it from the podium, okay.  Just

7    let's go.

8            MR. PRINCI:  Anthony Princi of Morrison & Foerster on

9    behalf of the debtors.

10           MR. BENTLEY:  Good morning, Your Honor.  For the

11   creditors' committee, Philip Bentley of Kramer Levin.  I'm here

12   with my partner Philip Kaufman and our colleague Brendan

13   Schulman.

14           THE COURT:  Okay.  Anybody else making an appearance?

15           MR. MOLONEY:  Tom Moloney on behalf of Wilmington

16   Trust.

17           MR. MADDEN:  Your Honor, Robert Madden of Gibbs &

18   Bruns, for the institutional investor steering group.

19           THE COURT:  I'm sorry, I just missed your last name.

20           MR. MADDEN:  Yes, Madden, M-A-D-D-E-N.

21           THE COURT:  Okay.  Thank you, Mr. Madden.

22           MR. MADDEN:  Thank you, Your Honor.

23           MR. PRINCI:  Your Honor, just for the record, also, I

24   believe my partner, Darryl Rains, is on the phone.  He's

25   presently in San Francisco -- excuse me, Palo Alto.

**RESIDENTIAL CAPITAL, LLC, et al.**                    7

1          THE COURT:  Okay.

2          MR. PRINCI:  So I believe he's called in.

3          THE COURT:  All right.  Just hang on a second.

4          MR. PRINCI:  Sure.

5          THE COURT:  My courtroom deputy has to call into --

6      (Court reporter calling)

7          THE COURT:  Mr. Princi.

8          MR. PRINCI:  Good morning, again, Your Honor.

9          Your Honor, two housekeeping items.  Number one is I'm

10 informed by Mr. Bentley that the committee would like to take

11 the opportunity today to also address some issues it has

12 regarding discovery.

13          But this hearing, Your Honor, was brought on by the

14 debtors' application to the Court with respect to certain

15 discovery disputes.  We understand from the Court that the

16 Court wanted the parties who are involved in those discovery

17 disputes to address these.  We believe those parties are the

18 committee, FGIC, MBIA and then the trustees and the

19 counterparty to the settlement; the institutional investors.

20          The backdrop, Your Honor, is as follows:  We were here

21 before you on September 19th.  The Court heard the various

22 arguments of the parties with respect to discovery.  Based on

23 that the Court moved the hearing date back for the hearing on

24 the 9019 motion from November 5th to November 13th.  The

25 parties submitted an order to the Court respecting certain

RESIDENTIAL CAPITAL, LLC, et al.                    8

1   amendments to the scheduling order, that order was entered on

2   September 25th.

3           That order, Your Honor, calls for with respect to

4   depositions and expert and fact discovery the following:  Fact

5   discovery ends on October 19th.  Expert discovery ends on

6   October 26th.  In that intervening period, Judge, where Your

7   Honor ruled for the first time that the parties could seek

8   depositions and documents respecting the settlement

9   communications, the debtors have been, in essence, besieged

10  with deposition requests.

11          Even after asking the parties to pare down their

12  deposition requests here's where we are.  Right now the

13  committee, together with the other parties, but led by the

14  committee, is seeking sixteen fact depositions.  Those fact

15  depositions would have to be conducted in eleven business days

16  to get us to October 19th.  The committee, FGIC and MBIA have

17  designated ten experts.  The reports of those experts are due

18  on October 19th; that's a Friday.  We, the debtors, would then

19  have five business days; Monday the 22nd through Friday the

20  26th to review and assimilate the information in the expert

21  reports.  Consider that with our experts and then take the

22  depositions of upwards of those ten depositions.  I say upwards

23  FGIC's designation says that it is designating the Berkeley

24  Research Group including Mr. Vinella, but not limited to him,

25  so maybe it's more.

**RESIDENTIAL CAPITAL, LLC, et al.**                                      9

1    Your Honor, we do not believe that this is what Your

2    Honor was -- we do not believe that the Court had this in mind

3    when the Court ruled the last time.  We do not believe that the

4    settlement negotiation issue should turn into this sort of a

5    disproportionate sideshow.  Yes, we understand the Court's

6    ruling, and yes, we're attempting to work with the other

7    parties to provide information.  But the central issues is the

8    merits of the 8.7 billion dollar settlement and it's value

9    potentially to this estate.  And we do not believe that this is

10   proportionate or called for at all.

11           With respect to the experts, Your Honor, we have asked

12   the other parties to please coordinate with themselves, so as

13   to limit that and reduce it to a fair number.  The parties

14   knew, Your Honor, when we submitted this order to the Court

15   what the timeline was.  It doesn't really serve much purpose,

16   in our view, Your Honor, to agree to a scheduling order like

17   that, and then to hand us that sort of witness designation.

18           And, again, it's troubling, Your Honor, because if you

19   just take MBIA's position, MBIA has designated four experts.

20   MBIA and FGIC have already both instructed their trustees not

21   to accept the settlement.

22           So at this point, Your Honor, this estate is

23   overburdened.  We have important things that we are --

24           THE COURT:  But you're saying the fact that they've

25   instructed their trustees not to accept the settlement, does

1   that somehow preclude them from arguing the settlement

2   shouldn't be approved?

3           MR. PRINCI:  No, Judge.  But I think there's got to be

4   some sort of proportionality.  You know, at some point a line

5   needs to be drawn with respect to the interests of the estate,

6   as well as the interest of the individual parties.

7           MBIA wrapped eight of the 392 trusts that are the

8   subject of the settlement agreement.  My professional opinion,

9   Your Honor, is if you're really looking out for your own

10  interests what you do is you opt out, they've instructed the

11  trustee to already do it, don't agree to it, and then pursue

12  your claim against the estate.  So, you know, are they

13  technically precluded from objecting to the settlement?  No, I

14  can't say that in good faith.  Do I think it makes any sense?

15  No.

16          That's our position, Your Honor.  Thank you.

17          THE COURT:  All right, thank you.

18          MR. BENTLEY:  Good morning, Your Honor.  For the

19  record, Philip Bentley for the committee.

20          My partner, Philip Kaufman, is going to be addressing

21  the fact discovery related issues, along with our e-discovery

22  counsel, Brendan Schulman.  And I'm going to be discussing

23  expert discovery issues.

24          Let me just say at the outset before turning it over

25  to Mr. Kaufman, that Princi mentioned that we have certain

**RESIDENTIAL CAPITAL, LLC, et al.**                                11

1   issues.  We're here this morning to report to the Court that

2   there are a number -- in our view, a number of very serious

3   deficiencies in the debtors' document production, which Your

4   Honor knows was required to be completed yesterday, completed.

5   We believe it's seriously deficient in multiple respects.  Mr.

6   Kaufman will be addressing that after we respond to the points

7   that Mr. Princi has raised.

8          So with that, Your Honor, I'll turn this over to Mr.

9   Kaufman.

10          MR. KAUFMAN:  Good morning, Your Honor.  Philip

11  Kaufman.

12          With respect to Mr. Princi's statements regarding the

13  purported deluge of depositions requests, I think he really has

14  his facts wrong.  I heard him say that there have been requests

15  for sixteen fact witness depositions.  And, in fact, not only

16  is that not correct, it's even significantly inconsistent

17  with --

18          THE COURT:  Just tell me how many fact witnesses

19  you're seeking to depose.

20          MR. KAUFMAN:  Eleven, Your Honor.  And, in fact, there

21  were sixteen initially.  And after a meet and confer last

22  week --

23          THE COURT:  Let's not review the past history, just --

24          MR. KAUFMAN:  Okay.

25          THE COURT:  -- tell me how many fact witnesses.

1    MR. KAUFMAN:  There are eleven.  Let me just tell Your

2  Honor about those.

3        At the September 19th hearing you will recall the

4  debtors were asked to identify those persons who were

5  substantially involved in the settlement negotiations, and they

6  identified a number of those people.

7        On page 143 of the transcript Your Honor recounted

8  that they had identified Ms. Hamzehpour, Mr. Cancelliere, Mr.

9  Nolan, Mr. Renzi, Mr. Puntus, Mr. Chopra, and you said they

10  clearly should be deposed.  Well, those people had been

11  requested for deposition.

12        In addition, Your Honor, the debtors have advised us,

13  although they're not required to make this definite until

14  tomorrow, that they plan to call nine fact witnesses.  I'm

15  sorry, six fact witnesses and three experts.  We want to depose

16  all six of the fact witnesses that they plan to call on direct

17  at the hearing, and we want to call the people they identified

18  before the Court on September 19th.  There are eleven total

19  witnesses.  We don't think there's any duplication among those

20  witnesses.  They all have specific issues that we want to

21  address.  And so we don't think there's anything untoward about

22  requesting that many depositions.

23        Mr. Princi characterized as a sideshow --

24        THE COURT:  I don't want to hear about --

25        MR. KAUFMAN:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                                    13

1          THE COURT:  I don't want characterizations, I just

2    want to know what discovery people want to take.

3          MR. KAUFMAN:  Okay.

4          THE COURT:  And what are the disputes.

5          MR. KAUFMAN:  Well, the dispute appears to be that

6    we've asked for too many depositions.  So we've asked for

7    eleven depositions of fact witnesses.

8          THE COURT:  Let me just stop for a second.

9          MR. KAUFMAN:  Okay.

10         THE COURT:  The eleven you've asked for are either

11   people who are identified in Court in the transcript you

12   referred to as substantially involved in the negotiations, or

13   people that the debtors have indicated that they may be calling

14   as fact witnesses at the hearing.

15         MR. KAUFMAN:  Correct, Your Honor.

16         THE COURT:  That totals eleven.

17         MR. KAUFMAN:  Correct.  Mr. Princi seems to believe

18   that it's difficult for the debtors to do that.

19         THE COURT:  Don't characterize what Mr. Princi is

20   arguing.

21         MR. KAUFMAN:  Okay.

22         THE COURT:  Just argue the issues.

23         MR. KAUFMAN:  I was simply responding to his

24   arguments, Your Honor, I apologize.

25              That's all I have to say then.  Eleven witnesses, all

**RESIDENTIAL CAPITAL, LLC, et al.**                              14

1   identified either as people who will be testifying on direct at

2   the hearing, or that were identified on September 19th as

3   having substantial information relating to settlement

4   negotiations.

5           AS to the expert issues, I will pass it to Mr. Bentley

6   to respond.

7           THE COURT:  All right.  I thought Mr. -- are you going

8   to do that or is Mr. Schulman --

9           MR. BENTLEY:  I'm going to do the expert issues, Your

10  Honor.

11          THE COURT:  Okay, let's go, Mr. Bentley.

12          MR. BENTLEY:  Okay.  Mr. Princi is asking the Court to

13  limit the committee plus all other objectors in the aggregate

14  to a total of three expert witnesses.  We believe that's

15  grossly inappropriate, Your Honor.

16          THE COURT:  So you intend to call three experts.

17          MR. BENTLEY:  We have designated three expert

18  witnesses as have --

19          THE COURT:  What issues?

20          MR. BENTLEY:  Excuse me?

21          THE COURT:  What issues?

22          MR. BENTLEY:  One expert will be testifying as to

23  estimated lifetime losses of the trust.  Another expert, Mr.

24  Cornell; Professor Cornell, will be testifying as to what

25  portion of those estimated losses are likely to translate into

1  putback liability.  And the third expert will be testifying

2  about one of the elements -- one of the components that went

3  into Mr. Cornell's analysis, namely the reunderwriting that has

4  been done of the sample of 1500 long files.

5         As for other parties' experts, I'll let the other

6  parties speak for themselves, Your Honor.  I would just note

7  one thing.  And that is the other parties have made the point

8  to me, and to the debtors, that they can't count on -- and I

9  think this is a valid point, Your Honor.  They can't be sure

10  what the committee is going to do.  Because the committee, as

11  you know we have a deadline of the 19th for expert reports, a

12  deadline of the 24th for our objection.  We have not yet

13  determined for certain, Your Honor, that we are going to be

14  objecting.  We are still working through our expert analysis.

15         We're working like mad in an amount of time that we

16  believe is inadequate, Your Honor.  We're going to do our best,

17  the Court has told us to do it, we will do it, but we are not

18  going to be able to decide until very shortly before our

19  deadline of the 24th for objecting.  We won't know until very

20  shortly before then whether, in fact, we will be objecting.

21  Because if we conclude -- if our experts conclude that this is

22  a good settlement we will actually support it rather than

23  object.

24         And so what the other parties have told me is they

25  certainly don't want to duplicate what we're doing.  But until

**RESIDENTIAL CAPITAL, LLC, et al.**                    16

1  they know for sure, which is after the expert deadline; for

2  sure the committee will be objecting.  If we're not objecting

3  we would not necessarily put on expert witnesses.  Until they

4  know for sure that we're objecting, until they know for sure

5  what the scope of our expert witnesses' reports is going to be,

6  what the substance of that is going to be, they can't tie their

7  hands and commit --

8          THE COURT:  Okay.

9          MR. BENTLEY:  -- to not put on experts of their own.

10          THE COURT:  Mr. Moloney, you want to be heard?

11          MR. MOLONEY:  your Honor, we don't have a dog in the

12  fight on the expert issues, so --

13          THE COURT:  Do you on the fact witnesses?

14          MR. MOLONEY:  Yes, Your Honor.  We have served a

15  deposition notice on one of the directors, who I believe they

16  don't contest is going to show up, Mr. Mack.

17          THE COURT:  This is in --

18          MR. MOLONEY:  I think he's in the eleven.

19          THE COURT:  Just a second.  Wait a minute.  Is he in

20  the eleven?

21          MR. MOLONEY:  He's in the eleven.

22          THE COURT:  All right.  Who else wants to be heard?

23          MR. WYNNE:  Your Honor, it's Richard Wynne for FGIC.

24  I'll be heard when people in the courtroom are done?

25          THE COURT:  No, go ahead now, Mr. Wynne.

**RESIDENTIAL CAPITAL, LLC, et al.**                    17

1          MR. WYNNE:  Okay, thank you, Your Honor.

2          Your Honor, thank you for letting me appear by

3     telephone.

4          With respect to FGIC we're exactly as Mr. Bentley

5     said.  We're in the position where we don't yet know who will

6     or who won't be objecting.  And, fundamentally, everything is

7     happening in parallel tracks.  Our own experts are far from

8     done with their own analysis.

9          THE COURT:  How many experts do you have, Mr. Wynne?

10         MR. WYNNE:  We have two potential experts, Your Honor.

11    One, the BRG Group, would be essentially doing all three roles

12    that Mr. Bentley's three different experts would be doing.  And

13    then we have another expert who would be opining on basically

14    the settlement process issues.

15         Mr. Princi --

16         THE COURT:  Just stop for a second.

17         MR. WYNNE:  -- really ignored I think one key issue

18    with saying why FGIC and MBIA care.  If, Your Honor, this

19    settlement should be more appropriately something like three

20    billion or four billion then we care hugely about dilution

21    about having it be eight or nine billion instead of that

22    number.  I mean, that is a very material issue, and we don't

23    yet know what position anyone else is taking.  We have no

24    desire to take extra experts to have spent the incredible

25    amount of money that we have spent so far in preparing to deal

RESIDENTIAL CAPITAL, LLC, et al.                                    18

1    with and analyze this.

2              But at this point we just can't unilaterally disarm

3    and say we're not going to go forward when we don't know what

4    any other party is going to do.

5              THE COURT:  Okay, thank you.  Who else wants to be

6    heard?

7              MR. WYNNE:  Your Honor, we had a few affirmative

8    issues which I can deal with later when the committee deals

9    with their requests.

10             THE COURT:  We'll deal with those a little later.  Go

11   ahead.

12             MS BAGBY:  Good morning, Your Honor.  Ingrid Bagby

13   from Cadwalader, Wickersham & Taft for MBIA.

14             I just wanted to respond to two points on the experts.

15   And to clarify, actually, one thing that was said earlier in

16   terms of MBIA's position on the settlement.  I think we have

17   clarified this previously for the debtors, but MBIA has not

18   made a decision with respect to settlement.

19             THE COURT:  How many fact witnesses?

20             MS. BAGBY:  Fact witnesses, Your Honor?

21             THE COURT:  Yes.

22             MS. BAGBY:  We're coordinating with the committee on

23   the fact witnesses.

24             THE COURT:  It's within the same eleven?

25             MS. BAGBY:  Yes, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                                        19

1      THE COURT:  Okay.

2           MS. BAGBY:  With respect to the experts --

3           THE COURT:  How many experts?

4           MS. BAGBY:  We had designated four potential experts.

5           THE COURT:  Why do you need four experts?

6           MS. BAGBY:  Your Honor, given the accelerated

7  schedule, and the fact that the day, the Friday -- the date

8  that the designations were due is the same day that the debtors

9  filed their supplemental Silmon (ph.) report.  We did not know

10  yet what that report would contain.  So we were in the

11  position, like other parties, of having to basically protect

12  ourselves by designating every potential expert.

13           THE COURT:  Okay.  How many experts do you know expect

14  to be calling?

15           MS. BAGBY:  As we informed the debtors last night, of

16  the three experts -- three of the four we believe we will not

17  need all three.

18           THE COURT:  All right.

19           MS. BAGBY:  So it's likely down to two.  Again,

20  subject to continued discovery.  And as in terms of our

21  position with respect to --

22           THE COURT:  What are the issues on which the two

23  experts -- and I'm not holding you to those two at this

24  point --

25           MS. BAGBY:  Of course.

RESIDENTIAL CAPITAL, LLC, et al.                                    20

1        THE COURT:  -- but what are the issues?

2        MS. BAGBY:  The first issue is looking at Mr. Silmon's

3    methodology.  And the second would be issues particular to

4    trust that MBIA has insured.

5        THE COURT:  What are the issues specific to the trust

6    you've insured?

7        MS. BAGBY:  In particular I think this goes to the

8    nature of the collateral and the reps and warranties that were

9    provided with respect to those particular trusts.

10       THE COURT:  Okay, anything else?

11       MS. BAGBY:  And we'd just like to echo the statements

12   that Mr. Wynne made with respect to the inability, at this

13   point, under the accelerated schedule to disarm, as he termed

14   it.

15       THE COURT:  Okay, thank you.

16       MS. BAGBY:  Thank you.

17       THE COURT:  Other counsel wish to be heard?

18       MR. MADDEN:  Very briefly, Your Honor.  Robert Madden,

19   Gibbs & Bruns, counsel for the steering committee group of

20   institutional investors.

21       I just want to raise a couple of points, Your Honor.

22   On the issue of the settlement negotiations, our position is,

23   Your Honor, that deposing every single person who has

24   substantial involvement with the settlement negotiations is

25   excessive.  We're not writing on a blank slate here, Your

1    Honor.   The issue of arm's length negotiations, the court

2    approval of settlement negotiations --

3           THE COURT:  You should be happy, I said they can't

4    take the depositions of your lawyers.  So, you know--

5           MR. MADDEN:  And I appreciate that, Your Honor.  But

6    what we're concerned with here, Your Honor, is simply holding

7    the schedule.  And what we're concerned with, Your Honor, is

8    that what is an attempt here by parties who have been very

9    clear that they don't want this to go forward are attempting to

10   deluge the debtor and push the hearing back.  We're happy for

11   the Court to allow however much discovery at once, as long as

12   we hold the hearing.  But we're not willing to sit by idly and

13   permit discovery that we think is excessive to push the hearing

14   back.  I'm happy to address that, Your Honor, but if you hear

15   me out --

16          THE COURT:  Do you have experts too?

17          MR. MADDEN:  No, we don't, Your Honor.

18          THE COURT:  Good.

19          MR. MADDEN:  And we're probably one of the most

20   interested parties in this case.

21          Again, I'd say, Your Honor, the issue is whether the

22   negotiations were arm's length.  Courts routinely do this

23   without even looking at settlement negotiations.  The idea that

24   you have to depose --

25          THE COURT:  In bankruptcy?

1    MR. MADDEN:  Yes, Your Honor.  And, in fact, we cited

2    the Court -- the issue never came up before, Your Honor.

3    THE COURT:  Yeah, I understand.  You were headed to a

4    battle with the committee.

5    MR. MADDEN:  And we averted that, Your Honor.

6    THE COURT:  Okay.  And, you know, I gather both sides

7    filed briefs.  I haven't looked at them --

8    MR. MADDEN:  Understood.

9    THE COURT:  -- because I had heard you had resolved

10   the issue.  So I didn't --

11   MR. MADDEN:  Understood, Your Honor.

12   THE COURT:  I'm sure they're fascinating but I didn't

13   read them.

14   MR. MADDEN:  Understood.  And I'm not asking the Court

15   to order -- that we ought not look at settlement negotiations.

16   What I'm suggesting is that it has to be in proportion to the

17   issue that's being decided.  And that is whether or not there

18   was collusion.  The point is not for this Court to have a mini

19   trial on what happened in the context of the settlement

20   negotiations.  The point is whether the settlement is fair.

21   And one thing; one factor, that the Court has to look at is

22   whether there's some reason to believe it's not fair because

23   it's collusive.  That doesn't require an exhaustive examination

24   of every person that participated in the settlement

25   negotiations.

1    THE COURT:  Okay.  Mr. Madden, I want a separate -- I

2  am separating -- whether the parties like it or not, I'm

3  separating what is discoverable from what will -- what the

4  Court will permit in evidence at the hearing.  Okay.

5    Those parties who wish to exhaust themselves in

6  discovery, subject to additional time limits the Court may

7  impose on the length of depositions, have at it.  But there are

8  three days for the hearing.  And we'll talk about that when we

9  finish this.  What I'm not going to have happen is get thirty-

10  seven affidavits that are direct testimony and leave it to the

11  debtor to use its time cross-examining everybody.  Okay.

12  Because there isn't enough time to do that.  So we may just

13  well say, okay, got the depositions, but you want to call a

14  witness you call him live, you use your time, you call him

15  live, do what you want with that, but you only have so much

16  time for direct, cross, et cetera.  Okay.

17    I think I have your position in mind, okay, Mr.

18  Madden.

19    MR. MADDEN:  Understood, thank you, Your Honor.  The

20  only other issue I want to address with the experts is just to

21  offer a suggestion.

22    THE COURT:  Okay.

23    MR. MADDEN:  What we've heard is well, gosh, we don't

24  know whether we're going to pose a settlement or not.  That's

25  fine, I understand that.  But what I would suggest is that once

1   people decide that, and I suggest they probably have an idea at

2   this point, that at that point they're required to coordinate.

3   We don't need multiple experts.  The only issue is whether it's

4   too high; that's the only issue that they're going to be

5   offering experts on if they oppose the settlement.  They don't

6   need -- the committee's got three different experts to address

7   what Mr. Silmon addressed in single expert report.  I would

8   suggest that perhaps some consolidation could occur, not

9   just --

10          THE COURT:  Well, look, you know if they want to call

11  three experts, I'm not sure I'm going to listen to three,

12  because if they're duplicative, I'm not going to -- it isn't

13  going to happen, I'm going to cut them off.  So they better

14  figure out who they want their principal expert to be.  If

15  they're calling an expert because that expert was the number

16  cruncher that provided the basis for Brad Cornell's opinion,

17  you know once the reports are done the parties need to meet and

18  confer and see whether they can stipulate as to particular

19  facts.  That's what usually happens.  Okay.

20          And so, yes, and expert is entitled to rely on

21  anything that they usually -- you know, that's customary,

22  paraphrasing very roughly.  Okay.  So if expert number one has

23  relied on work done by expert two or three, the parties are

24  going to have to figure out whether are they really going to

25  put everybody to the chore.  I will lose my patience and

**RESIDENTIAL CAPITAL, LLC, et al.**                          25

1  attention span if that's what's happening at the hearing.  The

2  hearing is going to be three days, no more.

3          MR. MADDEN:  Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Madden.  Anybody else want

5  to be heard?

6          All right.  Mr. Princi, is it eleven or sixteen?

7          MR. PRINCI:  It's neither.  I understand it's twelve,

8  Your Honor.  And so they consist of the following groups, Your

9  Honor.  There's --

10          THE COURT:  No, here's what I want you to do.

11          MR. PRINCI:  Yeah.

12          THE COURT:  I'm not going to write down twelve names,

13  okay.  Take ten minutes, see whether you agree on who the

14  individuals are.  It does seem to me, Mr. Princi, that to the

15  extent that you identified five people on the record at the

16  hearing as having been substantially involved in the

17  negotiations, they're appropriate people to be deposed.  To the

18  extent that you've indicated to the other parties-in-interest

19  that there are six other people who you're -- you may be

20  calling as witnesses, you may not have finalized that decision,

21  I understand that.  But if you've indicated to them, as is

22  completely appropriate, that there are six people who you may

23  be calling, then they should take those depositions.  The

24  other -- if that's eleven or whether it's twelve it's a lot of

25  depositions, so let's talk about what I would like to know, and

RESIDENTIAL CAPITAL, LLC, et al.                                    26

1    I guess it's the committee, Mr. Bentley, I'm not sure that

2    seven-hour depositions are appropriate in light of the tight

3    schedule.

4           I had indicated that the presumptive seven-hour -- Mr.

5    Kaufman, that the presumptive seven-hour limit would apply.  In

6    many other cases I've imposed a three-hour time limit on

7    depositions.

8           MR. KAUFMAN:  If I may, Your Honor?

9           THE COURT:  Go ahead, Mr. Kaufman.

10          MR. KAUFMAN:  It is eleven.  I could, if Your Honor

11   wishes, simply name them.

12          THE COURT:  No, I don't want to hear all the names.

13          MR. KAUFMAN:  But beyond that, Your Honor, we have

14   already advised debtors' counsel, repeatedly actually, that

15   with respect to the four directors whose depositions we wish to

16   take; two inside and two outside directors, we believe that

17   those depositions will not go more than a half day a piece.  We

18   have told them that.  And they may be shorter still.

19          THE COURT:  What about the other depositions?

20          MR. KAUFMAN:  The other depositions, we believe, at

21   least most of them, are likely to be substantially longer, a

22   day deposition.

23          THE COURT:  Why is that?

24          MR. KAUFMAN:  Well, if I can go through the actual

25   people we're --

1         THE COURT:  Okay.

2         MR. KAUFMAN:  -- talking about, Your Honor.  We

3    believe that Tim Devine's deposition is likely to take a day.

4    Tim Devine from the documents we've seen thus far appears to

5    have been -- I don't mean the engineer of this settlement, but

6    the one who is directing all the traffic.  There are quite a

7    number of documents involving Mr. Devine, and we want to depose

8    him on those things.

9         THE COURT:  You take depositions of people, not of

10   documents.

11        MR. KAUFMAN:  Well, documents are used to examine

12   people about.  And Mr. Devine appears to be a critical

13   participant in the entire settlement and in the plan support

14   agreements, and we believe his deposition is almost certainly

15   going to go to seven hours.

16        Ms. Hamzehpour, we believe also is likely to require a

17   seven-hour deposition.

18        Mr. Marano, we believe is almost certainly likely to

19   require that amount of time.

20        Mr. Renzi, the FTI person, who is most responsible for

21   the waterfall analyses based on what we've seen so far, and

22   somebody who the debtors identify as one of their fact

23   witnesses at trial, we believe we're going to require seven

24   hours with.

25        It's possible, although I can't be sure at this point,

**RESIDENTIAL CAPITAL, LLC, et al.**                                    28

1  that Mr. Ruckdaschel and Mr. Cancelliere, two in-house ResCap

2  employees, who were identified as likely to put in direct

3  testimony at the hearing, we believe might or might not require

4  a full day.  My best guess is they won't, but I can't be

5  certain.

6          You know we'll get to this, Your Honor, but we still

7  do not have a substantial quantity of the documents we've

8  requested.  So it is not -- it's not possible to be completely

9  certain as to how long these depositions are likely to last.

10  But I think I've given Your Honor my best guess as to now.

11          THE COURT:  Well, it is going to be certain.

12          MR. KAUFMAN:  But I think I've given Your Honor my

13  best guess as to now.

14          THE COURT:  No, it is going to be certain, because I

15  am going to impose timelines.

16          MR. KAUFMAN:  Okay, I've given Your Honor my best --

17  my best guess as to how long these depositions will likely

18  take, and I've told the debtors, in terms of the four

19  directors, that's four out of the 11, we do not believe that

20  any of them is likely to require more than a half day.

21          MR. PRINCI:  Your Honor, the big sway -- and in order

22  for us to make any progress outside the hallway -- is with

23  respect to the board members.  I think, you know, at this point

24  we'll fall on our sword in terms of the other people which --

25  and I mean they're taking what we think are duplicative

**RESIDENTIAL CAPITAL, LLC, et al.**                     29

1   depositions.  So they take Renzi from FTI, they take the other

2   guy from FTI, et cetera.  But putting that aside --

3          THE COURT:  Mr. Princi, stop.  To the extent that you

4   identify -- I asked the question at the hearing who was

5   principally involved in the negotiations, and you identified

6   five people.

7          MR. PRINCI:  Actually six, Your Honor.

8          THE COURT:  All right, six.  Now, you've indicated

9   additional people --

10         MR. PRINCI:  There's an overlap.  And, Your Honor, we

11  don't contest that.  We wouldn't attempt to suggest that they

12  shouldn't take those depositions.  The real issue, Judge, is

13  they want to take six board members, and we're at a time,

14  Judge, where the decision makers --

15         THE COURT:  Okay.

16         MR. PRINCI:  -- including members on the board are

17  involved with a lot of other things, and it's just not

18  necessary for them to deal with the issue of the settlement

19  negotiations, which is not the issue of whether 8.7 is good for

20  this estate, to have to take six board members.  Take a board

21  member, take two board members.

22         MR. KAUFMAN:  Your Honor, it's only four board

23  members.

24         THE COURT:  Mr. Kaufman, don't interrupt.

25         MR. KAUFMAN:  I don't know why Mr. --

RESIDENTIAL CAPITAL, LLC, et al.                                    30

1      THE COURT:  Don't interrupt.

2      MR. KAUFMAN:  I apologize.

3      MR. PRINCI:  And I was just hearing the same thing, so
4  I stand corrected.  It is four board members.  But you don't to
5  take four board members.  You can take a board member.  And if
6  there's a reason to believe that you're not getting, you know,
7  sufficient information from that board member, you could
8  another one, but -- but that -- that's where, Judge, you know,
9  the pile-on effect is having what we think is its intended
10  effect.

11      Your Honor, as far as the experts, do you want to
12  separate that, because some of the experts -- Judge, you can
13  hear -- just by description, I think Your Honor can determine
14  that right now.  For example, Mr. Rosenberg that FGIC wants to
15  call, they want to call him to address the propriety of the
16  board processes.  I mean, the facts are what they are.  Your
17  Honor knows the law, the people can argue that.

18      THE COURT:  This is an appropriate subject for expert
19  testimony, but I'm not deciding that.  If you want to make a
20  motion in limine to exclude his testimony, you'll do that,
21  okay.  It classically doesn't sound like an appropriate subject
22  for expert testimony.

23      MR. PRINCI:  And I can't imagine we won't if they
24  continue to pursue that, but the problem is we are still left,
25  Judge, in having to deal with that designation.  So we're going

RESIDENTIAL CAPITAL, LLC, et al.                                    31

1    to have to deal with the expert report, we're going to have to

2    make the motion in limine, we're going to have to take the

3    deposition because we don't have a guarantee what Your Honor's

4    ruling is going to be.

5            So all of this is having the effect of pushing the

6    debtors over the tipping scale in terms of what we can really

7    do, and I realize we're the ones that have asked for this

8    schedule, but, you know, when you look back there have now been

9    months for people to do this.

10           THE COURT:  You want the hearing in November and

11   whether the parties -- other parties-in-interest, any of them,

12   and I'm not going to assume bad faith on anybody's part, but if

13   this is an effort to filibuster, to make life so miserable that

14   the hearing doesn't go forward, you know, I'll draw my own

15   conclusions when we get to the hearing about it, but we're

16   going to take a five minute recess, and I want to know whether

17   there's 11 or 12 fact witnesses.  What is the total number of

18   experts now we're talking about?

19           MR. PRINCI:  Ten designated experts to be -- we get

20   the reports on Friday the 19th, and we have to finish their

21   depositions five business days later on Friday, October 26th.

22           THE COURT:  How many experts does the committee have,

23   Mr. Bentley?

24           MR. PRINCI:  Three.

25           MR. BENTLEY:  We have three just like the debtors,

**RESIDENTIAL CAPITAL, LLC, et al.**                                    32

1    Your Honor.

2            THE COURT:  So if you have three, the debtor has

3    three, that's six, FGIC says they have two, that's eight, and

4    MBIA told me they have four, that's twelve.  How do we -- is it

5    ten or twelve?

6            MR. BENTLEY:  Here's the math, Your Honor.  In the ten

7    that Mr. Princi mentioned, he's not counting his own experts.

8    So he's counting ours, which is three; two for FGIC; four for

9    MBIA; and then it is one or two for the trustee?

10           MR. PRINCI:  One for the trustee.

11           MR. KAUFMAN:  One for the trustee.

12           THE COURT:  So that's ten plus the three for the

13   debtors.

14           MR. BENTLEY:  Correct.

15           MR. PRINCI:  And, Your Honor, what the trustee is

16   saying is a good example of what's necessary.  They're the ones

17   that have to make the decision, which no less than me has

18   chided them, you know, early on for whether they were prepared

19   to embark on this.  Well, they are, and they have been.  And

20   here they are making an 8.7 billion dollar -- taking that 8.7

21   billion dollar question to task, and they've designated one

22   expert.

23           FGIC an MBIA, who have decided not to support this

24   settlement, because they told their trustees not to do that, so

25   they know the answer already, they've documented the fact that

1  they know that answer already.  They want four and two,

2  respectively.

3          THE COURT:  Well, MBIA said they designated four, but

4  it's likely going to be pared down to two, but they don't know

5  yet, and I understand that.  So, you know --

6          MR. PRINCI:  They wouldn't agree to it, Judge, and

7  we --

8          THE COURT:  Well, until they see the other experts'

9  reports, I understand that they won't agree.

10          MR. PRINCI:  But they've seen our expert reports,

11  Judge.  I mean we've submitted declarations.

12          THE COURT:  And when they see the other objectors

13  expert reports they may conclude it's duplicative, and I'm not

14  going to call my own expert.  You know, you ought to be happy

15  that you're going to get expert reports from all of these

16  people, because there are going to be inconsistencies in

17  methodology or whatever.

18          We're going to take a five minute recess.  I want to

19  know how many fact witnesses there are.  You ought to be able

20  to agree whether it's eleven or twelve.

21          (Recess from 11:50 a.m. until 11:55 a.m.)

22          THE COURT:  Please be seated.  Mr. Princi, how many

23  fact witnesses?

24          MR. PRINCI:  Your Honor, there was some -- there was

25  some confusion over the 30(b)(6) notices, so it turns out we

1   are down to eleven.

2           THE COURT:  Eleven fact witnesses?

3           MR. PRINCI:  Yes, Your Honor.

4           THE COURT:  Is there a 30(b)(6) in addition?

5           MR. PRINCI:  No, that was where, at least from our

6   part, a fair part of the confusion lies.  Your Honor, we

7   designated the six fact witnesses, and I think it's important

8   to put those fact witnesses and juxtapose them against the

9   number of depositions that are being taken.  We did that

10  because those are the people we think are the people who have

11  the knowledge that is necessary for the evidence that needs to

12  be proffered to come in.

13          So, you know, we have issues with the burdens, because

14  there's a very big, in our view, duplication of efforts here.

15  This is not the trial on the rep and warranty claims.  It is

16  not a plenary trial.  It's just a trial -- it's an evidentiary

17  hearing to see if the 8.7 billion proposed settlement falls

18  within the range of reasonableness.

19          And so, when we're offering, you know, these folks --

20  there's just unwillingness, because we did what we needed to

21  do.  We would say, well, these people all have knowledge.  And

22  the fact that we said that, which is true, doesn't mean that we

23  need or should have the depositions of all of them.

24          THE COURT:  Ten fact witnesses you're talking about.

25          MR. PRINCI:  I beg your pardon, Your Honor?

**RESIDENTIAL CAPITAL, LLC, et al.** 35

1    THE COURT:  Ten fact witnesses?

2    MR. PRINCI:  Eleven.

3    THE COURT:  Eleven fact witnesses.

4    MR. PRINCI:  But those include, Your Honor, four of

5  the directors.

6    THE COURT:  Yes.  All right, you should all proceed

7  with the deposition of eleven fact witnesses.  Four of the

8  depos shall not exceed three hours in length.  Four of the

9  depos should not exceed four hours in length.  And three depos

10  shall not exceed seven hours in length.  Please advise --

11  everyone needs to understand before the depo starts whether

12  it's going to be a three, four, or seven hour deposition.  So

13  you're going to have to make your choices with respect to fact

14  witnesses as in advance as to how much time you're going to

15  spend with respect to the experts, the total of 13 experts,

16  between all of the parties.  Expert depositions shall not

17  exceed four hours in length, okay.

18    MR. BENTLEY:  Your Honor, may I be heard on that

19  issue, very briefly?

20    THE COURT:  Very briefly.

21    MR. BENTLEY:  Okay, the debtor took three experts.

22  One of them is far and away their lead expert, Mr. Silmon.

23  He's testifying -- sorry -- on in effect all three topics that

24  our three experts are addressing.  So in a sense he's a little

25  bit like three experts rolled into one.

1    THE COURT:  You've got 12 hours total.  You figure out

2  how you want to divide it.  You can tell -- you tell Mr.

3  Princi, in advance, how much time you're going to use for each

4  of their three experts.  I'm saying four hours each.  If you

5  want to use most of it for Mr. Silmon, fine, but I'm only

6  allowing you -- when I say you, that's collectively, all right.

7  It's not four hours for each of you.

8    So anybody -- you know, you're going to have to

9  coordinate, there isn't going to be duplication.  That's going

10  to be the limit.  So a twelve hour limit on the depositions of

11  the debtors' experts.

12    MR. BENTLEY:  Thank you, Your Honor.

13    MR. KAUFMAN:  Your Honor, I think I know the answer,

14  I'd just like one clarification.  When the time limit -- the

15  time limits are exclusive of breaks, I assume.

16    THE COURT:  They are.

17    MR. KAUFMAN:  Okay.

18    MR. BENTLEY:  And may I ask whether Your Honor is

19  settling limits on the debtors' depositions of our experts?

20    THE COURT:  Four hours per deposition.  I'm saying for

21  all experts.  If Mr. Princi or his colleagues decide, you know,

22  for example, the committee -- you have three experts, so that's

23  a total of twelve hours, and he wants to divide that

24  differently than four hours each, I'm going to let him do it,

25  but it's not going to exceed twelve hours.

**RESIDENTIAL CAPITAL, LLC, et al.**                                      37

1   Now go across the board and figure out I'm allowing a

2   total of, in the aggregate, four hours per expert.  So if a

3   party has three designated that's twelve hours.  If the debtors

4   wanted to jigger that time arrangement, that's fine, I'll

5   permit them to do that.

6        MR. BENTLEY:  And just a clarification, Your Honor.  I

7   understand they can jigger the time as among the multiple

8   experts designated by one party --

9        THE COURT:  Correct.

10        MR. BENTLEY:  -- but only among that party?

11        THE COURT:  Among that one party.

12        MR. BENTLEY:  Thank you, Your Honor.

13        THE COURT:  Okay.

14    (Pause)

15        THE COURT:  Anything else you want to add, Mr. Princi?

16        MR. PRINCI:  Your Honor, I just have a request for the

17   court's calendar, and I do this with a heavy sense of

18   resignation of defeat, but I need to consult with the clients,

19   Your Honor, and it may be that we have to request that the

20   Court move the hearing dates back into January, so I wanted to

21   know what the Court's January calendar was like.

22    (Pause)

23        THE COURT:  The week of January 14th.

24        MR. PRINCI:  Okay, Judge, we will consult and advise

25   the Court and the parties if we seek to move the hearing back

**RESIDENTIAL CAPITAL, LLC, et al.**                    38

1   to that date, and I just wanted the Court to understand that we

2   appreciate the balancing act that Your Honor is engaging in,

3   and we have respect for it, obviously, and we appreciate the

4   efforts of the institutional investors who are the counter-

5   parties in the settlement and the trustees to work within the

6   timeframe such as it is right now, and we'll just get back to

7   the Court on that.  Thank you, Your Honor.

8            THE COURT:  Let's talk a little more before, because

9   I -- Mr. Bentley, go ahead.

10           MR. BENTLEY:  Yes.  Your Honor, I hate to burden the

11  Court, but as I mentioned at the outset we do have a few

12  document issues that we view as important and that we do need

13  to raise with Your Honor.

14           THE COURT:  All right, go into that now, Mr. Kaufman.

15           MR. KAUFMAN:  I'll try to make it very quick, Your

16  Honor.  We have not received from the debtors virtually any

17  documents that precede April 1, 2012.  In fact, they told us

18  they have not searched for any such documents.

19           THE COURT:  On what issue?

20           MR. KAUFMAN:  Excuse me, Your Honor?

21           THE COURT:  On what issue?

22           MR. KAUFMAN:  On the settlement communications and on

23  the evaluation and analysis of the settlement on both issues.

24  We think that's a big deal, Your Honor.  We know that prior to

25  the settlement in May that the debtors' put-back liability was

**RESIDENTIAL CAPITAL, LLC, et al.**                                        39

1  estimated within the debtors at zero to four billion.  We know

2  that because Ally's April 10-Q provided that estimate, which

3  was made public, and we know that the debtors' communicated it

4  to Ally as a result.  But we have not been given any analysis

5  of the put-back liability before the Silmon analysis.

6          THE COURT:  Which Q was that in?

7          MR. KAUFMAN:  The April 10-Q.  So we have not been

8  given any analyses or evaluations of the put-back liability

9  before that time, nor have we been given any communications

10 regarding how the debtors viewed the put-back claims prior to

11 the settlement.

12          So we think that their failure, refusal, I'm not sure

13 what it is, they're lack of production of documents before

14 April 1 is inappropriate, and we requested those.  So we

15 haven't seen any of them yet.

16          THE COURT:  Did you raise it with debtors' counsel?

17          MR. KAUFMAN:  Yes, we have, and they claim they don't

18 believe there are any such communications or documents, but I

19 don't believe they've made a search.  I think they're just

20 telling us they don't believe so.

21          There is also a significant issue, Your Honor, with

22 respect to what we regard as custodian self-collection of

23 documents and just generally I'm going to allow my colleague,

24 Mr. Schulman to explain it for the Court.  But basically the

25 fact witnesses, whose depositions we have requested, have been

RESIDENTIAL CAPITAL, LLC, et al.                                    40

1   allowed to self-collect the documents that would be responsive

2   to our document request and that applies --

3          THE COURT:  And -- the party that that isn't

4   permissible?

5          MR. KAUFMAN:  Yes, I believe Mr. Schulman will address

6   that, Your Honor.  And just -- in addition to that, as to FTI

7   and Centerview, the same is true.  They have either been

8   allowed to self-collect or they have -- and Mr. Puntus sent me

9   an e-mail the other day telling me that there are no documents

10  from Centerview other than the waterfall analyses that we've

11  received.  It's hard to believe there isn't a single e-mail

12  from anyone at Centerview relating to the waterfall analyses,

13  or the valuation of the claims, or of how there will be an

14  allocation of the value, but Mr. Puntus -- the e-mail which I

15  brought with me in case Your Honor wanted to see it, stated

16  that at least technically there are no documents responsive to

17  our requests.

18         THE COURT:  As to this term?

19         MR. KAUFMAN:  I will read it, Your Honor.  He said the

20  presentations Centerview made at those meetings, talking about

21  the presentations to Ms. Patrick, MBIA, FGIC, and other

22  constituents are the only documents Centerview prepared that

23  are responsive (at least technically so) to the document

24  request.  Those documents have been provided to MoFo to be

25  shared with the UCC.  So that's just Centerview.

1          The statement with FTI, I believe the same is true.

2    We haven't received any internal communications, any

3    communications with the debtors, with Ally, with any other --

4    with Centerview.  So none of those documents have been

5    produced.

6          Those are just two or three groups of or categories of

7    documents that we haven't received yet, Your Honor, with

8    depositions, of course, scheduled to begin next week.

9          MR. SCHULMAN:  Thank you, Your Honor.  Brendan

10   Schulman from Kramer Levin on behalf of the committee, and I

11   would just note for the record that I will be filing my notice

12   of appearance shortly.

13         So the issues of concern to us, is what appears to be

14   custodian self-collection or self-designation responsive or

15   potentially responsive documents.  And what we learned for the

16   first time on Friday was what the debtors had done to try to

17   search for responsive e-mails relating to our requests.

18         And what they told us in an e-mail, and I'm quoting

19   from them, "Is as to ResCap Company custodians, the custodian

20   selected all e-mails and folders potentially containing

21   responsive documents.  And it indicated something similar with

22   respect to FTI and Centerview as Mr. Kaufman has explained.

23         That approach to us is highly problematic.  These are

24   ResCap witnesses who are central to the matters at issue.  In

25   fact, three of them have been designated as being witnesses

1    that are intended to be called at the hearing.  So they're key

2    people that are involved in the matters at issue, yet they have

3    been asked to segregate, in one way or another, the e-mails

4    that would be responsive to our requests.

5              Various courts have deemed that to be inappropriate

6    including most recently Judge Sheindlin of this district who in

7    a decision of the National Day Labor case, I believe it was

8    July 13th -- I don't have the citation, because I believe it's

9    not published yet -- said that custodians cannot be trusted,

10   that's a quote from decision, to collect their own documents.

11             During our meet and confer process the debtors'

12   counsel seemed to back away from what they've said in the e-

13   mail saying, well, what they were really doing was pointing

14   lawyers to existing folders on an e-mail system.  We asked,

15   well when did these e-mail folders come to be created, and they

16   have not answered that question.  We asked twice, when were the

17   folders created?  All they've said is that there was an

18   instruction to these custodians, at some point in the

19   bankruptcy process, to begin organizing their materials by

20   topic or subject.  I think, although I don't know, in

21   anticipation of discovery responses, and that's problematic

22   because custodians don't understand, necessarily, what's

23   responsive to a litigation request.  If they're self-interested

24   they may decide not to put something embarrassing or sensitive

25   into the right folder or quite simply if they have an e-mail

1  that relates to three topics, and they're choosing which folder

2  to put it into, they may put it in one folder which is not a

3  folder that's been designated for search and collection in

4  respect to our discovery request.

5          So we are troubled by the self-collection or self-

6  selection by custodians rather than the ordinary process, which

7  is gathering the e-mails, review by attorneys, perhaps the use

8  of search terms and keywords.  Rather there's been reliance on

9  the custodians.  And what we've seen in the production that

10  came in last night is, I think, unsurprisingly an under

11  inclusive production.

12          As to Mr. Thompson, for example, there are only forty-

13  two emails; as to Mr. Cancelliere only forty-nine emails;

14  Hamzehpour a hundred and twenty-two.  Very small collections

15  quite possibly because the collection is so limited and focused

16  on what the custodians had deemed to be potentially responsive

17  in the discovery.  So we view that as --

18          THE COURT:  Did I set a deadline for privileged logs?

19          MR. KAUFMAN:  October 10th, Your Honor.

20          MR. BENTLEY:  No, no.

21          MR. KAUFMAN:  Is that not right?

22          MR. BENTLEY:  There's a dual deadline.  They have to

23  produce the initial privileged log October 5; final privileged

24  log on the 8th, with a hearing before Your Honor on the 10th.

25          THE COURT:  Whether they list Hamzehpour, I expect

**RESIDENTIAL CAPITAL, LLC, et al.**                    44

1    they will.  I mean they're going to be privileged e-mails.

2    Anything else, Mr. Schulman?

3            MR. SCHULMAN:  I also have a point to raise on the

4    search terms.  We even asked the debtors to provide us with

5    their list of search terms used for e-mail searches if they

6    were going to use them.  We only got those on Friday afternoon.

7    As I just explained there were no search terms used at all for

8    ResCap custodians.  Instead, those custodians were just asked

9    to point to the relevant e-mails and folders.  We think that's

10   unacceptable.

11           But as to Morrison & Foerster custodians, they used

12   only seven topical search terms and as to board members there

13   are only eleven.  We have a list of fourteen additional

14   terms --

15           THE COURT:  In other cases, what I have directed is

16   that counsel meet and confer and agree on a list of search

17   terms, okay.  What I don't like happening is you propose some,

18   they say it's different and never -- you know, there's no

19   meeting or the minds.  Fine, no meeting of the minds, but then

20   I have resolved issues where there are disputes about the

21   appropriate search terms.  Where there are search terms used

22   for electronic discovery it is not burdensome to add search

23   terms.

24           So that's what I've done in other cases is require --

25   and, you know, and each time I've required it the parties have

RESIDENTIAL CAPITAL, LLC, et al.                                              45

1    agreed on the search terms.  They start out with a

2    disagreement, and they wind up with an agreement, because the

3    last thing either side, any of the sides is going to want to

4    happen is that we get to a hearing, and it turns out that there

5    are relevant documents that have not -- material relevant

6    documents that have not been produced, okay.

7            Anything else, Mr. Schulman?

8            MR. SCHULMAN:  We have a very short list --

9            THE COURT:  I'm sorry.

10           MR. SCHULMAN:  We had a short list of additional terms

11   that we proposed that they apply.

12           THE COURT:  And did you try and resolve the issue?

13           MR. SCHULMAN:  We raised them in our meet and confer

14   and the response was they believe that their search was

15   accurately broad and because they were relying on the use of

16   domain names, exclusively, that they didn't have to run any

17   search terms.  So they didn't even consider the issue.

18           THE COURT:  Mr. Maloney.

19           MR. MALONEY:  Just very briefly.  As I indicated

20   earlier, Your Honor, we served one deposition notice on Mr.

21   Mack, the independent director, and we served one set of

22   limited document requests on Mr. Mack.  We got zero documents,

23   zero.  Apparently, the director saw no documents at all related

24   to this matter and engaged in self --

25           THE COURT:  The same thing.  You know, that's not the

**RESIDENTIAL CAPITAL, LLC, et al.**                                46

1   same thing as saying he saw the document.

2          MR. MALONEY:  No, he may have seen the documents, but,

3   Your Honor, it goes to the same question as --

4          THE COURT:  You're overstating your position, Mr.

5   Maloney.

6          MR. MALONEY:  Right, and I apologize.  But let me cut

7   back to why I stood up besides pointing out we got zero

8   documents.  It's the same story of self-selection by Mr. Mack

9   of what was relevant, as best I can tell from the meet and

10  confer, rather than the lawyer looking to prove his documents.

11  And Rule 26, lawyers have to certify that the production is

12  reasonable.  You can't do this.

13         MR. PRINCI:  Your Honor, we'd be happy to continue to

14  speak to the debtors' counsel about this.  If it requires

15  briefing -- we don't believe that the case cited is the

16  standard, but if it requires briefing we'll brief the issue for

17  the Court.  I'd like my partner Mr. Rains though to address the

18  specific allegations about our document production not being

19  complete or timely.  So, Mr. Rains, if you can address the

20  Court on that please?

21         MR. RAINS:  Thank you, Tommy.  Good morning, Your

22  Honor, I apologize for finding myself stuck on the West Coast

23  today.  Just a couple of quick points.  I'm not sure I captured

24  every criticism, but let me hit the highlights if I can.

25         First, the April 1 cut-off is a date range that we

**RESIDENTIAL CAPITAL, LLC, et al.**                                    47

1   applied for our e-mail searches, and we did it for the simple

2   reason that our review of the documents shows that the

3   negotiations began on April 16, and that's based on documents

4   that the creditors' committee has.  So, based on our review of

5   documents and our confirmation that the negotiations began in

6   April we began our searches on April 1st.

7          Search terms.  Yes, we used domain names for the --

8   well, let me back up.  There are two ways to collect emails for

9   some groups of people including the people at my law firm.  We

10  went to our IT department and actually collected all e-mails in

11  their mailboxes, and as to those people we applied search

12  terms.  The search terms we used for the lawyers in our firm

13  were largely e-mail addresses and domain names, which, as the

14  Court can imagine, are much more inclusive than subject matter

15  search terms.  We searched for all communications to anyone who

16  could have been involved in the settlement process.  That is

17  the search that we ran, adding search terms on subject matter

18  to that would produce subsets, but subsets are the documents

19  we've already produced.

20         As to other people such as consultants, FTI and

21  Centerview, in particular, we did begin by interviewing them

22  and asking them where they stored documents relevant to the

23  settlement process.  As you can imagine, they are involved in

24  many activities for the debtor, most of which have nothing to

25  do with this process.

**RESIDENTIAL CAPITAL, LLC, et al.**                                        48

1    So they were able to tell us all of the locations

2    where they stored documents relevant to the settlement and

3    those are the documents we collected and reviewed for

4    production.

5    Finally, I guess, it's not surprising that not that

6    many documents have been produced.  It's important for us to

7    get our privileged log out starting tomorrow and then next

8    week, because as the Court might imagine the vast majority of

9    communications that people like FTI, or Frank Cancelliere or

10   Centerview had were with Morrison & Foerster helping us

11   negotiate the settlement, and we will, on our privilege log,

12   show that most of those documents are being withheld as work

13   product.

14   I may not have covered all the issues, Judge, but

15   that's what I have here, and I'm happy to respond to any other

16   questions.

17   THE COURT:  Let me -- my questions relate -- let me

18   focus on first on the cutoff for searches, the April 1 date.

19   What I was hearing from other counsel -- Mr. Bentley talked

20   about or Mr. Kaufman talked about -- excuse me, Mr. Kaufman

21   talked about the April 2012 10-Q, discussing put-back claims in

22   the range of zero to four billion dollars.

23   I think that actually -- I don't have in front of me,

24   but it's my recollection that that figure was also used in the

25   Whitlinger first day declaration.  I don't remember the precise

**RESIDENTIAL CAPITAL, LLC, et al.**                                      49

1    date that he was referring to, but why isn't -- why aren't any

2    documents that discuss the debtors' evaluation of put-back

3    claims for, and I'm just hypothetically, just for the sake, it

4    was January 1, 2012.  Why isn't that relevant to the issues

5    before the Court or relevant to discovery for the issues about

6    whether the settlement is a reasonable settlement?  Any

7    nonprivileged evaluations by business people, financial people

8    that the debtors have that placed a range of value or more

9    refined analysis of potential put-back claims before the

10   negotiations get -- you don't begin negotiations until you've

11   done your own assessment of what your potential exposure is.

12   That usually forms the basis for sitting down to negotiate.

13   You don't -- settlement negotiations absent that are of little

14   value.

15          So it would seem to me if you say that settlement

16   negotiations began, I don't know, April 15th or 17th, whatever

17   the day in April it was, I have to believe that there was an

18   internal evaluation that was done to figure out what are these

19   claims -- what do we think they're worth.  What's the potential

20   exposure we have before we sit down?  How do you rely on an 8.7

21   billion dollar figure without knowing what the range of

22   potential exposure is?

23          So that is one big question I have.  It does seem to

24   me that -- and it may be privileged issues -- but putting that

25   aside that the April 1 date does seem arbitrary to me when

RESIDENTIAL CAPITAL, LLC, et al.                           50

1  negotiations began in April.  Go ahead and respond to that, Mr.

2  Rains.

3          MR. RAINS:  Thank you, Your Honor, two quick

4  responses.  The first one is the April 1 beginning of the time

5  period was specifically for e-mail searches having to do with

6  the negotiations.  We certainly have produced documents that

7  analyze potential exposure that were created in exchange prior

8  to that date, and I've seen some that go all the way back to

9  October of 2011.

10          Sadly, my second answer is I don't know the specific

11 question or the specific answer to the question about the April

12 10-Q.  I don't actually remember that specific document coming

13 up in our meet and confers.  If it did, I simply missed its

14 significance.  So as to the April 10-Q calculation I will

15 simply have to go back and check.

16          THE COURT:  And I'm just giving that as an example

17 that the debtor had indicated in the April Q a range of

18 potential liability it faced on put-back claims.  I don't --

19 that's what I understood Mr. Kaufman to be indicating, not that

20 there -- it really goes to -- you know, to come to that

21 evaluation you have to have done work, but what you're saying

22 is that the April 1 date was only limited as to settlement

23 negotiations.  Do I understand that --

24          MR. RAINS:  Yes, that's the cutoff we used for the e-

25 mail searches.  It was not necessarily a date range we apply to

**RESIDENTIAL CAPITAL, LLC, et al.**                                    51

1  other types of documents such as spreadsheets.  And, again, as

2  I say there were preliminary exchanges of lost rates and data

3  rates, you know, characteristics of the portfolio with the

4  institutional investors that goes back all the way to October

5  of 2011 and those documents we have all turned over.

6          THE COURT:  Let me ask you this.  Were the debtors

7  requested to produce all communications -- all e-mail

8  communications within and among the debtors and AFI relating to

9  potential liability on put-back claims?  Because the discovery

10  requests are broader than just this -- we've had a lot of focus

11  on settlement negotiations, but that doesn't confine the limit

12  of what I understood the discovery to be.  The major dispute

13  was, were they entitled to discovery about the settlement

14  negotiations.

15          Mr. Princi makes the point, which I think ultimately

16  is, if not determined, it was certainly the most important

17  issue, is whether the 8.7 billion dollars is above the

18  lowest -- you know, is it in range of reasonableness of the

19  settlement.

20          To get there you have to evaluate what was the

21  debtors' assessment of its exposure and how did it, you know,

22  wind up at the 8.7 billion, and if there were, for example, e-

23  mails internally either just among the debtors or among the

24  debtors and AFI, for example, that dealt with the issue of

25  potential put-back liability, have those been produced.  I mean

1  was the April 1 -- is the April 1 date only used specifically

2  with respect to settlement negotiations, but an earlier date

3  was used with respect to any and all communications, e-mail or

4  otherwise, that, you know, related to the issues of the

5  potential liabilities.  Can you answer that, Mr. Rains?

6          MR. RAINS:  Yes, thank you, Your Honor.  Again, the e-

7  mail searches were limited to settlement negotiations per se,

8  they were searches of various custodians -- you know, it was

9  largely settlement negotiations, but other topics as well.  And

10  for those communications we did use the April 1 beginning date.

11          I hear loud and clear the Court's comments, and it

12  makes sense to me that if there were earlier negotiations --

13  or, excuse me, earlier estimations of potential liabilities

14  that that's something that we should focus on.  I have to say,

15  again, I don't feel like I have all the facts at my fingertips,

16  and I don't believe this was a topic at our meet and confer

17  session, so maybe echoing what Mr. Princi said a little

18  earlier, perhaps the best thing for us to do is to continue our

19  conversations on this issue with the various creditors, and

20  I'll go back and make sure I understand exactly what we might

21  have relating to calculations of potential exposure.

22          MR. PRINCI:  Your Honor, we should produce -- we agree

23  with the Court.  We should produce any e-mails that are not

24  privileged within a reasonable timeframe, which is where I need

25  the guidance from the Court, even if they weren't settlement

**RESIDENTIAL CAPITAL, LLC, et al.**                                             53

1   negotiations.   They go to the question of the validity of what

2   is the exposure that these debtors have, then we agree with the

3   Court on those --

4           THE COURT:  What you put in a Q, I assume, is you set

5   up a reserve, okay, or you indicate in the footnotes what the

6   potential exposure is.

7           MR. PRINCI:  But that's Ally.  Judge, that's Ally,

8   that's not the ResCap entities, right?

9           THE COURT:  But there has to be --

10          MR. PRINCI:  Understood, we'll get --

11          THE COURT:  AFI doesn't put in the footnote in a Q

12  without -- where it's ResCap's liability.  There's got to be

13  communication between AFI and the debtors before they stick a

14  number in a Q.

15          MR. PRINCI:  Judge, as I think has already been

16  revealed the ResCap entities did not see eye-to-eye with Ally

17  on this.  So the fact of the matter is that is Ally's business,

18  but the point is about discovery.  That is an admission that

19  should be done.

20          THE COURT:  Right.  I do want the parties to continue

21  to meet and confer.  There appears to be agreement that a

22  search of e-mails needs to be made for a period before April 1.

23  The issue I see is for what period of time?  It doesn't go back

24  to the beginning of time.  For purposes of this hearing, it

25  does seem to me you ought to be able to agree on, and it's all

**RESIDENTIAL CAPITAL, LLC, et al.**                    54

1   in the eyes of the beholder, but a reasonable time period --

2          MR. PRINCI:  Any thoughts on that?

3          THE COURT:  I'm going to hold my fire on that, okay.

4   It needs to be the subject of a meet and confer and hopefully

5   you will be able to come to an agreement about what time period

6   should be covered by it.

7          All right, let me hear from Mr. Schulman with respect

8   to -- you know, Mr. Rains talked about that rather than using

9   search terms they used domain names and that is a broader

10  search, and that using search terms would be a subset of that.

11         MR. SCHULMAN:  I would disagree.

12         THE COURT:  You disagree?

13         MR. SCHULMAN:  I do, because those domain names are

14  external domain names.  And so by only including in the review

15  e-mails to and from those domain names you've left out a lot of

16  data including internal e-mails that may be responsive to our

17  requests, draft e-mails that were never sent to any domain

18  name, e-mails that include typos in the address, or e-mails

19  that are sent to personal or alternative e-mail accounts that

20  aren't necessarily anticipated.  That happens all the time when

21  I experience somebody uses a personal account over the weekend

22  for convenience, they're at home, send it to my Gmail account.

23         So I don't believe that the limit of discovery should

24  be focused on names.

25         THE COURT:  Mr. Rains, you want to respond to that?

1      MR. RAINS:  Yes.  So Mr. Schulman said we used seven

2   search terms when in fact we used over fifty.  We captured

3   massive numbers of e-mails to all, you know, people who were

4   involved in the settlement process.  I guess I'm not

5   appreciating the possibility -- well, all I can say is that the

6   quantity of documents that we captured is massive.  We captured

7   all the e-mails communicated outside of our firm.

8      Now, what I hear Mr. Schulman really saying is we

9   didn't capture internal e-mails, and we have been quite candid

10  and frank in telling everyone that we will assert work product

11  as to our internal e-mails that are related to the settlement

12  process if they never went outside of the firm.

13      So if that is the issue, I think we'll save that for

14  our attorney client privileged hearing which is on calendar for

15  October 10th.

16      THE COURT:  Okay.  All right.

17      MR. SCHULMAN:  Your Honor, can I briefly respond?

18      THE COURT:  Very quickly.

19      MR. SCHULMAN:  There are seven search terms that are

20  substantive for topical nature.  All the other search terms are

21  the domain names and e-mail addresses of --

22      THE COURT:  How long is your list of search terms?

23      MR. SCHULMAN:  We have an additional fourteen terms.

24      THE COURT:  Did you in a meet and confer come to an

25  agreement about a list of search terms?

**RESIDENTIAL CAPITAL, LLC, et al.**                    56

1          MR. SCHULMAN:  We have not reached an agreement, no.

2          THE COURT:  Did you try that though?

3          MR. SCHULMAN:  Most recently, yes.

4          THE COURT:  Okay.  All right, I am directing the

5   parties to meet and confer again, quickly, to reach an

6   agreement on search terms.  To the extent that you can't reach

7   an agreement on the search terms send the competing list of

8   search terms to my chambers, and I'll resolve -- you ought to

9   be able to resolve this, okay.  This is electronic discovery.

10  It is not a substantial burden to add search terms when

11  electronic searches are being made.

12          Let me make -- because we're going to bring this to an

13  end, but I want to speak more directly to what Mr. Bentley or

14  Kaufman first described as the custodian self-selection of

15  documents.

16          My view of the law, and I'm not making a ruling as I

17  will explain, but my view of the law is that there is -- well,

18  there certainly is an affirmative obligation of counsel to

19  certify the reasonableness of the search for documents that's

20  been made.  I haven't read the recent decision by Judge

21  Sheindlin that has been referred to.  It's been a while since

22  I've read -- I don't how many Zubulake opinions there are, it's

23  up to five or something like that, there are lot.  I've read

24  every one of them.

25          So my view of the law is this.  There is no

**RESIDENTIAL CAPITAL, LLC, et al.**                                                57

1  affirmative obligation on counsel to conduct a search.

2  However, counsel is responsible.  I really take that as the

3  Zubulake teaching in other cases as well, that counsel

4  ultimately is responsible to assure that a full, you know,

5  complete search for responsive documents has been made, that

6  counsel can't rely solely on the assurances of employees of its

7  client that a thorough search was made, that all responsive

8  documents have been produced.

9          So if it ever came to pass that relevant material

10  documents had not been produced by the debtors or listed in the

11  privileged log, the Court will hold the debtors' counsel

12  directly responsible for any shortcomings, including imposing

13  appropriate sanctions as the circumstances might dictate.

14          In a case of this magnitude and the volume of

15  discovery that's being conducted on an expedited basis it is

16  not unreasonable, in the Court's view, in the first instance,

17  to rely on what you refer to as custodian self-selection

18  documents that ordinarily would be followed up with interviews

19  and an effort to assure counsel that a full thorough search has

20  been made and that no responsive documents have been withheld.

21          So I'm not going to require anything more than that to

22  happen, but the consequences of getting it screwed up can be

23  draconian.  I mean the rules -- I know I've written at least

24  one decision imposing sanctions, and preclusion orders and

25  things of that nature, finding facts of things that can arise

1    in the rules, but I'm also not going to be shy about deciding

2    whether counsel sort of dropped the ball by not adequately

3    pursuing.  But I'm not satisfied, Mr. Kaufman, that you've

4    established any cause for me to enter any orders requiring the

5    debtors to do anything other than what they're doing.

6          You got a lot of depositions that are going on.  If

7    you want to take a 30(b)(6) deposition of custodians.  If you

8    think that there's a complete lack of production of documents

9    by particular people, take a 30(b)(6) and if it turns out that

10   there wasn't a suitable search made, you're going to have one

11   really mad judge, I'll tell you that, Mr. Princi, or Mr. Rains,

12   or whoever in your shop is responsible for that.

13         I'm not encouraging -- you got enough depositions

14   scheduled, but look if you think there are particular witnesses

15   whose documents exist and haven't been produced take a

16   30(b)(6).

17         MR. KAUFMAN:  Thank you, Your Honor.

18         THE COURT:  Okay.  All right.  I want to have --

19   you're on the calendar for October 10th.  We have a pretty long

20   docket.  At the end of everything else on the schedule I want

21   an update on where you are on these discovery disputes.  So

22   when I order that you continue to meet and confer and see

23   whether you can agree about an earlier than the April 1 date,

24   and agree on search terms, et cetera.  I know that there are

25   people who observe Monday and Tuesday as a holiday, so

**RESIDENTIAL CAPITAL, LLC, et al.**                                      59

1   Wednesday we've got a hearing in ResCap.  At the end of that

2   calendar we'll put on -- and I'm sure somebody will remind me

3   if I've forgotten -- a continued status conference on discovery

4   issues.

5           Anything else anybody wants to raise today?

6           MR. BENTLEY:  No, thank you, Your Honor.

7           THE COURT:  Thank you, Mr. Bentley.  Go ahead.

8           MR. PRINCI:  I think this is clear, but just for the

9   avoidance of doubt, the guidelines that the Court directed with

10  respect to hours of depositions, et cetera, et cetera, that

11  applies collectively to the group of perspective objectors, as

12  I understood the Court.

13          THE COURT:  It sure does.

14          MR. PRINCI:  Okay.

15          THE COURT:  When I say that the depositions are

16  limited to four hours, the objectors better get their act

17  together and agree on -- it's the aggregate amount.

18          MR. PRINCI:  That's what we understood.

19          THE COURT:  I hope everybody understands that.

20          MR. PRINCI:  Thank you, Your Honor.

21          THE COURT:  All right, anything else?  If not we're

22  adjourned.

23          MR. BENTLEY:  Thank you, Your Honor.

24       (Whereupon these proceedings were concluded at 12:41 PM)

25

60

C E R T I F I C A T I O N

I, Esther Accardi, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

ESTHER ACCARDI (CET**D 485)

AAERT Certified Electronic Transcriber


eScribers

700 West 192nd Street, Suite #607

New York, NY 10040


Date:  October 5, 2012

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

October 4, 2012

## A

**able (6)**
15:18;33:19;48:1;
53:25;54:5;56:9
**above (1)**
51:17
**absent (1)**
49:13
**accelerated (2)**
19:6;20:13
**accept (2)**
9:21,25
**account (2)**
54:21,22
**accounts (1)**
54:19
**accurately (1)**
45:15
**across (1)**
37:1
**act (2)**
38:2;59:16
**activities (1)**
47:24
**actual (1)**
26:24
**actually (7)**
15:22;18:15;26:14;
29:7;47:10;48:23;
50:12
**add (3)**
37:15;44:22;56:10
**adding (1)**
47:17
**addition (3)**
12:12;34:4;40:6
**additional (5)**
23:6;29:9;44:13;
45:10;55:23
**address (11)**
7:11,17;12:21;
21:14;23:20;24:6;
30:15;40:5;46:17,19;
54:18
**addressed (1)**
24:7
**addresses (2)**
47:13;55:21
**addressing (3)**
10:20;11:6;35:24
**adequately (1)**
58:2
**adjourned (1)**
59:22
**admission (1)**
53:18
**advance (2)**
35:14;36:3
**advise (2)**
35:10;37:24
**advised (2)**

## 12:12;26:14

**affidavits (1)**
23:10
**affirmative (3)**
18:7;56:18;57:1
**AFI (4)**
51:8;24;53:11,13
**afternoon (1)**
44:6
**again (8)**
7:8;9:18;19:19;
21:21;51:1;52:6,15;
56:5
**against (1)**
10:12;34:8
**aggregate (3)**
14:13;37:2;59:17
**agree (13)**
9:16;10:11;25:13;
33:6,9,20;44:16;
52:22;53:2,25;58:23,
24;59:17
**agreed (1)**
45:1
**agreement (8)**
10:8;45:2;53:21;
54:5;55:25;56:1,6,7
**agreements (1)**
27:14
**ahead (6)**
16:25;18:11;26:9;
38:9;50:1;59:7
**allegations (1)**
46:18
**allocation (1)**
40:14
**allow (2)**
21:11;39:23
**allowed (2)**
40:1,8
**allowing (2)**
36:6;37:1
**Ally (5)**
39:4;41:3;53:7,7,
16
**Ally's (2)**
39:2;53:17
**almost (2)**
27:14,18
**along (1)**
10:21
**alternative (1)**
54:19
**although (3)**
12:13;27:25;42:20
**Alto (1)**
6:25
**amendments (1)**
8:1
**Americas (1)**
4:4
**among (7)**
12:19;37:7,10,11;

## 51:8,23,23

**amount (4)**
15:15;17:25;27:19;
59:17
**analyses (4)**
27:21;39:8;40:10,
12
**analysis (7)**
15:3,14;17:8;
38:23;39:4,5;49:9
**analyze (2)**
18:1;50:7
**Angeles (1)**
4:15
**answered (1)**
42:16
**Anthony (1)**
6:8
**anticipated (1)**
54:20
**anticipation (1)**
42:21
**apologize (4)**
13:24;30:2;46:6,22
**Apparently (1)**
45:23
**appear (1)**
17:2
**appearance (3)**
6:4,14;41:12
**appearances (1)**
6:3
**appears (5)**
13:5;27:4,12;
41:13;53:21
**application (1)**
7:14
**applied (2)**
47:1,11
**applies (2)**
40:2;59:11
**apply (3)**
26:5;45:11;50:25
**appreciate (3)**
21:5;38:2,3
**appreciating (1)**
55:5
**approach (1)**
41:23
**appropriate (7)**
25:17,22;26:2;
30:18,21;44:21;
57:13
**appropriately (1)**
17:19
**approval (1)**
21:2
**approved (1)**
10:2
**April (24)**
38:17;39:2,7,14;
46:25;47:3,6,6;48:18,
21;49:16,17,25;50:1,

## 4,11,14,17,22;52:1,1, 10;53:22;58:23

**arbitrary (1)**
49:25
**argue (2)**
13:22;30:17
**arguing (2)**
10:1;13:20
**arguments (2)**
7:22;13:24
**arise (1)**
57:25
**arm's (2)**
21:1,22
**arrangement (1)**
37:4
**aside (2)**
29:2;49:25
**assert (1)**
55:10
**assessment (2)**
49:11;51:21
**assimilate (1)**
8:20
**assume (3)**
31:12;36:15;53:4
**assurances (1)**
57:6
**assure (2)**
57:4,19
**attempt (2)**
21:8;29:11
**attempting (2)**
9:6;21:9
**attention (1)**
25:1
**Attorney (2)**
4:13;55:14
**Attorneys (3)**
4:3;5:3;43:7
**Avenue (1)**
4:4
**averted (1)**
22:5
**avoidance (1)**
59:9
**away (2)**
35:22;42:12

## B

**back (15)**
7:23;21:10,14;
31:8;37:20,25;38:6;
42:12;46:7;47:8;
50:8,15;51:4;52:20;
53:23
**backdrop (1)**
7:20
**bad (1)**
31:12
**BAGBY (16)**
5:7;18:12,12,20,22,

## 25;19:2,4,6,15,19,25; 20:2,7,11,16

**balancing (1)**
38:2
**ball (1)**
58:2
**bankruptcy (2)**
21:25;42:19
**Based (4)**
7:22;27:21;47:3,4
**basically (3)**
17:13;19:11;39:24
**basis (3)**
24:16;49:12;57:17
**battle (1)**
22:4
**beg (1)**
34:25
**began (5)**
47:3,5,6;49:16;
50:1
**begin (4)**
41:8;42:19;47:21;
49:10
**beginning (3)**
50:4;52:10;53:24
**behalf (3)**
6:9,15;41:10
**beholder (1)**
54:1
**BENTLEY (36)**
4:7;6:10,11;7:10;
10:18,19;14:5,9,11,
12,17,20,22;16:9;
17:4;26:1;31:23,25;
32:6,14;35:18,21;
36:12,18;37:6,10,12;
38:9,10;43:20,22;
48:19;56:13;59:6,7,
23
**Bentley's (1)**
17:12
**Berkeley (1)**
8:23
**besides (1)**
46:7
**besieged (1)**
8:9
**best (8)**
15:16;28:4,10,13,
16,17;46:9;52:18
**better (2)**
24:13;59:16
**beyond (1)**
26:13
**big (4)**
28:21;34:14;38:24;
49:23
**billion (12)**
9:8;17:20,20,21;
32:20,21;34:17;39:1;
48:22;49:21;51:17,
22

12-12020-mg Doc 1756 Filed 10/05/12 Entered 10/09/12 11:24:37 Main Document
Pg 62 of 72

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

October 4, 2012

**bit (1)**
35:25
**blank (1)**
20:25
**board (14)**
28:23;29:13,16,20,
20,21,22;30:4,5,5,7,
16;37:1;44:12
**BOCKIUS (1)**
5:11
**both (3)**
9:20;22:6;38:23
**Brad (1)**
24:16
**breaks (1)**
36:15
**BRENDAN (4)**
4:9;6:12;10:22;
41:9
**BRG (1)**
17:11
**brief (1)**
46:16
**briefing (2)**
46:15,16
**briefly (5)**
20:18;35:19,20;
45:19;55:17
**briefs (1)**
22:7
**bring (1)**
56:12
**broad (1)**
45:15
**broader (2)**
51:10;54:9
**brought (2)**
7:13;40:15
**Bruns (2)**
6:18;20:19
**burden (2)**
38:10;56:10
**burdens (1)**
34:13
**burdensome (1)**
44:22
**business (5)**
8:15,19;31:21;
49:7;53:17

**C**

**CA (1)**
4:15
**CADWALADER (2)**
5:2;18:13
**calculation (1)**
50:14
**calculations (1)**
52:21
**calendar (5)**
37:17,21;55:14;
58:19;59:2

**call (12)**
7:5;12:14,16,17;
14:16;23:13,14,14;
24:10;30:15,15;
33:14
**called (3)**
7:2;9:10;42:1
**calling (6)**
7:6;13:13;19:14;
24:15;25:20,23
**calls (1)**
8:3
**came (3)**
22:2;43:10;57:9
**can (21)**
18:8;24:18;26:24;
30:5,12,13,17;31:6;
36:2;37:7;46:9,19,
24;47:14,23;52:5;
55:5,17;57:22,25;
58:23
**Cancelliere (4)**
12:8;28:1;43:13;
48:9
**candid (1)**
55:9
**Capital (1)**
6:2
**capture (1)**
55:9
**captured (4)**
46:23;55:2,6,6
**care (2)**
17:18,20
**case (5)**
21:20;40:15;42:7;
46:15;57:14
**cases (4)**
26:6;44:15,24;57:3
**categories (1)**
41:6
**cause (1)**
58:4
**Center (1)**
5:4
**Centerview (10)**
40:7,10,12,20,22,
25;41:4,22;47:21;
48:10
**central (2)**
9:7;41:24
**certain (8)**
7:14,25;10:25;
15:13;28:5,9,11,14
**certainly (6)**
15:25;27:14,18;
50:6;51:16;56:18
**certify (2)**
46:11;56:19
**cetera (5)**
23:16;29:2;58:24;
59:10,10
**chambers (1)**

56:8
**characteristics (1)**
51:3
**characterizations (1)**
13:1
**characterize (1)**
13:19
**characterized (1)**
12:23
**check (1)**
50:15
**chided (1)**
32:18
**choices (1)**
35:13
**choosing (1)**
43:1
**Chopra (1)**
12:9
**chore (1)**
24:25
**circumstances (1)**
57:13
**citation (1)**
42:8
**cited (2)**
22:1;46:15
**claim (2)**
10:12;39:17
**claims (9)**
34:15;39:10;40:13;
48:21;49:3,9,19;
50:18;51:9
**clarification (2)**
36:14;37:6
**clarified (1)**
18:17
**clarify (1)**
18:15
**classically (1)**
30:21
**clear (3)**
21:9;52:11;59:8
**clearly (1)**
12:10
**client (2)**
55:14;57:7
**clients (1)**
37:18
**Coast (1)**
46:22
**collateral (1)**
20:8
**colleague (2)**
6:12;39:23
**colleagues (1)**
36:21
**collect (2)**
42:10;47:8
**collected (2)**
47:10;48:3
**collection (2)**
43:3,15

**collections (1)**
43:14
**collectively (2)**
36:6;59:11
**collusion (1)**
22:18
**collusive (1)**
22:23
**coming (1)**
50:12
**comments (1)**
52:11
**commit (1)**
16:7
**Committee (21)**
4:3;6:11;7:10,18;
8:13,14,16;10:19;
14:13;15:10,10;16:2;
18:8,22;20:19;22:4;
26:1;31:22;36:22;
41:10;47:4
**committee's (1)**
24:6
**communicated (2)**
39:3;55:7
**communication (1)**
53:13
**communications (12)**
8:9;38:22;39:9,18;
41:2,3;47:15;48:9;
51:7,8;52:3,10
**Company (1)**
41:19
**competing (1)**
56:7
**complete (3)**
46:19;57:5;58:8
**completed (2)**
11:4,4
**completely (2)**
25:22;28:8
**components (1)**
15:2
**concern (1)**
41:13
**concerned (2)**
21:6,7
**conclude (3)**
15:21,21;33:13
**concluded (1)**
59:24
**conclusions (1)**
31:15
**conduct (1)**
57:1
**conducted (2)**
8:15;57:15
**confer (12)**
11:21;24:18;42:11;
44:16;45:13;46:10;
52:16;53:21;54:4;
55:24;56:5;58:22
**conference (1)**

59:3
**confers (1)**
50:13
**confine (1)**
51:11
**confirmation (1)**
47:5
**confusion (2)**
33:25;34:6
**consequences (1)**
57:22
**Consider (2)**
8:21;45:17
**consist (1)**
25:8
**consolidation (1)**
24:8
**constituents (1)**
40:22
**consult (2)**
37:18,24
**consultants (1)**
47:20
**contain (1)**
19:10
**containing (1)**
41:20
**contest (2)**
16:16;29:11
**context (1)**
22:19
**continue (5)**
30:24;46:13;52:18;
53:20;58:22
**continued (2)**
19:20;59:3
**convenience (1)**
54:22
**conversations (1)**
52:19
**coordinate (3)**
9:12;24:2;36:9
**coordinating (1)**
18:22
**Cornell (2)**
14:24,24
**Cornell's (2)**
15:3;24:16
**corrected (1)**
30:4
**counsel (18)**
6:3;10:22;20:17,
19;26:14;39:16;
42:12;44:16;46:14;
48:19;56:18;57:1,2,3,
6,11,19;58:2
**count (1)**
15:8
**counter- (1)**
38:4
**counterparty (1)**
7:19
**counting (2)**

32:7,8
**couple (2)**
20:21;46:23
**course (2)**
19:25;41:8
**COURT (181)**
6:2,6,14,19,21;7:1,
3,5,6,7,14,15,16,21,
23,25;9:2,3,14,24;
10:17;11:1,18,23,25;
12:18,24;13:1,4,8,10,
11,16,19,22;14:7,11,
12,16,19,21;15:17;
16:8,10,13,17,19,22,
25;17:9,16;18:5,10,
19,21,24;19:1,3,5,13,
18,22;20:1,5,10,15,
17;21:1,3,11,16,18,
25;22:2,3,6,9,12,14,
18,21;23:1,4,6,22;
24:10;25:4,10,12;
26:9,12,19,23;27:1,9;
28:11,14;29:3,8,15,
24;30:1,18;31:10,22;
32:2,12;33:3,8,12,22;
34:2,4,24;35:1,3,6,
20;36:1,16,20;37:9,
11,13,15,20,23,25;
38:1,7,8,11,14,19,21;
39:6,16,24;40:3,18;
43:18,25;44:15;45:9,
12,18,25;46:4,17,20;
47:14;48:8,17;49:5;
50:16;51:6;52:23,25;
53:3,4,9,11,20;54:3,
12,25;55:16,18,22,
24;56:2,4;57:11;
58:18;59:7,9,12,13,
15,19,21
**courtroom (2)**
7:5;16:24
**Courts (2)**
21:22;42:5
**Court's (5)**
9:5;37:17,21;
52:11;57:16
**covered (2)**
48:14;54:6
**created (3)**
42:15,17;50:7
**creditors (1)**
52:19
**Creditors' (3)**
4:3;6:11;47:4
**critical (1)**
27:12
**criticism (1)**
46:24
**cross (1)**
23:16
**cross-examining (1)**
23:11
**cruncher (1)**

24:16
**custodian (5)**
39:22;41:14,19;
56:14;57:17
**custodians (12)**
41:19;42:9,18,22;
43:6,9,16;44:8,8,11;
52:8;58:7
**customary (1)**
24:21
**cut (2)**
24:13;46:6
**cutoff (2)**
48:18;50:24
**cut-off (1)**
46:25

## D

**Darryl (1)**
6:24
**data (2)**
51:2;54:16
**date (14)**
7:23;19:7;38:1;
46:25;48:18;49:1,25;
50:8,22,25;52:1,2,10;
58:23
**dates (1)**
37:20
**DAY (12)**
4:12;19:7,8;26:17,
22;27:3;28:4,20;
40:9;42:7;48:25;
49:17
**days (5)**
8:15,19;23:8;25:2;
31:21
**deadline (6)**
15:11,12,19;16:1;
43:18,22
**deal (7)**
17:25;18:8,10;
29:18;30:25;31:1;
38:24
**deals (1)**
18:8
**dealt (1)**
51:24
**debtor (6)**
21:10;23:11;32:2;
35:21;47:24;50:17
**debtors (32)**
6:9;8:9,18;12:4,12;
13:13,18;15:8;18:17;
19:8,15;27:22;28:18;
31:6,25;32:13;37:3;
38:16;39:1,10;41:3,
16;44:4;49:8;51:6,8,
23,24;53:2,13;57:10;
58:5
**debtors' (13)**
7:14;11:3;26:14;

36:11,19;38:25;39:3,
16;42:11;46:14;49:2;
51:21;57:11
**decide (4)**
15:18;24:1;36:21;
42:24
**decided (2)**
22:17;32:23
**deciding (2)**
30:19;58:1
**decision (8)**
18:18;25:20;29:14;
32:17;42:7,10;56:20;
57:24
**declaration (1)**
48:25
**declarations (1)**
33:11
**deemed (2)**
42:5;43:16
**defeat (1)**
37:18
**deficiencies (1)**
11:3
**deficient (1)**
11:5
**definite (1)**
12:13
**deluge (2)**
11:13;21:10
**department (1)**
47:10
**depo (1)**
35:11
**depos (3)**
35:8,9,9
**depose (4)**
11:19;12:15;21:24;
22:7
**deposed (2)**
12:10;25:17
**deposing (1)**
20:23
**deposition (14)**
8:10,12;12:11;
16:15;26:22;27:3,14,
17;31:3;35:7,12;
36:20;45:20;58:7
**depositions (39)**
8:4,8,14,15,22,22;
11:13,15;12:22;13:6,
7;21:4;23:7,13;
25:23,25;26:2,7,15,
17,19,20;27:9;28:9,
17;29:1,12;31:21;
34:9,23;35:16;36:10,
19;39:25;41:8;58:6,
13;59:10,15
**deputy (1)**
7:5
**described (1)**
56:14
**description (1)**

30:13
**designated (12)**
8:17;9:19;14:17;
19:4;31:19;32:21;
33:3;34:7;37:3,8;
41:25;43:3
**designating (2)**
8:23;19:12
**designation (3)**
8:23;9:17;30:25
**designations (1)**
19:8
**desire (1)**
17:24
**determine (1)**
30:13
**determined (2)**
15:13;51:16
**Devine (3)**
27:4,7,12
**Devine's (1)**
27:3
**dictate (1)**
57:13
**different (3)**
17:12;24:6;44:18
**differently (1)**
36:24
**difficult (1)**
13:18
**dilution (1)**
17:20
**direct (5)**
12:16;14:1;23:10,
16;28:2
**directed (2)**
44:15;59:9
**directing (2)**
27:6;56:4
**directly (2)**
56:13;57:12
**director (2)**
45:21,23
**directors (5)**
16:15;26:15,16;
28:19;35:5
**disagree (2)**
54:11,12
**disagreement (1)**
45:2
**disarm (2)**
18:2;20:13
**discoverable (1)**
23:3
**discovery (28)**
7:12,15,16,22;8:4,
5,5;10:21,23;13:2;
19:20;21:11,13;23:6;
42:21;43:4,17;44:22;
49:5;51:9,12,13;
53:18;54:23;56:9;
57:15;58:21;59:3
**discuss (1)**

49:2
**discussing (2)**
10:22;48:21
**disproportionate (1)**
9:5
**dispute (2)**
13:5;51:12
**disputes (5)**
7:15,17;13:4;
44:20;58:21
**district (1)**
42:6
**divide (2)**
36:2,23
**docket (1)**
58:20
**document (8)**
11:3;38:12;40:2,
23;45:22;46:1,18;
50:12
**documented (1)**
32:25
**documents (51)**
8:8;27:4,7,10,11;
28:7;38:17,18;39:13,
18,23;40:1,9,16,22,
24;41:4,7,15,21;
42:10;45:5,6,22,23;
46:2,8,10;47:2,3,5,
18,22;48:2,3,6,12;
49:2;50:6;51:1,5;
55:6;56:15,19;57:5,8,
10,18,20;58:8,15
**dog (1)**
16:11
**dollar (1)**
9:8;32:20,21;49:21
**dollars (2)**
48:22;51:17
**domain (9)**
45:16;47:7,13;
54:9,13,14,15,17;
55:21
**don't (1)**
17:22
**done (11)**
15:4;16:24;17:8;
24:17,23;41:16;
44:24;49:11,18;
50:21;53:19
**doubt (1)**
59:9
**down (7)**
8:11;19:19;25:12;
33:4;34:1;49:12,20
**draconian (1)**
57:23
**draft (1)**
54:17
**draw (1)**
31:14
**drawn (1)**
10:5

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

October 4, 2012

**dropped (1)**
58:2
**dual (1)**
43:22
**due (2)**
8:17;19:8
**duplicate (1)**
15:25
**duplication (3)**
12:19;34:14;36:9
**duplicative (3)**
24:12;28:25;33:13
**During (1)**
42:11

**E**

**e- (4)**
42:12;50:24;51:22;
52:6
**earlier (7)**
18:15;45:20;52:2,
12,13,18;58:23
**early (1)**
32:18
**echo (1)**
20:11
**echoing (1)**
52:17
**ECKSTEIN (1)**
5:12
**e-discovery (1)**
10:21
**effect (4)**
30:9,10;31:5;35:23
**effort (2)**
31:13;57:19
**efforts (2)**
34:14;38:4
**eight (3)**
10:7;17:21;32:3
**either (5)**
13:10;14:1;40:7;
45:3;51:23
**electronic (3)**
44:22;56:9,11
**elements (1)**
15:2
**eleven (22)**
8:15;11:20;12:1,
18;13:7,10,16,25;
16:18,20,21;18:24;
25:6,24;26:10;33:20;
34:1,2;35:2,3,7;44:13
**else (12)**
6:14;16:22;17:23;
18:5;20:10;25:4;
37:15;44:2;45:7;
58:20;59:5,21
**e-mail (15)**
40:9,11,14;41:18;
42:14,15,25;44:5;
47:1,13;50:5;51:7;

**emails (3)**
43:13,13;47:8
**e-mails (18)**
41:17,20;42:3;
43:7;44:1,9;47:10;
52:23;53:22;54:15,
16,17,18,18;55:3,7,9,
11
**embark (1)**
32:19
**embarrassing (1)**
42:24
**employees (2)**
28:2;57:6
**encouraging (1)**
58:13
**end (3)**
56:13;58:20;59:1
**ends (2)**
8:5,5
**engaged (1)**
45:24
**engaging (1)**
38:2
**engineer (1)**
27:5
**enough (2)**
23:12;58:13
**enter (1)**
58:4
**entered (1)**
8:1
**entire (1)**
27:13
**entities (2)**
53:8,16
**entitled (2)**
24:20;51:13
**ESQ (7)**
4:7,8,9,17;5:7,11,
12
**essence (1)**
8:9
**essentially (1)**
17:11
**established (1)**
58:4
**estate (5)**
9:9,22;10:5,12;
29:20
**estimate (1)**
39:2
**estimated (3)**
14:23,25;39:1
**estimations (1)**
52:13
**et (5)**
23:16;29:2;58:24;
59:10,10
**evaluate (1)**
51:20
**evaluation (4)**

52:3;54:19;55:21
**evaluations (2)**
39:8;49:7
**Even (6)**
8:11;11:16;21:23;
44:4;45:17;52:25
**everybody (3)**
23:11;24:25;59:19
**everyone (2)**
35:11;55:10
**evidence (2)**
23:4;34:11
**evidentiary (1)**
34:16
**exactly (2)**
17:4;52:20
**examination (1)**
22:23
**examine (1)**
27:11
**example (7)**
30:14;32:16;36:22;
43:12;50:16;51:22,
24
**exceed (5)**
35:8,9,10,17;36:25
**excessive (2)**
20:25;21:13
**exchange (1)**
50:7
**exchanges (1)**
51:2
**exclude (1)**
30:20
**exclusive (1)**
36:15
**exclusively (1)**
45:16
**excuse (5)**
6:25;14:20;38:20;
48:20;52:13
**exhaust (1)**
23:5
**exhaustive (1)**
22:23
**exist (1)**
58:15
**existing (1)**
42:14
**expect (2)**
19:13;43:25
**expedited (1)**
57:15
**experience (1)**
54:21
**expert (37)**
8:4,5,20;10:23;
14:5,9,14,17,22,23;
15:1,11,14;16:1,3,5,
12;17:13;19:12;24:7,
14,15,15,20,22,23;
30:18,22;31:1;32:22;

**experts (46)**
8:17,17,21;9:11,
19;12:15;14:16;15:5,
21;16:9;17:7,9,10,12,
24;18:14;19:2,3,4,5,
13,16,23;21:16;
23:20;24:3,5,6,11;
30:11,12;31:18,19,
22;32:7;35:15,15,21,
24,25;36:4,11,19,21,
22;37:8
**experts' (1)**
33:8
**explain (2)**
39:24;56:17
**explained (2)**
41:22;44:7
**exposure (8)**
49:11,20,22;50:7;
51:21;52:21;53:2,6
**extent (4)**
25:15,18;29:3;56:6
**external (1)**
54:14
**extra (1)**
17:24
**eyes (1)**
54:1
**eye-to-eye (1)**
53:16

**F**

**faced (1)**
50:18
**fact (42)**
8:4,4,14,14;9:24;
10:21;11:15,15,18,
20,25;12:14,15,16;
13:7,14;15:20;16:13;
18:19,20,23;19:7;
22:1;27:22;31:17;
32:25;33:19,23;34:2,
7,8,22,24;35:1,3,7,
13;38:17;39:25;
41:25;53:17;55:2
**factor (1)**
22:21
**facts (5)**
11:14;24:19;30:16;
52:15;57:25
**failure (1)**
39:12
**fair (4)**
9:13;22:20,22;34:6
**faith (2)**
10:14;31:12
**fall (1)**
28:24
**falls (1)**
34:17

**far (6)**
17:7,25;27:4,21;
30:11;35:22
**fascinating (1)**
22:12
**feel (1)**
52:15
**few (2)**
18:7;38:11
**FGIC (12)**
4:13;7:18;8:16;
9:20;16:23;17:4,18;
30:14;32:3,8,23;
40:21
**FGIC's (1)**
8:23
**fifty (1)**
55:2
**fight (1)**
16:12
**figure (7)**
24:14,24;36:1;
37:1;48:24;49:18,21
**filed (2)**
19:9;22:7
**files (1)**
15:4
**filibuster (1)**
31:13
**filing (1)**
41:11
**final (1)**
43:23
**finalized (1)**
25:20
**Finally (1)**
48:5
**Financial (2)**
5:4;49:7
**finding (2)**
46:22;57:25
**fine (4)**
23:25;36:5;37:4;
44:19
**fingertips (1)**
58:12
**finish (2)**
23:9;31:20
**fire (1)**
54:3
**firm (4)**
47:9,12;55:7,12
**first (9)**
8:7;20:2;41:16;
46:25;48:18,25;50:4;
56:14;57:16
**five (7)**
8:19;25:15;29:6;
31:16,21;33:18;
56:23
**Flower (1)**
4:14
**focus (3)**

48:18;51:10;52:14
**focused (2)**
  43:15;54:24
**Foerster (3)**
  6:8;44:11;48:10
**folder (4)**
  42:25;43:1,2,3
**folders (5)**
  41:20;42:14,15,17;
  44:9
**folks (1)**
  34:19
**followed (1)**
  57:18
**following (2)**
  8:4;25:8
**follows (1)**
  7:20
**footnote (1)**
  53:11
**footnotes (1)**
  53:5
**forgotten (1)**
  59:3
**forms (1)**
  49:12
**forty- (1)**
  43:12
**forty-nine (1)**
  43:13
**forward (3)**
  18:3;21:9;31:14
**four (29)**
  9:19;17:20;19:4,5,
  16;26:15;28:18,19;
  29:22;30:4,5;32:4,8;
  33:1,3;35:4,7,8,9,12,
  17;36:4,7,20,24;37:2;
  39:1;48:22;59:16
**fourteen (2)**
  44:13;55:23
**Francisco (1)**
  6:25
**Frank (2)**
  48:9;55:10
**FRANKEL (2)**
  4:2;5:12
**Friday (7)**
  8:18;19;19:7;
  31:20,21;41:16;44:6
**front (1)**
  48:23
**FTI (8)**
  27:20;29:1,2;40:6;
  41:1,22;47:20;48:9
**full (3)**
  28:4;57:4,19
**fundamentally (1)**
  17:6

**G**

**GARRITY (1)**

5:11
**gather (1)**
  22:6
**gathering (1)**
  43:7
**generally (1)**
  39:23
**Gibbs (2)**
  6:17;20:19
**given (7)**
  19:6;28:10,12,16;
  39:4,8,9
**giving (1)**
  50:16
**Gmail (1)**
  54:22
**goes (4)**
  20:7;46:3;50:20;
  51:4
**Good (11)**
  6:10;7:8;10:14,18;
  11:10;15:22;18:12;
  21:18;29:19;32:16;
  46:21
**gosh (1)**
  23:23
**grossly (1)**
  14:15
**group (5)**
  6:18;8:24;17:11;
  20:19;59:11
**groups (3)**
  25:8;41:6;47:9
**guarantee (1)**
  31:3
**guess (7)**
  26:1;28:4,10,13,
  17;48:5;55:4
**guidance (1)**
  52:25
**guidelines (1)**
  59:9
**guy (1)**
  29:2

**H**

**half (2)**
  26:17;28:20
**hallway (1)**
  28:22
**Hamzehpour (4)**
  12:8;27:16;43:14,
  25
**hand (1)**
  9:17
**hands (1)**
  16:7
**hang (1)**
  7:3
**happen (4)**
  23:9;24:13;45:4;
  57:22

**happened (1)**
  22:19
**happening (3)**
  17:7;25:1;44:17
**happens (2)**
  24:19;54:20
**happy (6)**
  21:3,10,14;33:14;
  46:13;48:15
**hard (1)**
  40:11
**hate (1)**
  38:10
**headed (1)**
  22:3
**hear (7)**
  12:24;21:14;26:12;
  30:13;52:11;54:7;
  55:8
**heard (11)**
  7:21;11:14;16:10,
  22,24;18:6;20:17;
  22:9;23:23;25:5;
  35:18
**hearing (31)**
  7:13,23,23;12:3,
  17;13:14;14:2;21:10,
  12,13;23:4,8;25:1,2,
  16;28:3;29:4;30:3;
  31:10,14,15;34:17;
  37:20,25;42:1;43:24;
  45:4;48:19;53:24;
  55:14;59:1
**heavy (1)**
  37:17
**helping (1)**
  48:10
**here's (3)**
  8:12;25:10;32:6
**high (1)**
  24:4
**highlights (1)**
  46:24
**highly (1)**
  41:23
**history (1)**
  11:23
**hit (1)**
  46:24
**hold (3)**
  21:12;54:3;57:11
**holding (2)**
  19:23;21:6
**holiday (1)**
  58:25
**home (1)**
  54:22
**Honor (124)**
  6:5,10,17,22,23;
  7:8,9,13,20;8:3,7;9:1,
  2,11,14,16,18,22;
  10:9,16,18;11:4,8,10,
  20;12:2,7,12;13:15,

24;14:10,15;15:6,9,
  13,16;16:11,14,23;
  17:1,2,10,18;18:7,12,
  20,25;19:6;20:18,21,
  23;21:1,5,6,7,14,17,
  21;22:1,2,5,11;23:19;
  25:3,8,9;26:8,10,13;
  27:2;28:6,10,12,16,
  21;29:7,10,22;30:11,
  13,17;32:1,6,15;
  33:24;34:3,6,25;35:4,
  18;36:12,13,18;37:6,
  12,16,19;38:2,7,10,
  13,16,20,24;39:21;
  40:6,15,19;41:7,9;
  43:19,24;45:20;46:3,
  13,22;50:3;52:6,22;
  55:17;58:17;59:6,20,
  23
**Honor's (1)**
  31:3
**hope (1)**
  59:19
**hopefully (1)**
  54:4
**hour (2)**
  35:12;36:10
**hours (17)**
  27:15,24;35:8,9,10,
  17;36:1,4,7,20,23,24,
  25;37:2,3;59:10,16
**housekeeping (1)**
  7:9
**hugely (1)**
  17:20
**hundred (1)**
  43:14
**hypothetically (1)**
  49:3

**I**

**I'm (5)**
  22:14,16;24:12;
  25:12;26:1
**idea (2)**
  21:23;24:1
**identified (9)**
  12:6,8,17;13:11;
  14:1,2;25:15;28:2;
  29:5
**identify (3)**
  12:4;27:22;29:4
**idly (1)**
  21:12
**ignored (1)**
  17:17
**imagine (4)**
  30:23;47:14,23;
  48:8
**important (5)**
  9:23;34:7;38:12;
  48:6;51:16

**impose (2)**
  23:7;28:15
**imposed (1)**
  26:6
**imposing (2)**
  57:12,24
**inability (1)**
  20:12
**inadequate (1)**
  15:16
**inappropriate (3)**
  14:15;39:14;42:5
**include (2)**
  35:4;54:18
**including (7)**
  8:24;29:16;42:6;
  47:9;54:14,16;57:12
**inclusive (2)**
  43:11;47:14
**inconsistencies (1)**
  33:16
**inconsistent (1)**
  11:16
**incredible (1)**
  17:24
**independent (1)**
  45:21
**indicate (1)**
  53:5
**indicated (8)**
  13:13;25:18,21;
  26:4;29:8;41:21;
  45:19;50:17
**indicating (1)**
  50:19
**individual (1)**
  10:6
**individuals (1)**
  25:14
**information (4)**
  8:20;9:7;14:3;30:7
**informed (1)**
  7:10;19:15
**INGRID (2)**
  5:7;18:12
**in-house (1)**
  28:1
**initial (1)**
  43:23
**initially (1)**
  11:21
**inside (1)**
  26:16
**instance (1)**
  57:16
**instead (2)**
  17:21;44:8
**institutional (5)**
  6:18;7:19;20:20;
  38:4;51:4
**instructed (1)**
  9:20,25;10:10
**instruction (1)**

42:18
**insured (2)**
    20:4,6
**intend (1)**
    14:16
**intended (2)**
    30:9;42:1
**interest (1)**
    10:6
**interested (1)**
    21:20
**interests (2)**
    10:5,10
**internal (5)**
    41:2;49:18;54:16;
    55:9,11
**internally (1)**
    51:23
**interrupt (2)**
    29:24;30:1
**intervening (1)**
    8:6
**interviewing (1)**
    47:21
**interviews (1)**
    57:18
**into (9)**
    7:5;9:4;14:25;
    15:3;35:25;37:20;
    38:14;42:25;43:2
**investor (1)**
    6:18
**investors (4)**
    7:19;20:20;38:4;
    51:4
**involved (10)**
    7:16;12:5;13:12;
    25:16;29:5,17;42:2;
    47:16,23;55:4
**involvement (1)**
    20:24
**involving (1)**
    27:7
**issue (30)**
    9:4;17:17,22;20:2,
    22;21:1,21;22:2,10,
    17;23:20;24:3,4;
    29:12,18,19;35:19;
    38:19,21;39:21;
    41:24;42:2;45:12,17;
    46:16;51:17,24;
    52:19;53:23;55:13
**issues (29)**
    7:11;9:7;10:21,23;
    11:1;12:20;13:22;
    14:5,9,19,21;16:12;
    17:14;18:8;19:22;
    20:1,3,5;34:13;38:12,
    23;41:13;44:20;
    48:14;49:4,5,24;
    52:4;59:4
**items (1)**
    7:9

## J

**JAMES (1)**
    5:11
**January (4)**
    37:20,21,23;49:4
**jigger (2)**
    37:4,7
**JONES (1)**
    4:12
**Judge (16)**
    8:6;10:3;29:12,14;
    30:8,12,25;33:6,11;
    37:24;42:6;48:14;
    53:7,15;56:20;58:11
**July (1)**
    42:8
**juxtapose (1)**
    34:8

## K

**KAUFMAN (54)**
    4:8;6:12;10:20,25;
    11:6,9,10,11,20,24;
    12:1,25;13:3,5,9,15,
    17,21,23;26:5,8,9,10,
    13,20,24;27:2,11;
    28:12,16;29:22,24,
    25;30:2;32:11;36:13,
    17;38:14,15,20,22;
    39:7,17;40:5,19;
    41:22;43:19,21;
    48:20,20;50:19;
    56:14;58:3,17
**KENNETH (1)**
    5:12
**key (2)**
    17:17;42:1
**keywords (1)**
    43:8
**knew (1)**
    9:14
**know- (1)**
    21:4
**knowing (1)**
    49:21
**knowledge (2)**
    34:11,21
**knows (1)**
    11:4;30:17
**KRAMER (4)**
    4:2;5:12;6:11;
    41:10

## L

**Labor (1)**
    42:7
**lack (2)**
    39:13;58:8
**largely (2)**

47:13;52:9
**last (7)**
    6:19;9:3;11:21;
    19:15;28:9;43:10;
    45:3
**later (3)**
    18:8,10;31:21
**law (5)**
    30:17;47:9;56:16,
    17,25
**lawyer (1)**
    46:10
**lawyers (4)**
    21:4;42:14;46:11;
    47:12
**lead (1)**
    35:22
**learned (1)**
    41:15
**least (5)**
    26:21;34:5;40:16,
    23;57:23
**leave (1)**
    23:10
**led (1)**
    8:13
**left (2)**
    30:24;54:15
**length (7)**
    21:1,22;23:7;35:8,
    9,10,17
**less (1)**
    32:17
**letting (1)**
    17:2
**LEVIN (4)**
    4:2;5:12;6:11;
    41:10
**LEWIS (1)**
    5:11
**liabilities (2)**
    52:5,13
**liability (8)**
    15:1;38:25;39:5,8;
    50:18;51:9,25;53:12
**lies (1)**
    34:6
**life (1)**
    31:13
**lifetime (1)**
    14:23
**light (1)**
    26:2
**likely (11)**
    14:25;19:19;26:21;
    27:3,16,18;28:2,9,17,
    20;33:4
**limine (2)**
    30:20;31:2
**limit (9)**
    9:13;14:13;26:5,6;
    36:10,10,14;51:11;
    54:23

47:13;52:9
**limited (6)**
    8:24;43:15;45:22;
    50:22;52:7;59:16
**limits (3)**
    23:6;36:15,19
**line (1)**
    10:4
**list (5)**
    43:25;44:5,13,16;
    45:8,10;55:22,25;
    56:7
**listed (1)**
    57:10
**listen (1)**
    24:11
**litigation (1)**
    42:23
**little (5)**
    18:10;35:24;38:8;
    49:13;52:17
**live (2)**
    23:14,15
**LLP (1)**
    4:2;5:2
**locations (1)**
    48:1
**log (5)**
    43:23,24;48:7,11;
    57:11
**logs (1)**
    43:18
**long (6)**
    15:4;21:11;28:9,
    17;55:22;58:19
**longer (1)**
    26:21
**look (5)**
    22:15,21;24:10;
    31:8;58:14
**looked (1)**
    22:7
**looking (4)**
    10:9;20:2;21:23;
    46:10
**Los (1)**
    4:15
**lose (1)**
    24:25
**losses (2)**
    14:23,25
**lost (1)**
    51:2
**lot (6)**
    25:24;29:17;51:10;
    54:15;56:23;58:6
**loud (1)**
    52:11
**lowest (1)**
    51:18

## M

**Mack (4)**

16:16;45:21,22;
    46:8
**mad (2)**
    15:15;58:11
**MADDEN (22)**
    6:17,17,20,20,21,
    22;20:18,18;21:5,17,
    19;22:1,5,8,11,14;
    23:1,18,19,23;25:3,4
**M-A-D-D-E-N (1)**
    6:20
**magnitude (1)**
    57:14
**mail (3)**
    42:13;50:25;52:7
**mailboxes (1)**
    47:11
**mails (1)**
    51:23
**major (1)**
    51:12
**majority (1)**
    48:8
**makers (1)**
    29:14
**makes (3)**
    10:14;51:15;52:12
**making (3)**
    6:14;32:20;56:16
**Maloney (5)**
    45:18,19;46:2,5,6
**many (15)**
    11:18,25;12:22;
    13:6;17:9;18:19;
    19:3,13;26:6;31:22;
    33:19,22;47:24;48:6;
    56:22
**Marano (1)**
    27:18
**massive (2)**
    55:3,6
**material (3)**
    17:22;45:5;57:9
**materials (1)**
    42:19
**math (1)**
    32:6
**matter (4)**
    45:24;47:14,17;
    53:17
**matters (2)**
    41:24;42:2
**may (19)**
    13:13;23:6,12;
    25:19,20,22;26:8,18;
    33:13;35:18;36:18;
    37:19;38:25;42:24;
    43:2;46:2;48:14;
    49:24;54:16
**maybe (2)**
    8:25;52:17
**MBIA (15)**
    5:3;7:18;8:16;9:19,

20;10:7;17:18;18:13,
17;20:4;32:4,9,23;
33:3;40:21
**MBIA's (2)**
9:19;18:16
**mean (9)**
17:22;27:5;28:25;
30:16;33:11;34:22;
44:1;51:25;57:23
**meet (13)**
11:21;24:17;42:11;
44:16;45:13;46:9;
50:13;52:16;53:21;
54:4;55:24;56:5;
58:22
**meeting (2)**
44:19,19
**meetings (1)**
40:20
**member (3)**
29:21;30:5,7
**members (9)**
28:23;29:13,16,20,
21,23;30:4,5;44:12
**mentioned (3)**
10:25;32:7;38:11
**merits (1)**
9:8
**methodology (2)**
20:3;33:17
**might (5)**
28:3,3;48:8;52:20;
57:13
**mind (2)**
9:2;23:17
**minds (2)**
44:19,19
**mini (1)**
22:18
**minute (3)**
16:19;31:16;33:18
**minutes (1)**
25:13
**miserable (1)**
31:13
**missed (2)**
6:19;50:13
**MoFo (1)**
40:24
**MOLONEY (7)**
6:15,15;16:10,11,
14,18,21
**Monday (2)**
8:19;58:25
**money (1)**
17:25
**months (1)**
31:9
**more (10)**
8:25;17:19;25:2;
26:17;28:20;38:8;
47:14;49:8;56:13;
57:21

**MORGAN (1)**
5:11
**morning (7)**
6:10;7:8;10:18;
11:1,10;18:12;46:21
**Morrison (3)**
6:8;44:11;48:10
**most (9)**
21:19;26:21;27:20;
36:5;42:6;47:24;
48:12;51:16;56:3
**motion (3)**
7:24;30:20;31:2
**move (2)**
37:20,25
**moved (1)**
7:23
**much (6)**
9:15;21:11;23:15;
35:14;36:3;47:14
**multiple (3)**
11:5;24:3;37:7
**myself (1)**
46:22

## N

**NAFTALIS (2)**
4:2;5:12
**name (3)**
6:19;26:11;54:18
**namely (1)**
15:3
**names (11)**
25:12;26:12;45:16;
47:7,13;54:9,13,14,
15,24;55:21
**National (1)**
42:7
**nature (3)**
20:8;55:20;57:25
**necessarily (4)**
16:3;42:22;50:25;
54:20
**necessary (3)**
29:18;32:16;34:11
**need (9)**
19:5,17;24:3,6,17;
34:23;37:18;38:12;
52:24
**needed (1)**
34:20
**needs (5)**
10:5;34:11;35:11;
53:22;54:4
**negotiate (2)**
48:11;49:12
**negotiation (1)**
9:4
**negotiations (31)**
12:5;13:12;14:4;
20:22,24;21:1,2,22,
23;22:15,20,25;

25:17;29:5,19;47:3,
5;49:10,10,13,16;
50:1,6,23;51:11,14;
52:2,7,9,12;53:1
**neither (1)**
25:7
**New (2)**
4:5;5:5
**next (2)**
41:8;48:7
**night (2)**
19:15;43:10
**nine (2)**
12:14;17:21
**Nolan (1)**
12:9
**none (1)**
41:4
**nonprivileged (1)**
49:7
**nor (1)**
39:9
**note (2)**
15:6;41:11
**notice (3)**
16:15;41:11;45:20
**notices (1)**
33:25
**November (3)**
7:24,24;31:10
**Number (12)**
7:9;9:13;11:2,2;
12:6;17:22;24:15,22;
27:7;31:17;34:9;
53:14
**numbers (1)**
55:3
**NY (2)**
4:5;5:5

## O

**object (1)**
15:23
**objecting (8)**
10:13;15:14,19,20;
16:2,2,4;17:6
**objection (1)**
15:12
**objectors (4)**
14:13;33:12;59:11,
16
**obligation (2)**
56:18;57:1
**observe (1)**
58:25
**obviously (1)**
38:3
**occur (1)**
24:8
**October (11)**
8:5,6,16,18;31:21;
43:19,23;50:9;51:4;

55:15;58:19
**off (1)**
24:13
**offer (1)**
23:21
**offering (2)**
24:5;34:19
**Official (1)**
4:3
**once (3)**
21:11;23:25;24:17
**One (35)**
5:4;7:9;14:22;15:2,
2,7;16:15;17:11,17;
18:15;21:19;22:21,
21;24:22;27:6,22;
30:8;32:9,10,11,21;
35:22,25;36:14;37:8,
11;42:3;43:2;45:20,
21;49:23;50:4;56:24;
57:24;58:10
**ones (2)**
31:7;32:16
**only (17)**
11:15;23:15,20;
24:3,4;29:22;36:5;
37:10;40:22;43:12,
13;44:6,12,13;50:22;
52:1;54:14
**opining (1)**
17:13
**opinion (2)**
10:8;24:16
**opinions (1)**
56:22
**opportunity (1)**
7:11
**oppose (1)**
24:5
**opt (1)**
10:10
**order (9)**
7:25;8:1,1,3;9:14,
16;22:15;28:21;
58:22
**orders (2)**
57:24;58:4
**ordinarily (1)**
57:18
**ordinary (1)**
43:6
**organizing (1)**
42:19
**otherwise (1)**
52:4
**ought (5)**
22:15;33:14,19;
53:25;56:8
**ours (1)**
32:8
**ourselves (1)**
19:12
**out (16)**

10:9,10;21:15;
24:14,24;28:19;
33:25;36:1;37:1;
45:1,4;46:7;48:7;
49:18;54:15;58:9
**outset (2)**
10:24;38:11
**outside (4)**
26:16;28:22;55:7,
12
**over (7)**
10:24;11:8;31:6;
33:25;51:5;54:21;
55:2
**overburdened (1)**
9:23
**overlap (1)**
29:10
**overstating (1)**
46:4
**own (9)**
10:9;16:9;17:7,8;
31:14;32:7;33:14;
42:10;49:11

## P

**page (1)**
12:7
**Palo (1)**
6:25
**parallel (1)**
17:7
**paraphrasing (1)**
24:22
**pardon (1)**
34:25
**pare (1)**
8:11
**pared (1)**
33:4
**part (3)**
31:12;34:6,6
**participant (1)**
27:13
**participated (1)**
22:24
**particular (7)**
20:3,7,9;24:18;
47:21;58:9,14
**parties (28)**
7:16,17,22,25;8:7,
11,13;9:7,12,13;10:6;
15:6,7,24;19:11;21:8,
20;23:2,5;24:17,23;
31:11;35:16;37:25;
38:5;44:25;53:20;
56:5
**parties' (1)**
15:5
**parties-in-interest (2)**
25:18;31:11
**partner (4)**

6:12,24;10:20;
46:17
**party (6)**
18:4;37:3,8,10,11;
40:3
**pass (2)**
14:5;57:9
**past (1)**
11:23
**patience (1)**
24:25
**Patrick (1)**
40:21
**Pause (2)**
37:14,22
**people (36)**
12:6,10,17;13:2,11,
13;14:1;16:24;24:1;
25:15,17,19,22;
26:25;27:9,12;28:24;
29:6,9;30:17;31:9;
33:16;34:10,10,21;
42:2;47:9,9,11,20;
48:9;49:7,7;55:3;
58:9,25
**per (3)**
36:20;37:2;52:7
**perhaps (3)**
24:8;43:7;52:18
**period (6)**
8:6;50:5;53:22,23;
54:1,5
**permissible (1)**
40:4
**permit (3)**
21:13;23:4;37:5
**person (3)**
20:23;22:24;27:20
**personal (2)**
54:19,21
**persons (1)**
12:4
**perspective (1)**
59:11
**ph (1)**
19:9
**PHILIP (7)**
4:7,8;6:11,12;
10:19,20;11:10
**phone (1)**
6:24
**piece (1)**
26:17
**pile-on (1)**
30:9
**placed (1)**
49:8
**plan (3)**
12:14,16;27:13
**please (4)**
9:12;33:22;35:10;
46:20
**plenary (1)**

34:16
**plus (2)**
14:13;32:12
**PM (1)**
59:24
**podium (1)**
6:6
**point (18)**
9:22;10:4;15:7,9;
18:2;19:24;20:13;
22:18,20;24:2,2;
27:25;28:23;42:18;
44:3,9;51:15;53:18
**pointing (2)**
42:13;46:7
**points (4)**
11:6;18:14;20:21;
46:23
**portfolio (1)**
51:3
**portion (1)**
14:25
**pose (1)**
23:24
**position (10)**
9:19;10:16;17:5,
23;18:16;19:11,21;
20:22;23:17;46:4
**possibility (1)**
55:5
**possible (2)**
27:25;28:8
**possibly (1)**
43:15
**potential (15)**
17:10;19:4,12;
49:9,11,19,22;50:7,
18;51:9,25;52:5,13,
21;53:6
**potentially (4)**
9:9;41:15,20;43:16
**precede (1)**
38:17
**precise (1)**
48:25
**preclude (1)**
10:1
**precluded (1)**
10:13
**preclusion (1)**
57:24
**preliminary (1)**
51:2
**prepared (2)**
32:18;40:22
**preparing (1)**
17:25
**PRESENT (1)**
5:10
**presentations (2)**
40:20,21
**presently (1)**
6:25

**presumptive (2)**
26:4,5
**pretty (1)**
58:19
**previously (1)**
18:17
**Princi (60)**
6:3,5,8,8,23;7:2,4,
7,8;10:3,25;11:7;
12:23;13:17,19;
14:12;17:15;25:6,7,
11,14;28:21;29:3,7,
10,16;30:3,23;31:19,
24;32:7,10,15;33:6,
10,22,24;34:3,5,25;
35:2,4;36:3,21;37:15,
16,24;46:13;51:15;
52:17,22;53:7,10,15;
54:2;58:11;59:8,14,
18,20
**principal (1)**
24:14
**principally (1)**
29:5
**Princi's (1)**
11:12
**prior (3)**
38:24;39:10;50:7
**privilege (1)**
48:11
**privileged (9)**
43:18,23,23;44:1;
48:7;49:24;52:24;
55:14;57:11
**probably (2)**
21:19;24:1
**problem (1)**
30:24
**problematic (2)**
41:23;42:21
**proceed (1)**
35:6
**proceedings (1)**
59:24
**process (9)**
17:14;42:11,19;
43:6;47:16,23,25;
55:4,12
**processes (1)**
30:16
**produce (3)**
43:23;47:18;51:7;
52:22,23
**produced (9)**
41:5;45:6;47:19;
48:6;50:6;51:25;
57:8,10;58:15
**product (2)**
48:13;55:10
**production (8)**
11:3;39:13;43:9,
11;46:11,18;48:4;
58:8

**professional (1)**
10:8
**Professor (1)**
14:24
**proffered (1)**
34:12
**progress (1)**
28:22
**proportion (1)**
22:16
**proportionality (1)**
10:4
**proportionate (1)**
9:10
**propose (1)**
44:17
**proposed (2)**
34:17;45:11
**propriety (1)**
30:15
**protect (1)**
19:11
**prove (1)**
46:10
**provide (2)**
9:7;44:4
**provided (4)**
20:9;24:16;39:2;
40:24
**public (1)**
39:3
**published (1)**
42:9
**Puntus (3)**
12:9;40:8,14
**purported (1)**
11:13
**purpose (1)**
9:15
**purposes (1)**
53:24
**pursue (1)**
10:11;30:24
**pursuing (1)**
58:3
**push (2)**
21:10,13
**pushing (1)**
31:5
**put (11)**
16:3,9;24:25;28:2;
34:8;42:24;43:2,2;
53:4,11;59:2
**putback (1)**
15:1
**put-back (10)**
38:25;39:5,8,10;
48:21;49:2,9;50:18;
51:9,25
**putting (2)**
29:2;49:24

**Q**

**quantity (2)**
28:7;55:6
**quick (3)**
38:15;46:23;50:3
**quickly (2)**
55:18;56:5
**quite (4)**
27:6;42:25;43:15;
55:9
**quote (1)**
42:10
**quoting (1)**
41:18

**R**

**Rains (13)**
6:24;46:17,19,21;
50:2,3,24;52:5,6;
54:8,25;55:1;58:11
**raise (3)**
20:21;38:13;39:16;
44:3;59:5
**raised (2)**
11:7;45:13
**ran (1)**
47:17
**range (8)**
34:18;46:25;48:22;
49:8,21;50:17,25;
51:18
**rates (2)**
51:2,3
**rather (5)**
15:22;43:6,8;
46:10;54:8
**reach (2)**
56:5,6
**reached (1)**
56:1
**read (5)**
22:13;40:19;56:20,
22,23
**real (1)**
29:12
**realize (1)**
31:7
**really (5)**
9:15;10:9;11:13;
17:17;24:24;31:6;
42:13;50:20;55:8;
57:2;58:11
**reason (3)**
22:22;30:6;47:2
**reasonable (4)**
46:12;49:6;52:24;
54:1
**reasonableness (3)**
34:18;51:18;56:19
**recall (1)**

12:3

**received (4)**
38:16;40:11;41:2,7

**recent (1)**
56:20

**recently (2)**
42:6;56:3

**recess (3)**
31:16;33:18,21

**recollection (1)**
48:24

**record (4)**
6:23;10:19;25:15;
41:11

**recounted (1)**
12:7

**reduce (1)**
9:13

**refer (1)**
57:17

**referred (2)**
13:12;56:21

**referring (1)**
49:1

**refined (1)**
49:9

**refusal (1)**
39:12

**regard (1)**
39:22

**regarding (3)**
7:12;11:12;39:10

**relate (1)**
48:17

**related (4)**
10:21;45:23;52:4;
55:11

**relates (1)**
43:1

**relating (5)**
14:3;40:12;41:17;
51:8;52:21

**relevant (9)**
44:9;45:5,5;46:9;
47:22;48:2;49:4,5;
57:9

**reliance (1)**
43:8

**relied (1)**
24:23

**rely (4)**
24:20;49:20;57:6,
17

**relying (1)**
45:15

**remember (2)**
48:25;50:12

**remind (1)**
59:2

**Renzi (3)**
12:9;27:20;29:1

**rep (1)**
34:15

**repeatedly (1)**
26:14

**report (5)**
11:1;19:9,10;24:7;
31:1

**reporter (1)**
7:6

**reports (10)**
8:17,21;15:11;
16:5;24:17;31:20;
33:9,10,13,15

**reps (1)**
20:8

**request (6)**
37:16,19;40:2,24;
42:23;43:4

**requested (5)**
12:11;28:8;39:14,
25;51:7

**requesting (1)**
12:22

**requests (11)**
8:10,12;11:13,14;
18:9;40:17;41:17;
42:4;45:22;51:10;
54:17

**require (8)**
22:23;27:16,19,23;
28:3,20;44:24;57:21

**required (4)**
11:4;12:13;24:2;
44:25

**requires (2)**
46:14,16

**requiring (1)**
58:4

**ResCap (7)**
28:1;41:19,24;
44:8;53:8,16;59:1

**ResCap's (1)**
53:12

**Research (1)**
8:24

**reserve (1)**
53:5

**Residential (1)**
6:2

**resignation (1)**
37:18

**resolve (3)**
45:12;56:8,9

**resolved (2)**
22:9;44:20

**respect (24)**
7:14,22;8:3;9:11;
10:5;11:12;17:4;
18:18;19:2,21;20:9,
12;26:15;28:23;
35:13,15;38:3;39:22;
41:22;43:4;52:2,3;
54:7;59:10

**respecting (2)**
7:25;8:8

**respectively (1)**
33:2

**respects (1)**
11:5

**respond (7)**
11:6;14:6;18:14;
48:15;50:1;54:25;
55:17

**responding (1)**
13:23

**response (1)**
45:14

**responses (2)**
42:21;50:4

**responsible (5)**
27:20;57:2,4,12;
58:12

**responsive (14)**
40:1,16,23;41:14,
15,17,21;42:4,23;
43:16;54:16;57:5,7,
20

**result (1)**
39:4

**reunderwriting (1)**
15:3

**revealed (1)**
53:16

**review (6)**
8:20;11:23;43:7;
47:2,4;54:14

**reviewed (1)**
48:3

**RICHARD (2)**
4:17;16:23

**right (23)**
7:3;8:12;10:17;
14:7;16:22;19:18;
25:6;29:8;30:14;
35:6;36:6;38:6,14;
42:25;43:21;46:6;
53:8,20;54:7;55:16;
56:4;58:18;59:21

**Robert (2)**
6:17;20:18

**roles (1)**
17:11

**rolled (1)**
35:25

**Rosenberg (1)**
30:14

**roughly (1)**
24:22

**routinely (1)**
21:22

**Ruckdaschel (1)**
28:1

**Rule (1)**
46:11

**ruled (2)**
8:7;9:3

**rules (2)**
57:23;58:1

**ruling (3)**
9:6;31:4;56:16

**run (1)**
45:16

**S**

**Sadly (1)**
50:10

**sake (1)**
49:3

**same (9)**
18:24;19:8;30:3;
40:7;41:1;45:25;
46:1,3,8

**sample (1)**
15:4

**San (1)**
6:25

**sanctions (2)**
57:13,24

**satisfied (1)**
58:3

**save (1)**
55:13

**saw (2)**
45:23;46:1

**saying (9)**
9:24;17:18;32:16;
36:4,20;42:13;46:1;
50:21;55:8

**scale (1)**
31:6

**schedule (6)**
19:7;20:13;21:7;
26:3;31:8;58:20

**scheduled (2)**
41:8;58:14

**scheduling (2)**
8:1;9:16

**SCHULMAN (24)**
4:9;6:13;10:22;
14:8;39:24;40:5;
41:9,10;44:2,3;45:7,
8,10,13;54:7,11,13;
55:1,8,17,19,23;56:1,
3

**scope (1)**
16:5

**screwed (1)**
57:22

**se (1)**
52:7

**search (41)**
39:19;41:17;43:3,
8;44:4,5,7,12,16,21,
21,22;45:1,14,17;
47:7,11,12,15,17,17;
53:22;54:9,10,10;
55:2,19,20,22,25;
56:6,7,8,10,19;57:1,
5,7,19;58:10,24

**searched (2)**

**38:18;47:15**

**searches (9)**
44:5;47:1,6;48:18;
50:5,25;52:7,8;56:11

**seated (1)**
33:22

**second (6)**
7:3;13:8;16:19;
17:16;20:3;50:10

**seek (2)**
8:7;37:25

**seeking (2)**
8:14;11:19

**seem (5)**
25:14;49:15,23,25;
53:25

**seemed (1)**
42:12

**seems (1)**
13:17

**segregate (1)**
42:3

**selected (1)**
41:20

**selection (1)**
43:6

**self (1)**
45:24

**self- (1)**
43:5

**self-collect (2)**
40:1,8

**self-collection (1)**
39:22;41:14;43:5

**self-designation (1)**
41:14

**self-interested (1)**
42:23

**self-selection (3)**
46:8;56:14;57:17

**send (2)**
54:22;56:7

**sense (4)**
10:14;35:24;37:17;
52:12

**sensitive (1)**
42:24

**sent (3)**
40:8;54:17,19

**separate (2)**
23:1;30:12

**separating (2)**
23:2,3

**September (5)**
7:21;8:2;12:3,18;
14:2

**serious (1)**
11:2

**seriously (1)**
11:5

**serve (1)**
9:15

**served (3)**

16:14;45:20,21
**session (1)**
    52:17
**set (3)**
    43:18;45:21;53:4
**settlement (54)**
    7:19;8:8;9:4,8,21,
    25;10:1,8,13;12:5;
    14:3;15:22;17:14,19;
    18:16,18;20:22,24;
    21:2,23;22:15,19,20,
    24;23:24;24:5;27:5,
    13;29:18;32:24;
    34:17;38:5,22,23,25;
    39:11;47:16,23;48:2,
    11;49:6,6,13,15;
    50:22;51:11,13,19;
    52:2,7,9,25;55:4,11
**settling (1)**
    36:19
**seven (8)**
    23:10;27:15,23;
    35:10,12;44:12;55:1,
    19
**seven-hour (4)**
    26:2,4,5;27:17
**shall (3)**
    35:8,10,16
**shared (1)**
    40:25
**Sheindlin (2)**
    42:6;56:21
**shop (1)**
    58:12
**short (2)**
    45:8,10
**shortcomings (1)**
    57:12
**shorter (1)**
    26:18
**shortly (3)**
    15:18,20;41:12
**show (2)**
    16:16;48:12
**shows (1)**
    47:2
**shy (1)**
    58:1
**side (1)**
    45:3
**sides (2)**
    22:6;45:3
**sideshow (2)**
    9:5;12:23
**significance (1)**
    50:14
**significant (1)**
    39:21
**significantly (1)**
    11:16
**Silmon (5)**
    19:9;24:7;35:22;
    36:5;39:5

**Silmon's (1)**
    20:2
**similar (1)**
    41:21
**simple (1)**
    47:1
**simply (6)**
    13:23;21:6;26:11;
    42:25;50:13,15
**single (3)**
    20:23;24:7;40:11
**sit (2)**
    21:12;49:20
**sitting (1)**
    49:12
**six (10)**
    12:15,16;25:19,22;
    29:7,8,13,20;32:3;
    34:7
**sixteen (4)**
    8:14;11:15,21;25:6
**slate (1)**
    20:25
**small (1)**
    43:14
**solely (1)**
    57:6
**somebody (3)**
    27:22;54:21;59:2
**somehow (1)**
    10:1
**sorry (4)**
    6:19;12:15;35:23;
    45:9
**sort (4)**
    9:4,17;10:4;58:2
**sound (1)**
    30:21
**South (1)**
    4:14
**span (1)**
    25:1
**speak (3)**
    15:6;46:14;56:13
**specific (6)**
    12:20;20:5;46:18;
    50:10,11,12
**specifically (2)**
    50:5;52:1
**spend (1)**
    35:15
**spent (2)**
    17:24,25
**spreadsheets (1)**
    51:1
**stand (1)**
    30:4
**standard (1)**
    46:16
**start (1)**
    45:1
**starting (1)**
    48:7

**starts (1)**
    35:11
**stated (1)**
    40:15
**statement (1)**
    41:1
**statements (2)**
    11:12;20:11
**status (1)**
    59:3
**steering (2)**
    6:18;20:19
**stick (1)**
    53:13
**still (4)**
    15:14;26:18;28:6;
    30:24
**stipulate (1)**
    24:18
**stood (1)**
    46:7
**stop (3)**
    13:8;17:16;29:3
**stored (2)**
    47:22;48:2
**story (1)**
    46:8
**Street (1)**
    4:14
**stuck (1)**
    46:22
**subject (9)**
    10:8;19:20;23:6;
    30:18,21;42:20;
    47:14,17;54:4
**submitted (3)**
    7:25;9:14;33:11
**subset (1)**
    54:10
**subsets (2)**
    47:18,18
**substance (1)**
    16:6
**substantial (4)**
    14:3;20:24;28:7;
    56:10
**substantially (4)**
    12:5;13:12;25:16;
    26:21
**substantive (1)**
    55:20
**sufficient (1)**
    30:7
**suggest (4)**
    23:25;24:1,8;29:11
**suggesting (1)**
    22:16
**suggestion (1)**
    23:21
**suitable (1)**
    58:10
**supplemental (1)**
    19:9

**support (3)**
    15:22;27:13;32:23
**Sure (15)**
    7:4;15:9;16:1,2,4,
    4;22:12;24:11;26:1;
    27:25;39:12;46:23;
    52:20;59:2,13
**surprising (1)**
    48:5
**sway (1)**
    28:21
**sword (1)**
    28:24
**system (1)**
    42:14

**T**

**TAFT (2)**
    5:2;18:13
**talk (3)**
    23:8;25:25;38:8
**talked (2)**
    48:19,20,21;54:8
**talking (4)**
    27:2;31:18;34:24;
    40:20
**task (1)**
    32:21
**teaching (1)**
    57:3
**technically (3)**
    10:13;40:16,23
**telephone (1)**
    17:3
**Telephonically (2)**
    4:17;5:10
**telling (3)**
    39:20;40:9;55:10
**ten (9)**
    8:17,22;25:13;
    31:19;32:5,6,12;
    34:24;35:1
**term (1)**
    40:18
**termed (1)**
    20:13
**terms (36)**
    18:16;19:20;28:18,
    24;31:6;43:8;44:4,5,
    7,12,14,17,21,21,23;
    45:1,10,17;47:7,12,
    12,15,17;54:9,10;
    55:2,19,20,22,23,25;
    56:6,7,8,10;58:24
**testifying (5)**
    14:1,22,24;15:1;
    35:23
**testimony (5)**
    23:10;28:3;30:19,
    20,22
**third (1)**
    15:1

**thirty- (1)**
    23:9
**Thompson (1)**
    43:12
**thorough (2)**
    57:7,19
**though (2)**
    46:17;56:2
**thought (1)**
    14:7
**thoughts (1)**
    54:2
**three (35)**
    12:15;14:14,16,17;
    17:11,12,19;19:16,
    16,17;23:8;24:6,11,
    11,23;25:2;31:24,25;
    32:2,3,8,12;35:8,9,
    12,21,23,24;36:4,
    22;37:3;41:6,25;43:1
**three-hour (1)**
    26:6
**thus (1)**
    27:4
**tie (1)**
    16:6
**tight (1)**
    26:2
**Tim (2)**
    27:3,4
**timeframe (2)**
    38:6;52:24
**timeline (1)**
    9:15
**timelines (1)**
    28:15
**timely (1)**
    46:19
**tipping (1)**
    31:6
**today (3)**
    7:11;46:23;59:5
**together (2)**
    8:13;59:17
**told (8)**
    15:17,24;26:18;
    28:18;32:4,24;38:17;
    41:18
**Tom (1)**
    6:15
**Tommy (1)**
    46:21
**tomorrow (2)**
    12:14;48:7
**took (1)**
    35:21
**topic (2)**
    42:20;52:16
**topical (2)**
    44:12;55:20
**topics (3)**
    35:23;43:1;52:9
**total (7)**

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

October 4, 2012

12:18;14:14;31:17;
35:15;36:1,23;37:2
**totals (1)**
13:16
**tracks (1)**
17:7
**traffic (1)**
27:6
**transcript (2)**
12:7;13:11
**translate (1)**
14:25
**trial (5)**
22:19;27:23;34:15,
16,16
**troubled (1)**
43:5
**troubling (1)**
9:18
**true (3)**
34:22;40:7;41:1
**Trust (4)**
6:16;14:23;20:4,5
**trusted (1)**
42:9
**trustee (5)**
10:11;32:9,10,11,
15
**trustees (5)**
7:18;9:20,25;
32:24;38:5
**trusts (2)**
10:7;20:9
**try (4)**
38:15;41:16;45:12;
56:2
**Tuesday (1)**
58:25
**turn (2)**
9:4;11:8
**turned (1)**
51:5
**turning (1)**
10:24
**turns (3)**
33:25;45:4;58:9
**twelve (10)**
25:7,12,24;32:4,5;
33:20;36:10,23,25;
37:3
**twenty-two (1)**
43:14
**twice (1)**
42:16
**two (20)**
7:9;17:10;18:14;
19:19,22,23;24:23;
26:16,16;28:1;29:21;
32:3,8,9;33:1,4;41:6;
43:13;47:8;50:3
**types (1)**
51:1
**typos (1)**

54:18

**U**

**UCC (1)**
40:25
**ultimately (2)**
51:15;57:4
**unacceptable (1)**
44:10
**under (2)**
20:13;43:10
**understands (1)**
59:19
**Understood (9)**
22:8,11,14;23:19;
50:19;51:12;53:10;
59:12,18
**unilaterally (1)**
18:2
**unreasonable (1)**
57:16
**unsurprisingly (1)**
43:10
**untoward (1)**
12:21
**unwillingness (1)**
34:20
**up (11)**
16:16;22:2;45:2;
46:7;47:8;50:13;
51:22;53:5;56:23;
57:18,22
**update (1)**
58:21
**upwards (2)**
8:22,22
**use (8)**
23:11,14;36:3,5;
43:7;44:6;45:15;
52:10
**used (14)**
27:11;44:5,7,11,
21;47:7,12;48:24;
50:24;52:1,3;54:9;
55:1,2
**uses (1)**
54:21
**using (2)**
54:8,10
**usually (1)**
24:19,21;49:12

**V**

**valid (1)**
15:9
**validity (1)**
53:1
**valuation (1)**
40:13
**value (4)**
9:8;40:14;49:8,14

**various (4)**
7:21;42:5;52:8,19
**vast (1)**
48:8
**view (9)**
9:16;11:2;34:14;
38:12;43:17;56:16,
17,25;57:16
**viewed (1)**
39:10
**Vinella (1)**
8:24
**virtually (1)**
38:16
**volume (1)**
57:14

**W**

**Wait (1)**
16:19
**wants (5)**
16:22;18:5;30:14;
36:23;59:5
**warranties (1)**
20:8
**warranty (1)**
34:15
**waterfall (3)**
27:21;40:10,12
**way (3)**
42:3;50:8;51:4
**ways (1)**
47:8
**Wednesday (1)**
59:1
**week (4)**
11:22;37:23;41:8;
48:8
**weekend (1)**
54:21
**weren't (1)**
52:25
**West (1)**
46:22
**what's (4)**
25:1;32:16;42:22;
49:19
**Whereupon (1)**
59:24
**Whitlinger (1)**
48:25
**whose (3)**
26:15;39:25;58:15
**WICKERSHAM (2)**
5:2;18:13
**willing (1)**
21:12
**Wilmington (1)**
6:15
**wind (2)**
45:2;51:22
**wish (3)**

20:17;23:5;26:15
**wishes (1)**
26:11
**withheld (2)**
48:12;57:20
**within (6)**
18:24;34:18;38:5;
39:1;51:8;52:24
**without (3)**
21:23;49:21;53:12
**witness (3)**
9:17;11:15;23:14
**witnesses (34)**
11:18,25;12:14,15,
16,19,20;13:7,14,25;
14:14,18;16:3,13;
18:19,20,23;25:20;
27:23;31:17;33:19,
23;34:2,7,8,24;35:1,
3,7,14;39:25;41:24,
25;58:14
**witnesses' (1)**
16:5
**work (6)**
9:6;24:23;38:5;
48:12;50:21;55:10
**working (2)**
15:14,15
**World (1)**
5:4
**worth (1)**
49:19
**wrapped (1)**
10:7
**write (1)**
25:12
**writing (1)**
20:25
**written (1)**
57:23
**wrong (1)**
11:14
**WYNNE (10)**
4:17;16:23,23,25;
17:1,9,10,17;18:7;
20:12

**Y**

**yesterday (1)**
11:4
**York (2)**
4:5;5:5

**Z**

**zero (5)**
39:1;45:22,23;
46:7;48:22
**Zubulake (2)**
56:22;57:3

**1**

**1 (13)**
38:17;39:14;46:25;
48:18;49:4,25;50:4,
22;52:1,1,10;53:22;
58:23
**10036 (1)**
4:5
**10281 (1)**
5:5
**10-Q (5)**
39:2,7;48:21;
50:12,14
**10th (4)**
43:19,24;55:15;
58:19
**11 (2)**
28:19;31:17
**11:50 (1)**
33:21
**11:55 (1)**
33:21
**1177 (1)**
4:4
**12 (2)**
31:17;36:1
**12:41 (1)**
59:24
**13 (1)**
35:15
**13th (2)**
7:24;42:8
**143 (1)**
12:7
**14th (1)**
37:23
**1500 (1)**
15:4
**15th (1)**
49:16
**16 (1)**
47:3
**17th (1)**
49:16
**19th (9)**
7:21;8:5,16,18;
12:3,18;14:2;15:11;
31:20
**1st (1)**
47:6

**2**

**2011 (2)**
50:9;51:5
**2012 (3)**
38:17;48:21;49:4
**22nd (1)**
8:19
**24th (2)**
15:12,19

**RESIDENTIAL CAPITAL, LLC, et al.**
Case No. 12-12020-mg

October 4, 2012

**25th (1)**
  8:2
**26 (1)**
  46:11
**26th (3)**
  8:6,20;31:21

---
**3**
---

**30b6 (5)**
  33:25;34:4;58:7,9,
  16
**392 (1)**
  10:7

---
**5**
---

**5 (1)**
  43:23
**555 (1)**
  4:14
**5th (1)**
  7:24

---
**8**
---

**8.7 (8)**
  9:8;29:19;32:20,
  20;34:17;49:20;
  51:17,22
**8th (1)**
  43:24

---
**9**
---

**90071 (1)**
  4:15
**9019 (1)**
  7:24