**Hearing Date: October [17], 2012 at [10]:00 a.m. (ET)**
**Objection Deadline: October [15], 2012 at [12]:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew

*Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------- ) | |
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ------------------------------------------------------- ) | |

**DEBTORS' AMENDED MOTION FOR AN ORDER PURSUANT TO SECTIONS**
**503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF**
**A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND**
**(II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS**
**<u>ADMINISTRATIVE EXPENSES</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

    **A.**    Original KEIP Motion ...............................................................................4

    **B.**    Objection of the U.S. Trustee ...................................................................5

    **C.**    Prior Proceedings and The Court's Rulings. ...........................................5

    **D.**    Original KEIP Program .............................................................................6

    **E.**    The Modified KEIP ..................................................................................7

RELIEF REQUESTED ........................................................................................................9

BASIS FOR THE RELIEF REQUESTED ..........................................................................9

**I.**    **THE KEIP SHOULD BE AUTHORIZED PURSUANT TO BANKRUPTCY
CODE SECTION 503(3) BECAUSE IT HAS A SOUND BUSINESS
PURPOSE** ...........................................................................................................9

    **A.**    The Modified KEIP Incentivizes the KEIP Participants to Effectuate a
Value-Maximizing Sale of the Debtors' Businesses for the Benefit of All
Stakeholders ...........................................................................................10

            1.    Sales Proceeds Award (50%) ......................................................10

            2.    Closing the Stalking Horse Bids (20%)........................................13

            3.    Barclays DIP Covenant (10%) (Unchanged) ...............................13

            4.    Fannie Mae Servicer Rating (10%) (Unchanged) ........................14

            5.    "Effective" Performance Rating (10%) (Unchanged)..................15

    **B.**    The KEIP Should be Approved under Bankruptcy Code Section 503(c)(3)........16

CONCLUSION ..................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

In re Borders Grp., Inc.,
    453 B.R. 459 (Bankr. S.D.N.Y. 2011) ........................................................................passim

In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006).......................................................passim

In re Mesa Air Grp.,
    No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) ......................9,16

In re Velo Holdings, Inc.,
    472 B.R. 201 (Bankr. S.D.N.Y. 2012) ........................................................................passim

STATUTES

11 U.S.C. § 503(c)...........................................................................................................15

OTHER AUTHORITIES

In re Allen Family Foods, Inc.,
    No. 11-11764 (KJC) (Bankr. D. Del. July 13, 2011) [Docket No. 173] ...............................17

In re Diamond Glass, Inc.,
    No. 08-10601 (CSS) (Bankr. D. Del. June 6, 2008) [Docket No. 312]...................................17

In re Evergreen Solar,
    No. 11-12590 (MFW) (Bankr. D. Del. Sept. 6, 2011) [Docket No. 140] ..............................11

In re Nanogen, Inc.,
    No. 09-11696 (KJC) (Bankr. D. Del. June 24, 2009) [Docket No. 167]................................12

In re New Century TRS Holdings Inc.,
    No. 07-10416 (KJC) (Bankr. D. Del. May 29, 2007) [Docket No. 896]................................17

In re Proliance Int'l, Inc.,
    No. 09-12278 (CSS) (Bankr. D. Del. Aug. 21, 2009) [Docket No. 260] ..............................12

In re Spheris, Inc.,
    No. 10-10352 (KG) (Bankr. D. Del. Mar. 25, 2010) [Docket No. 226]................................12

TerreStar Networks, Inc.,
    No. 10-15446 (SHL) (Bankr. S.D.N.Y. Feb 23, 2011) [Docket No. 444] .............................11

i

In re Trident Microsystems, Inc.,
  No. 12-10069 (CSS) (Bankr. D. Del. Feb. 24, 2012) [Docket No. 250] ................................ 11

In re Velo Holdings, Inc.,
  No. 12-11384 (MG) (June 6, 2012) [Docket No. 232] ....................................................... 11,16

ny-1060785

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the

"**Debtors**")[1] hereby move for entry of an order, pursuant to sections 503(c)(3) of title 11 of the

United States Code  (the "**Bankruptcy Code**"), authorizing (i) implementation of a key

employee incentive plan for certain key executives, and (ii) payment of any obligations arising

thereunder as administrative expenses (the "**Motion**").  In support of the Motion, the Debtors

rely upon and incorporate by reference (i) the Declaration of Anne Janiczek (the "**Janiczek**

**Decl.**"), which is being filed concurrently herewith.  In further support of the Motion, the

Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.        This Court has jurisdiction over this Motion under 28 U.S.C. sections 157 and

1334.  Venue is proper under 28 U.S.C. sections 1408 and 1409.  This is a core proceeding as

defined in 28 U.S.C. section 157(b)(2).  The statutory predicate for the relief requested herein is

section 503(c)(3) of the Bankruptcy Code.

## INTRODUCTION

2.        Two months ago, the Debtors were before the Court seeking approval of a key

employee incentive program for 17 executives and senior managers.  The Court found that the

structure of the program (the "**Original KEIP**") was not primarily incentivizing and denied the

program without prejudice.

3.        Since the Court issued its Memorandum and Opinion on August 28, 2012 (the

"**Opinion**") [Docket No. 1286], the Debtors and their advisors have restructured the components

---

[1]      The names of the Debtors in these cases and their respective tax identification numbers are identified on
Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support
of Chapter 11 Petitions and First Day Motions (the "**Whitlinger Affidavit**") [Docket No. 6].

ny-1060785

of the Original KEIP and bring before this Court a modified program (the "**Modified KEIP**")

that they believe to be primarily incentivizing and consistent with this Court's earlier guidance.

4.      Over the past few weeks, the Debtors have presented the Modified KEIP[2] to both

the Office of the U.S. Trustee (the "**UST**") and the Official Committee of Unsecured Creditors

(the "**Creditors' Committee**"), explained how the program has been improved, and as a result of

such discussions, the Debtors believe that the Modified KEIP satisfies any objection to the

Original KEIP and addresses the Court's concerns, as expressed in the Opinion.

5.      As explained in greater detail herein and in the Janiczek Declaration, the

differences between the Original KEIP and the Modified KEIP are that (i) the aggregate award

for closing the stalking horse sales has been reduced from 63% to 20%, and (ii) a new metric

allocates a greater percentage (50%) of an individual's award to the improvement of the purchase

prices paid at the auctions for the Asset Sales (defined herein).  The remaining thirty percent of

the KEIP awards are allocated evenly (i.e., 10% each) among achieving the financial/operational

metrics utilized in the Original KEIP.

6.      The Debtors must not only ensure that their businesses continue to operate in

bankruptcy, but the Debtors' management needs to ensure that upon closing of the Asset Sales,

the purchasers will be able to seamlessly take over the businesses without interrupting customer

service.  To that end, the Debtors must ensure that its senior managers and executives work

towards the collective goal of preserving and maximizing the value of the estates for the benefit

of creditors.

---

[2]      A copy of a powerpoint presentation (the "**KEIP Presentation**") prepared by the Debtors and its professionals, which outlines the terms of the Modified KEIP, is attached to the Janiczek Declaration as **Appendix 1**.

ny-1060785

7.      As with the Original KEIP, the Modified KEIP provides 17 senior executives (the "**KEIP Participants**")[3] with target[4] payments of $4.1 million with a maximum payout of $7.0 million.[5]  The total potential award payouts have not changed in the Modified KEIP, and continue to represent a reasonable amount, especially when compared with the combined stalking horse bids of approximately $3.9 billion.

8.      Accordingly, the Debtors submit that the Modified KEIP is justified by the facts and circumstances of these Chapter 11 cases and is in the best interests of the Debtors, their estates, and their creditors and should be approved by the Court.  The Debtors are on the cusp of the most significant event to date in these Chapter 11 cases – auctions for assets that may yield proceeds in excess of $4 billion.  The KEIP Participants have worked extraordinarily hard throughout these Chapter 11 cases to create the most robust auction process for the benefit of their creditors.  The auctions for the sale of substantially all of the Debtors' assets, including the Debtors' mortgage loan origination and servicing businesses (the "**Platform Sale**") and the Debtors' "legacy" portfolio consisting mainly of mortgage loans and other residual financial assets (the "**Legacy Sale**," together with the Platform Sale, the "**Asset Sales**"), are scheduled to commence in approximately two weeks, and the KEIP Participants deserve to know going into the auctions that their efforts to date and going forward will be appropriately rewarded through the Modified KEIP.

---

[3]    A list of the KEIP Participants and their respective titles was provided to the Court, the UST and the Creditors' Committee at the time of the filing of the Original KEIP Motion, and to date, the list of KEIP Participants remains the same. The KEIP Participants do not include the Debtors' Chief Executive Officer, President and Chief Capital Markets Officer.

[4]    The term "target" means the aggregate awards that could be achieved by the KEIP Participants (i.e., $4.1mm) under the Original KEIP if an auction was held and the Debtors closed the stalking horse sales without realizing any additional sale proceeds.

[5]    The target payments total $4.1million; however, as noted herein, should new participants need to be added to the KEIP because of interim changes in the employee population, then the target payments would not exceed $4.6 million.  Janiczek Decl. ¶12 fn.5 [Docket No. 812].

## BACKGROUND

9.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy

Rule 1015(b).  No trustee has been appointed in these Chapter 11 cases.

10.     On May 16, 2012, the United States Trustee for the Southern District of New

York appointed a nine member official committee of unsecured creditors (the "**Creditors'**

**Committee**").

11.     On June 20, 2012, the Court directed that an examiner be appointed [Docket No.

454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner [Docket No.

674].

12.     On the Petition Date, the Debtors filed the Sale Motion[6], and on June 28, 2012,

the Court entered an order approving the sale and bid procedures for the Asset Sales [Docket

No. 62].

### A.      Original KEIP Motion

13.     On July 17, 2012, the Debtors filed *Motion for an Order Pursuant to Sections*

*363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key*

*Employee Retention Plan for Certain Non-Insiders and (B) a Key Employee Incentive Plan for*

---

[6]      *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), 365 and 1123 and Fed R. Bank. P. 2002, 6004, 6006 and 9014 for Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Hearing and Sale Deadline; (III) Approving Form and Manner of Notice Thereof and (IV) Granting Related Relief and (B)(I)  Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Sale Motion") [Docket No. 61].*

4

*Certain Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses* [Docket No. 812] (the "**KEIP/KERP Motion**").[7]

### B.    Objection of the U.S. Trustee

14.    On August 2, 2012, the Office of the U.S. Trustee filed its objection to the KEIP/KERP Motion. [Docket No. 987] (the "**Objection**").

15.    On August 6, 2012, the Debtors filed their reply to the Objection. [Docket No. 1005] (the "**Reply**").

### C.    Prior Proceedings and The Court's Rulings.

16.    At the hearing on the KEIP/KERP Motion, the UST withdrew its objection to the KERP and an order was entered approving the KERP on August 15, 2012 [Docket No. 1169].

17.    During the remainder of the hearing on August 8, 2012, the Debtors argued for approval of the KEIP, and the UST pressed its objection to the KEIP.  The Court took the matter under advisement, and at the Court's request, the Debtors provided the Court (and parties-in-interest) with supplemental information related to the KEIP Participants' historical annual compensation.

18.    On August 28, 2012, the Court entered the Opinion denying without prejudice approval of the KEIP, because the KEIP was "primarily retentive in nature." [Docket No. 1286]. The Opinion noted, in pertinent part, that to avoid the stringent requirements of section 503(c)(1), the Debtors must more closely link vesting of the KEIP Awards to metrics that are directly tied to challenging financial and operational goals for the businesses, tailored to the facts and circumstances of the case." See Opinion at 25.  Subsequent to the issuance of the Opinion,

---

[7]    The Debtors incorporate by reference herein the factual statements admitted into evidence in the earlier proceedings through declarations of Anne Janiczek, Ronald Greenspan, John Dempsey and John E. Mack. *See* Docket Nos. 812, 1005 & 1006 (the "**Declarations**"). Capitalized terms not otherwise defined herein shall have the meaning set forth in the KEIP/KERP Motion, the Reply and the Declarations.

the Court encouraged the Debtors to work with the UST and the Creditors' Committee to modify

the Original KEIP to comport with the Opinion and come back to the Court when there was

consensus among the parties.

19.    The Debtors followed the Court's instructions and by this Motion, present to the

Court the Modified KEIP that has the approval of both the UST and the Creditors' Committee.

**D.    Original KEIP Program**

20.    The Original KEIP was comprised of performance-based incentive payments

based on five separate milestones – (i) two sale-related metrics (closing the stalking horse sales

and conducting an auction for the assets) and (ii) three financial and operational metrics (i.e.,

compliance with DIP covenants, achieving the requisite Fannie Mae servicing rating and

achieving specific performance ratings).

### Sales Milestone (70%)[8]

- The Sales Milestone was deemed "achieved," and a KEIP Participant would earn up to a total of 70% of the KEIP award, with the KEIP Participant vesting in 42% of the award upon closing of the Platform Sale and 28% upon closing of the Legacy Sale at the negotiated stalking horse sale prices, or higher and better offers approved by the court.[9]
- 90% of the Sales Milestone (the "**Threshold Sales Award**") would be earned upon closing of each sale; and
- 10% of the Sales Milestone (the "**Target Sales Award**") would be earned upon an auction of the Debtors' assets, which results in the closing of a sale with a higher and better offer than the stalking horse purchase price.
- KEIP Participants were eligible to achieve up to an additional 100% of the Target Award if the sale proceeds realized through the auction process exceeded the relevant stalking horse bid by as much 3%.[10]

---

[8]    The Asset Sales, and the vesting of the awards, predicated on such sales, are intended to be treated separately.

[9]    In the event that the Platform Sale closing occurs prior to the closing of the Legacy Sale, KEIP Participants will still be eligible to earn the Legacy Sale award if they accept employment with the buyer in the Platform Sale and leave the Debtors' employ prior to the closing of the Legacy Sale.  Greenspan Decl. ¶34 fn. 3 [Docket No. 812].

[10]    The award level will be proportionate to the percentage of the potential 3% sale price increase actually achieved.

ny-1060785

**Financial/Operational Performance Milestone (30%)**

- Barclays DIP Covenant (10%)
  The DIP Covenant Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided the Debtors maintain compliance without being in default of the 20% Cash Flow Variance covenant (as such term is defined in the Barclays DIP financing agreement) through the earlier of (i) closing of the Platform Sale or (ii) payoff of the Barclays DIP.

- GSE Adherence (10%)
  The GSE Adherence Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided the Debtors maintain a year-to-date top 3 Fannie Mae service ranking, measured as of the earlier of (i) closing of the Platform Sale or (ii) December 31, 2012.

- Performance Rating (10%)
  The Performance Rating Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided such participant achieves an "Effective" rating based on his/her overall individual performance for all goals, as determined by the Debtors' compensation committee, measured as of the earlier of (i) closing of the Platform Sale or (ii) December 31, 2012.

21.    The total expected award amount for all KEIP awards was approximately $4.1 million, with a potential payout of $7.0 million if the final sale proceeds exceed anticipated sale proceeds by three percent or greater.  Greenspan Decl. ¶ 34 [Docket No. 812].

**E.    The Modified KEIP**

22.    The Debtors and their advisors set out to modify the Original KEIP to address the concerns of the UST and the Court.  As the Court noted in the Opinion, "[l]inking KEIP awards to increases in the auction sale prices of Debtors' assets, and to overall creditor recoveries may also provide permissible metrics for an incentivizing KEIP."  See Opinion at 25, n. 27.

23.    Accordingly, the most significant change from the original to modified program is that sale-related awards (from the Original KEIP) have been replaced with (i) an award tied to

7

the improvement in auction price (the "**Auction Metric**") and (ii) an award for closing the sales

(the "**Closing Metric**").

24.     In the original KEIP, a participant was entitled to receive 63% of their award for

closing the Asset Sales (and an additional 7% if an auction occurred).  In the Modified KEIP, the

70% sales-related awards have been restructured.  Specifically, an individual will only be

entitled to receive 20% of the overall award for closing the two asset sales. See Janiczek Decl. at

¶5.  In addition, an additional metric has been incorporated that ties 50% of the target awards to

augmenting aggregate sale proceeds at the auction.  The Sales Proceeds Award (defined herein)

is structured to allocate (on a sliding-scale basis) 4.25% of the incremental sales proceeds (net of

any break-up fees and expense reimbursements to be paid) generated by the Platform and Legacy

auctions to the KEIP incentive pool, subject to a cap of $4.9 million.[11]  See Janiczek Decl. at ¶9.

Under the revised process, the target award is achieved if the auction price (net of break-up fees

and expense reimbursement costs) improves by at least $48.3 million.[12]

25.     The remaining 30% of the KEIP award will include the pre-existing

financial/operational metrics, which the Debtors believe properly incentivizes the KEIP

Participants.  See Janiczek Decl. at ¶8.  As described at length in the Declarations, the KEIP

Participants have been and will continue to take on significant additional responsibility, in

addition to their normal daily activities and bankruptcy-related tasks, to provide additional value

to the Debtors' estate.

---

[11]   As with the Original KEIP, the Modified KEIP allows for the KEIP Participants to share in the upside if there is a robust auction with a significant increase in the auction price.  Accordingly, the aggregate maximum awards for the KEIP Participants could be as great as, but not exceed, $7.0 million.

[12]   Page 2 of the KEIP Presentation provides examples of how the participant's award amount increases with an improvement in the auction price.

8

**RELIEF REQUESTED**

26.     By this Motion, the Debtors seek entry of an order under Bankruptcy Code

section 503(c)(3) authorizing (i) implementation of the Modified KEIP, and (ii) payment of any

obligations arising thereunder as administrative expenses.[13]

**BASIS FOR THE RELIEF REQUESTED**

**I.      THE KEIP SHOULD BE AUTHORIZED PURSUANT TO BANKRUPTCY CODE
SECTION 503(3) BECAUSE IT HAS A SOUND BUSINESS PURPOSE**

27.     The Debtors respectfully submit that the Modified KEIP is governed by, and

meets the standards for approval under, section 503(c)(3) of the Bankruptcy Code.  Key

employee plans outside of the ordinary course and not governed by Bankruptcy Code section 363

must be analyzed under Bankruptcy Code section 503(c).  See In re Borders Grp., Inc., 453 B.R.

459, 470-71 (Bankr. S.D.N.Y. 2011); In re Mesa Air Grp., Inc., No. 10-10018 (MG), 2010 WL

3810899 (Bankr. S.D.N.Y. Sept. 24, 2010).[14]  Bankruptcy Code section 503(c) restricts a

debtor's ability to treat certain payments to "insiders" as administrative expenses.  The Debtors

acknowledge that the KEIP Participants are "insiders," as defined in section 101(31) of the

Bankruptcy Code; however, section 503(c) of the Bankruptcy Code does not bar approval of the

KEIP.

28.     Bankruptcy Code section 503(c)(1) restricts payments made to "insiders of the

debtor for the purpose of inducing such person to remain with the debtor's business" – i.e. those

insider plans that are essentially "pay to stay" plans.  In re Velo Holdings, Inc., 472 B.R. 201,

---

[13]  The Debtors represent that the Modified KEIP will comply with the limitations on employee compensation
      imposed by the Troubled Asset Relief Program.

[14]  Due to the volume of the unreported orders cited herein, such orders are not annexed to the Motion.  Copies of
      these orders (and, where cited material comes from motions and/or transcripts associated with the orders, copies
      of the relevant motions and/or transcripts) are being delivered to Chambers with copies of this Motion and will
      be made available to other parties in interest upon request to Debtors' counsel.

ny-1060785

210 (Bankr. S.D.N.Y. 2012) (citation omitted); In re Borders Grp., Inc., 453 B.R. at 471 (quoting

In re Dana Corp., 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) ("Dana II")). [15]

29.    Section 503(c) does not "foreclose a Chapter 11 debtor from reasonably

compensating employees, including 'insiders,' for their contribution to the debtors'

reorganization." In re Velo Holdings, Inc., 472 B.R. at 209 (citing Dana II, 358 B.R. at 575).

Instead, debtors may implement incentive plans covering insiders that meet the requirements of

Bankruptcy Code section 503(c)(3). See In re Borders Grp., Inc., 453 B.R. at 471.

30.    The Debtors' businesses are highly people-intensive service businesses that derive

a substantial portion of their value from their employees. The KEIP is necessary to ensure that

the Debtors' employees remain motivated in these difficult and taxing times. See Janiczek Decl.

at ¶4. Accordingly, the Debtors respectfully submit that the KEIP should be evaluated under

Bankruptcy Code section 503(c)(3) and is "justified by the facts and circumstances of the case."

A.    **The Modified KEIP Incentivizes the KEIP Participants to Effectuate a
Value-Maximizing Sale of the Debtors' Businesses for the Benefit of All
Stakeholders**

31.    The Modified KEIP was carefully crafted to align the interests of the KEIP

Participants with the interests of the Debtors' stakeholders, by incentivizing the KEIP

Participants to achieve the highest possible value for the Debtors' assets and close the value-

maximizing Asset Sales.

1.    **Sales Proceeds Award (50%)**

32.    As modified, fifty (50%) percent of the target KEIP awards is tied to increasing

the sale proceeds realized at the auction (i.e., from opening bid to winning bid). The incremental

sales proceeds under this metric are calculated based on the aggregate stalking horse bids of

---

[15]    Section 503(c)(2) also restricts payments of severance to insiders. Because the KEIP does not propose to make
any payments to insiders arising from termination of their employment with the Debtors, section 503(c)(2) is
inapplicable.

ny-1060785

approximately $3.9 billion and are net of any break-up fees or expense reimbursements.  The

Debtors must generate an additional $48.3 million, or a 1.2% increase, in incremental sales

proceeds to receive the target Sales Proceeds Award of $2.1 million.  In order to receive the

maximum allocation of $4.9 million under this metric, the auctions must generate incremental

sales proceeds of $115.8 million, or a 3% increase over the stalking horse bids. See KEIP

Presentation at 2.

33.    By tying 50 percent of the target Modified KEIP award to achieving an increase

in the sales proceeds at the auction, the Debtors align their interests with their creditors and

properly incentivize the KEIP Participants to continue to perform at the highest levels in order to

achieve one of the primary objectives of chapter 11 - - the sale of the Debtors' businesses as a

going concern and maximizing recoveries for creditors.  See Janiczek Decl. at ¶11.  In fact, such

an approach has been taken by numerous debtors, both in New York and Delaware. See Velo

Holdings, No. 12-11384 (MG) (Bankr. S.D.N.Y. June 6, 2012) [Docket No. 232] (approving, in

part, 2% incremental incentive payout increase for every 1% above 125% of target sales price for

each of two sales of the debtors' business units); see also In re Trident Microsystems, Inc., No.

12-10069 (CSS) (Bankr. D. Del. Feb. 24, 2012) [Docket No. 250] (approving KEIP providing, in

part, for incentives equal to 3.122% of the total consideration received for the debtors television

business unit, provided that the sale price exceeded $20 million); In re Evergreen Solar, No. 11-

12590 (MFW) (Bankr. D. Del. Sept. 6, 2011) [Docket No. 140] (approving KEIP with payouts

equal to 5% of purchase price, subject to a minimum KEIP payout of $1 million, in the event of a

sale to a bidder other than the stalking-horse bidder); TerreStar Networks, Inc., No. 10-15446

(SHL) (Bankr. S.D.N.Y. Feb 23, 2011) [Docket No. 444] (approving sale incentive plan with

minimum payout of $6.5 million in the event of a $1.215 billion sale, with increased payouts for

increased sale prices); In re Spheris, Inc., No. 10-10352 (KG) (Bankr. D. Del. Mar. 25, 2010)

[Docket No. 226] (approving KEIP with award paid if purchase price exceeded stalking-horse

bid by $3 million, with additional bonus if the purchase price exceeded the stalking horse-bid by

$6 million); In re Proliance Int'l, Inc., No. 09-12278 (CSS) (Bankr. D. Del. Aug. 21, 2009)

[Docket No. 260] (approving incentive plan that would pay, in part, 5% of sale proceeds in

excess of $16 million sale of a portion of the debtors businesses, subject to a cap); In re

Nanogen, Inc., 09-11696 (KJC) (Bankr. D. Del. June 24, 2009) [Docket No. 167] (approving

KEIP awarding participants a base award for a sale price between $20 and $22 million, plus 3%

of sale proceeds in excess of $22 million, 5% of sale proceeds in excess of $24.5 million, and 7%

of sale proceeds in excess of $27.5 million).

34.    Moreover, in Velo Holdings, this Court found that because the target sales

amounts were fair baselines for the value to the estate, each of the proposed performance targets

would properly incentivize the key employees to perform at the highest levels.  Velo Holdings,

472 B.R. at 211 (approving KEIP where key employees could receive additional awards if net

sales proceeds exceeded the baseline values).  Similarly, in approving the stalking horse sales

procedures, in this case, the Court found the asset purchase agreements to be reasonable

benchmarks for value to be delivered to creditors and designed to maximize the value of the

Debtors' estates.  See Order Under 11 U.S.C. §§ 105, 363(b) and 365 (I) Authorizing and

Approving Sales Procedures, Including Payment of Break-Up Fees; (II) Scheduling Bid

Deadline, Auction (if necessary) and Sale Hearing; (III) Establishing Assumption and

Assignment Procedures for Fixing Cure Amounts; and (IV) Establishing Notice Procedures and

Approving Forms of Notice, at ¶¶ H, M, In re Residential Capital, LLC, No. 12-12020 (Bankr.

S.D.N.Y. June 28, 2012) [Docket No. 538]. Thus, the Sales Award properly incentivizes the

KEIP Participants to produce value prior to receiving any award under this metric, which is consistent with KEIPs that have been approved in cases in this district and the other bankruptcy courts cited herein.

### 2.    Closing the Stalking Horse Bids (20%)

35.    In response to this Court's holding that the original KEIP awards for closing the pre-negotiated APAs were over-weighted (63%) relative to the other KEIP metrics, the Debtors significantly reduced the weighting for closing the stalking horse bids to only 20% of the overall award.

36.    It is undisputed that a significant amount of work needs to be completed to close the sales, and rewarding the senior executives for taking on responsibilities well beyond their ordinary duties is proper under the circumstances. See Velo Holdings, 472 B.R. at 211; see also In re Borders Grp., Inc., 453 B.R. at 472 (approving a KEIP that encouraged the debtor's executives to increase their pre-bankruptcy job responsibilities to achieve the bonus requirements and financial targets); see also Dana II, 358 B.R. at 583 (finding that reaching certain targets that were contingent upon negotiations with third parties are unpredictable and not a "layup."). In tying a lower percentage of the KEIP award to the closing of the existing stalking horse bids, the Debtors will reward the KEIP Participants' post-petition efforts to preserve the valuable servicing platform and address the myriad of regulatory and contractual issues associated with delivering a going-concern financial services company to a third party.

### 3.    Barclays DIP Covenant (10%) (Unchanged)

37.    The Debtors' continued compliance with the Barclays DIP facility is necessary for the Debtors to continue operating as a going concern during the sale process. The Debtors' value is inextricably linked to its ability to sell the platform as a going concern. Continued stress in the mortgage market and the Debtors' obligations under the government consent orders add

13

pressure to the Debtors' already constrained liquidity. See Greenspan Supp. Decl. at ¶15 [Docket No. 1006]. In Velo Holdings, this Court found that tying a substantial portion of the ACU target to compliance with the DIP budget appropriate because the performance measures the same targets set for the Debtors' businesses and "the Executive Employees [we]re required to *do more* to meet the wide-scale goals… as they must address concerns and issues that are unique to the bankruptcy proceeding." Velo Holdings, 472 B.R. at 210; see also Dana II, 358 B.R. at 582 (finding that financial targets were difficult to reach because of the market environment in general). Here, the global capital and U.S. mortgage markets continue in a state of flux that requires management to proactively plan and respond to so that they maximize the Debtors' ability to comply with both the revenue and expense budgetary requirements. External market factors and the Debtors' limited ability to originate new mortgages have made achievement of this metric substantially more difficult.

### 4.      Fannie Mae Servicer Rating (10%) (Unchanged)

38.      The KEIP's Fannie Mae Servicer Rating milestone is triggered by achieving a year-to-date "top three" Fannie Mae servicer ranking as of the earlier of a closing of a sale or December 31, 2012. Satisfaction of this milestone entitles the KEIP Participants to 10% of their overall target KEIP award. As discussed in the Motion and the Declarations, for most of the pre-bankruptcy months of 2012, the Debtors were at or near the top of the Fannie Mae servicer rankings for their peer group - in January and March, 2012 the Debtors ranked second among their peer group, and in February they ranked first. However, in April and May, the Debtors' servicer ranking dropped to sixth and fifth, respectively due in part to the addition of three new servicers to the Debtors' peer group, two of which are ranked in the top three and one of which holds the top rank. The Debtors' lower servicer ranking was partially the result of worsening

delinquency ratios as a result of decreases in origination activities intended to manage the

Debtors' cash reserves.[16]  See Greenspan Supp. Decl. at ¶5 [Docket No. 1006].

39.    Maintaining a high servicer score and ranking adds value to the Debtors' estates

because of the value the Fannie Mae servicing rights add to the servicing platform (and the tag-

along effect on all other servicing contracts if the Fannie Mae contract were to be compromised).

Id.  at ¶6.  However, achieving this metric will be difficult due to factors that are outside the

Debtors' control.  First, Fannie Mae added additional servicers to the Debtors' peer pool.

Second, delinquency ratios are increasing due to the Debtors' reduced origination activities,

which is also tied to meeting the DIP covenants as discussed above. See Velo Holdings, 472 B.R.

at 208; see also Dana II, 358 B.R. at 583 (finding that benchmarks for debtor's incentive plan that

are difficult targets to achieve are incentivizing).

### 5.    "Effective" Performance Rating (10%) (Unchanged)

40.    The Debtors' success in these cases requires the highest level of performance

from the KEIP Participants collectively.  The Debtors' prepetition human resources policy was to

assign a performance rating to all employees during the annual performance review process as

determined by an employee's supervisor.  Four performance levels could be achieved: (i)

Outstanding, (ii) Effective, (iii) Inconsistent, and (iv) Does Not Meet Expectations.  The

Performance Rating Milestone, consistent with the Debtors' prepetition practices, is designed to

challenge and incentivize employees to elevate the performance of their roles and each of the

additional responsibilities that are necessary simply as a result of the Debtors' filing a petition

for bankruptcy protection.  Also consistent with past practice, employees' supervisors will

---

[16]    Decreased loan originations result in a lower number of new, performing loans being added to the Debtors' loan
portfolio.  Combined with the inevitable repayment of existing loans and some existing loans rolling to
delinquent status, fewer new performing loans will result in increased delinquency ratios, especially when
compared to other servicers whose portfolios are growing because they do not face the Debtors' liquidity issues.

continue to set goals and regularly evaluate employees' performances.  See Greenspan Supp.

Decl. at ¶16 [Docket No. 1006].  Thus, the Performance Rating metric will take into account the

incremental post-petition responsibilities of each KEIP Participant.

**B.     The KEIP Should be Approved under Bankruptcy Code Section 503(c)(3)**

41.     Bankruptcy Code section 503(c)(3) governs incentive compensation plans like the

KEIP.  In re Borders Grp., Inc., 453 B.R. at 471 (concluding that a proposed KEIP was an

incentive plan, thus "alleviating the need for a section 503(c)(1) analysis," and instead analyzing

the KEIP under section 503(c)(3)).  Bankruptcy Code section 503(c)(3) precludes "transfers or

obligations that are outside of the ordinary course of business and not justified by the facts and

circumstances of the case. . .."  11 U.S.C. § 503(c)(3).  The "facts and circumstances of the case"

test in section 503(c)(3) is "no different than the business judgment standard under section

363(b)."  In re Borders Grp., Inc., 453 B.R. at 473; see also In re Velo Holdings Inc., 358 B.R. at

212; In re Mesa Air Grp., Inc., 2010 WL 3810899, at *3.  In determining whether a

compensation proposal meets the requirements of Bankruptcy Code section 503(c)(3), courts

consider several factors, including:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

16

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

Dana II, 358 B.R. at 576-77 (emphasis in original); see also In re Borders Grp., Inc., 453 B.R. at 474-77 (applying Dana II factors).  The KEIP satisfies each of these requirements and should be approved pursuant to Bankruptcy Code section 503(c)(3).

42.    Courts in this and other districts regularly approve incentive plans with features similar to the KEIP.  See, e.g., In re Velo Holdings, Inc., No. 12-11384 (MG) (June 6, 2012) [Docket No. 232] (approving sale related incentive plan based upon DIP budget goals); In re Borders Grp., Inc., 453 B.R. at 465 (approving a key employee incentive plan covering fifteen key executives and their achievement of transactional and financial goals); In re Diamond Glass, Inc., No. 08-10601 (CSS) (Bankr. D. Del. June 6, 2008) [Docket No. 312] (approving sale incentive plan for twenty-one employees, including insiders, portion of plan pool funding upon consummation of a sale to the stalking horse prepetition lender); In re Allen Family Foods, Inc., No. 11-11764 (KJC) (Bankr. D. Del. July 13, 2011) [Docket No. 173] (same); In re New Century TRS Holdings Inc., No. 07-10416 (KJC) (Bankr. D. Del. May 25, 2007) [Docket No. 896] (approving a sale incentive plan payable for consummating a sale to a stalking-horse bidder at the stalking horse bid).

43.    First, the KEIP is calculated to align the interests of the KEIP Participants and the Debtors' stakeholders.  Greenspan Decl. ¶ 17 [Docket No. 812].  As described above, the Debtors believe that including both objective sale and financial and operations milestones in the Modified KEIP strikes the proper balance between encouraging the KEIP Participants to expeditiously work toward a sale and also providing the KEIP Participants with an incentive to seek to obtain higher and better offers to maximize the value of the estates for the benefit of all creditors.  Moreover, the Modified KEIP is critical to keeping the KEIP Participants motivated

17

and maintaining morale by providing them with the opportunity to replace the prepetition BCIP plan.

44.    Second, the cost of the Modified KEIP is reasonable and consistent with (or even below) industry standards, particularly when compared with the Debtors' revenues and the aggregate of the stalking horse bids for the Asset Sales.  In total, the Debtors propose to pay a maximum of $7 million under the KEIP, or 0.18% of expected proceeds from the Asset Sales, which is well below the 0.68% cost/proceeds average for comparable programs.  Report at 4.  Indeed, the total potential KEIP award, as a percentage of sales proceeds, falls well below the 25th percentile of KEIP plans in comparable bankruptcy cases.  See Dempsey Decl. ¶ 19; Report at 4 [Docket No. 812].  Additionally, Target Sales Awards are reasonable as compared to comparable KEIP plans.  They range from 52% to 117% of base salary, with an average target award of $241,353.  Greenspan Decl. ¶ 34 [Docket No. 812].

45.    Despite the limited precedent for transactions of the size and complexity presented here, they have designed a compensation structure that is reasonable and well within market standards for the industry and companies in Chapter 11.

46.    Third, the scope of the Modified KEIP is fair and reasonable, as it applies to the 17 senior executives (excluding the CEO, President and Chief Capital Markets Officer) out of an employee population of over 3,600.  The Debtors have identified these individuals as the primary decision-makers who affect the direction of the Debtors' businesses and are therefore, critical to achieving the objective of closing the Asset Sales.   Greenspan Decl. ¶ 17 [Docket No. 812].  Additionally, purchasers of the Debtors' assets have expressed their opinion that they are impressed by the Debtors' management team.  Greenspan Decl. ¶ 20 [Docket No. 812].

18

47.    <u>Fourth</u>, the Modified KEIP was devised after extensive due diligence and

discussions with third parties.  FTI assisted the Debtors in devising the Modified KEIP after

carefully reviewing incentive plans instituted by comparable companies in Chapter 11 and

compensation plans of executives both in and out of bankruptcy.  The Debtors and their

professionals also conducted extensive analyses of incentive-based plans in complex Chapter 11

cases. Ultimately, after reviewing the results of the due diligence produced by FTI and Mercer,

the compensation committee of the Debtors' board of directors determined that the Modified

KEIP was appropriate, reasonable in cost and scope, and reasonably calculated to achieve the

Debtors' goals.  Most importantly, the Modified KEIP was vetted with both the UST and the

Creditors' Committee and neither party has an objection to its structure or proposed payments.

48.    <u>Finally</u>, in addition to consulting with FTI and Mercer, the Debtors engaged

counsel in discussions regarding the need for the KEIP, its scope, and its terms and tapped into

counsel's experience in negotiating and devising incentive plans on behalf of both debtors and

official creditors' committees.

49.    In sum, the Modified KEIP is necessary to encourage each of the KEIP

Participants to work toward the Debtors' ultimate goal – maximizing the estates' value for the

benefit of the Debtors' stakeholders through a sale of the Debtors' businesses as a going concern.

Accordingly, the Modified KEIP is "justified by the facts and circumstances" of these Chapter

11 cases and should be approved under section 503(c)(3).

**NOTICE**

50.    The Motion is being served in a manner consistent with the Court's Case

Management Procedures Order [Docket No. 141].  Because bids for the Asset Sales are due on

October 19, 2012, the Debtors have requested that the Motion be heard on October 17, 2012.

19

## CONCLUSION

The Debtors respectfully submit that the Modified KEIP is justified by the facts and

circumstances of these cases, represents a valid exercise of the Debtors' business judgment, and

is necessary and in the best interest of the Debtors, their creditors, and their estates.

Accordingly, the Modified KEIP should be approved, along with any obligations arising

thereunder, pursuant to section 503(c)(3) of the Bankruptcy Code.

Dated:  October 9, 2012
      New York, New York

                    /s/ Gary S. Lee
                    Gary S. Lee
                    Lorenzo Marinuzzi
                    Jordan A. Wishnew
                    MORRISON & FOERSTER LLP
                    1290 Avenue of the Americas
                    New York, New York 10104
                    Telephone: (212) 468-8000
                    Facsimile: (212) 468-7900

                    *Counsel for the Debtors and*
                    *Debtors in Possession*