**Hearing Date**: October 17, 2012 at 2:00 p.m. (ET)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage
Jennifer L. Marines

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' OMNIBUS REPLY TO THE RMBS TRUSTEES'
PRE-AUCTION OBJECTIONS TO THE DEBTORS' SALE MOTION**

ny-1056996

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ...............................................................................................................2

REPLY ................................................................................................................................4

I.    THE DEBTORS HAVE PROVIDED AND WILL CONTINUE TO PROVIDE ADEQUATE ASSURANCE OF NATIONSTAR'S ABILITY TO PERFORM UNDER THE SERVICING AGREEMENTS ..............................................................4

II.    THE SALE MOTION DOES NOT IMPERMISSIBLY LIMIT NATIONSTAR'S FUTURE PERFORMANCE .......................................................................................5

III.   THE PROVISIONS REQUIRING THIRD-PARTY CONSENT AND OTHER CONDITIONS TO TRANSFER CONSTITUTE ANTI-ASSIGNMENT CLAUSES THAT ARE UNENFORCEABLE UNDER SECTION 365(F) OF THE BANKRUPTCY CODE ...........................................................................................6

IV.   THE DEBTORS PROPOSE ADDRESSING PRE-CLOSING INDEMNIFICATION OBLIGATIONS THROUGH A RESERVE AND ESTIMATION PROCESS ...............................................................................................8

CONCLUSION ................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Chera v. 991 Blvd. Realty Corp. (In re Nat'l Shoes, Inc.)*,
  20 B.R. 55 (Bankr. S.D.N.Y. 1982) ..................................................................................... 8

*Cinicola v. Scharffenberger*,
  248 F.3d 110 (3d Cir. 2001) ............................................................................................. 10

*DB Structured Prods., Inc. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)*,
  402 B.R. 87 (Bankr. D. Del. 2009) ..................................................................................... 8

*Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*,
  316 B.R. 772 (Bankr. S.D.N.Y. 2004) ................................................................................ 6

*L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Centers, Inc.)*,
  209 F.3d 291 (3d Cir. 2000) ............................................................................................... 7

*In re Adelphia Bus. Solutions, Inc.*,
  341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003) ..................................................................... 10

*In re Chemtura Corp.*,
  448 B.R. 635 (Bankr. S.D.N.Y. 2011) .............................................................................. 10

*In re Chi. Invs., LLC*,
  470 B.R. 32 (Bankr. D. Mass. 2012) ................................................................................ 11

*In re Jamesway Corp.*,
  201 B.R. 73 (Bankr. S.D.N.Y. 1996) .................................................................................. 6

*In re Lafayette Radio Elecs. Corp.*,
  9 B.R. 993 (Bankr. E.D.N.Y. 1981) ................................................................................... 8

*In re Texas Health Enters., Inc.*,
  246 B.R. 832 (Bankr. E.D. Tex. 2000) ............................................................................. 10

*In re TXCO Res., Inc.*,
  No. 09-51807, 2010 Bankr. LEXIS 5660 (Bankr. W.D. Tex. Jan. 27, 2010) .................... 11

*In re U.L. Radio Corp.*,
  19 B.R. 537 (Bankr. S.D.N.Y. 1982) .................................................................................. 6

*In re Uniq Shoes Corp.*,
  316 B.R. 748 (Bankr. S.D. Fla. 2004) .............................................................................. 10

*In re Washington Capital Aviation & Leasing*,
   156 B.R. 167 (Bankr. E.D. Va. 1993) ......................................................................................10

*Raddison Design Mgmt., Inc. v. Cummins*,
   No. 07-92, 2008 WL 55998 (W.D. Pa. Jan. 3, 2008) ...............................................................10

**STATUTES**

11 U.S.C § 365(b)(1) ......................................................................................................................8

11 U.S.C. § 365(f)(1) .....................................................................................................................6

**OTHER AUTHORITIES**

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...........................................7

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 ...............................................7

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**")[1] submit this omnibus reply (the "**Reply**")[2] to objections (the "**Pre-Auction Objections**")[3] filed to the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (I)(A) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expenses Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 61] (the "**Sale Motion**").[4]  In support of the Reply, the Debtors, by and through their undersigned counsel, respectfully represent:

---

[1]  The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of the Debtors' "First Day" Pleadings* [Docket No. 6].

[2]  Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Reply may refer to http://www.kccllc.net/rescap for additional information.

[3]  The following relevant objections have been filed: (1) *Pre-Auction Objections of the RMBS Trustees to the Debtors' Sale Motion* [Docket No. 1242] filed by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas ("**Deutsche Bank**"), The Bank of New York Mellon Trust Company, N.A. ("**BNY**"), U.S. Bank National Association ("**U.S. Bank**"), and Wells Fargo Bank, N.A. ("**Wells Fargo**" and together with Deutsche Bank, BNY, and U.S. Bank, the "**RMBS Trustees**"); (2) *Joinder of Wells Fargo Bank, N.A., as Master Servicer For Residential Mortgage Backed Securities Trusts to "Pre-Auction Objections of the RMBS Trustees to the Debtors' Sale Motion"* [Docket No. 1243]; (3) *Joinder of U.S. Bank National Association as Master Servicer For Residential Mortgage Backed Securities Trusts to the Pre-Auction Objections of the RMBS Trustees to the Debtors' Sale Motion (Docket No. 1214)* [Docket No. 1246].  In addition, Frost National Bank filed a *Joinder of Frost National Bank in RMBS Trustees' Pre-Auction Objection to Debtors' Sale Motion* [Docket No. 1249].

[4]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

1

ny-1056996

## INTRODUCTION

1.      The sale of the Servicing Platform is expected to yield approximately $2.3 billion (if not more) of value to the Debtors' estates and is the fundamental driver of recovery for the Debtors' stakeholders. The terms of the Servicing Platform sale are memorialized in the Nationstar APA, which, among other things, provides for the transfer of Servicing Agreements to Nationstar. Although the RMBS Trustees object to the sale of the Servicing Platform, the sale will unquestionably yield a far better result for the RMBS Trustees than a liquidation of the Debtors' business because, under those circumstances, the Debtors would be forced to reject the Servicing Agreements, leaving the RMBS Trustees with general unsecured claims for contract rejection damages and the burden of self-servicing hundreds of transactions or finding replacement servicers.

2.      As part of the arm's length negotiations with Nationstar that preceded the Nationstar APA, Nationstar determined that it would acquire those assets and assume those obligations that are integral to the operation of the Debtors' servicing business. In order to more carefully delineate what obligations it was acquiring across a broad spectrum of servicing related agreements, Nationstar and the Debtors agreed to define with some specificity the types of obligations being assumed. Throughout, Nationstar's objective has been clear – to acquire and assume responsibility for the operations of a loan servicing business from and after the closing date of the transaction, and to leave behind the liabilities attributable to the Debtors' pre-closing operation of the business, which, in turn, will be addressed as part of the Debtors' claims resolution process.

3.      The RMBS Trustees raise four objections to the sale of the Servicing Platform. One is premature; the remainder should be overruled. *First*, the RMBS Trustees assert that the

Debtors have not provided adequate assurance of Nationstar's future performance of the Servicing Agreements. With respect to such objection, the Debtors and Nationstar have provided the RMBS Trustees with various supporting documentation evidencing Nationstar's ability to perform. The Debtors will also introduce evidence at the Sale Hearing that demonstrates adequate assurance of future performance by Nationstar or another successful bidder.

4. *Second*, the RMBS Trustees argue that the servicing related obligations contained in the Servicing Agreements cannot be severed from one another. This objection is fundamentally at odds with the Nationstar APA. Nationstar is in fact assuming all post-closing liabilities related to the Debtors' servicing business. Nationstar and the Debtors will clarify these points in a revised sale approval order.

5. *Third*, the RMBS Trustees insist on the enforcement of certain rating and consent requirements contained in the Servicing Agreements. Those conditions include obtaining "no downgrade" letters from rating agencies and third party consents. As demonstrated below, such contractual requirements are impermissible anti-assignment provisions that are unenforceable under section 365(f)(1) of the Code.

6. *Finally*, the RMBS Trustees insist that Nationstar must agree to assume an obligation to indemnify the RMBS Trustees for any claims arising out of the Debtors' pre-closing operations of their businesses. That such claims may not be discovered until after the closing date does not alter the result: any such "latent" liabilities are in the nature of a cure claim, which would be required (if known today) to be paid by the Debtors under section 365(b)(2). To instead require Nationstar to assume such an obligation would shift the obligation to pay cure claims to the assignee. Moreover, indemnity claims must be limited to servicing related claims,

3

as all other obligations under the agreements are being rejected – any indemnity claim arising out of origination breaches, for example, would be ordinary general unsecured claims.

7. To the extent any such pre-closing claims are discovered post-closing and would otherwise be payable by the Debtors under the applicable Servicing Agreements, the Debtors have proposed establishing a reserve for a specified duration, based on historical indemnification liabilities incurred by the Debtors. Establishing an escrow is practical – it addresses the RMBS Trustees' concerns regarding the source of payment for certain latent liabilities, while balancing a fundamental concern of the Debtors: proceeding to Auction and maximizing value to the estate.

8. In parallel with the Debtors' escrow proposal, the Debtors continue to work with Nationstar and the RMBS Trustees in the hopes of consensually resolving the Pre-Auction Objections. In the event, however, that no satisfactory resolution is reached by October 17, 2012, and mindful of the Auction on October 23, 2012, the Debtors respectfully request that this Court enter an Order overruling the Pre-Auction Objections and granting the Debtors such other relief as is just and proper.

## REPLY

**I. THE DEBTORS HAVE PROVIDED AND WILL CONTINUE TO PROVIDE ADEQUATE ASSURANCE OF NATIONSTAR'S ABILITY TO PERFORM UNDER THE SERVICING AGREEMENTS.**

9. The RMBS Trustees acknowledge that the Debtors and Nationstar have provided, and continue to provide, financial and other information demonstrating Nationstar's ability to perform under the Servicing Agreements. The Debtors submit (and will present supporting facts to the Court at the Sale Hearing) that Nationstar possesses the credibility, willingness, and operational and financial resources needed to assume the obligations contemplated by the sale of the Servicing Platform and the assignment of the Servicing Agreements.

## II. THE SALE MOTION DOES NOT IMPERMISSIBLY LIMIT NATIONSTAR'S FUTURE PERFORMANCE.

10. Nationstar is assuming all post-closing liabilities related to the Debtors' servicing business based on the mortgage loans' servicing status at that time. What Nationstar has not agreed to assume is any liability for any act or omission of the Debtors arising on or before the closing date.

11. The scope of Nationstar's post-closing obligations would include, for example, the obligation to perform future servicing duties (such as REO property remediation) that could be traced to any pre-closing "acts or omissions" of the Debtors. Furthermore, in response to the RMBS Trustees concerns regarding Nationstar "drop[ping] the defense of hundreds (if not thousands) of lawsuits against the RMBS Trusts and/or the RMBS Trustees that the Debtors, in their role as servicer, were defending pre-bankruptcy . . .",[5] sections 2.7 and 3.1(a) of the Nationstar APA generally provide that Nationstar will assume responsibility for all servicing obligations from and after the closing date. No exception exists for the defense of lawsuits involving loan servicing practices, consumer lending issues, or foreclosure litigation already in process.

12. To the extent the RMBS Trustees would like these concepts clarified in a revised form of Sale Approval Order, the Debtors will work with Nationstar to incorporate a mutually agreeable provision.

---

[5] *See* Pre-Auction Objection at ¶ 10.

### III. THE PROVISIONS REQUIRING THIRD-PARTY CONSENT AND OTHER CONDITIONS TO TRANSFER CONSTITUTE ANTI-ASSIGNMENT CLAUSES THAT ARE UNENFORCEABLE UNDER SECTION 365(F) OF THE BANKRUPTCY CODE.

13.  The provisions of the Servicing Agreements that require third-party consent or similar conditions to transfer, such as the requirement to obtain rating agency "no downgrade" letters, are impermissible anti-assignment provisions that are unenforceable under section 365(f)(1) of the Code. Courts routinely refuse to enforce these clauses because their restriction on assignment directly contradicts section 365(f) of the Code and frustrates the fundamental bankruptcy policy of maximizing the value of a debtor's assets for the benefit of all parties in interest.

14.  By its express terms, section 365(f)(1) of the Code provides that assignment under section 365(f)(2) is permissible "notwithstanding a provision in an executory contract…, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract…." 11 U.S.C. § 365(f)(1). The scope of this section is broad – all contractual provisions, not merely those denominated "anti-assignment" or *ipso facto* clauses, are subject to Court scrutiny regarding their anti-assignment effect. *In re Jamesway Corp.,* 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996).

15.  Section 365(f) was designed by Congress to preserve and maximize the value of the assets of a debtor's estate. *See, e.g., Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.),* 316 B.R. 772, 794 (Bankr. S.D.N.Y. 2004) ("Section 365(f) performs an important function for maximizing the value in an estate for creditors."); *In re Jamesway Corp.* 201 B.R. at 77 (recognizing that Section 365 "reflects the clear Congressional policy of assisting the debtor to realize the equity in all of its assets."); *In re U.L. Radio Corp.*, 19 B.R. 537, 540 (Bankr. S.D.N.Y. 1982) ("The aim of this statutory authority. . . is to 'assist in the

6

debtor's rehabilitation or liquidation.'") (quoting H.R. Rep. No. 95-595, at 348 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6304; S. Rep. No. 95-989, at 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.),* 209 F.3d 291, 299 (3d Cir. 2000) (the Bankruptcy Code "generally favors free assignability as a means to maximize the value of the debtor's estate and, to that end, allows the trustee to assign notwithstanding a provision in the contract or lease, or applicable law, prohibiting, restricting, or conditioning assignment.")

16. The RMBS Trustees would have the Court enforce provisions within the Servicing Agreements that are unenforceable anti-assignment provisions under the umbrella of "adequate protection of future performance." As an initial matter, it is up to this Court to determine whether Nationstar or any other successful bidder can provide the RMBS Trustees with adequate assurance of future performance. Adequate assurance of future performance itself does not require full performance or guaranteed performance of every condition set forth in the Servicing Agreements.

17. Each of the provisions the RMBS Trustees cite constitutes an impermissible anti-assignment provision. For example, the rating agency no downgrade letter (assuming such a letter could even be obtained in a reasonable period of time) is a limitation that has already been struck down as an impermissible anti-assignment clause by the Bankruptcy Court for the District of Delaware. *See* Transcript of Hearing, *In re Capmark Fin. Group Inc.,* No. 09-13684 (Bankr. D. Del. Oct. 25, 2009) (court rejected argument that a rating downgrade would cause significant economic harm and would deprive the servicing agreement counterparties the benefit of their bargain, noting that rating agencies, as a practice, "don't and won't provide a written agreement or commitment to [reinstate existing ratings] prior to the closing [of a sale]")

7

(transcript is attached hereto as Exhibit 1); *see also DB Structured Prods., Inc. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc*.), 402 B.R. 87, 100-04 (Bankr. D. Del. 2009) (court struck down requirement of Freddie Mac qualification as "contractual boilerplate included in most [servicing agreements] as a proxy for monitoring the financial wherewithal of the servicer."). Requirements for third party consents, including insurer consent, are similarly unenforceable as impermissible anti-assignment provisions under section 365(f)(1).

### IV. THE DEBTORS PROPOSE ADDRESSING PRE-CLOSING INDEMNIFICATION OBLIGATIONS THROUGH A RESERVE AND ESTIMATION PROCESS.

18. Section 365(b)(1) of the Code provides that the debtor may not assume an executory contract or unexpired lease unless, at the time of assumption, the debtor: (a) cures defaults or provides adequate assurance that defaults will be cured promptly; (b) compensates the non-debtor party to the lease or contract for any actual pecuniary loss resulting from defaults; and (c) provides adequate assurance of future performance. *See* 11 U.S.C § 365(b)(1). The RMBS Trustees have objected that the Sale Motion fails to satisfy this standard because the Nationstar APA provides that Nationstar will not assume liabilities for servicing defaults and related indemnification obligations that exist at the time of closing but that are unrealized and/or undiscovered until after closing occurs (collectively, the "**Pre-Closing Indemnification Obligations**").

19. The requirement under section 365(b)(1) that any existing defaults be cured, and the related requirement that a debtor must provide adequate assurance of future performance, is intended to assure that the non-debtor party to the contact receive the benefit of the bargain for which he has contracted. *Chera v. 991 Blvd. Realty Corp. (In re Nat'l Shoes, Inc.)*, 20 B.R. 55, 59 (Bankr. S.D.N.Y. 1982). The contract counterparty, however, is not entitled to greater rights than are given by the lease or contract. *In re Lafayette Radio Elecs. Corp.*, 9 B.R. 993, 998

(Bankr. E.D.N.Y. 1981). Here, the RMBS Trustees are not entitled to compensation for potential or speculative defaults under the Servicing Agreements that may never occur.

20. Similarly, Nationstar cannot be forced to incur obligations it has not agreed to assume as part of its proposal for the Debtors' Servicing Platform. The Nationstar APA was heavily negotiated at arm's length and represents the terms on which Nationstar is prepared to acquire the Debtors' business. Faced with the RMBS Trustee's concerns, the Debtors asked Nationstar to assume the Pre-Closing Indemnification Obligations. Indeed, this was the focus of many meetings and negotiations between the RMBS Trustees, the Debtors, and Nationstar. As of the filing of this Reply, however, Nationstar remains unwilling to assume the Pre-Closing Indemnification Obligations, and the parties have been unable to consensually resolve this issue.

21. Nevertheless, there is no requirement under the Code, or otherwise, that requires a purchaser of assets through a section 363 sale to incur more liabilities than it expressly agrees through the sale and purchase documents. Instead, the RMBS Trustees can file cure claims in whatever amount they believe is necessary to cure the Debtors' defaults under the Servicing Agreements, and such claims will be claims against the Debtors' estates. To the extent these cure amounts are contingent and unliquidated, the RMBS Trustees have the burden of proving the existence and amount of such claims.

22. The Debtors recognize that their estates will not exist indefinitely and that the RMBS Trustees wish to ensure there is a "pot of cash" out of which their alleged claims can be satisfied. To address that concern, the Debtors propose establishing a reserve out of which claims on account of the Pre-Closing Indemnification Obligations (to the extent they can be established) may be satisfied. To this end, the Debtors will work with the RMBS Trustees to

9

ny-1056996

assess through historical data a reasonable estimate for claims on account of Pre-Closing Indemnification Obligations to be placed in reserve for a finite duration.

23.    The Debtors submit that the establishment of this reserve will provide counterparties with adequate assurance that any claims on account of the Pre-Closing Indemnification Obligations will be cured, thereby satisfying the requirements of 365(b)(1). "Adequate assurance" of cure is not defined in the Code and depends on the facts in each case. In general, courts have found assurances to be "adequate" where they make the likelihood of cure more probable than not. An absolute guarantee is not required, although a speculative plan is not enough. *In re Uniq Shoes Corp.*, 316 B.R. 748, 752 (Bankr. S.D. Fla. 2004) (adequate assurance requires a "firm commitment to make all payments and at least a reasonably demonstrable capability to do so.") (citation omitted); *see also Cinicola v. Scharffenberger*, 248 F.3d 110 (3d Cir. 2001); *Raddison Design Mgmt., Inc. v. Cummins*, No. 07-92, 2008 WL 55998 (W.D. Pa. Jan. 3, 2008); *In re Texas Health Enters., Inc.*, 246 B.R. 832 (Bankr. E.D. Tex. 2000); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167 (Bankr. E.D. Va. 1993).

24.    Further, if the Pre-Closing Indemnification Obligations cannot be liquidated in a reasonable time, the Debtors submit that estimation of such claims is appropriate under the circumstances. The Code provides a mechanism for resolving uncertain claims that will avoid the staggering cost and delay to the Debtors' estates that attempting to prove such defaults have occurred would entail. As observed by Judge Gerber in *In re Chemtura Corp.*, 448 B.R. 635, 649-50 (Bankr. S.D.N.Y. 2011):

> Claims estimation under Section 502(c)(1), . . . can be used for a variety of purposes, including determining voting rights on a reorganization plan, gauging plan feasibility, determining the likely aggregate amount of a related series of claims, setting claim distribution reserves, or (though this is less commonly wise) allowing claims. As I explained in my 2003 decision in [*In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003)], "[e]stimation,

authorized under section 502(c) of the Code, provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine."

25.     Similar approaches have been approved in other cases with respect to estimating cure claims. *See, e.g.*, *In re TXCO Res., Inc.*, No. 09-51807, 2010 Bankr. LEXIS 5660, at *185 (Bankr. W.D. Tex. Jan. 27, 2010) (establishing a reserve for disputed cure claims in an amount to be determined by estimation proceedings); *In re Chi. Invs., LLC*, 470 B.R. 32, 103 (Bankr. D. Mass. 2012) (estimating a franchisor's cure costs in connection with the assumption of franchise agreements).

26.     The Debtors will attempt to coordinate with the RMBS Trustees to establish an appropriate mechanism for the estimation of the RMBS Trustees' claims on account of the Pre-Closing Indemnification Obligations.

11

ny-1056996

## CONCLUSION

Accordingly, for the reasons set forth herein the Debtors respectfully request that the Court overrule the Pre-Auction Objections and grant such other and further relief as it deems just and proper.

Dated: October 9, 2012
      New York, New York

                                      */s/* Gary S. Lee
                                      Gary S. Lee
                                      Todd M. Goren
                                      Alexandra Steinberg Barrage
                                      Jennifer L. Marines
                                      MORRISON & FOERSTER LLP
                                      1290 Avenue of the Americas
                                      New York, New York 10104
                                      Telephone: (212) 468-8000
                                      Facsimile: (212) 468-7900

                                      *Counsel for the Debtors and*
                                      *Debtors in Possession*

ny-1056996