## EXHIBIT 3

~~SECOND~~THIRD AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION

CREDIT AND GUARANTY AGREEMENT,

dated as of May 16, 2012,

as amended and restated as of June 29, 2012,

as further amended and restated as of August 14, 2012,

as further amended and restated as of October [   ], 2012,

among

**GMACM BORROWER LLC,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as a Borrower,

**RFC BORROWER LLC,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as a Borrower,

**RESIDENTIAL CAPITAL, LLC,**
**GMAC MORTGAGE, LLC,**
**RESIDENTIAL FUNDING COMPANY, LLC and**
**CERTAIN SUBSIDIARIES OF RESIDENTIAL CAPITAL, LLC,**
each a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Guarantors,

**GMACM BORROWER TRUST and RFC BORROWER TRUST, as Guarantors**

**GMAC MORTGAGE, LLC and**
**RESIDENTIAL FUNDING COMPANY, LLC,**
as Administrators, Originators, Receivables Custodians and Servicers,

**GMAC MORTGAGE, LLC, as GMACM Servicer,**

**THE LENDERS PARTY HERETO,**

**BARCLAYS BANK PLC,**
as Administrative Agent,

**BARCLAYS BANK PLC,**
as Collateral Agent,

**BARCLAYS BANK PLC,**
as Syndication Agent and as Documentation Agent,

and

**BARCLAYS BANK PLC,**
as Bookrunner and Lead Arranger for the Credit Facilities

---

$190,000,000 Superpriority Debtor-in-Possession Revolving Facility

$1,060,000,000 Superpriority Debtor-in-Possession Term A-1 Facility

$200,000,000 Superpriority Debtor-in-Possession Term A-2 Facility

---

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| **ARTICLE I DEFINITIONS AND INTERPRETATION** | | **2** |
| Section 1.01 | Definitions | 2 |
| Section 1.02 | Accounting Terms | 66 |
| Section 1.03 | Interpretation, Etc. | 6667 |
| Section 1.04 | Effect of Restatement | 67 |
| **ARTICLE II LOANS** | | **6768** |
| Section 2.01 | Term Loans | 6768 |
| Section 2.02 | Revolving Loans | 6869 |
| Section 2.03 | [Reserved] | 70 |
| Section 2.04 | [Reserved] | 70 |
| Section 2.05 | Pro Rata Shares; Availability of Funds | 70 |
| Section 2.06 | Use of Proceeds | 7071 |
| Section 2.07 | Evidence of Debt; Register; Lenders' Books and Records; Notes | 71 |
| Section 2.08 | Interest on Loans | 72 |
| Section 2.09 | Conversion/Continuation | 73 |
| Section 2.10 | Default Interest | 74 |
| Section 2.11 | Fees | 74 |
| Section 2.12 | Protective Advances | 7475 |
| Section 2.13 | Voluntary Prepayments/Commitment Reductions | 75 |
| Section 2.14 | Mandatory Prepayments | 76 |
| Section 2.15 | Application of Prepayments | 77 |
| Section 2.16 | General Provisions Regarding Payments | 7778 |
| Section 2.17 | Ratable Sharing | 79 |
| Section 2.18 | Making or Maintaining Eurodollar Rate Loans | 7980 |
| Section 2.19 | Increased Costs; Capital Adequacy | 81 |
| Section 2.20 | Taxes: Withholding, Etc. | 82 |
| Section 2.21 | Obligation to Mitigate | 86 |
| Section 2.22 | Defaulting Lenders | 86 |
| Section 2.23 | Removal or Replacement of a Lender | 87 |
| Section 2.24 | Determination of Borrowing Base and Collateral Amount | 8788 |
| Section 2.25 | Priority and Liens Applicable to Credit Parties | 90 |
| Section 2.26 | Payment of Obligations | 9192 |
| Section 2.27 | No Discharge; Survival of Claims | 92 |
| **ARTICLE III CONDITIONS PRECEDENT** | | **92** |
| Section 3.01 | Closing Date | 92 |
| Section 3.02 | Conditions to Revolver Post-Closing Availability Date | 97 |
| Section 3.03 | Conditions to Each Credit Date | 9798 |
| Section 3.04 | Conditions to Each Withdrawal Date | 99 |

71

846343.08 New York Server 6A   MSWJ787270.05-NYCSR07A - MSW
ny-1057190

Section 3.05   Conditions to Effectiveness of the First Amended CreditAgreement Credit Agreement ...................101
Section 3.06   Conditions to Effectiveness of the Second Amended Credit Agreement ...................103
Section 3.07   Conditions to Effectiveness of this Agreement ...................102 104

**ARTICLE IV REPRESENTATIONS AND WARRANTIES ...................104 105**
Section 4.01   Organization; Requisite Power and Authority; Qualification 104 106
Section 4.02   Capital Stock and Ownership ...................104 106
Section 4.03   Due Authorization ...................105 106
Section 4.04   No Conflict ...................105 107
Section 4.05   Governmental and Other Consents ...................105 107
Section 4.06   Binding Obligation ...................106 108
Section 4.07   Financial Statements ...................106 108
Section 4.08   Projections ...................106 108
Section 4.09   Approved DIP Budget ...................106 108
Section 4.10   No Material Adverse Effect ...................106 108
Section 4.11   Insurance ...................107 108
Section 4.12   Adverse Proceedings, Etc. ...................107 108
Section 4.13   Payment of Taxes ...................107 109
Section 4.14   Properties ...................107 109
Section 4.15   Environmental Matters ...................108 110
Section 4.16   No Defaults ...................109 110
Section 4.17   Material Contracts ...................109 110
Section 4.18   Governmental Regulation ...................109 111
Section 4.19   Margin Stock ...................109 111
Section 4.20   Employee Matters ...................109 111
Section 4.21   Employee Benefit Plans ...................110 111
Section 4.22   Specified Permitted Indebtedness Documents and Underlying Documents ...................110 112
Section 4.23   Compliance with Statutes, Etc. ...................111 112
Section 4.24   Accuracy of First Lien Collateral Schedules ...................111 112
Section 4.25   Disclosure ...................111 113
Section 4.26   Patriot Act ...................112 113
Section 4.27   Location of Books and Records ...................112 113
Section 4.28   Accuracy of Borrowing Base and Collateral Amount ...................112 113
Section 4.29   Post-Audit Asset Dispositions ...................112 114
Section 4.30   Collateral Documents ...................112 114
Section 4.31   ResCap ...................113 114
Section 4.32   Borrowers ...................113 115
Section 4.33   Adverse Actions ...................113 115
Section 4.34   The Orders ...................113 115
Section 4.35   Cash Collateral and Other Orders ...................114 115
Section 4.36   Provision of Information ...................114 116
Section 4.37   MERS ...................114 116
Section 4.38   GMACM Serviced /Specified Mortgage Loans ...................114 116

ii

| Section 4.39 | Mortgage Loan Level Representations and Warranties | ~~114~~116 |
| Section 4.40 | Administrators' and Servicers' Additional Representation and Warranty | ~~114~~116 |
| Section 4.41 | Servicers and Subservicers | ~~115~~116 |
| **ARTICLE V AFFIRMATIVE COVENANTS** | | **~~115~~117** |
| Section 5.01 | Financial Statements and Other Reports | ~~115~~117 |
| Section 5.02 | Approved DIP Budget | ~~123~~125 |
| Section 5.03 | Existence | ~~125~~126 |
| Section 5.04 | Payment of Taxes | ~~125~~126 |
| Section 5.05 | Maintenance of Properties | ~~125~~127 |
| Section 5.06 | Insurance | ~~125~~127 |
| Section 5.07 | Maintaining Records; Access to Properties and Inspections; Lender Discussions | ~~126~~128 |
| Section 5.08 | Compliance with Credit Documents | ~~127~~128 |
| Section 5.09 | Compliance with Laws | ~~127~~129 |
| Section 5.10 | Environmental | ~~127~~129 |
| Section 5.11 | Subsidiaries | ~~127~~129 |
| Section 5.12 | Security Interests; Further Assurances | ~~128~~130 |
| Section 5.13 | Non-Consolidation | ~~129~~130 |
| Section 5.14 | Information Regarding Collateral | ~~129~~130 |
| Section 5.15 | LOC Junior Lien Collateral | ~~129~~131 |
| Section 5.16 | Credit Rating | ~~129~~131 |
| Section 5.17 | Final Financing Order | ~~130~~131 |
| Section 5.18 | Advisory Firm | ~~130~~131 |
| Section 5.19 | Servicing | ~~130~~131 |
| Section 5.20 | Receivables | ~~130~~132 |
| Section 5.21 | Obligations and Contractual Exercise of Rights and Remedies | ~~130~~132 |
| Section 5.22 | Custodial Procedures | ~~131~~133 |
| Section 5.23 | REO Property | ~~131~~133 |
| Section 5.24 | Mortgage Loan Level Representations and Warranties | ~~132~~133 |
| Section 5.25 | MERS | ~~132~~133 |
| Section 5.26 | Servicing of GMACM Serviced Mortgage Loans | ~~132~~134 |
| Section 5.27 | Corporate Separateness of Borrowers; Related Matters and Covenants | ~~132~~134 |
| Section 5.28 | Corporate Separateness of the Borrowers' REO Subsidiaries; Related Matters and Covenants | ~~133~~134 |
| Section 5.29 | Amendments to Servicing Agreements | ~~133~~134 |
| Section 5.30 | Notice of Security Interest in Receivables | ~~133~~135 |
| Section 5.31 | Acquisition of Residual Interests | ~~133~~135 |
| Section 5.32 | Compliance with Designated Servicing Agreements | ~~133~~135 |
| Section 5.33 | Payment of Fees and Administrative Expenses | ~~133~~135 |
| Section 5.34 | Reimbursement of Non-Recoverable Advances | ~~133~~135 |
| Section 5.35 | MBS Trust Collection Accounts | ~~134~~135 |
| Section 5.36 | Verification Agent Duties with respect to MBS Trust Accounts | ~~134~~135 |

iii

Section 5.37        Broker's Price Opinions ........................................................ 134136
Section 5.38        Senior Management ............................................................... 134136
Section 5.39        Obligations Regarding Sale Process ..................................... 134136
Section 5.40        Servicer Acknowledgment and Instruction Letters............... 135136
Section 5.41        Borrowing Base and Collateral Amount Certificate
                    Variances............................................................................. 135136
Section 5.42        Notification of MBS Trustees............................................... 135137
Section 5.43        Collections; Blocked Accounts............................................. 135137
Section 5.44        Delaware Statutory Trusts.................................................... 135137
Section 5.45        Separateness of Trusts; Related Matters and Covenants ....... 136137
ARTICLE VI NEGATIVE COVENANTS ........................................................ 136138
Section 6.01        Indebtedness....................................................................... 136138
Section 6.02        Liens.................................................................................. 137139
Section 6.03        No Further Negative Pledges ............................................... 140141
Section 6.04        Restricted Junior Payments................................................. 140141
Section 6.05        Restrictions on Subsidiary Distributions ............................. 140142
Section 6.06        Investments ........................................................................ 140142
Section 6.07        Financial Covenants............................................................ 142143
Section 6.08        Fundamental Changes; Disposition of Assets; Acquisitions .142144
Section 6.09        Disposal Of Subsidiary Interests......................................... 143145
Section 6.10        Mortgage Loan Servicing Fees ............................................ 143146
Section 6.11        Transactions with Shareholders and Affiliates ..................... 144146
Section 6.12        Conduct of Business ........................................................... 144146
Section 6.13        Permitted Activities of ResCap............................................ 144146
Section 6.14        Amendments or Waivers of Certain Agreements.................. 144146
Section 6.15        Fiscal Year ......................................................................... 145147
Section 6.16        Use of Proceeds.................................................................. 145147
Section 6.17        Other Superpriority Claims.................................................. 145147
Section 6.18        Servicing Practices.............................................................. 145148
Section 6.19        Dispositions of LOC Junior Lien Collateral ........................ 146148
Section 6.20        Amendment to MSFTA ....................................................... 146148
ARTICLE VII GUARANTY ........................................................................... 146149
Section 7.01        Guaranty of the Obligations................................................. 146149
Section 7.02        Contribution by Guarantors ................................................ 147149
Section 7.03        Payment by Guarantors ....................................................... 147150
Section 7.04        Liability of Guarantors Absolute ......................................... 148150
Section 7.05        Waivers by Guarantors ....................................................... 149152
Section 7.06        Guarantors' Rights of Subrogation, Contribution, Etc. ......... 150152
Section 7.07        Subordination of Other Obligations..................................... 151153
Section 7.08        Continuing Guaranty............................................................ 151153
Section 7.09        Authority of Guarantors or Borrowers................................. 151154
Section 7.10        Financial Condition of Borrowers ........................................ 151154
Section 7.11        Discharge of Guaranty Upon Sale of Guarantor................... 152154
Section 7.12        Taxes.................................................................................. 152154
Section 7.13        Assignments........................................................................ 152154
Section 7.14        Reinstatement...................................................................... 152154

iv

**ARTICLE VIII EVENTS OF DEFAULT** .................................................. ~~152~~155
    Section 8.01      Events of Default ................................................ ~~152~~155
    Section 8.02      Application of Funds ............................................ ~~159~~161
**ARTICLE IX CASH MANAGEMENT; COLLECTIONS** ........................... ~~161~~163
    Section 9.01      Accounts; Cash Management .............................. ~~161~~163
    Section 9.02      Daily Deposits of Receivables Proceeds............................ ~~164~~166
    Section 9.03      Restoration of Amounts Held for Future Distribution........... ~~164~~166
**ARTICLE X AGENTS** ............................................................................. ~~164~~167
    Section 10.01     Appointment and Authorization of Agents........................... ~~164~~167
    Section 10.02     Rights as a Lender............................................ ~~165~~167
    Section 10.03     Exculpatory Provisions ...................................... ~~165~~167
    Section 10.04     Reliance by Agents ........................................... ~~166~~168
    Section 10.05     Delegation of Duties ......................................... ~~166~~169
    Section 10.06     Indemnification of Agents .................................. ~~167~~169
    Section 10.07     Resignation or Removal of Administrative Agent and
                      Collateral Agent ............................................. ~~167~~170
    Section 10.08     Non-Reliance on Agents and Other Lenders ..................... ~~169~~171
    Section 10.09     Administrative Agent May File Proofs of Claim.................. ~~169~~172
    Section 10.10     Collateral Documents and Guaranty ...................... ~~170~~172
**ARTICLE XI RECEIVABLES CUSTODIAN; VERIFICATION AGENT**.............. ~~171~~173
    Section 11.01     Receivable Files .............................................. ~~171~~173
    Section 11.02     Duties of Receivables Custodian with Respect to the
                      Receivables Files ........................................... ~~172~~174
    Section 11.03     Removal and Replacement of Verification Agent................. ~~172~~174
**ARTICLE XII MISCELLANEOUS** .......................................................... ~~172~~175
    Section 12.01     Notices ........................................................ ~~172~~175
    Section 12.02     Expenses ..................................................... ~~175~~177
    Section 12.03     Indemnity .................................................... ~~175~~178
    Section 12.04     Set Off........................................................ ~~178~~180
    Section 12.05     Amendments and Waivers .................................. ~~178~~181
    Section 12.06     Successors and Assigns; Participations ................... ~~182~~185
    Section 12.07     Independence of Covenants ............................... ~~186~~189
    Section 12.08     Survival of Representations, Warranties and Agreements .... ~~187~~189
    Section 12.09     No Waiver; Remedies Cumulative ..................... ~~187~~189
    Section 12.10     Marshalling; Payments Set Aside ...................... ~~187~~190
    Section 12.11     Severability .................................................. ~~188~~190
    Section 12.12     Obligations Several; Independent Nature of Lenders' Rights~~188~~190
    Section 12.13     Headings ..................................................... ~~188~~191
    Section 12.14     Applicable Law............................................... ~~188~~191
    Section 12.15     Jurisdiction; Etc ............................................. ~~188~~191
    Section 12.16     **Waiver of Jury Trial**................................... ~~189~~192
    Section 12.17     Confidentiality ............................................... ~~190~~192
    Section 12.18     Usury Savings Clause ...................................... ~~190~~193
    Section 12.19     Counterparts................................................. ~~191~~193
    Section 12.20     Effectiveness ................................................ ~~191~~194
    Section 12.21     Patriot Act .................................................. ~~191~~194

846343.08 New York Server 6A   MSW1787270.05-NYCSR07A - MSW
ny-1057190

Section 12.22    Electronic Execution of Assignments....................................192194
Section 12.23    No Fiduciary Duty ...............................................................192194
Section 12.24    Borrowers' Obligations ........................................................192195
Section 12.25    Inconsistency.......................................................................196199
Section 12.26    Liability of Administrator; Indemnities ................................196199
 Toc331432947

846343.08 New York Server 6A - MSW1787270.05-NYCSR07A - MSW
ny-1057190

APPENDICES:   A-1        Commitments as of the Closing Date
              A-2        Commitments as of the Restatement Effective Date
              B          Notice Addresses

SCHEDULES:    1.01A      Designated Servicing Agreement Schedule
              1.01B      Market Value
              1.01C      Senior Management
              3.01       Closing Date Credit Documents and Certain Deliverables
              3.05       Restatement Effective Date Credit Documents and Certain
                         Deliverables
              3.06       Second Restatement Effective Date Credit Documents and Certain
                         Deliverables
              3.07       Third Restatement Effective Date Credit Documents and Certain
                         Deliverables
              4.01       Jurisdictions of Organization and Qualification
              4.02       Capital Stock and Ownership
              4.11       Insurance
              4.12       Adverse Proceedings
              4.13       Taxes
              4.14       Real Estate Assets
              4.15       Environmental Matters
              4.17       Material Contracts
              4.21       Employee Benefit Plans
              4.24       Eligible Receivables, Eligible Mortgage Loans and other First
                         Lien Collateral
              4.27       Locations of Books and Records
              4.30       Filing Offices
              4.39       Representations and Warranties Relating to Eligible Mortgage
                         Loans
              4.41(a)    Servicers and Subservicers of Eligible Mortgage Loans
              4.41(b)    Specified Servicing Agreements
              6.01       Existing Indebtedness
              6.02(h)(i) Existing Liens – Borrowers and Borrowers REO Subsidiaries
              6.02(h)(ii) Existing Liens – Junior Lien Collateral
              6.05       Existing Restrictions on Subsidiary Distributions
              6.06       Existing Investments
              6.08       Excluded Assets
              6.10       Certain Mortgage Loan Servicing Fees

EXHIBITS:     A-1        Funding Notice
              A-2        Conversion/Continuation Notice
              A-3        Withdrawal Notice
              A-4        Withdrawal Direction Letter
              A-5        Notice of Payment/Commitment Termination
              B-1        Term A-1 Loan Note

846343.08 New York Server 6A   MSW 1787270.05 NYCSR07A - MSW
ny-1057190

# ~~SECOND~~THIRD AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION
# CREDIT AND GUARANTY AGREEMENT

This ~~SECOND~~THIRD AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of May 16, 2012, amended and restated as of June 29, 2012, ~~and further~~ amended ~~and restated~~by that certain Counterpart Agreement, dated as of August 14, 2012, further amended and restated as of August 14, 2012, and further amended and restated as of October [    ], 2012, is entered into by and among GMACM BORROWER LLC, a Delaware limited liability company and special purpose entity, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as a borrower (**"GMACM Borrower"**), RFC BORROWER LLC, a Delaware limited liability company and special purpose entity, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as a borrower (**"RFC Borrower**," and together with GMACM Borrower, **"Borrowers**," and each, a **"Borrower"**), RESIDENTIAL CAPITAL, LLC, a Delaware limited liability company (**"ResCap"**), GMAC MORTGAGE, LLC, a Delaware limited liability company (**"GMACM"**), RESIDENTIAL FUNDING COMPANY, LLC, a Delaware limited liability company (**"RFC"**), and CERTAIN SUBSIDIARIES OF RESCAP, each a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as Guarantors, GMACM BORROWER TRUST, a Delaware statutory trust, as a Guarantor, RFC BORROWER TRUST, a Delaware statutory trust, as a Guarantor, GMACM and RFC, as Administrators, Originators, Receivables Custodians and Servicers, GMACM, as GMACM Servicer, the Lenders party hereto from time to time, BARCLAYS BANK PLC (**"Barclays"**), as administrative agent for the Secured Parties (together with its successors and assigns in such capacity, **"Administrative Agent"**), BARCLAYS, as collateral agent for the Secured Parties (together with its successors and assigns in such capacity, **"Collateral Agent"**), and BARCLAYS, as syndication agent (together with its successors and assigns in such capacity, **"Syndication Agent"**).

## RECITALS:

WHEREAS, capitalized terms used in the preamble hereto and in these Recitals shall have the respective meanings set forth for such terms in Section 1.01;

WHEREAS, on May 14, 2012 (the **"Petition Date"**), the Debtor Credit Parties filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrowers and the other Debtor Credit Parties originally entered into that certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of May 16, 2012 (the **"Original Credit Agreement"**), among Borrowers, the other Credit Parties party thereto, the Lenders from time to time party thereto and Barclays, as Administrative Agent, Collateral Agent and Syndication Agent, under which the Lenders (i) made Term A-1 Loans in an initial aggregate principal amount of $1,050,000,000, (ii) made Term A-2 Loans in an initial

1

aggregate principal amount of $200,000,000, and (iii) agreed to Revolving Commitments in an initial aggregate principal amount of $200,000,000, in each case, on the terms and conditions set forth in the Original Credit Agreement;

WHEREAS, Borrowers, the other Debtor Credit Parties party thereto, the Lenders from time to time party thereto, the Administrative Agent, the Collateral Agent and the Syndication Agent subsequently entered into that certain Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of May 16, 2012, as amended and restated as of June 29, 2012 (the "**First Amended Credit Agreement**"), which amended and restated the Original Credit Agreement to, among other things, (a) reduce the Revolving Commitments in an aggregate principal amount of $10,000,000, (b) increase the Term A-1 Facility by an aggregate principal amount of $10,000,000, and (c) reflect the other agreements set forth in the Facility Fee Letter Amendment, in each case as provided for and subject to the terms and conditions set forth in the First Amended Credit Agreement;

WHEREAS, Borrowers, the other Debtor Credit Parties party thereto, the Lenders from time to time party thereto, the Administrative Agent, the Collateral Agent and the Syndication Agent subsequently entered into that certain Second Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of May 16, 2012, as amended and restated as of June 29, 2012, as further amended by that certain Counterpart Agreement, dated as of August 14, 2012, and as further amended and restated as of August 14, 2012 (the "**Second Amended Credit Agreement**"), which amended and restated the First Amended Credit Agreement to, among other things, effectuate certain technical amendments in connection with the formation of the Delaware statutory trusts required by Section 5.44, as provided for and subject to the terms and conditions set forth in the Second Amended Credit Agreement;

WHEREAS, the parties hereto have agreed to amend and restate the Second Amended Credit Agreement as provided in this Agreement to effectuate certain technical amendments in connection with the formation of the Delaware statutory trusts required by Section 5.44 of this Agreement; , among other things, amend and modify certain covenants and other agreements relating to the Debtors' sale process; and

WHEREAS, the respective priorities of the Facilities with respect to the Collateral shall be as set forth in the Interim Financing Order and the Final Financing Order, in each case upon entry thereof by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree that the Original Credit Agreement shall be and, subject to the satisfaction or waiver of the conditions set forth in Section 3.05, hereby is amended and restated in its entirety as follows:

(e)    The agreement shall fully disclose the identity of the proposed purchaser(s) and, if applicable, the proposed investors therein.

(f)    The agreement, and in the event there is more than one Replacement Sale Agreement and/or Overbid Sale Agreement, such Replacement and/or Overbid Sale Agreements, collectively, shall provide for (i) Net Asset Sale Proceeds in an aggregate amount sufficient for the payment in full in Cash of the Obligations after giving effect to the closing(s) of the sale(s) contemplated thereby in accordance with the terms of such agreement(s) and (ii) except as expressly permitted by Sections 6.08(e) and 6.08(f), payment in full in Cash of the Obligations and termination of the Commitments on the closing date of the sale(s).

"**Acceptable Reorganization Plan**" means a Reorganization Plan that (a) authorizes and implements the sale transactions contemplated under the Sale Agreements, (b) provides for the termination of the Commitments and the payment in full in Cash of the Obligations under the Credit Documents (other than contingent indemnification obligations not yet due and payable) on the effective date of such Reorganization Plan and (c) provides (i) for releases and exculpations reasonably acceptable to Administrative Agent (which, for the avoidance of doubt, will extend to the Credit Facilities and the Prepetition GSAP Facility) and (ii) that the Obligations shall not be discharged pursuant to the terms of such Reorganization Plan or the Confirmation Order.

"**Accepted Servicing Practices**" means with respect to any Mortgage Loan, REO Property, Serviced Loan and owned real property resulting from the foreclosure of a Serviced Loan, those mortgage servicing practices that are in accordance with the applicable Guidelines and consistent with past practices, in all the foregoing cases, subject to the following exceptions: (a) servicing practices may be modified to conform to the applicable Guidelines, other than conforming to modifications made to the GMAC-RFC Servicer Guide, (b) as otherwise expressly consented to by Administrative Agent, and (c) to the extent that complying with any such practice as to any Serviced Loan or owned real property resulting from the foreclosure of a Serviced Loan would cause the related Servicer to violate any provision of the related Designated Servicing Agreement.

"**Account Bank**" means the Borrower Account Bank, Collection Account Bank or Concentration Account Bank, as applicable.

"**Activation Notice**" as defined in Section 9.01(c)(i).

"**Activation Period**" means the period on and after the date that an Activation Notice has been received.

"**Activation Trigger Event**" means, at any time, Revolver Excess Availability shall be less than $25,000,000 for a period of three (3) consecutive Business Days.

"**Additional Receivables**" means all Receivables created on or after the Closing Date under the Designated Servicing Agreements that are sold, transferred and contributed by the Originators to the Borrowers pursuant to the Receivables Pooling and Purchase Agreements, as

4

"**Aggregate Revolving/Term A-1 Credit Exposure**" means, at any time, the sum of the aggregate Revolving Exposure and the aggregate Term A-1 Credit Exposure of all Lenders.

"**Agreement**" means this ~~Second~~Third Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of the Closing Date, and amended and restated as of the Restatement Effective Date, ~~and~~further amended by that certain Counterpart Agreement, dated as of August 14, 2012, further amended and restated as of the Second Restatement Effective Date, and further amended and restated as of the Third Restatement Effective Date by and among the Borrowers, the Guarantors from time to time party hereto, the Lenders from time to time party hereto, Administrative Agent, Collateral Agent, Syndication Agent and the other Persons from time to time party hereto, as the same may be amended, amended and restated, supplemented or modified from time to time after the ~~Second~~Third Restatement Effective Date in accordance with the terms hereof.

"**Ally Line of Credit**" means the credit facility under (a) the Prepetition Ally LOC Agreement, as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof (as so amended or supplemented, the "**Ally LOC Agreement**"), (b) the Prepetition Ally LOC Security Agreements, as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof (as so amended or supplemented, collectively, the "**Ally LOC Security Agreements**") and (c) the other Facility Documents (as defined in the Ally LOC Agreement), as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof.

"**Ally LOC Agreement**" as defined in the definition of "Ally Line of Credit."

"**Ally LOC DIP Amendment**" as defined in Section 3.01(o).

"**Ally LOC Security Agreements**" as defined in the definition of "Ally Line of Credit."

"**Ally Sale Agreement**" means the asset purchase agreement between ResCap, GMACM and RFC and Ally Financial Inc. and BMMZ Holdings LLC, in the form attached to the Sale Motion, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, as such agreement may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

"**Ally Superpriority Claim**" means, collectively, (a) AFI's rights, as lender under the AFI DIP Loan (as defined in the AFI/Junior Secured Notes Order ), in the AFI DIP Loan Collateral, as provided in paragraph 7 of the AFI/Junior Secured Notes Order; (b) Ally Bank's rights in the Collateral (as defined in the Master Purchase Pipeline Security Agreement), as provided in paragraph 8 of the Origination Order; and (c) Ally Investment Management LLC's rights in the Collateral (as defined in that certain MSFTA), as provided in paragraph 11 of the Origination Order.

7

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted Eurodollar Rate for a three (3) month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that, for the avoidance of doubt, the Adjusted Eurodollar Rate for any day shall be based on the rate appearing on Reuters Page LIBOR01 (or on any successor or substitute page) at approximately 11:00 a.m. London time on such day (without any rounding). Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Eurodollar Rate, respectively; provided that the Alternate Base Rate for purposes of interest rate determinations with respect to the Term Loans shall at no time be less than 2.25% per annum.

"~~**Amended Credit Agreement**~~" ~~as defined in the recitals hereto.~~

"~~**Amendment Agreement**~~" ~~means the Amendment and Restatement Agreement, dated as of June 29, 2012, among the Debtor Credit Parties, the Lenders party thereto, the Administrative Agent, the Collateral Agent and the other Persons party thereto.~~

"**Amounts Held for Future Distribution**" as defined in Section 9.03.

"**Applicable Margin**" and "**Applicable Revolving Commitment Fee Percentage**" mean:

(a)    for the period commencing on the Closing Date until (but not including) the Restatement Effective Date, with respect to each Class of Loans and the Applicable Revolving Commitment Fee Percentage, the percentage per annum set forth in the table below:

| Applicable Margin for Term A-1 Loans | | Applicable Margin for Term A-2 Loans | | Applicable Margin for Revolving Loans and Protective Advances | | Applicable Revolving Commitment Fee Percentage |
|---|---|---|---|---|---|---|
| Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | |
| 4.00% | 3.00% | 6.00% | 5.00% | 4.00% | 3.00% | 0.75% |

(b)    for the period commencing on the Restatement Effective Date until all Obligations are repaid in full in Cash and all Commitments terminated, with respect to each Class of Loans and the Applicable Revolving Commitment Fee Percentage, the percentage per annum set forth in the table below:

| Applicable Margin for Term A-1 Loans | | Applicable Margin for Term A-2 Loans | | Applicable Margin for Revolving Loans and Protective Advances | | Applicable Revolving Commitment Fee Percentage |
|---|---|---|---|---|---|---|
| Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | |
| 3.75% | 2.75% | 5.50% | 4.50% | 3.75% | 2.75% | 0.75% |

~~846343.08 New York Server 6A - MSW~~1787270.05-NYCSR07A - MSW
~~ny-1057190~~

"**Cases**" means collectively, each and all of (x) Borrower's Cases and (y) the Guarantor's Cases.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means (a) securities with maturities of ninety (90) days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with weighted average maturities of ninety (90) days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000 and a rating of at least "A+" and "A1" from S&P and Moody's, respectively, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven (7) days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) securities with weighted average maturities of ninety (90) days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by S&P or "A" by Moody's, (e) securities with maturities of ninety (90) days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition, or (f) shares of "2a-7" money market mutual funds rated "AAA" by Moody's and S&P that have a weighted average maturity of ninety (90) days or less or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (e) of this definition.

"**Cash Management Order**" as defined in Section 3.01(d).

"**Change in Law**" means (a) the adoption or taking effect of any law, rule or regulation or treaty after the ~~date of this Agreement~~Closing Date, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, central bank or comparable agency after the ~~date of this Agreement~~Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.19(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority, central bank or comparable agency made or issued after the ~~date of this Agreement~~Closing Date. Notwithstanding the foregoing, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines, requirements and directives promulgated thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been introduced or adopted after the Closing Date, regardless of the date enacted, adopted, issued or implemented.

15

**"Confirmation Order"** means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to Administrative Agent, confirming an Acceptable Reorganization Plan.

**"Contractual Obligation"** means, as applied to any Person, any provision of any Security issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

**"Contributing Guarantors"** as defined in Section 7.02.

**"Conversion/Continuation Date"** means the effective date of a continuation or conversion of any Loans, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

**"Conversion/Continuation Notice"** means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

**"Corporate Advance"** means, collectively, (a) any advance (other than those described in clause (b) below) made by a Servicer pursuant to a Designated Servicing Agreement to inspect, protect, preserve or repair properties that secure defaulted Serviced Loans or that have been acquired through foreclosure or deed in lieu of foreclosure or other similar action pending disposition thereof, or for similar or related purposes, including, but not limited to, necessary legal fees and costs expended or incurred by such Servicer in connection with foreclosure, bankruptcy, eviction or litigation actions with or involving Obligors on defaulted Serviced Loans, as well as costs to obtain clear title to such a property, to protect the priority of the lien created by a Serviced Loan on such a property and to dispose of properties taken through foreclosure or by deed in lieu thereof or other similar action, (b) any advance made by a Servicer pursuant to a Designated Servicing Agreement to foreclose or undertake similar action with respect to a Serviced Loan and (c) any other out of pocket expenses incurred by a Servicer pursuant to a Designated Servicing Agreement (including, for example, costs and expenses incurred in loss mitigation efforts and in processing assumptions of Serviced Loans), to the extent such advances are reimbursable in the manner required for an Eligible Receivable pursuant to the related Designated Servicing Agreement.

**"Counterpart Agreement"** means a Counterpart Agreement substantially in the form of Exhibit F delivered by a Credit Party pursuant to Section 5.11.

**"Credit Date"** means the date of a Credit Extension.

**"Credit Document"** means any of (a) this Agreement, (b) the Notes, if any, (c) the Collateral Documents, (d) the Fee Letters, (e) the Receivables Pooling and Purchase Agreements, (f) the Receivables Purchase Agreements, (g) the Mortgage Loan Purchase and Contribution Agreements, (h) the First Amendment Agreement, (i) the Second Amendment Agreement, (j) the Third Amendment Agreement and (jk) all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent or any Lender in connection herewith on or after the Closing Date.

19

"**Fannie Mae Guides**" means the Fannie Mae Seller's Guide, the Fannie Mae Servicing Guide and all amendments and additions thereto.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the ~~date of this Agreement~~<u>Closing Date</u> (or any amended or successor version that is substantially comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

"**Fee Letters**" means, collectively, the Barclays Fee Letter, Collateral Agent Fee Letter and the Facility Fee Letter.

"**Final Financing Order**" as defined in Section 3.05(a).

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the Chief Financial Officer or Treasurer of ResCap that such financial statements fairly present, in all material respects, the financial condition of ResCap and its Subsidiaries as at the dates indicated and the results of their operations and, with respect to any monthly financial statements required by Section 5.01(a), their cash flows for the periods indicated, subject to changes resulting from ordinary, good faith year-end audit adjustments and the absence of footnotes.

"**First Amended Credit Agreement**" as defined in the recitals hereto.

"**First Amendment Agreement**" means the Amendment and Restatement Agreement, dated as of June 29, 2012, among the Debtor Credit Parties, the Lenders party thereto, the Administrative Agent, the Collateral Agent and the other Persons party thereto.

"**First Lien Collateral**" means that portion of the Collateral in which the Secured Parties have a First Priority Lien and as to which no other Person has a *pari passu* or senior Lien (other than Liens described in clause (a) of the definition of "Permitted Collateral Liens").

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document and the Orders, that such Lien is the only Lien to which such Collateral is subject, other than Liens described in clause (a) of the definition of "Permitted Collateral Liens."

"**GMACM**" as defined in the preamble hereto, and its successors and assigns permitted hereunder.

"**GMACM Assignment Agreement**" means the Assignment Agreement, dated as of the ~~date hereof~~Second Restatement Effective Date, by and among GMACM Borrower, GMACM Trust, Administrative Agent and Collateral Agent.

"**GMACM Borrower**" as defined in the preamble hereto.

"**GMACM Borrower Accounts**" as defined in Section 9.01(a).

"**GMACM Mortgage Loan Purchase and Contribution Agreement**" means the Mortgage Loan Purchase and Contribution Agreement, substantially in the form of Exhibit H-1, dated as of the Closing Date, between GMACM, as seller, and GMACM Borrower, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**GMACM Receivables Pooling and Purchase Agreement**" means the Receivables Pooling and Purchase Agreement, substantially in the form of Exhibit U-1, dated as of the Closing Date, between GMACM, as Originator and Servicer, and GMACM Borrower, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**GMACM Receivables Purchase Agreement**" means the Receivables Purchase Agreement, substantially in the form of Exhibit V-1, dated as of the Closing Date, between the GSAP Transferor, as seller, GMACM Borrower, as purchaser, and GMACM, as Originator and Servicer, and acknowledged by PATI A, LLC, a Delaware limited liability company, as a preference shareholder of the GSAP Transferor, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**GMACM REO Subsidiary**" means GMACM REO LLC, a Delaware limited liability company, a debtor and debtor-in-possession, and Wholly Owned Subsidiary of GMACM Borrower.

"**GMACM Serviced Mortgage Loans**" means those certain Mortgage Loans owned by a Borrower or a Trust and identified on a Mortgage Schedule, as delivered from time to time pursuant to this Agreement, by a listing of "GMACM(MortgageServ)" under the column titled "SERVICER NAME."

"**GMACM Servicer**" means GMACM in its capacity as servicer of the GMACM Serviced Mortgage Loans.

"**GMACM Trust**" means GMACM Borrower Trust, a Delaware statutory trust and Wholly Owned Subsidiary of GMACM Borrower.

31

(a)    all indebtedness for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    that portion of obligations with respect to Capital Leases that would appear on a balance sheet of such Person in conformity with GAAP;

(c)    notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money;

(d)    any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA and any trade accounts payable in the ordinary course of business and not past due for more than thirty (30) days after the date on which such trade account was created);

(e)    all indebtedness secured by any Lien on any property or asset owned, held or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements) regardless of whether the indebtedness secured thereby shall have been assumed by such Person or is nonrecourse to the credit of such Person;

(f)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), banker's acceptances, bank guaranties, surety bonds and similar instruments;

(g)    the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another Person or having the economic effect of guarantying any Indebtedness or other obligation payable or performable by another Person in any manner, whether directly or indirectly;

(h)    any direct or indirect obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof;

(i)    any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (x) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (y) to maintain working ~~capital, equity~~ capital, equity capital, the solvency, liquidity or any balance sheet item, level of income, cash flow or financial condition of another if, in the case of any agreement described under subclauses (x) or (y) of this clause (i), the primary purpose or intent thereof is as described in clause (h) above;

(j)    all obligations of such Person in respect of any Hedge Agreement or any exchange traded or over the counter derivative transaction, whether entered into for hedging or speculative purposes; and

846343.08 New York Server 6A - MSW 1787270.05 NYCSR07A - MSW
ny-1057190

"**MSR Order**" as defined in Section 3.01(q).

"**MSR Security Agreement**" means the Second Lien Debtor-in-Possession Security Agreement, substantially in the form of Exhibit Z, dated as of the Closing Date, between GMACM and Collateral Agent, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**MSFTA**" means the Master Securities Forward Transaction Agreement, dated as of April 30, 2012, between Ally Investment Management LLC and GMACM, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Multiemployer Plan**" means any Employee Benefit Plan that is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of ResCap and its Subsidiaries in the form prepared for presentation to the audit committee of the Board of Directors of ResCap for the applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate; provided that such narrative report may be in the form of a management's discussion and analysis of financial condition and results of operations customarily included in filings made with the Securities and Exchange Commission.

"**Nationstar Sale Agreement**" means the asset purchase agreement between certain of the Debtors and Nationstar Mortgage LLC, in the form attached to the Sale Motion, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, as the same may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to (a) Cash payments received by any Credit Party from such Asset Sale, minus (b) bona fide costs incurred in connection with such Asset Sale consisting of (i) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale and any transfer, documentary or other taxes payable by any Credit Party or any of its Subsidiaries, as a seller, in connection therewith, (ii) other than for purposes of Section 6.08(e)(ii) and (iii), payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the subject assets and that is required to be repaid under the terms thereof as a result of such Asset Sale and (iii) legal fees, costs and expenses and other customary fees, costs and expenses actually incurred by any Credit Party or any of its Subsidiaries in connection with such Asset Sale.

846343.08 New York Server 6A - MSW 1787270.05 NYCSR07A - MSW
ny-1057190

"**Original Sale Agreements**" means, collectively, the Ally Sale Agreement and the Nationstar Sale Agreement.

"**Origination Order**" as defined in Section 3.01(dd).

"**Originator**" means GMACM or RFC, as the entity that disburses Advances, thereby originating the related Receivables, in its capacity as Servicer under a Designated Servicing Agreement.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, this Agreement, or sold or assigned an interest in this Agreement).

"**Other Taxes**" means any present or future stamp, court, documentary, intangible, recording, filing or similar excise or property Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, or from the registration, receipt or perfection of a security interest under, or otherwise with respect to, this Agreement, the First Amendment Agreement-or, the Second Amendment Agreement or the Third Amendment Agreement, as applicable, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment under Section 2.23).

"**Overbid Sale Agreement**" means one or more asset purchase agreements entered into pursuant to the bidding procedures and following the auction conducted pursuant to the Sale Procedures Order, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, which Overbid Sale Agreement is an Acceptable Alternative Sale Agreement, as such Overbid Sale Agreement may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

"**Owner Trustee**" means U.S. Bank Trust National Association, in its capacities as Owner Trustee under each of the GMACM Trust and the RFC Trust, together with any successors in any such capacity.

"**P&I Advance**" means any advance disbursed by a Servicer pursuant to any Designated Servicing Agreement, of delinquent interest and/or principal that have not been timely paid by Obligors, including any amounts deposited by a Servicer into an MBS Trust Collection Account in order to reimburse such MBS Trust Collection Account for Amounts Held for Future Distribution previously on deposit therein which such Servicer had used to make a previous P&I Advance in accordance with the related Designated Servicing Agreement.

"**Participant**" as defined in Section 12.06(d).

"**Participant Register**" as defined in Section 12.06(d).

846343.08 New York Server 6A - MSW 1787270.05-NYCSR07A - MSW
ny-1057190

stock of ResCap or any of its Subsidiaries outstanding as of the Closing Date or thereafter outstanding; (d) management or similar fees payable to Sponsor or any of its Affiliates; or (e) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to, any Specified ~~Prepetition~~Permitted Indebtedness or any Indebtedness incurred pursuant to the Master Purchase Documents or the Origination Order.

"**Revolver Excess Availability**" means, as of any date of determination, an amount equal to the least of (a) the Revolving Commitments of all of the Lenders <u>minus</u> the sum of (i) the Total Utilization of Revolving Commitments and (ii) the aggregate outstanding principal amount of Protective Advances, (b) the Borrowing Base, <u>minus</u> the sum of (i) the Aggregate Revolving/Term A-1 Credit Exposure and (ii) the aggregate outstanding principal amount of Protective Advances and (c) the Collateral Amount, <u>minus</u> the sum of (i) the Aggregate Credit Exposure and (ii) the aggregate outstanding principal amount of Protective Advances, in each case as of such date of determination.

"**Revolver Post-Closing Availability Date**" as defined in Section 3.02.

"**Revolving Commitment**" means the commitment of a Lender to make or otherwise fund any Revolving Loan hereunder and "Revolving Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The initial aggregate amount of the Revolving Commitments as of the Closing Date was $200,000,000. The aggregate amount of the Revolving Commitments as of the Restatement Effective Date is $190,000,000.

"**Revolving Commitment Availability Period**" means the period from the Revolver Post-Closing Availability Date to, but excluding, the Termination Date.

"**Revolving Exposure**" means, with respect to any Lender as of any date of determination, the aggregate outstanding principal amount of the Revolving Loans of that Lender.

"**Revolving Facility**" means, at any time, the aggregate amount of the Revolving Commitments at such time.

"**Revolving Lender**" means, as of any date of determination, a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"**Revolving Loan**" means a Loan made by a Lender to any Borrower pursuant to Section 2.02(a).

"**Revolving Loan Note**" means a promissory note in the form of Exhibit B-3, as it may be amended, supplemented or otherwise modified from time to time.

~~846343.08 New York Server 6A~~  ~~MSW~~1787270.05-NYCSR07A - MSW
~~ny-1057190~~

"**RFC**" as defined in the preamble hereto, and any successors and assigns permitted hereunder.

"**RFC Assignment Agreement**" means the Assignment Agreement, dated as of the ~~date hereof~~Second Restatement Effective Date, by and among RFC Borrower, RFC Trust, Administrative Agent and Collateral Agent.

"**RFC Borrower**" as defined in the preamble hereto.

"**RFC Borrower Accounts**" as defined in Section 9.01(a).

"**RFC Mortgage Loan Purchase and Contribution Agreement**" means the Mortgage Loan Purchase and Contribution Agreement, substantially in the form of Exhibit H-2, dated as of the Closing Date, between RFC, as seller, and RFC Borrower, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**RFC Receivables Pooling and Purchase Agreement**" means the Receivables Pooling and Purchase Agreement, substantially in the form of Exhibit U-2, dated as of the Closing Date, between RFC, as Originator, and Servicer, and RFC Borrower, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**RFC Receivables Purchase Agreement**" means the Receivables Purchase Agreement, dated as of the Closing Date, substantially in the form of Exhibit V-2, between the GSAP Transferor, as seller, RFC, as Originator and Servicer, and RFC Borrower, as purchaser, and acknowledged by RAHI A, LLC, a Delaware limited liability company, as a preference shareholder of the GSAP Transferor, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**RFC REO Subsidiary**" means RFC REO LLC, a Delaware limited liability company, a debtor and debtor-in-possession, and Wholly Owned Subsidiary of RFC Borrower.

"**RFC Trust**" means RFC Borrower Trust, a Delaware statutory trust and Wholly Owned Subsidiary of RFC Borrower.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

"**Sale Agreement**" means an Original Sale Agreement, an Overbid Sale Agreement or a Replacement Sale Agreement.

"**Sale Closing Milestone**" means April 15, 2013.

"**Sale Motion**" as defined in Section 3.01(r), with such amendments, supplements and modifications (including, without limitation, in connection with a Replacement Sale Agreement) as are reasonably acceptable to Administrative Agent.

"**Sale Procedures Order**" as defined in Section 3.01(r) and as such Sale Procedures Order is amended, supplemented or otherwise modified (including, without limitation, in connection with a Replacement Sale Agreement) with the consent of Administrative Agent.

"**Sale Order**" means (a) an order or orders of the Bankruptcy Court, in form and substance reasonably satisfactory to Administrative Agent, approving (i) the Ally Sale Agreement; (ii) the Nationstar Sale Agreement; and/or (iii) an Acceptable Alternative Sale Agreement, and, in each case, ~~directing the repayment~~(x) approving one or more Sale Agreements that collectively shall provide for Net Asset Sale Proceeds in an aggregate amount sufficient for the payment in full in Cash of the Obligations after giving effect to the closing(s) of the sale(s) contemplated thereby in accordance with the terms of such agreement(s), (y) directing any Net Asset Sale Proceeds of any sale transactions contemplated thereby to be applied as required by Section 2.14 and (z) except as expressly permitted by Sections 6.08(e) and 6.08(f), directing the repayment in full in Cash of the Obligations and the termination of the Commitments upon the closing of the transactions collectively contemplated by the applicable agreement(s) and/or (b) a Confirmation Order.

"**Sale Order Milestone**" means February 15, 2013.

"**Second Amended Credit Agreement**" as defined in the recitals hereto.

"**Second Amendment Agreement**" means the Amendment and Restatement Agreement, dated as of August 14, 2012, among the Credit Parties, the Lenders party thereto, the Administrative Agent, the Collateral Agent and the other Persons party thereto.

"**Second Restatement Effective Date**" means August 14, 2012.

"**Secured Parties**" means, collectively, the Lenders, the Agents and any other holder of the Obligations, and "Secured Party" means any one of them.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Specified Permitted Facilities**" means, collectively, the Ally Line of Credit, the Prepetition Ally Revolver, the Prepetition Junior Secured Notes, the EAF Facility and the Prepetition MSR Facility.

"**Specified Permitted Indebtedness**" means, collectively, all Indebtedness under the Specified Permitted Facilities.

"**Specified Permitted Indebtedness Documents**" means, collectively, any document, agreement or instrument that represents or relates to any of the Specified Permitted Indebtedness, including all amendments thereto (as amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date).

"**Specified Permitted Liens**" means, collectively and without duplication, (a) the Liens granted by the Credit Parties pursuant to the Specified ~~Prepetition~~Permitted Indebtedness Documents as in effect on the Closing Date and (b) Liens permitted under Section 6.02(k).

"**Specified Servicing Agreements**" as defined in Section 4.41(b).

"**Sponsor**" means Cerberus Capital Management, L.P., any of its affiliates and any affiliated investment funds or managed accounts which are managed or advised by Cerberus Capital Management, L.P. or any of its affiliates.

"**Sponsor Affiliated Institutional Lender**" means a bank, insurance company, investment bank, commercial finance company or other institutional lender (or any securitization vehicle that is wholly owned by such a bank, insurance company, investment bank, commercial finance company or other institutional lender) that is an Affiliate of ResCap or any Borrower as a result of common direct or indirect ownership by Sponsor, so long as (a) Sponsor owns directly or indirectly less than all of the Capital Stock of such Lender and (b) Sponsor does not directly appoint any Person with responsibility for reviewing or approving credit decisions with respect to the transactions contemplated by the Credit Documents; provided that such Person shall agree in the applicable Assignment Agreement that it will not provide any information obtained by such Sponsor Affiliated Institutional Lender in its capacity as a Lender to Sponsor or any Affiliate of Sponsor that is not itself a Sponsor Affiliated Institutional Lender.

"**Sponsor Affiliated Lender**" means investment funds or managed accounts with respect to which Sponsor or an Affiliate of Sponsor is an advisor or manager in the ordinary course of business and pursuant to written agreements provided such Person executes a waiver in form and substance reasonably satisfactory to Administrative Agent stating that such Person shall have no right whatsoever so long as such Person is an Affiliate of a Borrower, ResCap or Sponsor, and except as provided under Section 12.05(c), to (a) consent to any amendment, modification, waiver, consent or other such action with respect to any of the terms of this Agreement or any other Credit Document, (b) require any Agent or other Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Credit Document, (c) otherwise vote on any matter related to this Agreement or any other Credit Document, (d) attend any meeting with any Agent or Lender or receive any information from any Agent or Lender or (e) make or bring any claim, in its capacity as Lender, against any Agent

61

"**Term A-2 Lender**" means each Lender having a Term A-2 Commitment on the Closing Date as set forth on Appendix A-1 hereto, or after the making of the Term A-2 Loans, each Lender holding any Term A-2 Loan.

"**Term A-2 Loan**" means a term A-2 loan made by a Term A-2 Lender pursuant to Section 2.01(a)(ii) on the Closing Date.

"**Term A-2 Loan Note**" means a promissory note in the form of Exhibit B-2, as it may be amended, supplemented or otherwise modified from time to time.

"**Term Facility**" means the Term A-1 Facility or the Term A-2 Facility; collectively, the "**Term Facilities**."

"**Term Lender**" means any Term A-1 Lender or Term A-2 Lender; collectively, the "**Term Lenders**."

"**Term Loan**" means any Term A-1 Loan or Term A-2 Loan; collectively, "**Term Loans**."

"**Terminated Lender**" as defined in Section 2.23.

"**Termination Date**" means the earliest to occur of (a) November 18, 2013, (b) the date that is forty-five (45) days after entry of the Interim Financing Order if the Final Financing Order has not been entered by the Bankruptcy Court prior to the expiration of such 45-day period, (c) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of a Reorganization Plan for any Debtor that is confirmed pursuant to an order entered by the Bankruptcy Court, and (d) the date on which maturity of the Loans is accelerated and the Commitments are terminated pursuant to Section 8.01.

"**Third Amendment Agreement**" means the Amendment and Restatement Agreement, dated as of October [    ], 2012, among the Credit Parties, the Lenders party thereto, the Administrative Agent, the Collateral Agent and the other Persons party thereto.

"**Third Restatement Effective Date**" means October [    ], 2012.

"**Third Restatement Order**" as defined in Section 3.07(a).

"**Total Advances**" as defined in the definition of Stressed Non-Recoverable Advance Amount.

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the aggregate principal amount of all outstanding Revolving Loans.

"**Trade Date**" as defined in Section 12.06(b)(i).

"**Transactions**" means (a) the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party, the borrowing of Loans and the use of the

proceeds thereof, (b) the refinancing of the Prepetition Refinanced Indebtedness and (c) all other related transactions, including the payment of fees and expenses in connection therewith.

"**Transmittal Letter**" as defined in the Custodial Agreement.

"**Trust**" means each of GMACM Trust and RFC Trust; collectively, the "Trusts".

"**Trust Documents**" means (a) the Trust Agreement, dated as of the ~~date hereof~~Second Restatement Effective Date, by and among GMACM Borrower, U.S. Bank Trust National Association, as Owner Trustee, and U.S. Bank Trust National Association, as Delaware Trustee, (b) the Trust Agreement, dated as of the Second Restatement Effective Date, by and among RFC Borrower, U.S. Bank Trust National Association, as Owner Trustee, and U.S. ~~Bank Trust National Association, as Delaware Trustee, (b) the Trust Agreement, dated as of the date hereof, by and among RFC Borrower, U.S. Bank Trust National Association, as Owner Trustee, and U.S.~~ Bank Trust National Association, as Delaware Trustee, (c) the GMACM Assignment Agreement, (d) the RFC Assignment Agreement, and (e) all other documents, instruments or agreements executed and delivered by a Credit Party in connection with any of the foregoing on or after the Second Restatement Effective Date, in each of the foregoing cases, as the same may be amended, amended and restated, supplemented or modified from time to time after the Second Restatement Effective Date in accordance with the terms hereof and thereof.

"**Trust Receipt**" means the receipt and certification for Mortgage Loans as further described in the Custodial Agreement.

"**Trustee**" means each Delaware Trustee and each Owner Trustee; collectively, the "Trustees".

"**Type of Loan**" means, with respect to Term Loans or Revolving Loans, an ABR Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"**Underlying Documents**" means, collectively, (a) the Fannie Mae Contracts, (b), the Freddie Mac Contracts, (c) any "Underlying Document" as defined in the Ally LOC Agreement, (d) the Servicing Agreements, and (e) any other material agreement or document that relates to Collateral or any Primary Credit Party, the termination, material breach or material modification of such agreement or document could reasonably be expected to give rise to a Material Adverse Effect, in all the foregoing cases, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**United States**" and "**U.S.**" mean the United States of America.

"**Unmatured Default**" means, with respect to any Designated Servicing Agreement, the occurrence of any event or condition that, with notice and/or the passage of any

846343.08 New York Server 6A   MSW1787270.05 NYCSR07A - MSW
ny-1057190

statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law, rule or regulation shall, unless otherwise specified, refer to such law, rule or regulation as amended, modified or supplemented from time to time. Any references in this Agreement to "Articles" and/or "Sections" which make reference to any particular piece of legislation or statute, including without limitation, Bankruptcy Code, ERISA, Internal Revenue Code and/or UCC shall for greater certainty mean the equivalent section in the applicable piece of legislation to the extent that the context implies reference to such other similar or equivalent legislation as is in effect from time to time in any other applicable jurisdiction, as applicable. Furthermore, where any such reference is meant to apply to such other similar or equivalent legislation where such other similar or equivalent legislation has parallel or like concepts, then such references shall import such parallel or like concepts from such other similar or equivalent legislation, as applicable. Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as (a) including the exhibits, schedules, appendices, annexes and other attachments thereto and (b) referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, amendments and restatements, supplements or modifications set forth herein or in any other Credit Document). Any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions thereon herein or in any other Credit Document).

Section 1.04    Effect of Restatement. This Agreement shall, except as otherwise expressly set forth herein, supersede the Second Amended Credit Agreement from and after the ~~Second~~Third Restatement Effective Date with respect to the transactions hereunder and with respect to the Loans outstanding under the Second Amended Credit Agreement as of the ~~Second~~Third Restatement Effective Date. The parties hereto acknowledge and agree, however, that (a) this Agreement and all other Credit Documents executed and delivered herewith do not constitute a novation, payment and reborrowing or termination of the Obligations under the Second Amended Credit Agreement and the other Credit Documents as in effect prior to the ~~Second~~Third Restatement Effective Date, (b) such Obligations are in all respects continuing with only the terms being modified as provided in this Agreement and the other Credit Documents, (c) the Guaranties are in all respects continuing and remain in full force and effect with respect to all Obligations, (d) the Liens and security interests in favor of the Collateral Agent for the benefit of the Secured Parties securing payment of such Obligations are in all respects continuing and in full force and effect with respect to all Obligations and (e) all references in the other Credit Documents, any Order or any other order of the Bankruptcy Court to the "Credit Agreement" shall be deemed to refer without further amendment to this Agreement.

## ARTICLE II

## LOANS

Section 2.01    Term Loans.

(a)    Making of the Initial Term A-1 Loans and Term A-2 Loans

(i)    One (1) Business Day prior to the Closing Date, the Borrowers delivered a duly executed irrevocable Funding Notice with respect to the Initial Term A-1 Loans. On the Closing Date, each Term A-1 Lender identified on Appendix A-1 made an Initial Term A-1 Loan to Borrowers in a principal amount equal to such Term A-1 Lender's Initial Term A-1 Commitment. All such Initial Term A-1 Loans remain outstanding as of the Restatement Effective Date and, as of the Second Restatement Effective Date and as of the Third Restatement Effective Date. Amounts repaid in respect of Initial Term A-1 Loans may not be reborrowed. All Initial Term A-1 Loans and all other amounts owed hereunder with respect to the Initial Term A-1 Loans shall be paid in full on the Termination Date.

(ii)    One (1) Business Day prior to the Closing Date, the Borrowers delivered a duly executed irrevocable Funding Notice with respect to the Term A-2 Loans. On the Closing Date, each Term A-2 Lender made a Term A-2 Loan to Borrowers in a principal amount equal to such Term A-2 Lender's Term A-2 Commitment. All such Term A-2 Loans remain outstanding as of the Restatement Effective Date, as of the Second Restatement Effective Date and as of the Second Third Restatement Effective Date. Amounts repaid in respect of Term A-2 Loans may not be reborrowed. All Term A-2 Loans and all other amounts owed hereunder with respect to the Term A-2 Loans shall be paid in full on the Termination Date.

(iii)    On the Closing Date, the Initial Term A-1 Loans and Term A-2 Loans were made as ABR Loans.

(b)    Making of the Delayed Draw Term A-1 Loans.

(i)    One (1) Business Day prior to the Restatement Effective Date, the Borrowers delivered a duly executed irrevocable Funding Notice with respect to the Delayed Draw Term A-1 Loans. On the Restatement Effective Date, each Term A-1 Lender identified on Appendix A-2 made a Delayed Draw Term A-1 Loan to Borrowers in a principal amount equal to such Term A-1 Lender's Delayed Draw Term A-1 Commitment. All such Delayed Draw Term A-1 Loans remain outstanding as of the Second Restatement Effective Date and as of the Third Restatement Effective Date. Amounts repaid in respect of Delayed Draw Term A-1 Loans may not be reborrowed. All Delayed Draw Term A-1 Loans and all other amounts owed hereunder with respect to the Delayed Draw Term A-1 Loans shall be paid in full on the Termination Date.

(ii)    On the Restatement Effective Date, the Delayed Draw Term A-1 Loans were made as ABR Loans.

846343.08 New York Server 6A - MSW 1787270.05 NYCSR07A - MSW
ny-1057190

Agent to comply with its obligations under FATCA, to determine that such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.20(f)(iii), **"FATCA"** shall include any amendments made to FATCA after the ~~date of this Agreement~~Closing Date.

      (g)    Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including additional amounts paid pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid to such indemnified party pursuant to the previous sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.20(g), in no event will any indemnified party be required to pay any amount to any indemnifying party pursuant to this Section 2.20(g) if such payment would place such indemnified party in a less favorable position (on a net after-Tax basis) than such indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.20(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the indemnifying party or any other Person.

      (h)    Survival. Each party's obligations under this Section 2.20 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other obligations under this Agreement.

      Section 2.21   Obligation to Mitigate. Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments or Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments or Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other

(c)     Eligible REO Property.  On any date of determination of the
Borrowing Base or the Collateral Amount, any REO Property (i) owned by a Borrower's REO
Subsidiary, which Subsidiary is a Guarantor and a "Grantor" under and as defined in the
Borrowers Security Agreement and whose Capital Stock is subject to a perfected First Priority
Lien pursuant to the Borrowers Security Agreement and the Orders, and (ii) as to which
Collateral Agent has received a Broker's Price Opinion as of a date within ninety (90) days prior
to such date of determination and that is reflected in the most recent Borrowing Base and
Collateral Amount Certificate delivered to Collateral Agent and Administrative Agent shall be an
**"Eligible REO Property"** for the purposes of this Agreement.  For the avoidance of doubt, there
is no Eligible REO Property as of the Closing Date, as of the Restatement Effective Date or, as
of the Second Restatement Effective Date or as of the Third Restatement Effective Date.

        Section 2.25    Priority and Liens Applicable to Credit Parties.  Each Credit Party
hereby covenants and agrees that, upon the execution of the Original Credit Agreement and upon
the entry of the Interim Financing Order (and when applicable, the Final Financing Order), the
Obligations of the Credit Parties:

        (a)     pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all
times constitute joint and several Superpriority Claims in the Cases;

        (b)     pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code,
shall at all times be secured by (i) a valid, binding, perfected first priority Lien on all real,
personal, tangible and intangible property of the Borrowers' and the Borrowers' REO
Subsidiaries' respective estates in the Cases that (x) is not subject to valid, perfected and non-
avoidable Liens as of the Petition Date or (y) becomes unencumbered and is no longer subject to
a Lien as a result of the repayment of Prepetition Refinanced Indebtedness with the proceeds of
the Loans, and (ii) a valid, binding, perfected first priority priming Lien on all such property to
the extent that such property is subject to any valid, perfected and non-avoidable Lien as of the
Petition Date that is not being terminated as a result of the repayment of Prepetition Refinanced
Indebtedness;

        (c)     pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code,
shall at all times be secured by (i) a valid, binding, perfected first priority Lien on all right, title
and interest of ResCap in the Concentration Account and all funds from time to time held or
deposited in the Concentration Account to the extent such property is not subject to valid,
perfected and non-avoidable Liens as of the Petition Date, and (ii) a valid, binding, perfected first
priority priming Lien on all such property to the extent that such property is subject to any valid,
perfected and non-avoidable Lien as of the Petition Date;

        (d)     pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all
times be secured by a valid, binding, perfected first priority Lien on all rights of the Credit
Parties to all cash deposits, rights under escrow agreements or other security or credit
enhancements provided by or on behalf of a purchaser or the purchasers under any Sale
Agreement, whether existing as of the Closing Date or thereafter arising, including the Credit
Parties' rights under the Nationstar Sale Agreement to retain the Cash Deposit (as defined in the
Nationstar Sale Agreement) and all right, title and interest of the Credit Parties in, under and to

846343.08 New York Server 6A   MSW1787270.05 NYCSR07A - MSW
ny-1057190

AFI/Junior Secured Notes Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, and (ii) shall not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(p)    entry of one or more orders, in form and substance satisfactory to Administrative Agent in its sole discretion, authorizing the Debtors to use the EAF Facility and granting adequate protection (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, collectively, the "**EAF Order**") (it being understood and agreed that an order in the form of Exhibit P shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which EAF Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, and (ii) shall not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(q)    entry of one or more orders, in form and substance satisfactory to Administrative Agent in its sole discretion, approving and authorizing the Debtors to either (i) enter into a debtor-in-possession financing facility refinancing the Prepetition MSR Facility, or (ii) use the cash collateral of Citibank, N.A. under the Prepetition MSR Facility and granting adequate protection (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, collectively, the "**MSR Order**") (it being understood and agreed that an order in the form of Exhibit Q shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which MSR Order (x) shall have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, and (y) shall not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(r)    the Credit Parties shall have entered into the Ally Sale Agreement and the Nationstar Sale Agreement, and the Credit Parties shall have filed with the Bankruptcy Court a motion in form and substance reasonably acceptable to Administrative Agent (the "**Sale Motion**") seeking entry of orders by the Bankruptcy Court, respectively, approving (i) the Original Sale Agreements and (ii) bidding procedures, which bidding procedures shall be in form and substance reasonably satisfactory to Administrative Agent (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, the "**Sale Procedures Order**") in connection with the sales contemplated thereby;

(s)    the Credit Parties shall be in pro forma compliance with the Borrowing Base, the Collateral Amount and the financial covenants set forth in Section 6.07 (after giving effect to the amounts to be borrowed and the use of proceeds on the Closing Date);

(t)    the Eligible Receivables and Eligible Mortgage Loans and other assets comprising First Lien Collateral shall have been identified in reasonable detail to Administrative Agent on Schedule 4.24, in form and substance reasonably satisfactory to Administrative Agent, and Administrative Agent shall be satisfied that all such Eligible

stayed, or (ii) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion.

Section 3.05    Conditions to Effectiveness of the First Amended Credit Agreement. The effectiveness of the First Amended Credit Agreement and the obligation of any Term A-1 Lender identified on Appendix A-2 to make a Delayed Draw Term A-1 Loan was subject to satisfaction or waiver in accordance with Section 12.05, of the following conditions precedent:

(a)    a final order approving the Credit Documents (including, without limitation, the Facility Fee Letter Amendment, in accordance with the terms and conditions set forth therein), in form and substance satisfactory to Administrative Agent in its sole discretion (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, the "**Final Financing Order**") (it being understood and agreed that an order in the form of Exhibit N-2 shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), (i) shall have been entered by the Bankruptcy Court and shall be in full force and effect and (ii) shall not have been (A) vacated, reversed, or stayed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(b)    all of the "second day" orders entered by the Bankruptcy Court (and if any such orders shall not have been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) shall be in form and substance reasonably satisfactory to Administrative Agent;

(c)    the Credit Parties and the other parties hereto shall have duly executed and delivered the First Amendment Agreement;

(d)    the Lenders, the Agents and the Lead Arranger shall have received all fees required to be paid (including, without limitation, as required by the Fee Letters), and all expenses for which invoices have been presented, on or before the Restatement Effective Date;

(e)    (i) all governmental and third-party approvals necessary in connection with the (w) the execution and delivery by each Credit Party of the First Amendment Agreement and the performance and consummation by the Credit Parties of the transactions contemplated by the First Amendment Agreement, thisthe First Amended Credit Agreement and the other Credit Documents, (x) the grant by each Credit Party of the Liens granted by it pursuant to the Collateral Documents and the Final Financing Order, (y) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof to the extent provided for in the Final Financing Order) and (z) the exercise by any Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents and (ii) all material governmental and third-party approvals necessary in connection with the continuing operations of ResCap and its Subsidiaries, in all the foregoing cases, shall have been obtained on satisfactory terms and shall be in full force and effect (including shareholder approvals, if any);

104

(f)    Administrative Agent shall have received such closing documents as are customary for an amendment and restatement transaction of this type or as it may reasonably request, including but not limited to the documents set forth on Schedule 3.05;

(g)    the Credit Parties shall be in pro forma compliance with the Borrowing Base, the Collateral Amount and the financial covenants set forth in Section 6.07 (after giving effect to any Credit Extensions made and the use of proceeds thereof on the Restatement Effective Date);

(h)    no Default or Event of Default, both immediately prior to and after giving effect to the amendment and restatement of the Original Credit Agreement pursuant to ~~this~~the First Amended Credit Agreement and any Credit Extensions made on the Restatement Effective Date, shall, in each case, have occurred under any of the Credit Documents;

(i)    both immediately prior to and after giving effect to the amendment and restatement of the Original Credit Agreement pursuant to the First Amended Credit Agreement and any Credit Extensions made on the Restatement Effective Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Restatement Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification; and

(j)    Administrative Agent shall have received a certificate, signed by a Senior Officer of each Primary Credit Party, on the Restatement Effective Date, confirming compliance (other than, as applicable, with respect to the satisfaction of any Agent, Lender or the Lead Arranger) with the conditions set forth in this Section 3.05 and Sections 3.03(c), (d), (e) and (g).

Section 3.06    Conditions to Effectiveness of ~~this~~the Second Amended Credit Agreement. The effectiveness of the ~~amendment and restatement of the~~Second Amended Credit Agreement ~~in the form of this Agreement is~~was subject to satisfaction or waiver in accordance with Section 12.05, of the following conditions precedent:

(a)    (i) the Credit Parties and the other parties hereto shall have duly executed and delivered the Second Amendment Agreement, (ii) each Trust shall have duly executed and delivered a Counterpart Agreement and a joinder to the Security Agreement, in each case in form and substance satisfactory to Administrative Agent, and (iii) the Trusts, the Borrowers and the Custodian shall have duly executed and delivered an amended and restated Custodial Agreement in form and substance satisfactory to Administrative Agent;

(b)    the Lenders, the Agents and the Lead Arranger shall have received all expenses for which invoices have been presented, on or before the Second Restatement Effective Date;

105

(c)     (i) all governmental and third-party approvals necessary in connection with (w) the execution and delivery by each Credit Party of the Second Amendment Agreement and the performance and consummation by the Credit Parties of the transactions contemplated by the Second Amendment Agreement, ~~this~~the Second Amended Credit Agreement and the other Credit Documents, (x) the grant by each Credit Party of the Liens granted by it pursuant to the Collateral Documents and the Final Financing Order, (y) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof to the extent provided for in the Final Financing Order) and (z) the exercise by any Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents and (ii) all material governmental and third-party approvals necessary in connection with the continuing operations of ResCap and its Subsidiaries, in all the foregoing cases, shall have been obtained on satisfactory terms and shall be in full force and effect (including shareholder approvals, if any);

(d)     Administrative Agent shall have received duly authorized and executed Trust Documents and such other closing documents as are customary for an amendment and restatement transaction of this type or as it may reasonably request, including but not limited to the documents set forth on Schedule 3.06;

(e)     the Credit Parties shall be in pro forma compliance with the Borrowing Base, the Collateral Amount and the financial covenants set forth in Section 6.07 (after giving effect to any Credit Extensions made and the use of proceeds thereof on the Second Restatement Effective Date);

(f)     no Default or Event of Default, both immediately prior to and after giving effect to the amendment and restatement of the First Amended Credit Agreement pursuant to ~~this~~the Second Amended Credit Agreement and any Credit Extensions made on the Second Restatement Effective Date, shall, in each case, have occurred under any of the Credit Documents;

(g)     both immediately prior to and after giving effect to the amendment and restatement of the First Amended Credit Agreement pursuant to ~~this~~the Second Amended Credit Agreement and any Credit Extensions made on the Second Restatement Effective Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Second Restatement Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification;

(h)     UCC financing statements with respect to the Trusts shall have been filed in all jurisdictions required by Collateral Agent; and

(i)     Administrative Agent shall have received a certificate, signed by a Senior Officer of each Primary Credit Party, on the Second Restatement Effective Date,

846343-08 New York Server 6A - MSW1787270.05 NYCSR07A - MSW
ny-1057190

confirming compliance (other than, as applicable, with respect to the satisfaction of any Agent, Lender or the Lead Arranger) with the conditions set forth in this Section 3.06.

Section 3.07   Conditions to Effectiveness of this Agreement.  The effectiveness of the amendment and restatement of the Second Amended Credit Agreement in the form of this Agreement is subject to satisfaction of the following conditions precedent:

(a)      an order approving the Third Amendment Agreement and the amendment and restatement of the Second Amended Credit Agreement as provided in this Agreement, in accordance with the terms and conditions set forth herein and in the Third Amendment Agreement, in form and substance satisfactory to Administrative Agent in its sole discretion (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, the "**Third Restatement Order**"), (i) shall have been entered by the Bankruptcy Court and shall be in full force and effect and (ii) shall not have been (A) vacated, reversed, or stayed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(b)      the Credit Parties and the other parties hereto shall have duly executed and delivered the Third Amendment Agreement;

(c)      the Lenders, the Agents and the Lead Arranger shall have received (i) all fees (including, without limitation, the Consent Fees (as defined in the Third Amendment Agreement)) to be paid in connection with the Third Amendment Agreement as described in the Third Restatement Order and (ii) all expenses for which invoices have been presented, on or before the Third Restatement Effective Date;

(d)      (i) all governmental and third-party approvals necessary in connection with (w) the execution and delivery by each Credit Party of the Third Amendment Agreement and the performance and consummation by the Credit Parties of the transactions contemplated by the Third Amendment Agreement, this Agreement and the other Credit Documents, (x) the grant by each Credit Party of the Liens granted by it pursuant to the Collateral Documents and the Final Financing Order, (y) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof to the extent provided for in the Final Financing Order) and (z) the exercise by any Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents and (ii) all material governmental and third-party approvals necessary in connection with the continuing operations of ResCap and its Subsidiaries, in all the foregoing cases, shall have been obtained on terms satisfactory to the Administrative Agent and shall be in full force and effect (including shareholder approvals, if any);

(e)      Administrative Agent shall have received such other closing documents as are customary for an amendment and restatement transaction of this type or as it may reasonably request, including but not limited to the documents set forth on Schedule 3.07;

(f)      the Credit Parties shall be in pro forma compliance with the Borrowing Base, the Collateral Amount and the financial covenants set forth in Section 6.07

(after giving effect to any Credit Extensions made and the use of proceeds thereof on the Third Restatement Effective Date);

(g)    no Default or Event of Default, both immediately prior to and after giving effect to the amendment and restatement of the Second Amended Credit Agreement pursuant to the Third Amended Credit Agreement and any Credit Extensions made on the Third Restatement Effective Date, shall, in each case, have occurred under any of the Credit Documents;

(h)    both immediately prior to and after giving effect to the amendment and restatement of the Second Amended Credit Agreement pursuant to the Third Amended Credit Agreement and any Credit Extensions made on the Third Restatement Effective Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Third Restatement Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification; and

(i)    Administrative Agent shall have received a certificate, signed by a Senior Officer of each Primary Credit Party, on the Third Restatement Effective Date, confirming compliance (other than, as applicable, with respect to the satisfaction of any Agent, Lender or the Lead Arranger) with the conditions set forth in this Section 3.07.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

In order to induce Lenders to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Agent and each Lender, on the Closing Date, the Restatement Effective Date, the Second Restatement Effective Date, the Third Restatement Effective Date, each Credit Date and each Withdrawal Date and on the date of each Compliance Certificate delivered pursuant to Section 5.01(d) and each Borrowing Base and Collateral Amount Certificate delivered pursuant to Section 5.01(f), that the following statements are true and correct:

Section 4.01    Organization; Requisite Power and Authority; Qualification.  Each of ResCap and its Subsidiaries (a) is duly organized, validly existing and, to the extent such concept or a similar concept is applicable, in good standing under the laws of its jurisdiction of organization as identified on Schedule 4.01, (b) subject to entry of an applicable order of the Bankruptcy Court, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and had at all relevant times, and now has, all necessary power, authority and legal right to own the portion of the Collateral that it owns and to grant the Liens under the Collateral Documents, (c) subject to entry of an applicable order of the Bankruptcy Court has all necessary power and authority and legal

108

Effect; (b) violate any provision of, conflict with or result in a breach of any of the
Organizational Documents of AFI, ResCap or any of its Subsidiaries; (c) conflict with, result in a
breach of or constitute (with or without notice, lapse of time or both) a default or require any
payment to be made under any Contractual Obligation of ResCap or any of its Subsidiaries
entered into, assumed or binding after the Petition Date (other than the repayment of
indebtedness under the Prepetition Refinanced Facilities contemplated by Section 3.01(l)); (d)
result in or require the creation or imposition of any Lien upon any of the properties or assets of
ResCap or any of its Subsidiaries (other than any Liens created under any of the Credit
Documents in favor of Collateral Agent, on behalf of Secured Parties); or (e) require any
approval of any Board of Directors, stockholders, members or partners, except for any such
approvals or consents that have been obtained on or before the Closing Date, the Restatement
Effective Date, the Second Restatement Effective Date or the ~~Second~~Third Restatement
Effective Date, as applicable, and in each such case, are in full force and effect and were
disclosed in writing to Administrative Agent.

     Section 4.05    Governmental and Other Consents.  Subject to entry of the Interim
Financing Order (or the Final Financing Order, when applicable), (i) the execution, delivery and
performance by Credit Parties of the Credit Documents and the Trust Documents to which they
are parties and the consummation by the Credit Parties of the transactions contemplated by the
Credit Documents and the Trust Documents, (ii) the grant by any Credit Party of the Liens
granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the
Liens created under the Collateral Documents (including the first priority nature thereof to the
extent provided for in the Orders) and (iv) except for any notices that may be required by Article
VIII or pursuant to any applicable Intercreditor Provisions, the exercise by any Agent or any
Lender of its rights under the Credit Documents or the remedies in respect of the Collateral
pursuant to the Collateral Documents, in any case of the foregoing, do not and will not require
any registration with, consent, authorization or approval of, or notice to or filing with, or other
action to, with or by, any Governmental Authority or any other Person except (x) as have been
obtained prior to the Closing Date, the Restatement Effective Date ~~or~~, the Second Restatement
Effective Date or the Third Restatement Effective Date, as applicable, and, in each such case, are
in full force and effect and disclosed in writing to Administrative Agent, (y) when the failure of
which to be so made or delivered could not reasonably be expected to have a Material Adverse
Effect or (z) except for filings and recordings with any Governmental Authority with respect to
the Liens created under the Credit Documents.

     Section 4.06    Binding Obligation.  Subject to entry of the Interim Financing
Order (or the Final Financing Order, when applicable), each Credit Document and each Trust
Document has been duly executed and delivered by each Credit Party that is a party thereto and
is the legally valid and binding obligation of such Credit Party, enforceable against such Credit
Party in accordance with its respective terms.

     Section 4.07    Financial Statements.  The financial statements of ResCap and its
consolidated subsidiaries most recently delivered pursuant to Section 3.01(h) or Section 5.01(a),
(b) or (c) were prepared in conformity with GAAP, consistently applied, and fairly present, in all
material respects, the financial condition of ResCap and its Subsidiaries, on a consolidated basis,
as at the respective dates indicated therein and the results of their operations and (with respect to

~~846343.08 New York Server 6A - MSW~~1787270.05-NYCSR07A - MSW
~~ny-1057190~~

returns to be due and payable and all assessments, fees and other governmental charges upon ResCap and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable. Neither ResCap nor any of its Subsidiaries knows of any proposed tax assessment against ResCap or any of its Subsidiaries which is not being actively contested by ResCap or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. The charges, accruals and reserves on the books of such Credit Party or Subsidiary in respect of taxes and other governmental charges are, in the reasonable opinion of such Credit Party or Subsidiary, adequate.

Section 4.14    Properties.

(a)    Title.  Each of ResCap and its Subsidiaries has (i) good and marketable fee simple title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in the most recent financial statements of ResCap and its Subsidiaries delivered pursuant to Section 3.01(h) or Section 5.01(a), (b) or (c), in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.08 or 6.09.  Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b)    Real Estate.  As of the Closing Date, Schedule 4.14 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) with respect to any real property of any Credit Party which provides for monthly rental payments after the ~~date of this Agreement~~Closing Date of more than $100,000 or is otherwise material to the business or operations of such Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.  Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and neither ResCap nor any of its Subsidiaries has knowledge of any default that has occurred and is continuing thereunder, and subject to an applicable order of the Bankruptcy Court, each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms.  ResCap and its Subsidiaries enjoy peaceful and undisturbed possession under all of their respective leases except where the failure to enjoy such peaceful and undisturbed possession, individually or in the aggregate, is not reasonably expected to have a Material Adverse Effect.

Section 4.15    Environmental Matters.  Except as set forth on Schedule 4.15 or to the extent, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) ResCap and each of its Subsidiaries has been and is in compliance with all applicable Environmental Laws, including any Governmental Authorizations issued pursuant thereto, and ResCap and each of its Subsidiaries will be capable of maintaining compliance with applicable Environmental Laws, including any reasonably foreseeable future requirements of

112

Section 4.33    Adverse Actions.  Except to the extent as would be subject to the automatic stay under the Bankruptcy Code, no Credit Party has received from any Government Sponsored Entity or any other Governmental Authority any notice revoking or suspending, or indicating any intent to revoke or suspend or indicating any adverse fact or circumstance which could reasonably be expected to entitle such Governmental Authority, as the case may be, to revoke or suspend any approval relating to any Collateral.

Section 4.34    The Orders.  On the date of the making of the Term Loans, the Interim Financing Order shall have been entered, shall be in full force and effect and shall not have been (a) vacated, reversed or stayed or (b) amended or modified except as agreed in writing by Administrative Agent in its sole discretion.  On the date of the making of any Loan, the Interim Financing Order (or the Final Financing Order, when applicable) shall have been entered, shall be in full force and effect and shall not have been (a) vacated, reversed or stayed or (b) amended or modified except as agreed in writing by Administrative Agent in its sole discretion.  At all times after entry thereof by the Bankruptcy Court, the Orders shall be in full force and effect and shall not have been (a) vacated, reversed or stayed or (b) amended or modified except as agreed in writing by Administrative Agent in its sole discretion.  Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Credit Parties hereunder and under the other Credit Documents, the Agents and Lenders shall, subject to the provisions of Section 8.01 and the Orders, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

Section 4.35    Cash Collateral and Other Orders.

(a)    On the Closing Date, each of the Cash Management Order, the AFI/Junior Secured Notes Order, the EAF Order, the MSR Order and the Origination Order shall have been entered, shall be in full force and effect and shall not have been (i) vacated, reversed or stayed or (ii) amended or modified except as agreed in writing by Administrative Agent in its sole discretion.  At all times after entry thereof by the Bankruptcy Court, each of the Cash Management Order, the AFI/Junior Secured Notes Order, the EAF Order, the MSR Order and the Origination Order shall be in full force and effect and shall not have been (i) vacated, reversed or stayed or (ii) amended or modified except as agreed in writing by Administrative Agent in its sole discretion.

(b)    The Sale Order, at all times after entry thereof by the Bankruptcy Court, shall be in full force and effect and shall not have been (i) vacated, reversed or stayed or (ii) amended or modified in any manner that would adversely affect the ability of any Borrower to repay the Obligations in full in Cash with the sale proceeds upon consummation of the sale(s), except as otherwise expressly permitted by Sections 6.08(e) and 6.08(f).

Section 4.36    Provision of Information.  Each Credit Party has provided to Administrative Agent (whether pursuant to this Agreement or any other Credit Document) all relevant information about any (a) material investigation by or otherwise involving a Governmental Authority or Government Sponsored Entity relating to the Collateral and copies of each notice or other correspondence received from the SEC Division of Enforcement (or

118

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment that results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.04.

Section 6.07    Financial Covenants.

(a)    Borrower Liquidity.  The Credit Parties shall not permit the aggregate amount of Cash and Cash Equivalents on deposit in the Borrower Accounts, the Collection Account and the Concentration Account to be less than $50,000,000 in the aggregate at any time.

(b)    Consolidated Liquidity.  The Credit Parties shall not permit the aggregate amount of Unrestricted Cash of ResCap and its Subsidiaries, determined on a consolidated basis, to be (i) less than $250,000,000 for any four (4) consecutive Business Days or (ii) less than $75,000,000 at any time.

(c)    Net Outflows.  The Credit Parties shall not permit Net Outflows at any time to exceed $75,000,000.

Section 6.08    Fundamental Changes; Disposition of Assets; Acquisitions.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sublease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any portion of the Collateral, whether real, personal or mixed and whether tangible or intangible, whether owned as of the Closing Date or thereafter acquired, or acquire by purchase or otherwise the business, or all or substantially all of the property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, nor shall any Credit Party enter into any agreement with respect to any of the foregoing, or permit any of its Subsidiaries to enter into any such agreement, except transactions or agreements providing for:

(a)    any Non-Credit Party (other than any Restricted Entity) may be merged with or into any Wholly Owned Subsidiary that is a Non-Credit Party (other than any Restricted Entity), or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions to any Wholly Owned Subsidiary that is a Non-Credit Party (other than any Restricted Entity);

(b)    (i) sales, leases, licenses or other dispositions of assets that do not constitute Asset Sales and (ii) sales or other dispositions (other than by any Borrower, any Borrower's REO Subsidiary or any Trust) of (x) equipment that is obsolete, worn-out, condemned or no longer used or useful in the business of ResCap or any of its Subsidiaries and (y) other assets set forth on Schedule 6.08;

(c)    the sale transactions contemplated by any Sale Agreements; provided that (i) such sale transactions, collectively, ~~contemplates~~shall provide for Net Asset Sale

147

Proceeds in an aggregate amount sufficient for the payment in full in Cash of the Obligations at after giving effect to the closing(s) of the sale(s) contemplated thereby in accordance with the terms of such sales agreement(s), and (ii) on the closing date of the sales contemplated by the Sale Agreements (other than with respect to sale transactions permitted by Section 6.08(e) or 6.08(f)), sufficient Net Asset Sale Proceeds thereof are applied to repay the Obligations in full in Cash and the Commitments are terminated;

(d)      Asset Sales by ResCap or any of its Subsidiaries (other than a sale or disposition of any Capital Stock of any Borrower, any Borrower's REO Subsidiary or any Trust); provided that (i) both immediately prior to and after giving effect to any such Asset Sale and any prepayments of the Obligations required to be made hereunder, no Default or Event of Default shall exist or result therefrom, (ii) the consideration received for such assets shall be in an amount at least equal to (A) if such assets constitute First Lien Collateral, the greater of (x) the fair market value thereof (determined in good faith by the applicable Credit Parties (or, with respect to any Asset Sale or related series of Asset Sales for which the proceeds and consideration are anticipated to be in excess of $5,000,000, in good faith by the Board of Directors (or similar governing body) of the applicable Credit Parties)) and (y) an amount determined based on the advance rate set forth in the definition of "Collateral Amount" applicable to such First Lien Collateral (calculated on an aggregate basis for the assets in each transaction) hereunder, or (B) if such assets constitute Junior Lien Collateral, the fair market value thereof (determined in good faith by the applicable Credit Parties), (iii) 100% of the consideration shall be paid in Cash, (iv) the proceeds of all Asset Sales pursuant to this Section 6.08(d) involving First Lien Collateral do not exceed $25,000,000 in the aggregate for all such Asset Sales from and after the Closing Date, (v) the Net Asset Sale Proceeds thereof are applied as required by Section 2.14 and (vi) if such assets constitute Junior Lien Collateral, any such Asset Sale is permitted pursuant to Section 6.19;

(e)      on or before the Sale Closing Milestone, a one-time Asset Sale by ResCap or any of its Subsidiaries pursuant to a Sale Agreement of all or any portion of the Mortgage Loans constituting First Lien Collateral and/or the Pledged Mortgage Loans (as defined in the LOC Security Agreement); provided that (i) both immediately prior to and after giving effect to such Asset Sale and any prepayments of the Obligations required to be made hereunder, no Default or Event of Default shall exist or result therefrom, (ii) if such assets constitute First Lien Collateral, the Net Asset Sale Proceeds received for such assets shall be in an amount at least equal to 75% of the Market Value of such Mortgage Loans constituting First Lien Collateral (calculated on an aggregate basis for the assets in each transaction), (iii) if such assets constitute Junior Lien Collateral, the Net Asset Sale Proceeds received for such assets shall be in an amount at least equal to 75% of the book value of such Pledged Mortgage Loans (determined in good faith by the applicable Credit Parties) (calculated on an aggregate basis for the assets in each transaction), (iv) 100% of the consideration shall be paid in Cash, and (v) the Net Asset Sale Proceeds thereof are applied as required by Section 2.14;

(f)      on or before the Sale Closing Milestone, Asset Sales by ResCap or any of its Subsidiaries of Federal Housing Administration mortgage insurance backed mortgage loans and mortgage loans guaranteed by the U.S. Department of Veterans Affairs, in any such case, that constitute LOC Junior Lien Collateral pursuant to one or more sale transactions;

148

846343.08 New York Server 6A   MSW 1787270.05-NYCSR07A - MSW
ny-1057190

provided that (i) both immediately prior to and after giving effect to any such Asset Sale and any prepayments of the Obligations required to be made hereunder, no Default or Event of Default shall exist or result therefrom, (ii) the consideration received for such assets in any sale transaction or series of related sale transactions shall be, on average for any such transaction or series of transactions, no less than 90% of the par value of such mortgage loans subject to such transaction(s), (iii) 100% of the consideration shall be paid in Cash, (iv) the Net Asset Sale Proceeds thereof are applied as required by Section 2.14 and (v) the proceeds of all Asset Sales pursuant to this Section 6.08(f) do not exceed $200,000,000 in the aggregate for all such Asset Sales from and after the Closing Date;

(g)    (e) prior to receipt of notice from Administrative Agent given after the occurrence of an Event of Default, the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business consistent with past practice, other than First Lien Collateral; and

(h)    (f) transfers, sales or contributions by either Borrower of Designated Mortgage Loans to one or more Delaware statutory trusts owned by such Borrower.

Section 6.09    Disposal Of Subsidiary Interests. Except for any sale, assignment, transfer or disposition of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.08, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except by a Non-Credit Party to another Non-Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder) or to qualify directors if required by applicable law and except for (i) Specified Permitted Liens and (ii) Liens in favor of any Agent for the benefit of the Secured Parties granted pursuant to the Credit Documents and the Orders; provided that neither RFC nor GMACM may sell or dispose of any Capital Stock of any Borrower; provided further that neither Borrower may sell or dispose of any Capital Stock of any Borrower's REO Subsidiary or of any Trust.

Section 6.10    Mortgage Loan Servicing Fees. No Credit Party shall pay, or cause to be paid, directly or indirectly, servicing and subservicing fees for Mortgage Loans in an amount exceeding 0.25% per annum of the outstanding principal balance of the Mortgage Loans; provided that, with respect to the Mortgage Loans identified on Schedule 6.10 as of the Closing Date, no Credit Party shall pay, or cause to be paid, directly or indirectly, servicing and subservicing fees for such Mortgage Loans in an amount exceeding the percentage per annum set forth opposite the applicable loan identification number for such Mortgage Loan on Schedule 6.10 as of the Closing Date.

Section 6.11    Transactions with Shareholders and Affiliates. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of ResCap or any of its Subsidiaries, on terms that are less favorable to ResCap or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided that the foregoing restriction shall not apply to (a) any transaction authorized by the Orders or any "first

any Credit Party or the value of the Collateral, except as required by any applicable law, rule or regulation or the applicable Designated Servicing Agreement.

Section 6.19    Dispositions of LOC Junior Lien Collateral. NoExcept as otherwise expressly permitted pursuant to Section 6.08(f), no Credit Party shall, nor shall it permit any of its Subsidiaries to, convey, sell, exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any portion of the LOC Junior Lien Collateral, whether owned or existing as of the Closing Date or thereafter acquired except (a) in the ordinary course of business or (b) pursuant to a Sale Agreement.

Section 6.20    Amendment to MSFTA. Within fifteen (15) days following the Closing Date, GMACM shall enter into an amended MSFTA with Ally Investment Management LLC that includes the following terms: (i) the initial or independent margin shall be no more than $10,000,000 in the aggregate for all transactions, (ii) Ally Investment Management LLC shall hold any securities delivered to it under the MSFTA on a settlement date for the account of GMACM until they are delivered in settlement of Ally Investment Management LLC's related hedge transaction and return such securities to GMACM, net of any amounts that would have reduced the settlement payment under the MSFTA, by the end of the third (3rd) Business Day following such settlement date if such delivery has not occurred and (iii) such other terms reasonably acceptable to Administration Agent.

# ARTICLE VII

# GUARANTY

Section 7.01    Guaranty of the Obligations. Subject to the provisions of Section 7.02, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the "**Guaranteed Obligations**"). Notwithstanding the foregoing or any other provision of this Agreement to the contrary, if the obligations of any Guarantor under this Section 7.01 would, in any action or proceeding involving any state or provincial corporate law, or any state, provincial, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, otherwise be held or determined to be subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of a state, provincial or foreign law on account of the amount of its liability under this Section 7.01, then the amount of such liability shall, without further action by such Guarantor, or any Credit Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding.

Section 7.02    Contribution by Guarantors. All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty

152

of foreclosure or the like) on any Collateral of any of the Credit Parties with a value in excess of $5,000,000, either individually or in the aggregate; or

(m)   the Bankruptcy Court shall enter an order or orders permitting or authorizing any actions that could reasonably be expected to have a Material Adverse Effect, or a determination by a court of competent jurisdiction with respect to any motion, pleading or proceeding brought by another party that could reasonably be expected to have a Material Adverse Effect; or

(n)   any Order shall cease to be in full force and effect or an order of the Bankruptcy Court shall be entered reversing, staying, vacating or (except as otherwise agreed to in writing by Administrative Agent in its sole discretion) otherwise amending, supplementing or modifying the Interim Financing Order or the Final Financing Order; or

(o)   any Credit Party shall make any Prepetition Payment other than (i) as permitted by the Interim Financing Order or the Final Financing Order, (ii) as otherwise permitted by this Agreement or (iii) as authorized by the Bankruptcy Court in accordance with "first day" or "second day" orders entered on, before or after the Closing Date, which orders permitting any such payment are in form and substance satisfactory to Administrative Agent, or other orders of the Bankruptcy Court entered with the written consent of (or non-objection by) Administrative Agent; or

(p)   any Credit Party shall not comply with any terms of (i) the Interim Financing Order or the Final Financing Order or (ii) any other order of the Bankruptcy Court (x) authorizing the use of cash collateral, (y) approving debtor-in-possession financing, or (z) granting adequate protection; or

(q)   (i) the Ally Sale Agreement and/or the Nationstar Sale Agreement shall be terminated, rescinded or revoked (in whole or in part) by any party thereto and is not replaced by a Replacement Sale Agreement, which Replacement Sale Agreement shall have been approved by the Bankruptcy Court within such sixty (60) day period; or (ii) any party to any Sale Agreement shall (x) admit in writing or state publicly its intent not to pursue the transactions contemplated by the Sale Agreement, or (y) act or fail to act in a manner that impairs such party's ability to perform its obligations under, or otherwise constitutes an anticipatory repudiation of, or a breach or default under (to the extent not cured within the applicable grace period), any Sale Agreement unless a Replacement Sale Agreement shall have been approved by the Bankruptcy Court within sixty (60) days from such act; or (iii) the denial (in whole or in part) by the Bankruptcy Court of any of the relief sought in the Sale Motion or in any motion seeking approval of a Replacement Sale Agreement unless the initial relief requested shall be approved by the Bankruptcy Court pursuant to a Sale Order within sixty (60) days of such denial; or

(r)   except as otherwise expressly permitted pursuant to Section 6.08(e) and 6.08(f), (i) the failure of the Sale Order, as entered by the Bankruptcy Court, to provide that the Obligations shall be repaid in full in Cash at the closing of the transactions approved by the Sale Order or (ii) the failure of the Obligations to be repaid in full in Cash at the closing of the transactions approved by the Sale Order; or

161

claims of any Lender under the Credit Documents or challenge the Liens held by Collateral Agent or (y) oppose a motion by any Lender or any Agent to confirm its claims or Liens, or (ii) in any case of the foregoing, the Bankruptcy Court enters a final order granting such relief; or

(bb)    any stipulation shall be entered into by any Credit Party or any order shall be entered by the Bankruptcy Court with respect to the provision of adequate protection to any Person or the use of cash collateral by any Credit Party, in each case that is not satisfactory in form and substance to Administrative Agent in its sole and absolute discretion; or

(cc)    the Bankruptcy Court shall enter an order or orders authorizing recovery from the Collateral for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than (i) as may be provided in the Orders, (ii) de minimus amounts or (iii) with the consent of Administrative Agent; or

(dd)    the occurrence of any adverse events or failures that could result in termination of servicing rights in any Designated Servicing Agreement; or

(ee)    any default that could not by its nature be cured within any applicable grace period, event of default, early amortization event, termination event or other similar event (other than as a result of those events that customarily occur leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Cases and the continuation and prosecution thereof) shall occur under any Underlying Document and such event could reasonably be expected to be materially adverse to the rights and interests of any Agent or the Lenders; or

(ff)    any Credit Party shall assume or reject any Servicing Agreement, any Specified Servicing Agreement or any other servicing or subservicing contract relating to the Collateral pursuant to Section 365 of the Bankruptcy Code in violation of Section 6.18(d); or

(gg)    any Credit Party or AFI or any of their respective Subsidiaries shall take any action (including, without limitation, filing a motion, seeking such relief or filing a pleading in support of such action or a pleading not opposing such action in good faith) in support of any matter set forth in Section 8.01(i), (j), (k), (l), (m), (n), (o), (t), (v), (aa), (bb), (cc) or (ff) above or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(hh)    one or more Sale Orders, approving one or more Sale Agreements, that individually or collectively provide sufficient net proceeds to repay the Obligations in full in Cash are not entered by the Bankruptcy Court by the Sale Order Milestone, or the simultaneous (except as otherwise permitted by Section 6.08(e) or 6.08(f)) closing of such approved Sale Agreement transaction(s) has/have not occurred by the Sale Closing Milestone; or

(ii)    (i) any order of the Bankruptcy Court authorizing the use of the cash collateral of holders of Specified Permitted Indebtedness shall cease to be in full force and effect, (ii) an order or orders of the Bankruptcy Court shall be entered reversing, staying or vacating any such order, (iii) any cash collateral termination event specified in any such order

163

(b)     Right to Realize on Collateral and Enforce Guaranty. Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrowers, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

## ARTICLE XI

## RECEIVABLES CUSTODIAN; VERIFICATION AGENT

Section 11.01 Receivable Files.

(a)     Administrators as Receivables Custodian. To reduce administrative costs, Collateral Agent, on behalf of the Lenders, upon the execution and delivery of the Original Credit Agreement, appointed the Administrators, and each Administrator accepted such appointment, to act as the agent (each such Person, acting in such capacity, a "**Receivables Custodian**" hereunder) of Collateral Agent as custodian for the benefit of the Lenders of the following documents (collectively referred to as the "**Receivable File**") relating to each Receivable attributable to such Person:

(i)     a copy of the related Designated Servicing Agreement and each amendment and modification thereto;

(ii)     any other documents received from or made available by the related MBS Trustee, Servicer, securities administrator or other similar party in respect of such Receivable; and

(iii)     any and all other documents that the Primary Credit Parties, as the case may be, shall keep on file, in accordance with their customary procedures, relating to such Receivable or the related MBS Trust.

As of the Restatement Effective Date and, the Second Restatement Effective Date and the Third Restatement Effective Date, the Collateral Agent, on behalf of the Lenders, reaffirms such appointment, and each Administrator reaffirms acceptance of such appointment.

or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use, such information.

      (e)   Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT-RELATED PERSON IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall any Agent-Related Person have any liability to the Borrowers, any Lender or any other Person or entity for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or Administrative Agent's transmission of Borrower Materials through the Platform, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by an final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent-Related Person; provided that in no event shall any Agent-Related Person have any liability to the Borrowers, any Lender or any other Person for indirect, special, incidental, consequential damages or punitive damages (as opposed to direct or actual damages). Each of the Credit Parties, the Lenders and the Agents agree that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

      (f)   Reliance by Administrative Agent, Collateral Agent and Lenders. Administrative Agent, Collateral Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic funding requests and other telephonic notices) purportedly given by or on behalf of Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. Borrowers shall indemnify Administrative Agent, Collateral Agent, each Lender and the Related Parties of each of them for all losses, costs, expenses and liabilities resulting from the reliance of such Person on each notice purportedly given by or on behalf of the Borrowers. All telephonic notices to and telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereby consents to such recording.

      Section 12.02 Expenses. Borrowers agree to promptly or reimburse (a) all the reasonable out-of-pocket costs and expenses incurred by Administrative Agent and other Agents in connection with the syndication of the Credit Facilities, the preparation, negotiation, execution, delivery and administration of the First Amendment Agreement, the Second Amendment Agreement, the Third Amendment Agreement, this Agreement and the other Credit Documents (including, for the avoidance of doubt, fees and expenses payable by Administrative Agent or Collateral Agent to any other agent, sub-agent, appraiser or other third party in connection therewith), the Trust Documents, or any amendments, modifications or waivers of the

846343.08 New York Server 6A   MSW1787270.05-NYCSR07A - MSW
ny-1057190

provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including the reasonable fees, charges and disbursements of counsel and (b) all out-of-pocket costs and expenses incurred by Administrative Agent, the other Agents and each Lender (including the fees, charges and disbursements of any counsel for Administrative Agent, the other Agents and any Lender) in connection with the enforcement or protection of any rights and remedies under this Agreement and the other Credit Documents, including all such costs and expenses incurred during any legal proceeding, including the Cases and any other proceeding under any Debtor Relief Law, and including in connection with any workout, restructuring or negotiations in respect of the Credit Extensions and the Credit Documents, including the reasonable fees, charges and disbursements of counsel.

Section 12.03  Indemnity.

(a)    Indemnification by Credit Parties.  Each Credit Party shall indemnify Administrative Agent (and any sub-agent thereof), each other Agent (and any sub-agent thereof), each Lender, each Trustee and each Related Party of any of the foregoing Persons (each such Person being called an **"Indemnitee"**) against, and hold each Indemnitee harmless from, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims, demands, actions, judgments, suits, costs (including settlement costs and costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity or remedy any violation of Environmental Law and indemnities or other similar amounts payable by Administrative Agent or Collateral Agent to or on behalf of any other agent, sub-agent, appraiser or third party), disbursements and out-of-pocket fees and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee and indemnities or other similar amounts payable by Administrative Agent or Collateral Agent to or on behalf of any other agent, sub-agent, appraiser or third party) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted or awarded against any Indemnitee, whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, in each case other than Taxes, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any way relating to or arising out of or in connection with or by reason of (i) any actual or prospective claim, litigation, investigation or proceeding in any way relating to, arising out of, in connection with or by reason of any of the following, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation or proceeding): (x) the execution, delivery, enforcement, performance or administration of the Third Amendment Agreement, the Second Amendment Agreement, the First Amendment Agreement, this Agreement, any other Credit Document, any Trust Document or any other document delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby or (y) any Commitment, any Credit Extension or the use or proposed use thereof or of the proceeds thereof; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, fees and expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful

182

Lender having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.06(d).

(c)     Representations and Warranties of Assignee. Each Lender, upon ~~execution and delivery~~the effectiveness of the Third Amendment Agreement or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Third Restatement Effective Date or as of the effective date specified in the applicable Assignment Agreement that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 12.06, the disposition of such Commitments, Loans or any interests therein shall at all times remain within its exclusive control).

(d)     Participations; Participant Register. Any Lender may at any time, without the consent of, or notice to, Borrowers or Administrative Agent, sell participations to any Person (other than a natural person, Borrowers or any of their Affiliates or Subsidiaries, or a Person that Administrative Agent has identified in a notice to the Lenders as a Defaulting Lender) (each, a **"Participant"**) in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrowers, Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 10.06 with respect to any payments made by such Lender to its Participant(s). Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, waiver or consent in respect of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or consent described in the first proviso to Section 12.05(b) that directly affects such Participant. Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 (subject to the requirements and limitations of such Sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.06(b); provided that (x) such Participant agrees to be subject to the provisions of Section 2.17 as if it were an assignee under Section 12.06(b) and (y) a Participant shall not be entitled to receive any greater payments under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of such participation is made with the Borrowers' prior written consent. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.04 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.17 as though it were a Lender.

846343.08 New York Server 6A - MSW 1787270.05-NYCSR07A - MSW
ny-1057190

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers (and such agency being solely for tax purposes), maintain a register in the United States on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Credit Extensions or other obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that any such Commitment, Credit Extension or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(e)    Certain Other Assignments and Participations. In addition to any other assignment or participation permitted pursuant to this Section 12.06, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment, to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto; and provided further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder, until such time as such Federal Reserve Bank, pledgee or trustee has complied with the provisions of this Section 12.06 regarding assignments.

Section 12.07 Independence of Covenants. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

Section 12.08 Survival of Representations, Warranties and Agreements. All covenants, agreements, representations and warranties made by Borrowers herein and in any Credit Document or other documents delivered in connection herewith or therewith or pursuant hereto or thereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Original Credit Agreement, the First Amendment Agreement, the Second Amendment Agreement or the Third Amendment Agreement or such other Credit Document and the making of the Credit Extensions hereunder or under the Original Credit Agreement or, the First Amended Credit Agreement or the Second Amended Credit Agreement, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied and so long as the Commitments have not expired or been terminated. Notwithstanding anything herein or implied

193

above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrowers shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Borrowers to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrowers.

Section 12.19  Counterparts.  The First Amendment Agreement and, the Second Amendment Agreement and the Third Amendment Agreement may be executed in counterparts (and by different parties thereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the First Amendment Agreement, the Second Amendment Agreement, the Third Amendment Agreement and the other Credit Documents, and any separate letter agreements with respect to fees and expenses payable to the Agents and the Lenders (or any of them), constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

Section 12.20  Effectiveness.  Except as provided in Section 3.05 3.07 or the Third Amendment Agreement, this Agreement shall become effective when the Third Amendment Agreement shall have been executed by Administrative Agent and when Administrative Agent shall have received counterparts of the Third Amendment Agreement that, when taken together, bear the signatures of the Requisite Lenders, the Requisite Revolving Lenders and of each of the other parties thereto. Delivery of an executed counterpart of a signature page of the Third Amendment Agreement by telecopier or in electronic format (e.g., "pdf," "tif" or other lawful comparable format) shall be effective as delivery of a manually executed counterpart of the Third Amendment Agreement.

Section 12.21  Patriot Act.  Each Lender that is subject to the Patriot Act and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies such Credit Party, which information includes the name and address of such Credit Party and other information that will allow such Lender or Agent, as applicable, to identify the such Credit Party in accordance with the Patriot Act. Each Credit Party shall, promptly following a request by any Agent or any Lender, provide all documentation and other information that such Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money-laundering rules and regulations, including the Patriot Act.

Section 12.22  Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment Agreement or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be

198

APPENDIX A-1

TO ~~SECOND~~THIRD AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT

**Commitments as of the Closing Date**
**(without giving effect to any Loans made on the Closing Date)**

| Lender | Initial Term A-1 Loan Commitment | Term A-2 Loan Commitment | Revolving Commitment |
|---|---|---|---|
| Barclays Bank PLC | $1,050,000,000 | $200,000,000 | $200,000,000 |
| **Total** | **$1,050,000,000** | **$200,000,000** | **$200,000,000** |

Appendix A-1

**APPENDIX A-2**

# TO ~~SECOND~~THIRD AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION
# CREDIT AND GUARANTY AGREEMENT

### Commitments as of the Restatement Effective Date

**Revolving Commitments**:    $190,000,000

| Lender | Revolving Commitment |
|---|---|
| Various Lenders (list on file with the Administrative Agent) | $190,000,000 |
| **Total Revolving Commitments** | **$190,000,000** |

**Term A-1 Commitments**:    $10,000,000[1]

| Lender | Initial Term A-1 Commitment (previous funded in full and terminated on Closing Date) | Delayed Draw Term A-1 Commitment (without giving effect to Term A-1 Loans, if any, made on the Restatement Effective Date) |
|---|---|---|
| Barclays Bank PLC | $1,050,000,000 | $10,000,000 |
| **Total Remaining Term A-1 Commitments** | | **$10,000,000** |

**Term A-2 Commitments**:    $0[2]

---

[1]    Aggregate principal amount of Term A-1 Loans outstanding as of the Restatement Effective Date: $1,050,000,000 (without giving effect to Term A-1 Loans, if any, made on the Restatement Effective Date).

[2]    Aggregate principal amount of Term A-2 Loans outstanding as of the Restatement Effective Date: $200,000,000.

846343-08 New York Server 6A - MSW1787270.05-NYCSR07A - MSW
ny-1057190

**APPENDIX B**

# TO ~~SECOND~~THIRD AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION
## CREDIT AND GUARANTY AGREEMENT

**Notice Addresses**

**Credit Parties:**

| | |
|---|---|
| Contact: | Tammy Hamzehpour |
| Institution Name: | Residential Capital LLC |
| Street Address: | 1100 Virginia Drive |
| City, State, Zip: | Fort Washington, PA 19034 |
| Phone: | 215-682-1307 |
| Fax Number: | |
| Email Address: | tammy.hamzehpour@ally.com |

**Administrative Agent and/or Collateral Agent (other than for a Funding Notice, a Withdrawal Notice, a Conversion/ Continuation Notice or a Notice of Payment/Commitment Termination):**

| | |
|---|---|
| Contact: | Alicia Borys / Patrick Kerner |
| Institution Name: | Barclays Bank PLC |
| Street Address: | 745 7th Avenue, 27th Floor |
| City, State, Zip Code: | New York, NY, 10019 |
| Phone: | 212-526-4291 / 212-526-1447 |
| Fax Number: | 212-526-5115 |
| Email Address: | alicia.borys@barclays.com / patrick.kerner@barclays.com |

With a copy to:

| | |
|---|---|
| Contact: | Joe Tricamo / May Wong |
| Institution Name: | Barclays Bank PLC |
| Street Address: | 1301 Sixth Avenue |
| City, State, Zip Code: | New York, NY 10019 |
| Phone: | 212-320-7564 / 212-320-7890 |
| Email Address: | ~~xrausloanops5@barclays.com~~xrausloanops5@barclays.com |

With a copy to:

Appendix B-1

Contact:                Sarah M. Ward
Institution Name:       Skadden, Arps, Slate, Meagher & Flom LLP
Street Address:                Four Times Square
City, State, Zip Code:  New York, NY 10036
Fax Number:             917-777-2126
Email Address:          ~~sward@skadden.com~~sward@skadden.com

**Administrative Agent (solely in connection with a Funding Notice, a Withdrawal Notice, a Conversion/ Continuation Notice or a Notice of Payment/Commitment Termination):**

Contact:                Joe Tricamo / May Wong
Institution Name:       Barclays Bank PLC
Street Address:                1301 Sixth Avenue
City, State, Zip Code:  New York, NY 10019
Phone:                  212-320-7564 / 212-320-7890
Email Address:          ~~xrausloanops5@barclays.com~~xrausloanops5@barclays.com

**Barclays Bank PLC, as Lender:**

Contact:                Alicia Borys / Patrick Kerner
Institution Name:       Barclays Bank PLC
Street Address:                745 7th Avenue, 27th Floor
City, State, Zip Code:  New York, NY, 10019
Phone:                  212-526-4291 / 212-526-1447
Fax Number:             212-526-5115
Email Address:          alicia.borys@barclays.com / patrick.kerner@barclays.com

With a copy to:

Contact:                Joe Tricamo / May Wong
Institution Name:       Barclays Bank PLC
Street Address:                1301 Sixth Avenue
City, State, Zip Code:  New York, NY 10019
Phone:                  212-320-7564 / 212-320-7890
Email Address:          ~~xrausloanops5@barclays.com~~xrausloanops5@barclays.com

**Other Lenders**:  Initially, as provided in the applicable Lender's Administrative Questionnaire.

**SCHEDULE 3.07**

## THIRD RESTATEMENT EFFECTIVE DATE
## CREDIT DOCUMENTS AND CERTAIN DELIVERABLES

1.    Secretary's Certificate for each Credit Party confirming no changes to any Organizational Documents of such Credit Party and resolutions of the Board of Directors of such Credit Party.

846343.08 New York Server 6
1787270.05 NYCSR07A - MSW
ny-1057190

**SCHEDULE 4.39**

### REPRESENTATIONS AND WARRANTIES
### RELATING TO ELIGIBLE MORTGAGE LOANS

(a)    <u>Mortgage Schedule</u>. The information set forth in each Mortgage Schedule delivered to Administrative Agent is true, complete and correct in all material respects;

(b)    <u>Document Delivery</u>. For each Eligible Mortgage Loan, all documents required to be delivered under the Custodial Agreement pursuant to Section 2 of the Custodial Agreement for each Eligible Mortgage Loan have been delivered to Custodian. Borrowers or their agents are in possession of a true and materially accurate Note-Only Mortgage File or Complete Mortgage File in compliance with the Custodial Agreement, except for such documents the originals of which have been delivered to Custodian;

(c)    <u>Valid Lien</u>. The Mortgage creates a first or second lien on an estate in fee simple or a leasehold interest in real property securing the related Mortgage Note, free and clear of all adverse claims, liens and encumbrances having priority over the lien of the Mortgage subject only to (i) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording which are acceptable to mortgage lending institutions generally, (iii) with respect to each Mortgage Loan that is a second lien mortgage loan, the lien of the first mortgage on the Mortgaged Property and (iv) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property;

(d)    <u>Ownership</u>. Each Eligible Mortgage Loan is a whole loan and not a participation interest in a mortgage loan. Subject only to the Lien of Collateral Agent pursuant to the Collateral Documents and the Orders, the applicable Borrower or applicable Trust has good title to, and is the sole owner of, each Eligible Mortgage Loan and has full right, power and authority to pledge and assign each of the Eligible Mortgage Loans to Collateral Agent free and clear of any and all pledges, liens, charges, security interests and/or other encumbrances. To the best of the Primary Credit Parties' knowledge, each holder, originator and servicer of the Eligible Mortgage Loan was qualified and appropriately licensed (or was exempt from such qualification or license) to transact business in the jurisdiction in which the related Mortgaged Property is located at the time such entity had possession of the Mortgage Note except where the failure to be qualified or licensed would not reasonably be expected to have a Material Adverse Effect. None of the Required Documents (as defined in the Custodial Agreement) restricts the Borrowers' or the Trusts' right to pledge and assign the Eligible Mortgage Loan to Collateral Agent;

(e)    <u>No Outstanding Charges</u>. There are no delinquent taxes which are due and payable, ground rents, assessments or other outstanding charges affecting the related Mortgaged Property;

(f)     Original Terms Unmodified.  The Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded or submitted for recording to the extent any such recordation is required by applicable law or is necessary to protect the interests of the Secured Parties, and which have been approved by the title insurer and the primary mortgage insurer, as applicable, and copies of which written instruments are included in the Mortgage File.  No other instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released by any Primary Credit Party, or to the best of the Primary Credit Parties' knowledge by any other Person, in whole or in part, from the terms thereof except in connection with an assumption agreement, which assumption agreement is part of the Mortgage File and the terms of which are reflected on the most recently delivered Mortgage Schedule;

(g)     No Defenses.  There is no valid offset, defense or counterclaim to any Mortgage Note or Mortgage, or to any obligation of the mortgagor to pay the unpaid principal of or interest on such Mortgage Note.  The Mortgage Note and the Mortgage are not subject to any right of rescission, recoupment, set off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or Mortgage unenforceable, in whole or in part, or subject to any right of rescission, recoupment, set off, counterclaim or defense, including the defense of usury, and no such right of rescission, recoupment, set off, counterclaim or defense has been asserted with respect thereto;

(h)     Payment Terms.  Except as disclosed in the most recently delivered Mortgage Schedule, (i) with respect to each Adjustable Rate Mortgage Loan, on each adjustment date, the Mortgage Interest Rate will be adjusted to equal the index plus the margin, rounded to the nearest 0.125%, subject to the periodic rate cap, the maximum rate and the minimum rate and (ii) the related Mortgage Note is payable on the first day of each month in monthly installments of principal and/or interest, with interest payable in arrears;

(i)     Hazard Insurance.  The improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy that conforms in all respects to the requirements of Administrative Agent.  All individual insurance policies and flood policies referred to in clause (j) below contain a standard mortgagee clause naming Borrowers and/or the Trusts or the original mortgagee, and its successors in interest, as mortgagee, and no Primary Credit Party has received notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance, including flood insurance (if required), at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor, except as may be limited or restricted by applicable law.  Where required by state law or regulation, the Mortgagor has been given an opportunity to choose the carrier of the required hazard insurance, provided that the policy is not a "master" or "blanket" hazard insurance policy covering a condominium, or any hazard insurance policy covering the common facilities of a planned unit development.  The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of Collateral Agent upon the consummation of the transactions contemplated by this Agreement.  No Primary Credit Party has engaged in, and has no knowledge of the Mortgagor's or any servicer's having

Sched. 4.39-2

engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for herein, or the validity and binding effect of such policy, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other Person or entity, and no such unlawful items have been received, retained or realized by any Primary Credit Party;

(j)    Flood Insurance. If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property with a generally acceptable carrier and conforms in all respects to the Freddie Mac, Fannie Mae or Ginnie Mae requirements, as applicable;

(k)    Compliance with Laws. Each Eligible Mortgage Loan as of the time of its origination complied in all material respects with all applicable local, state and federal laws, including, without limitation, usury, unfair collection practice, equal credit opportunity, fair housing and regulations, real estate settlement procedures, all applicable predatory lending laws (including, for the avoidance of doubt, laws regarding the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit which has no apparent benefit to the Mortgagor), truth-in-lending and disclosure laws applicable to the solicitation, origination, collection and servicing of such Eligible Mortgage Loan and any obligations of the holder of the Mortgage Note, Mortgage and other loan documents have been complied with in all material respects and the consummation of the transaction contemplated hereby will not involve the violation of any such laws or regulations, and Borrowers shall maintain in their possession, available for inspection of Administrative Agent or its designee, and shall deliver to Administrative Agent or its designee, upon reasonable request, such evidence of compliance with such requirements as are customary or otherwise required by applicable law;

(l)    No Satisfaction of Mortgage. The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part nor has any instrument been executed that would effect any such satisfaction, release, cancellation, subordination or rescission;

(m)    Validity of Mortgage Loan Documents. The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency and other laws of general application affecting the rights of creditors. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage and each Mortgagor is an individual or natural person. The Mortgage Note and the Mortgage have been duly and properly executed by such parties. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading to the best of the Primary Credit Parties' knowledge;

Sched. 4.39-3

(n)    Full Disbursements of Proceeds. Except in the case of a HELOC, the proceeds of each Eligible Mortgage Loan have been fully disbursed, there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making, closing or recording the Eligible Mortgage Loans were paid and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(o)    Transfer of Mortgage Loans/Recordation. Each Mortgage other than MERS Mortgage Loans was recorded and the assignment of mortgage is in recordable form and (other than with respect to the blank assignee and the lack of mortgage recordation) is acceptable for recording under the laws of the jurisdiction in which Mortgaged Property is located;

(p)    Environmental Matters. To the best of the Primary Credit Parties' knowledge, the Mortgaged Property is in material compliance with all applicable environmental laws, and is free from any and all toxic or hazardous substances, other than those commonly used for homeowner repair and maintenance and/or household purposes, and there exists no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue;

(q)    Title Insurance. Except with respect to Eligible Mortgage Loans secured by second liens with an original principal balance of less than $200,000, the Eligible Mortgage Loan is covered by an ALTA lender's title insurance policy or other generally acceptable form of policy of insurance, as the case may be, with all necessary endorsements, issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in clause (c) (i), (ii) and (iii) of this Schedule 4.39) the applicable Borrower, its successors and assigns, as to the first priority lien or second priority lien of the Mortgage, as applicable, in the original principal amount of the Eligible Mortgage Loan. Such title insurance policy affirmatively insures ingress and egress and against encroachments by or upon the Mortgaged Property or any interest therein. In the case of Adjustable Rate Mortgage Loans, such title insurance policy also affirmatively insures against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment to the Mortgage Interest Rate. The applicable Borrower is the sole insured of such lender's title insurance policy, such title insurance policy has been duly and validly endorsed to Collateral Agent or the assignment to Collateral Agent of such Borrower's interest therein does not require the consent of or notification to the insurer and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage has done, by act or omission, anything that would impair the coverage of such lender's title insurance policy. The underwriting standards with respect to the origination of each second lien Mortgage Loan did not require title insurance for second lien Mortgage Loans with an original principal balance of less than $200,000;

(r)    No Default. To the best of the Primary Credit Parties' knowledge, except as disclosed in the most recently delivered Mortgage Schedule, there is no default, breach,

violation or event of acceleration existing under the Mortgage or the related Mortgage Note and, to the best of the Primary Credit Parties' knowledge, no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration; and no Primary Credit Party nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration;

(s)    No Mechanic's Liens.  To the best of the Primary Credit Parties' knowledge, there are no mechanics, or similar liens or claims which have been filed for work, labor or material affecting the related Mortgaged Property which are or may be liens prior to or equal to the lien of the related Mortgage;

(t)    Mortgaged Property Undamaged.  To the best of the Primary Credit Parties' knowledge, the Mortgaged Property for each Eligible Mortgage Loan is free of material damage and is in good repair and condition and free of any structural deficiencies or deferred maintenance that would influence the originator's decision to originate any such Eligible Mortgage Loan or Administrative Agent's decision to accept such Eligible Mortgage Loan as collateral under the Credit Documents. As of the date of its origination, there was no proceeding pending for the total or partial condemnation of any related Mortgaged Property that materially affects the value thereof. All of the improvements which were included for the purpose of determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the Mortgaged Property, except those, if any, which are considered de minimis by the Fannie Mae Guides or are insured against by the title insurance policy referred to in (q) above;

(u)    Occupancy of the Mortgaged Property.  All inspections, licenses and certificates required in connection with the origination of the Eligible Mortgage Loans to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities and the Mortgaged Property is lawfully occupied under applicable law;

(v)    Location of Mortgaged Property.  The Eligible Mortgage Loan is not (i) secured by a lien other than a first lien on Mortgaged Property located in Minnesota unless the original principal balance thereof was greater than or equal to $100,000 or (ii) secured by a Mortgaged Property located in Puerto Rico, the Virgin Islands or Guam or any other jurisdiction for which GMACM Servicer does not have all licenses required to purchase, hold and sell such Eligible Mortgage Loan;

(w)    Due on Sale.  Except as disclosed in the most recently delivered Mortgage Schedule, the Eligible Mortgage Loan contains the usual and enforceable provisions of the originator at the time of origination for the acceleration of the payment of the unpaid principal amount if the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(x)    Customary Provisions.  The related Mortgage contains enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the

realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.  Upon default by a Mortgagor on a Mortgage Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures, the holder of the Mortgage Loan will be able to deliver good and marketable title to the Mortgaged Property.  To the best of the Primary Credit Parties' knowledge, there is no homestead or other exemption available to the Mortgagor that would materially interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage.  The Mortgagor has not notified any Primary Credit Party and Primary Credit Parties have no actual knowledge of any relief requested or allowed to the Mortgage under the Servicemembers Relief Act of 1940;

(y)      Deeds of Trust.  If the Mortgage constitutes a deed of trust, a trustee, duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by any Agent to the trustee under the deed of trust, except in connection with a trustee's sale or attempted sale after default by the Mortgagor;

(z)      Location and Type of Mortgage Property.  Each of the Mortgaged Properties consists of a single parcel of real property improved by a one-to-four-family residential dwelling, including condominium units and dwelling units in planned unit developments.  The Eligible Mortgage Loans are not secured by a manufactured home, co-op, mobile home, condotel, multifamily, mixed use or commercial structure.  None of the Eligible Mortgage Loans are on commercial, industrial, agricultural or undeveloped property, or on any property located anywhere except the continental United States, Alaska or Hawaii;

(aa)      Origination and Collection Practices; Escrow Deposits.  The origination, collection, servicing and subservicing practices with respect to each Mortgage Note and Mortgage have been in all material respects proper, reasonable and customary in the mortgage origination and servicing business.  With respect to escrow deposits and payments that any Primary Credit Party collects, all such payments are in the possession of, or under the control of, such Primary Credit Party, and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made.  No escrow deposits or other charges or payments due under the Mortgage Note have been capitalized under any Mortgage or the related Mortgage Note;

(bb)      No Additional Security.  There is no pledged account or other security other than real estate securing the Mortgagor's obligations;

(cc)      Buydown Mortgage Loans.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan (i) contains provisions pursuant to which monthly payments are (x) paid or partially paid with funds deposited in any separate account established by any Primary Credit Party, the mortgagor, or anyone on behalf of the mortgagor or (y) paid by any source other than the mortgagor or (ii) contains any other similar provisions which may constitute a "buydown" provision.  Except as disclosed in the Mortgage Schedule delivered to Administrative Agent on the Closing Date, no Eligible Mortgage Loan is a graduated payment mortgage loan and the Eligible Mortgage Loan does not have a shared appreciation or other contingent interest feature;

Sched. 4.39-6

(dd)    No Reverse Mortgage Loan. Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is a reverse mortgage loan;

(ee)    No Additional Payments. There is no obligation on the part of any Primary Credit Party or any other party under the terms of the Mortgage or related Mortgage Note to make payments in addition to those made by the Mortgagor;

(ff)    Consolidation of Advances. Any advances made prior to the Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the related Mortgage Schedule. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second, as applicable, lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence reasonably acceptable to Administrative Agent. The consolidated principal amount does not exceed the maximum principal amount of the Eligible Mortgage Loan;

(gg)    No Error, Omission, Fraud etc. No material error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to an Eligible Mortgage Loan has taken place on the part of any Primary Credit Party, or to the best of the Primary Credit Parties' knowledge, on the part of any Person, including, without limitation, the related Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Eligible Mortgage Loan or in the application of any insurance in relation to such Eligible Mortgage Loan;

(hh)    Leasehold Interests. If any of the Eligible Mortgage Loans are secured by a leasehold interest, with respect to each leasehold interest: (i) the lessor under the lease holds a fee simple interest in the land; (ii) the terms of such lease expressly permit the mortgaging of the leasehold estate, the assignment of the lease without the lessor's consent and the acquisition by the holder of the Mortgage of the rights of the lessee upon foreclosure or assignment in lieu of foreclosure or provide the holder of the Mortgage with substantially similar protections; (iii) the terms of such lease do not (A) allow the termination thereof upon the lessee's default without the holder of the Mortgage being entitled to receive written notice of, and opportunity to cure, such default, (B) allow the termination of the lease in the event of damage or destruction as long as the Mortgage is in existence, (C) prohibit the holder of the Mortgage from being insured (or receiving proceeds of insurance) under the hazard insurance policy or policies relating to the Mortgaged Property or (D) permit any increase in rent other than pre-established increases set forth in the lease; (iv) the residential property in such area consisting of leasehold estates is readily marketable; (v) the lease is recorded and is in full force and effect and is not subject to any prior lien or encumbrance by which the leasehold could be terminated or subject to any charge or penalty; and (vi) the remaining term of the lease does not terminate less than ten years after the maturity date of such Eligible Mortgage Loan;

(ii)    No Bankruptcy Proceedings. The related Mortgagor was not subject to a proceeding under applicable bankruptcy laws at the time the Eligible Mortgage Loan was originated, except as disclosed in the most recently delivered Mortgage Schedule;

Sched. 4.39-7

(jj)    HOEPA.  No Eligible Mortgage Loan is (i) subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended ("**HOEPA**"), or has an "annual percentage rate" or "total points and fees" payable by the borrower thereunder or with respect thereto (as each such term is defined under HOEPA) that equals or exceeds the applicable thresholds defined under HOEPA (Section 32 of Regulation Z, 12 C.F.R. Section 226.32(a)(1)(i) and (ii)), (ii) a "high cost" mortgage loan, "covered" mortgage loan, "high risk home" mortgage loan, or "predatory" mortgage loan or any other comparable term, or a similarly classified loan using different terminology under any federal, state or local law, (iii) subject to any comparable federal, state or local statutes or regulations, or any other statute or regulation providing for heightened regulatory scrutiny or assignee liability to holders of such mortgage loans, or (iv) a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the current Standard & Poor's LEVELS® Glossary Revised, Appendix E) (in the case of state or local law, as determined without giving effect to any available federal preemption, other than any exemptions specifically provided for in the relevant state or local law).  No Eligible Mortgage Loan is considered a "high-cost" or "covered" loan under the Georgia Fair Lending Act or the New York Banking Law, Section 6-1, or under any federal, state or local law, or if located in the state of New Jersey, the Eligible Mortgage Loans were not originated subsequent to November 26, 2003 and considered "high cost," "covered refinancings," "home improvement loans" or loans secured by manufactured housing, within the meaning of the New Jersey Home Ownership Security Act of 2002;

(kk)    Lost Note Mortgage Loan.  No Eligible Mortgage Loan is a Lost Note Mortgage Loan;

(ll)    Interest Only Mortgage Loan.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is an interest only mortgage loan;

(mm)    No Credit Life Policies.  No borrower was required to purchase any single premium credit insurance policy (e.g., life, mortgage, disability, accident, unemployment or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit.  No borrower obtained a prepaid single premium credit insurance policy (e.g., life, mortgage, disability, accident, unemployment or health insurance product) or debt cancellation agreement in connection with the origination of the Eligible Mortgage Loan.  No proceeds from any Eligible Mortgage Loan were used to purchase single premium credit insurance policies (e.g., life, mortgage, disability, accident, unemployment, or health insurance product) or debt cancellation agreements as part of the origination of, or as a condition to closing, such Eligible Mortgage Loan;

(nn)    MERS Mortgage Loans.  With respect to each Eligible Mortgage Loan that is a MERS Mortgage Loan, a Mortgage Identification Number has been assigned by MERS and such Mortgage Identification Number is accurately provided on the Mortgage Schedule.  The related assignment of mortgage (unless such loan was originated in the name of MERS) to MERS has been duly and properly recorded.  With respect to each MERS Mortgage Loan, no Mortgagor has received any notice of liens or legal actions with respect to such Eligible Mortgage Loan and no such notices have been electronically posted by MERS;

Sched. 4.39-8

(oo)    <u>No Proceedings; Adverse Effect</u>.  There are no actions, suits or proceedings before any court, administrative agency or arbitrator concerning any Eligible Mortgage Loan, Mortgagor or related Mortgaged Property that could reasonably be expected to adversely affect title to the Mortgaged Property or the validity or enforceability of the related Mortgage or that could reasonably be expected to materially and adversely affect the value of the Mortgaged Property as security for the Eligible Mortgage Loan or the use for which the premises were intended;

(pp)    <u>Prepayment Charges</u>.  Except as disclosed in the most recently delivered Mortgage Schedule, no Mortgage Loan contains a provision permitting imposition of a penalty upon a prepayment prior to maturity;

(qq)    <u>Credit Reporting</u>.  The servicer for each Eligible Mortgage Loan has fully furnished accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis and in accordance with the Fair Credit Reporting Act and its implementing regulations;

(rr)    <u>Eligible Products</u>.  With respect to each Eligible Mortgage Loan, the borrower was not encouraged or required to select an Eligible Mortgage Loan product offered by the Eligible Mortgage Loan's originator which is a higher cost product designed for less creditworthy borrowers, taking into account such facts as, without limitation, the Eligible Mortgage Loan's requirements and the borrower's credit history, income, assets and liabilities. For a borrower who seeks financing through an Eligible Mortgage Loan originator's higher-priced subprime lending channel, the borrower should be directed towards or offered the Eligible Mortgage Loan originator's standard mortgage line if the borrower is able to qualify for one of the standard products;

(ss)    <u>Underwriting Methodology</u>.  The methodology used in underwriting the extension of credit for each Eligible Mortgage Loan did not rely solely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed related objective criteria such as the borrower's income, assets, and liabilities to the proposed mortgage payment and, based on such methodology, the Eligible Mortgage Loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Eligible Mortgage Loan;

(tt)    <u>Points and Fees</u>.  No borrower of an Eligible Mortgage Loan that is secured by the borrower's principal residence was charged "points and fees" in an amount greater than (i) $1,000 or (ii) 5% of the principal amount of such Eligible Mortgage Loan, whichever is greater.  For purposes of this representation, "points and fees" (x) include origination, underwriting, broker and finder's fees and charges that the lender imposed as a condition of making the Eligible Mortgage Loan, whether they are paid to the lender or a third party; and (y) exclude bona fide discount points, fees paid for actual services rendered in connection with the origination of the mortgage (such as attorneys' fees, notaries fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections); the cost of mortgage insurance or credit-risk price adjustments; the costs

Sched. 4.39-9

of title, hazard, and flood insurance policies; state and local transfer taxes or fees; escrow deposits for the future payment of taxes and insurance premiums; and other miscellaneous fees and charges, which miscellaneous fees and charges, in total, do not exceed 0.25 percent of the loan amount;

(uu)    Truth in Lending Act.  No Eligible Mortgage Loan that is a "residential mortgage transaction" within the meaning of the federal Truth in Lending Act, Regulation Z, 12 C.F.R. 226.2, has either an "annual percentage rate" or "total points and fees" payable by the borrower that exceeds the applicable thresholds under HOEPA;

(vv)    No Negative Amortization Loans.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is a Negative Amortization Loan.  As used herein, **"Negative Amortization Loan"** means a Mortgage Loan that may be subject to Negative Amortization; **"Negative Amortization"** means that portion of interest accrued at the Mortgage Interest Rate in any month which exceeds the monthly payment on the related Mortgage Loan for such month and which, pursuant to the terms of the Mortgage Note, is added to the principal balance of the Mortgage Loan;

(ww)    No Balloon Loans.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is a balloon Mortgage Loan;

(xx)    No Arbitration.  Neither the related Mortgage nor the related Mortgage Note requires the Mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Eligible Mortgage Loan; No Mortgagor agreed to submit to arbitration to resolve any dispute arising out of or relating in any way to the Eligible Mortgage Loan;

(yy)    Fees and Charges.  All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Eligible Mortgage Loan has been disclosed in writing to the borrower in accordance with applicable state and federal law and regulation;

(zz)    Anti-Money Laundering.  Each Primary Credit Party has complied with all applicable anti-money laundering laws and regulations, including without limitation the Patriot Act (collectively, the **"Anti-Money Laundering Laws"**).  Each Primary Credit Party has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Eligible Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws; no Eligible Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the **"Executive Order"**) or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the **"OFAC Regulations"**) or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

Sched. 4.39-10

(aaa)    Compliance with Interagency Guidance. Each Eligible Mortgage Loan that is a "nontraditional mortgage loan" within the meaning of the Interagency Guidance on Nontraditional Mortgage Product Risks, 71 FR 58609 (October 4, 2006), and that has a residential loan application date on or after September 13, 2007 (or, if such date cannot be determined, an origination date on or after October 1, 2007), complies in all respects with such guidance, including any interpretations, applications or implementation plans with respect thereto that have been communicated and/or agreed to by an institution's regulator, regardless of whether the Eligible Mortgage Loan's originator or seller is subject to such guidance;

(bbb)    Compliance with Subprime Statement. No Eligible Mortgage Loan that is an Adjustable Rate Mortgage Loan and that has a residential loan application date on or after September 13, 2007, is subject to the Interagency Statement on Subprime Mortgage Lending, 72 FR 37569 (July 10, 2007) as defined by Fannie Mae in the Lender Letter 03-07 (August 15, 2007) or by Freddie Mac in Freddie Mac Single Family Advisory (September 7, 2007) and Freddie Mac Bulletin 2007-4);

(ccc)    Georgia. No Mortgage Loan was originated in the state of Georgia between October 1, 2002 and March 6, 2003;

(ddd)    [Reserved].

(eee)    No Defense to Insurance Coverage. The Primary Credit Parties have caused or will cause to be performed any and all acts required to preserve the rights and remedies of Collateral Agent in any insurance policies applicable to the Mortgage Loans including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of Collateral Agent. No action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed on or prior to the Closing Date (whether or not known to the Primary Credit Parties on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under any applicable, special hazard insurance policy, primary mortgage guarantee insurance policy or bankruptcy bond (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence, or fraud of the Primary Credit Parties, the related Mortgagor or any party involved in the application for such coverage, including the appraisal, plans and specifications and other exhibits or documents submitted therewith to the insurer under such insurance policy, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay;

(fff)    Credit Information. As to each consumer report (as defined in the Fair Credit Reporting Act, Public Law 91-508) or other credit information furnished by the Primary Credit Parties to Administrative Agent, that each Primary Credit Party has full right and authority and is not precluded by law or contract from furnishing such information to the Agents and the Agents are not precluded from furnishing the same to any Lender or any subsequent or prospective purchaser of such Mortgage. The Primary Credit Parties shall hold each Agent harmless from any and all damages, losses, costs and expenses (including attorney's fees) arising

1787270.05-NYCSR07A - MSW

from disclosure of credit information in connection with each Agent's secondary marketing operations and the purchase and sale of mortgages or Servicing Rights thereto;

(ggg)   Tax Service Contract; Flood Certification Contract. Each Mortgage Loan is covered by a paid in full, life of loan, tax service contract and a paid in full, life of loan, flood certification contract and each of these contracts is assignable to Collateral Agent; and

(hhh)   Regarding the Mortgagor. The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae guidelines for such trusts.

Document comparison by Workshare Professional on Wednesday, October 10, 2012 4:24:48 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://NEW YORK/1057190/1 |
| Description | NEW YORK-#1057190-v1-ResCap_Barclays_DIP_2nd_A&R |
| Document 2 ID | PowerDocs://NEW YORK/1061297/1 |
| Description | NEW YORK-#1061297-v1-Rescap_Third_ARCA_10/10 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 380 |
| Deletions | 281 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 671 |