MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Todd M. Goren
Samantha Martin

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

---------------------------------------------------------------------------------

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF THE
(I) DEBTORS' MOTION TO APPROVE AMENDMENT TO THE BARCLAYS DIP
FACILITY AND FEES PAYABLE THEREUNDER AND (II) DEBTORS' MOTION TO
SHORTEN NOTICE OF THE DEBTORS' MOTION TO APPROVE AMENDMENT TO
THE BARCLAYS DIP FACILITY AND FEES PAYABLE THEREUNDER**

I, Marc D. Puntus, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury:

1.    I am a Partner and co-head of the Restructuring Group at Centerview Partners

LLC ("Centerview"), investment banker to Residential Capital LLC ("ResCap") and the other

above-captioned debtors and debtors in possession (collectively the "Debtors").[1]  I submit this

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings*, filed on May 14, 2012 [Docket No. 6].  Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

declaration in support of the *Debtors' Motion to Approve Amendment to the Barclays DIP*
*Facility and Fees Payable Thereunder* (the "DIP Amendment Motion") and the *Debtors' Motion*
*to Shorten Notice of the Debtors' Motion to Approve Amendment to the Barclays DIP Facility*
*and Fees Payable Thereunder*, each filed by the Debtors on October 10, 2012.[2]

### Benefit to the Debtors and their Estates

2.      The DIP Amendment amends the Barclays DIP Credit Agreement to permit the
Debtors to, among other things: (i) consummate the sale of their "legacy" whole loan portfolio
(the "Legacy Portfolio" and the "Legacy Portfolio Sale") prior to the sale of their mortgage loan
origination and servicing platform (the "Platform" and the "Platform Sale"), and (ii) sell certain
junior lien collateral consisting of Federal Housing Administration mortgage insurance backed
mortgage loans and mortgage loans guaranteed by the U.S. Department of Veterans Affairs (the
"FHA/VA Loan Sales").

3.      At the time the Debtors sought approval of the Barclays DIP Facility, due to the
uncertainty surrounding the sales process and timing, the Debtors were unable to obtain the
flexibility to close the Legacy Portfolio Sale prior to the closing of the Platform Sale. Thus, aside
from the simultaneous sale of the Legacy Portfolio and the Platform and payoff in full of the
Barclays DIP Facility, the Barclays DIP Facility, in its current form, only permits sales of first
lien collateral up to $25 million and sales of junior lien collateral in the ordinary course of
business.  Given the level of interest in the Legacy Portfolio and the Platform, the DIP Lenders
have now agreed, subject to Court approval, to amend the Barclays DIP Facility to permit the
Debtors to consummate the Legacy Portfolio Sale and FHA/VA Loan Sales of up to $200

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP
Amendment Motion.

ny-1060786

million prior to consummation of the Platform Sale, subject to the partial pay down of the Barclays DIP Facility in accordance with the terms thereof. The DIP Amendment would give the Debtors the flexibility to close the Legacy Portfolio Sale prior to the closing of the Platform Sale and also to monetize a meaningful amount of its loan portfolio.

4.      The DIP Amendment is beneficial to the Debtors' estates. It will ensure that the winning bidder for the Legacy Portfolio Sale will be able to close promptly and not be forced to wait for the closing of the Platform Sale. Bidders for the Legacy Portfolio desire to consummate the sale quickly because they are purchasing a static pool of mortgage loans for a percentage of the outstanding unpaid principal balance.  The normal course run-off of and prepayments associated with a mortgage loan portfolio represent value that bidders may forego if forced to delay closing until the Platform Sale closing. The Platform Sale will take longer to close than the Legacy Portfolio Sale due to the time required to obtain the consents and approvals necessary to transfer the Debtors' servicing and origination platforms and transition the Debtors' assets, employees and processes to the winning bidder.  It is my view that if the Legacy Portfolio Sale can close separately from and earlier than the Platform Sale, there should be more active bidding on the Legacy Portfolio due to the increased certainty.

5.      The Debtors, in conjunction with the Creditors' Committee, are currently evaluating the most efficient and value-maximizing strategy to monetize the Debtors' FHA/VA Loan portfolio, which is not included in either the Legacy Portfolio Sale or Platform Sale.  The DIP Amendment would provide the Debtors with the flexibility to pursue FHA/VA Loan Sales, subject to Court approval, as soon as the Debtors are prepared to do so.  Inasmuch as certain of the Debtors' employees who currently manage the FHA/VA Loan portfolio will likely be moving to the purchaser upon the closing of the Legacy Portfolio Sale, the Debtors believe that it

3

is important to work with the team currently available to test the market to determine if a value

maximizing price can be achieved through a bulk sale of the FHA/VA Loans versus simply

allowing such assets to monetize in the ordinary course.

6.        In addition to the foregoing, approval of the DIP Amendment will provide a direct

financial benefit to the Debtors' estates.    Specifically, subject to approval of the DIP

Amendment, the Debtors will be able, and in fact required, to use the proceeds from the Legacy

Portfolio Sale to reduce the outstanding obligations under the Barclays DIP Facility and repay

the AFI DIP Facility in full.    The reduction of outstanding obligations under the Barclays DIP

Facility, which will cause the termination of the Revolving Facility, will reduce interest expense

and eliminate unused line fees.[3]    If the Legacy Portfolio Sale closes only one month prior to the

Platform Sale, there will be approximately $2.07 million of savings under the Barclays DIP

Facility and the AFI DIP Facility, comprised of:

- Interest savings due to the partial paydown of Term A-1 Facility using proceeds from the Legacy Portfolio Sale;

- Interest savings due to the payoff of the AFI DIP Facility using proceeds from the Legacy Portfolio Sale;

- Unused line fee savings due to the termination of the Revolving Facility.

### Debtors' Need for Hearing on Shortened Notice

7.        The bid deadline for the Legacy Portfolio Sale is October 19, 2012, and the

auction for the Legacy Portfolio Sale is scheduled to begin on October 24, 2012.  I believe that it

is important for the Court to authorize the DIP Amendment prior to the bid deadline so that

---

[3]    The Debtors have carefully evaluated their liquidity needs and believe that they will have sufficient liquidity to operate pending the close of the Platform Sale, even with the termination of the Revolving Facility.

ny-1060786

bidders understand the timing for closing and can reflect that information in their bids.  I believe

that the staggered sales that will be accommodated by the DIP Amendment will encourage

bidders to participate in the Legacy Portfolio Sale auction and, potentially, result in more robust

bidding.

### Arm's Length Negotiations

8.      The terms and conditions of the DIP Amendment are fair, reasonable and

appropriate in the circumstances presented, and were negotiated by the parties in good faith and

at arms' length, with all parties represented by experienced counsel.  Accordingly, I believe the

Debtors' entry into the DIP Amendment is an exercise of their sound business judgment.

### DIP Lenders' Fees

9.      The Debtors have agreed, subject to Court approval, to pay certain fees described

in the DIP Amendment (the "Amendment Fees") on or before the DIP Amendment closing date.

In the aggregate, these fees shall not exceed $2.05 million.  While the Debtors would, of course,

prefer not to pay such Amendment Fees, the fees do, in my opinion, reflect market fees for an

amendment of this nature. The Amendment Fees were negotiated in good faith and at arms'

length and represent the most favorable terms to the Debtors on which the DIP Lenders would

agree to make the DIP Amendment. As described above, the payment of the fees by the Debtors

are offset by the interest expense and related savings associated with the paydowns of the

Barclays DIP Facility and the AFI DIP Facility. Thus, even putting aside the ancillary benefits

related to the auction, the DIP Amendment likely will result in a net economic benefit to the

Debtors' estates.  The Debtors considered the fees when determining in their sound business

judgment that the DIP Amendment constituted the best terms the Debtors could obtain.

ny-1060786

10.    Based on the foregoing, I believe that the DIP Amendment should be approved in

all respects.


Dated:  October 10, 2012
        New York, New York


                                                    /s/        Marc D. Puntus
                                                    Marc D. Puntus

ny-1060786