1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          October 10, 2012

          10:04 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE



eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

2

1

2  (Doc no. 1242, 945, 61) Status conference RE: Pre-Auction

3  Objections of the RMBS Trustees to the Debtors' Sale Motion.

4

5  (CC: Doc no. 1586, 1587) Motion to Remove Mortgage Loan alleged

6  by Kenneth Taggart from Assets of GMAC Mortgage, LLC & Motion

7  to Prove Ownership of Mortgage Assets (Mortgages & Notes)

8  Kenneth Taggart Dispute Asset(s) of GMAC Mortgage, LLC. filed

9  by Kenneth Taggart.

10

11  (CC: Doc no. 1472) Motion to Convert Case to Chapter 7 Filed by

12  Paul Papas.

13

14  (CC: Doc no. 1427) Debtors' Application Under Section 327(e) of

15  the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule

16  2014-1 for Authorization to Employ and Retain Hudson Cook, LLP

17  as Special Counsel to the Debtors, Nunc Pro Tunc to May 14,

18  2012 filed by Gary S. Lee on behalf of Residential Capital,

19  LLC.

20

21

22

23

24

25

(CC: Doc no. 1426) Debtors' Application for an Order Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the Debtors to Employ and Retain Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues to the Debtors, Nunc Pro Tunc to May 14, 2012 filed by Gary S. Lee on behalf of Residential Capital, LLC.

(CC: Docket No. 1585) Amended Motion of Kenneth Taggart for Stay to Order Regarding Limited Relief from Stay Until Order on Motion to Void Pleadings & Sanctions Due to Violation of Bankruptcy Code is Issued by the Court.

(CC: Doc No. 1114) Motion of Kenneth Taggart to Void Pleadings & Sanctions Due to Violation of Bankruptcy Code.

(CC: Doc# 1397) Motion for Stay and Request for Hearing to Order regarding Limited Relief from Stay until Order on Motion to Void Pleadings & Sanctions due to violations of Bankruptcy Code is Issued by the court. (RE: Montgomery Court of Common Pleas-Pennsylvania 2009-35338).

4

(Doc no. 1431, CC: Doc# 1359) Motion to Allow For a Declaratory Ruling as to Possible Violations of the Automatic Stay and to Sever Defendants Protected by the Automatic Stay.

(CC: Doc# 1416) Debtors Motion Under Bankruptcy Code Sections 105(a) and 362(d) for Entry of an Order Approving Procedures by Which Third Parties May Request and Obtain Stipulated Relief from the Automatic Stay to Commence or Continue Actions to Foreclose Senior Liens.

(CC: Doc# 1357) Debtors Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order.

(CC: Doc# 897) Motion for Relief from Stay 3355 Sunhaven Oval, Parma, OH.
A stipulation will be submitted to the Court prior to the hearing.

5

1

2 (CC: Doc# 1105) Motion for Relief from Stay In regards to

3 property located at 68 Hammock Lane, Staten Island, New York.

4 A stipulation will be submitted to the Court prior to the

5 hearing.

6

7 Doc# 1180 Motion for Relief from Stay in regards to property

8 located at 1700 North River Road, West Lafayette, Indiana.

9 A stipulation will be submitted to the Court prior to the

10 hearing.

11

12 (CC: Doc# 996) Motion for Relief from Stay in regards to

13 property located at 23904 Lakeside Road, Santa Clarita, CA.

14 A stipulation will be submitted to the Court prior to the

15 hearing.

16

17 (CC: Doc# 1438) Motion for Relief from Stay as it relates to

18 4601 Pocatella Avenue, North Port, FL 34287.

19 A stipulation will be submitted to the Court prior to the

20 hearing.

21

22 (CC: Doc# 677) Motion for Relief from Stay -Motion of Deborah

23 Bollinger and Bryan Bubnick for Relief from Automatic Stay as

24 to GMAC Mortgage, LLC and Residential Capital, LLC.

25

6

1

2    (CC: Doc no. 1261 ) Motion for Relief from Stay filed on behalf

3    of the People of the State of California filed by the Firm of

4    Biels Cohen.

5    A stipulation will be submitted to the Court prior to the

6    hearing.

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Penina Wolicki

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

7

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8  BY:   SAMANTHA MARTIN, ESQ.

9         LORENZO MARINUZZI, ESQ.

10        NORMAN S. ROSENBAUM, ESQ.

11        JAMES A. NEWTON, ESQ.

12        ERICA J. RICHARDS, ESQ.

13        ANTHONY PRINCI, ESQ.

14        DARRYL P. RAINS, ESQ.

15

16

17  MORRISON & FOERSTER

18        Attorneys for Debtors

19        2000 Pennsylvania Avenue NW

20        Suite 5500

21        Washington, DC 20006

22

23  BY:   ALEXANDRA STEINBERG BARRAGE, ESQ.

24

25

8

1

2  KRAMER, LEVIN, NAFTALIS & FRANKEL LLP

3       Attorneys for Official Creditors' Committee

4       1177 Avenue of the Americas

5       New York, NY 10036

6

7  BY:   KENNETH H. ECKSTEIN, ESQ.

8        PHILIP BENTLEY, ESQ.

9        BRENDAN M. SCHULMAN, ESQ.

10       PHILIP S. KAUFMAN, ESQ.

11

12  KIRKLAND & ELLIS LLP

13       Attorneys for Ally Financial, Inc. & Ally Bank

14       601 Lexington Avenue

15       New York, NY 10022

16

17  BY:   RAY C. SCHROCK, ESQ.

18

19

20  KIRKLAND & ELLIS LLP

21       Attorneys for Ally Financial, Inc. & Ally Bank

22       855 Fifteenth Street, N.W.

23       Washington, DC 20005

24

25  BY:   PATRICK M. BRYAN, ESQ.

9

MORGAN, LEWIS & BOCKIUS LLP

      Attorneys for Deutsche Bank

      101 Park Avenue

      New York, NY 10178


BY:   JAMES L. GARRITY, JR., ESQ.


SEWARD & KISSEL LLP

      Attorneys for US Bank N.A. as Securitization Trustee

      One Battery Park Plaza

      New York, NY 10004


BY:   ARLENE R. ALVES, ESQ.

      MARK D. KOTWICK, ESQ.



WHITE & CASE LLP

      Attorneys for Ad Hoc Group of Junior Secured Noteholders

      1155 Avenue of the Americas

      New York, NY 10036


BY:   J. CHRISTOPHER SHORE, ESQ.

      HARRISON DENMAN, ESQ.

10

1

2  CLEARY GOTTLIEB STEEN & HAMILTON

3        Attorneys for Wilmington Trust

4        One Liberty Plaza

5        New York, NY 10006

6

7  BY:   MARK A. LIGHTNER, ESQ.

8

9

10  ALLEN & OVERY

11        Attorneys for HSBC Bank USA, N.A.

12        1221 Avenue of the Americas

13        New York, NY 10020

14

15  BY:   JOHN KIBLER, ESQ.

16

17

18  MORRISON COHEN LLP

19        Attorneys for Independent Directors

20        909 Third Avenue

21        New York, NY 10022

22

23  BY:   JOSEPH T. MOLDOVAN, ESQ.

24        DAVID PIEDRA, ESQ.

25

11

```
 1

 2   SIDLEY AUSTIN LLP

 3         Attorneys for Nationstar

 4         One South Dearborn

 5         Chicago, IL 60603

 6

 7   BY:   LARRY J. NYHAN, ESQ. (TELEPHONICALLY)

 8         JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)

 9

10

11   JACKSON WALKER, L.L.P.

12         Attorneys for Frost Bank

13         100 Congress Avenue

14         Suite 1100

15         Austin, TX 78701

16

17   BY:   PATRICIA TOMASCO, ESQ. (TELEPHONICALLY)

18

19

20   ROPES & GRAY LLP

21         Attorneys for RMBS Noteholders

22         1211 Avenue of the Americas

23         New York, NY 10036

24

25   BY:   KEITH H. WOFFORD, ESQ. (TELEPHONICALLY)
```

12

1

2   JONES DAY

3          Attorneys for FGIC

4          222 East 41st Street

5          New York, NY 10017

6

7   BY:    HOWARD F. SIDMAN, ESQ.

8

9

10  JONES DAY

11         Attorneys for FGIC

12         555 South Flower Street

13         Fiftieth Floor

14         Los Angeles, CA 90071

15

16  BY:    RICHARD L. WYNNE, ESQ.

17

18

19  CHADBOURNE & PARKE LLP

20         Attorneys for the Examiner

21         30 Rockefeller Plaza

22         New York, NY 10112

23

24  BY:    DAVID LEMAY, ESQ.

25

13

1

2  GIBBS & BRUNS LLP

3        Attorneys for Steering Committee Investors

4        1100 Louisiana

5        Suite 5300

6        Houston, TX 77002

7

8  BY:   KATHY D. PATRICK, ESQ.

9

10

11  ALSTON & BIRD LLP

12        Attorneys for Wells Fargo Bank N.A.

13        1201 West Peachtree Street

14        Suite 4200

15        Atlanta, GA 30309

16

17  BY:   JOHN C. WEITNAUER, ESQ.

18

19

20  CARTER LEDYARD & MILBURN LLP

21        Attorneys for Talcott Franklin Group

22        2 Wall Street

23        New York, NY 10005

24

25  BY:   AARON R. CAHN, ESQ.

14

1

2  NICHOLS KASTER ATTORNEYS AT LAW

3       Attorneys for Deborah Bollinger

4       One Embarcadero Center

5       Suite 720

6       San Francisco, CA 94111

7

8  BY:   ROBERT L. SCHUG, ESQ.

9

10

11  CADWALADER, WICKERSHAM & TAFT LLP

12       Attorneys for MBIA Insurance Corp.

13       One World Financial Center

14       New York, NY 10281

15

16  BY:   JONATHAN HOFF, ESQ.

17

18

19  JACKSON LEWIS LLP

20       Attorneys for GMAC Mortgage

21       90 State House Square

22       8th Floor

23       Hartford, CT 06103

24

25  DAVID R. GOLDER, ESQ. (TELEPHONICALLY)

15

1

2  REED SMITH LLP

3         Pennsylvania Counsel to Debtors

4         650 Market Street

5         Suite 2500

6         Philadelphia PA, 19103

7

8  BY:   MARLA T. GUERIN, ESQ. (TELEPHONICALLY)

9

10

11  MUNGER, TOLLES & OLSON LLP

12         Attorneys for Berkshire Hathaway

13         355 South Grand Avenue

14         Los Angeles, CA 90071

15

16  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

17

18

19  DECHERT LLP

20         Attorneys for Bank of New York Mellon

21         1095 Avenue of the Americas

22         New York, NY 10036

23

24  BY:   GLENN E. SIEGEL, ESQ.

25

16

1

2    ALSO PRESENT:

3         KENNETH TAGGART, Pro Se

4         SEWIT BOCRESION, GMAC ResCap (TELEPHONICALLY)

5         JOSEPH A. CONNOR, III, Pro Se (TELEPHONICALLY)

6         PAUL N. PAPAS, II, Pro Se

7         JOSEPH PENSABENE, GMAC ResCap (TELEPHONICALLY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                              17
P R O C E E D I N G S

1

2          THE COURT:  All right.  Please be seated.  We're here

3    in Residential Capital, number 12-12020.

4          Mr. Princi?

5          MR. PRINCI:  Good morning, Your Honor.  There are --

6    this is an omnibus hearing, so there are a number of matters

7    before the Court.  We've submitted an agenda.  I believe the

8    first item, Your Honor, is the status report with respect to

9    the discovery matters concerning the debtors' 9019 motion.

10         I think Your Honor was sent last night a couple of

11   things.  Number one, Your Honor, we sent the Court a proposed

12   order which I will update the Court respecting in just a

13   moment, seeking to adjourn the hearing dates on the motion.

14   And then I believe, number two, Your Honor, the committee sent

15   the Court a letter outlining what it believes to be the present

16   status of certain discovery issues.

17         THE COURT:  Yes, let me -- and I did read them.  I

18   printed them out and I managed to leave them sitting on my

19   desk.  Let me just grab them.  Everybody stay seated.  I'm

20   going to come back.

21      (Pause)

22         THE COURT:  All right, go ahead, Mr. Princi.  I have

23   both letters in front of me.

24         MR. PRINCI:  Okay, Judge.  So, Your Honor, let me

25   first frame for you the background with respect to the order,

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1    tell you where it is.  And then I think we can ask the Court to

2    start to address some specific matters, if the Court would

3    entertain us.

4              So the revised order, Your Honor, was occasioned by

5    the need for the debtor to seek to adjourn the hearing dates,

6    because we couldn't comply with the number of depositions we

7    were facing.  Your Honor knows the background of that from the

8    last hearing.

9              The parties who had originally submitted the original

10   scheduling order to the Court:  the committee, the trustees,

11   and the institutional investors, were people that we then

12   approached to try to work out the details.  I will say, Your

13   Honor, the institutional investors were none too happy about

14   this for reasons that you've heard before.  We appreciate their

15   cooperation in working with us.

16             I believe with respect to the institutional

17   investors -- and their counsel is here and can correct me if

18   I'm wrong -- that notwithstanding that they would otherwise

19   prefer that this matter have gone forward as presently

20   scheduled, they otherwise find acceptable the particulars

21   contained in the revised order.

22             As for the trustees, Your Honor, they too have been

23   cooperative.  I think they're continuing to work apace to come

24   to their own conclusions with respect to the merits of the

25   proposed 8.7 billion dollar settlement.  They have identified

1   some initial concerns.  They are going back to reconsider based

2   on some discussions we've had.  What we would propose to do,

3   Judge, is to continue to work with them.  We think we're going

4   to work those issues out; not ask the Court to enter any order

5   today.

6            THE COURT:  When you say issues and they're going to

7   continue to work them out, is that in regard to schedule or --

8            MR. PRINCI:  Just a scheduling order, Judge.  Just a

9   scheduling order.

10           I will say, Judge, on the good news front, since,

11  again, I did, if you will, lay a challenge at the trustees'

12  feet early on in this case, the trustees are clearly working

13  very diligently to deal with what is before the Court, and that

14  is the merits of the 8.7 billion dollar proposed settlement.

15  So what we'd like to do, Judge, is continue to work with them.

16  We think we're going to be able to resolve the nits and nats in

17  the scheduling order.  And then we'd like to come back to the

18  Court by no later by Friday.

19           We'll either be, at that point, proposing on notice to

20  submit to the Court a proposed revised scheduling order that

21  has the consent of the trustees, or to the extent that we have

22  outstanding issues, we will alert the Court in writing as to

23  what those issues are, and then Your Honor can enter an order

24  at that point.

25           With respect to the issues that we have with the

RESIDENTIAL CAPITAL, LLC, ET AL.                                20

1   committee, Your Honor, we don't think we can make any further

2   progress.  So rather than delay things, I'm going to ask the

3   Court to just make a determination for us with respect to the

4   open issues we have.  Time did not allow us to talk to every

5   party that may have an issue concerning this order.  But we

6   would welcome parties to raise any issues.  If we can work them

7   out between now and Friday, we will.  If we believe that some

8   of the -- any issue raised today is not one we're going to be

9   able to negotiate, we'd ask the Court then to resolve it.

10          So what we're hoping to do, Judge, by way of going

11  forward, is leave this courtroom with Your Honor making a

12  determination as to the open issues we have with the committee,

13  any other open issue that any other party should raise, and

14  just leave to us and the trustees working out some of the

15  concerns they've raised.  And then by Friday, in writing, we'll

16  submit a proposed order to the Court.  That would be how we'd

17  like to proceed, Your Honor.

18          THE COURT:  Is there any disagreement with respect to

19  the proposal to move the hearing to the week of January 14th?

20  When I read the correspondence it seemed to me that the issues

21  focused on dates along the way, but -- let me ask the question.

22  Is there disagreement by any of the parties-in-interest with

23  respect to moving the hearing to January 14th, subject to

24  appropriate resolution of the interim dates and obligations?

25          MR. BENTLEY:  We are --

1    THE COURT:  Mr. Bentley?

2        MR. BENTLEY:  -- we are satisfied with the new hearing

3    date, Your Honor.

4        THE COURT:  All right.  I know you wanted more than

5    the three days, though, I gather?

6        MR. BENTLEY:  That's correct, Your Honor.  We don't

7    completely agree with the way our position was characterized,

8    but that is an issue we wanted to raise.

9        THE COURT:  Okay.  All right.

10    Come on up to the microphone.

11        MR. LEMAY:  Your Honor, David LeMay for the examiner.

12    I think all I'd like to do right now is just put a pin in an

13    issue relating to timing of the examination as it relates to

14    this process.  And perhaps if I could bother Your Honor for

15    about three minutes when all is done --

16        THE COURT:  It's not a bother.

17        MR. LEMAY:  -- I'd like to talk to you, at that time.

18        THE COURT:  All right.

19        MR. LEMAY:  Thank you.

20        THE COURT:  Okay; all right.

21        MR. PRINCI:  Your Honor, with respect to the specific

22    issues -- and as you correctly point out, that they are issues

23    having to do with how we get from here to there; "there" being

24    the new proposed dates for the hearing of January 14, 15, and

25    16 -- what I'd like to do is address the one matter that Mr.

1  Bentley raised, and that's the time for the hearing.  And then

2  I'm going to ask my partner, Mr. Rains to address the other

3  particular issues, since he was closer to the negotiations that

4  occurred over the last twenty-four hours.

5          Judge, with respect to the amount of time for the

6  hearing, two things.  Number one is we heard the Court, or so

7  we understood the Court to be saying that this hearing was

8  going to be three days.  The reality is, Judge, this is either

9  a hearing on the 8.7 with the all Iridium factors -- and we

10  understand that one of them is the question of whether the

11  negotiations were arm's-length -- or it's going to be some sort

12  of duplication of the efforts the examiner is doing, and an

13  opportunity for people to try to use this hearing for that

14  purpose.

15          The seventh factor in the Iridium factors, the arm's-

16  length negotiations, in this case, given the facts, doesn't

17  pertain to the negotiations between the two parties, i.e., the

18  ResCap debtors and the counterparties and institutional

19  investors.  What people are complaining -- and Your Honor knows

20  this and we know this -- those people are alleging that, in

21  essence, Ally, our parent company, was a puppeteer; we were the

22  puppet; and they used the puppet to promote a settlement with

23  the institutional investors that wasn't meritorious on its

24  face, wasn't designed for that purpose, and was designed

25  instead to procure the consent of the institutional investors

1  to enter into the plan support agreement which has third-party

2  releases proposed in connection with the plan.  So that's --

3  those are the allegations.

4          Those allegations are being reviewed by the examiner.

5  We have a concern, Judge, that there is a disproportionality

6  now, and to a great degree, with respect to that one factor in

7  the Iridium factors.  And we say this, Judge, because at the

8  end of the day, it seems to us, and we submit to the Court,

9  that if we were to prove to the Court that 8.7 falls within the

10  range of reasonableness for both parties, and yet let's just

11  hypothesize, Judge, that Your Honor should conclude that the

12  reason we really did that, wasn't because we were interested in

13  the interests of the estate, but we were only interested in

14  trying to get the parent company a release; at the end of the

15  day, we would submit, Your Honor, that the way the Iridium

16  factors work, it would still be appropriate and indeed

17  necessary for the Court to hold that the 8.7 is a fair

18  settlement.

19          THE COURT:  I disagree.

20          MR. PRINCI:  Okay.

21          THE COURT:  The seven Iridium factors, some of which

22  may or may not be applicable in each case, are seven

23  nonexclusive factors; and no one is determinative.  So when I

24  say I disagree, your -- the proposition you assert -- have

25  asserted that simply because the amount is within the range of

1   reasonableness, the Court is required to approve the

2   settlement, I don't read Iridium that way.  I don't read TMT

3   Trailer Ferry that way.  I don't read the other cases regarding

4   approval of 9019 settlements that way.

5           It is -- that isn't to say that I would conclude it

6   can't be approved.  You seem to be arguing that the Court has

7   no alternative at that point, but to approve it.  I don't agree

8   with that statement.

9           MR. PRINCI:  Understood, Your Honor.  I think the way

10  we -- what the debtors would argue, Your Honor, Iridium stands

11  for, is that --

12          THE COURT:  Because -- wait a second --

13          MR. PRINCI:  Yes.

14          THE COURT:  -- Mr. Princi.  8.7 could be a dollar

15  value within the range of reasonableness, but the other

16  settlement terms may be such that the settlement should not be

17  approved.  Okay?  I don't know whether that's the case.  I'm

18  not making any determination.  The parties will lay out their

19  positions.  But you shouldn't think you're going to come into

20  the hearing and simply -- because you've asserted this position

21  and you can carry forward with it, if you wish.  But it's not

22  my understanding of the law.

23          You've been consistent in articulating the view that

24  the only issue for the Court at the settlement hearing is

25  whether the 8.7 billion dollars is above the lowest point in

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                                            25

1  the range of reasonableness.  I will have an open mind at the

2  hearing.  But, you know, I can't count the number of times I

3  have applied the Iridium factors in 9019 motions, and I -- if

4  your argument is that the Court must approve a settlement any

5  time it is above the lowest point in the range of

6  reasonableness, that's not my understanding of the law.

7          That is certainly a very, very important factor, maybe

8  the most important factor.  We'll have to see.  But if the

9  remaining terms of the settlement are such, for example, if

10  the -- any party that objects were to establish that the range

11  of reasonableness was 3 billion to 12 billion, we settled on

12  8.7 billion, probably higher than we otherwise would have,

13  because of the benefits it confers on AFI, that's going to be

14  an argument I'm going to hear and consider.

15          So I don't doubt, it's a very complex matter.  But I

16  just -- the reason I take the time to go through this now is,

17  you've been consistent at every hearing when you've opposed

18  discovery about the negotiations that the only thing that

19  matters at this hearing is whether 8.7 billion is in the range

20  of reasonableness.  It's not.

21          MR. PRINCI:  Judge, I think I've been consistent, but

22  perhaps not clear.  We appreciate the fact that that is one of

23  the factors.

24          THE COURT:  We'll both agree on that.

25          MR. PRINCI:  Judge, we appreciate that it is a factor.

1   And as much as we would like to avoid what we're going through,

2   we do understand that there is some amount of information

3   that's appropriate in addressing that factor.  Our point,

4   Judge, is that this is now -- we now have the minnow eating the

5   whale.  We're spending --

6           THE COURT:  That's your view of it.  I don't have a

7   view of it.  But we'll see.

8           MR. PRINCI:  Okay.  But --

9           THE COURT:  The argument that it's the minnow eating

10  the whale is not going to lead me to say you -- that they can't

11  take twelve depositions or that they can't do -- you know, I'm

12  going to give -- within limits, I'm going to give all parties

13  an opportunity to develop and present their case.

14          MR. PRINCI:  I understand, Judge.  The practical issue

15  the debtor has is that -- and this was always the issue up

16  front when we were -- we always knew that some party needed to

17  do a thorough investigation of the settlement between Ally and

18  the debtor.  We originally thought it was going to be the

19  committee.  The committee originally proposed to do that.  We

20  have the examiner at a cost of approximately forty million

21  dollars, and that's fair and good.

22          But to have another group of parties come in and

23  fundamentally do the same thing under the guise of we need to

24  examine one of the factors referenced by the Second Circuit in

25  connection with 9019 motions, is very problematic.  We just

RESIDENTIAL CAPITAL, LLC, ET AL.                          27

1  think it's disproportionate.  It has led to our need to seek to

2  adjourn the hearing.  It is costing millions of dollars.  All

3  which Your Honor may say it is what it is.  But again, we

4  submit to the Court that we're --

5           THE COURT:  It's your motion, Mr. Princi.

6           MR. PRINCI:  Understood, Judge.

7           THE COURT:  You're seeking relief from the Court, and

8  there are consequences that come from that.  You know, you've

9  insisted from the start that this is a central aspect of the

10  debtors' effort to reorganize.  I've tried numerous times to

11  accommodate that request:  first by scheduling the hearing for

12  November 5th; then moving it to the 13th of November.  I made

13  clear from the start, however, that despite the effort of

14  numerous parties to argue that there was just too much to be

15  done, too much discovery, too much this, I'll give them their

16  discovery; I was going to hold those dates.  Okay?

17           I do have some questions, because it appears that

18  despite the Court having been quite clear as to what the

19  deadlines for various discovery being completed -- I'm not

20  saying it was any bad faith on anybody's part -- that hasn't

21  occurred at this point.  So with -- and you asked at the last

22  hearing about the Court's availability in January, and I told

23  you that the week of January 14th was available.

24           So I'm certainly -- with respect to that portion of

25  the request, yes, the hearing dates -- November 13th, 14th and

1    16th -- or I don't remember --

2              MR. PRINCI:  That's the present.

3              THE COURT:  -- will be moved to the week of January

4    14th.  We'll talk about how many days that week in a little

5    bit.  I'm quite concerned because I've indicated it's going to

6    be a timed trial.  This is not a two-party dispute.  And I want

7    to be sure that the parties-in-interest have a reasonable

8    amount of time.  We'll flesh that out a little bit more as we

9    talk today.

10             MR. PRINCI:  Okay.  Well, I'll -- Judge, that was all

11   moving towards the hearing dates.  So our estimation, Judge, is

12   that three days should more than suffice.  I think if Your

13   Honor gave twenty days, we'd feel that twenty days; if you gave

14   ten, we'd feel ten.

15             THE COURT:  Well, we're not going to take twenty days.

16             MR. PRINCI:  And it goes on and on.

17             THE COURT:  How much time do you -- how much time do

18   you anticipate requiring for your case?  And when I say for

19   your case, that includes -- you've seen the list of the

20   witnesses that they're deposing, how many experts -- how much

21   time do you anticipate using in cross-examina -- you know,

22   you're going to put in your case-in-chief through declarations

23   and exhibits.  And the issue is how much time, as you stand

24   here now, do you anticipate requiring for cross-examination of

25   witnesses that will be -- and perhaps rebuttal witnesses that

1   you intend to call?

2          MR. PRINCI:  So, Judge, I'm working on the assumption

3   that based on the indications we've gotten to date, that

4   there'll be at least three -- actually, there will be -- let's

5   see.  The Committee, MBIA, FGIC, Wilmington Trust --

6          THE COURT:  I thought they had designated eleven --

7          MR. PRINCI:  -- will all be objectors --

8          THE COURT:  Okay.

9          MR. PRINCI:  -- was my point.

10          THE COURT:  I'll assume that for now.  Yes.

11          MR. PRINCI:  Okay?  A question necessarily in length

12   of trial, is now many of those parties are going to have the

13   right to cross-examine, how much duplication --

14          THE COURT:  That's why I want to ask right now -- my

15   only question to you right now, Mr. Princi is --

16          MR. PRINCI:  Right.

17          THE COURT:  -- you know how many -- like I said, at

18   the last hearing there was a discussion about how many experts

19   witnesses did the parties have.  And there was some discussion

20   well, they've indicated more than they think they're going to

21   require at the actual hearing.  But if we assume that -- have

22   they told you who the experts are, at this point?

23          MR. PRINCI:  They've designated ten.

24          THE COURT:  All right.  So let's assume that ten ex --

25   that they object and they call ten witnesses.  How much time do

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                              30

1  you expect to require to cross-examine ten expert witnesses?

2          MR. PRINCI:  Coupled with the amount of time we would

3  anticipate there would be for cross-examination of our six fact

4  witnesses --

5          THE COURT:  No, let's -- I just -- I want to focus

6  just on the experts for a moment.  Assuming they call ten

7  expert witnesses, how much time do you request for cross-

8  examination of ten expert witnesses, who you have not yet

9  deposed?

10          MR. PRINCI:  Your Honor, without knowing what they're

11  going to testify, I simply cannot inform the Court.

12          THE COURT:  So how can you tell me that three days is

13  enough.  You won't even tell me how much time you anticipate

14  needing for cross-examination.

15          MR. PRINCI:  The way I'm doing it, Judge, is with the

16  expectation -- and I thought this was your -- Your Honor was

17  suggesting this -- that there won't be a need to have

18  duplicative experts, which is what's going to happen if we have

19  all ten.

20          I also indicated before that one of those ten is

21  somebody proposing to do your job, or so we believe.  That

22  would be an expert witness who would opine on --

23          THE COURT:  Let's assume they call five --

24          MR. PRINCI:  -- the propriety of corporate

25  formalities.  I beg your pardon?

RESIDENTIAL CAPITAL, LLC, ET AL.                                              31

1   THE COURT:  Let's assume they call five experts.  How

2   much time do you anticipate requiring for cross-examination?

3   You will have deposed the witnesses ahead of time.  But you're

4   going to have to cross-examine them when they're on the witness

5   stand.

6          MR. PRINCI:  You know, going by experience, Judge, I

7   would think we would need probably a day for those witnesses.

8          THE COURT:  All right.  And with respect to cross-

9   examination of fact witnesses?

10         MR. PRINCI:  I'm not -- are you talking about our fact

11  witnesses, Judge?

12         THE COURT:  No, you're going to put in your direct

13  ca -- well, unless I change my view about it, which I -- what

14  I'm concerned about is people dump in declarations and say go

15  ahead, I'll call -- I'll put in ten declarations of fact

16  witnesses.  Let them use their time to cross-examine.  So I'm

17  very mindful of that, okay?  But --

18         MR. PRINCI:  I'm not aware that they will have any

19  fact witnesses.  I wouldn't understand how they could, Judge.

20         THE COURT:  Okay.  Well, I suspect they may say

21  something different about that.  But --

22         MR. PRINCI:  Okay.  I don't --

23         THE COURT:  Let me ask you.  Are you prepared to

24  commit now that you'll take no more than one day for presenting

25  your case, which means opening statement, you're putting in

RESIDENTIAL CAPITAL, LLC, ET AL.                                          32

1  written narrative direct, cross-examination of their fact and

2  expert witnesses, any rebuttal case.  Are you agreeing now that

3  you will use no more than one day for that purpose?

4          MR. PRINCI:  Your Honor, I believe the answer is yes.

5  But if I may confer with --

6          THE COURT:  Go ahead.

7          MR. PRINCI:  -- the people working with me?  Excuse

8  me.

9          THE COURT:  Okay.

10          MR. PRINCI:  Yes, Your Honor.  The answer is yes.

11          THE COURT:  Okay.

12          MR. PRINCI:  So, Your Honor, if we put our case on in

13  a day, if we examine five expert witnesses that they present in

14  a day, it seems to us that three days should be enough time.

15  But I will leave it to the Court -- excuse me -- I will leave

16  it to the committee -- obviously the committee doesn't agree

17  with that -- to address the Court and then we can further

18  address the matter if the Court would like.

19          THE COURT:  Well, here.  So here when I set time --

20  when I do these timed trials, like -- I'm not sure any of my

21  colleagues do them; I do them; district court judges do them --

22  I set the total number of hours that you have.  You use it any

23  way you wish:  opening statement, here it will be cross-

24  examination, redirect, rebuttal case, closing argument.  So

25  when I say how much time -- and I'm asking -- because when I

1  ask for your commitment, when I set the length of a trial, I'm

2  going to hold you to that.  Okay?

3       I'll define it in terms of hours.  My law clerks track

4  the number of hours that each side uses.  I have to say, when

5  I've -- every case that I've done a timed trial, the parties

6  have finished in less time than they were allocated.  And

7  usually before a trial, it's miraculous.  They've pared the

8  number of witnesses they expect to call from twenty to four.

9  All right?  It does focus the mind.

10       MR. PRINCI:  Judge, my --

11       THE COURT:  No one at the end of a hearing has ever

12  complained that they didn't have sufficient time to present

13  their case.  And every time I've used it, they've actually

14  finished early.  And when I haven't done timed trials, they

15  never finish on time.  And I always have to carry over.  So

16  that's why I do it.  So I don't want -- but I want to be fair

17  to everybody.

18       MR. PRINCI:  Would you like to hear from the other

19  parties-in-interest?

20       THE COURT:  Well, I do in a minute.  But I just -- so

21  what we're going to do with the trial is start at 9 a.m.  And

22  we generally go to 12:15 with a fifteen minute recess.  So you

23  get three hours in the morning.  We resume at 2, and in theory,

24  we get three hours in the afternoon.  And I'll tell you why in

25  theory.  Because I'm not averse -- you know, if you're not

1  finished with witnesses, we just continue on.  I'll go into the

2  evening.  That's not an issue.

3          But generally, with recesses and hopefully not too

4  many sidebars, if I don't count it against somebody, it's

5  usually -- they're six-hour trial days.  As I say, unless -- I

6  mean, I've had trials that have gone on till 10 o'clock at

7  night, to cut down at the other -- at the back end on the days

8  that have been allocated.

9          But so when you say that you'll present your entire

10 case, opening statement, any cross-examination, any redirect,

11 any rebuttal case, closing argument, you're going to do it in

12 six hours?

13         MR. PRINCI:  What I'm doing -- I just want to make

14 sure -- I don't think we had taken into account the rebuttal

15 case, at least not when I answered your earlier question.

16         THE COURT:  Yes, I --

17         MR. PRINCI:  I thought you meant case-in-chief.  I

18 apologize.

19         THE COURT:  Look, I'm not -- I want to make clear to

20 you -- okay -- I'm not -- I'm going to ask the same questions

21 of the other parties.  Okay.  They may have more trouble

22 coordinating their cases, but I'm not giving everybody -- you

23 get six hours.  Each of them is not getting six hours.  Okay?

24         MR. PRINCI:  If I may confirm -- in my sidebar

25 discussion, Judge, I think we were thinking case-in-chief.  And

RESIDENTIAL CAPITAL, LLC, ET AL.                              35

1   six --

2           THE COURT:  No, no, no.   I'm talking about -- because

3   you get -- I will allocate the time, the total number of hours.

4   You use it any way you wish.  But when the time is up, you're

5   done.  That's why I need to know.  And if you -- six hours may

6   not be enough for you, Mr. Princi.

7           MR. PRINCI:  Understood.

8           THE COURT:  And I'm not --

9           MR. PRINCI:  No, no, no.  You're not -- and I realize

10  that you're not insisting that we finish, you're literally just

11  asking -- if I may confer with my colleagues, Your Honor?

12          THE COURT:  Go ahead.  Please do.

13          MR. PRINCI:  Thank you.

14          Judge, I think we would need a day and a half.

15          THE COURT:  Okay.  Nine hours.

16          MR. PRINCI:  Yes, Your Honor.

17          THE COURT:  Okay.  I'll let you come back up.  But let

18  me hear from the other principal combatants or likely

19  combatants.  Mr. Bentley.

20          MR. BENTLEY:  I have a question before I take the

21  podium, Your Honor.  Does it makes sense to hear first from

22  Ally and Ms. Patrick?  Because I would think that they will be

23  questioning along with the debtor.  And that changes the

24  timing.

25          THE COURT:  Perhaps it does.  Does Ally or -- who's

RESIDENTIAL CAPITAL, LLC, ET AL.                                              36

1  speaking for Ally.

2          MR. BRYAN:  Good morning, Your Honor.  Patrick Bryan

3  for Ally Financial.

4          THE COURT:  Right.

5          MR. BRYAN:  Your Honor, we don't -- obviously, this is

6  the debtors' motion.  However, we would like to reserve time,

7  to the extent that --

8          THE COURT:  How much time do you wish to reserve?

9          MR. BENTLEY:  Three hours, Your Honor.

10         THE COURT:  All right, Ms. Patrick?  Just so everybody

11  understands the ground rules; when I allocate the time -- and

12  I'm not saying you're going to get your three hours -- we'll

13  talk about it at the end -- use it any way you want, but when

14  you've used it, it's over.

15         Okay, Ms. Patrick?

16         MS. PATRICK:  Your Honor, I think that we can probably

17  live with three hours.  I had actually thought that we would be

18  counted in the debtors' nine, so I'm happy to have three.

19         THE COURT:  Well, you may be.  I'm not saying -- okay.

20  Ms. Patrick, I'm not saying I'm agreeing to this.  I want to

21  get the bid on the table and then --

22         MS. PATRICK:  And let me articulate for you why we

23  would --

24         THE COURT:  Go ahead.

25         MS. PATRICK:  -- why we would be, in our view,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    37

1   entitled.  It's the same reason that we filed a brief.  There

2   are issues in the order relating to fairness to the trusts that

3   are uniquely of concern to our clients and the trustees in

4   terms of the authority to enter into this settlement; what's in

5   the best interests of the trusts, which is not typically part

6   of the debtors' 9019 burden.  So it's in general, for that

7   purpose that we would ask for time.

8           THE COURT:  Okay.  Mr. Siegel?

9           MR. SIEGEL:  Your Honor, while we don't know if we're

10  even going to speak, we think if we do, we'll need three hours.

11          THE COURT:  Are you calling any witnesses?  You don't

12  know yet.  But what -- tell me what you can tell me, Mr.

13  Siegel.  Are you going to call --

14          MR. SIEGEL:  Well, I'm --

15          THE COURT:  -- do you anticipate calling witnesses?

16          MR. SIEGEL:  No.  The problem that we have, the

17  difficulty we have is if we think we are leaning toward --

18  well, if we're objecting to the settlement, we're in one place.

19  Our objection would be more in the nature of don't do this,

20  we're going to say no.  Think of it that way.  If we are --

21          THE COURT:  You'd rather be an innocent bystander and

22  let others fight it out?

23          MR. SIEGEL:  Well, I mean, this is a very strange

24  motion, as you know.

25          THE COURT:  It is.

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1    MR. SIEGEL:  I mean, it's a motion to make an offer to

2    us, which we're not bound to accept.

3    THE COURT:  Yes, I mean, if I approve the motion, I'm

4    not sure what it accomplishes.

5    MR. SIEGEL:  Right, well, that's why.  If we think, at

6    that point, that it's a fruitless act, we will tell you.  We

7    don't think that now.  But if we think that, we will tell you.

8    On the other hand, if we think that we're going --

9    THE COURT:  I won't hold it against you, personally,

10   if you tell me that it's a fruitless act.  Because maybe we can

11   save everybody a lot of time and money.

12   MR. SIEGEL:  Understood.  On --

13   THE COURT:  So if and when you get to that point --

14   MR. SIEGEL:  Yes.  On the other hand, if we are

15   supporting the motion, or we think that we're in that position

16   and we receive replies from certificate holders, objections

17   from certificate holders, since we cannot anticipate what they

18   will say, we may need some time to respond to that, both in the

19   form of papers, which is reflected in the scheduling order, and

20   then at the hearing-in-chief.  Again, we don't know, because

21   there are things that have not yet happened that we need to

22   address.

23   THE COURT:  Okay, Mr. Siegel.  Thank you.

24   MR. SIEGEL:  Thank you.

25   THE COURT:  Mr. Bentley?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                         39

1    MR. BENTLEY:  I'm prepared to give you our best

2    estimate today, Your Honor.  I would make one caveat at the

3    outset, and that is, with respect to fact witnesses in

4    particular, and also expert witnesses to some degree, we will

5    certainly have a clearer sense after we've taken depositions.

6         But with that caveat, which I'm sure the Court

7    understands, let me break our case into a few pieces.  We'll be

8    cross-examining the debtors' three experts.  We'll be cross-

9    examining the debtors' six fact witnesses.  And we'll be

10   putting on fact witnesses of our own, at --

11        THE COURT:  Well, when you say cross-examining the

12   debtors' six fact witnesses, has the debtor indicated it's

13   going to call -- it's putting in declarations from six fact

14   witnesses?

15        MR. BENTLEY:  Well, Mr. Princi said at the last

16   hearing, I guess last week -- we're losing track of time

17   here -- that his current estimation, while he can't say for

18   sure, because it's early --

19        THE COURT:  All right.

20        MR. BENTLEY:  -- is that he'll put on six fact

21   witnesses.

22        THE COURT:  Okay.

23        MR. BENTLEY:  So we're cross-examining those.  And

24   then finally, we're going to have at least one fact witness of

25   our own, maybe -- I can't speak for other objectors.  The

RESIDENTIAL CAPITAL, LLC, ET AL.                          40

1   committee's current expectation is we'll have at least one

2   adverse fact witness that we'll put on.

3           So to take those in turn --

4           THE COURT:  It sounds like you've made the

5   determination you're opposing?

6           MR. BENTLEY:  Actually, Your Honor, I'm glad you

7   raised that point, because let me say to the Court what I've

8   said to the other side many times.  All of these discussions --

9   we have not yet made that decision.  And in fact, we're meeting

10  with Ms. Patrick and her partner Bob Madden this Friday to have

11  a face-to-face sit-down about the merits.

12          Our experts are -- the debtors don't believe us when

13  we say this -- our experts are not anywhere near done.

14          THE COURT:  Okay.  Go ahead.  I'll --

15          MR. BENTLEY:  So we have not reached a decision.  But

16  I would say, Your Honor, for purposes of discussion of this --

17          THE COURT:  And you have what, three experts?

18          MR. BENTLEY:  -- we have to assume that we'll be

19  opposing.  We have three experts.  It may be less, Your Honor.

20  That's still up in the air.

21          THE COURT:  But you'll put in written testimony.  But

22  I expect you'll have redirect examination that you'll want of

23  your own witnesses?

24          MR. BENTLEY:  Yes, Your Honor.  And that will probably

25  be significant, because we think Your Honor will want to hear

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    41

1  from our experts directly, live.

2         As to our cr -- and I guess the debtors have said -- I

3  think what we've heard in terms of the amount of time the

4  debtors plus Ally plus Ms. Patrick, plus potentially the --

5         THE COURT:  Simplify it for me.  How many hours are

6  you asking for?

7         MR. BENTLEY:  If they're going to be cross-examining

8  them for more than day, which it sounds like, I think we --

9         THE COURT:  This is really not a trick question.

10 Okay?

11        MR. BENTLEY:  I'm trying to think it through, Your

12 Honor, because we frankly didn't come to court prepared to lay

13 this all out in detail.  So I'm doing my best, and excuse me.

14 I'll move as fast as I can.  It will take --

15        THE COURT:  Let me -- I'm going to interrupt you for

16 this purpose.  You're correct that I didn't alert you all that

17 I was going to ask these questions.  When I saw the letter last

18 night about moving the dates and the difference in view about

19 the length, that decided me I was going to raise this

20 specifically.  So what we're going to do -- I do want to press

21 everybody what they -- as they stand here now, what they

22 believe they expect to use.  But I'm going to direct you all to

23 meet and confer and see if you can come to a firmer agreement

24 where you're all sort of locking yourself in as to those hours.

25        So I'm going to give -- you'll get a slight second

1    bite at this.  Okay?  And when I slight, I mean, I don't --

2    don't tell me now you want six hours and then you come back and

3    tell me twenty-four hours.  It isn't going to happen.  Okay?

4    But what you -- this works best -- when I say "this",

5    establishing the time limits works best when the parties have

6    conferred and tried to reach an agreement on the time.  Okay?

7            And that's generally what I've successfully done in

8    the past.  And if I cut people's time down, it's generally

9    pretty evenly.  Everybody's going to feel the same cuts,

10   because I just think what's excessive.

11           But go on now and tell me what -- as you stand there

12   now, recognizing you will get a slight second bite at this

13   apple, how much time do you anticipate requiring?

14           MR. BENTLEY:  Certainly, Your Honor.  With respect to

15   direct of our experts -- and I'm speaking now of the

16   committee's experts.  I can't speak for the objectors.

17           THE COURT:  I understand.

18           MR. BENTLEY:  It depends on the amount of time that

19   they're crossed.  But depending on the length of time they're

20   crossed, it could be up to a day of redirect.  If we're putting

21   on three experts and if they're crossing --

22           THE COURT:  Six hours, one days, you're talking about?

23           MR. BENTLEY:  Yes, Your Honor.

24           THE COURT:  All right.  And what is your estimate on

25   cross-examination of six fact witnesses tendered by the debtor

1  and one adverse fact witness that you expect to call?

2          MR. BENTLEY:  And before I turn to that, could I turn

3  first, Your Honor, to our cross of their experts, just to take

4  it in --

5          THE COURT:  Sure.

6          MR. BENTLEY:  -- in sequence?  Your Honor, we think

7  it's realistic that it may take as long as two days for --

8  and --

9          THE COURT:  No.  It's not.

10         MR. BENTLEY:  And the other --

11         THE COURT:  I'm telling you right now, it's not.

12         MR. BENTLEY:  Okay.

13         THE COURT:  It's not.  Mr. Bentley --

14         MR. BENTLEY:  We will do our very best to --

15         THE COURT:  No.

16         MR. BENTLEY:  -- bring that --

17         THE COURT:  Just let me -- let me finish.  You know,

18  in my view, the best cross-examinations of expert witnesses are

19  targeted, to the point, and usually don't take more than two

20  hours or so.  Okay?  Three hours at the most.  I'm really quite

21  serious about it.  I mean, there is the point of diminishing

22  returns.  If you know that you've got to do this examination

23  because you need your time for your other parts of your case,

24  and you've got to cross-examine three experts --

25         MR. BENTLEY:  If it were --

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1    THE COURT:  -- you're going to lose my attention

2  pretty quickly.

3    MR. BENTLEY:  Understood, Your Honor.  And we very

4  much agree with Your Honor's point that it should be quick and

5  targeted.  We are talking three experts.  Two hours each would

6  be six hours.  And then we have all the other objectors who may

7  wish to cross as well.

8    THE COURT:  Well, we're going to talk about -- I'm not

9  going to permit duplicative cross-examination of experts.  I'm

10  just not.  You're going to need -- assuming, as it sounds, that

11  you're going to object, you're going to have to coordinate with

12  the other objectors.  Generally, what works best is when you

13  and other counsel agree who will take the primary lead on a

14  particular expert.

15    You know that ahead of time, so everybody's prepared.

16  You use time.  There may be some additional points particular

17  to another party, that for example, the committee wouldn't

18  bring out, or vice versa.  And that's appropriate for further

19  cross-examination.

20    What is not going to happen, and everybody needs to

21  understand that, because you think your forensic skills are

22  better than the person who came before, and therefore you're

23  going to cover the same subject, it is not going to happen.

24  All right?  I will cut it off.  I will give counsel a fair

25  opportunity to cross-examine the debtors' experts, but it will

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1   be nonduplicative, and therefore you need to coordinate ahead

2   of time.

3           MR. BENTLEY:  We understand that, Your Honor.  And we

4   do intend to work very hard to make sure that happens.  We

5   believe the most effective approach is exactly as Your Honor

6   said, and we're going to try our darndest to present it to the

7   Court that way.

8           THE COURT:  How -- you have three experts.

9           MR. BENTLEY:  Correct, Your Honor.

10          THE COURT:  You're saying you think you need six hours

11  for redirect?  You're putting their direct in through written

12  narrative form; I assume there'll be exhibits.  And you think

13  you're going to need two hours of redirect with each expert?

14          MR. BENTLEY:  We just heard that the cross of them may

15  be a day and a half, two days.  It's very hard to -- I would

16  prefer to keep it as short as possible.  It's very hard to lock

17  in to a much shorter time, if they're going to be cross-

18  examined for two days.

19          THE COURT:  Tell me what your total ask is, then, for

20  fact and -- I mean, for your entire trial time -- entire trial

21  time.  All trial phases:  openings, cross, redirect, closing.

22  Go ahead.

23          MR. BENTLEY:  Your Honor, give me one moment, please?

24          THE COURT:  Yes.

25          MR. BENTLEY:  I'm breaking it into pieces with Mr.

1  Kaufman.  There are six fact witnesses.  We think we can limit

2  our cross to an average of between one and two hours per

3  witness.  That gets you to between one and two days for the

4  cross of the fact witnesses.  And then we have at least one

5  expert -- sorry, one fact witness of our own.  And that would

6  be -- that would be, we estimate, two hours, Your Honor.

7          THE COURT:  And you think you need how much time to

8  cross-examine their six fact witnesses?

9          MR. BENTLEY:  We think we need an average of between

10 one and two hours per witness.  So that's a total of six to

11 twelve hours, Your Honor.

12         THE COURT:  Okay.  When I say okay, I'm not agreeing

13 that that's appropriate.

14         MR. BENTLEY:  Understood.

15         THE COURT:  That's your ask.

16         MR. BENTLEY:  By my rough math, Your Honor -- and I

17 apologize if I got this wrong -- but I think that adds up to

18 between five and six days total.

19         THE COURT:  You didn't add in your opening statement

20 and closing argument and --

21         MR. BENTLEY:  Correct.  Does Your Honor anticipate --

22         THE COURT:  I anticipate when I tell you -- let me

23 make this clear, okay?  If I say you have ten hours, you have

24 ten hours for every -- in the aggregate for all trial phases.

25 We will keep track of the time.  The more time you spend in

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    47

1  opening and closing the less time you have for witness

2  examinations.  You will get one number.  You can check back at

3  the lunch break and at the end of each day as to how much time

4  you've used and how much time you have left. Okay?

5          MR. BENTLEY:  We --

6          THE COURT:  But that will be it.

7          MR. BENTLEY:  Understood, Your Honor.  In terms of the

8  length of opening and the length of closing, we do think it

9  might be productive for us to confer with the other parties,

10  because frankly, if each party is giving roughly the same

11  amount of time to their opening or closing, that may be helpful

12  to the Court.

13          Does Your Honor -- some courts prefer not to have --

14          THE COURT:  I am going to read the briefs ahead of

15  time, you know.

16          MR. BENTLEY:  We're not sure we need an opening.  We

17  don't know if Your Honor prefers --

18          THE COURT:  I know.  You probably don't.

19          MR. BENTLEY:  Okay.

20          THE COURT:  But I don't deny you the right if you want

21  it.  You just use your time for it.  I will read the briefs

22  before.

23          MR. BENTLEY:  We think an hour is a reasonable amount

24  of time for us to close.

25          THE COURT:  Okay.  Who else wants to be heard?

RESIDENTIAL CAPITAL, LLC, ET AL.                                48

1          MR. WYNNE:  Good morning, Your Honor.  Richard Wynne

2     on behalf of FGIC.  Your Honor, to deal with the schedule issue

3     first, and then there's one issue I'd like to circle back to.

4     I think that we would like to ask for six hours on the

5     presumption that we're going to be pretty highly organized, but

6     right now, if I assume that the committee would be objecting,

7     we would anticipate, Your Honor -- behind the scenes, Your

8     Honor, we have tried to be highly coordinated in terms of

9     agreeing to have document discovery, for the committee taking

10    the lead, and we would have sort of one person or one party

11    have primary responsibility for each witness, so that we're not

12    having the sort of duplication Your Honor's talking about.

13          THE COURT:  Do you have experts?

14          MR. WYNNE:  We have two potential experts, Your Honor.

15    And when I say that we're talking about six hours, if it

16    goes -- if there are three or four parties objecting, I would

17    anticipate that we would probably use or need less, or we would

18    be sharing time.  It just really depends upon how much

19    additional work we would need to do.  So I think that's

20    probably a high estimate, is my guess.

21          THE COURT:  All right.  Who else wants to be heard?

22          MR. HOFF:  Jonathan Hoff; Cadwalader, Wickersham &

23    Taft, for MBIA.  I basically would have the same statement that

24    Mr. Wynne had.  We're -- as he's indicated, for the discovery

25    going forward, and in handling the case, we've been doing the

1   best we can to coordinate, largely letting the committee take

2   the lead and then we would be filling in.  We don't know what

3   the dynamics are going to be, but it would be the same

4   circumstances and the same estimate.

5          THE COURT:  I mean, I'm telling you right now, if you

6   stand up and go to cross-examine a witness on a subject that

7   they've already been -- that's been covered already, I'm going

8   to shut it down.  Do you understand that?

9          MR. HOFF:  I appreciate that -- I appreciate that,

10  Your Honor.  And you know --

11         THE COURT:  So how many hours are you asking for?

12         MR. HOFF:  I would say five to six.  But that's

13  probably on the high end, depending on -- and assuming that the

14  committee's objecting and taking -- and that we divided up

15  who's taking the leads, and that we either take the lead in our

16  area or we supplement where we're not.

17         THE COURT:  All right.  Who else wants to be heard?

18         MR. LIGHTNER:  Good morning, Your Honor.  Mark

19  Lightner from Cleary Gottlieb on behalf of Wilmington Trust.

20         We have been coordinating with the committee and other

21  parties to cooperate.  We don't anticipate taking a lead on

22  many of the issues, but there are certain issues related to

23  Residential Capital, just the holdco specifically, so we would

24  ask between two or three hours total.

25         THE COURT:  I'm sorry, say that again?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    50

1      MR. LIGHTNER:  Two and three.  Thank you.

2      THE COURT:  Thank you.  Anybody else want to be heard?

3      (Pause)

4      THE COURT:  Counsel for FGIC and MBIA, how do your

5  interests differ -- assuming the creditors' committee opposes,

6  how do your interests differ from those of the committee?

7      MR. WYNNE:  Your Honor, I wouldn't think that they

8  would.

9      THE COURT:  You have to identify yourself first.

10     MR. WYNNE:  Excuse me, Your Honor.  Richard Wynne for

11 FGIC.  Your Honor, I don't believe that they would.  And it

12 would really be -- we would use far less time, unless we had --

13 but I'm assuming, if we had principal responsibility for a

14 witness, that would kind of come out of the committee's time if

15 we took a witness.

16     THE COURT:  Mr. Hoff, how do your interests differ?

17 I'm not encouraging the committee to oppose, but I --

18     MR. HOFF:  Well, it's hard to say in the abstract

19 because the committee hasn't reached any conclusions yet, but

20 we --

21     THE COURT:  I asked you to assume.

22     MR. HOFF:  Well, we may be looking at issues among --

23 we look at each of the individual trusts.  Basically, MBIA

24 insured eight of these securitizations by -- I believe it's

25 eight.  And we look at each of the other trusts as separate

RESIDENTIAL CAPITAL, LLC, ET AL.                                          51

1   creditors and that this is not simply a monolithic group of

2   entities.  And we may have issues, for example, as to how the

3   MBIA insured trusts are treated under the settlement, and the

4   rulings you're being asked to make on the other trusts as

5   compared to our trusts.

6           THE COURT:  And what evidence do you plan to offer to

7   deal with your specific trusts?

8           MR. HOFF:  Well, we are looking at -- there's an 8.7

9   billion dollar total number, and then there is kind of a vague

10  mechanism for allocating the allowed claims among the trusts.

11  So we are looking at how the MBIA insured trusts fare in the

12  settlement vis-a-vis the other trusts, and may have something

13  to say about that.  There may be other issues.  I assume that,

14  for example, the issues about process are probably common, but

15  when it gets to how that number got allocated -- to determine

16  how the 8.7 got determined and how it got allocated, we may

17  have something to say something about that.

18          And as we're going through discovery, of course, and

19  our experts and we are analyzing the settlement and what we're

20  seeing in discovery -- and the experts -- there may be other

21  issues that arise as well.

22          THE COURT:  Mr. Princi, does approval of the

23  settlement necessarily resolve the issue of allocation among

24  trusts?

25          MR. PRINCI:  There is an allocation formula that has

1   been consistent throughout the iterations; that is in the

2   settlement agreement, Your Honor.

3           THE COURT:  Okay.  Mr. Wynne?

4           MR. WYNNE:  Once again, Your Honor, Richard Wynne.  I

5   did want to just add a footnote.  I was focusing on sort of the

6   central 8.7 issue, but I actually think that the sort of

7   separate issues -- we'll obviously try to brief with respect to

8   those, and it may be more legal argument and closing argument

9   on those issues.  I don't anticipate that -- on our separate

10  issues dealing with our specific trusts and our specific

11  agreements, those we'd put in in terms of a brief to Your

12  Honor, and there might be some closing issues.  I don't

13  anticipate that much time would be needed with any witnesses on

14  those issues, at this point.

15          THE COURT:  Yes, Mr. Kaufman, go ahead.

16          MR. KAUFMAN:  Philip Kaufman, Kramer Levin.  Your

17  Honor, I'd just like to amend what Mr. Bentley told the Court

18  regarding the committee's time with cross-examination of fact

19  witnesses, since I expect to be the one responsible for that.

20  I would estimate, for six fact witnesses, we're talking roughly

21  an hour to an hour and a half apiece; somewhere in the

22  neighborhood of six to eight hours, I think, is fair.  There

23  may be a couple of them that I can do in fifteen minutes, but I

24  suspect that a couple of them, looking at the names that they

25  have given to us, depending upon what we develop in discovery,

RESIDENTIAL CAPITAL, LLC, ET AL.                                           53

1   could take in excess of an hour, possibly two.

2            THE COURT:  Thank you.

3        (Pause)

4            THE COURT:  Mr. Princi, remind me, under this proposed

5   schedule, what's the cutoff for fact discovery and for expert

6   discovery?

7            MR. PRINCI:  Your Honor, may I have my partner,

8   Mr. Rains, address the Court?

9            THE COURT:  Yes, absolutely.

10            MR. PRINCI:  Thank you, Judge.

11            MR. RAINS:  Good morning, Your Honor.  Darryl Rains of

12   Morrison & Foerster, for the debtors.  If I could just give you

13   a quick overview of the proposed schedule, I think that would

14   help.  So we've broken it into four or five blocks.  The cutoff

15   for completing document production would be October 29; that's

16   to allow us to do the new searches and date ranges that the

17   creditors' committee asked us to do.

18            THE COURT:  And I know the committee differs whether

19   it's the 29th or, what, the 21st, but just my question -- I do

20   want to get to the details of the schedule.  Right now, what's

21   the cutoff of fact discovery, and what's the cutoff of expert

22   discovery?

23            MR. RAINS:  So those dates are:  the 29th for

24   documents; for fact witnesses, November 16; depositions of the

25   debtors' three experts, we are proposing November 21.

1    THE COURT:  I really -- right now, I just want to know

2    the two dates:  when fact discovery is over, and when all

3    expert discovery is over.

4    MR. RAINS:  Fair enough.  We broke it into multiple

5    dates, but the end of fact discovery would be November 16.

6    THE COURT:  Okay.

7    MR. RAINS:  And the end of all the expert depositions

8    is, I believe, December 14th.

9    THE COURT:  Okay.  Let me ask, is there disagreement

10   about those two dates?  There's some disagreement about dates

11   before those two final discovery dates.  Are there

12   disagreements about the November 16th and December 14th dates?

13   MR. RAINS:  No, there are not, Your Honor.

14   MR. BENTLEY:  There are not.

15   THE COURT:  Mr. Bentley, okay.

16   (Pause)

17   THE COURT:  All right, here's what I'm thinking,

18   Mr. Rains.

19   MR. RAINS:  Great.

20   THE COURT:  I'm going to make a tentative allocation

21   of time as divided between the parties supporting the RMBS

22   settlement and the parties opposing the RMBS settlement.  And I

23   understand we don't know where some parties-in-interest --

24   which side of that line people are going to fall.  Okay, and

25   when I say "tentative", I'll tell you when I'll revisit the

1   issue.   I'm tentatively allocating twelve hours for parties

2   supporting the RMBS settlement, so that includes the debtors,

3   Ally, and the institutional investors.   For the parties

4   opposing the settlement -- there's, I think, less clarity about

5   who they are -- I'm tentatively allocating a total of eighteen

6   hours.   So that's a total of thirty hours.   We're going to

7   revisit, on what I expect to be a final basis, the allocation

8   of time -- there appears to be one ResCap matter on the

9   calendar for Thursday, December 20th; I don't know what -- that

10  doesn't seem to be an omnibus day, but I don't know what that

11  is.   It's described as a motion for clarification regarding

12  relief from automatic stay.

13            UNIDENTIFIED SPEAKER:  It's listed as an omnibus day.

14            THE COURT:  It is an omnibus day?   Okay.   So we're

15  going to revisit on a final basis the time allocation on

16  December 20th.   People are going to have to be pretty

17  persuasive to adjust the time, the twelve hours and eighteen

18  hours.

19            The trial day, I said what it would be -- I said

20  before what it would be; I'm adjusting it, so everybody listen

21  carefully.   We will start at 9.   We will go till approximately

22  12:15; with a fifteen-minute recess, is three hours; and

23  depending on whether somebody's finishing a witness, et cetera,

24  generally speaking, three hours.   2 to 5:15, with a fifteen-

25  minute recess, is three hours.   And then 5:30 to 8:45 p.m.,

RESIDENTIAL CAPITAL, LLC, ET AL.                                    56

1    another three hours, with a fifteen-minute recess.  So there

2    will be nine-hour trial days.  And we will go Monday, Tuesday,

3    Wednesday -- that takes us through twenty-seven hours -- and

4    then Thursday, which is January 17th to conclude.  What I would

5    anticipate is, is that everybody would finish their witnesses

6    by the end of the night Wednesday and they'd have closing on

7    Thursday, so you'd have time to sort of reflect on your views.

8    When we get closer to the trial, I may be asking for proposed

9    find -- I expect I will be asking for proposed findings of fact

10   and conclusions of law.  Given the magnitude -- the size of the

11   matter, counsel should arrange for daily transcript; you're

12   going to have to do that.

13          I will tell you now that the hearing is not going

14   beyond Thursday the 17th.  I've sort of left three hours.

15   There may be a little flex after I hear you in December, but no

16   one -- Mr. Princi was, I think, it may be easier for the moving

17   parties to estimate their time.  Well, I understand; witnesses

18   can change and stuff like that.  But he was pretty clear.  And

19   I'm cutting down on the moving parties altogether.  Ms. Patrick

20   had said that she had assumed initially that she was going to

21   get stuck within his time limits, but -- so I've given a little

22   bit of a cushion on the moving parties' side.

23          I think that the amount of time that the objectors or

24   potential objectors have requested is unreasonable, would

25   result in too much duplication, which I've made clear I will

1  not abide.  But the depositions haven't taken place yet; and I

2  understand that, once they've occurred, it may be that the time

3  allocation ought to be reduced, okay, that the twelve and

4  eighteen hours should be less.  But until the discovery is

5  done, I don't want to impose a final limit.  But I want

6  everybody to go into discovery recognizing what you're likely

7  to have in terms of time limits at a hearing.  So it will be --

8  the calendar for December 20th should reflect a further status

9  conference with respect to this.

10          I think I've told you before, I will be away from

11  November 30th to December 16th, so this is right after --

12  shortly after I come back.  But everybody should work with

13  those dates in mind, okay?

14          Now, let's --

15          MR. RAINS:  Your Honor, one point of clarification.

16          THE COURT:  Go ahead, Mr. Rains.

17          MR. RAINS:  So when the clock is running, it will run

18  for the proponents and for the objectors and it's up to those

19  parties to work out among themselves how they allocate the

20  time?

21          THE COURT:  It is.  It is.

22          MR. RAINS:  Fantastic.

23          THE COURT:  And there are potentially more objectors

24  than there are proponents, but that's -- on the proponents'

25  side as well, I expect that you'll coordinate.  And it may be

1    that Ms. Patrick or one of her colleagues are going to take the

2    lead on some witnesses, or whatever; but in a well-prepared

3    trial, there shouldn't be duplication.  I understand that there

4    may be somewhat different interests reflected on the objectors'

5    side, that MBIA may have particular issues about certain

6    securitization trusts and how the allocation would affect them,

7    and others may have other issues.  So I recognize that.

8            So those are the tentative allocations, and I said

9    when we'll revisit it, okay?  But now there's some issues about

10   some of these intermediate dates in the proposed schedule.

11           MR. RAINS:  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. RAINS:  Darryl Rains again.  If --

14           THE COURT:  Go ahead, Mr. Rains.

15           MR. RAINS:  -- I could address those.

16           THE COURT:  Mr. Princi seems to want to --

17           MR. RAINS:  Oh.

18           THE COURT:  -- say something.

19           MR. RAINS:  Yeah.

20           MR. PRINCI:  Your Honor, just one clarification.  I

21   think, in the committee's proposed time, I think I heard

22   Mr. Bentley say that they were also including time for a fact

23   witness.  The order, Your Honor -- the scheduling order

24   required the committee to designate their fact witnesses by

25   October 5th.  We had not received any designation of fact

RESIDENTIAL CAPITAL, LLC, ET AL.                                    59

1  witnesses from the committee.  One of the -- I mentioned to you

2  (a) I didn't understand their general proposition how they

3  would have a fact witness, but (b) we were never informed of

4  any consistent with the scheduling order.

5        MR. BENTLEY:  There's a simple answer for that, Your

6  Honor.  Should I move to the podium or shall I --

7        THE COURT:  Just pull the microphone a little closer

8  to you, Mr. Bentley.  Go ahead.

9        MR. BENTLEY:  There's a simple answer.  The scheduling

10  order expressly carves out adverse witnesses who do not need to

11  be designated.  And the witness we're speaking of is an adverse

12  witness.

13        THE COURT:  Go ahead, Mr. Rains.

14        MR. RAINS:  Thank you, Your Honor.  Let me first say

15  that I am pleased to say that we have worked out most of the

16  issues with the creditors' committee, so it took a lot of work

17  to get where we're at, and I thank them for their cooperation.

18        The first disputed issue we have is a date that we set

19  as October 29; it's paragraph 2 of the proposed scheduling

20  order.  As you'll recall, at the hearing last week the

21  creditors' committee, for the first time, told us they were

22  unhappy with the search terms we used and the date ranges.

23  They gave us new proposed date ranges and search terms.

24        THE COURT:  I'm willing to bet that I'm going to hear

25  that it wasn't the first time they raised the issue with you.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    60

1   So I'm not sure that that's -- they raised the issue, okay?

2          MR. RAINS:  Fair enough.  We did get their new search

3   terms, for the first time, the day after the hearing.  We met

4   and conferred over the weekend.  We are happy to report we've

5   reached agreement on date ranges and search terms, but --

6          THE COURT:  And you think you need a little more time

7   to --

8          MR. RAINS:  Well, because the date range has changed,

9   it involves going back, pulling electronic data, getting it off

10  of backup tapes, uploading it.  There's just a lot to be done.

11  And we explained to them if they want us to do that, it will

12  take us to the 29th.  So that's what we've agreed to.  They now

13  want to cut that time short; we simply can't do it.

14         THE COURT:  Okay, Mr. Bentley, do you want to be

15  heard?  Or Mr. Kaufman?  Who's dealing with that?

16         MR. KAUFMAN:  I won't tell the Court what the Court

17  already knows.  This isn't the first time.  But be that as it

18  may, Your Honor, we know that when the original scheduling

19  order was set back in July, all the parties, including the

20  debtors, were prepared to produce documents on a ten-day

21  turnaround.  What we're proposing with respect to documents

22  that in our view we should have gotten a month ago, we're

23  asking for a twenty-one day turnaround; we think that's more

24  than reasonable.  Why suddenly with respect to extending date

25  ranges and doing a somewhat different --

RESIDENTIAL CAPITAL, LLC, ET AL.                    61

1        THE COURT:  Because I don't want to hear that --

2        MR. KAUFMAN:  Okay.

3        THE COURT:  -- they couldn't get it done in the few

4    days and --

5        MR. KAUFMAN:  Okay.

6        THE COURT:  Okay?  Just --

7        MR. KAUFMAN:  Your Honor, we think a twenty-one day

8    time from today --

9        THE COURT:  This is a real Solomonic decision.

10       MR. KAUFMAN:  -- for --

11       THE COURT:  5 p.m. on October 26.  That's the date.

12       MR. KAUFMAN:  Thank you, Your Honor.

13       MR. RAINS:  Thank you, Your Honor.  We need another

14   Solomonic decision.

15       THE COURT:  This is real scientific to be able to --

16       MR. RAINS:  We have a deadline, which you've heard,

17   which is the experts have to be finished being deposed by

18   December 14th.

19       THE COURT:  Right.

20       MR. RAINS:  We have allowed ourselves ten days to

21   write all of our replies to their objections and submit all of

22   our reply expert declarations.  We gave ourselves to December

23   24; they want December 21.  In the discussions just prior to

24   the hearing, it looks like we might be able to agree on

25   December 23.  So that leaves us our trunk and our arms but cuts

RESIDENTIAL CAPITAL, LLC, ET AL.                                      62

1   off our legs, but that's better than the 21st.

2          THE COURT:  Your associates are going to kill you if

3   you're expecting that Christmas Eve you're going to be

4   requiring --

5          MR. RAINS:  The smart ones have left already, Judge.

6          UNIDENTIFIED SPEAKER:  I'll take an associate if you

7   have one.

8          MR. RAINS:  It should be clear, of course.  All of our

9   pre-trial submissions are due on January 7, so we're leaving --

10  both sides leaving two weeks during the holidays to get those

11  done.

12         THE COURT:  Well, look, the reason I gave you January

13  14th rather than January 7th is I didn't want to completely

14  screw up people's New Years, okay?  And -- because I do -- but

15  I need the stuff a week ahead of time; so that's the January

16  7th.  You're all subjecting yourself to a very difficult

17  schedule.  Be that as it may --

18         MR. RAINS:  Judge, we're happy with the 23rd.

19         THE COURT:  Okay.  Any other issues?

20         MR. RAINS:  One very small one; this is paragraph 11,

21  excuse me.  There's a phrase in paragraph 11 that allows

22  supplemental declarations of experts.  Now, the genesis of

23  that, quite quickly, is we have a regular schedule which has

24  our expert declarations, which have already been done and

25  exchanged.  We get their opposition experts' reports on the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    63

1  28th.   And then we have a time to reply; that's now December

2  23.   But several of the objectors have said their experts will

3  continue to be working even after the reports are done; they

4  want an opportunity to supplement their reports.   And while I'm

5  not sure that's appropriate, we've agreed to that.   A new

6  proposal from the creditors' committee just last night is that

7  only they would be allowed to supplement.   We want the right to

8  supplement as well, as our experts will continue working as

9  well.

10            THE COURT:  Mr. Bentley?

11            MR. BENTLEY:   I won't quibble over the timing of when

12  this came up.   The issue, Your Honor, is whether the debtors

13  should get three rounds of expert reports or not, with their

14  third round of expert reports coming just seven days before the

15  trial begins.

16            THE COURT:  So let me ask you this, Mr. Bentley:   If

17  you get the last word with the supplemental report and they

18  call their experts at trial and they indicate that they wish to

19  examine their experts to respond to whatever was in your

20  supplemental expert declarations, I will listen to it.   Now, do

21  you think you're better off getting it in writing in advance of

22  the hearing, or waiting to be surprised when they examine their

23  witness at trial?   Tell me which you prefer.   Usually people

24  would rather see it in advance and not be surprised at trial.

25            MR. BENTLEY:   I think we're content to see it in

RESIDENTIAL CAPITAL, LLC, ET AL.                                    64

1    advance.

2           THE COURT:  I thought so too.

3           MR. RAINS:  Thank you, Your Honor.  Then the way we'll

4    proceed is as Mr. Princi described.  There are still parties --

5           THE COURT:  Okay.

6           MR. RAINS:  -- such as the trustees, giving us

7    comments.  We'll try to get a final order, approved as to form

8    by everyone, out to the Court on Friday.

9           THE COURT:  Okay.  Let me just add to my colloquy with

10   Mr. Bentley.  What goes with that, by allowing the debtors to

11   put in a supplemental expert report then as well, I don't

12   expect to get to a trial and find out that somebody's got a new

13   theory or new data that hasn't been set out in the expert

14   reports.  So it needs to be in the expert reports.  After a

15   cross-examination, you can redirect your expert, but I don't

16   want to hear saying, we've been sandbagged because now they've

17   laid out a new theory that they've gotten three rounds of

18   expert reports, supplemental expert reports, et cetera, and

19   this is nowhere to be found in there.  So that's the other side

20   of the coin on it.  Okay?

21          MR. RAINS:  Thank you, Your Honor.

22          THE COURT:  All right.

23          MR. BRYAN:  Your Honor, Patrick Bryan for Ally.  If I

24   can just briefly --

25          THE COURT:  Go ahead, Mr. Bryan.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    65

1        MR. BRYAN:  -- address the schedule.  Unfortunately,

2   we didn't see the schedule before it was submitted to Your

3   Honor.  We are happy with the October 26 date.  We are

4   continuing to work with the committee on search terms.  But we

5   believe we can live with the dates that are proposed.

6        One minor change that I proposed to Mr. Rains before

7   the hearing concerns paragraph number 5.  We propose altering

8   paragraph 5 so that it refers to nondebtors, other than Ally,

9   shall respond to discovery by November 16th.  We'd like to

10  leave open the possibility, Your Honor -- Ally's considering

11  serving discovery on objecting parties as well, and we'd like

12  to leave open the possibility to do so by the end of this week

13  and have that discovery responded to by November 16.

14        THE COURT:  What have you been waiting for?

15        MR. BRYAN:  Well, Your Honor, we have been served with

16  discovery from objectors not so long ago.

17        THE COURT:  Right.

18        MR. BRYAN:  And we've been dealing with those issues

19  and reviewing our own document discovery.  And we think the

20  issues are now ripe.  We have very targeted discovery that we

21  think may be appropriate.

22        THE COURT:  What is it that you're asking with respect

23  to paragraph 5?

24        MR. BRYAN:  Simply that it leaves open the possibility

25  for nondebtors like Ally to serve discovery and it be responded

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    66

1    to in a timely fashion by November 16.

2           THE COURT:  Mr. Kaufman, you want to be heard?

3           MR. KAUFMAN:  Your Honor, I had the same reaction you

4    did.  We served Ally with discovery requests in August.  So the

5    notion that suddenly they're going to be propounding new

6    discovery requests on us, we think, is inappropriate.  The

7    proposed scheduling order leaves in place deadlines that have

8    already passed.

9           THE COURT:  Ally's --

10          MR. KAUFMAN:  We think those deadlines have passed.

11          THE COURT:  -- request is denied.

12          Anybody else wish to be heard?

13          All right, Mr. Rains, you'll continue to work on

14   trying to get the order finalized; hopefully there won't be any

15   other glitches along the way, okay?

16          MR. RAINS:  We will, thank you, Your Honor.

17          THE COURT:  All right, thank you very much.  We spent

18   a lot of time on this, so --

19          Mr. Bentley or -- yes, Mr. Bentley, your letter raised

20   discovery issues.  Let's get this out of the way now.

21          MR. BENTLEY:  Correct, Your Honor.  And my partner,

22   Mr. Kaufman --

23          THE COURT:  Mr. Kaufman.

24          MR. BENTLEY:  -- will be handling that.

25          MR. KAUFMAN:  Your Honor, our letter last evening

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    67

1  simply identified what we believed the remaining issues are.  I

2  don't know whether the Court would prefer to discuss those or

3  whether you would prefer exchange of letter briefs, or

4  something else.  I'm happy to go through them if the Court will

5  give us the time to do that.

6          THE COURT:  Tell me, the first dispute you raise is --

7  you say "unable to reach an agreement with AFI concerning the

8  scope of additional document requests required by AFI or as to

9  search terms."  What's the give-and-take on this?  What's

10  the --

11          MR. KAUFMAN:  As far as I understand it, we've not

12  reached agreement on either the date by which AFI has to begin

13  searching -- the debtors have agreed to a June 1 forward date;

14  Ally has not.

15          THE COURT:  Let me hear from Ally with respect to the

16  June 1 date.

17          MR. KAUFMAN:  Sure.

18          MR. BRYAN:  Your Honor, that request -- again, Patrick

19  Bryan for Ally.  That request was just made yesterday.  We

20  agreed with the committee that we would run the extended search

21  period, using both our terms and their search terms, and that

22  we would get those results from our vendor and engage in that

23  dialogue.

24          THE COURT:  You've agreed to search back to the June 1

25  date?

RESIDENTIAL CAPITAL, LLC, ET AL.                                          68

1        MR. BRYAN:  With the reservation, Your Honor, if we

2    are dealing with -- the date also goes forward in time.  So we

3    have agreed to search it, engage in a meet-and-confer; if the

4    results are extraordinarily burdensome and we cannot comply

5    with it, we will confer with the committee and see if we can --

6        THE COURT:  Well, let's take it one piece at a time.

7    The one piece is you've agreed to search back to June 1, 2011.

8        MR. BRYAN:  We have agreed to run that search, Your

9    Honor.

10       THE COURT:  Okay.  All right.  And what you're

11   reserving is what?

12       MR. BRYAN:  Two issues, Your Honor:  both search terms

13   and the expanded date range.  Now, I think a little bit of

14   background is necessary here, Your Honor.  Back in June when we

15   got the committee's 2004 subpoena, they requested all documents

16   regarding the RMBS trust settlement agreement, and all

17   documents regarding the PSA.  We engaged the committee at that

18   time to reach agreement on search terms.  When we actually had

19   accepted and exchanged search terms and reached -- at least we

20   were moving forward, and we adopted many of their terms.  Back

21   in July --

22       THE COURT:  That sounds to me that you didn't adopt

23   their terms.

24       MR. BRYAN:  Well, Your Honor, with respect to RMBS,

25   those requests, we were very close.  In fact, there was very

RESIDENTIAL CAPITAL, LLC, ET AL.                                     69

1   little difference.  Now, in July the committee stopped

2   discussing search terms with us because the examiner was likely

3   to be appointed.  We continued to ask --

4           THE COURT:  All right, here's what we're going to do

5   on the discovery dispute:  Counsel to the discovery dispute

6   will come to chambers at 2 o'clock this afternoon and we'll

7   resolve the discovery dispute at 2 o'clock rather than taking

8   the time now.

9           MR. BRYAN:  Very good, Your Honor.

10          THE COURT:  All right.  Okay, what's next?

11          MS. BARRAGE:  Good morning, Your Honor.  Alexandra

12  Barrage of Morrison & Foerster, on behalf of the debtors.  I'm

13  here to address the second item, the status conferences for

14  today relating to the filed pre-auction objections of the RMBS

15  trustees.

16          THE COURT:  Yeah.

17          MS. BARRAGE:  Following our earlier status conference

18  on September 27th, the parties, despite attempts by all

19  parties, have been unable to resolve the issues that were

20  raised in the pre-auction objections.  Obviously, from the

21  debtors' perspective, resolving these issues is paramount to

22  ensuring a successful auction and a sale hearing.  Again, the

23  parties have worked diligently on these matters, and certainly

24  from the debtors' point of view, will continue to do so up

25  until the hearing that's scheduled on October 17th.

1    Your Honor may be aware that we filed a reply early

2    last night.

3         THE COURT:  I didn't -- I'm not aware of --

4         MS. BARRAGE:  We don't have to address, unless Your

5    Honor requests --

6         THE COURT:  I don't.

7         MS. BARRAGE:  -- the points therein.  But we thought

8    it would be helpful to frame the issues one week in advance of

9    the hearing.  We also think that it's important for parties to

10   understand the nature of these objections, within the larger

11   context of the case.

12        Candidly, Your Honor, we understand the trustees

13   concerns, and we've been receptive in our discussions to

14   various types of proposals for meeting their objections and

15   addressing them.  But given where we are today, we think the

16   most efficient and straightforward solution is one that

17   balances several competing interests of the debtors, again, to

18   proceed to auction in a smooth fashion as well as -- and to the

19   sale hearing, and the concerns about the trustees about being

20   indemnified for certain pre-closing indemnification obligations

21   that, if Nationstar were the successful bidder, Nationstar

22   would not be picking up.

23        Our proposal involves setting up an escrow; we've

24   raised that proposal with the trustees.  We think --

25        THE COURT:  Let me interrupt you.

1    MS. BARRAGE:  Sure.

2    THE COURT:  I encourage you to reach an agreement with

3  the trustees.  I hope you will reach an agreement with the

4  trustees.  An agreement usually involves compromise on all

5  sides.  You'll either reach an agreement or I will hear the

6  objections next week.

7    MS. BARRAGE:  Right.

8    THE COURT:  Don't lay out for me what you've proposed,

9  which is essentially settlement of disputed issues.  I hope you

10  can resolve them.  Are all the briefs in?

11    MS. BARRAGE:  The trustees may want to file a

12  surreply, Your Honor; I'll let them address that.  But -- I can

13  hand over the podium to Mr. Weitnauer for that.

14    THE COURT:  Okay.

15    MR. WEITNAUER:  Your Honor, Kit Weitnauer from Alston

16  & Bird, on behalf of the group of trustees.  In your earlier

17  remarks, you gave us until noon this Friday for a response to

18  what they filed last night, and we will be filing something.

19    THE COURT:  All right.  Thank you.  Are the parties

20  still trying to come to an agreement?

21    MR. WEITNAUER:  Absolutely.  We are.

22    THE COURT:  Okay.  I mean, the hearing is scheduled

23  for Wednesday, October 17th.  The auction is when?  October

24  23rd and 24th?

25    MS. BARRAGE:  That's correct, Your Honor.  The auction

RESIDENTIAL CAPITAL, LLC, ET AL.                          72

1   on the servicing platform starts on October 23rd, which is a

2   Tuesday.

3           THE COURT:  You know, I try to get my decisions out

4   quickly, but don't -- if you saw my desk, I've got this

5   incredibly large pile of things that I'm trying to get through.

6   So don't assume you're going to have a decision by the 23rd.  I

7   mean, I understand the need to get things done, and I've tried

8   to get things done rapidly, but take that into account.

9           MS. BARRAGE:  We're mindful of Your Honor's burden,

10  not just in this case but I see your other dockets.  I --

11          THE COURT:  I get more binders in this case to go

12  through, than in any other case I have.

13          MS. BARRAGE:  Your Honor, I think I speak for all

14  parties when I say we truly hope we can reach a resolution by

15  the 17th.

16          THE COURT:  Okay.  All right, but don't lay out what

17  the bid-and-ask is; you'll either resolve it or you won't.

18  Okay?

19          MS. BARRAGE:  Understood.

20          THE COURT:  Thank you.

21          MS. BARRAGE:  Thank you, Your Honor.

22          THE COURT:  Mr. Siegel, you need a last word?

23          MR. SIEGEL:  I don't need the last word.  I'm actually

24  not going to disagree with anything Ms. Barrage said, but I do

25  have to mention one thing, because we don't want to give people

**RESIDENTIAL CAPITAL, LLC, ET AL.**                      73

1   a misimpression.  In a moment of, I think, over-enthusiasm, the

2   debtor posted to the Web site an amendment we've not yet agreed

3   to, which has now been made available to the other bidders;

4   this is perhaps part of the ultimate solution.  It may in fact

5   turn out to be a document that we agree to, but we have to make

6   it clear to everybody that that document posted has not yet

7   been finally agreed to by us.  I think, given the pressure that

8   they faced with the auction, it's understandable what happened,

9   but we can't say that we've agreed to it yet.

10           THE COURT:  Okay.  Thank you.

11           Ms. Barrage?

12           MS. BARRAGE:  Thank you, Your Honor.  Just to clarify

13   one point, the agreement that counsel for --

14   Mr. Siegel referred to --

15           THE COURT:  You posted an amendment to the APA?

16           MS. BARRAGE:  No, Your Honor.  We did not post

17   anything, to my knowledge, to the Web site.  We provided a form

18   of omnibus pooling and servicing agreements to bidders.

19           THE COURT:  Okay.

20           MS. BARRAGE:  Our understanding was that, at least as

21   to form and substance, the trustees had agreed to it.

22           THE COURT:  All right, we'll leave -- Mr. Siegel says

23   he hasn't agreed.

24           MS. BARRAGE:  I understand, Your Honor.

25           THE COURT:  It is what it is, okay?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    74

1           MS. BARRAGE:  Just wanted to clarify the record on

2   that point.

3           THE COURT:  All right.  Okay, thank you, Ms. Barrage.

4           MS. BARRAGE:  Thank you.

5           THE COURT:  Mr. Marinuzzi?

6           MR. LEMAY:  Your Honor, would now be a good time for

7   me to talk to you before you get to the contested matters?

8           THE COURT:  Sure.  Quickly.

9           MR. LEMAY:  Your Honor, David LeMay, counsel for the

10  examiner.  And I think now probably is the right time, just

11  because this is more relevant to what's been talked about.  We

12  found out last night, around 7, about the proposed timing

13  change that Your Honor has just heard about.  Mr. Gonzalez, the

14  examiner-  and we spoke this morning -- he asked me to come

15  down here and address the Court very briefly.

16          Of course the timing is what the timing is.  I'm here

17  really just to talk about some of the implications of that

18  timing for the examiner's report.  We have seen in the past,

19  with respect to the prior subservicing dispute that was then

20  settled on an interim basis, and we are seeing now with respect

21  to the RMBS dispute, that a lot of the people who must, and

22  absolutely must, be prepared for and give depositions in those

23  disputes are the very same people we need to talk to in doing

24  our examination.

25          And we are in the midst of -- we are at it hammer and

1    tongs; I don't think anybody in the courtroom will say

2    otherwise.  We are getting document discovery; we're reviewing

3    it.  We have completed a first round of interviews, or I should

4    say we're in the midst of a first round of interviews; that's

5    approximately twelve people.  We're part of the way through

6    those twelve.  We are on the verge of identifying and then

7    attempting to schedule a much larger second round of

8    interviews, in the neighborhood of some thirty to forty people.

9            I think it's fair to assume that many, most, or even

10   all of the deponents in the RMBS litigation, who must be

11   deposed now before November the 16th, are the very same people

12   we're going to need to talk to.  You can see where I'm going

13   with this, Your Honor.  And obviously this is not a fault

14   issue; it's not anything other than just an intractable

15   problem:  the same witness can't be in two places at the same

16   time, for either preparation or for the actual interview.

17           With the RMBS litigation, fact discovery, closing of

18   witnesses, depositions ending on November the 16th, we then are

19   starting to look at a window for us, and of course very quickly

20   we find ourselves not too long after that into the December

21   period.  And all experience teaches that although the examiner

22   and his professionals don't intend to slack off in December,

23   it's just as a practical matter very hard to pin down a bunch

24   of witnesses.  And so that latter half of December is a tough

25   time.

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1    And then, of course, when all that is said and done,

2    after we've done everything that we've done, we still owe you a

3    report.  It will be great to take a lot of depositions and

4    interviews, and great to read a lot of documents, but

5    ultimately that has to be written up.

6    And so although we recognize the need for getting the

7    examiner's report out very promptly, and we projected an early

8    February delivery date when we did our scope order, I'm not at

9    this point formally asking for relief from that.

10   THE COURT:  You're just putting everybody on notice

11   that there may be a problem.

12   MR. LEMAY:  Mr. Gonzalez said that he thought Judge

13   Glenn would want to know about it sooner or later --

14   THE COURT:  This is true.

15   MR. LEMAY:  -- or sooner rather than later.  So that's

16   one of the reasons he sent me down here.

17   I know everybody's eagerly awaiting the examiner's

18   report; it's obviously very important input into plan

19   negotiations.  On the other hand, I think we all heard from the

20   bench, and correctly heard from the bench, at a prior hearing

21   that there should be no notion that the case is on ice until

22   then, and that all these other parties can be doing a lot of

23   good work in the meantime; and we know we're doing that.

24   We'll do our best.  We'll do everything we can.  I am

25   not, Your Honor, at this point in a position to say I want an

RESIDENTIAL CAPITAL, LLC, ET AL.                                          77

1  extension or how much of an extension I want; we're meeting

2  with Mr. Gonzalez this afternoon to talk about that and some

3  other things.  But I just wanted to make sure that the Court

4  wasn't taken by surprise.

5          THE COURT:  Thank you very much, Mr. LeMay.

6          MR. LEMAY:  Thank you, Your Honor.  Your Honor, may I

7  be excused?

8          THE COURT:  You certainly can.

9          MR. LEMAY:  I need to get back to a meeting with the

10 examiner.

11         THE COURT:  Absolutely.

12         MR. LEMAY:  Thank you.

13         THE COURT:  All right --

14         MR. PRINCI:  Your Honor, may I also be excused?

15         THE COURT:  Certainly, Mr. Princi.

16         MR. PRINCI:  Thank you, Judge.

17         THE COURT:  Mr. Marinuzzi, are you going to pick up?

18         MR. MARINUZZI:  I will, Your Honor.  Good afternoon,

19 Your Honor.  For the record, Lorenzo Marinuzzi, Morrison &

20 Foerster.  Your Honor, before we get into the contested

21 matters, just a bit of good news for the Court.

22         I'm going to assume it's not something I said.

23         Your Honor, at a hearing about a month ago, raised

24 with everyone in court the fact that Your Honor had denied the

25 debtors' motion seeking approval of a key employee incentive --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    78

1          THE COURT:  Right.

2          MR. MARINUZZI:  -- program.  And we went back to the

3    drawing board and we worked with the U.S. Trustee and the

4    committee to restructure that program in a way that we thought

5    addressed the Court's concerns and the concerns of the U.S.

6    Trustee.  And we're pleased to have filed yesterday a motion

7    asking Your Honor to approve the KEIP program as modified.  In

8    connection with that filing, we took Your Honor up on Your

9    Honor's invitation to do it on short notice.

10          So I don't know if the order's been entered, but we

11   would ask that, to the extent Your Honor was agreeable to doing

12   so, that it be heard on the 17th, with objections due at noon

13   on the 15th.  We hopefully will not see any objections, and we

14   hope that it satisfies Your Honor's concerns as expressed in

15   the decision denying the original KEIP.  I wanted to bring that

16   up for the Court.

17          THE COURT:  Okay.  I didn't see the order.  I clearly

18   made clear I was prepared to do this on shortened time.  The

19   order will be entered, putting it on for the 17th with the 15th

20   as a deadline.  Hopefully there won't be objections, but we'll

21   see.

22          MR. MARINUZZI:  Thank you, Your Honor.

23          THE COURT:  Thank you very much.

24          MR. MARINUZZI:  Thank you.  So that brings us to the

25   debtors' application to pay PwC and otherwise perform under the

1  consent order and the related 327(e) retention applications for

2  Pepper Hamilton and Hudson Cook.  And when we were here last on

3  the 27th, the debtors expressed a view that the consent order

4  is the consent order and we have obligations.  And we

5  sympathize certainly with everybody's view, including our own

6  obviously, that it's a very expensive foreclosure review and

7  that we would like to think that reasonable people thinking

8  about this reasonably could come to some other resolution that

9  would cost the estate less money and also provide the benefits

10  that the entire review is designed to provide to those that

11  have been injured through the foreclosure process.

12          And after that hearing, we met with the committee, a

13  very lengthy meeting; told them the story about the foreclosure

14  review and the consent order; expressed our views again; and

15  committed to work with them to see if there is some resolution

16  that allows us to continue to perform the obligations we

17  believe we have to perform under the consent order, but leaves

18  open the possibility that we can continue some discussions with

19  the Fed to see if maybe they'll have a change of heart.

20          And so what we arrived at, Your Honor, was presenting

21  interim orders that are based on the original proposed orders

22  that were submitted with the applications.  And I believe

23  copies of the marked orders were brought to chambers this

24  morning; if Your Honor doesn't have one --

25          THE COURT:  I didn't --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    80

1      MR. MARINUZZI:  -- I'd like to hand one up.

2      THE COURT:  I didn't see them, so why don't you --

3      MR. MARINUZZI:  Okay.  And we'll start with

4  PricewaterhouseCoopers.

5      THE COURT:  Okay.

6      MR. MARINUZZI:  Your Honor, this reflects the comments

7  and thoughts from the two parties that objected:  the committee

8  and Wilmington Trust; we shared it this morning with

9  Mr. Masumoto, who I don't see; I don't know if he has any

10  comments or questions on the order.  But it is fairly easy to

11  see what we've done here.  We've converted the order into an

12  interim order; the idea is that it'll be an interim order for

13  approximately ninety days, and we'll have a hearing around the

14  ninetieth day where we'll ask the Court to enter it on a final

15  basis in the absence of some other resolution.

16      The modifications:  Obviously, the preamble reflecting

17  the pleadings that were filed in connection with the motion.

18  And we've modified the operative language in the order to show

19  that this is being granted on an interim basis, to make it

20  clear that the costs payable to PwC are allocable to GMAC

21  Mortgage, which is a concern that Wilmington Trust had.  And

22  paragraph 3 of the consent order says GMAC Mortgage shall

23  conduct the foreclosure review.  We've also reflected that the

24  authority granted to the debtors to perform their obligations

25  under the consent order, which was part of the original GA

RESIDENTIAL CAPITAL, LLC, ET AL.                                        81

1    servicing order, were ratified by the Court.  And again, this

2    is all on an interim basis.

3         And what we're going to try to do -- because under the

4    consent order, the Fed will call us up and say, we need you to

5    do X, Y and Z.  And Your Honor may recall at the hearing on the

6    27th, I indicated that the Fed had agreed on a form of

7    engagement letter for Grant Thornton, which obviously the

8    debtors and Grant Thornton had agreed to as well, and that's to

9    fulfill the obligations set forth in paragraph 22 of the

10   consent order, for a validation agent.  That's something we

11   have to do.

12        And so the question -- and we posed this in our reply

13   papers that we filed on Monday -- is, is this something we can

14   do because the consent order requires it to do, without having

15   to come back to Your Honor with an application, spending the

16   money, which at the end of the day we know we're going to have

17   to engage the validation agent?  We hope that we don't have to

18   come back to court with an application on that, but that's just

19   an example of the things that we're going to tell the committee

20   that we need to do.  And we've agreed to give them an

21   opportunity, to the extent they think that maybe it's not

22   something we're required to do under the consent order or maybe

23   there's some alternative they'd rather have this Court

24   consider:  They can come to court and they could ask Your Honor

25   to change the status quo or prevent us from doing that which we

1  believe we need to do.  I think this accomplishes the goals

2  that we're really trying to accomplish here, which is to comply

3  and to give the committee the opportunity, which we are going

4  to further, to have a conversation with the Fed -- we're

5  arranging for those calls -- they've already sent

6  communications to the Fed to try to arrange for this -- and see

7  if there's something we can do during this ninety-day period to

8  change the cost of this.  At the same time, we can comply;

9  we'll give the committee notice.  If they think that there's

10 something wrong with what we're trying to do, they have an

11 opportunity to come to court.  And I think it resolves our

12 concerns as best as we can.

13         THE COURT:  I read your reply; the reply described --

14 I didn't see the marked-up order, but I read the reply.  And

15 may I hear from the committee?  Mr. Eckstein.

16         MR. ECKSTEIN:  Your Honor, Kenneth Eckstein with

17 Kramer Levin, on behalf of the creditors' committee.  I'm just

18 happy to be back to work.

19         THE COURT:  Holidays are over?

20         MR. ECKSTEIN:  Holidays are over.  Your Honor, as is

21 I'm sure apparent to you, we were mindful of the Court's

22 observations at the last hearing, where Your Honor expressed

23 some interim views.  And we're also mindful, Your Honor, that

24 to the extent we can try to accomplish things without embarking

25 on discovery, we really do want to try to do that.  And so we

1   suggested this approach really as an opportunity to avoid a

2   dispute regarding whether or not the consent order does or

3   doesn't have to be applied as written.

4           We may prove to be maybe naive a bit in terms of

5   hoping to deal with the Fed, but we have delivered a letter to

6   the Fed, and the debtor has assured us that they would like to

7   work with us to try to have a conversation with the Fed.  We

8   understand that this goes beyond just the Ally/ResCap order;

9   there are many orders in place affecting many institutions.

10  And we appreciate that there may be policies that may be

11  difficult to modify.

12          That said, ResCap is a Chapter 11 debtor and we think

13  that is a unique factor that we'd like to try to --

14          THE COURT:  With the Fed --

15          MR. ECKSTEIN:  -- impress upon the Fed.

16          THE COURT:  -- you'll either get relief from the Fed

17  or you won't.  I don't --

18          MR. ECKSTEIN:  So I think that's right.

19          THE COURT:  It's --

20          MR. ECKSTEIN:  So, basically --

21          THE COURT:  It is fairly extraordinary that the fifth

22  largest mortgage servicer, at least when the case started out,

23  is going to spend probably in excess of 250 million dollars

24  just to have professionals review what's being done, as opposed

25  to granting relief to the people who needed it.  But -- you

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                84

1   know?

2           MR. ECKSTEIN:  So we're going to use our best efforts

3   to see whether or not we can have a constructive dialogue

4   and --

5           THE COURT:  Are you agreeable to the form of the order

6   that's been presented?

7           MR. ECKSTEIN:  We're agreeable to the form of the

8   order.  We are deferring any issues with respect to allocation

9   between ResCap and Ally; I think at the last hearing that was

10  reserved, and we understand that that's an issue that will be

11  dealt with at a later date either by the Court or by the

12  examiner.  But for the meanwhile, this is a process that we

13  think is in the best interests of all parties involved.

14          THE COURT:  Thank you.

15          Anybody else want to be heard?  Mr. Schrock?

16          MR. SCHROCK:  Good morning, Your Honor.

17          THE COURT:  It's still morning.

18          MR. SCHROCK:  On behalf of AFI and Ally Bank.  We're

19  agreeable to the form of order.  I just did not want Your Honor

20  to be surprised that this issue of compliance with the consent

21  order, compliance with the DOJ settlement, it also comes up in

22  the context of the sale of the platform.  We did file a limited

23  objection and reservation of rights.

24          THE COURT:  I was interested to see that you're

25  objecting to the sale to Nationstar.

RESIDENTIAL CAPITAL, LLC, ET AL.                    85

1      MR. SCHROCK:  Well, Your Honor, I frame it mostly as a

2  reservation of rights, and we want to make sure the purchase --

3      THE COURT:  I didn't read it that way.  I read it and

4  I was surprised to see you're objecting to the sale to

5  Nationstar.  But, so be it.

6      MR. SCHROCK:  Purchaser has to pick up the obligations

7  for the consent order, that is clear, and as well as the

8  debtors have to remain compliant.  So, while we're agreeable to

9  put it off for a period of time, I just wanted the Court to be

10  mindful that it will probably come up again.

11      THE COURT:  All right.  Thank you, Mr. Schrock.

12      MR. SCHROCK:  Thank you.

13      THE COURT:  Anybody else wish to be heard?

14      MS. LIGHTNER:  Your Honor, Mark Lightner from Clearly

15  Gottlieb, on behalf of the Wilmington Trust.  We've reviewed

16  the order and it's okay.

17      THE COURT:  All right, thank you.

18      Anybody else wish to be heard?

19      All right, Mr. Marinuzzi, I'm going to grant the

20  pending motion to the extent of approving the interim order

21  that's been presented to the Court.  I have now had a chance to

22  look at it, and I'm certainly familiar with the matter, so I

23  will go ahead and approve that.

24      MR. MARINUZZI:  Thank you, Your Honor.  There's a

25  blank that we need to fill in, or chambers could fill in,

1    regarding final hearing.  The idea behind the order is that

2    it's effective for ninety days.  I don't think Your Honor has

3    anything on the calendar for January 14th, but I might be

4    mistaken.

5            THE COURT:  I'm not even going to respond to that.

6    But go ahead.

7            MR. MARINUZZI:  I don't know if Your Honor wants to

8    take the time to think of a different date to have a hearing on

9    this.

10           THE COURT:  It wouldn't be the first matter that had

11   gotten resolved by a second interim order as well.  But I'll

12   leave that initially to the parties to see whether they can

13   work that out.  You know, we're going to finish the trial day

14   at 8:45 p.m.  Would you like to take it up then, Mr. Marinuzzi?

15           MR. MARINUZZI:  Sure, Your Honor.

16           THE COURT:  That'd probably provide an incentive to

17   see whether everybody can get the issue resolved.

18           MR. MARINUZZI:  That's fine, Your Honor.

19           THE COURT:  So, schedule it for the 14th; it'll be at

20   the end of the calendar.

21           MR. MARINUZZI:  Okay.  Thank you, Your Honor.

22           MR. ECKSTEIN:  That's the Monday -- that's the first

23   trial day?

24           THE COURT:  That's the beginning, the first day of the

25   trial.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                                      87

1          MR. MARINUZZI:  That's the first trial day.

2          MR. ECKSTEIN:  That sounds perfect.

3          THE COURT:  Right, right, right.

4          MR. MARINUZZI:  Your Honor --

5          THE COURT:  It's an incentive to everybody to see

6    whether you can either come to an agreement completely or a

7    second interim order or --

8          MR. MARINUZZI:  Or a timed trial.

9          THE COURT:  Yeah.

10         MR. MARINUZZI:  Your Honor, I want to just go back to

11   Grant Thornton for a second, because we did commit, in the

12   pleading that we filed earlier this week, that we would try to

13   get the engagement letter to the committee and the U.S. Trustee

14   and with the Court; but it's subject to the Fed's signoff.  And

15   this morning at 9:14, I received an e-mail from the Fed that

16   said they consider the engagement letter to be confidential

17   regulatory information and should not be disclosed without

18   prior permission from the board of governors; any request to

19   disclose or access confidential supervisory information should

20   be submitted pursuant to 12 CFR 261.22.  I can't make this up.

21         And so we're going to provide the Fed with a written

22   request that they authorize us to release it.  So we're doing

23   the best we can to provide as much information as we can, but

24   we have to operate within these constraints.

25         THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                          88

1    MR. MARINUZZI:  Your Honor, then it's really the same

2    argument with respect to the application to retain --

3    THE COURT:  Yeah, let me just -- you had the

4    applications to retain Pepper Hamilton --

5    MR. MARINUZZI:  And Hudson Cook.

6    THE COURT:  -- and Hudson Cook?

7    MR. MARINUZZI:  Correct.

8    THE COURT:  And you have an interim order to present

9    with respect to them as well.

10   MR. MARINUZZI:  That's correct, Your Honor.  I'm happy

11   to hand it up.

12   THE COURT:  Is that agreed to as well?

13   MR. MARINUZZI:  Your Honor, yes, it is.

14   THE COURT:  All right, that's approved as well.

15   MR. MARINUZZI:  Okay, and we'll fill in the date.

16   THE COURT:  Okay, I've --

17   MR. MARINUZZI:  We'll submit it to chambers.

18   THE COURT:  Yes, okay.

19   MR. MARINUZZI:  Your Honor, that's all I have.  Next

20   item on the agenda is the debtors' motion approving procedures

21   by which third parties can request and obtain stipulated relief

22   in the automatic stay.  I'll turn --

23   THE COURT:  Right, and as I under --

24   MR. MARINUZZI:  -- this over to Norm Rosenbaum.

25   THE COURT:  Well, as I understand it, you're going

RESIDENTIAL CAPITAL, LLC, ET AL.                                89

1  forward with the proposed order with respect to everybody other

2  than Bank of America, and reserving as to Bank of America, and

3  still trying to work it out with Mr. Teitelbaum.

4  Mr. Rosenbaum?

5          MR. ROSENBAUM:  That's correct, Your Honor.  It's

6  JPMorgan Chase.

7          THE COURT:  Okay.  I admit I said Bank of America.

8  It's JPMorgan Chase.  All right.  I'm familiar with the matter.

9  The motion is granted; obviously, it's reserved as to JPMorgan

10 Chase; hopefully you'll be able to work it out.

11         MR. ROSENBAUM:  Thank you, Your Honor.  We'll submit

12 the order.

13         THE COURT:  Okay.  Thank you.

14         MR. MARINUZZI:  Your Honor, that, I believe, brings us

15 to the renewed motion of Paul N. Papas, II --

16         THE COURT:  Yes.  We're going to take a ten-minute

17 recess --

18         MR. MARINUZZI:  Fine, Your Honor.

19         THE COURT:  -- before I launch into those.

20         MR. MARINUZZI:  Thank you, Your Honor.

21    (Recess from 11:51 a.m. until 12:09 p.m.)

22         THE COURT:  Please be seated.  Sorry.  Okay.  Who is

23 going to pick up here?

24         MS. MARTIN:  Good morning, Your Honor.  Samantha

25 Martin from Morrison & Foerster on behalf of the debtors.

RESIDENTIAL CAPITAL, LLC, ET AL.                                90

1   I believe the next item on the agenda is Mr. Papas'

2   motion to convert the cases.

3         THE COURT:  All right.  Is Mr. Papas present?

4         MS. MARTIN:  I believe he may be --

5         MR. PAPAS:  Yes, I am, Your Honor.

6         THE COURT:  Go ahead Mr. Papas --

7         MR. PAPAS:  Can you hear --

8         THE COURT:  -- go ahead and argue your motion.

9         MR. PAPAS:  Good morning.  How are you?

10        THE COURT:  It's afternoon, but go ahead, Mr. Papas.

11        MR. PAPAS:  Okay.  All right.  Thank you.  I take it

12  you have read my renewed motion, the memorandum in support, and

13  my reply.

14        THE COURT:  I did.  I read everything.

15        MR. PAPAS:  Okay.  I do want to make a comment

16  initially.  On my reply, I only addressed ResCap.  I did not

17  address the unsecured creditors' committee, their objection,

18  simply because it came in after the date that I noticed for the

19  objections to be filed, which is October 1st.  Now I do see

20  that their objection is essentially the same as ResCap's.

21        Basically, I'll give you a very brief history of how

22  GMAC and I came together.  I've been in the real estate

23  business since 1970 professionally, and we buy a lot of short

24  sales.  We negotiate short sales.  We fund or help fund and

25  raise financing for various-sized companies.  And one of the

RESIDENTIAL CAPITAL, LLC, ET AL.                                          91

1  fundamental things that we do is we always find out what it is

2  that the company owns before there can be any financing

3  arranged.

4         We always want to know what's available to be

5  attached, if you will, encumbered, so that we can see what

6  might be available so that a potential client who has funds may

7  want to invest or help that company out.  So that's the premise

8  of my motion.

9         But GMAC and I came together in approximately 2008

10 when I was negotiating short sales for one particular woman in

11 Arizona.  She owned five different properties.  And during that

12 period, I recorded options to purchase.  Then shortly

13 thereafter, for whatever reason, she filed bankruptcy

14 protection in Chapter 7.  So then I became a creditor in that

15 particular case.  I attended a hearing where I expressed my

16 desire to purchase those five properties, and I continued to

17 negotiate with the different -- the five different lenders in

18 order to work out the short sale options on each of those

19 properties.  The only property that we were able to come to

20 some agreement with was GMAC.  All the documents are available;

21 but the short version is at the time when they filed their

22 motion for relief from stay, they did not notice me and those

23 documents are available.

24        So then I filed for a hearing and had a hearing at the

25 bankruptcy court in Arizona where I attended in person and GMAC

RESIDENTIAL CAPITAL, LLC, ET AL.                                    92

1    was represented by Pite Duncan.  And the short version is that

2    the bankruptcy court judge ruled that they should have noticed

3    me and he was not going to reverse the auction sale because

4    they had sold it to a third-party, and he told me that my

5    relief was in the state superior court.  So then we proceeded

6    in the state superior court, and from there, that -- it turns

7    out that that party who had the purchase -- had purchased the

8    property at the auction was an entity that didn't exist and

9    then they were -- they are a defendant in that suit.  And then

10   they turned around and they sold the property during the period

11   of the pendency of the suit, shortly -- and it was well after

12   they were served.

13        So what we have there is several violations of the

14   Uniform Fraudulent Transfer Act, and that's why I keep

15   mentioning it because this is a pattern that keeps occurring.

16   There's a property that's mentioned in this particular case.

17   It's in Marlboro, Massachusetts.  And in that particular case,

18   there was a purchase and sale agreement that was properly

19   executed with the proof of funds presented to GMAC through

20   common law, and for whatever reason, they had the auction

21   anyway, even though it was well-stated and it's well-documented

22   that if the woman had a purchase and sale agreement, then they

23   would postpone the auction and they would allow her to sell the

24   property so that she could pay off the mortgage out in full,

25   because the price that we were offering happened to exceed the

RESIDENTIAL CAPITAL, LLC, ET AL.                                      93

1  amount of the mortgage because that particular property at that

2  particular time still had equity in there.  I don't believe it

3  does today but at the time it did.  And so that's -- now the

4  property in Marlboro, Mass.

5          There's another property that's mentioned in these

6  documents and that's a property in Scottsdale, Arizona.  And

7  that property, GMAC had the mortgage.  They sold it to Fannie

8  Mae and then they rescinded the sale.  And then again, this

9  year, while the stay was on --

10         THE COURT:  Mr. Papas, let me try and focus you.

11 What's the specific basis on which you seek to convert this

12 Chapter 11 case to a case under Chapter 7?

13         MR. PAPAS:  Sure.  Okay.  The papers --

14         THE COURT:  Because I've read all your papers, Mr.

15 Papas.

16         MR. PAPAS:  Okay.

17         THE COURT:  Not only this set of papers but the prior

18 motion that you filed.

19         MR. PAPAS:  Okay.  All right.  Well I appreciate that.

20 My basis is bad faith and misconduct of the debtors, because my

21 belief is that they -- that the debtor has not properly stated

22 what they own; that their schedules are not correct and that's

23 why I attached the deed and several other documents to show

24 that on one hand, they're saying that they own certain things

25 and they don't, because the documents don't show that out.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    94

1    On the other hand, they're saying they do not own

2    property when, in fact, there's a deed that says they do.  So

3    it goes back to very simple; they have not been truthful and

4    forthright with the Court in exactly delineating what they

5    owe -- what they own.

6          Now I don't know what else may be amiss because I

7    don't have access to all the documents and I'm not an

8    accountant, but the problem is that there's no way of knowing

9    exactly what the estate is.  So before there's a sale, there

10   should be an exact accounting of what is available for sale.

11   And because of the various violations which I go through in the

12   documents, and I can easily give you more, it's my belief that

13   they have conducted fraudulent transfers for things that they

14   don't own.  And so for that reason alone, I think everything

15   should come to a stop until such time as we actually know

16   what's available.  Now --

17         THE COURT:  All right.  I'm going to cut you off

18   there.  I understand your arguments, Mr. Papas.

19         MR. PAPAS:  Okay.  All right.

20         THE COURT:  Go ahead, counsel.

21         MS. MARTIN:  Thank you, Your Honor.

22         THE COURT:  Just pull the microphone a little closer.

23         MS. MARTIN:  Sure.

24         THE COURT:  Thank you.

25         MS. MARTIN:  Before I begin discussing the merits of

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                     95

1  Mr. Papas' conversion motion, I would just like to take a

2  minute to discuss the relationship between Mr. Papas and the

3  debtors.  To start, there is no relationship, Your Honor.  Mr.

4  Papas is not a borrower to GMAC under a mortgage loan.  He's

5  also not a party to or beneficiary of any of the servicing

6  agreements.  He appears to be concerned with GMAC because he's

7  interested in purchasing certain properties that are from GMAC

8  borrowers, as he mentioned; and those borrowers typically are

9  going through foreclosure or eviction proceedings.

10        Due to this attenuated relationship, Mr. Papas has

11  participated in several proceedings among the debtors and

12  certain borrowers; and in one instance, he was named as a

13  defendant in a lawsuit along with GMAC because the borrower

14  noted that Mr. Papas claimed to have an interest in all of

15  GMAC's property and he had given the borrower permission to

16  continue residing there.

17        In several of these actions, Mr. Papas has filed

18  numerous, frivolous pleadings which have been denied.  In the

19  first case, which I believe is the case that Mr. Papas just

20  mentioned in the Superior Court of Arizona, case number CV-

21  2010-050028, Mr. Papas was actually sanctioned and ordered to

22  pay GMAC's attorneys fees of approximately 13,000 dollars, and

23  he was also later prohibited by that court from making any

24  future filings against GMAC and from serving additional

25  discovery requests on GMAC in that case without prior court

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                          96

1    approval.

2              With this --

3              MR. PAPAS:  Well that information is not --

4              THE COURT:  No, please don't interrupt.  No one

5    interrupted you, Mr. Papas.

6              MR. PAPAS:  Sorry.

7              THE COURT:  Go ahead.

8              MR. PAPAS:  Sorry.  Sorry.

9              MS. MARTIN:  With this background in mind, I would

10   like to turn to the conversion motion.  As you noted earlier,

11   Mr. Papas is seeking to convert the debtors' Chapter 11 cases

12   to Chapter 7 cases without providing legal or factual support.

13   The bankruptcy court (sic) provides that the Court may convert

14   a case or dismiss it if the movant shows by a preponderance of

15   the evidence that cause exists for conversion unless the Court

16   determines that the appointment of a trustee or examiner is in

17   the best interests of the creditors and the estate.  And, Your

18   Honor, Mr. Papas has not met that burden here.

19             For the reasons described in our reply or our

20   opposition, I should say, Mr. Papas did not establish cause as

21   defined by Section 1112(b)(4).  He makes general allegations

22   regarding the bad faith and misconduct of the debtors but does

23   not address them with any specificity.

24             With respect to some of the issues Mr. Papas just

25   raised on the phone, the debtors do believe their schedules are

RESIDENTIAL CAPITAL, LLC, ET AL.                    97

1  correct as of the petition date.  Some of the documents to

2  which Mr. Papas refers are dated as of different dates and

3  thus, there is probably a discrepancy there because the

4  property was transferred in the interim.  To the extent the

5  debtors discover that there are any errors in their schedules,

6  they can amend those and there's no reason for the Court to

7  convert the cases on that basis.

8         In addition, with respect to Mr. Papas' other point,

9  the debtors are not seeking to sell any assets that they don't

10 own.  The purchase agreements will provide representations that

11 the debtors own the assets they are selling.  And to the extent

12 the purchasers discover otherwise or any of the parties

13 discover otherwise, those assets will not be sold by the

14 debtors to the purchasers.

15        Going back to some of the reasons we set forth in our

16 opposition, this Court has already appointed an examiner to

17 oversee the Chapter 11 cases.  The debtors believe that any

18 further oversight in Chapter 7 is unnecessary and unwarranted.

19 In addition, liquidation under Chapter 7 would not provide a

20 maximum return to creditors, especially as compared to the

21 proposed return that the debtors anticipate from the upcoming

22 sales and some of the other issues in these cases.

23        Third, Mr. Papas relied in part on the Gilbert motion

24 which Your Honor has already denied.  The Gilberts sought to

25 dismiss these cases, and Your Honor determined that the

RESIDENTIAL CAPITAL, LLC, ET AL.                                      98

1  Gilberts did not establish cause for dismissal and I should

2  note that that motion was brought on substantially similar

3  grounds.

4          And finally, the Bankruptcy Code provides that the

5  Court may not convert the case if the Court decides that it is

6  not in the best interest of creditors and the estates; and we

7  believe that is the case here.  The debtors are poised to sell

8  substantially all of their assets in the near future.  We also

9  have established that it's in our best interest to continue

10 operating in the ordinary course of business until those sales

11 can be consummated.

12         And finally, the debtors are negotiating a plan of

13 reorganization with their major constituents, and it is likely

14 to be confirmed within a reasonable period of time.

15         THE COURT:  Thank you.

16         MS. MARTIN:  Thank you.

17         THE COURT:  All right.  I don't need to hear any

18 further argument.  The Court's prepared to rule.  On September

19 14, 2012, Mr. Papas submitted the renewed motion to convert

20 debtor to Chapter 7 bankruptcy.  It's at ECF docket number

21 1472.  On September 21st, Mr. Papas also filed a memorandum in

22 support of motion to convert debtor ResCap to Chapter 7.

23 That's at ECF number 1547.

24         The debtor filed its objection.  The creditors'

25 committee likewise filed an objection.  On October 5th, Mr.

1   Papas filed a reply to debtor ResCap/GMAC opposition to motion

2   to convert the debtor to Chapter 7.  That's at ECF 1731.

3        The issues raised by Mr. Papas' motion have previously

4   been considered and rejected in connection with the Court's

5   opinion in connection with the Gilbert motion to lift the

6   automatic stay.  The Gilbert motion was found at ECF docket

7   number 274, and the Gilberts sought dismissal of the underlying

8   Chapter 11 bankruptcy based upon the bad faith and misconduct

9   of the debtors.

10        In this renewed motion, Mr. Papas seeks conversion

11   because of "the bad faith and misconduct of the debtor

12   ResCap/GMAC."  That's ECF 1472 at paragraph number 4.

13        The standards for dismissal or conversion are set

14   forth in Bankruptcy Code Section 1112(b).  Just bear with me a

15   second.

16        The moving party has the burden of demonstrating cause

17   for conversion.  See In re: MF Global Holdings, Ltd. 465 BR

18   736, 742 (Bankr. S.D.N.Y. 2012).  And MF Global cites other

19   cases for that same proposition.

20        Section 1112(b)(4) provides sixteen examples of events

21   that constitute cause, but the list is not exhaustive, leaving

22   courts the option to consider other factors.  Bankruptcy judges

23   have wide discretion to determine whether cause exists to

24   dismiss or convert a case under Section 1112(b).  Once the

25   moving parties establish cause, the burden shifts to the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    100

1  respondent to demonstrate by evidence the unusual circumstances

2  that establish that dismissal or conversion is in the best

3  interests of creditors and the estate.  See 7 Collier on

4  Bankruptcy, paragraph 1112.05, subsection 1.

5          The Court has carefully reviewed Mr. Papas' papers,

6  and they set forth no evidentiary or legal support for

7  conversion of this case to a case under Chapter 7.  The Court

8  further concludes that Mr. Papas' motion is frivolous.  Any

9  effort by Mr. Papas to renew the motion in the event that -- or

10 seeks similar relief on alternate grounds, the Court will

11 entertain a motion by the debtors to impose sanctions against

12 Mr. Papas.  For the foregoing reasons as explained, the current

13 motion is denied.  Debtors' counsel should submit an order that

14 indicates for the reasons stated on the record, the motion is

15 denied.  Thank you.

16          Next matter?

17          MS. MARTIN:  Thank you.

18          MR. PAPAS:  Thank you.  I'll be filing my appeal.

19          MR. NEWTON:  Good afternoon, Your Honor.  James Newton

20 of Morrison & Foerster on behalf of the debtors.

21          The next items on the agenda are three or four motions

22 filed by Kenneth Taggart, who you're familiar with.  I'll just

23 run through them real quickly and then I'll cede the podium to

24 Mr. Taggart.

25          The first one, item number 6 on the agenda is a motion

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    101

1    to reconsider this Court's prior order on Mr. Taggart's first

2    motion for relief from the automatic stay.  That motion is

3    located at docket number 1397.  Mr. Taggart would like the

4    Court to reconsider, because he believes the Court didn't

5    address all of his concerns or the concerns he had raised in

6    that motion.

7         Item number 7 on the agenda is what we'll call the

8    first sanctions motion.  It's filed at docket number 1114.

9    This motion seeks, based on similar issues raised in the

10   reconsideration motion, to have the Court void all pleadings in

11   Mr. Taggart's underlying foreclosure proceeding since the

12   petition date and impose sanctions on the debtors for delay in

13   filing a notice of bankruptcy.

14        Item number 8 on the agenda is Mr. Taggart's amended

15   sanctions motion.  This again raises similar issues as the

16   previous two motions and seeks to void pleadings in two appeals

17   Mr. Taggart has taken from orders in the foreclosure proceeding

18   and also to impose sanctions on the debtors for the same

19   reason, for not -- for failure to file a notice of bankruptcy

20   in those cases.

21        And the final motion is item number 9 on the agenda,

22   it's docket number 1587.  It's a motion by which Mr. Taggart

23   seeks to have the debtors remove certain purported assets, Mr.

24   Taggart's mortgage and note from the assets of the estate.

25        Mr. Taggart's motions; with that, I'll cede the podium

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    102

1  to Mr. Taggart.

2            THE COURT:  All right.  Mr. Taggart?

3            MR. TAGGART:  Good afternoon, Your Honor.

4            THE COURT:  Good afternoon.

5            MR. TAGGART:  Okay.  May I proceed?

6            THE COURT:  Go ahead.

7            MR. TAGGART:  Okay.  Yeah, I just want to first let

8  the Court know, I believe Mr. -- I'm sorry, Mr. Newton, is it?

9            MR. NEWTON:  Yes.

10           MR. TAGGART:  Mr. Newton, I'm sorry -- I believe

11  mischaracterized the motion.  He's calling, at least the first

12  motion, a motion for reconsideration from the stay.  I'm not

13  seeking -- I initially came before this Court to seek

14  clarification of the stay in which the Court issued an order.

15  Upon issuing that order, there were several pleadings going on

16  at the time -- at least part of the time -- in which the Court

17  was -- before this came upon the Court.

18           I'm seeking, pursuant to the Bankruptcy Code, for

19  those pleadings in the state foreclosure case to be voided.

20           THE COURT:  The foreclosure case is a case that the

21  debtors commenced against you.

22           MR. TAGGART:  Correct.

23           THE COURT:  Do you understand that the automatic stay

24  does not apply to a case that the debtors bring but only

25  against actions that you would bring against the debtor?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    103

1      MR. TAGGART:  Yeah, I do.  My point being is they

2  asserted just to bring -- refresh the Court's memory if -- they

3  asserted with the Court in the state court, thirty-two

4  counterclaims -- I'm sorry, only one of the thirty-two

5  counterclaims could proceed against them.

6      THE COURT:  But you asserted thirty-two counterclaims.

7      MR. TAGGART:  I'm sorry, I filed thirty-two

8  counterclaims against GMAC Mortgage.

9      THE COURT:  And the issue was under supplemental

10  servicing order, it permits you to proceed with any affirmative

11  defenses but not to seek affirmative recovery from the debtors.

12  Do you understand that?

13      MR. TAGGART:  I do.  My point is they filed with the

14  Court, a notice to the Court that only one of the thirty-two

15  claims could continue.  So for approximately, I believe until

16  June 6th until July 18th, I was not able to proceed in state

17  court with those claims and I was burdened with filing answers,

18  coming back here.  So they were proceeding with their case,

19  whereas I was prejudiced.  I could not proceed with my case.

20  Do you understand my point?

21      THE COURT:  Go ahead, Mr. Taggart.

22      MR. TAGGART:  Okay.  So yeah, I was just looking for

23  in my opinion, to void those pleadings and sanctions.

24      THE COURT:  Mr. Taggart, it seems to me that every

25  time you've lost an issue in state court, you come running here

RESIDENTIAL CAPITAL, LLC, ET AL.                                104

1   and you seek to have this court void whatever order a state

2   court has entered against you.

3          MR. TAGGART:  They didn't --

4          THE COURT:  That's what I read this -- I mean, I have

5   a stack of motions that you have filed.  You have been before

6   the Court before.  Every time there's an adverse ruling against

7   you in a state court in connection with the foreclosure action,

8   you come back here and complain that the debtor violated the

9   automatic stay, that the order that the state court entered

10  ruling against you is void.  I don't review decisions that the

11  state court enters.

12         MR. TAGGART:  Your Honor, I've only been before this

13  court one time.

14         THE COURT:  Not true.

15         MR. TAGGART:  I was only here -- as far as regarding

16  the motion that I filed.

17         THE COURT:  Go ahead, Mr. Taggart.

18         MR. TAGGART:  Yeah, so I mean I'm just seeking relief

19  that I'm entitled to, I've only been here once, under the Code.

20         THE COURT:  Well you're seeking relief.  I decide

21  whether you're entitled to it.

22         MR. TAGGART:  Yeah, that's -- yeah, I understand.  I'm

23  filing, you know, a motion to the Court to do that.

24         THE COURT:  Anything else you want to add?

25         MR. TAGGART:  Regarding the stay, yeah, there's --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    105

1   there was two appeals filed in which GMAC never filed any

2   notice of stay whatsoever.

3           THE COURT:  These were appeals that you took in the

4   foreclosure action against you, correct?

5           MR. TAGGART:  Correct.

6           THE COURT:  What is it that leads you to believe the

7   automatic stay applies in an action that one of the debtors

8   commenced against you?

9           MR. TAGGART:  I'm sorry, say that again?

10          THE COURT:  What is it that leads you to believe that

11  the automatic stay applies in a case that the debtor has filed

12  against you?

13          MR. TAGGART:  Doesn't the debtor have an obligation to

14  file a notice in court of notice of bankruptcy in each case?

15          THE COURT:  All right.  I'm going to take the matter

16  under submission and I'll explain my ruling in writing.

17          MR. TAGGART:  Yeah.  I apologize, Your Honor.  I'm

18  just --

19          THE COURT:  That's okay.

20          MR. TAGGART:  Okay.  I'm --

21          THE COURT:  Okay.  Mr. Taggart, I have been -- I've

22  tried to be very patient with you and the flurry of motions

23  that I have before me, the motion to void pleadings and

24  sanctions due to violation of Bankruptcy Code, that's ECF

25  docket 1114.  A motion for a stay order regarding limited

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    106

1  relief for stay until order on motion to void pleadings and

2  sanctions due to violation of Bankruptcy Code is issued by the

3  Court, docket 1585.  Motion to remove mortgage loan alleged by

4  Kenneth Taggart from assets of GMAC Mortgage LLC and motion to

5  prove ownership of mortgage assets, mortgages and notes,

6  Kenneth Taggart dispute assets of GMAC, docket number 1586.

7  Motion for stay to order regarding limited relief from stay

8  until order on motion to void pleadings and sanctions due to

9  violation of Bankruptcy Code is issued by the Court, docket

10 number 1397.  I have all of those motions that you have filed

11 pending before me.  I will resolve them in a written order.

12 Thank you.

13         MR. TAGGART:  Do --

14         THE COURT:  Does the debtor want to be heard?

15         MR. NEWTON:  Unless you have any questions --

16         THE COURT:  I don't.  Thank you, Mr. Taggart.

17         MR. TAGGART:  Your Honor, can I offer anything more?

18         THE COURT:  No.

19         MR. TAGGART:  No.

20         THE COURT:  I've reviewed all the papers and I will

21 issue a written --

22         MR. TAGGART:  Okay.

23         THE COURT:  -- order.

24         MR. TAGGART:  Thank you.

25         MR. ROSENBAUM:  Good afternoon, Your Honor.  Norm

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    107

1  Rosenbaum, Morrison & Foerster for the debtors.

2          Your Honor, the next matter on the agenda is the

3  motion of Deborah Bollinger and Bryan Bubnik -- excuse me --

4  for relief from the automatic stay.  Counsel for the movants is

5  here.  This is docket 677.  I will cede the podium to counsel.

6          THE COURT:  Okay.

7          MR. SCHUG:  Thank you, Your Honor.  Robert Schug, from

8  Nichols Kaster for the movants.

9          Just to provide a little bit of background, the

10  movants are ninety-one mortgage underwriters who are part of a

11  Fair Labor Standards Act collective action that was filed in

12  July of 2010 in the Western District of Washington.  We're set

13  for a trial in January and we think the most efficient way to

14  go forward is for a trial on all our defendants and not just

15  one.  Right now we've got three defendants.

16          THE COURT:  You've had the benefit of sitting in court

17  this morning -- benefit or misfortune of sitting through the

18  long docket this morning?

19          MR. SCHUG:  I have, Your Honor.

20          THE COURT:  Do you have a sense for what is on the

21  Court's docket in the ResCap matter between now and the middle

22  of January?

23          MR. SCHUG:  I do.

24          THE COURT:  What's your motion to reopen discovery?

25          MR. SCHUG:  That hasn't been addressed by the Court

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    108

1  yet.  What we had happen in this case was early on, Ally

2  Financial had represented to us that they wouldn't contest the

3  issue of whether they were an employer under the Fair Labor

4  Standards Act.  Shortly after the notice of bankruptcy was

5  filed and shortly after the Court entered summary judgment

6  against the defendants on most of their defenses, Ally

7  Financial for the first time told us hey, you know, the stay

8  applies to us.  We're not an employer.  We can't go to trial.

9         We filed a motion with the Court asking for a status

10  conference to address that before trial and if they were going

11  to present that defense at trial, to let us have some discovery

12  because it was previously the understanding from our end that

13  that issue wasn't going to be a part of the case.

14         THE COURT:  So have you been specific about what

15  discovery you want to take?

16         MR. SCHUG:  We haven't been specific.  We haven't had

17  an opportunity to address the Court specifically on that.

18         THE COURT:  Tell me, who is the judge before whom the

19  action is pending?

20         MR. SCHUG:  It's Judge Martinez in the Western

21  District of Washington.

22         THE COURT:  The class is certified in the case?

23         MR. SCHUG:  It's not a Rule 23 class.  It's a 216(b)

24  collective action.  It has been certified and there are ninety-

25  one members.

RESIDENTIAL CAPITAL, LLC, ET AL. 109

1    THE COURT:  It's opt-in?

2    MR. SCHUG:  Yes, it's an opt-in.

3    THE COURT:  And how many plaintiffs opted-in?

4    MR. SCHUG:  Ninety-one.

5    THE COURT:  How many defendants in the case?

6    MR. SCHUG:  There are three; Ally Financial, GMAC

7  Mortgage and ResCap.

8    THE COURT:  Has the judge had a hearing since the

9  bankruptcy was filed?

10    MR. SCHUG:  No, he hasn't.

11    THE COURT:  Is there one scheduled?

12    MR. SCHUG:  There isn't one scheduled.  We put in an

13  inquiry to the court about our pending request for a status

14  conference and we haven't heard back yet.

15    THE COURT:  Who is going to address this for the

16  debtor?

17    MR. ROSENBAUM:  I am.

18    THE COURT:  Mr. Rosenbaum?

19    MR. ROSENBAUM:  Your Honor, I just want to add that

20  David Golder of Jackson Lewis who is counsel for the defendants

21  in the action is on the phone, in case Your Honor had specific

22  questions about the litigation.

23    THE COURT:  And Jackson Lewis represents all the

24  defendants in the case?

25    MR. ROSENBAUM:  As of now, yes, Your Honor.  Your

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    110

1  Honor as we stated in our papers, I think the -- we've had some

2  closer cases here on stay relief but I don't think is one of

3  them.  I think the movants acknowledge in their response that

4  this is going to be at least a ten-day trial.  We contend it's

5  a fifteen-day trial but if you meet in the middle, it's still a

6  two-and-a-half week trial.  I think there's been some

7  indication in their moving papers that this is trial ready when

8  it's clearly not trial ready, although the debtors believe --

9             THE COURT:  Why do you say it's not trial ready?

10            MR. ROSENBAUM:  Well although discovery is completed,

11  it's not as if the parties have been preparing for trial.  This

12  case has been dormant really for months, and particularly since

13  we've filed.  The debtors have not prepared for trial.  That

14  would be a substantial effort.  We've put in declaration of

15  Jennifer Scoliard, in-house counsel to debtors.  We anticipate

16  the cost of preparing for trial would be somewhere in the

17  neighborhood of between 100,000 and 175,000.  The trial itself

18  would be between 400,000 and 550,000.  This is just to litigate

19  a claim against the debtors that is in the range of 75,000 to 5

20  million.  It's not an unlimited amount.  So this is a

21  substantial effort from the debtors' perspective solely to

22  litigate a claim.

23            THE COURT:  Answer this for me.  How would you propose

24  to resolve the claim, if not in the trial in Washington?

25            MR. ROSENBAUM:  Well, Your Honor, I'm not sure these

RESIDENTIAL CAPITAL, LLC, ET AL.                                    111

1   plaintiffs have filed a proof of claim; it's potential to

2   resolve it as a class action before this court.  We could do it

3   on individual basis.  We could have other procedures such as

4   mediation or ADR; and this is a process we're looking at

5   currently.  As of today, there's been 1,000 claims filed.

6   We're a month away from the bar date.

7           So how we manage all these claims is an evolving one.

8   We have thirty-eight -- approximately thirty-eight pending

9   class actions, some of which have been certified, some of which

10  haven't.  So this is really a --

11          THE COURT:  I saw that in your papers that you

12  referred to the thirty-eight.  How many certified class actions

13  are there?

14          MR. ROSENBAUM:  I don't have that answer, Your Honor.

15          THE COURT:  So here --

16          MR. ROSENBAUM:  Can I just one other --

17          THE COURT:  Go ahead, Mr. Rosenbaum.

18          MR. ROSENBAUM:  Your Honor, we may come down the road

19  in two or three months or four months and decide perhaps it's

20  best to proceed before the district court to liquidate this

21  claim.  We hadn't made that decision yet, particularly now.

22  Stay -- relief from the stay should not be granted to allow

23  that trial to go forward.

24          THE COURT:  Let me interrupt, okay.  Now is clearly

25  not the time to lift the stay to permit a trial to go forward

RESIDENTIAL CAPITAL, LLC, ET AL.                                                112

1    in district court in Washington -- the state of Washington.

2    And I say that because of the very, very large number of

3    contested matters and other important events in this Chapter 11

4    case that's scheduled between now and the end of January.  So

5    on the basis of burden alone, I will not lift the stay at this

6    point in time.

7           You say this case is not trial ready, but other than

8    the issue that's been described to me, I read it in the papers,

9    about discovery and I don't know whether that's intended to be

10   discovery against AFI or against one of the debtors, it

11   nevertheless sounds like a limited amount of discovery.  It

12   also sounds like something that may be resolved by stipulation

13   of fact, I don't know but let's assume it's not.  It's a

14   limited amount of discovery.  You haven't done too well in this

15   case so far.  The Court granted summary judgment striking two

16   of the debtors' affirmative defenses, potentially the two most

17   significant affirmative defenses, maybe not.  And so the

18   district court in the state of Washington is very familiar with

19   this case.

20          I'm going to deny the motion to lift the stay without

21   prejudice.  I guess I should add to this list of important

22   matters that are going on here, and there's certainly some of

23   them reflected in the hearings this morning, the RMBS

24   settlement which is a contested hearing.  Expedited discovery

25   has been going on for quite some time, it's quite voluminous;

RESIDENTIAL CAPITAL, LLC, ET AL.                                        113

1   the examiner's investigation; the Court is still endeavoring to

2   resolve the issue about whether FHFA will get its discovery or

3   when it will get its discovery.  So permitting a trial of this

4   collective action to proceed in January would have an extremely

5   negative effect on the debtors' ability to proceed with this

6   case.  I left out the auction and whatever motions will result

7   from the auction.  So I'm denying the motion to lift the stay

8   without prejudice.

9        What counsel in the underlying case should do -- and

10  if the debtors' trial counsel feels that the automatic stay

11  prevents it from doing this, I will on the record state I am

12  going to lift the automatic stay for the purposes of permitting

13  a case conference with the trial judge in Washington and

14  express my willingness to have a joint telephonic case

15  management conference with the Court in the underlying case.

16       It may well be that applying the Sonnax factors, that

17  the most efficient way to liquidate the claim is to permit a

18  trial to go forward; I'm not making that decision now.  It may

19  be that that isn't the most efficient way, that the claims

20  allowance process is the most efficient way.  I'm not deciding

21  that.  But what the papers show is that the trial court has

22  lived with this case for about two years, has already decided

23  against the debtors the motion for summary judgment striking

24  affirmative defenses; and there was a January trial date.

25       I'm always reluctant to interfere with the district

RESIDENTIAL CAPITAL, LLC, ET AL.                                          114

1    court's schedule, and I don't know whether in light of events

2    that have taken place or lack of events since the bankruptcy

3    was filed, whether that would be a realistic date or not but I

4    mean the earliest this matter ought to come back before this

5    court for consideration is in February or March.  I mean,

6    there's just -- the debtors appropriately are consumed with

7    very, very important matters that are critical to this Chapter

8    11 case.  And so I'm not saying that in February or March I

9    would lift the stay, but the debtors shouldn't assume that the

10    stay won't be lifted.

11              To me, I mean there are two issues:  one, when; and

12    maybe the more important issue is how, whether it's more

13    appropriate for this matter to be addressed in the claims

14    allowance process.  The fact of the matter is, there is a non-

15    debtor affiliate, AFI, it's a defendant in the case, and

16    certainly the district court can decide we're going to go

17    forward with a trial against AFI.  I mean that's for the

18    district court to decide.  Ordinarily, you know, if a separate

19    trial was required here as to the debtor that wouldn't be the

20    most efficient way to hear it but you ought to advise the

21    district court -- I'm certainly prepared to have a joint

22    conference, hear what the judge has to say about his own

23    calendar and the schedule.  But until matters settle down here,

24    which isn't going to happen until February or March, I'm not

25    going to lift the stay.  So for the reasons stated on the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    115

1   record, the motion to lift the stay is denied without

2   prejudice.

3            MR. ROSENBAUM:  Thank you, Your Honor.

4            THE COURT:  Okay.

5            MR. ROSENBAUM:  Should we submit an order?

6            THE COURT:  Yes, just simply say the motion to lift

7   the stay is denied without prejudice for the reasons stated on

8   the record.

9            MR. ROSENBAUM:  Thank you, Your Honor.  I'm sorry.

10  Thank you.

11           THE COURT:  Okay.

12           MR. ROSENBAUM:  Your Honor, the next matter on is Mr.

13  Connor's motion and --

14           THE COURT:  Right.  Is Mr. Connor present?

15           MR. CONNOR:  I am, Your Honor.  It's Joseph Connor.

16           MR. ROSENBAUM:  And, Your Honor, Erica Richards from

17  Morrison & Foerster will be addressing this.

18           THE COURT:  Okay.  Go ahead, Mr. Connor.

19           MR. CONNOR:  Thank you, Your Honor.  I see you've got

20  your hands full with huge matters, and I just have small

21  matters.  So -- and I have benefitted from sitting here, so I

22  am going to try to get you off to lunch as quick as I can.

23           I have two -- three actually small housekeeping

24  matters and -- to get out of the way, and I don't want to make

25  a meal out of anyone of them but I just want to get them done,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    116

1  stated, and over with if that's okay with Your Honor.

2          THE COURT:  Go ahead, Mr. Connor.

3          MR. CONNOR:  Okay.  Thank you.  The first is that I

4  didn't get served with the debtors' objections to this motion

5  until yesterday.  I'm not sure whether Ms. Richards ever

6  intended to serve me at all.  I assume she did but in any case,

7  I didn't get served and -- but I did get the paperwork and

8  actually partially with her cooperation last week.

9          And my point here is that it had to come in an

10 unorthodox manner, and I mean correct me if I am wrong, but I

11 think I have a right to be properly served and on time and with

12 proof of service documents.  And my only wish here is that Your

13 Honor could remind Ms. Richards that I do have that right.  So

14 that was thing number one.

15         Now also in thing number one, Ms. Richards informed me

16 on Monday morning that she was filing additional materials with

17 the Court for today's hearing and I told her I needed to be

18 served those.  Now, I don't know whether you've got them.  Ms.

19 Chung said yesterday you didn't but if you have them, I don't.

20 So I don't know what the state of these additional materials is

21 or what they are.

22         The second quick thing is that in talking with Ms.

23 Richards, I've asked her who her clients actually are and in

24 what sense she might be representing --

25         THE COURT:  Mr. Connor?

1         MR. CONNOR:  Uh-huh?

2         THE COURT:  Mr. Connor?

3         MR. CONNOR:  Yeah?

4         THE COURT:  You have filed a motion relating to

5    possible violations of the automatic stay.  Address your

6    comments to your specific motion.  I don't want to hear about

7    your back-and-forth with counsel for the debtor.  Tell me

8    why -- what it is --

9         MR. CONNOR:  Well --

10        THE COURT:  What relief are you seeking and why?

11        MR. CONNOR:  Oh, okay.  I'm sorry.  I just have

12   those --

13        THE COURT:  Mr. Connor, just tell me what relief

14   you're seeking and why.

15        MR. CONNOR:  Yes.  I asked the Court for a declaratory

16   ruling about actions that were taken by the Washington State

17   Court that I enumerated in my motion.  I did it just because it

18   seems as if a declaratory ruling is proper, that it lets

19   everybody know where they stand and it's final.  And if such

20   actions were constituted violations of the automatic stay, I

21   sought to have that plainly stated.

22        THE COURT:  What was the action that was taken that

23   violated the automatic stay?

24        MR. CONNOR:  There were three of them, Your Honor, and

25   they're in my motion.  But one was on May 18th.  That was a

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    118

1  sanctions motion that they were -- where they won.  The other

2  was on June the 8th and that was a summary judgment motion

3  which they were granted.  And then the other was one May --

4  August 31st.  It was a judgment codifying those -- all those

5  things.  So that's what's in play, and I am asking the Court to

6  decide whether or not those were violations of the automatic

7  stay.  And that's all I'm asking the Court for.  I'm not asking

8  you to void anything or vacate anything.  I'm just asking for

9  the declaration.  I don't want anybody to be hammered here.  I

10  just want the rights and duties of all the parties laid out and

11  who had jurisdiction at the time.  And that's it for that

12  motion.

13          THE COURT:  Let me hear from debtors' counsel.

14          MR. CONNOR:  Huh?

15          THE COURT:  I'm going to hear from the debtors'

16  counsel now.

17          MS. RICHARDS:  Good afternoon, Your Honor.  Erica

18  Richards of Morrison & Foerster appearing for the debtors.

19          As Mr. Connor explained, he is seeking a declaratory

20  ruling apparently that the debtors or the Washington court

21  violated the automatic stay and nothing further.  Frankly, we

22  don't understand what the purpose of nothing but a declaratory

23  ruling would be.  His position appears to be that the debtors

24  should be told that they violated the automatic stay and not

25  permitted to remedy any such violation.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                119

1        THE COURT:  Look, let's cut through it.  Did the

2    Washington -- did the court in Washington take any action that

3    violated -- that you would acknowledge violated the automatic

4    stay?

5        MS. RICHARDS:  It did, Your Honor.  It entered two

6    orders.

7        THE COURT:  Which orders?

8        MS. RICHARDS:  There was an order on May 18th.  The

9    hearing was held before the petition date but the order was

10   actually entered after the petition date.

11       THE COURT:  Well did the Court rule at the hearing?

12       MS. RICHARDS:  It did, and it asked the debtors to

13   submit a proposed order on presentment.

14       THE COURT:  So are you familiar with the law that

15   indicates that the clerk's entry of an order is a ministerial

16   act that doesn't violate the automatic stay?  If the Court

17   ruled before the petition was filed but the order wasn't

18   entered until after, that that can be viewed as a ministerial

19   act; it does not violate the automatic stay?

20       MS. RICHARDS:  I am, Your Honor. I think it gets a

21   little bit fuzzy because the hearing at which the Court entered

22   that order, I believe Mr. Connor was unable to appear

23   telephonically through no fault of his own.  So the Court

24   entered the judgment without his being present.  He

25   subsequently filed a motion for rehearing.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              120

1    THE COURT:  But I guess I come back to my question,

2    that's why I asked did the Court -- before the petition was

3    filed did the Court rule that -- it was with respect to Mr.

4    Connor's sanction motion.  He sought sanctions and prior to May

5    18th -- am I right about that?

6    MS. RICHARDS:  We sought sanctions against Mr. Connor.

7    THE COURT:  You sought sanctions against him.  Okay.

8    He filed -- this is his action against one of the debtors.

9    MS. RICHARDS:  Correct.

10   THE COURT:  You sought sanctions against him?

11   MS. RICHARDS:  We did.

12   THE COURT:  And the Court -- what did the Court do?

13   MS. RICHARDS:  The Court --

14   THE COURT:  What did the Court do before the petition,

15   the bankruptcy petition?

16   MS. RICHARDS:  Before the petition date, the Court

17   held a hearing on our motion for sanctions and on Mr. Connor's

18   motion for authority to place a lis pendens on a certain

19   property.

20   THE COURT:  The Court denied the motion.

21   MS. RICHARDS:  The Court denied --

22   THE COURT:  And placed the lis pendens.

23   MS. RICHARDS:  Correct.

24   THE COURT:  And what did the Court do with the

25   sanctions?

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1          MS. RICHARDS:  Granted our motion for sanctions.

2          THE COURT:  What sanctions?  Did the Court indicate

3    what sanctions he or she was awarding?

4          MS. RICHARDS:  Our request for I think 1,500 dollars

5    and the Court said he wanted that to be based on attorneys'

6    fees.  So we submitted a proposed order.

7          THE COURT:  But the Court ruled on that before the

8    petition date?

9          MS. RICHARDS:  Correct.

10         THE COURT:  It's just that the order didn't get

11   entered until after.  Did the order deviate from what the Court

12   ruled at the hearing?

13         MS. RICHARDS:  I do not believe so, Your Honor.

14         THE COURT:  Okay.  What's the stay violation with

15   respect to the May 18th order?

16         MS. RICHARDS:  I'm sorry?

17         THE COURT:  What is the stay violation if -- I mean

18   because my understanding of the law is that the entry of an

19   order -- if the Court rules from the bench and the only thing

20   that happens after is the entry -- after the petition, is the

21   entry of the order, that that's not a stay violation.

22         MS. RICHARDS:  Your Honor, we argued in our pleadings

23   that that May 18th order was arguably administrative or

24   ministerial in nature and possibly didn't violate the stay, but

25   out of an abundance of caution --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                     122

1      THE COURT:  Okay.  Tell me about the June 8th summary

2  judgment?

3      MS. RICHARDS:  So, Mr. Connor's lawsuit essentially

4  asserts two claims.  The first is that GMAC Mortgage failed to

5  timely record certain documents, and the second is that -- it

6  was essentially a restatement of claims he had initially

7  asserted against all the debtors.

8      THE COURT:  And it settled.

9      MS. RICHARDS:  That were settled.  So our local

10  counsel filed a motion for summary judgment seeking dismissal

11  of that second count.

12      THE COURT:  Was that filed before or after the

13  petition date?

14      MS. RICHARDS:  The motion was filed before the

15  petition date.

16      THE COURT:  Okay.  And had there been a hearing on it

17  before?

18      MS. RICHARDS:  The hearing was held post-petition.

19      THE COURT:  Okay.

20      MS. RICHARDS:  On June 8th.  The Court found in our

21  favor.  We had also asked for sanctions in connection with that

22  motion.  The Court also found in our favor for that second

23  sanctions motion at the June 8th hearing.

24      THE COURT:  Do you agree that the order -- the June

25  8th order violated the automatic stay?

RESIDENTIAL CAPITAL, LLC, ET AL. 123

1    MS. RICHARDS:  We do, Your Honor.

2    THE COURT:  Okay.  And what are the consequences?

3  Does that make the order void?

4    MS. RICHARDS:  That's my understanding that under

5  applicable case law --

6    THE COURT:  An order entered in violation of the

7  automatic stay is void.

8    MS. RICHARDS:  Correct.

9    THE COURT:  Okay.  And tell me about the August 31

10  judgment?

11    MS. RICHARDS:  An the August 31 judgment was the order

12  entered reflecting the judgment that was made at the June 8th

13  hearing.

14    THE COURT:  Okay.  And what should the Court do in

15  your view?

16    MS. RICHARDS:  "The Court" meaning Your Honor or --

17    THE COURT:  Yes, I mean me.

18    MS. RICHARDS:  -- the Washington Court?

19    THE COURT:  Yes, yes.

20    MS. RICHARDS:  Your Honor, we would suggest that you

21  lift the automatic stay in order to allow the debtors to file

22  the motion to vacate any actions that were conducted in

23  violation of the automatic stay.  It could be that that is

24  unnecessary if the orders are void on their face, but to clean

25  up the record --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                          124

1      THE COURT:  Well, yes --

2          MS. RICHARDS:  -- we would suggest that.

3          THE COURT:  And so you won on summary judgment; and

4    are you asking the Court to lift the stay to permit the state

5    court to proceed with your summary judgment motion?  I just

6    want to understand -- I mean if the judge changes his mind,

7    you're going to be in the soup in the case.

8          MS. RICHARDS:  Your Honor -- and I think this goes to

9    Mr. Connor's second requested relief -- we're content to leave

10   the stay in place as against the debtors.  Certain of these

11   claims are also asserted against nondebtor entities.  We've not

12   contended that the stay stops the litigation as against them.

13   And so to the extent they wanted to refile the motion for

14   sanctions and summary judgment or to the extent the Court

15   wanted to enter an order just as against those nondebtor

16   defendants, we wouldn't oppose it.

17         THE COURT:  Tell me this.  Which of the orders dealt

18   with the lis pendens?  Was it the May 18th order?

19         MS. RICHARDS:  The May 18th order.

20         THE COURT:  Okay.  Anything else you want to add at

21   this point?

22         MS. RICHARDS:  Nothing right now.

23         THE COURT:  Mr. Connor, do you want to be heard again?

24         MR. CONNOR:  Yes, Your Honor.  Just very quickly, the

25   lis pendens order -- the lis pendens motion had been withdrawn

RESIDENTIAL CAPITAL, LLC, ET AL.                                          125

1    prior to the hearing, but he went ahead and ruled on it anyway.

2              The other thing was that at that April 27th hearing,

3    there was a CourtCall problem that wasn't my fault and

4    CourtCall acknowledged it and I put the CourtCall letter in the

5    pleadings for you.  And so at the May 18th hearing, I had asked

6    to just -- because of the CourtCall screw-up, I'd asked to have

7    a rehearing of the sanctions motion.

8              At that time on May 18th, the -- excuse me, but on

9    August 27th, the judge had delayed entry of the order on

10   sanctions to June 8th.  Now at the May 18th hearing, he

11   authorized the attorney for this -- for GMAC to go ahead and

12   send the order to him for signature.  So that was what happened

13   there.

14             And I'm just -- if an order that's taken in violation

15   of the stay is void, then that's what it is.  It doesn't

16   require anybody going around and vacating orders.  I mean if

17   that's going to be done, that's my prerogative.

18             THE COURT:  I don't think so.

19             MR. CONNOR:  Well then okay, I -- whose is it?

20             THE COURT:  Let me -- Ms. Richards, let me understand.

21   You want to be able to move the trial court to vacate certainly

22   the June 18th summary judgment and the August 31st judgment,

23   correct?

24             MS. RICHARDS:  Correct.

25             THE COURT:  And are --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                   126

1       MR. CONNOR:  That --

2       THE COURT:  Just a second, Mr. Connor.

3       MR. CONNOR:  Okay.

4       THE COURT:  You're also asking to vacate the May 18th

5    order?  What are you asking with respect to the May 18th order?

6    I want to understand what you want.

7       MS. RICHARDS:  To the extent Your Honor is comfortable

8    that it is a ministerial act that did not violate the automatic

9    stay, that is our position.  If you are concerned by Mr.

10   Connor's arguments that he wasn't --

11       THE COURT:  Well he'd have to go back -- you know,

12   there's concurrent jurisdiction in state and federal court to

13   determine whether the automatic stay applies.  If the automatic

14   stay applies, only the bankruptcy court can vacate it.  There

15   is good law that the entry of an order or judgment post-

16   petition based on a ruling pre-petition is a ministerial act as

17   to which the automatic stay doesn't apply.  It doesn't violate

18   the automatic stay for a court to enter an order.

19       I don't know exactly what the -- you know, whether the

20   order that got entered on May 18th reflected exactly what the

21   judge ruled or not.  I mean are you asking for a do-over?

22       MS. RICHARDS:  Not a do-over, Your Honor.  We want to

23   take it back to the beginning, avoid any possibility that Mr.

24   Connor could later allege prejudice as a result of the

25   violations.  We want to correct anything that might have gone

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    127

1    wrong.

2            THE COURT:  Okay.  So you're asking -- if I lift the

3    stay, you're going to go back to the state court judge and ask

4    that the May 18th, June 8th and August 31st orders or judgments

5    be vacated.

6            MS. RICHARDS:  June 8th was just a hearing, so there

7    were only two orders.

8            THE COURT:  I thought you said there was summary

9    judgment --

10           MS. RICHARDS:  He made a ruling from the bench, is my

11   understanding and denied --

12           THE COURT:  So you want to ask that -- what you're

13   asking for is to be able to go back and ask that the May 18th

14   and August 31st orders or judgment be vacated.

15           MS. RICHARDS:  Correct.  I think that's the cleanest

16   solution.

17           THE COURT:  Mr. Connor do you have an objection to

18   that?

19           MR. CONNOR:  They want to ask that they be vacated

20   without prejudice.  So that more or less leaves them in play,

21   you know.  They can be resurrected any time they want.

22           THE COURT:  Absolutely can, Mr. Connor; absolutely

23   can.

24           MR. CONNOR:  Huh?  I'm sorry.  I didn't hear you.

25           THE COURT:  I said yes, they absolutely can.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    128

1      MR. CONNOR:  Yes, I mean if an action taken in

2  violation of the stay is void, then what right does anybody got

3  to go back and resurrect it?  I mean I suppose --

4      THE COURT:  If they're entitled to summary judgment,

5  Mr. Connor, they can go back at some point -- if the Court

6  lifts the stay, they can go back and ask for summary judgment

7  again.  Good luck.  And if -- you made a motion to file a lis

8  pendens, the Court denied it.

9      MR. CONNOR:  Which is fine.

10      THE COURT:  Well, all right.  Here's the Court's

11  ruling then.  I'm going to ask the debtors' counsel to submit

12  an order to this effect.  I'm lifting the automatic stay to

13  permit debtors' counsel to return to the state court to seek to

14  vacate the May 18th and August 31 orders without prejudice to

15  the rights of any parties thereafter.  Those don't have to be

16  the exact words but it will take you back to where you were,

17  whether you had to do that with respect to the May 18th order,

18  that's what you asked for, that's what you're going to get.

19      MS. RICHARDS:  All right.  Thank you, Your Honor.

20      MR. CONNOR:  Thank you, Mr. Connor.

21      MR. CONNOR:  Thank you, Your Honor.

22      THE COURT:  Mr. Marinuzzi, is there anything else?  I

23  think that's it.

24      MR. MARINUZZI:  Your Honor, we have some uncontested

25  settled matters --

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1          THE COURT:  Yes.

2          MR. MARINUZZI:  -- where stipulations have been

3    presented.

4          THE COURT:  Right.  Anybody want to be heard?  They're

5    on the agenda.  I did review the agenda before to see what they

6    are.  These essentially are lift stays to allow the -- to lift

7    the stay so the first mortgagee can foreclose on property and

8    is that -- am I correct?

9          MR. MARINUZZI:  That's my understanding, Your Honor.

10          THE COURT:  All right.

11          MR. MARINUZZI:  Yes.

12          THE COURT:  Does anybody want to be heard?  All right.

13    Those will be granted.

14          MR. MARINUZZI:  Thank you, Your Honor.

15          THE COURT:  Okay.

16          MR. MARINUZZI:  That's all we have on the agenda.

17    We'll see you in a week.

18          THE COURT:  I guess I'm going to see some people at 2

19    o'clock.  The court's in recess.

20          MR. MARINUZZI:  Thank you.

21          THE COURT:  The 2 o'clock hearing is in chambers, not

22    on the record.

23      (Whereupon these proceedings were concluded at 1:09 PM)

24

25

130

1

2                                   **I N D E X**

3

4                                   RULINGS

5                                                          Page        Line

6  Debtors' interim application for order              85          19

7  authorizing debtors to compensate

8  PricewaterhouseCoopers, LLP for foreclosure

9  review services in furtherance of the debtors'

10 compliance obligations under Federal Reserve

11 Board Consent Order, and reaffirming relief

12 granted in the GA servicing order, granted.

13 Debtors' interim application for authorization  88          14

14 to employ and retain Hudson Cook, LLP as special

15 counsel to the debtors, nunc pro tunc to May

16 14, 2012, granted.

17 Debtors' interim application for an order        88          14

18 authorizing debtors to employ and retain Pepper

19 Hamilton as special foreclosure review counsel

20 for bankruptcy issues to the debtors, nunc

21 pro tunc to May 14, 2012, granted.

22 Debtors' motion approving procedures by which   89           9

23 third parties can request and obtain stipulated

24 relief in the automatic stay, but reserved as to

25 JPMorgan Chase, granted.

131

**I N D E X**

**RULINGS**

|  | Page | Line |
|---|---|---|
| Mr. Papas' motion to convert case to a Chapter 7 - denied | 100 | 12 |
| Motion of Debra Bollinger and Brian Bubnik relief from the automatic stay - denied without prejudice | 112 | 20 |
| Debtors Motion to lift automatic stay re: Mr. Connors - granted | 128 | 12 |
| All stipulations re lift stay motions granted | 129 | 13 |

132

C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  October 11, 2012

**#**

**#607 (1)**
6:22

**A**

**AARON (1)**
13:25
**abide (1)**
57:1
**ability (1)**
113:5
**able (9)**
19:16;20:9;61:15,
24;89:10;91:19;
103:16;125:21;
127:13
**above (2)**
24:25;25:5
**absence (1)**
80:15
**absolutely (7)**
53:9;71:21;74:22;
77:11;127:22,22,25
**abstract (1)**
50:18
**abundance (1)**
121:25
**accept (1)**
38:2
**acceptable (1)**
18:20
**accepted (1)**
68:19
**access (2)**
87:19;94:7
**accommodate (1)**
27:11
**accomplish (2)**
82:2,24
**accomplishes (2)**
38:4;82:1
**account (2)**
34:14;72:8
**accountant (1)**
94:8
**accounting (1)**
94:10
**acknowledge (2)**
110:3;119:3
**acknowledged (1)**
125:4
**act (9)**
38:6,10;92:14;
107:11;108:4;
119:16,19;126:8,16
**action (13)**
104:7;105:4,7;
107:11;108:19,24;
109:21;111:2;113:4;
117:22;119:2;120:8;

**Actions (8)**
4:9;95:17;102:25;
111:9,12;117:16,20;
123:22
**actual (2)**
29:21;75:16
**actually (13)**
29:4;33:13;36:17;
40:6;52:6;68:18;
72:23;94:15;95:21;
115:23;116:8,23;
119:10
**Ad (1)**
9:19
**add (7)**
46:19;52:5;64:9;
104:24;109:19;
112:21;124:20
**addition (2)**
97:8,19
**additional (6)**
44:16;48:19;67:8;
95:24;116:16,20
**address (20)**
18:2;21:25;22:2;
32:17,18;38:22;53:8;
58:15;65:1;69:13;
70:4;71:12;74:15;
90:17;96:23;101:5;
108:10,17;109:15;
117:5
**addressed (4)**
78:5;90:16;107:25;
114:13
**addressing (1)**
26:3;70:15;115:17
**adds (1)**
46:17
**adjourn (3)**
17:13;18:5;27:2
**adjust (1)**
55:17
**adjusting (1)**
55:20
**administrative (1)**
121:23
**admit (1)**
89:7
**adopt (1)**
68:22
**adopted (1)**
68:20
**ADR (1)**
111:4
**advance (4)**
63:21,24;64:1;70:8
**adverse (5)**
40:2;43:1;59:10,
11;104:6
**advise (1)**
114:20
**affect (1)**

**affecting (1)**
83:9
**affiliate (1)**
114:15
**affirmative (5)**
103:10,11;112:16,
17;113:24
**AFI (8)**
25:13;67:7,8,12;
84:18;112:10;
114:15,17
**afternoon (10)**
33:24;69:6;77:2,
18;90:10;100:19;
102:3,4;106:25;
118:17
**again (17)**
19:11;27:3;38:20;
49:25;52:4;58:13;
67:18;69:22;70:17;
79:14;81:1;85:10;
93:8;101:15;105:9;
124:23;128:7
**against (30)**
34:4;38:9;95:24;
100:11;102:21,25,25;
103:5,8;104:2,6,10;
105:4,8,12;108:6;
110:19;112:10,10;
113:23;114:17;
120:6,7,8,10;122:7;
124:10,11,12,15
**agenda (12)**
17:7;88:20;90:1;
100:21,25;101:7,14,
21;107:2;129:5,5,16
**agent (2)**
81:10,17
**aggregate (1)**
46:24
**ago (3)**
60:22;65:16;77:23
**agree (9)**
21:7;24:7;25:24;
32:16;44:4,13;61:24;
73:5;122:24
**agreeable (5)**
78:11;84:5,7,19;
85:8
**agreed (17)**
60:12;63:5;67:13,
20,24;68:3,7,8;73:2,
7,9,21,23;81:6,8,20;
88:12
**agreeing (4)**
32:2;36:20;46:12;
48:9
**agreement (19)**
23:1;41:23;42:6;
52:2;60:5;67:7,12;
68:16,18;71:2,3,4,5,
20;73:13;87:6;91:20;

**agreements (4)**
52:11;73:18;95:6;
97:10
**ahead (33)**
17:22;31:3,15;
32:6;35:12;36:24;
40:14;44:15;45:1,22;
47:14;52:15;57:16;
58:14;59:8,13;62:15;
64:25;85:23;86:6;
90:6,8,10;94:20;
96:7;102:6;103:21;
104:17;111:17;
115:18;116:2;125:1,
11
**air (1)**
40:20
**alert (1)**
19:22;41:16
**Alexandra (1)**
69:11
**allegations (3)**
23:3,4;96:21
**allege (1)**
126:24
**alleged (2)**
2:5;106:3
**alleging (1)**
22:20
**ALLEN (1)**
10:10
**allocable (1)**
80:20
**allocate (3)**
35:3;36:11;57:19
**allocated (4)**
33:6;34:8;51:15,16
**allocating (3)**
51:10;55:1,5
**allocation (8)**
51:23,25;54:20;
55:7,15;57:3;58:6;
84:8
**allocations (1)**
58:8
**Allow (7)**
4:2;20:4;53:16;
92:23;111:22;
123:21;129:6
**allowance (2)**
113:20;114:14
**allowed (3)**
51:10;61:20;63:7
**allowing (1)**
64:10
**allows (2)**
62:21;79:16
**Ally (24)**
8:13,13,21,21;
22:21;26:17;35:22,
25;36:1,3;41:4;55:3;
64:23;65:8,25;66:4;

**92:18,22**

**58:6**

**128:1**

**67:14,15,19;84:9,18;
108:1,6;109:6**

**Ally/ResCap (1)**
83:8
**Ally's (2)**
65:10;66:9
**alone (2)**
94:14;112:5
**along (4)**
20:21;35:23;66:15;
95:13
**ALSTON (2)**
13:11;71:15
**altering (1)**
65:7
**alternate (1)**
100:10
**alternative (1)**
24:7;81:23
**although (4)**
75:21;76:6;110:8,
10
**altogether (1)**
56:19
**ALVES (1)**
9:14
**always (6)**
26:15,16;33:15;
91:1,4;113:25
**amend (2)**
52:17;97:6
**Amended (2)**
3:10;101:14
**amendment (2)**
73:2,15
**America (3)**
89:2,2,7
**Americas (5)**
8:4;9:20;10:12;
11:22;15:21
**amiss (1)**
94:6
**among (5)**
50:22;51:10,23;
57:19;95:11
**amount (14)**
22:5;23:25;26:2;
28:8;30:2;41:3;
42:18;47:11,23;
56:23;93:1;110:20;
112:11,14
**analyzing (1)**
51:19
**Angeles (2)**
12:14;15:14
**answered (1)**
34:15
**anticipate (19)**
28:18,21,24;30:3,
13;31:2;37:15;38:17;
42:13;46:21,22;48:7,
17;49:21;52:9,13;
56:5;97:21;110:15

**APA (1)**
73:15
**apace (1)**
18:23
**apiece (1)**
52:21
**apologize (3)**
34:18;46:17;
105:17
**apparent (1)**
82:21
**apparently (1)**
118:20
**appeal (1)**
100:18
**appeals (3)**
101:16;105:1,3
**appear (1)**
119:22
**appearing (1)**
118:18
**appears (4)**
27:17;55:8;95:6;
118:23
**apple (1)**
42:13
**applicable (2)**
23:22;123:5
**Application (6)**
2:14;3:2;78:25;
81:15,18;88:2
**applications (3)**
79:1,22;88:4
**applied (2)**
25:3;83:3
**applies (5)**
105:7,11;108:8;
126:13,14
**apply (2)**
102:24;126:17
**applying (1)**
113:16
**appointed (2)**
69:3;97:16
**appointment (1)**
96:16
**appreciate (7)**
18:14;25:22,25;
49:9,9;83:10;93:19
**approach (2)**
45:5;83:1
**approached (1)**
18:12
**appropriate (8)**
20:24;23:16;26:3;
44:18;46:13;63:5;
65:21;114:13
**appropriately (1)**
114:6
**approval (4)**
24:4;51:22;77:25;
96:1
**approve (6)**

24:1,7;25:4;38:3;
78:7;85:23
**approved (4)**
24:6,17;64:7;88:14
**Approving (3)**
4:7;85:20;88:20
**approximately (8)**
26:20;55:21;75:5;
80:13;91:9;95:22;
103:15;111:8
**April (1)**
125:2
**area (1)**
49:16
**arguably (1)**
121:23
**argue (3)**
24:10;27:14;90:8
**argued (1)**
121:22
**arguing (1)**
24:6
**argument (10)**
25:4,14;26:9;
32:24;34:11;46:20;
52:8,8;88:2;98:18
**arguments (2)**
94:18;126:10
**arise (1)**
51:21
**Arizona (4)**
91:11,25;93:6;
95:20
**ARLENE (1)**
9:14
**arms (1)**
61:25
**arm's- (1)**
22:15
**arm's-length (1)**
22:11
**around (4)**
74:12;80:13;92:10;
125:16
**arrange (2)**
56:11;82:6
**arranged (1)**
91:3
**arranging (1)**
82:5
**arrived (1)**
79:20
**articulate (1)**
36:22
**articulating (1)**
24:23
**aspect (1)**
27:9
**assert (1)**
23:24
**asserted (7)**
23:25;24:20;103:2,
3,6;122:7;124:11

**asserts (1)**
122:4
**Assets (12)**
2:6,7,8;97:9,11,13;
98:8;101:23,24;
106:4,5,6
**associate (1)**
62:6
**associates (1)**
62:2
**assume (16)**
29:10,21,24;30:23;
31:1;40:18;45:12;
48:6;50:21;51:13;
72:6;75:9;77:22;
112:13;114:9;116:6
**assumed (1)**
56:20
**Assuming (5)**
30:6;44:10;49:13;
50:5,13
**assumption (1)**
29:2
**assured (1)**
83:6
**Atlanta (1)**
13:15
**attached (2)**
91:5;93:23
**attempting (1)**
75:7
**attempts (1)**
69:18
**attended (2)**
91:15,25
**attention (1)**
44:1
**attenuated (1)**
95:10
**attorney (1)**
125:11
**Attorneys (25)**
8:3,13,21;9:3,10,
19;10:3,11,19;11:3,
12,21;12:3,11,20;
13:3,12,21;14:2,3,12,
20;15:12,20;95:22
**attorneys' (1)**
121:5
**auction (11)**
69:22;70:18;71:23,
25;73:8;92:3,8,20,23;
113:6,7
**August (9)**
66:4;118:4;123:9,
11;125:9,22;127:4,
14;128:14
**AUSTIN (2)**
11:2,15
**authority (3)**
37:4;80:24;120:18
**Authorization (1)**
2:16

**authorize (1)**
87:22
**authorized (1)**
125:11
**Authorizing (2)**
3:4;4:14
**Automatic (34)**
4:3,4,9;5:23;55:12;
88:22;99:6;101:2;
102:23;104:9;105:7,
11;107:4;113:10,12;
117:5,20,23;118:6,
21,24;119:3,16,19;
122:25;123:7,21,23;
126:8,13,13,17,18;
128:12
**availability (1)**
27:22
**available (8)**
27:23;73:3;91:4,6,
20,23;94:10,16
**Avenue (11)**
5:18;8:4,14;9:4,20;
10:12,20;11:13,22;
15:13,21
**average (2)**
46:2,9
**averse (1)**
33:25
**avoid (3)**
26:1;83:1;126:23
**awaiting (1)**
76:17
**awarding (1)**
121:3
**aware (3)**
31:18;70:1,3
**away (2)**
57:10;111:6

**B**

**back (36)**
17:20;19:1,17;
34:7;35:17;42:2;
47:2;48:3;57:12;
60:9,19;67:24;68:7,
14,20;77:9;78:2;
81:15,18;82:18;
87:10;94:3;97:15;
103:18;104:8;
109:14;114:4;120:1;
126:11,23;127:3,13;
128:3,5,6,16
**back-and-forth (1)**
117:7
**background (5)**
17:25;18:7;68:14;
96:9;107:9
**backup (1)**
60:10
**bad (5)**
27:20;93:20;96:22;

99:8,11
**balances (1)**
70:17
**Bank (12)**
8:13,21;9:3,10;
10:11;11:12;13:12;
15:20;84:18;89:2,2,7
**Bankr (1)**
99:18
**Bankruptcy (33)**
2:15,15;3:3,3,6,13,
16,20;4:6,13,13;
91:13,25;92:2;96:13;
98:4,20;99:8,14,22;
100:4;101:13,19;
102:18;105:14,24;
106:2,9;108:4;109:9;
114:2;120:15;126:14
**bar (1)**
111:6
**BARRAGE (22)**
69:11,12,17;70:4,
7;71:1,7,11,25;72:9,
13,19,21,24;73:11,
12,16,20,24;74:1,3,4
**based (7)**
19:1;29:3;79:21;
99:8;101:9;121:5;
126:16
**basically (4)**
48:23;50:23;83:20;
90:21
**basis (11)**
55:7,15;74:20;
80:15,19;81:2;93:11,
20;97:7;111:3;112:5
**Battery (1)**
9:11
**bear (1)**
99:14
**became (1)**
91:14
**beg (1)**
30:25
**begin (2)**
67:12;94:25
**beginning (2)**
86:24;126:23
**begins (1)**
63:15
**behalf (12)**
2:18;3:7;6:2;48:2;
49:19;69:12;71:16;
82:17;84:18;85:15;
89:25;100:20
**behind (2)**
48:7;86:1
**belief (2)**
93:21;94:12
**believes (2)**
17:15;101:4
**bench (4)**
76:20,20;121:19;

127:10
**beneficiary (1)**
95:5
**benefit (2)**
107:16,17
**benefits (2)**
25:13;79:9
**benefitted (1)**
115:21
**BENTLEY (63)**
8:8;20:25;21:1,2,6;
22:1;35:19,20;36:9;
38:25;39:1,15,20,23;
40:6,15,18,24;41:7,
11;42:14,18,23;43:2,
6,10,12,13,14,16,25;
44:3;45:3,9,14,23,25;
46:9,14,16,21;47:5,7,
16,19,23;52:17;
54:14,15;58:22;59:5,
8,9;60:14;63:10,11,
16,25;64:10;66:19,
19,21,24
**Berkshire (1)**
15:12
**best (19)**
37:5;39:1;41:13;
42:4,5;43:14,18;
44:12;49:1;76:24;
82:12;84:2,13;87:23;
96:17;98:6,9;100:2;
111:20
**bet (1)**
59:24
**better (3)**
44:22;62:1;63:21
**beyond (2)**
56:14;83:8
**bid (1)**
36:21
**bid-and-ask (1)**
72:17
**bidder (1)**
70:21
**bidders (2)**
73:3,18
**Biels (1)**
6:4
**billion (8)**
18:25;19:14;24:25;
25:11,11,12,19;51:9
**binders (1)**
72:11
**BIRD (2)**
13:11;71:16
**bit (8)**
28:5,8;56:22;
68:13;77:21;83:4;
107:9;119:21
**bite (2)**
42:1,12
**blank (1)**
85:25

**blocks (1)**
53:14
**Board (3)**
4:16;78:3;87:18
**Bob (1)**
40:10
**BOCKIUS (1)**
9:2
**BOCRESION (1)**
16:4
**BOELTER (1)**
11:8
**Bollinger (3)**
5:23;14:3;107:3
**borrower (3)**
95:4,13,15
**borrowers (3)**
95:8,8,12
**both (7)**
17:23;23:10;25:24;
38:18;62:10;67:21;
68:12
**bother (2)**
21:14,16
**bound (1)**
38:2
**BR (1)**
99:17
**break (2)**
39:7;47:3
**breaking (1)**
45:25
**BRENDAN (1)**
8:9
**brief (4)**
37:1;52:7,11;90:21
**briefly (2)**
64:24;74:15
**briefs (4)**
47:14,21;67:3;
71:10
**bring (6)**
43:16;44:18;78:15;
102:24,25;103:2
**brings (2)**
78:24;89:14
**broke (1)**
54:4
**broken (1)**
53:14
**brought (2)**
79:23;98:2
**BRUNS (1)**
13:2
**Bryan (20)**
5:23;8:25;36:2,2,5;
64:23,23,25;65:1,15,
18,24;67:18,19;68:1,
8,12,24;69:9;107:3
**Bubnick (1)**
5:23
**Bubnik (1)**
107:3

**bunch (1)**
75:23
**burden (6)**
37:6;72:9;96:18;
99:16,25;112:5
**burdened (1)**
103:17
**burdensome (1)**
68:4
**business (2)**
90:23;98:10
**buy (1)**
90:23
**bystander (1)**
37:21

## C

**CA (5)**
5:13;12:14;14:6;
15:14;31:13
**CADWALADER (2)**
14:11;48:22
**CAHN (1)**
13:25
**calendar (5)**
55:9;57:8;86:3,20;
114:23
**California (1)**
6:3
**call (13)**
29:1,25;30:6,23;
31:1,15;33:8;37:13;
39:13;43:1;63:18;
81:4;101:7
**calling (3)**
37:11,15;102:11
**calls (1)**
82:5
**came (7)**
44:22;63:12;90:18,
22;91:9;102:13,17
**can (62)**
18:1,17;19:23;
20:1,6;24:21;30:12;
32:17;36:16;37:12;
38:10;41:14,23;46:1;
47:2;49:1;52:23;
56:18;64:15,24;65:5;
68:5;71:10,12;72:14;
75:12;76:22,24;77:8;
79:18;81:13,24;82:7,
8,12,24;84:3;86:12,
17;87:6,23,23;88:21;
90:7;91:2,5;94:12;
97:6;98:11;106:17;
111:16;114:16;
115:22;119:18;
126:14;127:21,22,23,
25;128:5,6;129:7
**Candidly (1)**
70:12
**Capital (5)**

2:18;3:8;5:24;
17:3;49:23
**carefully (2)**
55:21;100:5
**carry (2)**
24:21;33:15
**CARTER (1)**
13:20
**carves (1)**
59:10
**Case (72)**
2:11;9:18;19:12;
22:16;23:22;24:17;
26:13;28:18,19;
31:25;32:2,12,24;
33:5,13;34:10,11,15;
39:7;43:23;48:25;
70:11;72:10,11,12;
76:21;83:22;91:15;
92:16,17;93:12,12;
95:19,19,20,25;
96:14;98:5,7;99:24;
100:7,7;102:19,20,
20,24;103:18,19;
105:11,14;108:1,13,
22;109:5,21,24;
110:12;112:4,7,15,
19;113:6,9,13,14,15,
22;114:8,15;116:6;
123:5;124:7
**case-in-chief (3)**
28:22;34:17,25
**cases (12)**
24:3;34:22;90:2;
96:11,12;97:7,17,22,
25;99:19;101:20;
110:2
**cause (7)**
96:15,20;98:1;
99:16,21,23,25
**caution (1)**
121:25
**caveat (2)**
39:2,6
**CC (16)**
2:5,11,14;3:2,10,
15,18;4:2,6,12,20;
5:2,12,17,22;6:2
**cede (3)**
100:23;101:25;
107:5
**Center (2)**
14:4,13
**central (2)**
27:9;52:6
**certain (11)**
17:16;49:22;58:5;
70:20;93:24;95:7,12;
101:23;120:18;
122:5;124:10
**certainly (13)**
25:7;27:24;39:5;
42:14;69:23;77:8,15;

79:5;85:22;112:22;
114:16,21;125:21
**certificate (2)**
38:16,17
**certified (4)**
108:22,24;111:9,
12
**cetera (2)**
55:23;64:18
**CFR (1)**
87:20
**CHADBOURNE (1)**
12:19
**challenge (1)**
19:11
**chambers (5)**
69:6;79:23;85:25;
88:17;129:21
**chance (1)**
85:21
**change (7)**
31:13;56:18;65:6;
74:13;79:19;81:25;
82:8
**changed (1)**
60:8
**changes (2)**
35:23;124:6
**Chapter (17)**
2:11;83:12;91:14;
93:12,12;96:11,12;
97:17,18,19;98:20,
22;99:2,8;100:7;
112:3;114:7
**characterized (1)**
21:7
**Chase (3)**
89:6,8,10
**check (1)**
47:2
**Chicago (1)**
11:5
**Christmas (1)**
62:3
**CHRISTOPHER (1)**
9:23
**Chung (1)**
116:19
**circle (1)**
48:3
**Circuit (1)**
26:24
**circumstances (2)**
49:4;100:1
**cites (1)**
99:18
**CK (1)**
11:8
**claim (6)**
110:19,22,24;
111:1,21;113:17
**claimed (1)**
95:14

**claims (10)**
  51:10;103:15,17;
  111:5,7;113:19;
  114:13;122:4,6;
  124:11
**clarification (4)**
  55:11;57:15;58:20;
  102:14
**clarify (2)**
  73:12;74:1
**Clarita (1)**
  5:13
**clarity (1)**
  55:4
**class (5)**
  108:22,23;111:2,9,
  12
**clean (1)**
  123:24
**cleanest (1)**
  127:15
**clear (12)**
  25:22;27:13,18;
  34:19;46:23;56:18,
  25;62:8;73:6;78:18;
  80:20;85:7
**clearer (1)**
  39:5
**clearly (5)**
  19:12;78:17;85:14;
  110:8;111:24
**CLEARY (2)**
  10:2;49:19
**clerks (1)**
  33:3
**clerk's (1)**
  119:15
**client (1)**
  91:6
**clients (2)**
  37:3;116:23
**clock (1)**
  57:17
**close (2)**
  47:24;68:25
**closer (5)**
  22:3;56:8;59:7;
  94:22;110:2
**closing (11)**
  32:24;34:11;45:21;
  46:20;47:1,8,11;52:8,
  12;56:6;75:17
**Code (14)**
  2:15;3:3,13,16,21;
  4:6,13;98:4;99:14;
  102:18;104:19;
  105:24;106:2,9
**codifying (1)**
  118:4
**Cohen (2)**
  6:4;10:18
**coin (1)**
  64:20

**colleagues (3)**
  32:21;35:11;58:1
**collective (3)**
  107:11;108:24;
  113:4
**Collier (1)**
  100:3
**colloquy (1)**
  64:9
**combatants (2)**
  35:18,19
**comfortable (1)**
  126:7
**coming (2)**
  63:14;103:18
**Commence (1)**
  4:9
**commenced (2)**
  102:21;105:8
**comment (1)**
  90:15
**comments (4)**
  64:7;80:6,10;117:6
**commit (2)**
  31:24;87:11
**commitment (1)**
  33:1
**committed (1)**
  79:15
**Committee (43)**
  8:3;13:3;17:14;
  18:10;20:1,12;26:19,
  19;29:5;32:16,16;
  44:17;48:6,9;49:1,
  20;50:5,6,17,19;
  53:17,18;58:24;59:1,
  16,21;63:6;65:4;
  67:20;68:5,17;69:1;
  78:4;79:12;80:7;
  81:19;82:3,9,15,17;
  87:13;90:17;98:25
**committee's (7)**
  40:1;42:16;49:14;
  50:14;52:18;58:21;
  68:15
**Common (5)**
  3:21;51:14;92:20
**communications (1)**
  82:6
**companies (1)**
  90:25
**company (4)**
  22:21;23:14;91:2,7
**compared (2)**
  51:5;97:20
**Compensate (1)**
  4:14
**competing (1)**
  70:17
**complain (1)**
  104:8
**complained (1)**
  33:12

**complaining (1)**
  22:19
**completed (3)**
  27:19;75:3;110:10
**completely (3)**
  21:7;62:13;87:6
**completing (1)**
  53:15
**complex (1)**
  25:15
**Compliance (3)**
  4:16;84:20,21
**compliant (1)**
  85:8
**comply (4)**
  18:6;68:4;82:2,8
**compromise (1)**
  71:4
**concern (3)**
  23:5;37:3;80:21
**concerned (4)**
  28:5;31:14;95:6;
  126:9
**concerning (3)**
  17:9;20:5;67:7
**concerns (11)**
  19:1;20:15;65:7;
  70:13,19;78:5,5,14;
  82:12;101:5,5
**conclude (3)**
  23:11;24:5;56:4
**concluded (1)**
  129:23
**concludes (1)**
  100:8
**conclusions (3)**
  18:24;50:19;56:10
**concurrent (1)**
  126:12
**conduct (1)**
  80:23
**conducted (2)**
  94:13;123:22
**confer (5)**
  32:5;35:11;41:23;
  47:9;68:5
**conference (8)**
  2:2;57:9;69:17;
  108:10;109:14;
  113:13,15;114:22
**conferences (1)**
  69:13
**conferred (2)**
  42:6;60:4
**confers (1)**
  25:13
**confidential (2)**
  87:16,19
**confirm (1)**
  34:24
**confirmed (1)**
  98:14
**Congress (1)**

**11:13**
**connection (8)**
  23:2;26:25;78:8;
  80:17;99:4,5;104:7;
  122:21
**CONNOR (38)**
  16:5;115:14,15,15,
  18,19;116:2,3,25;
  117:1,2,3,9,11,13,15,
  24;118:14,19;
  119:22;120:6;
  124:23,24;125:19;
  126:1,2,3,24;127:17,
  19,22,24;128:1,5,9,
  20,20,21
**Connor's (6)**
  115:13;120:4,17;
  122:3;124:9;126:10
**Consent (17)**
  4:17;19:21;22:25;
  79:1,3,4,14,17;80:22,
  25;81:4,10,14,22;
  83:2;84:20;85:7
**consequences (2)**
  27:8;123:2
**consider (4)**
  25:14;81:24;87:16;
  99:22
**consideration (1)**
  114:5
**considered (1)**
  99:4
**considering (1)**
  65:10
**consistent (5)**
  24:23;25:17,21;
  52:1;59:4
**constituents (1)**
  98:13
**constitute (1)**
  99:21
**constituted (1)**
  117:20
**constraints (1)**
  87:24
**constructive (1)**
  84:3
**consumed (1)**
  114:6
**consummated (1)**
  98:11
**contained (1)**
  18:21
**contend (1)**
  110:4
**contended (1)**
  124:12
**content (2)**
  63:25;124:9
**contest (1)**
  108:2
**contested (4)**
  74:7;77:20;112:3,

**24**
**context (2)**
  70:11;84:22
**Continue (14)**
  4:9;19:3,7,15;34:1;
  63:3;8;66:13;69:24;
  79:16,18;95:16;98:9;
  103:15
**continued (2)**
  69:3;91:16
**continuing (2)**
  18:23;65:4
**conversation (2)**
  82:4;83:7
**conversion (8)**
  95:1;96:10,15;
  99:10,13,17;100:2,7
**Convert (11)**
  2:11;90:2;93:11;
  96:11,13;97:7;98:5,
  19,22;99:2,24
**converted (1)**
  80:11
**Cook (4)**
  2:16;79:2;88:5,6
**cooperate (1)**
  49:21
**cooperation (3)**
  18:15;59:17;116:8
**cooperative (1)**
  18:23
**coordinate (4)**
  44:11;45:1;49:1;
  57:25
**coordinated (1)**
  48:8
**coordinating (2)**
  34:22;49:20
**copies (1)**
  79:23
**Corp (1)**
  14:12
**corporate (1)**
  30:24
**correctly (2)**
  21:22;76:20
**correspondence (1)**
  20:20
**cost (4)**
  26:20;79:9;82:8;
  110:16
**costing (1)**
  27:2
**costs (1)**
  80:20
**Counsel (25)**
  2:17;3:6;15:3;
  18:17;44:13;24;50:4;
  56:11;69:5;73:13;
  74:9;94:20;100:13;
  107:4,5;109:20;
  110:15;113:9,10;
  117:7;118:13,16;

122:10;128:11,13

**count (3)**
25:2;34:4;122:11

**counted (1)**
36:18

**counterclaims (4)**
103:4,5,6,8

**counterparties (1)**
22:18

**couple (3)**
17:10;52:23,24

**Coupled (1)**
30:2

**course (6)**
51:18;62:8;74:16;
75:19;76:1;98:10

**Court (548)**
3:13,21,21;4:22;
5:4,9,14,19;6:5;17:2,
7,11,12,15,17,22;
18:1,2,10;19:4,6,13,
18,20,22;20:3,9,16,
18;21:1,4,9,16,18,20;
22:6,7;23:8,9,17,19,
21;24:1,6,12,14,24;
25:4,24;26:6,9;27:4,
5,7,7,18;28:3,15,17;
29:6,8,10,14,17,24;
30:5,11,12,23;31:1,8,
12,20,23;32:6,9,11,
15,17,18,19,21;
33:11,20;34:16,19;
35:2,8,12,15,17,25;
36:4,8,10,19,24;37:8,
11,15,21,25;38:3,9,
13,23,25;39:6,11,19,
22;40:4,7,14,17,21;
41:5,9,12,15;42:17,
22,24;43:5,9,11,13,
15,17;44:1,8;45:7,8,
10,19,24;46:7,12,15,
19,22;47:6,12,14,18,
20,25;48:13,21;49:5,
11,17,25;50:2,4,9,16,
21;51:6,22;52:3,15,
17;53:2,4,8,9,18;
54:1,6,9,15,17,20;
55:14;57:16,21,23;
58:12,14,16,18;59:7,
13,24;60:6,14,16,16;
61:1,3,6,9,11,15,19;
62:2,12,19;63:10,16;
64:2,5,8,9,22,25;
65:14,17,22;66:2,9,
11,17,23;67:2,4,6,15,
24;68:6,10,22;69:4,
10,16;70:3,6,25;71:2,
8,14,19,22;72:3,11,
16,20,22;73:10,15,
19,22,25;74:3,5,8,15;
76:10,14;77:3,5,8,11,
13,15,17,21,24;78:1,
16,17,23;79:25;80:2,

5,14;81:1,18,23,24;
82:11,13,19;83:14,
16,19,21;84:5,11,14,
17,24;85:3,9,11,13,
17,21;86:5,10,16,19,
24;87:3,5,9,14,25;
88:3,6,8,12,14,16,18,
23,25;89:7,13,16,19,
22;90:3,6,8,10,14;
91:25;92:2,5,6;93:10,
14,17;94:4,17,20,22,
24;95:20,23,25;96:4,
7,13,13,15;97:6,16;
98:5,5,15,17;100:5,7,
10;101:4,4,10;102:2,
4,6,8,13,14,16,17,20,
23;103:3,3,6,9,14,14,
17,21,24,25;104:1,2,
4,6,7,9,11,13,14,17,
20,23,24;105:3,6,10,
14,15,19,21;106:3,9,
14,16,18,20,23;
107:6,16,16,20,24,
25;108:5,9,14,17,18,
22;109:1,3,5,8,11,13,
15,18,23;110:9,23;
111:2,11,15,17,20,
24;112:1,15,18;
113:1,15,21;114:5,
16,18,21;115:4,6,11,
14,18;116:2,17,25;
117:2,4,10,13,15,17,
22;118:5,7,13,15,20;
119:1,2,7,11,11,14,
16,21,23;120:1,2,3,7,
10,12,12,12,13,14,14,
16,20,20,21,22,24,24;
121:2,2,5,7,7,10,11,
14,17,19;122:1,8,12,
16,19,20,22,24;
123:2,6,9,14,14,16,
17,18,19;124:1,3,4,5,
14,17,20,23;125:18,
20,21,25;126:2,4,11,
12,14,18;127:2,3,8,
12,17,22,25;128:4,5,
8,10,13,22;129:1,4,
10,12,15,18,21

**CourtCall (4)**
125:3,4,4,6

**courtroom (2)**
20:11;75:1

**courts (2)**
47:13;99:22

**Court's (11)**
27:22;78:5;82:21;
98:18;99:4;101:1;
103:2;107:21;114:1;
128:10;129:19

**cover (1)**
44:23

**covered (1)**
49:7

**cr (1)**
41:2

**creditor (1)**
91:14

**creditors (5)**
51:1;96:17;97:20;
98:6;100:3

**Creditors' (9)**
8:3;50:5;53:17;
59:16,21;63:6;82:17;
90:17;98:24

**critical (1)**
114:7

**cross (6)**
43:3;44:7;45:14,
21;46:2,4

**cross- (5)**
30:7;31:8;32:23;
39:8;45:17

**crossed (2)**
42:19,20

**cross-examina (1)**
28:21

**cross-examination (11)**
28:24;30:3,14;
31:2;32:1;34:10;
42:25;44:9,19;52:18;
64:15

**cross-examinations (1)**
43:18

**cross-examine (8)**
29:13;30:1;31:4,
16;43:24;44:25;46:8;
49:6

**cross-examining (4)**
39:8,11,23;41:7

**crossing (1)**
42:21

**CT (1)**
14:23

**current (1)**
39:17;40:1;100:12

**currently (1)**
111:5

**cushion (1)**
56:22

**cut (6)**
34:7;42:8;44:24;
60:13;94:17;119:1

**cutoff (4)**
53:5,14,21,21

**cuts (2)**
42:9;61:25

**cutting (1)**
56:19

**CV- (1)**
95:20

**D**

**daily (1)**
56:11

**darndest (1)**

45:6

**Darryl (2)**
53:11;58:13

**data (2)**
60:9;64:13

**date (33)**
21:3;29:3;53:16;
59:18,22,23;60:5,8,
24;61:11;65:3;67:12,
13,16,25;68:2,13;
76:8;84:11;86:8;
88:15;90:18;97:1;
101:12;111:6;
113:24;114:3;119:9,
10;120:16;121:8;
122:13,15

**dated (1)**
97:2

**dates (20)**
17:13;18:5;20:21,
24;21:24;27:16,25;
28:11;41:18;53:23;
54:2,5,10,10,11,12;
57:13;58:10;65:5;
97:2

**DAVID (6)**
10:24;12:24;14:25;
21:11;74:9;109:20

**DAY (27)**
12:2,10;23:8,15;
31:7,24;32:3,13,14;
35:14;41:8;42:20;
45:15;47:3;55:10,13,
14,19;60:3,23;61:7;
80:14;81:16;86:13,
23,24;87:1

**days (23)**
21:5;22:8;28:4,12,
13,13,15;30:12;
32:14;34:5,7;42:22;
43:7;45:15,18;46:3,
18;56:2;61:4,20;
63:14;80:13;86:2

**DC (1)**
8:23

**deadline (2)**
61:16;78:20

**deadlines (3)**
27:19;66:7,10

**deal (4)**
19:13;48:2;51:7;
83:5

**dealing (4)**
52:10;60:15;65:18;
68:2

**dealt (2)**
84:11;124:17

**Dearborn (1)**
11:4

**Deborah (3)**
5:22;14:3;107:3

**debtor (25)**
18:5;26:15,18;

35:23;39:12;42:25;
73:2;83:6,12;93:21;
98:20,22,24;99:1,2,
11;102:25;104:8;
105:11,13;106:14;
109:16;114:15,19;
117:7

**Debtors (66)**
2:17;3:4,6;4:6,12,
14,16;15:3;22:18;
24:10;40:12;41:2,4;
53:12;55:2;60:20;
63:12;64:10;67:13;
69:12;70:17;79:3;
80:24;81:8;85:8;
89:25;93:20;95:3,11;
96:22,25;97:5,9,11,
14,17,21;98:7,12;
99:9;100:11,20;
101:12,18,23;102:21,
24;103:11;105:7;
107:1;110:8,13,15,
19;112:10;113:23;
114:6,9;118:18,20,
23;119:12;120:8;
122:7;123:21;124:10

**Debtors' (29)**
2:3,14;3:2;17:9;
27:10;36:6,18;37:6;
39:8,9,12;44:25;
53:25;69:21,24;
77:25;78:25;88:20;
96:11;100:13;
110:21;112:16;
113:5,10;116:4;
118:13,15;128:11,13

**December (15)**
54:8,12;55:9,16;
56:15;57:8,11;61:18,
22,23,25;63:1;75:20,
22,24

**DECHERT (1)**
15:19

**decide (5)**
104:20;111:19;
114:16,18;118:6

**decided (2)**
41:19;113:22

**decides (1)**
98:5

**deciding (1)**
113:20

**decision (8)**
40:9,15;61:9,14;
72:6;78:15;111:21;
113:18

**decisions (2)**
72:3;104:10

**declaration (2)**
110:14;118:9

**declarations (8)**
28:22;31:14,15;
39:13;61:22;62:22,

24;63:20
**Declaratory (5)**
4:2;117:15,18;
118:19,22
**deed (2)**
93:23;94:2
**defendant (3)**
92:9;95:13;114:15
**Defendants (8)**
4:4;107:14,15;
108:6;109:5,20,24;
124:16
**defense (1)**
108:11
**defenses (5)**
103:11;108:6;
112:16,17;113:24
**deferring (1)**
84:8
**define (1)**
33:3
**defined (1)**
96:21
**degree (2)**
23:6;39:4
**delay (2)**
20:2;101:12
**delayed (1)**
125:9
**delineating (1)**
94:4
**delivered (1)**
83:5
**delivery (1)**
76:8
**demonstrate (1)**
100:1
**demonstrating (1)**
99:16
**denied (12)**
66:11;77:24;95:18;
97:24;100:13,15;
115:1,7;120:20,21;
127:11;128:8
**DENMAN (1)**
9:24
**deny (2)**
47:20;112:20
**denying (1)**
78:15;113:7
**depending (1)**
42:19;49:13;52:25;
55:23
**depends (2)**
42:18;48:18
**deponents (1)**
75:10
**deposed (4)**
30:9;31:3;61:17;
75:11
**deposing (1)**
28:20
**depositions (9)**

18:6;26:11;39:5;
53:24;54:7;57:1;
74:22;75:18;76:3
**described (5)**
55:11;64:4;82:13;
96:19;112:8
**designate (1)**
58:24
**designated (3)**
29:6,23;59:11
**designation (1)**
58:25
**designed (3)**
22:24,24;79:10
**desire (1)**
91:16
**desk (2)**
17:19;72:4
**despite (3)**
27:13,18;69:18
**detail (1)**
41:13
**details (2)**
18:12;53:20
**determination (4)**
20:3,12;24:18;40:5
**determinative (1)**
23:23
**determine (3)**
51:15;99:23;
126:13
**determined (2)**
51:16;97:25
**determines (1)**
96:16
**Deutsche (1)**
9:3
**develop (2)**
26:13;52:25
**deviate (1)**
121:11
**dialogue (2)**
67:23;84:3
**differ (3)**
50:5,6,16
**difference (2)**
41:18;69:1
**different (8)**
31:21;58:4;60:25;
86:8;91:11,17,17;
97:2
**differs (1)**
53:18
**difficult (2)**
62:16;83:11
**difficulty (1)**
37:17
**diligently (2)**
19:13;69:23
**diminishing (1)**
43:21
**direct (5)**
31:12;32:1;41:22;

42:15;45:11
**directly (1)**
41:1
**Directors (1)**
10:19
**disagree (3)**
23:19,24;72:24
**disagreement (4)**
20:18,22;54:9,10
**disagreements (1)**
54:12
**disclose (1)**
87:19
**disclosed (1)**
87:17
**discover (3)**
97:5,12,13
**discovery (49)**
17:9,16;25:18;
27:15,16,19;48:9,24;
51:18,20;52:25;53:5,
6,21,22;54:2,3,5,11;
57:4,6;65:9,11,13,16,
19,20,25;66:4,6,20;
69:5,5,7;75:2,17;
82:25;95:25;107:24;
108:11,15;110:10;
112:9,10,11,14,24;
113:2,3
**discrepancy (1)**
97:3
**discretion (1)**
99:23
**discuss (2)**
67:2;95:2
**discussing (2)**
69:2;94:25
**discussion (4)**
29:18,19;34:25;
40:16
**discussions (5)**
19:2;40:8;61:23;
70:13;79:18
**dismiss (3)**
96:14;97:25;99:24
**dismissal (5)**
98:1;99:7,13;
100:2;122:10
**disproportionality (1)**
23:5
**disproportionate (1)**
27:1
**Dispute (10)**
2:8;28:6;67:6;69:5,
5,7;74:19,21;83:2;
106:6
**disputed (2)**
59:18;71:9
**disputes (1)**
74:23
**district (10)**
32:21;107:12;
108:21;111:20;

112:1,18;113:25;
114:16,18,21
**divided (2)**
49:14;54:21
**Doc (8)**
2:2,5,11,14;3:2,15;
4:2;6:2
**Doc# (10)**
3:18;4:2,6,12,20;
5:2,7,12,17,22
**Docket (13)**
3:10;98:20;99:6;
101:3,8,22;105:25;
106:3,6,9;107:5,18,
21
**dockets (1)**
72:10
**document (7)**
48:9;53:15;65:19;
67:8;73:5,6;75:2
**documents (16)**
53:24;60:20,21;
68:15,17;76:4;91:20,
23;93:6,23,25;94:7,
12;97:1;116:12;
122:5
**DOJ (1)**
84:21
**dollar (4)**
18:25;19:14;24:14;
51:9
**dollars (6)**
24:25;26:21;27:2;
83:23;95:22;121:4
**done (23)**
21:15;27:15;33:5,
14;35:5;40:13;42:7;
57:5;60:10;61:3;
62:11,24;63:3;72:7,
8;76:1,2,2;80:11;
83:24;112:14;
115:25;125:17
**do-over (2)**
126:21,22
**dormant (1)**
110:12
**doubt (1)**
25:15
**down (9)**
34:7;42:8;49:8;
56:19;74:15;75:23;
76:16;111:18;114:23
**drawing (1)**
78:3
**Due (9)**
3:12,16,20;62:9;
78:12;95:10;105:24;
106:2,8
**dump (1)**
31:14
**Duncan (1)**
92:1
**duplication (5)**

22:12;29:13;48:12;
56:25;58:3
**duplicative (2)**
30:18;44:9
**during (4)**
62:10;82:7;91:11;
92:10
**duties (1)**
118:10
**dynamics (1)**
49:3

## E

**eagerly (1)**
76:17
**earlier (5)**
34:15;69:17;71:16;
87:12;96:10
**earliest (1)**
114:4
**early (6)**
19:12;33:14;39:18;
70:1;76:7;108:1
**easier (1)**
56:16
**easily (1)**
94:12
**East (1)**
12:4
**easy (1)**
80:10
**eating (2)**
26:4,9
**ECF (6)**
98:20,23;99:2,6,
12;105:24
**ECKSTEIN (12)**
8:7;82:15,16,16,
20;83:15,18,20;84:2,
7;86:22;87:2
**effect (2)**
113:5;128:12
**effective (2)**
45:5;86:2
**efficient (6)**
70:16;107:13;
113:17,19,20;114:20
**effort (5)**
27:10,13;100:9;
110:14,21
**efforts (2)**
22:12;84:2
**eight (3)**
50:24,25;52:22
**eighteen (3)**
55:5,17;57:4
**either (10)**
19:19;22:8;49:15;
67:12;71:5;72:17;
75:16;83:16;84:11;
87:6
**electronic (1)**

60:9

**eleven (1)**
29:6

**ELLIS (2)**
8:12,20

**else (13)**
47:25;48:21;49:17;
50:2;66:12;67:4;
84:15;85:13,18;94:6;
104:24;124:20;
128:22

**e-mail (1)**
87:15

**Embarcadero (1)**
14:4

**embarking (1)**
82:24

**Employ (2)**
2:16;3:4

**employee (1)**
77:25

**employer (2)**
108:3,8

**encourage (1)**
71:2

**encouraging (1)**
50:17

**encumbered (1)**
91:5

**end (15)**
23:8,14;33:11;
34:7;36:13;47:3;
49:13;54:5,7;56:6;
65:12;81:16;86:20;
108:12;112:4

**endeavoring (1)**
113:1

**ending (1)**
75:18

**engage (3)**
67:22;68:3;81:17

**engaged (1)**
68:17

**engagement (3)**
81:7;87:13,16

**enough (5)**
30:13;32:14;35:6;
54:4;60:2

**ensuring (1)**
69:22

**enter (5)**
19:4,23;23:1;37:4;
80:14;124:15;126:18

**entered (14)**
78:10,19;104:2,9;
108:5;119:5,10,18,
21,24;121:11;123:6,
12;126:20

**enters (1)**
104:11

**entertain (2)**
18:3;100:11

**entire (4)**

34:9;45:20,20;
79:10

**entities (2)**
51:2;124:11

**entitled (4)**
37:1;104:19,21;
128:4

**entity (1)**
92:8

**Entry (8)**
4:7,12;119:15;
121:18,20,21;125:9;
126:15

**enumerated (1)**
117:17

**equity (1)**
93:2

**Erica (1)**
115:16;118:17

**errors (1)**
97:5

**eScribers (1)**
6:21

**escrow (1)**
70:23

**especially (1)**
97:20

**ESQ (31)**
8:7,8,9,10,17,25;
9:7,14,15,23,24;10:7,
15,23,24;11:7,8,17,
25;12:7,16,24;13:8,
17,25;14:8,16,25;
15:8,16,24

**essence (1)**
22:21

**essentially (5)**
71:9;90:20;122:3,
6;129:6

**establish (5)**
25:10;96:20;98:1;
99:25;100:2

**established (1)**
98:9

**establishing (1)**
42:5

**estate (7)**
23:13;79:9;90:22;
94:9;96:17;100:3;
101:24

**estates (1)**
98:6

**estimate (7)**
39:2;42:24;46:6;
48:20;49:4;52:20;
56:17

**estimation (2)**
28:11;39:17

**et (2)**
55:23;64:18

**Eve (1)**
62:3

**even (6)**

30:13;37:10;63:3;
75:9;86:5;92:21

**evening (2)**
34:2;66:25

**evenly (1)**
42:9

**event (1)**
100:9

**events (4)**
99:20;112:3;114:1,
2

**Everybody (17)**
17:19;33:17;34:22;
36:10;38:11;41:21;
44:20;55:20;56:5;
57:6,12;73:6;76:10;
86:17;87:5;89:1;
117:19

**Everybody's (4)**
42:9;44:15;76:17;
79:5

**everyone (2)**
64:8;77:24

**eviction (1)**
95:9

**evidence (3)**
51:6;96:15;100:1

**evidentiary (1)**
100:6

**evolving (1)**
111:7

**ex (1)**
29:24

**exact (2)**
94:10;128:16

**exactly (5)**
45:5;94:4,9;
126:19,20

**examination (7)**
21:13;30:8;31:9;
32:24;40:22;43:22;
74:24

**examinations (1)**
47:2

**examine (4)**
26:24;32:13;63:19,
22

**examined (1)**
45:18

**Examiner (12)**
12:20;21:11;22:12;
23:4;26:20;69:2;
74:10;75:21;77:10;
84:12;96:16;97:16

**examiner- (1)**
74:14

**examiner's (4)**
74:18;76:7,17;
113:1

**examining (1)**
39:9

**example (5)**
25:9;44:17;51:2,

14;81:19

**examples (1)**
99:20

**exceed (1)**
92:25

**excess (2)**
53:1;83:23

**excessive (1)**
42:10

**exchange (1)**
67:3

**exchanged (2)**
62:25;68:19

**Excuse (7)**
32:7,15;41:13;
50:10;62:21;107:3;
125:8

**excused (2)**
77:7,14

**executed (1)**
92:19

**exhaustive (1)**
99:21

**exhibits (2)**
28:23;45:12

**exist (1)**
92:8

**exists (2)**
96:15;99:23

**expanded (1)**
68:13

**expect (10)**
30:1;33:8;40:22;
41:22;43:1;52:19;
55:7;56:9;57:25;
64:12

**expectation (2)**
30:16;40:1

**expecting (1)**
62:3

**Expedited (1)**
112:24

**expensive (1)**
79:6

**experience (2)**
31:6;75:21

**expert (26)**
30:1,7,8,22;32:2,
13;39:4;43:18;44:14;
45:13;46:5;53:5,21;
54:3,7;61:22;62:24;
63:13,14,20;64:11,
13,14,15,18,18

**experts (32)**
28:20;29:18,22;
30:6,18;31:1;39:8;
40:12,13,17,19;41:1;
42:15,16,21;43:3,24;
44:5,9,25;45:8;48:13,
14;51:19,20;53:25;
61:17;62:22;63:2,8,
18,19

**experts' (1)**

14;81:19

**explain (1)**
105:16

**explained (3)**
60:11;100:12;
118:19

**express (1)**
113:14

**expressed (5)**
78:14;79:3,14;
82:22;91:15

**expressly (1)**
59:10

**extended (1)**
67:20

**extending (1)**
60:24

**extension (2)**
77:1,1

**extent (11)**
19:21;36:7;78:11;
81:21;82:24;85:20;
97:4,11;124:13,14;
126:7

**extraordinarily (1)**
68:4

**extraordinary (1)**
83:21

**extremely (1)**
113:4

---

**F**

**face (2)**
22:24;123:24

**faced (1)**
73:8

**face-to-face (1)**
40:11

**facing (1)**
18:7

**fact (42)**
25:22;30:3;31:9,
10,15,19;32:1;39:3,9,
10,12,13,20,24;40:2,
9;42:25;43:1;45:20;
46:1,4,5,8;52:18,20;
53:5,21,24;54:2,5;
56:9;58:22,24,25;
59:3;68:25;73:4;
75:17;77:24;94:2;
112:13;114:14

**factor (7)**
22:15;23:6;25:7,8,
25;26:3;83:13

**factors (11)**
22:9,15;23:7,16,21,
23;25:3,23;26:24;
99:22;113:16

**facts (1)**
22:16

**factual (1)**
96:12

**failed (1)**
122:4
**failure (1)**
101:19
**fair (10)**
23:17;26:21;33:16;
44:24;52:22;54:4;
60:2;75:9;107:11;
108:3
**fairly (2)**
80:10;83:21
**fairness (1)**
37:2
**faith (5)**
27:20;93:20;96:22;
99:8,11
**fall (1)**
54:24
**falls (1)**
23:9
**familiar (5)**
85:22;89:8;100:22;
112:18;119:14
**Fannie (1)**
93:7
**Fantastic (1)**
57:22
**far (4)**
50:12;67:11;
104:15;112:15
**fare (1)**
51:11
**Fargo (1)**
13:12
**fashion (2)**
66:1;70:18
**fast (1)**
41:14
**fault (3)**
75:13;119:23;
125:3
**favor (2)**
122:21,22
**February (4)**
76:8;114:5,8,24
**Fed (13)**
79:19;81:4,6;82:4,
6;83:5,6,7,14,15,16;
87:15,21
**Federal (2)**
4:16;126:12
**Fed's (1)**
87:14
**feel (3)**
28:13,14;42:9
**feels (1)**
113:10
**fees (2)**
95:22;121:6
**feet (1)**
19:12
**Ferry (1)**
24:3

**few (2)**
39:7;61:3
**FGIC (6)**
12:3,11;29:5;48:2;
50:4,11
**FHFA (1)**
113:2
**fifteen (2)**
33:22;52:23
**fifteen- (1)**
55:24
**fifteen-day (1)**
110:5
**fifteen-minute (2)**
55:22;56:1
**Fifteenth (1)**
8:22
**fifth (1)**
83:21
**Fiftieth (1)**
12:13
**fight (1)**
37:22
**file (6)**
71:11;84:22;
101:19;105:14;
123:21;128:7
**filed (50)**
2:8,11,18;3:7;6:2,
3;37:1;69:14;70:1;
71:18;78:6;80:17;
81:13;87:12;90:19;
91:13,21,24;93:18;
95:17;98:21,24,25;
99:1;100:22;101:8;
103:7,13;104:5,16;
105:1,1,11;106:10;
107:11;108:5,9;
109:9;110:13;111:1,
5;114:3;117:4;
119:17,25;120:3,8;
122:10,12,14
**filing (7)**
71:18;78:8;100:18;
101:13;103:17;
104:23;116:16
**filings (1)**
95:24
**fill (3)**
85:25,25;88:15
**filling (1)**
49:2
**final (9)**
54:11;55:7,15;
57:5;64:7;80:14;
86:1;101:21;117:19
**finalized (1)**
66:14
**finally (4)**
39:24;73:7;98:4,12
**Financial (7)**
8:13,21;14:13;
36:3;108:2,7;109:6

**financing (2)**
90:25;91:2
**find (5)**
18:20;56:9;64:12;
75:20;91:1
**findings (1)**
56:9
**fine (3)**
86:18;89:18;128:9
**finish (5)**
33:15;35:10;43:17;
56:5;86:13
**finished (4)**
33:6,14;34:1;61:17
**finishing (1)**
55:23
**Firm (1)**
6:3
**firmer (1)**
41:23
**first (30)**
17:8,25;27:11;
35:21;43:3;48:3;
50:9;59:14,18,21,25;
60:3;17;67:6;75:3,4;
86:10,22,24;87:1;
95:19;100:25;101:1,
8;102:7,11;108:7;
116:3;122:4;129:7
**five (9)**
30:23;31:1;32:13;
46:18;49:12;53:14;
91:11,16,17
**FL (1)**
5:18
**flesh (1)**
28:8
**flex (1)**
56:15
**Floor (2)**
12:13;14:22
**Flower (1)**
12:12
**flurry (1)**
105:22
**focus (3)**
30:5;33:9;93:10
**focused (1)**
20:21
**focusing (1)**
52:5
**Foerster (8)**
53:12;69:12;77:20;
89:25;100:20;107:1;
115:17;118:18
**Following (1)**
69:17
**footnote (1)**
52:5
**Foreclose (2)**
4:10;129:7
**Foreclosure (13)**
3:5;4:15;79:6,11,

13;80:23;95:9;
101:11,17;102:19,20;
104:7;105:4
**foregoing (1)**
100:12
**forensic (1)**
44:21
**form (7)**
38:19;45:12;64:7;
73:17,21;81:6;84:5,7,
19
**formalities (1)**
30:25
**formally (1)**
76:9
**formula (1)**
51:25
**forth (4)**
81:9;97:15;99:14;
100:6
**forthright (1)**
94:4
**forty (2)**
26:20;75:8
**forward (13)**
18:19;20:11;24:21;
48:25;67:13;68:2,20;
89:1;107:14;111:23,
25;113:18;114:17
**found (5)**
64:19;74:12;99:6;
122:20,22
**four (5)**
33:8;48:16;53:14;
100:21;111:19
**frame (3)**
17:25;70:8;85:1
**Francisco (1)**
14:6
**FRANKEL (1)**
8:2
**Franklin (1)**
13:21
**frankly (3)**
41:12;47:10;
118:21
**Fraudulent (2)**
92:14;94:13
**Friday (6)**
19:18;20:7,15;
40:10;64:8;71:17
**frivolous (2)**
95:18;100:8
**front (3)**
17:23;19:10;26:16
**Frost (1)**
11:12
**fruitless (2)**
38:6,10
**fulfill (1)**
81:9
**full (2)**
92:24;115:20

**fund (2)**
90:24,24
**fundamental (1)**
91:1
**fundamentally (1)**
26:23
**funds (2)**
91:6;92:19
**further (9)**
20:1;32:17;44:18;
57:8;82:4;97:18;
98:18;100:8;118:21
**Furtherance (1)**
4:15
**future (2)**
95:24;98:8
**fuzzy (1)**
119:21

---

**G**

**GA (3)**
4:17;13:15;80:25
**GARRITY (1)**
9:7
**Gary (2)**
2:18;3:7
**gather (1)**
21:5
**gave (3)**
28:13,13;59:23;
61:22;62:12;71:17
**general (3)**
37:6;59:2;96:21
**generally (6)**
33:22;34:3;42:7,8;
44:12;55:24
**genesis (1)**
62:22
**gets (3)**
46:3;51:15;119:20
**GIBBS (1)**
13:2
**Gilbert (3)**
97:23;99:5,6
**Gilberts (3)**
97:24;98:1;99:7
**give-and-take (1)**
67:9
**given (7)**
22:16;52:25;56:10,
21;70:15;73:7;95:15
**giving (3)**
34:22;47:10;64:6
**glad (1)**
40:6
**GLENN (2)**
15:24;76:13
**glitches (1)**
66:15
**Global (2)**
99:17,18
**GMAC (27)**

2:6,8;5:24;14:20;
16:4,7;80:20,22;
90:22;91:9,20,25;
92:19;93:7;95:4,6,7,
13,24,25;103:8;
105:1;106:4,6;109:6;
122:4;125:11
**GMAC's (2)**
95:15,22
**goals (1)**
82:1
**goes (7)**
28:16;48:16;64:10;
68:2;83:8;94:3;124:8
**GOLDER (2)**
14:25;109:20
**Gonzalez (3)**
74:13;76:12;77:2
**Good (23)**
17:5;19:10;26:21;
36:2;48:1;49:18;
53:11;69:9,11;74:6;
76:23;77:18,21;
84:16;89:24;90:9;
100:19;102:3,4;
106:25;118:17;
126:15;128:7
**GOTTLIEB (3)**
10:2;49:19;85:15
**governors (1)**
87:18
**grab (1)**
17:19
**Grand (1)**
15:13
**Grant (4)**
81:7,8;85:19;87:11
**granted (8)**
80:19,24;89:9;
111:22;112:15;
118:3;121:1;129:13
**Granting (2)**
4:17;83:25
**GRAY (1)**
11:20
**great (4)**
23:6;54:19;76:3,4
**ground (1)**
36:11
**grounds (2)**
98:3;100:10
**Group (5)**
9:19;13:21;26:22;
51:1;71:16
**GUERIN (1)**
15:8
**guess (6)**
39:16;41:2;48:20;
112:21;120:1;129:18
**guise (1)**
26:23

## H

**half (4)**
35:14;45:15;52:21;
75:24
**Hamilton (4)**
3:5;10:2;79:2;88:4
**hammer (1)**
74:25
**hammered (1)**
118:9
**Hammock (1)**
5:3
**hand (8)**
38:8,14;71:13;
76:19;80:1;88:11;
93:24;94:1
**handling (2)**
48:25;66:24
**hands (1)**
115:20
**happen (6)**
30:18;42:3;44:20,
23;108:1;114:24
**happened (4)**
38:21;73:8;92:25;
125:12
**happens (2)**
45:4;121:20
**happy (5)**
18:13;36:18;60:4;
62:18;65:3;67:4;
82:18;88:10
**hard (5)**
45:4,15,16;50:18;
75:23
**HARRISON (1)**
9:24
**Hartford (1)**
14:23
**Hathaway (1)**
15:12
**hear (20)**
25:14;33:18;35:18,
21;40:25;56:15;
59:24;61:1;64:16;
67:15;71:5;82:15;
90:7;98:17;114:20,
22;117:6;118:13,15;
127:24
**heard (25)**
18:14;22:6;41:3;
45:14;47:25;48:21;
49:17;50:2;58:21;
60:15;61:16;66:2,12;
74:13;76:19,20;
78:12;84:15;85:13,
18;106:14;109:14;
124:23;129:4,12
**Hearing (76)**
3:18;4:23;5:5,10,
15,20;6:6;17:6,13;

18:5,8;20:19,23;21:2,
24;22:1,6,7,9,13;
24:20,24;25:2,17,19;
27:2,11,22,25;28:11;
29:18,21;33:11;
39:16;56:13;57:7;
59:20;60:3;61:24;
63:22;65:7;69:22,25;
70:9,19;71:22;76:20;
77:23;79:12;80:13;
81:5;82:22;84:9;
86:1,8;91:15,24,24;
109:8;112:24;
116:17;119:9,11,21;
120:17;121:12;
122:16,18,23;123:13;
125:1,2,5,10;127:6;
129:21
**hearing-in-chief (1)**
38:20
**hearings (1)**
112:23
**heart (1)**
79:19
**held (3)**
119:9;120:17;
122:18
**help (3)**
53:14;90:24;91:7
**helpful (2)**
47:11;70:8
**here's (3)**
54:17;69:4;128:10
**hey (1)**
108:7
**high (2)**
48:20;49:13
**higher (1)**
25:12
**highly (2)**
48:5,8
**history (1)**
90:21
**Hoc (1)**
9:19
**HOFF (9)**
14:16;48:22,22;
49:9,12;50:16,18,22;
51:8
**hold (4)**
23:17;27:16;33:2;
38:9
**holdco (1)**
49:23
**holders (2)**
38:16,17
**Holdings (1)**
99:17
**holidays (3)**
62:10;82:19,20
**Honor (216)**
17:5,8,10,11,14,24;
18:4,7,13,22;19:23;

20:1,11,17;21:3,6,11,
14,21;22:19;23:11,
15;24:9,10;27:3;
28:13;30:10,16;32:4,
10,12;35:11,16,21;
36:2,5,9,16;37:9;
39:2;40:6,16,19,24,
25;41:12;42:14,23;
43:3,6;44:3;45:3,5,9,
23;46:6,11,16,21;
47:7,13,17;48:1,2,7,
8,14;49:10,18;50:7,
10,11;52:2,4,12,17;
53:7,11;54:13;57:15;
58:11,20,23;59:6,14;
60:18;61:7,12,13;
63:12;64:3,21,23;
65:3,10,15;66:3,16,
21,25;67:18;68:1,9,
12,14,24;69:9,11;
70:1,5,12;71:12,15,
25;72:13,21;73:12,
16,24;74:6,9,13;
75:13;76:25;77:6,6,
14,18,19,20,23,24;
78:7,8,11,22;79:20,
24;80:6;81:5,15,24;
82:16,20,22,23;
84:16,19;85:1,14,24;
86:2,7,15,18,21;87:4,
10;88:1,10,13,19;
89:5,11,14,18,20,24;
90:5;94:21;95:3;
96:18;97:24,25;
100:19;102:3;
104:12;105:17;
106:17,25;107:2,7,
19;109:19,21,25;
110:1,25;111:14,18;
115:3,9,12,15,16,19;
116:1,13;117:24;
118:17;119:5,20;
121:13,22;123:1,16,
20;124:8,24;126:7,
22;128:19,21,24;
129:9,14
**Honor's (5)**
44:4;48:12;72:9;
78:9,14
**hope (5)**
71:3,9;72:14;
78:14;81:17
**hopefully (5)**
34:3;66:14;78:13,
20;89:10
**hoping (2)**
20:10;83:5
**hour (4)**
47:23;52:21,21;
53:1
**hours (50)**
22:4;32:22;33:3,4,
23,24;34:12,23,23;

35:3,5,15;36:9,12,17;
37:10;41:5,24;42:2,3,
22;43:20,20;44:5,6;
45:10,13;46:2,6,10,
11,23,24;48:4,15;
49:11,24;52:22;55:1,
6,6,17,18,22,24,25;
56:1,3,14;57:4
**House (1)**
14:21
**housekeeping (1)**
115:23
**Houston (1)**
13:6
**HOWARD (1)**
12:7
**HSBC (1)**
10:11
**Hudson (3)**
2:16;79:2;88:5,6
**huge (1)**
115:20
**Huh (2)**
118:14;127:24
**hypothesize (1)**
23:11

## I

**ice (1)**
76:21
**idea (2)**
80:12;86:1
**identified (2)**
18:25;67:1
**identify (1)**
50:9
**identifying (1)**
75:6
**ie (1)**
22:17
**II (3)**
4:17;16:6;89:15
**III (1)**
16:5
**IL (1)**
11:5
**implications (1)**
74:17
**important (8)**
25:7,8;70:9;76:18;
112:3,21;114:7,12
**impose (4)**
57:5;100:11;
101:12,18
**impress (1)**
83:15
**inappropriate (1)**
66:6
**Inc (2)**
8:13,21
**incentive (3)**
77:25;86:16;87:5

**includes (2)**
28:19;55:2
**including (3)**
58:22;60:19;79:5
**incredibly (1)**
72:5
**indeed (1)**
23:16
**indemnification (1)**
70:20
**indemnified (1)**
70:20
**Independent (1)**
10:19
**Indiana (1)**
5:8
**indicate (2)**
63:18;121:2
**indicated (6)**
28:5;29:20;30:20;
39:12;48:24;81:6
**indicates (2)**
100:14;119:15
**indication (1)**
110:7
**indications (1)**
29:3
**individual (2)**
50:23;111:3
**inform (1)**
30:11
**information (5)**
26:2;87:17,19,23;
96:3
**informed (2)**
59:3;116:15
**in-house (1)**
110:15
**initial (1)**
19:1
**initially (5)**
56:20;86:12;90:16;
102:13;122:6
**injured (1)**
79:11
**innocent (1)**
37:21
**input (1)**
76:18
**inquiry (1)**
109:13
**insisted (1)**
27:9
**insisting (1)**
35:10
**instance (1)**
95:12
**instead (1)**
22:25
**institutional (7)**
18:11,13,16;22:18,
23,25;55:3
**institutions (1)**

83:9
**Insurance (1)**
14:12
**insured (3)**
50:24;51:3,11
**intend (3)**
29:1;45:4;75:22
**intended (2)**
112:9;116:6
**interest (3)**
95:14;98:6,9
**interested (4)**
23:12,13;84:24;
95:7
**interests (10)**
23:13;37:5;50:5,6,
16;58:4;70:17;84:13;
96:17;100:3
**interfere (1)**
113:25
**interim (13)**
20:24;74:20;79:21;
80:12,12,19;81:2;
82:23;85:20;86:11;
87:7;88:8;97:4
**intermediate (1)**
58:10
**interrupt (3)**
41:15;70:25;96:4;
111:24
**interrupted (1)**
96:5
**interview (1)**
75:16
**interviews (4)**
75:3,4,8;76:4
**into (16)**
23:1;24:19;34:1,
14;37:4;39:7;45:25;
53:14;54:4;57:6;
72:8;75:20;76:18;
77:20;80:11;89:19
**intractable (1)**
75:14
**invest (1)**
91:7
**investigation (2)**
26:17;113:1
**Investors (8)**
13:3;18:11,13,17;
22:19,23,25;55:3
**invitation (1)**
78:9
**involved (1)**
84:13
**involves (3)**
60:9;70:23;71:4
**Iridium (8)**
22:9,15;23:7,15,
21;24:2,10;25:3
**Island (1)**
5:3
**issue (31)**

20:5,8,13;21:8,13;
24:24;26:14,15;
28:23;34:2;48:2,3;
51:23;52:6;55:1;
59:18,25;60:1;63:12;
75:14;84:10,20;
86:17;103:9,25;
106:21;108:3,13;
112:8;113:2;114:12
**Issued (5)**
3:13,21;102:14;
106:2,9
**Issues (48)**
3:6;17:16;19:4,6,
22,23,25;20:4,6,12,
20;21:22,22;22:3;
37:2;49:22,22;50:22;
51:2,13,14,21;52:7,9,
10,12,14;58:5,7,9;
59:16;62:19;65:18,
20;66:20;67:1;68:12;
69:19,21;70:8;71:9;
84:8;96:24;97:22;
99:3;101:9,15;
114:11
**issuing (1)**
102:15
**item (8)**
17:8;69:13;88:20;
90:1;100:25;101:7,
14,21
**items (1)**
100:21
**iterations (1)**
52:1

**J**

**JACKSON (4)**
11:11;14:19;
109:20,23
**JAMES (2)**
9:7;100:19
**January (17)**
20:19,23;21:24;
27:22,23;28:3;56:4;
62:9,12,13,15;86:3;
107:13,22;112:4;
113:4,24
**Jennifer (1)**
110:15
**JESSICA (1)**
11:8
**job (1)**
30:21
**JOHN (2)**
10:15;13:17
**joint (2)**
113:14;114:21
**JONATHAN (2)**
14:16;48:22
**JONES (2)**
12:2,10

**JOSEPH (4)**
10:23;16:5,7;
115:15
**JPMorgan (3)**
89:6,8,9
**JR (1)**
9:7
**Judge (41)**
17:24;19:3,8,10,
15;20:10;22:5,8;
23:5,7,11;25:21,25;
26:4,14;27:6;28:10,
11;29:2;30:15;31:6,
11,19;33:10;34:25;
35:14;53:10;62:5,18;
76:12;77:16;92:2;
108:18,20;109:8;
113:13;114:22;
124:6;125:9;126:21;
127:3
**judges (2)**
32:21;99:22
**judgment (21)**
108:5;112:15;
113:23;118:2,4;
119:24;122:2,10;
123:10,11,12;124:3,
5,14;125:22,22;
126:15;127:9,14;
128:4,6
**judgments (1)**
127:4
**July (5)**
60:19;68:21;69:1;
103:16;107:12
**June (16)**
67:13,16,24;68:7,
14;103:16;118:2;
122:1,20,23,24;
123:12;125:10,22;
127:4,6
**Junior (1)**
9:19
**jurisdiction (2)**
118:11;126:12

**K**

**KASTER (2)**
14:2;107:8
**KATHY (1)**
13:8
**KAUFMAN (20)**
8:10;46:1;52:15,
16,16;60:15,16;61:2,
5,7,10,12;66:2,3,10,
22,23,25;67:11,17
**keep (3)**
45:16;46:25;92:14
**keeps (1)**
92:15
**KEIP (2)**
78:7,15

**KEITH (1)**
11:25
**Kenneth (11)**
2:6,8,9;3:10,15;
8:7;16:3;82:16;
100:22;106:4,6
**key (1)**
77:25
**KIBLER (1)**
10:15
**kill (1)**
62:2
**kind (2)**
50:14;51:9
**KIRKLAND (2)**
8:12,20
**KISSEL (1)**
9:9
**Kit (1)**
71:15
**knew (1)**
26:16
**knowing (2)**
30:10;94:8
**knowledge (1)**
73:17
**knows (3)**
18:7;22:19;60:17
**KOTWICK (1)**
9:15
**KRAMER (3)**
8:2;52:16;82:17

**L**

**Labor (2)**
107:11;108:3
**lack (1)**
114:2
**Lafayette (1)**
5:8
**laid (2)**
64:17;118:10
**Lakeside (1)**
5:13
**Lane (1)**
5:3
**language (1)**
80:18
**large (1)**
72:5;112:2
**largely (1)**
49:1
**larger (2)**
70:10;75:7
**largest (1)**
83:22
**LARRY (1)**
11:7
**last (21)**
17:10;18:8;22:4;
27:21;29:18;39:15,
16;41:17;59:20;63:6,

17;66:25;70:2;71:18;
72:22,23;74:12;79:2;
82:22;84:9;116:8

**later (6)**
19:18;76:13,15;
84:11;95:23;126:24

**latter (1)**
75:24

**launch (1)**
89:19

**LAW (10)**
14:2;24:22;25:6;
33:3;56:10;92:20;
119:14;121:18;
123:5;126:15

**lawsuit (2)**
95:13;122:3

**lay (5)**
19:11;24:18;41:12;
71:8;72:16

**lead (7)**
26:10;44:13;48:10;
49:2,15,21;58:2

**leads (3)**
49:15;105:6,10

**leaning (1)**
37:17

**least (11)**
29:4;34:15;39:24;
40:1;46:4;68:19;
73:20;83:22;102:11,
16;110:4

**leave (10)**
17:18;20:11,14;
32:15,15;65:10,12;
73:22;86:12;124:9

**leaves (5)**
61:25;65:24;66:7;
79:17;127:20

**leaving (3)**
62:9,10;99:21

**led (1)**
27:1

**LEDYARD (1)**
13:20

**Lee (2)**
2:18;3:7

**left (4)**
47:4;56:14;62:5;
113:6

**legal (3)**
52:8;96:12;100:6

**legs (1)**
62:1

**LEMAY (14)**
12:24;21:11,11,17,
19;74:6,9,9;76:12,15;
77:5,6,9,12

**lenders (1)**
91:17

**length (7)**
22:16;29:11;33:1;
41:19;42:19;47:8,8

**lengthy (1)**
79:13

**less (9)**
33:6;40:19;47:1;
48:17;50:12;55:4;
57:4;79:9;127:20

**lets (1)**
117:18

**letter (10)**
17:15;41:17;66:19,
25;67:3;81:7;83:5;
87:13,16;125:4

**letters (1)**
17:23

**letting (1)**
49:1

**LEVIN (3)**
8:2;52:16;82:17

**LEWIS (4)**
9:2;14:19;109:20,
23

**Lexington (1)**
8:14

**Liberty (1)**
10:4

**Liens (1)**
4:10

**lift (15)**
99:5;111:25;112:5,
20;113:7,12;114:9,
25;115:1,6;123:21;
124:4;127:2;129:6,6

**lifted (1)**
114:10

**lifting (1)**
128:12

**lifts (1)**
128:6

**light (1)**
114:1

**LIGHTNER (6)**
10:7;49:18,19;
50:1;85:14,14

**likely (4)**
35:18;57:6;69:2;
98:13

**likewise (1)**
98:25

**limit (2)**
46:1;57:5

**Limited (7)**
3:11,19;84:22;
105:25;106:7;
112:11,14

**limits (4)**
26:12;42:5;56:21;
57:7

**line (1)**
54:24

**liquidate (2)**
111:20;113:17

**liquidation (1)**
97:19

**lis (6)**
120:18,22;124:18,
25,25;128:7

**list (3)**
28:19;99:21;
112:21

**listed (1)**
55:13

**listen (2)**
55:20;63:20

**literally (1)**
35:10

**litigate (2)**
110:18,22

**litigation (4)**
75:10,17;109:22;
124:12

**little (11)**
28:4,8;56:15,21;
59:7;60:6;68:13;
69:1;94:22;107:9;
119:21

**live (3)**
36:17;41:1;65:5

**lived (1)**
113:22

**LLC (8)**
2:6,8,19;3:8;5:24,
24;6:21;106:4

**LLP (22)**
2:16;3:5;4:15;8:2,
12,20;9:2,9,18;10:18;
11:2,11,20;12:19;
13:2,11,20;14:11,19;
15:2,11,19

**Loan (3)**
2:5;95:4;106:3

**Local (3)**
2:15;3:4;122:9

**located (4)**
5:3,8,13;101:3

**lock (1)**
45:16

**locking (1)**
41:24

**long (4)**
43:7;65:16;75:20;
107:18

**Look (7)**
34:19;50:23,25;
62:12;75:19;85:22;
119:1

**looking (6)**
50:22;51:8,11;
52:24;103:22;111:4

**looks (1)**
61:24

**Lorenzo (1)**
77:19

**Los (2)**
12:14;15:14

**lose (1)**
44:1

**losing (1)**
39:16

**lost (1)**
103:25

**lot (9)**
38:11;59:16;60:10;
66:18;74:21;76:3,4,
22;90:23

**Louisiana (1)**
13:4

**lowest (2)**
24:25;25:5

**Ltd (1)**
99:17

**luck (1)**
128:7

**lunch (2)**
47:3;115:22

## M

**Madden (1)**
40:10

**Mae (1)**
93:8

**magnitude (1)**
56:10

**major (1)**
98:13

**makes (2)**
35:21;96:21

**making (4)**
20:11;24:18;95:23;
113:18

**manage (1)**
111:7

**managed (1)**
17:18

**management (1)**
113:15

**manner (1)**
116:10

**many (17)**
28:4,20;29:12,17,
18;34:4;40:8;41:5;
49:11,22;68:20;75:9;
83:9,9;109:3,5;
111:12

**March (3)**
114:5,8,24

**Marinuzzi (41)**
74:5;77:17,18,19;
78:2,22,24;80:1,3,6;
85:19,24;86:7,14,15,
18,21;87:1,4,8,10;
88:1,5,7,10,13,15,17,
19,24;89:14,18,20;
128:22,24;129:2,9,
11,14,16,20

**MARK (4)**
9:15;10:7;49:18;
85:14

**marked (1)**

**marked-up (1)**
82:14

**Market (1)**
15:4

**MARLA (1)**
15:8

**Marlboro (2)**
92:17;93:4

**MARTIN (9)**
89:24,25;90:4;
94:21,23,25;96:9;
98:16;100:17

**Martinez (1)**
108:20

**Mass (1)**
93:4

**Massachusetts (1)**
92:17

**Masumoto (1)**
80:9

**materials (2)**
116:16,20

**math (1)**
46:16

**matter (18)**
18:19;21:25;25:15;
32:18;55:8;56:11;
75:23;85:22;86:10;
89:8;100:16;105:15;
107:2,21;114:4,13,
14;115:12

**matters (15)**
17:6,9;18:2;25:19;
69:23;74:7;77:21;
112:3,22;114:7,23;
115:20,21,24;128:25

**maximum (1)**
97:20

**May (81)**
2:17;3:7;4:8;20:5;
23:22,22;24:16;27:3;
31:20;32:5;34:21,24;
35:5,11;36:19;38:18;
40:19;43:7;44:6,16;
45:14;47:11;50:22;
51:2,12,13,16,20;
52:8,23;53:7;56:8,15,
16;57:2,25;58:4,5,7;
60:18;62:17;65:21;
70:1;71:11;73:4;
76:11;77:6,14;81:5;
82:15;83:4,10,10;
90:4;91:6;94:6;
96:13;98:5;102:5;
111:18;112:12;
113:16,18;117:25;
118:3;119:8;120:4;
121:15,23;124:18,19;
125:5,8,10;126:4,5,
20;127:4,13;128:14,
17

**maybe (9)**

12-12020-mg    Doc 1800    Filed 10/10/12    Entered 10/11/12 15:25:19    Main Document

RESIDENTIAL CAPITAL, LLC, et al.    Pg 144 of 154

Case No. 12-12020-mg    October 10, 2012

25:7;38:10;39:25;
79:19;81:21,22;83:4;
112:17;114:12
**MBIA (8)**
14:12;29:5;48:23;
50:4,23;51:3,11;58:5
**meal (1)**
115:25
**mean (24)**
34:6;37:23;38:1,3;
42:1;43:21;45:20;
49:5;71:22;72:7;
104:4,18;114:4,5,11,
17;116:10;121:17;
123:17;124:6;
125:16;126:21;
128:1,3
**meaning (1)**
123:16
**means (1)**
31:25
**meant (1)**
34:17
**meantime (1)**
76:23
**meanwhile (1)**
84:12
**mechanism (1)**
51:10
**mediation (1)**
111:4
**meet (2)**
41:23;110:5
**meet-and-confer (1)**
68:3
**meeting (5)**
40:9;70:14;77:1,9;
79:13
**Mellon (1)**
15:20
**members (1)**
108:25
**memorandum (2)**
90:12;98:21
**memory (1)**
103:2
**mention (1)**
72:25
**mentioned (5)**
59:1;92:16;93:5;
95:8,20
**mentioning (1)**
92:15
**meritorious (1)**
22:23
**merits (4)**
18:24;19:14;40:11;
94:25
**met (3)**
60:3;79:12;96:18
**MF (2)**
99:17,18
**microphone (3)**

21:10;59:7;94:22
**middle (2)**
107:21;110:5
**midst (2)**
74:25;75:4
**might (7)**
47:9;52:12;61:24;
86:3;91:6;116:24;
126:25
**MILBURN (1)**
13:20
**million (3)**
26:20;83:23;
110:20
**millions (1)**
27:2
**mind (5)**
25:1;33:9;57:13;
96:9;124:6
**mindful (5)**
31:17;72:9;82:21,
23;85:10
**ministerial (2)**
119:15,18;121:24;
126:8,16
**minnow (2)**
26:4,9
**minor (1)**
65:6
**minute (4)**
33:20,22;55:25;
95:2
**minutes (2)**
21:15;52:23
**miraculous (1)**
33:7
**mischaracterized (1)**
102:11
**misconduct (4)**
93:20;96:22;99:8,
11
**misfortune (1)**
107:17
**misimpression (1)**
73:1
**mistaken (1)**
86:4
**modifications (1)**
80:16
**modified (2)**
78:7;80:18
**modify (1)**
83:11
**MOLDOVAN (1)**
10:23
**moment (4)**
17:13;30:6;45:23;
73:1
**Monday (4)**
56:2;81:13;86:22;
116:16
**money (3)**
38:11;79:9;81:16

**monolithic (1)**
51:1
**Montgomery (1)**
3:21
**month (3)**
60:22;77:23;111:6
**months (3)**
110:12;111:19,19
**more (22)**
21:4;28:8,12;
29:20;31:24;32:3;
34:21;37:19;41:8;
43:19;46:25;52:8;
57:23;60:6,23;72:11;
74:11;94:12;106:17;
114:12,12;127:20
**MORGAN (1)**
9:2
**morning (19)**
17:5;33:23;36:2;
48:1;49:18;53:11;
69:11;74:14;79:24;
80:8;84:16,17;87:15;
89:24;90:9;107:17,
18;112:23;116:16
**MORRISON (9)**
10:18;53:12;69:12;
77:19;89:25;100:20;
107:1;115:17;118:18
**Mortgage (21)**
2:5,6,7,8;5:24;
14:20;80:21,22;
83:22;92:24;93:1,7;
95:4;101:24;103:8;
106:3,4,5;107:10;
109:7;122:4
**mortgagee (1)**
129:7
**Mortgages (2)**
2:7;106:5
**most (13)**
25:8;43:20;45:5;
59:15;70:16;75:9;
107:13;108:6;
112:16;113:17,19,20;
114:20
**mostly (1)**
85:1
**Motion (113)**
2:3,5,6,11;3:10,12,
15,18,19;4:2,6,12,20;
5:2,7,12,17,22,22;
6:2;17:9,13;27:5;
36:6;37:24;38:1,3,
15;55:11;77:25;78:6;
80:17;85:20;88:20;
89:9,15;90:2,8,12;
91:8,22;93:18;95:1;
96:10;97:23;98:2,19,
22;99:1,3,5,6,10;
100:8,9,11,13,14,25;
101:2,2,6,8,9,10,15,
21,22;102:11,12,12;

104:16,23;105:23,25;
106:1,3,4,7,8;107:3,
24;108:9;112:20;
113:7,23;115:1,6,13;
116:4;117:4,6,17,25;
118:1,2,12;119:25;
120:4,17,18,20;
121:1;122:10,14,22,
23;123:22;124:5,13,
25;125:7;128:7
**motions (9)**
25:3;26:25;100:21;
101:16,25;104:5;
105:22;106:10;113:6
**movant (1)**
96:14
**movants (4)**
107:4,8,10;110:3
**move (4)**
20:19;41:14;59:6;
125:21
**moved (1)**
28:3
**moving (11)**
20:23;27:12;28:11;
41:18;56:16,19,22;
68:20;99:16,25;
110:7
**much (30)**
26:1;27:14,15,15;
28:17,17,20,23;
29:13,25;30:7,13;
31:2;32:25;36:8;
42:13;44:4;45:17;
46:7;47:3,4;48:18;
52:13;56:25;66:17;
75:7;77:1,5;78:23;
87:23
**multiple (1)**
54:4
**MUNGER (1)**
15:11
**must (4)**
25:4;74:21,22;
75:10

**N**

**NA (3)**
9:10;10:11;13:12
**NAFTALIS (1)**
8:2
**naive (1)**
83:4
**named (1)**
95:12
**names (1)**
52:24
**narrative (2)**
32:1;45:12
**Nationstar (5)**
11:3;70:21,21;
84:25;85:5

**nats (1)**
19:16
**nature (3)**
37:19;70:10;
121:24
**near (2)**
40:13;98:8
**necessarily (2)**
29:11;51:23
**necessary (2)**
23:17;68:14
**need (36)**
18:5;26:23;27:1;
30:17;31:7;35:5,14;
37:10;38:18,21;
43:23;44:10;45:1,10,
13;46:7,9;47:16;
48:17,19;59:10;60:6;
61:13;62:15;72:7,22,
23;74:23;75:12;76:6;
77:9;81:4,20;82:1;
85:25;98:17
**needed (4)**
26:16;52:13;83:25;
116:17
**needing (1)**
30:14
**needs (2)**
44:20;64:14
**negative (1)**
113:5
**negotiate (3)**
20:9;90:24;91:17
**negotiating (2)**
91:10;98:12
**negotiations (6)**
22:3,11,16,17;
25:18;76:19
**neighborhood (3)**
52:22;75:8;110:17
**nevertheless (1)**
112:11
**New (28)**
5:3;6:23;8:5,15;
9:5,12,21;10:5,13,21;
11:23;12:5,22;13:23;
14:14;15:20,22;21:2,
24;53:16;59:23;60:2;
62:14;63:5;64:12,13,
17;66:5
**news (2)**
19:10;77:21
**Newton (6)**
100:19,19;102:8,9,
10;106:15
**next (8)**
69:10;71:6;88:19;
90:1;100:16,21;
107:2;115:12
**NICHOLS (2)**
14:2;107:8
**night (8)**
17:10;34:7;41:18;

56:6;63:6;70:2;
71:18;74:12
**Nine (2)**
35:15;36:18
**nine-hour (1)**
56:2
**ninetieth (1)**
80:14
**ninety (2)**
80:13;86:2
**ninety- (1)**
108:24
**ninety-day (1)**
82:7
**ninety-one (2)**
107:10;109:4
**nits (1)**
19:16
**non- (1)**
114:14
**nondebtor (2)**
124:11,15
**nondebtors (2)**
65:8,25
**nonduplicative (1)**
45:1
**none (1)**
18:13
**nonexclusive (1)**
23:23
**noon (2)**
71:17;78:12
**Norm (2)**
88:24;106:25
**North (2)**
5:8,18
**note (2)**
98:2;101:24
**noted (2)**
95:14;96:10
**Noteholders (2)**
9:19;11:21
**Notes (2)**
2:7;106:5
**notice (12)**
19:19;76:10;78:9;
82:9;91:22;101:13,
19;103:14;105:2,14,
14;108:4
**noticed (2)**
90:18;92:2
**notion (2)**
66:5;76:21
**notwithstanding (1)**
18:18
**November (13)**
27:12,12,25;53:24,
25;54:5,12;57:11;
65:9,13;66:1;75:11,
18
**nowhere (1)**
64:19
**number (32)**

17:3,6,11,14;18:6;
22:6;25:2;32:22;
33:4,8;35:3;47:2;
51:9,15;65:7;95:20;
98:20,23;99:7,12;
100:25;101:3,7,8,14,
21,22;106:6,10;
112:2;116:14,15
**numerous (3)**
27:10,14;95:18
**Nunc (2)**
2:17;3:6
**NW (1)**
8:22
**NY (15)**
6:23;8:5,15;9:5,12,
21;10:5,13,21;11:23;
12:5,22;13:23;14:14;
15:22
**NYHAN (1)**
11:7

## O

**object (2)**
29:25;44:11
**objected (1)**
80:7
**objecting (7)**
37:18;48:6,16;
49:14;65:11;84:25;
85:4
**objection (7)**
37:19;84:23;90:17,
20;98:24,25;127:17
**Objections (13)**
2:3;38:16;61:21;
69:14,20;70:10,14;
71:6;78:12,13,20;
90:19;116:4
**objectors (11)**
29:7;39:25;42:16;
44:6,12;56:23,24;
57:18,23;63:2;65:16
**objectors' (1)**
58:4
**objects (1)**
25:10
**obligation (1)**
105:13
**Obligations (8)**
4:16;20:24;70:20;
79:4,16;80:24;81:9;
85:6
**observations (1)**
82:22
**Obtain (2)**
4:8;88:21
**obviously (10)**
32:16;36:5;52:7;
69:20;75:13;76:18;
79:6;80:16;81:7;89:9
**occasioned (1)**

18:4
**occurred (3)**
22:4;27:21;57:2
**occurring (1)**
92:15
**o'clock (5)**
34:6;69:6,7;
129:19,21
**October (11)**
53:15;58:25;59:19;
61:11;65:3;69:25;
71:23,23;72:1;90:19;
98:25
**off (9)**
44:24;60:9;62:1;
63:21;75:22;85:9;
92:24;94:17;115:22
**offer (3)**
38:1;51:6;106:17
**offering (1)**
92:25
**Official (1)**
8:3
**OLSON (1)**
15:11
**omnibus (5)**
17:6;55:10,13,14;
73:18
**Once (4)**
52:4;57:2;99:24;
104:19
**One (78)**
9:11;10:4;11:4;
14:4,13;17:11;20:8;
21:25;22:6,10;23:6,
23;25:22;26:24;
30:20;31:24;32:3;
33:11;37:18;39:2,24;
40:1;42:22;43:1;
45:23;46:2,3,4,5,10;
47:2;48:3,10,10;
52:19;55:8;56:16;
57:15;58:1,20;59:1;
62:7,20,20;65:6;68:6,
7;70:8,16;72:25;
73:13;76:16;79:24;
80:1;90:25;91:10;
93:24;95:12;96:4;
100:25;103:4,14;
104:13;105:7;
107:15;108:25;
109:11,12;110:2;
111:7,16;112:10;
114:11;116:14,15;
117:25;118:3;120:8
**ones (1)**
62:5
**only (18)**
23:13;24:24;25:18;
29:15;63:7;90:16;
91:19;93:17;102:24;
103:4,14;104:12,15,
19;116:12;121:19;

126:14;127:7
**open (8)**
20:4,12,13;25:1;
65:10,12,24;79:18
**opening (8)**
31:25;32:23;34:10;
46:19;47:1,8,11,16
**openings (1)**
45:21
**operate (1)**
87:24
**operating (1)**
98:10
**operations@escribersnet (1)**
6:25
**operative (1)**
80:18
**opine (1)**
30:22
**opinion (2)**
99:5;103:23
**opportunity (9)**
22:13;26:13;44:25;
63:4;81:21;82:3,11;
83:1;108:17
**oppose (2)**
50:17;124:16
**opposed (2)**
25:17;83:24
**opposes (1)**
50:5
**opposing (4)**
40:5,19;54:22;55:4
**opposition (4)**
62:25;96:20;97:16;
99:1
**opted-in (1)**
109:3
**opt-in (2)**
109:1,2
**option (1)**
99:22
**options (2)**
91:12,18
**Order (117)**
3:2,11,11,19,19;
4:7,12,17,18;17:12,
25;18:4,10,21;19:4,8,
9,17,20,23;20:5,16;
37:2;38:19;58:23,23;
59:4,10,20;60:19;
64:7;66:7,14;76:8;
78:17,19;79:1,3,4,14,
17;80:10,11,11,12,12,
18,22,25;81:1,4,10,
14,22;82:14;83:2,8;
84:5,8,19,21;85:7,16,
20;86:1,11;87:7;
88:8;89:1,12;91:18;
100:13;101:1;
102:14,15;103:10;
104:1,9;105:25;
106:1,7,8,11,23;

115:5;119:8,9,13,15,
17,22;121:6,10,11,
15,19,21,23;122:24,
25;123:3,6,11,21;
124:15,18,19,25;
125:9,12,14;126:5,5,
15,18,20;128:12,17
**ordered (1)**
95:21
**orders (14)**
79:21,21,23;83:9;
101:17;119:6,7;
123:24;124:17;
125:16;127:4,7,14;
128:14
**order's (1)**
78:10
**Ordinarily (1)**
114:18
**ordinary (1)**
98:10
**organized (1)**
48:5
**original (5)**
18:9;60:18;78:15;
79:21;80:25
**originally (3)**
18:9;26:18,19
**others (2)**
37:22;58:7
**otherwise (7)**
18:18,20;25:12;
75:2;78:25;97:12,13
**ought (3)**
57:3;114:4,20
**ourselves (3)**
61:20,22;75:20
**out (42)**
17:18;18:12;19:4,
7;20:7,14;21:22;
24:18;28:8;37:22;
41:13;44:18;50:14;
57:19;59:10,15;64:8,
12,13,17;66:20;71:8;
72:3,16;73:5;74:12;
76:7;83:22;86:13;
89:3,10;91:1,7,18;
92:7,24;93:25;113:6;
115:24,25;118:10;
121:25
**outlining (1)**
17:15
**outset (1)**
39:3
**outstanding (1)**
19:22
**Oval (1)**
4:20
**over (12)**
22:4;33:15;36:14;
54:2,3;60:4;63:11;
71:13;82:19,20;
88:24;116:1

**over-enthusiasm (1)**
73:1
**oversee (1)**
97:17
**oversight (1)**
97:18
**overview (1)**
53:13
**OVERY (1)**
10:10
**owe (2)**
76:2;94:5
**own (16)**
18:24;39:10,25;
40:23;46:5;65:19;
79:5;93:22,24;94:1,5,
14;97:10,11;114:22;
119:23
**owned (1)**
91:11
**Ownership (2)**
2:7;106:5
**owns (1)**
91:2

**P**

**PA (1)**
15:6
**Papas (42)**
2:12;16:6;89:15;
90:3,5,6,7,9,10,11,15;
93:10,13,15,16,19;
94:18,19;95:2,4,10,
14,17,19,21;96:3,5,6,
8,11,18,20,24;97:2,
23;98:19,21;99:1,10;
100:9,12,18
**Papas' (6)**
90:1;95:1;97:8;
99:3;100:5,8
**papers (12)**
38:19;81:13;93:13,
14,17;100:5;106:20;
110:1,7;111:11;
112:8;113:21
**paperwork (1)**
116:7
**paragraph (10)**
59:19;62:20,21;
65:7,8,23;80:22;
81:9;99:12;100:4
**paramount (1)**
69:21
**pardon (1)**
30:25
**pared (1)**
33:7
**parent (2)**
22:21;23:14
**Park (2)**
9:4,11
**PARKE (1)**

12:19
**Parma (1)**
4:21
**part (9)**
27:20;37:5;73:4;
75:5;80:25;97:23;
102:16;107:10;
108:13
**partially (1)**
116:8
**participated (1)**
95:11
**particular (11)**
22:3;39:4;44:14,
16;58:5;91:10,15;
92:16,17;93:1,2
**particularly (2)**
110:12;111:21
**particulars (1)**
18:20
**Parties (43)**
4:8;18:9;20:6;
22:17;23:10;24:18;
26:12,22;27:14;
29:12,19;33:5;34:21;
42:5;47:9;48:16;
49:21;54:21,22;55:1,
3;56:17,19;57:19;
60:19;64:4;65:11;
69:18,19,23;70:9;
71:19;72:14;76:22;
80:7;84:13;86:12;
88:21;97:12;99:25;
110:11;118:10;
128:15
**parties' (1)**
56:22
**parties-in-interest (4)**
20:22;28:7;33:19;
54:23
**partner (4)**
22:2;40:10;53:7;
66:21
**parts (1)**
43:23
**party (10)**
20:5,13;25:10;
26:16;44:17;47:10;
48:10;92:7;95:5;
99:16
**passed (2)**
66:8,10
**past (2)**
42:8;74:18
**patient (1)**
105:22
**PATRICIA (1)**
11:17
**PATRICK (16)**
8:25;13:8;35:22;
36:2,10,15,16,20,22,
25;40:10;41:4;56:19;
58:1;64:23;67:18

**pattern (1)**
92:15
**Paul (3)**
2:12;16:6;89:15
**Pause (4)**
17:21;50:3;53:3;
54:16
**pay (3)**
78:25;92:24;95:22
**payable (1)**
80:20
**Peachtree (1)**
13:13
**pendency (1)**
92:11
**pendens (6)**
120:18,22;124:18,
25,25;128:8
**pending (5)**
85:20;106:11;
108:19;109:13;111:8
**Penina (1)**
6:20
**Pennsylvania (1)**
15:3
**PENSABENE (1)**
16:7
**People (19)**
6:3;18:11;22:13,
19,20;31:14;32:7;
54:24;55:16;63:23;
72:25;74:21,23;75:5,
8,11;79:7;83:25;
129:18
**people's (2)**
42:8;62:14
**Pepper (3)**
3:5;79:2;88:4
**per (2)**
46:2,10
**perfect (1)**
87:2
**perform (4)**
78:25;79:16,17;
80:24
**perhaps (6)**
21:14;25:22;28:25;
35:25;73:4;111:19
**period (7)**
67:21;75:21;82:7;
85:9;91:12;92:10;
98:14
**permission (2)**
87:18;95:15
**permit (5)**
44:9;111:25;
113:17;124:4;128:13
**permits (1)**
103:10
**permitted (1)**
118:25
**permitting (2)**
113:3,12

**person (3)**
44:22;48:10;91:25
**personally (1)**
38:9
**perspective (2)**
69:21;110:21
**persuasive (1)**
55:17
**pertain (1)**
22:17
**petition (14)**
97:1;101:12;119:9,
10,17;120:2,14,15,
16;121:8,20;122:13,
15;126:16
**phases (2)**
45:21;46:24
**Philadelphia (1)**
15:6
**PHILIP (3)**
8:8,10;52:16
**phone (2)**
96:25;109:21
**phrase (1)**
62:21
**pick (3)**
77:17;85:6;89:23
**picking (1)**
70:22
**piece (2)**
68:6,7
**pieces (2)**
39:7;45:25
**PIEDRA (1)**
10:24
**pile (1)**
72:5
**pin (2)**
21:12;75:23
**Pite (1)**
92:1
**place (7)**
37:18;57:1;66:7;
83:9;114:2;120:18;
124:10
**placed (1)**
120:22
**places (1)**
75:15
**plainly (1)**
117:21
**plaintiffs (2)**
109:3;111:1
**plan (5)**
23:1,2;51:6;76:18;
98:12
**platform (2)**
72:1;84:22
**play (2)**
118:5;127:20
**Plaza (3)**
9:11;10:4;12:21
**pleading (1)**

87:12
**Pleadings (15)**
3:12,15,20;80:17;
95:18;101:10,16;
102:15,19;103:23;
105:23;106:1,8;
121:22;125:5
**Please (5)**
17:2;35:12;45:23;
89:22;96:4
**pleased (2)**
59:15;78:6
**Pleas-Pennsylvania (1)**
3:22
**plus (3)**
41:4,4,4
**pm (5)**
55:25;61:11;86:14;
89:21;129:23
**Pocatella (1)**
5:18
**podium (6)**
35:21;59:6;71:13;
100:23;101:25;107:5
**point (31)**
19:19,24;21:22;
24:7,25;25:5;26:3;
13;40:7;43:19,21;
44:4;52:14;57:15;
69:24;73:13;74:2;
76:9,25;97:8;103:1,
13,20;112:6;116:9;
124:21;128:5
**points (2)**
44:16;70:7
**poised (1)**
98:7
**policies (1)**
83:10
**pooling (1)**
73:18
**Port (1)**
5:18
**portion (1)**
27:24
**posed (1)**
81:12
**position (6)**
21:7;24:20;38:15;
76:25;118:23;126:9
**positions (1)**
24:19
**possibility (5)**
65:10,12,24;79:18;
126:23
**Possible (3)**
4:3;45:16;117:5
**possibly (2)**
53:1;121:24
**post (1)**
73:16
**post- (1)**

126:15

**posted (3)**
73:2,6,15

**post-petition (1)**
122:18

**postpone (1)**
92:23

**potential (4)**
48:14;56:24;91:6;
111:1

**potentially (3)**
41:4;57:23;112:16

**practical (2)**
26:14;75:23

**preamble (1)**
80:16

**Pre-Auction (3)**
2:2;69:14,20

**pre-closing (1)**
70:20

**prefer (6)**
18:19;45:16;47:13;
63:23;67:2,3

**prefers (1)**
47:17

**prejudice (7)**
112:21;113:8;
115:2,7;126:24;
127:20;128:14

**prejudiced (1)**
103:19

**premise (1)**
91:7

**preparation (1)**
75:16

**prepared (10)**
31:23;39:1;41:12;
44:15;60:20;74:22;
78:18;98:18;110:13;
114:21

**preparing (2)**
110:11,16

**pre-petition (1)**
126:16

**preponderance (1)**
96:14

**prerogative (1)**
125:17

**PRESENT (13)**
16:2;17:15;26:13;
28:2;32:13;33:12;
34:9;45:6;88:8;90:3;
108:11;115:14;
119:24

**presented (4)**
84:6;85:21;92:19;
129:3

**presenting (2)**
31:24;79:20

**presently (1)**
18:19

**presentment (1)**
119:13

**press (1)**
41:20

**pressure (1)**
73:7

**presumption (1)**
48:5

**pre-trial (1)**
62:9

**pretty (5)**
42:9;44:2;48:5;
56:16;56:18

**prevent (1)**
81:25

**prevents (1)**
113:11

**previous (1)**
101:16

**previously (2)**
99:3;108:12

**price (1)**
92:25

**PricewaterhouseCoopers (2)**
4:14;80:4

**primary (1)**
44:13;48:11

**Princi (8)**
17:4,5,22,24;19:8;
21:21;23:20;24:9,13,
14;25:21,25;26:8,14;
27:5,6;28:2,10,16;
29:2,7,9,11,15,16,23;
30:2,10,15,24;31:6,
10,18,22;32:4,7,10,
12;33:10,18;34:13,
17,24;35:6,7,9,13,16;
39:15;51:22,25;53:4,
7,10;56:16;58:16,20;
64:4;77:14,15,16

**principal (2)**
35:18;50:13

**printed (1)**
17:18

**prior (15)**
4:22;5:4,9,14,19;
6:5;61:23;74:19;
76:20;87:18;93:17;
95:25;101:1;120:4;
125:1

**Pro (5)**
2:17;3:6;16:3,5,6

**probably (14)**
25:12;31:7;36:16;
40:24;47:18;48:17,
20;49:13;51:14;
74:10;83:23;85:10;
86:16;97:3

**problem (5)**
37:16;75:15;76:11;
94:8;125:3

**problematic (1)**
26:25

**Procedures (3)**
4:7;88:20;111:3

**proceed (12)**
20:17;64:4;70:18;
102:5;103:5,10,16,
19;111:20;113:4,5;
124:5

**proceeded (1)**
92:5

**proceeding (3)**
101:11,17;103:18

**proceedings (3)**
95:9,11;129:23

**process (7)**
21:14;51:14;79:11;
84:12;111:4;113:20;
114:14

**procure (1)**
22:25

**produce (1)**
60:20

**production (1)**
53:15

**productive (1)**
47:9

**professionally (1)**
90:23

**professionals (2)**
75:22;83:24

**program (3)**
78:2,4,7

**progress (1)**
20:2

**prohibited (1)**
95:23

**projected (1)**
76:7

**promote (1)**
22:22

**promptly (1)**
76:7

**proof (3)**
92:19;111:1;
116:12

**proper (1)**
117:18

**properly (3)**
92:18;93:21;
116:11

**properties (4)**
91:11,16,19;95:7

**property (18)**
5:3,7,13;91:19;
92:8,10,16,24;93:1,4,
5,6,7;94:2;95:15;
97:4;120:19;129:7

**proponents (2)**
57:18,24

**proponents' (1)**
57:24

**proposal (4)**
20:19;63:6;70:23,
24

**proposals (1)**
70:14

**propose (3)**
19:2;65:7;110:23

**proposed (26)**
17:11;18:25;19:14,
20;20:16;21:24;23:2;
26:19;53:4,13;56:8,
9;58:10,21;59:19,23;
65:5,6;66:7;71:8;
74:12;79:21;89:1;
97:21;119:13;121:6

**proposing (4)**
19:19;30:21;53:25;
60:21

**proposition (3)**
23:24;59:2;99:19

**propounding (1)**
66:5

**propriety (1)**
30:24

**Protected (1)**
4:4

**protection (1)**
91:14

**Prove (4)**
2:7;23:9;83:4;
106:5

**provide (8)**
79:9,10;86:16;
87:21,23;97:10,19;
107:9

**provided (1)**
73:17

**provides (3)**
96:13;98:4;99:20

**providing (1)**
96:12

**PSA (1)**
68:17

**pull (2)**
59:7;94:22

**pulling (1)**
60:9

**puppet (2)**
22:22,22

**puppeteer (1)**
22:21

**purchase (7)**
85:2;91:12,16;
92:7,18,22;97:10

**purchased (1)**
92:7

**Purchaser (1)**
85:6

**purchasers (2)**
97:12,14

**purchasing (1)**
95:7

**purported (1)**
101:23

**purpose (6)**
22:14,24;32:3;
37:7;41:16;118:22

**purposes (2)**

**40:16;113:12**

**pursuant (2)**
87:20;102:18

**put (14)**
21:12;28:22;31:12,
15;32:12;39:20;40:2,
21;52:11;64:11;85:9;
109:12;110:14;125:4

**putting (7)**
31:25;39:10,13;
42:20;45:11;76:10;
78:19

**PwC (2)**
78:25;80:20

## Q

**quibble (1)**
63:11

**quick (4)**
44:4;53:13;115:22;
116:22

**quickly (4)**
44:2;62:23;72:4;
74:8;75:19;100:23;
124:24

**quite (6)**
27:18;28:5;43:20;
62:23;112:25,25

**quo (1)**
81:25

## R

**Rains (38)**
22:2;53:8,11,11,
23;54:4,7,13,18,19;
57:15,16,17,22;
58:11,13,13,14,15,17,
19;59:13,14;60:2,8;
61:13,16,20;62:5,8,
18,20;64:3,6,21;65:6;
66:13,16

**raise (6)**
20:6,13;21:8;
41:19;67:6;90:25

**raised (14)**
20:8,15;22:1;40:7;
59:25;60:1;66:19;
69:20;70:24;77:23;
96:25;99:3;101:5,9

**raises (1)**
101:15

**range (10)**
23:10,25;24:15;
25:1,5,10,19;60:8;
68:13;110:19

**ranges (5)**
53:16;59:22,23;
60:5,25

**rapidly (1)**
72:8

**rather (7)**

20:2;37:21;62:13;
63:24;69:7;76:15;
81:23
**ratified (1)**
81:1
**RAY (1)**
8:17
**RE (3)**
2:2;3:21;99:17
**reach (7)**
42:6;67:7;68:18;
71:2,3,5;72:14
**reached (5)**
40:15;50:19;60:5;
67:12;68:19
**reaction (1)**
66:3
**read (17)**
17:17;20:20;24:2,
2,3;47:14,21;76:4;
82:13,14;85:3,3;
90:12,14;93:14;
104:4;112:8
**ready (4)**
110:7,8,9;112:7
**Reaffirming (1)**
4:17
**real (4)**
61:9,15;90:22;
100:23
**realistic (2)**
43:7;114:3
**reality (1)**
22:8
**realize (1)**
35:9
**really (13)**
23:12;41:9;43:20;
48:18;50:12;54:1;
74:17;82:2,25;83:1;
88:1;110:12;111:10
**reason (9)**
23:12;25:16;37:1;
62:12;91:13;92:20;
94:14;97:6;101:19
**reasonable (5)**
28:7;47:23;60:24;
79:7;98:14
**reasonableness (7)**
23:10;24:1,15;
25:1,6,11,20
**reasonably (1)**
79:8
**reasons (8)**
18:14;76:16;96:19;
97:15;100:12,14;
114:25;115:7
**rebuttal (5)**
28:25;32:2,24;
34:11,14
**recall (2)**
59:20;81:5
**receive (1)**

38:16
**received (2)**
58:25;87:15
**receptive (1)**
70:13
**recess (7)**
33:22;55:22,25;
56:1;89:17,21;
129:19
**recesses (1)**
34:3
**recognize (2)**
58:7;76:6
**recognizing (2)**
42:12;57:6
**reconsider (3)**
19:1;101:1,4
**reconsideration (2)**
101:10;102:12
**record (9)**
74:1;77:19;100:14;
113:11;115:1,8;
122:5;123:25;129:22
**recorded (1)**
91:12
**recovery (1)**
103:11
**redirect (8)**
32:24;34:10;40:22;
42:20;45:11,13,21;
64:15
**reduced (1)**
57:3
**REED (1)**
15:2
**referenced (1)**
26:24
**referred (2)**
73:14;111:12
**refers (2)**
65:8;97:2
**refile (1)**
124:13
**reflect (2)**
56:7;57:8
**reflected (5)**
38:19;58:4;80:23;
112:23;126:20
**reflecting (2)**
80:16;123:12
**reflects (1)**
80:6
**refresh (1)**
103:2
**regard (1)**
19:7
**Regarding (14)**
3:11,19;24:3;
52:18;55:11;68:16,
17;83:2;86:1;96:22;
104:15,25;105:25;
106:7
**regards (3)**

5:2,7,12
**regular (1)**
62:23
**regulatory (1)**
87:17
**rehearing (2)**
119:25;125:7
**rejected (1)**
99:4
**related (2)**
49:22;79:1
**relates (2)**
5:17;21:13
**relating (4)**
21:13;37:2;69:14;
117:4
**relationship (3)**
95:2,3,10
**release (2)**
23:14;87:22
**releases (1)**
23:2
**relevant (1)**
74:11
**relied (1)**
97:23
**Relief (32)**
3:11,19;4:8,17,20;
5:2,7,12,17,22,23;
6:2;27:7;55:12;76:9;
83:16,25;88:21;
91:22;92:5;100:10;
101:2;104:18,20;
106:1,7;107:4;110:2;
111:22;117:10,13;
124:9
**reluctant (1)**
113:25
**remain (1)**
85:8
**remaining (2)**
25:9;67:1
**remarks (1)**
71:17
**remedy (1)**
118:25
**remember (2)**
28:1
**remind (2)**
53:4;116:13
**Remove (3)**
2:5;101:23;106:3
**renew (1)**
100:9
**renewed (4)**
89:15;90:12;98:19;
99:10
**reopen (1)**
107:24
**reorganization (1)**
98:13
**reorganize (1)**
27:10

**replies (2)**
38:16;61:21
**reply (11)**
61:22;63:1;70:1;
81:12;82:13,13,14;
90:13,16;96:19;99:1
**report (8)**
17:8;60:4;63:17;
64:11;74:18;76:3,7,
18
**reports (9)**
62:25;63:3,4,13,
14;64:14,14,18,18
**representations (1)**
97:10
**represented (2)**
92:1;108:2
**representing (1)**
116:24
**represents (1)**
109:23
**Request (13)**
3:18;4:8;27:11,25;
30:7;66:11;67:18,19;
87:18,22;88:21;
109:13;121:4
**requested (3)**
56:24;68:15;124:9
**requests (6)**
66:4,6;67:8;68:25;
70:5;95:25
**require (3)**
29:21;30:1;125:16
**required (5)**
24:1;58:24;67:8;
81:22;114:19
**requires (1)**
81:14
**requiring (5)**
28:18,24;31:2;
42:13;62:4
**ResCap (10)**
16:4,7;22:18;55:8;
83:12;84:9;90:16;
98:22;107:21;109:7
**ResCap/GMAC (2)**
99:1,12
**ResCap's (1)**
90:20
**rescinded (1)**
93:8
**reservation (3)**
68:1;84:23;85:2
**Reserve (3)**
4:16;36:6,8
**reserved (2)**
84:10;89:9
**reserving (2)**
68:11;89:2
**Residential (5)**
2:18;3:7;5:24;
17:3;49:23
**residing (1)**

95:16
**resolution (5)**
20:24;72:14;79:8,
15;80:15
**resolve (11)**
19:16;20:9;51:23;
69:7,19;71:10;72:17;
106:11;110:24;
111:2;113:2
**resolved (3)**
86:11,17;112:12
**resolves (1)**
82:11
**resolving (1)**
69:21
**respect (34)**
17:8,25;18:16,24;
19:25;20:3,18,23;
21:21;22:5;23:6;
27:24;31:8;39:3;
42:14;52:7;57:9;
60:21,24;65:22;
67:15;68:24;74:19,
20;84:8;88:2,9;89:11;
96:24;97:8;120:3;
121:15;126:5;128:17
**respecting (1)**
17:12
**respond (4)**
38:18;63:19;65:9;
86:5
**responded (2)**
65:13,25
**respondent (1)**
100:1
**response (2)**
71:17;110:3
**responsibility (2)**
48:11;50:13
**responsible (1)**
52:19
**restatement (1)**
122:6
**restructure (1)**
78:4
**result (3)**
56:25;113:6;
126:24
**results (2)**
67:22;68:4
**resume (1)**
33:23
**resurrect (1)**
128:3
**resurrected (1)**
127:21
**Retain (4)**
2:16;3:5;88:2,4
**retention (1)**
79:1
**return (3)**
97:20,21;128:13
**returns (1)**

43:22
**reverse (1)**
 92:3
**Review (9)**
 3:5;4:15;79:6,10,
 14;80:23;83:24;
 104:10;129:5
**reviewed (4)**
 23:4;85:15;100:5;
 106:20
**reviewing (2)**
 65:19;75:2
**revised (3)**
 18:4,21;19:20
**revisit (4)**
 54:25;55:7,15;58:9
**RICHARD (4)**
 12:16;48:1;50:10;
 52:4
**Richards (48)**
 115:16;116:5,13,
 15,23;118:17,18;
 119:5,8,12,20;120:6,
 9,11,13,16,21,23;
 121:1,4,9,13,16,22;
 122:3,9,14,18,20;
 123:1,4,8,11,16,18,
 20;124:2,8,19,22;
 125:20,24;126:7,22;
 127:6,10,15;128:19
**right (77)**
 17:2,22;21:4,9,12,
 18,20;29:13,14,15,
 16,24;31:8;33:9;
 36:4,10;38:5;39:19;
 42:24;43:11;44:24;
 47:20;48:6,21;49:5,
 17;53:20;54:1,17;
 57:11;61:19;63:7;
 64:22;65:17;66:13,
 17;68:10;69:4,10;
 71:7,19;72:16;73:22;
 74:3,10;77:13;78:1;
 83:18;85:11,17,19;
 87:3,3,3;88:14,23;
 89:8;90:3,11;93:19;
 94:17,19;98:17;
 102:2;105:15;
 107:15;115:14;
 116:11,13;120:5;
 124:22;128:2,10,19;
 129:4,10,12
**rights (4)**
 84:23;85:2;118:10;
 128:15
**ripe (1)**
 65:20
**River (1)**
 5:8
**RMBS (12)**
 2:3;11:21;54:21,
 22;55:2;68:16,24;
 69:14;74:21;75:10,

17;112:23
**Road (3)**
 5:8,13;111:18
**ROBERT (2)**
 14:8;107:7
**Rockefeller (1)**
 12:21
**ROPES (1)**
 11:20
**Rosenbaum (21)**
 88:24;89:4,5,11;
 106:25;107:1;
 109:17,18,19,25;
 110:10,25;111:14,16,
 17,18;115:3,5,9,12,
 16
**rough (1)**
 46:16
**roughly (2)**
 47:10;52:20
**round (4)**
 63:14;75:3,4,7
**rounds (2)**
 63:13;64:17
**Rule (9)**
 2:15,15;3:3,4;4:13;
 98:18;108:23;
 119:11;120:3
**ruled (6)**
 92:2;119:17;121:7,
 12;125:1;126:21
**rules (2)**
 36:11;121:19
**Ruling (11)**
 4:3;104:6,10;
 105:16;117:16,18;
 118:20,23;126:16;
 127:10;128:11
**rulings (1)**
 51:4
**run (4)**
 57:17;67:20;68:8;
 100:23
**running (2)**
 57:17;103:25

# S

**Sale (13)**
 2:3;69:22;70:19;
 84:22,25;85:4;91:18;
 92:3,18,22;93:8;94:9,
 10
**sales (5)**
 90:24,24;91:10;
 97:22;98:10
**Samantha (1)**
 89:24
**same (19)**
 26:23;34:20;37:1;
 42:9;44:23;47:10;
 48:23;49:3,4;66:3;
 74:23;75:11,15,15;

82:8;88:1;90:20;
 99:19;101:18
**San (1)**
 14:6
**sanction (1)**
 120:4
**sanctioned (1)**
 95:21
**Sanctions (27)**
 3:12,16,20;100:11;
 101:8,12,15,18;
 103:23;105:24;
 106:2,8;118:1;120:4,
 6,7,10,17,25;121:1,2,
 3;122:21,23;124:14;
 125:7,10
**sandbagged (1)**
 64:16
**Santa (1)**
 5:13
**satisfied (1)**
 21:2
**satisfies (1)**
 78:14
**save (1)**
 38:11
**saw (3)**
 41:17;72:4;111:11
**saying (10)**
 22:7;27:20;36:12,
 19,20;45:10;64:16;
 93:24;94:1;114:8
**scenes (1)**
 48:7
**schedule (14)**
 19:7;48:2;53:5,13,
 20;58:10;62:17,23;
 65:1,2;75:7;86:19;
 114:1,23
**scheduled (6)**
 18:20;69:25;71:22;
 109:11,12;112:4
**schedules (3)**
 93:22;96:25;97:5
**scheduling (13)**
 18:10;19:8,9,17,
 20;27:11;38:19;
 58:23;59:4,9,19;
 60:18;66:7
**SCHROCK (8)**
 8:17;84:15,16,18;
 85:1,6,11,12
**SCHUG (14)**
 14:8;107:7,7,19,23,
 25;108:16,20,23;
 109:2,4,6,10,12
**SCHULMAN (1)**
 8:9
**scientific (1)**
 61:15
**Scoliard (1)**
 110:15
**scope (2)**

67:8;76:8
**Scottsdale (1)**
 93:6
**screw (1)**
 62:14
**screw-up (1)**
 125:6
**SDNY (1)**
 99:18
**Se (3)**
 16:3,5,6
**search (16)**
 59:22,23;60:2,5;
 65:4;67:9,20,21,24;
 68:3,7,8,12,18,19;
 69:2
**searches (1)**
 53:16
**searching (1)**
 67:13
**seated (3)**
 17:2,19;89:22
**second (26)**
 24:12;26:24;41:25;
 42:12;69:13;75:7;
 86:11;87:7,11;99:15;
 116:22;122:5,11,22;
 124:9;126:2
**Section (7)**
 2:14;3:3;4:13;
 96:21;99:14,20,24
**Sections (1)**
 4:6
**Secured (1)**
 9:19
**Securitization (2)**
 9:10;58:6
**securitizations (1)**
 50:24
**seeing (2)**
 51:20;74:20
**seek (7)**
 18:5;27:1;93:11;
 102:13;103:11;
 104:1;128:13
**seeking (3)**
 17:13;27:7;77:25;
 96:11;97:9;102:13,
 18;104:18,20;117:10,
 14;118:19;122:10
**seeks (5)**
 99:10;100:10;
 101:9,16,23
**seem (2)**
 24:6;55:10
**seemed (1)**
 20:20
**seems (5)**
 23:8;32:14;58:16;
 103:24;117:18
**sell (3)**
 92:23;97:9;98:7
**selling (1)**

97:11
**send (1)**
 125:12
**Senior (1)**
 4:10
**sense (4)**
 35:21;39:5;107:20;
 116:24
**sent (5)**
 17:10,11,14;76:16;
 82:5
**separate (4)**
 50:25;52:7,9;
 114:18
**September (3)**
 69:18;98:18,21
**sequence (1)**
 43:6
**serious (1)**
 43:21
**serve (2)**
 65:25;116:6
**served (7)**
 65:15;66:4;92:12;
 116:4,7,11,18
**service (1)**
 116:12
**servicer (1)**
 83:22
**Services (1)**
 4:15
**Servicing (6)**
 4:18;72:1;73:18;
 81:1;95:5;103:10
**serving (2)**
 65:11;95:24
**set (12)**
 32:19,22;33:1;
 59:18;60:19;64:13;
 81:9;93:17;97:15;
 99:13;100:6;107:12
**setting (1)**
 70:23
**settle (1)**
 114:23
**settled (5)**
 25:11;74:20;122:8,
 9;128:25
**settlement (26)**
 18:25;19:14;22:22;
 23:18;24:2,16,16,24;
 25:4,9;26:17;37:4,
 18;51:3,12,19,23;
 52:2;54:22,22;55:2,
 4;68:16;71:9;84:21;
 112:24
**settlements (1)**
 24:4
**seven (3)**
 23:21,22;63:14
**seventh (1)**
 22:15
**Sever (1)**

4:4
**several (7)**
63:2;70:17;92:13;
93:23;95:11,17;
102:15
**SEWARD (1)**
9:9
**SEWIT (1)**
16:4
**shall (3)**
59:6;65:9;80:22
**shared (1)**
80:8
**sharing (1)**
48:18
**shifts (1)**
99:25
**SHORE (1)**
9:23
**short (9)**
45:16;60:13;78:9;
90:23,24;91:10,18,
21;92:1
**shortened (1)**
78:18
**shorter (1)**
45:17
**shortly (5)**
57:12;91:12;92:11;
108:4,5
**show (4)**
80:18;93:23,25;
113:21
**shows (1)**
96:14
**shut (1)**
49:8
**sic (1)**
96:13
**side (7)**
33:4;40:8;54:24;
56:22;57:25;58:5;
64:19
**sidebar (1)**
34:24
**sidebars (1)**
34:4
**sides (2)**
62:10;71:5
**SIDLEY (1)**
11:2
**SIDMAN (1)**
12:7
**SIEGEL (17)**
15:24;37:8,9,13,14,
16,23;38:1,5,12,14,
23,24;72:22,23;
73:14,22
**signature (1)**
125:12
**significant (2)**
40:25;112:17
**signoff (1)**

87:14
**similar (4)**
98:2;100:10;101:9,
15
**simple (3)**
59:5;9;94:3
**Simplify (1)**
41:5
**simply (9)**
23:25;24:20;30:11;
51:1;60:13;65:24;
67:1;90:18;115:6
**sit-down (1)**
40:11
**site (2)**
73:2,17
**sitting (4)**
17:18;107:16,17;
115:21
**six (24)**
30:3;34:12,23,23;
35:1,5;39:9,12,13,20;
42:2,22,25;44:6;
45:10;46:1,8,10,18;
48:4,15;49:12;52:20,
22
**six-hour (1)**
34:5
**sixteen (1)**
99:20
**size (1)**
56:10
**skills (1)**
44:21
**slack (1)**
75:22
**slight (3)**
41:25;42:1,12
**small (3)**
62:20;115:20,23
**smart (1)**
62:5
**SMITH (1)**
15:2
**smooth (1)**
70:18
**sold (4)**
92:4,10;93:7;97:13
**solely (1)**
110:21
**Solomonic (2)**
61:9,14
**solution (3)**
70:16;73:4;127:16
**somebody (2)**
30:21;34:4
**somebody's (2)**
55:23;64:12
**somewhat (2)**
58:4;60:25
**somewhere (2)**
52:21;110:16
**Sonnax (1)**

113:16
**sooner (2)**
76:13,15
**sorry (15)**
46:5;49:25;89:22;
96:6,8,8;102:8,10;
103:4,7;105:9;115:9;
117:11;121:16;
127:24
**sort (8)**
22:11;41:24;48:10,
12;52:5,6;56:7,14
**sought (7)**
97:24;99:7;117:21;
120:4,6,7,10
**sounds (7)**
40:4;41:8;44:10;
68:22;87:2;112:11,
12
**soup (1)**
124:7
**South (3)**
11:4;12:12;15:13
**speak (4)**
37:10;39:25;42:16;
72:13
**SPEAKER (2)**
55:13;62:6
**speaking (4)**
36:1;42:15;55:24;
59:11
**Special (2)**
2:17;3:5
**specific (10)**
18:2;21:21;51:7;
52:10,10;93:11;
108:14,16;109:21;
117:6
**specifically (3)**
41:20;49:23;
108:17
**specificity (1)**
96:23
**spend (2)**
46:25;83:23
**spending (2)**
26:5;81:15
**spent (1)**
66:17
**spoke (1)**
74:14
**Square (1)**
14:21
**stack (1)**
104:5
**stand (6)**
28:23;31:5;41:21;
42:11;49:6;117:19
**standards (3)**
99:13;107:11;
108:4
**stands (1)**
24:10

**start (7)**
18:2;27:9,13;
33:21;55:21;80:3;
95:3
**started (1)**
83:22
**starting (1)**
75:19
**starts (1)**
72:1
**State (21)**
6:3;14:21;92:5,6;
102:19;103:3,16,25;
104:1,7,9,11;112:1,
18;113:11;116:20;
117:16;124:4;
126:12;127:3;128:13
**stated (7)**
93:21;100:14;
110:1;114:25;115:7;
116:1;117:21
**statement (6)**
24:8;31:25;32:23;
34:10;46:19;48:23
**Staten (1)**
5:3
**Status (9)**
2:2;17:8,16;57:8;
69:13,17;81:25;
108:9;109:13
**Stay (81)**
3:11,11,18,19;4:3,
4,9,20;5:2,7,12,17,22,
23;6:2;17:19;55:12;
88:22;91:22;93:9;
99:6;101:2;102:12,
14,23;104:9,25;
105:2,7,11,25;106:1,
7,7;107:4;108:7;
110:2;111:22,22,25;
112:5,20;113:7,10,
12;114:9,10,25;
115:1,7;117:5,20,23;
118:7,21,24;119:4,
16,19;121:14,17,21,
24;122:25;123:7,21,
23;124:4,10,12;
125:15;126:9,13,14,
17,18;127:3;128:2,6,
12;129:7
**stays (1)**
129:6
**STEEN (1)**
10:2
**Steering (1)**
13:3
**still (10)**
23:16;40:20;64:4;
71:20;76:2;84:17;
89:3;93:2;110:5;
113:1
**Stipulated (2)**
4:8;88:21

**stipulation (7)**
4:22;5:4,9,14,19;
6:5;112:12
**stipulations (1)**
129:2
**stop (1)**
94:15
**stopped (1)**
69:1
**stops (1)**
124:12
**story (1)**
79:13
**straightforward (1)**
70:16
**strange (1)**
37:23
**Street (7)**
6:22;8:22;12:4,12;
13:13,22;15:4
**striking (1)**
112:15;113:23
**stuck (1)**
56:21
**stuff (2)**
56:18;62:15
**subject (4)**
20:23;44:23;49:6;
87:14
**subjecting (1)**
62:16
**submission (1)**
105:16
**submissions (1)**
62:9
**submit (12)**
19:20;20:16;23:8,
15;27:4;61:21;88:17;
89:11;100:13;115:5;
119:13;128:11
**submitted (13)**
4:22;5:4,9,14,19;
6:5;17:7;18:9;65:2;
79:22;87:20;98:19;
121:6
**subpoena (1)**
68:15
**subsection (1)**
100:4
**subsequently (1)**
119:25
**subservicing (1)**
74:19
**substance (1)**
73:21
**substantial (2)**
110:14,21
**substantially (2)**
98:2,8
**successful (2)**
69:22;70:21
**successfully (1)**
42:7

**suddenly (2)**
60:24;66:5
**suffice (1)**
28:12
**sufficient (1)**
33:12
**suggest (2)**
123:20;124:2
**suggested (1)**
83:1
**suggesting (1)**
30:17
**suit (2)**
92:9,11
**Suite (6)**
6:22;11:14;13:5,
14;14:5;15:5
**summary (13)**
108:5;112:15;
113:23;118:2;122:1,
10;124:3,5,14;
125:22;127:8;128:4,
6
**Sunhaven (1)**
4:20
**superior (3)**
92:5,6;95:20
**supervisory (1)**
87:19
**supplement (4)**
49:16;63:4,7,8
**supplemental (6)**
62:22;63:17,20;
64:11,18;103:9
**support (5)**
23:1;90:12;96:12;
98:22;100:6
**supporting (3)**
38:15;54:21;55:2
**suppose (1)**
128:3
**sure (22)**
28:7;32:20;34:14;
38:4;39:6,18;43:5;
45:4;47:16;60:1;
63:5;67:17;71:1;
74:8;77:3;82:21;
85:2;86:15;93:13;
94:23;110:25;116:5
**surprise (1)**
77:4
**surprised (4)**
63:22,24;84:20;
85:4
**surreply (1)**
71:12
**suspect (2)**
31:20;52:24
**sympathize (1)**
79:5

**T**

**table (1)**
36:21
**TAFT (2)**
14:11;48:23
**Taggart (45)**
2:6,8,9;3:10,15;
16:3;100:22,24;
101:3,17,22;102:1,2,
3,5,7,10,22;103:1,7,
13,21,22,24;104:3,
12,15,17,18,22,25;
105:5,9,13,17,20,21;
106:4,6,13,16,17,19,
22,24
**Taggart's (5)**
101:1,11,14,24,25
**Talcott (1)**
13:21
**talk (11)**
20:4;21:17;28:4,9;
36:13;44:8;74:7,17,
23;75:12;77:2
**talked (1)**
74:11
**talking (8)**
31:10;35:2;42:22;
44:5;48:12,15;52:20;
116:22
**tapes (1)**
60:10
**targeted (3)**
43:19;44:5;65:20
**teaches (1)**
75:21
**Teitelbaum (1)**
89:3
**telephonic (1)**
113:14
**TELEPHONICALLY (11)**
11:7,8,17,25;
14:25;15:8,16;16:4,5,
7;119:23
**telling (2)**
43:11;49:5
**ten (14)**
28:14,14;29:23,24,
25;30:1,6,8,19,20;
31:15;46:23,24;
61:20
**ten-day (2)**
60:20;110:4
**tendered (1)**
42:25
**ten-minute (1)**
89:16
**tentative (3)**
54:20,25;58:8
**tentatively (2)**
55:1,5
**terms (24)**
24:16;25:9;33:3;
37:4;41:3;47:7;48:8;
52:11;57:7;59:22,23;

60:3,5;65:4;67:9,21,
21;68:12,18,19,20,
23;69:2;83:4
**testify (1)**
30:11
**testimony (1)**
40:21
**That'd (1)**
86:16
**theory (4)**
33:23,25;64:13,17
**thereafter (2)**
91:13;128:15
**therefore (2)**
44:22;45:1
**therein (1)**
70:7
**there'll (2)**
29:4;45:12
**thinking (3)**
34:25;54:17;79:7
**Third (5)**
4:8;10:20;63:14;
88:21;97:23
**third-party (2)**
23:1;92:4
**thirty (2)**
55:6;75:8
**thirty-eight (3)**
111:8,8,12
**thirty-two (5)**
103:3,4,6,7,14
**THOMAS (1)**
15:16
**Thornton (3)**
81:7,8;87:11
**thorough (1)**
26:17
**though (2)**
21:5;92:21
**thought (10)**
26:18;29:6;30:16;
34:17;36:17;64:2;
70:7;76:12;78:4;
127:8
**thoughts (1)**
80:7
**three (39)**
21:5,15;22:8;
28:12;29:4;30:12;
32:14;33:23,24;36:9,
12,17,18;37:10;39:8;
40:17,19;42:21;
43:20,24;44:5;45:8;
48:16;49:24;50:1;
53:25;55:22,24,25;
56:1,14;63:13;64:17;
100:21;107:15;
109:6;111:19;
115:23;117:24
**throughout (1)**
52:1
**Thursday (4)**

55:9;56:4,7,14
**thus (1)**
97:3
**till (2)**
34:6;55:21
**timed (5)**
28:6;32:20;33:5,
14;87:8
**timely (2)**
66:1;122:5
**times (3)**
25:2;27:10;40:8
**timing (7)**
21:13;35:24;63:11;
74:12,16,16,18
**TMT (1)**
24:2
**today (9)**
19:5;20:8;28:9;
39:2;61:8;69:14;
70:15;93:3;111:5
**today's (1)**
116:17
**together (2)**
90:22;91:9
**told (10)**
27:22;29:22;52:17;
57:10;59:21;79:13;
92:4;108:7;116:17;
118:24
**TOLLES (1)**
15:11
**TOMASCO (1)**
11:17
**tongs (1)**
75:1
**took (4)**
50:15;59:16;78:8;
105:3
**total (9)**
32:22;35:3;45:19;
46:10,18;49:24;51:9;
55:5,6
**tough (1)**
75:24
**toward (1)**
37:17
**towards (1)**
28:11
**track (3)**
33:3;39:16;46:25
**Trailer (1)**
24:3
**Transcribed (1)**
6:20
**transcript (1)**
56:11
**Transfer (1)**
92:14
**transferred (1)**
97:4
**transfers (1)**
94:13

**treated (1)**
51:3
**trial (53)**
28:6;29:12;33:1,5,
7,21;34:5;45:20,20,
21;46:24;55:19;56:2,
8;58:3;63:15,18,23,
24;64:12;86:13,23,
25;87:1,8;107:13,14;
108:8,10,11;110:4,5,
6,7,8,9,11,13,16,17,
24;111:23,25;112:7;
113:3,10,13,18,21,
24;114:17,19;125:21
**trials (3)**
32:20;33:14;34:6
**trick (1)**
41:9
**tried (5)**
27:10;42:6;48:8;
72:7;105:22
**trouble (1)**
34:21
**true (2)**
76:14;104:14
**truly (1)**
72:14
**trunk (1)**
61:25
**Trust (7)**
10:3;29:5;49:19;
68:16;80:8,21;85:15
**Trustee (5)**
9:10;78:3,6;87:13;
96:16
**Trustees (17)**
2:3;18:10,22;
19:12,21;20:14;37:3;
64:6;69:15;70:12,19,
24;71:3,4,11,16;
73:21
**trustees' (1)**
19:11
**trusts (14)**
37:2,5;50:23,25;
51:3,4,5,7,10,11,12,
24;52:10;58:6
**truthful (1)**
94:3
**try (15)**
18:12;22:13;45:6;
52:7;64:7;72:3;81:3;
82:6,24,25;83:7,13;
87:12;93:10;115:22
**trying (8)**
23:14;41:11;66:14;
71:20;72:5;82:2,10;
89:3
**Tuesday (2)**
56:2;72:2
**Tunc (2)**
2:17;3:6
**turn (6)**

40:3;43:2,2;73:5;
88:22;96:10
**turnaround (2)**
60:21,23
**turned (1)**
92:10
**turns (1)**
92:6
**twelve (7)**
26:11;46:11;55:1,
17;57:3;75:5,6
**twenty (4)**
28:13,13,15;33:8
**twenty-four (1)**
22:4;42:3
**twenty-one (2)**
60:23;61:7
**twenty-seven (1)**
56:3
**two (36)**
17:14;22:6,17;
43:7,19;44:5;45:13,
15,18;46:2,3,6,10;
48:14;49:24;50:1;
53:1;54:2,10,11;
62:10;68:12;75:15;
80:7;101:16,16;
105:1;111:19;
112:15,16;113:22;
114:11;115:23;
119:5;122:4;127:7
**two-and-a-half (1)**
110:6
**two-party (1)**
28:6
**TX (2)**
11:15;13:6
**types (1)**
70:14
**typically (2)**
37:5;95:8

**U**

**ultimate (1)**
73:4
**ultimately (1)**
76:5
**unable (3)**
67:7;69:19;119:22
**uncontested (1)**
128:24
**Under (24)**
2:14;3:2;4:6,12,16;
26:23;51:3;53:4;
78:25;79:17;80:25;
81:3,22;88:23;93:12;
95:4;97:19;99:24;
100:7;103:9;104:19;
105:16;108:3;123:4
**underlying (4)**
99:7;101:11;113:9,
15

**understandable (1)**
73:8
**understands (2)**
36:11;39:7
**understood (9)**
22:7;24:9;27:6;
35:7;38:12;44:3;
46:14;47:7;72:19
**underwriters (1)**
107:10
**Unfortunately (1)**
65:1
**unhappy (1)**
59:22
**UNIDENTIFIED (2)**
55:13;62:6
**Uniform (1)**
92:14
**unique (1)**
83:13
**uniquely (1)**
37:3
**unless (6)**
31:13;34:5;50:12;
70:4;96:15;106:15
**unlimited (1)**
110:20
**unnecessary (2)**
97:18;123:24
**unorthodox (1)**
116:10
**unreasonable (1)**
56:24
**unsecured (1)**
90:17
**unusual (1)**
100:1
**unwarranted (1)**
97:18
**up (29)**
21:10;26:15;35:4,
17;40:20;42:20;
46:17;49:6,14;57:18;
62:14;63:12;69:24;
70:22,23;76:5;77:17;
78:8,16;80:1;81:4;
84:21;85:6,10;86:14;
87:20;88:11;89:23;
123:25
**upcoming (1)**
97:21
**update (1)**
17:12
**uploading (1)**
60:10
**upon (6)**
48:18;52:25;83:15;
99:8;102:15,17
**USA (1)**
10:11
**use (12)**
22:13;31:16;32:3,
22;35:4;36:13;41:22;

44:16;47:21;48:17;
50:12;84:2
**used (5)**
22:22;33:13;36:14;
47:4;59:22
**uses (1)**
33:4
**using (2)**
28:21;67:21
**usually (5)**
33:7;34:5;43:19;
63:23;71:4

**V**

**vacate (6)**
118:8;123:22;
125:21;126:4,14;
128:14
**vacated (3)**
127:5,14,19
**vacating (1)**
125:16
**vague (1)**
51:9
**validation (2)**
81:10,17
**value (1)**
24:15
**various (3)**
27:19;70:14;94:11
**various-sized (1)**
90:25
**vendor (1)**
67:22
**verge (1)**
75:6
**versa (1)**
44:18
**version (2)**
91:21;92:1
**vice (1)**
44:18
**view (12)**
24:23;26:6,7;
31:13;36:25;41:18;
43:18;60:22;69:24;
79:3,5;123:15
**viewed (1)**
119:18
**views (3)**
56:7;79:14;82:23
**violate (5)**
119:16,19;121:24;
126:8,17
**violated (7)**
104:8;117:23;
118:21,24;119:3,3;
122:25
**Violation (13)**
3:12,16;105:24;
106:2,9;118:25;
121:14,17,21;123:6,

23;125:14;128:2
**violations (8)**
3:20;4:3;92:13;
94:11;117:5,20;
118:6;126:25
**vis-a-vis (1)**
51:12
**Void (17)**
3:12,15,20;101:10,
16;103:23;104:1,10;
105:23;106:1,8;
118:8;123:3,7,24;
125:15;128:2
**voided (1)**
102:19
**voluminous (1)**
112:25

**W**

**wait (1)**
24:12
**waiting (1)**
63:22;65:14
**WALKER (1)**
11:11
**Wall (1)**
13:22
**WALPER (1)**
15:16
**wants (4)**
47:25;48:21;49:17;
86:7
**Washington (13)**
8:23;107:12;
108:21;110:24;
112:1,1,18;113:13;
117:16;118:20;
119:2,2;123:18
**way (27)**
20:10,21;21:7;
23:15;24:2,3,4,9;
30:15;32:23;35:4;
36:13;37:20;45:7;
64:3;66:15,20;75:5;
78:4;85:3;94:8;
107:13;113:17,19,20;
114:20;115:24
**Web (2)**
73:2,17
**Wednesday (3)**
56:3,6;71:23
**week (14)**
20:19;27:23;28:3,
4;39:16;59:20;62:15;
65:12;70:8;71:6;
87:12;110:6;116:8;
129:17
**weekend (1)**
60:4
**weeks (1)**
62:10
**WEITNAUER (5)**

13:17;71:13,15,15,
21
**welcome (1)**
20:6
**well-documented (1)**
92:21
**well-prepared (1)**
58:2
**Wells (1)**
13:12
**well-stated (1)**
92:21
**West (3)**
5:8;6:22;13:13
**Western (2)**
107:12;108:20
**whale (2)**
26:5,10
**what's (17)**
30:18;37:4;42:10;
53:5,20,21;67:9,9;
69:10;74:11;83:24;
91:4;93:11;94:16;
107:24;118:5;121:14
**whatsoever (1)**
105:2
**whereas (1)**
103:19
**Whereupon (1)**
129:23
**WHITE (1)**
9:18
**who's (3)**
35:25;49:15;60:15
**whose (1)**
125:19
**WICKERSHAM (2)**
14:11;48:22
**wide (1)**
99:23
**willing (1)**
59:24
**willingness (1)**
113:14
**Wilmington (6)**
10:3;29:5;49:19;
80:8,21;85:15
**window (1)**
75:19
**wish (10)**
24:21;32:23;35:4;
36:8;44:7;63:18;
66:12;85:13,18;
116:12
**withdrawn (1)**
124:25
**within (8)**
23:9,25;24:15;
26:12;56:21;70:10;
87:24;98:14
**without (13)**
30:10;81:14;82:24;
87:17;95:25;96:12;

112:20;113:8;115:1,
7;119:24;127:20;
128:14
**witness (20)**
30:22;31:4;39:24;
40:2;43:1;46:3,5,10;
47:1;48:11;49:6;
50:14,15;55:23;
58:23;59:3,11,12;
63:23;75:15
**witnesses (46)**
28:20,25,25;29:19,
25;30:1,4,7,8;31:3,7,
9,11,16,19;32:2,13;
33:8;34:1;37:11,15;
39:3,4,9,10,12,14,21;
40:23;42:25;43:18;
46:1,4,8;52:13,19,20;
53:24;56:5,17;58:2,
24;59:1,10;75:18,24
**WOFFORD (1)**
11:25
**Wolicki (1)**
6:20
**woman (2)**
91:10;92:22
**won (2)**
118:1;124:3
**word (3)**
63:17;72:22,23
**words (1)**
128:16
**work (23)**
18:12,23;19:3,4,7,
15;20:6;23:16;45:4;
48:19;57:12,19;
59:16;65:4;66:13;
76:23;79:15;82:18;
83:7;86:13;89:3,10;
91:18
**worked (3)**
59:15;69:23;78:3
**working (7)**
18:15;19:12;20:14;
29:2;32:7;63:3,8
**works (3)**
42:4,5;44:12
**World (1)**
14:13
**write (1)**
61:21
**writing (4)**
19:22;20:15;63:21;
105:16
**written (8)**
32:1;40:21;45:11;
76:5;83:3;87:21;
106:11,21
**wrong (5)**
18:18;46:17;82:10;
116:10;127:1
**WYNNE (11)**
12:16;48:1,1,14,

24;50:7,10,10;52:3,4,
4

---

**Y**

---

**year (1)**
93:9
**Years (2)**
62:14;113:22
**yesterday (4)**
67:19;78:6;116:5,
19
**York (17)**
5:3;6:23;8:5,15;
9:5,12,21;10:5,13,21;
11:23;12:5,22;13:23;
14:14;15:20,22

---

**0**

---

**06103 (1)**
14:23

---

**1**

---

**1 (5)**
67:13,16,24;68:7;
100:4
**1,000 (1)**
111:5
**1,500 (1)**
121:4
**1:09 (1)**
129:23
**10 (1)**
34:6
**100 (1)**
11:13
**100,000 (1)**
110:17
**10004 (1)**
9:12
**10005 (1)**
13:23
**10006 (1)**
10:5
**10017 (1)**
12:5
**10020 (1)**
10:13
**10022 (2)**
8:15;10:21
**10036 (4)**
8:5;9:21;11:23;
15:22
**10040 (1)**
6:23
**101 (1)**
9:4
**10112 (1)**
12:22
**10178 (1)**
9:5

**10281 (1)**
14:14
**105a (1)**
4:7
**1095 (1)**
15:21
**11 (9)**
62:20,21;83:12;
93:12;96:11;97:17;
99:8;112:3;114:8
**11:51 (1)**
89:21
**1100 (2)**
11:14;13:4
**1105 (1)**
5:2
**1112.05 (1)**
100:4
**1112b (2)**
99:14,24
**1112b4 (2)**
96:21;99:20
**1114 (3)**
3:15;101:8;105:25
**1155 (1)**
9:20
**1177 (1)**
8:4
**1180 (1)**
5:7
**12 (2)**
25:11;87:20
**12:09 (1)**
89:21
**12:15 (2)**
33:22;55:22
**1201 (1)**
13:13
**1211 (1)**
11:22
**12-12020 (1)**
17:3
**1221 (1)**
10:12
**1242 (1)**
2:2
**1261 (1)**
6:2
**13,000 (1)**
95:22
**1357 (1)**
4:12
**1359 (1)**
4:2
**1397 (3)**
3:18;101:3;106:10
**13th (2)**
27:12,25
**14 (4)**
2:17;3:7;21:24;
98:19
**1416 (1)**
4:6

**1426 (1)**
3:2
**1427 (1)**
2:14
**1431 (1)**
4:2
**1438 (1)**
5:17
**1472 (3)**
2:11;98:21;99:12
**14th (11)**
20:19,23;27:23,25;
28:4;54:8,12;61:18;
62:13;86:3,19
**15 (1)**
21:24
**1547 (1)**
98:23
**1585 (2)**
3:10;106:3
**1586 (2)**
2:5;106:6
**1587 (2)**
2:5;101:22
**15th (2)**
78:13,19
**16 (5)**
21:25;53:24;54:5;
65:13;66:1
**16th (6)**
28:1;54:12;57:11;
65:9;75:11,18
**1700 (1)**
5:8
**1731 (1)**
99:2
**175,000 (1)**
110:17
**17th (7)**
56:4,14;69:25;
71:23;72:15;78:12,
19
**18th (19)**
103:16;117:25;
119:8;120:5;121:15,
23;124:18,19;125:5,
8,10,22;126:4,5,20;
127:4,13;128:14,17
**19103 (1)**
15:6
**192nd (1)**
6:22
**1970 (1)**
90:23
**1st (1)**
90:19

---

**2**

---

**2 (8)**
13:22;33:23;55:24;
59:19;69:6,7;129:18,
21

**20005 (1)**
8:23
**2004 (1)**
68:15
**2008 (1)**
91:9
**2009-35338 (1)**
3:22
**2010 (1)**
107:12
**2010-050028 (1)**
95:21
**2011 (1)**
68:7
**2012 (4)**
2:18;3:7;98:19;
99:18
**2014-1 (2)**
2:16;3:4
**2014a (2)**
2:15;3:3
**20th (1)**
55:9,16;57:8
**21 (2)**
53:25;61:23
**216b (1)**
108:23
**21st (3)**
53:19;62:1;98:21
**22 (1)**
81:9
**222 (1)**
12:4
**23 (3)**
61:25;63:2;108:23
**23904 (1)**
5:13
**23rd (4)**
62:18;71:24;72:1,6
**24 (1)**
61:23
**24th (1)**
71:24
**250 (1)**
83:23
**2500 (1)**
15:5
**26 (2)**
61:11;65:3
**261.22 (1)**
87:20
**274 (1)**
99:7
**27th (5)**
69:18;79:3;81:6;
125:2,9
**28th (1)**
63:1
**29 (2)**
53:15;59:19
**29th (3)**
53:19,23;60:12

12-12020-mg    Doc 1800    Filed 10/10/12    Entered 10/11/12 15:25:19    Main Document
Pg 154 of 154

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

October 10, 2012

**3**

**3 (2)**
25:11;80:22
**30 (1)**
12:21
**30309 (1)**
13:15
**30th (1)**
57:11
**31 (3)**
123:9,11;128:14
**31st (4)**
118:4;125:22;
127:4,14
**327e (3)**
2:14;3:3;79:1
**3355 (1)**
4:20
**34287 (1)**
5:18
**355 (1)**
15:13
**362d (1)**
4:7
**363 (1)**
4:13

**4**

**4 (1)**
99:12
**400,000 (1)**
110:18
**41st (1)**
12:4
**4200 (1)**
13:14
**4601 (1)**
5:18
**465 (1)**
99:17

**5**

**5 (5)**
61:11;65:7,8,23;
110:19
**5:15 (1)**
55:24
**5:30 (1)**
55:25
**5300 (1)**
13:5
**550,000 (1)**
110:18
**555 (1)**
12:12
**5th (3)**
27:12;58:25;98:25

**6**

**6 (1)**
100:25
**6004 (1)**
4:13
**601 (1)**
8:14
**60603 (1)**
11:5
**61 (1)**
2:2
**650 (1)**
15:4
**677 (2)**
5:22;107:5
**68 (1)**
5:3
**6th (1)**
103:16

**7**

**7 (14)**
2:11;62:9;74:12;
91:14;93:12;96:12;
97:18,19;98:20,22;
99:2;100:3,7;101:7
**700 (1)**
6:22
**720 (1)**
14:5
**736 (1)**
99:18
**742 (1)**
99:18
**75,000 (1)**
110:19
**77002 (1)**
13:6
**78701 (1)**
11:15
**7th (2)**
62:13,16

**8**

**8 (1)**
101:14
**8.7 (12)**
18:25;19:14;22:9;
23:9,17;24:14,25;
25:12,19;51:8,16;
52:6
**8:45 (2)**
55:25;86:14
**855 (1)**
8:22
**897 (1)**
4:20
**8th (10)**
14:22;118:2;122:1,

20,23,25;123:12;
125:10;127:4,6

**9**

**9 (3)**
33:21;55:21;
101:21
**9:14 (1)**
87:15
**90 (1)**
14:21
**90071 (2)**
12:14;15:14
**9019 (5)**
17:9;24:4;25:3;
26:25;37:6
**909 (1)**
10:20
**94111 (1)**
14:6
**945 (1)**
2:2
**973406-2250 (1)**
6:24
**996 (1)**
5:12