David W. Dykhouse  
Brian P. Guiney  
**PATTERSON BELKNAP WEBB & TYLER** LLP  
1133 Avenue of the Americas  
New York, New York 10036-6710  
Telephone: (212) 336-2000  
Fax: (212) 336-2222  

Attorneys for Ambac Assurance Corporation and the  
Segregated Account of Ambac Assurance Corporation  

**Hearing Date: November 19, 2012 at 10:00 a.m.**  
**Objection Deadline: October 12, 2012 at 5:00 p.m.**[1]

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  

------------------------------------- x  
In re:                                :   Chapter 11  
                                      :  
RESIDENTIAL CAPITAL, LLC, *et al.*    :   Case No. 12-12020 (MG)  
                                      :  
                       Debtors.       :   Jointly Administered  
                                      :  
------------------------------------- x  

**OBJECTION AND RESERVATION OF RIGHTS OF  
AMBAC ASSURANCE CORPORATION AND THE SEGREGATED  
ACCOUNT OF AMBAC ASSURANCE CORPORATION TO PROPOSED  
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

---

[1] With the permission of this Court, the Debtors extended the deadline for Ambac to file this Objection.

5669236v.2

## TABLE OF CONTENTS

I.  Factual Background ................................................................................................................2

    A.  General Background ..................................................................................................2

    B.  Ambac's Servicing-Related Rights ............................................................................3

II. Objections to Assumption and Assignment .........................................................................5

    A.  The Debtors' Right to Service the Terminated Servicer Transactions Is Not Property of the Estate and Thus Cannot Be Assigned to the Purchaser. ..................5

    B.  The Sale Order Appears to Absolve the Purchaser of Compliance With Important Servicing-Related Rights Contained in the Transaction Documents ......................6

        i.   The Debtors Cannot "Sub-Sever" the Transaction Documents to Eliminate or Diminish Any of Ambac's Servicing-Related Rights. .............6

        ii.  The Remaining Transactions Must Remain Subject to the Servicing Triggers After the Closing Date ................................................................10

        iii. The Debtors Must Assume and Assign All Transaction Documents Related to a Single RMBS Transaction. ....................................................11

    C.  The Debtors Must Cure All Defaults and Provide Adequate Assurance of the Purchaser's Performance Before the Transaction Documents Can Be Assumed and Assigned. .............................................................................................................12

        i.   Cure Obligations ................................................................................................12

        ii.  Adequate Assurance of Future Performance .............................................13

III. Reservation of Rights and Joinder .....................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Erickson v. Polk,*
   921 F.2d 200 (8th Cir. 1990) ...................................................................................................5

*In re Adelphia Business Solutions, Inc.,*
   322 B.R. 51 (Bankr. S.D.N.Y. 2005) .......................................................................................6

*In re Balfour MacLaine Int'l,*
   85 F.3d 68 (2d Cir. 1996) .........................................................................................................8

*In re Best Payphones, Inc.,*
   2007 Bankr. LEXIS 1677 (Bankr. S.D.N.Y. May 8, 2007) ....................................................10

*In re Margulis,*
   323 B.R. 130 (Bankr. S.D.N.Y. 2005) .....................................................................................5

*In re MF Global Holdings Ltd.,*
   466 B.R. 239 (Bankr. S.D.N.Y. 2012) .....................................................................................6

*In re Tornado Pizza, LLC,*
   431 B.R. 503 (Bankr. D. Kan. 2010) .......................................................................................5

*Moody v. Amoco Oil Co.,*
   734 F.2d 1200 (7th Cir. 1984) .................................................................................................5

*N.L.R.B. v. Bildisco and Bildisco,*
   465 U.S. 513, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984) ........................................................6

**STATUTES**

11 U.S.C. § 362(d) ........................................................................................................................5

11 U.S.C. § 365(f)(2)(B) ..............................................................................................................13

Ambac Assurance Corporation ("Ambac Assurance") and the Segregated Account of Ambac Assurance Corporation ("Segregated Account" and, collectively with Ambac Assurance, "Ambac"), respectfully submit this objection and reservation of rights ("Objection") to the *Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto*, Docket No. 926, which was filed by the above-captioned debtors ("Debtors") on July 26, 2012, and amended and restated on September 18, 2012, Dkt. No 1484 ("Notice").

## PRELIMINARY STATEMENT

1. As a financial guarantee insurer, Ambac has a significant economic interest in ensuring that mortgage loans in the securitization trusts that it insured are properly serviced, and that any losses from delinquent mortgage loans serviced by the Debtors or their successor are minimized to the extent possible. Therefore, before agreeing to insure any of the Debtors' securitization trusts, Ambac bargained for an array of essential protections related to servicing to safeguard its interests. The proposed Sale Order (as defined below) appears to strip away many of those important rights, and even purports to transfer rights that are no longer property of the Debtors' estates.

2. Ambac files this Objection to: (a) object to the proposed assumption and assignment of certain servicing rights which are no longer property of the Debtors' estates (*see infra* II.A.); (b) object to any proposed "sub-severing" of the Transaction Documents (as defined below) that would eliminate or diminish any of Ambac's rights related to mortgage servicing, including, without limitation, the right to terminate the mortgage servicer if certain conditions are met (*see infra* II.B.i); (c) seek clarification regarding the impact of the Sale Order on the

transactions insured by Ambac (and to object to the Sale Order to the extent it is intended to or has the effect of eliminating or diminishing Ambac's rights in contravention of the Bankruptcy Code or other applicable law) (*see infra* II.B.ii); and (d) demand that the Debtors cure all defaults under the Transaction Documents and provide adequate assurance of the Purchaser's future performance of all agreements in which Ambac has an interest (*see infra* II.C.).

## OBJECTION

### I. FACTUAL BACKGROUND

#### A. General Background

3. Ambac Assurance is a financial guaranty insurance company, known as a "monoline," organized under the laws of the State of Wisconsin with its principal place of business in New York, New York.

4. On March 24, 2010, the Wisconsin Office of the Commissioner of Insurance approved the creation of the Segregated Account pursuant to Wisconsin Statutes § 611.24. That same day, the Circuit Court for Dane County, Wisconsin, upon the Verified Petition of the Commissioner of Insurance ("Commissioner"), placed the Segregated Account into statutory rehabilitation under Wisconsin Statutes §§ 645.31 and 645.32. Pursuant to Wisconsin Statutes § 611.24(3)(e), the Segregated Account is a separate Wisconsin insurer with the legal capacity and authority to sue in its own name and right. Ambac allocated the policies described below and all claims related to those policies to the Segregated Account pursuant to the Plan of Operation for the Segregated Account attached to the Commissioner's Verified Petition.

5. In order to enhance the marketability of certain securities issued in connection with certain of their securitization transactions (commonly and hereinafter referred to as "RMBS Transactions"), the Debtors frequently obtained financial guarantee insurance policies from Ambac Assurance, which policies guaranteed principal and interest payments to certain

2

classes of securities issued in connection with these RMBS Transactions. As an inducement to issue such policies, Ambac entered into Insurance and Indemnity Agreements with certain of the Debtors, which agreements provided Ambac with certain rights and remedies, and was also expressly named as a third party beneficiary of, and has a variety of rights and remedies against the Debtors under the other principal transaction documents that comprise an RMBS Transaction ("Transaction Documents").[2] Pursuant to the Notice and in connection with the proposed sale of their mortgage loan origination and servicing platform (the "Sale"), the Debtors propose to assume and assign the Transaction Documents (or, more accurately, an allegedly severable piece thereof), to Nationstar Mortgage LLC or other party that is named the winning bidder for the servicing platform ("Purchaser").

### B. Ambac's Servicing-Related Rights

6. Ambac negotiated a variety of rights and remedies related to servicing ("Servicing-Related Rights") before agreeing to insure securities issued in connection with any of the Debtors' RMBS Transactions.[3] Such Servicing-Related Rights include, but are not limited to, contractual provisions that: require the servicers to service the mortgage loans in accordance with industry standards, all applicable laws and regulations, and other more specific requirements described in the Transaction Documents; require the servicers to provide detailed informa-

---

[2] Attached as Exhibit A is a list of the transactions for which Ambac issued an insurance policy and for which the contracts related to such transactions are included in the Notice. For most of the RMBS Transactions insured by Ambac, the Transaction Documents consist of: Pooling and Servicing Agreements, Insurance and Indemnity Agreements, Sale and Servicing Agreements and/or Custodial Agreements, as applicable. To include actual copies of each document would burden the Court with thousands of pages of exhibits. Ambac reserves the right to introduce any Transaction Document, or portion thereof, as evidence in support of this Objection.

[3] The summary of the Servicing-Related Rights and Servicing Triggers (as defined below) contained in this Objection are intended for descriptive purposes only and in no way limit Ambac's rights under any of the Transaction Documents. Ambac reserves all such rights to the full extent set forth in those agreements. Additionally, the terms "servicing" and "servicer" in this Objection are used generically to describe such functions, and such terms as used in this Objection include "master servicing" and "master servicer" and "sub-servicing" and "sub-servicer" to the extent such functions are performed by any of the Debtors pursuant to any of the Transaction Documents.

tion to the Trustees, Ambac and/or other transaction participants about their servicing activities, transaction cash flows and the mortgage loans; require the servicers to indemnify the trusts and/or Ambac in certain circumstances; and provide Ambac and the Trustees overseeing these trusts with the right to terminate the servicers under certain circumstances.

7.     One important Servicing-Related Right that Ambac obtained is the ability to terminate, or direct the applicable Trustee to terminate, the servicers in certain RMBS Transactions when certain negative transaction performance triggers (each, a "Servicing Trigger") are "tripped," such as when delinquency rates over a set period of time or aggregate realized loss percentages exceed a certain contractually-specified threshold.[4]

8.     The different RMBS Transactions insured by Ambac generally fall into two categories with respect to the Servicing Triggers:

- First, with respect to certain RMBS Transactions ("Terminated Servicer Transactions"), Ambac determined prior to the Petition Date that one or more Servicing Triggers had been tripped. And, also prior to the Petition Date, Ambac gave notice of its decision not to renew the term of the Master Servicer for those transactions beyond June 30, 2012. Therefore, on July 1, 2012, the Trustee automatically became the Master Servicer for the Terminated Servicer Transactions.[5]

- Second, with respect to the remaining RMBS Transactions that include a Servicing Trigger ("Remaining Transactions"), Ambac is not aware of any Servicing Triggers that were tripped prior to the Petition Date. However, either Servicing Triggers have tripped after the Petition Date or certain conditions exist now that make it possible or even likely that one or more of the Servicing Triggers will be tripped at some point in the future (e.g., delinquency rates and aggregate losses for the Remaining Transactions are still below the applicable threshold that would result in a Servicing Trigger being tripped).

---

[4] For each RMBS Transaction relevant to this Objection, one of the Debtors was the servicer as of May 14, 2012 ("Petition Date").

[5] Notwithstanding this fact, the Debtors have continued to act as Master Servicer for the Terminated Servicer Transactions. The Debtors and certain of the Trustees have disputed that the Master Servicer could be replaced after the Petition Date. In order to ensure that there was no interruption in servicing and to afford the parties time to resolve the matter consensually, the Debtors and Ambac agreed informally that the passage of time after July 1, 2012 would not be deemed to alter the rights of either party as they existed on that date. A list of the Terminated Servicer Transactions is attached as Exhibit B.

4

II.   OBJECTIONS TO ASSUMPTION AND ASSIGNMENT

   A.   **The Debtors' Right to Service the Terminated Servicer Transactions Is Not Property of the Estate and Thus Cannot Be Assigned to the Purchaser.**

   9.   A debtor can assign rights only in contracts that are part of its bankruptcy estate. A debtor cannot assign a contract in which it has no interest or transfer rights that it does not have. The Debtors' role as Master Servicer for the Terminated Servicer Transactions terminated on June 30, 2012. Therefore, the Debtor cannot transfer the rights to service these transactions to the Purchaser--those rights are no longer part of the Debtors' bankruptcy estates. *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984)("Section 541 is not intended to expand the debtor's rights against others more than they exist at the commencement of the case"). *Cf. Erickson v. Polk*, 921 F.2d 200, 201 (8th Cir. 1990)("Property of the estate does not include a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case.").

   10.   The automatic stay set forth in Section 362(d) of the Bankruptcy Code does not alter this result. The automatic stay does not toll the passage of time or prevent a contract from terminating by its own terms when termination does not require a post-petition act. *Moody*, 734 F.2d at 1213; *In re Margulis*, 323 B.R. 130, 133 (Bankr. S.D.N.Y. 2005)(where non-debtor party serves termination notice prior to bankruptcy that takes effect at future date without further action, filing of petition between notice and termination date does not toll or stay termination). *See also In re Tornado Pizza, LLC*, 431 B.R. 503, 515 (Bankr. D. Kan. 2010)("There is no question that a contract that terminated completely prior to filing cannot be assumed. The same rule applies to a contract that expires by its own terms solely due to the passage of time after the bankruptcy is filed. If [an agreement] expires by its own terms or by the mere passage of time

after a debtor commences its bankruptcy case, the Bankruptcy Code does not somehow preserve the expired agreement.").

11. The right to serve as Master Servicer for the Terminated Servicer Transactions is no longer property of RFC's bankruptcy estate. That right expired on July 1, 2012, pursuant to a notice of non-renewal that Ambac delivered pre-petition. Therefore, the contracts associated with these transactions cannot be assumed or assigned to the Purchaser.

**B.     The Sale Order Appears to Absolve the Purchaser of Compliance With Important Servicing-Related Rights Contained in the Transaction Documents.[6]**

   i.     *The Debtors Cannot "Sub-Sever" the Transaction Documents to Eliminate or Diminish Any of Ambac's Servicing-Related Rights.*

12. A debtor cannot "cherry pick" those provisions of an executory contract it likes for assumption; it "must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits." *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012). *See also N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984)(same). But, where a single contract is in fact multiple, divisible agreements memorialized together, a debtor may "sever" the agreement and assume or reject each discrete contract. *See, e.g., In re Adelphia Business Solutions, Inc.*, 322 B.R. 51, 55 n.10 (Bankr. S.D.N.Y. 2005)(collecting cases).[7]

---

[6] In the *Debtors' Omnibus Reply to the RMBS Trustees' Pre-Auction Objections to the Debtors' Sale Motion*, dated October 9, 2012, Dkt. No. 1768, the Debtors insist that "Nationstar is in fact assuming all post-closing liabilities related to the Debtors' servicing business," and that the Trustees' argument "that the servicing related obligations contained in the Servicing Agreements cannot be severed from one another . . . is fundamentally at odds with the Nationstar APA." Ambac is encouraged by this statement, and further encouraged by the Debtors' promise to "clarify these points in a revised sale approval order." But, until the revised sale order is made available and found to be satisfactory, Ambac has no choice but to prosecute this Objection.

[7] The question of whether a contract is severable is determined by reference to state law. *See In re Adelphia Business Solutions, Inc.*, 322 B.R. at 55 ("[M]any courts, including courts in the Southern District of New York, allow a single contract to be separately assumed and rejected if the contract is 'divisible' or 'severable' under state law.").

13.     The proposed severing of the servicing platform from put-back obligations is the *sine qua non* of the Debtors' sale strategy: it would likely be impossible to find a buyer that would accept assignment of the Debtors' servicing platform if it was saddled with potential put-back liabilities in the tens of billions of dollars. Ambac takes no position as to the appropriateness or legality of the severing of servicing obligations from put-back obligations. But the Sale Order can be read to go far beyond severing the servicing agreements, *in toto*, from the put-back obligations, *in toto*. Pursuant to the Sale Order, the Purchaser would acquire only a very specific subset of rights embodied within the servicing agreements--*see* Sale Order, Finding P, ¶15[8]--without a concomitant acceptance of the burdens that come along with those rights (at least not one that is explicit anywhere in the Sale Order).

14.     Even assuming that the proposed severing of servicing and put-back obligations is permissible, the Debtors have not demonstrated that any sub-severing *within* the Servicing-Related Rights is appropriate. And it would border on the absurd for the Debtors to try. "According to New York law, the severability of a contract is a question of the parties' intent, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted. As a general rule, the contract is consid-

---

[8] The Sale Order states that the Debtors are not assuming and assigning "Other Agreements," which are defined as

> any right, obligation, representation, covenant or agreement (i) contained in a Servicing Agreement that is not related to (a) collections with respect to, or the administration or servicing or subservicing or master servicing of, or reporting in respect of, Mortgage Loans, (b) servicing fees or ancillary income, (c) the disbursement of collections with respect to Mortgage Loans, (d) the making of delinquency advances and servicing advances in connection with the servicing or subservicing or master servicing of Mortgage Loans, (e) payment of expenses associated with the administration, servicing or subservicing or master servicing of Mortgage Loans, (f) the limitation on liability of, and indemnification in favor of, the servicer, subservicer or master servicer thereunder, or (g) representations, warranties and covenants running in favor of the servicer, subservicer or master servicer thereunder, or (ii) that relates to mortgage loan origination, or the sale of mortgage loans, in all cases regardless of whether such Other Agreement arises from, or is memorialized in, the same writing as a Servicing Agreement.

Sale Order, Finding P.

ered severable and divisible when by its terms, nature, and purpose, it is susceptible of division and apportionment." *In re Balfour MacLaine Int'l*, 85 F.3d 68, 81 (2d Cir. 1996).

15.   The Servicing-Related Rights (including the Servicing Triggers) are an integral component of the deal, an array of essential protections that Ambac bargained for before it would agree to insure the RMBS Transactions. Far from being "susceptible of division and apportionment," the Servicing-Related Rights, including the Servicing Triggers – indeed, especially the Servicing Triggers – all work together. As noted above, Ambac bargained for a contractual commitment that the servicers would service the mortgage loans in accordance with industry standards and applicable laws and regulations (among other requirements) and would provide detailed information to Ambac (and other transaction participants) about their servicing activities. Ambac also bargained for the right to terminate the servicers under certain circumstances, which provides a meaningful ability to oversee the servicing of the transactions. To remove them or any other Servicing-Related Rights from the Transaction Documents, or even prune them to suit the Purchaser's preference, would radically alter the allocation of benefits and burdens that the parties agreed to before entering into these agreements.

16.   In *Calyon N.Y. Branch v. Am. Home Mortg. Corp.*, the Delaware Bankruptcy Court considered whether the servicing of mortgage loans under a contract was severable from the sale and repurchase of mortgage loans under the same contract. 379 B.R. 503 (Bankr. D. Del. 2008). The Court concluded that the agreement was severable under New York law:

> The sale and repurchase of mortgage loans concerns the Debtors obtaining financing through the repo market for the origination of mortgage loans and the Purchasers providing that financing in a manner that preserves the liquidity of their investment. Servicing a mortgage loan, on the other hand, encompasses collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over the collection and default mitigation processes. *Id. at 521.*

Even if this holding supports the Debtors' assertion that a single agreement that contains a servicing component and a repurchase component is divisible—a disputed proposition on which Ambac takes no position—it plainly does not support a complete reformation of the Transaction Documents to the Purchaser's benefit. To the contrary, it underscores the conclusion that the components of the contract that comprise the servicing agreement are interdependent: servicing a mortgage loan includes "maintaining control over the collection and default mitigation process." This is precisely the purpose of the Servicing-Related Rights that Ambac negotiated before it agreed to insure the Debtors' RMBS Transactions.

17. The Sale Order should make clear that, even if contract terms that govern servicing can be severed from contract terms that govern repurchase obligations, the Debtors and the Purchaser may not subdivide the contract to eliminate or diminish the rights of contract counter-parties as they relate to servicing. The Purchaser may be entitled to take assignment of the benefits of the Transaction Documents, but it must accept those benefits subject to all of their burdens (including, *inter alia*, compliance with the Servicing Triggers and other Servicing-Related Rights). Ambac has proposed the following language to make this important clarification:

> Notwithstanding anything contained herein to the contrary, the assumption and assignment to the Purchaser of the Servicing Agreements, and the severing of the Other Agreements from the Servicing Agreements, will not alter, amend, diminish or eliminate any of the rights of Ambac Assurance Corporation or the Segregated Account of Ambac Assurance Corporation (together, "Ambac") that relate to the servicing of Mortgage Loans (collectively, the "Insurer's Servicing-Related Rights"). The Insurer's Servicing-Related Rights include, but are not limited to, all contractual rights to terminate the Master Servicer, Servicer, or any Sub-Servicer based upon the performance or status of the loans in the applicable Transaction (including, without limitation delinquency status or cumulative realized losses incurred) (the "Performance Trigger Termination Rights"), which Performance Trigger Termination Rights shall continue to be in effect and exercisable by Ambac against the Purchaser to the same extent as they would have been exercisable with respect to any Debtor without regard to the relief sought by

the Debtors pursuant to these proceedings. For the avoidance of doubt, the Insurer's Servicing-Related Rights (a) will not be deemed to arise under an Other Agreement; (b) will not be severed from the Servicing Agreements pursuant to this Order or otherwise; (c) will survive the assumption and assignment of the Servicing Agreements to the Purchaser and (d) will remain fully enforceable against the Purchaser after the Closing Date.

18. Ambac submitted this proposed language to the Debtors prior to filing this Objection, but the Debtors have not yet agreed to include it in the Sale Order.

  ii. *The Remaining Transactions Must Remain Subject to the Servicing Triggers After the Closing Date.*

19. With respect to the Remaining Transactions, Ambac seeks to ensure that the assignment of the Transaction Documents to the Purchaser will not adversely affect Ambac's right to enforce the Servicing Triggers. Specifically, Ambac is concerned that in the event one of the Servicing Triggers is tripped either before or after the Closing Date, the Purchaser could argue that Ambac is barred from enforcing the Servicing Trigger against the Purchaser because the primary fault for the delinquencies and defaults that caused the Servicing Trigger to be tripped lies with the Debtors. As drafted, the Sale Order would arguably enable the Purchaser to argue that Ambac is "barred, estopped, and permanently enjoined from asserting against the Purchased Assets, the Purchaser, its Affiliates or their respective property . . . any . . . default asserted or assertable against, or otherwise delay, defer or impair any rights of the Purchaser with respect to the Purchased Assets with respect to an act or omission of, the Debtors." Sale Order, ¶ 6.

20. The Purchaser cannot reset the individual loan defaults and delinquencies in the portfolio to zero, even if such defaults and delinquencies were "assertable against the Debtors" or attributable to "an act or omission of the Debtors." Instead, the Purchaser must accept assignment of the contracts subject to the fact that certain existing individual loan delinquencies and defaults may combine with post-Closing Date delinquencies and defaults to trip a Servicing Trigger. *See, e.g., In re Best Payphones, Inc.*, 2007 Bankr. LEXIS 1677 (Bankr.

10

S.D.N.Y. May 8, 2007)("the assignee cannot impose terms, implicitly or explicitly, that render performance less onerous to the assignee or more onerous to the non-debtor party to the contract").

21.     The Sale Order should make clear that the Purchaser may take assignment of contracts from the Debtors only subject to the current state of the individual loans that comprise the loan portfolios (even if delinquencies and defaults under those loans could combine with post-Closing Date delinquencies and defaults to trip a Servicing Trigger).[9] Ambac has proposed the following language to make this important clarification:

> Any breach of an Insurer's Servicing-Related Rights that occurs after the Closing Date will be actionable by Ambac to the extent and in the manner set forth in the applicable Servicing Agreement notwithstanding the fact that a condition or event that existed or occurred prior to the Closing Date contributed to such post-Closing Date breach.
>
> Without limiting the foregoing, the Purchaser shall not seek to prevent, hinder or delay any of the Performance Trigger Termination Rights from being exercised on the basis that any applicable loan performance metric triggering such rights was caused in whole or in part by any action taken, or constitutes a state of facts in existence, prior to the Closing Date, or any other basis or defense that would not have been available to the Debtors prior to the Petition Date.

22.     Ambac submitted this proposed language to the Debtors prior to filing this Objection, but the Debtors have not yet agreed to include it in the Sale Order.

        iii.    *The Debtors Must Assume and Assign All Transaction Documents Related to a Single RMBS Transaction.*

23.     Each of the Transaction Documents that comprise an RMBS Transaction are inseparable components of a single, integrated transaction. For the reasons set forth in paragraphs 63-70 of *Limited Objection of Financial Guaranty Insurance Company to the Debtors' Sale Motion and Assumption Notice*, Dkt. No. 1746 (the "FGIC Objection"), which Ambac

---

[9] With respect to the Remaining Transactions for which a Servicing Trigger is tripped either before or after the Closing Date, Ambac would have the right, after the Closing Date, to terminate the Purchaser as servicer in accordance with the Transaction Documents.

11

hereby joins and incorporates by reference, the Debtors may not assume one without assuming the others. Ambac is still reviewing the list of contracts to be assumed and assigned by the Debtors to determine whether the Debtors have omitted any of the Transaction Documents from the RMBS Transactions that they propose to transfer to the Purchaser.

### C. The Debtors Must Cure All Defaults and Provide Adequate Assurance of the Purchaser's Performance Before the Transaction Documents Can Be Assumed and Assigned.

#### i. Cure Obligations

24. The Debtors have scheduled a cure amount of $0.00 for all of the contracts associated with the Remaining Transactions. Ambac estimates that it has suffered not less than $15,516,745 in damages attributable to the Debtors' failure to service the mortgage loans in these transactions in accordance with the applicable servicing standards set forth in the Transaction Documents, which failures involve, among other things, improper and illegal foreclosure practices with respect to which the Debtors are subject to numerous lawsuits across the country and have entered into numerous settlements and consent orders with regulators.[10] The discovery of these improper and illegal foreclosure practices, among other things, caused the Debtors to impose lengthy foreclosure moratoriums and caused other substantial delays in foreclosure proceedings, which delays resulted in substantial additional costs borne by the securitization trusts,

---

[10] Since the Debtors are not entitled to assume and assign the contracts associated with the Terminated Servicer Transactions, the losses suffered in connection with those deals are not included in this cure claim. Ambac intends to assert these amounts in its proof of claim. But if the Court were to permit the Debtors to assume and assign those contracts over Ambac's objection, Ambac estimates that its cure claim would increase to not less than $26,299,769.

thereby damaging Ambac in the amount sought hereunder. This amount must be paid to Ambac before the Debtors can assume and assign the Transaction Documents to the Purchaser.[11]

        ii.    *Adequate Assurance of Future Performance*

25.    Pursuant to section 365(f)(2)(B) of the Bankruptcy Code, the Debtors must provide adequate assurance of the Purchaser's future performance under the Transaction Documents. Depending on the identity of the Purchaser and the results of the auction, Ambac reserves the right to argue that the Debtors have not submitted adequate assurance of the Purchaser's future performance.

### III. RESERVATION OF RIGHTS AND JOINDER

26.    Ambac reserves all rights with respect to the Transaction Documents, including but not limited to the right to demand compliance with and enforce the Servicing Triggers and all other Servicing-Related Rights, whether or not they are explicitly addressed in this Objection. Ambac further reserves the right to supplement this Objection, introduce additional evidence (both documentary and testimonial), and appear and be heard at the hearing to consider approval of the Sale and the assumption and assignment of the Transaction Documents to the Purchaser.

27.    Ambac hereby joins and incorporates by reference (a) the Pre-Auction Objections of the RMBS Trustees to the Debtors' Sale Motion, Dkt. No. 1242, (b) Syncora Guarantee Inc.'s Limited Objection to Debtors' Sale Motion, Dkt. No. 1657, and (c) the FGIC Objection, but only to the extent such objections are consistent with this Objection.

---

[11] Ambac continues to analyze and develop its claims and reserves the right to amend, modify or supplement this preliminary estimate of its cure claim. Notwithstanding the Debtors' unilateral pronouncement in the Notice that documentation and evidence in support of a cure claim be submitted now – a requirement that the Debtors themselves have failed to comply with by scheduling every single cure claim in this case at zero – the submission of such documents and evidence with this Objection would needlessly burden the Court, the Debtors and Ambac. Instead, Ambac will work in good faith with the Debtors to agree upon the appropriate cure amount, seeking an adjudication from this Court only if those negotiations are not successful.

Dated:  New York, New York
        October 12, 2012

Respectfully submitted,

**PATTERSON BELKNAP WEBB & TYLER** LLP
Attorneys for Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation

By:  ___s/David W. Dykhouse___
        David W. Dykhouse
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222