MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Todd M. Goren
Samantha Martin

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**DEBTORS' LIMITED OBJECTION TO THE MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER
AUTHORIZING IT TO PROSECUTE AND SETTLE CERTAIN CLAIMS
ON BEHALF OF THE DEBTORS' ESTATES**

Residential Capital, LLC and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "***Debtors***") hereby submit this limited objection (the "***Limited Objection***") to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates*, dated September 24, 2012 [Docket No. 1546] (the "***Motion***").[1] In support of hereof, the Debtors respectfully represent:

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

ny-1061717

**PRELIMINARY STATEMENT**

1.   As noted in the Motion, the Debtors have consented to the Committee's standing to investigate the claims of the Junior Secured Parties and initiate an adversary proceeding with respect thereto.  However, the Committee should *not* be granted the "sole right" to settle the Junior Secured Parties' claims.  A grant of standing to bring the claims does not change the fact that the ownership of such claims belongs to the Debtors.  Moreover, the alleged claims could be key issues to be resolved as part of the Debtors' plan of reorganization.  As a result, the Debtors believe that they should be permitted to retain the ability to resolve any pending litigation, including a resolution as part of their plan of reorganization, where such settlement may be reviewed and voted on by the Debtors' creditors.

**BACKGROUND**

2.   On May 14, 2012 (the "***Petition Date***"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee has been appointed in the Chapter 11 Cases.[2]

3.   On May 16, 2012, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed a nine member official committee of unsecured creditors (the "***Committee***").

---

[2] The Debtors are a leading residential real estate finance company indirectly owned by Ally Financial Inc. ("***AFI***"), which is not a Debtor.  The Debtors and their non-debtor affiliates operate the fifth largest mortgage servicing business and the tenth largest mortgage origination business in the United States.  A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6] (the "***Whitlinger Affidavit***").

2

4. On July 3, 2012, the U.S. Trustee appointed the Honorable Arthur T. Gonzalez, former Chief Judge of this Court, as examiner (the "***Examiner***").

## LIMITED OBJECTION

**A.     The Committee Has Mischaracterized the Events Leading Up to the Petition Date**

5. In the Motion, the Committee paints a picture that the Debtors granted additional liens to the Junior Secured Parties "at the eleventh hour to induce the Ad Hoc Group to enter into the JSN PSA" (Mot. at ¶ 6). That picture is patently distorted.

6. As the Debtors have informed the Committee repeatedly, the Debtors' internal collateral tracking database (the "***Database***") was designed to ensure that the Debtors were meeting their reporting obligations in accordance with all applicable loan documents and law. Historically, the Debtors were only obligated to report on the "Primary Collateral" under the governing documents for the AFI Revolver and Junior Secured Notes. Thus, the Database identified only those assets that were Primary Collateral under each of those facilities, and did not specifically identify assets that were covered by the so-called "Blanket Lien."

7. The Debtors and their employees, however, clearly treated the Blanket Lien Assets as encumbered during the entire time the AFI Revolver and Junior Secured Notes have been outstanding. For example, the Debtors generally executed Partial Releases of Collateral and filed UCC-3 termination statements to release the Junior Secured Parties' security interests in certain of the Blanket Lien Assets. Indeed, the Committee acknowledges that certain of these releases took place well before the eve of the Petition Date. (See Mot. at ¶ 47) ("the Collateral Agent granted a certain Partial Release of Collateral, dated as of May 17, 2010 (the "Pledge Release"), which released the Junior Secured Parties' liens on the Purchased Mortgage Loans, and also filed UCC-3 termination statements that released any security interest in the

3

Purchased Mortgage Loans…. Even if such liens had not been released by the Pledge Release, portions of the Purchased Mortgage Loans would otherwise constitute Released Excluded Assets (as explained above) because they were pledged to secure the Debtors' obligations under Bilateral Facilities that were subsequently terminated."). In addition, the Debtors identified the Blanket Lien Assets in a collateral report provided to the advisors for the Junior Secured Parties during their initial discussions regarding the potential Chapter 11 filing, which took place several months before the JSN PSA was negotiated.[3]

8.  Notwithstanding the Debtors repeated explanations, the Committee mischaracterizes the purpose of the Database and the Debtors' updates thereto. The Database is simply a tool to assist the Debtors in meeting their reporting obligations. The Debtors began to update the Database as they approached the Petition Date to reflect all of their collateral packages, including the Blanket Lien Assets, so they would be able to meet the new reporting requirements under their debtor-in-possession financing and cash collateral orders and to assist in preparing other bankruptcy-related documents (i.e., the waterfall analysis in connection with the Debtors' plan of reorganization). The Committee's disingenuous attempts to characterize the Debtors' updates as surreptitious is unsupported and unwarranted.

**B.  The Debtors and the Committee Should Have Joint Rights to Settle the Junior Secured Parties' Claims**

9.  The Debtors have consented to the Committee's standing to bring claims against the Junior Secured Parties. However, the Debtors do not believe that the Committee

---

[3] Indeed, in their consolidated financial statements, the Debtors have identified a lien on certain of their consolidated assets for the benefit of the AFI Revolver and the Junior Secured Notes. See, for example, Residential Capital, LLC, Quarterly Report (Form 10-Q) at 27 (Aug. 7, 2009) (the relevant pages are annexed hereto as Exhibit 1).

4

should be granted the *exclusive* right to enter into a settlement with the Junior Secured Parties regarding their collateral package.

10. The Committee does not cite to any case law or statute in support of the argument that it deserves the "sole right" to settle with the Junior Secured Parties.[4] Indeed, the law does not support the Committee's request to strip the debtor of its ownership of the claims. The Committee relies on Unsecured Creditors Comm. v. Noyes (In re STN Enters.), 779 F.2d 901 (2d Cir. 1985) and its progeny, which permit committees to initiate adversary proceedings in the name of the debtor in possession with the approval of the Bankruptcy Court. However, as Judge Gerber noted, "[t]he STN Trilogy speaks to when a party other than a trustee or debtor may bring an estate cause of action. At least as a general matter, it does not strip a debtor of standing." In re Adelphia Commc'ns. Corp., 368 B.R. 140, 272 (Bankr. S.D.N.Y. 2007).[5] Indeed, the Second Circuit has noted that:

> Under the Code, the debtor-in-possession is held "accountable for all property [of the estate] received." 11 U.S.C. § 1106(a)(1) (incorporating § 704(2)). Property of the estate for which the debtor is held accountable includes, inter alia, "all legal or equitable interests of the debtor . . . as of the commencement of the case," id. § 541(a)(1), such as valuable causes of action, … as well as "proceeds, product, offspring, rents, or profits of or from property of the estate," 11 U.S.C. § 541(a)(6). Courts therefore have interpreted § 1106(a)(1) to include "the duty to appear and prosecute, or defend against, any cause of action on behalf of the estate" that may benefit or adversely affect the property of the debtor's estate. 7 Collier P 1107.02[1][a] …. In making the debtor-in-possession accountable for the estate's legal claims, Congress vested the debtor with the responsibility to determine how best to handle those claims. Similarly, the debtor's duty to wisely manage the estate's legal claims is implicit in the debtor's role as the estate's only fiduciary. … As fiduciary, the debtor bears the burden of "maximizing the value of the estate," … including the value of any legal claims.

---

[4] The Committee cited to three court orders where the court granted the committee exclusive standing to settle claims on behalf of the debtors' estates. In each of these orders, the debtors did not object to the committee's requests for such rights.

[5] The "STN Trilogy" is identified by the Adelphia court as In re STN Enterprises, 779 F.2d 901 (2d Cir. 1985); Commodore Int'l, Ltd. v. Gould (In re Commodore Int'l, Ltd.), 262 F.3d 96 (2d Cir. 2001); and Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64 (2d Cir. 2002).

Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 175 (2d Cir. N.Y. 2005) (case citations omitted).

11. The Second Circuit further noted that by "creating the § 1109(b) right 'to appear and to be heard on any issue,' Congress cannot have intended to override the Code provisions in which it carved out an exclusive role for the debtor-in-possession as legal representative and fiduciary of the estate." Smart World Techs, LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d at 183 (declining to grant creditors derivative standing and further declining to permit the settlement, purportedly entered into by the creditors pursuant to Sections 1109 and 105, over the debtor's objections).

12. In addition, the Debtors believe that the Committee's request to have the "sole right to negotiate a settlement with the Junior Secured Parties" interferes with the Debtors' exclusive right to file a plan of reorganization. The Debtors maintain the exclusive right to file a plan of reorganization through and including December 20, 2012 at 5:00 p.m. and the exclusive right to solicit acceptances of a plan of reorganization through and including February 18, 2013. See *Order Extending the Exclusive Periods During Which Only the Debtors May File Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1413]. "Courts, as a general rule, favor compromise as compromises are 'a normal part of the process of reorganization.' In this spirit, section 1123(b)(3)(A) of the Bankruptcy Code specifically permits a plan to provide for the settlement of any claim belonging to the debtor or the estate." In re Best Prods. Co., 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (citations omitted) (aff'd Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 177 B.R. 791, 794 (S.D.N.Y. 1995)). See also 11 U.S.C. § 1123(b)(3)(A) (a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate"); In re Adelphia Commc'ns. Corp., 368 B.R. at 224

("section 1123(b)(3), which describes what a plan may contain, expressly includes settlements, and the Settlement that this Plan contains is one of its most important, and controversial features.").

13. Accordingly, the Debtors consent to the Committee's standing to initiate an adversary proceeding against the Junior Secured Parties, but the Debtors must retain the ability to settle the Junior Secured Parties' collateral issues as part of their plan of reorganization where such settlement may be reviewed and voted on by the Debtors' creditors.

### C. The Committee's Request for a 45-Day Extension

14. The Committee requests a period of forty-five (45) days from entry of the proposed order to commence an adversary proceeding against the Junior Secured Parties. The Committee believes this time is necessary to complete its analysis and engage in substantive discussions with the Junior Secured Parties to narrow the potential issues on a consensual basis.

15. The Debtors believe an extension of the deadline to commence an adversary proceeding could result in advanced negotiations among the Junior Secured Parties and the Committee, which may benefit all parties in the plan negotiation process. Further, any litigation among the Debtors' main constituents at this junction would distract the parties from the sale processes that are occurring in these cases over the next month.

[*Remainder of page intentionally left blank*]

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Debtors request that the Court enter an Order denying the Committee's request for exclusive settlement authority and granting such other relief as the Court deems proper.

New York, New York  
Dated: October 19, 2012

/s/ Todd M. Goren  
Gary S. Lee  
Todd M. Goren  
Samantha Martin  
MORRISON & FOERSTER LLP  
1290 Avenue of the Americas  
New York, New York 10104  
Telephone: (212) 468-8000  
Facsimile: (212) 468-7900  

*Counsel to the Debtors and Debtors in Possession*

**EXHIBIT 1**

9

10-Q 1 d10q.htm FORM 10-Q

Table of Contents

---

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549-1004

## FORM 10-Q

☑ QUARTERLY REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2009, or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from          to         .

Commission file number: 0-51438

# RESIDENTIAL CAPITAL, LLC
*(Exact name of registrant as specified in its charter)*

| Delaware | 20-1770738 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

One Meridian Crossings
Minneapolis, MN
55423
*(Address of principal executive offices)*
*(Zip Code)*

(952) 857-8700
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☐    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐            Accelerated filer ☐            Non-accelerated filer ☑            Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑

As of June 30, 2009, there were outstanding 1,000 common limited liability company interests of the registrant.

**Reduced Disclosure Format**

The registrant meets the conditions set forth in General Instruction H(1)(a) and (b) of Form 10-Q and is therefore filing this Form with the reduced disclosure format.

Table of Contents

**RESIDENTIAL CAPITAL, LLC**
**NOTES TO THE CONDENSED**
**CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited) — (Continued)**

The following table summarizes assets at carrying value that are restricted, pledged or for which a security interest has been granted as collateral for the payment of certain debt obligations:

|  | June 30, 2009 | December 31, 2008 |
|---|---:|---:|
|  | (In thousands) | |
| Cash and cash equivalents | $ 13,731 | $ 5,431,602 |
| Mortgage loans held for sale | 636,832 | 1,760,553 |
| Certificated trading securities | 109,740 | 127,839 |
| Mortgage loans held for investment | 7,151,901 | 22,925,818 |
| Lending receivables, net | 689,727 | 5,728,496 |
| Mortgage servicing rights | 2,426,493 | 2,644,146 |
| Accounts receivable, net | 1,730,075 | 1,826,064 |
| Investments in real estate and other | 81,799 | 128,533 |
| Other assets | 471,776 | 7,071,419 |
| Total assets restricted as collateral | $ 13,312,074 | $ 47,644,470 |
| Related secured debt | $ 12,750,265 | $ 25,710,172 |

The Company also pledges equity interests of certain subsidiaries or other affiliates to the GMAC Senior Secured Credit Facility. At June 30, 2009 there was $515.8 million of equity interest in these subsidiaries pledged against this facility. In addition, the Company provided a lien on certain of the Company's consolidated assets, as specified in the GMAC Senior Secured Credit Facility agreements, for the benefit of the GMAC Senior Secured Credit Facility and the senior and junior secured notes. The Company also pledged $218.3 million of equity interests to both the $430 million loan agreement ("GMAC LOC") facility and the $470 million GMAC Credit Agreement at June 30, 2009.

The carrying value of assets that were pledged as collateral in the preceding table that can be sold or repledged were as follows:

|  | June 30, 2009 | December 31, 2008 |
|---|---:|---:|
|  | (In thousands) | |
| Mortgage loans held for sale | $ 78,030 | $ 148,545 |
| Mortgage loans held for investment | 347,260 | 478,988 |
| Lending receivables, net | 78,210 | — |
| Accounts receivable, net | 7,437 | 6,006 |
| Other assets | 2,049 | — |
| Total | $ 512,986 | $ 633,539 |

27