## Exhibit 5

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468 8000
Facsimile:    (212) 468 7900
Gary S. Lee
Anthony Princi
Darryl Rains
Jamie A. Levitt

*Counsel for the Debtors*
*and Debtors in Possession*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
|   )
In re:                                                   )    Case No. 12-12020 (MG)
                                                         )
RESIDENTIAL CAPITAL, LLC, et al.,                        )    Chapter 11
                                                         )
                              Debtors.                   )    Jointly Administered
---------------------------------------------------------------    )

### SUPPLEMENTAL DECLARATION OF FRANK SILLMAN IN SUPPORT OF DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS

I, Frank Sillman, being duly sworn, depose and say:

1.    I serve as Managing Partner for Fortace, LLC ("Fortace")[1] an advisory and consulting firm to banks, mortgage companies, insurance companies, trustees and other investors. I am authorized to submit this Supplemental Declaration (the "Supplemental Declaration") on behalf of the Debtors in connection with their motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for approval of RMBS Trust Settlement Agreements. This Supplemental Declaration

---

[1] Capitalized terms not otherwise defined herein are as defined in the Original Declaration, in the RMBS Trust Settlement Agreement, or in the Governing Agreements for each of the Debtors' Trusts, or in the defined terms incorporated by reference therein.

1

reflects the Estimated Loan Loss work performed since my original declaration ("Original Declaration") and I reserve the right to augment and refine the analysis as my work is ongoing.

2.      Except as otherwise indicated, all statements in this Supplemental Declaration are based upon my review of the cash flow and Estimated Lifetime Loss model output, the relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and expert experience.  If I were called upon to testify, I could and would testify to each of the facts set forth below.

## INTRODUCTION

3.      As I discussed in my Original Declaration, the first step in estimating the range of potential repurchase liability for the Debtors ("Potential Repurchase Requirements") is developing the potential cumulative lifetime loss ranges ("Estimated Lifetime Losses") for the 392 Trusts included in the RMBS Trust Settlement ("Settlement Trusts").

4.      In my Original Declaration, I discussed that there are a variety of methods accepted in the financial services industry to estimate RMBS Trust lifetime losses.  In my Original Declaration I utilized one of those methods, the Shelf Level Estimated Lifetime Loss methodology ("Shelf Level Model"), to develop the Estimated Lifetime Losses.  For this Supplemental Declaration, I utilized another of the accepted methods to supplement the Estimated Lifetime Loss model work I performed in my Original Declaration. For this Supplemental Declaration, I employed the more granular and detailed Loan Level and Trust Level Estimated Lifetime Loss model ("Trust Level Model") process for the Settlement Trusts.  The Trust Level Model process is regularly used by market participants and financial institutions to estimate repurchase exposure, including estimates provided by financial institutions in their regulatory filings.   Both the Shelf Level Model and the Trust Level Model methods utilize similar frequency and severity rate-based forecasting and historically based assumption development methodologies.  Accordingly, the Trust Level Model

2

methodology that I used in this Supplemental Declaration is generally accepted in the industry as a

sound means of forecasting estimated lifetime losses and estimating potential repurchase liability.

The Trust Level Model process I utilized in the development of the Estimated Lifetime Losses ranges

in this Supplemental Declaration is described below.



ny-1059784

## <u>DETERMINATION OF THE SETTLEMENT TRUSTS'</u>

## <u>ESTIMATED LIFETIME LOSSES</u>

**Trust Level Model Process Overview**



5.    Step 1 -  The first step in developing estimated loss ranges for RMBS Trusts is to obtain the historical borrower loan payment remittance data ("<u>Remit Data</u>") for both (1) the Settlement Trusts, and  (2) other industry RMBS Trusts which consist of loan products and securitization structures similar to the Settlement Trusts[2].  This Remit Data contains hundreds of data fields including loan level payment histories, prepayment data, default data and loan level losses.  The Remit Data may be available on either a loan level basis or at a trust level basis.  For the 392 Settlement Trusts, we were able to obtain loan level data from Loan Performance[3] ("<u>LP</u>") for 352 Settlement Trusts, Intex[4] loan level data for 16 Settlement Trusts and Intex trust level data for 23 Settlement Trusts.  We utilized Remit Data from May 2012.

---

[2] WestPat model groups the RMBS Trusts into the following categories: Alt A/Sub Prime, Prime, HELOC & Fixed 2nds.
[3] CoreLogic Loan Performance is a provider of RMBS Trust loan remittance data.
[4] Intex Solutions, Inc. is a provider of structured fixed income cash flow models and RMBS Trust loan remittance data.

6.      Step 2a – I employed WestPat LLC to run their proprietary RMBS estimated loss and cash flow model (the "<u>WestPat Model</u>") to determine Estimated Lifetime Loss ranges for the Settlement Trusts for which loan level Remit Data was available.   The WestPat Model requires loan level Remit Data.  The WestPat Model is a commercially available estimated loss and cash flow model used by mortgage lenders, mortgage bond investors and money managers to estimate loan losses, cash flows and value RMBS mortgage bonds.

7.      Step 2b – For the 23 Settlement Trusts for which only trust level Remit Data was available, I utilized the Intex Model, as defined below, to determine Estimated Lifetime Loss ranges. The Intex Model is a commercially available cash flow model used by mortgage lenders, mortgage bond investors and money managers to estimate loan losses, cash flows and value RMBS mortgage bonds ("<u>Intex Model</u>").

8.      Step 3 – WestPat and Intex Model assumption requirements and discussion:

(a)      <u>WestPat Model assumptions</u>:

(i)      The WestPat Model independently develops its Validated Settlement Trusts Assumptions for forecasting cash flows and estimated losses from actual historical performance of certain key data elements ("<u>HIST PERF</u>") from the Remit Data for each of the Settlement Trusts:

(a)      Actual Trust Losses to date.

(b)      Actual Severity Rates to date.

(c)      Actual Constant Default Rates to date ("<u>CDR</u>") aka Roll Rates aka Frequency Rates.

(d)      Actual Voluntary Constant Prepayment Rates ("<u>VCPR</u>").

(e)      Actual Loan Level Payment Histories to date ("<u>PAY HIST</u>") aka Pay Strings.

(ii)      Additionally, I provided a few macro economic assumptions to WestPat for use in the WestPat Model based on industry available data and my expert experience in developing these assumptions:

5

(a)    Forward Yield Curve from 6/20/12.

(b)    The unemployment rate[5] utilized was 8.1% from April 2012.  The unemployment rate was held constant for the life of the loans.

(c)    The current Combined Loan To Value ("CLTV") was calculated using Case-Shiller[6] home price data as of April 2012. The model uses the zip code when available. If the zip code is not available, the model uses Metropolitan Statistical Area ("MSA") level or state level data.  Once the CLTV is updated,  it is varied over time based on our Forward Home Price Index assumptions described below.

(d)    FICO scores - The model does not update Borrowers' FICO scores, the model utilizes the Borrowers' origination FICO scores.

(e)    LP and Intex Remit Data reflect the RMBS Trusts' actual Losses to Date after applying any mortgage insurance claims paid to the Trusts.   The LP and Intex Remit Data do not include any Monoline insurance claims paid to the Trustee for the benefit of the CertificateHolders.

(f)    Forward Home Price Index ("HPI") for distressed home sales.

(g)    The WestPat Model varies time to foreclosure by state.  The WestPat Model utilized time to foreclosure history through March 2012.

(b)    Intex Model assumptions:

(i)    The Intex Model requires the user to develop and input assumptions into the model.  I provided assumptions for use in the Intex Model based on industry available data and my expert experience in developing these assumptions:

(a)    Forward Yield Curve from 6/20/12.

(b)    VCPR – determined after reviewing each individual Settlement Trusts' 6 month, 12 month and monthly time series trends.

---

[5] U.S. Bureau of Labor Statistics.
[6] S&P/Case-Shiller Home Price Index is a leading measure of the U.S. residential housing market.

(c)    CDR - determined after reviewing each individual Settlement Trusts' 6 month, 12 month and monthly time series trends.

(d)    Severity Rates - determined after reviewing each individual Settlement Trusts' monthly time series Severity trends.

**Validating the Industry RMBS Assumptions**



9.    Step 4a – The WestPat Model evaluates RMBS Trust historical Remit Data for loan products and securitization structures similar to the Settlement Trusts from the available industry Remit Data from LP or Intex ("Industry RMBS Remit Data") to develop the Preliminary Industry RMBS Assumptions utilized to estimate the remaining lifetime losses for these industry RMBS Trusts.

10.    Step 4b - The WestPat Model then performs a series of regression analyses to validate the Preliminary Industry RMBS Assumptions against the actual performance of these Industry RMBS Trusts to create the validated assumptions for the industry RMBS Trusts ("Validated Industry RMBS Trust Assumptions").

**Validating the Settlement Trusts Assumptions and Forecasted Remaining Lifetime Losses**



11.    Step 4c - The WestPat Model then applies these Validated Industry RMBS Trust Assumptions to the Settlement Trusts ("<u>Preliminary Settlement Trusts Assumptions</u>").  The WestPat Model then performs a series of regression analyses to validate these Preliminary Settlement Trusts Assumptions against the actual performance of the Settlement Trusts to obtain the validated Settlement Trust assumptions ("<u>Validated Settlement Trusts Assumptions</u>").

12.    Step 4d - After this last regression analysis step, the WestPat Model then utilizes the Validated Settlement Trusts Assumptions for each of the 369 Settlement Trusts to forecast the Remaining Lifetime Losses for the Settlement Trusts.

13.    Step 5 -  Determining the Forecasted Remaining Lifetime Losses for the Settlement Trusts: I added the Forecasted Remaining Lifetime Losses from the both the WestPat and Intex Models for both the lower and higher ranges. The calculations are  illustrated below:

| Model | Data Source | # of Trusts | Forecasted Remaining Lifetime Losses (in billions) | |
| --- | --- | --- | --- | --- |
| | | | Lower Range | Higher Range |
| WestPat | LP | 353 | $11.7 | $14.7 |
| WestPat | Intex | 16 | $0.2 | $0.2 |
| Intex | Intex | 23 | $1.0 | $1.3 |
| **Total** | | **392** | **$12.9** | **$16.2** |

14.      Step 6 - Determining the Actual Losses to Date for the Settlement Trusts: I
added the Actual Trust Losses to Date for the Settlement Trusts from both the LP and Intex Remit
Data.  The calculations are illustrated below:

| Actual Settlement Trust Losses to Date (in billions) | | |
| --- | --- | --- |
| Data Source | # of Trusts | Actual Losses to Date |
| LP | 353 | $26.9 |
| Intex | 16 | $1.6 |
| Intex | 23 | $2.1 |
| **Total** | **392** | **$30.6** |

15.      Step 7 – Determining the Total Estimated Lifetime Loss ranges for the
Settlement Trusts: I added the Total Actual Trust Losses to Date for the Settlement Trusts to the
Forecasted Remaining Lifetime Losses for the Settlement Trusts to determine the Total Estimated
Lifetime Loss for both the lower and higher ranges for the Settlement Trusts.  The calculations are
illustrated below:

| LOWER RANGE (in billions) | | | | | |
| --- | --- | --- | --- | --- | --- |
| Model | Data Source | # of Trusts | Actual Losses to Date | Forecasted Remaining Lifetime Losses | Total Estimated Lifetime Losses |
| WestPat | LP | 353 | $26.9 | $11.7 | $38.6 |
| WestPat | Intex | 16 | $1.6 | $0.2 | $1.8 |
| Intex | Intex | 23 | $2.1 | $1.0 | $3.1 |
| **Total** | | **392** | **$30.6** | **$12.9** | **$43.5** |

9

| Model | Data Source | # of Trusts | Actual Losses to Date | Forecasted Remaining Lifetime Losses | Total Estimated Lifetime Losses |
|---|---|---|---|---|---|
| **HIGHER RANGE** (in billions) | | | | | |
| WestPat | LP | 353 | $26.9 | $14.7 | $41.6 |
| WestPat | Intex | 16 | $1.6 | $0.2 | $1.8 |
| Intex | Intex | 23 | $2.1 | $1.3 | $3.4 |
| **Total** | | **392** | **$30.6** | **$16.2** | **$46.8** |

16.     The Total Estimated Lifetime Loss ranges determined in this Supplemental

Declaration are similar to the Total Estimated Lifetime Loss ranges determined in my Original

Declaration.  See the comparison in the following charts:

| | Total Estimated Lifetime Losses (in billions) | |
|---|---|---|
| | Orig. Decl. | Suppl. Decl. |
| Lower Range | $45.6 | $43.5 |
| Higher Range | $49.8 | $46.8 |

Comparison of models by Shelf:

| Shelf | Lower Range | | Higher Range | |
|---|---|---|---|---|
| **Total Estimated Lifetime Losses (in billions)** | | | | |
| | Orig. Decl. | Suppl. Decl. | Orig. Decl. | Suppl. Decl. |
| GMACM | $3.4 | $3.3 | $3.8 | $3.6 |
| RAAC | $0.8 | $0.7 | $0.9 | $0.8 |
| RAAC RP | $1.3 | $1.2 | $1.3 | $1.4 |
| RALI | $16.1 | $15.7 | $17.8 | $17.1 |
| RAMP | $8.3 | $8.0 | $8.9 | $8.5 |
| RASC | $10.6 | $9.9 | $11.4 | $10.5 |
| RFMSI | $1.9 | $1.6 | $2.3 | $1.8 |
| RFMSII | $3.2 | $3.1 | $3.4 | $3.1 |
| **Total Est. Lifetime Losses** | **$45.6** | **$43.5** | **$49.8** | **$46.8** |

## CONCLUSION

17.     In summary, for this Supplemental Declaration I utilized a detailed and granular

process to estimate the lifetime losses of the Settlement Trusts.  This Trust Level Estimated Lifetime

Loss model process is regularly used by market participants and financial institutions to estimate their

repurchase exposure, including estimates provided by financial institutions in their regulatory filings.

10

Based on my analysis described above, both the lower and higher Estimated Lifetime Loss ranges for the Shelf Level Model and Trust Level Model in my opinion, to a reasonable degree of certainty, supports the reasonableness of the proposed Allowed Claim of $8.7 billion.

### Of the $45 billion in Estimated Lifetime Trust Losses, 2/3 of the Losses have already occurred



### Settling for 19% of the Estimated Lifetime Trust Losses is fair and reasonable based on the below Breach, Agree and Loss Share Rates



### The Allowed Claim of $8.7 Billion is within the range of fair and reasonable



ny-1059784

## INDUSTRY STANDARDS FOR FORECASTING REMAINING LIFETIME LOSSES

18.    As I discussed in my Original Declaration, one of the key steps in estimating

the range of potential repurchase liability for the Debtors ("Potential Repurchase Requirements") is

forecasting the remaining lifetime losses for the Settlement Trusts utilizing an industry standard cash

flow/estimated loss model.

19.    I am familiar various Financial Accounting Standards Board ("FASB")

statements and updates discussing acceptable valuation frameworks and methodologies for

forecasting future RMBS cash flows, estimated losses and fair market values.  Here are the few of

those statements and updates:

(a)    FASB - Statement of Financial Accounting Standards 157 - defines fair

value, establishes a framework for measuring fair value in generally accepted accounting principles

("GAAP"), and expands disclosures about fair value measurements.   FASB 157 discusses three

approved approaches to determining fair value, one of which is the Income approach.  The Income

approach allows the user to select assumptions (Level 3 inputs) such as loss severity, default rates and

prepayment rate and input those assumptions into a cash flow model to determine future cash flows

and losses on the underlying loans or RMBS securities.

(b)    FASB Accounting Standards Update[7] – this FASB update discusses the

following significant inputs for a valuation model to include the following weighted averages:

(i)    Yield: XX percent (not required unless you're pricing a security)

(ii)    Probability of default:  XX percent constant default rate

(iii)    Loss severity: XX percent

(iv)    Prepayment:  XX percent constant prepayment rate

---

[7] FASB Accounting Standards Update, No. 2010-06, January 2010.

(c)    FASB approves the use of a valuation model, key user input assumptions and cash flow/estimated loss model methodologies that I utilized in both the Shelf Level and Trust Level estimated lifetime loss model process discussed in my Original Declaration and this Supplemental Declaration.

20.    DBRS[8] utilizes a RMBS loss model[9] that estimates loan level default probability, loss severity and expected loss for a pool of mortgage loans to help determine its credit ratings for a particular mortgage pool or RMBS Trust.

21.    As part of its modeling process, DBRS utilizes certain regional economic data such as growth in civilian labor force, per-capita income, unemployment rate and house price index at the MSA level to help its model better forecast future loses.  Their model also provides users with the option to forecast certain variables such as changes in unemployment rates, housing prices, voluntary prepayment rate (CPR), liquidation timelines, months in REO properties and roll rates from 180 days delinquent to default to better forecast losses.

22.    The DBRS model utilizes remittance data[10], regional economic data[11] and Case-Schiller home price indices as inputs in its loss model.

23.    The DBRS model primarily utilizes the Probability of Default (or Frequency) and the Loss Severity at default to drive its loss modeling results.  These two significant components are determined by analyzing the historical remittance data of like residential mortgage loan products and RMBS securitization structures provided in the remittance data and the various user inputs discussed above.

---

[8] DBRS, Inc. is a full-service credit rating agency established in 1976.
[9] DBRS' RMBS Insight: U.S. Residential Mortgage-Backed Securities Loss Model and Rating Methodology published in January 2012.
[10] Remittance data from MBS Data LLC.
[11] Regional economic data from the St. Louis Federal Reserve.

24.     This modeling process including the user inputs and heavy reliance on

historical remittance data to determine future assumptions is very similar to the estimated loss

modeling process employed in this Supplemental Declaration.

## **INDUSTRY STANDARDS FOR THE REPURCHASE DEMAND PROCESS**

25.     As I discussed in my Original Declaration, one of the key methods utilized in

estimating the range of potential repurchase liability for the Debtors ("Potential Repurchase

Requirements") is to develop data on the Audit Rate, Demand Rate, Breach Rate, Agree Rate and

Loss Share Rate for the loans in the Settlement Trusts.  The repurchase demand process methodology

I utilized in my Original Declaration is regularly used by major financial institutions such as Fannie

Mae, Wells Fargo Bank and many other top national banks to manage their repurchase demand

process and is commonly accepted in the industry.   I am familiar with the use of this repurchase

demand process methodology and I have utilized this repurchase demand process methodology over

the last 10 years for Fannie Mae, Freddie Mac and various PLS RMBS sellers and clients.

### **Fannie Mae's Repurchase Demand Process**

26.     I am familiar with Fannie Mae's current National Underwriting Center

("NUC") Quality Assurance review process[12] as a result of my professional experience. The process

has the following steps:

(a)     Step 1 – Loans are selected for review by the National Underwriting

Center ("Audit Rate").

(b)     Step 2 – Loans are requested from the Lender and the Lender provides

the original file and any missing documentation to Fannie Mae.

---

[12] Fannie Mae's National Underwriting Center Quality Assurance review process dated 2010.

14

(c)    Step 3 - An underwriter reviews the file and records any defects both significant and informational. If any significant defects are identified, the underwriter recommends the loan be repurchased by the Lender.

(d)    Step 4 - Upon validation of the significant defect(s) and determination that the loan does not meet Fannie Mae criteria, a request for repurchase is sent to the Lender ("Demand Rate").

(e)    Step 5 - The Lender reviews the loan file and responds with a Concur or Rebuttal ("Agree Rate").

27.    Fannie Mae employs an industry standard repurchase demand methodology which is similar to the repurchase demand methodology utilized in my Original Declaration. Additionally, Fannie Mae requires its Sellers or customers to participate in their repurchase process for all loans sold to them, including but not limited to large financial institutions such as Bank of America, Wells Fargo, JP Morgan Chase, Citi, SunTrust, US Bank and other top banks (See the IMF Special Report).

**Wells Fargo Repurchase Demand Process**

28.    I am familiar with the Wells Fargo Repurchase and Rescission Process[13] as a result of my professional experience.  The process has the following steps:

(a)    Step 1 – Wells Fargo loans are selected for review ("Audit Rate") by an investor.

(b)    Step 2 – The investor reviews the file and records for any breach of representations and warranties.  If any breaches are identified, the investor issues a repurchase demand to Wells Fargo ("Demand Rate").

---

[13] Wells Fargo Funding Repurchase and Rescission Process Overview dated October 15, 2010.

(c)    Step 3 – Upon receipt a demand, Wells Fargo researches the demand to determine if there was a breach of representation or warranty or non-compliance with a term of the mortgage insurance policy. Wells Fargo either agrees to repurchase the loan or appeals the demand ("Agree Rate").

(d)    Wells Fargo thus utilizes an industry standard repurchase process similar to the repurchase demand methodology utilized in my Original Declaration.  Wells Fargo originated approximately 33% of all residential mortgages in the United States through the first six months of 2012 according to a Bloomberg article from August 2012.

## CLARIFICATIONS AND CORRECTIONS TO ORIGINAL 9019 DECLARATION

29.    In my Original Declaration (page 5, item 5(3); page 13, item 32), I stated that I reviewed Frequency Rates from one Trust for each of the representative Shelves.  I would like to clarify that I reviewed Frequency Rates from at least one Series by Issue Year, which may consist of multiple Trusts, for each of the representative Shelves.

30.    In my Original Declaration (page 14, item 35), I inadvertently stated that the Severity Rate is also known as the Default Rate.

Dated:  September 28, 2012

/s/
Frank Sillman

EXHIBITS

Exhibit A -    U.S. Bureau of Labor Statistics Labor Force Statistics from the Current Population

Survey for unemployment rates, data extracted on September 26, 2012.

Exhibit B -    Financial Accounting Standards Board Financial Accounting Series Accounting

Standards Update No. 2010-06, dated January 2010.

Exhibit C -    DBRS, Inc.'s RMBS Insight: U.S. Residential Mortgage-Backed Securities Loss

Model and Rating Methodology, dated January 2010.

Exhibit D -    Fannie Mae's National Underwriting Center Quality Assurance review process,

dated 2010.

Exhibit E -    Wells Fargo Funding Repurchase and Rescission Process Overview, dated October

15, 2010.

**Exhibit A**

A to Z Index | FAQs | About BLS | Contact Us    Subscribe to E-mail Updates    GO

Follow Us 🐦 | What's New | Release Calendar | Site Map

Search BLS.gov    🔍

| Home | Subject Areas | **Databases & Tools** | Publications | Economic Releases | Beta |

# Databases, Tables & Calculators by Subject

FONT SIZE: ➖ ➕

Change Output Options:    From: 2002    To: 2012    

☐ include graphs

**More Formatting Options** ➡️

Data extracted on: September 26, 2012 (10:53:51 AM)

### Labor Force Statistics from the Current Population Survey

| | |
|---|---|
| **Series Id:** | LNS14000000 |
| | Seasonally Adjusted |
| **Series title:** | (Seas) Unemployment Rate |
| **Labor force status:** | Unemployment rate |
| **Type of data:** | Percent or rate |
| **Age:** | 16 years and over |

**Download:** 📊 **.xls**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|--------|
| **2002** | 5.7 | 5.7 | 5.7 | 5.9 | 5.8 | 5.8 | 5.8 | 5.7 | 5.7 | 5.7 | 5.9 | 6.0 | |
| **2003** | 5.8 | 5.9 | 5.9 | 6.0 | 6.1 | 6.3 | 6.2 | 6.1 | 6.1 | 6.0 | 5.8 | 5.7 | |
| **2004** | 5.7 | 5.6 | 5.8 | 5.6 | 5.6 | 5.6 | 5.5 | 5.4 | 5.4 | 5.5 | 5.4 | 5.4 | |
| **2005** | 5.3 | 5.4 | 5.2 | 5.2 | 5.1 | 5.0 | 5.0 | 4.9 | 5.0 | 5.0 | 5.0 | 4.9 | |
| **2006** | 4.7 | 4.8 | 4.7 | 4.7 | 4.6 | 4.6 | 4.7 | 4.7 | 4.5 | 4.4 | 4.5 | 4.4 | |
| **2007** | 4.6 | 4.5 | 4.4 | 4.5 | 4.4 | 4.6 | 4.7 | 4.6 | 4.7 | 4.7 | 4.7 | 5.0 | |
| **2008** | 5.0 | 4.9 | 5.1 | 5.0 | 5.4 | 5.6 | 5.8 | 6.1 | 6.1 | 6.5 | 6.8 | 7.3 | |
| **2009** | 7.8 | 8.3 | 8.7 | 8.9 | 9.4 | 9.5 | 9.5 | 9.6 | 9.8 | 10.0 | 9.9 | 9.9 | |
| **2010** | 9.7 | 9.8 | 9.9 | 9.9 | 9.6 | 9.4 | 9.5 | 9.6 | 9.5 | 9.5 | 9.8 | 9.4 | |
| **2011** | 9.1 | 9.0 | 8.9 | 9.0 | 9.0 | 9.1 | 9.1 | 9.1 | 9.0 | 8.9 | 8.7 | 8.5 | |
| **2012** | 8.3 | 8.3 | 8.2 | 8.1 | 8.2 | 8.2 | 8.3 | 8.1 | | | | | |

**TOOLS**
Areas at a Glance
Industries at a Glance
Economic Releases
Databases & Tables
Maps

**CALCULATORS**
Inflation
Location Quotient
Injury And Illness

**HELP**
Help & Tutorials
FAQs
Glossary
About BLS
Contact Us

**INFO**
What's New
Careers @ BLS
Find It! DOL
Join our Mailing Lists
Linking & Copyright Info

**RESOURCES**
Inspector General (OIG)
Budget and Performance
No Fear Act
USA.gov
Benefits.gov
Disability.gov

Freedom of Information Act | Privacy & Security Statement | Disclaimers | Customer Survey | Important Web Site Notices

U.S. Bureau of Labor Statistics | Postal Square Building, 2 Massachusetts Avenue, NE Washington, DC 20212-0001
www.bls.gov | Telephone: 1-202-691-5200 | TDD: 1-800-877-8339 | Contact Us

# Exhibit B

# FINANCIAL ACCOUNTING SERIES



## ACCOUNTING STANDARDS UPDATE

No. 2010-06
January 2010

## Fair Value Measurements and Disclosures
### (Topic 820)

Improving Disclosures about
Fair Value Measurements

An Amendment of the *FASB Accounting Standards Codification*™

## Financial Accounting Standards Board
### of the Financial Accounting Foundation

The *FASB Accounting Standards Codification™* is the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities. An Accounting Standards Update is not authoritative; rather, it is a document that communicates how the Accounting Standards Codification is being amended. It also provides other information to help a user of GAAP understand how and why GAAP is changing and when the changes will be effective.

For additional copies of this Accounting Standards Update and information on applicable prices and discount rates contact:

Order Department
Financial Accounting Standards Board
401 Merritt 7
PO Box 5116
Norwalk, CT 06856-5116

*Please ask for our Product Code No. ASU2010-06.*

FINANCIAL ACCOUNTING SERIES (ISSN 0885-9051) is published quarterly by the Financial Accounting Foundation. Periodicals postage paid at Norwalk, CT and at additional mailing offices. The full subscription rate is $230 per year. POSTMASTER: Send address changes to Financial Accounting Standards Board, 401 Merritt 7, PO Box 5116, Norwalk, CT 06856-5116. | **No. 335**

Copyright © 2010 by Financial Accounting Foundation. All rights reserved. Content copyrighted by Financial Accounting Foundation may not be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the Financial Accounting Foundation. Financial Accounting Foundation claims no copyright in any portion hereof that constitutes a work of the United States Government.



# Accounting Standards Update

No. 2010-06
January 2010

# Fair Value Measurements and Disclosures
# (Topic 820)

Improving Disclosures about
Fair Value Measurements

An Amendment of the *FASB Accounting Standards Codification*™

## Financial Accounting Standards Board
of the Financial Accounting Foundation

401 MERRITT 7, PO BOX 5116, NORWALK, CONNECTICUT 06856-5116

Accounting Standards Update 2010-06

Fair Value Measurements and Disclosures (Topic 820)

Improving Disclosures about Fair Value Measurements

January 2010

## CONTENTS

Page
Numbers

Summary ............................................................................................................1–3
Amendments to the *FASB Accounting Standards Codification™* ....................5–40
Background Information and Basis for Conclusions ......................................41–47
Amendments to the XBRL Taxonomy ..........................................................48–61

# Summary

## Why Is the FASB Issuing This Accounting Standards Update (Update)?

A number of constituents have recommended that the Board improve disclosure requirements related to Fair Value Measurements and Disclosures—Overall Subtopic (Subtopic 820-10) of the *FASB Accounting Standards Codification*[TM], originally issued as FASB Statement No. 157, *Fair Value Measurements.* The Board concluded that users will benefit from improved disclosures in this Update and that the benefits of the increased transparency in financial reporting will outweigh the costs of complying with the new requirements.

## Who Is Affected by the Amendments in This Update?

All entities that are required to make disclosures about recurring or nonrecurring fair value measurements are affected by the amendments in this Update.

## What Are the Main Provisions?

This Update provides amendments to Subtopic 820-10 that require new disclosures as follows:

1. Transfers in and out of Levels 1 and 2. A reporting entity should disclose separately the amounts of significant transfers in and out of Level 1 and Level 2 fair value measurements and describe the reasons for the transfers.
2. Activity in Level 3 fair value measurements. In the reconciliation for fair value measurements using significant unobservable inputs (Level 3), a reporting entity should present separately information about purchases, sales, issuances, and settlements (that is, on a gross basis rather than as one net number).

This Update provides amendments to Subtopic 820-10 that clarify existing disclosures as follows:

1. Level of disaggregation. A reporting entity should provide fair value measurement disclosures for each class of assets and liabilities. A class is often a subset of assets or liabilities within a line item in the statement of financial position. A reporting entity needs to use judgment in determining the appropriate classes of assets and liabilities.
2. Disclosures about inputs and valuation techniques. A reporting entity should provide disclosures about the valuation techniques and inputs

1

used to measure fair value for both recurring and nonrecurring fair value measurements. Those disclosures are required for fair value measurements that fall in either Level 2 or Level 3.

This Update also includes conforming amendments to the guidance on employers' disclosures about postretirement benefit plan assets (Subtopic 715-20). The conforming amendments to Subtopic 715-20 change the terminology from *major categories* of assets to *classes* of assets and provide a cross reference to the guidance in Subtopic 820-10 on how to determine appropriate classes to present fair value disclosures.

## How Do the Main Provisions Differ from Current U.S. Generally Accepted Accounting Principles (GAAP) and Why Are They an Improvement?

The Board has improved the disclosures about fair value measurements on the basis of input received from users of financial statements. The Board concluded that the changes will provide a greater level of disaggregated information and more robust disclosures about valuation techniques and inputs to fair value measurements. Users have stated that separate information about purchases, sales, issuances, and settlements would indicate the reasons for changes in the reporting entity's Level 3 fair value measurements. They also have said that because of the different degrees of subjectivity and reliability of Level 1, Level 2, and Level 3 fair value measurements, information about significant transfers between the three levels and the reasons for such transfers would be useful.

## When Will the Amendments Be Effective?

The new disclosures and clarifications of existing disclosures are effective for interim and annual reporting periods beginning after December 15, 2009, except for the disclosures about purchases, sales, issuances, and settlements in the roll forward of activity in Level 3 fair value measurements. Those disclosures are effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years.

## How Do the Provisions Compare with International Financial Reporting Standards (IFRS)?

The amendments in this Update improve the comparability of financial reporting internationally because those required disclosures also are required by IFRS. For example, IFRS 7, *Financial Instruments: Disclosures,* as amended in March 2009, requires disclosures similar to those provided in this Update, such as

disclosures about transfers between Level 1, Level 2, and Level 3 and the disaggregated activity in the roll forward for Level 3 fair value measurements.

In May 2009, the International Accounting Standards Board published an Exposure Draft, *Fair Value Measurement,* which includes disclosures similar to those in IFRS 7 that would apply to all assets and liabilities measured at fair value after initial recognition, not just to financial instruments.

# Amendments to the
# *FASB Accounting Standards Codification*<sup>TM</sup>

## Introduction

1.    The Accounting Standards Codification is amended as described in paragraphs 2–14. In some cases, not only are the amended paragraphs shown but also the preceding and following paragraphs are shown to put the change in context. Terms from the Master Glossary are in **bold** type. Added text is <u>underlined</u> and deleted text is ~~struck out~~.

## Amendments to Subtopic 820-10

2.    Amend paragraphs 820-10-50-1 through 50-2, with a link to transition paragraph 820-10-65-7 as follows:

### Fair Value Measurements and Disclosures—Overall

### Disclosure

**820-10-50-1** The reporting entity shall disclose information that enables users of its financial statements to assess both of the following:

    a.   For assets and liabilities that are measured at **fair value** on a recurring basis in periods subsequent to initial recognition (for example, trading securities), the <u>valuation techniques and</u> **inputs** used to develop those measurements

    b.   For recurring fair value measurements using significant **unobservable inputs** (Level 3), the effect of the measurements on earnings (or changes in net assets) for the period.

**820-10-50-2** To meet ~~that objective,~~<u>the objectives of the preceding paragraph,</u> the reporting entity shall disclose all of the ~~following~~ information <u>in (a) through (e) below</u> for each interim and annual period separately for each ~~major category~~<u>class</u> of assets and ~~liabilities:~~<u>liabilities. The reporting entity shall determine appropriate classes of assets and liabilities on the basis of guidance in the following paragraph. It shall provide sufficient information to permit reconciliation of the fair value measurement disclosures for the various classes of assets and liabilities to the line items in the statement of financial position.</u>

    a.   The fair value ~~measurements~~<u>measurement</u> at the reporting ~~date~~<u>date.</u>

b.  The level within the fair value hierarchy in which the fair value ~~measurements~~measurement in ~~its~~their entirety ~~fall,~~falls, segregating the fair value ~~measurements~~measurement using any of the following:

1.  Quoted prices in active markets for identical assets or liabilities (Level 1)
2.  Significant other **observable inputs** (Level 2)
3.  Significant unobservable inputs (Level 3).

bb. The amounts of significant transfers between Level 1 and Level 2 of the fair value hierarchy and the reasons for the transfers. Significant transfers into each level shall be disclosed separately from transfers out of each level. For this purpose, significance shall be judged with respect to earnings and total assets or total liabilities or, when changes in fair value are recognized in other comprehensive income, with respect to total equity. A reporting entity shall disclose and consistently follow its policy for determining when transfers between levels are recognized. The policy about the timing of recognizing transfers shall be the same for transfers into the levels as that for transfers out of the levels. Examples of policies for when to recognize the transfers are as follows:

1.  The actual date of the event or change in circumstances that caused the transfer
2.  The beginning of the reporting period
3.  The end of the reporting period.

c.  For fair value measurements using significant unobservable inputs (Level 3), a reconciliation of the beginning and ending balances, separately presenting changes during the period attributable to any of the following:

1.  Total gains or losses for the period (realized and unrealized)~~,~~ ~~segregating those~~, separately presenting gains or losses included in earnings (or changes in net ~~assets),~~assets) and gains or losses recognized in other comprehensive income, and a description of where those gains or losses included in earnings (or changes in net assets) are reported in the statement of income (or activities) or in other comprehensive income
2.  Purchases, sales, issuances, and settlements ~~(net)~~(each type disclosed separately)
3.  Transfers in and/or out of Level 3 ~~(for example, transfers due to changes in the observability of significant inputs).~~and the reasons for those transfers. Significant transfers into Level 3 shall be disclosed separately from significant transfers out of Level 3. For this purpose, significance shall be judged with respect to earnings and total assets or total liabilities or, when changes in fair value are recognized in other comprehensive income, with respect to total equity. A reporting entity shall disclose and consistently follow its policy for determining when transfers between levels are recognized. The policy about the timing of recognizing transfers shall be the same for transfers into Level 3 as that for transfers out

of Level 3. Examples of policies for when to recognize the transfers are as follows:

    i.    The actual date of the event or change in circumstances that caused the transfer

    ii.    The beginning of the reporting period

    iii.    The end of the reporting period.

d.    The amount of the total gains or losses for the period in (c)(1) included in earnings (or changes in net assets) that are attributable to the change in unrealized gains or losses relating to those assets and liabilities still held at the reporting date and a description of where those unrealized gains or losses are reported in the statement of income (or ~~activities)~~ activities).

e.    ~~The inputs and valuation technique(s) used to measure fair value and a discussion of changes in valuation techniques and related inputs, if any, during the period.~~ For fair value measurements using significant other observable inputs (Level 2) and significant unobservable inputs (Level 3), a description of the valuation technique (or multiple valuation techniques) used, such as the market approach, income approach, or the cost approach, and the inputs used in determining the fair values of each class of assets or liabilities. If there has been a change in the valuation technique(s) (for example, changing from a market approach to an income approach or the use of an additional valuation technique), the reporting entity shall disclose that change and the reason for making it. For examples of disclosures that a reporting entity may present to comply with the requirement to disclose the inputs used in measuring fair value in this paragraph, see paragraphs 820-10-55-22A through 55-22B.

~~For equity and debt securities *major category* shall be defined as *major security type* as described in paragraph 320-10-50-1B, even if the equity securities or debt securities are not within the scope of Subtopic 320-10 and, for a reporting entity within the scope of Topic 942, as described in paragraph 942-320-50-2.~~

3.    Add paragraph 820-10-50-2A, with a link to transition paragraph 820-10-65-7, as follows:

**820-10-50-2A** For equity and debt securities, class shall be determined on the basis of the nature and risks of the investments in a manner consistent with the guidance in paragraph 320-10-50-1B and, if applicable, shall be the same as the guidance on major security type as described in paragraph 942-320-50-2 even if the equity securities or debt securities are not within the scope of paragraph 320-10-50-1B. For all other assets and liabilities, judgment is needed to determine the appropriate classes of assets and liabilities for which disclosures about fair value measurements should be provided. Fair value measurement disclosures for each class of assets and liabilities often will require greater disaggregation than the reporting entity's line items in the statement of financial position. A reporting entity shall determine the appropriate classes for those disclosures on the basis

of the nature and risks of the assets and liabilities and their classification in the fair value hierarchy (that is, Levels 1, 2, and 3). In determining the appropriate classes for fair value measurement disclosures, the reporting entity shall consider the level of disaggregated information required for specific assets and liabilities under other Topics. For example, under Topic 815, disclosures about derivative instruments are presented separately by type of contract such as interest rate contracts, foreign exchange contracts, equity contracts, commodity contracts, and credit contracts. The classification of the asset or liability in the fair value hierarchy also shall affect the level of disaggregation because of the different degrees of uncertainty and subjectivity involved in Level 1, Level 2, and Level 3 measurements. For example, the number of classes may need to be greater for fair value measurements using significant unobservable inputs (that is, Level 3 measurements) to achieve the disclosure objectives because Level 3 measurements have a greater degree of uncertainty and subjectivity.

4.    Amend paragraph 820-10-50-3, with a link to transition paragraph 820-10-65-7, as follows:

**820-10-50-3** For derivative assets and liabilities, the reporting entity shall present both of the following:

  a.    The fair value disclosures required by paragraph 820-10-50-2(a) through (bb) on a gross basis (which is consistent with the requirement of paragraph 815-10-50-4B(a))

  b.    The~~the~~ reconciliation disclosure required by ~~(c) in the preceding~~ paragraph 820-10-50-2(c) through (d) ~~may be presented net.~~on either a gross or a net basis.

**820-10-50-4** Example 8, Cases A and B (see paragraphs 820-10-55-60 through 55-63) illustrate disclosures about recurring measurements.

5.    Amend paragraph 820-10-50-5, with a link to transition paragraph 820-10-65-7, as follows:

**820-10-50-5** For assets and liabilities that are measured at fair value on a nonrecurring basis in periods after~~subsequent to~~ initial recognition (for example, impaired assets), the reporting entity shall disclose information that enables users of its financial statements to assess the valuation techniques and inputs used to develop those measurements. To meet that objective, the reporting entity shall disclose all of the following information for each interim and annual period separately for each ~~major category~~class of assets and ~~liabilities:~~liabilities. The reporting entity shall determine classes of assets and liabilities on the basis of the guidance in paragraph 820-10-50-2A.

  a.    The fair value ~~measurements~~measurement recorded during the period and the reasons for the ~~measurements~~measurement

b. The level within the fair value hierarchy in which the fair value ~~measurements~~measurement in ~~their~~its entirety ~~fall,~~falls, segregating the fair value ~~measurements~~measurement using any of the following:
1. Quoted prices in active markets for identical assets or liabilities (Level 1)
2. Significant other observable inputs (Level 2)
3. Significant unobservable inputs (Level 3).

c. Subparagraph superseded by Accounting Standards Update 2010-06.~~For fair value measurements using significant unobservable inputs (Level 3), a description of the inputs and the information used to develop the inputs~~

d. For fair value measurements using significant other observable inputs (Level 2) and significant unobservable inputs (Level 3), the disclosure required by paragraph 820-10-50-2(e).~~The inputs and valuation technique(s) used to measure fair value and a discussion of changes, if any, in the valuation technique(s) and related inputs used to measure similar assets and/or liabilities in prior periods.~~

~~For equity and debt securities *major category* shall be defined as *major security type* as described in paragraph 320-10-50-1B, even if the equity securities or debt securities are not within the scope of Subtopic 320-10 and, for reporting entities within the scope of Topic 942, paragraph 942-320-50-2.~~

**820-10-50-6** Example 8, Case C (see paragraph 820-10-55-64) illustrates disclosures about nonrecurring measurements.

6. Amend paragraph 820-10-50-6A, with a link to transition paragraph 820-10-65-7, as follows:

**820-10-50-6A** For investments that are within the scope of paragraphs 820-10-15-4 through 15-5 (regardless of whether the practical expedient in paragraph 820-10-35-59 has been applied) and measured at fair value on a recurring or nonrecurring basis during the period, the reporting entity shall disclose information that enables users of its financial statements to understand the nature and risks of the investments and whether the investments are probable of being sold at amounts different from net asset value per share (or its equivalent, such as member units or an ownership interest in partners' capital to which a proportionate share of net assets is attributed). To meet that objective, to the extent applicable, the reporting entity shall disclose all of the following information for each interim and annual period separately for each class~~major category~~ of investment (class~~major category~~ of investment shall be determined on the basis of the nature and risks of the investments in a manner consistent with the guidance for major security types in paragraph 320-10-50-1B):

a. The fair value (as determined by applying paragraphs 820-10-35-59 through 35-62) of the investments in the class~~major category~~, and a description of the significant investment strategies of the investee(s) in the class~~major category~~.

b.   For each class~~major category~~ of investment that includes investments that can never be redeemed with the investees, but the reporting entity receives distributions through the liquidation of the underlying assets of the investees, the reporting entity's estimate of the period of time over which the underlying assets are expected to be liquidated by the investees.

c.   The amount of the reporting entity's unfunded commitments related to investments in the class~~major category~~.

d.   A general description of the terms and conditions upon which the investor may redeem investments in the class~~major category~~ (for example, quarterly redemption with 60 days' notice).

e.   The circumstances in which an otherwise redeemable investment in the class~~major category~~ (or a portion thereof) might not be redeemable (for example, investments subject to a lockup or gate). Also, for those otherwise redeemable investments that are restricted from redemption as of the reporting entity's measurement date, the reporting entity shall disclose its estimate of when the restriction from redemption might lapse. If an estimate cannot be made, the reporting entity shall disclose that fact and how long the restriction has been in effect.

f.   Any other significant restriction on the ability to sell investments in the class~~major category~~ at the measurement date.

g.   If a reporting entity determines that it is probable that it will sell an investment(s) for an amount different from net asset value per share (or its equivalent) as described in paragraph 820-10-35-62, the reporting entity shall disclose the total fair value of all investments that meet the criteria in paragraph 820-10-35-62 and any remaining actions required to complete the sale.

h.   If a group of investments would otherwise meet the criteria in paragraph 820-10-35-62 but the individual investments to be sold have not been identified (for example, if a reporting entity decides to sell 20 percent of its investments in private equity funds but the individual investments to be sold have not been identified), so the investments continue to qualify for the practical expedient in paragraph 820-10-35-59, the reporting entity shall disclose its plans to sell and any remaining actions required to complete the sale(s).

7.   Add paragraphs 820-10-55-22A through 55-22B and their related heading, with a link to transition paragraph 820-10-65-7, as follows:

## Implementation Guidance and Illustrations

### > > > Disclosures—Valuation Techniques and Inputs

**820-10-55-22A** Examples of disclosures that the reporting entity may present to comply with the input disclosure requirement of paragraph 820-10-50-2(e) include the following:

a.   Quantitative information about the inputs, for example, for certain debt securities or derivatives, information such as, but not limited to, prepayment rates, rates of estimated credit losses, interest rates (for example, LIBOR swap rate) or discount rates, and volatilities.

b.   The nature of the item being measured at fair value, including the characteristics of the item being measured that are considered in the determination of relevant inputs. For example, for residential mortgage-backed securities, a reporting entity may conclude that meeting the objective of this disclosure requirement requires disclosure of items such as the following:

1.   The types of underlying loans (for example, subprime or home equity lines of credit)

2.   Collateral

3.   Guarantees or other credit enhancements

4.   Seniority level of the tranches of securities

5.   The year of issuance

6.   The weighted-average coupon rate of the underlying loans and the securities

7.   The weighted-average maturity of the underlying loans and the securities

8.   The geographical concentration of the underlying loans

9.   Information about the credit ratings of the securities.

c.   How third-party information such as broker quotes, pricing services, net asset values, and relevant market data was considered in measuring fair value.

**820-10-55-22B**  For example, with respect to its investment in a class of residential mortgage-backed securities, a reporting entity may disclose the following:

As of December 31, 20X1, the fair value of the entity's investments in available-for-sale Level 3 residential mortgage-backed securities was $XXX million. These securities are senior tranches in a securitization trust and have a weighted-average coupon rate of XX percent and a weighted-average maturity of XX years. The underlying loans for these securities are residential subprime mortgages that originated in California in 2006. The underlying loans have a weighted-average coupon rate of XX percent and a weighted-average maturity of XX years. These securities are currently rated below investment grade. To estimate their fair value, the entity used an industry standard valuation model, which is based on an income approach. The significant inputs for the valuation model include the following weighted averages:

a.   Yield: XX percent

b.   Probability of default: XX percent constant default rate

c.   Loss severity: XX percent

d.   Prepayment: XX percent constant prepayment rate.

8.      Amend paragraphs 820-10-55-61 through 55-64A, with a link to transition paragraph 820-10-65-7, as follows:

**[Note: For ease of readability, the new tables have not been underlined. The tables in paragraphs 820-10-55-64 and 820-10-55-64A are not new; they are included for context.]**

### > > > Case A: Disclosure—Assets Measured at Fair Value on a Recurring Basis

**820-10-55-61** For assets and liabilities measured at fair value on a recurring basis during the period, this Subtopic requires quantitative disclosures about the fair value measurements separately for each ~~major category~~class of assets and liabilities (see paragraph 820-10-50-2(a) through (b)). For assets, that information might be presented as follows.

| ~~($ in 000s)~~ | | ~~Fair Value Measurements at Reporting Date Using~~ | | |
|---|---|---|---|---|
| ~~Description~~ | ~~12/31/XX~~ | ~~Quoted Prices in Active Markets for Identical Assets (Level 1)~~ | ~~Significant Other Observable Inputs (Level 2)~~ | ~~Significant Unobservable Inputs (Level 3)~~ |
| ~~Trading securities:~~ | | | | |
| ~~Equity securities-real estate~~ | ~~$    115~~ | ~~$    105~~ | ~~$    10~~ | |
| ~~Available-for-sale securities:~~ | | | | |
| ~~Residential mortgage backed securities~~ | ~~75~~ | | | ~~$    75~~ |
| ~~Derivatives~~ | ~~60~~ | ~~25~~ | ~~15~~ | ~~20~~ |
| ~~Venture capital investments~~ | ~~10~~ | | | ~~10~~ |
| ~~Total~~ | ~~$    260~~ | ~~$    130~~ | ~~$    25~~ | ~~$    105~~ |

~~(Note: For liabilities, a similar table should be presented.)~~

| ($ in millions) | | Fair Value at Reporting Date Using | | |
| --- | --- | --- | --- | --- |
| | 12/31/XX | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Description** | | | | |
| Trading securities | | | | |
| Equity securities—real estate industry | $ 93 | $ 70 | $ 23 | |
| Equity securities—oil and gas industry | 45 | 45 | | |
| Equity securities—other | 15 | 15 | | |
| Total trading securities | $ 153 | $ 130 | $ 23 | |
| Available-for-sale debt securities | | | | |
| Residential-mortgage-backed securities | $ 149 | | $ 24 | $ 125 |
| Commercial-mortgage-backed securities | 50 | | | 50 |
| Collateralized debt obligations | 35 | | | 35 |
| U.S. Treasury securities | 85 | $ 85 | | |
| Corporate bonds | 93 | 9 | 84 | |
| Total available-for-sale debt securities | $ 412 | $ 94 | $ 108 | $ 210 |
| Available-for-sale equity securities | | | | |
| Financial services industry | $ 150 | $ 150 | | |
| Healthcare industry | 110 | 110 | | |
| Other | 15 | 15 | | |
| Total available-for-sale equity securities | $ 275 | $ 275 | | |
| Total available-for-sale securities | $ 687 | $ 369 | $ 108 | $ 210 |
| Hedge fund investments | | | | |
| Equity long/short | $ 55 | $ 55 | | |
| Global opportunities | 35 | 35 | | |
| Distressed debt | 90 | | | $ 90 |
| Total hedge fund investments | $ 180 | $ 90 | | $ 90 |
| Private equity investments[a] | $ 25 | | | $ 25 |
| Venture capital investments[a] | 10 | | | 10 |
| Derivatives | | | | |
| Interest rate contracts | 57 | | $ 57 | |
| Foreign exchange contracts | 43 | | 43 | |
| Credit contracts | 38 | | | 38 |
| Commodity futures contracts | 78 | $ 78 | | |
| Commodity forward contracts | 20 | | 20 | |
| Total derivatives | $ 236 | $ 78 | $ 120 | $ 38 |
| Total | $ 1,291 | $ 667 | $ 251 | $ 373 |

(a) Based on its analysis of the nature and risks of these investments, the reporting entity has determined that presenting them as a single class is appropriate.

(Note: For liabilities, a similar table should be presented.)

Paragraph 820-10-50-2(bb) requires that the reporting entity also disclose any significant transfers to or from Levels 1 and 2 and the reasons for those transfers. Transfers to or from Level 3 are disclosed in the table illustrated in Case B (see paragraphs 820-10-55-62 through 55-63).

### > > > Case B: Disclosure—Assets Measured at Fair Value on a Recurring Basis Using Significant Unobservable Inputs (Level 3)

**820-10-55-62** For assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) during the period, this Subtopic requires a reconciliation of the beginning and ending balances, separately for each class~~major category~~ of assets and liabilities, except for derivative assets and liabilities, which may be presented net (see paragraph 820-10-50-2(c) through (d)). For assets, the reconciliation might be presented as follows.

| ($ in 000s) | Residential Mortgage-Backed Securities | Derivatives | Venture Capital Investments | Total |
|---|---|---|---|---|
| | | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) | | |
| Beginning balance | $      80 | $      14 | $      11 | $     105 |
| Total gains or losses (realized/unrealized) | | | | |
| Included in earnings (or changes in net assets) | | 11 | (3) | 8 |
| Included in other comprehensive income | (5) | 4 | | (1) |
| Purchases, issuances, and settlements | | (7) | 2 | (5) |
| Transfers in and/or out of Level 3 | | (2) | | (2) |
| Ending balance | $      75 | $      20 | $      10 | $     105 |
| The amount of total gains or losses for the period included in earnings (or changes in net assets) attributable to the change in unrealized gains or losses relating to assets still held at the reporting date | $       — | $       7 | $       2 | $       9 |

(Note: For liabilities, a similar table should be presented.)

**Roll forward**
**($ in millions)**

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Available-for-Sale Debt Securities | | | Other Fund Investments | | | | |
| | Residential Mortgage-Backed Securities | Commercial Mortgage-Backed Securities | Collateralized Debt Obligations | Hedge Fund Distressed Debt | Private Equity | Venture Capital | Derivatives Credit Contracts | Total |
| Beginning balance | $ 100 | $ 39 | $ 25 | $ 145 | $ 20 | $ 11 | $ 30 | $ 370 |
| Transfers into Level 3 | 60 (a) (b) | | | | | | | 60 |
| Transfers out of Level 3 | | | | | | | | |
| Total gains or losses | | | | | | | | |
|   Included in earnings (or changes in net assets) | (8) | | | 7 | 5 | (3) | 5 | 6 |
|   Included in other comprehensive income | (15) | (5) | (7) | | | | (5) | (32) |
| Purchases, issuances, sales, and settlements | | | | | | | | |
|   Purchases | | 16 | 17 | | | 2 | 18 | 53 |
|   Issuances | | | | | | | | |
|   Sales | (12) | | | (62) | | | | (74) |
|   Settlements | | | | | | | (10) | (10) |
| Ending balance | $ 125 | $ 50 | $ 35 | $ 90 | $ 25 | $ 10 | $ 38 | $ 373 |
| The amount of total gains or losses for the period included in earnings (or changes in net assets) attributable to the change in unrealized gains or losses relating to assets still held at the reporting date | | | | $ (5) | $ 5 | $ (3) | $ 2 | $ (1) |

(a)  Transferred from Level 2 to Level 3 because of lack of observable market data due to decrease in market activity
for these securities.

(b)  The company's policy is to recognize transfers in and transfers out as of the actual date of the event or change in
circumstances that caused the transfer.

(Note: For liabilities, a similar table should be presented.)

**820-10-55-63** Gains and losses (realized and unrealized) included in earnings (or changes in net assets) for the period (above) are reported in trading revenues and in other revenues as follows.

|  | Trading Revenues | | Other Revenues | |
|---|---|---|---|---|
| Total gains or losses included in earnings (or changes in net assets) for the period (as shown in the table in the preceding paragraph) | $ | ~~11~~ 5 | $ | ~~(3)~~ 1 |
| Change in unrealized gains or losses relating to assets still held at reporting date | $ | ~~7~~ 2 | $ | ~~2~~ (3) |

### > > > Case C: Disclosure—Assets Measured at Fair Value on a Nonrecurring Basis

**820-10-55-64** For each ~~major category~~class of assets and liabilities measured at fair value on a nonrecurring basis during the period, this Subtopic requires disclosures about the fair value measurements (see paragraph 820-10-50-5(a) through (b)). That information might be presented as follows.

**($ in millions)**

| Description | Year Ended 12/31/XX | | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total Gains (Losses) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-lived assets held and used | $ | 75 | $ | | $ | 75 | | | $ | (25) |
| Goodwill | | 30 | | | | | $ | 30 | | (35) |
| Long-lived assets held for sale | | 26 | | | | 26 | | | | (15) |
| | | | | | | | | | $ | (75) |

In accordance with the provisions of the Impairment or Disposal of Long-Lived
Assets Subsections of FASB Codification Subtopic 360-10, long-lived assets held
and used with a carrying amount of $100 million were written down to their fair
value of $75 million, resulting in an impairment charge of $25 million, which was
included in earnings for the period.

In accordance with the provisions of FASB Codification Topic 350, Intangibles—
Goodwill and Other, goodwill with a carrying amount of $65 million was written
down to its implied fair value of $30 million, resulting in an impairment charge of
$35 million, which was included in earnings for the period.

In accordance with the provisions of the Impairment or Disposal of Long-Lived
Assets Subsections of FASB Codification Subtopic 360-10, long-lived assets held
for sale with a carrying amount of $35 million were written down to their fair value
of $26 million, less cost to sell of $6 million (or $20 million), resulting in a loss of
$15 million, which was included in earnings for the period.

### > > > Case D: Disclosure—Fair Value Measurements of Investments in Certain Entities That Calculate Net Asset Value per Share (or Its Equivalent)

**820-10-55-64A**  For investments that are within the scope of paragraphs 820-10-
15-4 through 15-5 measured at fair value on a recurring or nonrecurring basis
during the period, in addition to the disclosures required in paragraphs 820-10-
50-1 through 50-2 and 820-10-50-5, this Subtopic requires disclosure of
information that enables users to understand the nature and risk of the
investments by ~~major category~~class and whether the investments are probable of
being sold at amounts different from net asset value per share (or its equivalent,
such as member units or an ownership interest in partners' capital to which a
proportionate share of net assets is attributed) (see paragraph 820-10-50-6A).
That information may be presented as follows. (The ~~major categories~~classes
presented below are provided as examples only and are not intended to be
treated as a template. The ~~major categories~~classes disclosed should be tailored
to the nature and risks of the reporting entity's investments.)

| | Fair Value (in millions) | | Unfundend Commitments | | Redemption Frequency (If Currently Eligible) | Redemption Notice Period |
|---|---|---|---|---|---|---|
| Equity long/short hedge funds [a] | $ | 55 | | | quarterly | 30–60 days |
| Event driven hedge funds [b] | | 45 | | | quarterly, annually | 30–60 days |
| Global opportunities hedge funds [c] | | 35 | | | quarterly | 30–45 days |
| Multi-strategy hedge funds [d] | | 40 | | | quarterly | 30–60 days |
| Real estate funds [e] | | 47 | $ | 20 | | |
| Private equity funds—international [f] | | 43 | | 15 | | |
| Total | $ | 265 | $ | 35 | | |

a.  This ~~category~~class includes investments in hedge funds that invest both long and short primarily in U.S. common stocks. Management of the hedge funds has the ability to shift investments from value to growth strategies, from small to large capitalization stocks, and from a net long position to a net short position. The fair values of the investments in this ~~category~~class have been estimated using the net asset value per share of the investments. Investments representing approximately 22 percent of the value of the investments in this ~~category~~class cannot be redeemed because the investments include restrictions that do not allow for redemption in the first 12 to 18 months after acquisition. The remaining restriction period for these investments ranged from three to seven months at December 31, 20X3.

b.  This ~~category~~class includes investments in hedge funds that invest in approximately 60 percent equities and 40 percent bonds to profit from economic, political, and government driven events. A majority of the investments are targeted at economic policy decisions. The fair values of the investments in this ~~category~~class have been estimated using the net asset value per share of the investments.

c.  This ~~category~~class includes investments in hedge funds that hold approximately 80 percent of the funds' investments in non-U.S. common stocks in the healthcare, energy, information technology, utilities, and telecommunications sectors and approximately 20 percent of the funds' investments in diversified currencies. The fair values of the investments in this ~~category~~class have been estimated using the net asset value per share of the investments. For one investment, valued at $8.75 million, a gate has been imposed by the hedge fund manager and no redemptions are currently permitted. This redemption restriction has been in place for six months and the time at which the redemption restriction might lapse cannot be estimated.

19

d.   This ~~category~~class invests in hedge funds that pursue multiple strategies to diversify risks and reduce volatility. The hedge funds' composite portfolio for this ~~category~~class includes investments in approximately 50 percent U.S. common stocks, 30 percent global real estate projects, and 20 percent arbitrage investments. The fair values of the investments in this ~~category~~class have been estimated using the net asset value per share of the investments. Investments representing approximately 15 percent of the value of the investments in this ~~category~~class cannot be redeemed because the investments include restrictions that do not allow for redemption in the first year after acquisition. The remaining restriction period for these investments ranged from four to six months at December 31, 20X3.

e.   This ~~category~~class includes several real estate funds that invest primarily in U.S. commercial real estate. The fair values of the investments in this ~~category~~class have been estimated using the net asset value of the Company's ownership interest in partners' capital. These investments can never be redeemed with the funds. Distributions from each fund will be received as the underlying investments of the funds are liquidated. It is estimated that the underlying assets of the fund will be liquidated over the next 7 to 10 years. Twenty percent of the total investment in this ~~category~~class is planned to be sold. However, the individual investments that will be sold have not yet been determined. Because it is not probable that any individual investment will be sold, the fair value of each individual investment has been estimated using the net asset value of the Company's ownership interest in partners' capital. Once it has been determined which investments will be sold and whether those investments will be sold individually or in a group, the investments will be sold in an action process. The investee fund's management must approve of the buyer before the sale of the investments can be completed.

f.   This ~~category~~class includes several private equity funds that invest primarily in foreign technology companies. These investments can never be redeemed with the funds. Instead, the nature of the investments in this ~~category~~class is that distributions are received through the liquidation of the underlying assets of the fund. If these investments were held, it is estimated that the underlying assets of the fund would be liquidated over 5 to 8 years. However, as of December 31, 20X3, it is probable that all of the investments in this ~~category~~class will be sold at an amount different from the net asset value of the Company's ownership interest in partners' capital. Therefore, the fair values of the investments in this class~~category~~ have been estimated using recent observable transaction information for similar investments and non-binding bids received from potential buyers of the investments. As of December 31, 20X3, a buyer (or buyers) for these investments has not yet been identified. Once a buyer has been identified, the

investee fund's management must approve of the buyer before the sale of the investments can be completed.

9.    Add paragraph 820-10-65-7 and its related heading as follows:

**> Transition Related to Accounting Standards Update No. 2010-06,** *Fair Value Measurements and Disclosures (Topic 820): Improving Disclosures about Fair Value Measurements*

**820-10-65-7** The following represents the transition and effective date information related to Accounting Standards Update No. 2010-06, *Fair Value Measurements and Disclosures (Topic 820): Improving Disclosures about Fair Value Measurements:*

a.    The pending content that links to this paragraph shall be effective for interim and annual reporting periods beginning after December 15, 2009, except for the separate disclosures about purchases, sales, issuances, and settlements relating to Level 3 measurements (see paragraph 820-10-50-2(c)(2)), which shall be effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years.

b.    In the period of initial adoption, the reporting entity shall not be required to provide the disclosures otherwise required by the pending content that links to this paragraph for any previous periods presented for comparative purposes.

c.    In periods after initial adoption, comparative disclosures of the pending content that links to this paragraph shall be required only for periods ending after initial adoption.

d.    Early adoption of the pending content that links to this paragraph is permitted.

# Amendments to Subtopic 715-20

10.    Amend paragraph 715-20-50-1, with a link to transition paragraph 820-10-65-7, as follows:

## Compensation—Retirement Benefits—Defined Benefit Plans—General

### Disclosure

**715-20-50-1** An employer that sponsors one or more defined benefit pension plans or one or more defined benefit other postretirement plans shall provide the following information, separately for pension plans and other postretirement benefit plans. Amounts related to the employer's results of operations shall be disclosed for each period for which a statement of income is presented. Amounts related to the employer's statement of financial position shall be disclosed as of

the date of each statement of financial position presented. All of the following shall be disclosed:

    a.   A reconciliation of beginning and ending balances of the benefit obligation showing separately, if applicable, the effects during the period attributable to each of the following:
1. Service cost
2. Interest cost
3. Contributions by plan participants
4. Actuarial gains and losses
5. Foreign currency exchange rate changes (The effects of foreign currency exchange rate changes that are to be disclosed are those applicable to plans of a foreign operation whose functional currency is not the reporting currency pursuant to Section 830-10-45.)
6. Benefits paid
7. Plan amendments
8. Business combinations
9. Divestitures
10. Curtailments, settlements, and special and contractual termination benefits.

For defined benefit pension plans, the benefit obligation is the projected benefit obligation. For defined benefit other postretirement plans, the benefit obligation is the accumulated postretirement benefit obligation.

    b.   A reconciliation of beginning and ending balances of the fair value of plan assets showing separately, if applicable, the effects during the period attributable to each of the following:
1. Actual return on plan assets
2. Foreign currency exchange rate changes (see [a][5])(a)(5))
3. Contributions by the employer
4. Contributions by plan participants
5. Benefits paid
6. Business combinations
7. Divestitures
8. Settlements.

    c.   The funded status of the plans and the amounts recognized in the statement of financial position, showing separately the assets and current and noncurrent liabilities recognized.

    d.   The objectives of the disclosures about postretirement benefit plan assets are to provide users of financial statements with an understanding of:
1. How investment allocation decisions are made, including the factors that are pertinent to an understanding of investment policies and strategies
2. The major categories classes of plan assets

3. The inputs and valuation techniques used to measure the fair value of plan assets

4. The effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the period

5. Significant concentrations of risk within plan assets.

An employer shall consider those overall objectives in providing the following information about plan assets:

i. A narrative description of investment policies and strategies, including target allocation percentages or range of percentages considering the ~~major categories~~classes of plan assets disclosed pursuant to (ii) below, as of the latest statement of financial position presented (on a weighted-average basis for employers with more than one plan), and other factors that are pertinent to an understanding of those policies and strategies such as investment goals, risk management practices, permitted and prohibited investments including the use of derivatives, diversification, and the relationship between plan assets and benefit obligations. For investment funds disclosed as ~~major categories~~classes as described in (ii) below, a description of the significant investment strategies of those funds shall be provided.

ii. The fair value of each ~~major category~~class of plan assets as of each date for which a statement of financial position is presented. Asset ~~categories~~classes shall be based on the nature and risks of assets in an employer's plan(s). For additional guidance on determining appropriate classes of plan assets, see paragraph 820-10-50-2A. Examples of ~~major categories~~classes of assets could include, but are not limited to, the following: cash and cash equivalents; equity securities (segregated by industry type, company size, or investment objective); debt securities issued by national, state, and local governments; corporate debt securities; asset-backed securities; structured debt; derivatives on a gross basis (segregated by type of underlying risk in the contract, for example, interest rate contracts, foreign exchange contracts, equity contracts, commodity contracts, credit contracts, and other contracts); investment funds (segregated by type of fund); and real estate. Those examples are not meant to be all inclusive. An employer should consider the overall objectives in ~~paragraphs~~paragraph 715-20-50-1(d)(1) through ~~50-1(d)(5)~~(5) in determining whether additional ~~categories~~classes of plan assets or further disaggregation of ~~major categories~~classes should be disclosed.

23

iii. A narrative description of the basis used to determine the overall expected long-term rate-of-return-on-assets assumption, such as the general approach used, the extent to which the overall rate-of-return-on-assets assumption was based on historical returns, the extent to which adjustments were made to those historical returns in order to reflect expectations of future returns, and how those adjustments were determined. The description should consider the ~~major categories~~classes of assets as described in (ii) above, as appropriate.

iv. Information that enables users of financial statements to assess the inputs and valuation techniques used to develop fair value measurements of plan assets at the reporting date. For fair value measurements using significant observable inputs, an employer shall disclose the effect of the measurements on changes in plan assets for the period. To meet those objectives, the employer shall disclose the following information for each ~~major category~~class of plan assets disclosed pursuant to (ii) above for each annual period:

   01. The level within the fair value hierarchy in which the fair value measurements in their entirety fall, segregating fair value measurements using quoted prices in active markets for identical assets or liabilities (Level 1), significant other observable inputs (Level 2), and significant unobservable inputs (Level 3). The guidance in paragraph 820-10-35-37 is applicable.

   02. For fair value measurements of plan assets using significant unobservable inputs (Level 3), a reconciliation of the beginning and ending balances, separately presenting changes during the period attributable to the following:

      A. Actual Return on Plan Assets (Component of **Net Periodic Postretirement Benefit Cost**) or Actual Return on Plan Assets (Component of **Net Periodic Pension Cost**), separately identifying the amount related to assets still held at the reporting date and the amount related to assets sold during the period

      B. Purchases, sales, and **settlements**, net

      C. Transfers in and/or out of Level 3 (for example, transfers due to changes in the observability of significant inputs)

   03. Information about the valuation technique(s) and inputs used to measure fair value and a discussion of changes in valuation techniques and inputs, if any, during the period.

e. For defined benefit pension plans, the accumulated benefit obligation.

f.  The benefits (as of the date of the latest statement of financial position presented) expected to be paid in each of the next five fiscal years, and in the aggregate for the five fiscal years thereafter. The expected benefits shall be estimated based on the same assumptions used to measure the entity's benefit obligation at the end of the year and shall include benefits attributable to estimated future employee service.

g.  The employer's best estimate, as soon as it can reasonably be determined, of contributions expected to be paid to the plan during the next fiscal year beginning after the date of the latest statement of financial position presented. Estimated contributions may be presented in the aggregate combining all of the following:

1.  Contributions required by funding regulations or laws
2.  Discretionary contributions
3.  Noncash contributions.

h.  The amount of net benefit cost recognized, showing separately all of the following:

1.  The service cost component
2.  The interest cost component
3.  The expected return on plan assets for the period
4.  The gain or loss component
5.  The prior service cost or credit component
6.  The transition asset or obligation component
7.  The gain or loss recognized due to settlements or curtailments.

i.  Separately the net gain or loss and net prior service cost or credit recognized in other comprehensive income for the period pursuant to paragraphs 715-30-35-11, 715-30-35-21, 715-60-35-16, and 715-60-35-25, and reclassification adjustments of other comprehensive income for the period, as those amounts, including amortization of the net transition asset or obligation, are recognized as components of net periodic benefit cost.

j.  The amounts in accumulated other comprehensive income that have not yet been recognized as components of net periodic benefit cost, showing separately the net gain or loss, net prior service cost or credit, and net transition asset or obligation.

k.  On a weighted-average basis, all of the following assumptions used in the accounting for the plans, specifying in a tabular format, the assumptions used to determine the benefit obligation and the assumptions used to determine net benefit cost:

1.  Assumed discount rates (~~refer to~~see paragraph 715-30-35-45 for a discussion of representationally faithful disclosure)
2.  Rates of compensation increase (for pay-related plans)
3.  Expected long-term rates of return on plan assets.

l.  The assumed health care cost trend rate(s) for the next year used to measure the expected cost of benefits covered by the plan (gross eligible charges), and a general description of the direction and pattern

of change in the assumed trend rates thereafter, together with the ultimate trend rate(s) and when that rate is expected to be achieved.

m.  The effect of a one-percentage-point increase and the effect of a one-percentage-point decrease in the assumed health care cost trend rates on the aggregate of the service and interest cost components of net periodic postretirement health care benefit costs and the accumulated postretirement benefit obligation for health care benefits. Measuring the sensitivity of the accumulated postretirement benefit obligation and the combined service and interest cost components to a change in the assumed health care cost trend rates requires remeasuring the accumulated postretirement benefit obligation as of the beginning and end of the year. (For purposes of this disclosure, all other assumptions shall be held constant, and the effects shall be measured based on the substantive plan that is the basis for the accounting.)

n.  If applicable, the amounts and types of securities of the employer and **related parties** included in plan assets, the approximate amount of future annual benefits of plan participants covered by insurance contracts, including annuity contracts issued by the employer or related parties, and any significant transactions between the employer or related parties and the plan during the period.

o.  If applicable, any alternative method used to amortize prior service amounts or net gains and losses pursuant to paragraphs 715-30-35-13 and 715-30-35-25 or 715-60-35-18 and 715-60-35-31.

p.  If applicable, any substantive commitment, such as past practice or a history of regular benefit increases, used as the basis for accounting for the benefit obligation.

q.  If applicable, the cost of providing special or contractual termination benefits recognized during the period and a description of the nature of the event.

r.  An explanation of any significant change in the benefit obligation or plan assets not otherwise apparent in the other disclosures required by this Subtopic.

s.  The amounts in accumulated other comprehensive income expected to be recognized as components of net periodic benefit cost over the fiscal year that follows the most recent annual statement of financial position presented, showing separately the net gain or loss, net prior service cost or credit, and net transition asset or obligation.

t.  The amount and timing of any plan assets expected to be returned to the employer during the 12-month period, or operating cycle if longer, that follows the most recent annual statement of financial position presented.

u.  Subparagraph not used.

11.  Amend paragraph 715-20-50-5, with a link to transition paragraph 820-10-65-7, as follows:

**715-20-50-5** A **nonpublic entity** is not required to disclose the information required by paragraphs 715-20-50-1(a) through ~~50-1(c)~~(c), 715-20-50-1(h), 715-20-50-1(m), and 715-20-50-1(o) through ~~50-1(r)~~(r). A nonpublic entity that sponsors one or more defined benefit pension plans or one or more other defined benefit postretirement plans shall provide all of the following information, separately for pension plans and other postretirement benefit plans. Amounts related to the employer's results of operations shall be disclosed for each period for which a statement of income is presented. Amounts related to the employer's statement of financial position shall be disclosed as of the date of each statement of financial position presented.

    a.   The benefit obligation, fair value of plan assets, and funded status of the plan.

    b.   Employer contributions, participant contributions, and benefits paid.

    c.   The objectives of the disclosures about postretirement benefit plan assets are to provide users of financial statements with an understanding of:

        1.   How investment allocation decisions are made, including the factors that are pertinent to an understanding of investment policies and strategies

        2.   The ~~major categories~~classes of plan assets

        3.   The inputs and valuation techniques used to measure the fair value of plan assets

        4.   The effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the period

        5.   Significant concentrations of risk within plan assets.

        An employer shall consider those overall objectives in providing the following information about plan assets:

        i.   A narrative description of investment policies and strategies, including target allocation percentages or range of percentages considering the ~~major categories~~classes of plan assets disclosed pursuant to (ii) below, as of the latest statement of financial position presented (on a weighted-average basis for employers with more than one plan), and other factors that are pertinent to an understanding of those policies and strategies such as investment goals, risk management practices, permitted and prohibited investments including the use of derivatives, diversification, and the relationship between plan assets and benefit obligations. For investment funds disclosed as ~~major categories~~classes as described in (ii) below, a description of the significant investment strategies of those funds shall be provided.

        ii.   The fair value of each ~~major category~~class of plan assets as of each date for which a statement of financial position is

presented. Asset ~~categories~~classes shall be based on the nature and risks of assets in an employer's plan(s). Examples of ~~major categories~~classes include, but are not limited to, the following: cash and cash equivalents; equity securities (segregated by industry type, company size, or investment objective); debt securities issued by national, state, and local governments; corporate debt securities; asset-backed securities; structured debt; derivatives on a gross basis (segregated by type of underlying risk in the contract, for example, interest rate contracts, foreign exchange contracts, equity contracts, commodity contracts, credit contracts, and other contracts); investment funds (segregated by type of fund); and real estate. Those examples are not meant to be all inclusive. An employer should consider the overall objectives in ~~paragraphs~~paragraph 715-20-50-5(c)(1) through ~~50-5(c)(5)~~(5) in determining whether additional ~~categories~~classes of plan assets or further disaggregation of ~~major categories~~classes should be disclosed.

iii. A narrative description of the basis used to determine the overall expected long-term rate-of-return-on-assets assumption, such as the general approach used, the extent to which the overall rate-of-return-on-assets assumption was based on historical returns, the extent to which adjustments were made to those historical returns in order to reflect expectations of future returns, and how those adjustments were determined. The description should consider the ~~major categories~~classes of assets described in (ii) above, as appropriate.

iv. Information that enables users of financial statements to assess the inputs and valuation techniques used to develop fair value measurements of plan assets at the reporting date. For fair value measurements using significant unobservable inputs, an employer shall disclose the effect of the measurements on changes in plan assets for the period. To meet those objectives, the employer shall disclose the following information for each ~~major category~~class of plan assets disclosed pursuant to (ii) above for each annual period:

01. The level within the fair value hierarchy in which the fair value measurements in their entirety fall, segregating fair value measurements using quoted prices in active markets for identical assets or liabilities (Level 1), significant other observable inputs (Level 2), and significant unobservable inputs (Level 3). The guidance in paragraph 820-10-35-37 is applicable.

02. For fair value measurements of plan assets using significant unobservable inputs (Level 3), a reconciliation

of the beginning and ending balances, separately presenting changes during the period attributable to the following:

A. Actual Return on Plan Assets (Component of Net Periodic Postretirement Benefit Cost) or Actual Return on Plan Assets (Component of Net Periodic Pension Cost), separately identifying the amount related to assets still held at the reporting date and the amount related to assets sold during the period

B. Purchases, sales, and settlements, net

C. Transfers in and/or out of Level 3 (for example, transfers due to changes in the observability of significant inputs)

03. Information about the valuation technique(s) and inputs used to measure fair value and a discussion of changes in valuation techniques and inputs, if any, during the period.

d. For defined benefit pension plans, the accumulated benefit obligation.

e. The benefits (as of the date of the latest statement of financial position presented) expected to be paid in each of the next five fiscal years, and in the aggregate for the five fiscal years thereafter. The expected benefits shall be estimated based on the same assumptions used to measure the entity's benefit obligation at the end of the year and shall include benefits attributable to estimated future employee service.

f. The employer's best estimate, as soon as it can reasonably be determined, of contributions expected to be paid to the plan during the next fiscal year beginning after the date of the latest statement of financial position presented. Estimated contributions may be presented in the aggregate combining any of the following:

1. Contributions required by funding regulations or laws
2. Discretionary contributions
3. Noncash contributions.

g. The amounts recognized in the statements of financial position, showing separately the postretirement benefit assets and current and noncurrent postretirement benefit liabilities.

h. Separately, the net gain or loss and net prior service cost or credit recognized in other comprehensive income for the period pursuant to paragraphs 715-30-35-11, 715-30-35-21, 715-60-35-16, and 715-60-35-25 and reclassification adjustments of other comprehensive income for the period, as those amounts, including amortization of the net transition asset or obligation, are recognized as components of net periodic benefit cost.

i. The amounts in accumulated other comprehensive income that have not yet been recognized as components of net periodic benefit cost, showing separately the net gain or loss, net prior service cost or credit, and net transition asset or obligation.

j.   On a weighted-average basis, all of the following assumptions used in the accounting for the plans, specifying in a tabular format, the assumptions used to determine the benefit obligation and the assumptions used to determine net benefit cost:

   1.   Assumed discount rates (~~refer to~~see paragraph 715-30-35-45 for a discussion of representationally faithful disclosure)
   2.   Rates of compensation increase (for pay-related plans)
   3.   Expected long-term rates of return on plan assets.

k.   The assumed health care cost trend rate(s) for the next year used to measure the expected cost of benefits covered by the plan (gross eligible charges), and a general description of the direction and pattern of change in the assumed trend rates thereafter, together with the ultimate trend rate(s) and when that rate is expected to be achieved.

l.   If applicable, the amounts and types of securities of the employer and related parties included in plan assets, the approximate amount of future annual benefits of plan participants covered by insurance contracts, including annuity contracts, issued by the employer or related parties, and any significant transactions between the employer or related parties and the plan during the period.

m.   The nature and effect of significant nonroutine events, such as amendments, combinations, divestitures, curtailments, and settlements.

n.   The amounts in accumulated other comprehensive income expected to be recognized as components of net periodic benefit cost over the fiscal year that follows the most recent annual statement of financial position presented, showing separately the net gain or loss, net prior service cost or credit, and net transition asset or obligation.

o.   The amount and timing of any plan assets expected to be returned to the employer during the 12-month period, or operating cycle if longer, that follows the most recent annual statement of financial position presented.

p.   Subparagraph not used.

q.   The amount of net periodic benefit cost recognized.

12.   Amend paragraph 715-20-55-17, with a link to transition paragraph 820-10-65-7, as follows:

## Implementation Guidance and Illustrations

**715-20-55-16**   The following illustrates the fiscal 20X3 financial statement disclosures for an employer (Entity A) with multiple defined benefit pension plans and other postretirement benefit plans (dollar amounts in millions). Narrative descriptions of the basis used to determine the overall expected long-term rate-of-return-on-assets assumption (see paragraph 715-20-50-1(d)(iii)) and disclosure of the valuation technique(s) and inputs used to measure the fair value of plan assets and a discussion of changes in valuation techniques and inputs (see paragraph 715-20-55-1(d)(iv)(.03)), if any, are not included in this Example. The narrative description of the basis used to determine the overall expected

long-term rate-of-return-on-assets assumption is meant to be entity-specific. For purposes of this Example, the disclosures required by paragraphs 715-20-50-1(d)(ii) and 715-20-50-1(d)(iv) are provided for only the fiscal year ending December 31, 20X3. However, those paragraphs indicate that the disclosures are required to be presented as of each date for which a statement of financial position is presented.

**715-20-55-17**  During 20X3, Entity A acquired FV Industries and amended its plans. Entity A would make the following disclosure.

### Notes to Financial Statements

### Pension and Other Postretirement Benefit Plans

Entity A has both funded and unfunded noncontributory defined benefit pension plans that together cover substantially all of its employees. The plans provide defined benefits based on years of service and final average salary.

Entity A also has other postretirement benefit plans covering substantially all of its employees. The health care plans are contributory with participants' contributions adjusted annually; the life insurance plans are noncontributory. The accounting for the health care plans anticipates future cost-sharing changes to the written plans that are consistent with the entity's expressed intent to increase retiree contributions each year by 50 percent of health care cost increases in excess of 6 percent. The postretirement health care plans include a limit on the entity's share of costs for recent and future retirees.

Entity A acquired FV Industries on December 27, 20X3, including its pension plans and other postretirement benefit plans. Amendments made at the end of 20X3 to Entity A's plans increased the pension benefit obligations by $70 and reduced the other postretirement benefit obligations by $75.

**Obligations and Funded Status**

**At December 31**

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 20X3 | 20X2 | 20X3 | 20X2 |
| **Change in benefit obligation** | | | | |
| Benefit obligation at beginning of year | $1,246 | $1,200 | $ 742 | $ 712 |
| Service cost | 76 | 72 | 36 | 32 |
| Interest cost | 90 | 88 | 55 | 55 |
| Plan participants' contributions | | | 20 | 13 |
| Amendments | 70 | | (75) | |
| Actuarial loss | 20 | | 25 | |
| Acquisition | 900 | | 600 | |
| Benefits paid | (125) | (114) | (90) | (70) |
| Benefit obligation at end of year | 2,277 | 1,246 | 1,313 | 742 |
| **Change in plan assets** | | | | |
| Fair value of plan assets at beginning of year | 1,068 | 894 | 206 | 87 |
| Actual return on plan assets | 29 | 188 | 5 | 24 |
| Acquisition | 1,000 | | 25 | |
| Employer contributions | 75 | 100 | 137 | 152 |
| Plan participants' contributions | | | 20 | 13 |
| Benefits paid | (125) | (114) | (90) | (70) |
| Fair value of plan assets at end of year | 2,047 | 1,068 | 303 | 206 |
| Funded status at end of year | $ (230) | $ (178) | $(1,010) | $ (536) |

[Note: Nonpublic entities are not required to provide information in the preceding tables; they are required to disclose the employer's contributions, participants' contributions, benefit payments, and the funded status.]

Amounts recognized in the statement of financial position consist of the following.

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 20X3 | 20X2 | 20X3 | 20X2 |
| Noncurrent assets | $ 227 | $ 127 | $ - | $ - |
| Current liabilities | (125) | (125) | (150) | (150) |
| Noncurrent liabilities | (332) | (180) | (860) | (386) |
| | $ (230) | $ (178) | $(1,010) | $ (536) |

Amounts recognized in accumulated other comprehensive income consist of the following.

|  | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
|  | 20X3 | 20X2 | 20X3 | 20X2 |
| Net loss (gain) | $ 94 | $ 18 | $ (11) | $ (48) |
| Prior service cost (credit) | 210 | 160 | (92) | (22) |
|  | $ 304 | $ 178 | $ (103) | $ (70) |

The accumulated benefit obligation for all defined benefit pension plans was $1,300 and $850 at December 31, 20X3, and 20X2, respectively.

### Information for pension plans with an accumulated benefit obligation in excess of plan assets

|  | December 31 | |
|---|---|---|
|  | 20X3 | 20X2 |
| Projected benefit obligation | $ 263 | $ 247 |
| Accumulated benefit obligation | 237 | 222 |
| Fair value of plan assets | 84 | 95 |

### Components of Net Periodic Benefit Cost and Other Amounts Recognized in Accumulated Other Comprehensive Income

| Net Periodic Benefit Cost | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
|  | 20X3 | 20X2 | 20X3 | 20X2 |
| Service cost | $ 76 | $ 72 | $ 36 | $ 32 |
| Interest cost | 90 | 88 | 55 | 55 |
| Expected return on plan assets | (85) | (76) | (17) | (8) |
| Amortization of prior service cost | 20 | 16 | (5) | (5) |
| Amortization of net (gain) loss | - | - | - | - |
| Net periodic benefit cost | $ 101 | $ 100 | $ 69 | $ 74 |

**Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive Income**

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 20X3 | 20X2 | 20X3 | 20X2 |
| Net loss (gain) | $ 76 | $ 112 | $ 37 | $ (48) |
| Prior service cost (credit) | 70 | - | (75) | (27) |
| Amortization of prior service cost | (20) | (16) | 5 | 5 |
| Total recognized in other comprehensive income | 126 | 96 | (33) | (70) |
| Total recognized in net periodic benefit cost and other comprehensive income | $ 227 | $ 196 | $ 36 | $ 4 |

The estimated net loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive income into net periodic benefit cost over the next fiscal year are $4 and $27, respectively. The estimated prior service credit for the other defined benefit postretirement plans that will be amortized from accumulated other comprehensive income into net periodic benefit cost over the next fiscal year is $10.

[Note: Nonpublic entities are not required to separately disclose components of net periodic benefit cost.]

## Assumptions

**Weighted-average assumptions used to determine benefit obligations at December 31**

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 20X3 | 20X2 | 20X3 | 20X2 |
| Discount rate | 6.75% | 7.25% | 7.00% | 7.50% |
| Rate of compensation increase | 4.25 | 4.50 | | |

**Weighted-average assumptions used to determine net periodic benefit cost for years ended December 31**

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 20X3 | 20X2 | 20X3 | 20X2 |
| Discount rate | 7.25% | 7.50% | 7.50% | 7.75% |
| Expected long-term return on plan assets | 8.00 | 8.50 | 8.10 | 8.75 |
| Rate of compensation increase | 4.50 | 4.75 | | |

[Entity-specific narrative description of the basis used to determine the overall expected long-term rate of return on assets, as described in paragraph 715-20-50-1(d)(iii), would be included here.]

**Assumed health care cost trend rates at December 31**

|  | 20X3 | 20X2 |
|---|---|---|
| Health care cost trend rate assumed for next year | 12% | 12.5% |
| Rate to which the cost trend rate is assumed to decline (the ultimate trend rate) | 6% | 5% |
| Year that the rate reaches the ultimate trend rate | 20X9 | 20X9 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effects.

|  | 1-Percentage-Point Increase | 1-Percentage-Point Decrease |
|---|---|---|
| Effect on total of service and interest cost | $    22 | $    (20) |
| Effect on postretirement benefit obligation | 173 | (156) |

[Note: Nonpublic entities are not required to provide the information about the impact of a one-percentage-point increase and one-percentage-point decrease in the assumed health care cost trend rates.]

## Plan Assets

The company's overall investment strategy is to achieve a mix of approximately 75 percent of investments for long-term growth and 25 percent for near-term benefit payments with a wide diversification of asset types, fund strategies, and fund managers. The target allocations for plan assets are 65 percent equity securities, 20 percent corporate bonds and U.S. Treasury securities, and 15 percent to all other types of investments. Equity securities primarily include investments in large-cap and mid-cap companies primarily located in the United States. Fixed income securities include corporate bonds of companies from diversified industries, mortgage-backed securities, and U.S. Treasuries. Other types of investments include investments in hedge funds and private equity funds that follow several different strategies.

The fair value of Entity A's pension plan assets at December 31, 20X3, by asset ~~category~~class are as follows.

[Note: The two methods for disclosing the fair value of ~~major categories~~classes of plan assets presented below are not intended to be treated as a template. While they both provide examples of disclosures that comply with the requirements of paragraph 715-20-50-5(d)(ii), the ~~major categories~~classes disclosed should be tailored to the nature and risks of assets in an employer's plan(s). Additionally, an employer should consider the overall objectives in ~~paragraphs~~paragraph 715-20-50-5(d)(1), ~~715-20-50-5(d)(2), and 715-20-50-5(d)(5).]~~(2), and (5).]

**Method 1:**

| Asset ~~Category~~ Class | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| | | **Fair Value Measurements at December 31, 20X3 (in millions)** | | |
| Cash | $    150 | $    150 | | |
| Equity securities: | | | | |
|    U.S. large-cap [(a)] | 550 | 550 | | |
|    U.S. mid-cap growth | 100 | 100 | | |
|    International large-cap value | 325 | 325 | | |
|    Emerging markets growth | 75 | 25 | $    50 | |
|    Domestic real estate | 100 | 20 | 80 | |
| Fixed income securities: | | | | |
|    U.S. Treasuries | 200 | 200 | | |
|    Corporate bonds [(b)] | 200 | | 200 | |
|    Mortgage-backed securities | 50 | | 50 | |
| Other types of investments: | | | | |
|    Equity long/short hedge funds [(c)] | 55 | | | $    55 |
|    Event driven hedge funds [(d)] | 45 | | | 45 |
|    Global opportunities hedge funds [(e)] | 35 | | | 35 |
|    Multi-strategy hedge funds [(f)] | 40 | | | 40 |
|    Private equity funds [(g)] | 47 | | | 47 |
| Real estate | 75 | | | 75 |
|     **Total** | **$  2,047** | **$    1,370** | **$    380** | **$    297** |

(a) This ~~category~~class comprises low-cost equity index funds not actively managed that track the S&P 500.

(b) This ~~category~~class represents investment grade bonds of U.S. issuers from diverse industries.

(c) This ~~category~~class includes hedge funds that invest both long and short in primarily U.S. common stocks. Management of the hedge funds has the ability to shift investments from value to growth strategies, from small to large capitalization stocks, and from a net long position to a net short position.

(d) This ~~category~~class includes investments in approximately 60% equities and 40% bonds to profit from economic, political, and government driven events. A majority of the investments are targeted at economic policy decisions.

(e) This ~~category~~class includes approximately 80% investments in non-U.S. common stocks in the health care, energy, information technology, utilities, and telecommunications sectors and approximately 20% investments in diversified currencies.

(f) This ~~category~~class invests in multiple strategies to diversify risks and reduce volatility.  It includes investment: in approximately 50% U.S. common stocks, 30% global real estate projects, and 20% arbitrage investments.

(g) This ~~category~~class includes several private equity funds that invest primarily in U.S. commercial real estate.

[Note: Presented below is another method by which management could disclose ~~categories~~classes of plan assets.]

## Method 2:

| Asset ~~Category~~ Class | Total | Fair Value Measurements at December 31, 20X3 (in millions) | | |
|---|---|---|---|---|
| | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Cash | $ 150 | $ 150 | | |
| Equity securities: | | | | |
| U.S. companies | 400 | 400 | | |
| International companies | 300 | 300 | | |
| Mutual funds [a] | 450 | 320 | $ 130 | |
| U.S. Treasury securities | 200 | 200 | | |
| AA corporate bonds | 100 | | 100 | |
| A corporate bonds | 100 | | 100 | |
| Mortgage-backed securities | 50 | | 50 | |
| Equity long/short hedge funds [b] | 55 | | | $ 55 |
| Event driven hedge funds [c] | 45 | | | 45 |
| Global opportunities hedge funds [d] | 35 | | | 35 |
| Multi-strategy hedge funds [e] | 40 | | | 40 |
| Private equity funds [f] | 47 | | | 47 |
| Real estate | 75 | | | 75 |
| **Total** | **$ 2,047** | **$ 1,370** | **$ 380** | **$ 297** |

(a) 70% of mutual funds invest in common stock of large-cap U.S. companies. 30% of the company's mutual fund investments focus on emerging markets and domestic real estate common stocks.

(b) This ~~category~~class includes hedge funds that invest both long and short in primarily U.S. common stocks. Management of the hedge funds has the ability to shift investments from value to growth strategies, from small to large capitalization stocks, and from a net long position to a net short position.

(c) This ~~category~~class includes investments in approximately 60% equities and 40% bonds to profit from economic, political, and government driven events. A majority of the investments are targeted at economic policy decisions.

(d) This ~~category~~class includes approximately 80% investments in non-U.S. common stocks in the health care, energy, information technology, utilities, and telecommunications sectors and approximately 20% investments in diversified currencies.

(e) This ~~category~~class invests in multiple strategies to diversify risks and reduce volatility. It includes investments in approximately 50% U.S. common stocks, 30% global real estate projects, and 20% arbitrage investments.

(f) This ~~category~~class includes several private equity funds that invest primarily in U.S. commercial real estate.

[Note: An entity shall disclose the following information regardless of its method for disclosing ~~major categories~~classes of plan assets.]

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) | | | | | | |
| | Equity Long/ Short Hedge Funds | Event Driven Hedge Funds | Global Opportu- nities Hedge Funds | Multi- Strategy Hedge Funds | Private Equity Funds | Real Estate | Total |
|---|---|---|---|---|---|---|---|
| Beginning balance at December 31, 20X2 | $ 40 | $ 35 | $ 39 | $ 35 | $ 40 | $ 10 | $ 199 |
| Actual return on plan assets: | | | | | | | |
| Relating to assets still held at the reporting date | (2) | 5 | (7) | 5 | 2 | 3 | 6 |
| Relating to assets sold during the period | | 3 | | | 2 | | 5 |
| Purchases, sales, and settlements | 15 | 2 | | | 3 | 62 | 82 |
| Transfers in and/or out of Level 3 | 2 | | 3 | | | | 5 |
| Ending balance at December 31, 20X3 | $ 55 | $ 45 | $ 35 | $ 40 | $ 47 | $ 75 | $ 297 |

[Entity-specific narrative description of investment policies and strategies for plan assets, including weighted-average target asset allocations [if used as part of those policies and strategies] as described in paragraph 715-20-50-1(d)(ii) would be included here.]

The fair values of Entity A's other postretirement benefit plan assets at December 31, 20X3, by asset ~~category~~class are as follows.

| | Fair Value Measurements at December 31, 20X3 (in millions) | | | |
| Asset ~~Category~~ Class | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Diversified equity securities | $ 150 | $ 150 | - | $ - |
| U.S. Treasury securities | 50 | 50 | - | - |
| Diversified corporate bonds | 103 | - | $ 103 | - |
| Total | $ 303 | $ 200 | $ 103 | $ - |

Diversified equity securities include Entity A common stock in the amounts of $12 at December 31, 20X3.

## Cash Flows

## Contributions

Entity A expects to contribute $125 million to its pension plan and $150 million to its other postretirement benefit plan in 20X4.

38

**Estimated Future Benefit Payments**

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid.

|  | Pension Benefits | Other Benefits |
|---|---|---|
| 20X4 | $    200 | $   150 |
| 20X5 | 208 | 155 |
| 20X6 | 215 | 160 |
| 20X7 | 225 | 165 |
| 20X8 | 235 | 170 |
| Years 20X9–20Y3 | 1,352 | 984 |

## Amendments to Status Sections

13.    Add paragraph 715-20-00-1 as follows:

**715-20-00-1**  The following table identifies the changes made to this Subtopic.

| Paragraph Number | Action | Accounting Standards Update | Date |
|---|---|---|---|
| 715-20-50-1 | Amended | 2010-06 | 01/21/2010 |
| 715-20-50-5 | Amended | 2010-06 | 01/21/2010 |
| 715-20-55-17 | Amended | 2010-06 | 01/21/2010 |

14.    Amend paragraph 820-10-00-1, by adding the following items to the table, as follows:

**820-10-00-1** The following table identifies the changes made to this Subtopic.

| Paragraph Number | Action | Accounting Standards Update | Date |
|---|---|---|---|
| 820-10-50-1 | Amended | 2010-06 | 01/21/2010 |
| 820-10-50-2 | Amended | 2010-06 | 01/21/2010 |
| 820-10-50-2A | Added | 2010-06 | 01/21/2010 |

| 820-10-50-3 | Amended | 2010-06 | 01/21/2010 |
|---|---|---|---|
| 820-10-50-5 | Amended | 2010-06 | 01/21/2010 |
| 820-10-50-6A | Amended | 2010-06 | 01/21/2010 |
| 820-10-55-22A | Added | 2010-06 | 01/21/2010 |
| 820-10-55-22B | Added | 2010-06 | 01/21/2010 |
| 820-10-55-61 through 55-64A | Amended | 2010-06 | 01/21/2010 |
| 820-10-65-7 | Added | 2010-06 | 01/21/2010 |

*The amendments in this Update were adopted by the unanimous vote of the five members of the Financial Accounting Standards Board:*

Robert H. Herz, *Chairman*
Thomas J. Linsmeier
Leslie F. Seidman
Marc A. Siegel
Lawrence W. Smith

# Background Information and Basis for Conclusions

BC1.  The following summarizes the Board's considerations in reaching the conclusions in this Update. It includes reasons for accepting certain approaches and rejecting others. Individual Board members gave greater weight to some factors than to others.

## Background Information

BC2.  U.S. GAAP requires that a reporting entity provide disclosures about fair value measurements used in financial statements. Most of those requirements are set out in Subtopic 820-10.

BC3.  A number of constituents recommended that the Board improve disclosure requirements in U.S. GAAP on fair value measurements. Some of the more recent requests and developments include the following:

a.  During 2008, the Securities and Exchange Commission's (SEC) Division of Corporation Finance issued letters to some public companies that encouraged additional disclosures in the management's discussion and analysis (MD&A) section of their SEC filings about the application of the fair value measurement standards in U.S. GAAP.

b.  In October 2008, in responding to FSP FAS 157-3, *Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active,* some financial statement users urged the Board to enhance the disclosure requirements in U.S. GAAP on fair value measurements.

c.  In October 2008, the International Accounting Standard Board's (IASB) Expert Advisory Panel issued a report titled *Measuring and Disclosing the Fair Value of Financial Instruments in Markets That Are No Longer Active*. On the basis of that report, the IASB issued proposals to improve the fair value disclosures in IFRS 7.

d.  In December 2008, the SEC released its *Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-To-Market Accounting*. This report recommended that the FASB consider enhancing the disclosure requirements in U.S. GAAP on fair value measurements.

e.  In February 2009, the FASB's Valuation Resource Group met to discuss various issues on the implementation of fair value disclosure requirements in U.S. GAAP and suggested additional disclosures.

f.  In March 2009, the International Monetary Fund issued the Working Paper, *Procyclicality and Fair Value Accounting*. The authors of that

Paper recommend that fair value measurements be supplemented with adequate disclosures.

g.   In March 2009, the IASB issued *Improving Disclosures about Financial Instruments (Amendments to IFRS 7)*. The amendments require some new disclosures and improve convergence with the fair value hierarchy and the related disclosures in Subtopic 820-10.

BC4.   In response to the developments summarized above, the Board issued a proposed Accounting Standards Update, *Fair Value Measurements and Disclosures (Topic 820): Improving Disclosures about Fair Value Measurements,* on August 28, 2009. The Board received 111 comment letters in response to questions in the proposed Update. The Board considered those comments during its redeliberations of the issues addressed by the proposed Update at a public Board meeting in November 2009.

## Clarifications of Existing Disclosure Requirements

### Level of Disaggregation

BC5.   Existing U.S. GAAP on fair value measurement and disclosures requires that a reporting entity provide disclosures about fair value measurements for each major category of assets and liabilities. Some users noted that many companies have interpreted the term *major category* to mean a line item in the statement of financial position. Those users told the Board that disclosures at that relatively high level of aggregation are often less useful. They recommended that the Board require that entities provide disclosures for meaningful subsets of line items in the statement of financial position.

BC6.   The Board concluded that disclosures about fair value measurements are more useful if an entity provided them for each class of assets and liabilities within the line items in the statement of financial position. The Board decided to amend U.S. GAAP on fair value measurements and disclosures to include additional guidance on determining the appropriate level of disaggregation for those disclosures.

## Disclosures about Inputs to Recurring Fair Value Measurements

BC7.   U.S. GAAP on fair value measurements and disclosures includes specific objectives that an entity should achieve when providing disclosures about recurring fair value measurements (paragraph 820-10-50-1). Those objectives state:

The reporting entity shall disclose information that enables users of its financial statements to assess both of the following:

a. For assets and liabilities that are measured at **fair value** on a recurring basis in periods subsequent to initial recognition (for example, trading securities), the **inputs** used to develop those measurements

b. For recurring fair value measurements using significant **unobservable inputs** (Level 3), the effect of the measurements on earnings (or changes in net assets) for the period.

BC8.   U.S. GAAP on fair value measurements and disclosures also provides a list of specific disclosures necessary to achieve the above objectives; however, that list does not include a requirement to discuss the inputs to recurring fair value measurements. The Board notes that paragraph 820-10-50-2(e) requires that a reporting entity describe the techniques used for recurring fair value measurements. In the Board's view, a discussion of techniques is incomplete without a discussion of the inputs. However, the Board concluded that a more explicit requirement to discuss the inputs for recurring fair value measurements will clarify and improve disclosures. The amendments in this Update also clarify that for recurring, as well as nonrecurring, fair value measurements, the disclosures about inputs and valuation techniques apply to both Level 2 and Level 3 fair value measurements, not just Level 3 fair value measurements.

# New Disclosures Requirements

## Transfers between Levels 1, 2, and 3

BC9.   Paragraph 820-10-50-2(c)(3) requires disclosure of the amounts of transfers in and/or out of Level 3 inputs. Financial statement users have indicated that similar information for significant transfers between all input levels (that is, Levels 1, 2, and 3) during the reporting period are useful. IFRS 7, as amended in March 2009, requires the disclosure of that information. Users may use the information about the amounts and reasons for transfers between levels in their assessment of the reporting entity's quality of reported earnings and expected future cash flows. The Board concluded that information about significant transfers between Levels 1, 2, and 3 is useful and should be required.

## Activity in Level 3 Fair Value Measurements

BC10.   Users indicated that for fair value measurements using significant unobservable inputs (Level 3), information about movements due to purchases, sales, issuances, and settlements is most helpful if it is not presented as a single net amount (for example, see paragraph 144(b) on page 47 of the IASB's October 2008 Expert Advisory Panel Report, *Measuring and Disclosing the Fair Value of Financial Instruments in Markets That Are No Longer Active*). Therefore,

the proposed amendments required presentation of this activity on a gross rather than net basis.

BC11.    Respondents who commented on that issue had mixed opinions about the operationality and usefulness of providing purchases, sales, issuances, and settlements of Level 3 fair value measurements on a gross basis. Users, accounting firms, valuation firms, and some banks generally agreed with the requirement, while private equity firms and entities with significant trading activities stated that the requirement was too onerous, or was operational, but would not provide useful information. The Board noted that IFRS 7, as amended in March 2009, also requires separate disclosure of Level 3 purchases, sales, issuances, and settlements. The Board concluded that the proposed disclosure is useful and should be required because it would indicate the reasons for changes in Level 3 fair value measurements. However, the Board decided on a delayed effective date and prospective transition to give entities that need significant changes to their information systems adequate time to comply with the new disclosure requirement.

## Other Disclosures Considered

### Effect of Reasonably Possible Alternative Level 3 Inputs— Sensitivity Disclosures

BC12.    Regarding fair value measurements using Level 3 inputs, financial statement users indicated that information about the effect(s) of reasonably possible alternative inputs (sometimes also referred to as sensitivity analysis) would be relevant in their analysis of the reporting entity's performance.

BC13.    Under current SEC rules, registrants may present sensitivity information to comply with the disclosure requirements in Financial Reporting Release No. 48, *Disclosure of Accounting Policies for Derivative Financial Instruments and Derivative Commodity Instruments and Disclosure of Quantitative and Qualitative Information About Market Risk Inherent in Derivative Financial Instruments, Other Financial Instruments, and Derivative Commodity Instruments,* for quantitative information about exposure to future changes in market risk from financial instruments. Consequently, some SEC registrants may already be providing sensitivity information in their MD&A disclosures although it is different from the type of sensitivity information that was included in the proposed Update. Furthermore, IFRS 7, as amended in March 2009, requires sensitivity information about potential changes in fair value measurements resulting from using reasonably possible alternative Level 3 inputs.

BC14.    To be consistent with the approach adopted in IFRS 7, as amended in March 2009, amendments in the proposed Update did not prescribe any specific method to calculate the effect(s) of reasonably possible alternative inputs but did require disclosure of the method that the reporting entity used in complying with

the sensitivity disclosure requirement. While not prescribing any specific method, the amendments in the proposed Update would have clarified that when estimating the effect of more than one reasonably possible input, the reporting entity should include the expected effect of correlation among changes in different significant inputs. For sensitivity disclosures to be useful for further analyses by users of financial statements, the proposed Update also would have required quantitative disclosure about the significant inputs used in Level 3 measurements and about reasonably possible alternative inputs.

BC15.    Before issuing the proposed Update, the Board asked the staff to seek preparer input to assess the operationality of the disclosures about the level of disaggregation and about the effect(s) of reasonably possible alternative inputs for fair value measurements using significant unobservable inputs (Level 3) (sometimes also referred to as sensitivity analysis). Seven financial statement preparers volunteered to participate in that outreach effort. The proposed Update incorporated some of the suggestions made by those preparers.

BC16.    During September and October 2009, the FASB staff conducted additional outreach with various entities. The effort involved calls with firms that provide third-party security pricing data (that is, pricing services) and a user group. As a result of that effort, the staff gained a better understanding of the operationality and usefulness of the proposed sensitivity disclosures for Level 3 fair value measurements.

BC17.    Most respondents (other than users) did not support the proposed sensitivity disclosures. They stated that the proposed disclosures would be challenging to implement and would significantly increase costs while providing little, if any, benefit to users. Many respondents stated that the information provided by the proposed sensitivity disclosures would not be decision useful because the range of reasonably possible Level 3 fair values would be extremely wide and, thus, would be meaningless and possibly confusing to users. Other respondents questioned the usefulness of the information due to the complexities in capturing correlation and interdependencies among multiple significant inputs.

BC18.    Some respondents also noted differences between the disclosure requirements in the proposed Update and those in IFRS 7. For example, entities are not required to consider the correlation between multiple significant inputs in the sensitivity disclosures under IFRS 7.

BC19.    Users, however, supported the proposed disclosures because, in their view, the disclosures would provide useful information to better understand a reporting entity's fair value measurements, especially Level 3 measurements. Users noted the inherent subjectivity in Level 3 measurements and stated that the proposed sensitivity information would allow them to better evaluate the reporting entity's cash flows, earnings, capital requirements, and compliance with debt covenants.

BC20.    At the October 2009 joint meeting, the FASB and the IASB decided that the staffs on Boards should develop recommendations that would seek to eliminate all differences in the Boards' guidance for fair value measurement and disclosure. The staffs have not yet performed a formal analysis to identify the differences in fair value disclosures. The FASB staff also would like to obtain input from the IASB staff and others about the operationality and usefulness of the sensitivity disclosures required under IFRS 7.

BC21.    In view of the respondents' concerns about the operationality and costs of the sensitivity disclosures in the proposed Update and the October 2009 joint Board meeting decision to achieve convergence on fair value measurement and disclosure, the FASB decided to defer consideration of the proposed sensitivity disclosures. In the meantime, the FASB staff will assess the operationality and usefulness of similar disclosures currently required under IFRS 7. A final decision on the Level 3 sensitivity disclosures will be part of the convergence project on fair value measurement and disclosures.

## Conforming Amendments to Subtopic 715-20

BC22.    This Update includes conforming amendments to guidance on employers' disclosures about postretirement benefit plan assets (Subtopic 715-20). The Board does not expect any significant changes in the application of Subtopic 715-20, as amended, because the objectives and basic principles of disaggregating fair value disclosures are the same for the financial statements of both an employer and a postretirement plan. The conforming amendments to Subtopic 715-20 change the terminology from *major categories* of assets to *classes* of assets and provide a cross reference to the guidance in Subtopic 820-10 on how to determine appropriate classes to present fair value disclosures.

## Effective Date

BC23.    The proposed Update would have required that the disclosures be effective for annual or interim reporting periods ending after December 15, 2009, except for Level 3 sensitivity disclosures, which would have been effective for periods ending after March 15, 2010.

BC24.    Respondents generally disagreed with the proposed effective date(s), stating that additional time is necessary for entities to comply with the expanded disclosure requirements. Those respondents stated that the period would be used to make necessary information systems changes and to provide adequate time to comply with other accounting requirements that will become effective at year-end, such as the guidance in FASB Statements No. 166, *Accounting for Transfers of Financial Assets,* and No. 167, *Amendments to FASB Interpretation No. 46(R).*

BC25.    Based on the input from constituents, the Board concluded that the guidance in this Update should be effective for annual and interim reporting periods beginning after December 15, 2009, except for the requirement to provide the Level 3 activity between purchases, sales, issuances, and settlements on a gross basis. That requirement is effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years.

## Benefits and Costs

BC26.    The objective of financial reporting is to provide information that is useful to present and potential investors, creditors, donors, and other capital market participants in making rational investment, credit, and similar resource allocation decisions. However, the benefits of providing information for that purpose should justify the related costs. Present and potential investors, creditors, donors, and other users of financial information benefit from improvements in financial reporting, while the costs to implement new guidance are borne primarily by present investors. The Board's assessment of the costs and benefits of issuing new guidance is unavoidably more qualitative than quantitative because there is no method to objectively measure the costs to implement new guidance or to quantify the value of improved information in financial statements.

BC27.    Users have told the Board that a greater level of disaggregation information about fair value measurements as well as more robust disclosures about valuation techniques and assumptions related to Level 2 and Level 3 measurements are useful in their analysis of a reporting entity's performance and expected future cash flows. Furthermore, users have said that because of the different degrees of subjectivity and reliability of Level 1, Level 2, and Level 3 fair value measurements, information about significant transfers between the three levels and the reasons for such transfers are useful. They also are interested in the level of activity in the Level 3 roll forward, which is indicated by the separate disclosure of gross purchases, sales, issuances, and settlements rather than as one net number.

BC28.    The Board concluded that the information required to comply with the amendments in this Update generally should be available to most reporting entities without significant changes to their current information systems. Regarding the reporting of purchases, sales, issuances, and settlements on a gross basis in the Level 3 roll forward, the Board acknowledges that some entities will need to change information systems, and therefore, has provided a delayed effective date for that disclosure.

# Amendments to the XBRL Taxonomy

The following elements are proposed additions or modifications to the XBRL taxonomy as a result of the amendments in this Update. (Elements that currently exist in the 2009 taxonomy are marked with an asterisk* and have been **bolded.** If an existing element was modified, it has been marked to reflect any changes.)

| Standard Label† | Definition | Codification Reference |
|---|---|---|
| OBSERVABLE/RECURRING OR NONRECURRING /ASSETS | | |
| Fair Value, Assets, Measurement with Observable Inputs, Significant Transfers Into Level 1 from Level 2 Fair Value Measurements, [Text Block] | This element represents significant transfers of assets into Level 1 from Level 2 of the fair value hierarchy and the reasons for those transfers. | 820-10-50-2(bb) |
| Fair Value, Assets, Measurement with Observable Inputs, Significant Transfers Out of Level 1 and Into Level 2 Fair Value Measurements, [Text Block] | This element represents significant transfers of assets out of Level 1 and into Level 2 of the fair value hierarchy and the reasons for those transfers. | 820-10-50-2(bb) |
| Fair Value, Assets Measured on Recurring Basis, Reason for Significant Transfers between Level 1 and Level 2 Fair Value Measurements | Disclosure of the reasons for significant transfers between Level 1 and Level 2 fair value measurements. | 820-10-50-2-(bb) |

†The Standard Label and the Element Name are the same (except that the Element Name does not include spaces). If they are different, the Element Name is shown in *italics* after the Standard Label.

| Standard Label[†] | Definition | Codification Reference |
|---|---|---|
| Fair Value, Assets Measured on Recurring Basis, Observable Inputs, Description and Development [Text Block] | This item represents, for each class of assets, a description of the inputs and the information used to develop the inputs for fair value measurements using observable inputs (Level 2). | 820-10-20-2(e) |
| Fair Value, Assets Measured on Recurring Basis, Valuation Techniques [Text Block] | This element discloses the valuation techniques used to measure fair value, and a discussion of changes in valuation techniques, if any, applied during the period to each separate class of assets (Level 2). | 820-10-50-2(e) |
| Fair Value, Assets Measured on Recurring Basis, Inputs [Text Block] | This element discloses the inputs used to measure fair value, and a discussion of changes in inputs, if any, applied during the period to each separate class of assets (Level 2). | 820-10-50-2(e) |
| UNOBSERVABLE/RECURRING/ASSETS | | |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Assets, Transfers In | This element represents transfers in to Level 3 of assets measured at fair value on a recurring basis using unobservable inputs, which have taken place during the period. | 820-10-50-2(c)(3) |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Assets, Transfers Out | This element represents transfers out of Level 3 of assets measured at fair value on a recurring basis using unobservable inputs, which have taken place during the period. | 820-10-50-2(c)(3) |

| Standard Label[†] | Definition | Codification Reference |
|---|---|---|
| Fair Value, Assets Measured on Recurring Basis, Reason for Significant Transfers In or Out of Level 3 Fair Value Measurement | Disclosure of the reasons for significant transfers in or out of Level 3 fair value measurement. | 820-10-50-2-(c)(3) |
| **\*Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Asset, Gain (Loss) Included in Other Comprehensive Income** | This element represents total gains or losses for the period (realized and unrealized) arising from assets measured at fair value on a recurring basis using unobservable inputs (Level 3), which are included in other comprehensive income (a separate component of shareholders' equity). | 820-10-50-2(c)(1) |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Assets, Purchases | This element represents purchases that have taken place during the period in relation to assets measured at fair value on a recurring basis using unobservable inputs (Level 3). | 820-10-50-2(c)(2) |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Assets, Sales | This element represents sales that have taken place during the period in relation to assets measured at fair value on a recurring basis using unobservable inputs (Level 3). | 820-10-50-2(c)(2) |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Assets, Issuances | This element represents issuances that have taken place during the period in relation to assets measured at fair value on a recurring basis using unobservable inputs (Level 3). | 820-10-50-2(c)(2) |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Assets, Settlements | This element represents settlements that  have taken place during the period in relation to assets measured at fair value on a recurring basis using unobservable inputs (Level 3). | 820-10-50-2(c)(2) |