1



```
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x    11 CV 5201 (DLC)
 2                                             11 CV 6188 (DLC)
 3    FEDERAL HOUSING FINANCE AGENCY,          11 CV 6189 (DLC)
 3                                             11 CV 6190 (DLC)
 4                    Plaintiff,               11 CV 6192 (DLC)
 4                                             11 CV 6193 (DLC)
 5            v.                               11 CV 6195 (DLC)
 5                                             11 CV 6196 (DLC)
 6    JPMORGAN CHASE & CO., INC., et al.,      11 CV 6198 (DLC)
 6                                             11 CV 6200 (DLC)
 7                    Defendants;              11 CV 6201 (DLC)
 7                                             11 CV 6202 (DLC)
 8                                             11 CV 6739 (DLC)
 8                                             11 CV 6203 (DLC)
 9    And other FHFA cases.                    11 CV 6739 (DLC)
 9                                             11 CV 7010 (DLC)
10                                             11 CV 7048 (DLC)
10    ------------------------------------x
11
11                                             New York, N.Y.
12                                             October 15, 2012
12                                             2:30 p.m.
13
13    Before:
14
14                    HON. DENISE COTE,
15
15                                             District Judge
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
                                                        2
 1                              APPEARANCES
 1
 2     QUINN EMANUEL URQUHART & SULLIVAN LLP
 2          Attorneys for Plaintiff
 3          Federal Housing Finance Agency
 3     BY:  PHILIPPE Z. SELENDY, ESQ.
 4          MANISHA M. SHETH, ESQ.
 4          CHRISTINE H. CHUNG, ESQ.
 5          SASCHA RAND, ESQ.
 5          JULIA GUARAGNA BESKIN, ESQ.
 6          ADAM M. ABENSOHN, ESQ.
 6
 7     FEDERAL HOUSING FINANCE AGENCY
 7     BY:  STEPHEN E. HART, ESQ.
 8          Managing Associate General Counsel
 8
 9     KASOWITZ BENSON TORRES & FRIEDMAN LLP
 9          Attorneys for Plaintiff
10          Federal Housing Finance Agency
10     BY:  KANCHANA WANGKEO LEUNG, ESQ.
11          CHRISTOPHER P. JOHNSON, ESQ.
11          MICHAEL HANIN, ESQ.
12          ANDREW K. GLENN, ESQ.
12
13     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13          Attorneys for Defendants UBS Americas Inc.,
14          SG Americas, Inc. and
14          affiliated entities and individuals
15     BY:  ROBERT A. FUMERTON, ESQ.
15          JAY B. KASNER, ESQ.
16          SCOTT D. MUSOFF, ESQ.
16          JOSEPH N. SACCA, ESQ.
17
17     SPEARS & IMES LLP
18          Attorneys for Defendants UBS Americas Inc.,
18     BY:  DAVID SPEARS, ESQ.
19          MONICA P. FOLCH, ESQ.
19
20     SULLIVAN & CROMWELL LLP
20          Attorneys for Defendant JP Morgan Chase
21          and affiliated entities, and certain individuals
21     BY:  PENNY SHANE, ESQ.
22          SHARON L. NELLES, ESQ.
22          JONATHAN M. SEDLAK, ESQ.
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

3

```
 1    APPEARANCES (Cont'd)
 1
 2    SULLIVAN & CROMWELL LLP
 2         Attorneys for Defendant Goldman Sachs
 3         and affiliated entities and individuals
 3    BY:  RICHARD H. KLAPPER, ESQ.
 4         THEODORE EDELMAN, ESQ.
 4         W. RUDOLPH KLEYSTEUBER IV, ESQ.
 5         BRADLEY A. HARSCH, ESQ.
 5
 6    SULLIVAN & CROMWELL LLP
 6         Attorneys for Defendant Barclays Bank
 7         and affiliated entities and individuals
 7    BY:  DAVID H. BRAFF, ESQ.
 8         BRIAN T. FRAWLEY, ESQ.
 8
 9    SULLIVAN & CROMWELL LLP
 9         Attorneys for Defendant First Horizon,
10         Nomura Holding, and affiliated entities
10    BY:  BRUCE E. CLARK, ESQ.
11         AMANDA F. DAVIDOFF, ESQ.
11
12    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
12         Attorneys for Defendant Citigroup
13         and affiliated entities and individuals
13    BY:  SUSANNA M. BUERGEL, ESQ.
14         CAITLIN E. GRUSAUSKAS, ESQ.
14         BRUCE BIRENBOIM, ESQ.
15
15    CRAVATH, SWAINE & MOORE LLP
16         Attorneys for Defendant Credit Suisse
16         and affiliated entities and individuals
17    BY:  RICHARD W. CLARY, ESQ.
17         LAUREN A. MOSKOWITZ, ESQ.
18
18    DEWEY PEGNO & KRAMARSY LLP
19         Attorneys for for Credit Suisse
19    BY:  KEARA A. BERGIN, ESQ.
20
20    SIMPSON THACHER & BARTLETT LLP
21         Attorneys for Defendants RBS Securities,
21         Deutsche Bank, and affiliated entities
22    BY:  DAVID J. WOLL, ESQ.
22         THOMAS C. RICE, ESQ.
23
24
25
```

4

```
 1     APPEARANCES (Cont'd)
 1
 2     MAYER BROWN LLP
 2          Attorneys for Defendant HSBC North America Holdings
 3          and affiliated entities and individuals
 3     BY:  JOHN M. CONLON, ESQ.
 4          MICHAEL O. WARE, ESQ.
 4          ALLISON J. ZOLOT, ESQ.
 5          JENNIFER M. ROSA, ESQ.
 5
 6     MAYER BROWN LLP
 6          Attorneys for Defendants Ally Financial
 7          and GMAC Mortgage Group, Inc.
 7     BY:  REGINALD R. GOEKE, ESQ.
 8          MICHAEL O. WARE, ESQ.
 8          CATHERINE A. BERNARD, ESQ.
 9
 9     KIRKLAND & ELLIS LLP
10          Attorneys for Defendant Ally Securities
10     BY:  ROBERT J. KOPECKY, ESQ.
11
11     WILLIAMS & CONNOLLY, LLP
12          Attorneys for Defendants Bank of America Corporation,
12          Merrill Lynch, and affiliated entities
13     BY:  BETH A. STEWART, ESQ.
13          EDWARD J. BENNETT, ESQ.
14          LAUREN K. COLLOGAN, ESQ.
14
15     DAVIS POLK & WARDWELL LLP
15          Attorneys for Defendant Morgan Stanley
16          and affiliated entities and individuals
16     BY:  JAMES P. ROUHANDEH, ESQ.
17          BRIAN S. WEINSTEIN, ESQ.
17          DANIEL J. SCHWARTZ, ESQ.
18
18     WEIL, GOTSHAL & MANGES LLP
19          Attorneys for Defendant General Electric
19          and affiliated entities
20     BY:  GREG A. DANILOW, ESQ.
20          VERNON S. BRODERICK, ESQ.
21          SETH GOODCHILD, ESQ.
21
22     RICHARDS KIBBE & ORBE, LLP
22          Attorneys for Numerous Individual Defendants
23     BY:  DANIEL ZINMAN, ESQ.
23
24     ALLEN & OVERY LLP
24          Attorneys for Defendant Molinaro
25     BY:  JOSEPHINE A. CHEATHAM, ESQ.
25
```

5

```
 1    APPEARANCES (Cont'd)
 1
 2    GREENBERG TRAURIG, LLP
 2         Attorneys for Defendant Mayer
 3    BY:  RONALD D. LEFTON, ESQ.
 3
 4    MORRISON & FOERSTER LLP
 4         Attorneys for Defendants Marano & Nierenberg
 5    BY:  JOEL C. HAIMS, ESQ.
 5
 6    SNR DENTON US LLP
 6         Attorneys for Defendant Perkins
 7    BY:  PATRICK E. FITZMAURICE, ESQ.
 7
 8    KRAMER LEVIN NAFTALIS & FRANKEL, LLP
 8         Attorneys for Defendant Verschleiser
 9    BY:  DANI R. JAMES, ESQ.
 9
10
11              (In open court)
12              THE CLERK:  In the matter of Federal Housing Finance
13    Agency v. UBS Americas Inc. and others, and other FHFA cases,
14    for plaintiff Federal Housing Finance Agency, are you ready to
15    proceed?
16              MR. SELENDY:  Yes, we are.  Thank you.
17              THE CLERK:  Please state your name for the record.
18              MR. SELENDY:  Philippe Selendy, Quinn Emanuel, for
19    FHFA.
20              MS. CHUNG:  Christine Chung with Quinn Emanuel for
21    FHFA.  Good afternoon, your Honor.
22              MS. SHETH:  Good afternoon.  Manisha Sheth for FHFA.
23              MR RAND:  Good afternoon, your Honor.  Sascha Rand,
24    Quinn Emanuel, for FHFA.
25              MR. ABENSOHN:  Good afternoon, your Honor, Adam
```

6

```
 1   Abensohn for FHFA.
 2           MR. HART:  Good afternoon, your Honor.  Steve Hart
 3   with FHFA.
 4           MS. LEUNG:  Good afternoon, your Honor.  Kanchana
 5   Leung with Kasowitz Benson for FHFA.
 6           MR. GLENN:  Andrew Glenn,  Kasowitz Benson, on behalf
 7   of FHFA.
 8           MR. JOHNSON:  Christopher Johnson from Kasowitz Benson
 8   for FHFA.
 9
10           MR. HANIN:  Michael Hanin, Kasowitz Benson, for FHFA.
11           THE CLERK:  Counsel, just to make sure your names are
12   included on the appearance sheet.
13           THE COURT:  One minute, Ms. Rojas.
14           THE CLERK:  For defendants UBS Americas Inc. and SG
15   America, please state your name for the record.
16           MR. KASNER:  Your Honor, good afternoon.  Jay Kasner,
17   Robert Fumerton, and Scott Musoff from Skadden Arps.
18           MR. SPEARS:  And, your Honor, David Spears and Monica
19   Folch are working with Skadden Arps on behalf of UBS on these
20   matters.
21           THE CLERK:  For defendant JP Morgan Chase & Co.
22           MS. SHANE:  Good afternoon, your Honor.  Penny Shane,
23   Sullivan & Cromwell, with Sharon Nelles and Jonathan Sedlak,
24   also from Sullivan & Cromwell.
25           THE CLERK:  For defendant Goldman Sachs.
```

7

```
 1              MR. KLAPPER:  Good afternoon, your Honor.  Richard
 2    Klapper from Sullivan & Cromwell, along with my partner,
 3    Theodore Edelman.
 4              THE CLERK:  For defendant Barclays Bank.
 5              MR. BRAFF:  Good afternoon.  David Braff from Sullivan
 6    & Cromwell with Brian Frawley, also of Sullivan & Cromwell.
 7              THE CLERK:  For defendants First Horizon National
 8    Corp. and Nomura Holding America.
 9              MR. CLARK:  Good afternoon, your Honor.  Bruce Clark
10    and Amanda Davidoff, Sullivan & Cromwell.
11              THE CLERK:  For defendant Citigroup Global.
12              MR. BIRENBOIM:  Good afternoon, your Honor.  Bruce
13    Birenboim, Susanna Buergel, and Caitlin Grusauskas from Paul
14    Weiss for the Citigroup defendants.
15              THE CLERK:  For defendant Credit Suisse Securities.
16              MR. CLARY:  Good afternoon, your Honor.  Richard Clary
17    and Lauren Moskowitz from Cravath Swaine & Moore.
18              MS. BERGIN:  Keara Bergin, Dewey Pegno & Kramarsky,
19    also for Credit Suisse.
20              THE CLERK:  For defendant RBS Securities and Deutsche
21    Bank.
22              MR. WOLL:  Good afternoon, your Honor.  David Woll and
23    Tom Rice from Simpson Thacher.
24              THE CLERK:  For defendant HSBC North America Holdings.
25              MR. CONLON:  Good afternoon, your Honor.  John Conlon
```

8

```
 1    and Michael Ware of Mayer Brown.
 2              THE CLERK:  For defendants Ally Financial and GMAC
 3    Mortgage Group.
 4              MR. GOEKE:  Good afternoon, your Honor.  Reginald
 5    Goeke, Michael Ware, and Catherine Bernard of Mayer Brown.
 6              THE CLERK:  For defendant Ally Securities LLC.
 7              MR. KOPECKY:  Good afternoon, your Honor.  Robert
 8    Kopecky, Kirkland Ellis.
 9              THE CLERK:  For defendants Bank of America and Merrill
10    Lynch.
11              MS. STEWART:  Good afternoon, your Honor.  Beth
12    Stewart from William & Connolly, and with me today are Ted
13    Bennett and Lauren Collogan.
14              THE CLERK:  For defendants Morgan Stanley.
15              MR. ROUHANDEH:  Good afternoon, your Honor.  Jim
16    Rouhandeh, Brian Weinstein, and Daniel Schwartz from Davis
17    Polk.
18              THE CLERK:  For defendants General Electric.
19              MR. DANILOW:  Good afternoon, your Honor.  Greg
20    Danilow, Vernon Broderick, and Seth Goodchild from Weil
21    Gotshal.
22              THE CLERK:  For the individual defendants including
23    George C. Carp.
24              MR. ZINMAN:  Good afternoon, your Honor.  Daniel
25    Zinman from Richards Kibbe & Orbe.
```

9

```
 1              THE CLERK:  For the individual defendant Jeffrey
 2    Mayer.
 3              MR. LEFTON:  Ronald Lefton from Greenberg Traurig.
 4              THE CLERK:  For the defendant individual Samuel
 5    Molinaro Jr.
 6              MS. CHEATHAM:  Good afternoon, your Honor.  Josephine
 7    Cheatham from Allen & Overy.
 8              THE CLERK:  For the individual defendants Thomas
 9    Marano.
10              MR. HAIMS:  Good afternoon, your Honor.  Bill Haims,
11    Morrison & Foerster.
12              THE CLERK:  For the defendant individual Matthew
13    Perkins.
14              MR. MORRIS:  Good afternoon, your Honor.  Patrick
15    Fitzmaurice, SNR Denton.
16              THE CLERK:  And for the individual defendant Jeffrey
17    Verschleiser.
18              MR. JAMES:  Good afternoon, your Honor.  Dani James
19    from Kramer Levin.
20              THE COURT:  Thank you.
21              Welcome, everyone.  And I appreciate your cooperation
22    in being here on such short notice.  It just seemed to me,
23    given the letters I received late last week, that it would be
24    impossible for me to work through all the items that were
25    raised by that exchange of correspondence through a telephone
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

```
 1    conference, or at least difficult to accomplish.
 2            So let me tell you what I have on our agenda today,
 3    and counsel may have additional issues.  I want to address the
 4    issues raised to those three sets of letters.  I want to talk
 5    about the Daubert motion practice.  I want to see if we can fit
 6    in some summary judgment motion schedule dates in the UBS case.
 7    I want to talk about the coordination in the RBS case, Royal
 8    Bank of Scotland, with the Connecticut action.  I want to
 9    address the ResCap loan file production issue.  I want to talk
10    about the schedule for reports by the plaintiff and the
11    defendants on reunderwriting in the UBS action and potentially
12    in other actions.
13            I want to talk about loan file production from true
14    third parties.  This comes up, obviously, in the sets of the
15    three letters, but whether we're moving towards the point where
16    motions to compel are necessary or appropriate with respect to
17    any of those subpoenas that have been issued.
18            Good.  So that's my list, and I want to thank counsel
19    for the reports that you exchanged this morning.  I haven't
20    looked at them in detail, but I did look at them a bit.
21            I thought we might start by talking about some of the
22    issues raised in the letters.  The plaintiff's letter was
23    labeled "Loan File Production."  The first specific issue it
24    raised was loan numbers for loans that were reviewed as part of
25    the defendants' due diligence and are referred to by the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

```
 1   plaintiff with the term "due diligence samples."  And I think
 2   there were least five issues raised in that letter and its
 3   responsive letter.
 4          For many of the issues that came to me through these
 5   three sets of letters, the defendants indicated there was a
 6   need for further opportunity to meet and confer, and I issued
 7   an order requiring the parties to do that.  So for some of the
 8   issues raised in this first set of letters, I realize you may
 9   have made some progress and the issues may be a little
10   different now than was presented to me.  So why don't I take a
11   report with respect to these issues and then we'll resolve
12   hopefully any outstanding disputes.
13          MR. SELENDY:  OK.  Your Honor, Philippe Selendy for
14   FHFA.  Would you like me to address all the issues in that
15   letter or just focus on the due diligence question?
16          THE COURT:  Well, so many of these issues are
17   interrelated.  Whatever you think is the most efficient way to
18   do it.
19          MR. SELENDY:  OK.  Well, I can report that progress
20   has been made on some of the issues.  In particular, as your
21   Honor will recall, we had sought to request defendants to
22   prioritize the production of loans that fall within the samples
23   designated by Dr.~Cowan.  And it is my understanding that the
24   defendants, notwithstanding the submission originally from UBS,
25   they have now agreed to prioritize those samples.  And I think
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

1    that is an agreement that efforts will be made to secure the
2    production from third parties of loans in the sample population
3    and to ensure prioritization from defendants themselves.
4              That's not the case with respect to the defendants'
5    due diligence files.  And so your Honor is clear, those are the
6    files that we understand defendants assert they reviewed not
7    for the purposes of a full underwriting but for various tests,
8    whether it was sent out to third parties or otherwise, in the
9    course of underwriting the transactions.  And we have sought to
10   request defendants to, first of all, identify what those loans
11   are out of the populations of the securitizations, and secondly
12   to similarly prioritize the production.
13             In the letter that came in from Skadden Arps on
14   October 11, they asserted that we had never raised this issue
15   before.  But your Honor will see from Exhibit 2 to our letter,
16   this very issue was stated, among other times, in the September
17   5th letter that we presented to them, asking them to prioritize
18   due diligence files and also, in footnote 1, page 2 of that
19   exhibit, to identify the loan numbers of those loans so that
20   the population is clear.
21             The reason for this is that we understand defendants
22   are intending to rely upon that population as a key part of
23   their defense of adequate underwriting, and just as with the
24   sample populations that we have selected for purposes of
25   demonstrating representativeness across all populations, we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

1   would like the opportunity to be able to reunderwrite those
2   loans and determine whether in fact they demonstrated
3   compliance with the various representations or not.  So we are
4   at an impasse on that point.
5           THE COURT:  Let me interrupt, sorry, and ask a
6   question.  Is it helpful to think about loan files as falling
7   within three categories: loan files that the defendants possess
8   as defendants, loan files that the defendants possess as third
9   parties, and loan files that true third parties possess?
10          With respect to the first two categories, I think the
11  report I got suggests that all the loan files that defendants
12  have, either as parties or as third parties, have already been
13  produced or will be produced shortly.  And I want to put aside
14  for one moment the 100,000 files for JP Morgan Chase in
15  Louisiana.  Let's just put those aside.  They're a separate
16  issue.
17          So with respect to true third parties which have -- I
18  don't know, I'm getting slightly different numbers -- but maybe
19  half a million loan files in the possession of true third
20  parties -- and these are people who have subpoenas, many of
21  them which require production be complete in August, not every
22  one, but many.  But let's talk about one of those true third
23  parties.  And I'm glad we have some people who are deeply
24  involved in loan production pursuant to subpoena in this
25  courtroom.  I wonder if it really makes sense to prioritize

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

1   production of loan files, either the FHFA samples or the due
2   diligence loans.  It seemed to me that some of the subpoenas
3   that were served, and the fundamental argument presented by
4   FHFA, was that besides requesting loan files, the subpoenas
5   requested, for instance, e-discovery, communications with FHFA
6   or concerning FHFA.  And if a party receiving the subpoena had
7   many tasks to perform besides production of loan files, they
8   may be delayed in their production because they had to, in
9   their mind, fulfill all those tasks.  I don't know the answer
10  to this question, but if we ultimately are going to want all
11  the loan files from a party and all their underwriting
12  guidelines, don't we want to prioritize the loan files and
13  underwriting guidelines, and the rest of the issues, about
14  electronic discovery, e-mail searches, about relevant
15  communications, that could come in a second production, as
16  opposed to having piecemeal production and searching for and
17  production of loan files?  I hope my question is clear enough.
18          MR. SELENDY:  OK.  So let me take the last issue that
19  you raised first, your Honor.  We do agree, the most important
20  category of information from third parties will be the loan
21  files as well as the guidelines that relate to those loans.
22  And it does make sense to prioritize them as a category.  We
23  had, for example, issues with defendants seeking single
24  family-related information from those third parties and
25  increasing the burden on frankly irrelevant areas or areas that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

1   this Court already ruled were not appropriate for discovery.  I
2   think we've reached some agreement on curtailing that, as well
3   as, I believe, on prioritization of loan files and guidelines.
4   And that is critical.
5           To date, in fact, we have had limited reports of what
6   information has come from the third parties until this morning.
7   We had understood that only 14 of these third parties had
8   actually produced loan files.
9           In the joint letter that was submitted this morning,
10  it looks as if a much greater volume has been produced, but
11  that has not yet made it across to us.
12          THE COURT:  Excuse me one second.  (Pause)
13          MR. SELENDY:  OK.  Just to continue, there is, we
14  understand, for certain of these third-party entities -- and
15  this is based on our own communications with originators and
16  others -- there are burden issues such as it may be simpler to
17  produce on a timely basis a subset of all the loan files.  I
18  think that varies according to how the files are maintained.
19  And we have made efforts to identify both the specific loans in
20  the samples and the categories of due diligence to the extent
21  that will facilitate a faster production.
22          So I think, in answer to your question, it may vary
23  entity by entity as to whether, for that entity, it is an
24  easier pathway to produce all the loan files and guidelines or
25  to sort within them and produce a subset.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

1          In terms of the requirements for us in ultimately
2   getting to the reunderwriting of loans, the most important
3   category of those in the samples and the due diligence
4   populations.
5          THE COURT:  I ordered on September 4 that the parties
6   meet and confer at least every two weeks on the status of loan
7   file production.  Have you been having those meetings on that
8   regular basis?
9          MR. SELENDY:  That's why I referred your Honor to the
10  September 5th letter in which we requested the biweekly
11  meetings of defendants.  The stay then came in the way of that.
12  And no defendant was willing to meet with us during the
13  pendency of the stay.  We have resumed discussions with
14  defendants in this regard.  And we remain very willing to
15  identify any mechanism to simplify the collection of files.
16         To date, our concern is that notwithstanding the
17  volume of subpoenas that defendants have served, a very small
18  percentage of those files have actually made their way back to
19  FHFA.  It's an immediate concern, a pressing one.  We can't
20  satisfy the strict deadlines that we have here for trials, much
21  less the reunderwriting, unless those files come in.  And
22  that's why we sought the assistance of the Court.
23         THE COURT:  OK.  So you just got this report at 10 or
24  so this morning.  I don't expect you to have analyzed it with
25  care, much less met and conferred with the defendants about it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

```
 1    I'll hear from defense counsel in a moment, but assuming that
 2    defendants agree that with respect to any third-party subpoenas
 3    that have been served they are willing to prioritize the
 4    production of loan files and underwriting guidelines even if
 5    they have sought additional categories of information, and for
 6    institutions that have received subpoenas where they would find
 7    it possible to prioritize further the production of the FHFA
 8    samples and the due diligence samples, that the defendants are
 9    willing to make that request as well, and that the parties will
10    regularly, the plaintiff and defendants will regularly confer
11    about the status of those productions, and if any party thinks
12    that someone is not sufficiently focused on the need to get
13    these materials, the loans and underwriting guidelines,
14    produced, that they discuss with each other whether or not it
15    is now ripe for a motion to compel and whether or not they have
16    agreement on that they will feel free to come to me and talk
17    about whether it is now ripe for a motion to compel.  Obviously
18    if the subpoenaed is someone that I have control of within the
19    Southern District of New York, that simplifies it.  That's one.
20    I'll hear from the defendants if we have agreement on that.
21    But that sounds like it would meet the requirements of the
22    plaintiff.
23            MR. SELENDY:  Your Honor, depending upon the timing --
24    and just to give your Honor some perspective of that -- as of
25    today, if we look at the numbers, in the, for example, in the
```

18
```
 1    Goldman Sachs deals in the supporting loan groups, there are
 2    82,000 loan files.  I believe to date we received 547 loan
 3    files.  If we look at Credit Suisse, there are 100 --
 4         THE COURT:  I'm sorry.  You're looking at Exhibit A to
 5    the defendants' report.
 6         MR. SELENDY:  Yes, that's correct.
 7         THE COURT:  And so what did you just say?
 8         MR. SELENDY:  I said if you look at Goldman Sachs, for
 9    example, 547 loan files have been produced, out of 82,000 loan
10    files in the supporting loan groups.  If you look at Credit
11    Suisse, they've only --
12         THE COURT:  Wait one minute.  OK.  Well --
13         MR. SELENDY:  My point is that the timing of this is
14    critical, and if in fact efforts are made and agreements are
15    reached with third parties to produce files within a matter of
16    weeks as opposed to months or several months, that is very
17    useful to us.  We've not been a part of the discussion between
18    defendants and those third parties, and we are looking for that
19    confirmation.
20         It also matters how those files are produced.  To date
21    defendants have not been willing to, for example, Bates-stamp
22    the productions, even by electronic file, a single Bates number
23    for the whole file.  Nor have they been willing, for the most
24    part, to identify which loans correspond to which
25    securitizations so they can be readily tracked and processed by
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

19
1    us.  When you're dealing with volumes in the hundreds of
2    millions, it's essential to do that.  And in fact FHFA has done
3    that for its entire production.
4              THE COURT:  Excuse me, counsel.  Could you be seated.
5              MS. STEWART:  Sorry, your Honor.
6              MR. SELENDY:  So it needs to be done as part of a
7    comprehensive effort in which there's a timely production
8    properly categorized, Bates-stamped, and made just as FHFA has
9    made that production to defendants.  If we have agreement from
10   defendants on that, then I think that would address this part
11   as to the sampling, although we still have due diligence files.
12             THE COURT:  Mr. Selendy, I outlined -- and I hope the
13   defendants are going to agree to it, but I will give them an
14   opportunity to be heard.  So the issue is whether or not, right
15   now, the plaintiff agrees, OK.  So I understand you to be
16   agreeing with what I outlined.
17             MR. SELENDY:  That's correct.
18             THE COURT:  OK.  And so this is going to put a burden
19   on the plaintiff to be in daily communication with defense
20   counsel, now you have this report, identifying where the
21   problems lie with what I'll call these true third parties
22   talking about what's being done, whether more needs to be done,
23   including applications to this Court.  OK.
24             You moved on to another topic, which was fine, which
25   was the Bates-stamping and, as I think you described it, the

20

1    manifests.  And you saw in today's submission of October 15th
2    the defendants' report on loan file production.  Their position
3    with respect to the manifests, which was that you had, sadly,
4    only a draft stipulation, which I take it was never finalized,
5    but no agreement with respect to, as I understand it from the
6    defendants' report today, no agreement with respect to the form
7    in which these loan files would be produced other than what
8    might be reflected in this, I guess the latest draft was
9    October 5th.
10          So as I understand it, you now want, in addition to
11   what the parties had agreed to as of October 5th,
12   identification by loan, by securitization, and with Bates
13   numbers.
14          MR. SELENDY:  Yes, your Honor.  And to be clear, it
15   has been our understanding throughout that all parties would
16   produce loan files in a way that identified to which
17   securitizations they corresponded, and to indicate in the
18   production where the loan file begins and ends.  That's not
19   something that can be determined if you have, for example, 50
20   million pages.  You can't determine which pages correspond to
21   which loan files and which loan files go to which
22   securitizations in all instances.  Sometimes there are
23   inconsistencies between the same pages for the same loan file.
24   Sometimes they're missing pages.  And sometimes we can't
25   identify which securitization a loan ultimately went into.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

```
 1            So that's information that is available to defendants
 2    and should be made part of the production.
 3            THE COURT:  OK.  Well, let's talk about that.  Again,
 4    looking at loan files in these three categories: loan files
 5    that a defendant is producing as a defendant, loan files where
 6    the defendant is producing as a third party but from its own
 7    files or those of its affiliates, and loan files produced from
 8    true third parties pursuant to subpoena.  Now, are you
 9    representing to me that you had agreement with the defendants
10    with respect to these production issues for any of those three
11    categories?
12            MR. SELENDY:  Clearly we did not.  We were operating
13    under an understanding that loan files would be produced as I
14    have outlined, and clearly we have not had agreement.  And
15    that, as we have looked at the production and as we have
16    requested these steps, we've been rebuffed, and it's perfectly
17    apparent there is no agreement on that.
18            THE COURT:  OK.  So with respect to productions from
19    true third parties who have not yet made a production, it seems
20    to me, since by and large these are the defendants' subpoenas,
21    to the extent that they could request production in a certain
22    way that would not burden the producing party, that's something
23    you can talk about with the defendants.  With respect to the
24    production by the defendants themselves of loan files that are
25    under their custody and control, either as parties or as third
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

1    parties, it seems to me that's a different conversation.  It
2    seems to me that everybody is going to need to have
3    Bates-stamped copies, at least of the file, so people can refer
4    to it and manage it.  And did you have a meet-and-confer about
5    this and have you exhausted that process?
6            MR. SELENDY:  My colleague, Ms. Sheth, will address
7    the meet-and-confer.
8            MS. SHETH:  Yes, your Honor.  With regard to the party
9    production of loan file documents, the answer is yes.  And that
10   was the extensive negotiations that occurred with regard to the
11   draft loan files stipulation or the discovery.  And part of
12   that discussion involved whether or not those files should be
13   Bates-stamped, whether there should be a beginning and an end
14   Bates number that identified the beginning and end of each
15   Bates number, and also various either metadata or field data
16   that would accompany the loan file production so that we could
17   identify among other things the securitization.  But
18   unfortunately that was never resolved and the discussions of
19   that loan file stipulation have gone on many months without
20   resolution.
21           THE COURT:  So you have no agreement with the
22   defendants with respect -- have you exhausted the
23   meet-and-confer process with respect to this issue, for all
24   three categories of loan files?
25           MS. SHETH:  I don't believe that we have with regard

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

23

```
 1   to the parties' productions.  I know that there were still
 2   ongoing communications on that front.  As to the third-party
 3   production, that has been as a separate carve-out from the loan
 4   file stipulation.
 5            THE COURT:  And have you exhausted that
 6   meet-and-confer process?
 7            MS. SHETH:  No, your Honor, we have not.
 8            THE COURT:  OK.  So this issue is not ripe for me
 9   today.  I would like you to exhaust that meet-and-confer
10   process this week.  And I'll get you some time.  I'm available
11   hopefully on Thursday for any unresolved issue on that score.
12            MR. SELENDY:  Thank you, your Honor.
13            THE COURT:  I'm not sure I have a sufficient
14   understanding of what the status is from the plaintiff's point
15   of view of the identification of the due diligence loans by
16   loan number.  Has that been involved in a meet-and-confer
17   process?
18            MR. SELENDY:  I believe it has, your Honor.  My
19   understanding is that defendants have not agreed to identify
20   the loan numbers of the due diligence samples or to make a
21   prioritized production.  There may be one or two exceptions,
22   but in general that is the case.
23            THE COURT:  OK.  Let's turn to -- well, let's put
24   aside, then, on this -- I think the last issue I haven't heard
25   from plaintiffs on is the hundred thousand files in Louisiana.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

```
 1    And we'll just address those separately.
 2            So who wants to be heard first among the defendants on
 3    the issues I've just discussed with plaintiff's counsel?
 4            Ms. Shane.
 5            MS. SHANE:  Thank you very much, your Honor.  Penny
 6    Shane.  The status of meet-and-confer discussions on these
 7    topics, I think your Honor had rightly perceived, was unduly
 8    truncated and there is ground to be covered still with respect
 9    to production.  And it is very helpful to think about the
10    issues and the categories your Honor described, where loan
11    files are being produced as party, as non-party, and then as
12    true non-parties, because JPM is producing both as parties and
13    as non-parties and has had some dealings with true non-parties.
14    We do have a sense of the practicalities that your Honor has
15    started touching on with respect to whether prioritizing
16    certain loan numbers out of other loan numbers actually saves
17    anybody anything in the way of time, and the meet-and-confer
18    discussions that we've been having with the plaintiffs have
19    helped to bring everybody along on that topic, the need to be
20    practical.  And so we have reached a very helpful, I think,
21    agreement that we are fleshing out still about outreach to
22    non-parties in ways that will take account of their practical
23    constraints.  In responding to the subpoenas, if loan file
24    numbers can be prioritized by them in way that saves them time
25    and trouble, we're more than happy to do that.  We're more than
```

25

```
 1    happy to do that with respect to the samples that FHFA recently
 2    provided to us.  For most defendants those sample numbers came
 3    in last week.  So it's a list that is fairly fresh for all of
 4    us, but we're pleased to attach it to a communication to true
 5    non-parties and suggest to them that if it would be helpful for
 6    them to focus theirs, we're more than pleased to have them do
 7    that as well.  And that agreement would be one that I think
 8    would resolve many of the issues before your Honor.
 9            With respect to the due diligence loan numbers, it is
10    far more complicated, again simply as a practical matter.
11    While Mr. Selendy sites to a September 5 letter in which
12    plaintiff put some priority on the due diligence samples as a
13    production matter, and we responded immediately by trying to
14    gather those together, generating a list of those loan numbers
15    is a different exercise.  True, the documents will be
16    sufficient to show it, and the documents are rapidly being
17    assembled by many of us.  And different defendants are
18    differently situated, your Honor, with respect to the level of
19    difficulty associated with extracting those numbers.  I know it
20    sounds easy.  But depending on whether the due diligence files
21    resided and how they did or didn't match up to the actual
22    supporting loans of the securitization, there was not always
23    perfect matching.  The extraction process is one that can be a
24    challenge.  Some defendants may be better situated, and others
25    will need to do what is essentially an extraction from
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

26

```
 1    documents to be produced.  I know of no defendant that isn't
 2    planning promptly to complete its production of the documents
 3    sufficient to generate an assessment of what those loan file
 4    numbers would be and to work with plaintiff in attaching those
 5    as well to a communication to the two non-parties indicating,
 6    because plaintiff would like to see them first, that if they
 7    can prioritize practically speaking and it won't slow them down
 8    to have these numbers in hand in making priorities, that also
 9    is fine with defendants.
10            So we have very little in the way of disagreement with
11    respect to communications of non-parties and how to speed them
12    along.  What is remaining is an underlying disagreement about
13    who has the task of extracting due diligence loan file numbers
14    from documents that are being shared with FHFA, where some
15    judgment may be required about what that final universe looks
16    like.
17            THE COURT:  So are defendants not planning to have a
18    due diligence defense in these cases?
19            MS. SHANE:  We are, your Honor.
20            THE COURT:  So you are actually going to want to know
21    what you did with respect to your due diligence.
22            MS. SHANE:  Absolutely, your Honor.  And we intend to
23    collect all loan files, as we have all along.  So the
24    prioritization again, we're perfectly pleased to join in it and
25    we're pleased to have this set receive that level of attention,
```

27

1    if it makes sense for the non-parties.  We are in no way
2    resisting that.  It's only a question of getting the
3    information collected and out through those non-parties.
4            THE COURT:  So it seems to me then that the defendant
5    should have the burden of identifying by loan number the files
6    on which their due diligence defense is going to rely.  So I'll
7    just ask you to pull that into your meet-and-confer process,
8    the date by which you can get, individually each defendant can
9    get those numbers to the plaintiffs.
10            And, again, counsel, I'm here.  You have to do the
11   meet-and-confer work.  You have to bring issues to my
12   attention.  I can't do more than that.  If there is an
13   individual defendant in one of these cases that is not relying
14   on a due diligence defense, then that's just fine.  I won't
15   impose that burden on them, and just tell the plaintiff that
16   and they can make a decision whether or not they will extract
17   the files and otherwise pursue a showing at trial with respect
18   to the due diligence defense.
19            So I take it, Ms. Shane, you are in agreement with the
20   plaintiff that the meet-and-confer process with respect to
21   Bates-stamping and manifests and identifying which loan belongs
22   in which securitization, that that meet-and-confer process is
23   not exhausted yet.
24            MS. SHANE:  I think there could still be benefit to
25   our meeting and conferring further with each other on those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300



28

```
 1    topics, especially trying to keep it straight, which are the
 2    ones that pertain to true non-parties productions and whether
 3    the parties then have an obligation to do something to those
 4    non-parties' productions, as opposed to the ones that have to
 5    do with the ways that the parties are producing.
 6            Your Honor, with respect to that latter category, it
 7    has not been identified to us which defendants are not
 8    producing in accordance with the agreement that's nearly an
 9    agreement that we all have been relying on and seeking to
10    produce pursuant to with respect to our own production.  We
11    have asked plaintiff, Who is not providing you with the linkage
12    information as contemplated by the agreement?  It seems to have
13    taken on a new name or a new life form in recent letters.  But
14    for JPM at least and to our knowledge other defendants, we have
15    been relying on the specifications that plaintiffs put out
16    there and we negotiated in what has been produced in thousands
17    of loan files all of this time, in accordance with what we
18    understood to be our obligations, and we understand that other
19    defendants have too.  We have asked the question, who is not
20    doing it, where is the dispute coming from.  And we have not
21    received an answer to that.
22            THE COURT:  Well, what I understood Ms. Sheth to be
23    saying is -- and Mr. Selendy too -- is that actually there has
24    been no agreement and this is a new request for more detailed
25    specification.  And that request for additional information on
```

29

```
 1    the files needs to be the subject of a meet-and confer process.
 2    Did I misunderstand you, Ms. Sheth?
 3            MS. SHETH:  No, your Honor.  I think your Honor is
 4    correct.  I think the distinction is between party productions
 5    of loan files versus third-party productions of loan files.
 6            THE COURT:  Sorry.  I think there are three
 7    categories.  So just so I'm clear -- I'm sure you all
 8    understand what you're talking about.  But to assist me, what
 9    distinction are you making?
10            MS. SHETH:  As to the loan file stipulation, that was
11    intend to govern party production, so the defendants' and
12    FHFA's production of loan files.
13            THE COURT:  Defendants as defendants or defendants as
14    defendants and as third parties?
15            MS. SHETH:  I don't know if that was actually
16    specified in this stipulation with that level of specificity.
17            THE COURT:  OK.  So you have no quarrel with the way
18    the defendants have produced their loan files either as
19    defendants or as third-party producers?
20            MS. SHETH:  Based on the information that we have at
21    present, that is correct.  There was one issue --
22            THE COURT:  So the request you have is that the
23    defendants make requests of the third parties, the true third
24    parties, for production in a particular way that would be of
25    assistance to you.
```

30

```
 1              MS. SHETH:  That is correct.  And FHFA has done the
 2    same with regard to the third-party production it has received.
 3              THE COURT:  OK.  And that is what you're going to have
 4    a meet-and-confer with the defendants about.
 5              MS. SHETH:  Yes, your Honor.
 6              THE COURT:  And obviously that request would have to
 7    be framed in a way that would not be overly burdensome on these
 8    true third parties.
 9              MS. SHETH:  That is correct, your Honor.
10              THE COURT:  So if there is a way they can produce the
11    documents with minimal burden but in a way that would greatly
12    assist you folks, all the parties in this litigation, you want
13    defendants to make that request of the true third parties.
14              MS. SHETH:  That is correct, your Honor.
15              THE COURT:  OK.  So you'll meet and confer with the
16    defendants about that.  You'll have agreement or not.
17              MS. SHETH:  Yes.  And there is one issue I can take
18    off the table, which was our dispute about JP Morgan's
19    hard-copy loan origination files.  We have met and conferred
20    about that issue and we understand that JP Morgan has agreed to
21    image those files, so that is no longer an issue.
22              THE COURT:  Ah, Louisiana.  Good.
23              So with respect to the letters which I call the due
24    diligence samples letters, because that's the first items
25    raised, I think everything is resolved, either by agreement by
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

```
 1    the parties or by my ruling today except for one issue, which
 2    is going to be subject to a further meet-and-confer, and that
 3    is the request that the plaintiffs would like the defendants to
 4    make of true third parties about the way they should make
 5    production of their loan files.  They're going to meet and
 6    confer about that.  If you can't resolve it, you'll come back
 7    to me.
 8              MS. SHANE:  Your Honor, if I may, defendants offered
 9    already and renew the offer to make the request of third
10    parties that they go ahead and Bates-stamp their productions as
11    a way of resolving this dispute.  Defendants have no problem
12    with including that request in its communications to third
13    parties.
14              THE COURT:  Great.  So you'll meet and confer.  If you
15    have agreement, that's off the table and I never need to hear
16    about this again.
17              MS. SHANE:  Thank you.
18              THE COURT:  I thought the next set of letters we might
19    turn to.
20              MR. FUMERTON:  Your Honor?
21              THE COURT:  I'm sorry.
22              MR. FUMERTON:  Robert Fumerton on behalf of UBS.
23              THE COURT:  Yes, Mr. Fumerton.
24              MR. FUMERTON:  If I may raise one issue before we
25    leave the loan file set of letters.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

```
 1                THE COURT:  Yes.
 2                MR. FUMERTON:  Defendants have affirmatively requested
 3      that the Court order the plaintiff here to bear its equitable
 4      share of the costs associated with obtaining loan files from
 5      third parties.  As your Honor may recall, back in December of
 6      last year, we informed the Court that many defendants,
 7      including my client, UBS, simply do not maintain loan files in
 8      the ordinary course of business.  Literally a few short weeks
 9      after the motion to dismiss was decided, defendants, including
10      the UBS defendants, went out and subpoenaed servicers,
11      trustees, originators of these loan files.  We served a
12      comprehensive set of requests back in June.  And that's the
13      reason why we've been able to obtain in the UBS action or will
14      be obtaining by October 22nd the vast majority of loan files.
15                Since early June, we've asked plaintiff to participate
16      in this process.  No one can dispute here that plaintiff is
17      seeking all of the loan files.  They have served a document
18      request for all the loan files.  This morning they provided
19      your Honor a chart of 379 subpoenas for loan files that they
20      have served.  We ask plaintiff to participate in this process
21      and let's share the costs.  Plaintiff refused to do so.  Again,
22      after your Honor ordered the parties to meet and confer this
23      past week end on Friday we again raised the issue.  Plaintiff
24      refused.
25                Plaintiff offers two justifications for refusing to
```

33

```
 1    participate in the production of materials it claims it needs
 2    to prosecute its claims here.  One is sheer delay.  Plaintiff
 3    told us, look, unlike defendants that served their third-party
 4    subpoenas right away, plaintiff waited until August to serve a
 5    single subpoena.  And the chart they served this morning, they
 6    served 200 subpoenas just last week, months after defendants
 7    served these subpoenas.  So plaintiff's reaction is, look,
 8    because defendants were diligent in prosecuting these
 9    subpoenas, because defendants went first, defendants should
10    bear the full cost.  We have a tremendous difficulty explaining
11    to our client why defendants are bearing this burden all by
12    themselves.  Plaintiff is the party that has the burden of
13    proof here.  Plaintiff is requesting these loan files.
14            THE COURT:  Mr. Fumerton, I have great confidence in
15    you.  I think you could explain that to your clients, since it
16    was their strategy that has gotten us to this point.
17            MR. FUMERTON:  As your Honor recognized in the June
18    13th conference, plaintiff reserved the right to seek loan
19    files outside of the sample from the very beginning and
20    plaintiff --
21            THE COURT:  And why did they do that?
22            MR. FUMERTON:  Why did plaintiff reserve that right?
23            THE COURT:  Yes .
24            MR. FUMERTON:  Presumably because they weren't
25    confident enough to rely on a more limited subset
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

34

```
 1              THE COURT:  Well, you weren't, as I remember the state
 2     of play here, the plaintiff proposed to the defendants that we
 3     have a sample of files that we all agree that this case, all
 4     these cases would rise or fall based on the sample of files.
 5     They wanted to talk to you about a protocol for creating the
 6     sample and get agreement on that.  They wanted that sample
 7     universe to govern basically all the decisions in this case and
 8     substantially reduce the burden of discovery.  And as I
 9     remember it, the defendants were unable or unwilling to do so
10     for reasons that I accepted.
11              Based on the fact that the defendants required
12     production of all loan files so they could go into the entire
13     universe of loan files in this case, over a million, over I
14     think a million point 1, the plaintiffs came back and said,
15     well, look, if we're going to meet a case in which the
16     defendants are picking out loans from hither and yon beyond our
17     sample, we of course reserve the right to similarly go beyond
18     our sample.
19              Now, that seemed eminently reasonable to me as well.
20     So your clients made a decision.  And I'm not saying it's the
21     wrong one.  But it was an expensive one.  They made a very
22     expensive decision here about how to litigate these cases.
23     Absolutely within their rights.  And as a result, in the June
24     13th conference, I caved.  I had made my request clear in our
25     prior conferences that I wanted the parties to agree on some
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

35

```
 1    sampling protocol and some percentage, small percentage of
 2    loans on which these cases could be litigated.  But I
 3    acknowledged the defendants' right not to reach that agreement.
 4            Therefore, we are in this very expensive, burdensome
 5    document production, which has enormous ramifications for your
 6    clients, the defendants, the plaintiff, and now third parties.
 7    And the defendants will bear the cost of that.
 8        MR. FUMERTON:  Your Honor, if I may respond.  From the
 9    initial proposal on sampling, plaintiff reserved the right to
10    go outside or redraw a sample.  In the UBS case alone, it has
11    doubled its sample from the summer, the initial sample it had
12    proposed.
13            Your Honor, plaintiff refuses even to participate in
14    the cost sharing for the loan files as part of their sample.
15    Even accepting your Honor's premise that the defendants are
16    somehow to blame here, how can defendants bear the cost of the
17    loan files in plaintiff's own sample which plaintiff claims it
18    needs to prosecute its claims?
19            What defense is requesting, your Honor, is the
20    opportunity to brief this issue.  We have reached out to
21    plaintiff, met and conferred with them.  They agreed on a
22    briefing schedule.  We could brief them at the end of the week.
23        THE COURT:  I don't need a brief on this.  And I
24    think, as I understood those early discussions, the plaintiff
25    was reserving the right since when we were having these
```

36

1  discussions was in the spring to keep modifying their protocol
2  until they were comfortable that they have properly designed
3  their sample.  And they were willing to rely on their initial
4  numbers that they gave to me as estimates because they wanted
5  further time to work with their expert.
6          So, counsel, we don't need a brief.  I appreciate the
7  briefing you've given me, everyone, on the motions to dismiss.
8  I'm enjoying working through those motions.  If I feel I need
9  to have briefs on anything, I'll make sure to tell you.
10         MR. FUMERTON:  And your Honor, just for clarification,
11 that will then apply also to the loan files in plaintiff's own
12 sample; defendants have to bear the cost of guesting those loan
13 files as well?
14         THE COURT:  Yes, Mr. Fumerton.
15         MR. FUMERTON:  Thank you, your Honor.
16         THE COURT:  Thank you.
17         OK.  The protective order.
18         So the series of letters that I've labeled the
19 protective order, the plaintiff has labeled -- I'm sure this is
20 helpful to you that I've renamed it -- "Defendants' Improper
21 Third-Party Requests," and it ends with a request by FHFA for a
22 protective order.
23         So I personally thought this was very related to the
24 discussion we just had about prioritization.  And in my view if
25 we prioritize the production of the loan files and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

1  underwriting guidelines, then we're doing what we really need
2  to do for this litigation, for everybody, the plaintiff and
3  defendants.  And if the defendants want additional discovery
4  from third parties, those third parties have a right to come in
5  here and seek protective orders.  If they do, I'll hear them,
6  give everybody an opportunity to be heard.  But the rulings I
7  made with respect to production between the parties before me
8  were in the context of those issues as they arose, not binding
9  or preventing someone from seeking third-party discovery.
10          So I'll let the plaintiffs be heard here, but I think
11  that pretty much -- so long as we're able to prioritize the
12  production of loan files and underwriting guidelines from the
13  third parties, the fact that the defendants are seeking
14  additional documents which may slow down and delay production,
15  I think, is an issue I don't need to concern myself with right
16  now.
17          Do the plaintiffs want to be heard about anything in
18  that letter?
19          MS. SHETH:  Yes, your Honor.  Manisha Sheth on behalf
20  of FHFA.  We actually did meet and confer with the defendants
21  on this precise issue over the course of Friday as well as this
22  past weekend.  And we're happy to report that as a result of
23  that meet-and-confer process, we have reached an agreement with
24  defendants to narrow the scope of their subpoena and decline to
25  enforce certain of the requests in the subpoena which we found
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

38

```
 1    to be very broad in relating to the single-family side.  What
 2    we did on, I believe it was Saturday, we identified a specific
 3    request in the originator subpoenas.  As your Honor will
 4    recall, the defendants issued subpoenas to various categories
 5    of third parties.  One of those categories was originators.
 6    Another was credit-rating agencies, due-diligence firms.  There
 7    were also some law firms and consultants involved as well.
 8            As to the originator subpoenas, we have reached an
 9    agreement that certain requests, namely, requests 1 through 5
10    and request no. 9 of the form originator subpoena, will be
11    included as is, subject to a few modifications as to the term
12    securitization, and remaining subpoena requests 6, 7, and 8
13    will not be pursued for enforcement by the defendants.
14            In addition, defendants have agreed to provide a
15    letter to the third parties notifying them of that agreement.
16            In addition, as part of that letter, the defendants
17    have agreed to request the third parties to prioritize the loan
18    files as well as underwriting guidelines over these custodial
19    or e-mail-type documents.
20            We have recently also reached an agreement as to
21    timing this morning where defendants have agreed that the
22    production of loan files by the third parties and underwriting
23    guidelines should be a rolling production to commence October
24    29 and to be completed by November 16.  So that will help us in
25    our reunderwriting review of those documents.
```

39

```
 1              THE COURT:  I'm sorry.  Which files are being produced
 2      over that roughly two-week period?
 3              MS. SHETH:  The loan files and the underwriting
 4      guidelines.
 5              THE COURT:  From?
 6              MS. SHETH:  For the FHFA samples.
 7              THE COURT:  From?
 8              MS. SHETH:  From third parties.
 9              THE COURT:  From the true third parties.
10              MS. SHETH:  From the true third parties, correct.
11              THE COURT:  Nice.
12              MS. SHETH:  In addition, what we thought would also
13      make sense is if the parties were to draft a proposed
14      stipulation order for the Court's approval.  And we are looking
15      on that.  We should have something exchanged today or tomorrow,
16      and submit that for the Court's approval so that that can also
17      go to the third parties so that they receive comfort as to the
18      subpoena, the modified subpoena.
19              That is the process as to the originator subpoenas.
20      As to the credit-rating agency subpoenas, due diligence
21      subpoenas, and other remaining subpoenas, we will engage in a
22      similar process using the same principles.
23              THE COURT:  Great.  So from the plaintiff's point of
24      view, is there anything else you need to bring to my attention
25      for the series of letters which I've labeled the protective
```

40

```
 1   order letters?
 2            MS. SHETH:  No, your Honor.
 3            THE COURT:  Do the defendants have anything they wish
 4   to raise with respect to the protective order letters.
 5            MS. STEWART:  Yes, your Honor.  I just want to clarify
 6   something.  First of all, apologies for standing earlier.
 7            THE COURT:  Your name?
 8            MS. STEWART:  Beth Stewart from Williams & Connolly.
 9   I realize I'm tall and probably needlessly distracted you.
10            In any event, what Ms. Sheth has said is basically
11   correct.  We have had a long and fruitful weekend of working
12   together.  We appreciate your Honor's comments about how the
13   prior rulings had effect or not on the scope of discovery we
14   are entitled to.  But one thing I just wanted to clarify is a
15   letter we had proposed to send and which I think Ms. Sheth
16   agreed would tell third parties that if they cannot confirm to
17   us by a certain date, which I think was October 25, that they
18   will be unable to produce loan files and underwriting
19   guidelines by a second date, which I think our most recent
20   discussion was that day November 15, but Ms. Sheth will please
21   correct me if I'm wrong, then we reserve the right to enforce
22   decision with the Court.
23            So I just didn't want to be overrepresented that all
24   these parties have as of now committed to make that production
25   by the 16th.  It's rather that we share plaintiff's goal of
```

41

1   making sure there is a prompt and orderly production of all of
2   the remaining third-party discovery.  And we wanted to have in
3   place with them a schedule so that they would be aware of what
4   we expected of them and what steps we might take otherwise.
5           THE COURT:  Thank you.
6           MS. STEWART:  Thank you.
7           THE COURT:  Can I ask you --
8           MS. STEWART:  Yes, ma'am.
9           THE COURT:  As far as you know, did any defendant
10  during the period of the stay tell third parties not to keep
11  working on these issues?
12          MS. STEWART:  What defendants did -- and plaintiff was
13  aware, I think plaintiff actually did the same thing, we
14  provided notice to all third parties that a stay had been
15  entered.  We did not tell them what they should do about them,
16  but we did provide them notice that the stay had been lifted
17  once the stay had been lifted, and I believe plaintiff did the
18  exact same thing that we did.
19          THE COURT:  Thank you so much.
20          Let's move to the third set of letters.  I've labeled
21  these "Compel Discovery From 12 Defendants."
22          So I think I need to ask you if you've made progress
23  in narrowing the issues in dispute as a result of the
24  meet-and-confer process.
25          MS. CHUNG:  Good afternoon, your Honor.  Christine
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

42

1    Chung for FHFA.  Your Honor, the issues that are live and on
2    which the parties have reached an impasse are, first, to
3    identify the letters.  So what we call the post-closing
4    originator search date range issue, there is a slight wrinkle
5    in that JP Morgan is somewhat differently situated.  So I think
6    they're on the side now.  But we have revisited this issue
7    during a lengthy meet-and-confer on Friday and I think it's
8    fair to say that we have an impasse on this as to most
9    defendants if not all.
10          The second issue identified in the letter is the issue
11   of the date ranges and how they're being run in the pre-closing
12   period.  This is all related to how the originator terms are
13   being served in the pre-closing period.  That issue is also at
14   an impasse.
15          THE COURT:  I'm sorry.  I thought you were just
16   addressing that issue.  So what is the distinction between the
17   two issues?
18          MS. CHUNG:  In both cases, your Honor, it involves the
19   extent to which the originator terms, the originator searches,
20   so searches about references to originators, particularly
21   departures from the guidelines etc., repurchase requests,
22   basically they're originator base searches, so you will be
23   looking in the e-mails for mentions of originators with
24   specific reference to the purchasing guidelines.  The two
25   different issues, one is the extent to which the defendants are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

1    running those searches in the post-closing period, so
2    effectively since 2007.
3         The second issued is that some of the defendants are
4    limiting their date ranges for those searches even in the
5    pre-closing period.  Your Honor, colloquially we've called it
6    amongst the parties "the bubble issue" because the defendants
7    are using a four-month window.  They're applying a four-month
8    window around each securitization and searching in the
9    pre-closing period on a per-securitization basis only the
10   originators who were involved in that securitization.  So those
11   are the two different -- the originator term is common to both.
12   They're both date range issues.  But one is pre-closing, one is
13   post-closing.  On those I think it's safe to say we have
14   impasse.
15        On the last issue, which was raised in our letter,
16   which was the searches that the requests, the document requests
17   that we made for, in the first instance, deposition
18   transcripts, witness statements, things that were previously
19   produced in government investigations or other RMBS litigation,
20   I think what I would describe there is, I'm reluctant to say
21   that there is an impasse.  We have been talking about this
22   issue for a very long time and came up at the conference the
23   last time we were here with a version of this.  I don't think
24   we're at a stage where there is agreement, but I think that
25   it's not something that is ripe for the Court at this time.

44

```
 1    But I welcome different views.
 2          THE COURT:  Ms. Chung, couple questions.  Have the
 3    plaintiffs sought and been given lists of litigations and
 4    investigations regarding private-label securitizations?
 5          MS. CHUNG:  Your Honor, we have.  And in fact, there
 6    is one easy list that we referred the defendants to in the last
 7    meet-and-confer, which is that the complaints themselves, as
 8    your Honor knows, contain many references to PLS litigation,
 9    RMBS litigation, government investigations, CIC reports, SEC
10    investigations that we have already identified that in our
11    view, in the complaints, are relevant because we have alleged
12    systematic violations of the underwriting guidelines.  We asked
13    the defendants on Friday to start with that as the starting
14    point and say, identify if you have claims -- and some of them
15    have had claims -- that these litigations are simply not
16    relevant, then can you identify which ones you're claiming are
17    relevant and not relevant.  And we haven't heard back on that.
18    But that is a very obvious starting point.
19          To answer your Honor's -- a different thing that you
20    might be referring to, your Honor, we also had proposed at one
21    point, FHFA, to -- because this issue has been under discussion
22    for a very long time -- to try to jump-start it, we offered,
23    could we at least exchange lists, because they've made similar
24    requests of FHFA, of which litigations each party believes that
25    they think are in play in response to these document requests.
```

45

```
 1    And effectively there, your Honor, we had at least -- I'm going
 2    to limit my comment, I think, to UBS.  There are some others
 3    who have taken dispute along the way, but I think it's most
 4    crystallized with UBS.  Their view was, if your list is going
 5    to exclude single-family information, then we're not going to
 6    have reciprocal agreement.  And it's ultimately in our
 7    position, your Honor, and this will be consistent with what
 8    Mr. Schirtzer told you last time, if there is an investigation
 9    out there involving GSE that is partly single-family and partly
10    private-label securitization, we're willing to consider that
11    investigation in play and would be willing to consider perusing
12    documents from that production.  But it seemed that we were at
13    an impasse with UBS because they're of a view that we should
14    still be producing even things that were wholly single family.
15         From our side, we feel that the list idea did not
16    work, that we've made very clear from the very moment we filed
17    the cases which litigations we thought were relevant to this
18    suit.  And it is now, you know, months of meet-and-confers
19    later, and as I say I don't want to back away from the idea
20    that I think there could be more discussions, but I also don't
21    want to lead the Court to believe that things are in a
22    different place than they are.
23         THE COURT:  So, Ms. Chung, do I understand that there
24    was a formal written document demand for the list of the
25    litigations and investigations?
```

46

```
 1              MS. CHUNG:  No, your Honor.  No.  No.  There was no
 2     document requests for lists.  We made the document requests for
 3     the documents.
 4              THE COURT:  OK.  And you have not gotten a list.
 5              MS. CHUNG:  What we did ask for is for them to take
 6     the lists that would be the cases and investigation of our
 7     complaints and to list back to us, well, which ones do you
 8     think are not in play here, because we thought maybe that would
 9     get us a little bit down the road.
10              THE COURT:  Do you feel that the plaintiff -- when I
11     was thinking about this, it just seemed to me -- and I
12     understand, a document request is for the documents, not for a
13     party to create a list that doesn't otherwise exist.  But it
14     just seemed to me, in terms of making any dispute concrete and
15     seeing whether or not the parties could reach agreement about,
16     yes, we all agree that a production with respect to this
17     universe is appropriate, we have a dispute about these other
18     cases, that it would be helpful to have a list of litigations,
19     a list of investigations, and start production with respect to
20     those who have agreement about.
21              MS. CHUNG:  As part of the meet-and-confer process,
22     your Honor, we did ask to exchange those lists.  We have done
23     that.  And not only was there a single-family issue; at
24     different points we had heard, well, we're not going to
25     consider something a relevant investigation or civil litigation
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

47

```
 1    if it doesn't involve the very same securitizations at issue in
 2    that case.  That's another issue at which we have impasse.  We
 3    would never adopt that view.
 4            But that being said, the last idea that was exchanged
 5    was indeed maybe a variation of what your Honor is pursuing
 6    here, which is, can we at least look at the complaint and
 7    figure out which ones you agree and don't agree with because
 8    then maybe it will crystallize what the areas of disagreement
 9    are.
10            THE COURT:  OK.  Is there someone from the defense
11    side that would like to address this issue?
12            Mr. Fumerton.
13            MR. FUMERTON:  Your Honor, I could address the latter
14    issue in terms of the regulatory investigations in other
15    proceedings.  We are in the process of meeting and conferring
16    with the plaintiff.  We're hopeful we can reach an agreement.
17    We had the discussions as of late Friday.  Plaintiff indicated
18    it was focused on the exchange of testimony, both written and
19    oral testimony, that had been given in other RMBS actions.
20    It's important to stress, defendants are situated very
21    differently here, have different views.  Speaking on behalf of
22    UBS only, I hope you do think it's a productive idea to have an
23    exchange of testimony from actions, RMBS actions and actions
24    relating to allegations in the complaint.  We'll meet and
25    confer with plaintiff and hope we can reach an agreement on
```

48

```
 1    that issue.
 2              THE COURT:  Thank you.
 3              MR. FUMERTON:  Thank you, your Honor.
 4              THE COURT:  Any other defense counsel wish to be
 5    heard?
 6              Ms. Shane.
 7              MS. SHANE:  I would only underscore what Mr. Fumerton
 8    said, which is that this is a very defendant-specific issue,
 9    and for JPM, over the course of the weekend, it looked to us as
10    if we have an agreement governing testimony with the plaintiff,
11    and so we don't think that it would be accurate to think that
12    these folks can't resolve these issues.  We have experience
13    that they have.
14              THE COURT:  Ms. Shane, are you making a distinction,
15    when you say testimony, between deposition transcripts,
16    affidavits, and declarations, or are you including all three
17    categories?
18              MS. SHANE:  The way that the parties have been talking
19    about testimony has included witness statements, which would
20    appear to me to potentially include those that had previously
21    been written down, but we have not used the vocabulary your
22    Honor used.  I'm sure we will hash that out once we get back to
23    the document and what we've agreed.
24              THE COURT:  And Ms. Shane, has there been any
25    distinction in these discussions between litigation that's been
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

```
 1    filed in court and therefore part of the public database, so to
 2    speak, and investigations that may not yet be public?  Was that
 3    then a subject of discussion?
 4          MS. SHANE:  The issue has arisen, yes, your Honor, and
 5    it does raise very different kinds of issues for different
 6    defendants.  But it has come up in our discussions with
 7    plaintiffs well as well.  And Ms. Chung indicated, the focus at
 8    this time, because it does look like there's a substantial
 9    likelihood of agreement, has been on the proceedings, whether
10    regulatory or litigation-oriented, that plaintiff already has
11    identified in their complaint as relevant ones, and that we can
12    all at least get out of the way as ones where we can reach
13    agreement by ourselves.
14          THE COURT:  OK.
15          MS. CHUNG:  Could I make a proposal, your Honor?
16          THE COURT:  Yes, Ms. Chung.
17          MS. CHUNG:  I did want to clarify one thing, which is,
18    we certainly intended our requests to apply to the different
19    categories that your Honor identifies, the deposition
20    transcripts, etc., etc.  We also specifically raised with the
21    defendants throughout the meet-and-confers that, to us, any
22    deposition testimony should include exhibits, that that would
23    be considered part of the deposition.
24          I think on this issue, as on the first issue we
25    discussed -- and you know this, your Honor, that's one of our
```

50

 1    overriding considerations, is the overall time schedule.  We've
 2    been talking about this issue for a very long time.  I think it
 3    would be useful if we were -- maybe I'm volunteering for
 4    something -- I think we should be reporting to the Court, as we
 5    are in the first issue, in short order on whether we have been
 6    able to make progress.
 7              THE COURT:  Yes.  Well, I have Thursday afternoon
 8    free.  So I think we have to get this issue with respect to
 9    prior cases and investigations teed up for Thursday.  Hopefully
10    the meet-and-confer process between the parties will mean it
11    doesn't have to be on the agenda for Thursday afternoon.  But I
12    think it has to be defendant by defendant, since some
13    defendants may have no quarrel with the production or have
14    concerns about certain aspects of it.
15              So I'm going to need a chart from plaintiff's counsel
16    about where the problems lie defendant by defendant.  I think
17    that the parties need to produce to each other, to the extent
18    they've made requests for documents from each other -- and I
19    understand the defendants have made requests from the
20    plaintiff.  I think it's almost impossible to get our hands
21    around this without a list of the lawsuits or regulatory
22    actions that have been filed and are part of the public record,
23    and there shouldn't be any problem with creating such a list
24    since it is a matter of public record.
25              With respect to investigations that are not a matter

51

1    of public record, I think that should be a subject of the
2    meet-and-confer process.  There may be less need for that if we
3    have fulsome discovery with respect to actions that are filed
4    and publicly available.
5            So I'm going to expect with respect to these prior
6    cases and investigations that the meet-and-confer process will
7    continue this week and to the extent there isn't agreement with
8    any particular plaintiff and defendant, of the plaintiff with
9    any particular defendant, I'll get a schedule or list from FHFA
10   and they will be on the agenda for Thursday afternoon.
11           Which defense counsel wants to address the issue about
12   the date ranges?
13           MR. WOLL:  Your Honor, David Woll.  I'll do that if I
14   may.  As defense counsel noted, FHFA has raised this issue in
15   12 of the 16 cases.  As I understand there are meet-and-confers
16   with the other four cases with this issue still being
17   discussed.  In fact we were meeting and conferring with FHFA in
18   the 12 cases when the letters to the Court were sent.  And as
19   counsel also pointed out, there are two timing issues.  One is
20   the request for e-mails up to the date of the complaint, and
21   the other one is the bubble issue.
22           So firstly with respect to the e-mails up to the date
23   of the complaint:  Prior to raising the requests to the Court
24   that all custodians, all e-mails for all custodians be searched
25   up to the date of the complaint, FHFA had not requested that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

1   from any of the defendants.  What FHFA had requested was that
2   defendants consider providing e-mails or searching for e-mails
3   for limited groups of custodians who had post-securitization
4   responsibility, which was a part of the negotiations to be
5   hammered out, and in fact some defendants have agreed to
6   provide post-securitization e-mails up to the date of the
7   complaint for some groups of custodians.  Deutsche Bank, for
8   instance, has agreed to provide e-mails with respect to
9   repurchase claims, which counsel mentioned was one of the
10  things that they were interested in.  Other counsel have either
11  agreed to provide either e-mails or search central files for
12  those types of documents.  But the request that all custodians
13  and all e-mails up to the date of the complaint be searched and
14  produced was made for the first time in the October 9th letter
15  to your Honor.  That in fact is not even what FHFA itself is
16  doing.  As FHFA noted in that letter, it has certain custodians
17  which it believed had post-securitization responsibilities.
18  And for those custodians, about half of the custodians it said
19  in the letter, it is doing searches up to the date of the
20  complaint, but not for the rest of the FHFA custodians.  So as
21  the record currently stands, FHFA is asking defendants to do
22  something that it has not agreed to do itself.
23          THE COURT:  Do I understand correctly, then, that some
24  of the defendants have agreed to custodian searches up until
25  the date of the complaint -- I guess that's September 2,

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

53

1   2011 -- who had post-securitization responsibilities, and other
2   defendants have not?
3          MR. WOLL:   Correct, your Honor.   And this is, again,
4   this is a defendant-by-defendant specific issue, and when
5   plaintiff in their letter requested leave to brief this as a
6   motion to compel, I think the defendants envisioned that each
7   of them have particular issues to raise in response to the
8   negotiations that have gone on with the plaintiff in that
9   particular situation.   Deutsche Bank, for instance, as I said,
10  on the repurchase point, has designated people who were
11  involved in that activity, that they had such people, and is
12  providing e-mails for that category.   Not everybody has people
13  involved in the activities that the plaintiff has designated.
14         So I think there are two problems with the plaintiff's
15  request.   First of all, there is no need to search for e-mails
16  that postdate the transactions at issue by as many as five
17  years.   The documents that plaintiff is searching for are
18  likely not going to be relevant at all to the issue in dispute.
19  And if I can identify the four things that FHFA mentions in its
20  letter that it wants these e-mails for and then talk about them
21  a little bit, one of them is repurchase requests.   As I said,
22  some defendants have already agreed to provide information
23  about that.   The other issue that they identify is
24  securitization and loan performance, i.e. downgrades, defaults,
25  delinquencies, and delinquency.   Well, that's all a matter of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

1    either public record or easily accessible record.  I don't
2    think FHFA would tell you that they don't have access to
3    information about the performance of the securitization or that
4    they can't through Intex or APS or some other system get access
5    to performance information on securitizations or loans.  So the
6    parties don't have to greatly expand the scope of their e-mail
7    production.  And I assume if this were done it would be done on
8    a reciprocal basis so that all the FHFA custodians and all the
9    defendant custodians would have to be searched for this
10   additional five-year period, which would generate obviously
11   millions of additional e-mails.  I don't think we have to go
12   through that exercise just to figure out how the transaction
13   was performed because I think there are other more readily
14   accessible sources of that.
15           The other category that FHFA identified in its letter
16   to the Court were poor underwriting practices.  First of all,
17   the issuance so far as the claims against defendant are
18   concerned is not whether the originators underwriting practices
19   were poor, but, rather, the extent to which the loans and the
20   securitizations departed from underwriting guidelines with the
21   disclosures concerning LPDs and owner occupancies assistance.
22   By contrast, I would note that HFA's knowledge post
23   securitization is a lot more relevant to this case due to the
24   statute of limitations on this issue if not other things.
25           But insofar as information to be derived from the

55

1  defendants' e-mails is concerned, the question of whether loans
2  complied with the underwriting guidelines or representations
3  can be deduced by looking at the contemporaneous e-mails around
4  the transaction.  There's no need to go searching far and wide
5  for years after the transaction to see if there's some e-mail
6  where somebody in 2009 said, you know, I remember back in 2006
7  this originator wasn't complying with this particular guideline
8  in place at the time.  Is it possible that a potentially
9  relevant e-mail could be found if we looked at all the e-mails
10  for that five-year period?  Sure.  Is it worth it?  We submit,
11  no.
12          And obviously with respect to the fraud issues, or
13  those who have fraud claims against them, anything that
14  happened after the transaction is completely irrelevant to
15  dates' state of mind vis-a-vis the fraud issue.
16          The other thing that the plaintiffs say they need the
17  information for is defendants' retrospective realizations of
18  risks created by poor underwriting practices.  Frankly I'm not
19  exactly sure what that means.  But, again, to the extent it
20  means that defendants' knowledge post securitization is somehow
21  relevant to their state of mind at the time of the
22  transactions, that's just simply not the case.
23          So if I may, let me just talk about the bubble issue
24  next.
25          THE COURT:  Well --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              MR. WOLL:  Well --
 2              THE COURT:  Or not.  I just want to make sure,
 3    Mr. Woll, that I've captured what you've just told me.
 4              MR. WOLL:  Yes.
 5              THE COURT:  For those defendants who agreed to what,
 6    we'll call it the five-year search, for custodians who have
 7    post-securitization responsibilities, are you saying that you
 8    want to further limit the search of those custodians on these
 9    four topics?  Or -- I'm not quite sure how these four topics
10    intersect with those custodians.
11              MR. WOLL:  Again, each defendant is situated
12    differently.  But what we did on the repurchase issue was, we
13    agreed that there are certain individuals who were identified
14    in repurchase activities.  Your Honor knows what the repurchase
15    claims are.  So what we propose to do is to run terms designed
16    to obtain information about those repurchase claims.  We know
17    what loans and what securitization repurchase claims were made
18    for.  So we have terms doe signed to identify documents
19    relating to repurchase claims.
20              I think other defendants may have agreed to do
21    something after 2007 for some custodians, maybe not all the way
22    up to the date of the complaint.  It really varies defendant by
23    defendant, so I don't want to misrepresent it.
24              THE COURT:  So even for defendants who have agreed
25    that certain custodians who have post-securitization
```

57

 1    responsibilities, that their e-mails may be searched for this
 2    five-year period, even in those circumstances, they're asking
 3    that the searches be narrowed to what they believe are relevant
 4    topics.
 5           MR. WOLL:  Well, your Honor, again, just speaking for
 6    Deutsche Bank, what we did, because these were repurchase
 7    custodians, is, we thought it made sense to look for repurchase
 8    documents.  If plaintiff prefers instead we do the originator
 9    search term for those custodians, I think frankly the
10    repurchase search terms are going to pull up as many if not
11    more than the originator search terms for these particular
12    individuals.  But I don't know that.  I have to run that test.
13    But it's not a limiting exercise that we were doing.  It was
14    more a question of trying to focus in on what people actually
15    did and what information we were trying to get from them.
16           THE COURT:  As I hear this, one of your concerns --
17    this should be a concern, no doubt is a concern -- on behalf of
18    plaintiff and all defendants -- is that you would get an
19    extraordinary volume of e-mail with the burden of searching
20    that if you extend the search for all custodians who are
21    relevant during the period of the securitizations and move it
22    forward five years.
23           MR. WOLL:  Yes, your Honor.
24           THE COURT:  So if we had an identification of a subset
25    of custodians and did a narrow search, or somewhat narrow

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58

```
 1    search, of a reduced group of custodians for the five-year
 2    period, could that be the basis of an agreement, do you think?
 3    I know you can't speak on behalf of anyone else but your
 4    client.
 5              MR. WOLL:  Your Honor, I think it could.  We reached
 6    agreement with respect to the repurchase issue.  We didn't hear
 7    back from plaintiff specifically with respect to other
 8    custodians on our list that they thought this would make sense
 9    with.  But the concept that there are limited categories of
10    relevant information post securitization we agree with, as I
11    imagine other defendants do too.  It's doing the
12    across-the-board all-custodian thing that we think is just
13    frankly abnormal.
14              THE COURT:  I interrupted you.  You wanted to go on to
15    something else.
16              MR. WOLL:  Your Honor, I'm sorry, I was just going to
17    talk about this bubble issue that counsel mentioned, which is
18    that some defendants -- and Deutsche Bank is one -- for the
19    period from 2005 to 2007 when the securitizations were being
20    done, have taken what we've been calling the bubble approach so
21    that for each securitization a period of three months before
22    the securitization until one month after the securitization has
23    been searched, all custodians' e-mail have been searched for
24    that period.  And the idea behind that search is that
25    originators who were involved in those securitizations, e-mails
```

59

1   relating to those originators and whether the specific loans
2   underlying those securitizations complied with underlying
3   writing guidelines, etc., that that search would capture those
4   e-mails.
5           Now, in practice what happens with an originator that
6   hasn't been involved in multiple securitizations is, over the
7   course of that period, their e-mails would be captured over a
8   much larger period of time.  So, for instance, we have one
9   originator that, for example, American Home, where the bubble
10  overlaps because they were involved in so many securitizations.
11  So essentially e-mails for the entire period from July '05 to
12  August '07 are provided that mention American home.
13          So as I said, it's designed to capture e-mails that
14  relate to securitization, including e-mails that focus on this
15  specific issue of whether the loans at issue complied with the
16  guidelines.
17          We all know that these guidelines changed on a very
18  frequent basis and that a comment about what allegation
19  originator is doing in 2007 is not necessarily relevant to
20  whether that originator's loans complied with guidelines in
21  2005.
22          So that's why we thought the approach made sense.  It
23  would get at the relevant documents and frankly would allow us
24  to complete the e-mail review that we need to complete on a
25  fairly compressed schedule, especially those of us who have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

60

 1   relatively big case.  We have 42 securitizations in our case.
 2          We told the plaintiff that we were doing this back on
 3   June 11.  And since then there have been at least three or four
 4   letters exchanged where Deutsche Bank at least says this is
 5   what we're doing and defendant and the plaintiff says, we know
 6   that you're doing this.  And then they raised other issues.
 7   But, again, they didn't raise this bubble issue until they
 8   wrote to the Court.
 9          THE COURT:  And I didn't even see it in the letter.
10   So...
11          MR. WOLL:  OK.  See, they snuck it right in there.
12   So, your Honor, we think the bubble approach for our documents
13   gets at the relevant documents.  Again, is it possible that
14   some relevant document might be missed with the bubble
15   approach?  It's possible.  But we doesn't think it's, frankly,
16   very likely.  And we think that, given the inordinate amount of
17   documents that all the defendants are going to be producing,
18   FHFA is going to have more than enough relevant documents to
19   look at.  So far, the defendants have searched e-mails from
20   over 600 custodians and collectively produced over 2.4 million
21   documents comprised of over 33 million pains.  It's a lot to
22   read.  We're producing a lot of documents.  And we took the
23   approach that we've taken and some of the other bubble
24   defendants have taken.
25          THE COURT:  And Mr. Woll, those numbers that you just
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

61

```
 1   gave me, are you talking about the defendants collectively?
 2              MR. WOLL:  Yes.
 3              THE COURT:  Thank you.
 4              MR. WOLL:  I'm sorry, your Honor.  Excluding loan
 5   files.
 6              THE COURT:  So Ms. Chung, is it helpful to think about
 7   the post-closing period for a reduced number of custodians,
 8   searches during the five-year period for a limited number of
 9   custodians of each institution?
10              MS. CHUNG:  Your Honor, we did propose that along the
11   way.  We would like to argue this, your Honor, with your
12   permission.  I want to address particularly two things that
13   your Honor just heard.  One, these are really the most
14   important documents in the case.  It was later in the time
15   period, especially after the mortgage crisis hit, that people
16   began talking about -- and saw public and privately that the
17   performance was failing -- that people began writing e-mails
18   about what the problems in origination process had been.  So I
19   think it's exactly understating the importance of this category
20   of documents to say, well, it's limited to these subsets so
21   this is really not a big deal, you have enough documents.  So I
22   want to address the relevant particularly, but also what your
23   Honor had proposed, which is, doesn't it seem logical that some
24   subset would do.  And I embrace that, your Honor.  The letter
25   that they attach as Exhibit B to their letter to your Honor was
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

62

```
 1    a proposal that we made in July saying, here's a proposal from
 2    us, since we've been talking about time frames, we don't seem
 3    to be making much progress, let's consider a post-closing world
 4    and a pre-closing world.  And in the three months since then,
 5    your Honor, what's happened is, FHFA has 111 custodians, and
 6    our post-closing world is 66 custodians.  We are now reviewing
 7    2.8 million documents just in the post-closing period.  And
 8    why?  Because I can't stand in front of your Honor and say that
 9    it's not relevant.  It's relevant.  You've heard them make the
10    arguments about GSEs came to these realizations.  We need to
11    know what they know.  Well, we agree with that.  So we're
12    searching seriously in this post-closing period.  Their
13    numbers, when Mr. Woll says, well, we have subsets, seven of
14    the defendants have nominated one or zero custodians in the
15    time period.  So whatever searches they're doing, they're
16    reaching -- and their custodian numbers overall are much lower
17    than ours, with the exception of JP Morgan and UBS -- I want to
18    be careful to make some distinctions.  They have significant
19    numbers of custodians.  But we're talking about almost all
20    defendants have less than 50 custodians to begin with.  And the
21    range of post-closing custodians they're searching is from 0 to
22    15.
23            So, your Honor, when we proposed that we could think
24    about, let's think about this, let's split the world, and then
25    we had multiple meet-and-confers about what that world would
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

63

1   look like, what we found is, we're getting dribs and drabs on
2   specific topics, exactly the ones Mr. Woll mentioned.   So
3   repurchases, some, not all defendants have agreed to nominate
4   repurchase custodians.   This is critical information, because
5   as the banks got repurchased and evaluated them -- so these are
6   loans that are being put back because somebody realizes there
7   is something wrong with them -- when they write e-mails about
8   those repurchases or they're applying standards about whether
9   the guidelines meet them and what they are going to agree
10  that's a properly repurchased loan, that is a whole -- that's
11  everything on what they believe the guidelines mean.   And so,
12  yes, we're looking for that information.
13          And we're getting from some defendants, we'll give you
14  one or two people on that.   We don't have a good way to get
15  behind what the nominations are.   But we've also had defendants
16  tell us, we don't have anybody who did any of these things, we
17  don't have anybody who did monitoring of the performance, not
18  just the public monitoring but the reaction to the public
19  monitoring -- gee, do you see what that bond is doing, that's
20  something that we never expected would happen, what do we think
21  is going on.   And we know from the media reports and
22  allegations in the complaint that what's going on there is, you
23  will see e-mail traffic of people saying, well, we knew that
24  they were doing things they shouldn't be doing.
25          But I want to be clear, it's not just about knowledge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

64

1    of falsity.  All of this information goes to falsity.
2    Departures from the underwriting guidelines are the heart of
3    the case.  And the search terms that we're talking about are
4    things like the name of the underwriter, plus "abandon," plus
5    "departure," plus "guidelines."  So if you're not running that
6    search any time past 2007, which is what half of the defendants
7    are doing, then it's giving FHFA a null set.  OK.  In that
8    period, the meaning of a repurchase -- repurchase didn't start
9    going seriously until 2009.  So saying that you're going to do
10   your searches up to 2007 or 2008 is offering FHFA exactly zero.
11   It's a false offer.
12           So, your Honor, what we have done is, in this long
13   process, I think -- and this is why I started with, I agree
14   that some of the defendants are -- they're not all perfectly
15   situated, but I think also there's just not a meeting of the
16   minds on this idea that -- we're not talking about one or two
17   people.  You have to seriously go and look at who worked on
18   repurchases.  Not a single defendant has offered anything on
19   this category that Mr. Wilson can understand, which is the
20   retrospective reviews.
21           Another thing that happened after the mortgage crisis
22   hit is that all these banks, the GSEs, everybody, took a step
23   back and many of their risk committees, the very highest
24   echelons of these banks and entities said, why did this go
25   wrong, where did we abandon our risk policies, and anybody who

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
 1   was in these litigations knows that the parties on all sides
 2   have these reports.  These may not be ordinary custodians.
 3   This is not going to be the trader.  This is going to be some
 4   special theater or the highest people who were looking at risk
 5   in the institution.  And so it takes some diligence to figure
 6   out who these people are.  And what we found in our
 7   meet-and-confers was that diligence was not being exercised.
 8   When we are told there's nobody in the post-closing period that
 9   is relevant, that is very, very difficult for us to accept even
10   if it's also hard for to us attack.
11          And so, your Honor, I think what we ultimately
12   defaulted to, because we just found that we were not making
13   headway on this, is, OK -- no one is saying, by the way, during
14   these meet-and-confers, nobody said this was not relevant.  I
15   think we all understand it's relevant.  What we're hearing is,
16   it's burdensome, OK.  So as I explained, FHFA has taken on the
17   burden.  Our view is, only one or two defendants gave us
18   figures on burden.  Those figures are AA.  I mean, when
19   somebody tells me, I got 2 million hits, well, you know, we got
20   2 million hits, but that means there are relevant things.  It
21   may take a while to go through it, but it's there.  So our
22   option was, you know what, if this is where we are, run the
23   terms, run the terms on everybody.  If certain people are
24   completely irrelevant, you won't have any hits on them.  So
25   that shouldn't be the issue.  And this is the way that we're
```

66

1   going to find what is some very, very meaty information that is
2   highly relevant to the case.
3           Given that we proposed this idea of the pre-closing
4   and post-closing world, I think, your Honor, certainly one
5   thing that we had a lot of problems with, in addition -- it
6   sort of layers onto this problem -- is, we've made many
7   requests.  FHFA two months ago supplied a list of defendants of
8   all 111 custodians, what their title is, what their department
9   is, what their role is.  And you can imagine that many of these
10  meet-and-confers in order to test the adequacy of the custodian
11  list and to test the adequacy of the custodian list for the
12  post-closing period, we're seeking information about what these
13  people did.  We asked the defendants for reciprocal
14  information.  And in many cases we didn't get it.  I had a
15  demonstrative, which unfortunately I can't show your Honor, but
16  what we depict is, we sent Credit Suisse, for example -- we
17  were on a meet-and-confer and they said, you know, well, what
18  information do you want, so what information don't you have.
19  We actually made a chart with 30 rows or so with all the
20  custodians, the name -- we filled in what we had.  And we left
21  question marks in the boxes we didn't have.  And we asked for a
22  limited description of the role so we would see what these
23  people are doing.  And what we got back was a partial amount of
24  that list in which the last column had been deleted, the
25  description of what the person does.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

```
 1              OK.  That in a nutshell is kind of the problem that
 2      we've been having in probing the adequacy of the post-closing
 3      period.  I want to be clear, the number that we have just don't
 4      add up.  There is not a way that you don't have a single person
 5      in the organization, just one person.  But if we were to go to
 6      one system where we are denominating people, then I think at a
 7      minimum what FHFA would need is more information to tell what
 8      the list is because we have applied that backup route and it
 9      also has not really worked.
10              I'm kind of reluctant to hand around a demonstrative
11      because they came in during the period and defendants haven't
12      had a chance to see them.  But I think that describes kind of
13      where we've been.
14              I would like to just answer -- the negotiating history
15      obviously is relevant.  The defense has raised it.  And as I
16      say, I raised the idea that we originally proposed pre- and
17      post-closing world.  We did raise with the defendants, I just
18      want to answer this, certainly in the meet-and-confers that I
19      was involved in, we raised with the defendants that we were
20      producing, because of this law enforcement negotiation for lack
21      of progress, that they just run all the custodian terms for
22      everybody.  And that is indeed, for example, in the instance
23      where we got numbers back on what the number of hits would be,
24      that is what the defendant did to try to demonstrate this, and
25      this is going to return a lot of documents, maybe not a
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

1   shocking proposition to begin with.  But it's not true that
2   this was first raised with defendants in the letter.
3           Your Honor, I just would say a few things about the
4   data so that your Honor has the full picture.  We have a few
5   defendants who have offered a few repurchase custodians, which
6   is not adequate.  We have some defendants who have offered
7   nobody.  We have no defendant who has offered any custodian on
8   these retrospective reviews.  And on performance or monitoring
9   of performance, I would say, I think maybe half of defendants
10  have offered between zero and eight people on this topic.
11          THE COURT:  Mr. Woll.
12          MR. WOLL:  Can I just be heard on a couple of things,
13  your Honor.  First of all, on the repurchase documents, I just
14  wanted to mention this, FHFA has taken the position that all of
15  its internal repurchase documents are privileged, so they're
16  not going to be producing, as I understand it, any internal
17  repurchase documents.  And just as a point of clarification,
18  repurchase claims involve lots of things.  They don't just
19  involve the purchase and underwriting guidelines.  And so there
20  could be repurchase documents that we come up with that have
21  nothing do with underwriting guidelines.
22          In terms of relevance and the argument that it's not
23  just the state of mind but it's compliance with guidelines,
24  this information after the fact, well, the whole point of this
25  sample that the plaintiff has proposed where this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69

```
 1    reunderwriting exercise has been discussed is, that's going to
 2    be a lot of focus on loans to determine whether they in fact
 3    complied with underwriting guidelines or not.  So, again, to do
 4    a huge e-mail review to see if somebody said something three
 5    years after fact about compliance with the date of the
 6    transaction I don't think is a particularly efficient way to
 7    go.
 8             And then finally, just with respect to details about
 9    the custodians, as far as I know, and I could stand to be
10    corrected, I don't think we got detailed information about the
11    FHFA custodians in terms of which ones they've decided have had
12    post-securitization responsibilities or how they made that
13    decision.
14             THE COURT:  Thank you.
15             So to the extent that -- most of these cases are
16    non-fraud cases.  There are only six of the 16, I think, that
17    have fraud claims in them.  And even the fraud claims, of
18    course, are enormously impacted by the Section 11 claims, the
19    straight misrepresentation claims.  And statements that the
20    defendants make which the plaintiffs would argue would be
21    admissions that there was a noncompliance with underwriting
22    guidelines or underwriting practices would take some of the
23    disputes potentially off the table here.  So I can certainly
24    understand the importance of having a meaty production for the
25    post-closing period.
```

70

```
 1              And with respect to these four categories of topics
 2      outlined in the plaintiff's letters and which Mr. Woll
 3      addressed, it seems to me each of them is an appropriate ground
 4      for post-closing discovery.  It remains unclear to me, though,
 5      whether we need all custodians searched.  But I think the
 6      burden would be on the defendants to make a showing that a more
 7      limited search would be sufficiently productive.  It seems to
 8      me if executives, people with management responsibilities,
 9      people who are members of special committees and make reports
10      for the institution with fact finding about what happened, in a
11      way that could be binding on the defendants at trial or
12      certainly highly relevant to a jury's analysis of the defenses
13      that are being put forward at trial, they have to be searched.
14      So if a defendant doesn't want all the custodians searched for
15      the five-year period, then I think they have a responsibility
16      to create a custodian list that identifies the custodians by
17      title and role and with a sufficiently detailed description of
18      their jobs and responsibilities to make a showing that a search
19      of their e-mails for the post-closing period won't be likely to
20      produce or isn't sufficiently likely to produce productive
21      materials.
22              It seems to me in the post-closing period what we're
23      talking about would be -- and, Ms. Chung, I'm happy to hear
24      from you on this -- but I think what we're talking about in the
25      post-closing period is people with a high-enough responsibility
```

71

```
 1    within the organization that their knowledge and observations
 2    about these historical practices bear some weight, and that
 3    some of the more junior-level people, that would have highly
 4    relevant information during the periods of securitizations
 5    themselves, their stray comments or thoughts might be of less
 6    interest or importance in the post-closing period.  One could
 7    argue the other way.  But I think that defendants need to get
 8    to the plaintiff by the close of business tomorrow a list of
 9    their custodians by title and role and indicating which
10    custodians they do not believe there should a search for for
11    the post-closing period, so that there can be an adequate
12    meet-and-confer on that topic on Wednesday between the parties
13    and so Thursday afternoon I can address any areas of
14    disagreement.
15              With respect to the bubble --
16              MS. CHUNG:  Your Honor, I didn't really address that.
17    I don't know -- I could do it briefly.
18              THE COURT:  Ms. Chung.
19              MS. CHUNG:  It is a version of the same argument
20    because -- on this one I want to be clear, there's a clear
21    split in defendants.  I want to give credit; a lot of
22    defendants are not using this bubble approach.  For FHFA it was
23    never an issue because on our side, and one of the reasons --
24    it was funny when you said I didn't see it in the letter.  On
25    our side we don't have a bubble because we just ran all our
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

72

```
 1    custodians pre-period for all deals and all originator terms.
 2    Most of our employees worked on the same deal so it didn't make
 3    a difference.  So our eye was not really on the idea that you
 4    would ever try to separate the originator terms by deal.  And
 5    so when defendants started doing that, and there's been some
 6    the movement in it but now I think it's clear there's sort of
 7    two camps.  One camp is searching it all the way through.  And
 8    another camp has said, no, we're always going to associate an
 9    the individual originator with the deal that they were welded
10    to.  And the problem with that, your Honor, again, is the
11    arbitrary cutoff of relevance.  It may be, you know, there are,
12    for example, there is an example in the -- I think it's Merrill
13    Lynch, where during the time period the deals are being done --
14    that's information that comes about in different RBS case
15    that's public because there has been motion practice about it,
16    so, oh, gee, this originator, looks a little weird, let's start
17    doing some quality control on this.  OK.  If that kind of thing
18    happens and they're looking for quality control in the
19    origination of the loans, that's not going to happen in a
20    four-month window.  So that's the logic, that it's just -- I
21    think it's hard to say that it's burdensome if the plaintiffs
22    are doing it and then there's this kind of arbitrary three
23    months before, one month after that we don't think bears any
24    relation to the relevance of the documents.
25              THE COURT:  Ms. Chung, with respect to that division
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73

```
 1   between pre-closing and post-closing, where is that line drawn,
 2   in your view?
 3           MS. CHUNG:   In terms of what, your Honor?
 4           THE COURT:   An individual defendant.
 5           MS. CHUNG:   Well, I guess the distinction we drew,
 6   your Honor, is, we're not insisting -- we put the bubbles
 7   around what we've been calling the deal terms.  So there have
 8   been two sets of searches.  One is geared off of the actual
 9   securitization names and the CUSIPs and things like that.  That
10   to us is debatable.  Frankly, we could have asked this as well,
11   I think, but we didn't.  We said, OK, if you want to run the
12   deal terms in bubbles, that makes some sense because you expect
13   there to be higher volume about the deal when it's being
14   arranged.  But to us the originator information is not like
15   that.  There can be e-mail chatter about the originators and
16   their practices and perhaps the falsity of their
17   representations in the offering materials to the extent they're
18   talking about departures from the guidelines at any point in
19   time.  And so I guess what I'm saying is, much of the argument
20   for us is the same.
21           THE COURT:   But then you made the proposal of a pre-
22   and post-closing search and a distinction between the two.  For
23   any individual defendant, what is the demarcation for it?
24           MS. CHUNG:   Your Honor, it depended on what duties
25   they had.  So we were saying -- it's not unlike what your Honor
```

74

```
 1    was just saying.  If you can give us enough information that
 2    they only would have had e-mail traffic in an earlier period,
 3    so this might be people who are doing the arranging of the
 4    deal, so all they're doing is picking the loans that are going
 5    to go into the deal, that could have some logic to it, there's
 6    no need to go up to the date of the complaint from
 7    post-closing.  But that was exactly the kind of information
 8    that we found it difficult to get.
 9            I think the key thing was what your Honor identified,
10    which is -- because I think most of the defendants have already
11    staked out the position that if they're on the custodian list
12    and they haven't already been designated by them as a
13    post-closing custodian, that those people do not have duties
14    that would implicate those fewer areas.
15            I think what we're -- so we're very interested in the
16    first part of what your Honor ordered, which is, can you
17    identify people in these four buckets who -- have you
18    identified those people, if they are the higher-level people
19    that's fine -- who did have responsibility for these things.  I
20    think that's really what we've been missing.
21            THE COURT:  Do you agree that with respect to that
22    five-year period -- I'll call it the post-closing period --
23    that what is most important to the plaintiff are things that
24    could be thought of as admissions, that they are basically
25    things that were said to, heard by, or articulated by people in
```

75

```
 1   managerial or executive positions with respect the
 2   organization?
 3            MS. CHUNG:  Yes.  Your Honor, I think we could make a
 4   broader argument.  It depends.  For example, on repurchases,
 5   many of these entities had, when repurchases started coming in
 6   in big volumes, they would form committees where there would be
 7   standards set.  There would even be things like, you know, I've
 8   seen a policy that said to employees, if you can find ways to
 9   turn down these repurchases, you'll get incentive-based pay.
10            So there can be a range of things that e-mail traffic
11   and -- you know, it can be at a committee level.  It can be at
12   the executives' level.  I understand what your Honor is saying
13   about having the importance to bind the company.  But I think
14   in many ways -- I mean, this is an argument defendants have
15   made -- that, you know, you're an employee and you're there and
16   that's still relevant information if you're talking about the
17   business and the aspects of the business that are relevant to
18   the case.
19            But I hasten to say, I think that a big issue has been
20   for us so far just identifying any people that relate to those
21   four buckets.  That's what the big hurdle has been so far.
22            THE COURT:  Mr. Woll,
23            MR. WOLL:  Yes.  Your Honor, I just wanted to add that
24   you instructed defendants to provide information about their
25   custodians and ones that are not appropriate for post-
```

76

```
1    securitization search, and I would ask that the plaintiffs be
2    asked to do the same thing.
3           THE COURT:  I thought Ms. Chung gave you a chart like
4    that.  She was describing what she provided, FHFA provided to
5    the defendants, with title and duties.  Did I misunderstand
6    you, Ms. Chung?
7           MS. CHUNG:  No, your Honor.  I have copies.  Yes, we
8    have turned over a full list of our 111 custodians with their
9    functions and the time frames to the defense.
10          MR. WOLL:  And the defendants did too, at least
11   Deutsche Bank, we provided a list of custodians and what their
12   titles were.  But if we are to justify why people should not be
13   subject to a post-securitization search, that's additional
14   information we would ask the plaintiffs also to provide,
15   because understandably the title may not tell the whole story
16   and since that's what we've been provided, it doesn't
17   necessarily show why they're not doing it on the other half of
18   their custodians.
19          THE COURT:  Ms. Chung.
20          MS. CHUNG:  Your Honor, I don't think we're similarly
21   situated on this.  On defensive discovery, there have been
22   enormous amounts of discussion about our custodians and we
23   have, as a result of that, designated 111 people.  And we have
24   provided the information about who they are and what they do
25   and the time periods.  It's this information we haven't been
```

1    able to get from defendants.  But more fundamentally, we have
2    put forward literally scores of people, and the issue that
3    we're having on their side is, it's not being reciprocated.  I
4    think seriously -- I've been a part of these conversations --
5    we have said a lot of things, including in meet-and-confers, to
6    drill down on who the people are and why they're being added or
7    not.
8            THE COURT:  So, Mr. Woll, I am happy if you don't
9    reach agreement with the plaintiffs and we're together again on
10   Thursday afternoon, I am happy to look at the chart you gave to
11   the plaintiffs in the past all those custodian identifications,
12   and am happy to look at the chart you will produce tomorrow by
13   5 for the plaintiffs and be able to observe whether or not the
14   information you gave in the past was really fulsome enough.  So
15   I'd be happy to look at it now if you have a copy, but there is
16   no expectation you would have brought it to court.
17           MR. WOLL:  I'm not sure I do, your Honor.
18           THE COURT:  Yes.
19           MR. WOLL:  And with respect to the plaintiffs, can you
20   also look at their chart and see whether it provides
21   information?
22           THE COURT:  I'd be happy to.  I'd be happy to.
23   Everybody should bring their charts.
24           MR. WOLL:  Thank you.
25           THE COURT:  So on this third letter, I think nothing

78

```
 1    is resolved.  I think everything remains open to a
 2    meet-and-confer process this week.  And it's on the agenda for
 3    Thursday.
 4            MS. SHANE:  Your Honor, I'm sorry, if I may just a
 5    moment confirm that our understanding, which we had with the
 6    plaintiff before we came here and which I believe was mentioned
 7    at the start of this conversation, is that this JPM defendant
 8    and the plaintiff had an agreement resolving this issue as to
 9    JPM.
10            MS. CHUNG:  Yes, your Honor.  We set aside JP -- I
11    think I did in this conversation.
12            MS. SHANE:  Thank you.
13            THE COURT:  Thank you.
14            MR. HANIN:  Excuse me, your Honor.  Michael Hanin on
15    behalf of FHFA.  With respect to the four cases that were not
16    the subject of the letter you received last week, we had not --
17            THE COURT:  What four cases?
18            MR. HANIN:  Well, the letter you received from FHFA
19    related to 12 of the 16 cases coordinated before you.  We
20    suspect that in the four cases that our firm is handling, we
21    would continue to meet and confer on the very same issues that
22    the other 12 defendants were dealing with.  And we actually had
23    meet-and-confers on each of those cases scheduled for tomorrow
24    and Wednesday.  And so I just wanted to make sure of two
25    things: one, that we would also receive from the defendants the
```

79

```
 1    same list of custodians who they believe are appropriate for
 2    post-securitization searches by 5 p.m. tomorrow, and, two, that
 3    with your Honor's permission, we could in the course of these
 4    meet-and-confers, in which we have requested all the same
 5    searches that FHFA requested in all of the cases, get on the
 6    same timetable such that to the extent there are any
 7    outstanding issues by the close of business Wednesday we can
 8    address them with your Honor on Thursday.
 9              THE COURT:  Yes.
10              MR. HANIN:  Thank you.
11              THE COURT:  Sadly I thought there were four cases that
12    were moving along without any need for intervention.  OK.
13              Let's talk about the RBS litigation.
14              Thank you very much for your submissions to Judge
15    Thompson and myself.  And, Mr. Woll, I'm glad you're here.
16              MR. WOLL:  And I'm glad my partner, Tom Rice, is here.
17              THE COURT:  I had spoken with Judge Thompson months
18    ago and again last week and again today, and I'm very aware
19    that he is the judge responsible for the Royal Bank of Scotland
20    case filed in Connecticut.  And I have enough on my plate and
21    that's just fine.  But I think what I have in mind with respect
22    to the coordination order is something that is, I think, pretty
23    common in litigation across districts.  And it's agreements
24    along these lines, that no deponent will be deposed twice, that
25    documents produced in the litigation before me will be produced
```

```
 1    in Connecticut and vice versa to the extent that that's
 2    relevant.  So I expect that that's extraordinarily standard and
 3    desired by one and all.  I may be wrong about that.  So I think
 4    the next layer of issues potentially for agreement or
 5    disagreement is whether or not the 20-deposition limit that's
 6    imposed in the 16 actions here, of all defendants vis-a-vis
 7    FHFA and FHFA vis-a-vis any corporate family, whether or not
 8    that will be deemed to be imposed with respect to the
 9    Connecticut litigation as well.  And of course Judge Thompson
10    will speak for himself.  But RBS, at least one of the
11    defendants in the RBS family who is a defendant in the
12    Connecticut litigation is present before me in four cases, and
13    I think two or three of those are fraud cases, not that they're
14    defendants on fraud counts, but -- I have my chart.  But
15    anyway, so it's my understanding that Judge Thompson believes
16    that that 20-deposition limit should apply with equal force to
17    the Connecticut action.  Therefore Royal Bank of Scotland, that
18    family of corporations, will be involved in taking the no more
19    than 20 depositions of the FHFA that binds all the defendants
20    before me.  And similarly, the plaintiff and any co-defendants
21    should expect a 20-deposition limit of the Royal Bank of
22    Scotland family of companies, whether they are named in the
23    four actions here or the Connecticut action.  So Royal Bank of
24    Scotland, as a family of companies, is only going to face 20
25    depositions, whether those depositions are taken as part of my
```

81

```
 1   four cases or the Connecticut case.
 2           Now, with respect to the Connecticut action, I think
 3   Judge Thompson would like to treat this -- and again, he will
 4   speak for himself as presumptive and give Royal Bank of
 5   Scotland and FHFA an opportunity to be further heard before him
 6   if and when they feel they feel there is a need for relief.
 7   But of course that applies here as well.
 8           So with respect to the plaintiff's proposal that we be
 9   scheduling a trial date in the Royal Bank of Scotland case, I
10   think I will leave summary judgment practice and trial dates to
11   Judge Thompson and it doesn't need to be part of a coordination
12   order.
13           Similarly with respect to document production in the
14   Connecticut case and a substantial complete date or a cutoff
15   with fact and expert discovery, I think Judge Thompson and I
16   will meet and confer about that more.  But I think
17   fundamentally that's for Judge Thompson to decide.  The issue
18   is to what extent it will impact the management jointly of
19   these 17 cases.
20           So I hope that gives you enough -- I wanted to respond
21   as promptly as I could on behalf of both of us since you are
22   before me today and it does affect your life going forward,
23   because that means that Royal Bank of Scotland is going to have
24   to be prepared to begin deposition discovery of FHFA in January
25   of this year.  It of course knows that for my four cases, but
```

82

1    it has to know that for the Connecticut case as well.
2            I think that there should be continuing consultation
3    between the plaintiff and the RBS defendants, indeed all the
4    defendants in the Connecticut case, document production issues
5    and the scheduling of the RBS depositions.  Those do connect
6    with issues before me, but I don't want to say anything
7    further.  I think Judge Thompson and I would like joint
8    proposals on that detail.  So what I would like is a proposed
9    coordination order that provides for no deponent being deposed
10   twice, documents produced in one of the 17 litigations being
11   produced in all, the 20-deposition limit being deposed.  And I
12   think then the other things which are customary in coordination
13   orders -- and I don't understand there is any dispute about
14   it -- which is signing on the confidentiality agreement and the
15   other stipulations that have governed document production and
16   otherwise helped you all manage your lives in this case that
17   are customary.
18           Mr. Rice.
19           MR. RICE:  Yes, your Honor.  If I may just approach.
20           THE COURT:  Sure.
21           MR. RICE:  Thank you.  And I don't propose to speak
22   very long, your Honor.  I just don't want to speak from the
23   back of the room.
24           THE COURT:  Sure.
25           MR. RICE:  First of all, thank you, your Honor.  And

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

83

1  just to be clear, first, we do appreciate your Honor's efforts
2  here and we appreciate your communicating what Judge Thompson's
3  view of the case is.  We have asked Judge Thompson today in a
4  letter to him when we sent him a courtesy copy of the papers we
5  filed Friday, we asked him to please set a conference as soon
6  as possible so we can talk to him about these issues.  We want
7  to proceed in a way that's sensible but that protects my
8  client's rights at the same time.  And I'm concerned, your
9  Honor, that some of the things you've said today are perfectly
10 fine and some of them really are a problem in terms of the
11 substantive rights of the RBS defendants and the Connecticut
12 defendants.
13         Sure, documents produced in all cases and depositions
14 taken in all cases can be used in all cases, there's no
15 question about that.  We have no issue with that.  We would
16 like, if it were feasible, to have a rule that says deponents
17 are only taken once in a case.  The problem with that is, given
18 where we are now, the RBS defendants on the 68 securitizations
19 that are at issue in Connecticut will not be ready to take
20 depositions in the first half of next year, which is when all
21 the depositions of the FHFA witnesses are going to take place,
22 so that we're going to have an issue there and we're going to
23 have a problem there.  And I hope your Honor will understand
24 that.  I hope equally that Judge Thompson will understand that.
25 And we would like to try to get before him on that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

84

```
 1              And frankly, your Honor, I'd like to try to get before
 2      him on that before we come to --
 3              THE COURT:  Before January.
 4              MR. RICE:  Well before January, your Honor, and
 5      certainly before your Honor and Judge Thompson enter any kind
 6      of coordination order.  I think certainly my client has a right
 7      to be heard in Connecticut where the plaintiff brought this
 8      case, where the case is going to be tried.  We have no, no
 9      interest in trying to duplicate things.  But what your Honor
10      has outlined causes huge and, I would submit, with all respect,
11      unfair issues for the RBS clients.
12              THE COURT:  So, Mr. Rice, could I get your cooperation
13      to this degree; would you draft with FHFA a proposed
14      coordination order that reaches agreement where you can and has
15      competing paragraphs where there is no agreement so we can make
16      the differences concrete in one document and/or -- yes, that's
17      my request.  Would you be able to do that.
18              MR. RICE:  First of all, your Honor, I think you will
19      always be able to count on me to cooperate, and, yes, of course
20      we'll do that.  We'll certainly work with them on that.  I
21      think having a competing order already gives us a basis to come
22      up with something.  There are a couple of areas at least in
23      which we agree.  There is obviously much about which we don't
24      agree at this point.
25              THE COURT:  OK.  So I take it, though -- there are
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```

85

1  some things that I could say with respect to the 20-deposition
2  limit.  But I very much appreciate that you have a separate
3  right to be heard before Judge Thompson.  And I certainly won't
4  be entering any order before he has an opportunity to grant
5  your request for a conference before him and before he is ready
6  to sign.  So I don't want to put any party in the uncomfortable
7  position of wondering who is the person you should be obeying.
8       MR. RICE:  Thank you.
9       THE COURT:  So I think Judge Thompson and I agreed
10  from our very first conversation that we would try to work
11  cooperatively with each other.  But I do want to be very
12  respectful of his independent role over that 17-defendant case.
13       MR. RICE:  Thank you very much, your Honor.
14       THE COURT:  Yes.
15       MR. ABENSOHN:  Your Honor -- I apologize.
16       THE COURT:  Counsel.
17       MR. ABENSOHN:  Yes, your Honor.  Adam Abensohn for
18  FHFA.  And I'll be brief because we do certainly respect that
19  Judge Thompson will ultimately draw out the issues in the RBS
20  case.
21       THE COURT:  In one of the five RBS cases.
22       MR. ABENSOHN:  In one of the five RBS case, yes, of
23  course, your Honor.
24       The only thing I would say with respect to defendants'
25  opportunity to be heard by Judge Thompson is, to a large

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86

1    extent, they have been heard by Judge Thompson, who ordered two
2    months ago that discovery begin, quote/unquote, promptly.  So
3    much of the complaint we hear today from RBS, in my view, is
4    self-created.  My understanding is that they've got to begin
5    document collection, they've got to begin document production.
6    They have yet to begin any of the process despite this order
7    outstanding for two months.  And our concern frankly is that
8    they are trying to create a scenario that makes it impossible
9    to get coordinated, that makes it impossible to spare witnesses
10   multiple depositions.  And that is then what we are trying to
11   prevent.  And again I understand your Honor's guidance and will
12   proceed on that basis.
13           THE COURT:  And when did you serve the document
14   demands in the Connecticut RBS case?
15           MR. ABENSOHN:  I believe the document demands went out
16   the day after the exchange of initial disclosures, so that
17   would have been, I think, on the order of a week to two weeks
18   ago.
19           THE COURT:  Thank you.
20           MR. ABENSOHN:  Thank you.
21           MR. RICE:  With your Honor's permission, I just can't
22   leave some of this unchallenged.
23           THE COURT:  I thought I asked the right questions.
24           MR. RICE:  You did, your Honor, and I appreciate is.
25   But there's something else your Honor doesn't know.  We were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87

```
1    before Judge Thompson in January of last year on a conference
2    that talked about discovery in these cases.  Mr. Abensohn was
3    there.  There wasn't a hint at that time that they were going
4    to seek to somehow cram us into a schedule that was here,
5    absolutely unfair, your Honor.  And again, we'll be heard
6    before Judge Thompson.
7              THE COURT:  Good.
8              I think we can move on.
9              MR. ABENSOHN:  OK.  Thank you, your Honor.
10             THE COURT:  Thank you so much.
11             I don't need to take much time.  You can write me a
12   letter.  I think we still have two dates in the UBS summary
13   judgment motion practice that you were going to meet and confer
14   about, and I'd love to get those down.  So if you could just
15   send me a letter with those two dates.
16             The issue about the Daubert challenges, I would like
17   the defendants, other than UBS, to advise the plaintiff by
18   October 19 whether or not they were they are making any Daubert
19   motion at this time to challenge the Cowan report.  If not, as
20   was true in the UBS case, their right to make a Daubert motion
21   to challenge his report is waived to the extent it could have
22   been made at this time.  So it is without prejudice to filing a
23   Daubert motion on additional opinions that may be expressed by
24   the plaintiff's expert.
25             Obviously this early Daubert motion practice has been
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

88

```
 1    necessitated by the enormity of the task that confronts all of
 2    us.  It's not just the plaintiffs who will be doing a
 3    reunderwriting analysis of the sample.  I have no doubt that
 4    the defendants will be doing that as well.  And the defendants
 5    will be deciding whether or not they want to make a
 6    counterproposal or look at additional files of everything.
 7    Unless we have devastating e-mails that come in as straight
 8    admissions with respect to the Section 11 violations, an
 9    enormous amount of work by the plaintiff and defendants is
10    going to be driven by the plaintiff's protocol for choosing
11    this sample and by the identification of the individual loan
12    files.  All of you need to know now whether this sampling
13    protocol is so fatally flawed that it should be stricken on
14    Daubert grounds.  You all have the right, of course, to make
15    any arguments to a jury about weight at any time.  That
16    wouldn't be appropriate for a Daubert motion.  And of course
17    you can't make a Daubert motion with respect to something you
18    don't have.  So to the extent that there are additional
19    opinions and expert reports, you have all your rights to make
20    additional Daubert challenges at that time.
21            So by October 19th you'll advise the plaintiff in
22    writing whether or not you're making a Daubert challenge.  And
23    if you do, here is the briefing schedule.  Motion by the
24    defendants October 26, opposition November 9, reply November
25    16.  Two courtesy copies to the Court.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89

1          Counsel.
2              MS. DAVIDOFF:  Your Honor, Amanda Davidoff from
3     Sullivan & Cromwell.  We certainly agree that we can't make a
4     Daubert challenge based on information that we don't have yet.
5     And speaking on behalf of the nine UBS defendant, we did
6     receive our Cowan report last week.  What's missing from that
7     report -- that report includes a general methodology, it
8     includes a list of about 44,000 loan members that are included
9     in the sample plaintiffs said they drew.  What's missing is all
10    of the data one would need to evaluate whether the sample was
11    reliably drawn based on the methodology that plaintiff has
12    presented.
13             Now, it's quite a complicated process to adequately
14    draw a sample based on general methodology.  It's not take the
15    loan tapes, close your machine, the sample pops out.  The loan
16    tape have to be processed.  Dr. Cowan's report says that he
17    divided them into four side by side.  That's probably a lot of
18    calculation, copying and pasting Excel charts.  And Dr.~Cowan
19    had to choose a number generator.  That's going to usually
20    generate a number between 0 and 1, a series of random numbers
21    between 0 and 1.  You need a computer program that maps those
22    random numbers onto the loan numbers.  Dr. Cowan says that he
23    did a number of tests of representativeness.  We don't have any
24    of the backup data for those.  And then of course overall, we
25    do not have any discussion and information of how many times

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

90

1    they did this process, whether this was something they did once
2    and took a sample or whether it's something they did a thousand
3    times and took a thousand samples.
4            So we would submit, your Honor, a couple things in
5    response to their proposal.  We are more than happy to make a
6    determination of whether we're going to make a Daubert motion
7    on a relatively expedited basis.  But that can't be done until
8    we have this backup information.  We've asked for it, not only
9    what's automatically required under the rules; it's also the
10   subject of a document request.  We also asked for it in
11   response to the motions letter that we got from the plaintiff
12   last week.
13           So I would say that probably October 19 is too soon to
14   make a determination about whether the defendants are going to
15   make a Daubert motion.  Plaintiffs have had these loans tapes.
16   Your Honor's order had an outside date of June 8 for getting
17   the loan tapes.  There was a lot of back-and-forth on what the
18   right loan tape was for each securitization.  Plaintiffs
19   themselves have said that they had to supplement the loan tapes
20   with data for logic.  Defendants certainly had a right to
21   evaluate how that was done.  They took from June until October
22   to give us our sample numbers.  And the samples are, you know,
23   there are still a lot of numbers.  There were 44,000 loans,
24   there were a hundred loans for each securitization.  It's going
25   to take our experts some time to crunch those numbers once we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

91

1  get the data that we need to evaluate a response to this
2  proposal.
3           Presumably, if that's the kind of early Daubert motion
4  your Honor has in mind in order to vet these numbers -- of
5  course let UBS speak for themselves.  They may want the same
6  discovery.  I'm not aware of whether they got it or not.  But I
7  don't think we can make a decision by October 19, given that
8  it's October 15 and we don't have this data.
9           I also don't realistically think we could put in a
10 motion on such a short time frame.  It's just so many loans and
11 there's some expert work to be done with these calculations.
12 That's why it has taken such a long time to do.
13          THE COURT:  Thank you so much.
14          MS. DAVIDOFF:  Thank you.
15          THE COURT:  The next topic will be the schedule for
16 the reports on reunderwriting.  As I understand it, to do the
17 reunderwriting, the plaintiff needs the sample loan files.  So
18 for any particular case, the reunderwriting process requires
19 that sample set to be complete.  And I had proposed, I believe,
20 at the July 31st conference the following schedule -- and just
21 proposed -- that two months after the plaintiff has the sample
22 loan files for a particular case and the underwriting
23 guidelines, that it would identify for the defendants the
24 results of its reunderwriting process to identify with some
25 specificity what it contended the individual misrepresentations

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92

1  or failings were.  And I proposed that the defendants would
2  then respond within six weeks.
3       So I just want to remind counsel of that discussion
4  that we had on July 31 and ask you to fold that into your
5  meet-and-confer process and come up with a schedule so we don't
6  lose track of that.  Thank you.
7       And I think that takes me to the last issue on my
8  list, which is ResCap.  I have not had an opportunity to read
9  the entirety of Judge Glenn's decision.  But I have read
10 selected portions of it.  And believe me, I will read it all
11 with great interest as soon as I can.  But I think I got the
12 gist of it.  And so I'd like to give counsel before me, who
13 wish to be heard on this issue, and -- is it Mr. Goeke?
14      MR. GOEKE:  Yes, your Honor.
15      THE COURT:  Thank you.  I'm so glad you're here.
16 Anyone who wants to be heard on this issue, I want to give them
17 an opportunity.
18      So what I'm thinking is ordering the production of, I
19 think it's 2100 files, loan files now that FHFA has identified
20 and requiring Ally to pay ResCap for that production.  The
21 issue is whether I allow defendants to identify any additional
22 files beyond the 2100 and fold that in to my order.  For
23 instance, if the defendants could this week identify 500 or a
24 thousand additional files that they would like ResCap to
25 produce, I'd be happy to fold that in as well, if you think

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

93

```
 1    that the set of 2100 is too small.
 2              So that's going to be my proposal.  And Mr. Goeke, you
 3    may wish to oppose that.
 4              MR. GOEKE:  Yes, your Honor.
 5              THE COURT:  I'll take any submission on Wednesday.
 6    The FHFA I'll take any submission on Friday.  And Mr. Goeke,
 7    any reply on Monday.
 8              MR. GOEKE:  Thank you, your Honor.
 9              THE COURT:  Thank you.
10              So, counsel, two and a half hours later, it's 5
11    o'clock.  And by the way, I want to thank everybody for always
12    being so prompt.  It's greatly appreciated.
13              Mr. Goeke.
14              MR. GOEKE:  Your Honor, I'm sorry to interrupt you.
15    May I just ask, if we are to address this on Wednesday, on what
16    authority are you actually ruling that we should be providing
17    the information given that Ally does not have any control over
18    this information?  Is it under the shared services agreement or
19    is it for some other reason?  Just so we can be addressing the
20    correct issue before your Honor.
21              THE COURT:  I think you should assume that I'm going
22    to act with every piece of authority I have at my command.  And
23    so that you should feel free to give me any and every argument
24    why I should not order this.
25              MR. GOEKE:  Thank you, your Honor.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94

```
 1              THE COURT:   Thank you.
 2              MS. CHUNG:   Your Honor, did you have some time in mind
 3    for the Thursday?
 4              THE COURT:   2 o'clock.
 5              MS. SHANE:   Your Honor, is that in person or
 6    telephonic?
 7              THE COURT:   Well, it actually will depend upon the
 8    length of the agenda.  I think this would have been impossible
 9    to do by phone.  So either Ms. Shane and Mr. Kasner, the two of
10    you together, and Mr. Selendy, if you would notify my chambers
11    Thursday morning of the agenda items that have not been
12    resolved through the meet-and-confer process and your
13    recommendation, hopefully joint, as to whether or not this can
14    be done by phone or -- I have to say, anything longer than 45
15    minutes we're going to do in court.  If we're down to one or
16    two issues, fine.  But for me to give everybody a chance to be
17    heard and reflect on these and give you a ruling and perhaps to
18    look at charts -- I'm so anxious to see Mr. Woll's charts and
19    FHFA's charts -- document custodians, some of this, depending
20    on what the issue is, it may of necessity be an in-person
21    conference.
22              MR. KASNER:   Your Honor, Jay Kasner.  Good afternoon,
23    your Honor.  Just as a hypertechnical housekeeping matter, I
24    will be in the Second Circuit Thursday morning.  I will ask
25    Mr. Fumerton to take responsibility and Ms. Shane for
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95
```
 1   contacting chambers if that's acceptable to the Court.
 2            THE COURT:  Thank you.  Is it a case I know about?
 3            MR. KASNER:  Your Honor, it is a case I'm not certain
 4   you know about but it will be of interest to the Court.   It
 5   involves an application of the same decision that your Honor
 6   discussed at our very first conference.
 7            THE COURT:  Thank you all.
 8                            o0o
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

