**In Re:**

*RESIDENTIAL CAPITAL, LLC, et al. v.*
*Case No. 12-12020-mg*

*P.M. SESSION ONLY*
*September 11, 2012*

*eScribers, LLC*
*(973) 406-2250*
*operations@escribers.net*
*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 11, 2012

          2:04 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1  Doc.#810, 859, 861 Evidentiary Hearing Regarding (I) Motion of

2  the Federal Housing Finance Agency Pursuant to the July 11,

3  2012 Order of the Honorable Denise L. Cote Seeking Limited

4  Discovery from the Debtors and, if Necessary to that Purpose,

5  Relief from the Automatic Stay and (II) Supplement to July 17,

6  2012 Motion of the Federal Housing Finance Agency Pursuant to

7  the July 11, 2012 Order of the Honorable Denise L. Cote Seeking

8  Limited Discovery from the Debtors and, if Necessary to that

9  Purpose, Relief from the Automatic Stay.  (CC: document(s)

10  1295, 1296, 1297)

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Ellen S. Kolman

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   JOEL C. HAIMS, ESQ.

9        JONATHAN C. ROTHBERG, ESQ.

10

11

12  KRAMER LEVIN NAFTALIS & FRANKEL LLP

13        Attorneys for Official Creditors' Committee

14        1177 Avenue of the Americas

15        New York, NY 10036

16

17  BY:   ELISE S. FREJKA, ESQ.

18

19

20  CRAVATH, SWAINE & MOORE LLP

21        Attorneys for Credit Suisse First Boston

22        825 Eighth Avenue

23        New York, NY 10019

24

25  BY:   LAUREN A. MOSKOWITZ, ESQ.

4

1

2  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

3       Attorneys for FHFA

4       1633 Broadway

5       New York, NY 10019

6

7  BY:   KANGHANA WANGKEO LEUNG, ESQ.

8       ANDREW K. GLENN, ESQ.

9       DANIEL A. FLIMAN, ESQ.

10

11

12  KIRKLAND & ELLIS LLP

13       Attorneys for Ally Financial Inc. and Ally Bank

14       655 Fifteenth Street, N.W.

15       Washington, DC 20005

16

17  BY:   JUDSON D. BROWN, ESQ.

18

19

20  MAYER BROWN LLP

21       Attorneys for Ally Financial, Inc.

22       1999 K Street, N.W.

23       Washington, DC 20006

24

25  BY:   REGINALD R. GOEKE, ESQ.

5

1

2 MAYER BROWN LLP

3      Attorneys for Ally Financial, Inc.

4      1675 Broadway

5      New York, NY 10019

6

7 BY:   MICHAEL O. WARE, ESQ.

8

9

10 MCKOOL SMITH

11      Attorneys for Freddie Mac

12      600 Travis Street

13      Suite 7000

14      Houston, TX 77002

15

16 BY:   PAUL MOAK, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, et al.**                    6
P R O C E E D I N G S

1

2          THE COURT:  Please be seated.  All right.  We're here

3    in Residential Capital LLC, number 12-12020.  Mr. Glenn?

4          MR. GLENN:  Good afternoon, Your Honor.  Andrew Glenn,

5    Kasowitz Benson Torres & Friedman along with Kanchana Leung and

6    Daniel Fliman on behalf of the Federal Housing Finance Agency

7    acting as conservator for Freddie Mac and Fannie Mae.

8          Your Honor, we're here pursuant to the adjourned

9    motion that we filed.  We understand that the other parties to

10   the proceeding before Judge Cote have also filed a separate

11   motion seeking additional information.

12         Before we proceed, I wanted to bring one update to

13   Your Honor's attention; it was a late breaking development

14   solely from our end.  We have consulted with our sampling

15   experts in this case, and we are prepared further to cut our

16   request at this point in time by half to 2,500 loan files to be

17   selected by the expert after the conclusion of these

18   proceedings.  Otherwise, we'll be guided by Your Honor in terms

19   of how you want to proceed today given the argument that we

20   presented in the last hearing.

21         THE COURT:  Let me ask you this.  Are you introducing

22   any evidence as part of your affirmative case?

23         MR. GLENN:  No, Your Honor.  We have the transmittal

24   declarations and that's all.

25         THE COURT:  What do you mean by the transmittal

**RESIDENTIAL CAPITAL, LLC, et al.**       7

1   declarations?

2          MR. GLENN:  The declarations of Ms. Leung, my partner.

3          THE COURT:  All right.  Do you want to -- I think

4   what -- if you're going to offer anything in evidence, you

5   ought to do that.  Let me ask you, are you going to cross-

6   examine the declarants that ResCap has proffered?

7          MR. GLENN:  I don't believe so, Your Honor.

8          THE COURT:  Okay.  Because this is an evidentiary

9   hearing, if there are -- if there's anything you wish to

10   introduce in evidence, offer it now, okay, including, if you're

11   offering your partner's declaration.  Identify it specifically

12   for the record, indicate the nature of the offer, et cetera.

13   Okay?

14          MR. GLENN:  We offer the two declarations of Kanchana

15   Wangkeo Leung.  One was submitted as part of our application

16   and the other one was a supplement affidavit in our reply

17   briefing.

18          THE COURT:  Can you identify those by ECF document?  I

19   mean the debtors have put everything together in a binder.  Do

20   you have that --

21          MR. GLENN:  I believe I have that --

22          THE COURT:  It looks like you've got it.  It's just I

23   want to be clear what is part of the record before me on which

24   I'm going to rule.

25          MR. GLENN:  Docket number 808 and 1296.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    8

1        THE COURT:  All right.  Are there any objections to

2   those two declarations?  Mr. Haims?

3        MR. HAIMS:  No, Your Honor.

4        THE COURT:  All right.  The two Leung declarations at

5   ECF docket numbers 808 and 1296 are admitted in evidence.

6   (Declaration and supplemental declaration of Kanchana Wangkeo

7   Leung was hereby received into evidence as of this date.)

8        THE COURT:  All right.  Do you rest at this point?

9        MR. GLENN:  Well, on the evidence, Your Honor --

10        THE COURT:  Yes.

11        MR. GLENN:  -- yes, we rest.

12        THE COURT:  Okay.  All right.  Mr. Haims, are you

13   going to -- I think you ought to start by offering in evidence

14   whatever you're going to proffer.

15        MR. HAIMS:  Your Honor, I'd like to start by -- before

16   I just do the evidence, just to say that Your Honor has been

17   clear that the automatic stay applies to third party discovery.

18   And Your Honor also stated that anyone --

19        THE COURT:  I was not.  I think you misstate what I

20   said.  We'll deal with it.  I think that the Kasowitz firm

21   accurately collected -- I asked a question whether the use of

22   the term "process" in 362(a) applied to subpoenas -- third

23   party subpoenas.  And I may have pondered whether -- you know,

24   why didn't it.  But I asked that that issue be addressed in

25   briefs.  Kasowitz addressed it and your brief just simply

**RESIDENTIAL CAPITAL, LLC, et al.**                                    9

1  recites the Court has already determined that 362(a) applies.

2  I did no such thing.  I asked a question based on the language

3  of the statute.  I asked that it be addressed.  You chose in

4  your brief to address it by saying the Court's already decided

5  it.  Kasowitz addressed it by addressing the substance of it.

6  I have not decided whether 362(a) applies to subpoenas served

7  in other litigation.

8           MR. HAIMS:  Okay, Your Honor.  So I will offer into

9  evidence the following declarations.  We have the first the

10  declaration of Jeffrey Lipps, which is document number 1023 --

11  1023.

12           THE COURT:  Dash -- I'm sorry?

13           MR. HAIMS:  Dash 1.

14           THE COURT:  Dash 1.  Okay.  Go ahead.  Anything else?

15  I'll take them as --

16           MR. HAIMS:  Take -- oh, I'm sorry.

17           THE COURT:  Mr. Glenn, are you going to object to any

18  of these declarations?

19           MR. GLENN:  Your Honor, I think we have one general

20  subject matter.  After all the affidavits are proffered, we

21  would like to address those.

22           THE COURT:  That's fine.

23           MR. GLENN:  Thank you.

24           THE COURT:  All right.  Go ahead, Mr. Haims.

25           MR. HAIMS:  There's the declaration of John G.

**RESIDENTIAL CAPITAL, LLC, et al.**                    10

1    Mongelluzzo, which is document 1023-2, which was filed on

2    August 7th, 2012.

3              THE COURT:  Okay.

4              MR. HAIMS:  There's the declaration of John G.

5    Mongelluzzo, which is document number 1295-2, filed on August

6    28th, 2012.  There's the declaration of Mary Fahy Woehr, which

7    is document number 1295-1, filed on August 28th, 2012.  And the

8    declaration of Philip Marc Scheipe, document number 1299, filed

9    on August 28th, 2012.  Those are the declarations.

10             THE COURT:  All right.  Mr. --

11             MR. HAIMS:  We also submitted --

12             THE COURT:  No.  Go ahead.  I'm sorry.

13             MR. HAIMS:  -- a binder of exhibits.

14             THE COURT:  Yes, but let me deal with the declarations

15   first.

16             MR. HAIMS:  Okay.

17             THE COURT:  Okay.

18             MR. HAIMS:  Sure.

19             THE COURT:  Go ahead, Mr. Glenn.  You have objections?

20             MR. GLENN:  Your Honor, Ms. Leung will handle that.

21             THE COURT:  Okay.  Ms. Leung?

22             MS. LEUNG:  Kanchana Leung of Kasowitz Benson.

23             THE COURT:  You're going to have to speak into the

24   microphone.

25             MR. GLENN:  You can sit here.

**RESIDENTIAL CAPITAL, LLC, et al.**                                      11

1          THE COURT:  Okay?  I want to be sure we have a clear

2    transcript.

3          MS. LEUNG:  Kanchana Leung of Kasowitz Benson.  As to

4    the declarations, we object to the paragraphs in portions of

5    the Mongelluzzo, Woehr and Scheipe declarations that purport to

6    speak as to the intent of the parties when they negotiated and

7    entered into the shared services agreement.  There has been no

8    argument by any party that the agreement is ambiguous and that

9    there is a need for any parol evidence as to intent.  And so,

10   we would, as a general subject matter objection, object to all

11   those paragraphs and ask that those be stricken and not

12   considered.

13         THE COURT:  Okay.  Mr. Haims, you want to address

14   that?

15         MR. HAIMS:  Your Honor, we agree that the language

16   says what it says, and is clear in what it says, and that it

17   doesn't provide, as we said, for these productions.  However,

18   to the extent that it doesn't and intent is an issue, we

19   respectfully disagree and think that intent is certainly an

20   issue here.  And the intent -- to the extent that Your Honor is

21   construing the language, the case law is pretty clear that you

22   could look at intent to see how the specific language is to be

23   construed.  Both parties here, Mr. Scheipe, on one side, and

24   the ResCap defendants on the other -- the ResCap declarants on

25   the other side, have testified as to what their intent was in

1  their negotiations in drafting the agreement.  We think it's

2  clear --

3            THE COURT:  But if the language --

4            MR. HAIMS:  We think it's clear, but if you're going

5  to get --

6            THE COURT:  Let me ask this.  Under New York -- New

7  York law governs, correct?

8            MR. HAIMS:  Correct.

9            THE COURT:  If under New York law the language of a

10  contract is clear and unambiguous, parol evidence is not

11  admissible for purposes of determining the meaning of a

12  contract.  Do you agree with that?

13            MR. HAIMS:  I agree with that.

14            THE COURT:  All right.  Here's what I'm going to do.

15  I'm going to -- all the declarations are admitted into

16  evidence.  The Court is reserving decision about the objection

17  from Ms. Leung with respect to the statements of intent.  I

18  have not fully resolved, in my own mind, this issue of whether

19  the agreement is clear and unambiguous and therefore parol

20  evidence should not be considered.  If parol is admissible, I

21  think it's fair to say this is the only evidence that's been

22  offered with respect to -- that would be parol evidence, but I

23  haven't decided that.  So I'm going to reserve decision on the

24  admissibility of testimony with respect to the supposed intent

25  of the parties.  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**                    13

1  (Declaration of Jeffrey A. Lipps in support of debtors'

2  objection to motion of the Federal Housing Finance Agency for

3  relief from the automatic stay was hereby received into

4  evidence as of this date.)

5  (Declaration and supplemental declaration of John G.

6  Mongelluzzo in support of AFI's submission regarding the shared

7  services agreement was hereby received into evidence as of this

8  date.)

9  (Declaration of Mary Fahy Woehr in support of debtors'

10  objection to motion of the Federal Housing Finance Agency for

11  relief from the automatic stay was hereby received into

12  evidence as of this date.)

13  (Declaration of Philip Marc Scheipe in support of AFI's

14  submission regarding the shared services agreement was hereby

15  received into evidence as of this date.)

16             THE COURT:  You want to address your --

17             MR. HAIMS:  Yeah.

18             THE COURT:  -- exhibits?

19             MR. HAIMS:  Yeah.  We have an exhibit binder --

20             THE COURT:  Yes.

21             MR. HAIMS:  -- which was submitted.  It has --

22             THE COURT:  I have that here.

23             MR. HAIMS:  -- certain exhibits listed as Exhibits 1

24  through 8.  And I'm happy to move them in as one or --

25             THE COURT:  Well, let's --

**RESIDENTIAL CAPITAL, LLC, et al.**                    14

1        MR. HAIMS:  -- take them through, whatever is --

2        THE COURT:  -- do it that way.  Offer them all and

3   then I'll --

4        MR. HAIMS:  I'll offer this binder in evidence.

5        THE COURT:  Okay.  All right.  The debtors' have

6   offered and have presented to the Court an exhibit binder with

7   exhibits premarked as Exhibits 1 through 8 and have now offered

8   them in evidence.  Mr. Glenn or Ms. Leung, do you have any

9   exhibits?

10       MR. HAIMS:  These are all the exhibits that were

11  attached to our declarations.

12       MR. GLENN:  No objection.

13       MR. HAIMS:  There's no new --

14       THE COURT:  All right.  So the documents marked as

15  Exhibits 1 through 8, Debtors' Exhibits 1 through 8, are

16  admitted in evidence for purposes of the hearing.

17  (Debtors' Exhibits 1 through 8 were hereby received into

18  evidence as of this date.)

19       MR. HAIMS:  And we have no further evidence, Your

20  Honor.

21       THE COURT:  All right.  You rest?

22       MR. HAIMS:  We rest.

23       THE COURT:  You responded that you do rest?

24       MR. HAIMS:  Yes, Your Honor.

25       THE COURT:  Okay.  All right.  Just to be clear, Mr.

**RESIDENTIAL CAPITAL, LLC, et al.**                    15

1  Glenn, do you wish to cross-examine any of the declarants?

2          MR. GLENN:  No, Your Honor.

3          THE COURT:  All right.  Do you have any rebuttal

4  evidence you wish to offer?

5          MR. GLENN:  We do not, Your Honor.

6          THE COURT:  All right.  You rest as well?

7          MR. GLENN:  We do.

8          THE COURT:  All right.  Now let me hear argument then.

9  Go ahead, Mr. Glenn.

10          MR. GLENN:  Thank you, Your Honor.  I don't want to

11  take the Court's time on issues that I know the Court has

12  examined closely and that we talked about last time that we

13  briefed on a supplemental basis.  I think the Court is in a

14  difficult situation in this case, because it is a very unique

15  case and the Court is being asked to decide a legal question

16  that could have far-reaching ramifications beyond this very

17  unique case.  And that is, does the automatic stay apply to

18  third party discovery.

19          We don't think it does for all the reasons we've set

20  forth in our papers.  We have addressed the Johns-Manville

21  case.  We've talked about all the other cases around the

22  country that go our way.  I think as a general rule --

23          THE COURT:  Well, let me ask you, Hillsborough

24  Holdings which you rely on --

25          MR. GLENN:  Yes.

**RESIDENTIAL CAPITAL, LLC, et al.**                    16

1    THE COURT:  Judge Paskay's decision in Florida --

2        MR. GLENN:  Yes.

3    THE COURT:   Manville.  Both of those cases involved

4    issues of discovery -- efforts to take discovery from employees

5    of the debtors in those cases, not from the debtors themselves.

6    And in this case, in its present posture, the issue is whether

7    discovery from the debtors should be permitted.

8        MR. GLENN:  That's correct.

9    THE COURT:  So you had pointed out -- at the last

10   hearing when I raised the issue about Manville, you said there

11   was an adversary pending, that you can't get an injunction

12   without an adversary proceeding, 105 -- your argument that 105

13   can't apply against FHFA.  But the issues in those cases where

14   discovery -- I mean, I don't have before me a subpoena from

15   FHFA for present or former officers or employees of any of the

16   debtors.  I have a subpoena for production of documents by the

17   debtors themselves.  Do you agree with that?

18       MR. GLENN:  Yes.

19   THE COURT:  I haven't found any decisions at all that

20   address the issue of the power of a bankruptcy court to

21   regulate or limit discovery from the debtor in connection with

22   third party actions.  Are you aware of any?

23       MR. GLENN:  Under 362 --

24       THE COURT:  Let me just --

25       MR. GLENN:  -- the answer is no.

**RESIDENTIAL CAPITAL, LLC, et al.**                    17

1    THE COURT:  Let's put 362 -- my question is really

2    more -- let's assume that I agree with the Ninth Circuit BAP.

3    There really isn't much law on this point.

4         MR. GLENN:  That's correct.

5         THE COURT:  Okay.  But let's assume I agree with the

6    Ninth Circuit BAP that 362(a) doesn't apply to third party

7    discovery from the debtor.  You did brief it.  You addressed

8    the legislative history and the wording in 362(a) itself.  But

9    what I've been pondering is whether 105 provides the Court with

10   authority not to enjoin FHFA, but to extend the protection of

11   362(a) to discovery from the debtor.  And it seemed to me in

12   thinking it through that doing so doesn't require an adversary

13   proceeding.  It doesn't require an injunction.  It is an order

14   -- it would be an order affecting the administration of the

15   case, affecting property of the estate.  You may dispute around

16   the margins on this but the estimate of the cost of

17   complying -- the only evidence I have before me with respect to

18   an estimate of the cost of the debtor to comply is probably

19   over a million dollars.  There are ranges that are given, and I

20   understand that.  I don't want to get into quibbling about the

21   exact dollars from --

22        MR. GLENN:  I would dispute that, Your Honor, insofar

23   as our application is concerned.  The other application is a

24   different story.

25        THE COURT:  Well --

**RESIDENTIAL CAPITAL, LLC, et al.**                          18

1        MR. GLENN:  And I just want to make that clear

2    because --

3        THE COURT:  Well, you've just reduced --

4        MR. GLENN:  -- we're being punished for trying to be

5    reasonable in this case.  So our application, the way we do the

6    math, Your Honor, just to be perfectly clear, 2,500 loan files

7    times approximately, give or take, twenty-five dollars.

8        THE COURT:  Well, for the third party cost to retrieve

9    the files from the vendor --

10        MR. GLENN:  Correct.

11        THE COURT:  -- no lawyer in his right mind would

12    ever -- you would never produce documents that your office

13    hadn't screened for privilege or any other protection for here

14    issues of confidential borrower information.  I mean, you just

15    wouldn't do that.

16        MR. GLENN:  Ms. Leung is probably more qualified to

17    handle that, but as I understand it, there is no privileged

18    information in these loan files.  The loan files --

19        THE COURT:  What about personally identifiable

20    information?

21        MR. GLENN:  That there is and that can be addressed,

22    and has been addressed, through a standard confidentiality

23    agreement with all the other defendants.  I just don't see that

24    as -- it's an issue, but I don't think that's a cost issue.

25        I didn't mean to sidetrack, Your Honor, so much.

**RESIDENTIAL CAPITAL, LLC, et al.**                                      19

1          THE COURT:  No.

2          MR. GLENN:  I just wanted to make my position --

3          THE COURT:  No.  But here's --

4          MR. GLENN:  -- clear.

5          THE COURT:  Look, the non-Ally underwriters have said

6    we need all 43,000 loan files.  And I understand that Judge

7    Cote said if you think you need it, you apply for it.  Well,

8    they've now filed a motion.

9          The issue that I framed was whether 105 provides a

10   source of authority for the Court.  I'm going to very -- I want

11   to be careful about -- this is not selected accidentally --

12   regulate discovery in a third party action.  And I say

13   "regulate" because to the extent that a debtor or these debtors

14   were to argue to me that no discovery now, no discovery ever

15   from the debtors in connection with third party actions, I

16   think that's an unsupportable position to take.

17         I start with a 350 year old maxim that the public has

18   a right to every man's evidence.  It's a proposition that has

19   been repeatedly relied upon by the U.S. Supreme Court, by the

20   circuit courts including the Second Circuit.  And what the

21   courts have roughly said is that to limit that, if by statute

22   or if there is some privilege issue, it has to be a well

23   established privilege.  And the issue in my mind is about

24   regulating it.  Can the bankruptcy court, charged with

25   overseeing these Chapter 11 cases, regulate discovery?  When do

1  you want the documents?

2       MR. GLENN:  We want them as soon as we can get them.

3  I believe something in the order of sixty days would work, like

4  six -- about sixty days.

5       THE COURT:  So over the next sixty days in this case,

6  there is an enormous amount of activity that's at the very core

7  of Chapter 11 bankruptcy proceedings.  There is an auction

8  scheduled, I think, for October 23rd.  There are twenty some

9  odd parties that have signed nondisclosure agreements that are

10  engaged in due diligence.  If you or one of your colleagues was

11  here this morning, you know that there was extensive colloquy

12  about a contested hearing scheduled for November 5th for which

13  expedited discovery is underway and arguments that the debtor

14  hasn't fully complied with its obligations to produce

15  everything it was required to produce.  So there's expedited

16  discovery ongoing for a very important hearing currently

17  scheduled for November 5th, whether it happens then or at a

18  later date, remains to be seen, but it'll happen soon.  There's

19  an examiner's investigation going on.

20       There is -- what I think -- you can respond to this if

21  you'd like.  I mean -- and I invite you to.  With everything

22  that's going on in this case, the debtor has more than its

23  hands full over the next sixty days just to do what it is

24  required to do to move this Chapter 11 case forward.  And

25  diverting -- at this time, diverting the resources -- let's put

**RESIDENTIAL CAPITAL, LLC, et al.**                    21

1  who pays for it aside.  Okay?  Just diverting the people and --

2  you know, there was an argument this morning about the

3  creditors' committee has asked for 1,500 loan files for their

4  sampling expert.  And there was a dispute as to whether all

5  1,500 were supposed to be produced before today, whether

6  they've now been produced or not, but that's just -- I give

7  that just as an example.  There's an enormous amount of work

8  being done.  And are you telling me the bankruptcy judge can't

9  say you, FHFA, you can't get your discovery now because of

10 everything that's going on and has to happen in this case very

11 soon.  I'm not telling you, FHFA, that you're not going to be

12 entitled to discovery from the debtors.  But I, as the judge

13 responsible for this Chapter 11, am telling you you're not

14 getting it now.  You're saying that's beyond my power to do.

15         MR. GLENN:  Let me start on a more general level, and

16 I'll try to finish there.  I think Your Honor posited the

17 question, the more general question, how can the Court regulate

18 discovery -- third party discovery in a complex -- an important

19 Chapter 11 case, such as this, such that that discovery doesn't

20 derail the fundamental purpose of Chapter 11.  And I think

21 there are plenty of cases out there that stand for that

22 proposition.  And I think that would be underpinning of Your

23 Honor's decision with respect to the other defendants granting

24 the Section 105 injunction dealing with potential

25 indemnification obligations, discovery, collateral estoppel,

**RESIDENTIAL CAPITAL, LLC, et al.**                                    22

1   res judicata.   Those are all the concerns that are appropriate

2   for a Section 105 injunction.   And I think that they can be

3   used to limit discovery in appropriate cases and including the

4   asbestos cases are a great example of that.   Manville -- that

5   was the central holding in Manville that apart from the bona

6   fides and the merits of the litigation itself, the avalanche of

7   that litigation, including discovery obligations, would

8   restrict, if not eliminate, the company's ability to

9   reorganize.   I think Your Honor has that general power and I

10  think that that power is well documented in a long string of

11  cases.

12          In this case, however -- and that's where I want to go

13  back to the beginning of what I said.   I think that the case

14  has far reaching ramifications if FHFA were not involved.   We

15  happen to be in the unique circumstance of being the

16  beneficiaries of this provision of --

17          THE COURT:   Well, you're not exercising police power.

18          MR. GLENN:   No, no.   But what Judge Cote held and what

19  the Second Circuit held in Colonial Realty is that Congress,

20  for the decision -- for the reasons that we've cited in our

21  papers and in the legislative history of HERA going back to

22  FIRREA has decided that FHFA's work is so important that

23  Congress did not want that work restricted by Courts outside of

24  what HERA is litigating in the Courts in which he is reporting.

25          THE COURT:   So you say that that gives FHFA a free

**RESIDENTIAL CAPITAL, LLC, et al.**                                    23

1   pass.  If you decided that you wanted discovery that was going

2   to cost twenty million dollars, I would have no power to

3   regulate or restrict it.  That's your view, correct?

4            MR. GLENN:  Under HERA, I think the answer is yes.

5            THE COURT:  No.  Tell me is there any source of

6   authority that I have, in your view, that would permit me to

7   restrict discovery sought from the debtors in this case by FHFA

8   if the uncontroverted evidence established that the cost was

9   twenty million dollars, and it would derail a whole series of

10  matters that are currently scheduled over the next three or

11  four months?

12           MR. GLENN:  I don't think Your Honor has to reach that

13  question because of what we've done.

14           THE COURT:  Well, I want you to answer that question.

15           MR. GLENN:  I'm going to.  The answer is no.  Your

16  Honor does not have that power.

17           THE COURT:  Okay.

18           MR. GLENN:  And I'm not here to make any value

19  judgments on that.  I'm not here to say it's right or wrong.  I

20  think that as a matter of statutory interpretation, starting

21  with Colonial Realty and Judge Cote's opinion the --

22           THE COURT:  Even though -- let's assume I agree with

23  you that under Colonial Realty, I can't -- I couldn't -- I

24  mean, the reference was withdrawn with respect to FHFA so it's

25  not an issue for me, as far as I'm concerned.  I know it's

1  being appealed, but that's -- it's just not my issue.  And what

2  I'm really asking is not an injunction against FHFA.  It is an

3  order that says, in substance, that 362(a) is hereby extended

4  so that discovery in third party actions may not be obtained

5  from the debtors absent further order of the bankruptcy court.

6  It is not specific to FHFA or FDIC.  You know, there are 1900

7  plus actions pending around the country; more than that.

8  Thousands of actions pending around the country.  The debtors

9  have, and they cited this, at least one stipulation where it

10  was fairly limited discovery.  They stipulated, and they

11  agreed.

12          And so, again, I start with the proposition I'm not --

13  they don't get a free pass on discovery in third party actions.

14  Okay.  The question is scope, context, timing, burden --

15  burden, I don't mean necessarily the dollars in costs.  Those

16  are among the factors that it would seem to me -- and you said

17  I can't take any of that into account if you decided you wanted

18  twenty million dollars.  If it was going to cost twenty million

19  dollars to comply, tough luck.  Do it.

20          MR. GLENN:  Your Honor, I think we have to divide the

21  two questions of cost and authority.

22          THE COURT:  No.  That's why I asked you a

23  hypothetical.

24          MR. GLENN:  Okay.  Your Honor, I think the solution to

25  the problem Your Honor identified is to either in this court or

**RESIDENTIAL CAPITAL, LLC, et al.**                                        25

1   the court in which the matter is presiding for the cost issue

2   to be resolved separately from the legal entitlement to the

3   documents.

4            THE COURT:  So you would agree that I could resolve

5   the cost issue and decide that FHFA would only be permitted its

6   discovery if it posts a bond for the estimate of costs in

7   complying and those -- and as soon as that is quantified

8   precisely that those costs will be paid.  Do you agree I have

9   the authority to do that?

10           MR. GLENN:  I'm not going to concede that Your Honor

11  has that authority, but I will concede that that's an

12  appropriate consideration --

13           THE COURT:  Well, either I have the --

14           MR. GLENN:  -- that either this Court --

15           THE COURT:  -- authority or I don't.

16           MR. GLENN:  I --

17           THE COURT:  What is your position?

18           MR. GLENN:  I think that my personal view, and we can

19  go into this further separately, is that the Court --

20           THE COURT:  No.  We're going to do it here now.  I

21  always love to talk to you, Mr. Glenn, but --

22           MR. GLENN:  Well, I know.

23           THE COURT:  People will think we're related --

24           MR. GLENN:  Ms. Leung will go into --

25           THE COURT:  -- or something.

**RESIDENTIAL CAPITAL, LLC, et al.**                          26

1    MR. GLENN:  Ms. Leung will go into the control issue

2  and where we think the cost should end up.  It's a -- I think

3  that the Court -- if we had a subpoena, a normal subpoena, the

4  Court who --

5          THE COURT:  You do have a normal subpoena.

6          MR. GLENN:  Well, the court out of which the subpoena

7  is issued would have the authority to determine who should pay

8  for the cost.

9          THE COURT:  Okay.  But let's just focus on that for a

10  minute, okay?  And Rule 45 specifically --

11          MR. GLENN:  Yes.

12          THE COURT:  -- talks about the Court that's issuing

13  the subpoena.  And so, that's not this Court; it's the district

14  court, right?

15          MR. GLENN:  Correct.

16          THE COURT:  Okay.  With all respect to Judge Cote, or

17  any other district judge, or any of the state judges around the

18  country, or federal judges around the country that have these

19  matters, I mean, they're not really -- first off, it's not

20  their job to worry about whether these Chapter 11 cases proceed

21  expeditiously in the ordinary course.  They have to worry about

22  their specific litigation.  One could call it a parochial

23  interest.  I think it's certainly an appropriate interest for

24  the judges.  In federal court, you know, Judge Cote could

25  address the issue of cost, but that doesn't address the issue

1  from a standpoint of a debtor whether it's a Chapter 7, or 13,

2  or 11 debtor.  That's a particular interest of the bankruptcy

3  court.

4          MR. GLENN:  Correct.

5          THE COURT:  And again, it would seem to me that when I

6  ticked off potential factors to consider, context -- you know,

7  scope, context, timing, burden, expense, those are all things

8  that a bankruptcy judge should consider.  I don't know which

9  way -- the balance they come out differently in different

10  cases.

11          Just let me back up for a second.  You didn't -- I

12  take it you resolved the issue about the loan tapes and

13  origination information?

14          MR. GLENN:  We did, subject to an issue about the

15  confidentiality agreement.

16          THE COURT: Okay.

17          MR. GLENN:  But I'm not here to --

18          THE COURT:  You're going to -- right.

19          MR. GLENN:  -- to deal with that, Your Honor.

20          THE COURT:  Okay.

21          MR. GLENN:  I think that there are a couple things I'd

22  like to observe, because we're talking both in terms of general

23  policy considerations, Your Honor, and issues -- practical

24  issues with this dispute.  I think that the issue of who should

25  pay for this discovery in this dispute --

**RESIDENTIAL CAPITAL, LLC, et al.**                    28

 1          THE COURT:  I'll get to who pays.

 2          MR. GLENN:  Okay.  Okay.

 3          THE COURT:  I'll get to who pays.

 4          MR. GLENN:  I think that if our request were

 5   unreasonable, that the scope was an issue, that the cost was an

 6   issue, that the timing of production was an issue, that those

 7   are practical issues that the Court has -- certainly has some

 8   input on just like any other Court would --

 9          THE COURT:  How are --

10          MR. GLENN:  -- that was --

11          THE COURT:  What's the source of my authority for

12   input on that?

13          MR. GLENN:  Well, you would have jurisdiction to rule

14   on those issues in the first instance.

15          THE COURT:  Under what authority?

16          MR. GLENN:  Under Rule 45.

17          THE COURT:  I don't.  I mean, Rule 45 -- it

18   specifically says the Court that issued the subpoena --

19          MR. GLENN:  Well, in this case, Your Honor, the

20   district court has deferred to you.  And that's what I was

21   getting to on cost.  The Court wanted to hear your concerns

22   about the cost and whether this would derail the company's

23   reorganization.  The Court did make those comments.  I believe

24   it's in the transcript that she did want to hear from you on

25   that.  And she cited the Johns-Manville case as a circumstance

**RESIDENTIAL CAPITAL, LLC, et al.**                    29

1    where those were considered.

2            THE COURT:  Let me ask you another hypothetical.

3    Let's assume not only that it was going to cost ten million

4    dollars for the debtor to comply, and we'll deal with the issue

5    of cost, you want the stuff -- you say -- let's say a district

6    judge, and this is not what Judge Cote has done, let's say the

7    district judge orders that this be produced -- the judge who

8    issues the subpoena says produce it within forty-five days.

9    And the bankruptcy judge who's got the case, not this case,

10   concludes that, you know, producing -- requiring the debtor to

11   produce documents at a cost of ten million dollars in the next

12   forty-five days guarantees this case is derailed and converts

13   to a Chapter 7 liquidation.  The bankruptcy judge has no

14   authority to do anything about it?

15           MR. GLENN:  In our --

16           THE COURT:  Yeah.

17           MR. GLENN:  -- particular circumstance --

18           THE COURT:  FHFA is the plaintiff or FDIC and says,

19   got to produce this document within forty-five days.  It's

20   going to cost ten million dollars.  And the debtor comes in

21   with uncontroverted evidence that complying with that subpoena

22   would result in conversion of the case to Chapter 7

23   liquidation.  Bankruptcy has no power -- the bankruptcy court

24   has no power to do anything about it.

25           MR. GLENN:  It's funny, Your Honor.  If I were here

1   about nine months ago when I represented Borders, I might have

2   a different viewpoint of that --

3           THE COURT:  Really?

4           MR. GLENN:  -- case.  Yes.  But what I have to say is,

5   I have to start from the text of HERA.  And the text of HERA

6   says that no court can issue any order enjoining or limiting

7   FHFA's activities.  So I think we have to draw the line between

8   what is a regulatory -- a discovery burden weighing exercise

9   versus what is -- a court throwing down the gauntlet and

10  saying, no, I'm not infringing -- you don't get it, and I'm not

11  infringing on FHFA.

12          THE COURT:  You don't get it now.

13          MR. GLENN:  You don't get -- well, that question

14  straddles the line between --

15          THE COURT:  Does it?

16          MR. GLENN:  -- those two -- it does, Your Honor,

17  because if Your Honor said that it's going to -- you're going

18  to delay the debtors from producing documents for a year, and

19  we have a written discovery deadline of the end of the year.

20          THE COURT:  You haven't even had to have motion

21  practice in your case.  I understand.  Judge Cote issued an

22  order.

23          MR. GLENN:  I am subject to an order.  My client is

24  subject to an order today for written discovery to end at the

25  end of this year.  Whether -- if the Court said you can't get

**RESIDENTIAL CAPITAL, LLC, et al.**                                       31

1  the documents, whether Judge Cote would default FHFA because it

2  couldn't proceed with its case at that point in time, I would

3  hope --

4          THE COURT:  You know, I look with --

5          MR. GLENN:  -- I would hope that she would --

6          THE COURT:  I look with interest --

7          MR. GLENN:  -- be flexible about that.

8          THE COURT:  -- on -- I think you cited what I refer to

9  as Winnick I, Judge Lynch's decision in the district court.

10 There's also a Winnick II which is an interesting case.  I

11 mean, in that Luzzano case that I had called to your attention,

12 I discussed both Winnick I and Winnick II.  Winnick I, Judge

13 Lynch said you've got to produce this discovery.  In Winnick

14 II, which was -- Citibank had the documents.  It wasn't a party

15 to the case, and they claimed it was too burdensome.  And I

16 guess Judge Lynch agreed.  And so, Citibank was relieved of the

17 obligation to produce any of the documents, but Judge Lynch had

18 decided that the plaintiffs, as assignees of the claim they

19 were prosecuting, were obligated to do it.  It leaves -- I

20 mean, I guess the judge could default the defendant, but that

21 was one of the twists in the Winnick case.

22         But let's say I'm not going to just stay it for a

23 year.  I mean there's an auction at the end of October.

24 There's an RMBS settlement hearing scheduled for November 5th

25 which may or may not hold to November 5th.  There are a whole

**RESIDENTIAL CAPITAL, LLC, et al.**                                      32

1  slew of things sort of between now and January that are going

2  to happen in this case where if, based on the uncontroverted

3  evidence and the record in the Chapter 11 cases, I was to

4  conclude that the debtors having to comply now with the

5  subpoena would be seriously prejudiced.  It would threaten to

6  derail an important Chapter 11 case and consequently -- look,

7  what I did with respect to the 105 injunction, it runs to

8  October 31.  They may come back and say they need it extended

9  for some period or not, but it isn't going to get extended

10 indefinitely.  It was not an injunction.  You know, and I said

11 in the one that was contested and went to decision, you know,

12 parties are free to take discovery from AFI, but not from the

13 debtors while the stay is in place.

14          So --

15          MR. GLENN:  Your Honor --

16          THE COURT:  I mean, I see that -- yeah.  You want to

17 go the outlier the other way.  Judge Cote's ordered, you know,

18 a year discovery cutoff for fact discovery, and, you know, it

19 may be you got to wait three or four months before the debtor

20 has to comply.  I don't know what the appropriate period is.

21          MR. GLENN:  Those are very difficult questions.

22          THE COURT:  That's why I'm asking them, yes.

23          MR. GLENN:  And I'm obviously -- I understand that.

24 And I'm doing my best to help the Court.  But ultimately, Your

25 Honor has to decide this case based on the record before Your

**RESIDENTIAL CAPITAL, LLC, et al.**                    33

1   Honor.  And I would point Your Honor to the Mongelluzzo

2   declarations, and I hope I haven't slaughtered that name.  But

3   what is conspicuously absent from both of those declarations,

4   and it's interesting to look at the progression between the

5   two.  The first one spoke to the situation before the last

6   hearing when it was up in the air exactly how much FHFA --

7            THE COURT:  Well, it was 105,000 files.

8            MR. GLENN:  Correct.  Correct.  So if Your Honor goes

9   to the supplemental Mongelluzzo declaration and goes back and

10  forth between the two, there's absolutely nothing in those

11  declarations that says that complying with our request, I

12  should say, with FHFA's request is going to somehow derail --

13           THE COURT:  Well, time out.

14           MR. GLENN:  -- this reorganization.

15           THE COURT:  Wait a second.  I mean, you say that the

16  statute prevents me from doing anything to regulate the

17  discovery by FHFA.  What does it do with respect to the

18  defendants' -- the nondebtor defendants in your case, to their

19  subpoena?

20           MR. GLENN:  I have no idea ,and I will leave it to

21  them to argue that.

22           THE COURT:  I see.  So, you know, they can't -- I

23  could say you can't get it, but FHFA I can't stop them.  They

24  only want, now, 2,500, you want 43,000.

25           MR. GLENN:  We don't think they want it.  We think

**RESIDENTIAL CAPITAL, LLC, et al.**                    34

1   that, putting aside the burden on the debtors, the process

2   here, Your Honor, is the loan files in this litigation

3   effectively have to be re-underwritten.  Data's collected, a

4   person who has the capabilities of a loan officer who can

5   determine whether the loan is worthy and meets the underwriting

6   guidelines, has to reexamine them.

7          THE COURT:  I think I know the answer to this

8   question, but did you and your experts seek to meet and confer

9   with the defendants' counsel to see whether the experts could

10  agree on an appropriate sampling methodology?  I'm sure the

11  answer is you did and they said no, they want all 43,000 files.

12  Do I have that roughly right?

13         MR. GLENN:  Not with respect to this in particular,

14  but globally there are many, many securitizations.  And if Your

15  Honor were to look at the entire record of all the loan files

16  at issue and all the securitizations in dispute the number is

17  staggering, and we just don't think it's possible, not only

18  within Judge Cote's schedule, but with any reasonable schedule

19  to undertake this process.

20         So there are broader issues at play in the litigation.

21  We're trying to be reasonable.  We're trying to work with the

22  Court and work with the debtor to obtain a sample size that

23  achieves our objectives with being able to prove our case with

24  minimizing and hopefully eliminating the burden on the company.

25         Some of their vendors are FHFA's vendors and there are

**RESIDENTIAL CAPITAL, LLC, et al.**                    35

1    pricing and other potential efficiencies that we can take

2    advantage of.  I think today the question Your Honor has to

3    decide is do we have the legal entitlement to these documents

4    and who should bear the cost.

5              THE COURT:  Let me ask you this specifically.  Do I

6    have the authority, under Section 105, to extend to the debtors

7    protection against discovery in any action, absent further

8    order of the Court?

9              MR. GLENN:  A blanket?

10             THE COURT:  Yes.  It would -- in words or in substance

11   it would say that in light of the large number of lawsuits

12   pending around the country, from which discovery may

13   potentially be requested or is responsive, and in light of the

14   burden and expense to the debtors of complying with discovery,

15   in order to regulate discovery in aid of administration of

16   these Chapter 11 cases, the Court extends the protection of

17   362(a) to any subpoena or other request for production of

18   documents, from the debtors.

19             MR. GLENN:  Not as against FHFA, certainly, because of

20   the reasons we've articulated.  But --

21             THE COURT:  Well, but that's not an injunction against

22   FHFA.  It is saying in the administration of this case, and I'm

23   not saying FHFA can't get that stay lifted on conditions, but

24   it is not an injunction -- it's not an injunction against FHFA

25   proceeding with its action.  It is because, I'll just use the

**RESIDENTIAL CAPITAL, LLC, et al.**                                      36

1  hypothetical to make it easy, I know you say that the costs,

2  particularly when you get down to 2,500 loan files is

3  substantially less, if the burden and expense to the debtor of

4  complying with discovery, it will require use of property of

5  the estate.  It will affect the administration of the case, the

6  effective administration of the case, and in aid of that power

7  the Court, using 105, extends the stay, subject to further

8  order of the Court, to any discovery from the debtors.

9          That doesn't seem to me to require a 105, an

10  injunction.  It's not an injunction of any outside activity.

11  In Hillsboro Holding it was depositions of present and

12  former --

13          MR. GLENN:  Senior officers, right.

14          THE COURT:  -- officer or employees.  In Manville it

15  was, again, discovery from -- at least that decision -- Judge

16  Bryant's decision was discovery of officers and directors.

17          I understand your argument that, and I subscribe to

18  the law, that to get an injunction against any outside

19  activity, if you will, it's got to be done by adversary

20  proceeding under 7001.  But 105 is utilized other than in the

21  injunction context.  Just the words of the statute 105(a), "The

22  Court may issue any order, process or judgment that is

23  necessary and appropriate to carry out the provisions of this

24  title."

25          Well, the provisions of this title are intended, under

**RESIDENTIAL CAPITAL, LLC, et al.**                    37

1  541, to marshal and protect the assets and the property of the

2  estate in Chapter 11 dealing with administration of the case.

3  The kind of order that I'm asking you about is designed

4  specifically not to extend powers beyond what the Code does,

5  but to apply the powers that the Code already contains to a

6  context that's slightly different.

7          MR. GLENN:  I think the answer is no, Your Honor,

8  unfortunately.  I think that --

9          THE COURT:  Let me just say, I haven't found any cases

10  one way or the other.

11          MR. GLENN:  I was going to say, I haven't heard of a

12  case that says that.  I think that Rule 7001 doesn't just say

13  injunction, it says other equitable relief.

14          THE COURT:  Against a third -- against some party.

15          MR. GLENN:  Yes.

16          THE COURT:  So if I -- look, it isn't even on -- the

17  debtors sought an injunction against FHFA, Judge Cote withdrew

18  the reference, she made a determination, no stay.  I'm not

19  making any effort to second guess that.

20          MR. GLENN:  I think that those are the types of

21  matters that probably have a practical solution, because what

22  Your Honor is saying that the -- given what Your Honor has

23  either taken judicial notice of or seen in a first day hearing,

24  seen in other similar complex cases, Your Honor could establish

25  guidelines that before a party can come in and get this kind of

**RESIDENTIAL CAPITAL, LLC, et al.**                                      38

1   discovery they would have to prove that that is not going to

2   derail the reorganization, cost -- have a cost that's

3   prohibitive or other matters so that it would be more of a

4   controlling the docket type of approach to solve a practical

5   problem.  But as a blanket matter to issue an order that has

6   either a direct or indirect effect of enjoining third parties,

7   I don't think Your Honor could do that without an adversary

8   proceeding.

9           THE COURT:  Address the expense issue.

10          MR. GLENN:  I'm sorry?

11          THE COURT:  Address the expense issue.

12          MR. GLENN:  Your Honor, what I would like to do for

13  that is cede the podium to Ms. Leung on the control issue,

14  which I think is the issue which is the major issue of expense.

15          THE COURT:  Okay.  Fine.

16          MR. GLENN:  Thank you.

17          MR. HAIMS:  Your Honor, before she does if I could

18  make one quick, just, note.

19          THE COURT:  I can't hear you, Mr. Haims.

20          MR. HAIMS:  Oh, I'm sorry.

21          Before she starts I just want to make one quick point.

22  We just got an e-mail that the Second Circuit has stayed the

23  FHFA case, has issued an order today, and that it's going to be

24  pending full briefing on the motion for a stay, which is going

25  to be heard on September 25th.  I just wanted to bring that to

**RESIDENTIAL CAPITAL, LLC, et al.**                    39

1  your -- we just got an e-mail, and I wanted to bring that to

2  the Court's attention.

3          THE COURT:  Okay.  All right.  Thank you.  We'll

4  continue on though.  Go ahead, Ms. Leung.

5          Can I -- let me just before -- the application that I

6  understood was before the Second Circuit was in the UBS case.

7          MR. HAIMS:  The application was by UBS for all of the

8  FHFA cases.

9          THE COURT:  For all of them?  Okay.  All right.  Go

10 ahead, Ms. Leung.

11         MS. LEUNG:  And I just wanted to address that briefly.

12         As we set forth in our letter response yesterday,

13 regardless of the UBS appeal, this case was still go forward.

14         THE COURT:  Just pull the microphone a little closer.

15         MS. LEUNG:  This case would still go forward, because

16 there are fraud and aiding and abetting fraud claims again --

17         THE COURT:  Not if the Second Circuit stays it, it

18 won't.

19         MS. LEUNG:  Right.  But that's not an issue that --

20 the legal issue that's before the Court.  So --

21         THE COURT:  No, I -- it may be that the issue before

22 the Second Circuit is a narrower one, but if they stay the case

23 the case is stayed, but we'll see what they order.

24         Go ahead.

25         MS. LEUNG:  Okay.  Before I get to the control issue I

**RESIDENTIAL CAPITAL, LLC, et al.**                                    40

1   do want to clarify something for the record.  Before Your Honor

2   was speaking in terms of Rule 45 subpoenas.  In fact there is

3   not a Rule 45 subpoena against the debtors.  There may be some

4   confusion because several years ago, I believe in 2010, FHFA

5   issued a number of subpoenas to different servicers including

6   RFC and GMAC Mortgage LLC, which does cover loan files.  So

7   there is an outstanding subpoena to the debtors, but it wasn't

8   in the context of the litigation, and it wasn't issued out of

9   the district court as part of the litigation.

10          THE COURT:  So you're telling me there's no

11   outstanding -- I mean, they're not a party to your action,

12   correct?

13          MS. LEUNG:  Correct.

14          THE COURT:  And therefore, in order to take discovery

15   from them you have to proceed by Rule 45?

16          MS. LEUNG:  Well, not exactly, Your Honor.  We are in

17   an odd procedural posture because of the way that we got here,

18   and I think we've been very clear that FHFA's position is that

19   Ally has control over the loan files and various other

20   documents.  Ally should be producing those documents as part of

21   party discovery, whether or not it's actually in the possession

22   or custody of the debtors, and that Ally should bear the costs

23   of that production as a party.  And our understanding is that

24   Judge Cote wanted you to decide the bankruptcy issues in the

25   first instance, but we've always tried to get these documents

**RESIDENTIAL CAPITAL, LLC, et al.**                                      41

1   through party discovery, not third party discovery.

2              THE COURT:  Okay.

3              MS. LEUNG:  And the papers that were submitted by the

4   debtors don't -- or Ally, don't undercut that position at all

5   and that only confirms our position, as set forth in our

6   papers, that Ally does have control over the loan files.

7              As Your Honor correctly seized upon the last time we

8   were here, the relevant legal issue is whether Ally has access

9   or the ability to obtain the documents and the shared services

10  agreement is clear on that front.

11             The record services statement of work is clear on its

12  face that it covers litigation requests, and it's also clear

13  that it covers loan files.  In fact, in paragraph 28 of the

14  Mongelluzzo supplemental declaration, the debtors concede that

15  as part of records services they provide loan files to Ally

16  upon request.

17             It's also clear, on the face of the agreement --

18             THE COURT:  They just didn't think that 5,000, 2,500,

19  104,000, 42 -- 43,000 would have to be produced at one time?

20             MS. LEUNG:  Maybe, maybe not.  I can't speak to that.

21  But it is clear, on the face of the agreement, that ResCap does

22  not have discretion to turn down a request.  In Section 6(b) it

23  says "During the term of the statement of work ResCap will

24  provide all services under the terms and conditions of the

25  statement of work."  And ResCap argues that despite the plain

1    words of the statement of work that other provisions of the

2    agreement support their conclusion that they're not required to

3    produce the loan files.  For example, they argue that the

4    timeframe for responding to requests is a day turnaround and if

5    the parties had contemplated a request for thousands of loan

6    files, that that would make no sense.

7          But in fact ResCap bargained for more time to complete

8    services and for more staffing in Section 7(a)(5) of that

9    statement --

10         THE COURT:  Give me that section again?

11         MS. LEUNG:  7(a)(5) --

12         THE COURT:  Uh-huh.

13         MS. LEUNG:  -- of the statement of work under

14   performance standards it says, "Any references to established

15   timelines herein refers to Exhibit D.  ResCap may change such

16   established timelines and will provide AFI with an updated

17   Exhibit D.  To the extent there are material changes in

18   ResCap's established timelines, ResCap and AFI shall work

19   towards establishing mutually agreeable timelines."

20         In addition, in Section 7(b)(1), Remediation

21   Processes, it provides for additional staffing.  It says, "If

22   ResCap reasonably determines that there is inadequate staffing

23   or staffing that lacks necessary training or skills to meet the

24   service level agreements set forth in Section 7(a), AFI agrees

25   to work reasonably with ResCap to address any such deficiencies

**RESIDENTIAL CAPITAL, LLC, et al.**                                43

1    in staffing or skill sets."

2           So the agreement, on its face, provides for

3    contingencies such as large order requests for documents.  So

4    their -- the provisions they cite that say -- that they argue

5    undercut a plain reading of the statement of work, we think

6    don't support that reading, in fact quite the opposite that

7    they bargained for and gave themselves maximum flexibility for

8    things -- for unforeseen circumstances like a large request for

9    loan files.  We think that that's clear on its face.

10          As for the fee structure, the parties -- ResCap and, I

11   think, Ally also concedes that the agreement provides for Ally

12   to pay for services.  So even though there's a basis --

13          THE COURT:  I had some question whether they're

14   limited to that 50,000 dollars for document production services

15   versus potentially millions that it's going to cost to do it.

16          MS. LEUNG:  But I think the debtors clearly -- I think

17   the agreement clearly states that the pass-through costs would

18   be absorbed by Ally.  So it appears that most of these pass-

19   through costs would be the costs of the vendor to retrieve the

20   documents and not actually ResCap costs or personnel time or

21   labor in terms of identifying the loan files.  That most of

22   that cost is actually in the retrieval.

23          THE COURT:  Is there anything in the shared services

24   agreement or the statements of work that -- let's assume that

25   AFI requested ResCap to produce 43,000 loan files, is there

**RESIDENTIAL CAPITAL, LLC, et al.**                    44

1   anything in the shared services agreement or the statement of

2   work that addresses how quickly ResCap would have to comply

3   with the request?

4          MS. LEUNG:  Other than what I just read into the

5   record, not that I'm aware.  It just gives them flexibility to

6   do it in more time then what's in Exhibit D.

7          THE COURT:  Okay.  So that, for example, if Judge Cote

8   ordered Ally to produce 43,000 loan files and this Court

9   determined that yes they should produce it over a different

10  timeline, beginning ninety days from now when things settle

11  down in the case and setting out reasonable parameters as to

12  when it should be done, is there anything in the shared

13  services agreement or the statements of work that would limit

14  this Court's ability to set out that timetable?

15         MS. LEUNG:  Not that I'm aware.

16         THE COURT:  Okay.

17         MS. LEUNG:  Also, for the shared services agreement we

18  have pointed out the legal services statement of work and the

19  reason we think that that also supports ResCap's obligation to

20  provide loan files, is it shows that ResCap is required to

21  facilitate access to documents and --

22         THE COURT:  Let me put it -- let me just stop you

23  there; I'll let you go on.  I've actually read these pretty

24  carefully.

25         MS. LEUNG:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**                    **45**

1       THE COURT:  I think you have the much stronger side of

2   the argument on the point of whether -- I don't think you

3   can -- I mean, it's -- I don't think I can order Ally to

4   request the documents; I think Judge Cote could.  I don't think

5   if I said produce them under these documents that ResCap would,

6   as a result of my order that they produce them, would trigger

7   the response -- the obligation of Ally to pay for it.

8       I think if -- I mean, I approved the entry into the

9   shared services agreement.  I believe I can, therefore -- it

10  was presented to me by AFI and the debtors and I approved it

11  and I believe I can have the power to interpret it.  If Judge

12  Cote ordered them to it and they -- and she directed them to

13  forward that request to the debtors, I think she could

14  certainly deal with, to the extent necessary, the cost issue.

15  I think if she ordered them to do it, I think, since I approved

16  this agreement I could interpret it, hypothetically, as saying

17  okay you've got to do it, Ally's got to pay for it under these

18  sections.

19      But I'm -- you can gather from my colloquy with Mr.

20  Glenn that my focus isn't so much whether documents have to be

21  produced but when they have to be produced and who bears the

22  cost of having to do it.  Those are -- you know, I haven't

23  decided any of this at this point but those are my principal

24  concerns.

25      I just -- they're in court several times a week and we

**RESIDENTIAL CAPITAL, LLC, et al.**                                46

1  have this very, very full docket, all front-loaded in this case

2  between now and the end of this year.  It may spill over into

3  early next year.  There'll be stuff that obviously goes on

4  after that but we are jam-packed with very time-intensive

5  things that are going on, such that having to comply in the

6  next sixty days with -- you say, well, you're only asking for

7  2,500 now; the other side in your cases want 43,000, a much

8  heavier burden from it.

9          The task of complying -- I don't think one side should

10 get its discovery and the other side get shut out.  So it's as

11 much an issue -- what's the scope of the request, what's the

12 context in which it's being asked, what's the timing, what's

13 the burden, what's the expense, those are the things that I'm

14 focused on.

15         I'll let Mr. Haims address the issue.  I'm not -- I'm

16 taking this under submission today.  I think you've got the

17 much stronger side of the argument about what this shared

18 services agreement requires ResCap to do if AFI asks for it.

19 That request hasn't been made yet.  And Judge Cote could order

20 AFI to request the documents from ResCap.

21         I think the issue that the debtors have raised and

22 Ally -- AFI raised it in their filing here, I don't care who

23 owns the stuff.  It doesn't make any difference who owns this

24 data or the documents.  That's a red herring issue as far as

25 I'm concerned.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    47

1    MS. LEUNG:  Well, we agree with that.  I think that

2   where it would be helpful is for -- an interpretation of this

3   agreement would be helpful to the district court because of

4   AFI's position that they can't ask or do anything or take

5   copies of the documents, for some reason, because of the

6   bankruptcy stay.  That is the position that they have set forth

7   in terms of objecting to our document requests and in the

8   district court, that the automatic stay prevents them from

9   getting copies of these documents.

10       So we have stated very clearly we think that the

11  shared services agreement is a method by which they can request

12  the documents that Your Honor has already ruled on that.

13       THE COURT:  Well, I know Mr. Glenn disagrees with my

14  view that 105 is a potential -- I'm not deciding it yet -- the

15  potential source of power for the Court to say no discovery

16  absent further order of this Court from the debtors.  The

17  shared service agreement, not to the contrary withstanding, and

18  even though that agreement was entered into post-petition,

19  approved post-petition, I think I would still, under my

20  analysis, have the ability to regulate AFI's discovery from the

21  debtors as well.

22       Again, none of this is to say that -- I mean, I've

23  said it already.  Okay.  Anything else?

24       MS. LEUNG:  Well, to the extent that the stay does

25  apply, Your Honor already did rule on that issue when you

**RESIDENTIAL CAPITAL, LLC, et al.**                    48

1  approved the shared services agreement.  There is a -- I don't

2  have it in front of me but there is a paragraph in that order

3  that says that the stay is lifted to the extent necessary to

4  fulfill the shared services agreement.

5           So to the extent that it does apply --

6           THE COURT:  So you'd say I would have -- your view is

7  I would have no -- if ResCap said look, we've got twenty-seven

8  similar lawsuits pending against us, Ally says we've got

9  twenty-seven similar lawsuits pending us around the country.

10  It involves not 43,000 loan files; it involves 105,000 or

11  200,000 loan files, every loan file that ResCap has control

12  of -- possession of -- let's put control aside -- we need them

13  and we need them in the next sixty days, you don't think I

14  would have the power to say not so fast?

15           MS. LEUNG:  Well, I'm out of my element when it comes

16  to bankruptcy law, but I believe that Your Honor ruled on the

17  basis of Section 105 as to discovery in those cases and that

18  does not apply to FHFA.

19           THE COURT:  Until October 31st.  Well, it's -- okay.

20  Thank you, Ms. Leung.

21           MS. LEUNG:  Thank you.

22           THE COURT:  Mr. Haims?

23           Let me raise a couple other questions with you, while

24  you come up.

25           MR. HAIMS:  Oh, sure.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    49

1        THE COURT:  I'll listen to your argument.  I mean, I

2   thought -- I was not particularly taken by the factual showing

3   that you made as to the -- your vendors don't have to provide

4   more than 1,500 files a month and it's going to take thirteen

5   months or thirteen years or you figure it out to provide it.  I

6   mean, you're -- the showing you made is without additional cost

7   they wouldn't produce more -- there is no judge that I know who

8   would give you several years -- let's assume that they could

9   take discovery, okay?  There's no judge I know who would say

10  okay, it may take you a year or two to produce the documents

11  because your vendor is only under contract to do 1,500 a month

12  without additional expense.  So that's unpersuasive.

13        I mean, you seem to have acknowledged, but not really

14  addressed, that you have the ability to request much more

15  expedited but costly service.  The issue of who pays for it is

16  a different issue, okay.  How quickly -- tell me this, Mr.

17  Haims, if you had to produce 43,000 loan files and somebody

18  else was going to pay for it, so cost is not an issue, how

19  quickly could you produce them?

20        MR. HAIMS:  As we say in the papers -- in the

21  documents, it's going to be nine months.

22        Now, we don't control --

23        THE COURT:  Mr. Haims, I can't believe that.  I

24  just --

25        MR. HAIMS:  We don't control the vendors.  We can ask

**RESIDENTIAL CAPITAL, LLC, et al.**                    50

1    the vendors.  You're right, that we -- there's additional --

2            THE COURT:  Oh, they'll be more than happy to provide

3    expedited service at a substantial cost.

4            MR. HAIMS:  Well, but there are lots of other

5    productions going on at the same time.  So this is not the only

6    -- this is not a standalone production.  Things are different,

7    for example, when the MBIA case was done several years ago --

8            THE COURT:  Why was it different?

9            MR. HAIMS:  This was pre-bankruptcy.  We didn't have

10   all of the other loan file pulls that we were doing now, the

11   governmental reviews, the committee reviews, the due diligence

12   on the sales, none of that.  So we haven't gotten the list of

13   loan files.  We don't know where those loan files are.  We

14   don't know in how many warehouses they're housed in.  We don't

15   know in what states.  We don't know whether east coast, west.

16   We don't know any of that at this point in time.

17           THE COURT:  Okay.  And tell me this --

18           MR. HAIMS:  So it's hard to say --

19           THE COURT:  -- if FHFA gives you a list -- let's put

20   FHFA aside.  The other defendants in the FHFA cases give you a

21   list of 43,000 loan files, what do the debtors have to do to

22   determine where the files are?

23           MR. HAIMS:  The debtors have to run those 43,000 loan

24   numbers through fourteen databases, find out -- that will pull

25   up where those loan files --

**RESIDENTIAL CAPITAL, LLC, et al.**                    51

1            THE COURT:  How long is it going to take to do that?

2            MR. HAIMS:  What we estimate, it's going to be about a

3   day of processing for each database.  These are batch --

4            THE COURT:  How many databases are there?

5            MR. HAIMS:  Fourteen.

6            THE COURT:  Okay.

7            MR. HAIMS:  And then --

8            THE COURT:  They can't be run simultaneously in

9   fourteen databases?

10           MR. HAIMS:  Mr. Mongelluzzo can talk better than I can

11  about that.  But the answer -- I understand the answer is --

12           THE COURT:  Do you know the answer to that?

13           MR. HAIMS:  I understand the answer to that is no.

14           THE COURT:  Why not?  Is he here?

15           MR. HAIMS:  He is here.

16           THE COURT:  Ask him the question.

17           MR. HAIMS:  Sure.

18           THE COURT:  I want to know how long -- if you -- for

19  43,000 loan files can searches of four databases --

20           MR. MONGELLUZZO:  Fourteen.

21           MR. HAIMS:  Fourteen.

22           THE COURT:  -- fourteen databases, can they be run

23  simultaneously?

24           MR. MONGELLUZZO:  There's two issues, Your Honor.  One

25  is that we would -- they -- some of the loans are in some

**RESIDENTIAL CAPITAL, LLC, et al.**                                    52

1  databases and some are in others.  So until you exclude it from

2  the first database you don't move to the second.  It's just the

3  way the IT batching process works, and I'm not an IT expert so

4  I can't explain to you why we have those system constraints.

5  We're dealing with multiple systems that are legacy systems.

6  So whenever we've had to do large searches like this, i.e. the

7  MBIA case, it basically takes us three to four weeks to go

8  through all of that processing and do all the reconciliation

9  till we can finally tell you exactly where everything is.

10         THE COURT:  Okay.  Thank you.  Thank you very much.

11         So let's say it takes two weeks to figure out where

12  the loan files are.  Then what does it take to get them back?

13         MR. HAIMS:  You've got to ask the vendors.

14         THE COURT:  Okay.

15         MR. HAIMS:  The vendor's got to pull them.

16         THE COURT:  And do you have -- I mean, vendors -- my

17  experience is that the vendors have -- you have a contract, and

18  I understand it limits the number that they have to do.  But

19  they've got a cost sheet, and my recollection is the cost --

20  the more quickly you need it, the greater the cost.  And so if

21  after you identify the location in your fourteen databases,

22  where the location of those files are, I don't know how many

23  vendors we're talking about.

24         MR. HAIMS:  Primarily two --

25         THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**     53

1     MR. HAIMS:  -- but it could be more.

2     THE COURT:  Your two vendors, if you told them we need

3 all of those files in a month, they would quote you a cost for

4 providing the expedited service of getting those files.  Mr.

5 Glenn said, what, sixty days, was that the period you were --

6     MR. GLENN:  Yes.

7     THE COURT:  Okay.  If you said we need the 43,000

8 files in sixty days, your two -- Iron Mountain is one of them?

9     MR. HAIMS:  Yes.

10     THE COURT:  And who's the other?

11     MR. HAIMS:  Kenwood, I believe.

12     THE COURT:  Okay.  Iron Mountain will give you a quote

13 for retrieving, I don't know, whatever the number is that's

14 with them and it'll be quantified as a dollar amount and it'll

15 be expensive, but they'll give you a quote.  It won't take nine

16 months to do it.  Am I right or wrong?

17     MR. HAIMS:  Assuming they're doing nothing else, and

18 again these are not necess -- this has never been done, as I

19 understand here, so with -- by the debtors.

20     THE COURT:  Oh, really?

21     MR. HAIMS:  By the debtors.

22     THE COURT:  Oh, well by the debtors.

23     MR. HAIMS:  By the debtors.

24     THE COURT:  Do you know how often --

25     MR. HAIMS:  Yeah.

**RESIDENTIAL CAPITAL, LLC, et al.**                    54

1        THE COURT:  -- Iron Mountain is one of the main

2    document --

3        MR. HAIMS:  Agreed.

4        THE COURT:  -- retention -- multiple facilities in the

5    country and how often in complex litigation they're getting

6    requests?  They love it because they can charge an arm and a

7    leg for doing it.

8        MR. HAIMS:  I mean, again, Mr. Mongelluzzo could

9    probably just talk about it better.  Sure.  You're going to pay

10   them whatever you want to drop everything else.  These are not

11   only our vendors, our documents are stored with other servicers

12   and other companies.  Could they do it quicker?  I would assume

13   so.  For any price someone will do something quicker.

14       THE COURT:  Okay.  So I am directing the debtors to

15   obtain a quote from their vendors for retrieving 43,000 loan

16   files sixty days -- within sixty days after the vendors get the

17   request.  Okay.  You say it's going to take you two weeks to do

18   it, to identify where they are, I don't know, you can probably

19   make some rough allocation how many Iron Mountain has and how

20   many your other vendor has, you can approximate it.  But I want

21   to see what the cost is for doing that.  Okay.  I don't want to

22   find out it's going to take nine months because it's not.  It

23   isn't going to happen.

24       I can tell you, if I rule for FHFA and this matter

25   goes back to Judge Cote, do you think she's going to give you

**RESIDENTIAL CAPITAL, LLC, et al.**                                   55

1   nine months to produce the documents?  I don't think so.

2          MR. HAIMS:  Okay, Your Honor.  We will do that.  When

3   would you like that?

4          THE COURT:  Within a week.

5          MR. HAIMS:  Okay.  Can I just confirm with my client?

6          THE COURT:  Yeah.  In other words, I'm not asking you

7   to figure out where the loan files are now, I'm not asking you

8   to run the fourteen databases.  What I'm asking for you is to

9   get quotes from your two vendors of what the cost would be of

10  retrieving files within a sixty-day period after you identify

11  them.

12         MR. HAIMS:  Can I consult before I agree with it?

13         THE COURT:  Yes, go ahead.  Yeah.

14         MR. HAIMS:  Okay.

15      (Pause)

16         MR. HAIMS:  Mr. Mongelluzzo raises two concerns.  One

17  is, he doesn't know whether they would do it and get us a quote

18  within a week.  But more importantly, he thinks they're going

19  to come back and say unless we know where the files are, we

20  can't -- because there are multiple locations, unless we know

21  how many files we have and where they're located we can't do

22  it.  We can ask them.

23         THE COURT:  How many locations?  Do you decide where

24  the files go?

25         MR. HAIMS:  My understanding is no.  But we could ask

1   them for that information, Your Honor.

2            THE COURT:  Okay.  I want you to ask them.

3            MR. HAIMS:  Okay.  We will do that.

4            THE COURT:  And I want a written response.

5            All right.  Go ahead.  You have a reply that you want

6   to make?

7            MR. HAIMS:  Yeah.  So I don't think that the anti-

8   injunction provision is applicable here.  We are not saying --

9            THE COURT:  105 is not an anti-injunction -- is not an

10  injunction.

11           MR. HAIMS:  No, no.  I'm sorry, the hearing anti-

12  injunction provision.

13           THE COURT:  Okay.

14           MR. HAIMS:  We have not said no discovery ever.  We

15  haven't said that for anybody, in fact for -- we've given some

16  discovery to some parties, and what we're saying -- we're not

17  asking this Court for an injunction enjoining their case.

18  Their case, to the extent the Second Circuit allows it to go

19  forward, is going to go forward -- is going forward and is not

20  going to be impeded other than the deadline for document

21  production in that one case will slip.  Other than that, the

22  case itself is not being impeded.

23           This is no different, I submit, to the order from

24  Judge Cote at the outset of the case, as I understand, staying

25  certain parts of the Ally case pending a decision on the motion

**RESIDENTIAL CAPITAL, LLC, et al.**                                    57

1  to dismiss in the UBS case.  And I don't think it's any

2  different than Judge Cote issuing an order putting the Ally

3  case in tranche 4 for trial three years down the road versus --

4  behind the UBS --

5           THE COURT:  Yes, but Judge Cote gets to decide that,

6  not me.

7           MR. HAIMS:  Agreed.  But the FHFA --

8           THE COURT:  Put it this way, if -- for example, if I

9  ruled that FHFA can't get the discovery for six months, just

10 hypothetically, and Judge Cote says that's all well and good; I

11 order that they produce all the documents in sixty days; if

12 they don't I'm going to enter their default.  That's, kind of,

13 like Winnick II (ph.).  Do you know what -- have you read

14 Winnick II?

15          MR. HAIMS:  No.  But -- I suspect --

16          THE COURT:  I mean, I don't have any control over what

17 Judge Cote does with respect to Ally; that's for her to decide.

18          MR. HAIMS:  Agree, Your Honor.  What we're saying here

19 is that I disagree with Mr. Glenn's position that you are

20 powerless to not grant their motion here because of --

21          THE COURT:  I want to see him argue that in the next

22 case he comes in.

23          MR. HAIMS:  -- because of the anti-injunction

24 provision.  Because we haven't said -- we are not asking you

25 here to enjoin their case.  They have hundreds of subpoenas,

**RESIDENTIAL CAPITAL, LLC, et al.**                    58

1   they and the underwriter defendants, to get the same loan

2   files.  They already have hundreds of thousands of loan files;

3   they may even have some of these.

4           THE COURT:  Let me stop you a second.  Are you

5   suggesting that somebody other than the debtors have these loan

6   files?

7           MR. HAIMS:  It's certainly possible that other debtors

8   have -- that people other than the debtors have copies of these

9   loan files.  Yeah, that's correct.

10          THE COURT:  Other than speculating about it, do you

11  have any --

12          MR. HAIMS:  No, because we don't know -- I don't have

13  a list of the loan files they're looking for.

14          THE COURT:  Well, do you know what the 43,000 loan

15  files that the non-Ally underwriters are talking about?

16          MR. HAIMS:  Do I have a list of those?  No, Your

17  Honor.

18          THE COURT:  Have you made any effort to ascertain what

19  loan files they're talking about?  They're specific

20  securitizations, right?

21          MR. HAIMS:  Uh-huh.  Uh-huh.

22          THE COURT:  You don't need them to tell you what the

23  loans are that are in those securitization trusts?

24          MR. HAIMS:  To find the loan files, Your Honor.  The

25  loan files --

**RESIDENTIAL CAPITAL, LLC, et al.**                    59

1    THE COURT:  Not to find the loan files.

2        MR. HAIMS:  The record -- again, Mr. Mongelluzzo is in

3    charge of records.  The files are not stored or sorted even by

4    securitization.  So is it possible that there are loans in the

5    securitization that we no longer have the files for?  Sure.

6        THE COURT:  It's pure speculation.

7        MR. HAIMS:  Pure speculation, sure.  But all of this

8    is until we see what the loans actually are that want.

9        THE COURT:  Okay.  You know, under Rule 45 or even

10   Rule 34, one of the factors for the Court to consider is

11   whether the documents could be obtained more easily from

12   another party.

13       MR. HAIMS:  Uh-huh.

14       THE COURT:  That's for Ally to argue with Judge Cote.

15       All right.  Go ahead.

16       MR. HAIMS:  So we don't think the anti-injunction

17   provision has any bearing on this issue.

18       Secondly, to say that this is only limited to 2,500

19   now or 5,000 is --

20       THE COURT:  All they're asking for is 2,500.

21       MR. HAIMS:  In their motion papers they specifically

22   reserve the right to ask for all 43,000.  They've -- in

23   communication with Judge Cote, and this is part of our

24   exhibits, have asked for -- said that they're going to be

25   asking for all e-mails and they're going to be asking for all

**RESIDENTIAL CAPITAL, LLC, et al.**                    60

1  of the documents.  That dispute has already been teed up before

2  Judge Cote and they specifically said they're going to -- they

3  want those documents from the debtors.

4          THE COURT:  Do you have all of Ally's e-mail files?

5          MR. HAIMS:  There are custodians in the case.  There

6  are, I think, thirty -- from the communications that we've

7  read, there are thirty some-odd custodians in the case from

8  which they want documents.

9          THE COURT:  You know, I've got enough problems with

10 this current one.

11         MR. HAIMS:  Right.

12         THE COURT:  When the next one comes before me I'll

13 deal with that.

14         MR. HAIMS:  Well, but to say that this is limited only

15 2,500 I don't think is the case.  And I think we have to look

16 to see what's -- whether the granting of these 2,500 leads to

17 the next 43,000 and the next e-mail and when the other --

18         THE COURT:  Well, that's why I ask --

19         MR. HAIMS:  -- twenty-seven cases --

20         THE COURT:  That's why I asked Mr. Glenn just assume

21 that complying with discovery is going to cost ten million

22 dollars and tank the case if it has to be done within a

23 schedule, he adheres to his absolutist position that I have no

24 power to alter that.

25         MR. HAIMS:  I disagree with that position.  And then,

**RESIDENTIAL CAPITAL, LLC, et al.**                                    61

1    I guess, the last --

2            THE COURT:  That wasn't quite what he said.  Close.

3    Close.

4            MR. HAIMS:  And then the last provision -- the last

5    point I would just make is on the shared services agreement.

6    We have not taken the position that Ally, if they asked for

7    documents under the shared service agreement for the loan

8    files, they couldn't get them.

9            What we've taken the position is that would be an

10   additional service that would have to be negotiated.  There's a

11   specific provision in the agreement that says if it's a service

12   not covered by the agreement, the parties could sit down and

13   negotiate --

14           THE COURT:  Producing loan files is covered by the

15   agreement, isn't it?

16           MR. HAIMS:  Well --

17           THE COURT:  Yes or no?

18           MR. HAIMS:  Producing small numbers of loan files --

19           THE COURT:  Does it say that?

20           MR. HAIMS:  -- in the ordinary course of business.

21           THE COURT:  Does it say that?  Does it say small

22   numbers of loan files in the ordinary course of business?

23           MR. HAIMS:  Well we think, and that's why we put in

24   the --

25           THE COURT:  No.  Just say it:  does it say that?

**RESIDENTIAL CAPITAL, LLC, et al.**                    62

1          MR. HAIMS:  Does it specifically say?

2          THE COURT:  Yeah.

3          MR. HAIMS:  It says -- no.

4          THE COURT:  Okay.  Just go over the fee structure

5     because I was a little unclear about -- are you capped at

6     50,000 dollars a month?

7          MR. HAIMS:  For the fixed monthly costs, it's capped

8     at 50,000 dollars for the record services, yes.  And that's for

9     pulling the loan files and all of the other enumerated records.

10          THE COURT:  You pass through any third party costs?

11          MR. HAIMS:  Third party costs, correct.

12          THE COURT:  So if Iron Mountain charged three million

13     dollars, that would be a pass-through cost --

14          MR. HAIMS:  That's correct.

15          THE COURT:  -- under the shared services agreement?

16          MR. HAIMS:  Correct.  The 50,000, as I understand it,

17     deals with the time of the in-house employees to pull those

18     files.

19          THE COURT:  And if Morrison & Foerster put thirty

20     paralegals and twenty lawyers the task of reviewing those files

21     before they were produced, that would be passed-along cost?

22          MR. HAIMS:  That's correct.

23          So what we're saying is there is provision in this

24     agreement; this is just not covered by it.

25          THE COURT:  Does Ally disagree with what you and I

**RESIDENTIAL CAPITAL, LLC, et al.**                    63

1   just said?

2          MR. HAIMS:  I'd let Ally speak to themselves on that

3   one.

4          THE COURT:  Okay.  All right.  Anything else before I

5   hear from Ally's counsel?

6          MR. HAIMS:  No, Your Honor.

7          THE COURT:  Thank you, Mr. Haims.

8          MR. BROWN:  Your Honor, I'll take that as my cue.

9          Judson Brown from Kirkland & Ellis on behalf of Ally.

10  And I just want to address, for a moment, the record services

11  statement of work that you've been discussing with FHFA and the

12  debtors' counsel here.

13         It's our view that that statement of work is clear and

14  does not cover a request for the loan files at issue here, and

15  let me read a provision from that --

16         THE COURT:  Go ahead.

17         MR. BROWN:  -- statement of work for you.

18         In section 7(a), Your Honor, the final paragraph of

19  that section of the statement of work, the third sentence reads

20  as follows:  "In addition, any deliverables in this statement

21  of work must be consistent with historical practice and

22  services provided must be delivered with the same standard of

23  care, diligence, priority and frequency with which the services

24  were provided immediately prior to the date hereof."

25         THE COURT:  Let me ask you this, as AFI been a

**RESIDENTIAL CAPITAL, LLC, et al.**                                    64

1   defendant in any litigation in the past involving any loans?

2           MR. BROWN:  Other than the FHFA lawsuit, Your Honor?

3           THE COURT:  Yes.

4           MR. BROWN:  Has AFI?

5           THE COURT:  Yes.

6           MR. BROWN:  Sure.

7           THE COURT:  Okay.  And in any of those litigations,

8   prior into the entry into the shared services agreement, did

9   you request production of loan files from the debtors?

10          MR. BROWN:  Pursuant to this statement --

11          THE COURT:  No.

12          MR. BROWN:  -- of work or generically?

13          THE COURT:  No, no, no, generic.  Did you -- in other

14  words, you acknowledged that AFI has been a defendant in

15  lawsuits involving mortgage loans and underwriting loans and

16  all that, correct?

17          MR. BROWN:  AFI has been a defendant in those types of

18  lawsuits.

19          THE COURT:  And in any of those lawsuits, before the

20  shared services agreement was entered into, did AFI request

21  that any of the now debtors pull the loan files for them to

22  review?

23          MR. BROWN:  For AFI?

24          THE COURT:  Yes.

25          MR. BROWN:  No, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**                    65

1       THE COURT:  Never?

2           MR. BROWN:  No, Your Honor.  This record services

3    statement of work, Your Honor, is meant to cover loan files for

4    Ally Bank, not for AFI.  Separate and different.  And

5    historically the request for those loan files has been small in

6    nature, nothing like the ones --

7           THE COURT:  I don't want to know whether they're small

8    in nature because until the litigation bomb exploded on the

9    mortgage servicing and origination business, of course they

10   were small in number.  But that changed; changed before this

11   bankruptcy.

12          MR. BROWN:  Right.  But just to track the language of

13   this record service, consistent with historical practice,

14   Ally -- AFI has never made a request of this sort.  And so at

15   best, Your Honor --

16          THE COURT:  Yeah, but the statement of work

17   specifically covers -- I don't have the words open in front of

18   me but basically is litigation support.

19          MR. BROWN:  At best, Your Honor, this statement of

20   work is ambiguous.  What this discussion reveals is this

21   statement of work, at best, is ambiguous as to what it covers

22   and thus the testimony that the debtors have offered, from the

23   various witnesses, particularly to the intent behind the shared

24   services agreement and this statement of work would thus be

25   relevant for Your Honor to consider.

**RESIDENTIAL CAPITAL, LLC, et al.**                                66

1    THE COURT:  You know, at the point where -- how many

2  lawsuits was AFI a defendant in involving origination or

3  servicing of loans at the time these debtors filed their

4  Chapter 11 petitions?

5    MR. BROWN:  Your Honor, off the top of my head I don't

6  know that number for you right now.

7    THE COURT:  Quite a few?

8    MR. BROWN:  Your Honor, honestly I just don't know the

9  number.

10    THE COURT:  Mr. Haims, I'm only able to listen to one

11  at a time, okay?

12    And you're saying AFI didn't get any document requests

13  in any of those litigations before?

14    MR. BROWN:  No, and let me explain that Your Honor.

15  It's not the case that AFI was sued individually and ResCap

16  wasn't a defendant.  In those --

17    THE COURT:  Oh, I know they were defendants.  I know

18  you were all in that same pot.

19    MR. BROWN:  And so AFI didn't have to make a request

20  to ResCap for any loan files and it never did so.  ResCap was

21  in the case of the defendant and it was asked to produce those

22  loan files.  And so there is no historical practice to track

23  the language of this statement of work where AFI requests loan

24  files from the debtors.

25    Your Honor, I only wanted to address this --

**RESIDENTIAL CAPITAL, LLC, et al.**                    67

1          THE COURT:  Okay.  That's fine.

2          MR. BROWN:  -- particular statement of work.  Do you

3    have anything else that I could answer?

4          THE COURT:  No, I don't.  I don't.  Thank you very

5    much.

6          MR. BROWN:  Thank you, Your Honor.

7          THE COURT:  Mr. Haims, you wanted to be heard again?

8          MR. HAIMS:  Thank you, Your Honor.  I just wanted to

9    clarify that in historical precedent the -- ResCap was a

10   defendant in all those cases.  In the MBIA case it was ResCap

11   who made the production itself, not at the direction of Ally or

12   to Ally or at its direction.

13         THE COURT:  All right.  Anybody else wish to be heard?

14         MS. MOSKOWITZ:  Yes, Your Honor.

15         THE COURT:  Come on up.

16         MS. MOSKOWITZ:  Thank you.

17         Lauren Moskowitz, I represent Credit Suisse and I'm

18   here on behalf of the non-Ally underwriter defendants.

19         If it's appropriate for this motion, I didn't know if

20   you were setting it aside separately.

21         THE COURT:  Well, I'm going to hear your motion when

22   it's on the calendar, which isn't today.  But I'll -- you did

23   file in connection with this motion so I'll certainly hear you.

24         MS. MOSKOWITZ:  Okay.  Thank you.

25         With respect to the number of loan files at issue we,

**RESIDENTIAL CAPITAL, LLC, et al.**                    68

1   as Your Honor knows from our submission, do not agree that the

2   appropriate number if 5,000, let alone the 2,500.

3          THE COURT:  All right.  So let me ask you this,

4   though, let's assume -- you want 43,000 loan files.  Let's just

5   assume, hypothetically, that the cost of producing 43,000 loan

6   files is five million dollars.  Are your clients ready,

7   willing, I know they're able but -- are they ready to advance

8   the funds against an accounting after the documents are

9   provided?

10         MS. MOSKOWITZ:  Your Honor, the non-Ally underwriter

11  defendants are willing to discuss cost sharing.

12         THE COURT:  No, I didn't ask whether they're willing

13  to discuss.  If the Court were to order on an appropriate

14  timetable that ResCap provide all 43,000 files, are your

15  clients prepared to pay the debtors' costs, direct and indirect

16  costs, including the vendors' costs, the attorneys' time in

17  reviewing -- in producing the files, all of that costs, subject

18  to review by the Court, are they prepared to pay that cost?

19         MS. MOSKOWITZ:  If FHFA is contributing and the

20  other -- all defendants are contributing, yes, Your Honor, we

21  are.

22         THE COURT:  Well, Mr. Glenn only wants 2,500 files,

23  you want 43,000 and Judge Cote ordered if you want more go to

24  the bankruptcy court.  So you'll soon be here asking for 43,000

25  files.  Mr. Glenn, for now, is asking for 2,500.  He has --

**RESIDENTIAL CAPITAL, LLC, et al.**                                    69

1  well, and what I wanted -- so if -- the factors that I talked

2  about earlier, including cost, are factors that the Court

3  considered, I mean even under Rule 45, which I don't -- it

4  might provide guidance to me but I didn't issue a subpoena, I

5  mean when I say I this Court didn't issue a subpoena.  But one

6  of the subsections of Rule 45 deals with cost.  I guess it's

7  Rule 45(b)(3)(C)(ii), (C) is specifying conditions as an

8  alternative.  In the circumstances described in Rule

9  45(c)(3)(B) "The Court may, instead of quashing or modifying

10  the subpoena, order appearance or production under specified

11  conditions if the party served," and then "(ii) ensures that

12  the subpoenaed person will be reasonably compensated."

13       Now I don't think that applies, by its terms, to what

14  I have but let's assume it provides guidance to me in deciding

15  what to -- if I were to decide that 105 allows me to regulate

16  discovery from the debtors, I look to that subsection as

17  providing guidance.  My specific question is, are you prepared

18  to pay the costs of the 43,000 files you want.

19       MS. MOSKOWITZ:  We are prepared to share reasonable

20  costs among the defendants.  Yes, Your Honor.

21       THE COURT:  All right.

22       MS. MOSKOWITZ:  With respect to how those should be

23  shared, however, we disagree that FHFA should be responsible

24  only for the 2,500.  We're happy to talk to Judge Cote about

25  that if that's the appropriate forum to discuss allocation.

**RESIDENTIAL CAPITAL, LLC, et al.**                    70

1  But we disagree with the position they're taking here today,

2  with the constant reduction in the files so that they can, I

3  think the language was, one -- so that they could do what they

4  needed to do to carry their burden, but leave no room for what

5  we need to do to carry our burden and defend against the claims

6  that they've brought.  Our due process concerns are of

7  paramount concern here given that what they're effectively

8  requesting is what they want for their case but let us wait or

9  perhaps not get at all what we need for our defenses.

10         THE COURT:  And that wasn't -- my question is let's --

11  I mean, timing, as I've explained, is a factor.  But -- and

12  I -- you heard my expressions of skepticism about nine months

13  to produce the files.  But if the debtors are required to

14  provide them, I think someone else should be paying the cost,

15  okay.  It may -- it would undoubtedly take longer to produce

16  43,000 files than 2,500 files, but assuming a reasonable

17  timeframe and all that, I come back -- one thing I didn't raise

18  with Ms. Leung or with Mr. Glenn is I didn't ask whether FHFA,

19  in order to get this discovery, is prepared to agree to waive

20  any claim it wishes to file in these bankruptcy proceedings

21  because certainly the production of documents, you may need

22  them to prosecute your actions against the other defendants,

23  but I don't think there's any mistake about the fact that you

24  want them to substantiate a claim to file in the bankruptcy

25  cases against the debtors.

1    In granting the 105 injunction in the one case that

2  went to decision, I believe I identified the risk of issue

3  preclusion as an appropriate -- and the cases identify that as

4  an appropriate consideration.  I don't have the 105 issue about

5  enjoining prosecution of the AFI -- the case against AFI is not

6  before me, but it does, certainly, in deciding scope context,

7  context includes whether a party wishes to -- that's seeking

8  discovery today say I need it for this other action, but do

9  they intend to use that information in the claims allowance

10  process before the Court?

11    You, on behalf of the non-Ally underwriters indicate

12  in your papers your claims for indemnification.  So the same

13  factor comes into account, you want to be able to use whatever

14  information you get, not only to defend the actions -- the

15  action -- the actions before Judge Cote, but also to bolster a

16  claim that you would assert against the debtors in this case.

17    MS. MOSKOWITZ:  No, Your Honor.  I think the

18  indemnification is for the underwriters' legal fees and any

19  ultimate liability that they suffer.  And so, to the extent

20  that we need these files to defend ourselves, we're actually

21  protecting the assets of the estate to some extent because

22  anything --

23    THE COURT:  Are you entitled -- if there's a judgment

24  in the securities against your clients are you entitled to

25  indemnification?

**RESIDENTIAL CAPITAL, LLC, et al.**                                    72

1          MS. MOSKOWITZ:  Yes, Your Honor, and we have filed a

2    proof of claim in this court.

3          THE COURT:  These are 33 Act claims against your

4    client?

5          MS. MOSKOWITZ:  As well as state Blue Sky Law claims

6    as well.

7          THE COURT:  Okay.  Well, I'm not going to reach that

8    now.  But, I mean, when I'm talk about context, the context is

9    important, is the party who's seeking the discovery from the

10   debtor or the debtors' defendants in the actions before the

11   bankruptcy, have the parties seeking discovery indicated their

12   belief that they have a claim against the debtors that are

13   likely to be asserted in the claims allowance process?  Those

14   are all, it seems to me, to be factors that go to the context

15   in which the discovery request rises.

16         But with all that said, I think whether the party is a

17   plaintiff or a defendant in an action outside of the bankruptcy

18   court it's entitled to the evidence to prosecute or defend the

19   claims.  Timing becomes -- and burden and expense become a big

20   issue.

21         MS. MOSKOWITZ:  Yes, Your Honor.  And that is -- that

22   is appropriate for Your Honor to consider, and we're willing to

23   work with the debtors as well in working out a schedule.

24         We also would like to get these files sooner rather

25   than later, of course, because we are subject to the same

**RESIDENTIAL CAPITAL, LLC, et al.**                    73

1  timing as the FHFA is in the case that's pending in front of

2  Judge Cote.

3          THE COURT:  Okay.  Thank you.

4          MS. MOSKOWITZ:  Thank you, Your Honor.

5          THE COURT:  Anybody else want to be heard?

6          MS. FREJKA:  Good afternoon, Your Honor.  Elise

7  Frejka, Kramer, Levin, Naftalis & Frankel appearing on behalf

8  of the committee.

9          The committee wants to echo most of the comments of

10 the Court regarding the cost, the distraction, and the timing.

11 We support the debtors in this position and feel that expedited

12 discovery, at this critical time in the case, will distract the

13 debtors from the current, very important deadlines that are

14 ahead in the coming months.

15         The committee also feels that the cost should not be

16 borne by the debtors.  That these loan file expenses should be

17 borne by the defendants along the lines as just suggested.

18         THE COURT:  Well, it may be -- I mean, it -- I mean,

19 Judge Cote could well decide the expenses should be borne by

20 Ally.  Usually the -- by AFI, because usually with our system

21 is -- the issue for third party discovery is more acute about

22 expenses, but ordinarily the party bears its own costs for

23 discovery.

24         MS. FREJKA:  And we -- the committee is aware of the

25 cost, and I think that it's probably some place between where

**RESIDENTIAL CAPITAL, LLC, et al.**                    74

1   the two parties are suggesting the number is, but it does have

2   the ability to ever expand as requests expand and the committee

3   just wants to be sensitive to what those costs are and where

4   they should be allocated and passed through under the shared

5   services agreement.

6           THE COURT:  Well, other than this Court deciding that

7   under the agreement that it approved that -- if the Court were

8   to decide that AFI is -- if AFI, either because it's ordered to

9   by the district court or it decides, for its own defense, it

10  needs it,  requests 43,000 loan files, that the cost -- that

11  they bear the pass-through costs for providing it and perhaps

12  more than the 50,000 a month or not.  And it may be appropriate

13  for this Court to decide that the one thing that's clear is

14  that the debtors shouldn't bear the cost, that under the shared

15  services agreement AFI is potentially responsible for the cost.

16  But the issue of whether AFI or FHFA, I have trouble with that

17  all the time, FHFA or the other underwriter defendants should

18  bear the cost that does seem to me to be for Judge Cote to

19  decide, not for me to decide.  This is discovery in an action

20  pending before her not before me.

21          MS. FREJKA:  I don't think we disagree with that.  I

22  think we just raise the issue of the cost to the estate --

23          THE COURT:  Okay.

24          MS. FREJKA:  -- as well as the timing.  And I think

25  that you've reached those same points.

**RESIDENTIAL CAPITAL, LLC, et al.**                    75

1       THE COURT:  I've addressed them, let's put it that

2   way.

3       MS. FREJKA:  You've well addressed them.

4       THE COURT:  I haven't decided them, but I've addressed

5   those issues.

6       MS. FREJKA:  Yes, you have.  Thank you.

7       THE COURT:  Thank you, Ms. Frejka.  Anybody else wish

8   to be heard?  You want the last word, Mr. Haims?

9       MR. HAIMS:  Your Honor, just two quick --

10       THE COURT:  Okay.

11       MR. HAIMS:  One is on the schedule for the additional

12   submission.  Just as I was sitting here I remembered that next

13   week is Rosh Hashanah, I will not be in Monday and Tuesday.

14       THE COURT:  I won't either.

15       MR. HAIMS:  So if we could have it past that date,

16   Wednesday or Thursday when I get back.

17       THE COURT:  I thought Friday, a week from -- I'm

18   talking about the end of next week, by Friday of next week.

19       MR. HAIMS:  Thank you, Your Honor.

20       And lastly, I think we had heard from the underwriters

21   as to whether they are going to assert their claim against the

22   debtors, and I don't know if we've ever heard from FHFA whether

23   they intend to do it as well.

24       THE COURT:  I'm going to be surprised, but go ahead,

25   Mr. Glenn.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    76

1      MR. GLENN:  Your Honor, we're not prepared to waive

2   our claims and --

3      THE COURT:  I didn't expect you to.

4      MR. GLENN:  -- in the claims allowance process the

5   irony is that we could then issue a subpoena under the rule --

6   the 7000 rules and get it as party discovery ironically.

7      THE COURT:  No, it would be a contested matter under

8   9014 and the discovery rules, subject to the way the Court

9   would regulate it, would apply.  But, of course, in the claims

10  allowance process estimation of a claim can be a much more

11  truncated and expedited proceeding than a district court

12  action.

13     MR. GLENN:  That's correct.

14     THE COURT:  So it wouldn't necessarily -- and look,

15  the completion of the litigation before Judge Cote, as

16  efficient as she is, will be, you know, with appeals is a time

17  consuming process.  I think that the estimation process is

18  designed to deal with the situation where you can't really,

19  finally quantify a claim in the time needed to resolve a case.

20  Those issues aren't before me, but one shouldn't assume that

21  the same discovery, the same process applies in the claims

22  allowance process as would apply in the district court for any

23  action.

24     MR. GLENN:  To answer the Court's question, the answer

25  is no.  We're not preparing to waive our claim.

**RESIDENTIAL CAPITAL, LLC, et al.**                                77

1        THE COURT:  I didn't expect you would.

2        MR. GLENN:  Thank you.

3        THE COURT:  Thank you.

4        All right.  Anybody else wish to be heard?

5        MS. MOSKOWITZ:  Your Honor, just one procedural

6   question for you, something Your Honor said just raised a

7   question in my mind.  We did make our submission on behalf of

8   the non-Ally underwriter defendants according to Your Honor's

9   schedule for supplemental submissions --

10       THE COURT:  Right.

11       MS. MOSKOWITZ:  -- on FHFA.

12       THE COURT:  You did.

13       MS. MOSKOWITZ:  So to the extent that Your Honor is

14  taking evidence, we would move for admission of the exhibits

15  submitted.

16       THE COURT:  Well, you have a separate motion pending

17  so we'll wait till we get to your motion.

18       MS. MOSKOWITZ:  Is that scheduled for some separate --

19       THE COURT:  I don't know.  Is it on the calendar, Mr.

20  Haims?

21       MR. HAIMS:  I think it's actually noticed for today.

22       MS. MOSKOWITZ:  That's what I thought.

23       THE COURT:  It is?  I'm sorry.

24       MR. HAIMS:  I think in their notice they noticed it

25  for the same day.

**RESIDENTIAL CAPITAL, LLC, et al.**                    78

1    THE COURT:  I'm sorry.

2        MS. MOSKOWITZ:  I'm sorry; that's what I thought.  So

3  I was just confused.

4        THE COURT:  I apologize.

5        MS. MOSKOWITZ:  So if --

6        THE COURT:  I read everything, but I just -- I don't

7  focus, sometimes, on those little details.

8        MS. MOSKOWITZ:  Right.

9        THE COURT:  What is it that you're offering in

10  evidence?

11        MS. MOSKOWITZ:  Your Honor, we would offer the

12  submission, which is docket number 1293 and the exhibits

13  submitted thereto, which are docket numbers 1293-1 through -9,

14  which it would include the affidavits, or declarations rather,

15  of two experts, Professor Arnold Barnett and Professor Chris

16  James, which are respectively 1293-9 and 1293-8, as well as the

17  underwriter or the defendants' submission, across all actions,

18  to the court on June 6th, which was 1293 --

19        THE COURT:  When you say submissions I'm only

20  interested in the evidence.

21        MS. MOSKOWITZ:  The evidence are those two exhibits

22  that were submitted in support that I just cited to Your Honor.

23        THE COURT:  1293-8 and 1293-9?

24        MS. MOSKOWITZ:  Yes, Your Honor.

25        THE COURT:  Are there any objections to those

**RESIDENTIAL CAPITAL, LLC, et al.**                    79

1  declarations?

2          MR. HAIMS:  No, Your Honor.

3          THE COURT:  Mr. Glenn?

4          MR. GLENN:  We're not a party to that motion.  I don't

5  believe that motion is directed to us.

6          THE COURT:  Okay.

7          MR. GLENN:  We're not taking any position on any of --

8  anything in their pleadings.

9          THE COURT:  Okay.  All right.  So the two declarations

10  that are ECF docket number 1293-8 and 1293-9 are admitted into

11  evidence for purposes of this hearing.

12  (Declaration of Professor Arnold Barnett was hereby received

13  into evidence as Credit Suisse's Exhibit 1293-8, as of this

14  date.)

15  (Declaration of Professor Chris James was hereby received into

16  evidence as Credit Suisse's Exhibit 1293-9, as of this date.)

17          MS. MOSKOWITZ:  Thank you, Your Honor.

18          THE COURT:  I'm going to take the matter under

19  submission.  I do -- I am working on this but I want to see the

20  specific additional information that I requested that the

21  debtors provide with respect to the cost of producing within

22  sixty days the approximately 43,000 loan files.  Okay?

23          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

24          THE COURT:  All right.  We're adjourned.  Thank you

25  very much.

**RESIDENTIAL CAPITAL, LLC, et al.**                                     80

1          MS. MOSKOWITZ:   Thank you.

2      (Whereupon these proceedings were concluded at 3:51 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

81

1

2                                    **I N D E X**

3                                **E X H I B I T S**

4   **DEBTORS'   DESCRIPTION                              ID.      EVID.**

5                Declaration and supplemental                        8

6                  declaration of Kanchana Wangkeo

7                  Leung in support of FHFA's motion

8                  seeking limited discovery from the

9                  debtors and relief from the

10                 automatic stay

11               Declaration of Jeffrey A. Lipps                     13

12                 in support of debtors' objection

13                 to FHFA's motion for relief from the

14                 automatic stay

15               Declaration and supplemental                       13

16                 declaration of John G. Mongelluzzo

17                 in support of debtors' objection

18                 to FHFA's motion for relief from the

19                 automatic stay

20               Declaration of Mary Fahy Woehr in

21                 support of debtors' objection to

22                 FHFA's motion for relief from the

23                 automatic stay

24               Declaration of Philip Marc Scheipe              13

25                 in support of AFI's submission

82

1           regarding the shared services agreement

2                        I N D E X

3                  E X H I B I T S (cont'd)

4    DEBTOR'S   DESCRIPTION                    ID.      EVID.

5           Debtor's Exhibits 1 through 8              14

6

7    CREDIT    DESCRIPTION                     ID.      EVID.

8    SUISSE'S

9    1293-8   Declaration of Prof. Arnold Barnett       46

10   1293-9   Declaration of Prof. Chris James          46

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83

1

2                        C E R T I F I C A T I O N

3

4   I, Ellen S. Kolman, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9   _____

10  ELLEN S.KOLMAN

11  AAERT Certified Electronic Transcriber CET**D 568

12

13  eScribers

14  700 West 192nd Street, Suite #607

15  New York, NY 10040

16

17  Date:  September 12, 2012

18

19

20

21

22

23

24

25

12-12020-mg    Doc 1920-5    Filed 10/22/12    Entered 10/22/12 21:41:42    Exhibit E

RESIDENTIAL CAPITAL, LLC, et al. v.

Pg 85 of 98

**P.M. SESSION ONLY**

Case No. 12-12020-mg

September 11, 2012

## A

abetting (1)
39:16
ability (6)
22:8;41:9;44:14;
47:20;49:14;74:2
able (4)
34:23;66:10;68:7;
71:13
absent (4)
24:5;33:3;35:7;
47:16
absolutely (1)
33:10
absolutist (1)
60:23
absorbed (1)
43:18
access (2)
41:8;44:21
accidentally (1)
19:11
according (1)
77:8
account (2)
24:17;71:13
accounting (1)
68:8
accurately (1)
8:21
achieves (1)
34:23
acknowledged (2)
49:13;64:14
across (1)
78:17
Act (1)
72:3
acting (1)
6:7
action (10)
19:12;35:7,25;
40:11;71:8,15;72:17;
74:19;76:12,23
actions (11)
16:22;19:15;24:4,
7,8,13;70:22;71:14,
15;72:10;78:17
activities (1)
30:7
activity (3)
20:6;36:10,19
actually (7)
40:21;43:20,22;
44:23;59:8;71:20;
77:21
acute (1)
73:21
addition (2)
42:20;63:20
additional (8)

address (14)
9:4,21;11:13;
13:16;16:20;26:25,
25;38:9,11;39:11;
42:25;46:15;63:10;
66:25
addressed (12)
8:24,25;9:3,5;
15:20;17:7;18:21,22;
49:14;75:1,3,4
addresses (1)
44:2
addressing (1)
9:5
adheres (1)
60:23
adjourned (2)
6:8;79:24
administration (6)
17:14;35:15,22;
36:5,6;37:2
admissibility (1)
12:24
admissible (2)
12:11,20
admission (1)
77:14
admitted (4)
8:5;12:15;14:16;
79:10
advance (1)
68:7
advantage (1)
35:2
adversary (5)
16:11,12;17:12;
36:19;38:7
affect (1)
36:5
affecting (2)
17:14,15
affidavit (1)
7:16
affidavits (2)
9:20;78:14
affirmative (1)
6:22
AFI (29)
32:12;42:16,18,24;
43:25;45:10;46:18,
20,22;63:25;64:4,14,
17,20,23;65:4,14;
66:2,12,15,19,23;
71:5,5;73:20;74:8,8,
15,16
AFI's (4)
13:6,13;47:4,20
afternoon (2)
6:4;73:6
again (10)

against (22)
16:13;24:2;35:7,
19,21,24;36:18;
37:14,14,17;40:3;
48:8;68:8;70:5,22,
25;71:5,16,24;72:3,
12;75:21
Agency (3)
6:6;13:2,10
ago (3)
30:1;40:4;50:7
agree (15)
11:15;12:12,13;
16:17;17:2,5;23:22;
25:4,8;34:10;47:1;
55:12;57:18;68:1;
70:19
agreeable (1)
42:19
agreed (4)
24:11;31:16;54:3;
57:7
agreement (41)
11:7,8;12:1,19;
13:7,14;18:23;27:15;
41:10,17,21;42:2;
43:2,11,17,24;44:1,
13,17;45:9,16;46:18;
47:3,11,17,18;48:1,4;
61:5,7,11,12,15;
62:15,24;64:8,20;
65:24;74:5,7,15
agreements (2)
20:9;42:24
agrees (1)
42:24
ahead (14)
9:14,24;10:12,19;
15:9;39:4,10,24;
55:13;56:5;59:15;
63:16;73:14;75:24
aid (2)
35:15;36:6
aiding (1)
39:16
air (1)
33:6
allocated (1)
74:4
allocation (2)
54:19;69:25
allowance (5)
71:9;72:13;76:4,
10,22
allows (2)
56:18;69:15
Ally (32)
4:13,13,21;5:3;
40:19,20,22;41:4,6,8,
15;43:11,11,18;44:8;

Ally's (3)
45:17;60:4;63:5
alone (1)
68:2
along (2)
6:5;73:17
alter (1)
60:24
alternative (1)
69:8
always (2)
25:21;40:25
ambiguous (3)
11:8;65:20,21
among (2)
24:16;69:20
amount (2)
20:6;21:7;53:14
analysis (1)
47:20
ANDREW (2)
4:8;6:4
anti- (2)
56:7,11
anti-injunction (3)
56:9;57:23;59:16
apart (1)
22:5
apologize (1)
78:4
appeal (1)
39:13
appealed (1)
24:1
appeals (1)
76:16
appearance (1)
69:10
appearing (1)
73:7
appears (1)
43:18
applicable (1)
56:8
application (6)
7:15;17:23,23;
18:5;39:5,7
applied (1)
8:22
applies (5)
8:17;9:1,6;69:13;
76:21
apply (10)
15:17;16:13;17:6;
19:7;37:5;47:25;
48:5,18;76:9,22
approach (1)
38:4

appropriate (15)
22:1,3;25:12;
26:23;32:20;34:10;
36:23;67:19;68:2,13;
69:25;71:3,4;72:22;
74:12
approved (6)
45:8,10,15;47:19;
48:1;74:7
approximate (1)
54:20
approximately (2)
18:7;79:22
argue (6)
19:14;33:21;42:3;
43:4;57:21;59:14
argues (1)
41:25
argument (9)
6:19;11:8;15:8;
16:12;21:2;36:17;
45:2;46:17;49:1
arguments (1)
20:13
arm (1)
54:6
Arnold (2)
78:15;79:12
around (2)
15:21;17:15;24:7;
8;26:17,18;35:12;
48:9
articulated (1)
35:20
asbestos (1)
22:4
ascertain (1)
58:18
aside (5)
21:1;34:1;48:12;
50:20;67:20
assert (2)
71:16;75:21
asserted (1)
72:13
assets (2)
37:1;71:21
assignees (1)
31:18
assume (12)
17:2,5;23:22;29:3;
43:24;49:8;54:12;
60:20;68:4,5;69:14;
76:20
Assuming (2)
53:17;70:16
attached (1)
14:11
attention (3)
6:13;31:11;39:2
Attorneys (5)
4:3,13,21;5:3,11
attorneys' (1)

12-12020-mg    Doc 1920-5    Filed 10/22/12    Entered 10/22/12 21:41:42    Exhibit E
RESIDENTIAL CAPITAL, LLC, et al. v.                                    P.M. SESSION ONLY
Case No. 12-12020-mg                          Pg 86 of 98                September 11, 2012

68:16
**auction (2)**
20:7;31:23
**August (4)**
10:2,5,7,9
**authority (12)**
17:10;19:10;23:6;
24:21;25:9,11,15;
26:7;28:11,15;29:14;
35:6
**automatic (5)**
8:17;13:3,11;
15:17;47:8
**avalanche (1)**
22:6
**aware (4)**
16:22;44:5,15;
73:24

**B**

**back (10)**
22:13,21;27:11;
32:8;33:9;52:12;
54:25;55:19;70:17;
75:16
**balance (1)**
27:9
**Bank (2)**
4:13;65:4
**bankruptcy (20)**
16:20;19:24;20:7;
21:8;24:5;27:2,8;
29:9,13,23,23;40:24;
47:6;48:16;65:11;
68:24;70:20,24;
72:11,17
**BAP (2)**
17:2,6
**bargained (2)**
42:7;43:7
**Barnett (2)**
78:15;79:12
**based (3)**
9:2;32:2,25
**basically (2)**
52:7;65:18
**basis (3)**
15:13;43:12;48:17
**batch (1)**
51:3
**batching (1)**
52:3
**bear (5)**
35:4;40:22;74:11,
14,18
**bearing (1)**
59:17
**bears (2)**
45:21;73:22
**become (1)**
72:19
**becomes (1)**

72:19
**beginning (2)**
22:13;44:10
**behalf (6)**
6:6;63:9;67:18;
71:11;73:7;77:7
**behind (2)**
57:4;65:23
**belief (1)**
72:12
**beneficiaries (1)**
22:16
**BENSON (4)**
4:2;6:5;10:22;11:3
**best (4)**
32:24;65:15,19,21
**better (2)**
51:10;54:9
**beyond (3)**
15:16;21:14;37:4
**big (1)**
72:19
**binder (5)**
7:19;10:13;13:19;
14:4,6
**blanket (2)**
35:9;38:5
**Blue (1)**
72:5
**bolster (1)**
71:15
**bomb (1)**
65:8
**bona (1)**
22:5
**bond (1)**
25:6
**Borders (1)**
30:1
**borne (3)**
73:16,17,19
**borrower (1)**
18:14
**Both (5)**
11:23;16:3;27:22;
31:12;33:3
**breaking (1)**
6:13
**brief (3)**
8:25;9:4;17:7
**briefed (1)**
15:13
**briefing (2)**
7:17;38:24
**briefly (1)**
39:11
**briefs (1)**
8:25
**bring (3)**
6:12;38:25;39:1
**broader (1)**
34:20
**Broadway (2)**

4:4;5:4
**brought (1)**
70:6
**BROWN (23)**
4:17,20;5:2;63:8,9,
17;64:2,4,6,10,12,17,
23,25;65:2,12,19;
66:5,8,14,19;67:2,6
**Bryant's (1)**
36:16
**burden (13)**
24:14,15;27:7;
30:8;34:1,24;35:14;
36:3;46:8,13;70:4,5;
72:19
**burdensome (1)**
31:15
**business (3)**
61:20,22;65:9

**C**

**calendar (2)**
67:22;77:19
**call (1)**
26:22
**called (1)**
31:11
**Can (35)**
7:18;10:25;18:21;
19:24;20:2,20;21:17;
22:2;25:18;30:6;
34:4;35:1;37:25;
39:5;45:3,3,9,11,19;
47:11;49:25;51:10,
10,19,22;52:9;54:6,
18,20,24;55:5,12,22;
70:2;76:10
**capabilities (1)**
34:4
**Capital (1)**
6:3
**capped (2)**
62:5,7
**care (2)**
46:22;63:23
**careful (1)**
19:11
**carefully (1)**
44:24
**carry (3)**
36:23;70:4,5
**case (75)**
6:15,22;11:21;
15:14,15,17,21;16:6;
17:15;18:5;20:5,22,
24;21:10,19;22:12,
13;23:7;28:19,25;
29:9,9,12,22;30:4,21;
31:2,10,11,15,21;
32:2,6,25;33:18;
34:23;35:22;36:5,6;
37:2,12;38:23;39:6,

13,15,22,23;44:11;
46:1;50:7;52:7;
56:17,18,21,22,24,
25;57:1,3,22,25;60:5,
7,15,22;66:15,21;
67:10;70:8;71:1,5,
16;73:1,12;76:19
**cases (23)**
15:21;16:3,5,13;
19:25;21:21;22:3,4,
11;26:20;27:10;32:3;
35:16;37:9,24;39:8;
46:7;48:17;50:20;
60:19;67:10;70:25;
71:3
**cede (1)**
38:13
**central (1)**
22:5
**certain (2)**
13:23;56:25
**certainly (9)**
11:19;26:23;28:7;
35:19;45:14;58:7;
67:23;70:21;71:6
**cetera (1)**
7:12
**change (1)**
42:15
**changed (2)**
65:10,10
**changes (1)**
42:17
**Chapter (15)**
19:25;20:7,24;
21:13,19,20;26:20;
27:1;29:13,22;32:3,
6;35:16;37:2;66:4
**charge (2)**
54:6;59:3
**charged (2)**
19:24;62:12
**chose (1)**
9:3
**Chris (2)**
78:15;79:15
**Circuit (10)**
17:2,6;19:20,20;
22:19;38:22;39:6,17,
22;56:18
**circumstance (3)**
22:15;28:25;29:17
**circumstances (2)**
43:8;69:8
**cite (1)**
43:4
**cited (5)**
22:20;24:9;28:25;
31:8;78:22
**Citibank (2)**
31:14,16
**claim (10)**
31:18;70:20,24;

71:16;72:2,12;75:21;
76:10,19,25
**claimed (1)**
31:15
**claims (12)**
39:16;70:5;71:9,
12;72:3,5,13,19;76:2,
4,9,21
**clarify (2)**
40:1;67:9
**clear (22)**
7:23;8:17;11:1,16,
21;12:2,4,10,19;
14:25;18:1,6;19:4;
40:18;41:10,11,12,
17,21;43:9;63:13;
74:13
**clearly (2)**
43:16,17;47:10
**client (3)**
30:23;55:5;72:4
**clients (3)**
68:6,15;71:24
**Close (2)**
61:2,3
**closely (1)**
15:12
**closer (1)**
39:14
**coast (1)**
50:15
**Code (2)**
37:4,5
**collateral (1)**
21:25
**colleagues (1)**
20:10
**collected (2)**
8:21;34:3
**colloquy (2)**
20:11;45:19
**Colonial (3)**
22:19;23:21,23
**coming (1)**
73:14
**comments (2)**
28:23;73:9
**committee (7)**
21:3;50:11;73:8,9,
15,24;74:2
**communication (1)**
59:23
**communications (1)**
60:6
**companies (1)**
54:12
**company (1)**
34:24
**company's (2)**
22:8;28:22
**compensated (1)**
69:12
**complete (1)**

12-12020-mg    Doc 1920-5    Filed 10/22/12    Entered 10/22/12 21:41:42    Exhibit E
RESIDENTIAL CAPITAL, LLC, et al. v.                    **P.M. SESSION ONLY**
Case No. 12-12020-mg                    Pg 87 of 98                    September 11, 2012

42:7
**completion (1)**
  76:15
**complex (3)**
  21:18;37:24;54:5
**complied (1)**
  20:14
**comply (7)**
  17:18;24:19;29:4;
  32:4,20;44:2;46:5
**complying (8)**
  17:17;25:7;29:21;
  33:11;35:14;36:4;
  46:9;60:21
**concede (3)**
  25:10,11;41:14
**concedes (1)**
  43:11
**concern (1)**
  70:7
**concerned (3)**
  17:23;23:25;46:25
**concerns (2)**
  22:1;28:21;45:24;
  55:16;70:6
**conclude (1)**
  32:4
**concluded (1)**
  80:2
**concludes (1)**
  29:10
**conclusion (2)**
  6:17;42:2
**conditions (4)**
  35:23;41:24;69:7,
  11
**confer (1)**
  34:8
**confidential (1)**
  18:14
**confidentiality (2)**
  18:22;27:15
**confirm (1)**
  55:5
**confirms (1)**
  41:5
**confused (1)**
  78:3
**confusion (1)**
  40:4
**Congress (2)**
  22:19,23
**connection (3)**
  16:21;19:15;67:23
**consequently (1)**
  32:6
**conservator (1)**
  6:7
**consider (5)**
  27:6,8;59:10;
  65:25;72:22
**consideration (2)**
  25:12;71:4

**considerations (1)**
  27:23
**considered (4)**
  11:12;12:20;29:1;
  69:3
**consistent (2)**
  63:21;65:13
**conspicuously (1)**
  33:3
**constant (1)**
  70:2
**constraints (1)**
  52:4
**construed (1)**
  11:23
**construing (1)**
  11:21
**consult (1)**
  55:12
**consulted (1)**
  6:14
**consuming (1)**
  76:17
**contains (1)**
  37:5
**contemplated (1)**
  42:5
**contested (3)**
  20:12;32:11;76:7
**context (12)**
  24:14;27:6,7;
  36:21;37:6;40:8;
  46:12;71:6,7;72:8,8,
  14
**contingencies (1)**
  43:3
**continue (1)**
  39:4
**contract (4)**
  12:10,12;49:11;
  52:17
**contrary (1)**
  47:17
**contributing (2)**
  68:19,20
**control (10)**
  26:1;38:13;39:25;
  40:19;41:6;48:11,12;
  49:22,25;57:16
**controlling (1)**
  38:4
**conversion (1)**
  29:22
**converts (1)**
  29:12
**copies (3)**
  47:5,9;58:8
**core (1)**
  20:6
**correctly (1)**
  41:7
**cost (54)**
  17:16,18;18:8,24;

23:2,8;24:18,21;25:1,
5;26:2,8,25;28:5,21,
22;29:3,5,11,20;35:4;
38:2,2;43:15,22;
45:14,22;49:6,18;
50:3;52:19,19,20;
53:3;54:21;55:9;
60:21;62:13,21;68:5,
11,18;69:2,6;70:14;
73:10,15,25;74:10,
14,15,18,22;79:21
**costly (1)**
  49:15
**costs (21)**
  24:15;25:6,8;36:1;
  40:22;43:17,19,19,
  20;62:7,10,11;68:15,
  16,16,17;69:18,20;
  73:22;74:3,11
**Cote (30)**
  6:10;19:7;22:18;
  26:16,24;29:6;30:21;
  31:1;37:17;40:24;
  44:7;45:4,12;46:19;
  54:25;56:24;57:2,5,
  10,17;59:14,23;60:2;
  68:23;69:24;71:15;
  73:2,19;74:18;76:15
**Cote's (3)**
  23:21;32:17;34:18
**counsel (3)**
  34:9;63:5,12
**country (8)**
  15:22;24:7,8;
  26:18,18;35:12;48:9;
  54:5
**couple (2)**
  27:21;48:23
**course (6)**
  26:21;61:20,22;
  65:9;72:25;76:9
**COURT (346)**
  6:2,21,25;7:3,8,18,
  22;8:1,4,8,10,12,19;
  9:1,12,14,17,22,24;
  10:3,10,12,14,17,19,
  21,23;11:1,13;12:3,6,
  9,14,16;13:16,18,20,
  22,25;14:2,5,6,14,21,
  23,25;15:3,6,8,11,13,
  15,23;16:1,3,9,19,20,
  24;17:1,5,9,25;18:3,
  8,11,19;19:1,3,5,10,
  19,24;20:5;21:17;
  22:17,25;23:5,14,17,
  22;24:5,22,25;25:5,14,
  13,14,15,17,19,20,23,
  25;26:3,4,5,6,9,12,12,
  13,14,16,24;27:3,5,
  16,18,20;28:1,3,7,8,9,
  11,15,17,18,20,21,23;
  29:2,16,18,23;30:3,6,
  9,12,15,20,25;31:4,6,

8,9;32:16,22,24;33:7,
13,15,22;34:7,22;
35:5,8,10,16,21;36:7,
8,14,22;37:9,14,16;
38:9,11,15,19;39:3,9,
14,17,20,21;40:9,10,
14;41:2,18;42:10,12;
43:13,23;44:7,8,16,
22;45:1,25;47:3,8,13,
15,16;48:6,19,22;
49:1,23;50:2,8,17,19;
51:1,4,6,8,12,14,16,
18,22;52:10,14,16,
25;53:2,7,10,12,20,
22,24;54:1,4,14;55:4,
6,13,23;56:2,4,9,13,
17;57:5,8,16,21;58:4,
10,14,18,22;59:1,6,9,
10,14,20;60:4,9,12,
18,20;61:2,14,17,19,
21,25;62:2,4,4,10,12,
15,19,25;63:4,7,16,
25;64:3,5,7,11,13,19,
24;65:1,7,16;66:1,7,
10,17;67:1,4,7,13,15,
21;68:3,12,13,18,22,
24;69:2,5,9,21;70:10;
71:10,23;72:2,3,7,18;
73:3,5,10,18;74:6,6,
7,9,13,23;75:1,4,7,10,
14,17,24;76:3,7,8,11,
14,22;77:1,3,10,12,
16,19,23;78:1,4,6,9,
18,19,23,25;79:3,6,9,
18,24
**courts (4)**
  19:20,21;22:23,24
**Court's (5)**
  9:4;15:11;39:2;
  44:14;76:24
**cover (3)**
  40:6;63:14;65:3
**covered (3)**
  61:12,14;62:24
**covers (4)**
  41:12,13;65:17,21
**Credit (3)**
  67:17;79:13,16
**creditors' (1)**
  21:3
**critical (1)**
  73:12
**cross- (1)**
  7:5
**cross-examine (1)**
  15:1
**cue (1)**
  63:8
**current (2)**
  60:10;73:13
**currently (2)**
  20:16;23:10
**custodians (2)**

8,9;32:16,22,24;33:7,
13,15,22;34:7,22;
35:5,8,10,16,21;36:7,
8,14,22;37:9,14,16;
38:9,11,15,19;39:3,9,
14,17,20,21;40:9,10,
14;41:2,18;42:10,12;
43:13,23;44:7,8,16,
22;45:1,25;47:3,8,13,
15,16;48:6,19,22;
49:1,23;50:2,8,17,19;
51:1,4,6,8,12,14,16,
18,22;52:10,14,16,
25;53:2,7,10,12,20,
22,24;54:1,4,14;55:4,
6,13,21;58:4,
...

60:5,7
**custody (1)**
  40:22
**cut (1)**
  6:15
**cutoff (1)**
  32:18

---

# D

**DANIEL (2)**
  4:9;6:6
**Dash (3)**
  9:12,13,14
**data (1)**
  46:24
**database (2)**
  51:3;52:2
**databases (8)**
  50:24;51:4,9,19,
  22;52:1,21;55:8
**Data's (1)**
  34:3
**date (11)**
  8:7;13:4,8,12,15;
  14:18;20:18;63:24;
  75:15;79:14,16
**day (4)**
  37:23;42:4;51:3;
  77:25
**days (16)**
  20:3,4,5,23;29:8,
  12,19;44:10;46:6;
  48:13;53:5,8;54:16,
  16;57:11;79:22
**DC (2)**
  4:15,23
**deadline (2)**
  30:19;56:20
**deadlines (1)**
  73:13
**deal (7)**
  8:20;10:14;27:19;
  29:4;45:14;60:13;
  76:18
**dealing (3)**
  21:24;37:2;52:5
**deals (2)**
  62:17;69:6
**debtor (16)**
  16:21;17:7,11,18;
  19:13;20:13,22;27:1,
  2;29:4,10,20;32:19;
  34:22;36:3;72:10
**debtors (60)**
  7:19;16:5,5,7,16,
  17;19:13,15;21:12;
  23:7;24:5,8;30:18;
  32:4,13;34:1;35:6,14,
  18;36:8;37:17;40:3,
  7,22;41:4,14;43:16;
  45:10,13;46:21;
  47:16,21;50:21,23;

53:19,21,22,23;
54:14;58:5,7,8;60:3;
64:9,21;65:22;66:3,
24;69:16;70:13,25;
71:16;72:12,23;
73:11,13,16;74:14;
75:22;79:21
**debtors' (8)**
13:1,9;14:5,15,17;
63:12;68:15;72:10
**decide (14)**
15:15;25:5;32:25;
35:3;40:24;55:23;
57:5,17;69:15;73:19;
74:8,13,19,19
**decided (9)**
9:4,6;12:23;22:22;
23:1;24:17;31:18;
45:23;75:4
**decides (1)**
74:9
**deciding (4)**
47:14;69:14;71:6;
74:6
**decision (11)**
12:16,23;16:1;
21:23;22:20;31:9;
32:11;36:15,16;
56:25;71:2
**decisions (1)**
16:19
**declarants (3)**
7:6;11:24;15:1
**declaration (17)**
7:11;8:6,6;9:10,25;
10:4,6,8;13:1,5,5,9,
13;33:9;41:14;79:12,
15
**declarations (20)**
6:24;7:1,2,14;8:2,
4;9:9,18;10:9,14;
11:4,5;12:15;14:11;
33:2,3,11;78:14;79:1,
9
**default (3)**
31:1,20;57:12
**defend (3)**
70:5;71:14,20;
72:18
**defendant (9)**
31:20;64:1,14,17;
66:2,16,21;67:10;
72:17
**defendants (16)**
11:24;18:23;21:23;
33:18;50:20;58:1;
66:17;67:18;68:11,
20;69:20;70:22;
72:10;73:17;74:17;
77:8
**defendants' (3)**
33:18;34:9;78:17
**defense (1)**

74:9
**defenses (1)**
70:9
**deferred (1)**
28:20
**deficiencies (1)**
42:25
**delay (1)**
30:18
**deliverables (1)**
63:20
**delivered (1)**
63:22
**depositions (1)**
36:11
**derail (6)**
21:20;23:9;28:22;
32:6;33:12;38:2
**derailed (1)**
29:12
**described (1)**
69:8
**designed (2)**
37:3;76:18
**despite (1)**
41:25
**details (1)**
78:7
**determination (1)**
37:18
**determine (3)**
26:7;34:5;50:22
**determined (2)**
9:1;44:9
**determines (1)**
42:22
**determining (1)**
12:11
**development (1)**
6:13
**difference (1)**
46:23
**different (12)**
17:24;27:9;30:2;
37:6;40:5;44:9;
49:16;50:6,8;56:23;
57:2;65:4
**differently (1)**
27:9
**difficult (2)**
15:14;32:21
**diligence (3)**
20:10;50:11;63:23
**direct (2)**
38:6;68:15
**directed (2)**
45:12;79:5
**directing (1)**
54:14
**direction (2)**
67:11,12
**directors (1)**
36:16

**disagree (7)**
11:19;57:19;60:25;
62:25;69:23;70:1;
74:21
**disagrees (1)**
47:13
**discovery (73)**
8:17;15:18;16:4,4,
7,14,21;17:7,11;
19:12,14,14,25;
20:13,16;21:9,12,18,
18,19,25;22:3,7;23:1,
7;24:4,10,13;25:6;
27:25;30:8,19,24;
31:13;32:12,18,18;
33:17;35:7,12,14,15;
36:4,8,15,16;38:1;
40:14,21;41:1,1;
46:10;47:15,20;
48:17;49:9;56:14,16;
57:9;60:21;69:16;
70:19;71:8;72:9,11,
15;73:12,21,23;
74:19;76:6,8,21
**discretion (1)**
41:22
**discuss (3)**
68:11,13;69:25
**discussed (1)**
31:12
**discussing (1)**
63:11
**discussion (1)**
65:20
**dismiss (1)**
57:1
**dispute (7)**
17:15,22;21:4;
27:24,25;34:16;60:1
**distract (1)**
73:12
**distraction (1)**
73:10
**district (12)**
26:13,17;28:20;
29:5,7;31:9;40:9;
47:3,8;74:9;76:11,22
**diverting (3)**
20:25,25;21:1
**divide (1)**
24:20
**Docket (7)**
7:25;8:5;38:4;
46:1;78:12,13;79:10
**document (12)**
7:18;9:10;10:1,5,7,
8;29:19;43:14;47:7;
54:2;56:20;66:12
**documented (1)**
22:10
**documents (39)**
14:14;16:16;18:12;
20:1;25:3;29:11;

30:18;31:1,14,17;
35:3,18;40:20,20,25;
41:9;43:3,20;44:21;
45:4,5,20;46:20,24;
47:5,9,12;49:10,21;
54:11;55:1;57:11;
59:11;60:1,3,8;61:7;
68:8;70:21
**dollar (1)**
53:14
**dollars (17)**
17:19,21;18:7;
23:2,9;24:15,18,19;
29:4,11,20;43:14;
60:22;62:6,8,13;68:6
**done (8)**
21:8;23:13;29:6;
36:19;44:12;50:7;
53:18;60:22
**down (6)**
30:9;36:2;41:22;
44:11;57:3;61:12
**drafting (1)**
12:1
**draw (1)**
30:7
**drop (1)**
54:10
**due (3)**
20:10;50:11;70:6
**During (1)**
41:23

## E

**earlier (1)**
69:2
**early (1)**
46:3
**easily (1)**
59:11
**east (1)**
50:15
**easy (1)**
36:1
**ECF (3)**
7:18;8:5;79:10
**echo (1)**
73:9
**effect (1)**
38:6
**effective (1)**
36:6
**effectively (2)**
34:3;70:7
**efficiencies (1)**
35:1
**efficient (1)**
76:16
**effort (2)**
37:19;58:18
**efforts (1)**
16:4

**either (7)**
24:25;25:13,14;
37:23;38:6;74:8;
75:14
**element (1)**
48:15
**eliminate (1)**
22:8
**eliminating (1)**
34:24
**Elise (1)**
73:6
**ELLIS (2)**
4:12;63:9
**else (12)**
9:14;47:23;49:18;
53:17;54:10;63:4;
67:3,13;70:14;73:5;
75:7;77:4
**e-mail (4)**
38:22;39:1;60:4,17
**e-mails (1)**
59:25
**employees (4)**
16:4,15;36:14;
62:17
**end (8)**
6:14;26:2;30:19,
24,25;31:23;46:2;
75:18
**engaged (1)**
20:10
**enjoin (2)**
17:10;57:25
**enjoining (4)**
30:6;38:6;56:17;
71:5
**enormous (2)**
20:6;21:7
**enough (1)**
60:9
**ensures (1)**
69:11
**enter (1)**
57:12
**entered (2)**
11:7;47:18;64:20
**entire (1)**
34:15
**entitled (4)**
21:12;71:23,24;
72:18
**entitlement (2)**
25:2;35:3
**entry (2)**
45:8;64:8
**enumerated (1)**
62:9
**equitable (1)**
37:13
**ESQ (7)**
4:7,8,9,17,25;5:7,
16

**establish (1)**
37:24
**established (5)**
19:23;23:8;42:14,
16,18
**establishing (1)**
42:19
**estate (5)**
17:15;36:5;37:2;
71:21;74:22
**estimate (4)**
17:16,18;25:6;51:2
**estimation (2)**
76:10,17
**estoppel (1)**
21:25
**et (1)**
7:12
**Even (9)**
23:22;30:20;37:16;
43:12;47:18;58:3;
59:3,9;69:3
**evidence (38)**
6:22;7:4,10;8:5,7,
9,13,16;9:9;11:9;
12:10,16,20,21,22;
13:4,7,12,15;14:4,8,
16,18,19;15:4;17:17;
19:18;23:8;29:21;
32:3;72:18;77:14;
78:10,20,21;79:11,
13,16
**evidentiary (1)**
7:8
**exact (1)**
17:21
**exactly (3)**
33:6;40:16;52:9
**examine (1)**
7:6
**examined (1)**
15:12
**examiner's (1)**
20:19
**example (6)**
21:7;22:4;42:3;
44:7;50:7;57:8
**exclude (1)**
52:1
**exercise (1)**
30:8
**exercising (1)**
22:17
**exhibit (7)**
13:19;14:6;42:15,
17;44:6;79:13,16
**exhibits (15)**
10:13;13:18,23,23;
14:7,7,9,10,15,15,17;
59:24;77:14;78:12,
21
**expand (2)**
74:2,2

**expect (2)**
76:3;77:1
**expedited (7)**
20:13,15;49:15;
50:3;53:4;73:11;
76:11
**expeditiously (1)**
26:21
**expense (9)**
27:7;35:14;36:3;
38:9,11,14;46:13;
49:12;72:19
**expenses (3)**
73:16,19,22
**expensive (1)**
53:15
**experience (1)**
52:17
**expert (3)**
6:17;21:4;52:3
**experts (4)**
6:15;34:8,9;78:15
**explain (2)**
52:4;66:14
**explained (1)**
70:11
**exploded (1)**
65:8
**expressions (1)**
70:12
**extend (3)**
17:10;35:6;37:4
**extended (1)**
24:3;32:8,9
**extends (2)**
35:16;36:7
**extensive (1)**
20:11
**extent (12)**
11:18,20;19:13;
42:17;45:14;47:24;
48:3,5;56:18;71:19,
21;77:13

## F

**face (5)**
41:12,17,21;43:2,9
**facilitate (1)**
44:21
**facilities (1)**
54:4
**fact (7)**
32:18;40:2;41:13;
42:7;43:6;56:15;
70:23
**factor (2)**
70:11;71:13
**factors (6)**
24:16;27:6;59:10;
69:1,2;72:14
**factual (1)**
49:2

**Fahy (2)**
10:6;13:9
**fair (1)**
12:21
**fairly (1)**
24:10
**Fannie (1)**
6:7
**far (3)**
22:14;23:25;46:24
**far-reaching (1)**
15:16
**fast (1)**
48:14
**FDIC (2)**
24:6;29:18
**Federal (5)**
6:6;13:2,10;26:18,
24
**fee (2)**
43:10;62:4
**feel (1)**
73:11
**feels (1)**
73:15
**fees (1)**
71:18
**few (1)**
66:7
**FHFA (44)**
4:3;16:13,15;
17:10;21:9,11;22:14,
25;23:7,24;24:2,6;
25:5;29:18;30:11;
31:1;33:6,17,23;
35:19,22,23,24;
37:17;38:23;39:8;
40:4;48:18;50:19,20,
20;54:24;57:7,9;
63:11;64:2;68:19;
69:23;70:18;73:1;
74:16,17;75:22;
77:11
**FHFA's (5)**
22:22;30:7;33:12;
34:25;40:18
**fides (1)**
22:6
**Fifteenth (1)**
4:14
**figure (3)**
49:5;52:11;55:7
**file (6)**
48:11;50:10;67:23;
70:20,24;73:16
**filed (9)**
6:9,10;10:1,5,7,8;
19:8;66:3;72:1
**files (89)**
6:16;18:6,9,18,18;
19:6;21:3;33:7;34:2,
11,15;36:2;40:6,19;
41:6,13,15;42:3,6;

43:9,21,25;44:8,20;
48:10,11;49:4,17;
50:13,13,21,22,25;
51:19;52:12,22;53:3,
4,8;54:16;55:7,10,19,
21,24;58:2,2,6,9,13,
15,19,24,25;59:1,3,5;
60:4;61:8,14,18,22;
62:9,18,20;63:14;
64:9,21;65:3,5;66:20,
22,24;67:25;68:4,6,
14,17,22,25;69:18;
70:2,13,16,16;71:20;
72:24;74:10;79:22
**filing (1)**
46:22
**final (1)**
63:18
**finally (2)**
52:9;76:19
**Finance (2)**
6:6;13:2,10
**Financial (1)**
4:13,21;5:3
**find (4)**
50:24;54:22;58:24;
59:1
**fine (3)**
9:22;38:15;67:1
**finish (1)**
21:16
**firm (1)**
8:20
**FIRREA (1)**
22:22
**first (8)**
9:9;10:15;26:19;
28:14;33:5;37:23;
40:25;52:2
**five (1)**
68:6
**fixed (1)**
62:7
**flexibility (2)**
43:7;44:5
**flexible (1)**
31:7
**FLIMAN (2)**
4:9;6:6
**Florida (1)**
16:1
**focus (3)**
26:9;45:20;78:7
**focused (1)**
46:14
**Foerster (1)**
62:19
**following (1)**
9:9
**follows (1)**
63:20
**former (2)**
16:15;36:12

**forth (6)**
15:20;33:10;39:12;
41:5;42:24;47:6
**forty-five (3)**
29:8,12,19
**forum (1)**
69:25
**forward (7)**
20:24;39:13,15;
45:13;56:19,19,19
**found (2)**
16:19;37:9
**four (4)**
23:11;32:19;51:19;
52:7
**fourteen (8)**
50:24;51:5,9,20,21,
22;52:21;55:8
**framed (1)**
19:9
**Frankel (1)**
73:7
**fraud (2)**
39:16,16
**Freddie (2)**
5:11;6:7
**free (3)**
22:25;24:13;32:12
**FREJKA (8)**
73:6,7,24;74:21,
24;75:3,6,7
**frequency (1)**
63:23
**Friday (2)**
75:17,18
**FRIEDMAN (2)**
4:2;6:5
**front (4)**
41:10;48:2;65:17;
73:1
**front-loaded (1)**
46:1
**fulfill (1)**
48:4
**full (3)**
20:23;38:24;46:1
**fully (2)**
12:18;20:14
**fundamental (1)**
21:20
**funds (1)**
68:8
**funny (1)**
29:25
**further (7)**
6:15;14:19;24:5;
25:19;35:7;36:7;
47:16

## G

**gather (1)**
45:19

12-12020-mg    Doc 1920-5    Filed 10/22/12    Entered 10/22/12 21:41:42    Exhibit E
RESIDENTIAL CAPITAL, LLC, et al. v.                                    P.M. SESSION ONLY
Case No. 12-12020-mg                    Pg 90 of 98                    September 11, 2012

**gauntlet (1)**
30:9
**gave (1)**
43:7
**general (7)**
9:19;11:10;15:22;
21:15,17;22:9;27:22
**generic (1)**
64:13
**generically (1)**
64:12
**gets (1)**
57:5
**given (5)**
6:19;17:19;37:22;
56:15;70:7
**gives (3)**
22:25;44:5;50:19
**GLENN (116)**
4:8;6:3,4,4,23;7:2,
7,14,21,25;8:9,11;
9:17,19,23;10:19,20,
25;14:8,12;15:1,2,5,
7,9,10,25;16:2,8,18,
23,25;17:4,22;18:1,4,
10,16,21;19:2,4;20:2;
21:15;22:18;23:4,12,
15,18;24:20,24;
25:10,14,16,18,21,22,
24;26:1,6,11,15;27:4,
14,17,19,21;28:2,4,
10,13,16,19;29:15,
17,25;30:4,13,16,23;
31:5,7;32:15,21,23;
33:8,14,20,25;34:13;
35:9,19;36:13;37:7,
11,15,20;38:10,12,
16;45:20;47:13;53:5,
6;60:20;68:22,25;
70:18;75:25;76:1,4,
13,24;77:2;79:3,4,7
**Glenn's (1)**
57:19
**globally (1)**
34:14
**GMAC (1)**
40:6
**GOEKE (1)**
4:25
**goes (4)**
33:8,9;46:3;54:25
**Good (3)**
6:4;57:10;73:6
**governmental (1)**
50:11
**governs (1)**
12:7
**grant (1)**
57:20
**granting (3)**
21:23;60:16;71:1
**great (1)**
22:4

**greater (1)**
52:20
**guarantees (1)**
29:12
**guess (5)**
31:16,20;37:19;
61:1;69:6
**guidance (1)**
69:4,14,17
**guided (1)**
6:18
**guidelines (2)**
34:6;37:25

## H

**Haims (121)**
8:2,3,12,15;9:8,13,
16,24,25;10:4,11,13,
16,18;11:13,15;12:4,
8,13;13:17,19,21,23;
14:1,4,10,13,19,22,
24;38:17,19,20;39:7;
46:15;48:22,25;
49:17,20,23,25;50:4,
9,18,23;51:2,5,7,10,
13,15,17,21;52:13,
15,24;53:1,9,11,17,
21,23,25;54:3,8;55:2,
5,12,14,16,25;56:3,7,
11,14;57:7,15,18,23;
58:7,12,16,21,24;
59:2,7,13,16,21;60:5,
11,14,19,25;61:4,16,
18,20,23;62:1,3,7,11,
14,16,22;63:2,6,7;
66:10;67:7,8;75:8,9,
11,15,19;77:20,21,
24;79:2
**half (1)**
6:16
**handle (2)**
10:20;18:17
**hands (1)**
20:23
**happen (5)**
20:18;21:10;22:15;
32:2;54:23
**happens (1)**
20:17
**happy (3)**
13:24;50:2;69:24
**hard (1)**
50:18
**Hashanah (1)**
75:13
**head (1)**
66:5
**hear (7)**
15:8;28:21,24;
38:19;63:5;67:21,23
**heard (10)**
37:11;38:25;67:7,

13;70:12;73:5;75:8,
20,22;77:4
**hearing (11)**
6:20;7:9;14:16;
16:10;20:12,16;
31:24;33:6;37:23;
56:11;79:11
**heavier (1)**
46:8
**held (2)**
22:18,19
**help (1)**
32:24
**helpful (2)**
47:2,3
**HERA (5)**
22:21,24;23:4;
30:5,5
**hereby (9)**
8:7;13:3,7,11,14;
14:17;24:3;79:12,15
**herein (1)**
42:15
**hereof (1)**
63:24
**Here's (2)**
12:14;19:3
**herring (1)**
46:24
**Hillsboro (1)**
36:11
**Hillsborough (1)**
15:23
**historical (4)**
63:21;65:13;66:22;
67:9
**historically (1)**
65:5
**history (2)**
17:8;22:21
**hold (1)**
31:25
**holding (2)**
22:5;36:11
**Holdings (1)**
15:24
**honestly (1)**
66:8
**Honor (103)**
6:4,8,18,23;7:7;
8:3,9,15,16,18;9:8,
19;10:20;11:15,20;
14:20,24;15:2,5,10;
17:22;18:6,25;21:16;
22:9;23:12,16;24:20,
24,25;25:10;27:19,
23;28:19;29:25;
30:16,17;32:15,25;
33:1,1,8;34:2,15;
35:2;37:7,22,22,24;
38:7,12,17;40:1,16;
41:7;47:12,25;48:16;
51:24;55:2;56:1;

57:18;58:17,24;63:6,
8,18;64:2,25;65:2,3,
15,19,25;66:5,8,14,
25;67:6,8,14;68:1,10,
20;69:20;71:17;72:1,
21,22;73:4,6;75:9,19;
76:1;77:5,6,13;78:11,
22,24;79:2,17,23
**Honor's (2)**
6:13;21:23;77:8
**hope (3)**
31:3,5;33:2
**hopefully (1)**
34:24
**housed (1)**
50:14
**Housing (3)**
6:6;13:2,10
**Houston (1)**
5:14
**hundreds (2)**
57:25;58:2
**hypothetical (3)**
24:23;29:2;36:1
**hypothetically (3)**
45:16;57:10;68:5

## I

**idea (1)**
33:20
**identifiable (1)**
18:19
**identified (2)**
24:25;71:2
**Identify (5)**
7:11,18;52:21;
54:18;55:10;71:3
**identifying (1)**
43:21
**ie (1)**
52:6
**II (6)**
31:10,12,14;57:13,
14;69:11
**immediately (1)**
63:24
**impeded (2)**
56:20,22
**important (6)**
20:16;21:18;22:22;
32:6;72:9;73:13
**importantly (1)**
55:18
**inadequate (1)**
42:22
**Inc (3)**
4:13,21;5:3
**include (1)**
78:14
**includes (1)**
71:7
**including (7)**

7:10;19:20;22:3,7;
40:5;68:16;69:2
**indefinitely (1)**
32:10
**indemnification (4)**
21:25;71:12,18,25
**indicate (2)**
7:12;71:11
**indicated (1)**
72:11
**indirect (2)**
38:6;68:15
**individually (1)**
66:15
**information (9)**
6:11;18:14,18,20;
27:13;56:1;71:9,14;
79:20
**infringing (1)**
30:10,11
**in-house (1)**
62:17
**injunction (21)**
16:11;17:13;21:24;
22:2;24:2;32:7,10;
35:21,24,24;36:10,
10,18,21;37:13,17;
56:8,10,12,17;71:1
**input (2)**
28:8,12
**insofar (1)**
17:22
**instance (2)**
28:14;40:25
**instead (1)**
69:9
**intend (2)**
71:9;75:23
**intended (1)**
36:25
**intent (10)**
11:6,9,18,19,20,22,
25;12:17,24;65:23
**interest (4)**
26:23,23;27:2;31:6
**interested (1)**
78:20
**interesting (2)**
31:10;33:4
**interpret (2)**
45:11,16
**interpretation (2)**
23:20;47:2
**into (26)**
8:7;9:8;10:23;
11:7;12:15;13:3,7,11,
15;14:17;17:20;
24:17;25:19,24;26:1;
44:4;45:8;46:2;
47:18;64:8,8,20;
71:13;79:10,13,15
**introduce (1)**
7:10

**introducing (1)**
 6:21
**investigation (1)**
 20:19
**invite (1)**
 20:21
**involved (2)**
 16:3;22:14
**involves (2)**
 48:10,10
**involving (3)**
 64:1,15;66:2
**Iron (5)**
 53:8,12;54:1,19;
 62:12
**ironically (1)**
 76:6
**irony (1)**
 76:5
**issue (61)**
 8:24;11:18,20;
 12:18;16:6,10,20;
 18:24,24;19:9,22,23;
 23:25;24:1;25:1,5;
 26:1,25,25;27:12,14,
 24;28:5,6,6;29:4;
 30:6;34:16;36:22;
 38:5,9,11,13,14,14;
 39:19,20,21,25;41:8;
 45:14;46:11,15,21,
 24;47:25;49:15,16,
 18;59:17;63:14;
 67:25;69:4,5;71:2,4;
 72:20;73:21;74:16,
 22;76:5
**issued (6)**
 26:7;28:18;30:21;
 38:23;40:5,8
**issues (14)**
 15:11;16:4,13;
 18:14;27:23,24;28:7,
 14;29:8;34:20;40:24;
 51:24;75:5;76:20
**issuing (2)**
 26:12;57:2

**J**

**James (2)**
 78:16;79:15
**jam-packed (1)**
 46:4
**January (1)**
 32:1
**Jeffrey (2)**
 9:10;13:1
**job (1)**
 26:20
**John (3)**
 9:25;10:4;13:5
**Johns-Manville (2)**
 15:20;28:25
**Judge (51)**

**last (9)**
 6:20;15:12;16:9;
 21:8,12;22:18;23:21;
 26:16,17,24;27:8;
 29:6,6,7,7,9,13;
 30:21;31:1,9,12,16,
 17,20;32:17;34:18;
 36:15;37:17;40:24;
 44:7;45:4,11;46:19;
 49:7,9;54:25;56:24;
 57:2,5,10,17;59:14,
 23;60:2;68:23;69:24;
 71:15;73:2,19;74:18;
 76:15
**judges (3)**
 26:17,18,24
**judgment (2)**
 36:22;71:23
**judgments (1)**
 23:19
**judicata (1)**
 22:1
**judicial (1)**
 37:23
**JUDSON (2)**
 4:17;63:9
**June (1)**
 78:18
**jurisdiction (1)**
 28:13

**K**

**Kanchana (5)**
 6:5;7:14;8:6;
 10:22;11:3
**KANGHANA (1)**
 4:7
**KASOWITZ (7)**
 4:2;6:5;8:20,25;
 9:5;10:22;11:3
**Kenwood (1)**
 53:11
**kind (3)**
 37:3,25;57:12
**KIRKLAND (2)**
 4:12;63:9
**knows (1)**
 68:1
**Kramer (1)**
 73:7

**L**

**labor (1)**
 43:21
**lacks (1)**
 42:23
**language (9)**
 9:2;11:15,21,22;
 12:3,9;65:12;66:23;
 70:3
**large (4)**
 35:11;43:3,8;52:6

 35:23;48:3
**light (2)**
 35:11,13
**likely (1)**
 72:13
**limit (4)**
 16:21;19:21;22:3;
 44:13
**limited (4)**
 24:10;43:14;59:18;
 60:14
**limiting (1)**
 30:6
**limits (1)**
 52:18
**line (2)**
 30:7,14
**lines (1)**
 73:17
**Lipps (2)**
 9:10;13:1
**liquidation (2)**
 29:13,23
**list (5)**
 50:12,19,21;58:13,
 16
**listed (1)**
 13:23
**listen (2)**
 49:1;66:10
**litigating (1)**
 22:24
**litigation (14)**
 9:7;22:6,7;26:22;
 34:2,20;40:8,9;
 41:12;54:5;64:1;
 65:8,18;76:15
**litigations (2)**
 64:7;66:13
**little (3)**
 39:14;62:5;78:7
**LLC (2)**
 6:3;40:6
**LLP (4)**
 4:2,12,20;5:2
**loan (67)**
 6:16;18:6,18,18;
 19:6;21:3;27:12;
 34:2,4,5,15;36:2;
 40:6,19;41:6,13,15;
 42:3,5;43:9,21,25;
 44:8,20;48:10,11,11;
 49:17;50:10,13,13,
 21,23,25;51:19;
 52:12;54:15;55:7;
 58:1,2,5,9,13,14,19,
 24,25;59:1;61:7,14,
 18,22;62:9;63:14;
 64:9,21;65:3,5;66:20,
 22,23;67:25;68:4,5;
 73:16;74:10;79:22
**loans (8)**
 51:25;58:23;59:4,

 8;64:1,15,15;66:3
**located (1)**
 55:21
**location (2)**
 52:21,22
**locations (2)**
 55:20,23
**long (3)**
 22:10;51:1,18
**longer (2)**
 59:5;70:15
**look (12)**
 11:22;19:5;31:4,6;
 32:6;33:4;34:15;
 37:16;48:7;60:15;
 69:16;76:14
**looking (1)**
 58:13
**looks (1)**
 7:22
**lots (1)**
 50:4
**love (2)**
 25:21;54:6
**luck (1)**
 24:19
**Luzzano (1)**
 31:11
**Lynch (3)**
 31:13,16,17
**Lynch's (1)**
 31:9

**M**

**Mac (2)**
 5:11;6:7
**Mae (1)**
 6:7
**main (1)**
 54:1
**major (1)**
 38:14
**making (1)**
 37:19
**man's (1)**
 19:18
**Manville (5)**
 16:3,10;22:4,5;
 36:14
**many (10)**
 34:14,14;50:14;
 51:4;52:22;54:19,20;
 55:21,23;66:1
**Marc (2)**
 10:8;13:13
**margins (1)**
 17:16
**marked (1)**
 14:14
**marshal (1)**
 37:1
**Mary (2)**

**lastly (1)**
 75:20
**late (1)**
 6:13
**later (2)**
 20:18;72:25
**Lauren (1)**
 67:17
**law (7)**
 11:21;12:7,9;17:3;
 36:18;48:16;72:5
**lawsuit (1)**
 64:2
**lawsuits (7)**
 35:11;48:8,9;
 64:15,18,19;66:2
**lawyer (1)**
 18:11
**lawyers (1)**
 62:20
**leads (1)**
 60:16
**least (2)**
 24:9;36:15
**leave (2)**
 33:20;70:4
**leaves (1)**
 31:19
**leg (1)**
 54:7
**legacy (1)**
 52:5
**legal (7)**
 15:15;25:2;35:3;
 39:20;41:8;44:18;
 71:18
**legislative (2)**
 17:8;22:21
**less (1)**
 36:3
**letter (1)**
 39:12
**LEUNG (41)**
 4:7;6:5;7:2,15;8:4,
 7;10:20,21,22,22;
 11:3,3;12:17;14:8;
 18:16;25:24;26:1;
 38:13;39:4,10,11,15,
 19,25;40:13,16;41:3,
 20;42:11,13;43:16;
 44:4,15,17,25;47:1,
 24;48:15,20,21;70:18
**level (2)**
 21:15;42:24
**Levin (1)**
 73:7
**liability (1)**
 71:19
**lifted (2)**

10:6;13:9

**material (1)**
42:17

**math (1)**
18:6

**matter (8)**
9:20;11:10;23:20;
25:1;38:5;54:24;
76:7;79:18

**matters (4)**
23:10;26:19;37:21;
38:3

**maxim (1)**
19:17

**maximum (1)**
43:7

**may (20)**
8:23;17:15;24:4;
31:25,25;32:8,19;
35:12;36:22;39:21;
40:3;42:15;46:2;
49:10;58:3;69:9;
70:15,21;73:18;
74:12

**Maybe (2)**
41:20,20

**MAYER (2)**
4:20;5:2

**MBIA (3)**
50:7;52:7;67:10

**MCKOOL (1)**
5:10

**mean (31)**
6:25;7:19;16:14;
18:14,25;20:21;
23:24;24:15;26:19;
28:17;31:11,20,23;
32:16;33:15;40:11;
45:3,8;47:22;49:1,6,
13;52:16;54:8;57:16;
69:3,5;70:11;72:8;
73:18,18

**meaning (1)**
12:11

**meant (1)**
65:3

**meet (2)**
34:8;42:23

**meets (1)**
34:5

**merits (1)**
22:6

**method (1)**
47:11

**methodology (1)**
34:10

**MICHAEL (1)**
5:7

**microphone (2)**
10:24;39:14

**might (2)**
30:1;69:4

**million (11)**

17:19;23:2,9;
24:18,18;29:3,11,20;
60:21;62:12;68:6

**millions (1)**
43:15

**mind (4)**
12:18;18:11;19:23;
77:7

**minimizing (1)**
34:24

**minute (1)**
26:10

**misstate (1)**
8:19

**mistake (1)**
70:23

**MOAK (1)**
5:16

**modifying (1)**
69:9

**moment (1)**
63:10

**Monday (1)**
75:13

**Mongelluzzo (13)**
10:1,5;11:5;13:6;
33:1,9;41:14;51:10,
20,24;54:8;55:16;
59:2

**month (5)**
49:4,11;53:3;62:6;
74:12

**monthly (1)**
62:7

**months (11)**
23:11;30:1;32:19;
49:5,21;53:16;54:22;
55:1;57:9;70:12;
73:14

**more (22)**
17:2;18:16;20:22;
21:15,17;24:7;38:3;
42:7,8;44:6;49:4,7,
14;50:2;52:20;53:1;
55:18;59:11;68:23;
73:21;74:12;76:10

**morning (2)**
20:11;21:2

**Morrison (1)**
62:19

**Mortgage (3)**
40:6;64:15;65:9

**MOSKOWITZ (26)**
67:14,16,17,24;
68:10,19;69:19,22;
71:17;72:1,5,21;
73:4;77:5,11,13,18,
22;78:2,5,8,11,21,24;
79:17;80:1

**most (3)**
43:18,21;73:9

**motion (17)**
6:9,11;13:2,10;

19:8;30:20;38:24;
56:25;57:20;59:21;
67:19,21,23;77:16,
17;79:4,5

**Mountain (5)**
53:8,12;54:1,19;
62:12

**move (4)**
13:24;20:24;52:2;
77:14

**much (13)**
17:3;18:25;33:6;
45:1,20;46:7,11,17;
49:14;52:10;67:5;
76:10;79:25

**multiple (1)**
52:5;54:4;55:20

**must (2)**
63:21,22

**mutually (1)**
42:19

---

## N

**Naftalis (1)**
73:7

**name (1)**
33:2

**narrower (1)**
39:22

**nature (3)**
7:12;65:6,8

**necess (1)**
53:18

**necessarily (2)**
24:15;76:14

**necessary (4)**
36:23;42:23;45:14;
48:3

**need (15)**
11:9;19:6,7;32:8;
48:12,13;52:20;53:2,
7;58:22;70:5,9,21;
71:8,20

**needed (2)**
70:4;76:19

**needs (1)**
74:10

**negotiate (1)**
61:13

**negotiated (2)**
11:6;61:10

**negotiations (1)**
12:1

**New (6)**
4:5;5:5;12:6,6,9;
14:13

**next (14)**
20:5,23;23:10;
29:11;46:3,6;48:13;
57:21;60:12,17,17;
75:12,18,18

**nine (6)**

30:1;49:21;53:15;
54:22;55:1;70:12

**ninety (1)**
44:10

**Ninth (2)**
17:2,6

**non-Ally (6)**
19:5;58:15;67:18;
68:10;71:11;77:8

**nondebtor (1)**
33:18

**nondisclosure (1)**
20:9

**none (2)**
47:22;50:12

**normal (2)**
26:3,5

**note (1)**
38:18

**notice (2)**
37:23;77:24

**noticed (2)**
77:21,24

**November (3)**
20:12,17;31:24,25

**number (19)**
6:3;7:25;9:10;10:5,
7,8;34:16;35:11;
40:5;52:18;53:13;
65:10;66:6,9;67:25;
68:2;74:1;78:12;
79:10

**numbers (2)**
8:5;50:24;61:18,
22;78:13

**NW (2)**
4:14,22

**NY (2)**
4:5;5:5

---

## O

**object (3)**
9:17;11:4,10

**objecting (1)**
47:7

**objection (5)**
11:10;12:16;13:2,
10;14:12

**objections (3)**
8:1;10:19;78:25

**objectives (1)**
34:23

**obligated (1)**
31:19

**obligation (3)**
31:17;44:19;45:7

**obligations (3)**
20:14;21:25;22:7

**observe (1)**
27:22

**obtain (3)**
34:22;41:9;54:15

**obtained (2)**
24:4;59:11

**obviously (1)**
32:23;46:3

**October (4)**
20:8;31:23;32:8;
48:19

**odd (2)**
20:9;40:17

**off (3)**
26:19;27:6;66:5

**offer (9)**
7:4,10,12,14;9:8;
14:2,4;15:4;78:11

**offered (4)**
12:22;14:6,7;65:22

**offering (3)**
7:11;8:13;78:9

**office (1)**
18:12

**officer (2)**
34:4;36:14

**officers (3)**
16:15;36:13,16

**often (2)**
53:24;54:5

**old (1)**
19:17

**one (36)**
6:12;7:15,16;9:19;
11:23;13:24;20:10;
24:9;26:22;31:21;
32:11;33:5;37:10;
38:18,21;39:22;
41:19;46:9;51:24;
53:8;54:1;55:16;
56:21;59:10;60:10,
12;63:3;66:10;69:5;
70:3,17;71:1;74:13;
75:11;76:20;77:5

**ones (1)**
65:6

**ongoing (1)**
20:16

**only (19)**
12:21;17:17;25:5;
29:3;33:24;34:17;
41:5;46:6;49:11;
50:5;54:11;59:18;
60:14;66:10,25;
68:22;69:24;71:14;
78:19

**open (1)**
65:17

**opinion (1)**
23:21

**opposite (1)**
43:6

**order (30)**
17:13,14;20:3;
24:3,5;30:6,22,23,24;
35:8,15;36:8,22;
37:3;38:5,23;39:23;

12-12020-mg    Doc 1920-5    Filed 10/22/12    Entered 10/22/12 21:41:42    Exhibit E

RESIDENTIAL CAPITAL, LLC, et al. v.
Case No. 12-12020-mg

Pg 93 of 98

P.M. SESSION ONLY
September 11, 2012

40:14;43:3;45:3,6;
46:19;47:16;48:2;
56:23;57:2,11;68:13;
69:10;70:19
**ordered (6)**
32:17;44:8;45:12,
15;68:23;74:8
**orders (1)**
29:7
**ordinarily (1)**
73:22
**ordinary (3)**
26:21;61:20,22
**origination (3)**
27:13;65:9;66:2
**others (1)**
52:1
**Otherwise (1)**
6:18
**ought (2)**
7:5;8:13
**ourselves (1)**
71:20
**out (18)**
16:9;21:21;26:6;
27:9;33:13;36:23;
40:8;44:11,14,18;
46:10;48:15;49:5;
50:24;52:11;54:22;
55:7;72:23
**outlier (1)**
32:17
**outset (1)**
56:24
**outside (4)**
22:23;36:10,18;
72:17
**outstanding (2)**
40:7,11
**over (10)**
17:19;20:5,23;
23:10;40:19;41:6;
44:9;46:2;57:16;62:4
**overseeing (1)**
19:25
**own (3)**
12:18;73:22;74:9
**owns (2)**
46:23,23

**P**

**paid (1)**
25:8
**papers (7)**
15:20;22:21;41:3,
6;49:20;59:21;71:12
**paragraph (3)**
41:13;48:2;63:18
**paragraphs (2)**
11:4,11
**paralegals (1)**
62:20

**parameters (1)**
44:11
**paramount (1)**
70:7
**parochial (1)**
26:22
**parol (5)**
11:9;12:10,19,20,
22
**part (7)**
6:22;7:15,23;40:9,
20;41:15;59:23
**particular (4)**
27:2;29:17;34:13;
67:2
**particularly (3)**
36:2;49:2;65:23
**parties (13)**
6:9;11:6,23;12:25;
20:9;32:12;38:6;
42:5;43:10;56:16;
61:12;72:11;74:1
**partner (1)**
7:2
**partner's (1)**
7:11
**parts (1)**
56:25
**party (31)**
8:17,23;11:8;
15:18;16:22;17:6;
18:8;19:12,15;21:18;
24:4,13;31:14;37:14,
25;40:11,21,23;41:1,
1;59:12;62:10,11;
69:11;71:7;72:9,16;
73:21,22;76:6;79:4
**Paskay's (1)**
16:1
**pass (1)**
23:1;24:13;62:10
**pass- (1)**
43:18
**passed (1)**
74:4
**passed-along (1)**
62:21
**pass-through (3)**
43:17;62:13;74:11
**past (2)**
64:1;75:15
**PAUL (1)**
5:16
**Pause (1)**
55:15
**pay (10)**
26:7;27:25;43:12;
45:7,17;49:18;54:9;
68:15,18;69:18
**paying (1)**
70:14
**pays (4)**
21:1;28:1,3;49:15

**pending (11)**
16:11;24:7,8;
35:12;38:24;48:8,9;
56:25;73:1;74:20;
77:16
**people (3)**
21:1;25:23;58:8
**perfectly (1)**
18:6
**performance (1)**
42:14
**perhaps (2)**
70:9;74:11
**period (4)**
32:9,20;53:5;55:10
**permit (1)**
23:6
**permitted (2)**
16:7;25:5
**person (2)**
34:4;69:12
**personal (1)**
25:18
**personally (1)**
18:19
**personnel (1)**
43:20
**petitions (1)**
66:4
**ph (1)**
57:13
**Philip (2)**
10:8;13:13
**place (2)**
32:13;73:25
**plain (2)**
41:25;43:5
**plaintiff (2)**
29:18;72:17
**plaintiffs (1)**
31:18
**play (1)**
34:20
**pleadings (1)**
79:8
**Please (1)**
6:2
**plenty (1)**
21:21
**plus (1)**
24:7
**PM (1)**
80:2
**podium (1)**
38:13
**point (11)**
6:16;8:8;17:3;
31:2;33:1;38:21;
45:2,23;50:16;61:5;
66:1
**pointed (2)**
16:9;44:18
**points (1)**

74:25
**police (1)**
22:17
**policy (1)**
27:23
**pondered (1)**
8:23
**pondering (1)**
17:9
**portions (1)**
11:4
**posited (1)**
21:16
**position (16)**
19:2,16;25:17;
40:18;41:4,5;47:4,6;
57:19;60:23,25;61:6,
9;70:1;73:11;79:7
**possession (2)**
40:21;48:12
**possible (3)**
34:17;58:7;59:4
**post-petition (2)**
47:18,19
**posts (1)**
25:6
**posture (2)**
16:6;40:17
**pot (1)**
66:18
**potential (5)**
21:24;27:6;35:1;
47:14,15
**potentially (3)**
35:13;43:15;74:15
**power (14)**
16:20;21:14;22:9,
10,17;23:2,16;29:23,
24;36:6;45:11;47:15;
48:14;60:24
**powerless (1)**
57:20
**powers (2)**
37:4,5
**practical (4)**
27:23;28:7;37:21;
38:4
**practice (4)**
30:21;63:21;65:13;
66:22
**pre-bankruptcy (1)**
50:9
**precedent (1)**
67:9
**precisely (1)**
25:8
**preclusion (1)**
71:3
**prejudiced (1)**
32:5
**premarked (1)**
14:7
**prepared (7)**

6:15;68:15,18;
69:17,19;70:19;76:1
**preparing (1)**
76:25
**present (3)**
16:6,15;36:11
**presented (3)**
6:20;14:6;45:10
**presiding (1)**
25:1
**pretty (2)**
11:21;44:23
**prevents (2)**
33:16;47:8
**price (1)**
54:13
**pricing (1)**
35:1
**Primarily (1)**
52:24
**principal (1)**
45:23
**prior (2)**
63:24;64:8
**priority (1)**
63:23
**privilege (3)**
18:13;19:22,23
**privileged (1)**
18:17
**probably (6)**
17:18;18:16;37:21;
54:9,18;73:25
**problem (2)**
24:25;38:5
**problems (1)**
60:9
**procedural (2)**
40:17;77:5
**proceed (5)**
6:12,19;26:20;
31:2;40:15
**proceeding (7)**
6:10;16:12;17:13;
35:25;36:20;38:8;
76:11
**proceedings (4)**
6:18;20:7;70:20;
80:2
**process (14)**
8:22;34:1,19;
36:22;52:3;70:6;
71:10;72:13;76:4,10,
17,17,21,22
**Processes (1)**
42:21
**processing (2)**
51:3;52:8
**produce (23)**
18:12;20:14,15;
29:8,11,19;31:13,17;
42:3;43:25;44:8,9;
45:5,6;49:7,10,17,19;

55:1;57:11;66:21;
70:13,15
**produced (7)**
21:5,6;29:7;41:19;
45:21,21;62:21
**producing (8)**
29:10;30:18;40:20;
61:14,18;68:5,17;
79:21
**production (11)**
16:16;28:6;35:17;
40:23;43:14;50:6;
56:21;64:9;67:11;
69:10;70:21
**productions (2)**
11:17;50:5
**Professor (4)**
78:15,15;79:12,15
**proffer (1)**
8:14
**proffered (2)**
7:6;9:20
**progression (1)**
33:4
**prohibitive (1)**
38:3
**proof (1)**
72:2
**property (3)**
17:15;36:4;37:1
**proposition (1)**
19:18;21:22;24:12
**prosecute (2)**
70:22;72:18
**prosecuting (1)**
31:19
**prosecution (1)**
71:5
**protect (1)**
37:1
**protecting (1)**
71:21
**protection (4)**
17:10;18:13;35:7,
16
**prove (1)**
34:23;38:1
**provide (12)**
11:17;41:15,24;
42:16;44:20;49:3,5;
50:2;68:14;69:4;
70:14;79:21
**provided (3)**
63:22,24;68:9
**provides (6)**
17:9;19:9;42:21;
43:2,11;69:14
**providing (3)**
53:4;69:17;74:11
**provision (9)**
22:16;56:8,12;
57:24;59:17;61:4,11;
62:23;63:15

**provisions (4)**
36:23,25;42:1;43:4
**public (1)**
19:17
**pull (5)**
39:14;50:24;52:15;
62:17;64:21
**pulling (1)**
62:9
**pulls (1)**
50:10
**punished (1)**
18:4
**pure (1)**
59:6,7
**purport (1)**
11:5
**purpose (1)**
21:20
**purposes (3)**
12:11;14:16;79:11
**pursuant (2)**
6:8;64:10
**put (10)**
7:19;17:1;20:25;
44:22;48:12;50:19;
57:8;61:23;62:19;
75:1
**putting (2)**
34:1;57:2

## Q

**qualified (1)**
18:16
**quantified (2)**
25:7;53:14
**quantify (1)**
76:19
**quashing (1)**
69:9
**quibbling (1)**
17:20
**quick (3)**
38:18,21;75:9
**quicker (2)**
54:12,13
**quickly (4)**
44:2;49:16,19;
52:20
**quite (3)**
43:6:61:2;66:7
**quote (5)**
53:3,12,15;54:15;
55:17
**quotes (1)**
55:9

## R

**raise (3)**
48:23;70:17;74:22
**raised (4)**

16:10;46:21,22;
77:6
**raises (1)**
55:16
**ramifications (2)**
15:16;22:14
**ranges (1)**
17:19
**rather (2)**
72:24;78:14
**reach (2)**
23:12;72:7
**reached (1)**
74:25
**reaching (1)**
22:14
**read (6)**
44:4,23;57:13;
60:7;63:15;78:6
**reading (2)**
43:5,6
**reads (1)**
63:19
**ready (2)**
68:6,7
**really (8)**
17:1,3;24:2;26:19;
30:3;49:13;53:20;
76:18
**Realty (3)**
22:19;23:21,23
**reason (2)**
44:19;47:5
**reasonable (6)**
18:5;34:18,21;
44:11;69:19;70:16
**reasonably (3)**
42:22,25;69:12
**reasons (3)**
15:19;22:20;35:20
**rebuttal (1)**
15:3
**received (8)**
8:7;13:3,7,11,15;
14:17;79:12,15
**recites (1)**
9:1
**recollection (1)**
52:19
**reconciliation (1)**
52:8
**record (13)**
7:12,23;32:3,25;
34:15;40:1;41:11;
44:5;59:2;62:8;
63:10;65:2,13
**records (3)**
41:15;59:3;62:9
**red (1)**
46:24
**reduced (1)**
18:3
**reduction (1)**

70:2
**reexamine (1)**
34:6
**refer (1)**
31:8
**reference (2)**
23:24;37:18
**references (1)**
42:14
**refers (1)**
42:15
**regarding (3)**
13:6,14;73:10
**regardless (1)**
39:13
**REGINALD (1)**
4:25
**regulate (11)**
16:21;19:12,13,25;
21:17;23:3;33:16;
35:15;47:20;69:15;
76:9
**regulating (1)**
19:24
**regulatory (1)**
30:8
**related (1)**
25:23
**relevant (2)**
41:8;65:25
**relied (1)**
19:19
**relief (3)**
13:3,11;37:13
**relieved (1)**
31:16
**rely (1)**
15:24
**remains (1)**
20:18
**Remediation (1)**
42:20
**remembered (1)**
75:12
**reorganization (3)**
28:23;33:14;38:2
**reorganize (1)**
22:9
**repeatedly (1)**
19:19
**reply (2)**
7:16;56:5
**reporting (1)**
22:24
**represent (1)**
67:17
**represented (1)**
30:1
**request (25)**
6:16;28:4;33:11,
12;35:17;41:16,22;
42:5;43:8;44:3;45:4,
13;46:11,19,20;

47:11;49:14;54:17;
63:14;64:9,20;65:5,
14;66:19;72:15
**requested (3)**
35:13;43:25;79:20
**requesting (1)**
70:8
**requests (9)**
41:12;42:4;43:3;
47:7;54:6;66:12,23;
74:2,10
**require (4)**
17:12,13;36:4,9
**required (5)**
20:15,24;42:2;
44:20;70:13
**requires (1)**
46:18
**requiring (1)**
29:10
**res (1)**
22:1
**ResCap (27)**
7:6;11:24,24;
41:21,23,25;42:7,15,
18,22,25;43:10,20,
25;44:2,20;45:5;
46:18,20;48:7,11;
66:15,20,20;67:9,10;
68:14
**ResCap's (2)**
42:18;44:19
**reserve (2)**
12:23;59:22
**reserving (1)**
12:16
**Residential (1)**
6:3
**resolve (2)**
25:4;76:19
**resolved (3)**
12:18;25:2;27:12
**resources (1)**
20:25
**respect (14)**
12:17,22,24;17:17;
21:23;23:24;26:16;
32:7;33:17;34:13;
57:17;67:25;69:22;
79:21
**respectfully (1)**
11:19
**respectively (1)**
78:16
**respond (1)**
20:20
**responded (1)**
14:23
**responding (1)**
42:4
**response (3)**
39:12;45:7;56:4
**responsible (3)**

21:13;69:23;74:15

**responsive (1)**
35:13

**rest (6)**
8:8,11;14:21,22,
23;15:6

**restrict (3)**
22:8;23:3,7

**restricted (1)**
22:23

**result (2)**
29:22;45:6

**retention (1)**
54:4

**retrieval (1)**
43:22

**retrieve (2)**
18:8;43:19

**retrieving (3)**
53:13;54:15;55:10

**re-underwritten (1)**
34:3

**reveals (1)**
65:20

**review (2)**
64:22;68:18

**reviewing (2)**
62:20;68:17

**reviews (2)**
50:11,11

**RFC (1)**
40:6

**right (44)**
6:2;7:3;8:1,4,8,12;
9:24;10:10;12:14;
14:5,14,21,25;15:3,6,
8;18:11;19:18;23:19;
26:14;27:18;34:12;
36:13;39:3,9,19;
50:1;53:16;56:5;
58:20;59:15,22;
60:11;63:4;65:12;
66:6;67:13;68:3;
69:21;77:4,10;78:8;
79:9,24

**rises (1)**
72:15

**risk (1)**
71:2

**RMBS (1)**
31:24

**road (1)**
57:3

**room (1)**
70:4

**Rosh (1)**
75:13

**rough (1)**
54:19

**roughly (2)**
19:21;34:12

**rule (19)**
7:24;15:22;26:10;

28:13,16,17;37:12;
40:2,3,15;47:25;
54:24;59:9,10;69:3,6,
7,8;76:5

**ruled (3)**
47:12;48:16;57:9

**rules (2)**
76:6,8

**run (4)**
50:23;51:8,22;55:8

**runs (1)**
32:7

## S

**sales (1)**
50:12

**same (10)**
50:5;58:1;63:22;
66:18;71:12;72:25;
74:25;76:21,21;
77:25

**sample (1)**
34:22

**sampling (3)**
6:14;21:4;34:10

**saying (12)**
9:4;21:14;30:10;
35:22,23;37:22;
45:16;56:8,16;57:18;
62:23;66:12

**schedule (6)**
34:18,18;60:23;
72:23;75:11;77:9

**scheduled (6)**
20:8,12,17;23:10;
31:24;77:18

**Scheipe (4)**
10:8;11:5,23;13:13

**scope (5)**
24:14;27:7;28:5;
46:11;71:6

**screened (1)**
18:13

**searches (2)**
51:19;52:6

**seated (1)**
6:2

**Second (12)**
19:20;22:19;27:11;
33:15;37:19;38:22;
39:6,17,22;52:2;
56:18;58:4

**Secondly (1)**
59:18

**Section (11)**
21:24;22:2;35:6;
41:22;42:8,10,20,24;
48:17;63:18,19

**sections (1)**
45:18

**securities (1)**
71:24

**securitization (3)**
58:23;59:4,5

**securitizations (3)**
34:14,16;58:20

**seek (1)**
34:8

**seeking (4)**
6:11;71:7;72:9,11

**seem (5)**
24:16;27:5;36:9;
49:13;74:18

**seemed (1)**
17:11

**seems (1)**
72:14

**seized (1)**
41:7

**selected (2)**
6:17;19:11

**Senior (1)**
36:13

**sense (1)**
42:6

**sensitive (1)**
74:3

**sentence (1)**
63:19

**separate (4)**
6:10;65:4;77:16,18

**separately (3)**
25:2,19;67:20

**September (1)**
38:25

**series (1)**
23:9

**seriously (1)**
32:5

**served (2)**
9:6;69:11

**service (9)**
42:24;47:17;49:15;
50:3;53:4;61:7,10,
11;65:13

**servicers (2)**
40:5;54:11

**services (32)**
11:7;13:7,14;41:9,
11,15,24;42:8;43:12,
14,23;44:1,13,17,18;
45:9;46:18;47:11;
48:1,4;61:5;62:8,15;
63:10,22,23;64:8,20;
65:2,24;74:5,15

**servicing (2)**
65:9;66:3

**set (6)**
15:19;39:12;41:5;
42:24;44:14;47:6

**sets (1)**
43:1

**setting (2)**
44:11;67:20

**settle (1)**

44:10

**settlement (1)**
31:24

**several (4)**
40:4;45:25;49:8;
50:7

**shall (1)**
42:18

**share (1)**
69:19

**shared (23)**
11:7;13:6,14;41:9;
43:23;44:1,12,17;
45:9;46:17;47:11,17;
48:1,4;61:5,7;62:15;
64:8,20;65:23;69:23;
74:4,14

**sharing (1)**
68:11

**sheet (1)**
52:19

**showing (2)**
49:2,6

**shows (1)**
44:20

**shut (1)**
46:10

**side (7)**
11:23,25;45:1;
46:7,9,10,17

**sidetrack (1)**
18:25

**signed (1)**
20:9

**similar (3)**
37:24;48:8,9

**simply (1)**
8:25

**simultaneously (2)**
51:8,23

**sit (2)**
10:25;61:12

**sitting (1)**
75:12

**situation (3)**
15:14;33:5;76:18

**six (2)**
20:4;57:9

**sixty (12)**
20:3,4,5,23;46:6;
48:13;53:5,8;54:16,
16;57:11;79:22

**sixty-day (1)**
55:10

**size (1)**
34:22

**skepticism (1)**
70:12

**skill (1)**
43:1

**skills (1)**
42:23

**Sky (1)**

72:5

**slaughtered (1)**
33:2

**slew (1)**
32:1

**slightly (1)**
37:6

**slip (1)**
56:21

**small (5)**
61:18,21;65:5,7,10

**SMITH (1)**
5:10

**solely (1)**
6:14

**solution (2)**
24:24;37:21

**solve (1)**
38:4

**somebody (2)**
49:17;58:5

**somehow (1)**
33:12

**some-odd (1)**
60:7

**someone (2)**
54:13;70:14

**sometimes (1)**
78:7

**soon (5)**
20:2,18;21:11;
25:7;68:24

**sooner (1)**
72:24

**sorry (9)**
9:12,16;10:12;
38:10,20;56:11;
77:23;78:1,2

**sort (2)**
32:1;65:14

**sorted (1)**
59:3

**sought (2)**
23:7;37:17

**source (4)**
19:10;23:5;28:11;
47:15

**speak (4)**
10:23;11:6;41:20;
63:2

**SPEAKER (1)**
79:23

**speaking (1)**
40:2

**specific (7)**
11:22;24:6;26:22;
58:19;61:11;69:17;
79:20

**specifically (9)**
7:11;26:10;28:18;
35:5;37:4;59:21;
60:2;62:1;65:17

**specified (1)**

69:10
**specifying (1)**
    69:7
**speculating (1)**
    58:10
**speculation (2)**
    59:6,7
**spill (1)**
    46:2
**spoke (1)**
    33:5
**staffing (5)**
    42:8,21,22,23;43:1
**staggering (1)**
    34:17
**stand (1)**
    21:21
**standalone (1)**
    50:6
**standard (2)**
    18:22;63:22
**standards (1)**
    42:14
**standpoint (1)**
    27:1
**start (6)**
    8:13,15;19:17;
    21:15;24:12;30:5
**starting (1)**
    23:20
**starts (1)**
    38:21
**state (2)**
    26:17;72:5
**stated (2)**
    8:18;47:10
**statement (22)**
    41:11,23,25;42:1,9,
    13;43:5;44:1,18;
    63:11,13,17,19,20;
    64:10;65:3,16,19,21,
    24;66:23;67:2
**statements (3)**
    12:17;43:24;44:13
**states (2)**
    43:17;50:15
**statute (4)**
    9:3;19:21;33:16;
    36:21
**statutory (1)**
    23:20
**stay (15)**
    8:17;13:3,11;
    15:17;31:22;32:13;
    35:23;36:7;37:18;
    38:24;39:22;47:6,8,
    24;48:3
**stayed (2)**
    38:22;39:23
**staying (1)**
    56:24
**stays (1)**
    39:17

**still (3)**
    39:13,15;47:19
**stipulated (1)**
    24:10
**stipulation (1)**
    24:9
**stop (3)**
    33:23;44:22;58:4
**stored (2)**
    54:11;59:3
**story (1)**
    17:24
**straddles (1)**
    30:14
**Street (3)**
    4:14,22;5:12
**stricken (1)**
    11:11
**string (1)**
    22:10
**stronger (2)**
    45:1;46:17
**structure (2)**
    43:10;62:4
**stuff (3)**
    29:5;46:3,23
**subject (9)**
    9:20;11:10;27:14;
    30:23,24;36:7;68:17;
    72:25;76:8
**submission (9)**
    13:6,14;46:16;
    68:1;75:12;77:7;
    78:12,17;79:19
**submissions (2)**
    77:9;78:19
**submit (1)**
    56:23
**submitted (7)**
    7:15;10:11;13:21;
    41:3;77:15;78:13,22
**subpoena (19)**
    16:14,16;26:3,3,5,
    6,13;28:18;29:8,21;
    32:5;33:19;35:17;
    40:3,7;69:4,5,10;76:5
**subpoenaed (1)**
    69:12
**subpoenas (6)**
    8:22,23;9:6;40:2,5;
    57:25
**subscribe (1)**
    36:17
**subsection (1)**
    69:16
**subsections (1)**
    69:6
**substance (1)**
    9:5;24:3;35:10
**substantial (1)**
    50:3
**substantially (1)**
    36:3

**substantiate (1)**
    70:24
**sued (1)**
    66:15
**suffer (1)**
    71:19
**suggested (1)**
    73:17
**suggesting (2)**
    58:5;74:1
**Suisse (1)**
    67:17
**Suisse's (2)**
    79:13,16
**Suite (1)**
    5:13
**supplement (1)**
    7:16
**supplemental (6)**
    8:6;13:5;15:13;
    33:9;41:14;77:9
**support (9)**
    13:1,6,9,13;42:2;
    43:6;65:18;73:11;
    78:22
**supports (1)**
    44:19
**supposed (2)**
    12:24;21:5
**Supreme (1)**
    19:19
**Sure (9)**
    10:18;11:1;34:10;
    48:25;51:17;54:9;
    59:5,7;64:6
**surprised (1)**
    75:24
**suspect (1)**
    57:15
**system (2)**
    52:4;73:20
**systems (2)**
    52:5,5

## T

**talk (5)**
    25:21;51:10;54:9;
    69:24;72:8
**talked (3)**
    15:12,21;69:1
**talking (5)**
    27:22;52:23;58:15,
    19;75:18
**talks (1)**
    26:12
**tank (1)**
    60:22
**tapes (1)**
    27:12
**task (2)**
    46:9;62:20
**teed (1)**

60:1
**TELEPHONICALLY (1)**
    5:16
**telling (4)**
    21:8,11,13;40:10
**ten (4)**
    29:3,11,20;60:21
**term (2)**
    8:22;41:23
**terms (7)**
    6:18;27:22;40:2;
    41:24;43:21;47:7;
    69:13
**testified (1)**
    11:25
**testimony (2)**
    12:24;65:22
**therefore (3)**
    12:19;40:14;45:9
**There'll (1)**
    46:3
**thereto (1)**
    78:13
**thinking (1)**
    17:12
**third (18)**
    8:17,22;15:18;
    16:22;17:6;18:8;
    19:12,15;21:18;24:4,
    13;37:14;38:6;41:1;
    62:10,11;63:19;
    73:21
**thirteen (2)**
    49:4,5
**thirty (3)**
    60:6,7;62:19
**though (5)**
    23:22;39:4;43:12;
    47:18;68:4
**thought (4)**
    49:2;75:17;77:22;
    78:2
**Thousands (3)**
    24:8;42:5;58:2
**threaten (1)**
    32:5
**three (5)**
    23:10;32:19;52:7;
    57:3;62:12
**throwing (1)**
    30:9
**Thursday (1)**
    75:16
**thus (2)**
    65:22,24
**ticked (1)**
    27:6
**till (2)**
    52:9;77:17
**timeframe (2)**
    42:4;70:17
**time-intensive (1)**
    46:4

**timeline (1)**
    44:10
**timelines (2)**
    42:15,16,18,19
**times (2)**
    18:7;45:25
**timetable (2)**
    44:14;68:14
**timing (9)**
    24:14;27:7;28:6;
    46:12;70:11;72:19;
    73:1,10;74:24
**title (2)**
    36:24,25
**today (10)**
    6:19;21:5;30:24;
    35:2;38:23;46:16;
    67:22;70:1;71:8;
    77:21
**together (1)**
    7:19
**told (1)**
    53:2
**top (1)**
    66:5
**TORRES (2)**
    4:2;6:5
**tough (1)**
    24:19
**towards (1)**
    42:19
**track (2)**
    65:12;66:22
**training (1)**
    42:23
**tranche (1)**
    57:3
**transcript (2)**
    11:2;28:24
**transmittal (2)**
    6:23,25
**Travis (1)**
    5:12
**trial (1)**
    57:3
**tried (1)**
    40:25
**trigger (1)**
    45:6
**trouble (1)**
    74:16
**truncated (1)**
    76:11
**trusts (1)**
    58:23
**try (1)**
    21:16
**trying (3)**
    18:4;34:21,21
**Tuesday (1)**
    75:13
**turn (1)**
    41:22

**turnaround (1)**
42:4
**twenty (6)**
20:8;23:2,9;24:18,
18;62:20
**twenty-five (1)**
18:7
**twenty-seven (3)**
48:7,9;60:19
**twists (1)**
31:21
**two (21)**
7:14;8:2,4;24:21;
30:16;33:5,10;49:10;
51:24;52:11,24;53:2,
8;54:17;55:9,16;
74:1;75:9;78:15,21;
79:9
**TX (1)**
5:14
**type (1)**
38:4
**types (2)**
37:20;64:17

**U**

**UBS (5)**
39:6,7,13;57:1,4
**ultimate (1)**
71:19
**ultimately (1)**
32:24
**unambiguous (2)**
12:10,19
**unclear (1)**
62:5
**uncontroverted (3)**
23:8;29:21;32:2
**Under (28)**
12:6,9;16:23;23:4,
23;28:15,16;35:6;
36:20,25;41:24;
42:13;45:5,17;46:16;
47:19;49:11;59:9;
61:7;62:15;69:3,10;
74:4,7,14;76:5,7;
79:18
**undercut (2)**
41:4;43:5
**underpinning (1)**
21:22
**understood (1)**
39:6
**undertake (1)**
34:19
**underway (1)**
20:13
**underwriter (6)**
58:1;67:18;68:10;
74:17;77:8;78:17
**underwriters (4)**
19:5;58:15;71:11;

75:20
**underwriters' (1)**
71:18
**underwriting (2)**
34:5;64:15
**undoubtedly (1)**
70:15
**unforeseen (1)**
43:8
**unfortunately (1)**
37:8
**UNIDENTIFIED (1)**
79:23
**unique (3)**
15:14,17;22:15
**unless (2)**
55:19,20
**unpersuasive (1)**
49:12
**unreasonable (1)**
28:5
**unsupportable (1)**
19:16
**up (7)**
26:2;27:11;33:6;
48:24;50:25;60:1;
67:15
**update (1)**
6:12
**updated (1)**
42:16
**upon (3)**
19:19;41:7,16
**use (5)**
8:21;35:25;36:4;
71:9,13
**used (1)**
22:3
**using (1)**
36:7
**Usually (2)**
73:20,20
**utilized (1)**
36:20

**V**

**value (1)**
23:18
**various (2)**
40:19;65:23
**vendor (4)**
18:9;43:19;49:11;
54:20
**vendors (14)**
34:25,25;49:3,25;
50:1;52:13,16,17,23;
53:2;54:11,15,16;
55:9
**vendors' (1)**
68:16
**vendor's (1)**
52:15

**versus (3)**
30:9;43:15;57:3
**view (6)**
23:3,6;25:18;
47:14;48:6;63:13
**viewpoint (1)**
30:2

**W**

**wait (4)**
32:19;33:15;70:8;
77:17
**waive (3)**
70:19;76:1,25
**WANGKEO (3)**
4:7;7:15;8:6
**wants (3)**
68:22;73:9;74:3
**WARE (1)**
5:7
**warehouses (1)**
50:14
**Washington (2)**
4:15,23
**way (11)**
14:2;15:22;18:5;
27:9;32:17;37:10;
40:17;52:3;57:8;
75:2;76:8
**Wednesday (1)**
75:16
**week (7)**
45:25;55:4,18;
75:13,17,18,18
**weeks (3)**
52:7,11;54:17
**weighing (1)**
30:8
**west (1)**
50:15
**What's (8)**
28:11;44:6;46:11,
11,12,12,13;60:16
**whenever (1)**
52:6
**Whereupon (1)**
80:2
**whole (2)**
23:9;31:25
**who's (3)**
29:9;53:10;72:9
**willing (4)**
68:7,11,12;72:22
**Winnick (9)**
31:9,10,12,12,12,
13,21;57:13,14
**wish (6)**
7:9;15:1,4;67:13;
75:7;77:4
**wishes (2)**
70:20;71:7
**withdrawn (1)**

23:24
**withdrew (1)**
37:17
**within (9)**
29:8,19;34:18;
54:16;55:4,10,18;
60:22;79:21
**without (4)**
16:12;38:7;49:6,12
**withstanding (1)**
47:17
**witnesses (1)**
65:23
**Woehr (3)**
10:6;11:5;13:9
**word (1)**
75:8
**wording (1)**
17:8
**words (6)**
35:10;36:21;42:1;
55:6;64:14;65:17
**work (32)**
20:3;21:7;22:22,
23;34:21,22;41:11,
23,25;42:1,13,18,25;
43:5,24;44:2,13,18;
63:11,13,17,19,21;
64:12;65:3,16,20,21,
24;66:23;67:2;72:23
**working (2)**
72:23;79:19
**works (1)**
52:3
**worry (2)**
26:20,21
**worthy (1)**
34:5
**written (3)**
30:19,24;56:4
**wrong (2)**
23:19;53:16

**Y**

**year (9)**
19:17;30:18,19,25;
31:23;32:18;46:2,3;
49:10
**years (5)**
40:4;49:5,8;50:7;
57:3
**yesterday (1)**
39:12
**York (5)**
4:5;5:5;12:6,7,9

**1**

**1 (7)**
9:13,14;13:23;
14:7,15,15,17
**1,500 (4)**

21:3,5;49:4,11
**10019 (2)**
4:5;5:5
**1023 (2)**
9:10,11
**1023-2 (1)**
10:1
**104,000 (1)**
41:19
**105 (17)**
16:12,12;17:9;
19:9;21:24;22:2;
32:7;35:6;36:7,9,20;
47:14;48:17;56:9;
69:15;71:1,4
**105,000 (2)**
33:7;48:10
**105a (1)**
36:21
**11 (13)**
19:25;20:7,24;
21:13,19,20;26:20;
27:2;32:3,6;35:16;
37:2;66:4
**12-12020 (1)**
6:3
**1293 (2)**
78:12,18
**1293-1 (1)**
78:13
**1293-8 (4)**
78:16,23;79:10,13
**1293-9 (4)**
78:16,23;79:10,16
**1295-1 (1)**
10:7
**1295-2 (1)**
10:5
**1296 (2)**
7:25;8:5
**1299 (1)**
10:8
**13 (1)**
27:1
**1633 (1)**
4:4
**1675 (1)**
5:4
**1900 (1)**
24:6
**1999 (1)**
4:22

**2**

**2,500 (15)**
6:16;18:6;33:24;
36:2;41:18;46:7;
59:18,20;60:15,16;
68:2,22,25;69:24;
70:16
**200,000 (1)**
48:11

12-12020-mg     Doc 1920-5     Filed 10/22/12     Entered 10/22/12 21:41:42     Exhibit E

RESIDENTIAL CAPITAL, LLC, et al. v.
Case No. 12-12020-mg

Pg 98 of 98

P.M. SESSION ONLY
September 11, 2012

**20005 (1)**
  4:15
**20006 (1)**
  4:23
**2010 (1)**
  40:4
**2012 (4)**
  10:2,6,7,9
**23rd (1)**
  20:8
**25th (1)**
  38:25
**28 (1)**
  41:13
**28th (3)**
  10:6,7,9

**3**

**3:51 (1)**
  80:2
**31 (1)**
  32:8
**31st (1)**
  48:19
**33 (1)**
  72:3
**34 (1)**
  59:10
**350 (1)**
  19:17
**362 (2)**
  16:23;17:1
**362a (8)**
  8:22;9:1,6;17:6,8,
  11;24:3;35:17

**4**

**4 (1)**
  57:3
**42 (1)**
  41:19
**43,000 (26)**
  19:6;33:24;34:11;
  41:19;43:25;44:8;
  46:7;48:10;49:17;
  50:21,23;51:19;53:7;
  54:15;58:14;59:22;
  60:17;68:4,5,14,23,
  24;69:18;70:16;
  74:10;79:22
**45 (9)**
  26:10;28:16,17;
  40:2,3,15;59:9;69:3,6
**45b3Cii (1)**
  69:7
**45c3B (1)**
  69:9

**5**

**5,000 (3)**

**41:18;59:19;68:2**
**50,000 (5)**
  43:14;62:6,8,16;
  74:12
**541 (1)**
  37:1
**5th (4)**
  20:12,17;31:24,25

**6**

**600 (1)**
  5:12
**655 (1)**
  4:14
**6b (1)**
  41:22
**6th (1)**
  78:18

**7**

**7 (3)**
  27:1;29:13,22
**7000 (2)**
  5:13;76:6
**7001 (2)**
  36:20;37:12
**77002 (1)**
  5:14
**7a (2)**
  42:24;63:18
**7a5 (2)**
  42:8,11
**7b1 (1)**
  42:20
**7th (1)**
  10:2

**8**

**8 (5)**
  13:24;14:7,15,15,
  17
**808 (2)**
  7:25;8:5

**9**

**9 (1)**
  78:13
**9014 (1)**
  76:8