```
                                                              1
      C7h6resc
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 2
 3    RESIDENTIAL CAPITAL, LLC, et
 3    al.,,
 4
 4                  Plaintiffs,
 5
 5          v.                          12 CV 5116(DLC)
 6
 6    FEDERAL HOUSING FINANCE
 7    AGENCY,
 7
 8                  Defendant.
 8
 9    ------------------------------x
 9                                      New York, N.Y.
10                                      July 17, 2012
10                                      3:30 p.m.
11
11    Before:
12
12                  HON. DENISE L. COTE,
13
13                                      District Judge
14
14                        APPEARANCES
15
15    MORRISON & FOERSTER, LLP
16         Attorneys for Plaintiff ResCap
16    BY:  JAMIE LEVITT
17         JONATHAN C. ROTHBERG
18
18    KASOWITZ BENSON TORRES & FRIEDMAN, LLP
19         Attorneys for Defendant FHFA
19    BY:  ANDREW GLENN
20         KANCHANA W. LEUNG
21
21    MAYER BROWN, LLP
22         Attorneys for Ally Financial, Inc. and GMAC
22    BY:  REGINALD GOEKE
23         MICHAEL WARE
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
                                                              2
         C7h6resc
1                   Appearances (Cont'd)
2
2        CARPENTER LIPPS & LELAND LLP
3        KIRKLAND & ELLIS, LLP
3             Attorneys for Ally Securities, LLC
4        BY:  JEFFREY A. LIPPS
4             JUDSON D. BROWN
5
5        SULLIVAN & CROMWELL, LLP
6             Attorneys for JP Morgan Chase & Co.
6        BY:  PENNY SHANE
7             SHARON NELLES
7
8        CRAVATH, SWAINE & MOORE, LLP
8             Attorneys for Credit Suisse Securities (USA) LLC
9        BY:  ANDREW BOSSE
9
10       SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
10            Attorneys for UBS Americas, Inc.
11       BY:  JOSEPH SACCA
11            ALEXANDER C. DRYLEWSKI
12
12       SULLIVAN & CROMWELL, LLP
13            Attorneys for Goldman Sachs & Co.
13       BY:  W. RUDOLPH KLEYSTEUBER, IV
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                        3
        C7h6resc
1                 (In open court; case called)
2                 THE DEPUTY CLERK:  Residential Capital, LLC, et al.,
3       v. Federal Housing Finance Agency.
4                 For ResCap.
5                 MS. LEVITT:  Your Honor, Jamie Levitt form Morrison &
6       Foerster on behalf of the plaintiff debtors.
7                 THE COURT:  Are you accompanied by someone?
8                 MS. LEVITT:  I am.  John Rothberg also from Morrison &
9       Foerster.
10                THE COURT:  For FHFA?
11                MR. GLENN:  Good afternoon, your Honor.  Andrew Glenn,
12      Kawowitz Benson Torres & Friedman.  I am joined by Kanchana
13      Leung.
14                THE COURT:  For Ally Financial and related entities?
15                MR. WARE:  Good afternoon, your Honor.  Reginald Goeke
16      and Michael Ware here for Ally Financial, Inc.
17                THE COURT:  For Ally Securities?
18                MR. LIPPS:  Jeff Lipps, Carpenter Lipps & Leland,
19      together with Judson Brown of Kirkland & Ellis.
20                THE COURT:  Thank you.
21                Is there anyone from JP Morgan Chase?
22                MS. SHANE:  Yes, your Honor.  Forgive us for sitting
23      in the back Penny Shane and Sharon Nelles from Sullivan &
24      Cromwell.
25                THE COURT:  Credit Suisse?
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

C7h6resc

```
 1              MR. BOSSE:  Andrew Bosse from Cravath Swaine & Moore
 2    representing Credit Suisse.
 3              THE COURT:  UBS?
 4              MR. SACCA:  Joseph Sacca from Skadden Arps for UBS,
 5    and with me is Alexander Drylewski.
 6              THE COURT:  For Goldman Sachs?
 7              MR. KLEYSTEUBER:  Good afternoon, your Honor.  Rudolph
 8    Kleystuber of Sullivan Cromwell.
 9              THE COURT:  Does anyone else wish to place their
10    appearance on the record?
11              Thank you.
12              I am going to ask counsel please if you speak this
13    afternoon to identify yourself for the record by name first so
14    that the record is clear.
15              Let me describe for the record what papers I have
16    reviewed in connection with today's proceeding.  I have a
17    notice of debtors' motion to extend the automatic stay or in
18    the alternative for injunctive relief.  I think that was
19    initially dated May 25th.  I have a declaration from Mr. Lipps
20    that was entered on the record July 6th.  I have the FHFA
21    memorandum of law in opposition to the motion to extend the
22    automatic stay.  I believe that is dated June 28th.  I have a
23    reply from the debtors of July 6th and I have two letters.  I
24    have a letter from Morrison & Foerster of July 13th and a
25    letter from Kawowitz Benson of July 17th.
```

5

C7h6resc
```
 1          MS. LEVITT:  Your Honor, if I may interrupt.  There
 2   was also a supplemental declaration for Mr. Lipps.  I believe
 3   it was submitted on July 10th.
 4          THE COURT:  I have a supplemental declaration from
 5   Mr. Lipps from July 6th.
 6          MS. LEVITT:  Yes, your Honor.  Dated July 6th.
 7          THE COURT:  Thank you so much.
 8          I think there are three issues as I see it that are
 9   important to address.  One is the effect of the anti-injunction
10   provision of HERA, the Housing and Economic Recovery Act.  The
11   other is an alternative argument pursuant to Section 105.  And
12   the third issue is the extent to which particular documents
13   other than loan tapes are critical at this point of the
14   litigation pending before me, 11 CV 7010, and potentially the
15   other 15 actions identification of those documents and what
16   should be our next steps, if any, to obtain those documents.
17          I have a number of questions for the parties.  I have
18   read these materials.  I thought I would begin by giving you a
19   ruling with respect to the anti-injunction provision of HERA
20   unless there is anybody who wishes briefly to address that
21   issue.
22          Is there anyone who wishes to add to the submissions
23   they already made on papers?
24          Hearing no one, let me give you my ruling.
25          Currently before the Court is a motion by ResCap and
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

6

C7h6resc

1   related debtor entities to enjoin FHFA from pursuing certain
2   litigation against ResCap's non-debtor corporate affiliates,
3   including the Ally defendants -- Ally Financial, Ally
4   Securities, and GMACM Group.
5          The automatic stay provision of the bankruptcy court
6   can be found at 11, U.S.C., section 360(a) and it generally
7   applies for proceedings against the debtor.  I will let counsel
8   look at each of the eight provisions that have more or less
9   relevance to the issues I need to address this afternoon, but
10  repeatedly those provisions with respect to the automatic stay
11  contained in the Bankruptcy Code talk about property of the
12  estate and the claims against the debtor.
13         I am persuaded that the anti-injunction provision of
14  HERA deprives this Court of jurisdiction to grant the relief
15  that ResCap seeks.  The relevant provision which can be found
16  at 12, U.S.C., Section 4617(f) states: "Except as provided in
17  this section or at the request of the director, no court may
18  take any action to restrain or affect the exercise of powers or
19  functions of the agency as a conservator or a receiver."
20  Although, there is no appellate authority construing this
21  section, HERS' anti-injunction provision is modeled on a nearly
22  identical provision of the statute we refer to as FIRREA, which
23  is relevant here, governs actions taken by the FDIC as
24  conservator for insolvent financial institutions.
25         Courts of Appeals that have considered FIRREAH's

7

C7h6resc

1   anti-injunction provision, which is codified at 12, U.S.C.,
2   Section 1821, have concluded that it "effects a sweeping ouster
3   of courts' power to grant equitable remedies.  Freeman v. FDIC,
4   56 F.3d at 1399.  Thus, in Freeman, the DC Circuit affirmed the
5   dismissal on jurisdictional grounds of a suit by two homeowners
6   seeking to prevent the FDIC as receiver for a failed bank from
7   foreclosing on their home.  Judge Wald, writing for a unanimous
8   panel, read the anti-injunction provision broadly concluding
9   that it precluded not only an action to enjoin the FDIC from
10  prosecuting foreclosure proceedings, but also efforts to obtain
11  other equitable relief against the agency, such as rescission
12  or declaration of rights.  Other courts have followed suit,
13  suggesting that a would-be plaintiff could avoid the
14  anti-injunction provision only by showing that the agency
15  action at issue was ultra vires.  Gross v. Bell Sav., 974 F.2d
16  403, 407.
17          The Second Circuit has examined the FIRREA provision
18  on two different occasions in Volges, 32 F.3d 50 (2d Cir 1994),
19  the Second Circuit concluded that FIRREAH strips the district
20  court's jurisdiction over a mortgage debtor to enjoin the
21  Resolution Trust Corporation, a predecessor entity to the FDIC,
22  from auctioning off the mortgages Judge Walker writing for the
23  Court, described the anti-injunction provision as "broad and
24  unequivocal" to the point that it precludes not only efforts to
25  maintain the status quo but also equitable relief intended to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8

C7h6resc
1    remedy clear-cut violations of law.  The holding was influenced
2    not only by the statutory language, but also by the Court's
3    observation o the "anti-injunction provision is a direct
4    manifestation of Congress's intent to prevent courts from
5    interfering with the RTC in the exercise of its statutory
6    powers" as "part of a broader scheme to allow the RTC
7    expeditiously to wind up the affairs of defunct savings and
8    loan institutions without judicial interference."  32 F.3d at
9    52.
10            FIRREA's anti-injunction provision was also at issue
11    In re Colonial Realty Co., 980 F.2d 125.  There the Court of
12    Appeals affirmed an order of the bankruptcy court that enjoined
13    the FDIC, acting as receiver for several failed banks, from
14    prosecuting an action to recover assets alleged to have been
15    fraudulently conveyed by the debtor to certain third parties.
16    The bankruptcy court had concluded that the fraudulent
17    conveyance claims were the property of the bankruptcy estate
18    and the thus subject of the automatic stay provision of the
19    Bankruptcy Code.  On appeal, the FDIC argus that the bankruptcy
20    courts order violated FIRREA'S anti-injunction provision.  The
21    Second Circuit rejected this argument concluding that the
22    bankruptcy court's injunction order was redundant in light of
23    its conclusion that the claims were governed by the automatic
24    stay and that the automatic stay itself does not violate
25    FIRREAH's anti-injunction provision because it is statutorily,

9

C7h6resc

1   rather than judicially, imposed.
2           The teaching of these cases is that HERA's
3   anti-injunction provision must be construed broadly to preclude
4   judicial action of any kind that could impair the FHFA's
5   ability to carry out its statutorily mandated function.
6   Apparently recognizing that the anti-injunction provision
7   forecloses this Court from directly enjoining FHFA from
8   pursuing litigation against Ally, ResCap's reply brief
9   relegates its injunction argument to a single page.
10          As for whether the anti-injunction provision precludes
11  an extension of the bankruptcy stay, ResCap tries to use
12  Colonial Realty to its advantage, noting that in that case
13  "neither debtors nor the bankruptcy trustee were named" in the
14  action that they bankruptcy court successfully enjoined.  But
15  this argument overlooks the fact that in Colonial the
16  bankruptcy court concluded that the fraudulent conveyance
17  claims being pressed by the FDIC were themselves the property
18  of the bankruptcy estate and therefore encompassed within the
19  automatic stay.  That argument is not available to ResCap here,
20  as it impliedly acknowledges in arguing that the bankruptcy
21  stay must be "extended" rather than merely enforced.
22          There is no dispute that the stay that ResCap seeks
23  cannot be obtained through mere application of the statutory
24  automatic stay provided in Section 362.  After all, the FHFA
25  lawsuit is no longer proceeding against the debtors, and even

10

C7h6resc

1    if it were, ResCap is requesting an extension of the stay to
2    non-debtor -- its affiliates, the Ally entities.  I am sorry.
3    Alley entity who are defendants.  Such an extension may only be
4    obtained through a court's exercise of its equitable powers
5    through Section 105 of the Bankruptcy Code as recently.  As
6    last week, Judge Glenn extended bankruptcy stay to Ally and
7    other RMBS litigation affecting ResCap pursuant to Section 105.
8    Thus the anti-injunction provision in HERA bars the relief
9    ResCap seeks here.
10           Despite this ruling, I am inclined also to rule in the
11   alternative under Section 105, and I would like to ask the
12   parties to fill in some facts here.  In its 105 argument,
13   ResCap emphasizes several points including the fact that the
14   stay request would only govern a period of document production
15   in the litigation pending before this Court and of course the
16   briefing and the motion to dismiss.  As I understand it a
17   confirmation order is due before the bankruptcy court under the
18   present schedule on October 31.  So at that date theoretically
19   the bankruptcy court would know more about what was happening
20   with the reorganization.
21           ResCap makes four arguments, not all which I fully
22   understand.  The first argument has to do with the effect of
23   collateral estoppel.  Now, I don't think that argument is
24   pressed as much in the reply papers when it was dealing solely
25   with this litigation before me as opposed to the many other

C7h6resc

1    lawsuits that have adversary proceedings addressed before Judge
2    Glenn, but I wanted to give ResCap an opportunity, if it
3    wishes, to address this argument.  ResCap is no longer a
4    defendant in the litigation before me, 11 CV 7010.  So I do not
5    understand that the collateral estoppel or res judicata
6    arguments or anything else that makes of that nature could have
7    much weight.
8             It was interesting that I did not have a request by
9    the Ally defendants to postpone a carve-out of the briefing on
10   the motion to dismiss, which they filed last Friday.  I would
11   be happy to defer briefing on that motion to dismiss so it
12   wouldn't have the burden of an immediate decision once its
13   reply papers are in.
14            In any event, not seeing an immediate desire to
15   further address the collateral estoppel argument, I will move
16   on to the next one.
17            MS. LEVITT:  Your Honor, are you inviting me to give
18   my position now?  I was waiting for end.  I am happy to give
19   you our position now if you would like.
20            THE COURT:  Sure.
21            MS. LEVITT:  Your Honor, the claims against the Ally
22   non-debtor entities here are based on the same nucleus of facts
23   of the claims that would be against the debtors in the
24   bankruptcy or another proceeding in which they are parties.
25   The liability as I understand it for the Ally defendants is

12

C7h6resc

1  derivative for liability ResCap and we do believe that if this
2  case were to proceed, first on substantive issues, there would
3  be collateral estoppel, res judicata law of the case findings
4  that could be determined here against the Ally parties that
5  would necessarily implicate ResCap.  That is the first point.
6          THE COURT:  I don't understand how any court, when you
7  are not a party to the litigation and did not have an
8  opportunity to defend yourself or argue your position, could
9  apply collateral estoppel against you.
10         MS. LEVITT:  Your Honor, we would certainly argue that
11 they shouldn't; but it is a risk that we take in having this
12 case move forward in creating case law and law of the case and
13 collateral estoppel arguments for parties who would come
14 against us, either in the bankruptcy or with respect to other
15 cases.
16         THE COURT:  Have there been any claims filed against
17 ResCap out of the securitizations that are at issue at 11 CV
18 7010 as of today?
19         MS. LEVITT:  The exact securitizations, no, but I
20 think many of the securitizations would have the same issues
21 and claims made against them.  You are correct, your Honor,
22 there are different securitizations.
23         THE COURT:  So I don't find that there is any strength
24 to this argument regarding prejudice from the doctrine of
25 collateral estoppel.  To the extent that I rule on any party's

13

C7h6resc

1   motion to dismiss and conduct an analysis that is persuasive to
2   some other court on a related issue that is to run every day of
3   the week.
4           Let's turn then to the document discovery issues.  I
5   understand that there are 21 securitizations that are involved
6   in 11 CV 7010 and an argument that those 21 securitizations
7   involve 105,000 mortgaged loan files.
8           Some basic questions so I understand this argument
9   better:  Are there 105,000 mortgaged loan files in these 21
10  securitizations for what we call the supporting loan groups?
11          MR. GLENN:  Yes, your Honor.  There are 105,000 loans
12  at issue in the 21 securitizations.
13          THE COURT:  FHFA.  Sometimes the securitizations
14  included several tranches and the FHFA did not participate in
15  each tranche.  Therefore, those tranches in which the FHFA
16  participated are called the supporting loan group files.  Is
17  the 105,000 figure for the supporting loan groups or for the
18  tranches or the securitizations whether or not the FHFA
19  participated?
20          MS. LEVITT:  Your Honor, I defer to counsel who have
21  been more closely involved in the underlying matter.  My
22  understanding is that 105,000 loans are at issue in the FHFA
23  CASE.
24          MR. LIPPS:  Your Honor, if I understand what you are
25  asking, you are asking whether or not FHFA's tranche that it

14

C7h6resc
1  bought is supported by the 105,000 loans.  I think that the
2  105,000 is the entire loan pool in each of those
3  securitizations.  So I don't think it is slivered the way
4  you've just indicated.  So there will be fewer loans properly
5  supporting the loan groups where FHFA invested.
6            THE COURT:  So some subset of the 105,000 will form
7  the supporting loan groups for the litigation in 11 CV 7010 and
8  we don't know what percentage that is?
9            MR. LIPPS:  I think that is right, your Honor.  I
10  don't know what percentage it is and I think the 105,000 was
11  the entire of all tranches for each of those securitizations.
12            THE COURT:  Thank you.
13            Next question:  Are the loan files electronically
14  available, or are they only available in paper form?
15            MS. LEVITT:  I am going to defer to Mr. Lipps because
16  I don't want to misspeak before the Court.
17            MR. LIPPS:  Your Honor, there are some combination of
18  that.  The practices of RFC had some loan files being scanned.
19  And when I say "loan file," it is not the entire loan file.  It
20  maybe the legal file, as opposed to the credit file.  So there
21  are some loan files that are completely available in all
22  information in electronic form.  There are some loan files that
23  are available in partial electronic and partial paper.  And
24  then this are many, many, many loan files out of the 105,000
25  that would be in paper file and offsite storage facilities
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

15

C7h6resc
```
 1   throughout the Minneapolis/St. Paul area.
 2            THE COURT:  There is argument by counsel in their
 3   papers about a stocking horse agreement and I am not sure that
 4   I understand the impact of the Ally Financial stocking horse
 5   agreement on any of this litigation.  It is my understanding
 6   that pursuant to that agreement, Ally Financial may be buying
 7   the legacy portfolio, which would contain the loans at issue in
 8   11 CV 7010, but whether it does or doesn't make that purchase,
 9   I am not sure how that is supposed to impact our analysis.
10            Is there anyone who wishes to speak to that?
11            MS. LEVITT:  Your Honor, only to say that our position
12   is there is no relevance to that stocking horse bid.  First of
13   all, it is unclear who will end up being the successful
14   purchaser of the legacy files.  Also, my understanding is Judge
15   Glenn found that had no relevance to this analysis.
16            THE COURT:  That is Ms. Levitt again.
17            MS. LEVITT:  Yes.  I apologize, your Honor.
18            MR. BROWN:  Your Honor, if I may, Judson Brown of
19   Kirkland & Ellis.  So the record is straight, your Honor, Ally
20   Financial, had been the stocking horse bidder for that legacy
21   portfolio; but as I understand it, the bankruptcy proceedings
22   at Ally Financial isn't currently the stocking horse bidder.
23            MS. LEVITT:  That's correct, your Honor.  There is
24   another potential purchaser is the stocking horse, but we don't
25   know how that will turn out.
```

16

C7h6resc

 1            THE COURT:  There is another question that I had.  The
 2    loan files -- and we don't know the number, but it is a
 3    knowable number, something less than 105,000 apparently -- are
 4    you going to be essential to the prosecution of the litigation
 5    in 11 CV 7010.  It is my judgment that they are also essential
 6    to the prosecution of the 16 cases before me for reasons I
 7    discussed in last week's telephone call because there are seven
 8    non-affiliate defendants who are in 11 CV 7010 and one or more
 9    of the remaining 15 actions and the 16 actions are moving
10    forward in a coordinated fashion with an understanding -- well,
11    it is hope that through coordinated discovery, there will be
12    efficiencies for the party and ultimately savings for all
13    concerned.
14            The first parties to be deposed beginning in January
15    are FHFA, which would need access to all the documentation that
16    was important, certainly at a minimum the loan files, and UBS
17    who is a defendant in 11 7010 and three other cases before me
18    and a case in California that is related.  So those depositions
19    will begin in January.
20            It is my understanding, and nobody has argued to me
21    the contrary, that when a debtor is in bankruptcy proceedings,
22    it is not immune from discovery and whether it is in bankruptcy
23    or emerges some day from bankruptcy with its assets, in this
24    instance the loan files retained by it or some other entity,
25    whoever has those loan files is going to have to produce them.

C7h6resc

1   Therefore, in the restructuring process or the reorganization
2   process that is ongoing before the bankruptcy court, I would
3   understand that all the parties, including any potential
4   bidders for assets, would be evaluating the burdens of
5   participating in the inevitable discovery.
6           Now, Mr. Lipps in his affidavits has describe some of
7   the costs associated with the production of material.  He has a
8   figure that on average it takes $25 per file to produce a loan
9   file.  I assume that number is influenced by how many of the
10  documents or loan files are entirely electronic and how many
11  are composite and how many arn't electronic at all.  Again, we
12  don't know the number of loan files in our supporting loan
13  books here.
14          So it seems to me that when it comes down to the
15  arguments with respect to indemnification for defense costs or
16  wasting insurance policies that those arguments have to be
17  weighed in the context of understanding that this discovery is
18  going to occur and there will be a cost to participation in
19  this discovery and that the cost is affecting the economics of
20  the restructuring, whether or not the documents are produced
21  today or in the future.
22          Ms. Levitt.
23          MS. LEVITT:  Your Honor, there are two things that I
24  need to address with respect to your Honor's question or
25  position.  One, it is our understanding that the debtors will

18

C7h6resc

1    not be required to do discovery during the bankruptcy due to
2    the automatic stay.  I know your Honor has directed the FHFA to
3    Judge Glenn to determine that; but from statements he has made
4    in the hearings, I don't believe he will allow discovery to be
5    taken from the debtor.  So if the documents are in their
6    possession, custody and control with respect to the loan case
7    as we contend, then that discovery will be stayed by the
8    automatic stay.
9          THE COURT:  Well, the automatic stay does not require
10   that there be no discovery of a debtor.  That is a separate
11   issue, a separate legal doctrine.  And whether or not someone
12   is in bankruptcy, a bankruptcy court may or may not -- and I
13   will address this later with respect to the standard -- permit
14   them to produce discovery materials.  But the automatic stay
15   under the bankruptcy statute does not prevent by itself
16   discovery being taken of a debtor in third party litigation.
17         MS. LEVITT:  You are, correct, your Honor.  My point
18   was based on his ruling in the Western and Southern case and
19   what he said on record, our belief is because Judge Glenn
20   extended the stay to third-party, to non-debtor affiliates in
21   that case and based on reasoning for it, which in large part
22   was the discovery burdens, the cost of the estate and its
23   creditors through indemnification, through the wasting
24   insurance policy and then the enormous costs on the time and
25   focus of the employee of the debtor who need to be focused on

19

C7h6resc

1  these very important asset sales and on the restructuring for
2  the benefit of the estate that we don't beleive Judge Glenn is
3  going to order discovery.  Putting that aside those were the
4  factors that the Court looked at, which are the same that we're
5  asking the Court to look at here, which is the very short
6  discovery stay we're asking for here, perhaps three months --
7            THE COURT:  I don't think you are responding to my
8  question, and I am sorry if I wasn't clear enough, and I did
9  read Judge Glenn's ruling.  Thank you, counsel, for submitting
10  it to me.
11            My question is different.  ResCap has the loan files.
12  They are going to have to be produced some day.  There is going
13  to be a cost associated with the production of those loan
14  files, whether it is today or next year.  Isn't that cost of
15  production already part of the financial analysis in the
16  restructuring events before the bankruptcy court?
17            MS. LEVITT:  Your Honor, I am a little bit out of my
18  depth here in terms what is at issue in the bankruptcy.  I
19  don't beleive, and I could be wrong here, that the bankruptcy
20  and the district creditors are taking into account the costs of
21  this third-party discovery and the indemnification obligations,
22  I don't know that, your Honor.  What I can tell you is from the
23  bankruptcy court's perspective anything that will disrupt or
24  delay consummation of the plan and the employee's focus on
25  getting that plan done as opposed to dealing with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

20

C7h6resc

1    extraordinarily burdensome discovery in another case, as well
2    as the time to prepare for depositions or whatever might occur,
3    that I believe the bankruptcy court would find that to be not a
4    good use of resources both monetary and time.  It will have an
5    effect on the ultimate recovery to creditors.  But, your Honor,
6    I apologize that I cannot tell you how that factors in at this
7    point other than to repeat what I think was probably not
8    responsive but which is that this short delay while on the flip
9    side allowing debtors to consummate this reorganization, we
10    submit is reasonable in terms of the overall management of this
11    case.
12         THE COURT:  Mr. Glenn, I am focusing now on the loan
13    tapes and the loan files.  Is there anything immediately
14    critical in terms of discovery from ResCap beyond those two
15    items?
16         MR. GLENN:  I am going to defer to Ms. Leung on that
17    point who is handling the.
18         MS. LEUNG:  First of all, I think that it is difficult
19    for us to answer that question because we don't have any
20    transparency into what Ally has versus what the debtors have.
21    Your Honor has seen the objections that have been interposed by
22    Ally Financial and Ally Securities for document requests.  I
23    think it was one of the exhibits to the motion where they
24    object to the document requests on the grounds that it is in
25    the possession of debtors or its property estate subject to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

C7h6resc

1  automatic stat.  We don't really have transparency into that
2  and so it is difficult for us to when we're talking to them to
3  know in terms of should they be searching the custodial files
4  for ResCap or should they be searching the files or e-mails of
5  employees of ResCap.  We're not really sure because we don't
6  have any, like I said, transparency or window into Ally and
7  ResCap.
8          So one solution might be to have a 30(b)(6) deposition
9  so that we can get that clarity in terms of what does Ally have
10  versus what does the debtors have, how much access does Ally
11  have over ResCap's files.  As you know it is our position that
12  Ally does have access to all of ResCap's and the debtor's files
13  and personnel by virtue of, among other things, the shared
14  services agreement.  We think that is a relevant legal
15  question, not whether the debtors have title to certain
16  documents but whether they have access to it.  We do need other
17  types of documents, but it is difficult for us to say that it
18  is in the possession of the debtors and we need it right now
19  because we don't know what one entity possesses versus what
20  another entity possesses.  That is the first point.
21          I know your Honor didn't ask this, but I do want to
22  address the issue of the loan files, because that has come up
23  in terms of how burdensome the discovery is going to be.  At
24  the outset plaintiff has always been willing to talk to Ally
25  and all the other defendants about limiting the burden of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

C7h6resc

```
 1    producing loan files.  That was the purpose of trying to get
 2    out our sample protocols early and try to limit the universe of
 3    loan files that would have to be produced.  That is still a
 4    conversation that we're willing to have with Ally and the
 5    debtors in terms of minimizing the number of loan files that we
 6    need to reproduce and the burden to them, whether there are
 7    other ways we can reduce burden by, for example, getting copies
 8    of what is already being produced in the bankruptcy litigation
 9    that might overlap with the discovery that we're looking for.
10    So we're certainly open to having that conversation with the
11    debtors and with Ally and Ally Securities.
12              So I can't point to anything immediately besides the
13    loan tapes and the loan files that we need that would be in the
14    possession of debtors, but I would like to reserve on that
15    because like I said we just don't know enough.
16              THE COURT:  I am not going to give you a ruling on the
17    shared services agreement argument until there has been an
18    application to Judge Glenn for production of documents, and it
19    has not been fruitful to make that application.
20              So I don't have an answer on the question that I
21    posed, which stems from this fact:  Whether or not ResCap is a
22    defendant in any litigation, it is holding in its physical
23    possession documents which are critical to litigation and they
24    include at least the loan files.  There will be a cost in
25    production of those loan files.  There will be a cost of being
```

23

C7h6resc
```
 1    a witness in the various lawsuits that have arisen out of
 2    ResCap's business, whether it is a defendant or not in those
 3    litigations.  That is known.  That is not unknown.  Everyone
 4    knows that ResCap or any restructured entity is going to have
 5    some litigation to deal with in the future, whether it is a
 6    defendant or not, because it possesses critical documents.
 7              So it seems to me the arguments about the wasting
 8    insurance policies and even the indemnification arguments,
 9    indemnification for defense costs are impacted, both of those
10    arguments, by that financial reality.
11              So I have already ruled that the stay cannot be
12    extended because of the anti-injunction bar to the
13    defendants.  I personally don't find the Section 105 analysis
14    very strong either.  I don't need to reach it because I
15    wouldn't have jurisdiction to extend the stay, but I don't find
16    that ResCap has made a strong enough showing even if it were
17    within my jurisdiction to consider the Section 105 argument.
18              The critical thing that has to happen right now, and
19    it is important that it happen right now, is production of the
20    loan tapes and the loan files.  I don't see that there is any
21    risk of prejudice to a debtor on collateral estoppel or res
22    judicata grounds.  The cost is hard to quantify now because we
23    don't know how many loans are part of the supporting loan
24    groups.  We don't know how many of those loans are
25    electronically available, but that is an expense that is going
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

C7h6resc

1   to have to be borne at some point no matter what.  It is not an
2   expense that is going away.
3           I don't think production of either the loan files or
4   the loan tapes is something that is going to involve management
5   of ResCap.  These are ministerial duties, clerical duties to
6   gather these documents.  I don't see how they would be
7   interfering in any way with the involvement of management in
8   making judgments or negotiating a restructuring.
9           I want FHFA to go in the first instance to Judge
10  Glenn.  I have already told you to do that with respect to the
11  loan tapes.  I want you to do that with respect to the loan
12  files as well.  I have read his decision of July 10th with
13  respect to Western and Southern Life Insurance and I think that
14  decision is quite distinguishable and not terribly predictive
15  of what is going to happen with your application here.
16          In the Ohio case, the Western and Southern Life
17  Insurance case, as I understand it there were five
18  securitizations that were at issue out of about 61 or so.  Here
19  every securitization in this lawsuit is at issue and cannot
20  proceed without production of the loan files and the loan
21  tapes.  Here there are seven non-affiliated defendants against
22  whom this litigation will continue no matter what happens with
23  ResCap, and it is not a defendant, or the Ally defendants.
24          It is important that document discovery proceed
25  quickly so that counsel and their experts have an opportunity

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

C7h6resc
1    to review the documents and prepare for the January
2    depositions.  As I mentioned, the FHFA and UBS depositions
3    begin in January and both are parties to 11 CV 7010.
4          I notice with some interest the discussion the page
5    133 of the transcript of Judge Glenn's decision in which he
6    pointed out that when the parties hold an indirect direct claim
7    against a non-debtor for violating the federal securities laws,
8    there is no compelling basis by which a court must extend the
9    automatic stay.  There are claims here, direct claims, against
10   Ally and the Ally entities.  I also emphasize the point I have
11   already made that these documents are going to have to be
12   produced and knowledge of that expense will affect the
13   organization whether or not that expense is incurred today or
14   later.
15         I have no showing that there is any significant
16   participation of any individual critical to the reorganization
17   in the production of the loan files or the loan tapes.  Again,
18   we're talking about a period in which the only thing that has
19   happened is production of documents.  I want to underscore that
20   this issue isn't confined to the impact production of these
21   critical documents will have just on 11 CV 7010.  That is one
22   of 16 cases before me.  The seven non-Ally underwriter
23   defendants are involved in a number of lawsuits.  It is
24   important that there be access to these entities, to all the
25   loan files that there being sued upon so that their witnesses
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

26

C7h6resc

1    can be prepared with respect to the entire universe of issues
2    that they are going to face and that depositions occur just
3    once.  The depositions will begin in January.  It is too late
4    to wait to produce those documents until later this fall.
5            With respect to the law about discovery of a debtor,
6    during the bankruptcy process, of course this is something that
7    the Ninth Circuit has spoken of in the Miller case, 262 BR
8    4909, as the Ninth Circuit noted at page 505, information is
9    information, and when it is in the possession of a debtor, it
10   is discoverable.  More recently Judge Dolinger permitted
11   depositions to occur of a debtor's employees in the Signature
12   Bank case, 2008 WL 4126248, noting that the automatic
13   litigation stay in Section 362 does not prevent discovery in a
14   current lawsuit even if the depositions in question unearth
15   information that may be relevant to the bank's state claims
16   against a debtor.
17           I know the parties are familiar with the Johns
18   Manville case from 1984, which can be found in 40 BR 219.  But
19   even there the test is, as articulated in that court, one of
20   significant interference with a debtor's reorganization
21   efforts.  For all the reasons I have already described, I don't
22   think that the limited production of loan tapes and loan files
23   can meet that test, but I want FHFA to go to Judge Glenn in the
24   first instance and if need be you can come back to me.  If you
25   need a 30(b)(6) deposition of Ally, go ahead and schedule it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

C7h6resc

1   Take it next week if you need.  Time's a wastin.  We need to
2   get all the critical documents produced so that they can be
3   analyzed before depositions begin in January.
4               Ms. Levitt, is there anything you wish to add?
5               MS. LEVITT:  No, your Honor.  Thank you.
6               THE COURT:  Mr. Glenn?
7               MR. GLENN:  Just by way of update, your Honor.  We're
8   filing the motion for Judge Glenn today.  That motion will
9   include only the loan tapes consistent with the last court
10  conference.  We'll supplement that motion to include the loan
11  files hopefully with and next 24 to 48 hours.
12              THE COURT:  Thank you.
13              MR. GLENN:  Thank you.
14              THE COURT:  Is it Mr. Goeke?
15              MR. GOEKE:  Yes, your Honor.  Nothing further.
16              THE COURT:  Mr. Lipps.
17              MR. LIPPS:  Nothing further, your Honor.
18              THE COURT:  Does anyone else wish to add anything or
19  be heard?
20              Not hearing anyone, thank you so much.
21                                  o0o
22
23
24
25